## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION and

CARE IN ACTION,

     *Plaintiffs*,

     v.

ROBYN A. CRITTENDEN, in her official capacity as interim Secretary of State of the State of Georgia and as Chair of the State Election Board of Georgia;

REBECCA N. SULLIVAN, DAVID J. WORLEY, RALPH F. "RUSTY" SIMPSON, and SETH HARP, in their official capacities as members of the STATE ELECTION BOARD; and

STATE ELECTION BOARD,

     *Defendants*.

Civ. Act. No. _____
Jury Trial Demanded

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Without the right to vote, all other democratic rights are illusory.  Fair elections ensure the consent of the governed; they are the moral foundation of the compact between the government and its citizens.

2.     In the 2018 General Election (the "2018 Election"), Georgia's elections officials broke that compact.  The Secretary of State and State Election Board ("Defendants") grossly mismanaged an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote.  This Complaint describes the serious and unconstitutional flaws in Georgia's elections process—flaws that persist today.

3.     The resulting electoral process not only did violence to Georgia's laws, but also violated the First, Fourteenth, and Fifteenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and Sections 301–303 of the Help America Vote Act of 2002, 52 U.S.C. §§ 21081–21083.

## PARTIES, JURISDICTION, AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States of America.

5.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a) and 42 U.S.C. §§ 1983, 1988(a) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Section 2 of the

Voting Rights Act, 52 U.S.C. § 10301, and Sections 301–303 of the Help America

Vote Act of 2002, 52 U.S.C. §§ 21081–21083.

6.     This Court has jurisdiction to grant both declaratory and injunctive

relief pursuant to 28 U.S.C. §§ 2201, 2202.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because defendant

Robyn A. Crittenden is a resident of this district.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claims occurred in this

district and division.

9.     Plaintiff Fair Fight Action is an Internal Revenue Code § 501(c)(4)

non-profit entity organized under the laws of Georgia.  The organization advocates

for election reform, engages in voter education, and strives to increase voter

turnout to secure the voting rights of all Georgians.  In the past, the organization

has conducted a large vote-by-mail program; worked with churches to register

voters; educated voters about elections procedures and voting rights; and engaged

in a get-out-the-vote program during early voting and on Election Day.

10.     Fair Fight Action advocates for election reform and voter access by

raising public awareness about election reform, lobbying the state legislature for

election reform, and engaging in a targeted voter registration program.  The

3

violations of law described in this Complaint will require Fair Fight Action to spend additional resources educating voters about their rights, registering voters, and ensuring voters know the process for casting a ballot that will actually be counted.

11.     Plaintiff Care in Action is an Internal Revenue Code § 501(c)(4) non-profit entity organized under the laws of Delaware.  Care in Action is dedicated to fighting for dignity and fairness for the millions of domestic workers in the United States—most of whom are women—including by educating voters about voting rights and procedures and advocating for candidates who support domestic worker concerns.  During the 2018 election campaign, Care in Action conducted significant advocacy, education, and outreach activities to ensure that domestic workers and others could informedly cast their ballots.  And immediately after the 2018 Election, Care in Action contacted voters who cast provisional ballots to ensure that they took the steps required to cause the State to count their ballots. Care in Action registered with the Georgia Government Transparency and Campaign Finance Commission as an independent committee due to the portion of its activities that consisted of independent expenditures in support of several statewide and legislative candidates in the 2018 Election.

12.    The violations of law described in this Complaint have required, and will continue to require, Care in Action to spend additional resources educating voters about their rights and ensuring that voters know the process for casting a ballot that will actually count.  Defendants' widespread misconduct in administering the 2018 Election thwarted Care in Action's mission because its advocacy and education programs focused on enabling voter participation in the 2018 Election and educating citizens on how to register, where to vote, and how to cast a ballot.

13.    Robyn A. Crittenden is Georgia's Interim Secretary of State and is named solely in her official capacity.  The Secretary of State is the constitutional officer serving as Georgia's chief official who oversees and administers elections. O.C.G.A. § 21-2-50.  The Secretary of State is also the chairperson of the State Election Board.  O.C.G.A. § 21-2-30(d).  As the chief elections officer designated under the Help American Vote Act of 2002 ("HAVA"), the Secretary of State is also responsible for coordinating the obligations of the state under HAVA. O.C.G.A. § 21-2-50.2.  Crittenden was appointed Georgia's Secretary of State on Thursday, November 8, 2018, immediately after then-Secretary Brian Kemp resigned.

14.     Defendant State Election Board of Georgia is responsible for, inter alia, (1) promulgating rules and regulations to "obtain uniformity" in the practices and proceedings of elections officials, "as well as the legality and purity in all . . . elections"; (2) formulating, adopting, and promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; (3) promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as vote"; and (4) investigating frauds and irregularities in elections.  *See* O.C.G.A. § 21-2-31.

15.     Defendants Rebecca N. Sullivan, David J. Worley, Ralph F. "Rusty" Simpson, and Seth Harp are members of the State Election Board of Georgia and are named solely in their official capacity.  As members, their responsibilities include: (1) promulgating rules and regulations to "obtain uniformity" in the practices and proceedings of elections officials, "as well as the legality and purity in all . . . elections"; (2) formulating, adopting, and promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; (3) promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be

6

counted as vote"; and (4) investigating frauds and irregularities in elections. *See* O.C.G.A. § 21-2-31.

## FACTUAL ALLEGATIONS

16.    Georgia has a history of neglecting its elections infrastructure and suppressing votes—particularly of people of color.

17.    Many long-standing barriers to voting were halted by the Voting Rights Act of 1965, 52 U.S.C. §§ 10101-10702.  After *Shelby County v. Holder*, 570 U.S. 529 (2013), removed the Act's preclearance requirement for voting changes,[1] Georgia began again to erect discriminatory voting barriers reminiscent of the Jim Crow era.

18.    The U.S. Commission on Civil Rights, a bipartisan, independent agency, found that among the states previously subject to preclearance by the Voting Rights Act, Georgia was the only state that had implemented voting restrictions in every category the Commission examined: strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from

---

[1] Before the Supreme Court's decision in *Shelby County*, Georgia needed "preclearance" from the United States Department of Justice to implement changes in its elections, such as the location of a polling place, to prevent the state from implementing policies that discriminate against voters of color.  *Shelby County* struck down that preclearance requirement.

voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

19.     In 2015, the Electoral Integrity Project[2] ranked Georgia as the eighth worst state in the nation for electoral integrity.

20.     The 2018 Election drew historic voter registration and turnout, particularly among voters of color.  Almost four million people voted, more than one million for the first time.  This voter turnout was more than any previous midterm election in Georgia history.

21.     But decades-long neglect of the elections infrastructure left a system virtually guaranteed to fail.  And time-tested voter suppression tactics further burdened the right to vote:  voters faced a systematic disregard for established rules; a refusal to provide resources adequate to enable a fair voting process; and policies and practices that stifled the votes of the people.

---

[2] The Electoral Integrity Project is an independent academic project based at Harvard University and the University of Sydney.  Its focus is on evaluating the integrity of elections around the world.  *See* https://www.electoralintegrityproject.com (last visited Nov. 26, 2018).

22.    The Secretary of State is Georgia's chief official who oversees and administers elections; the Secretary also served as Georgia's chief architect of these voting barriers.[3]

23.    In 2017, for example, the Secretary of State unconstitutionally purged the rolls of nearly ten percent of Georgia's registered voters.  These voters were disenfranchised under Georgia's "use it or lose it" law merely because they had not recently exercised their right to vote.

