# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, INC; CARE IN
ACTION, INC; EBENEZER BAPTIST
CHURCH OF ATLANTA, GEORGIA,
INC.; BACONTON MISSIONARY
BAPTIST CHURCH, INC; VIRGINIA-
HIGHLAND CHURCH, INC.; and THE
SIXTH EPISCOPAL DISTRICT, INC.,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of the State of
Georgia and as Chair of the State Election
Board of Georgia; REBECCA N.
SULLIVAN, DAVID J. WORLEY, and
SETH HARP, in their official capacities as
members of the STATE ELECTION
BOARD; and STATE ELECTION
BOARD,

    *Defendants*.

Civ. Act. No. 1:18-cv-05391-SCJ
Jury Trial Demanded

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

PARTIES, JURISDICTION, AND VENUE ........................................... 2

FACTUAL ALLEGATIONS ............................................................... 17

  I.  Defendants Are Responsible for Georgia's Election System. ...................... 23

  II. Defendants Disenfranchise Voters. ................................................... 28

    A. "Use It or Lose It" Statute: The Secretary of State Purges Georgians From the Rolls of Registered Voters. ......................................................... 28

    B. "Exact Match" Policy: The Secretary of State Prevents Georgians From Registering to Vote. ..................................................................... 33

    C. Defendants Use Election Technology That Is Vulnerable to Hacking and Manipulation. ........................................................................... 38

    D. Defendants Oversee an Election System Dependent on Unreliable Voting Machines. ................................................................................ 40

    E. Defendants Promote Moving and Closing Precincts and Polling Places....42

    F. The Secretary of State Maintains Inaccurate Voter Registration Rolls. .....43

    G. The Secretary of State Does Not Provide Adequate Resources to Polling Places...................................................................................48

    H. Defendants Inadequately Oversee and Train Elections Officials on Provisional Ballots. ..................................................................... 51

    I.  Defendants Inadequately Oversee Absentee Ballots and Inadequately Train and Advise Elections Officials about Them. ................................... 55

CLAIMS FOR RELIEF ..............................................................................62

  Count I: Violation of the Fundamental Right to Vote ..........................................62

  Count II: Violation of the Ban on Racial Discrimination in Voting ..................65

  Count III: Violation of Equal Protection ............................................................68

  Count IV: Violation of Procedural Due Process..................................................73

  Count V: Violation of Section 2 of the Voting Rights Act of 1965 ...................75

  Count VI: Violation of the Help America Vote Act of 2002  ............................83

PRAYER FOR RELIEF ...........................................................................85

# INTRODUCTION[1]

1.      Without the right to vote, all other democratic rights are illusory.  Fair elections ensure the consent of the governed; they are the moral foundation of the compact between the government and its citizens.

2.      In the 2018 General Election (the "2018 Election"), Georgia's elections officials broke that compact.  The Secretary of State, the State Election Board, and its members ("Defendants") enforced unconstitutional and otherwise unlawful legislation, created and enforced unconstitutional and otherwise unlawful policies, and engaged in gross mismanagement that resulted in an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote.  This Amended Complaint describes the serious and unconstitutional flaws in Georgia's elections process—flaws that persist today.

3.      The resulting elections process violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution; Section 2 of the Voting

---

[1] Plaintiffs, pursuant to Fed. R. Civ. P. 15(a)(1)(B), hereby amend their Complaint as a matter of right to add as Plaintiffs Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.; to supplement the previous allegations; and to respond to the Defendants' Motion to Dismiss (as encouraged by the Advisory Committee Notes to the 2009 Amendments to Rule 15).

Error! Unknown document property name.

Rights Act, 52 U.S.C. § 10301; and Sections 301–303 of the Help America Vote Act of 2002, 52 U.S.C. §§ 21081–21083.

4.      The responsibility for ensuring access to the ballot is a bipartisan responsibility—and one that, if ignored, will harm our democracy.  Without judicial relief the violations detailed in this Amended Complaint will continue and taint the outcome of future elections in Georgia, including the primary and general elections in 2020.

## PARTIES, JURISDICTION, AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States of America.

6.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a) and 42 U.S.C. §§ 1983, 1988(a) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution; Section 2 of the Voting Rights Act, 52 U.S.C. § 10301; and Sections 301–303 of the Help America Vote Act of 2002, 52 U.S.C. §§ 21081–21083.

7.      This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because defendant Brad Raffensperger is a resident of this district.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

10.     Plaintiff Fair Fight Action, Inc. ("Fair Fight Action"), formerly known as Voter Access Institute, is an Internal Revenue Code § 501(c)(4) non-profit entity organized under the laws of Georgia.  Fair Fight Action's core mission is to secure the voting rights of Georgians.  The unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Amended Complaint thwart Fair Fight Action's mission and will continue to do so in the future.

11.     When it was known as Voter Access Institute, the organization conducted a large vote-by-mail program; provided voters with information about upcoming elections (e.g., how and where to vote, polling place hours and locations, ballot information, and voter registration deadlines); and engaged in a get-out-the-vote program during early voting and on election day.  Fair Fight Action also engages with and advocates for Georgians on other issues, including health care.

12.     Fair Fight Action's past voter-related efforts were focused on getting-out-the-vote activities and providing voters with general information about

upcoming elections and voter registration.  Those efforts were not focused on

educating voters about how to overcome the voter suppression efforts described in

this Amended Complaint and did not entail efforts to reform the election system.

While Fair Fight Action plans to continue its past work, Fair Fight Action will also

implement new education programs and engage in election reform efforts that are

focused specifically on counteracting problems voters encountered in the 2018

Election as a result of the unconstitutional and otherwise unlawful legislation,

policies, and actions alleged in this Amended Complaint.  Fair Fight Action's new

activities are in direct response to the voter suppression that occurred in connection

with the 2018 Election.

13.    Engaging in these new activities to counteract the voting impediments

alleged in this Amended Complaint will require Fair Fight Action to expend

additional resources diverted from its other programs, such as getting-out-the vote

drives and providing voters with general information on upcoming elections.  This

diversion of resources is necessitated by and directly traceable to Defendants'

misconduct described in this Amended Complaint.  If, however, the relief

requested in this Amended Complaint is granted, that relief will redress Fair Fight

Action's injuries.

14.     Plaintiff Care in Action, Inc. is an Internal Revenue Code § 501(c)(4) non-profit entity organized under the laws of Delaware.  Care in Action is dedicated to fighting for dignity and fairness for the millions of domestic workers in the United States.  Care in Action works on a number of issues, including immigration, sexual harassment, and human trafficking.  Its activities have included organizing and training domestic workers, as well as direct service work (e.g., providing food to a refugee camp).

15.     To further its mission of securing fairness and dignity for domestic workers, Care in Action encourages domestic workers to vote so that they have a voice in the issues that affect them.  During the campaign for the 2018 Election, Care in Action provided voters with basic information about the election, including the date of election day.  Care in Action also conducted significant advocacy and outreach activities to ensure that domestic workers and others could be well-informed when casting their ballots.  Care in Action registered with the Georgia Government Transparency and Campaign Finance Commission as an independent committee due to the portion of its activities that consisted of independent expenditures in support of several statewide and legislative candidates in the 2018 Election.

16.     The unlawful legislation, policies, and misconduct alleged in this Amended Complaint with respect to the 2018 Election thwarted Care in Action's mission by burdening domestic workers' right to vote.

17.     Care in Action dedicated significant resources to counteracting the voter suppression that occurred during the 2018 Election.  For example, Care in Action contacted voters who cast provisional ballots to ensure that they took the steps required to cause the State to count their ballots.  Multiple national Care in Action staff—who lived outside of Georgia but had been in the State to help with election efforts—stayed in Georgia for weeks after the election.  These were not people who regularly worked on voting rights issues.  They included Care in Action's Digital Director, as well as a person who regularly worked on immigration.  The usual work these Care in Action employees were supposed to be doing during this time went undone.

18.     As a result of Care in Action's experience with Georgia's 2018 Election—during which domestic workers were disenfranchised—the organization has now shifted its budget priorities and added more staff to address voting rights. Care in Action will provide education and assistance to voters so that Defendants' wrongdoing does not prevent those voters from voting and having their votes counted.  To carry out these efforts, the organization has diverted, and will

continue to divert, resources from its efforts with respect to other core issues,

including a federal domestic workers bill of rights, immigration, sexual

harassment, and human trafficking, and has sacrificed non-voting rights work it

had hoped to do in the future.

19.     Because the unlawful legislation, policies, and misconduct alleged in

this Amended Complaint are ongoing and will continue unless this Court grants the

relief Plaintiffs are requesting, Care in Action will have to continue diverting

resources in the future to counteract that voter suppression in upcoming Georgia

elections.

20.     Care in Action's above-described diversion of resources is

necessitated by and directly traceable to Defendants' enforcement of

unconstitutional legislation and policies and to Defendants' other misconduct

alleged in this Amended Complaint, and Care in Action's injuries will be redressed

by the relief requested herein.

21.     Plaintiff Ebenezer Baptist Church of Atlanta, Georgia, Inc.

("Ebenezer"), is an Internal Revenue Code § 501(c)(3) non-profit entity organized

under the laws of Georgia.  Ebenezer is a 6,000-member church that has long-

served Atlanta's African American community and has been at the forefront of the

Civil Rights Movement.  Its purpose is to be a global ministry dedicated to

7

individual growth and social transformation through living in the message and carrying out the mission of Jesus Christ.  The church believes that the test of a congregation's spiritual health and the relevance of its ministry is their effect on the community.

22.     Voting rights are at the core of Ebenezer's work for social transformation; without a voice, people cannot speak.  Ebenezer has been engaged in the fight for voting rights since at least 1935, when its then head pastor, Martin Luther King, Sr., led a voting rights campaign in Atlanta, Georgia.  Since 1935, Ebenezer's pastors, leadership, and congregation have been active in efforts to educate and empower its congregants and community.  In alignment with its mission of social transformation, Ebenezer regularly sponsors voter registration drives and activities, partners with community organizations to raise awareness regarding voting, provides information and education to the community about voting, and provides community members with rides to voting locations.  The unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Amended Complaint thwart Ebenezer's mission and will continue to do so in the future, unless redressed.

23.     In addition to the more generalized voter awareness and registration efforts described in the preceding paragraph, Ebenezer has undertaken work to

8

counteract voter suppression.  Prior to the 2018 Election cycle, Ebenezer urged people to vote early so that they would have time to try to remedy any impediments to voting caused by voter suppression tactics.  In connection with the 2018 Election, however, the church's concerns about voter suppression and the integrity of the elections system were heightened due to the extent of the voter suppression tactics being employed to prevent people from voting at their polling places and due to the publicity about the lack of security surrounding the DRE system and its failure to produce an auditable and verifiable paper trail.  To counteract these problems—problems alleged in this Amended Complaint— Ebenezer engaged in an extensive vote-by-mail campaign.  This new campaign required significant time and effort:  all of the Ebenezer ministers on staff were involved in some aspect of it, as was the church's administrative staff.  Church space and volunteers were also dedicated to this campaign.  To expend the resources necessary to carry out this campaign, Ebenezer had to divert resources, including personnel and time, from its other ministries and activities.  As long as the wrongful conduct alleged in this Amended Complaint continues in future election cycles, Ebenezer will continue to divert resources to counteracting it.  In fact, Ebenezer expects to undertake additional activities in future election cycles to counteract the wrongdoing alleged in the Amended Complaint.  To carry out these

activities, Ebenezer will be required to divert resources from its other church activities.

24.     Ebenezer's past and future diversion of resources to counteract the wrongdoing alleged in the Amended Complaint has been, and will in the future be, necessitated by and directly traceable to Defendants' misconduct.  If, however, the relief requested in this Amended Complaint is granted, that relief will redress Ebenezer's injuries.

