## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al*.,

     Plaintiffs,

vs.

BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia; *et al.*,

     Defendants.

Civil Action No.: 1:18-cv-05391-SCJ

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendants Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia and Chairman of the State Election Board of Georgia ("Secretary Raffensperger"), and Rebecca N. Sullivan, David J. Worley, Anh Lee,[1] and Seth Harp, in their official capacities as members of the State Election Board (collectively, "Members"), and the State Election Board ("Board") (collectively "Defendants"), hereby submit this Brief in Support of Their Renewed Motion to Dismiss Plaintiffs' Amended Complaint.

---

[1] Replacing Ralph "Rusty" Simpson pursuant to Fed. R. Civ. P. 25(d).

# **INTRODUCTION**

After Defendants pointed out the serious deficiencies in the original Complaint, Plaintiffs have now tried again to state a claim—but still have come up short. Ignoring the oft-quoted saying, "the plural of 'anecdote' is not 'data,'" Plaintiffs' Amended Complaint attempts to string together a variety of isolated incidents to weave a new theory: that a variety of independent and unrelated actions by mostly local officials somehow resulted in constitutional violations that require massive judicial intervention. Indeed, Plaintiffs claim that Georgia's election system is so flawed that the only solution is to place the entire state in a federal receivership, with this Court as the new source of "uniform standards and processes" for governing all Georgia elections. [Doc. 41, pp. 87-90].

Whatever Plaintiffs' views on proper election administration, they should direct their critiques to the state's policy-making body: the Georgia General Assembly.[2] Even as this brief is filed, the legislature is considering legislation that

---

[2] At least one of the Plaintiffs appears to recognize this. Fair Fight Action has hired lobbyists to engage on the election reform bill that passed the Georgia House of Representatives and is currently being considered by the State Senate. *See* Lobbyist Search – by Group Results for 2006 and Newer (showing five registered lobbyists for Plaintiff Fair Fight Action, Inc.), *available at* http://media.ethics.ga.gov/search/Lobbyist/Lobbyist_Groupsearchresults.aspx?&Year=2006%20and%20Newer&GroupName=fair%20fight&GroupNameContains=

could moot or significantly alter most of Plaintiffs' claims and transform them into even more speculative harms.

Specifically, the House of Representatives passed House Bill 316 on February 26, 2019, which, among other changes, (1) provides for new voting machines that mark paper ballots; (2) gives more time and notifications to voters before their registrations are cancelled; (3) creates new processes for list maintenance in coordination with other states; (4) limits rejections of absentee ballots; (5) prohibits changes in polling locations within certain time limits before an election; (6) eliminates most restrictions on assistance to voters; and (7) provides for audits of voting systems after elections.[3] The Senate is currently considering the legislation. This likely change in law is critical: because the Eleventh Amendment limits Plaintiffs to prospective relief only, any statutory change automatically moots any claims of harm caused by current law and policy.

But even if this case goes forward after this legislation is enacted, Plaintiffs' Amended Complaint still fails to sufficiently allege standing or place any claims properly before this Court. Specifically, Plaintiffs have not (1) alleged sufficient facts to confer standing; (2) joined all proper parties; (3) stated a failure to train theory; (4) stated a claim regarding voter list maintenance; (5) stated a claim

---

[3] *See* Bill Status, available at http://www.legis.ga.gov/legislation/en-US/Display/20192020/HB/316

against the Board or its Members permissible under the Eleventh Amendment nor 42 U.S.C. § 1983; and (6) stated sufficient causation against the Board or its Members. This is not mere advocacy; it is binding precedent: the United States Supreme Court has already ruled on a system for voter list maintenance like Georgia's and this Court has granted a motion to dismiss on a similar claim. Dismissal is, therefore, warranted.

## STATEMENT OF FACTS

The 2018 Election in Georgia produced "historic voter registration and turnout," that was greater than any previous midterm election in Georgia history. [Doc. 41, ¶ 43]. Plaintiffs[4] allege, generally, that this record turnout and vote total (and electoral loss of their preferred candidate) masked "time-tested voter suppression tactics." *Id.* at ¶ 44. Their candidate having lost the election, Plaintiffs now seek to litigate the 2018 election not only through their legislative lobbying efforts, but by attempting an end-run around the legislature by relying on this Court to rewrite Georgia's election laws. *See generally* [Doc. 41].

