IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

   Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of the State
of Georgia and as Chair of the State
Election Board of Georgia, *et al.*,

   Defendants.

CIVIL ACTION FILE

NO. 1:18-cv-5391-SCJ

## ORDER

This matter appears before the Court on Defendants' Renewed Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. [48]).

## I. BACKGROUND

On February 19, 2019, Plaintiffs Fair Fight Action, Inc. ("Fair Fight Action"), Care in Action, Inc. ("Care in Action"), Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer"), Baconton Missionary Baptist Church, Inc. ("Baconton"), Virginia-Highland Church, Inc. ("Virginia-Highland"), and The

Sixth Episcopal District, Inc. ("Sixth Episcopal District") (collectively, the "Plaintiffs") filed an Amended Complaint for Declaratory and Injunctive Relief against Defendants Brad Raffensperger (in his official capacity as Secretary of State of the State of Georgia and as Chair of the State Election Board of Georgia), Members of the State Election Board in their official capacities (Rebecca N. Sullivan, David J. Worley, and Seth Harp), and the State Election Board (collectively, the "Defendants").  Doc. No. [41].[1]

In their Amended Complaint, Plaintiffs allege that there are "serious and unconstitutional flaws in Georgia's elections process" and that Defendants' actions with respect to the recent 2018 General Election "deprived Georgia citizens . . . particularly citizens of color, of their fundamental right to vote."  Doc. No. [41], ¶ 2.  More specifically, Plaintiffs allege that with respect to the 2018 General Election, "[t]he Secretary of State, the State Election Board, and its

───────────────────

[1] Plaintiffs' Amended Complaint was filed after Defendants sought to dismiss Plaintiffs' initial complaint, which was filed on November 27, 2018.  Doc. Nos. [1], [35].  As stated in the Court's prior order, the Amended Complaint superseded the initial complaint and is now the operative pleading in this case.  Doc. No. [55].  The Court also notes that the Amended Complaint did not re-name Ralph F. (Rusty) Simpson or his successor, Mrs. Anh Le as a member of the State Election Board, though Mrs. Le is referenced in the briefing as a member of the Board.  Doc. No. [48], p. 1., n.1.

members ("Defendants") enforced unconstitutional and otherwise unlawful legislation (such as O.C.G.A. § 21-2-234, which Plaintiffs refer to as the "Use it or Lose it" or voter-list purge statute[2]); created and enforced unconstitutional and otherwise unlawful policies (such as the "Exact Match" policy, which Plaintiffs say prevented Georgians from registering to vote); and engaged in gross mismanagement (through the use of technology that is vulnerable to hacking and manipulation, overseeing an election system dependent on unreliable voting machines, promoting the moving and closing of precincts and polling places, maintaining inaccurate voter registration rolls, not providing adequate resources to polling places, and inadequately overseeing and training election officials on provisional and absentee ballots). Id. ¶¶ 2, 39–157.

Plaintiffs assert six causes of action: (1) violation of the fundamental right to vote (First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count I); (2) violation of the ban on racial discrimination in voting (Fifteenth Amendment to the United States

---

[2] By contrast, Defendants assert that these are not accurate descriptions of O.C.G.A. § 21-2-234 and, instead, describe the statute as a "voter-list maintenance" statute. Doc. No. [48-1], p. 23, n.14.

Constitution, as enforced by 42 U.S.C. § 1983) (Count II); (3) violation of Equal Protection (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count III); (4) violation of Procedural Due Process (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count IV); (5) violation of Section 2 of the Voting Rights Act of 1965 (Count V); and (6) violation of the Help America Vote Act of 2002 (Count VI).   Plaintiffs seek injunctive and declaratory relief as to each count of the Amended Complaint.  Doc. No. [41], ¶¶ 168, 181, 200, 208, 230, and 240.

On March 5, 2019, Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint on various grounds, which include:  lack of standing, failure to join necessary parties, failure to state a claim, Eleventh Amendment immunity, and shotgun pleading.  Doc. No. [48].  The motion has been fully briefed by the parties. The Court also held a hearing on the pending motion on April 29, 2019.  The purpose of this hearing was for the parties to address the grounds of the pending motion, as well as the mootness doctrine due to the enactment of new election legislation by the Georgia General Assembly (House Bill 316 and House Bill 392, hereinafter "HB 316" and HB 392") after the close of the briefing.  Doc. No. [56].  Post-hearing, the Court permitted both sides an

4

additional seven days to submit supplemental briefing.  The briefing deadline expired on May 6, 2019, and this case is now ripe for review.

## II. DISCUSSION

The Court's discussion is divided into four parts.  First, the Court considers the jurisdictional threshold matters (i.e., standing, mootness, ripeness, and Eleventh Amendment Immunity).  Second, the Court considers the joinder/necessary party issue.  Third, the Court considers the failure to state a claim arguments and, last, the Court addresses the shotgun pleading assertions.

### A. <u>Standing</u>

#### 1. *The Plaintiffs*

Plaintiff Ebenezer is a 501(c)(3) non-profit entity organized under the laws of Georgia.  Doc. No. [41], ¶ 21.  Its purpose is "to be a global ministry dedicated to individual growth and social transformation through living in the message and carrying out the mission of Jesus Christ."  <u>Id.</u>  As a church serving Atlanta's African-American community, Ebenezer "has been engaged in the fight for voting rights since at least 1935."  <u>Id.</u> ¶ 22.  Consistent with its overall mission of social transformation, Ebenezer "regularly sponsors voter registration drives and activities, partners with community organizations to raise awareness regarding

5

voting, provides information and education to the community about voting, and provides community members with rides to voting locations."  Doc. No. [41], ¶ 22.  Plaintiffs allege that due to Defendants' conduct, Ebenezer engaged in an extensive vote-by-mail campaign in connection with 2018 General Election in an attempt to counter voter suppression tactics.  Id. ¶ 23.  Plaintiffs also allege that Ebenezer will have to undertake new activities in future election cycles to address the voting issues that arose in the 2018 election cycle.  Id.  According to Plaintiffs, Ebenezer was required to divert resources from its generalized voter awareness and registration efforts (and from other ministry activities) and will be required to do so in the future.  Id.

Baconton is a non-profit religious corporation organized under the laws of the state of Georgia.  Id. ¶ 25.  Its mission is to build "a biblically-based community of loving relationships where members love, follow, and model Jesus on a daily basis."  Id.  Baconton views voting as "an integral part of its community-building mission."  Id. It hosts activities such as voter registration drives and prayer meetings for candidates. Id.  Plaintiffs allege that in the 2018 election cycle, due to the "Use it or Lose it" statute and voter purges, Baconton diverted time and resources away from its regular voter activities to assisting

community members with determining whether they had been purged from the voter rolls. Doc. No. [41], ¶ 26. Plaintiffs allege that Baconton will have to continue to divert resources in future election cycles due to the Defendants' conduct. Id.

The Sixth Episcopal District is a 501(c)(3) non-profit entity, consisting of twelve church districts that represent 534 Georgia African Methodist Episcopal churches. Id. ¶ 31. Its mission is "church growth, Christian education, handling money God's way, and social justice." Id. As part of its social justice mission, the Sixth Episcopal District encourages voter registration of its congregants and provides funding to transport voters to the polls. Id. ¶ 32. In connection with the 2018 General Election, the Sixth Episcopal District focused on encouraging early voting and increasing voter education. Id. ¶ 33. Plaintiffs claim that the Sixth Episcopal District will have to divert resources from general "Souls to the Polls" work in future elections to counteract voter suppression. Id. ¶ 34. The resources that it will employ to ensure its congregants' votes are counted will be diverted from other ministry activities and programs, including those for food banks and homeless shelters. Id. ¶ 35.

7

Virginia-Highland is a 501(c)(3) non-profit corporation with a mission to "do justice, love mercy, and walk humbly." Doc. No. [41], ¶ 28. As part of its focus on social justice, Virginia-Highland engages in activities such as voter registration, training congregants to help others register, voter engagement efforts, and assisting with election-day transportation. Id. As a result of the voter suppression Virginia-Highland observed in the 2018 General Election, it is creating programs to educate voters on how to overcome voter-suppression obstacles in upcoming elections. Id. ¶ 29. To do so, Virginia-Highland must divert resources away from other church ministries and activities. Id. ¶ 30.

Fair Fight Action, formerly known as Voter Access Institute, is a 501(c)(4) non-profit corporation whose mission is to secure the voting rights of Georgians. Id. ¶ 10. It focuses on get-out-the-vote activities, providing general information to voters, and voter registration. Id. ¶ 12. To address the voter suppression tactics that it encountered in the 2018 General Election, Fair Fight Action is diverting resources from its existing general information/get-out-the-vote programs to new education programs designed to address voter suppression in future election cycles. Id. ¶¶ 12–13.

8

Care in Action is a 501(c)(4) non-profit entity dedicated to dignity and fairness for domestic workers.  Doc. No. [41], ¶ 14.  Its activities include organizing and training domestic workers on issues such as immigration, sexual harassment, and human trafficking.  Id.  As part of its mission, Care in Action encourages voting and provides basic election information to voters.  Id. ¶ 15.  According to Care in Action, Defendants' policies and misconduct burdened the right to vote of the domestic workers it serves.  Id. ¶ 16.  Thus, it had to divert resources away from its normal activities and use those resources to contact voters who cast provisional ballots to make sure they took the steps required for their vote to be counted.  Id. ¶ 17.  National staff who were not normally assigned to work on voting rights issues had to stay in Georgia for weeks after the election to help address some of the issues with provisional ballots.  Id.  Plaintiffs allege that Care in Action has had to shift its budget priorities away from its other efforts (including a federal domestic workers bill of rights, immigration, sexual harassment, and human trafficking) and add more staff in order to provide education and assistance to voters due to Defendants' conduct.  Id. ¶ 18.

## 2. *Applicable Legal Standard*

"Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).  Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies."  U.S. Const. Art. III § 2; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60 (1992).  Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing.[3] Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities); Johnson v. Bd. of Regents of Univ. of Ga., 263

---

[3] Events that occur after the initiation of a lawsuit do not alter a plaintiff's standing to bring the suit, but may result in the case becoming moot.  While the concepts of standing and mootness are related, they are each subject to a distinct body of case law.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174 (2000).  Thus, the Court analyzes standing and mootness separately in this order.

F.3d 1234, 1267 (11th Cir. 2001); Charles H. Wesley Educ. Found., Inc. v. Cox, 408

F.3d 1349, 1352 n.3 (11th Cir. 2005).

> To establish standing, a plaintiff must show three things:

>> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted).

"The party invoking federal jurisdiction bears the burden of establishing these

elements." Id. at 561. The burden by which a plaintiff must show these elements

depends upon the stage of litigation at which it is challenged. Id.; see also CAMP

Legal Def. Fund, 451 F.3d at 1269. At the motion-to-dismiss stage, "general

factual allegations of injury resulting from the defendant's conduct may suffice"

as there is a presumption that such general allegations are based on specific facts

necessary to support the claim. Lujan, 504 U.S. at 561.

11

The injury-in-fact requirement ensures that persons involved in the litigation have a direct stake in its outcome.  Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1340 (11th Cir. 2014).  As such, the injury must be particularized (affecting the plaintiff in a personal way) and concrete (actual as opposed to abstract). Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct. 1540, 1548–49 (2016).  Harms can be tangible or intangible and meet the "concrete and particularized" criteria.  Id. at 1549.  Likewise, harms can be direct or indirect.  Focus on the Family, 344 F.3d at 1273 (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 260–61 (1977)).  Even the risk of future harm can meet this criteria when that harm is "imminent."  Clapper, 568 U.S. at 409.  In fact, the potential for future harm is a requirement for plaintiffs who seek prospective injunctive relief.  Focus on the Family, 344 F.3d at 1274–75; see also Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1265 (11th Cir. 2001).

