*--Fair Fight Action, Inc.; ACTION, Inc.; Care in Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia Highland Church, Inc.; The Sixth Episcopal District, Inc.; and Plaintiffs v. Brad Raffensperger*

**Expert Report**
**Dr. Khalilah L. Brown-Dean**

# EXPERT REPORT
## KHALILAH L. BROWN-DEAN, Ph.D.
August 15, 2019

### BACKGROUND

I am a tenured Associate Professor of Political Science at Quinnipiac University. I received a Bachelor of Arts in Government from the University of Virginia, and a Master's and Ph.D. in Political Science from The Ohio State University. I received advanced training in the Tufts University Metric Geometry and Gerrymandering Summer Program. I specialize in American Politics with an emphasis on elections, political behavior, and public policy. I study historical and contemporary institutional dynamics surrounding voting rights in the United States. In 2015, I co-authored a policy report for the non-partisan, nonprofit, public policy research organization the Joint Center for Political and Economic Studies titled, "Fifty Years of the Voting Rights Act: The State of Race in Politics."[1] The report combined extensive archival, quantitative, and qualitative data to examine the impact of the Voting Rights Act on registration, turnout, representation, and policy responsiveness.

My research on various aspects of voting rights, election administration, and political representation is published in peer-reviewed journals (e.g. *Politics, Groups, and Identities; National Political Science Review*), books, and policy reports. In 2015, Cambridge University Press published a chapter I authored in *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* that was co-edited by Michael Alvarez and Bernard Grofman.[2] In it I examine the changing landscape of electoral reform and its impact on civic engagement and institutional accountability. In September 2019, Polity Press will publish my book *Identity Politics in the United States* that traces historical and contemporary tensions surrounding the rights and privileges of American citizenship. It concludes that the defining feature of American

---

[1] Brown-Dean, K.L., Hajnal, Z., Rivers, C., & White, I. (2015). *Fifty Years of the Voting Rights Act: The State of Race in Politics*. Washington, DC: Joint Center for Political and Economic Studies. Available at http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

[2] *See* Brown-Dean, K.L. (2015). *Felon Disenfranchisement Ten Years After Bush v. Gore*. In Michael Alvarez and Bernard Grofman (Eds.), *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* (pp. 199-211). at 199-211. Cambridge: Cambridge University Press.

democracy—federalism—both shapes and is shaped by Americans' ability to fully exercise the franchise. I highlight the delicate balance between federal provisions and state discretion in administering electoral functions. My witness report reflects the research I have conducted on federalism, voting rights, and election administration since 2003. A copy of my full curriculum vitae including publications over the last ten years is included in the Appendix of this report. I attest to its truth and accuracy. I am being compensated at a rate of $400/hour in this case. However, my opinions rendered in this report are in no way influenced by or contingent upon monies owed to me for my services.

## ASSIGNMENT

On June 11th, I was asked by the plaintiffs' attorneys to address the role of the Georgia Secretary of State in the domain of election administration and enforcement. I have not been asked to opine about the specific claims made in this particular case. My opinions reflect on the office of the Secretary of State, not the individual holding that position.

## SUMMARY OF OPINIONS

1) The right to vote is enshrined in the Federal Constitution with the primary responsibility for enforcement and administrative oversight resting at the state level. Federalism, or the division of power, extends to states the unique power to set the "time, place, and manner" of elections. Federalism recognizes the discretion of subordinate governments, while asserting the primacy of state provisions for outlining the duties and responsibilities of various offices and officers.

2) The federal mandates contained in the Voting Rights Act of 1965 (hereafter "VRA"), the National Voter Registration Act of 1993[3] (hereafter "NVRA"), and the Help America Vote Act of 2002[4] (hereafter "HAVA") affirm the responsibility of each state and territory's Chief Election Officer to oversee the process of voter participation in federal elections.

3) In the wake of the Supreme Court's decision in *Shelby County v. Holder* (2013), it is even more important that state Chief Election Officers carry out their

---

[3] National Voter Registration Act of 1993, 52 U.S.C.A. §§ 20501-20511, available at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

[4] Help America Vote Act, 52 U.S.C.A. §§ 20901-21145, available at https://www.eac.gov/about/help-america-vote-act/.

responsibilities to address and reconcile undue barriers to voting within the state and to prevent harmful electoral practices from being implemented.

4) Based on the State Constitution, Official Code of Georgia, and the Official Compilation of Rules and Regulations of the State of Georgia, the Secretary of State is the Chief Election Officer bearing primary responsibility for protecting voter access to federal elections at the local, county, and state level. This role is affirmed, in practice, by the Secretary of State's formal interactions with voters, candidates, and various local, county, state, and federal officials.

## ANALYSES

### A. BACKGROUND: FEDERALISM AND THE RIGHT TO VOTE

The United States is comprised of an intricate patchwork of laws and provisions governing the right to vote. Federalism, defined as the division of power and authority between a central government and regional governments, is key to understanding the administration, enforcement, and oversight of voting rights in the United States.[5] In Kentucky, for example, those convicted of felonies face a lifetime ban on voting while formerly incarcerated residents of Mississippi may petition members of the state legislature to have their rights restored.[6] Georgia residents must complete their prison sentence, pay all fines and restitution, and be free from parole and/or probation before they can vote again.[7] By comparison, Maine and Vermont are the only two states in the United States that allow prison inmates to vote. Determining to whom voting rights

---

[5] Kousser, J.M. (1999). *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction*. Chapel Hill: University of North Carolina Press.

[6] Manza, J.,& Uggen, C. (2008). *Locked Out: Felon Disenfranchisement and American Democracy*. Oxford: Oxford University Press.

[7] The Georgia State Constitution provides that, "No person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence." Ga. Const. art. II, § I, ¶ III(a); *see also* O.C.G.A. § 21-2-216(b) ("In addition to the qualifications in subsection (a) of this Code section, no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence and no person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed.").

should be extended,[8] the methods for exercising this right,[9] and how to best navigate a complicated maze of regulations has been a highly contested calculation since the country's founding.[10]

In drafting the Constitution, the Framers took special care to strengthen the federal government without impairing the power of state governments that were already in place. Indeed much of the debate over what form of government would be most desirable rested on demands to balance federal interests against state traditions.[11] States had the power to limit access to voting based on various characteristics such as race, gender, property ownership, moral fitness, religious identity, and residency.[12] Virginia, for example, required men to possess at least 50 acres of land without structures, or 25 acres of land with structures.[13] In other states like Rhode Island, citizenship—and by extension, voting—was limited to Christians and excluded those who identified as Catholic or Jewish.[14] Georgia's 1777 state constitution restricted suffrage to white men who "possessed in his own right of 10 pounds value, and liable

---

[8] Grofman, B., Handley, L., & Niemi, R. (1992). *Minority Representation and the Quest for Voting Equality*. Cambridge: Cambridge University Press.

[9] Kousser, J.M. (1974). *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910*. New Haven: Yale University Press.

[10] Vallely, R.C. (2004). *The Two Reconstructions: The Struggle for Black Enfranchisement*. B.I. Page (Ed.). Chicago: University of Chicago Press.

[11] Smith, R.M. (1999). *Civic Ideals: Conflicting Visions of Citizenship in U.S. History*. New Haven: Yale University Press.

[12] *See* Rogers, D.W. (1992). *Voting and the Spirit of American Democracy: Essays on the History of Voting and Voting Rights in America*. Champaign, IL: University of Illinois Press.

[13] For a detailed table of suffrage requirements by state from 1776-1790, *see* Table A.1 of Keyssar, A. (2009). *The Right to Vote: The Contested History of Democracy in the United States* (rev. ed.) (pp. 306) New York: Basic Books.

[14] Kettner, J.H. (1978). *The Development of American Citizenship, 1608-1870*. Chapel Hill: University of North Carolina Press.

to pay tax in this State, or being of any mechanic trade."[15] Those eligible to vote were also required to have at least six months residency in the state.  The variation in voter eligibility requirements often mapped onto the variation in state demographics.[16]

The new Constitution allowed states to maintain their own eligibility provisions while guaranteeing that those deemed eligible for full citizenship at the state level, could participate in federal elections.[17] Throughout earlier periods, federal eligibility for full citizenship explicitly barred certain groups such as American Indians,[18] women,[19] enslaved Africans,[20] and immigrants from certain countries.[21]

Article 1, section 4 of the U.S. Constitution contains the Elections Clause that delineates the division of power between the federal government—specifically

---

[15] Porter, K.H. *A History of Suffrage in the United States*. (1918). Chicago: University of Chicago Press.

[16] *See* Key, V.O. (1949). *Southern Politics in State and Nation*. New York: Knopf.

[17] Citizenship in the United States is built upon three key conceptions. The first, *jus soli,* automatically confers citizenship upon anyone born on U.S. soil. This status did not apply to African Americans, whether enslaved or free, until the adoption of the Thirteenth Amendment (1865). The second conception, *jus sanguinis,* grants citizenship to those who have at least one parent with U.S. citizenship. The last conception, naturalization, allows those born elsewhere to pursue citizenship. For a detailed discussion of the various dimensions of U.S. citizenship, *see* Brown-Dean, K.L. (2019). *Identity Politics in the United States* (ch. 2). Cambridge: Polity Press.

[18] *See Elk v. Wilkins*, 112 U.S. 94 (1884) and McDonald, L. (2011). *American Indians and the Fight for Equal Voting Rights*. Oklahoma City: University of Oklahoma Press. for a detailed understanding of the challenges for defining citizenship and voting rights for Native Americans.

[19] *See* McConnaughy, C. (2013). *The Woman Suffrage Movement in America: A Reassessment*. Cambridge: Cambridge University Press.

[20] *See* Woodward, C.V. (1974). *The Strange Career of Jim Crow*. New York: Oxford University Press.

[21] Hayduk, R. (2006). *Democracy For All: Restoring Immigrant Voting Rights in the United States*. New York: Routledge Press.

6

Congress—and the states in the domain of voting rights. It provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except to the Place of Chusing (sic) Senators."[22] The principle of federalism underlies a bifurcated system allowing each level of government (federal, state, local/county) to adopt its own provisions related to things such as voter registration, polling hours, the siting of voting apparatus, the removal of individuals from voting rolls, and the tabulation of votes.

The Elections Clause does not specify which state office and/or officer(s) is responsible for overseeing election administration. Nor does it mandate that each state or territory adopt a uniform structure or central chain of command to govern how elections are administered across the state. Rather, it defers to state statutes to outline this function, task a chief administrator, and define his/her accompanying responsibilities. In most states and territories, the day-to-day duties of election administration are shared between local authorities and state officials. To be certain, local administrators have the most direct contact with voters and potential voters and must be acutely aware of the laws governing the electoral process. The Constitution grants Congress the unique and exclusive authority to enact federal laws designed to ensure state residents have fair and unfettered access to voting.[23] Therefore, it is necessary to examine state provisions coupled with federal mandates to determine where the responsibility for elections oversight and enforcement lies.

### B. CITIZENSHIP, FEDERALISM, AND STATE DISCRETION

Congress adopted three key Amendments designed to carve out broader protections of citizenship and its accompanying benefits. Together, the Thirteenth, Fourteenth, and Fifteenth Amendments abolished slavery, granted citizenship to all

---

[22] The 1813 ratification of the Seventeenth Amendment provided for the direct election of U.S. Senators.

[23] *See The Scope of Congressional Authority in Election Administration* (2001). Washington, DC: General Accounting Office. Available at https://www.gao.gov/new.items/d01470.pdf.; Shanton, K. (2019). *The State and Local Role in Election Administration: Duties and Structures.* Washington, DC: Congressional Research Service. Available at https://fas.org/sgp/crs/misc/R45549.pdf.; Garrett, R.S. (2019). *Federal Role in U.S. Campaigns and Elections: An Overview.* Washington, DC: Congressional Research Service. Available at https://fas.org/sgp/crs/misc/R45302.pdf.

who were born or naturalized in the United States,[24] and extended the franchise to African American males.[25] These new provisions led to a dramatic, yet brief, increase in the number of previously disenfranchised groups who were registering, voting, and running for elected office.[26]

The expansion of citizenship and voting rights at the federal level prompted numerous state constitutional conventions between 1890 and 1910 to adopt new restrictions. The concern for many state legislators was that these new protections at the federal level would undermine the distribution of power at the local level. This was particularly true for communities across the South with sizeable minority communities. These new federal guarantees of citizenship and voting rights enhanced the potential for minority groups to convert their numerical presence into political influence. In turn, the new state guidelines were constructed in such a way that upheld the federal Constitution's explicit ban on race-based disenfranchisement, while still retaining the state's power to define which groups were desirable as full citizens. To do so, most states based their disenfranchisement provisions on behaviors and attributes most commonly associated with certain groups rather than specifying such groups by name. For example, delegates to Georgia's 1908 constitutional convention adopted a cumulative poll tax, grandfather clause, and literacy tests that effectively eliminated the bulk of Black voters and most Whites who were poor. The Georgia state constitution allowed counties to hold white-only primaries and adopt additional disenfranchising techniques to meet their local interests. These institutional measures coupled with documented instances of racial violence significantly deterred many residents from

---

[24] The Fourteenth Amendment did not explicitly address the unique standing of Native Americans and people of Asian descent who pursued citizenship.

[25] The Fourteenth Amendment prohibited states from making or enforcing laws that abridged the privileges and immunities of citizenship and provided that "[a]ll persons born or nationalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." *See* U.S. Const. amend XIV, § 1.

[26] Much of the focus on the path of American political development has focused on race-based exclusions that disenfranchised African Americans. It is important to note, however, that many of the restrictions also limited the number of non-landowning white men and ethnic immigrants who were barred from voting. Therefore, we see an overall increase in electoral participation rates across racial/ethnic groups after passage of the Civil War Amendments.

even attempting to register.[27] Below, as Figure 1 illustrates, the legacies of these restrictions effectively eliminated Black voters for nearly 30 years.

Even as federal legislative and judicial decisions struck down state provisions such as white-only primaries,[28] poll taxes,[29] and grandfather clauses,[30] they did not translate into substantial gains in registration and turnout. Local and state elected officials retained significant power to limit access to voting using both legal and extralegal means.[31] It wasn't until the passage of the VRA that the federal government took a more aggressive approach to protecting state residents against arbitrary barriers imposed at the state and local level.

---

[27] *See* Brundage, W.F. (1993). *Lynching in the New South: Georgia and Virginia, 1880-1930*. Champaign, IL: University of Illinois Press.; Przeworski, A. (2009). Conquered or Granted? A History of Suffrage Extensions. *British Journal of Political Science*, 39(2), 291–321.; Johnson, K. (2010). *Reforming Jim Crow: Southern Politics and State in the Age Before Brown*. Oxford: Oxford University Press.; Corzine, J., Creech, J. & Corzine, L. (1983). Black Concentration and Lynchings in the South: Testing Blalock's Power-Threat Hypothesis, *Social Forces*, 61(3), 774–96.; Epperly, B., Witko, C., Strickler, R., & White, P. (2019). Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S. *Perspectives on Politics*, 1-14.

[28] *See Smith v. Allwright*, 321 U.S. 649 (1944); *United States v. Classic*, 313 U.S. 299 (1941) and.

[29] The Twenty-fourth Amendment was ratified in 1964.

[30] *See Guinn v. United States*, 238 U.S. 347 (1915).

[31] The Civil Rights Act of 1957 created a Civil Rights Division within the Department of Justice. *See* Pub. L. No. 85-195, 71 Stat. 472 (1957). The Division is tasked with providing federal oversight of voting rights violations. The U.S. Department of Justice filed a total of 71 voting rights lawsuits in the Deep South before 1965. However, the depth of state discretion allowed local officials to devise new methods that circumvented these protections and continued to limit civic participation. *See* Hawk, B.E., & Kirby, J.J. (1965). *Federal Protection of Negro Voting Rights. Virginia Law Review*, 51(6), 1093–96.

The Act contained numerous provisions for strengthening federal protection of voting rights.[32] Most notably, the VRA allowed for federal elections monitors and created an outlet for the federal government (the U.S. Dep't of Justice) or private parties to bring lawsuits to prevent racially discriminatory laws and policies from taking effect. The "preclearance" provision required that states and jurisdictions with a documented history of discrimination (section 5) submit proposed electoral changes to federal officials before they could take effect.[33] The preclearance provision identified as covered jurisdictions those areas (all or parts of states) with discriminatory tests or devices and low turnout or registration in the 1964 presidential election. Section 5 covered nine states (Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia) in their entirety. Georgia was identified as a covered jurisdiction on August 7, 1965 based on data from its November 1, 1964 election and its use of devices such as the poll tax (adopted in 1802), grandfather clause (adopted in 1908), and literacy test (adopted in 1908).[34] By shifting the responsibility to states and localities to prove to federal officials that the proposed changes were not discriminatory, the preclearance process avoided the delays and expenses of litigation, and prevented discriminatory laws before they were used in elections. In 1982, Congress amended the Act to clarify that discriminatory *purpose* was not required to bring a lawsuit to invalidate election procedures that *result* in discrimination.

## C. FEDERAL CHANGES AND HEIGHTENED STATE ACCOUNTABILITY

The impact of the Voting Rights Act of 1965 was immediate. Its protections coupled with federal oversight of potential violations translated into increased rates of

---

[32] VRA § 2 is a permanent provision that prohibits "any voting standard, practice, or procedure that results in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group." *See* https://www.justice.gov/crt/section-2-voting-rights-act#sec2.

[33] The coverage provision was originally scheduled to expire after five years. Congress extended the provisions and made additional updates to the VRA in 1970, 1975, 1982, and 2006. The ban on discriminatory devices was made permanent in 1975 in addition to extending preclearance requirements to areas with large concentrations of certain language minorities and low registration and turnout rates.

[34] Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-01 (Aug. 7, 1965).

registration, turnout, representation, and policy responsiveness for various communities across the United States (*see* Figures 1 and 2). This success provided a foundation for additional federal provisions that increased state responsibility in ensuring their electoral policies and procedures did not conflict.

Figure 1: Black and White Voter Registration Rates in Louisiana and the Former Confederate States, 1878-2010[35]



Confederate states' data are self-reported turnout of each year's voting age population. Data from 1956 to 1968 are from the American National Election Study. Data from 1972 to 2012 are from the United States Census, Current Population Survey, Voter Supplement File. *See* Brown-Dean, K.L., Hajnal, Z., Rivers, C., & White, I. (2015). *Fifty Years of the Voting Rights Act: The State of Race in Politics*. Washington, DC: Joint Center for Political and Economic Studies. Available at http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

Figure 2: Black and White Presidential Election Voter Turnout in Former Confederate States, 1956-2012. (Percent of Voting Age Population)



## NATIONAL VOTER REGISTRATION ACT

Congress passed the NVRA[36] to make it easier for eligible American citizens to register to vote and to streamline the processing and maintenance of voter registration applications. The NVRA sets requirements for state compliance in *federal* elections; not state or local elections. Those requirements include offering voter registration opportunities at motor vehicle offices,[37] social services offices and agencies that accommodate those with disabilities,[38] facilitate mail-in registration,[39] and regulate how

---

[36] 52 U.S.C.A. §§ 20501 – 20511.

[37] *Id.* § 20504(c)(1) Simultaneous Application for Voter Registration and Application for Motor Vehicle Driver's License.

[38] *Id.* § 20506(4)(B) Voter Registration Agencies.

[39] 52 U.S.C.A. § 2505 Mail Registration.

registration lists are to be maintained.[40] The NVRA also created a uniform federal registration form that every state and territory is required to recognize. The Act's provisions apply to 44 states (including Georgia) and the District of Columbia.[41]

The NVRA both affirmed and heightened the responsibility of state election officials to ensure compliance with federal provisions governing various aspects of election administration. Section 10 of the Act requires that, "Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[42] The NVRA does not mandate what state officer is responsible for this coordination; only that each state identify this individual based on its own constitution. Other parts of the NVRA outline the responsibilities of the state-designated chief election official, "The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."[43] In addition, "On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 10 of the State of the person's residence."[44]

In *Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005), the court ruled that the State of Georgia violated the provisions of the NVRA by rejecting 64 mail-in voter applications bundled and submitted by a local non-profit organization.[45]

---

[40] *Id.* § 20507 Requirements With Respect to Administration of Voter Registration.

[41] *See* the amici curiae briefs filed by the State of Georgia and 14 other states, on September 22, 2017, accompanying *Husted v. Randolph* ___ U.S. ___, 138 S. Ct. 1833 (2018) seeking clarification of state responsibilities in adhering to the National Voter Registration Act.

[42] 52 U.S.C.A. § 20509.

[43] *Id.* § 20505.

[44] *See* 52 U.S.C.A. § 20507, Requirements with Respect to Administration of Voter Registration for the full list of responsibilities for the chief election officer as required by, *id.* § 20509, of the NVRA.

[45] The lead defendant in that case, Cathy Cox, was the Georgia Secretary of State at the time.

Additional challenges to Georgia's compliance with the NVRA address the relationship between proof of citizenship and voting and the maintenance of voter lists.[46] Section 5 of the NVRA provides that voter registration applications may only require the minimum amount of information necessary for a state to determine applicants' eligibility to register to vote and to perform its registration duties.

**HELP AMERICA VOTE ACT**

In the wake of overwhelming concerns about voter access, voting equipment, and disenfranchisement allegations during the 2000 Presidential election, the Help America Vote Act of 2002 ("HAVA") provides federal resources to help states and local governments streamline, strengthen, and enhance election administration. The Act created a bipartisan, independent Election Assistance Commission ("EAC") and allocated $3.65 billion to help states carry out the following provisions: The creation and maintenance of a computerized state voter registration system,[47] the replacement of punch card and lever voting machines,[48] the distribution of provisional ballots to residents whose registrations are questioned,[49] enhanced access for voters with disabilities,[50] and assistance in developing plans to secure voting systems. HAVA required that states replace their voting machines with one of three forms: Direct-Recording Electronic Voting ("DRE"), Optical Scans, or Ballot Marking Devices ("BMD"). The State of Georgia, along with 17 other states, opted to create a uniform voting system where all voting equipment is purchased at the state level.[51] Table 1

---

[46] *See Georgia Coal. for the People's Agenda, Inc v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018); *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) for cases challenging Georgia's compliance with the mandates of the NVRA. In each of those cases the named defendant was acting in his/her official capacity as Secretary of the State of Georgia.

[47] 52 U.S.C.A. § 21083.

[48] *Id.* § 20902. States could be exempted from this requirement if they received a waiver.

[49] *Id.* § 21082. HAVA allows for provisional ballots to be tabulated according to the provisions established in each state or territory.

[50] 52 U.S.C.A. § 21081.

[51] Other states with uniform voting systems include Alabama, Alaska, Connecticut, Delaware, Georgia, Hawaii, Louisiana, Maine, Maryland, Nevada, New Hampshire,

below illustrates the types of voting machines used in Georgia during the 2000 election as well as accompanying information regarding the number of counties using each type of machine and the estimated number of spoiled ballots.

**Table 1: [Georgia] Voting Equipment Performance**
**(2000 General Election)[52]**

| Voting System | Introduced in Georgia | Counties Using System | Under Vote Percentage | Votes Not Counted |
|---|---|---|---|---|
| Paper Ballot | 1900 | 2 | 3.3 | 113 |
| Punch Card | 1964 | 17 | 4.6 | 38, 065 |
| Lever Machine | 1959 | 73 | 4.2 | 16,926 |
| Optical-Scan | 1986 | 67 | 2.7 | 38,195 |
|    Central Count | _____ | _____ | 4.2 | 21,999 |
|    Precinct Count | _____ | _____ | 4.7 | 16,196 |

The provisions of HAVA, via the Election Assistance Commission in particular, affirm the important interaction between state and local officials involved in election administration. The EAC's Standards Board is comprised of 55 state elections officials and 55 local officials. While the EAC provides a range of technical assistance to local election officials, HAVA's statutes specify that each State's Chief Election Officer has primary oversight responsibility in overseeing the proper implementation and compliance with its provisions. As with the NVRA, HAVA relies on each state or territory to identify a Chief Election Officer. The Federal Register publishes state plans, pursuant to the HAVA, as submitted to the EAC. As part of my research for this case, I reviewed the Federal Registers from 2018 (Vol. 83, No. 104), 2014 (Vol. 79, No. 127), 2010 (Vol. 75, No. 234), 2008 (Vol. 73, No. 182), 2006 (Vol. 71, No. 8), and 2004 (Vol. 69, No. 57). The 2018 lists the Chief Election Officer for each state. I examined that document and noted that the Chief Election Officer for the State of Georgia is listed as the

---

New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, Utah, and Vermont.

[52] Publication of State Plan Pursuant to the Help America Vote Act, 73 Fed. Reg. 54141-02 (Sept. 18, 2008).

Secretary of State.[53] The information contained in the 2018 Federal Register is consistent with other publications of the Federal Record I researched for the years listed above.

I reviewed EAC allocations to states for the same years. In my research of recent EAC allocations to states, I found that in April 2018 the Georgia Secretary of State's Office accepted a $10,305,783 grant allocation from the U.S. Election Assistance Commission to "improve the administration of elections for Federal office, including to enhance election technology and make election security improvements."[54] The modular budget and federal financial report (*see* Attachment C) accompanying the grant memorandum includes a 5% state match to improve "election security, simplicity, and accessibility" for a total award of $10,821,072.[55]  Some of the proposed uses included purchasing secure devices that produce a verifiable paper ballot, improving voter registration database management, and updating the online voter registration page. In April 2018, then-Secretary of State Brian Kemp established Georgia's Secure, Accessible, and Fair (SAFE) Elections Commission to study and propose options for the state's election system. I reviewed the report containing the final recommendations the commission submitted to the General Assembly on January 10, 2019. Page five of the

[53] There is no federal requirement that the Secretary of State serve as the Chief Election Officer; this designation is specified in each state constitution or charter. In Delaware, for example, the Chief Election Officer is the Commissioner of Elections while Kentucky's Chief Elections Officer is the Executive Director of the State Board of Elections.

