United States District Court
Northern District of Georgia

Fair Fight Action
v.
Brad Raffensperger

August 15, 2019

**Expert report of Dr. Adrienne Jones**

Pursuant to the Federal Rules of Civil Procedure, I, Adrienne Jones, render the following expert report:

1. My name is Dr. Adrienne Jones and I reside in Atlanta, Georgia.  I am a lawyer and political scientist by education and training and have taught political science at the university level since 1999. I am an Assistant Professor of Political Science at Morehouse College in Atlanta, Georgia, and I teach political science and serve as the Pre-Law Director.

2. I received a J.D. from the University of California at Berkeley School of Law in 1993 and I obtained my Ph.D. from the City University Graduate Center in 2015.  My primary Ph.D. training was in American Government, with a minor in public policy.  I began teaching political science in 1999 and have taught courses in American Government, Law and Public Policy for 17 years at The City College of New York, The Center for Workers Education, The University of Wisconsin at Platteville, Radford University and Morehouse College.

3. As a political science professor, I am regarded as the "public law" person in my department. My courses are based in American Government, public policy and law. These courses include, but have not been limited to, American Government, Constitutional Law I and II, Race and Law, Legal Research and Writing, Issues in Civil and Criminal Law, and similar courses.

4. Presently, at Morehouse College, I teach Race and Law, National Government, Constitutional Law and the Senior Seminar.  I also serve as the campus Pre-law director. In that capacity I provide pre-law advice for students of all majors and make and maintain relationships with law schools across the country.

5. Since earning my Ph.D., I have made presentations about the Voting Rights Act and have published lay and academically reviewed articles about the VRA and Black American history and politics. My C.V. lists both my presentations and publications. At present, I am writing a book on the Voting Rights Act based on my doctoral dissertation.

6. I have not previously testified as an expert witness. I am being paid $275 per hour for my services.

I. **Opinion:  From the beginning of its existence to present, the state of Georgia has continually suppressed the right of people of color to vote.**

    a.  The basis and reasons for my opinions are set forth below along with the facts and data I considered.

The state of Georgia has been a leader in voter suppression since its beginnings as a state.  Georgia established in its first state constitution that blacks would not be granted the right to vote and the state remained dedicated to this position and to maintaining white supremacy throughout its history.  The state has adjusted its efforts to racially discriminate at the polls when compelled by federal intervention, during Reconstruction and by enforcement of the Voting Rights Act ("VRA"), but has consistently resisted the federal government's attempts to ensure fair voting based on race, due to its dedication to white supremacy at the ballot box.

Georgia's first constitution in 1777 limited the franchise to "male white inhabitants, of the age of twenty-one years"[1]   The 1789 constitution included only "citizens and inhabitants," in the franchise and it was universally understood at the time that neither slave nor free blacks fell into either category.[2]  Black voters were excluded  again from the 1861 Constitution after the state seceded from the Union,[3] and again after the conclusion of the war in 1865, the Constitution limited the franchise to "free white male citizens of this state."[4]  Georgia excluded black voters again after the state was free of federal oversight related to Reconstruction (1867-1877).[5]

Pursuant to the Reconstruction Act of July 19, 1867, the state of Georgia was obliged to accept the registration of new voters.[6]  Some 200,000 new voters were registered in the state.  Approximately 50% of those registered were black.[7]  In 1867, a second state constitutional convention convened to adapt state government to match the Reconstruction program.  The convention included 37 blacks out of 165 delegates.[8]  The convention "guaranteed blacks citizenship, protection of the law, and the right of male suffrage."[9]  It also provided free public school education for black voters, a benefit previously extended only to white citizens; but it imposed a $1 poll tax—ostensibly to support the public school plan but which simultaneously excluded black voters, most of whom

---

[1] Ga. Const. of 1777, art. IX.

[2] Ga. Const. of 1789, art. IV.

[3] Ga. Const. of 1861.

[4] Ga. Const. of 1865.

[5] Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (Cambridge University Press, 2003), 2. Laughlin McDonald is the former director of the Southern Regional Office of the ACLU in Atlanta, GA, now special counsel and director emeritus of the Voting Rights Project.  He has represented plaintiffs in discrimination cases and specialized in voting rights, argued before the U.S. Supreme Court and testified before Congress.  He is the author of several books including, A *Voting Rights Odyssey: Black Enfranchisement in Georgia*. The text is the leading treatise on Georgia voting rights and on the relationship of the state with the VRA of 1965.

[6] 15 Stat. 14-16 (July 19, 1867).

[7] Numan V. Bartley, *The Creation of Modern Georgia* (Athens, GA: The University of Georgia Press 1983), 48.

[8] Bartley, *Modern Georgia*, 54-5.

[9] McDonald, *Odyssey*, 19; Ga. Const. 1868, art. I, sec. 2.

were unable to afford the tax.[10] Additionally, black representatives reported that they "foolishly" accepted assurances of Republican party leadership that there was no need to include a proposed clause that specifically guaranteed blacks the right to hold office. Later, they regretted support for a constitution without the explicit clause.[11]

During the enforcement of the Reconstruction Program, Georgia state actors remained steadfastly committed to a white electorate and to Democratic party dominance. Statewide, white residents engaged in violence and terrorism to ensure the exclusion of black voters and to purge the state of Republican power. In 1868, the Ku Klux Klan was organized in Georgia and established itself as the terrorist, paramilitary wing of the Democratic party and assisted in the campaign of terror. [12] The April 1868 state election involved extreme violence as a result of the desire of Democrats to keep blacks away from the polls. Nonetheless in 1868, a Republican was elected to the governorship, 25 blacks were elected to the house, 3 blacks to the senate, and a new constitution was ratified.[13] As a result of these "improvements," Georgia was offered readmission to the Union pending its ratification of the 14th Amendment.[14] The state ratified the 14th Amendment on July 21, 1868.[15]

But, by September 1868, whites seized on the fact that the constitution did not specifically authorize black officeholders to forcibly remove all black members from the state legislature, except those who could not be ejected because their light complexions made it "impossible to prove that they were African Americans."[16] The November 1868 general election was also violent. The Freedman's Bureau reported that between August and October of that year, there were "31 killings, 43 shootings, 5 stabbings, 55 beatings, and 8 whippings of 300 to 500 lashes apiece [in the state]." [17] On election day, there were "open confrontations between blacks and whites."[18] As a result of these accumulated events, Georgia was again evicted from the Union and returned to military supervision. In 1870, the military commander of the state returned the black legislators to their seats in the General Assembly and returned control to Republicans.[19] In 1870, the General Assembly re-ratified the 14th Amendment, ratified the 15th Amendment, and Georgia was readmitted to the Union, a second time, on July 15, 1870.[20]

Black participation lasted precariously until after the Hayes-Tilden Agreement of 1877 and the removal of military control over the state. Once military control was lifted, Georgia took a

---

[10] Edmund L. Drago, *Black Politicians and Reconstruction in Georgia* (Baton Rouge: Louisiana State University Press, 1982), 45.

[11] Bartley, *Modern Georgia*, 57.

[12] McDonald, *Odyssey*, 21.

[13] Bartley, *Modern Georgia*, 59.

[14] McDonald, *Odyssey*, 21.

[15] Georgia House Journal, July 21, 1868, pp. 49-50.

[16] John Hope Franklin, *Reconstruction and the Civil War* (Chicago: University of Chicago Press, 1994), 130; See also Drago, *Black Politicians*, 69-70.

[17] Allen W. Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1971), 117; House Miscellaneous Documents, 40th Congress, 3rd sess., No. 52, p. 41.

[18] McDonald, *Odyssey*, 24; Drago, *Black Politicians*, 150.

[19] McDonald, 24.

[20] 16 Stat. 363-64 (July 15, 1870); Gabriel J. Chin, "The Voting Rights Act of 1867: The Constitutionality of Federal Regulation of Suffrage during Reconstruction," 82 N.C. L. Rev. 1581 (2004).

leadership role in black voter suppression.  "[N]o state was more systematic and thorough in its efforts to deny or limit voting and office holding by African Americans after the Civil War." [21] From the end of Reconstruction to the middle of the 20th century, the state,

> …adopted virtually every one of the traditional "expedients" to obstruct the exercise of the franchise by blacks, including literacy and understanding tests, the poll tax, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the abolition of elective offices, the use of discriminatory redistricting and apportionment schemes, the expulsion of elected blacks from office, and the adoption of primary elections in which only whites were allowed to vote. And where these technically legal measures failed to work or were thought insufficient, the state was more than willing to resort to fraud and violence in order to smother black political participation and safeguard white supremacy.[22]

Beginning in 1917, Georgia established a county unit voting system to administer elections. The county unit system restricted blacks statewide from influencing state elections and maintained Georgia political control in rural white counties.  Under the system, each of Georgia's 159 counties was classified as urban, town or rural and granted 6, 4 or 2 units in voting power and permitted the candidate who carried the Democratic primary with the most units to be nominated and elected.[23] The county unit system enabled the state to devalue the strength of the urban vote, in Atlanta, Columbus, and other areas, therefore minimizing the power of black voters in the state.  Because county unit rule effectively disenfranchised black voters concentrated in urban counties, gubernatorial candidates such as Eugene Talmadge and Herman Talmadge ran successful, explicitly racist campaigns for governor.[24]  It is not surprising that blacks in Georgia parodied the cigarette slogan abbreviated "LS/MFT" (*Lucky Strike Means Fine Tobacco*) to mean "Lord Save Me From Talmadge."[25]

Georgia used the county unit system until the early 1960s when, as a result of a series of Supreme Court decisions designed to facilitate the "one man, one vote rule," it became federally mandated to draw districts and to apportion legislators equitably.  In  *Baker v. Carr*, 369 U.S. 186 (1962), a Tennessee case, the Court reversed the long held protocol that redistricting was a political question immune to federal oversight (and therefore to Supreme Court review) and held that redistricting was a justiciable question.[26]  The Court enforced the terms of the Tennessee Constitution calling for decennial redistricting to establish districts of *equal population* pursuant to a 14th Amendment Equal Protection clause.  Tennessee had not redistricted since 1901.  Population shifts in the state since 1900 had been significant and it was necessary to revise districting plans to ensure equitable districting and representation for citizens. With the concentration of black voters in urban areas, the failure of Tennessee to re-district permitted the rural, white counties to control the political

---

[21] McDonald, *Odyssey*, 2.

[22] McDonald, 3.

[23] New Georgia Encyclopedia, s.v. "County Unit System." by Scott E. Buchanan, accessed August 9, 2019, https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system.

[24] McDonald, *Odyssey*, 80-4.

[25] Stetson Kennedy, *The Klan Unmasked: With a New Introduction by David Pilgrim and a New Author's Note*, (Tuscaloosa, Alabama: University of Alabama Press, 1990), 169.

