*Fair Fight Action, Inc.; ACTION, Inc.; Care in Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia Highland Church, Inc.; The Sixth Episcopal District, Inc.; and Plaintiffs v. Brad Raffensperger*

**Expert Report**
**Dr. Khalilah L. Brown-Dean**

**EXPERT REPORT**
KHALILAH L. BROWN-DEAN, Ph.D.
Original Report July 19, 2019
Revised Report November 15, 2019

<u>BACKGROUND</u>

I am a tenured Associate Professor of Political Science at Quinnipiac University. I received a Bachelor of Arts in Government from the University of Virginia, and a Master's and Ph.D. in Political Science from The Ohio State University. I received advanced training in the Tufts University Metric Geometry and Gerrymandering Summer Program. I specialize in American Politics with an emphasis on elections, political behavior, and public policy. I study historical and contemporary institutional dynamics surrounding voting rights in the United States. In 2015, I co-authored a policy report for the non-partisan, nonprofit, public policy research organization the Joint Center for Political and Economic Studies titled, "Fifty Years of the Voting Rights Act: The State of Race in Politics."[1] The report combined extensive archival, quantitative, and qualitative data to examine the impact of the Voting Rights Act on registration, turnout, representation, and policy responsiveness.

My research on various aspects of voting rights, election administration, and political representation is published in peer-reviewed journals (e.g. *Politics, Groups, and Identities; National Political Science Review*), books, and policy reports. In 2015, Cambridge University Press published a chapter I authored in *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* that was co-edited by Michael Alvarez and Bernard Grofman.[2] In it I examine the changing landscape of electoral reform and its impact on civic engagement and institutional accountability. In September 2019, Polity Press will publish my book *Identity Politics in the United States*

---

[1] Khalilah L. Brown-Dean, Zoltan Hajnal, Christina Rivers, and Ismail White, "Fifty Years of the Voting Rights Act: The State of Race in Politics" (Washington, DC: Joint Center for Political and Economic Studies, 2015), *available via* http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

[2] Khalilah L. Brown-Dean, "Felon Disenfranchisement Ten Years After *Bush v. Gore."* In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore*. Co-Edited by Michael Alvarez and Bernard Grofman (Cambridge: Cambridge University Press, 2015).

that traces historical and contemporary tensions surrounding the rights and privileges of American citizenship. It concludes that the defining feature of American democracy- federalism- both shapes and is shaped by Americans' ability to fully exercise the franchise. I highlight the delicate balance between federal provisions and state discretion in administering electoral functions. My witness report reflects the research I have conducted on federalism, voting rights, and election administration since 2003. A copy of my full CV including publications over the last ten years is included in the Appendix of this report. I attest to its truth and accuracy. I am being compensated at a rate of $400/hour in this case. However, my opinions rendered in this report are in no way influenced by or contingent upon monies owed to me for my services.

## ASSIGNMENT

On June 11th, I was asked by the plaintiffs' attorneys to address the role of the Georgia Secretary of State in the domain of election administration and enforcement. I have not been asked to opine about the specific claims made in this particular case. My opinions reflect on the office of the Secretary of State, not the individual holding that position.

## SUMMARY OF OPINIONS

1) The right to vote is enshrined in the Federal Constitution with the primary responsibility for enforcement and administrative oversight resting at the state level. Federalism, or the division of power, extends to states the unique power to set the "time, place, and manner" of elections. Federalism recognizes the discretion of subordinate governments, while asserting the primacy of state provisions for outlining the duties and responsibilities of various offices and officers.

2) The federal mandates contained in the Voting Rights Act of 1965 (hereafter VRA), the National Voter Registration Act of 1993[3] (hereafter NVRA), and the Help America Vote Act of 2002[4] (hereafter HAVA) affirm the responsibility of each state and territory's Chief Election Officer to oversee the process of voter participation in federal elections.

3) In the wake of the Supreme Court's decision in *Shelby County v. Holder* (2013*)*, the primary responsibility to prevent subnational governments from implementing harmful electoral practices shifted from the federal government (represented by the Attorney General and the Department of Justice) to state governments

---

[3] https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

[4] https://www.eac.gov/about/help-america-vote-act/

(represented by the Chief Election Officer). Accordingly, the post-*Shelby County* era heightens the Chief Election Officer's responsibility to address and reconcile undue barriers to voting within the state where s/he is elected or appointed to serve.

4) Based on the State Constitution, Official Code of Georgia, and the Official Compilation of Rules and Regulations of the State of Georgia, the Secretary of State is the Chief Election Officer bearing primary responsibility for protecting voter access to federal elections at the local, county, and state level. This role is affirmed, in practice, by the Secretary of State's formal interactions with voters, candidates, and various local, county, state, and federal officials.

## ANALYSES

### A.  BACKGROUND: FEDERALISM AND THE RIGHT TO VOTE

The United States is comprised of an intricate patchwork of laws and provisions governing the right to vote. Federalism, defined as the division of power and authority between a central government and regional governments, is key to understanding the administration, enforcement, and oversight of voting rights in the U.S.[5] In Kentucky, for example, those convicted of felonies face a lifetime ban on voting while formerly incarcerated residents of Mississippi may petition members of the state legislature to have their rights restored.[6] Georgia residents must complete their prison sentence, pay all fines and restitution, and be free from parole and/or probation before they can vote again.[7] By comparison, Maine and Vermont are the only two states in the U.S. that allow

---

[5] J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill: University of North Carolina Press, 1999).

[6] Jeff Manza and Christopher Uggen, *Locked Out: Felon Disenfranchisement and American Democracy* (Oxford: Oxford University Press, 2008).

[7] Article II, Section I, Paragraph III of the Georgia State Constitution provides that, "No person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence." Also see O.C.G.A. § 21-2-216(b), "In addition to the qualifications in subsection (a) of this Code section, no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence and no person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed."

prison inmates to vote. Determining to whom voting rights should be extended,[8] the methods for exercising this right,[9] and how to best navigate a complicated maze of regulations has been a highly contested calculation since the country's founding.[10]

In drafting the Constitution, the Framers took special care to strengthen the federal government without impairing the power of state governments that were already in place. Indeed much of the debate over what form of government would be most desirable rested on demands to balance federal interests against state traditions.[11] States had the power to limit access to voting based on various characteristics such as race, gender, property ownership, moral fitness, religious identity, and residency.[12] Virginia, for example, required men to possess at least 50 acres of land without structures, or 25 acres of land with structures.[13] In other states like Rhode Island, citizenship- and by extension, voting- was limited to Christians and excluded those who identified as Catholic or Jewish.[14] Georgia's 1777 state constitution restricted suffrage to

---

[8] Bernard Grofman, Lisa Handley, and Richard Niemi, *Minority Representation and the Quest for Voting Equality* (Cambridge: Cambridge University Press, 1992).

[9] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974).

[10] Richard C. Vallely, *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago: University of Chicago Press, 2004).

[11] Rogers Smith, *Civic Ideals: Conflicting Visions of Citizenship in American History* (New Haven: Yale University Press, 1999).

[12] See Donald W. Rogers, *Voting and the Spirit of American Democracy: Essays on the History of Voting and Voting Rights in America* (Champaign, IL: University of Illinois Press, 1992).

[13] For a detailed table of suffrage requirements by state from 1776-1790, See Table A.2 of Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States.* (New York: Basic Books, 2009).

[14] James H. Kettner, *The Development of American Citizenship, 1608-1870* (Chapel Hill: University of North Carolina Press, 1978).

white men who "possessed in his own right of 10 pounds value, and liable to pay tax in this State, or being of any mechanic trade."[15] Those eligible to vote were also required to have at least six months residency in the state.  The variation in voter eligibility requirements often mapped onto the variation in state demographics.[16]

The new Constitution allowed states to maintain their own eligibility provisions while guaranteeing that those deemed eligible for full citizenship at the state level, could participate in federal elections.[17] Throughout earlier periods, federal eligibility for full citizenship explicitly barred certain groups such as American Indians,[18] women,[19] enslaved Africans,[20] and immigrants from certain countries.[21]

---

[15] Kirk Porter, *A History of Suffrage in the United States* (Chicago: University of Chicago Press, 1918).

[16] See V.O. Key, *Southern Politics in State and Nation* (New York: Knopf, 1949).

[17] Citizenship in the United States is built upon three key conceptions. The first, *jus soli,* automatically confers citizenship upon anyone born on U.S. soil. This status did not apply to African Americans, whether enslaved or free, until the adoption of the Thirteenth Amendment (1865). The second conception, *jus sanguinis,* grants citizenship to those who have at least one parent with U.S. citizenship. The last conception, naturalization, allows those born elsewhere to pursue citizenship. For a detailed discussion of the various dimensions of U.S. citizenship see Chapter 2 of Khalilah L. Brown-Dean, *Identity Politics in the United States* (Cambridge: Polity Press, 2019).

[18] See *Elk v. Wilkins*, 112 U.S. 94 (1884) and Laughlin McDonald, *American Indians and the Fight for Equal Voting Rights* (Oklahoma City: University of Oklahoma Press, 2011) for a detailed understanding of the challenges for defining citizenship and voting rights for Native Americans.

[19] See Corrinne McConnaughy, *The Woman Suffrage Movement in America: A Reassessment* (Cambridge: Cambridge University Press, 2013).

[20] See C. Vann Woodward, *The Strange Career of Jim Crow* (New York: Oxford University Press, 1974).

[21] Ron Hayduk, *Democracy For All: Restoring Immigrant Voting Rights in the United States* (New York: Routledge Press, 2006).

Article 1, Section 4 of the Constitution contains the Elections Clause that delineates the division of power between the federal government- specifically Congress- and the states in the domain of voting rights. It provides that "the Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except to the Place of Chusing (sic) Senators."[22] The principle of federalism underlies a bifurcated system allowing each level of government (federal, state, local/county) to adopt its own provisions related to things such as voter registration, polling hours, the siting of voting apparatus, the removal of individuals from voting rolls, and the tabulation of votes.

The Elections Clause does not specify which state office and/or officer(s) is responsible for overseeing election administration. Nor does it mandate that each state or territory adopt a uniform structure or central chain of command to govern how elections are administered across the state. Rather, it defers to state statutes to outline this function, task a chief administrator, and define his/her accompanying responsibilities. In most states and territories, the day-to-day duties of election administration are shared between local authorities and state officials. To be certain, local administrators have the most direct contact with voters and potential voters and most be acutely aware of the laws governing the electoral process. The Constitution grants Congress the unique and exclusive authority to enact federal laws designed to ensure state residents have fair and unfettered access to voting.[23]  Therefore, it is necessary to examine state provisions coupled with federal mandates to determine where the responsibility for elections oversight and enforcement lies.

## B.  CITIZENSHIP, FEDERALISM, AND STATE DISCRETION

Congress adopted three key Amendments designed to carve out broader protections of citizenship and its accompanying benefits. Together, the Thirteenth,

---

[22] The 1813 ratification of the Seventeenth Amendment provided for the direct election of U.S. Senators.

[23] See "The Scope of Congressional Authority in Election Administration" (Washington, DC: General Accounting Office, 2001); Karen Shanton, "The State and Local Role in Election Administration: Duties and Structures" (Washington, DC: Congressional Research Service, 2019); R. Sam Garrett, "Federal Role in U.S. Campaigns and Elections: An Overview" (Washington, DC: Congressional Research Service, 2019).

Fourteenth, and Fifteenth Amendments abolished slavery, granted citizenship to all who were born or naturalized in the United States,[24] and extended the franchise to African American males.[25] These new provisions led to a dramatic, yet brief, increase in the number of previously disenfranchised groups who were registering, voting, and running for elected office.[26]

The expansion of citizenship and voting rights at the federal level prompted numerous state constitutional conventions between 1890 and 1910 to adopt new restrictions. The concern for many state legislators was that these new protections at the federal level would undermine the distribution of power at the local level. This was particularly true for communities across the South with sizeable minority communities. These new federal guarantees of citizenship and voting rights enhanced the potential for minority groups to convert their numerical presence into political influence. In turn, the new state guidelines were constructed in such a way that upheld the federal Constitution's explicit ban on race-based disenfranchisement, while still retaining the state's power to define which groups were desirable as full citizens. To do so, most states based their disenfranchisement provisions on behaviors and attributes most commonly associated with certain groups rather than specifying such groups by name. For example, delegates to Georgia's 1908 constitutional convention adopted a cumulative poll tax, grandfather clause, and literacy tests that effectively eliminated the bulk of Black voters and most Whites who were poor. The Georgia state constitution allowed counties to hold white-only primaries and adopt additional disenfranchising techniques to meet their local interests. These institutional measures coupled with documented instances of racial violence significantly deterred many residents from

---

[24] The 14th Amendment did not explicitly address the unique standing of Native Americans and people of Asian descent who pursued citizenship.

[25] The Fourteenth Amendment prohibited states from making or enforcing laws that abridged the privileges and immunities of citizenship and provided that "all persons born or nationalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

[26] Much of the focus on the path of American political development has focused on race-based exclusions that disenfranchised African Americans. It is important to note, however, that many of the restrictions also limited the number of non-landowning White men and ethnic immigrants who were barred from voting. Therefore, we see an overall increase in electoral participation rates across racial/ethnic groups after passage of the Civil War Amendments.

even attempting to register.[27] As Figure 1 illustrates, the legacies of these restrictions effectively eliminated Black voters for nearly 30 years.

Even as federal legislative and judicial decisions struck down state provisions such as white-only primaries,[28] poll taxes,[29] and grandfather clauses,[30] they did not translate into substantial gains in registration and turnout. Local and state elected officials retained significant power to limit access to voting using both legal and extralegal means.[31] It wasn't until the passage of the Voting Rights Act of 1965 (VRA) that the federal government took a more aggressive approach to protecting state residents against arbitrary barriers imposed at the state and local level.

---

[27] See W. Fitzhugh Brundage, *Lynching in the New South: Georgia and Virginia, 1880-1930* (Champaign, IL: University of Illinois Press, 1983); Adam Przeworski, "Conquered or Granted? A History of Suffrage Extensions" *British Journal of Political Science* Volume 39, Issue 2 (April 2009, pp. 291-321); Kimberley Johnson, *Reforming Jim Crow: Southern Politics and State in the Age Before Brown* (Oxford: Oxford University Press, 2010); Jay Corzine, James Creech, and Lin Corzine, "Black Concentration and Lynchings in the South: Testing Blalock's Power-Threat Hypothesis" *Social Forces* Volume 61, Issue 3 (March 1983, pp. 774–796); Brad Epperly, Christopher Witko, Ryan Strickler, and Paul White, "Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S." *Perspectives on Politics,* pp. 1-14 doi:10.1017/S1537592718003584.

[28] See *United States v. Classic* 313 U.S. 299 (1941) and *Smith v. Allwright* 321 U.S. 649 (1944).

[29] The 24th Amendment was ratified in 1964.

[30] See *Guinn v. United States* 238 U.S. 347 (1915).

[31] The Civil Rights Act of 1957 created a Civil Rights Division within the Department of Justice. The Division is tasked with providing federal oversight of voting rights violations. The U.S. Department of Justice filed a total of 71 voting rights lawsuits in the Deep South before 1965. However, the depth of state discretion allowed local officials to devise new methods that circumvented these protections and continued to limit civic participation. See Barry E. Hawk & John J. Kirby, Jr., "Federal Protection of Negro Voting Rights," *Virginia Law Review* 51, no. 6 (Oct, 1965):1093-96.

The Act contained numerous provisions for strengthening federal protection of voting rights.[32] Most notably, the VRA allowed for federal elections monitors and created an outlet for the federal government (the DOJ) or private parties to bring lawsuits to prevent racially discriminatory laws and policies from taking effect. The "preclearance" provision required that states and jurisdictions with a documented history of discrimination (Section 5) submit proposed electoral changes to federal officials before they could take effect.[33]  The preclearance provision identified as covered jurisdictions those areas (all or parts of states) with discriminatory tests or devices and low turnout or registration in the 1964 presidential election. Section 5 covered nine states (Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia) in their entirety. Georgia was identified as a covered jurisdiction on August 7, 1965 based on data from its November 1, 1964 election and its use of devices such as the poll tax (adopted in 1802), grandfather clause (adopted in 1908), and literacy test (adopted in 1908).[34] By shifting the responsibility to states and localities to prove to federal officials that the proposed changes were not discriminatory, the preclearance process avoided the delays and expenses of litigation, and prevented discriminatory laws before they were used in elections. In 1982, Congress amended the Act to clarify that discriminatory *purpose* was not required to bring a lawsuit to invalidate election procedures that *result* in discrimination.

### C.  FEDERAL CHANGES AND HEIGHTENED STATE ACCOUNTABILITY

---

[32] Section 2 of the Voting Rights Act is a permanent provision that prohibits "any voting standard, practice, or procedure that results in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group." See https://www.justice.gov/crt/section-2-voting-rights-act.

