# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

      v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## **EXPERT REPORT OF LORRAINE C. MINNITE**

## TABLE OF CONTENTS

I. Summary of Opinions ........................................................................................................1

II. Background and Qualifications.........................................................................................1

III. Discussion .........................................................................................................................3

A. Brief History of Voting Restrictions ...............................................................3

B. Defining "Voter Fraud"....................................................................................6

C. Analysis of the Incidence of Voter Fraud in Contemporary U.S. Elections .................8

D. Evidence and Analysis of Voter Fraud in Georgia ......................................16

IV. Conclusion ......................................................................................................................22

Appendix      *Curriculum Vitae*

Attachment      2006 Correspondence with Georgia Attorney General and Secretary of State

## I.      SUMMARY OF OPINIONS[1]

I have been retained by the Plaintiffs in the above-captioned case to provide expert analyses and opinions regarding the incidence of voter fraud in elections in the United States, both nationally, and in Georgia.[2] Based on my extensive research and analysis on contemporary voter fraud in U.S. elections, I conclude:

**A.**      The empirical evidence makes clear that fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare, both nationally, and in Georgia.

**B.**      A review of available evidence in Georgia finds no cases of voter impersonation at the polling place.  In addition, there is minimal evidence of other forms of fraud intentionally committed by voters, such as 'repeat' voting, or voting when knowing one is ineligible to vote.

The facts and data I considered in forming my opinions are set forth below.  In Section II, I discuss my educational and professional background and qualifications.  In Section III.A, I briefly discuss the historical background of voting requirements to set the context for my discussion of voter fraud nationally and in Georgia.  In Section III.B, I examine the electoral process and define voter fraud as "the intentional corruption of the voting process by voters."  Next, in Section III.C, I review the research conducted for my 2010 book on voter fraud, *The Myth of Voter Fraud*, and demonstrate that voter fraud does not pose a threat to elections, as some claim.  I update the conclusions of my book with a review of new research on voter fraud in U.S. elections.  In Section III.D, I analyze the available data of specific cases of alleged voter fraud in Georgia over the last two decades; I then conclude the report.

## II.      BACKGROUND AND QUALIFICATIONS

I am an associate professor and chair of the Department of Public Policy and Administration at Rutgers University-Camden.  I received a Bachelor of Arts degree in History from Boston University, and two Master's Degrees and a Ph.D. in Political Science from the City University of New York.  One of my areas of expertise is American Politics with a specialization in elections and the political process.  Specifically, I study the incidence and effect of voter fraud in American elections.

In 2003, I co-authored a study of voter fraud with David Callahan for the public policy research and advocacy organization, Demos, titled, "Securing the Vote: An Analysis of Voter

---

[1] This report is based on information that is currently available for my review.  I reserve the right to update my report and opinions upon review of any additional documents or information produced in discovery and previously unavailable to me.

[2] I am being compensated for my work at the rate of $250 per hour.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Fraud." I updated this study with new material in 2007.[3]  At that time, Demos published a preliminary report I wrote on voter fraud and same-day registration,[4] and in March of 2007, I published a report, "The Politics of Voter Fraud," for Project Vote, a national nonpartisan, nonprofit voting rights organization.[5]  In June 2010, Cornell University Press published *The Myth of Voter Fraud*, my full-length scholarly treatment of the subject and the politics surrounding the uses of voter fraud allegations to shape electoral policy.  The book analyzes the evidence of voter fraud and concludes that the widespread allegation that voter fraud is a rampant problem of unknown proportions in contemporary U.S. elections is unsupported by evidence, and that actual voter fraud is extremely rare.  In *The Myth of Voter Fraud*, I argue and provide evidence to show that having no basis in fact, these allegations are motivated by political interests, and are designed to make voting harder for certain populations.  I provide an analysis of the role of the voter fraud myth in the contemporary voter identification debate in "Voter Identification Laws: The Controversy over Voter Fraud," published by Routledge in 2012 book edited by Matthew J. Streb titled, *Law and Election Politics*.

This report incorporates all of the research I have conducted on the subject of voter fraud and voter ID laws since 2001, cited above and published in peer-reviewed books and journals.[6] To expand my research on supposed recent evidence of voter fraud in Georgia, I analyzed the following:

- Articles appearing in more than 60 different Georgia newspapers and other news sources, focusing my analysis on articles appearing over the last fifteen years;

- Materials produced by the Georgia State Board of Elections, including transcribed meeting minutes from SEB meetings held from February 12, 2010, through August 21, 2019;

- All news and press releases by the Georgia Attorney General's Office, from August 29, 1997 to November 21, 2019, and any other relevant documents I could find on the Attorney General's website, including official, unofficial, and modified opinions (some dating back to 1992);

---

[3] Lorraine C. Minnite, "An Analysis of Voter Fraud," (New York: Demos, 2007), *available at* http://www.demos.org/publication/analysis-voter-fraud-united-states-adapted-2003-report-securing-vote (last accessed November 24, 2019).

[4] Lorraine C. Minnite, "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security," (New York: Demos, 2007), *available at* https://www.issuelab.org/resource/election-day-registration-a-study-of-voter-fraud-allegations-and-findings-on-voter-roll-security.html (last accessed November 24, 2019).

[5] Lorraine C. Minnite, "The Politics of Voter Fraud," (Washington, D.C.: Project Vote, 2007), *available at* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwjc_tPstYPmAhXNvZ4K HXTUC8AQFjAAegQIBRAC&url=http%3A%2F%2Fwww.projectvote.org%2Fwp-content%2Fuploads%2F2007%2F03%2FPolitics_of_Voter_Fraud_Final.pdf&usg=AOvVaw1jUdV8sW1HtHfxbtXs m66W (last accessed November 24, 2019).

[6] A complete list of my peer reviewed publications is set forth in my *Curriculum Vitae* in the Appendix of this report.

- Press releases from the U.S. Attorney's Office for the Northern, Middle and Southern Districts of Georgia;

- Other materials produced by U.S. federal agencies, including the Government Accountability Office, and the Public Integrity Section of the Justice Department's Criminal Division;

- Briefs and materials in evidence in *Common Cause/Georgia et al. v. Billups and State Election Board*, U.S. District Court for the Northern District of Georgia, Rome Division, Civil Action, 4:05-CV-HLM, 2005-2007;

- Other materials produced by U.S. federal agencies, including the Government Accountability Office, and the Public Integrity Section of the Justice Department's Criminal Division;

- Additional blog posts, press releases and reports by advocacy groups, including but not limited to, the ACLU of Georgia, Facing South, the Heritage Foundation, Media Matters, the Republican National Lawyers Association, and True the Vote;

- Additional materials, as cited in the footnotes.


## III.   DISCUSSION

### A.  Brief History of Voting Restrictions

The history of voting in the United States is generally told as a story of enfranchisement, as first property and tax-paying requirements fell away in the early decades of the nineteenth century,[7] and prohibitions against race, gender, and age discrimination were incorporated into the U.S. Constitution.[8]  As a matter of formal constitutional protections and rights there is truth to the story.  But the United States also has a long history of using electoral laws to suppress voting.  Prior to the late nineteenth century, there were very limited voter registration requirements placed upon eligible voters.[9]  The earliest of registration laws put the obligation on the government to

---

[7] Chilton Williamson, *American Suffrage from Property to Democracy, 1760-1860* (Princeton: Princeton University Press, 1960).

[8] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the U.S.* (New York: Basic Books, 2000).

[9] Keyssar, *The Right to Vote*, 151; Joseph P. Harris, *The Registration of Voters in the United States* (Baltimore: Lord Baltimore Press, 1929), 65-66; *see also*, John Mark Hansen, et al., "Voter Registration," Reports of The Task Force on the Federal Election System (to accompany the Report of the National Commission on Election Reform, *To Assure Pride and Confidence in the Electoral Process*), National Commission on Federal Election Reform, August 2001, 2 (on file with author).

enroll qualified voters, and allowed voters to register on Election Day.[10]  The pool of eligible voters vastly expanded in the nineteenth century when property and tax-paying requirements for voter eligibility were mostly eliminated.  By the end of the century, a competitive national party system was helping to produce the highest rates of voter turnout in U.S. history.  At the same time, however, as the population of the United States swelled through the mass immigration of southern and eastern Europeans that gave rise to a new industrial proletariat, states began adopting more onerous voter registration and voting laws, supplanting the restrictive effects of property requirements and shifting the burden of establishing voter eligibility away from the government to the individual.[11]

Following the emancipation of African Americans and the enfranchisement of black men by the Civil War Amendments, a reactionary, white supremacist counter-movement in the South arose to re-erect a system of racial subordination.  By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the southern states, at first by the use of violent intimidation and trickery, and later by the introduction or reintroduction of a series of superficially color-blind requirements intended to circumvent the Fourteenth and Fifteenth Amendments.[12]

Voter registration requirements were especially important because of the degree to which they ceded discretion to local registrars and election officials.  Thus, an 1873 Georgia law permitted local registrars to close their books to new registrants except during the planting and harvesting months, or in other words, during the time of the year that African American farm workers most likely would not be able to make the trip to the county seat to register to vote.  Once word of the effectiveness of this stratagem and other election administration techniques to disfranchise blacks spread, similar laws followed in North Carolina[13] and Alabama.

---

[10] Charles Edward Merriam and Harold Foote Gosnell, *The American Party System: An Introduction to the Study of Political Parties in the United States* (New York: The Macmillan Company, 1929); Harris, *Registration of Voters*, xi.

[11] Dayna L. Cunningham, "Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States," *Yale Law and Policy Review* 9, no. 2 (1991): 370-404.

[12] *See* Frances Fox Piven, Lorraine C. Minnite, and Margaret Groarke, *Keeping Down the Black Vote: Race and the Demobilization of American Voters* (New York: The New Press, 2009).  The authoritative work on this subject is J. Morgan Kousser, *The Shaping of the Southern Politics: Suffrage Restriction and the Establishment of the One-Party South* (New Haven: Yale University Press, 1974).  See also, Laughlin McDonald, Michael B. Binford, and Ken Johnson, "Georgia," Chapter 3 in *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990*, eds. Chandler Davidson and Bernard Grofman (Princeton: Princeton University Press, 1994), 67-102.

[13] Logan writes of the suffrage qualification laws passed in North Carolina during the 1876-1877 legislative session: "The most thorough and wide sweeping of these enactments was the act to regulate elections.  The wide, almost autocratic powers granted to the registrars and judges of elections, the residence requirements, and the right of one voter to challenge another – all of these pointed to the intent of the framers to disfranchise or reduce the number of Negro voters."  *See* Frenise A. Logan, *The Negro in North Carolina, 1876-1894*, UNC Enduring Edition (Chapel Hill, N.C.: University of North Carolina Press, [1964] 2011), 55.  For more on North Carolina's election law of 1877, *see* chapter 5 "Fusion Election Law," in Helen G. Edmonds, *Negro and Fusion Politics in North Carolina, 1894-1901* (Chapel Hill, N.C.: University of North Carolina Press, [1951] 1979).

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Laws requiring voters to show their registration certificates before they were permitted to cast ballots were also effective in disenfranchising African Americans in the South.  Most states adopting personal registration closed registration periods long before an election, and it would not be uncommon for illiterate and impoverished migrant farm workers to lose track of paperwork.  In addition, this rule made blacks doubly vulnerable to harassment and attack as they made their way to the polling place.  There are numerous accounts from the period of blacks walking to the county seat to vote and being set upon by white mobs who robbed them of their registration papers.  For example, in November 1876, the Republican governor of Louisiana wrote to Republican National Committee officials in New York:

> Dispatches from Ouachita and Morehouse Parishes, near the Arkansas line, and West Feliciana near the Mississippi line, report that their parishes are now patrolled by the White League, reinforced by armed bodies from Arkansas and Mississippi.  Most of the Republican leaders have been driven away or murdered.  Under the State law voters are entitled to vote at any poll in the parish in which they reside.  The colored people generally are attempting to reach the parish seats of those parishes in order to vote under the protection of the authorities.  Numbers of them have been intercepted by the White League pickets, and their registration papers destroyed.[14]

Election fraud documented by early election reformers was not primarily committed by individual voters, who are the target of election reforms to widen the franchise, but instead by election officials and politicians.[15]  In some places, corrupt politicians used the police to "colonize" closely contested elections with fraudulently registered voters.[16]  Prior to the widespread adoption of the secret ballot in the late 1880s,[17] party agents arguably used "inflationary" corruption by buying votes and recycling voters.[18]  Afterward, parties also pursued "deflationary" corruption by paying opponents to stay home or otherwise defeating their efforts to vote, using devices such as poll taxes, literacy tests, long residency periods and other onerous requirements for voter registration to further their goals.  Reformers justified the enactment of voter registration as a

---

[14] "The Close of the Canvass," *New York Times*, November 7, 1876, 1.

[15] *See* Joseph P. Harris, *Election Administration in the United States* (Washington, D.C.: The Brookings Institution, 1934), 375-376 ("Isolated, individual cases of election frauds are uncommon and unimportant.  Election frauds cannot be carried on successfully and upon a wide scale without protection, without the pre-arrangement of election officers who will 'deliver' if necessary, and without the backing of a powerful political organization.")

