# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

      *Plaintiffs*,

      v.

BRAD RAFFENSPERGER, *et al.*,

      *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................1

BACKGROUND .............................................................................4

    A.    Georgia Law Regarding Voter Purges ....................................4

    B.    Factual Background...........................................................7

ARGUMENT ...............................................................................10

    A.    Plaintiffs Are Likely To Prevail On the Merits of Their Claims ........11

    B.    Plaintiffs Will Suffer Irreparable Harm Absent a TRO .....................19

    C.    The Balance of Equities Heavily Favor Plaintiffs, and a TRO Is
        in the Public Interest...........................................................22

CONCLUSION .............................................................................23

# TABLE OF AUTHORITIES

CASES

*Addington v. Texas*, 441 U.S. 418 (1979) ................................................. 16

*Allstate Insurance Co. v. Shah*, No. 1:16-CV-997-SCJ, 2016 WL 10906482 (N.D. Ga. May 20, 2016) ................................................. 11

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................. 11, 12

*Brown v. Georgia Department of Revenue*, 881 F.2d 1018 (11th Cir. 1989) ................................................. 18

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................. 12, 19

*Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) ................................................. 19

*Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) ................................................. 20, 21

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ................................................. 12

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ................................................. 11, 16

*Dillard v. Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986) ................................................. 20

*Doe v. Pennsylvania Board of Probation & Parole*, 513 F.3d 95 (3d Cir. 2008) ................................................. 17, 18

*Federal Deposit Insurance Corp. v. Loudermilk*, 826 S.E.2d 116 (Ga. 2019) ................................................. 16

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ................................................. 20

*Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) ................................................. 13, 14, 22

*Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) ................................................. 2

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012) ................................................. 19

*Madera v. Detzner*, 325 F. Supp. 3d 1269 (N.D. Fla. 2018) ...................................21

*Nation v. San Juan County*, 150 F. Supp. 3d 1253 (D. Utah 2015), *aff'd sub nom. Navajo Nation v. San Juan County*, 929 F.3d 1270 (10th Cir. 2019) ...........................................................................................17

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*, No. 1:16CV1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ...........................................................22

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) ..........................20, 23

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223 (11th Cir. 2005)...................10

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ...................................................20

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ..................................................21

*Wesberry v. Sanders*, 376 U.S. 1 (1964)................................................................11

*Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) .................................................20

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .............................................................20

STATUTES

52 U.S.C. § 20507 ...................................................................................................2, 4

O.C.G.A. § 21-2-211.................................................................................................4

O.C.G.A. § 21-2-224...............................................................................................15

O.C.G.A. § 21-2-231.................................................................................................4

O.C.G.A. § 21-2-232.................................................................................................4

O.C.G.A. § 21-2-233.................................................................................................4

O.C.G.A. § 21-2-234..........................................................................................passim

O.C.G.A. § 21-2-234 (2018)....................................................................................5

O.C.G.A. § 21-2-235 ............................................................................passim

**LEGISLATIVE MATERIALS**

H.B. 316 § 51, 155th Gen. Assemb., Reg. Sess. (Ga. 2019) ...........................passim

Ga. S. Weekly Report, 2019 Reg. Sess. (Mar. 19, 2019) ..........................................6

**OTHER AUTHORITIES**

*2020 State Elections and Voter Registration Calendar*, https://sos.ga. gov/admin/files/2020_Short_Calendar.pdf (last visited Dec. 14, 2019) ...........................................................................................................15

Brief of Appellee, *Common Cause v. Kemp*, 714 F. App'x 990 (11th Cir. 2018) (No. 17-11315), 2017 WL 3124358....................................................5

Angela Caputo, Geoff Hing, & Johnny Kaufman, *They Didn't Vote . . . Now They Can't*, APMReports (Oct. 19, 2018), https://www.apm reports.org/story/2018/10/19/georgia-voter-purge ......................................6

Erin Durkin, *GOP Candidate Improperly Purged 340,000 from Georgia Voter Rolls, Investigation Claims*, Guardian (Oct. 19, 2018), https://www.theguardian.com/us-news/2018/oct/19/georgia-governor-race-voter-suppression-brian-kemp ......................................................7

Office of Brad Raffensperger, Georgia Secretary of State, *Georgia Secretary of State's Office Cleans Voter File by 4 Percent as Required by Law*, https://sos.ga.gov/index.php/elections/georgia_ secretary_of_states_office_cleans_voter_file_by_4_as_required_b y_law (last accessed Dec. 14, 2019) ...................................................................8

