# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

     *Plaintiffs*,

     v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

# EXPERT REPORT OF KEVIN J. KENNEDY

# Expert Report of Kevin J. Kennedy

*Fair Fight Action, Inc., et al. v. Raffensperger, et al.*
U.S. District Court for the Northern District of Georgia, Atlanta Division
Civ. Act. No. 1:18-cv-05391-SCJ

## Introduction

I have been asked to opine on the basic policies, procedures and practices that the Georgia Secretary of State and the State Election Board must have in place in order to train county election superintendents, registrars and poll workers to carry out their duties; and in order to ensure that elections comply with state and federal election laws and the United States Constitution; and whether those policies, practices and procedures are in place in Georgia.

To prepare this report, I have reviewed Plaintiffs' Amended Complaint and numerous materials produced in discovery. I have also reviewed Georgia state statutes, rules and regulations pertaining to elections. In addition, I reviewed Plaintiffs' expert reports prepared by Dr. Khalilah L. Brown-Dean and Dr. Adrienne Jones. A more comprehensive description of the facts, data and materials I have examined and considered in preparing this report is set out in Appendix A.

In developing the conclusions described in this report I have drawn on my experience and expertise as an administrator, consultant and attorney actively involved in election administration at the state, local and national level since April 1, 1979. My opinions reflect on the offices of the Secretary of State and State Elections Board, not the individuals holding those positions or agency employees.

## Synopsis

There is a basic training and monitoring framework a chief state election official must have in place to ensure that local election officials know and are carrying out their responsibilities to fairly and effectively administer elections conducted in the chief state election official's jurisdiction and to protect the voting rights of state voters.

The Georgia State Election Board and the Georgia Secretary of State are required by law to train local election officials in their election administration duties and responsibilities and ensure their performance conforms to Georgia and federal law.

Although the Georgia Secretary of State has developed a large portfolio of training materials and methods for county superintendents and registrars since 2012, that portfolio is lacking key ingredients required to ensure Georgia elections are administered fairly, effectively and in a uniform manner that protects the voting rights of Georgia electors. Only a small part of that portfolio is directed to the training of poll workers.

In order to be effective, the training protocols of the Georgia Secretary of State must address significant challenges presented by the large number of local election officials, a diverse voter population along with evolving legal and technological complexity in election administration.

The Georgia Secretary of State's training does an effective job of providing county superintendents and registrars with information, guidance and support with its complex electronic election administration tools. However, electronic election administration tools are just one component of election administration.

The Georgia State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections.

The Georgia State Election Board and Secretary of State need to better track and analyze in a comprehensive, transparent manner recurring voter issues that impact individuals' voting rights.

**Professional Background**

I served as Wisconsin's Chief Election Officer for more than 33 years, including an initial 8½ months in an acting capacity before my permanent appointment on August 17, 1983, by the Wisconsin State Elections Board. In my capacity as chief state election officer, I served at the pleasure of two different executive branch state agencies run by independent citizen boards. The Wisconsin State Elections Board was an independent, bipartisan citizen board responsible for the administration and enforcement of Wisconsin election and campaign finance law from July 1, 1974, through January 8, 2008.

In January, 2007, legislation was enacted creating the Wisconsin Government Accountability Board (GAB).[i] The GAB was an independent, nonpartisan citizen board comprised of former state judges responsible for the administration and enforcement of Wisconsin election, campaign finance, ethics and lobby law from January 9, 2008, through June 29, 2016. The legislation creating the GAB combined the former State Elections Board and former State Ethics Board into a single independent state agency. After a national search, I was selected as the Director and General Counsel for the Wisconsin Government Accountability Board on November 5, 2007. I held that position until the dissolution of the GAB on June 29, 2016.[ii]

I have been actively involved in election administration as an administrator, consultant and attorney since April 1, 1979, at the state, local and national level. In addition to my service as Wisconsin's Chief Election Officer, I have served on several national task forces, committees and working groups focused on developing, implementing and administering innovations in election law.

Currently I serve on the Boards of Directors of two non-profit organizations focused on improving the administration of elections: Center for Election Innovation and Research[iii] (Vice-President and Treasurer) and U.S. Vote Foundation[iv] (Director). I also serve on the Advisory Board for the MIT Election Data Science Lab.[v]

Last year I completed service on the *Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine. That work resulted in the publication and release of a nationally acclaimed consensus report: *Securing the Vote: Protecting American Democracy*.[vi]

In addition, I have served as an election inspector (poll worker) and chief inspector-in-training for the City of Madison, Wisconsin since the beginning of 2018. A copy of my resume follows the substantive report.

In these capacities I have overseen and supervised the development, implementation and application of a wide range of election official training. I have also participated in extensive election official training at the local, state and national level.

Along with this case, I am currently serving as an expert witness in *Louis M. Bouvier, Jr. v. William Clark Porter, IV*, No. 17 CVS 3273 (N.C. Super. Ct., Guilford Cty.). During my service as Wisconsin's chief election officer I have testified on numerous occasions as a fact witness and an expert in election and campaign finance law. Most recently I was called adversely by the plaintiffs as the lead witness in litigation challenging a series of voting restrictions enacted into Wisconsin law in the 2011-12 and 2013-14 legislative sessions. *One Wisconsin Institute, Inc. v. Mark L. Thomsen*, No. 3:15-cv-00324-jdp (W.D. Wis.)

I am being compensated at the rate of $175 per hour for my work in this case.

In order to provide context for my analysis of the basic training policies, procedures, and practices that the Georgia Secretary of State and the State Election Board must have in place, I describe my experience with election official training at the state, local and national level in more detail in the following section of this report.

**Experience with Election Official Training**

In 37 years as a state election official beginning on April 1, 1979, and the three plus years since I left government service on June 29, 2016, I have had extensive experience with election official training at the state, local and national level.

Wisconsin law requires the state elections agency (initially the State Elections Board, then the Government Accountability Board and now the Wisconsin Elections Commission) to conduct regular information and training meetings at various locations in the state for county and municipal clerks and other election officials.[vii] This requirement has been in place since July 1, 1974, when the responsibility for administering elections was removed from the Office of Secretary of State and placed under the direction of an independent executive branch agency.[viii] These information and training meetings must be designed to explain the election laws and the forms and rules of the state elections agency, to promote uniform procedures and to assure that clerks and other election officials are made aware of the integrity and importance of the vote of each citizen.[ix]

In Wisconsin, the 1,850 municipal clerks are responsible for conducting elections for federal, state and local offices and referenda. This includes selecting and training poll workers; establishing, equipping and supplying polling places; registering voters; administering absentee voting by mail and in-person; and overseeing voting on Election Day.[x]

Wisconsin's 72 county clerks also play a significant role in the administration of elections. County clerks are required to publish election notices for county, state and federal elections; prepare ballots and program voting equipment for county, state and federal elections; and canvass and certify election results for county, state and federal elections.[xi]

The state elections agency is required to prepare and publish an elections manual for local election officials.[xii] The election manual is required to be written so as to be easily understood by the general public explaining the duties of election officials. An essential element of the election manual is a statutory requirement to emphasize the fact that election officials should help, not hinder, electors in exercising their voting rights. During my tenure with the Wisconsin independent election agencies I authored versions of the manual and directed the preparation of later versions as the agency staff expanded.

In my role as legal counsel and then administrative director of the Wisconsin state elections agency I was actively involved in planning, designing, developing and vetting training materials and programs for local election officials. Initially as legal counsel, and as executive director, I personally presented the bulk of the training for local election officials in administrative meetings as well as regional and statewide conferences of local election officials.

I was primarily responsible for writing the election manual and presenting it for approval by the Board. As the agency staff increased I was able to delegate the responsibility for maintaining and updating the election manual to our two agency election specialists. They were also able to assist in making in-person presentations. We also utilized the services of the University of Wisconsin Extension to conduct electronic presentations through the Extension's statewide telecommunications network.

