## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*

    *Plaintiffs,*

    v.

BRAD RAFFENSPERGER, *et al,*

    *Defendants.*

CIVIL ACTION

FILE NO. 1:18-cv-05391-SCJ

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[1]

## INTRODUCTION

This Court denied Plaintiffs' request for a temporary restraining order because Plaintiffs could not show imminent harm. [Doc. 164]. They still cannot. In addition, and as this Court recognized, Plaintiffs have known about the scheduled regular list-maintenance program for months, and given the 90-day window for conducting list maintenance under federal law, they could easily calculate the deadline by which the State needed to act. Yet, they

---

[1] Defendants are Secretary of State Brad Raffensperger and SEB Members Rebecca Sullivan, David Worley, Seth Harp, and Anh Le. This response is being filed by 5:00pm on December 17, 2019 per the Court's Order [Doc. 164].

inexplicably did not ask this Court for relief until the day it was scheduled to take place.

Beyond these fatal flaws, Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Motion") suffers from critical substantive errors as well: (1) it seeks to address state-law claims in federal court; (2) Plaintiffs misunderstand Georgia and federal law regarding voter-list-maintenance efforts; and (3) Plaintiffs have provided no evidence that would "clearly establish" a likelihood of success on the merits. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

## FACTUAL BACKGROUND

Georgia has engaged in list maintenance required by the National Voter Registration Act ("NVRA") since the NVRA became effective. This year, the process began on September 24, 2019 when Chris Harvey, Director of Elections for the Secretary of State, and Ryan Germany, General Counsel for the Secretary of State, both authorized the start of the no-contact voter-list maintenance process in the voter-registration system.[2] Declaration of Chris

---

[2] As articulated at the hearing on the temporary restraining order, stopping the automatic maintenance process is far more difficult than reversing it. Moving voters from cancelled status back to active status is a process that can be completed overnight by providing a list of voter registration numbers to the vendor, which then updates the database. Harvey Dec. at ¶ 4. The Secretary of State's office is isolating the voter-registration numbers of all

Harvey ("Harvey Dec."), attached as Ex. A, at ¶ 3. On October 28, 2019, the Secretary of State's office announced that the "routine and legally required updates to Georgia's voter file" would take place in accordance with Georgia law. *Georgia Secretary of State's Office Cleans Voter File by 4 Percent as Required by Law*,

https://sos.ga.gov/index.php/elections/georgia_secretary_of_states_office_cleans_voter_file_by_4_as_required_by_law (October 28, 2019). Two days later, the Secretary's office released the entire database of voters (the "Database"), so that individuals and organizations, like Plaintiff Fair Fight Action ("Fair Fight") could check the list and encourage individuals to take action to maintain their eligibility. *Id*.

## I.   Plaintiffs' actions in response to the release of the list.

Plaintiffs' prior knowledge of the Secretary's plans should not be in dispute.  Plaintiffs' Amended Complaint challenges former state statutes directly and, indirectly, the NVRA itself. [Doc. 41 at ¶¶ 69-81]. Despite Plaintiffs' facial challenge, rhetoric, and political and fundraising appeals, by September, Fair Fight's Chief Executive Officer could not state that the State's list-maintenance effort was wholly invalid:

---

individuals who were moved to cancelled status who were in Inactive status for reason of No Contact and their respective last contact dates. *Id*. at ¶ 6.

Q. Is it your personal opinion that all of those voters that were purged should not have been, or were there some that were within that group that were, in fact, ineligible to vote?

A. I don't know the answer to that.

Excerpts from Deposition of Lauren Groh-Wargo ("Groh-Wargo Dep."), attached as Ex. B, at 148:16-20.

The following month, two days after the Secretary announced the voter-list-maintenance effort, Fair Fight's 30(b)(6) witness testified that the organization was aware of the pending effort. Deposition of Fair Fight Action ("FFA Dep."), attached as Ex. C, at 174:16-176:8. Indeed, at least Fair Fight used the pending list maintenance in fundraising solicitations. Tweet from @fairfightaction on October 31, 2019, attached as Ex. D. Plaintiffs also created a "tool" allowing what they claimed was easier navigation of the list of voters released by the Secretary of State. Tweet from @fairfightaction on November 25, 2019, attached as Ex. E.

