# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Defendants' response to Plaintiffs' Motion for a Preliminary Injunction is striking in what it does *not* say.  Defendants do not dispute that current Georgia law requires that an individual have "no contact" with election officials for five calendar years and then not vote in two subsequent general elections before he or she can be purged from the voter rolls for inactivity alone.  H.B. 316 created that five-year requirement to mitigate the risk of inappropriate purging of voters who have not voted but also have not moved.  And, Defendants also do not dispute that tens of thousands of individuals were just removed from the rolls solely for inactivity even though they do not meet the current statutory standards because they voted or had contact with the State within the five-year window.

For these reasons, the constitutional balance favors the Plaintiffs.  The State has no interest in a purge that violates state law.  As Elections Director Chris Harvey's own testimony clarifies, the State itself sees no benefit from this kind of purge and is only engaging in it based upon its (incorrect) view of what state law requires.  *See* Harvey Dep. 341:2–342:24; Pls.' Br. 19–20.  On the other side of the ledger, using inactivity as a proxy always risks improper purging of people who have not moved.  Nor is there any doubt that barring people from the opportunity to vote in upcoming elections is a severe burden on the purged individuals' right to vote. These essentially undisputed points of fact and law resolve this dispute.

Defendants' responses are unavailing.  For one, they claim that Plaintiffs waited too long to stop the unconstitutional purge, but that is wrong as both a matter of fact and law and essentially irrelevant now that the challenged purge has been completed and Defendants have had the chance for full briefing.  Next, they argue that because the question of what interest the State has in this purge must be determined referring to state law—as will often be the case when evaluating a federal constitutional claim requires balancing the burden on an individual against the interest of a state—Plaintiffs' motion is barred by the Eleventh Amendment.  But Plaintiffs' claims arise from the First and Fourteenth Amendments, not state law. Finally, Defendants attempt to manufacture a compelling interest in the purge—notwithstanding current state law to the contrary—by misstating the content of state law.  But understanding when Georgia permits an individual to be removed from the voter rolls does not require analyzing "novel" issues of state law. To the contrary, the text of the relevant statutes and applying simple arithmetic answers the question. And when current, governing law is applied, tens of thousands of individuals, including a number of Plaintiffs' declarants, are being unconstitutionally disenfranchised.

## I.    PLAINTIFFS WERE DILIGENT IN BRINGING THIS MOTION AND DEFENDANTS HAVE SUFFERED NO PREJUDICE.

In evaluating whether to grant a preliminary injunction, this Court considers the "reasonable diligence" of a plaintiff in bringing the motion, and any prejudice a defendant may suffer resulting from the plaintiff's timing.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (U.S. 2018); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (holding delay was insufficient grounds to reverse a grant of a preliminary injunction).  Defendants argue Plaintiffs showed "no diligence whatsoever in their efforts related to their [m]otion," Defs.' Br. 22, ECF No. 172, and this lack of diligence is a "fatal flaw[]" in Plaintiffs' motion, *id.* at 2.  Defendants are incorrect.

*First*, Plaintiffs were reasonably diligent in bringing their motion when they did.  As noted in Plaintiffs' opening memorandum, the Secretary of State (SOS) has not conducted purges consistently and in the past has declined to purge voters in the midst of litigation challenging the validity of the SOS's practices.  *See* Pls.' Br. 21 n.7, ECF No. 159-1.  Plaintiffs were not aware of the actual timing of the proposed purge until the deposition of Ryan Germany on December 11, *id.*, nor were they aware until that deposition that Defendants would be basing this purge on a patently incorrect reading of state law that negated any interest the State might have.  Once Plaintiffs learned of the timing of the purge and the specific basis for it on December

11, Plaintiffs filed their motion within five days.  In *Benisek*, upon which Defendants rely in claiming a lack of diligence, the moving party "did not move for a preliminary injunction in the District Court until six years, and three general elections, after the [challenged] map was adopted, and over three years after the plaintiffs' first complaint was filed." *Benisek*, 138 S. Ct. at 1944.  Because of the factual differences between the two cases, *Benisek* distinguishes itself.

*Second*, even were Defendants correct that Plaintiffs were belated in seeking relief—and they are not—Defendants suffered no prejudice.  In *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019), the Eleventh Circuit refused to stay a preliminary injunction based on a laches argument, finding the defendant had "not established that any of the harms it anticipate[d] [we]re anything more than minimal or nonexistent." *Id.* at 1326.  Specifically, "the state's administrative burden was nominal; its interest in preventing fraud was unaffected; and public faith in the election [wa]s better-served by allowing Plaintiffs' suit." *Lee*, 915 F. 3d at 1326.  The same logic applies here.  This Court denied Plaintiffs' requested TRO, and Defendants carried out the purge as scheduled.  Defendants have now had the opportunity for full briefing.  And they have represented that each "record's status can easily be updated to 'active' or 'inactive' in an overnight database-updating effort by the vendor."   Defs.' Br. 22.

Thus if Plaintiffs prevail, Defendants face only a minimal administrative burden in restoring the list.  Finally, although claiming Plaintiffs' motion "will ensure that no list maintenance will take place until at least 2021" given various elections in 2020, Defendants fail to explain how they would have been in any better position had Plaintiffs brought their motion in late October or November as Defendants suggest they should have.  Id. at 23.  The only "prejudice" Defendants may suffer from this motion is that they must comply with existing law.

## II.   THE ELEVENTH AMENDMENT POSES NO BAR TO PLAINTIFFS' MOTION.

Defendants assert Plaintiffs' challenge is "state-law-based," Defs.' Br. 15, because evaluating the State's interest in the purge depends in part on evaluating whether the purge complies with state law, *id.* at 16-17.  On this rationale, Defendants argue the Eleventh Amendment bars Plaintiffs' motion.  But, as courts have recognized, the mere fact a federal court might have cause to examine a state's interest in a particular course of conduct by reference to state law does not transform a federal constitutional claim into one under state law.

Defendants do not dispute that federal courts apply a balancing test to evaluate whether voting restrictions violate Due Process or the First Amendment.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality opinion).  Defendants also do not dispute that, as part of that inquiry, federal courts

must evaluate the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Here, as in many, state law is relevant to determining whether the State's justifications are legitimate. *See Addington v. Texas*, 441 U.S. 418, 426 (1979) (relying on State statute to define the State's interest).

As Plaintiffs noted, *Brown v. Georgia Department of Revenue*, 881 F.2d 1018 (11th Cir. 1989), recognized this very point, and Defendants' attempts at distinguishing *Brown* are unavailing. As *Brown* held, "[u]nder *Pennhurst*, . . . the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law." 881 F. 2d at 1023-24. Here, as in *Brown*, the requested relief would arise under the U.S. Constitution. *See id.* at 1024.[1]

Other courts have readily dispensed with arguments like those Defendants make. Some courts have made their reasoning explicit. *See, e.g., Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1036 (7th Cir. 1987) (concluding that *Pennhurst* was not controlling because the plaintiffs were "not seeking to vindicate rights based on state law" but rather alleged that they had "been injured by the defendants' failure

---

[1] Defendants are also wrong in arguing that Plaintiffs' claims must arise under state law because Plaintiffs seek to stop "only" the removal of 120,561 individuals whose purge violates state law, as opposed to all "list-maintenance activities." Defs.' Br. 17-18. The point, of course, is that a purge in violation of state law cannot serve a compelling state interest as required to burden the First Amendment right.

to implement [a] state enactment to the extent required by *federal* law"). Other courts address state law questions intertwined with federal law claims without seeing a need to address *Pennhurst*. *See, e.g., Nation v. San Juan Cty.*, 150 F. Supp. 3d 1253, 1269 (D. Utah 2015) (finding that a county's alleged interests that required violating state statutory requirements were "illegitimate and b[ore] no weight in th[e] court's assessment" of a potential Equal Protection violation), *aff'd sub nom. Navajo Nation v. San Juan Cty.*, 929 F.3d 1270 (10th Cir. 2019). As these cases demonstrate, evaluating state law as part of adjudicating a federal claim is routine and poses no Eleventh Amendment issue.

