**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FAIR FIGHT ACTION, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.*, <br><br> *Defendants*. | Civ. Act. No. 18-cv-5391 (SCJ) |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Defendants' response to Plaintiffs' Motion for a Preliminary Injunction is striking in what it does *not* say.  Defendants do not dispute that current Georgia law requires that an individual have "no contact" with election officials for five calendar years and then not vote in two subsequent general elections before he or she can be purged from the voter rolls for inactivity alone.  H.B. 316 created that five-year requirement to mitigate the risk of inappropriate purging of voters who have not voted but also have not moved.  And, Defendants also do not dispute that tens of thousands of individuals were just removed from the rolls solely for inactivity even though they do not meet the current statutory standards because they voted or had contact with the State within the five-year window.

For these reasons, the constitutional balance favors the Plaintiffs.  The State has no interest in a purge that violates state law.  As Elections Director Chris Harvey's own testimony clarifies, the State itself sees no benefit from this kind of purge and is only engaging in it based upon its (incorrect) view of what state law requires.  *See* Harvey Dep. 341:2–342:24; Pls.' Br. 19–20.  On the other side of the ledger, using inactivity as a proxy always risks improper purging of people who have not moved.  Nor is there any doubt that barring people from the opportunity to vote in upcoming elections is a severe burden on the purged individuals' right to vote.  These essentially undisputed points of fact and law resolve this dispute.

Defendants' responses are unavailing. For one, they claim that Plaintiffs waited too long to stop the unconstitutional purge, but that is wrong as both a matter of fact and law and essentially irrelevant now that the challenged purge has been completed and Defendants have had the chance for full briefing. Next, they argue that because the question of what interest the State has in this purge must be determined referring to state law—as will often be the case when evaluating a federal constitutional claim requires balancing the burden on an individual against the interest of a state—Plaintiffs' motion is barred by the Eleventh Amendment. But Plaintiffs' claims arise from the First and Fourteenth Amendments, not state law. Finally, Defendants attempt to manufacture a compelling interest in the purge—notwithstanding current state law to the contrary—by misstating the content of state law. But understanding when Georgia permits an individual to be removed from the voter rolls does not require analyzing "novel" issues of state law. To the contrary, the text of the relevant statutes and applying simple arithmetic answers the question. And when current, governing law is applied, tens of thousands of individuals, including a number of Plaintiffs' declarants, are being unconstitutionally disenfranchised.

## I. PLAINTIFFS WERE DILIGENT IN BRINGING THIS MOTION AND DEFENDANTS HAVE SUFFERED NO PREJUDICE.

In evaluating whether to grant a preliminary injunction, this Court considers the "reasonable diligence" of a plaintiff in bringing the motion, and any prejudice a defendant may suffer resulting from the plaintiff's timing. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (U.S. 2018); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (holding delay was insufficient grounds to reverse a grant of a preliminary injunction). Defendants argue Plaintiffs showed "no diligence whatsoever in their efforts related to their [m]otion," Defs.' Br. 22, ECF No. 172, and this lack of diligence is a "fatal flaw[]" in Plaintiffs' motion, *id.* at 2. Defendants are incorrect.

*First*, Plaintiffs were reasonably diligent in bringing their motion when they did. As noted in Plaintiffs' opening memorandum, the Secretary of State (SOS) has not conducted purges consistently and in the past has declined to purge voters in the midst of litigation challenging the validity of the SOS's practices. *See* Pls.' Br. 21 n.7, ECF No. 159-1. Plaintiffs were not aware of the actual timing of the proposed purge until the deposition of Ryan Germany on December 11, *id.*, nor were they aware until that deposition that Defendants would be basing this purge on a patently incorrect reading of state law that negated any interest the State might have. Once Plaintiffs learned of the timing of the purge and the specific basis for it on December

3

11, Plaintiffs filed their motion within five days. In *Benisek*, upon which Defendants rely in claiming a lack of diligence, the moving party "did not move for a preliminary injunction in the District Court until six years, and three general elections, after the [challenged] map was adopted, and over three years after the plaintiffs' first complaint was filed." *Benisek*, 138 S. Ct. at 1944. Because of the factual differences between the two cases, *Benisek* distinguishes itself.

