

## ROBBINS
LITIGATION AND REGULATORY LAW

JOSH BELINFANTE
DIRECT LINE: 404-856-3262
Email: jbelinfante@robbinsfirm.com

December 23, 2019

The Honorable Steve C. Jones
United States District Judge
Northern District of Georgia
Richard B. Russell Federal Building
2211 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303-3309

      Re:    *Fair Fight Action, Inc., et al. v. Brad Raffensperger, et al.*
              U.S. District Court, Northern District of Georgia
              Civil Action File No. 1:18-CV-05391-SCJ

Dear Judge Jones,

     On December 20, 2019, the Court posed one question to each party. Plaintiffs were asked to identify the "precise injury that will be suffered by the approximately 120,000 people at issue here if this preliminary injunction is denied."[1] Defendants must identify the "interest … in applying its interpretation of H.B. 316 to the approximately 120,000 people at issue here."[2] Both questions arise from the Supreme Court's decision in *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

     In response to the Court's questions, Defendants identify at least three recognized interests in enforcing the law as written. As a preliminary matter, federal law requires (and the State has an interest in) maintaining accurate voter lists. Second, there is a strong and fundamental interest in applying the State's laws as written. Finally, the State has an interest in consistent and effective election administration, and having voters appear at a polling place that is no longer their correct one slows the process for all voters at that polling place and increases the possibility that the voter may be disenfranchise (for example, if they now reside in a different county). Any of these interests outweigh the "extremely small" burden of registering to vote.[3]

---

[1] Email from Pamela Wright to the Parties' Counsel (the "Email") (Dec. 12, 2019).
[2] *Id.*
[3] *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

The Honorable Steve C. Jones
United States District Judge
December 23, 2019
Page 2

**Facts**

As things currently stand before the Court, Plaintiffs challenge slightly less than 100,000 individuals whose voter status is currently "cancelled."[4]  These individuals remain on cancelled status after the Court denied Plaintiffs' Motion for Temporary Restraining Order on Monday, December 16, and after the Secretary moved some of the voters (around 22,000) to inactive status on Thursday, December 19.  The remaining individuals have had "no contact" with the State since at least December 31, 2011.[5]  In 2015, each of them were mailed a "confirmation notice," which Georgia law defines as "a postage prepaid, preaddressed return card on which an elector may state such elector's current address," and which provides instructions on how to return the postcard to the relevant county election official to return to active status.[6]  There is no evidence to suggest any of the notices were returned.

The lack of confirmation from these individuals that they remained at their listed address continued.  In late summer 2019, an additional communication was sent to the individuals at issue by the Secretary.[7]  This final notice included a postage prepaid and preaddressed return card asking the individual to return the card if they wished to return to the "official list of electors."[8]  No evidence supports that any of the voters who were ultimately moved to cancelled status did.

Plaintiffs introduced eight declarations to support their Motion.  Testimony demonstrated that four of the individuals remain on the official list of electors (e.g., active status).[9]  Others were sent notices, but the Secretary received nothing in return.[10]  There is no evidence that any of the affiants are precluded from or burdened by registering to vote again.  Indeed, under Georgia law, re-registering to vote is as simple as going online to use the Online Voter Registration system or renewing one's driver's license or identification card with the Department of Driver Services.

---

[4] Hr'g Tr. at 85.
[5] O.C.G.A. § 21-2-234(a). *See also* Hr'g. Tr. at 41-42.
[6] O.C.G.A. § 21-2-234(c).
[7] Hr'g Tr. at 65 (Harvey Testimony).
[8] O.C.G.A. § 21-2-235(a) (distinguishing between the "official list of electors" and the "inactive list of electors." *See also* Hr'g Tr. at 65 (Harvey Testimony).
[9] Hr'g Tr. at 108 (Harvey Testimony).
[10] *Id.* at

The Honorable Steve C. Jones
United States District Judge
December 23, 2019
Page 3

### Legal Analysis

In the light of these facts, the Court asked the Parties to respond to questions based on the Supreme Court's decision in *Anderson*, 460 U.S. at 780. There, the Court held that a burden on the right to vote must be sufficiently severe as to outweigh a state's legitimate interest in administering elections.[11] It is axiomatic that "all election regulations[] have an impact on the right to vote."[12] Consequently, courts apply a lesser scrutiny to election laws that have a minimal burden on the right to vote and strict scrutiny when the burden is significant.[13] *Anderson* does not, however, impose on states any burden of proof or evidentiary showing; the burden remains with the Plaintiffs.[14]

Here, Plaintiffs have provided no evidence of *any* burden on the right to vote. They have asked the Court only to *presume* a burden exists when the record does not support such a finding at all. Of the affiants who have cancelled status, none expressed an inability or difficulty in registering to vote.[15] Plaintiffs offered no testimony to fill the gap left by their affiants.[16] This omission distinguishes the record here from other cases where courts applied *Anderson*.[17] The Eleventh Circuit's ruling in *Billups*, however, is on point. There, the plaintiffs could not "locate a single voter who would bear a significant burden[, which] 'provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote.'"[18] And, recently, the Ninth Circuit concluded that registering to vote does *not* present a significant constitutional burden.[19]

