# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. Action No. 1:18-cv-05391-SCJ |
| ) | |
| BRAD RAFFENSPERGER, ) | |
| in his official capacity as ) | |
| Secretary of State of the ) | |
| State of Georgia, et al., ) | |
| ) | |
| Defendants. ) | |

## EXPERT REPORT OF KENNETH R. MAYER

Professor of Political Science
University of Wisconsin-Madison
201 D North Hall
1050 Bascom Mall
Madison, WI 53706

February 18, 2020

Kenneth R. Mayer, Ph.D.

## I.     Scope of Assignment

I have been asked by Plaintiffs' counsel to offer opinions about the voter registration and voter verification processes in Georgia.

This report contains my opinions on these matters. To develop these opinions, I relied upon technical and specialized knowledge I gained from my education, training, and experience; widely accepted and reliable statistical methods; and my knowledge of the academic literature on elections and voting rights. My opinions are based on the review and analysis of the following information and materials:

1.  The Georgia statewide voter file, with a last recorded action on December 20, 2019;

2.  A list of voters in pending status on February 22, 2018;

3.  A list of voters registering between January 2, 2014, and July 24, 2019, who were still in pending status as of July 24, 2019;

4.  County files of registered voters as of January 28, 2020, including fields identifying voters in pending status and those in Missing ID Required status;[1]

5.  The 2014-2018 American Community Survey;

6.  Depositions of Chris Harvey (Director of Elections, Office of the Secretary of State), August 16, 2019 and December 5, 2019; Kevin Rayburn (Deputy Counsel, Office of Secretary of State), December 6, 2019; and Ryan Germany (General Counsel, Office of Secretary of State), December 11, 2019.

7.  The academic literature cited in this report.

I conducted all data handling and analysis using Stata/SE v. 15.1

---

[1] Bates numbers STATE-DEFENDANTS-00154046 to 00154204.

## II.      Background and Qualifications

I have a Ph.D. in political science from Yale University, where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego, where I majored in political science and minored in applied mathematics. I have been on the faculty of the political science department at the University of Wisconsin-Madison since August 1989. My curriculum vitae is attached to this report as Appendix A.

All publications that I have authored and published in the past ten years appear in my curriculum vitae. Those publications include the following peer-reviewed journals: *Journal of Politics*, *American Journal of Political Science*, *Election Law Journal*, *Legislative Studies Quarterly*, *Presidential Studies Quarterly*, *American Politics Research*, *Congress and the Presidency*, *Public Administration Review*, *Political Research Quarterly*, and *PS: Political Science and Politics*. I have also published in law reviews, including the *Richmond Law Review*, the *UCLA Pacific Basin Law Journal*, and the *University of Utah Law Review*. My work on campaign finance has been published in *Legislative Studies Quarterly*, *Regulation*, *PS: Political Science and Politics*, *Richmond Law Review*, the Democratic Audit of Australia, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My research on campaign finance has been cited by the U.S. Government Accountability Office, and by legislative research offices in Connecticut and Wisconsin.

My work on election administration has been published in the *Election Law Journal*, *American Journal of Political Science*, *Public Administration Review*, *Political Research Quarterly*, and *American Politics Research*. I was part of a research group retained by the Wisconsin Government Accountability Board to review their compliance with federal mandates and reporting systems under the Help America Vote Act, and to survey local election officials throughout the state. I serve on the Steering Committee of the Wisconsin Elections Research Center, a unit with the UW-Madison College of Letters and Science. In 2012, I was retained by the United States Department of Justice to analyze data and methods regarding Florida's efforts to identify and remove claimed ineligible noncitizens from the statewide file of registered voters.

In the past nine years, I have testified as an expert witness in trial, deposition, or report in the following cases:

Federal:  *Kumar v. Frisco Independent School District*, No. 4:19-cv-00284 (E.D.

2

Tex. 2019); *Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Tex. 2019); *Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Tex. 2018); *Dwight, et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga. 2018); *League of Women Voters of Mich., et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich. 2018); *One Wis. Inst., Inc. v. Thomsen* 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012).

State:  *Priorities U.S.A, et al. v. Missouri, et al.,* No. 18AC-CC00226 (Cir. Ct. of Cole Cty., Mo. 2018); *Milwaukee Branch of NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Kenosha  Cty. v. City of Kenosha*, No.  11-CV-1813 (Wis. Cir. Ct.,  Kenosha Cty.,  Wis. 2011).

Courts consistently have accepted my expert opinions, and the basis for those opinions. No court has ever excluded my expert opinion under *Daubert* or any other standard. Courts have cited my expert opinions in their decisions, finding my opinions reliable and persuasive. *See Priorities U.S.A. v. State,* No. 18AC-CC00226, 2018 WL 6031529, at *3 (Cir. Ct. Cole Cty., Mo. Oct. 23, 2018), *aff'd*, __S.W.3d __, 2020 WL 203129 (Mo. Jan. 14, 2020); *see generally Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 953-54 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 856-58 (E.D. Wis. 2012); *Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 290-91, 297-98 (Wis. 2014); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

I am being compensated at a rate of $350 per hour. I am independent and impartial. My compensation is not dependent on either the substance of my opinion or the outcome of this case.

### III.   **Summary of Findings**

- At nearly every level, and at every combination of status, no matter when individuals registered, registrants in the pending file are disproportionately minority:  this includes registrants in pending status, registrants in "Missing ID Required" (MIDR) status, registrants flagged as noncitizens, registrants who failed the Georgia Department of Driver Services (DDS) or Social Security Administration (SSA) verification process, registrants whose names did not match into DDS or SSA records, and pending registrants who were not moved to the active voter file. The only category of registrants not disproportionately minority are those who are pending because of age.

- The verification process is opaque, subject to a wide exercise of discretion by county registrars, and not uniformly implemented. Staff from the Secretary of State's office did not know all of the details, and their description of the process did not always match the data in the pending or active voter files. The evidence suggests strongly that election officials do not know how the verification process actually operates in practice.

- The verification process, particularly the algorithm for matching names across voter registration and DDS files and the process of flagging potential noncitizens, relies on methods known to produce both false verification failures and false noncitizenship flags. These methods also produce higher verification failure rates and noncitizenship flags for minority registrants compared to non-Hispanic White registrants.

- One noteworthy example of data errors is the following: non-U.S. citizens are eligible for a Georgia driver's license or state ID card if they are legally present in the country (this applies to Real ID as well). If a noncitizen obtains a license or ID, their noncitizenship status at that time is recorded in DDS files. If that person later naturalizes, they are not required to update their information with DDS, but will continue to be flagged as noncitizens by the DDS verification process if they register to vote unless they present naturalization documents at the time they register. According to the 2014-2018 American Community Survey, there were nearly 460,000 naturalized citizens over 18 in Georgia in 2017, over 80% of whom were members of minority groups (only16.9% were non-Hispanic Whites).

4

- Georgia has only recently implemented changes to the verification process through HB 316, and the new procedures have yet to be tested in a statewide election.  Given the ambiguities and errors in the policies and training materials that I have reviewed, the probability of election-day mistakes and confusion remains very high.

- Claims by election officials that registrants in MIDR status will experience no difference in how they are treated at a polling place are likely incorrect. Based on the testimony of state election officials and materials I have reviewed, I have seen three different descriptions of what MIDR status means:  (1) that voters in MIDR status can show any photo ID that qualifies under Georgia's voter ID requirement; (2) that voters will have to show a HAVA-compliant photo ID; and (3) that voters who registered in Georgia for the first time will not have to show a photo ID in order to vote.

