IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,
Plaintiffs,

Civil Action No.: 1:18-cv-05391-SCJ

vs.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State of Georgia; *et al.*,
Defendants.

# Supplemental Report #1 of Thomas L. Brunell, Ph.D.
## Professor of Political Science
## Program Head, Political Science
## Program Head, Public Policy and Political Economy
## University of Texas at Dallas

I was asked by defendant's counsel to read and respond to the reports by Professor Michael P. McDonald and Professor Michael Herron.

**McDonald Report**

Prof. McDonald's report shows that voter-list maintenance procedures in Georgia affect White voters far more than Black voters or any other racial or ethnic sub-group.

In Table 1, Prof. McDonald compares the race/ethnicity of registrants on the voter rolls with the various categories on his "purge list". Only two groups are

1

overrepresented on the purge list relative to the voter list: Whites and those of unknown race or ethnicity. Blacks, Hispanics, Asians, and American Indians all make up smaller proportions on the purge list relative to the voter list. So the voter-list maintenance disproportionately affects White voters relative to Black voters (and all other racial and ethnic minorities). And in terms of the number of registrants affected there are far more Whites than any other group (159,313 Whites, 77,091 Blacks).

Based of Prof. McDonald's analysis, the administration of voter-list maintenance in Georgia does not have a disparate impact on Black voters in the state. Similarly, there is no basis for concluding the state of Georgia acts in a racially discriminatory manner with respect to these processes.

**Survey**

Prof. McDonald had Latino Decisions conduct a poll among those Georgia residents who were on purge list. The number of respondents to the survey is very low. There were 142 respondents from the No Contact list, just 19 from the NCOA list, and only 17 from the Returned Mail list. Prof. McDonald drops the two smaller samples from his analysis, leaving just the 142 respondents that were on the No Contact list. A sample size of just 142 people is well below the sample size that we usually see for political science surveys published peer-reviewed journal articles. The American National Election Study is the most well known survey regarding American's and their attitudes about politics and elections. It has been run

continuously for every biennial election since 1952.  The sample size of these surveys for each election range from 1,132 to 5,852.[1]

The small sample size leads makes it almost impossible to draw correct inferences from the data.  One of Prof. McDonald's biggest problems from the small sample is the distribution of respondents across age groups, which I listed below with the total size of each age group just in the NCOA category from Prof. McDonald's Table 2.

There are only 14 respondents between 18-29 (out of 10,124)

There are only 18 respondents between 30-44 (out of 41,338)

There are only 37 respondents between 45-59 (out of 29,474)

This leaves over half of the survey sample comprised of respondents over the age of 60 - the survey is clearly biased toward older respondents.  It could be biased in other ways as well which we do not know about.  For instance, it makes sense that the survey is likely to find respondents who haven't moved compared to those that did move.  This might be one of the reasons that more older residents were surveyed as they are less likely to move than younger people.[2]

Prof. McDonald weights the respondents, which is standard procedure in survey research, though small samples like this are *not* standard, and when an analyst weights responses it means that respondents in undersampled groups count more

---

[1] https://electionstudies.org/resources/anes-guide/top-tables/?id=1
[2] https://www.census.gov/library/publications/2003/dec/censr-10.html

3

heavily in the overall analysis. So the 14 respondents in the 18-29 age group would be more heavily weighted in the analysis since there are fewer responses in this group than there should be. Are 14 respondents (out of 10,124) representative of all the people on the No Contact list who are between 18-29 years old? We do not know, and we should be overly cautious in drawing inferences from small samples.

Beyond the serious problems of the very small sample size and the over-sampling of older Georgians, it is unclear to me why this analysis was done at all and it fails to add any weight to Prof. McDonald's analysis. Why compare a group of people who were moved to inactive status because of No Contact to a list of people who submitted a National Change of Address form? What's the connection? There is no surprise that many people who were moved to inactive status due to No contact could be found at the same address. No Contact does not mean someone necessarily moved – rather it means, for one reason or another the person hasn't voted in several consecutive elections and were moved to inactive status because they failed to confirm that they wished to remain a registered voter and still lived at the same address. These processes of moving registered voters from active to inactive status for No Contact and NCOA are separate and independent.

