# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, et al., )
)
   Plaintiffs, )
)
v. )   Civ. Action No. 1:18-cv-05391-SCJ
)
BRAD RAFFENSPERGER, )
in his official capacity as )
Secretary of State of the )
State of Georgia, et al., )
)
   Defendants. )

## SUPPLEMEMENTAL EXPERT REPORT OF MICHAEL P. MCDONALD

Associate Professor of Political Science
University of Florida
222 Anderson Hall
P.O. Box 117325
Gainesville, FL 32611

April 7, 2020

Michael P. McDonald, Ph.D.

**Supplemental Report of Dr. Michael P. McDonald in Response to Dr. Thomas L. Brunell's Supplemental Report**

### I.   Points of Agreement

Dr. Brunell agrees with a fundamental conclusion of my report, namely that the Georgia Secretary of State's purge of voters for "No Contact" cancels the registration of voters who have not in fact moved. And he does not contest the accuracy of the National Change of Address (NCOA) match-analysis I conducted, which revealed that at least 14% of voters purged for reason of "NCOA" did not actually file an NCOA form.

Specifically, Dr. Brunell and I agree, "There is no surprise that many people who were moved to inactive status due to No contact could be found at the same address" (Brunell Supp. Report at 4). This opinion supports my conclusion that "the Georgia Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact registrants who continue to reside at their current voter registration address" (McDonald Report at 17).

Dr. Brunell offers no opinion regarding the accuracy of my NCOA analysis. Defendants' expert thus does not contest my assertion that the Georgia Secretary of State's NCOA procedure "may identify too many registrants as having filed an NCOA form with the U.S. Post Office" (McDonald Report at 17).

### II.  Points of Disagreement

As noted, Dr. Brunell agrees with or fails to criticize the central conclusions in my report. He raises three points of disagreement which, even if they were valid, would not undermine my central conclusions. Nonetheless, I respond to each of them below.

  **A. Latino Decisions Survey**

Dr. Brunell focuses primarily on the accuracy of the survey of registrants on the Purge List that the polling firm, Latino Decisions, conducted at my direction.[1]

---

[1] *See* McDonald Report at 3–4 (defining data sources including the Purge List).

1

Dr. Brunell asserts that "[a] sample size of just 142 people is well below the sample size that we *usually* see for political science surveys published peer-reviewed journal articles" (Brunell Report at 2 (emphasis added)).  Dr. Brunell offers a single survey to support this assertion, the American National Election Study, a survey for which the National Science Foundation currently provides $11.5 million in support.[2]

In reality, academics publish small sample-sized surveys frequently.  In the context of political science surveys, small survey sample sizes are often encountered by researchers studying the political behavior of small sub-groups in the overall population.  For example, Jan Leighley and Jonathan Nagler, two highly respected voting scholars, conduct an analysis of the revered American National Election Study analyzing as few as 139 Latino foreign-born citizens in one of their statistical models.[3]  Analyses with small sample sizes are common in other disciplines as well.  Medical scholars, for instance, publish small sample studies in clinical trials.[4]

A key to any inferential statement, be it from a large or small survey, is to consider how certain one is about the accuracy of the survey percentages.  I employ in my report the familiar margin of error, a mathematical formula taught in introductory undergraduate statistics courses.  The margin of error applied to a survey percentage essentially provides a range within which the true population percentage is likely to lie.  Dr. Brunell does not and cannot dispute the margin of error calculation for my survey of +/- 5.9%, and he does not challenge the interpretation of the statistics I report taking into account the uncertainty expressed by the margin of error.  Nor could he, because the margin of error helps to ensure

---

[2] *See American National Election Study*, Program Solicitation NSF 18-519, Nat'l Sci. Found., https://www.nsf.gov/pubs/2018/nsf18519/nsf18519.htm (last visited Apr. 3, 2020).

[3] *See* Jan Leighley & Jonathan Nagler, *Latino Electoral Participation: Variations on Demographics and Ethnicity* 2 Russell Sage Found. J. Soc. Sci. 148, 156 (2016), https://muse.jhu.edu/article/625101/pdf.

