## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia; *et al.*,

    Defendants.

Civil Action File
No. 1:18-cv-05391-SCJ

### Expert Report of Dr. Peyton McCrary

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), I, Peyton McCrary, submit the following Report setting out my opinions:

My name is Peyton McCrary, and I reside in Arlington, Virginia.  I have been asked by attorneys for the plaintiffs in this litigation to assist the court in assessing the impact of the Voting Rights Act on Georgia's historical voting policies and practices and the impact of the removal of preclearance requirements based on the Supreme Court's opinion in *Shelby County v. Holder*.[1]  In legal terms I have been asked to examine empirical evidence relevant to applying the totality

---

[1] *Shelby County v. Holder*, 570 U.S. 529 (2013).

1

of circumstances test found in Section 2 of the Voting Rights Act and to assess that evidence based on my expertise as a social scientist.[2]  Congress set forth specific factors it believed should guide the federal courts in applying Section 2 in its official report[3]  often identified as the "Senate Factors" – based in part on the totality of circumstances test first articulated by the Supreme Court in *White v. Register* in 1973.[4]

## Qualifications

2.  I am an historian by training and taught history at the university level from 1969 until 1990.  During the 1980s, while teaching at the University of South Alabama, I served as an expert witness in numerous voting rights cases in the South.  From 1990 until my retirement in 2016, I was employed by the Voting Section, Civil Rights Division, of the Department of Justice. During the academic year 1998-1999, however, I took leave from the government to teach political science as the Eugene Lang Professor at Swarthmore College.  My responsibilities in the Civil Rights Division included the planning, direction, coordination, and performance of historical research and empirical analysis for voting rights

---

[2] Pub. L. No. 97-205, June 29, 1982.  See *Thornburg v. Gingles*, 478 U.S. 30, 36-38, 44-45 (1986).
[3] Report of the Committee on the Judiciary on S. 1992 (Voting Rights Act Extension), U.S. Senate, 97th Cong., 2nd Sess., Report No. 97-417 (hereafter cited as 1982 Senate Report).
[4] 412 U.S. 755 (1973).

litigation, including the identification of appropriate expert witnesses to appear for

the government at trial.  I worked with experts in analyzing: 1) the adoption and

maintenance of election laws; 2) the statistical analysis of racially polarized voting;

3) the use of database matching techniques in the construction of statewide voter

registration databases; and 4) other issues relating to the conduct of elections.

Since 1981, I have testified in court in 17 voting rights cases; in four of these cases

I also presented sworn written testimony as an expert.  In addition, I have

presented sworn written testimony as an expert in 10 cases.  Over the last 36 years

I have published numerous studies in scholarly journals and books dealing with the

history of minority voting rights, as well as with the implementation of the Voting

Rights Act.

    3.  I received B.A. and M.A. degrees from the University of Virginia in 1965

and 1966, respectively, and obtained my Ph.D. in History from Princeton

University in 1972.  My primary training was in the history of the United States,

with a specialization in the history of the South during the 19th and 20th centuries.

Before working at the United States Department of Justice, for 20 years I taught

courses in my specialization at the University of Minnesota, Vanderbilt University,

and the University of South Alabama.  I took a leave from my position at the

Department of Justice in 1998-1999 to teach at Swarthmore College; I taught two

political science courses: Law and the Political Process in the fall semester and

Civil Rights Policy in the spring semester.  For the last thirteen years I have co-taught a course on voting rights law as an adjunct professor at the George Washington University Law School.

4.  I have published a prize-winning book, *Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978) (winner of the L. Kemper Williams Prize of the Louisiana Historical Association), six law review articles, seven articles in refereed journals, and seven chapters in refereed books.  Over the last 35 years my published work has focused on the history of discriminatory election laws in the South, evidence concerning discriminatory intent or racially polarized voting presented in the context of voting rights litigation, and the impact of the Voting Rights Act in the South.

5.  I explain the methods of assessing the discriminatory effects of challenged election procedures in "Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990," *University of Pennsylvania Journal of Constitutional Law*, 5 (May 2003), 665-708; "Racially Polarized Voting in the South: Quantitative Evidence from the Courtroom," *Social Science History*, 14 (Winter 1990), 507-31; "Alabama," co-authored with Jerome A. Gray, Edward Still, and Huey Perry, and "South Carolina," co-authored with Orville Vernon Burton, Terence R. Finnegan, and James W. Loewen, in Chandler Davidson and Bernard Grofman (eds.), *Quiet*

4

*Revolution in the South: The Impact of the Voting Rights Act, 1965-1990*
(Princeton, N.J., Princeton University Press, 1994), 38-66, 397-409.

    6.   Some of my published work focuses specifically on Georgia.  I address
the intent underlying the adoption of at-large elections – and the racially
discriminatory effects of the at-large system – in a major Georgia city in "The
Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1946-1986,"
*Journal of Urban History*, 25 (Jan. 1999), 199-225.  In "Race and
Reapportionment, 1962: The Case of Georgia Senate Redistricting," co-authored
with Steven F. Lawson, *Journal of Policy History*, 12 (No. 3, 2000), 293-320, I
examine the intent underlying the use of multi-member districts in the first
legislative redistricting following the decision in the malapportionment case
*Toombs v. Fortson*, 205 F. Supp. 248 (N.D. Ga. 1962.  In "The End of
Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of
the Voting Rights Act," 11 *Mich. J. Race & L.* 275 (2006) (co-authored with
Christopher Seaman and Richard Valelly), *reproduced before publication in*
*Voting Rights Act: Section 5 Preclearance and Standards: Hearings Before the*
*Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 96-
181 (2005), we recount the facts regarding Georgia congressional redistricting in
1981 and Georgia legislative redistricting in 2001.

7. Over the last four decades I have published numerous reviews of books in my areas of specialization and served as a scholarly referee for numerous journals and university presses. I continued to publish scholarly work in my areas of expertise while employed by the Department of Justice and expect to continue my scholarly writing now that I have retired from government service. A detailed record of my professional qualifications, a curriculum vitae, which I prepared and know to be accurate, is attached as Exhibit 1 to this Report. My rate of compensation for work on this case is $300.00 per hour.

## Summary of Findings

8. In this Report I document the history of voter registration from 1945 through 2018, explaining in some detail how the registration process worked – and how it evolved over time. I present evidence of racial and ethnic disparities in the state's registration list and the degree to which that disparity changed as the registration process evolved. I also explain how federal law and public policy – including the Voting Rights Act and the Help America Vote Act (HAVA) (and the enforcement of both in the federal courts) – have affected Georgia's voter registration system. Finally, I place the changes in the state's voter registration system in the context of Georgia's party system as it, too, evolved over time.

9. In my opinion, Georgia's implementation of its voter verification process under HAVA since 2006 has exercised a persistent discriminatory effect on

minority voters' opportunity to register and vote.  The state's insistence on using a simple – and methodologically obsolete – exact match requirement forms a very substantial obstacle to fair and equal registration for minority citizens. Its decentralized system of decision-making about individual voter verifications – granting ultimate authority over voter registration decisions to local registrars who have had little legal education or training – compounds the difficulty of correcting errors produced by the voter verification process using statewide databases.  The evidence about the effects of Georgia's exact match system of voter verification presented in the following pages demonstrates that it has exercised a racially and ethnically discriminatory effect on voter registration.

10.  The current pattern of voter registration and voting in Georgia bears a striking resemblance, in my opinion, to the system of voter registration in the Jim Crow era before 1965.  The difficulty African Americans faced in dealing with the complexities of the literacy test used by Georgia between 1945 and 1965 – coupled with the racial disparity in income and education documented by the U.S. Census in those days – closely resembles the difficulties minority voters face in dealing with Georgia's voter registration system since 2008 – when racial disparities in income and education continue to affect the ability of minority citizens to navigate the complexities of Georgia's voter verification process.

11.  It is my opinion that the political context within which the current registration system operates also resembles the politics of Georgia before the adoption of the 1965 Voting Rights Act.  In those days Georgia politics was dominated by the Democratic Party, which white citizens supported overwhelmingly.  The state's Democrats were for the most part staunch defenders of racial discrimination in registration and voting, as well as defending official racial segregation in all aspects of public life.  Since the adoption of the 1965 Voting Rights Act African American voter registration has increased dramatically in Georgia as in the rest of the South, but a continuing pattern of racially polarized voting – and the incremental shift of white citizens from the Democratic to the Republican Party – culminated in the early twenty-first century in Republican (rather than Democratic) control of state government.  In Georgia politics since 2002, state government is dominated by the Republican Party, the party to which now most non-Hispanic white persons belong.  The greatest electoral threat to the Republican Party – to the extent Republican control *is* threatened – is the growing number of African American, Hispanic, and Asian citizens, who tend strongly to support Democratic candidates.  The increase in minority population and the threat of increasing minority voting strength provides a powerful incentive for Republican officials at the state and local level to place hurdles in the path of minority citizens seeking to register and vote.  That is what has happened.

8

## Preliminary Observations

**12.** In this Report, as in previous expert testimony and scholarly publications, I have employed the standard methodology used by historians and political scientists in my fields of expertise when investigating the intent underlying the adoption or maintenance of election laws, and the effects of these laws on the political process.[5]

13. The evidence presented in this Report is found in a wide range of documents – the type of documents I routinely examine in my scholarly writing and expert testimony about elections – cited in almost 300 footnotes in the following pages. These include scholarly studies by historians, political scientists, and other social scientists, both in published research and in expert witness reports. In this Report, when I cite evidence presented by other scholars, I only rely on work based on methodology I am qualified to evaluate from my training and experience.[6] If I have a critical view of the assessment by an author of a published

---

[5] When analyzing political decision-making, historians and political scientists examine the political, institutional, and social context within which a decision is made. When examining how the political system operates, we consider quantitative evidence regarding voter behavior, the conduct of registration and voting by state or local officials, and the behavior of legislative bodies. In both types of investigations, we examine relevant scholarly studies, newspaper articles concerning events, reports of state or federal governments, and relevant court decisions as well.

[6] For example, I cite a significant number of studies reporting findings about voting behavior based on statistical analysis (such as levels of voter turnout or the degree to which voting patterns are racially polarized). In my article "Racially Polarized

work or other source cited in this Report, as in my scholarly writing, I note that I

disagree with the author's assessment.  Otherwise, I am endorsing the professional

opinion of the scholar whose findings I cite.

14.  In this Report I also routinely cite statutes or constitutional provisions I

have examined, together with evidence about the legislative history – broadly

defined – of those provisions.  This includes both official legislative history

documents and newspaper coverage of the legislature's actions between the

introduction of the provision and its final passage.  I cite in this Report – as in my

published work – other documents produced in litigation, such as deposition

transcripts, stipulations of fact between the parties, or settlement agreements.  I cite

---

Voting in the South: Quantitative Evidence from the Courtroom," *Social Science History*, 14 (Winter 1990), 507-31, I describe the evolution of the statistical methods used in voting rights litigation in the 1970s and 1980s.  I was able to evaluate the expert reports used as evidence in that article because I had previously used ecological regression and multiple regression in analyzing voting behavior in the deep South during the 19th century.  See e.g., Peyton McCrary, *Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978).  As noted earlier, my work on voting rights litigation in the Department of Justice entailed identifying the appropriate expert witnesses for new cases.  For lawsuits involving claims of vote denial or abridgment – such as this case – this required me to become conversant with the methodology employed in database matching with large data sets, in order to assess the skills of potential experts, to work with those experts once retained, and to advise attorneys regarding the expert reports produced by opposing parties.  In prior expert testimony since my retirement from government service I routinely rely on expert testimony from political scientists employing both ecological inference of individual voting behavior and database matching of voter registration records with other large data sets (such as drivers' license databases).

here as well records of government agencies when examining the implementation of a law; in recent decades government records have expanded to include not only official bulletins, printed training materials, or memoranda but electronic documents (such as websites, webinars, Power Point presentations, or emails).

15.  I have also examined for this Report records of Department of Justice enforcement of the preclearance requirements of Section 5 of the Voting Rights Act: 1) the public submissions of voting changes for administrative review by the Civil Rights Division of the Department; 2) litigation seeking preclearance of a voting change by a three-judge court in the District of Columbia; or 3) public letters setting forth the reasons for objecting to specific voting changes by the Assistant Attorney General for Civil Rights.  I have routinely relied on such documents in my published writing.[7]

16.  Much of the process of registration and voting in Georgia, especially in the last two decades, has been the subject of litigation in the federal courts.  For the convenience of the court in this case, I have cross-referenced prior judicial findings to place in context the evidence I provide in this declaration.  In addition, the

---

[7] See e.g., "The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," 11 *Mich. J. Race & L.* 275 (2006) (co-authored with Christopher Seaman and Richard Valelly).  Beginning with research for this co-authored article, I have all objection letters in my files; they are also accessible through the website of the Voting Section of the Civil Rights Division.

findings reflected in court opinions often provide valuable evidence for

investigations by social scientists.  In my scholarly writing I routinely utilize the

factual evidence provided by court decisions.  As I observed in a recent journal

article: "The factual evidence presented in court proceedings – in voting rights

cases key evidence often comes in through expert witness testimony by political

scientists or historians – is an invaluable resource for historical and social science

research."[8]

## The Historical Context of Voter Registration and Elections in Georgia, 1945-1965

17.  There is a long history of racial discrimination affecting voting in

Georgia that applies specifically to African Americans.  The state's method of

assessing whether persons are legally registered voters and United States citizens –

from 2008 to the present – has evolved in ways reminiscent of the state's racially

discriminatory requirements for registration and voting before the adoption of the

1965 Voting Rights Act.  That similarity justifies a brief examination of the history

of racial discrimination affecting registration before the adoption of the 1965

Voting Rights Act.

---

[8] Peyton McCrary, "The Interaction of Policy and Law: How the Courts Came to
Treat Annexations under the Voting Rights Act," *Journal of Policy History*, 26
(No. 4, 2014), 429-58 (quoted sentence at p. 431).

18.  The year after the United States Supreme Court struck down the Texas

white primary in 1944,[9] Georgia's white primary – in which Democratic party

rules restricted voting to white registered voters – was successfully challenged in

*King v. Chapman*.[10]  Once the Democratic white primary – the only election that

mattered in one-party Georgia – was struck down, the state's long-standing voter

registration law became more important than ever to Georgia political leaders as a

way of minimizing the number of African Americans registered to vote.

Beginning with a statute enacted in 1908, Georgia had restricted the registration of

voters to: 1) persons who served in any war on behalf of the United States or the

Confederate states, or who was a lawful descendant of a person who fought in

those wars (that is, a "grandfather clause"); 2) a person of "good character" who

understood the duties and obligations of citizenship (a standard allowing broad

discretion for racial discrimination); 3) a person who was able to read and write

correctly any paragraph of either the federal or state constitutions (to be assessed

by registrars who rarely had education beyond high school and who had no legal

training); or 4) a person who owned 40 acres of land or $500.00 worth of taxable

property.[11]

---

[9] *Smith v. Allwright*, 321 U.S. 649 (1944).

[10] 62 F. Supp. 639 (M.D. Ga. 1945), *aff'd* 154 F.2d 450 (5th Cir. 1946).

[11] Dewey W. Grantham, Jr., *Hoke Smith and the Politics of the New South* (Baton Rouge, Louisiana State University Press, 1958), 159; Laughlin McDonald, Michael B. Binford, and Ken Johnson, "Georgia," in Chandler Davidson and Bernard

19.  In order to create a more difficult registration hurdle, the state adopted a re-registration law in 1949, requiring *all* voters to register again under a new literacy test.  Under this test voters would have to demonstrate their ability to read and write or answer correctly at least 10 of 30 factual questions.[12]  In 1957 the legislature established an Election Laws Study Committee.[13]  The following year Georgia adopted a new voter registration act that increased the number of correct answers to factual questions asked of prospective registrants who were illiterate.[14]  Instead of 10 out of 30 questions (as in the 1949 law) a person who could not read or write had to answer correctly 20 of 30 questions to the satisfaction of the county registrar.  Among the questions asked were what qualifications someone had to possess to run for representative in the Georgia General Assembly, how the writ of habeas corpus can be suspended, or what procedures were required to amend the

---

Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, NJ, Princeton University Press, 1994), 69-70, 410; Joseph L. Bernd and Lynwood M. Holland, "Recent Restrictions Upon Negro Suffrage: The Case of Georgia," *Journal of Politics*, 21 (1959), 488.

[12] Bernd and Holland, "Recent Restrictions," 492, 496; *Franklin v. Harper*, 55 S.E.2d 221, 227 (Ga. 1949).  This re-registration law proved to be as difficult for whites as well as blacks and under heavy pressure the state amended it to allow persons already registered before 1949 to remain eligible to vote.  Bernd and Holland, "Recent Restrictions," 496.

[13] *Id.,* 497.

[14] *Id.*  Political scientists Bernd and Holland contend that the new law was likely motivated by the fact that the NAACP had inaugurated a voter registration drive in Georgia and "the number of persons of color eligible for the franchise was rising throughout the South."

