IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No.1:18-cv-05391-SCJ |
| BRAD RAFFENSPERGER, in his official ) | |
| capacity as Secretary of State of the State of ) | |
| Georgia, et al., ) | |
| ) | |
| Defendants. | |

## Second Rebuttal Report of Janet R. Thornton, Ph.D.

I, Janet R. Thornton, being first duly sworn, depose and say that:

1. I am over 21 years old, have not been declared incompetent, and make the statements contained herein based upon facts presently known to me.

2. Counsel for the State of Georgia in the above captioned matter asked BRG to review the Supplemental Report of Plaintiffs' Expert, Michael C. Herron,[1] and to examine the new analyses contained in his report. Based on my review, the conclusions contained in my March 2020 Report[2] do *not* change.

3. Dr. Herron's Supplemental Report includes new analyses that fail to adequately address the conclusions of my Rebuttal Report. The following summarizes the findings from my review of Dr. Herron's Supplemental Report, which are described more fully in the subsequent sections of this report:

---

[1] Supplemental Expert Report of Michael C. Herron, dated April 8, 2020 (hereafter, "Herron Supplemental Report").
[2] Rebuttal Report of Janet R. Thornton, Ph.D., dated March 24, 2020 (hereafter, "Thornton Rebuttal Report"), reviewed the Expert Report of Michael C. Herron, dated February 18, 2020 (hereafter, "Herron Report" or "February Report").

- Without justification, Dr. Herron continues to report his results on a statewide basis and argues that his reliance on statewide analyses is not problematic, thereby ignoring the individual decision-making of each county to determine the location of its polling place(s) as dictated by Georgia Statute § 21-2-265.
- He fails to consider the political make-up of the county Boards of Elections. A review of county Board of Elections websites suggests that they tend to describe themselves as being bipartisan. For example, in Bibb County, two of the five board members are Democrats, two are Republicans, and one is appointed by the county commission. The Chairman of the Board of Elections is African-American and a Democrat. Dr. Herron fails to consider the function of the county Boards of Elections and their make-up.
- Dr. Herron argues that he can assume that the percentage of closed polling places that no longer exist is uniform among African-American and Caucasian dominant polling places, even though he fails to actually test this assumption, and further assumes that I should bear the burden of this testing.
- Dr. Herron suggests that I should have sampled closed polling places to determine the reason for the closure, even though it is his burden. He fails to recognize that sampling closed polling places to adequately determine the reasons for closure would not simply involve research to determine if a place was demolished. Each county Board of Elections with changes in polling places between 2014 and 2018 would need to be contacted to understand the reasoning/rationale for each, information that a Google search would not yield.
- As a researcher, it is surprising that Dr. Herron does not understand what it means to adjust for factors other than race that may influence the county-by-county decisions to close a polling place.
    - Dr. Herron is testing only one factor to potentially explain closure and voting rates: race.
    - There are other factors that could be correlated with race, such as the location of demolished polling place facilities, the desire of facilities to no longer serve as polling places, and the usage of early voting, which may influence his outcomes and conclusions.
    - By *adjusting* for these factors, Dr. Herron could determine whether the other factors, and not race, explain his findings.
- Dr. Herron's Supplemental Report selectively compares the 2014-2016 and 2016-2018 effects of voters who did not move but had new polling places to voters who did not move and did not have a polling place change.
    - His selective comparison is not limited to election day voting.
    - He fails to make the same period distinctions (i.e., 2014-2016 and 2016-2018) for any of his other comparisons included in his February Report.
    - For example, if at a minimum, he prepared the information on "closed" polling places contained in Tables 3 and 4 of his February Report separated by period, he would have reported a different conclusion for the period 2016-2018. Between 2016 and 2018, the percentage African-American among those with closed polling places is *lower*. By combining 2014 through 2018 in his February Report and continuing to do so in his Supplemental Report, Dr. Herron has hidden this difference.

