## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,

     Plaintiffs,

v.

BRAD RAFFENSPERGER, in his
official Capacity as Secretary of
State of Georgia, *et al.*,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action File

No. 1:18-cv-05391-SCJ

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY
## OF DR. M. ADRIENNE JONES AND BRIEF IN SUPPORT

Defendants Brad Raffensperger, in his official capacity as Secretary of

State (the "Secretary"), the State Election Board (the "SEB"), and State

Election Board Members Rebecca Sullivan, David Worley, and Anh Le, also

in their official capacities (collectively, the "Defendants"), hereby move the

Court to exclude the testimony of Dr. M. Adrienne Jones for both trial and

this Court's consideration of Defendants' Motions for Summary Judgment.

*See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1313 (11th

Cir. 2014) (only admissible evidence can be considered on a motion for

summary judgment). In support of this Motion, Defendants show the Court

as follows:

## I.    Introduction

Plaintiffs have put forth Dr. M. Adrienne Jones to testify to "the history of voting and voter suppression throughout the country with an emphasis on suppression in the [S]tate of Georgia." (Doc. 80, p. 3). In her report, (Doc. 92), Jones offers two opinions: (1) "From the beginning of its existence to present, the State of Georgia has continually suppressed the right of people of color to vote;" and (2) "Georgia's suppression of people of color's right to vote is consistent with the long history of Georgia and Southern states." (Doc. 92, pp. 2 and 12). Dr. Jones, however, is not qualified to testify as an expert on these matters. She is not a historian; she has not published any peer-reviewed articles or conducted any specific research on this topic; and she has never been qualified to testify as an expert on **any matter** in **any court**. Further, Jones's opinions are not the product of reliable methodology (or really, any methodology at all), nor will her testimony assist the trier of fact. While any of these failures would be sufficient to disqualify Dr. Jones and exclude her testimony, perhaps most disqualifying is the fact that her purported testimony is not even relevant to this case. By her own admission, Dr. Jones's testimony does not address any event occurring after 2013 (or indeed, any event in the last thirty years), nor any of Plaintiffs' claims.

In truth, Dr. Jones is an activist and ardent supporter of Plaintiff Fair Fight Action. A prolific newspaper opinion writer, Dr. Jones only became involved in this case upon being recruited at an event hosted by Plaintiff Ebenezer Baptist Church regarding this litigation, after having worked with Fair Fight in an attempt to bring hearings of the House Oversight Committee to Morehouse College. In like manner, her report, (Doc. 92), is more akin to her numerous op-ed pieces than the unbiased work of a historian.

Dr. Jones's testimony provides no more than what Plaintiffs and their counsel have offered throughout this litigation: inflammatory, inaccurate, and irrelevant opinions advanced to smear Defendants, confuse the issues, and gain an unfair advantage at trial. This is not the proper role of an expert and her testimony should be excluded for the reasons explained herein.

## II.   Standard of Admissibility

"Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579 (1993)], district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) The

testimony is based on sufficient facts or data; (c) The testimony is the product of reliable principles or methods; and (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Pursuant to Rule 702, the Court:

can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.

*Sumner v. Biomet, Inc.*, No. 7:08-CV-98, 2010 WL 4736320, at *3 (M.D. Ga. Nov. 16, 2010) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)).

The Eleventh Circuit refers to these three requirements as the "qualifications," "reliability," and "helpfulness" prongs, respectively. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). These requirements apply to opinion testimony by both scientific and non-scientific expert witnesses. *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343, 1350 (M.D. Ga. 2007). While some overlap exists among these requirements, the court must individually analyze each concept. *Frazier*, 387 F.3d at 1260.

The primary purpose of the Court's gatekeeping function is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field.'" *Am. Gen. Life & Acc. Ins. Co. v. Ward*, 530 F.Supp. 2d 1306, 1312 (N.D. Ga. 2008) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The party offering the expert testimony bears the burden of laying the proper foundation and demonstrating the testimony's admissibility by a preponderance of the evidence. *Rink*, 400 F.3d at 1291–92.