24.    Many Georgians worked tirelessly to register new voters.  In response to these voter registration efforts, then-Secretary of State Kemp adopted an extreme interpretation of the statute requiring a "match" between the information on a voter registration form and other government records, implementing a policy requiring the match to be exact.  Under the "exact match" policy, inconsequential typographical mismatches were used to deny Georgians their right to vote.  These mismatches were often caused by technical limitations on government computer systems or typographical errors by government employees.  Before a federal court

---

[3] Brian Kemp, Georgia's Governor-elect, served as Secretary of State from early 2010, shortly before the preclearance requirements under the Voting Rights Act were eliminated, until two days after the November 6, 2018, gubernatorial election that he administered and oversaw.

9

halted the practice, the "exact match" policy suspended tens of thousands of new voter registrations.

25.     Georgia elections officials deployed a known strategy of voter suppression: closing and relocating polling places.  Despite projections of record turnout, elections officials closed or moved approximately 305 locations, many in neighborhoods with numerous voters of color.  Fewer polling places meant that the remaining locations strained to accommodate an influx of voters.  Yet elections officials failed to supply sufficient, functioning voting machines (both DRE and Express Polls) and enough provisional ballots.  In one precinct, for example, elections officials supplied only two of the special pens required to complete provisional ballots.  Depriving polling places of basic tools needed for voting meant that voters who arrived at polling places anxious and excited to express their patriotism through the basic, fundamental act of voting were met with hours-long lines.  Some lines were four hours long.  Georgians who could not wait—because of disability, health, or work or family obligations—effectively lost the right to vote.

26.     Voters who managed to reach their polling places and endure the wait to reach a poll worker then faced an increased chance that they would not be found on the voter rolls.  A voter who is registered to vote at a precinct but cannot be

confirmed by a poll worker can vote by provisional ballot.  Yet the provisional ballot process failed.

27.     Georgia law requires elections officials to provide a provisional ballot to any voter whose registration cannot be confirmed, but many poll workers refused to comply with this legal obligation, or simply did not understand it.  And in other locations—particularly high-turnout precincts for voters of color— precincts ran out of provisional ballots.  Without access to provisional ballots, many voters lost their right to vote entirely.

28.     Absentee ballots fared no better.  Thousands of Georgians who cast absentee ballots—one way to avoid long lines and other voting place problems— experienced significant impediments.  Some voters who applied for an absentee ballot never received one; some received a ballot too late to ensure that it would be counted; and some had their applications or ballots illegally rejected.  Elections officials also misinformed voters about whether absentee ballots had been accepted, preventing potential absentee voters from curing purported deficiencies in their ballots.[4]

---

[4] Strictly speaking, Georgia law describes in-person voters at early voting locations as absentee voters.  Because this description is different from how the terms are used generally, this Complaint uses "absentee voting" to describe traditional mail-in absentee voting rather than early voting.

29.    Further, Defendants knowingly left Georgia's voting infrastructure vulnerable to hacking.  Georgia maintains one of the least secure elections systems in the country.  Despite being aware of these vulnerabilities for years, the Secretary of State and State Election Board rejected and rebuffed attempts to improve the data security of the Georgia database of voters.

## I.    Defendants Are Responsible for Georgia's Election System.

30.    The Secretary of State is the chief elections officer in Georgia. O.C.G.A. § 21-2-50.

31.    The Secretary of State and the State Election Board are responsible for the election system as a whole, a responsibility that includes promoting and supporting accurate, fair, open, and secure elections; implementing election laws, regulations, and policies that are consistent with Georgia law and the constitutional rights of the voters of Georgia; and ensuring consistency across counties to protect the equal protection rights of Georgians.  *See Bush v. Gore*, 531 U.S. 98, 107 (2000) ("[T]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." (internal quotation marks omitted)).

12

32.    The Secretary of State is also the designated state official for ensuring compliance with the federal Help America Vote Act of 2002, 52 U.S.C. §§ 20901 *et seq. See* O.C.G.A. § 20-2-50.2.

33.    The Secretary of State is the chair of the State Election Board and is responsible for promulgating, adopting, and enforcing uniform rules for election administration. O.C.G.A. § 21-2-31(1). The State Election Board has four additional members whose elections are governed by law. O.C.G.A. § 21-2-30(a). The Secretary of State is also responsible for training county elections officials, including registrars and superintendents. O.C.G.A. § 21-2-50(a)(11).

34.    Thus, while Georgia counties have responsibility for some aspects of Georgia elections, the Secretary of State and the State Election Board have broad authority to oversee, manage, and train the counties on implementation of their duties.

35.    Before the 2018 Election, the Secretary of State took an active role in how counties conducted elections. For example, Randolph County hired a consultant to help it determine whether polling locations should be changed. That consultant recommended closing polling locations, and those locations were where high numbers of voters of color have historically voted. The Secretary of State's Office acknowledged that it recommended the consultant. In a presentation to

Randolph County residents, the consultant explained that he was following the Secretary of State's recommendations regarding closing polling locations.

36.   The Secretary of State is responsible for maintaining the official list of registered voters, O.C.G.A. § 21-2-50(a)(14), and for providing the superintendent with all forms to use in elections, O.C.G.A. § 21-2-50(a)(5).

37.   The Secretary also is responsible for tabulating the consolidated returns from Georgia's counties, for directing county election superintendents to conduct recounts when required under Georgia law, and for certifying the vote total for federal and state offices, among other races.  *See* O.C.G.A. §§ 21-2-50(b), -495, -499; Ga. Comp. R. & Regs. 590-1-1-.01, .02.  This Court recently explained that the Secretary has robust supervision of the counties when certifying elections: "[t]he certification process required of the Secretary of State under Georgia law, on its face, is more than a mere rubber stamp.  It requires that Secretary of State to engage in the same tabulation, computation, and canvassing process undertaken by the counties as set forth in O.C.G.A. § 21-2-493 prior to final certification.  And in the event errors are discovered, the Secretary of State shall notify and direct the counties to engage in a redo." *Common Cause Ga. v. Kemp*, __ F. Supp. 3d __, No. 1:18-cv-5102-AT, 2018 WL 5915657, at *15 (N.D. Ga. Nov. 12, 2018).  In short, there is much that Georgia law requires the Secretary of State to do.

14

## II.     Defendants Disenfranchise Voters.

38.     Over the last eight years, Defendants' policies, actions, and inaction
disenfranchised voters and thwarted new voter registrations.  These policies,
actions, and inactions disproportionately affected low-income voters and voters of
color.

### A.     "Use It or Lose It" Policy: The Secretary of State Purges Georgians From the Rolls of Registered Voters.

39.     In 1994, Georgia enacted the "use it or lose it" law, which permits the
Secretary of State to purge from the voter registration rolls voters who do not
regularly use their right to vote.  Under this law, voters who have not voted in the
past three years or otherwise contacted elections officials—for example, by
updating their addresses—are sent a single postcard notifying them that they may
lose their right to vote.  O.C.G.A. § 21-2-234.  The postcard asks the voter to
confirm his or her current address.  If a voter fails to return the postcard, the voter
is then moved to inactive status.  If the voter does not vote in the next two general
elections, he or she can be purged from the rolls of registered voters.

40.     Then-Secretary Kemp purged hundreds of thousands of voter
registrations under the "use it or lose it" policy.  Many of these purged voters had
not moved, had not died, and had not been convicted of a felony.  The registration
information for these voters remained accurate; the Secretary of State simply

15

deemed them no longer eligible to vote because, after not voting for a few years they failed, one time, to return a postcard.

41.     Many voters learned they had been purged from the rolls only when they showed up to vote.  For example, on Election Day, a poll watcher at Iglesia Bautista Nueva Jerusalén precinct in Gwinnett County observed many people who were told they were not on the voter rolls.  The poll watcher saw at least five voters who had previously voted at the precinct, had not moved residences, and were no longer found in the voter rolls.  A common thread among them was that the last time they voted was in 2012.

42.     Purging voters for inactivity penalizes infrequent voters, who are disproportionately young, poor, and people of color.