25.     Plaintiff Baconton Missionary Baptist Church, Inc. ("BMBC") is a Christian church, established and existing as a non-profit religious corporation under the laws of the State of Georgia.  BMBC is dedicated to building a biblically-based community of loving relationships where members love, follow, and model Jesus on a daily basis.  BMBC considers voting an integral part of its community building mission. Thus, during past election cycles, including during the 2018 Election, BMBC's civic activities have included various voter engagement activities, including voter registration drives, voter education efforts, and weekly prayer meetings for Georgia candidates running for office.

26.     The unconstitutional legislation, policies, and conduct alleged in this Amended Complaint frustrated BMBC's community-building mission and will continue to do so in the future. Leading up to the 2018 Election, BMBC's head

pastor learned of the purges of registered voters from Georgia's voter registration rolls pursuant to the "use it or lose it" statute described in this Amended Complaint.  In response to learning of those purges, BMBC diverted time of its church volunteers and church resources to assist church and community members determine whether they had been purged from the voter rolls.  In future election cycles, BMBC will continue to dedicate resources to counteract the conduct alleged in this Amended Complaint.  In the absence of Defendants' misconduct, BMBC, a religious organization with limited resources, would be able to use those resources on other church activities.

27.    BMBC's above-described diversion of resources was, and will continue to be, necessitated by and directly traceable to Defendants' enforcement of unconstitutional legislation and policies, and to Defendants' other misconduct alleged in this Amended Complaint, and BMBC's injuries will be redressed by the relief requested herein.

28.    Plaintiff Virginia-Highland Church, Inc. ("Virginia-Highland") is an Internal Revenue Code § 501(c)(3) non-profit corporation and Atlanta church that was established in 1923.  The church's mission is to "do justice, love mercy, and walk humbly." Since its inception, Virginia-Highland has focused on inclusivity and has championed social justice for marginalized members of society.  Virginia-

11

Highland views voting rights as being at the heart of inclusivity and social justice issues.  In the past, Virginia-Highland has encouraged people to vote.  Its efforts have included voter registration for the congregation and wider church community, training congregants to help others register to vote, voter engagement efforts, generally, and assisting with election day transport.  Those previous efforts were not focused on educating voters about how to overcome the voter suppression described in this Amended Complaint.

29.     The racial dynamics and disparities that were evident during the 2018 Election cycle are contrary to Virginia-Highland's mission and spurred the church to action.  For future elections, and in direct response to the voter suppression the church saw in the 2018 Election, Virginia-Highland will create programs specifically geared towards educating voters on how to overcome the obstacles, alleged in this Amended Complaint, to voter registration and to having votes counted.

30.     For Virginia-Highland to provide those programs, Virginia-Highland will have to divert to them church resources that otherwise would have been dedicated to other church ministries and activities.  This diversion of resources will be necessitated by and directly traceable to Defendants' misconduct described in

this Amended Complaint.  If the relief requested in this Amended Complaint is granted, that relief will redress Virginia-Highland's injuries.

31.     Plaintiff The Sixth Episcopal District, Inc. (d/b/a the "Sixth Episcopal District of the African Methodist Episcopal Church" or the "Sixth District A.M.E."), is a collective group of twelve church districts representing 534 Georgia African Methodist Episcopal ("A.M.E.") churches. It is incorporated pursuant to the laws of the State of Georgia and is an Internal Revenue Code § 501(c)(3) non-profit entity.  Sixth District A.M.E. principles are in keeping with the A.M.E. Church motto, "God Our Father, Christ Our Redeemer, Man Our brother," and place a high value on social service.  As such, Sixth District A.M.E.'s mission priorities are "church growth, Christian education, handling money God's way, and social justice."

32.     Voting rights are of great current and historical importance to Sixth District A.M.E.'s social justice mission.  Sixth District A.M.E. churches grew, in large part, through missionary efforts to newly-freed slaves in Georgia during the post-Civil War Reconstruction Era.  Many Sixth District A.M.E. member-churches played an important role during the Civil Rights movement, with church buildings hosting mass meetings for Civil Rights leaders.  Sixth District A.M.E. leadership has addressed election priorities within its largely African American churches and

communities as part of its social justice initiative, encouraging voter registration at all congregations, and providing funding for transportation to the polls on Election Day.  The voter suppression tactics alleged in the Amended Complaint frustrated Sixth District A.M.E.'s mission of working for social justice.

33.     In connection with the 2018 election, Sixth District A.M.E. leadership undertook district-wide voter education and empowerment efforts.  Bishop Reginald Jackson traveled to most of the twelve Georgia districts asking church elders to encourage congregants to vote early and by mail and emphasizing the importance of voting and understanding candidates' positions on the issues.  Also in connection with the 2018 election, Sixth District A.M.E. leadership urged church leadership to speak to their congregations about the many sacrifices made to secure the vote for African Americans and to encourage congregants to educate themselves on 2018 election matters and to vote.  To further effect its mission in connection with the 2018 election, Sixth District A.M.E. also registered voters within its member churches and local communities, assisted with voter registration record verification, encouraged congregants to vote (and to encourage others to do the same), and coordinated efforts to deliver voters to the polls on Election Day.

34.     These previous efforts were issue-driven and to encourage voting. They were not focused on educating voters about how to overcome the voter

14

suppression described in this Amended Complaint.  While Sixth District A.M.E. plans to continue its past "Souls to the Polls" work, the voter suppression tactics that it saw in the 2018 election have led it believe that it needs to spend additional resources specifically to counteract voter suppression.  In the future, and among other things, the Sixth District A.M.E. will not only emphasize the importance of voting by mail but will also follow-up with congregants to ensure that they were able to vote and that their ballots have actually been counted.

36.    For Sixth District A.M.E. to undertake the additional efforts to verify that its congregants have voted and that their ballots were counted, the District will have to divert resources that otherwise would have been dedicated to ministries and programs, including those for food banks and homeless shelters, across 534 Georgia churches.  This diversion of resources will be necessitated by and directly traceable to Defendants' misconduct described in this Amended Complaint.  If the relief requested in this Amended Complaint is granted, that relief will redress Sixth District A.M.E.'s injuries.

36.    Brad Raffensperger is Georgia's Secretary of State and is named solely in his official capacity.  The Secretary of State is the constitutional officer serving as Georgia's chief official who oversees and administers elections. O.C.G.A. § 21-2-50.  The Secretary of State is also the chairperson of the State

Election Board.  O.C.G.A. § 21-2-30(d).  As the chief elections officer designated

under the Help America Vote Act of 2002 ("HAVA"), the Secretary of State is also

responsible for coordinating the obligations of the state under HAVA.  O.C.G.A. §

21-2-50.2.

 37. Defendant State Election Board of Georgia is responsible for, inter

alia, (1) promulgating rules and regulations to "obtain uniformity" in the practices

and proceedings of elections officials, "as well as the legality and purity in all . . .

elections"; (2) formulating, adopting, and promulgating rules and regulations

"conducive to the fair, legal, and orderly conduct of primaries and elections"; (3)

promulgating rules and regulations to "define uniform and nondiscriminatory

standards concerning what constitutes a vote and what will be counted as a vote";

and (4) investigating frauds and irregularities in elections.  *See* O.C.G.A. § 21-2-

31.

 38. Defendants Rebecca N. Sullivan, David J. Worley, and Seth Harp are

members of the State Election Board of Georgia and are named solely in their

official capacity.  As members of the State Election Board, their responsibilities

include: (1) promulgating rules and regulations to "obtain uniformity" in the

practices and proceedings of elections officials, "as well as the legality and purity

in all . . . elections"; (2) formulating, adopting, and promulgating rules and

16

regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; (3) promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote"; and (4) investigating frauds and irregularities in elections. *See* O.C.G.A. § 21-2-31.

## FACTUAL ALLEGATIONS

39.     Georgia has a history of neglecting its elections infrastructure and suppressing votes—particularly those of people of color.

40.     Many long-standing barriers to voting were halted by the Voting Rights Act of 1965, 52 U.S.C. §§ 10101-10702.  But, after *Shelby County v. Holder*, 570 U.S. 529 (2013), removed the Act's preclearance requirement for voting changes,[2] Georgia began again to erect discriminatory voting barriers reminiscent of the Jim Crow era.

41.     The U.S. Commission on Civil Rights, a bipartisan, independent agency, found that, among the states previously subject to preclearance under the

---

[2] Before the Supreme Court's decision in *Shelby County*, Georgia needed "preclearance" from the United States Department of Justice to implement changes in its elections, such as the location of a polling place, to prevent the state from implementing policies that discriminate against voters of color.  *Shelby County* struck down that preclearance requirement.

Voting Rights Act, Georgia was the only state that had implemented voting restrictions in every category the Commission examined: strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

42.     The Secretary of State is Georgia's chief official who oversees and administers elections; the Secretary also serves as Georgia's chief architect of these voting barriers.[3]

43.     The 2018 election cycle drew historic voter registration and turnout, particularly among voters of color.  Almost four million people voted, including hundreds of thousands of voters of color for the first time.  This voter turnout was more than that for any previous midterm election in Georgia history—and would have been even greater but for the unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Amended Complaint.  The rise in turnout cannot be allowed to mask a more troubling trend of voter suppression.

---

[3] Brian Kemp, Georgia's new Governor, served as Secretary of State from early 2010 (shortly before the preclearance requirements under the Voting Rights Act were eliminated) until two days after the November 6, 2018, gubernatorial election that he administered and oversaw.

44.     Decades-long neglect of the Georgia elections infrastructure left the voting system virtually guaranteed to fail.  Time-tested voter suppression tactics further burdened the right to vote:  voters faced an unconstitutional statute whose arbitrary enforcement purged thousands of voters from the voter registration rolls; an "exact match" policy that prevented voters from registering to vote; the systematic disregard for established rules and requirements, including those for absentee and provisional ballots; the failure to provide polling places with resources adequate to enable a fair voting process; and other policies and practices that stymied Georgians trying to exercise their right to vote.  In isolation, each example is troubling because it represents a voter who could not fully participate in this democracy.  Combined, they represent the disenfranchisement of Georgia voters in general, and targeted communities of color or low-income neighborhoods in particular.

45.     In 1997, Georgia enacted legislation (the "use it or lose it" statute) requiring Georgia citizens to be purged from the voter registration rolls based in large measure on whether they decided to vote in certain time frames.  O.C.G.A. § 21-2-234.  In 2017 alone, the Secretary of State used this unconstitutional statute to purge the voter rolls of nearly ten percent of Georgia's registered voters.

46.     Many Georgians worked tirelessly to register new voters.  In response to these voter registration efforts, then-Secretary of State Kemp adopted an extreme interpretation of the statute requiring a "match" between the information on a voter registration form and other government records, implementing a policy requiring the match to be exact.  Under the "exact match" policy, inconsequential typographical mismatches were used to deny Georgians their right to vote.  These mismatches were often caused by technical limitations on government computer systems or typographical errors by government employees.  Before a federal court halted the practice, the "exact match" policy suspended tens of thousands of new voter registrations.

47.     Georgia elections officials deployed a known strategy of voter suppression: closing and relocating polling places.  Over the past few years, elections officials closed or moved approximately 305 polling places, many in neighborhoods with numerous voters of color.  Fewer polling places meant that the remaining locations strained to accommodate an influx of voters.  Yet elections officials failed to supply sufficient, functioning voting machines (both DRE and Express Polls), and enough provisional ballots.  Depriving polling places of basic tools needed for voting meant that voters who arrived at polling places anxious and excited to express their patriotism through the basic, fundamental act of voting

20

were met with hours-long lines.  Some lines were four hours long.  Georgians who could not wait—because of disability, health, or work or family obligations—effectively lost the right to vote.