To achieve these goals, the Amended Complaint raises six flawed counts that allege a wide array of unconstitutional or otherwise illegal acts under the First,

---

[4] Plaintiffs are Fair Fight Action; Care in Action; Ebenezer Baptist Church of Atlanta, Inc.; Baconton Missionary Baptist Church, Inc. (BMBC); Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc. (Sixth District A.M.E.).

Fourteenth, and Fifteenth Amendments to the United States Constitution, § 2 of the

Voting Rights Act, and §§ 301 and 302 of the Help America Vote Act. *Id.*

## ARGUMENT AND CITATION OF AUTHORITY

To survive a motion to dismiss, a complaint must "state a claim to relief that

is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The

complaint must demonstrate "more than a sheer possibility that a defendant has

acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court

must assume the veracity of well-pleaded factual allegations, it is not required to

accept as true legal conclusions when they are "couched as [] factual

allegation[s]." *Iqbal*, 556 U.S. at 678-79.

## I.   Plaintiffs' Amended Complaint Should Be Dismissed for Lack of Standing.

A party invoking federal jurisdiction bears the burden of establishing standing

at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561, 570 n.5 (1992). *See also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267

(11th Cir. 2001) ("A party's standing to sue is generally measured at the time of

the complaint . . . "). "No principle is more fundamental to the judiciary's proper

role in our system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818

(1997).

Article III standing requires that each claim "clearly" establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)). Plaintiffs must allege sufficient facts to demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Plaintiffs have failed to do so.

   *A. Plaintiffs' Only Claimed Injury is an Alleged Diversion of Resources.*

There are no individual voters who are plaintiffs in this case. All of the Plaintiffs are organizations and have alleged no harm other than to their respective corporate missions and budgets. Several have alleged no harm except possible future spending. Such generalized grievances do not establish standing in federal courts. *United States v. Hays*, 515 U.S. 737, 743 (1995).

First, an injury must actually "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560. It must be a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982).

Second, an injury must constitute more than a "setback to the organization's abstract social interests." *Id.* at 379. Standing is not established when the alleged harm that befalls an organization is to act consistently with its existing mission.

This includes plaintiffs that engage in advocacy efforts. *Int'l Acad. of Oral Med. & Toxicology v. Food & Drug Admin.*, 195 F. Supp. 3d 243, 256 (D. D.C. 2016). To the contrary, Plaintiffs must show Defendants' allegedly "illegal acts *impaired* the organization's ability to engage in its own projects by forcing the organization to *divert resources in response*." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (emphasis added). *See also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (injury must inhibit "organization's daily operations"); *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (conflict between policy and organizational mission not enough for Article III standing).

Third, any alleged harm must be imminent and not "conjectural or hypothetical." *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003). This means that, when various steps are necessary to establish the injury, each step must be alleged. *Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). While there is no "per se rule denying standing to prevent probabilistic injuries," *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1162. (11th Cir. 2008), threatened injuries that depend on conjecture are too speculative. *Id*. at 1163. Turning to the individual Plaintiffs in this action, several allege only possible future injuries (based on current but likely changing law). Plaintiff Fair Fight Action only alleges

that it plans to "implement new education programs" and engage in other new activities in the future.[5] [Doc. 41, ¶¶ 12-13]. Plaintiff BMBC's only alleged current harm was a frustration of their mission; all its other alleged harm is in the future. [Doc. 41, ¶ 26]. Plaintiff Virginia-Highland only alleges that it will undertake future education efforts but has not yet spent any resources on those efforts. [Doc. 41, ¶¶ 29-30]. Plaintiff Sixth District A.M.E. likewise only plans to spend future funds. [Doc. 41, ¶ 34].