The concept of imminence is "somewhat elastic," and only requires "that the anticipated injury occur with[in] some fixed period of time in the future."  Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1161 (11th Cir. 2008). Therefore, "probabilistic harm is 'enough injury in fact to confer . . . standing in

12

the undemanding Article III sense.'" 522 F.3d at 1163 (quoting Tenn. Valley Auth. v. U.S. Envtl. Protection Agency, 278 F.3d 1184, 1207 (11th Cir. 2002)).

At the pleading stage, the causation and redressability requirements are easily satisfied where the facts alleged indicate a "fairly traceable" link to the defendants' conduct and the potential for redress of the injury. See Ga. Latino All. for Human Rights v. Governor, 691 F.3d 1250, 1260 (11th Cir. 2012). In evaluating Article III causation, something less than proximate cause is required. Focus on the Family, 344 F.3d at 1272. "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." Id. Finally, a plaintiff must properly plead that it is likely as opposed to merely speculative that a favorable court decision will redress the injury. Lujan, 504 U.S. at 561.

Organizations, like individuals, can establish standing to sue. Arcia, 772 F.3d at 1341–42 (describing two different theories under which an organization can demonstrate standing—diversion-of-resources and associational). In the instant case, Plaintiffs assert standing under the diversion-of-resources theory. See Doc. No. [41], ¶¶ 10–35. "Under the diversion of resources theory, an organization has standing to sue when a defendant's illegal acts impair the

13

organization's ability to engage in its own projects by forcing the organization to divert resources in response."  Arcia, 772 F.3d at 1341.

In election law cases, an organization can establish standing by showing that it will need to divert resources from general voting initiatives or other missions of the organization to address the impacts of election laws or policies. Id. ("[O]ur precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day."); see also Common Cause/Georgia v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009); Browning, 522 F.3d at 1165.  Organizations do not necessarily have to show that they have already diverted resources.  Reasonably anticipating the organization will need to divert resources in the future suffices to establish standing, particularly at the earliest stage of a case.  Browning, 522 F.3d at 1165–66 (finding organizations that "reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance" with the challenged practices make a sufficient showing to meet the injury-in-fact requirement for standing); see also Arcia, 772 F.3d at 1341; Billups, 554 F.3d at 1350.

14

### 3. *Analysis*

The Court approaches this analysis of standing mindful of the current procedural posture of the case, as well as the distinctions between standing and mootness.  The impact of the State of Georgia's recent election legislation (HB 316 and HB 392) on Plaintiffs' claims is discussed under the "Mootness" section of this Order, *infra*.  The focus of the present inquiry is whether Plaintiffs, at the outset of this litigation, have alleged injury, causation, and redressability sufficient to confer standing.

### i. Injury in fact

Defendants argue that Plaintiffs' claimed injury of a diversion of resources does not meet the standard for an injury in fact.  Doc. No. [48-1], pp. 6–9.  Defendants assert that Plaintiffs "have alleged no harm other than to their respective corporate missions and budgets.  Several have alleged no harm except possible future spending."  Id. at 6.  They argue that standing "is not established when the alleged harm that befalls an organization is to act consistently with its existing mission."  Id.  Defendants say that only two Plaintiffs have alleged past

15

harm (Care in Action and Ebenezer),[4] and their alleged injury is merely acting consistently with their mission to assist voters.  Doc. No. [48-1], pp. 8–9.  Finally, Defendants argue that the other four Plaintiffs' alleged future harm is too conjectural and speculative, primarily because it has yet to occur and the passage of HB 316 and HB 392 may make future education efforts unnecessary. Id. at 7–8, 9.

The Court finds that Plaintiffs have alleged an injury in fact sufficient to survive a motion to dismiss.  Defendants' arguments contradict Eleventh Circuit precedent regarding standing under the diversion-of-resources theory.  Even though Plaintiffs all have promoting voting and voter education as part of their missions, they each allege that they have had to, or will have to, redistribute resources from existing programs to ones specifically designed to address Defendants' challenged practices.  Doc. No. [41], ¶¶ 12–13, 17–18, 22–23, 25–26, 28–29, 33–35.  The diversion of resources from general voting initiatives or other missions of the organization to programs designed to address the impact of the specific conduct of the Defendants satisfies the injury-in-fact prong.

_____

[4] In addition to Care in Action's and Ebenezer's allegations of past harm (see Doc. No. [41], ¶¶ 17, 23), Baconton also alleged past harm.  See id. at ¶ 26.

16

For example, in <u>Browning</u>, the Eleventh Circuit held that the plaintiffs had standing to challenge a state statute implementing a voter-verification process for first-time voters.  522 F.3d at 1165–66.  The Eleventh Circuit reasoned that the organizations reasonably anticipated they would need to use funds that would have otherwise been used for "registration drives and election-day education and monitoring" towards following up with voters that may have had their applications denied.  <u>Id.</u>  The court specifically rejected the defendant's arguments that impeding voter registration efforts was not sufficiently concrete and particularized and that shifting resources is a self-inflicted injury.  <u>Id.</u> at 1166 ("The Secretary attempts to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury . . . , and an act or law merely causing the organization to voluntarily divert resources in response to the law, which he claims is not an injury cognizable under Article III.  This distinction finds no support in the law, and it misses the point.").

In <u>Billups</u>, the Eleventh Circuit held that the NAACP had standing because the organization was forced to redistribute volunteers and resources in response to a new voter ID law.  554 F.3d at 1350–51.  The Eleventh Circuit reasoned that the NAACP would be required to divert funds from general "get out the vote"

17

efforts to new programs focused on helping voters obtain photo IDs and promoting absentee voting.  Billups, 554 F.3d at 1350–51.

In Arcia, the Eleventh Circuit held that the NAACP had standing to sue under the diversion-of-resources theory because it was required to divert resources to address a new plan implemented to identify non-citizens and remove them from the voter rolls.  772 F.3d at 1341–42.  The Eleventh Circuit reasoned that "organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day."  Id. at 1341 (citing Browning, 522 F.3d at 1165–66).

Thus, according to Browning, Billups, and Arcia, having general get-out-the-vote activities and voter-education programs as part of each Plaintiffs' mission does not undermine the Plaintiffs' ability to demonstrate standing.  Neither does the fact that such diversion is alleged as future expenditures.  Arcia, 772 F.3d at 1341 (describing Eleventh Circuit precedent in terms of plaintiffs showing "they will have to divert personnel and time" in the future); Billups, 554 F.3d at 1350 (reasonably anticipating the need to divert resources in the future is

18

an injury sufficient to confer standing); <u>Browning</u>, 522 F.3d at 1166 ("Even though the injuries are anticipated rather than completed events, they satisfy the immediacy and likelihood requirements [of standing].").  As each Plaintiff has alleged reasonably anticipating having to shift resources from general activities to new programs aimed directly at counteracting the activities Defendants allegedly engaged in, the Plaintiffs have adequately pled an injury in fact.

### ii.  <u>Causation</u>

Defendants argue that under the Supreme Court precedent from <u>Clapper</u>, Plaintiffs' injuries must be traceable to Defendants' conduct, and there is not a sufficient connection between Defendants' conduct and Plaintiffs' possible future injuries.  Doc. No. [48-1], pp. 9–10.  Defendants compare Plaintiffs' anticipated need to create programs for upcoming elections to the fear of hypothetical harm the Court described the plaintiffs as having in <u>Clapper</u>.  <u>See</u> 568 U.S. at 415–16.

However, Defendants misread and oversimplify <u>Clapper</u>'s holding.  That case does not stand for the proposition that future injuries can never be traceable to a defendant's conduct because they have not happened yet.  Rather, <u>Clapper</u>'s discussion surrounding causation relied on its previous finding that the plaintiffs' alleged injuries did not meet the "imminent" requirement for an injury

in fact. <u>Clapper</u>, 568 U.S. at 410–14.  The plaintiffs in <u>Clapper</u> could not specify a time frame within which their communications would be intercepted by the government, or even that it would happen at all.  To arrive at an injury, a series of speculations was necessary, which involved actions of parties other than the plaintiffs and defendants. <u>Id.</u> at 410–14.  Thus, the Court described the plaintiffs as relying on "a highly attenuated chain of possibilities."  <u>Id.</u> at 410.

Unlike the plaintiffs in <u>Clapper</u>, Plaintiffs in this case are able to demonstrate a time period in which the injury will occur (<i>i.e.</i>, prior to the next scheduled elections).  There is no speculation that elections will occur; thus, this satisfies the "imminent" requirement.   They are also able to show how Defendants' actions have,[5] and will, result in injury to the Plaintiffs.

Plaintiffs' Amended Complaint contains examples of how each challenged piece of conduct (enforcing the "Use it or Lose it" statute, enforcing the Exact Match policy, failure to secure voter registration data, failure to secure voting machines, promoting poll closures, maintaining inaccurate voter rolls, failing to

---

[5]  The fact that several Plaintiffs already experienced harm is an important factor in distinguishing this case from <u>Clapper</u>.  <u>See</u> <u>Arcia</u>, 772 F.3d at 1342 n.2 (distinguishing <u>Clapper</u> from the facts in that case because harm had already occurred); <u>Curling v. Kemp</u>, 334 F. Supp. 1303, 1315 (N.D. Ga. 2018) (reasoning that fear of harm was not unfounded because harm already occurred).

20

provide adequate resources, and failing to properly train election officials on provisional and absentee ballots) denied voters their right to vote and, as a result, impacted the organizations' missions.  Therefore, Plaintiffs are not relying on a highly attenuated chain of possibilities like the plaintiffs in <u>Clapper</u>.  Furthermore, Plaintiffs allege Defendants will continue to engage in this behavior, causing Plaintiffs to divert resources to address these issues in the next election cycle.[6]

### iii. <u>Redressability</u>

Defendants assert that Plaintiffs fail to establish redressability because, even if the Court were to grant Plaintiffs the remedies they seek, Plaintiffs would still be experiencing the "sole injury" alleged: devoting resources to their mission of educating voters and improving voter turnout.  Doc. No. [48-1], p. 11.  This

---

[6] The Court notes that much of Defendants' causation argument relies on changes to existing law or policies made by HB 316.  <u>See</u> Doc. No. [48-1], pp. 10–11 ("[Plaintiffs'] allegations ignore that the existing laws are likely to change; that any harm based on the implementation of new laws is completely speculative; and Plaintiffs' assertions are based on fears that the exact statutes will be implemented the exact same way as they contend was wrong in 2018.").  As the passage of the bill after the initiation of litigation does not impact Plaintiffs' standing to bring this case at the time of filing, the Court does not discuss this aspect of Defendants' argument here.  Defendants' arguments about how both HB 316 and HB 392 impact the existence of a controversy are, however, addressed in the "Mootness" section of this order, *infra*.

21

argument is actually a re-framing of Defendants' injury argument that the Court already addressed above. Plaintiffs' injury is not spending money and resources on their mission; Plaintiffs' injury is having to re-allocate resources from specific programs they already engage in to new programs designed to counteract Defendants' actions or inactions.

Thus, injunctive relief of the type Plaintiffs seek in this case could, and would be likely to, address Plaintiffs' diversion of resources. See Doc. No. [41], pp. 88–93. For example, without the "Use it or Lose it" statute, Plaintiffs would not have to divert resources toward ensuring voters have not been purged from the voter registration rolls and assisting voters whose registrations have been purged. If the State of Georgia maintained more accurate voter registration rolls, Plaintiffs would not have to divert resources toward assisting voters who have been turned away from the polls due to registration errors on election day.