[54] *See* Attachment C, Memorandum and Grant Budget from Chris Harvey, Elecs. Dir. in the Office of Ga. Sec'y of State Brian P. Kemp, to Brian Newby, Exec. Dir. of the U.S. Elec. Assistance Comm'n (July 10, 2018). 52 U.S.C. § 20901(a) specifies that, "[n]ot later than 45 days after October 29, 2002, the Administrator of General Services (in this subchapter referred to as the 'Administrator') shall establish a program under which the Administrator shall make a payment to each State in which the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after October 29, 2002, that the State intends to use the payment in accordance with this section.".

[55] 52 U.S.C.A. § 21003(a) of the HAVA outlines the condition for receipt of funds, "a state is eligible to receive a requirements payment for a fiscal year if the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, has filed with the Commission a statement certifying that the State is in compliance with the requirements referred to in subsection (b)."

document notes that, "Georgia implemented its current uniform voting system that uses DRE systems for in-person voting. Georgia has a 'top-down' election system where ballots are constructed by the Center for Elections System, which was previously a part of Kennesaw State University, but is now part of the Office of the Secretary of State."[56] Many of report's proposals reflect the provisions covered by HAVA and thus eligible for funding from the Elections Assistance Commission, and compliance with its mandates.[57]

***Shelby County v. Holder***

      In 2010, election officials from Shelby County, Alabama sued the US Attorney General to challenge the constitutionality of Sections 4(b) and 5 of the Voting Rights Act of 1965. In a 5-4 ruling, the Supreme Court struck down the coverage formula (Section 4) used to identify covered jurisdictions that were previously required to submit proposed election rule changes (Section 5) to the Department of Justice, "Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned nationwide for over 40 years. And voter registration and turnout numbers in the covered States have risen dramatically . . . ."[58]

      While the ruling in *Shelby County* did not eliminate the VRA, it significantly weakened federal oversight of election administration. Previously covered jurisdictions in Texas, North Carolina, Florida, Mississippi, Alabama, and Georgia introduced new measures regulating voter access following the ruling. *Shelby County* allowed local election officials to make decisions such as consolidating polling places, purging voters, adopting stricter voter id requirements, changing election dates, and eliminating early voting without first submitting those proposed changes for federal review. The ruling heightened concerns from some groups that these facially neutral restrictions could

---

[56] *See Secure, Accessible, and Fair Elections (SAFE) Commission Report*, submitted to the Ga. Gen. Assemb. (Jan. 10, 2019), available at https://sos.ga.gov/admin/uploads/SAFE_Commission_Report_FINAL_(1-10-18).pdf (Comm'n Co-Chairs: Secy of State Robyn Crittenden and State Rep Barry A. Fleming).

[57] *Id.*

[58] *Shelby Cty v. Holder*, 133 S. Ct. 2612, 2627-28 (2013).

disproportionately impact minority groups who necessitated the original passage of the VRA.[59]

*Shelby County* reaffirmed the importance of federalism outlined in earlier passages of this report. First, it placed the onus on Congress to exercise its Constitutional authority to create a new Section 4 formula based on more contemporary data. Second, in the absence of federal authority to prevent discriminatory policies from taking effect, *Shelby County* increased the importance of state election officials carrying out their responsibility to both monitor and remediate electoral practices that undermine the rights enshrined in the Federal Constitution and protected by other sections (most notably Section 2) of the VRA. Local officials continue to play a key role in executing various election administration functions in accordance with the mandates of state law and constitutional authority. For example, in researching the duties and functions of various county election boards in Georgia I noted the charge of the Augusta-Richmond County Board of Elections, "[t]o make and issue rules, regulations, and instructions, consistent with law as deemed necessary for the guidance of poll officers and voter registration officers."[60]

However, this local discretion does not supersede the primary responsibility that now falls more heavily upon state election officials to ensure no procedure, device, or practice adopted at the local or state level impairs the rights and protections afforded at the federal level. The Chief Election Officer may exercise this oversight in a number of ways. For example, the Official Code of Georgia instructs the Secretary of State, "to develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in the state."[61] Similarly, "the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002."[62]

---

[59] *See, e.g.*, Thurgood Marshall Institute at the NAACP Legal Defense and Education Fund. (2018). *Democracy Diminished: State and Local Threats to Voting Post Shelby County v. Holder*.New York: NAACP LDF. Available at https://www.naacpldf.org/wp-content/uploads/Democracy-Diminished-State-and-Local-Threats-to-Voting-Post-Shelby-County-Alabama-v.-Holder.pdf.

[60] *See* Attachment K at 2.

[61] O.C.G.A. § 21-2-50(a)(15).

[62] O.C.G.A. § 21-2-50.2(c).

Under *Shelby County*, the Chief Election Officer must now work closely with other government officials to ensure state residents have fair and consistent access to the electoral process. When measures are passed by the legislature, for example, the duty falls upon election administrators to carry them out in accordance with the previously described federal guidelines. A decision by a state legislature to raise the minimum voting age to 21, for example, should not be carried out by state election officials because it imposes a more stringent age qualification than what is required by the Twenty-Sixth Amendment. However, a state election officer could legally carry out a legislative plan to lower the minimum age to 17 for state and local elections. It should be noted that Georgia is one of seven states where election management is handled by both a Chief Election Official and a State Board. However, the federal mandates of the NVRA and the HAVA vest authority with the singular Chief Election Official identified by the state. In Georgia, that official is the Secretary of State.[63]

In sum, *Shelby County* significantly heightened the need for each State's Chief Election Officer to oversee and enforce election administration to ensure state compliance with the protections embedded in the Federal Constitution and affirmed by the Voting Rights Act of 1965, the National Voter Registration Act, and the Help America Vote Act. Barring direct federal oversight of compliance leaves that responsibility to state election officials.

### D. GEORGIA STATE PROVISIONS FOR ELECTION ADMINISTRATION AND AUTHORITY

I conducted an extensive review of Georgia statutes and regulations to evaluate the following questions:

1) What, if anything, is the role of the Secretary of State ("SOS") with respect to voting and elections?
2) What is the statutory authority identifying the SOS as the Chief Election Officer?
3) And accordingly, what powers and responsibilities are assigned to the Chief Election Officer?

Based on this review, I identified a total of 151 duties and responsibilities connecting the SOS to election administration. These 151 duties are found in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia. I organized those 151 provisions into three key categories of election administration: 1) Interaction With Candidates for Public Office, 2) Interaction With Voters, and 3) Interaction With Election Officials. These categories often overlap and should not be considered as mutually exclusive. Rather, I focus on the primary duties in each

---

[63] O.C.G.A. § 21-2-50.2(a).

provision when assigning to categories. Table 2 (*see* Attachment A) contains all 151 provisions, as well as my categorizations. There are few, but important statements outlining the Secretary of State's interactions with (potential) candidates for public office. An example of Category 1 is the Secretary of State's duty to "receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the SOS in accordance with this chapter."[64] Category 2, interactions with voters, most closely aligns with educating and protecting voters' rights. An example of Category 2 is the obligation to "prepare and furnish information for citizens on voter registration and voting."[65] I noted in my research that the bulk of Georgia's provisions defining the role of the SOS in election administration falls under Category 3; defining her/his duties to guide and oversee the actions of local officials. An example of Category 3 is:

> The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State. The board of registrars shall provide each deputy registrar with a copy of the manual.[66]

The SOS, by statute[67], is also the chair of the State Election Board.  The State Election Board, in turn, is statutorily required to "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers and other officials, as well as the legality and purity in all primaries and elections."[68]

---

[64] O.C.G.A. § 21-2-50(a)(3).

[65] O.C.G.A. § 21-2-50(a)(13).

[66] Ga. Comp. R. & Regs. 183-1-6-.03(3)(n).

[67] O.C.G.A. § 21-2-30(d).

[68] O.C.G.A. § 21-2-31(1).  *See also* O.C.G.A. § 21-2-31(10) (stating the State Board has the duty to take "such other action, consistent with the law, as the board may determine to be conducive to the fair, legal, orderly conduct of primaries and elections").

In Table 3 (*see* Attachment B), I juxtapose the NVRA, HAVA, and VRA requirements with the Georgia statutes regulating the duties of the Chief Election Official. In the space below I highlight some of the major provisions governing the Secretary of State's responsibilities for election administration.

*The Role of the Secretary of State*

The SOS for Georgia is an elected position tasked with numerous duties such as housing the Professional Licensing Boards Division, implementing and enforcing the Georgia Uniform Securities Act of 2008, registering charitable organizations, and of specific interest to this report,

> The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, municipal, state, county, and federal elections. They are responsible for certification of election results as well as certifying the qualification of candidates and preparation of ballots and election forms and materials. The Elections Division provides Great Seal certification for authentication of public documents for foreign use for non-Hague countries. Along with those duties, the Elections Division maintains the Statewide Voter Registration Database to ensure that voter registration lists are current statewide. **They are also accountable for investigating election fraud and enforcing state election laws**.[69]

(emphasis added).

*Chief Election Officer*

Several provisions in the **Official Code of Georgia** identify the SOS as the Chief Election Official.[70]   Further, as stated above, the SOS is also the chair of the State Election Board, which has the responsibility to take action, including the promulgation of rules, to obtain uniformity in the practices and proceedings of local elections officials and to ensure that primaries and elections are fair, legal and orderly.[71]

---

[69] *See* Ga. Sec'y of State, *Elections*, available at https://sos.ga.gov/index.php/elections.

[70] *E.g.,*O.C.G.A. §§ 21-2-10 and 21-2-50 (14

[71] O.C.G.A. § 21-2-31(1).  *See also* O.C.G.A. § 21-2-31(10) (stating the State Board has the duty to take "such other action, consistent with the law, as the board may determine to be conducive to the fair, legal, orderly conduct of primaries and elections"); *Grizzle v. Kemp*, 634 F.3d 1314, 1319, 1326 (11th Cir. 2011) (stating the SOS  has the "duty and

In the particular context of HAVA, O.C.G.A. § 21-2-50.2(a) provides that:

> The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.

Accordingly, O.C.G.A. § 21-2-50.2(b) states:

> As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.[72]

These two provisions, as well as the SOS's overall responsibility to ensure that elections in Georgia are legal, fair and orderly, create an oversight function of the SOS in ensuring compliance with the mandates of HAVA. In a broader sense, over 100 of the 151 statutes I examined highlight the key role the State's Chief Election Official must play in coordinating, monitoring, and overseeing the administrative functions of subordinate election administrators. For example, the SOS approves the certification program for:

> All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by completing a certification program approved by the Secretary of State by no later than December 31 of the year in which they are appointed. Such program may

---

power to enforce the State's election code" and to "ensure that the entities [such as local election officials] charged with those responsibilities comply with Georgia's election code in carrying out those tasks.")

[72] Title III (*see* 52 U.S.C.A. §§ 21081-21085, 21101) of HAVA refers to the Uniform and Non-Discriminatory Technology and Administration Requirements. It guarantees provisional ballots to electors whose registration is disputed, requires appropriate voting systems, mandates a centralized voter registration database, and allows for absentee ballots. 52 U.S.C.A. § 21085 is of particular note, "[t]he specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State."

include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections.[73]

The Office of the SOS acts as a key resource for voters in the State of Georgia. For example, I analyzed the My Voter Page ("MVP") portal that is maintained by the SOS's Office. The MVP portal enables Georgia voters to review their voter registration status, locate early voting and poll locations, check the status of mail-in applications, view sample ballots, and review the status of their provisional ballots.[74] The site's disclaimer documents that the data provided by the SOS site is extracted from data provided by the various counties of residence. The portal also contains links to the state's Election Advisory Council, the state's voter identification requirements,[75] the VoteSafe program,[76] and a form to report allegations of voter fraud.[77]

*Election Oversight with Intrastate and Interstate Officials*

The SOS is required to provide multiple training sessions for the aforementioned election officials, has the discretion to waive training requirements for local election officials, and has the responsibility to ensure that local election officials are adequately training poll workers and others involved in the election process. As just one example of the SOS being involved in local training efforts, the Georgia Election Code provides :

A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to

---

[73] O.C.G.A. § 21-2-101(a).

[74] Ga. Sec'y of State, *My Voter Page*, available at
https://www.mvp.sos.ga.gov/MVP/mvp.do.

[75] O.C.G.A § 21-2-417.

[76] Ga. Sec'y of State, *VoteSafe*, available at
https://sos.ga.gov/index.php/elections/votesafe.

[77] Ga. Sec'y of State, *Elections Division*, available at https://sos.ga.gov/cgi-bin/EMailStopVoterFraud.asp.

complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State.[78]

Another example is that the SOS's official website contains poll worker manuals and videos.

My review of the official website for the Secretary of State's Office also shows information and resources to assist various state and local agencies (e.g. public high schools and colleges; the Georgia Department of Natural Resources; and public libraries) in carrying out the federal voter registration provisions required by the NVRA.[79] For example, the Election Connection tab contains links to a document for agencies entitled, "Implementing NVRA in Department of Human Services." The document's preface states:

> *Implementing NVRA in Department of Human Services* is to be used as a guide for the administration of voter registration conducted by Georgia Agencies under the National Voter Registration Act of 1993 (NVRA). This manual is not intended to be used as a substitute for the Georgia Constitution, relevant statutes, or applicable case law. Whenever there is a question regarding the interpretation of information contained in this guide, or of a particular section of the Election Code, or any other statute, the user should contact competent legal counsel or the Office of the Secretary of State, Elections Division.[80]

The "Implementing NVRA" guide also outlines the Role of the Secretary of State's Office:

> The NVRA requires that each state designate a chief election official to be responsible for coordination of the state responsibilities under this act. The Secretary of State has been named the chief election official for the State of Georgia. Under state law, the Secretary of State is charged with establishing

---

[78] O.C.G.A. § 21-2-100(c). *See also* O.C.G.A. § 21-2-50 (11); Ga. Comp. R. & Regs. 183-1-6-.03(3)(m).

[79] Ga. Sec'y of State, *Election Connection*, available at https://sos.ga.gov/index.php/Elections/election_connection.

[80] Ga. Sec'y of State: Elecs. Div., *Implementing NVRA: Dep't of Human Servs.*, Preface (ver. 1 2001), available at http://sos.ga.gov/admin/files/Implementing_NVRA_DHS_v.1_2011_.pdf.

and maintaining a statewide voter registration system. The system must be capable of meeting federal requirements for maintaining lists of both eligible active voters and those voters considered inactive. The Secretary of State is responsible for overseeing statewide list maintenance activities and functions required under federal and state laws. These relate to updating voter information and removing ineligible persons from the voter lists.[81]

The SOS has exclusive powers over various details governing the local administration of elections including determining the size and shape of the envelopes used to submit absentee ballots[82] and designing and supplying tally sheets, voting rights posters, and oaths of assisted electors and poll officers.[83] The SOS receives election results from election superintendents of the various counties and certifies the votes. Election results for each of Georgia's 159 counties are tabulated and made available via the Secretary's official website pursuant to O.C.G.A. § 21-2-499. In addition,

> In the case of primaries, elections, and runoffs for county, state, and federal office, the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State, within seven days following a primary, election, or runoff.[84]

The SOS acts as the central point of contact for receiving information regarding voter eligibility of Georgia residents. The Office receives information from federal officials (e.g. Georgia residents who have been convicted of federal felonies and thus ineligible to vote while incarcerated or on parole or probation), state agencies (e.g. natural resources and the Department of Driver Services), and local entities (e.g. probate court). The SOS is responsible for using this data to update the central registration database that local superintendents and election officials use to verify registrations, "prior to approving the application of a person to register to vote, the

---

[81] *See supra* note 76, *Implementing NVRA: Dep't of Human Servs.* at 1.

[82] O.C.G.A. § 21-2-384(b).

[83] O.C.G.A. § 21-2-400(a).

[84] Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9).

registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State."[85]

The Office of the SOS also plays a key role in ensuring election integrity by notifying other states of new Georgia residents' status:

Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.[86]

Relatedly, the SOS is the central point of contact for notifying counties and municipalities within the state of changes to residence:

Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making application to register to vote in that county or municipality, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.[87]

*Election Oversight with Federal Officials*

As the Chief Election Official for the State of Georgia, the SOS represents the state in official interactions with the federal government related to election administration. For example, in May 2017, President Donald J. Trump signed Executive Order 13799 establishing the Presidential Advisory Commission on Election Integrity to study registration and voting procedures in order "to promote fair and honest Federal elections.[88]" Commission Vice-Chair Kris Kobach sent a request to each state's chief

---

[85] O.C.G.A. § 21-2-216(h).

[86] O.C.G.A. § 21-2-218(a).

[87] *Id.*

[88] Executive Order 13799, 82 Fed. Reg. 22389 (May 11, 2017).

election official for "publicly-available data from state voter rolls and feedback on how to improve election integrity."[89] The Georgia Secretary of State's Office responded to this federal request in its official capacity as the state's chief election officer, "The Georgia Secretary of State's Office will provide the publicly available voter list. As specified in Georgia law, the public list does not contain a registered voter's driver's license number, Social Security number, month and day of birth, site of voter registration, phone number, or email address."[90] The SOS complied with the federal request while withholding personal information (e.g. social security numbers, phone numbers, and email addresses) as required by Georgia state law.

The Appendix to this report includes official memoranda I researched documenting interactions between the Secretary of State, acting in his official capacity as the Chief Election Official, and the Chair of the federal EAC. Of note is a series of memoranda from 2013 and 2014 requesting permission to make changes to the National Voter Registration Mail Application Form. Although *Shelby v. Holder* means that states are no longer required to submit proposed changes for federal approval, the mandates of the National Voter Registration Act are still intact and require pre-approval for state changes to the federal information forms and requirements. A memorandum (Attachment D) written to Ms. Alice Miller, Acting Executive Director of the EAC, from Secretary of State Brian P. Kemp dated August 1, 2013 begins as follows:

> Dear Ms. Miller,
>
> As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

---

[89] https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election

[90] *Georgia to release data to Trump election commission*, 11Alive, June 30, available at https://www.11alive.com/article/news/politics/national-politics/georgia-to-release-data-to-trump-election-commission/85-453342487

Attachment E includes Miller's subsequent responses (2) to Secretary Kemp:

Dear Secretary Kemp:

Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that EAC revise the Georgia state-specific instructions by making the following changes:

1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:

   • Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship

2. Revision of the mailing address as follows:

   Elections Division
   Office of the Secretary of State
   2 Martin Luther King, Jr. Drive
   Suite 802 Floyd West Tower
   Atlanta, GA 30334

Finally, I attach copies of correspondence between Secretary Kemp and EAC Director Newby regarding the state's requests to make changes to Georgia-specific information on the federal voter registration form related to agency address and proof of citizenship (Attachments F, G, and H). This correspondence illustrates the important role Georgia's Chief Election Official plays in overseeing election administration on behalf of the state's residents.

The U.S. Election Assistance Commission conducts a biennial Election Administration and Voting Survey ("EAVS") to gather state-level data on various aspects such as the number of military personnel registering to vote, voting technology, and the frequency of provisional voting. The comprehensive data is used to ensure compliance with the various mandates of both HAVA and NVRA and to improve election administration. The official federal report lists Georgia as one of 38 states in the country with what it terms a "top-down" voter registration process where the chief election official "gathers and aggregates information from local jurisdictions' voter registration databases."[91] Each state's election office works in conjunction with local officials to gather the data, which is then submitted to the EAC. I reviewed the 2018 Comprehensive Report to the 116th Congress that was published in June 2019 to gain a better understanding of the information provided on behalf of the State of Georgia and by whom. Unfortunately, several key measures were not provided by Georgia officials

---

[91] *See* U.S. Elec. Assistance Comm'n. (2019). *Election Administration and Voting Survey 2018: Comprehensive Report to the 116th Congress.* Silver Spring, MD: EAC, 2019. (pp. 119) Available at https://www.eac.gov/assets/1/6/2018_EAVS_Report.pdf.

such as the number of poll workers. Of relevance to my report, however, was the official data provided by Georgia's SOS indicating the number and form of new voter registration applications and the use and rejection of provisional ballots. Tables 4 and 5 below provide this data.[92]

Table 4: Georgia Voter Registration Applications*

| Total | Mail, Fax, Email | In-Person | Online | Motor Vehicle Offices | Public Assistance Offices | Disability Services Office | Armed Forces | Other Agencies | Registration Drives- Advocacy Groups or Parties | Other Sources | Not Categorized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,498,331 | 280,957 (6.25%) | 102,468 (2.28%) | 357,491 (7.95%) | 3,596,384 (79.95%) | 23,656 (.53%) | 30,914 (.69%) | 97 (0%) | _____ | _____ | 106,634 (2.36%) | 0 0% |

\* Indicates requests for which the state did not submit data

Table 5: Georgia Provisional Voting*

| Total Provisional Ballots Submitted | Full Ballots Counted | Partial Ballots Counted | Rejected Ballots | Other |
|---|---|---|---|---|
| 21,604 | 11,905 (55.1%) | _____ – _____ – | 9,699 (44.9%) | _____ _____ |

\* Indicates requests for which the state did not submit data

Taken together the state statutes, memos, press releases, grant acknowledgements, NVRA implementation guide for state agencies, website resources, federal reports and bulletins I researched affirm the practical ways the Georgia SOS acts in his/her official

---

[92] Ibid.

capacity as the Chief Election Official responsible for administering, enforcing, and reconciling key functions at the local, state, and federal level.

### E. Conclusion

The federal provisions found in the Constitution guarantee that all eligible citizens have unfettered access to voting in federal elections. The principle of federalism allows state discretion in defining fair and consistent standards for determining eligibility. However, the mandates of the National Voter Registration Act and the Help America Vote Act, coupled with *Shelby County v. Holder*'s removal of federal oversight in preclearing or preventing potentially harmful electoral changes and procedures amplify the importance of each state's Chief Election Officer in overseeing election administration across the entire state. In Georgia, the Chief Election Officer is identified by state statutes as the Secretary of State. That position is tasked with over 151 duties establishing broad oversight, enforcement, and correction responsibilities to ensure Georgia residents may effectively exercise the right to vote. The evidence contained in this report is consistent with my research into voting rights and election administration in various states and the nation as a whole.