[26] See Colgrove v. Green, 328 U.S. 549 (1946) (The federal judiciary has no power to interfere with apportionment of state legislatures).

process. In additional cases, the court extended the equitable districting logic.  In *Wesberry v. Sanders,* 376 U.S. 1 (1964), the Supreme Court held that House of Representative districts must be relatively equal in population; and in *Reynolds v. Sims,* 377 U.S. 533 (1964), the Court held that for districting purposes, total population would be assessed to facilitate redistricting and not be limited to some other unit, for example, 'all voters.'  The Court ultimately concluded that representation is for *district populations* and not just for voters.[27]  Subsequent lawsuits resulted in the redrawing of districts nationwide.

Georgia had not redistricted in decades. Instead it used the county unit system.  The state did not desire districting that would ensure equitable districts or apportionment.  However, as a result of the 'one man, one vote' line of cases, Georgia was federally mandated to establish equality of representation based on fairly drawn districts that contained roughly similar population numbers and evenly apportioned representation.  In 1963, Georgia was forced to abolish the county unit system that allowed white counties to control elections.[28]

On the other hand, *Baker* did not strike the entire bevy of voter restrictions exercised in Georgia. These did not come under fire until the next year, when the Voting Rights Act of 1965 was passed. Georgia state and local governments immediately pushed back against the VRA and took action designed to continue to use racially discriminatory voting tactics and to avoid regulation by the Act. This was not a surprise—Georgia resisted all civil rights legislation that affected all voters, including the *Baker v. Carr* line of cases, *Brown v. Board of Education*, and civil rights legislation passed specifically to benefit blacks in 1957, 1960, 1964 and 1968.

When the VRA of 1965 was being proposed and debated in Congress, Georgia representatives complained vehemently that the law was an inappropriate imposition on states sovereignty.  The Georgia governor, Carl Sanders, wrote to President Lyndon B. Johnson "urging defeat of the voting rights bill."[29]  In his nine-page letter, Sanders argued that states determine all aspects of voting. He objected to the prohibition against literacy tests, and called the empowerment of federal registrars "extreme."[30]  Overall Sanders considered the Act "unnecessary" despite the state's culture of voter discrimination, or more accurately, because of it.[31]

The VRA required Georgia to submit changes in voting laws or procedures for preclearance by the Department of Justice ("DOJ").  When the VRA passed, Georgia supported the lawsuit brought by the state of South Carolina attacking the constitutionality of the Act.[32] When the lawsuit failed, Georgia refused to comply with the law generally and with the preclearance process specifically. Georgia government–large and small –immediately passed laws and enacted procedural changes to voting to minimize the impact of regulation under the VRA and to ensure white supremacy. The state passed a new election code that made registration for blacks even harder than before the VRA, and established majority vote protocols, numbered post requirements, and other procedures

---

[27] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (New York: Basic Books ,2000), 286.
[28] Gray v. Sanders, 372 U.S. 368 (1963).
[29] McDonald, *Odyssey*, 11.
[30] McDonald, 11
[31] McDonald, 12.
[32] South Carolina v. Katzenbach, 383 U.S. 301 (1966).

to dilute black voting power. These provisions were intentionally designed to curtail black enfranchisement. The sponsor of the state majority vote bill, for example, blatantly urged its passage to prevent black bloc voting power."[33] And, the state refused to submit new laws for preclearance. Between 1965 and 1968, the state submitted exactly *one* of its hundreds of voting law changes to the DOJ for preclearance.[34]

Key to Georgia's VRA resistance campaign was the use of at-large election schemes by local governments and school boards. With white bloc voting, it was impossible for blacks to gain an electoral foothold in an at-large district. In Georgia, after 1965, local jurisdictions that did not already use at-large voting switched from single member political and school board districts to at-large voting systems. At-large voting systems diluted black votes and ensured that, despite an expanded black electorate in places like Atlanta, whites could control the votes. By 1968, fewer than half of eligible black voters were registered to vote in most Georgia counties.[35] Blacks who attempted to run for office in the state in the mid-1970s were hamstrung by the racial discrimination endemic to the state franchise. It was virtually impossible for blacks to campaign in rural areas and therefore to mount a successful campaign for many offices.[36]

The VRA was designed to *solve* the problem of black voter access and therefore was designed to expire if it were no longer necessary. However, due to the slow pace of compliance by governmental entities because of the resistance to including blacks in the citizenry in a nation where whiteness was defined as "not black," and where the foundation of the national economy, arguably, was based on the enslavement and the non-inclusion of blacks into the polity, Congress renewed the law every time that it came up for renewal. The VRA preclearance provisions were renewed in 1970, 1975, 1982, and 2006. Preclearance for voting changes was enforced for 48 years, from 1965 until 2013.

The state of Georgia resisted the VRA and opposed being covered by the preclearance provisions from the time the law was proposed until the *Shelby County v. Holder* decision in 2013 when the preclearance schema was struck down.[37] Georgia state representatives argued against the legislation in 1970 and 1975, boycotted the 1982 hearings and strongly opposed preclearance in 2006. At the last reauthorization session in 2006, when the two parties agreed that they would renew the Act essentially "as is," Georgia representatives wasted no time in taking the lead in an effort to rebel against the "as is" agreement on the floor. At no point did the state of Georgia agree with the legislation or accept that it should be subject to VRA coverage.

While under the auspices of the VRA, the state engaged in discriminatory districting drawn to limit the black vote. In 1971, the state made new districts for congress. The plan was unfriendly to black voters. The plan divided black Atlanta into three districts to ensure that the 5th district was majority white. The plan excluded the residences of Andrew Young and Maynard Jackson to prevent them from running for Congress, yet it included the residences of several potential white 5th District candidates. White state legislators drummed up support for the plan by threatening that

---

[33] Runoff Bill Revived by Senate Unit: Majority Vote Plan Sent to Sub-Panel, *Atlanta Constitution*, March 1, 1963.
[34] McDonald, *Odyssey*, 130
[35] McDonald, 130.
[36] McDonald, 155.
[37] Shelby County v. Holder, 570 U.S. 529 (2013).

if the 5th district maintained a black majority, it was highly likely that Julian Bond would be elected to Congress. [38] Georgia representatives insisted that the proposed districting plan was necessary to protect the state despite its severely irregular shape. When the district plan was reviewed under the VRA, the federal government forced the state to return Young and Jackson's residences to the 5th district and to increase the black percentage in the 5th district to 44% from 38%. In 1972, Andrew Young was elected under the 1971 redistricting plan, "the first black person elected to Congress from Georgia since Reconstruction."[39]

The application of the VRA did contribute to a decrease in voter suppression in Georgia despite state and local action. Franchise reform under the law was achieved by black civil rights activists and plaintiffs aided by civil rights attorneys, attorney members of organizations like the NAACP, ACLU, SPLC, and the Department of Justice, even if it was ultimately precarious.[40] In 1973, the Supreme Court decision, *White v. Regester*, "gave a huge boost to the voting rights enforcement campaign in Georgia."[41] In *White,* the Supreme Court invalidated an at-large election district in Texas based on a theory of vote dilution.[42] The Court held in *White* that single member districts were necessary to integrate black voters and to allow them the potential to elect candidates of their choice.[43] Subsequently, many challenges were filed in Georgia against at-large jurisdiction systems used in city and school board elections – none of which had been precleared by the Department of Justice.[44] Federal courts struck a number of at-large systems challenged in court. In Fulton County, for example, a federal court disqualified the at-large voting system because the county remained inaccessible to blacks on an equitable basis. The court concluded that "there was a history of undisputable, pervasive de jure racial segregation in Georgia and Fulton County," and that "the government had never been equally open to participation by black and white members of the community."[45] The court noted that no black had served on the County commission or as a department head, and that racist campaign tactics and voting procedures persisted including the majority vote rule and numbered post requirements, all designed to maintain inequitable access to the county franchise. [46] Similar decisions applied to local government and school board lawsuits across the state.[47]

Georgia government actors also abruptly changed rules to deter blacks from running for and securing elected offices. In 1972, when John E. White, of Albany, GA, an employee of the Dougherty County Board of Education, announced that he would run for a seat in the Georgia House of Representatives, the first black candidate to do so since Reconstruction, the Board adopted a new rule, "Rule 58" the following month. Rule 58 required Board employees to take an unpaid leave of absence while running for or serving in a government office. White subsequently ran for office three times and lost more than $11,000 in unpaid salary as a result. White sued

---

[38] McDonald, *Odyssey*, 149-150.

[39] Bartlett C. Jones, *Flawed Triumphs: Andy Young at the United Nations* (Lanham, Md.: University Press of America, 1996), 3.

[40] Mc Donald, *Odyssey*, 195-6.

[41] McDonald, 159.

[42] *White v. Regester*, 412 U.S. 755 (1973).

[43] *White,* at 769.

[44] McDonald, *Odyssey*, 158-163.

[45] *Pitts v. Busbee*, 395 F. Supp. 35, 40-1 (N.D. Ga. 1975).

[46] *Pitts*, 395 F. Supp. 35, at 40.

[47] McDonald, *Odyssey*, 160.

arguing that Rule 58 had not been precleared under Section 5 of the VRA even though it was a "standard, practice or procedure with respect to voting," enacted by a covered jurisdiction.[48] White stressed that he was the first black person to run for the General Assembly from the county and that no other Dougherty County employees had been subject to the same rule. Ultimately, the Court affirmed the decision that pursuant to the precedent in *Allen v. State Board of Elections*, 393 U.S. 544 (1969), and contemporary cases, Rule 58 should have been submitted for preclearance. The Court enjoined application of the law and ordered preclearance compliance.

> By imposing a financial loss on [Board] employees who choose to become candidates, [the Rule] makes it more difficult for them to participate in the democratic process and, consequently, restricts the field from which the voters may select their representatives.[49]

While subject to the VRA in 1975, Georgia continued to engage in discriminatory action. Georgia's 1981 redistricting plans again drew objections including the plans for congressional, state and local redistricting. In a repeat of the antics of the early 1970s, white legislators rejected the plan proposed by the black politician from Fulton County, Julian Bond, in favor of a plan that would maintain white majority voting strength.[50] Julian Bond's proposed plan to increase the percentage of the black vote in the 5th district to 69% was rejected. Legislators complained that the plan would cause white flight and racial discord.[51] Instead, white legislators submitted a plan for that would reduce the power of black voters in Fulton County.[52]

By 1982, the state still had very few black elected officials. Black officials reliably hailed from majority black districts. Only 3% of the county governing board members were black and there were no blacks elected to statewide office.[53] The low numbers were the result of at-large election systems and other policies that prevented blacks from winning elections in the state. Preclearance compliance by the state had improved but approximately 361 acts of the general assembly and an unknown number of local changes remained unsubmitted.[54]

The resulting court challenge by Georgia to the Department of Justice denial of preclearance of its districting plan, is notable. The case was reviewed by the United States District Court for the District of Columbia.[55] State legislators were so blatantly racist that the state could not prove lack of discriminatory intent. Complicating matters was the attempt by the state to create a district for "mountain communities" which they justified for the same kind of reasons that justified black voting strength in the 5th ¹, i.e., district voters in the mountain areas maintained similar opinions and voting interests and so should be districted together.