[33] The coverage provision was originally scheduled to expire after five years. Congress extended the provisions and made additional updates to the VRA in 1970, 1975, 1982, and 2006. The ban on discriminatory devices was made permanent in 1975 in addition to extending preclearance requirements to areas with large concentrations of certain language minorities and low registration and turnout rates.

[34] Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-01 (Aug. 7, 1965).

The impact of the Voting Rights Act of 1965 was immediate. Its protections coupled with federal oversight of potential violations translated into increased rates of registration, turnout, representation, and policy responsiveness for various communities across the United States (See Figures 1 and 2). This success provided a foundation for additional federal provisions that increased state responsibility in ensuring their electoral policies and procedures did not conflict.

Figure 1: Black and White Voter Registration Rates in Louisiana and the Former Confederate States, 1878-2010[35]



---

[35] Confederate states' data are self-reported turnout of each year's voting age population. Data from 1956 to 1968 are from the American National Election Study. Data from 1972 to 2012 are from the United States Census, Current Population Survey, Voter Supplement File. See Khalilah L. Brown-Dean, Zoltan Hajnal, Christina Rivers, and Ismail White, "Fifty Years of the Voting Rights Act: The State of Race in Politics" (Washington, DC: Joint Center for Political and Economic Studies, 2015), *available via* http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

Figure 2: Black and White Presidential Election Voter Turnout in Former Confederate States, 1956-2012. (Percent of Voting Age Population)



## NATIONAL VOTER REGISTRATION ACT

Congress passed the National Voter Registration Act of 1993 (NVRA)[36] to make it easier for eligible American citizens to register to vote and to streamline the processing and maintenance of voter registration applications. The NVRA sets requirements for state compliance in *federal* elections; not state or local elections. Those requirements include offering voter registration opportunities at motor vehicle offices,[37] social services offices and agencies that accommodate those with disabilities,[38] facilitate mail-

---

[36] 42 U.S.C. §§ 1973gg – 1973gg-10.

[37] Section 1973gg-3 Simultaneous Application for Voter Registration and Application for Motor Vehicle Driver's License.

[38] Section 1973gg-5 Voter Registration Agencies.

in registration,[39] and regulate how registration lists are to be maintained.[40] The NVRA also created a uniform federal registration form that every state and territory is required to recognize. The Act's provisions apply to 44 states (including Georgia) and the District of Columbia.[41]

The NVRA both affirmed and heightened the responsibility of state election officials to ensure compliance with federal provisions governing various aspects of election administration. Section 10 of the Act requires that, "Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[42] The NVRA does not mandate what state officer is responsible for this coordination; only that each state identify this individual based on its own constitution. Other parts of the NVRA outline the responsibilities of the state-designated chief election official, "The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."[43] In addition, "On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 10 of the State of the person's residence."[44]

In *Charles H. Wesley Education Foundation, Inc. v. Cathy Cox et al.*, 408 F.3d 1349 (11th Cir. 2005), the Court ruled that the State of Georgia violated the provisions of the NVRA by rejecting 64 mail-in voter applications bundled and submitted by a local non-

---

[39] Section 1973gg-4 Mail Registration.

[40] Section 1973gg-6 Requirements With Respect to Administration of Voter Registration.

[41] See the amici curiae briefs filed by the State of Georgia and 14 other states accompanying *Husted v. Randolph* ___ U.S. ___, 138 S.Ct. 1833 (2018) seeking clarification of state responsibilities in adhering to the National Voter Registration Act.

[42] Section 10, National Voter Registration Act.

[43] Section 6, National Voter Registration Act.

[44] See Section 8, Requirements with Respect to Administration of Voter Registration for the full list of responsibilities for the chief election officer as required by Section 10 of the NVRA.

profit organization.[45] Additional challenges to Georgia's compliance with the NVRA address the relationship between proof of citizenship and voting and the maintenance of voter lists.[46] Section 5 of the National Voter Registration Act provides that voter registration applications may only require the minimum amount of information necessary for a state to determine applicants' eligibility to register to vote and to perform its registration duties.

**HELP AMERICA VOTE ACT**

In the wake of overwhelming concerns about voter access, voting equipment, and disenfranchisement allegations during the 2000 Presidential election, the Help America Vote Act (HAVA) of 2002 provides federal resources to help states and local governments streamline, strengthen, and enhance election administration. The Act created a bipartisan, independent Election Assistance Commission (EAC) and allocated $3.65 billion to help states carry out the following provisions: The creation and maintenance of a computerized state voter registration system,[47] the replacement of punch card and lever voting machines,[48] the distribution of provisional ballots to residents whose registrations are questioned,[49] enhanced access for voters with disabilities,[50] and assistance in developing plans to secure voting systems. HAVA

---

[45] The lead defendant in that case, Cathy Cox, was the Georgia Secretary of State at the time.

[46] See *Georgia Coalition for the People's Agenda, Inc. et al. v. Brian Kemp* 347 F. Supp. 3d 1251 (N.D. Ga. 2018); and *Morales v. Handel* No. 1:08-CV-3172m 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) for cases challenging Georgia's compliance with the mandates of the National Voter Registration Act. In each of those cases the named defendant was acting in his/her official capacity as Secretary of the State of Georgia.

[47] Pub. Law 107-252 § 303(a); 42 U.S.C. § 14853(a).

[48] Pub. Law 107-252 § 102(a); 42 U.S.C. § 15302(a). States could be exempted from this requirement if they received a waiver.

[49] Pub. Law 107-252 § 302; 42 U.S.C. § 15482. HAVA allows for provisional ballots to be tabulated according to the provisions established in each state or territory.

[50] Pub. Law 107-252 § 301; 42 U.S.C. § 15481.

required that states replace their voting machines with one of three forms: Direct-Recording Electronic Voting (DRE), Optical Scans, or Ballot Marking Devices (BMD). The State of Georgia, along with 17 other states, opted to create a uniform voting system where all voting equipment is purchased at the state level.[51] Table 1 below illustrates the types of voting machines used in Georgia during the 2000 election as well as accompanying information regarding the number of counties using each type of machine and the estimated number of spoiled ballots.

### Table 1: Georgia Voting Equipment Performance
### (2000 General Election)[52]

| Voting System | Introduced in Georgia | Counties Using System | Under Vote Percentage | Votes Not Counted |
|---|---|---|---|---|
| Paper Ballot | 1900 | 2 | 3.3 | 113 |
| Punch Card | 1964 | 17 | 4.6 | 38,065 |
| Lever Machine | 1959 | 73 | 4.2 | 16,926 |
| Optical-Scan | 1986 | 67 | 2.7 | 38,195 |
|     Central Count | _____ | _____ | 4.2 | 21,999 |
|     Precinct Count | _____ | _____ | 4.7 | 16,196 |

---

[51] Other states with uniform voting systems include Alabama, Alaska, Connecticut, Delaware, Hawaii, Louisiana, Maine, Maryland, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, Utah, and Vermont.

[52] Publication of State Plan Pursuant to the Help America Vote Act, 73 Fed. Reg. 54141-02 (Sept. 18, 2008). Precinct count optical-scans scan paper ballots at the polling place and provide opportunities for voters to be notified of and correct a ballot error or receive a new ballot. Central count scans collect ballots that are scanned and counted at an offsite, central location. This process does not allow individual voters to correct any errors. I was unable to find data on the number of counties using central or precinct count scans in 2000. See Charles S. Bullock, III and M.V. Hood, III, "One Person-No Vote; One Vote; Two Votes: Voting Methods, Ballot Types, and Undervote Frequency in the 2000 Presidential Election" *Social Sciences Quarterly* Volume 83, No. 4 (December 2002, pp. 981-993).

The provisions of HAVA, via the Election Assistance Commission in particular, affirm the important interaction between state and local officials involved in election administration. The EAC's Standards Board is comprised of 55 state elections officials and 55 local officials. While the EAC provides a range of technical assistance to local election officials, HAVA's statutes specify that each State's Chief Election Officer has primary oversight responsibility in overseeing the proper implementation and compliance with its provisions. As with the National Voter Registration Act, HAVA relies on each state or territory to identify a Chief Election Officer. The Federal Register publishes state plans, pursuant to the Help America Vote Act, as submitted to the Election Assistance Commission. As part of my research for this case I reviewed the Federal Registers from 2018 (Vol. 83, No. 104), 2014 (Vol. 79, No. 127), 2010 (Vol. 75, No. 234), 2008 (Vol. 73, No. 182), 2006 (Vol. 71, No. 8), and 2004 (Vol. 69, No. 57). The 2018 lists the Chief Election Officer for each state. I examined that document and noted that the Chief Election Officer for the State of Georgia is listed as the Secretary of State.[53] The information contained in the 2018 Federal Register is consistent with other publications of the Federal Record I researched for the years listed above.

I reviewed EAC allocations to states for the same years. In my research of recent EAC allocations to states, I found that in April 2018 the Georgia Secretary of State's Office accepted a $10,305,783 grant allocation from the U.S. Election Assistance Commission to "improve the administration of elections for Federal office, including to enhance election technology and make election security improvements."[54] The modular

---

[53] There is no federal requirement that the Secretary of State serve as the Chief Election Officer; this designation is specified in each state constitution or charter. In Delaware, for example, the Chief Election Officer is the Commissioner of Elections while Kentucky's Chief Elections Officer is the Executive Director of the State Board of Elections.

[54] 52 U.S. Code § 20901 specifies that, "Not later than 45 days after October 29, 2002, the Administrator of General Services (in this subchapter referred to as the "Administrator") shall establish a program under which the Administrator shall make a payment to each State in which the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after October 29, 2002, that the State intends to use the payment in accordance with this section." See the Attached Memo and Grant Budget from Chris Harvey, identified as the Elections Director in the Office of Georgia

budget and federal financial report (see Attachment C) accompanying the grant memo includes a 5% state match to improve "election security, simplicity, and accessibility" for a total award of $10,821,072.[55]  Some of the proposed uses included purchasing secure devices that produce a verifiable paper ballot, improving voter registration database management, and updating the online voter registration page. In April 2018, then-Secretary of State Brian Kemp established Georgia's Secure, Accessible, and Fair (SAFE) Elections Commission to study and propose options for the state's election system. I reviewed the report containing the final recommendations the commission submitted to the General Assembly on January 10, 2019. Page five of the document notes that, "Georgia implemented its current uniform voting system that uses DRE systems for in-person voting. Georgia has a 'top-down' election system where ballots are constructed by the Center for Elections System, which was previously a part of Kennesaw State University, but is now part of the Office of the Secretary of State."[56] Many of report's proposals reflect the provisions covered by HAVA and thus eligible for funding from the Elections Assistance Commission, and compliance with its mandates.[57]

### *Shelby County v. Holder*

In 2010, election officials from Shelby County, Alabama sued the US Attorney General to challenge the constitutionality of Sections 4(b) and 5 of the Voting Rights Act

---

Secretary of State Brian P. Kemp, addressed to Brian Newby, Executive Director of the U.S. Election Assistance Commission.

[55] §15403 of the Help America Vote Act outlines the condition for receipt of funds, "a state is eligible to receive a requirements payment for a fiscal year if the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, has filed with the Commission a statement certifying that the State is in compliance with the requirements referred to in subsection (b) of this section."

[56] See "Secure, Accessible, and Fair Elections (SAFE) Commission Report," submitted to the General Assembly, January 10, 2019. Commission Co-Chairs Secretary of State Robyn Crittenden and State Representative Barry A. Fleming.

[57]

https://sos.ga.gov/index.php/elections/secure_accessible__fair_elections_safe_commission.

of 1965. In a 5-4 ruling, the Supreme Court struck down the coverage formula (Section 4) used to identify covered jurisdictions that were previously required to submit proposed election rule changes (Section 5) to the Department of Justice, "Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned nationwide for over 40 years. And voter registration and turnout numbers in the covered States have risen dramatically."[58]

While the ruling in *Shelby County* did not eliminate the VRA, it significantly weakened federal oversight of election administration. Previously covered jurisdictions in Texas, North Carolina, Florida, Mississippi, Alabama, and Georgia introduced new measures regulating voter access following the ruling. *Shelby County* allowed local election officials to make decisions such as consolidating polling places, purging voters, adopting stricter voter id requirements, changing election dates, and eliminating early voting without first submitting those proposed changes for federal review. The ruling heightened concerns from some groups that these facially neutral restrictions could disproportionately impact minority groups who necessitated the original passage of the Voting Rights Act of 1965.[59]

*Shelby County* reaffirmed the importance of federalism outlined in earlier passages of this report. First, it placed the onus on Congress to exercise its Constitutional authority to create a new Section 4 formula based on more contemporary data. Second, in the absence of federal authority to prevent discriminatory policies from taking effect, *Shelby County* shifted the responsibility to state election officials to both monitor and remediate electoral practices that undermine the rights enshrined in the Federal Constitution and protected by other sections (most notably Section 2) of the Voting Rights Act of 1965. Local officials continue to play a key role in executing various election administration functions in accordance with the mandates of state law and constitutional authority. For example, in researching the duties and functions of various county election boards in Georgia I noted the charge of the Augusta-Richmond County Board of Elections, "To make and issue rules, regulations, and instructions,

---

[58] *Shelby County v. Holder*, 133 S.Ct. 2612, 2627-28 (2013).

[59] See for example, Thurgood Marshall Institute at the NAACP Legal Defense and Education Fund, "Democracy Diminished: State and Local Threats to Voting Post *Shelby County v. Holder*" (New York: NAACP LDF, 2018).

consistent with law as deemed necessary for the guidance of poll officers and voter registration officers."[60]

However, this local discretion does not supersede the primary responsibility that now falls upon state election officials to ensure no procedure, device, or practice adopted at the local or state level, impairs the rights and protections afforded at the federal level. The Chief Election Officer may exercise this oversight in a number of ways. For example, the Official Code of Georgia instructs the Secretary of State, "to develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state."[61] Similarly, "the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002."[62]

Under *Shelby County,* the Chief Election Officer must now work closely with other government officials to ensure state residents have fair and consistent access to the electoral process. When measures are passed by the legislature, for example, the duty falls upon election administrators to carry them out in accordance with the previously described federal guidelines. A decision by a state legislature to raise the minimum voting age to 21, for example, should not be carried out by state election officials because it imposes a more stringent age qualification than what is required by the Twenty-Sixth Amendment. However, a state election officer could legally carry out a legislative plan to lower the minimum age to 17 for state and local elections. It should be noted that Georgia is one of seven states where election management is handled by both a Chief Election Official and a State Board. However, the federal mandates of the National Voter Registration Act and the Help America Vote Act vest authority with the singular Chief Election Official identified by the state. In Georgia, that official is the Secretary of State.[63]

In sum, *Shelby County* significantly heightened the responsibility of each State's Chief Election Officer to oversee and enforce election administration to ensure state compliance with the protections embedded in the Federal Constitution and affirmed by

---

[60] See Attachment K.

[61] O.C.G.A. § 21-2-50(a)(15).

[62] O.C.G.A. § 21-2-50.2(c).

[63] O.C.G.A. § 21-2-50.2(a).

the Voting Rights Act of 1965, the National Voter Registration Act, and the Help America Vote Act. Barring direct federal oversight of compliance, the principle of federalism shifts that responsibility to state election officials.

### D. Georgia state provisions for Election Administration and Authority

With these federal requirements in mind, I conducted an extensive review of Georgia statutes and regulations to evaluate the following questions:

1) What, if anything, is the role of the Secretary of State (SOS) with respect to voting and elections?
2) What is the statutory authority identifying the Secretary of State as the Chief Election Officer?
3) And accordingly, what powers and responsibilities are assigned to the Chief Election Officer?

Based on this review, I identified a total of 156 duties and responsibilities connecting the Secretary of State to election administration. These 156 duties are found in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia. I organized those 156 provisions into three key categories of election administration: 1) Interaction With Candidates for Public Office 2) Interaction With Voters, and 3) Interaction With Election Officials. These categories often overlap and should not be considered as mutually exclusive. Rather, I focus on the primary duties in each provision when assigning to categories. Table 2 (see Attachment A) contains all 156 provisions, as well as my categorizations. There are few, but important statements outlining the Secretary of State's interactions with (potential) candidates for public office. An example of Category 1 is the Secretary of State's duty to "receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State in accordance with this chapter."[64] Category 2, interactions with voters, most closely aligns with educating and protecting voters' rights. An example of Category 2 is the obligation to "prepare and furnish information for citizens on voter registration and voting."[65] I noted in my research that the bulk of Georgia's provisions defining the role of the Secretary of State in election administration falls under Category 3; defining her/his duties to guide and oversee the actions of local

---

[64] O.C.G.A. § 21-2-50(a)(3).

[65] O.C.G.A. § 21-2-50(a)(13).

officials. An example of Category 3 is "The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State. The board of registrars shall provide each deputy registrar with a copy of the manual."[66]

In Table 3 (see Attachment B) I juxtapose the NVRA, HAVA, and VRA requirements with the Georgia statutes regulating the duties of the Chief Election Official. In the space below I highlight some of the major provisions governing the Secretary of State's responsibilities for election administration.