[16] Richard L. McCormick, *From Realignment to Reform: Political Change in New York State, 1893-1910* (Ithaca: Cornell University Press, 1981), 44.

[17] In 1888, Kentucky experimented with the "Australian" or secret ballot in a Louisville municipal election and Massachusetts became the first state to legislate the reform.  Over the next four years, another 36 states rapidly passed similar laws, with all but two adopting the secret ballot by 1910.  See Lionel E. Fredman, *The Australian Ballot: The Story of an American Reform* (East Lansing: Michigan State University Press, 1968).

[18] Gary W. Cox and J. Morgan Kousser, "Turnout and Rural Corruption: New York as a Test Case," *American Journal of Political Science* 25, no. 4 (November 1981), 646-63.

means to subdue broader electoral fraud, yet it remains unclear whether the reforms played any part in reducing it.[19]

No conclusive tie between enfranchising reform and voter fraud has ever been proven. And yet, at each significant effort to protect and extend the right to vote since the great victories of the Civil Rights Movement, franchising opponents have argued that reduced barriers would lead to voter fraud. For example, the alleged fraud threat was taken up by congressional opponents time and time again in the debates over the Voting Rights Act of 1965, the Universal Voter Registration Act of 1977, and the National Voter Registration Act of 1993.[20] The political usefulness of the voter fraud myth however, has not been limited to national reform efforts. In the recent period of what one scholar has called "the voting wars"[21] leading to a flurry of restrictive new voting rules adopted at the state level, the alleged threat of voter fraud has been a common refrain.

### B. Defining "Voter Fraud"

Most statutes criminalizing what we might think of as voter fraud do not specifically define the term. Instead, nefarious election-related practices are prevented by state laws making "double voting" or "falsifying records," or "voting by unqualified elector," and the like illegal.[22] Nevertheless, the process of formulating precise definitions is critical in the social sciences

---

[19] Paul Kleppner, *Who Voted? The Dynamics of Voter Turnout 1870-1980*, American Political Party and Election Series (New York: Greenwood Publishing Group, Inc., 1982), 59-60.

[20] *See, e.g.*, U.S. Congress, Senate Committee on the Judiciary, "To Enforce the 15th Amendment to the Constitution of the United States: Hearings on S.1564," 89th Cong., 1st sess., 1965; U.S. Congress, House Committee on House Administration, "To Establish a Universal Voter Registration Program, and for Other Purposes: Hearings on H.R. 5400," 95th Cong., 1st sess., 1977; and U.S. Congress, House Committee on House Administration, Subcommittee on Elections, "Hearing on Voter Registration," 103rd Cong., 1st sess., January 26, 1993. For an important account of the movement to reform voter registration laws leading to the passage of the National Voter Registration Act of 1993, *see* Frances Fox Piven and Richard A. Cloward, *Why Americans Don't Vote and Why Politicians Want It That Way* (Boston: Beacon Press, 2000); *see also*, Piven, et al., *Keeping Down the Black Vote*.

[21] Richard L. Hasen, *The Voting Wars: From Florida 2000 to the Next Election Meltdown* (New Haven, Conn.: Yale University Press, 2013).

[22] For example, in Georgia, "Any person who votes or attempts to vote at any primary or election, knowing that such person does not possess all the qualifications of an elector at such primary or election, as required by law, or…who knowingly gives false information to poll officers in an attempt to vote in any primary or election…" commits a felony. O.C.G.A. § 21-2-571 (2010). In Texas it is a third degree felony to "vote or attempt to vote in an election in which the person knows the person is not eligible to vote; knowingly votes or attempts to vote more than once in an election; or knowingly impersonates another person and votes as the impersonated person." Tex. Elec. Code Ann. § 64.012 (2003). California prohibits specific election related activity like fraudulent registration, voting in an election which one is not entitled to vote in, voting more than once or to try to buy a vote with the promise of a job. Cal. Elec. Code § 18520 (1994). In Minnesota, it is a felony to submit more than one absentee ballot or to assist another in submitting more than one absentee ballot, or alter another's absentee ballot. Minn. Stat. § 203B.03 (1999). In New Jersey, it is a third degree crime to "fraudulently vote…or in any manner so interfere…with the voters lawfully exercising their rights of voting at the election, as to prevent the election or canvass from being fairly had and lawfully conducted." N.J. Stat. Ann. § 19:34-11 (2011).

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

because it is necessary for accurate measurement of empirical phenomena.[23]  To develop the definition of voter fraud for my research on the incidence of voter fraud in contemporary U.S. elections published in *The Myth of Voter Fraud*, I examined the electoral process and looked at the capacity of actors in the political process to impact the outcome and integrity of elections. Various actors with that capacity include, but are not limited to, voters, campaign officials, elected officials, and election poll workers.

I examined the parts of the political process that different actors could corrupt, and found a distinction between what voters can corrupt given their role and access to the electoral process, compared to what other electoral actors can corrupt.  Voters are only capable of corrupting that part of the electoral process to which they have access.  To wit, voters cannot corrupt the election count because they do not count the ballots; only an official with broad access to the counting process can corrupt an entire count.  But, individual voters can corrupt their registration process and balloting by falsifying their records or identity on a registration application and/or fraudulently misrepresenting themselves to poll workers.

In the U.S., people commit voter fraud when they knowingly provide false information concerning their own voter eligibility credentials (i.e., citizenship status, age, permanent address), or when they knowingly cast more than one ballot ("double voting"), or cast a ballot knowing that they are not eligible to vote.  With some exceptions (i.e, laws concerning age, felon disfranchisement and mental incompetence), voter eligibility requirements are fairly standard across the states: one must be alive when casting a ballot, 18 years of age, a U.S. citizen, and not under state supervision for a conviction of a felony crime.  In our geographically-based system of representation, voters are required to vote in the jurisdiction in which they live.

People who *knowingly* abrogate eligibility rules commit voter fraud.  This may include so-called "non-citizen" voting by individuals who know they are not eligible to vote because they are not U.S. citizens, or so-called "felon" voting by people who have been convicted of a felony and not had their voting rights restored as required by state law.  Voting in the name of a dead person is fraudulent when the person casting the ballot intentionally impersonates the dead voter.  The voter fraud outlined here can be committed in person at the polls or early voting sites, or through the use of absentee or mail-in ballots.

By breaking up the electoral process according to its various stages and the actors that participate, I can derive a definition of voter fraud that centers on the behavior of individual voters, of primary interest in the current policy debates over new state laws restricting access to the ballot. Accordingly, my definition of voter fraud is "the *intentional corruption* of the *voting process* by *voters*."  This definition is specific to the elements I research.[24]

---

[23] W. Phillips Shively, *The Craft of Political Research*, 5th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2002), 30-8.

[24] The U.S. Department of Justice prosecutes election crimes committed when there is a federal candidate on the ballot, or in cases where there is jurisdiction to enforce federal criminal laws that potentially apply to both federal and non-federal elections when there is no federal candidate on the ballot.  The federal government's definition of "election fraud" centers on the corruption of "the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters," and is over-broad for the purpose of measuring election crime committed by voters because it includes acts of official malfeasance, such as ballot box stuffing or corruption of the

I emphasize the importance of intent in my definition, distinguishing election errors such as misspelled names and recording mistakes. I do this to keep the definition of voter fraud consistent with the legal concept of fraud and also, with principles of election administration.

Innocent administrative errors on the part of election officials and confusion on the part of voters can cause technically invalid ballots to be cast, however, there is an important distinction to be made between *invalid* registration and ballots, and *fraudulent* registration and ballots. Fraudulent registration and ballots are illegal; but not all invalid registration and ballots are fraudulent. Thus, in measuring the incidence of voter fraud, it is important to first determine the validity of registrations and ballots, and then, to identify, if possible, the intent on the part of the registrant or voter to register and vote and whether the ineligible or invalid registrant or voter knew that it was illegal to do so.

The research strategy outlined above is the one I have used in all of my work on the incidence of voter fraud over the last nearly twenty years. Because voter fraud is illegal, and because the available evidence for analyzing the incidence of voter fraud is not always conclusive on the question of intent, it is also important to research and understand the context and circumstances surrounding the behavior and the bare facts of alleged fraud.

The reasoning and logic I use to derive a definition of voter fraud for purposes of measuring the phenomenon lead to the following conclusions:

1) it is important to identify who is committing the fraud – the electoral process is complex and multi-staged; not all actors in the process have access to all parts of the process; therefore, not all forms of electoral fraud may be committed by all actors in the process;

2) thus, there is an important distinction to be made between *voter* fraud and broader *election* fraud; voter fraud is the intentional corruption of the electoral process by voters; election fraud encompasses all other forms of intentional corruption of the electoral process;

3) invalid registration and balloting, which may be detected as anomalies or irregularities in electoral mechanics, may not be fraudulent; therefore, there are competing explanations for electoral anomalies and irregularities: invalid registration and balloting may be caused by simple human error, confusion and mistakes.

**C.  Analysis of the Incidence of Voter Fraud in Contemporary U.S. Elections**

There are no officially compiled national or statewide statistics reliably reporting the instances of voter fraud. Therefore, assessing the degree to which voter fraud is a "problem" in

---

count. *See*, Richard C. Pilger, ed., *Federal Prosecution of Election Offenses*, 8th ed., U.S. Department of Justice, Criminal Division, Public Integrity Section (Washington, D.C.: Government Printing Office, 2017, 22-26; *available at* https://www.justice.gov/criminal/file/1029066/download). Because *voters* do not have access, those activities are not included in my definition of voter fraud.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

contemporary U.S. elections, either because it frequently mars the outcomes of elections, or because it may not occur with regular frequency but is highly likely to undermine elections for significant state or federal offices, is not easy.  In fact, I spent nearly ten years collecting and analyzing data and evidence using a wide variety of social science methods for my study of the contemporary incidence of voter fraud, *The Myth of Voter Fraud*, the first and only systematic, full scholarly treatment of the subject.

The two most important sources of evidence of voter fraud are social scientific studies and official government investigations and reports.

Social scientific research finds very little evidence of voter fraud in contemporary U.S. elections.  In 2014, the U.S. Government Accountability Office published a performance audit of issues related to state voter identification laws.[25]  Part of the study involved a review of "academic literature, organizational studies, peer-reviewed journals, books, and other regularly cited research published from January 2004 through April 2014 to identify studies that attempted to estimate in-person voter fraud, using a documented methodology."[26]  More than 300 studies were reviewed and analyzed by GAO staff to determine whether they contained data on in-person voter fraud and provided an adequate description of the methodology used for collecting the data.  Studies based on anecdotal reports of in-person voter fraud were excluded from the analysis.  Only five studies, including my 2010 book, *The Myth of Voter Fraud*, met the criteria.[27]  While all of the studies had various limitations for estimating a complete count of cases of in-person voter impersonation, two GAO analysts and a GAO statistician reviewed each of the studies and determined that "the design, implementation, and analyses of the studies were sufficiently sound to support the studies' results and conclusions based on generally accepted social science principles."[28]

The five scientifically sound studies identified by the GAO find very little evidence of voter fraud in contemporary U.S. elections.  Three of these studies use quantitative methods to identify anomalies in registration and voting data as proxies for voter fraud, finding very little fraud.[29]  The News21 project (discussed in more detail below) and *The Myth of Voter Fraud* do

---

[25] GAO, "Elections: Issues Related to State Voter Identification Laws."  For this report, the GAO was tasked only with identifying the challenges to determining a complete measure of in-person voter fraud, not with estimating the incidence of voter fraud overall.

[26] *Ibid.*, 7.

[27] John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election: Evidence from a Survey List Experiment," *Election Law Journal* 13(4): 460-475; Ray Christensen and Thomas J. Schultz, "Identifying Election Fraud Using Orphan and Low Propensity Voters," *American Politics Research*, vol. 42 (2): 311-345; M.V. Hood III and William Gillespie, "They Just Do Not Vote Like They Used To: A Methodology to Empirically Assess Election Fraud," *Social Science Quarterly*, 93(1): 76-94; Lorraine C. Minnite, *The Myth of Voter Fraud* (Ithaca: Cornell University Press, 2010); and Corbin Carson, "Exhaustive Database of Voter Fraud Cases Turns Up Scant Evidence That It Happens," News21, August 12, 2012, *available at* https://votingrights.news21.com/article/election-fraud-explainer/ (last accessed September 12, 2019).

[28] GAO, "Elections: Issues Related to State Voter Identification Laws," 3-4.

[29] Hood and Gillespie performed an audit of the 2006 general election in Georgia "to ascertain the extent to which deceased registrants are being used in a fraudulent manner."  Using a data mining technique, they initially identified 66 suspect ballots out of a total of approximately 2.1 million cast.  Only four of the suspect ballots were cast in-

not rely solely on quantitative methodologies, focusing instead on identifying actual instances of voter fraud in recent elections.

### The Myth of Voter Fraud

I spent nearly ten years collecting and analyzing hard data and evidence using a wide variety of social science methods for *The Myth of Voter Fraud*, the first and only peer-reviewed book on the subject of voter fraud in contemporary U.S. elections. My main research question was, what is the incidence of voter fraud – defined as the intentional corruption of the electoral process by voters – in contemporary U.S. elections? After analyzing original data and concluding that voter fraud is exceedingly rare, I asked, what then explains the persistent and growing chorus of evidence-free allegations that voter fraud is in fact an unchecked threat to the integrity of U.S. elections? In other words, my book also addresses the question of how we might make sense of the disjuncture between stubborn claims that voter fraud is a significant threat to the integrity of U.S. elections, and the contradictory facts.