Press Release, Secretary Raffensperger Fights "Voter Purge" Narrative, Releases Address Change Notices (May 30, 2019) ..........................................18

United States Election Assistance Commission, *Election Administration and Voting Survey 2018 Comprehensive Report: A Report to the 116th Congress* (2019), https://www.eac.gov/assets/ 1/6/2018_EAVS_Report.pdf ...............................................................9, 13, 14

*Voter Turnout in United States Elections*, Ballotpedia, https://ballot pedia.org/Voter_turnout_in_United_States_elections (last accessed Dec. 14, 2019)....................................................................................................8

Plaintiffs Fair Fight Action, Inc., Care in Action, Inc., Ebenezer Baptist Church of Atlanta, Georgia, Inc., Baconton Missionary Baptist Church, Inc., Virginia-Highland Church, Inc., and the Sixth Episcopal District, Inc., hereby file this Memorandum of Law in Support of their Emergency Motion for a Temporary Restraining Order barring Defendants from conducting a purge of Georgia's voter roll on or around December 16, 2019.  As detailed in this memorandum, Plaintiffs respectfully ask this Court to enjoin Defendants from purging the voter rolls of "inactive" voters until Plaintiffs have the opportunity to seek a preliminary injunction to bar such purges during the pendency of this case.

## INTRODUCTION

Defendant Brad Raffensperger, in his official capacity as Georgia's Secretary of State ("SOS") plans to purge more than 300,000 registered Georgia voters from the current voter roll on or around December 16, 2019.  As SOS General Counsel Ryan Germany revealed in his deposition on December 11, this purge will remove from the rolls people who are eligible to vote under the currently applicable Georgia statute.  Specifically, 120,561 individuals will be removed solely because they have not voted or had any other statutorily-defined "contact" with election officials in the past seven years and have not responded to two notices seeking confirmation of their current address.  The SOS is treating those facts as a proxy for proof that these voters

have moved to a different county or state.[1]  But under current Georgia law, enacted this year through House Bill ("H.B.") 316, such an inference may not be drawn unless the voter had "no contact" with the State *for at least nine years*.[2]

H.B. 316 was signed into law with the express purpose of making Georgia's elections more "secure and fair" in large part by lengthening the period of inactivity required before a voter could be purged.  In order to justify purging voters who have been inactive for less than nine years, the SOS claims H.B. 316 does not apply "retroactively".  *See* Germany Dep. (Rough) at 47:10-14, attached as Exhibit A. Retroactivity is a red herring.  H.B. 316—which expressly repealed all prior contrary laws—is *current, governing, law* and the SOS is obligated to comply with it when purging the voter rolls.  Indeed, the SOS recognizes this reality at least in part because it sent a second notice to voters it planned to purge from the rolls 30 to 60 days ago, a requirement imposed only by H.B. 316.  The SOS cannot pick and choose which parts of the law to follow and which parts to violate in its eagerness to purge voters before the 2020 election.

---

[1] Under the federal National Voter Registration Act, a voter may not be purged solely because of not voting.  52 U.S.C. § 20507(b)(2).  For that reason, states that purge based on voter inactivity do so treating the inactivity as a proxy indicator that a voter has moved to a different county or state.  *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018).

[2] H.B. 316 modified Georgia law in several respects.  In this brief, Plaintiffs use "H.B. 316" as shorthand for the changes made to O.C.G.A. §§ 21-2-234 and -235.

Critically, the anticipated purge violates not only state law but also the constitutional right to vote. Because the State is relying on inactivity alone as a basis for purging voters, it is certain that a substantial number of the people to be purged have not moved and remain validly registered. Moreover, at least 120,561 of those voters are ineligible for purging under state law, so cancellation of their registration imposes a severe burden. Imposing such a heavy burden on the right to vote can be justified only if the State has a compelling interest and deregistration is narrowly tailored to that interest. But because Georgia law now permits an individual to be deregistered only after nine years of "no contact," Georgia has *no* interest—compelling or otherwise—in deregistering an individual after seven years. Indeed, removing these voters from the rolls *undermines* the State's interests as embodied in Georgia law.

For this reason, the SOS's anticipated purge of the voter rolls today will violate the First and Fourteenth Amendments. Plaintiffs therefore seek emergency injunctive relief to prevent the SOS from removing Georgia residents from its voter rolls and ask this Court to preserve the status quo until this Court reaches a final decision on the merits of Plaintiffs' claims.