Following the 2000 Presidential election, increased emphasis was focused on local election official and poll worker training. Wisconsin law was amended to require training and certification of the chief election inspector at each of the approximately 3,000 polling places in the state.[xiii] The requirements of the training and certification program were developed under my direction and promulgated as rules in the Wisconsin Administrative Code.[xiv]

Certification of municipal clerks was added to Wisconsin law in 2006.[xv] The requirements and content of the training and certification program were also developed under my direction and promulgated as administrative rules in the Wisconsin Administrative Code.[xvi]

At the national level, in 2003 I completed the Certified Election and Registration Administrator Program (CERA) offered by the Election Center.[xvii] During my tenure as a state election official I completed the CERA recertification process every three years through 2018. The Election Center is a 501(c)(3) organization dedicated to the training and certification of state and local

election officials.[xviii] I served on the Professional Education Program Committee of the Election Center for several years until 2017.

As a member of the National Academies of Sciences, Engineering and Medicine *Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology* I wrote the section on Election Administrator and Poll Worker Training for the Committee's report: *Securing the Vote: Protecting American Democracy*.[xix]

During my time as Wisconsin's chief election officer, I spent many elections observing the voting process at the polls and early voting locations throughout the state. On many occasions I escorted international observers and U.S. Elections Assistance Commission members and staff on these observations. From 2008 through 2016 I visited polling places for every scheduled election as well as numerous early voting locations in the two weeks before Election Day.

In my role as a poll worker for the City of Madison, Wisconsin I have taken pre-election online training before each of the four elections I worked since 2018. In January 2019, I completed the Chief Election Inspector certification program. This is the same program whose implementation and development I directed in 2002, following the legislative mandate for the program.

**Opinions and Analysis**

In my analysis, references to elections includes primary, general and special elections and referenda. Unless otherwise specifically indicated references to election officials includes registrars, superintendents of elections, poll managers, poll officers, absentee ballot clerks and staff of the Office of Secretary of State. References to poll workers includes poll managers, poll officers, clerks and other election officials appointed by the superintendent to work at the polling place or advance voting location.

***There is a basic training and monitoring framework a chief state election official must have in place to ensure local election officials know and are carrying out their responsibilities to fairly and effectively administer elections conducted in the chief state election official's jurisdiction and to protect the voting rights of voters.***

Laws governing the duties of a chief state election official and training requirements for local election officials vary among the states. However, state and federal law along with the evolution of election administration since the 2000 presidential election suggest that there is a threshold foundation for training and holding election officials accountable that must be in place under the direction of the chief state election official to ensure elections are administered in a fair, uniform and transparent manner.

Both Georgia and Wisconsin assign this responsibility to the chief state election official by requiring training of local election officials and the development of a certification program for local election officials. Georgia requires the Secretary of State to conduct annual training sessions with superintendents of elections and registrars. O.C.G.A. § 21-2-50(a)(11). Wisconsin requires the state election agency to conduct regular information and training meetings at various locations in the state for county and municipal clerks and other election officials. Wis. Stat

§ 5.05(7). Other states have similar provisions.

The first major infusion of federal funds to address the nationwide fallout from the 2000 presidential election included a major component for training local election officials. The Help America Vote Act of 2002 (HAVA) was enacted to provide assistance with the administration of certain federal election laws and programs and establish minimum federal election administration standards for states and local units of government responsible for administering those laws.[xx] HAVA put the onus for implementation of its provisions on the chief state election official. 52 U.S.C. § 21003(e).

HAVA Section 101 payments were made available to all states immediately upon passage of the Act.[xxi] These payments were designated to improve the administration of elections. One of the specified permissible uses for the payments was for training election officials, poll workers and election volunteers. *Id.* § 20901(b)(1)(d).

These payments for training underscored the importance of ensuring election officials and poll workers had the information, knowledge and skills essential to conducting fair and uniform elections. HAVA also introduced and funded technology upgrades for the administration of elections including statewide electronic voter registration systems, electronic voting equipment and requirements for voting accessibility for persons with disabilities and voters in need of language assistance. A separate pool of HAVA payments to states through the Department of Health Services to improve voting accessibility for persons with disabilities includes provisions for training election officials, poll workers and election volunteers on how to best promote access and participation of individuals with disabilities in elections. *Id.* § 21021(b)(2).

The technology upgrades mandated under HAVA along with specific provisions for training election officials and poll workers demonstrate the importance of a robust state-directed training portfolio for local election officials and poll workers to ensure they are carrying out their responsibilities to administer fair and uniform elections. Other federal laws have created similar significant changes in election administration for state and local election officials to ensure fair and uniform elections. While these laws have not provided funding or specifically authorized election official or poll worker training, the new federal requirements necessitated enhanced training for local election officials and poll workers.

The Voting Rights Act of 1965 (VRA)[xxii] and the National Voter Registration Act of 1993[xxiii] (NVRA) are the best examples of comprehensive federal provisions that require a knowledgeable workforce of election officials and poll workers to ensure that voters are provided the fair and uniform treatment required by law. These laws, along with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)[xxiv] and the Voting Accessibility for the Elderly and Handicapped Act,[xxv] provide essential protections for voters to ensure citizens have equal access and opportunity to fully participate in federal elections. A comprehensive training program for election officials and poll workers is essential to ensuring voting rights are protected.

Following the 2000 presidential election, I was among a group of state and local election officials organized by the Election Center to meet with Members of Congress and their staff as they worked on legislation that became the Help America Vote Act of 2002. One key takeaway

from these discussions that resonated with me was the idea that the proposed legislation was going to make available early money to enable state officials to adequately plan for the implementation of new federal requirements and quickly address chronic issues including election official and poll worker training. Congressional staffers viewed this as a lesson learned from experience with the haphazard implementation of the NVRA.

This idea was manifested in the HAVA Section 101 payments. The fourth item of the eight permitted uses of these payments is training election officials, poll workers and election volunteers. 52 U.S.C. § 20901(b)(1).

The latest infusion of federal funds for improving the administration of elections adds more levels of complexity for election officials and poll workers. In 2018, Congress authorized $380 million in payments to the states as part of the Consolidated Appropriations Act of 2018 to improve the administration of federal elections including to enhance technology and make cyber security improvements. Congress chose to fund the payments through HAVA Section 101. This infusion of federal funds also entails training local election officials to ensure the efficacy of the funding.

The elaborate framework of state and federal laws designed to facilitate voter participation requires a comprehensive, robust training program to ensure election officials at all levels are able to carry out their responsibilities. This cannot be done by occasional meetings supplemented by a written manual which may or may not be accessible online. The audience of election officials is too large and diverse for a limited training endeavor. The many layers of regulations is too vast to distill into a cursory presentation supported by a voluminous set of materials. The process of conveying complex requirements with a range of exceptions in legalese is too fraught with confusion to risk not properly explaining what is expected of election officials and poll workers. The increased reliance on technology in election administration requires a supportive approach to ensure election officials and poll workers are able to effectively use the electronic tools available to them.

According to the 2016 Election Administration and Voting Survey,[xxvi] Georgia had 20,062 poll workers in the 2016 presidential election. Along with the superintendents of election, registrars and their staff in 159 counties, this constitutes a large number of election officials requiring comprehensive training. They all have different informational needs and more importantly different ways of learning. Superintendents and registrars need to see the big picture of election administration as well as the detailed steps necessary to carry out their tasks. They also need to have the resources and knowledge to properly train their poll workers.

Poll workers do their work a few times a year. They need to be thoroughly trained in their Election Day responsibilities and brought up to date on changes since the last time they worked. They also need access to information to resolve critical issues that occur at the polling place, such as how to resolve a provisional ballot issue. Because poll workers tend to be elderly compared to the rest of the election official population, they will have different learning styles and will need easily accessible support to assist in making crucial Election Day decisions.

I have described a number of federal election laws that election officials need to be familiar with along with the Georgia Elections Code and State Election Board rules. The training protocol has to account for all of these requirements, regulations and rules. This is an immense amount of information that has to be accessible to election officials and poll workers.