Plaintiffs continued to use the list-maintenance process as a political tool throughout the month of November, recruiting four Democratic presidential candidates to participate in a November phone bank to attempt to reach voters on the cancellation list. Stephen Fowler, *Presidential Candidates Send Calls, Texts To Potential Purged Georgia Voters*, GPB News,

https://www.gpbnews.org/post/presidential-candidates-send-calls-texts-potential-purged-georgia-voters (November 21, 2019).[3]

Plaintiffs' fundraising purpose and political rhetoric reached a crescendo just before the filing of Plaintiffs' Motion. On December 15, 2019, Fair Fight Inc. (Plaintiff Fair Fight Action's affiliated political action committee) sent an email from Stacey Abrams asking individuals to help it meet its $2 million fundraising goal by comparing current Georgia policymakers to the arrest of Ms. Abrams' father in Mississippi when he sought to help people register to vote many decades ago. Abrams fundraising email, attached as Ex. F.

Plaintiffs' Motion was filed the next day and uses variations of the word "purge" 70 times. [Doc. 159-1]. The total time between the filing of [Doc. 159] and Fair Fight Action's first tweet about the TRO was nine minutes.[4] *See* Tweet from @fairfightaction on December 16, 2019, attached as Ex. H.

---

[3] Those candidates found people who were correctly on the cancellation list because they had moved out of state: "'I got someone who moved to Kentucky,' Klobuchar exclaimed." *Id.*

[4] If more evidence is required of the political nature of this motion, as the hearing was starting yesterday, the Campaign Legal Center also sent out a fundraising appeal based on this case, with Mr. Smith asking for donations: "120,561 voters might be purged from Georgia's voter rolls tonight. That's why I'm in Georgia right now, as Fair Fight Action's counsel, standing up for the voting rights of 120,561 voters who might be purged from the voter rolls solely based on voter inactivity." Email from CLC on December 16, 2019,

The clearest evidence of Plaintiffs' decision to use the voter-list-maintenance effort for extra-litigation purposes is Plaintiffs' concession in the hearing on the temporary restraining order: Plaintiffs' counsel acknowledged knowledge of the NVRA's deadlines and that the deadline for cancelling voters before the 2020 elections is Christmas Eve, December 24, 2019. O.C.G.A. § 21-2-234(i) (prohibiting list maintenance within 90 days of a presidential preference primary); 52 U.S.C. § 20507(c)(2)(A). The bottom line is that Plaintiffs have known of the Secretary's efforts for months and only after weeks of fundraising solicitations and inflammatory accusations against Georgia's elected officials did they seek any judicial relief.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs correctly state the legal standard for obtaining a temporary restraining order. [Doc. 159, p. 11]. But Plaintiffs cannot show that they can carry the heavy burden on any of the four prongs.

Because "a preliminary injunction is 'an extraordinary remedy [it] is never awarded as of right.'" *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943–44 (2018) (citation omitted). To obtain relief, Plaintiffs must "*clearly*

---

attached as Ex. G. Plaintiffs are utilizing this Court and their motions to fundraise for their organizations, which they clearly have a First Amendment right to do. But this Court should consider these efforts in the context of the lack of reasonable diligence in bringing these claims to this Court.

*establish* the 'burden of persuasion' as to the four requisites of a preliminary injunction." *Robertson*, 147 F.3d at 1306 (emphasis added) (citation omitted). These elements are (1) a substantial likelihood of success on the merits; (2) irreparable injury without the injunctive relief; (3) the threatened injury outweighs the "damaged the proposed injunction may cause the opposing party;" and (4) the injunction would not be adverse to the public interest." *De La Fuente v. Kemp*, 679 Fed. Appx. 932, 934 (11th Cir. 2017). Indeed, the extraordinary nature of the relief sought by Plaintiffs is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006).

## I.     Plaintiffs Are Not Likely To Succeed On The Merits.

Plaintiffs advance the radical notion that there is "no justification" for deregistering voters. [Doc. 159-1, p. 17]. This is directly contrary to the NVRA and binding precedent from the United States Supreme Court and Eleventh Circuit that apply the statute. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018); *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019). Indeed, the Supreme Court expressly recognized that a key purpose of the NVRA is to remove "ineligible persons from the States' voter registration rolls." *Husted*, 138 S. Ct. at 1838. To get around this precedent, Plaintiffs

manufacture a conflict with Georgia law that a state court should decide in the first instance. For this reason, Plaintiffs' legal theory is barred by the Eleventh Amendment, and Plaintiffs have provided no evidentiary basis to allow this Court to conclude that anyone is actually harmed by the Secretary's actions.