### III. STATE LAW PROHIBITS THE PURGE OF VOTERS WHOSE LAST CONTACT WITH THE STATE WAS AFTER JANUARY 1, 2010.

As detailed in Plaintiffs' memorandum of law in support of their motion, Defendants' purge of voters for inactivity, whose last contact with the state was on or after January 1, 2010, violates both state and federal law.[2] Under state law,

---

[2] To be clear, while the notion of a nine-year threshold serves as useful shorthand for the state-law requirement, it is important to recognize that H.B. 316 operates to bar voters from being purged after a period of inactivity that fluctuates depending on the date of the voter's most recent contact with election officials and the date of the planned purge. In this case, however, the rule is simple: any voter that made contact with the State at any point on or after January 1, 2010, may not be purged—pursuant to both state law and the U.S. Constitution.

Defendants may purge voters for inactivity only if their last contact with election officials occurred before January 1, 2010.

Georgia law sets firm time limits on when the State may move a registered voter to the "inactive list," and when it may purge voters from the "inactive list." Specifically, O.C.G.A. § 21-2-234(a)(1) defines "no contact" to mean a voter has not had one of several types of contact with election officials "during the preceding five calendar years." Then, "[i]n the first six months of each odd-numbered year, the Secretary of State shall identify all electors" with "no contact during the preceding five calendar years," and must send them a "confirmation notice . . . during each odd numbered year." § 21-2-234(a)(2). A voter cannot move to the "inactive list" unless "the card is not returned within 30 days after the date of the notice." § 21-2-234(c)(2). To be purged from the "inactive list," the voter must have made "no contact" "until the day after the second November general election held after the elector is placed on the inactive list." § 21-2-235(b).

Here is how the statute plays out in practical terms. All voters subject to a voter-purge in December 2019—or, any time before the November 2020 election— must have been moved to the inactive list before the 2016 general election. *See* O.C.G.A. § 21-2-235(b). To have been moved to the inactive list before November 2016, voters would need to have been identified and mailed notice in 2015, the "odd-

numbered year" immediately before 2016. *See id*. § 21-2-234(a)(2). All voters identified in 2015 as having "no contact" with election officials could not have engaged in any of the statutorily-defined modes of contact with the state "during the preceding five calendar years": 2014, 2013, 2012, 2011, or 2010. *Id.* Thus, only voters who had their most recent contact with election officials during 2009 are eligible to be purged under Georgia law. The graphic below sets forth the proper timeline for a purge under current law—contrary to Defendants' incorrect approach.



This result accords with the SOS's own admissions. The SOS has repeatedly emphasized the consistency between the 10-year driver's-license-renewal period and the voter-inactivity period under Georgia law. In a hearing before this Court,

Defendants argued that it was "important . . . to remember" that "having the list matching process and the database matching happening simultaneously when someone goes to get a driver's license, under House Bill 316[,] that timeline, that lack of contact would be lined up with the time which you have to renew your driver's license. So if you go nine years without voting, in that 10th year when you're renewing your driver's license that will constitute a contact. We can verify you're still an eligible voter at a location and can proceed from there." ECF No. 64 at 16:21-17:10. And in a press statement, the SOS defended H.B. 316 on the same basis.[3] These statements are completely inconsistent with the State's new position that a seven-year threshold for "no-contact" is lawful.

---

[3] *See* Johnny Kaufman, *Georgia Governor Signs Law To Slow 'Use It Or Lose It' Voter Purges*, APMReports (Apr. 11, 2019), https://www.apmreports.org/story/2019/04/11/georgia-brian-kemp-use-it-or-lose-it-voting-law-changes ("To Raffensperger, it makes sense that the period for when someone is removed lines up with driver's license renewal. He called this an 'objective measure.'"); *see also* Mark Niesse, *Georgia Election Bill Would Give Voters More Time Before Being Purged*, Atlanta Journal-Constitution (Feb. 15, 2019), https://www.ajc.com/news/state--regional-govt--politics/georgia-election-bill-would-give-voters-more-time-before-being-purged/0TcTGgTkdIKcPFLjMFQgiP (reporting H.B. 316's sponsor stating that "[i]t makes sense to extend the period before inactive voters' registrations are canceled so that it's more likely to coincide with when voters renew their driver's licenses every 10 years.").

But it is clear from the SOS's data that nearly all voters purged on December 16 had contact with the State on or after January 1, 2010.  *See* Expert Report of Michael P. McDonald 10 ("McDonald Report"), attached as Exhibit A (confirming that over 99% of voters on the State's spreadsheet had contact after this date).[4] Among them were several Georgia voters who submitted declarations in support of Plaintiffs' motion.[5]

The SOS defends its unlawful practice by ignoring the portions of the statute it finds inconvenient.  Under Defendants' theory, § 234 is irrelevant because it establishes a completely different "clock" than the one at issue in this purge.  But Defendants' recitation of § 235 ignores § 234's express incorporation into the § 235 standard: § 235 prohibits the SOS from purging voters unless they "make[] no contact, *as defined in Code Section 21-2-234*," "until the day after the second

---

[4] As explained in McDonald's Expert Report, the Georgia Registered Voter File includes a field entitled "LAST_CONTACT_DATE."  The State's documentation only identifies the existence of this field, not the information it tracks.  Plaintiffs assume that the field identifies the last contact a registered voter had with local election officials, barring any evidence to the contrary from Defendants.  *See* McDonald Expert Report 7-8.

[5] Defendants falsely claim that Plaintiffs have not provided declarations from a single person who should not be purged.  Linda Bradshaw, David Hopkins, Kilton Smith, Clifford Thomas, and Charlesetta Young had contact with election officials after January 1, 2010.  *See* Screenshot of Records for Linda Bradshaw, David Hopkins, Kilton Smith, Clifford Thomas, and Charlesetta Young in Georgia Registered Voter File generated by the Secretary of State's office on November 15, 2019, Attached as Exhibit B.  These declarants are merely the tip of the iceberg.

November general election held after the elector is placed on the inactive list of electors." O.C.G.A. § 21-2-235(b) (emphasis added).  Georgia law establishes one, single clock.  That clock was enacted in H.B. 316, and any other "clock" was stricken from the law effective April 2, 2019.  *See* H.B. 316 § 51.

Even if the Defendants were right that they could rely on the now-repealed three-year time period for placement in inactive status for the group of voters they just purged, they did not comply with that requirement either.  As the McDonald report shows, about 19% of the group purged for inactivity had contacts like voting or registering during calendar year 2012.  *See* McDonald Report at 10; *supra* at 11 n.3.  They were only placed on the purge list because of the SOS's decision to ignore all 2012 contacts before the November general election, in clear violation of even the old state law.

And Defendants' tortured reading of the statute does nothing to help their constitutional argument.  As Defendants themselves repeatedly emphasize, likelihood of success on a state-law claim is not what matters—likelihood of success on a *constitutional* claim does.  And success on Plaintiffs' constitutional claim depends on the state's interest in the action it is taking:  purging voters whose most recent contact with election officials occurred during 2010, 2011, and 2012.  But that is the very same interest that Georgia's General Assembly and Governor Kemp

repudiated by enacting H.B. 316. A state interest is best determined by looking at the legislation it passes, *see Addington*, 441 U.S. at 426 (looking to state law to determine the state's interest), and this legislation spoke clearly: the State has no interest at all in purging voters for a period of inactivity that is shorter than the statute was revised to allow. Ga. S. Weekly Report, 2019 Reg. Sess. (Mar. 19, 2019) (describing H.B. 316 as intended to achieve "a secure and fair election"). Defendants cannot rest their constitutional argument on a state interest in denying voters the precise benefit that H.B. 316 conferred.

## IV. THE PURGED VOTERS WILL SUFFER IRREPARABLE HARM.

Defendants dismiss the idea voters face irreparable harm in three sentences, claiming that "an overnight database-updating effort by the vendor" can easily switch a voter's status from "cancelled" back to "active." Defs.' Br. 22. But the technical details of how a voter's record is modified once a voter successfully re-registers—or after the court *grants* Plaintiffs' requested injunctive relief—is entirely beside the point. Defendants do not dispute there is no post-purge notice sent to a voter informing them they have been removed from the rolls, nor do they dispute Georgia offers no same-day registration option. *See* O.C.G.A. § 21-2-224 (establishing registration deadlines). It is plain many purged voters are likely to

show up on Election Day and only learn at that very moment they cannot vote, period.