*Second*, even were Defendants correct that Plaintiffs were belated in seeking relief—and they are not—Defendants suffered no prejudice. In *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019), the Eleventh Circuit refused to stay a preliminary injunction based on a laches argument, finding the defendant had "not established that any of the harms it anticipate[d] [we]re anything more than minimal or nonexistent." *Id.* at 1326. Specifically, "the state's administrative burden was nominal; its interest in preventing fraud was unaffected; and public faith in the election [wa]s better-served by allowing Plaintiffs' suit." *Lee*, 915 F. 3d at 1326. The same logic applies here. This Court denied Plaintiffs' requested TRO, and Defendants carried out the purge as scheduled. Defendants have now had the opportunity for full briefing. And they have represented that each "record's status can easily be updated to 'active' or 'inactive' in an overnight database-updating effort by the vendor." Defs.' Br. 22.

4

Thus if Plaintiffs prevail, Defendants face only a minimal administrative burden in restoring the list. Finally, although claiming Plaintiffs' motion "will ensure that no list maintenance will take place until at least 2021" given various elections in 2020, Defendants fail to explain how they would have been in any better position had Plaintiffs brought their motion in late October or November as Defendants suggest they should have. Id. at 23. The only "prejudice" Defendants may suffer from this motion is that they must comply with existing law.

## II. THE ELEVENTH AMENDMENT POSES NO BAR TO PLAINTIFFS' MOTION.

Defendants assert Plaintiffs' challenge is "state-law-based," Defs.' Br. 15, because evaluating the State's interest in the purge depends in part on evaluating whether the purge complies with state law, *id.* at 16-17. On this rationale, Defendants argue the Eleventh Amendment bars Plaintiffs' motion. But, as courts have recognized, the mere fact a federal court might have cause to examine a state's interest in a particular course of conduct by reference to state law does not transform a federal constitutional claim into one under state law.

Defendants do not dispute that federal courts apply a balancing test to evaluate whether voting restrictions violate Due Process or the First Amendment. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality opinion). Defendants also do not dispute that, as part of that inquiry, federal courts

5

must evaluate the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Here, as in many, state law is relevant to determining whether the State's justifications are legitimate. *See Addington v. Texas*, 441 U.S. 418, 426 (1979) (relying on State statute to define the State's interest).

As Plaintiffs noted, *Brown v. Georgia Department of Revenue*, 881 F.2d 1018 (11th Cir. 1989), recognized this very point, and Defendants' attempts at distinguishing *Brown* are unavailing. As *Brown* held, "[u]nder *Pennhurst*, . . . the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law." 881 F. 2d at 1023-24. Here, as in *Brown*, the requested relief would arise under the U.S. Constitution. *See id.* at 1024.[1]

Other courts have readily dispensed with arguments like those Defendants make. Some courts have made their reasoning explicit. *See, e.g., Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1036 (7th Cir. 1987) (concluding that *Pennhurst* was not controlling because the plaintiffs were "not seeking to vindicate rights based on state law" but rather alleged that they had "been injured by the defendants' failure

---

[1] Defendants are also wrong in arguing that Plaintiffs' claims must arise under state law because Plaintiffs seek to stop "only" the removal of 120,561 individuals whose purge violates state law, as opposed to all "list-maintenance activities." Defs.' Br. 17-18. The point, of course, is that a purge in violation of state law cannot serve a compelling state interest as required to burden the First Amendment right.