---

[11] *Id.* at 789.
[12] *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 2064, 119 L. Ed. 2d 245 (1992).
[13] *See generally Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1320-21 (11th Cir. 2019).
[14] *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *see also Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123 (9th Cir. 2016) (maintaining that the demonstration of a burden on the right to vote falls squarely on the plaintiff).
[15] *See* Pls.' Br. in Supp. of Mot. for Preliminary Inj., Exs. C to L. (Docs. 159-3 – 12.)
[16] *See generally* Hr'g Tr.
[17] *Lee*, 915 F.3d at 1320 (considering plaintiffs' handwriting expert and testimony from individual who had a ballot cancelled).
[18] 554 F.3d at 1354.
[19] *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

The Honorable Steve C. Jones
United States District Judge
December 23, 2019
Page 4

      As a consequence, and pursuant to the precedent established in *Billups*, the State must show only that it has a legitimate (not compelling) interest in applying the law as written.[20] The State offers three. First, as articulated in the National Voter Registration Act ("NVRA"), Georgia has an interest—both generally and as compelled by federal law—in maintaining reliable lists of electors.[21] Congress mandates this, in part, "to protect the integrity of the electoral process; and ... [to] ensure that accurate and current voter registration rolls are maintained."[22] The Supreme Court of the United States spoke of similar state interests in the context of photo identification laws:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.[23]

      Until the enactment of HB 316, Georgia had long maintained that these interests were satisfied by having a three-year lookback for voter contact. If voters refuse to respond within that time period, the State can legitimately presume that they have moved and are no longer eligible voters at their registration address—or that they do not wish to remain on the list of electors. They are then placed on the inactive list of electors. That Georgia has now prospectively extended the time period does not minimize that the efficacy or need of the three-year lookback. Put differently, the unquestionable interests that placed the impacted voters on the inactive elector list remain valid today.

---

[20] *Id.*
[21] 52 U.S.C. § 21083(a)(4)(A).
[22] 52 U.S.C. §§ 20501(b)(3) and (b)(4). Plaintiffs do not (and cannot) allege that Georgia's voter list maintenance efforts conflict with the NVRA. *See generally* 52 U.S.C. § 20507(c)(1) (providing a "safe harbor" for compliance for those states with voter roll maintenance efforts like Georgia); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019).
[23] *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008).

The Honorable Steve C. Jones
United States District Judge
December 23, 2019
Page 5

This leads to the State's second legitimate interest in the Secretary's decisions: the correct (and required) application of state law.[24] Having shown that State has a general interest in maintaining accurate voter rolls, the only question is whether the statute should be interpreted as written or in accordance with what Plaintiffs argue was the General Assembly's legislative intent. Under our system of government, applying the law as written is its own interest. Plaintiffs challenge rests completely on an interpretation of state law that cannot be reconciled with legislative text. Thus, the State is entitled to rely on the government interest in maintaining voter rolls generally, and the interest in applying the law as written specifically. Georgia courts would agree: "I write separately to encourage the parties who appear before us to stop referencing altogether the ethereal fiction of 'legislative intent' in the context of statutory interpretation."[25]

Third, sustaining the Secretary's decisions from December 16-17 and 19 has the added benefit of avoiding voter confusion and improving election-day operations. A review of the record demonstrates that persons with cancelled status due to no contact for a period of seven years have purposefully chosen not to engage with the State and twice have refused to return postage prepaid communications verifying their current address. These choices must be respected. Alternatively, such individuals have likely moved, died, or otherwise rendered themselves ineligible to vote at their current address. This is supported by the record and Plaintiffs' inability to demonstrate otherwise.

Similarly, reversing the Secretary's application of state law would leave numerous individuals on voter registration lists in spite of this evidence demonstrating ineligibility, affecting voter data and imposing additional administrative burdens as well. For instance, incongruently large voter registration will lead to the appearance of lower voter turnout (as a percentage of registration), creating an artificial perception of voter apathy or impediments to appearing at the polls when no such problem exist in reality. Further, registration figures which incorporate individuals who have moved and

---

[24] See N. Fulton Med. Ctr. v. Stephenson, 269 Ga. 540, 543–44 (1998) ("Administrative agencies … are not authorized to enlarge the scope of, or supply omissions in, a properly-enacted statute. Nor may administrative agencies change a statute by interpretation, or establish different standards within a statute that are not established by a legislative body.")

[25] Georgia Lottery Corp. v. Tabletop Media, LLC, 346 Ga. App. 498, 505, 816 S.E.2d 438, 444 (2018) (Dillard, C.J., concurring). See also Malphurs v. State, 336 Ga. App. 867, 870–71, 785 S.E.2d 414, 417 (2016) ("The General Assembly does not enact a general intention; it enacts statutes. Statutes have words, and words have meanings. It is those meanings that we interpret and apply, not some amorphous general intention.")

The Honorable Steve C. Jones
United States District Judge
December 23, 2019
Page 6

are no longer eligible at their old address, may cause local election officials to improperly assess where equipment and personnel should be deployed on election day in 2020.  At minimum, local and state election officials would be preparing for future elections with less accurate data thus increasing the risk of deploying limited human and equipment resources to geographic areas where they are less needed, depriving higher-need areas.

     Each of these interests – (1) maintaining accurate voter lists; (2) enforcing the law as written; and (3) avoiding voter confusion and improving election day administration – outweigh the presumed (but not established) minimal burden on voters that Plaintiffs ask this Court to find by judicial fiat.  For any of these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Sincerely yours,

*[signature]*

Josh Belinfante

JB/db