- Adding registrants to the active voter file with an MIDR requirement does not eliminate the burden on registrants. It is possible, even likely, that voters, local election officials and poll workers may be confused about what a registrant in MIDR must do in order to vote.

- While the percentages of individuals in the active voter file in MIDR status or pending status is not large (on the order of 1% of registered voters), the absolute number of individuals flagged is not trivial (over 60,000) and will certainly grow larger when registration increases as the March presidential primary and November general election approach.

## IV.   <u>Estimating the Quantity of Interest</u>

The key empirical quantity of interest is the number of otherwise eligible people incorrectly placed in "MIDR" status because their registration information did not exactly match with information in state driver's license files maintained by the DDS or national Social Security files (the "verification" process), or because they were flagged as noncitizens.

Prior to April 2, 2019, registrants who failed the verification process were put in "pending status" and required to provide additional documentation to election officials before being placed on the active voter rolls. Officials in the Secretary of State's office stated in deposition testimony that since that date registrants who fail the verification process were either placed on the active rolls with an "MIDR"

notation (Missing ID Required), or placed in pending status and not added to the voter rolls if they are "flagged by DDS records as potential noncitizens."[2]

The defining character of these registrants is that their voter registration was either held up (prior to April 2, 2019, or afterwards if their citizenship is questioned), or they face an additional administrative step at the polling place (after April 2, 2019), because their registration information did not exactly match records held by either DDS or the United States Social Security Administration (SSA), in an unclear "verification" process that even election officials have difficulty explaining.

These individuals are flagged even if the verification failure was the result of:

- a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error;
- errors made by Georgia election officials manually entering information from paper registration forms;
- incorrect data in the verification files, such as outdated citizenship or name data in Georgia DDS or SSA files;
- differences in data entered for the same individual in voter registration, DDS, or Social Security Administration files, such as a different spelling of a first or last name in the files or a nickname in one file and a formal name in another (e.g., "Rob" in one file and "Robert" in the other).

*All* of these issues are known issues in exact match methods and the use of driver's license files to verify registration and citizenship, and will produce both false non-matches and false matches (see below).

This quantity – the total number of burdened registrants – is not completely and directly observable with the available data. I cannot observe the number of pending registrants who are incorrectly flagged as noncitizens, though I am certain that the number is nonzero.

Similarly, I do not know how many registrants in non-MIDR status were previously in that status but were able to provide additional identification to election officials. I can calculate how many registrants who were in MIDR status in July 2019 had resolved the issue by January 2020.

---

[2] Letter from Bryan Tyson to John Chandler (Aug. 27, 2019).

Moreover, I do not have access to DDS or Social Security Administration data and therefore do not know the specific reason *why* a registrant did not match with these files and is in MIDR status, only that a non-match existed and the general category of the non-match in July 2019.[3] In the July 2019 and February 2018 pending files, some registrants whose data are forwarded to DDS[4] and returned as not matching have separate fields recording whether a match occurred on the first name, last name, date of birth, driver's license number, and social security number and whether they are flagged as potential noncitizens. I do not know if the match failure was the result of a typographical error, nickname, spelling variation, transposition, or other known issue with exact matching algorithms.  The Social Security Administration verification process produces only a one-letter code (signifying a match, no match, multiple matches, invalid data, or system error).

Nevertheless, I am able to reach conclusions about the verification process, by analyzing patterns in the pending data and determining how many formerly pending voters were added to the active voter rolls. I am certain that the verification process imposes a burden on eligible individuals by incorrectly flagging citizens as noncitizens, failing to verify individuals because of false non-matches into DDS or SSA files, or errors in the data entry process. The evidence is conclusive that these burdens fall disproportionately on racial or ethnic minority registrants who are members of protected classes of voters under Section II of the Voting Rights Act.

## V.   <u>Lack of Clarity in the Verification Process</u>

The Help America Vote Act (HAVA) requires states to maintain statewide lists of registered voters and implement a process to verify the eligibility of new registrants through state driver's license records or Social Security Administration data. New registrants must either provide a GA driver's license or ID number if they have one, or the last four digits of their social security number. This

---

[3] The February 2018 pending file and the January-July 2019 file use one or more the following categories for pending status: citizenship verification, DDS verification, incomplete address, incomplete DOB, incomplete name, missing information, no signature, pending age, pending hearing, SSN verification, or verification.

[4] This excludes registrants who are listed as having incomplete information, missing address, or a signature.

information is compared (or "matched") to data in DDS or SSA records to verify the identity of those registrants.

States may set their own definitions of what constitutes verification, or evidence that the registrant is in either driver's license or SSA files, including what fields are used and how closely the data across various files must match:

> States have considerable discretion to decide for themselves the criteria to be used for matching, although these criteria cannot be used to disenfranchise legitimate voters. Some states will use fuzzy matching and others exact matching for checking any given data field. States also vary in the fields that they check—for example, some will compare addresses and others will not. In general, some election offices may be using match criteria without sufficient consideration of possible false-positive and false negative error rates associated with different variants of the methods (National Research Council 2010, 67).

Georgia *appears* to use an exact matching process using a registrant's first name, last name, date of birth, and either driver's license number or last for digits of social security number. I use the word *appears* intentionally, as the details of the verification process are not clear, the descriptions given by officials in the Secretary of State's office indicate that even they are not sure how the process operates, and those descriptions do not accurately describe the data in the voter file or whether registrants in pending status are moved to active status.

Based on the descriptions in the depositions of Chris Harvey and Kevin Rayburn, the process appears to involve the following steps:

1. When an individual registers to vote, the voter's first name, last name, date of birth, and either a driver's license/state ID number or last four digits of the social security number are forwarded to DDS. If a voter registers using a paper form, county registrars manually enter the data into the state's "eNet" electronic voter registration system.

2. DDS compares eNet information to its database of driver's licenses and state IDs. If the name, date of birth, ID number and social security number fields do not all *exactly* match the data in the DDS file – meaning every character in every field, including spaces, hyphens and apostrophes – the record is

returned as a non-match. A non-match in any field results in a non-match for the record.

3. If a registrant used a Georgia driver's license or state ID number to register and showed the photo-ID to county registrars, a match on the ID number overrides non-matches on name and date of birth fields.[5] It is not clear how often this occurs.

4. A record with a driver's license or ID number that matches in DDS files is flagged if DDS records indicate that the registrant is a potential noncitizen. It does not appear that these records are forwarded to the Social Security Administration to verify citizenship status.[6]

5. For records using the last four digits of a social security number to register instead of a driver's license or ID number, DDS forwards the information to the Social Security Administration (though this does not always appear to happen). SSA returns a code indicating whether a match exists, and whether an individual is flagged as a noncitizen.

6. Based on steps 2-5, DDS informs county registrars whether or not a match exists, and in cases of non-matches which fields did not match (license or ID number, name, date of birth, social security number). DDS also reports whether the registrant is flagged as a potential noncitizen.

7. For registrants failing the verification process, county registrars have discretion in correcting typographical errors and resubmitting to records to DDS, but there is no uniform policy. The data files do not indicate if registrants had their information corrected and resubmitted.

---

[5] Dep. of Chris Harvey, 233:20-235:22 (Aug. 16, 2019): "Okay. Somebody registers to vote and the law requires that they provide their driver's license number, if they have one, or the last four of the social, if they have one. If they don't – if they have one or the other, if they don't provide a driver's license and they provide photo ID when they register to vote, they are automatically registered and active to vote. They still go through the DDS verification. However, by checking they provided ID, it overrides any DDS failure that might happen."
[6] In the July 2019 pending file, 2,655 registrants were flagged by DDS as noncitizens. Only 22 (0.8%) have an SSA response code, and all failed verification with a code of "invalid input data."