**Herron Report**

The subject of Prof. Herron's report is the closing of polling places and the reassignment of voters in Georgia to new polling places. Before getting into the specifics, it is important to note that decisions regarding whether to move, open, or

close a polling place is made at the county level.  The state of Georgia is not responsible for these decisions.  Thus, from the start, Prof. Herron's report does not add any value to considerations related to policies of the *state of Georgia*.  Just like any report about zoning decisions made by local governments would demonstrate anything about other statewide policies.

**Research on turnout and reprecincting**

Prof. Herron cites only two peer-reviewed articles in his report to support his argument that when a voter is reassigned to a new polling location, the likelihood of voting decreases.  The first one, written by Amos, Smith, and Ste. Claire, is a study of Manatee County, Florida in 2014.  So in terms of breadth and depth, this study is highly specific rather than general – one county in a single election.  Similarly, the Brady and McNulty article is a snapshot of Los Angeles County in 2003 for a gubernatorial recall election.  There is some evidence for the proposition at hand in the article, though in terms of generalizability we may want to proceed with caution, because these highly specific studies may not be true of voters more generally.

In Table 2, Prof. Herron examines the closure rates for racially homogeneous precincts for Blacks and Whites.  While in four of the five categories the Black closure rate is higher than the White closure rate, it is important to note that there are far more White voters affected than Black voters.  The closure rate differences are relatively small, but the difference in the number of voters affected is not.  There are 765,904 Blacks in the precincts listed in Table 2, while there are 1,690,436

White voters. The average closure rate for Black precincts is 23.70, while it is 22.42 for Whites (a difference of 1.28 percent). Multiplying the closure rate by the total number of voters we get the number of voters that we might expect to be affected by the closure if precincts are uniformly populated. For Blacks the number of potential affected voters is 181,519 while we would expect more than double the number of White voters to be affected: 378,995. Thus, while Black voters are affected at a slightly higher percentage than White voters, there are far more White voters affected by reprecincting decisions made at the county level.

Table 3 indicates remarkable similarity in closing rates for both White and Black registrants across Georgia in terms of closure rate (16.68 percent versus 16.80 percent), and, again, since White registrants outnumber Black registrants in the state, there are far more White registrants affected than Black registrants or any other racial or ethnic group. The differences between closure rates for these two racial groups is not sufficient, in my opinion, to support a conclusion that counties are engaged in systematic, racially discriminatory fashion in terms of decisions they make with respect to where polling places ought to be. Indeed the similarity of the rates of closure suggests that they do not.

Prof. Herron's analysis for election day turnout for the 2018 election indicates White voters experience nearly twice as much drop off in terms of percentages relative to Black voters. Again, if instead of proportions, we substitute raw numbers of voters, the picture is even more clear in terms of how new precincts affect White voters in

6

far larger number than Black voters – county decisions on polling locations affected far more White voters than Black voters.

It is important to note there are legitimate reasons for counties to move polling place, open new polling places, and close existing polling places – and Prof. Herron's analysis does not take any of these potential reasons into account.  It is worth noting that if a county adds new polling places or moves some polling places around but keeps the same number of polling places, both of these scenarios would result in voters being reprecincted.  Prof. Herron does not take this into account in his analyses.

Prof. Herron concludes by saying that polling place closures were not racially neutral, and I agree, far more White voters were affected by polling place closures than Black voters.  If we restrict our analyses strictly to proportions, Prof. Herron's analyses are inconclusive.  There are some metrics in which the proportion of Black voters is slightly higher than White voters, although the reverse is true as well.  If counties were engaged in systematic, race-based decision-making I would expect the evidence to be consistent across various metrics and to show significant differences between closures for White registrants and Black registrants.  Prof. Herron does not find such evidence.

Under the penalty of perjury, I certify the above is true and correct to the best of my knowledge.

_____
Thomas Brunell

March 24, 2020