[4] *See, e.g.*, Jianjun Gao Zhenxue Tian, & Xu Yang, *Breakthrough: Chloroquine Phosphate Has Shown Apparent Efficacy in Treatment of COVID-19 Associated Pneumonia in Clinical Studies*, 14 BioScience Trends 72 (2020), https://www.jstage.jst.go.jp/article/bst/14/1/14_2020.01047/_pdf/-char/en.

that any conclusion based on a sample of any size is understood to incorporate the defined range of uncertainty.

Instead, Dr. Brunell attempts to throw doubt on the survey by arguing the age subsamples are too small for valid analysis.

> Are 14 respondents (out of 10,124) representative of all the people on the No Contact list who are between 18-29 years old? We do not know, and we should be overly cautious in drawing inferences from small samples (Brunell Supp. Report at 4).

To be clear, I never draw inferences about the behavior of 18-29 year-olds on the Purge List from the survey responses in my report. For that reason alone, this criticism is a red herring. Moreover, winnowing down a survey to small subsamples and then claiming these subsamples are unrepresentative of the population is a tactic that can be applied to any survey, including the American National Election Study. In the link provided by Dr. Brunell in his report, the 2016 survey uses a sample of 18 respondents born 1911-1926.[5] Yet I, and many other scholars, including Dr. Brunell, confidently rely upon the American National Election Study in our scholarly work.[6]

Dr. Brunell claims that weighting for "small samples like this are *not* standard" (Brunell Supp. Report at 3 (emphasis in original)). Dr. Brunell has at his disposal all the information needed to determine how much I "more heavily weighted" (Brunell Supp. Report at 4) certain groups, yet he relies solely on the vague suggestion that this weighting method has distorted my survey analysis. Dr. Brunell's lack of analysis is reason alone to disregard his concerns about weighting. But his concern is without merit in any event. In Table 1, I provide the weighting contribution from the four age categories. The Weight column is the percentage in the Purge List No Contact column divided by the percentage in the Survey column (as provided in my report). Table 1 shows that each 18-29 year old counts as 1.41 persons, while respondents age 60 and older count as roughly half a

---

[5] *See The ANES Guide to Public Opinion and Electoral Behavior*, Am. Nat'l Election Stud., https://electionstudies.org/resources/anes-guide/top-tables/?id=1 (last visited Apr. 3, 2020).

[6] *See, e.g.*, Thomas L. Brunell & Justin Buchler, *Ideological Representation and Competitive Congressional Elections*, 28 Electoral Stud. 448 (2009).

person for the weighted survey calculations. Contrary to Dr. Brunell's suggestion, these weight calculations are not alarming or extreme.

**Table 1. Latino Decisions Survey Weight Calculations for Age**

| Age | Survey Count | % | Purge List No Contact Count | % | Weight |
|---|---|---|---|---|---|
| *18-29* | 14 | 9.9% | 13,661 | 14.0% | 1.41 |
| *30-44* | 18 | 12.7% | 34,435 | 35.3% | 2.78 |
| *45-59* | 37 | 26.1% | 24,619 | 25.2% | 0.97 |
| *60+* | 73 | 51.4% | 24,862 | 25.5% | 0.50 |

In any event, I provide unweighted statistics in my report, too:

> Among our 142 respondents, 122 or 85.3% reported living at the address associated with their voter registration record. *Weighting has little effect on their percentage*, 84.8%. Of the 122 registrants reporting that the Voter File correctly reflects where these respondents are registered vote, 112 or 91.8% (88.8% weighted) reported living at the same address for the last eight years. Thus, among those registrants we contacted, the overwhelming majority live at their current address (McDonald Report at 16 (emphasis added)).

Dr. Brunell's concern might have been more valid if the weighted and unweighted statistics were meaningfully different. However, a large percentage of respondents report living at their registration address whether or not the survey estimates are weighted or unweighted. In other words, the overwhelming percentage of survey respondents contacted report living at their registration address, regardless of their age. My conclusion that most No Contact Purge List registrants continue to reside at their registration address does not depend on whether or not the survey is weighted.