U.S. Constitution.[15]  The tests were usually administered by unsympathetic white persons with little legal education or training – but even if administered fairly, notes one study, the questions "were difficult for even the best educated person to answer."[16]

20.  The burden of satisfying even a fairly administered literacy test was greater for African Americans in Georgia because they were the victims of many years of inferior public education in segregated schools, putting them at a marked disadvantage compared with white Georgians.  In 1940 the average per-pupil expenditure for white schools in the state was $46.70, compared with only $14.61 for blacks.  By 1952 the degree of racial disparity had narrowed, with the average per-pupil expenditure for whites at $163.76 and for blacks $110.59.[17]

21.  One characteristic of Georgia elections in those days was quite different from the years following the 1950s.  Political leaders always knew how many African Americans voted on election day – and for which candidates they voted –

---

[15] Bernd and Holland, "Recent Restrictions," 498.  As they saw it, the "principal intent of the literacy test is racial discrimination."  In their view the "most pervasive type of discrimination in registration involves the failure to apply the [literacy] test to white persons," which is "just as definitely a denial of equal protection to Negroes as is the most sordid device to keep the latter away from the ballot box."

[16] McDonald, et. al., "Georgia," in Davidson and Grofman (eds.), *Quiet Revolution in the South*, 71, 410.

[17] Harry S. Ashmore, *The Negro and the Schools* (Chapel Hill, University of North Carolina Press, 1954), 153 (Table 8).

because ballot boxes were segregated in each polling place and the returns were reported by race.[18]  That enabled them to talk about the "Negro bloc" vote – charging their opponents with encouraging black voting – with proof as to which candidates African Americans actually supported in each election.[19]  No statistical inference was required.

### How the Voting Rights Act Worked in Georgia, 1965-1999

22.  The Voting Rights Act of 1965 abolished the literacy test for voter registration employed by Georgia, as by other states, primarily in the South.  In addition to whether a state used this or other "tests or devices," the formula for determining which states and localities would be covered by the special requirements of the Act focused on participation rates for the total population.[20]

---

[18] Peyton McCrary, "The Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1945-1986," *Journal of Urban History*, 25 (January 1999), 220 n. 18.  Not until 1962 did a federal court outlaw the segregated voting boxes in *Anderson v. Courson*, 203 F. Supp. 806 (M.D. Ga. 1962).

[19] McCrary, "The Dynamics of Minority Vote Dilution," 203, 220 n. 18.  That knowledge helped persuade political leaders in Augusta to switch from ward to at-large elections in 1953 to minimize the chances of African American candidates winning a seat on the Augusta city council.  *Id.*, 208-11.  The state adopted multi-member districts for the state senate in 1962, for the explicit purpose of preventing a black candidate from electing a member of the state senate, which the state was ordered by a federal court to reapportion to resolve its malapportionment.  See Peyton McCrary and Steven F. Lawson, "Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," *Journal of Policy History*, 12 (No. 3, 2000), 293-320.

[20] The registration and turnout data used in the formula were *not* broken down by race because most states did not – and do not – maintain registration and turnout data by race – unlike Georgia.

Georgia was covered under the formula in Section 4 of the Act because its total voter registration – white as well as African American – was under 50 percent of the total voting age population.[21]  Looking at other data, however, the best estimate is that blacks in Georgia were 27 percent of the registered voters before the Act and whites were 63 percent.[22]  The Act's elimination of tests or devices and the threat of federal examiners taking over voter registration in recalcitrant counties led to substantial gains in black voter registration in Georgia, as in other covered jurisdictions.  As of 1971, black registration in Georgia had jumped to 68 percent of the black voting age population, while whites had increased only to 71 percent.[23]

23.  Georgia continued to erect barriers to African American registration and voting after 1965.  In 1966 the state amended the law permitting assistance to illiterate voters – which in the past allowed one individual to assist up to 10 illiterate voters in casting their ballot at the polls – "to provide that no person might assist more than one such voter."[24]  In 1968 the Department of Justice objected to that change under the preclearance requirement set forth in Section 5 of the Act.[25]

---

[21] U.S. Commission on Civil Rights, *The Voting Rights Act: Ten Years After* (Washington, D.C. 1975), 5.

[22] *Id.*, 53.

[23] *Id.*

[24] *Morris v. Fortson*, 261 F. Supp. 538, 541 (N.D Ga. 1966).

[25] Objection letter from Stephen J. Pollak to Arthur K. Bolton, July 11, 1968. Section 5 required that in all jurisdictions covered under the formula provided in Section 4 of the Act secure federal approval – either administratively through the Civil Rights Division of the Department of Justice or through a declaratory

When the Department objected to a change in election laws, that change could not take effect unless the change was approved by a federal court.  In 1981 the state adopted a similar change, reducing the number of illiterate or disabled voters a person could assist from ten to five.  The Department objected to this change as well, noting that "our analysis reveals that a disproportionately larger number of black than white voters depend on assistance in order to effectively exercise their right to vote."[26]  According to the available census data 32 percent of blacks aged 25 and over have completed less than five years of school, compared to eight percent of whites aged 25 and over, the Department noted.[27]  Based on years of examining elections in Georgia, the Department had concluded that "the vast majority of voters who request assistance because of illiteracy are black," and that in Georgia "it is common for more than five black voters to receive assistance from the same person."[28]

---

judgment by a three-judge court in the District of Columbia – before *any* voting change could legally be enforced.

[26] Objection letter from William Bradford Reynolds to Michael Bowers, September 18, 1981, 2-3.  In the same letter the Department objected to a change in the procedures for voter identification, which gave wide discretion to local registrars to determine which documents were (and were not) sufficient to identify the person seeking to register.

[27] *Id.*, 3.  The latest available census data at the time of the objection were from the 1970 census.

[28] *Id.*

24.  In 1984 the American Civil Liberties Union (ACLU) sued state officials on behalf of the Voter Education Project, the NAACP, and Operation PUSH seeking, among other changes to the state's voter registration procedures, the appointment of more black deputy registrars and the creation of additional satellite voter registration sites.[29]  When the state, under the leadership of Secretary of State Max Cleland, agreed to encourage local boards of registrars to appoint more black deputy registrars and provide more satellite registration locations, the court dismissed the case.[30]  The State Board of Elections then adopted regulations that "established minimum requirements for the provision of satellite registration opportunities," according to the Department of Justice.[31]  The new regulations included "a formula specifying the minimum number of satellite locations in each county and requiring that satellite locations be open a minimum number of weekend and weekday evening hours."[32]

---

[29] *Voter Education Project v. Cleland*, CA84:1181A (N.D. Ga. 1984).  See the summary in Laughlin McDonald and Daniel Levitas, *Voting Rights Litigation, 1982-2006: A Report of the Voting Rights Project of the American Civil Liberties Union* (March 2006), 161-63.

[30] McDonald, et.al., "Georgia," in Davidson and Grofman (eds.), *Quiet Revolution in the South*, 76, 411.

[31] Objection letter from John R. Dunne to Mark H. Cohen, February 11, 1992, 1-2.

[32] *Id.*  When Georgia tried to cut back on the availability of satellite registration in 1991, the Department of Justice objected to amendments that would "reduce the minimum number of permanent satellite voter registration locations established by certain counties, and eliminate the requirement for Saturday registration hours" for satellite registration sites other than for "the six months preceding the close of registration for November general elections in even-numbered years."  This limited

25.  The Department objected in 1994 to some aspects of Georgia's changes designed to comply with the National Voter Registration Act of 1993 (NVRA).[33] The NVRA "specifically provides" that procedures for removing registered voters from the registration rolls "shall not" result in the removal of any person from the registration rolls for Federal office "by reason of the person's failure to vote."[34]  In response to this objection the state amended its election laws to comply with the NVRA, according to the trial court in a later case.[35]  Among these changes in 1995 "Georgia began keeping statewide voter registration data."[36]  This change helped the state to develop the statewide voter registration database required by federal legislation following the controversy surrounding the disputed presidential election of 2000.

---

satellite registration opportunities for months when "potentially significant elections regularly occur," the Department pointed out: municipal general elections were scheduled for November of odd-numbered years and the state's presidential primary took place in March of even-numbered years (outside the time for which full satellite registration opportunities would be available).  The Department observed that while "there has been substantial progress since the adoption of the Voting Rights Act in 1965, blacks of voting age continue to register at . . . a significantly lower rate than voting age whites." At the time of the November 1990 general election "only 52.3 percent of voting age blacks were registered compared to 62.1 percent of eligible whites."  *Id.*, 1-2.

[33] The changes were set forth in Georgia Act No. 1207 (1994).  See the Objection letter from Deval Patrick to Dennis Dunn, October 24, 1994.

[34] *Id.*, 1, 3.

[35] *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1268 n.3 (N.D. Ga. 2005).

[36] *Id.*, at 1269.  The court noted (p. 1272) that the state "admits that there was no centralized system in place prior to 1995."

26.  During the period between 1965 and the Supreme Court's decision in *Shelby v. Holder*, the Department of Justice blocked 177 proposed changes to election law by Georgia and its counties and municipalities.  The Department found that each had a retrogressive impact on voters of color in Georgia.

### The Adoption of DREs in Georgia, 2000-2002

27.  In the wake of the 2000 presidential election debacle in Florida – which demonstrated for the nation how imperfect election technology could lead to crisis in a close election – Georgia undertook pro-actively to correct the deficiencies of its own election technology.  In November 2000, Democratic Secretary of State Cathy Cox directed her staff to compile data on what political scientists call *undervotes* – the difference between the number of ballots cast and the number of votes recorded for a candidate.[37]  The initial findings of her staff showed that 3.5 percent of the ballots cast in the contest failed to include a vote for a presidential candidate (compared with the national undervote average of 1.9 percent).  Georgia's 3.5 percent was greater than even Florida's undervote percentage of 2.9 percent in the 2000 presidential contest.[38]  The staff's findings suggested that there were problems with the accuracy of vote counts from the types of election machines used in Georgia.  In the 2000 election the state's 159 counties used "four

---

[37] "Report of the 21st Century Voting Commission" (December 2001), 7, 9.
[38] *Id.*, 9.

different systems to cast and count ballots: [mechanical] lever machines, paper and scanning machines, punch-out ballots [punch cards], and pen and paper."[39]  In April 2001 the state established a commission "to advise the Secretary of State on the choice of voting equipment to be used statewide in all counties" and to "report its findings to the Governor and the General Assembly."[40]

28.  As political scientists R. Michael Alvarez and Thad E. Hall explain, "Cox saw the 2000 election debacle as an opening for her to improve election administration in Georgia and to secure resources for this purpose."[41]  She outlined the problems she saw with the "antiquated voting systems used in the state" in a report entitled "The 2000 Election, A Wake-Up Call for Reform and Change."[42]  Cox focused on two measures that political scientists employ in analyses of election technology – under-vote and over-vote rates[43] – for the different types of voting machines used in Georgia, and for variation among demographic groups.

---

[39] "Secure, Accessible & Fair Elections (SAFE) Commission Report," Submitted to the General Assembly (January 10, 2019), 4.

[40] "Report of the 21st Century Commission," 5.

[41] Alvarez and Hall, "Rational and Pluralistic Approaches to HAVA Implementation: The Cases of Georgia and California," *Publius*, 35 (Fall 2005), 569.  They characterize Secretary Cox as "a policy entrepreneur," acting to get "the result she desired."  *Id.*, 569-70.

[42] *Id.*, 570.

[43] Undervotes are the difference between the number of ballots cast and the number of votes counted by the machinery in each individual contest.  Overvotes are defined as "the inadvertent selection by a voter of more than one candidate in a single race." Report of the 21st Century Commission," 7.

Alvarez and Hall note that Cox's report "and subsequent studies found that African American voters were statistically less likely to have their votes counted on paper-based voting systems – punch cards and optical scan ballots – than white voters."[44]

29.  Cox "drafted and had legislation introduced into the Georgia General Assembly that would promote election reform by having the state purchase a uniform electronic voting system to be implemented across the state."  The legislation created the 21st Century Voting Commission "to conduct a pilot test of various voting technologies to determine which one best suited the needs of Georgians."[45]  The commission's 18 members held hearings "to allow for greater civic involvement and to educate the public about the state's election reform efforts."  It also conducted pilot tests of seven different electronic voting systems.[46] The Secretary of State then entered into a contract with the University of Georgia Survey Research Center "to design and compute results of an extensive exit poll of DRE voters" in municipal elections in 13 pilot cities.[47]  Exit poll results indicated that 94.5 percent of voters who cast votes on one of the new electronic systems agreed that Georgia "*should upgrade its voting system to a system like the one I used today*."[48]

---

[44] Alvarez and Hall, "Rational and Pluralistic Approaches," 570.

[45] *Id.*

[46] *Id.*

[47] "Report of the 21st Century Commission," 12.

[48] *Id.*, 13 (emphasis in original).

30.  Analysis of the 2002 election results by the Secretary of State's office demonstrated that "approximately 77,000 more ballots were counted using electronic voting than would have been counted under the previous systems."[49] Political scientist Charles Stewart explored the operation of Georgia's new DRE machines in a 2004 paper examining the residual vote rate – the combination of undervotes and over-votes – in elections from 1998 through 2002.[50]  Stewart began by asking: "Did the Diebold machines perform better than the collection of voter technologies that Georgia had used before?"  The answer, he wrote, was "yes."[51] In fact, "implementation of the Diebold system produced a significant reduction in the residual vote rate throughout the state of Georgia.  Just as important, the implementation of the new machines removed gaping disparities in voting machine reliability that could have raised serious questions about the fairness of Georgia's election system."[52]

31.  Stewart explained that before "the 2002 rollout of DREs, Georgia used a hodgepodge of voting equipment."  During the 1990s voting technology had

---

[49] Alvarez and Hall, "Rational and Pluralistic Approaches," 571 (reporting the results of Georgia Secretary of State, "Analysis of Undervote Performance of Georgia's Uniform Electronic Voting System," December 1, 2004).  This analysis indicated that the residual vote rate went from 4.8 percent for "the top-ticket race" in 1988 to .88 percent in 2002.

[50] Charles Stewart III, "The Reliability of Electronic Voting Machines in Georgia," CALTECH/MIT Voting Technology Project Working Paper #20 (October 2004).

[51] *Id.*, 3.

[52] *Id.*

"proceeded slowly, gradually replacing mechanical lever machines and punch cards with optical scanning."[53]  In the 2000 election 44 percent of votes "were cast on punch cards," 38 percent on optical scanners, 18 percent on aging mechanical lever machines, and a tiny 0.1 percent on traditional paper ballots.[54]  Georgia results (measured by residual vote rates) were consistent with nationwide statistics: "punch cards and mechanical lever machines performed the poorest, with traditional paper and optical scanning performing the best."[55]

32.  Comparing the performance of election technology in Georgia counties before and after the shift to statewide use of DREs – first used in the 2002 election – Stewart finds that in general: "the greatest reductions in residual vote rates were in counties that had larger 'disadvantaged' populations."  To be more specific, the use of DREs brought the greatest improvement in election technology in "counties with larger African American populations, rural counties, low-income counties, and counties whose residents were less likely to have completed high school."[56]

---

[53] *Id.*, 5.

[54] *Id.*

[55] *Id.*, 6 (and see Table 1).  For the nationwide statistics, see Stephen Ansolabehere and Charles Stewart III, "Residual Votes Attributable to Technology," *Journal of Politics*, 67 (May 2005), 365-89.

[56] Stewart, "The Reliability of Electronic Voting Machines in Georgia," 13-14 (and Table 6).  Stewart correctly points out that we cannot leap to the conclusion from these data that – because the residual vote rate "improved the most in counties with more African Americans" – more ballots cast by African Americans were counted.  "To establish that pattern, we would need to have data (both electoral and demographic) at a more finely tuned level of disaggregation, like the precinct

33.  The clearest pattern is that the biggest gains from using DREs in 2002 "occurred in the counties that had previously used lever machines."[57]  "The strongest predictor of whether a county used lever machines in 1998 is county wealth – poorer counties were more likely to use them."  Stewart also notes – and this may be equally important – these mechanical lever machines were quite old. "Aging lever machines require a significant amount of maintenance.  Therefore, it is not too much of a leap to speculate that a major part of the increase in machine reliability" – caused by the statewide use of DREs in 2002 – "was due specifically to the retirement of these machines that were probably beginning to fail in subtle ways."[58]  The aging of any new DRE machines over the years would likely become an issue just as aging had debilitated the voting machines they replaced.

34.  There were, Stewart points out, "two independent processes that occurred in 2002, each of which could account for the major gains in Georgia's residual vote rate" – equipment and training.[59]  With regard to equipment, it may be "that the Diebold DREs were better voting machines" than those previously used in Georgia.  "They were certainly brand new."  Just as important: "the

---

level."  *Id.*, 14.

[57] *Id.*, 15.  There was also a great improvement in counties previously using paper ballots, but only a couple of counties used paper ballots.  *Id.*

[58] *Id.*  Stewart calls this inference "speculative," but his inference is certainly plausible.

[59] *Id.*, 19 (pointing out that it is "impossible to separate" the effects of these two factors).

implementation of the machines was accompanied by an unprecedented amount of

vendor support and precinct worker training."[60]

35.   With the involvement of staff from both Diebold and Kennesaw State

University's Center for Election Systems (CES), training in the use of the new

DREs was provided to each county's election supervisor and persons who worked

in the county's precincts – "at least two workers per precinct," Stewart notes.  The

state made video tapes for further training and to educate voters, spending

"hundreds of thousands of dollars in voter education."[61]  Diebold allocated to the

Georgia project "more than 360 professionals, including 190 field technicians, 160

county support technicians and a dozen regional support managers."[62]  What

happens, Stewart asked in his paper in 2004, once those 360 professionals are no

longer available?  At that point in time, he concluded, "It is certainly too early to

tell."[63]  In short, the initial success of the state's switch in election technology was

---

[60] *Id.*, 20.