- Dr. Herron erroneously argues the irrelevance of early voting and its impact on election day voting, even though he included comparisons limited to election day voting in his February Report.
    - From an economist's perspective, the placement of polling places involves finding an optimal solution while considering supply and demand for election day polling places.
    - To the extent that there is a decline in the demand for election day voting, then presumably the supply of polling places would decline.
    - Recent reporting has shown that the usage of early voting polling places has increased from 2002.
- When Dr. Herron's analyses of voting are limited to election day voting, which is relevant to the polling places at the core of his reports, African-American registered voters were "disenfranchised" *the least* compared to Caucasians for the periods 2014-2016 and 2016-2018 by changes in the polling place.

4.  To arrive at these conclusions, I relied upon the programming logic that Dr. Herron produced on March 4 and April 9, 11, and 13, 2020.[3] His code was modified in order to produce the polling place closure rates by period and on election day that were prepared at Tables 3, 4, 12, and 13 of his February Report, now divided into the periods 2014-2016 and 2016-2018 in his Supplemental Report.

### I. Dr. Herron's Continued Reliance on Statewide Statistics is Not Justified

5.  Dr. Herron argues that his use of statewide statistics is justified because the counties/jurisdictions follow state and federal law.[4] However, his justification fails to address the role of each county Board of Elections and the independent decision-making regarding the placement and number of polling places. It is the sole responsibility of the county Boards of

---

[3] Dr. Herron provided programming code in support of his Supplemental Report on April 9. However, he did not provide the programming code in its native format but instead as a PDF. One cannot execute his programming code as a PDF and, therefore, we requested the native format of his programming code, which was produced on April 11. However, this production failed to include all programming code to replicate his results. After the additional programming code was requested, it was produced on April 13. Appendix A lists the materials replied upon in preparation of this report.

[4] Dr. Herron also assumes that because I do not criticize his programming code, that I agree with his findings. The programming code/logic is not the issue; it is what he instructed the programming code to do that is the issue, in particular, instructing the programming code to produce statewide statistics.

3

Elections, not the Secretary of State or the federal government, to determine polling place locations. Merely stating that "there is nothing problematic about analyzing election administrative practices within a state"[5] does not provide justification for his statewide comparisons as I described in my Rebuttal Report.[6] Dr. Herron, in his February Report, demonstrates variation by county in his Figures 1-4 yet he ignores the variation when conducting his statewide analyses, i.e., he does not control for this variation in his statewide statistics. For example, some counties moved *all* the polling places and in other counties *none* of the polling places were closed or moved.[7] Despite Dr. Herron's assertion that there is nothing "problematic" with a statewide analysis, the statewide analysis does not provide a representation of the actual decision-making process followed by each county Board of Elections to determine polling place locations.

6.  A review of some of the county Boards of Elections reveals that in each instance they were comprised of five members consisting of both Democratic and Republican members. For example, in Fulton County, which moved and closed a number of polling places between 2014 and 2018, the Board is comprised of two Democrats, two Republicans, and one Non-affiliated. In Bibb County, a small county with a relatively higher proportion African-American with closed polling places, the Board of Elections' website states that the Board consists of five members: "Two members are appointed by the Republican Party – Two members by the Democratic Party –

---

[5] Herron Supplemental Report, page 25, paragraph 55.
[6] Thornton Rebuttal Report, pages 6-7.
[7] This is analogous to comparisons with which I am familiar in employment matters. While there may be a company policy regarding employment practices (analogous to state/federal polling place requirements), the question becomes at what level were the decisions made and is the subjective decision making made by an overarching corporate head or at lower levels organizationally (analogous to state/federal v. county Boards of Elections). In *Wal-Mart Stores, Inc. v. Dukes, et al.*, 564 U.S. 338 (2011), the Supreme Court ruled that there was no evidence that the nationwide group of class-plaintiffs was subject to the same discriminatory employment policy; store managers (analogous to county Boards of Elections) at Wal-Mart could make their own pay and promotion decisions (analogous to decisions regarding moving/closing polling places).