## III.   Dr. Jones is not qualified to testify regarding the "history of voter suppression."

To fulfill its duties under Federal Rule of Evidence 702, the trial court "must determine whether the expert has the requisite qualifications to offer the opinions he [or she] gives." *Bowers*, 537 F. Supp. 2d at 1349 (citing *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004) and *Frazier*, 387 F.3d at 1260–61). Those qualifications may be based on the proffered expert's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The examination of a witness's qualifications to form an opinion "is a separate and distinct inquiry from whether or not that opinion has a reliable basis." *Coshap, LLC v. Ark Corp. Member Ltd.*, No. 1:16-cv-0904-SCJ, 2017 WL 9287017 at *2 (N.D. Ga. Dec. 12, 2017) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). Applying those legal standards here, Dr. Jones lacks sufficient qualification to testify as an expert

in this case and, whatever Dr. Jones's qualifications may be, she is not

qualified to opine upon "the history of voting and voter suppression

throughout the country [and] the State of Georgia." (Doc. 80, p. 3).

A.   Dr. Jones possesses only limited academic and professional
     experience.

Dr. Jones holds a Bachelor of Arts in "Modern Culture and Media

(Semiotics)" from Brown University and a Juris Doctor from the University of

California at Berkeley. (Doc. 92, p. 29). After obtaining her law degree in

1996, Dr. Jones worked as an Assistant Editor for the American Bar

Association's Sports and Entertainment Law Journal, a Staff Attorney with

the United States Court of Appeals for the Ninth Circuit, an independent

filmmaker and interviewer, and a Staff Attorney for the Communications

Workers of America. *Id.*, p. 30. Dr. Jones's work in those roles did not involve

elections generally, elections in Georgia, the history of elections, nor the

Voting Rights Act.[1] *See* (Jones Dep. Tr., attached hereto as **Exhibit 1**, 12:10–

12, 13:20–25 and 14:1–3, 14:17–25, 16:2–9, 16:20–25).

---

[1] Dr. Jones did state in her deposition that a topic covered in her independent
filmmaking was "Black people in politics." (Jones Dep. Tr. 14:9-10). However,
subsequent questioning revealed she produced three films during that period
concerning: "a black barbecue place in Oklahoma[,] . . . some students from
New York visiting Mississippi for the first time," and "the first black students
to attend [her] all girl's private high school in Cleveland[.]" (*Id.*, 14:14–25).

Entering academia in 2001, Dr. Jones became an Adjunct Professor in the Department of Political Science of City College of New York and in its Center for Workers Education. (Doc. 92, p. 29). She subsequently obtained two graduate degrees—M. Phil. and Ph. D.—in Political Science from City University of New York in 2013, and 2015, respectively. *Id.* Before obtaining (and while completing coursework for) those degrees, Dr. Jones held the academic positions of Faculty Fellow and Adjunct Lecturer at the University of Wisconsin-Platteville. *Id.*[2] None of these positions were tenure-track positions. (Jones Dep. Tr., 17:14–16). In 2017, Dr. Jones became an Assistant Professor in the Department of Political Science and Director of Pre-Law at Morehouse College, (Doc. 92, p. 29), the first tenure-track position she has held, though she has not yet applied for tenure. (Jones Dep. Tr., 22:21–23:5).

Throughout her career, Dr. Jones has authored dozens of opinion pieces published in the *Dubuque Telegraph-Herald*, covering a variety of topics.[3] Those opinion pieces relevant to Dr. Jones's testimony in this case include: "Something's Rotten in the State of Georgia," "Georgia Can 'Runoff,' But it Can't Hide Voter Suppression," "Election Outcome Invites More

---

[2] Dr. Jones's deposition testimony revealed she was a Visiting Professor at Radford University, not noted on her CV. (Jones Dep. Tr. 21:4–19).
[3] Only a handful of Dr. Jones's op-eds are listed on her CV. *See* (Jones Dep. Tr. 31:17–32:21).