43.     The "use it or lose it policy" is also subject to manipulation and abuse by the Secretary of State.  Specifically, then-Secretary Kemp would wait until just before his own elections to remove hundreds of thousands of voters under the "use it or lose it" policy.  In 2014, when he was running for reelection, then-Secretary Kemp purged over 250,000 people under the "use it or lose it" policy.  In 2017, when he was running for governor in the upcoming 2018 Election, then-Secretary Kemp purged over 665,000 people under the "use it or lose it" policy.  In a single night in July 2017, he struck over 500,000 people from the voter rolls—

approximately eight percent of Georgia's registered voters.  The *Atlanta Journal-Constitution* called it the "largest mass disenfranchisement in U.S. history."[5]  By contrast, in years when he was not running for office (2013, 2015, and 2016), then-Secretary Kemp removed fewer than 100 people cumulatively under the "use it or lose it" policy.

44.    The "use it or lose it" policy—and the purges of voters that occurred under it—violated Georgia voters' rights under the First and Fourteenth Amendments.  The "use it or lose it" policy disenfranchised thousands of Georgia voters in the 2018 Election and will continue to disenfranchise voters in the future.

### B.    "Exact Match" Policy: The Secretary of State Prevents Georgians From Registering to Vote.

45.    Many Georgians submitted new voter registration forms shortly before the 2018 Election.  Yet many of these registrations were rejected under an aggressive and extreme interpretation of Georgia's statute requiring voter registration information to match information in certain government files.

46.    Georgia law requires the state's voter registration information to match the information in the state's Department of Driver Services ("DDS") files if

---

[5] Alan Judd, *Georgia's Strict Laws Lead to Large Purge of Voters*, Atlanta J.-Const. (Oct. 27, 2018), https://www.myajc.com/news/state--regional-govt--politics/voter-purge-begs-question-what-the-matter-with-georgia/YAFvuk3Bu95kJIMaDiDFqJ.

the voter uses his or her driver's license as proof of identity.  O.C.G.A. § 21-2-220.1.[6]  If a voter's application information does not match those files, then the Secretary of State holds the application in "pending" status.  An applicant whose registration is pending must resolve the mismatch; if the applicant fails to do so, the Secretary of State will reject the application.  *Ga. Coal. for People's Agenda, Inc. v. Kemp*, __ F. Supp. 3d __, No. 1:18-CV-04727, 2018 WL 5729058, at *1 (N.D. Ga. Nov. 2, 2018) (addressing the "exact match" policy and registration processing).

47.   The Secretary of State has interpreted and applied the statutory "match" requirement in ways that unfairly and disproportionately prevent voters of color from voting.

48.   Specifically, the Secretary of State applied the "match" in an unreasonably literal way—requiring an "exact" match of all information no matter how insignificant that information is.  Under the Secretary's onerous "exact match" policy, voter registrations were rejected if the mismatch consisted of insignificant typographical errors or inconsequential differences.  For example, if

---

[6] If the voter uses a Social Security card, then the information must match the records in the Social Security Administration.  On information and belief, the vast majority of people use a driver's license instead of a Social Security card.

the punctuation in voters' last names on their voter registration forms did not match their DDS files, those voters' applications were rejected—even if the problem originated entirely with the DDS system and not with the voter.

49.    Shortly before the 2018 Election, the Secretary's "exact match" policy prevented 53,000 Georgians from having their registrations accepted.

50.    The experience of Dr. Carlos del Rio, the chair of the Department of Global Health Studies at the Rollins School of Public Health at Emory University, illustrates this problem with the "exact match" policy.  Dr. del Rio had correctly written his last name as "del Rio" on his voter registration form; but because the DDS system does not recognize spaces in last names, DDS incorrectly lists his last name as "delRio" in its system and on his driver's license.[7]  Dr. del Rio explained to elections officials that their actions were illegal; only after being forced to navigate a lengthy process was he finally allowed to vote.  Dr. del Rio reflected, "While I was ultimately able to cast my vote, it was a frustrating experience and I

---

[7] Citizens of Latino descent are disproportionately likely to have two surnames or a surname beginning with the preposition "de" or "del," making them more likely to print their name with a space.  *See* Lotus D. Cirilo, *Naming Conventions of Spanish-Speaking Cultures*, http://lrc.salemstate.edu/hispanics/other/Naming_Conventions_of_Spanish-Speaking_Cultures.htm (last visited Nov. 19, 2018).

Case 1:18-cv-05391-SCJ   Document 1   Filed 11/27/18   Page 20 of 66

can only imagine the powerlessness that others less fortunate than I may have felt as they attempted to exercise a fundamental American right."

51.    Dr. del Rio is right—other Georgians were powerless to vote when they arrived at the polls due to the "exact match" policy.  One poll worker reported seeing at least six voters who were told that they were not on voter rolls because their names had hyphens, apostrophes, or spellings unfamiliar to poll workers.

52.    The "exact match" policy disenfranchises recently naturalized U.S. citizens because the Secretary of State places new citizens' voter registration forms in pending status if those voters have not informed DDS of the change to their citizenship.  But whether a person is a citizen is irrelevant to whether he or she can have a driver's license.  In effect, the Secretary of State has denied new citizens the right to vote because they do not update DDS with information it neither asks for nor needs.

53.    This disenfranchisement of recently naturalized citizens disproportionately affects people of color, too, both because many new citizens are

people of color [8] and because recently naturalized citizens may be more likely to have state employees enter their names incorrectly if those names are less familiar to those employees.  Of the Georgians whose applications were pending for a citizenship mismatch, about a quarter were Asian American, although only 2.1 percent of Georgia's registered voter pool is Asian American; and 17 percent were of Latino descent, although only 2.8 percent of Georgia's registered voter pool is of Latino descent.  *Ga. Coal.*, 2018 WL 5729058, at *8.  These percentages contrast with those for white voters; only 13.7 percent of Georgians whose applications were pending for a citizenship mismatch were white, even though more than half of Georgia's registered voter pool is white.  *Id.*  Because of this disparate impact on minority voters, a federal judge concluded that new citizens whose voter registrations were placed in pending status had demonstrated a substantial likelihood that the State violated their constitutional rights.  *Id.*

54.    Beyond the harm to recent citizens, the "exact match" policy has a disparate impact on black voters.  Of the voter registrations pending because of the

---

[8] In 2016, 49 percent of new citizens in the United States were born in countries in South America and Mexico, Asia, and the Caribbean.  *See* Jie Zong, *et al.*, Migration Policy Institute, *Frequently Requested Statistics on Immigrants and Immigration in the United States*, (Feb. 8, 2018), https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Naturalization.

policy before the 2018 Election, approximately 70 percent were for black voters, even though only approximately a third of Georgia's population is black.

55.     The impact of the "use it or lose it" and "exact match" policies can be seen in the record-breaking number of provisional ballots cast in the 2018 Election: over 21,000.  This number is higher than the number of provisional ballots cast in the 2016 presidential election even though overall turnout in 2018 was slightly lower than in 2016.  This Court recently noted that "[c]omparing the 2018 election and the last non-presidential election in 2014, there has been a statistically significant increase in the proportion of voters required to vote on provisional ballots relative to the total vote."  *Common Cause Ga. v. Kemp*, __ F. Supp. 3d __, No. 1:18-cv-5102-AT, 2018 WL 5915657, at *17 (N.D. Ga. Nov. 12, 2018).

56.     The Secretary of State's adoption and application of the "exact match" policy—as well as other failures to register voters—disenfranchised, and will continue to disenfranchise, thousands of voters, violating their constitutional rights.

### C.     Defendants Use Election Technology That Is Vulnerable to Hacking and Manipulation.

57.     Georgia's electoral system, including its voter registration data and voting machines, lacks adequate data security.  This insecurity presents a risk of hacking and tampering that could cause voters to be removed from voter rolls or cause cast votes to be removed or altered.  Georgia's voter registration data already

has been breached twice.  More than a decade of research shows that electronic voting machines, especially those used in Georgia, are vulnerable to hacking.  The Secretary of State and the State Election Board have had notice of these problems but have done precious little to fix them.