48.    Voters who managed to reach their polling places and endure the wait to reach a poll worker then faced an increased chance that they would not be found on the voter rolls.  A voter who is registered to vote at a precinct but cannot be confirmed by a poll worker can vote by provisional ballot.  Yet the provisional ballot process failed.

49.    Georgia law requires elections officials to provide a provisional ballot to any voter whose registration cannot be confirmed, but many poll workers either did not understand the requirement or simply refused to comply.  In other locations, particularly high-turnout precincts for voters of color, precincts ran out of provisional ballots.  Without access to provisional ballots, many voters lost their right to vote entirely.

50.    Absentee ballots fared no better.[4]  Thousands of Georgians who cast absentee ballots—one way to avoid long lines and other voting place problems—

---

[4] Georgia law describes in-person voters at early voting locations as absentee voters.  Because this description is different from how the terms are commonly used, this Amended Complaint uses "absentee voting" to describe traditional mail-in absentee voting only.

experienced significant impediments.  Some voters who applied for an absentee ballot never received one; some received a ballot too late to ensure that it would be counted; and some had their applications or ballots illegally rejected.  Elections officials also misinformed voters about whether absentee ballots had been accepted, preventing potential absentee voters from curing purported deficiencies in their ballots.

51.    Further, Defendants knowingly left Georgia's voting infrastructure vulnerable to hacking.  Georgia maintains one of the least secure elections systems in the country.  Despite being aware of these well-publicized vulnerabilities for years, the Secretary of State and State Election Board rejected and rebuffed attempts, including by the federal Department of Homeland Security, to improve the data security of the Georgia database of voters.

52.    These problems in Georgia's voting system are pervasive, severe, chronic, and persistent.  Their foreseeable, cumulative effect is to disenfranchise Georgia voters or severely burden their right to vote, with voters of color being particularly targeted and affected.  Georgia voters will continue to be disenfranchised or have their voting rights severely burdened unless this Court grants the relief requested in this Amended Complaint.

## I.     Defendants Are Responsible for Georgia's Election System.

53.     Georgia's election system is administered at the state-level and directed by the Secretary of State and the State Election Board.  The Secretary of State is the chief elections officer in Georgia.  O.C.G.A. § 21-2-50.  The State Election Board is responsible for ensuring uniform election processes across the state.  O.C.G.A. § 21-2-31.  The Secretary of State chairs the State Election Board, which has four additional members.  O.C.G.A. § 21-2-30(a).

54.     The Secretary of State and the State Election Board are responsible for the election system as a whole, a responsibility that includes promoting and supporting accurate, fair, open, and secure elections; implementing election laws, regulations, and policies that are consistent with Georgia law and the constitutional rights of the voters of Georgia; and ensuring consistency across counties to guard the rights of Georgians.

55.     The "Elections" page of the Secretary of State's website describes the Secretary's broad authority over elections: "The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including

voter registration, municipal, state, county, and federal elections. . . .  They are also accountable for investigating election fraud and enforcing state election laws."[5]

56.    The Secretary of State is responsible for maintaining the official list of registered voters, O.C.G.A. § 21-2-50(a)(14), and is the designated state official for ensuring compliance with the Help America Vote Act of 2002, 52 U.S.C. §§ 20901 *et seq.  See* O.C.G.A. § 20-2-50.2.

57.    The Secretary of State is also responsible for preparing ballots, election forms, and other materials to distribute across the state, and for training county elections officials, including registrars and superintendents.  O.C.G.A. § 21-2-50(a)(5), (11).

58.    Voting machines are "supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State." Ga. Comp. R. & Regs 183-1-12-.01, .02, .07.

59.    The Secretary of State is also responsible for tabulating the consolidated election returns from Georgia's counties, for directing county election superintendents to conduct vote recounts, and for certifying the vote total for federal and state offices, among other offices.  *See* O.C.G.A. §§ 21-2-50(b), -495, -

---

[5] Ga. Sec'y of State, *Elections*, http://sos.ga.gov/index.php/elections (last visited February 4, 2019).

499; Ga. Comp. R. & Regs. 590-1-1-.01, .02.  This District recently explained that the Secretary has robust supervision of the counties when certifying elections: "[t]he certification process required of the Secretary of State under Georgia law, on its face, is more than a mere rubber stamp.  It requires that Secretary of State to engage in the same tabulation, computation, and canvassing process undertaken by the counties as set forth in O.C.G.A. § 21-2-493 prior to final certification.  And in the event errors are discovered, the Secretary of State shall notify and direct the counties to engage in a redo." *Common Cause Ga. v. Kemp*, __ F. Supp. 3d __, No. 1:18-cv-5102-AT, 2018 WL 5915657, at *15 (N.D. Ga. Nov. 12, 2018).

60.    The Secretary of State takes an active role in how counties conduct elections.  For example, before the 2018 Election, Randolph County hired a consultant to help it determine whether polling locations should be changed.  That consultant recommended closing seven of the nine polling locations in the majority African American county before the election.  The Secretary of State's Office acknowledged that it recommended the consultant to Randolph County.  The Secretary of State had also recommended what the consultant should do:  In a presentation to Randolph County residents, the consultant, Mike Malone, displayed a slide that said, "[c]onsolidation has come highly recommended by the Secretary of State. . . ."

61.     The State Election Board, whose Chair is the Secretary of State, is responsible for "promulgating rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

62.     The State Election board is responsible for distributing "indexed copies of all primary and election laws and pertinent rules and regulations then in force." O.C.G.A. § 21-2-31(3).

63.     The State Election Board must also "formulate and conduct a voter education program concerning voting procedures for voting by absentee ballot and at the polls with particular emphasis on the proper types of identification required for voting." O.C.G.A. § 21-2-31(9).

64.     The State Election Board has broad authority to act "as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections."  O.C.G.A. § 21-2-31(10).  And, in recent testimony, the Fulton County Director of Registration and Elections, Mr. Richard Barron, testified "The State

Election Board has the -- the ultimate authority over the boards, the -- the Fulton County Board of Registration and Elections."[6]

65.     Thus, while Georgia counties have responsibility for some aspects of Georgia elections, the Secretary of State and the State Election Board have broad authority to oversee, manage, and train the counties on their duties.  And, if the counties fail in their responsibilities, the Secretary of State and the State Election Board can impose penalties.  *See* O.C.G.A. § 21-2-31(5).

66.     Indeed, a presentation by then-Secretary Kemp in 2011 details the duties of the Secretary of State and of the State Election Board.  He explained the Secretary of State is "empowered with numerous" duties and responsibilities, including "[g]enerally facilitating the operation of the State's election system by helping to train and coordinate with the various local elections officials."  "As such," the Secretary of State wrote, "local elections officials look to the Secretary of State for guidance and coordination on elections questions."  As for the State Election Board, the Secretary of State described it as "[c]reat[ing] and enforc[ing] rules regarding elections" and "[t]ak[ing] action to ensure fair, legal, and orderly conduct of primaries and elections."

---

[6] Transcript of Record at 35:14-16, *Coal. for Good Governance v. Crittenden*, No. 2018-CV-313418 (Ga. Sup. Ct. Jan. 18, 2019).

27

67.    Thus, Defendants directly administer and supervise Georgia's

elections processes and are ultimately responsible for overseeing the entire system.

## II.    Defendants Disenfranchise Voters.

68.    The unconstitutional and otherwise unlawful legislation, policies, and

other misconduct alleged in this Amended Complaint disenfranchise voters and

thwart new voter registrations, with the impact disproportionately affecting low-

income voters and voters of color.  If not enjoined, Defendants will continue to

disenfranchise Georgia voters and suppress their voting rights in the future,

including in the 2020 elections in Georgia.

### A. "Use It or Lose It" Statute: The Secretary of State Purges Georgians From the Rolls of Registered Voters.

69.    Georgia's Secretary of State is responsible for maintaining the state's

voter registration list.  Georgia law requires the Secretary of State to ascertain

regularly whether Georgia voters have moved, died, been convicted of a felony, or

been declared mentally incompetent.  *See* O.C.G.A. § § 21-2-231, -232.

70.    The statute mandates that the Secretary of State coordinate with other

state agencies and the U.S. Postal Service to obtain information the Secretary of

State uses to indicate whose names should be removed from the voter registration

rolls or whose voter registration information should be updated.  *See* O.C.G.A. §

21-2-231, -233.  On information and belief, the Secretary of State subscribes to a

28

private service that provides all change of address notifications filed with the U.S. Postal Service.

71.     Under Georgia's "use it or lose it" statute, the Secretary of State must also remove voters' names from the registration list based primarily on whether those voters voted recently.  Voters who opted not to vote in the past three years or otherwise did not contact elections officials—for example, by updating their addresses—are sent a single postcard notifying them that they may lose their right to vote.  O.C.G.A. § 21-2-234.  The postcard asks voters to confirm their current address.  If a voter fails to return the postcard, the voter's status on the registration list is changed to "inactive."  If the voter does not vote in the next two general elections, he or she will be purged from the rolls of registered voters.

72.     Then-Secretary Kemp purged hundreds of thousands of voter registrations under the "use it or lose it" statute.  Many of those purged voters had not moved, had not died, and had not been convicted of a felony.  The registration information for these voters remained accurate; the Secretary of State simply deemed them no longer eligible to vote because those voters chose not to vote in certain elections and failed, one time, to return a postcard.  As a result of the "use it or lose it" statute and the Secretary of State's purges, Georgia's voter rolls have become less accurate.

29

73.    Many Georgia voters learned they had been purged from the voter rolls only when they showed up to vote.  For example, on election day in 2018, a poll watcher at Iglesia Bautista Nueva Jerusalén polling location in Gwinnett County observed many people being told they were not on the voter rolls.  The poll watcher saw at least five voters who had previously voted at the polling location and had not moved residences, but who were no longer on the voter rolls.

74.    Georgia does not provide same-day registration for voters.  Thus, voters who learn they are purged from the rolls only when they show up to vote on election day are denied their right to vote.

75.    Purging voters from the voter rolls because of voter inactivity penalizes infrequent voters, who are disproportionately young, poor, and people of color, and voters who make a conscious choice not to vote in every election.

76.    For example, in the 2008 and 2012 elections, when President Obama headed the Democratic ticket, voter turnout among African American women was eighty percent and seventy-seven percent, respectively.  For African American men, the turnout numbers for those elections were seventy percent and sixty-six percent, respectively.  But in 2014, with the governorship and a U.S. senate seat at stake, African American voters signaled their lack of enthusiasm for the candidates by not voting, causing African American voter turnout to plummet.  In fact, in only

one Georgia county did turnout for African American women exceed sixty percent and in only fourteen other counties did that turnout exceed fifty percent. That same pattern persisted in 2016. In 2018, however, African American voter turnout surged[7], as many voters chose to engage in the political process again.

77.    The "use it or lose it" statute, as well as its enforcement by Defendants, unlawfully disenfranchise voters or severely burden their right to vote by penalizing voters based on their voting choices, providing voters inadequate notice, and failing to ameliorate the purges by offering same-day registration.

78.    Further exacerbating these harms, the "use it or lose it" statute is subject to manipulation, and has in fact been manipulated, for political benefit. For example, then-Secretary Kemp waited until before his own elections to remove hundreds of thousands of voters under the statute. In 2014, when he was running for reelection, then-Secretary Kemp purged over 250,000 people under the "use it or lose it" statute. In 2017, when he was running for governor in the upcoming 2018 Election, then-Secretary Kemp purged over 665,000 people under the "use it or lose it" statute. In a single night in July 2017, he struck over 500,000 people from the voter rolls—approximately eight percent of Georgia's registered voters.