Only Plaintiffs Care in Action and Ebenezer Baptist Church have alleged that any diversion has already taken place. [Doc. 41, ¶¶ 18-19, 23]. Plaintiff Care in Action claims it spent additional resources during the 2018 Election, but only for purposes that related to its existing mission: assisting individuals in voting. [Doc. 41, ¶¶ 15-17]. The only other alleged harm is the need for future education and assistance to voters (other than a conclusory statement that resources have been shifted). [Doc. 41, ¶ 18]. Likewise, Plaintiff Ebenezer Baptist Church alleges

---

[5] Plaintiffs cannot include resources spent on litigation or "detecting and challenging illegal practices" as an injury for standing purposes. *Browning*, 522 F.3d at 1166; *see also Food & Water Watch*, 808 F.3d at 919 (use of "resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury"). Perhaps recognizing this fact, the Amended Complaint does not cite spending on this lawsuit as a harm to Fair Fight Action. Of course, the organization's primary purpose is this lawsuit, as former state representative Stacey Abrams announced when it was created. *See* fundraising email quoted at https://www.georgiapol.com/2018/11/26/fair-fight-to-host-press-conference-on-federal-lawsuit-to-be-filed-tuesday/

that it worried about potential problems and so it engaged in a vote-by-mail effort that was consistent with the church's larger mission. [Doc. 41, ¶¶ 22-23]. In other words, it spent resources to further its *existing* mission. Any remaining alleged harms are future in nature, with the allegation that the church will have to undertake additional activities. [Doc. 41, ¶ 23].

Plaintiffs' alleged future harms require a series of speculative events before they occur, especially in light of the General Assembly's current efforts. If the law changes, which seems likely, Plaintiffs' future education efforts will become unnecessary. While Plaintiffs have clear advocacy positions, like the plaintiffs in *Int'l Acad. of Oral Med.*, they only plan to continue working to further their missions and may not even undertake future education efforts. Doing the job one sets out to do is not an injury—it is a purpose, and it does not establish standing.

### B. Plaintiffs' Alleged Injury Is Not Traceable To Defendants.

The "causation piece of Article III standing is vital." *Samuels v. Fed. Hous. Fin. Agency*, 54 F. Supp. 3d 1328, 1334 (S. D. Fla. 2014) (declining to find standing based on diversion of resources because it was not "fairly traceable to the defendant's allegedly unlawful conduct"). Not only must the injury (here, the diversion of resources) be traceable to Defendants, the expenditure must relate to the challenged conduct; "allegations of a possible future injury are not sufficient."

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1999)). In *Clapper*, the Supreme Court found that the plaintiffs lacked standing despite (1) having a good-faith, non-paranoid belief that they would be surveilled by the challenged government program; and (2) making financial decisions based on those fears. 495 U.S. at 415-16. After *Clapper*, federal courts may not allow plaintiffs to demonstrate standing by "manufactur[ing] standing merely by inflicting harm on themselves [by expending resources] based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416.[6]

Plaintiffs here are engaged in the same, flawed exercise. They allege little more than (1) state officials will implement existing laws using existing voting systems (which is likely inaccurate); and (2) that they plan to spend resources to fund already-existing programs or potentially establish new programs to advance their already-existing organizational missions. [Doc. 41, ¶¶ 10-35]. Both allegations ignore that the existing laws are likely to change; that any harm based

---

[6] Many of the Eleventh Circuit's decisions on organizational standing came before *Clapper*, but each identified a traceable harm back to the actions of the named defendant. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353-55 (11th Cir. 2009) (new photo ID law); *Arcia*, 772 F.3d at 1340 (new voter list maintenance program); *Browning*, 522 F.3d at 1157-58 (new voter verification program). Here, Plaintiffs focus on a fear of existing voting laws, much more like the plaintiffs in *Clapper*.

on the implementation of new laws is completely speculative; and Plaintiffs'
assertions are based on fears that the exact statutes will be implemented the exact
same way as they contend was wrong in 2018. This type of speculation cannot
establish standing, and Plaintiffs' Amended Complaint should be dismissed.

    *C. Plaintiffs Alleged Injuries Are Not Redressable By Defendants.*

    A related but independent element of standing, redressability, requires a
court to consider whether deciding for plaintiffs would increase the likelihood "that
the plaintiff would obtain relief that directly redresses the injury suffered."
*Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010).

    Plaintiffs cannot show redressability as, even if the Court grants every
remedy sought by Plaintiffs, they would not obtain relief from the sole injury they
allege. Plaintiffs would still spend resources on their primary missions: educating
voters and assisting voter turnout operations. Despite the Amended Complaint's
conclusory statements about redressability, a wholesale change to Georgia's voting
system would likely require Plaintiffs to spend even *more* resources on their
lobbying and education missions.