The Court finds that Plaintiffs' Amended Complaint sufficiently alleges facts supporting an injury in fact, causation, and redressability. Therefore, the Court finds that Plaintiffs have adequately demonstrated standing to bring this suit.

B. **Mootness and Ripeness**

Defendants' motion does not seek dismissal on grounds of mootness, as their motion was filed before the Governor signed HB 316 and HB 392 into law. However, the Court raised the issue *sua sponte* in its April 8, 2019 order and asked the parties to address how the mootness doctrine applies to Plaintiffs' claims at the hearing held on April 29, 2019. Doc. No. [56].

### 1. Overview of the 2019 Legislation (HB 316 and HB 392)

During the 2019 Legislative Session, the Georgia General Assembly passed HB 316 and HB 392. HB 316, which was signed into law by the Governor on April 2, 2019, amends the Georgia Election Code to, among other things, provide for more notice under Georgia's voter-list-maintenance process; to provide that a voter registration is not automatically rejected under the Exact Match policy; to provide for the implementation of new voting machines; to prohibit the superintendent of a county from changing a polling place less than thirty days before a general primary or general election; to authorize the Secretary of State to become a member of a nongovernmental entity whose purpose is to share and exchange information in order to improve the accuracy and efficiency of voter registration systems; and to change the way which provisional ballots and

23

absentee ballots are counted. The specifics of HB 316 as it pertains to each of Plaintiffs' claims are described in greater detail below.

HB 392, which was signed into law by the Governor on April 29, 2019, requires the Secretary of State to promulgate a regulation establishing industry-based security standards and to annually certify that Georgia is substantially complying with its own security regulations. The specifics of HB 392 as it pertains to each of Plaintiffs' claims are described in greater detail below.

## 2. *Applicable Legal Standard*

While standing is evaluated at the inception of a case, mootness can occur at any point in the litigation. Friends of the Earth, 528 U.S. at 180; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."). Although the mootness doctrine, like the doctrine of standing, arises out of the "cases and controversies" requirement of Article III, the analysis involves more than just determining if standing exists at the particular point in time challenged. See Friends of the Earth, 528 U.S. at 189–93 (describing how mootness is more than just "standing set in a time frame" and outlining several mootness exceptions).

A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." De La Teja v. United States, 321 F.3d 1357, 1362 (11th Cir. 2003). "If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to afford the plaintiff . . . meaningful relief, then the case becomes moot and must be dismissed." Id. However, if the plaintiff's injury is likely to reoccur, despite the subsequent event, then the court can still provide injunctive relief, and the claim is not moot. See id.; Friends of the Earth, 528 U.S. at 193.

One "event" that may moot a claim is when the defendant ceases the behavior on which a claim is based. "[A] defendant claiming that its voluntary [cessation] moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, 528 U.S. at 190; see also United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (describing defendant's burden as "heavy"). The defendant's burden to show that a plaintiff is not facing future injury (and, therefore, is not in need of court-ordered relief) is heavier than the plaintiff's burden of demonstrating the possibility of future injury when establishing standing. Friends of the Earth, 528 U.S. at 190 ("The plain lesson of

25

these cases is that there are circumstances in which the prospect that a defendant

will engage in (or resume) harmful conduct may be too speculative to support

standing, but not too speculative to overcome mootness.").

"Only when the defendant can demonstrate that there is no reasonable

expectation that the wrong will be repeated are federal courts precluded from

deciding the case on mootness grounds." <u>Christian Coal. of Ala. v. Cole</u>, 355 F.3d

1288, 1291 (11th Cir. 2004) (internal quotation omitted); <u>see also</u> <u>City of Mesquite

v. Aladdin's Castle, Inc.</u>, 455 U.S. 283, 289 (1982) ("It is well settled that a

defendant's voluntary cessation of a challenged practice does not deprive a

federal court of its power to determine the legality of the practice.   Such

abandonment is an important factor bearing on the question whether a court

should exercise its power to enjoin the defendant from renewing the practice, but

that is a matter relating to the exercise rather than the existence of judicial

power."); <u>W.T. Grant Co.</u>, 345 U.S. at 633 ("Along with its power to hear the case,

the court's power to grant injunctive relief survives discontinuance of the illegal

conduct.   The purpose of an injunction is to prevent future violations, and, of

course, it can be utilized even without a showing of past wrongs. . . .   The

necessary determination is that there exists some cognizable danger of recurrent

violation, something more than the mere possibility which serves to keep the case alive.").

"[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004). Thus, the repeal or amendment of a law may moot a plaintiff's claims. See id. With respect to changes in the law, the Eleventh Circuit has instructed that

> [w]hen a subsequent law brings the existing controversy to an end, the case becomes moot and should be treated accordingly. Generally, when an ordinance is repealed, any challenges to the constitutionality of that ordinance become moot. Nonetheless, when an ordinance is repealed by the enactment of a superseding statute, then the superseding statute or regulation moots a case **only to the extent that it removes challenged features of the prior law**. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot.

Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1310 (11th Cir. 2000) (internal citations and quotations omitted) (emphasis added). Claims based on provisions of the law that continue after the enactment

27

of a superseding law are not moot.  Naturist Soc'y, Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th Cir. 1992) ("Where a superseding statute leaves objectionable features of the prior law substantially undisturbed, the case is not moot.").

Neither are claims regarding practices and policies employed by election officials when administering and conducting elections moot just because an election has passed.  Arcia, 772 F.3d at 1342 (finding that a challenge to the secretary's program for removing non-citizens from voter rolls was excepted from the mootness doctrine).  Such claims are subject to the "capable of repetition, yet evading review" exception.  Id.  "The 'capable of repetition, yet evading review' exception to the mootness doctrine applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  Id. at 1343.  "Election cases also frequently present issues that will persist in future elections, and resolving these disputes can simplify future challenges."  Id.

Further, like mootness, "[t]he ripeness doctrine 'prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  Wilderness Soc'y v. Alcock, 83 F.3d 386, 390 (11th Cir.

28

1996) (quoting Abbott Labs v. Gardner, 387 U.S. 136, 148–49 (1967)) (second alteration in the original). Courts must determine "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir. 1995). The ripeness inquiry requires a determination of (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. Abbott, 387 U.S. at 149. "The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Harrell v. Florida Bar, 608 F.3d 1241, 1258 (11th Cir. 2010). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." Id.

### 3. *Analysis*

In the case at hand, Plaintiffs challenge administrative policies and election-law enforcement practices of the Secretary of State and State Board of Elections, as well as aspects of Georgia's statutory election scheme. Defendants assert that the passage of HB 316 and HB 392 largely moots Plaintiffs' claims.

29

Thus, the Court must determine which of Plaintiffs' claims may be impacted by Georgia's new laws, and to what extent those claims may have become moot.

### i. <u>Voter List Maintenance</u>

In their Amended Complaint, Plaintiffs allege that Georgia's voter-list-maintenance process, which is codified in O.C.G.A. § 21-2-234, violates Georgia voters' constitutional rights under the First and Fourteenth Amendments. Doc. No. [41], ¶¶ 69–81. Specifically, Plaintiffs argue that using voter inactivity as a trigger for the removal of voters from registration rolls unreasonably burdens the right to vote, violates voters' First Amendment right to send a political message by not voting, and disparately impacts minority voters. In response, Defendants contend that HB 316 addresses Plaintiffs' concerns and renders them moot. Doc. No. [65], pp. 7–8.

Prior to its amendment, O.C.G.A. § 21-2-234—commonly referred to as Georgia's "Use it or Lose it" statute—required the Secretary of State to send a postcard to voters with whom there had been "no contact" for three calendar years. If the voter failed to return the postcard, the voter's status was changed to "inactive." If the voter still did not vote in the next two general elections, he or she was removed from the registration rolls. HB 316 amended

30

O.C.G.A. § 21-2-234 to mandate that the Secretary of State cannot remove voters from registrations rolls unless there has been "no contact" with them for *five* calendar years—as opposed to the previous three calendar years.  See O.C.G.A. § 21-2-234(a)(2).  HB 316 also amended O.C.G.A. § 21-2-234 to require notice to the voter not less than thirty days but no more than sixty days prior to the cancellation of the voter's registration.  Id. at § 21-2-235(b).

Despite these amendments to O.C.G.A. § 21-2-234, Plaintiffs' allegations predicated on Georgia's voter-list-maintenance process remain unaddressed. While HB 316 extends the "no contact" time of a voter from three calendar years to five calendar years and provides additional notice to a voter before they are removed from registration rolls, such changes do not address Plaintiffs' claim that the statute is unconstitutional because it uses voter inactivity as a triggering event for the removal of voters from the registration rolls. HB 316 also does not address Plaintiffs' claim that the voter-list-maintenance process is subject to, or has been subject to, manipulation for political benefit. Finally, HB 316 does not address Plaintiffs' claim that Georgia's voter-list maintenance process penalizes infrequent voters, who are disproportionately people of color.  Accordingly, the

31

Court finds that HB 316 does not render Plaintiffs' claims based on Georgia's voter-list-maintenance process moot.

### ii. "Exact Match" Policy

In their Amended Complaint, Plaintiffs also allege that the Secretary of State removes and prevents voter registrations by implementing the "Exact Match" policy, which in turn severely burdens the right to vote and disparately impacts minority voters. Doc. No. [41], ¶¶ 82–93. O.C.G.A. § 21-2-220.1 requires a voter's registration information to match the information in the State's Department of Driver Services files or records in the Social Security Administration.  See O.C.G.A. § 21-2-220.1(a). Previously, a voter's registration was automatically rejected if their application did not exactly match the information in these databases. For example, if the punctation in voters' last names on their voter registration forms did not match their Department of Driver Services' files, those voters' applications were rejected. Id. ¶ 85. HB 316, however, amended O.C.G.A. § 21-2-220.1 to provide that a voter registration is not automatically rejected under the Exact Match policy. While voters whose information does not match are still allowed to register to vote, the voters must

32

subsequently verify their identity with acceptable, matching identification before casting a ballot.

Defendants argue that HB 316 addresses Plaintiffs' concerns regarding the Exact Match policy and renders them moot. Yet, Plaintiffs' allegations regarding the Exact Match policy are still unaddressed by HB 316.  HB 316 does not address Plaintiffs' claims that the Exact Match policy disproportionately impacts minority voters and recently naturalized citizens. HB 316 also does not address Plaintiffs' allegations that the Exact Match policy provides no method to reconcile immaterial discrepancies between registration information and acceptable identification. Accordingly, the Court finds that HB 316 does not render Plaintiffs' claims based on the Exact Match policy moot.

### iii.  Technology vulnerable to hacking and manipulation and unreliable voting machines

In their Amended Complaint, Plaintiffs also allege that Georgia's election system, including its voter registration data and voting machines, lacks adequate data security, imposing a severe burden on Georgia voters' right to vote. Doc. No. [41], ¶¶ 94–101. Specifically, Plaintiffs claim that Georgia's Direct Recording Electronic voting machines ("DRE voting machines")—an electronic-only voting system that produces no auditable paper trail—is vulnerable to

33

hacking and tampering that could cause votes to be added, removed, or altered. Id. at ¶ 94. Plaintiffs further allege that Defendants, who are responsible for maintaining and programing the machines that voters use to cast ballots, fail to ensure that voters are able to vote without undue burden. Id. at ¶¶ 102–107.