## LIST OF ATTACHMENTS AND APPENDIXES

ATTACHMENT A: Georgia Statutes Outlining the Secretary of State's Duties (Table 2)

ATTACHMENT B: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State (Table 3)

ATTACHMENT C: 2018 HAVA Election Security Grant Award Letter from Georgia Secretary of State to the U.S. Election Assistance Commission (July 10, 2018)

Correspondence between the U.S. Election Assistance Commission and the Georgia Secretary of State
- August 1, 2013 ATTACHMENT D
- August 15, 2013 ATTACHMENT E
- January 17, 2014 ATTACHMENT F
- January 29, 2016 ATTACHMENT G
- September 12, 2016 ATTACHMENT H

ATTACHMENT I: Federal Financial Report for Grant Received by the Georgia Secretary of State's Office (December 27, 2018)

ATTACHMENT J: Federal Voter Registration Guide and Form with Georgia-Specific Information

ATTACHMENT K: Augusta-Richmond County Georgia Board of Elections Pamphlet (March 2018)

APPENDIX A: Brown-Dean Curriculum Vitae

# ATTACHMENT A

TABLE 2: Georgia Statutes Outlining the Secretary of State's Duties
CATEGORY 1: Candidate Interaction
CATEGORY 2: Voter Interaction
CATEGORY 3: Election Official Interaction

| Duty | Text | Source | Function Classification |
|---|---|---|---|
| Powers and duties of the SOS | **To determine the forms of nomination petitions, ballots, and other forms the Secretary of State is required to determine under this chapter** | O.C.G.A. § 21-2-50(a)(1) | Category 1 Category 3 |
| Powers and duties of the SOS | **To receive registration statements from political parties and bodies and to determine their sufficiency prior to filing, in accordance with this chapter, and to settle any disputes concerning such statements;** | O.C.G.A. § 21-2-50(a)(2) | Category 1 Category 3 |
| Powers and duties of the SOS | **To receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State** in accordance with this chapter; | O.C.G.A. § 21-2-50(a)(3) | Category 1 |
| Powers and duties of the SOS | **To certify to the proper superintendent official lists of all the political party candidates who have been certified to the Secretary of State as qualified candidates for the succeeding primary and to certify to the proper superintendent official lists of all the candidates who have filed their notices of candidacy with the Secretary of State, both such certifications to be in substantially the form of the ballots to be used in the primary or election. The Secretary of State shall add to such form the language to be used in submitting any proposed constitutional amendment or other question to be voted upon at such election;** | O.C.G.A. § 21-2-50(a)(4) | Category 1 Category 3 |
| Powers and duties of the SOS | **To furnish to the proper superintendent all blank forms, including tally and return sheets, numbered lists of voters, cards of instructions, notices of penalties, instructions for marking ballots, tally sheets, precinct returns, recap sheets, consolidated returns, oaths of managers and clerks, oaths of assisted electors, voters certificates and binders,** | O.C.G.A. § 21-2-50(a)(5) | Category 3 |

|  |  |  |  |
|---|---|---|---|
|  | **applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries. Such forms shall have printed thereon appropriate instructions for their use**; |  |  |
| Powers and duties of the SOS | **To receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions**, as required by this chapter; | O.C.G.A. § 21-2-50(a)(6) | Category 3 |
| Powers and duties of the SOS | **To furnish upon request a certified copy of any document in the Secretary of State's custody by virtue of this chapter and to fix and charge a fee to cover the cost of furnishing same**; | O.C.G.A. § 21-2-50(a)(7) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To perform such other duties as may be prescribed by law**; | O.C.G.A. § 21-2-50(a)(8) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To determine and approve the form of ballots for use in special elections**; | O.C.G.A. § 21-2-50(a)(9) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To prepare and provide a notice to all candidates for federal or state office advising such candidates of such information, to include requirements of this chapter, as may, in the discretion of the Secretary of State, be conducive to the fair, legal, and orderly conduct of primaries and elections.** A copy of such notice shall be provided to each superintendent for further distribution to candidates for county and militia district offices; | O.C.G.A. § 21-2-50(a)(10) | Category 1<br>Category 3 |
| Powers and duties of the SOS | **To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections**; | O.C.G.A. § 21-2-50(a)(11) | Category 3 |

2

| | | | |
|---|---|---|---|
| Powers and duties of the SOS | **To prepare and publish, in the manner provided in this chapter, all notices and advertisements in connection with the conduct of elections which may be required by law**; | O.C.G.A. § 21-2-50(a)(12) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To prepare and furnish information for citizens on voter registration and voting**; | O.C.G.A. § 21-2-50(a)(13) | Category 2 |
| Powers and duties of the SOS | **To maintain the official list of registered voters for this state and the list of inactive voters required by this chapter**; | O.C.G.A. § 21-2-50(a)(14) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state**. | O.C.G.A. § 21-2-50(a)(15) | Category 3 |
| Extension or postponement of qualifying periods and primaries and elections in even of state of emergency or disaster | In the event the Governor declares that a state of emergency or disaster exists pursuant to Code Section 38-3-51 or a federal agency declares that a state of emergency or disaster exists, **the Secretary of State is authorized to postpone or extend the qualifying periods** provided in this chapter for the qualification of candidates seeking municipal, county, or state-wide office and to postpone the date of any primary, special primary, election, or special election in the affected area. | O.C.G.A. § 21-2-50.1 | Category 1<br>Category 2<br>Category 3 |
| Responsibilities under HAVA | **The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(a) | Category 1<br>Category 2<br>Category 3 |
| Responsibilities under HAVA | As the chief election official, **the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.** | O.C.G.A. § 21-2-50.2(b) | Category 1<br>Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| Responsibilities under HAVA | Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby **the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(c) | Category 1<br>Category 2<br>Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars** to determine the eligibility of the applicant and, if found eligible, **to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts**. | O.C.G.A. § 21-2-223(a) | Category 1<br>Category 2<br>Category 3 |
| Instruction and training of private entities | **The Secretary of State may develop and provide to the boards of registrars manuals for this instruction**. The Secretary of State may also make such manuals available to the public, including via electronic means on the Secretary of State's website. Until such time as the Secretary of State develops such manuals, boards of registrars shall utilize such materials as will meet the training requirements of this rule. | Ga. Comp. R. & Regs. 183-1-6-.02(5)(c) | Category 1<br>Category 2<br>Category 3 |
| Rules and Regulations for Voter Registration by Registrars and Deputy Registrars | **The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State.** The board of registrars shall provide each deputy registrar with a copy of the manual. | Ga. Comp. R. & Regs. 183-1-6-.03(3)(n) | Category 3 |

| | | | |
|---|---|---|---|
| Accessibility for Elderly and Disabled Voters | Polling Places. The election superintendent of each county and municipality shall conduct, or cause to be conducted, an on-site inspection of each polling place located within the county or municipality to determine if the polling place is accessible. **This inspection shall be reported to the Secretary of State on forms prepared by the Secretary of State at such times as the Secretary of State shall prescribe.** Any polling place found not to be accessible shall either be made accessible prior to its use in a primary or election or shall not be used as a polling place. | Ga. Comp. R. & Regs. 183-1-6-.04(5)(a) | Category 3 |
| Accessibility for Elderly and Disabled Voters | Printed Instructions. The Secretary of State shall provide instructions for use by election superintendents at polling places and registrars at voter registration places, printed in large type, to assist visually and hearing impaired electors in voting and registering to vote. | Ga. Comp. R. & Regs. 183-1-6-.04(7) | Category 3 |
| Conduct of Elections: Voting Machines—Vote Recorders | Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia **shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**. In addition, absentee balloting shall be conducted through the use of optical scan ballots which **shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**; provided, however, that the **use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.** | Ga. Comp. R. & Regs. 183-1-12-.01 | Category 1 Category 2 Category 3 |
| Direct Recording Electronic | Acceptance tests. Upon the receipt of each new direct recording electronic voting unit (DRE), **the election superintendent of the county is responsible to ensure that an acceptance test is** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(a) | Category 3 |

5

| Voting Equipment | **performed on the device in accordance with standards issued by the Secretary of** State. No DRE unit shall be accepted by the county or placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | The election superintendent of the county **shall maintain the DRE units in accordance with** the requirements of this rule, **the directives of the Secretary of State,** and the specifications and requirements of the manufacturer. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(b)(1) | Category 3 |
| Direct Recording Electronic Voting Equipment | Software security. The software contained in each DRE unit, regardless of whether the unit is owned by the county or the state, and **the software used to program the unit and to tabulate and consolidate election results shall not be modified, upgraded, or changed in any way without the specific approval of the Secretary of State. No other software shall be loaded onto or maintained or used on computers on which the GEMS software is located except as specifically authorized by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(c) | Category 3 |
| Direct Recording Electronic Voting Equipment | The GEMS server shall not be moved or relocated for educational or training purposes. Should it become necessary to relocate the GEMS server or any of its components from one facility to another, the election superintendent shall notify the Secretary of State in writing of the reason for the relocation and the proposed new location. **Under no circumstances shall the GEMS server or any of its components be relocated unless and until written authorization for the relocation is received from the Secretary of State** except in the event of an emergency situation beyond the control of the election superintendent. | Ga. Comp. R. & Regs.183-1-12-.02(2)(g)(3) | Category 3 |
| Direct Recording Electronic Voting Equipment | The poll manager shall sign a receipt for all supervisor cards, encoders, voter access cards, memory cards, and DRE unit keys assigned to such poll manager's precinct. Upon returning election supplies to the election superintendent's office | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(4) | Category 3 |

| | following the close of the polls, the poll manager shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have<br>not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | All supervisor cards, encoders, voter access cards, memory cards, DRE unit keys, and other equipment assigned to designated county election technicians shall be accounted for on the night of a primary, election, or runoff and shall be returned to storage. Each technician shall sign a receipt for all such items issued to such technician and,<br>upon returning such items to the election superintendent's office following the close of the polls, the technician shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | **The election superintendent shall notify the Secretary of State** of any instances of unaccounted for DRE units, optical scanner devices, voter access cards, supervisor cards, memory cards, DRE unit keys, voting system software, and encoders at the completion of certification by delivering such notification to the Secretary of State when the certified election results are delivered to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(6) | Category 3 |
| Direct Recording Electronic Voting Equipment | After placing the memory card (PCMCIA card) in the DRE unit, the DRE unit shall have such internal diagnostic tests performed as shall be directed by the Secretary of State or the election superintendent. | Ga. Comp. R. & Regs. 183-1-12-.02(3)(b)(1)(ii) | Category 3 |
| Direct Recording Electronic | The poll officers shall affix a card of instructions for voting within each voting booth and **shall place at least two printed sample ballots and at least two voting instructions posters** | Ga. Comp. R. & Regs. 183-1-12-.02(3)(d)(7) | Category 1<br>Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| Voting Equipment | **approved or provided by the Secretary of State** outside the enclosed space at the polling place for the information of the voters. **Prior to voters entering the enclosed space, the poll officers may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** | | |
| Direct Recording Electronic Voting Equipment | In the case of primaries, elections, and runoffs for county, state, and federal office, **the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State**, within seven days following a primary, election, or runoff. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | Electronic Transmission of Precinct Results to Central Office. The election superintendent shall transmit to the Secretary of State unofficial election results for all races for state offices in any primary, election, or runoff as soon as possible after the closing of the polls for such primary, election, or runoff. **Such results shall be transmitted in a format prescribed by the Secretary of State.** At a minimum, the results shall be transmitted upon one third of the precincts reporting results, upon two thirds of the precincts reporting results, and upon all precincts reporting results, including absentee ballots within all precincts. Except upon notice to and consultation with the Secretary of State, no election superintendent shall conclude the tabulation of votes on election night in any primary, election, or runoff in which there are contested races for federal and state offices until and unless all such unofficial results, including absentee ballots, have been transmitted to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(d) | Category 3 |
| Direct Recording Electronic Voting Equipment | **In the event of any malfunction or problem with DRE units, the county election superintendent shall document the problem and its resolution and shall provide such information to the Secretary of State.** The documentation | Ga. Comp. R. & Regs. 183-1-12-.02(8)(b) | Category 3 |

8

| | | | |
|---|---|---|---|
| | shall include a detailed description of the malfunction or problem, the steps taken to correct the malfunction or problem, and the cause of such malfunction or problem if a cause can be determined. | | |
| Direct Recording Electronic Voting Equipment | Use of Equipment by Municipalities. The county election superintendent is authorized to permit any municipality within the county to conduct its election with the DRE equipment through a written intergovernmental agreement between the county and the municipality; provided that the municipality agrees to maintain and operate the equipment in accordance with law, these rules and regulations, and the manufacturer's guidelines and specifications and provided further that the municipality trains all of its election personnel and poll workers in the proper operation and conduct of elections utilizing such equipment **through a training program conducted by or approved by the Secretary of State**. | Ga. Comp. R. & Regs. 183-1-12-.02(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | The registrars of each county shall complete the entry of new and updated voter registrations **on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.** | Ga. Comp. R. & Regs. 183-1-12-.07(4) | Category 3 |
| Direct Recording Electronic Voting Equipment | Prior to each primary or election **as specified by the Secretary of State, the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the GEMS database for the county.** | Ga. Comp. R. & Regs. 183-1-12-.07(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | The county election superintendent and the registrars **shall notify the Secretary of State or his or her designee of any changes to the voter registration file** for the county or the GEMS database that occur after the process for creating ExpressPoll flash cards begins. | Ga. Comp. R. & Regs. 183-1-12-.07(6) | Category 3 |

| Direct Recording Electronic Voting Equipment | Upon the conclusion of each primary, election, or runoff, the poll officers shall return the ExpressPoll units with the other election materials from the precinct to the election superintendent. **The registrars and election superintendent shall coordinate the return of the flash cards from the ExpressPoll units to the Secretary of State** such that the cards are returned in the same time period as the official election returns. | Ga. Comp. R. & Regs. 183-1-12-.07(9) | Category 3 |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | On the first day of the absentee voting period, prior to any votes being cast on the DRE units, the registrars shall verify that the seal for each DRE unit is intact and that there is no evidence or indication of any tampering with the seal or the unit. The registrars shall verify that the number of the seal matches the number of the seal recorded for that unit when such unit was prepared by the election superintendent for the primary, election, or runoff. If a seal number does not match or if there is any evidence or indication of tampering with the seal or unit, **the Secretary of State and the election superintendent shall be immediately notified and such unit shall not be used until such matters are resolved by agreement of the Secretary of State, the election superintendent, and the registrars.** The set up shall be performed in public and the public may view the set up subject to such reasonable rules and regulations as the registrars may deem appropriate to protect the security of the DRE units and to prevent interference with the duties of the registrars, except that the public view shall not be obstructed. The registrars shall run a zero tape on each DRE unit prior to the beginning of absentee voting on such units. The registrars shall, without removing the tape from the unit, verify that all vote registers shown on the zero tape are set to zero and that there are no votes showing on the unit and shall sign the tape in the space provided. If the zero tape does not show that all vote registers are set to zero and there are votes on the unit, the election superintendent shall be immediately notified and such unit shall not be used until the unit is cleared and the matter is resolved by agreement of the election superintendent and the registrars. After verifying and | Ga. Comp. R. & Regs. 183-1-14-.02(6) | Category 1<br>Category 2<br>Category 3 |

10

| | | | |
|---|---|---|---|
| | signing the zero tape, the registrars shall securely lock the tape compartment leaving the zero tape in place on the unit and shall configure the unit for voting. The registrars shall verify that the election counter on each DRE unit is set at zero. If the election counter is not set to zero, the election superintendent shall be immediately notified and such unit shall not be used until the election counter is set to zero and the matter is resolved by agreement of the election superintendent and the registrars. The registrars shall verify that there is no unauthorized matter affixed to the DRE units or present in the cases or voting booths. The registrars shall affix a card of instructions for voting within each voting booth. **Prior to voters entering the voting booth, the registrars may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** Each DRE unit shall be clearly marked with a unique designation that is visible on the exterior of the unit. | | |
| Use of DRE Units for Absentee Balloting | At the close of business each day during the absentee voting period, the registrars shall document the election counter number on the daily recap sheet. Each DRE unit used for in-person absentee voting shall then be turned off and closed. The memory card (PCMCIA card) shall remain in the unit at all times during the absentee balloting period until the polls close on the day of the primary, election, or runoff. Each DRE unit shall then be sealed and the seal number and the time of sealing shall be recorded on the daily recap sheet. Each DRE unit shall then be secured overnight. In addition, all voter access cards shall be securely stored overnight and when not in use. If a DRE unit is used to program voter access cards, the registrars shall make a notation of the election counter number on the daily recap sheet. **If such number is not zero, the registrars shall notify the Secretary of State immediately and shall ascertain the reason for the discrepancy and shall make a notation of such discrepancy and the reason for it on the daily recap sheet. Such DRE unit shall not be used for creation of voter access cards unless and until the unit is fully tested and reconfigured and the election counter reset** | Ga. Comp. R. & Regs. 183-1-14-.02(8) | Category 3 |

| | **at zero pursuant to procedures established by the Secretary of State.** The DRE unit shall be turned off and secured for the night. | | |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | Each morning during the absentee balloting period, the registrars shall publicly verify the seal numbers on each DRE unit to be used for absentee voting with the number of the seal recorded on the daily recap sheet from the previous day of absentee voting and shall verify that the seal and DRE unit do not show any signs of tampering. If the seal number corresponds to the entry on the daily recap sheet and there is no evidence of tampering, the DRE unit shall be opened and turned on. **If the numbers do not match or there is evidence of tampering, the Secretary of State shall be notified immediately and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** After opening and turning on the unit, the registrars shall verify the election counter number with the number recorded on the daily recap sheet from the previous day of absentee voting. **If the numbers do not match, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** The election counter number shall then be entered onto the daily recap sheet for that day. If a DRE unit is to be used for programming voter access cards, the registrars shall open and turn on the power for such unit. The registrars shall then verify that the election counter is set on zero. **If the election counter is not set at zero, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** A notation shall be made on the daily recap sheet of the election counter number and the unit shall be configured to create voter access cards. | Ga. Comp. R. & Regs. 183-1-14-.02(9) | Category 3 |

| Reporting Requirements for Absentee Ballots | **The registrars of each county shall on the 32nd day prior to each statewide general primary and general election submit to the Secretary of State on a form provided by the Secretary of State information concerning absentee ballots requested by electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended.** Such report shall include the number of absentee ballots requested by each such category of absentee voter, the date on which the absentee ballots were available in the registrars' office, and the date on which the ballots requested by such voters were sent to the voters. **The Secretary of State may request further information related to the application for and the transmittal of such ballots.** | Ga. Comp. R. & Regs. 183-1-14-.04(1) | Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | **The Secretary of State shall design a state write-in absentee ballot for use in runoff primaries and runoff elections** by an elector of this state who resides outside the county or the municipality in which the election is being conducted and is: (1) a member of the armed forces of the United States, a member of the merchant marine of the United States, a member of the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration, or a spouse or dependent of such member residing with or accompanying said member; or (2) A citizen of the United States residing outside the United States. | Ga. Comp. R. & Regs. 183-1-14-.05(a) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | **The Secretary of State shall prepare and print instructions for completing and returning such ballot that shall also be enclosed with such ballot.** The state write-in absentee ballot, the envelopes for returning it, and the instructions shall be enclosed with the regular absentee ballot, envelopes, and instructions for completing and returning the regular absentee ballot. | Ga. Comp. R. & Regs. 183-1-14-.05(d) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| State Write-In Absentee Ballot | **Additionally, the Secretary of State and the county registrars shall provide for the transmission of such blank ballots by facsimile transmission and electronic mail transmission to electors.** Instructions for voting such ballots shall be included on the website and shall accompany any facsimile and electronic mail ballot transmissions. Voted ballots shall not be returned by facsimile or electronic mail. | Ga. Comp. R. & Regs. 183-1-14-.05(e) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | As soon as practicable after a general primary or general election, **the Secretary of State shall cause to be published on the official website of the Secretary of State a list of all federal offices and state offices in which there will be a runoff primary or runoff election**, as the case may be, along with the names of the candidates who will be on the ballot in such runoff. | Ga. Comp. R. & Regs. 183-1-14-.05(f) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | If an elector obtains the ballot by facsimile or by downloading from electronic mail or the Secretary of State's website, the elector shall return the ballot by mail using two envelopes. The elector shall enclose and seal the ballot in a plain envelope and insert that envelope into another envelope for transmission to the registrars. The elector shall copy and sign the appropriate oath onto the back of the outer envelope. **The Secretary of State shall provide a sample envelope and oath form on the Secretary of State's website in such a manner that such form may be used by an elector to print out the forms for the purpose of pasting or attaching such forms to an envelope for returning the ballot or for printing an envelope for returning the ballot.** | Ga. Comp. R. & Regs. 183-1-14-.05(g) | Category 1 Category 2 Category 3 |
| Secretary of State designated chief state election official | **The Secretary of State is designated as the chief state election** official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8. | O.C.G.A. § 21-2-210 | Category 1 Category 2 Category 3 |
| Official list of electors; | **The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state** | O.C.G.A. § 21-2-211(a) | Category 1 Category 2 |

| equipment to access list | **which shall be the official list of electors for use in all elections in this state conducted under this title.** | | Category 3 |
|---|---|---|---|
| Official list of electors; equipment to access list | **The Secretary of State is authorized to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State pursuant to this Code section**, provided that funds are specifically appropriated by the General Assembly for that purpose. | O.C.G.A. § 21-2-211(b)(2) | Category 3 |
| Voter registration | **The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.** | O.C.G.A. § 21-2-216(g)(7) | Category 2 Category 3 |
| Voter registration | Prior to approving the application of a person to register to vote, **the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State.** | O.C.G.A. § 21-2-216(h) | Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.** | O.C.G.A. § 21-2-218(a) | Category 2 Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making | O.C.G.A. § 21-2-218(b) | Category 2 Category 3 |

| | application to register to vote in that county or municipality, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.** | | |
|---|---|---|---|
| Change of residence of elector | In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. **The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's** present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail. | O.C.G.A. § 21-2-218(d) | Category 2 Category 3 |
| Change of residence of elector | In the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, **the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the address previously provided to the board of registrars.** The registrars shall correct the elector's registration record to reflect the correct address. | O.C.G.A. § 21-2-218(g) | Category 2 Category 3 |

| Registration cards; absentee regulations | The registration cards for use by persons in making application to register to vote shall be **in a form as specified by the Secretary of State**, which shall include printed forms, forms made available through electronic means, or otherwise. Except as provided in subsection (b) of this Code section and Code Section 21-2-221.2, only registration cards issued or authorized for use by the Secretary of State or the national voter registration card promulgated under the provisions of the National Voter Registration Act of 1993, 42 U.S.C. Section 1973gg-7, shall be accepted for purposes of voter registration. | O.C.G.A. § 21-2-219(a) | Category 2 Category 3 |
|---|---|---|---|
| Registration cards; absentee regulations | **The office of the Secretary of State is designated as the office, under the federal Help America Vote Act, to be responsible for providing information on registration and absentee ballot procedures for use by absent uniformed services and overseas voters, including the use of the federal write-in absentee ballot.** | O.C.G.A. § 21-2-219(f) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The Secretary of State shall** within 90 days after a general election in which federal candidates were on the ballot **report to the federal Election Assistance Commission**, on such form as may be prescribed by such commission, **the combined number of absentee ballots transmitted to absent uniformed services and overseas voters in such election and the combined number of such ballots that were returned by such voters and cast in such election.** | O.C.G.A. § 21-2-219(h) | Category 3 |
| Application for driver's license; service as application for voter registration | The commissioner of driver services and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.** | O.C.G.A. § 21-2-221(b) | Category 3 |
| Application for driver's license; service as | The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of** | O.C.G.A. § 21-2-221(e) | Category 3 |

| | | | |
|---|---|---|---|
| application for voter registration | **registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | | |
| Application for driver's license; service as application for voter registration | The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-221(f) | Category 3 |
| Application for driver's license; service as application for voter registration | **The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221(h) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Board of Natural Resources and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section,** including without limitation procedures applicable to processing of applications received by persons approved as license agents for the Department of Natural Resources pursuant to Code Section 27-2-2. | O.C.G.A. § 21-2-221.1(b) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-221.1(f) | Category 3 |

18

| | | | |
|---|---|---|---|
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State**. | O.C.G.A. § 21-2-221.1(g) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | **The Secretary of State and the Board of Natural Resources shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221.1(i) | Category 3 |
| Electronic voter registration | A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. **The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.** | O.C.G.A. § 21-2-221.2(a) | Category 2<br>Category 3 |
| Electronic voter registration | Upon the submission of an application through the website pursuant to this Code section, **the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:**<br><br>(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the | O.C.G.A. § 21-2-221.2(c) | Category 3 |

19

| | | | |
|---|---|---|---|
| | number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;<br><br>(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and<br>(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.<br><br>If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected. | | |
| Electronic voter registration | If all of the items enumerated in subsection (c) of this Code section are verified, **the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services.** The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. | O.C.G.A. § 21-2-221.2(d) | Category 3 |
| Electronic voter registration | **The Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically pursuant to this Code section.** | O.C.G.A. § 21-2-221.2(f) | Category 3 |
| Offices designated as voter registration agencies | In addition to the offices listed in subsection (b) of this Code section, **the Secretary of State shall designate other offices within the state as designated voter registration offices.** | O.C.G.A. § 21-2-222(c) | Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| Offices designated as voter registration agencies | **Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week**, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-222(i) | Category 3 |
| Offices designated as voter registration agencies | Each office shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State**. | O.C.G.A. § 21-2-222(j) | Category 3 |
| Offices designated as voter registration agencies | **The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-222(l) | Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the** | O.C.G.A. § 21-2-223(a) | Category 1<br>Category 2<br>Category 3 |

| | **appropriate county board of registrars to determine the eligibility of the applicant** and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
|---|---|---|---|
| Mail voter registration application forms | The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public **shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.** | O.C.G.A. § 21-2-223(b) | Category 1<br>Category 2<br>Category 3 |
| What data [sic] available for public inspection | **It shall be the duty of the Secretary of State to furnish copies of such data as may be collected and maintained on electors whose names appear on the list of electors maintained by the Secretary of State pursuant to this article, within the limitations provided in this article, on electronic media or computer run list or both.** Notwithstanding any other provision of law to the contrary, the Secretary of State shall establish the cost to be charged for such data. The Secretary of State may contract with private vendors to make such data available in accordance with this subsection. Such data may not be used by any person for commercial purposes. | O.C.G.A. § 21-2-225(c) | Category 1<br>Category 2<br>Category 3 |
| Confidentiality of voter addresses | **The Secretary of State shall provide by procedure, rule, or regulation for the mechanism by which such information shall be made confidential on the voter registration data base and may provide for forms for use in making such requests and for the use of alternate addresses** for electors who file requests for the confidentiality of their residence addresses. | O.C.G.A. § 21-2-225.1(d) | Category 1<br>Category 2<br>Category 3 |

| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; issuance of cards to electors | Each elector found eligible to be registered to vote by the board of registrars shall be issued a card which shall contain the elector's name and address, a block or space for the elector's signature, the date of the elector's registration, the name and location of the elector's polling place or polling places if the county and municipal polling places are not the same, and the designation of the elector's congressional district; state Senate district; state House district; county commission district, if any; county or independent board of education district, if any; and municipal governing authority district, if any, and such other voting districts, if any. On the reverse side of the card, there shall be printed instructions which shall indicate the procedure to be followed in the event of the change of address of the elector. In the event an elector changes residences within the county in which an elector is registered to vote, the elector may change such elector's address by returning the card to the board of registrars of such county indicating the new address. Upon receipt of such card, the board of registrars shall make the necessary changes in the elector's registration records and issue a new card to the elector. In the event that an elector's precinct, polling place, or voting district or districts change, a new card shall be issued to the elector reflecting such changes. When the boundaries of a precinct are changed, all affected electors shall be sent a new card prior to the next primary or election. **The form of such cards shall be determined by the Secretary of State.** The issuance of such cards shall be sufficient as a notification of the disposition of an application for voter registration under this Code section, provided that such cards are sent by nonforwardable, first-class mail. | O.C.G.A. § 21-2-226(e) | Category 2 Category 3 |
| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; | In the event that the registrars are required to issue voters new cards under subsection (e) of this Code section due to changes in districts or precincts as a result of reapportionment or court order, the registrars may apply to the Secretary of State prior to June 30 of each year for reimbursement of the costs of postage with respect to mailing such cards during the 12 month period ending on June 30 of that year. **The Secretary of State shall receive all such applications and** | O.C.G.A. § 21-2-226(f) | Category 3 |

| | | | |
|---|---|---|---|
| issuance of cards to electors | **shall, no later than June 30 of each year, reimburse the counties for such costs from funds specifically appropriated for that purpose. In the event that the total amount of the requests for reimbursement exceeds the funds appropriated for reimbursement, the Secretary of State shall reimburse the counties on a pro rata basis. In the event that no funds are specifically appropriated for reimbursement, no such reimbursement shall be made**. | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State** and The Council of Superior Court Clerks of Georgia **a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State** or The Council of Superior Court Clerks of Georgia, **who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information** relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, **the Secretary of State** and The Council of Superior Court Clerks of Georgia **shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available.** | O.C.G.A. § 21-2-231(a) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county. | O.C.G.A. § 21-2-231(a.1) | Category 3 |

| | | | |
|---|---|---|---|
| Georgia; removal of persons from list of electors | | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. | O.C.G.A. § 21-2-231(b) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsections (a), (a.1), and (b) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 42 U.S.C. Section 1973gg-6(g), **the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.** | O.C.G.A. § 21-2-231(c) | Category 3 |
| Monthly transmittal of information to Secretary of State and The | **Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the** | O.C.G.A. § 21-2-231(d) | Category 3 |

| Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Secretary of State, who died during the preceding calendar month in the county.** The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsection (d) of this Code section, **the Secretary of State or his or her designated agent shall remove all such names of deceased persons from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.** | O.C.G.A. § 21-2-231(e) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235.** Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes. | O.C.G.A. § 21-2-231(g) | Category 3 |
| Removal of elector's name | When an elector of this state moves to another county or state and registers to vote and the registration officials send a notice of cancellation reflecting the registration of the elector in the | O.C.G.A. § 21-2-232(b) | Category 3 |