The chair of the Georgia House appropriations committee, Joe Mack Wilson, who dominated the redistricting process in the lower chamber and who often expressed his hate for "blacks and

---

[48] 42 U.S.C. 1973c; Dougherty County, Georgia, Board of Education et al., dv. White, 439 U.S. 32, 35 (1978).
[49] White v. Dougherty County, Georgia, Board of Ed., 431 F. Supp. 919 (M.D. Ga. 1977).
[50] Busbee 549 F. Supp. at 499 (D.D.C. 1982); McDonald, Odyssey, 168.
[51] Busbee, 549 F. Supp. at 494, 510.
[52] McDonald, *Odyssey*, 169-173.
[53] McDonald, 175.
[54] McDonald, 175
[55] *Busbee*, 549 F. Supp. 494.

Republicans," caused the DOJ to reject the plan. When a member of the reapportionment planning committee was deposed, and asked about Mr. Wilson, she admitted that she was taken aback by Wilson's blatant expressions of dislike for blacks and Republicans and the language that he used to convey that information. When asked to specify, Dorothy Felton testified that instead of "blacks" he used the word "Niggers."[56]

> At that moment, in the small conference room in the Richard B. Russell Building in downtown Atlanta where the deposition was being taken, the state effectively lost its preclearance case.[57]

The district court found that racial discrimination was the purpose of the 1981 plan, and it noted that the state treated black and white districts in a disparate manner. The Court made an explicit finding that Mr. Wilson was a "racist." Ultimately the state districting plan included a 65% black voting percentage in the 5th district. That plan resulted in the election of John Lewis to the 5th district in 1986 in a contest against Julian Bond. [58]

Lawsuits were unsuccessful at getting the majority vote rule eradicated using the VRA. In 1990, Georgia plaintiffs brought a challenge to the statewide majority vote requirement. Plaintiffs claimed that the policy was adopted with a discriminatory purpose and that it had a discriminatory effect on black candidates and voters. But, during depositions and testimony, Georgia state representatives who participated in the 1964 process either denied that the bill was motivated by a desire to suppress votes or they claimed that they could not remember the intention of the legislation. The chief sponsor of the bill in the state house, Denmark Groover, blatantly encouraged support for the law in 1964 to "thwart election control by Negroes and other minorities" and to hinder federal efforts to register black voters.[59] Plaintiffs witnesses also provided evidence that the majority vote rule was enacted to ensure limits on black electoral power, but the Court disagreed and rejected the claim. The Court held that the policy was *not* intentionally discriminatory and that legislators who passed the 1964 bill did not pass it to achieve race discrimination.

In 2006, Georgia state representatives took the lead in opposing reauthorization of the VRA and preclearance. After the two parties agreed to renew the Act "as is" by not objecting to it on the floor, Georgia Representative Lynn Westmoreland refused to abide by the agreement. Before the hearings could begin, in a closed-door GOP meeting, Representative Lynn Westmoreland (GA) led colleagues from Georgia, Texas, Oklahoma, Michigan, Florida, and Alabama in a demand for debate to express on the record their opposition to the VRA and to preclearance in particular. Westmoreland argued that the reauthorization of preclearance would fail to acknowledge state improvements in voting rights since the inception of the VRA in 1965. Westmoreland averred that it would be unfair to covered states like Georgia that had significantly improved their voting records under the VRA to reauthorize the preclearance rubric "as is".[60] The closed-door meeting

---

[56] McDonald, *Odyssey*, 170.

[57] McDonald, 170.

[58] Dudley Clendinen, "Ex Colleague Upsets Julian Bond in Atlanta Congressional Runoff," *The New York Times*, September 3, 1986.

[59] McDonald, *Odyssey*, 12.

[60] Hulse, Carl. "Rebellion Stalls Extension of the VRA," *The New York Times*, June 22, 2006.

became so heated that Jim Sensenbrenner walked out and the originally scheduled hearings were delayed indefinitely.

Hearings finally began in June, but only on the condition that the Republican "rebels" be permitted to ignore the pre-existing agreement not to debate and be allowed to propose amendments.[61] Rebels proposed four amendments. All four failed. Supporters of the reauthorization bill called the four amendments "poison pills" and described them as "mean spirited."[62] But Westmoreland and his supporters claimed they were attempting to protect the law by making it applicable nationwide. [63] According to Westmoreland, it might have looked as if "some old boys from the South" were trying to do away with the civil rights law, but they were actually trying to save it. "These old boys are trying to make it constitutional enough that it will withstand the scrutiny of the Supreme Court."[64] Needless to say, white Georgia legislators voted against the reauthorization of the VRA in 2006.

Very recently, the state has been reported to have engaged in discrimination against Puerto Rican voters in a manner that seems eerily similar to former segregation tactics. In July 2019, the Atlanta Journal Constitution ("AJC") reported that Puerto Rican voters have had difficulty obtaining driver's licenses in the state. When Puerto Rican citizens have visited the Georgia Department of Driver Services ("DDS"), many have had their birth certificates and other documents confiscated, fraud investigations against them initiated, and have been subjected to questioning. A Puerto Rican expert commented that he was unable to answer some of the questions that he was asked. [65]

When a U.S. citizen obtains a driver's license in the state of Georgia, they are also registered to vote if eligible. By preventing Puerto Rican residents from obtaining driver's licenses, the state is also denying the same U.S. citizens the right to vote. Under the Privileges and Immunities clause of the Constitution, Puerto Ricans are entitled to be treated as if they are the resident of any other state in the nation or Washington D.C. [66] If a person is a citizen of the United States, which Puerto Ricans are, when he or she obtains a driver's license they should be registered to vote. Because non-citizens are not entitled to be registered for the franchise, the Secretary of State is obligated by law to confer with the head of the Driver's License Bureau to establish appropriate protocols. The Secretary of State appears to be treating citizens of Puerto Rico, who are often people of color, differently. The state of Georgia has a long history of using voter suppression tactics against black voters. The questioning of Puerto Rican citizens evokes memories of the same kinds of tactics used when Georgia administered literacy and understanding tests as a part of its effort to discriminate against black voters before 1965 and since. According to the AJC, more than 93,000 Puerto Ricans live in the state of Georgia.

---

[61] Fuller, Jaime. "The Fix: Republicans Used to Unanimously Back the Voting Rights Act. Not Any More" *The Washington Post*, June 26, 2014.
[62] Ed. Daniel McCool, *The Most Fundamental Right*, (Bloomington, Indiana: Indiana University Press, 2012), 14.
[63] Lyman, Rick. "Extension of Voting Rights Act Likely Despite Critics," *The New York Times*, March 29, 2006.
[64] Amanda Becker, "Voting Rights Act At Risk?" *CQ Weekly*, Feb 2, 2013,
http://public.cq.com/docs/weeklyreport/weeklyreport-000004214386.html.
[65] David Wickert, "Georgia agency under scrutiny for treatment of Puerto Ricans," *AJC*, July 12, 2019.
[66] 8 U.S.C. 1402

Caban Gonzalez has a pending lawsuit alleging that when he attempted to apply for a driver's license after satisfying the 30-day residency requirement, that he was subject to requirements only applied to Puerto Ricans.  Gonzalez alleges that the DDS inspector confiscated his documents, asked him questions about Puerto Rico, and ultimately had him arrested for fraud.[67]  Gonzalez further alleges that he submitted a valid Puerto Rican driver's license, dated 2014, a pay stub and his social security card.  Others have alleged that when they have submitted Puerto Rican birth certificates in order to obtain a Georgia driver's license that they have been flagged and accused of fraud.[68]  The DDS claims that all driver's license applicants are treated according to law, but Shevondah Leslie, a representative of the DDS, admitted that the DDS does use a document from the department titled, "Puerto Rican Interview Guide" which the DDS also claims is not authorized by the DDS.[69]

Counties in Georgia have also recently been involved in disputes about whether to close voting precincts in predominately black areas.  Before the 2018 midterm elections, the Randolph County Board of Elections voted 3 to 0 to close seven majority black precincts.  After a public outcry, the Board backed down.[70]

Those critical of the closings are suspicious about the closings and concerned that they will make it more difficult for black and low-income voters to access the polls.  These closures also come on the heels of a dispute about closing precincts last year causing similar concerns, as even in white precincts the closing of polling locations results in a loss of votes by minority and low- income voters.  The Secretary of State's office claimed last year that it does not monitor the number of polling places that are closed and that the decisions about precinct closures occur at the county level. But former Secretary of State Brian Kemp provided a manual to counties that includes information designed to assist counties at deciding to close and closing precincts.  In that manual, the former Secretary reminded counties twice that they were no longer required to preclear laws with the DOJ in order to close polling locations in areas with "low incomes, small populations and substantial minority populations."[71]  According to an AJC investigation, since the 2013 decision in *Shelby v. Holder*, 8%, or 214, polling locations have been closed in Georgia.[72]

---

[67] Elliot McLaughlin, "Fritters and frogs: Is Georgia's discriminating against Puerto Ricans with driver's license quiz?" *CNN*, July 4, 2019, https://flipboard.com/@CNN/fritters-and-frogs-is-georgia-discriminating-against-puerto-ricans-with-driver-/a-HFfMJ3QqTkai2mvPcerwlg%3A4a%3A132361178-cc4de46e51/cnn.com.

[68] McLaughlin, E., "Fritters and frogs"

[69] McLaughlin, E., "Fritters and frogs*."*

[70] Richard, Fausset, "Georgia County Rejects Plan to Close 7 Polling Places in Majority Black Areas." *The New York Times*, August 28, 2018.

[71] Mark Niesse, Maya T. Prabhu and Jacquelyn Elias, "Voting Precincts Closed Across Georgia Since Election Oversight Lifted," *The Atlanta Journal Constitution*, Aug. 31, 2018, https://www.ajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/.

[72] Niesse, M; Prabhu, M; Elias, J; "Precincts Closed."

**Opinion:  Georgia's suppression of people of color's right to vote is consistent with the long history of Georgia and Southern states.**

    a.   The basis and reasons for my opinions are set forth below along with the facts and data I considered.