*The Role of the Secretary of State*

The Secretary of State for Georgia is an elected position tasked with numerous duties such as housing the Professional Licensing Boards Division, implementing and enforcing the Georgia Uniform Securities Act of 2008, registering charitable organizations, and of specific interest to this report, "The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, municipal, state, county, and federal elections. They are responsible for certification of election results as well as certifying the qualification of candidates and preparation of ballots and election forms and materials. The Elections Division provides Great Seal certification for authentication of public documents for foreign use for non-Hague countries. Along with those duties, the Elections Division maintains the Statewide Voter Registration Database to ensure that voter registration lists are current statewide. **They are also accountable for investigating election fraud and enforcing state election laws**."[67] (emphasis added).

*Chief Election Officer*

The Office of the Secretary of State acts as a key resource for voters in the State of Georgia. For example, I analyzed the My Voter Page (MVP) portal that is maintained by

---

[66] Ga. Comp. R. & Regs. 183-1-6-.03(3)(n).

[67] https://sos.ga.gov/index.php/elections.

the SOS's Office. The MVP portal enables Georgia voters to review their voter registration status, locate early voting and poll locations, check the status of mail-in applications, view sample ballots, and review the status of their provisional ballots.[68] The site's disclaimer documents that the data provided by the SOS site is extracted from data provided by the various counties of residence. The portal also contains links to the state's Election Advisory Council, the state's voter identification requirements,[69] the VoteSafe program,[70] and a form to report allegations of voter fraud.[71]

Several provisions in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia identify the Secretary of State as the Chief Election Official. Most notably, O.C.G.A. § 21-2-50.2(a) provides that:

> The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.

Accordingly, O.C.G.A. § 21-2-50.2(b) states:

> As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.[72]

---

[68] https://www.mvp.sos.ga.gov/MVP/mvp.do.

[69] O.C.G.A § 21-2-417.

[70] https://sos.ga.gov/index.php/elections/votesafe.

[71] https://sos.ga.gov/cgi-bin/EMailStopVoterFraud.asp.

[72] Title III of HAVA refers to the Uniform and Non-Discriminatory Technology and Administration Requirements. It guarantees provisional ballots to electors whose registration is disputed, requires appropriate voting systems, mandates a centralized voter registration database, and allows for absentee ballots. Section 305 is of particular

Together these two provisions create an oversight function of the Secretary of State in ensuring compliance with the mandates of the Help America Vote Act. In a broader sense, over 100 of the 156 statutes I examined highlight the key role the State's Chief Election Official must play in coordinating, monitoring, and overseeing the administrative functions of subordinate election administrators. For example, the Secretary of State approves the certification program for "all county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by completing a certification program approved by the Secretary of State by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections."[73]

*Election Oversight with Intrastate and Interstate Officials*

The Secretary of State is required to provide multiple training sessions for the aforementioned election officials, and has the discretion to waive training requirements for local election officials:

> A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State.[74]

---

note, "The specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State."

[73] O.C.G.A. § 21-2-101(a).

[74] O.C.G.A. § 21-2-100(c).

My review of the official website for the Secretary of State's Office shows a wealth of information and resources to assist various state and local agencies (e.g. public high schools and colleges; the Georgia Department of Natural Resources; and public libraries) in carrying out the federal voter registration provisions required by the NVRA.[75] For example, the Election Connection tab contains links to a document for agencies entitled, "Implementing NVRA in Designated Agencies." The document's preface states:

> *Implementing NVRA in Designated Agencies* is to be used as a guide for the administration of voter registration conducted by Georgia Agencies under the National Voter Registration Act of 1993 (NVRA). This manual is not intended to be used as a substitute for the Georgia Constitution, relevant statutes, or applicable case law. Whenever there is a question regarding the interpretation of information contained in this guide, or of a particular section of the Election Code, or any other statute, the user should contact competent legal counsel or the Office of the Secretary of State, Elections Division.[76]

The "Implementing NVRA" guide also outlines the Role of the Secretary of State's Office:

> The NVRA requires that each state designate a chief election official to be responsible for coordination of the state responsibilities under this act. The Secretary of State has been named the chief election official for Georgia. Under state law, the Secretary of State is charged with establishing and maintaining a statewide voter registration system. The system must be capable of meeting federal requirements for maintaining lists of eligible active voters and those voters considered inactive. The Secretary of State is responsible for overseeing statewide list maintenance activities and functions required under federal and

---

[75] https://sos.ga.gov/index.php/Elections/election_connection.

[76] http://sos.ga.gov/admin/files/Implementing_NVRA_DHS_v.1_2011_.pdf.

state laws. These relate to updating voter information and removing ineligible persons from the voter lists.[77]

The Secretary of State has oversight powers for various details governing the local administration of elections including determining the size and shape of the envelopes used to submit absentee ballots,[78] designing and supplying tally sheets, voting rights posters, oaths of assisted electors, and poll officers.[79] The Secretary of State receives election results from election superintendents of the various counties and certifies the votes. Election results for each of Georgia's 159 counties are tabulated and made available via the Secretary's official website pursuant to O.C.G.A. § 21-2-499. In addition, "in the case of primaries, elections, and runoffs for county, state, and federal office, the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State, within seven days following a primary, election, or runoff."[80]

The Secretary of State acts as the central point of contact for receiving information regarding voter eligibility of Georgia residents. The Office receives information from federal officials (e.g. Georgia residents who have been convicted of federal felonies and thus ineligible to vote while incarcerated or on parole or probation), state agencies (e.g. natural resources and the Department of Driver Services), and local entities (e.g. probate court). The SOS is responsible for using this data to update the central registration database that local superintendents and election officials use to verify registrations, "prior to approving the application of a person to register to vote, the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State."[81]

---

[77] p. 4.

[78] O.C.G.A. § 21-2-384(b).

[79] O.C.G.A. § 21-2-400(a).

[80] Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9).

[81] O.C.G.A. § 21-2-216(h).

The Office of the Secretary of State also plays a key role in ensuring election integrity by notifying other states of new Georgia residents' status, "Any person who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence."[82]

Relatedly, the Secretary of State is the central point of contact for notifying counties and municipalities within the state of changes to residence, "Any person, who is registered to vote in another country or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, at the time of making application to register to vote in that county or municipality, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence."[83]

*Election Oversight with Federal Officials*

As the Chief Election Official for the State of Georgia, the Secretary of State represents the state in official interactions with the federal government related to election administration. For example, in May 2017, President Donald J. Trump signed Executive Order 13799 establishing the Presidential Advisory Commission on Election Integrity to study registration and voting procedures in order "to promote fair and honest Federal elections.[84]" Commission Vice-Chair Kris Kobach sent a request to each state's chief election official for "publicly-available data from state voter rolls and feedback on how to improve election integrity."[85] The Georgia Secretary of State's Office responded to this federal request in its official capacity as the state's chief election officer, "The Georgia Secretary of State's Office will provide the publicly available voter

---

[82] O.C.G.A. § 21-2-218(a).

[83] Ibid.

[84] Executive Order, https://www.whitehouse.gov/presidential-actions/presidential-executive-order-establishment-presidential-advisory-commission-election-integrity/.

[85] Ibid.

list. As specified in Georgia law, the public list does not contain a registered voter's driver's license number, Social Security number, month and day of birth, site of voter registration, phone number or email address."[86] The Secretary of State complied with the federal request while withholding personal information (e.g. social security numbers, phone numbers, and email addresses) as required by Georgia state law.

The Appendix to this report includes official memos I researched documenting interactions between the Secretary of State, acting in his official capacity as the Chief Election Official, and the Chair of the federal Election Assistance Commission (EAC). Of note is a series of memos from 2013 and 2014 requesting permission to make changes to the National Voter Registration Mail Application Form. Although *Shelby v. Holder* means that states are no longer required to submit proposed changes for federal approval, the mandates of the National Voter Registration Act are still intact and require pre-approval for state changes to the federal information forms and requirements. A memo (Attachment D) written to Ms. Alice Miller, Acting Executive Director of the EAC, from Secretary of State Brian P. Kemp dated August 1, 2013 begins as follows:

> Dear Ms. Miller,
>
> As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

Attachment E includes Miller's subsequent responses (2) to Secretary Kemp:

---

[86] Coverage of this official press release from the Secretary of State's Office can be found here https://www.11alive.com/article/news/politics/national-politics/georgia-to-release-data-to-trump-election-commission/85-453342487

Dear Secretary Kemp:

Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that EAC revise the Georgia state-specific instructions by making the following changes:

1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:

   • Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship

2. Revision of the mailing address as follows:

   Elections Division
   Office of the Secretary of State
   2 Martin Luther King, Jr. Drive
   Suite 802 Floyd West Tower
   Atlanta, GA 30334

Finally, I attach copies of correspondence between Secretary Kemp and EAC Director Newby regarding the state's requests to make changes to Georgia-specific information on the federal voter registration form related to agency address and proof of citizenship (Attachments F, G, and H). This correspondence illustrates the important role Georgia's Chief Election Official plays in overseeing election administration on behalf of the state's residents.

The U.S. Election Assistance Commission conducts a biennial Election Administration and Voting Survey (EAVS) to gather state-level data on various aspects such as the number of military personnel registering to vote, voting technology, and the frequency of provisional voting. The comprehensive data is used to ensure compliance with the various mandates of both HAVA and NVRA and to improve election administration. The official federal report lists Georgia as one of 38 states in the country with what it terms a "top-down" voter registration process where the chief election official "gathers and aggregates information from local jurisdictions' voter registration databases."[87] Each state's election office works in conjunction with local officials to gather the data, which is then submitted to the EAC. I reviewed the 2018 Comprehensive Report to the 116th Congress that was published in June 2019 to gain a

---

[87] See United States Election Assistance Commission, "Election Administration and Voting Survey 2018: Comprehensive Report to the 116th Congress," (Silver Spring, MD: EAC, 2019). https://www.eac.gov/assets/1/6/2018_EAVS_Report.pdf.

better understanding of the information provided on behalf of the State of Georgia and by whom. Unfortunately, several key measures were not provided by Georgia officials such as the number of poll workers. Of relevance to my report, however, was the official data provided by Georgia's Secretary of State indicating the number and form of new voter registration applications and the use and rejection of provisional ballots. Tables 4 and 5 below provide this data.[88]

### Table 4: Georgia Voter Registration Applications*

| Total | Mail, Fax, Email | In-Person | Online | Motor Vehicle Offices | Public Assistance Offices | Disability Services Office | Armed Forces | Other Agencies | Registration Drives-Advocacy Groups or Parties | Other Sources | Not Categorized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,498,331 | 280,957 (6.25%) | 102,468 (2.28%) | 357,491 (7.95%) | 3,596,384 (79.95%) | 23,656 (.53%) | 30,914 (.69%) | 97 (0%) | _____ | _____ | 106,634 (2.36%) | 0 0% |

* Indicates requests for which the state did not submit data

### Table 5: Georgia Provisional Voting*

| Total Provisional Ballots Submitted | Full Ballots Counted | Partial Ballots Counted | Rejected Ballots | Other |
|---|---|---|---|---|
| 21,604 | 11,905 (55.1%) | _____ – _____ – | 9,699 (44.9%) | _____ _____ |

* Indicates requests for which the state did not submit data

---

[88] Ibid.

Taken together the state statutes, memos, press releases, grant acknowledgements, NVRA implementation guide for state agencies, website resources, federal reports and bulletins I researched affirm the practical ways the Georgia Secretary of State acts in his/her official capacity as the Chief Election Official responsible for administering, enforcing, and reconciling key functions at the local, state, and federal level.

### E.  CONCLUSION

The federal provisions found in the Constitution guarantee that all eligible citizens have unfettered access to voting in federal elections. The principle of federalism allows state discretion in defining fair and consistent standards for determining eligibility. However, the mandates of the National Voter Registration Act and the Help America Vote Act, coupled with *Shelby County v. Holder*'s removal of federal oversight in preclearing or preventing potentially harmful electoral changes and procedures amplify the importance of each state's Chief Election Officer in overseeing election administration across the entire state. In Georgia, the Chief Election Officer is identified by state statutes as the Secretary of State. That position is tasked with over 156 duties establishing broad oversight, enforcement, and correction responsibilities to ensure Georgia residents may effectively exercise the right to vote. The evidence contained in this report is consistent with my research into voting rights and election administration in various states and the nation as a whole.

## LIST OF ATTACHMENTS AND APPENDIXES

ATTACHMENT A: Georgia Statutes Outlining the Secretary of State's Duties (Table 2)

ATTACHMENT B: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State (Table 3)

ATTACHMENT C: 2018 HAVA Election Security Grant Award Letter from Georgia Secretary of State to the U.S. Election Assistance Commission (July 10, 2018)

Correspondence between the U.S. Election Assistance Commission and the Georgia Secretary of State
-   August 1, 2013 ATTACHMENT D
-   August 15, 2013 ATTACHMENT E
-   January 17, 2014 ATTACHMENT F
-   January 29, 2016 ATTACHMENT G
-   September 12, 2016 ATTACHMENT H

ATTACHMENT I: Federal Financial Report for Grant Received by the Georgia Secretary of State's Office (December 27, 2018)

ATTACHMENT J: Federal Voter Registration Guide and Form with Georgia-Specific Information

ATTACHMENT K: Augusta-Richmond County Georgia Board of Elections Pamphlet (March 2018)

APPENDIX A: Brown-Dean Curriculum Vitae

APPENDIX A:  Curriculum Vitae for Khalilah L. Brown-Dean

## ACADEMIC EMPLOYMENT

*Quinnipiac University*
>   Associate Professor of Political Science, 2011-Present

*Yale University*
>   Peter Strauss Family Assistant Professor of Political Science and African American Studies (2006-2011)

>   Director of Undergraduate Studies for the Department of African American Studies (2009-2010)

>   Assistant Professor of Political Science and African American Studies (2003-2006)

## EDUCATION

2003 The Ohio State University, Ph.D., Political Science (American Politics and Political Psychology) Dissertation: "One Lens, Multiple Views: Felon Disenfranchisement Laws and American Political Inequality" *APSA Race, Ethnicity, and Politics Section Best Dissertation Award (2005)*

2001 The Ohio State University, M.A., Political Science

1998 The University of Virginia, B.A., Government

## ADDITIONAL EDUCATION AND TRAINING

2017 Tufts University Metric Geometry and Gerrymandering Summer Program
2017 Tufts University Gerrymandering Expert Witness Training
1999 Summer Institute in Political Psychology, Certificate, Political Psychology

## SCHOLARSHIP AND RESEARCH PUBLICATIONS

### *Books*

>   Brown-Dean, Khalilah L. September 2019. *Identity Politics in the United States*. London: Polity Press. ISBN: 9780745654119

>   Duffy, Sean, Timothy Dansdill, Jill Shahverdian, Aileen Dever, Khalilah L. Brown-Dean, and Julia Giblin, eds., 2014. *The Individual in the Community*. Pearson. 8th Edition.

## Refereed Articles

Brown-Dean, Khalilah L. and Benjamin E. Jones. 2015. "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." *Politics, Groups, and Identities.*

Alexander-Floyd, Nikol C., Byron D'Andra Orey, and Khalilah L. Brown-Dean. 2015. "Professional Conferences and the Challenges of Studying Black Politics." *PS: Political Science and Politics.*

Brown-Dean, Khalilah L. 2015. "Emphasizing the Scholar in Public Scholarship." *PS: Political Science and Politics.*

Wilson, David C. and Khalilah L. Brown-Dean. 2012. "Great[er] Expectations: Group Interests, Deracialization, and Candidate Evaluations." *National Political Science Review.*

Brown-Dean, Khalilah. L. 2009. "Do Classes Matter?: Evaluating the Impact of College Courses on Tolerance." *Journal of the Institution for Social and Policy Studies.*

Brown-Dean, Khalilah L. 2007. "Permanent Outsiders: Felon Disenfranchisement and the Breakdown of Black Politics." *National Political Science Review.*

Brown-Dean, Khalilah L. 2005. "Trading *Brown* for Prison Orange: Reflections on Race and Justice Fifty Years after *Brown v. Board.*" *Journal of the Institution for Social and Policy Studies.*

## Book Chapters

Brown-Dean, Khalilah L. *Forthcoming.* "Monumental Promises, Incremental Gains: Criminal Justice Reform in the Obama Era." In *After Obama: African American Politics in a Post-Obama Era.* Edited by Todd C. Shaw, Robert Brown, and Joseph McCormick III. New York, NY: NYU Press.

Brown-Dean, Khalilah L. 2016. "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation." In *Urban Citizenship and American Democracy.* Edited by Amy Bridges and Michael Javin Fortner. Albany, NY: SUNY Press.

Brown-Dean, Khalilah L. 2015. "Felon Disenfranchisement Ten Years After *Bush v. Gore.*" In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore.* Co-Edited by Michael Alvarez and Bernard Grofman. Cambridge: Cambridge University Press.

## Policy Papers and Other Publications

Brown-Dean, Khalilah L. and Don C. Sawyer, III. 2019. "The State of Education in Urban Connecticut." In *The State of Urban Connecticut,* edited by Robert Brown, III. New Haven, CT: The Urban League of Southern Connecticut.