To answer these questions I used what is known in the social sciences as a "mixed methods" or "multimethod" research approach.[30] This intuitive methodology, which has been called the "third methodological movement" in the social sciences following the developments of quantitative ("traditionalist") and then qualitative ("revolutionary") methodologies,[31] integrates quantitative, and qualitative and archival styles of evidence and modes of analysis, to triangulate independent and imperfect sources of information from which the researcher then draws inferences. It is particularly suited to research projects where the sources of evidence are scattered and incomplete, or where any one source is otherwise too limited on its own to serve as the basis for reliable analysis and valid inference.

Mixed methods is, therefore, the best methodological approach for the kind of research problems I faced. Since the publication of *The Myth of Voter Fraud*, other political scientists, including those whose work was reviewed by the GAO, and a few others, have used mostly

---

person. Further research determined conclusively that none of the in-person ballots and almost none of the absentee ballots (57 of the remaining 62 suspect ballots) were fraudulently cast. Hood and Gillespie were not able to obtain enough information from county registrars to make a determination one way or the other about five of the absentee ballots. They found "no evidence that election fraud was committed under the auspices of deceased registrants" in Georgia's 2006 election (Hood and Gillespie, "They Just Do Not Vote Like They Used To," 76). Ahlquist, Mayer and Jackman use a different technique to search for proxies for voter impersonation in the 2012 national general election, finding "no evidence of systematic voter impersonation" in that election (Ahlquist *et al.*, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election," 30). Christensen and Schultz use yet another quantitative methods technique to search for anomalies in election returns that might indicate the presence of fraud. Their findings "…support the conclusion that electoral fraud, if it occurs, is an isolated and rare occurrence in modern U.S. elections" (Christensen and Schultz, "Identifying Election Fraud Using Orphan and Low Propensity Voters," 313).

[30] See John W. Creswell and Vicki L. Plano Clark, eds., *Designing and Conducting Mixed Methods Research*, 3rd Ed., (Los Angeles: Sage Publications, Inc., 2017).

[31] Charles Teddlie and Abbas Tashakkori, "Major Issues and Controversies in the Use of Mixed Methods in the Social and Behavioral Sciences," in Abbas Tashakkori and Charles Teddlie, eds., *Handbook of Mixed Methods in Social and Behavioral Research* (Thousand Oaks, Calif.: Sage Publications, Inc., 2003), 5.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

quantitative methods to study election fraud.  While I believe that such methods can be useful in detecting anomalous patterns in registration lists or other sources of electoral data, the most that we can learn from such studies is that anomalous patterns may (or may not) exist in the data.[32] Moreover, the mere existence of anomalous data is insufficient to demonstrate actual voter fraud.

In the absence of reliable or official data, I gathered my own from a wide range of sources.[33] My conclusions in *The Myth of Voter Fraud* about the rarity of voter fraud relies on all of this data,

---

[32] Important improvements to election administration in recent years have been centered on applying computer-based information technologies across a range of record-keeping and administrative functions important to maintaining election integrity.  One of these functions is what is referred to as 'list maintenance,' or maintaining accurate voter rolls, as mandated by state and federal laws.  Section 8 of the federal National Voter Registration Act of 1993, sets a regulatory floor for maintaining registration lists, and governs conditions under which voter records may be removed.  In addition, Section 303 of the Help America Vote Act of 2002, sets basic requirements for computerized list maintenance, including coordination with state agency death and felon records and the removal of duplicates from the files.  Under HAVA, states are also required to collect either driver's license numbers or the last four digits of voter registration applicants' Social Security numbers for purposes of verifying application information.  Federal law allows states to determine what constitutes a "match."  List matching is also used by election agencies such as the North Carolina State Board of Elections, to audit elections and flag irregularities for review by agency personnel, and where appropriate, law enforcement.  List matching alone cannot identify fraud, and poor execution will produce bad data.  Indeed, there is an advanced statistical science of record linkage that incorporates probability theory, the construction and use of algorithms, data parsing and imputation strategies, and sophisticated methods for estimating error that make list matching exercises treacherous terrain for the amateur.  For an overview, see William E. Winkler, "Overview of Record Linkage and Current Research Directions," Statistical Research Division, U.S. Census Bureau, Research Report Series, Statistics #2006-2, February 8, 2006.  See also, Ivan P. Fellegi and Alan B. Sunter, "A Theory of Record Linkage," *Journal of the American Statistical Association*, 64(328): 1183-1210; Wendy Alvey and Bettye Jamerson, eds. *Record Linkage Techniques – 1997*, Proceedings of An International Record Linkage Workshop and Exposition, March 20-21, 1997, Arlington, Virginia; *available at* https://nces.ed.gov/FCSM/pdf/RLT97.pdf; and Peter Christen, *Data Matching: Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection* (New York: Springer, 2014).

[33] These included, but not limited to: a review of all of the scholarly literature by historians, political scientists, and legal scholars on voter fraud in American history (of which, given the extensive literature on American elections and electoral behavior, there is very little); review and analysis of all pertinent federal and state election statutes erected to ensure the integrity of elections and criminalizing certain behaviors; broad and deep database searches of hundreds of news sources across the U.S. at the state and local levels (including wire services); searches of legal databases and case law, and review of relevant legal materials and opinions at the state and federal levels; documents and material produced through public records requests sent to thousands of election and law enforcement officials in every state; Freedom of Information Act requests to various agencies within the U.S. Department of Justice; analysis of a longitudinal data set produced by the Administrative Office of the United States Courts; analysis of voluminous records of contested federal and state elections; interviews with a wide range of people with relevant expertise, including, but not limited to, prosecutors, defense lawyers, election officials, voters, academics, and advocates working on voter registration drives; in-depth case studies in four states of the worst alleged cases of voter fraud since 2000; and collection and review of a wide range of reports, evaluations, studies, testimony and the like produced by the federal government (i.e., audits by the U.S. Government Accountability Office; reports to Congress by the Congressional Research Service; reports produced by the U.S. Elections Commission and the U.S. Commission on Civil Rights; transcripts and materials from congressional hearings), state legislatures and state government agencies (i.e., data from the Elections Fraud Investigations Unit of the California Secretary of State's Office; a public complaints file from the Minnesota Secretary of State's Office established to comply with the federal Help America Vote Act of 2002; a report from a broad investigation of allegations of voter fraud by the New Hampshire Attorney General's Office), national election reform task forces (i.e., the Commission on Federal Election Reform, the Social Science Research Council National Research Commission on Elections and Voting), and a wide range of organizations, including party groups, good government and civic organizations, and other advocacy organizations, especially those claiming to find alarming evidence of voter fraud (i.e., a report by an

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

including a record of federal indictments generated during the first three years of a special program at the George W. Bush Administration's Department of Justice called the Ballot Access and Voting Integrity Initiative (BAVII). This initiative was specifically aimed at rooting out alleged voter fraud in federal elections. To be clear, it would not have been good social science to rely on only one source of evidence given the nature of my research questions and the lack of available data to examine the problems I set out to study. My conclusions about the incidence of voter fraud in contemporary U.S. elections most certainly do not rest solely upon prosecution records, as some have mistakenly claimed, but prosecution records are, nevertheless, an important indicator of the extent of the problem. Before I conclude this section with a discussion of social science research findings on the incidence of voter fraud since the publication of *The Myth of Voter Fraud*, I want to briefly review the book's analysis of the outcomes of the Justice Department's BAVII program. Those outcomes strongly challenge a common refrain from critics who without evidence claim that voter fraud is a large and looming problem demanding a policy response such as more stringent voter identification requirements, and that statistics drawn from law enforcement efforts against voter fraud crime are misleading because the law enforcement effort is allegedly so weak.

### *The U.S. Department of Justice's Ballot Access and Voting Integrity Initiative, 2002-2005*

In March 2001, United States Attorney General John Ashcroft announced the creation of a Ballot Access and Voting Integrity Initiative ("BAVII").[34] The BAVII brought together civil rights and criminal division lawyers of the Justice Department for an Election Day program, the stated purpose of which was to help attorneys recognize election fraud and voter intimidation, and to provide their services to voters who make complaints of the same. In 2008, the long-time director of the Election Crimes branch of the Justice Department's Public Integrity Section stated, that at the time, "the investigation and prosecution of election crimes...was outranked [in official agency prioritization] only by crimes involving terrorism and espionage."[35]

After numerous attempts at locating information regarding voter fraud from the BAVII, including a Freedom of Information Act request made to four different units of the U.S. Department of Justice,[36] I found a case list of indictments brought under the program buried in the

---

organization called the American Center for Voting Rights that claimed to be "the most comprehensive and authoritative review of the facts surrounding allegations of vote fraud, intimidation and suppression made during the 2004 presidential election:" reports compiled by the conservative Heritage Foundation and the Public Interest Legal Foundation).

[34] U.S. Department of Justice, press conference, Washington, D.C., March 7, 2001, *available at* http://www.justice.gov/archive/ag/speeches/2001/0307civilrightspressconf.htm. *See also*, Dan Eggen and David A. Vise, "Ashcroft Takes On Voting Issues; Enforcement, Monitoring of Election Laws to Be Increased," *Washington Post*, March 8, 2001, A19.

[35] Craig C. Donsanto, "Corruption of the Election Process under U.S. Federal Law," in *Election Fraud: Detecting and Deterring Electoral Manipulation*, ed. R. Michael Alvarez, Thad E. Hall, and Susan D. Hyde (Washington, D.C.: Brookings Institution, 2008), 34.

[36] The Justice Department stonewalled my request. It took more than two years, formal appeals of various denials, and the intervention of my U.S. Senator before any materials were released to me.

records of a congressional hearing held in 2006.[37]   The list, which was prepared by the U.S. Department of Justice, records 95 people indicted or charged by information over the first three years of the program (FY2003 to FY2005).  I concluded that this was a complete list of indictments brought under the BAVII for those three years by comparing it to Justice Department press releases announcing numbers of indictments brought under the program.[38]   I researched the BAVII indictments and concluded that only 40 of the 95 people indicted were in-person voters;[39] the other 55 people were associated with elections in other ways, for example, serving as campaign, party or election officials.  Of the 40 voters indicted, 26 pleaded or were found guilty by a jury.  More than 200 million votes were cast in the 2002 and 2004 federal elections combined.  Thus, we have an important example in which prosecutors vigorously pursued voter fraud cases, and yet almost no voter fraud was actually found or prosecuted.

More recent findings from a study by the U.S. Government Accountability Office (GAO) examining the federal enforcement effort against election fraud are consistent with my findings regarding the scant record of voter fraud in the 2002 and 2004 federal elections uncovered by the BAVII program.  The GAO analyzed data for the period 2001 through 2017, drawn from two different U.S. Department of Justice case management systems used by the two Department components responsible for prosecuting election fraud, the Criminal Division's Public Integrity Section, and the U.S. Attorneys' Office.  Again, as noted above, the federal government defines election fraud broadly to include the corruption of "the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters."[40]   The data analyzed by the GAO goes beyond my careful and precise definition of voter fraud to include crimes committed by public officials, politicians and their campaigns, and fraud committed through voter intimidation, such as vote-buying conspiracies in which the powerful use money and other inducements to lure the powerless into selling their votes.[41]   The GAO assessed the reliability of

---

[37] U.S. Congress, House Committee on House Administration, "Hearing on 'You Don't Need Papers to Vote?': Non-Citizen Voting and ID Requirements in U.S. Elections," 109th Congress, 2d Sess., June 22, 2006, 245-54.

[38] A recent report by the U.S. Government Accountability Office examined proprietary data maintained by the Public Integrity Section of the U.S. Department of Justice's Criminal Division, and the Executive Office for United States Attorneys to respond to queries regarding election fraud by several U.S. Senators.  The GAO's study period extends beyond the period I examined for *The Myth of Voter Fraud*, but their findings for FY2002 through FY2005 are consistent with my own.  See U.S. Government Accountability Office, "Voter Registration: Information on Federal Enforcement Efforts and State and Local List Management," Report to Requesters GAO-19-485 (June 2019).

[39] None of the 40 indictments of voters were brought against voters in Georgia.

[40] See note 24.