## BACKGROUND

### A.   <u>Georgia Law Regarding Voter Purges</u>

The SOS is the State's chief election official and is responsible for maintaining an official list of registered voters.  O.C.G.A. § 21-2-211(a).  State and federal law require the SOS to purge from that list individuals who have moved to a different county or state, died, been convicted of a relevant felony, or been declared mentally incompetent.  *See* O.C.G.A. §§ 21-2-231, -232; 52 U.S.C. § 20507; Am. Compl. ¶ 69, ECF No. 41.

In addition to providing for removal of persons who affirmatively notify election officials they have moved to a different county or state, Georgia law attempts to identify voters who have moved away in three ways: (i) voters who have filed a National Change of Address ("NCOA") form with the U.S. Postal Service; (ii) voters whose mail has been returned as undeliverable; and (iii) voters who have had "no contact" with election officials for a specified period of time.  *See* O.C.G.A. §§ 21-2-233, -234; Germany Dep. (Rough) at 41:7-13.  As required by state and federal law, in odd-numbered years, such voters are placed into "inactive" status and if they do not vote for two more general elections (essentially four more years) they are purged from the rolls.  *See* O.C.G.A. §§ 21-2-233, -234, -235; 52 U.S.C. § 20507.

Georgia law currently defines a voter as having had "no contact" with the State if the voter:

4

> [H]as not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, has not submitted an absentee ballot application or voted an absentee ballot, and has not confirmed the elector's continuation at the same address during the preceding *five* calendar years.

O.C.G.A. § 21-2-234(a)(1) (emphasis added).  Adding these five years to the four years during which a "no contact" voter remains on the rolls in inactive status, Georgia law requires a total period of inactivity of nine years before a person can be purged based on a presumption that he or she has moved away.

Before April 2019, Georgia law was different.  A no-contact voter could be sent a notice and placed in inactive status after only *three* years of inactivity.  *See* O.C.G.A. § 21-2-234 (2018).  There would then follow the same four years of inactive status before a voter could be purged.  *Id.* §§ 21-2-234(g), -235.  So, prior to April 2019, a voter could be purged from the rolls after a minimum of seven years of inactivity.  *See, e.g.*, Br. of Appellee at 11, *Common Cause v. Kemp*, 714 F. App'x 990 (11th Cir. 2018) (No. 17-11315), 2017 WL 3124358 ("[V]oters are only removed from Georgia's voter-registration list if they have not had *any contact* (as defined in the statute) with election officials in Georgia for a minimum of seven years, including four federal election cycles. . . .").

On April 2, 2019, the law changed.  *See* H.B. 316 § 51, 155th Gen. Assemb., Reg. Sess. (Ga. 2019).  As this Court recognized in its Order resolving the

Defendants' Motion to Dismiss, H.B. 316 made two key changes to Georgia's process for purging voters due to inactivity. *See* Order Denying Mot. to Dismiss In Part at 23, 30-31, ECF No. 68. *First*, voters cannot be classified as "inactive" unless they have had "no contact" with election officials for at least *five* years, as opposed to three years under the prior regime. *See* O.C.G.A. § 21-2-234(a)(2). *Second*, the SOS is required to send a second notification to inactive voters (after the initial notice, sent after five years of "no contact") 30-60 days before the State removes them from the voter rolls. O.C.G.A. § 21-2-235(b). In promulgating this new regime, H.B. 316 repealed "[a]ll laws and parts of laws in conflict" with its provisions. H.B. 316 § 51.

Under current law, therefore, the State may purge voters only after a minimum of nine years of inactivity: five years of "no contact" before being labeled "inactive," plus at least four years of "no contact" after being labeled "inactive." *See id.* § 21-2-235(b); -234(a)(1). Following months of national press attention and mounting concerns that the pre-April 2019 regime purged many eligible voters from the registration rolls ahead of the 2018 elections, the legislature enacted these changes (including the change from seven to nine years of inactivity) to achieve "a secure and fair election." Ga. S. Weekly Report, 2019 Reg. Sess. (Mar. 19, 2019) (describing the purpose of H.B. 316); *see, e.g.*, Angela Caputo, Geoff Hing, & Johnny Kaufman, *They Didn't Vote . . . Now They Can't*, APMReports (Oct. 19,

2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge (stating that 107,000 people were purged in July 2017 for not voting); Erin Durkin, GOP Candidate Improperly Purged 340,000 from Georgia Voter Rolls, Investigation Claims, Guardian (Oct. 19, 2018), https://www.theguardian.com/us-news/2018/oct/19/georgia-governor-race-voter-suppression-brian-kemp (describing investigation alleging over 340,000 voters were purged improperly).