These requirements, regulations and rules are not written in plain English. They must be presented in language that is easy for a diverse audience to understand. While poll workers are required to read, write and speak English, they will have to convey information to voters who are not as conversant. [xxvii] They may also bring their experience of English as a second language to their training. The presentation and content of training materials need to be easily understood by the target audience of election officials and poll workers.

Administering elections is driven by technology. The days of operating a polling place out of supplies contained in a shoebox are long gone. In Georgia new voting technology was introduced in 2002. That voting equipment is scheduled for replacement in 2020. Training election officials and poll workers in the use of new technology requires a hands-on approach in addition to demonstration of the equipment capabilities and making user manuals available. The information in user manuals will have to be distilled into checklists and step-by-step instructions to ensure election officials and poll workers can easily do their work and resolve problems.

There also have to be accountability mechanisms included as part of the training program if the program is to be effective. This includes a test or assessment to ensure the election officials and poll workers have learned the information presented. It also includes a method for reviewing their performance such as an audit. There must also be clear procedures for identifying and tracking errors or failure to perform required duties and holding individuals accountable.

Finally, the training protocols must be accessible to the public. Transparency enables voters and community groups the opportunity to assess the quality of the training program. Feedback from outside the narrow world of election administrators ensures critical issues are being addressed and provides for an additional level of accountability. It also engenders public confidence in the electoral process.

In sum, a statewide training protocol must be comprehensive both in scope to cover all regulatory requirements and in breadth to ensure all essential election personnel are reached. The training portfolio must be easily accessible to election officials and poll workers. The training must be presented in a variety of formats to enable election officials and poll workers the best opportunity to absorb the information. There must be accountability measures in place to assess the viability of the program and ensure participants are responsible for their performance. The full training program must be transparent and accessible to the public.

***The Georgia State Election Board and the Georgia Secretary of State are required by law to train local election officials in their election administration duties and responsibilities and ensure their performance conforms to Georgia and federal law.***

The State Election Board is required to promulgate rules and regulations to ensure uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers and

other election officials. O.C.G.A. § 21-2-31(1). The Board is also required to formulate, adopt and promulgate rules and regulations consistent with law that will be conducive to the fair, legal and orderly conduct of elections. O.C.G.A. § 21-2-31(2). Finally, the Board is required to promulgate rules and regulations to define uniform and nondiscriminatory standards on what constitutes a vote and what will be counted as a vote. O.C.G.A. § 21-2-31(7).

Upon adoption, the Board is required to file certified copies of the rules and regulations with the Secretary of State and each superintendent of elections. O.C.G.A. § 21-2-31(2). The Board is also required to publish and furnish to election officials indexed copies of current election laws, rules and regulations. O.C.G.A. § 21-2-31(3).

The State Election Board has the authority to fine registrars and superintendents of elections and their government authority employer for failure to attend training or complete the required certification. O.C.G.A. §§ 21-2-100(e), 21-2-101(d). The Board may require additional or remedial training or limit, suspend or revoke a superintendent of elections for a violation of Title 21, O.C.G.A. or any rule, regulation or order issued by the Board. O.C.G.A. § 21-2-101(e). The State Election Board is authorized to promulgate, amend or repeal rules and regulations to implement and enforce the training and certification requirements. O.C.G.A. § 21-2-101(f).

The State Election Board is required to investigate the administration of election laws and frauds and irregularities in elections. O.C.G.A. § 21-2-31(5). Among the available resolutions of these investigations is the issuance of a letter of instruction to local election officials or the imposition of a civil monetary penalty on local election officials. *See* Deposition of Chris Harvey, 117:8-120:5 (Aug. 16, 2019);  Depositions of State Elections Board Members Seth Harp, 28:9-29:2 (Oct. 16, 2019); Rebecca Sullivan, 76:22-78:8 (Oct. 15, 2019); and David Worley, 108:12-109:16 (Oct. 10, 2019).

Implicit in the requirements for the State Election Board to promulgate rules and regulations and investigate election administration, fraud and irregularities is the responsibility for the Board to ensure local election officials are apprised of their responsibilities and the consequences of failure to carry out their duties. Because the State Election Board has no staff and only meets sporadically, this responsibility appears to have devolved upon the Secretary of State, who serves as Chair of the State Election Board. O.C.G.A. § 21-2-30(d).

Since 2012 the State Election Board has met an average of slightly more than 4 times a year including just two meetings in 2017 and three in 2019.[xxviii] Board Members have indicated they have very little contact with local election officials. Depositions of State Elections Board Members Seth Harp, 36:21-37:9 (Oct. 16, 2019); Rebecca Sullivan, 24:22-27:10, 48:25-49:22 (Oct. 15, 2019); and David Worley, 109:17-110:7 (Oct. 10, 2019). Board members have also stated that they have not received any training in their duties and responsibilities. Rebecca Sullivan, 20:7–9 (Oct. 15, 2019); Seth Harp, 7:25-8:6, 23:3-9 (Oct. 16, 2019); David Worley 10:6-12 (Oct. 10, 2019).

Georgia law specifically requires the Secretary of State to conduct annual training sessions for registrars and superintendents of elections. O.C.G.A. § 21-2-50(a)(11). The Secretary of State is also required by law to carry out specific election-related tasks in coordination with local

election officials that necessitate ensuring local election officials have the direction and information essential to complying with directives from the Secretary of State. These include certifying the names of candidates in substantially the form of ballots to superintendents of elections, furnishing election forms and supplies to superintendents of elections with the appropriate instructions for their use, maintaining the official list of registered state voters and developing, programing, building and reviewing ballots on voting systems in use in the state. O.C.G.A. § 21-2-50(a)(4), (5), (14), (15).

All county and municipal election superintendents, chief registrars and absentee ballot clerks along with other specified election officials are required to complete a certification program approved by the Secretary of State within six months of appointment. The program shall not exceed 64 hours and may include instruction on the operation of voting equipment along with state and federal law and procedures related to elections. O.C.G.A. § 21-2-101(a).

The election superintendent and at least one registrar—or in counties with boards of election or combined boards of election and registration—a board member or designee of the board, are required to complete a minimum of 12 hours training annually. In municipalities, the election superintendent and at least one registrar shall complete a minimum of 12 hours training biennially. The Secretary of State selects the training. O.C.G.A. § 21-2-100(a).

In addition to this state mandated training, there are also several essential federal laws whose complex provisions necessitate training local election officials and poll workers to ensure the voting rights protected by federal law are protected in practice by state and local election officials.

These laws protecting citizen voting rights include the Voting Rights Act of 1965, the National Voter Registration Act of 1993, the Uniformed and Overseas Citizens Absentee Voting Act, the Voting Accessibility for the Elderly and Handicapped Act and the Help America Vote Act of 2002. The State Election Board and the Secretary of State cannot be confident these laws are administered in a consistent and uniform manner unless the county election officials and poll workers are effectively trained in the requirements of these critical federal laws.

***Although the Georgia Secretary of State has developed a large portfolio of training materials and methods for county superintendents and registrars since 2012, that portfolio is lacking key ingredients required to ensure Georgia elections are administered fairly, effectively and in a uniform manner that protects the voting rights of Georgia electors. Only a small part of that portfolio is directed to the training of poll workers.***

In preparation of this report I have reviewed a large amount of training materials and information provided by the defendants in discovery. For purposes of my report, I focus on *The Poll Worker Manual*, 2018 Edition and 5,148 pages of PowerPoint presentations. This part of the discussion focuses on the PowerPoint presentations, not on the poll worker manual.

Although many of the presentations are undated, the materials appear to be arranged chronologically. Most presentations seem to be connected with annual conferences of the Georgia Election Officials Association (GEOA), the Voter Registrars Association of Georgia

10

(VRAG) and combined meetings of the two organizations of local election officials. The first referenced conference is the May 2012 GEOA conference and the last referenced conference is the March 2018 VRAG/GEOA combined conference.[xxix] I am aware that there will be a state conference in December 2019 as well.