A.   *The Supreme Court and Eleventh Circuit have already found the process used in Georgia complies with the NVRA.*

Whatever policy concerns Plaintiffs have about voter roll maintenance efforts, they are required, in some fashion, by the federal government. 52 U.S.C. § 20507(a)(4). The method chosen by Georgia—both prior to and after the enactment of H.B. 316—are contemplated by the NVRA[5] and have been upheld by the Supreme Court in *Husted*. 138 S. Ct. at 1842 ("as permitted by the [NVRA], Ohio removes registrants only if they have failed to vote *and* have failed to respond to a notice" (emphasis in original)). The Eleventh Circuit recently recognized that the NVRA "encourages" states to "conduct[] a general program of list maintenance that makes a reasonable effort to

---

[5] A state is specifically authorized to remove the name of a registrant if that registrant has "failed to respond" to a notice that is "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address," with several included notices. 52 U.S.C. § 20507(d)(2).

remove voters who become ineligible because of a change of address." *Snipes*, 935 F.3d at 1203.

Plaintiffs' Motion does not argue that the Secretary's voter-list-maintenance efforts violate the NVRA. Instead, their claim is based exclusively on a purported violation of state law that, in turn, violates individuals' federal constitutional rights. *See* [Doc. 159-1 at 22-23]. Plaintiffs may even be arguing that the State's change in the law in H.B. 316 removed every state interest from the *Anderson/Burdick* balancing test, essentially making the state's prior laws *per se* invalid. But Plaintiffs cite to no case that treats a state's voting laws this way. Indeed, Plaintiffs cite to *Billups*, which upheld the requirement to obtain a photo identification card, which is arguably more burdensome than registering to vote in person or online or returning a notice with postage prepaid. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) ("The [Plaintiffs] argue that the burden is 'severe' and affects 'between 5 and 10 percent of all registered voters,' largely minorities, but the record tells a different story . . . The [Plaintiffs] are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute"). As shown, there is no violation of H.B. 316, and as discussed below, Plaintiffs' argument violates the Eleventh Amendment.

B.      *The Secretary's office fully complied with state law.*

Plaintiffs apparently still do not understand the process for list maintenance in Georgia. But reading the relevant statutes in context makes the process clear. *See Deal v. Coleman*, 294 Ga. 170, 172-73 (2013).

Before a voter is placed into cancelled status, Georgia law has two different clocks that *both* must run prior to a voter being placed in cancelled status (and a voter can always move back to active status prior to cancellation):[6]

- *From the Active to the Inactive List:* if (1) a voter has had no contact with the election superintendent in the preceding five calendar years; (2) a confirmation notice is mailed to the voter and, (3) if the voter does not return it, then the voter is moved into "inactive" status. O.C.G.A. § 21-2-234(a)(1), (2); (g). Voters in the inactive status can vote a regular ballot, just like voters in active status.

- *From Inactive to Active*: if at any point in the process, the voter has contact with election officials in which he or she confirms or updates his or her address, or updates his or her voter record through the

---

[6] As discussed below, no voter is ever "removed" from the voter rolls which is why the term "purge" is not appropriate in this context. Instead, the voter's status is changed to "cancelled," which means the voter is not eligible to vote. Harvey Dec. at ¶ 5.

Department of Driver Services, the voter is restored to active status. O.C.G.A. § 21-2-235(a), (d).

- *From the Inactive List to Cancelled Status*: if voters on the inactive list (1) have no further contact with election officials for two November general elections; (2) then another notice is mailed to the voter; and (3) if the voter fails to respond, then that voter's status is cancelled. O.C.G.A. § 21-2-235(a) and (b).