The risk of this irreparable harm occurring is all the greater given, for purged voters, the deadlines to re-register are imminent.  To vote in the March 24, 2020 presidential primary and special election, voters would need to discover they have been purged and re-register by February 24, 2020.[6]

The irreparable harm faced by purged voters results from Georgia's rules that all but guarantee voters will learn they are no longer registered only at the moment they cannot re-register, and the imminent deadlines for upcoming elections make that re-registration highly unlikely.  On these points, Defendants have nothing to say.

---

[6] *2020 State Elections and Voter Registration Calendar*, https://sos.ga.gov/admin/files/2020_Short_Calendar.pdf (last visited Dec. 17, 2019).  For the January 28, 2020 special election for the District 171 seat in the Georgia House of Representatives voters would need to register even sooner, by December 30.  Daniel Anderson, *Georgia House of Representatives District 171 Special Election*, BallotPedia News (Dec. 10, 2019), https://news.ballotpedia.org/2019/12/10/georgia-house-of-representatives-district-171-special-election/; O.C.G.A. § 21-2-224(b) (setting registration deadlines for special elections).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Preliminary Injunction returning the 120,561 voters moved to cancelled status on December 16, 2019, based on inactivity back to their status before the purge.

## CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief is prepared with one of the font and point selections approved by the Court in LR 5.1(C).

Respectfully submitted,

December 18, 2019

*/s/ Leslie J. Bryan*

Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
Fax: (770) 635-0029
kurt@summervillefirm.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali Bracey (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com

Jeremy H. Ershow (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jershow@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 18, 2019, I caused to be served the

foregoing **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY**

**INJUNCTION** by filing it with the Court using the ECF system, which will effect

service on opposing counsel:

Chris Carr
Attorney General
Dennis Dunn
Deputy Attorney General
Russell Willard
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Bryan P. Tyson
Bryan F. Jacoutot
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com

Joshua Barrett Belinfante
Vincent Robert Russo, Jr.
Brian Edward Lake
Carey Allen Miller
Alexander Denton
Special Assistant Attorneys General
**Robbins Ross Alloy Belinfante Littlefield, LLC**
500 Fourteenth St., N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
vrusso@robbinsfirm.com
cmiller@robbinsfirm.com
adenton@robbinsfirm.com

This the 18th day of December, 2019.

*/s/ Leslie J. Bryan*
Leslie J. Bryan

# Exhibit A

**Expert Report of Dr. Michael P. McDonald**

I am Dr. Michael P. McDonald, an Associate Professor of Political Science at the University of Florida. I am widely regarded as a leading expert on United States elections. I have published extensively on elections in peer-reviewed journals and I produce what many consider to be the most reliable turnout rates of the nation and the states.[1] I have specifically published peer-reviewed articles on the reliability of voter registration files[2] and matching algorithms as applied to voter registration files.[3] In the course of my election work, I consulted for the United States Election Assistance Commission, the Department of Defense's Federal Voting Assistance Program, the Colorado Secretary of State, the Virginia Division of Elections, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

I have testified or submitted expert reports in numerous election-related cases. With respect specifically to voter registration, I was an expert witness for plaintiffs challenging the Kansas requirement for documentary proof of citizenship.[4] I have been an expert witness in other litigation specifically involving voter registration in Florida[5] and Washington.[6] I also have an extensive publishing record and experience testifying in redistricting and other election-related cases. Please see my curriculum vitae for more information.

Plaintiffs' counsel asked me to analyze a list of 120,561 Georgia registered voters who were scheduled to be removed from the voter registration rolls as of December 16, 2019 for the reason of "No Contact" with local election officials. Specifically, Plaintiffs' counsel asked me to:

---

[1] Michael P. McDonald and Samuel L. Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-974.

[2] Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.

[3] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.

[4] *Fish v. Kobach*, No. 2:16-cv-02105 (D. Kan.).

[5] *League of Women Voters of Florida v. Browning*, No. 1:08-cv-21243 (S.D. Fla.).

[6] *Washington Association of Churches v. Reed*, No. 2:06-cv-000726 (W.D. Wash.).

(1) Identify how many, if any, of those 120,561 Georgia registered voters have voted, registered, or had other contacts with local election officials since each of January 1, 2010; January 1, 2012; and November 6, 2012, according to Georgia's voter records; and

(2) Analyze whether there are any other anomalies in the list of 120,561 Georgia registered voters scheduled to be removed from the rolls.

Plaintiffs' counsel did not ask me to look at this time at additional voters who were scheduled to be removed for other reasons, including a match to the NCOA database or having mail returned as undeliverable.

I am compensated at a rate of $400/hour for my work on this case.

**Data Sources**

I examine two data sources in my analysis for this report.

The first data source is an Excel file downloaded from the Georgia Secretary of State's Elections Division webpage entitled "2019 List Maintenance."[7] The Secretary of State's webpage describes the file as "[t]he list of registrations subject to cancellation."[8] The file is titled "2019_NGE.xlsx," and, according to its properties, was created on October 30, 2019 at 7:47am by John Hallman and last modified on October 30, 2019 at 11:39am by Kevin Rayburn. I hereafter refer to this Excel file as the "Purge List." This file does not include any changes to the Purge List that the Georgia Secretary of State's office may have implemented following the public disclosure of the list.

The second data source is a Georgia statewide voter registration file generated by the Secretary of State's office on November 15, 2019. I hereafter refer to this file as the "Georgia Registered Voter File."

**Scope of Analysis**

There are 313,243 voter records in the Purge List. Each voter record is listed as having an "Inactive Reason" of either (a) "Returned Mail," (b) "NCOA," or (c)

---

[7] See: *2019 List Maintenance*, Ga. Secretary of St.,
https://sos.ga.gov/index.php/elections/2019_list_maintenance (last visited Dec. 13, 2019).
[8] *Id.*

"No Contact." There are 120,561 out of the 313,243 voter records that have an "Inactive Reason" of "No Contact."

The Secretary of State's website describes the 120,561 registered voters represented by these records thusly:

> The remaining 120,561, or 38.5 percent, have had no contact with their county election officials since prior to the 2012 presidential election and failed to respond to a confirmation card sent by their county elections office.[9]

I match the Purge List with the Georgia Registered Voter File using the voter registration number common to both datasets. When I do this merge, I find 120,473 records in the Purge List with the same voter registration number in the Georgia Registered Voter File. The difference of 88 records could be due to any number of reasons, the most likely being that state election officials removed these voters from the Georgia Registered Voter File between October 31, 2019 (the last modified date of the Purge List) and November 15, 2019 (the date of the Georgia Registered Voter File).

I restrict my analysis that follows to these 120,473 "No Contact" records in the Purge List that I can match to the Georgia Registered Voter File.

**Evidence of Registrants' Contact with Local Election Officials**

The Georgia State Code—Ga. Code Ann. § 21-2-234(a)(1)—defines registered voters as having "No Contact" with election officials as follows:

> As used in this Code section and Code Section 21-2-235, the term "no contact" shall mean that the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, has not submitted an absentee ballot application or voted an absentee ballot, and has not confirmed the elector's continuation at the same address during the preceding five calendar years.

The Georgia Registered Voter File provides evidence that some individuals flagged by the Georgia Secretary of State's office as being on the Purge List for the

---

[9] *Id.*

reason of "No Contact" with local election officials have, to the contrary, had some contact.

I examine three pieces of information available from the Georgia Registered Voter File:

- The date a registrant is recorded as having last voted (recorded in a field called DATE_LAST_VOTED)[10]
- The date a registrant is recorded as being registered to vote (recorded in a field called REGISTRATION_DATE)
- The date of a registrant's last contact with election officials (recorded in a field called LAST_CONTACT_DATE).

My analysis of these three key pieces of information is as follows.

## Prior Voting Record

In Table 1, I report the number of registered voters on the Purge List who are identified as having "No Contact" with local election officials, and who are recorded in the Georgia Registered Voter File as having voted in any election that occurred January 1, 2010 or later.

Consistent with plaintiffs' counsel's instructions, I tally the total number of registered voters on the Purge List who are identified as having "No Contact" with local officials, and who are recorded in the Georgia Registered Voter File as having last voted on January 1, 2010 or later; January 1, 2012 or later; and November 6, 2012 or later. The totals are inclusive, such that the total registrants who voted January 1, 2010 or later includes those who voted in January 1, 2012 or later, and so on.