6

to implement [a] state enactment to the extent required by *federal* law"). Other courts address state law questions intertwined with federal law claims without seeing a need to address *Pennhurst*. *See, e.g., Nation v. San Juan Cty.*, 150 F. Supp. 3d 1253, 1269 (D. Utah 2015) (finding that a county's alleged interests that required violating state statutory requirements were "illegitimate and b[ore] no weight in th[e] court's assessment" of a potential Equal Protection violation), *aff'd sub nom. Navajo Nation v. San Juan Cty.*, 929 F.3d 1270 (10th Cir. 2019). As these cases demonstrate, evaluating state law as part of adjudicating a federal claim is routine and poses no Eleventh Amendment issue.

### III. STATE LAW PROHIBITS THE PURGE OF VOTERS WHOSE LAST CONTACT WITH THE STATE WAS AFTER JANUARY 1, 2010.

As detailed in Plaintiffs' memorandum of law in support of their motion, Defendants' purge of voters for inactivity, whose last contact with the state was on or after January 1, 2010, violates both state and federal law.[2] Under state law,

---

[2] To be clear, while the notion of a nine-year threshold serves as useful shorthand for the state-law requirement, it is important to recognize that H.B. 316 operates to bar voters from being purged after a period of inactivity that fluctuates depending on the date of the voter's most recent contact with election officials and the date of the planned purge. In this case, however, the rule is simple: any voter that made contact with the State at any point on or after January 1, 2010, may not be purged—pursuant to both state law and the U.S. Constitution.

7

Defendants may purge voters for inactivity only if their last contact with election officials occurred before January 1, 2010.

Georgia law sets firm time limits on when the State may move a registered voter to the "inactive list," and when it may purge voters from the "inactive list." Specifically, O.C.G.A. § 21-2-234(a)(1) defines "no contact" to mean a voter has not had one of several types of contact with election officials "during the preceding five calendar years." Then, "[i]n the first six months of each odd-numbered year, the Secretary of State shall identify all electors" with "no contact during the preceding five calendar years," and must send them a "confirmation notice . . . during each odd numbered year." § 21-2-234(a)(2). A voter cannot move to the "inactive list" unless "the card is not returned within 30 days after the date of the notice." § 21-2-234(c)(2). To be purged from the "inactive list," the voter must have made "no contact" "until the day after the second November general election held after the elector is placed on the inactive list." § 21-2-235(b).

Here is how the statute plays out in practical terms. All voters subject to a voter-purge in December 2019—or, any time before the November 2020 election—must have been moved to the inactive list before the 2016 general election. *See* O.C.G.A. § 21-2-235(b). To have been moved to the inactive list before November 2016, voters would need to have been identified and mailed notice in 2015, the "odd-

numbered year" immediately before 2016. *See id*. § 21-2-234(a)(2).  All voters identified in 2015 as having "no contact" with election officials could not have engaged in any of the statutorily-defined modes of contact with the state "during the preceding five calendar years":  2014, 2013, 2012, 2011, or 2010.  *Id.*  Thus, only voters who had their most recent contact with election officials during 2009 are eligible to be purged under Georgia law.  The graphic below sets forth the proper timeline for a purge under current law—contrary to Defendants' incorrect approach.



This result accords with the SOS's own admissions.  The SOS has repeatedly emphasized the consistency between the 10-year driver's-license-renewal period and the voter-inactivity period under Georgia law.  In a hearing before this Court,

9

Defendants argued that it was "important . . . to remember" that "having the list matching process and the database matching happening simultaneously when someone goes to get a driver's license, under House Bill 316[,] that timeline, that lack of contact would be lined up with the time which you have to renew your driver's license. So if you go nine years without voting, in that 10th year when you're renewing your driver's license that will constitute a contact. We can verify you're still an eligible voter at a location and can proceed from there." ECF No. 64 at 16:21-17:10. And in a press statement, the SOS defended H.B. 316 on the same basis.[3] These statements are completely inconsistent with the State's new position that a seven-year threshold for "no-contact" is lawful.