8.  Registrants who fail the verification process (post April 2, 2019) are added to the active voter rolls and flagged with MIDR (Missing ID Required).

9.  Registrants who are flagged as noncitizens by either DDS or SSA must provide documentation of citizenship before they are added to the active voter rolls.

The keys in this process are (1) the definition of what constitutes a "match" into driver's license or Social Security data, and how often false verification failures occur; (2) how often false noncitizen flags occur; and (3) the precise implications of being in MIDR status.

In requiring that records submitted for verification match all fields (first name, last name, date of birth, license number, or social security number), Georgia imposes a strict match definition that is *guaranteed* to produce false non-matches, false noncitizen flags, and erroneous verification failures.

Even so, the precise details of how the matching process operates is unclear. In depositions, staff of the Georgia Secretary of State Office gave conflicting information about the process and were not always sure about how it worked. For example, one official said that a mismatched space character between DDS and voter registration records would trigger a non-match.[7] Another said he was not sure.[8] The General Counsel did not know whether a hyphen in one data set but not the other would result in a verification failure.[9] The Director of Elections testified that matching is done on "last name, first name, date of birth, and last four of social,"[10] but the General Counsel testified that the match is only done on the first letter of the first name (and that some counties were using the entire first name).[11]There are no indications that either county registrars or DDS take any steps to standardize name fields or remove nonalphanumeric characters. It appears that the actual matching is conducted within DDS.

---

[7] Dep. of Chris Harvey, 244:1-16 (Aug. 16, 2019).
[8] Dep. of Kevin Rayburn, 187:13-188:15 (Dec. 6, 2019).
[9] Dep. of Ryan Germany, 146:4-22 (Dec. 11, 2019).
[10] Dep. of Chris Harvey, 238:7-18 (Aug. 16, 2019).
[11] Dep. of Ryan Germany, 143:24-144:23 (Dec. 11, 2019).

Changes to the verification process (via HB 316, which went into effect on April 2, 2019)[12] do not eliminate the burden on affected individuals. As I explain below, registrants who do not have a photo ID will be placed in MIDR status if they fail the verification process. Moreover, registrants remaining in pending status because of outdated citizenship information in DDS files are required to present evidence of citizenship before being permitted to vote. As far as I am able to determine, neither DDS nor the Secretary of State's Office attempts to obtain updated naturalization data before placing a registrant in pending status.

## VI.    The Data Used for Verification Are Not Suited to "Exact Matching"

The Georgia Secretary of State relies on "exact matching" to verify voter registrations. While the precise nature of that process, as I noted above, is opaque, the available evidence is that it requires voter registration information (first name, last name, birthdate, and either driver's license number or last four digits of the social security number) to match character-for-character to entries in either DDS driver's license files or federal Social Security Administration files.

This is an example of data linkage – attempting to match a record in one data set to a record in a second data set, in an effort to link data about the same entity, usually an individual, who is in both data sets. The process is also referred to as data matching or data merging. In the present instance, information about an individual in the voter registration files – last name, first name, data of birth, driver's license number, and the last for digits of a social security number – is linked to data in DDS files or SSA files, in a process designed to verify that an individual registering is the *same individual* in either the DDS or SSA files, and obtain citizenship information about that individual.

Data linkage is straightforward when there is a unique identifier for each individual in both data sets (Christen 2012, 5). A classic example is a full nine-digit Social Security number (SSN), which is unique for each person.[13] In this case, assuming that the full number is accurately recorded in both data sets, we are certain that the individual with an SSN in one data set is the same individual with that SSN in the other. The links between the two data sets are direct and unambiguous, as long as no errors exist in the identifiers.

---

[12] http://www.legis.ga.gov/legislation/en-US/Display/20192020/HB/316 (last visited Feb. 13, 2020).

[13] https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (last visited Feb. 13, 2020).

In the data sets linked in the voter verification process, however, there is no unique identifier in both data sets. While voters using their Georgia driver's license or DDS ID card will have their license number in both files, not every voter who registers will have a Georgia driver's license or, if they have one, use it for registration or display it to county registrars (something that purportedly overrides match failures on other fields).[14] The last four digits of a social security number will not be unique, even when combined with the date of birth.

A.   **Voter Verification Through Exact Matching Is Certain to Produce Errors**

When no unique identifier is present in both linked data sets, linkage requires some combination of other attributes available in both data sets. Two immediate problems are that there may not be an available combination of data attributes that is unique, or there may be differences in data formats in the two data sets, either of which will complicate efforts to match fields. Both of these problems exist in the process of linking voter registration data to DDS or SSA data.

The two types of errors in data linkage are false matches, when an individual in one data set is linked to a different individual in the other; and false non-matches, when an individual present in both files is not linked, because of a difference in data attributes between the files or an error in how the data are recorded. In voter verification, false non-matching is the more important problem, since it will result in an eligible registrant being placed in MIDR status.

Exact-match linkage using combined data attributes is likely to produce false non-matches, particularly when alphanumeric data are used, and even more likely when *names* are used. Numeric data attributes have only 10 character options (0-9), have no non-alphabetical characters (dashes, spaces, apostrophes), and are relatively short in the case of Georgia driver's licenses (nine digits) and voter registration numbers (a maximum of eight digits). A Georgia driver's license or voter registration number that has a nonnumeric character is immediately and obviously recognizable as erroneous.

---

[14] Under the Help America Vote Act, individuals who do not use their driver's licenses to register may use the last four digits of their social security number. The 9-digit Georgia driver's license number is a unique identifier.

In contrast, name fields are unstandardized, can be long, may contain non-alphanumeric characters, can vary over the course of an individual's life, and frequently differ in various data sets even for the same individual:

> All these issues make data matching or deduplication using personal names a challenging undertaking, because the name values for the same individual might differ across two databases, or even within a single database. In our increasingly multicultural world where people are more mobile than ever before, where international travels and living in a country different to one's home country are common, and with the globalisation of businesses, the appropriate cleaning and standardization of names in databases used for data matching are crucial components to achieve accurate matching results (Christen 2012, 44).

The result is that exact matching will incorrectly result in registrants not matching into DDS and SSA data because of minor differences in spelling, formatting, or errors. The burden will fall most heavily on individuals without a Georgia driver's license or ID.  License and ID possession rates among minority populations are lower than for non-Hispanic Whites, both generally (Stewart 2013, 25) and in Georgia (Hood and Bullock 2008).

Shortly after HAVA went into effect, an audit conducted by the Social Security Administration highlighted flaws in matching processes – particularly exact match – used to verify voter registrations. In 2009, the Social Security Administration's Office of the Inspector General identified problems in the Help America Vote Verification (HAVV) system:

> Our review found the HAVV program did not always provide States with accurate verification responses for individuals who were registering to vote. We determined the HAVV program had a significantly higher no-match response rate when compared to other verification programs used by States and employers. HAVV's no-match response rate was 31 percent, while the no-match response rate for other verification programs used by States and employers ranged from 6 to 15 percent. Additionally, we determined the HAVV program did not provide consistent verification responses to the States when the same applicant data were entered into the program. For example, States were provided responses for at least 356 applicants that initially indicated a match response but subsequently the States were provided a no-match response when the same data (name, SSN, DoB, and last four digits of the SSN) were entered into the verification program (SSA OIG 2009, 4).

The analysis noted that one reason for high non-match rates was the use of exact matching, which "may indicate a no-match when a match does in fact exist in SSA records." *Id.*[15]

A 2004 audit of New York City registration record found that 20% of records in voter registration files failed to match into state driver's license files because of typographical errors by election officials (Levitt, Weiser, and Muñoz 2006, 4-5).