### B. National Change of Address Analysis

Dr. Brunell wonders, "Why compare a group of people who were moved to inactive status because of No Contact to a list of people who submitted a National Change of Address form? What's the connection?" (Brunell Supp. Report at 4). I conduct this analysis to shed further light on whether registrants on the Purge List for the reason of No Contact still live at their registration address. The NCOA match provides further evidence that a substantial share of voters purged for "No Contact" have not in fact moved:

> If the list vendors' NCOA match is accurate, it is my opinion that the Georgia Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact registrants who continue to reside at their current voter registration address (McDonald Report at 17).

In fact, Dr. Brunell agrees with this bottom-line conclusion. In his view, "[t]here is no surprise that many people who were moved to inactive status due to No contact could be found at the same address" (Brunell Supp. Report at 4).

To the extent that Dr. Brunell's report is intended to question my NCOA analysis more broadly, additional information provided by Defendants in this case further supports the results of this analysis as applied to the voters purged for reason of "NCOA."

My initial report explains:

> Based on the same NCOA matching evidence, only 86.4% of the registered voters set to be purged for "Inactive Reason of NCOA"— *i.e.*, presence in the NCOA database—actually appear in the NCOA database. I do not have sufficient information to determine the reasons for this discrepancy, but it raises significant concerns that Georgia may be purging voters for reason of NCOA who have not actually submitted NCOA forms for individual or family moves (McDonald Report at 3).

While I still cannot definitively determine every reason for this discrepancy, I am now able to identify several reasons to believe that the Secretary of State's NCOA match process systematically casts too wide a net and does so unnecessarily.

A document produced by the Georgia Secretary of State's office in discovery and entitled "NCOA List Maintenance Process" (STATE-DEFENDANTS-00287546, attached as Exhibit A) identifies the Secretary of State's NCOA vendor, Todd Pestal, who is apparently president, secretary, treasurer, and director of Total Data Technologies, Inc., a company located in Omaha, Nebraska.[7]

The document describes the parameters of the Secretary of State's NCOA match process as it existed leading up to the match conducted in 2019 (NCOA List Maintenance Process at 1). Because the voters on the 2019 Purge List needed to have been matched to the NCOA database and thus labeled inactive before the November 2016 election (allowing two general election cycles prior to their cancellation in 2019), I understand this document to describe the NCOA-match process that resulted in voters being placed on the 2019 Purge List for reason of "NCOA."

My review of this document further strengthens my opinion that Georgia's NCOA process may incorrectly identify people who have not moved because of how registered voters are matched to the Post Office's NCOA database and what the vendor considers a positive match. Several of the Secretary of State's NCOA match procedures likely led to false NCOA matches on the 2019 Purge List, including:

- **The SOS uses mailing addresses instead of residential addresses**. According to the memorandum, the address provided by the Secretary of State's office to their vendor to conduct the NCOA match is the "… mailing address on the record. If the voter does not have a mailing address, the system includes the residential address in the address field" (NCOA List Maintenance Process at 2). A person changing their mailing address, such as a P.O. Box, but not changing their residential address could thus be flagged for NCOA removal procedures without having moved.

- **The SOS uses first and last names for individual matches.** According to the memorandum, a positive match for an individual move occurs when

---

[7] *See* Total Data Technologies, Inc., OpenCorporates, https://opencorporates.com/companies/us_ne/1639369 (last visited Apr. 3, 2020). A link on this website points to the Nebraska Secretary of State's office, which provides a search tool to the canonical database to verify the posted information.

"…the First and Last name match in both data sources and the address provided by the SOS matches the old address supplied by the individual" (NCOA List Maintenance Process at 2). Persons who share the same first and last name would be identified for NCOA removal procedures by this approach if one of the two persons moves but the other does not, such as a son with a "Jr." name moving out of the home where a father continues to reside. The SOS does not appear to use criteria that would distinguish these people, such as birthdates.