[61] *Id.*

[62] *Id.*, quoting an online Diebold news release.

[63] *Id.*, 20-21.  Stewart mentions one final issue that presaged problems that would trouble Georgia's use of the new DREs from 2002 to the present: technical difficulties discovered by independent experts. "In the midst of implementing the new machines, computer scientists came upon versions of the Diebold computer code, analyzed it, and concluded that it was riddled with programming lapses, especially security vulnerabilities." *Id*, 1.  Stewart notes further that, because the 2002 election was imminent, Diebold had to apply a software patch to the equipment that was not properly certified." *Id.*, 1-2.  In addition, several computer scientists demonstrated that the Diebold DREs could be successfully hacked – and votes could be changed.  See, e.g., Kellie Ottoboni and Philip B. Stark, "Election

not guaranteed to last without replacing the DREs as they aged – and continuing to train election workers effectively.

36.  The Help America Vote Act (HAVA) became law in 2002, "just as Georgia was holding its 2002 elections, the first using electronic voting statewide," note Alvarez and Hall.  They added that post-election analysis established that the reforms developed through the leadership of Secretary Cox "had been a success."[64] This initial success would not, as it turned out, be replicated in coming years, as the new DREs aged and the impressive training of election administrators and the staff they supervised in 2002 was replaced with less intensive training efforts, as Stewart suggested would happen.  Just as important, HAVA implementation after the 2002 state elections would take place in a quite different political context.

### Realignment in the Georgia Party System

37.  The defeat of incumbent Governor Roy Barnes, a Democrat, by Republican challenger Sonny Perdue in the 2002 gubernatorial election was, according to political scientists Danny Hayes and Seth McKee, "more than

---

Integrity and Electronic Voting Machines in 2018 Georgia, USA," paper presented at E-Vote-ID: The International Conference for Electronic Voting, 2019, 2-3; David Wagner, et.al., "Security Analysis of the Diebold AccuBasic Interpreter," February 14, 2006.  For a detailed account of the flaws in Georgia's operation of DRE technology and its statewide databases in the years following HAVA, see *Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018), and *Curling v. Raffensperger*, 397 F. Supp. 3d 1334 (N.D. Ga., 2019).
[64] Alvarez and Hall, "Rational and Pluralistic Approaches," 571.

stunning – it was historic." The outcome "broke a Democratic stronghold on the Georgia governorship that had kept the GOP out since Reconstruction."[65] It signaled, moreover, what proved to be a major realignment in the Georgia party system. Since 2002 Republicans have, as political scientists M.V. Hood and Seth McKee observe, consistently won most statewide contests and majorities in the state senate (beginning in 2002) and the state house (since 2004).[66]

38. Historians and political scientists distinguish between two types of partisan realignment in the United States: secular and critical realignment. Secular realignment is gradual, incremental realignment, in which groups of voters change their party identification and voter preferences in a consistent trend over a significant amount of time. Critical realignment, on the other hand, refers to a rapid change in the outcome of elections that fundamentally reshapes the balance of power between the parties for perhaps a generation.[67]

---

[65] Danny Hayes and Seth C. McKee, "Booting Barnes: Explaining the Historic Upset in the 2002 Georgia Gubernatorial Election," *Politics and Policy*, 32 (December 2004), 1.

[66] M.V. Hood III and Seth C. McKee, "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Proprieties and Their Impact on the 2018 Gubernatorial Election," *Social Science Quarterly*, 100 (No. 5, 2019), 1828, 1830.

[67] See, e.g., V.O. Key, Jr., "A Theory of Critical Elections," *Journal of Politics*, 17 (February 1955), 3-18; Walter Dean Burnham, "The Changing Shape of the American Political Universe, *American Political Science Review*, 59 (March 1965), 7-28; Burnham, *Critical Elections and the Mainsprings of American Politics* (New York, W.W. Norton, 1970); James L. Sundquist, *Dynamics of the Party System* (Washington, D.C. The Brookings Institution, 1970).

39.  Georgia has experienced a secular realignment of white voters leaving the Democratic Party and switching to the Republican Party – beginning in the 1960s but accelerating in recent decades.[68]  The 2002 gubernatorial election looks like part of a critical realignment in the Georgia party system, accelerating the pattern of white movement into the Republican Party and reaching a critical mass that gave the Republicans long-standing control of state government and politics. As a result, decisions about voter registration, election administration, and the machinery by which ballots were cast in Georgia after 2002 reflected the policy preferences of the Republican Party.[69]

40.  In white-majority Georgia, Republicans benefitted from a pattern of voting that was polarized along racial lines.[70]  The pattern was evident in the 2002 election.  As political scientist Charles Bullock points out, "the relationship between race and voting in 2002 was striking."[71]  Despite the long-standing pattern of racially polarized voting – both in the years when a Democratic majority controlled state politics and after Republicans became the majority party in Georgia – African American candidates were nevertheless elected to local and state

---

[68] Hood and McKee, "Booting Barnes," 709.
[69] See, e.g., Charles S. Bullock III, "Georgia: Republicans at the High Water Mark?" in Bullock and Mark J. Rozell (eds.), *The New Politics of the Old South* 5th edition (New York, Rowman & Littlefield, 2014), 49, 51 (Table 2.1).
[70] Hood and McKee, "Booting Barnes," 709.
[71] Bullock, "Georgia," 58.

office, largely from black-majority districts created as a result of successful voting rights lawsuits brought under Section 2 of the Voting Rights Act after Congress amended the statute in 1982.[72]  Fairly drawn single-member districts provided a means for increasing minority representation *in spite of* white refusal to vote for minority-preferred candidates.[73]

41.  A recent study by Bullock and Ronald Keith Gaddie provides evidence that statewide voting patterns in Georgia continued to be polarized along racial lines into the 21st century.  Increasingly, however, white voters were switching from the Democratic to the Republican Party.[74]  In the 1990s African American congressional candidates running as Democrats enjoyed between 77 and 100 percent of black votes, but only 18-54 percent of white votes.  Between 30 and 45 percent of white voters in the state supported Democratic candidates in the 1990s, but only about a quarter of whites voted Democratic beginning in 2002.  Black voters favored Democratic candidates by 85 to 92 percent.[75]  Such polarized voting is evidence of vote dilution, of course, only in contests where minority-preferred candidates usually lose.[76]

---

[72] McDonald, et.al., "Georgia," 77-81, 91-100 (Tables 3.1-3.8).

[73] *Id.*, 84-85, 412-13 (citing judicial findings of racially polarized voting).

[74] The fact that partisan identification was becoming more racially polarized does *not* suggest that the *cause* of the polarized voting was partisanship rather than race.

[75] Charles S. Bullock III and Ronald Keith Gaddie, *The Triumph of Voting Rights in the South* (Norman, University of Oklahoma Press, 2009), 101 (Table 3.6).

[76] See, e.g., Bernard Grofman, Lisa Handley, and Richard G. Niemi, *Minority*

42.  Exit poll data have consistently demonstrated that African American voters are the most reliably Democratic voters in Georgia, whereas most whites consistently vote Republican.  In their 2009 study Bullock and Gaddie report, based on exit poll results, that "since 1992, Democrats have always taken at least 80 percent of the black vote while most whites invariably preferred Republicans."[77] Exit polls in statewide elections for federal office from 1992 through 2006 show that African Americans supported the Democratic candidate at rates between 81 and 92 percent, whereas whites voted Democratic at rates between 23 and 45 percent.[78]

43.  Georgia elections, like elections elsewhere in the United States, are usually characterized by racial disparities in voter participation.[79]  Official data on turnout by race – such as Georgia provides – reveal that, from 1992 through 2006, the white percentage of registered voters who turned out to vote in the general election for president – normally the highest turnout election for all voters – was

_____

*Representation and the Quest for Voting Equality* (New York, Cambridge University Press, 1992), 50-51.

[77] Bullock and Gaddie, *Triumph of Voting Rights,* 100.

[78] *Id.*, 100, 103 (Table 3.8).

[79] Bullock and Gaddie cite the estimates of registration and turnout by race for Georgia from 1980 through 2006 published by the Bureau of the Census. *Id.*, at 380 (Table B.1: registration by race), and 383 (Table B.2: turnout by race).  The Census Bureau at that time included Hispanics with non-Hispanic whites in the published estimates; correcting that error, Bullock and Gaddie report that non-Hispanic white registration and turnout in Georgia has exceeded that for African Americans according to the Census estimates.

consistently higher than for African Americans.  In the 1996 presidential election,

for example, white turnout was 64.3 percent and black turnout only 53.5 percent.

In 2000 the presidential election brought 71.4 percent of whites to the polls but

only 62.8 percent of blacks.  In the 2004 contest white turnout was at 80.4 percent

and black turnout at only 72.2 percent.[80]

44.  The election of the first African American president in 2008 was seen

by some as a sign that racially polarized voting had declined in the United States –

and in the South.  In fact, if we look at exit poll data for the nation – as well as

from Georgia and other states formerly covered by the preclearance requirements

of Section 5 of the Voting Rights Act – the pattern looks quite different.  Based on

exit poll data, three respected political scientists found that "the magnitude of race-

based differences in voting preferences *increased* across the nation in the 2008

election," but especially in Georgia and other Southern states.[81]  Turnout among

African Americans increased from 2004 to 2008, "and they voted more solidly for

the Democrats in 2008 than they did in 2004."[82]  The level of racial polarization

was greater in the states covered by Section 5 than in the rest of the country.  In the

---

[80] *Id.*, 86 (Table 3.2).

[81] Stephen Ansolabehere, Nathaniel Persily, and Charles Stewart III. "Race, Region, and Vote Choice in the 2008 Presidential Election: Implications for the Future of the Voting Rights Act," 123 *Harv. L. Rev*. 1385, 1401, 1409-10 (2010), emphasis added.

[82] *Id.*, 1412.

covered states there was a 71 percent difference between presidential preferences

for whites and blacks: only 26 percent of whites supported Barack Obama,

compared with 97 percent of African Americans, and 67 percent of Latinos.  In

noncovered states a much greater 48 percent of whites voted for Obama, compared

with 96 percent of blacks (a smaller gap of 48 percent, compared with 71 percent

in covered states).[83]

45.  Georgia's voting patterns resembled trends in the rest of the South in

2008.  Only 23 percent of whites voted for Obama (the same percentage as voted

for Democratic nominee John Kerry in 2004).  Thus, it was the overwhelming

support of African American voters – turning out in greater numbers – that boosted

Obama's total vote in Georgia (increasing the vote for the Democrat in 2004 from

41 percent to 47 percent).[84]  The results when President Obama sought re-election

in 2012 displayed the same pattern, as the same three political scientists noted.

"Voting in the covered jurisdictions has become even more polarized over the last

four years, as the gap between whites and racial minorities has continued to grow.

This is due both to a decline among whites and an increase among minorities in

supporting President Obama's reelection."[85]

---

[83] *Id.*, 1415 (Table 5).
[84] *Id.*, 1422 (Table 9).
[85] Stephen Ansolabehere, Nathaniel Persily, and Charles Stewart III, "Regional Differences in Racial Polarization in the 2012 Presidential Election: Implications for the Constitutionality of Section 5 of the Voting Rights Act," 126 *Harv. L. Rev.*

46.  Party identification estimates in Georgia from a 2014 survey designed by political scientists show only 25 percent of whites still reporting themselves as Democrats while 59 percent said they were Republicans and 17 percent were Independents.  Among African Americans reporting their party identification in the survey, 73 percent saw themselves as Democrats, only 12 percent as Republicans and 15 percent as Independents.[86]  The 2014 gubernatorial election in Georgia displayed the same general pattern of racial polarization.  Only 25 percent of whites voted for the Democratic gubernatorial candidate in 2014, as compared with 89 percent of African Americans.  The victorious Republican candidate, Nathan Deal, won the support of 73 percent of white voters but only 10 percent of black voters.[87]

47.  In a voting rights lawsuit involving local elections in Gwinnett County – where the Hispanic or Asian voters were numerous enough for reliable statistical estimates – expert analysis of voting patterns provides evidence regarding not only polarized voting between non-Hispanic whites and African Americans but also cohesion between African American voters, Hispanic voters, and Asian American

---

*Forum*, 205, 206 (April 2013).

[86] Declaration of Vincent L. Hutchings, *Georgia State Conference NAACP v. Gwinnett County Board of Registrations and Elections*, C. A. No.1:16-cv-02852 (N.D. Ga.), August 6, 2017, Table 1. (p. 9), relying on Georgia survey data from the Pew Research Center.

[87] *Id*., 11, relying on CNN exit poll data.

voters.[88]  Non-Hispanic whites consistently defeated minority-preferred candidates in inter-racial contests.  Expert Richard Engstrom's statistical analysis showed that "African American, Latino, and Asian American voters are politically cohesive in and of themselves, and as a group" – that is, they formed a cohesive tri-racial coalition – but were usually defeated by non-Hispanic whites, even when Gwinnett became a majority-minority county.[89]

48.  In a case challenging the mid-census redistricting of two state house districts in Gwinnett and Henry counties, political scientist Jowei Chen found that "voters in both HD 105 and HD 111 exhibit significant racially polarized voting." In both districts virtually all African American voters supported Democratic candidates, while 75 to 85 percent of non-black voters supported Republican candidates.[90]  By the 2016 election, whites were no longer over 50 percent of the

---

[88] Declaration of Richard L. Engstrom, August 8, 2017, and Rebuttal Declaration of Richard L. Engstrom, February 2, 2018), *Georgia State Conference NAACP v. Gwinnett County Board of Registrations and Elections*, C.A. No. 1:16-cv-02852 (N.D. Ga.).

[89] Engstrom Declaration, p. 8.  Engstrom's summary of his findings is found on pp. 9-14, and in Tables 1 and 2 (pp. 18-20).  The defendants' expert political scientist, John Alford, offered criticisms of Engstrom's interpretation – but his statistical estimates "do not materially differ" from those provided by Engstrom, except in a few district elections where the small number of precincts created problems for statistical analysis.  Engstrom relied primarily on countywide contests in his analysis.  See Engstrom Rebuttal Declaration, pp. 2-3, and Exhibit R.1 (pp. 8-10).

[90] Expert Report of Jowei Chen, December 22, 2017, *Georgia State Conference NAACP v. State of Georgia*, C.A. No. 1:17-cv-01247 (N.D. Ga.); pp. 2, 4, and Tables 1 and 2, pp. 5-6.

turnout in these districts. Chen broke down turnout for Hispanic and Asian, as well as black and white, voters. Non-Hispanic white turnout in HD 105 was only 43 percent of the total, while non-Hispanic black turnout was 37 percent; Hispanic voters were almost six percent of total turnout and Asian voters were over two percent of the turnout.[91] In HD 111 turnout patterns were similar. Non-Hispanic whites were less than 46 percent of the turnout by 2016, non-Hispanic blacks were 40 percent, Hispanics were over two percent and Asian Americans were a bit over one percent of turnout.[92]

49. Republicans controlled the governor's office, the legislature, and – after the 2006 election of Republican Karen Handel – the office of Secretary of State. According to political scientists Hood and McKee, the likeliest threat to Republican domination of Georgia elections – should it materialize – came from "changing demography and minority voter mobilization in favor of Democrats."[93] Between 1990 and 2016, Georgia's black population – by now including modest percentages of African immigrants – increased from 27 to 31 percent, and Latinos from two to nine percent. As a result, the non-Hispanic white population declined from 71 to 60 percent.[94] Because minority voters routinely support Democratic

---

[91] Chen Report, Table 7, p. 14.
[92] *Id*., Table 8, p. 15.
[93] Hood and McKee, "Why Georgia, Why?" 1832.
[94] *Id.*, 1833.

candidates, Republicans stood to benefit from making registration and voting by minority citizens more difficult. "Control of election administration," note Hood and McKee, "has increasingly been recognized and deployed as a means to seek electoral advantage," not just in Georgia but in the United States generally."[95]

## Immigration and the Citizenship Issues in
## Georgia's Voter Verification Process

50. A key aspect of demographic change that could add to the threat against Republican strength at the polls in recent decades has been immigration. In the 1990s Georgia had – in proportion to its prior population – the second highest increase in its minority population of any state in the country. Much of this growth was due to migration from Latin America, Asia, and Africa[96] – but also to migration of Hispanics, Asians, and Africans from other states in this country. These immigrants were attracted by booming economic conditions in agriculture,

---

[95] *Id.* The specific election administration issues Hood and McKee cite (pp. 1833-34) are: the first Georgia law establishing a very strict photo identification requirement for in-person voting, Georgia's "use it or lose it" law (that may have been noncompliant with the National Voter Registration Act), the requirement that the information on voter registration applications match *exactly* the information for the applicant on the driver's license database or that of the Social Security Administration, and the vulnerability of the state's voter registration database to hacking.