A fifth member shall be appointed by the Macon-Bibb County Commission from a list of nominees voted on by a majority of the four partisan appointees." The current Board of Elections Chairman for Bibb County is an African-American, Mr. Henry Ficklin, a Democrat.[8]

7.	Dr. Herron ignores the racial and partisan make-up of each of the county Boards of Elections involved in the decisions to move or close polling places. Of these Boards of Elections (not the state or federal government), 70% chose *not* to reduce the number of polling places between 2014 and 2018 (i.e., the number of polling places was the same or greater in 2018 relative to 2014 in these counties) and 36% chose *not* to move polling places (i.e., the county did not close any polling places and among the closed polling places the county may or may not have replaced the polling places with a new location). Further, among the 101 counties with at least one closure, 54 (or 53.5%) had a higher proportion of Caucasian registered voters with a closure compared to the proportion of African-American registered voters. Dr. Herron does not refute the variation among the counties or my findings. His only justification is that there are state and federal laws, which does not address the independent decision-making by each county Board of Elections.

## II. Dr. Herron Failed to Independently Determine the Reason for Closed and Moved Polling Places

8.	In my Rebuttal Report, I provided examples of polling places that were "closed" due to the demolishment of the building and the lack of availability of the location to continue to serve as a polling place. Dr. Herron criticizes me for providing examples of three polling places that were demolished and/or no longer available. He recommended that a random sample of

---

[8] See the Macon-Bibb County Board of Elections website at https://www.maconbibb.us/board-of-elections-2/.

polling places be taken to determine the reasoning for closure.[9] However, more than a Google search is required to understand the polling place changes made by county officials.

9. Dr. Herron further states that because he is comparing the rate of polling place closures in predominantly Caucasian and African-American areas of Georgia, that any inflation in the number of closures is irrelevant.[10] However, he did nothing to test this assumption and, instead, has placed the burden on me to determine the reasoning behind each closure or move. It is my position that Dr. Herron made this assumption and consequently, it is his burden to test it. He has not endeavored to undertake research into the reasons for polling place closures/moves, and instead assumes that the only factor to consider is race/ethnicity on a statewide basis instead of at the decision-making level, i.e., the county Boards of Elections.

10. As a researcher, it is surprising that Dr. Herron does not understand what it means to adjust for factors other than race. There are other factors that could be correlated with race, such as the location of demolished polling place facilities, the desire of facilities to no longer serve as a polling place, and the usage of early voting, which may influence his outcomes and conclusions. By adjusting for relevant factors, Dr. Herron could determine whether they, and not race, explain his findings.[11] This is why I used the word "inflated,"[12] to distinguish the polling places that closed or moved because of factors which the county Boards of Elections could not

---

[9] Herron Supplemental Report, page 27, paragraph 61.
[10] Herron Supplemental Report, page 32, paragraph 73.
[11] A common theme in statistical and econometric texts is that a correlation cannot prove causation. For example, Studenmund and Cassidy state, "While many economic relationships are causal by their very nature, a regression result, no matter how statistically significant, cannot prove causality. All regression analysis can do is test whether a significant quantitative relationship exists. Judgments as to causality must also include a healthy dose of economic theory and common sense. For example, the fact that the bell on the door of a flower shop rings just before a customer enters and purchases some flowers by no means implies that the ringing of the bell causes the purchase! If events A and B are related statistically it may be that A causes B, that B causes A, that some omitted factor causes both or that a chance correlation exists between the two." (Studenmund, A. H. and Cassidy, Henry J. (1987). *Using Econometrics: A Practical Guide.* Boston, MA: Little, Brown & Company, page 5.)
[12] Herron Supplemental Report, page 30, paragraph 67.

influence or control from those decisions made solely by the county Boards of Elections for other reasons.