Discrimination and Denial," "Voter Suppression, a Form of Contemporary Slavery," and "National Mood Hearkens Back to 1955." (*Id.*, Exs. 3–6, 8). Dr. Jones admits that authorship of these lay opinion pieces does not form a foundation to be qualified as an expert. (*Id.*, 58:10–25).[4]

Moreover, Dr. Jones has published only one academically reviewed article in her career, two if you include her dissertation (defended but not published in any academic journal). (*Id.*, 25:13-19, 72:8-12). Both the article, "When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006," and dissertation, "Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on the Federal Government and the Voting Rights Act," are also subject to the same reliability issues that plague Dr. Jones's report in this case.[5] *See, infra*, Section IV; *see also, e.g.*, (Jones Dep. Tr., 83:7-84:5 (reliance on secondary source), *id.*, 81:12–22 (no source cited for statement), *id.*, 77:20-23 (statement beyond temporal scope of research), *id.*, 88:7-14 (article derivative of

---

[4] Indeed, if it did, Dr. Jones would be qualified as an expert in any number of fields including Supreme Court confirmations, Census administration, and police use of force. *See* "Kavanaugh Confirmation Would Be a Step Backward," "Census: 1 Bad Question Would Spoil Whole Count," and "Lynchings in a 21st Century Context," *Dubuque Telegraph-Herald*; *see also* (Jones Dep. Tr. 58:15–59:1-3 (discussing the articles)).

[5] These pieces are attached in their entirety to Dr. Jones's Deposition Transcript as Exhibits 9 (Dissertation) and 10 ("When Yes Means No").

dissertation)). Making matters worse, Jones was unable to testify to the reputation of the journal that published her only peer-reviewed article: "I don't know a lot about the forum. My colleague was editing it. I assumed as a result it was reputable . . .[.]" (*Id.*, 87:12-15).

In light of the forgoing, Dr. Jones has only limited professional qualifications at this early point in her career. While Dr. Jones explains she has taught courses in political science for 17 years, (Doc. 92, ¶ 2), all of those courses were undergraduate-level—while holding non- tenure track positions (save her current position at Morehouse)—and she has taught for fewer than five years since obtaining her Ph. D. (*Id.* at p. 29). Moreover, her published work is limited to non-academic opinion pieces and **one** peer-reviewed article rife with factual errors, published in a journal whose reputation she cannot attest to. (Jones Dep. Tr., 87:8-15). Accordingly, Jones's limited experience does not render her "qualified" to offer opinions on matters beyond her personal knowledge. Fed. R. Evid. 702.

B.   <u>Dr. Jones's limited experience and knowledge are insufficient qualifications to support her historical opinions.</u>

Even assuming Dr. Jones were generally qualified to provide opinion testimony on matters beyond her personal knowledge, her limited experience is insufficient to permit her testimony regarding the "history of voter

suppression." (Doc. 80, p. 3). As a political scientist and not a historian, she has not been sufficiently trained to provide expert historical analysis and her fields of academic study are incongruent with the subject of her testimony.

As a general matter, the expert testimony of a historian may be admissible, but it is subject to the same qualification requirements imposed upon experts in other fields under Rule 702. *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702. F.3d 1279, 1295 (11th Cir. 2012). Further, the law requires that "the area of the witness's competence match the subject matter of the witness's testimony." *Bowers*, 537 F. Supp. 2d at 1376 (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) and *U.S. v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999)). To qualify as an expert historian, one must be "**trained to seek answers through objective analysis** into an arena where the answers come from comparing arguments made by opposing sides." *Saginaw v. Chippewa Indian Tribe of Michigan v. Granholm*, 690 F. Supp. 2d 622, 637 (E.D. Mich. 2010) (emphasis added). Here, Dr. Jones's scholarship and experience, at best, focus on the legislative process and political forces surrounding the enactment and reauthorization of the Voting Rights Act— not any historical analysis of voting rights or "voter suppression."

Accordingly, Jones does not possess the requisite qualifications for the two opinions she offers.[6]

Dr. Jones is a political science professor, not a historian. A review of Jones's credentials, published work, and courses taught affirm this fact. Dr. Jones holds no degree in history but instead holds an undergraduate degree in "Semiotics," a Juris Doctor, and graduate degrees in Political Science. She has never lectured or otherwise taught any course in history but instead is considered the "'public law' person" in her Political Science Department at Morehouse College, teaching courses in "Race and Law, National Government, Constitutional Law, and the Senior Seminar." (Doc. 92, ¶¶ 3, 4).