58.     The threat of hacking is not hypothetical.  Georgia's voter rolls were breached in 2015, when 6 million voters had their personal information taken from the State, and in 2017 when as many as 7.5 million voter records were compromised.  Special Counsel Robert Mueller indicted Russian military officers for, among other things, exploring vulnerabilities in Georgia counties' elections systems in an effort to identify cybersecurity flaws.

59.     The experience of many Georgia voters suggests significant problems with the State's voter registration data—whether because of a security breach or Defendants' failure to maintain adequately this essential database.  Many voters were told when they tried to vote that the voter registration rolls contained information different from the information the voters had supplied when registering to vote.

60.     Georgia is one of only five states to use an entirely paperless voting system.  This electronic-only voting system creates no paper trail, making the state unable to confirm if irregularities during an election resulted from hacking.

61.     Keeping a paper trail of votes on election day is a common and reasonable way to mitigate some risks of election hacking.  If, upon tabulation, vote totals look odd, a paper trail from voting machines allows for a reconstruction of what went wrong.  Despite the demonstrated insecurity of Georgia's election system, Georgia has no means to recover what happened on election day if data suggests the system has been hacked or is compromised in other ways.

62.     Georgia even rejected federal funds and assistance for election and voting security from the United States Department of Homeland Security.  Georgia voters have been left with an election system that this Court recently criticized as a "dated, vulnerable voting system that provides no independent paper audit trail." *Curling v. Kemp*, __ F. Supp. 3d __, No. 1:17-CV-2989, 2018 WL 4625653, at *1 (N.D. Ga. Sept. 17, 2018).

63.     By leaving Georgia's registration database and voting machines vulnerable to tampering, Defendants place voters at risk of having their voter registrations, and votes, removed or changed.

64.     These unnecessary and reckless security vulnerabilities place a severe burden on the right to vote.

**D.     Defendants Oversee an Election System Dependent on Unreliable Voting Machines.**

65.     Defendants maintain and program the machines that voters use to cast ballots.  Here again, Defendants failed to ensure that voters were able to vote in the 2018 Election without undue burden.

66.     One troubling problem—encountered by several voters—is that voting machines switched their votes from Leader Stacey Abrams to Secretary Kemp.  Allison Bish, a Gwinnett County voter, used a machine to vote for Leader Abrams.  But after selecting Leader Abrams, the machine switched her vote to Secretary Kemp.  Ms. Bish switched her vote back to Leader Abrams.  The machine again switched her vote to Secretary Kemp.  Ms. Bish switched her vote back to Leader Abrams.  The machine switched her vote to Secretary Kemp for the third time.  Only on Ms. Bish's fourth attempt was she was able to cast a ballot for Leader Abrams.

67.     Jocelyn Lester experienced a similar problem when she voted in Early County.  Ms. Lester voted early at the Registrar's Office in Blakely.  She voted using the voting machine, and pressed the button for Leader Abrams.  But the voting machine showed her selection as Secretary Kemp.  Ms. Lester reports she kept pressing Leader Abrams and by the fourth time, the machine finally corrected.  While Ms. Lester was ultimately able to vote for Leader Abrams, she expresses

concern that other voters may have been less attentive, inadvertently voting for

Secretary Kemp.  As Ms. Lester said, "If I were not paying more attention, or were

less persistent, it would have been easy for the machine to incorrectly cast my vote

for Secretary Kemp.  And I can see how a less persistent or attentive person could

have the machine incorrectly cast their vote for Secretary Kemp when they were

meaning to vote for Leader Abrams."

68.    The absence of a paper trail to track votes compounds the problem of

inaccurate voting machines.

69.    These errors should not happen.  The Secretary of State is responsible

for maintaining and programming voting machines that accurately report a voter's

selections.  The Secretary of State failed to do so.  This failure disenfranchised

Georgia voters.

### E.    Defendants Promote Moving and Closing Precincts.

70.    The Secretary of State issued a memorandum to local elections boards

outlining why precinct closures might be appropriate and emphasizing that *Shelby

County v. Holder*, 570 U.S. 529 (2013), removed the requirement that elections

officials submit precinct changes to the U.S. Department of Justice for preclearance.[9]

71.     Since preclearance requirements were lifted, Georgia has closed precincts in places with high proportions of voters of color.  In just a few short years, elections officials closed or moved more than 300 precincts.  As a result, approximately one-third of Georgia's counties now have fewer polling places than in 2012.  In those counties, most have poverty rates higher than the state average and almost half have black populations over 25%.

72.     These precinct closures left voters without enough polling places on Election Day, disproportionately affecting low-income voters and voters of color.  These polling place closures unduly burdened Georgians' right to vote.

### F.     The Secretary of State Maintains Inaccurate Voter Registration Rolls.

73.     Many Georgians who registered to vote arrived at the polls and were told that they were not on the list of registered voters.  One poll worker explained to a poll watcher that voters should never expect to be on the rolls if they registered near or on the deadline.  "This," the poll worker said, "is Georgia."

---

[9] Ga. Sec'y of State Elections Div., Manual on Precinct Closures (Feb. 2015), https://drive.google.com/file/d/1xFw-DbVRcdFustzb_SJHziFrONtkpXL3/view

74.     Specific voter registration rolls issues affecting voters across multiple counties in Georgia included: (i) family members living in the same house and who used the same address when they registered to vote being told they would have to vote in different locations; (ii) Georgians who had registered to vote being told that their names were not on the rolls; (iii) Georgians who had been voting at the same polling place for years being told their polling place had moved or that they were no longer registered to vote; and (iv) Georgians who registered under the Motor Voter law not being on the rolls.

> (i)     *Family Members With the Same Address Are Told to Vote at Different Polling Places.*

75.     Several voters and poll watchers describe family members who live in the same house being directed to vote in different polling places.  For example, a disabled veteran who relies on a service dog, confirmed, weeks before Election Day, that she and her husband were registered to vote.  On Election Day, she, accompanied by her service dog, husband, and eight-year-old son, went to vote at Mill Creek Middle School.  Her husband was allowed to vote there.  But, while she had registered to vote using the same address as her husband, she was told that she could not vote at that precinct because her address on the voter rolls differed from the address she provided when she registered to vote.  She had never even lived at the address on the registration rolls.

28

76.     A poll watcher at the Liberty Elementary School in Cherokee County was troubled by what happened when married couples arrived to vote.  He saw repeated instances when both spouses had changed their addresses through DDS to reflect their Cherokee County addresses.  Even though the address on their drivers' licenses were correct, at least three couples learned that one spouse's address had been correctly updated while the other spouse's address still showed as the former address.  The poll workers directed the spouse with the unchanged address to go to the voting location for the unchanged address.

77.     A poll worker who staffed the Express Poll machine at the Coralwood Precinct in DeKalb County said a couple arrived together and displayed identification showing they resided at the same address.  But the voter registration list stated that they were registered to vote at two different precincts.  Because this couple had different voting precincts, the poll worker has concerns about the integrity of the voting records and whether there had been tampering with the records.

> *(ii)    Georgians Who Registered to Vote Shortly Before the Deadline Are Not on the Voter Rolls.*

78.     Many Georgians registered to vote before the registration deadline, but learned on Election Day that they were not on the rolls of registered voters. Even worse, poll workers did not offer many of these voters provisional ballots.

79.   Tyra Bates is a Gwinnett County resident who registered to vote online in early October 2018.  She received a reference number and even took a screenshot of the confirmation page after she completed the registration process. When she arrived at her precinct, however, an elections official told her she was not registered.  She was not allowed to cast a provisional ballot.

> (iii)   *Voter Registration Roll Information for Voters Who Had Voted at the Same Polling Place for Years is Inaccurate.*

80.   Elections officials told many voters that they were at the wrong polling place even though they had voted at that polling place for years and had not moved.  Some of these voters were directed to vote at another location.  Others were given provisional ballots.  Of those voters given provisional ballots, many were not given the instructions required under Georgia law about how to cure any deficiencies and how to learn whether their votes were counted.