_____

[7] *See* Ga. Sec'y of State, *Elections*, sos.ga.gov/index.php/elections/voter_registration_statistics (last visited February 4, 2019).

The *Atlanta Journal-Constitution* called it the "largest mass disenfranchisement in U.S. history."[8]  By contrast, in years when he was not running for office (2013, 2015, and 2016), then-Secretary Kemp removed fewer than 100 people cumulatively under the "use it or lose it" statute.

79.     Defendants have no compelling or substantial governmental interest for this irregular and arbitrary removal of voters from Georgia's registration rolls; nor does the "use it or lose it" statute, which results in less accurate voting rolls, serve any compelling or substantial governmental interest in maintaining the rolls.

80.     Secretary of State Raffensperger has publicly stated that he will continue removing voter registrations under the "use it or lose it" statute.

81.     The "use it or lose it" statute—and the selective, arbitrary purges of voters that occur, and will continue to occur, under it—violate Georgia voters' rights under the First and Fourteenth Amendments.  The "use it or lose it" statute penalizes voters for voicing their dissatisfaction with candidates by opting not to vote.  It also disenfranchised thousands of Georgia voters in the 2018 Election and will continue to disenfranchise voters in the future.

---

[8] Alan Judd, *Georgia's Strict Laws Lead to Large Purge of Voters*, Atlanta J.-Const. (Oct. 27, 2018), https://www.myajc.com/news/state--regional-govt--politics/voter-purge-begs-question-what-the-matter-with-georgia/YAFvuk3Bu95kJIMaDiDFqJ.

**B. "Exact Match" Policy: The Secretary of State Prevents Georgians From Registering to Vote.**

82.     Many Georgians submitted new voter registration forms shortly before the 2018 Election.  Yet many of those registrations were rejected under an aggressive and extreme interpretation of Georgia's statute requiring voter registration information to match information in certain government files.

83.     Georgia law requires the State's voter registration information to match the information in the State's Department of Driver Services ("DDS") files if the voter uses his or her driver's license as proof of identity.  O.C.G.A. § 21-2-220.1.[9]  If a voter's application information does not match those files, then the Secretary of State holds the application in "pending" status.  An applicant whose registration is pending must resolve the mismatch; if the applicant fails to do so, the Secretary of State will reject the application.  *Ga. Coal. for People's Agenda, Inc. v. Kemp*, __ F. Supp. 3d __, No. 1:18-CV-04727, 2018 WL 5729058, at *1 (N.D. Ga. Nov. 2, 2018) (addressing the "exact match" policy and registration processing).

---

[9] If the voter uses a Social Security card, then the information must match the records in the Social Security Administration.  On information and belief, the vast majority of people use a driver's license instead of a Social Security card.

84.     The Secretary of State interprets and applies the statutory "match" requirement in ways that unfairly and disproportionately prevent voters of color from voting.

85.     Specifically, the Secretary of State applies the statutory "match" language in an unreasonably literal way—requiring an "exact" match of all information no matter how insignificant that information is.  Under the Secretary's onerous "exact match" policy, voter registrations were, and are, rejected if the mismatch consisted of insignificant typographical errors or other inconsequential differences.  For example, if the punctuation in voters' last names on their voter registration forms do not match their DDS files, those voters' applications are rejected—even if the problem originates entirely with the DDS system and not with the voter.

86.     Shortly before the 2018 Election, the Secretary's "exact match" policy prevented 53,000 Georgians from having their registrations accepted.

87.     The experience of Dr. Carlos del Rio, the chair of the Department of Global Health Studies at the Rollins School of Public Health at Emory University, illustrates this problem with the "exact match" policy.  Dr. del Rio had correctly written his last name as "del Rio" on his voter registration form; but because the DDS system does not recognize spaces in last names, DDS incorrectly lists his last

34

name as "delRio" in its system and on his driver's license.[10]  Dr. del Rio explained

to elections officials that their actions were illegal; only after being forced to

navigate a lengthy process was he finally allowed to vote.  Dr. del Rio reflected,

"While I was ultimately able to cast my vote, it was a frustrating experience and I

can only imagine the powerlessness that others less fortunate than I may have felt

as they attempted to exercise a fundamental American right."

88.     Dr. del Rio is right—other Georgians were powerless to vote when

they arrived at the polls due to the "exact match" policy.  One poll worker reported

seeing at least six voters who were told they were not on voter rolls because their

names had hyphens, apostrophes, or spellings unfamiliar to poll workers.

89.     The "exact match" policy disproportionately disenfranchises recently

naturalized U.S. citizens because the Secretary of State places new citizens' voter

registration forms in pending status if those voters have not informed DDS of the

change to their citizenship.  But whether a person is a citizen is irrelevant to

whether he or she can have a driver's license.  In effect, the Secretary of State has

---

[10] Citizens of Latino descent are disproportionately likely to have two surnames or
a surname beginning with the preposition "de" or "del," making them more likely
to print their name with a space.  *See* Lotus D. Cirilo, *Naming Conventions of
Spanish-Speaking Cultures*,
http://lrc.salemstate.edu/hispanics/other/Naming_Conventions_of_Spanish-
Speaking_Cultures.htm (last visited Nov. 19, 2018).

denied new citizens the right to vote because they do not update DDS with information it neither asks for nor needs.

90.     This disenfranchisement of recently naturalized citizens disproportionately affects people of color, too, both because many new citizens are people of color [11] and because recently naturalized citizens may be more likely to have state employees enter their names incorrectly if those names are less familiar to those employees.  Of the Georgians whose applications were pending for a citizenship mismatch, about a quarter were Asian American, although only 2.1 percent of Georgia's registered voter pool is Asian American; and 17 percent were of Latino descent, although only 2.8 percent of Georgia's registered voter pool is of Latino descent.  *Ga. Coal.*, 2018 WL 5729058, at *8.  These percentages contrast with those for white voters; only 13.7 percent of Georgians whose applications were pending for a citizenship mismatch were white, even though more than half of Georgia's registered voter pool is white.  *Id.*  Because of this disparate impact on minority voters, a federal judge concluded that new citizens

---

[11] In 2016, 49 percent of new citizens in the United States were born in countries in South America and Mexico, Asia, and the Caribbean.  *See* Jie Zong, *et al*., Migration Policy Institute, *Frequently Requested Statistics on Immigrants and Immigration in the United States*, (Feb. 8, 2018), https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Naturalization.

whose voter registrations were placed in pending status had demonstrated a substantial likelihood the State violated their constitutional rights. *Id.*

91.     Beyond the harm to recent citizens, the "exact match" policy has a disparate impact on black voters. Of the voter registrations pending because of the policy before the 2018 Election, approximately 70 percent were for black voters, even though only approximately a third of Georgia's population is black.

92.     The impact of the "use it or lose it" statute and "exact match" policy can be seen in the record-breaking number of provisional ballots cast in the 2018 Election: over 21,000. This number is higher than the number of provisional ballots cast in the 2016 presidential election even though overall turnout in 2018 was slightly lower than in 2016. This Court recently noted that "[c]omparing the 2018 election and the last non-presidential election in 2014, there has been a statistically significant increase in the proportion of voters required to vote on provisional ballots relative to the total vote." *Common Cause Ga.*, 2018 WL 5915657, at *17.

93.     The Secretary of State's adoption and application of the "exact match" policy—as well as his other impediments to voter registration alleged herein—disenfranchised, and will continue to disenfranchise, thousands of Georgia voters, thereby violating their constitutional and other legal rights.

37

**C. Defendants Use Election Technology That Is Vulnerable to Hacking and Manipulation.**

94.     Georgia's elections system, including its voter registration data and voting machines, lacks adequate data security.  This insecurity presents a risk of hacking and tampering that could cause voters to be removed from voter rolls or cause cast votes to be added, removed, or altered.  Georgia's voter registration data already has been breached twice.  More than a decade of research shows that electronic voting machines, especially those used in Georgia with their lack of voter-verified paper trails, are vulnerable to hacking.  Defendants have had notice of these problems but have done little to fix them.

95.     The threat of hacking is not hypothetical.  Georgia's voter rolls were breached in 2015, when 6 million voters had their personal information taken from the State, and in 2017 when as many as 7.5 million voter records were compromised.  Special Counsel Robert Mueller indicted Russian military officers for, among other things, exploring vulnerabilities in Georgia counties' elections systems in an effort to identify cybersecurity flaws.

96.     The experience of many Georgia voters suggests significant problems with the State's voter registration data—whether because of a security breach or Defendants' failure to maintain adequately this essential database.  Many voters were told when they tried to vote that the voter registration rolls contained

information different from the information the voters had supplied when registering to vote.

97.    Georgia is one of only five states to use an entirely paperless voting system.  This electronic-only voting system creates no paper trail, let alone a voter-verified trail, making the State unable to confirm if irregularities during an election resulted from hacking.

98.    Keeping a paper trail of votes on election day is a common and reasonable way to mitigate some risks of election hacking.  If, upon tabulation, vote totals look odd, a paper trail from voting machines allows a reconstruction of what went wrong.  Despite the demonstrated insecurity of Georgia's election system, Georgia has no means to recover what happened on election day if data suggests the system has been hacked or is compromised in other ways.

99.    Defendants even rejected federal funds and assistance for election and voting security from the United States Department of Homeland Security.  Georgia voters have been left with an election system that this Court recently criticized as a "dated, vulnerable voting system that provides no independent paper audit trail." *Curling v. Kemp*, __ F. Supp. 3d __, No. 1:17-CV-2989, 2018 WL 4625653, at *1 (N.D. Ga. Sept. 17, 2018).

100.   By leaving Georgia's registration database and voting machines vulnerable to tampering, Defendants place voters at risk of having their voter registrations, and votes, removed or changed.

101.   Integral to the fundamental right to vote is the right to have one's vote choices properly recorded, counted as they were cast, and correctly reported in the final tally.  The unnecessary and reckless security vulnerabilities alleged in this Amended Complaint place a severe burden on the right to vote.

## D. Defendants Oversee an Election System Dependent on Unreliable Voting Machines.

102.   Defendants maintain and program the machines voters use to cast ballots.  Here again, Defendants fail to ensure voters are able to vote without undue burden, as shown in the 2018 Election.

103.   One troubling problem—encountered by several voters—is that voting machines switched their votes from Leader Stacey Abrams to Secretary Kemp.  Allison Bish, a Gwinnett County voter, used a machine to vote for Leader Abrams.  But after selecting Leader Abrams, the machine switched her vote to Secretary Kemp.  Ms. Bish switched her vote back to Leader Abrams.  The machine again switched her vote to Secretary Kemp.  Ms. Bish switched her vote back to Leader Abrams.  The machine switched her vote to Secretary Kemp for the

third time.  Only on Ms. Bish's fourth attempt was she was able to cast a ballot for Leader Abrams.

104.   Joycelyn Lester experienced a similar problem when she voted in Early County.  Ms. Lester voted early at the Registrar's Office in Blakely.  She voted using the voting machine, and pressed the button for Leader Abrams.  But the voting machine showed her selection as Secretary Kemp.  Ms. Lester reports she kept pressing Leader Abrams and, by the fourth time, the machine finally corrected.  While Ms. Lester was ultimately able to vote for Leader Abrams, she expresses concern that other voters may have been less attentive, inadvertently voting for Secretary Kemp.  As Ms. Lester said, "If I were not paying more attention, or were less persistent, it would have been easy for the machine to incorrectly cast my vote for Secretary Kemp.  And I can see how a less persistent or attentive person could have the machine incorrectly cast their vote for Secretary Kemp when they were meaning to vote for Leader Abrams."