    This is in sharp contrast to the remedies for other organizations in Eleventh
Circuit cases involving organizational standing. In *Ga. Latino Alliance for Human
Rights v. Governor of Ga.*, the plaintiffs would no longer have to cancel citizenship

classes if the allegedly unconstitutional law was overturned. 691 F. 3d 1250, 1260 (11th Cir. 2012). In *Browning*, the plaintiffs would be able to begin "specific projects during a specific time" if a challenged Florida law was overturned. 522 F.3d at 1166. In *Common Cause*, the plaintiffs would be able to conduct 15-20 voter registration drives if they no longer had to help individuals obtain photo identification. 554 F.3d at 1350. Here, Plaintiffs would merely spend funds on the same (or similar) projects they did before the change.

Because Plaintiffs have not shown any of the required elements of standing, the Amended Complaint should be dismissed. At the very least, this Court should dismiss all Plaintiffs other than Care in Action and Ebenezer Baptist Church; the only Plaintiffs to allege they have taken any action beyond filing this lawsuit.

## II.   Plaintiffs Failed To Join Necessary Parties Or Inadequately Pleaded A Failure to Train Theory.

Either Plaintiffs failed to join necessary parties, or their claims are limited to a failure to train theory. If the former, the case should be dismissed for failure to join all necessary parties. If the latter, Plaintiffs' failure to train claims should be dismissed for failure to state a claim for which relief can be granted.

### A. *Plaintiffs Failed To Join Necessary Parties.*

As a consequence of Plaintiffs' erroneous contention that state (and not local) government officials administer elections, the Amended Complaint is

subject to dismissal under Federal Rules of Civil Procedure 12(b)(7) and 19. Those rules require plaintiffs in federal court to join all necessary parties. *Id.* A party is necessary if, "in that person's absence, the court cannot afford complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). The essence of Plaintiffs' Amended Complaint is that Defendants engaged in "gross mismanagement" of an election. [Doc. 41, ¶ 2]. The problem with that theory is that Defendants neither manage nor administer Georgia elections; county election officials do.

Plaintiffs' first error is alleging that the Georgia Secretary of State "oversees and administers elections." [Doc. 41, ¶¶ 36, 42]. *See Iqbal*, 556 U.S. at 678 ("[T]enet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions."). Despite Plaintiffs' litany of claims that the Secretary is responsible for elections, O.C.G.A. § 21-2-50 enumerates the statutory authority of the Secretary, and none of the 15 enumerated duties give the Secretary control over counties and election superintendents. The Secretary must provide training to registrars and superintendents (O.C.G.A. § 21-2-50(11)), but he does not watch them process voter registration applications, count ballots, administer provisional ballots, or control how poll officers undertake those activities. The Secretary must maintain the official list of registered voters (O.C.G.A. § 21-2-50(a)(14)), but he does not enter information into the voter registration system;

local voter registrars do.[7] Similarly, the Board's statutory duties are set forth in

O.C.G.A. § 21-2-31, which also does not give it control over county officials.[8]

The Georgia Election Code is equally clear that the duties of administering

and conducting elections fall onto local superintendents who "instruct poll officers

and others in their duties" and "select and equip polling places" (as well as a host

of other acts complained of by Plaintiffs). O.C.G.A. § 21-2-70. As such, any

alleged defects in the election administration are properly addressed to local

officials. Here, the Amended Complaint alleges issues with determinations made at

local county elections offices—including counting of votes, handing out of

provisional ballots and supplies, decisions regarding precinct locations, informing

voters where to vote, and administering absentee ballots—all of which are under

local control. [Doc. 41, ¶¶ 60, 109, 111-119, 122-127[9], 134-138, 142-143, 151-

152].

---

[7] Even Plaintiffs cannot deny which entity conducts elections, because one of their allegations about the Secretary's role specifically refers to "how counties conduct elections." [Doc. 41, ¶ 60].