In response, Defendants contend that HB 316 addresses Plaintiffs' concerns regarding the current DRE voting machines and renders them moot. HB 316 authorizes the purchase of new voting machines "as soon as possible" that provide "paper ballots which are marked with an elector's choice in a format readable by the elector."  See O.C.G.A. § 21-2-300.  According to Defendants, funds have been appropriated to purchase these new voting machines and requests for proposals are currently being evaluated with a notice of intent to award the contract expected by July of 2019. Doc. No. [65], p. 6. Defendants thus argue that the implementation of these new voting machines "squarely addresses and moots" Plaintiffs' claims based on Georgia's current DRE voting machines. Id. at p. 7.  Moreover, Defendants also contend that HB 392 addresses Plaintiffs' concerns regarding voter data security. HB 392 amended O.C.G.A. § 45-13-20 to require the Secretary of State to promulgate a regulation establishing industry-based security standards and to annually certify that

34

Georgia is substantially complying with its own security regulations. See O.C.G.A. § 45-13-20(14.1).   Therefore, Defendants argue that the passage of HB 392 addresses and moots Plaintiffs' claims based on voter data security. Doc. No. [65], p. 7.

In support of their argument, Defendants rely on the decision in United States v. Georgia, 778 F.3d 1202 (11th Cir. 2015), in which the Eleventh Circuit held that the Georgia Legislature's repeal and amendment of the challenged law eliminated the asserted harms and rendered the entire lawsuit moot.   Thus, because HB 316 authorizes the purchase and implementation of new voting machines, Defendants argue that Plaintiffs' asserted harms regarding the current DRE voting machines should be rendered moot.   Plaintiffs, however, argue that unlike the repeal and amendment of the challenged statute in Georgia, the implementation of the new voting machines is subject to a series of contingencies that must occur before they are officially put into place. Plaintiffs rely on the decision in Fanin v. United States Department of Veterans Affairs, 572 F.3d 868 (11th Cir. 2009), in which the Eleventh Circuit found that the plaintiff's case was not moot because there was "a wide gulf between the [defendant] being 'in the

process' of implementing new procedures and it having those new procedures fully in place." Id. at 876.

Upon review, the Court agrees with Plaintiffs and finds that their claims based on the current DRE voting machines are not moot at this time. While funds have been appropriated to purchase the new voting machines, the current DRE voting machines are still in use and will likely remain in use through at least the next election and potentially longer.  Until such time when the current DRE voting machines are no longer in use and the new voting machines are implemented, Plaintiffs' allegations that the current DRE voting machines are unreliable and insecure cannot be rendered moot.[7] See Fanin, 572 F.3d at 876 ("Almost moot is not actually moot."); see also Buono v. Norton, 371 F.3d 543, 545 (9th Cir. 2004) ("Defendants urge that, given the impending mootness of this case, the Court should avoid deciding the constitutional issues raised here . . . We

_____

[7] The Court notes, however, that upon the statewide implementation of the new voting machines, Plaintiffs' claims based on the current DRE voting machines could be subject to becoming moot. Further, any of Plaintiffs' claims based on the new voting machines might not yet be ripe for review. See Beaulieu v. City of Alabaster, 454 F.3d 1219, 1227 (11th Cir. 2006) ("The ripeness doctrine keeps federal courts from deciding cases prematurely."); see also Derner v. Miami-Dade Cty., 599 F.3d 1217, 1221 (11th Cir. 2010) (finding that the plaintiff's claims were moot because "the factual predicate for the injury [had] not fully materialized.") (citations omitted).

36

are not convinced. This case is not yet moot and may not be for a significant time . . . .") (internal quotation marks omitted).

Moreover, for similar reasons, the Court also finds that Plaintiffs' claims based on voter data security are not moot at this time. HB 392, which requires the Secretary of State to promulgate rules regarding security protocols for voter registration information, is still contingent upon the enactment of a regulation consistent with industry standards that effectively eliminates the alleged harms of the insecure voter registration list. Thus, until such regulation is established, Plaintiffs' allegation based on voter data security cannot be rendered moot.

### iv.  Closing precincts and polling places

In their Amended Complaint, Plaintiffs also allege that the Secretary of State encourages precinct consolidation and polling place closures. Doc. No. [41], ¶¶ 108–110. Consequently, Plaintiffs claim that such precinct and polling place changes have left voters without enough places to vote, disproportionately affecting low-income and minority voters. Id. ¶110.

Prior to its amendment, O.C.G.A. § 21-2-262 prohibited the superintendent of a county from changing a polling place less than ten days before a general primary or general election. HB 316 increases that time period to 30 days, as well

37

as prohibits a superintendent from changing a polling place less than 30 days before a special primary or special election, absent an emergency.  See O.C.G.A. § 21-2-262(c) and § 21-2-265(f). These changes, however, do not address Plaintiffs' allegations that the closing or consolidating of polling precincts disproportionately affects low-income and minority voters. Accordingly, the Court finds that Plaintiffs' claims based on the closing of polling places and precincts are not moot.

### v.  Inaccurate voter registration rolls

In their Amended Complaint, Plaintiffs also allege that Georgia's voter registration rolls are inaccurate, foreclosing voters from exercising their right to vote. Doc. No. [41], ¶¶111–120. Neither HB 316 nor HB 392 addresses or eliminates Plaintiffs' claims.  While HB 316 now authorizes the Secretary of State to become a member of a nongovernmental entity whose purpose is to share and exchange information in order to improve the accuracy and efficiency of voter registration systems, it does not directly require him or her to do so.  See O.C.G.A. § 21-2-225(d)(1).  Accordingly, the Court finds that Plaintiffs' claims based on inaccurate voter rolls are not moot.

38

### vi.  <u>Inadequate resources to polling places</u>

In their Amended Complaint, Plaintiffs also allege that the Secretary of State fails to provide enough voting machines to counties, provides voting machines that do not work, and fails to advise counties on sufficient numbers of ballots, provisional ballots, and other supplies to meet turnout expectations. Doc. No. [41], ¶¶ 121–131.  Plaintiffs further allege that polling locations in areas with large numbers of minority voters have disproportionately fewer resources, such as adequate numbers of voting machines or ballots, creating hours-long waits that deter many Georgians from voting. <u>Id.</u> ¶ 130.

Neither HB 316 nor HB 392 eliminates Plaintiffs' claims regarding the insufficient number of provisional ballots and other supplies. As previously discussed, Plaintiffs' claims regarding the insufficient number of voting machines and the failure to provide voting machines that work are not moot so long as the current DRE voting machines are still in use. Accordingly, the Court finds that Plaintiffs' claims based on inadequate resources to polling places are not moot.

### vii.  __Provisional ballots__

In their Amended Complaint, Plaintiffs also allege that Defendants inadequately oversee and train election officials on provisional ballots, which in turn imposes a severe burden on the right to vote and creates pervasive problems for voters who are entitled by law to cast a provisional ballot. Doc. No. [41], ¶¶ 132–139.  HB 316 amended O.C.G.A. § 21-2-418 to provide that at the earliest time possible after casting a provisional ballot, the election superintendent must notify the Secretary of State that a voter casted a provisional ballot, why such ballot was counted, or the reason why such ballot was not counted. See O.C.G.A. § 21-2-418(e).  HB 316 also amended O.C.G.A. § 21-2-419 to require the board of directors to make a "good faith effort" to determine whether a voter casting a provisional ballot was entitled to vote and to notify voter at the earliest time possible after a determination is made regarding a provisional ballot. See O.C.G.A. § 21-2-419(b) & (d).  However, nothing in HB 316 addresses Plaintiffs' claims that Defendants inadequately oversee and train election officials on provisional ballots in accordance with Georgia law. Accordingly, the Court finds that Plaintiffs' claims based on provisional ballots are not moot.

### viii.  Absentee ballots

Finally, in their Amended Complaint, Plaintiffs allege that Defendants fail to adequately oversee, train, and advise counties on the proper handling of absentee ballots.  Doc. No. [41], ¶¶ 140–157.  Specifically, Plaintiffs claim that election officials reject absentee ballots for improper reasons, including immaterial errors and omissions like failure to state voters' birth dates on the oath.  Id. at ¶ 144.  Plaintiffs also claim that some election officials fail to permit voters to cancel their absentee ballots and vote in person, which in turn violates voters' equal opportunity to cast a ballot.  Id. at ¶ 149.

HB 316 requires voters' oath on their absentee ballots to be in "substantially the following form" as the oath provided in O.C.G.A. § 21-2-384(c)(1), which removes voters' residence and year of birth. HB 316 also amended O.C.G.A. § 21-2-386 to provide for an opportunity to cure absentee ballots rejected for failing to sign the oath, an invalid signature, or missing information by submitting an affidavit to the board of registrars or absentee ballot clerk.  See O.C.G.A. § 21-2-384(a)(1)(C).  Finally, HB 316 amended § 21-2-388 to provide that voters who have "not yet returned" their absentee

41

ballots can cancel their absentee ballots and vote in person. <u>See</u> O.C.G.A. § 21-2-388.

Defendants contend that HB 316 addresses Plaintiffs' concerns regarding absentee ballots and renders them moot. Plaintiffs' allegations, however, remain unaddressed.  Nothing in HB 316 addresses Plaintiffs' claims that Defendants have failed to adequately oversee, train, and advise counties on the proper handling of absentee ballots as well as failed to enforce provisions of the Georgia Election Code pertaining to absentee ballots.  Accordingly, the Court finds that Plaintiffs' claims based on absentee ballots are not moot.

## C. Eleventh Amendment Immunity

### 1. The State Election Board

In their motion to dismiss, Defendants assert that the Eleventh Amendment bars Plaintiffs' claim against the State Election Board.  Doc. No. [48], p. 5, ¶ 8.[8]

Eleventh Amendment immunity is a threshold issue that is "in the nature of a jurisdictional bar" to be decided early in the litigation.  Bouchard Transp. Co. v. Fla. Dep't of Envtl. Prot., 91 F.3d 1445, 1448 (11th Cir. 1996).

The Eleventh Amendment states in relevant part:  "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. XI.[9]  "The Eleventh Amendment prohibits a federal

_____

[8] Plaintiffs agree that the State Election Board has sovereign immunity with respect to the § 1983 claims (Counts I to IV) and the Help America Vote Act claim (Count VI) and seek to withdraw those claims in their briefing.  Doc. No. [52], p. 23, n.11.  However, Plaintiffs have not yet amended their complaint to eliminate these claims.  See Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1106 (11th Cir. 2004) ("A plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) . . . . ") (internal quotation omitted).  In the absence of an amended complaint, the claims are not eliminated and the Court deems it proper to consider the merits of the pending motion to dismiss.

[9] "Though by its plain terms the Eleventh Amendment only precludes federal courts from entertaining suits against a state brought by citizens of another state, it has been

court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." <u>Cross v. Ala. State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490, 1502 (11th Cir. 1995) (citations omitted).  "[T]he Eleventh Amendment is a recognition that the states retain certain attributes of sovereignty, and one of its purposes is to protect states from the indignity of being haled into federal court by private litigants." <u>Bouchard</u>, 91 F.3d at 1448.

State agencies and arms of the State, such as the State Election Board, are also immune from suit in federal court, as to the extent that they are defendants, the action is really an action against the State of Georgia.  <u>See</u> <u>Schopler v. Bliss</u>, 903 F.2d 1373, 1379 (11th Cir. 1990) (holding that "to the extent that the [state] Board [is a defendant], then, this is an action against the State . . . ."), and <u>Grizzle v. Kemp</u>, No. 4:10-CV-0007-HLM, 2010 WL 11519159, at *7 (N.D. Ga. Mar. 15, 2010) ("The State Election Board, however, is a state agency."); <u>see also</u> <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 146 (1993)

---

construed to bar suits against a state brought by that state's own citizens as well . . . . In short, the Eleventh Amendment's ultimate guarantee is that nonconsenting states may not be sued by private individuals in federal court." <u>McClendon v. Ga. Dep't of Cmty. Health</u>, 261 F.3d 1252, 1256 (11th Cir. 2001) (citations omitted).