26

| | | | |
|---|---|---|---|
| from list of electors upon request of elector or upon removal of elector from county | other county or state, **the Secretary of State or the board** of registrars, as the case may be, shall remove such elector's name from the list of electors. It shall not be necessary to send a confirmation notice to the elector in such circumstances. | | |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | **The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service** through its licensees periodically for the purpose of identifying those electors whose addresses have changed. | O.C.G.A. § 21-2-233(a) | Category 3 |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is** | O.C.G.A. § 21-2-233(c) | Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | **located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235. | | |
| Identification of electors with whom there has been no contact for three years; confirmation notice | In the first six months of each odd-numbered year, **the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233.** The confirmation notice described in this Code section shall be sent to each such elector during each odd-numbered year. Such notices shall be sent by forwardable, first-class mail. | O.C.G.A. § 21-2-234(a)(2) | Category 3 |
| Identification of electors with whom there has been no contact for three years; confirmation notice | If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** | O.C.G.A. § 21-2-234(d) | Category 2 Category 3 |
| Inactive list of electors | **In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors.** Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be | O.C.G.A. § 21-2-235(a) | Category 3 |

28

| | | | |
|---|---|---|---|
| | counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records. | | |
| SOS on the SEB | **There is created a state board to be known as the State Election Board, to be composed of the Secretary of State**, an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board. | O.C.G.A. § 21-2-30(a) | Category 3 |
| SOS Chairperson of the SEB | **The Secretary of State shall be the chairperson of the board.** Three members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure. | O.C.G.A. § 21-2-30(d) | Category 3 |

| | | | |
|---|---|---|---|
| Superintendents to Election returns to be provided to Secretary of State in electronic format | **The Secretary of State is authorized to prescribe by rule or regulation the type of electronic format for the provision of such election returns.** | O.C.G.A. § 21-2-77(c) | Category 3 |
| Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll workers not to serve | The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. **Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction.** For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction. | O.C.G.A. § 21-2-99(a) | Category 3 |
| Training of local election officials | The election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board **shall attend a minimum of 12 hours' training annually as may be selected by the Secretary** | O.C.G.A. § 21-2-100(a) | Category 3 |

| | **of State.** The election superintendent and at least one registrar of each municipality shall attend a minimum of **12 hours' training biennially as may be selected by the Secretary of State.** | | |
|---|---|---|---|
| Training of local election officials | **A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of S**tate, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-100(c) | Category 3 |
| Certification of local election officials | All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by **completing a certification program approved by the Secretary of State** by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections. The local government employing the superintendent or designee shall cover the costs, if any, incurred by such superintendent's or designee's participation in the certification program. **Such certification programs shall be offered by the Secretary of State** on multiple occasions before December 31 of the year in which such superintendents or designees are appointed and shall not exceed 64 hours of classroom, online, **and practical instruction as authorized and approved by the Secretary of State.** | O.C.G.A. § 21-2-101(a) | Category 3 |

| Certification of local election officials | **A full, partial, or conditional waiver of the certification requirement may be granted by the Secretary of State, in the discretion of the Secretary of State**, upon the presentation of evidence by the election superintendent or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-101(c)(1) | Category 3 |
| Certification of local election officials | In the event that a municipality authorizes a county to conduct its elections pursuant to Code Section 21-2-45, **the municipality may be granted by the Secretary of State, in the discretion of the Secretary of State, a waiver of the certification requirement**, provided that the superintendent in charge of running the municipal election shall have previously completed a certification program approved by the Secretary of State and has demonstrated a proficiency in the operation of the voting equipment used in said municipality. | O.C.G.A. § 21-2-101(c)(2) | Category 3 |
| Form of ballots; printing ballots; stubs; numbers | **Ballots for direct recording electronic voting systems shall be designed as prescribed by the Secretary of State to ensure easy reading by electors.** | O.C.G.A. § 21-2-286(b)(2) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Provided that the General Assembly specifically appropriates funding to the Secretary of State to implement this subsection, **the equipment used for casting and counting votes in county, state, and federal elections shall, by the July, 2004, primary election and afterwards, be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.** | O.C.G.A. § 21-2-300(a) | Category 3 |
| Uniform election equipment throughout state; education of | **The Secretary of State shall be responsible for the development, implementation, and provision of a continuing program to educate voters, election officials, and poll workers in the proper use of such voting equipment.** Each | O.C.G.A. § 21-2-300(d) | Category 1<br>Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| voters, election officials, and poll officers in operation of election equipment | county shall bear the costs, including transportation, subsistence, and lodging, incurred by its election and registration officials in **attending courses taught by or arranged by the Secretary of State for instruction in the use of the voting equipment.** | | |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Counties shall be authorized to contract with municipal governments for the use of such voting equipment in municipal elections **under terms and conditions specified by the Secretary of State to assure that the equipment is properly used and kept secure.** | O.C.G.A. § 21-2-300(e)(1) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Each county shall, prior to being provided with voting equipment by the state, provide or contract for adequate technical support for the installation, set up, and operation of such voting equipment for each primary, election, and special primary and special election **as the Secretary of State shall determine by rule or regulation**. | O.C.G.A. § 21-2-300(c) | Category 3 |
| Examination and approval of voting machines by Secretary of State | Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine **may request the Secretary of State to examine the machine**. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or | O.C.G.A. § 21-2-324(a) | Category 1 Category 2 Category 3 |

| | reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $250.00. **The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine**. | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The Secretary of State shall thereupon require such machine to be examined or reexamined** by three examiners whom he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall require of them a written report on such machine, attested by their signatures; **and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-324(b) | Category 3 |
| Examination and approval of voting machines by Secretary of State | No kind of voting machine not so approved shall be used at any primary or election and if, upon the reexamination of any voting machine previously approved, it shall appear that the machine so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate **votes, the approval of the same shall immediately be revoked by the Secretary of State**; and no such voting machine shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-324(c) | Category 3 |
| Examination and approval of | At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, | O.C.G.A. § 21-2-324(d) | Category 3 |

| voting machines by Secretary of State | **the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State.** | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The compensation of each examiner appointed under this Code section shall be fixed and paid by the Secretary of State**. | O.C.G.A. § 21-2-324(h) | Category 3 |
| Form of ballots on voting machines | If the construction of the machine shall require it, the ballot label for each candidate, group of candidates, political party or body, or question to be voted on shall bear the designating letter or number of the counter on the voting machine which will register or record votes therefor. Each question to be voted on shall appear on the ballot labels in brief form. Unless otherwise provided by law, proposed constitutional amendments so submitted shall be in brief form as directed by the General Assembly and, **in the failure to so direct, the form shall be determined by the Secretary of State**. Unless otherwise provided by law, any other state-wide questions or questions to be presented to the electors of more than one county so submitted shall be printed in brief form as directed by the General Assembly and, **in the event of a failure to so direct, the form shall be determined by the Secretary of State** and shall include a short title or heading in bold face at the beginning of each such question on the ballot and any local questions so submitted shall be printed in brief form as directed by the General Assembly and, in the event of a failure to so direct, the form shall be determined by the superintendent. In the case of questions to be voted on by the electors of a municipality, the governing authority shall determine the brief form of the questions. | O.C.G.A. § 21-2-325(b) | Category 3 |
| Preparation of voting machines by | The superintendent shall appoint one custodian of voting machines and such deputy custodians as may be necessary, whose duty it shall be to prepare the machines to be used at the | O.C.G.A. § 21-2-327(b) | Category 3 |

| superintendents; duties of custodians and deputy custodians | primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the municipality such compensation as shall be fixed by the governing authority of the municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the voting machines as required by this chapter, and he or she and the deputy custodians, whose duty it shall be to assist him or her in the discharge of his or her duties, shall serve at the pleasure of the superintendent. **Each custodian shall take an oath of office framed by the Secretary of State, which shall be filed with the superintendent**. | | |
|---|---|---|---|
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | **In every primary or election, the superintendent shall furnish, at the expense of the municipality, all ballot labels, forms of certificates, and other papers and supplies which are required under this chapter and which are not furnished by the Secretary of State, all of which shall be in the form and according to the specifications prescribed from time to time by the Secretary of State**. In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such primary. | O.C.G.A. § 21-2-327(f) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system**. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning voting system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. **The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system**. | O.C.G.A. § 21-2-368(a) | Category 3 |

| | | | |
|---|---|---|---|
| Examination and approval of optical scanning voting systems by Secretary of State | **The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors** at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-368(b) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | No kind of optical scanning voting system not so approved shall be used at any primary or election and if, upon the reexamination of any optical scanning voting system previously approved, it shall appear that the optical scanning voting system so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, **the approval of the same shall immediately be revoked by the Secretary of State**; and no such optical scanning voting system shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-368(c) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any vendor who completes a sale of optical scanning voting system that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia**, plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have authority to impose such penalty upon a finding that such a sale has occurred. | O.C.G.A. § 21-2-368(e) | Category 3 |
| Form and arrangement of | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the superintendent | O.C.G.A. § 21-2-369(c) | Category 3 |

| ballots for optical scanning voting systems | | | |
|---|---|---|---|
| Write-in ballots | In elections, electors shall be permitted to cast write-in votes. The design of the ballot shall permit the superintendents, in counting the write-in votes, to determine readily whether an elector has cast any write-in vote not authorized by law. **The Secretary of State, in specifying the form of the ballot, and the State Election Board, in promulgating rules and regulations respecting the conduct of elections, shall provide for ballot secrecy** in connection with write-in votes. | O.C.G.A. § 21-2-373 | Category 2<br>Category 3 |
| Form and arrangement of ballots for DRE voting systems; write-in votes | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the election superintendent | O.C.G.A. § 21-2-379.4 | Category 3 |
| State write-in absentee ballots | **The Secretary of State shall design a state write-in absentee ballot for federal offices and state offices** that are voted upon on a state-wide basis for use in a primary runoff or election runoff by an eligible absentee elector who lives outside the county or municipality in which the election is held and who is: | O.C.G.A. § 21-2-381.2(a) | Category 2<br>Category 3 |
| State write-in absentee ballots | **The Secretary of State shall establish a website which such eligible absentee electors may access to determine if there is a primary runoff or election runoff for a federal office or a state office that is voted upon on a state-wide basis.** The address of such website shall be included in the instructions for voting such state write-in absentee ballot. | O.C.G.A. § 21-2-381.2(d) | Category 2<br>Category 3 |
| Official absentee ballots | **The form for either ballot shall be determined and prescribed by the Secretary of State**, except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent. | O.C.G.A. § 21-2-383(a) | Category 3 |

38

| Preparation and delivery of absentee ballots; mailing ballots to absentee voters; oaths; assistance; master list; transmission to uniformed and overseas citizens | Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope, the superintendent, board of registrars, or absentee **ballot clerk shall provide two envelopes for each official absentee ballot**, of such **size and shape as shall be determined by the Secretary of State**, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words "Official Absentee Ballot" and nothing else. On the back of the larger of the two envelopes to be enclosed within the mailing envelope shall be printed the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21-2-409, and the penalties provided for in Code Sections 21-2-568, 21-2-573, 21-2-579, and 21-2-599 for violations of oaths; and on the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. **The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, and a notice in the form provided by the Secretary of State** of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. | O.C.G.A. § 21-2-384(b) | Category 3 |
| Voting by absentee electors; penalties | The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. **In addition, the registrars or absentee ballot clerk shall notify** | O.C.G.A. § 21-2-385(d)(2) | Category 3 |

| | | | |
|---|---|---|---|
| | **the Secretary of State in the manner prescribed by the Secretary of State of the times, dates, and locations at which advance voting will be conducted**. | | |
| Pilot program | **The Secretary of State shall develop and implement a pilot program** for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, for use in a primary or a general election. | O.C.G.A. § 21-2-387(a) | Category 3 |
| Cards of instructions and supplies; sample ballots and ballot labels | Prior to each primary and election, **the superintendent shall obtain from the Secretary of State a sufficient number of cards of instruction for guidance of electors**. Such cards of instruction **shall include such portions of this chapter as deemed necessary by the Secretary of State** and shall be printed for the type of voting equipment or ballots used in the county or municipality. **The superintendent shall also obtain from the Secretary of State a sufficient number of blank forms of oaths of poll officers, voter's certificates, voting rights posters, notices of penalties, oaths of assisted electors, numbered list of voters, tally sheets, return sheets, and such other forms and supplies required by this chapter, in each precinct of the county or municipality**. | O.C.G.A. § 21-2-400(a) | Category 3 |
| Delivery of ballots and supplies to managers | The superintendent shall provide at the polling place copies of the sample or facsimile ballots for such primary or election as well as a list of the certified write-in candidates for such election **in the form as provided by the Secretary of State or appropriate municipal official pursuant to** Code Section 21-2-133. | O.C.G.A. § 21-2-401(d) | Category 3 |
| Voter's certificates | At each primary and election, **the Secretary of State shall prepare and furnish to each superintendent a suitable number of voter's certificates** which shall be in substantially the following form: | O.C.G.A. § 21-2-402(a) | Category 3 |

| Voter identification cards | **The Secretary of State shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment**. | O.C.G.A. § 21-2-417.1(g) | Category 3 |
|---|---|---|---|
| Casting of provisional ballots | Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State.** The person shall also present the identification required by Code Section 21-2-417. | O.C.G.A. § 21-2-418(b) | Category 2 Category 3 |
| Method of voting and counting provisional ballots | The board of registrars shall complete a report **in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted** in the primary or election. | O.C.G.A. § 21-2-419(e) | Category 3 |
| Absentee ballots | Ballots in a precinct using optical scanning voting equipment for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked "Official Absentee Ballot" and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or optical scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed | O.C.G.A. § 21-2-482 | Category 3 |

41

| | on the face thereof the following: "I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." **The form for either ballot shall be determined and prescribed by the Secretary of State**. | | |
|---|---|---|---|
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | Each county and municipal superintendent shall prepare four copies of the consolidated return of the primary to be **certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-496(a) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **The Secretary of State is authorized to provide a method by which the election superintendent can file the results of primaries and elections electronically**. Once the Secretary of State provides such a method of filing, **the election superintendent shall file a copy of the election returns electronically in the manner prescribed by the Secretary of State** in addition to the filing provided in subsection (a) of this Code section. **The Secretary of State is authorized to promulgate such rules and regulations as necessary to provide for such an electronic filing**. | O.C.G.A. § 21-2-496(b) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such p**rimary. | O.C.G.A. § 21-2-496(c) | Category 3 |

| Consolidated certified returns of elections; returns forwarded to Secretary of State | Each county and municipal superintendent shall prepare four copies of the consolidated return of the election **to be certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-497(a) | Category 3 |
|---|---|---|---|
| Consolidated certified returns of elections; returns forwarded to Secretary of State | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election**. | O.C.G.A. § 21-2-497(b) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | Upon receiving the certified returns of any election from the various superintendents, **the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast for all candidates** described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall thereupon certify and file in his or her office the tabulation thereof. In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns**. Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results and shall file the same in his or her office. | O.C.G.A. § 21-2-499(a) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and | **The Secretary of State shall also, upon receiving the certified returns for presidential electors, proceed to tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them** | O.C.G.A. § 21-2-499(b) | Category 3 |

43

| | | | |
|---|---|---|---|
| certify certain returns | **before the Governor**. Not later than 5:00 P.M. on the fourteenth day following the date on which such election was conducted, the Secretary of State shall certify the votes cast for all candidates described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall no later than that same time lay the returns for presidential electors before the Governor. The Governor shall enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes. The Governor shall certify the slates of presidential electors no later than 5:00 P.M. on the fifteenth day following the date on which such election was conducted. Notwithstanding the deadlines specified in this Code section, such times may be altered for just cause by an order of a judge of superior court of this state. | | |
| Certificates of election; commissions; proclamations | *Governor and other constitutional officers.* Upon completing the tabulation of any election for Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of Agriculture, or Commissioner of Labor, **the Secretary of State shall lay the same before the Governor upon his or her oath of office as Governor**; and the Governor, upon the other constitutional officers taking their oaths of office, shall issue a commission under the great seal of the State of Georgia signed by the Governor and countersigned by the Secretary of State, to each such person. **The Secretary of State shall issue the commission to the person elected Governor.** | O.C.G.A. § 21-2-502(a) | Category 3 |
| Certificates of election; commissions; proclamations | *United States senators; representatives in Congress; members of the General Assembly.* (1) Upon completing the tabulation of any election for United States senator or representative in Congress, **the Secretary of State shall lay the same before the Governor,** who shall immediately issue certificates of election and commissions under the seal of the state, duly signed by the Governor and | O.C.G.A. § 21-2-502(b) | Category 3 |

| | attested by the Secretary of State and deliver the same to the candidates receiving the required number of votes to be elected to the respective offices.<br><br>(2) **The Secretary of State shall issue certificates of election to the persons elected members of the Senate and the House of Representative**s of the General Assembly and, between the hours of 12:00 Noon and 1:00 P.M. on the second Monday in January of each odd-numbered year, present before the Senate and the House of Representatives the<br>several returns of the elections of members of the respective houses. **In case of a special election the Secretary of State shall issue a certificate of election to each person so elected**, and the Secretary of State shall present the returns of such election to the proper house as soon as received and tabulated by the Secretary of State. Immediately upon their taking the oath of office, each member of the Senate and the House of Representatives shall be issued **a commission under the great seal of the State of Georgia, signed by the Secretary of State.** | | |
|---|---|---|---|
| Certificates of election; commissions; proclamations | *Justices of the Supreme Court, Judges of the Court of Appeals, Commissioners of the Georgia Public Service Commission, judges of the superior court, judges of the juvenile court, and district attorneys.* Upon completion of the tabulation **the Secretary of State shall certify the result of each election of Justices of the Supreme Court, of Judges of the Court of Appeals, of Commissioners of the Georgia Public Service Commission, of judges of the superior court, of judges of the juvenile court where elected, and of district attorneys to the Governor and shall issue a certificate of election to each person so elected**. The Governor shall, upon each such person taking the oath of office, immediately issue a commission under the great seal of the State of Georgia, signed by the Governor and **countersigned by the Secretary of State**, to each such person. | O.C.G.A. § 21-2-502(c) | Category 3 |
| | | | |

| Certificates of election; commissions; proclamations | *Presidential electors.* **The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor**, who shall enumerate and ascertain the number | O.C.G.A. § 21-2-502(e) | Category 3 |
|---|---|---|---|

# ATTACHMENT B

**Table 3: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State**

| NVRA PROVISIONS | Related Georgia Provision(s) |
|---|---|
| **Section 5 Voter Registration**<br>**What voter registration opportunity is required by Section 5 of the NVRA?**<br>Each State motor vehicle driver's license application (including any renewal application) submitted to a State motor vehicle authority must serve as a simultaneous voter registration application unless the applicant fails to sign the voter registration application. This application for voter registration must be considered as updating any previous voter registration by the applicant.<br><br>In addition, any change of address form submitted for State driver's license purposes must also serve as notification of change of address for voter registration purposes unless the registrant states on the form that the change of address is not for voter registration purposes. This means that all changes of address submitted to State motor vehicle offices must be forwarded to election authorities unless the registrant affirmatively requests otherwise by opting out on the form.<br><br>**Does Section 5 of the NVRA mandate the use by States of any particular forms or procedures?**<br><br>Yes. Each State must include a voter registration form as part of an application for a State driver's license and any application for driver's license renewal.<br><br>The voter registration portion of the application may not require any information that duplicates information required on the driver's license portion of the application and may require only the minimum amount of information necessary to prevent duplicate voter registrations and permit State officials both to determine the eligibility of the applicant to vote and to administer the voting process. | **O.C.G.A. § 21-2-221(b)**<br>The commissioner of driver services and the Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.<br><br>**O.C.G.A. § 21-2-221(e)**<br>The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.<br><br>**O.C.G.A. § 21-2-216(g)(7)**<br>The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.<br><br>**O.C.G.A. § 21-2-221(h)**<br>The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application.<br><br>**O.C.G.A. § 21-2-221(f)** |

The voter registration application must state each voter eligibility requirement (including citizenship), contain an attestation that the applicant meets each requirement, state the penalties provided by law for submission of a false voter registration application and require the signature of the applicant under penalty of perjury. In addition, the application shall also include statements specifying that: 1) if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and 2) if an applicant does register to vote, the identity of the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

When a state contracts with a private entity to administer services in an agency that is required to offer voter registration, the ultimate responsibility for ensuring provision of voter registration services remains with the state, and the voter registration requirements under the NVRA remain the same.

**What is a motor vehicle agency required to do with completed voter registration applications accepted at its offices?**

Completed voter registration applications accepted at a motor vehicle agency must be transmitted to the appropriate State election official no later than ten days after acceptance. However, if an application is accepted at a motor vehicle agency within five days of a voter registration deadline for an election, the application must be transmitted to election officials no later than five days after acceptance. The agency providing voter-registration services may not require a registrant to mail in the form himself or herself or discourage him or her in any manner from submitting the form to the agency. Similarly, if it is agency practice to make sure that agency forms are completed and signed when submitted by an applicant, the same practice should apply to a voter registration application submitted by that applicant.

The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State.

**O.C.G.A. § 21-2-221.2(a)**
A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.

**O.C.G.A. § 21-2-221.2(c)**
Upon the submission of an application through the website pursuant to this Code section, the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:
(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;
(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and
(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.
If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected.

**O.C.G.A. § 21-2-221.2(d)**
If all of the items enumerated in subsection (c) of this Code section are verified, the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services. The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the

<table>
<tr>
<td></td>
<td>application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website.</td>
</tr>
<tr>
<td>

**Section 6 Mail Registration**

**What are the requirements for voter registration by mail provided by Section 6 of the NVRA?**

Section 6 of the NVRA requires each State to accept and use the federal mail voter registration application form developed by the U.S. Election Assistance Commission. This form is available on the EAC's web site at http://www.eac.gov/program-areas/national-voter-registration-form. In addition to containing a voter-registration application, this EAC application booklet describes certain state-specific requirements. The national form and booklet have been developed by the EAC in consultation with the States.

**Can a State develop its own mail voter registration application?**

Yes. Section 6 of the NVRA also provides that, in addition to accepting and using the federal mail application, a State may develop and use its own mail voter registration form, if it meets all of the same criteria the NVRA requires for the EAC's national mail voter registration application.

**What are the requirements for the national mail voter registration application?**

</td>
<td>

**O.C.G.A. § 21-2-218(d)**

In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former

residence for such election or primary and for any runoffs resulting therefrom. The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such

elector to reflect such elector's present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail.

**O.C.G.A. § 21-2-223(a)**

The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the

</td>
</tr>
</table>

Section 9 of the NVRA provides that the national mail voter registration application may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

The application also must include a statement that specifies each eligibility requirement (including citizenship), contain an attestation that the applicant meets each such requirement and require the signature of the applicant under penalty of perjury. The mail application must also include a statement of the penalties provided by law for submission of a false voter registration application.

The mail application must also include statements specifying that: 1) if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and 2) if an applicant does register to vote, the identity of the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes. The mail application may not include any requirement for notarization or other formal authentication.

Section 303(b) of the Help America Vote Act of 2002 (HAVA) also requires that the national mail application include certain additional information: First, the question "Are you a citizen of the United States of America?" and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States. Second, the question "Will you be 18 years of age on or before election day?" and boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day. Third, the statement, "If you checked 'no' in response to either of these questions, do not complete this form." Fourth, a statement informing the individual that if the form is submitted by mail and the individual is registering for the first time, the appropriate identification required by HAVA must be submitted with the mail-in registration form to avoid the additional identification

form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.

**O.C.G.A. § 21-2-223(b)**

The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.

requirements upon voting for the first time. (See Question 11 below for a list of these forms of identification).

**Does the NVRA require States to make mail voter registration applications available?**
Yes. The chief election official of each State must make mail voter registration applications available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs. Most states satisfy these requirements by, among other things, making applications available at local registrar offices, driver license offices, public assistance offices and disability-service offices, to groups doing voter registration drives, and through the internet on the website of the chief election official. These forms are also available on the website of the U.S. Election Assistance Commission.