The United States Constitution has no explicit grant of the right of individuals to vote. Article I Section 4 of the Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed by each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Place of Chusing (sic) Senators."[73]

When the Constitution was adopted, each state decided which individuals in the state had the right to vote. Pursuant to Article 1 Section 4 and the reserved powers of the 10th Amendment, states have historically understood themselves as constitutionally able to regulate elections, and traditionally Georgia has exercised that right by suppressing the black vote.  State governments administer elections, determine their time, place and manner, decide who will have access to the polls, what the district boundaries will be, how representation will be apportioned, how registration will work, how ballots will be handled, and what will be the responsibilities of the elected official once elected.  Southern states considered the power to administer electoral functions critical to their ability to be independent of the federal government, and key to their ability to control state politics, economy and governance. Most important to Southern states in this regard was the ability to exclude *black* voters from the electorate.  In this regard, the state of Georgia has acted as a "laboratory of democracy," in a number of instances in the development of national voter suppression measures against minorities, throughout U.S. history, emulated by other states.[74]

Several sections of the Constitution seem to imply that *individuals* have a right to vote. Article I Section 2 states that the House of Representatives will be composed of members chosen "by the people of the several states."[75]  Several amendments also make it appear that U.S. citizens are constitutionally empowered to vote.  The 14th Amendment prohibits states from denying persons in their jurisdiction the equal protection of the laws, including with respect to the right to vote.[76] The Fifteenth Amendment provides that the right to vote "shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."[77]  The 17th Amendment indicates that senators will be "elected by the people."  The 19th Amendment forbids denial of the "right of citizens of the United States to vote … by the United States or by any State on account of sex."[78]  The 23rd Amendment facilitates presidential elections for D.C. residents.[79]  The 24th Amendment prohibits poll taxes.[80] The 26th Amendment states that the right

---

[73] U.S. Const. article I, section 4.

[74] New State Ice Co. v. Liebmann, 285 U.S. 262 (1932), "Laboratories of democracy" is a phrase popularized by U.S. Supreme Court Justice Louis Brandies to describe how a "state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

[75] U.S. Const. article I, section 2.

[76] U.S. Const. Amendment XIV.

[77] U.S. Const. Amendment XV.

[78] U.S. Const. Amendment XIX.

[79] U.S. Const. Amendment XXIII.

[80] U.S. Const. Amendment XXIV.

to vote will not be denied to those eighteen years of age or on account of age.[81] A number of these amendments were proposed because states were prone under the original Constitution to exclude particular factions of voters, including those based on race and gender.

Surprisingly, after the American Revolution, several states included blacks as part of their electorate. "African Americans were enfranchised in North Carolina, Massachusetts, New York, Pennsylvania, Maryland and Vermont."[82] Only a few states restricted voting based on race and in 1790, after the ratification of the Constitution, "only Virginia, Georgia, and South Carolina" had formal rules that prevented blacks from voting.[83]  By 1855, Massachusetts, Vermont, New Hampshire, Maine and Rhode Island were the only states that did not exclude black voters, however these states had very small black populations. In fact, just before the Civil War, five New England states allowed blacks to vote based on the same qualifications as whites.[84] However, after the Civil War, states that allowed blacks to vote began to restrict access to the franchise to *white* men only.[85]  It should be noted that all states at this time barred women from voting.

In the South, black enfranchisement was widely rejected from the start.[86] The black slave labor system yielded major economic benefits that motivated Southern state governments to actively exercise race-based voter suppression.  The denial of the franchise was codified in state constitutions and/or by state statute, was not prohibited by the U.S. Constitution, and was socially accepted and expected to ensure the social, political, and economic order of the state.  The state of Georgia showed its early commitment to black voter suppression when its constitutions prohibited blacks from voting.

The conclusion of the Civil War brought with it an expectation of civic engagement by blacks residing in the many states.  Legislative enactments by Republicans laid the groundwork for a franchise that included newly freed slaves.  President Lincoln urged the passage of the 13th Amendment to codify the freedom of slaves with a permanence not provided by either of the Emancipation Proclamations. The first Proclamation applied only to the Union states (some of which were slave holding) and had no impact on the legal apparatus of the Confederacy.[87]  The second Emancipation Proclamation freed slaves in the South but was essentially an executive order, not imbued with the more permanent nature of a Constitutional amendment. [88]

The 13th Amendment, passed in 1865, ended the social death caused by the designation of slave and ended the legal presumption that those born of black mothers were slaves.  Now involuntary servitude and slavery were prohibited, "except as a punishment for a crime whereof the party had

---

[81] U.S. Const. Amendment XXVI.
[82] Bridgett A. King and Kathleen Hale, Eds., *Why Don't Americans Vote: Causes and Consequences* (Santa Barbara, ABC-CLIO, LLC 2016), xvi.
[83] King and Hale, *Why Don't*, xvi.
[84] King and Hale, *Why Don't*, xvi.
[85] King and Hale, *Why Don't,* xvi.
[86] King and Hale, *Why Don't*, xvi.
[87] Lincoln, A. (1862) Preliminary Emancipation Proclamation. Retrieved from the Library of Congress, https://www.loc.gov/item/scsm000950/.
[88] Emancipation Proclamation, January 1, 1863; Presidential Proclamations, 1791-1991; Record Group 11; General Records of the United States Government; National Archives.

been duly convicted" inside the United States, "or any place subject to its' jurisdiction."[89] Radical Republicans were unable to glean support for a specific enfranchisement requirement and include it in the 13th Amendment,[90] and Southern states were resistant to the advent of blacks' civil rights. To avoid compliance, Southern states passed black codes to revise the social structure in effect before the war and ensure the viability of the southern social, political and economic hierarchy and the persistence of white supremacy.[91]Custom and enforcement of the black codes resulted in the exclusion of blacks from the franchise despite the amendment of the U.S. Constitution.

The Lincoln (and later the Johnson) Reconstruction programs did not include black suffrage as a requirement. Lincoln's plan, issued in December of 1863, the "Ten Percent Plan," pardoned and restored property to former rebels willing to take an oath of allegiance to the Union.[92] Once 10% of voters in a jurisdiction took the oath, voters could establish a new state government that would be recognized by the president.[93] President Johnson in fact promised the radicals that he would include suffrage as a redemption requirement. Radical Republicans "… wanted to make universal manhood suffrage a prerequisite for the readmission of the former Confederate states to the Union."[94] Johnson's plan did not include black suffrage. When Johnson put his Reconstruction plan into action, Congress was in recess and Johnson hoped that he could have Reconstruction complete before Congress and its Radical Republican members returned to session in December of 1865. His assumption was incorrect.[95] Subsequently, the President clashed with Radical Republicans who craved the ability to establish a black franchise, in large part to expand the parties' influence in the South.

In response, moderate Republicans passed the Freedman's Bureau Bill and the Civil Rights Act of 1866, to confer national citizenship and basic civil and economic rights to blacks.[96] The Freedman's Bureau Act provided aid to former slaves including food, housing, education, health care, employment contracts and land acquisition.[97] The CRA of 1866 allowed freedmen to own property, make contracts, and sue.[98] Moderate and Radical Republicans then proposed the 14th Amendment to further solidify black citizenship and ensure black access to the polity.

The 14th Amendment, adopted in 1868, was designed to provide a basis for black suffrage though it did not do so affirmatively. Instead, the Amendment forbade discrimination at the polls based on race and stipulated that states denying any male residents over the age of 21 the right to vote would suffer a reduction in their delegation to the U.S. House, "in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state."[99] However, the Section 2 sanctions were never enforced and did not dissuade states

---

[89] U.S. Constitution Amend. XIII; States, including Georgia took advantage of the "convicted of a crime" ca

[90] Xi Wang, *The Voting Rights Act: Securing the Ballot* ed. Richard Valelly, (Washington, D.C. CQ Press, 2006), 5-6.

[91] Xi Wang, 7.

[92] 13 Stat. 737 (August 31, 1964); Xi Wang, *African American Voting*, 5.

[93] Xi Wang, *African American Voting*, 5.

[94] Xi Wang, 6.

[95] *Reconstruction: America After the Civil War*, Henry Louis Gates Jr., PBS Documentary, April 2019

[96] 13 Stat. 507 (March 3, 1865); 14 Stat. 27-30 (April 9, 1866).

[97] 13 Stat. 507 (March 3, 1865).

[98]14 Stat. 27-30 (April 9, 1866).

[99] US Constitution, Amend. XIV.

from race discrimination in the franchise.  This failure was in part because Radical Republicans were unable to secure nationwide support for an integrated franchise.[100]

The 14th Amendment did provide fuel for Radical Republicans to push for enfranchisement in Washington D.C. and the federal territories, which was achieved in 1867.  Ten former Confederate states, Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia and Texas, were placed under military control and required to write new constitutions, ratify the 14th Amendment, and establish black suffrage.

The radical wing of the Republican Party took over Southern Reconstruction from President Johnson in 1867.  Radical Republicans were interested in preventing the return of the same southern gentry who ran Southern governments prior to the Civil War, and in establishing a foothold for the Republican Party in the South.  As a result, Radical Republicans were extremely interested in black inclusion in the franchise.  In 1867, Radicals established martial law in the South, creating military districts and inserting Republican leadership into Southern government.  Radical Reconstruction lasted from 1867 until the Hayes-Tilden Compromise in 1877.

Pursuant to the First Reconstruction Act, approximately 735,000 blacks and 635,000 whites were registered to vote in the former Confederacy.[101]  In five of those states, black voters were the majority.[102]  Six states ratified new constitutions pursuant to the Second Reconstruction Act passed in March, 1868.[103]  In June, seven more states, Alabama, Arkansas, Florida, Georgia, Louisiana, North Carolina, and South Carolina, were readmitted with the proviso that none ever "amend their constitutions to deny African Americans the right to vote."[104]  Moderate Republicans again sought the passage of a constitutional amendment and passed the 15th Amendment in 1870.[105] Like the construction of the 14th Amendment, the 15th Amendment did not affirmatively grant blacks the right to vote, instead it forbade voter discrimination based on race.

However, the prospect of a successful black electorate was an anathema to white Georgians and other Southerners.  Southerners generally feared that if granted the franchise, blacks, who made up a majority of the population in most deep South states, would take control of the social, political and economies of the states, hence the widespread violence and other efforts to disenfranchise blacks was waged during Reconstruction.  "[I]ntimidation [was] used on an extensive scale." In many localities, blacks were "not allowed, under penalties of severe reprisals, to show their faces in town on election day."[106]  Other devices were also widely used.  Polling places were established at significant distances from black communities and common modes of transportation to access polling places were destabilized at election time.  Polling places were moved without notice, ballots went unrecognized, ballot boxes were "stuffed" with fraudulent ballots, and vote counts were manipulated.  According to historian John Hope Franklin:

---

[100] Xi Wang, *African American Voting*, 8.

[101] 14 Stat. 428-430 (March 2, 1867).

[102] Xi Wang, *African American Voting*, 9.

[103] 15 Stat. 41 (March 11, 1868); Xi Wang, *African American Voting,* 10.

[104] Xi Wang, *African American Voting*, 10.

[105] U.S. Constitution Amend. XV.

[106] John Hope Franklin, *Slavery to Freedom: A History of Negro Americans*, 3rd. Ed. (Alfred A. Knopf 1967), 333.