Brown-Dean, Khalilah L. 2018. "Fighting From a Powerless Space: Black Women and the Criminal Justice System." In *State of Black Women in the U.S. and Key States,* edited by Avis A. Jones-DeWeever. Washington, DC: National Coalition on Black Civic Participation.

Brown-Dean, Khalilah L. 2017. Book Review of *Sisters in the Statehouse* by Nadia Brown. *Journal of Race, Ethnicity, and Politics.*

Brown-Dean, Khalilah L., Zoltan Hajnal, Christina Rivers, and Ismail White. 2015. "Fifty Years of the Voting Rights Act: The State of Race in Politics." *Joint Center for Political and Economic Studies.*

Brown-Dean, Khalilah L. November 2013. "In the Final Analysis: On Nick Nelson's Contributions to the Study of Black Politics." *Politics, Groups, and Identities.*

Brown-Dean, Khalilah L. 2012. Cited in the Connecticut State Judiciary Committee's Favorable Report for SB-280: An Act Revising Penalties for Capital Felonies. https://www.cga.ct.gov/2012/JFR/S/2012SB-00280-R00JUD-JFR.htm

Brown-Dean, Khalilah L. 2010. Book Review of *The Perils of Federalism: Race, Poverty, and the Politics of Crime Control* by Lisa L. Miller. *Political Science Quarterly.*

Brown-Dean, Khalilah L. et al. 2008. "Lift Every Voice: Democracy, Voting Rights, and Electoral Reform." Published in conjunction with the Advisory Committee on Social Witness Policy (ACSWP) and the Advocacy Committee for Racial Ethnic Concerns (ACREC).

## WORKS IN PROGRESS

Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context (journal manuscript with David C. Wilson and TaLisa Carter)

Centering Victims' Voices in Criminal Justice Reform Movements (book manuscript)

Negotiating Voting Rights Policy in the Post-*Shelby* Era (journal manuscript)

Inmate Labor and Post-Disaster Recovery (journal manuscript with Randolph Burnside)

## ACADEMIC AWARDS, GRANTS, AND FELLOWSHIPS

2018, 2017, 2016 Quinnipiac University Provost's Innovation Grants ($15,000)

2018-2012 Quinnipiac University College of Arts and Sciences Faculty Research Grants ($30,000)

2017 Top 25 Women Making a Difference in Higher Education Award, Presented by *Diverse: Issues in Higher Education*

2014 National Conference of Black Political Scientists Julia R. Hight Summer Writing Fellowship

2010 National Conference of Black Political Scientists Rodney Higgins Award for Best Faculty Paper

2009-2011 The Open Society Foundations Justice Advocacy Senior Fellowship ($200,000)

2008-2010 Ford Foundation Difficult Dialogues Initiative ($200,000)

2005 American Political Science Association Best Dissertation Award (Race, Ethnicity, and Politics Section)

2005 Yale Center for International and Area Studies ($10,000)

2005 Social Science Research Fund ($5,000)

2005 Yale University Center for the Study of American Politics ($50,000)

2005 The College Board/AP Scholars Program Fellow ($7,000)

## AWARDS FOR PUBLIC SCHOLARSHIP AND SERVICE

2017 Game Changer Award in Public Safety and Criminal Justice, Presented by the Connecticut NAACP State Conference Youth and College Division

2017 Education Award, Presented by the Delta Iota Sigma Chapter of Phi Beta Sigma Fraternity, Incorporated

2016 Fannie Lou Hamer Award for Outstanding Community Service, Presented by the National Conference of Black Political Scientists

2015 Outstanding Community Leadership Award, Presented by the Connecticut State Martin Luther King, Jr. Commission

2014 Legacy Award, Presented by the National Association of Blacks in Law Enforcement

Walt Everitt Humanitarian Award, Presented by the Connecticut Network to Abolish the Death Penalty

Forty Under Forty Award, Presented by *Connecticut Magazine*

2007 Wilma Holmes Tootle Education Advancement Award, Presented by the North Atlantic Region of Alpha Kappa Alpha Sorority, Incorporated

## PRIOR AWARDS AND ACHIEVEMENTS

2002 National Conference of Black Political Scientists Sammy R. Young Best Student Conference Paper Award

2002 The Ohio State University Alumni Grant for Graduate Research and Scholarship ($2,000)

2002 The Ohio State University Madison F. Scott Research Grant ($2,000)

2001 The Ohio State University Madison F. Scott Research Grant ($1,500)

2000 The American Political Science Association Advanced Graduate Student Travel Grant ($500)

2000 Carl Albert Center for Congressional Research Stipend ($500)

2000 The Ohio State University Program for the Enhancement of Graduate Studies Summer Research Fellowship ($4,000)

1999 The Ohio State University Madison F. Scott Research Grant ($1,500)

1998 The Ohio State University Graduate Enrichment Fellowship ($30,000)

1997 American Political Science Association Ralph Bunche Summer Institute Fellow

## RESEARCH AND TEACHING INTERESTS

Civic Engagement; Racial and Ethnic Politics; Urban Politics and Policy; Voting Rights and Representation; The Politics of Punishment and Crime Control Policy; Mass Political Behavior; Political Psychology; Public Policy and Leadership

## PUBLIC SCHOLARSHIP

**2019**
    Brown-Dean, Khalilah L. "Why Victims of Crime Deserve a Voice." *The Hill*
    Brown-Dean, Khalilah L. "Yes Virginia, There is a Choice." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Defining Political Progress." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "On the Meaning of Survival." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "First STEP or First Stumble?" *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Myth of Meritocracy." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Fallacy of NOT Seeing Race." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Dr. King Deserves More." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Sorority Life as an Act of Resistance." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Teaching Through Trauma." *Diverse: Issues in Higher Education*

**2018**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."

Brown-Dean, Khalilah L. "Civics 101 Podcast: The Fifteenth Amendment." New Hampshire Public Radio

Brown-Dean, Khalilah L. "Giving Thanks Amid Political Uncertainty." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "On Citizenship and Voting." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Hate We Give: Voting Against Violence." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "Still Separate, Still Unequal: American Indians and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Feminism, Womanism, and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Stakes is High." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Aretha Franklin, John McCain, and the Meaning of Legacy." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Opposite of Progress." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "As American as Apple Pie." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "For Colored Folks Who Have Considered Suicide." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Why We Celebrate." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Mothering Behind Bars." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Bill Cosby Isn't a Victim." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "It's Time to Secure the Vote." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "From Pain to Power." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Reclaiming the 'Fierce Urgency of Now'." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Politics of Mental Health." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Not Yet Just, Not Yet Free." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Five Things More Effective Than Political Panic." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Honoring Black History Month, In Prison." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "In Defense of Youth Organizing." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Art as Political Resistance." *Diverse: Issues in Higher Education*

**2016**

Brown-Dean, Khalilah L. "Can She Do It? Women in Politics Remain Dogged By Gender Stereotypes." *New York Daily News.*

Brown-Dean, Khalilah L. "Justice Trump'd? The Path Toward Criminal Justice Reform Post-Obama." WEAA Radio.

**2015**

Brown-Dean, Khalilah L. "Leaving Victims Behind is Unjust." *New Haven Register.*

**2014**

Brown-Dean, Khalilah L. "Saying Farewell to Maya Angelou." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Who Fights For Black Girls?" *Ebony Magazine.*

**2013**

Brown-Dean, Khalilah L. Documentary Feature: "The Color of Justice."

Brown-Dean, Khalilah L. "Kids and Families: The REAL Victims of the GOP Shutdown." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Primary Offers Opportunity to Move New Haven Forward." *New Haven Register.*

Brown-Dean, Khalilah L. "An End to the War on Weed?: Not Likely." *Ebony Magazine.*

Brown-Dean, Khalilah L. "What Do the Supreme Court's Decisions Mean For Blacks?" *Ebony Magazine***.**

**2012**

Akinwole-Bandele, Lumumba and Khalilah L. Brown-Dean. "A Call to Community: Why We Cannot Wait for the Next Troy Davis." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Beyond Barack Obama: Is America Ready For a New Political Party?" *Dominion of New York Magazine.*

**2011**

Brown-Dean, Khalilah L. "Are HBCU's Still Relevant?" *Uptown Magazine.*

Brown-Dean, Khalilah L. "If Black Men Live Longer in Prison It's Time For Change." *TheGrio.*

# INVITED TALKS AND PRESENTATIONS

"The 400th Anniversary of Jamestown and the Arrival of Enslaved Africans in Virginia." American Political Science Association Annual Meeting. Washington, DC. August 2019.

"The Future of American Democracy." Quinnipiac University Presidential Inauguration. May 2019.

"A New Vision of Criminal Justice Reform." Quinnipiac University Admissions Preview. March 2019.

"Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context." David C. Wilson, TaLisa Carter, and Khalilah L. Brown-Dean. National Conference of Black Political Scientists Annual Meeting. Baton Rouge, Louisiana. March 2019.

"Fighting from a Powerless Space: Women of Color in the Criminal Justice System." Feminism and Incarceration Conference. University of North Carolina-Greensboro. February 2019.

"The Continuing Struggle for Voting Rights in the United States." Wiggin & Dana Law Firm. February 2019.

"Not Yet Just, Not Yet Free: Black Women, Political Freedom, and the 2018 Midterm Elections." Connecticut College. October 2018.

"A Letter to the Free: Reimagining Justice and Democracy in the Trump Era." University of Bridgeport Necessary Voices Lecture Series. February 2018.

"Freedom in the Era of Reform." Cheshire (CT) Correctional Institute. February 2018.

"On the Meaning of Justice and Reform." College of William and Mary. February 2018.

"A Conversation on Justice and Freedom." University of Connecticut School of Social Work. February 2018.

"Redefining Civil Rights Post-Obama." NAACP Albuquerque Civil Rights and Diversity Conference. September 2017.

"The Legacy of the 15th Amendment Post-*Shelby."* Duke University's Samuel DuBois Cook Center Research Symposium on the Social and Economic Outcomes of the 13th, 14th, and 15th Amendments. March 2017.

"Race, Representation, and Disenfranchisement: As American As Apple Pie." Pace University. March 2017.

"The Public Spectacle: Exploring Anger and Political Transformations." William Paterson University. October 2016.

"The State of Race and Policing in America." Texas A&M University Bush School for Public Service. September 2016.

"Contemporary Challenges to Voting Rights in the United States." University of Connecticut. March 2016.

"The Black Predicament and the 2016 Elections." National Conference of Black Political Scientists. Jackson, Mississippi. March 2016.

"Beyond Ferguson: Reimagining Race and Social Justice in the United States." Walker-Horizon Lecture. Depauw University. February 2016.

"Counter-Emancipation and the Voting Rights Act of 1965." University of Illinois-Springfield. June 2015.

"Fifty Years of the Voting Rights Act: The State of Race in American Politics." Selma Public Library for the 50th Anniversary Celebration of the Bloody Sunday March. March 2015.

"Why We Cannot Wait: Reclaiming the Fierce Urgency of Now." Claflin College. February 2015.

"Lessons From the Past, Prospects For the Future: Voting Rights Post *Shelby v. Holder.*" US Attorney's Office. February 2015.

"Beyond Ferguson: Understanding the Nexus of Incarceration and Disenfranchisement." Connecticut Court Support Services. February 2015.

"The Mass Incarceration of Women of Color." Harvard University. March 2014.

 "45 Years: A Retrospective on NCOBPS and the Work of William E. Nelson, Jr." Presented at the National Conference of Black Political Scientists Annual Meeting. Wilmington, Delaware. March 2014.

"The Role of Community Mobilization Within Social Justice Movements." U.S. Human Rights Network. December 2013.

"From Painful to Powerful: How Crime Victims Persuaded Legislators to Reform the Death Penalty in Connecticut and Maryland." Presented at the American Political Science Association Annual Meeting, Chicago, Illinois. August 2013.

"Public Scholarship vs. Public Intellectualism." Women of Color in Political Science Mini-Conference, American Political Science Association. Chicago, Illinois. August 2013.

"How the Affected and Underrepresented Are Ending the Death Penalty." Yale University Law School Rebellious Lawyering Conference. New Haven, Connecticut. February 2013.

"Building Authentic Power: An Examination of Connecticut's Death Penalty Repeal Campaign." Presented at the Southern Political Science Association Annual Meeting. Orlando, Florida. January 2013.

 "The Relationship Between Perceptions of Justice and Grassroots Mobilization." Maryland State Conference of NAACP Branches. October 2012.

"Beyond Troy Davis: Understanding the Death Penalty Abolition Movement in the United States." William Paterson University. September 2012.

"A Tale of Two States: Death Penalty Reform in Connecticut and Maryland." Soros Institute/Open Society Foundations. July 2012.

"From Pain to Power: A New Model of Social Justice Organizing." National Conference on Race and Education in Higher Education. May 2012.

"Redefining Citizenship in a 'Post Racial' America." Carter G. Woodson Lecture Series. Central Connecticut State University. New Britain, CT February 2012.

"Race and Domestic Policy." George Mason University School of Public Policy. October 2011.

"Three-Fifths Revisited: The Census and Inmate Enumeration." Presented at the Drexel Summer Conference on the City. June 2011.

"Concentrating Punishment." Presented at the Princeton University Imprisonment of a Race Conference. March 2011.

"From Exclusion to Inclusion: Promoting Civic Engagement When Times are Always Hard." Paper presented at the American Political Science Association Annual Meeting, Washington, DC. September 2010.

"Greater Expectations: Perceptions of Racial Group Interests and Candidate Evaluations." (with David C. Wilson). Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, IL. April 2010.

"The Future of Post-Racial Politics." Presented at the "From Slavery to Freedom to the White House: Race in Twenty-First Century America, A Conference in Honor of John Hope Franklin." Sponsored by the Duke University School of Law. April 2010.

"Race, Representation, and Punitive Politics." Presented at "The Challenge of Racial Inequality in a Post-Racial World: Race, Rights, and Public Policy in the Age of Obama." Sponsored by Rutgers and Princeton Universities. March 2010.

"Identity Politics in the Age of Obama." 15th Annual Multicultural Lecture Series. University of Rhode Island. February 2010.

"Identity Politics in the Age of Obama." University of Rochester Two Icons Lecture Series. February 2009.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Presented at the UCLA Center for the Study of Race and Ethnicity in the Americas. February 2008.

"Reforming the State: Assessing Recent Changes in State Felon Disenfranchisement Laws." Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada. September 2009.

"Race, Crime, and Political Inequality." Presented to The University of North Carolina, Chapel Hill American Politics Research Group. November 2007.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois. September 2007.
"Once Convicted, Forever Doomed: The Politics of Punishment in the United States." The University of Michigan Distinguished Speakers Series. September 2007.

"Contemporary Challenges to the Voting Rights Act." Presented for the National Presbyterian Church Voting Rights and Electoral Reform Committee. Washington, DC April 2007.

"Once Convicted, Forever Doomed: Understanding the Political Consequences of Mass Incarceration." University of Kentucky. March 2007.

"Inmate Enumeration and Political Representation: *Reynolds v. Sims* Revisited." University of Kentucky Law School. March 2007.

"Race, Religion, and Attitudes Toward Criminal Justice Policy." The University of Texas Conference on Race, Religion, and Politics. March 2007.

"Race and the Politics of Punishment in the United States." Presented at Oxford University, Nuffield College. Oxford, England February 2007.

"Voting Rights Policy in the Post-Civil Rights Era." The Ohio State University Law and Democracy Forum. February 2007.

"African American Communities and the Politics of Incarceration." Presented to the Black Solidarity

Conference, Yale University. New Haven, CT October 2006.

"Fighting from a Powerless Space: The Impact of Criminal Justice Policy on Women of Color." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2006.

"The Politics of Incarceration." African American Research Collaborative. Philadelphia, PA. August 2006.

"Is the Voting Rights Act Still Relevant?" Morning at Yale Program sponsored by the Association of Yale Alumni. May 2006.

"Inmate Enumeration and the Return of the Three-Fifths Clause." Paper presented at the National Conference of Black Political Scientists Annual Meeting, Atlanta, GA. March 2006.

"New Considerations in Redistricting and Minority Representation." Presented at the "Who Draws the Lines?: The Politics of Redistricting Conference." University of North Carolina at Chapel Hill School of Law. Chapel Hill, NC February 2006.

"The Race, Education, and Incarceration Nexus." Twentieth Century American Politics and Society Workshop. Columbia University. November 2005.

"Contemporary Challenges to the Voting Rights Act of 1965." Presented at Virginia State University. September 2005.

"Race, Crime, and American Political Inequality." Presented at Oxford University, Pembroke College. Oxford, England. March 2005.

"Trading Brown for Prison Orange: The Link Between Race, Education, and Incarceration." Reflections: 50 Years after *Brown v. Board* Symposium. Central Connecticut State University. New Britain, CT. September 2004.