[41] "Public Integrity Section officials stated the Section did not focus its efforts on particular types of election fraud, but vote buying...was the most frequent type of election fraud related crime the Section prosecuted during the period of our review.  Officials said vote buying is the most common type of election fraud related crime that has come to their attention in recent decades and noted that it tends to occur in communities that are more insular and isolated and have higher levels of poverty.  For example, officials observed that in rural communities with high levels of poverty, some residents may be more vulnerable to vote-buying efforts due to their difficult circumstances or the power of local officials who seek to buy votes to provide or cut off needed services."  GAO, "Voter Registration," 34-35.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

the databases and "found the data sufficiently reliable to provide information on the nature and characteristics of DOJ's efforts to address potential instances of election fraud."[42] Keeping in mind that the GAO's analysis is overbroad for the purpose of this report, their principle findings are consistent with my findings in *The Myth of Voter Fraud*, that voter fraud is exceedingly rare:

1) Over the period of fiscal years 2001 through 2017, the Public Integrity Section initiated 1,408 criminal investigations or "matters," filing charges in 695 cases.[43]  Of the total number of matters initiated, about two percent (33 matters) were categorized by Section attorneys as election fraud-related; of the total number of cases filed as a result of the Section's investigations, 19 cases involving 37 individual defendants were election fraud-related;[44]

2) Over the same study period, U.S. Attorneys' Offices initiated more than 2.2 million criminal investigations, of which 525 were election fraud-related, two one-hundredths of a percent of their overall criminal matters.  The U.S. Attorneys' Office filed just over one million criminal cases during this time period; of these, 185 cases were election fraud-related, or the same two one-hundredths of a percent of their overall caseload.  Fifteen of these cases were jointly filed by the U.S. Attorneys Offices and the Public Integrity Section (and double counted in the Public Integrity Section equivalent category cited above);[45]

3) In sum, "[A]ccording to officials from EOUSA [the Executive Office of the U.S. Attorneys], which provides guidance, direction, and oversight to the U.S. Attorneys' Offices, election fraud was one of the least frequent crimes addressed by U.S. Attorneys' Offices."  The GAO report continues: "Officials further noted that *election fraud related cases were taken seriously and thoroughly investigated when facts supporting such charges were uncovered*" (emphasis added).[46]

Using the same standard for judging voter fraud crime rates as we do for measuring other crimes, which is to assess the incidence of crime using law enforcement statistics on arrests, indictments and convictions, we must conclude that the scant evidence of arrests, indictments or convictions for any of the practices defined as voter fraud means that little fraud is being committed relative to the millions of votes cast each year in state, local and federal elections.  This is one reliable way to think about how much voter fraud is being committed, even if we are not able to conclusively determine a complete measure of actual voter fraud.

---

[42] *Ibid*., 4.

[43] "A matter is defined as an activity, such as an investigation, that has not yet resulted in the filing of a complaint, indictment, or information in court."  *Ibid*., 3, n3.

[44] *Ibid*., 29-30.

[45] *Ibid*., 35-36.

[46] *Ibid*., 36.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

### Current Social Scientific Evidence

Since the publication of *The Myth of Voter Fraud*, there have been only a handful of social scientific studies published on the incidence of voter fraud in contemporary U.S. elections.  These include the three academic papers flagged by the GAO in their 2014 audit and mentioned above;[47] and two additional academic papers.[48]  All of these papers rely only on quantitative methodologies and proxy measures to estimate the probability of fraud; only two, the papers by Ahlquist, *et al.*, and Christensen and Shultz, address potential voter impersonation.[49]

### State Government Investigations and Reports

---

[47] Ahlquist, Mayer and Jackman, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election;" Christensen and Schulz, "Identifying Election Fraud Using Orphan and Low Propensity Voters;" and Hood and Gillespie, "They Just Do Not Vote Like They Used To."

[48] In a 2019 working paper, Sharad Goel and colleagues use statistical techniques to look for proxy evidence of double voting in the 2012 presidential election.  They find that "double voting is not currently carried out in such a systematic way that it presents a threat to the integrity of American elections."  They estimate that "at most," one in 4,000 votes cast in 2012 were double votes, "with measurement error in turnout records possibly explaining a significant portion, if not all, of this."  In other words, 1 in 4,000 votes could have been double votes, or the 2012 election could have had an administrative error rate producing the appearance of duplicates votes of roughly .025 percent.  See, Sharad Goel, Marc Meredith, Michael Morse, David Rothschild, and Houshmand Shirani-Mehr, "One Person, One Vote: Estimating the prevalence of Double Voting in U.S. Presidential Elections," unpublished working paper, January 17, 2019, 26-27.  A second paper by Cottrell, Herron and Westwood, investigates claims made by President Donald J. Trump that his election in 2016 was tainted by massive voter fraud.  The researchers use a variety of statistical modeling techniques and county-level election returns, census data, and other federal and state government data to estimate the likelihood of invalid non-citizen voting in that election.  "Our empirical results share a common theme," they write.  "[T]hey are inconsistent with fraud allegations made by Trump.  The results are, however, consistent with various state-level investigations conducted in the initial months of 2017, all of which have failed to find any evidence of widespread voter fraud in the 2016 General Election."  See, David Cottrell, Michael C. Herron, and Sean J. Westwood, "An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election," *Electoral Studies* 51 (2018): 123-142, 140.

[49] Not included in this discussion is a set of methodology papers addressing various elections forensics techniques, including anomalous digit distributions in election data as a means for detecting election fraud.  See, for example, Bernd Beber and Alexandra Scacco, "What the Numbers Say: A Digit-Based Test for Election Fraud," *Political Analysis* 20(2):211-234; C. Breunig and A. Goerres, "Searching for Electoral Irregularities in an Established Democracy: Applying Benford's Law Tests to Bundestag Elections in Unified Germany," *Electoral Studies* 30(3): 534-545; Joseph Deckert, Mikhail Myagkov, and Peter C. Ordeshook, "Benford's Law and the Detection of Election Fraud," *Political Analysis* 19(3): 245-268; Walter Mebane, "Election Forensics: The Second Digit Benford's Law Test and Recent American Presidential Elections," in R. Michael Alvarez, Thad E. Hall, and Susan D. Hyde, *Election Fraud* (Washington, D.C.: Brookings Institution, 2008); Juraj Medzihorsky, "Election Fraud: A Latent Class Framework for Digit-Based Tests," *Political Analysis* 23(4): 506-517;  Jacob M. Montgomery, *et al.*, "An Informed Forensics Approach to Detecting Vote Irregularities," *Political Analysis* 23(4): 488-505.  Most of this work addresses the detection of fraud in national elections and at the national level.  In addition, I exclude a discredited paper published in 2014 the peer-reviewed journal, *Electoral Studies*, by Richman, Chattha, and Earnest that analyzes survey data and concludes that "non-citizens participate in U.S. elections, and that this participation has been large enough to change meaningful election outcomes including Electoral College votes, and Congressional elections."  The methodology used by the authors was widely criticized as faulty, including by the political scientists who generated the survey data.  See, Jesse T. Richman, Gulshan A. Chattha, and David C. Earnest, "Do Non-citizens Vote in U.S. Elections?" *Electoral Studies* 36 (2014): 149-157; and rebuttal, Stephen Ansolabehere, Samantha Luks, and Brian F. Schaffner, "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys," *Electoral Studies* 40 (2015):" 409-410.

Other important sources of data for analyzing the incidence of voter fraud in U.S. elections are studies conducted by state agencies responsible for the administration of elections, and state law enforcement and auditing agencies. I review several such reports in *The Myth of Voter Fraud*,[50] and also in several subsequent expert reports prepared for plaintiffs in litigation challenging various election laws.[51] Despite variation in the context, scope, type of fraud examined, time period covered, and investigating agency involved, these studies demonstrate a clear and consistent pattern of findings: very little voter fraud, and irregularities and anomalies in the data more likely the result of administrative or voter error or confusion than they are voter fraud.[52]

### D.   Evidence and Analysis of Voter Fraud in Georgia

The recent record of voter fraud in Georgia is consistent with the recent record of voter fraud elsewhere in the U.S., which is to say there is very little evidence of voters intentionally corrupting the electoral process in Georgia. In fact, I have been unable to identify a single criminal conviction for voter impersonation at the polls in Georgia over the last decade. My findings are based on the record of state and local news reporting on the subject;[53] my prior research on voter

---

[50] For example, as a result of public records requests sent to all Attorneys General and Secretaries of State, I obtained and analyzed all election fraud complaints referred to the California Secretary of State's Office for the period of 1994 to 2007; voter complaints collected by the Minnesota Secretary of State's Office from 2005 to 2006; investigation logs maintained by the Election Division of the Oregon Secretary of State's Office for all election law complaints for the period of 1991 to 2006; and a report of a broad investigation by the New Hampshire Attorney General's Office into concerns about voter fraud in the 2004 general election. See chapter 4 of *The Myth of Voter Fraud*.

[51] See my expert reports in Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018; *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018; *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016; *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015; *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016; *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015; and *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2015.

[52] A number of states in recent years have conducted investigations of alleged voter fraud including those cited earlier in footnote 33, and in some of my expert reports cited in footnote 51, and others, for example: A multi-year investigation by the Iowa Secretary of State resulted in 27 prosecutions out of approximately 1.6 million votes cast; see Iowa Secretary of State Matt Schultz, "DCI Voter Fraud Investigations Report," May 8, 2014, available at http://publications.iowa.gov/16874/1/DCI%20Voter%20Fraud%20Report%205-8-14.pdf (last accessed September 12, 2019); a 2013 voter fraud investigation by the Colorado Secretary of State alleged 155 non-citizens had illegally voted, however, upon further investigation by local prosecutors, almost none were charged (four people were charged, but only one man was eventually convicted of a false registration charge (see, "Gessler Voter Sting Nets 1 Conviction Despite Accusation of Widespread Fraud," *The Sentinel*, March 13, 2015, available at https://sentinelcolorado.com/news/gessler-voter-sting-nets-1-conviction-despite-accusation-widespread-fraud/ (last accessed September 12, 2019)).

[53] In keeping with my general methodology for analyzing the incidence of voter fraud, I usually begin with an overview of the news coverage of election and voter fraud in a particular place, in this case, the state of Georgia. I searched NewsBank's Access World News Georgia State File, which contains full-text content for 61 Georgia newspapers and the Associated Press State Wire Service, using the Boolean search term, "voter fraud" OR "election

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

fraud in Georgia; efforts by a nonprofit journalism project at Arizona State University, and by the Heritage Foundation to compile the record of voter fraud in Georgia over the last roughly two decades; and a selective review of minutes from meetings of the Georgia State Board of Elections, which has a central role in investigating complaints about fraud and voting irregularities in primary and general elections statewide.

Georgia election law establishes the State Election Board (SEB) and grants it significant power to oversee, promulgate and enforce laws and policies governing the electoral process in the state.[54]  The SEB consists of the Secretary of State, who chairs the body, an elector chosen by majority vote of the General Assembly, an elector chosen by majority vote in the Senate, and electors nominated by each political party[55] and appointed by the Governor.[56]  One of the SEB's statutory duties is,

> ...to investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution.[57]

In the early years of my research on voter fraud, I sent public records requests to all Secretaries of State and Attorneys General of the U.S. requesting copies of records related to cases or complaints of voter fraud.[58]  In his February 10, 2006, reply letter to me, Deputy Attorney General Dennis Dunn explained the process of enforcement of Georgia's Election Code, noting that between 2000 and early 2006, the State Board of Elections had referred 39 cases to the Attorney General's Office for the conduct of administrative hearings.  Deputy Attorney General Dunn explained further that the records of these proceedings were not categorized by any particular statute or offense, and, "there could by any number of reasons why a matter would be administratively referred to our office.  He understood my request to ask for records of criminal prosecutions of voter fraud, and because the Attorney General's Office" is not authorized to pursue general criminal law violations in Georgia," the Department of Law had "no records responsive to [my] request."

---

fraud" OR "vote fraud," for the period January 1, 2010 through November 19, 2019.  For *The Myth of Voter Fraud*, and an earlier report, "Securing the Vote: An Analysis of Election Fraud" (published by Demos in 2003; and updated four years later as "An Analysis of Voter Fraud; see note 2 above) I carefully tracked news articles about voter fraud in Georgia going back to 1992.

[54] O.C.G.A. § 21-2-31.  See also, Karen C. Handel and Wesley B. Tailor, "Election Law in Georgia: What City and County Attorneys Need to Know," September 2008, available at http://pentz.com/NoIncinerator/GA_election_law.pdf (last accessed November 19, 2019).

[55] "Political party" is defined by Georgia statute at O.C.G.A. § 21-2-2.

[56] O.C.G.A. § 21-2-30.

[57] O.C.G.A. § 21-2-31(5).

[58] See the Attachment at the end of this report for copies of my letters to Georgia Secretary of State Cathy Cox, and Attorney General Thurbert Baker, and the responses I received from their offices.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

With a better understanding of the election law enforcement process in Georgia at hand, on October 1, 2006, I sent a more specific request for records related to cases or complaints of voter fraud to Secretary of State Cox. Assistant Director of Legal Affairs Clifford D. Tatum replied to me by email and we scheduled a telephone interview for October 16, 2006, to discuss the request (the written notes of this interview are appended). Mr. Tatum wanted to clarify what I was looking for because he thought the fees for providing the copies of the records I was seeking would run into the hundreds of dollars. Similar to Deputy Attorney Dunn, Mr. Tatum noted that there is no general "voter fraud" statute in Georgia and that the meaning of "voter fraud" could be broadly defined. He wanted to be sure, for example, that I was interested in absentee ballot fraud, which he said was the main type of fraud dealt with by his office. He asked me if I was interested in cases where there was a technical violation of law, such as the mishandling of an absentee ballot by an unauthorized person, even if there was no intent to commit fraud. I told him that I was. I asked about cases of "double" or duplicate voting. Mr. Tatum related that he could recall only two cases in the previous couple of years where people filed an absentee ballot and then showed up in person to vote. The first case involved a person on medication who was confused about his voting activities. In the second case, Mr. Tatum said he believed the person was trying to "test" the system, and the matter was referred for prosecution (although later, not prosecuted).