### B.   Factual Background

The Plaintiffs in this case, as part of their respective missions, promote and protect fair elections in Georgia. *See* Am. Compl. ¶¶ 10-35. In this suit they challenge several modes of voter suppression perpetrated by Defendants, including purging voters who allegedly have had "no contact" with the State—a policy known as "Use It or Lose It." *Id*. ¶¶ 68-81. Plaintiffs have been and will be required to divert substantial resources from their other projects to counter Defendants' unlawful attempts at voter suppression and disenfranchisement. *See id*. ¶¶ 10-35; Order Denying Mot. to Dismiss at 13-22 (denying the Defendants' motion to dismiss on standing grounds).

In his December 11, 2019 deposition, SOS's General Counsel Ryan Germany testified the SOS intends to purge voters from its rolls on or around Monday,

December 16, 2019.   Germany Dep. (Rough) at 38:15-16.[3]   Germany further

revealed that this purge encompasses voters who have had only *seven* years of

inactivity, not nine.   *See* Germany Dep. (Rough) at 42:10-21, 45:12-17.   Using its

standard of seven years of inactivity, the SOS plans to purge 120,561 voters for

inactivity.   *See* Office of Brad Raffensperger, Georgia Secretary of State, *Georgia*

*Secretary of State's Office Cleans Voter File by 4 Percent as Required by Law,*

https://sos.ga.gov/index.php/elections/georgia_secretary_of_states_office_cleans_

voter_file_by_4_as_required_by_law (last accessed Dec. 14, 2019).[4]   In other

words, the SOS is ignoring the very state law that requires a voter be inactive for

nine years prior to deregistration.

A purge using inactivity as proof that a voter has moved out of the county will

inevitably deregister a substantial number of people who have not moved and remain

eligible to vote.   *First*, many voters show up at the polls only sporadically.   Voter

turnout in Georgia, even in general elections, hovers around 60%, *see Voter Turnout*

*in United States Elections*, Ballotpedia, https://ballotpedia.org/Voter_turnout_in_

---

[3] Germany initially testified that he "believe[d]" the purge would occur on December 16 or "a date around there."  Germany Dep. (Rough) at 38:15-16.  After his counsel instructed him not to speculate, Germany clarified that he believes the purge "happens next week."   *Id.* at 38:12-20.

[4] After discovering that the SOS planned to purge voters based on unlawful criteria, the Plaintiffs asked the SOS to delay the purge in light of the ongoing litigation, as the SOS has done in the past.  *See* December 14 Letter to Josh Belinfante, attached as Exhibit K.  The SOS has declined the request.

United_States_elections (last accessed Dec. 14, 2019).  *Second*, the confirmation notices sent to inactive voters are largely ineffectual.  In Georgia, just like everywhere else in the country, the large majority of such notices are ignored by the voters who receive them.  *See* United States Election Assistance Commission, *Election Administration and Voting Survey 2018 Comprehensive Report:  A Report to the 116th Congress* at 78 (2019), https://www.eac.gov/assets/1/6/2018_ EAVS_Report.pdf ("2018 EAVS Report") (Exhibit B).  *Third*, leaving aside the 300,000 voters currently on the SOS's "inactive" list those voters who posted a change of address with the U.S. Postal Service or whose mailings were returned "addressee unknown," many if not most of the remaining 120,561 are certain to be inactive non-movers.  Indeed, state law recognizes that some of the people placed on the inactive list and subject to purge have not moved.  *See* O.C.G.A. § 21-2-235(a) (voter on inactive list may be returned to full registration status if the elector verifies that he or she "still resides at the address listed on the elector's registration records.").

The actual experiences of Georgia voters confirm that the State's inactive-voter list includes people who have not moved.  Linda Bradshaw has lived at the same address since 2007, last voted in 2017, and nonetheless received notice from the State that she is to be removed from the rolls.  *See* Declaration of Linda Bradshaw ¶¶ 3-5, attached as Exhibit C.  Tommie Jordan has lived in the same house for over

9

thirty years, last voted in 2018, and received notice that he is to be removed from the rolls. *See* Declaration of Tommie Jordan ¶¶ 3-5, attached as Exhibit D. Deepak Eidnani is in the same position—on the list of inactive voters to be purged even though he has lived at the same address for more than eighteen years and last voted fewer than nine years ago. *See* Declaration of Deepak Eidnani ¶¶ 4-5, attached as Exhibit E. Clifford Thomas has lived at his address for decades, but he too is on the list to be purged. *See* Declaration of Clifford Thomas ¶¶ 3, 6, attached as Exhibit F. David Hopkins has not voted since 2008, and he recently found out that he is on the list of voters to be purged even though he has not moved and never received any notice in the mail from the State. *See* Declaration of David Hopkins ¶¶ 4-5, attached as Exhibit G; *see also* Declaration of Charlesetta Young, Declaration of Kilton Smith, and Declaration of Keme Hawkins, attached as Exhibits H, I, and L. For these Georgians and countless others, the SOS's efforts to remove so-called inactive voters represents a great threat to their constitutional rights.