The Secretary of State's Elections Director, Chris Harvey, refers to these conferences as the primary opportunity to train local election officials. Deposition of Chris Harvey, August 16, 2019, 30:20-35:20. Notably, other local election officials including poll workers and poll managers do not participate in these conferences. There are no statewide meetings designed to reach poll workers and the Secretary of State does not do anything to ensure information from these conferences reach those front line election officials.

The majority of the presentations were done by staff from the Office of the Secretary of State. They were responsible for 89 of the 160 different sets of training materials.

Presentations ranged from professional development such as *The Art of Communicating* (State-Defendants 00002381) to high level discussions with historical perspective such as *Setting the Stage - How Did We Get to Where We Are Now?* (State-Defendants 00002852) along with legislative updates. The bulk of the presentations focused on detailed step-by-step procedures to carryout specific election administration tasks such as *UOCAVA Voters: Mail and Electronic Ballot Delivery* (State-Defendants 00003080). As new technology was implemented, like the new Georgia Voter Registration System, the presentations included screen shots from the technology platforms. *Overview of GVRS* (State-Defendants 00003682).

Local election officials provided the next highest number of presentations. These presentations generally focused on successful local election administration initiatives such as *Ballot On Demand* from Athens-Clarke County (State-Defendants 00003201) to best practices for required duties such as *Absentee Reconciliation* from Gwinnett County (State-Defendants 00006168).

Staff from Kennesaw State University Center for Election Systems (KSU) also provided a large number of presentations. KSU has played an integral role in Georgia election administration since the acquisition of a uniform touch screen electronic voting system in 2002. The KSU Center for Election Systems was responsible for maintaining and programming the voting equipment in a partnership with the Office of the Secretary of State and local election officials. KSU presentations ranged from detailed step by step programming procedures such as *Creating and Saving Export Files in GEMS* (State-Defendants 00002557) to high level discussion of issues faced by election officials such as *General Security Concepts and Terms* (State-Defendants 00006732).

The relationship between Kennesaw State University and the Office of Secretary of State ended in late 2017 or early 2018. Some staff from the KSU Center for Election Systems moved to the Secretary of State's office to continue to support state and local election officials.

Presentations also were provided by representatives from other government offices such as the Georgia Government Transparency and Campaign Finance Commission, *Update on Georgia Campaign Finance Law and Filing Requirements* (State-Defendants 00006677). On occasion

federal agencies also played a role in the conference presentations: *What FVAP Can Do for Georgia UOCAVA Voters* (State-Defendants 00002577) from the U.S. Department of Defense Federal Voting Assistance Program and *Election Infrastructure Security Initiative* (State-Defendants 00007452) from the U.S. Department of Homeland Security.

The training materials reference other modes of training made available to local election officials by the Secretary of State besides the conference PowerPoint presentations. The voter registration system and electronic voting equipment are supported with print and electronic manuals. There were also a series of video tutorials covering a wide range of election administration subjects available on the eLearn platform.

In 2015 eLearn was replaced with Firefly. Firefly is an electronic searchable document repository developed and maintained by the Office of Secretary of State and available to local election officials. Firefly is accessible to county superintendents and registrars through a controlled access system. References to Firefly appear in materials presented at the May 2015 GEOA conference. (State-Defendants 00004630, 00005098, and 00005118). I was not provided access to Firefly.

A small number of Georgia election officials also participate in the training opportunities provided by the Election Center. The Election Center offers special two-day workshops in February and April of each year along with a three-day Annual Conference in August. The Election Center in conjunction with faculty from Auburn University administers a nationally recognized election official certification program.

The Certified Election and Registration Administrator (CERA) core curriculum program consists of 12 day-long and half-day courses covering a range of election administration areas including Management and Leadership Concepts; Planning and Budgeting; Facilitating Voter Participation; Enfranchisement, Enhancement & Enforcement: Modern Federal Election Law and Regulation; and the History of Elections. Appendix B contains a full list of the core courses along with a description of the core competencies of the course materials. These core courses are required as part of the initial CERA certification.

According to the Election Center website only six current Georgia election officials have completed the CERA certification program.[xxx] A total of 12 Georgia election officials are included among the 1,208 CERA graduates since the first class of graduates in 1995. Election Center staff has informed me that there are presently 34 Election Center members from Georgia including 11 in the Office of the Secretary of State.[xxxi]

The Election Center provides an opportunity to bring fresh ideas and innovations to Georgia's election officials training program. Participation by all county superintendents and registrars is essential to ensure a more professional cadre of local election officials with a broader perspective on their role in ensuring fair and effective administration of Georgia elections and protection of the voting rights of Georgia citizens.

***In order to be effective, the training protocols of the Georgia Secretary of State must address significant challenges presented by the large number of local election officials, a diverse voter population along with evolving legal and technological complexity in election administration.***

Training local election officials in Georgia presents some unique challenges. These challenges arise from the large number of local election officials and the differing organizational structure of election administration among Georgia counties. Georgia's history of restricting the vote of citizens of color also significantly impacts training approaches.

County, state and federal elections are administered at the county level in Georgia's 159 counties. Only Texas has more counties responsible for election administration.[xxxii] There are 103 Combined Boards of Elections and Voter Registration. Elections in 53 counties are administered by a probate judge and registrar and three counties have an election supervisor and registrar. (State-Defendants 00002408).

Wisconsin has an even larger number of local election officials. Elections are conducted at the municipal level in the state's 1,850 towns, villages and cities. In addition, the 72 counties also have significant election responsibilities. From my 30 plus years of experience as Wisconsin's chief election official, I can describe the challenges presented in establishing and maintaining an effective training program for a large, diverse group of local election officials.

The Georgia Secretary of State has a variety of training challenges based on the number of local election officials. Establishing a communication protocol is the foundation for effective training. Information needs to be delivered in a timely and efficient manner. The Secretary of State cannot rely on just one channel of communication such as email or providing internet access to a central contact point to convey important information. It is essential that the Secretary of State identify and utilize multiple communication channels when reaching out to local election officials.

For example, as a result of litigation in 2018 and other years, the Secretary of State was required by the courts to issue several Official Election Bulletins (OEBs) to county election officials to ensure federal court orders were carried out. In their depositions Elections Director Chris Harvey, Deputy Elections Director/Deputy General Counsel Kevin Rayburn and State Election Board Member David Worley described the distribution of these OEBs.[xxxiii]

They were emailed to county election officials and posted on Firefly. However, there was no mechanism in place to ensure the county election officials received, reviewed and implemented the OEBs. There must be a requirement that county election officials report back to the Secretary of State that they have received the OEBs, reviewed the content of the OEBs and taken steps to implement the court ordered requirements spelled out in the OEBs including directing poll workers and other front line election workers to carry out their duties consistent with the court directives.

Tracking names and contact information of county election officials is also a challenge. There will be constant turnover due to the expiration of terms, resignations, retirement, health issues and in some cases death of local election officials. Not only must contact information be kept

current, but tracking compliance with training requirements and election-driven deadlines is a responsibility of the Secretary of State that presents logistical challenges.

In developing and implementing training programs, the Secretary of State needs to focus on teaching challenges due to age, background and learning styles of the local election officials. While these differences may not be tracked, they have to be accounted for in each presentation and the overall training curriculum.

The Secretary of State has to also evaluate what information is the most essential to focus on at a given point in time. New technology such as voting equipment often drives the content of training, but certain election administration tasks present recurring challenges. Absentee voting and provisional ballots are examples that all election officials need to be attentive to – especially given the consequences of any error.

Georgia's history of restricting access to the ballot for citizens of color also presents significant challenges to an effective training program. Georgia was one of several states identified in the Voting Rights Act of 1965 that drew special scrutiny because of past practices of election discrimination based on race. This should be addressed in a straight forward manner in training for local election officials and poll workers. Leaving this history of discrimination unspoken when presenting information about election officials' duties creates the impression treating all voters equally and fairly is not a paramount responsibility for doing their job.