Plaintiffs' motion confuses the two separate clocks for moving into inactive status and moving into cancelled status. Even with the amendments made by H.B. 316, there were already individuals on the inactive list who had been placed in inactive status under the prior statute, which was a three-year period of no contact.[7] *See* O.C.G.A. § 21-2-234(a)(1) (2018). The Secretary only performed list maintenance for voters who were *already* on the inactive list under the prior statute and also triggered the *second* clock—no further contact for two November general elections under O.C.G.A. § 21-2-235(a) and (b). Put another way, when the General Assembly passed H.B. 316, it did not

---

[7] Notably, the only amendment in H.B. 316 to O.C.G.A. § 21-2-235 was to add the following at the end of the existing subsection (b): "Not less than 30 nor more than 60 days prior to the date on which the elector is to be removed from the inactive list of electors, the board of registrars shall mail a notice to the address on the elector's registration record." H.B. 316 did not amend the existing process for cancelling a voter in inactive status in O.C.G.A. § 21-2-235.

place all voters back in "active" status to restart both no-contact clocks. The Secretary's office is carrying out the exact direction of the Georgia General Assembly: (1) moving people from active status to inactive status according to the statute in effect at the time of the triggering event and (2) moving people from inactive status to cancelled status according to the statute in effect at the time of that triggering event.

The Secretary's office is fully complying with Georgia law. Plaintiffs cannot show otherwise because of their apparent inability to understand the applicable statutes.

C.    *Plaintiffs' evidence does not clearly establish a likelihood of success on the merits.*

Of the likely tens of thousands of calls Plaintiffs made during their efforts to contact voters on the Database, they identified only *eight* individuals who claim to have an issue with the Secretary's voter-list-maintenance efforts. These declarations constitute the *sole* evidentiary basis for Plaintiffs' claims. *But, even under Plaintiffs' flawed interpretation of the law, none are entitled to the relief Plaintiffs seek*.[8]

_____

[8] The factual posture of this motion is identical to the challenge to the state's photo identification laws 10 years ago. Despite equally fervent political and rhetorical advocacy, the Eleventh Circuit found that the plaintiffs "failed to prove that any individual would bear a significant burden" because they could not "identify a single individual who would be unable to vote because of

1.    <u>Active-status voters.</u>

Four of the Declarants are active-status voters who have suffered no injury and are in no danger of suffering any injury. Linda Bradshaw was sent confirmation notices in June 2015 and November 2019. Harvey Dec. at ¶ 8. Once she responded to the confirmation notice in December 2019, she was placed back into active status and remains there today. *Id.* Ms. Bradshaw also claims that she last voted in 2017 [Doc. 159-3], but the Secretary of State's audit logs indicate that the last time she voted was in the July 2010 Democratic primary, meaning she would still have been removed under Plaintiffs' nine-year timeline. Harvey Dec. at ¶ 8.

Likewise Keme Hawkins is listed as an active voter with a note confirming the correct address was updated in September 2019. Harvey Dec. at ¶ 9. The notice Dr. Hawkins attached is not a cancellation notice and Dr. Hawkins voted without incident in person in the municipal elections in November 2019. *Id.*; [Doc. 159-12 at ¶ 8].

Tommie Jordan correctly identified the difference in spelling of his first name from the confirmation notice he received and his voter-registration records. [Doc. 159-4 at ¶ 6]. Mr. Jordan (with his first name spelled correctly

the Georgia statute or who would face an undue burden to obtain a free voter identification card." *Billups*, 554 F.3d at 1354.

as Tommie instead of Tommy) is an active voter in the registration database and voted in both the 2016 Democratic Presidential Preference Primary and the 2018 General Election. Harvey Dec. at ¶ 10. Mr. Jordan's correctly spelled records were not moved to cancelled status, which demonstrates that the voter maintenance effort appropriately located a duplicate, misspelled name.

Similarly, Deepak Eidnani is also an active voter in the database, voting in all recent elections. Harvey Dec. at ¶ 11. As Mr. Eidnani correctly deduced, the record to which the confirmation notice was sent was a duplicate record with his name misspelled. [Doc. 159-5, p. 4], Harvey Dec. at ¶ 11.

2.   Failure to respond to correspondence.

One voter is dissatisfied with policy decisions. Clifford Thomas correctly remembers that he has not voted in a long time [Doc. 159-6], because the Secretary of State's records do not indicate that he ever voted, meaning he also would be removed under Plaintiffs' nine-year timeline. Harvey Dec. at ¶ 15. Mr. Thomas received confirmation notices by mail in June 2015 and November 2019 but failed to respond to any of those notices. *Id*. at ¶ 15.