---

[10] Given that H.B. 316 added voting an absentee ballot as a type of "contact" under the statute, it is not clear that the Georgia Registered Voter File treated voting an absentee ballot as part of the "last voted" category prior to April 2019.

| Election Date Last Voted In (according to Georgia Registered Voter File) | Number of Registrants Listed as "No Contact" in Purge List |
|---|---|
| *2/2/2010* | 1 |
| *3/16/2010* | 3 |
| *4/13/2010* | 3 |
| *5/11/2010* | 8 |
| *6/8/2010* | 3 |
| *7/20/2010* | 2,154 |
| *8/10/2010* | 942 |
| *9/21/2010* | 9 |
| *11/2/2010* | 28,725 |
| *11/30/2010* | 1,425 |
| *2/15/2011* | 27 |
| *3/15/2011* | 423 |
| *4/12/2011* | 5 |
| *6/21/2011* | 44 |
| *7/19/2011* | 102 |
| *8/16/2011* | 77 |
| *9/20/2011* | 18 |
| *10/18/2011* | 33 |
| *11/8/2011* | 2,106 |
| *12/6/2011* | 72 |
| *1/3/2012* | 1 |
| *3/6/2012* | 3,678 |
| *4/3/2012* | 6 |
| *11/6/2012* | 293 |
| *11/5/2019* | 17 |
|  |  |
| **Total 1/1/2010 or later** | 40,175 |
| **Total 1/1/2012 or later** | 3,995 |
| **Total 11/6/2012 or later** | 310 |

**Table 1. "No Contact" Registrants, Last Election Voted In**

These totals are as follows:

- 40,175 "No Contact" registrants last voted in an election held January 1, 2010 or later.
- 3,995 "No Contact" registrants last voted in an election held January 1, 2012 or later. I note that this approximate number of voters—about 4000—were removed from the Purge List before the final purge, according to the *Atlanta Journal-Constitution*.[11]
- 310 "No Contact" registrants last voted in an election held November 6, 2012 or later. This total includes 293 registrants who the media outlet *APM Reports* identified, and the Georgia Secretary of State verified, were incorrectly identified as "No Contact" due to a data conversion problem from Lowndes County, Georgia.[12]

**Date of Registration**

In Table 2, I report the number of registered voters on the Purge List who are identified as having "No Contact" with local election officials, and who are recorded in the Georgia Registered Voter File as having a voter registration date of January 1, 2010 or later; January 1, 2012 or later; and November 6, 2012 or later. The totals are inclusive, such that the total registrants who registered January 1, 2010 or later includes those who registered on or after January 1, 2012, and so on.

---

[11] Mark Niesse, *Judge Allows Georgia To Purge 309K Voter Registrations Overnight*, Atlanta Journal-Constitution (Dec. 16, 2019), https://www.ajc.com/news/state--regional-govt--politics/judge-allows-georgia-purge-309k-voter-registrations-overnight/fVBSMzCLR7ontBc3RpjyrJ/.
[12] See: Geoff Hing, *Georgia Nearly Purged Hundreds of Eligible Voters By Mistake*, APM Rep. (Nov. 8, 2019), https://www.apmreports.org/story/2019/11/08/georgia-nearly-purged-hundreds-of-eligible-voters-by-mistake.

| Registration Date (according to Georgia Registered Voter File) | Number of Registrants Listed as "No Contact" in Purge List |
|---|---|
| Total 1/1/2010 or later | 60,415 |
| Total 1/1/2012 or later | 12,043 |
| Total 11/6/2012 or later | 21 |

**Table 2. "No Contact" Registrants, Registration Date**

The totals are as follows:

- 60,415 "No Contact" registrants' registration date is recorded as January 1, 2010 or later.
- 12,043 "No Contact" registrants' registration date is recorded as January 1, 2012 or later.
- 21 "No Contact" registrants' registration date is recorded as November 6, 2012 or later.

Among the 21 registrants whose registration date is January 1, 2012 or later, five have registration dates seemingly *after* the Secretary of State's office generated the Purge List. One has a registration date of October 30, 2019, two have a registration date of November 11, 2019, and two have a registration date of November 13, 2019. I do not have an explanation for this, as I would expect a registration date to represent the date a registration record was established by Georgia election officials.

### Last Contact

The Georgia Registered Voter File has a field labeled LAST_CONTACT_DATE. I am uncertain what information is tracked in this field, as the State's documentation only identifies the existence of this field. I provide statistics for this field in the event that this field identifies the last contact a registered voter had with local election officials.

In Table 3, I report the number of registered voters on the Purge List who are identified as having "No Contact" with local election officials, and who are

7

recorded in the Georgia Registered Voter File as having a last contact date of
January 1, 2010 or later; January 1, 2012 or later; and November 6, 2012 or later.
As before, the totals are inclusive, such that the total registrants who have a last
contact of January 1, 2010 or later includes those who are listed as having a last
contact date on or after January 1, 2012, and so on.

| Last Contact Date (according to Georgia Registered Voter File) | Number of Registrants Listed as "No Contact" in Purge List |
|---|---|
| Total 1/1/2010 or later | 119,997 |
| Total 1/1/2012 or later | 22,896 |
| Total 11/6/2012 or later | 529 |

Table 3. "No Contact" Registrants, Last Contact Date

The totals are as follows:

- 119,997 "No Contact" registrants' last contact date is recorded as January 1,
  2010 or later.
- 22,896 "No Contact" registrants' last contact date is recorded as January 1,
  2012 or later.
- 529 "No Contact" registrants' last contact date is recorded as November 6,
  2012 or later.

I conduct forensics work on LAST_CONTACT_DATE to help me form an
opinion as to what the field may indicate. I infer a clue as to the purpose of the
LAST_CONTACT_DATE from the DATE_LAST_VOTED field. All of the 293
registered voters incorrectly flagged as not voting in the November 6, 2012 by
*APM Reports* had their LAST_CONTACT_DATE field updated on November 14,
2019. It appears that on that date an election official changed these voters' statuses
to correct the error of these voters being included on the Purge List. Similarly,
election officials updated the LAST_CONTACT_DATE of the 17 registered voters
who participated in a November 5, 2019 election in the days immediately
following the election.

The LAST_CONTACT_DATE thus appears to capture contacts between
registrants and election officials. In these cases of voting, the field is capturing

actions by registered voters that qualify as a contact under Ga. Code Ann. § 21-2-234(a)(1).

Further investigation of daily statistics in the Georgia Registered Voter File reveals that prior to May 27, 2012, election officials were regularly recording on an almost-daily basis batches of last contacts with the registered voters on the Purge List who are identified as having "No Contact" with local election officials. This routine daily activity appears to cease on May 27, 2012. After that date, records of last contact tend to occur on a sporadic basis.

## Compiled Figures

In Table 4, I compile the information in Tables 1-3 to provide an inclusive view of the dates of last contact, registration, and most recent election voted in for the registered voters on the Purge List who are identified as having "No Contact" with local election officials.

|  | Last Contact Date | Registration Date | Election Date Last Voted In |
|---|---|---|---|
| **1/1/2010 or later** | 119,997 | 60,415 | 40,175 |
| **1/1/2012 or later** | 22,896 | 12,043 | 3,995 |
| **11/6/2012 or later** | 529 | 21 | 310 |

**Table 4. "No Contact" Registrants, Relevant Dates Compiled (cross referencing names on Purge List with date information in Georgia Registered Voter File)**

In Table 5, I represent the figures contained in Table 4 as a percentage of the total 120,561 registered voters on the Purge List who are identified as having "No Contact" with local election officials.

| | Last Contact Date | Registration Date | Election Date Last Voted In |
|---|---|---|---|
| **1/1/2010 or later** | 99.53% | 50.11% | 33.32% |
| **1/1/2012 or later** | 18.99% | 9.99% | 3.31% |
| **11/6/2012 or later** | 0.44% | 0.02% | 0.26% |

**Table 5. "No Contact" Registrants, Relevant Dates as a Percentage of 120,561 Total Registrants (cross referencing names on Purge List with date information in Georgia Registered Voter File)**

I declare that the foregoing is true and correct under penalty of perjury. Executed this _18th_ day of November, 2019, in Gainesville, Florida

Michael McDonald

# Dr. Michael P. McDonald

Associate Professor, University of Florida
Department of Political Science
222 Anderson Hall
P.O. Box 117325
Gainesville, FL 32611

Office:          352-273-2371
Fax:             352-392-8127
Email:           michael.mcdonald@ufl.edu

## Education

Post-Doctoral Fellow. Harvard University. August 1998 – August 1999.
Ph.D. Political Science. University of California, San Diego. February, 1999.
BS Economics. California Institute of Technology. June, 1989.