---

[3] *See* Johnny Kaufman, *Georgia Governor Signs Law To Slow 'Use It Or Lose It' Voter Purges*, APMReports (Apr. 11, 2019), https://www.apmreports.org/story/2019/04/11/georgia-brian-kemp-use-it-or-lose-it-voting-law-changes ("To Raffensperger, it makes sense that the period for when someone is removed lines up with driver's license renewal. He called this an 'objective measure.'"); *see also* Mark Niesse, *Georgia Election Bill Would Give Voters More Time Before Being Purged*, Atlanta Journal-Constitution (Feb. 15, 2019), https://www.ajc.com/news/state--regional-govt--politics/georgia-election-bill-would-give-voters-more-time-before-being-purged/0TcTGgTkdIKcPFLjMFQgiP (reporting H.B. 316's sponsor stating that "[i]t makes sense to extend the period before inactive voters' registrations are canceled so that it's more likely to coincide with when voters renew their driver's licenses every 10 years.").

But it is clear from the SOS's data that nearly all voters purged on December 16 had contact with the State on or after January 1, 2010. *See* Expert Report of Michael P. McDonald 10 ("McDonald Report"), attached as Exhibit A (confirming that over 99% of voters on the State's spreadsheet had contact after this date).[4] Among them were several Georgia voters who submitted declarations in support of Plaintiffs' motion.[5]

The SOS defends its unlawful practice by ignoring the portions of the statute it finds inconvenient. Under Defendants' theory, § 234 is irrelevant because it establishes a completely different "clock" than the one at issue in this purge. But Defendants' recitation of § 235 ignores § 234's express incorporation into the § 235 standard: § 235 prohibits the SOS from purging voters unless they "make[] no contact, *as defined in Code Section 21-2-234*," "until the day after the second

---

[4] As explained in McDonald's Expert Report, the Georgia Registered Voter File includes a field entitled "LAST_CONTACT_DATE." The State's documentation only identifies the existence of this field, not the information it tracks. Plaintiffs assume that the field identifies the last contact a registered voter had with local election officials, barring any evidence to the contrary from Defendants. *See* McDonald Expert Report 7-8.

[5] Defendants falsely claim that Plaintiffs have not provided declarations from a single person who should not be purged. Linda Bradshaw, David Hopkins, Kilton Smith, Clifford Thomas, and Charlesetta Young had contact with election officials after January 1, 2010. *See* Screenshot of Records for Linda Bradshaw, David Hopkins, Kilton Smith, Clifford Thomas, and Charlesetta Young in Georgia Registered Voter File generated by the Secretary of State's office on November 15, 2019, Attached as Exhibit B. These declarants are merely the tip of the iceberg.

November general election held after the elector is placed on the inactive list of electors." O.C.G.A. § 21-2-235(b) (emphasis added). Georgia law establishes one, single clock. That clock was enacted in H.B. 316, and any other "clock" was stricken from the law effective April 2, 2019. *See* H.B. 316 § 51.

Even if the Defendants were right that they could rely on the now-repealed three-year time period for placement in inactive status for the group of voters they just purged, they did not comply with that requirement either. As the McDonald report shows, about 19% of the group purged for inactivity had contacts like voting or registering during calendar year 2012. *See* McDonald Report at 10; *supra* at 11 n.3. They were only placed on the purge list because of the SOS's decision to ignore all 2012 contacts before the November general election, in clear violation of even the old state law.

And Defendants' tortured reading of the statute does nothing to help their constitutional argument. As Defendants themselves repeatedly emphasize, likelihood of success on a state-law claim is not what matters—likelihood of success on a *constitutional* claim does. And success on Plaintiffs' constitutional claim depends on the state's interest in the action it is taking: purging voters whose most recent contact with election officials occurred during 2010, 2011, and 2012. But that is the very same interest that Georgia's General Assembly and Governor Kemp

12

repudiated by enacting H.B. 316.  A state interest is best determined by looking at the legislation it passes, *see Addington*, 441 U.S. at 426 (looking to state law to determine the state's interest), and this legislation spoke clearly:  the State has no interest at all in purging voters for a period of inactivity that is shorter than the statute was revised to allow.  Ga. S. Weekly Report, 2019 Reg. Sess. (Mar. 19, 2019) (describing H.B. 316 as intended to achieve "a secure and fair election").  Defendants cannot rest their constitutional argument on a state interest in denying voters the precise benefit that H.B. 316 conferred.