Data from the Social Security Administration show that since January 2011, over half (53.4%) of records sent by the state of Georgia failed to match into the SSA database using name, date of birth, and last four digits of the social security number.[16]

The result is that a high percentage of verification failures using DDS or SSA data are likely to be false non-matches, and incorrectly flag individuals as not verified when they are in fact present in the verification data.

### B.   The Pending Files Contain Name Mismatches for the Same Individuals

To give a clear example of how exact matching on name fields produces false non-matches, I linked the two pending files (Pending February 2018, and Pending January 2014 to July 24, 2019) to identify every individual in both, using the unique voter registration number as the identifier. 5,543 individuals were in both files. For each merged record I have all fields in both files, including the first name and last name entered in both data sets. All of the information in both files should be identical for each individual: we know that they are the same person, all information was entered via the same processes, and the data are used for the same purposes.

---

[15] The HAVV matching process "does not allow flexibility with matching and DoB to its records to compensate for typographical errors, other common database errors, and mistakes because it does not use the full SSN. Because of the limitations of the matching criteria established by the legislation, HAVV may be provided a high number of false negative responses to the States, which may lead to applicants having difficulty while registering to vote" (SSA OIG 2009, 5).

[16] https://www.ssa.gov/open/havv/#representation (last visited Feb. 13, 2020). Data are in the downloadable spreadsheet HAVV-running-list.xlsx.

Yet even in these files, which consisted of the same underlying data, there were *still* records in which first or last names for the same person did not match between the two files. Some involved trivial differences between the two files in spelling ("Malaya" and "Melaya"; "Jenkins" and "Jankins"), apostrophes in one file but not the other ("ONeal" and "O'Neal"), middle names added to the first name field, name changes, and obvious typographical errors. However, even though we know that these are in fact the same people because they have the same unique voter registration number, matching methods using exact matches on names failed to link them.

The number of non-matching names is not large (a total of 19 out of 5,543), but nevertheless demonstrates that even in databases based on the same underlying data, false non-matches still occur when exact matching is used.

Of the 19 false non-matches on first or last name, 89% belong to minority groups (eight are African American, four are Asian, four are Hispanic, and one is Other/two or more). Only one is non-Hispanic White.

### C.   Alternatives to Exact Matching

The problems with exact matching methods in the absence of unique identifiers are well known (Christen 2012; Enamorado, Fifield, and Imai 2019). The method is especially inappropriate in the context of voter registration, when an incorrectly unmatched record places a burden on a registrant to provide additional documentation and may impede the ability to vote.

The Electronic Registration Information Center (ERIC), an organization that helps participating states track registrants who move to another state, uses a "contextual" matching algorithm that allows for small and predictable variations in names, birthdates, and addresses. For example, in Washington the Department of Licensing (DOL) requires full legal names, while voter registration forms permit people to use nicknames. An internal matching process would probably make mistakes in linking people who provide different name variants to different agencies, while the ERIC technology is better able to account for such disparities. State officials lack the time and resources to connect such records by hand, so they appreciate that ERIC's contextual matching process will identify matches even when names are not identical across files (Bland and Burden 2013, 22).

## VII.   Composition of Electorate

Table 1 shows the breakdown of active Georgia registrants, as of December 30, 2019 by race.[17]

| Table 1 Active Registrants, December 2019 | | |
|---|---|---|
| Race | Number of Active Registrants | % Active Registrants |
| White Non-Hispanic | 3,594,048 | 52.9% |
| African American | 2,011,116 | 29.6% |
| Hispanic | 224,119 | 3.3% |
| Asian or Pacific Islander | 161,944 | 2.4% |
| Other/2 or More | 113,878 | 1.7% |
| Unknown | 693,383 | 10.2% |
| Total | 6,798,488 | 100 |

These totals are based on self-identification by registrants at the time they register.[18] The largest demographic group consists of non-Hispanic White registrants (52.9% of all registrants), followed by African Americans (29.6%), Hispanics (3.3%) and Asians (2.4%). Minorities comprise 36.9% of registered voters.[19]

---

[17] The January 2020, aggregation of county files produce nearly identical data, and the differences between the two are not material.

[18] The 10.2% of registrants who do not record their race on the registration forms do not affect any substantive conclusions, as nondisclosure is not related to the underlying demographics of registrants.

[19] There is no relationship between the percentage of registrants of unknown race and the underlying demographics of a geography, so this figure does not affect any of my substantive conclusions.

I use this breakdown of active registrants as a baseline, to analyze the effect of administrative processes on the racial composition of other aggregations of registrants.

## VIII.  Characteristics of Pending and MIDR Registrants

I received 159 separate files, one from each county, containing all registered voters, their status, and whether they were flagged as MIDR status. Combining them in to a single statewide file permits the calculation of summary statistics for the entire state.

### A.  Pending Registrants

Excluding those under 18, registrants in pending status have the following demographic characteristics:[20]

| Table 2 Pending Registrations, January 2020 Excluding Pending Age | | |
|---|---|---|
| Race | Number | Percent |
| African American | 1,847 | 39.4% |
| White Non-Hispanic | 688 | 14.7% |
| Hispanic | 719 | 15.3% |
| Asian or Pacific Islander | 789 | 16.8% |
| Other/2 or More | 220 | 4.7% |
| Unknown | 425 | 9.1% |
| Total | 4,688 | 100% |

It is immediately apparent that voters in pending status are disproportionately minority compared to the overall composition of active registrants. Only 14.7% of

---

[20] This includes registrants whose status is listed as either "Pending" or "Pending Verification."

pending registrants are non-Hispanic White, a rate far below their share of active registered voters (52.9%). Over three-fourths of those in pending status are members of minority groups (76.3%), far exceeding the share of overall minority registrants (37.0%). Hispanic and Asian registrants are massively overrepresented among pending voters: while these groups comprise only 5.7% of active registrants, they make up 31.2% of registrants in pending status.

Excluding those under 18, most registrants in pending status (65.6%) have failed citizenship verification. Most of the remaining 34.4% are in pending status because of missing information. 5.8% of nonactive registrants are recorded as "Pending Verification" status, with no specific reason given for that status.

## B.   Registrants in MIDR Status

Post HB 316, registrants who fail the verification process should be added to the voter rolls in active status with an MIDR (missing ID required) flag. Registrants in MIDR status have the following demographic characteristics:[21]

| Table 3 Registrants in MIDR Status | | |
|---|---|---|
| **Race** | **Number** | **Percent** |
| **African American** | 41,946 | 69.4% |
| **White Non-Hispanic** | 6,878 | 11.4% |
| **Hispanic** | 3,432 | 5.7% |
| **Asian or Pacific Islander** | 1,968 | 3.3% |
| **Other/2 or More** | 2,043 | 3.4% |
| **Unknown** | 4,210 | 7.0 % |
| **Total** | 60,477 | 100 |

---

[21] Because the quantity of interest here is the total number of registrants who are flagged, and who face additional identification requirements, I include both active and pending registrants, as well as those under age 18.

Here as well, MIDR registrants are disproportionately minority. African Americans make up over 2/3 of registrants in MIDR status, well over twice their percentage of all registrants (29.6%). Hispanic and Asian registrants are also overrepresented int his group. Non-Hispanic White registrants, who comprise over half of all registrants, make up only 11.4% of MIDR registrants.