- **The SOS does not incorporate first names into family matches and does not require entire address fields to match for individual and family matches**. According to the memorandum, a positive match for a family move is "similar, except the first name is not used for matching purposes" (NCOA List Maintenance Process at 2). When combined with the "NCOA Return Codes" that the SOS treats as a match, this parameter risks a substantial number of false NCOA matches. Specifically, the list of "NCOA Return Codes" the SOS treats as an NCOA match includes "91 – COA MATCH – SECONDARY NUMBER DROPPED FROM COA" and "92 – COA MATCH – SECONDARY NUMBER DROPPED FROM INPUT" (NCOA List Maintenance Process at 3). A secondary number is part of an address field, such as an apartment or suite number.[8] When a secondary number is dropped because a matching secondary number cannot be found either in the voter registration database or the post office NCOA database, the additional dropping of the first name for a family move can flag all individuals with the same last name living in multi-unit housing for NCOA removal procedures. For example, one Smith moving from a 2,000 person apartment complex could trigger NCOA removal procedures for all Smiths living in the complex. Or if two people happened to share the same first and last name in multi-unit housing where a secondary number was dropped, they could both be flagged for NCOA removal procedures under the individual match criteria, such as two James Smiths.

---

[8] *See*, *213 Secondary Address Unit Designators*, USPS.COM: Postal Explorer, https://pe.usps.com/text/pub28/28c2_003.htm (last visited Apr. 3, 2020).

- **The SOS appears to use business changes of address in its NCOA match procedures.** As my initial report explains, there are three types of NCOA matches: individual, family, and business (McDonald Report at 11). The NCOA analysis in my initial report located 69 business change of address matches to the data on the Purge List (McDonald Report at 12). I observed that "[i]t appears problematic if the Georgia Secretary of State's office uses a business change of address as evidence of a residential change of address" (McDonald Report at 13). According to the SOS memorandum, "the *majority* of moves for our purposes are Individual moves and Family moves" (NCOA List Maintenance Process at 2 (emphasis added)). This appears to confirm my concern that the SOS's NCOA process treats some business moves as residential moves.

### C.  Disparate Impact

Dr. Brunell draws a conclusion that, "Based o[n] Prof. McDonald's analysis, the administration of voter-list maintenance in Georgia does not have a disparate impact on Black voters in the state" (Brunell Supp. Report at 2).

This statement does not accurately reflect my conclusions. First, it is an over-generalization regarding all of Georgia's voter-list maintenance based on evidence arising from one data source: my analysis of the 2019 Purge List. My report does not analyze Purge Lists preceding 2019 or any of the SOS's list-maintenance procedures beyond the NGE process. Any conclusions about disparate impact of Georgia's voter-list maintenance procedures as a whole is outside the scope of my report.

Second, Dr. Brunell's conclusion is misleading because it does not account for the variation among the "No Contact," "Returned Mail," and "NCOA" categories. Dr. Brunell states that "Only two groups are overrepresented on the purge list relative to the voter list: Whites and those of unknown race or ethnicity" (Brunell Supp. Report at 1-2). I agree with these statistics regarding the list overall, which are drawn from my report tables. However, his conclusion does not hold true among all the three Purge List categories. Whites not of Hispanic Origin are 1.2 percentage points less likely to appear on the Purge List for the reason of No Contact than compared to the Voter File (McDonald Report at 6-7), meaning that minority voters are overrepresented on the SOS's list of voters to be purged for No Contact.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of April 2020, at Gainesville, Florida.

*Michael P. McDonald*

Michael P. McDonald, Ph.D.

# CERTIFICATE OF SERVICE

I hereby certify that, on April 8, 2020, I caused to be served the foregoing **SUPPLEMENTAL EXPERT REPORT OF MICHAEL P. MCDONALD** by filing it through the Court's ECF system, which will serve the following counsel:

Chris Carr
Attorney General
Dennis Dunn
Deputy Attorney General
Russell Willard
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Joshua Barrett Belinfante
Vincent Robert Russo, Jr.
Brian Edward Lake
Carey Allen Miller
Alexander Denton
Special Assistant Attorneys General
**Robbins Ross Alloy Belinfante Littlefield, LLC**
500 Fourteenth St., N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
vrusso@robbinsfirm.com
cmiller@robbinsfirm.com
adenton@robbinsfirm.com

Bryan P. Tyson
Bryan F. Jacoutot
Diana LaRoss
Loree Anne Paradise, Esq.
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com
dlaross@taylorenglish.com
laparadise@taylorenglish.com

This the 8th day of April, 2020.

*/s/ Leslie J. Bryan*
Leslie J. Bryan