[96] We learn from Stephanie A. Bohon, Megan Conley, and Michelle Brown, "Unequal Protection Under the Law: Racial Disparities for Hispanics in the Case of *Smith v. Georgia*," *American Behavioral Scientist*, (2014), 12, that according to ACS data Georgia had over 10,000 black non-citizens, mostly from Africa.

construction, poultry processing, and the carpet industry.[97]  A lawyer for the

Immigration and Naturalization Service declared: "Immigrants are the key to the

Georgia economy.  Hispanics keep the poultry industry running in Gainesville and

the carpet industry productive in Dalton."[98]  By 2005, moreover, four counties in

the Atlanta metropolitan area – Fulton, DeKalb, Cobb, and Gwinnett, where

construction, manufacturing, and retail provided plenty of jobs – were home to

more than half of the state's 650,000 Hispanics.[99]

51.  Increased immigration unsurprisingly brought a growing percentage of

non-citizens.  In 1990 only 2.7 percent of the state's population was foreign-born.

By 2000 those born in other countries made up 7.1 percent of the population; by

2017 the one-year American Community Survey (ACS) estimated that 10.2 percent

---

[97] Micki Neal and Stephanie A. Bohon, "The Dixie Diaspora: Attitudes Toward Immigrants in Georgia," *Sociological Spectrum*, 23 2003), 181-212 (data cited on p. 182), noting that 25 Georgia counties saw increases in immigrants of 50 percent or greater. *Id.*, 191.

[98] *Id.*, 190.  Corporate executives in Dalton's carpet factories described Mexican immigrants as the "lifeblood" of the industry.

[99] Debra Sabia, "The Anti-Immigrant Fervor in Georgia: Return of the Nativist or Just Politics as Usual?" *Politics & Policy*, 38 (No. 1, 2010), 53-80 (data reported on p. 56).  See also Robert A. Yarbrough, "Becoming 'Hispanic' in the 'New South': Central American Immigrants' Racialization Experiences in Atlanta, GA, USA." *GeoJournal* 75 (No. 3, 2010), 249-60.  After mapping the location of Central American immigrants in the Atlanta region, using a measure known as a Location Quotient, Yarbrough notes (p. 251) that their greatest concentration was in "the I-85/Buford Highway corridor stretching through northern DeKalb and western Gwinnett counties," an area "known for its immigrant residential settlement as well as immigrant-driven business activities."

of Georgia's population was foreign-born.[100]  Some, however, had lived in other

states before moving to Georgia in search of opportunity.  Many of the foreign-

born became U.S. citizens – and could then legally register and vote.  The

proportion of the foreign-born in Georgia who were naturalized citizens was 61.1

percent in 1990, 29.3 percent in 2000, and 43.6 percent according to the 2017 ACS

estimate.[101]

52.  Georgia continued to have increases in its Hispanic community.

Between 2000 and 2015, the state had the highest growth rate in its Hispanic

population in the entire country – 118.8 percent.[102]  Hispanics constituted the

largest contingent of the state's foreign-born immigrants, according to the 2017

estimates: 48.1 percent.  Breaking down the total number of Hispanics by nation of

origin, Mexicans made up 23.1 percent of the state's foreign-born, other Central

American countries 8.9 percent, the Caribbean 9.4 percent, and South American

countries another 6.7 percent.[103]  Predictably, the changing demographics in the

Atlanta metropolitan area, the smaller urban centers of Dalton, Gainesville, and

---

[100] Migration Policy Institute (MPI), "State Demographics Data: Georgia."  MPI reports rely on data from the decennial U.S. Census and estimates from the American Community Survey which are reported here.

[101] *Id.*

[102] Atlanta Regional Commission, "Regional Snapshot: Metro Atlanta's Hispanic and Latino Community" (February 2018), citing the Pew Research Center tabulations of the 2000 census and the 2015 ACS.

[103] MPI, "State Demographics Data: Georgia."  The percentage who were non-citizens had decreased from 70.7 percent in 2000 to 56.4 percent in 2017.

Athens, and the agricultural counties of southeastern Georgia had a significant impact on the state's politics in the era of HAVA implementation – and under Republican control.

53.  As one study points out, Georgia has a "history of anti-immigrant laws and policies in response to the increasing Hispanic and immigrant population."[104] Republican legislators' concern about the effects of rapid immigration was already on display by 2006 when the state adopted SB 529, the Security and Immigration Compliance Act.  Two key provisions of the act required verification of citizenship for either applications for employment or applications for public benefits.  Section 2 of the bill required employers hiring a new worker to participate in a federal work authorization program – E-Verify – to determine, among other things, whether the applicant was a U.S. citizen.[105]  Section 9 required citizenship verification for any person applying for public benefits (local, state, or federal benefits), utilizing a program operated by the Department of Homeland Security called Systematic Alien Verification of Entitlement (SAVE).[106]

---

[104] Bohon, et.al., "Unequal Protection," 4, citing Bohon, "Georgia's Response to New Immigration," in Greg Anrig and Tova A. Wang (eds.), *Immigration's New Frontiers* (New York, Century Foundation, 2006), 67-100.
[105] S.B. 529, pp. 2-3, Section 2, amending Code Section 13-10-91 (and applying to some but not all categories of employers).  Ryan Mahoney, "Perdue Signs Illegal Immigration Bill," *Atlanta Business Chronicle*, April 17, 2006, characterized this provision as "targeting illegal immigrants and their employers."
[106] S.B. 529, pp. 11-13, Section 9, Code Section 50-36-1 to Title 50 of the Georgia Code.  The policies at issue in these provisions were designed to identify – and

54.   Two other provisions of SB 529 – perhaps the most controversial –
created a channel for local and state law enforcement to assist in enforcing federal
immigration laws.[107]   Section 4 directed the state's Commissioner of the
Department of Labor to negotiate a Memorandum of Understanding (MOA) with
the U.S. Department of Justice or the Department of Homeland Security
"concerning the enforcement of federal immigration and custom laws, detention
and removals, and investigations" in Georgia.[108]   Federal funding would be
required under such an MOA to provide for training Georgia law enforcement
officers to enforce federal immigration law, "while performing within the scope of
his or her authorized duties."[109]   Section 5 of the act specified that whenever a
person charged with a felony (as well as "with driving under the influence") is
confined to jail in a municipality or county "a reasonable effort shall be made to
determine the nationality of the person."   If the person proved to be a foreign
national, law enforcement was to seek citizenship verification through the
Department of Homeland Security.   The Georgia Sheriffs Association was to issue

---

remove – undocumented immigrants who were not U.S. citizens.  Identifying
undocumented immigrants was a legitimate goal, but the laws were drafted in such
a way that – at least as implemented – they swept more broadly than necessary,
risking a discriminatory effect.

[107] S.B. 529, pp. 5-6, Section 4 (relating to "peace officers") and Section 5 (relating
to penal institutions).

[108] S.B. 529, p. 5, Section 4 adding a new code section, 35-2-14.

[109] *Id*.

guidelines and procedures for carrying out this responsibility.[110]  These new functions would likely have a significant effect on the state's Hispanic – or perhaps Asian – residents.

55.  When signing the bill Republican Governor Sonny Perdue justified SB 529 in inflammatory language reflecting his party's current preoccupation with the problem of illegal immigrants gaining access to welfare benefits[111] – as well as committing voter fraud – that rose to the level of demagoguery. "It is simply unacceptable for people to sneak into this country illegally on Thursday, obtain a government-issued ID on Friday, head for the welfare office on Monday, and go to vote on Tuesday."[112]  The state's voting process at the time – including a restrictive

---

[110] *Id*.

[111] See, e.g., the comments of State Senator – and later Lieutenant Governor – Casey Cagle, in a Congressional Hearing a few months later: "the issue of dealing with the impact of illegal aliens on the healthcare system is a significant one for Georgia."  Stressing that for many Georgia families "affordable health coverage is rapidly becoming unreachable," Cagle said, "healthcare costs are being significantly increased by the cost of providing free or subsidized care to citizens of other nations who broke Federal law to come here."  Testimony of Hon. Casey Cagle, "Examining the Impact of Illegal Immigration on the Medicaid Program and our Healthcare Delivery:" *Hearings Before the Comm. on Energy and Commerce,* 109th Cong. 109-134 (2006), at 73.

[112] Quoted in Sabia, "Anti-Immigrant Fervor in Georgia," 62.  Although inflammatory, the Governor's remarks did not rise to the level of a contemporary speech given by activist D. A. King to a Republican audience, warning that illegal immigrants were "not here to mow your lawn.  They're here to blow up your buildings and kill your children, you, and me."  King was reportedly one of the persons consulted by Republican Senator Chip Rogers in drafting SB 529.  Senator Rogers was also a sponsor of the Georgia photo identification requirement for in-person voting in 2005.  *Id.*

photo identification requirement for in-person voting – made the Governor's claim of undocumented immigrants voting extremely unlikely, unless local election officials were routinely failing to enforce the law.

56.  Six of 18 members of the Latino Commission for a New Georgia – which Perdue had set up in 2003 to "play a consulting role in policy development" – resigned in protest over his decision to sign SB 529 into law.  As one of those resigning in protest – a restaurateur who described himself as "a dedicated Republican and citizen of Georgia" – put it: "By continuing to serve, I feel I would be giving you credibility for having compassion and understanding of the plight of the Latino people which you obviously do not have."[113]  According to an Associated Press story, "Hispanic groups warned that Georgia's immigration crackdown would turn conservative Hispanic voters away from the Republican Party."[114]

57.  Governor Perdue's assertion that immigrants cost taxpayers by depending on public assistance programs, was factually incorrect, judging from an

---

[113] Alex Salgueiro, president of the Savannah Restaurants Group, quoted in Walter C. Jones, "6 Latinos Leave Perdue Panel; One-Third of Economic Group Resigns; Many Cite Immigration Bill," *Florida Times Union*, April 21, 2006.  Other members submitting their resignations included Sara Gonzalez, president of the Georgia Hispanic Chamber of Commerce, and Venus Gines, former Cobb County chair of the Republican National Hispanic Association.
[114] Vicky Eckenrode, Associated Press, "Athens March Vigil One of Many Scheduled Today," *Athens Banner-Herald*, May 1, 2006.

analysis of the issue by Sarah Beth Coffey of the Georgia Budget and Policy Institute (GBPI) a few months earlier.  Coffey addressed the "belief among some Georgians that undocumented immigrants are abusing the system and receiving services from which they are restricted by federal law."[115]  Coffey pointed out that legislation currently under consideration – likely SB 529 – "seeks to restrict undocumented immigrants from government services," but the majority of those services are already restricted by federal law."  She then listed the welfare benefits "for which undocumented immigrants do not qualify" under federal law: food stamps; Social Security; Supplemental Security Income; Temporary Assistance for Needy Families (TANF); Full-Scope Medicaid; Medicare "Premium Free" (Part A); Peach Care (Georgia's children's health insurance); and HUD Public Housing and Section 8 programs.  The only benefits for which undocumented immigrants *did* qualify were state-funded programs *not* affected by SB 529: "K-12 public education and emergency medical care."[116]  Coffey also calculated that on average an "undocumented family in Georgia contributes between $2,340 and $2,470 in state and local sales, income, and property taxes combined" – or between $1,800

---

[115] Sarah Beth Coffey, "Undocumented Immigrants in Georgia: Tax Contribution and Fiscal Concerns" (Georgia Budget and Policy Institute, January 2006), p. 1.
[116] Coffey, "Undocumented Immigrants in Georgia," p. 3.  See also Neal and Bohon, "Dixie Diaspora," 191-92, citing a 1997 report from the Georgia Department of Human Resources documenting that immigrants made up only 1.2 percent of all families receiving TANF benefits and only 1.3 percent of families receiving food stamps.

and $1,860 if the family does not pay income taxes.[117]  The Governor's claims

about the costs to taxpayers of benefits enjoyed by illegal immigrants could only

have been true if persons charged with enforcing state and federal law in Georgia

failed to enforce those legal restrictions.  In short, setting up barriers to the use of

public benefits by illegal immigrants was a solution in search of a problem.

58.  Businessmen – normally a key focus of the state's Republican

leadership – struggled to understand the ways in which SB 529 would affect them.

According to a news account from Gwinnett County, the local Chamber of

Commerce held a session in October attended by around 50 business leaders "to try

to learn how to comply with the new laws, which go into effect next year."[118]  A

local accountant correctly explained to his audience that "companies that contract

with the state must confirm employees are eligible through a Department of

Homeland Security database" – E-Verify – "that is wrong about 20 to 40 percent of

the time."[119]  The accountant added that there were "a lot of reasons why the

mismatches are happening," such as "the Hispanic tradition of keeping the last

name of both the father and the mother after marriage."[120]  A lawyer at the

Chamber of Commerce meeting saw so little practical need for such restrictions as

---

[117] *Id*., p. 2.

[118] "Law Boosts Businesses' Burden," *Gwinnett Daily Post*, October 20, 2006.

[119] *Id*.

[120] *Id*.

in SB 529 that "these laws are political in nature," expressing his view that "racism never left Georgia.  It just laid dormant for a while until they found someone else to pick on."[121]

59.  In September 2006, a few months after SB 529 was signed into law – even before many of its provisions were implemented – local law enforcement in Georgia cooperated with U.S. Immigration and Customs Enforcement (ICE) in raids on undocumented immigrants.  In Forsythe County 20 sheriff's deputies worked with ICE agents in a pre-dawn raid on a local construction firm and rounded up 30 undocumented workers who worked there.  The sheriff's office had been investigating allegations of fake resident alien cards (green cards) and Social Security cards.[122]  In the little southeast Georgia town of Stillmore, in Emmanuel County, federal agents raided the local chicken-processing plant and the surrounding area.  "They cuffed and arrested more than 120 illegal immigrants, mostly men, and took them away."[123]  When the raid went down, another reporter noted, the local sheriff "began to get calls from residents wondering why armed

---

[121] *Id*.

[122] "30 Men Snared in Raid on Company," *Forsyth County News*, September 17, 2006, p. 1A.  A follow-up story reported that all of them men "have immigration holds and are likely to be deported."  See "Workplace Raid Signals Changes in Strategies," *Forsyth County News*, September 21, 2006, p. 1A.

[123] *Id*.  Another news account reported that many Hispanics who were not arrested fled and one family "hid for two nights in a tree."  The reporter estimated that "perhaps as many as 300 others disappeared."  "Crackdown on Immigrants Empties a Town," *Christian Science Monitor*, October 3, 2006, p. 1.

men with bulletproof vests were running down the sidewalk; why Mexican immigrants were hiding behind homes and in the woods."[124]  By October, 2,000 people marched near the state capitol to protest SB 529, according to yet another reporter.  A group of Latino men carried a sign in English that made its point despite the syntax and spelling: "I never live from welfare because I hard worker. I just build houses for yu."[125]

60.  In 2011 Georgia returned to the concerns addressed in 2006 when the legislature adopted HB 87.[126]  This bill – which was among the most controversial pieces of legislation in the 2011 session – was essentially an effort to provide more effective enforcement of the provisions in the 2006 law.[127]  HB 87 spelled out requirements for anyone contracting with the state – and any sub-contractors – to use E-Verify.[128]  It created a new crime of "aggravated identity fraud" whenever a person used fictitious or counterfeit information for the purpose of obtaining

---

[124] "Immigration Issue Ripples Both Ways," *Atlanta Journal and Constitution (AJC),* September 25, 2006, p. B1.

[125] "Latinos Call for Legalization," *AJC*, October 8, 2006, p. D3.

[126] HB 87 was enacted into law as the Illegal Immigration Reform and Enforcement Act, 2011 Ga. Laws 795.

[127] Note, "State Government HB 87," 28 Ga. St. U. L. Rev. 51, 57 (Fall 2011). This Note provides a detailed legislative history of HB 87 accompanied by the authors' analysis of the bill.  A legislative study committee set up in 2010 concluded, after multiple hearings, that SB 529 did not have any enforcement mechanisms.  HB 87 was designed to establish effective ways of putting teeth into enforcement.  *Id.*, 86-87.

[128] *Id.*, 77.  All employers were to submit compliance reports annually.

employment, and specified the penalties for the offense.[129] The bill also specified

penalties for knowingly transporting or harboring illegal immigrants or inducing

them to enter the state.[130]  It authorized all law enforcement officers to use the

resources of their office to work with federal immigration authorities, and to arrest

and transport illegal immigrants.[131]  HB 87 added penalties for agency heads who

violated the requirements for using E-Verify or SAVE or other requirements of the

bill.[132]  It set up a new Immigration Enforcement Review Board, established the

procedures under which it would operate, and gave it authority to investigate

complaints.[133]

61.  Buried in Section 8 of HB 87 – which strengthened the authority of law

enforcement to seek verification of a suspect's "immigration status" – was a

provision that appeared to forbid racial profiling: "A peace officer shall not

consider race, color, or national origin in implementing the requirements of this

Code section."\[134]  Unlike other provisions specifying in great detail the legal

authority afforded law enforcement when apprehending illegal immigrants, nothing

in this provision specified how police officers were to avoid taking race or national

---

[129] *Id.*, 77-78.

[130] *Id.*, 78.

[131] *Id.*, 79.

[132] *Id.*, 80-81.

[133] *Id.*, 81-82.