11. By aggregating the outcomes across counties without regard to the role of each county Board of Elections, Dr. Herron has masked these individual county level decisions. А more meaningful measure of polling place closures and movement would be to examine the county decisions that closed polling places for reasons that were made solely by the Boards (i.e., outside influences did not play a role such as a facility no longer wishing to serve as a polling place). Because these polling place decisions are a subset of the total number of closures and changes, the closure rate would be lower than the rates calculated by Dr. Herron.

### III. Dr. Herron Selectively Distinguished the Periods from 2014 to 2016 and 2016 to 2018, Thereby Misleading the Court

12. In his February Report, Dr. Herron combined election cycles from 2014 through 2018, which I criticized. In response to my criticism that Dr. Herron did not separately examine the cycles from 2014 to 2016 and from 2016 to 2018,[13] he selectively prepared new analyses that reported the outcomes from two of his several tables for the two periods (Tables 10 and 11 of the Herron February Report). To illustrate the result of this selectivity, I have additionally examined the polling place closure rates as reported in Tables 3 and 4 of Dr. Herron's February Report for the two periods.

13. At Table 3 of his February Report, Dr. Herron reported polling place closure rates by the race of registered voters, comparing polling places between 2014 and 2018. Below I have prepared the same information for the periods from 2014 to 2016 and from 2016 to 2018. The information diverges between the two periods. Between 2014 and 2016, the closure rate is higher

---

[13] Herron Supplemental Report, page 34, paragraph 76.

among African-American compared to Caucasian registered voters. However, between 2016 and 2018, the closure rate is lower among African-American compared to Caucasian registered voters. Therefore, the African-American closure rate is not consistently higher over the period, contrary to Dr. Herron's finding when he combined the two distinct periods.

**Table 1—Dr. Herron's February Report, Table 3**
**Polling Place Closure Rates by Race, 2014-2016 and 2016-2018**

|  | 2014-2016 | | | 2016-2018 | | |
|---|---|---|---|---|---|---|
| Race | Registered Voters | Closed | Percent Closed | Registered Voters | Closed | Percent Closed |
| White | 3,382,803 | 289,117 | 8.55% | 3,721,448 | 385,048 | 10.35% |
| **Black** | **1,793,742** | **185,807** | **10.36%** | **2,007,233** | **189,231** | **9.43%** |
| Unknown | 440,652 | 45,936 | 10.42% | 554,386 | 59,632 | 10.76% |
| Hispanic | 121,373 | 12,456 | 10.26% | 161,034 | 13,888 | 8.62% |
| Asian/Pacific Islander | 93,005 | 8,263 | 8.88% | 121,417 | 10,251 | 8.44% |
| Other | 66,082 | 6,518 | 9.86% | 81,758 | 7,956 | 9.73% |
| American Indian/Alaskan | 3,385 | 357 | 10.55% | 5,391 | 468 | 8.68% |

14. At Table 4 of his February Report, Dr. Herron counts the number of closed polling places between 2014 and 2018. He distinguishes each polling place as being an African-American majority or not, by using the percentage African-American among the registered voters associated with the polling place. At Table 4, he applies a 50% threshold to classify African-American polling places. I have similarly prepared the same information as contained in Dr. Herron's Table 4, but distinguishing the periods 2014-2016 and 2016-2018.

15. Consistent with closure rates by race reported in Table 1 above, the information diverges between the two periods. Between 2014 and 2016, the closure rate is higher among polling places labelled African-American. In contrast, between 2016 and 2018, the closure rate is *lower* among the polling places classified as African-American using the 50% threshold.

Therefore, the African-American closure rate is not consistently higher over the period contrary to Dr. Herron's finding when he combined the two distinct periods.