To the extent Dr. Jones's academic work includes anything even tangentially related to her testimony, it is limited to only one peer-reviewed article, "When Yes Means No." (Doc. 92, p. 29). Even that article is focused on the political forces and legislative process surrounding the enactment and reauthorization of the Voting Rights Act—not the "history of voter suppression" and certainly not "voter suppression in the State of Georgia."

---

[6] (1) "From the beginning of its existence to present, the State of Georgia has continually suppressed the right of people of color to vote;" and (2) "Georgia's suppression of people of color's right to vote is consistent with the long history of Georgia and Southern states." (Doc. 92, pp. 2 and 12).

(Doc. 80, p. 3). Of course, the political motivations and implications of the Voting Rights Act are simply not at issue in this case and, in any event, that single peer-reviewed article—derivative of her dissertation, (Jones Dep. Tr. 88:13-14)—has no focus on Georgia and contains only passing reference to the actions of the State or its elected officials. Jones has no skill, experience, training, or education in the "history of voter suppression," or even voting rights, as opposed to the legislative process regarding the Voting Rights Act.[7]

The Eleventh Circuit has upheld the exclusion of similar testimony where the purported expert's qualifications were unrelated to the field upon which the expert sought to opine. In *United States v. Paul*, the District Court excluded handwriting analysis expert testimony proffered by a criminal defendant, while admitting similar testimony proffered by the government. 175 F.3d at 909. On appeal, the Eleventh Circuit discussed the distinct difference in qualifications of the two: the government's witness, among other qualifications, "was a full time handwriting examiner for thirty years," had established handwriting analysis laboratories, and "lectured and taught

---

[7] *See* (Jones Dep. Tr. 30:16–23 (**Mr. Miller**: "Have you published any peer reviewed articles on voting rights as opposed to the legislative process in voting rights?" **Dr. Jones**: "No. I have another article that's about the presidency and voting rights. **Mr. Miller**: "What article is that?" **Dr. Jones**: "I don't know its title. It's under review . . ."); *see also id.*, 31:2–3 (**Dr. Jones**: "I'm not really an elections person. I'm a Voting Rights Act-- . . . --focused.")

extensively in the field of handwriting analysis." *Id.* at 911. On the other hand, the defendant's witness, Mr. Denbeaux, was a law professor who taught evidence, had reviewed literature in the field, and coauthored a single law review article on the topic of handwriting analysis. *Id.* at 912. Upholding the District Court's exclusion of Denbeaux's testimony (and admission of the government-witness's testimony), the Eleventh Circuit noted that Denbeaux's "background did not qualify him as an expert and his knowledge of the subject matter is so limited that it was not an abuse of discretion . . . to exclude his testimony under [Fed. R. Evid. 702]." *Id.*

The qualifications supporting Dr. Jones's admission as an expert are analogous to those of Mr. Denbeaux in *Paul* and require the same result. Dr. Jones does not teach history, nor the history of "voter suppression," but instead teaches political science courses—at best related to the "history of voter suppression" in the same way Mr. Denbeaux's courses related to handwriting analysis (except at the undergraduate level). Dr. Jones has reviewed largely non-academic secondary sources on the topic of her report, and she has published only one peer-reviewed article even tangentially related to the "history of voter suppression" (examining the legislative process of the VRA's reauthorization)—just as Denbeaux had published a single law review article related to handwriting analysis. Moreover, Dr. Jones

-13-

**has never been admitted as an expert in any state or federal court,** on this or any other topic. (Jones Dep. at 32:24–33:6; Doc 92, ¶ 6). Accordingly, this Court should rule as the District Court and Eleventh Circuit did in *Paul*, and exclude Dr. Jones's testimony because her "skill, experience, training and education as a [political scientist does not] make [her] any more qualified to testify as an expert on [the history of voter suppression] than a lay person who read the same articles." 173 F.3d at 912.