81.   For example, Jim Peterson, an attorney who lives in DeKalb County, went to his polling place at Mary Lin Elementary School on Election Day.  Mr. Peterson's registration information showed that his precinct was in Fulton County's Morningside neighborhood even though he had not lived in Morningside since 1993.  Poll workers gave him a provisional ballot, which he cast.  Although the poll workers were required under Georgia law to provide him "written information" about how "to ascertain if his . . . ballot was counted and, if such

ballot was not counted, the reason why such ballot was not counted," O.C.G.A. §

21-2-418(f), he was not given this information.  Instead, a poll worker assured him

his vote would be counted.  The poll worker was not correct; Georgia law does not

allow voters to vote in a county other than where they are registered.

> *(iv)   Georgians Who Registered to Vote Pursuant to the Motor*
> *Voter Act Are Not on the Voter Rolls.*

82.   Under the Motor Voter Act, Georgia must provide its voters with the

opportunity to register to vote at the same time they apply for a driver's license.  52

U.S.C. § 20504.  But Georgians who registered to vote under the Motor Voter Act

discovered on Election Day that they were not on the voter rolls.  Some voters

completed voter registration paperwork at the same time they applied for their

drivers' licenses, but arrived at the polls and were unable to vote.  Voters and poll

watchers reported this occurring in many counties, including Athens-Clarke,

Carroll, Cobb, DeKalb, Fulton, and Gwinnett.

### G.   The Secretary of State Does Not Provide Adequate Resources to Polling Places.

83.   The Secretary of State failed to provide enough voting machines to

the counties, provided voting machines that did not work, and failed to advise the

counties that they would need additional ballots, provisional ballots, and other

supplies given the anticipated turnout in the 2018 Election.

84.    Despite express warnings from the Democratic Party of Georgia that counties did not print enough ballots, some polling stations ran out of provisional ballots.  Other polling stations lacked enough voting machines to accommodate the expected demand.  As CNN reported, thousands of voters waited at polling places with only three voting machines.[10]  As a result, voters faced unreasonably long lines—as long as four hours in some places.  Many voters came to vote, saw the long lines, and left without voting.

85.    For example, one precinct in Snellville, Gwinnett County, had no power cords for the voting machines at the start of Election Day, requiring its machines to operate on battery power.  The batteries died in less than an hour.

86.    Pittman Recreational Center, a precinct in Atlanta, started Election Day with only three operational voting machines.  While more machines were provided during the day, those machines lacked the equipment necessary to operate them.  Wait times ranged from two to four hours, causing people to leave before voting.  One voter went to Pittman three times but could not vote because of the hours-long wait.  In addition, Pittman closed for 30 minutes at 7:00 pm, violating a

---

[10] Van Jones, *Don't Let Brian Kemp Steal Georgia's Gubernatorial Election*, CNN (Nov. 9, 2018), https://www.cnn.com/2018/11/09/opinions/dont-let-brian-kemp-steal-georgias-gubernatorial-election-van-jones/index.html.

court order to stay open until 9:00 pm.  While Pittman was closed, many voters left without voting.

87.     Similarly, at a Gwinnett County precinct, the voting machines malfunctioned shortly after the polls opened.  These malfunctioning machines created long lines that prompted voters to leave without voting.

88.     A number of busy polling places lacked an adequate number of the machines that verify a voter's registration or had machines that malfunctioned.  This lack contributed to the inability of Georgians to exercise their right to vote because the check-in bottlenecks led to unreasonably long lines.

89.     The problems with voting machines were compounded by polling places not having enough provisional ballots.  Provisional ballots are used when an elections official cannot determine whether a voter is eligible to vote.  Provisional ballots must be preprinted and supplied by the Secretary of State.  *See* O.C.G.A. § 21-2-400(a).

90.     Because of the problems with inoperable machines, the inaccurate voter registration list, and the "exact match" and "use it or lose it" policies, provisional ballots were in high demand and many precincts ran out of them.  Once a precinct runs out of provisional ballots, voters at that polling place who would otherwise cast a provisional ballot lose the right to vote.

91.     The Secretary of State knew that the "use it or lose it" purge and the "exact match" policy would increase the need for provisional ballots.  The Secretary had also been warned by the Democratic Party that voter turnout would be high, a warning reinforced by the high voter turnout during early voting. Despite knowing that counties needed to be given a large number of provisional ballots, Defendants did nothing to let the counties know they would need more provisional ballots or to supply the counties with an adequate number of these ballots.

92.     Many of the voters who had to wait in long lines to vote in the 2018 Election were voters of color.  On information and belief, polling locations in areas with large numbers of voters of color had disproportionately fewer resources, such as adequate numbers of voting machines or ballots, creating the hours-long waits that deterred many Georgians from voting.  Moreover, the increased need for provisional ballots came, in part, from the "exact match" and "use it or lose it" policies, which disproportionately affected voters of color.

93.     Defendants had a duty to oversee the election, train county officials to staff adequately polling places, and issue guidance to the counties to protect every Georgian's right to vote.  Defendants had a duty to prevent Georgians' right to vote from being unduly burdened.  Defendants did not fulfill this duty.

34

### H.    Defendants Inadequately Oversee and Train Elections Officials on Provisional Ballots.

94.    The State Election Board, chaired by the Secretary of State, is responsible for promulgating, adopting, and enforcing uniform rules for election administration.  O.C.G.A. § 21-2-31(1).  The Secretary of State is also responsible for training county elections officials, including registrars and superintendents, on the law governing state elections.  O.C.G.A. § 21-2-50(a)(11).

95.    Defendants did not satisfy these obligations; throughout the State, elections officials misunderstood their duties and ignored the law.

96.    At a Gwinnett County precinct, for example, voters were properly given provisional ballot forms after a voting machine malfunctioned, but voters were misinformed about how those ballots would be handled.  Those ballots should have been counted as regular ballots.  *See* O.C.G.A. § 21-2-418(h) (stating that "in the event that the voting machines or DRE units at a polling place malfunction and cannot be used to cast ballots . . . provisional ballots may be used by the electors at the polling place to cast their ballots.  In such event, the ballots cast by electors whose names appear on the electors list for such polling place *shall not be considered provisional ballots*[]") (emphasis added).  But instead of treating those ballots like regular ballots, elections officials added a cover page to the ballots that incorrectly told voters that the county election office would treat those ballots as

provisional and decide later whether they would be counted.  County officials later admitted that at least 50 people left the polling place without voting because they believed elections officials were requiring them to vote by provisional ballot.

97.    Elections officials also gave the wrong instructions to voters who showed up at the wrong polling place.  A poll worker must offer a provisional ballot to any voter who appears at the wrong polling place.  That way, voters need not go elsewhere to vote.  Yet at some polling locations, poll workers did not provide these voters with provisional ballots and instead told them they had to go to another polling place if they wanted to vote.  At least one unfortunate voter was sent from one polling place to another, and then, to yet a third.  Even when voters knew to ask for a provisional ballot, they sometimes were not given one.[11]

98.    Under both federal and Georgia law, provisional ballots must also be offered to voters who show up to vote and whose names are not on the voter registration rolls.  *See* O.C.G.A. § 21-2-418(a).  Elections officials failed to offer provisional ballots to people in this situation, too.  For example, when Kia Marlene

---

[11] As this Court explained in another case: "[T]here was evidence that voters were sometimes refused provisional ballots or if provided provisional ballots, sometimes had to return to the polls to insist on this." *Common Cause Ga. v. Kemp*, __ F. Supp. 3d __, No. 18-CV-05102, 2018 WL 5915657, at *17 (N.D. Ga. Nov. 12, 2018).