105.   Not only did Defendants oversee an election system that depended on unreliable voting machines but they also failed to adequately secure the election system, making it vulnerable to cyber-breaches or hacking that could undermine electors' confidence in the outcome.  Indeed, recent analysis of the results of the Lieutenant Governor's race in the 2018 Election shows a statistically unexpected

41

drop-off in the number of votes compared to the number of votes cast in the

Governor's race.  That drop-off was significantly more pronounced in primarily

African American precincts than it was in non-minority precincts.

106.   The absence of a paper trail to track votes compounds the problem of

inaccurate voting machines.

107.   These errors should not happen.  The Secretary of State is responsible

for maintaining and programming voting machines that accurately report a voter's

selections.  The Secretary of State fails to do so, resulting in disenfranchised

Georgia voters.

**E. Defendants Promote Moving and Closing Precincts and Polling Places.**

108.   The Secretary of State encourages precinct consolidation and polling

place closures.  In 2015, then-Secretary Kemp issued a memorandum to local

elections boards outlining why polling place closures might be appropriate and

emphasizing that *Shelby County v. Holder*, 570 U.S. 529 (2013), removed the

Voting Rights Act requirement that elections officials submit precinct or polling

place changes to the U.S. Department of Justice for preclearance.[12]

---

[12] Ga. Sec'y of State Elections Div., Manual on Precinct Closures (Feb. 2015),
https://drive.google.com/file/d/1xFw-DbVRcdFustzb_SJHziFrONtkpXL3/view

109.   Since preclearance requirements were lifted, Georgia has consolidated and moved precincts and closed polling places in areas with high proportions of voters of color.  In just a few short years, elections officials closed or moved more than 300 precincts.  As a result, approximately one-third of Georgia's counties now have fewer polling places than they had in 2012.  Most of those counties have poverty rates higher than the state average and almost half have populations that are over 25 percent black.

110.   In addition, precinct and polling place changes and closures left voters without enough places to vote on election day in 2018, disproportionately affecting low-income voters and voters of color.  These polling place closures unduly burdened Georgians' right to vote.

### F. The Secretary of State Maintains Inaccurate Voter Registration Rolls.

111.   Georgia's voter registration rolls, which are maintained by the Secretary of State, are inaccurate, often foreclosing voters from exercising their right to vote.  Many Georgians who register to vote arrive at the polls and are told they are not on the list of registered voters.  One poll worker in the 2018 Election explained to a poll watcher that voters should never expect to be on the rolls if they registered near or on the deadline.  "This," the poll worker said, "is Georgia."

112.   Issues with voter registration rolls affect voters across multiple counties in Georgia and include: (i) family members who lived in the same house and used the same address when they registered to vote being told they would have to vote in different locations; (ii) Georgians who had registered to vote being told that their names were not on the rolls; (iii) Georgians who had voted at the same polling place for years being told their polling place had moved or that they were no longer registered to vote; and (iv) Georgians who registered under the Motor Voter Act not being on the rolls.

> *(i)*     *Family Members With the Same Address Are Told to Vote at Different Polling Places.*

113.   Several voters and poll watchers have described family members who live in the same house being directed to vote in different polling places.  For example, a disabled veteran who relies on a service dog confirmed, weeks before election day in 2018, that she and her husband were registered to vote.  On election day, she, accompanied by her service dog, husband, and eight-year-old son, went to vote at Mill Creek Middle School.  Her husband was allowed to vote there. Although she had registered to vote using the same address as her husband, she was told that she could not vote at that polling place because her address on the voter rolls differed from the address she provided when she registered to vote.  Her

address as shown on the voter rolls was an address she had never had.  Without her input or action, her registration data had changed.

114.   A poll watcher at the Liberty Elementary School in Cherokee County was troubled by what happened when married couples arrived to vote.  He repeatedly saw instances when both spouses had changed their addresses through DDS to reflect their current Cherokee County addresses.  Even though the address on their drivers' licenses were correct, at least three couples learned that only one spouse's address had been correctly updated on the voter rolls, while the other spouse's address still showed as the couple's former address.  The poll workers directed the spouse with the unchanged address to go to the voting location for the unchanged address.

115.   A poll worker who staffed the Express Poll machine in the Coralwood Precinct in DeKalb County said a couple arrived together and displayed identification showing they resided at the same address.  But the voter registration rolls stated that they were registered to vote in two different precincts.  Because the voter registration rolls showed the couple as having different voting precincts from each other, the poll worker has concerns about the integrity of the voting records and whether they had been tampered with.

> ### (ii)   Georgians Who Registered to Vote Shortly Before the Deadline Are Not on the Voter Rolls.

116.   Many Georgians register to vote before the registration deadline but learn on election day that they are not on the rolls of registered voters.  Even worse, poll workers do not offer many of these voters provisional ballots.

117.   For example, Tyra Bates is a Gwinnett County resident who registered to vote online in early October 2018.  She received a reference number and even took a screenshot of the confirmation page after she completed the registration process.  When she arrived at her polling place, however, an elections official told her she was not registered.  She was not allowed to cast a provisional ballot.

> ### (iii)   Voter Registration Roll Information for Voters Who Had Voted at the Same Polling Place for Years is Inaccurate.

118.   Elections officials told many voters during the 2018 Election they were at the wrong polling place even though they had voted at that polling place for years and had not moved.  Some of those voters were directed to vote at another location.  Others were given provisional ballots.  Of those voters given provisional ballots, many were not given the instructions required under Georgia law about how to cure any deficiencies in their voter registrations and how to learn whether their votes were counted.

119.   For example, Jim Peterson, an attorney who lives in DeKalb County, went to his polling place at Mary Lin Elementary School on election day in 2018.

Mr. Peterson's registration information showed that his precinct was in Fulton

County's Morningside neighborhood even though he had not lived in Morningside

since 1993.  Poll workers gave him a provisional ballot, which he cast.  Although

the poll workers were required under Georgia law to provide him "written

information" about how "to ascertain if his . . . ballot was counted and, if such

ballot was not counted, the reason why such ballot was not counted," O.C.G.A. §

21-2-418(f), he was not given that information.  Instead, a poll worker assured him

his vote would be counted.  The poll worker was not correct; Georgia law does not

allow voters to vote in a county other than where they are registered.

> *(iv)    Georgians Who Registered to Vote Pursuant to the Motor Voter Act Are Not on the Voter Rolls.*

120.    Under the Motor Voter Act, Georgia must provide its voters with the

opportunity to register to vote at the same time they apply for a driver's license.  52

U.S.C. § 20504.  But Georgians who registered to vote under the Motor Voter Act

discovered on election day that they were not on the voter rolls.  Voters and poll

watchers reported this occurring in many counties, including Athens-Clarke,

Carroll, Cobb, DeKalb, Fulton, and Gwinnett.

**G. The Secretary of State Does Not Provide Adequate Resources to Polling Places.**

121.   The Secretary of State fails to provide enough voting machines to counties, provides voting machines that do not work, and fails to advise counties on sufficient numbers of ballots, provisional ballots, and other supplies to meet turnout expectations.  These problems were acute in the 2018 Election despite the anticipated high turnout.

122.   Despite express warnings from the Democratic Party of Georgia about anticipated turnout, counties did not print enough ballots and some polling places ran out of provisional ballots.  Other polling places lacked enough voting machines to accommodate the expected demand.  As CNN reported, thousands of voters waited at polling places with only three voting machines.[13]  As a result, voters faced unreasonably long lines—as long as four hours in some places.  Many voters came to vote, saw the long lines, and left without voting.

123.   For example, one polling place in Snellville, Gwinnett County, had no power cords for the voting machines at the start of election day in 2018, requiring its machines to operate on battery power.  The batteries died in under an hour.

---

[13] Van Jones, *Don't Let Brian Kemp Steal Georgia's Gubernatorial Election*, CNN (Nov. 9, 2018), https://www.cnn.com/2018/11/09/opinions/dont-let-brian-kemp-steal-georgias-gubernatorial-election-van-jones/index.html.

124.   Pittman Recreational Center, a polling place in Atlanta, started election day in 2018 with only three operational voting machines.  While more machines were provided during the day, those newly-installed machines lacked the equipment necessary to operate them.  Wait times ranged from two to four hours, causing people to leave without voting.  One voter went to Pittman three times but could not vote because of the hours-long wait.  In addition, Pittman closed for 30 minutes at 7:00 p.m., violating a court order to stay open until 9:00 p.m.  While Pittman was closed, many voters left without voting.

125.   Similarly, at a Gwinnett County polling place, the voting machines malfunctioned shortly after the polls opened.  These malfunctioning machines created long lines that prompted voters to leave without voting.

126.   A number of busy polling places lacked an adequate number of the machines to verify a voter's registration or had machines that malfunctioned.  This lack of equipment contributed to the inability of Georgians to exercise their right to vote because the check-in bottlenecks led to unreasonably long lines.

127.   The problems with voting machines were compounded when polling places did not have enough provisional ballots.  Provisional ballots are used when an elections official cannot determine whether a voter is eligible to vote.

Provisional ballots are preprinted and supplied by the Secretary of State. *See* O.C.G.A. § 21-2-400(a).

128.   Because of the problems with inoperable machines, the inaccurate voter registration list, the "exact match" policy and "use it or lose it" statute and its enforcement, provisional ballots were in high demand and many polling places ran out of them. Once a polling place runs out of provisional ballots, voters at that polling place who would otherwise cast a provisional ballot lose the right to vote.

129.   The Secretary of State knew that the "use it or lose it" purge and the "exact match" policy would increase the need for provisional ballots. The Democratic Party had warned the Secretary of State that voter turnout would be high, a warning reinforced by the high voter turnout during early voting. Despite knowing that counties needed to have a large number of provisional ballots, Defendants did nothing to let the counties know they would need more provisional ballots or to supply the counties with an adequate number of these ballots.

130.   Many of the voters who had to wait in long lines to vote in the 2018 Election were voters of color. On information and belief, polling locations in areas with large numbers of voters of color had disproportionately fewer resources, such as adequate numbers of voting machines or ballots, creating the hours-long waits that deterred many Georgians from voting. Moreover, the increased need for

provisional ballots came, in part, from the "exact match" policy and "use it or lose it" statute, which disproportionately affected voters of color.

131.   Defendants have a duty to oversee the election, train county officials to staff polling places adequately, and issue guidance to the counties to protect every Georgian's right to vote.  Defendants have a duty to prevent Georgians' right to vote from being unduly burdened.  Defendants have not fulfilled these duties.

## H. Defendants Inadequately Oversee and Train Elections Officials on Provisional Ballots.

132.   The State Election Board, chaired by the Secretary of State, is responsible for enforcing uniform rules for election administration.  O.C.G.A. § 21-2-31(1).  The Secretary of State is also responsible for training county elections officials, including registrars and superintendents, on the law governing state elections.  O.C.G.A. § 21-2-50(a)(11).

133.   Defendants did not and do not satisfy these obligations, as demonstrated in the 2018 Election; throughout the State, elections officials misunderstand their duties and ignore the law.

134.   At a Gwinnett County precinct, for example, voters were properly given provisional ballot forms after a voting machine malfunctioned, but voters were misinformed about how those ballots would be handled.  Those ballots should

51

have been counted as regular ballots.  *See* O.C.G.A. § 21-2-418(h) (stating that "in the event that the voting machines or DRE units at a polling place malfunction and cannot be used to cast ballots . . . provisional ballots may be used by the electors at the polling place to cast their ballots.  In such event, the ballots cast by electors whose names appear on the electors list for such polling place *shall not be considered provisional ballots*[]") (emphasis added).  Instead of treating those ballots like regular ballots, elections officials added a cover page to the ballots that incorrectly told voters that the county election office would treat those ballots as provisional and decide later whether they would be counted.  County officials later admitted that at least 50 people left the polling place without voting because they believed elections officials were requiring them to vote by provisional ballot.