[8] Plaintiffs correctly identify that the State Election Board has the authority to investigate violations of election laws and bring enforcement actions (O.C.G.A. § 21-2-31), but Plaintiffs are not alleging that Defendants are violating the Election Code—instead they are challenging the constitutionality of a variety of election laws that county officials are implementing as written.

[9] Plaintiffs' contention that the Secretary prints provisional ballots is also wrong as a matter of law. *See* O.C.G.A. §§ 21-2-418, -419 (provisional ballots use same form as absentee ballots from local superintendent); 21-2-400(a) (Secretary responsible for providing some supplies, but not provisional ballots).

In addition, Plaintiffs allege that these purported injuries took place in at least Carroll, Chatham, Cherokee, Clarke, Cobb, DeKalb, Dougherty, Early, Fulton, Gwinnett, Henry, Muscogee, and Randolph counties. [Doc. 41, ¶¶ 60, 73, 103, 104, 114, 117, 120, 123, 125, 134, 136, 137, 142, 151]. No one from those counties is named in the Amended Complaint or under the control of Defendants.[10]

Thus, Defendants do not control and cannot directly prevent a local official(s) from (1) closing polling places [Doc. 41, ¶¶ 108-110]; (2) not distributing provisional ballots [Doc. 41, ¶¶ 127-129]; (3) not allocating sufficient resources to polling places [Doc. 41, ¶¶ 121-126]; (4) processing absentee ballots [Doc. 41, ¶ 142-149]; or (5) improperly entering information for voter registration [Doc. 41, ¶¶ 111-120]. All of these are county functions as a matter of law—not the responsibility of Defendants. O.C.G.A. §§ 21-2-31, 21-2-50. This Court cannot substitute Georgia law with Plaintiffs' erroneous description of facts. *Iqbal*, 556 U.S. at 678. This error is dispositive and warrants a dismissal of Counts I-V and parts of VI, including the HAVA claims against the Board and its Members.

---

[10] Plaintiffs' claims are dramatically different than those heard by this Court in *Democratic Party v. Crittenden*, No. 1:18-CV-5181-SCJ, 2018 U.S. Dist. LEXIS 196218 (N.D. Ga. Nov. 14, 2018), because the plaintiff asserted associational standing and the remedy sought was rooted in the Secretary's authority under O.C.G.A. § 21-2-499 to "notify counties of errors in their computation and tabulation of votes, and to direct them to re-certify such returns." *Id*. at *22 n.2.

B.  *Plaintiffs' Failure To Train Theory Fails To State A Claim.*

Plaintiffs' Amended Complaint repeatedly alleges that the inaction of Defendants and various actions of local county election officials amount to an unconstitutional failure to train by Defendants. *See, e.g.,* [Doc. 41 ¶ 139] (noting Defendants' alleged "failure to train county elections officials adequately"). Plaintiffs similarly incorporate this alleged failure in their constitutional claims in Counts I, II, and III, [Doc. 41 ¶¶ 163, 164, 175, 175, 189, 190, 197]. Plaintiffs' Amended Complaint remains insufficient. Constitutional claims brought pursuant to 42 U.S.C. § 1983 under a failure to train theory require greater specificity and, at minimum, a responsibility for training must exist prior to liability attaching for an alleged failure.

In the failure to train context, the Supreme Court has held that the inadequacy of "training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [trainee] comes into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Similarly, unsatisfactory training of a particular officer "will not alone suffice to fasten liability on the [government]" nor will allegations that claim "an injury or accident could have been avoided if an officer had had better or more training" establish liability. *Id*.

Additionally, the conduct at issue must be the responsibility of an employee or agent of Defendants to sustain a failure to train claim—liability absent such a relationship would be illogical and would contort § 1983 in an untenable manner, vitiating any requirement of causation between alleged improper training and unconstitutional actions. *See Monell v. Dept of Social Svcs. Of the City of New York*, 436 U.S. 658, 692-95 (1978) (liability attaches only where government caused employee or agent to violate another's constitutional rights). Here, Defendants train only elections superintendents and registrars. O.C.G.A. §§ 21-2-50, 21-2-100. Defendants do not supervise, train, or guide local poll officers—that duty falls to the counties whom Defendants have chosen to not join in this suit. O.C.G.A. §§ 21-2-40, 21-2-70.