44

(holding that the state and its agencies retain their immunity against all suits in federal court).

"Congress has not abrogated eleventh amendment immunity in [§] 1983 cases," and there is nothing in the record that shows that the State of Georgia has waived its immunity or otherwise consented to suit in federal court.  Cross, 49 F.3d at 1502 (citing Carr v. City of Florence, 916 F.2d 1521, 1525 (11th Cir. 1990)). Accordingly, this Court lacks jurisdiction to entertain Plaintiffs' § 1983 claims against the State Election Board, i.e., Counts I through IV and VI of the Amended Complaint.   See   McClendon, 261 F.3d at 1256 ("Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment.") (citations omitted).[10]

_____

[10] In their motion, Defendants also assert that "Plaintiffs' constitutional claims against the State Election Board as enforced by 42 U.S.C. § 1983 fail to state a claim," because "[t]he State Election Board is not a 'person' within the meaning of § 1983."  Doc. No. [48], p. 5, ¶ 9 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 61 (1989)).  The Court recognizes that the Supreme Court has deemed it proper to decide the statutory question first—prior to the Eleventh Amendment issue.  See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 779–80 (2000) ("The ultimate issue in the statutory inquiry is whether States can be sued under this statute; and the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under this statute. This combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first. We therefore begin

In their opposition brief, Plaintiffs assert that "[t]he Eleventh Amendment, however, does not immunize Plaintiffs' claim (Count V) under Section 2 of the Voting Rights Act, which was promulgated under the Fourteenth and Fifteenth Amendments and abrogates sovereign immunity."  Doc. No. [52], p. 22.

In a now-vacated opinion, a panel of the Eleventh Circuit Court of Appeals concluded that "Congress validly abrogated state sovereign immunity in § 2 of the Voting Rights Act" and that the Eleventh Amendment did not prohibit such claims against a state.  See Lewis v. Governor of Ala., 896 F.3d 1282, 1294 (11th Cir. 2018), *reh'g en banc granted*, 914 F.3d 1291 (11th Cir. 2019).

Because the opinion was vacated, it has no precedential effect and cannot be considered as expressing a view of the Eleventh Circuit.  See United States v. Sigma Int'l, Inc., 300 F.3d 1278, 1280 (11th Cir. 2002) (holding that vacated opinions "are officially gone. They have no legal effect whatever. They are void.

_____

(and will end) with the statutory question."); see also GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1254 (11th Cir. 2012) ("The [d]istrict [c]ourt dismissed the State under the Eleventh Amendment, but could have dismissed it on the ground that it is not amenable to § 1983 liability.").  To this regard, the following analysis controls.  Section 1983 subjects 'persons,' who act under the color of state law to deprive someone of their constitutional rights, to civil liability.  States [and arms of the State/agencies] are not considered 'persons' within the meaning of § 1983.  Will, 491 U.S. at 64.  Accordingly, Plaintiffs have also failed to state a § 1983 claim against the State Election Board.

46

None of the statements made in either of them has any remaining force and cannot be considered to express the view of this Court."). However, the Court may give the vacated opinion persuasive value if the Court thinks that the vacated opinion deserves it.  Cf. Friends of Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it."); see also United States v. W.B.H., 664 F.3d 848, 853 n.3 (11th Cir. 2011).

After review, the Court finds that the vacated Lewis opinion has persuasive value.  The Court will also draw guidance from persuasive authority in the Fifth and Sixth Circuits and adopt the conclusion that Section 2 effects a valid abrogation on state sovereign immunity.  See OCA-Greater Houston v. Texas, 867 F.3d 604, 614 (5th Cir. 2017); Mixon v. Ohio, 193 F.3d 389, 398–99 (6th Cir. 1999); see also Ga. State Conference of NAACP v. Georgia, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (holding that "Section 2 [of the Voting Rights Act] effects a valid abrogation of state sovereign immunity").

Accordingly, Defendants' motion to dismiss as to the State Election Board is **GRANTED** in part as to the § 1983 claims (Counts I to IV) and the Help America Vote Act claim (Count VI).  The State Election Board has sovereign

47

immunity as to these counts.  The Defendants' motion is **DENIED** as to Count V, which asserts a violation of Section 2 of the Voting Rights Act of 1965.

### 2. *Members of the State Election Board*

The Court now considers whether the members of the State Election Board, who are being sued in their official capacity for injunctive relief, are subject to suit.  Doc. No. [41].

"Under the doctrine enunciated in <u>*Ex parte* Young</u>, 209 U.S. 123 (1908), . . . a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment."  <u>Grizzle v. Kemp</u>, 634 F.3d 1314, 1319 (11th Cir. 2011) (citations omitted); <u>see also</u> <u>Alden v. Maine</u>, 527 U.S. 706, 756–57 (1999) ("The rule [of sovereign immunity], however, does not bar certain actions against state officers for injunctive or declaratory relief.") and <u>Will</u>, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

In seeking dismissal, Defendants assert that Plaintiffs can no longer obtain prospective relief, based on the passage of HB 316—as the law and regulations that are alleged to have caused harm are no longer in place.  Tr. pp. 12, lines 6-14; 22, lines 9–10; 34.

"Prospective relief is designed to avoid future harm." Luckey v. Harris, 860 F.2d 1012, 1017 (11th Cir. 1988) (citing Swift & Co. v. United States, 276 U.S. 311, 326 (1928)).

"[A] court need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 636 (2002).  In addition, "[t]he inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim."  Id. "The focus of the inquiry remains on the allegations [of the complaint] only," as opposed to subsequent legislative action.  League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 474 (6th Cir. 2008).  Here, Plaintiffs' prayer for injunctive relief—that state officials be enjoined from using the "Use it or Lose it" statute, using the "Exact Match" policy, using the DRE voting machines, and to adequately oversee elections using uniform standards and processes and ensure

49

fair elections—satisfies the "straightforward inquiry." Verizon, 535 U.S. at 636 (finding that a "prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies [the Supreme Court's] 'straightforward inquiry.'").

Defendants also argue that a lawsuit against the members of the State Election Board is not proper because Plaintiffs seek for the Court to direct the precise way in which Georgia should conduct voting. Defendants' argument is based upon a recent unpublished Eleventh Circuit opinion in which the Court appeared to indicate that a voting rights lawsuit against state officials would not be permissible in light of the _Ex parte_ Young doctrine if plaintiffs sought "a court order directing the precise way in which Georgia should conduct voting." Curling v. Sec'y of Ga., 761 F. App'x 927, 934 (11th Cir. 2019). Defendants argue that this is exactly what Plaintiffs' lawsuit does—i.e., seeks the Court to direct the precise way in which Georgia should conduct voting. Further review of the Curling opinion shows that Eleventh Circuit's decision was made in the context of considering an unusual case exception to the _Ex parte_ Young doctrine found in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997), essentially a quiet title action brought by an Indian tribe against the state of Idaho. The Supreme Court

50

treated the Coeur d'Alene Tribe case as an "unusual case that presented an exception to the *Ex parte* Young doctrine because ruling in the tribe's favor would [have] 'extinguish[ed]' the state's ownership over 'a vast reach of lands and waters long deemed by the State to be an integral part of its territory.'" Curling, 761 F. App'x at 933–34. "[B]ecause the relief sought implicated the state's 'special sovereignty interests' and was the 'functional equivalent' of relief that would otherwise be barred by the Eleventh Amendment, the Court concluded that the *Ex parte* Young doctrine did not apply." Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1340 (11th Cir. 1999).

This Court finds that "there is nothing unusual about [the case *sub judice*] that would necessitate summoning [the] Coeur d'Alene Tribe's exception." Curling, 761 F. App'x at 934. "Unlike the quiet title action in Coeur d'Alene, the relief sought here does not implicate the state's real property interests that the Supreme Court found to be protected by the Eleventh Amendment." Sumitt, 180 F.3d at 1340. In addition, the remedy of prospective injunctive relief is "not the 'functional equivalent' of a form of relief barred by the Eleventh Amendment." Id. The proposed remedy also will not resolve "for all time," Georgia's election system. Id. Plaintiffs only request that the Court retain jurisdiction "for such

51

period [of time] as it may deem appropriate" to determine if any new prerequisite, standard, practice, or procedure will have the effect of abridging the right to vote on account of race or color in accordance with § 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c).  Doc. No. [41], p. 89, ¶ 6.

Accordingly, the members of the State Election Board Defendants are not subject to dismissal on Eleventh Amendment grounds.

### 3. *"Obey the Law" Injunctions*

Defendants also assert that Plaintiffs' requests for injunctive relief essentially amount to unpermitted "Obey the Law" injunctions.  Doc. No. [65], p. 17.

"As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law. [The Eleventh Circuit has] repeatedly questioned the enforceability of obey-the-law injunctions . . . .," because they are broad, non-specific, and do not give the restrained party fair notice of what conduct will risk contempt.  S.E.C. v. Goble, 682 F.3d 934, 949 (11th Cir. 2012); see also Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 n.12 (11th Cir. 1996) ("A person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing.").

52

It is, however, "premature to review the precise nature of [any type of] injunction because, at this stage, [the Court] has not issued an injunction and it remains possible that the Plaintiffs will seek injunctive relief that is "specific and narrow enough that the parties would be afforded sufficient warning to conform their conduct." <u>S.E.C. v. Graham</u>, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016).

**D.  <u>Joinder</u>**

In their motion, Defendants assert that Counts One through Five and parts of Counts Six should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19 because Plaintiffs have failed join necessary parties, i.e., the county election boards and officials (in each of Georgia's 159 counties) who carry out the elections.  Doc. No. [48], p. 3, ¶ 5.

*1.  Applicable Legal Standard*

Federal Rule of Civil Procedure 12(b)(7) provides that a party may move to dismiss a case based on a failure to join a party under Rule 19.

"The purpose of Rule 19 is to 'permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources.'" <u>Askew v. Sheriff of Cook Cty., Ill.</u>, 568 F.3d 632, 634 (7th Cir. 2009) (citing <u>Moore v. Ashland Oil, Inc.</u>, 901 F.2d 1445, 1447 (7th Cir. 1990)).

53

"Dismissal, however, is not the preferred outcome under the Rules." <u>Id.</u> (citations omitted). Courts are 'reluctant to dismiss for failure to join where doing so deprives the plaintiff[s] of [their] choice of federal forum.'" <u>Id.</u> (citations omitted).