**What requirements does federal law place on first-time voters who register to vote by mail?**
If a person registers to vote by mail and has not previously voted in a federal election in a State, Section 303(b) of the Help America Vote Act of 2002 established new requirements.
Where a person registers to vote by mail and has not previously voted in a federal election in a State, if the voter does not qualify for one of the exemptions in Section 303(b)(3) of HAVA (described below), then he or she must submit one of the forms of identification required by Section 303(b)(2)(A) of HAVA the first time that he or she votes in a federal election. These forms of identification are: 1) a current and valid photo identification; or 2) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. If the voter does not present the required identification, Section 303(b)(2)(B) of HAVA provides that he or she may nonetheless cast a provisional ballot.
Sections 303(b)(3)(A)-(C) of HAVA create certain exemptions from these identification requirements. An applicant who provides the specified

| | |
|---|---|
| identification documents with his or her registration application (or otherwise provides such documentation to election officials before Election Day), is exempt from the requirement to show identification the first time he or she votes in a federal election. Likewise, an applicant who provides his or her driver's license number or last four digits of his or her social security number, and the State is able to match this information against an existing State record, is exempt from the requirement to show identification the first time he or she votes in a federal election. In addition, persons entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act, or entitled to vote other than in person under the Voting Accessibility for the Elderly and Handicapped Act or other federal law, are exempt from HAVA's identification requirements. | |
| **Section 7 Voter Registration Agencies**<br>**Under Section 7 of the NVRA, which offices must offer voter-registration services?**<br>Any office in a covered State that provides either public assistance or state-funded programs primarily engaged in providing services to persons with disabilities must offer voter-registration services. Armed Forces recruitment offices must also provide voter registration services. In addition, a State must designate other offices in the State as voter-registration agencies. (See Question 15 below for a description of these other offices).<br><br>**What is an office that provides public assistance under Section 7?**<br>"Public assistance" offices that must offer voter-registration services under Section 7 of the NVRA include each agency and office in a State that administers or provides services or assistance under any public assistance programs. This includes any of the following federal public assistance programs: the Supplemental Nutrition Assistance Program (SNAP, formerly the Food-Stamp Program), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the | **O.C.G.A. § 21-2-222(c)**<br>In addition to the offices listed in subsection (b) of this Code section, the Secretary of State shall designate other offices within the state as designated voter registration offices.<br><br>**O.C.G.A. § 21-2-222(i)**<br>Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.<br><br>**O.C.G.A. § 21-2-222(j)**<br>Each office shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State. |

Temporary Assistance for Needy Families (TANF) program (formerly the Aid to Families with Dependent Children or AFDC program), the Medicaid program, and the State Children's Health Insurance Program (SCHIP). This also includes state public assistance programs.

**What is an office that provides state-funded programs primarily engaged in providing services to persons with disabilities?**
Offices that provide state-funded programs primarily engaged in providing services to persons with disabilities include offices providing vocational rehabilitation, transportation, job training, education counseling, rehabilitation, or independent-living services for persons with disabilities. Because States vary greatly in the manner in which they provide services to persons with disabilities, each State must identify the specific offices and agencies that fit this definition. In doing so, States may want to consult with offices that deal with issues related to persons with disabilities, such as the protection and advocacy offices and client assistance program offices within that State. A list of such offices for each State is available at: http://www.napas.org/aboutus/PA_CAP.htm. Section 7 also requires that if an office provides services to a person with disabilities at the person's home, the office must provide the opportunity to register to vote at home. Offices serving persons with disabilities often offer specialized assistance in completing the agency service or benefit application forms, and Section 7 requires such offices to offer voter registration applicants the same degree of assistance in completing voter registration forms as is offered in completing the agency's own application forms.

**Does Section 7 require designation of other offices as voter registration agencies?**
Yes. In addition to offices providing public assistance and services to persons with disabilities, States are also required by Section 7 to designate "other offices" within a State as voter-registration agencies. A State is free to determine which other agencies/offices should be designated, according to its needs and preferences, but it must make

**O.C.G.A. § 21-2-222(l)**
The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application.

additional designations. Such other agency designations may include State or local government offices such as public libraries, public schools, State colleges, universities and community colleges, city and county clerks offices, marriage license offices, fishing and hunting license offices, government revenue offices, and unemployment compensation offices. Offices not otherwise covered under the NVRA that provide services to persons with disabilities may also be designated. In addition, with the agreement of such entities, States may designate as voter-registration agencies nongovernmental offices (such as private colleges) or Federal government offices.

**Do armed forces recruitment offices have to provide voter-registration services?**
Yes. The NVRA provides that all federal Armed Forces recruitment offices in each State subject to the NVRA must provide voter registration services. Within the Department of Defense, the Federal Voting Assistance Program (FVAP) maintains a web site that contains information concerning voter registration at Armed Forces recruitment offices: http://www.fvap.gov/reference/laws/nat-vote-reg-act.html and http://www.fvap.gov/reference/milinfo.html.

**What voter-registration services must be made available?**
Each office designated as a voter registration agency under Section 7 that provides service or assistance in addition to conducting voter registration must do the following:
1. distribute voter-registration application forms;
2. provide an "information" form that contains information on the voter-registration process (see Question 21 below for a description of the "information" form);
3. provide the same level of assistance to all applicants in completing voter-registration application forms as is provided with respect to every other service or application for benefits (unless the applicant specifically refuses such assistance);

4. accept completed voter-registration forms from applicants; and

5. transmit each completed voter-registration application to the appropriate State election official within a prescribed time frame.

**What persons must be provided the opportunity to register to vote by Section 7 designated offices and agencies?**
Designated agencies must provide the opportunity to register to vote to persons when: (1) applying for the agency's assistance or services; (2) seeking recertification or renewal of those services; and (3) changing address for the assistance or services.

**What does Section 7 require with regard to distribution of voter registration forms and information forms?**
Each office designated under Section 7 that provides services or assistance must distribute to each applicant for services or assistance, and each applicant for recertification, renewal or change of address with respect to such services or assistance, one of the voter registration application forms described in Question 20 below. In addition, each such office also must distribute to each applicant a form, known as an information form, described in Question 21 below.

**What types of voter-registration forms can be distributed to applicants?**
Section 7 agencies must distribute one of the three voter-registration forms listed below:

6. National Mail Voter Registration Form — The agency may use this federal form, which has been developed by the U.S. Election Assistance Commission. This form is available on the EAC's web site at http://www.eac.gov/program-areas/national-voter-registration-form. In addition to containing a voter-registration application, this document lists certain state-specific voting requirements.

7. State mail voter-registration form — The agency may use its State mail voter-registration form, so long as it meets the requirements of Section 9 of the NVRA. This State form would not be as lengthy as the federal form, which contains information about voter registration in each state. Such a form should be easier for applicants to navigate and easier for agencies and election officials to process.

8. Designated agency's own form — The agency also may use its own version of a voter-registration form, if it is equivalent to the federal form and has been approved by the State. This type of form may lead to more efficient voter-registration transactions at designated agencies that provide services or assistance, since it could be made a seamless part of the forms normally used by the designated agency. As an example, where agency assistance/services forms are generated by computer during the process of interviewing the applicant, the voter-registration form likewise might be generated during this same process, pre-populated with information already provided by the applicant. Or a perforated voter-registration application might be attached at the bottom of a State services form, so that it can be easily completed, detached, and transmitted to the appropriate election official.

**What is the "information form," and what should States put on it?**
Section 7 requires that designated offices provide each applicant for services or assistance an information form containing specific information concerning the individual's opportunity to register to vote. This form, which may be part of or separate from the voter-registration form, must include the following information:

9.  the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

10. if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

11. boxes for the applicant to check to indicate whether the applicant would like to register to vote or declines to register to vote, together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME." (Failure to check either box is deemed a declination to register for purposes of receiving assistance in registration but is not deemed a written declination to receive an application);

12. the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

13. the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _ _ _ _ _." The blank should be filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed.

No information relating to a declination to register to vote may be used for any purpose other than voter registration. If the information form is separate from the voter-registration form, it is recommended that a statement regarding this non-use of declination information be included

on the voter-registration form, as well as a statement that if the applicant registers to vote, information submitted will be used only for voter-registration purposes.

**Are Section 7 agencies required to assist persons in completing a voter-registration application?**
Yes. Section 7 agencies must provide to each applicant the same degree of assistance in completing the voter-registration application form as is provided by the office in completing its own agency forms, unless the applicant declines to register to vote or declines such assistance.
As an example, if it is the practice of a Section 7 agency for its employees to take time to explain to each applicant the various forms involved in the agency application, recertification or other process and answer applicant questions before the applicant completes the forms, this type of assistance must also be given at that time to such applicants with regard to the voter registration application process. Similarly, if it is agency practice to make sure that agency forms are completed and signed when submitted by an applicant, the same practice should apply to a voter registration application submitted by that applicant.
Offices serving persons with disabilities often offer specialized assistance in completing the agency service or benefit application forms. Section 7 requires such offices to offer voter registration applicants the same degree of assistance in completing voter registration forms as is offered in completing the agency's own application forms.

**Does Section 7 put any restrictions on how office staff may interact with applicants?**
Yes. Any person who provides voter-registration services at a Section 7 agency is prohibited from: 1) seeking to influence an applicant's political preference or party registration; 2) displaying any political preference or party allegiance; 3) taking any action or making any statement to an applicant to discourage the applicant from registering to vote; or 4) taking any action or making any statement that may lead the applicant to

believe that a decision to register or not to register has any bearing on the availability of services or benefits.

**Do the voter registration requirements of Section 7 of the NVRA apply to all application, renewal, recertification and change of address transactions with designated offices?**

Yes. The NVRA requires that voter registration opportunities be provided with respect to all application, renewal, recertification and change of address transactions regarding service and assistance with Section 7 offices. Many Section 7 designated agencies/offices routinely provide services/assistance such as application for, or renewal of, services or change-of-address notification through the internet, by telephone, or by mail. States should ensure the availability of voter-registration opportunities to individuals using such remote service/assistance opportunities from designated agencies. Thus, for all such internet transactions, States should advise of the opportunity to register to vote, and should provide some online capability to download or request a voter-registration form. For phone transactions, designated-agency personnel should advise applicants of the opportunity to register to vote and to request a voter registration form. Materials sent by mail to individuals completing phone or internet transactions (such as statements confirming a phone transaction, or renewal or change-of-address forms) should contain a voter-registration form.

In all such internet, phone, and mail transactions, individuals should be given a toll-free phone number, where possible, to call for information and instruction on how to complete the voter-registration process. Where feasible, as is done at many motor-vehicle agencies, States may consider providing for a simultaneous voter-registration opportunity through the electronic portal when individuals apply for services or assistance at a designated agency by that means. In addition, where possible, agencies may consider assisting the applicant in registering to vote by automatically filling in appropriate fields on voter-registration applications with information previously provided by the applicant in order to make the registration process easier and more efficient.

| | |
|---|---|
| When upgrading technology related to the application/recertification/change of address process at Section 7 agencies, States should ensure that such upgrade includes the voter registration process. When a state contracts with a private entity to administer services in an agency that is required to offer voter registration, the ultimate responsibility for ensuring provision of voter registration services remains with the state, and the voter registration requirements under the NVRA remain the same.<br><br>**What is a Section 7 agency required to do with completed voter registration applications accepted at its offices?**<br>The designated agency must submit the completed voter-registration application to the appropriate State or local election official within a prescribed period of time unless the applicant desires to submit it himself or herself. The agency providing voter-registration services may not require a registrant to mail in the form himself or herself or discourage him or her in any manner from submitting the form to the agency. When an applicant submits a completed voter-registration application to an agency, the agency must transmit the form to the appropriate State or local election official within ten days. However, if the agency receives a completed voter-registration application within five days before the last day to register to vote in an election, the application must be transmitted to the appropriate State or local election official within five days. | |
| **Section 8 Administration of Voter Registration**<br>**What does Section 8 of the NVRA require States to do?**<br>Section 8 mandates certain action by States concerning the administration of voter registration for elections for federal office. These requirements involve important issues such as the date by which valid voter registration applications must be accepted and eligible persons registered, rules for changing a registrant's address information, rules for removing names from the voter registration list, and administration of a | **O.C.G.A. § 21-2-222(i)**<br>Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. |

uniform, nondiscriminatory voter registration list maintenance program that complies with the Voting Rights Act.

**Does Section 8 impose a time deadline on States for accepting voter registration applications and registering eligible applicants?**
Yes. States must set a voter registration cutoff for federal elections of no more than 30 days before the election. A valid voter registration application from an eligible applicant is considered timely and the State has to ensure that the applicant is registered to vote if it is: 1) submitted not later than the lesser of 30 days, or the period provided by State law, before the date of a federal election to a driver's license office, designated public assistance or disability office, other designated office, or an appropriate State or local election official, or 2) postmarked not later than the lesser of 30 days, or the period provided by State law, before a federal election when submitted by mail. States can set a voter registration deadline for federal elections shorter than 30 days, and a number of States do so, but cannot set a longer deadline.

**Are States required to let an applicant know what has happened to his or her application?**
Yes. Section 8 requires State election officials to notify each applicant of the disposition of his or her registration application, e.g., a voter registration card if the application is accepted or a notice of rejection if the application is not accepted.
Where a notice of disposition for a mail voter registration application is sent by nonforwardable mail and returned as undeliverable, Section 6 of the NVRA provides that local election officials may proceed in accordance with the provisions of Section 8(d) of the NVRA (see Question 35 below).

**Under the NVRA, what are the circumstances under which a State can remove a person's name from the voter registration rolls?**
Section 8 permits States to remove the name of a person from the voter registration rolls upon the request of the registrant, and, if State law so

**Ga. Comp. R. & Regs. 183-1-12-.07(4)**
The registrars of each county shall complete the entry of new and updated voter registrations on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.

**O.C.G.A. § 21-2-231(a)**
Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State and The Council of Superior Court Clerks of Georgia a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, the Secretary of State and The Council of Superior Court Clerks of Georgia shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available.

**O.C.G.A. § 21-2-231(a.1)**
The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county.

provides, for mental incapacity or for criminal conviction. The Act also requires States to conduct a general voter registration list maintenance program that makes a reasonable effort to remove ineligible persons from the voter rolls by reason of the person's death, or a change in the residence of the registrant outside of the jurisdiction, in accordance with procedures set forth in the NVRA. The list maintenance program must be uniform, nondiscriminatory and in compliance with the Voting Rights Act.

**Does the NVRA contain any prohibitions on removal of persons' names from the voter registration list?**
Yes. Section 8 of the NVRA prohibits removing registrants from the voter registration list solely because of a failure to vote.  It also places restrictions of notice and timing on removals from the voter registration list based on a change of residence.

**What is "removal at the request of the registrant" under Section 8?**
A "removal at the request of the registrant" under the NVRA involves first-hand information from a registrant that can originate in at least three ways: 1) a registrant requesting to remove his or her name from the voting registration list, 2) a registrant completing and returning a notice card indicating an address change outside the jurisdiction, or 3) a registrant submitting a new application registering to vote a second time in a new jurisdiction, and providing information regarding the registrant's prior voter registration address on the new application, which the State can treat as a request to cancel or transfer his or her prior registration. A registrant advising of a new address within the same jurisdiction, or registering to vote a second time at a new address within the same jurisdiction, should trigger an updating of the original registration, rather than its cancellation.

**Are there any required procedures in the NVRA concerning removal of a person's name from the voter registration rolls for mental incapacity, criminal conviction or death?**

**O.C.G.A. § 21-2-231(b)**
The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed.

**O.C.G.A. § 21-2-231(c)**
Upon receipt of the lists described in subsections (a), (a.1), and (b) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 42 U.S.C. Section 1973gg-6(g), the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.

**O.C.G.A. § 21-2-231(d)**
Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county. The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states.

**O.C.G.A. § 21-2-231(e)**
Upon receipt of the lists described in subsection (d) of this Code section, the Secretary of State or his or her designated agent shall remove all such names of deceased persons

The NVRA does not require any particular process for removing persons who have been disqualified from voting pursuant to State law based upon a criminal conviction or an adjudication of mental incapacity. Moreover, while the NVRA requires States to make reasonable efforts to remove persons who have died, it does not require any particular process for doing so. States can follow whatever State law process exists for doing this. Section 303(a) of HAVA adds an additional requirement for NVRA covered States to coordinate the statewide voter registration database with State records on felony status and death. HAVA provides that list maintenance on the statewide database shall be done on a regular basis in accordance with the requirements of the NVRA.

In those States where state law provides for removals from the voter rolls based on mental incapacity or criminal conviction, state laws generally provide for election officials to rely on court determinations to identify the individuals who are subject to removal. Section 8 of the NVRA also provides for the U.S. Attorney Offices to forward information regarding felony criminal convictions in federal courts to chief state election officials.

**Under what circumstances does the NVRA allow States to remove a person from the voting rolls based on change of residence?**
A State may remove the name of a person from the voter registration list due to a change of residence upon 1) the person's written confirmation of a change of residence to a place outside the jurisdiction, or 2) completion of the notice process described in Section 8(d) of the NVRA.

**What does the NVRA notice process require to remove a person from the voting rolls based on a change of residence?**
In the absence of a written confirmation from a registrant of a change of address outside the jurisdiction, Section 8(d) of the NVRA sets forth a process for removing a person based on change of residence. This process requires sending a forwardable notice, in the form of a postage-prepaid and pre-addressed return card, on which the person may state his or her current address. The notice must include the language required by

from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.

**O.C.G.A. § 21-2-231(g)**
The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235. Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes.

**O.C.G.A. § 21-2-232(b)**
When an elector of this state moves to another county or state and registers to vote and the registration officials send a notice of cancellation reflecting the registration of the elector in the other county or state, the Secretary of State or the board of registrars, as the case may be, shall remove such elector's name from the list of electors. It shall not be necessary to send a confirmation notice to the elector in such circumstances.

**O.C.G.A. § 21-2-233(a)**
The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed.

**O.C.G.A. § 21-2-233(c)**
If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or

Section 8(d)(2) of the NVRA. For example, the notice must advise (1) that if the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should complete and return the card not later than the voter registration deadline for the next election; (2) that if the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice; and (3) that if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

The jurisdiction may designate the registrant as inactive if the registrant fails to return the card by the voter registration deadline for the next election after the notice is sent.

The jurisdiction may remove the registrant from the voter rolls after sending the notice in two circumstances. First, if the registrant confirms in writing, such as by completing and returning the notice card, that the registrant has changed residence to a place outside the jurisdiction then the registrant can be removed from the list immediately. Second, if the registrant fails to respond to the notice and fails to vote or to appear to vote in an election beginning on the date the notice is sent and ending on the day after the date of the second federal general election after the notice is sent, then the registrant can be removed from the list after that second federal general election.

**Does the NVRA create a "safe harbor" procedure under which States can satisfy their obligation to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the voter rolls due to a change of residence?**

Yes. The NVRA gives one example of a safe harbor procedure. Under that procedure, States may utilize change-of-address information supplied by the United States Postal Service through its National Change of Address

municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address. If the elector responds to the notice and affirms that the elector has not moved, the elector shall

remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235.

### O.C.G.A. § 21-2-234(a)(2)

In the first six months of each odd-numbered year, the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233. The confirmation notice described in this Code section shall be sent to each such elector during each odd-numbered year. Such notices shall be sent by forwardable, first-class mail.

### O.C.G.A. § 21-2-234(d)

If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. The Secretary of State or the registrars

program (NCOA) to identify registrants who may have changed residences and then take one of two actions.

1. If it appears from the NCOA information that the person has moved to a different residence in the same registrar's jurisdiction, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid, pre-addressed return form by which the registrant may verify or correct the address information.

2. If it appears that the registrant has moved to a residence outside the registrar's jurisdiction, the registrar uses the NVRA's Section 8(d) notice process and may remove the registrant from the voter rolls after satisfying all requirements of that process.

**Do States have to use the NCOA process to initiate the notice process?**
No. States do not have to use the NCOA process. Under the NVRA, States must have a general program that makes a reasonable effort to identify and remove the names of voters who have become ineligible to vote by means of a change of address. The program has to be uniform, non-discriminatory, in compliance with the Voting Rights Act and must be completed 90 days before a federal election. States otherwise have discretion under the NVRA and HAVA in how they design their general program, and States currently undertake a variety of approaches to how they initiate the notice process.

For example, some general programs involve a State undertaking a uniform mailing of a voter registration card, sample ballot, or other election mailing to all voters in a jurisdiction, and then using information obtained from returned non-deliverable mail as the basis for correcting voter registration records (for apparent moves within a jurisdiction) or for initiating the notice process (for apparent moves outside a jurisdiction or non-deliverable mail with no forwarding address noted).

Another example involves general programs where States initiate the notice process based on information showing that a voter has not voted

shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.

**O.C.G.A. § 21-2-235(a)**
In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors. Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records.

in elections nor made contact with a registrar over some period of time. This is <u>not</u> prohibited by the NVRA and its bar on removing voters from the list solely for failure to vote, since it relies on the NVRA notice process, and thus utilizes both a notice and a waiting period of two federal general elections.

**Does Section 8 impose any time restrictions on States as to when a general list maintenance program can be conducted?**
Yes. Section 8 requires States to complete any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters not later than 90 days prior to the date of a primary election or general election for federal office. This 90 day deadline applies to state list maintenance verification activities such as general mailings and door to door canvasses. This 90 day deadline does not, however, preclude removal of names at the request of the registrant, removal due to death of the registrant, removal due to criminal conviction or mental incapacity of the registrant as provided by State law, nor does the deadline preclude correction of a registrant's information.

**Are there any protections in the NVRA for those eligible registered voters who have changed address to another location within a registrar's jurisdiction, or are otherwise on an inactive voter list, but have not notified the registrar prior to the date of a federal election?**
Yes. The NVRA contains fail-safe provisions to enable such persons who show up to vote on a federal election day to update their registration and to vote in that election even though they have not notified the registrar of the address change:

       3.  An eligible registered voter who has moved to an address in an area covered by the same polling place as his or her previous address is permitted to vote at that same polling place upon oral or written affirmation by the registrant of the change of address at the polling place;

4.  An eligible registered voter who has moved to an address in an area covered by a different polling place from the polling place for his or her previous address, but within the same registrar's jurisdiction and the same congressional district, at the option of the registrant:

1.  shall be permitted to correct the voting records and vote at the old polling place upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

2.  shall be permitted to correct the voting records and vote at a designated central location within the same registrar's jurisdiction, upon written affirmation by the registrant of the new address on a standard form provided by the registrar; or

3.  shall be permitted to correct the voting records for purposes of future elections at the new polling place, and shall be permitted vote in the current election at that polling place if allowed under State law, upon confirmation by the registrant of the new address by such means as are required by law.

A central voting location need not be made available by the registrar if State law allows the person to vote at either the old or new polling place in the current election upon oral or written affirmation of the address change.

The failsafe provisions of Section 8 draw a distinction between the registrant's need for "affirmation" or "confirmation" of a new address, depending upon the circumstances in which the failsafe voting occurs.

**What if a mistake has been made, and registration records indicate that a person has moved from an address covered by a polling place when that person has in fact not moved?**

If a person has not moved, but the registration records indicate that a person has moved from an address covered by a polling place, that person shall be permitted to vote at that polling place upon oral or written affirmation by the registrant that the registrant continues to reside at his or her address previously known to the registrar.

**Are States required to keep records of their voter registration activities under the NVRA?**

Yes. Section 8 of the NVRA requires that States keep and make available for public inspection, for a period of at least two years, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered. The records to be kept shall include lists of the names and addresses of all persons to whom Section 8(d) notices are sent, and information concerning whether or not each such person has responded to the notice, as of the date that inspection of the records is made.

In addition, an independent requirement in 52 U.S.C. 20701 mandates that all records and papers relating to any application, registration, or other act requisite to voting in any election for federal office, be preserved for a period of twenty-two months from that federal election. Since voter registration is unitary and permanent, this obligation is ongoing, such that registration records must be preserved as long as the voter registration to which they pertain is considered an "active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active." Hence, States should maintain all written records related to applications to register to vote as well as declinations to register to vote. The Department of Justice can require that such records be produced for inspection and copying through a written demand, and a lawsuit to enforce such demand.

## COORDINATION, REPORTING, AND ENFORCEMENT

**What are the State's obligations to coordinate voter registration activities?**

The State is responsible for ensuring compliance with the NVRA. The NVRA requires each State to designate a State officer or employee as the chief State election official to be responsible for coordinating State responsibilities under the Act. Because of the importance of monitoring compliance with the NVRA's voter registration requirements, States should consider employing a person at the State level to serve as the NVRA coordinator for the State. This person could be responsible for coordinating and overseeing all NVRA activity at designated voter-registration agencies/offices in the State. In addition, States may consider employing a person at each designated voter-registration agency, and at each designated agency office, whose ongoing responsibility would be coordinating and overseeing the conduct of all voter registration activities in that agency/office. This person's responsibilities could include ensuring that the voter registration responsibilities are carried out, ensuring that the voter registration system is administered in a uniform and non-discriminatory manner, reviewing monthly data of voter-registration activity at voter registration offices, monitoring voter-registration activities, training new employees and providing for training updates at periodic intervals, ensuring an adequate supply of forms, and resolving voter-registration coordination issues that arise between State and local officials.

**Are States required to report on their NVRA voter-registration and list maintenance efforts?**

Yes. States must report various voter registration information to the U.S. Election Assistance Commission (EAC), in response to the EAC survey, every two years. This includes the number of voter-registration applications by mail and from motor vehicle offices, public-assistance offices, offices providing state-funded programs primarily serving persons with disabilities, Armed Forces recruitment offices, and other state-designated offices and agencies. Likewise, States must report voter

registration list maintenance information in response to the EAC survey every two years.

These biennial NVRA reports are available on the EAC web site at the following link: http://www.eac.gov/program-areas/research-resources-and-reports/completed-research-and-reports/ national-voter-registration-act-studies.