The practice of stuffing ballot boxes was widespread. Criminal manipulation of the counting gave point to the assertion of an enthusiastic Democrat that "the white and black Republicans may outvote us, but we can out count them.[107]

The "bloodiest single instance of racial carnage in the Reconstruction era, the Colfax massacre"[108] was motivated by black suffrage. On Easter Sunday 1873, after a contested election for governor in 1872 in Louisiana, armed white Democrats murdered Republican freedmen and black state militia who occupied the Grant Parish courthouse to ensure that the Republican governor was seated. Most of the blacks were killed after they surrendered and 50 more were killed later that evening after being held as hostages. According to historian Eric Foner, 288 blacks lost their lives in the fray.[109]

In the related judicial review of the incidents, which culminated in the *United States v. Cruikshank* decision, the Supreme Court held that the Enforcement Acts of 1870 which were specifically designed to punish the kind of terroristic violence that occurred at Colfax, was not applicable.[110] The Court held that because the offenders were private actors and not state actors acting under color of state law, they were not regulated by the statute.[111] The Court held too that the Due Process and Equal Protection Clauses of the 14th Amendment applied only to state action and not to the actions of individuals at large. "The 14th Amendment prohibits a State from depriving any person of life, liberty of property, without due process of law: but this adds nothing to the to the rights of one citizen against another,"[112] said the Court. The Court stressed the boundaries of federalism and refused to incorporate the Bill of Rights.[113]

The presidential election of 1876 dealt "[t]he final blow to black suffrage was dealt by the 1876 presidential election, perhaps the most bitterly fought presidential contest of the nineteenth century."[114] The election returns resulted in disputed electoral votes which were ultimately granted to Republican candidate Rutherford B. Hayes as part of a compromise between the two parties. In exchange for the presidency, Republican Hayes pledged to restore "home rule" in the South and to withdraw federal troops from the south, which he did in April, 1877. Once federal restrictions were lifted, Republican Party government largely collapsed in the South which was recaptured, or "redeemed" by Democrats.[115] Democrats specifically, and white Southerners generally, were rabid about suppression of black suffrage to ensure the survival of white supremacy and to maintain control of the social, political and economic systems that controlled government before the Civil War.

---

[107] Franklin, p. 333.
[108] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Perennial Classics, 2002), 437.
[109] Foner, 437.
[110] 16 Stat. 140-146 (May 31, 1870).
[111] United States v. Cruikshank, 92 U.S. 543, 546 (1876).
[112] *Cruikshank*, 92 U.S. 554.
[113] Cruikshank, 92 U.S. 554.
[114] Xi Wang, *African American Voting*, 15.
[115] Xi Wang, 15.

Wide scale black voter participation did not end immediately after the Hayes- Tilden Agreement. Blacks voted in the 1880s and continued to hold elected positions until 1890.[116] But, over the course of 1880 to 1890, all former Confederate states engaged in some set of tactics to ban black voters from access to primaries and elections within their boundaries. "Virginia for example, reapportioned or gerrymandered its voting districts five times within seventeen years to nullify Negro ballots."[117] The state added petty larceny to the list of suffrage disqualifications," and used a complicated balloting system.[118] Southern states instituted poll taxes, and Georgia passed one in 1877. It was upheld as constitutional by the Supreme Court in 1937.[119]

Southern states instituted confusing balloting processes, enacted highly centralized election codes, and adopted white primaries.  South Carolina, for example, used a system of specific ballot boxes that demanded a voter deposit his vote into the correct box but forbade poll workers to speak with voters. Incorrectly boxed ballots were discarded.[120]

> In Louisiana, black voter registration fell from 95.6 percent before an 1896 registration law, to 9.5 percent immediately thereafter, to 1.1 percent in 1904.  Black voter registration in Alabama plummeted from 180,000 in 1900 to 3,000 in 1903.  Registration figures undoubtedly overstated turnout.  In Mississippi, black voter turnout was estimated at 29 percent in 1888, 2 percent in 1892, and 0 percent in 1895. [121]

Not only did this mean that blacks could no longer vote but it also meant they lost electoral offices and related power. Elected officials usually controlled not only the aspects of power related directly to their elected office but also held auxiliary powers held as a result of being an elected office holder.  For example, elected officials sometimes had influence over the selection of school board leadership, the allocation of school funding, and/or over grand and petit jury pools.  Because blacks were excluded from elected office, blacks were excluded from all layers of political power relevant to viable civic power in the communities in which they lived, in addition to literal exclusion from the ballot box.[122]

All southern whites were not against black franchise after Reconstruction.  For a period, there was biracial progressive activism in some areas.  Progressive whites in some localities acknowledged their similarities with blacks and were willing to work together with African Americans to ensure economic and political survival in the face of elite government control.  Progressive movements sustained black economic survival in some Southern cities and towns and the establishment of black towns in some states ensured the economic and political progress of blacks in scattered Southern and western outposts, many through the early 1920s.  However, progressive alliances were threatened by white supremacist and Lost Cause propaganda which eventually split political alignment between black and white communities and left blacks alone, alienated from political

---

[116] Michael J. Klarman, -*The Voting Rights Act: Securing the Ballot*, ed. Richard Valelly (Washington D.C.: CQ Press, 2006), 37.
[117] Franklin, *Slavery to Freedom*, 334.
[118] Franklin, *Slavery to Freedom*, 334.
[119] Breedlove v. Suttles*, 302 U.S. 277 (1937).
[120] Franklin, *Slavery to Freedom*, 334.
[121] Klarman, *Black Disenfranchisement*, 38.
[122] Klarman, *Black Disenfranchisement*, 38.

power, subject to debasement and violence, and eventually stripped of political power and access to local or national government support.[123]

According to historian C. Vann Woodward, the Jim Crow regime was not an inevitable outgrowth of the end of Reconstruction, but he argues, momentum toward the system did emerge after 1876 and grew in the 1890s. By 1900, Jim Crow statutes had been enacted in several states, at that point commonly restricting passengers aboard trains, but quickly became more varied, and pervasive. States passed similar restrictions to one another in "waves of popularity," across the nation expanding Jim Crow laws to waiting rooms, street cars, and eventually for separate street cars.[124] "Whites Only" and "Colored" signs emerged across the South visible at the city and local levels. Segregation law expanded too, into employment, state services, amusements, and residential living, restaurants and entertainment.[125] A majority of states enacted statutory segregation laws between 1890 and 1910 and most restricted the franchise based on race.

In this milieu, federal jurists continued to deny blacks relief from discrimination under Jim Crow based on theories like that applied in *United States v. Cruikshank*.[126] In the 1883 Civil Rights Cases (five consolidated cases concerning discrimination by theaters, hotels, and transit companies that refused to serve plaintiffs on the basis of their color in violation of the Civil Rights Act of 1875 which prohibited race discrimination in services offered to the public), the Court held that Congress lacked authority under the 13th and 14th Amendments to restrict private discrimination and treatment.[127] According to the Court, the 13th Amendment did absolutely nothing but abolish slavery (and did not protect blacks from treatment that conveyed the indicia of slavery).[128] The Court rejected the idea that the Constitution restricted private actors in the same ways that it presumably restrained state action of the same sort. By habitually interpreting discriminatory activity as unrelated to state authority, a trend begun in The Slaughterhouse Cases, there was to be no regulation of discrimination under the Constitutional amendments and statutes passed to provide protections to antebellum blacks.[129]

The 1896 *Plessy v. Ferguson* decision legally justified Jim Crow laws and codified the *Cruikshank-esque* analysis of the Reconstruction Amendment cases.[130] The *Plessy* decision parsed coverage under the 14th Amendment between activity that could be influenced by the Constitution and that which could not. On the issue of whether the East Louisiana Railroad Company needed to abide by the states Separate Car Act, the Court agreed that separate accommodations would be required for white and black riders. The Court denied that the law exercised the indicia of slavery and

---

[123] Gates, *Reconstruction.*

[124] C. Vann Woodward, *The Strange Career of Jim Crow*, 3rd ed. (New York: Oxford University Press, 202), 97.

[125] Woodward, 98-102.

[126] U.S. v. Cruikshank, 92 U.S. 542 (1876).

[127] Civil Rights Cases, 109 U.S. 3 (1883).

[128] Cruikshank, 92 U.S. at 555.

[129] See, The Slaughter-House Cases, 16 Wall. 36 (1873) (holding that the Privileges and Immunities Clause of the 14th Amendment only protects *federal* citizenship and not state); United State v. Reese, 92 U.S. 214 (1876); The Civil Rights Cases, 109 U.S. 3, 25 (1883) (Striking the Civil Rights Act of 1875 because the 13th Amendment "merely abolishe[d] slavery" and did not apply to private acts of discrimination); Plessy v Ferguson, 163 U.S. 537, 552 (1896) (holding that "separate but equal" is legitimate under the 14th Amendment).

[130] Plessy 163 U.S. at 543-44.

therefore held that it did not violate the 13th Amendment. And the Court upheld the constitutionality of separate train cars so long as they were equal in quality, or "separate but equal."[131] In effect, the Court tortured the purpose of the 14th Amendment, denied its purpose, and flatly rejected the idea that the Court had control over racial interaction.

> The object of the [Fourteenth] Amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either.[132]

The *Plessy* decision was interpreted as a legal foundation for the Jim Crow system even though the decision legally only applied to the case at bar. The case law was used subsequently to support all manner of exclusive public and private, state and federal, racially discriminatory behavior including importantly, the exclusion of blacks from the polls.

Voting rights challenges immediately following *Plessy*, extended its logic. In *Williams v. Mississippi*, the court held that the state constitutional requirements for voters to take a literacy test and pay poll taxes did not discriminate because they applied universally to all Mississippians.[133] However, a grandfather clause exempted white voters from the literacy requirements so that the statute did plainly discriminate against blacks. The court also denied relief in *Giles v. Harris,* holding that plaintiffs claim of discrimination against the state of Alabama was moot where the state voter registration qualifications theoretically applied to all voters and where the state did not affirmatively indicate an intention to discriminate.[134] And in *Giles v Teasley*, the court similarly rejected plaintiff's challenge to Alabama's discriminatory statutory registration scheme where he was not permitted to vote because of his race.[135] The court held that the law was one of general applicability. In both the *Williams* and *Giles* cases, the Court refused to restrict even state action.[136] The high court persisted in its fundamental theory that private interference was not sanctionable by Constitutional challenge. Constitutional Law scholar Michael J. Klarman suggests that the Court understood that its power to control state electoral behavior was limited and that sitting justices for the most part were not themselves committed to black suffrage or opposed it outright.[137] "By 1900, says Klarman, most white Southerners were determined to eliminate black suffrage by any means necessary."[138]

The other branches of federal government also opposed and refused to protect black voting rights. In the mid-1890s, electoral realignment placed Republicans back in control of the House and the Senate, the party did not re-invest in black suffrage.[139] Republicans did nothing to restore Reconstruction voting provisions voided by Democrats during their time in the majority between

---

[131] Plessy, 163 U.S. at 551.