"Racial Disparities in Sentencing." Panel sponsored by the Greater New Haven NAACP. "Narrowing the Gap: Reducing Access Inequality for (Ex)Felons." Crime, Inequality, and Justice Symposium, The Ohio Criminal Justice Research Center. Columbus, OH. August 2004.

"Stolen Democracy: The Consequences of Felon Disenfranchisement Laws for Black and Latino Communities." Florida State of Black Studies Conference, Miami, FL. April 2004.

"Women of Color and the American Prison System," with J. Perez-Monforti. Paper presented at the Western Political Science Association Annual Meeting, Portland, OR. March 2004.

"The Impact of Elite Framing on Public Attitudes Toward Disenfranchisement." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Paper presented at the Midwest Political Science Association Conference, Chicago, Illinois. April 2003.

"Racial Profiling or Racist Profiling?: Perception and Opinion on the Profiling of Arabs and Blacks," with Thomas E. Nelson, Ray Block, Jr. and Javonne A. Paul. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts. September 2002.

"Ignorance or Intolerance?: An Analysis of Public Attitudes Toward Felon Disenfranchisement Laws." Paper presented at the Edward F. Hayes Graduate Research Forum, Columbus, Ohio. February 2002.

"One Lens, Different Views: An Examination of Public Opinion on Felon Disenfranchisement Laws." Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002. **Recipient of the Sammy R. Young Best Conference Paper Award**.

"The Effects of Crisis-Related Imagery on Public Opinion about Racial Profiling," with Ray Block, Jr. and Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002.

"Heritage or Hate?: An Analysis of Public Attitudes Toward the Confederate Flag," with B. D"Andra Orey. Paper presented at the Southern Political Science Association, Atlanta, Georgia. January 2001.

"Shades of Discontent: Minority Group Competition and Attitudes Toward the Elian Gonzalez Issue," with J. Perez-Monforti. Paper presented at the National Conference of Black Political Scientists, Richmond, Virginia. **Nominated for the Sammy R. Young Best Conference Paper Award**. March 2001.

"Toeing the Party Line, Toeing the Color Line: African American Women in Congress and the Impeachment Process." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 2000.

"Stolen Democracy: Felony Disenfranchisement Laws and the Future of Black America," with Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Washington, D.C. *Recipient of the Francis Aumann Award for the Best Graduate Student Conference Paper*. March 2000.

"African American Female Legislators and the Clinton Impeachment Process." Women Transforming Congress: Gender Analyses of Institutional Life Conference, Carl Albert Center for Congressional Research. April 2000.

"The Influence of Politically Active Black Churches on Community Activism among African Americans." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 1997.

## KEYNOTE ADDRESSES AND PANEL DISCUSSIONS

"Not Yet Just, Not Yet Free: Women and Social Justice." Keynoted address presented to Southern Connecticut State University Women's Conference. May 2019.

"The Future of Voting Rights in the United States." Keynote address presented to the Sphex Club of Virginia. May 2019.

"The State of Justice Reform." Whitneyville United Church of Christ Social Justice Symposium. May 2019.

"The State of Urban Connecticut." Urban League of Southern Connecticut and Quinnipiac University. April 2019.

"School/Gun Violence: An Interdisciplinary Concern." Quinnipiac University School of Education. April 2018.

"A New Vision of Freedom and Democracy." Keynote Address presented to the Farmington Valley Links, Incorporated. Mark Twain House. February 2018.

"To Build the Beloved Community in the Face of Chaos." Annual Martin Luther King, Jr. Breakfast Keynote Address. Lynchburg, VA. January 2018.

"Women Leading Change: Promoting and Sustaining Women in Leadership Roles." Southern Connecticut State University Sustainability Initiative. November 2017.

"Gender, Voting, and the Voting Rights Act." Community Foundation for Greater New Haven. October 2017.

"We Who Believe in Freedom." Keynote Address presented to the Connecticut Department of Children and Families Region 6 Foster Youth Celebration. May 2017.

"Community Conversation on the Thirteenth Documentary." Greater New Haven Branch of the NAACP. April 2017.

"Women, Media, and the Gender Lens." University of New Haven Women's Leadership Conference. April 2017.

"A Day After the Election…Now What?" Quinnipiac University. November 2016.

"Bridging the Past and the Future: 30 years of the Ralph Bunche Summer Institute and the Intellectual Legacy of Dr. Ralph Bunche." American Political Science Association. October 2016.

"Chaos or Community?" Southern New England Community Action Conference. September 2016.

"A Community Conversation on Race in America." With Congressman Jim Himes. July 2016.

"Reflections on Voting Rights in the U.S." With Congressman Jim Himes. April 2016.

"To Whom Much is Given." National Association of Negro Business Women and Professionals Club. New Haven, CT. March 2016.

"Reclaiming the Fierce Urgency of Now." Frontiers International Keynote Address. Springfield, Illinois. January 2016.

"One Person, One Vote: Voting Rights 50 Years Later." Harriett Beecher Stowe Center. November 2015.

"A Call to Leadership." Keynote Address for the North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated's Undergraduate Luncheon. April 2012.

"Taking the L.E.A.D.: Social Media and Contemporary Youth Movements." Keynote Address for the C.H.A.P. Youth Leadership Conference. March 2012.

"Post-Racial or Post-Racism? New Directions in the Quest for Equality." Presented to the United States Department of Agriculture. February 2011.

"Fractured Citizenship and the Politics of Punishment." Presented to inmates at the Cheshire State Correctional Institution. Sponsored by Wesleyan University Center for Prison Education. May 2010.

"Managing the Politics of Diversity." Keynote Address for the Virginia Community Dialogue on Race and Racism. January 2008.

Panelist, "The Politics of Hate." Yale University. New Haven, CT March 2008.

Panelist, "Strategies for Strengthening Your Voice in the Political Process." North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated. March 2008.

"The Political Impact of American Criminal Justice Policy." Presented at the *New York Times* Center New York, NY November 2008.

"Empowerment Through Education." Keynote Address presented for the Links, Incorporated Scholarship Luncheon. May 2006.

"To Whom Much is Given, Much is Required: The Need for Youth Leadership." Keynote Address presented to the Hyde Leadership Academy. February 2006.

"Lessons from the Past, Prospects for the Future: Reflections on the Voting Rights Act of 1965." Association of Yale Alumni. October 2005.

"Dismantling the Hierarchy of Oppression: The Common Political Fate of Black Women and Latinas." Co-Sponsored by the Xi Omicron Chapter of Alpha Kappa Alpha Sorority, Inc. and Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. April 2005.

"Lest We Forget." Keynote Address, African American Women's Summit. March 2005.

"Criminal Justice Expenditures and the Public Health Crisis." Frantz Fanon Lecture Series, Yale University School of Medicine. February 2005.

"The Spirit of Sankofa." Keynote Address, The New Haven Club. New Haven, CT. February 2005.

"On Heroism: Honoring the Legacy of Rosa Parks." Roundtable panelist, Afro-American Cultural Center at Yale. January 2005.

"For God and For Country: The Role of Religious Values in the 2004 Presidential Election." Yale University Election Post-Mortem. November 2004.

"The Politics of Power: Public Policy and Justice in the Black Community." Panel in honor of the 35th Anniversary of the Afro-American Cultural Center at Yale. October 2004.

"Assessing the Limits of Democracy Via Felon Disenfranchisement Laws." Washington University Department of Political Science, St. Louis, Missouri; Wesleyan University, Middletown, Connecticut.

"Just Being Here Is Not Enough!: Recognizing Your Role in Community Development." Yale University Afro-American Cultural Center Student Achievement Dinner. May 2004.

International Festival of Art and Ideas. May 2004.

"To Whom Much is Given: Communal Responsibility and the Challenges of Black Politics." Mental Pabulum Series, Yale University. February 2004.

"Power, Pride, and Patriotism: Reflections on the Political Significance of Veterans' Day." Holcomb Rock Baptist Church. November 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Invited presentations for Yale University, Texas A&M University, Emory University, Hunter College, and Indiana University-Indianapolis. 2002.

## OTHER CONFERENCE PARTICIPATION

Served as a Section Head, Panelist, Discussant, Chair, and Organizer for numerous panels at national conferences such as the American Political Science Association, National Conference of Black Political Scientists, Southern Political Science Conference, and Midwest Political Science Conference.

## TEACHING EXPERIENCE

Designing Political Inquiry (Undergraduate Lecture/Seminar); Senior Thesis in American Politics (Undergraduate Seminar); American Political Movements (Undergraduate Lecture/Seminar); Introduction to American Politics (Undergraduate Lecture); The Politics of Intimacy (Undergraduate Seminar); The Politics of Community (Undergraduate Seminars); Race, Ethnicity, and Citizenship (Undergraduate Seminar); Ethnic Politics in the United States (Undergraduate Lecture); Voting Rights and Representation (Undergraduate Seminar); The Individual and the Community (Undergraduate Seminar); Power, Politics, and Punishment (Graduate/Undergraduate Seminar); Public Opinion (Graduate Seminar); Race and Ethnicity in American Politics (Graduate Seminar); Race and Ethnicity in American Politics (Undergraduate Seminar) African American Politics (Undergraduate Seminar); Black and Jewish Community Politics (Undergraduate Lecture/Seminar)

## FACULTY ADVISING AND SUPERVISION

Responsible for advising approximately 20 undergraduate students in the Quinnipiac University College of Arts and Sciences each semester

Previously advised health policy and advocacy scholars in the Netter School of Medicine
Dissertation Committee Member/Reader: Andra Gillespie (Emory University); Rachel Milstein
Sondheimer (United States Military Academy at West Point); Shatema Threadcraft (Rutgers University);
Joanna Mosser (Drake University)
Research Supervision: Sheree Bennett and Luke Thompson (Difficult Dialogues Graduate Research
Assistants); Kayla Vinson and Adrea Hernandez (Mellon Mays Undergraduate Fellows); Brandee Blocker
and Christopher Pagliarella (undergraduate research assistant)


## PROFESSIONAL MEMBERSHIP

American Political Science Association; International Society of Political Psychology; Midwest Political
Science Association; National Conference of Black Political Scientists; Pi Sigma Alpha National Political
Science Honor Fraternity; National Association for Ethnic Studies

## PROFESSIONAL SERVICE

Advisory Board, Ronald W. Walters Leadership and Public Policy Center (2019-)
Advisory Board, *Issues in Race and Society* journal (2019-)
Member, American Political Science Association Rules and Elections Committee (2019-)
Chair, National Conference of Black Political Scientists Fannie Lou Hamer Award Committee (2019-)
Executive Council Member, National Conference of Black Political Scientists (2016-2018)
Member, American Political Science Association Ralph Bunche Summer Institute Advisory Committee
(2016-)
Section Chair, Undergraduate Research Section of the National Conference of Black Political Scientists
(2017)
Board Member, Association for Ethnic Studies/National Association for Ethnic Studies (2015-Present)
Section Chair, Public Opinion and Political Participation Section of the National Conference of Black
Political Scientists Annual Meeting (2014-2015)
Parliamentarian, National Conference of Black Political Scientists (2014-2016)
Section Head, Race, Ethnicity, and Gender Section of the Southern Political Science Association
Conference (2012-2013)
Section Head, Race, Class, and Ethnicity Section of the Midwest Political Science Association
Conference (2011-2012)
Executive Council, Public Policy Section of the American Political Science Association (2010-2012).
Executive Council, Urban Politics Section of the American Political Science Association (2010-2012).
Executive Council, Race and Ethnic Politics Section of the American Political Science Association
(2009-2011).
Research Advisor, The National Presbyterian Church Voting Rights and Electoral Reform Committee
(2006-2009).
Selection Committee, The Southwest Political Science Association's Jewel L. Prestage Award for the
Best Paper on the Intersection of Race, Gender, Ethnicity, and Political Behavior (2006).
Selection Committee, Warren E. Miller Prize for an Outstanding Career and Intellectual
Accomplishment in the field of Elections, Public Opinion, and Voting Behavior (Elections, Public
Opinion, and Voting Behavior Section of the American Political Science Association) (2007).
Conference Director, "Lessons From the Past, Prospects for the Future: Honoring the Fortieth
Anniversary of the Voting Rights Act of 1965." Co-Sponsored by the Yale University Center for
American Politics and Institution for Social and Policy Studies (2004-2005).

Selection Committee, American Political Science Association Ralph Bunche Book Award (2004)
Secretary, Race and Ethnic Politics Section of the American Political Science Association (2003-2005).

## UNIVERSITY SERVICE

Member, Quinnipiac University Strategic Plan Committee (2018)
Faculty Researcher, Urban League of Southern Connecticut and Quinnipiac University State of Urban Connecticut Project (2016-)
Affiliated Faculty, The Prison Project at Quinnipiac University (2016-)
Co-Chair, College of Arts and Sciences Faculty Scholarships and Grants Committee (2015-2018)
Member, College Evaluation (Tenure and Promotion) Committee (2015-2018)
Co-Coordinator, Frank M. Netter School of Medicine Health Policy and Advocacy Concentration (2015-2016)
Co-Leader, University Academic Seminar Series and Advisory Board (2013-2014)
Co-Organizer, Dilemmas of Justice Speakers Series (2013)
Exploratory Committee, African American Studies Minor/Civil Rights Institute (2013-2014)
Chair, College of Arts and Sciences Scholars Working Group (2013)

## REVIEWER

National Science Foundation; *American Journal of Political Science; Journal of Race and Politics; Law and Social Inquiry; The Journal of Conflict Resolution; Politics and Gender; Journal of Politics; Russell Sage; Political Research Quarterly;* Yale University Press*; DuBois Review; Political Behavior; Urban Affairs Review; The Political Chronicle;* Palgrave-McMillan; *SOULS Journal; DuBois Review; Politics, Groups, and Identities; Election Law Journal; Journal of the Center for Policy Analysis and Research; Election Law Journal.*

## MEDIA COMMENTARY

Over 400 media outlets including *New York Times; Washington Post;* Fox News Radio; Democracy Now; American Urban Radio Network; WTNH; *The Forum; The Hill;* CNN; WURD; Minnesota Public Radio; WHYY; WNPR; CPTV; *Ebony.com;* Google; NPR; WFSB TV; CBS Radio; AP News; *Wall Street Journal.*

## RELATED PUBLIC SERVICE

Board Chair, The Community Foundation *for* Greater New Haven (2019-)
Board Member, The New Haven Pearls of Excellence Foundation (2018-)
Board Member, The Community Foundation for Greater New Haven (2015-2021)
Appointed Member, 2018 Transition Team for Connecticut Governor Ned Lamont (Women & Girls Policy)
President, Theta Epsilon Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated (2017-2018)
Board Member, Prison Policy Initiative (2015-2016)

TABLE 2: Georgia Statutes Outlining the Secretary of State's Duties
CATEGORY 1: Candidate Interaction
CATEGORY 2: Voter Interaction
CATEGORY 3: Election Official Interaction

| Duty | Text | Source | Function Classification |
|---|---|---|---|
| Powers and duties of the SOS | **To determine the forms of nomination petitions, ballots, and other forms the Secretary of State is required to determine under this chapter** | O.C.G.A. § 21-2-50(a)(1) | Category 1<br>Category 3 |
| Powers and duties of the SOS | **To receive registration statements from political parties and bodies and to determine their sufficiency prior to filing, in accordance with this chapter, and to settle any disputes concerning such statements;** | O.C.G.A. § 21-2-50(a)(2) | Category 1<br>Category 3 |
| Powers and duties of the SOS | **To receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State** in accordance with this chapter; | O.C.G.A. § 21-2-50(a)(3) | Category 1 |
| Powers and duties of the SOS | **To certify to the proper superintendent official lists of all the political party candidates who have been certified to the Secretary of State as qualified candidates for the succeeding primary and to certify to the proper superintendent official lists of all the candidates who have filed their notices of candidacy with the Secretary of State, both such certifications to be in substantially the form of the ballots to be used in the primary or election. The Secretary of State shall add to such form the language to be used in submitting any proposed constitutional amendment or other question to be voted upon at such election;** | O.C.G.A. § 21-2-50(a)(4) | Category 1<br>Category 3 |
| Powers and duties of the SOS | **To furnish to the proper superintendent all blank forms, including tally and return sheets, numbered lists of voters, cards of instructions, notices of penalties, instructions for marking ballots, tally sheets, precinct returns, recap sheets, consolidated returns, oaths of managers and clerks, oaths of assisted electors, voters certificates and binders,** | O.C.G.A. § 21-2-50(a)(5) | Category 3 |