As a result of my interview with Mr. Tatum, I revised my public records request to the Georgia Secretary of State to case summaries of alleged incidents of absentee ballot irregularities and polling place irregularities investigated by the Secretary of State's Office for the two-year period covered of 2004 and 2005.

I received those records in early December of 2006 (by this time, Mr. Tatum had become the Interim Director of the Elections Division of the Secretary of State's Office). The file contained eight case summaries for 2004, and nine for 2005. Of the 17 cases, all but four involved a variety of allegations of manipulation or outright violation of the absentee balloting process, usually by people running for local office, their campaigns, or in some instances, local election staff (supervisors, registrars, absentee ballot clerks, etc.). The other cases alleged mismanagement of the voting process by election workers, voters casting ballots in precincts where they no longer lived (i.e., the son of an opponent in a school board race voting where he did not live to help his mother in her race against the complainant), and racial discrimination by election officials toward people of color. The picture that emerges from these cases is of voters as victims rather than perpetrators of election fraud. (I note that the innocence or guilt of the alleged violators was not established in the case files.)

My inquiries and communications with Georgia officials regarding the incidence of voter fraud in the state occurred shortly after Georgia adopted one of the first restrictive photo identification laws in the U.S.[59]   Unlike most states at the time, Georgia already had an

---

[59] Indiana passed a restrictive photo identification law in 2005, just prior to Georgia (Voter Identification Statute, Public Law No. 109-2005, codified in several sections of the Indiana Code, including Sections 3-5-2-40.5, 3-10-1-7.2, 3-11-8-25.1, and 3-11.7-5.2.5). In 2007, I filed a joint amicus brief in the U.S. Supreme Court case, *Crawford v. Marion County Election Board*, a constitutional challenge to the Indiana law; see "Brief of Amici Curiae the Brennan Center for Justice; Demos: A Network for Ideas & Action; Lorraine C. Minnite; Project Vote; and People for the American Way Foundation in Support of Petitioners," November 13, 2007 (finding that Indiana had no record of voter impersonation fraud at the polls, and that there is no more evidence that polling place impersonation

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

identification requirement for polling place voting.  The new law reduced the number of acceptable forms of identification from 17 to six, and loosened the requirements for absentee balloting.[60]  The Georgia legislature's actions were controversial, generating numerous legal challenges and modifications of the law over the next several years.[61]

      At the time of its passage, the Georgia Secretary of State strongly objected to the law, urging the governor to veto the legislation.  In her April 8, 2005, letter to Governor Sonny Perdue, Secretary of State Cathy Cox wrote of her concerns that the bill would impose an undue burden on many Georgia voters, especially the poor and elderly who are less likely to own or drive a car and therefore, lacking of the basic form of identification privileged by the bill, a driver's license.[62]  Secretary Cox also stated her belief that existing Georgia practices and procedures were working very well to prevent voter fraud, the justification for the photo identification requirement, which Secretary Cox called a "pretext."

---

fraud is a problem outside Indiana than there is in Indiana; author's files).

[60] O.C.G.A. § 21-2-417.

[61] The debate in the Georgia Assembly over photo identification was highly partisan, with Republican Party proponents of the legislation arguing that it was only intended to combat the potential for voter fraud, and Democrats charging intentional racial discrimination in voting.  Most of the state's black legislators walked out of the Capitol when the bill passed the Senate.  Four months after Georgia Governor Sonny Perdue signed HB 244 into law (Act No. 53, The 2005 Photo ID Act,  an amendment to O.C.G.A. § 21-2-417), which requires Georgia voters to present a valid photo identification in order to vote, opponents filed a federal lawsuit claiming the law violated the First and Fourteenth Amendments to the U.S. Constitution, the Georgia constitution, was a poll tax in violation of the Twenty-Fourth Amendment and Equal Protection Clause, and violated the Civil Rights Act of 1964 and section 2 of the Voting Rights Act of 1965.  The U.S. Department of Justice had "precleared" the law under requirements of the Voting Rights Act, although later, the disclosure of an internal memorandum leaked to the *Washington Post* indicated that the decision to preclear was unusual because it was in contradistinction to the recommendations of the Voting Section's professional staff analysis, finding a likely retrogressive racially discriminatory effect of the law. U.S. District Court Judge Harold Murphy found that the photo identification requirement was an unconstitutional poll tax, and blocked its enforcement.  Meanwhile, the Georgia Assembly revised the law to provide a free state-issued photo identification, but in July 2006, Judge Murphy again blocked enforcement, finding the revised law continues to discriminate against people lacking driver's licenses, passports or other forms of government-issued identification.  A year later, a separate state challenge is dismissed by the Georgia Supreme Court, which found that the plaintiff in the case, Rosalind Lake, lacked standing to sue.  The Court dodged the state constitutional question. In late summer 2007, Georgia Secretary of State launched an outreach effort to educate Georgia citizens on the photo identification requirement, and in September, Judge Murphy finds the law constitutional.  It takes effect for the first time in municipal elections in about two dozen Georgia counties, and faces its first statewide test in the 2008 presidential preference primary.

[62] Letter from Georgia Secretary of State Cathy Cox to the Honorable Sonny Perdue, Governor, State of Georgia, dated April 8, 2005, available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/exhibit_000.pdf. Secretary Cox sent a similar memorandum to the Members of the Georgia State Senate, urging the senators to consider what the Secretary saw as contradiction in the bill (HB 244), which on the one hand would impose a restrictive photo identification requirement to vote, and on the other loosen access to absentee ballots, which the Secretary saw as creating "staggering opportunities for voter fraud" (available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/motionforleavetofilesecondamendedcomplaintexhibit6.pdf).

> I cannot recall one documented case of voter fraud during my tenure as Secretary of State or Assistant Secretary of State that specifically related to the impersonation of a registered voter at voting polls.[63]

Secretary Cox served in those positions for about a decade, from 1996, when she relinquished her seat in the Georgia House of Representatives to become Assistant Secretary of State, to 1998 when she became Georgia's first female Secretary of State, serving two terms ending in 2006. Though her statements were made some fourteen years ago, I subsequently have found no evidence that would contradict Secretary Cox's claims today. There still is no evidence of voter impersonation in recent Georgia elections, and very little evidence of any other kind of fraud perpetrated by voters.

Since 2006, and the publication of *The Myth of Voter Fraud* in 2010, other researchers have attempted to compile the record of voter fraud in Georgia. For example, the Heritage Foundation has created an online, publicly accessible database of what it calls "Election Fraud Cases from Across the United States."[64] There is no explanation of the methodology used to create the database or the criteria for inclusion of cases, and the website for the database contains a disclaimer that "this database is not an exhaustive or comprehensive list, but is intended to demonstrate the many ways in which fraud is committed," although specific numbers of "proven instances of voter fraud," criminal convictions, civil penalties, diversion programs are tallied and reported on the database homepage.

Users can search and select cases by state. The Georgia file contains 19 cases of election fraud involving 23 people, going back to 1998. None involve voter impersonation. In fact, only two of the 23 people appear to be voters. Both were found guilty by the SEB of an administrative violation of the voter registration rules by registering to vote at addresses where they did not live. The other 21 people are candidates for local office or supporters of candidates found guilty by either the SEB or in some cases, federal prosecutors for a variety of election law violations related to vote buying, double or what Georgia election law terms "repeat" voting[65] (one case – former Dodge County Sheriff Michael Douglas, Jr. in his first election for sheriff in 2004), illegal possession of absentee ballots, improper assistance to absentee ballot voters (10 of the 23 people), ballot petition fraud, and submitting false voter registration cards.

The same record of evidence of very little voter fraud is corroborated by the research conducted by the News21 journalism project at the Walter J. Cronkite School of Journalism and

---

[63] It should be noted that Secretary Cox provided nearly identical statements under oath in her 2005 deposition in the litigation challenging Georgia's photo identification law and at trial (see U.S. District Court Judge Harold Murphy's order in *Common Cause v. Billups*, U.S. District Court for the Northern District of Georgia, Rome Division, Civil Action No. 4:05-CV-0201-HLM, October 18, 2005).

[64] See, the Heritage Foundation's website, (https://www.heritage.org/voterfraud), last accessed November 19, 2019.

[65] O.C.G.A. § 21-2-572 (Repeat Voting in Same Primary or Election), states, "Any person who votes in more than one precinct in the same primary or election or otherwise fraudulently votes more than once at the same primary or election shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than one nor more than ten years or to pay a fine not to exceed $100,000.00, or both."

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Mass Communications at Arizona State University. The year-long project compiled cases of alleged voter fraud in the United States between 2000 and 2012, replicating the data collection methodology I used in *The Myth of Voter Fraud*, by sending out more than 2,000 public records requests to state elections and law enforcement authorities in every state, and the U.S. Department of Justice (and FBI).[66] The student journalists followed up these document requests with phone calls and emails, and reviewed more than 5,000 court documents, official records and media reports. They found just over 2,000 alleged cases of a variety of forms of election or voter fraud nationwide, including ten cases of alleged voter impersonation over the twelve-year study period – or fewer than one case of voter impersonation across the nation per year.

Like the Heritage Foundation database, the News21 database may be searched and sorted by state. It contains records for 48 individuals found guilty of various forms of voter or election fraud related to violations of absentee balloting procedures, double or repeat voting, voter registration fraud, or voting by persons ineligible to cast ballots. Of these 48 people, three were either candidates for office or assisting candidates for office. About half of the cases (25) resulted in illegal ballots being cast. None of the cases researched by the News21 project involve voter impersonation.

The time periods covered by the Heritage Foundation and the News21 project overlap between 2000 and 2012, however, they share only one case in common.[67] If we focus the analysis on ordinary voters violating the rules for proper and valid voter registration and balloting, we find a total of 47 cases in Georgia documented by the Heritage Foundation and News21, about half of which resulted in invalid votes, over the last two decades. Without knowing more about these cases, it is difficult to assess whether any of them are cases of fraud because the information presented by the two organizations is too limited to draw solid conclusions. Nevertheless, if we assume all of them *are* cases of intentional corruption of the electoral process by voters, and not mistakes absent the intent to defraud the people of Georgia, the data suggest no more than two to three cases of voter fraud per year have occurred. Again, there is no other evidence that I am aware of that would contradict a finding and conclusion that voter fraud, defined as the intentional corruption of the voting process by voters, is exceedingly rare in Georgia, consistent with patterns found in other U.S. states.

In addition to these sources, I conducted an initial scan for mentions of 'fraud' in the thousands of pages of minutes of the last nearly 50 meetings of the SEB going back to 2010. This review yielded only a few cases of voter fraud among the hundreds handled by the SEB over the period. I then reviewed the minutes in more detail to gain a better understanding of the nature of the cases of alleged fraud referred to the SEB. With respect to cases dealing with the registration

---

[66] See the project's website, "Who Can Vote?," for more information, https://votingrights.news21.com/
(last visited September 5, 2019). I served as an (unpaid) consultant on the research design and conducted a seminar for the students on the research methodology I used for *The Myth of Voter Fraud*. Their work replicates my approach and produces similar results with respect to a documented low incidence of voter fraud in contemporary U.S. elections.

[67] This is the case of former Twiggs County Sheriff Doyle Stone and his son Greg Stone, and their mishandling of four absentee ballots in Greg Stone's 2008 primary election for sheriff. Greg Stone lost the election by a wide margin, and he and his father eventually agreed to pay civil fines in a consent order with the SEB.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

or voting process, I found the same pattern of irregularity noted some years ago by Secretary Cox, of abuse of the absentee ballot process, and virtually no fraud committed by voters.

## IV.    CONCLUSION

Voters can only influence the part of the electoral process to which they have access, namely registering themselves to vote and casting their own votes.  In my review of the available evidence of the last two decades or so, I found virtually no evidence that would suggest voters are systematically intentionally corrupting the electoral process, either nationally or in Georgia.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Executed on:   November 24, 2019

_____

Lorraine C. Minnite

22

## Appendix

## LORRAINE CAROL MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526

## EDUCATION

**The Graduate School and University Center of the City University of New York**
**Ph.D.** in Political Science, 2000
*Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
*Honors:* Distinction

**M.Phil.** in Political Science, 1994
*Major field:* American Politics
*Minor field:* Public Policy

**M.A.** in Political Science, 1992
*Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
**B.A.** in History, 1983
*Area of Concentration:* American Civilization

## ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development, and undergraduate courses in urban studies and voting rights.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**
*Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.*
Worked on various research projects for Prof. Marilyn Gittell.

## OTHER EMPLOYMENT

**Research Director**
*Project Vote, 2010 to 2011.*
Developed a research program and conducted research for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

**Issues Director**
*The Committee for David N. Dinkins, II, New York City, 1991 to 1993.*
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

**Campaign Manager**
*McCabe for City Council, Brooklyn, New York, 1991.*
Organized and administered a successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

**Union Organizer**
*District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.*
Participated in the planning and implementation of a union organizing campaign; served as editor of a union local's newsletter; assisted negotiating committee in contract negotiations.