## ARGUMENT

A movant seeking a TRO must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *See, e.g.*, *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam) (quoting *Ingram*

*v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995)); *see also Allstate Ins. Co. v. Shah, No.* 1:16-CV-997-SCJ, 2016 WL 10906482, at *1 (N.D. Ga. May 20, 2016) (Jones, J.). Plaintiffs satisfy each of these requirements.

### A.   Plaintiffs Are Likely To Prevail On the Merits of Their Claims.

The SOS can offer no justification, let alone the compelling justification the Constitution demands, for deregistering voters the Georgia Legislature has decided should remain on the voting rolls.

Restrictions on voting burden "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)). These rights "rank among our most precious freedoms" and are, accordingly, protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment. *Id*.; *see also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws.").

To determine whether a restriction on the right to vote violates Due Process or the First Amendment, courts apply a "balancing approach." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality opinion). The court "first consider[s] the character and magnitude of the asserted injury to the rights protected

11

by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789.  It then "identif[ies] and evaluate[s] the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* The court must "not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*  "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id.*; *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

When a state imposes only "reasonable, nondiscriminatory restrictions" upon the right to vote, a "State's important regulatory interests are generally sufficient to justify" those restrictions.  *Burdick*, 504 U.S., at 434 (quotation marks omitted). Thus, when a state requires voters to produce photo identification that is available to registered voters free of charge, the Eleventh Circuit has held the "insignificant burden imposed . . . is outweighed by the interests in detecting and deterring voter fraud." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009). But if a state imposes a "severe" burden on the right to vote, the state's regulation "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 1355 (quoting *Burdick*, 504 U.S. at 434).  The disenfranchisement of voters that occurs when they are removed from the voter rolls—as will occur if the scheduled purge takes place—is amongst the severest burdens upon the right to vote

that exist. *Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018), makes this clear. The plaintiffs sought emergency relief for individuals whose voter registration applications had been flagged by the State and placed in pending status due to citizenship. *Id.* at 1257. The State argued that these individuals could still exercise the right to vote by verifying their citizenship, but the court concluded that doing so took more than a "nominal effort." *Id.* at 1261-62, 1264. The court concluded the plaintiffs "ha[d] shown a substantial likelihood of success that the burden" on their right to vote was "severe." *Id*. at 1264. Similarly here, voters who have been deregistered pursuant to this purge would be required not only to learn they had been deregistered prior to Election Day but then go through the various steps required to re-register in advance of Election Day itself given Georgia's prohibition on same-day registration. *See infra* 16.

As noted above, in purging its voter lists based on "no contact," Georgia purports to be attempting to remove from the rolls voters who have left the county or State. But a purge based solely on inactivity without any other evidence that people have relocated—as will be the case for the voters set to be purged today with seven years of "no contact"—raises a substantial risk that individuals will be erroneously deprived of their constitutional right to vote. Georgia mailed 478,295 voter confirmation notices in advance of the 2018 election to individuals it suspected of having moved. *See* 2018 EAVS Report at 78 (Table 3a). The status of over three

13

quarters of those notices—representing 365,150 voters—is unknown, meaning that the voter did not send the confirmation back to the State and the notice was also not returned as undeliverable. *See id*. Beyond the mere fact that these notices were not returned, Defendants have no reason to believe that any of the voters being removed are actually voters who have moved, died, or otherwise become ineligible to vote).[5] Indeed, the experiences of myriad Georgia voters, including those discussed above, voters confirm that the State's effort to use inactivity as a proxy for having moved yields erroneous—and unconstitutional—results. *See* Exhibits C-I, L. The risk that Georgia residents are being erroneously disenfranchised based on inactivity is significant.