Until the U.S. Supreme Court decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), all voting changes in Georgia were required to be precleared by the U.S. Department of Justice. Preclearance provided training challenges for Georgia election officials that still persist. Even without preclearance requirements any voting change made by local election officials will be scrutinized and questioned. It has to be stressed in training protocols how important it is for local election officials to ensure any voting change does not have a disparate impact on voters of color.

This description of the challenges faced by the Secretary of State in developing and implementing a comprehensive training program sets a high bar for the Secretary of State and the State Election Board to ensure local election officials and poll workers have the information and tools required to do their jobs. In a subsequent section I describe how the current training does not measure up to this mark.

***The Georgia Secretary of State's training does an effective job of providing county superintendents and registrars with information, guidance and support with its complex electronic election administration tools. However, electronic election administration tools are just one component of election administration.***

Technology has become an integral part of administering elections since the 2000 election. The Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901 *et seq.*, provided the impetus with requirements for a computerized list of registered voters maintained at the state level, accessible voting equipment for voters with disabilities, uniform voting equipment standards and requirements for tracking and accessing the status of provisional ballots. Georgia implemented a

single system of electronic voting in 2002 and developed a statewide voter registration system to comply with HAVA.

The partnership with Kennesaw State University's Center for Election Systems provided a central point of focus for state and local election officials for the programming and maintenance of the voting equipment. When Georgia implemented electronic poll books KSU helped ensure uniform procedures and practices were implemented statewide.

In 2015, the Secretary of State rolled out a new statewide voter registration system. The training materials demonstrate a deep dive into the nuts and bolts of the new system. The PowerPoint presentations have step by step instructions along with screen shots for guiding local election officials in the training sessions. The presentations refer to user manuals that were distributed at the sessions and available in electronic form through Firefly. (State-Defendants 00005001-00005023).

This "in the weeds" detailed level of technology training is one of the stronger aspects of the programs developed by the Office of the Secretary of State. However, electronic election administration tools are just one component of election administration. The Secretary of State needs to make all aspects of its training program comprehensive enough to ensure local election officials and poll workers are treating voters in an equal, fair and uniform manner,

***The Georgia State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections.***

The State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections. In particular Georgia training programs should be more voter-centric with an emphasis that election officials and poll workers should help, not hinder, citizens exercising their voting rights and emphasize the integrity and importance of the vote of each citizen.

This includes training for State Election Board Members who presently receive no training about their duties or how the Georgia election system works. It is incomprehensible that citizens should be asked to serve on a Board charged with the oversight of election administration and enforcement of election laws, rules and regulations without receiving any training.

For example, in Wisconsin when a new member was appointed to the Government Accountability Board, I set up a half-day training for the new member. The training included presentations from several different staff members, along with a briefing on pending cases and a review of the agency website. We also demonstrated the use and capabilities of agency electronic platforms such as the statewide voter registration system, complaint tracking data base and election official training portal. This provided the new Board Member with a solid background before participating in Board meetings.

From my perspective, there are four crucial elements missing from the State Election Board and the Office of Secretary of State training and enforcement of state and federal election law. The first element is a focus on serving the voter from registration to voting to dealing with ballot issues. The second element is a comprehensive training program for poll officers and poll workers directed by the State Election Board and the Office of Secretary of State. The third element is a consistent regimen of accountability for election officials' performance. The final element is transparency.

<u>Focus on the Voter</u>

Complying with statutory requirements, rules and regulations appears to be the primary focus of the current training programs along with detailed instruction on working effectively with election technology. While this is important and essential to a smooth functioning election, it alone does not protect voters' rights.

Elections are the event where voters have the opportunity to shape government by choosing their elected officials. There needs to be more of a voter-centric focus to the overall training program. Facilitating voter participation is a core value of election administration. There needs to be a strong message imbued into the training that emphasizes serving the voter. This is not an element in the Secretary of State's training materials.

This must be reflected in an emphasis on making voting easy, accessible and transparent. This requires a focus not only on accessibility for persons with disabilities, but selecting locations and setting hours that enable voters to easily get to the voting location. This is essential in ensuring that advance voting and Elections Day voting are accessible to all voters.

A voter-centric focus will also mitigate the impact of discrimination in the voting process directed towards persons of color. This is important in establishing voter confidence in the Georgia electoral process. The conference training materials on the Voting Rights Act were limited to a description of the law. There was no discussion on how Voting Rights Act is voter focused to ensure all voters have an equal opportunity to participate in the electoral process.

Training scenarios that deal with resolving voter problems are a key component for a comprehensive and effective training protocol. Absentee voting and the issuance of provisional ballots commonly present the most challenges to poll workers. From my experience training local election officials, observing poll workers at the polls on Election Day and working as a poll worker, absentee voting and processing absentee ballots comprise the largest segment of election administration issues. Developing training scenarios that illustrate the problem and the options for resolution must be an integral part of the Secretary of State's training program.

For example, many of the Election Day complaints fielded by Chris Harvey and Kevin Rayburn in November 2018 dealt with individuals with questions about their registration status and voting location. This led to concerns about issuing provisional ballots. There were also numerous questions about absentee voting. A well-designed poll worker training program implemented statewide would provide scenarios dealing with the situations encountered by voters.

This would enable state and local election officials to work out resolutions to these frequently encountered problems in advance of voting. It would provide poll workers with a road map for addressing these issues. If made publicly available, it would provide an opportunity for voters and the media to see what is expected of election officials and how particular issues are resolved.

This voter-centric approach only works if the State Election Board and the Office of Secretary of State incorporate it in their training materials and require its use for poll workers as well as county election officials. This training approach would send a message to everyone involved in the electoral process, from poll workers to county election officials to voters to candidates, that enabling full participation by all voters is the foundation for conducting Georgia elections.

<u>Mandatory Uniform Training Protocol for Poll Workers</u>

The voter is the central focus of administering and conducting elections. The Secretary of State's training materials recognize poll workers hold in their hands "the citizen's right to cast a vote" and "ensure that eligible citizens are able to cast a vote and have that vote counted." (State-Defendants 00008025).

Georgia law vests the responsibility for training poll officers and poll workers with the county superintendents. O.C.G.A. §§ 21-2-70(8), 21-2-99(a). The responsibility for ensuring uniformity in the practices of poll officers and the fair, legal and orderly conduct of elections is vested in the State Election Board. O.C.G.A. § 21-2-31(1), (2). A mandatory state-directed uniform training program for poll workers is the best way to ensure "the citizen's right to vote" is protected and "eligible citizens are able to cast a vote and have that vote counted."

If poll workers are not complying with their statutory duties or implementing practices that hinder voters in exercising their rights, it will be the State Elections Board and Secretary of State that will ultimately have to answer for that failure.

The Office of Secretary of State has developed a 104 page manual for poll workers. *The Poll Worker Manual*, 2018 Edition. (State-Defendants 00008952-9059). It appears this manual is designed to assist superintendents in carrying out their statutory training responsibilities. There are also some related materials about qualifications of poll workers, a sample poll worker training certificate, as well as instructions and training tips directed to superintendents. (State-Defendants 00009060-9070). No State Election Board rules or Office of the Secretary of State directives require this manual be used in poll worker training although the Secretary of State encourages its use in poll worker training.

Although the manual contains helpful information, it is far from comprehensive and contains large chunks of statutory language that are difficult to understand. It also takes an inappropriately passive approach to issuing provisional ballots, which appears from my review of complaints in the 2018 general election to be a significant source of inconsistent practices. (State-Defendants 00018885 – 00036315).

The chief state election official must develop and mandate a robust training program for the election personnel that are the primary contact with voters when casting their ballots. This is

necessary to ensure uniform practices throughout Georgia and that poll workers are adequately trained in "the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith . . . ." as required by law. [xxxiv]

It is my understanding that the Office of the Secretary of State is focused on developing and implementing a training program for election officials including poll workers for the new electronic voting system which has been piloted in a handful of counties and will be deployed statewide for the March 2020 presidential primary. It is also my understanding that a new poll worker manual has been prepared, but that manual has not yet been produced in this case.