3.    Voters satisfying Plaintiffs' nine-year timeline.

Some voters insist they did not receive confirmation notices, but Secretary of State records show that confirmation notices were sent and the voters failed to respond. David Hopkins last voted in 2008 and received confirmation notices in June 2015 and November 2019 but did not respond. Harvey Dec. at ¶ 12. Charlesetta Young and Kilton Smith have no record of voting and received confirmation notices in June 2015 and November 2019 but did not respond. *Id*. at ¶¶13, 14. These voters would have been removed even under Plaintiffs' nine-year timeline because of their lack of contact for more than nine years.

Thus, out of more than 120,000 voters and extensive efforts, Plaintiffs *have not identified a single voter* who is being removed under the seven-year timeline they allege is improper. Every voter declarant also only had to do what Ms. Bradshaw did—contact the registrar and be placed back in active status. Under these facts, Plaintiffs cannot "clearly establish" a likelihood of success on the merits. *Robertson*, 147 F.3d at 1306.

D.    *Plaintiffs' state-law-based challenge violates the Eleventh Amendment.*

Even if this Court were to accept Plaintiffs' theory, their relief is barred by the Eleventh Amendment. While Plaintiffs' attempt to describe their

- 15 -

claims as being based in federal constitutional law, Plaintiffs seek declaratory and injunctive relief by asking this Court to adjudicate state law for the first time. Put simply, Plaintiffs' requested injunction *requires* this Court to endorse their interpretation of state law. This relief is barred by the Eleventh Amendment and State sovereign immunity, and even if it were not, this Court should decline the invitation to decide a novel issue of state law in this context.

      1.   <u>The Eleventh Amendment precludes Plaintiffs' legal theory.</u>

The Eleventh Amendment generally bars claims against the State Defendants in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). While *Ex Parte Young*, 209 U.S. 123 (1908), provides for an exception to Eleventh Amendment immunity, it does so only for prospective injunctive relief grounded in a violation of federal law. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105–106 (1984). Plaintiffs apparently recognize the troubling nature of their state-law assertion, suggesting in a footnote that their Motion is not rooted in state law. *See* [Doc. 159-1, p. 19 n. 6]. Plaintiffs cite the Eleventh Circuit's holding in *Brown v. Georgia Department of Revenue* for the proposition that their relief is grounded in federal constitutional rights and is therefore permissible. 881

F.2d 1018, 1023–24 (11th Cir. 1989). But this claim ignores the reality of Plaintiffs' Motion—it is a declaratory judgment claim regarding compliance with H.B. 316 masquerading as a constitutional argument.

Plaintiffs' brief begins with some ten pages of (inaccurate) assertions regarding state law and the Secretary's practice of enforcing that law, with only one passing reference to any federal right. *See* [Doc. 159-1, pp. 1–10]; *see also id*. at 3 ("For this reason, [the Secretary's enforcement of state law] will violate the First and Fourteenth Amendments"). And their misplaced interpretation forms the basis of the entirety of their federal claims and their requested relief—Plaintiffs repeat their "nine-year" distinction or otherwise re-assert misapplication of state law some seven times throughout the argument section of their Motion. *Id*. at pp. 17–18, 20–21, 23–24. Further, Plaintiffs' requested relief is explicitly conditioned on their state-law arguments, seeking to enjoin only list maintenance for the 120,561 individuals whose registrations will be canceled "on the basis of *fewer than nine years* of inactivity," not the entirety of the list-maintenance activities and not even the entirety of inactivity cancellations. *Id*. at p. 25 (emphasis added); *see also* [Doc. 159, pp. 1–2].

This review of Plaintiffs' Motion makes clear that they seek a declaration regarding the proper interpretation of H.B. 316. If they were not

doing so, Plaintiffs would instead move to enjoin *all* list-maintenance (or at least list-maintenance for inactivity in its entirety) as unconstitutional—and not only for those individuals whom they argue will be subject to the Secretary's interpretation of O.C.G.A. §§ 21-2-234 and -235 as modified by H.B. 316. The *Brown* court acknowledged this reality in approving of relief premised upon federal constitutional rights. 881 F.2d at 1023–24. Here, unlike in *Brown*, Plaintiffs cannot succeed in suggesting their relief is based in *federal* law when it requires this Court to determine a novel issue of *state* law. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law," and for that reason, *Ex Parte Young* is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst*, 465 U.S. at 106. This Court should accordingly decline Plaintiffs' invitation to adjudicate a state-law claim.