## Awards

University of Florida Term Professorship. 2019.

Brown Democracy Medal, McCourtney Institute for Democracy at Penn State University. 2018.
    Positive impact on democracy for the Public Mapping Project.

Tides Pizzigati Prize. 2013. Public interest software for DistrictBuilder.

Strata Innovation Award. 2012. Data Used for Social Impact for DistrictBuilder.

American Political Science Association, Information and Technology Politics Section. 2012.
    Software of the Year for DistrictBuilder.

*Politico*. 2011. Top Ten Political Innovations for DistrictBuilder.

GovFresh. 2011. 2nd Place, Best Use of Open Source for DistrictBuilder.

Virginia Senate. 2010. Commendation for Virginia Redistricting Competition.

American Political Science Association, Information and Technology Politics Section. 2009.
    Software of the Year for BARD.

# Publications

### Books

Michael P. McDonald. Under Contract. *The Art of Voting*. New York, NY: Oxford University Press.

Michael P. McDonald and Micah Altman. 2018. *The Public Mapping Project: How Public Participation Can Revolutionize Redistricting*. Ithaca, NY: Cornell University Press.

Michael P. McDonald and John Samples, eds. 2006. *The Marketplace of Democracy: Electoral Competition and American Politics*.  Washington DC: Brookings Press.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2003. *Numerical Issues in Statistical Computing for the Social Scientist*.  Hoboken, NJ: Wiley and Sons.

### Peer-Reviewed Articles

Brian Amos and Michael P. McDonald. Forthcoming. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis*.

Matthew DeBell, Jon A. Krosnick, Katie Gera, David Yeager, and Michael McDonald. Forthcoming. "The Turnout Gap in Surveys: Explanations and Solutions." *Sociological Methods and Research*.

Tyler Culberson, Suzanne Robbins, and Michael P. McDonald. 2019. "Small Donors in Congressional Elections." *American Politics Research* 47(5): 970-99.

Micah Altman and Michael P. McDonald. 2017. "Redistricting by Formula: The Case of Ohio." *American Politics Research* 46(1): 103-31.

Micah Altman, Eric Magar, Michael P. McDonald, and Alejandro Trelles. 2017. "Measuring Partisan Bias in a Multi-Party Setting: the Case of Mexico." *Political Geography* 57(1): 1-12.

Brian Amos, Michael P. McDonald, and Russell Watkins. 2017. "When Boundaries Collide: Constructing a Database of Election and Census Data." *Public Opinion Quarterly* 81(S1): 385-400.

Trelles, Alejandro, Micah Altman, Eric Magar, and Michael P. McDonald. 2016. "Datos abiertos, transparencia y redistritación en México." *Política y Gobierno* 23(2): 331-364.

Michael P. McDonald. 2014. "Calculating Presidential Vote for Legislative Districts." *State Politics and Policy Quarterly* 14(2): 196-204.

Micah Altman and Michael P. McDonald. 2014. "Public Participation GIS: The Case of Redistricting." *Proceedings of the 47th Annual Hawaii International Conference on System Sciences*, Computer Society Press.

Michael P. McDonald and Caroline Tolbert. 2012. "Perceptions vs. Actual Exposure to Electoral Competition and Political Participation." *Public Opinion Quarterly* 76(3): 538-54.

Michael P. McDonald and Matthew Thornburg. 2012. "Interview Mode Effects: The Case of Supplementing Exit Polls with Early Voter Phone Surveys." *Public Opinion Quarterly* 76(2): 326-63.

Micah Altman and Michael P. McDonald. 2011. "BARD: Better Automated Redistricting." *Journal of Statistical Software* 42(5): 1-28.

Michael P. McDonald. 2011. "The 2010 Election: Signs and Portents for Redistricting." *PS: Political Science and Politics* 44(2): 311-15.

Richard Engstrom and Michael P. McDonald. 2011. "The Political Scientist as Expert Witness." *PS: Political Science and Politics* 44(2): 285-89.

Michael P. McDonald. 2008. "Portable Voter Registration." *Political Behavior* 30(4): 491–501.

Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.

Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.

Michael P. McDonald. 2007. "Regulating Redistricting." *PS: Political Science and Politics* 40(4): 675-9.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2007. "Accuracy: Tools for Accurate and Reliable Statistical Computing." *Journal of Statistical Software* 21(1).

David Lublin and Michael P. McDonald. 2006. "Is It Time to Draw the Line? The Impact of Redistricting on Competition in State House Elections." *Election Law Journal* 5(2): 144-57.

Michael P. McDonald. 2006. "Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 91-94.

Michael P. McDonald. 2006. "Re-Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 99-102.

Micah Altman, Karin MacDonald, and Michael P. McDonald. 2005. "From Crayons to Computers: The Evolution of Computer Use in Redistricting." *Social Science Computing Review* 23(2): 334-46.

Michael P. McDonald. 2004. "A Comparative Analysis of U.S. State Redistricting Institutions." *State Politics and Policy Quarterly* 4(4): 371-96.

Michael P. McDonald. 2003. "On the Over-Report Bias of the National Election Study." *Political Analysis* 11(2): 180-86.

Micah Altman and Michael P. McDonald. 2003. "Replication with Attention to Numerical Accuracy." *Political Analysis* 11(3): 302-7.

Michael P. McDonald. 2002. "The Turnout Rate among Eligible Voters for U.S. States, 1980-2000." *State Politics and Policy Quarterly* 2(2): 199-212.

Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-74.  Reprinted 2006 in *Classic Ideas and Current Issues in American Government*, Bose and DiIulio, eds.

Micah Altman and Michael P. McDonald. 2001. "Choosing Reliable Statistical Software." *PS: Political Science and Politics*.  43(3): 681-7.

Bernard Grofman, William Koetzel, Michael P. McDonald, and Thomas Brunell. 2000. "A New Look at Ticket Splitting: The Comparative Midpoints Model."  *Journal of Politics* 62(1): 24-50.

Samuel Kernell and Michael P. McDonald. 1999. "Congress and America's Political Development: Political Strategy and the Transformation of the Post Office from Patronage to Service." *American Journal of Political Science* 43(3): 792-811.

***Law Review Articles***

Michael P. McDonald. 2019-2020. "The Predominance Test: A Judicially Manageable Compactness Standard for Redistricting." *Yale Law Review*, *Forum* 129.

Micah Altman and Michael P. McDonald. 2013. "A Half-Century of Virginia Redistricting Battles: Shifting from Rural Malapportionment to Voting Rights and Participation." *University of Richmond Law Review* 47: 771-831.

Micah Altman and Michael P. McDonald. 2012. "Redistricting Principles for the 21st Century." *Case Western Law Review* 62(4): 1179-1204.

Michael P. McDonald and Matthew Thornburg. 2010. "Registering the Youth: Preregistration Programs." *New York University Journal of Legislation and Public Policy* 13(3): 551-72.

Micah Altman and Michael P. McDonald. 2010. "The Promise and Perils of Computers in Redistricting." *Duke J. Constitutional Law and Public Policy* 5: 69-112.

Justin Levitt and Michael P. McDonald. 2007. "Taking the 'Re' out of Redistricting: State Constitutional Provisions on Redistricting Timing." *Georgetown Law Review* 95(4): 1247-86.

### Peer-Reviewed Book Chapters

Michael P. McDonald. 2014. "Contextual Income Inequality and Political Behavior." in *Political Trust and Disenchantment with Politics: Comparative Perspectives from around the Globe*, Christina Eder, Ingvill Mochmann, Markus Quandt eds. Leiden, Netherlands: Brill Publishers.

Michael P. McDonald. 2010. "Income Inequality and Participation in the United States." in *United in Diversity? Comparing Social Models in European and America*, Jens Alber and Neil Gilbert, eds.  New York, NY: Oxford University Press.

Michael P. McDonald. 2008. "Redistricting and the Decline of Competitive Congressional Districts." in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles*, Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, eds. New York, NY: Russell Sage Publications.