## IV.   THE PURGED VOTERS WILL SUFFER IRREPARABLE HARM.

Defendants dismiss the idea voters face irreparable harm in three sentences, claiming that "an overnight database-updating effort by the vendor" can easily switch a voter's status from "cancelled" back to "active."  Defs.' Br. 22.  But the technical details of how a voter's record is modified once a voter successfully re-registers—or after the court *grants* Plaintiffs' requested injunctive relief—is entirely beside the point.  Defendants do not dispute there is no post-purge notice sent to a voter informing them they have been removed from the rolls, nor do they dispute Georgia offers no same-day registration option.  *See* O.C.G.A. § 21-2-224 (establishing registration deadlines).  It is plain many purged voters are likely to

show up on Election Day and only learn at that very moment they cannot vote, period.

The risk of this irreparable harm occurring is all the greater given, for purged voters, the deadlines to re-register are imminent. To vote in the March 24, 2020 presidential primary and special election, voters would need to discover they have been purged and re-register by February 24, 2020.[6]

The irreparable harm faced by purged voters results from Georgia's rules that all but guarantee voters will learn they are no longer registered only at the moment they cannot re-register, and the imminent deadlines for upcoming elections make that re-registration highly unlikely. On these points, Defendants have nothing to say.

---

[6] *2020 State Elections and Voter Registration Calendar*, https://sos.ga.gov/admin/files/2020_Short_Calendar.pdf (last visited Dec. 17, 2019). For the January 28, 2020 special election for the District 171 seat in the Georgia House of Representatives voters would need to register even sooner, by December 30. Daniel Anderson, *Georgia House of Representatives District 171 Special Election*, BallotPedia News (Dec. 10, 2019), https://news.ballotpedia.org/2019/12/10/georgia-house-of-representatives-district-171-special-election/; O.C.G.A. § 21-2-224(b) (setting registration deadlines for special elections).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Preliminary Injunction returning the 120,561 voters moved to cancelled status on December 16, 2019, based on inactivity back to their status before the purge.

## CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief is prepared with one of the font and point selections approved by the Court in LR 5.1(C).

Respectfully submitted,


December 18, 2019                    */s/ Leslie J. Bryan*
                                     Allegra J. Lawrence (GA Bar No. 439797)
                                     Leslie J. Bryan (GA Bar No. 091175)
                                     Maia Cogen (GA Bar No. 832438)
                                     Suzanne Smith Williams (GA Bar No. 526105)
                                     **LAWRENCE & BUNDY LLC**
                                     1180 West Peachtree Street
                                     Suite 1650
                                     Atlanta, GA 30309
                                     Telephone: (404) 400-3350
                                     Fax: (404) 609-2504
                                     allegra.lawrence-hardy@lawrencebundy.com
                                     leslie.bryan@lawrencebundy.com
                                     maia.cogen@lawrencebundy.com
                                     suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillion.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
Fax: (770) 635-0029
kurt@summervillefirm.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

16

Kali Bracey (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com

Jeremy H. Ershow (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jershow@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 18, 2019, I caused to be served the foregoing **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** by filing it with the Court using the ECF system, which will effect service on opposing counsel:

Chris Carr
Attorney General
Dennis Dunn
Deputy Attorney General
Russell Willard
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Bryan P. Tyson
Bryan F. Jacoutot
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com

Joshua Barrett Belinfante
Vincent Robert Russo, Jr.
Brian Edward Lake
Carey Allen Miller
Alexander Denton
Special Assistant Attorneys General
**Robbins Ross Alloy Belinfante Littlefield, LLC**
500 Fourteenth St., N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
vrusso@robbinsfirm.com
cmiller@robbinsfirm.com
adenton@robbinsfirm.com


This the 18th day of December, 2019.

*/s/ Leslie J. Bryan*
Leslie J. Bryan