The differences become even more stark if we examine the *rate* at which registrants are in MIDR status. Table 4 shows the results for each racial or ethnic group (with the percentage calculated as the number of registrants in MIDR status for each group divided by the total number of registrants in that group):

| Table 4 Likelihood of MIDR Status Statewide | |
| --- | --- |
| Race | Percentage of Registrants in MIDR Status |
| African American | 2.03% |
| White Non-Hispanic | 0.19% |
| Hispanic | 1.50% |
| Asian or Pacific Islander | 1.19% |
| Other/2 or More | 1.71% |

Minority registrants are between 6 and 10 times more likely to be in MIDR status than non-Hispanic White registrants.

A key question is what happens when a registrant in MIDR status presents at the polls. Director of Elections Chris Harvey testified that MIDR status in fact does not trigger any additional process, because all voters must present a photo ID that qualifies under Georgia's voter ID statute. [22] But there are reasons to doubt this. According to Harvey and training materials created by the Secretary of State's office, a person who registers without providing a Georgia driver's license or state-

---

[22] Dep. of Chris Harvey 235:3-22 (Aug. 16, 2019).

issued ID card, and who fails the verification process by failing to exactly match into either DDS or SSA files is placed in MIDR status as an active registrant.[23] While officials claim that voters in MIDR status will see no difference in treatment at the polls, the data offer little confidence that this is actually true. The HB 316 regime has not been tested in a statewide election, and there appears to be confusion among officials about the difference between a person who registers by mail without providing ID, and someone who registers *in person* without showing ID. In addition, the academic literature on election administration establishes that the exercise of discretion by administrative personnel adversely affects non-white individuals.

For example, a June 27, 2019 3T Webinar presented by Melanie Frechette, Elections Training Administrator in the Secretary of State's Office provided an example of a post-HB 316 MIDR letter that will be sent to voters who fail the verification process (those who are in MIDR status). However, the slide that presents this information – Titled "SPECIAL TOPICS OF THE MONTH – Verification Changes due to HB 316" – displays a letter that refers specifically to a voter who registered for the first time in Georgia by mail without providing an ID, *not* to a voter who attempted to register in person but who failed the verification process.

### C.    Registrants Flagged as Noncitizens

The main reason registrants are placed in pending status – and considered not registered – is because they appear in DDS or SSA records as noncitizens. Noncitizens rarely register to vote, and claims of widespread illegal registration by noncitizens invariably turn out to be wildly exaggerated.

Georgia permits noncitizens legally present in the U.S. to obtain a driver's license or state ID, (in fact, noncitizens who establish residency in Georgia are required to obtain a license).[24] An applicant's citizenship status is recorded at the time and does not update if the applicant later naturalizes unless the naturalized citizen self-reports to DDS. The use of driver's license files to screen for citizenship is well-

---

[23] These individuals would have to provide the last four digits of their social security number in order to register.

[24] https://dds.georgia.gov/information-non-us-citizens (last visited Feb. 13, 2020).

known to produce false noncitizenship flags (with error rates that approach 100%).[25]

In the January 2020, voter files, 3,073 registrations were in pending status because of a citizenship flag. These registrants have the following demographic characteristics:

| Table 5 Registrants in Pending Status Flagged as Noncitizens | | |
|---|---|---|
| Race | Number | Percent |
| African American | 972 | 31.6% |
| White Non-Hispanic | 400 | 13.0% |
| Hispanic | 642 | 20.9% |
| Asian or Pacific Islander | 714 | 23.2% |
| Other/2 or More | 159 | 5.2% |
| Unknown | 186 | 6.1% |
| Total | 3,073 | 100 |

The voter file does not indicate which of these registrations failed DDS citizenship verification, and which failed SSA verification. However, I can draw inferences from the earlier files of voters in pending status, which do show the results of DDS and SSA verification.

The file "Pending January 2014 to July 24 2019," contains registrants in pending status prior to the date when registrants failing DDS verification were added to the active rolls in MIDR status. It includes data on the results of DDS and SSA verification, and whether a registrant was flagged as a noncitizen.

_____

[25] In 2012, the State of Florida officials claimed that 182,000 noncitizens were registered to vote, relying on citizenship data in driver's license files. In the end only 40 registrants were ultimately identified as noncitizens (almost certainly the result of administrative error or confusion), an error rate of 99.98% (Weiner 2020).

There are 2,920 registrants in this file who are recorded as noncitizens. Of these, only 22 were identified through the Social Security Administration Data. Over 99% of noncitizen flags were generated using DDS data.

While I do not have information on which of these individuals flagged for noncitizenship were, in fact, citizens, and were incorrectly flagged because of outdated DDS information, the number is certain to be nonzero.[26] Georgia has a large population of naturalized foreign-born US citizens, many of whom may have obtained a driver's license or ID card before they naturalized.

According to the 2014-2018 5-year American Community Survey, there are 457,179 voting age naturalized citizens living in Georgia. These citizens have the following demographic characteristics:

| Table 6 Voting Age Population, Naturalized Foreign Born 2014-2018 American Community Survey | | |
|---|---|---|
| | Number | Percent |
| African American | 105,324 | 23.0% |
| White Non-Hispanic | 77,488 | 16.9% |
| Hispanic | 95,735 | 20.9% |
| Asian or Pacific Islander | 141,580 | 31.0% |
| Other/2 or more | 37,052 | 8.1% |
| Total | 457,179 | |

---

[26] There is an option in eNET that allows a registrar to override citizenship verification if a registrant presents citizenship documentation at time of registration. I do not have data on what percentage of naturalized citizens provide such documentation.

### D. Registrants in Pending Status for Reasons Other than Citizenship Verification

1,343 registrants are in pending status for reasons other than citizenship verification, usually because of missing information or a lack of signature. These registrants have the following demographic composition:

| Table 7 Registrants in Pending Status for Reasons Other than Citizenship Verification | | |
|---|---|---|
| Race | Number | Percent |
| African American | 751 | 55.9% |
| White Non-Hispanic | 209 | 15.6% |
| Hispanic | 62 | 4.6% |
| Asian or Pacific Islander | 40 | 3.0% |
| Other | 54 | 4.0% |
| Unknown | 227 | 16.9% |
| Total | 1,343 | 100 |

Again, the effects of this measure of pending status falls most heavily on minority registrants. Over half are African American (55.9%), and over two thirds (67.5%) are members of minority groups. Only 15.6% are non-Hispanic White.

### E. Pending to Active Status

In the file of individuals in pending status as of July 2019, 3,672 were listed as MIDR and 2,671 were pending because of a noncitizenship flag. By merging the pending file with the January 2020 statewide aggregation of county files using registration numbers, I can identify those registrants who were able to resolve their identification or citizenship status.

Of the 3,672 MIDR pending registrants in July 2019, only 429 – 13% – had provided identification to registrars and were restored to active non-MIDR status by January 2020.

Of the 2,671 registrants who were pending in July 2019 because of a noncitizenship flag, only 630 – 23.6% – had been restored to active status by January 2020. An additional 1,032 individuals who were not in the July 2019 pending file, most of whom attempted to register after June 1, 2019, remained in pending status because of citizenship verification.

## F.   <u>Summary</u>

When combined, these data show a compelling pattern (table 8). Without exception, minority registrants are disproportionately present in every category of pending or MIDR status. In some cases, the disparities are stark: Asian and Pacific Islanders comprise only 2.4% of all active registrants, but are 16.8% of pending voters and 23.2% of registrants flagged as noncitizens. Hispanic registrants are 3.3% of all active registrants, but are 15.3% of pending registrants and 20.9% of registrants flagged as noncitizens. African Americans are 29.6% of active registrants, but are 69.4% of those in MIDR status and 55.9% of those in pending status for reasons other than citizenship verification.