[134] HB 87 (As Passed House and Senate), www.legis.ga.gov/Legislation/20132014/137020.pdf, Section 8, 17-5-100(d).

origin into account when investigating a suspect.[135]  This brief bow to avoiding

racial profiling  prompted a sarcastic response from prominent Atlanta immigration

lawyer, Republican Charles Kuck.  "Let me ask you a question," he asked a

reporter.  "Do you think any white people are going to be taken in for an

immigration background check if they forgot their wallet at home?"[136]

62.  The crackdown against undocumented immigrants threatened to cause

problems with traditional Republican constituencies in business and agriculture –

which underscores the importance of lawmakers' animosity against undocumented

immigrants – most of whom were Hispanic. According to a report in the state's

leading newspaper, Republican Governor Nathan Deal and Republican legislators

"came under intense pressure in recent weeks from business groups that lobbied

against the proposed law."[137] The requirement to use the federal E-Verify database

was a "particular concern to Georgia businesses," in part because the faced

financial penalties "for not complying with the E-Verify requirement."[138]

---

[135] There was, however, an exception to the instruction not to consider race or national origin: "except to the extent permitted by the Constitutions of Georgia and of the United States."  *Id.*
[136] Quoted in "Georgia Passes Immigration Bill Similar to Arizona's," *Los Angeles Times*, April 14, 2011.
[137] Jeremy Redmon, "Georgia Lawmakers Pass Illegal Immigration Crackdown," *Atlanta Journal and Constitution*, April 15, 2011.
[138] *Id.*  "We're coming out of [a] recession, and businesses are doing all they can do right now to stay afloat," according to Jann Moore of the Gwinnett County Chamber of Commerce.  *Id.*

According to another report, HB 87 "has drawn stiff opposition from the state's agricultural, landscaping, restaurant and tourism industries, who "fear the law will damage the state's economy by scaring away migrant workers" and prompting cancellations of scheduled conferences.[139]  "With the law passed and ready for implementation, many rural farmers – especially in Central and South Georgia – are taking notice of the exodus of migrant workers and immigrants which has left some farmers without workers to pick crops."[140]  Many of these farmers who are "losing their crops in these rural counties," the reporter added, "had voted Republican for years."[141]

63.  The law's constitutionality was challenged by private plaintiffs seeking a preliminary injunction shortly after it was enacted into law.[142]  Their primary legal argument – at least the one that succeeded before the trial court – was that Sections 7 and 8 of the act pre-empted federal immigration law.[143]  Summarizing Section 7, the court said it "prohibits 'transporting or moving an illegal alien' [as well as] 'concealing of harboring an illegal alien'" and "'inducing an illegal alien

---

[139] Jeremy Redmon, "Governor Signs Arizona-style Immigration Bill into Law," *Atlanta Journal and Constitution*, May 13, 2011.

[140] "Rural Republicans in Georgia Can't Have It Both Ways," *Macon Examiner*, June 21, 2011.

[141] *Id.* See also Megan McArdle, "Georgia's Harsh Immigration Law Costs Millions in Unharvested Crops," *The Atlantic*, June 21, 2011.

[142] *Georgia Latino Alliance for Human Rights v. Deal,* 793 F. Supp. 2d 1317 (N.D. Ga. 2011).

[143] *Id.* at 1340.

to enter' into [Georgia] while committing another criminal offense."[144]  Section 8,

the court added, "authorizes Georgia law enforcement officers to investigate the

immigration status of criminal suspects where the officer has probable cause to

believe that the suspect committed another criminal offense."[145]  If the officer

concludes that the suspect is an illegal immigrant, moreover, "he may detain the

suspect, transport him to a state of federal detention facility," or notify the

Department of Homeland Security.[146]  The court granted the plaintiffs' motion  for

a preliminary injunction as to these two sections of HB 87, because the plaintiffs

"demonstrated likelihood of success on the merits of their claim that federal law

preempted" the enforcement actions required by each.[147]  The court added that the

"apparent legislative intent is to create such a climate of hostility, fear, mistrust and

insecurity that all illegal aliens will leave Georgia."[148]

64.  When Governor Nathan Deal signed HB 87 into law, he told reporters

"this legislation I believe is a responsible step forward in the absence of federal

action."[149]  The author of HB 87, Republican Representative Matt Ramsey, "said

the bill addresses issues forced on the states because of the federal government's

---

[144] *Id.* at 1322.

[145] *Id.*

[146] *Id.*

[147] *Id.* at 1317, 1340.

[148] *Georgia Latino Alliance for Human Rights v. Deal,* 793 F. Supp. 2d, at 1333.

[149] Quoted in "Deal Signs Immigration Bill," *Augusta Chronicle*, May 24, 2011.

decades-long failure to secure the nation's borders."[150]  To this claim the judge

hearing the case bristled: "The widespread belief that the federal government is

doing nothing about illegal immigration is a myth," and the state's claim "has no

basis in fact."[151]

65.  On appeal the Eleventh Circuit upheld the preliminary injunction ruling

on Section 7 because the federal Immigration and Nationality Act[152] "provides a

comprehensive framework to penalize the transportation, concealment, and

inducement of unlawfully present aliens."[153] The appeals court reversed the

preliminary injunction ruling, however, as to Section 8, in large part apparently

because of the clause ostensibly prohibiting racial profiling: "In determining

whether to investigate citizenship, police officers are expressly prohibited from

considering 'race, color, or national origin . . . except to the extent permitted by the

United States and Georgia Constitutions."[154]  The Eleventh Circuit concluded that

it would be inappropriate "to assume that the state will disregard its own law," but

noted that "unconstitutional *application* of the statute could be challenged in later

---

[150] "Georgia Governor to Sign Law Targeting Illegal Immigrants," *CNN*, April 15, 2011.

[151] *Georgia Latino Alliance for Human Rights v. Deal,* 793 F. Supp. 2d, at 1335.

[152] 8 U.S.C. Section 1102 *et.seq.*

[153] *Georgia Latino Alliance for Human Rights v. Governor Nathan Deal*, No. 1:11-cv-1804 (N.D. Ga.), March 20, 2013.  The court also ordered the defendants to "take appropriate measures to inform state law enforcement agencies of the permanent injunction."

[154] *Id.*, at 1267.

litigation."[155] Because the appeals court had affirmed the preliminary injunction against Section 7 of HB 87, however, the trial court permanently enjoined that section of the law.[156]

### Problems with Election Administration and Database Matching, 2002-2010

66.  Despite the state's promising beginning in developing a statewide system of new DRE voting technology under Secretary of State Cox, its subsequent compliance with the requirements of the 2002 Help America Vote Act was spotty and reflected an uncertain grasp of what HAVA requires.  Decisions by the federal courts and by the Department of Justice in a Section 5 preclearance review were often necessary to obtain Georgia's compliance with the law.  This was especially true of the state's flawed implementation of HAVA's requirement that states use electronic database matching to create a voter verification program.

67.  Among other requirements all states must meet under HAVA, Georgia was obligated to create a digital statewide voter registration database and compare the information provided by registration applicants with information provided by those individuals to the state's driver license database – or for those without drivers' license or other state identification – to the database of the Social Security

---

[155] *Id.*, at 1268.
[156] *Georgia Latino Alliance for Human Rights v. Deal,* 793 F. Supp. 2d, at 1335.

Agency (SSA).[157]  The purpose of this database matching was to identify the

applicant as a resident of the state and county and to confirm that the person was a

citizen of the United States.  To be clear, HAVA did *not* require states to deny

voter registration to persons whose information in the paired databases did not

satisfy an exact match requirement.   As the Department of Justice noted in

objecting to Georgia's voter verification program in 2009: "HAVA does not speak

to the question of whether a state should deem an applicant eligible or ineligible,

whose information fails to match on some element contained in a state or federal

database."[158]  Whether the applicant was qualified under state law for registration

as a legal voter, in other words, was left to the judgment of the states – and was

thus subject to the preclearance requirements of Section 5.[159]

68.  Whether Georgia had complied with preclearance requirements – it had

not – was the key issue in *Morales v. Handel*, a lawsuit by a Latino citizen initially

disqualified as a non-citizen when he registered to vote in Cherokee County,

---

[157] *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *5 (N.D. Ga. Oct. 27, 2008).

[158] Loretta King, Acting Assistant Attorney General, to Attorney General Thurbert Baker, May 29, 2009.  This objection letter accurately summarizes relevant aspects of HAVA, according to my reading of the statute, but see more generally Arthur L. Burris and Eric A. Fisher, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election* (Congressional Research Service, October 18, 2016).

[159] King to Baker, May 29, 2009.

Georgia.[160]  The court found that Georgia had not undertaken HAVA's voter

verification requirement for several years because it contended the state was

exempt from this requirement on the theory that its voter registration law already

obligated voter registration applicants to supply their full nine-digit Social Security

number.[161]  As a result of a federal court decision in 2006, however, the state could

no longer argue that it was exempt from the need to implement HAVA's voter

verification requirement.[162]

69.  Georgia began to comply with the voter verification provisions of

HAVA in March 2007, when Secretary of State Karen Handel entered into an

information-sharing agreement with the state's Department of Driver Services

(DDS).[163]  Under this agreement DDS was to compare the information about each

new applicant for voter registration with information about that individual in the

DDS database of persons with drivers' licenses – and to flag any individual whose

information did not *exactly* match in this process as unverified.[164]  In addition, the

---

[160] *Morales*, 2008 WL 9401054.

[161] *Id.* at *6, 9, n.9.

[162] *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga., 2005), rejecting the state's interpretation of 42 U.S.C. Sec. 15483(a)(5)(D).

[163] *Morales*, 6.  See "Memorandum of Understanding Between the Georgia Department of Driver Services and the Office of the Secretary of State" (March 27, 2007).

[164] *Id*. The database matching was to examine the following fields: "driver's license number, last name, first name, date of birth, last four digits of Social Security number, and citizenship status." *Id.* at *7.

state's increasing concern about verifying citizenship status led to a new source of information from the federal government.

70.  According to the DDS: "As of January 1, 2008, Georgia state law requires DDS to verify all immigration documents presented by non-citizens via SAVE" – the acronym for "Systematic Alien Verification for Entitlements" – "prior to issuing a driver's license/permit/ID card."[165]  SAVE is a program permitting a state agency supplying benefits or services to legal residents (who are not citizens of the United States) to ask U.S. Citizenship and Immigration Services (the federal agency administering SAVE) for information about an applicant's citizenship status.  The inquiry does *not* utilize a database matching methodology: as USCIS puts it, SAVE is "not itself a database."  The inquiring agency supplies "the applicant's biographic information (first name, last name and date of birth)," and one of three numeric identifiers supplied by USCIS or "an unexpired foreign passport number."[166]  Most importantly, SAVE supplies the citizenship status of persons applying for government benefits or services "at the time an application is initially filed."[167]  In short, when DDS checks SAVE for information about citizenship status of a voter registration applicant who is a naturalized citizen, the

---

[165] Citing O.C.G.A. § 40-5-21.1.  (https://dds.georgia.gov/save).
[166] https:www.uscis.gov/save/verification-process.
[167] Immigration Policy Center, "Using the Systematic Alien Verification for Entitlements (SAVE) Program for Voter Eligibility Verification" (August 2012), p. 1.

information may well date from a time *prior to* naturalization and thus be inaccurate at the time of applying for voter registration.

71. DDS had, in turn, entered into a memorandum of understanding with the Social Security Administration (SSA) to verify – through a database SSA designated HAVV – to complete the verification of an applicant's status where the applicant lacked a driver's license.[168]  This made Georgia one of the first states to require evidence of a voter registration applicant's citizenship status through database matching.[169]  As it turned out, using HAVV was problematic.

72. Database matching is a complex process requiring a reliable methodology – and requiring an exact match between variables in separate databases is guaranteed to produce errors.  This problem is highlighted in an inspector general's report from the Social Security Administration, designed "to assess the accuracy of the verification responses provided by the Help America Vote Verification (HAVV)."[170]  The Inspector General reported that, as of

---

[168] "User Agreement for Voter Registration Information Verification System Services between The Georgia Department of Driver Services (MVA) and the Social Security Administration (SSA)," (signed February 14, 2007 by the Commissioner of DDS and April 23, 2007 by the Regional Commissioner of SSA).

[169] Ana Henderson, "Citizenship, Voting, and Asian American Political Engagement," 3 *UC Irvine L. Rev.* 1077, 1084 (2013).  As noted in Paragraph 70 (above), the SAVE program used by DDS beginning in 2008 did not involve database matching because there *was* no SAVE database (SAVE was a process by which state agencies requested specific data on individuals from the federal agency, which then supplied information from its own files).

[170] "Quick Response Evaluation: Accuracy of the Help America Vote Verification

December 2008, SSA had signed user agreements with state drivers' license offices from 46 states and territories "to use the HAVV system when a voter registrant who does not have a driver's license number provides the last four digits of their SSN for verification purposes."[171]  SSA could provide a match for *only 69 percent* of the applicants nationwide – some of those matches also applied to another applicant as well – and a *"no-match"* response for 31 percent.  "This occurs because the last four digits of the SSN is [sic] not a unique identifier," the Inspector General explained.[172]  As a result of its investigation, the report concluded that HAVV had "a significantly higher no-match response rate when compared to other verification programs used by States and employers," which ranged from 6 to 15 percent.[173]

73.  The Inspector General pointed out that HAVV used an "exact match" requirement, searching "for exact matches on the full first and last name, which is problematic because it does not consider possible human error (that is, data entry errors, transpositions [of characters], and nicknames)."[174]  He then added a damning lament: "The HAVV program provided the States with responses that

_____

Program Responses," A-03-09-29115, June 2009, p. 1.
[171] *Id.*, p. 2.
[172] *Id.*, p. 2 (emphasis added).
[173] *Id.*, p. 4.
[174] *Id.*, p. 6.  Table 3 on p. 7 of the report provided illustrations of the sort of human errors that result in a no-match in HAVV.

may have prevented eligible individuals from registering to vote and allowed ineligible individuals to vote."[175]  This inspector general's report clearly should have raised a red flag about Georgia's use of an exact match methodology like that used by HAVV.

74.  The same sort of human error that affected the no-match results in HAVV searches are inevitable in *any* exact match data linkage – such as efforts to match individual records in a voter registration database and a driver's license database (matches affecting far more Georgians than the linkage between DDS and HAVV).  To be reliable, Georgia would have to devise ways of checking and cleaning up its database matching results to address these routine human errors or face the prospect of disfranchising numerous individuals who were, in fact, qualified to vote.

75.  On May 29, 2009, the Department of Justice objected to Georgia's voter verification program.[176]  "Our analysis shows that the state's process does not produce accurate and reliable information and that thousands of citizens who are in fact eligible to vote under Georgia law have been flagged" as ineligible.[177]  The objection letter cited "deposition testimony by state employees" in the *Morales*

---

[175] *Id.*, p. 11.

[176] Loretta King, Acting Assistant Attorney General, to Attorney General Thurbert Baker, May 29, 2009, p. 1.

[177] *Id.*, p. 3.

litigation indicating "that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields."[178]  The problem was compounded when inquiring into an applicant's citizenship status.  Georgia's use of data from HAVV to ascertain whether individual applicants were citizens increased "the potential for unreliable results."  Of the 7,007 individuals who have been flagged as non-citizens as a result of using HAVV data, "more than half were in fact citizens."[179]

> Of those persons erroneously identified as non-citizens, 14.9 percent, more than one in seven, established eligibility with a birth certificate, showing they were born in this country.  Another 45.7 percent provided proof that they were naturalized citizens, suggesting that the driver's license data base is not current for recently naturalized citizens.[180]

76.  The Department noted further that "[t]he impact of these errors falls disproportionately on minority voters," including Hispanic and Asian as well as African American applicants.[181]  The state generated two reports for use by local registrars, R1 (examining variables other than citizenship) and R2, "which seeks to verify citizenship status."[182]  The R1 report for those applying between May 2008 and March 2009 indicated that "sixty percent more African American" than white applicants were flagged as non-matches, although blacks and whites "represent

---

[178] *Id.*
[179] *Id.*, p. 4.
[180] *Id.*, p. 4.
[181] *Id.*, p. 4.
[182] *Id.*, p. 3.

approximately equal shares" of new registrants.  On the R2 report, Hispanics and Asians were "more than twice as likely to appear on the list" of non-citizens "as are white applicants."[183]

77.  In 2010, after apparently taking steps to reform its procedures for implementing the state's exact match law, Georgia sought preclearance of its newly revised voter verification process from a three-judge court in the District of Columbia as well as through administrative review by the Department of Justice.[184] The submission followed shortly after Republican Governor Sonny Perdue appointed Brian Kemp as Secretary of State, when the prior Secretary, Karen Handel, resigned to run (unsuccessfully) for governor.  According to a news account, Georgia Attorney General Thurbert Baker, an African American Democrat, "refused to file the lawsuit," which was filed instead by private attorney Anne Lewis, serving as a special attorney general for this purpose.[185]

---

[183] *Id.*, p. 4.

[184] *Georgia v. Holder*, 748 F. Supp. 2d 16 (D.D.C. 2010); Submission letter from Anne W. Lewis to T. Christian Herren, August 17, 2010.  At the time I was employed as a social science analyst in the Voting Section of the Civil Rights Division.  For the record, however, I was involved neither in the Section 5 litigation nor in the administrative review of this submission and have never examined the internal documents relating to the preclearance of this version of Georgia's voter verification process.