**Table 2—Dr. Herron's February Report, Table 4**
**Closures Among Black Majority Polling Places, 2014-2016 and 2016-2018**

| Black Majority | Closed | 2014-2016 | | 2016-2018 | |
| --- | --- | --- | --- | --- | --- |
| | | Count | Closure Rate | Count | Closure Rate |
| No | No | 1,784 | | 1,696 | |
| No | Yes | 190 | 9.63% | 200 | 10.55% |
| Yes | No | 468 | | 493 | |
| Yes | Yes | 74 | 13.65% | 50 | 9.21% |

16. These comparisons illustrate the selective reporting by Dr. Herron with respect to the information that he chose to report for the two periods in his Supplemental Report. The closures that occurred between 2016 and 2018 as reported above were the closures that occurred prior to the 2018 election. These comparisons show that prior to the 2018 election (i.e., period between 2016 and 2018 election) the closure rate was *lower* among African-Americans using the methodology applied by Dr. Herron to measure closures.

17.

**IV.    Dr. Herron's Voting Comparisons Incorrectly Include Early Voting**

18. In his Supplemental Report, Dr. Herron selectively chose to divide the 2014 to 2018 period into 2014-2016 and 2016-2018 for two of his February Report tables (Tables 10 and 11). At Tables 1 and 2 of his Supplemental Report, he provides the information formerly at Table 10 and 11 of his February Report for the period 2014 to 2016.[14] Similarly, at Tables 3 and 4 of his

---

[14] Herron Supplemental Report, pages 39 and 40. Table 1 provides the distribution of voters by race between new voting places and unchanged voting places between 2014 and 2016. Table 2 is the same information but limited to 2014 voters.

9

Supplemental Report, Dr. Herron provides the same information for the period 2016 to 2018.[15] He selectively did not do the same for Tables 12 and 13 (or any of his other tables) that focused on election day voting, which is the voting relevant to the number and location of polling places.

19. Even though Dr. Herron included tables in his February Report that focused on election day ballots, he now argues that a voter may cast an absentee or early ballot because of polling place closures. He does not provide any justification for this view which is contrary to the pattern of early voting nationwide.

20. A 2016 Washington Post article reported on the increasing usage and value of early voting: "The value of early voting to candidates doesn't lie solely in increasing turnout, of course. Instead, it's valuable because it increases the amount of time that campaigns have to get their base of voters to the polls. For Democrats, that can be important: Younger voters and people of color tend to turn out less regularly. Such increases are at the margins, a few hundred or few thousands in a handful of races."[16]

21. As the Bureau of Census reports, the availability of alternative voting, such as early voting and voting by mail, has changed how voters vote. The Bureau reports that in 2018, nationwide, 40% of voters used an alternative voting method rather than voting on election day. Additionally, while the usage of alternative voting tends to decline slightly during midterm elections relative to presidential elections, that was not the case in 2018. Instead, in 2018 the rate of alternative voting usage was not significantly different from the rate from the 2016 presidential

---

[15] Herron Supplemental Report, page 44. Table 3 provides the distribution of voters by race between new voting places and unchanged voting places between 2016 and 2018. Table 4 is the same information but limited to 2016 voters. Dr. Herron appears to have the incorrect label on Table 4 as it compares 2016-2018 and not 2014-2016 based on the subsequent paragraph on page 45 of his report.

[16] Bump, Philip. (2016, December 16). "America Keeps Voting Earlier – And It Keeps Not Affecting Turnout that Much." *The Washington Post*. Retrieved from: https://www.washingtonpost.com/news/the-fix/wp/2016/12/29/america-keeps-voting-earlier-and-it-keeps-not-affecting-turnout-that-much/.

election. The following figure depicts the increasing usage of alternative voting in midterm elections from 2002 through 2018, nationwide as reported by the Bureau of Census.

**Figure 1—Percentage Uses of Alternative Voting Methods (Mail-in and Early Voting Ballots) in Midterm Elections from 2002 through 2018**



Alternative Methods of voting include early voting and voting by mail.
Source: U.S. Census Bureau; Current Population Survey Voting and Registration Supplements: Midterm Elections 2002-2018.
Recreated from U.S. Bureau of Census, "Behind the 2018 U.S. Midterm Election Turnout: Voter Turnout Rates Among All Voting Age and Major Racial and Ethnic Groups Were Higher Than in 2014"; April 23, 2019.