## IV.   Dr. Jones's testimony is not supported by reliable principles and methodology.

The second prong of expert examination under Fed. R. Evidence 702 requires the trial court to determine whether "the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*.'" *Chapman*, 766 F.3d at 1304 (quoting *Frazier*, 387 F.3d at 1260). This examination focuses solely on the "principles and methodology underlying the expert's opinion, not the expert's conclusions." *Coggon*, No. 1:17-CV-03189-SCJ, 2019 WL 2137465 at *2 (N.D. Ga. Feb. 6, 2019) (citations omitted). "Thus, the question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable." *Id.* Here, the basis of Dr. Jones's opinions is fatally flawed. Her report relies extensively on secondary sources (even where primary sources are available), misstates facts

upon which her opinions rest, and provides opinions beyond the temporal scope of her research (and beyond the topical scope of her purported expertise).

Specific to the opinion of a historian, as Dr. Jones seeks to opine, the proper methodology for "historical work involves surveying the full array of available sources, evaluating the reliability of sources, and thus 'providing a basis for a reliable narrative about the past.'" *Burton v. American Cyanamid*, No. 10-cv-0075, 2018 WL 3954858, at *5 (E.D. Wis. Aug. 16, 2018) (quoting *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2013)) (citations omitted). Dr. Jones's methodology fails to meet this standard. Instead, she provides voluminous citations to secondary sources even where the primary source was readily available—of the 188 footnotes in her report, fewer than half cite to primary sources and many of those are the same cases or statutes repeated multiple times. The remaining 55% of Jones's citations include items such as encyclopedia citations, online news articles, and the work of a handful of others.[8] This is hardly the full array of available sources, and Dr. Jones made no effort to evaluate their reliability.

---

[8] Moreover, Dr. Jones relies extensively on a single text by Laughlin McDonald (*A Voting Rights Odyssey: Black Enfranchisement in Georgia*) for nearly 18% of the **total** citations in her report. Dr. Jones describes McDonald's background as "the former director of the Southern Regional

The folly of resting conclusions upon a foundation of secondary sources, and failing to examine the readily available primary source, affects Dr. Jones's report throughout. For example, Dr. Jones discusses the Randolph County Board of Elections' decision to close polling places, using articles from the *New York Times* and *Atlanta Journal-Constitution* ("*AJC*") as sources. *See* (Doc. 92, p. 11, nn. 70-72). She goes on to state:

> [F]ormer Secretary of State Brian Kemp provided a manual to counties that includes information designed to assist counties at [*sic*] deciding to close and closing precincts. In that manual, the former Secretary reminded counties twice that they were no longer required to preclear laws with the DOJ in order to close polling locations in areas with 'low incomes, small populations and substantial minority populations.'

*Id.*, p. 11. In support of this statement, Jones cites to an *AJC* article written about Randolph County.[9] Contrary to Jones's report, the former Secretary

---

Office of the ACLU in Atlanta, GA, now special counsel and director emeritus of the Voting Rights Project." (Doc. 92, p. 2 n. 5). The ACLU, in turn, describes its Voting Rights Project in terms strikingly similar to those used by Plaintiffs describing their work: "fighting back" against politicians who "engage in voter suppression." ACLU, *Voting Rights: What's at Stake*, https://www.aclu.org/issues/voting-rights (last visited May 26, 2020); *see also* ACLU, *About the Voting Rights Project*, https://www.aclu.org/other/about-voting-rights-project (last visited May 26, 2020) ("The ACLU is currently litigating voter suppression and minority vote dilution cases in over a dozen states, from coast to coast, in every region of the country.").

[9] Mark Niesse, Maya T. Prabhu and Jacquelyn Elias, "Voting Precincts Closed Across Georgia Since Election Oversight Lifted," *The Atlanta Journal Constitution*, Aug. 31, 2018, https://www.ajc.com/news/state--regional-govt--

never reminded counties to close polling locations "in areas with 'low incomes, small populations and substantial minority populations.'" *Id.* Instead, that quoted text comes from John Powers, an attorney with the Lawyer's Committee on Civil Rights and frequent opposing counsel in election litigation.[10] A review of the primary source document **linked in the article** confirms that fact (as does the article itself), yet Dr. Jones chose not to examine that primary source document. (Jones Dep. Tr. 116:10–18).