Carter tried to vote at Shiloh Education Center in Henry County, she was told by the poll worker who scanned her identification card that the information on file for her showed that she was not a United States citizen.  Ms. Carter was born in Virginia, had voted in Georgia during the past 18 years, and never before had her citizenship questioned when she voted.  In the 2018 Election, however, county officials did not allow Ms. Carter to vote and did not offer her a provisional ballot.

99.     Moreover, some precincts followed rules that conflict with the law.  According to the poll watcher at Rothschild Middle School in Muscogee County, the poll manager explained that provisional ballots were only allowed for people arriving at the polls close to closing.  The poll workers at that location would not distribute provisional ballots in the morning because the poll manager thought it was not late enough in the day.  The Secretary's statutorily-mandated training program failed voters at this polling place.

## I.     Defendants Inadequately Oversee and Train Elections Officials on Absentee Ballots.

100.   Defendants also failed to oversee, train, and advise counties about the proper handling of absentee ballots.  Georgia voters may vote by absentee ballot without needing a reason.  Georgia law requires that county elections officials who receive a request for an absentee ballot determine whether the voter who requested the ballot is eligible to vote and, if he or she is, immediately mail the voter a ballot.

*See* O.C.G.A. § 21-2-381.  The voter can either return the completed absentee ballot by mail or by hand-delivery, or cancel the absentee ballot and vote in person during early voting or on election day.

101.   At least 283,839 voters tried to vote by absentee ballot in the 2018 Election.  Many ran into hurdles that prevented them from voting absentee, or from voting at all.

102.   Elections officials failed to mail absentee ballots to voters in a timely manner, violating Georgia law.  For example, despite receiving timely absentee ballot requests, Dougherty County was still mailing ballots on October 29, 2018, just days before the election.[12]  Because of this delay, many Dougherty County residents—67 percent of whom are black—could not vote absentee.  Moreover, thousands of absentee ballots were mailed out three weeks, or more, after absentee ballot requests were received by county elections officials.

---

[12] Dougherty County admitted during a proceeding in the United States District Court for the Middle District of Georgia that it had mailed ballots as late as Monday or Tuesday the week before Election Day, and evidence presented at that hearing showed both that mail routing in Dougherty County is unusually slow due to the closure of a distribution facility and that at least one outgoing ballot had not been postmarked until the day before Election Day.  *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212 (M.D. Ga. Nov. 8, 2018).

103.   Elections officials also rejected absentee ballots for improper reasons. It is illegal for an elections official to reject an absentee ballot because of a minor error or omission that is not material to whether a voter can vote.  *See* 52 U.S.C. § 10101(a)(2)(B).  Because counties must verify voter eligibility before sending an absentee ballot, errors on the absentee ballots themselves are immaterial as the county can still determine the identity of the voter.  Yet in the 2018 Election, elections officials nonetheless rejected absentee ballots for irrelevant mistakes.

104.   For example, absentee ballots request Georgia voters' birthdates.  On some absentee ballots, the line that asked for that information just said "Date," without specifying that the date being requested was the voter's birthdate.  Because of this lack of specificity, many voters reasonably wrote the date they completed the ballot instead of their birth date.  Their ballots were rejected.

105.   Under intense criticism for allowing counties to reject these ballots, the Secretary of State took the unusual step, after the election, of issuing an Election Bulletin stating that elections officials would not violate state law if they accepted absentee ballots with immaterial discrepancies.  The Election Bulletin, however, did not explain that elections officials must in fact accept such ballots. And although the Election Bulletin quotes from an opinion by the Georgia Attorney General addressing the issue, the Bulletin omits from that quotation the

Attorney General's conclusion that rejecting such ballots would violate federal law.

106.   Two separate judges from the United States District Court for the Northern District of Georgia remedied some of these problems, requiring first Gwinnett, and then other counties, to accept absentee ballots missing voters' birth years. *Martin v. Crittenden*, __ F. Supp. 3d __, No. 1:18-CV-4776-LMM, 2018 WL 5917860, at *7 (N.D. Ga. Nov. 13, 2018); *Democratic Party of Ga. v. Crittenden*, __ F. Supp. 3d __, No. 1:18-CV-05181-SCJ,  2018 WL 5986537, at *10 (N.D. Ga. Nov. 14, 2018).  But this relief still left some voters disenfranchised if their absentee ballots contained other minor errors immaterial to verifying their identity.

107.   Exacerbating the effect of these errors, some counties failed to promptly notify many Georgians that their absentee ballots had been rejected. Georgia law requires the elections officials to "promptly notify the elector" if the elector's absentee ballot is rejected.  O.C.G.A. § 21-2-386(a)(1)(C).  Because absentee ballots are submitted before election day, this prompt—and legally required—notification gives the voter whose ballot was rejected time to fix the error.  The Secretary of State maintains a website that, in theory, tells voters whether their absentee ballot has been rejected and indicates which errors need to

40

be fixed.  But this system failed, too.  Some voters who learned from the website before Election Day that their absentee ballots had been received and "approved" (i.e., that their absentee votes would count) learned later that their ballots did not count after all.

108.   Some voters who hand-delivered their absentee ballots were also given false information about whether their votes would be counted.  One seventy-two-year-old voter, for example, hand-delivered his absentee ballot and an elections official told him there was nothing else he needed to do to ensure his vote would count.  But after the 2018 Election, he learned that his absentee ballot was not counted because it was missing his birth year.

109.   Elections officials also failed to permit voters to cancel absentee ballots and vote in person.  Georgia law is clear:  voters who have requested an absentee ballot can cancel that ballot and vote in person either by surrendering the absentee ballot or by requesting in writing that the envelope containing the absentee ballot be marked "cancelled."  O.C.G.A. § 21-2-388.  Yet many voters encountered poll workers who would not allow them to cancel their absentee ballots and vote in person.  Even voters who had applied for but never received absentee ballots were told they could not cancel their absentee ballots.

110.   These problems with absentee ballots had a disproportionate impact on voters of color.  In Gwinnett County, where over 60 percent of residents are Latino, African American, or Asian American, elections officials rejected approximately eight and a half percent of all absentee ballots received by October 15, 2018.  This rejection rate was more than three times the statewide average.

111.   In Chatham County, a county with a higher African-American population rate than the state average, some completed ballots mailed by voters were returned to those voters as undeliverable, even though the ballots were mailed in an envelope supplied by the county and with a pre-printed delivery address. These validly-cast ballots were not counted, and the voters could not re-send the ballots in time to be counted.

112.   The United States District Court for the Middle District of Georgia remedied some of these problems.  The Court found that Dougherty County violated voters' constitutional rights by failing to mail absentee ballots on time, and ordered that some ballots received by voters and mailed back by Election Day be counted. *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212-WLS, Consent Order and Court Order at 3 (M.D. Ga. Nov. 9, 2018), ECF No. 5.  But the Court could not grant relief to voters who never received their absentee ballots at all, or received them so close to Election Day that the voters reasonably concluded

42

it would be futile to mail them back.  Voters who requested an absentee ballot because they could not get to the polls (*e.g.*, voters who were elderly, disabled, or out of state on Election Day) were simply denied a vote.

113.   Finally, the counties—under the supervision of Defendants— committed errors in counting absentee votes and other kinds of votes.  Presumably, these errors involved some subset of votes at the polling places or at county election boards that were missed during the counting process.  These types of errors underscore the importance of paper ballots—so that elections returns are auditable—as well as robust reporting from polling locations about the number of voters, the number of machines voted on, the number of votes cast, and the number of votes counted.

114.   In the 2018 Election, Georgia citizens tried to exercise their constitutional rights but were denied the ability to elect their leaders.  Defendants' failed policies and limited to no oversight disenfranchised untold numbers of voters.  This Complaint has detailed an extensive list of the systemic problems plaguing Georgia's elections systems.  Absent judicial intervention, future elections in Georgia will be no different.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Fundamental Right to Vote (First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

115.    Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

116.    Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . . without due process of law."  This due process principle protects the fundamental right to vote.  If a state imposes a severe burden on the right to vote, that burden must be narrowly drawn to advance a state interest of compelling importance.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

117.    The First Amendment prohibits a state from interfering with "the freedom of speech" or the right "to petition the Government for a redress of grievances."