135.   Elections officials also give the wrong instructions to voters who show up at the wrong polling place.  A poll worker must offer a provisional ballot to any voter who appears at the wrong polling place but who is registered to vote in that county.  That way, voters need not go elsewhere to vote.  Yet at some polling locations, poll workers did not provide those voters with provisional ballots and instead told them they had to go to another polling place if they wanted to vote.  At least one unfortunate voter was sent from one polling place to another, and then to

a third.  Even when voters knew to ask for a provisional ballot, they sometimes were not given one.[14]

136.   Under both federal and Georgia law, provisional ballots must also be offered to voters who show up to vote and whose names are not on the voter registration rolls.  *See* O.C.G.A. § 21-2-418(a).  Elections officials fail to offer provisional ballots to people in this situation, too.  For example, when Kia Marlene Carter tried to vote at Shiloh Education Center in Henry County, she was told by the poll worker who scanned her identification card that the information on file for her showed that she was not a United States citizen.  Ms. Carter was born in Virginia, had voted in Georgia during the past 18 years, and never before had her citizenship questioned when she voted.  In the 2018 Election, however, county officials did not allow Ms. Carter to vote and did not offer her a provisional ballot.

137.   Moreover, some precincts follow rules that conflict with the law.  According to the poll watcher at Rothschild Middle School in Muscogee County, the poll manager explained that provisional ballots were allowed only for

---

[14] As this District explained in another case: "[T]here was evidence that voters were sometimes refused provisional ballots or if provided provisional ballots, sometimes had to return to the polls to insist on this." *Common Cause Ga. v. Kemp*, __ F. Supp. 3d __, No. 18-CV-05102, 2018 WL 5915657, at *17 (N.D. Ga. Nov. 12, 2018).

people arriving at the polls near closing time.  The poll workers at that location

would not distribute provisional ballots in the morning because the poll manager

thought it was not late enough in the day.  The Secretary's statutorily-mandated

training program failed voters at this polling place and many voters were denied

their right to cast a provisional ballot.

138.   These inconsistent and arbitrary local rules on provisional ballots that

differ from county to county violate Georgians' right to the equal opportunity to

vote.

139.   Defendants know that many Georgia voters cast provisional ballots

and that the "use it or lose it" statute, the "exact match" policy, and the other

elections systems problems identified in this Amended Complaint will cause many

more voters to cast provisional ballots.  Nonetheless, Defendants fail to train

county elections officials adequately on the use of provisional ballots, despite

knowing that this training is necessary.  Defendants' failure to train county

elections officials adequately has imposed, and will continue to impose, a severe

burden on the right to vote and reflects the Defendants' deliberate indifference and

willful blindness to the constitutional rights of Georgians.

**I.  Defendants Inadequately Oversee Absentee Ballots and Inadequately Train and Advise Elections Officials about Them.**

140.  Defendants also fail to oversee, train, and advise counties about the proper handling of absentee ballots.  Georgia law permits voters to vote by absentee ballot without needing a reason to do so.  Georgia law requires county elections officials who receive a request for an absentee ballot to determine whether the voter who requested the ballot is eligible to vote and, if he or she is, immediately mail the voter a ballot.  *See* O.C.G.A. § 21-2-381.  The voter can either return the completed absentee ballot by mail or by hand-delivery, or cancel the absentee ballot and vote in person during early voting or on election day.

141.  At least 283,839 voters tried to vote by absentee ballot in the 2018 Election.  Many ran into hurdles that prevented them from voting absentee, or from voting at all.

142.  Elections officials fail to mail absentee ballots to voters in a timely manner, violating Georgia law.  For example, despite receiving timely absentee ballot requests, Dougherty County was still mailing ballots on October 29, 2018, just days before the election.[15]  Because of this delay, many Dougherty County

---

[15] Dougherty County admitted during a proceeding in the United States District Court for the Middle District of Georgia that it had mailed ballots as late as Monday or Tuesday the week before election day, and evidence presented at that

residents—67 percent of whom are black—could not vote absentee.  Moreover,

thousands of absentee ballots were mailed out three weeks or more after absentee

ballot requests were received by county elections officials.

143.   Elections officials also reject absentee ballots for improper reasons.  It

is illegal for an elections official to reject an absentee ballot because of a minor

error or omission that is not material to whether a voter can vote.  *See* 52 U.S.C. §

10101(a)(2)(B).  Because counties must verify voter eligibility before sending an

absentee ballot, errors on the absentee ballots themselves are immaterial as the

county can still determine the identity of the voter.  Yet in the 2018 Election,

elections officials rejected absentee ballots for irrelevant mistakes.

144.   For example, absentee ballots request Georgia voters' birthdates.  On

some absentee ballots, the line that asked for that information just said "Date,"

without specifying that the date being requested was the voter's birthdate.  Because

of this lack of specificity, many voters reasonably wrote the date they completed

the ballot instead of their birth date.  Their ballots were rejected.

---

hearing showed both that mail routing in Dougherty County is unusually slow due
to the closure of a distribution facility and that at least one outgoing ballot had not
been postmarked until the day before election day.  *Democratic Party of Ga. v.
Burkes*, No. 1:18-CV-00212 (M.D. Ga. Nov. 8, 2018).

145.   Under intense criticism for allowing counties to reject these ballots, the Secretary of State took the unusual step, after the election, of issuing an Election Bulletin stating that elections officials would not violate state law if they accepted absentee ballots with immaterial discrepancies.  The Election Bulletin, however, did not explain that this is not discretionary; elections officials are legally required to accept such ballots.  And although the Election Bulletin quotes a Georgia Attorney General opinion, the Bulletin does not quote the Attorney General's conclusion that rejecting such ballots would violate federal law.

146.   Two judges from the United States District Court for the Northern District of Georgia remedied some of these problems, requiring first Gwinnett, and then other counties, to accept absentee ballots missing voters' birth years.  *Martin v. Crittenden*, __ F. Supp. 3d __, No. 1:18-CV-4776-LMM, 2018 WL 5917860, at *7 (N.D. Ga. Nov. 13, 2018); *Democratic Party of Ga. v. Crittenden*, __ F. Supp. 3d __, No. 1:18-CV-05181-SCJ, 2018 WL 5986537, at *10 (N.D. Ga. Nov. 14, 2018).  The granted relief, however, addressed only the 2018 election, leaving future absentee voters vulnerable to the same misconduct.  The granted relief also did not address voters disenfranchised if their absentee ballots contained other minor errors immaterial to verifying their identity.

147.   Exacerbating the effect of these errors, some counties fail to promptly notify many Georgians that their absentee ballots have been rejected.  Georgia law requires elections officials to "promptly notify the elector" if the elector's absentee ballot is rejected.  O.C.G.A. § 21-2-386(a)(1)(C).  Because absentee ballots are submitted before election day, this prompt—and legally required—notification gives the voter whose ballot was rejected time to fix the error.  The Secretary of State maintains a website that, in theory, tells voters whether their absentee ballot has been rejected and indicates which errors need to be fixed.  But this system fails, too.  Some voters who learned from the website before the 2018 Election that their absentee ballots had been received and "approved" (i.e., that their absentee votes would count) learned later that their ballots did not count after all.

148.   Some voters who hand-deliver their absentee ballots are also given false information about whether their votes will be counted.  One seventy-two-year-old voter, for example, hand-delivered his absentee ballot and an elections official told him there was nothing else he needed to do to ensure his vote would count.  But after the 2018 Election, he learned that his absentee ballot was not counted because it was missing his birth year.

149.   Elections officials also fail to permit voters to cancel absentee ballots and vote in person.  Georgia law is clear:  voters who have requested an absentee

ballot can cancel that ballot and vote in person either by surrendering the absentee ballot or by requesting in writing that the envelope containing the absentee ballot be marked "cancelled."  O.C.G.A. § 21-2-388.  Yet many voters encountered poll workers who would not allow them to cancel their absentee ballots and vote in person.  Even voters who had applied for but never received absentee ballots were told they could not cancel their absentee ballots.

150.   These problems with absentee ballots have a disproportionate impact on voters of color.  In Gwinnett County, where over 60 percent of residents are Latino, African American, or Asian American, elections officials rejected approximately eight and a half percent of all absentee ballots received by October 15, 2018.  This rejection rate was more than three times the statewide average.

151.   In Chatham County, a county with a higher African American population than the State average, some completed ballots mailed by voters were returned to those voters as undeliverable, even though the ballots were mailed in an envelope supplied by the county and containing a pre-printed delivery address.  These validly-cast ballots were not counted, and the voters could not re-send the ballots in time to be counted.

152.   The United States District Court for the Middle District of Georgia remedied some of these problems.  The Court found that Dougherty County

59

violated voters' constitutional rights by failing to mail absentee ballots on time and ordered that some ballots received by voters and mailed back by election day be counted. *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212-WLS, Consent Order and Court Order at 3 (M.D. Ga. Nov. 9, 2018), ECF No. 5. But the relief provided only applied to the 2018 Election, leaving future voters vulnerable to the same misconduct. In addition, the Court could not grant relief to voters who never received their absentee ballots at all, or received them so close to election day that the voters reasonably concluded it would be futile to mail them back. Voters who requested an absentee ballot because they could not get to the polls (e.g., voters who were elderly, disabled, or out of state on election day) were simply denied a vote.

153.   The counties—under the supervision of Defendants—also commit errors in counting absentee votes and other kinds of votes. These types of errors underscore the importance of paper ballots—so that elections returns are auditable—as well as robust reporting from polling locations about the number of voters, the number of machines voted on, the number of votes cast, and the number of votes counted.

154.   The inconsistent and arbitrary local rules on absentee ballots that differ from county to county violate Georgians' right to the equal opportunity to vote.

155.   Defendants know that many voters cast absentee ballots.  Defendants also knew that the 2018 Election would have particularly high turnout. Nonetheless, Defendants failed to train county elections officials adequately on the use of absentee ballots, despite knowing that this training was necessary.  Defendants' failure to train county elections officials adequately imposes, and will continue to impose, a severe burden on the right to vote and reflects the Defendants' deliberate indifference and willful blindness to the constitutional rights of Georgians.

156.   The serious and pervasive problems in Georgia's elections system are not an accident.  Defendants know that voter disenfranchisement is likely from their conduct, and further know that the effect of any voter suppression is likely to fall disproportionately on Georgia's racial and ethnic minorities.  Defendants' intent and motivation are to create this anticipated and foreseeable racially discriminatory effect through their policies, actions, and inaction.

157.   As shown in the 2018 Election, Georgia citizens try to exercise their constitutional rights but are denied the ability to elect their leaders because of an

unconstitutional elections process.  The problems plaguing Georgia's elections process are chronic, systemic, and pervasive.  Defendants' failed policies and limited-to-no oversight disenfranchises or severely burdens untold numbers of voters.  Absent judicial intervention, future elections in Georgia will be no different.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Fundamental Right to Vote (First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

158.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

159.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . . without due process of law."  This due process principle protects the fundamental right to vote.  If a state imposes a severe burden on the right to vote, that burden must be narrowly drawn to advance a state interest of compelling importance.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

160.   The First Amendment prohibits a state from interfering with "the freedom of speech" or the right "to petition the Government for a redress of

grievances."  Freedom of speech includes the right to send political messages by voting as well as by not voting.

161.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is liable at law and in equity.

162.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that does not severely burden the right to vote.