Even if Defendants did have supervisory authority over local officials, Plaintiffs have failed to elucidate (1) what training provided by or required of Defendants may have been at fault; (2) whether the allegedly faulty training policy was a "'moving force' behind the constitutional violation[s]" *id.* at 389 (quoting *Monell*, 236 U.S. at 694 and *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)); (3) which local officials were not properly trained; (4) how any alleged failures could be traced to systemic and unconstitutional insufficient training (versus, human error); and (5) that adequate training would have prevented alleged harms.

Instead, Plaintiffs point only to broad statutory requirements of Defendants and scattered instances of local election official conduct. For example, Plaintiffs point to the Secretary of State's responsibility to conduct yearly "training sessions . . . for the training of registrars and superintendents," [Doc. 41 ¶ 57] (citing O.C.G.A. § 21-2-20(a)(11)), and an uncited 2011 presentation given by then-Secretary Kemp to county officials [Doc. 41 ¶ 66],[11] then go on to repeat boilerplate training language throughout the Amended Complaint. Such broad allegations are insufficient to put Defendants on notice of what training, or training responsibility, was allegedly unconstitutional. *See Twombly*, 550 U.S. at 570.

Even if Plaintiffs had sufficiently identified what training or training responsibility was at fault here, their Amended Complaint fails to establish a sufficient pattern of conduct to amount to a deliberate indifference as required to state a claim. *Harris*, 489 U.S. at 388. Plaintiffs allege Defendants failed to train officials regarding provisional and absentee ballots, [Doc. 41 ¶¶ 51-61], and in doing so point to three instances in Gwinnett, Henry, and Muscogee counties where voters were allegedly either misinformed as to their ballot status or

---

[11] Notably, Plaintiffs point to no statutory requirement of training as it pertains to the Board, and for good reason—none exists. *See generally* O.C.G.A. § 21-2-31 (enumerating duties of the Board). As such, to the extent Plaintiffs' claims in Counts I-III attempt to pin liability on the Board on the basis of training, those claims must be dismissed.

provisional ballot availability. [Doc. 41 ¶¶ 134-37]. Plaintiffs do not, however, allege how such isolated instances were the result of a systemic failure to train. Similarly, Plaintiffs cite a handful of instances where conduct of *local* officials is questioned as to absentee ballots [Doc. 41 ¶ 140-55], but again allege no facts linking the alleged actionable conduct to constitutionally insufficient training by Defendants.

Incredulously, Plaintiffs also cite *Democratic Party of Ga. v. Burkes* in support of their failure to train theory. No. 1:18-cv-00212 (M.D. Ga. Nov. 8, 2018). The facts in *Burkes* are unusual and specific, but in no way point to a failure in training. There, an individual had successfully enjoined the printing of absentee ballots as he sought to qualify as an independent candidate. *Id*. That injunction was ultimately lifted, but it was followed by Hurricane Michael. The hurricane shuttered the offices of the Dougherty County Board of Elections for three additional days. *Id.* [Doc. 2-1]. After litigation that lasted *a single day*, the County Board entered into a consent order to accept absentee ballots postmarked by Election Day for an additional three days. *Id*. [Doc. 2-5]. Plaintiffs' use of *Burkes* is simply a bridge too far. As counsel for the plaintiffs acknowledged in *Burkes*, that case was simply "a confluence of extraordinary circumstances," *Id.* [Doc. 1], not an example of a systemic failure to train which led to constitutional violations.

### III.   Plaintiffs' Claims About Voter List Maintenance Should Be Dismissed.

In Counts I-V of the Amended Complaint, Plaintiffs allege that the voter list maintenance process contained in O.C.G.A. § 21-2-234 violates a variety of constitutional and statutory provisions. Plaintiffs' claims about this statute should be dismissed for failure to state a claim.[12] The Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The voter-list-maintenance statute is just such a regulation.

The evaluation of voting regulations under the right to vote takes place under a sliding scale, considering the alleged burden against the interest of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428,

---

[12] Two years ago, this Court granted a motion to dismiss a challenge to the same statute under the National Voter Registration Act (NVRA) and the First Amendment. *Common Cause v. Kemp*, 243 F. Supp. 3d 1315 (N.D. Ga. 2017), *vacated and remanded* 714 Fed. App'x. 990 (11th Cir. 2018).