"Rule 19 states a two-part test for determining whether a party is indispensable," or should proceed in the absence of a non-party. <u>Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.</u>, 669 F.2d 667, 669 (11th Cir. 1982); <u>see also</u> <u>United States v. Rigel Ships Agencies, Inc.</u>, 432 F.3d 1282, 1291 (11th Cir. 2005). "The first question is whether [under the standard of Rule 19(a)(1)][11]

---

[11] Rule 19(a) states in relevant part:

(a) Persons Required to Be Joined if Feasible.
   (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
      (A) in that person's absence, the court cannot accord complete relief among existing parties; or
      (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
         (i) as a practical matter impair or impede the person's ability to protect the interest; or
         (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

complete relief can be afforded in the present procedural posture."[12]   <u>City of Marietta v. CSX Transp., Inc.</u>, 196 F.3d 1300, 1305 (11th Cir. 1999).   In considering the threshold question, "pragmatic concerns, especially the effect on the parties and the litigation, control."   <u>Focus on the Family</u>, 344 F.3d at 1280 (citations omitted).   "Only if [the Court] can answer this threshold question 'yes,' and if the nonparty cannot be joined (say for jurisdictional reasons), [does the Court] go to step two."   <u>Id.</u>[13]   "Step two asks [the Court] to determine, "in equity and good conscience," whether the action should go forward as cast" and requires

_____

[12] Rule 19(a)(1) and the <u>CSX</u> case also indicate that the Court should consider whether the non-party's absence will impede either the non-party's protection of an interest at stake or subject parties to a risk of inconsistent obligations. Said consideration is "contingent . . . upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action."   <u>Saint Paul United Methodist Church v. Gulf States Conference Ass'n of Seventh-Day Adventists, Inc.</u>, No. 3:11-CV-873-WKW, 2012 WL 4477653, at *3 (M.D. Ala. Sept. 28, 2012) (citing <u>Northrop Corp. v. McDonnell Douglas Corp.</u>, 705 F.2d 1030, 1043 (9th Cir.1983)); <u>cf.</u> <u>Landmark Equity Fund II, LLC v. Residential Fund 76, LLC</u>, 631 F. App'x 882, 885 (11th Cir. 2015) (finding no abuse of discretion in the district court's conclusion that non-parties were dispensable parties where the non-parties had not asserted an interest in the outcome of the case or attempted to intervene).   Here, there are no allegations that the absent parties, i.e., Georgia's 159 counties, have made a claim as to any protected interest in this civil action.

[13] This is because, "a party that is not necessary within the meaning of Rule 19(a), by definition cannot be indispensable within the meaning of Rule 19(b)." <u>New Hampshire Ins. Co. v. Cincinnati Ins. Co.</u>, No. CIV.A. 14-0099-CG-N, 2014 WL 3428911, at *3 (S.D. Ala. July 15, 2014) (citations and alterations omitted).

consideration of the four factors listed in Rule 19(b).[14] <u>Focus on the Family</u>, 344

F.3d at 1280.[15]  It is the burden of the party invoking Rule 19(b) to demonstrate

which Rule 19(b) factors requires dismissal "in equity and good conscience."

<u>Molinos Valle Del Cibao, C. por A. v. Lama</u>, 633 F.3d 1330, 1347 (11th Cir. 2011);

<u>see also</u> <u>Shermoen v. United States</u>, 982 F.2d 1312, 1317 (9th Cir. 1992) ("The

inquiry is a practical one and fact specific, and is designed to avoid the harsh

_____

[14] Rule 19(b) states in relevant part:

> When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> > (A) protective provisions in the judgment;
> > (B) shaping the relief; or
> > (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19.

[15] The two steps/subsections of Rule 19 have also been described as follows: "Rule 19(a) addresses 'persons required to be joined if feasible,' and Rule 19(b) describes what the court must do if joinder is not feasible."  <u>Askew</u>, 568 F.3d at 635.

56

results of rigid application. The moving party has the burden of persuasion in arguing for dismissal.") (citations omitted).

### 2. *Analysis*

As indicated above, in determining whether a party is a necessary party, the first question is whether the Court can accord complete relief among the existing parties. "The 'complete' relief concept of Rule 19(a)(1) 'refers to relief as between the persons already parties, not as between a party and the absent [party] whose joinder is sought.'" Heinrich v. Goodyear Tire & Rubber Co., 532 F. Supp. 1348, 1359–60 (D. Md. 1982) (citations omitted). Also, as stated above, in making this decision, "pragmatic concerns, especially the effect on the parties and the litigation, control." Challenge Homes, 669 F.2d at 669–70 (citations omitted).

A review of the Amended Complaint shows that Plaintiffs seek declaratory and equitable relief, as well as attorney's fees. Doc. No. [41].

In their supplemental briefing, Defendants' arguments focus on Paragraphs 11(d) and (h) of the "Prayer for Relief" section of the Amended Complaint (Doc. No. [41], p. 90). Doc. No. [65], p. 40. In those paragraphs, Plaintiffs state that they request that the Court enter a judgment "[p]ermanently

57

enjoining Defendants to oversee adequately [sic] elections by enforcing uniform standards and processes that . . . (d) [e]nsure that counties accurately and timely process all absentee ballot requests consistent with Georgia and federal law governing absentee ballots . . . [and,] (h) [e]nsure each county timely recruits and hires an adequate number of elections officials and poll workers before each election to ensure proper staffing on any election day . . . ." Doc. No. [41], pp. 91– 92. Defendants argue that "[s]pecific statutory law makes clear that these obligations rest with the counties and not the state." Doc. No. [65], p. 20 (citing O.C.G.A. § 21-2-220.1 (discerning whether voter registration information matches other state information); O.C.G.A. § 21-2-417 (evaluating voter qualifications at the polls); O.C.G.A. §§ 21-2-383 through 21-2-386 (preparing, delivering, and certifying or rejecting absentee ballots); O.C.G.A. §§ 21-2-283, -418, -379.3 (providing provisional ballots and purchase additional DRE machines); O.C.G.A. § 21-2-70(4) (equipping polling places and determining the number of machines to deploy); O.C.G.A. §§ 21-2-261, 21-2-265 (determining the number of precincts and location of polling places); and O.C.G.A. § 21-2-40, 21-2-70 (train and hire poll workers)). Defendants also argue that they only have "power to enforce promulgated rules or law against the counties" but do not

58

have "unilateral authority to require" the "entirely new processes" that Plaintiffs' apparently seek in their lawsuit.  Doc. No. [65], p. 22.

Plaintiffs' responsive arguments focus on the statutory oversight authority granted to the Secretary of State and the State Election Board.  Plaintiffs indicate that under Georgia law, the Secretary of State wears two hats, (1) Secretary of State, and (2) Chair of the State Election Board.  Doc. No. [64], p. 63, lines 1–9. Plaintiffs also emphasize that the Georgia Code refers to the Secretary of State as "the state's chief election official."  Id. at lines 10–12 (citing O.C.G.A. § 21-2-50(b). Plaintiffs state that "Georgia law grants Defendants oversight authority to set uniform standards across the state, to train, and to investigate failures of local elections officials."    Doc.  No.  [52],  p.  16  (citing  O.C.G.A.  §  21-2-31; O.C.G.A. § 21- 2-50(a)(11)).  Plaintiffs also assert that because Defendants oversee and administer Georgia's election, complete relief can be afforded among the existing parties for implementation of the state-wide remedies that Plaintiffs seek.  Doc. No. [52], p. 16.

In ruling on Defendants' motion, the Court has reviewed the relief section of Plaintiffs' Amended Complaint, in which Plaintiffs essentially want the Court to order Defendants to provide oversight of the elections by enforcement of

"uniform standards and processes."    Doc.  No. [41], p. 90.  Such relief can be

ordered  of  the  Secretary  of  State  and  the  State  Election  Board,  because,  as

correctly stated by Plaintiffs, "Georgia law [specifically O.C.G.A. §§ 21-2-31[16] and

---

[16] Said Code section states in relevant part:

> It shall be the duty of the State Election Board:
> (1) To  promulgate  rules  and  regulations  so  as  to  obtain
> uniformity  in  the  practices  and  proceedings  of
> superintendents, registrars, deputy registrars, poll officers,
> and other officials, as well as the legality and purity in all
> primaries and elections;
> (2) To  formulate,  adopt,  and  promulgate  such  rules  and
> regulations, consistent with law, as will be conducive to the
> fair, legal, and orderly conduct of primaries and elections;
> and, upon the adoption of each rule and regulation, the
> board  shall  promptly  file  certified  copies  thereof  with  the
> Secretary of State and each superintendent;
> . . . .
> (5) To  investigate,  or  authorize  the  Secretary  of  State  to
> investigate, when necessary or advisable the administration
> of primary and election laws and frauds and irregularities in
> primaries  and  elections  and  to  report  violations  of  the
> primary and election laws either to the Attorney General or
> the appropriate district attorney who shall be responsible for
> further  investigation  and  prosecution.  Nothing  in  this
> paragraph  shall  be  so  construed  as  to  require  any
> complaining party to request an investigation by the board
> before such party might proceed to seek any other remedy
> available  to  that  party  under  this  chapter  or  any  other
> provision of law;
> . . .
> (7) To promulgate rules and regulations to define uniform
> and  nondiscriminatory  standards  concerning  what
> constitutes a vote and what will be counted as a vote for each

60

21-2-50(a)(11)[17]] grants Defendants oversight authority to set uniform standards across the state, to train, and to investigate failures of local elections officials."

Doc. No. [52], p. 16.[18]

_____

> category of voting system used in this state;
> . . .
> (9) Subject to funds being specifically appropriated by the General Assembly, to formulate and conduct a voter education program concerning voting procedures for voting by absentee ballot and at the polls with particular emphasis on the proper types of identification required for voting; and
> (10) To take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections.

O.C.G.A. § 21-2-31.

[17] Said Code section states in relevant part:
> (a) The Secretary of State shall exercise all the powers granted to the Secretary of State by this chapter and shall perform all the duties imposed by this chapter, which shall include the following . . . . (11) To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections . . . ."

O.C.G.A. § 21-2-50(a)(11).

[18] The Court recognizes Defendants' assertion that they only have the power to enforce promulgated rules against the County and do not have the unilateral authority to require entirely new processes (Doc. No. [65], p. 22); however, the Court's review of the plain language of O.C.G.A. § 21- 2- 31(a) shows that the State Election Board has the duty "[t]o promulgate rules and regulations so as to obtain uniformity in practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." Without more,

In addition, as the Eleventh Circuit stated in <u>Grizzle v. Kemp</u>, 634 F.3d 1314 (2011), although the Secretary of State cannot directly perform certain acts  that are ordinarily performed by the counties, "as a member and the chairperson of the State Election Board, he has both the power and the duty to ensure that the entities charged with those responsibilities comply with Georgia's election code in carrying out those tasks . . . . [H]is power by virtue of his office sufficiently connect[s] him with the duty of enforcement . . . ."[19]

Georgia's Attorney General has also issued an Official Opinion that recognizes the Secretary of State's authority to manage the State of Georgia's electoral system and the oversight duty of the State Election Board.  <u>See</u> Ga. Op. Att'y Gen. No. 05-3 (Apr. 15, 2005)[20] ("Just as a matter of sheer volume and scope, it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system . . . . In the context of O.C.G.A. § 21-2-31 and the other limited

_____

the Court is unable to uphold Defendants' argument.

[19] Defendants' attempt to limit the <u>Grizzle</u> case (Doc. No. [65], p. 21, n.18) to only standing for the "proposition that the Secretary cannot enforce unconstitutional laws" is not persuasive.

[20] "These opinions, however, are not law, but at most persuasive legal authority." <u>Metheny v. Hammonds</u>, 216 F.3d 1307, 1308 (11th Cir. 2000).

statutory provisions regarding the [State Election Board], this means the Board is given the authority to provide policy direction and oversight to the Office of the Secretary of State and local election officials in the area of elections to the extent that such policy direction and oversight is in accordance with the Board's statutory purpose of assuring 'uniformity in their practices and proceedings and legality and purity in all primaries and elections.' The Board's 'supervisory' authority can extend no further than that statutorily authorized purpose.").

Here, county election officials are not necessary parties under Rule 19(a)(1)(A) because this Court can provide "complete relief" among the current plaintiffs and defendants without joining the counties in that existing defendants have the statutory oversight ability to enforce uniform and state-wide election standards and processes. See e.g., Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1039 (11th Cir. 2014) (affirming the denial of joinder where district court could provide complete relief among the existing parties).