States should ensure that the NVRA data provided to the EAC is complete and accurate. The Department of Justice carefully considers this data, among other information, in determining how it will carry out its enforcement responsibilities.

To facilitate accurate NVRA data reporting to the EAC, states should consider having a system in place to track the number of voter registration applications from each designated voter registration agency. Barcodes or other coding could be included on voter registration applications to designate the agency from which the form originated. Such coding can be implemented in such a way that also allows states to comply with the obligation not to disclose the office at which any particular individual has registered to vote.

**For jurisdictions covered by the language minority provisions of the Voting Rights Act, what obligations do such jurisdictions have to ensure voter registration access under the NVRA to covered limited-English proficient citizens?**

Certain States and local jurisdictions are covered by the language minority requirements of the Voting Rights Act (VRA) for specific language minority groups. The VRA requires that when covered states and jurisdictions provide voter registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, they must provide them in the language of the applicable minority group as well as in the English language. The NVRA provides that its requirements do not supersede, restrict, or limit the application of the requirements of the VRA. Thus, each State or jurisdiction covered by the language minority requirements of the VRA should consider how to ensure that NVRA voter registration opportunities are conducted so as to provide language access to covered

limited-English proficient language minority citizens so that they have equal access to the voter registration process.

To assist covered States and jurisdictions, extensive information regarding the language minority requirements is available on the Voting Section's website: http://www.justice.gov/crt/voting/sec_203/activ_203.php. Various language resources are also available on the EAC website. These include versions of the national mail voter registration form translated into Spanish, Chinese, Japanese, Korean, Tagalog, and Vietnamese. http://www.eac.gov/voter/Register to Vote. These resources also include translated versions of a voter's guide to federal elections. http://www.eac.gov/voter/voters-guides. And these resources also include a glossary of election terms in six languages. http://www.eac.gov/voter/language-accessibility-program-1.

**What agency is responsible for enforcement of the NVRA?**

The U.S. Department of Justice has enforcement responsibility under the NVRA. The Department undertakes activities designed to ensure compliance with the NVRA, including monitoring state compliance, conducting investigations and, filing litigation in federal court to enforce the NVRA's requirements. Private parties may also bring litigation in federal court to enforce the NVRA. The U.S. Election Assistance Commission is responsible for administration of the national voter registration form, as well as State reporting under the NVRA.

**What are some examples of the Department's activities to enforce the provisions of the NVRA?**

An extensive description of the Department's NVRA enforcement activities can be found on the Voting Section's website: http://www.justice.gov/crt/voting/litigation/caselist.php#nvra_cases. In particular, significant NVRA decisions or settlements have been obtained by the Department in litigation with the State of Tennessee (Sections 5 and 7 of the NVRA) http://www.justice.gov/crt/voting/nvra/tn_cd.pdf; and the State

of New York (Section 7 of the NVRA), http://www.justice.gov/crt/voting/nvra/nynvra_order.pdf.

**How can I contact the Department of Justice about the NVRA's voter registration requirements?**
As a general matter, the Department of Justice does not issue advisory opinions concerning the statutes that it enforces. The Department will certainly consider inquiries from State officials concerning the NVRA, however, in the hope of providing assistance. Within the Department of Justice, the responsibility for NVRA enforcement is committed to the Voting Section of the Civil Rights Division. You may reach the Voting Section at its toll-free telephone number, 800-253-393

# ATTACHMENT C



## The Office of Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

2 Martin Luther King Jr. Drive
802 West Tower
Atlanta, Georgia 30334

*Chris Harvey*
ELECTIONS DIRECTOR

July 10, 2018

Brian Newby, Executive Director
U.S. Election Assistance Commission
1335 East-West Highway, Suite 4300
Silver Spring, MD 20910

Dear Mr. Newby:

This letter is to certify that the Georgia Secretary of State's Office will use the funds provided under the 2018 HAVA Election Security Grant award #GA18101001 from the U.S. Election Assistance Commission to improve the administration of elections for Federal office, including to enhance election technology and make election security improvements.

I have reviewed the terms of this award, and I accept the terms as described in the Notice of Grant Award dated April 17, 2018. I have also provided a signed copy of the Certification Regarding Lobbying.

These funds will be used in a manner consistent with the laws described in Section 906 of HAVA, and the funds will not be used in a manner inconsistent with the requirements of Title III of HAVA.

We request $10,305,783 at this time. We will develop the program narrative as follows:

The Georgia Secretary of State's Office is ready to use these funds for a list of projects to enhance voting in Georgia by increasing election security, simplicity, and accessibility. We are considering these funds for the following uses:

- Purchase secure voting devices that produce a voter-verifiable paper ballot;

- Provide a screen-readable, ADA-compliant online sample ballot for all voters;

- Purchase MS-ISAC Cyber Security Sensors for each of Georgia's 159 county election offices;

- Purchase cyber security services, such as diagnostics and testing assessments;

- Improve and enhance our online voter self-service page "My Voter Page" (MVP) in order to be mobile-adaptable with enhanced features;

- Purchase new Electronic Poll Books;

- Enhance and update our Online Voter Registration Page to be optimized for mobile use and allow for multiple ballot options for voters who are eligible to participate in multiple pending elections;

- Obtain new reports that allow improved demographic reporting for voter registration in our voter registration database;

- Pay for re-design of voter precinct cards to become fully compatible with USPS mailing standards and optimize delivery of cards to voters;

- Improve voter registration database management and access control;

- Enhance the state's "Petitions Module" and high speed scanners for more efficient and secure processing; and

- Engage an outside firm to conduct election audits and testing.

If you have any questions about this request, please contact me at (404) 657-5380 or charvey@sos.ga.gov.

Sincerely,

Chris Harvey, Elections Director
Office of Georgia Secretary of State Brian P. Kemp

## 2018 HAVA ELECTION SECURITY GRANT

| Budget Information | | | | | | | | CFDA # 90.404 | | Non-Construction Program |

**Name of Organization:** Georgia Secretary of State

**Budget Period Start:** 3/23/2018 **SECTION A -   BUDGET SUMMARY**

**Budget Period End:** 3/22/2023 **FEDERAL & NON-FEDERAL FUNDS (Match)** *(Consolidated Budget for total project term-- up to 5 years as defined by grantee)*

| BUDGET CATEGORIES | PROGRAM CATEGORIES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Voting Equipment | (b) Election Auditing | (c ) Voter Registration Systems | (d) Cyber Security | (e) Communications | (f) Other _____ | (g) Other _____ | TOTALS | % Fed Total |
| 1.  PERSONNEL (including fringe) | | | | | | | | $           - | 0% |
| 2.  EQUIPMENT | $     5,395,247.00 | | | | | | | $   5,395,247.00 | 52% |
| 3.  SUBGRANTS- to local voting jurisdictions | | | | | | | | $           - | 0% |
| 4.  TRAINING | | | | $      50,000.00 | | | | $      50,000.00 | 0% |
| 5.  All OTHER COSTS | | $     500,000.00 | | $   4,360,536.00 | | | | $   4,860,536.00 | 47% |
| 6.  TOTAL DIRECT COSTS (1-6) | $     5,395,247.00 | $     500,000.00 | $           - | $   4,410,536.00 | $           - | $           - | $           - | $  10,305,783.00 | |
| 7.  INDIRECT COSTS (if applied) | | | | | | | | $           - | 0% |
| 8.  Total Federal Budget | $     5,395,247.00 | $     500,000.00 | $           - | $   4,410,536.00 | $           - | $           - | $           - | $  10,305,783.00 | |
| 11.  Non-Federal Match | $     515,290.00 | | | | | | | $     515,290.00 | |
| 12.  Total Program Budget | $     5,910,537.00 | $     500,000.00 | $           - | $   4,410,536.00 | $           - | $           - | $           - | $  10,821,073.00 | |
| 13.  Percentage By Category | 52% | 5% | 0% | 43% | 0% | 0% | 0% | | |

**Proposed State Match** 5.0%

A.  Do you have an Indirect Cost Rate Agreement approved by the Federal government or some other non-federal entity?
If yes, please provide the following information:

B.  Period Covered by the Indirect Cost Agreement  (mm/dd/yyyy-mm/dd/yyy):

C.  Approving Federal agency:

D.  If other than Federal agency, please specify:

E.  The Indirect Cost Rate is:

# ATTACHMENT D



# The Office of the Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

August 1, 2013

Ms. Alice Miller
Acting Executive Director
Election Assistance Commission
1201 New York Ave., NW
Washington, DC 20005

Dear Ms. Miller,

As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

Specifically, I am requesting that the EAC alter the state-specific instructions for Georgia in the Federal Form as follows:

1. In Georgia, a person is not qualified to vote unless such person is registered as an elector in the manner prescribed by Georgia law, a citizen of the State of Georgia and of the United States, and possess all other qualifications set by law. O.C.G.A. § 21-2-216(a). Act 143 of the 2009 Georgia General Assembly, codified at O.C.G.A. § 21-2-216(g), along with the implementing regulations contained in Ga. Comp. R. & Regs. r. 183-1-6-.06 and Ga. Comp. R. & Regs. r. 590-8-1-.02, directs applicants for voter registration to provide satisfactory evidence of United States citizenship so that the board of registrars can determine the applicant's eligibility. Upon the receipt of an application without satisfactory evidence of citizenship, the board of registrars shall accept the application and notify the applicant in writing of the requirement to provide satisfactory evidence of citizenship. Failure to respond to such request will result in the rejection of the application.

   Accordingly, we request the insertion of an additional bullet after the last bullet in the "Signature" section with the following text: "be found eligible to vote by supplying satisfactory evidence of U.S. citizenship."

2. Additionally, the mailing address for the Elections Division in the Federal Form should be revised as follows: Elections Division, Office of the Secretary of State, 2 Martin Luther King Jr. Drive, Suite 802 Floyd West Tower, Atlanta, Georgia 30334.

Alice Miller
Election Assistance Commission
Page | 2


Since this information is necessary to enable state election officials to assess the eligibility of an applicant, your prompt consideration of this request is appreciated. In the event we do not receive the EAC's response to this request in the next ten (10) days, we will understand that to mean the EAC is unable to make a determination on our request. Thank you in advance for your attention to this request, and please contact me if you have any questions.


                              Sincerely,



                              Brian P. Kemp
                              Secretary of State

# ATTACHMENT E



**U.S. Election Assistance Commission**
**1201 New York Ave. NW – Suite 300**
**Washington, DC 20005**

August 15, 2013

Honorable Brian P. Kemp
Secretary of State
214 State Capitol
Atlanta, GA 30334

Dear Secretary Kemp:

Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that EAC revise the Georgia state-specific instructions by making the following changes:

1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:

   • Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship

2. Revision of the mailing address as follows:

   Elections Division
   Office of the Secretary of State
   2 Martin Luther King, Jr. Drive
   Suite 802 Floyd West Tower
   Atlanta, GA 30334

EAC staff is authorized to approve the change related to mailing address and will accordingly make the change to the Georgia instructions on the Federal Form. However, as you know, EAC currently has four vacancies on the Commission. EAC staff is authorized to process State requests to modify state-specific instructions on the Federal Form but according to current procedures must defer any requests that raise "issues of broad policy concern to more than one state" until EAC has a quorum. I have attached a copy of the memo to former EAC Commissioners Donetta Davidson and Gineen Bresso from former Executive Director Thomas Wilkey, November 9, 2011 which delineates the process EAC staff must follow when receiving State requests to modify their state-specific instructions on the Federal Form.

Your correspondence states that

Upon receipt of an application without satisfactory evidence of citizenship, the board of registrars shall accept the application and notify the applicant in writing of the requirement to provide satisfactory evidence of citizenship. *Failure to respond to such request will result in the rejection of the application.*

(Emphasis added).

Honorable Brian P. Kemp
August 15, 2013

Thus the result would be that the Federal Form would be rejected in Georgia without the proper citizenship documentation. Failure to "accept and use" the Federal Form has broad policy impact that could affect more than one State.

In addition, citizenship documentation is not addressed in the National Voter Registration Act of 1993 or the Help America Vote Act of 2002 and the inclusion of such information with the Federal Form constitutes a policy question which EAC Commissioners must decide. EAC staff has no authority to establish policy for the EAC.

The requested modification to the state-specific instruction on the Federal Form regarding citizenship documentation appears to raise issues of broad policy concern to more than one state. EAC staff is therefore constrained to defer the request until EAC has a quorum.

If you have any questions on this matter, please do not hesitate to contact me.

Sincerely,

Alice Miller,
Acting Executive Director &
Chief Operating Officer

# ATTACHMENT F



**U. S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD 20910

January 17, 2014

Honorable Brian P. Kemp
Secretary of State
214 State Capitol
Atlanta, Georgia 30334

**Re:     Docket No. EAC-2013-004: State Requests to Include Additional Proof of
Citizenship Instructions on the National Mail Voter Registration Form**

Dear Secretary Kemp:

I write in reference to your request dated August 1, 2013 for the U.S. Election Assistance
Commission ("EAC") to modify the state-specific instructions of the National Mail Voter
Registration Form ("Federal Form") to include instructions mandating that, as a precondition
to registering to vote in federal elections in Georgia, applicants must provide additional proof
of their United States citizenship not otherwise required by the Federal Form.

As you know, the EAC initially deferred consideration of your request pending the
reestablishment of a quorum of EAC commissioners, in accordance with the EAC's internal
procedures.  On December 13, 2013, the EAC was ordered by the United States District
Court for the District of Kansas to render final agency action by January 17, 2014 in regard
to requests submitted by the states of Arizona and Kansas which are similar to your request.
Because the requests are similar, the EAC has determined that it would render a final
determination on your request as well. The EAC solicited public comments regarding all
three requests, *see* 78 Fed. Reg. 77666 (Dec. 24, 2013), and has reviewed those comments.
The agency did not receive any comments from state officials in Georgia.

For the reasons discussed in the attached Memorandum of Decision, the Commission denies
your request to modify the Federal Form's state-specific instructions.  The attached decision
constitutes final agency action with respect to your request, in accordance with 5 U.S.C.
§ 704.

Sincerely,

Alice Miller
Acting Executive Director &
Chief Operating Officer

# ATTACHMENT G



**U.S. ELECTION ASSISTANCE COMMISSION**
**1335 East West Highway, Suite 4300**
**Silver Spring, MD 20910**

January 29, 2016

Honorable Brian P. Kemp
Georgia Secretary of State
214 State Capitol
Atlanta, GA 30334

Dear Secretary Kemp:

This letter is a follow-up to correspondence to the U.S. Election Assistance Commission requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that the EAC revise the Georgia State-Specific Instructions by making the following changes *(in italics):*

Revision of the mailing address is as follows:
 **Mailing address:**
 Election Division
 Office of the Secretary of State
 *Suite 802 Floyd West Tower*
 *2 Martin Luther King, Jr. Drive*
 *Atlanta, GA 30334*

Insertion of an additional bullet after the last bullet in the Signature section with the following text:

 **9. Signature.** To register in Georgia you must:
 - be a citizen of the United States
 - be a legal resident of Georgia and of the county in which you want to vote
 - be 18 years old within six months after the day of registration, and be 18 years old to vote
 - not be serving a sentence for having been convicted of a felony
 - not have been judicially determined to be mentally incompetent, unless the disability has been removed
 - *be found eligible to vote by supplying satisfactory evidence of U.S. citizenship*

On August 15, 2013, Acting Executive Director Alice Miller opined that the EAC was authorized to approve the change related to the mail address and accordingly made that change to the Georgia instructions on the Federal Form. Her August 15, 2013, letter further opined that EAC staff was constrained to defer the request regarding citizenship documentation until EAC had a quorum of Commissioners.

Upon review of your request, I write to inform you that all of the changes requested to the State of Georgia instructions on the national mail voter registration form (Federal form) have been made and are posted on the EAC website.

If the changes do not accurately reflect your request, please notify me immediately. Further, we have begun a systematic process with all states to update State-Specific Instruction Changes regularly. Please look for a separate mailing from us in the coming days and notify us if any additional State-Specific Instructions are in need of modernization or further calibration with your procedures.

If you have any questions on this matter, please do not hesitate to contact me at 301-563-3959 or at bnewby@eac.gov.

Sincerely,

Brian D. Newby
Executive Director

# ATTACHMENT H



**U.S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD  20910

September 12, 2016

Honorable Brian P. Kemp
Georgia Secretary of State
214 State Capitol
Atlanta, GA  303334

Re:     United States Court of Appeals Case #16-5196
        League of Women Voters, et al, v. Brian D. Newby, et al

Dear Secretary Kemp:

This letter is to advise you that the United States Court of Appeals for the District of Columbia Circuit has reversed the denial of a preliminary injunction regarding State-Specific Instructions of the Federal Voter Registration Form.  I have attached a copy of the Order for your reference.

The order requires that the Election Assistance Commission "take all actions necessary to restore the status quo ante, pending a determination of the merits, including promptly removing from the state-specific instructions those requirements directing voter registration applicants to submit proof of their citizenship." These changes were made on our website the day of the Order, September 9, 2016.

The order also requires that the EAC inform you that, "Federal Form applications filed since January 29, 2016 should be treated as if they did not contain the now-stricken state-specific instructions."

If you know how many applications have been filed in Georgia using the federal form since January 29, 2016, we would appreciate knowing that information.

If you have any questions on this matter, please do not hesitate to contact me at 301-563-3959 or at bnewby@eac.gov.

Sincerely,

Brian D. Newby
Executive Director

enc.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 16-5196**                                      **September Term, 2016**

FILED: SEPTEMBER 9, 2016

LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, ET AL.,
    APPELLANTS

v.

BRIAN D. NEWBY, IN HIS CAPACITY AS THE EXECUTIVE DIRECTOR OF THE UNITED STATES
ELECTION ASSISTANCE COMMISSION, ET AL.,
    APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00236)

Before: ROGERS, *Circuit Judge*, and WILLIAMS and RANDOLPH\*, *Senior Circuit Judges*

## J U D G M E N T

This case came to be heard on the record of the United States District Court and was argued by counsel. On consideration thereof, and as will be explained more fully in opinions to be filed at a later date, it is

**ORDERED and ADJUDGED** that the order of the District Court denying the motion for a preliminary injunction be reversed. Appellants have demonstrated irreparable harm, a likelihood of success on the merits, that the balance of equities tips in their favor, and that an injunction is in the public interest. It is

**FURTHER ORDERED** that the United States Election Assistance Commission ("the Commission"), and anyone acting on its behalf, be enjoined from giving effect to the January 29, 2016, decisions of its Executive Director, Brian D. Newby, approving requests by Kansas, Alabama, and Georgia to add a proof of citizenship requirement to the state-specific instructions that accompany the National Mail Voter Registration Form (the "Federal Form"). It is

**FURTHER ORDERED** that the Commission take all actions necessary to restore the status quo ante, pending a determination on the merits, including promptly removing from the state-specific instructions those requirements directing voter registration applicants to submit proof of their United States citizenship, informing Kansas, Alabama, and Georgia that Federal Form applications filed since January 29, 2016 should be treated as if they did not contain the now-stricken state-specific instructions, and promptly posting on the Commission's website the modified version of the Federal Form.

Our dissenting colleague claims that a Constitutional issue "would arise if a court issued a final injunction in this case forbidding the Commission from including the states' requirements." But that issue is not presented in this case because the Leagues seek only to enjoin the Commission (or its agents) from giving effect to the January 29, 2016 decisions of Executive Director Newby. Neither this preliminary injunction nor a final judgment would forbid the Commission from including a proof-of-citizenship requirement if it determined that such a requirement was necessary to "effectuate [the States'] citizenship requirement[s]." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 (2013). Like Arizona after *ITCA*, the States here remain free to renew their "request[s] that the [Commission] alter the Federal Form to include information the State[s] deem[] necessary to determine eligibility." *Id.* If the Commission refuses those requests (or fails to act timely), the States here (like Arizona) will have the "opportunity to establish in a reviewing court" that their proof-of-citizenship requirements are necessary to enable them to assess eligibility. *Id.*; see 52 U.S.C. § 20508(b)(1). Because they have yet to do so, our review of the agency action here presents no Constitutional issue.

<u>**Per Curiam**</u>

FOR THE COURT:
Mark J. Langer, Clerk

BY:   /s/
      Amy Yacisin
      Deputy Clerk

* Senior Circuit Judge Randolph would affirm the order denying the preliminary injunction. A separate dissenting statement by Senior Circuit Judge Randolph is attached.

Randolph, *Senior Circuit Judge*, dissenting:

I would affirm the District Court's denial of a preliminary injunction on the ground that appellants have not demonstrated irreparable harm.

The Supreme Court in *Arizona v. Inter Tribal Council of Arizona, Inc.* recognized that under Article I, § 2, cl. 1, and the Seventeenth Amendment to the Constitution, the states – not the federal government – have the power to establish "voting requirements" in federal elections. 133 S.Ct. 2247, 2258-59 (2013).

The Court also held that it would "raise serious constitutional doubts" if the Election Assistance Commission prevented a state from "enforcing its voter qualifications" and that the Commission may be "under a nondiscretionary duty to include [a state's proof of citizenship requirements] on the Federal Form." *Id.* at 2259-60. That issue is not presented because the Commission's Executive Director granted the requests of Kansas, Georgia and Alabama to include their requirements on the Federal Form. But the issue would arise if a court issued a final injunction in this case forbidding the Commission from including the states' requirements.

3

# ATTACHMENT I

# Federal Financial Report

(Follow form instructions)

OMB Number: 4040-0014
Expiration Date: 01/31/2019

| 1. Federal Agency and Organizational Element to Which Report is Submitted | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency (To report multiple grants, use FFR Attachment) |
|---|---|
| Election Assistance Commission | Title 1, Section 101 2018 |

**3. Recipient Organization** (Name and complete address including Zip code)

Recipient Organization Name: Georgia Secretary of State

| | | | |
|---|---|---|---|
| Street1: | 214 State Capitol | | |
| Street2: | | | |
| City: | Atlanta | County: | Fulton |
| State: | GA: Georgia | Province: | |
| Country: | USA: UNITED STATES | ZIP / Postal Code: | 30334-160014 |

| 4a. DUNS Number | 4b. EIN | 5. Recipient Account Number or Identifying Number (To report multiple grants, use FFR Attachment) |
|---|---|---|
| | | 10142 |

| 6. Report Type | 7. Basis of Accounting | 8. Project/Grant Period | 9. Reporting Period End Date |
|---|---|---|---|
| ☐ Quarterly | ☒ Cash | From: 02/01/2018 | 09/30/2018 |
| ☐ Semi-Annual | ☐ Accrual | To: 09/30/2018 | |
| ☒ Annual | | | |
| ☐ Final | | | |

| 10. Transactions | Cumulative |
|---|---|
| *(Use lines a-c for single or multiple grant reporting)* | |
| **Federal Cash (To report multiple grants, also use FFR attachment):** | |
| a. Cash Receipts | 0.00 |
| b. Cash Disbursements | 0.00 |
| c. Cash on Hand (line a minus b) | 0.00 |
| *(Use lines d-o for single grant reporting)* | |
| **Federal Expenditures and Unobligated Balance:** | |
| d. Total Federal funds authorized | 10,305,783.00 |
| e. Federal share of expenditures | 0.00 |
| f. Federal share of unliquidated obligations | 0.00 |
| g. Total Federal share (sum of lines e and f) | 0.00 |
| h. Unobligated balance of Federal Funds (line d minus g) | 10,305,783.00 |
| **Recipient Share:** | |
| i. Total recipient share required | 515,289.00 |
| j. Recipient share of expenditures | 0.00 |
| k. Remaining recipient share to be provided (line i minus j) | 515,289.00 |
| **Program Income:** | |
| l. Total Federal program income earned | 0.00 |
| m. Program income expended in accordance with the deduction alternative | 0.00 |
| n. Program income expended in accordance with the addition alternative | 0.00 |
| o. Unexpended program income (line l minus line m or line n) | 0.00 |

**11. Indirect Expense**

| a. Type | b. Rate | c. Period From | Period To | d. Base | e. Amount Charged | f. Federal Share |
|---------|---------|----------------|-----------|---------|-------------------|------------------|
|         |         |                |           |         |                   |                  |
|         |         |                |           |         |                   |                  |
|         |         |                | g. Totals: |        |                   |                  |

*12. Remarks: Attach any explanations deemed necessary or information required by Federal sponsoring agency in compliance with governing legislation:*

[ Add Attachment ] [ Delete Attachment ] [ View Attachment ]

**13. Certification: By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729-3730 and 3801-3812).**

a. Name and Title of Authorized Certifying Official

Prefix:     First Name: Phyllis     Middle Name:

Last Name: Studdard     Suffix:

Title: Accounting Manager

b. Signature of Authorized Certifying Official

*Phyllis Studdard*

c. Telephone (Area code, number and extension)

d. Email Address

e. Date Report Submitted: 12/27/2018

**14. Agency use only:**

Standard Form 425

# ATTACHMENT J

# Register To Vote In Your State
# By Using This
# Postcard Form and Guide



# For U.S. Citizens

# General Instructions

## Who Can Use this Application

If you are a U.S. citizen who lives or has an address within the United States, you can use the application in this booklet to:

- Register to vote in your State,
- Report a change of name to your voter registration office,
- Report a change of address to your voter registration office, or
- Register with a political party.

## Exceptions

Please do not use this application if you live outside the United States and its territories and have no home (legal) address in this country, *or* if you are in the military stationed away from home. Use the Federal Postcard Application available to you from military bases, American embassies, or consular offices.

**New Hampshire** town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form.
**North Dakota** does not have voter registration.
**Wyoming** law does not permit mail registration.