[132] Plessy, 163 U.S. at 543–44.

[133] Williams v. Mississippi, 170 U.S. 213 (1898).

[134] Giles v. Harris, 189 U.S. 475 (1903).

[135] Giles v. Teasley, *193 U.S. 146* (1904).

[136] Klarman, "Black Disenfranchisement," 39-40.

[137] Klarman, 40.

[138] Klarman, 40.

[139] Klarman, 41.

1894-1910.[140]  And Congress continued to refuse to enforce Section 2 of the 14th Amendment and did not decrease the number of any state delegation for denying the right to vote to back male inhabitants,[141] despite rampant voter suppression in southern and northern states.

By 1910, Jim Crow ruled the franchise.[142] Most U.S. blacks were completely barred from the polls and most black office holders had been removed.[143]  Radical racists took power and maintained it in every Southern state.  Openly racist attestations were a part of this effort.  Southern legislators were customarily vocal about their intent to maintain black voter exclusion.  For example, Senator James Vardaman of Mississippi promised that "every Negro in the state will be lynched" if necessary, to ensure white supremacy.[144]  Hoke Smith of Georgia made black disenfranchisement a focus of his successful campaign for governor and connected disenfranchisement to protection against race mingling. "The best way to tamp out such notions, he said, was to take the ballot out of the hands of the black man."[145] Even the president, William Howard Taft, stated in his 1909 inaugural address, that the South should not allow itself to be controlled by an "ignorant, irresponsible, electorate" and he agreed that the 15th Amendment was no longer being upheld by public opinion.[146]  In Georgia, the number of registered voters by 1910 was very small but that was irrelevant.  Georgia continued to use a white's only Democratic primary and the Democratic nominee was inevitably elected until 1946 when the Supreme Court struck down the state primary system.

Black voters made some progress against Jim Crow and voter suppression in the early 1900s, through social movement combined with the efforts of the NAACP and ACLU; however even where progress was made, it was slight in relationship to the full-scale voter suppression system at work in the nation.  The NAACP was successful in for example *Guinn v. United States*, where the Court agreed with the NAACP and invalidated Oklahoma's grandfather clause exempting whites from the literacy test.[147]  However, the decision had minimal impact.  The *Guinn* holding did not apply to other important impediments including poll taxes and literacy tests and most states did not have statutory grandfather clauses and so the decision did not force them to strike any existing law. Most states that exercised grandfather clause exclusions did so by custom and continued to do so after the ruling.  In states that did maintain grandfather clauses they continued to enforce, the NAACP was unable to afford to monitor their behavior or engage in follow up litigation.

The NAACP lobbied Congress to pass anti-lynching legislation but congressional action proved to be extremely difficult.  Southern Democrats held significant power in Congress by the first decade of the new century and as a result of a combination of seniority and leadership, had the power to block civil rights legislation that found its way onto the floor. Richard B. Russell, Senator from Georgia for whom the federal court building in Atlanta is named, "began contesting civil

---

[140] Klarman, 41.

[141] Klarman, 41.

[142] Franklin, *Slavery to Freedom*, 340-1.

[143] Klarman, "Black Disenfranchisement," 41.

[144] Leon F. Litwack, *Trouble In Mind: Black Southerners in the Age of Jim Crow*, (Alfred A. Knopf, 1998), 295.

[145] McDonald, Odyssey, 41.

[146] Inaugural Address of President William Howard Taft, March 4, 1909.

[147] Guinn v. United States, 238 U.S. 347 (1915).

rights legislation as early as 1935, when an antilynching bill was introduced in Congress."[148] By the late 30s he led the Southern Bloc in objecting to federal civil rights legislation. Southern Bloc representatives claimed that civil rights legislation imposed unconstitutionally on states' rights. Russell used his ability to block the passage of a cloture rule in the Senate to maintain unlimited debate as a method to ensure filibuster of civil rights legislation or to ensure Southerners could severely limit that legislation. Under Russell's leadership, "the Southern Bloc stymied all civil rights legislation" over the course of thirty years.[149]

The NAACP also worked through its legal branch, The Legal Defense Fund, on judicial campaigns to establish civil right for blacks, decrease discrimination at the polls, and end Jim Crow by overturning the *Plessy v. Ferguson* decision. The judicial initiative proved to be more fruitful than the Congressional one. The NAACP made headway in voter access through cases challenging the all-white primary. The campaign did not result in instantaneous reform, but it did initiate change in black access to American electoral process. A common feature of the post Reconstruction voter suppression regime included the declination of blacks to party membership and/or to party primaries. In the South, exclusion from the primary meant missing the election. In states like Georgia, elections were systematically determined at the primary. Texas was the first to pass a statute restricting blacks from Democratic primaries, which provided an opportunity for the NAACP to challenge the statute. In *Nixon v. Herndon*, the Supreme Court held the Texas statute unconstitutional under the 14th Amendment because it denied black access to the primaries.[150] But like the decision in *Guinn*, the decision had very little weight. As in the Oklahoma grandfather statute, the Texas statute was an outlier, thus the decision did little to increase black access to primaries in fact. The *Nixon v. Herndon* decision also only applied to state action and could not reach Democratic party "private" action which was considered not subject to the 14th Amendment.

Despite those facts, both the state of Texas and Mr. Nixon were persistent. Texans repealed the statute prohibiting blacks from the primary and passed another which dictated that political parties would determine who would be qualified to vote or otherwise participate in party business. The Texas Democratic committee responded by passing a rule that excluded blacks from the primary. When Mr. Nixon tried to vote again, he was denied under the new stratagem. When Nixon sued this time, the Court held that the state's statute did transfer state power to the Democratic party, therefore state action was at issue which meant that *Nixon v. Herndon* did apply. State officials could not, said the court, "discharge their official functions in such a way as to discriminate invidiously between white citizens and black."[151]

The Court continued to exercise the private/public analysis, however. Voters could still be legally excluded from primary elections based on private action. In *Grovey v. Townsend*, the court held in favor of the county clerk who enforced a Democratic party rule restricting the primary to whites.[152] Here the Court held that the party rule was constitutional because state action was not

---

[148] New Georgia Encyclopedia, s.v. "Richard B. Russell, Jr. (1897-1971)" by Sheryl B. Vogt, accessed August 10, 2019, https://www.georgiaencyclopedia.org/articles/government-politics/richard-b-russell-jr-1897-1971.
[149] New Georgia Encyclopedia, "Russell."
[150] Nixon v. Herndon, 273 U.S. 536 (1927).
[151] Nixon v. Condon, 286 U.S. 73 (1932).
[152] Grovey v. Townsend, 295 U.S. 45 (1935).

involved, and the discrimination imposed by the party was exercised by a private organization and not the state.

In response to the Court's decision in *Guinn,* the state of Oklahoma replaced its grandfather clause with a new law that restricted voter registration to a short, strict 12-14-day period.  Anyone who missed the registration window was subject to permanent disenfranchisement and the law provided an exception for whites who missed the deadline.  After plaintiffs lost on appeal, the Supreme Court held that the Oklahoma law in fact violated the 15th Amendment.[153]

In the 1940s, a conflagration of events fostered an atmosphere of consideration for black civic engagement by the judiciary.  In 1944, the United States was engaged in WWII, in a global fight against fascism, on a pro democratic platform that did not comport with state side race discrimination and segregated U.S. military forces.  After a lively development of cases on the issue of the white primary brought by the NAACP or victims in the state of Texas, the Court refused to hold firmly that parties engaged in state action by facilitating nominations and elections.  But the Court made a ruling in *U.S. v. Classic* a non-race case that edged over to the side of black plaintiffs. [154]  In the non-race case, the Court held that registered Democrats could not be defrauded out of a Congressional primary by party agents.  *Classic* did not directly apply to blacks, who were largely not party members, but it provided a basis on which to make persuasive arguments that urged denial of access to the primary was a denial the right to vote.

Lonnie Smith sued a Texas county election official for the right to vote in the Democratic Party primary and challenged a 1923 law that authorized the party to make its own rules.  Pursuant to the party rules, all members of the Democratic Party had to be white.  Smith argued that by regulating elections, the Democratic Party disenfranchised him by not allowing him to vote in the primary which was the meaningful election in his jurisdiction.  In *Smith v. Allwright*, the Court agreed that the state party primary was key to the election process, and therefore the responsibility of the state. Because state action was involved, the 14th and 15th Amendments applied and they "required an end to the white primary."[155]  The *Smith* decision did not completely settle the issue of white primaries, but it did mark the beginning of a tangible loosening of black voter restrictions.  In 1946, the Court struck Georgia's white primary after it continued to exclude blacks in contravention of the *Smith v. Allwright* decision.[156] And in 1947, a federal court applying *Smith* integrated the South Carolina Democratic primary.[157]

The *Smith v. Allwright* decision left the Georgia primary system vulnerable.  The Georgia state system was similar to that in Texas[158] however, the state of Georgia decided that the *Allwright* decision did not apply in Georgia and used white primaries in 1946. When Primus E. King of Columbus, GA sued to participate in the 1946 Georgia primary, the federal court applied the *Smith*

---

[153] Lane v. Wilson, 307 U.S. 268 (1939).

[154] United States v. Classic, 313 U.S. 299 (1941).

[155] The Allwright decision was bolstered by two subsequent decisions, Elmore v. Rice, 72 F. Supp. 516 (E.D.S.C. 1947) (holding that African Americans must be permitted to enroll in the Democratic party) and Brown v. Baskin, 80 F. Supp. 1017 (E.D.S.C. 1948) (removing the "loyalty oath" that required would-be voters to swear that they supported white supremacy).

[156] King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945).

[157] Elmore v. Rice, 72 F. Supp. 516 (E.D.S.C. 1947).

[158] McDonald, *Odyssey*, 48-9.

decision. The court held that the "Muscogee County executive committee had violated Primus Kings' equal right to vote as protected by the 14th and 15th Amendments," and invalidated the white primary in the state.[159] Very quickly more than 116,000 blacks signed up to vote which had an impact on the politics of the state, especially in the urban areas like Columbus and Atlanta.[160] According to Laughlin McDonald, "125,000 blacks or 18.8 percent of the eligible population were registered by late 1947."[161]  According to Steven Lawson, Ralph Bunche estimated that 250,000 Negroes were registered to vote in the southern states; by 1947 the estimated number had jumped to 775,000.  "Especially in Texas and Georgia, where the judiciary had toppled the white primary, did Negroes take advantage of their newly acquired freedom."[162]

Much of this progress was as a result of the return of black G.I.s from WWII. Many black soldiers back from war were motivated to push for civil rights and willing to risk the perils related to registering to vote.[163]  As a feature of their military discharge paperwork, veterans were exempt from poll taxes.[164]  Black voter registration began to rise as a result of this conflagration of events, energy, and legal development.