1

| | applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries. Such forms shall have printed thereon appropriate instructions for their use; | | |
|---|---|---|---|
| Powers and duties of the SOS | **To receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions**, as required by this chapter; | O.C.G.A. § 21-2-50(a)(6) | Category 3 |
| Powers and duties of the SOS | **To furnish upon request a certified copy of any document in the Secretary of State's custody by virtue of this chapter and to fix and charge a fee to cover the cost of furnishing same;** | O.C.G.A. § 21-2-50(a)(7) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To perform such other duties as may be prescribed by law;** | O.C.G.A. § 21-2-50(a)(8) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To determine and approve the form of ballots for use in special elections;** | O.C.G.A. § 21-2-50(a)(9) | Category 1<br>Category 2<br>Category 3 |
| Powers and duties of the SOS | **To prepare and provide a notice to all candidates for federal or state office advising such candidates of such information, to include requirements of this chapter, as may, in the discretion of the Secretary of State, be conducive to the fair, legal, and orderly conduct of primaries and elections.** A copy of such notice shall be provided to each superintendent for further distribution to candidates for county and militia district offices; | O.C.G.A. § 21-2-50(a)(10) | Category 1<br>Category 3 |
| Powers and duties of the SOS | **To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections;** | O.C.G.A. § 21-2-50(a)(11) | Category 3 |

| Powers and duties of the SOS | **To prepare and publish, in the manner provided in this chapter, all notices and advertisements in connection with the conduct of elections which may be required by law;** | O.C.G.A. § 21-2-50(a)(12) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Powers and duties of the SOS | **To prepare and furnish information for citizens on voter registration and voting;** | O.C.G.A. § 21-2-50(a)(13) | Category 2 |
| Powers and duties of the SOS | **To maintain the official list of registered voters for this state and the list of inactive voters required by this chapter;** | O.C.G.A. § 21-2-50(a)(14) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state.** | O.C.G.A. § 21-2-50(a)(15) | Category 3 |
| Extension or postponement of qualifying periods and primaries and elections in even of state of emergency or disaster | In the event the Governor declares that a state of emergency or disaster exists pursuant to Code Section 38-3-51 or a federal agency declares that a state of emergency or disaster exists, **the Secretary of State is authorized to postpone or extend the qualifying periods** provided in this chapter for the qualification of candidates seeking municipal, county, or state-wide office and to postpone the date of any primary, special primary, election, or special election in the affected area. | O.C.G.A. § 21-2-50.1 | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | **The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(a) | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | As the chief election official, **the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.** | O.C.G.A. § 21-2-50.2(b) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| Responsibilities under HAVA | Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby **the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(c) | Category 1 Category 2 Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars** to determine the eligibility of the applicant and, if found eligible, **to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts**. | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |
| Instruction and training of private entities | **The Secretary of State may develop and provide to the boards of registrars manuals for this instruction**. The Secretary of State may also make such manuals available to the public, including via electronic means on the Secretary of State's website. Until such time as the Secretary of State develops such manuals, boards of registrars shall utilize such materials as will meet the training requirements of this rule. | Ga. Comp. R. & Regs. 183-1-6-.02(5)(c) | Category 1 Category 2 Category 3 |
| Rules and Regulations for Voter Registration by Registrars and Deputy Registrars | **The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State.** The board of registrars shall provide each deputy registrar with a copy of the manual. | Ga. Comp. R. & Regs. 183-1-6-.03(3)(n) | Category 3 |

4

| | | | |
|---|---|---|---|
| Accessibility for Elderly and Disabled Voters | Polling Places. The election superintendent of each county and municipality shall conduct, or cause to be conducted, an on-site inspection of each polling place located within the county or municipality to determine if the polling place is accessible. **This inspection shall be reported to the Secretary of State on forms prepared by the Secretary of State at such times as the Secretary of State shall prescribe.** Any polling place found not to be accessible shall either be made accessible prior to its use in a primary or election or shall not be used as a polling place. | Ga. Comp. R. & Regs. 183-1-6-.04(5)(a) | Category 3 |
| Accessibility for Elderly and Disabled Voters | Printed Instructions. The Secretary of State shall provide instructions for use by election superintendents at polling places and registrars at voter registration places, printed in large type, to assist visually and hearing impaired electors in voting and registering to vote. | Ga. Comp. R. & Regs. 183-1-6-.04(7) | Category 3 |
| Conduct of Elections: Voting Machines—Vote Recorders | Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia **shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**. In addition, absentee balloting shall be conducted through the use of optical scan ballots which **shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**; provided, however, that the **use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.** | Ga. Comp. R. & Regs. 183-1-12-.01 | Category 1 Category 2 Category 3 |
| Direct Recording Electronic | Acceptance tests. Upon the receipt of each new direct recording electronic voting unit (DRE), **the election superintendent of the county is responsible to ensure that an acceptance test is** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(a) | Category 3 |

| Voting Equipment | **performed on the device in accordance with standards issued by the Secretary of** State. No DRE unit shall be accepted by the county or placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | The election superintendent of the county **shall maintain the DRE units in accordance with** the requirements of this rule, **the directives of the Secretary of State,** and the specifications and requirements of the manufacturer. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(b)(1) | Category 3 |
| Direct Recording Electronic Voting Equipment | Software security. The software contained in each DRE unit, regardless of whether the unit is owned by the county or the state, and **the software used to program the unit and to tabulate and consolidate election results shall not be modified, upgraded, or changed in any way without the specific approval of the Secretary of State. No other software shall be loaded onto or maintained or used on computers on which the GEMS software is located except as specifically authorized by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(c) | Category 3 |
| Direct Recording Electronic Voting Equipment | The GEMS server shall not be moved or relocated for educational or training purposes. Should it become necessary to relocate the GEMS server or any of its components from one facility to another, the election superintendent shall notify the Secretary of State in writing of the reason for the relocation and the proposed new location. **Under no circumstances shall the GEMS server or any of its components be relocated unless and until written authorization for the relocation is received from the Secretary of State** except in the event of an emergency situation beyond the control of the election superintendent. | Ga. Comp. R. & Regs.183-1-12-.02(2)(g)(3) | Category 3 |
| Direct Recording Electronic Voting Equipment | The poll manager shall sign a receipt for all supervisor cards, encoders, voter access cards, memory cards, and DRE unit keys assigned to such poll manager's precinct. Upon returning election supplies to the election superintendent's office | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(4) | Category 3 |

| | following the close of the polls, the poll manager shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have<br>not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | All supervisor cards, encoders, voter access cards, memory cards, DRE unit keys, and other equipment assigned to designated county election technicians shall be accounted for on the night of a primary, election, or runoff and shall be returned to storage. Each technician shall sign a receipt for all such items issued to such technician and,<br>upon returning such items to the election superintendent's office following the close of the polls, the technician shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | **The election superintendent shall notify the Secretary of State** of any instances of unaccounted for DRE units, optical scanner devices, voter access cards, supervisor cards, memory cards, DRE unit keys, voting system software, and encoders at the completion of certification by delivering such notification to the Secretary of State when the certified election results are delivered to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(6) | Category 3 |
| Direct Recording Electronic Voting Equipment | After placing the memory card (PCMCIA card) in the DRE unit, the DRE unit shall have such internal diagnostic tests performed as shall be directed by the Secretary of State or the election superintendent. | Ga. Comp. R. & Regs. 183-1-12-.02(3)(b)(1)(ii) | Category 3 |
| Direct Recording Electronic | The poll officers shall affix a card of instructions for voting within each voting booth and **shall place at least two printed sample ballots and at least two voting instructions posters** | Ga. Comp. R. & Regs. 183-1-12-.02(3)(d)(7) | Category 1<br>Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| Voting Equipment | **approved or provided by the Secretary of State** outside the enclosed space at the polling place for the information of the voters. **Prior to voters entering the enclosed space, the poll officers may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** | | |
| Direct Recording Electronic Voting Equipment | In the case of primaries, elections, and runoffs for county, state, and federal office, **the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State**, within seven days following a primary, election, or runoff. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | Electronic Transmission of Precinct Results to Central Office. The election superintendent shall transmit to the Secretary of State unofficial election results for all races for state offices in any primary, election, or runoff as soon as possible after the closing of the polls for such primary, election, or runoff. **Such results shall be transmitted in a format prescribed by the Secretary of State.** At a minimum, the results shall be transmitted upon one third of the precincts reporting results, upon two thirds of the precincts reporting results, and upon all precincts reporting results, including absentee ballots within all precincts. Except upon notice to and consultation with the Secretary of State, no election superintendent shall conclude the tabulation of votes on election night in any primary, election, or runoff in which there are contested races for federal and state offices until and unless all such unofficial results, including absentee ballots, have been transmitted to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(d) | Category 3 |
| Direct Recording Electronic Voting Equipment | **In the event of any malfunction or problem with DRE units, the county election superintendent shall document the problem and its resolution and shall provide such information to the Secretary of State.** The documentation | Ga. Comp. R. & Regs. 183-1-12-.02(8)(b) | Category 3 |

| | | | |
|---|---|---|---|
| | shall include a detailed description of the malfunction or problem, the steps taken to correct the malfunction or problem, and the cause of such malfunction or problem if a cause can be determined. | | |
| Direct Recording Electronic Voting Equipment | Use of Equipment by Municipalities. The county election superintendent is authorized to permit any municipality within the county to conduct its election with the DRE equipment through a written intergovernmental agreement between the county and the municipality; provided that the municipality agrees to maintain and operate the equipment in accordance with law, these rules and regulations, and the manufacturer's guidelines and specifications and provided further that the municipality trains all of its election personnel and poll workers in the proper operation and conduct of elections utilizing such equipment **through a training program conducted by or approved by the Secretary of State**. | Ga. Comp. R. & Regs. 183-1-12-.02(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | The registrars of each county shall complete the entry of new and updated voter registrations **on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.** | Ga. Comp. R. & Regs. 183-1-12-.07(4) | Category 3 |
| Direct Recording Electronic Voting Equipment | Prior to each primary or election **as specified by the Secretary of State, the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the GEMS database for the county.** | Ga. Comp. R. & Regs. 183-1-12-.07(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | The county election superintendent and the registrars **shall notify the Secretary of State or his or her designee of any changes to the voter registration file** for the county or the GEMS database that occur after the process for creating ExpressPoll flash cards begins. | Ga. Comp. R. & Regs. 183-1-12-.07(6) | Category 3 |

9

| Direct Recording Electronic Voting Equipment | Upon the conclusion of each primary, election, or runoff, the poll officers shall return the ExpressPoll units with the other election materials from the precinct to the election superintendent. **The registrars and election superintendent shall coordinate the return of the flash cards from the ExpressPoll units to the Secretary of State** such that the cards are returned in the same time period as the official election returns. | Ga. Comp. R. & Regs. 183-1-12-.07(9) | Category 3 |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | On the first day of the absentee voting period, prior to any votes being cast on the DRE units, the registrars shall verify that the seal for each DRE unit is intact and that there is no evidence or indication of any tampering with the seal or the unit. The registrars shall verify that the number of the seal matches the number of the seal recorded for that unit when such unit was prepared by the election superintendent for the primary, election, or runoff. If a seal number does not match or if there is any evidence or indication of tampering with the seal or unit, **the Secretary of State and the election superintendent shall be immediately notified and such unit shall not be used until such matters are resolved by agreement of the Secretary of State, the election superintendent, and the registrars.** The set up shall be performed in public and the public may view the set up subject to such reasonable rules and regulations as the registrars may deem appropriate to protect the security of the DRE units and to prevent interference with the duties of the registrars, except that the public view shall not be obstructed. The registrars shall run a zero tape on each DRE unit prior to the beginning of absentee voting on such units. The registrars shall, without removing the tape from the unit, verify that all vote registers shown on the zero tape are set to zero and that there are no votes showing on the unit and shall sign the tape in the space provided. If the zero tape does not show that all vote registers are set to zero and that there are votes on the unit, the election superintendent shall be immediately notified and such unit shall not be used until the unit is cleared and the matter is resolved by agreement of the election superintendent and the registrars. After verifying and | Ga. Comp. R. & Regs. 183-1-14-.02(6) | Category 1 Category 2 Category 3 |

| | signing the zero tape, the registrars shall securely lock the tape compartment leaving the zero tape in place on the unit and shall configure the unit for voting. The registrars shall verify that the election counter on each DRE unit is set at zero. If the election counter is not set to zero, the election superintendent shall be immediately notified and such unit shall not be used until the election counter is set to zero and the matter is resolved by agreement of the election superintendent and the registrars. The registrars shall verify that there is no unauthorized matter affixed to the DRE units or present in the cases or voting booths. The registrars shall affix a card of instructions for voting within each voting booth. **Prior to voters entering the voting booth, the registrars may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** Each DRE unit shall be clearly marked with a unique designation that is visible on the exterior of the unit. | | |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | At the close of business each day during the absentee voting period, the registrars shall document the election counter number on the daily recap sheet. Each DRE unit used for in-person absentee voting shall then be turned off and closed. The memory card (PCMCIA card) shall remain in the unit at all times during the absentee balloting period until the polls close on the day of the primary, election, or runoff. Each DRE unit shall then be sealed and the seal number and the time of sealing shall be recorded on the daily recap sheet. Each DRE unit shall then be secured overnight. In addition, all voter access cards shall be securely stored overnight and when not in use. If a DRE unit is used to program voter access cards, the registrars shall make a notation of the election counter number on the daily recap sheet. **If such number is not zero, the registrars shall notify the Secretary of State immediately and shall ascertain the reason for the discrepancy and shall make a notation of such discrepancy and the reason for it on the daily recap sheet. Such DRE unit shall not be used for creation of voter access cards unless and until the unit is fully tested and reconfigured and the election counter reset** | Ga. Comp. R. & Regs. 183-1-14-.02(8) | Category 3 |

| | | | |
|---|---|---|---|
| | **at zero pursuant to procedures established by the Secretary of State.** The DRE unit shall be turned off and secured for the night. | | |
| Use of DRE Units for Absentee Balloting | Each morning during the absentee balloting period, the registrars shall publicly verify the seal numbers on each DRE unit to be used for absentee voting with the number of the seal recorded on the daily recap sheet from the previous day of absentee voting and shall verify that the seal and DRE unit do not show any signs of tampering. If the seal number corresponds to the entry on the daily recap sheet and there is no evidence of tampering, the DRE unit shall be opened and turned on. **If the numbers do not match or there is evidence of tampering, the Secretary of State shall be notified immediately and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** After opening and turning on the unit, the registrars shall verify the election counter number with the number recorded on the daily recap sheet from the previous day of absentee voting. **If the numbers do not match, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** The election counter number shall then be entered onto the daily recap sheet for that day. If a DRE unit is to be used for programming voter access cards, the registrars shall open and turn on the power for such unit. The registrars shall then verify that the election counter is set on zero. **If the election counter is not set at zero, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** A notation shall be made on the daily recap sheet of the election counter number and the unit shall be configured to create voter access cards. | Ga. Comp. R. & Regs. 183-1-14-.02(9) | Category 3 |

| Reporting Requirements for Absentee Ballots | **The registrars of each county shall on the 32nd day prior to each statewide general primary and general election submit to the Secretary of State on a form provided by the Secretary of State information concerning absentee ballots requested by electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended.** Such report shall include the number of absentee ballots requested by each such category of absentee voter, the date on which the absentee ballots were available in the registrars' office, and the date on which the ballots requested by such voters were sent to the voters. **The Secretary of State may request further information related to the application for and the transmittal of such ballots.** | Ga. Comp. R. & Regs. 183-1-14-.04(1) | Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | **The Secretary of State shall design a state write-in absentee ballot for use in runoff primaries and runoff elections** by an elector of this state who resides outside the county or the municipality in which the election is being conducted and is: (1) a member of the armed forces of the United States, a member of the merchant marine of the United States, a member of the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration, or a spouse or dependent of such member residing with or accompanying said member; or (2) A citizen of the United States residing outside the United States. | Ga. Comp. R. & Regs. 183-1-14-.05(a) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | **The Secretary of State shall prepare and print instructions for completing and returning such ballot that shall also be enclosed with such ballot.** The state write-in absentee ballot, the envelopes for returning it, and the instructions shall be enclosed with the regular absentee ballot, envelopes, and instructions for completing and returning the regular absentee ballot. | Ga. Comp. R. & Regs. 183-1-14-.05(d) | Category 1 Category 2 Category 3 |