## ACADEMIC AND PROFESSIONAL HONORS

Distinguished Alumni Award, Department of Political Science, CUNY Graduate School, 2014
Jay Sigler Award for Teaching Excellence, Rutgers-Camden Public Administration Student Association, 2013
Affiliated Faculty, Center for Community Leadership, Rutgers-Camden, 2013 to present
Affiliated Faculty, Center for Urban Research and Education, Rutgers-Camden, 2012 to present
Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Selected a "Top Wonk" in Democracy and Elections, The Agenda Project, 2012
2011 *Choice* Magazine "Outstanding Academic Title" for *The Myth of Voter Fraud*
Carnegie Corporation of New York Special Opportunities Fund Award ($50,000), 2007
Senior Fellow, Dēmos – A Network for Ideas and Action, 2006 to 2014
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award ($1,500), Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship ($10,000), 1996-1997

## PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
Association for Public Policy Analysis and Management
Scholars Strategy Network
Social Science History Association
Southern Political Science Association

Urban Affairs Association

## TEACHING ACTIVITIES

**Doctoral Supervision: Chair**

***Rutgers-Camden***
Lew Bivona, *in-progress*
Jackie Bradley-McFarlane, *in progress*
Shaina Gaines, *in-progress*
Peggy Jean Craig McCaffery, *in-progress*
Dan Tarng, *in-progress*
Rasheda Weaver, *completed 5/17*
Curtis Williams, *in-progress*
Zachary Wood, *completed 5/18*

**Doctoral Supervision: Committee Member**

***Rutgers-Camden***
Spencer Clayton, *completed 5/18*
Ashley Nickels, *completed 5/16*
Wendy Osefo, *completed 7/16*
Jason Rivera, *completed 7/15*

**External Examiner (Ph.D.)**

***Fielding Graduate School***
Gregory Williams, *completed 10/18*

**Courses Taught**

***Rutgers University-Camden (Graduate)***
Alternative Development Strategies for Distressed Cities (Ph.D.)
Civic Engagement, Nonprofits and Community Development (Ph.D.)
Foundations of Policy Analysis (MPA and Executive MPA)
Politics of Community Development (Ph.D.)
Practicum in Community Development (Ph.D.)
Research Workshop (MPA)
Theory and History of Community Development (Ph.D.)
Urbanism and Sustainable Development in Cuba (Undergraduate and Graduate-level Study Trip)

***Rutgers University-Camden (Undergraduate)***
Honors College Seminar: The Right to Vote
Poverty and the Urban Environment

***Barnard College, Columbia University (Undergraduate)***
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

***New York University (Undergraduate)***
The Crisis of the Modern American City

**Graduate Committee Examiner**

Rutgers University, Ph.D. Program in Public Affairs/Community Development, Dissertation Committees (see above)

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Fielding Graduate University, Program in Human and Organizational Development, External Examiner, 12/18.
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.
CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

## PEER-REVIEWED PUBLICATIONS

### Books

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

### Journal Articles

"New Challenges in the Study of Right-wing Propaganda: Priming the Populist Backlash to 'Hope and Change,'" *New Political Science* 34:4 (2012), 506-526.

"Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

"Models, Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

### Chapters in Edited Volumes

"Voter Suppression," in Levon Chorbajian and Daniel Egan, eds., *Power and Inequality: Critical Readings for a New Era*, New York: Routledge, *forthcoming*; co-authored with Frances Fox Piven.

"Competing Concepts of Social Class: Implications and Applications for Community Development," in Mae Shaw and Marjorie Mayo, eds., *Class, Inequality and Community Development*, Bristol, UK: Policy Press at the University of Bristol, 2016; co-authored with Frances Fox Piven.

"The Voter Fraud Myth," in Benjamin E. Griffith, ed., *America Votes! Challenges to Election Law and Voting Rights*, Chicago: American Bar Association, 2016.

"Making Policy in the Streets," in James DeFilippis, ed., *Urban Policy in the Time of Obama*, Minneapolis: University of Minnesota Press, 2016; co-authored with Frances Fox Piven.

"Poor People's Politics," in David Brady and Linda Burton, eds., *Oxford Handbook of the Social Science of Poverty*, New York: Oxford University Press, 2016; co-authored with Frances Fox Piven.

"Crisis, Convulsion and the Welfare State," in Kevin Farnsworth and Zoë Irving, eds. *Social Policy in an Age of Austerity*, Policy Press, 2015; co-authored with Frances Fox Piven.

"Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd Ed., New York: Routledge, 2012.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between White and Black: Asian and Latino Political Participation in the 2000 Presidential Election in New York City," in William E. Nelson, Jr. and Jessica Lavariega Monforti, eds., *Black and Latino/a Politics: Issues in Political Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.

## OTHER PUBLICATIONS

### Chapter in Conference Proceedings

"The Political Participation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 2000 Annual National Legal Conference on Immigration and Refugee Policy*, Vol. XXIII. New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

### Encyclopedia Entries

"Voter Participation," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008, online version, 2013; co-authored with Frances Fox Piven.

"The Underclass," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Paul J. Jargowsky.

"Welfare," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Joan Maya Mazelis.

"The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

### Book Reviews

*Waiting for the Cemetery Vote,* by Tom Glaze, *American Review of Politics*, (Spring/Summer 2012).

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can A Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

### Research Reports, Memoranda and Briefs

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*The Misleading Myth of Voter Fraud in American Elections*, Key Findings Brief, Scholars Strategy Network, February 2014.

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network (NYLARNet) at The University of Albany, Fall 2011.

*Research Memo: First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election*, Project Vote, Washington, D.C., November 2010.

*Research Memo: Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters*, Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security*, Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud*, Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud*, Dēmos – A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

***Journalism***

My expertise on elections and voter fraud was sought and widely cited and I was quoted in print and broadcast media in every federal election since 2008, including, for example, in the following: *The New Yorker Magazine*, *The New Yorker Radio Hour*, *The New Republic*, *Mother Jones*, *The Wall Street Journal*, *In These Times*, *American Prospect*, *Washington Monthly*, *Monthly Review*, *New Left Review*, *The New York Times*, *The Washington Post*, *The Christian Science Monitor, Associated Press*, McClatchy, Al Jazeera English (*Fault Lines*, Washington, D.C.), WZBC (*News*, Boston), WBAI (*Democracy Now!*, New York), WNYC (*The Brian Lehrer Show*, New York), WHYY (*Radio Times*, Philadelphia), NPR (*Morning Edition*, Washington, D.C.), CBS News, ABC News Radio, Salon.com, Talking Points Memo, Alternet, The Huffington Post, Slate Magazine, and CQ Researcher, among many others.

"Why the Democrats and Movements Need Each Other," *In These Times* (cover story), October 17, 2017; co-authored with Frances Fox Piven.

"The Power of Disruption: An Interview with Frances Fox Piven," *Global Dialogue: Newsletter for the International Sociological Association* 5(4): December 2015.

"The Myth of Voter Fraud," BillMoyers.com, March 9, 2015.

"Movements Need Politicians – And Vice Versa," *The Nation*, October 22, 2012; co-authored with Frances Fox Piven.

"The Other Campaign: Who Gets To Vote," *New Labor Forum*, May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times*, April 22, 2010; co-authored with Frances Fox Piven.

"Re-Drawing the Map of U.S. Politics," *Red Pepper*, April, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer*, Charlotte, North Carolina, July 18, 2007.

"They Are Arriving: Immigrants Are Gaining Power in New York's Voting Booths," *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

***Works in Progress***

"*Demosprudence* and Grassroots Struggles to Protect and Expand the Right to Vote"

"Does Concentration Worsen Poverty? The Case of Philadelphia"

"Human Error in Election Administration"

"Felony Disfranchisement and the New Three-Fifths Rule"

"The Voting Rights of the Poor"

### Conference Participation, Papers and Invited Presentations

Discussant, "Local Election Officials and Election Management," Conference Within a Conference, 91st Annual Meeting of the Southern Political Science Association, San Juan, Puerto Rico, January 9-11, 2020.

"Human Error in Election Administration," paper presented at the 89th Annual Meeting of the Southern Political Science Association, New Orleans, January 4-6, 2018.

Invited Panelist, "Impasses: Beyond Social Democracy," Transcending Pessimism, Reimagining Democracy: A Conference in Honor of Leo Panitch, York University, Toronto, October 6-7, 2017.

Invited Lecture, "The Politics of Voting: Who Shall Be the Electors?" Saul O. Sidore Lecture Series, Centers on Race, Class and Gender in a Divided America, University of New Hampshire-Manchester, Manchester, New Hampshire, March 21, 2017.

"Deadwood and Disenfranchisement: Maintaining Election Lists in the United States," paper presented at the 87th Annual Meeting of the Southern Political Science Association, New Orleans, January 12-14, 2017; co-authored with Margaret Groarke.

Invited Speaker, "Defending Democracy: How Political Scientists Are Engaging in the Fight Over Voting Rights (And Why You and Your Dept. Should Too)," roundtable presented by the Scholars Strategy Network at the 112th Annual Meeting of the American Political Science Association, Philadelphia, September 1-4, 2016.

Invited Panelist, "Beyond Neoliberalism: Social Justice after the Welfare State," Symposium Sponsored by the Center for the Study of Social Difference, Women Creating Change, the Heyman Center for the Humanities, and the History Department at Columbia University, New York City, April 2, 2016.

Invited Panelist, "Voting Rights at 50," 22nd Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 7, 2015.

Panel Organizer and Chair, "Electoral Rules, Voting and Turnout: New Pathways for Research," panel at the 111th Annual Meeting of the American Political Science Association, San Francisco, September 3-6, 2015.

"Community and Class in a Neoliberal Age," paper presented at the 110th Annual Meeting of the American Sociological Association, Chicago, August 22-25, 2015; co-authored with Frances Fox Piven.

"Black Urban Liberalism: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2010," paper presented at the 45th Annual Meeting of the Urban Affairs Association, Miami, April 8-11, 2015.

Invited Speaker, "Does Concentration Worsen Poverty? The Philadelphia Case," Center for Urban Research and Education, Rutgers University, Camden, December 12, 2014.

Invited Speaker, "The State of Voting Rights," sponsored by the Atlanta Chapter of the Scholars Strategy Network, Atlanta, December 2, 2014.

"The Poverty of Politics in a Northern City: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2000," paper presented at the 39th Annual Meeting of the Social Science History Association, Toronto, November 6-9, 2014.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"Crisis, Convulsion and the Welfare State," roundtable presentation at the 109th Annual Meeting of the American Sociological Association, San Francisco, August 16-19, 2014; co-authored with Frances Fox Piven.

"Making Policy in the Streets," paper presented at the 44th Annual Meeting of the Urban Affairs Association, San Antonio, March 20, 2014; co-authored with Frances Fox Piven.

Invited Panelist, "Voter Suppression, Equal Rights, and the Promise of Democracy," sponsored by the Scholars Strategy Network, the Center for American Political Studies, and the Malcolm Wiener Center for Social Policy, Harvard University, March 6, 2014.

"Crisis, Convulsion and the Welfare State," paper presented at the 11th Annual Meeting of the European Sociological Association, Torino, Italy, August 28-31, 2013; co-authored with Frances Fox Piven.

Invited Panelist, "Anatomy of A Public Interest Lawsuit: Voter ID Legislation – A Public Interest Legal Challenge," sponsored by Penn Law Clinical Programs, Lawyering in the Public Interest, Toll Public Interest Center, American Constitution Society and the Civil Rights Law Project, University of Pennsylvania Law School, Philadelphia, Pennsylvania, November 5, 2012.

Invited Panelist, "Disenfranchise This: The Cost of Voter Suppression," 19th Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 3, 2012.

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium, Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, Virginia, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the 69th Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," 82nd Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the 67th Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience – Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the 8th Annual State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31-September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1-4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1-4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 – September 2, 2001; co-authored with John H. Mollenkopf.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," paper presented at the 96th Annual Meeting of the American Political Science Association, Washington, D.C., August 31-September 3, 2000; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference*, sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City*, seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on *Integration of Immigrants and Their Descendents*, Center for Migration Studies 20th Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab Americans in New York City*, symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"The Political Incorporation of Immigrants in New York," paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999; co-authored with Jennifer Holdaway and Ronald Hayduk.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999; co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election:  A Comparison of Ecological Regression Techniques and Exit Poll Data," paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998; co-authored with David K. Park and Daniel M. Slotwiner.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

### Research Reports

*How to Think About Voter Participation*, White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud*, White Paper, Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative,* Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey*, with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers*, Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

### Expert Participation in Federal and State Voting Rights Cases

Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018.

Expert Witness, *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018.

Expert Witness, *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016.

Expert Witness, *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016.

Expert Witness, *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015.

Expert Witness, *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016.

Expert Witness, *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015.

Expert Witness, *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

Expert Witness, *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania, 2012-2013.

Expert Report, *Rutgers University Student Assembly et al. v. Middlesex County Board of Elections*, Superior Court of New Jersey/Middlesex County, 2011.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

### Amicus Filings and Congressional and Other Testimony

U.S. Commission on Civil Rights Briefing, "An Assessment of Minority Voting Rights Obstacles in the United States," Raleigh, North Carolina, February 2, 2018 (oral and written testimony).

*Shelby County, Alabama v. Holder*; U.S. Supreme Court, Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents, February 1, 2013 (signatory).