Moreover, once a voter is deregistered based on inactivity, the likelihood of complete disenfranchisement, at least for the next general election, is very high. Individuals subject to the purge are supposed to receive a notice 30 to 60 days before the purge, *see* O.C.G.A. § 21-2-235(b), but there is no guarantee that voters will receive or read that notice—again, the status of over *75%* of notices sent in 2018 was completely unknown. *See* 2018 EAVS Report at 78 (Table 3a). Because the State provides no post-purge notice to individuals who are struck from the rolls,

---

[5] As this Court recognized in its Order resolving the Defendants' Motion to Dismiss, the Supreme Court's decision in *Husted* poses no bar to Plaintiff's constitutional challenge because *Husted* addressed only whether the challenged voter-list-maintenance process complied with the National Voter Registration Act, *not* with First Amendment requirements. *See* Order Denying Mot. To Dismiss at 79-80.

individuals who for whatever reason did not see or respond to the pre-purge notice may not even discover that they have been deregistered until they arrive at the polls to vote on Election Day. But Georgia does not provide same-day registration, so any voters who learn on Election Day that they have been purged simply cannot vote at all. *See* O.C.G.A. § 21-2-224 (setting registration deadlines in advance of elections).

Even in the rare case that a voter discovers prior to Election Day that he or she has been purged from the rolls, Georgia makes reregistering and ultimately exercising the right to vote a difficult task. Georgia sets a registration deadline well in advance of state elections. *See* O.C.G.A. § 21-2-224 (voters must register for a general primary, general election, or presidential preference primary roughly one month before the date of the election); *2020 State Elections and Voter Registration Calendar*, https://sos.ga.gov/admin/files/2020_Short_Calendar.pdf (last visited Dec. 14, 2019) (listing registration deadlines in advance of elections). If a voter purged tonight found out tomorrow about the purge, he or she would have just over two months to reregister to be eligible to vote in the next statewide election. *Id.* In short, once voters have been removed from Georgia's voter rolls, numerous obstacles prevent them from reregistering. This combination of factors imposes a severe burden upon voters' First Amendment rights and a very real likelihood of disenfranchisement for no valid reason.

To evaluate the permissibility of this substantial burden on voter's First Amendment rights, the Court must determine whether the anticipated purge is justified by a compelling state interest and narrowly tailored to achieve that interest. *See Crawford*, 553 U.S. at 190 (plurality opinion) (looking to the "precise interests put forward by the State as justifications for the burden imposed by its rule" (quoting *Burdick*, 504 U.S. at 434 (internal quotation marks omitted))).  The state's interest can best be determined through the legislation it passes.  *See, e.g., Addington v. Texas*, 441 U.S. 418, 426 (1979) (looking to Texas law to define the state's interest in confining individuals involuntarily); *FDIC. v. Loudermilk*, 826 S.E.2d 116, 120 (Ga. 2019) ("[W]e presume that the General Assembly meant what it said and said what it meant when it comes to the meaning of statutes" (internal quotation marks omitted)).

The Georgia legislature has directly addressed the State's interest in cleaning up voter rolls and what it said makes clear that the anticipated purge, far from serving a compelling interest of the State, is actually directly in conflict with the State's interest.  Prior to H.B. 316, Georgia had claimed an interest in purging voters who were inactive for seven years.  *See* O.C.G.A. §§ 21-2-234, -235 (2018).  But the legislature repudiated that interest over eight months ago when it enacted H.B. 316. *See* O.C.G.A. §§ 21-2-234, -235.  Expressly repealing "[a]ll laws and parts of laws in conflict," H.B. 316 § 51, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), Georgia law

16

now unambiguously prohibits the State from deregistering individuals on the basis of inactivity unless those individuals have had "no contact" for nine or more years. *See* O.C.G.A. § 21-2-235 (explicitly incorporating the revised definition of "no contact" from O.C.G.A. § 21-2-234). SOS's planned purge will deregister voters who do not meet this nine-year threshold. *See Germany Dep. (Rough)* at 42:12-43:24.

Whatever goals the SOS may believe this purge achieves are irrelevant because the SOS's judgment conflicts with the State's interest as enacted into law by the legislature. A state has no interest—let alone a compelling interest—in violating its own law. *See Nation v. San Juan Cty.*, 150 F. Supp. 3d 1253, 1269 (D. Utah 2015) ("A county or other local governing body cannot have a legitimate governmental interest in violating state law"), *aff'd sub nom. Navajo Nation v. San Juan Cty.*, 929 F.3d 1270 (10th Cir. 2019). The Third Circuit's decision in *Doe v. Pennsylvania Board of Probation & Parole*, 513 F.3d 95 (3d Cir. 2008), is instructive. Pennsylvania imposed greater burdens on out-of-state sex offenders than it did upon in-state sex offenders, notwithstanding that the State had signed an intrastate compact prohibiting such disparate treatment. *Id.* at 108. The Third Circuit invalidated Pennsylvania's disparate treatment of out-of-state offenders on Equal Protection grounds, noting that "the Commonwealth's approval and participation in the Interstate Compact invalidate[d] any rational connection between