My opinion is based on *The Poll Worker Manual*, 2018 Edition. To the extent the new poll worker manual contains the same deficiencies I identify in this report, my opinion also addresses the new manual.

My comments on *The Poll Worker Manual*, 2018 Edition, are intended to illustrate key elements that must be incorporated in order to have more robust training for poll workers that provides confidence poll workers will help, not hinder, voter participation and are mindful of the integrity and importance of the vote of each citizen. I do not believe a single manual can effectively serve as the end all of a robust training program. It is important to have a wide range of resources that are part of the training and accessible to election officials and poll workers during voting.

It is logical to organize an Election Day training program chronologically from setting up and opening the polling place; checking in voters; confirming voter identity; issuing ballots; handling absentee, challenged and provisional ballots; to wrapping up, closing the polling place and transporting ballots, results and closing documentation. However, this information has to be presented in a user-friendly manner that makes it easier for the poll workers to understand what is expected and required.

The manual opens with two pages of statutory language about poll worker qualifications, conduct and training. In fact, 23 of the 104 pages consist of statutory language. (Pages 1, 2, 5, 6, 24, 25, 29, 45-47, 51-59 and 69-71) It is essential for poll workers to have access to the law because a plain language description of legal requirements may not be comprehensive. However, if a poll worker is reading the manual to gain an understating of what is required, a recitation of statutory language will not effectively convey that information. A narrative description of each step will be easier to digest.

However, narrative information needs to be accented and augmented with visual information to illustrate key components such as signage and acceptable voter identification. Flow charts, checklists and step-by-step procedures are also important elements for conveying critical information. These tools will also facilitate comprehension of the required information.

The 104 page manual contains 17 pages of forms, 19 pages of flow charts, 11 pages of step-by-step instructions and 10 pages dedicated to troubleshooting particular issues such as problems setting up voting equipment. These are helpful tools that can convey critical information, but as presented they lack context.

18

One contextual element that is missing is a focus on the voter as the central actor in Election Day scenarios. It is important for the poll workers to be presented with the voter's perspective. This provides the "why" we are doing this that is essential to getting poll worker buy-in to the required procedures.

There are 26 pages in the manual devoted to provisional and challenged ballots. Twelve pages consist of language from the applicable statute or State Election Board rule. There is no voter-centric context to provide a perspective why these procedures are important. Interestingly, the manual seems to suggest that issuing a provisional ballot is an optional procedure. On page 20 in the flowchart, the language is if a voter "would like to be issued a provisional ballot" because for some reason they cannot vote at the polling place. On page 30, the voter "may vote a provisional ballot" if they do not have acceptable identification. On page 42, the voter "may be offered a provisional ballot" if the voter's name cannot be located on the voter list.

Provisional voting is a complex procedure with many different scenarios. The instructions in the manual are overly simplified, do not provide the full context for provisional ballots or a reference to where complete information can be found. Given the importance of provisional ballots as a mechanism for protecting voter rights, this part of the manual is woefully deficient.

The manual allocates six pages to voter identification including one page of statutory language. There are four pages of examples of acceptable identification documents. Interestingly, there is only one person of color depicted in the 12 examples of acceptable identification. Given Georgia's history of discrimination, the manual should reflect the diverse composition of the electorate.

This dissection of the primary example of poll working training developed at the state level illustrates what a state-directed poll worker training program has to contain if it is going to provide a comprehensive, user friendly training experience for the front line workers in election administration. A model state-directed training initiative for poll workers must provide participants in the electoral process with confidence that poll workers know their responsibilities, will help, not hinder, voter participation and are mindful of the integrity and importance of the vote of each citizen.

<u>Accountability for Election Official Performance</u>

The most robust, comprehensive training program can be a wasted effort if there is not an effective means of holding election officials accountable for properly performing their duties and helping not hindering voter participation in the electoral process. Georgia has three accountability mechanisms in place. There are statutory training and certification requirements for superintendents and registrars.[xxxv] There appears to be a monitoring program in place where investigators from the Secretary of State's Office are present at some voting locations during elections. The State Election Board has the authority to investigate irregularities and fraud in the administration of elections.[xxxvi]

These are important accountability tools, but they are not effectively utilized by the State Election Board and the Secretary of State.

Election superintendents and voter registrars are required to take a minimum of 12 hours of annual training. This requirement can be met through participation in the annual conference. The State Election Board can fine individual election officials and their government employer for failure to attend the required training. O.C.G.A. § 21-2-100(e).

Election superintendents, voter registrars and absentee ballot clerks are required to complete a certification program offered by the Secretary of State within six months of their appointment. The certification program consists of up 64 hours of online or in-person training and includes an exam. The State Election Board can fine individual election officials and their government employer for failure to complete the certification. *Id.* § 21-2-101(d).

This would be a powerful tool to ensure compliance with the minimum training requirements if it was implemented consistently, in a timely and transparent manner. I have no information on how often election officials fail to complete the certification or training. In his deposition, Chris Harvey suggests that if local election officials do not comply with the law they are subject to sanctions from the State Election Board. He refers to that process as "the stick" to ensure compliance. Deposition of Chris Harvey, 96:21-25 (Aug. 16, 2019). However, the State Election Board meets on ad hoc basis at most a few times a year.

Chris Harvey also suggested that counties regularly pay attention to complaints involving election officials before the State Elections Board. *Id.* at 196:12-25 197:1-11. He believes this has a deterrent effect and county election officials will learn from the transgressions of other county election officials. But he provided no basis for this belief and I saw no documents demonstrating that counties pay attention to complaints before the State Election Board. The counties are not informed when State Election Board minutes and transcripts are posted online. The lack of a regular schedule provides no predictability to when minutes and transcripts may be posted. In addition, there appears to be a long lag time between the date of a meeting and when minutes and transcripts are posted online. The training materials do not emphasize the consequences election officials face if they do not comply with state and federal election administration requirements.

My review of complaints considered by the State Election Board shows a large number are disposed of without any action. It also takes two to three years before a complaint is presented to the State Election Board. In cases involving local election officials failing to comply with the law where a sanction is imposed, a letter of instruction seems to be the most common penalty. If there is a more egregious case it seems that the election official has already left government service.

The Georgia State Election Board and Secretary of State need to better track and analyze in a comprehensive, transparent manner recurring voter issues that impact individuals' voting rights. There is no comprehensive, transparent monitoring system for tracking the receipt and disposition of election complaints. Most complaints appear to come to the Secretary of State

through emails or telephone contacts. Complaints filed through the Secretary of State's website generate an email for review by the Election Director or Deputy Election Director.

Chris Harvey testified in his depositions that there is no logging system for complaints. Deposition of Chris Harvey, 116:18-117:12__(Aug. 16, 2019), 267:21-268:4 (Dec. 5, 2019). There is no categorization, analysis or quantification of the complaints. Deposition of Chris Harvey, 134:14-19 (Aug. 16, 2019), 268:5-16 (Dec. 5,2019). There is no tracking of the disposition of complaints. *Id.* at 116:18-120:14, 129:7-19 (Dec. 5, 2019). There are also no written procedures for Secretary of State staff on how to handle complaints including criteria for assessing the seriousness of complaints. (Deposition of Chris Harvey, 129:7-19 (Aug. 16, 2019), 263:10-267:20__ (Dec. 5, 2019).

There are commercial software applications designed for customer service centers that could be modified to facilitate tracking complaints. If complaints are properly logged with relevant information such as the nature of the complaint and where and when it happened, the State Election Board and Secretary of State would have an effective tool for monitoring election official compliance and assessing local election official performance.

There seems to be very little information about the Election Day monitoring activities of investigators with the Office of the Secretary of State. According to Chris Harvey in his December 5, 2019 deposition, there are about 40-45 investigators from the Secretary of State's Office in the field on Election Day. If a violation is observed, it is written up as a complaint and goes through the investigation process. (Deposition of Chris Harvey, 31:12-32:11 (Dec. 5, 2019). This can lead to consideration of the matter by the State Election Board. However, given the limitations of review by the State Election Board, this accountability mechanism is not timely or readily transparent to local election officials or the public.