> 2.  <u>The Eleventh Amendment precludes Plaintiffs'</u>
> <u>retrospective relief.</u>

Plaintiffs are also seeking retrospective relief which is beyond the scope of *Ex Parte Young*. *See Green v. Mansour*, 474 U.S. 64, 68 (1985). For clarity, there are three steps of the list-maintenance process which are relevant. First, an elector is identified pursuant to O.C.G.A. § 21-2-234 as likely to

have moved based on inactivity and is sent a confirmation notice. Second, if the elector does not return the postage prepaid and preaddressed card, confirming their continued residence within 30 days, the elector is moved to the inactive list of voters. *Id.* Finally, if such an elector still makes no contact between the point of becoming inactive and the second November general election thereafter, the elector is again mailed a notice and his or her registration is cancelled under O.C.G.A. § 21-2-235.

Plaintiffs' state-law arguments quibble with the interpretation of *only the first step*, arguing that H.B 316's five-year "inactivity" trigger should retroactively apply. Plaintiffs' arguments cannot be that the third piece of the puzzle which the Secretary has now conducted—subsequent continued inactivity for two general election cycles and cancellation—is unconstitutional. If it were, Plaintiffs would be seeking relief for the entirety of the 120,561 electors, not the subset based on "fewer than nine years of inactivity." [Doc. 159-1, p. 25]. In other words, Plaintiffs seek to have this Court declare that the State violated the Constitution when it *previously* determined a voter to be inactive pursuant to Georgia law, and not that the State is *currently* violating federal law with respect to these electors and list maintenance pursuant to O.C.G.A. § 21-2-235. That being the case, there is no ongoing violation of federal law because the statutory changes to O.C.G.A.

§ 21-2-234 have eliminated any alleged ongoing violation of constitutional rights based on the three-year scheme which previously governed inactive status. *See Green*, 474 U.S. at 74. Plaintiffs' proposed relief is focused on the *inactivity* of voters, not their *cancellation*, and thus is retrospective in nature and "insufficient to overcome the dictates of the Eleventh Amendment." *Fla. Ass'n of Rehabilitation Facilities, Inc. v. State of Fla. Dep't of Health and Rehabilitative Svcs.*, 225 F.3d 1208, 1219 (11th Cir. 2000).

> 3.   Plaintiffs' Motion should be heard first by a Georgia state court.

Since Plaintiffs' Motion is predicated upon only one discrete subset of list-maintenance activities that has not been adjudicated by state courts, this Court should refrain from adopting Plaintiffs' arguments on an unsettled issue of state law. While Defendants believe (and have explained above) that no ambiguity in the statute exists, should the Court find Plaintiffs' state-law contentions meritorious, the Court should abstain from deciding this novel issue of state law.

Plaintiffs' Motion, insisting that a certain interpretation of state law results in a constitutional violation, requires this Court to interpret a novel issue of state law for the first time. The Supreme Court has held that "federal courts should abstain from decision when difficult and unsettled questions of

state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236 (1984) (citing *Railroad Comm'n of Tx. v. Pullman*, 312 U.S. 496 (1941). "The *Pullman* doctrine rests on the desirability of avoiding unnecessary decision of constitutional issues." Wright & Miller, *Federal Practice and Procedure* § 4242 Avoidance of Federal Constitutional Questions—When Abstention Required. This is precisely the predicament Plaintiffs' Motion foists upon this Court—unlike Plaintiffs' case writ large, Plaintiffs' constitutional arguments in their Motion are premised *solely* on their interpretation of O.C.G.A. §§ 21-2-234 and -235, as amended by H.B. 316, and resolving that question would resolve Plaintiffs' apparent constitutional claims presented in their Motion.

As Defendants noted in the December 16, 2019 Hearing on Plaintiffs' Temporary Restraining Order, Plaintiffs have an adequate venue and method to proceed in Georgia's state courts—a writ of mandamus or prohibition. See O.C.G.A. § 9-6-20 and -40. Moreover, setting aside the issue of adequate state remedies, the Court can adjudicate Plaintiffs' constitutional claims regarding list maintenance at the trial. Accordingly, the Court should refrain from adjudicating this novel state issue when Plaintiffs' hastened Motion is entirely unnecessary.