Michael P. McDonald. 2008. "Reforming Redistricting." in *Democracy in the States: Experiments in Elections Reform*, Bruce Cain, Todd Donovan, and Caroline Tolbert, eds. Washington, DC: Brookings Press.

Michael P. McDonald. 2006. "Who's Covered?  Section 4 Coverage Formula and Bailout" in *The Future of the Voting Rights Act*, David Epstein, Richard H. Pildes, Rodolfo O. de la Garza, and Sharyn O'Halloran, eds.  New York, NY: Russell Sage Publications.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2004. "A Comparison of the Numerical Properties of EI Methods" in *Ecological Inference: New Methods and Strategies*, Gary King, Ori Rosen, and Martin Tanner, eds.  New York, NY: Cambridge University Press.

### Non-Peer-Reviewed Book Chapters

Michael P. McDonald. 2018. "Challenges and Opportunities in Collecting Election Administration Data" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Michael P. McDonald. 2018. "History and Promise and Blending Survey Data with Government Records on Turnout" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Micah Altman and Michael P. McDonald. 2015. "Redistricting and Polarization" in *American Gridlock: The Sources, Character, and Impact of Political Polarization*, James Thurber and Antonie Yoshinaka, eds. Cambridge.

Micah Altman and Michael P. McDonald. 2015. "Florida Congressional Redistricting." *Jigsaw Politics in the Sunshine State*, Seth McKee, ed. Gainesville, FL: University Press of Florida.

Michael P. McDonald. 2013. "State Legislative Districting." *Guide to State Politics and Policy*, Richard Niemi and Joshua Dyck, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2013. "Democracy in American Elections" in *Imperfect Democracies: The Democracy Deficit in Canada and the United States*, Richard Simeon and Patti Lenard, eds. Vancouver, BC: University of British Columbia Press.

Micah Altman and Michael P. McDonald. 2012. "Technology for Public Participation in Redistricting" in *Redistricting in the West*, Gary Moncrief, ed. Lanham, MD: Lexington Press.

Michael P. McDonald and Thomas Schaller. 2011. "Voter Mobilization in the 2008 Presidential Election" in *The Change Election: Money, Mobilization and Persuasion in the 2008 Federal Elections*, David Magleby, ed. Philadelphia, PA: Temple University Press. (previously published as a Pew Charitable Trusts monograph).

Michael P. McDonald. 2011. "Congressional Redistricting" in *Oxford Handbook of Congress*, Frances Lee and Eric Schickler, eds. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2011. "Voter Turnout: Eligibility Has Its Benefits" in *Controversies in Voting Behavior*, 2nd Edition, Richard G. Niemi, Herbert F. Weisberg, and David Kimball, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2010. "In Support of Non-Partisan Redistricting." in *Debating Reform: Conflicting Perspectives on How to Mend American Government and Politics*, Richard Ellis and Mike Nelson, eds. Washington, DC: Congressional Quarterly Press.

Michael P. McDonald. 2010. "American Voter Turnout in Historical Perspective." in *Oxford Handbook of American Elections and Political Behavior*, Jan Leighley, ed. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2009. "Mechanical Effects of Duverger's Law in the USA." in *Duverger's Law of Plurality Voting: The Logic of Party Competition in Canada, India, the United Kingdom and the United States*, Bernard Grofman, André Blais and Shaun Bowler, eds. New York, NY: Springer.

Michael P. McDonald. 2008. "United States Redistricting: A Comparative Look at the 50 States." in *Redistricting in Comparative Perspective*, Lisa Handley and Bernard Grofman, eds. Oxford, U.K.: Oxford University Press.

Michael P. McDonald and Matthew Thornburg. 2008. "State and Local Redistricting" in *Political Encyclopedia of U.S. States and Regions*, Donald Haider-Markel, ed. New York, NY: MTM Publishing.

Michael P. McDonald. 2006. "Redistricting and District Competition" in *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds. Washington, DC: Brookings Press.

Micah Altman, Karin Mac Donald, and Michael P. McDonald. 2005. "Pushbutton Gerrymanders? How Computing Has Changed Redistricting" in *Party Lines: Competition,*

*Partisanship and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds.  Washington, DC: Brookings Press.

Bruce Cain, Karin Mac Donald, and Michael P. McDonald. 2005. "From Equality to Fairness: The Path of Political Reform Since Baker v Carr" in *Party Lines: Competition, Partisanship and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds.  Washington, DC: Brookings Press.

Michael P. McDonald. 2005. "Validity, Data Sources" in *Encyclopedia of Social Measurement, Vol. 3.*  Kimberly Kempf-Leonard, ed. San Deigo, CA: Elsevier Inc.

Michael P. McDonald. 2005. "Reporting Bias" in *Polling in America: An Encyclopedia of Public Opinion*. Benjamin Radcliff and Samuel Best, eds.  Westport, CT: Greenwood Press.

### *Other Non-Peer Reviewed Academic Publications (Book Reviews, Invited Articles, etc.)*

Michael P. McDonald and Thessalia Merivaki. 2015. "Voter Participation in Presidential Nomination Contests." *The Forum* 13(4).

Michael P. McDonald. 2011. "Redistricting Developments of the Last Decade—and What's on the Table in This One." *Election Law Journal* 10(3): 313-318.

Michael P. McDonald and Chrisopher Z. Mooney. 2011. "'Pracademics': Mixing an Academic Career with Practical Politics." *PS: Political Science and Politics* 44(2): 251-53.

Michael P. McDonald. 2011. "Voter Turnout in the 2010 Midterm Election." *The Forum* 8(4).

Michael P. McDonald. 2011. "*Redistricting: The Most Political Activity in America* by Charles S. Bullock III (book review)." *American Review of Politics* (Fall 2010/Spring 2011).

Michael P. McDonald. 2009. "'A Magnificent Catastrophe' Retold by Edward Larson (book review)." *The Election Law Journal* 8(3): 234-47.

Michael P. McDonald. 2008. "The Return of the Voter: Voter Turnout in the 2008 Presidential Election." *The Forum* 6(4).

Michael P. McDonald. 2006. "American Voter Turnout: An Institutional Perspective by David Hill (book review)." *Political Science Quarterly* 121(3): 516-7.

Michael P. McDonald. 2006. "Rocking the House: Competition and Turnout in the 2006 Midterm Election." *The Forum* 4(3).

Micah Altman and Michael P. McDonald. 2006. "How to Set a Random Clock (Remarks on Earnest 2006)." *PS: Political Science and Politics* 39(4): 795.

Michael P. McDonald. 2004. "Up, Up, and Away!  Turnout in the 2004 Presidential Election."  *The Forum* 2(4).

Michael P. McDonald. 2004. "Drawing the Line on the 2004 Congressional Elections." *Legislative Studies Section Newsletter* (Fall): 14-18.

Michael P. McDonald. 2004. "2001: A Redistricting Odyssey." *State Politics and Policy* Quarterly 4(4): 369-370.

Micah Altman and Michael P. McDonald. 1999. "Resources for Testing and Enhancement of Statistical Software" in *The Political Methodologist* 9(1).

Michael P. McDonald. 1999. "Representational Theories of the Polarization of the House of Representatives" in *Legislative Studies Section Newsletter, Extension of Remarks* 22(2): 8-10.

Michael P. McDonald. 2003. "California Recall Voting: Nuggets of California Gold for Political Behavior." The *Forum* 1(4).

### *Reports*

Michael P. McDonald. 2009. "Voter Preregistration Programs." Fairfax, VA: George Mason University.

Michael P. McDonald. 2009. *Midwest Mapping Project*. Fairfax, VA: George Mason University.

Michael P. McDonald and Matthew Thornburg. 2008. "The 2008 Virginia Election Administration Survey." Fairfax, VA: George Mason University.

Kimball Brace and Michael P. McDonald. 2005. "Report to the Election Assistance Commission on the Election Day Survey."  Sept. 27, 2005.

### *Opinion Editorials*

Michael P. McDonald. 2019. "Let 16-year-olds vote for L.A. school board." *Los Angeles Times*. May 8, 2019.

Michael P. McDonald. 2018. "I agree with Donald Trump, we should have voter ID. Here's how and why." *USA Today*. Jan. 15, 2018.

Michael P. McDonald. 2017. "The Russians are hacking. Luckily the Trump voter fraud commission isn't in charge." *USA Today*. Sept. 23, 2017.