Non-Hispanic Whites make up over half of all registrants, but are only 14.7% of pending, 13.0% of flagged noncitizens, 11.4% of MIDR status, and 15.6% of pending for reasons other than citizenship verification.

| Table 8 Summary of Data on Registration, Pending, and MIDR Status | | | | | |
|---|---|---|---|---|---|
| Race | All Active Registrants | Pending | MIDR | Flagged Noncitizen | Pending for Other Reasons |
| African American | 29.6% | 39.4% | 69.4% | 31.6% | 55.9% |
| White Non-Hispanic | 52.9% | 14.7% | 11.4% | 13.0% | 15.6% |
| Hispanic | 3.3% | 15.3% | 5.7% | 20.9% | 4.6% |
| Asian or Pacific Islander | 2.4% | 16.8% | 3.3% | 23.2% | 3.0% |
| Other/ 2 or More | 1.7% | 4.7% | 3.4% | 5.2% | 4.0% |
| Unknown | 10.2% | 9.1% | 7.0% | 6.1% | 16.9% |

## IX.   Data Errors and Potential Nonuniform Administration

It is apparent that the voter registration data contain errors. To give some examples from the December 30, 2019, voter file:

- Eight records have a date added value of January 1, 1900.
- One record has a date changed value of September 21, 2021.
- Seven records have a registration date recorded in the year 1900.
- 28 records have birthdate occurring after the registration date
- 1,857 records have a birthdate of 1901 or earlier, including 17 with a birthdate in 1800.
- 203 records have a registration date recorded after the last contact date.

The January 2020 voter files from Georgia counties did not include a birth year field, but contain 14 records with a registration date of January 1, 1901 or earlier (including one with a registration date of October 11, 520).

Large data sets almost inevitably contain some errors, but these are immediately obvious and should be caught. According to Ryan Germany, General Counsel of the Elections Division in the Secretary of State's Office, it is not possible for the voter file to record a registration date after a "last contact date" (the last contact date should be updated when registration occurs), because internal validity checking would prevent it.[27]

What this indicates is a degree of administrative error in the registration process, ineffective and lax data checking protocols, and a lack of familiarity among agency heads about how their internal procedures actually operate.

A second inference that I draw from the data is that administration is not uniform across the state. If registration requirements and verification processes are administered uniformly, we would expect to see regularity across the state in the probabilities that registration are placed in pending or MIDR status. If, however, there were differences in how county officials handle registrations – by, for example, adopting different practices for identifying and correcting typographical errors in applications – there may be large variation in these probabilities between counties.

The testimony of election officials in the Secretary of State's office leads me to conclude that there will in fact be differences across counties – the geographic administrative unit responsible for voter registration and election administration. Chris Harvey, the State Elections Director, noted that county election officials

_____

[27] In his December  2019Germany said the following: "I'm not sure exactly what fields are included on the list that we – so when we ask our vendor to create the list, there's a field in eNet that says Last Contact. So you use that date. So, you know, if that last [contact] date is after whatever the date would be, then the process shouldn't pick up that voter. So that's one of the checks is to make sure the process did what it was supposed to do, that it didn't pick up any other voters. And the other checks we run are to make sure that a contact date is accurate. So I think checks that have been run in the past have been like well, _you can't have a – this is – I might not get this exactly right. You can't have a registration date after your contact date. To us, that would be a sign that something didn't work properly. So we run checks like that to make sure that the logic makes sense and that the process is working correctly._" (emphasis added). Dep. of Ryan Germany, 39:3-40:4 (Dec. 11, 2019).

might – or might not – correct typographical errors in voter registrations that failed the verification process and resubmit them.[28]

The academic literature on election administration has authoritatively established that implementation of election laws varies considerably even in the same jurisdictions, frequently in ways that are biased against minority voters (Atkeson, et al. 2009; Cobb 2012; Page and Pitts 2009; Porter and Rogowski 2018; Tokaji 2004; White, Nathan and Faller 2015). There is every reason to expect a degree of variation and inconsistency between Georgia counties in how voter registration and election administration is conducted, and to expect that this discretion will result in discrimination against voters of color.

One possible reason for variation is that training materials provided to county election officials include some basic errors. For example, the Georgia Registration Official Certification Registrar Course No. 4 (Registration Basics), which is intended to "server (*sic*) as the foundation to build on your legal and procedural expertise of (*sic*) the process of voter registration,"[29] sets out the qualifications of an elector in Georgia:

---

[28] Dep. of Chris Harvey, 241:4-242:3, 243:3-24 (Aug. 16, 2019).
[29] GROC Registrar Course No. 4, *Registration Basics*, slide 4, STATE-DEFENDANTS-00008401.

To register to vote in the state of Georgia, an elector must be:

- A resident of this state and of the county or municipality in which he or she seeks to vote
- A citizen of this state and of the United States
- At least 17 ½ years of age[30]

This information is incorrect, as "[a] citizen of [Georgia]" is not a meaningful term. While this might mean "[a] *resident* of this state and a citizen of the United States," the residency requirement is specified immediately above this line and defined elsewhere in the training materials. Whether these errors reflect a fundamental misunderstanding of the law or are typographical mistakes, the fact that such misinformation is provided in training documents indicates a lack of rigor in how materials are vetted and how local election officials are trained.[31]

Further, the voter data suggest inconsistent administration. While the numbers are not large, in the January 2020 voter file 22 registrants are in pending status because of a "pending hearing" (no further explanation is provided). This could be the result of a provision in Georgia law (O.C.G.A. § 21-2-229) that allows a registrant to challenge the eligibility of another registrant in the same county. Such a challenge can trigger a hearing held by county registration officials. Nearly all of the registrants in this status (21 out of 22) are in Walton County, and 13 of these are in a single municipality (Monroe).[32] The fact that there are no "pending

---

[30] *Id.*, slide 5.

[31] In addition, the information in this slide differs from the requirements specified on the Georgia Secretary of State voter registration page:  In order "[t]o register to vote you must:

- Be a citizen of the United States
- Be a legal resident of the county
- Be at least 17 1/2 years of age to register and 18 years of age to vote
- Not be serving a sentence for conviction of a felony involving moral turpitude
- Have not been found mentally incompetent by a judge"

https://sos.ga.gov/index.php/Elections/register_to_vote (last visited Feb. 13, 2020).

[32] The other "pending hearing" registrant is in Barrow County.

hearing" registrants anywhere else in the state is suggestive of atypical administrative practices in these areas.

The geographic distribution of voters in MIDR status also suggests uneven application of registration laws at the county level. More than 2/3 of MIDR status registrants (69.5%) are in five counties that contain less than one-third of all registrants.[33] The highest rate of voters in MIDR status (Fulton County, 3.22%) is 135 times larger than the lowest rate (Treutlen County, 0.024%).

Figure 1 shows the county-level percentage of voters in MIDR status plotted by the percentage of registrants who are non-Hispanic White. The size of each circle is proportional to the overall number of registrants in each county. The data show a clear pattern: counties with higher percentages of non-Hispanic White registrants are much less likely to place voters in MIDR status. Once the percentage of registrants who are non-Hispanic White exceeds 60%, MIDR rates virtually disappear. With the exception of one very small county (Chattahoochee County, which has 3,480 registrants), every county with a MIDR rate greater than 1% is majority-minority.



Figure 1
Percentage of Registrants in MIDR Status
By County

---

[33] Fulton, DeKalb, Clayton, Gwinnett, and Chatham Counties.

Figure 2 plots the percentage of registrants in each county in pending status against the percentage of registrants who are non-Hispanic White. The relationship between the racial composition of a county and the rate of pending registrations is apparent here as well. With the exception of a handful of small counties, the rate of pending registrations increases as the percentage of African American registrants goes up.