[185] Ewa Kochanska, "Georgia Files Lawsuit Against U.S. Justice Department," *Atlanta Examiner*, June 23, 2010.  According to this account, new Secretary Brian Kemp "accused the Obama administration of playing politics" when objecting to the prior submission of the state's voter verification process, a charge with which Baker disagreed.

78.  Although the new procedure submitted by the Secretary of State's office continued to employ an exact match requirement – as arguably required by state law – the submission letter set forth a detailed explanation of the revised program, including its database matching with DDS and SSA.  The voter verification system it proposed called for careful monitoring of the voter verification process on a daily basis, with prompt notice to any applicant whom the system could not verify as a citizen and resident of Georgia under the exact match requirement.[186]  According to the federal court, on August 18, 2010, the Department "informed the plaintiff [Georgia] that it did not intend to object to implementation of the revised Verification Process."[187] According to the file, the Department agreed to preclear the process to settle Georgia's lawsuit.   "With preclearance in hand," noted a staff member in the Secretary of State's office a few years later, Georgia's voter

---

[186] Lewis to Herren, August 17, 2010, Exhibit 1, pp. 1-5.  According to another news account, a spokesman for the Secretary of State confirmed that the state was proposing changes in "the scope of the [verification] program."  Aaron Gould Sheinin, "Justice Department Approves Georgia Voter Verification System," *Atlanta Journal-Constitution*, August 23, 2010.

[187] 748 F. Supp. 2d at 18.  Secretary of State Brian Kemp characterized the preclearance decision to suggest that administrative review would have had a different result without court involvement.  "After the litigation was filed, it took less than two months for the DOJ to consent to preclearance of the verification process and determine that Georgia's verification process, including citizenship verification, does not have a discriminatory effect or purpose."  See his op-ed column, "Kemp: Victory for Georgia Voters," *Athens Banner-Herald*, August 27, 2010.

verification procedures "remained largely unchanged until 2016."[188] The voter

verification system was never adopted by the Secretary of State as a rule or policy,

nor was it otherwise disclosed to the public.   Whether that voter verification

system lived up to the state's claims of careful monitoring of the exact match

process remained to be determined.

### Increasing Concern about Non-citizen Voting in Georgia, 2010-2016

79.  A June 2015 Power Point document provided by the Secretary of State's

office for use in a webinar for county officials describes a process resembling

closely the description submitted by the state for preclearance in 2010.[189]  "For the

applicant who is registering to vote using their DL [driver's license] number –

nothing changes."  But an applicant without a driver's license who had submitted

the last four digits of his/her social security number "will need to provide **one** of

the required proofs of citizenship."[190]  The Power Point then listed numerous

documents that could be used to prove that an applicant was a citizen, including

---

[188] STATE-DEFENDANTS-00114398, 00114404 (Kevin Rayburn, "Georgia
HAVA Verification," Power Point presentation (undated, but based on internal
evidence prepared in 2017), p. 7.  At the time, Rayburn was assistant general
counsel to the Secretary of State, a position he stills holds.
[189] STATE-DEFENDANTS-001274761 ("Verification of United States Citizenship
of Applicants for Voter Registration" (June 2015)).
[190] *Id.*, STATE-DEFENDANTS-00127470 (emphasis in original).

several demonstrating that the person was a naturalized citizen.[191]  It emphasized,

however, that DDS was "the hub" of the verification process.[192]

80.  Applicants who failed the verification process in some way were placed

"in the Pending bucket," in the words of the Power Point.[193]  At that point the

pending application "should first be checked to determine whether there are

processing or data entry errors, such as transposing of numbers, misspelling of

applicant's name, use of a nickname or other typographical or 'common sense'

errors that the registrar is able to identify and correct."  The registrar had the

authority to correct such errors in the eNet system, and then "mark the record to be

run through the verification process again overnight."[194]  If that step left the

applicant still in Pending status, he/she received a notification letter, triggering a

40-day clock to provide the necessary documentation – without which "the system

---

[191] STATE-DEFENDANTS-00127471 - 0012472.

[192] STATE-DEFENDANTS-00127475.  When an applicant did not possess a driver's license number, on the other hand, then "DDS sent the information to SSA."  The Power Point then adds (p. 22): "To fully implement citizenship verification, the Secretary of State's Office has been given access to the Systematic Alien Verification for Entitlement (SAVE) Program through U.S. Citizenship and Immigration Services," adding that SAVE "works very similarly to DDS verification."  As noted above (Paragraph 70), DDS has been using SAVE since 2008 for citizenship verification when providing driver's licenses.  Under HAVA, as described above, the need to seek citizenship verification from SSA arose only when an applicant had no driver's license – and supplied none of the documents needed to prove citizenship when seeking to register – but could supply the last four digits of the social security number.

[193] STATE-DEFENDANTS-00127475.

[194] *Id*.

will cancel the applicant."[195]  In my opinion, if preclearance had still been in effect,

the Department would have objected to these overly technical identification

requirements and the Secretary of State's use of a pending list.

**Georgia's Flawed System of Voter Verification in Operation, 2010-2016**

81.  The central focus of the state's voter verification process was its use of

an inflexible and unsystematic "exact match" procedure for database matching.

Evaluating Georgia's implementation of its exact match requirement after the 2010

preclearance requires an understanding of the methodological problems

confronting any database matching.  A careful study examining the degree of

election fraud in Georgia by political scientists M.V. Hood and William Gillespie

describes how database matching *should* work – using official data provided by the

Secretary of State's Office.[196]  They explain that in order to produce valid data,

researchers "cannot simply stop with matching cases" – the first step (and in some

instances the last step) in Georgia's exact match methodology.[197]  "The next step

---

[195] STATE-DEFENDANTS-00127479.

[196] M. V. Hood III and William Gillespie, "They Just Do Not Vote Like They Used to: A Methodology to Empirically Assess Election Fraud," *Social Science Quarterly*, 93 (March 2012), 79-94.  To be clear, Hood and Gillespie do not address the merits of the state's voter verification process directly in their study.

[197] To be clear, the state's exact match method of voter verification utilized a series of paired matches between characteristics of the applicant in the voter registration database and in the DDS database.  As explained above (Paragraph 80), the Secretary of State's office in some instances encouraged local registrars to check an unverified application for human errors (which, when actually performed, would have offered a limited step in the direction recommended by Hood and

must involve manually examining those cases where matches [or non-matches]

between databases are produced" – to examine whether the initial finding is in

error.[198]

82.  Most experts on database matching use several different algorithms to

provide a more accurate result, rather than a simple (and inflexible) "exact match"

of each pair of variables such as Georgia's voter verification system employed.

"The more characteristics of a subject one can utilize (i.e., county of residence,

race/ethnicity, sex)," Hood and Gillespie point out, "the more confidence one can

have in matching cases or in eliminating cases that are not, in reality, matches."

Examining each potential match between two databases accurately, they conclude,

requires "using all available information in order to make a determination

concerning their validity." [199]

83.  Hood and Gillespie apply their methodology to assess the degree to

which ballots were fraudulently cast in the name of persons who were in fact

---

Gillespie).

[198] *Id.*, 80. "Probability theory dictates that when dealing with a large number of cases, a certain number of false matches will be produced.  For example, the *birthday paradox* or *problem* tells us that by random chance a certain number of unrelated registrants under examination will have the same date of birth and even name," citing Michael P. McDonald and Justin Levitt, "Seeing Double Voting: An Extension of the Birthday Problem," *Election Law Journal*, 7 (No. 2, 2008), 111-22.

[199] *Id.*, 80.  These observations are consistent with steps taken by every expert witness in conducting database matching in voting rights litigation with whom I worked in cases brought by the United States.

deceased at the time of an election (sometimes characterized as voting the graveyard). They summarize their findings – after very careful searches of vital statistics, obituaries, and other detailed sources – for all 57 cases "where we were able to obtain information from county registrars." They found that 52 of the 57 registrants that seemed to reflect election fraud had, in fact, "requested an absentee ballot before they died." For 51 of the 57, furthermore, "a ballot had been returned to the county prior to their date of death." As for the few remaining questionable votes, they report, "we can make no calls either way," because not all county registrars responded to their inquiries.[200]

84. That an honest researcher "cannot simply stop with matching cases," as Hood and Gillespie put it,[201] is the point made by expert witness reports in a voting rights case filed in 2016. Both Gary Bartlett – for two decades the executive director of the North Carolina State Board of Elections – and political scientist Michael McDonald, who has examined database matching in several states, including Georgia, describe in detail how Georgia's voter verification process worked between 2010 and 2016, relying on documents received from the state through the discovery process in that case. Both experts criticize the state's

---

[200] *Id.*, 92.
[201] *Id.*, 80.

inadequate methods of applying the exact match requirement.[202]  McDonald's

report also provides detailed quantitative evidence regarding the racial *effects* of

Georgia's implementation of the exact match law.[203]  These careful studies

demonstrate that the state's assurances in the Section 5 submission of its revised

voter verification program in 2010 – that it would carefully monitor the exact

match requirement on a daily basis to prevent errors in determining voter eligibility

– were inaccurate.

85.  Bartlett points out that the office of Secretary of State Brian Kemp

produced a training manual for registrars in 2010 that "generally outlined" how the

voter verification procedures were to work.[204]  The registrars learned that "the

identifying information supplied on a voter registration application form" would

have to match "exactly" the data about the applicant on either the DDS or the SSA

databases.[205]  "If the identifying information on the registration form fails to

---

[202] See Gary O. Bartlett, Declaration, September 14, 2016, *Georgia State Conf. NAACP v. Kemp*, No. 2:16-cv-00219 (N.D. Ga.), September 14, 2016; Dr. Michael P. McDonald Expert Report, September 14, 2016, *Georgia State Conf. NAACP v. Kemp*, No. 2:16-cv-00219 (N.D. Ga.).  The plaintiffs also used a third expert, Christopher Brill, a senior data analyst with TargetSmart Communications, LLC, who prepared data files for use by Professor McDonald and provided a preliminary analysis of the data.  See "Declaration of Christopher Brill," *Georgia State Conf. NAACP v. Kemp,* September 14, 2016.
[203] McDonald 2016 Report, and McDonald 2016 Declaration.
[204] Bartlett 2016 Declaration, 8.
[205] *Id.*, 10.  Bartlett's description is consistent with later training manuals and with the deposition testimony of Chris Harvey, the director of elections in the Secretary of State's office since 2015.  See Chris Harvey, 30(b)(6) Deposition, August 16,

strictly match," Bartlett observes, "a notification letter is issued to the applicant" –
but the letter did not indicate what fields in the application failed to match, or
whether data entry errors by state employees might explain the failure of
information to match.[206]  A person flagged as a non-match (and thus placed in
Pending status) had only 40 days to provide satisfactory identification or the
application would be cancelled.  Bartlett emphasized that "Georgia is one of the
few states that are going beyond the computerized list maintenance requirements of
the Help America Vote Act of 2002 to authorize the disenfranchisement of eligible
voters using strict database matching criteria."[207]

    86.  Statisticians and social scientists have known for decades, as McDonald
points out, that an exact match procedure such as Georgia's is deeply flawed.[208]
"The DDS exact matching procedure is a primitive method that is no longer an

---

2019, *Fair Fight Action v. Raffensperger* (hereafter Harvey August Deposition),
pp. 5, 62, 238.
[206] Bartlett 2016 Declaration, 10.  Bartlett points out (p. 16) that notification letters
"fail to explain to the applicants that their applications may have failed to match
the DDS or SSA databases because of data entry errors by the registrar's office,
data entry errors that were made in the underlying databases . . . that can result in
false negative matching results."
[207]*Id.*, 11.
[208] McDonald 2016 Report, 8-9, citing Ivan Fellegi and Alan Sunter, "A Theory for
Record Linkage," *Journal of the American Statistical Association*, 64 (1969),
1183-1210, and Ahmed Elmagarmid, Panagiotis Ipeirotis, and Vassilios Verykios,
"Duplicate Record Detection: A Survey," *IEEE Transactions on Knowledge and
Data Engineering*, 19 (2007), 1-16.

accepted practice in the field."[209]  Georgia's exact match method does not even take simple steps such as standardizing how names are recorded, such as by removing all spaces, hyphens, or apostrophes.[210]  McDonald also observes that when Georgia revised its voter verification process in 2010 it ignored the criticism of the exact match procedure identified in the 2009 evaluation of the HAVV system by the Social Security Administration's Inspector General.[211]

87.  McDonald examines all the records of applicants whom Georgia ruled ineligible to register and those whose applications were listed as pending – between July 7, 2013 and July 15, 2016.  These were the files provided to the plaintiffs during the discovery process in that litigation.[212]  Non-Hispanic blacks were 28.2 percent of those registered during a roughly comparable period, but an astonishing *68.5* percent of the applicants in the pending or cancellation files (25,213 individuals).  In contrast, only 4,409 non-Hispanic white applicants were in the cancelled or pending files (12.0 percent).[213]

---

[209] *Id.*, 9.

[210] *Id.*

[211] *Id.*, 11-14.

[212] *Id.*, 16-17.

[213] *Id.*, 17 (Table 2).  Because Hispanics as well as Asian and Pacific Islanders constituted such small percentages of the registered voters statewide, it is useful to consider their proportion of those in pending or canceled status separately.   Only 3.7 percent of the registered voters during this period were Hispanics, but they made up 6.9 percent of those in pending or canceled status (almost twice as high).  Only 2.6 percent of the recently registered voters were Asian or Pacific Islanders, but they constituted 3.3 percent of those in the pending or canceled category.

88.  Separating the applicants who failed the exact match requirement with DDS from those failing the SSA exact match, McDonald finds the same pattern of racial disparity in each.  In the DDS match, African Americans, who made up only 28.2 percent of the registered voters (as noted above), were 53.3 percent of applicants in the cancelled and pending files.  By contrast, non-Hispanic whites – 48.3 percent of the registered voters – were a far lower 18.3 percent of those canceled or pending.[214]   In the SSA match, African Americans made up 74.6 percent of applicants in the cancelled and pending files, and non-Hispanic whites were only 9.5 percent.[215]

89.  The state's record of DDS exact match failures includes the reasons assigned for each failure.  As a result, McDonald calculates the number of persons of each race or ethnicity who failed the exact match due to special characters in the first or last names.  One would expect the names of the Hispanic applicants – a much smaller number than African Americans or non-Hispanic white applicants –

---

[214] *Id.*, 18 (Tables 3A and 3B).  In the DDS match Hispanics, who were (as noted above) only 3.7 percent of recently registered voters, made up 13.2 percent of those in the canceled or pending files.  Asian or Pacific Islanders were only 2.6 percent of the registered voters but 7.5 percent of those canceled or pending.  The data for both groups, in short, revealed a significantly higher rate of non-matches compared with their percentage of the registered voters, resembling the patterns for African Americans.

[215] *Id.*, 18 (Tables 3A and 3B).  In the SSA match Hispanics, who were (as noted above) only 3.7 percent of recently registered voters, made up 4.4 percent of those in pending or canceled status.  Surprisingly, Asian and Pacific Islanders were 2.6 percent of the registered voters but only 1.6 percent of the pending or canceled.

to cause match failures due to special characters, because many Hispanic names include spaces and hyphens. There is a higher rate of Hispanic mismatches. Latinos, as noted above, were only 3.78 percent of persons registered during the time period of McDonald's data (recently registered voters) but made up 27.7 percent of applicants in the cancelled and pending files due to name issues. African Americans (surprisingly) made up an even higher proportion – 36.1 percent – of failed applicants due to special characters in names but were only 28.2 percent of recently registered voters. Asian and Pacific Islanders constituted 17.8 percent of failed applicants because of name issues (though only 2.6 percent of recently registered voters). Non-Hispanic whites were only 10.9 percent of the failed applicants due to name issues, but (as noted earlier) 48.3 percent of recently registered voters.[216]

90. Summing up these findings, McDonald observes that "there are almost twice as many registered whites than blacks, but there are nearly six times more black applicants than whites in cancelled or pending status who failed the DDS or SSA exact match." This leads him to the natural conclusion that Georgia's practice of requiring an exact match of information in its voter registration files with DDS or SSA records "has a clear discriminatory effect."[217]

---

[216] *Id.*, 20 (Table 4).