22. In addition, Georgia was one of three states with the highest percentage point increases in alternative voting rates from 2014 to 2018, with an increase of 21 percentage points. The Bureau of Census attributes the increase to high profile elections in 2018, not polling place closures. The chart below provided by the Bureau of Census shows the change in the usage of alternative voting by state.[17]

---

[17] Misra, Jordan. (2019, April 23). "Voter Turnout Rates Among All Voting Age and Major Racial and Ethnic Groups Were Higher Than in 2014." U.S. Bureau of Census, *Behind the 2018 U.S. Midterm Election Turnout*. Retrieved from: https://www.census.gov/library/stories/2019/04/behind-2018-united-states-midterm-election-turnout.html.



23. In addition to the general trend of increased alternative voting, in 2018, African-American voters in particular used early voting polling places at a higher rate.[18] Recall from my Rebuttal Report that Georgia voters have increased their usage of early voting polling places at a much higher rate than their usage of absentee ballots.[19] Thus, Dr. Herron has falsely minimized the importance of in-person early voting on the need for election day polling places, i.e., there has been a reduction in the demand for election day polling places.

**Table 3—Method of Alternative Voting among Each Racial/Ethnic Group: November 2018 Election**

| Racial/Ethnic Group | In-person Before Election Day | By mail |
|---|---|---|
| White alone | 16.2% | 24.0% |
| White non-Hispanic alone | 15.9% | 23.5% |
| Black alone | **21.8%** | 11.0% |
| Asian alone | 11.0% | 41.0% |
| Hispanic (of any race) | 17.8% | 27.3% |
| White alone or in combination | 16.1% | 24.1% |
| Black alone or in combination | 21.4% | 11.4% |
| Asian alone or in combination | 11.5% | 40.2% |
| Source: U.S. Bureau of Census, Voting and Registration in the Election of November 2018, Table 14, available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html | | |

---

[18] U.S. Bureau of Census. (April 2019). "Voting and Registration in the Election of November 2018," Table 14. Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html

[19] As I reported in my Rebuttal Report, I examined the way Georgia voted during the 2014 and 2018 general elections by type of ballot cast. As shown in the table below, Georgia registered voters increased their usage of absentee ballots (mail) and early voting and reduced their usage of election day ballots between 2014 and 2018.

**Type of Voter Participation by Election in Georgia**

| General Election Year | Election Day | UOCAVA | Mail | Provisional Ballot | Early Voting |
|---|---|---|---|---|---|
| 2014 | 62.90% | 0.05% | 4.10% | 0.27% | 32.68% |
| 2018 | 46.07% | 0.14% | 5.58% | 0.30% | 47.91% |
| Source: U.S. Election Assistance Commission Data (EAC), 2014 and 2018 elections: https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys. | | | | | |

24. The question is, then, which came first, polling place closures or the trend in the usage of alternative voting? The nationwide statistics show that usage of early voting was increasing well before the closures that Dr. Herron measured. Thus, the relevant comparison of polling place closures and changes is election day voting and not all voting.

25. At Tables 12 and 13 of his February Report,[20] Dr. Herron makes just such a comparison, examining voter turnout as a function of polling place changes after limiting the comparisons to election day voting. At Table 12, the difference in the distribution between the percentage African-American among changed and unchanged polling places is less than it is for any other racial/ethnic category. Similarly, at Table 13, Dr. Herron further restricted the voters to those who also voted in 2014. Again, the difference in the distribution between the percentage African-American among those with and without a change in polling places is less than it is for any other racial/ethnic category.

26. I have also prepared the information contained in Dr. Herron's Tables 12 and 13 for the two periods, 2014-2016 and 2016-2018. The table below shows that, regardless of the period, the decline in turnout is greater among Caucasians, particularly during the 2016-2018 period. During the 2016-2018 period, the percentage Caucasian among those voters with a new polling place on election day is 26.16% compared to 30.75% among voters without a polling place change, a difference of -4.59 percentage points. For the same period, the percentage African-American among those voters with a new polling place on election day is 21.57% compared to 24.26% among voters without a polling place change, a difference of -2.69 percentage points. Consequently, the difference in the distribution percentage reported by Dr. Herron is *smaller* for African-Americans compared to Caucasians, regardless of the time period.