Dr. Jones makes the same mistake elsewhere in her report. For instance, while discussing litigation concerning Georgia's majority vote and runoff scheme, Jones provides a single citation to Laughlin McDonald's book rather than citing the District Court or Eleventh Circuit decisions in that case. (Doc. 92, p. 9 n.59). A review of the Eleventh Circuit's Opinion in *Brooks v. Miller*, 158 F.3d 1230 (1998), reveals errors of fact in Dr. Jones's version of that litigation's history, yet Jones chose not to review that opinion. (Jones

---

politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/; *see also* (Jones Dep., Ex. 13).

[10] *See* Niesse, et al. "Voting Precincts Closed," *supra* n. 9 ("John Powers, an attorney for the Lawyers' Committee, said that while decisions to close precincts are made by independent election boards . . . [l]oss of voting access frequently happens in counties with *low incomes, small populations and substantial minority populations*, he said.") (emphasis added).

Dep. 92:11-23; *see also, generally*, 91:12-101:10 (discussing discrepancies between court findings and Jones's report)).

The fundamental imprecision of the methodology utilized by Jones in her report also leads her to draw conclusions beyond the scope of her purported testimony. For example, Jones discusses a recent controversy concerning the Georgia Department of Driver Services and Puerto Rican citizens seeking Georgia licenses, (Doc. 92, pp. 10-11), stating that "the Secretary is obligated by law to confer with the head of the Driver's License Bureau [*sic*] to establish appropriate protocols." *Id.* at 10. Dr. Jones provides no citation for that purported legal obligation but, throwing caution to the wind, she takes that nonexistent obligation a step further: imputing liability for acts of another agency upon the Secretary **with no basis for doing so other than her own opinion.** *See* Jones Dep. at 109:6-21.[11] Dr. Jones's assertion here is also a legal conclusion—a "statement that expresses a legal

---

[11] "**Mr. Miller**: . . . are you implying that the Secretary had some knowledge or was otherwise involved in an intentional discrimination against Puerto Rican citizens based on DDS's actions?
**Dr. Jones**: I'm going to say yes because these are people in the state registering to vote through the DMV [*sic*] . . . They're related to registration of people to vote in the state.
**Mr. Miller**: But you have no citation for that obligation; right?
**Dr. Jones**: I have the statement that the State has a long history of voter suppression and here is an example of voters – potential voters of color having difficulty registering to vote."

duty or result but omits the facts creating or supporting the duty or result," *Black's Law Dictionary*, legal conclusion (11th ed. 2019)—and pertains to an ultimate issue of law, rendering such testimony inadmissible. *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009) (noting "that an expert witness may not testify as to his opinion regarding ultimate legal conclusions") (citation omitted).

Notwithstanding the reliability (and admissibility) questions that legal conclusion raises, that it was offered at all is problematic in and of itself. Dr. Jones was noticed as an expert to testify about "the history of voting and voter suppression throughout the country with an emphasis on voter suppression in the State of Georgia." (Doc. 80, p. 3). And Jones's statements and research confirm that the scope of her report only extends through 2013. (Jones Dep. at 124:25–126:5). Yet, Jones offers opinions regarding the present state of "voter suppression" for her report in this case. *See, e.g.*, (Doc. 92, p. 2) ("Opinion: From the beginning of its existence **to present**") (emphasis added). Indeed, offering opinions which are unsupported by the temporal scope of her research is a problem Jones ran into before with her dissertation. *See* "Voting Rights Act Under Siege," p. 129 (portending post-2013 results based on research ending in 2013); *see also* (Jones Dep. at 77:13–23) (discussing the same).