118.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is liable at law and in equity.

119.    Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing

44

all laws and policies and overseeing elections entities in a manner that does not

severely burden the right to vote.

120.   Voters in Georgia have a liberty interest in their fundamental right to

vote.  Defendants acted to deprive voters of this right through the following

misconduct and severe burdens on the right: (a) failing to furnish counties and

precincts with sufficient tools for voting, including secure and functioning voting

machines; (b) failing to train adequately county elections officials on laws

governing elections; (c) failing to maintain an accurate and secure voter

registration list; (d) removing and preventing voter registrations under the "use it

or lose it" and "exact match" policies; and (e) failing to maintain secure and

functioning voting machines.

121.   Defendants further acted to deprive voters of their right to vote

through the following specific misconduct in training and oversight of county

elections officials, imposing severe burdens on the right to vote: (a) failing to

provide absentee ballots requested by voters; (b) delivering requested absentee

ballots to voters after the deadline for casting the ballots had passed; (c) providing

requested absentee ballots that were undeliverable to the appropriate recipient; (d)

refusing to accept delivery of absentee ballots; (e) refusing to provide provisional

ballots; (f) discouraging and preventing the use of provisional ballots; (g)

providing an insufficient number of provisional ballots to precincts; (h) creating conditions that produced unreasonably and avoidably long waits to vote at polling places; (i) providing an insufficient number of voting machines and inoperable voting machines to polling places; and (j) failing to provide an adequate number of paper ballots to polling places.

122.   Due to Defendants' misconduct, voters in Georgia have suffered and will continue to suffer irreparable harm—including severe burdens on the right to vote and disenfranchisement.

123.   Defendants did not narrowly draw the laws and policies at issue and have no compelling interest to justify the severe burdens on fundamental voting rights imposed by their misconduct.

124.   Unless enjoined from doing so, the Defendants' unconstitutional burden on the fundamental right to vote will continue to violate Georgians' First and Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

125.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count II

### Violation of the Ban on Racial Discrimination in Voting (Fifteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

126.    Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

127.    Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

128.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

129.    Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing all laws and policies and overseeing elections entities in a manner that does not discriminate against any Georgians based on race or color.

130.    The Fifteenth Amendment "bans racial discrimination in voting by both state and nation." *Terry v. Adams*, 345 U.S. 461, 467 (1953).  The Fifteenth Amendment is "obviously applicable" to the rights of people of color "not to be discriminated against as voters in elections to determine public governmental policies . . . ." *Id.*

131.   Voters who are members of racial minority groups have a right under the Fifteenth Amendment to participate in elections on an equal basis with voters who are not members of racial minority groups.

132.   Acting under color of state law, Defendants deprived Georgians of the right to vote—as secured by the Fifteenth Amendment—by administering an election plagued with irregularities that disproportionately affected voters of color. Defendants acted to deprive voters of this right through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish counties and precincts with sufficient tools for voting, including secure and functioning voting machines; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; (e) purging voters from voter registration rolls under the "use it or lose it" policy; and (f) failing to maintain secure and functioning voting machines.

133.   Defendants further acted to deprive voters of color of their fundamental right to vote through the following specific misconduct in oversight and training of county elections officials, which fell disproportionately on voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to be able to vote; (b) failing to timely send absentee

48

ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.

134.   The severe burdens Defendants imposed on racial minority voters' fundamental right to vote are not outweighed or justified by, or necessary to promote, a compelling state interest that cannot be accomplished by other less restrictive means.

135.   Defendants' misconduct irreparably harmed voters of color in Georgia by imposing severe burdens on their right to vote, sometimes resulting in complete disenfranchisement.

136.   Unless enjoined from doing so, Defendants' unconstitutional election administration will continue to violate Georgians' Fifteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

137.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count III

### Violation of Equal Protection (Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

138.   Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

49

139.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

140.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

141.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing all laws and policies and overseeing elections entities in a manner that provides equal protection to all Georgians.

142.   Under the Equal Protection Clause of the Fourteenth Amendment, citizens have "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Thus, "state actions in election processes must not result in 'arbitrary and disparate treatment'" of voters.  *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98, 104–05 (2000)).

143.   Voters who are members of racial minority groups have a constitutionally protected right under the Equal Protection Clause of the Fourteenth

Amendment to participate in elections on an equal basis with voters who are not members of racial minority groups.

144.   Before and during the 2018 Election, Defendants treated voters who are members of racial minority groups differently from similarly situated voters who are not members of racial minority groups.

145.   Acting under color of state law, Defendants deprived Georgians of the right to vote on an equal basis, as secured by the Equal Protection Clause, by administering an election plagued with irregularities that disproportionately affected voters of color.  Defendants acted to deprive voters of this right through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish sufficient tools for voting to counties and precincts, including secure and functioning voting machines; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; (e) purging voters from voter registration rolls under the "use it or lose it" policy; and (e) failing to maintain secure and functioning voting machines.

146.   Defendants further acted to deprive voters of color of their fundamental right to vote through the following specific misconduct in oversight

and training of county elections officials, which disproportionately affected voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to vote; (b) failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.

147.   The differential treatment of voters who are members of racial minority groups compared to the treatment of similarly-situated voters who are not members of racial minority groups imposed severe burdens on the fundamental right to vote of the former group.

148.   The severe burdens Defendants imposed on racial minority voters' fundamental right to vote is not outweighed or justified by, or necessary to promote, a compelling state interest that cannot be accomplished by other less restrictive means.

149.   Defendants' misconduct irreparably harmed voters of color in Georgia by imposing severe burdens on their right to vote, sometimes resulting in complete disenfranchisement.

150.   Having different standards for administering elections or for counting ballots in different counties violates the Equal Protection Clause.  As the Supreme Court has recognized, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government."  *Bush v. Gore*, 531 U.S. 98, 107 (2000) (internal quotation marks omitted).  Defendants facilitated and permitted different elections systems in different counties in Georgia, and will continue to do so.

151.   Unless enjoined from doing so, Defendants' unconstitutional election administration will continue to violate Georgians' Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

152.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count IV

### Violation of Procedural Due Process (Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

153.   Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

154.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . . without due process of law."  This due process principle protects the fundamental right to vote.

53

155.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

156.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing all laws and policies and overseeing elections entities in a manner that complies with the constitutional requirements of procedural due process.

157.   Defendants, acting under color of state law, are administering an election process that Plaintiffs estimate deprives hundreds of thousands of voters in Georgia of their liberty interest in voting by purging their already existing voter registrations under the State's "use it or lose it" policy without constitutionally adequate pre- and post-deprivation process.  Georgia's process fails to provide sufficient and meaningful notice of actions and decisions affecting registration status, casting, and counting of ballots and fails to provide adequate or timely process for Georgia citizens to challenge such actions and decisions.  This failure creates an unreasonably high risk that Georgians will be erroneously denied the right to vote.  The "use it or lose it" policy has frustrated Plaintiffs' efforts to ensure that registered voters are able to vote and have their votes counted, and by

54

doing so violates voters' right to procedural Due Process under the Fourteenth Amendment to the U.S. Constitution.

158.   As a result, voters in Georgia have suffered and will continue to suffer irreparable harm—disenfranchisement.

159.   Unless enjoined from doing so, the Defendants' unconstitutional "use it or lose it" policy will continue to violate Georgians' Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

160.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count V

### Violation of Section 2 of the Voting Rights Act of 1965

161.   Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

162.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established, inter alia, if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by" citizens in a protected class in that they "have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

163.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing all laws and policies and overseeing elections entities in a manner that complies with the Voting Rights Act.