163.   Voters in Georgia have a liberty interest in their fundamental right to vote.  Defendants acted to deprive voters of this right through the following misconduct and severe burdens on the right: (a) failing to furnish counties and precincts with sufficient tools for voting, including secure and functioning voting machines; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "use it or lose it" statute and "exact match" policy; and (e) failing to maintain secure and functioning voting machines.  The foreseeable, cumulative effects of these actions have been to disenfranchise Georgia voters or severely burden their right to vote.

Case 1:18-cv-05391-SCJ   Document 41   Filed 02/19/19   Page 67 of 98

Unless this Court grants the relief requested by Plaintiffs in this Amended

Complaint, Georgia voters will continue to be disenfranchised or their voting rights

severely burdened.

164.   Defendants further disenfranchised Georgia voters and deprived them

of their right to vote through the following specific misconduct in training and

overseeing county elections officials, imposing severe burdens on the right to vote:

(a) failing to provide absentee ballots requested by voters; (b) delivering requested

absentee ballots to voters after the deadline for casting the ballots had passed; (c)

providing requested absentee ballots that were undeliverable to the appropriate

recipient; (d) refusing to accept delivery of absentee ballots; (e) refusing to provide

provisional ballots; (f) discouraging and preventing the use of provisional ballots;

(g) providing an insufficient number of provisional ballots to precincts; (h) creating

conditions that produced unreasonably and avoidably long waits to vote at polling

places; (i) providing an insufficient number of voting machines and inoperable

voting machines to polling places; and (j) failing to provide an adequate number of

paper ballots to polling places.  The foreseeable, cumulative effects of these

actions have been to disenfranchise Georgia voters or severely burden their right to

vote.  Unless this Court grants the relief requested by Plaintiffs in this Amended

64

Complaint, Georgia voters will continue to be disenfranchised and their voting rights severely burdened.

165.   Due to Defendants' misconduct, voters in Georgia have suffered and will continue to suffer irreparable harm—including disenfranchisement and severe burdens on the right to vote in any and all elections and disenfranchisement.

166.   Defendants did not narrowly draw the laws and policies at issue and have no compelling or substantial interest to justify the severe burdens on fundamental voting rights imposed by their misconduct.

167.   Unless enjoined from doing so, Defendants will continue to violate Georgians' First and Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

168.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count II

### Violation of the Ban on Racial Discrimination in Voting (Fifteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

169.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

170.   Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

171.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

172.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that does not discriminate against any Georgians based on race or color.

173.   The Fifteenth Amendment "bans racial discrimination in voting by both state and nation." *Terry v. Adams*, 345 U.S. 461, 467 (1953).  The Fifteenth Amendment is "obviously applicable" to the rights of people of color "not to be discriminated against as voters in elections to determine public governmental policies . . . ." *Id.*

174.   Voters who are members of racial minority groups have a right under the Fifteenth Amendment to participate in elections on an equal basis with voters who are not members of racial minority groups.

175.   Acting under color of state law, Defendants deprived Georgians of the right to vote—as secured by the Fifteenth Amendment—by administering an election plagued with irregularities that disproportionately affected voters of color. Defendants acted to deprive voters of this right through the following misconduct

66

that fell disproportionately on voters of color: (a) failing to furnish counties and precincts with sufficient tools for voting, including secure and functioning voting machines; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; (e) purging voters from voter registration rolls under the "use it or lose it" statute; and (f) failing to maintain secure and functioning voting machines. This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

176.   Defendants further acted to deprive voters of color of their fundamental right to vote through the following specific misconduct in overseeing and training of county elections officials, which fell disproportionately on voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to be able to vote; (b) failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.  This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

177.   The severe burdens Defendants imposed on racial minority voters'
fundamental right to vote are not outweighed or justified by, or necessary to
promote, a compelling state interest that cannot be accomplished by other less
restrictive means.

178.   Defendants' misconduct irreparably harmed voters of color in Georgia
by imposing severe burdens on their right to vote, sometimes resulting in complete
disenfranchisement.

179.   In acting as they did, Defendants intended, at least in part, to suppress
the number of votes cast by persons of color.  State action intended, at least in part,
to discriminate on the basis of race in the voting context violates the Fifteenth
Amendment.

180.   Unless enjoined from doing so, Defendants will continue to violate
Georgians' Fifteenth Amendment rights and inflict injuries for which voters have
no adequate remedy at law.

181.   Plaintiffs are entitled to injunctive and declaratory relief to remedy
these unconstitutional violations of Georgians' fundamental right to vote.

### Count III

**Violation of Equal Protection (Fourteenth Amendment to the U.S.
Constitution, as enforced by 42 U.S.C. § 1983)**

182.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

183.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

184.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

185.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that provides equal protection to all Georgians.

186.   Under the Equal Protection Clause of the Fourteenth Amendment, citizens have "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Thus, "state actions in election processes must not result in 'arbitrary and disparate treatment'" of voters.  *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98, 104–05 (2000)).

187.   Voters who are members of racial minority groups have a constitutionally protected right under the Equal Protection Clause of the Fourteenth

Amendment to participate in elections on an equal basis with voters who are not members of racial minority groups.

188.   Before and during the 2018 Election, Defendants treated voters who are members of racial minority groups differently from similarly situated voters who are not members of racial minority groups.

189.   Acting under color of state law, Defendants deprived Georgians of the right to vote on an equal basis, as secured by the Equal Protection Clause, by administering an election plagued with irregularities that disproportionately affected voters of color.  Defendants acted to deprive voters of this right through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish counties and precincts with sufficient tools for voting, including secure and functioning voting machines; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; (e) purging voters from voter registration rolls under the "use it or lose it" statute; and (f) failing to maintain secure and functioning voting machines.  This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

190.   Defendants further acted to deprive voters of color of their fundamental right to vote through the following specific misconduct in overseeing and training of county elections officials, which fell disproportionately on voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to be able to vote; (b) failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.  This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

191.   The differential treatment of voters who are members of racial minority groups compared to the treatment of similarly-situated voters who are not members of racial minority groups imposed severe burdens on the fundamental right to vote of the former group.

192.   The severe burdens Defendants imposed on racial minority voters' fundamental right to vote is not outweighed or justified by, or necessary to promote, a compelling state interest that cannot be accomplished by other less restrictive means.

193.   Defendants' misconduct irreparably harmed voters of color in Georgia by imposing severe burdens on their right to vote, sometimes resulting in complete disenfranchisement.  In acting as they did, Defendants intended, at least in part, to suppress the number of votes cast by persons of color.  State action intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth Amendment.

194.   Georgia's voting system also violates Equal Protection because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside.

195.   Having different standards for administering elections or for counting ballots in different counties violates the Equal Protection Clause.  As the Supreme Court has recognized, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Bush*, 531 U.S. at 107 (internal quotation marks omitted). Defendants facilitated and permitted different elections systems in different counties in Georgia, and will continue to do so.

196.   Abdicating their responsibilities under state law, Defendants have allowed the voting processes in the 159 counties in Georgia to devolve into an arbitrary and inconsistent web of actual laws, erroneous interpretations of laws,

and local rules that are often unannounced until applied to a voter.  These inconsistent, non-uniform rules subject voters to unequal voting strength.

197.   Defendants also knowingly permit wide variations among jurisdictions in the allocation of resources, such as ballots and voting machines, and in the training of election personnel.

198.   The cumulative effect of these geographic variations is that the likelihood of being disenfranchised was and is substantially—and arbitrarily—determined by the county in which a voter lives.

199.   Unless enjoined from doing so, Defendants will continue to violate Georgians' Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

200.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count IV

### Violation of Procedural Due Process (Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

201.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

202.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . .

without due process of law." This due process principle protects the fundamental right to vote.

203. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

204. Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that complies with the constitutional requirements of procedural due process.

205. The Secretary of State, acting under color of state law, is administering an election process that Plaintiffs estimate deprives hundreds of thousands of voters in Georgia of their liberty interest in voting by purging their already existing voter registrations under the State's "use it or lose it" statute without constitutionally adequate pre- and post-deprivation process. Georgia's "use it or lose it" statute, and its enforcement by the Secretary of State, fail to provide sufficient and meaningful notice of actions and decisions affecting voters' registration status and its effect on casting and counting of ballots and fail to provide adequate or timely process for Georgia citizens to challenge such actions and decisions. These failures create an unreasonably high risk that Georgians will

be erroneously denied the right to vote.  The "use it or lose it" statute has frustrated, and will continue to frustrate, Plaintiffs' efforts to ensure that registered voters are able to vote and have their votes counted, and thereby violates voters' right to procedural Due Process under the Fourteenth Amendment to the U.S. Constitution.

206.   As a result, voters in Georgia have suffered and will continue to suffer irreparable harm—disenfranchisement.

207.   Unless enjoined from doing so, the Secretary of State will continue to enforce the "use it or lose it" statute and will continue to violate Georgians' Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

208.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count V

## Violation of Section 2 of the Voting Rights Act of 1965

209.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

210.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

A violation of Section 2 is established, inter alia, if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by" citizens in a protected class in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

211.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that complies with the Voting Rights Act.

212.   The totality of the circumstances alleged herein establishes that the Defendants' administration of the election denied voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  This deprivation of the right to vote based on status as a member of a racial minority group has caused and will continue to cause irreparable harm—disenfranchisement.

213.   Defendants violated Section 2 of the Voting Rights Act through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish sufficient tools for voting to counties and precincts, including secure and functioning voting machines; (b) failing to train adequately county elections

officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; (e) purging voters from voter registration rolls under the "use it or lose it" statute; and (f) failing to maintain secure and functioning voting machines.

214.   Defendants further violated Section 2 of the Voting Rights Act through the following specific misconduct in oversight and training of county elections officials, which disproportionately affected voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to vote; (b) failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.

215.   Historical, socioeconomic, and other electoral conditions in Georgia combined with Defendants' misconduct to prevent Georgians of color from having an equal opportunity to register and vote. *See Thornburg v. Gingles*, 478 U.S. 30 (1986).

216.   Georgia has a long history of official discrimination that excludes people of color—and particularly African Americans—from participating in democratic processes.

217.   Georgia's history of state-sanctioned race discrimination is so familiar that courts have taken judicial notice of it.  *See, e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("[T]he history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof.").  As the Southern District of Georgia explained in *Brooks*, "Georgia has a history chocked full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception."  *Id.*

218.   Indeed, Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

219.   In 2015, the Electoral Integrity Project[16] ranked Georgia as the eighth worst state in the nation for electoral integrity.

220.   Further, voting in Georgia elections is racially polarized on the state, county, and local levels.  *See, e.g.*, *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

221.   Georgia's people of color bear the effects of discrimination in areas such as education, employment, and health that hinder their ability to participate effectively in the political process.  The Georgia Department of Community Health reports that people of color have worse health status and more chronic health conditions than whites.  In 2016, the infant mortality rate for African Americans in Georgia was more than double than that of whites.  The Economic Policy Institute reported the 2018 unemployment rate in Georgia for African Americans was 2.6 times higher than that for whites.  And for the 2015–2016 school year in Georgia, the gap between high school graduation rates for African American and white students was 7 percentage points.  Further, in Atlanta, Cobb, DeKalb, and

---

[16] The Electoral Integrity Project is an independent academic project based at Harvard University and the University of Sydney.  Its focus is on evaluating the integrity of elections around the world.  *See* https://www.electoralintegrityproject.com (last visited Nov. 26, 2018).

Gwinnett school districts, in the 2012–2013 school year, the graduation rate for white males was 20 percentage points higher than for African American males.

222.   Georgia has a history of voting practices that enhance the opportunity for discrimination against voters of color.  For example, Georgia has an election requirement that the winner receive a majority of all votes cast.  This prevents a candidate who wins a plurality of votes cast from being elected and forces a runoff between the top two candidates.  By increasing the percentage of votes needed to win an election, this requirement lessens the prospects for a candidate of color. Another example is Georgia's use of large election districts, including county-wide election districts.  Using large election districts increases the chances that white voters will be in the majority, thereby enhancing the prospects of white candidates; subdivided districts result in the election of more candidates of color.