434 (1992)). This *Anderson/Burdick* standard is applied regardless of how

Plaintiffs frame a Fourteenth Amendment claim. *Friedman v. Snipes*, 345 F. Supp.

2d 1356, at 1378-1379 (S.D. Fla. 2004) (citing *Fulani v. Krivanek*, 973 F.2d 1539,

1543 (11th Cir. 1992)).

Maintaining an accurate voter list using the process in O.C.G.A. § 21-2-234

is part of the state's important regulatory interests. The Supreme Court recognized

this fact in reviewing Ohio's list maintenance procedures last year. In *Husted v. A.*

*Philip Randolph Inst*., 584 U.S. ___, 138 S. Ct. 1833 (2018), the Supreme Court

explained that the National Voter Registration Act (NVRA) requires states to

conduct voter list maintenance to remove the names of voters who are ineligible by

reason of death or a change in residence. *Id*. at 1838.

In *Husted*, the Court was reviewing a challenge to Ohio's list maintenance

system under the NVRA and explained that Ohio's process involved two steps.

First, the state lawfully sent notices to registrants identified by the Postal Service

as having moved. *Id*. at 1840. Second, Ohio sent notices to anyone who had not

engaged in voter activity for two consecutive years—having no contact with the

registrar for that period. *Id*. If the individual failed to respond to the notice and was

inactive for four additional years, they were removed from the voter rolls. *Id*. at

1841. This process is almost identical to Georgia's process, as outlined in

O.C.G.A. § 21-2-234 and Plaintiffs' Amended Complaint.[13] [Doc. 41, ¶¶ 70-72].

While relying on other constitutional provisions than those raised in *Husted*, Plaintiffs' challenge to O.C.G.A. § 21-2-234 similarly centers on the impact of a voter failing to return the notification from the state. [Doc. 41, ¶¶ 71-72, 75], 138 S. Ct. at 1845-46. The plaintiffs in *Husted* argued, as Plaintiffs do here, that a non-returned notice effectively removed someone from the rolls for failing to vote. *Id*. The Supreme Court disagreed, finding that a "State violates the Failure to Vote Clause *only* if it removes registrants for *no reason other* than their failure to vote." *Husted*, 138 S. Ct. at 1842 (emphasis added). Ohio's (and thus Georgia's) laws did not meet that standard. *Id*. at 1845-46.

Squarely rejecting the sort of judicial encroachment that Plaintiffs seek here, the Supreme Court based its decision to uphold Ohio's process on the fact that it had "no authority to dismiss the considered judgment of Congress and the Ohio Legislature regarding the probative value of a registrant's failure to send back a return card." *Husted*, 138 S. Ct. at 1846. As the Court determined, Congress *requires* states to use a voter list maintenance process under the NVRA that specifically includes the option of a return card. 52 U.S.C. §§ 20507(a)(4),

---

[13] In fact, Georgia's process is *more forgiving* than that of Ohio at issue in *Husted*, requiring three years of no contact before an initial notice and then two federal election cycles of inactivity before removal. O.C.G.A. §§ 21-2-234, 21-2-235.

20507(d)(2). And, the Constitution expressly grants to States the authority to set the "Times, Places and Manner" of elections absent additional congressional direction. U.S. Const. Art. I, § 4, cl. 1.

Plaintiffs have not challenged the federal laws that specifically require voter list maintenance and outline the processes to be used by the state, nor have they pleaded any facts different from those raised in *Husted*. Thus, *Husted* is dispositive and warrants a dismissal of those portions of Plaintiffs' Amended Complaint that challenge O.C.G.A. § 21-2-234.[14]

## IV.   Plaintiffs' Claims Against The Board Are Barred By The Eleventh Amendment And Because State Agencies Are Not Persons Under § 1983.

"Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, [ ] a State cannot be sued directly in its own name regardless of the relief sought." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985). This immunity also extends to state agencies. *Id.* at 169; *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *Howlett v. Rose*, 496 U.S. 356, 365 (1990) ("[T]he State, and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either

---

[14] This is also why Plaintiffs' use of the political catchphrases "voter purges" and "use it or lose it" to describe the statutory voter list maintenance process required by the NVRA are not accurate descriptions of the statute at issue before this Court.

federal court or state court."). Because the Board is a state agency, O.C.G.A.