Lastly, the Court recognizes that Defendants also assert that "it would be inequitable to issue an order compelling the spending of county resources—local taxpayer dollars—without bringing the counties into the lawsuit." Doc. No. [65], p. 22. However, the fact that there may be some type of indirect cost to the

counties in having to comply with the law is not the test at this point, as the focus of the Rule 19(a)(1)(A) analysis is whether the Court can provide complete relief among the parties presently in the case. Furthermore, any arguments as to various costs that the counties may incur are premature, as no county has asserted an interest relating to this civil action so that a Rule 19(a)(1)(B) analysis may be performed.

As the Court can afford complete relief among the existing parties at this stage in the litigation, it is not necessary to perform the second step of the Rule 19 analysis and Defendants' motion is denied on the joinder ground.

## D. Failure to State a Claim

### 1. Applicable Legal Standard

Federal Rule of Civil Procedure 8(a) requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Pleadings do not require any particular technical form.  Fed. R. Civ. P. (8d)(d)(1).  However, labels, conclusions, and formulaic recitations of the elements of the case of action "will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

"To decide whether a complaint survives a motion to dismiss, [courts] use a two-step framework." McCullough v. Finley, 907 F.3d 1324, 1333 (11th Cir. 2018).   First, the court identifies "the allegations that are 'no more than conclusions," [as] [c]onclusory allegations are not entitled to the assumption of truth. Id. (citations omitted).  "Second, after disregarding conclusory allegations, [the Court] assume[s] any remaining factual allegations are true, [identifies the elements that the plaintiffs must plead to state a claim] and determine[s] whether those factual allegations 'plausibly give rise to an entitlement to relief.'" Id.; see also Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009) (beginning the 12(b)(6) analysis "by taking note of the elements a plaintiff must plead to state a claim . . . .") and Speaker v. U.S. Dep't. of Health & Human Servs. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff.") and Fed. R. Civ. P. 8 (e) ("Pleadings must be construed so as to do justice.").

A complaint will be dismissed for failure to state a claim only if the facts as pled do not state a claim that is plausible on its face. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555–56.  In order to state a plausible claim, a plaintiff need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556.

"[W]hile notice pleading may not require that the pleader allege a specific fact to cover every element or allege with precision each element of a claim, it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007) (quotations omitted).

66

### 2. *Unconstitutional Failure to Train/ Oversee County Officials*

Counts I, II, III, V of the Amended Complaint allege, *inter alia*, that Defendants disenfranchised Georgia voters and deprived them of their right to vote through specific misconduct in training and overseeing county election officials.   Doc. No. [41], ¶¶ 163, 164, 175, 176, 189, 190, 213, 214.[21]  In addition to the failure to train allegations, Plaintiffs allege four other acts of misconduct by Defendants that led to the effect of disenfranchisement of Georgia voters:  (1)

_____

[21] Plaintiffs state that the following allegations are of "specific misconduct in training and overseeing county elections officials" committed by Defendants:

> (a) failing to provide absentee ballots requested by voters;
> (b) delivering requested absentee ballots to voters after the deadline for casting the ballots had passed;
> (c) providing requested absentee ballots that were undeliverable to the appropriate recipient;
> (d) refusing to accept delivery of absentee ballots;
> (e) refusing to provide provisional ballots;
> (f) discouraging and preventing the use of provisional ballots;
> (g) providing an insufficient number of provisional ballots to precincts;
> (h) creating conditions that produced unreasonably and avoidably long waits to vote at polling places;
> (i) providing an insufficient number of voting machines and inoperable voting machines to polling places; and
> (j) failing to provide an adequate number of paper ballots to polling places.

Doc. No. [41], ¶ 164.

failing to furnish counties and precincts with sufficient tools for voting, including secure and functioning voting machines; (2) failing to maintain an accurate and secure voter registration list; (3) removing and preventing voter registrations under the "Use it or Lose it" statute and "Exact Match" policy; and (4) failing to maintain secure and functioning voting machines.  Doc. No. [41], ¶¶ 163, 164, 175, 176, 189, 190, 213, 214.  These counts and allegations of misconduct are brought under § 1983 and the Voting Rights Act.

Defendants argue that Plaintiffs' unconstitutional failure to train claims fail because Plaintiffs have alleged insufficient facts to set forth a claim for failure-to-train or-oversee.  Doc. No. [65], pp. 12–13.[22]

_____

[22] Defendants also assert two additional reasons that Plaintiffs' unconstitutional failure to train claims fail:  (1) the 2019 Legislation forecloses any claims for failure- to-train or-oversee, because there can be no allegation that the Defendants have failed to oversee the implementation of new mandates; and (2) the Eleventh Amendment also precludes relief.  Doc. No. [65], pp. 12–13.  Defendants' first argument is akin to the mootness/ripeness arguments, addressed *supra*.  To be clear, the Court concludes that the Amended Complaint is not subject to dismissal on the asserted ground, because the implementation of new mandates under the Georgia Election Code does not foreclose Plaintiffs' failure to train claims, as their allegations are not that the Georgia Election Code is deficient, but rather that Defendants have failed to follow the Georgia Election Code.  Thus, amending the Georgia Election Code does not eliminate or address Plaintiffs' grievances.  The Eleventh Amendment arguments have also been addressed, *supra*, in Section II(C) of this Order.

68

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).[23]  In addition, to state a claim under Section 2 of the Voting Rights Act, "[i]t must also be established that there has been a denial or abridgement of the right to vote on account of race." Smith v. Winter, 717 F.2d 191, 197 (5th Cir. 1983); see also 52 U.S.C. § 10301(a).

In regard to the latter element of the § 1983 claim, there does not appear to be a question as to whether the conduct complained of is alleged to have been committed by Defendants while acting under color of state election law.  See West v. Atkins, 487 U.S. 42, 49 (1988) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.").  Thus, the focus of the Court's analysis will be on the initial element of a § 1983 claim and the essence of

---

[23] As stated above, the State Election Board is not amenable to § 1983 liability.  The § 1983 claims only apply to the Secretary of State and the members of the State Election Board.  However, the State Election Board may be sued for a Voting Rights Act claim.

the Voting Rights claim, i.e., whether Plaintiffs have alleged facts that show they have suffered a constitutional violation.

In their motion to dismiss, Defendants assert that Plaintiffs have failed to assert a plausible claim for failure to train because:  (1) local officials—not the Secretary nor State Election Board Members, individually—have the statutory authority and duty to administer elections in Georgia; (2) Defendants do not have training or oversight authority over such local officials sufficient to impose § 1983 liability for failure to train; and (3) the named Defendants are not responsible for Plaintiffs' alleged harms.  Doc. No. [53], p. 7.

In the context of their arguments, Defendants focus on the failure to train liability standards set forth in City of Canton v. Harris, 489 U.S. 378 (1989) and its progeny; however, the City of Canton case addressed municipal liability and it is not clear to this Court if the municipal liability standards should be applied in a case involving the conduct of state election officials and prospective injunctive relief.  See e.g., Gonzales v. Cate, No. 1:09-CV-02149 LJO, 2011 WL 23068, at *1 (E.D. Cal. Jan. 4, 2011), report and recommendation adopted sub nom. Gonzalez v. Cate, No. 1:09-CV-02149-LJO, 2011 WL 778642 (E.D. Cal. Feb. 25, 2011) ("As to [p]laintiff's specific allegations of failure to train, in [City of

70

Canton], which is cited by defendants in their motion, the Supreme Court held that, under certain circumstances, a municipality may be held liable based on the failure to train its employees. This court finds no authority for the extension of City of Canton and its progeny to a state prison official being sued in his personal capacity. It appears to this court, following a review of the relevant case law, that the cases involving failure to train are limited to suits against city and county entities.") and Pelletier v. Magnusson, 195 F. Supp. 2d 214, 240 n.26 (D. Me. 2002) ("Part of the confusion in this case may be that [plaintiff] is trying to hold [defendants] liable in their individual capacities for what is really a policy and failure to train claim best articulated in [City of Canton], and relating to municipal liability, not the liability of state supervisory officials.")[24] (citations omitted); cf. Sanville v. McCaughtry, 266 F.3d 724, 739–40 (7th Cir. 2001) ("The plaintiff faces a substantial challenge because failure to train claims are usually maintained against municipalities, not against individuals . . . .").[25]

---

[24] The Court recognizes that Gonzalez and Pelletier cases involved personal/individual capacity lawsuits and the case *sub judice* involves state officials sued in their official capacity for injunctive relief; however, for applicability considerations, the difference appears to be a distinction without substance.

[25] The Court is aware of the League of Women Voters of Ohio v. Blackwell, 432 F. Supp. 2d 723 (N.D. Ohio 2005) case in which the district court applied the City of Canton case

Putting aside the <u>City of Canton</u> municipal liability analysis, the Court will now consider general principles of § 1983 law for purposes of addressing Defendants' arguments, which essentially assert that they are not responsible for the alleged election misconduct, as opposed to the counties.

In <u>Luckey v. Harris</u>, 860 F.2d 1012, 1015–16 (11th Cir. 1988), the Eleventh Circuit held that "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity."  The Court further stated:

> All that is required is that the official be responsible for the challenged action . . . .[I]t is sufficient that the state officer sued must, "by virtue of his office, ha[ve] some connection" with the unconstitutional act or conduct complained of. "[W]hether [this connection] arises out

_____

to state officers in an election challenge; however, the <u>Blackwell</u> court's analysis does not sufficiently answer this Court's applicability concern.  To this regard, if Defendants present their failure to train arguments again in the context of summary judgment, additional briefing on the applicability of the <u>City of Canton</u> case to state election officials is necessary.  The future briefing and evidentiary submissions should also focus on the following standard set forth in <u>Dollar v. Haralson Cty</u>, 704 F.2d 1540, 1543 (11th Cir. 1983): "[i]n determining whether a constitutional deprivation has occurred, courts must examine whether the defendant was under any obligation to the particular plaintiff. The question of the existence of such a duty is an issue of law. The court, not the jury, must determine 'whether, upon the facts in evidence, [a duty] exists between the parties that the community will impose a legal obligation upon one for the benefit of the other.'  The duty inquiry focuses upon the relationship between plaintiff and defendant."

> of general law, or is specially created by the act itself, is
> not material so long as it exists."

Luckey, 860 F.2d at 1015–16 (citing *Ex parte* Young, 209 U.S. at 157).

Here, by virtue of their offices as Secretary of State (and his role as the State's Chief Election Official (O.C.G.A. § 21-2-50(b)) and members of the State Election Board (who have a statutory duty pursuant to O.C.G.A. § 21-2-31(10) to take "such . . . action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections), these Defendants have some connection with the asserted misconduct at issue in this case. Said connection is sufficient for this case to proceed against the named State Defendants (as opposed to the counties).

The Court will now consider whether Plaintiffs have sufficiently alleged the violation of a right secured by the Constitution and laws of the United States. As stated above, in the Amended Complaint, Plaintiffs allege a violation of the right to vote, a violation of the ban on racial discrimination in voting, a violation of the Equal Protection Clause, and a violation of the Voting Rights Act. Doc. No. [41].

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections . . . . [In addition,]

73

[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted . . . ." Reynolds v. Sims, 377 U.S. 533, 554 (1964).   The United States Supreme Court has also "made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn v. Blumstein, 405 U.S. 330, 336 (1972).   And the Voting Rights Act provides in relevant part that:   "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301.