## How to Find Out If You Are Eligible to Register to Vote in Your State

Each State has its own laws about who may register and vote. Check the information under your State in the State Instructions. All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election. You **cannot** be registered to vote in more than one place at a time.

## How to Fill Out this Application

Use both the Application Instructions and State Instructions to guide you in filling out the application.

- First, read the Application Instructions. These instructions will give you important information that applies to everyone using this application.
- Next, find your State under the State Instructions. Use these instructions to fill out Boxes 6, 7, and refer to these instructions for information about voter eligibility and any oath required for Box 9.

## When to Register to Vote

Each State has its own deadline for registering to vote. Check the deadline for your State on the last page of this booklet.

## How to Submit Your Application

Mail your application to the address listed under your State in the State Instructions. Or, deliver the application in person to your local voter registration office. The States that are required to accept the national form will accept copies of the application printed from the computer image on regular paper stock, signed by the applicant, and mailed in an envelope with the correct postage.

## First Time Voters Who Register by Mail

If you are registering to vote for the first time in your jurisdiction and are mailing this registration application, Federal law requires you to show proof of identification the first time you vote. Proof of identification includes:

- A current and valid photo identification or
- A current utility bill, bank statement, government check, paycheck or government document that shows your name and address.

Voters may be exempt from this requirement if they submit a **COPY** of this identification with their mail in voter registration form. If you wish to submit a **COPY**, please keep the following in mind:

- Your state may have additional identification requirements which may mandate you show identification at the polling place even if you meet the Federal proof of identification.
- Do not submit original documents with this application, only **COPIES.**

---

### If You Were Given this Application in a State Agency or Public Office

If you have been given this application in a State agency or public office, it is your choice to use the application. If you decide to use this application to register to vote, you can fill it out and leave it with the State agency or public office. The application will be submitted for you. Or, you can take it with you to mail to the address listed under your State in the State Instructions. You also may take it with you to deliver in person to your local voter registration office.
Note: The name and location of the State agency or public office where you received the application will remain confidential. It will not appear on your application. Also, if you decide not to use this application to register to vote, that decision will remain confidential. It will not affect the service you receive from the agency or office.

# Application Instructions

Before filling out the body of the form, please answer the questions on the top of the form as to whether you are a United States citizen and whether you will be 18 years old on or before Election Day. If you answer no to either of these questions, you may not use this form to register to vote. However, state specific instructions may provide additional information on eligibility to register to vote prior to age 18.

**Box 1 — Name**
Put in this box your full name in this order — Last, First, Middle. Do not use nicknames or initials.
*Note:* If this application is for a change of name, please tell us in **Box A** *(on the bottom half of the form)* your full name before you changed it.

**Box 2 — Home Address**
Put in this box your home address (legal address). Do **not** put your mailing address here if it is different from your home address. Do **not** use a post office box or rural route without a box number. Refer to state-specific instructions for rules regarding use of route numbers.

*Note:* If you were registered before but this is the first time you are registering from the address in Box 2, please tell us in **Box B** *(on the bottom half of the form)* the address where you were registered before. Please give us as much of the address as you can remember.

*Also Note:* If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C *(at the bottom of the form).*

**Box 3 — Mailing Address**
If you get your mail at an address that is different from the address in Box 2, put your mailing address in this box. If you have no address in Box 2, you **must** write in Box 3 an address where you can be reached by mail.

**Box 4 — Date of Birth**
Put in this box your date of birth in this order — Month, Day, Year. *Be careful not to use today's date!*

**Box 5 — Telephone Number**
Most States ask for your telephone number in case there are questions about your application. However, you do not have to fill in this box.

**Box 6 — ID Number**
Federal law requires that states collect from each registrant an identification number. You must refer to your state's specific instructions for item 6 regarding information on what number is acceptable for your state. If you have neither a drivers license nor a social security number, please indicate this on the form and a number will be assigned to you by your state.

**Box 7 — Choice of Party**
In some States, you must register with a party if you want to take part in that party's primary election, caucus, or convention. To find out if your State requires this, see item 7 in the instructions under your State.

If you want to register with a party, print in the box the full name of the party of your choice.

If you do not want to register with a party, write "no party" or leave the box blank. Do not write in the word "independent" if you mean "no party," because this might be confused with the name of a political party in your State.
*Note:* If you do not register with a party, you can still vote in general elections and nonpartisan (nonparty) primary elections.

**Box 8 — Race or Ethnic Group**
A few States ask for your race or ethnic group, in order to administer the Federal Voting Rights Act. To find out if your State asks for this information, see item 8 in the instructions under your State. If so, put in Box 8 the choice that best describes you from the list below:
- American Indian *or* Alaskan Native
- Asian or Pacific Islander
- Black, *not* of Hispanic Origin
- Hispanic
- Multi-racial
- White, *not* of Hispanic Origin
- Other

**Box 9 — Signature**
Review the information in item 9 in the instructions under your State. Before you sign or make your mark, make sure that:

(1) You meet your State's requirements, and
(2) You understand **all** of Box 9.

Finally, sign your **full** name or make your mark, and print today's date in this order — Month, Day, Year. If the applicant is unable to sign, put in **Box D** the name, address, and telephone number (optional) of the person who helped the applicant.

# Voter Registration Application

**Before completing this form, review the General, Application, and State specific instructions.**

Are you a citizen of the United States of America? ☐ Yes ☐ No
Will you be 18 years old on or before election day? ☐ Yes ☐ No
**If you checked "No" in response to either of these questions, do not complete form.**
(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.)

This space for office use only.

**1** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

**2** Home Address | Apt. or Lot # | City/Town | State | Zip Code

**3** Address Where You Get Your Mail If Different From Above | City/Town | State | Zip Code

**4** Date of Birth ___ Month ___ Day ___ Year
**5** Telephone Number (optional)
**6** ID Number – (See item 6 in the instructions for your state)

**7** Choice of Party (see item 7 in the instructions for your State)
**8** Race or Ethnic Group (see item 8 in the instructions for your State)

**9** I have reviewed my state's instructions and I swear/affirm that:
- I am a United States citizen
- I meet the eligibility requirements of my state and subscribe to any oath required.
- The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States.

Please sign full name (or put mark) ▲

Date: ___ Month ___ Day ___ Year

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## *Please fill out the sections below if they apply to you.*

If this application is for a **change of name**, what was your name before you changed it?

**A** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

If you were **registered before but this is the first time you are registering from the address in Box 2**, what was your address where you were registered before?

**B** Street (or route and box number) | Apt. or Lot # | City/Town/County | State | Zip Code

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

**C**
- Write in the names of the crossroads (or streets) nearest to where you live.
- Draw an X to show where you live.
- Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.

NORTH ↑

Example
Route #2
● Grocery Store
Woodchuck Road
Public School ● | X

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

**D**

## Mail this application to the address provided for your State.

# State Instructions

## Georgia

**Updated: 08-15-2013**

**Registration Deadline —** The fifth Monday before any general primary, general election, or presidential preference primary, or regularly scheduled special election pursuant to the Georgia Election Code. In the event that a special election is scheduled on a date other that those dates prescribed by the Georgia Election Code, registration would close on the 5th day after the call.

**6. ID Number.** Federal law requires you to provide your full GA Drivers License number or GA State issued ID number. If you do not have a GA Drivers License or GA ID you must provide the last 4 digits of your Social Security number. Providing your full Social Security number is optional. Your Social Security number will be kept confidential and may be used for comparison with other state agency databases for voter registration identification purposes. If you do not possess a GA Drivers License or Social Security number, a unique identifier will be provided for you.

**7. Choice of Party.** You do not have to register with a party to take part in that party's primary, caucus or convention.

**8. Race or Ethnic Group.** You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).

**9. Signature.** To register in Georgia you must:
• be a citizen of the United States
• be a legal resident of Georgia and of the county in which you want to vote

• be 18 years old within six months after the day of registration, and be 18 years old to vote
• not be serving a sentence for having been convicted of a felony
• not have been judicially determined to be mentally incompetent, unless the disability has been removed

**Mailing address:**
Elections Division
Office of the Secretary of State
2 Martin Luther King Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334

## Hawaii

**Updated: 06-18-2018**

**Registration Deadline —** 30 days before the election.

**6. ID Number.** When you register to vote, you must provide your Hawaii driver's license or State identification number, if you have one. If you do not have a driver's license or ID number, you must provide the last four digits of your Social Security Number (SSN). If you do not have any of this information, the Clerk's Office will issue you a unique identification number, which will serve to identify you for voter registration purposes.

**7. Choice of Party.** A "choice of party" is not required for voter registration.

**8. Race or Ethnic Group.** Race or ethnic group information is not required for voter registration.

**9. Signature.** To register in Hawaii you must:
• be a citizen of the United States
• be a resident of the State of Hawaii

• be at least 16 years old (you must be 18 years old by election day in order to vote)
• not be incarcerated for a felony conviction
• not be adjudicated by a court as "non compos mentis"

**Mailing address:**
Office of Elections
State of Hawaii
802 Lehua Avenue
Pearl City, HI 96782

## Idaho

**Updated: 03-01-2006**

**Registration Deadline —** 25 days before the election.

**6. ID Number.** Enter your driver's license number. If you have no driver's license, enter the last 4 digits of your social security number.

**7. Choice of Party.** You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Idaho you must:
• be a citizen of the United States
• have resided in Idaho and in the county for 30 days prior to the day of election
• be at least 18 years old
• not have been convicted of a felony, and without having been restored to the rights of citizenship, or confined in prison on conviction of a criminal offense

**Mailing address:**
Secretary of State
P.O. Box 83720
State Capitol Bldg.
Boise, ID 83720-0080

# State Instructions

## Illinois

**Updated: 08-14-2012**

**Registration Deadline —** 28 days prior to each election.

**6. ID Number.** Your driver's license number is required to register to vote. If you do not have a driver's license, at least the last four digits of your social security number are required. If you have neither, please write "NONE" on the form. A unique identifier will be assigned to you by the State.

**7. Choice of Party.** Party registration or preference is not required for voter registration. However, when you apply for a primary ballot, you must indicate your party preference for that election.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** A signature is required. If signature is missing from registration form, you will be notified your registration is incomplete.

To register in Illinois you must:
• be a citizen of the United States
• be a resident of Illinois and of your election precinct at least 30 days before the next election
• be at least 18 years old on or before the next election
• not be in jail for a felony conviction
• not claim the right to vote anywhere else

**Mailing address:**
> State Board of Elections
> 2329 S. MacArthur Boulevard
> Springfield, IL 62704

## Indiana

**Updated: 03-01-2006**

**Registration Deadline —** 29 days before the election.

**6. ID Number.** Your state voter ID number is your ten digit Indiana issued driver's license number. If you do not possess an Indiana driver's license then provide the last four digits of your social security number. Please indicate which number was provided. (Indiana Code 3-7-13-13)

**7. Choice of Party.** Leave blank.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Indiana you must:
• be a citizen of the United States
• have resided in the precinct at least 30 days before the next election
• be at least 18 years of age on the day of the next general election
• not currently be in jail for a criminal conviction

**Mailing address:**
> Election Division
> Office of the Secretary of State
> 302 West Washington Street, Room E-204
> Indianapolis, IN 46204-2743

## Iowa

**Updated: 03-28-2008**

**Registration Deadline —** Must be delivered by 5 p.m. 10 days before the election, if it is a state primary or general election; 11 days before all others.* Registration forms which are postmarked 15 or more days before an election are considered on time even if received after the deadline.

*If you fail to meet the voter registration deadlines above you can register and vote by following the guidelines for election day registration. You can find these on the Iowa Secretary of State's website: www.sos.state.ia.us/pdfs/elections/EDRbrochure.pdf.

**6. ID Number.** Your ID number is your Iowa driver's license number (or Iowa non-driver identification number) if you have one, if not then the last four digits of your social security number. The ID number you provide will be verified with the Iowa Department of Transportation or the Social Security Administration.

**7. Choice of Party.** You may, but do not have to, register with a party in advance if you want to take part in that party's primary election. You may change or declare a party affiliation at the polls on primary election day.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Iowa you must:
• be a citizen of the United States
• be a resident of Iowa
• be at least 17-1/2 years old (you must be 18 to vote)
• not have been convicted of a felony (or have had your rights restored)
• not currently be judged by a court to be "incompetent to vote"
• not claim the right to vote in more than one place
• give up your right to vote in any other place

**Mailing address:**
> Elections Division
> Office of the Secretary of State
> Lucas Building-1st Floor
> 321 E. 12th Street
> Des Moines, IA 50319

# ATTACHMENT K

# HISTORY OF THE BOARD

- Created in 1973 for the purpose of conducting elections and voter registration

- Prior to 1973, elections were conducted by the Probate Court and voter registration was conducted in the Voter Registrar's Office.

- The first office in local government to be consolidated with voter registration records for Richmond County and the City of Augusta being consolidated in 1947.

- First Executive Director appointed in 1973.  Linda Beazley served as Director from 1973 until 1993.

- Current Executive Director is Lynn Bailey who was appointed in 1993.

# CONTACT INFORMATION

- Board of Elections Office
  535 Telfair St., Suite 500
  Augusta, GA  30901

- Phone:  (706) 821-2340

- Fax:  (706) 821-2814

- Web:  www.augustaga.gov

# MEETING INFORMATION

- The Board of Elections conducts its Regular Monthly Meeting the 2nd Monday of each month at 6:00 PM.  The location varies.  Contact the Office for more information.

- The meetings are open to the public.

# AUGUSTA-RICHMOND COUNTY, GEORGIA



# Ensuring That Every Eligible Voter's Ballot Is Accurately Counted

# WHAT IS THE BOARD OF ELECTIONS?

- The Board of Elections was created in 1973 for the purpose of performing all duties relating to elections and voter registration.

- The Board is made up of five voting members.

- Two of the Board Members are appointed by the local Democratic Party.

- Two of the Board Members are appointed by the local Republican Party.

- The Chair is a nonpartisan individual appointed by the Augusta Commission from a list of three names submitted to them by the local Legislative Delegation.

# MEMBERS OF THE BOARD

- Timothy McFalls, Chair
  Nonpartisan
  Appointed February 2016
  Term Exp. March 31, 2017

- Terence Dicks, Vice Chair
  Democratic Appointee
  Appointed April 1, 2015
  Term Exp. March 31, 2019

- Bob Finnegan, Secretary
  Republican Appointee
  Appointed April 1, 2017
  Term Exp. March 31, 2021

- Sherry T. Barnes
  Republican Appointee
  Appointed April 1, 2015
  Term Exp. March 31, 2019

- L. C. Myles
  Democratic Appointee
  Appointed April 1, 2013
  Term Exp. March 31, 2017

# DUTIES OF THE BOARD

- To conduct all elections in accordance with State law and in such manner as to guarantee the secrecy of the ballot.

- To make and issue rules, regulations, and instructions, consistent with law as deemed necessary for the guidance of poll officers and voter registration officers.

- To provide oversight in the appointment of poll officers

- To select and equip polling places and to provide for the security of all voting equipment.

- To provide oversight in the development of the Board of Elections annual budget.

- To manage and, if necessary, to hire and fire the Executive Director.

Revised March 2018

APPENDIX A:  Curriculum Vitae for Khalilah L. Brown-Dean

## ACADEMIC EMPLOYMENT

*Quinnipiac University*
    Associate Professor of Political Science, 2011-Present

*Yale University*
    Peter Strauss Family Assistant Professor of Political Science and African American Studies (2006-2011)

    Director of Undergraduate Studies for the Department of African American Studies (2009-2010)

    Assistant Professor of Political Science and African American Studies (2003-2006)

## EDUCATION

2003 The Ohio State University, Ph.D., Political Science (American Politics and Political Psychology) Dissertation: "One Lens, Multiple Views: Felon Disenfranchisement Laws and American Political Inequality" *APSA Race, Ethnicity, and Politics Section Best Dissertation Award (2005)*

2001 The Ohio State University, M.A., Political Science

1998 The University of Virginia, B.A., Government

## ADDITIONAL EDUCATION AND TRAINING

2017 Tufts University Metric Geometry and Gerrymandering Summer Program
2017 Tufts University Gerrymandering Expert Witness Training
1999 Summer Institute in Political Psychology, Certificate, Political Psychology

## SCHOLARSHIP AND RESEARCH PUBLICATIONS

### *Books*

    Brown-Dean, Khalilah L. September 2019. *Identity Politics in the United States.* London: Polity Press. ISBN: 9780745654119

    Duffy, Sean, Timothy Dansdill, Jill Shahverdian, Aileen Dever, Khalilah L. Brown-Dean, and Julia Giblin, eds., 2014. *The Individual in the Community.* Pearson. 8th Edition.

## *Refereed Articles*

Brown-Dean, Khalilah L. and Benjamin E. Jones. 2015. "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." *Politics, Groups, and Identities.*

Alexander-Floyd, Nikol C., Byron D'Andra Orey, and Khalilah L. Brown-Dean. 2015. "Professional Conferences and the Challenges of Studying Black Politics." *PS: Political Science and Politics.*

Brown-Dean, Khalilah L. 2015. "Emphasizing the Scholar in Public Scholarship." *PS: Political Science and Politics.*

Wilson, David C. and Khalilah L. Brown-Dean. 2012. "Great[er] Expectations: Group Interests, Deracialization, and Candidate Evaluations." *National Political Science Review.*

Brown-Dean, Khalilah. L. 2009. "Do Classes Matter?: Evaluating the Impact of College Courses on Tolerance." *Journal of the Institution for Social and Policy Studies.*

Brown-Dean, Khalilah L. 2007. "Permanent Outsiders: Felon Disenfranchisement and the Breakdown of Black Politics." *National Political Science Review.*

Brown-Dean, Khalilah L. 2005. "Trading *Brown* for Prison Orange: Reflections on Race and Justice Fifty Years after *Brown v. Board.*" *Journal of the Institution for Social and Policy Studies.*

## *Book Chapters*

Brown-Dean, Khalilah L. *Forthcoming.* "Monumental Promises, Incremental Gains: Criminal Justice Reform in the Obama Era." In *After Obama: African American Politics in a Post-Obama Era.* Edited by Todd C. Shaw, Robert Brown, and Joseph McCormick III. New York, NY: NYU Press.

Brown-Dean, Khalilah L. 2016. "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation." In *Urban Citizenship and American Democracy.* Edited by Amy Bridges and Michael Javin Fortner. Albany, NY: SUNY Press.

Brown-Dean, Khalilah L. 2015. "Felon Disenfranchisement Ten Years After *Bush v. Gore.*" In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore.* Co-Edited by Michael Alvarez and Bernard Grofman. Cambridge: Cambridge University Press.

## *Policy Papers and Other Publications*

Brown-Dean, Khalilah L. and Don C. Sawyer, III. 2019. "The State of Education in Urban Connecticut." In *The State of Urban Connecticut,* edited by Robert Brown, III. New Haven, CT: The Urban League of Southern Connecticut.

Brown-Dean, Khalilah L. 2018. "Fighting From a Powerless Space: Black Women and the Criminal Justice System." In *State of Black Women in the U.S. and Key States,* edited by Avis A. Jones-DeWeever. Washington, DC: National Coalition on Black Civic Participation.

Brown-Dean, Khalilah L. 2017. Book Review of *Sisters in the Statehouse* by Nadia Brown. *Journal of Race, Ethnicity, and Politics.*

Brown-Dean, Khalilah L., Zoltan Hajnal, Christina Rivers, and Ismail White. 2015. "Fifty Years of the Voting Rights Act: The State of Race in Politics." *Joint Center for Political and Economic Studies.*

Brown-Dean, Khalilah L. November 2013. "In the Final Analysis: On Nick Nelson's Contributions to the Study of Black Politics." *Politics, Groups, and Identities.*

Brown-Dean, Khalilah L. 2012. Cited in the Connecticut State Judiciary Committee's Favorable Report for SB-280: An Act Revising Penalties for Capital Felonies. https://www.cga.ct.gov/2012/JFR/S/2012SB-00280-R00JUD-JFR.htm

Brown-Dean, Khalilah L. 2010. Book Review of *The Perils of Federalism: Race, Poverty, and the Politics of Crime Control* by Lisa L. Miller. *Political Science Quarterly.*

Brown-Dean, Khalilah L. et al. 2008. "Lift Every Voice: Democracy, Voting Rights, and Electoral Reform." Published in conjunction with the Advisory Committee on Social Witness Policy (ACSWP) and the Advocacy Committee for Racial Ethnic Concerns (ACREC).

## WORKS IN PROGRESS

Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context (journal manuscript with David C. Wilson and TaLisa Carter)

Centering Victims' Voices in Criminal Justice Reform Movements (book manuscript)

Negotiating Voting Rights Policy in the Post-*Shelby* Era (journal manuscript)

Inmate Labor and Post-Disaster Recovery (journal manuscript with Randolph Burnside)

## ACADEMIC AWARDS, GRANTS, AND FELLOWSHIPS

2018, 2017, 2016 Quinnipiac University Provost's Innovation Grants ($15,000)

2018-2012 Quinnipiac University College of Arts and Sciences Faculty Research Grants ($30,000)

2017 Top 25 Women Making a Difference in Higher Education Award, Presented by *Diverse: Issues in Higher Education*

2014 National Conference of Black Political Scientists Julia R. Hight Summer Writing Fellowship

2010 National Conference of Black Political Scientists Rodney Higgins Award for Best Faculty Paper

2009-2011 The Open Society Foundations Justice Advocacy Senior Fellowship ($200,000)

2008-2010 Ford Foundation Difficult Dialogues Initiative ($200,000)

2005 American Political Science Association Best Dissertation Award (Race, Ethnicity, and Politics Section)

2005 Yale Center for International and Area Studies ($10,000)

2005 Social Science Research Fund ($5,000)

2005 Yale University Center for the Study of American Politics ($50,000)

2005 The College Board/AP Scholars Program Fellow ($7,000)

## AWARDS FOR PUBLIC SCHOLARSHIP AND SERVICE

2017 Game Changer Award in Public Safety and Criminal Justice, Presented by the Connecticut NAACP State Conference Youth and College Division

2017 Education Award, Presented by the Delta Iota Sigma Chapter of Phi Beta Sigma Fraternity, Incorporated

2016 Fannie Lou Hamer Award for Outstanding Community Service, Presented by the National Conference of Black Political Scientists

2015 Outstanding Community Leadership Award, Presented by the Connecticut State Martin Luther King, Jr. Commission

2014 Legacy Award, Presented by the National Association of Blacks in Law Enforcement

Walt Everitt Humanitarian Award, Presented by the Connecticut Network to Abolish the Death Penalty

Forty Under Forty Award, Presented by *Connecticut Magazine*

2007 Wilma Holmes Tootle Education Advancement Award, Presented by the North Atlantic Region of Alpha Kappa Alpha Sorority, Incorporated

## PRIOR AWARDS AND ACHIEVEMENTS

2002 National Conference of Black Political Scientists Sammy R. Young Best Student Conference Paper Award

2002 The Ohio State University Alumni Grant for Graduate Research and Scholarship ($2,000)

2002 The Ohio State University Madison F. Scott Research Grant ($2,000)

2001 The Ohio State University Madison F. Scott Research Grant ($1,500)

2000 The American Political Science Association Advanced Graduate Student Travel Grant ($500)

2000 Carl Albert Center for Congressional Research Stipend ($500)

2000 The Ohio State University Program for the Enhancement of Graduate Studies Summer Research Fellowship ($4,000)

1999 The Ohio State University Madison F. Scott Research Grant ($1,500)

1998 The Ohio State University Graduate Enrichment Fellowship ($30,000)

1997 American Political Science Association Ralph Bunche Summer Institute Fellow

## RESEARCH AND TEACHING INTERESTS

Civic Engagement; Racial and Ethnic Politics; Urban Politics and Policy; Voting Rights and Representation; The Politics of Punishment and Crime Control Policy; Mass Political Behavior; Political Psychology; Public Policy and Leadership

## PUBLIC SCHOLARSHIP

**2019**
    Brown-Dean, Khalilah L. "Why Victims of Crime Deserve a Voice." *The Hill*
    Brown-Dean, Khalilah L. "Yes Virginia, There is a Choice." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Defining Political Progress." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "On the Meaning of Survival." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "First STEP or First Stumble?" *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Myth of Meritocracy." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Fallacy of NOT Seeing Race." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Dr. King Deserves More." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Sorority Life as an Act of Resistance." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Teaching Through Trauma." *Diverse: Issues in Higher Education*

**2018**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."

Brown-Dean, Khalilah L. "Civics 101 Podcast: The Fifteenth Amendment." New Hampshire Public Radio

Brown-Dean, Khalilah L. "Giving Thanks Amid Political Uncertainty." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "On Citizenship and Voting." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Hate We Give: Voting Against Violence." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "Still Separate, Still Unequal: American Indians and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Feminism, Womanism, and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Stakes is High." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Aretha Franklin, John McCain, and the Meaning of Legacy." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Opposite of Progress." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "As American as Apple Pie." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "For Colored Folks Who Have Considered Suicide." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Why We Celebrate." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Mothering Behind Bars." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Bill Cosby Isn't a Victim." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "It's Time to Secure the Vote." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "From Pain to Power." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Reclaiming the 'Fierce Urgency of Now'." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Politics of Mental Health." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Not Yet Just, Not Yet Free." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Five Things More Effective Than Political Panic." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Honoring Black History Month, In Prison." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "In Defense of Youth Organizing." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Art as Political Resistance." *Diverse: Issues in Higher Education*

**2016**

Brown-Dean, Khalilah L. "Can She Do It? Women in Politics Remain Dogged By Gender Stereotypes." *New York Daily News.*

Brown-Dean, Khalilah L. "Justice Trump'd? The Path Toward Criminal Justice Reform Post-Obama." WEAA Radio.