> In 1940, just 3% of southern black adults were registered to vote, but in 1952, 20 percent were registered.[165]Ironically, the most rapid transformation occurred in Georgia.  Black voter registration increased from approximately 20,000 in 1940 to 125,000 in 1947.  Other states encountered similar growth.  The number of registered black voters in Louisiana increased from 8,000 to 43,000 within an eight-month period in 1948 and then rose to 107,000 by 1952.  In Florida, roughly 20,000 black voters were registered in 1944, 49,000 in 1947, and 116,000 in 1950.  Even in Mississippi, where white resistance to black suffrage remained intense, black voter registration increased form 2,500 in 1946 to 20,000 in 1950."[166]

In *Brown v. Board of Education*, 347 U.S. 483 (1954), and the subsequent 1955 decision, *Brown II*, 349 U.S. 294 (1955), the Court held that the legal basis of the Jim Crow system, the *Plessy v. Ferguson*, 163 U.S. 537 (1896) decision, was overruled. No longer would "separate but equal" be the law of the land.  A consolidated case, multiple plaintiffs alleged a violation of the Equal Protection clause due to substandard education in a mandated segregated setting.  The Court determined that black children were being unduly stigmatized by the exclusion and held therefore the "separate but equal" interpretation of the amendment was unconstitutional. When states and jurisdictions were slow or defiant against responding to the requirement that they integrate public schools, the *Brown* decision was followed by a second set of hearings and decision, *Brown II*,

---

[159] McDonald, 49.

[160] New Georgia Encyclopedia, s.v. "Segregation," by Edward A. Hatfield, accessed August 10, 2019, https://www.georgiaencyclopedia.org/articles/history-archaeology/segregation.

[161] McDonald, *Odyssey*, 49.

[162] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969,* (New York Columbia University Press, 1976), 53.; Julia Baxter, "NAACP Conducts Branch Survey on Negro Vote," NAACP Bulletin, (October-November 1946), 2.

[163] Keyssar, *Right to Vote,* 250.

[164] Keyssar,  246-247; Klarman, "Black Disenfranchisement," 49-50.

[165] Klarman, "Black Disenfranchisement," 49.

[166] Klarman, "Black Disenfranchisement," 49.

which ordered states to use "all deliberate speed" to integrate in accordance with the unanimous Supreme Court decision in *Brown*.

Though school integration may not seem directly related to voting, integration into the polity was a critical step toward integrating blacks into the franchise. Education had historically been used as a pillar of the voter suppression system. Blacks were denigrated as unfit for citizenship and civic engagement in part because of their lack of education and considered unable to understand electoral choices and responsibly cast ballots. The grant of the right to education was perceived as a precursor to opening the franchise to blacks. Integration resistance included vitriol aimed at the prospect of an earnest black franchise. If the *Brown* logic was applied to voting rights, presumably discrimination at the polls would no longer be constitutional.

The *Brown* decision caused resistance and motivated violence as had the opening of the franchise during Reconstruction. Historian John Hope Franklin pointed out that "[s]outhern resistance to any change in the status of the Negroes often degenerated into violence…" [167] As a result, the years 1954 – 1957 were extremely hostile and violent due to resistance to the *Brown* decisions' dictates and the expectation that integration would be mandated by the federal government.

In 1955, "[each] of the eleven states of the old Confederacy enacted interposition, nullification, or protest resolutions against the Supreme Court decision in the school desegregation cases."[168] In Congress in 1956, Georgia Senator Walter George presented the Declaration of Constitutional Principles, also known as The Southern Manifesto, which condemned the *Brown* decision and pledged that all possible means should be exercised to resist the implementation of integration.[169] Although a few jurisdictions proceeded to integrate their school systems, the vast majority did not. In 1955, the Georgia General Assembly decided to cut off state funds to any system that integrated its schools. Governor Ernest Vandiver was forced to choose between closing the public schools or to give the situation to the Federal Government to order them to desegregate the schools. State representative George Busbee introduced the legislation creating the General Assembly Committee on schools known as Sibley Commission. On January 6, 1961, federal district court Judge W. A. Bottle ordered the immediate admission of Hamilton Holmes and Charlayne Hunter to the University of Georgia, ending 160 years of segregation at the school.[170]

Civil Rights legislation was regenerated at the federal level in the late 1950s, reaching its peak performance in 1964 and '65. The Civil Rights Act of 1957 was the first civil rights act passed since 1875.[171] Another civil rights act was passed in 1960.[172] Both CRAs were ostensibly dedicated to creating parity in voting access for black Americans. The 1957 Act established the Civil Rights Commission which was empowered to investigate vote denials and study equal protection[173] and it established an office of Civil Rights at the Justice Department to enforce civil

---

[167] Franklin, *Slavery to Freedom*, 618.
[168] Franklin, 619.
[169] Franklin, 616-617.
[170] *Holmes v. Danner*, 191 F. Supp. 394 (M.D. Ga. 1961); "Bottle Orders University To Admit Negro Students," *The Red and Black: The University of Georgia, Athens,* Thursday January 5, 1961
https://www.libs.uga.edu/hargrett/archives/integration/integration1_integration1_rbbootle.jpg
[171] 71 Stat. 634. (Sept. 9, 1957).
[172] 74 Stat. 89 (May 6, 1960).
[173] Franklin, *Slavery to Freedom*, 622.

rights law.[174]  The Civil Rights Act of 1960 empowered federal registrars to register voters in jurisdictions with past civil rights violations; authorized federal inspection of voter registration locations;  and established sanctions for anyone who obstructed another's right to register.  The 1960 act extended the life of the Civil Rights Commission and expanded its purview to oversight of voting processes in the South in particular. Finally, the Civil Rights Act of 1964.[175]  A landmark piece of legislation, it too, aimed to improve the black franchise.  The bill prohibited discrimination based on race, color, religion, sex and national origin and it *outlawed unequal voter application requirements*, racial segregation in schools, employment and public accommodations.  The law barred discrimination in any project aided by federal funds and school districts were required to desegregate or present acceptable desegregation plans.  Combined with the Elementary and Secondary Act of 1965, the CRA 1964 provided motivation to encourage school districts to integrate.  Previously southern school districts had managed to satisfy federal requirements, accept federal funds and still maintain segregated schools.[176]

All the Civil Rights Acts were ostensibly designed to promote voter protection.  Each of the Acts emerged from efforts motivated by the need to establish a working right to vote for black Americans and an attempt to strengthen the protection through legislation.  However, none had the needed positive impact.  All three civil rights acts passed between 1957-1964 were important in facilitating a momentum and establishing important structures that ultimately supported the civil rights agenda, but none had the key to deliver black voters who cast ballots.

One major reason why the 1957, 1960 and 1964 federal laws did not have an impact at the local level was because the only recourse of blacks for racial discrimination generally including voter suppression was litigation.  Litigation was costly, time consuming and often involved delays that resulted in injury or repeat injury even if the outcome of the lawsuit held in plaintiff's favor.  In Terrell County, Georgia, the DOJ obtained an injunction against the county for preventing black voter registration where in 1960 only 5 blacks were registered.[177] The sheriff in Terrell County continued to arrest voter registration workers without recourse.  States including Georgia passed laws to avoid federal law enforcement.  "Georgia passed a thirty-question test for voter registration in response to the Civil Rights Act of 1957."[178]  Finally, in 1965, a conflagration of important events aligned to produce the Voting Rights Act of 1965, a civil rights act that reintroduced black voting en masse to the American electorate because it used methods other than litigation to impose behavioral change on recalcitrant jurisdictions engaged in voter suppression.[179]

The Voting Rights Act of 1965 was different because it ignored traditional federalism boundaries in order to achieve its goal and, by doing so, it emanated a moral imperative that states tolerate and promote the inclusion of blacks into the electorate.  The Section 5 "preclearance" framework provided the federal government oversight of any new state voting laws or change in southern and some other states.  No more would states have exclusive control over voter qualifications and

---

[174] THE DEPARTMENT OF JUSTICE'S CIVIL RIGHTS DIVISION: A HISTORICAL PERSPECTIVE AS THE DIVISION NEARS 50 March 22, 2006 Remarks by Wan J. Kim, Assistant Attorney General for the Civil Rights Division.

[175] 78 Stat. 241 (July 2, 1964).

[176] Franklin, *Slavery to Freedom*, 644.

[177] McDonald, *Odyessy*, 123.

[178] McDonald, 123.

[179] 79 Stat. 437 (August 6, 1965).

access to ballots, instead, the assumption would be that black voters would be included in the electorate and the DOJ would have the opportunity to vet new state laws that affected voting and determine if those laws discriminated against minority voters.  If states or jurisdictional laws were challenged under Section 5, the burden of proof now lay with the state and not with plaintiffs to show that a policy did not discriminate against black voters. Under the Section 5 preclearance provision, eligible states were required to submit new voting laws for review to the Department of Justice for approval.  Failure to abide by the dictates of the VRA was also classified as criminal behavior opening the state to potential criminal sanction.  Georgia was subject to preclearance for changes in voting laws.

The VRA of 1965 was designed to enforce the 14th and 15th Amendments. Several parts were designed to protect black voters.[180]  Its unique preclearance provision, codified in Sections 4 and 5, sparked the most controversy. The VRA and its preclearance provision had a phenomenal effect.

> In the subsequent decades, the number of black registered voters in the South increased from 31 percent to 73 percent; the number of black elected officials increased from fewer than 500 to 10,500 nationwide; the number of black members of Congress increased from 5 to 44.[181]

This unique provision of the VRA, Section 5, was designed to be temporary so that the exercise of preclearance review could be suspended when it was no longer necessary.  Section 5 was authorized for five years in 1965, but it was renewable.  Congress could choose to continue federal jurisdiction over state voting laws if it reauthorized the preclearance provision.  As previously stated, Congress chose to renew Section 5 of the VRA four times, in 1970, 1975, 1982, and 2006.  Each time reauthorization was achieved by overwhelmingly positive, bipartisan roll call votes.[182]

---

[180] Under Section 2 of the Act, citizens in all jurisdictions were granted standing to sue for discrimination based on the general prohibition against voter discrimination.  Section 3 of the Act empowered the Attorney General to appoint and dispatch examiners to the polls, to suspend tests or devices used to deny the right to vote based on race, to take jurisdiction over offending precincts, and to provide equitable relief.  Section 6 of the act outlined the responsibilities of examiners and hearing officers (authorized under section 9(a)).  Sections 7 and 8 provided for the dispatch of federal examiners to polls under certain conditions. Section 9 provided guidelines to evaluate challenges to voter eligibility, and the right to subpoena witnesses for that purpose.  Section 10 prohibited poll taxes.  Section 11 forbid state actors from failure to permit voting or ballot counting. Section 12 instituted a fine schedule for VRA violations. Sections 13- 19 complete the legislation and include provisions not outlined here. In 1975, Congress extended the Act to some language minorities under Sections 2 and 4(b) (persons of Spanish Heritage, American Indians, Asian Americans, and Alaskan Natives) and Congress added Section 203 which required bilingual elections under specified conditions. In 1982 Congress adopted a more relaxed bailout standard under 4(a) which allowed a political subdivision to bail out of Section 5 coverage separate from its' covered state and allowed plaintiffs to establish a violation of the Section without having to prove discriminatory purpose. In 2006 Congress repealed Sections 6, 7, and 9 that referred to examiners and observers.
[181] Ari Berman, *Give Us The Ballot: The Modern Struggle for Voting Rights in America* (New York: Farrar, Straus and Giroux, 2015), 6.
[182] In 1970, the VRA reauthorization garnered 333-85 votes in the House and 77-19 in the Senate.  In 1975, the House voted 341-70 and the Senate, 77-12.  In 1982 the House voted 389-24, the Senate, 85-5.  In 2006, the House voted 390-33 and the Senate, 98-0.