13

| | | | |
|---|---|---|---|
| State Write-In Absentee Ballot | **Additionally, the Secretary of State and the county registrars shall provide for the transmission of such blank ballots by facsimile transmission and electronic mail transmission to electors.** Instructions for voting such ballots shall be included on the website and shall accompany any facsimile and electronic mail ballot transmissions. Voted ballots shall not be returned by facsimile or electronic mail. | Ga. Comp. R. & Regs. 183-1-14-.05(e) | Category 1<br>Category 2<br>Category 3 |
| State Write-In Absentee Ballot | As soon as practicable after a general primary or general election, **the Secretary of State shall cause to be published on the official website of the Secretary of State a list of all federal offices and state offices in which there will be a runoff primary or runoff election,** as the case may be, along with the names of the candidates who will be on the ballot in such runoff. | Ga. Comp. R. & Regs. 183-1-14-.05(f) | Category 1<br>Category 2<br>Category 3 |
| State Write-In Absentee Ballot | If an elector obtains the ballot by facsimile or by downloading from electronic mail or the Secretary of State's website, the elector shall return the ballot by mail using two envelopes. The elector shall enclose and seal the ballot in a plain envelope and insert that envelope into another envelope for transmission to the registrars. The elector shall copy and sign the appropriate oath onto the back of the outer envelope. **The Secretary of State shall provide a sample envelope and oath form on the Secretary of State's website in such a manner that such form may be used by an elector to print out the forms for the purpose of pasting or attaching such forms to an envelope for returning the ballot or for printing an envelope for returning the ballot.** | Ga. Comp. R. & Regs. 183-1-14-.05(g) | Category 1<br>Category 2<br>Category 3 |
| Secretary of State designated chief state election official | **The Secretary of State is designated as the chief state election** official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8. | O.C.G.A. § 21-2-210 | Category 1<br>Category 2<br>Category 3 |
| Official list of electors; | **The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state** | O.C.G.A. § 21-2-211(a) | Category 1<br>Category 2 |

| equipment to access list | **which shall be the official list of electors for use in all elections in this state conducted under this title.** | | Category 3 |
|---|---|---|---|
| Official list of electors; equipment to access list | **The Secretary of State is authorized to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State pursuant to this Code section**, provided that funds are specifically appropriated by the General Assembly for that purpose. | O.C.G.A. § 21-2-211(b)(2) | Category 3 |
| Voter registration | **The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.** | O.C.G.A. § 21-2-216(g)(7) | Category 2 Category 3 |
| Voter registration | Prior to approving the application of a person to register to vote, **the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State.** | O.C.G.A. § 21-2-216(h) | Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.** | O.C.G.A. § 21-2-218(a) | Category 2 Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making | O.C.G.A. § 21-2-218(b) | Category 2 Category 3 |

| | application to register to vote in that county or municipality, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.** | | |
|---|---|---|---|
| Change of residence of elector | In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. **The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's** present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail. | O.C.G.A. § 21-2-218(d) | Category 2<br>Category 3 |
| Change of residence of elector | In the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, **the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the address previously provided to the board of registrars.** The registrars shall correct the elector's registration record to reflect the correct address. | O.C.G.A. § 21-2-218(g) | Category 2<br>Category 3 |

| Registration cards; absentee regulations | The registration cards for use by persons in making application to register to vote shall be **in a form as specified by the Secretary of State**, which shall include printed forms, forms made available through electronic means, or otherwise. Except as provided in subsection (b) of this Code section and Code Section 21-2-221.2, only registration cards issued or authorized for use by the Secretary of State or the national voter registration card promulgated under the provisions of the National Voter Registration Act of 1993, 42 U.S.C. Section 1973gg-7, shall be accepted for purposes of voter registration. | O.C.G.A. § 21-2-219(a) | Category 2 Category 3 |
|---|---|---|---|
| Registration cards; absentee regulations | **The office of the Secretary of State is designated as the office, under the federal Help America Vote Act, to be responsible for providing information on registration and absentee ballot procedures for use by absent uniformed services and overseas voters, including the use of the federal write-in absentee ballot.** | O.C.G.A. § 21-2-219(f) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The Secretary of State shall** within 90 days after a general election in which federal candidates were on the ballot **report to the federal Election Assistance Commission**, on such form as may be prescribed by such commission, **the combined number of absentee ballots transmitted to absent uniformed services and overseas voters in such election and the combined number of such ballots that were returned by such voters and cast in such election.** | O.C.G.A. § 21-2-219(h) | Category 3 |
| Application for driver's license; service as application for voter registration | The commissioner of driver services and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.** | O.C.G.A. § 21-2-221(b) | Category 3 |
| Application for driver's license; service as | The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of** | O.C.G.A. § 21-2-221(e) | Category 3 |

17

| application for voter registration | **registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | | |
|---|---|---|---|
| Application for driver's license; service as application for voter registration | The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-221(f) | Category 3 |
| Application for driver's license; service as application for voter registration | **The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221(h) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Board of Natural Resources and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section,** including without limitation procedures applicable to processing of applications received by persons approved as license agents for the Department of Natural Resources pursuant to Code Section 27-2-2. | O.C.G.A. § 21-2-221.1(b) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-221.1(f) | Category 3 |

| | | | |
|---|---|---|---|
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State**. | O.C.G.A. § 21-2-221.1(g) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | **The Secretary of State and the Board of Natural Resources shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221.1(i) | Category 3 |
| Electronic voter registration | A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. **The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.** | O.C.G.A. § 21-2-221.2(a) | Category 2<br>Category 3 |
| Electronic voter registration | Upon the submission of an application through the website pursuant to this Code section, **the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:**<br><br>(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the | O.C.G.A. § 21-2-221.2(c) | Category 3 |

| | | | |
|---|---|---|---|
| | number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;<br><br>(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and<br>(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.<br><br>If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected. | | |
| Electronic voter registration | If all of the items enumerated in subsection (c) of this Code section are verified, **the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services.** The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. | O.C.G.A. § 21-2-221.2(d) | Category 3 |
| Electronic voter registration | **The Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically pursuant to this Code section.** | O.C.G.A. § 21-2-221.2(f) | Category 3 |
| Offices designated as voter registration agencies | In addition to the offices listed in subsection (b) of this Code section, **the Secretary of State shall designate other offices within the state as designated voter registration offices.** | O.C.G.A. § 21-2-222(c) | Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| Offices designated as voter registration agencies | **Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week**, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-222(i) | Category 3 |
| Offices designated as voter registration agencies | Each office shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State**. | O.C.G.A. § 21-2-222(j) | Category 3 |
| Offices designated as voter registration agencies | **The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-222(l) | Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the** | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |

| | appropriate county board of registrars to determine the **eligibility of the applicant** and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
|---|---|---|---|
| Mail voter registration application forms | The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public **shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.** | O.C.G.A. § 21-2-223(b) | Category 1 Category 2 Category 3 |
| What data [sic] available for public inspection | **It shall be the duty of the Secretary of State to furnish copies of such data as may be collected and maintained on electors whose names appear on the list of electors maintained by the Secretary of State pursuant to this article, within the limitations provided in this article, on electronic media or computer run list or both.** Notwithstanding any other provision of law to the contrary, the Secretary of State shall establish the cost to be charged for such data. The Secretary of State may contract with private vendors to make such data available in accordance with this subsection. Such data may not be used by any person for commercial purposes. | O.C.G.A. § 21-2-225(c) | Category 1 Category 2 Category 3 |
| Confidentiality of voter addresses | **The Secretary of State shall provide by procedure, rule, or regulation for the mechanism by which such information shall be made confidential on the voter registration data base and may provide for forms for use in making such requests and for the use of alternate addresses** for electors who file requests for the confidentiality of their residence addresses. | O.C.G.A. § 21-2-225.1(d) | Category 1 Category 2 Category 3 |

| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; issuance of cards to electors | Each elector found eligible to be registered to vote by the board of registrars shall be issued a card which shall contain the elector's name and address, a block or space for the elector's signature, the date of the elector's registration, the name and location of the elector's polling place or polling places if the county and municipal polling places are not the same, and the designation of the elector's congressional district; state Senate district; state House district; county commission district, if any; county or independent board of education district, if any; and municipal governing authority district, if any, and such other voting districts, if any. On the reverse side of the card, there shall be printed instructions which shall indicate the procedure to be followed in the event of the change of address of the elector. In the event an elector changes residences within the county in which an elector is registered to vote, the elector may change such elector's address by returning the card to the board of registrars of such county indicating the new address. Upon receipt of such card, the board of registrars shall make the necessary changes in the elector's registration records and issue a new card to the elector. In the event that an elector's precinct, polling place, or voting district or districts change, a new card shall be issued to the elector reflecting such changes. When the boundaries of a precinct are changed, all affected electors shall be sent a new card prior to the next primary or election. **The form of such cards shall be determined by the Secretary of State.** The issuance of such cards shall be sufficient as a notification of the disposition of an application for voter registration under this Code section, provided that such cards are sent by nonforwardable, first-class mail. | O.C.G.A. § 21-2-226(e) | Category 2 Category 3 |
| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; | In the event that the registrars are required to issue voters new cards under subsection (e) of this Code section due to changes in districts or precincts as a result of reapportionment or court order, the registrars may apply to the Secretary of State prior to June 30 of each year for reimbursement of the costs of postage with respect to mailing such cards during the 12 month period ending on June 30 of that year. **The Secretary of State shall receive all such applications and** | O.C.G.A. § 21-2-226(f) | Category 3 |

| | | | |
|---|---|---|---|
| issuance of cards to electors | **shall, no later than June 30 of each year, reimburse the counties for such costs from funds specifically appropriated for that purpose. In the event that the total amount of the requests for reimbursement exceeds the funds appropriated for reimbursement, the Secretary of State shall reimburse the counties on a pro rata basis. In the event that no funds are specifically appropriated for reimbursement, no such reimbursement shall be made**. | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State** and The Council of Superior Court Clerks of Georgia **a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State** or The Council of Superior Court Clerks of Georgia, **who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information** relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, **the Secretary of State** and The Council of Superior Court Clerks of Georgia **shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available.** | O.C.G.A. § 21-2-231(a) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county. | O.C.G.A. § 21-2-231(a.1) | Category 3 |

| Georgia; removal of persons from list of electors | | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. | O.C.G.A. § 21-2-231(b) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | (1) Upon receipt of the lists described in subsections (a.1) and (b) of this Code, **the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.** (2) Upon receipt of the list described in subsection (a) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 52 U.S.C. Section 20507(g), **the Secretary of State shall transmit the names of such persons whose names appear on the lists of electors to the appropriate county board of registrars who shall mail a notice to the last known address of each such person by first-class mail, stating that the board of registrars has received information that such person has been convicted of a felony and will be removed from the list of electors 30 days after the** | O.C.G.A. § 21-2-231(c) | Category 3 |

25

| | date of the notice unless such person requests a hearing before the board of registrars on such removal. | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county.** The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. | O.C.G.A. § 21-2-231(d) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsection (d) of this Code section, **the Secretary of State or his or her designated agent shall remove all such names of deceased persons from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.** | O.C.G.A. § 21-2-231(e) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | **The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235.** Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for | O.C.G.A. § 21-2-231(g) | Category 3 |

| | | | |
|---|---|---|---|
| Georgia; removal of persons from list of electors | maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes. | | |
| Removal of elector's name from list of electors upon request of elector or upon removal of elector from county | (1) When an elector of this state moves to another state and registers to vote and the registration officials in such state send a notice of cancellation reflecting the registration of the elector in the other state, which includes a copy of such elector's voter registration application bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall remove such elector's name from the list of electors.** It shall not be necessary to send a confirmation notice to the elector in such circumstances.<br><br>(2) When an elector of this state moves to another state and the registration officials in such other state or a nongovernmental entity as described in subsection (d) of Code Section 21-2-225 sends a notice of cancellation or other information indicating that the elector has moved to such state but such notice or information does not include a copy of such elector's voter registration application in such other state bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall send a confirmation notice to the elector as provided in Code Section 21-2-234.** | O.C.G.A. § 21-2-232(b) | Category 3 |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where | **The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service** through its licensees periodically for the purpose of identifying those electors whose addresses have changed. | O.C.G.A. § 21-2-233(a) | Category 3 |

| elector has moved | | | |
|---|---|---|---|
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235. | O.C.G.A. § 21-2-233(c) | Category 2 Category 3 |
| Identification of electors with whom there has been no contact for three years; confirmation notice | In the first six months of each odd-numbered year, **the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding five calendar years and who were not identified as changing addresses under Code Section 21-2-233.** The confirmation notice described in this Code section shall be sent to each such elector during each odd- | O.C.G.A. § 21-2-234(a)(2) | Category 3 |

28

| | numbered year. Such notices shall be sent by forwardable, first-class mail. | | |
|---|---|---|---|
| Identification of electors with whom there has been no contact for three years; confirmation notice | If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** | O.C.G.A. § 21-2-234(d) | Category 2 Category 3 |
| Inactive list of electors | **In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors.** Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records. | O.C.G.A. § 21-2-235(a) | Category 3 |

29

| | | | |
|---|---|---|---|
| SOS on the SEB | **There is created a state board to be known as the State Election Board, to be composed of the Secretary of State**, an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board. | O.C.G.A. § 21-2-30(a) | Category 3 |
| SOS Chairperson of the SEB | **The Secretary of State shall be the chairperson of the board.** Three members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure. | O.C.G.A. § 21-2-30(d) | Category 3 |
| Superintendents to Election returns to be provided to Secretary of State in electronic format | **The Secretary of State is authorized to prescribe by rule or regulation the type of electronic format for the provision of such election returns.** | O.C.G.A. § 21-2-77(c) | Category 3 |
| Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll workers not to serve | The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent | O.C.G.A. § 21-2-99(a) | Category 3 |

| | | | |
|---|---|---|---|
| | shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. **Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction.** For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction. | | |
| Training of local election officials | The election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board **shall attend a minimum of 12 hours' training annually as may be selected by the Secretary of State.** The election superintendent and at least one registrar of each municipality shall attend a minimum of **12 hours' training biennially as may be selected by the Secretary of State.** | O.C.G.A. § 21-2-100(a) | Category 3 |
| Training of local election officials | **A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of S**tate, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-100(c) | Category 3 |
| Certification of local election officials | All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by **completing a certification program** | O.C.G.A. § 21-2-101(a) | Category 3 |

| | **approved by the Secretary of State** by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections. The local government employing the superintendent or designee shall cover the costs, if any, incurred by such superintendent's or designee's participation in the certification program. **Such certification programs shall be offered by the Secretary of State** on multiple occasions before December 31 of the year in which such superintendents or designees are appointed and shall not exceed 64 hours of classroom, online, **and practical instruction as authorized and approved by the Secretary of State.** | | |
|---|---|---|---|
| Certification of local election officials | **A full, partial, or conditional waiver of the certification requirement may be granted by the Secretary of State, in the discretion of the Secretary of State**, upon the presentation of evidence by the election superintendent or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-101(c)(1) | Category 3 |
| Certification of local election officials | In the event that a municipality authorizes a county to conduct its elections pursuant to Code Section 21-2-45, **the municipality may be granted by the Secretary of State, in the discretion of the Secretary of State, a waiver of the certification requirement**, provided that the superintendent in charge of running the municipal election shall have previously completed a certification program approved by the Secretary of State and has demonstrated a proficiency in the operation of the voting equipment used in said municipality. | O.C.G.A. § 21-2-101(c)(2) | Category 3 |

| Form of ballots; printing ballots; stubs; numbers | **(2) Ballots for direct recording electronic voting systems shall be designed as prescribed by the Secretary of State to ensure easy reading by electors.** <br> **(3) Ballots printed by an electronic ballot marker shall be designed as prescribed by the Secretary of State to ensure ease of reading by electors.** | O.C.G.A. § 21-2-286(b) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | (1) The **equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.** <br><br> **(2) As soon as possible, once such equipment is certified by the Secretary of State as safe and practicable for use, all federal, state, and county general primaries and general** elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector. <br><br> **(3) The state shall furnish a uniform system of electronic ballot markers and ballot scanners for use in each county as soon as possible…** <br><br> (4) Notwithstanding any provision of law to the contrary, **the Secretary of State is authorized to conduct pilot programs to test and evaluate the use of electronic ballot markers and ballot scanners in primaries and elections in this state.** | O.C.G.A. § 21-2-300(a) | Category 3 |
| Uniform election equipment | **The Secretary of State shall be responsible for the development, implementation, and provision of a continuing** | O.C.G.A. § 21-2-300(d) | Category 1 <br> Category 2 |

| | | | |
|---|---|---|---|
| throughout state; education of voters, election officials, and poll officers in operation of election equipment | **program to educate voters, election officials, and poll workers in the proper use of such voting equipment.** Each county shall bear the costs, including transportation, subsistence, and lodging, incurred by its election and registration officials **attending courses taught by or arranged by the Secretary of State for instruction in the use of the voting equipment.** | | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Counties shall be authorized to contract with municipal governments for the use of such voting equipment in municipal elections **under terms and conditions specified by the Secretary of State to assure that the equipment is properly used and kept secure.** | O.C.G.A. § 21-2-300(e)(1) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Each county shall, prior to being provided with voting equipment by the state, provide or contract for adequate technical support for the installation, set up, and operation of such voting equipment for each primary, election, and special primary and special election **as the Secretary of State shall determine by rule or regulation**. | O.C.G.A. § 21-2-300(c) | Category 3 |
| Examination and approval of voting machines by Secretary of State | Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine **may request the Secretary of State to examine the machine**. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. | O.C.G.A. § 21-2-324(a) | Category 1<br>Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| | Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $250.00. **The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine**. | | |
| Examination and approval of voting machines by Secretary of State | **The Secretary of State shall thereupon require such machine to be examined or reexamined** by three examiners whom he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall require of them a written report on such machine, attested by their signatures; **and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-324(b) | Category 3 |
| Examination and approval of voting machines by Secretary of State | No kind of voting machine not so approved shall be used at any primary or election and if, upon the reexamination of any voting machine previously approved, it shall appear that the machine so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate **votes, the approval of the same shall immediately be revoked by the Secretary of State**; and no such voting machine shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-324(c) | Category 3 |

| | | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, **the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State.** | O.C.G.A. § 21-2-324(d) | Category 3 |
| Examination and approval of voting machines by Secretary of State | **The compensation of each examiner appointed under this Code section shall be fixed and paid by the Secretary of State**. | O.C.G.A. § 21-2-324(h) | Category 3 |
| Form of ballots on voting machines | If the construction of the machine shall require it, the ballot label for each candidate, group of candidates, political party or body, or question to be voted on shall bear the designating letter or number of the counter on the voting machine which will register or record votes therefor. Each question to be voted on shall appear on the ballot labels in brief form. Unless otherwise provided by law, proposed constitutional amendments so submitted shall be in brief form as directed by the General Assembly and, **in the failure to so direct, the form shall be determined by the Secretary of State**. Unless otherwise provided by law, any other state-wide questions or questions to be presented to the electors of more than one county so submitted shall be printed in brief form as directed by the General Assembly and, **in the event of a failure to so direct, the form shall be determined by the Secretary of State** and shall include a short title or heading in bold face at the beginning of each such question on the ballot and any local questions so submitted shall be printed in brief form as directed by the General Assembly and, in the event of a failure to so direct, the form shall be determined by the superintendent. In the case of questions to be voted on by the electors of a municipality, the governing authority shall determine the brief form of the questions. | O.C.G.A. § 21-2-325(b) | Category 3 |

| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | The superintendent shall appoint one custodian of voting machines and such deputy custodians as may be necessary, whose duty it shall be to prepare the machines to be used at the primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the municipality such compensation as shall be fixed by the governing authority of the municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the voting machines as required by this chapter, and he or she and the deputy custodians, whose duty it shall be to assist him or her in the discharge of his or her duties, shall serve at the pleasure of the superintendent. **Each custodian shall take an oath of office framed by the Secretary of State, which shall be filed with the superintendent**. | O.C.G.A. § 21-2-327(b) | Category 3 |
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | **In every primary or election, the superintendent shall furnish, at the expense of the municipality, all ballot labels, forms of certificates, and other papers and supplies which are required under this chapter and which are not furnished by the Secretary of State, all of which shall be in the form and according to the specifications prescribed from time to time by the Secretary of State**. In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such primary. | O.C.G.A. § 21-2-327(f) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system**. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning voting system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable | O.C.G.A. § 21-2-368(a) | Category 3 |

| | expenses of such examination. **The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system**. | | |
|---|---|---|---|
| Examination and approval of optical scanning voting systems by Secretary of State | **The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors** at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-368(b) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | No kind of optical scanning voting system not so approved shall be used at any primary or election and if, upon the reexamination of any optical scanning voting system previously approved, it shall appear that the optical scanning voting system so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, **the approval of the same shall immediately be revoked by the Secretary of State**; and no such optical scanning voting system shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-368(c) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any vendor who completes a sale of optical scanning voting system that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia**, plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have authority to impose such penalty upon a finding that such a sale has occurred. | O.C.G.A. § 21-2-368(e) | Category 3 |

| | | | |
|---|---|---|---|
| Form and arrangement of ballots for optical scanning voting systems | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the superintendent | O.C.G.A. § 21-2-369(c) | Category 3 |
| Write-in ballots | In elections, electors shall be permitted to cast write-in votes. The design of the ballot shall permit the superintendents, in counting the write-in votes, to determine readily whether an elector has cast any write-in vote not authorized by law. **The Secretary of State, in specifying the form of the ballot, and the State Election Board, in promulgating rules and regulations respecting the conduct of elections, shall provide for ballot secrecy** in connection with write-in votes. | O.C.G.A. § 21-2-373 | Category 2 Category 3 |
| Form and arrangement of ballots for DRE voting systems; write-in votes | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the election superintendent | O.C.G.A. § 21-2-379.4 | Category 3 |
| Appearance, form, and arrangement of ballots | **The form and arrangement of ballots marked and printed by an electronic ballot marker shall be prescribed by the Secretary of State.** | O.C.G.A. § 21-2-379.23(b) | Category 1 Category 2 Category 3 |
| Examination requests; sale of unapproved devices | (a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any electronic ballot marker may request that the Secretary of State examine the device. **Any ten or more electors of this state may, at any time, request that the Secretary of State reexamine any such device previously examined and approved by him or her.** Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination or reexamination. **The Secretary of State shall publish and maintain on his or her website the cost of such examination** | O.C.G.A. § 21-2-379.24(a)-(d) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | **or reexamination. The Secretary of State may, at any time, in his or her discretion, reexamine any such device.**<br><br>**(b) The Secretary of State shall thereupon examine or reexamine such device and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of device so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If this report states that the device can be so used, the device shall be deemed approved, and devices of its kind may be adopted for use at primaries and elections as provided in this chapter.<br><br>(c) Any device that is not so approved shall not be used at any primary or election and if, upon reexamination, a previously approved device appears to be no longer safe or accurate for use by electors at primaries or elections as provided in this chapter because of an inability to accurately record votes, the approval of the same **shall immediately be revoked by the Secretary of State**, and no such device shall thereafter be used or purchased for use in this state.<br><br>(d) Any vendor who completes a sale of an electronic ballot marker that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia, plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have the authority to impose such penalty upon a finding that such a sale has occurred. | | |
| Programming proper design and style of ballots; custodian of electronic ballot | The superintendent may appoint, with the approval of the county or municipal governing authority, as appropriate, a custodian of the electronic ballot markers, and deputy custodians as may be necessary, whose duty shall be to prepare the devices to be used in the county or municipality at the primaries and elections to be held therein. Each custodian and | O.C.G.A. § 21-2-379.25(b) | Category 3 |

| markers; testing of electronic ballot markers | deputy custodian shall receive from the county or municipality such compensation as shall be fixed by the governing authority of such county or municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the devices as required by this chapter. **The custodian and deputy custodians shall serve at the pleasure of the superintendent and each shall take an oath of office prepared by the Secretary of State before each primary or election, which shall be filed with the superintendent.** | | |
|---|---|---|---|
| Storage and security of electronic ballot markers | **All electronic ballot markers and related equipment, when not in use, shall be properly stored and secured under conditions as shall be specified by the Secretary of State.** | O.C.G.A. § 21-2-379.26(a) | Category 3 |
| Application for ballot | If found ineligible, the clerk or the board of registrars shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility, a copy of which notification should be retained on file in the office of the board of registrars or absentee ballot clerk for at least one year. However, an absentee ballot application shall not be rejected due to an apparent mismatch between the signature of the elector on the application and the signature of the elector on file with the board of registrars. **In such cases, the board of registrars or absentee ballot clerk shall send the elector a provisional absentee ballot with the designation "Provisional Ballot" on the outer oath envelope and information prepared by the Secretary of State as to the process to be followed to cure the signature discrepancy.** If such ballot is returned to the board of registrars or absentee ballot clerk prior to the closing of the polls on the day of the primary or election, the elector may cure the signature discrepancy by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21-2-417 before the close of the period for verifying provisional | O.C.G.A. § 21-2-381(b)(3) | Category 2<br>Category 3 |

| | | | |
|---|---|---|---|
| | ballots contained in subsection (c) of Code Section 21-2-419. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient, the absentee ballot shall be counted as other absentee ballots. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be insufficient, then the procedure contained in Code Section 21-2-386 shall be followed for rejected absentee ballots. | | |
| State write-in absentee ballots | **The Secretary of State shall design a state write-in absentee ballot for federal offices and state offices** that are voted upon on a state-wide basis for use in a primary runoff or election runoff by an eligible absentee elector who lives outside the county or municipality in which the election is held and who is: | O.C.G.A. § 21-2-381.2(a) | Category 2 Category 3 |
| State write-in absentee ballots | **The Secretary of State shall establish a website which such eligible absentee electors may access to determine if there is a primary runoff or election runoff for a federal office or a state office that is voted upon on a state-wide basis**. The address of such website shall be included in the instructions for voting such state write-in absentee ballot. | O.C.G.A. § 21-2-381.2(d) | Category 2 Category 3 |
| Official absentee ballots | **The form for either ballot shall be determined and prescribed by the Secretary of State**, except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent. | O.C.G.A. § 21-2-383(a) | Category 3 |
| Preparation and delivery of absentee ballots; mailing ballots to absentee voters; oaths; assistance; master list; transmission to | Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope addressed to the elector, the superintendent, board of registrars, or absentee **ballot clerk shall provide two envelopes for each official absentee ballot**, of such **size and shape as shall be determined by the Secretary of State**, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words "Official Absentee Ballot" and nothing else. | O.C.G.A. § 21-2-384(b) | Category 3 |

| | | | |
|---|---|---|---|
| uniformed and overseas citizens | On the back of the larger of the two envelopes to be enclosed within the mailing envelope shall be printed the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21-2-409, and the penalties provided for in Code Sections 21-2-568, 21-2-573, 21-2-579, and 21-2-599 for violations of oaths; and on the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. The larger of the two envelopes shall also display the elector's name and voter registration number. **The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, provisional absentee ballot information, if necessary, and a notice in the form provided by the Secretary of State** of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. | | |
| Voting by absentee electors; penalties | The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. **In addition, the registrars or absentee ballot clerk shall notify the Secretary of State in the manner prescribed by the Secretary of State of the times, dates, and locations at which advance voting will be conducted**. | O.C.G.A. § 21-2-385(d)(2) | Category 3 |

| Pilot program | **The Secretary of State shall develop and implement a pilot program** for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, for use in a primary or a general election. | O.C.G.A. § 21-2-387(a) | Category 3 |
|---|---|---|---|
| Cards of instructions and supplies; sample ballots and ballot labels | Prior to each primary and election, **the superintendent shall obtain from the Secretary of State a sufficient number of cards of instruction for guidance of electors**. Such cards of instruction **shall include such portions of this chapter as deemed necessary by the Secretary of State** and shall be printed for the type of voting equipment or ballots used in the county or municipality. **The superintendent shall also obtain from the Secretary of State a sufficient number of blank forms of oaths of poll officers, voter's certificates, voting rights posters, notices of penalties, oaths of assisted electors, numbered list of voters, tally sheets, return sheets, and such other forms and supplies required by this chapter, in each precinct of the county or municipality**. | O.C.G.A. § 21-2-400(a) | Category 3 |
| Delivery of ballots and supplies to managers | The superintendent shall provide at the polling place copies of the sample or facsimile ballots for such primary or election as well as a list of the certified write-in candidates for such election **in the form as provided by the Secretary of State or appropriate municipal official pursuant to** Code Section 21-2-133. | O.C.G.A. § 21-2-401(d) | Category 3 |
| Voter's certificates | At each primary and election, **the Secretary of State shall prepare and furnish to each superintendent a suitable number of voter's certificates** which shall be in substantially the following form: | O.C.G.A. § 21-2-402(a) | Category 3 |
| Voter identification cards | **The Secretary of State shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment**. | O.C.G.A. § 21-2-417.1(g) | Category 3 |

| | | | |
|---|---|---|---|
| Casting of provisional ballots | Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State.** The person shall also present the identification required by Code Section 21-2-417. | O.C.G.A. § 21-2-418(b) | Category 2 Category 3 |
| Method of voting and counting provisional ballots | The board of registrars shall complete a report **in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted** in the primary or election. | O.C.G.A. § 21-2-419(e) | Category 3 |
| Absentee ballots | Ballots in a precinct using optical scanning voting equipment for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked "Official Absentee Ballot" and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or ballot scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed on the face thereof the following: "I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." **The form for either ballot** | O.C.G.A. § 21-2-482 | Category 3 |

| | shall be determined and prescribed by the Secretary of State. | | |
|---|---|---|---|
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | Each county and municipal superintendent shall prepare four copies of the consolidated return of the primary to be **certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-496(a) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **The Secretary of State is authorized to provide a method by which the election superintendent can file the results of primaries and elections electronically**. Once the Secretary of State provides such a method of filing, **the election superintendent shall file a copy of the election returns electronically in the manner prescribed by the Secretary of State** in addition to the filing provided in subsection (a) of this Code section. **The Secretary of State is authorized to promulgate such rules and regulations as necessary to provide for such an electronic filing**. | O.C.G.A. § 21-2-496(b) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such p**rimary. | O.C.G.A. § 21-2-496(c) | Category 3 |
| Consolidated certified returns of elections; returns forwarded to | Each county and municipal superintendent shall prepare four copies of the consolidated return of the election **to be certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-497(a) | Category 3 |

| Secretary of State | | | |
|---|---|---|---|
| Consolidated certified returns of elections; returns forwarded to Secretary of State | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election**. | O.C.G.A. § 21-2-497(b) | Category 3 |
| Precertification tabulation audits; rules and regulations; risk-limiting audit pilot program | **The Secretary of State shall conduct a risk-limiting audit pilot program with a risk limit of not greater than 10 percent in one or more counties by December 31, 2021. The Secretary of State shall review the results of the pilot program and, within 90 days following the election in which such pilot program is used, shall provide the members of the General Assembly with a comprehensive report, including a plan on how to implement risk-limiting audits state wide.** If such risk-limiting audit is successful in achieving the specified confidence level within five business days following the election for which it was conducted, then all audits performed pursuant to this Code section shall be similarly conducted, beginning not later than November 1, 2024. | O.C.G.A. § 21-2-498(e) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | Upon receiving the certified returns of any election from the various superintendents, **the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast for all candidates** described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall thereupon certify and file in his or her office the tabulation thereof. In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county** | O.C.G.A. § 21-2-499(a) | Category 3 |

47

| | | | |
|---|---|---|---|
| | **submitting the incorrect returns and direct the county to correct and recertify such returns**. Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results and shall file the same in his or her office. | | |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | **The Secretary of State shall also, upon receiving the certified returns for presidential electors, proceed to tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them before the Governor**. Not later than 5:00 P.M. on the seventeenth day following the date on which such election was conducted, the Secretary of State shall certify the votes cast for all candidates described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall no later than that same time lay the returns for presidential electors before the Governor. The Governor shall enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes. The Governor shall certify the slates of presidential electors no later than 5:00 P.M. on the eighteenth day following the date on which such election was conducted. Notwithstanding the deadlines specified in this Code section, such times may be altered for just cause by an order of a judge of superior court of this state. | O.C.G.A. § 21-2-499(b) | Category 3 |
| Certificates of election; commissions; proclamations | *Governor and other constitutional officers.* Upon completing the tabulation of any election for Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of Agriculture, or Commissioner of Labor, **the Secretary of State shall lay the same before the Governor upon his or her oath of office as Governor**; and the Governor, upon the other constitutional officers taking their oaths of office, shall issue a commission under the great seal of the State of Georgia signed by the Governor and countersigned by the | O.C.G.A. § 21-2-502(a) | Category 3 |

| | Secretary of State, to each such person. **The Secretary of State shall issue the commission to the person elected Governor.** | | |
|---|---|---|---|
| Certificates of election; commissions; proclamations | *United States senators; representatives in Congress; members of the General Assembly.*<br>(1) Upon completing the tabulation of any election for United States senator or representative in Congress, **the Secretary of State shall lay the same before the Governor,** who shall immediately issue certificates of election and commissions under the seal of the state, duly signed by the Governor and attested by the Secretary of State and deliver the same to the candidates receiving the required number of votes to be elected to the respective offices.<br>(2) **The Secretary of State shall issue certificates of election to the persons elected members of the Senate and the House of Representative**s of the General Assembly and, between the hours of 12:00 Noon and 1:00 P.M. on the second Monday in January of each odd-numbered year, present before the Senate and the House of Representatives the several returns of the elections of members of the respective houses. **In case of a special election the Secretary of State shall issue a certificate of election to each person so elected**, and the Secretary of State shall present the returns of such election to the proper house as soon as received and tabulated by the Secretary of State. Immediately upon their taking the oath of office, each member of the Senate and the House of Representatives shall be issued **a commission under the great seal of the State of Georgia, signed by the Secretary of State.** | O.C.G.A. § 21-2-502(b) | Category 3 |
| Certificates of election; commissions; proclamations | *Justices of the Supreme Court, Judges of the Court of Appeals, Commissioners of the Georgia Public Service Commission, judges of the superior court, judges of the juvenile court, and district attorneys.* Upon completion of the tabulation **the Secretary of State shall certify the result of each election of Justices of the Supreme Court, of Judges of the Court of Appeals, of Commissioners of the Georgia Public Service Commission, of judges of the superior court, of judges of the** | O.C.G.A. § 21-2-502(c) | Category 3 |

| | | | |
|---|---|---|---|
| | **juvenile court where elected, and of district attorneys to the Governor and shall issue a certificate of election to each person so elected**. The Governor shall, upon each such person taking the oath of office, immediately issue a commission under the great seal of the State of Georgia, signed by the Governor and **countersigned by the Secretary of State**, to each such person. | | |
| Certificates of election; commissions; proclamations | *Presidential electors.* **The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor**, who shall enumerate and ascertain the number | O.C.G.A. § 21-2-502(e) | Category 3 |

50