*League of Women Voters v. Rokita;* Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November 2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (invited written testimony).

Expert Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation *in Support of Petitioners*, November 2007.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* of Historians and Other Scholars *in Support of Petitioners*, November 2007 (signatory).

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.

## RESEARCH AND OTHER GRANTS

*Principle Investigator*, "Camden City Exit Poll," Rutgers Research Council Award, 2018-2019 ($2,000).

*Co-Recipient*, Rutgers University Centers for Global Advancement and International Affairs, 2016 ($10,000).

*Recipient,* Rutgers-Camden Learning Abroad Office, Course Development Grant, 2015 ($1,000).

*Principle Investigator*, "The Political Exclusion of the Urban Poor," Rutgers Research Council Award, 2013-2014 ($3,000).

*Recipient*, RU FAIR ADVANCE (NSF) Rutgers-Camden Travel Award, March/April 2013 ($1,590).
Funded by the Rutgers University Office for the Promotion of Women in Science, Engineering, and Mathematics (SciWomen) Institutional Transformation grant from the ADVANCE program of the National Science Foundation.

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000). Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000). Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700). Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000). Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800). Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University. Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University. Funded by the Ford Foundation.

## SERVICE

### College and University

Invited Panelist, "Voting Law in the 2016 Election: Perspectives from Political Science, Public Policy and Public Law," Rutgers University, Camden, New Jersey, December 7, 2016.
Member, Steering Committee, Rutgers University-Camden International Conference on Sustainable Community Development and STEAM Fields: What We Can Learn from A Changing Cuba," October 31 – November 3, 2016.
Chair, Department of Public Policy and Administration, Rutgers-Camden, 2016 to present.
Member, Advisory Committee, Continuing Education Program in Historic Preservation, Rutgers-Camden, 2016 to present.
Member, Global Research and Education Committee, Rutgers-Camden, 2016-2017.
Member, Tenure and Third-Year Review Committees, Department of Political Science, Rutgers-Camden, 2015 to present.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Committee, 2014-present.
Co-Organizer, "Symposia on Urban Poverty and Inequality," Rutgers University-Camden, February 4, February 19, April 2, and April 22, 2014.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Exam (Theory) Committee, 2013-present.
Member, General Education Committee, Subcommittee on Engaged Civic Learning, Rutgers-Camden, 2013-2014, 2015.
Marshal, Rutgers-Camden Commencement, 2013, 2014.
Member, Rutgers-Camden Department of Political Science Search Committee, 2013.
Member, Rutgers-Camden Department of Public Policy & Administration Search Committee, 2012, 2013.
Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011 to 2016.
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.
Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.
Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.
Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.
Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.
Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).
Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).
Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).
Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.
Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.
Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.
Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.
Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.
Member, Columbia University Seminar on the City, 2001 to 2011.
Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.
Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.
First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.
One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

*Professional*

I have reviewed numerous journal articles for the *American Political Science Review*, *American Journal of Political Science*, *American Review of Politics, British Journal of Industrial Relations*, *Community Development Journal, Election Law Journal, Ethnic and Racial Studies, Journal of Electoral Studies, Journal of Ethnic and Migration Studies*, *Law and Society Review*, *New Political Science, Perspectives on Politics*, *Political Behavior, Political Communication, Political Research Quarterly, Political Science Quarterly*, *Public Opinion Quarterly, Urban Affairs Review*, and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., New York University Press, and The New Press.

Chair, Social Science History Association President's Book Award Selection Committee, 2018.
Co-Organizer, "Insurgency from Below and the Future of American Democracy: A Conference in Celebration of the Work of Frances Fox Piven and Richard A. Cloward," Graduate School and University Center of the City University of New York, New York City, October 11, 2017.
Member, Social Science History Association President's Book Award Selection Committee, 2017.
Invited Speaker, Voting Rights Institute Expert Witness Training Conference, sponsored by The Campaign Legal Center, the American Constitution Society and Harvard University Center for Governmental and International Studies, Cambridge, September 14, 2016.
Dissertation Fellowship Reviewer, Center for Engaged Scholarship, 2016-present.
Faculty Presenter, American Bar Association, "The Voter Fraud Myth, Voter ID, Immigration and Voting Rights, and State Legislative Reapportionment," February 18, 2016 (1.5 CLE credits).
Co-Chair, Scholars Strategy Network, New Jersey Chapter, 2015 to present.
Consulting Expert, U.S. Government Accountability Office, Issues Related to State Voter Identification Laws, May 2013.
Guest Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.
Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011, 2012-2013.
Executive Council Member, Urban Section, American Political Science Association, 2005-2006, 2008-2010.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.
Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.
Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.
Nominating Committee, Urban Section, American Political Science Association, 2006-2007.
Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association, 2005-6.
Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.
Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.
Grant Reviewer, Research Award Program, The City University of New York, 2003.
Member, New York Colloquium on American Political Development, 2001 to 2011.

*Community*

Invited Speaker, National Organization for Women, South Jersey 'Alice Paul' Chapter, Moorestown, New Jersey, February 14, 2018.
Invited Speaker, Annual Fall Meeting of the Mercer County Division of Elections, Clerks Workshop, October 3, 2017.
Invited Keynote Speaker, League of Women Voters of Burlington County, New Jersey, Annual Fall Conference, Moorestown Friends, Moorestown, New Jersey, September 18, 2017.
Poll Worker, Gloucester County Board of Elections, (Republican Party Representative), 2017 to present.
Faculty Adviser and Organizer, Graduate Student Conference on State and Local Economic Development Policy, The Neighborhood Center, Camden, New Jersey, April 17, 2016; March 28, 2017.
Invited Panelist, "Voting Fraud, Voter Suppression: Myths and Realities," League of Women Voters of Connecticut Education Fund Annual Fall Conference, Darien Library, Darien, Connecticut, October 24, 2015.
Member, Participatory Budgeting in New York City Research Board, Community Development Project of the Urban Justice Center, 2013-2015.
Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.
Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month Celebration, Atlantic City, New Jersey, February 15, 2012.
Organizer, "National Teach-in on Debt, Austerity and How People Are Fighting Back," Judson Memorial Church, New York City, April 11, 2011.
Host Committee, New York State Immigrant Action Fund, 2010.
Board Member, The Left Forum, 2009 to 2013.
Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.
Board Member, Project Vote, 2008-2009.
Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19, 2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17, 2005; New York City Central Labor Council, New York City, April 28, 2004.
Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25, 2004.
Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.

## PAID CONSULTANTSHIPS

*American Civil Liberties Union Voting Rights Project, 2016-2018*
Wrote expert reports and testified at trial for plaintiffs in *Fish v. Kobach*, U.S. District Court for the District of Kansas.

*Perkins Coie, LLP, 2015-2018.*
Wrote expert reports and testified at trial for plaintiffs in *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, Eastern Division; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District in Virginia, Richmond Division; and *One Wisconsin v. Wisconsin Government Accountability Board* in the U.S. District of the Western District of Wisconsin; and wrote expert report for plaintiffs in *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough SS., Southern District.

*Kirkland & Ellis, LLP, 2014-2016.*
Wrote expert reports and testified at trial for plaintiffs in *North Carolina State Conference of NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina.

*Dechert, LLP, 2014*
Wrote expert report for plaintiffs and testified at trial in *Veasey v. Perry*, U.S. District Court for the Southern District of Texas.

***Arnold & Porter LLP, 2012-2013.***
Wrote expert reports for plaintiffs (2012, 2013) and testified (2012) at trial in *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania.

***New York City Charter Revision Commission, 2010.***
Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

***New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.***
Analyzed survey and other data and wrote report on Latino political participation in New York City and New York State in the 2008 presidential election.

***New York Immigration Coalition, New York, New York, 2006.***
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

***Brennan Center for Justice at New York University School of Law, 2004-2005.***
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz,* Civil Action No. 3:04-CV-1624 (MRK), U.S. District Court for the District of Connecticut.

***Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.***
Consulted on survey design for a project on the efficacy of community-based organizations.

***Dēmos, New York, New York, 2001 to 2002.***
Researched and wrote a study of voter fraud in contemporary American politics.

***1199 Child Care Fund, New York, New York, 2000 to 2002.***
Prepared demographic data for Fund-eligible union members and their children.

(11/19)

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

# Attachment



February 1, 2006


Mr. Thurbert E. Baker
Attorney General of the State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334

Dear Attorney General Baker:

Pursuant to the state open records law, Ga. Code Ann. Secs. 50-18-70 to 50-18-77, I write to respectfully request access to and a copy of records related to cases of voter fraud investigated and prosecuted by the Georgia Attorney General's office since 2000. Specifically, I request copies of records of referrals of voter fraud cases from the Georgia Secretary of State or district attorneys' offices, and records of investigations of those cases of voter fraud so referred, including the locality where the alleged fraud took place, since 2000. I realize that open investigations may be privileged and may fall under one of the numerous legal exceptions to disclosure; where investigations are still open, therefore, I request segregable information regarding the alleged violation of Georgia election law. In other words, to respect confidentiality and discovery rules, I request only information regarding the nature and type of violation of all pending investigations of voter fraud, and the county and city in which the alleged fraud took place. In addition, I request copies of records of charges of violations of Georgia election law for voter fraud made by the Attorney General's office, and records of indictments obtained by the Attorney General since 2000. Finally, I request copies of records of settlements in voter fraud cases brought by the Attorney General since 2000, including plea bargains, guilty pleas, and cases in which charges were dropped.

If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely.

If possible, I would like to receive all requested information on electronic media (CDROM). If your agency does not maintain these public records, please let me know who does and include the proper custodian's name and address. I agree to pay any reasonable copying and postage fees up to $100. If the cost would be greater than this amount, please notify me, my phone number is 212-854-4385. Please provide a receipt indicating the charges for each document.

Thank you for your assistance.

Sincerely,


Lorraine C. Minnite
Assistant Professor



**Department of Law**
**State of Georgia**

THURBERT E. BAKER
ATTORNEY GENERAL

40 CAPITOL SQUARE SW
ATLANTA, GA 30334-1300
Writer's Direct Dial:
404-656-5614
Fax 404-657-9932

February 10, 2006

Dr. Lorraine C. Minnite
Assistant Professor
Department of Political Science
Barnard College
3009 Broadway
New York, NY 10027-6598

      RE:   Open Records Request for Information Related to "Voter Fraud" Cases.

Dear Dr. Minnite:

This is to acknowledge receipt on February 7 of your letter of February 1, 2006. You have requested pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq.*:

> [C]opies of records of referrals of voter fraud cases from the Georgia
> Secretary of state or district attorneys' offices, and records of
> investigations of those cases of voter fraud so referred, including the
> locality where the alleged fraud took place, since 2000. . . . In addition, I
> request copies of records of charges of violations of Georgia election law
> for voter fraud made by the Attorney General's office, and records of
> indictments obtained by the Attorney General since 2000. Finally, I
> request copies of records of settlements in voter fraud cases brought by
> the Attorney General since 2000, including plea bargains, guilty pleas,
> and cases in which charges were dropped.

You have requested this information on electronic media and have offered to pay up to $100 for reasonable copying and postage fees.

Georgia has no election code offense for "voter fraud". *See, e.g.,* O.C.G.A. § 21-2-560 *et seq.* (Election law offenses). Matters could be referred to our office for any number of alleged statutory or rule violations. As such, we cannot identify any such records which are within the custody of the Department of Law which are specifically responsive to your inquiry.

You may wish to review the Georgia laws relating to the process of enforcement of the Election Code. The State Election Board is created by statute and has the power to enforce provisions of the Code. O.C.G.A. § 21-2-30 *et seq.* That entity is separate and distinct from the Office of the Secretary of State. On occasion, the Board may refer matters to the Office of the Attorney General for the conduct of administrative hearings. Since January 1, 2000, the Board has referred approximately 39 files for

Dr. Lorraine C. Minnite
February 10, 2006
Page 2

administrative hearings. The records of those proceedings are not categorized by us in relation to any statute or offense. As noted above, there could be any number of reasons why a matter would be administratively referred to our office.

The Office of the Attorney General is not authorized to pursue general criminal law violations in Georgia. Criminal cases are usually presented and tried in local courts by the appropriate prosecuting officials. The Office of the Attorney General does not routinely maintain records of those local criminal prosecutions and is not charged with pursuing criminal cases in election related matters. Such records would be maintained by the individual local jurisdictions. Therefore the Department has no records responsive to your request for documents in relation to criminal prosecutions.

Were the Department in possession of any identifiable records responsive to your inquiry, as you noted, matters involved in pending investigations would be exempt from disclosure under O.C.G.A. § 50-18-72(a)(4). Additionally any specific records that were exempt from disclosure under O.C.G.A. § 50-18-72 would not be released, including documents that are covered either by the attorney-client privilege or those which represent attorney work product. Specific exemptions could be determined only upon identifying and inspecting the individual records.

Under Georgia law, the Open Records Act provides that covered records be made available for public inspection. O.C.G.A. § 50-18-70(b). The custodian of records is not required to create documents that are not otherwise in existence when the request is made. O.C.G.A. § 50-18-70(d). The Office of the Attorney General does not maintain its case files in electronic format. The files are all usually hard copy papers.