17

the Compact's stated goals and the Commonwealth's disparate treatment of in-state and out-of-state offenders." *Id.* at 110.  In so holding, the court recognized it was not its role to "judge the wisdom, fairness, or logic of legislative choices," *id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  Rather, it could only interpret the state's interest with reference to "the performance it agreed to." *Id.*  A similar approach is called for here: any made-for-litigation effort by the SOS to cast the seven-year purge as advancing a state interest cannot override the contrary judgment made by the Georgia General Assembly.[6]

Even the SOS acknowledges that the planned voter purge will not serve a legitimate, much less a compelling, state interest.  *See* Harvey Dep. at 345:22–349:19, attached as Exhibit J (acknowledging that Georgia Elections Director Chris Harvey could not conclusively say whether the no-contact requirement made the voter rolls more accurate given other mechanisms to achieve accuracy); *id.* at 341:4–342:21 (providing no reason for the no-contact requirement, given Georgia's partnerships with the U.S. Postal Service and the Electronic Registration Information Center, beyond the fact that he believed it was "what the Georgia law requires"); Press Release, Secretary Raffensperger Fights "Voter Purge" Narrative, Releases

---

[6] The relief Plaintiffs seek is based on federal law, not state law.  *See Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023–24 (11th Cir. 1989) (finding *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), is "no bar" to "relief . . . granted as a matter of federal due process").

Address Change Notices (May 30, 2019) ("By partnering regularly with stakeholders like the US Postal Service, we're ensuring that only registered, eligible voters are participating in our elections . . . .").

Both *Anderson* and *Burdick* require this Court to balance the burdens of the purge "against the precise interests put forward by the State as justifications . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quotation marks omitted). In this case, the burdens on Georgia's voters are significant, and the State simply has no interest whatsoever—and certainly not a compelling interest—in purging from its rolls 120,561 voters who have been inactive for seven years. Because the State has no interest in placing this substantial burden on Georgia's voters—and indeed, the SOS's actions directly undermine the legislature's aims—Plaintiffs have shown a substantial likelihood of success on the merits.

## B. **Plaintiffs Will Suffer Irreparable Harm Absent a TRO.**

As the Eleventh Circuit and other courts have recognized, a violation of a right as fundamental as the right to vote "almost always inflicts irreparable harm." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012); *see, e.g.*, *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (plaintiffs' "franchise-related rights" were "threatened with significant, irreparable harm" by Georgia's refusal to process voter registration

applications); *Fish v. Kobach*, 840 F.3d 710, 752-53 (10th Cir. 2016) ("weigh[ing] heavily" as part of an irreparable harm analysis, the "constitutionally protected fundamental" nature of the right to vote, and finding irreparable harm in the denial of that right caused by cancellation and suspension of registration applications); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (finding that voter registrants "would certainly suffer irreparable harm if their right to vote were impinged upon"); *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) ("[T]he right to vote is a fundamental right and is preservative of all other rights. Denying an individual the right to vote works a serious, irreparable injury upon that individual."); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (recognizing the likelihood of irreparable harm is greater where claims implicate a "fundamental political right . . . [that is] preservative of all rights").

Today's planned purge will violate Plaintiffs' members' right to vote by stripping them of their status as eligible voters two years before they can be legally deregistered.  *See supra* at 6-7.  This harm "cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotation marks omitted); *see Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Given the fundamental nature of the right to vote, monetary remedies would

obviously be inadequate. . .; it is simply not possible to pay someone for having been denied a right of this importance.").  And, given that Plaintiff's voting members are slated for deregistration today, the harm is inarguably "actual and imminent," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation marks omitted).[7]  See Germany Dep. (Rough) at 38:12-20.

The threat of disenfranchisement posed by the SOS's scheduled purge is neither theoretical nor speculative.  Because the inactive voter list very likely includes voters who are still eligible to vote, *see supra* at 14-15, and the SOS will not inform voters they have been deregistered, many voters purged today will not discover they are no longer registered until they arrive to vote.  *See supra* at 15. Because Georgia does not offer same-day registration these voters may not be able to vote *at all* in the March 2020 primaries.  And "[o]nce the election comes and goes, 'there can be no do-over and no redress.'" *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1282 (N.D. Fla. 2018) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).  The purge "likely will cause a number of Georgia voters to be unable to cast a vote and to have their votes counted," and thus will undoubtedly inflict irreparable injury on Plaintiffs, if not enjoined.  *Common*

---

[7] Plaintiffs have sought this TRO expeditiously.  Plaintiffs did not know that a purge was scheduled for today until the Germany deposition.  Historically, the SOS has not scheduled purges in any meaningfully consistent way and indeed has traditionally *not* conducted purges during active litigation over the validity of its practices.  *See* Am. Compl. ¶ 78.