Election Day and advance voting monitoring is also not a comprehensive accountability mechanism. Georgia has a large number of polling places and advance voting locations. The on-site investigators cannot cover a significant number at any given election. If Georgia law permitted nonpartisan observers, the number of eyes on the voting process could be increased significantly.

In Wisconsin, the state election agency regularly reviews reports from election observers, voter advocacy groups and disability rights groups following major election events. This provides a public forum for raising the voting issues and an effective assessment tool for monitoring election official performance.

One additional tool to ensure compliance would be to require the implementation of an Election Day observation and post election audit of polling places throughout the state. Observers or monitors under the direction of the State Election Board would be present at selected polling places and prepare a report on what they saw and heard. In addition, following the election the paperwork completed by the poll workers should be reviewed to ensure it was properly completed.

While election superintendents should be doing the post election audit as a matter of practice, having a state representative observing Election Day activities and reviewing post-election paperwork provides a more objective evaluation. This activity can also be contracted out to an independent organization specializing in performance audits.

Transparency

Transparency is an essential element of a robust training program. Transparency provides individuals and organizations with a stake in the electoral process with a window into how it operates. It is important that there be more transparency for all aspects of Georgia's election official and poll worker training program. Currently that is not the case. Members of the public and the media must have access to training manuals and videos so they can assess the efficacy of the materials.

**Conclusion**

I was asked to opine on the basic policies, procedures, and practices that the Georgia Secretary of State and the State Election Board must have in place in order to train county election superintendents, registrars and poll workers to carry out their duties and in order to ensure that elections comply with state and federal election laws and the United States Constitution and whether those policies, practices, and procedures are in place in Georgia.

I started with a description of a robust top to bottom training program under the direction and responsibility of the chief state election officer that must be in place to ensure that elections comply with state and federal election laws and the United States constitution. My analysis examined the state and federal statutory requirements applicable to the State Election Board and Secretary of State.

My conclusions are that there is a large portfolio of election official training materials in place in Georgia. Their strength is the detailed training in support of the technological tools used in elections particularly the statewide voter registration system. But there is much more to administering an election than mastering technology. There has to be a focus on the people involved in elections – primarily the voters and the poll workers.

What is missing and crucial to ensuring Georgia elections comply with state and federal election laws and the United States Constitution is a robust training initiative for poll workers under the direction of the Secretary of State. There are several essential elements that need to be integrated into a state directed poll worker training program. These essential elements should also be incorporated into the current training program for county election officials.

The first element is a voter focused component to training on duties and responsibilities related to voter registration, absentee voting, issuing provisional ballots and the voting experience at advance voting locations and polling places. There needs to be an increased commitment to accountability of poll workers and county election officials. Developing a tracking mechanism for election complaints will enable the State Election Board and Secretary of State to identify

performance issues, track complaint dispositions, tailor training content and target the delivery of training to election officials who need it the most.

Finally, it is important that there is more transparency for all aspects of Georgia's election official and poll worker training. Members of the public and the media should have access to training manuals and videos so they can assess the efficacy of the materials. They should also have access to the tracking mechanism for complaints.

I believe these training, tracking, accountability and transparency enhancements will ensure that Georgia election officials and poll workers are better positioned to carry out their election administration duties in a manner that helps, not hinders, voter participation, emphasizes the integrity and importance of the vote of each citizen and complies with state and federal law.

---

[i] 2007 Wisconsin Act 1.
[ii] Effective June 30, 2016, the Government Accountability Board, an independent executive branch agency, was replaced by two separate legislatively controlled bipartisan commissions, the Wisconsin Elections Commission and the Wisconsin Ethics Commission. 2015 Wisconsin Act 118.
[iii] https://electioninnovation.org/.
[iv] https://www.usvotefoundation.org/.
[v] https://electionlab.mit.edu/.
[vi] https://www.nap.edu/catalog/25120/securing-the-vote-protecting-american-democracy.
[vii] Wis. Stat § 5.05(7).
[viii] Chapter 334, (Wisconsin) Laws of 1973.
[ix] Wis. Stat § 5.05(7).
[x] Wis. Stat § 7.15.
[xi] Wis. Stat § 7.10.
[xii] Wis. Stat § 7.08(3).
[xiii] Wis. Stat § 7.31 as created by 2001 Wisconsin Act 16, § .
[xiv] Chapter EL 11, Wis. Admin. Code.
[xv] 2005 Wisconsin Act 451, § 122, creating Wis. Stat § 7.315.
[xvi] Chapter EL 12, Wis. Admin. Code.
[xvii] https://www.electioncenter.org/certified-elections-registration-administrator.html.
[xviii] https://www.electioncenter.org/about-us.html.
[xix] The National Academies Press, National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy.*: doi: https://doi.org/10.17226/25120, Pp 107-109 (2018).
[xx] 42 U.S.C. §§ 15301-15545 (2013).
[xxi] Georgia was entitled to receive $8.6 million in HAVA § 101 payments.  69 Fed. Reg. 14002, 14260, 14247-63 (Mar. 24, 2004).
[xxii] 52 U.S.C. §§ 10301-10702.
[xxiii] 52 U.S.C. §§ 20501-20511.
[xxiv] 52 U.S.C. §§ 20301-20311.
[xxv] 52 U.S.C. §§ 20101-20107.
[xxvi] https://public.tableau.com/profile/u.s.election.assistance.commission#!/vizhome/EAVS2016DataViz-FinalVersion_1/EACDataVizTool.
[xxvii] O.C.G.A. § 21-2-92.
[xxviii] https://sos.ga.gov/index.php/elections/state_election_board.
[xxix] These inferences are supported by the chronological organization of the materials, references within the materials to outside events such as specific elections, court cases, legislative updates or the implementation of election-related technology including a new voter registration system, a new e-learning platform and most recently election security initiatives.
[xxx] https://www.electioncenter.org/certified-elections-registration-administrator.html.

xxxi Email from Tim Mattice, Election Center Executive Director (Nov. 3, 2019).

xxxii https://thefactfile.org/us-states-counties/.

xxxiii The December 6, 2019 deposition of Kevin Rayburn was presented to me in rough draft form so I am unable to include specific cites to the material discussed in this report.

xxxiv O.C.G.A. § 21-2-99(a).

xxxv O.C.G.A. §§ 21-2-100, 21-2-101.

xxxvi O.C.G.A § 21-2-31(5).

**List of Cases – Kevin J. Kennedy, Expert Witness – 2016-2019**

*Louis M. Bouvier, Jr. v. William Clark Porter, IV*, No. 17 CVS 3273 (N.C. Super. Ct., Guilford Cty.) – Deposition, Trial Not Scheduled

*One Wisconsin Institute, Inc. v. Mark L. Thomsen*, No. 3:15-cv-00324-jdp (W.D. Wis.) – Trial Testimony, Deposition

**List of Publications - - Kevin J. Kennedy – 2010-2019**

National Academies of Sciences, Engineering, and Medicine 2018. *Securing the Vote: Protecting American Democracy*. Washington, DC: The National Academies Press*
https://doi.org/10.17226/25120

Hands on or Hands Off? – Watchdog Agencies and Their Independence, *The Guardian*, Volume 38, Issue 1; Spring 2017**

*This publication was crafted and edited individual members of *the Committee on the Future of Voting:Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine working with a Committee reporter.

***The Guardian* is a publication of the Council on Governmental Ethics Laws (COGEL)

My expert report is attached.

Kevin J. Kennedy
December 16, 2019

# Kevin J. Kennedy

## Educational Background

University of Wisconsin-Madison, Law School, J.D. December 1976

University of Wisconsin-Madison, College of Letters and Science, B.A., Honors Candidate in Mathematics and Communication Arts, May 1974

## Professional Qualifications

Admitted to State Bar of Wisconsin, December 27, 1976
Admitted to practice in the Eastern and Western Districts, Wisconsin Federal District Court
Admitted to practice in the Seventh Circuit, United States Court of Appeals

## Work Experience

**Kennedy Election Law Services**
**July 2016 to present**

Provide consulting services including advice, expert testimony, lectures and speeches in the areas of election administration, campaign finance and governmental ethics.