**II.    There is no irreparable harm because voters are not deleted from the database.**

As Mr. Harvey explains in his declaration and which the Court covered extensively yesterday, there are no voters deleted from the database. Harvey Dec. at ¶ 5. Instead, a particular record has the status changed from "inactive" to "cancelled." *Id*. As a result, there is no irreparable harm because a record's status can easily be updated to "active" or "inactive" in an overnight database-updating effort by the vendor. *Id*.

**III.    The equities do not favor a preliminary injunction and a preliminary injunction is not in the public interest.**

Plaintiffs devote barely more than a page to the equities and public-interest prongs of their effort to obtain a TRO [Doc. 159-1, pp. 28-29]. But the equities and public interest significantly disfavor granting a TRO that would disrupt Georgia's current statutory process.

First, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S. Ct. at 1944. As detailed above, Plaintiffs have shown no diligence whatsoever in the efforts related to their Motion. In addition, Plaintiffs fail to account for "the public interest in orderly elections." *Benisek*, 138 S. Ct. at 1944. Plaintiffs' request is also far more drastic than it appears. The NVRA provides that "a State *may not remove a registrant's name on change-of-residence grounds unless* either (A)

the registrant confirms in writing that he or she has moved or (B) the registrant fails to return a preaddressed, postage prepaid 'return card' containing statutorily prescribed content." *Husted*, 138 S. Ct. at 1838-39 (emphasis added). If this Court prevents Georgia from removing voters from its voter list through the no-contact process outlined in existing statutes, individuals who moved out of the state and are no longer eligible to vote will remain on the voter list.

Further, list maintenance must be performed no later than 90 days before the presidential preference primary. O.C.G.A. § 21-2-234(i); 52 U.S.C. § 20507(c)(2)(A). Granting Plaintiffs' motion will ensure that no list maintenance will take place until at least 2021 given the lateness of their motion. Once the 2020 election cycle begins, there are elections almost every 90 days and federal law places further restrictions on list maintenance in federal-election years. The state has an interest in the orderly conduct of elections and election integrity, *Purcell*, 549 U.S. at 4-5, and preventing the regular list maintenance for two entire years because of Plaintiffs' last-minute effort has the potential to interfere with the electoral processes in the state over multiple years. Ultimately, the public interest in the orderly conduct of elections would be thwarted by the preliminary injunction

Plaintiffs seek, which would effectively end list-maintenance in Georgia for two additional years.

Plaintiffs did not exercise the diligence required to bring these issues before the Court and fail to account for the massive changes their preliminary injunction would wreak on the electoral system in Georgia. Even if Plaintiffs could show a likelihood of success on the merits (which they cannot, as discussed above), this Court should deny Plaintiffs' request for a preliminary injunction and Plaintiffs have provided no basis for the restoration of limited universe of individuals who failed to respond to multiple attempts to confirm they remain present in the state.

## CONCLUSION

Plaintiffs did not exercise reasonable diligence in bringing this motion. Instead, they used their concerns as a means of raising funds and failed to identify a single person that was harmed by the federally-mandated voter maintenance efforts. This Court should deny Plaintiffs' Motion and allow this case to continue to proceed through the regular litigation process.

Respectfully submitted this 17th day of December, 2019.

STATE LAW DEPARTMENT

Christopher M. Carr
Attorney General
GA Bar No. 112505
Annette M. Cowart
Deputy Attorney General
GA Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

ROBBINS ROSS ALLOY BELINFANTE
LITTLEFIELD LLC

Josh Belinfante
GA Bar No. 047399
Vincent R. Russo
GA Bar No. 242648
Brian E. Lake
GA Bar No. 575966
Carey A. Miller
GA Bar No. 976420
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250
jbelinfante@robbinsfirm.com
vrusso@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com
kanderson@robbinsfirm.com

TAYLOR ENGLISH DUMA LLP

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
GA Bar No. 515411
Bryan F. Jacoutot
GA Bar No. 668272
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678.336.7249
btyson@taylorenglish.com
bjacoutot@taylorenglish.com

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing DEFENDANTS' RESPONSE IN

OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY

RESTRAINING ORDER AND PRELIMINARY INJUNCTION was prepared

double-spaced in 13-point Century Schoolbook pursuant to Local Rule 5.1(C).

/s/ Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411