Michael P. McDonald. 2016. "Better Hope the Election is Not Close." *USA Today*. Nov. 2, 2016.

Michael P. McDonald. 2016. "Blame Government for Voting Crisis." *USA Today*. March 24, 2016.

Michael P. McDonald, Peter Licari and Lia Merivaki. 2015. "The Big Cost of Using Big Data in Elections." *The Washington Post*. Oct. 18, 2015.

Michael P. McDonald 2013. "Truths and Uncertainties that Surround the 2014 Midterms." *The Hill*. November 5, 2013.

Michael P. McDonald. 2011. "The Shape of Things to Come: New Software May Help the Public Have a Crucial Redrawing of Voting Districts." *Sojouners*. April 2011: 11-12.

Micah Altman and Michael P. McDonald. 2011. "Computers: Redistricting Super Hero or Evil Mastermind?" *Campaigns and Elections Magazine*. January 2011.

Michael P. McDonald. 2010. "Who Voted in 2010, and Why It Matters for 2012." *AOL News*. Nov. 4, 2010.

Michael P. McDonald and Seth McKee. "The Revenge of the Moderates." *The Politico*. Oct. 10, 2010.

Michael P. McDonald and Micah Altman. 2010. "Pulling Back the Curtain on Redistricting." *The Washington Post*. July 9, 2010.

Michael P. McDonald. 2008. "This May Be the Election of the Century." *The Politico*. Sept. 9, 2008.

Michael P. McDonald. 2008. "Super Tuesday Turned into a Super Flop." *Roll Call*. Feb. 11, 2008.

Michael P. McDonald. 2006. "5 Myths About Turning Out the Vote." *The Washington Post*. Oct. 29, 2006, p. B3.

Michael P. McDonald. 2006. "Supreme Court Lets the Politicians Run Wild." *Roll Call*. June 29, 2006.

Michael P. McDonald. 2006. "Re-Redistricting Redux." *The American Prospect*. March 6, 2006.

Michael P. McDonald and Kimball Brace. "EAC Survey Sheds Light on Election Administration." *Roll Call*. Oct. 27, 2005.

Michael P. McDonald. 2004. "The Numbers Prove that 2004 May Signal More Voter Interest." *Milwaukee Journal Sentinel*.  Milwaukee, WI.

Michael P. McDonald. 2004. "Democracy in America?" *La Vanguardia*.  Barcelona, Spain.

Michael P. McDonald. 2003. "Enhancing Democracy in Virginia." *Connection Newspapers*. March 24.

Michael P. McDonald. 2001. "Piecing Together the Illinois Redistricting Puzzle." *Illinois Issues*.  March, 2001.

Samuel Popkin and Michael P. McDonald. 2000. "Turnout's Not as Bad as You Think." *The Washington Post*.  Nov. 5: B-1.

Samuel Popkin and Michael P. McDonald. 1998. "Who Votes? A Comparison of NES, CPS, and VNS Polls." *Democratic Leadership Council Bluebook*. Sept., 1998.

### Software Packages

Micah Altman, Michael P. McDonald, and Azavea. 2012. "DistrictBuilder." Open source software to enable public participation in redistricting. Source code available at Github. Project website, http://www.districtbuilder.org.

Micah Altman and Michael P. McDonald.  2007.  "BARD: Better Automated Redistricting." R package available through CRAN. Source code available at Sourceforge.

Micah Altman, Jeff Gill, and Michael P. McDonald.  2004.  "Accuracy: Tools for testing and improving accuracy of statistical results."  R package available through CRAN.

# Grants and Contracts

Election Data Administrative Data Research Facility. ($843,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Virginia Election Data. ($6,500) Produced election data for *The Washington Post*'s 2019 Virginia state elections coverage.

Audit of Assignment of Virginia Registered Voters to Districts. ($154,000). Work for the Virginia Department of Elections to audit the assignment of registered voters to districts.

National Voter File. ($125,000) Alfred P. Sloan Foundation grant to pilot the collection of a national voter file for academic and non-partisan purposes.

Pilot Study for Election Data Administrative Data Research Facility. ($125,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Improving Integrity of Voter File Addresses. ($20,000) Colorado Secretary of State support to develop methods to improve voter file addresses.

Fabricating Precinct Boundaries. ($17,000). MIT Election Science and Data Lab support to explore fabricating precinct boundaries from geocoded voter files.

UF Informatics Post-Doc Top-Off Award. 2017. ($16,000). Funding from the UF Informatics Institute to provide additional post-doc funding in support of Hewlett Foundation grant.

U.S. Election Project. 2016. ($50,000). Hewlett Foundation support for U.S. Election Project Activities.

UF Informatics Institute Seed Fund Award. 2016. ($48,000). Project funded by the UF Informatics Institute to explore the reliability of Florida's voter registration file.

Election Forum. 2016. ($20,000). Project funded by the Pew Charitable Trusts for an election forum held at the University of Florida.

Survey of Voter File Accessibility. 2016. ($1,650). Contract from the Institute for Money in State Politics to survey costs and accessibility of states' voter files.

Florida Election Reform. 2015. ($13,000). Project funded by Democracy Fund for an election reform forum held in Tallahassee, FL. Pew Charitable Trusts independently provided travel support for some speakers.

New York Redistricting. 2011. ($379,000). Project funded by the Sloan Foundation to provide for public redistricting in New York and continued software development.

Citizen Redistricting Education, Software Supplemental. 2011. ($50,000). Project funded by Joyce Foundation to provide continued redistricting software development for use by advocacy groups in six Midwestern states.

National Redistricting Reform Coordination. 2009-10. ($100,000). With Thomas Mann and Norman Ornstein. Project funded by Joyce Foundation to support coordination of national redistricting reform efforts by the Brookings Institution and the American Enterprise Institute.

Citizen Mapping Project. 2009-10. ($124,000 & $98,000). With Micah Altman, Thomas Mann, and Norman Ornstein. Project funded by the Alfred P. Sloan Foundation. An award to George Mason University enables development of software that, essentially, permits on-line redistricting through commonly used internet mapping programs. A second award to the Brookings Institution and American Enterprise Institute provides organizational support, including the convening of an advisory board.

Citizen Redistricting Education. 2010. ($104,000). Project funded by the Joyce Foundation. Provides for redistricting education forums in five Midwestern state capitals in 2010 and other continuing education efforts.

Pre-Registration Programs. 2008-9. ($86,000). Project funded by the Pew Charitable Trusts' Make Voting Work Initiative to examine pre-registration programs (voter registration for persons under age 18) in Florida and Hawaii.

Sound Redistricting Reform. 2006-9. ($405,000). Project funded by the Joyce Foundation, conducted jointly with the Brennan Center for Justice at NYU to investigate impacts of redistricting reform in Midwestern states.

Electoral Competition Project. 2005-6. ($200,000)  Project funded by The Armstrong Foundation, the Carnegie Corporation of New York, the JEHT Foundation, The Joyce Foundation, The Kerr Foundation, Inc., and anonymous donors.  Jointly conducted by the Brookings Institution and Cato Institute to investigate the state of electoral competition in the United States.

George Mason University Provost Summer Research Grant.  2004. ($5,000).

ICPSR Data Document Initiative. 1999.  Awarded beta test grant. Member, advisory committee on creation of electronic codebook standards.

# Academic Experience

*Courses Taught:* Election Data Science (graduate and undergraduate), Election Law, Public Opinion and Voting Behavior, Parties and Campaigns (graduate and undergraduate), Comparative Electoral Institutions, Introduction to American Politics, American Politics Graduate Field Seminar, Congress, Legislative Politics, Research Methods (undergraduate), Advanced Research Methods (graduate), Freshman Seminar: Topics in Race and Gender Policies, and Legislative Staff Internship Program.

University of Florida

- Associate Professor. August 2014- Present.

George Mason University

- Associate Professor. May 2007 – May, 2014.
- Assistant Professor. Aug 2002 – May, 2007.

The Brookings Institution

- Non-Resident Senior Fellow. January 2006 – June 2016.
- Visiting Fellow.  June 2004 – December 2006.

University of Illinois, Springfield. Assistant Professor. Aug 2000 – June 2002. Joint appointment in Political Studies Department and Legislative Studies Center.

Vanderbilt University. Assistant Professor. Aug 1999 – Aug 2000.