Figure 2
Percentage of Registrants in Pending Status (excl. age)
By County

### G.   **Conclusions**

These data tell a clear story.

- The Georgia verification process is premised on a flawed methodology known to produce inaccurate results. By requiring exact matching on multiple fields in DDS and SSA data, the verification process *guarantees* that otherwise qualified voters will be flagged as MIDR because of outdated information and incorrect verification failures These failures occur even if the failure to match was the result of mistakes by registration officials, or due to errors in the underlying data.

- The use of DDS data to verify citizenship will result in eligible voters being inaccurately flagged as noncitizens, because of outdated information in DDS files.

- No matter how the data are aggregated, the verification process disproportionately affects minority registrants, who are more likely to have their registration placed in pending status; more likely to be flagged as noncitizens; and more likely to be in MIDR status. The rates at which minority registrants are placed in MIDR, pending, or noncitizen status are up to 10 times higher than the rates for non-Hispanic White registrants.

- The rates at which registrants are placed in MIDR and pending status vary widely by county, suggesting nonuniform implementation of administrative practices. The election administration literature has repeatedly demonstrated that election rules are not applied neutrally, and that discriminatory application against minority voters and registrants is commonplace.

- Invalid and obviously incorrect data values in the voter files – including mistakes that should not be possible – indicate administrative errors and failure to verify data.  To the extent that the verification process relies on these entries, it will result in verification  failures that are not the fault of the registrant.

- The data suggest that officials in the Secretary of State's office do not understand their own policies and procedures. These officials could not fully describe the matching process used in verification, and their description of how registrants were moved from pending to active status post-HB 316 did not always match the data in the pending and active files. The training materials I reviewed contain inaccurate and ambiguous information that will likely lead to errors in election administration.

# Sources

Ansolabehere, Stephen and Eitan D. Hersh. 2017. "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name." *Statistics and Public Policy* 4:1-10.

Atkeson, Lonna Rae, Lisa A. Bryant, Thad E. Hall, Kyle L. Sanders, and R. Michael Alvarez. 2009. "A New Barrier to Participation: Heterogenous Application of Voter Identification Policies." *Electoral Studies* 29:66-73.

Bland, Gary and Barry C. Burden 2013. *Electronic Registration Information Center (ERIC) State 1 Evaluation*. Report to the Pew Charitable Trusts. December 13.

Christen, Peter. 2012. *Data Matching: Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection*. New York: Springer-Verlag.

Cobb, Rachel V. 2012. "Can Voter ID Laws Be Administered in a Race-Neutral Manner? Evidence from the City of Boston in 2008." *Quarterly Journal of Political Science* 7:1-33.

Enamorado, Ted, Benjamin Fifield, and Kosuka Imai. 2019. "Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records." *American Political Science Review* 113:353-371.

Hood, M.V. III and Charles S. Bullock III.  2008. "Worth a Thousand Words?  An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36:555-579.

National Research Council. 2010. *Improving State Voter Registration Databases: Final Report*. Washington, DC: National Academies Press. https://doi.org/10.17226/12788.

Page, Anthony and Michael J. Pitts. 2009. "Poll Workers, Election Administration, and the Problem of Implicit Bias." *Michigan Journal of Race & Law* 15:1-56.

Porter, Ethan and Jon C. Rogowski. 2018. "Partisanship, Bureaucratic Responsiveness, and Election Administration: Evidence from a Field

Experiment." *Journal of Public Administration Research and Theory* 28:602-617.

Social Security Administration, Office of the Inspector General. 2009. *Quick Response Evaluation: Accuracy of the Help America Vote Verification Program Responses*. A-03-09-29115. June. Cited as (SSA OIG 2009). https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-03-09-29115.pdf

Stewart, Charles III. 2013. "Voter ID: Who Has Them? Who Shows Them?" *Oklahoma Law Review* 66:21-52.

Tokaji, Daniel P. 2004. "Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act." *George Washington Law Review* 73:1206.

Weiner, Rachel. 2012. "Florida's Voter Purge Explained." *Washington Post*, June 18.

White, Ariel R, Noah L. Nathan, and Julie K. Faller. 2015. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *American Political Science Review* 109:129-142.

# APPENDIX A

**Kenneth R. Mayer**

Department of Political Science                                     Phone:  608-263-2286
Affiliate, La Follette School of Public Affairs                    Email: krmayer@wisc.edu
110 North Hall / 1050 Bascom Mall
University of Wisconsin – Madison
Madison, WI 53706

**Education**
Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

**Positions Held**
University of Wisconsin, Madison. Department of Political Science.
        Professor, July 2000-present.
        Associate Professor, June 1996-June 2000.
        Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra,
        ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-
        Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994.  Conducted study of acquisition
        reform, and the effects of acquisition policy on the defense industrial base. Performed computer
        simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986.  Responsible for cost
        and price analysis, contract negotiation, and contract administration for aerial target missile
        programs in the $5 million - $100 million range.

**Awards**
American Political Science Association, State Politics and Policy Section.  Award for best Journal
        Article Published in the *American Journal of Political Science* in 2014.  Awarded for Burden,
        Canon, Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying
        Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting.  Awarded for
        Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award.  Awarded by the Presidency Research Group of the American Political
        Science Association, for the best book published on the American presidency in 2001.
        Awarded for *With the Stroke of a Pen: Executive Orders and Presidential Power*.
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student
        Association, March 1992.
Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

1

## Service as an Expert Witness

*The Andrew Goodman Foundation v. Bostelmann*, No. 19-cv-955 (W.D. Wisc.), voter ID (2020)

*Suresh Kumar v. Frisco Independent School District et al.*, No,4:19-cv-00284 (E.D. Tex.), voting rights (2019)

*Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Texas), voting rights (2019).

*Dwight et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).

*Priorities U.S.A.et al. v. Missouri et al.,* No. 19AC-CC00226 (Circuit Court of Cole County, MO), voter ID (2018).

*Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Texas), voting rights (2018).

*League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich.), redistricting (2018).

*One Wisconsin Institute, Inc., et al. v. Nichol, et al.*, 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).

*Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).

*Milwaukee NAACP et al. v. Scott Walker. et. al*, N.W.2d 262 (Dane County WI Circuit Court), voter ID (2012).

*Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).

*County of Kenosha v. City of Kenosha,* No. 22-CV-1813 (*Kenosha County WI Circuit Court) municipal redistricting  (2011).

*McComish et al. v Brewer et al..* 2010 WL 2292213 (D. Ariz.), campaign finance (2009).

*Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).

## Grants

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin."  Dane County (WI) Clerk, $44,157.  November 2016-December 2017.  Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

"How do You Know?  The Structure of Presidential Advising and Error Correction in the White House." Graduate School Research Committee, University of Wisconsin, $18,941.  July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs."  $43,234.  Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI).  October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute.  September 2009-December 2010.  $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008- September 2009.  Pew Charitable Trusts.  $49,400.  With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188. January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY.  $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy?  Evaluating the State of Knowledge." JEHT Foundation, New York, NY.  $42,291. October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499. April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000.  March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000.  May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School Research Committee, University of Wisconsin, $21,965.  Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein).  June 1993-January 1995.  $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992.  $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995. National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee at the University of Wisconsin, $2,600.  MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500

**<u>Professional and Public Service</u>**

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair, Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).

Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).

Chair, Blue Ribbon Commission on Clean Elections (Madison, WI), August 2007-April 2011.

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana, Minnesota, and Wisconsin, 2006-2011.

Section Head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December 2009.

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board, September 2002-present.

Book Review Editor, *Congress and the Presidency*, 2001-2006.

Editorial Board, *American Political Science Review*, September 2004-September 2007.

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform (Wisconsin), 1997.