[217] *Id.*, 27. McDonald's detailed quantitative findings were consistent with the belief recently expressed by Election Director Chris Harvey, who thinks "the

91.  Beyond the racial effect of the exact match protocol, the battle faced by persons whose registration was cancelled or pending carries additional burdens. As McDonald notes, a "voter registration application is effectively a literacy and writing test."[218]  In addition to the need for sufficient education to understand the application form, trying to secure approval of their voter registration requires rejected applicants to "overcome a series of unduly burdensome and arbitrary hurdles," as the veteran state election director Gary Bartlett put it in his expert report.[219]

92.  First, each failed applicant had a problem finding out just why his or her registration application was flagged as a non-match – and how to cure the defect. The notification letter sent to rejected applicants set a "40 day clock" in motion – the time the individual has to provide corrective information to the local registrar – but does not say when the 40 days begins.[220]  Nor do the letters "provide any instruction to the applicants about what they should do if the information they originally provided in their voter registration applications was correct" – if, for

---

people that were in pending status as a result of not being verified were majority African American."  See Harvey August Deposition, p. 257.  In a second deposition, Harvey was even stronger, agreeing with the questioner that "70 or so percent of the applicants in pending status were African American." Chris Harvey, Deposition, December 5, 2019, *Fair Fight Action v. Raffensperger*, p. 207.
[218] *Id.*, 24.
[219] Bartlett 2016 Declaration, 14.
[220] *Id.*, 15.

example the failure to match the DDS or SSA databases was due to a clerical error by the person doing data entry for the local registrar, rather than by the applicant, or perhaps because of data entry mistakes in the DDS database.[221]  In addition, "the letters fail to inform applicants that they will not be able to vote in an upcoming election unless they submit a new application before the close of registration."[222] The wording of the notification letters was sufficiently obscure that applicants "who have not attained a high school diploma or post-secondary degrees may also have difficulty understanding the letter or the urgency by which they need to act" to have their registration finally approved.[223]

93.  The process, in short, was especially difficult for individuals with lower educational achievement.  Just as political scientists have demonstrated the importance of disparities in socio-economic characteristics such as educational achievement (as measured by the census) in deterring political participation rates,[224] those disparities would also affect the ability to cope with the burdensome process of dealing with the failure of their registration applications.  Among

---

[221] *Id.*, 16.

[222] *Id.*, 17.

[223] *Id.*, 18.

[224] See for example, the classic study by Steven J. Rosenstone and Raymond E. Wolfinger, *Who Votes?* (New Haven, Yale University Press, 1978) and, following up on their insights with more recent data, Jan E. Leighley and Jonathan Nagler, *Who Votes Now?  Demographics, Issues, Inequality, and Turnout in the United States*, Princeton, Princeton University Press, 2013).

African Americans 25 years or older in Georgia, 16.6 percent had less than a high school degree, whereas only 10.1 percent of non-Hispanic whites had failed to graduate from high school.[225]  For Hispanics the disparity was even greater: 39.6 percent had less than a high school degree.[226]

94.  Lower educational achievement was also related to economic status. The poverty rate for persons of all races 25 years or older was 29.4 percent for those with less than a high school degree, but 16.4 percent for those with a high school degree or higher (and only 4.6 percent for those with a bachelor's degree or higher.[227]  The proportion of African Americans below the poverty level was 24.4 percent, compared with only 11.1 percent among whites.[228]  Among Hispanics in Georgia 26.7 percent were below the poverty level.[229]  Employment, not surprisingly, affected the degree to which persons of all races fell below the poverty level; only 8.0 percent of employed persons were below the poverty level, as compared with 35.6 percent among those unemployed.[230]  The unemployment rate among African Americans in Georgia was 11.5 percent, but only 5.6 percent

---

[225] *American Fact Finder*, S1501, p. 2, reporting American Community Survey, 2013-2017 5-year Estimates.  I calculated each estimate of persons with less than a high school degree by subtracting the proportion with a high school degree or higher from 100 percent.

[226] *Id*.

[227] *Id*.

[228] *Id*., S1701, p. 1.

[229] *Id*.

[230] *Id*., p. 2.

among non-Hispanic whites.[231]  In short, there were consistent racial disparities in

those socio-economic characteristics usually affecting participation rates and the

same disparities are likely to have a significant impact on the ability to remedy

exact match failures in the state's flawed voter verification program.

95.  Minority plaintiffs filed a lawsuit on September 14, 2016, challenging

the administrative policy employed by the office of the Secretary of State to

enforce Georgia's exact match law, relying in part on the Bartlett and McDonald

expert reports whose findings are reported in preceding paragraphs.[232]  "HAVA

does not mandate that voter registration applications be cancelled if the

information contained on the application fails to match fields in the DDS or SSA

databases," the plaintiffs noted in their complaint.[233]  Nor, they argued, does the

Georgia Election Code "specify that the 'match' be an exact match or require the

cancellation of applications that do not match the DDS database," and the

matching protocol adopted as an administrative policy by the Secretary of State "is

not codified in any statute or regulation.[234]  The racial effect of the matching

---

[231] *Id.*, S2301, p. 3.  Among Hispanics the unemployment rate was 6.1 percent.
[232] Complaint, *Georgia State Conf. NAACP v. Kemp*, No. 2:16-cv-00219 (N.D. Ga.), September 14, 2016, attaching each of the three expert reports cited in Note 202 above.
[233] *Id.*, 12, citing 52 U.S.C. Section 21083, *Fla. State Conf. NAACP v. Browning*, 522 F.3d 1153, 1171-72 (11th Cir. 2008), *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1268-69 (W.D. Wash. 2006), *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054 at * 7-8 (N.D. Ga. Oct. 27, 2008).
[234] *Id.*, 12, 14, citing Ga. Code Ann. Section 21-2-216(g)(7).

protocol used by the state from July 2013 through July 2016, the plaintiffs alleged, was that the cancellation rates for African American applicants "was far higher than the cancellation or rejection rates for White applicants."  According to the plaintiffs, the same discriminatory effect was clear as well in non-matches on the question of citizenship.  Just under 14 percent of those failing verification as citizens were non-Hispanic whites, compared with 30 percent for African Americans, 21 percent for Latinos, and 25 percent for those identified as Asian American or Pacific Islander.[235]

96.  Plaintiffs moved for a preliminary injunction shortly after filing the case.  Before the preliminary injunction hearing, the defendant Secretary of State agreed to interim relief.[236]  Chris Harvey, the director of the Elections Division, then sent an Official Election Bulletin (OEB) to county election and registration officials listing certain changes to the voter verification process.[237]  "All voters that

---

[235] *Id.*, 28, providing (pp. 28-32) detailed quantitative findings from the Brill 2016 Declaration.

[236] Kristen Clarke, Julie Houk, and John Powers, "Strict Construction of Voter Registration Laws; Georgia's Experience in 20-18," Chapter 2 of *America Votes! Challenges to Modern Election Law and Voting Rights* (4th edition, American Bar Association, 2019), 21-41 (at p. 30).

[237] STATE-DEFENDANTS-00961597 (Chris Harvey, Official Election Bulletin (OEB), "Recent Actions for Previously Unverified Voter Registration Applicants," September 27, 2016, p. 1).  Harvey's OEBs were regularly sent to all county election and registration officials in Georgia whenever regulations of the law changed, explaining precisely how the state's exact match verification was to be implemented under the new rules.

were moved into Cancelled status by the 40 day clock because they failed

verification," he added, "as of October 1, 2014 will be moved out of Cancelled

status and placed into Pending status."  Such applicants would be run through the

exact match system again and "new [notice] letters will be generated if they fail

verification."  The new notice letters would specify that – instead of the prior 40-

day clock – the applicant had "one year to respond before their application is

rejected."  During that time, moreover, "they will be able to cast a ballot as if they

were an active voter if they are able to present appropriate ID," and documentary

proof of citizenship, if their citizenship was unverified through the exact match.[238]

    97.  The state agreed to settle the case in an agreement reached on February

8, 2017.[239]  Under the settlement agreement, applications for voter registration with

fields that failed to match the records in the DDS or SSA databases would be

placed in pending status and – in contrast to the prior 40-day limit (or even the

one-year limit just adopted in September) – would "not be under any time

---

[238] *Id.*  The OEB also gave two pages of detailed instructions for registrars
concerning how to administer these changes.  A somewhat more cumbersome
process was required as to the November general election of 2016 for persons
flagged as potential non-citizens, who had to present proof of citizenship to a
registrar or deputy registrar in order to vote a regular (rather than provisional)
ballot.  STATE-DEFENDANTS-00007613, 7614-7616 (Official Election
Bulletins, "More Details on Pending Voter Registration Processing," November 4,
2016, pp. 2-4), and STATE-DEFENDANTS-00007619, 7619-7620 ("Processing
'Pending' Voters on Election Day," November 4, 2016, pp. 1-2).

[239] "Settlement Agreement," February 8, 2017.

limitation to cure the mismatch or otherwise confirm their identity," whether the "failure to match" related to DDS, SSA, or citizenship.[240]  The state also agreed to move from cancelled to pending status all applications cancelled "on or after October 1, 2013," by sending those applications "back through the HAVA match process."[241]  The settlement agreement spelled out various changes in the process of notifying applicants and new training for county registrars to administer the altered procedures for voter verification.[242]

## Continuing Flaws in Georgia's Voter Verification System

98.   Shortly after the settlement agreement, however, the Georgia legislature adopted a bill (HB 268) that – as implemented in the state's voter verification process – undermined equitable implementation of the settlement.  The prior exact match protocol – only an unpublished administrative procedure devised by the Secretary of State's office – remained in place with some modifications.[243]  The

---

[240] *Id.*, 2.  The state could still cancel applications when a notification letter as returned by the post office and applicants failed to confirm their address through the procedures spelled out in the prior exact match policy.  *Id.*, 2-3.
[241] *Id.*, 3.
[242] *Id.*, 3-6 and Exhibits 2-4 (the notification process), and Exhibit 5 (training). Chris Harvey informed county election officials and registrars of the procedures revised by the settlement agreement in an Official Election Bulletin, "Updated Pending Voters Action," February 23, 2017, pp. 1-2.
[243] See the text of HB 268, Section 8. The Power Point presentation prepared for county election official training by Kevin Rayburn, "Georgia HAVA Verification," 2017, p. 11, contends that, in the view of the Secretary of State's office, HB 268 "codifies the Georgia HAVA verification process." STATE-DEFENDANTS-00114408.  That claim appears to me to be inaccurate.

state was on notice from expert testimony in the 2016 lawsuit that the state's exact match procedures operated with a racially discriminatory effect.[244]  Despite that awareness, the state left in place those very procedures requiring an exact match between the voter registration database and the DDS database – and in some instances with the SSA database – that would continue to have a racially discriminatory effect.

99.  Were the preclearance review process removed by the Supreme Court in *Shelby County v. Holder*[245] still in place – and still functioning under the same standards that were applied by the Civil Rights Division since 1976 – the administrative implementation of HB 268 in 2017 would likely have been objectionable.  Under those assumptions, the Civil Rights Division would have considered the evidence in the 2016 Section 2 case challenging the Secretary of State's exact match policy and the state's settlement agreement in that litigation. The evidence in the prior case would have documented that the state's exact match methodology – as implemented following the 2010 preclearance decision – had a racially discriminatory effect on the opportunity of minority voters to participate equally in the political process.  Based on the settlement agreement the state had signed in order to end that litigation, the state agreed to reform its voter verification

---

[244] See McDonald 2016 Declaration, *passim*.
[245] 570 U.S. 527 (2013).

so as to eliminate that discriminatory effect. Because the state now implemented

voting changes with a racially discriminatory effect, *knowing* that it would have

that effect, this voting change would have been adopted with a racially

discriminatory purpose. But of course, there was no longer any Section 5

preclearance review in 2017.

100. In October 2018 minority plaintiffs filed suit against implementation of

the new law, alleging that Georgia's voter verification program continued to

produce a high rate of erroneous non-matches with racially disparate results. They

also filed an emergency motion for a preliminary injunction, asking the court to

protect new voter registration applicants from the use of inaccurate *citizenship*

information in the state's database.[246] They emphasized that the provisions of HB

268 regarding citizenship were *not* in effect at the time the parties settled the 2016

lawsuit.[247]

101. Under HB 268 there would be different treatment for applicants with a

non-match on citizenship status, as compared with all other applicants with non-

matches. As Chris Harvey, the director of the Election Division, explained to

county election officials and registrars in an OEB, the passage of HB 268 meant

---

[246] *Georgia Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251
(N.D. Ga. 2018). The allegation about the numerous non-matches with a racially
discriminatory effect was supported by the Declaration of Michael McDonald,
October 19, 2018, filed with the preliminary injunction motion.
[247] 347 F. Supp. 3d, at 1259.

that poll workers would find in the Express Poll equipment used at every precinct "two different indicators for voters in Pending status" – either a "V" or an "X."[248] Persons with non-matching information *other than* their citizenship status (identified as "V") would, as under the settlement agreement, be able to cast a regular ballot if they produced readily available photo identification to a poll worker.[249]

102.  Persons flagged as potential non-citizens as a result of the exact match with the DDS database, on the other hand, were treated differently at the polls.  "If a Poll Worker pulls up [on the screen] a voter that is in X status, they will notice that the record is highlighted in purple."[250]  That meant that the person was flagged as a possible non-citizen and was to be issued a "Challenged Ballot."  The poll worker then had to refer the person to a deputy registrar – if the voter had the required ID documentation and proof of citizenship and if a deputy registrar happened to be at the polling place.  If no deputy registrar was available, the Poll Manager had the authority to contact the county registrar's office and provide a copy of the individual's proof of citizenship "if the technology [for copying and

---

[248] STATE-DEFENDANTS-00069566, 69569 (Chris Harvey, Official Election Bulletin, "Handling Pending Verification Registrations at Voting Location," October 23, 2018, p. 4).
[249] *Id*.  A voter did *not* have one of the required ID documents, however, would "be sent to the provisional ballot station.
[250] *Id*.

sending the document] is available." The county registrar would then update the voter's citizenship status in eNet, instruct the poll manager "to override the X status," and the voter would then become an active voter (and eligible to cast a regular ballot).[251] That presented a series of bureaucratic hurdles that could take lots of time to resolve, even if the voter had proper identification, proof of citizenship, and could afford plenty of time away from work or child care.

103.  According to the defendants, persons whose citizenship status was in question had several options for satisfying the requirements of HB 268. They could: 1) provide the registrar's office before the election with citizenship identification by personal delivery, mail or email; 2) produce proof of citizenship to a deputy registrar at a polling location (deputy registrars are authorized by the statute to approve the person's right to cast a regular ballot); 3) present proof of citizenship to the poll manager for the precinct, who must then transmit the proof to the county registrar's office, which can then approve the person to cast a regular ballot; 4) cast a provisional ballot if the poll manager is unable to contact the county registrar's office but confirms in writing that proof of citizenship was provided at the poll; or 5) cast a provisional ballot and submit proof of citizenship to the county registrar before the Friday after the election.[252]

---

[251] *Id*.
[252] *Georgia Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d at 1261-62.

104.  Plaintiffs presented evidence at the preliminary injunction hearing, however – among other things, the declaration of Yotam Oren – which persuaded the court that these options were not, in fact, being implemented.[253]  Mr. Oren became a naturalized citizen of the United States on December 18, 2017.  He then completed a Georgia voter registration application and included a copy of his naturalization certificate with the form.  Mr. Oren "does not recall ever being informed that he needed to update his records with DDS" – he had been a licensed driver in Georgia since 2010 – "to reflect the change in his citizenship after becoming a naturalized citizen."[254]  After submitting his registration application, he received notice that his application was in pending status because the DDS record showed that he was a non-citizen.  "Mr. Oren understood from the letter that he could simply bring proof of citizenship to the polling station at the time he voted," and cast a regular ballot.  When he checked the website of the Secretary of State this understanding was confirmed.[255]

105.  Mr. Oren's experience when he went to his designated early voting location and presented his valid U.S. passport, however, did not conform to the information in the notice letter or the official website.  Poll officials were unable to reach anyone by phone to approve changing his status from pending to active and

---

[253] *Id.*, 1262.
[254] *Id.*
[255] *Id.*

told him he would have to wait or come back at another time to vote. "No one

offered Mr. Oren an option to cast a provisional ballot," so he left without

voting.[256]  The next day the voter registration office provided the name and phone

number to have a poll official call to request confirmation that Mr. Oren was a

naturalized citizen.  On his second trip to the polling station Mr. Oren's status was

changed from pending to active – "and he was finally able to cast his first vote as a

United States citizen."[257] The court saw Mr. Oren's experience as jumping hurdles:

he was able to vote only "after two trips to his polling location, looking up

information on the Defendant's website, placing his own call to the Fulton County

voter registration office, and providing election officials with a name and

telephone number to call to help change his status."  The state "seems to overlook

the hurdles Mr. Oren jumped."[258]

106.  The court pointed to additional problems.  The 2018 edition of the

Georgia Poll Worker Manual did not provide many of the options the state claimed

were available to persons flagged as non-citizens.  "This indicates a lack of

training to poll workers about the citizenship verification process."[259]  The court

---

[256] *Id.*

[257] *Id.*  "At a minimum," the court observed (p. 1263), of the five options the state
contended were available to persons flagged as non-citizens by the Enet system,
"Mr. Oren was not offered Options 3, 4, and 5."

[258] *Id.*, 1263.

[259] *Id.*

then quoted information on the Secretary of State's website that merely advises

persons in Mr. Oren's situation to "show acceptable proof of citizenship when you

go to vote or when you request an absentee ballot."[260]  Persons in the same

situation as Mr. Oren are understandably confused by this digital advice, which is

both contrary to the language of HB 268 and to actual experience

107.  County registrars are not *required* by Georgia law to change

naturalized citizens in the Enet system from pending to active status when

presented with proof of naturalization at the time of the registration application.

Nor does the training by the Secretary of State's office address this issue.