---

[20] Herron Report, pages 73 and 74.

**Table 4—General Election Day Turnout by Race as a Function of Polling Place Changes**

| Race | Registered Voters | New Place | Not New | Difference |
|---|---|---|---|---|
| *2016 General Election Day Turnout as a Function of 2014-2016 Polling Place Changes* | | | | |
| White | 2,899,943 | 23.91% | 26.83% | -2.92 |
| **Black** | **1,460,087** | **19.55%** | **20.85%** | **-1.30** |
| Unknown | 370,663 | 17.30% | 19.60% | -2.30 |
| Hispanic | 97,928 | 22.17% | 24.59% | -2.42 |
| Asian/Pacific Islander | 78,793 | 20.49% | 23.47% | -2.98 |
| Other | 54,207 | 18.50% | 21.32% | -2.82 |
| American Indian/Alaskan | 2,526 | 15.47% | 20.28% | -4.82 |
| *2018 General Election Day Turnout as a Function of 2016-2018 Polling Place Changes* | | | | |
| White | 2,788,963 | 26.16% | 30.75% | -4.59 |
| **Black** | **1,394,610** | **21.57%** | **24.26%** | **-2.69** |
| Unknown | 387,959 | 20.90% | 22.75% | -1.85 |
| Hispanic | 112,315 | 25.09% | 27.64% | -2.55 |
| Asian/Pacific Islander | 89,874 | 22.99% | 24.81% | -1.82 |
| Other | 55,569 | 21.90% | 25.06% | -3.16 |
| American Indian/Alaskan | 3,862 | 18.26% | 22.40% | -4.15 |

27.  Similarly, at Table 13 of his February Report, Dr. Herron limited the comparison to those who also voted in 2014.  I have prepared a similar comparison but for the two periods, 2014-2016 and 2016-2018.  Regardless of the period, the difference in the distribution percentage is *smaller* for African-Americans compared to Caucasians.

**Table 5—General Election Day Turnout by Race as a Function of Polling Place Changes, Limited to Those who Voted in 2014 and 2016, Respectively**

| Race | Registered Voters | New Place | Not New | Difference |
|---|---|---|---|---|
| *2016 General Election Day Turnout as a Function of 2014-2016 Polling Place Changes, Limited to 2014 Voters* | | | | |
| White | 1,441,693 | 31.02% | 34.90% | -3.88 |
| **Black** | **621,184** | **27.47%** | **29.08%** | **-1.61** |
| Unknown | 109,115 | 29.13% | 32.96% | -3.83 |
| Hispanic | 21,774 | 39.04% | 42.40% | -3.36 |
| Asian/Pacific Islander | 18,156 | 33.06% | 40.92% | -7.86 |
| Other | 15,853 | 32.23% | 35.85% | -3.62 |
| American Indian/Alaskan | 586 | 17.24% | 36.55% | -19.31 |
| *2018 General Election Day Turnout as a Function of 2016-2018 Polling Place Changes, Limited to 2016 Voters* | | | | |
| White | 2,116,841 | 32.14% | 38.05% | -5.91 |
| **Black** | **916,052** | **28.93%** | **32.25%** | **-3.32** |
| Unknown | 220,282 | 31.69% | 35.26% | -3.58 |
| Hispanic | 69,313 | 35.97% | 39.38% | -3.41 |
| Asian/Pacific Islander | 54,287 | 32.44% | 35.59% | -3.16 |
| Other | 33,483 | 31.37% | 36.21% | -4.85 |
| American Indian/Alaskan | 2,210 | 28.71% | 33.47% | -4.75 |

## V. Conclusions

28.  In his Supplemental Report, Dr. Herron did not refute my calculations or find error in my findings. Instead, he continues to provide statewide statistics that mask the individualized county-by-county decisions and selectively prepared new analyses that separated the 2014 to 2018 period. The county Boards of Elections are responsible for the decision-making to determine the number and location of each polling place as dictated by Georgia Statute § 21-2-265. Dr. Herron merely states that jurisdictions have to follow state and federal law, which provides no explanation for the variation by county in the number of closed polling places and changes to polling places. When examined by county as provided in my Rebuttal Report, there are *fewer* counties with a higher African-American closure rate.