In sum, Dr. Jones's commentary (offered as an expert report) is not the product of appropriate historical methodology and thus does not satisfy Fed. R. Evid. 702. Jones's methodology does not "fulfill[ ] the historian's role of surveying a daunting amount of historical sources, evaluating their reliability, and providing a basis for a reliable narrative[ ] about the past." *U.S. v. Katengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (citations and internal quotation marks omitted). Dr. Jones does none of this. Instead, Dr. Jones's report follows a formulaic pattern of citation to a historic occurrence followed by Jones's unsupported commentary—while relying heavily upon secondary sources (mostly the work of a single, non-neutral lawyer), disregarding primary sources (even when linked in an article she did review), and offering opinions beyond the scope of the minimal work conducted. So viewed, "there is simply too great an analytical gap between the data and the opinion proffered" by Dr. Jones to render it reliable. *General Elec. Co. v. Joiner*, 522 U.S. at 146 (1997).

**V.    Dr. Jones's testimony is not helpful to the trier of fact, irrelevant to the issues in the case, and its minimal probative value is outweighed by the dangers articulated in Rule 403.**

The "helpfulness" prong, which proffered expert testimony must also satisfy, requires that the testimony assist the trier of fact in resolving some disputed issue by offering insights "beyond the understanding and experience

of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (citations omitted). Moreover, even testimony that is helpful (and satisfies the qualification and reliability prongs) may still be subject to exclusion under Federal Rule of Evidence 403. Dr. Jones's testimony satisfies neither requirement since it is irrelevant to the issues at hand and its minimal (at best) probative value in this case is substantially outweighed by the dangers of unfair prejudice, confusion, waste of time, and needless presentation of cumulative evidence.

A.   <u>Dr. Jones's testimony does not relate to any disputed issue in this case and is therefore not "helpful" to the trier of fact.</u>

"'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Kilgore v. Reckitt Benckiser, Inc.*, 917 F. Supp. 2d 1288, 1292 (N.D. Ga. 2013) (quoting *Quiet Tech.*, 326 F.3d at 1347). Thus, even if the other two *Daubert* prongs are satisfied, "if the opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted." *Coggon, Inc.*, 2019 WL 2137465, at *3 (quoting *Daubert*, 509 U.S. at 591). As the Court has correctly observed, "this case is about what occurred leading up to and during the 2018 election." (Doc. 271 at 9); *see also* (Doc. 41 ¶ 2) (Amended Complaint based on allegations of wrongful acts "[i]n the 2018 General Election"). Dr. Jones's proffered

testimony however, focuses almost entirely on incidents occurring prior to the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).[12]

Put another way, Dr. Jones's testimony is limited (by her and Plaintiffs' own admission) to "the history of voting and voter suppression throughout the country with an emphasis on suppression in the state of Georgia," (Doc. 80, p. 3), and most of the events referenced in her report occurred over thirty years ago. *See generally* (Doc. 92), (Jones Dep. at 122:24–123:25). But this case is about the 2018 elections, and as such, Jones's testimony does not "have a valid scientific connection to the disputed facts in the case." *Coggon*, 2019 WL 2137465, at *3 (citation and internal quotation marks omitted). Undoubtedly, Plaintiffs will claim that Dr. Jones's testimony is needed to provide historical "context" to their arguments, but such testimony is unnecessary to resolve any disputed issue, and any argument thereon is best left to counsel. *Frazier*, 387 F.3d at 1262–63 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what

---

[12] **Dr. Jones**: . . . And this report really only focuses on — through *Shelby* — **Mr. Miller**: Okay.
**Dr. Jones**: — so, you know.
**Mr. Miller**: So your report is then limited to the period up to 2013?
**Dr. Jones**: My report is definitely historical and not focused so much on the immediate information for — situation in this case. And so I think other experts have that. (Jones Dep. at 125:9–18); *see also id.*, 125:23–126:11.

lawyers for the parties can argue in closing arguments."); *see also Sackman v. Balfour Beatty Communities, LLC*, No. CV 113-066, 2014 WL 4415938, at *26 (S.D. Ga. Sept. 8, 2014) ("If an expert can offer nothing more than his stamp of approval on the plaintiff's case, . . . [it] lacks the indicia of relevance required by Rule 702 and Daubert."). Thus, Dr. Jones's testimony must be excluded since it is unhelpful to the trier of fact.