164.   The totality of the circumstances alleged herein establishes that the Defendants' administration of the election denied voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  This deprivation of the right to vote based on status as a member of a racial minority group has caused and will continue to cause irreparable harm—disenfranchisement.

165.   Unless enjoined from doing so, Defendants' unconstitutional election administration will continue to violate Section 2 of the Voting Rights Act and inflict injuries for which voters have no adequate remedy at law.

166.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these violations of Section 2 of the Voting Rights Act.

**Count VI**

**Violation of the Help America Vote Act of 2002**

167.   Plaintiffs hereby incorporate by reference paragraphs 1 through 114.

168.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by promulgating, adopting, and enforcing all laws and policies and overseeing elections entities in a manner that complies with HAVA.

169.   Section 301 of HAVA requires states or other jurisdictions to maintain voting systems capable of producing a permanent paper record that can be audited. 52 U.S.C. § 21081(a)(2)(B)(i).

170.   Defendants violated Section 301 of HAVA by: (a) deploying voting machines that produce no paper record when votes are cast; and (b) deploying voting machines that cannot be audited because they fail to produce a paper record when votes are cast.

171.   Section 302 of HAVA requires states to provide a provisional ballot to any person not on the voter registration list or whom an elections official determines is ineligible to vote.  *Id.* § 21082(a).  Section 302 of HAVA also requires states to provide a voter with information on how to check whether his or her provisional ballot has been counted.  *Id.* § 21082(a)(5).  Section 302 of HAVA

further provides that states must count a provisional ballot if the voter is eligible to vote. *Id.* § 21082(a)(4).

172.   Defendants violated Section 302 of HAVA by: (a) failing to ensure that elections officials provided accurate information about provisional ballots; (b) failing to ensure that elections officials permitted people to cast provisional ballots; (c) failing to ensure that precincts had a sufficient number of provisional ballots for voters; and (d) failing to count otherwise valid provisional ballots.

173.   Section 303 of HAVA requires states to maintain a centralized, uniform, accurate, and interactive statewide voter registration list that contains the name and registration of every legally registered voter in the state. *Id.* § 21083(a)(1)(A).  Section 303 of HAVA also requires the state to ensure that records are accurate and updated regularly and that the statewide voter registration list is secure enough to prevent unauthorized access to the list. *Id.* § 21083(a)(2).

174.   Defendants violated Section 303 of HAVA by failing to maintain a functioning, accurate, and secure statewide voter registration list. *Id.* § 21083.

175.   Unless enjoined from doing so, Defendants' election administration will continue to violate HAVA and inflict injuries for which voters have no adequate remedy at law.

176.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these violations of HAVA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

1. Declaring that Georgia's current elections process violates Georgians' fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution;

2. Declaring that Georgia's current elections process violates the ban on racial discrimination in voting under the Fifteenth Amendment to the U.S. Constitution;

3. Declaring that Georgia's current elections process violates Georgians' right to Equal Protection under the Fourteenth Amendment to the U.S. Constitution;

4. Declaring that Georgia's "use it or lose it" policy violates Georgians' procedural Due Process rights under the Fourteenth Amendment to the U.S. Constitution;

5. Declaring that Georgia's current elections process violates § 2 of the Voting Rights Act, 52 U.S.C. § 10301;

6. Declaring that this Court will retain jurisdiction pursuant to § 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), for such period as it may deem appropriate.  During such period no voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until this Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color;

7. Declaring that Defendants, in violation of the Help America Vote Act, failed to use secure, auditable voting machines; failed to ensure proper administration of provisional ballots; and failed to maintain a functioning, accurate, and secure statewide voter registration list;

8. Permanently enjoining Defendants from using the "use it or lose it" policy described above and to reinstate all Georgia voters who were removed from the voter registration list based on this unconstitutional policy, unless the person is ineligible to vote for a different, constitutional reason based on Georgia law;

9.  Permanently enjoining Defendants from using the "exact match" policy

    described above and to register all Georgia voters whose registrations were

    not completed based on this unconstitutional policy;

10. Permanently enjoining Defendants from using the insecure and unreliable

    DRE voting machines that lack a paper trail, and replace DRE voting

    machines with paper ballots counted by optical scanners;

11. Permanently enjoining Defendants to oversee adequately elections by

    promulgating, adopting, and enforcing uniform standards and processes that:

    a.  Ensure that counties accurately, timely, and securely process all voter

        registration requests consistent with Georgia and federal law

        governing voter registration;

    b.  Ensure Georgia's voter registration list is administered in accordance

        with the Help America Vote Act, including by maintaining a

        functioning, accurate, and secure voter registration website where

        people can check their registration status, precinct, and ballot status;

    c.  Document each person whom elections officials or poll workers

        determine will not be given a ballot, the reason for the determination,

        and the person who made the determination;

d.  Ensure that counties accurately and timely process all absentee ballot requests consistent with Georgia and federal law governing absentee ballots;

e.  Ensure each county has and deploys to each polling place for any election day an adequate and reasonable number of functioning and secure voting machines, including Express Polls; an adequate and reasonable number of paper ballots and provisional ballots; an adequate and reasonable amount of signage, including signage explaining voters' rights; and all other materials or tools necessary for voting;

f.  Ensure each precinct and county has enough ballot-casting stations to service adequately the number of voters assigned to the precinct, such that no voter will wait longer than 30 minutes to vote;

g.  Ensure all registered voters in a precinct can vote without unreasonable delay or hardship during any election;

h.  Ensure each county timely recruits and hires an adequate number of elections officials and poll workers before each election to ensure proper staffing on any election day;

i. Provide for the timely and systematic training, based on comprehensive statewide curriculum, of elections officials and poll workers before every election;

j. Ensure each county has adequate materials, training, and support for all elections officials and poll workers to fairly and reasonably administer elections in accordance with Georgia and federal law;

k. Ensure timely, adequate, and meaningful processes before Georgians are deprived of the right to vote, and timely, adequate, and meaningful processes for Georgians to remedy erroneous deprivations of the right to vote, including for voter registration, voter eligibility, and provisional ballot casting;

l. Establish and maintain requirements and processes for periodic reports from county boards of elections and audits of county boards of elections' activities to ensure that the foregoing standards, processes, and requirements are adhered to and that each county has adequate procedures, policies, and staff in place to ensure efficient, just, and fair elections; and

m. Provide such periodic reports and audits to be made public at or about the same time that they are received by the Defendants, including at

regular intervals during any election day, to allow voters and the

public access to information about voting problems with sufficient

time to seek redress about those problems in court;

12. Permanently enjoining Defendants to ensure each county conducts efficient, just, and fair elections;

13. Awarding Plaintiffs their reasonable attorneys' fees and costs in bringing this action; and

14. Providing such other and further relief as the Court may deem just and proper.

Respectfully submitted,

November 27, 2018                By: _____

Allegra Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogan (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
Allegra.Lawrence-Hardy@lawrencebundy.com
Leslie.Bryan@lawrencebundy.com
Maia.Cogen@lawrencebundy.com

Thomas R. Bundy (*Pro hac vice* to be sought)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Blvd.
Suite 350
Fulton, MD 20789
Telephone: 240-786-4998
Fax: (240) 786-4501
Thomas.Bundy@lawrencebundy.com

Dara Lindenbaum (*Pro hac vice* to be sought)
**SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, N.E.
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
kurt@summervillefirm.com

Matthew G. Kaiser (*Pro hac vice* to be sought)
Sarah R. Fink (*Pro hac vice* to be sought)
**KAISERDILLON LLP**
1099 14th Street, NW
8th Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com

Andrew D. Herman (*Pro hac vice* to be sought)
Sarah Dowd (*Pro hac vice* to be sought)
**MILLER & CHEVALIER CHARTERED**
900 16th St. NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
sdowd@milchev.com

Kali Bracey (*Pro hac vice* to be sought)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
KBracey@jenner.com

*Counsel for Fair Fight Action and Care in Action*