223.   Georgia also has a history of political campaigns with both overt and subtle racial appeals.

224.   For example, in January 2017, a Gwinnett County Commissioner called Representative John Lewis—who has been described as "one of the most courageous persons the Civil Rights Movement ever produced"—a "racist pig" and

suggested his re-election was "all illegitimate" because his district is "drawn to keep him in power."[17]

225.   During the gubernatorial campaign leading up to the 2018 Election, gubernatorial candidate and then-Secretary of State Brian Kemp posed in a photo with a man who wore a shirt that stated, "Allah is not God" and was known for ranting about killing Black Lives Matter protesters.[18]  Kemp had one arm around this man and gave a thumbs-up gesture with the other.

226.   During Leader Abrams' campaign for governor, a robo-call producer who pretended to be Oprah Winfrey called Georgian voters and spewed racist comments about Leader Abrams.  Those comments included, "This is the magical Negro Oprah Winfrey asking you to make my fellow Negress Stacey Abrams the governor of Georgia;" labeling leader Abrams "a poor man's Aunt Jemima;" and "Years ago, the Jews who own the American media saw something in me—the

---

[17] Tyler Estep, *Gwinnett commissioner calls John Lewis 'a racist pig,' faces backlash*, Atlanta J.-Const. (Jan. 16, 2017), https://www.ajc.com/news/gwinnett-commissioner-calls-john-lewis-racist-pig-faces-backlash/K2uAUZFikv57szlncpZilO/.

[18] Greg Bluestein, *Critics blast Kemp for posing for photo with anti-Muslim extremist*, Atlanta J.-Const. (Oct. 26, 2018), https://www.ajc.com/blog/politics/critics-blast-kemp-for-posing-for-photo-with-anti-muslim-activist/PMFHRugCobgSHKsN9hxmJP/.

ability to trick dumb white women into thinking I was like them.  I see that same potential in Stacey Abrams."[19]

227.   Members of minority groups in Georgia have been elected to public office at vastly disparate rates than majority groups.  Between 1908 and 1962, not a single person of African descent served in the Georgia General Assembly. Currently, every statewide elected official in Georgia is white, and non-white Georgians are underrepresented in the Georgia House of Representatives, Senate, and in the congressional delegation.

228.   These historical, socioeconomic, and other electoral conditions in Georgia combined with Defendants' ongoing misconduct prevented voters of color, and particularly African American voters, from having an equal opportunity to register and vote.  Defendants' unlawful actions thus imposed a substantial, unwarranted, and disproportionate burden on account of race or color in violation of Section 2 of the Voting Rights Act.

---

[19] Emily Birnbaum, *Stacey Abrams, Oprah targeted by racist robocall funded by white supremacist group*, The Hill (Nov. 3, 2018), https://thehill.com/homenews/campaign/414703-abrams-targeted-by-racist-robocall-in-georgia.

82

229.   Unless enjoined from doing so, Defendants will continue to violate Section 2 of the Voting Rights Act and inflict injuries for which voters have no adequate remedy at law.

230.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these violations of Section 2 of the Voting Rights Act.

## Count VI

## Violation of the Help America Vote Act of 2002

231.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

232.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that complies with HAVA.

233.   Section 301 of HAVA requires states or other jurisdictions to maintain voting systems capable of producing a permanent paper record that can be audited. 52 U.S.C. § 21081(a)(2)(B)(i).

234.   Defendants violated Section 301 of HAVA by: (a) deploying voting machines that produce no paper record when votes are cast; and (b) deploying voting machines that cannot be audited because they fail to produce a paper record when votes are cast.

235.   Section 302 of HAVA requires states to provide a provisional ballot to any person not on the voter registration list or whom an elections official determines is ineligible to vote.  *Id.* § 21082(a).  Section 302 of HAVA also requires states to provide a voter with information on how to check whether his or her provisional ballot has been counted.  *Id.* § 21082(a)(5).  Section 302 of HAVA further provides that states must count a provisional ballot if the voter is eligible to vote.  *Id.* § 21082(a)(4).

236.   Defendants violated Section 302 of HAVA by: (a) failing to ensure that elections officials provided accurate information about provisional ballots; (b) failing to ensure that elections officials permitted people to cast provisional ballots; (c) failing to ensure that precincts had a sufficient number of provisional ballots for voters; and (d) failing to count otherwise valid provisional ballots.

237.   Under Section 303 of HAVA, voters have a right to a centralized, uniform, accurate, and interactive statewide voter registration list that contains the name and registration of every legally registered voter in the state and is maintained by the state.  *Id.* § 21083(a)(1)(A), (a)(4).  Section 303 of HAVA also gives voters a right to an accurate, regularly updated, and secure list that is maintained by the state and secure enough to prevent unauthorized access.  *Id.* § 21083(a)(2), (a)(4).

238.   Defendants violated Section 303 of HAVA by failing to maintain a functioning, accurate, and secure statewide voter registration list.  *Id.* § 21083(a)(4).

239.   Unless enjoined from doing so, Defendants' election administration will continue to violate HAVA and inflict injuries for which voters have no adequate remedy at law.

240.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these violations of HAVA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

1. Declaring that Georgia's current elections process violates Georgians' fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution;

2. Declaring that Georgia's current elections process violates the ban on racial discrimination in voting under the Fifteenth Amendment to the U.S. Constitution;

3. Declaring that Georgia's current elections process violates Georgians' right to Equal Protection under the Fourteenth Amendment to the U.S. Constitution;

4. Declaring that Georgia's "use it or lose it" statute violates Georgians' procedural Due Process rights under the Fourteenth Amendment to the U.S. Constitution;

5. Declaring that Georgia's current elections process violates § 2 of the Voting Rights Act, 52 U.S.C. § 10301;

6. Declaring that this Court will retain jurisdiction pursuant to § 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), for such period as it may deem appropriate.  During such period no voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until this Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color;

7. Declaring that Defendants, in violation of the Help America Vote Act, failed to use secure, auditable voting machines; failed to ensure proper administration of provisional ballots; and failed to maintain a functioning, accurate, and secure statewide voter registration list;

8. Permanently enjoining Defendant Secretary of State from using the "use it or lose it" statute described above and to reinstate all Georgia voters who were removed from the voter registration list based on this unconstitutional policy, unless the person is ineligible to vote for a different, constitutional reason based on Georgia law;

9. Permanently enjoining Defendant Secretary of State from using the "exact match" policy described above and to register all Georgia voters whose registrations were not completed based on this unconstitutional policy;

10. Permanently enjoining Defendants from using the insecure and unreliable DRE voting machines that lack a paper trail, and replace DRE voting machines with paper ballots counted by optical scanners;

11. Permanently enjoining Defendants to oversee adequately elections by enforcing uniform standards and processes that:

   a. Ensure that counties accurately, timely, and securely process all voter registration requests consistent with Georgia and federal law governing voter registration;

   b. Ensure Georgia's voter registration list is administered in accordance with the Help America Vote Act, including by maintaining a

functioning, accurate, and secure voter registration website where

people can check their registration status, precinct, and ballot status;

c.   Document each person whom elections officials or poll workers

determine will not be given a ballot, the reason for the determination,

and the person who made the determination;

d.   Ensure that counties accurately and timely process all absentee ballot

requests consistent with Georgia and federal law governing absentee

ballots;

e.   Ensure each county has and deploys to each polling place for any

election day an adequate and reasonable number of functioning and

secure voting machines, including Express Polls; an adequate and

reasonable number of paper ballots and provisional ballots; an

adequate and reasonable amount of signage, including signage

explaining voters' rights; and all other materials or tools necessary for

voting;

f.   Ensure each precinct and county has enough ballot-casting stations to

service adequately the number of voters assigned to the precinct, such

that no voter will wait longer than 30 minutes to vote;

88

g.  Ensure all registered voters in a precinct can vote without unreasonable delay or hardship during any election;

h.  Ensure each county timely recruits and hires an adequate number of elections officials and poll workers before each election to ensure proper staffing on any election day;

i.  Provide for the timely and systematic training, based on comprehensive statewide curriculum, of elections officials and poll workers before every election;

j.  Ensure each county has adequate materials, training, and support for all elections officials and poll workers to fairly and reasonably administer elections in accordance with Georgia and federal law;

k.  Ensure timely, adequate, and meaningful processes before Georgians are deprived of the right to vote, and timely, adequate, and meaningful processes for Georgians to remedy erroneous deprivations of the right to vote, including for voter registration, voter eligibility, and provisional ballot casting;

l.  Establish and maintain requirements and processes for periodic reports from county boards of elections and audits of county boards of elections' activities to ensure that the foregoing standards, processes,

89

and requirements are adhered to and that each county has adequate

procedures, policies, and staff in place to ensure efficient, just, and

fair elections; and

m. Provide such periodic reports and audits to be made public at or about

the same time that they are received by the Defendants, including at

regular intervals during any election day, to allow voters and the

public access to information about voting problems with sufficient

time to seek redress about those problems in court;

12. Permanently enjoining Defendants to ensure each county conducts efficient,

just, and fair elections;

13. Awarding Plaintiffs their reasonable attorneys' fees and costs in bringing

this action; and

14. Providing such other and further relief as the Court may deem just and

proper.

Respectfully submitted,

February 19, 2019         By: _____

Allegra Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
Allegra.Lawrence-Hardy@lawrencebundy.com
Leslie.Bryan@lawrencebundy.com
Maia.Cogen@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Blvd.
Suite 350
Fulton, MD 20789
Telephone: 240-786-4998
Fax: (240) 786-4501
Thomas.Bundy@lawrencebundy.com

Lovita Tandy (GA Bar No. 697242)
**TANDY LEGAL**
4480 South Cobb Drive
Suite H-315
Smyrna, GA 30080
Telephone: (770) 274-6179
lovita@tandylegal.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005

Telephone: (202) 479-1111
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, N.E.
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
kurt@summervillefirm.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 14th Street, NW
8th Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com

Andrew D. Herman (Admitted *pro hac vice*)
Sarah Dowd (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 16th St. NW
Washington, DC 20006
Telephone: (202) 626-5800

Fax: (202) 626-5801
aherman@milchev.com
sdowd@milchev.com

Kali Bracey (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
KBracey@jenner.com

Jeremy H. Ershow (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jershow@jenner.com

*Counsel for Fair Fight Action; Care in Action;
Ebenezer Baptist Church of Atlanta, Georgia, Inc.;
Baconton Missionary Baptist Church; Virginia-
Highland Church, Inc.; and Sixth Episcopal
District of the African Methodist Episcopal Church*

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of February, 2019, I electronically filed the foregoing AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Brian Edward Lake**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth St., N.W.
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: blake@robbinsfirm.com

**Bryan P. Tyson**
Strickland Brockington Lewis, LLP
1170 Peachtree Street, NE
Suite 2200, Midtown Proscenium
Atlanta, GA 30309-7200
678-347-2200
Fax: 678-347-2210
Email: bpt@sbllaw.net

**Carey Allen Miller**
Robbins Ross Alloy Belinfante Littlefield, LLC
500 14th Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: cmiller@robbinsfirm.com

**Joshua Barrett Belinfante**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth St., N.W.
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com

**Vincent Robert Russo , Jr.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth St., N.W.
Atlanta, GA 30318
404-856-3260
Fax: 404-856-3250
Email: vrusso@robbinsfirm.com

*/s/Allegra  Lawrence*
—————————————————————
Allegra Lawrence
Georgia Bar No. 439797