§ 21-2-30, claims against it are barred by the Eleventh Amendment. Plaintiffs may

also not pursue their federal claims against the Board because it is not a "person"

within the meaning of 42 U.S.C. §1983.[15] *See Will*, 491 U.S. at 65 ("[A] State is

not a 'person' within the meaning of §1983.").

**V.    Plaintiffs' Claims Against The Board And Its Members Should Be Dismissed For Failure to Plead Causation.**

As an initial matter, Plaintiffs' Amended Complaint is a shotgun pleading,

where every Count incorporates by reference each of 157 preceding paragraphs.

*See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1359 n. 9 (11th Cir. 1997).

Accordingly, Defendants have no way of knowing which allegations are against

them, and have therefore not been given adequate notice of the grounds for each

claim. *Id*. Plaintiffs' claims should be dismissed on this basis alone.

Plaintiffs also have not alleged any conduct by the Board or its Members

within their statutory authority that led to any supposed injury. As recognized in

the Amended Complaint, the statutory duties of the Board are limited and outlined

in O.C.G.A. § 21-2-31. Plaintiffs failed, however, to allege that the Board's

performance or non-performance of any of its statutory duties caused any of

---

[15] 42 U.S.C. § 1983 provides a cause of action for violations of federal constitutional or statutory rights by any "person" acting under color of law.

Plaintiffs' alleged harms. This warrants dismissal of the claims against the Board.

Indeed, Plaintiffs' only specific allegation regarding the Board is that it "rejected and rebuffed attempts . . . to improve the data security of the Georgia database of voters." [Doc. 41 ¶ 51]. This may not be Plaintiffs' preferred policy decision, but it is neither unconstitutional nor the basis of any of Plaintiffs' claims. Each Count simply asserts broadly that "Defendants" must "protect the integrity of elections," [Doc. 41, ¶¶ 162, 172, 185, 204, 211, 232] and that "Defendants" failed to do so as a result of various acts outside the Board's statutory purview [Doc. 41, ¶¶ 163, 164, 175, 176, 189, 190, 213, 214, 234]. Plaintiffs do not identify what harms, if any, are alleged to have been caused by the Board or its Members, nor do they challenge any rule promulgated by the Board. This is fatal to Plaintiffs' claims against the Board and its Members and, accordingly, they should be dismissed.

## <u>CONCLUSION</u>

Plaintiffs announced their lawsuit with great fanfare and have effectively used it as a means of raising funds, generating press coverage for their chosen policy preferences, and advancing a political agenda. Now, however, the Amended Complaint must survive judicial scrutiny. Like their first attempt, this second effort cannot. For these reasons, Defendants request that the Amended Complaint be dismissed with prejudice.

## <u>CERTIFICATION</u>

I certify that this brief has been prepared in a Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

Respectfully submitted this 5th day of March, 2019.

STATE LAW DEPARTMENT
Christopher M. Carr
     Attorney General
     GA Bar No. 112505
Annette M. Cowart
     Deputy Attorney General
     GA Bar No. 191199
Russell D. Willard
     Senior Assistant Attorney General
     GA Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

ROBBINS ROSS ALLOY BELINFANTE
LITTLEFIELD LLC

/s/ Josh B. Belinfante
Josh B. Belinfante
     GA Bar No. 047399
Vincent R. Russo
     GA Bar No. 242648
Brian E. Lake
     GA Bar No. 575966
Carey A. Miller
     GA Bar No. 976420
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381

Facsimile:    (404) 856-3250
jbelinfante@robbinsfirm.com
vrusso@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com

TAYLOR ENGLISH DUMA LLP
Bryan P. Tyson
     Special Assistant Attorney General
     GA Bar No. 515411
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678.336.7249
btyson@taylorenglish.com

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, *et al*.,

      Plaintiffs,

vs.

BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia; *et al.*,

      Defendants.

Civil Action No.: 1:18-cv-05391-SCJ

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this date electronically filed the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record listed on the case.

This 5th day of March, 2019.

                      /s/ Josh B. Belinfante
                      Josh B. Belinfante
                      GA Bar No. 047399