Assuming the non-conclusory factual allegations of the Amended Complaint are true (in accordance with the above-stated standard), the Court finds that the allegations of the Amended Complaint state claims for relief (as to Counts I, II, III, V of the Amended Complaint) that are plausible on their face. More specifically, Plaintiffs' allegations of inadequate training are consistent with persuasive authority found in League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 466 (6th Cir. 2008), in which the Sixth Circuit held that allegations

74

of inadequate training of poll workers, combined with other acts of misconduct, were sufficient to establish that the State of Ohio's voting system deprived its citizens of the right to vote.  See also Smith v. Winter, 717 F.2d 191, 197 (5th Cir. 1983) (concluding that allegations that showed that defendants' conduct had the effect of denying or abridging minorities' right to vote state a claim under the Voting Rights Act).

Lastly, the Court addresses Defendants' failure to state a claim-causation arguments, i.e., "Plaintiffs do not identify what harms, if any, are alleged to have been caused by the Board or its Members, nor do they challenge any rule promulgated by the Board." Doc. No. [48-1], p. 25.[26]

In response, Plaintiffs state that they have set forth "lengthy allegations that the Board has central responsibility for administering Georgia elections and ensuring their fairness, and that Georgia elections were unfair on the Board's watch."  Doc. No. [52], pp. 22–23 (citing Am. Compl. ¶¶ 1–4, 37–54, 61–157). Plaintiffs further assert that they did plead causation, as "[e]ach count [of the

_____

[26] In light of the above-stated Eleventh Amendment and § 1983 "person" rulings, with respect to the State Election Board (*supra*, n.10), Defendants' arguments only apply to the Voting Rights Act claim (Count V of the Amended Complaint) for which there is no Eleventh Amendment Immunity for the State Election Board.

75

Amended Complaint] claims constitutional and federal statutory harms resulting from the Board and its members breaching their duties. Doc. No. 52, p. 22 (citing Am. Compl. ¶¶ 162–65, 172–79, 185–98, 204–06, 211–14, 228, 232, 236, 238).

The Court recognizes that "[§] 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). While determinations of proof are reserved for another day and are not appropriate for consideration at this stage of the case, the Court finds that Plaintiffs have plausibly pled the element of causation sufficient to survive Defendants' motion to dismiss. The Court's language in its standing analysis applies equally here. Plaintiffs' Amended Complaint contains examples of how each challenged piece of conduct (enforcing the "Use it or Lose it" statute, enforcing the Exact Match policy, failure to secure voter registration data, failure to secure voting machines, promoting poll closures, maintaining inaccurate voter rolls, failing to provide adequate resources, and failing to properly train election officials on provisional and absentee ballots) caused harm by denying voters their right to vote and, therefore, impacting the Plaintiff-organizations' missions.

These allegations move "the realm of the possible into the plausible." Resnick v. AvMed, Inc., 693 F.3d 1317, 1327 (11th Cir. 2012).

### 3. *Voter List Maintenance*

In their Amended Complaint, Plaintiffs challenge Georgia's voter-list-maintenance process, which is codified in O.C.G.A. § 21-2-234 ("§ 234"), as unconstitutional under the First, Fourteenth, and Fifteenth Amendments, and the Voting Rights Act. Defendants, however, argue that Plaintiffs' allegations predicated on voter list maintenance should be dismissed for failure to state a claim. Doc. No. [48], p. 4, ¶ 7.

Section 234, which is also referred to as Georgia's "Use it or Lose it" statute, operates as follows: during the first six months of each odd-numbered year, the Secretary of State is tasked with identifying electors with whom there has been "no contact" during the previous five years and who were not identified as changing addresses under O.C.G.A. § 21-1-233.[27] See O.C.G.A. § 21-2-234(a)(2). "No contact" is deemed to have been satisfied when

> the elector has not filed an updated voter registration
> card, has not filed a change of name or address, has not

---

[27] As previously discussed, HB 316 extended the amount of time of "no contact" under Section 234 from three years to five years.

> signed a petition which is required by law to be verified by the election superintendent of a county or municipality of the Secretary, has not signed a voter's certificate, has not submitted an absentee ballot application or voted an absentee ballot, and has not confirmed the elector's continuation at the same address during the preceding five calendar years.

Id. at § 21-2-234(a)(1). The electors identified by the Secretary of State are then sent an address confirmation notice that includes a postage prepaid, preaddressed return card. Id. at § 21-2-234(c). The elector can use the card for address confirmation or to inform the Secretary of State that he or she has moved. Id. at § 21-2-234(d), (e), & (f). If the card is not returned within thirty (30) days, then the elector's name is moved to the list of "inactive" electors. Id. at § 21-2-234(c)(2) & (g). Electors on the inactive list, however, are still allowed to vote. Id. at § 21-2-235(c). Any contact with the electoral system—including voting—would return the person to the list of active electors. An elector placed on the inactive list remains on the list until the day after the second November general election held after the elector is first placed on the inactive list. Id. at § 21-2-235(b). If the elector still makes no contact during that period, the elector is removed from the inactive list of voters. Id. Not less than 30 nor more than 60 days prior to the date on which

the elector is to be removed from the inactive list, the board of registrars must mail a notice to the address on the elector's registration record.  Id.

In their motion, Defendants contend that the Supreme Court's decision in Husted v. A. Philip Randolph Inst., 584 U.S. ___, 138 S. Ct. 1833 (2018) is dispositive and warrants dismissal of those portions of Plaintiff's Amended Complaint that challenge § 234.  In Husted, the Supreme Court reviewed a challenge to Ohio's voter list maintenance system under the National Voter Registration Act ("NVRA"), which requires states to conduct voter list maintenance to remove the names of voters who are ineligible by reason of death or a change in residence. Id. Specifically, Ohio uses two procedures to identify and remove electors from the voter rolls. First, Ohio sends notices to electors whom the Postal Service's "national change of address service" identifies as having moved. Id. at 1840. Second, Ohio also sends notices to electors who have not engaged in any voter activity for a period of two consecutive years. Id. If an elector still fails to respond to the notice and remains inactive for an additional four years, they are removed from the voter rolls. [28] Id. at 1841.

---

[28] In contrast, Defendants argue that Georgia's voter-list-maintenance process is even more forgiving than Ohio's, as it requires five years of voter inactivity followed by

In upholding Ohio's voter-list-maintenance process, the Supreme Court found that it complies with the NVRA.  <u>Husted</u>, 138 S. Ct. at 1848.  As Plaintiffs correctly point out, however, the Supreme Court in <u>Husted</u> did not address whether the Ohio voter-list-maintenance process was constitutional.  In <u>Husted</u>, the Supreme Court specifically noted that "this case presents a question of *statutory* interpretation . . . [t]he only question before us is whether it violates federal law." <u>Id.</u> (emphasis added).

Moreover, Defendants support their argument by citing to <u>Common Cause v. Kemp</u>, 234 F. Supp. 3d 1315 (N.D. Ga. 2017), in which a court in this district granted a motion to dismiss challenge to § 234 under the NVRA and the First Amendment. The Eleventh Circuit, however, ultimately vacated and remanded that dismissal, instructing the court to "conduct a more detailed analysis of the First Amendment question."  <u>Common Cause v. Kemp</u>, 714 F. App'x 990, 991 (11th Cir. 2018). In doing so, the Eleventh Circuit made clear that <u>Husted</u> does not foreclose constitutional challenges to § 234 and that, to the contrary, the Court must consider such constitutional challenges.

_____

another two federal election cycles. Doc. No. [65], p. 11 n.8.

The Court therefore finds that Plaintiffs' allegations in Counts One through Five of their Amended Complaint predicated on voter list maintenance sufficiently state a claim for relief.

### E.  Shotgun Pleadings

Complaints that violate the Federal Rules of Civil Procedure on proper pleading, "either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015).

Defendants assert that "Plaintiffs' complaint is a shotgun pleading, [because] every count incorporates by reference each of the 157 preceding paragraphs." Doc. No. [48], p. 5, ¶ 10. Defendants assert that because of the incorporation of reference method of pleading, they have no way of knowing which allegations pertain to which Defendant and they have not been given adequate notice of the Plaintiffs' claims." Id. Defendants cite the case of Chudasama v. Mazda Motor Corporation, 123 F.3d 1353 (11th Cir. 1997) in support of their arguments.

In Chudasama, the Eleventh Circuit Court of Appeals indicated in a footnote that a complaint with four counts containing two numbered paragraphs

81

and that incorporated by reference "all forty-three paragraphs of factual allegations" was a shotgun pleading.  123 F.3d at 1359 n.9.  The Court also noted that "many of the factual allegations [were vague and] appear[ed] to relate to only one or two counts, or to none of the counts at all . . . ." and that the reader had to 'speculate' as to which factual allegations pertained to which count." Id.

Interestingly, in Chudasama, the Eleventh Circuit did not *sua sponte* dismiss plaintiff's complaint on shotgun pleading grounds and as to the pending motion to dismiss in the present case, this Court will follow the Eleventh Circuit's example.  Here, while a review of the Amended Complaint shows that Plaintiffs used the incorporation by reference method to include 157 paragraphs of factual allegations in each of the six counts/causes of action, Plaintiffs did not just stop there, as Plaintiffs included additional paragraphs, factual assertions, and elements in each of the six counts.  Plaintiffs also used headers and titles in the 157 paragraphs to organize their factual allegations.  Furthermore, in more recent authority, the Eleventh Circuit recognized that while re-alleging factual paragraphs "at the beginning of each count looks, at first glance, like the most common type of shotgun pleading . . . . it is not . . . . [because] [t]he allegations of

82

each count are not rolled into every successive count on down the line." <u>Weiland</u>, 792 F.3d at 1324.

Unlike the complaint in the <u>Chudasama</u> case, in the case *sub judice*, Plaintiffs' allegations are not vague and the reader does not have to speculate as to which factual allegations pertain to which count.  Furthermore, the Eleventh Circuit has held that "[w]hen multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually." <u>Crowe v. Coleman</u>, 113 F.3d 1536, 1539 (11th Cir. 1997); <u>see also</u> <u>Kyle K. v. Chapman</u>, 208 F.3d 940, 944 (11th Cir. 2000) ("The fact that defendants are accused collectively does not render the complaint deficient. The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.").

The Court also notes that Federal Rule of Civil Procedure 10(c) permits incorporation by reference to the extent that it is not overused and problematic. <u>See</u> <u>Regenicin, Inc. v. Lonza Walkersville, Inc.</u>, 997 F. Supp. 2d 1304, 1313 (N.D. Ga. 2014) ("While Rule 10(c) explicitly permits incorporation by reference, overusing the technique and 'indiscriminately incorporat[ing] assertions from one count to another' is problematic.") (citation omitted).  Here, Plaintiffs'

83

Complaint provides adequate notice of the claims against Defendants and the grounds upon which each claim rests, as well as the factual allegations that support Plaintiffs' claims. Weiland, 792 F.3d at 1323 ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). Accordingly, the Complaint, *as amended*, is not a shotgun pleading and will not be dismissed on such basis.

## III. CONCLUSION

Defendants' Renewed Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. [48]) is hereby **GRANTED in part and DENIED in part.**

As to the State Election Board, Defendants' motion is **GRANTED** *in part* on the 42 U.S.C. § 1983 claims (Counts I to IV) and the Help America Vote Act claim (Count VI). These counts are dismissed against the State Election Board based on sovereign immunity. Defendants' motion is **DENIED** with respect to Count V (which pertains to Section 2 of the Voting Rights Act of 1965). To this regard, only Count V remains pending against the State Election Board.

As to Defendants Raffensperger, Sullivan, Worley, and Harp, the motion

(Doc. No. [48]) is **DENIED**.  All counts remain pending against said Defendants.

**IT IS SO ORDERED** this 30th day of May, 2019.

<u>s/Steve C. Jones</u>
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**