**2015**

Brown-Dean, Khalilah L. "Leaving Victims Behind is Unjust." *New Haven Register.*

**2014**

Brown-Dean, Khalilah L. "Saying Farewell to Maya Angelou." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Who Fights For Black Girls?" *Ebony Magazine.*

**2013**

Brown-Dean, Khalilah L. Documentary Feature: "The Color of Justice."

Brown-Dean, Khalilah L. "Kids and Families: The REAL Victims of the GOP Shutdown." *Ebony Magazine*.

Brown-Dean, Khalilah L. "Primary Offers Opportunity to Move New Haven Forward." *New Haven Register*.

Brown-Dean, Khalilah L. "An End to the War on Weed?: Not Likely." *Ebony Magazine*.

Brown-Dean, Khalilah L. "What Do the Supreme Court's Decisions Mean For Blacks?" *Ebony Magazine*.

**2012**

Akinwole-Bandele, Lumumba and Khalilah L. Brown-Dean. "A Call to Community: Why We Cannot Wait for the Next Troy Davis." *Ebony Magazine*.

Brown-Dean, Khalilah L. "Beyond Barack Obama: Is America Ready For a New Political Party?" *Dominion of New York Magazine*.

**2011**

Brown-Dean, Khalilah L. "Are HBCU's Still Relevant?" *Uptown Magazine*.

Brown-Dean, Khalilah L. "If Black Men Live Longer in Prison It's Time For Change." *TheGrio*.

# INVITED TALKS AND PRESENTATIONS

"The 400th Anniversary of Jamestown and the Arrival of Enslaved Africans in Virginia." American Political Science Association Annual Meeting. Washington, DC. August 2019.

"The Future of American Democracy." Quinnipiac University Presidential Inauguration. May 2019.

"A New Vision of Criminal Justice Reform." Quinnipiac University Admissions Preview. March 2019.

"Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context." David C. Wilson, TaLisa Carter, and Khalilah L. Brown-Dean. National Conference of Black Political Scientists Annual Meeting. Baton Rouge, Louisiana. March 2019.

"Fighting from a Powerless Space: Women of Color in the Criminal Justice System." Feminism and Incarceration Conference. University of North Carolina-Greensboro. February 2019.

"The Continuing Struggle for Voting Rights in the United States." Wiggin & Dana Law Firm. February 2019.

"Not Yet Just, Not Yet Free: Black Women, Political Freedom, and the 2018 Midterm Elections." Connecticut College. October 2018.

"A Letter to the Free: Reimagining Justice and Democracy in the Trump Era." University of Bridgeport Necessary Voices Lecture Series. February 2018.

"Freedom in the Era of Reform." Cheshire (CT) Correctional Institute. February 2018.

"On the Meaning of Justice and Reform." College of William and Mary. February 2018.

"A Conversation on Justice and Freedom." University of Connecticut School of Social Work. February 2018.

"Redefining Civil Rights Post-Obama." NAACP Albuquerque Civil Rights and Diversity Conference. September 2017.

"The Legacy of the 15th Amendment Post-*Shelby.*" Duke University's Samuel DuBois Cook Center Research Symposium on the Social and Economic Outcomes of the 13th, 14th, and 15th Amendments. March 2017.

"Race, Representation, and Disenfranchisement: As American As Apple Pie." Pace University. March 2017.

"The Public Spectacle: Exploring Anger and Political Transformations." William Paterson University. October 2016.

"The State of Race and Policing in America." Texas A&M University Bush School for Public Service. September 2016.

"Contemporary Challenges to Voting Rights in the United States." University of Connecticut. March 2016.

"The Black Predicament and the 2016 Elections." National Conference of Black Political Scientists. Jackson, Mississippi. March 2016.

"Beyond Ferguson: Reimagining Race and Social Justice in the United States." Walker-Horizon Lecture. Depauw University. February 2016.

"Counter-Emancipation and the Voting Rights Act of 1965." University of Illinois-Springfield. June 2015.

"Fifty Years of the Voting Rights Act: The State of Race in American Politics." Selma Public Library for the 50th Anniversary Celebration of the Bloody Sunday March. March 2015.

"Why We Cannot Wait: Reclaiming the Fierce Urgency of Now." Claflin College. February 2015.

"Lessons From the Past, Prospects For the Future: Voting Rights Post *Shelby v. Holder.*" US Attorney's Office. February 2015.

"Beyond Ferguson: Understanding the Nexus of Incarceration and Disenfranchisement." Connecticut Court Support Services. February 2015.

"The Mass Incarceration of Women of Color." Harvard University. March 2014.

 "45 Years: A Retrospective on NCOBPS and the Work of William E. Nelson, Jr." Presented at the National Conference of Black Political Scientists Annual Meeting. Wilmington, Delaware. March 2014.

"The Role of Community Mobilization Within Social Justice Movements." U.S. Human Rights Network. December 2013.

"From Painful to Powerful: How Crime Victims Persuaded Legislators to Reform the Death Penalty in Connecticut and Maryland." Presented at the American Political Science Association Annual Meeting, Chicago, Illinois. August 2013.

"Public Scholarship vs. Public Intellectualism." Women of Color in Political Science Mini-Conference, American Political Science Association. Chicago, Illinois. August 2013.

"How the Affected and Underrepresented Are Ending the Death Penalty." Yale University Law School Rebellious Lawyering Conference. New Haven, Connecticut. February 2013.

"Building Authentic Power: An Examination of Connecticut's Death Penalty Repeal Campaign." Presented at the Southern Political Science Association Annual Meeting. Orlando, Florida. January 2013.

 "The Relationship Between Perceptions of Justice and Grassroots Mobilization." Maryland State Conference of NAACP Branches. October 2012.

"Beyond Troy Davis: Understanding the Death Penalty Abolition Movement in the United States." William Paterson University. September 2012.

"A Tale of Two States: Death Penalty Reform in Connecticut and Maryland." Soros Institute/Open Society Foundations. July 2012.

"From Pain to Power: A New Model of Social Justice Organizing." National Conference on Race and Education in Higher Education. May 2012.

"Redefining Citizenship in a 'Post Racial' America." Carter G. Woodson Lecture Series. Central Connecticut State University. New Britain, CT February 2012.

"Race and Domestic Policy." George Mason University School of Public Policy. October 2011.

"Three-Fifths Revisited: The Census and Inmate Enumeration." Presented at the Drexel Summer Conference on the City. June 2011.

"Concentrating Punishment." Presented at the Princeton University Imprisonment of a Race Conference. March 2011.

"From Exclusion to Inclusion: Promoting Civic Engagement When Times are Always Hard." Paper presented at the American Political Science Association Annual Meeting, Washington, DC. September 2010.

"Greater Expectations: Perceptions of Racial Group Interests and Candidate Evaluations." (with David C. Wilson). Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, IL. April 2010.

"The Future of Post-Racial Politics." Presented at the "From Slavery to Freedom to the White House: Race in Twenty-First Century America, A Conference in Honor of John Hope Franklin." Sponsored by the Duke University School of Law. April 2010.

"Race, Representation, and Punitive Politics." Presented at "The Challenge of Racial Inequality in a Post-Racial World: Race, Rights, and Public Policy in the Age of Obama." Sponsored by Rutgers and Princeton Universities. March 2010.

"Identity Politics in the Age of Obama." 15th Annual Multicultural Lecture Series. University of Rhode Island. February 2010.

"Identity Politics in the Age of Obama." University of Rochester Two Icons Lecture Series. February 2009.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Presented at the UCLA Center for the Study of Race and Ethnicity in the Americas. February 2008.

"Reforming the State: Assessing Recent Changes in State Felon Disenfranchisement Laws." Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada. September 2009.

"Race, Crime, and Political Inequality." Presented to The University of North Carolina, Chapel Hill American Politics Research Group. November 2007.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois. September 2007.

"Once Convicted, Forever Doomed: The Politics of Punishment in the United States." The University of Michigan Distinguished Speakers Series. September 2007.

"Contemporary Challenges to the Voting Rights Act." Presented for the National Presbyterian Church Voting Rights and Electoral Reform Committee. Washington, DC April 2007.

"Once Convicted, Forever Doomed: Understanding the Political Consequences of Mass Incarceration." University of Kentucky. March 2007.

"Inmate Enumeration and Political Representation: *Reynolds v. Sims* Revisited." University of Kentucky Law School. March 2007.

"Race, Religion, and Attitudes Toward Criminal Justice Policy." The University of Texas Conference on Race, Religion, and Politics. March 2007.

"Race and the Politics of Punishment in the United States." Presented at Oxford University, Nuffield College. Oxford, England February 2007.

"Voting Rights Policy in the Post-Civil Rights Era." The Ohio State University Law and Democracy Forum. February 2007.

"African American Communities and the Politics of Incarceration." Presented to the Black Solidarity Conference, Yale University. New Haven, CT October 2006.

"Fighting from a Powerless Space: The Impact of Criminal Justice Policy on Women of Color." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2006.

"The Politics of Incarceration." African American Research Collaborative. Philadelphia, PA. August 2006.

"Is the Voting Rights Act Still Relevant?" Morning at Yale Program sponsored by the Association of Yale Alumni. May 2006.

"Inmate Enumeration and the Return of the Three-Fifths Clause." Paper presented at the National Conference of Black Political Scientists Annual Meeting, Atlanta, GA. March 2006.

"New Considerations in Redistricting and Minority Representation." Presented at the "Who Draws the Lines?: The Politics of Redistricting Conference." University of North Carolina at Chapel Hill School of Law. Chapel Hill, NC February 2006.

"The Race, Education, and Incarceration Nexus." Twentieth Century American Politics and Society Workshop. Columbia University. November 2005.

"Contemporary Challenges to the Voting Rights Act of 1965." Presented at Virginia State University. September 2005.

"Race, Crime, and American Political Inequality." Presented at Oxford University, Pembroke College. Oxford, England. March 2005.

"Trading Brown for Prison Orange: The Link Between Race, Education, and Incarceration." Reflections: 50 Years after *Brown v. Board* Symposium. Central Connecticut State University. New Britain, CT. September 2004.

"Racial Disparities in Sentencing." Panel sponsored by the Greater New Haven NAACP. "Narrowing the Gap: Reducing Access Inequality for (Ex)Felons." Crime, Inequality, and Justice Symposium, The Ohio Criminal Justice Research Center. Columbus, OH. August 2004.

"Stolen Democracy: The Consequences of Felon Disenfranchisement Laws for Black and Latino Communities." Florida State of Black Studies Conference, Miami, FL. April 2004.

"Women of Color and the American Prison System," with J. Perez-Monforti. Paper presented at the Western Political Science Association Annual Meeting, Portland, OR. March 2004.

"The Impact of Elite Framing on Public Attitudes Toward Disenfranchisement." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Paper presented at the Midwest Political Science Association Conference, Chicago, Illinois. April 2003.

"Racial Profiling or Racist Profiling?: Perception and Opinion on the Profiling of Arabs and Blacks," with Thomas E. Nelson, Ray Block, Jr. and Javonne A. Paul. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts. September 2002.

"Ignorance or Intolerance?: An Analysis of Public Attitudes Toward Felon Disenfranchisement Laws." Paper presented at the Edward F. Hayes Graduate Research Forum, Columbus, Ohio. February 2002.

"One Lens, Different Views: An Examination of Public Opinion on Felon Disenfranchisement Laws." Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002. **Recipient of the Sammy R. Young Best Conference Paper Award**.

"The Effects of Crisis-Related Imagery on Public Opinion about Racial Profiling," with Ray Block, Jr. and Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002.

"Heritage or Hate?: An Analysis of Public Attitudes Toward the Confederate Flag," with B. D"Andra Orey. Paper presented at the Southern Political Science Association, Atlanta, Georgia. January 2001.

"Shades of Discontent: Minority Group Competition and Attitudes Toward the Elian Gonzalez Issue," with J. Perez-Monforti. Paper presented at the National Conference of Black Political Scientists, Richmond, Virginia. **Nominated for the Sammy R. Young Best Conference Paper Award**. March 2001.

"Toeing the Party Line, Toeing the Color Line: African American Women in Congress and the Impeachment Process." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 2000.

"Stolen Democracy: Felony Disenfranchisement Laws and the Future of Black America," with Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Washington, D.C. *Recipient of the Francis Aumann Award for the Best Graduate Student Conference Paper*. March 2000.

"African American Female Legislators and the Clinton Impeachment Process." Women Transforming Congress: Gender Analyses of Institutional Life Conference, Carl Albert Center for Congressional Research. April 2000.

"The Influence of Politically Active Black Churches on Community Activism among African Americans." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 1997.

## KEYNOTE ADDRESSES AND PANEL DISCUSSIONS

"Not Yet Just, Not Yet Free: Women and Social Justice." Keynoted address presented to Southern Connecticut State University Women's Conference. May 2019.

"The Future of Voting Rights in the United States." Keynote address presented to the Sphex Club of Virginia. May 2019.

"The State of Justice Reform." Whitneyville United Church of Christ Social Justice Symposium. May 2019.

"The State of Urban Connecticut." Urban League of Southern Connecticut and Quinnipiac University. April 2019.

"School/Gun Violence: An Interdisciplinary Concern." Quinnipiac University School of Education. April 2018.

"A New Vision of Freedom and Democracy." Keynote Address presented to the Farmington Valley Links, Incorporated. Mark Twain House. February 2018.

"To Build the Beloved Community in the Face of Chaos." Annual Martin Luther King, Jr. Breakfast Keynote Address. Lynchburg, VA. January 2018.

"Women Leading Change: Promoting and Sustaining Women in Leadership Roles." Southern Connecticut State University Sustainability Initiative. November 2017.

"Gender, Voting, and the Voting Rights Act." Community Foundation for Greater New Haven. October 2017.

"We Who Believe in Freedom." Keynote Address presented to the Connecticut Department of Children and Families Region 6 Foster Youth Celebration. May 2017.

"Community Conversation on the Thirteenth Documentary." Greater New Haven Branch of the NAACP. April 2017.

"Women, Media, and the Gender Lens." University of New Haven Women's Leadership Conference. April 2017.

"A Day After the Election…Now What?" Quinnipiac University. November 2016.

"Bridging the Past and the Future: 30 years of the Ralph Bunche Summer Institute and the Intellectual Legacy of Dr. Ralph Bunche." American Political Science Association. October 2016.

"Chaos or Community?" Southern New England Community Action Conference. September 2016.

"A Community Conversation on Race in America." With Congressman Jim Himes. July 2016.

"Reflections on Voting Rights in the U.S." With Congressman Jim Himes. April 2016.

"To Whom Much is Given." National Association of Negro Business Women and Professionals Club. New Haven, CT. March 2016.

"Reclaiming the Fierce Urgency of Now." Frontiers International Keynote Address. Springfield, Illinois. January 2016.

"One Person, One Vote: Voting Rights 50 Years Later." Harriett Beecher Stowe Center. November 2015.

"A Call to Leadership." Keynote Address for the North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated's Undergraduate Luncheon. April 2012.

"Taking the L.E.A.D.: Social Media and Contemporary Youth Movements." Keynote Address for the C.H.A.P. Youth Leadership Conference. March 2012.

"Post-Racial or Post-Racism? New Directions in the Quest for Equality." Presented to the United States Department of Agriculture. February 2011.

"Fractured Citizenship and the Politics of Punishment." Presented to inmates at the Cheshire State Correctional Institution. Sponsored by Wesleyan University Center for Prison Education. May 2010.

"Managing the Politics of Diversity." Keynote Address for the Virginia Community Dialogue on Race and Racism. January 2008.

Panelist, "The Politics of Hate." Yale University. New Haven, CT March 2008.

Panelist, "Strategies for Strengthening Your Voice in the Political Process." North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated. March 2008.

"The Political Impact of American Criminal Justice Policy." Presented at the *New York Times* Center New York, NY November 2008.

"Empowerment Through Education." Keynote Address presented for the Links, Incorporated Scholarship Luncheon. May 2006.

"To Whom Much is Given, Much is Required: The Need for Youth Leadership." Keynote Address presented to the Hyde Leadership Academy. February 2006.

"Lessons from the Past, Prospects for the Future: Reflections on the Voting Rights Act of 1965." Association of Yale Alumni. October 2005.

"Dismantling the Hierarchy of Oppression: The Common Political Fate of Black Women and Latinas." Co-Sponsored by the Xi Omicron Chapter of Alpha Kappa Alpha Sorority, Inc. and Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. April 2005.

"Lest We Forget." Keynote Address, African American Women's Summit. March 2005.

"Criminal Justice Expenditures and the Public Health Crisis." Frantz Fanon Lecture Series, Yale University School of Medicine. February 2005.

"The Spirit of Sankofa." Keynote Address, The New Haven Club. New Haven, CT. February 2005.

"On Heroism: Honoring the Legacy of Rosa Parks." Roundtable panelist, Afro-American Cultural Center at Yale. January 2005.

"For God and For Country: The Role of Religious Values in the 2004 Presidential Election." Yale University Election Post-Mortem. November 2004.

"The Politics of Power: Public Policy and Justice in the Black Community." Panel in honor of the 35th Anniversary of the Afro-American Cultural Center at Yale. October 2004.

 "Assessing the Limits of Democracy Via Felon Disenfranchisement Laws." Washington University Department of Political Science, St. Louis, Missouri; Wesleyan University, Middletown, Connecticut.

"Just Being Here Is Not Enough!: Recognizing Your Role in Community Development." Yale University Afro-American Cultural Center Student Achievement Dinner. May 2004.

International Festival of Art and Ideas. May 2004.

 "To Whom Much is Given: Communal Responsibility and the Challenges of Black Politics." Mental Pabulum Series, Yale University. February 2004.

"Power, Pride, and Patriotism: Reflections on the Political Significance of Veterans" Day." Holcomb Rock Baptist Church. November 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Invited presentations for Yale University, Texas A&M University, Emory University, Hunter College, and Indiana University-Indianapolis. 2002.

## OTHER CONFERENCE PARTICIPATION

Served as a Section Head, Panelist, Discussant, Chair, and Organizer for numerous panels at national conferences such as the American Political Science Association, National Conference of Black Political Scientists, Southern Political Science Conference, and Midwest Political Science Conference.

## TEACHING EXPERIENCE

Designing Political Inquiry (Undergraduate Lecture/Seminar); Senior Thesis in American Politics (Undergraduate Seminar); American Political Movements (Undergraduate Lecture/Seminar); Introduction to American Politics (Undergraduate Lecture); The Politics of Intimacy (Undergraduate Seminar); The Politics of Community (Undergraduate Seminars); Race, Ethnicity, and Citizenship (Undergraduate Seminar); Ethnic Politics in the United States (Undergraduate Lecture); Voting Rights and Representation (Undergraduate Seminar); The Individual and the Community (Undergraduate Seminar); Power, Politics, and Punishment (Graduate/Undergraduate Seminar); Public Opinion (Graduate Seminar); Race and Ethnicity in American Politics (Graduate Seminar); Race and Ethnicity in American Politics (Undergraduate Seminar) African American Politics (Undergraduate Seminar); Black and Jewish Community Politics (Undergraduate Lecture/Seminar)

## FACULTY ADVISING AND SUPERVISION

Responsible for advising approximately 20 undergraduate students in the Quinnipiac University College of Arts and Sciences each semester

Previously advised health policy and advocacy scholars in the Netter School of Medicine
Dissertation Committee Member/Reader: Andra Gillespie (Emory University); Rachel Milstein
Sondheimer (United States Military Academy at West Point); Shatema Threadcraft (Rutgers University);
Joanna Mosser (Drake University)
Research Supervision: Sheree Bennett and Luke Thompson (Difficult Dialogues Graduate Research
Assistants); Kayla Vinson and Adrea Hernandez (Mellon Mays Undergraduate Fellows); Brandee Blocker
and Christopher Pagliarella (undergraduate research assistant)


## PROFESSIONAL MEMBERSHIP

American Political Science Association; International Society of Political Psychology; Midwest Political
Science Association; National Conference of Black Political Scientists; Pi Sigma Alpha National Political
Science Honor Fraternity; National Association for Ethnic Studies

## PROFESSIONAL SERVICE

Advisory Board, Ronald W. Walters Leadership and Public Policy Center (2019-)
Member, American Political Science Association Rules and Ethics Committee (2019-)
Chair, National Conference of Black Political Scientists Fannie Lou Hamer Outstanding Community
Service Awards Committee (2019-)
Advisory Board, *Issues in Race and Society* journal (2019-)
Executive Council Member, National Conference of Black Political Scientists (2016-2018)
Member, American Political Science Association Ralph Bunche Summer Institute Advisory Committee
(2016-)
Section Chair, Undergraduate Research Section of the National Conference of Black Political Scientists
(2017)
Board Member, Association for Ethnic Studies/National Association for Ethnic Studies (2015-Present)
Section Chair, Public Opinion and Political Participation Section of the National Conference of Black
Political Scientists Annual Meeting (2014-2015)
Parliamentarian, National Conference of Black Political Scientists (2014-2016)
Section Head, Race, Ethnicity, and Gender Section of the Southern Political Science Association
Conference (2012-2013)
Section Head, Race, Class, and Ethnicity Section of the Midwest Political Science Association
Conference (2011-2012)
Executive Council, Public Policy Section of the American Political Science Association (2010-2012).
Executive Council, Urban Politics Section of the American Political Science Association (2010-2012).
Executive Council, Race and Ethnic Politics Section of the American Political Science Association
(2009-2011).
Research Advisor, The National Presbyterian Church Voting Rights and Electoral Reform Committee
(2006-2009).
Selection Committee, The Southwest Political Science Association's Jewel L. Prestage Award for the
Best Paper on the Intersection of Race, Gender, Ethnicity, and Political Behavior (2006).
Selection Committee, Warren E. Miller Prize for an Outstanding Career and Intellectual
Accomplishment in the field of Elections, Public Opinion, and Voting Behavior (Elections, Public
Opinion, and Voting Behavior Section of the American Political Science Association) (2007).
Conference Director, "Lessons From the Past, Prospects for the Future: Honoring the Fortieth
Anniversary of the Voting Rights Act of 1965." Co-Sponsored by the Yale University Center for

American Politics and Institution for Social and Policy Studies (2004-2005).
Selection Committee, American Political Science Association Ralph Bunche Book Award (2004)
Secretary, Race and Ethnic Politics Section of the American Political Science Association (2003-2005).

**UNIVERSITY SERVICE**

Member, Quinnipiac University Strategic Plan Committee (2018)
Faculty Researcher, Urban League of Southern Connecticut and Quinnipiac University State of Urban
Connecticut Project (2016-)
Affiliated Faculty, The Prison Project at Quinnipiac University (2016-)
Co-Chair, College of Arts and Sciences Faculty Scholarships and Grants Committee (2015-2018)
Member, College Evaluation (Tenure and Promotion) Committee (2015-2018)
Co-Coordinator, Frank M. Netter School of Medicine Health Policy and Advocacy Concentration (2015-
2016)
Co-Leader, University Academic Seminar Series and Advisory Board (2013-2014)
Co-Organizer, Dilemmas of Justice Speakers Series (2013)
Exploratory Committee, African American Studies Minor/Civil Rights Institute (2013-2014)
Chair, College of Arts and Sciences Scholars Working Group (2013)

**REVIEWER**

National Science Foundation; *American Journal of Political Science; Journal of Race and Politics; Law and Social
Inquiry; The Journal of Conflict Resolution; Politics and Gender; Journal of Politics; Russell Sage; Political Research
Quarterly;* Yale University Press*; DuBois Review; Political Behavior; Urban Affairs Review; The Political Chronicle;*
Palgrave-McMillan; *SOULS Journal; DuBois Review; Politics, Groups, and Identities; Election Law Journal; Journal
of the Center for Policy Analysis and Research; Election Law Journal.*

**MEDIA COMMENTARY**

Over 400 media outlets including *New York Times; Washington Post;* Fox News Radio; Democracy Now;
American Urban Radio Network; WTNH; *The Forum; The Hill;* CNN; WURD; Minnesota Public Radio;
WHYY; WNPR; CPTV; *Ebony.com;* Google; NPR; WFSB TV; CBS Radio; AP News; *Wall Street Journal.*

**RELATED PUBLIC SERVICE**

Board Chair, The Community Foundation *for* Greater New Haven (2019-)
Board Member, The New Haven Pearls of Excellence Foundation (2018-)
Board Member, The Community Foundation for Greater New Haven (2015-2021)
Appointed Member, 2018 Transition Team for Connecticut Governor Ned Lamont (Women & Girls
Policy)
President, Theta Epsilon Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated (2017-2018)
Board Member, Prison Policy Initiative (2015-2016)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 15th day of August 2019, I caused to be electronically filed the foregoing Expert Report of Dr. Khalilah L. Brown-Dean with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Chris Carr, Esq.**
Attorney General
**Dennis Dunn, Esq.**
Deputy Attorney General
**Russell Willard, Esq.**
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Email: ccarr@law.ga.gov
Email: ddunn@law.ga.gov
Email: rwillard@law.ga.gov

**Joshua Barrett Belinfante, Esq.**
**Brian Edward Lake, Esq.**
**Carey Allen Miller, Esq.**
**Vincent Robert Russo, Jr., Esq.**
**Kimberly Anderson, Esq.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com
Email: blake@robbinsfirm.com
Email: cmiller@robbinsfirm.com
Email: vrusso@robbinsfirm.com
Email: kanderson@robbinsfirm.com

**Bryan P. Tyson, Esq.**
Special Assistant Attorney General
**Bryan Jacoutot, Esq.**
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Email: btyson@taylorenglish.com
Email: bjacoutot@taylorenglish.com
404-856-3260
Fax: 404-856-3250

*/s/Allegra J. Lawrence*
Allegra J. Lawrence
Georgia Bar No. 439797