Each time changes were made to the law its purview was usually expanded. And each time preclearance was reauthorized, additional states and jurisdictions became covered.[183]

Over the years, the southern states continually challenged the VRA's requirement that they not discriminate against blacks. States continually challenged the VRA, starting with South Carolina, which argued the VRA was unconstitutional. Georgia filed an amicus brief supporting the South Carolina position. The Supreme Court rejected South Carolina's argument in 1966.[184] Southern governments continued to attack the VRA, early on, to no avail. *Allen v. State Board of Elections* and *Gaston County v. United States* augmented the South Carolina decision and ensured the applicability of Section 5 to a broad range of state voting law changes.[185] Political subdivisions in Georgia fought the law. In *City of Rome v. United States*, Rome, Georgia sought to escape from VRA coverage independent of the state. [186] The Court maintained that individual jurisdictions within a state could not avoid coverage independently when a state was covered under the VRA in its entirety. Similarly, in a case involving Burke County, Georgia, the court invalidated at large elections. "[A]lthough the state policy behind the at-large electoral system was 'neutral in origin,' the policy was being maintained for invidious purposes in violation of appellees' Fourteenth and Fifteenth Amendment rights."[187] The system prevented blacks from being elected and was maintained to perpetuate invidious discrimination. Because the law resulted in discrimination against black voters, there was a viable basis for VRA relief that the Supreme Court upheld. The initial challenges to the Act provided a firm foundation for the VRA and gave it the precedential footing it needed to operate according to the intentions of VRA proponents for a significant period of time.

In 2013, the Court reversed its support of the preclearance provision wholeheartedly in the *Shelby v. Holder*. Here, the Supreme Court held that the preclearance provision formula in Section 4 of the VRA was unconstitutional.[188] By disengaging the Section 4 provision the Court tacitly held that Section 5 should no longer be operational. Without the ability to identify states covered by Section 5, the preclearance function of the Federal Government was disengaged. As a result of *Shelby County*, the justice department no longer preclears restrictions on minority voter suppression and freed states including formerly covered states like Georgia to pass new voting laws without a requirement to have them vetted by the federal government for their ability to discriminate. Today, when the state enacts a provision that results in discrimination against black voters, litigation, like this one, is the main vehicle for relief.

---

[183] For example, in 1970, Arizona, California, Connecticut, Idaho, Massachusetts, New Hampshire, New York, and Wyoming became covered. *See*, Laney, Garrine P., *The Voting Rights Act of 1965: Historical Background and Current Issues* (New York: Novinka, 2003), 23.

[184] South Carolina v. Katzenbach, 383 U.S. 301 (1966).

[185] Allen v. State Board of Elections, 393 U.S. 544 (1969); Gaston County v. United States, 395 U.S. 285 (1969).

[186] City of Rome v. United States, 446 U.S. 156 (1980).

[187] Rodgers v. Lodge, 458 U.S.613, 622 (1982).

[188] *Shelby County v. Holder*, 570 U.S. 529 (2013).

# APPENDIX A

# M. Adrienne Jones

950 Ponce de Leon Ave. NE
Atlanta, GA 30306
646-522-1029
adrienne.jones@morehouse.edu

## Education

**Ph.D.**    Political Science, City University of New York Graduate Center, 2015
**M.Phil.** Political Science, City University of New York Graduate Center, 2013
**J.D**.       University of California at Berkeley, 1996
**B.A.**     Modern Culture and Media (Semiotics), Brown University, 1993

## Professional Experience

| | |
|---|---|
| **Assistant Professor**, Dept. of Political Science, Morehouse College | 2017-present |
| **Director of Pre-Law,** Dept. of Political Science, Morehouse College | 2017- present |
| **Interim Director of Transition**, External Affairs, UWP | 2015- present |
| **Adjunct Lecturer**, Dept. of Social Science, UWP | 2014- present |
| **Chief Public Relations Officer**, Office of the Chancellor, UWP | 2014-2015 |
| **Faculty Fellow**, Dept. of Social Science, UWP | 2011-2014 |
| **Adjunct Professor**, Dept. of Political Science, City College of New York (CCNY) | |
| and the Center for Workers Education (CWE) | 2001-2011 |
| **Pre-Law Advisor**, Pre-Law Program, CCNY | 2006-2011 |
| **Director**, Mock Trial and Moot Court Programs, CCNY | 2003-2011 |

## Publications

Jones, M. Adrienne, "When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006." *The Forum*, 16(2), 2018, pp. 289-312.Retrieved 17 Oct. 2018, from doi:10.1515/for-2018-0014.

Jones, Adrienne, "It's a War Movie," *Satya,* pp.48-53, 2016.

Op-Ed, "Erosion of the Voting Rights Act Threatens Fair Elections," Dubuque Telegraph Herald, August 8, 2015.
Op-Ed, "Confederate Flag Still a Sign That War Not Settled," Dubuque Telegraph Herald, July 19, 2015.
Op-ed, "The March on Selma: What's the Big Deal?" *Dubuque Telegraph Herald*, March 15, 2015.
Op-ed, "Supreme Court Decision a Sad Step Backward for Voting Rights," *Dubuque Telegraph Herald*, July 28, 2013.
Op-ed, "Scalia, Section 5 of the Voting Rights Act," *Dubuque Telegraph Herald*, June 9, 2013.

## Presentations

Interviewee, "Minority Turnout is Low In Runoff Elections And That Will Matter," December 4, NPR, GPB News, November 30, 2018.
Presenter, Morehouse College Crown Forum w/Byron Hurt, October 11, 2018.
Panelist, "The Politics of Rape," Morehouse College, Brisbane Inst., October 10, 2018.
Presenter, Crown Forum w/ john a.powell, February 22, 2018.
Panelist, *When Yes Means No the GOP and VRA*, Southern Political Science Association, New Orleans, January, 2018.
Moderator, Know Your Rights Panel, Crown Forum After Dark, October 25, 2017.
Moderator, Crown Forum After Dark, *Crown Heights* Panel, August 22, 2017.
Presenter, "The Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on Congress and the Voting Rights Act," City University of New York Political Science Job Talk Colloquium, New York, NY, September 11, 2014.
Panelist, "Citizen Koch," Screening and Panel Discussion at Mindframe Theater, Dubuque IA, August 17, 2014.

Guest Speaker, Introduction to Politics, "The VRA Today," UWP, Platteville, WI, October 3, 2013.
Panelist, "Voting in Iowa," Chambers Government Committee Meeting on the Legislative
        Agenda, Dubuque, IA, September 12, 2012.
Presenter, "Voting Rights Act: Redistricting in Covered States," 2012 Midwest Political
        Science Association (MPSA) Annual Meeting, Chicago, IL, April 12, 2012.
Speaker, "The Voting Rights Act and Redistricting in 2011," Invited Lecture for the Social Science
        Lecture Series, UWP, Platteville, WI, January 27, 2011.

## Fellowships and Awards

| | |
|---|---|
| **Faculty Fellowship**, University of Wisconsin, Platteville | 2011-2014 |
| **Black Male Initiative Fellowship Award**, CUNY | 2010 |
| **Dean K. Harrison Fellowship**, CUNY | 2011, 2013 and 2014 |

## Professional Service

| | |
|---|---|
| **Student Member**, Executive Committee, Political Science Department, City University of New York Graduate Center | 2009-2011 |
| **Moot Court Judge,** Loras College Annual Moot Court Competition | 2010-present |
| **Board Member and Organizer** of the 2012 Multicultural Inclusive Conference, University of Wisconsin, Platteville | 2011-2012 |
| **Faculty Representative,** University Strategic Planning Committee for Diversity, University of Wisconsin-Platteville | 2013- 2015 |
| **Judge for Leadership Awards**, University of Wisconsin, Platteville, | 2013 |
| **Member,** Faculty Council, Morehouse College | 2018- present |

## Employment History

| | |
|---|---|
| **Assistant Editor**, ABA Sports and Entertainment Law Journal | 1996-1997 |
| **Staff Attorney**, United States Court of Appeals | 1996-1999 |
| **Independent Filmmaker**, New York City, Los Angeles | 1996-2007 |
| **Interviewer**, The History Makers | 2007-2008 |
| **Staff Attorney**, Communications Workers of America | 2008-2011 |
| **Opinion Editorial Writer**, The Dubuque Telegraph Herald (monthly) | 2015-present |

## Membership in Volunteer and Professional Societies

| | |
|---|---|
| Co-Chair, MAC Committee, Brown Alumni Association | 2018-present |
| Member, Brown Alumni Association Board | 2014-2018 |
| Brooklyn Salon | 2010-present |
| Writer, Class News, Hathaway Brown School | 2012 -present |
| Member, New York Bar Association | 2007-present |
| Treasurer, Inman Page Black Alumni Council | 2012- 2014 |
| Treasurer, Black Documentary Collective | 2006-2011 |
| Member, North American Pre-Law Association | 2005-2011 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 15th day of August 2019, I caused to be electronically filed the foregoing Expert Report of Dr. Adrienne Jones with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Chris Carr, Esq.**
Attorney General
**Dennis Dunn, Esq.**
Deputy Attorney General
**Russell Willard, Esq.**
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Email: ccarr@law.ga.gov
Email: ddunn@law.ga.gov
Email: rwillard@law.ga.gov

**Joshua Barrett Belinfante, Esq.**
**Brian Edward Lake, Esq.**
**Carey Allen Miller, Esq.**
**Vincent Robert Russo, Jr., Esq.**
**Kimberly Anderson, Esq.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com
Email: blake@robbinsfirm.com
Email: cmiller@robbinsfirm.com
Email: vrusso@robbinsfirm.com
Email: kanderson@robbinsfirm.com

**Bryan P. Tyson, Esq.**
Special Assistant Attorney General
**Bryan Jacoutot, Esq.**
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Email: btyson@taylorenglish.com
Email: bjacoutot@taylorenglish.com
404-856-3260
Fax: 404-856-3250

/s/Allegra J. Lawrence
Allegra J. Lawrence
Georgia Bar No. 439797