The first quarter hour time spent in responding to any open records request is done at no charge. O.C.G.A. § 50-18-71(d). The response to this letter provides that first quarter hour response time. If the Department were to provide copies of documents in the future, there will be a charge of 25 cents per page for paper copies of documents. Additionally, there will be assessed a reasonable charge for the search, retrieval and other direct administrative costs involved in complying with your request. O.C.G.A. § 50-18-71(d). You will be charged an hourly rate not to exceed the salary of the lowest paid full-time employee who, in the discretion of the Office, has the necessary skill and training to perform the request. *Id.*

I hope this has been responsive to your inquiry.

Sincerely,

DENNIS R. DUNN
Deputy Attorney General

DRD/me

U.S. Postal Service...
CERTIFIED MAIL... RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

ATLANTA GA 30334

| Postage | $ | $0.39 | 0266 |
| Certified Fee | | $2.40 | 05 |
| Return Receipt Fee (Endorsement Required) | | $1.85 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $4.64 | 09/30/2006 |

Sent To
Cox
Street, Apt. No.;
or PO Box No.
City, State, ZIP+4
G-A

PS Form 3800, June 2002                        See Reverse for Instructions

October 1, 2006

Hon. Cathy Cox
Secretary of State
State capitol, Room 214
Atlanta, Georgia 30334

Dear Secretary of State Cox:

I write to ask for your assistance. I am a political scientist conducting non-partisan research on the U.S. electoral system's vulnerabilities to fraud in the voting process.

I am compiling statistics on voter registration fraud, illegal voting, and absentee ballot fraud. State laws governing "voter fraud" vary widely, although all states criminalize the provision of false information to register or vote, double or multiple voting, the mishandling of absentee ballots, and various forms of vote buying. Given the variation and the local nature of election administration, there are no existing standard measures of voter fraud and no official statistics. The Public Integrity Section of the U.S. Department of Justice is charged with investigating and aiding in the prosecution of voter fraud when it involves elections for federal office, but they do not produce data that can be independently analyzed.

Pursuant to the state open records law, Ga. Code Ann. Secs. 50-18-70 to 50-18-77, I write to respectfully request a copy of records related to cases or complaints of voter fraud, defined as a violation of Ga. Code Ann. Secs. 21-2-560, 21-2-561, 21-2-562, 21-2-570, 21-2-571, 21-2-572, 21-2-573, or 21-2-603 (2005). Specifically, I request copies of any and all records of referrals of voter fraud cases to U.S. Attorneys, the Georgia Attorney General or local prosecutors since 2000 (or as far back to 2000 as possible). The Congress passed major election reform legislation, the Help America Vote Act, in 2002, and allocated over $4 billion for the upgrading of the nation's electoral machinery to enhance the integrity of the voting process. Given these kinds of investments there is an important public interest in knowing whether voter fraud is corrupting elections. Your cooperation in this project is critical to the public interest.

If your agency does not maintain these public records, please let me know who does and include the proper custodian's name and address. I agree to pay any reasonable copying and postage fees up to $100. If the cost would be greater than this amount, please notify me, my phone number is 212-854-4385, and please provide a receipt indicating the charges for each document.

Thank you for your assistance.

Sincerely,


Lorraine C. Minnite
Assistant Professor
lcm25@columbia.edu

**Subject:** Open records request
**From:** "Tatum, Clifford" <ctatum@sos.state.ga.us>
**Date:** Thu, 12 Oct 2006 17:42:37 -0400
**To:** <lcm25@columbia.edu>

Dear Professor Minnite,

At your convenience please contact me at the telephone number below regarding your open records request to the Georgia Secretary of State.  I would like to clarify what you are looking for, discuss the volume of records that may exist, and determine what to provide for inspection.

Sincerely,

Clifford


Clifford D. Tatum
Assistant Director of Legal Affairs
State Elections Division
2 MLK Jr. Drive, Suite 1104 West Tower
Atlanta, Georgia 30334
404-657-5352

Notes from conversation with Clifford D. Tatum, Assistant Director of
Legal Affairs, State Elections Division, Georgia (404-657-5352);
October 16, 2006

Upon receipt of my open records request of October 1, 2006, Mr. Tatum
emailed me asking me to call him to discuss the request. I reached him
today. He wanted to clarify my request because he thought the fees
would run into the hundred of dollars. He noted that "voter fraud" had
a broad meaning and he wanted to be sure I was interested in absentee
ballot fraud because he said that was the main type voter fraud dealt
with by his office. He asked me if I was interested in cases where
there was a technical violation of law, such as the mishandling of an
absentee ballot by an unauthorized person, even if there was no intent
to commit fraud. I told him that I did want to know about such cases.
I asked him about double voting and other irregularities at the polling
place and he said that they just didn't see that kind of fraud. As for
double voting, he could recall only two cases in the last couple of
years where people 'double voted,' and both of them involved cases
where people filed an absentee ballot and then showed up in person to
vote. In the first case, it turned out that the person was taking
medication and did not remember filing an absentee ballot. This person
then tried to vote in person after he had stopped taking the
medication. The second case involved the same form of double voting
(first filing an absentee ballot and then casting a ballot at the
polling place on election day). In this case, Mr. Tatum said that he
felt the person was trying to "test the system." His case was referred
for prosecution because the SOS's office believed they had found
someone trying to commit fraud, but in the end, the case was not
prosecuted. I agreed to revise my request for case summaries of
alleged incidents of absentee ballot irregularities and polling place
irregularities and to narrow the time period covered by the request to
2004 and 2005 (letter mailed today).

Mr. Tatum further explained the process for dealing with allegations of
voter fraud: when an allegation is made to the SOS's office, they do an
initial investigation and write it up for referral to the State
Elections Board (this document is usually about ten pages long). The
State Elections Board takes the next step and decides what to do,
whether, for example, to refer the matter to a local district attorney
for investigation and prosecution, or to send it to an administrative
law judge, or they may deal with the matter themselves (issuing a
warning or admonition but not seeking prosecution). The SOS's office
tracks cases because once they are dealt with by other authorities,
they return to the SOS's office which then closes them. The case files
typically run 15-20 pages but can be longer because they may include
documentation. The case summaries are usually shorter, two to five
pages long, but they include the pertinent information regarding the
nature of the allegation and whether the SOS's office found a violation
of law.

I agreed to write a new letter revising my request and forwarding $100
so that the office could get started in pulling the records together.
The total fee (with associated labor costs) should be about $300, based
on Mr. Tatum's guess that they would have about 20 cases for each year,
running about ten pages long (photocopies cost $.25 per page), plus
about eight hours of work at $20 per hour (the rate charged is the rate
of the lowest paid professional staff person in the office).

October 16, 2006


Mr. Clifford D. Tatum
Assistant Director of Legal Affairs
State Elections Division
2 MLK Jr. Drive, Suite 1104 West Tower
Atlanta, Georgia 30334

Dear Mr. Tatum:

Thank you for speaking with me today regarding my open records request of October 1, 2006. Pursuant to our conversation, I am revising that request to narrow it to records related to cases of absentee ballot irregularities and polling place irregularities referred to and investigated by your office for 2004 and 2005. As we discussed, I request copies of the case summaries your office prepares for each such case file.

I am enclosing a check for $100 so that your staff can begin the research and photocopying involved in preparing these records. It is my understanding that you will bill me for any fees and labor costs exceeding this initial payment.

Thank you for your assistance in this matter.

Sincerely,



Lorraine C. Minnite
Assistant Professor
lcm25@columbia.edu

Mr. Clifford D. Tatum
Interim Director
Secretary of State, Elections Division
Suite 1104, West Tower
2 Martin Luther King, Jr. Drive, S.E.
Atlanta, Georgia 30334-1505

Dear Mr. Tatum:

Thank you for your assistance with my open records request.  As per your directions, I enclose payment of $100 for photocopying and labor fees associated with this request, and a copy of your letter, dated December 4, 2006.

Once I review the documents you have provided I will contact you with any further questions should they arise.  I appreciate your time and cooperation in assisting me with my research.

Sincerely yours,



Lori Minnite
Assistant Professor



**Secretary of State**
Elections Division
Suite 1104, West Tower
2 Martin Luther King, Jr. Drive, S.E.
Atlanta, Georgia 30334-1505
www.sos.state.ga.us

December 4, 2006

**Cathy Cox**
SECRETARY OF STATE

**CLIFFORD D. TATUM**
INTERIM DIRECTOR
(404) 656-2871
FAX (404) 651-9531
ctatum@sos.state.ga.us

Lorraine C. Minnite
Assistant Professor
Department of Political Science
Barnard College
3009 Broadway
New York, NY  10027-6598

Dear Prof. Minnite:

Our office has received your open records request for absentee voting cases investigated by our office from 2004 to 2005.  Pursuant to O.C.G.A. § 50-18-70, this letter serves as a response to that request.  We are, of course, willing to make available to you for personal inspection all appropriate documents in so far as they exist.

As you know, the Georgia Open Records Act provides that reasonable charges may be assessed "for search, retrieval, and other administrative costs associated for complying with you request including 25¢ per page for copying (O.C.G.A. § 50-18-71).  The cost of copying the enclosed 88 pages is $22.  The cost associated to the appropriate staff to review the requested documents and prepare for your inspection comes to $78.  The total fee due for your request is $100.

The documents associated with your request are enclosed.  Please make your check payable to the Secretary of State, and include a copy of this letter with your check for our records.  If I may be of any further assistance, please call 404-656-2871.

Sincerely,

Clifford D. Tatum
Interim Director

Encl
CT:rlm

| Case # | County/City | Complaint/Violation | # of Ballots | Respondents | Resolution | Comments |
|---|---|---|---|---|---|---|
| 2004-000021 | Oglethorpe/Macon | election official | undetermined | 3 respondents | referred for Admin. Hearing | |
| 2004-000022 | Homerville/Clinch | unlawful possession of absentee ballots | 3 | 3 respondents | case closed | |
| 2004-000029 | Warren County | voter registration | 2 | 2 respondents | referred to OSAH | |
| 2004-000046 | Pearson/Atkinson | absentee ballots, voter registration | 7 | 1 respondent | Referred to ALJ | |
| 2004-000048 | Crawford County | unlawful possession & mishandling of absentee ballots | 50 | 2 respondents | Referred to OSAH for hearing | |
| 2004-000050 | Treutlen County | absentee ballots | 3 | 3, then 2 | Referred to OSAH for hearing | |
| 2004-000052 | Montgomery County | absentee ballot concerns | 1 | 1 respondent | referred for Admin. Hearing | |
| 2004-000070 | | campaign literature | undetermined | 1 respondent | referred for Admin. Hearing | |
| 2004-000083 | Brantley County | absentee ballots | | | | TRACKING |
| 2005-000034 | Clayton/Rabun | unauthorized assistance at poll | undetermined | 3 respondents | referred to AG for admin. Hearing | |
| 2005-000054 | Milledgeville/Baldwin | absentee ballots | undetermined | 2 respondents | referred to AG for admin. Hearing | |
| 2005-000055 | Americus/Sumter | absentee ballots | undetermined | 1 respondent | bound over for Admin hearing | |
| 2005-000056 | Sumter County | irregularities by election official | undetermined | 1 respondent | case closed | |
| 2005-000057 | Auburn/Barrow | unlawful possession & mishandling of absentee ballots | 2 | 1 respondent | referred to AG for admin. Hearing | |
| 2005-000061 | Lumber City/Telfair | absentee ballots | | | case pending bound over for Admin hearing | |
| 2005-000062 | Ft. Oglethorpe/Catoosa | absentee ballot concerns | undetermined | 1 respondent | | Still under investigation; no summary. Will be closed soon. |

| 2005-000063 | Moultrie/Colquitt | absentee ballot and application mishandling | undetermined | 1 respondent | referred to AG to negotiate cease and desist order |
| 2005-000065 | Chickamauga/Walker | miscounting absentee ballots | 57 | 2 respondents | bound over for Admin hearing |
| 2005-000067 | Commerce/Jackson | absentee ballot and application mishandling | 6 | 1 respondent | |
| 2005-000069 | Pavo/Brooks | irregularities by election official | undetermined | 1 respondent | referred to AG to negotiate consent order |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 25th day of November 2019, I electronically

filed the foregoing **EXPERT REPORT OF LORRAINE C. MINNITE** with

the Clerk of Court using the CM/ECF system, which will automatically send

notification of such filing to Counsel of Record:


Chris Carr, Esq.
Attorney General
Dennis Dunn, Esq.
Deputy Attorney General
Russell Willard, Esq.
Senior Assistant Attorneys General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Telephone: (404) 656-3300
Fax: (404) 657-8733
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov


Joshua Barrett Belinfante, Esq.
Brian Edward Lake, Esq.
Carey Allen Miller, Esq.
Vincent Robert Russo, Jr., Esq.
Kimberly Anderson, Esq.
**Robbins Ross Alloy Belinfante Littlefield, LLC -Atl**
500 Fourteenth Street, NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com
vrusso@robbinsfirm.com
kanderson@robbinsfirm.com

Bryan P. Tyson, Esq.
Special Assistant Attorneys
General Bryan Jacoutot, Esq.
**Taylor English Duma LLP** 1600
Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Fax: (404) 856-3250
btyson@taylorenglish.com
bjacoutot@taylorenglish.com


*/s/ Leslie J. Bryan*
Allegra J. Lawrence
Georgia Bar No. 439797