*Cause/Georgia*, 406 F. Supp. 2d at 1375 (rejecting argument that voter photo identification requirement would not impair right to vote because voters could vote absentee, in part because "a significant number of the registered Georgia voters" lacking identification "likely [were] unaware of [the absentee] alternative," and thus would likely "forgo going to the polls.").

C. **The Balance of Equities Heavily Favor Plaintiffs, and a TRO Is in the Public Interest.**

Georgia has no interest in purging 120,561 voters in violation of its own laws. *See supra* at 17-20.  With no interest from the State to weigh on the scale, the balance of equities must tip in favor of Plaintiffs, who seek only to ensure that eligible voters are not unlawfully disenfranchised.  *See, e.g.*, *Ga. Coal. for People's Agenda*, 347 F. Supp. 3d at 1268; *Browning*, 863 F. Supp. 2d at 1167; *Common Cause/Georgia*, 406 F. Supp. 2d at 1375-76; *see also N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *10 (M.D.N.C. Nov. 4, 2016) ("Any additional burden that may result from restoring voter registrations that were improperly canceled should fall on the State, not on the voter.").  A TRO enjoining the SOS from deregistering eligible voters, moreover, will not impose *any* burden on the State: given Germany's representation that all "no contact" voters set for purge have been "no contact" for less than nine years, and thus cannot legally be

purge, the SOS can comply with the TRO by simply leaving the registrations of all "no contact" voters alone until they are actually eligible for deregistration.

Nor can there be any public interest in enforcing a law that deprives eligible voters of their fundamental right to vote. *Scott*, 612 F.3d at 1297 ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law"). To the contrary, the public "has a 'strong interest in exercising the fundamental political right to vote,'" which "is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Obama for Am.*, 697 F.3d at 436-37 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted)). Through the enactment of HB 316, Georgia residents have made clear that their interests will be *served*, not stymied, by a TRO that only seeks to prevent the SOS from illegally disenfranchising eligible voters.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Temporary Restraining Order and Preliminary Injunction enjoining Defendants from purging 120,561 voters from Georgia's rolls on the basis of fewer than nine years of inactivity. Plaintiffs respectfully request that the Court hear the motion today due to the planned December 16, 2019 voter purge by Defendants, which would remove tens of thousands of Georgia residents from Georgia's voter rolls.

Plaintiffs further request that this Court set this matter for a hearing on its motion for preliminary injunction on expedited basis and with the opportunity for the parties to submit additional evidence and briefing as appropriate.

Respectfully submitted,

December 16, 2019          */s/Leslie J. Bryan*
                          Allegra J. Lawrence (GA Bar No. 439797)
                          Leslie J. Bryan (GA Bar No. 091175)
                          Maia Cogen (GA Bar No. 832438)
                          Suzanne Smith Williams (GA Bar No. 526105)
                          **LAWRENCE & BUNDY LLC**
                          1180 West Peachtree Street
                          Suite 1650
                          Atlanta, GA 30309
                          Telephone: (404) 400-3350
                          Fax: (404) 609-2504
                          allegra.lawrence-hardy@lawrencebundy.com
                          leslie.bryan@lawrencebundy.com
                          maia.cogen@lawrencebundy.com
                          suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
Fax: (770) 635-0029
kurt@summervillefirm.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali Bracey (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com

Jeremy H. Ershow (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jershow@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 16, 2019, I caused to be served the foregoing **<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>** by filing it with the Court using the ECF system, which will effect service on opposing counsel:

Chris Carr
Attorney General
Dennis Dunn
Deputy Attorney General
Russell Willard
Senior Assistant Attorney General
**Georgia Office of the Attorney General**

40 Capitol Square
Atlanta, GA 30334
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Joshua Barrett Belinfante
Vincent Robert Russo, Jr.
Brian Edward Lake
Carey Allen Miller
Andrew Swindle
Special Assistant Attorneys General
**Robbins Ross Alloy Belinfante Littlefield, LLC**
500 Fourteenth St., N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
vrusso@robbinsfirm.com
cmiller@robbinsfirm.com
aswindle@robbinsfirm.com

Bryan P. Tyson
Bryan F. Jacoutot
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com

s/ *Leslie J. Bryan*
Leslie J. Bryan

28