**Director and General Counsel, Wisconsin Government Accountability Board**
**November 2007 to June 2016**

Serve as chief administrative and legal officer for state agency responsible for administering, interpreting and enforcing the campaign finance, election, ethics, lobbying and public campaign funding laws of the State of Wisconsin.  Serve as Chief Election Officer for the State of Wisconsin.

**Executive Director, Wisconsin State Elections Board, August 1983 to January 2008**

Provide agency leadership on behalf of the Board.  Responsible for all administrative duties including implementing Board policy, preparation of formal opinions, budget development, legislative activity including administrative rules, staff supervision and development.  Carry out delegated decision making authority with respect to litigation and review of decisions of local election officials.

Serve as Chief Election Officer for the State of Wisconsin.  Responsible for directing the implementation of federal mandates under Help America Vote Act of 2002 (HAVA).  Initiated

1

efforts that ensured full accessibility of state polling places including the use of HAVA compliant voting systems. Developed comprehensive voting system testing and security procedures to assure the transparency and integrity of the election process.

**Acting Executive Secretary, Wisconsin State Elections Board, December 1982 to July 1983**

**Legal Counsel, Wisconsin State Elections Board, April 1979 to July 1983**

**Associate, Cyrak Law Offices S.C., Madison and Waterloo, Wisconsin**

**Assistant District Attorney, Washington County, Wisconsin**

**Law Student Intern, District Attorney's Office, Sauk County, Wisconsin**

**Law Student Intern, Legal Assistance to Institutionalized Persons Program, University of Wisconsin-Madison, Law School**

**Professional Organizations**

**Massachusetts Institute of Technology Election Data Science Lab Board, 2017 to present**

**Center for Election Innovation & Research Board, 2017 to present**

**U.S. Vote Foundation Board, 2017 to present**

**The Madison Institute Board, 2017 to present**

**State Bar of Wisconsin, 1976 to present**

**Dane County Bar Association, 1977 to present**

**Member, Council on Governmental Ethics Laws (COGEL), 1986 to present**

**Member, Past President, National Association of State Election Directors (NASED), 1990 to present**

**National Academies of Sciences Engineering and Medicine**

Member, Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology February 2017 to September 2018

Produced Consensus Study Report - ***Securing the Vote: Protecting American Democracy***, September 2018

**American Law Institute (ALI)**

Serve as Adviser on ALI's Principles of Election Law: Dispute Resolution Project.  February 2011 to June, 2016

**Pew Center on the States**

Voter Registration Modernization Working Group – July 2009-August 2014

Election Performance Index Working Group – July 2010- October 2013

**Council of State Governments (CSG)**

Member, Policy Advisory Board, Overseas Voting Initiative. February 2014 to June 2016

**United States Election Assistance Commission**

Wisconsin State Representative – Standards Board, 2004 – 2008.

**Election Center, 1988 to 2017**

Co-Chair of the National Task Force on Election Reform responsible for the preparation of two comprehensive reports on election reform in 2001 and 2005.  Member, Professional Education Program Committee.  Certified Elections and Registration Administrator (CERA) - Completed professional certification program (2003) and recertification program (2006, 2009, 2012, 2015, 2018) Member, Election Hall of Fame

**Federal Election Commission (FEC)**

Member of the National Advisory Panel of State and Local Election Officials.  Served on an advisory panel for the FEC Ballot Access publications.

**Contact Information**

**41 Rough Lee Court**
**Madison, WI 53705-1083**

**kennedyjkevin@yahoo.com**

**608-843-8683**

# Appendix A

Description of facts, data and materials examined and considered in preparation of report.

**Statutes, Rules and Regulations**

Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20601-21145

The Voting Rights Act of 1965 (VRA), 52 U.S.C. §§ 10301-10702

National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §§ 20501-20511

Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301-20311

Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. §§ 20101-20107

69 Fed. Reg. 14002 (Mar. 24, 2004)

Official Code of Georgia Annotated, Title 21 Elections

Georgia Administrative Code, Title 183 State Election Board,

Wisconsin Statutes; Chapter 5, Chapter 7

Wisconsin Administrative Code; Chapter EL 11, Chapter 12

Wisconsin Session Laws; 1973 (Chapter 334), 2005 (Act 451), 2007. (Act 1), 2015 (Act 118)


**Pleadings and Depositions**

Plaintiffs' Amended Complaint

Deposition of Chris Harvey, August 16, 2019

Deposition of David Worley, October 10, 2019

Deposition of Rebecca Sullivan October 15, 2019

Deposition of Seth Harp, October 16, 2019

Second Deposition of Chris Harvey, December 5, 2019

Rough Draft of Deposition of Kevin Rayburn, December 6, 2019

Report of Dr. Khalilah L. Brown-Dean, August 16, 2019

Report of Dr. Adrienne Jones, August 16, 2019

**Materials Produced in Discovery**

I reviewed hundreds of documents produced by the State-Defendants. Some of the specific documents I relied on for this report include:

GEOA/VRAG Annual Conference PowerPoint, STATE-DEFENDANTS 00002381-00007500

GEOC Certification Program, STATE-DEFENDANTS 00007768-00008243

*The Poll Worker Manual*, 2018 Edition, STATE-DEFENDANTS 00008952-00009059

Miscellaneous Materials from Secretary of State Related to Poll Worker Training, STATE-DEFENDANTS 00009060-00009070

Miscellaneous 2019 Training Materials, STATE-DEFENDANTS 00008732-00008837

Email Complaints from November 2018 General Election, STATE-DEFENDANTS 00018885-00036315

**Georgia Federal Court Decisions**

*Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018)

*Common Cause of Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018)

*Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324  (N.D. Ga. 2018)

**Websites**

https://sos.ga.gov/
https://ga.gov
https://elections.wi.gov
https://eac.gov
https://electioninnovation.org/
https://www.usvotefoundation.org/
https://electionlab.mit.edu/
https://national academies.org
https://www.nap.edu/
https://www.electioncenter.org

https://thefactfile.org/us-states-counties/

<u>Other Materials</u>

*Securing the Vote:  Protecting American Democracy*, Report of *Committee on the Future of Voting:Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine

Interview with Matt Masterson, Former Commissioner, U.S. Election Assistance Commission, November 6, 2019

Interview with Merle King, Former Director Kennesaw State university, Center for Elections Systems, November 12, 2019

Interview with Tammy Patrick, Former Federal Coordinator, Maricopa County, Arizona County Clerk, November 13, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 16th day of  December 2019, I electronically

filed the foregoing **EXPERT REPORT OF KEVIN J. KENNEDY** with the

Clerk of Court using the CM/ECF system, which will automatically send

notification of such filing to Counsel of Record:

Chris Carr, Esq.
Attorney General
Dennis Dunn, Esq.
Deputy Attorney General
Russell Willard, Esq.
Senior Assistant Attorneys General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Telephone: (404) 656-3300
Fax: (404) 657-8733
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Joshua Barrett Belinfante, Esq.
Brian Edward Lake, Esq.
Carey Allen Miller, Esq.
Vincent Robert Russo, Jr., Esq.
Kimberly Anderson, Esq.
**Robbins Ross Alloy Belinfante Littlefield, LLC -Atl**
500 Fourteenth Street, NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com
vrusso@robbinsfirm.com
kanderson@robbinsfirm.com

Bryan P. Tyson, Esq.
Special Assistant Attorneys General
Bryan Jacoutot, Esq.
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Fax: (404) 856-3250
btyson@taylorenglish.com
bjacoutot@taylorenglish.com

                                        */s/Leslie J. Bryan*
                                        Leslie J. Bryan
                                        Georgia Bar No. 091175