Harvard-MIT Data Center. Post-Doctoral Research Fellow. Sept. 1998 – Aug 1999. Developed Virtual Data Center, a web-based data sharing system for academics.  Maintained Record of American Democracy (U.S. precinct-level election data).

University of California-San Diego

- Assistant to the Director for University of California, Washington DC program. Sept 1997 – June 1998.
- Instructor for research methods seminar for UCSD Washington interns.
- Visiting Assistant Professor. Spring Quarter 1997.
- Visiting Assistant Professor. Summer Session, Aug 1996 and Aug 1997.
- Teaching Assistant/Grader. Aug 1991 – March 1997.

# Professional Service

*National Academy of Sciences,* Member, Program Committee for "Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations."
*Non-Profit Voter Engagement Network,* Member, Advisory Board.  2007 – present.
*National States Geographic Information Council - Geo-Enabled Elections,* Member, Circle of Advisors. 2018 – present.
*Election Sciences Conference-in-a-conference at the 207 Southern Political Science Association Conference.* Organizer. 2016.
*Overseas Vote Foundation*, Member, Advisory Board.  2005 – 2013.
*National Capital Area Political Science Association,* Member, Council, 2010 – 2012.
*State Politics and Policy Quarterly*, Editorial Board Member 2004-2011.
*Virginia Public Access Project*, Member, Board of Directors.  2004 – 2006.
*Fairfax County School Board Adult and Community Education Advisory Committee*, Member.  2004 – 2005.
*State Politics and Policy Quarterly*, Guest Editor.  Dec 2004 issue.

# Related Professional Experience

Media Consultant

- Edison Media Research/Mitofsky International. Nov. 2018; Nov. 2004; Nov. 2006; Feb. 2008; Nov. 2008. Worked national exit polling organization's "Decision Desk."
- Associated Press. Nov. 2016 and Nov. 2010. Worked "Decision Desk."
- ABC News.  Nov. 2002.  Worked "Decision Desk."
- NBC News. Aug 1996.  Analyzed polls during the Republican National Convention.

Redistricting/Elections Consultant.

- Consultant. 2019. Virginia Division of Elections. Audited the assignment of registered voters to districts.
- Expert Witness. 2018. *Georgia Coalition for the Peoples' Agenda, Inc. et. al v. Kemp.* No. 1:18-cv-04727-ELR (N.D. Ga.)
- Expert Witness. 2018. *Martin v. Kemp*. Civil Action No. 1:18-cv-04776-LMM.
- Expert Witness. 2018. *Georgia Coalition for the Peoples' Agenda, Inc. v. Kemp*. Civil Action No. 1:18-cv-04727-ELR.

- Expert Witness. 2018. *Common Cause Indiana v. Lawson*. Case No. 1:17-cv-3936-TWP-MPB (Indiana).
- Expert Witness. 2017-18. *Benisek v. Lamone*. Case No. 13-cv-3233 (Maryland).
- Expert Witness. 2016-2017. *Vesilind v. Virginia State Board of Elections*. Case No. CL15003886 (Virginia).
- Expert Witness. 2016-2017. *Fish v. Kobach*. Case No. 2:16-cv-02105 (Kansas).
- Expert Witness. 2016. *Arizona Libertarian Party v. Reagan*. Case No.: 2:16-cv-01019-DGC (Arizona).
- Expert Witness. 2016. *Georgia State Conf. of the NAACP, et al. v. Brian* Kemp. Case No. 2:16-cv-00219-WCO (Georgia).
- Consultant. Federal Voting Assistance Program. 2014-2015. Analyzed voting experience of military and overseas voters.
- Expert Witness. 2013-2014. *Page v. Virginia State Board of Elections*. No. 3:13-cv-678 (E.D.VA).
- Expert Witness. 2013-2014. *Delgado v. Galvin*. (D. MA).
- Beaumont Independent School District. 2013. Prepared response to DOJ data request.
- Federal Voting Assistance Program. 2012-13. Analyzed voting experience of military and overseas voters.
- Gerson Lehrman Group. 2012. Provided election analysis to corporate clients.
- Expert Witness. 2011-2012. *Backus* v. *South Carolina*. No. 3:11-cv-03120 (D.S.C.).
- Expert Witness. 2012. *Wilson* v. *Kasich*. No. 2012-0019 (Ohio Sup. Ct.).
- Consulting Expert. 2011-2012. Bondurant, Mixson, and Elmore, LLP. (Review of Georgia's state legislative and congressional redistricting Section 5 submission).
- Consultant. 2012. New Jersey Congressional Redistricting Commission.
- Expert Witness. 2011. *Perez v. Texas*. No. 5:11-cv-00360 (W.D. Tex.).
- Expert Witness. 2011. *Wilson v. Fallin*. No. O-109652 (Okla. Sup. Ct.).
- Consultant. 2011. United States Federal Voting Assistance Program.
- Consultant. 2011. Virginia Governor's Independent Bipartisan Advisory Redistricting Commission.
- Consultant. 2011. New Jersey State Legislative Redistricting Commission.
- Expert Witness. 2010. *Healey v. State, et al.* C.A. No. 10-316--S (USDC-RI).
- Research Triangle Institute. 2008-2009. Consultant for Election Assistance Commission, 2008 Election Day Survey.
- U.S. State Department. 2008. Briefed visiting foreign nationals on U.S. elections.
- Expert Witness. 2008. *League of Women Voters of Florida v. Browning* (08-21243-CV-ALTONAGA/BROWN)
- Pew Center for the States. 2007. Consultant for Trends to Watch project.
- Expert Witness. 2007. *Washington Association of Churches v. Reed* (CV06-0726).
- Electoral Assistance Commission. 2005. Analyzed election administration surveys.
- Arizona Independent Redistricting Commission. 2001-2003. Consultant.
- Expert Witness. 2003. *Minority Coalition for Fair Redistricting, et al. v. Arizona Independent Redistricting Commission* CV2002-004380 (2003).
- Expert Witness. 2003. *Rodriguez v. Pataki* 308 F. Supp. 2d 346 (S.D.N.Y 2004).

- Consulting Expert. 2002. *O'Lear v. Miller* No. 222 F. Supp. 2d 850 (E.D. Mich.).
- Expert Witness. 2001-2002. *In Re 2001 Redistricting Cases* (Case No. S-10504).
- Expert Witness. 2001. *United States v. Upper San Gabriel Valley Municipal Water District* (C.D. Cal. 2000).
- California State Assembly. 1991. Consultant.
- Pactech Data and Research. Research Associate. Aug 1989 - June 1991.

Campaign/Political Consultant.

- Ron Christian for Virginia State Senate.  June – November, 2003.
- Theresa Martinez for Virginia House of Delegates. May, 2003.
- Senior Consultant. California State Assembly. Nov. – Dec 1998.
- California Assembly Democrats. June – November 1998.
- Susan Davis & Howard Wayne for CA State Assembly '96. 1996.
- Intern. June – Sept 1995. UC-San Diego, Science and Technology Policy and Projects.

Polling Consultant.

- Hickman-Brown.  July, 2000.  Analyzed national and state level exit and CPS polls for use in various campaigns. Analyzed surveys for congressional, state, and local political campaigns.
- Decision Research. Aug 1994 – Dec 1994. Conducted and analyzes surveys for congressional and statewide campaigns.
- Speaker Jose de Venecia of the Philippines. Feb, 1997.
- Joong-Ang Ilbo/RAND. Oct, 1996. Analyzed survey of Korean attitudes on national security issues.
- UCSD.  Nov. 1991. Conducted and analyzed survey of student attitudes.

# Exhibit B

qry: Purge + VR Lookup

| REGISTRATION_NUMBER | LAST_NAME | FIRST_NAME | DATE_LAST_VOTED | REGISTRATION_DATE | DATE_ADDED | LAST_CONTACT_DATE |
|---|---|---|---|---|---|---|
| 02225062 | BRADSHAW | LINDA | 20100720 | 19920512 | 19950621 | 20100720 |
| 06656377 | THOMAS | CLIFFORD | | 20051004 | 20051012 | 20101001 |
| 07761478 | HOPKINS | DAVID | 20081104 | 20080925 | 20080930 | 20101129 |
| 08546194 | SMITH | KILTON | | 20111206 | 20111206 | 20111206 |
| 08589524 | YOUNG | CHARLESETTA | | 20120113 | 20120202 | 20120113 |