**PUBLICATIONS**

**Books**

*Presidential Leadership: Politics and Policymaking*, 11th edition.  Lanham, MD: Rowman and Littlefield, forthcoming 2019.  With George C. Edwards, III and Steven J. Wayne. Previous editions 10th (2018).

*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*.  Lanham, MD: Lexington Press, 2017.  Co-edited with Amnon Cavari and Richard J. Powell.

*The Enduring Debate: Classic and Contemporary Readings in American Government*. 8th ed. New York: W.W. Norton & Co. 2017.  Co-edited with David T. Canon and John Coleman. Previous editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013).

*Faultlines: Readings in American Government*, 5th  ed. New York: W.W. Norton & Co.  2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th (2013).

*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.

*Readings in American Government*, 7th edition.  New York: W.W. Norton & Co. 2002.  Co-edited with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

*With the Stroke of a Pen: Executive Orders and Presidential Power*.   Princeton, NJ: Princeton University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies Group of the American Political Science Association, for the Best Book on the Presidency Published in 2001.

*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*. Boulder, CO: Westview Press. 1999. With David T. Canon.

*The Political Economy of Defense Contracting*. New Haven: Yale University Press. 1991.

**Monographs**

*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009.  With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*. September 1999.

*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research Foundation, April 1998.

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of Wisconsin).  February 1998.  Portions reprinted in Anthony Corrado, Thomas E. Mann, Daniel Ortiz, Trevor Potter, and Frank J. Sorauf, ed., *Campaign Finance Reform: A Sourcebook*. Washington, D.C.: Brookings Institution, 1997.

"Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*.  Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA.  1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*. N-4624-AF. Santa Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodilly, Frank Camm, and Timothy J. Webb.

**Articles**

 "Voter Identification and Nonvoting in Wisconsin - Evidence from the 2016 Election." *Election Law Journal* 18:342-359 (2019).  With Michael DeCrescenzo.

"Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study." *Political Research Quarterly* 71(2019). With Robert M. Stein, Christopher Mann, Charles Stewart III, et al.

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018).  With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"The Complicated Partisan Effects of State Election Laws."  *Political Research Quarterly* 70:549-563 (No. 3, September 2017).  With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public Administration Review* 77:354-364 (No. 3, May/June 2017).  With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election  Evidence from a Survey List Experiment." *Election Law Journal*  13:460-475 No.4, December 2014). With John S. Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science*, 58:95-109 (No. 1, January 2014).  With Barry C. Burden, David T. Canon, and Donald P. Moynihan.  Winner of the State Politics and Politics Section of the American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law Review* 2014:821-841 (No. 4, 2014).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485 (No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections."  *American Politics Research* 41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2, 2011).  With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December 2009).

"Does Australia Have a Constitution?  Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008).  With Howard Schweber.

"Does Australia Have a Constitution?  Part II: The Rights Constitution."  *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008).  With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007).  With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?"  In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006).  With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials.* Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005).  With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May

2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002).  With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review*  56:180-190 (1996).  With Anne Khademian.

"Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185 (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense." *Public Administration Review* 53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

**Book Chapters**

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake.*  Lanham, MD: Lexington Press, 2017.  Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election.  In Amnon Cavari, Richard J. Powell, and Kenneth R. Mayer, eds.*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences.*  Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency.* Baltimore: Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." In  Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform.* Lanham, MD: Rowman & Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle.* New York: New York University Press. 2001. With David T. Canon.

"The Institutionalization of Power."  In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds.  *Presidential Power: Forging the Presidency for the 21st Century.*  New York: Columbia University Press, 2000.  With Thomas J. Weko.

"Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In *Downsizing Defense,* Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In Alex Mintz, ed.  *The Political Economy of Military Spending.* London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed., *Arms, Politics, and the Economy: Contemporary and Historical Perspectives.* New York: Holmes and Meier.

1990.

**Other**

"Campaign Finance: Some Basics." Bauer-Ginsberg Campaign Finance Task Force, Stanford
    University.  September 2017.  With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington
    Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart,
    III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military
    Relations*. *The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small
    Change: Money, Political Parties, and Campaign Finance Reform*. *The Forum*  6 (No. 1,
    2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*,
    Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*,
    David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval
    Office*, Adam L. Warber.  In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center
    for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power
    in the U.S. and Australia), manuscript, February 2007**.**

 "Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring
    2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives."
    *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education;
    Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book*.  Project Vote Smart.
    2006.  With Meghan Condon.

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia,
    Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King?  Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy;
    Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book*.  Project
    Vote Smart.  2004.  With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a
    Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget
    and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart.  2002.
    With Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief*.  December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J.
    Rozell. *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani
    Guinier. *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993)

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles Times*, July 8, 1988.

**Conference Papers**

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the 2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8, 2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA, August 30, 2017, and at the 2017 Annual Meeting of the American Political Science Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the Polls." Conference on New Research on Election Administration and Reform, Massachusetts Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R Neiheisel.

"Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin, Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Annual Meeting of the American Political Science Association, Chicago, IL,

August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007.  With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days."  Annual Meeting of the American Political Science Association, Philadelphia, PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform."  Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.


**Talks and Presentations**

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017.  With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017.  With Michael DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?"  Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom"  Geometry of Redistricting Conference, University of Wisconsin-Madison  October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers."  American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013, Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008."

Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power.  University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31,2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives.  *Hearing on Executive Order and Presidential Power*, Washington, DC.  March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI.  August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17,1992.

Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH,  September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

**University and Department Service**
Cross-Campus Human Research Protection Program (HRPP) Advisory Committee, 2019-present.
Athletic Board, 2014-present.
General Education Requirements Committee (Letters and Science), 1997-1998.
Communications-B Implementation Committee(Letters and Science), 1997-1999
Verbal Assessment Committee (University) 1997-1998.
College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).
Committee on Information Technology, Distance Education and Outreach, 1997-98.
Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.
Department Computer Committee, 1996-1997; 1997-1998, 2005-2006.  Chair, 2013-present.
Faculty Senate, 2000-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.
Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.
Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.
Department Honors Advisor, 1991-1993.
Brown-bag Seminar Series on Job Talks (for graduate students), 1992.
Keynote speaker, Undergraduate Honors Symposium, April 13 1991.
Undergraduate Curriculum Committee, Department of Political Science, 1990-1992; 1993-1994.
Individual Majors Committee, College of Letters and Sciences, 1990-1991.
Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

**Teaching**
Undergraduate
Introduction to American Government (regular and honors)
The American Presidency
Campaign Finance
Election Law
Classics of American Politics
Presidential Debates
Comparative Electoral Systems
Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

Graduate
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 18, 2020, I caused to be served the

foregoing **REPORT OF PLAINTIFFS' EXPERT WITNESS KENNETH**

**MAYER** by filing it through the Court's ECF system, which will serve the

following counsel:

Chris Carr, Esq.
Attorney General
Dennis Dunn, Esq.
Deputy Attorney General
Russell Willard, Esq.
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Joshua Barrett Belinfante, Esq.
Vincent Robert Russo, Jr., Esq.
Brian Edward Lake, Esq.
Carey Allen Miller, Esq.
Alexander Denton, Esq.
Special Assistant Attorneys General
**Robbins Ross Alloy Belinfante Littlefield, LLC**
500 Fourteenth St., N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
vrusso@robbinsfirm.com
cmiller@robbinsfirm.com
adenton@robbinsfirm.com

Bryan P. Tyson, Esq.
Bryan F. Jacoutot, Esq.
Diana LaRoss, Esq.
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com
dlaross@taylorenglish.com


*/s/ Leslie J. Bryan*
Leslie J. Bryan
Georgia Bar No. 091175