Evidence submitted by the plaintiffs included a declaration from Diana Cofield, a

recently retired deputy registrar from Troup County, Georgia.[261]  "During my

tenure as a deputy registrar," she notes, "I became aware of several instances

where applicants were put into pending status due to the failure to verify for

citizenship" – as a result of the exact match process with DDS (the source of

information about citizenship in Enet) – "even though they had submitted a copy of

their naturalization certificate with their voter registration form." [262]  Ms. Cofield

---

[260] *Id.*

[261] *Georgia Coalition for the People's Agenda v. Kemp*, Declaration of Diana
Cofield, October 29, 2018.  Ms. Cofield had worked for the Troup County Board
of Elections and Registration for 14 years, ten of them as deputy registrar.  She
retired two months before her sworn testimony was filed.

[262] Cofield Declaration, p. 6.  "I made this discovery as a result of my practice of
reviewing the original applications and any accompanying documents submitted by

testified that, to the best of her knowledge, the state's training during her service as deputy registrar never "mandat[ed] that I review the original voter registrations and accompanying documents for pending voters to determine whether they had submitted proof of their identity or citizenship."[263]  Nevertheless, "I chose to do this because I believed it was a good practice to follow."[264]

108.  Evidence of the racially discriminatory effect of the state's exact match methodology on applicants flagged as potential non-citizens comes from the 2018 declaration of political scientist Michael McDonald, on which the court relied.[265] McDonald reported that non-Hispanic blacks were 30.7 percent of the applicants required to provide documentary proof of citizenship – approximately their proportion of all registered voters.  Non-Hispanic whites, by comparison, who made up 54 percent of registered voters, were only 13.7 percent of applicants in pending status.  Naturally the proportional effect of the exact match system on Hispanics and Asians was far greater.  Hispanics were only 2.8 percent of all registered voters but 17 percent of persons in pending status.  Asian or Pacific

---

the applicant with their registration form if the applicant was put into pending status."
[263] *Id.*, pp. 6-7.
[264] *Id.*, p. 7.
[265] *Georgia Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d at 1263-64.  McDonald's analysis was not contested at the preliminary injunction hearing. *Id.*, 1264.

Islanders made up only 2.1 percent of all registered voters in Georgia, but 27

percent of applicants required to document their United States citizenship.[266]

109.  The court found that plaintiffs had shown "that the burden is severe for

those individuals who have been flagged and placed in pending status due to

citizenship."[267]  The next task for the court was to balance evidence of this burden

against the state's interest "in assuring that voters are United States citizens, which

the Court finds compelling." [268]  It was far too close to the 2018 election to "require

the county registrars of the 159 counties in Georgia to review the voter registration

applications for all individuals placed in pending status due to citizenship by

checking to see if these individuals submitted proof of citizenship with their

applications" – the practice followed by the conscientious Diana Cofield of Troup

County.[269]

110.  On the other hand, the state's interest did *not* require "placing needless

hurdles in from of voters when they bring documentary proof of citizenship with

them to vote!"[270]  The court agreed with plaintiffs' contention that "Defendant's

requirement that proof of citizenship may be accepted only by a deputy registrar

---

[266] McDonald 2018 Declaration, Tables 3 & 4, p. 8.
[267] *Georgia Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d at 1264.
[268] *Id.*
[269] *Id.*
[270] *Id.*, at 1265.

cannot survive any level of scrutiny."[271]  The only justification offered by the state

at the preliminary injunction hearing, the court noted, "was because the law

requires deputy registrars to do so."[272]  This requirement "crumbles," in the court's

view, in light of the way in which the state actually implements citizenship

identification in the election process.[273]  As a result, the state's requirements for

citizenship verification "sweep broader than necessary to advance the State's

interest, creating confusion as Election Day looms," and plaintiffs have shown "a

substantial likelihood of success on the merits of their claim that Defendant has

violated the right to vote for individuals placed in pending status due to

citizenship."[274]  The court ordered the state "to allow county officials to permit

individuals flagged and placed in pending status due to citizenship to vote a regular

ballot by furnishing proof of citizenship to poll managers or deputy registrars."[275]

The court's order was designed to remove the racially discriminatory hurdles the

state placed in the path of voters flagged inaccurately as non-citizens.

---

[271] *Id.*

[272] *Id.*, citing O.C.G.A. Sec. 21-2-216(g)(1), codifying a provision of HB 268.

[273] *Id.*

[274] *Id.*, at 1267.

[275] *Id.*; STATE-DEFENDANTS-00257396 (Chris Harvey, Official Election Bulletin, "Pending Citizenship Registrations at Voting Locations," November 2, 2018), summarized District Judge Eleanor Ross's order granting the preliminary injunction in this case for election officials and registrars.  Her order was separately available as an OEB.  In a subsequent OEB, "Reminders about Existing Orders for Runoff Election," November 21, 2018, Harvey summarized four other changes in election procedures resulting from judicial orders in other cases.

111. Elections Division Director Chris Harvey later testified that judicial orders such as this were helpful "in that they gave us specific things to do."[276] He immediately sent out an OEB explaining to local officials: "District Court Judge Eleanor Ross has just issued an injunction regarding the way voters in pending citizenship status are able to resolve their citizenship verification issue at the polls."[277] He also made the judge's order available as an OEB. The key change was that "**Poll Managers**, in addition to Deputy Registrars, be allowed to verify proof of citizenship at the polls."[278] To perform this function poll managers were to be provided with "the list of acceptable proof of citizenship," which they were also to post for view at the polling place. Poll managers were also to document whenever someone in pending status on citizenship provided proof of citizenship and voted, "so that registrars can update the person's record in ENET," and the voter could be restored to active status.[279]

112. According to Harvey, the state responded to the changes required by Judge Ross's injunction by adopting HB 316 (2019).[280] As Elections Division Director, Harvey issued an OEB that included an explanation of how to override

---

[276] Harvey, August 2019 Deposition, pp. 138-39.
[277] STATE-DEFENDANTS-00257396.
[278] *Id*. (emphasis in original).
[279] *Id*. If the voter did *not* have proof of citizenship, he/she was still to be allowed to vote a provisional ballot. *Id*., p. 3.
[280] Harvey, August 2019 Deposition, pp. 138-39.

the non-citizen flag in eNet when a voter provided proof of citizenship at the polls "and prevent new citizens that have not updated their information with DDS from failing verification." [281]   The OEB instructed local officials "to double check data entry for typos" and check "the pocket of the physical applications" to determine whether proof of citizenship might have been missed when the person applied to register.[282]   Whether HB 316 fully resolved the issues in the exact match case, however, remains to be seen.

113.   The expert report by political scientist Kenneth Mayer in this case addresses that point.   The changes implemented as a result of HB 316 "have yet to be tested in a statewide election," he notes.[283]   He was able to assess the most recent results of the state's voter verification system, however, by examining: the statewide voter file through December 20, 2019; a list of voters registering between January 2, 2014, and July 24, 2019; county registered voter files on January 28, 2020; and data from the 2014-2018 American Community Survey.[284] His findings from analysis of the most recent data resemble the patterns observed by the Civil Rights Division of the Department of Justice in denying preclearance to the state's exact match system in 2009, as well as the findings of political

---

[281] STATE-DEFENDANTS-00007766 (Harvey, Official Election Bulletin, June 26, 2019, p. 1).

[282] *Id.*

[283] Mayer Expert Report, 5.

[284] *Id.*, 1.

scientist Michael McDonald's expert reports in 2016 and 2018 voting rights cases in Georgia.[285]

114.  The errors in the state's voter verification system begin with its persistent use of an exact match methodology, Mayer observes.

> In requiring that records submitted for verification match all fields (first name, last name, date of birth, [driver's] license number or [last four digits of the person's] social security number, Georgia imposes a strict match definition that is *guaranteed* to produce false non-matches, false noncitizen flags, and erroneous verification failures.[286]

115.  Database matching (or linkage) is straightforward, Mayer points out, when there is a *unique identifier* for each individual in both sets" of data – such as "a full nine-digit Social Security number."[287]  In Georgia, however, the linkage of records in the statewide voter registration database and the drivers' license database at DDS – assuming the individual has a driver's license – has to link

---

[285] *Id.*, Paragraphs 75-76 above (re: 2009 objection letter), Paragraphs 84, 86-90 above (McDonald's 2016 expert report), and Paragraph 108 above (McDonald's 2018 expert report).

[286] *Id.*, 10 (emphasis in original).  False non-matches are particularly likely, Mayer adds (p. 12), "when alphanumeric [rather than numeric] data are used," because numeric data "have only 10 character options (0-9)" and have no dashes, spaces, apostrophes, etc.

[287] *Id.*, 11 (emphasis added).  Mayer experimented by linking the two files of persons in pending status (those in pending status as of February 2018 and in the entire period from January 2014 through July 24, 2019).  The information in both files about each individual should be identical, he writes (p. 14) because "we know that they are the same person."  Yet there were "*still* records in which first or last names for the same person did not match between the two files," he notes (p. 15).  There were only 19 out of 5,543 names with non-matches but 89 percent of the 19 were minority voters.

individual records *without* a unique identifier.[288]  When the two databases to be

linked have no unique identifier – as is true here – "linkage requires some

combination of other attributes [that are] available in both data sets."[289]  That need

requires, in turn, more complex algorithms than Georgia uses.[290]

116.  Mayer's key findings regarding the racial effects of Georgia's voter

verification process are documented in a series of tables.  Looking first at

registrants in pending status in January 2020, 39.4 percent of the registrants were

African American – although African Americans made up only 29.4 percent of

active voters.[291]  The pattern was dramatically different for Non-Hispanic whites,

who were 52.9 percent of active voters, but only 14.7 percent of those in pending

status.[292]  Because Hispanics and Asians were a much smaller percentage of

Georgia's population, the comparison looks a bit different – but still displays a

pattern of racial disparity.  Hispanics were only 3.3 percent of active voters but

---

[288] *Id.*, 12.  In addition, not all Georgia voters in its registration database have a
driver's license or identity card obtainable through DDS.  Such persons have to
supply the last four digits of their social security number, and as Mayer points out,
the last four digits – unlike the full nine digit number – are not unique to that
individual, even when combined with the [person's] date of birth."
[289] *Id.*
[290] For example, Mayer cites the "contextual" matching algorithm developed by the
Electronic Registration Information Center (ERIC), which is better able to account
for disparities in names between two databases being linked.  *Id.*, 15.
[291] *Id.*, 16-17 (comparing Table 1, Active Registrants, with Table 2, Pending
Registrants).
[292] *Id.*

15.3 percent of those in pending status.[293]  Asian or Pacific Islanders made up only

2.4 percent of active voters, but 16.8 percent of voters in pending status.[294]  As

Mayer summarizes: "voters in pending status are disproportionately minority."[295]

117.  After the enactment of HB 316, Mayer notes, "registrants who fail the

verification process" – that is, non-matches – were to be classified as active voters

"with an MIDR (missing ID required) flag."[296]  For this table (Table 3), Mayer

uses both registrants classified as active voters and those in pending status, because

"the quantity of interest here is the total number of registrants who are flagged, and

who face additional identification requirements."[297]  African Americans comprised

69.4 percent of registrants in MIDR status, compared to Non-Hispanic whites (the

majority group) at only 11.4 percent.  Hispanics made up 5.7 percent and

Asian/Pacific Islanders 3.3 percent.[298]

118.  Mayer then examines the pattern of registrants flagged as non-citizens

– based overwhelmingly on the match between the voter registration and DDS

databases.  "Over 99 percent of noncitizen flags were generated using DDS data"

---

[293] *Id.*

[294] *Id.*

[295] *Id.*, 17.

[296] *Id.*, 18.

[297] *Id.*, n. 21.

[298] *Id.*, 19 (Table 3).

and less than 1 percent using HAVV data.[299]  As Mayer explains: "The use of DDS

data to verify citizenship will result in eligible voters being inaccurately flagged as

noncitizens because of outdated information in DDS files."[300]  Surprisingly, 31.6

percent of persons identifying as African American and in pending status were

flagged as non-citizens[301] either due to errors in the matching process or because

they were, in fact, foreign-born black persons from the Caribbean or from Africa.

Hispanics flagged as non-citizens made up 20.9 percent of the total pending, and

Asian/Pacific Islanders 23.2 percent.[302]  Non-Hispanic whites were a mere 13

percent of those in pending status.[303]

119.  "According to the 2014-2018 5-year American Community Survey"

estimates, Mayer notes, "there are 457,179 voting age naturalized citizens living in

Georgia."[304]  Non-Hispanic whites made up a surprising 16.9 percent of naturalized

citizens of voting age in Georgia.[305]  Persons classified as African Americans

(presumably including persons born in the Caribbean or Africa) were 23 percent of

---

[299] *Id.*, 20, 22.  Mayer points out (p. 20) that "Georgia permits noncitizens legally
present in the U.S. to obtain a driver's license or state ID," and in fact requires
them to obtain a license if they establish residency in the state.
[300] *Id.*, 30.
[301] *Id.*, 21 (Table 5).
[302] *Id.*
[303] *Id.*
[304] *Id.*, 22.
[305] *Id.*, 22 (Table 6).

naturalized citizens of voting age; Hispanics made up 20.9 percent and

Asian/Pacific Islanders 31 percent.[306]

120.  A small number of registrants (1,343) were listed "in pending status for

reasons other than citizenship verification, usually because of missing information

or a lack of signature."[307]  African Americans made up 55.9 percent of these

registrants, compared with only 15.6 percent of Non-Hispanic whites.  Hispanics

were only 4.6 percent and Asian/Pacific Islanders 3 percent of registrants flagged

for something other than citizenship,[308]  Again these data reveal an impact of these

missing data "falls most heavily on minority registrants."[309]

121.  Mayer's summary of what the data presented in his tables show is that

"these data show a compelling pattern"[310]  "Without exception, minority registrants

are disproportionately present in every category of pending or MIDR status," and

he adds that in "some cases, the disparities are stark."[311]  I concur in Mayer's

opinion, because he uses a database matching methodology that is consistent with

best practices in political science and his findings are credible.  It is also my

opinion that Mayer's conclusions – which are based on the most recent data

---

[306] *Id.*

[307] *Id.*, 23.

[308] *Id.*, Table 7.

[309] *Id.*, 23.

[310] *Id.*, 24.  Table 8 in his report summarizes the key data from the preceding tables.

[311] *Id.*, 24.

available – confirm the same pattern demonstrated earlier in the expert reports of Michael McDonald and the findings of the Civil Rights Division in 2009.

## Conclusion

122.  The evidence presented in the preceding pages makes clear that Georgia's implementation of its voter verification process under HAVA – since 2008 – has exercised a persistent discriminatory effect on minority voters' opportunity to register and vote.  The state's insistence on using a simple – and methodologically obsolete – exact match requirement forms a very substantial obstacle to fair and equal registration.  Its cumbersome and decentralized system of decision-making about individual voter verifications – granting ultimate authority over voter registration decisions to local registrars who had little legal education or training – compounded the difficulty of correcting errors produced by the voter verification process.  As we have seen, it continues to have a racially and ethnically discriminatory effect, as my analysis has concluded.

123.  The current pattern has its analogue in the system of voter registration in the Jim Crow era before 1965.  The difficulty African Americans faced in dealing with the complexities of the literacy test used by Georgia between 1945 and 1965 – coupled with the continuing racial disparity in income, and education documented by the U.S. Census of 1950 - and by the recent Census data cited in

this report – closely resembles the difficulties minority voters face in dealing with Georgia's voter verification system since 2008.

124.   The political context within which the current voter verification process operates also resembles the politics of Georgia before the adoption of the 1965 Voting Rights Act.  In those days Georgia politics was dominated by the Democratic Party – for the most part a staunch defender of racial discrimination in the registration and voting process as well as official racial segregation in all aspects of public life.  In the current politics of Georgia state government is dominated by the Republican Party – but now, unlike in the 1950s, that is the party to which most non-Hispanic whites belong.  The Republican Party's greatest electoral threat is the growing strength of African American, Hispanic, and Asian citizens – and that threat of increasing minority voting strength provides a powerful incentive for Republican officials to place hurdles in the path of minority citizens seeking to register and vote.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 24th day of  April 2020, I electronically filed

the foregoing **Expert Report of Dr. Peyton McCrary** with the Clerk of Court

using the CM/ECF system, which will automatically send notification of such

filing to Counsel of Record:

Chris Carr, Esq.
Attorney General
Dennis Dunn, Esq.
Deputy Attorney General
Russell Willard, Esq.
Senior Assistant Attorneys General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Telephone: (404) 656-3300
Fax: (404) 657-8733
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Bryan Tyson, Esq.
Bryan Jacoutot, Esq.
Diane F. LaRoss, Esq.
Loree Anne Paradise, Esq.
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Fax: (404) 856-3250
btyson@taylorenglish.com
bjacoutot@taylorenglish.com
dlaross@taylorenglish.com
lparadise@taylorenglish.com

Joshua Barrett Belinfante, Esq.
Brian Edward Lake, Esq.
Carey Allen Miller, Esq.
Vincent Robert Russo, Jr., Esq.
Alexander Denton, Esq.
Melanie Johnson,Esq.
**Robbins Ross Alloy Belinfante Littlefield, LLC -Atl**
500 Fourteenth Street, NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com
vrusso@robbinsfirm.com
adenton@robbinsfirm.com
mjohnson@robbinsfirm.com

*/s/ Leslie J. Bryan*
Leslie J. Bryan
Georgia Bar No. 091175