16

29. Dr. Herron fails to recognize that sampling closed polling places to adequately determine the reasons for closure would not simply involve researching to determine if a place has been demolished, but would require determining from each of the counties who made the historical decisions and the rationale behind the decisions, because polling places are closed for reasons other than demolishment, such as the changing desire of facilities to serve as polling places. It is Dr. Herron's burden to rule out potential reasons, rather than assuming that the presumed race of the precinct was the impetus for the polling place changes.

30. As a researcher, it is surprising that Dr. Herron does not understand what it means to adjust for other factors. Dr. Herron is testing only one factor in his comparison, race/ethnicity. However, there are other factors that could be correlated with race/ethnicity, such as the location of demolished polling place facilities, the desire of facilities to no longer serve as polling places, and the usage of early voting, which may influence his outcomes and conclusions. By adjusting for these factors, Dr. Herron could determine whether they, and not race, explain his findings.

31. Dr. Herron's Supplemental Report provides new analyses that compare the 2014-2016 and 2016-2018 effects of voters who did not move but had new polling places to voters who did not move and did not have a polling place change. However, Dr. Herron is quite selective in his choice of results to report. He limits his comparison of voting by these two groups of voters (i.e., those with and without a change in polling place) to race alone. Dr. Herron fails to separate the two periods for any of his other February Report comparisons. If he, at a minimum, had prepared this same comparison for the "closed" polling places contained in Tables 3 and 4 of his February Report, he would have reported that there is a different conclusion drawn between 2014-2016 as compared to 2016-2018. Between 2016 and 2018, the percentage African-American

among those with closed polling places is *lower* for this period. Thus, by combining 2014 through 2018 in his February Report, Dr. Herron has masked this difference.

31. Dr. Herron erroneously argues the irrelevance of early voting and its impact on election day voting. Yet, contrary to this argument, he provided election day comparisons in his February Report. From an economist's perspective, the placement of polling places involves finding an optimal solution while considering supply and demand. To the extent that there is a decline in the demand for election day voting, then presumably the supply of polling places would decline. Recent reporting has shown that the usage of early voting polling places has increased since 2002.

32. When Dr. Herron's analyses of voting are limited to the election day voting, which is relevant to the polling places at the core of his reports, African-American registered voters were "disenfranchised" *the least* compared to Caucasians for the periods 2014-2016 and 2016-2018 by changes in the polling place.

I have read the foregoing statement consisting of 32 paragraphs and swear that it is true and accurate to the best of my knowledge and belief.

*Janet R. Thornton*
Janet R. Thornton, Ph.D.

Subscribed and sworn to before me
this 30TH day of April, 2020.

*Diana R. Bryson*

DIANA R. BRYSON
Commission # GG 296050
Expires March 1, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

\*

**Appendix A**

**Materials Relied Upon**

## Materials Relied On

- Amended Complaint for Declaratory and Injunctive Relief, dated February 19, 2019
- Expert Report of Michael C. Herron, Ph.D., dated February 18, 2020, and supporting materials
- Supplemental Report of Michael C. Herron, Ph.D., dated April 8, 2020, and supporting materials
- Additional materials in support of his February 18, 2020 report provided on March 4, 2020
- Additional materials in support of his April 8, 2020 report provided on April 9, 11, and 13
- Deposition of Michael C. Herron, Ph.D., dated February 26, 2020
- Statute regarding selection of polling places (Ga. Code Ann., § 21-2-265)
- Publicly available data as referenced in the report