B.   <u>The probative value of Dr. Jones's testimony is substantially outweighed by the dangers of unfair prejudice, confusion, waste of time, and needless presentation of cumulative evidence.</u>

Even relevant expert testimony—unlike Dr. Jones's—also stands to be excluded where, as here, it poses a threat of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Frazier*, 387 F.3d at 1263 (noting that, in applying Rule 403, the trial judge "exercises more control over experts than over lay witnesses . . . [and] must take care to weigh the value of [expert testimony] against its potential to lead or confuse") (citations and internal quotations omitted); *accord Rouco*, 765 F.2d at 995. Here, the minimal probative value of Dr. Jones's testimony is far outweighed by the dangers enumerated in Rule 403.

Dr. Jones is but one of eleven experts Plaintiffs have identified and (as the Court is well-aware) discovery in this case has been extensive,

culminating in the production of over **two million documents by Defendants—none of which Jones reviewed**. (Jones Dep. at 68:21–22). Further, Plaintiffs have identified more than 300 potential declarant witnesses whose testimony they may seek to use at trial. Thus, given the volume of materials to be presented at trial and summary judgment—and the (at most) minimal relevance of Dr. Jones's opinions—Dr. Jones's testimony should be excluded as a matter of judicial efficiency and conservation of resources if nothing else.

Moreover, Jones makes no attempt to hide her bias or animosity toward the State in her "report," filled with hyperbole and insults more fitting for a newspaper's editorial page than evidence in a court proceeding. This is not surprising: Dr. Jones was recruited to join this litigation while attending an event hosted by Plaintiff Ebenezer Baptist Church regarding their participation in it, (*id.*, 36:5–12); she has penned numerous, vitriolic op-eds in which she lodges unsupported political allegations at Defendants and other Republican politicians;[13] and Jones even worked with Fair Fight in

---

[13] *See, e.g.*, (Jones Dep., Exhibit 4 and Tr. 47:2–6 ("Kemp is a voter suppression advocate who has purged thousands of voters from the rolls since he took office in 2010 [and]. . . waged a multiprong suppression attack in the midterms[.]")); *id.*, Exhibit 8 and Tr. 65:21–67:13 (proclaiming that after President Trump's election "internment camps are in [*sic*] vogue[.]"); *see also, e.g.*, A. Jones, "Tennessee voter-suppression law must not stand," *Dubuque*

attempting to host hearings of the United States House Oversight Committee at Morehouse. (*Id.*, 40:13–17). Dr. Jones is an unabashed and outspoken ally of Plaintiffs' political efforts; presenting her inflammatory opinions as those of an "expert historian" is an improper attempt by Plaintiffs to confuse the issues, smear Defendants, and disguise the absence of evidence supporting their claims. *See Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993) (affirming exclusion of expert testimony where minimal probative value outweighed by danger of unfair prejudice).

## <u>CONCLUSION</u>

A review of Dr. Jones's experience, testimony under oath, and report in this case demonstrates she is not qualified to testify as an expert regarding "the history of voter suppression," and further shows her methodology is fatally flawed. Regardless, her testimony is unhelpful to the trier of fact and will needlessly complicate trial. Accordingly, this Court should exclude Dr. Jones's unvarnished political commentary, offered as expert testimony.

---

*Telegraph-Herald*, Oct. 13, 2019,
https://www.telegraphherald.com/news/opinion/article_27d7d3d3-dc81-5f30-9f3e-cf1305991efb.html ("In Georgia, a combination of [purported voting] barriers resulted in a Republican being elected governor; but without voter suppression tactics, the seat would have gone to Democrat Stacey Abrams.").

Respectfully submitted this 23rd day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:   (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. M.**

**ADRIENNE JONES AND BRIEF IN SUPPORT** was prepared double-

spaced in 13-point Century Schoolbook font, approved by the Court in Local

Rule 5.1(C).


*/s/Josh Belinfante*
Josh Belinfante