# EXHIBIT 1

# In The Matter Of:

*Fair Fight Action v.*
*Raffensperger*

---

*Adrienne Jones*
*December 19, 2019*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3

4

5  FAIR FIGHT ACTION, INC., et al.,

6     Plaintiffs,             Civil Action
                            File No.:
7  vs.                  1:18-cv-05391-SCJ

8  BRAD RAFFENSPERGER, In His
   Official Capacity as Secretary of
9  State of Georgia, et al.,

10     Defendants.

11

12

13         DEPOSITION OF ADRIENNE JONES

14        December 19, 2019, 9:30 a.m.

15          DuBose Miller LLC
           75 14th Street N.E.
16           Suite 2110
           Atlanta, Georgia
17

18

19      Michelle R. Lowe, RPR, CCR-2748

20

21

22

23        REGENCY-BRENTANO, INC.
       CERTIFIED COURT REPORTERS
24       13 Corporate Square
          Suite 140
25      Atlanta, Georgia 30329

```
 1   APPEARANCE OF COUNSEL:

 2   On behalf of the Plaintiffs:

 3           VON A. DUBOSE

 4           Attorney at Law

 5           DUBOSE MILLER LLC

 6           75 14th Street N.E.

 7           Suite 2110

 8           Atlanta, Georgia  30309

 9           404-720-8111

10           dubose@dubosemiller.com

11

12   On behalf of the Defendants:

13           CAREY MILLER

14           Attorney at Law

15           ROBBINS-ROSS-ALLOY-BELINFANTE-LITTLEFIELD

16           LLC

17           500 14th Street, NW

18           Atlanta, Georgia  30318

19           404-856-3286

20           cmiller@robbinsfirm.com

21

22

23

24

25
```

1  INDEX TO EXAMINATIONS                           PAGE

2  Examination by Mr. Miller:                        7

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              INDEX OF EXHIBITS
 2  For the Defendants:
 3  EXHIBIT   DESCRIPTION                    PAGE
 4    D-1     Notice of Deposition of Dr. Adrienne   6
 5            Jones
 6    D-2     Expert Report of Dr. Adrienne Jones    9
 7    D-3     Something's Rotten in the State of     44
 8            Georgia
 9    D-4     Georgia Can 'Runoff,' But Can't Hide   45
10            Voter Suppression
11    D-5     Election Outcome Invites More          59
12            Discrimination and Denial
13    D-6     Voter Suppression, a Form of           63
14            Contemporary Slavery
15    D-7     Lynchings in a 21st Century Context    64
16    D-8     National Mood Hearkens Back to 1995    65
17    D-9     The Voting Rights Act Under Siege:     71
18            The Development of the Influence of
19            Colorblind Conservation on the Federal
20            Government and the Voting Rights Act
21    D-10    When Yes Means No:  GOP Congressional  87
22            Strategy and the Reauthorization of
23            the VRA in 2006
24    D-11    Brooks v. Miller                       92
25
```

**Regency-Brentano, Inc.**

```
 1                    INDEX OF EXHIBITS

 2   For the Defendants:

 3   EXHIBIT   DESCRIPTION                        PAGE

 4     D-12    Voting Precincts Closed Across      113

 5             Georgia Since Election Oversight

 6             Lifted

 7     D-13    Are Precincts and Polling Places    116

 8             Synonymous?

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

1            MR. MILLER:  This will be the deposition

2    of Dr. Adrienne Jones taken by Defendant Secretary

3    of State Brad Raffensperger for the purpose of

4    discovery and all other purposes allowed under the

5    Rules of Civil Procedure.

6            I'll start by marking the deposition

7    notice as Exhibit 1.

8            (Jones Deposition Exhibit D-1 was marked

9    for identification and attached to the transcript.)

10            MR. MILLER:  Have you seen this document

11    before, Miss Jones?

12            THE WITNESS:  No.

13            MR. MILLER:  This is just giving notice

14    that the deposition is being taken today.  Of

15    course, by agreement of the parties we have changed

16    the location.  We're at the offices of Mr. Von

17    DuBose.

18            Mr. DuBose, would you just state your full

19    name for the record as being present today.

20            MR. DUBOSE:  Von DuBose on behalf of

21    plaintiffs.

22            MR. MILLER:  And, Mr. DuBose, I would

23    suggest that we stipulate that all objections except

24    for those going to privilege and the form of the

25    question and responsiveness of the answer be

```
 1  reserved until trial or first use of the deposition.
 2  Is that agreeable with you?
 3           MR. DUBOSE:  That's fine.
 4           MR. MILLER:  Miss Jones, have you ever
 5  given a deposition before?
 6           THE WITNESS:  Never.
 7                 ADRIENNE JONES,
 8  being first duly sworn or affirmed to testify to the
 9  truth, the whole truth, and nothing but the truth,
10  was examined and testified as follows:
11      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
12  BY MR. MILLER:
13      Q    So, Miss Jones, before we get started,
14  just a few ground rules about a deposition.  The
15  deposition, of course, is slightly different than
16  normal conversation.  It's important for clarity of
17  the record that when I'm speaking, you don't
18  interrupt me and let me finish a question before you
19  respond, even if it seems obvious where my question
20  is going.  I will, of course, extend the same
21  courtesy to you.
22           My purpose with any question is not to
23  confuse you; so if I ask one that you don't
24  understand, please let me know.
25           For the court reporter, please speak
```

```
 1   clearly and loudly enough; so audible yes or no as

 2   opposed to uh-huh or uh-uh.  And also rather than

 3   shake your head up and down to give an audible

 4   answer.

 5        A     Okay.

 6        Q     That always gets somebody to start shaking

 7   their head.

 8              If at any point you need to take a break,

 9   just let me know.

10        A     Okay.

11        Q     The only thing I will ask is that you

12   answer any pending question before we break.

13        A     Okay.

14        Q     Is that agreeable to you?

15        A     That's agreeable.

16        Q     All right.  So we'll go ahead and start by

17   marking Exhibit 2 as your expert report in this

18   case.

19              MR. MILLER:  Can we go off the record for

20   a second.

21              (Off-the-record discussion.)

22              (Recess taken from 9:42 a.m. to 9:52 a.m.)

23   BY MR. MILLER:

24        Q     So we'll mark as Exhibit 2 your expert

25   report, which has been filed under the docket in
```

1    this case at Docket Number 92.

2              (Jones Deposition Exhibit D-2 was marked

3    for identification and attached to the transcript.)

4    BY MR. MILLER:

5         Q    Do you recognize that to be your report?

6         A    Yes, I do.

7         Q    If you could flip with me toward the back

8    to your Appendix A --

9         A    Yes.

10        Q    -- where you have attached your CV.

11             Is this CV still accurate?

12        A    There are some additional things and there

13   are more op-ed publications than this.  This is a

14   smattering.

15        Q    Okay.  And what kind of additions?

16        A    Oh, simple things I've done since then.  I

17   added recently that I interviewed a presidential

18   candidate.  I think I added a position that I have

19   at Morehouse on the faculty counsel.  Simple things,

20   just keeping it updated.

21        Q    And what position is that at Morehouse?

22        A    I'm just on the faculty counsel.

23        Q    Okay.

24        A    You know, faculty are expected to serve on

25   various committees.

1      Q    Other than that, still accurate?

2      A    Yes.

3      Q    I'll just ask you a few questions about

4  your background as reflected in your CV.

5      A    Okay.

6      Q    So you hold a bachelor's degree from Brown

7  University; is that correct?

8      A    I do.

9      Q    That degree is in modern culture and media

10 semiotics?

11     A    Yes.

12     Q    Can you explain to me what that entails.

13     A    The subject matter was mostly film theory

14 and analysis.  So we would read VICO, for example,

15 and watch films and write analysis based upon that

16 theory of various forms of media.

17     Q    Okay.  And I think you were alluding to it

18 then, but when you say theory and analysis, you're

19 talking about theory and analysis of filmmaking --

20     A    And --

21     Q    -- or communication?

22     A    VICO isn't just about film, but it's -- I

23 mean, it's sort of a certain -- a particular

24 theoretical genre, as you will.  It's about the

25 view, how people are seen and perceived.

```
 1        Q     And then you attended UC Berkeley for law
 2   school; correct?
 3        A     I did.
 4        Q     Graduated from there in '96?
 5        A     Yes.
 6        Q     Did you participate in or write for any
 7   journals or law reviews there?
 8        A     No.
 9        Q     Okay.  So no published articles, like a
10   student note, while you were there?
11        A     No.
12        Q     Okay.  And after law school, did you take
13   any state's bar exam?
14        A     Yes.
15        Q     And where did you sit for the bar exam?
16        A     California and New York.
17        Q     Okay.  And were you admitted to --
18        A     New York.
19        Q     Okay.  And are you currently admitted to
20   New York?
21        A     Yes.
22        Q     And you're not admitted to California?
23        A     I am not.
24        Q     Were you previously admitted to
25   California?
```

```
 1        A      No, I was not.

 2        Q      Under sort of your employment history,

 3   subsequent to law school, before going back to

 4   school you were an assistant editor for the ABA

 5   Sports and Entertainment Law journal?

 6        A      I was.

 7        Q      I assume you didn't touch on any election

 8   or election administration -- excuse me -- strike

 9   that.

10               I assume you didn't touch on any election

11   or election administration topics in that role.

12        A      We did not.

13        Q      And then you were a staff attorney for the

14   U.S. Court of Appeals; correct?

15        A      Yes.

16        Q      Which circuit was that?

17        A      Ninth.

18        Q      Okay.  And where were you in the Ninth

19   Circuit?

20        A      In the San Francisco staff attorney's

21   office.

22        Q      What courthouse within the Ninth Circuit?

23        A      San Francisco.

24        Q      It's a big circuit out there.

25        A      San Francisco.
```

1        Q    That was concurrent at least for a little

2   bit with your role as assistant editor for the ABA

3   Journal; correct?

4        A    I think so.

5        Q    I'm just going by the year; so it could be

6   the case, you know, that it was a half a year or so

7   on.

8             And what were your duties as a staff

9   attorney?

10       A    As a staff attorney I reviewed appeals

11   that did not go to oral argument --

12       Q    Okay.

13       A    -- and disposed of those appeals.  And

14   then once a month I would present a panel of three

15   of the various Ninth Circuit judges to essentially

16   tell them what they had written and ask their

17   opinion.  They would give staff attorneys feedback.

18   I would file or make changes as requested and then

19   go to the next month's set of cases.

20       Q    Okay.  Did you work on any appeals dealing

21   with elections?

22       A    I don't think so.

23       Q    Okay.

24       A    I worked for -- I worked on criminal and

25   then civil or civil and then criminal caseworks, but

```
 1   I don't remember any election issues.
 2        Q    No Voting Rights Act appeals?
 3        A    No, I don't think so.
 4        Q    And for a period of time you were an
 5   independent filmmaker; correct?
 6        A    I was.
 7        Q    What kind of films?
 8        A    Documentary.
 9        Q    What topics did you cover?
10        A    Black people in politics.
11        Q    Black people in politics?
12        A    Which ultimately sort of segued into
13   political science.
14        Q    And how many films did you produce during
15   that period?
16        A    Maybe three.
17        Q    Okay.  Do you recall the names of those
18   films?
19        A    Not really.  I did one about a black
20   barbecue place in Oklahoma, black-owned barbecue.  I
21   did one about some students from New York visiting
22   Mississippi for the first time.  And I did one about
23   the first black students to attend my all girl's
24   private high school in Cleveland -- Shaker Heights,
25   Ohio.
```

```
 1      Q    And as a general rule, how were those
 2  films disseminated or distributed?
 3      A    They were either projects for myself -- so
 4  they're not disseminated.
 5      Q    Okay.
 6      A    The one for the group from New York was
 7  for them.  The one for my high school was for the
 8  high school.  And the one about the barbecue place
 9  has not been disseminated.
10      Q    Okay.  And then from 2007 to 2018 you were
11  an interviewer with The History Makers?
12      A    Yes.
13      Q    I had an opportunity to see the Web site
14  on your CV.  Very interesting.
15      A    I thought so.
16      Q    How did you come to be a part of that?
17      A    I'm not sure.  But I applied and was
18  accepted into the role.  And it involved myself and
19  a filmmaker going to visit black people who had been
20  successful in their fields to talk to them about
21  their careers and life.
22      Q    Okay.  So you were there for about a year
23  or two?
24      A    Yes.
25      Q    Something around there?
```

1      A     Yes.

2      Q     Do you know how many different films you

3  conducted interviews for or different clips you

4  conducted interviews for in that?

5      A     I don't.

6      Q     Ballpark it?

7      A     25.

8      Q     Okay.  Any related to elections?

9      A     No.

10     Q     And then from 2008 to 2011 you were a

11 staff attorney for the Communications Workers of

12 America; right?

13     A     Yes.

14     Q     And just a brief look, that's a union for

15 telecommunications workers?

16     A     Yes.  I think they also have some airline

17 employees.

18     Q     Okay.

19     A     I'm not positive.

20     Q     What did your job there entail?

21     A     I worked exclusively on an FMLA complaint

22 that involved me essentially compiling -- putting

23 the complaint together with the various employees

24 who were making FMLA claims in this broader FML

25 claim that CWA was bringing.

1     Q     So switching gears to your academic

2   career.  A lot of that overlaps a little bit with

3   some of the --

4     A     I did work at CWA at the same time that I

5   taught at City College.

6     Q     Okay.  And so you started at City College

7   as mock trial and moot court director?

8     A     I started as an adjunct professor.

9     Q     Okay.

10     A     I did run the mock trial and moot court

11   programs.

12     Q     Okay.

13     A     And I'm a prelaw advisor.

14     Q     Okay.  And as an adjunct professor that

15   was not a tenure-track position; correct?

16     A     It was not.

17     Q     For my clarity, City College -- is that

18   different from CUNY?

19     A     They are connected.  CUNY is the system;

20   so the CUNY graduate center is the graduate school.

21   Among the colleges in that system one is City

22   College of New York.  It's an undergraduate

23   institution.

24     Q     Okay.  I should clarify for the record,

25   that is my fault.  By CUNY, we're talking about

1  City --
2      A    City University of New York.  But there's
3  also SUNY, which makes it very confusing for people.
4  The State University of New York.  So no
5  embarrassment in needing an explanation.
6      Q    Okay.  And so what kind of courses did you
7  teach there?
8      A    I -- the same that I teach now.  I teach
9  American government -- or taught American
10  government, constitutional law.  I taught some
11  specialized courses, like issues in civil criminal
12  law -- civil and criminal, legal research and
13  writing.  I would say that's a fair list --
14      Q    Okay.
15      A    -- of the things I taught at City College.
16      Q    Okay.  And based on your indication
17  regarding the nature of City College, those were
18  undergraduate level courses?
19      A    Yes.
20      Q    And was this during the period you were
21  working on your master's?
22      A    I started working on my Ph.D. or master's
23  while I was teaching at City College.
24      Q    Okay.  Gotcha.
25           Did you write a thesis for your master's?

1        A     No.

2        Q     Okay.  And then you alluded to your Ph.D.

3   at City University of New York; right?

4        A     Yes.

5        Q     And you completed that in 2015?

6        A     Yes.

7        Q     And your thesis there was titled Voting

8   Rights Act Under Siege, the Development of the

9   Influence of Colorblind Conservatism of the Federal

10  Government and the Voting Rights Act; correct?

11       A     Yes.

12       Q     And then you were a faculty fellow at

13  Wisconsin, Platteville, Department of Social

14  Science; right?

15       A     Yes.

16       Q     And what is a faculty fellow?

17       A     It essentially meant that I was a faculty

18  member who had both class responsibilities as well

19  as dissertation writing responsibilities.  So I

20  essentially provided -- freed up another professor

21  to teach less and then had a job that allowed me

22  to -- that funded the writing of my dissertation.

23       Q     Okay.  And the faculty fellow position --

24  am I correct in assuming that is not a tenure-track

25  position?

1        A    It is not.

2        Q    Okay.  And then while you were at UWP

3   still, you, at one point, became the chief public

4   relations officer; right?

5        A    I did.  So the fellowship was for two

6   years or three.  I might have extended it.  And then

7   I became the speech writer for the chancellor.  Then

8   I worked in the development office, helping them

9   make a transition with their foundation, checking

10  their contracts, and making sure that they were in

11  compliance with these changes they were making to

12  how their foundation was going to sit.

13       Q    Okay.  That's what you refer to as interim

14  director of transition; right?

15       A    Yes.

16       Q    Am I correct in assuming that that interim

17  director of transition and the chief public

18  relations officer position were administrative and

19  not academic positions?

20       A    Yes.  I continued to teach, however.

21       Q    As an adjunct lecturer; right?

22       A    Yes.

23       Q    And that is not a tenure-track position;

24  correct?

25       A    It was not.

1          Q     At what courses did you lecture?

2          A     American government, constitutional law

3    perhaps.

4          Q     Then you made the wise decision to get out

5    of Wisconsin and move to Atlanta; correct?

6          A     I was in Virginia for one year at Radford

7    University for visiting faculty position.

8          Q     Okay.

9          A     And then I came to Atlanta.

10         Q     And I might have missed it, but the

11   Radford University position is not on your CV;

12   right?

13         A     I might have missed it to.  It is not

14   there.

15         Q     Could you repeat again your position at

16   Radford.

17         A     Visiting professor.

18         Q     Okay.  What period of time was that?

19         A     2015, 2016.

20         Q     Okay.  And skipping ahead a little bit,

21   but regarding your professional experience there,

22   I'm looking at the two positions at Wisconsin,

23   Platteville and also the two positions at Morehouse

24   College.  Are you still currently employed at

25   Wisconsin, Platteville?

```
 1        A     I do write speeches for the University of
 2   Wisconsin, Platteville, yes.
 3        Q     Okay.  Are you still an adjunct lecturer
 4   there?
 5        A     No.
 6        Q     But so that -- but you're not still the
 7   interim director of transition; right?
 8        A     I'm not.
 9        Q     But you are still the chief public
10   relations officer?
11        A     Yes.  I wouldn't call it chief, but I
12   still -- I work in that capacity.
13        Q     Some of the same duties?
14        A     Exactly.
15        Q     So you've just got a few things flipped
16   there; right?
17        A     Yes.
18        Q     Okay.  So at Morehouse you are director of
19   prelaw and an assistant professor there?
20        A     Yes.
21        Q     And is assistant professor a tenured
22   position?
23        A     It is a tenure-track position.
24        Q     But you do not have tenure yet?
25        A     Not yet.
```

1        Q     Have you applied for tenure at Morehouse?

2        A     Not yet.

3        Q     Have you ever applied for tenure at any of

4    your previous institutions?

5        A     No, I have not.

6        Q     And the courses you teach at Morehouse are

7    undergraduate level; right?

8        A     Yes.

9        Q     If you'll flip back with me to the first

10   page of your report?

11       A     Okay.

12       Q     In numeral Number III there, you state

13   that you were regarded as the public law person in

14   my department.  Public law in quotes; right?

15       A     Yes.

16       Q     What do you mean by that?

17       A     I mean that I teach law-related courses

18   and I serve as the prelaw advisor.

19       Q     But in terms of public, is that as opposed

20   to private law?

21       A     No.  That would just -- political science

22   departments are divided by specialty; so you have

23   theorists and Americanists, compared to the folks

24   who do international law.  And more recently there

25   is a list of job offerings under public law where

 1  your role involves the law, but, of course, you're

 2  not at a law school.  It's law for undergraduates --

 3        Q    So it's --

 4        A    -- and legal resources in terms of them

 5  trying to matriculate to law school.

 6        Q    Would public policy in law be an accurate

 7  way to put that?

 8        A    Sure.

 9        Q    Okay.  And then, of course, the classes

10  that you were referring to there in the ones that

11  you list in Roman Numeral III, the constitutional

12  law, race and law, civil and criminal law courses,

13  those are undergraduate level courses?

14        A    Yes.

15        Q    Do you teach any graduate and law school

16  courses?

17        A    I do not.

18        Q    And then of those, are there certain ones

19  in particular you have stopped teaching?  What are

20  you currently teaching at Morehouse?

21        A    Right now I'm teaching national government

22  and race and law.

23        Q    Okay.  So in Numeral V there on the same

24  page of your report you state that you have

25  published lay and academically reviewed articles

1   about the Voting Rights Act about black American

2   history in politics; right?

3        A     Yes.

4        Q     And are those items referenced in your CV

5   under publications or presentations?

6        A     Yes.

7        Q     And by academically reviewed, do you mean

8   by the process of peer review for an academic

9   journal or something different?

10       A     Peer review.

11       Q     So refereed and prior to acceptance?

12       A     Yes.

13       Q     And if you've got your CV there, I see

14  you've flipped to the same page.  Am I correct in

15  assuming that When Yes Means No, GOP Congressional

16  Strategy and the Reauthorization of the VRA in 2006

17  is the only academically reviewed article you're

18  referring to there?

19       A     Yes.

20       Q     And while I'm on the page, the It's a War

21  Movie -- what is that?

22       A     It's what I would call a lay article for a

23  magazine in New York that focuses on -- they're

24  basically focused on animal safety and

25  vegetarianism, but it's political.

```
 1       Q    And so was that article related to
 2  individual vegetarianism?
 3       A    It was about the Voting Rights Act.
 4       Q    Can you tell me about that article.
 5       A    I want to say that it was about the
 6  development of the Voting Rights Act, particularly
 7  the post Shelby versus Holder; so a little bit of
 8  history.  I want to say they talked about the 2006
 9  reauthorization hearings and then the Shelby
10  decision, and it analogized two war movies.  And it
11  was also to some degree a personal -- involved some
12  discussion of my personal history and relationship
13  to the right to vote.
14       Q    And Satya?  Am I saying that correctly?
15       A    Satya.
16       Q    Satya?
17       A    Satya.
18       Q    Satya?
19       A    Yes.
20       Q    S-A-T-Y-A?
21       A    Yes.
22       Q    Is that magazine still in publication?
23       A    I don't think so.  They had been in
24  publication for a number of years.  And this was
25  like a special -- I don't remember if it was like an
```

1  anniversary issue, but this was a special edition

2  that they did after they had closed the magazine,

3  which was open for a number of years.

4       Q    Okay.  And when you say you analogized the

5  Voting Rights Act with war movies, am I summarizing

6  that correctly?

7       A    I would have to look at it to tell you

8  exactly what I'm talking about there.  I haven't

9  read the article for quite a while.

10      Q    You can't recall what you compared it to?

11      A    No.  I'm saying -- yeah, to some degree it

12  talked about war movies.

13      Q    Okay.  And what were some of the

14 comparisons you drew there?

15      A    Again, I'm going -- I would have to pull

16 the article and take a look at it.

17      Q    And with regard to your personal

18 experience, what did you talk about there?

19           MR. DUBOSE:  Were you able to pull the

20 article?  Do you have a copy?

21           MR. MILLER:  No.  I couldn't find it

22 anywhere.

23           MR. DUBOSE:  Okay.  She's testified that

24 she needs to look at it to kind of --

25 BY MR. MILLER:

```
 1        Q     To the best of your recollection?
 2        A     To the best of my recollection, I think I
 3   said something about the development during the
 4   civil rights movement of legislation like the VRA
 5   and the Civil Rights Act of 1964 and expecting
 6   integration to have been more advanced than it was
 7   when I attended my various educational institutions.
 8        Q     If you'll turn with me back to your CV.  I
 9   see you've got it there.  Under fellowships and
10   awards you have three fellowships listed there.  I
11   believe we already talked about the faculty
12   fellowship which is also listed in your professional
13   experience; right?
14        A     Yes.
15        Q     Okay.  What does the Dean K. Harrison
16   fellowship entail?
17        A     These are both fellowships that were
18   available at CUNY.  And it's been a while, but they
19   were an office that was upstairs in CUNY that had
20   fellowships available.  They gave it to me several
21   times.
22        Q     Okay.  And in terms of fellowship that's
23   a --
24        A     Again, that's money to help you.
25        Q     Get through your dissertation?
```

```
 1       A     Continue your study.
 2       Q     Okay.  Have you received any grant-funded
 3   research?
 4       A     No.
 5       Q     I'm sorry.  I should rephrase that.
 6             Have you received any grants to fund your
 7   research?
 8       A     No.
 9       Q     And regarding just kind of your teaching
10   generally, how many classes have you taught that
11   focus exclusively on election administration?
12       A     None.
13       Q     And regarding voting rights and the Voting
14   Rights Act, you've taught a few?
15       A     No.  I've just taught about it in the
16   midst of my syllabus usually.  I study that; so I
17   tend to bring it up.
18       Q     Okay.
19       A     But my courses are not about that
20   exclusively.
21       Q     How many classes have you taught that
22   focus on Georgia elections?
23       A     None.
24       Q     Taught any classes on issues arising in
25   Georgia elections?
```

```
 1       A     I've taught classes where we discuss
 2  ongoing elections.
 3       Q     By ongoing, you mean contemporary issues?
 4       A     Right.  It's the middle of the midterms.
 5  I am going to mention we're in the midst of the
 6  midterms.
 7       Q     What would be an example of something that
 8  you discussed in that context?
 9       A     The Voting Rights Act, what it is and how
10  it works, how it has worked since Shelby.  And, you
11  know, discussion of the ongoing topics like the
12  midterm election developments and voting, seeing if
13  students are voting, the impeachment hearings, just
14  stuff that's in the news to connect what we're
15  talking about theoretically to contemporary issues.
16       Q     Have you published any peer review
17  articles on voting rights as opposed to the
18  legislative process in voting rights?
19       A     No.  I have another article that's about
20  the presidency and voting rights.
21       Q     What article is that?
22       A     I don't know its title.  It's under
23  review --
24       Q     Okay.
25       A     -- so it's not published here.
```

1        Q    Okay.

2        A    Again, it's about -- I'm not really an

3    elections person.  I'm a Voting Rights Act --

4        Q    Okay.

5        A    -- focused.

6        Q    And so you're not offering an opinion

7    today about election administration?

8        A    No.

9        Q    Okay.  That other article, is it --

10   forgive me.  I have a lack of familiarity with the

11   peer review process, but can you disclose where it's

12   pending at?

13       A    I just got it back.  I have to make

14   revisions.

15       Q    Okay.  What journal is that with?

16       A    Political Science Quarterly.

17       Q    Okay.  And regarding your publications,

18   those op-eds there, those are articles in public

19   newspapers; right?

20       A    These are articles in the Dubuque

21   Telegraph Herald.

22       Q    Have you published op-eds in any other

23   newspapers?

24       A    No.

25       Q    And so, of course, these op-eds are lay

1  articles; right?

2      A    Yes.

3      Q    And opinion-based articles; right?

4      A    Yes.

5      Q    And thus they're not peer-reviewed, of

6  course?

7      A    No.

8      Q    I think you alluded to this earlier.  I

9  noticed several which are not included in your CV.

10 Is there any reason for that?

11     A    They're just voluminous.

12     Q    And do you adjust articles you put in your

13 CV for a particular audience?

14     A    I did not.  I think I just chose something

15 I liked.

16     Q    Okay.

17     A    There are many.

18     Q    So I notice some of your more recent ones

19 are not in here; right?

20     A    Yes.  It's every month.  No, I haven't

21 listed them all.

22     Q    Okay.  And so on Page 1, you state you've

23 never been qualified -- excuse me.  Strike that.

24          You state you've never testified as an

25 expert witness before; correct?

1          A     I have not.

2          Q     Never been qualified as an expert in a

3     litigation matter?

4          A     No.

5          Q     In state or federal court?

6          A     Never.

7          Q     Have you ever given any testimony

8     otherwise in state or federal court?

9          A     No.

10         Q     Just to discuss briefly about this

11    litigation --

12         A     That's not true.  I testified in my

13    cousin's divorce or custody proceeding.

14         Q     Okay.  So switching gears to talk a little

15    bit about this case.

16         A     Okay.

17         Q     Have you read the complaint in this case?

18         A     Yes.

19         Q     And how about the amended complaint?

20         A     I've read the amended complaint.

21         Q     Okay.  Any other pleadings?

22         A     I might have read the complaint, but I

23    think that I've read -- I think when I first read

24    it, it had been amended.

25         Q     Okay.  But haven't reviewed any other

```
 1    pleadings other than the complaint or amended
 2    complaint?
 3         A    That's it.
 4         Q    Okay.  Do you have an understanding about
 5    what this case is about?
 6         A    I think so.
 7         Q    And can you tell me that, in your own
 8    words.
 9         A    It's about issues that arose during the
10    midterm 2018 elections, actions that were taken by
11    the Secretary of State that the plaintiff alleges
12    hindered minority voters from exercising their full
13    vote share.
14         Q    And do you know what kind of relief is
15    being sought in this case?
16         A    I don't have it all memorized, but the one
17    that stands out to me is bringing Georgia under
18    cover of Section 5.
19         Q    And that colloquially would be referred to
20    as bail-in?
21         A    Bail-in.  And there was some -- you know,
22    some injunctive relief being requested.  I
23    definitely don't have it all memorized.
24         Q    But you understand that nothing in this
25    case will change the result of the 2018 election;
```

```
 1   correct?
 2        A    Yes.
 3             MR. DUBOSE:  Objection.
 4             I will object from time to time.  It does
 5   not mean that anybody is saying don't answer.  Don't
 6   be alarmed.
 7             THE WITNESS:  Okay.
 8             MR. DUBOSE:  If I object, it's just lawyer
 9   stuff between me and Carey; so just proceed.
10   BY MR. MILLER:
11        Q    As a general matter, if he issues
12   objections, you'll still have to answer the
13   question.
14        A    Okay.
15        Q    He will instruct you if you're not
16   supposed to.
17        A    Okay.
18        Q    And speaking of which, without disclosing
19   particular communications with counsel, who
20   contacted you about providing services in this
21   litigation?
22        A    Of course her name just stepped out of my
23   brain.  Someone from Lawrence & Bundy.
24        Q    Would it be Leslie Brand or Allegra
25   Lawrence Hardy?
```

1      A     Yes.  I know the woman's name well; right

2  now it's escaping me.  One of the attorneys there

3  approached me if and asked me if I would speak with

4  them.

5      Q     How did you come in contact with this

6  person?  Did you have a preexisting relationship?

7      A     No.  I was at an event when several black

8  churches joined the complaint or were having forum

9  about the complaint.  And I was talking with someone

10  about what I do, and then I think this lawyer heard

11  me.  And so she asked me if we could have a further

12  discussion later.

13     Q     Okay.  And when were you contacted about

14  providing services?

15     A     That same week after we met we spoke on

16  the phone, and then they asked me about expert

17  witnessing.

18     Q     And did they provide you with any facts or

19  assumptions that you used in your report?

20     A     No.  They asked me to write something

21  about the history of the U.S. and Georgia.

22     Q     Okay.  No facts or assumptions regarding

23  Georgia specifically?

24     A     No.

25     Q     And no facts or assumptions regarding the

1  litigation?

2      A    No.

3      Q    And how did you communicate?

4      A    On the phone, by e-mail, and in person.

5      Q    Okay.  Did you exchange drafts of the

6  report with counsel before it was final?

7      A    Yes.

8      Q    Did you have any involvement with the

9  plaintiffs before the case?

10     A    No.

11     Q    Who do you understand the plaintiffs to

12 be?

13     A    Fair Fight Action.

14     Q    Okay.  Are you aware of any other

15 plaintiffs?

16     A    I have a friend who works at Fair Fight

17 Action.

18     Q    Okay.

19     A    But that's sort of -- that's it.

20     Q    Who is that?

21     A    Hilary Hall -- Holly.

22     Q    Hilary Holly?

23     A    Yes.

24     Q    I'm going to list off the names of some

25 plaintiffs and ask you if you've had involvement

```
 1   with them prior to the start of this litigation.
 2        A     Okay.
 3        Q     Ebenezer Baptist Church?
 4        A     No.  Although that's the church I think I
 5   was visiting when I met the plaintiff's attorney.
 6        Q     Baconton Missionary Baptist Church?
 7        A     No.
 8        Q     Virginia Highland Church?
 9        A     No.
10        Q     The Sixth Episcopal District AME?
11        A     No.
12        Q     And Care in Action?
13        A     No.
14        Q     And so prior to your attendance at this
15   event at the church, you had had no other
16   interaction with any of these groups; right?
17        A     No.
18        Q     And when was this event that you're
19   referring to?
20        A     I don't know.  In the spring.
21        Q     Okay.  Spring of this year?
22        A     Yes, I think so.
23        Q     Okay.  And you stated earlier that was an
24   event regarding the churches joining the case;
25   right?
```

```
 1        A    I think that's what was happening.

 2        Q    Okay.

 3        A    They were speaking with voters about their

 4   experiences on this little panel, but I think the

 5   point was that the church was joining.  But I don't

 6   know the procedural --

 7        Q    Okay.  I see.

 8        A    -- developments.

 9        Q    That was a public event?

10        A    It was.  So they might have already been a

11   plaintiff.

12        Q    How did you come to find out about it?

13        A    Through my friend that works at Fair Fight

14   Action.

15        Q    Okay.  That would be Hilary?

16        A    Yes.

17        Q    Okay.

18        A    I think I attempted to have that event or

19   another one at Morehouse.  That was a fail.  We

20   didn't have the event there.  And so I -- there were

21   a couple of events that weekend, and I went to this

22   Ebenezer one.

23        Q    When you say attempted to have it at

24   Morehouse, what are you referring to?

25        A    I think the federal congress was coming to
```

```
 1  do hearings, which they did the day before this
 2  Ebenezer thing.  So I attempted to try to work on
 3  getting that to sit at Morehouse.  It didn't work.
 4  They went to the Carter Center.
 5        Q     The congressional hearings or the --
 6        A     The congressional hearings.
 7        Q     You're referring to the House Oversight
 8  Committee?
 9        A     Yes.  I think it's Marcia Fudge.
10        Q     And Marcia Fudge you're referring to
11  there -- is that a congresswoman or staffer?
12        A     She's a representative.
13        Q     Okay.  And when you say you attempted to
14  have it at Morehouse, did you, you know, call up
15  your local congressperson and try and get it there?
16        A     No.  I talked to Fair Fight Action about
17  scheduling this event at Morehouse.
18        Q     Okay.
19        A     So they were also working on it.
20        Q     Had you done other events with Fair Fight?
21        A     I had not.
22        Q     But you went through Hilary to try and
23  schedule this event?
24        A     She -- you know, she passed me to someone
25  else.
```

```
 1        Q     Okay.
 2        A     But ultimately it was -- Yes, oh, they're
 3   looking for a venue; so I sort of was intensively
 4   bidding.
 5        Q     Okay.
 6        A     I mean, there was no money involved, but
 7   just trying to see if I could bring it for my
 8   students.
 9        Q     So Fair Fight was helping the Oversight
10   Committee find a venue?
11        A     Exactly.
12        Q     And is it your understanding that Fair
13   Fight helped to organize this event and cause it to
14   happen?
15        A     I was not necessarily under that
16   impression.
17        Q     Okay.
18        A     I really don't know the details there.
19             MR. DUBOSE:  Let's take a quick break when
20   you get to a good place.
21             MR. MILLER:  Yes.  I think this will
22   actually be fine.
23             We can go off the record.
24             (Recess taken from 10:31 a.m. to 10:38
25   a.m.)
```

```
 1   BY MR. MILLER:
 2        Q    Okay.  Dr. Jones, have you ever met Stacy
 3   Abrams before?
 4        A    Not really.  I've been in the same space
 5   as she has, but never talked to her.
 6        Q    Never talked to her?
 7        A    Maybe like hi.
 8        Q    Yeah.  Okay.
 9             What kind of spaces were these?  Large
10   public events or small group gatherings?
11        A    Large public events.
12        Q    No smaller settings?
13        A    I saw her at a small DNC event, but I
14   don't know her.  Never spoken with her.
15        Q    And what DNC event was that?
16        A    It was about black voters and disabled
17   voters.
18        Q    And what was the nature of your
19   participation there?
20        A    Audience member.
21        Q    Okay.  But you -- I say that because you
22   mentioned it was a smaller event.  Was it a smaller
23   invited list?  A panel?  A discussion?
24        A    It was a panel.
25        Q    Okay.  Were you a panelist there?
```

```
 1       A     No.  I was just in the audience.

 2       Q     I see.

 3             But the audience -- and forgive me if

 4  you've stated this before.  But the audience wasn't

 5  limited to certain invited guests?

 6       A     I don't know.

 7       Q     Okay.  I did not cover this before; so

 8  forgive me.

 9             Do you know who the defendants are in this

10  case?

11       A     Yes.

12       Q     And who are they?

13       A     The Secretary of State's office.

14       Q     And have you met Secretary of State Brad

15  Raffensperger?

16       A     Never.

17       Q     Have you met former Secretary of State,

18  now Governor, Brian Kemp?

19       A     No.

20       Q     But you did follow Georgia's 2018

21  elections; right?

22       A     Yes.

23       Q     Okay.  And you wrote a few op-eds in the

24  Dubuque Telegraph Herald related to those; correct?

25       A     At least, maybe two.
```

1      Q    I'm going to hand you one now.  We'll mark

2 it as Exhibit 3.

3           (Jones Deposition Exhibit D-3 was marked

4 for identification and attached to the transcript.)

5 BY MR. MILLER:

6      Q    I apologize for the bizarre type.

7 Printing out some of these online articles can be a

8 little difficult.

9           So this op-ed is called Something's Rotten

10 in the State of Georgia; correct?

11     A    Yes.  I do not write the titles.

12     Q    Okay.  You don't write the titles?

13     A    No.

14     Q    Who does?

15     A    The editor of the Dubuque Telegraph Herald

16 or some other person.

17     Q    Does he or she consult you about the

18 titles at all?

19     A    Not at all.

20     Q    This op-ed is not listed in your CV;

21 correct?

22     A    I doubt it.  I'd say no.

23     Q    So if you'll turn to the -- I'm sorry the

24 pages are not numbered -- one, two, three -- fourth

25 page.  It's toward the end of your article there.

1    Yeah, same page.

2              You state this investigation, referring to

3    an alleged hack of the state election system; right?

4         A    Yes.

5         Q    This investigation is simply the latest in

6    a litany of tactics designed to steal the election

7    or to destroy the mandate of Abrams should she

8    become Georgia's first black female governor.

9              Is that accurate?

10        A    Yes.

11        Q    Do you believe the 2018 election was

12   stolen?

13        A    Yes.

14        Q    And what's your basis for that?

15        A    I thought it was a conflict of interest

16   for the Secretary of State to operate his own

17   election.

18        Q    And that's not a legal opinion; right?

19        A    No.

20        Q    Okay.  I'm going to hand you one more,

21   which we'll mark as Exhibit 4.

22             (Jones Deposition Exhibit D-4 was marked

23   for identification and attached to the transcript.)

24   BY MR. MILLER:

25        Q    Just as a housekeeping note, I'll just ask

1    you to keep all the exhibits together there.

2         A    No problem.

3         Q    I know how bad I am about losing track of

4    paper.

5              So this op-ed is titled Georgia Can

6    'Runoff,' But it Can't Hide Voter Suppression;

7    right?

8         A    Yes.

9         Q    Also in the Dubuque Telegraph Herald?

10        A    Yes.

11        Q    This one is also not listed in your CV;

12   correct?

13        A    It is not.

14        Q    And I'll turn your attention to the first

15   and second pages there.  Starting at the last

16   sentence of that third paragraph, you state:  While

17   running against Abrams, Kemp kept his job as

18   Secretary of State and state elections commissioner

19   and used his office to influence the outcome of the

20   election.

21             You say that; right?

22        A    I do.

23        Q    Is that what you're referring to about it

24   being, quote, stolen?

25        A    That's what I'm referring to when I say I

 1    thought this was a conflict of interest.

 2        Q    And you go on to state:  Kemp is a voter

 3    suppression advocate who has purged thousands of

 4    voters from the rolls since he took office in 2010.

 5    Purges are allowed by state law.  He waged a

 6    multiprong suppression attack in the midterms.

 7            Do you see that?

 8        A    Yes.

 9        Q    Are you familiar with the National Voter

10    Registration Act?

11        A    Yes.

12        Q    You're aware that it's a federal law that

13    also requires states to conduct voter list

14    maintenance on their voter rolls?

15        A    I am.

16        Q    Is it fair to say you were disappointed

17    when Miss Abrams lost her race for Governor?

18            MR. DUBOSE:  Objection.

19    BY MR. MILLER:

20        Q    You can answer.

21        A    Yes.

22        Q    And you believe that election was stolen;

23    right?

24            MR. DUBOSE:  Objection.

25        A    I believe that the election operation was

1  inappropriate, yes.  This is an opinion editorial

2  which I am expressing my opinion loudly and

3  flamboyantly, as it were.  And, yes, I think

4  inappropriate things happened during the election

5  caused by the Secretary of State.

6  BY MR. MILLER:

7      Q    Do you believe that the state of Georgia

8  engaged in intentional voter disenfranchisement in

9  the 2018 gubernatorial election?

10     A    Yes.

11     Q    And would that be what you're referring to

12 with your multiprong suppression attack reference in

13 that Georgia Can Runoff article?

14     A    Yes.

15     Q    In some of the examples you provided -- in

16 that next paragraph there, you state:  Kemp's office

17 rejected absentee ballots, refused to ensure that

18 there were enough voting machines, power cords and

19 provisional ballots, and he enacted an exact match

20 law which rejected ballots if the voters' names on

21 their identification did not exactly match on the

22 voter rolls.

23         Do you see that?

24     A    Yes.

25     Q    Do you know who the responsibility for

1   each of these functions falls to under Georgia law?

2       A    Secretary of State.

3       Q    But you're not giving a legal opinion on

4   that legal responsibility in this case; correct?

5       A    I'm not.

6       Q    So you're not aware that absentee ballots

7   are accepted and rejected by local county officials?

8            MR. DUBOSE:  Objection.

9       A    I'm aware.

10  BY MR. MILLER:

11      Q    And you're not aware that local election

12  officials are responsible for ensuring supplies at

13  precincts?

14           MR. DUBOSE:  Objection.

15      A    I am aware.

16  BY MR. MILLER:

17      Q    So if you are -- is it your -- and correct

18  me if I'm misstating things, but is it your position

19  that Secretary Kemp exercised control and directed

20  local officials to do these things?

21           MR. DUBOSE:  Objection.  Form.

22      A    It's my contention that the Secretary of

23  State has some responsibilities in making sure that

24  locals are prepared.  So if there's going to be a

25  heavy election, the Secretary of State would make

```
 1   sure that -- direct jurisdictions to make sure they

 2   had enough equipment and be prepared for the voters

 3   that are coming.  He doesn't personally do the

 4   activity, but he's responsible for it ultimately.

 5   BY MR. MILLER:

 6        Q    And so the power cord reference you're

 7   talking about there, that was a local precinct in

 8   Gwinnett County; right?

 9        A    Likely.

10        Q    Do you think that was done on purpose?

11             MR. DUBOSE:  Objection.

12        A    I don't have an opinion.  I wouldn't say

13   on purpose.  I would say the precinct had a power

14   cord that did not work.  That's a problem.

15   BY MR. MILLER:

16        Q    And that's your understanding there of

17   what occurred?

18        A    Yes.

19        Q    And so you're not referring to the

20   situation where the local poll manager forgot

21   extension cords?

22             MR. DUBOSE:  Objection.  Form.

23        A    I don't think so.

24   BY MR. MILLER:

25        Q    And you state there:  He enacted an exact
```

```
 1   match law which rejected ballots if the voter's name
 2   on their identification did not exactly match that
 3   on the voter rolls.
 4           Do you see that?
 5      A    Yes.
 6      Q    Is it your understanding that exact match
 7   refers to ballot or voter rejection at the polling
 8   place?
 9      A    I don't quite understand your question.
10      Q    Okay.  I'll rephrase.
11           So you state:  The exact match law which
12   rejected ballots if voters' names on their
13   identification did not exactly match that on the
14   voter rolls.
15           Right?
16      A    Yes.
17      Q    So you're referring to rejection of a
18   ballot due to --
19      A    Yes.
20      Q    -- what you refer to as exact match?
21      A    Yes.
22      Q    And so are you familiar with the Help
23   America Vote Act?
24      A    Yes.
25      Q    What's your understanding of that law?
```

1              MR. DUBOSE:  Objection.

2              You just want her to give a general --

3        A     The main thing I think of --

4              MR. DUBOSE:  Hold on.  Just give me second

5     to --

6              THE WITNESS:  Sorry.

7              MR. DUBOSE:  -- just kind of --

8              MR. MILLER:  I'll rephrase.

9     BY MR. MILLER:

10        Q     In your own words, what is your

11    understanding of what the Help America Vote Act

12    deals with generally?  I'm not asking you to recite

13    specific provisions.

14        A     Making sure that voters have the

15    opportunity to register to vote.

16        Q     And the -- do you understand that the Help

17    America Vote Act requires either a driver's license

18    or the last four digits of the Social Security

19    number generally for voter registration?

20        A     Yes.

21        Q     And that it requires state entities to

22    enter into agreements to match that information?

23        A     Yes.

24        Q     And do you understand that this -- what I

25    will refer to as HAVA match process, what you

1  referred to as exact match, refers to the context of

2  voter registration and not appearance at the poll?

3      A    Ask that again.  Do I understand what?

4      Q    Based on what we just discussed of HAVA

5  requiring matching of information, Social Security

6  number, driver's license numbers for registration --

7      A    Yes.

8      Q    -- do you understand that what I referred

9  to as HAVA match, what you refer to here as exact

10 match, is in the context of voter registration and

11 not when a voter appears at the poll?

12     A    I do understand that.

13     Q    And you understand that under Georgia law

14 if a voter has registered, but not provided a Social

15 Security number or driver's license number, that

16 they are permitted to vote if their identification

17 name substantially matches what is on the

18 registration?

19          MR. DUBOSE:  Objection.

20     A    I think I would take -- I can't remember

21 exactly what you just said.  But I think -- my

22 understanding is that your identification needs to

23 match exactly when you go to the polling place to

24 vote.

25 BY MR. MILLER:

1      Q    But your understanding of that is in the

2   context of what is commonly referred to as exact

3   match, which we discussed in relation to

4   registration?

5      A    Yes.  But exact match relates to casting a

6   ballot when you show up at the polls.

7      Q    Is it your understanding that the exact

8   match law is the same as a voter ID law?

9      A    Exact match is a -- I feel like it's

10  additive to a voter ID law.

11     Q    So the --

12     A    It's an aspect of the voter ID law.

13     Q    So the exact match occurs at registration,

14  where the voter ID law occurs when you arrive at the

15  polling place?

16     A    No.  I'm understanding exact match to

17  matter when you arrive also at the polling place --

18     Q    Okay.

19     A    -- with your ID.

20     Q    But you're not giving a legal opinion on

21  that matter in this case; right?

22     A    No.

23     Q    Okay.  Is it safe to say that you would

24  consider yourself affiliated with the Democratic

25  Party?

```
 1        A    Yes.
 2        Q    Have you ever contributed to the Abrams
 3   campaign?
 4             MR. DUBOSE:  Objection.
 5        A    No.
 6   BY MR. MILLER:
 7        Q    Have you ever contributed to Fair Fight or
 8   Fair Fight Action?
 9             MR. DUBOSE:  Objection.
10        A    No.
11   BY MR. MILLER:
12        Q    How about Fair Count?
13             MR. DUBOSE:  Same objection.
14        A    No.
15   BY MR. MILLER:
16        Q    The Democratic Party of Georgia?
17             MR. DUBOSE:  Objection.
18        A    No.
19   BY MR. MILLER:
20        Q    The Democratic National Committee?
21             MR. DUBOSE:  Objection.
22        A    See.  I'm not willing to give you -- I
23   don't think so, but --
24   BY MR. MILLER:
25        Q    Okay.  How about this?  Have you ever
```

```
 1   contributed, that you can recall, to a democratic

 2   party or democratic candidate?

 3              MR. DUBOSE:  Objection.

 4        A    Yes.

 5   BY MR. MILLER:

 6        Q    And do you recall who that was?

 7        A    I donated yesterday --

 8        Q    Okay.

 9        A    -- to a democratic campaign.

10        Q    Who was that?

11        A    Sara Ghazal.

12              MR. DUBOSE:  Objection.  Just let me have

13   a running line of objection to this.

14              MR. MILLER:  To political contributions

15   questions?

16              MR. DUBOSE:  Yeah.  Contribution,

17   affiliation questions --

18              MR. MILLER:  Okay.

19              MR. DUBOSE:  -- or the sort.

20              MR. MILLER:  That's okay.  We've reserved

21   objections too.

22   BY MR. MILLER:

23        Q    So I guess other than Miss Ghazal have you

24   contributed to any other democratic candidates in

25   Georgia?
```

**Regency-Brentano, Inc.**

```
 1        A    I don't think so.
 2        Q    Okay.  And Miss Ghazal, of course,
 3   previously worked with the state Democratic Party;
 4   right?
 5        A    Yes.
 6        Q    And do you know what her position was
 7   there?
 8        A    Voter protection director.
 9        Q    Have you ever contributed to a republican
10   candidate?
11        A    I don't think so.
12        Q    And you mentioned earlier you interviewed
13   a presidential candidate this year; right?
14        A    I did.
15        Q    That was Pete Buttigieg?
16        A    Yes.
17        Q    How did that come about?
18        A    The school asked me to.
19        Q    So you didn't have any involvement with
20   the campaign coming to Morehouse; right?
21        A    None whatsoever.
22        Q    And we talked about a couple of your
23   op-eds, but we also discussed -- I think you agreed
24   with me that op-eds are not scholarship as opposed
25   to your peer review articles?
```

**Regency-Brentano, Inc.**

1      A     They absolutely are not.

2      Q     And you believe it's appropriate for a

3   scholar to write these op-eds?

4      A     Yes.

5      Q     Is there a line to be drawn between a call

6   to action of sorts in an op-ed for a scholar at all?

7            MR. DUBOSE:  Objection.

8      A     Probably.  Publish false information.

9   BY MR. MILLER:

10     Q     And you would agree with me that

11  publishing editorials alone and lay articles alone

12  would not qualify someone as an expert in the topic;

13  right?

14     A     No.

15     Q     So you would not consider yourself an

16  expert on Supreme Court confirmations; right?

17     A     Yes.

18     Q     And you wrote a couple of op-eds about the

19  Cavanaugh confirmation rife with troubling messages,

20  Cavanaugh confirmation would be a step backward.  Do

21  you recall those?

22     A     Yes.  Again, not my titles.

23     Q     Okay.  And you wouldn't consider yourself

24  an expert on the census either?

25     A     I'm not.

1      Q    You wrote a op-ed there titled One Bad

2   Question Would Spoil the Whole Count; right?

3      A    Yes.

4      Q    We'll talk about a few more of your op-eds

5   here.  I'll mark this as Exhibit 5.

6           (Jones Deposition Exhibit D-5 was marked

7   for identification and attached to the transcript.)

8   BY MR. MILLER:

9      Q    You have a call of action here, so to

10  speak; right?

11          You state at the end of your op-ed here --

12  this is talking about the election of President

13  Trump and I hope that we will do something about it;

14  right?

15     A    Yes.

16     Q    And the title of this op-ed -- as you

17  mentioned before, it's not your title -- Election

18  Outcome Invites More Discrimination and Denial;

19  right?

20     A    Yes.

21     Q    Safe to say you were not pleased with the

22  election of President Trump?

23          MR. DUBOSE:  Objection.

24     A    Safe to say that I thought people should

25  be sensitive to the issues and participate in

1  elections accordingly.

2  BY MR. MILLER:

3      Q    You state on the second page, middle of

4  the page there:  As a result of the loss of VRA

5  protection former covered states, including Texas

6  and North Carolina, engaged in active voter

7  discrimination during this election.  So did

8  Wisconsin.

9          Do you see that?

10     A    Yes.

11     Q    What are you referring to there?

12     A    Texas and North Carolina both passed voter

13 ID laws after Shelby versus Holder, almost

14 immediately, that had been previously rejected

15 because they would discriminate against voters.  The

16 Wisconsin details are a little bit less fresh in my

17 mind, but they've got some gerrymandering issues and

18 adjustment of their electorate so that -- so the

19 voter discrimination goes on.

20     Q    Do you believe that voter ID laws are, per

21 se, unconstitutional?

22     A    I wouldn't -- I'm not a Supreme Court

23 justice, but I think that voter ID laws, strict ones

24 in particular, are very problematic.

25     Q    And you understand that in this case voter

```
 1   ID is not an issue; right?

 2        A    Yes.

 3        Q    Because Georgia's law has previously been

 4   upheld; right?

 5        A    Yes.

 6        Q    There at the bottom of that page you

 7   state:  Are you worried about the election of a

 8   president who insisted that U.S. elections are

 9   rigged?

10             Do you see that?

11        A    Yes.

12        Q    You don't think that's an issue with your

13   statement about stealing the election?

14             MR. DUBOSE:  Just for the sake of the --

15        A    I don't understand the question.

16             MR. DUBOSE:  Just for the sake of the

17   record, why don't you just go ahead and read the

18   entire sentence in.

19             MR. MILLER:  Sure.

20   BY MR. MILLER:

21        Q    You state:  Are you worried about the

22   election of a president who insisted that U.S.

23   elections are rigged, but who encouraged electoral

24   rigging and the intimidation of voters in urban

25   areas.
```

```
 1            Do you see that?
 2      A     Yes.
 3      Q     Okay.  So do you believe this is -- strike
 4   that.
 5            Are you worried about your statement of
 6   the 2018 election being stolen being similar to what
 7   you complain about here?
 8            MR. DUBOSE:  Objection.
 9      A     No.  Am I worried about them being
10   similar?
11   BY MR. MILLER:
12      Q     Well, here you state:  Are you worried
13   about the president making these statements of
14   elections being rigged?
15            Right?
16      A     Yes.
17      Q     While he was a candidate making these
18   statements; right?
19      A     Yes.
20      Q     And you discussed earlier that you believe
21   the 2018 election was stolen on the basis of voter
22   suppression tactics; right?
23      A     Yes.
24      Q     You don't believe that's similar?
25      A     I had not thought about it.  These are
```

1  different situations.  I don't -- I mean --

2      Q    I'll hand you another one here.  Again,

3  from the Dubuque Telegraph Herald, which we'll mark

4  as Exhibit 6.

5          (Jones Deposition Exhibit D-6 was marked

6  for identification and attached to the transcript.)

7  BY MR. MILLER:

8      Q    This one is titled Voter Suppression, a

9  Form of Contemporary Slavery; right?

10     A    Yes.  Again, not my title.

11     Q    Do you believe these titles that we've

12 discussed so far are misleading?

13     A    I -- I would have to put some thought into

14 that.  I don't have an opinion on that.  And I

15 generally don't see them under the title; so I just

16 haven't put any thought into it at all.

17     Q    So you state there on the second page:

18 Today the vast majority of Americans assume that

19 slavery will not re-emerge in the United States.

20     A    Yes.

21     Q    We think the possibility of a trail of

22 tears or mass interment is unlikely, but these

23 events occurred because our government refused to

24 abide an inclusive franchise.

25     A    Yes.

```
 1        Q    You go on to state:  State and federal
 2   governments today are working to make sure that
 3   large slots of people, in this case democrats, are
 4   unable to vote or overlooked politically.
 5             Right?
 6        A    Yes.
 7        Q    Do you believe that the federal government
 8   is engaging in voter suppression?
 9        A    I'm going to say yes.  But, I mean -- I
10   mean, states control voting, but -- I'm just going
11   to say yes.
12        Q    And do you believe that to be tantamount
13   to slavery, or is the title here just entirely
14   misleading?
15        A    The title is provocative.  My point is
16   that once large slots of people are disenfranchised,
17   terrible things have and will happen, or could
18   potentially happen.
19        Q    I'll hand you another article which we'll
20   mark as Exhibit 7.
21             (Jones Deposition Exhibit D-7 was marked
22   for identification and attached to the transcript.)
23   BY MR. MILLER:
24        Q    Do you recall writing this article?
25        A    Not off the top of my head.
```

**Regency-Brentano, Inc.**

```
 1        Q     And here you're talking about killing by
 2   police officers; right?
 3        A     Yes.
 4        Q     And on the second page there, you say:
 5   But police killings are judged by whether or not
 6   officers feel threatened.  They do; so there are
 7   essentially no rules against this violation.
 8        A     Yes.
 9        Q     Do you see that?
10              Are you suggesting here that a killing of
11   a suspected criminal by law enforcement is, per se,
12   lynching?
13        A     No.
14        Q     Okay.  Only in certain contexts?
15        A     Yes.
16        Q     I'll show you one more we'll mark as
17   Exhibit 8.
18              (Jones Deposition Exhibit D-8 was marked
19   for identification and attached to the transcript.)
20   BY MR. MILLER:
21        Q     This one is titled National Mood Hearkens
22   Back to 1955; right?
23        A     Yes.
24        Q     Again, I know we discussed the title.  I
25   don't mean to attribute these to you, but to make
```

1   sure we're clear about which article we're talking

2   about in the record.

3        A     Okay.

4        Q     You state there on the third page:  Today,

5   despite the gains of the civil rights movement, we

6   will win in November -- excuse me.  Strike that.

7              Today, despite the gains of the civil

8   rights movement, we will in November encounter a

9   midterm election during a period when the tenor of

10  the nation feels like 1955.

11       A     Yes.

12       Q     Right?

13             Earlier in this article you're talking

14  about the murder of Emmett Till; right?

15       A     Yes.

16       Q     You state in the next paragraph there:

17  Disparate treatment of minorities by the police and

18  the justice system continue.  Interment camps are en

19  vogue.  If the GOP retains a majority in congress

20  the national impulse to disdain others for who they

21  are will certainly get worse.

22             Do you see that?

23       A     I do.

24       Q     Do you believe that republicans

25  maintaining a majority in congress in the 2018

1   elections would have prompted another Emmett Till

2   murder?

3           MR. DUBOSE:  Objection.

4      A    That's a lot.  But, yes, I feel that the

5   environment is definitely discriminatory.  I would

6   need more than a yes-or-no answer to get -- that's

7   not --

8   BY MR. MILLER:

9      Q    Not tantamount to the abject horror of

10  Emmett Till's murder, but consistent with the

11  environment leading up to that?

12          MR. DUBOSE:  Objection.

13     A    Yes.

14  BY MR. MILLER:

15     Q    Okay.  Let's talk about your report

16  generally.

17     A    Okay.

18     Q    If you have that in front of you there.

19  That would have been Exhibit 2.  In conducting your

20  research for this report, did you speak to anyone in

21  Georgia not a part of the plaintiff's legal team?

22     A    In preparing the report?

23     Q    Uh-huh.

24     A    Like in finding information for the

25  report?

```
 1          Q     Yeah.   In researching for your report.
 2          A     No.
 3          Q     Anyone assist you with the research needed
 4   for the report?
 5          A     No.
 6          Q     Anyone assist for your conclusions for the
 7   report?
 8          A     No.
 9          Q     Were you asked to reach certain
10   conclusions?
11          A     No.
12          Q     And you stated earlier you read the
13   complaint and possibly the amended complaint or one
14   or the other?
15          A     Yes.
16          Q     No other pleadings?
17          A     None.
18          Q     Did you read any depositions from this
19   case?
20          A     I have not.
21          Q     Anything that was produced in discovery?
22          A     No.
23          Q     Other than what's cited in the report
24   itself, did you consult any media reports?
25          A     No.
```

```
 1      Q    Any academic articles not cited?

 2      A    No.

 3      Q    Did you consider any documents produced in

 4  discovery in this case?

 5      A    No.

 6           MR. DUBOSE:  Objection.

 7  BY MR. MILLER:

 8      Q    Did you consider any documents that were

 9  produced by the state to the House Oversight

10  Committee?

11      A    No.

12      Q    So we discussed earlier your academically

13  reviewed publications?

14      A    Yes.

15      Q    And you reference those -- the publication

16  on Number 5 there on the first page of your report;

17  right?

18      A    Yes.

19      Q    And so only academically reviewed article

20  would be the When Yes Means No; correct?

21      A    Yes.

22      Q    Did you rely on your dissertation or that

23  article in producing this report?

24      A    On that background.

25      Q    On background?
```

1          A     Yes.

2          Q     You didn't cite it anywhere in this

3    report; right?

4          A     I don't think so.

5          Q     And so did you rely on any of the same

6    source materials?

7          A     I'm going to say insofar as having had a

8    previous understanding about some of this history.

9    I'm looking now.

10         Q     Okay.

11         A     I might have cited the John Hope Franklin

12   in the dissertation; it's possible.  I'm sure I

13   cited the C. Vann Woodward, some of these cases.

14   But the -- this is a new writing for the most -- I

15   might have cited the Ari Berman, but I feel like it

16   didn't get published until I was finished.

17         Q     Okay.  What about your -- your

18   academically reviewed publication relative to your

19   dissertation?  Did you rely on some of the same

20   materials there?  Do you recall?

21         A     I don't -- again, only insofar as that's

22   related to the dissertation.

23         Q     Similar topic?

24         A     That article is really about the 2006

25   congressional reauthorization hearings; so to the

```
 1  degree that there's some discussion of that here,
 2  but I --
 3      Q    I should correct, because I think we're
 4  not on the same page.  I was talking with regard to
 5  your dissertation and your academically reviewed
 6  article.  I'm --
 7      A    They are related.
 8      Q    -- setting aside --
 9      A    Those two are related.
10      Q    Okay.
11      A    So the article is derivative of the --
12      Q    Of the dissertation?
13      A    But different.
14      Q    Okay.  All right.  Let's talk a little bit
15  about your dissertation.  We'll mark this as Exhibit
16  9.
17          (Jones Deposition Exhibit D-9 was marked
18  for identification and attached to the transcript.)
19  BY MR. MILLER:
20      Q    Do you recognize this to be your
21  dissertation?
22      A    I do.
23      Q    Entitled the Voting Rights Act Under
24  Siege, the Development of the Influence of
25  Colorblind Conservatism in the Voting Rights Act?
```

 1       A    Yes.

 2       Q    As an initial question, is there a reason

 3  the faculty signature page isn't signed?  I couldn't

 4  seem to locate a signed version.

 5       A    I don't -- there isn't.  I would assume

 6  that my submitted copy is a signed version.  It's

 7  required.

 8       Q    But it was successfully defended; right?

 9       A    Yes.

10       Q    Okay.  Did you seek to publish this

11  dissertation anywhere?

12       A    No.

13       Q    Seek to deposit it at the library?

14       A    It's deposited at the University of

15  Michigan.

16       Q    Okay.  So in your abstract, on the -- it

17  says Romanette v there?

18       A    Okay.

19       Q    You with me?

20       A    Yeah.

21       Q    Okay.  You state in the middle of that

22  paragraph, quote, I argue that the development of

23  colorblind conservatism and the ideological platform

24  undergirding it has had a chilling and potentially

25  devastating impact on the federal government's

1    implementation of the spirit and the letter of the

2    Voting Rights Act.

3              Right?

4        A    Yes.

5        Q    And just to go on to complete the

6    sentence, you state:  On stated adherence to the

7    mandates and intention of the Act and ultimately on

8    the rights of those the VRA was designed to protect.

9              Right?

10       A    Yes.

11       Q    Is that an accurate summary of the

12   argument of your thesis?

13       A    Yes.

14       Q    So on Page 2 of your thesis there on the

15   first full paragraph, you state:  The main driving

16   force over time has been conservative republicans

17   and the anti-VRA coalition has found a secure home

18   in the republican.

19             Right?

20       A    Yes.  I'm not there, but yes.

21       Q    First full paragraph, second page.

22       A    Okay.

23       Q    Are you with me there?

24       A    Yeah.

25       Q    You go on to state:  They are attacks on

1   the VRA have been a part -- excuse me.  Strike that.

2            Their attacks on the VRA have been part of

3   a race-based strategy to establish a popular

4   majority grounded in hostility to affirmative steps

5   to promote equality for racial and language

6   minorities.

7        A    Yes.

8        Q    Do you believe that conservative

9   republicans in general seek to establish a popular

10  majority grounded in hostility to equality?

11       A    Yes.  That's interesting -- that's an

12  overstatement, but yes.

13       Q    Okay.

14       A    Grounded in hostility to the Voting Rights

15  Act for political equality.

16       Q    Do you believe there could be any

17  legitimate criticisms of the Voting Rights Act?

18            MR. DUBOSE:  Objection.

19       A    Do I believe there are any legitimate

20  criticisms?

21  BY MR. MILLER:

22       Q    Yeah.

23       A    Yes.

24       Q    That there can be legitimate criticisms

25  made of the Voting Rights Act?

1        A      Absolutely.

2        Q      And I should clarify.  I'm talking about

3    pre-2013 Voting Rights Act.

4        A      No, I understand.  There are arguments on

5    both sides for -- I mean, I understand the arguments

6    over the Voting Rights Act.

7        Q      Okay.  On Page 12 of your dissertation,

8    the final sentence of the statement of the argument,

9    you state:  To answer these questions my research

10   examines the conservative influence on the

11   executive, legislative, and judicial branches

12   between 1965 and 2013.

13            Right?

14       A      Yes.

15       Q      And that's the basis of your analysis in

16   this dissertation; right?  The scope of your

17   research was between 1965 and 2013; right?

18       A      Yes.

19       Q      So I had an opportunity to read your

20   dissertation.  And your argument particularly

21   related to Voting Rights Act reauthorizations seems

22   to suggest that republican support of the Voting

23   Rights Act was actually a ruse.  Would you agree

24   with that summary?

25            MR. DUBOSE:  Objection.

1        A    I would say that yes,

2   southern-democrat-cum-republicans.

3   BY MR. MILLER:

4        Q    And so on Page 57 you acknowledge that

5   President Bush expressed support for a straight

6   reauthorization of the VRA for 25 years; right?

7        A    I do.

8        Q    And you state that the 2006 voting rights

9   reauthorization passed with overwhelming support on

10  the roll call votes from both parties; right?

11       A    Absolutely.

12       Q    And that the '06 reauthorization

13  overturned two Supreme Court decisions that, quote,

14  were considered to be -- excuse me.  Strike that.

15            That were considered to impose limitations

16  on the VRA; right?

17       A    Yes.

18       Q    Okay.  But you believe this was all a trap

19  laid by conservatives to eventually overturn the

20  VRA; right?

21       A    Yes.

22            MR. DUBOSE:  Objection.

23  BY MR. MILLER:

24       Q    On Page 129, you state:  Woodward warned

25  in his 1981 congressional testimony of

```
 1   reauthorization of the VRA that a weakening of

 2   Section 5 might portend a revival of voting

 3   discrimination.

 4           Right?

 5      A    Yes.

 6      Q    And then at the end of that first

 7   paragraph, on 129, you state:  In the aftermath of

 8   Shelby -- strike that.

 9           In the aftermath of Shelby v. Holder,

10   Woodward's warning appears to become fact.

11           Right?

12      A    Yes.

13      Q    And Shelby, of course, was decided in

14   2013; right?

15      A    It was.

16      Q    And, as we discussed earlier, your

17   research scope was limited to the period between

18   1965 and 2013?

19      A    Yes.

20      Q    So you were portending post 2013 results

21   based on research that stopped in 2013; right?

22           MR. DUBOSE:  Objection.

23      A    Yes.

24   BY MR. MILLER:

25      Q    Okay.  On Page 130 -- well, excuse me --
```

```
 1   129 into 130, you're talking about Richard Valelly;
 2   right?
 3        A    Yes.
 4        Q    And you take issue with Valelly for
 5   suggesting the permanent success of the Voting
 6   Rights Act?
 7        A    I do.
 8        Q    But you know he was writing it in 2004;
 9   right?
10        A    Yes.
11        Q    Are you not doing the same thing here that
12   you criticize Valelly for?
13             MR. DUBOSE:  Objection.
14        A    What?
15   BY MR. MILLER:
16        Q    That we just discussed.  You're projecting
17   the future of voter discrimination post Shelby based
18   on research that stopped in 2013.  You criticize
19   Valelly for projecting the permanence of the Voting
20   Rights Act as is in success of the second
21   reconstruction, based on writing that stopped in
22   2004; right?
23             MR. DUBOSE:  Objection.  Form.
24        A    No.  I wouldn't have an objection with
25   Valelly commenting on the upcoming reauthorization,
```

**Regency-Brentano, Inc.**

```
 1    which is what he was doing in 2004, because that was

 2    coming.  And since it's after 2013 when I'm actually

 3    submitting this, I don't find it strange to have

 4    made some commentary about what's happened post

 5    Shelby, although the article is not designed to

 6    address that really in its main part at all.

 7    BY MR. MILLER:

 8        Q    And yet the research scope was limited to

 9    1965 to 2013; right?

10        A    Yes.

11        Q    Okay.  And this paper is not specifically

12    about Georgia; correct?

13        A    It is not.

14        Q    And the focus of Chapters 3 through 5 are

15    not about the actions of any state officials, but

16    about the actions of federal lawmakers from 1965 to

17    2013; right?

18        A    Yes.

19        Q    And in those chapters it's not specific to

20    Georgia; right?

21        A    It is not.

22        Q    On Page -- I'm just going to walk through

23    with you here a few Georgia references.

24        A    Okay.

25        Q    So on Page 56 you talk about
```

```
 1    representative --
 2              MR. DUBOSE:  Give her just a second to get
 3    there.
 4    BY MR. MILLER:
 5         Q    Okay.  You talk about representative Lynn
 6    Westmoreland; right?
 7         A    Yes.
 8         Q    Okay.  And you talk about his opposition
 9    to reauthorization of the Voting Rights Act as is;
10    right?
11         A    Yes.
12         Q    You believe this is not sincere?
13         A    What?  Do I think Westmoreland was being
14    insincere?
15         Q    Right.
16         A    No.  I think Westmoreland did not support
17    the Voting Rights Act reauthorization.
18         Q    So you don't think he was part of the
19    ruse?
20         A    Well, this goes to a point about the fact
21    that the GOP had agreed to reauthorize the 2006 bill
22    as is.  And instead of doing that, the small group
23    of GOP members led by the state of Georgia contested
24    it after this agreement.  So no.  I mean, I can only
25    speculate on exactly what they're doing, but I think
```

```
 1   he's earnest.
 2        Q     So when you say led by the state of
 3   Georgia, you're talking about representatives from
 4   the state of Georgia; right?
 5        A     Yes.
 6        Q     And to your point there you mention on
 7   Page 55:  The pledge signaled smooth sailing for
 8   reauthorization.
 9              You're talking about a republican pledge
10   to renew the act for 25 years; right?
11        A     Yes.
12        Q     And you state in the last half of that
13   sentence:  Since republicans tended toward extreme
14   party discipline.
15              Right?
16        A     Yes.
17        Q     And you cite a source for this statement;
18   right?
19        A     For which one?
20        Q     That republicans tended toward extreme
21   party discipline.
22        A     I did not.
23        Q     Back on Page 56, just below the reference
24   to Lynn Westmoreland, you talk about -- well, let's
25   just read it:  The rebels found support among
```

1   legislators critical of coverage for bilingual

2   minorities under Section 203.

3           Right?

4       A   Yes.

5       Q   You see the second sentence starts with:

6   Led by Steven King, republican of Georgia.

7           Right?

8       A   Yes.

9       Q   He's actually a republican from Iowa;

10  right?

11      A   Yes.

12      Q   Just a typo?

13      A   Yes.

14      Q   Okay.  On Page 77.  About midway through

15  the last paragraph there, it starts with:  In one

16  major.

17          Do you see that?  Page 77.

18      A   I'm coming.

19      Q   Okay.

20      A   Yes, I see it.

21      Q   In one major voting rights case involving

22  Alabama and Georgia, the DOJ filed legal briefs

23  supporting positions rejected by career DOJ

24  employees.

25          Right?

```
 1      A    Okay.
 2      Q    And here you're talking about a active
 3 case; correct?  An active lawsuit; right?
 4           MR. DUBOSE:  Objection.
 5           Active at the time or active now?
 6 BY MR. MILLER:
 7      Q    Frankly, I'll skip to the point.
 8           The reason I'm asking you is you cite a
 9 New York Times article for this statement and the
10 briefs are not cited.
11      A    Okay.  The brief cite would have been
12 better.
13      Q    Did you read those briefs?
14      A    I do not remember.
15           MR. DUBOSE:  Are you saying the quote from
16 the brief or citation to the brief or docket
17 citation?  I'm not quite sure I'm following what you
18 mean by brief citation.
19           MR. MILLER:  I think it would be a
20 citation to the brief that's been filed in federal
21 government.
22 BY MR. MILLER:
23      Q    Did you understand my question,
24 Miss Jones?
25      A    I do.  At the same time, it's an action.
```

1    They filed legal briefs.  A brief cite might well

2    have been the better choice.

3         Q    And you don't recall if you read those

4    briefs?

5         A    I do not.

6         Q    Okay.  And so in Footnote 168, you talk

7    about the case there; right?

8         A    Okay.  Yes.

9         Q    Okay.  And you refer to -- it said in the

10   second sentence, where you're talking about Georgia:

11   In Georgia the DOJ ruled that blacks did not have

12   legal basis to challenge the state commissioner.

13            Do you see that?

14        A    Yes.

15        Q    Who exercised all legislative and

16   executive power and who was elected at large.

17            Right?

18        A    Yes.

19        Q    What state commissioner are you referring

20   to?

21        A    I do not know.

22        Q    So just to touch on the other references

23   to Georgia, you mention a few lawsuits; right?

24   Elsewhere?

25        A    Okay.

```
 1        Q     Page 101, you're talking about the Rogers
 2   v. Lodge case?
 3        A     Yes.
 4        Q     Page 110, you discuss the Holder v. Hall
 5   case?
 6        A     Okay.
 7        Q     And then in Page 113, you discuss
 8   Georgia v. Ashcroft; right?
 9        A     Yes.
10        Q     So other than those instances we've
11   discussed and Chapters 2 through 5, no other focus
12   on Georgia; right?
13        A     I'm going to have to go with your review
14   of the material --
15        Q     Okay.
16        A     -- focused on Georgia.
17        Q     So I noticed, back to the front of the
18   dissertation -- I know it's a large document.  On
19   Page 4, you state that your analysis of primary and
20   secondary literature will support your argument;
21   right?
22        A     Yes.
23        Q     Is it standard practice to rely on
24   secondary sources?
25        A     Yes.
```

1          Q     Even when primary sources are available

2     for the same proposition?

3          A     Sometimes, yes.

4          Q     So, for instance, in the footnote we

5     discussed earlier --

6          A     Again, I would grant you that a cite of

7     the briefs would be superior to the New York Times.

8          Q     You cite several law review articles

9     throughout; right?

10         A     I will believe you when you say that, yes.

11    I haven't looked at this.

12         Q     Okay.  And you understand law review

13    articles to not undergo a peer-review process;

14    right?

15         A     Yes.

16         Q     You as a -- with a law degree, get that a

17    lot of people -- it's a surprise to them?

18         A     Understood.

19         Q     And, of course, news articles are not

20    peer-reviewed either, as we discussed; right?

21         A     Yes.

22         Q     Okay.  All right.  So let's talk about

23    your academically reviewed article When Yes Means

24    No.

25         A     Okay.

```
 1              MR. MILLER:  This will be Exhibit 10, I
 2    believe.
 3              (Jones Deposition Exhibit D-10 was marked
 4    for identification and attached to the transcript.)
 5    BY MR. MILLER:
 6         Q    Do you recognize this article?
 7         A    I do.
 8         Q    And what is the forum?  The journal this
 9    was published in?
10         A    I don't mean to sound --
11         Q    Can you describe it to me.
12         A    -- rude -- I can.  It's -- I don't know a
13    lot about the forum.  My colleague was editing it.
14    I assumed as a result it was reputable.  I know
15    other people who've heard of it.  This is it.
16         Q    Is it a political science focus or kind of
17    all over the place?
18         A    I think it's generally political science
19    focused.
20         Q    Okay.
21         A    My client who was editing is a political
22    scientist.
23         Q    Again, in this article you cite a good
24    number of secondary sources; right?
25         A    I do.
```

1        Q     And you would agree with me that this

2    article is not specific to Georgia; right?

3        A     Yes.

4        Q     And not specific to Georgia State

5    officials; right?

6        A     True.

7        Q     Is there any significant difference in the

8    thrust of the argument here than in your

9    dissertation?

10       A     I don't think so.  Again, I haven't read

11   this.  I didn't read this last night.

12       Q     Right.

13       A     I mean, this is derivative of the

14   dissertation.

15       Q     Okay.  And you -- this was published in

16   2018; right?

17       A     Yes.

18       Q     Do you recall about what you submitted it

19   for publication?

20       A     Maybe even the year before that.  It took

21   a long time.

22       Q     I'm not familiar with the timeline of it.

23       A     It depends on the department, but -- I

24   mean, the -- department isn't what I want to say.

25   It depends on what you teach.  Political science

```
 1   review takes a long time.
 2            MR. MILLER:  Okay.  Can we go off the
 3   record for a second.
 4            (Off-the-record discussion.)
 5            (Recess taken from 11:40 a.m. to 11:53
 6   a.m.)
 7   BY MR. MILLER:
 8       Q    So let's shift gears here and talk a
 9   little bit more about your report in this case.
10       A    Okay.
11       Q    If you can put that in front of you.  And
12   so you offer two opinions in this case; right?
13       A    Yes.
14       Q    The first is on Page 2.  And you state
15   there in Roman Numeral I:  Opinion, from the
16   beginning of its existence to present the State of
17   Georgia has continually suppressed the right of
18   people of color to vote.
19            Right?
20       A    Yes.
21       Q    And then on Page 12, your second opinion,
22   you state:  Opinion, Georgia suppression of people
23   of color's right to vote is consistent with the long
24   history of Georgia and Southern states.
25            Right?
```

```
 1        A    Yes.

 2        Q    Outside of considering other southern

 3   states, is there a difference between those two

 4   opinions?

 5        A    I don't know that there is.

 6        Q    Okay.  But your basis for each opinion --

 7   am I correct in assuming -- and this is repeated on

 8   Page 2 and Page 12 with Point A:  The basis and

 9   reasons for my opinions are set forth below along

10   with the facts and data I considered.

11        A    Yes.

12        Q    Am I correct in assuming that your basis

13   for each opinion is contained within those two

14   different breakups of headings; is that right?

15        A    Yes.

16        Q    Okay.  So, in other words, the basis

17   for -- yeah, Opinion 1 is on Pages 2 through 11?

18        A    Yes.

19        Q    Okay.  So let's start with Opinion 1.  On

20   Page 9, you take issue with the majority vote

21   requirement for elections under Georgia law;

22   correct?

23        A    Yes.

24             MR. DUBOSE:  You want to focus her in on

25   what particular page you're working from.
```

```
 1              MR. MILLER:  Sure.
 2    BY MR. MILLER:
 3         Q    Starting with the paragraph lawsuits.  Do
 4    you see that?
 5         A    Okay.
 6         Q    You want to take a minute to read it.
 7         A    Yeah.
 8              Okay.  Yes, I remember this.
 9         Q    Okay.  I think we discussed this earlier,
10    but you understand that -- strike that.  Because I'm
11    thinking that we did.
12              You understand that plaintiffs are not
13    challenging the majority vote law in this case;
14    right?
15         A    Yes.
16         Q    Okay.  And you reference a lawsuit
17    regarding that majority vote law; right?
18         A    Yes.  I'm saying plaintiff brought a
19    lawsuit.
20         Q    Yeah.  But you don't cite to that lawsuit;
21    right?
22         A    I do not.
23         Q    You rely on secondary sources instead?
24         A    I don't actually say lawsuits.  Yes,
25    you're correct.
```

1      Q    Do you recall the name of any of those

2   cases?

3      A    I do not know them, off the top of my

4   head.

5      Q    Okay.  Have you ever read any District

6   Court orders regarding those cases?

7      A    I'm not sure.

8      Q    What about the Eleventh Circuit?

9      A    Again, not necessarily.

10     Q    Okay.

11     A    I'm going to show you what we'll mark as

12  Exhibit 11.

13          (Jones Deposition Exhibit D-11 was marked

14  for identification and attached to the transcript.)

15  BY MR. MILLER:

16     Q    And this is the case of Brooks v. Miller;

17  right?

18     A    Yes.

19     Q    And you see that's in the United States

20  Court of Appeals for the Eleventh Circuit?

21     A    Yes.

22     Q    Have you read this opinion?

23     A    I have not.

24     Q    Okay.  So back to your Page 9 of your

25  report.  You state that the chief sponsor of the

1   statewide majority bill in the statehouse, Denmark

2   Groover, blatantly encouraged support of the law in

3   1964 to, quote, thwart election control by Negroes

4   and other minorities.

5           Right?

6       A   Yes.

7       Q   Okay.  Is it your understanding that

8   Denmark sponsored the legislation that became the

9   majority vote law?

10      A   It's my understanding that he was a driver

11  of the legislation; so he was important to the

12  process moving forward.

13      Q   And you -- but you state there:  The chief

14  sponsor of the bill.

15          Right?

16      A   I would say that even if he isn't the

17  official chief sponsor, he's the tacit one.

18      Q   Even if he isn't the official chief

19  sponsor, he's the tacit one?

20      A   Yeah.  So in terms of in the environment

21  in which they are working.

22      Q   In other words, without his support, it

23  wouldn't have gotten done?

24      A   Yes.  Whether he's named on the lawsuit or

25  actually filed paperwork.  I'm not arguing that.

```
 1    I'm saying his energy motivated the moving forward
 2    of that bill.
 3         Q    Okay.  So do you understand that Denmark
 4    was not a sponsor of the 1964 law?
 5         A    Yes.
 6              MR. DUBOSE:  Objection.
 7         A    Again, I would say that he's -- how do I
 8    put this?  He's a motivator of the bill even if he
 9    is not its direct sponsor.
10    BY MR. MILLER:
11         Q    Okay.  And so --
12         A    As you said, you know, he's critical to
13    that -- to that moving forward, you said.
14         Q    That he was a motivating force --
15         A    Yes.
16         Q    -- behind passing the legislature and
17    getting signed into law?
18         A    He's excited about it and making it move
19    forward.
20         Q    So when you say he was the chief sponsor
21    of the bill, you don't mean to imply he was actually
22    the lead sponsor of the legislation?
23              MR. DUBOSE:  Objection.
24         A    Exactly.
25    BY MR. MILLER:
```

1        Q     Is it your understanding -- strike that.

2              So I'll ask you to turn to the Eleventh

3    Circuit opinion I just handed you.

4        A     Okay.

5        Q     That would be -- I forget what exhibit --

6    that would be Exhibit 11.  Are you familiar with how

7    asterisks pagination works in terms of reporters,

8    because I'll refer to that number --

9        A     Okay.

10        Q     -- if you are.

11        A     Yes.

12        Q     So it would be Page 1234 in the --

13        A     Yes.

14        Q     -- F.3d Reporter.  Are you with me?  Page

15    5 of the document you have.

16        A     Yes.

17        Q     Do you see on the second column -- so the

18    right column, second paragraph, the Eleventh Circuit

19    says -- this is the second sentence:  The District

20    Court found that Groover's racist motives were not

21    attributable to the supporters of the 1964 law.

22        A     I do see that.

23        Q     Groover supported Sanders's opponent in

24    the governor's race and was not involved in the

25    Sanders administration.  He was not a member of the

```
 1   third ELSC and he had no influence over that
 2   committee.
 3            Do you see that?
 4       A    Yes.
 5       Q    Okay.  And you understand that Sanders is
 6   referring to Governor Carl Sanders?
 7       A    Yes.
 8       Q    And that ELSC -- I will point you to the
 9   left-hand column.  Do you see where it says election
10   law study committee?
11       A    Yes.  I'm looking at that now.  Okay.
12       Q    And so, in fact, there were three versions
13   of the ELSC.  So we're in the left-hand column now.
14       A    Okay.
15       Q    When the Georgia legislature created the
16   first ELSC in 1957 --
17            Do you see that?
18       A    Not yet.
19       Q    That's the second full paragraph on the
20   left column.
21       A    Left?
22       Q    Yeah.  I'm sorry.  Second full
23   paragraph --
24       A    I see.
25       Q    -- first sentence.
```

```
 1            So that's referring to the first ELSC;
 2    right?
 3        A    Okay.
 4        Q    Then there was a -- if you go to the end
 5    of that paragraph --
 6        A    1961.
 7        Q    -- a second ELSC in 1961 that dissolved
 8    without taking action.
 9            You see in that paragraph that starts with
10    1963?  Do you see that?
11        A    Uh-huh.
12        Q    After the county unit system had been
13    struck down as unconstitutional, Denmark Groover, a
14    state representative known for his staunch
15    segregationist views, attempted to pass the majority
16    vote requirement.  There is no doubt that Groover's
17    majority vote bill was the product of racial animus.
18    He opposed bloc voting, a euphemism for black
19    citizens voting in bloc.  Groover's bill passed in
20    the House but died in the committee in the Senate.
21            Right?
22            And so you take that to understand that --
23    I apologize.  I cut you off.  I need you to answer
24    audibly there.
25        A    Yes.
```

1      Q    Okay.  And so do you understand from this

2   that Denmark Groover -- I'm sorry.  Strike that

3   before we get there.

4           The next paragraph states:  Governor

5   Sanders called for the creation of a third ELSC in

6   1963 for the purpose of drafting an election code.

7           Do you see that?

8      A    Yes.

9      Q    And in that second paragraph, on the right

10  column that we were in before, the first sentence

11  states:  Plaintiffs emphasize the racial antipathy

12  of Groover and attempt to impute the improper

13  motivations behind his proposal of the majority vote

14  in 1963 to the supporters of the 1964 code's

15  majority vote requirement.

16          Right?

17     A    Okay.

18     Q    So by reading this, do you understand that

19  Groover was not a sponsor of the 1964 law?

20          MR. DUBOSE:  Objection.

21     A    Okay.

22  BY MR. MILLER:

23     Q    That the 1964 law is what became law;

24  correct?

25     A    Yes.

```
 1        Q     And that Groover had no influence over the
 2   ELSC and no influence over the governor; right?
 3              MR. DUBOSE:   Objection.
 4        A     I'm seeing that that's what the Court
 5   decided here, yes.
 6   BY MR. MILLER:
 7        Q     Right.  Okay.  And you'll see if you'll
 8   turn to Page 7 of your document, it would be the
 9   star pagination 1236 in the F.3d Reporter on the
10   left column.
11        A     Okay.
12        Q     I'm sorry.  Page -- did I say Page 6?
13   Page 7 of the document you have.
14        A     You said the right page.
15        Q     So the star pagination would be 1236,
16   but that --
17        A     It's at --
18        Q     -- 1236 is at the bottom of the page.
19              So at the bottom paragraph on the
20   left-hand column --
21        A     Okay.
22        Q     -- this is the Eleventh Circuit again
23   talking about the findings of fact in the District
24   Court.
25        A     Okay.
```

1       Q    And the second sentence there it says:
2  However, Governor Sanders testified that Groover,
3  who had supported his opponent in the governor's
4  race, had nothing to do with the comprehensive 1964
5  election law.  Testimony as to Groover's lack of
6  input in the 1964 bill was corroborated by Smith.
7            I will represent to you that they are
8  referring to George T. Smith, speaker of the house
9  at that point in time.  Do you see that?
10      A    I do.
11      Q    Okay.  And so your report implies that --
12  well, first, it implies that Denmark Groover was the
13  actual sponsor of the bill itself; right?
14            MR. DUBOSE:  Objection.
15      A    Okay.
16  BY MR. MILLER:
17      Q    But that is not what you meant there;
18  right?
19      A    I'm -- you know, I would need to look at
20  this more closely, what you're just putting in front
21  of me, but okay.
22      Q    So in your report, back on Page 9, what we
23  discussed earlier that Denmark Groover was a
24  motivating force behind the law, that's contrary to
25  what the District Court in the Eleventh Circuit

1   found; right?

2       A    Yes, I understand that.

3       Q    But you didn't cite this case in your

4   report?

5       A    I did not.

6       Q    Okay.  And you didn't delineate the

7   difference between any pieces of legislation in your

8   report?

9           MR. DUBOSE:  Objection.

10      A    No.  I'll just go with a no there.

11  BY MR. MILLER:

12      Q    Okay.  So back to your report.  On Pages 9

13  and 10, you're talking about the 2006

14  reauthorization of the Voting Rights Act; right?

15      A    Okay.

16      Q    This is also contained in your

17  dissertation and in your peer-reviewed article;

18  right?

19      A    Possibly, yes.

20      Q    And I don't mean word for word, but the

21  topic?

22      A    The topic and the event, yes.

23      Q    And you note Representative Westmoreland's

24  opposition to the bill; right?

25      A    I do.

```
 1        Q      Are you with me?

 2        A      Yeah, I'm with you.

 3        Q      So you quote Representative

 4   Westmoreland -- I'm sorry, on Page 10.  That he was

 5   trying to make the bill constitutional enough that

 6   it would withstand the scrutiny of the Supreme

 7   Court; right?

 8        A      Yes.

 9        Q      And you mentioned earlier that you thought

10   he was sincere in his prior statement.  Do you think

11   he's sincere here?

12        A      No.

13        Q      Okay.  And what do you base that on?

14        A      He's antireauthorization.

15        Q      You do note he wanted to amend the bill;

16   right?

17        A      Yes.

18        Q      But it's your contention that those

19   amendments were poison pills; right?

20        A      I would not say it that way.

21        Q      I think you do say it that way.  I'll draw

22   your attention to it.

23        A      I still -- okay.

24        Q      Yeah.

25        A      Supporters of the --
```

1       Q    I'm sorry.

2       A    -- reauthorization bill called it poison

3  pills.  So no, I probably would not discuss it that

4  way in conversation.  But yes, I believe that those

5  amendments were designed.  I believe that there was

6  an issue with passing any amendments at all.  So the

7  general belief by the two parties was that if

8  amendments occurred, they wouldn't be able to

9  reauthorize the bill.  And so any effort to amend

10  the bill was designed to fail it.  I would -- it's

11  my opinion that that was designed to fail it.

12      Q    Okay.

13      A    And that's why they want to bring

14  amendments.

15      Q    And correct me if I'm summarizing your

16  other works incorrectly, but I took portions to mean

17  that attempts -- or the lack of amendment was

18  purposeful and caused the downfall of Section 4, the

19  coverage?

20      A    The lack of amendment was problematic and

21  did result in a negative view of reauthorization by

22  the court -- the high court.

23      Q    Okay.  And you understand that

24  Mr. Westmoreland is not a state official acting in

25  this capacity; right?

```
 1       A    Okay.  He's in congress.  Is that what you
 2   mean?
 3       Q    Right.  He's not an official of the state
 4   of Georgia?
 5       A    Okay.
 6       Q    Is that a yes or no?
 7       A    Yes.  I don't -- I don't quite know what
 8   you mean.
 9       Q    So as opposed to his capacity as a federal
10   official.
11       A    I understand.  But he's from Georgia.
12       Q    Sure.
13       A    So I'm not saying that he's making state
14   action.
15       Q    Okay.  So he's not acting for the state of
16   Georgia as a governmental entity in this capacity as
17   opposed to representing his constituents?
18            MR. DUBOSE:  Objection.
19       A    Isn't he coming from Georgia to the
20   federal government?
21   BY MR. MILLER:
22       Q    Sure.
23            I'm asking you:  Is he acting as a state
24   official in this capacity?
25       A    He's representing Georgians in the federal
```

```
 1   government.
 2        Q    Okay.  On Page 10, you reference a
 3   controversy regarding Puerto Rican residents
 4   obtaining driver's licenses; right?
 5        A    Yes.
 6        Q    You state that because noncitizens are not
 7   entitled to be registered for the franchise, the
 8   Secretary of State is obligated to confer with the
 9   head of driver's license bureau to establish
10   appropriate protocols; right?
11        A    Yes.  I don't see it, but I don't remember
12   that.
13        Q    This would be --
14        A    I see it.
15        Q    There now?  Okay.
16             And what is the driver's license bureau?
17        A    That's here in Georgia.  Is that not how
18   you refer to it in Georgia?  I'm a little confused
19   about it.  I want to call it the DMV.
20        Q    Department of Driver Services is what
21   you're --
22        A    I believe that I got that and that that's
23   incorrect, yes.
24        Q    The state agency?
25        A    I'm talking about when you go to get a
```

1    driver's license, the office that you go to.

2         Q    Okay.

3         A    Okay.

4         Q    I'll represent to you that that's the

5    Department of Driver Services.

6         A    Department of Driver Services.  Okay.

7         Q    You understand that the Department of

8    Driver Services is not a defendant in this case;

9    right?

10        A    I do.

11        Q    And is your statement regarding that

12   obligation a legal opinion?

13             MR. DUBOSE:  Objection.

14        A    No.  This is -- I don't quite know what

15   that means in this context.

16   BY MR. MILLER:

17        Q    So just to clarify, the obligation that

18   I'm talking about -- you state:  The Secretary of

19   State is obligated by law to confer with the head of

20   the driver's license bureau to establish appropriate

21   protocols.

22             Right?

23        A    Yes.

24        Q    What is the basis of your statement that

25   the Secretary of State has an obligation to confer

1  with the head of DDS there?

2      A     That when people are registering to get

3  licenses that are also able to register to vote and

4  so sometimes there's -- depending on who the person

5  is, they may or may not be eligible to register to

6  vote.  And that's based upon the protocols dictated

7  by the Secretary of State, not anything to do with

8  the driver's license, but having to do with

9  registering to vote.

10     Q     So dictated by the Secretary of State and

11 not federal or state law?

12     A     So the federal law says that you're

13 supposed to be able to register to vote at the DMV.

14 So the Secretary of State here has some involvement

15 in absorbing those names into the state rolls and

16 giving DMV some information, if necessary, about

17 eligibility for registration to vote.

18     Q     And, in fact, you're aware that in Georgia

19 we have a opt-out voter registration?  So, in other

20 words, the default is you're automatically

21 registered; right?

22          MR. DUBOSE:  Objection.

23     A     Okay.  I don't know that I would say I

24 know that.

25 BY MR. MILLER:

```
 1      Q     Okay.
 2      A     I got a driver's license here and had to
 3  push buttons in order -- thought I was pushing
 4  buttons to make sure I was registered to vote.
 5      Q     Okay.  Is it -- strike that.
 6            Are you implying here that the Secretary
 7  had any knowledge at all of what DDS was doing with
 8  regard to Puerto Rican residents?
 9            MR. DUBOSE:  Objection.
10      A     Yes.
11  BY MR. MILLER:
12      Q     You believe he did?
13      A     I'm implying that it's definitely
14  possible.
15      Q     And what do you base that statement on?
16      A     It doesn't -- hold on.  My understanding
17  was that the -- what are you calling it?  The
18  drivers --
19      Q     DDS.
20      A     Okay.  I'm calling it the right thing
21  here.
22            My understanding was that the DDS had some
23  information from the State about how to treat Puerto
24  Rican drivers' voter applications.
25            So that might have been from the highest
```

1    position in the DDS, but if the -- but since voting

2    is a state function, I was under the impression that

3    the Secretary of State had some knowledge of -- and

4    some responsibility for voters who are automatically

5    or intentionally registered at the DMV.

6         Q    Back to the original question about is it

7    your concern -- are you implying that the Secretary

8    had some knowledge or was otherwise involved in an

9    intentional discrimination against Puerto Rican

10   citizens based on DDS's actions?

11        A    I'm going to say yes, because these are

12   people in the state registering to vote through the

13   DMV.  And therefore -- and people of color -- and

14   so, yes.  They're related to registration of people

15   to vote in the state.

16        Q    But you have no citation for that

17   obligation; right?

18        A    I have the statement that the State has a

19   long history of voter suppression and here is an

20   example of voters -- potential voters of color

21   having difficulty registering to vote.

22        Q    Page 11, you talk about Randolph County

23   closing precinct locations; right?

24        A    Yes.

25        Q    And in that second paragraph there, you

1    state:  Before the 2018 midterm elections, the

2    Randolph County Board of Elections voted three to

3    nothing to close seven majority black primary

4    runoffs.  After a public outcry, the board backed

5    down.

6              Right?

7         A    Yes.

8         Q    So you acknowledge there that the local

9    Board of Elections was the one that voted to close

10   any precincts; right?

11        A    Yes.

12        Q    And so you understand that local election

13   officials are responsible for closing, moving, or

14   otherwise changing precinct locations under Georgia

15   law?

16             MR. DUBOSE:  Objection.

17        A    I do, I also know that the Secretary of

18   State is provided information to locals about when

19   and how to do that.

20   BY MR. DUBOSE:

21        Q    I'm sorry.  Can you -- the Secretary of

22   State?

23        A    The Secretary of State has issued

24   information to -- since Shelby, about closures to

25   assist local jurisdictions in determining --

1      Q    I see.

2      A    -- when and where they can close.

3      Q    Okay.

4      A    So yes, the local is doing it, but it's

5  not un -- it's not unplugged from our state voting

6  apparatus.

7      Q    Okay.  We'll get to that.  Strike that.

8           Is it your understanding that the

9  Secretary has any authority to order or -- order a

10  precinct closed or opened in one way or another in

11  terms of new or consolidated precincts?

12      A    It would be my impression that the

13  Secretary of State has oversight over the State's

14  voting, opening, closing of polls, the use of exact

15  match, et cetera.  I mean --

16      Q    Okay.

17      A    -- he's not -- he might not be the

18  individual who directly sanctions that in your

19  particular neighborhood, but he runs the voting and

20  electoral apparatus in the state.

21      Q    Okay.  And you know that Randolph County

22  is not a defendant in this case; right?

23      A    I do.

24      Q    And no other local election board is a

25  defendant in this case?

1      A     Yes.

2      Q     Okay.  And do you know that the Randolph

3  County Board of Elections is appointed by the

4  Randolph County Board of Commissioners?

5      A     No.

6      Q     Do you know that that commission is

7  majority democrat?

8      A     No.

9      Q     I think this is what you were referring to

10  earlier.  You say, quote, former Secretary of State

11  Brian Kemp provided a manual to counties that

12  includes information designed to assist in closing

13  precincts.

14          Right?

15      A     Yes.

16      Q     And you go on to say in that manual:  The

17  former secretary reminded counties twice they were

18  no longer required to preclear laws with DOJ in

19  order to close polling locations in areas with,

20  quote, low income, small populations, and

21  substantial minority populations.

22          Right?

23      A     Yes.

24      Q     And you cite an AJC article for this;

25  correct?

1        A     I do.

2        Q     And that's the one referenced in Footnote

3   71; right?

4        A     Yes.

5        Q     I'm going to hand you what I will mark as

6   Exhibit 12.

7              (Jones Deposition Exhibit D-12 was marked

8   for identification and attached to the transcript.)

9   BY MR. MILLER:

10       Q     Again, I apologize for the bizarre way

11  these things print out.

12             Is that the article you're citing there in

13  Footnote 71?

14       A     Yes.

15       Q     Okay.  If you'll turn with me -- I'm

16  sorry.  Strike that.

17             Okay.  If you'll turn with me to what is

18  Page -- 1, 2, 3 -- so it's the -- it's printed front

19  and back; so 1, 2, 3, 4, 5, 6.  It's a picture of a

20  water tower on it.

21       A     Yeah.

22       Q     Are you with me there?

23       A     I'm here.

24       Q     And so you see in this article it states:

25  The document dated February 2015 doesn't recommend

1    closing precincts, but it outlines the reasons local

2    governments can do so.

3              Do you see that?

4        A    Yes.

5        Q    Okay.  And do you see in that article

6    where the document is a different shade than the

7    rest of the type, a hyperlink there?

8              MR. DUBOSE:  What where?

9              MR. MILLER:  The word document.  Mine is

10   highlighted.

11       A    The second word on the page?

12   BY MR. MILLER:

13       Q    Yeah.

14       A    Okay.

15       Q    And so have you viewed this article

16   online?

17             MR. DUBOSE:  Are you saying the word

18   document?

19             THE WITNESS:  He's saying you can click on

20   this.

21             MR. MILLER:  If you're looking at it

22   online.

23   BY MR. MILLER:

24       Q    When you looked at this article, did you

25   do it online?

```
 1        A     Yes.

 2        Q     Okay.

 3        A     Although I can't guarantee that.  I mean,

 4   maybe I printed it out.

 5        Q     Okay.

 6        A     But go ahead.

 7              MR. DUBOSE:  So are you representing to

 8   her that the second word on the page that you're

 9   working for is a hyperlink?

10              MR. MILLER:  Yes.

11              MR. DUBOSE:  You can't see it from what we

12   have.

13              MR. MILLER:  It's a slightly different

14   shade.  But, nonetheless, I'll represent it.  And if

15   you contest it, then that's --

16              MR. DUBOSE:  Hyperlinks typically have an

17   underline or are bright blue.  Maybe if we had color

18   copies, that might be helpful.

19              MR. MILLER:  Yeah, I would agree.

20              MR. DUBOSE:  That paralegal again?

21              MR. MILLER:  If you have any reason to

22   doubt me, we can print out another version or look

23   at it on my cell phone.

24   BY MR. MILLER:

25        Q     So I will represent to you that that word
```

```
 1   document is a hyperlink.
 2       A    Got it.
 3       Q    Okay.  But you're not sure if you've ever
 4   seen this article online?  I should clarify --
 5       A    I've seen that this article is online.
 6       Q    Okay.  And, of course, you've seen other
 7   articles that have hyperlinks in them from the AJC;
 8   right?
 9       A    Yes.
10       Q    Okay.  So that document it's referring to
11   there, the document, is referring to the manual
12   you're talking about in your expert report; right?
13       A    Yes.
14       Q    Okay.  Have you ever seen that manual?
15       A    I'm not sure.
16       Q    Okay.  And why not cite that document?
17       A    Again, that would be -- it might be a
18   superior cite.
19       Q    So I pulled that document by clicking on
20   the hyperlink there.  I'll hand to you what we'll
21   mark as Exhibit 13.
22            (Jones Deposition Exhibit D-13 was marked
23   for identification and attached to the transcript.)
24   BY MR. MILLER:
25       Q    Have you seen this document?
```

1        A     Yeah.

2        Q     So let's go back to your statement on Page

3     11.

4        A     Okay.

5        Q     Again, you say:  In that manual, the DOJ

6     reminded counties twice -- excuse me.  Strike that.

7               In that manual, the former secretary

8     reminded counties twice that they were no longer

9     required to preclear laws with the DOJ in order to

10    close polling locations in areas with, quote, low

11    income, small populations, and substantial minority

12    population, end quote.

13               Right?

14       A     Yes.

15       Q     Can you show me where that quoted language

16    comes from the document.

17               And that says?

18       A     You are no longer required to submit

19    precinct changes to the Department of Justice for

20    preclearance.

21       Q     And nowhere in there does it say low

22    income, small populations, and substantial minority

23    populations?

24       A     No.

25       Q     Okay.  But your sentence here is implying

1    that the manual says that; right?

2              MR. DUBOSE:  Objection.

3         A    Yes.

4    BY MR. MILLER:

5         Q    Okay.  Is that incorrect?

6         A    I think so.

7         Q    Okay.  Instead --

8         A    I mean, I think that the -- yes, let's go

9    with yes.

10        Q    Instead that quote comes from the AJC

11   article; right?

12        A    Yes.

13        Q    So back on the page with the --

14        A    So, yeah, it's not here.  But this is

15   citing to the fact that the manual reminds counties

16   twice.  And you're saying it's not in this article.

17        Q    I'm telling you -- so let's go back to

18   what you just said.

19        A    Okay.

20        Q    The manual reminds counties twice that

21   they were no longer required to preclear laws with

22   the DOJ in order to close polling locations in areas

23   with low income, small populations, and substantial

24   minority populations.

25        A    Okay.

1          In the manual, the former secretary

2    reminded counties twice that they were no longer

3    required to preclear laws with the DOJ.

4          And then I'm saying in order to close

5    polling places and using this quote.

6      Q    Do you see how that sentence implies that

7    the secretary directed counties on closing polling

8    locations in areas with low income, small

9    populations, and substantial minority populations?

10     A    I see where the sentence implies that the

11   polling places that were closed were a low income

12   and small population, substantial minority

13   population, in compliance with the manual issued by

14   the Secretary of State.

15     Q    So would you agree with me on a slight

16   variation of this sentence that in the manual the

17   former secretary reminded counties twice that they

18   were no longer required to preclear laws with the

19   DOJ, period?

20          MR. DUBOSE:  Objection.

21     A    Yes.

22   BY MR. MILLER:

23     Q    Okay.

24     A    I'm not saying you can't say --

25     Q    I'm just -- to clarify --

1          MR. DUBOSE:  Let her finish.

2     A    I hear your interpretation, but yes.  So

3 yes.  I mean --

4 BY MR. MILLER:

5     Q    Okay.

6     A    -- I could read, but no.

7     Q    So you didn't mean to imply that the

8 manual informs county about -- informs counties

9 about closing locations in those areas?

10     A    No.  I meant to imply that the manual

11 reminds people about the Shelby decision and that

12 the polling closures are in low income areas.

13     Q    Did you intend to make this sentence sound

14 in a way where it could be read as though the manual

15 says that?

16          MR. DUBOSE:  Objection.

17     A    No.

18 BY MR. MILLER:

19     Q    Okay.

20     A    No.

21     Q    And so actually that quote comes from the

22 AJC article --

23     A    Yes.

24     Q    -- right?

25          And it's at the bottom of that same page

 1  we were looking at earlier with the water tower on

 2  it; right?

 3       A    I don't know.  I'll look.

 4            Yes.

 5       Q    And so you see that that is, in fact,

 6  quoting an article which is --

 7       A    It's quoting a quote from John Powers.

 8       Q    Right.  And John Powers is an attorney for

 9  the lawyer's committee for civil rights.  Do you see

10  that?

11       A    Yes.

12       Q    And even if in that context he's stating

13  that while decisions to close precincts are made by

14  independent election boards in each of Georgia's 159

15  counties; right?

16       A    Yes.

17       Q    So we've talked about four examples in the

18  latter half of your Opinion 1 after 1990; right?

19       A    Okay.  I don't know what you mean.

20       Q    In your report we've talked about four

21  examples now?

22       A    That are after 1990?

23       Q    As part of your analysis which occurred

24  after 1990; right?

25            MR. DUBOSE:  Examples of what?

1        A    What difference does it make about the --
2    I don't understand what you're saying.
3    BY MR. MILLER:
4        Q    So we just talked about the majority vote
5    law being a lawsuit plaintiffs brought; right?  In
6    1990?
7        A    In the 1960s.
8        Q    Page 9, you with me?
9        A    Yeah.
10       Q    In 1990 Georgia plaintiffs --
11       A    They brought this.
12       Q    -- the lawsuit?
13       A    Okay.
14       Q    So we talked about that.
15            We talked about the Voting Rights Act
16    reauthorization in 2006; right?
17       A    Okay.
18       Q    We talked about the Puerto Rican driver's
19    licenses; right?
20       A    Okay.
21       Q    And we talked about polling place
22    closures; right?
23       A    Okay.
24       Q    Are there any other instances in Opinion 1
25    which are referencing actions that occurred after

1    1990?

2         A    What's your point about 1990?

3         Q    If you'll answer the question, please.

4         A    Okay.

5         Q    Is that a yes?

6         A    Yes.

7         Q    Yes, as in there are other instances, or

8    yes, that's it?

9         A    That's a yes, and then I'm skeptical

10   unless you tell me what you're asking me, because I

11   don't understand based upon your reference to the

12   1990s.

13        Q    Respectfully, Dr. Jones, I'm asking you

14   what in -- the Opinion 1 section of your report is

15   referencing actions which occurred after 1990.

16        A    Okay.

17        Q    Are those the only four things?

18        A    I don't know.  I'm assuming that you've

19   looked at it and that those are the four things.

20        Q    But you can't recall others that were

21   after 1990?

22        A    No, I don't think about it in this

23   context.

24        Q    Okay.  So am I to understand that these

25   four more recent examples represent the portion of

```
 1   your opinion of, quote, to present, the state of
 2   Georgia has continually suppressed the right of
 3   people of color to vote?
 4             MR. DUBOSE:  Objection.
 5             When you say to present, you're talking
 6   about --
 7             MR. MILLER:  I'm referring to --
 8             MR. DUBOSE:  -- Page 2, that the formal --
 9             MR. MILLER:  Her Opinion 1 on Page 2,
10   right.
11             MR. DUBOSE:  He's talking about right
12   here, Page 2.
13             THE WITNESS:  This is over here.
14             MR. DUBOSE:  So Page 2.
15             THE WITNESS:  Yeah, I see the argument.
16             MR. DUBOSE:  Yeah, go to Page 2.  So he's
17   talking about that heading right there that starts
18   from the beginning of its existence to present.
19             THE WITNESS:  I understand.
20             MR. DUBOSE:  So he's focused on the fact
21   that your heading says to present right now.
22             THE WITNESS:  I understand.
23             MR. DUBOSE:  Go ahead, Carey.
24   BY MR. MILLER:
25        Q    I'm asking you:  Are these examples that
```

1   were just discussed what support your opinion that,

2   quote, to present, the state of Georgia has

3   continually suppressed the right of people of color

4   to vote?

5       A    I consider that statement to be broader, I

6   feel like, than you're making it.  I'm saying that

7   the state of Georgia has a persistent history of

8   voter suppression from the beginning of its

9   statehood until now.  And this report really only

10  focuses on -- through Shelby --

11      Q    Okay.

12      A    -- so, you know.

13      Q    So your report is then limited to the

14  period up to 2013?

15      A    My report is definitely historical and not

16  focused so much on the immediate information for --

17  situation in this case.  And so I think other

18  experts have that.

19      Q    Okay.

20      A    But I would say that the state of Georgia

21  has a habit of attempting to suppress the votes of

22  people of color.

23      Q    So it's not focused on actions in the '16

24  elections or '14 elections?

25      A    No.

```
1        Q     Stops at Shelby?
2        A     And then -- I think other experts are
3   dealt with the more contemporary review under
4   Section 5 and exactly what happened with the
5   midterms that you're talking about.
6        Q     Okay.  And so Opinion 2 -- I think we
7   talked about earlier the similarities there between
8   Opinion 1 and 2.
9        A     I agree.
10       Q     Is that in the same context up to Shelby?
11       A     Yes.
12       Q     Okay.
13       A     And it starts at what I'm calling the
14   beginning of time.
15       Q     Okay.  The beginning -- yeah, as far as --
16       A     U.S. time.
17       Q     -- the --
18       A     Exactly.
19       Q     Okay.  So Page 27, you state:  As a result
20   of Shelby County, the Justice Department no longer
21   preclears restrictions on minority voter suppression
22   in freed states, including formerly covered states
23   like Georgia, to pass new voting laws without a
24   requirement to have them vetted by the federal
25   government.
```

```
 1          Right?
 2               MR. DUBOSE:  What page?
 3               MR. MILLER:  Page 27.
 4      A    Yes.
 5  BY MR. MILLER:
 6      Q    Okay.  But you're just -- so there aren't
 7  any examples there, but that's because your report
 8  is limited to Shelby and Shelby got rid of
 9  preclearance.  That's what you're saying there;
10  right?
11      A    Yes.
12      Q    So regarding these two opinions here, your
13  report has not been peer-reviewed; right?
14      A    No.
15      Q    Okay.  Tested in other contexts?
16               MR. DUBOSE:  Objection.
17  BY MR. MILLER:
18      Q    Your conclusions and analysis here, have
19  they been tested in any context?
20      A    I don't even know what that means.
21      Q    Is there a known error rate to this type
22  of analysis?
23               MR. DUBOSE:  Objection.
24      A    No.
25  BY MR. MILLER:
```

1        Q    Okay.  And are there certain standards
2   controlling the analysis?
3               MR. DUBOSE:  Objection.
4        A    Again, I don't understand the question.
5               MR. MILLER:  We can go off the record.
6               (Off-the-record discussion.)
7               (Recess taken from 12:41 p.m. to 12:47
8   p.m.)
9               MR. MILLER:  Dr. Jones, thank you for your
10  time here today.  I appreciate it.
11              THE WITNESS:  Thank you.
12              MR. MILLER:  This will conclude the
13  deposition of Dr. Adrienne Jones.
14              Before we officially conclude, though, I
15  suppose plaintiff's counsel will handle signature or
16  anything?
17              MR. DUBOSE:  Yeah.
18              MR. MILLER:  All right.  Then that will
19  conclude the deposition.
20              THE WITNESS:  Thank you.
21              (Deposition concluded 12:47 p.m.)
22
23
24
25

1          CERTIFICATE OF COURT REPORTER

2

3     STATE OF GEORGIA:

4     COUNTY OF COBB:

5

6          I hereby certify that the foregoing

7     transcript was taken down, as stated in the caption,

8     and the questions and answers were reduced to

9     typewriting under my direction; that the foregoing

10    128 pages represent a true and correct transcript of

11    the evidence given upon said proceeding.

12

13          This the 21st day of December 2019.

14

15

16    _____

17          MICHELLE LOWE, RPR, CCR-2748

18

19

20

21

22

23

24

25

**Regency-Brentano, Inc.**

```
 1              DISCLOSURE OF COURT REPORTER

 2

 3              Pursuant to Article 10.B of the Rules and

 4    Regulations of the Board Of Court Reporting of the

 5    Judicial Council of Georgia, I make the following

 6    disclosures:

 7              That I am not disqualified for a

 8    relationship of interest under the provisions of

 9    OCGA Section 9-11-28(c); that I am a Georgia

10    Certified Court Reporter; that I am a representative

11    of MLowe Reporting, LLC; that MLowe Reporting, LLC,

12    was contacted by Regency-Brentano, Inc. to provide

13    court reporting services for this deposition; that

14    all financial arrangements beyond the usual and

15    customary rates have been disclosed and offered to

16    all parties; and that I will not be taking this

17    deposition under any contract prohibited by Georgia

18    law.

19

20              This the 21st day of December 2019.

21

22

23    _____

24         MICHELLE LOWE, RPR, CCR-2748

25
```

**Regency-Brentano, Inc.**

```
1                          ERRATA SHEET

2          I, ADRIENNE JONE, the witness herein, do hereby

3    certify that I have read the transcript of my

4    deposition testimony dated December 19, 2019, and

5    the same is true and correct to the best of my

6    knowledge with the exception of the following

7    changes noted below, if any:

8    _____ 1)  There are no changes noted.
     _____ 2)  The following changes are noted:
9
            Pursuant to Rule 30(7) (e) of the Federal
10   Rules of Civil Procedure and/or the Official Code of
     Georgia Annotated 9-11-30 (e), both of which read in
11   part:  Any changes in form or substance which you
     desire to make shall be entered upon the
12   deposition... with a statement of the reasons
     given... for making them.  Accordingly, to assist
13   you in effecting corrections, please use the form
     below:
14

15   Page No. _____ Line No. _____

16   Change to:_____

17   Reason for Change:_____

18

19   Page No. _____ Line No. _____

20   Change to:_____

21   Reason for Change:_____

22

23   Page No. _____ Line No. _____

24   Change to:_____

25   Reason for Change:_____
```

**Regency-Brentano, Inc.**

```
1   Deposition of ADRIENNE JONES

2

3   Page No. _____ Line No. _____

4   Change to:_____

5   Reason for Change:_____

6

7   Page No. _____ Line No. _____

8   Change to:_____

9   Reason for Change:_____

10

11  Page No. _____ Line No. _____

12  Change to:_____

13  Reason for Change:_____

14

15  Page No. _____ Line No. _____

16  Change to:_____

17  Reason for Change:_____

18

19                          _____
                                   ADRIENNE JONES
20
    Sworn to and subscribed before me,
21  this the _____ day of _____, 20___.

22
                                _____
23                                  Notary Public
                                    My commission expires:
24

25
```

**Regency-Brentano, Inc.**

## A

**ABA (2)**
12:4;13:2
**abide (1)**
63:24
**abject (1)**
67:9
**able (4)**
27:19;103:8;107:3,
13
**Abrams (5)**
42:3;45:7;46:17;
47:17;55:2
**absentee (2)**
48:17;49:6
**absolutely (3)**
58:1;75:1;76:11
**absorbing (1)**
107:15
**abstract (1)**
72:16
**academic (4)**
17:1;20:19;25:8;
69:1
**academically (8)**
24:25;25:7,17;
69:12,19;70:18;71:5;
86:23
**acceptance (1)**
25:11
**accepted (2)**
15:18;49:7
**accordingly (2)**
60:1;131:
**accurate (5)**
9:11;10:1;24:6;
45:9;73:11
**acknowledge (2)**
76:4;110:8
**Across (1)**
5:4
**Act (35)**
4:17,20;14:2;19:8,
10;25:1;26:3,6;27:5;
28:5;29:14;30:9;31:3;
47:10;51:23;52:11,
17;71:23,25;73:2,7;
74:15,17,25;75:3,6,
21,23;78:6,20;80:9,
17;81:10;101:14;
122:15
**acting (3)**
103:24;104:15,23
**ACTION (13)**
0:5,6;37:13,17;
38:12;39:14;40:16;
55:8;58:6;59:9;83:25;
97:8;104:14
**actions (7)**
34:10;79:15,16;
109:10;122:25;

**123:15;125:23**
**active (5)**
60:6;83:2,3,5,5
**activity (1)**
50:4
**actual (1)**
100:13
**actually (8)**
41:22;75:23;79:2;
82:9;91:24;93:25;
94:21;120:21
**added (2)**
9:17,18
**additional (1)**
9:12
**additions (1)**
9:15
**additive (1)**
54:10
**address (1)**
79:6
**adherence (1)**
73:6
**adjunct (4)**
17:8,14;20:21;22:3
**adjust (1)**
32:12
**adjustment (1)**
60:18
**administration (5)**
12:8,11;29:11;31:7;
95:25
**administrative (1)**
20:18
**admitted (4)**
11:17,19,22,24
**ADRIENNE (9)**
0:13;4:4,6;6:2;7:7;
128:13;131:2;132:,1
**advanced (1)**
28:6
**advisor (2)**
17:13;23:18
**advocate (1)**
47:3
**affiliated (1)**
54:24
**affiliation (1)**
56:17
**affirmative (1)**
74:4
**affirmed (1)**
7:8
**aftermath (2)**
77:7,9
**again (21)**
21:15;27:15;28:24;
31:2;53:3;58:22;63:2,
10;65:24;70:21;86:6;
87:23;88:10;92:9;
94:7;99:22;113:10;
115:20;116:17;117:5;
128:4

**against (4)**
46:17;60:15;65:7;
109:9
**agency (1)**
105:24
**agree (6)**
58:10;75:23;88:1;
115:19;119:15;126:9
**agreeable (3)**
7:2;8:14,15
**agreed (2)**
57:23;80:21
**agreement (2)**
6:15;80:24
**agreements (1)**
52:22
**ahead (5)**
8:16;21:20;61:17;
115:6;124:23
**airline (1)**
16:16
**AJC (4)**
112:24;116:7;
118:10;120:22
**al (2)**
0:5,9
**Alabama (1)**
82:22
**alarmed (1)**
35:6
**alleged (1)**
45:3
**alleges (1)**
34:11
**Allegra (1)**
35:24
**allowed (3)**
6:4;19:21;47:5
**alluded (2)**
19:2;32:8
**alluding (1)**
10:17
**almost (1)**
60:13
**alone (2)**
58:11,11
**along (1)**
90:9
**Although (3)**
38:4;79:5;115:3
**always (1)**
8:6
**AME (1)**
38:10
**amend (2)**
102:15;103:9
**amended (5)**
33:19,20,24;34:1;
68:13
**amendment (2)**
103:17,20
**amendments (5)**
102:19;103:5,6,8,

**14**
**America (4)**
16:12;51:23;52:11,
17
**American (4)**
18:9,9;21:2;25:1
**Americanists (1)**
23:23
**Americans (1)**
63:18
**Among (2)**
17:21;81:25
**analogized (2)**
26:10;27:4
**analysis (10)**
10:14,15,18,19;
75:15;85:19;121:23;
127:18,22;128:2
**and/or (1)**
131:10
**animal (1)**
25:24
**animus (1)**
97:17
**anniversary (1)**
27:1
**Annotated (1)**
131:
**antipathy (1)**
98:11
**antireauthorization (1)**
102:14
**anti-VRA (1)**
73:17
**apologize (3)**
44:6;97:23;113:10
**apparatus (2)**
111:6,20
**Appeals (6)**
12:14;13:10,13,20;
14:2;92:20
**APPEARANCE (2)**
2:1;53:2
**appears (2)**
53:11;77:10
**Appendix (1)**
9:8
**applications (1)**
108:24
**applied (3)**
15:17;23:1,3
**appointed (1)**
112:3
**appreciate (1)**
128:10
**approached (1)**
36:3
**appropriate (3)**
58:2;105:10;106:20
**areas (7)**
61:25;112:19;
117:10;118:22;119:8;
120:9,12

**argue (1)**
72:22
**arguing (1)**
93:25
**argument (7)**
13:11;73:12;75:8,
20;85:20;88:8;124:15
**arguments (2)**
75:4,5
**Ari (1)**
70:15
**arising (1)**
29:24
**arose (1)**
34:9
**around (1)**
15:25
**arrangements (1)**
130:14
**arrive (2)**
54:14,17
**article (41)**
25:17,22;26:1,4;
27:9,16,20;30:19,21;
31:9;44:25;48:13;
64:19,24;66:1,13;
69:19,23;70:24;71:6,
11;79:5;83:9;86:23;
87:6,23;88:2;101:17;
112:24;113:12,24;
114:5,15,24;116:4,5;
118:11,16;120:22;
121:6;130:3
**articles (16)**
11:9;24:25;30:17;
31:18,20;32:1,3,12;
44:7;57:25;58:11;
69:1;86:8,13,19;
116:7
**Ashcroft (1)**
85:8
**aside (1)**
71:8
**aspect (1)**
54:12
**assist (5)**
68:3,6;110:25;
112:12;131:
**assistant (4)**
12:4;13:2;22:19,21
**assume (4)**
12:7,10;63:18;72:5
**assumed (1)**
87:14
**assuming (6)**
19:24;20:16;25:15;
90:7,12;123:18
**assumptions (3)**
36:19,22,25
**asterisks (1)**
95:7
**Atlanta (7)**
0:,2,25;2:8,18;21:5,

9
**attached (14)**
6:9;9:3,10;44:4;
45:23;59:7;63:6;
64:22;65:19;71:18;
87:4;92:14;113:8;
116:23
**attack (2)**
47:6;48:12
**attacks (2)**
73:25;74:2
**attempt (1)**
98:12
**attempted (5)**
39:18,23;40:2,13;
97:15
**attempting (1)**
125:21
**attempts (1)**
103:17
**attend (1)**
14:23
**attendance (1)**
38:14
**attended (2)**
11:1;28:7
**attention (2)**
46:14;102:22
**Attorney (8)**
2:4,14;12:13;13:9,
10;16:11;38:5;121:8
**attorneys (2)**
13:17;36:2
**attorney's (1)**
12:20
**attributable (1)**
95:21
**attribute (1)**
65:25
**audible (2)**
8:1,3
**audibly (1)**
97:24
**audience (5)**
32:13;42:20;43:1,3,
4
**authority (1)**
111:9
**automatically (2)**
107:20;109:4
**available (3)**
28:18,20;86:1
**awards (1)**
28:10
**aware (7)**
37:14;47:12;49:6,9,
11,15;107:18

**B**

**bachelor's (1)**
10:6
**Back (17)**

4:16;9:7;12:3;23:9;
28:8;31:13;65:22;
81:23;85:17;92:24;
100:22;101:12;109:6;
113:19;117:2;118:13,
17
**backed (1)**
110:4
**background (3)**
10:4;69:24,25
**backward (1)**
58:20
**Baconton (1)**
38:6
**bad (2)**
46:3;59:1
**bail-in (2)**
34:20,21
**ballot (3)**
51:7,18;54:6
**ballots (6)**
48:17,19,20;49:6;
51:1,12
**Ballpark (1)**
16:6
**Baptist (2)**
38:3,6
**bar (2)**
11:13,15
**barbecue (3)**
14:20,20;15:8
**base (2)**
102:13;108:15
**based (9)**
10:15;18:16;53:4;
77:21;78:17,21;
107:6;109:10;123:11
**basically (1)**
25:24
**basis (9)**
45:14;62:21;75:15;
84:12;90:6,8,12,16;
106:24
**became (4)**
20:3,7;93:8;98:23
**become (2)**
45:8;77:10
**beginning (5)**
89:16;124:18;
125:8;126:14,15
**behalf (3)**
2:2,12;6:20
**behind (3)**
94:16;98:13;100:24
**belief (1)**
103:7
**below (4)**
81:23;90:9;131:,7
**Berkeley (1)**
11:1
**Berman (1)**
70:15
**best (3)**

28:1,2;131:5
**better (2)**
83:12;84:2
**beyond (1)**
130:14
**bidding (1)**
41:4
**big (1)**
12:24
**bilingual (1)**
82:1
**bill (16)**
80:21;93:1,14;94:2,
8,21;97:17,19;100:6,
13;101:24;102:5,15;
103:2,9,10
**bit (8)**
13:2;17:2;21:20;
26:7;33:15;60:16;
71:14;89:9
**bizarre (2)**
44:6;113:10
**Black (11)**
14:10,11,19,23;
15:19;25:1;36:7;
42:16;45:8;97:18;
110:3
**black-owned (1)**
14:20
**blacks (1)**
84:11
**blatantly (1)**
93:2
**bloc (2)**
97:18,19
**blue (1)**
115:17
**Board (7)**
110:2,4,9;111:24;
112:3,4;130:4
**boards (1)**
121:14
**both (6)**
19:18;28:17;60:12;
75:5;76:10;131:
**bottom (4)**
61:6;99:18,19;
120:25
**BRAD (3)**
0:8;6:3;43:14
**brain (1)**
35:23
**branches (1)**
75:11
**Brand (1)**
35:24
**break (3)**
8:8,12;41:19
**breakups (1)**
90:14
**Brian (2)**
43:18;112:11
**brief (7)**

16:14;83:11,16,16,
18,20;84:1
**briefly (1)**
33:10
**briefs (6)**
82:22;83:10,13;
84:1,4;86:7
**bright (1)**
115:17
**bring (3)**
29:17;41:7;103:13
**bringing (2)**
16:25;34:17
**broader (2)**
16:24;125:5
**Brooks (2)**
4:24;92:16
**brought (3)**
91:18;122:5,11
**Brown (1)**
10:6
**Bundy (1)**
35:23
**bureau (3)**
105:9,16;106:20
**Bush (1)**
76:5
**Buttigieg (1)**
57:15
**buttons (2)**
108:3,4

**C**

**California (3)**
11:16,22,25
**call (7)**
22:11;25:22;40:14;
58:5;59:9;76:10;
105:19
**called (3)**
44:9;98:5;103:2
**calling (3)**
108:17,20;126:13
**came (1)**
21:9
**campaign (3)**
55:3;56:9;57:20
**camps (1)**
66:18
**Can (25)**
4:9;8:19;10:12;
26:4;31:11;34:7;
41:23;44:7;46:5;
47:20;48:13;56:1;
74:24;80:24;87:11,
12;89:2,11;110:21;
111:2;114:2,19;
115:22;117:15;128:5
**candidate (5)**
9:18;56:2;57:10,13;
62:17
**candidates (1)**

56:24
**Capacity (6)**
0:;22:12;103:25;
104:9,16,24
**caption (1)**
129:7
**Care (1)**
38:12
**career (2)**
17:2;82:23
**careers (1)**
15:21
**CAREY (2)**
2:13;35:9;124:23
**Carl (1)**
96:6
**Carolina (2)**
60:6,12
**Carter (1)**
40:4
**case (31)**
8:18;9:1;13:6;
33:15,17;34:5,15,25;
37:9;38:24;43:10;
49:4;54:21;60:25;
64:3;68:19;69:4;
82:21;83:3;84:7;85:2,
5;89:9,12;91:13;
92:16;101:3;106:8;
111:22,25;125:17
**cases (4)**
13:19;70:13;92:2,6
**caseworks (1)**
13:25
**casting (1)**
54:5
**cause (1)**
41:13
**caused (2)**
48:5;103:18
**Cavanaugh (2)**
58:19,20
**CCR-2748 (3)**
0:19;129:17;130:24
**cell (1)**
115:23
**census (1)**
58:24
**center (2)**
17:20;40:4
**Century (1)**
4:15
**certain (6)**
10:23;24:18;43:5;
65:14;68:9;128:1
**certainly (1)**
66:21
**CERTIFICATE (1)**
129:1
**CERTIFIED (2)**
0:;130:10
**certify (2)**
129:6;131:3

cetera (1)
111:15
challenge (1)
84:12
challenging (1)
91:13
chancellor (1)
20:7
change (8)
34:25;131:16,20,
24;132:4,8,12,16
Change_ (7)
131:17,21,25;
132:5,9,13,17
changed (1)
6:15
changes (7)
13:18;20:11;
117:19;131:,7,8,11
changing (1)
110:14
Chapters (3)
79:14,19;85:11
checking (1)
20:9
chief (9)
20:3,17;22:9,11;
92:25;93:13,17,18;
94:20
chilling (1)
72:24
choice (1)
84:2
chose (1)
32:14
Church (6)
38:3,4,6,8,15;39:5
churches (2)
36:8;38:24
circuit (11)
12:16,19,22,24;
13:15;92:8,20;95:3,
18;99:22;100:25
citation (5)
83:16,17,18,20;
109:16
cite (13)
70:2;81:17;83:8,11;
84:1;86:6,8;87:23;
91:20;101:3;112:24;
116:16,18
cited (6)
68:23;69:1;70:11,
13,15;83:10
citing (2)
113:12;118:15
citizens (2)
97:19;109:10
City (10)
17:5,6,17,21;18:1,2,
15,17,23;19:3
Civil (13)
0:6;6:5;13:25,25;

18:11,12;24:12;28:4,
5;66:5,7;121:9;
131:10
claim (1)
16:25
claims (1)
16:24
clarify (5)
17:24;75:2;106:17;
116:4;119:25
clarity (2)
7:16;17:17
class (1)
19:18
classes (5)
24:9;29:10,21,24;
30:1
clear (1)
66:1
clearly (1)
8:1
Cleveland (1)
14:24
click (1)
114:19
clicking (1)
116:19
client (1)
87:21
clips (1)
16:3
close (8)
110:3,9;111:2;
112:19;117:10;
118:22;119:4;121:13
Closed (4)
5:4;27:2;111:10;
119:11
closely (1)
100:20
closing (7)
109:23;110:13;
111:14;112:12;114:1;
119:7;120:9
closures (3)
110:24;120:12;
122:22
cmiller@robbinsfirmcom (1)
2:20
coalition (1)
73:17
COBB (1)
129:4
code (2)
98:6;131:10
code's (1)
98:14
colleague (1)
87:13
College (8)
17:5,6,17,22;18:15,
17,23;21:24
colleges (1)

17:21
colloquially (1)
34:19
color (7)
89:18;109:13,20;
115:17;124:3;125:3,
22
Colorblind (1)
4:19;19:9;71:25;
72:23
color's (1)
89:23
column (8)
95:17,18;96:9,13,
20;98:10;99:10,20
coming (6)
39:25;50:3;57:20;
79:2;82:18;104:19
commentary (1)
79:4
commenting (1)
78:25
commission (2)
112:6;132:
commissioner (3)
46:18;84:12,19
Commissioners (1)
112:4
Committee (8)
40:8;41:10;55:20;
69:10;96:2,10;97:20;
121:9
committees (1)
9:25
commonly (1)
54:2
communicate (1)
37:3
communication (1)
10:21
Communications (2)
16:11;35:19
compared (2)
23:23;27:10
comparisons (1)
27:14
compiling (1)
16:22
complain (1)
62:7
complaint (12)
16:21,23;33:17,19,
20,22;34:1,2;36:8,9;
68:13,13
complete (1)
73:5
completed (1)
19:5
compliance (2)
20:11;119:13
comprehensive (1)
100:4
concern (1)

109:7
conclude (3)
128:12,14,19
concluded (1)
128:21
conclusions (3)
68:6,10;127:18
concurrent (1)
13:1
conduct (1)
47:13
conducted (2)
16:3,4
conducting (1)
67:19
confer (3)
105:8;106:19,25
confirmation (2)
58:19,20
confirmations (1)
58:16
conflict (2)
45:15;47:1
confuse (1)
7:23
confused (1)
105:18
confusing (1)
18:3
congress (4)
39:25;66:19,25;
104:1
Congressional (6)
4:21;25:15;40:5,6;
70:25;76:25
congressperson (1)
40:15
congresswoman (1)
40:11
connect (1)
30:14
connected (1)
17:19
Conservation (1)
4:19
Conservatism (3)
19:9;71:25;72:23
conservative (3)
73:16;74:8;75:10
conservatives (1)
76:19
consider (6)
54:24;58:15,23;
69:3,8;125:5
considered (3)
76:14,15;90:10
considering (1)
90:2
consistent (2)
67:10;89:23
consolidated (1)
111:11
constituents (1)

104:17
constitutional (4)
18:10;21:2;24:11;
102:5
consult (2)
44:17;68:24
contact (1)
36:5
contacted (3)
35:20;36:13;130:12
contained (2)
90:13;101:16
Contemporary (5)
4:14;30:3,15;63:9;
126:3
contention (2)
49:22;102:18
contest (1)
115:15
contested (1)
80:23
Context (10)
4:15;30:8;53:1,10;
54:2;106:15;121:12;
123:23;126:10;
127:19
contexts (2)
65:14;127:15
continually (3)
89:17;124:2;125:3
Continue (2)
29:1;66:18
continued (1)
20:20
contract (1)
130:17
contracts (1)
20:10
contrary (1)
100:24
contributed (5)
55:2,7;56:1,24;57:9
Contribution (1)
56:16
contributions (1)
56:14
control (3)
49:19;64:10;93:3
controlling (1)
128:2
controversy (1)
105:3
conversation (2)
7:16;103:4
copies (1)
115:18
copy (2)
27:20;72:6
cord (2)
50:6,14
cords (2)
48:18;50:21
Corporate (1)

0:24
**corrections (1)**
131:13
**correctly (2)**
26:14;27:6
**corroborated (1)**
100:6
**Council (1)**
130:5
**COUNSEL (7)**
2:1;7:11;9:19,22;
35:19;37:6;128:15
**Count (2)**
55:12;59:2
**counties (11)**
112:11,17;117:6,8;
118:15,20;119:2,7,17;
120:8;121:15
**county (11)**
49:7;50:8;97:12;
109:22;110:2;111:21;
112:3,4;120:8;
126:20;129:4
**couple (3)**
39:21;57:22;58:18
**course (2)**
6:15;7:15,20;24:1,
9;31:25;32:6;35:22;
57:2;77:13;86:19;
116:6
**courses (10)**
18:6,11,18;21:1;
23:6,17;24:12,13,16;
29:19
**COURT (25)**
0:,1;7:25;12:14;
17:7,10;33:5,8;58:16;
60:22;76:13;92:6,20;
95:20;99:4,24;
100:25;102:7;103:22,
22;129:1;130:1,4,10,
13
**courtesy (1)**
7:21
**courthouse (1)**
12:22
**cousin's (1)**
33:13
**cover (3)**
14:9;34:18;43:7
**coverage (2)**
82:1;103:19
**covered (2)**
60:5;126:22
**created (1)**
96:15
**creation (1)**
98:5
**criminal (6)**
13:24,25;18:11,12;
24:12;65:11
**critical (2)**
82:1;94:12

**criticisms (3)**
74:17,20,24
**criticize (2)**
78:12,18
**culture (1)**
10:9
**CUNY (6)**
17:18,19,20,25;
28:18,19
**currently (3)**
11:19;21:24;24:20
**custody (1)**
33:13
**customary (1)**
130:15
**cut (1)**
97:23
**CV (12)**
9:10,11;10:4;15:14;
21:11;25:4,13;28:8;
32:9,13;44:20;46:11
**CWA (2)**
16:25;17:4

# D

**D-1 (2)**
4:4;6:8
**D-10 (2)**
4:21;87:3
**D-11 (2)**
4:24;92:13
**D-12 (2)**
5:4;113:7
**D-13 (2)**
5:7;116:22
**D-2 (2)**
4:6;9:2
**D-3 (2)**
4:7;44:3
**D-4 (2)**
4:9;45:22
**D-5 (2)**
4:11;59:6
**D-6 (2)**
4:13;63:5
**D-7 (2)**
4:15;64:21
**D-8 (2)**
4:16;65:18
**D-9 (2)**
4:17;71:17
**data (1)**
90:10
**dated (2)**
113:25;131:4
**day (4)**
40:1;129:13;
130:20;132:21
**DDS (5)**
107:1;108:7,19,22;
109:1
**DDS's (1)**

109:10
**dealing (1)**
13:20
**deals (1)**
52:12
**dealt (1)**
126:3
**Dean (1)**
28:15
**December (4)**
0:14;129:13;
130:20;131:4
**decided (2)**
77:13;99:5
**decision (3)**
21:4;26:10;120:11
**decisions (2)**
76:13;121:13
**default (1)**
107:20
**Defendant (4)**
6:2;106:8;111:22,
25
**Defendants (6)**
0:10;2:12;4:2;5:2;
7:11;43:9
**defended (1)**
72:8
**definitely (4)**
34:23;67:5;108:13;
125:15
**degree (6)**
10:6,9;26:11;27:11;
71:1;86:16
**delineate (1)**
101:6
**democrat (1)**
112:7
**Democratic (8)**
54:24;55:16,20;
56:1,2,9,24;57:3
**democrats (1)**
64:3
**Denial (2)**
4:12;59:18
**Denmark (7)**
93:1,8;94:3;97:13;
98:2;100:12,23
**Department (10)**
19:13;23:14;88:23,
24;105:20;106:5,6,7;
117:19;126:20
**departments (1)**
23:22
**depending (1)**
107:4
**depends (2)**
88:23,25
**deposit (1)**
72:13
**deposited (1)**
72:14
**DEPOSITION (30)**

0:13;4:4;6:1,6,8,14;
7:1,5,14,15;9:2;44:3;
45:22;59:6;63:5;
64:21;65:18;71:17;
87:3;92:13;113:7;
116:22;128:13,19,21;
130:13,17;131:4,12;
132:1
**depositions (1)**
68:18
**derivative (2)**
71:11;88:13
**describe (1)**
87:11
**DESCRIPTION (2)**
4:3;5:3
**designed (7)**
45:6;73:8;79:5;
103:5,10,11;112:12
**desire (1)**
131:
**despite (2)**
66:5,7
**destroy (1)**
45:7
**details (2)**
41:18;60:16
**determining (1)**
110:25
**devastating (1)**
72:25
**Development (7)**
4:18;19:8;20:8;
26:6;28:3;71:24;
72:22
**developments (2)**
30:12;39:8
**dictated (2)**
107:6,10
**died (1)**
97:20
**difference (4)**
88:7;90:3;101:7;
122:1
**different (10)**
7:15;16:2,3;17:18;
25:9;63:1;71:13;
90:14;114:6;115:13
**difficult (1)**
44:8
**difficulty (1)**
109:21
**digits (1)**
52:18
**direct (2)**
50:1;94:9
**directed (2)**
49:19;119:7
**direction (1)**
129:9
**directly (1)**
111:18
**director (6)**

17:7;20:14,17;22:7,
18;57:8
**disabled (1)**
42:16
**disappointed (1)**
47:16
**discipline (2)**
81:14,21
**disclose (1)**
31:11
**disclosed (1)**
130:15
**disclosing (1)**
35:18
**DISCLOSURE (1)**
130:1
**disclosures (1)**
130:6
**discovery (3)**
6:4;68:21;69:4
**discriminate (1)**
60:15
**Discrimination (7)**
4:12;59:18;60:7,19;
77:3;78:17;109:9
**discriminatory (1)**
67:5
**discuss (5)**
30:1;33:10;85:4,7;
103:3
**discussed (16)**
30:8;53:4;54:3;
57:23;62:20;63:12;
65:24;69:12;77:16;
78:16;85:11;86:5,20;
91:9;100:23;125:1
**discussion (8)**
8:21;26:12;30:11;
36:12;42:23;71:1;
89:4;128:6
**disdain (1)**
66:20
**disenfranchised (1)**
64:16
**disenfranchisement (1)**
48:8
**Disparate (1)**
66:17
**disposed (1)**
13:13
**disqualified (1)**
130:7
**disseminated (3)**
15:2,4,9
**dissertation (19)**
19:19,22;28:25;
69:22;70:12,19,22;
71:5,12,15,21;72:11;
75:7,16,20;85:18;
88:9,14;101:17
**dissolved (1)**
97:7
**distributed (1)**

15:2
**DISTRICT (7)**
0:,1;38:10;92:5;
95:19;99:23;100:25
**divided (1)**
23:22
**DIVISION (1)**
0:2
**divorce (1)**
33:13
**DMV (5)**
105:19;107:13,16;
109:5,13
**DNC (2)**
42:13,15
**docket (3)**
8:25;9:1;83:16
**document (16)**
6:10;85:18;95:15;
99:8,13;113:25;
114:6,9,18;116:1,10,
11,16,19,25;117:16
**Documentary (1)**
14:8
**documents (2)**
69:3,8
**DOJ (9)**
82:22,23;84:11;
112:18;117:5,9;
118:22;119:3,19
**donated (1)**
56:7
**done (4)**
9:16;40:20;50:10;
93:23
**doubt (3)**
44:22;97:16;115:22
**down (4)**
8:3;97:13;110:5;
129:7
**downfall (1)**
103:18
**Dr (7)**
4:4,6;6:2;42:2;
123:13;128:9,13
**drafting (1)**
98:6
**drafts (1)**
37:5
**draw (1)**
102:21
**drawn (1)**
58:5
**drew (1)**
27:14
**driver (5)**
93:10;105:20;
106:5,6,8
**drivers (1)**
108:18
**drivers' (1)**
108:24
**driver's (11)**

52:17;53:6,15;
105:4,9,16;106:1,20;
107:8;108:2;122:18
**driving (1)**
73:15
**DuBose (87)**
0:15;2:3,5;6:17,18,
20,20,22;7:3;27:19,
23;35:3,8;41:19;
47:18,24;49:8,14,21;
50:11,22;52:1,4,7;
53:19;55:4,9,13,17,
21;56:3,12,16,19;
58:7;59:23;61:14,16;
62:8;67:3,12;69:6;
74:18;75:25;76:22;
77:22;78:13,23;80:2;
83:4,15;90:24;94:6,
23;98:20;99:3;
100:14;101:9;104:18;
110:16,20;114:8,17;
115:7,11,16,20;118:2;
119:20;120:1,16;
121:25;124:4,8,11,14,
16,20,23;127:2,16,23;
128:3,17
**dubose@dubosemillercom (1)**
2:10
**Dubuque (5)**
31:20;43:24;44:15;
46:9;63:3
**due (1)**
51:18
**duly (1)**
7:8
**during (7)**
14:14;18:20;28:3;
34:9;48:4;60:7;66:9
**duties (2)**
13:8;22:13

---

**E**

**earlier (15)**
32:8;38:23;57:12;
62:20;66:13;68:12;
69:12;77:16;86:5;
91:9;100:23;102:9;
112:10;121:1;126:7
**earnest (1)**
81:1
**Ebenezer (3)**
38:3;39:22;40:2
**editing (2)**
87:13,21
**edition (1)**
27:1
**editor (3)**
12:4;13:2;44:15
**editorial (1)**
48:1
**editorials (1)**

58:11
**educational (1)**
28:7
**effecting (1)**
131:13
**effort (1)**
103:9
**either (4)**
15:3;52:17;58:24;
86:20
**elected (1)**
84:16
**Election (39)**
4:11;5:5;12:7,8,10,
11;14:1;29:11;30:12;
31:7;34:25;45:3,6,11,
17;46:20;47:22,25;
48:4,9;49:11,25;
59:12,17,22;60:7;
61:7,13,22;62:6,21;
66:9;93:3;96:9;98:6;
100:5;110:12;111:24;
121:14
**elections (21)**
13:21;16:8;29:22,
25;30:2;31:3;34:10;
43:21;46:18;60:1;
61:8,23;62:14;67:1;
90:21;110:1,2,9;
112:3;125:24,24
**electoral (2)**
61:23;111:20
**electorate (1)**
60:18
**Eleventh (6)**
92:8,20;95:2,18;
99:22;100:25
**eligibility (1)**
107:17
**eligible (1)**
107:5
**ELSC (8)**
96:1,8,13,16;97:1,
7;98:5;99:2
**else (1)**
40:25
**Elsewhere (1)**
84:24
**e-mail (1)**
37:4
**embarrassment (1)**
18:5
**Emmett (3)**
66:14;67:1,10
**emphasize (1)**
98:11
**employed (1)**
21:24
**employees (3)**
16:17,23;82:24
**employment (1)**
12:2
**en (1)**

66:18
**enacted (2)**
48:19;50:25
**encounter (1)**
66:8
**encouraged (2)**
61:23;93:2
**end (5)**
44:25;59:11;77:6;
97:4;117:12
**energy (1)**
94:1
**enforcement (1)**
65:11
**engaged (2)**
48:8;60:6
**engaging (1)**
64:8
**enough (4)**
8:1;48:18;50:2;
102:5
**ensure (1)**
48:17
**ensuring (1)**
49:12
**entail (2)**
16:20;28:16
**entails (1)**
10:12
**enter (1)**
52:22
**entered (1)**
131:
**Entertainment (1)**
12:5
**entire (1)**
61:18
**entirely (1)**
64:13
**entities (1)**
52:21
**Entitled (2)**
71:23;105:7
**entity (1)**
104:16
**environment (3)**
67:5,11;93:20
**Episcopal (1)**
38:10
**equality (3)**
74:5,10,15
**equipment (1)**
50:2
**ERRATA (1)**
131:1
**error (1)**
127:21
**escaping (1)**
36:2
**essentially (5)**
13:15;16:22;19:17,
20;65:7
**establish (4)**

74:3,9;105:9;
106:20
**et (3)**
0:5,9;111:15
**euphemism (1)**
97:18
**even (8)**
7:19;86:1;88:20;
93:16,18;94:8;
121:12;127:20
**event (14)**
36:7;38:15,18,24;
39:9,18,20;40:17,23;
41:13;42:13,15,22;
101:22
**events (5)**
39:21;40:20;42:10,
11;63:23
**eventually (1)**
76:19
**evidence (1)**
129:11
**exact (14)**
48:19;50:25;51:6,
11,20;53:1,9;54:2,5,7,
9,13,16;111:14
**Exactly (12)**
22:14;27:8;41:11;
48:21;51:2,13;53:21,
23;80:25;94:24;
126:4,18
**exam (2)**
11:13,15
**Examination (2)**
3:2;7:11
**EXAMINATIONS (1)**
3:1
**examined (1)**
7:10
**examines (1)**
75:10
**example (3)**
10:14;30:7;109:20
**examples (7)**
48:15;121:17,21,
25;123:25;124:25;
127:7
**except (1)**
6:23
**exception (1)**
131:6
**exchange (1)**
37:5
**excited (1)**
94:18
**exclusively (3)**
16:21;29:11,20
**excuse (7)**
12:8;32:23;66:6;
74:1;76:14;77:25;
117:6
**executive (2)**
75:11;84:16

exercised (2)
    49:19;84:15
exercising (1)
    34:12
EXHIBIT (32)
    4:3;5:3;6:7,8;8:17,
    24;9:2;44:2,3;45:21,
    22;59:5,6;63:4,5;
    64:20,21;65:17,18;
    67:19;71:15,17;87:1,
    3;92:12,13;95:5,6;
    113:6,7;116:21,22
EXHIBITS (3)
    4:1;5:1;46:1
existence (2)
    89:16;124:18
expected (1)
    9:24
expecting (1)
    28:5
experience (3)
    21:21;27:18;28:13
experiences (1)
    39:4
Expert (10)
    4:6;8:17,24;32:25;
    33:2;36:16;58:12,16,
    24;116:12
experts (2)
    125:18;126:2
expires (1)
    132:
explain (1)
    10:12
explanation (1)
    18:5
expressed (1)
    76:5
expressing (1)
    48:2
extend (1)
    7:20
extended (1)
    20:6
extension (1)
    50:21
extreme (2)
    81:13,20

**F**

F3d (2)
    95:14;99:9
fact (8)
    77:10;80:20;96:12;
    99:23;107:18;118:15;
    121:5;124:20
facts (4)
    36:18,22,25;90:10
faculty (10)
    9:19,22,24;19:12,
    16,17,23;21:7;28:11;
    72:3

fail (3)
    39:19;103:10,11
FAIR (13)
    0:5;18:13;37:13,16;
    39:13;40:16,20;41:9,
    12;47:16;55:7,8,12
falls (1)
    49:1
false (1)
    58:8
familiar (4)
    47:9;51:22;88:22;
    95:6
familiarity (1)
    31:10
far (2)
    63:12;126:15
fault (1)
    17:25
February (1)
    113:25
Federal (18)
    4:19;19:9;33:5,8;
    39:25;47:12;64:1,7;
    72:25;79:16;83:20;
    104:9,20,25;107:11,
    12;126:24;131:
feedback (1)
    13:17
feel (5)
    54:9;65:6;67:4;
    70:15;125:6
feels (1)
    66:10
fellow (3)
    19:12,16,23
fellowship (4)
    20:5;28:12,16,22
fellowships (4)
    28:9,10,17,20
female (1)
    45:8
few (8)
    7:14;10:3;22:15;
    29:14;43:23;59:4;
    79:23;84:23
fields (1)
    15:20
FIGHT (10)
    0:5;37:13,16;39:13;
    40:16,20;41:9,13;
    55:7,8
File (2)
    0:;13:18
filed (5)
    8:25;82:22;83:20;
    84:1;93:25
film (2)
    10:13,22
filmmaker (2)
    14:5;15:19
filmmaking (1)
    10:19

films (6)
    10:15;14:7,14,18;
    15:2;16:2
final (2)
    37:6;75:8
financial (1)
    130:14
find (4)
    27:21;39:12;41:10;
    79:3
finding (1)
    67:24
findings (1)
    99:23
fine (2)
    7:3;41:22
finish (2)
    7:18;120:1
finished (1)
    70:16
first (18)
    7:1,8;14:22,23;
    23:9;33:23;45:8;
    46:14;69:16;73:15,
    21;77:6;89:14;96:16,
    25;97:1;98:10;100:12
flamboyantly (1)
    48:3
flip (2)
    9:7;23:9
flipped (2)
    22:15;25:14
FML (1)
    16:24
FMLA (2)
    16:21,24
focus (6)
    29:11,22;79:14;
    85:11;87:16;90:24
focused (7)
    25:24;31:5;85:16;
    87:19;124:20;125:16,
    23
focuses (2)
    25:23;125:10
folks (1)
    23:23
follow (1)
    43:20
following (4)
    83:17;130:5;131:,6
follows (1)
    7:10
Footnote (4)
    84:6;86:4;113:2,13
force (3)
    73:16;94:14;100:24
foregoing (2)
    129:6,9
forget (1)
    95:5
forgive (3)
    31:10;43:3,8

forgot (1)
    50:20
Form (8)
    4:13;6:24;49:21;
    50:22;63:9;78:23;
    131:11,13
formal (1)
    124:8
former (7)
    43:17;60:5;112:10,
    17;117:7;119:1,17
formerly (1)
    126:22
forms (1)
    10:16
forth (1)
    90:9
forum (1)
    36:8;87:8,13
forward (4)
    93:12;94:1,13,19
found (4)
    73:17;81:25;95:20;
    101:1
foundation (2)
    70:9,12
four (6)
    52:18;121:17,20;
    123:17,19,25
fourth (1)
    44:24
franchise (2)
    63:24;105:7
Francisco (3)
    12:20,23,25
Franklin (1)
    70:11
Frankly (1)
    83:7
freed (2)
    19:20;126:22
fresh (1)
    60:16
friend (2)
    37:16;39:13
front (5)
    67:18;85:17;89:11;
    100:20;113:18
Fudge (2)
    40:9,10
full (6)
    6:18;34:12;73:15,
    21;96:19,22
function (1)
    109:2
functions (1)
    49:1
fund (1)
    29:6
funded (1)
    19:22
further (1)
    36:11

future (1)
    78:17

**G**

gains (2)
    66:5,7
gatherings (1)
    42:10
gave (1)
    28:20
gears (3)
    17:1;33:14;89:8
general (5)
    15:1;35:11;52:2;
    74:9;103:7
generally (3)
    29:10;52:12,19;
    63:15;67:16;87:18
genre (1)
    10:24
George (1)
    100:8
Georgia (63)
    0:,,9,25;2:8,18;4:8,
    9;5:5;29:22,25;34:17;
    36:21,23;44:10;46:5;
    48:7,13;49:1;53:13;
    55:16;56:25;67:21;
    79:12,20,23;80:23;
    81:3,4;82:6,22;84:10,
    11,23;85:8,12,16;
    88:2,4;89:17,22,24;
    90:21;96:15;104:4,
    11,16,19;105:17,18;
    107:18;110:14;
    122:10;124:2;125:2,
    7,20;126:23;129:3;
    130:5,9,17;131:
Georgians (1)
    104:25
Georgia's (4)
    43:20;45:8;61:3;
    121:14
gerrymandering (1)
    60:17
gets (1)
    8:6
Ghazal (3)
    56:11,23;57:2
girl's (1)
    14:23
given (4)
    7:5;33:7;129:11;
    131:
giving (4)
    6:13;49:3;54:20;
    107:16
goes (2)
    60:19;80:20
good (2)
    41:20;87:23
GOP (5)

4:21;25:15;66:19;
80:21,23
**Gotcha (1)**
18:24
**Government (12)**
4:20;18:9,10;19:10;
21:2;24:21;63:23;
64:7;83:21;104:20;
105:1;126:25
**governmental (1)**
104:16
**governments (2)**
64:2;114:2
**government's (1)**
72:25
**Governor (7)**
43:18;45:8;47:17;
96:6;98:4;99:2;100:2
**governor's (2)**
95:24;100:3
**graduate (3)**
17:20,20;24:15
**Graduated (1)**
11:4
**grant (1)**
86:6
**grant-funded (1)**
29:2
**grants (1)**
29:6
**Groover (10)**
93:2;95:23;97:13;
98:2,12,19;99:1;
100:2,12,23
**Groover's (4)**
95:20;97:16,19;
100:5
**ground (1)**
7:14
**grounded (3)**
74:4,10,14
**group (3)**
15:6;42:10;80:22
**groups (1)**
38:16
**guarantee (1)**
115:3
**gubernatorial (1)**
48:9
**guess (1)**
56:23
**guests (1)**
43:5
**Gwinnett (1)**
50:8

## H

**habit (1)**
125:21
**hack (1)**
45:3
**half (3)**

13:6;81:12;121:18
**Hall (2)**
37:21;85:4
**hand (6)**
44:1;45:20;63:2;
64:19;113:5;116:20
**handed (1)**
95:3
**handle (1)**
128:15
**happen (3)**
41:14;64:17,18
**happened (3)**
48:4;79:4;126:4
**happening (1)**
39:1
**Hardy (1)**
35:25
**Harrison (1)**
28:15
**HAVA (3)**
52:25;53:4,9
**head (7)**
8:3,7;64:25;92:4;
105:9;106:19;107:1
**heading (2)**
124:17,21
**headings (1)**
90:14
**hear (1)**
120:2
**heard (2)**
36:10;87:15
**hearings (6)**
26:9;30:13;40:1,5,
6;70:25
**Hearkens (2)**
4:16;65:21
**heavy (1)**
49:25
**Heights (1)**
14:24
**help (4)**
28:24;51:22;52:11,
16
**helped (1)**
41:13
**helpful (1)**
115:18
**helping (2)**
20:8;41:9
**Herald (5)**
31:21;43:24;44:15;
46:9;63:3
**hereby (2)**
129:6;131:2
**herein (1)**
131:2
**hi (1)**
42:7
**Hide (2)**
4:9;46:6
**high (4)**

14:24;15:7,8;
103:22
**highest (1)**
108:25
**Highland (1)**
38:8
**highlighted (1)**
114:10
**Hilary (4)**
37:21,22;39:15;
40:22
**hindered (1)**
34:12
**historical (1)**
125:15
**history (10)**
12:2;15:11;25:2;
26:8,12;36:21;70:8;
89:24;109:19;125:7
**hold (3)**
10:6;52:4;108:16
**Holder (4)**
26:7;60:13;77:9;
85:4
**Holly (2)**
37:21,22
**home (1)**
73:17
**hope (2)**
59:13;70:11
**horror (1)**
67:9
**hostility (3)**
74:4,10,14
**House (4)**
40:7;69:9;97:20;
100:8
**housekeeping (1)**
45:25
**hyperlink (4)**
114:7;115:9;116:1,
20
**Hyperlinks (2)**
115:16;116:7

## I

**ID (9)**
54:8,10,12,14,19;
60:13,20,23;61:1
**identification (18)**
6:9;9:3;44:4;45:23;
48:21;51:2,13;53:16,
22;59:7;63:6;64:22;
65:19;71:18;87:4;
92:14;113:8;116:23
**ideological (1)**
72:23
**III (2)**
23:12;24:11
**immediate (1)**
125:16
**immediately (1)**

60:14
**impact (1)**
72:25
**impeachment (1)**
30:13
**implementation (1)**
73:1
**implies (4)**
100:11,12;119:6,10
**imply (3)**
94:21;120:7,10
**implying (4)**
108:6,13;109:7;
117:25
**important (2)**
7:16;93:11
**impose (1)**
76:15
**impression (3)**
41:16;109:2;111:12
**improper (1)**
98:12
**impulse (1)**
66:20
**impute (1)**
98:12
**inappropriate (2)**
48:1,4
**INC (3)**
0:5,23;130:12
**included (1)**
32:9
**includes (1)**
112:12
**including (2)**
60:5;126:22
**inclusive (1)**
63:24
**income (7)**
112:20;117:11,22;
118:23;119:8,11;
120:12
**incorrect (2)**
105:23;118:5
**incorrectly (1)**
103:16
**independent (2)**
14:5;121:14
**INDEX (3)**
3:1;4:1;5:1
**indication (1)**
18:16
**individual (2)**
26:2;111:18
**Influence (8)**
4:18;19:9;46:19;
71:24;75:10;96:1;
99:1,2
**information (10)**
52:22;53:5;58:8;
67:24;107:16;108:23;
110:18,24;112:12;
125:16

**informs (2)**
120:8,8
**initial (1)**
72:2
**injunctive (1)**
34:22
**input (1)**
100:6
**insincere (1)**
80:14
**insisted (2)**
61:8,22
**insofar (2)**
70:7,21
**instance (1)**
86:4
**instances (3)**
85:10;122:24;123:7
**instead (4)**
80:22;91:23;118:7,
10
**institution (1)**
17:23
**institutions (2)**
23:4;28:7
**instruct (1)**
35:15
**integration (1)**
28:6
**intend (1)**
120:13
**intensively (1)**
41:3
**intention (1)**
73:7
**intentional (2)**
48:8;109:9
**intentionally (1)**
109:5
**interaction (1)**
38:16
**interest (3)**
45:15;47:1;130:8
**interesting (2)**
15:14;74:11
**interim (3)**
20:13,16;22:7
**interment (2)**
63:22;66:18
**international (1)**
23:24
**interpretation (1)**
120:2
**interrupt (1)**
7:18
**interviewed (2)**
9:17;57:12
**interviewer (1)**
15:11
**interviews (2)**
16:3,4
**intimidation (1)**
61:24

**into (8)**
14:12;15:18;52:22;
63:13,16;78:1;94:17;
107:15
**investigation (2)**
45:2,5
**invited (2)**
42:23;43:5
**Invites (2)**
4:11;59:18
**involved (6)**
15:18;16:22;26:11;
41:6;95:24;109:8
**involvement (4)**
37:8,25;57:19;
107:14
**involves (1)**
24:1
**involving (1)**
82:21
**Iowa (1)**
82:9
**issue (6)**
27:1;61:1,12;78:4;
90:20;103:6
**issued (2)**
110:23;119:13
**issues (9)**
14:1;18:11;29:24;
30:3,15;34:9;35:11;
59:25;60:17
**items (1)**
25:4

## J

**job (4)**
16:20;19:21;23:25;
46:17
**John (3)**
70:11;121:7,8
**joined (1)**
36:8
**joining (2)**
38:24;39:5
**JONE (1)**
131:2
**JONES (28)**
0:13;4:5,6;6:2,8,11;
7:4,7,13;9:2;42:2;
44:3;45:22;59:6;63:5;
64:21;65:18;71:17;
83:24;87:3;92:13;
113:7;116:22;123:13;
128:9,13;132:,1
**journal (5)**
12:5;13:3;25:9;
31:15;87:8
**journals (1)**
11:7
**judged (1)**
65:5
**judges (1)**

13:15
**judicial (2)**
75:11;130:5
**jurisdictions (2)**
50:1;110:25
**justice (4)**
60:23;66:18;
117:19;126:20

## K

**keep (1)**
46:1
**keeping (1)**
9:20
**Kemp (5)**
43:18;46:17;47:2;
49:19;112:11
**Kemp's (1)**
48:16
**kept (1)**
46:17
**killing (2)**
65:1,10
**killings (1)**
65:5
**kind (9)**
9:15;14:7;18:6;
27:24;29:9;34:14;
42:9;52:7;87:16
**King (1)**
82:6
**knowledge (4)**
108:7;109:3,8;
131:6
**known (2)**
97:14;127:21

## L

**lack (4)**
31:10;100:5;
103:17,20
**laid (1)**
76:19
**language (2)**
74:5;117:15
**Large (6)**
42:9,11;64:3,16;
84:16;85:18
**last (5)**
46:15;52:18;81:12;
82:15;88:11
**later (1)**
36:12
**latest (1)**
45:5
**latter (1)**
121:18
**Law (63)**
2:4,14;11:1,7,12;
12:3,5;18:10,12;21:2;
23:13,14,20,24,25;

24:1,2,2,5,6,12,12,12,
15,22;47:5,12;48:20;
49:1;51:1,11,25;
53:13;54:8,8,10,12,
14;61:3;65:11;86:8,
12,16;90:21;91:13,
17;93:2,9;94:4,17;
95:21;96:10;98:19,
23,23;100:5,24;
106:19;107:11,12;
110:15;122:5;130:18
**lawmakers (1)**
79:16
**law-related (1)**
23:17
**Lawrence (2)**
35:23,25
**laws (9)**
60:13,20,23;
112:18;117:9;118:21;
119:3,18;126:23
**lawsuit (7)**
83:3;91:16,19,20;
93:24;122:5,12
**lawsuits (3)**
84:23;91:3,24
**lawyer (2)**
35:8;36:10
**lawyer's (1)**
121:9
**lay (4)**
24:25;25:22;31:25;
58:11
**lead (1)**
94:22
**leading (1)**
67:11
**least (2)**
13:1;43:25
**lecture (1)**
21:1
**lecturer (2)**
20:21;22:3
**led (3)**
80:23;81:2;82:6
**left (3)**
96:20,21;99:10
**left-hand (3)**
96:9,13;99:20
**legal (11)**
18:12;24:4;45:18;
49:3,4;54:20;67:21;
82:22;84:1,12;106:12
**legislation (5)**
28:4;93:8,11;94:22;
101:7
**legislative (3)**
30:18;75:11;84:15
**legislators (1)**
82:1
**legislature (2)**
94:16;96:15
**legitimate (3)**

74:17,19,24
**Leslie (1)**
35:24
**less (2)**
19:21;60:16
**letter (1)**
73:1
**level (3)**
18:18;23:7;24:13
**library (1)**
72:13
**license (9)**
52:17;53:6,15;
105:9,16;106:1,20;
107:8;108:2
**licenses (3)**
105:4;107:3;122:19
**life (1)**
15:21
**Lifted (1)**
5:6
**liked (1)**
32:15
**Likely (1)**
50:9
**limitations (1)**
76:15
**limited (5)**
43:5;77:17;79:8;
125:13;127:8
**line (6)**
56:13;58:5;131:15,
19,23;132:3,7,11,15
**list (6)**
18:13;23:25;24:11;
37:24;42:23;47:13
**listed (5)**
28:10,12;32:21;
44:20;46:11
**litany (1)**
45:6
**literature (1)**
85:20
**litigation (5)**
33:3,11;35:21;37:1;
38:1
**little (11)**
13:1;17:2;21:20;
26:7;33:14;39:4;44:8;
60:16;71:14;89:9;
105:18
**LLC (5)**
0:15;2:5,16;130:11,
11
**local (12)**
40:15;49:7,11,20;
50:7,20;110:8,12,25;
111:4,24;114:1
**locals (2)**
49:24;110:18
**locate (1)**
72:4
**location (1)**

6:16
**locations (7)**
109:23;110:14;
112:19;117:10;
118:22;119:8;120:9
**Lodge (1)**
85:2
**long (4)**
88:21;89:1,23;
109:19
**longer (7)**
112:18;117:8,18;
118:21;119:2,18;
126:20
**look (7)**
16:14;27:7,16,24;
100:19;115:22;121:3
**looked (3)**
86:11;114:24;
123:19
**looking (6)**
21:22;41:3;70:9;
96:11;114:21;121:1
**losing (1)**
46:3
**loss (1)**
60:4
**lost (1)**
47:17
**lot (4)**
17:2;67:4;86:17;
87:13
**loudly (2)**
8:1;48:2
**low (7)**
112:20;117:10,21;
118:23;119:8,11;
120:12
**Lowe (3)**
0:19;129:17;130:24
**lynching (1)**
65:12
**Lynchings (1)**
4:15
**Lynn (2)**
80:5;81:24

## M

**machines (1)**
48:18
**magazine (3)**
25:23;26:22;27:2
**main (3)**
52:3;73:15;79:6
**maintaining (1)**
66:25
**maintenance (1)**
47:14
**major (2)**
82:16,21
**majority (17)**
63:18;66:19,25;

**74:4,10;90:20;91:13,**
17;93:1,9;97:15,17;
98:13,15;110:3;
112:7;122:4
**Makers (1)**
15:11
**makes (1)**
18:3
**making (11)**
16:24;20:10,11;
49:23;52:14;62:13,
17;94:18;104:13;
125:6;131:
**manager (1)**
50:20
**mandate (1)**
45:7
**mandates (1)**
73:7
**manual (15)**
112:11,16;116:11,
14;117:5,7;118:1,15,
20;119:1,13,16;120:8,
10,14
**many (5)**
14:14;16:2;29:10,
21;32:17
**Marcia (2)**
40:9,10
**mark (11)**
8:24;44:1;45:21;
59:5;63:3;64:20;
65:16;71:15;92:11;
113:5;116:21
**marked (13)**
6:8;9:2;44:3;45:22;
59:6;63:5;64:21;
65:18;71:17;87:3;
92:13;113:7;116:22
**marking (2)**
6:6;8:17
**mass (1)**
63:22
**master's (3)**
18:21,22,25
**match (21)**
48:19,21;51:1,2,6,
11,13,20;52:22,25;
53:1,9,10,23;54:3,5,8,
9,13,16;111:15
**matches (1)**
53:17
**matching (1)**
53:5
**material (1)**
85:14
**materials (2)**
70:6,20
**matriculate (1)**
24:5
**matter (5)**
10:13;33:3;35:11;
54:17,21

**may (2)**
107:5,5
**Maybe (6)**
14:16;42:7;43:25;
88:20;115:4,17
**mean (7)**
10:23;23:16,17;
25:7;30:3;35:5;41:6;
63:1;64:9,10;65:25;
75:5;80:24;83:18;
87:10;88:13,24;
94:21;101:20;103:16;
104:2,8;111:15;
115:3;118:8;120:3,7;
121:19
**Means (6)**
4:21;25:15;69:20;
86:23;106:15;127:20
**meant (3)**
19:17;100:17;
120:10
**media (3)**
10:9,16;68:24
**member (3)**
19:18;42:20;95:25
**members (1)**
80:23
**memorized (2)**
34:16,23
**mention (3)**
30:5;81:6;84:23
**mentioned (4)**
42:22;57:12;59:17;
102:9
**messages (1)**
58:19
**met (5)**
36:15;38:5;42:2;
43:14,17
**Michelle (3)**
0:19;129:17;130:24
**Michigan (1)**
72:15
**middle (3)**
30:4;60:3;72:21
**midst (2)**
29:16;30:5
**midterm (4)**
30:12;34:10;66:9;
110:1
**midterms (4)**
30:4,6;47:6;126:5
**midway (1)**
82:14
**might (13)**
20:6;21:10,13;
33:22;39:10;70:11,
15;77:2;84:1;108:25;
111:17;115:18;
116:17
**Miller (109)**
0:15;2:5,13;3:2;
4:24;6:1,10,13,22;7:4,

12;8:19,23;9:4;27:21,
25;35:10;41:21;42:1;
44:5;45:24;47:19;
48:6;49:10,16;50:5,
15,24;52:8,9;53:25;
55:6,11,15,19,24;
56:5,14,18,20,22;
58:9;59:8;60:2;61:19,
20;62:11;63:7;64:23;
65:20;67:8,14;69:7;
71:19;74:21;76:3,23;
77:24;78:15;79:7;
80:4;83:6,19,22;87:1,
5;89:2,7;91:1,2;
92:15,16;94:10,25;
98:22;99:6;100:16;
101:11;104:21;
106:16;107:25;
108:11;113:9;114:9,
12,21,23;115:10,13,
19,21,24;116:24;
118:4;119:22;120:4,
18;122:3;124:7,9,24;
127:3,5,17,25;128:5,
9,12,18
**mind (1)**
60:17
**Mine (1)**
114:9
**minorities (4)**
66:17;74:6;82:2;
93:4
**minority (8)**
34:12;112:21;
117:11,22;118:24;
119:9,12;126:21
**minute (1)**
91:6
**misleading (2)**
63:12;64:14
**Miss (7)**
6:11;7:4,13;47:17;
56:23;57:2;83:24
**missed (2)**
21:10,13
**Missionary (1)**
38:6
**Mississippi (1)**
14:22
**misstating (1)**
49:18
**MLowe (2)**
130:11,11
**mock (2)**
17:7,10
**modern (1)**
10:9
**money (2)**
28:24;41:6
**month (2)**
13:14;32:20
**month's (1)**
13:19

**Mood (2)**
4:16;65:21
**moot (2)**
17:7,10
**More (14)**
4:11;9:13;23:24;
28:6;32:18;45:20;
59:4,18;65:16;67:6;
89:9;100:20;123:25;
126:3
**Morehouse (13)**
9:19,21;21:23;
22:18;23:1,6;24:20;
39:19,24;40:3,14,17;
57:20
**most (1)**
70:14
**mostly (1)**
10:13
**motivated (1)**
94:1
**motivating (2)**
94:14;100:24
**motivations (1)**
98:13
**motivator (1)**
94:8
**motives (1)**
95:20
**move (2)**
21:5;94:18
**movement (3)**
28:4;66:5,8
**Movie (1)**
25:21
**movies (3)**
26:10;27:5,12
**moving (4)**
93:12;94:1,13;
110:13
**much (1)**
125:16
**multiprong (2)**
47:6;48:12
**murder (3)**
66:14;67:2,10
**myself (2)**
15:3,18

**N**

**name (6)**
6:19;35:22;36:1;
51:1;53:17;92:1
**named (1)**
93:24
**names (5)**
14:17;37:24;48:20;
51:12;107:15
**nation (1)**
66:10
**National (6)**
4:16;24:21;47:9;

55:20;65:21;66:20
**nature (2)**
18:17;42:18
**NE (2)**
0:;2:6
**necessarily (2)**
41:15;92:9
**necessary (1)**
107:16
**need (4)**
8:8;67:6;97:23;
100:19
**needed (1)**
68:3
**needing (1)**
18:5
**needs (2)**
27:24;53:22
**negative (1)**
103:21
**Negroes (1)**
93:3
**neighborhood (1)**
111:19
**New (15)**
11:16,18,20;14:21;
15:6;17:22;18:2,4;
19:3;25:23;70:14;
83:9;86:7;111:11;
126:23
**news (2)**
30:14;86:19
**newspapers (2)**
31:19,23
**next (4)**
13:19;48:16;66:16;
98:4
**night (1)**
88:11
**Ninth (4)**
12:17,18,22;13:15
**noncitizens (1)**
105:6
**None (4)**
29:12,23;57:21;
68:17
**nonetheless (1)**
115:14
**normal (1)**
7:16
**North (2)**
60:6,12
**NORTHERN (1)**
0:
**Notary (1)**
132:23
**note (4)**
11:10;45:25;
101:23;102:15
**noted (3)**
131:,7,8
**Notice (4)**
4:4;6:7,13;32:18

noticed (2)
  32:9;85:17
November (2)
  66:6,8
nowhere (1)
  117:21
Number (11)
  9:1;23:12;26:24;
  27:3;52:19;53:6,15,
  15;69:16;87:24;95:8
numbered (1)
  44:24
numbers (1)
  53:6
numeral (4)
  23:12;24:11,23;
  89:15
NW (1)
  2:17

**O**

object (2)
  35:4,8
Objection (50)
  35:3;47:18,24;49:8,
  14,21;50:11,22;52:1;
  53:19;55:4,9,13,17,
  21;56:3,12,13;58:7;
  59:23;62:8;67:3,12;
  69:6;74:18;75:25;
  76:22;77:22;78:13,
  23,24;83:4;94:6,23;
  98:20;99:3;100:14;
  101:9;104:18;106:13;
  107:22;108:9;110:16;
  118:2;119:20;120:16;
  124:4;127:16,23;
  128:3
objections (3)
  6:23;35:12;56:21
obligated (2)
  105:8;106:19
obligation (4)
  106:12,17,25;
  109:17
obtaining (1)
  105:4
obvious (1)
  7:19
occurred (6)
  50:17;63:23;103:8;
  121:23;122:25;
  123:15
occurs (2)
  54:13,14
OCGA (1)
  130:9
off (8)
  8:19;37:24;41:23;
  64:25;89:2;92:3;
  97:23;128:5
offer (1)

89:12
offered (1)
  130:15
offering (1)
  31:6
offerings (1)
  23:25
office (8)
  12:21;20:8;28:19;
  43:13;46:19;47:4;
  48:16;106:1
officer (3)
  20:4,18;22:10
officers (2)
  65:2,6
offices (1)
  6:16
Official (8)
  0:;93:17,18;103:24;
  104:3,10,24;131:10
officially (1)
  128:14
officials (6)
  49:7,12,20;79:15;
  88:5;110:13
Off-the-record (3)
  8:21;89:4;128:6
Ohio (1)
  14:25
Oklahoma (1)
  14:20
once (2)
  13:14;64:16
one (32)
  7:23;14:19,21,22;
  15:6,7,8;17:21;20:3;
  21:6;34:16;36:2;
  39:19,22;44:1,24;
  45:20;46:11;59:1;
  63:2,8;65:16,21;
  68:13;81:19;82:15,
  21;93:17,19;110:9;
  111:10;113:2
ones (4)
  24:10,18;32:18;
  60:23
ongoing (3)
  30:2,3,11
online (6)
  44:7;114:16,22,25;
  116:4,5
only (8)
  8:11;25:17;65:14;
  69:19;70:21;80:24;
  123:17;125:9
op-ed (8)
  9:13;44:9,20;46:5;
  58:6;59:1,11,16
op-eds (9)
  31:18,22;25:43:23;
  57:23,24;58:3,18;
  59:4
open (1)

27:3
opened (1)
  111:10
opening (1)
  111:14
operate (1)
  45:16
operation (1)
  47:25
opinion (28)
  13:17;31:6;45:18;
  48:1,2;49:3;50:12;
  54:20;63:14;89:15,
  21,22;90:6,13,17,19;
  92:22;95:3;103:11;
  106:12;121:18;
  122:24;123:14;124:1,
  9;125:1;126:6,8
opinion-based (1)
  32:3
opinions (4)
  89:12;90:4,9;
  127:12
opponent (2)
  95:23;100:3
opportunity (2)
  15:13;52:15;75:19
opposed (7)
  8:2;23:19;30:17;
  57:24;97:18;104:9,17
opposition (2)
  80:8;101:24
opt-out (1)
  107:19
oral (1)
  13:11
order (7)
  108:3;111:9,9;
  112:19;117:9;118:22;
  119:4
orders (1)
  92:6
organize (1)
  41:13
original (1)
  109:6
others (2)
  66:20;123:20
otherwise (3)
  33:8;109:8;110:14
out (9)
  12:24;21:4;34:17;
  35:22;39:12;44:7;
  113:11;115:4,22
Outcome (3)
  4:11;46:19;59:18
outcry (1)
  110:4
outlines (1)
  114:1
Outside (1)
  90:2
over (8)

73:16;75:6;87:17;
  96:1;99:1,2;111:13;
  124:13
overlaps (1)
  17:2
overlooked (1)
  64:4
Oversight (5)
  5:5;40:7;41:9;69:9;
  111:13
overstatement (1)
  74:12
overturn (1)
  76:19
overturned (1)
  76:13
overwhelming (1)
  76:9
own (3)
  34:7;45:16;52:10

**P**

PAGE (76)
  3:1;4:3;5:3;23:10;
  24:24;25:14,20;
  32:22;44:25;45:1;
  60:3,4;61:6;63:17;
  65:4;66:4;69:16;71:4;
  72:3;73:14,21;75:7;
  76:4,24;77:25;79:22,
  25;81:7,23;82:14,17;
  85:1,4,7,19;89:14,21;
  90:8,8,20,25;92:24;
  95:12,14;99:8,12,12,
  13,14,18;100:22;
  102:4;105:2;109:22;
  113:18;114:11;115:8;
  117:2;118:13;120:25;
  122:8;124:8,9,12,14,
  16;126:19;127:2,3;
  131:15,19,23;132:3,7,
  11,15
pages (4)
  44:24;46:15;90:17;
  101:12;129:10
pagination (3)
  95:7;99:9,15
panel (4)
  13:14;39:4;42:23,
  24
panelist (1)
  42:25
paper (2)
  46:4;79:11
paperwork (1)
  93:25
paragraph (18)
  46:16;48:16;66:16;
  72:22;73:15,21;77:7;
  82:15;91:3;95:18;
  96:19,23;97:5,9;98:4,
  9;99:19;109:25

paralegal (1)
  115:20
part (8)
  15:16;67:21;74:1,2;
  79:6;80:18;121:23;
  131:11
participate (2)
  11:6;59:25
participation (1)
  42:19
particular (7)
  10:23;24:19;32:13;
  35:19;60:24;90:25;
  111:19
particularly (2)
  26:6;75:20
parties (4)
  6:15;76:10;103:7;
  130:16
Party (6)
  54:25;55:16;56:2;
  57:3;81:14,21
pass (2)
  97:15;126:23
passed (4)
  40:24;60:12;76:9;
  97:19
passing (2)
  94:16;103:6
peer (5)
  25:8,10;30:16;
  31:11;57:25
peer-review (1)
  86:13
peer-reviewed (4)
  32:5;86:20;101:17;
  127:13
pending (2)
  8:12;31:12
people (20)
  10:25;14:10,11;
  15:19;18:3;59:24;
  64:3,16;86:17;87:15;
  89:18,22;107:2;
  109:12,13,14;120:11;
  124:3;125:3,22
per (2)
  60:20;65:11
perceived (1)
  10:25
perhaps (1)
  21:3
period (8)
  14:4,15;18:20;
  21:18;66:9;77:17;
  119:19;125:14
permanence (1)
  78:19
permanent (1)
  78:5
permitted (1)
  53:16
persistent (1)

125:7
**person (6)**
23:13;31:3;36:6;
37:4;44:16;107:4
**personal (3)**
26:11,12;27:17
**personally (1)**
50:3
**Pete (1)**
57:15
**PhD (2)**
18:22;19:2
**phone (3)**
36:16;37:4;115:23
**picture (1)**
113:19
**pieces (1)**
101:7
**pills (2)**
102:19;103:3
**place (9)**
14:20;15:8;41:20;
51:8;53:23;54:15,17;
87:17;122:21
**Places (3)**
5:7;119:5,11
**plaintiff (3)**
34:11;39:11;91:18
**Plaintiffs (11)**
0:6;2:2;6:21;37:9,
11,15,25;91:12;
98:11;122:5,10
**plaintiff's (3)**
38:5;67:21;128:15
**platform (1)**
72:23
**Platteville (4)**
19:13;21:23,25;
22:2
**pleadings (3)**
33:21;34:1;68:16
**please (4)**
7:24,25;123:3;
131:13
**pleased (1)**
59:21
**pledge (2)**
81:7,9
**pm (3)**
128:7,8,21
**point (11)**
8:8;20:3;39:5;
64:15;80:20;81:6;
83:7;90:8;96:8;100:9;
123:2
**poison (2)**
102:19;103:2
**police (3)**
65:2,5;66:17
**policy (1)**
24:6
**political (10)**
14:13;23:21;25:25;

31:16;56:14;74:15;
87:16,18,21;88:25
**politically (1)**
64:4
**politics (3)**
14:10,11;25:2
**poll (3)**
50:20;53:2,11
**Polling (13)**
5:7;51:7;53:23;
54:15,17;112:19;
117:10;118:22;119:5,
7,11;120:12;122:21
**polls (2)**
54:6;111:14
**popular (2)**
74:3,9
**population (3)**
117:12;119:12,13
**populations (9)**
112:20,21;117:11,
22,23;118:23,24;
119:9,9
**portend (1)**
77:2
**portending (1)**
77:20
**portion (1)**
123:25
**portions (1)**
103:16
**position (15)**
9:18,21;17:15;
19:23,25;20:18,23;
21:7,11,15;22:22,23;
49:18;57:6;109:1
**positions (4)**
20:19;21:22,23;
82:23
**positive (1)**
16:19
**possibility (1)**
63:21
**possible (2)**
70:12;108:14
**possibly (2)**
68:13;101:19
**post (4)**
26:7;77:20;78:17;
79:4
**potential (1)**
109:20
**potentially (2)**
64:18;72:24
**power (4)**
48:18;50:6,13;
84:16
**Powers (2)**
121:7,8
**practice (1)**
85:23
**pre-2013 (1)**
75:3

**precinct (6)**
50:7,13;109:23;
110:14;111:10;
117:19
**Precincts (8)**
5:4,7;49:13;110:10;
111:11;112:13;114:1;
121:13
**preclear (5)**
112:18;117:9;
118:21;119:3,18
**preclearance (2)**
117:20;127:9
**preclears (1)**
126:21
**preexisting (1)**
36:6
**prelaw (3)**
17:13;22:19;23:18
**prepared (2)**
49:24;50:2
**preparing (1)**
67:22
**present (8)**
6:19;13:14;89:16;
124:1,5,18,21;125:2
**presentations (1)**
25:5
**presidency (1)**
30:20
**President (6)**
59:12,22;61:8,22;
62:13;76:5
**presidential (2)**
9:17;57:13
**previous (2)**
23:4;70:8
**previously (4)**
11:24;57:3;60:14;
61:3
**primary (3)**
85:19;86:1;110:3
**print (2)**
113:11;115:22
**printed (2)**
113:18;115:4
**Printing (1)**
44:7
**prior (4)**
25:11;38:1,14;
102:10
**private (2)**
14:24;23:20
**privilege (1)**
6:24
**Probably (4)**
58:8;103:3
**problem (2)**
46:2;50:14
**problematic (2)**
60:24;103:20
**procedural (1)**
39:6

**Procedure (2)**
6:5;131:10
**proceed (1)**
35:9
**proceeding (2)**
33:13;129:11
**process (6)**
25:8;30:18;31:11;
52:25;86:13;93:12
**produce (1)**
14:14
**produced (3)**
68:21;69:3,9
**producing (1)**
69:23
**product (1)**
97:17
**professional (2)**
21:21;28:12
**professor (6)**
17:8,14;19:20;
21:17;22:19,21
**programs (1)**
17:11
**prohibited (1)**
130:17
**projecting (2)**
78:16,19
**projects (1)**
15:3
**promote (1)**
74:5
**prompted (1)**
67:1
**proposal (1)**
98:13
**proposition (1)**
86:2
**protect (1)**
73:8
**protection (2)**
57:8;60:5
**protocols (3)**
105:10;106:21;
107:6
**provide (2)**
36:18;130:12
**provided (5)**
19:20;48:15;53:14;
110:18;112:11
**providing (2)**
35:20;36:14
**provisional (1)**
48:19
**provisions (2)**
52:13;130:8
**provocative (1)**
64:15
**public (14)**
20:3,17;22:9;23:13,
14,19,25;24:6;31:18;
39:9;42:10,11;110:4;
132:23

**publication (5)**
26:22,24;69:15;
70:18;88:19
**publications (4)**
9:13;25:5;31:17;
69:13
**Publish (2)**
58:8;72:10
**published (8)**
11:9;24:25;30:16,
25;31:22;70:16;87:9;
88:15
**publishing (1)**
58:11
**Puerto (5)**
105:3;108:8,23;
109:9;122:18
**pull (2)**
27:15,19
**pulled (1)**
116:19
**purged (1)**
47:3
**Purges (1)**
47:5
**purpose (5)**
6:3;7:22;50:10,13;
98:6
**purposeful (1)**
103:18
**purposes (1)**
6:4
**Pursuant (2)**
130:3;131:
**push (1)**
108:3
**pushing (1)**
108:3
**put (6)**
24:7;32:12;63:13,
16;89:11;94:8
**putting (2)**
16:22;100:20

## Q

**qualified (2)**
32:23;33:2
**qualify (1)**
58:12
**Quarterly (1)**
31:16
**quick (1)**
41:19
**quite (5)**
27:9;51:9;83:17;
104:7;106:14
**quote (16)**
46:24;72:22;76:13;
83:15;93:3;102:3;
112:10,20;117:10,12;
118:10;119:5;120:21;
121:7;124:1;125:2

**quoted (1)**
117:15
**quotes (1)**
23:14
**quoting (2)**
121:6,7

## R

**race (5)**
24:12,22;47:17;
95:24;100:4
**race-based (1)**
74:3
**racial (3)**
74:5;97:17;98:11
**racist (1)**
95:20
**Radford (3)**
21:6,11,16
**RAFFENSPERGER (3)**
0:8;6:3;43:15
**Randolph (5)**
109:22;110:2;
111:21;112:2,4
**rate (1)**
127:21
**rates (1)**
130:15
**rather (1)**
8:2
**reach (1)**
68:9
**read (23)**
10:14;27:9;33:17,
20,22,23,23;61:17;
68:12,18;75:19;
81:25;83:13;84:3;
88:10,11;91:6;92:5,
22;120:6,14;131:,3
**reading (1)**
98:18
**really (7)**
14:19;31:2;41:18;
42:4;70:24;79:6;
125:9
**reason (11)**
32:10;72:2;83:8;
115:21;131:17,21,25;
132:5,9,13,17
**reasons (3)**
90:9;114:1;131:12
**Reauthorization (16)**
4:22;25:16;26:9;
70:25;76:6,9,12;77:1;
78:25;80:9,17;81:8;
101:14;103:2,21;
122:16
**reauthorizations (1)**
75:21
**reauthorize (2)**
80:21;103:9
**rebels (1)**

81:25
**recall (11)**
14:17;27:10;56:1,6;
58:21;64:24;70:20;
84:3;88:18;92:1;
123:20
**received (2)**
29:2,6
**recent (2)**
32:18;123:25
**recently (2)**
9:17;23:24
**Recess (4)**
8:22;41:24;89:5;
128:7
**recite (1)**
52:12
**recognize (3)**
9:5;71:20;87:6
**recollection (2)**
28:1,2
**recommend (1)**
113:25
**reconstruction (1)**
78:21
**record (9)**
6:19;7:17;8:19;
17:24;41:23;61:17;
66:2;89:3;128:5
**reduced (1)**
129:8
**re-emerge (1)**
63:19
**refer (7)**
20:13;51:20;52:25;
53:9;84:9;95:8;
105:18
**refereed (1)**
25:11
**reference (7)**
48:12;50:6;69:15;
81:23;91:16;105:2;
123:11
**referenced (2)**
25:4;113:2
**references (2)**
79:23;84:22
**referencing (2)**
122:25;123:15
**referred (4)**
34:19;53:1,8;54:2
**referring (21)**
24:10;25:18;38:19;
39:24;40:7,10;45:2;
46:23,25;48:11;
50:19;51:17;60:11;
84:19;96:6;97:1;
100:8;112:9;116:10,
11;124:7
**refers (2)**
51:7;53:1
**reflected (1)**
10:4

**refused (2)**
48:17;63:23
**regard (3)**
27:17;71:4;108:8
**regarded (1)**
23:13
**regarding (13)**
18:17;21:21;29:9,
13;31:17;36:22,25;
38:24;91:17;92:6;
105:3;106:11;127:12
**REGENCY-BRENTANO (2)**
0:23;130:12
**register (4)**
52:15;107:3,5,13
**registered (5)**
53:14;105:7;
107:21;108:4;109:5
**registering (4)**
107:2,9;109:12,21
**Registration (11)**
47:10;52:19;53:2,6,
10,18;54:4,13;107:17,
19;109:14
**Regulations (1)**
130:4
**rejected (7)**
48:17,20;49:7;51:1,
12;60:14;82:23
**rejection (2)**
51:7,17
**related (8)**
16:8;26:1;43:24;
70:22;71:7,9;75:21;
109:14
**relates (1)**
54:5
**relation (1)**
54:3
**relations (3)**
20:4,18;22:10
**relationship (3)**
26:12;36:6;130:8
**relative (1)**
70:18
**relief (2)**
34:14,22
**rely (5)**
69:22;70:5,19;
85:23;91:23
**remember (6)**
14:1;26:25;53:20;
83:14;91:8;105:11
**reminded (5)**
112:17;117:6,8;
119:2,17
**reminds (3)**
118:15,20;120:11
**renew (1)**
81:10
**repeat (1)**
21:15
**repeated (1)**

90:7
**rephrase (3)**
29:5;51:10;52:8
**Report (34)**
4:6;8:17,25;9:5;
23:10;24:24;36:19;
37:6;67:15,20,22,25;
68:1,4,7,23;69:16,23;
70:3;89:9;92:25;
100:11,22;101:4,8,12;
116:12;121:20;
123:14;125:9,13,15;
127:7,13
**reporter (6)**
7:25;95:14;99:9;
129:1;130:1,10
**REPORTERS (2)**
0:;95:7
**Reporting (4)**
130:4,11,11,13
**reports (1)**
68:24
**represent (6)**
100:7;106:4;
115:14,25;123:25;
129:10
**representative (7)**
40:12;80:1,5;97:14;
101:23;102:3;130:10
**representatives (1)**
81:3
**representing (3)**
104:17,25;115:7
**republican (6)**
57:9;73:18;75:22;
81:9;82:6,9
**republicans (5)**
66:24;73:16;74:9;
81:13,20
**reputable (1)**
87:14
**requested (2)**
13:18;34:22
**required (7)**
72:7;112:18;117:9,
18;118:21;119:3,18
**requirement (4)**
90:21;97:16;98:15;
126:24
**requires (3)**
47:13;52:17,21
**requiring (1)**
53:5
**research (11)**
18:12;29:3,7;67:20;
68:3;75:9,17;77:17,
21;78:18;79:8
**researching (1)**
68:1
**reserved (2)**
7:1;56:20
**residents (2)**
105:3;108:8

**resources (1)**
24:4
**Respectfully (1)**
123:13
**respond (1)**
7:19
**responsibilities (3)**
19:18,19;49:23
**responsibility (3)**
48:25;49:4;109:4
**responsible (3)**
49:12;50:4;110:13
**responsiveness (1)**
6:25
**rest (1)**
114:7
**restrictions (1)**
126:21
**result (5)**
34:25;60:4;87:14;
103:21;126:19
**results (1)**
77:20
**retains (1)**
66:19
**review (11)**
25:8,10;30:16,23;
31:11;57:25;85:13;
86:8,12;89:1;126:3
**reviewed (10)**
13:10;24:25;25:7,
17;33:25;69:13,19;
70:18;71:5;86:23
**reviews (1)**
11:7
**revisions (1)**
31:14
**revival (1)**
77:2
**Rican (5)**
105:3;108:8,24;
109:9;122:18
**Richard (1)**
78:1
**rid (1)**
127:8
**rife (1)**
58:19
**rigged (3)**
61:9,23;62:14
**rigging (1)**
61:24
**right (174)**
8:16;16:12;19:3,14;
20:4,14,21;21:12;
22:7,16;23:7,14;
24:21;25:2;26:13;
28:13;30:4;31:19;
32:1,3,19;36:1;38:16,
25;43:21;45:3,18;
46:7,21;47:23;50:8;
51:15;54:21;57:4,13,
20;58:13,16;59:2,10,

14,19;61:1,4;62:15,
18,22;63:9;64:5;65:2,
22;66:12,14;69:17;
70:3;71:14;72:8;73:3,
9,19;75:13,16,17;
76:6,10,16,20;77:4,
11,14,21;78:2,9,22;
79:9,17,20;80:6,10,
15;81:4,10,15,18;
82:3,7,10,25;83:3;
84:7,17,23;85:8,12,
21;86:9,14,20,22;
87:24;88:2,5,12,16;
89:12,17,19,23,25;
90:14;91:14,17,21;
92:17;93:5,15;95:18;
97:2,21;98:9,16;99:2,
7,14;100:13,18;101:1,
14,18,24;102:7,16,19;
103:25;104:3;105:4,
10;106:9,22;107:21;
108:20;109:17,23;
110:6,10;111:22;
112:14,22;113:3;
116:8,12;117:13;
118:1,11;120:24;
121:2,8,15,18,24;
122:5,16,19,22;124:2,
10,11,17,21;125:3;
127:1,10,13;128:18
**Rights (40)**
4:17,20;14:2;19:8,
10;25:1;26:3,6;27:5;
28:4,5;29:13,14;30:9,
17,18,20;31:3;66:5,8;
71:23,25;73:2,8;
74:14,17,25;75:3,6,
21,23;76:8;78:6,20;
80:9,17;82:21;
101:14;121:9;122:15
ROBINS-ROSS-ALLOY-BELINFANTE-LITTLEFIELD (1)
2:15
**Rogers (1)**
85:1
**role (4)**
12:11;13:2;15:18;
24:1
**roll (1)**
76:10
**rolls (6)**
47:4,14;48:22;51:3,
14;107:15
**Roman (2)**
24:11;89:15
**Romanette (1)**
72:17
**Rotten (2)**
4:7;44:9
**RPR (3)**
0:19;129:17;130:24
**rude (1)**
87:12
**rule (2)**

15:1;131:
**ruled (1)**
84:11
**Rules (5)**
6:5;7:14;65:7;
130:3;131:10
**run (1)**
17:10
**running (2)**
46:17;56:13
**Runoff (1)**
48:13
**Runoff' (2)**
4:9;46:6
**runoffs (1)**
110:4
**runs (1)**
111:19
**ruse (2)**
75:23;80:19

## S

**safe (3)**
54:23;59:21,24
**safety (1)**
25:24
**sailing (1)**
81:7
**sake (2)**
61:14,16
**same (20)**
7:20;17:4;18:8;
22:13;24:23;25:14;
36:15;42:4;45:1;54:8;
55:13;70:5,19;71:4;
78:11;83:25;86:2;
120:25;126:10;131:5
**San (3)**
12:20,23,25
**sanctions (1)**
111:18
**Sanders (5)**
95:25;96:5,6;98:5;
100:2
**Sanders's (1)**
95:23
**Sara (1)**
56:11
**Satya (5)**
26:14,15,16,17,18
**S-A-T-Y-A (1)**
26:20
**saw (1)**
42:13
**saying (15)**
26:14;27:11;35:5;
83:15;91:18;94:1;
104:13;114:17,19;
118:16;119:4,24;
122:2;125:6;127:9
**schedule (1)**
40:23

**scheduling (1)**
40:17
**scholar (2)**
58:3,6
**scholarship (1)**
57:24
**school (12)**
11:2,12;12:3,4;
14:24;15:7,8;17:20;
24:2,5,15;57:18
**science (7)**
14:13;19:14;23:21;
31:16;87:16,18;88:25
**scientist (1)**
87:22
**scope (3)**
75:16;77:17;79:8
**scrutiny (1)**
102:6
**se (2)**
60:21;65:11
**second (24)**
8:20;46:15;52:4;
60:3;63:17;65:4;
73:21;78:20;80:2;
82:5;84:10;89:3,21;
95:17,18,19;96:19,22;
97:7;98:9;100:1;
109:25;114:11;115:8
**secondary (4)**
85:20,24;87:24;
91:23
**Secretary (34)**
0:;6:2;34:11;43:13,
14,17;45:16;46:18;
48:5;49:2,19,22,25;
105:8;106:18,25;
107:7,10,14;108:6;
109:3,7;110:17,21,23;
111:9,13;112:10,17;
117:7;119:1,7,14,17
**Section (7)**
34:18;77:2;82:2;
103:18;123:14;126:4;
130:9
**secure (1)**
73:17
**Security (3)**
52:18;53:5,15
**seeing (2)**
30:12;99:4
**seek (3)**
72:10,13;74:9
**seem (1)**
72:4
**seems (2)**
7:19;75:21
**segregationist (1)**
97:15
**segued (1)**
14:12
**semiotics (1)**
10:10

**Senate (1)**
97:20
**sensitive (1)**
59:25
**sentence (16)**
46:16;61:18;73:6;
75:8;81:13;82:5;
84:10;95:19;96:25;
98:10;100:1;117:25;
119:6,10,16;120:13
**serve (2)**
9:24;23:18
**services (7)**
35:20;36:14;
105:20;106:5,6,8;
130:13
**set (2)**
13:19;90:9
**setting (1)**
71:8
**settings (1)**
42:12
**seven (1)**
110:3
**several (4)**
28:20;32:9;36:7;
86:8
**shade (2)**
114:6;115:14
**shake (1)**
8:3
**Shaker (1)**
14:24
**shaking (1)**
8:6
**shall (1)**
131:
**share (1)**
34:13
**SHEET (1)**
131:1
**Shelby (17)**
26:7,9;30:10;60:13;
77:8,9,13;78:17;79:5;
110:24;120:11;
125:10;126:1,10,20;
127:8,8
**shift (1)**
89:8
**show (4)**
54:6;65:16;92:11;
117:15
**sides (1)**
75:5
**Siege (3)**
4:17;19:8;71:24
**signaled (1)**
81:7
**signature (2)**
72:3;128:15
**signed (4)**
72:3,4,6;94:17
**significant (1)**

88:7
**similar (4)**
62:6,10,24;70:23
**similarities (1)**
126:7
**simple (2)**
9:16,19
**simply (1)**
45:5
**sincere (3)**
80:12;102:10,11
**sit (3)**
11:15;20:12;40:3
**site (1)**
15:13
**situation (2)**
50:20;125:17
**situations (1)**
63:1
**Sixth (1)**
38:10
**skeptical (1)**
123:9
**skip (1)**
83:7
**skipping (1)**
21:20
**Slavery (4)**
4:14;63:9,19;64:13
**slight (1)**
119:15
**slightly (2)**
7:15;115:13
**slots (2)**
64:3,16
**small (9)**
42:10,13;80:22;
112:20;117:11,22;
118:23;119:8,12
**smaller (3)**
42:12,22,22
**smattering (1)**
9:14
**Smith (2)**
100:6,8
**smooth (1)**
81:7
**Social (4)**
19:13;52:18;53:5,
14
**somebody (1)**
8:6
**Someone (4)**
35:23;36:9;40:24;
58:12
**Something's (2)**
4:7;44:9
**Sometimes (2)**
86:3;107:4
**sorry (10)**
29:5;44:23;52:6;
96:22;98:2;99:12;
102:4;103:1;110:21;

Fair Fight Action v.
Raffensperger

Adrienne Jones
December 19, 2019

113:16

**sort (6)**
10:23;12:2;14:12;
37:19;41:3;56:19

**sorts (1)**
58:6

**sought (1)**
34:15

**sound (2)**
87:10;120:13

**source (2)**
70:6;81:17

**sources (4)**
85:24;86:1;87:24;
91:23

**Southern (2)**
89:24;90:2

**southern-democrat-cum-republicans (1)**
76:2

**space (1)**
42:4

**spaces (1)**
42:9

**speak (4)**
7:25;36:3;59:10;
67:20

**speaker (1)**
100:8

**speaking (3)**
7:17;35:18;39:3

**special (2)**
26:25;27:1

**specialized (1)**
18:11

**specialty (1)**
23:22

**specific (4)**
52:13;79:19;88:2,4

**specifically (2)**
36:23;79:11

**speculate (1)**
80:25

**speech (1)**
20:7

**speeches (1)**
22:1

**spirit (1)**
73:1

**Spoil (1)**
59:2

**spoke (1)**
36:15

**spoken (1)**
42:14

**sponsor (10)**
92:25;93:14,17,19;
94:4,9,20,22;98:19;
100:13

**sponsored (1)**
93:8

**Sports (1)**
12:5

**spring (2)**

**38:20,21**

**Square (1)**
0:24

**Stacy (1)**
42:2

**staff (6)**
12:13,20;13:8,10,
17;16:11

**staffer (1)**
40:11

**standard (1)**
85:23

**standards (1)**
128:1

**stands (1)**
34:17

**star (2)**
99:9,15

**start (5)**
6:6;8:6,16;38:1;
90:19

**started (4)**
7:13;17:6,8;18:22

**Starting (2)**
46:15;91:3

**starts (5)**
82:5;15;97:9;
124:17;126:13

**State (104)**
0:9;4:7;6:3,18;
18:4;23:12;24:24;
32:22,24;33:5,8;
34:11;43:14,17;
44:10;45:2,3,16;
46:16,18,18;47:2,5;
48:5,7,16;49:2,23,25;
50:25;51:11;52:21;
57:3;59:11;60:3;61:7,
21;62:12;63:17;64:1,
1;66:4,16;69:9;72:21;
73:6,15,25;75:9;76:8,
24;77:7;79:15;80:23;
81:2,4,12;84:12,19;
85:19;88:4;89:14,16,
22;92:25;93:13;
97:14;103:24;104:3,
13,15,23;105:6,8,24;
106:18,19,25;107:7,
10,11,14,15;108:23;
109:2,3,12,15,18;
110:1,18,22,23;111:5,
13,20;112:10;119:14;
124:1;125:2,7,20;
126:19;129:3

**stated (5)**
38:23;43:4;68:12;
73:6;129:7

**statehood (1)**
125:9

**statehouse (1)**
93:1

**statement (13)**
61:13;62:5;75:8;

**81:17;83:9;102:10;**
106:11,24;108:15;
109:18;117:2;125:5;
131:12

**statements (2)**
62:13,18

**STATES (13)**
0:1;47:13;60:5;
63:19;64:10;89:24;
90:3;92:19;98:4,11;
113:24;126:22,22

**state's (3)**
11:13;43:13;111:13

**statewide (1)**
93:1

**stating (1)**
121:12

**staunch (1)**
97:14

**steal (1)**
45:6

**stealing (1)**
61:13

**step (1)**
58:20

**stepped (1)**
35:22

**steps (1)**
74:4

**Steven (1)**
82:6

**still (11)**
9:11;10:1;20:3;
21:24;22:3,6,9,12;
26:22;35:12;102:23

**stipulate (1)**
6:23

**stolen (5)**
45:12;46:24;47:22;
62:6,21

**stopped (4)**
24:19;77:21;78:14,
21

**Stops (1)**
126:1

**straight (1)**
76:5

**strange (1)**
79:3

**Strategy (3)**
4:22;25:16;74:3

**Street (3)**
0:;2:6,17

**strict (1)**
60:23

**strike (14)**
12:8;32:23;62:3;
66:6;74:1;76:14;77:8;
91:10;95:1;98:2;
108:5;111:7;113:16;
117:6

**struck (1)**
97:13

**student (1)**
11:10

**students (4)**
14:21,23;30:13;
41:8

**study (3)**
29:1,16;96:10

**stuff (2)**
30:14;35:9

**subject (1)**
10:13

**submit (1)**
117:18

**submitted (2)**
72:6;88:18

**submitting (1)**
79:3

**subscribed (1)**
132:

**subsequent (1)**
12:3

**substance (1)**
131:11

**substantial (6)**
112:21;117:11,22;
118:23;119:9,12

**substantially (1)**
53:17

**success (2)**
78:5,20

**successful (1)**
15:20

**successfully (1)**
72:8

**suggest (2)**
6:23;75:22

**suggesting (2)**
65:10;78:5

**Suite (3)**
0:,16;2:7

**summarizing (1)**
27:5;103:15

**summary (2)**
73:11;75:24

**SUNY (1)**
18:3

**superior (2)**
86:7;116:18

**supplies (1)**
49:12

**support (9)**
75:22;76:5,9;80:16;
81:25;85:20;93:2,22;
125:1

**supported (2)**
95:23;100:3

**supporters (3)**
95:21;98:14;102:25

**supporting (1)**
82:23

**suppose (1)**
128:15

**supposed (2)**

**35:16;107:13**

**suppress (1)**
125:21

**suppressed (3)**
89:17;124:2;125:3

**Suppression (13)**
4:10,13;46:6;47:3,
6;48:12;62:22;63:8;
64:8;89:22;109:19;
125:8;126:21

**Supreme (4)**
58:16;60:22;76:13;
102:6

**sure (19)**
15:17;20:10;24:8;
49:23;50:1,1;52:14;
61:19;64:2;66:1;
70:12;83:17;91:1;
92:7;104:12,22;
108:4;116:3,15

**surprise (1)**
86:17

**suspected (1)**
65:11

**switching (2)**
17:1;33:14

**sworn (2)**
7:8;132:

**syllabus (1)**
29:16

**Synonymous (1)**
5:8

**system (3)**
17:19,21;45:3;
66:18;97:12

**T**

**tacit (2)**
93:17,19

**tactics (2)**
45:6;62:22

**talk (14)**
15:20;27:18;33:14;
59:4;67:15;71:14;
79:25;80:5,8;81:24;
84:6;86:22;89:8;
109:22

**talked (15)**
26:8;27:12;28:11;
40:16;42:5,6;57:22;
121:17,20;122:4,14,
15,18,21;126:7

**talking (27)**
10:19;17:25;27:8;
30:15;36:9;50:7;
59:12;65:1;66:1,13;
71:4;75:2;78:1;81:3,
9;83:2;84:10;85:1;
99:23;101:13;105:25;
106:18;116:12;124:5,
11,17;126:5

**tantamount (2)**

64:12;67:9
**taught (10)**
17:5;18:9,10,15;
29:10,14,15,21,24;
30:1
**teach (9)**
18:7,8,8;19:21;
20:20;23:6,17;24:15;
88:25
**teaching (5)**
18:23;24:19,20,21;
29:9
**team (1)**
67:21
**tears (1)**
63:22
**telecommunications (1)**
16:15
**Telegraph (5)**
31:21;43:24;44:15;
46:9;63:3
**telling (1)**
118:17
**tend (1)**
29:17
**tended (2)**
81:13,20
**tenor (1)**
66:9
**tenure (3)**
22:24;23:1,3
**tenured (1)**
22:21
**tenure-track (4)**
17:15;19:24;20:23;
22:23
**terms (6)**
23:19;24:4;28:22;
93:20;95:7;111:11
**terrible (1)**
64:17
**Tested (2)**
127:15,19
**testified (5)**
7:10;27:23;32:24;
33:12;100:2
**testify (1)**
7:8
**testimony (4)**
33:7;76:25;100:5;
131:4
**Texas (2)**
60:5,12
**theoretical (1)**
10:24
**theoretically (1)**
30:15
**theorists (1)**
23:23
**theory (4)**
10:13,16,18,19
**therefore (1)**
109:13

**thesis (4)**
18:25;19:7;73:12,
14
**thinking (1)**
91:11
**third (4)**
46:16;66:4;96:1;
98:5
**though (2)**
120:14;128:14
**thought (9)**
15:15;45:15;47:1;
59:24;62:25;63:13,
16;102:9;108:3
**thousands (1)**
47:3
**threatened (1)**
65:6
**three (7)**
13:14;14:16;20:6;
28:10;44:24;96:12;
110:2
**throughout (1)**
86:9
**thrust (1)**
88:8
**thus (1)**
32:5
**thwart (1)**
93:3
**Till (2)**
66:14;67:1
**Till's (1)**
67:10
**timeline (1)**
88:22
**times (3)**
28:21;83:9;86:7
**title (8)**
30:22;59:16,17;
63:10,15;64:13,15;
65:24
**titled (5)**
19:7;46:5;59:1;
63:8;65:21
**titles (5)**
44:11,12,18;58:22;
63:11
**to_ (7)**
131:16,20,24;
132:4,8,12,16
**today (8)**
6:14,19;31:7;63:18;
64:2;66:4,7;128:10
**together (2)**
16:23;46:1
**took (3)**
47:4;88:20;103:16
**top (2)**
64:25;92:3
**topic (3)**
58:12;70:23;
101:21,22

**topics (3)**
12:11;14:9;30:11
**touch (3)**
12:7;10;84:22
**toward (4)**
9:7;44:25;81:13,20
**tower (2)**
113:20;121:1
**track (1)**
46:3
**trail (1)**
63:21
**transcript (16)**
6:9;9:3;44:4;45:23;
59:7;63:6;64:22;
65:19;71:18;87:4;
92:14;113:8;116:23;
129:7,10;131:3
**transition (4)**
20:9,14,17;22:7
**trap (1)**
76:18
**treat (1)**
108:23
**treatment (1)**
66:17
**trial (3)**
7:1;17:7,10
**troubling (1)**
58:19
**true (4)**
33:12;88:6;129:10;
131:5
**Trump (2)**
59:13,22
**truth (3)**
7:9,9,9
**try (3)**
40:2,15,22
**trying (3)**
24:5;41:7;102:5
**turn (7)**
28:8;44:23;46:14;
95:2;99:8;113:15,17
**twice (7)**
112:17;117:6,8;
118:16,20;119:2,17
**two (14)**
15:23;20:5;21:22,
23;26:10;43:25;
44:24;71:9;76:13;
89:12;90:3,13;103:7;
127:12
**type (3)**
44:6;114:7;127:21
**typewriting (1)**
129:9
**typically (1)**
115:16
**typo (1)**
82:12

**UC (1)**
11:1
**uh-uh (1)**
8:2
**ultimately (4)**
14:12;41:2;50:4;
73:7
**un (1)**
111:5
**unable (1)**
64:4
**unconstitutional (2)**
60:21;97:13
**Under (23)**
4:17;6:4;8:25;12:2;
19:8;23:25;25:5;28:9;
30:22;34:17;41:15;
49:1;53:13;63:15;
71:23;82:2;90:21;
109:2;110:14;126:3;
129:9;130:8,17
**undergirding (1)**
72:24
**undergo (1)**
86:13
**undergraduate (4)**
17:22;18:18;23:7;
24:13
**undergraduates (1)**
24:2
**underline (1)**
115:17
**Understood (1)**
86:18
**union (1)**
16:14
**unit (1)**
97:12
**UNITED (3)**
0:1;63:19;92:19
**University (8)**
10:7;18:2,4;19:3;
21:7,11;22:1;72:14
**unless (1)**
123:10
**unlikely (1)**
63:22
**unplugged (1)**
111:5
**up (8)**
8:3;19:20;29:17;
40:14;54:6;67:11;
125:14;126:10
**upcoming (1)**
78:25
**updated (1)**
9:20
**upheld (1)**
61:4
**upon (5)**

10:15;107:6;
123:11;129:11;131:
**upstairs (1)**
28:19
**urban (1)**
61:24
**use (3)**
7:1;111:14;131:13
**used (2)**
36:19;46:19
**using (1)**
119:5
**usual (1)**
130:14
**usually (1)**
29:16
**UWP (1)**
20:2

**Valelly (5)**
78:1,4,12,19,25
**Vann (1)**
70:13
**variation (1)**
119:16
**various (5)**
9:25;10:16;13:15;
16:23;28:7
**vast (1)**
63:18
**vegetarianism (2)**
25:25;26:2
**venue (2)**
41:3,10
**version (3)**
72:4,6;115:22
**versions (1)**
96:12
**versus (2)**
26:7;60:13
**vetted (1)**
126:24
**VICO (2)**
10:14,22
**view (2)**
10:25;103:21
**viewed (1)**
114:15
**views (1)**
97:15
**violation (1)**
65:7
**Virginia (2)**
21:6;38:8
**visit (1)**
15:19
**visiting (4)**
14:21;21:7,17;38:5
**vogue (1)**
66:19
**voluminous (1)**

32:11
**VON (3)**
   2:3;6:16,20
**vote (31)**
   26:13;34:13;51:23;
   52:11,15,17;53:16,24;
   64:4;89:18,23;90:20;
   91:13,17;93:9;97:16,
   17;98:13,15;107:3,6,
   9,13,17;108:4;109:12,
   15,21;122:4;124:3;
   125:4
**voted (2)**
   110:2,9
**Voter (37)**
   4:10,13;46:6;47:2,
   9,13,14;48:8,22;51:3,
   7,14;52:19;53:2,10,
   11,14;54:8,10,12,14;
   57:8;60:6,12,19,20,
   23,25;62:21;63:8;
   64:8;78:17;107:19;
   108:24;109:19;125:8;
   126:21
**voters (12)**
   34:12;39:3;42:16,
   17;47:4;50:2;52:14;
   60:15;61:24;109:4,
   20,20
**voters' (2)**
   48:20;51:12
**voter's (1)**
   51:1
**votes (2)**
   76:10;125:21
**Voting (47)**
   4:17,20;5:4;14:2;
   19:7,10;25:1;26:3,6;
   27:5;29:13,13;30:9,
   12,13,17,18,20;31:3;
   48:18;64:10;71:23,
   25;73:2;74:14,17,25;
   75:3,6,21,22;76:8;
   77:2;78:5,19;80:9,17;
   82:21;97:18,19;
   101:14;109:1;111:5,
   14,19;122:15;126:23
**VRA (11)**
   4:23;25:16;28:4;
   60:4;73:8;74:1,2;
   76:6,16,20;77:1
**vs (1)**
   0:7

**W**

**waged (1)**
   47:5
**walk (1)**
   79:22
**War (4)**
   25:20;26:10;27:5,
   12

**warned (1)**
   76:24
**warning (1)**
   77:10
**watch (1)**
   10:15
**water (2)**
   113:20;121:1
**way (7)**
   24:7;102:20,21;
   103:4;111:10;113:10;
   120:14
**weakening (1)**
   77:1
**Web (1)**
   15:13
**week (1)**
   36:15
**weekend (1)**
   39:21
**Westmoreland (6)**
   80:6,13,16;81:24;
   102:4;103:24
**Westmoreland's (1)**
   101:23
**what's (5)**
   45:14;51:25;68:23;
   79:4;123:2
**whatsoever (1)**
   57:21
**whole (2)**
   7:9;59:2
**who've (1)**
   87:15
**willing (1)**
   55:22
**win (1)**
   66:6
**Wisconsin (7)**
   19:13;21:5,22,25;
   22:2;60:8,16
**wise (1)**
   21:4
**within (2)**
   12:22;90:13
**without (4)**
   35:18;93:22;97:8;
   126:23
**withstand (1)**
   102:6
**WITNESS (13)**
   6:12;7:6;32:25;
   35:7;52:6;114:19;
   124:13,15,19,22;
   128:11,20;131:2
**witnessing (1)**
   36:17
**woman's (1)**
   36:1
**Woodward (2)**
   70:13;76:24
**Woodward's (1)**
   77:10

**word (7)**
   101:20,20;114:9,
   11,17;115:8,25
**words (5)**
   34:8;52:10;90:16;
   93:22;107:20
**work (6)**
   13:20;17:4;22:12;
   40:2,3;50:14
**worked (6)**
   13:24,24;16:21;
   20:8;30:10;57:3
**Workers (2)**
   16:11,15
**working (7)**
   18:21,22;40:19;
   64:2;90:25;93:21;
   115:9
**works (5)**
   30:10;37:16;39:13;
   95:7;103:16
**worried (5)**
   61:7,21;62:5,9,12
**worse (1)**
   66:21
**write (8)**
   10:15;11:6;18:25;
   22:1;36:20;44:11,12;
   58:3
**writer (1)**
   20:7
**writing (7)**
   18:13;19:19,22;
   64:24;70:14;78:8,21
**written (1)**
   13:16
**wrote (3)**
   43:23;58:18;59:1

**Y**

**year (7)**
   13:5,6;15:22;21:6;
   38:21;57:13;88:20
**years (5)**
   20:6;26:24;27:3;
   76:6;81:10
**yes-or-no (1)**
   67:6
**yesterday (1)**
   56:7
**York (12)**
   11:16,18,20;14:21;
   15:6;17:22;18:2,4;
   19:3;25:23;83:9;86:7

**0**

**06 (1)**
   76:12

**1**

**1 (12)**
   6:7;32:22;90:17,19;
   113:18,19;121:18;
   122:24;123:14;124:9;
   126:8;131:8
**1:18-cv-05391-SCJ (1)**
   0:7
**10 (4)**
   87:1;101:13;102:4;
   105:2
**10:31 (1)**
   41:24
**10:38 (1)**
   41:24
**101 (1)**
   85:1
**10B (1)**
   130:3
**11 (5)**
   90:17;92:12;95:6;
   109:22;117:3
**11:40 (1)**
   89:5
**11:53 (1)**
   89:5
**110 (1)**
   85:4
**113 (2)**
   5:4;85:7
**116 (1)**
   5:7
**12 (4)**
   75:7;89:21;90:8;
   113:6
**12:41 (1)**
   128:7
**12:47 (2)**
   128:7,21
**1234 (1)**
   95:12
**1236 (3)**
   99:9,15,18
**128 (1)**
   129:10
**129 (3)**
   76:24;77:7;78:1
**13 (2)**
   0:24;116:21
**130 (2)**
   77:25;78:1
**14 (1)**
   125:24
**140 (1)**
   0:
**14th (3)**
   0::2,6,17
**159 (1)**
   121:14
**16 (1)**
   125:23
**168 (1)**
   84:6
**19 (2)**

**1955 (2)**
   65:22;66:10
**1957 (1)**
   96:16
**1960s (1)**
   122:7
**1961 (2)**
   97:6,7
**1963 (3)**
   97:10;98:6,14
**1964 (9)**
   28:5;93:3;94:4;
   95:21;98:14,19,23;
   100:4,6
**1965 (5)**
   75:12,17;77:18;
   79:9,16
**1981 (1)**
   76:25
**1990 (9)**
   121:18,22,24;
   122:6,10;123:1,2,15,
   21
**1990s (1)**
   123:12
**1995 (1)**
   4:16

**2**

**2 (18)**
   8:17,24;67:19;
   73:14;85:11;89:14;
   90:8,17;113:18,19;
   124:8,9,12,14,16;
   126:6,6,8;131:
**20_ (1)**
   132:21
**2004 (3)**
   78:8,22;79:1
**2006 (8)**
   4:23;25:16;26:8;
   70:24;76:8;80:21;
   101:13;122:16
**2007 (1)**
   15:10
**2008 (1)**
   16:10
**2010 (1)**
   47:4
**2011 (1)**
   16:10
**2013 (11)**
   75:12,17;77:14,18,
   20,21;78:18;79:2,9,
   17;125:14
**2015 (3)**
   19:5;21:19;113:25
**2016 (1)**
   21:19
**2018 (11)**
   15:10;34:10,25;

0:14;131:4

43:20;45:11;48:9;
62:6,21;66:25;88:16;
110:1
**2019 (4)**
0:14;129:13;
130:20;131:4
**203 (1)**
82:2
**2110 (2)**
0:16;2:7
**21st (3)**
4:15;129:13;130:20
**25 (3)**
16:7;76:6;81:10
**27 (2)**
126:19;127:3

**3**

**3 (4)**
44:2;79:14;113:18,
19
**30309 (1)**
2:8
**30318 (1)**
2:18
**30329 (1)**
0:25
**307 (1)**
131:

**4**

**4 (4)**
45:21;85:19;
103:18;113:19
**404-720-8111 (1)**
2:9
**404-856-3286 (1)**
2:19
**44 (1)**
4:7
**45 (1)**
4:9

**5**

**5 (9)**
34:18;59:5;69:16;
77:2;79:14;85:11;
95:15;113:19;126:4
**500 (1)**
2:17
**55 (1)**
81:7
**56 (2)**
79:25;81:23
**57 (1)**
76:4
**59 (1)**
4:11

**6**

**6 (4)**
4:4;63:4;99:12;
113:19
**63 (1)**
4:13
**64 (1)**
4:15
**65 (1)**
4:16

**7**

**7 (4)**
3:2;64:20;99:8,13
**71 (3)**
4:17;113:3,13
**75 (2)**
0:;2:6
**77 (2)**
82:14,17

**8**

**8 (1)**
65:17
**87 (1)**
4:21

**9**

**9 (7)**
4:6;71:16;90:20;
92:24;100:22;101:12;
122:8
**9:30 (1)**
0:14
**9:42 (1)**
8:22
**9:52 (1)**
8:22
**9-11-28c (1)**
130:9
**9-11-30 (1)**
131:
**92 (2)**
4:24;9:1
**96 (1)**
11:4

**DEFENDANTS' EX. 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

      Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
Capacity as Secretary of State of Georgia,
*et al.*,

      Defendants.

Civil Action File

No. 1:18-cv-05391-SCJ

**TO:  Dr. Adrienne Jones**
     **950 Ponce de Leon Avenue, NE**
     **Atlanta, GA 30306**

### NOTICE OF DEPOSITION OF DR. ADRIENNE JONES

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of

Civil Procedure, counsel for Defendants Brad Raffensperger, et al., will take the

oral deposition of **Dr. Adrienne Jones** at the office of **Lawrence & Bundy LLC,**

**1180 West Peachtree Street, N.E., Suite 1650, Atlanta, GA 30309,** unless parties

agree on another location, on **December 19, 2019**, beginning at **9:30 a.m.** and

continuing thereafter until completed.

The deposition shall be taken before a Notary Public or some other officer

authorized by law to administer oaths for use at trial.  The deposition will be taken

DEFENDANT'S
EXHIBIT

by oral examination with a written and/or sound and visual record made thereof (*e.g.,* videotape, LiveNote, etc.).  The deposition will be taken for the purposes of cross-examination, discovery, and for all other purposes permitted under the Federal Rules of Civil Procedure or other applicable law.

This 16th day of December, 2019.

Josh B. Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone:  (678) 701-9381
Facsimile:  (404) 856-3250

Christopher M. Carr
Attorney General
GA Bar No. 112505
Annette M. Cowart
Deputy Attorney General
GA Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
GA Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle - Suite 200
Atlanta, Georgia 30339
Telephone:  (678) 336-7249

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 16, 2019, I caused to be served the

foregoing **NOTICE OF DEPOSITION OF DR. ADRIENNE JONES** by

sending it via email and U.S. Mail, postage prepaid, and addressed as follows:

**Lawrence & Bundy LLC**
Allegra Lawrence-Hardy
Leslie J. Bryan
Maia J. Cogen
Suzanne Smith Williams
1180 West Peachtree Street, NE
Suite 1650
Atlanta, GA 30309
Allegra.Lawrence-
Hardy@lawrencebundy.com
Leslie.Bryan@lawrencebundy.com
Maia.Cogen@lawrencebundy.com
Suzanne.williams
@lawrencebundy.com

**KaiserDillon PLLC**
Matthew G. Kaiser
Sarah R. Fink
Scott S. Bernstein
Norman G. Anderson
1099 14th Street, NW
8th Floor West
Washington, DC 20005
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

**Lawrence & Bundy, LLC**
Thomas R. Bundy
8115 Maple Lawn Blvd.
Suite 350
Fulton, MD 20759
Thomas.Bundy@lawrencebundy.com

**Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.**
Dara Lindenbaum
1090 Vermont Ave, NW, Suite 750
Washington, DC 20005
lindenbaum@sandlerreiff.com

Elizabeth Vranicar Tanis
John A. Chandler
957 Springdale Road, N.E.
Atlanta, GA 30306
beth.tanis@gmail.com
jachandler@gmail.com

**Kastorf Law, LLC**
Kurt G. Kastorf
Suite 100
1387 Iverson Street, N.E.
Atlanta, GA 30307
kurt@summervillefirm.com
kurt@kastorflaw.com

**Jenner & Block LLP**
Kali Nneka Bracey
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
kbracey@jenner.com

**Jenner & Block LLP**
Jeremy H. Ershow
919 Third Avenue
New York, New York 10022
jershow@jenner.com

**Miller & Chevalier Chartered**
Andrew D. Herman
Nina C. Gupta
900 16th Street NW
Washington, DC 20006
aherman@milchev.com
ngupta@milchev.com

**DuBose Miller LLC**
Von A. DuBose
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
dubose@dubosemiller.com

Carey A. Miller
Georgia Bar No. 976240

**DEFENDANTS' EX. 2**

United States District Court
Northern District of Georgia

Fair Fight Action
v.
Brad Raffensperger

August 15, 2019

### Expert report of Dr. Adrienne Jones

Pursuant to the Federal Rules of Civil Procedure, I, Adrienne Jones, render the following expert report:

1. My name is Dr. Adrienne Jones and I reside in Atlanta, Georgia. I am a lawyer and political scientist by education and training and have taught political science at the university level since 1999. I am an Assistant Professor of Political Science at Morehouse College in Atlanta, Georgia, and I teach political science and serve as the Pre-Law Director.

2. I received a J.D. from the University of California at Berkeley School of Law in 1993 and I obtained my Ph.D. from the City University Graduate Center in 2015. My primary Ph.D. training was in American Government, with a minor in public policy. I began teaching political science in 1999 and have taught courses in American Government, Law and Public Policy for 17 years at The City College of New York, The Center for Workers Education, The University of Wisconsin at Platteville, Radford University and Morehouse College.

3. As a political science professor, I am regarded as the "public law" person in my department. My courses are based in American Government, public policy and law. These courses include, but have not been limited to, American Government, Constitutional Law I and II, Race and Law, Legal Research and Writing, Issues in Civil and Criminal Law, and similar courses.

4. Presently, at Morehouse College, I teach Race and Law, National Government, Constitutional Law and the Senior Seminar. I also serve as the campus Pre-law director. In that capacity I provide pre-law advice for students of all majors and make and maintain relationships with law schools across the country.

5. Since earning my Ph.D., I have made presentations about the Voting Rights Act and have published lay and academically reviewed articles about the VRA and Black American history and politics. My C.V. lists both my presentations and publications. At present, I am writing a book on the Voting Rights Act based on my doctoral dissertation.

6. I have not previously testified as an expert witness. I am being paid $275 per hour for my services.



1

I. **Opinion: From the beginning of its existence to present, the state of Georgia has continually suppressed the right of people of color to vote.**

    a. The basis and reasons for my opinions are set forth below along with the facts and data I considered.

The state of Georgia has been a leader in voter suppression since its beginnings as a state. Georgia established in its first state constitution that blacks would not be granted the right to vote and the state remained dedicated to this position and to maintaining white supremacy throughout its history. The state has adjusted its efforts to racially discriminate at the polls when compelled by federal intervention, during Reconstruction and by enforcement of the Voting Rights Act ("VRA"), but has consistently resisted the federal government's attempts to ensure fair voting based on race, due to its dedication to white supremacy at the ballot box.

Georgia's first constitution in 1777 limited the franchise to "male white inhabitants, of the age of twenty-one years"[1] The 1789 constitution included only "citizens and inhabitants," in the franchise and it was universally understood at the time that neither slave nor free blacks fell into either category.[2] Black voters were excluded again from the 1861 Constitution after the state seceded from the Union,[3] and again after the conclusion of the war in 1865, the Constitution limited the franchise to "free white male citizens of this state."[4] Georgia excluded black voters again after the state was free of federal oversight related to Reconstruction (1867-1877).[5]

Pursuant to the Reconstruction Act of July 19, 1867, the state of Georgia was obliged to accept the registration of new voters.[6] Some 200,000 new voters were registered in the state. Approximately 50% of those registered were black.[7] In 1867, a second state constitutional convention convened to adapt state government to match the Reconstruction program. The convention included 37 blacks out of 165 delegates.[8] The convention "guaranteed blacks citizenship, protection of the law, and the right of male suffrage."[9] It also provided free public school education for black voters, a benefit previously extended only to white citizens; but it imposed a $1 poll tax—ostensibly to support the public school plan but which simultaneously excluded black voters, most of whom

---

[1] Ga. Const. of 1777, art. IX.
[2] Ga. Const. of 1789, art. IV.
[3] Ga. Const. of 1861.
[4] Ga. Const. of 1865.
[5] Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (Cambridge University Press, 2003), 2. Laughlin McDonald is the former director of the Southern Regional Office of the ACLU in Atlanta, GA, now special counsel and director emeritus of the Voting Rights Project. He has represented plaintiffs in discrimination cases and specialized in voting rights, argued before the U.S. Supreme Court and testified before Congress. He is the author of several books including, A Voting Rights Odyssey: Black Enfranchisement in Georgia. The text is the leading treatise on Georgia voting rights and on the relationship of the state with the VRA of 1965.
[6] 15 Stat. 14-16 (July 19, 1867).
[7] Numan V. Bartley, *The Creation of Modern Georgia* (Athens, GA: The University of Georgia Press 1983), 48.
[8] Bartley, *Modern Georgia*, 54-5.
[9] McDonald, *Odyssey*, 19; Ga. Const. 1868, art. I, sec. 2.

2

were unable to afford the tax.[10] Additionally, black representatives reported that they "foolishly" accepted assurances of Republican party leadership that there was no need to include a proposed clause that specifically guaranteed blacks the right to hold office. Later, they regretted support for a constitution without the explicit clause.[11]

During the enforcement of the Reconstruction Program, Georgia state actors remained steadfastly committed to a white electorate and to Democratic party dominance. Statewide, white residents engaged in violence and terrorism to ensure the exclusion of black voters and to purge the state of Republican power. In 1868, the Ku Klux Klan was organized in Georgia and established itself as the terrorist, paramilitary wing of the Democratic party and assisted in the campaign of terror. [12] The April 1868 state election involved extreme violence as a result of the desire of Democrats to keep blacks away from the polls. Nonetheless in 1868, a Republican was elected to the governorship, 25 blacks were elected to the house, 3 blacks to the senate, and a new constitution was ratified.[13] As a result of these "improvements," Georgia was offered readmission to the Union pending its ratification of the 14th Amendment.[14] The state ratified the 14th Amendment on July 21, 1868.[15]

But, by September 1868, whites seized on the fact that the constitution did not specifically authorize black officeholders to forcibly remove all black members from the state legislature, except those who could not be ejected because their light complexions made it "impossible to prove that they were African Americans."[16] The November 1868 general election was also violent. The Freedman's Bureau reported that between August and October of that year, there were "31 killings, 43 shootings, 5 stabbings, 55 beatings, and 8 whippings of 300 to 500 lashes apiece [in the state]." [17] On election day, there were "open confrontations between blacks and whites."[18] As a result of these accumulated events, Georgia was again evicted from the Union and returned to military supervision. In 1870, the military commander of the state returned the black legislators to their seats in the General Assembly and returned control to Republicans.[19] In 1870, the General Assembly re-ratified the 14th Amendment, ratified the 15th Amendment, and Georgia was readmitted to the Union, a second time, on July 15, 1870.[20]

Black participation lasted precariously until after the Hayes-Tilden Agreement of 1877 and the removal of military control over the state. Once military control was lifted, Georgia took a

---

[10] Edmund L. Drago, *Black Politicians and Reconstruction in Georgia* (Baton Rouge: Louisiana State University Press, 1982), 45.

[11] Bartley, *Modern Georgia*, 57.

[12] McDonald, *Odyssey*, 21.

[13] Bartley, *Modern Georgia*, 59.

[14] McDonald, *Odyssey*, 21.

[15] Georgia House Journal, July 21, 1868, pp. 49-50.

[16] John Hope Franklin, *Reconstruction and the Civil War* (Chicago: University of Chicago Press, 1994), 130; See also Drago, *Black Politicians*, 69-70.

[17] Allen W. Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1971), 117; House Miscellaneous Documents, 40th Congress, 3rd sess., No. 52, p. 41.

[18] McDonald, *Odyssey*, 24; Drago, *Black Politicians*, 150.

[19] McDonald, 24.

[20] 16 Stat. 363-64 (July 15, 1870); Gabriel J. Chin, "The Voting Rights Act of 1867: The Constitutionality of Federal Regulation of Suffrage during Reconstruction," 82 N.C. L. Rev. 1581 (2004).

leadership role in black voter suppression. "[N]o state was more systematic and thorough in its efforts to deny or limit voting and office holding by African Americans after the Civil War."[21] From the end of Reconstruction to the middle of the 20th century, the state,

> ...adopted virtually every one of the traditional "expedients" to obstruct the exercise of the franchise by blacks, including literacy and understanding tests, the poll tax, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the abolition of elective offices, the use of discriminatory redistricting and apportionment schemes, the expulsion of elected blacks from office, and the adoption of primary elections in which only whites were allowed to vote. And where these technically legal measures failed to work or were thought insufficient, the state was more than willing to resort to fraud and violence in order to smother black political participation and safeguard white supremacy.[22]

Beginning in 1917, Georgia established a county unit voting system to administer elections. The county unit system restricted blacks statewide from influencing state elections and maintained Georgia political control in rural white counties. Under the system, each of Georgia's 159 counties was classified as urban, town or rural and granted 6, 4 or 2 units in voting power and permitted the candidate who carried the Democratic primary with the most units to be nominated and elected.[23] The county unit system enabled the state to devalue the strength of the urban vote, in Atlanta, Columbus, and other areas, therefore minimizing the power of black voters in the state. Because county unit rule effectively disenfranchised black voters concentrated in urban counties, gubernatorial candidates such as Eugene Talmadge and Herman Talmadge ran successful, explicitly racist campaigns for governor.[24] It is not surprising that blacks in Georgia parodied the cigarette slogan abbreviated "LS/MFT" (*Lucky Strike Means Fine Tobacco*) to mean "Lord Save Me From Talmadge."[25]

Georgia used the county unit system until the early 1960s when, as a result of a series of Supreme Court decisions designed to facilitate the "one man, one vote rule," it became federally mandated to draw districts and to apportion legislators equitably. In *Baker v. Carr*, 369 U.S. 186 (1962), a Tennessee case, the Court reversed the long held protocol that redistricting was a political question immune to federal oversight (and therefore to Supreme Court review) and held that redistricting was a justiciable question.[26] The Court enforced the terms of the Tennessee Constitution calling for decennial redistricting to establish districts of *equal population* pursuant to a 14th Amendment Equal Protection clause. Tennessee had not redistricted since 1901. Population shifts in the state since 1900 had been significant and it was necessary to revise districting plans to ensure equitable districting and representation for citizens. With the concentration of black voters in urban areas, the failure of Tennessee to re-district permitted the rural, white counties to control the political

---

[21] McDonald, *Odyssey*, 2.

[22] McDonald, 3.

[23] New Georgia Encyclopedia, s.v. "County Unit System." by Scott E. Buchanan, accessed August 9, 2019, https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system.

[24] McDonald, *Odyssey*, 80-4.

[25] Stetson Kennedy, *The Klan Unmasked: With a New Introduction by David Pilgrim and a New Author's Note*, (Tuscaloosa, Alabama: University of Alabama Press, 1990), 169.

[26] See Colgrove v. Green, 328 U.S. 549 (1946) (The federal judiciary has no power to interfere with apportionment of state legislatures).

process. In additional cases, the court extended the equitable districting logic. In *Wesberry v. Sanders,* 376 U.S. 1 (1964), the Supreme Court held that House of Representative districts must be relatively equal in population; and in *Reynolds v. Sims,* 377 U.S. 533 (1964), the Court held that for districting purposes, total population would be assessed to facilitate redistricting and not be limited to some other unit, for example, 'all voters.' The Court ultimately concluded that representation is for *district populations* and not just for voters.[27] Subsequent lawsuits resulted in the redrawing of districts nationwide.

Georgia had not redistricted in decades. Instead it used the county unit system. The state did not desire districting that would ensure equitable districts or apportionment. However, as a result of the 'one man, one vote' line of cases, Georgia was federally mandated to establish equality of representation based on fairly drawn districts that contained roughly similar population numbers and evenly apportioned representation. In 1963, Georgia was forced to abolish the county unit system that allowed white counties to control elections.[28]

On the other hand, *Baker* did not strike the entire bevy of voter restrictions exercised in Georgia. These did not come under fire until the next year, when the Voting Rights Act of 1965 was passed. Georgia state and local governments immediately pushed back against the VRA and took action designed to continue to use racially discriminatory voting tactics and to avoid regulation by the Act. This was not a surprise—Georgia resisted all civil rights legislation that affected all voters, including the *Baker v. Carr* line of cases, *Brown v. Board of Education*, and civil rights legislation passed specifically to benefit blacks in 1957, 1960, 1964 and 1968.

When the VRA of 1965 was being proposed and debated in Congress, Georgia representatives complained vehemently that the law was an inappropriate imposition on states sovereignty. The Georgia governor, Carl Sanders, wrote to President Lyndon B. Johnson "urging defeat of the voting rights bill."[29] In his nine-page letter, Sanders argued that states determine all aspects of voting. He objected to the prohibition against literacy tests, and called the empowerment of federal registrars "extreme."[30] Overall Sanders considered the Act "unnecessary" despite the state's culture of voter discrimination, or more accurately, because of it.[31]

The VRA required Georgia to submit changes in voting laws or procedures for preclearance by the Department of Justice ("DOJ"). When the VRA passed, Georgia supported the lawsuit brought by the state of South Carolina attacking the constitutionality of the Act.[32] When the lawsuit failed, Georgia refused to comply with the law generally and with the preclearance process specifically. Georgia government–large and small –immediately passed laws and enacted procedural changes to voting to minimize the impact of regulation under the VRA and to ensure white supremacy. The state passed a new election code that made registration for blacks even harder than before the VRA, and established majority vote protocols, numbered post requirements, and other procedures

---

[27] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (New York: Basic Books ,2000), 286.

[28] Gray v. Sanders, 372 U.S. 368 (1963).

[29] McDonald, *Odyssey*, 11.

[30] McDonald, 11

[31] McDonald, 12.

[32] South Carolina v. Katzenbach, 383 U.S. 301 (1966).

to dilute black voting power. These provisions were intentionally designed to curtail black enfranchisement. The sponsor of the state majority vote bill, for example, blatantly urged its passage to prevent black bloc voting power."[33] And, the state refused to submit new laws for preclearance. Between 1965 and 1968, the state submitted exactly *one* of its hundreds of voting law changes to the DOJ for preclearance.[34]

Key to Georgia's VRA resistance campaign was the use of at-large election schemes by local governments and school boards. With white bloc voting, it was impossible for blacks to gain an electoral foothold in an at-large district. In Georgia, after 1965, local jurisdictions that did not already use at-large voting switched from single member political and school board districts to at-large voting systems. At-large voting systems diluted black votes and ensured that, despite an expanded black electorate in places like Atlanta, whites could control the votes. By 1968, fewer than half of eligible black voters were registered to vote in most Georgia counties.[35] Blacks who attempted to run for office in the state in the mid-1970s were hamstrung by the racial discrimination endemic to the state franchise. It was virtually impossible for blacks to campaign in rural areas and therefore to mount a successful campaign for many offices.[36]

The VRA was designed to *solve* the problem of black voter access and therefore was designed to expire if it were no longer necessary. However, due to the slow pace of compliance by governmental entities because of the resistance to including blacks in the citizenry in a nation where whiteness was defined as "not black," and where the foundation of the national economy, arguably, was based on the enslavement and the non-inclusion of blacks into the polity, Congress renewed the law every time that it came up for renewal. The VRA preclearance provisions were renewed in 1970, 1975, 1982, and 2006. Preclearance for voting changes was enforced for 48 years, from 1965 until 2013.

The state of Georgia resisted the VRA and opposed being covered by the preclearance provisions from the time the law was proposed until the *Shelby County v. Holder* decision in 2013 when the preclearance schema was struck down.[37] Georgia state representatives argued against the legislation in 1970 and 1975, boycotted the 1982 hearings and strongly opposed preclearance in 2006. At the last reauthorization session in 2006, when the two parties agreed that they would renew the Act essentially "as is," Georgia representatives wasted no time in taking the lead in an effort to rebel against the "as is" agreement on the floor. At no point did the state of Georgia agree with the legislation or accept that it should be subject to VRA coverage.

While under the auspices of the VRA, the state engaged in discriminatory districting drawn to limit the black vote. In 1971, the state made new districts for congress. The plan was unfriendly to black voters. The plan divided black Atlanta into three districts to ensure that the 5th district was majority white. The plan excluded the residences of Andrew Young and Maynard Jackson to prevent them from running for Congress, yet it included the residences of several potential white 5th District candidates. White state legislators drummed up support for the plan by threatening that

---

[33] Runoff Bill Revived by Senate Unit: Majority Vote Plan Sent to Sub-Panel, *Atlanta Constitution*, March 1, 1963.

[34] McDonald, *Odyssey*, 130

[35] McDonald, 130.

[36] McDonald, 155.

[37] Shelby County v. Holder, 570 U.S. 529 (2013).

if the 5th district maintained a black majority, it was highly likely that Julian Bond would be elected to Congress. [38] Georgia representatives insisted that the proposed districting plan was necessary to protect the state despite its severely irregular shape.  When the district plan was reviewed under the VRA, the federal government forced the state to return Young and Jackson's residences to the 5th district and to increase the black percentage in the 5th district to 44% from 38%. In 1972, Andrew Young was elected under the 1971 redistricting plan, "the first black person elected to Congress from Georgia since Reconstruction."[39]

The application of the VRA did contribute to a decrease in voter suppression in Georgia despite state and local action.  Franchise reform under the law was achieved by black civil rights activists and plaintiffs aided by civil rights attorneys, attorney members of organizations like the NAACP, ACLU, SPLC, and the Department of Justice, even if it was ultimately precarious.[40] In 1973, the Supreme Court decision, *White v. Regester*, "gave a huge boost to the voting rights enforcement campaign in Georgia."[41] In *White,* the Supreme Court invalidated an at-large election district in Texas based on a theory of vote dilution.[42] The Court held in *White* that single member districts were necessary to integrate black voters and to allow them the potential to elect candidates of their choice.[43] Subsequently, many challenges were filed in Georgia against at-large jurisdiction systems used in city and school board elections – none of which had been precleared by the Department of Justice.[44] Federal courts struck a number of at-large systems challenged in court. In Fulton County, for example, a federal court disqualified the at-large voting system because the county remained inaccessible to blacks on an equitable basis.  The court concluded that "there was a history of undisputable, pervasive de jure racial segregation in Georgia and Fulton County," and that "the government had never been equally open to participation by black and white members of the community."[45]  The court noted that no black had served on the County commission or as a department head, and that racist campaign tactics and voting procedures persisted including the majority vote rule and numbered post requirements, all designed to maintain inequitable access to the county franchise. [46]  Similar decisions applied to local government and school board lawsuits across the state.[47]

Georgia government actors also abruptly changed rules to deter blacks from running for and securing elected offices.  In 1972, when John E. White, of Albany, GA, an employee of the Dougherty County Board of Education, announced that he would run for a seat in the Georgia House of Representatives, the first black candidate to do so since Reconstruction, the Board adopted a new rule, "Rule 58" the following month.  Rule 58 required Board employees to take an unpaid leave of absence while running for or serving in a government office.  White subsequently ran for office three times and lost more than $11,000 in unpaid salary as a result.  White sued

---

[38] McDonald, *Odyssey*, 149-150.

[39] Bartlett C. Jones, *Flawed Triumphs: Andy Young at the United Nations* (Lanham, Md.: University Press of America, 1996), 3.

[40] Mc Donald, *Odyssey*, 195-6.

[41] McDonald, 159.

[42] *White v. Regester*, 412 U.S. 755 (1973).

[43] *White,* at 769.

[44] McDonald, *Odyssey*, 158-163.

[45] *Pitts v. Busbee*, 395 F. Supp. 35, 40-1 (N.D. Ga. 1975).

[46] *Pitts*, 395 F. Supp. 35, at 40.

[47] McDonald, *Odyssey*, 160.

arguing that Rule 58 had not been precleared under Section 5 of the VRA even though it was a "standard, practice or procedure with respect to voting," enacted by a covered jurisdiction.[48] White stressed that he was the first black person to run for the General Assembly from the county and that no other Dougherty County employees had been subject to the same rule.   Ultimately, the Court affirmed the decision that pursuant to the precedent in *Allen v. State Board of Elections*, 393 U.S. 544 (1969), and contemporary cases, Rule 58 should have been submitted for preclearance. The Court enjoined application of the law and ordered preclearance compliance.

> By imposing a financial loss on [Board] employees who choose to become candidates, [the Rule] makes it more difficult for them to participate in the democratic process and, consequently, restricts the field from which the voters may select their representatives.[49]

While subject to the VRA in 1975, Georgia continued to engage in discriminatory action. Georgia's 1981 redistricting plans again drew objections including the plans for congressional, state and local redistricting.  In a repeat of the antics of the early 1970s, white legislators rejected the plan proposed by the black politician from Fulton County, Julian Bond, in favor of a plan that would maintain white majority voting strength.[50]  Julian Bond's proposed plan to increase the percentage of the black vote in the 5th district to 69% was rejected. Legislators complained that the plan would cause white flight and racial discord.[51] Instead, white legislators submitted a plan for that would reduce the power of black voters in Fulton County.[52]

By 1982, the state still had very few black elected officials.  Black officials reliably hailed from majority black districts.  Only 3% of the county governing board members were black and there were no blacks elected to statewide office.[53] The low numbers were the result of at-large election systems and other policies that prevented blacks from winning elections in the state.  Preclearance compliance by the state had improved but approximately 361 acts of the general assembly and an unknown number of local changes remained unsubmitted.[54]

The resulting court challenge by Georgia to the Department of Justice denial of preclearance of its districting plan, is notable. The case was reviewed by the United States District Court for the District of Columbia.[55]  State legislators were so blatantly racist that the state could not prove lack of discriminatory intent.  Complicating matters was the attempt by the state to create a district for "mountain communities" which they justified for the same kind of reasons that justified black voting strength in the 5th ', i.e., district voters in the mountain areas maintained similar opinions and voting interests and so should be districted together.

The chair of the Georgia House appropriations committee, Joe Mack Wilson, who dominated the redistricting process in the lower chamber and who often expressed his hate for "blacks and

---

[48] 42 U.S.C. 1973c; Dougherty County, Georgia, Board of Education et al., dv. White, 439 U.S. 32, 35 (1978).
[49] White v. Dougherty County, Georgia, Board of Ed., 431 F. Supp. 919 (M.D. Ga. 1977).
[50] Busbee 549 F. Supp. at 499 (D.D.C. 1982); McDonald, Odyssey, 168.
[51] Busbee, 549 F. Supp. at 494, 510.
[52] McDonald, *Odyssey*, 169-173.
[53] McDonald, 175.
[54] McDonald, 175
[55] *Busbee*, 549 F. Supp. 494.

Republicans," caused the DOJ to reject the plan. When a member of the reapportionment planning committee was deposed, and asked about Mr. Wilson, she admitted that she was taken aback by Wilson's blatant expressions of dislike for blacks and Republicans and the language that he used to convey that information. When asked to specify, Dorothy Felton testified that instead of "blacks" he used the word "Niggers."[56]

> At that moment, in the small conference room in the Richard B. Russell Building in downtown Atlanta where the deposition was being taken, the state effectively lost its preclearance case.[57]

The district court found that racial discrimination was the purpose of the 1981 plan, and it noted that the state treated black and white districts in a disparate manner. The Court made an explicit finding that Mr. Wilson was a "racist." Ultimately the state districting plan included a 65% black voting percentage in the 5th district. That plan resulted in the election of John Lewis to the 5th district in 1986 in a contest against Julian Bond. [58]

Lawsuits were unsuccessful at getting the majority vote rule eradicated using the VRA. In 1990, Georgia plaintiffs brought a challenge to the statewide majority vote requirement. Plaintiffs claimed that the policy was adopted with a discriminatory purpose and that it had a discriminatory effect on black candidates and voters. But, during depositions and testimony, Georgia state representatives who participated in the 1964 process either denied that the bill was motivated by a desire to suppress votes or they claimed that they could not remember the intention of the legislation. The chief sponsor of the bill in the state house, Denmark Groover, blatantly encouraged support for the law in 1964 to "thwart election control by Negroes and other minorities" and to hinder federal efforts to register black voters.[59] Plaintiffs witnesses also provided evidence that the majority vote rule was enacted to ensure limits on black electoral power, but the Court disagreed and rejected the claim. The Court held that the policy was *not* intentionally discriminatory and that legislators who passed the 1964 bill did not pass it to achieve race discrimination.

In 2006, Georgia state representatives took the lead in opposing reauthorization of the VRA and preclearance. After the two parties agreed to renew the Act "as is" by not objecting to it on the floor, Georgia Representative Lynn Westmoreland refused to abide by the agreement. Before the hearings could begin, in a closed-door GOP meeting, Representative Lynn Westmoreland (GA) led colleagues from Georgia, Texas, Oklahoma, Michigan, Florida, and Alabama in a demand for debate to express on the record their opposition to the VRA and to preclearance in particular. Westmoreland argued that the reauthorization of preclearance would fail to acknowledge state improvements in voting rights since the inception of the VRA in 1965. Westmoreland averred that it would be unfair to covered states like Georgia that had significantly improved their voting records under the VRA to reauthorize the preclearance rubric "as is".[60] The closed-door meeting

---

[56] McDonald, *Odyssey*, 170.

[57] McDonald, 170.

[58] Dudley Clendinen, "Ex Colleague Upsets Julian Bond in Atlanta Congressional Runoff," *The New York Times*, September 3, 1986.

[59] McDonald, *Odyssey*, 12.

[60] Hulse, Carl. "Rebellion Stalls Extension of the VRA," *The New York Times*, June 22, 2006.

became so heated that Jim Sensenbrenner walked out and the originally scheduled hearings were delayed indefinitely.

Hearings finally began in June, but only on the condition that the Republican "rebels" be permitted to ignore the pre-existing agreement not to debate and be allowed to propose amendments.[61] Rebels proposed four amendments. All four failed. Supporters of the reauthorization bill called the four amendments "poison pills" and described them as "mean spirited."[62] But Westmoreland and his supporters claimed they were attempting to protect the law by making it applicable nationwide.[63] According to Westmoreland, it might have looked as if "some old boys from the South" were trying to do away with the civil rights law, but they were actually trying to save it. "These old boys are trying to make it constitutional enough that it will withstand the scrutiny of the Supreme Court."[64] Needless to say, white Georgia legislators voted against the reauthorization of the VRA in 2006.

Very recently, the state has been reported to have engaged in discrimination against Puerto Rican voters in a manner that seems eerily similar to former segregation tactics. In July 2019, the Atlanta Journal Constitution ("AJC") reported that Puerto Rican voters have had difficulty obtaining driver's licenses in the state. When Puerto Rican citizens have visited the Georgia Department of Driver Services ("DDS"), many have had their birth certificates and other documents confiscated, fraud investigations against them initiated, and have been subjected to questioning. A Puerto Rican expert commented that he was unable to answer some of the questions that he was asked.[65]

When a U.S. citizen obtains a driver's license in the state of Georgia, they are also registered to vote if eligible. By preventing Puerto Rican residents from obtaining driver's licenses, the state is also denying the same U.S. citizens the right to vote. Under the Privileges and Immunities clause of the Constitution, Puerto Ricans are entitled to be treated as if they are the resident of any other state in the nation or Washington D.C.[66] If a person is a citizen of the United States, which Puerto Ricans are, when he or she obtains a driver's license they should be registered to vote. Because non-citizens are not entitled to be registered for the franchise, the Secretary of State is obligated by law to confer with the head of the Driver's License Bureau to establish appropriate protocols. The Secretary of State appears to be treating citizens of Puerto Rico, who are often people of color, differently. The state of Georgia has a long history of using voter suppression tactics against black voters. The questioning of Puerto Rican citizens evokes memories of the same kinds of tactics used when Georgia administered literacy and understanding tests as a part of its effort to discriminate against black voters before 1965 and since. According to the AJC, more than 93,000 Puerto Ricans live in the state of Georgia.

---

[61] Fuller, Jaime. "The Fix: Republicans Used to Unanimously Back the Voting Rights Act. Not Any More" *The Washington Post*, June 26, 2014.

[62] Ed. Daniel McCool, *The Most Fundamental Right*, (Bloomington, Indiana: Indiana University Press, 2012), 14.

[63] Lyman, Rick. "Extension of Voting Rights Act Likely Despite Critics," *The New York Times*, March 29, 2006.

[64] Amanda Becker, "Voting Rights Act At Risk?" *CQ Weekly*, Feb 2, 2013,
http://public.cq.com/docs/weeklyreport/weeklyreport-000004214386.html.

[65] David Wickert, "Georgia agency under scrutiny for treatment of Puerto Ricans," *AJC*, July 12, 2019.

[66] 8 U.S.C. 1402

Caban Gonzalez has a pending lawsuit alleging that when he attempted to apply for a driver's license after satisfying the 30-day residency requirement, that he was subject to requirements only applied to Puerto Ricans. Gonzalez alleges that the DDS inspector confiscated his documents, asked him questions about Puerto Rico, and ultimately had him arrested for fraud.[67] Gonzalez further alleges that he submitted a valid Puerto Rican driver's license, dated 2014, a pay stub and his social security card. Others have alleged that when they have submitted Puerto Rican birth certificates in order to obtain a Georgia driver's license that they have been flagged and accused of fraud.[68] The DDS claims that all driver's license applicants are treated according to law, but Shevondah Leslie, a representative of the DDS, admitted that the DDS does use a document from the department titled, "Puerto Rican Interview Guide" which the DDS also claims is not authorized by the DDS.[69]

Counties in Georgia have also recently been involved in disputes about whether to close voting precincts in predominately black areas. Before the 2018 midterm elections, the Randolph County Board of Elections voted 3 to 0 to close seven majority black precincts. After a public outcry, the Board backed down.[70]

Those critical of the closings are suspicious about the closings and concerned that they will make it more difficult for black and low-income voters to access the polls. These closures also come on the heels of a dispute about closing precincts last year causing similar concerns, as even in white precincts the closing of polling locations results in a loss of votes by minority and low- income voters. The Secretary of State's office claimed last year that it does not monitor the number of polling places that are closed and that the decisions about precinct closures occur at the county level. But former Secretary of State Brian Kemp provided a manual to counties that includes information designed to assist counties at deciding to close and closing precincts. In that manual, the former Secretary reminded counties twice that they were no longer required to preclear laws with the DOJ in order to close polling locations in areas with "low incomes, small populations and substantial minority populations."[71] According to an AJC investigation, since the 2013 decision in *Shelby v. Holder*, 8%, or 214, polling locations have been closed in Georgia.[72]

---

[67] Elliot McLaughlin, "Fritters and frogs: Is Georgia's discriminating against Puerto Ricans with driver's license quiz?" *CNN*, July 4, 2019, https://flipboard.com/@CNN/fritters-and-frogs-is-georgia-discriminating-against-puerto-ricans-with-driver-/a-HFfMJ3QqTkai2mvPcerwlg%3Aa%3A132361178-cc4de46e51/cnn.com.
[68] McLaughlin, E., "Fritters and frogs"
[69] McLaughlin, E., "Fritters and frogs."
[70] Richard, Fausset, "Georgia County Rejects Plan to Close 7 Polling Places in Majority Black Areas." *The New York Times*, August 28, 2018.
[71] Mark Niesse, Maya T. Prabhu and Jacquelyn Elias, "Voting Precincts Closed Across Georgia Since Election Oversight Lifted," *The Atlanta Journal Constitution*, Aug. 31, 2018, https://www.ajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/.
[72] Niesse, M; Prabhu, M; Elias, J; "Precincts Closed."

11

**Opinion: Georgia's suppression of people of color's right to vote is consistent with the long history of Georgia and Southern states.**

    a. The basis and reasons for my opinions are set forth below along with the facts and data I considered.

The United States Constitution has no explicit grant of the right of individuals to vote. Article I Section 4 of the Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed by each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Place of Chusing (sic) Senators."[73]

When the Constitution was adopted, each state decided which individuals in the state had the right to vote. Pursuant to Article 1 Section 4 and the reserved powers of the 10th Amendment, states have historically understood themselves as constitutionally able to regulate elections, and traditionally Georgia has exercised that right by suppressing the black vote. State governments administer elections, determine their time, place and manner, decide who will have access to the polls, what the district boundaries will be, how representation will be apportioned, how registration will work, how ballots will be handled, and what will be the responsibilities of the elected official once elected. Southern states considered the power to administer electoral functions critical to their ability to be independent of the federal government, and key to their ability to control state politics, economy and governance. Most important to Southern states in this regard was the ability to exclude *black* voters from the electorate. In this regard, the state of Georgia has acted as a "laboratory of democracy," in a number of instances in the development of national voter suppression measures against minorities, throughout U.S. history, emulated by other states.[74]

Several sections of the Constitution seem to imply that *individuals* have a right to vote. Article I Section 2 states that the House of Representatives will be composed of members chosen "by the people of the several states."[75] Several amendments also make it appear that U.S. citizens are constitutionally empowered to vote. The 14th Amendment prohibits states from denying persons in their jurisdiction the equal protection of the laws, including with respect to the right to vote.[76] The Fifteenth Amendment provides that the right to vote "shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."[77] The 17th Amendment indicates that senators will be "elected by the people." The 19th Amendment forbids denial of the "right of citizens of the United States to vote … by the United States or by any State on account of sex."[78] The 23rd Amendment facilitates presidential elections for D.C. residents.[79] The 24th Amendment prohibits poll taxes.[80] The 26th Amendment states that the right

---

[73] U.S. Const. article I, section 4.
[74] New State Ice Co. v. Liebmann, 285 U.S. 262 (1932), "Laboratories of democracy" is a phrase popularized by U.S. Supreme Court Justice Louis Brandies to describe how a "state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.
[75] U.S. Const. article I, section 2.
[76] U.S. Const. Amendment XIV.
[77] U.S. Const. Amendment XV.
[78] U.S. Const. Amendment XIX.
[79] U.S. Const. Amendment XXIII.
[80] U.S. Const. Amendment XXIV.

to vote will not be denied to those eighteen years of age or on account of age.[81] A number of these amendments were proposed because states were prone under the original Constitution to exclude particular factions of voters, including those based on race and gender.

Surprisingly, after the American Revolution, several states included blacks as part of their electorate. "African Americans were enfranchised in North Carolina, Massachusetts, New York, Pennsylvania, Maryland and Vermont."[82] Only a few states restricted voting based on race and in 1790, after the ratification of the Constitution, "only Virginia, Georgia, and South Carolina" had formal rules that prevented blacks from voting.[83] By 1855, Massachusetts, Vermont, New Hampshire, Maine and Rhode Island were the only states that did not exclude black voters, however these states had very small black populations. In fact, just before the Civil War, five New England states allowed blacks to vote based on the same qualifications as whites.[84] However, after the Civil War, states that allowed blacks to vote began to restrict access to the franchise to *white* men only.[85] It should be noted that all states at this time barred women from voting.

In the South, black enfranchisement was widely rejected from the start.[86] The black slave labor system yielded major economic benefits that motivated Southern state governments to actively exercise race-based voter suppression. The denial of the franchise was codified in state constitutions and/or by state statute, was not prohibited by the U.S. Constitution, and was socially accepted and expected to ensure the social, political, and economic order of the state. The state of Georgia showed its early commitment to black voter suppression when its constitutions prohibited blacks from voting.

The conclusion of the Civil War brought with it an expectation of civic engagement by blacks residing in the many states. Legislative enactments by Republicans laid the groundwork for a franchise that included newly freed slaves. President Lincoln urged the passage of the 13th Amendment to codify the freedom of slaves with a permanence not provided by either of the Emancipation Proclamations. The first Proclamation applied only to the Union states (some of which were slave holding) and had no impact on the legal apparatus of the Confederacy.[87] The second Emancipation Proclamation freed slaves in the South but was essentially an executive order, not imbued with the more permanent nature of a Constitutional amendment.[88]

The 13th Amendment, passed in 1865, ended the social death caused by the designation of slave and ended the legal presumption that those born of black mothers were slaves. Now involuntary servitude and slavery were prohibited, "except as a punishment for a crime whereof the party had

---

[81] U.S. Const. Amendment XXVI.

[82] Bridgett A. King and Kathleen Hale, Eds., *Why Don't Americans Vote: Causes and Consequences* (Santa Barbara, ABC-CLIO, LLC 2016), xvi.

[83] King and Hale, *Why Don't*, xvi.

[84] King and Hale, *Why Don't*, xvi.

[85] King and Hale, *Why Don't*, xvi.

[86] King and Hale, *Why Don't*, xvi.

[87] Lincoln, A. (1862) Preliminary Emancipation Proclamation. Retrieved from the Library of Congress, https://www.loc.gov/item/scsm000950/.

[88] Emancipation Proclamation, January 1, 1863; Presidential Proclamations, 1791-1991; Record Group 11; General Records of the United States Government; National Archives.

been duly convicted" inside the United States, "or any place subject to its' jurisdiction."[89] Radical Republicans were unable to glean support for a specific enfranchisement requirement and include it in the 13th Amendment,[90] and Southern states were resistant to the advent of blacks' civil rights. To avoid compliance, Southern states passed black codes to revise the social structure in effect before the war and ensure the viability of the southern social, political and economic hierarchy and the persistence of white supremacy.[91] Custom and enforcement of the black codes resulted in the exclusion of blacks from the franchise despite the amendment of the U.S. Constitution.

The Lincoln (and later the Johnson) Reconstruction programs did not include black suffrage as a requirement. Lincoln's plan, issued in December of 1863, the "Ten Percent Plan," pardoned and restored property to former rebels willing to take an oath of allegiance to the Union.[92] Once 10% of voters in a jurisdiction took the oath, voters could establish a new state government that would be recognized by the president.[93] President Johnson in fact promised the radicals that he would include suffrage as a redemption requirement. Radical Republicans "… wanted to make universal manhood suffrage a prerequisite for the readmission of the former Confederate states to the Union."[94] Johnson's plan did not include black suffrage. When Johnson put his Reconstruction plan into action, Congress was in recess and Johnson hoped that he could have Reconstruction complete before Congress and its Radical Republican members returned to session in December of 1865. His assumption was incorrect.[95] Subsequently, the President clashed with Radical Republicans who craved the ability to establish a black franchise, in large part to expand the parties' influence in the South.

In response, moderate Republicans passed the Freedman's Bureau Bill and the Civil Rights Act of 1866, to confer national citizenship and basic civil and economic rights to blacks.[96] The Freedman's Bureau Act provided aid to former slaves including food, housing, education, health care, employment contracts and land acquisition.[97] The CRA of 1866 allowed freedmen to own property, make contracts, and sue.[98] Moderate and Radical Republicans then proposed the 14th Amendment to further solidify black citizenship and ensure black access to the polity.

The 14th Amendment, adopted in 1868, was designed to provide a basis for black suffrage though it did not do so affirmatively. Instead, the Amendment forbade discrimination at the polls based on race and stipulated that states denying any male residents over the age of 21 the right to vote would suffer a reduction in their delegation to the U.S. House, "in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state."[99] However, the Section 2 sanctions were never enforced and did not dissuade states

---

[89] U.S. Constitution Amend. XIII; States, including Georgia took advantage of the "convicted of a crime" ca

[90] Xi Wang, *The Voting Rights Act: Securing the Ballot* ed. Richard Valelly, (Washington, D.C. CQ Press, 2006), 5-6.

[91] Xi Wang, 7.

[92] 13 Stat. 737 (August 31, 1964); Xi Wang, *African American Voting*, 5.

[93] Xi Wang, *African American Voting*, 5.

[94] Xi Wang, 6.

[95] *Reconstruction: America After the Civil War*, Henry Louis Gates Jr., PBS Documentary, April 2019

[96] 13 Stat. 507 (March 3, 1865); 14 Stat. 27-30 (April 9, 1866).

[97] 13 Stat. 507 (March 3, 1865).

[98] 14 Stat. 27-30 (April 9, 1866).

[99] US Constitution, Amend. XIV.

from race discrimination in the franchise. This failure was in part because Radical Republicans were unable to secure nationwide support for an integrated franchise.[100]

The 14th Amendment did provide fuel for Radical Republicans to push for enfranchisement in Washington D.C. and the federal territories, which was achieved in 1867. Ten former Confederate states, Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Virginia and Texas, were placed under military control and required to write new constitutions, ratify the 14th Amendment, and establish black suffrage.

The radical wing of the Republican Party took over Southern Reconstruction from President Johnson in 1867. Radical Republicans were interested in preventing the return of the same southern gentry who ran Southern governments prior to the Civil War, and in establishing a foothold for the Republican Party in the South. As a result, Radical Republicans were extremely interested in black inclusion in the franchise. In 1867, Radicals established martial law in the South, creating military districts and inserting Republican leadership into Southern government. Radical Reconstruction lasted from 1867 until the Hayes-Tilden Compromise in 1877.

Pursuant to the First Reconstruction Act, approximately 735,000 blacks and 635,000 whites were registered to vote in the former Confederacy.[101] In five of those states, black voters were the majority.[102] Six states ratified new constitutions pursuant to the Second Reconstruction Act passed in March, 1868.[103] In June, seven more states, Alabama, Arkansas, Florida, Georgia, Louisiana, North Carolina, and South Carolina, were readmitted with the proviso that none ever "amend their constitutions to deny African Americans the right to vote."[104] Moderate Republicans again sought the passage of a constitutional amendment and passed the 15th Amendment in 1870.[105] Like the construction of the 14th Amendment, the 15th Amendment did not affirmatively grant blacks the right to vote, instead it forbade voter discrimination based on race.

However, the prospect of a successful black electorate was an anathema to white Georgians and other Southerners. Southerners generally feared that if granted the franchise, blacks, who made up a majority of the population in most deep South states, would take control of the social, political and economies of the states, hence the widespread violence and other efforts to disenfranchise blacks was waged during Reconstruction. "[I]ntimidation [was] used on an extensive scale." In many localities, blacks were "not allowed, under penalties of severe reprisals, to show their faces in town on election day."[106] Other devices were also widely used. Polling places were established at significant distances from black communities and common modes of transportation to access polling places were destabilized at election time. Polling places were moved without notice, ballots went unrecognized, ballot boxes were "stuffed" with fraudulent ballots, and vote counts were manipulated. According to historian John Hope Franklin:

---

[100] Xi Wang, *African American Voting*, 8.
[101] 14 Stat. 428-430 (March 2, 1867).
[102] Xi Wang, *African American Voting*, 9.
[103] 15 Stat. 41 (March 11, 1868); Xi Wang, *African American Voting*, 10.
[104] Xi Wang, *African American Voting*, 10.
[105] U.S. Constitution Amend. XV.
[106] John Hope Franklin, *Slavery to Freedom: A History of Negro Americans*, 3rd. Ed. (Alfred A. Knopf 1967), 333.

15

The practice of stuffing ballot boxes was widespread. Criminal manipulation of the counting gave point to the assertion of an enthusiastic Democrat that "the white and black Republicans may outvote us, but we can out count them.[107]

The "bloodiest single instance of racial carnage in the Reconstruction era, the Colfax massacre"[108] was motivated by black suffrage. On Easter Sunday 1873, after a contested election for governor in 1872 in Louisiana, armed white Democrats murdered Republican freedmen and black state militia who occupied the Grant Parish courthouse to ensure that the Republican governor was seated. Most of the blacks were killed after they surrendered and 50 more were killed later that evening after being held as hostages. According to historian Eric Foner, 288 blacks lost their lives in the fray.[109]

In the related judicial review of the incidents, which culminated in the *United States v. Cruikshank* decision, the Supreme Court held that the Enforcement Acts of 1870 which were specifically designed to punish the kind of terroristic violence that occurred at Colfax, was not applicable.[110] The Court held that because the offenders were private actors and not state actors acting under color of state law, they were not regulated by the statute.[111] The Court held too that the Due Process and Equal Protection Clauses of the 14th Amendment applied only to state action and not to the actions of individuals at large. "The 14th Amendment prohibits a State from depriving any person of life, liberty of property, without due process of law: but this adds nothing to the to the rights of one citizen against another,"[112] said the Court. The Court stressed the boundaries of federalism and refused to incorporate the Bill of Rights.[113]

The presidential election of 1876 dealt "[t]he final blow to black suffrage was dealt by the 1876 presidential election, perhaps the most bitterly fought presidential contest of the nineteenth century."[114] The election returns resulted in disputed electoral votes which were ultimately granted to Republican candidate Rutherford B. Hayes as part of a compromise between the two parties. In exchange for the presidency, Republican Hayes pledged to restore "home rule" in the South and to withdraw federal troops from the south, which he did in April, 1877. Once federal restrictions were lifted, Republican Party government largely collapsed in the South which was recaptured, or "redeemed" by Democrats.[115] Democrats specifically, and white Southerners generally, were rabid about suppression of black suffrage to ensure the survival of white supremacy and to maintain control of the social, political and economic systems that controlled government before the Civil War.

---

[107] Franklin, p. 333.
[108] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Perennial Classics, 2002), 437.
[109] Foner, 437.
[110] 16 Stat. 140-146 (May 31, 1870).
[111] United States v. Cruikshank, 92 U.S. 543, 546 (1876).
[112] *Cruikshank,* 92 U.S. 554.
[113] Cruikshank, 92 U.S. 554.
[114] Xi Wang, *African American Voting,* 15.
[115] Xi Wang, 15.

Wide scale black voter participation did not end immediately after the Hayes- Tilden Agreement. Blacks voted in the 1880s and continued to hold elected positions until 1890.[116] But, over the course of 1880 to 1890, all former Confederate states engaged in some set of tactics to ban black voters from access to primaries and elections within their boundaries. "Virginia for example, reapportioned or gerrymandered its voting districts five times within seventeen years to nullify Negro ballots."[117] The state added petty larceny to the list of suffrage disqualifications," and used a complicated balloting system.[118] Southern states instituted poll taxes, and Georgia passed one in 1877. It was upheld as constitutional by the Supreme Court in 1937.[119]

Southern states instituted confusing balloting processes, enacted highly centralized election codes, and adopted white primaries. South Carolina, for example, used a system of specific ballot boxes that demanded a voter deposit his vote into the correct box but forbade poll workers to speak with voters. Incorrectly boxed ballots were discarded.[120]

In Louisiana, black voter registration fell from 95.6 percent before an 1896 registration law, to 9.5 percent immediately thereafter, to 1.1 percent in 1904. Black voter registration in Alabama plummeted from 180,000 in 1900 to 3,000 in 1903. Registration figures undoubtedly overstated turnout. In Mississippi, black voter turnout was estimated at 29 percent in 1888, 2 percent in 1892, and 0 percent in 1895. [121]

Not only did this mean that blacks could no longer vote but it also meant they lost electoral offices and related power. Elected officials usually controlled not only the aspects of power related directly to their elected office but also held auxiliary powers held as a result of being an elected office holder. For example, elected officials sometimes had influence over the selection of school board leadership, the allocation of school funding, and/or over grand and petit jury pools. Because blacks were excluded from elected office, blacks were excluded from all layers of political power relevant to viable civic power in the communities in which they lived, in addition to literal exclusion from the ballot box.[122]

All southern whites were not against black franchise after Reconstruction. For a period, there was biracial progressive activism in some areas. Progressive whites in some localities acknowledged their similarities with blacks and were willing to work together with African Americans to ensure economic and political survival in the face of elite government control. Progressive movements sustained black economic survival in some Southern cities and towns and the establishment of black towns in some states ensured the economic and political progress of blacks in scattered Southern and western outposts, many through the early 1920s. However, progressive alliances were threatened by white supremacist and Lost Cause propaganda which eventually split political alignment between black and white communities and left blacks alone, alienated from political

[116] Michael J. Klarman, *The Voting Rights Act: Securing the Ballot*, ed. Richard Valelly (Washington D.C.: CQ Press, 2006), 37.
[117] Franklin, *Slavery to Freedom*, 334.
[118] Franklin, *Slavery to Freedom*, 334.
[119] Breedlove v. Suttles, 302 U.S. 277 (1937).
[120] Franklin, *Slavery to Freedom*, 334.
[121] Klarman, *Black Disenfranchisement*, 38.
[122] Klarman, *Black Disenfranchisement*, 38.

power, subject to debasement and violence, and eventually stripped of political power and access to local or national government support.[123]

According to historian C. Vann Woodward, the Jim Crow regime was not an inevitable outgrowth of the end of Reconstruction, but he argues, momentum toward the system did emerge after 1876 and grew in the 1890s. By 1900, Jim Crow statutes had been enacted in several states, at that point commonly restricting passengers aboard trains, but quickly became more varied, and pervasive. States passed similar restrictions to one another in "waves of popularity," across the nation expanding Jim Crow laws to waiting rooms, street cars, and eventually for separate street cars.[124] "Whites Only" and "Colored" signs emerged across the South visible at the city and local levels. Segregation law expanded too, into employment, state services, amusements, and residential living, restaurants and entertainment.[125]   A majority of states enacted statutory segregation laws between 1890 and 1910 and most restricted the franchise based on race.

In this milieu, federal jurists continued to deny blacks relief from discrimination under Jim Crow based on theories like that applied in *United States v. Cruikshank*.[126] In the 1883 Civil Rights Cases (five consolidated cases concerning discrimination by theaters, hotels, and transit companies that refused to serve plaintiffs on the basis of their color in violation of the Civil Rights Act of 1875 which prohibited race discrimination in services offered to the public), the Court held that Congress lacked authority under the 13th and 14th Amendments to restrict private discrimination and treatment.[127] According to the Court, the 13th Amendment did absolutely nothing but abolish slavery (and did not protect blacks from treatment that conveyed the indicia of slavery).[128] The Court rejected the idea that the Constitution restricted private actors in the same ways that it presumably restrained state action of the same sort.  By habitually interpreting discriminatory activity as unrelated to state authority, a trend begun in The Slaughterhouse Cases, there was to be no regulation of discrimination under the Constitutional amendments and statutes passed to provide protections to antebellum blacks.[129]

The 1896 *Plessy v. Ferguson* decision legally justified Jim Crow laws and codified the *Cruikshank-esque* analysis of the Reconstruction Amendment cases.[130]  The *Plessy* decision parsed coverage under the 14th Amendment between activity that could be influenced by the Constitution and that which could not. On the issue of whether the East Louisiana Railroad Company needed to abide by the states Separate Car Act, the Court agreed that separate accommodations would be required for white and black riders.  The Court denied that the law exercised the indicia of slavery and

[123] Gates, *Reconstruction.*

[124] C. Vann Woodward, *The Strange Career of Jim Crow*, 3rd ed. (New York: Oxford University Press, 202), 97.

[125] Woodward, 98-102.

[126] U.S. v. Cruikshank, 92 U.S. 542 (1876).

[127] Civil Rights Cases, 109 U.S. 3 (1883).

[128] Cruikshank, 92 U.S. at 555.

[129] See, The Slaughter-House Cases, 16 Wall. 36 (1873) (holding that the Privileges and Immunities Clause of the 14th Amendment only protects *federal* citizenship and not state); United State v. Reese, 92 U.S. 214 (1876); The Civil Rights Cases, 109 U.S. 3, 25 (1883) (Striking the Civil Rights Act of 1875 because the 13th Amendment "merely abolishe[d] slavery" and did not apply to private acts of discrimination); Plessy v Ferguson, 163 U.S. 537, 552 (1896) (holding that "separate but equal" is legitimate under the 14th Amendment).

[130] Plessy 163 U.S. at 543-44.

therefore held that it did not violate the 13th Amendment. And the Court upheld the constitutionality of separate train cars so long as they were equal in quality, or "separate but equal."[131] In effect, the Court tortured the purpose of the 14th Amendment, denied its purpose, and flatly rejected the idea that the Court had control over racial interaction.

> The object of the [Fourteenth] Amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either.[132]

The *Plessy* decision was interpreted as a legal foundation for the Jim Crow system even though the decision legally only applied to the case at bar. The case law was used subsequently to support all manner of exclusive public and private, state and federal, racially discriminatory behavior including importantly, the exclusion of blacks from the polls.

Voting rights challenges immediately following *Plessy*, extended its logic. In *Williams v. Mississippi*, the court held that the state constitutional requirements for voters to take a literacy test and pay poll taxes did not discriminate because they applied universally to all Mississippians.[133] However, a grandfather clause exempted white voters from the literacy requirements so that the statute did plainly discriminate against blacks. The court also denied relief in *Giles v. Harris,* holding that plaintiffs claim of discrimination against the state of Alabama was moot where the state voter registration qualifications theoretically applied to all voters and where the state did not affirmatively indicate an intention to discriminate.[134] And in *Giles v Teasley*, the court similarly rejected plaintiff's challenge to Alabama's discriminatory statutory registration scheme where he was not permitted to vote because of his race.[135] The court held that the law was one of general applicability. In both the *Williams* and *Giles* cases, the Court refused to restrict even state action.[136] The high court persisted in its fundamental theory that private interference was not sanctionable by Constitutional challenge. Constitutional Law scholar Michael J. Klarman suggests that the Court understood that its power to control state electoral behavior was limited and that sitting justices for the most part were not themselves committed to black suffrage or opposed it outright.[137] "By 1900, says Klarman, most white Southerners were determined to eliminate black suffrage by any means necessary."[138]

The other branches of federal government also opposed and refused to protect black voting rights. In the mid-1890s, electoral realignment placed Republicans back in control of the House and the Senate, the party did not re-invest in black suffrage.[139] Republicans did nothing to restore Reconstruction voting provisions voided by Democrats during their time in the majority between

---

[131] Plessy, 163 U.S. at 551.
[132] Plessy, 163 U.S. at 543–44.
[133] Williams v. Mississippi, 170 U.S. 213 (1898).
[134] Giles v. Harris, 189 U.S. 475 (1903).
[135] Giles v. Teasley, *193 U.S. 146* (1904).
[136] Klarman, "Black Disenfranchisement," 39-40.
[137] Klarman, 40.
[138] Klarman, 40.
[139] Klarman, 41.

1894-1910.[140]  And Congress continued to refuse to enforce Section 2 of the 14th Amendment and did not decrease the number of any state delegation for denying the right to vote to back male inhabitants,[141] despite rampant voter suppression in southern and northern states.

By 1910, Jim Crow ruled the franchise.[142] Most U.S. blacks were completely barred from the polls and most black office holders had been removed.[143] Radical racists took power and maintained it in every Southern state.  Openly racist attestations were a part of this effort.  Southern legislators were customarily vocal about their intent to maintain black voter exclusion.  For example, Senator James Vardaman of Mississippi promised that "every Negro in the state will be lynched" if necessary, to ensure white supremacy.[144]  Hoke Smith of Georgia made black disenfranchisement a focus of his successful campaign for governor and connected disenfranchisement to protection against race mingling. "The best way to tamp out such notions, he said, was to take the ballot out of the hands of the black man."[145] Even the president, William Howard Taft, stated in his 1909 inaugural address, that the South should not allow itself to be controlled by an "ignorant, irresponsible, electorate" and he agreed that the 15th Amendment was no longer being upheld by public opinion.[146]  In Georgia, the number of registered voters by 1910 was very small but that was irrelevant.  Georgia continued to use a white's only Democratic primary and the Democratic nominee was inevitably elected until 1946 when the Supreme Court struck down the state primary system.

Black voters made some progress against Jim Crow and voter suppression in the early 1900s, through social movement combined with the efforts of the NAACP and ACLU; however even where progress was made, it was slight in relationship to the full-scale voter suppression system at work in the nation.  The NAACP was successful in for example *Guinn v. United States*, where the Court agreed with the NAACP and invalidated Oklahoma's grandfather clause exempting whites from the literacy test.[147]  However, the decision had minimal impact.  The *Guinn* holding did not apply to other important impediments including poll taxes and literacy tests and most states did not have statutory grandfather clauses and so the decision did not force them to strike any existing law.  Most states that exercised grandfather clause exclusions did so by custom and continued to do so after the ruling.  In states that did maintain grandfather clauses they continued to enforce, the NAACP was unable to afford to monitor their behavior or engage in follow up litigation.

The NAACP lobbied Congress to pass anti-lynching legislation but congressional action proved to be extremely difficult.  Southern Democrats held significant power in Congress by the first decade of the new century and as a result of a combination of seniority and leadership, had the power to block civil rights legislation that found its way onto the floor. Richard B. Russell, Senator from Georgia for whom the federal court building in Atlanta is named, "began contesting civil

---

[140] Klarman, 41.
[141] Klarman, 41.
[142] Franklin, *Slavery to Freedom*, 340-1.
[143] Klarman, "Black Disenfranchisement," 41.
[144] Leon F. Litwack, *Trouble In Mind: Black Southerners in the Age of Jim Crow*, (Alfred A. Knopf, 1998), 295.
[145] McDonald, *Odyssey*, 41.
[146] Inaugural Address of President William Howard Taft, March 4, 1909.
[147] Guinn v. United States, 238 U.S. 347 (1915).

rights legislation as early as 1935, when an antilynching bill was introduced in Congress."[148] By the late 30s he led the Southern Bloc in objecting to federal civil rights legislation. Southern Bloc representatives claimed that civil rights legislation imposed unconstitutionally on states' rights. Russell used his ability to block the passage of a cloture rule in the Senate to maintain unlimited debate as a method to ensure filibuster of civil rights legislation or to ensure Southerners could severely limit that legislation. Under Russell's leadership, "the Southern Bloc stymied all civil rights legislation" over the course of thirty years.[149]

The NAACP also worked through its legal branch, The Legal Defense Fund, on judicial campaigns to establish civil right for blacks, decrease discrimination at the polls, and end Jim Crow by overturning the *Plessy v. Ferguson* decision. The judicial initiative proved to be more fruitful than the Congressional one. The NAACP made headway in voter access through cases challenging the all-white primary. The campaign did not result in instantaneous reform, but it did initiate change in black access to American electoral process. A common feature of the post Reconstruction voter suppression regime included the declination of blacks to party membership and/or to party primaries. In the South, exclusion from the primary meant missing the election. In states like Georgia, elections were systematically determined at the primary. Texas was the first to pass a statute restricting blacks from Democratic primaries, which provided an opportunity for the NAACP to challenge the statute. In *Nixon v. Herndon*, the Supreme Court held the Texas statute unconstitutional under the 14th Amendment because it denied black access to the primaries.[150] But like the decision in *Guinn*, the decision had very little weight. As in the Oklahoma grandfather statute, the Texas statute was an outlier, thus the decision did little to increase black access to primaries in fact. The *Nixon v. Herndon* decision also only applied to state action and could not reach Democratic party "private" action which was considered not subject to the 14th Amendment.

Despite those facts, both the state of Texas and Mr. Nixon were persistent. Texans repealed the statute prohibiting blacks from the primary and passed another which dictated that political parties would determine who would be qualified to vote or otherwise participate in party business. The Texas Democratic committee responded by passing a rule that excluded blacks from the primary. When Mr. Nixon tried to vote again, he was denied under the new stratagem. When Nixon sued this time, the Court held that the state's statute did transfer state power to the Democratic party, therefore state action was at issue which meant that *Nixon v. Herndon* did apply. State officials could not, said the court, "discharge their official functions in such a way as to discriminate invidiously between white citizens and black."[151]

The Court continued to exercise the private/public analysis, however. Voters could still be legally excluded from primary elections based on private action. In *Grovey v. Townsend*, the court held in favor of the county clerk who enforced a Democratic party rule restricting the primary to whites.[152] Here the Court held that the party rule was constitutional because state action was not

[148] New Georgia Encyclopedia, s.v. "Richard B. Russell, Jr. (1897-1971)" by Sheryl B. Vogt, accessed August 10, 2019, https://www.georgiaencyclopedia.org/articles/government-politics/richard-b-russell-jr-1897-1971.
[149] New Georgia Encyclopedia, "Russell."
[150] Nixon v. Herndon, 273 U.S. 536 (1927).
[151] Nixon v. Condon, 286 U.S. 73 (1932).
[152] Grovey v. Townsend, 295 U.S. 45 (1935).

involved, and the discrimination imposed by the party was exercised by a private organization and not the state.

In response to the Court's decision in *Guinn*, the state of Oklahoma replaced its grandfather clause with a new law that restricted voter registration to a short, strict 12-14-day period. Anyone who missed the registration window was subject to permanent disenfranchisement and the law provided an exception for whites who missed the deadline. After plaintiffs lost on appeal, the Supreme Court held that the Oklahoma law in fact violated the 15th Amendment.[153]

In the 1940s, a conflagration of events fostered an atmosphere of consideration for black civic engagement by the judiciary. In 1944, the United States was engaged in WWII, in a global fight against fascism, on a pro democratic platform that did not comport with state side race discrimination and segregated U.S. military forces. After a lively development of cases on the issue of the white primary brought by the NAACP or victims in the state of Texas, the Court refused to hold firmly that parties engaged in state action by facilitating nominations and elections. But the Court made a ruling in *U.S. v. Classic* a non-race case that edged over to the side of black plaintiffs.[154] In the non-race case, the Court held that registered Democrats could not be defrauded out of a Congressional primary by party agents. *Classic* did not directly apply to blacks, who were largely not party members, but it provided a basis on which to make persuasive arguments that urged denial of access to the primary was a denial the right to vote.

Lonnie Smith sued a Texas county election official for the right to vote in the Democratic Party primary and challenged a 1923 law that authorized the party to make its own rules. Pursuant to the party rules, all members of the Democratic Party had to be white. Smith argued that by regulating elections, the Democratic Party disenfranchised him by not allowing him to vote in the primary which was the meaningful election in his jurisdiction. In *Smith v. Allwright*, the Court agreed that the state party primary was key to the election process, and therefore the responsibility of the state. Because state action was involved, the 14th and 15th Amendments applied and they "required an end to the white primary."[155] The *Smith* decision did not completely settle the issue of white primaries, but it did mark the beginning of a tangible loosening of black voter restrictions. In 1946, the Court struck Georgia's white primary after it continued to exclude blacks in contravention of the *Smith v. Allwright* decision.[156] And in 1947, a federal court applying *Smith* integrated the South Carolina Democratic primary.[157]

The *Smith v. Allwright* decision left the Georgia primary system vulnerable. The Georgia state system was similar to that in Texas[158] however, the state of Georgia decided that the *Allwright* decision did not apply in Georgia and used white primaries in 1946. When Primus E. King of Columbus, GA sued to participate in the 1946 Georgia primary, the federal court applied the *Smith*

---

[153] Lane v. Wilson, 307 U.S. 268 (1939).

[154] United States v. Classic, 313 U.S. 299 (1941).

[155] The Allwright decision was bolstered by two subsequent decisions, Elmore v. Rice, 72 F. Supp. 516 (E.D.S.C. 1947) (holding that African Americans must be permitted to enroll in the Democratic party) and Brown v. Baskin, 80 F. Supp. 1017 (E.D.S.C. 1948) (removing the "loyalty oath" that required would-be voters to swear that they supported white supremacy).

[156] King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945).

[157] Elmore v. Rice, 72 F. Supp. 516 (E.D.S.C. 1947).

[158] McDonald, *Odyssey*, 48-9.

22

decision. The court held that the "Muscogee County executive committee had violated Primus Kings' equal right to vote as protected by the 14th and 15[th] Amendments," and invalidated the white primary in the state.[159] Very quickly more than 116,000 blacks signed up to vote which had an impact on the politics of the state, especially in the urban areas like Columbus and Atlanta.[160] According to Laughlin McDonald, "125,000 blacks or 18.8 percent of the eligible population were registered by late 1947."[161] According to Steven Lawson, Ralph Bunche estimated that 250,000 Negroes were registered to vote in the southern states; by 1947 the estimated number had jumped to 775,000. "Especially in Texas and Georgia, where the judiciary had toppled the white primary, did Negroes take advantage of their newly acquired freedom."[162]

Much of this progress was as a result of the return of black G.I.s from WWII. Many black soldiers back from war were motivated to push for civil rights and willing to risk the perils related to registering to vote.[163] As a feature of their military discharge paperwork, veterans were exempt from poll taxes.[164] Black voter registration began to rise as a result of this conflagration of events, energy, and legal development.

> In 1940, just 3% of southern black adults were registered to vote, but in 1952, 20 percent were registered.[165]Ironically, the most rapid transformation occurred in Georgia. Black voter registration increased from approximately 20,000 in 1940 to 125,000 in 1947. Other states encountered similar growth. The number of registered black voters in Louisiana increased from 8,000 to 43,000 within an eight-month period in 1948 and then rose to 107,000 by 1952. In Florida, roughly 20,000 black voters were registered in 1944, 49,000 in 1947, and 116,000 in 1950. Even in Mississippi, where white resistance to black suffrage remained intense, black voter registration increased form 2,500 in 1946 to 20,000 in 1950."[166]

In *Brown v. Board of Education*, 347 U.S. 483 (1954), and the subsequent 1955 decision, *Brown II*, 349 U.S. 294 (1955), the Court held that the legal basis of the Jim Crow system, the *Plessy v. Ferguson*, 163 U.S. 537 (1896) decision, was overruled. No longer would "separate but equal" be the law of the land. A consolidated case, multiple plaintiffs alleged a violation of the Equal Protection clause due to substandard education in a mandated segregated setting. The Court determined that black children were being unduly stigmatized by the exclusion and held therefore the "separate but equal" interpretation of the amendment was unconstitutional. When states and jurisdictions were slow or defiant against responding to the requirement that they integrate public schools, the *Brown* decision was followed by a second set of hearings and decision, *Brown II*,

---

[159] McDonald, 49.

[160] New Georgia Encyclopedia, s.v. "Segregation," by Edward A. Hatfield, accessed August 10, 2019, https://www.georgiaencyclopedia.org/articles/history-archaeology/segregation.

[161] McDonald, *Odyssey*, 49.

[162] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969*, (New York Columbia University Press, 1976), 53.; Julia Baxter, "NAACP Conducts Branch Survey on Negro Vote," NAACP Bulletin, (October-November 1946), 2.

[163] Keyssar, *Right to Vote*, 250.

[164] Keyssar, 246-247; Klarman, "Black Disenfranchisement," 49-50.

[165] Klarman, "Black Disenfranchisement," 49.

[166] Klarman, "Black Disenfranchisement," 49.

which ordered states to use "all deliberate speed" to integrate in accordance with the unanimous Supreme Court decision in *Brown*.

Though school integration may not seem directly related to voting, integration into the polity was a critical step toward integrating blacks into the franchise. Education had historically been used as a pillar of the voter suppression system. Blacks were denigrated as unfit for citizenship and civic engagement in part because of their lack of education and considered unable to understand electoral choices and responsibly cast ballots. The grant of the right to education was perceived as a precursor to opening the franchise to blacks. Integration resistance included vitriol aimed at the prospect of an earnest black franchise. If the *Brown* logic was applied to voting rights, presumably discrimination at the polls would no longer be constitutional.

The *Brown* decision caused resistance and motivated violence as had the opening of the franchise during Reconstruction. Historian John Hope Franklin pointed out that "[s]outhern resistance to any change in the status of the Negroes often degenerated into violence…" [167] As a result, the years 1954 – 1957 were extremely hostile and violent due to resistance to the *Brown* decisions' dictates and the expectation that integration would be mandated by the federal government.

In 1955, "[each] of the eleven states of the old Confederacy enacted interposition, nullification, or protest resolutions against the Supreme Court decision in the school desegregation cases." [168] In Congress in 1956, Georgia Senator Walter George presented the Declaration of Constitutional Principles, also known as The Southern Manifesto, which condemned the *Brown* decision and pledged that all possible means should be exercised to resist the implementation of integration. [169] Although a few jurisdictions proceeded to integrate their school systems, the vast majority did not. In 1955, the Georgia General Assembly decided to cut off state funds to any system that integrated its schools. Governor Ernest Vandiver was forced to choose between closing the public schools or to give the situation to the Federal Government to order them to desegregate the schools. State representative George Busbee introduced the legislation creating the General Assembly Committee on schools known as Sibley Commission. On January 6, 1961, federal district court Judge W. A. Bottle ordered the immediate admission of Hamilton Holmes and Charlayne Hunter to the University of Georgia, ending 160 years of segregation at the school. [170]

Civil Rights legislation was regenerated at the federal level in the late 1950s, reaching its peak performance in 1964 and '65. The Civil Rights Act of 1957 was the first civil rights act passed since 1875. [171] Another civil rights act was passed in 1960. [172] Both CRAs were ostensibly dedicated to creating parity in voting access for black Americans. The 1957 Act established the Civil Rights Commission which was empowered to investigate vote denials and study equal protection [173] and it established an office of Civil Rights at the Justice Department to enforce civil

---

[167] Franklin, *Slavery to Freedom*, 618.
[168] Franklin, 619.
[169] Franklin, 616-617.
[170] *Holmes v. Danner*, 191 F. Supp. 394 (M.D. Ga. 1961); "Bottle Orders University To Admit Negro Students," *The Red and Black: The University of Georgia, Athens,* Thursday January 5, 1961
https://www.libs.uga.edu/hargrett/archives/integration/integration1_integration1_rbbootle.jpg
[171] 71 Stat. 634. (Sept. 9, 1957).
[172] 74 Stat. 89 (May 6, 1960).
[173] Franklin, *Slavery to Freedom*, 622.

rights law.[174]   The Civil Rights Act of 1960 empowered federal registrars to register voters in jurisdictions with past civil rights violations; authorized federal inspection of voter registration locations; and established sanctions for anyone who obstructed another's right to register. The 1960 act extended the life of the Civil Rights Commission and expanded its purview to oversight of voting processes in the South in particular. Finally, the Civil Rights Act of 1964.[175]   A landmark piece of legislation, it too, aimed to improve the black franchise. The bill prohibited discrimination based on race, color, religion, sex and national origin and it *outlawed unequal voter application requirements*, racial segregation in schools, employment and public accommodations. The law barred discrimination in any project aided by federal funds and school districts were required to desegregate or present acceptable desegregation plans. Combined with the Elementary and Secondary Act of 1965, the CRA 1964 provided motivation to encourage school districts to integrate. Previously southern school districts had managed to satisfy federal requirements, accept federal funds and still maintain segregated schools.[176]

All the Civil Rights Acts were ostensibly designed to promote voter protection. Each of the Acts emerged from efforts motivated by the need to establish a working right to vote for black Americans and an attempt to strengthen the protection through legislation. However, none had the needed positive impact. All three civil rights acts passed between 1957-1964 were important in facilitating a momentum and establishing important structures that ultimately supported the civil rights agenda, but none had the key to deliver black voters who cast ballots.

One major reason why the 1957, 1960 and 1964 federal laws did not have an impact at the local level was because the only recourse of blacks for racial discrimination generally including voter suppression was litigation. Litigation was costly, time consuming and often involved delays that resulted in injury or repeat injury even if the outcome of the lawsuit held in plaintiff's favor. In Terrell County, Georgia, the DOJ obtained an injunction against the county for preventing black voter registration where in 1960 only 5 blacks were registered.[177] The sheriff in Terrell County continued to arrest voter registration workers without recourse. States including Georgia passed laws to avoid federal law enforcement. "Georgia passed a thirty-question test for voter registration in response to the Civil Rights Act of 1957."[178] Finally, in 1965, a conflagration of important events aligned to produce the Voting Rights Act of 1965, a civil rights act that reintroduced black voting en masse to the American electorate because it used methods other than litigation to impose behavioral change on recalcitrant jurisdictions engaged in voter suppression.[179]

The Voting Rights Act of 1965 was different because it ignored traditional federalism boundaries in order to achieve its goal and, by doing so, it emanated a moral imperative that states tolerate and promote the inclusion of blacks into the electorate. The Section 5 "preclearance" framework provided the federal government oversight of any new state voting laws or change in southern and some other states. No more would states have exclusive control over voter qualifications and

---

[174] THE DEPARTMENT OF JUSTICE'S CIVIL RIGHTS DIVISION: A HISTORICAL PERSPECTIVE AS THE DIVISION NEARS 50 March 22, 2006 Remarks by Wan J. Kim, Assistant Attorney General for the Civil Rights Division.

[175] 78 Stat. 241 (July 2, 1964).

[176] Franklin, *Slavery to Freedom*, 644.

[177] McDonald, *Odyessy*, 123.

[178] McDonald, 123.

[179] 79 Stat. 437 (August 6, 1965).

access to ballots, instead, the assumption would be that black voters would be included in the electorate and the DOJ would have the opportunity to vet new state laws that affected voting and determine if those laws discriminated against minority voters. If states or jurisdictional laws were challenged under Section 5, the burden of proof now lay with the state and not with plaintiffs to show that a policy did not discriminate against black voters. Under the Section 5 preclearance provision, eligible states were required to submit new voting laws for review to the Department of Justice for approval. Failure to abide by the dictates of the VRA was also classified as criminal behavior opening the state to potential criminal sanction. Georgia was subject to preclearance for changes in voting laws.

The VRA of 1965 was designed to enforce the 14th and 15th Amendments. Several parts were designed to protect black voters.[180] Its unique preclearance provision, codified in Sections 4 and 5, sparked the most controversy. The VRA and its preclearance provision had a phenomenal effect.

> In the subsequent decades, the number of black registered voters in the South increased from 31 percent to 73 percent; the number of black elected officials increased from fewer than 500 to 10,500 nationwide; the number of black members of Congress increased from 5 to 44.[181]

This unique provision of the VRA, Section 5, was designed to be temporary so that the exercise of preclearance review could be suspended when it was no longer necessary. Section 5 was authorized for five years in 1965, but it was renewable. Congress could choose to continue federal jurisdiction over state voting laws if it reauthorized the preclearance provision. As previously stated, Congress chose to renew Section 5 of the VRA four times, in 1970, 1975, 1982, and 2006. Each time reauthorization was achieved by overwhelmingly positive, bipartisan roll call votes.[182]

---

[180] Under Section 2 of the Act, citizens in all jurisdictions were granted standing to sue for discrimination based on the general prohibition against voter discrimination. Section 3 of the Act empowered the Attorney General to appoint and dispatch examiners to the polls, to suspend tests or devices used to deny the right to vote based on race, to take jurisdiction over offending precincts, and to provide equitable relief. Section 6 of the act outlined the responsibilities of examiners and hearing officers (authorized under section 9(a)). Sections 7 and 8 provided for the dispatch of federal examiners to polls under certain conditions. Section 9 provided guidelines to evaluate challenges to voter eligibility, and the right to subpoena witnesses for that purpose. Section 10 prohibited poll taxes. Section 11 forbid state actors from failure to permit voting or ballot counting. Section 12 instituted a fine schedule for VRA violations. Sections 13- 19 complete the legislation and include provisions not outlined here. In 1975, Congress extended the Act to some language minorities under Sections 2 and 4(b) (persons of Spanish Heritage, American Indians, Asian Americans, and Alaskan Natives) and Congress added Section 203 which required bilingual elections under specified conditions. In 1982 Congress adopted a more relaxed bailout standard under 4(a) which allowed a political subdivision to bail out of Section 5 coverage separate from its' covered state and allowed plaintiffs to establish a violation of the Section without having to prove discriminatory purpose. In 2006 Congress repealed Sections 6, 7, and 9 that referred to examiners and observers.
[181] Ari Berman, *Give Us The Ballot: The Modern Struggle for Voting Rights in America* (New York: Farrar, Straus and Giroux, 2015), 6.
[182] In 1970, the VRA reauthorization garnered 333-85 votes in the House and 77-19 in the Senate. In 1975, the House voted 341-70 and the Senate, 77-12. In 1982 the House voted 389-24, the Senate, 85-5. In 2006, the House voted 390-33 and the Senate, 98-0.

Each time changes were made to the law its purview was usually expanded. And each time preclearance was reauthorized, additional states and jurisdictions became covered.[183]

Over the years, the southern states continually challenged the VRA's requirement that they not discriminate against blacks. States continually challenged the VRA, starting with South Carolina, which argued the VRA was unconstitutional. Georgia filed an amicus brief supporting the South Carolina position. The Supreme Court rejected South Carolina's argument in 1966.[184] Southern governments continued to attack the VRA, early on, to no avail. *Allen v. State Board of Elections* and *Gaston County v. United States* augmented the South Carolina decision and ensured the applicability of Section 5 to a broad range of state voting law changes.[185] Political subdivisions in Georgia fought the law. In *City of Rome v. United States*, Rome, Georgia sought to escape from VRA coverage independent of the state. [186] The Court maintained that individual jurisdictions within a state could not avoid coverage independently when a state was covered under the VRA in its entirety. Similarly, in a case involving Burke County, Georgia, the court invalidated at large elections. "[A]lthough the state policy behind the at-large electoral system was 'neutral in origin,' the policy was being maintained for invidious purposes in violation of appellees' Fourteenth and Fifteenth Amendment rights."[187] The system prevented blacks from being elected and was maintained to perpetuate invidious discrimination. Because the law resulted in discrimination against black voters, there was a viable basis for VRA relief that the Supreme Court upheld. The initial challenges to the Act provided a firm foundation for the VRA and gave it the precedential footing it needed to operate according to the intentions of VRA proponents for a significant period of time.

In 2013, the Court reversed its support of the preclearance provision wholeheartedly in the *Shelby v. Holder*. Here, the Supreme Court held that the preclearance provision formula in Section 4 of the VRA was unconstitutional.[188] By disengaging the Section 4 provision the Court tacitly held that Section 5 should no longer be operational. Without the ability to identify states covered by Section 5, the preclearance function of the Federal Government was disengaged. As a result of *Shelby County*, the justice department no longer preclears restrictions on minority voter suppression and freed states including formerly covered states like Georgia to pass new voting laws without a requirement to have them vetted by the federal government for their ability to discriminate. Today, when the state enacts a provision that results in discrimination against black voters, litigation, like this one, is the main vehicle for relief.

---

[183] For example, in 1970, Arizona, California, Connecticut, Idaho, Massachusetts, New Hampshire, New York, and Wyoming became covered. *See*, Laney, Garrine P., *The Voting Rights Act of 1965: Historical Background and Current Issues* (New York: Novinka, 2003), 23.

[184] South Carolina v. Katzenbach, 383 U.S. 301 (1966).

[185] Allen v. State Board of Elections, 393 U.S. 544 (1969); Gaston County v. United States, 395 U.S. 285 (1969).

[186] City of Rome v. United States, 446 U.S. 156 (1980).

[187] Rodgers v. Lodge, 458 U.S.613, 622 (1982).

[188] *Shelby County v. Holder*, 570 U.S. 529 (2013).

# APPENDIX A

# M. Adrienne Jones

950 Ponce de Leon Ave. NE
Atlanta, GA 30306
646-522-1029
adrienne.jones@morehouse.edu

## Education

**Ph.D.**    Political Science, City University of New York Graduate Center, 2015
**M.Phil.** Political Science, City University of New York Graduate Center, 2013
**J.D.**     University of California at Berkeley, 1996
**B.A.**     Modern Culture and Media (Semiotics), Brown University, 1993

## Professional Experience

| | |
|---|---|
| **Assistant Professor,** Dept. of Political Science, Morehouse College | 2017-present |
| **Director of Pre-Law,** Dept. of Political Science, Morehouse College | 2017- present |
| **Interim Director of Transition**, External Affairs, UWP | 2015- present |
| **Adjunct Lecturer**, Dept. of Social Science, UWP | 2014- present |
| **Chief Public Relations Officer**, Office of the Chancellor, UWP | 2014-2015 |
| **Faculty Fellow**, Dept. of Social Science, UWP | 2011-2014 |
| **Adjunct Professor**, Dept. of Political Science, City College of New York (CCNY) and the Center for Workers Education (CWE) | 2001-2011 |
| **Pre-Law Advisor**, Pre-Law Program, CCNY | 2006-2011 |
| **Director**, Mock Trial and Moot Court Programs, CCNY | 2003-2011 |

## Publications

Jones, M. Adrienne, "When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006." *The Forum*, 16(2), 2018, pp. 289-312.Retrieved 17 Oct. 2018, from doi:10.1515/for-2018-0014.

Jones, Adrienne, "It's a War Movie," *Satya*, pp.48-53, 2016.

Op-Ed, "Erosion of the Voting Rights Act Threatens Fair Elections," Dubuque Telegraph Herald, August 8, 2015.
Op-Ed, "Confederate Flag Still a Sign That War Not Settled," Dubuque Telegraph Herald, July 19, 2015.
Op-ed, "The March on Selma: What's the Big Deal?" *Dubuque Telegraph Herald*, March 15, 2015.
Op-ed, "Supreme Court Decision a Sad Step Backward for Voting Rights," *Dubuque Telegraph Herald*, July 28, 2013.
Op-ed, "Scalia, Section 5 of the Voting Rights Act," *Dubuque Telegraph Herald*, June 9, 2013.

## Presentations

Interviewee, "Minority Turnout is Low In Runoff Elections And That Will Matter," December 4, NPR, GPB News, November 30, 2018.
Presenter, Morehouse College Crown Forum w/Byron Hurt, October 11, 2018.
Panelist, "The Politics of Rape," Morehouse College, Brisbane Inst., October 10, 2018.
Presenter, Crown Forum w/ john a.powell, February 22, 2018.
Panelist, *When Yes Means No the GOP and VRA*, Southern Political Science Association, New Orleans, January, 2018.
Moderator, Know Your Rights Panel, Crown Forum After Dark, October 25, 2017.
Moderator, Crown Forum After Dark, *Crown Heights* Panel, August 22, 2017.
Presenter, "The Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on Congress and the Voting Rights Act," City University of New York Political Science Job Talk Colloquium, New York, NY, September 11, 2014.
Panelist, "Citizen Koch," Screening and Panel Discussion at Mindframe Theater, Dubuque IA, August 17, 2014.

Guest Speaker, Introduction to Politics, "The VRA Today," UWP, Platteville, WI, October 3, 2013.
Panelist, "Voting in Iowa," Chambers Government Committee Meeting on the Legislative
      Agenda, Dubuque, IA, September 12, 2012.
Presenter, "Voting Rights Act: Redistricting in Covered States," 2012 Midwest Political
      Science Association (MPSA) Annual Meeting, Chicago, IL, April 12, 2012.
Speaker, "The Voting Rights Act and Redistricting in 2011," Invited Lecture for the Social Science
      Lecture Series, UWP, Platteville, WI, January 27, 2011.

## Fellowships and Awards

| | |
|---|---|
| **Faculty Fellowship**, University of Wisconsin, Platteville | 2011-2014 |
| **Black Male Initiative Fellowship Award**, CUNY | 2010 |
| **Dean K. Harrison Fellowship**, CUNY | 2011, 2013 and 2014 |

## Professional Service

| | |
|---|---|
| **Student Member**, Executive Committee, Political Science Department, City University of New York Graduate Center | 2009-2011 |
| **Moot Court Judge**, Loras College Annual Moot Court Competition | 2010-present |
| **Board Member and Organizer** of the 2012 Multicultural Inclusive Conference, University of Wisconsin, Platteville | 2011-2012 |
| **Faculty Representative**, University Strategic Planning Committee for Diversity, University of Wisconsin-Platteville | 2013- 2015 |
| **Judge for Leadership Awards**, University of Wisconsin, Platteville, | 2013 |
| **Member**, Faculty Council, Morehouse College | 2018- present |

## Employment History

| | |
|---|---|
| **Assistant Editor**, ABA Sports and Entertainment Law Journal | 1996-1997 |
| **Staff Attorney**, United States Court of Appeals | 1996-1999 |
| **Independent Filmmaker**, New York City, Los Angeles | 1996-2007 |
| **Interviewer**, The History Makers | 2007-2008 |
| **Staff Attorney**, Communications Workers of America | 2008-2011 |
| **Opinion Editorial Writer**, The Dubuque Telegraph Herald (monthly) | 2015-present |

## Membership in Volunteer and Professional Societies

| | |
|---|---|
| Co-Chair, MAC Committee, Brown Alumni Association | 2018-present |
| Member, Brown Alumni Association Board | 2014-2018 |
| Brooklyn Salon | 2010-present |
| Writer, Class News, Hathaway Brown School | 2012 -present |
| Member, New York Bar Association | 2007-present |
| Treasurer, Inman Page Black Alumni Council | 2012- 2014 |
| Treasurer, Black Documentary Collective | 2006-2011 |
| Member, North American Pre-Law Association | 2005-2011 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 15th day of August 2019, I caused to be electronically filed the foregoing Expert Report of Dr. Adrienne Jones with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Chris Carr, Esq.**
Attorney General
**Dennis Dunn, Esq.**
Deputy Attorney General
**Russell Willard, Esq.**
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Email: ccarr@law.ga.gov
Email: ddunn@law.ga.gov
Email: rwillard@law.ga.gov

**Joshua Barrett Belinfante, Esq.**
**Brian Edward Lake, Esq.**
**Carey Allen Miller, Esq.**
**Vincent Robert Russo, Jr., Esq.**
**Kimberly Anderson, Esq.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com
Email: blake@robbinsfirm.com
Email: cmiller@robbinsfirm.com
Email: vrusso@robbinsfirm.com
Email: kanderson@robbinsfirm.com

**Bryan P. Tyson, Esq.**
Special Assistant Attorney General
**Bryan Jacoutot, Esq.**
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Email: btyson@taylorenglish.com
Email: bjacoutot@taylorenglish.com
404-856-3260
Fax: 404-856-3250

/s/Allegra J. Lawrence
Allegra J. Lawrence
Georgia Bar No. 439797

**DEFENDANTS' EX. 3**

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

DEFENDANT'S
EXHIBIT
3
PENGAD 800-631-6889

SEARCH    E-EDITION    SUBS

M?RE

25°

LOCAL    NEWS    SPORTS    FEATURES    OBITS    OPINION    EVENTS    STORE

SUBMIT A    [?]    CLASSIFIEDS    [?]

# EDITORIALS

Submit a Letter    Read Letters

**Editorials | Submit Letter to Editor**

TH Editorials



NEXT UP
Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b...

# Adrienne Jones: Something's rotten in the state of Georgia

BY ADRIENNE JONES For the Telegraph Herald    Nov 11, 2018



Adrienne Jones

On Monday, Brian Kemp, Georgia secretary of state and gubernatorial candidate, was scheduled to meet with the Federal Bureau of Investigation, Georgia Board of Investigations and Department of Homeland Security to discuss his allegation accusing the Georgia Democratic Party of hacking the state's voter-registration system.

Kemp released no evidence linking the Democratic Party to an illegal cyber scheme. His filing was a last-ditch

effort to steal the gubernatorial election, which, as predicted, went down to the wire. Kemp has claimed victory, but Democrat Stacey Abrams, bidding to become the state's first black governor, is holding out hope that the count of provisional ballots will be enough to force a runoff election.

The Friday before the election, Judge Eleanor L. Ross issued an injunction against Kemp's "exact match" law and ordered the state to allow voters to prove their citizenship at the polls with documentation.

The U.S. Court of Appeals for the

11th Circuit also ruled that Kemp was required to exercise due process and cease summarily rejecting absentee ballots for handwriting issues.

I was surprised that Kemp did not file a complaint with the five-member Georgia State Elections Board, of which, as secretary of state (and elections commissioner), he is chairman. The board is responsible for issuing all election rules and regulations and for authorizing the secretary of state to investigate election "irregularities" and to report violations to the attorney general or appropriate district attorney.

Because the State Elections Board's conflict-of-interest rules are merely a "guide" and not a mandate, board members are also Kemp campaign donors. Two donated at least $1,000, and the board's chief investigator

donated $4,000. None pledged to recuse themselves from issues that come before the board, including those involving Kemp's run for governor.

However, State Elections Board rules make clear that "complaining parties ... [may] .. seek any ... remedy available ..." And so, since Kemp's ability to win the election by abusing his power as secretary of state was uncertain — on Sunday, polls had Kemp and Abrams just 0.2 percent apart — Kemp filed with the FBI and the Department of Homeland Security.

Before the 2016 elections, Kemp rejected an offer by Homeland Security to evaluate and ensure the sanctity of state election networks, claiming that the state already had a contract with a private company to secure Georgia's voting system. Ironically, it is Kemp who rigged the system, holding 53,000 voter registrations in limbo under the "exact match" law, 70 percent of them black voters. He purged over 650,000 voters from the rolls in 2017 and 1.4 million since 2012.

Frankly, it doesn't matter where Kemp filed and the outcome of the investigation. He has already achieved his goal of creating distrust in the outcome of the election. On Sunday, polls showed that 49 percent of voters were concerned that they would be turned away at the polls and 48 percent believed that ineligible voters would be casting ballots. The opinions split down party lines.

This investigation is simply the latest in a litany of tactics designed to steal the election or to destroy the mandate of Abrams, should she become Georgia's first black, female governor.

———————

The author, formerly of Dubuque and the University of Wisconsin-Platteville, is an assistant professor and pre-law adviser at Morehouse College in Atlanta. Her email address is adrienne.jones@morehouse.edu.

*Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.*

Tags   Adrienne-jones   Civil-rights   Georgia   Election-2018   Brian-kemp   Stacey-abrams

| Photo Gallery | Video Gallery | Email Alerts |
|---|---|---|
| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |

• Gilligan: Veteran's memories a gift for this daughter
13h

• Goldberg: Diversity panic hits Democratic field
14h

• Letter: GOP must stand up for what's right
1d

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

- TH guidelines for letters to the editor

  6d

- Page: Trump fights anti-Semitism on 1 day, fuels it the next

  1d

- L.A. Times: Boris Johnson's victory means no going back on Brexit

  1d

- Collins: Giving of ourselves a civic responsibility

  2d

- Tucker: White people use food stamps, too

  2d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

  2d

- Letter: Questions around transmission line remain

  2d

- TH guidelines for letters to the editor

  2d

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

- Our opinion: Dubuque County needs better system to decide compensation

  2d

- Leubsdorf: Barr proves himself to be partisan

  3d

- Reeder: Recalling bad old days of patronage in Illinois

  3d

- Cyr: U.S. leaders show courage regarding Hong Kong

  4d

- Letter: Relaxed certification rules could help teacher shortage

  4d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

  4d

- TH guidelines for letters to the editor

  4d

- Hanson: When our guardians fail us

  5d

- Page: Many Democrats dread all-white debate stage — do black voters?

  5d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

  6d

- Our opinion: Lame duck sessions bring lame governing

  6d

- Gilligan: When you learn something new -- then see it everywhere

  7d

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

- Tampa Bay Times: It's not us vs. them, AG Barr

  7d

- Goldberg: It's a mistake for Democrats to rush impeachment process

  7d

- Page: 50 years later, easier to see how Black Panther raid changed racial politics

  8d

- Parker: Marriage, pregnancy reduce crime

  8d

- Letter: Smoking bigger concern than signage at casinos

  8d

- Jones: 2020 election as much about preserving judiciary

  9d

- Tucker: 'R' is for 'Republican,' but also for 'Russian'

  9d

- Goldberg: Nostalgia the ace up Biden's sleeve

  9d

- Our opinion: Word of thanks to Tom Barton

  9d

- Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

  10d

- Letter: Highway of horrors or picturesque pathway?

  10d

- Letter: Community effort needed for mental health support system

  10d

- Cyr: Is there a chance for Bloomberg?

  11d

- Letter: Low minimum wage contributes to poverty

  11d

- Letter: Nabhan a climate change denier

  11d

- Our opinion: Voting access for felons should be simpler

  11d

- Hanson: 'Coup' concerns suddenly don't seem so far-fetched

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

12d

- Letter: Standard time, not DLS, should be the norm

12d

- Isenhart: Get flowing right way on water quality

12d

- Rubin: Why U.S.-China tensions over future of Taiwan could rise

13d

- Our opinion: Iowa must do better on reporting immunization rates

13d

- Gilligan: Local news, not impeachment, leads in TH

14d

- Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

14d

- Goldberg: 'Deep state' contagion has spread beyond impeachment

14d

- Ullrich: December feels like drifting into history

15d

- Page: Are Biden's gaffes tied to stuttering? I know what that feels like

15d

- Double Take -- Scharnau: Addressing gun control debate

16d

Adrienne Jones: Something's rotten in the state of Georgia | Opinion | telegraphherald.com

**DEFENDANT'S EX. 4**



SEARCH   E-EDITION   SUBSCRIBER SERVICES

MORE

LOCAL   NEWS   SPORTS   FEATURES   OBITS   OPINION   EVENTS   STORE

SUBMIT A   [?]        CLASSIFIEDS   [?]

## EDITORIALS

Submit a Letter          Read Letters

**Editorials | Submit Letter to Editor**

TH Editorials

NEXT UP
Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b…

# Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression

BY ADRIENNE JONES For the Telegraph Herald   Dec 9, 2018



Adrienne Jones

This year, I'm getting a lesson in the importance of runoff elections.

Georgia has a "two-round system" in which, if no candidate gets a majority of the votes cast, a runoff between the top two vote-getters is required.

Last month in Georgia, supporters of Democratic gubernatorial candidate Stacy Abrams hoped for a runoff against Republican Brian Kemp. While running against Abrams, Kemp kept

Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression | Opinion | telegraphherald.com

his job as secretary of state (and state elections commissioner) and used his office to influence the outcome of the election. The election was close and hotly contested. Kemp's tactics may have cost Abrams the state's highest office.

Kemp is a voter suppression advocate who has purged thousands of voters from the rolls since he took office in 2010 — purges are allowed by state law — and he waged a multi-pronged suppression attack in the midterms.

Kemp's office rejected absentee ballots; refused to ensure that there were enough voting machines, power cords and provisional ballots; and he enacted an "exact match" law which rejected ballots if the voters' names on their identification did not exactly match that on the voter rolls.

As a result, Georgians became keenly aware of the power and importance of the secretary of state, which, perhaps ironically, ended up being one of Georgia's two statewide runoff contests. The other was for public service commissioner, who has authority over telecommunications and gas service in the state. (There was also a runoff in one state House district.)

As a rule, runoffs suffer lower voter turnout than general elections. Of 171 regularly scheduled primary runoffs between 1994 and 2012, all but six had a decrease in turnout between the primary and the runoff. Additionally,

minority voter turnout in any election is always lower than majority turnout.

Nonetheless, in early November, a runoff seemed like a great idea! Georgia voters seemed ultra-motivated and likely to approve Stacey Abrams' bid, given a second chance.

But it turns out, voters were only motivated because Abrams was in the race. She worked a strong ground game — no Democratic candidate in recent Georgia history has even had a ground game — that matched her strategy. She successfully mobilized both habitual voters and the 537,000 who did not vote in the 2016 presidential election,

38 percent of whom were black.

Unfortunately, the runoff contests followed the trend. During early voting, turnout was down about 60 percent from the midterm a month earlier.

This revealed to me that runoffs are not a natural extension of a primary or general election; they are entirely new and separate elections, which need the kind of mobilization effort Georgians saw in the midterms.

Though the Abrams team canvassed to mobilize runoff voters, John Barrow, the Democratic candidate for secretary of state, failed to take advantage of Abrams' midterm momentum.

Although Barrow maintained an anti-voter suppression platform, he didn't

treat the issue with the kind of urgency that motivates turnout. He lost the runoff by a margin of

52 to 48 percent, after a 49-49 virtual tie a month ago.

Barrow's loss means Kemp's 2018-style midterm tactics will continue. Republican Brad Raffensperger, the new secretary of state, has pledged to combat (nonexistent) voter fraud and will continue to purge the voter rolls.

In 2013, I wondered about the impact of the Shelby v. Holder decision, which ended preclearance under the Voting Rights Act. Would states return to Jim Crow voter-suppression tactics as a result? Today, I dare say, the answer is "yes."

———————

The author, formerly of Dubuque and the University of Wisconsin-Platteville, is an assistant professor and pre-law adviser at Morehouse College in Atlanta. Her email address is adrienne.jones@morehouse.edu.

*Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.*

Tags   Adrienne-jones   Civil-rights   Georgia   Election-2018   Brian-kemp   Stacey-abrams   Voting-rights

| Photo Gallery | Video Gallery | Email Alerts |
|---|---|---|

| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |
|---|---|---|

● Gilligan: Veteran's memories a gift for this daughter

13h

● Goldberg: Diversity panic hits Democratic field

14h

● Letter: GOP must stand up for what's right

1d

● TH guidelines for letters to the editor

6d

● Page: Trump fights anti-Semitism on 1 day, fuels it the next

1d

● L.A. Times: Boris Johnson's victory means no going back on Brexit

Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression | Opinion | telegraphherald.com

1d

- Collins: Giving of ourselves a civic responsibility

2d

- Tucker: White people use food stamps, too

2d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

2d

- Letter: Questions around transmission line remain

2d

- TH guidelines for letters to the editor

2d

- Our opinion: Dubuque County needs better system to decide compensation

2d

- Leubsdorf: Barr proves himself to be partisan

3d

- Reeder: Recalling bad old days of patronage in Illinois

3d

- Cyr: U.S. leaders show courage regarding Hong Kong

4d

- Letter: Relaxed certification rules could help teacher shortage

4d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

4d

- TH guidelines for letters to the editor

Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression | Opinion | telegraphherald.com

4d

- Hanson: When our guardians fail us

5d

- Page: Many Democrats dread all-white debate stage — do black voters?

5d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

6d

- Our opinion: Lame duck sessions bring lame governing

6d

- Gilligan: When you learn something new -- then see it everywhere

7d

- Tampa Bay Times: It's not us vs. them, AG Barr

7d

- Goldberg: It's a mistake for Democrats to rush impeachment process

7d

- Page: 50 years later, easier to see how Black Panther raid changed racial politics

8d

- Parker: Marriage, pregnancy reduce crime

8d

- Letter: Smoking bigger concern than signage at casinos

8d

- Jones: 2020 election as much about preserving judiciary

9d

- Tucker: 'R' is for 'Republican,' but also for 'Russian'

9d

- Goldberg: Nostalgia the ace up Biden's sleeve

9d

- Our opinion: Word of thanks to Tom Barton

9d

- Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

10d

- Letter: Highway of horrors or picturesque pathway?

10d

- Letter: Community effort needed for mental health support system

10d

- Cyr: Is there a chance for Bloomberg?

11d

- Letter: Low minimum wage contributes to poverty

11d

- Letter: Nabhan a climate change denier

11d

- Our opinion: Voting access for felons should be simpler

11d

- Hanson: 'Coup' concerns suddenly don't seem so far-fetched

12d

- Letter: Standard time, not DLS, should be the norm

12d

- Isenhart: Get flowing right way on water quality

12d

- Rubin: Why U.S.-China tensions over future of Taiwan could rise

13d

- Our opinion: Iowa must do better on reporting immunization rates

13d

- Gilligan: Local news, not impeachment, leads in TH

14d

- Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

14d

Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression | Opinion | telegraphherald.com

- Goldberg: 'Deep state' contagion has spread beyond impeachment

  14d

- Ullrich: December feels like drifting into history

  15d

- Page: Are Biden's gaffes tied to stuttering? I know what that feels like

  15d

- Double Take -- Scharnau: Addressing gun control debate

  16d

Adrienne Jones: Georgia can 'runoff,' but can't hide voter suppression | Opinion | telegraphherald.com

**DEFENDANTS' EX. 5**

DEFENDANT'S
EXHIBIT
7
PENGAD 800-631-6989

SEARCH   E-EDITION   SU

M?RE

26°

LOCAL   NEWS ①   SPORTS   FEATURES   OBITS   OPINION   EVENTS   STORE

SUBMIT A   [?]         CLASSIFIEDS   [?]

## EDITORIALS

Submit a Letter          Read Letters

Editorials | Submit Letter to Editor

TH Editorials

**DuTrac** Community Credit Union

**BREAKING NEWS**

Officials announce, approve $22 million hotel pro

Read Story

**NEXT UP**

Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b…

# Jones: Election outcome invites more discrimination and denial

BY ADRIENNE JONES For the Telegraph Herald    Nov 13, 2016



Adrienne Jones

Contributed

Do you feel it yet?

The uncertainty that pervades when you take part in an election in which you are certain that the winning candidate will not attempt to exercise the ideals of the nation in furtherance of your safety, protection and well-being?

The concern that pervades when legislation that people endured oppression to achieve — that they died for — is undone or ignored?

The 2016 election is the first time in 50 years that Americans have voted without the full protection of the Voting Rights Act of 1965.

In 2013, the Supreme Court held that a key section of the act was unconstitutional and thus freed states with ongoing records of voter discrimination from federal oversight.

As a result of the loss of VRA protection, formerly covered states, including Texas and North Carolina, engaged in active voter discrimination during this election. So did Wisconsin.

Are you concerned yet about the strict voter-ID laws designed to eliminate swaths of electoral participation by people of color, the poor and the elderly, and that might now include you?

Does it occur to you that decreases in early voting, limiting absentee ballot access, reductions in the number of polling stations (there were 868 fewer places to vote this past Tuesday) the illegal purging of election rolls, and the vast inability of felons to vote impacts your political, social and economic safety?

Are you worried about the election of a president who insisted that U.S. elections are "rigged" but who

encouraged electoral rigging and the intimidation of voters in urban areas? "We can't lose an election, Trump said, because of, you know what I'm talking about. . . We can't lose."

Does it upset you that your president-elect erroneously argued that election "fraud was rampant" after one of his own supporters voted twice by absentee ballot? (The Iowan was caught and charged).

Does it bother you that the president-elect is married to an immigrant who worked illegally and yet he based his entire campaign on maligning minorities and illegal immigrants? That he doesn't pay taxes?

Does it concern you at all, today, that the political atmosphere has been inundated with polarization, that the Senate refused to process the nomination of the current president's Supreme Court nominee, or that we are enduring continuous high-profile instances of police brutality?

I hope so.

Our historic dedication to the inability of some to participate puts us all at risk. Participation discrimination makes it impossible for us as individuals and as a body politic to elect responsible leaders and to require them to follow the law, maintain legislation fought for in furtherance of our democratic ideals, follow the Constitution and promulgate laws and policies that will protect us.

Jones: Election outcome invites more discrimination and denial | Opinion | telegraphherald.com

Are we going to build a wall to keep Mexicans out? Characterize Black Lives Matter as a terrorist organization? Is it going to be OK to harass and rape women? Is police brutality going to increase? Will the KKK rise again? Will the untethered militias that have sprung up nationwide as a result of the Obama election be allowed to menace immigrants and minorities under this new regime? Probably.

And these developments are going to negatively affect those who hold resentment about the fact that the democracy has expanded to include women and minorities, too.

I hope this election increases the number of Americans sensitive to these issues and motivates them to understand that they are also eligible for discrimination and denial.

And I hope that we will do something about it.

———————

The author, a former Dubuque resident, is a lawyer who earned a Ph.D. from City University of New York. She is a visiting professor in political science at Radford (Va.) University.

*Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.*

Tags   Law-enforcement   Civil-rights   Race-relations   Voting-rights   Donald-trump   Election-november2016-president   Immigration   Politics

| Photo Gallery | Video Gallery | Email Alerts |
| --- | --- | --- |
| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |

- Gilligan: Veteran's memories a gift for this daughter

14h

Jones: Election outcome invites more discrimination and denial | Opinion | telegraphherald.com

- Goldberg: Diversity panic hits Democratic field

14h

- Letter: GOP must stand up for what's right

1d

- TH guidelines for letters to the editor

6d

- Page: Trump fights anti-Semitism on 1 day, fuels it the next

1d

- L.A. Times: Boris Johnson's victory means no going back on Brexit

1d

- Collins: Giving of ourselves a civic responsibility

2d

- Tucker: White people use food stamps, too

2d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

2d

- Letter: Questions around transmission line remain

2d

- TH guidelines for letters to the editor

  2d

- Our opinion: Dubuque County needs better system to decide compensation

  2d

- Leubsdorf: Barr proves himself to be partisan

  3d

- Reeder: Recalling bad old days of patronage in Illinois

  3d

- Cyr: U.S. leaders show courage regarding Hong Kong

  4d

- Letter: Relaxed certification rules could help teacher shortage

  4d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

  4d

- TH guidelines for letters to the editor

  4d

- Hanson: When our guardians fail us

  5d

- Page: Many Democrats dread all-white debate stage — do black voters?

  5d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

  6d

- Our opinion: Lame duck sessions bring lame governing

  6d

Jones: Election outcome invites more discrimination and denial | Opinion | telegraphherald.com

- Gilligan: When you learn something new -- then see it everywhere

7d

- Tampa Bay Times: It's not us vs. them, AG Barr

7d

- Goldberg: It's a mistake for Democrats to rush impeachment process

7d

- Page: 50 years later, easier to see how Black Panther raid changed racial politics

8d

- Parker: Marriage, pregnancy reduce crime

8d

- Letter: Smoking bigger concern than signage at casinos

8d

- Jones: 2020 election as much about preserving judiciary

9d

- Tucker: 'R' is for 'Republican,' but also for 'Russian'

9d

- Goldberg: Nostalgia the ace up Biden's sleeve

9d

- Our opinion: Word of thanks to Tom Barton

9d

- Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

10d

- Letter: Highway of horrors or picturesque pathway?

10d

- Letter: Community effort needed for mental health support system

10d

- Cyr: Is there a chance for Bloomberg?

11d

- Letter: Low minimum wage contributes to poverty

11d

- Letter: Nabhan a climate change denier

11d

Our opinion: Voting access for felons should be simpler

11d

Hanson: 'Coup' concerns suddenly don't seem so far-fetched

12d

Letter: Standard time, not DLS, should be the norm

12d

Isenhart: Get flowing right way on water quality

12d

Rubin: Why U.S.-China tensions over future of Taiwan could rise

13d

Our opinion: Iowa must do better on reporting immunization rates

13d

Gilligan: Local news, not impeachment, leads in TH

14d

Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

14d

Goldberg: 'Deep state' contagion has spread beyond impeachment

14d

Ullrich: December feels like drifting into history

15d

Page: Are Biden's gaffes tied to stuttering? I know what that feels like

15d

Double Take -- Scharnau: Addressing gun control debate

16d

**DEFENDANTS' EX. 6**

Jones: Voter suppression a form of contemporary slavery | Opinion | telegraphherald.com



SEARCH   E-EDITION   SUB

**DEFENDANT'S EXHIBIT** 6

27°

LOCAL   NEWS 3   SPORTS   FEATURES   OBITS   OPINION   EVENTS   STORE

SUBMIT A [ ? ]   CLASSIFIEDS [ ? ]

# EDITORIALS

Submit a Letter        Read Letters

Editorials | Submit Letter to Editor

**DuTrac** Community Credit Union   BREAKING NEWS

TH Editorials

UPDATE: Officials approve $22 million hotel proj

Read Story

NEXT UP
Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b…

# Jones: Voter suppression a form of contemporary slavery

BY ADRIENNE JONES For the Telegraph Herald    Jul 9, 2017



Adrienne Jones

On July 5, 1852, Frederick Douglass, a former slave, addressed the Ladies Anti-Slavery Society at Rochester, N.Y.

He expressed embarrassment at being the keynote speaker at a Fourth of July commemoration because it meant that he was recognizing a celebration of American independence and political freedom.

Both independence and political freedom were denied to slaves and severely restricted to free blacks, such that blacks in the United States lived in constant fear for their lives, their livelihoods and the safety of their minds and bodies.

Douglass took the opportunity to discuss the schism between slavery and American ideals. Slavery was ongoing in 1852 and all states were engaged in slavery, in enforcing the Fugitive Slave Act of 1850 and/or in denying blacks economic and political participation.

"What," asked Douglass, "is the Fourth of July to the slave?" He answered that it is "a day that reveals to him more than all other days of the year, the gross injustice and cruelty to which he is the constant victim."

Today, the vast majority of Americans assume that slavery will not re-emerge in the United States. We think the possibility of a Trail of Tears or mass internment is unlikely. But these events occurred because our government refused to abide an inclusive franchise.

State and federal governments today are working to make sure that large swaths of people — in this case, Democrats — are unable to vote or are overlooked politically.

On the eve of our national anniversary this year, several developments occurred in the effort to disenfranchise Americans.

Jones: Voter suppression a form of contemporary slavery | Opinion | telegraphherald.com

On Monday, the U.S. Supreme Court agreed to hear the Wisconsin dispute over the constitutionality of its partisan redistricting maps. The court has regulated gerrymandering based on race pursuant to the Voting Rights Act, but it has refused to set a standard to determine when partisan districting maps cease to be constitutional apparatuses of democracy.

However, the court refused to enforce an order that Wisconsin Republicans redraw the maps in advance of the court's review. This means that the current map, which enhances the natural advantage held by Republicans in the state, will make full consideration of Democratic votes impossible in November 2018.

On June 28, the Pence-Kobach led Presidential Advisory Commission on Election Integrity, headed by Vice President Mike Pence and Kris W. Kobach, demanded that states submit data to the Feds including voter birth dates, voter histories, party affiliations, information about voter fraud, convictions for election-related crimes, and recommendations for preventing voter intimidation.

Nearly all the states have refused, in whole or in part, citing violations of state law or objections to the commission's disingenuous mission.

Secretaries of state and election experts expressed concern about the request by an administration dedicated to voter suppression. It's likely the

commission intends to use the information to justify the disenfranchisement of additional voters or to purge voter rolls.

Meanwhile, the president announced the appointment of Hans von Spakovsky to the commission. Von Spakovsky leads the Election Law Reform Initiative at the Heritage Foundation, is a former member of the Justice Department and long-time opponent of voter inclusion. Election expert Rick Hasen called the appointment a "big middle finger from Trump to people serious" about fair elections.

If these developments pan out in favor of voter suppression, it is not unreasonable to assume that on a future Fourth of July a majority of Americans who consider themselves immune from franchise exclusion — because they aren't black or native or Japanese during WWII — might well have the impulse to ask, "What is the Fourth of July to us?"

Their answer may be similar to that of Mr. Douglass in 1852.

———————

The author, a former Dubuque resident, is a lawyer who earned a Ph.D. from City University of New York. She is a visiting professor in political science at Radford (Va.) University.

Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.

Tags    Race-relations   Us-civil-war   Slavery   Frederick-douglass   Voting-rights

Photo Gallery    Video Gallery    Email Alerts

| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |
|---|---|---|

- Gilligan: Veteran's memories a gift for this daughter

16h

- Goldberg: Diversity panic hits Democratic field

16h

- Letter: GOP must stand up for what's right

1d

- TH guidelines for letters to the editor

6d

- Page: Trump fights anti-Semitism on 1 day, fuels it the next

1d

- L.A. Times: Boris Johnson's victory means no going back on Brexit

1d

- Collins: Giving of ourselves a civic responsibility

2d

- Tucker: White people use food stamps, too

2d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

2d

- Letter: Questions around transmission line remain

2d

- TH guidelines for letters to the editor

  2d

- Our opinion: Dubuque County needs better system to decide compensation

  2d

- Leubsdorf: Barr proves himself to be partisan

  3d

- Reeder: Recalling bad old days of patronage in Illinois

  3d

- Cyr: U.S. leaders show courage regarding Hong Kong

  4d

- Letter: Relaxed certification rules could help teacher shortage

  4d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

  4d

- TH guidelines for letters to the editor

  4d

- Hanson: When our guardians fail us

  5d

- Page: Many Democrats dread all-white debate stage — do black voters?

  5d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

  6d

- Our opinion: Lame duck sessions bring lame governing

  6d

Jones: Voter suppression a form of contemporary slavery | Opinion | telegraphherald.com

- Gilligan: When you learn something new -- then see it everywhere

  7d

- Tampa Bay Times: It's not us vs. them, AG Barr

  7d

- Goldberg: It's a mistake for Democrats to rush impeachment process

  7d

- Page: 50 years later, easier to see how Black Panther raid changed racial politics

  8d

- Parker: Marriage, pregnancy reduce crime

  8d

- Letter: Smoking bigger concern than signage at casinos

  8d

- Jones: 2020 election as much about preserving judiciary

  9d

- Tucker: 'R' is for 'Republican,' but also for 'Russian'

  9d

- Goldberg: Nostalgia the ace up Biden's sleeve

  9d

- Our opinion: Word of thanks to Tom Barton

  9d

- Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

  10d

- Letter: Highway of horrors or picturesque pathway?

  10d

- Letter: Community effort needed for mental health support system

  10d

- Cyr: Is there a chance for Bloomberg?

  11d

- Letter: Low minimum wage contributes to poverty

  11d

- Letter: Nabhan a climate change denier

  11d

- Our opinion: Voting access for felons should be simpler

  11d

- Hanson: 'Coup' concerns suddenly don't seem so far-fetched

  12d

- Letter: Standard time, not DLS, should be the norm

  12d

- Isenhart: Get flowing right way on water quality

  12d

- Rubin: Why U.S.-China tensions over future of Taiwan could rise

  13d

- Our opinion: Iowa must do better on reporting immunization rates

  13d

- Gilligan: Local news, not impeachment, leads in TH

  14d

- Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

  14d

- Goldberg: 'Deep state' contagion has spread beyond impeachment

  14d

- Ullrich: December feels like drifting into history

  15d

- Page: Are Biden's gaffes tied to stuttering? I know what that feels like

  15d

- Double Take -- Scharnau: Addressing gun control debate

  16d

Jones: Voter suppression a form of contemporary slavery | Opinion | telegraphherald.com

**DEFENDANTS' EX. 7**

DEFENDANT'S
EXHIBIT
7

SEARCH   E-EDITION   SUB

M☐RE

☁ 27°

LOCAL   NEWS ③   SPORTS   FEATURES   OBITS   OPINION   EVENTS   STORE

SUBMIT A [ ? ]          CLASSIFIEDS [ ? ]

## EDITORIALS

Submit a Letter          Read Letters

Editorials | Submit Letter to Editor

TH Editorials

**DuTrac** Community Credit Union

**BREAKING NEWS**

UPDATE: Officials approve $22 million hotel proj

Read Story

NEXT UP



Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b...

# Jones: Lynchings in a 21st century context

BY ADRIENNE JONES For the Telegraph Herald   Oct 9, 2016



Adrienne Jones

Contributed

I used to think that lynching was specific to the United States and involved mobs killing blacks by hanging them from trees. However, lynching has a more dynamic history and broader definition.

Lynching occurs any time a mob causes the death of a person suspected of wrongdoing without legal authority. I've come to decide that the long list of extrajudicial killings by

police of blacks over the recent years are lynchings.

The events have all the indicia. They are executed by mob, committed in violation of the Constitution and/or police department regulations, they are popular public spectacle and involve tacit societal acceptance.

In fact, this phase of killings is worse. According to sociologist Jerome Karabel of UC-Berkeley, "extrajudicial killings by police occur 1,100 times a year, more than four times the number lynched or executed during the height of lynching during the Jim Crow period." A disproportionate number of these deaths involve black victims.

According to David Klinger, a criminologist at the University of Missouri-St. Louis, constitutionally, police officers are only allowed to use deadly force "to protect their lives and the lives of other people," and to prevent a suspect from escaping because they think the person is dangerous. And most police department regulations are more strict than the constitutional standards and put additional limits on officer's actions.

But police killings are judged by whether or not officers feel threatened. They do. So there are essentially no rules against this violence.

It's not all the responsibility of the police. Organized policing in the U.S. emerged out of a need to control those we consider dangerous, basically

blacks in the South, and the poor, immigrants and blacks in the cities. Control is delegated to and executed by the police, but it emerges out of our collective social, political and economic past and present. The permission to commit these acts of violence based in racial fear is a societal choice.

And so it keeps happening.

As recently as September, there were three of these deaths: Alfred Olango, of San Diego, Terrance Crutcher, in Tulsa, and Keith Lamont Scott, in Charlotte, N.C. As usual, in each case, there is protest, and debate over the truth of the assumption that death was justifiable because the victim was threatening and therefore culpable for his own death.

These events are terrible, but like lynching, there is no law against it, and no consensus that there should be rehabilitation of the system or an end to the behavior.

I am routinely concerned today, every time I drive my car anywhere, lest I be pulled over by a police officer and end up like Sandra Bland. I'm afraid for the people I know. It's a sliver of the constant fear endured by folks living in the United States during any year prior to 1960 on a moment-to-moment, day-by-day, subconscious and conscious basis.

On Friday, Ava Duvernay's new documentary, "13th," was released on Netflix. Its thesis is that the exception

to the 13th Amendment's slavery prohibition, which allows slavery for criminals, was used from the outset to develop the culture I cite here — of black criminality and culpability, and to justify official and extrajudicial violence.

I hope information helps us to shed these long-held beliefs and routine exercises of extrajudicial terror. May the dungeon shake and our chains fall off.

———————

The author, a former Dubuque resident, is a lawyer who earned a Ph.D. from City University of New York. She is a visiting professor in political science at Radford (Va.) University.

*Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.*

Tags   Law-enforcement   Civil-rights   Race-relations

| Photo Gallery | Video Gallery | Email Alerts |
| --- | --- | --- |
| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |

- Gilligan: Veteran's memories a gift for this daughter

16h

- Goldberg: Diversity panic hits Democratic field

  16h

- Letter: GOP must stand up for what's right

  1d

- TH guidelines for letters to the editor

  6d

- Page: Trump fights anti-Semitism on 1 day, fuels it the next

  1d

- L.A. Times: Boris Johnson's victory means no going back on Brexit

  1d

- Collins: Giving of ourselves a civic responsibility

  2d

- Tucker: White people use food stamps, too

  2d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

  2d

- Letter: Questions around transmission line remain

  2d

Jones: Lynchings in a 21st century context | Opinion | telegraphherald.com

- TH guidelines for letters to the editor

  2d

- Our opinion: Dubuque County needs better system to decide compensation

  2d

- Leubsdorf: Barr proves himself to be partisan

  3d

- Reeder: Recalling bad old days of patronage in Illinois

  3d

- Cyr: U.S. leaders show courage regarding Hong Kong

  4d

- Letter: Relaxed certification rules could help teacher shortage

  4d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

  4d

- TH guidelines for letters to the editor

  4d

- Hanson: When our guardians fail us

  5d

- Page: Many Democrats dread all-white debate stage — do black voters?

  5d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

  6d

- Our opinion: Lame duck sessions bring lame governing

  6d

Gilligan: When you learn something new -- then see it everywhere

7d

Tampa Bay Times: It's not us vs. them, AG Barr

7d

Goldberg: It's a mistake for Democrats to rush impeachment process

7d

Page: 50 years later, easier to see how Black Panther raid changed racial politics

8d

Parker: Marriage, pregnancy reduce crime

8d

Letter: Smoking bigger concern than signage at casinos

8d

Jones: 2020 election as much about preserving judiciary

9d

Tucker: 'R' is for 'Republican,' but also for 'Russian'

9d

Goldberg: Nostalgia the ace up Biden's sleeve

9d

Our opinion: Word of thanks to Tom Barton

9d

Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

10d

Letter: Highway of horrors or picturesque pathway?

10d

Letter: Community effort needed for mental health support system

10d

Cyr: Is there a chance for Bloomberg?

11d

Letter: Low minimum wage contributes to poverty

11d

Jones: Lynchings in a 21st century context | Opinion | telegraphherald.com

- Letter: Nabhan a climate change denier

  11d

- Our opinion: Voting access for felons should be simpler

  11d

- Hanson: 'Coup' concerns suddenly don't seem so far-fetched

  12d

- Letter: Standard time, not DLS, should be the norm

  12d

- Isenhart: Get flowing right way on water quality

  12d

- Rubin: Why U.S.-China tensions over future of Taiwan could rise

  13d

- Our opinion: Iowa must do better on reporting immunization rates

  13d

- Gilligan: Local news, not impeachment, leads in TH

  14d

- Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

  14d

- Goldberg: 'Deep state' contagion has spread beyond impeachment

  14d

- Ullrich: December feels like drifting into history

  15d

- Page: Are Biden's gaffes tied to stuttering? I know what that feels like

  15d

- Double Take -- Scharnau: Addressing gun control debate

  16d

Jones: Lynchings in a 21st century context | Opinion | telegraphherald.com

**DEFENDANTS' EX. 8**



DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

SEARCH   E-EDITION   SUB

MORE

☀ -19°

LOCAL   NEWS   SPORTS ❶   FEATURES   OBITS   OPINION   EVENTS   STORE

SUBMIT A [?]      CLASSIFIEDS [?]

## EDITORIALS

Submit a Letter        Read Letters

Editorials | Submit Letter to Editor

**DuTrac** Community Credit Union    BREAKING NEWS        TH Editorials

NEXT UP
Goldberg: Diversity panic hits Democratic field
Stop me if you've heard this one before. An Asian guy, two b...

# Jones: National mood hearkens back to 1955

BY ADRIENNE JONES For the Telegraph Herald    Aug 12, 2018



+1

Adrienne Jones

+1

This month marks the 63rd anniversary of the death of Emmett Till, a 14-year-old boy from Chicago, who was lynched in Mississippi after being accused of offending a white woman in her family's grocery store.

His murder in 1955 was brutal.

In an act of vigilante justice, Till was abducted from his great uncle's house in the middle of the night, beaten, shot



Emmett Louis Till

STF

and sunk in the Tallahatchie River.

His body was found three days later — mutilated, mangled and almost unidentifiable.

Till's mother publicized his funeral and displayed his bloated body in an open casket, so that the world could see what had been done to her son. Till's murderers were acquitted in court, later admitted guilt but were not tried again due to the constitutional protection against double-jeopardy.

During the Jim Crow period after the U.S. Civil War and Reconstruction, blacks were not respected as citizens. In daily interaction with whites, blacks were expected to be subservient and were subject to severe judicial sanction or vigilante justice sanctioned by the legal system and the community.

Important to the regime was the denial of political power by restrictions on the right to vote. Without political power, blacks were unsuccessful at securing the benefits of government when local communities denied them basic rights or engaged in terroristic acts against them.

Till's death is heralded as motivating the phase of the Civil Rights movement that most of us are most familiar with. The Montgomery Bus Boycott began in December 1955, and the movement aimed at equal access for black citizens in the public realm and at the ballot box.

The achievements of the Civil Rights movement culminated in the passage of the Voting Rights Act of 1965 which was designed to pierce the Jim Crow veil, open the franchise to blacks and secure them an equal place as citizens.

Today, despite the gains of the Civil Rights movement, we will in November encounter a midterm election during a period when the tenor of the nation feels like 1955.

Disparate treatment of minorities by the police and the justice system continue. Internment camps are in vogue. If the GOP retains a majority in Congress, the national impulse to disdain others for who they are will certainly get worse.

It has become popular again for individuals to harass minorities for engaging in seemingly innocuous activities — grilling in the park, arriving at their own homes, swimming in apartment complex pools and being in common areas at colleges.

And, again, like in the 1950s, the right to vote is under attack. This year, 34 states will enforce voter ID laws during the midterm elections — laws that if they are successful will deny minority, poor and elderly voters access to the polls.

Emmett Till died because without social respect and civil rights protections, even daily acknowledgments were forbidden to

blacks, and because the nation at that time was comfortable with the exclusion of "others" from our democratic system. This was a mistake then, and it is a mistake now.

We need to respect Americans whom we perceive as different from us. We must decide to get to know and to engage positively with our neighbors and with visitors to our land. Only by participating in community will we be able to find mutual respect, safety and shared political interests.

We must make a habit of acknowledging the humanity of our neighbors. Mutual respect must become the new normal. Our daily social interactions are ultimately what form the foundation for our political system.

Had Emmett Till's presence in a Mississippi grocery store not been patently objectionable, he might still be alive today.

The author, formerly of Dubuque and the University of Wisconsin-Platteville, is an assistant professor and pre-law adviser at Morehouse College in

Atlanta. Her email address is adrienne.jones@morehouse.edu.

*Copyright, Telegraph Herald. This story cannot be published, broadcast, rewritten or redistributed without prior authorization from the TH.*

Adrienne-jones   Civil-rights   Voter-id-law   Emmett-till

Tags  ████████  ██████  ███████  ████████

| Photo Gallery | Video Gallery | Email Alerts |

| MOST RECENT | MOST READ | NEWS IN YOUR TOWN |

● Gilligan: Veteran's memories a gift for this daughter

1d

● Goldberg: Diversity panic hits Democratic field

1d

● Letter: GOP must stand up for what's right

2d

● TH guidelines for letters to the editor

7d

● Page: Trump fights anti-Semitism on 1 day, fuels it the next

2d

● L.A. Times: Boris Johnson's victory means no going back on Brexit

2d

- Collins: Giving of ourselves a civic responsibility

  3d

- Tucker: White people use food stamps, too

  3d

- Goldberg: Trump defenders continue to push Ukraine conspiracy theories

  3d

- Letter: Questions around transmission line remain

  3d

- TH guidelines for letters to the editor

  3d

- Our opinion: Dubuque County needs better system to decide compensation

  3d

- Leubsdorf: Barr proves himself to be partisan

  4d

- Reeder: Recalling bad old days of patronage in Illinois

  4d

- Cyr: U.S. leaders show courage regarding Hong Kong

  5d

- Letter: Relaxed certification rules could help teacher shortage

  5d

- Our opinion: Finding facts, not fiction, online tricky for kids... and adults

  5d

- TH guidelines for letters to the editor

  5d

Jones: National mood hearkens back to 1955 | Opinion | telegraphherald.com

- Page: Many Democrats dread all-white debate stage — do black voters?

  6d

- Hanson: When our guardians fail us

  6d

- Rubin: Trump's most dangerous behavior on Ukraine not among impeachment articles

  7d

- Our opinion: Lame duck sessions bring lame governing

  7d

- Gilligan: When you learn something new -- then see it everywhere

  8d

- Tampa Bay Times: It's not us vs. them, AG Barr

  8d

- Goldberg: It's a mistake for Democrats to rush impeachment process

  8d

- Page: 50 years later, easier to see how Black Panther raid changed racial politics

  9d

- Parker: Marriage, pregnancy reduce crime

  9d

- Letter: Smoking bigger concern than signage at casinos

  9d

- Jones: 2020 election as much about preserving judiciary

  10d

- Tucker: 'R' is for 'Republican,' but also for 'Russian'

  10d

-

Jones: National mood hearkens back to 1955 | Opinion | telegraphherald.com

- Goldberg: Nostalgia the ace up Biden's sleeve

  10d

- Our opinion: Word of thanks to Tom Barton

  10d

- Leubsdorf: Pelosi right to be cautious of impeachment -- and to proceed

  11d

- Letter: Highway of horrors or picturesque pathway?

  11d

- Letter: Community effort needed for mental health support system

  11d

- Cyr: Is there a chance for Bloomberg?

  12d

- Letter: Low minimum wage contributes to poverty

  12d

- Letter: Nabhan a climate change denier

  12d

- Our opinion: Voting access for felons should be simpler

  12d

- Letter: Standard time, not DLS, should be the norm

  13d

- Hanson: 'Coup' concerns suddenly don't seem so far-fetched

  13d

- Isenhart: Get flowing right way on water quality

  13d

- Rubin: Why U.S.-China tensions over future of Taiwan could rise

  14d

- Our opinion: Iowa must do better on reporting immunization rates

  14d

- Gilligan: Local news, not impeachment, leads in TH

  15d

- Chicago Tribune: Speaker Pelosi, replace NAFTA with USMCA

  15d

- Goldberg: 'Deep state' contagion has spread beyond impeachment

  15d

- Ullrich: December feels like drifting into history

  16d

- Page: Are Biden's gaffes tied to stuttering? I know what that feels like

  16d

- Double Take -- Scharnau: Addressing gun control debate

  17d

**DEFENDANTS' EX. 9**

**City University of New York (CUNY)**
## CUNY Academic Works

Dissertations, Theses, and Capstone Projects                    Graduate Center

5-2015

# The Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on the Federal Government and the Voting Rights Act

Melanie Adrienne Jones
*Graduate Center, City University of New York*

How does access to this work benefit you? Let us know!

Follow this and additional works at: https://academicworks.cuny.edu/gc_etds

 Part of the Political Science Commons

Recommended Citation

Jones, Melanie Adrienne, "The Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on the Federal Government and the Voting Rights Act" (2015). *CUNY Academic Works.*
https://academicworks.cuny.edu/gc_etds/996

This Dissertation is brought to you by CUNY Academic Works. It has been accepted for inclusion in All Dissertations, Theses, and Capstone Projects by an authorized administrator of CUNY Academic Works. For more information, please contact deposit@gc.cuny.edu.



DEFENDANT'S
EXHIBIT

**THE VOTING RIGHTS ACT UNDER SIEGE:**
THE DEVELOPMENT OF THE INFLUENCE OF COLORBLIND CONSERVATISM
ON THE FEDERAL GOVERNMENT AND THE VOTING RIGHTS ACT

by

Melanie A. Jones

A dissertation submitted to the Graduate Faculty in Political Science in partial fulfillment
of the requirements for the Doctor of Philosophy, The City University of New York

2015

2015
MELANIE A. JONES
All Rights Reserved

This manuscript has been read and accepted for the Graduate Faculty in Political Science in satisfaction of the dissertation requirement for the degree of Doctor of Philosophy.

Dr. Andrew Polsky

_____                    _____
Date                                         Chair of Examining Committee

                                             Dr. Joe Rollins

_____                    _____
Date                                         Executive Officer

Dr. Andrew Polsky
Dr. Frances Fox-Piven
Dr. Charles Tien

Abstract

**THE VOTING RIGHTS ACT UNDER SIEGE:**
THE DEVELOPMENT OF THE INFLUENCE OF COLORBLIND CONSERVATISM
ON THE FEDERAL GOVERNMENT AND THE VOTING RIGHTS ACT

by

Melanie A. Jones

Advisor: Dr. Andrew Polsky

Recent activity by state governments to change voting rights law to limit access to the polls by minority voters, and directly challenge the legislation that protects voters from discrimination based on race, reveals an unsettling trend: states are increasingly comfortable challenging the federal mandate promulgated by the Voting Rights Act (VRA) of 1965. The Voting Rights Act was once hailed as a crown jewel in the constellation of legislation born of the Civil Rights movement. Its implementation had a significant positive impact, expanding the integration of polls and elected offices. Reauthorized four times since 1965, the VRA appeared to have become a permanent piece of the American voting system. Yet in fact, the VRA has endured significant opposition from conservatives since 1965, opposition that has influenced the federal government that implements the law. The effort to weaken the protection made possible by the VRA is driven by race-based Republican partisanship interested in the establishment of a durable conservative majority. Recently, a challenge to Section 5 of the VRA, *Shelby v. Holder* (2013), resulted in a Supreme Court decision that ruled Section 4 of the Act is unconstitutional, thereby removing Section 5 coverage over all the states required to submit to federal review of their voting law changes.

This dissertation examines how the development of conservatism since 1965 has affected the implementation of the Voting Rights Act and the response by the federal government and the states to the law and its implementation over time. I argue that the development of colorblind conservatism and the ideological platform undergirding it has had a chilling and potentially devastating impact on the federal government's implementation of the spirit and letter of the VRA, on stated adherence to the mandates and intention of the Act, and, ultimately, on the rights of those the VRA was designed to protect.

## Acknowledgements

My utmost gratitude goes to Dr. Daniel DiSalvo, who was kind enough to help me identify and develop a topic for this dissertation. I am even more indebted to Dr. Andrew Polsky, who agreed to sponsor me, took the time to read my many drafts, and met with me by phone and in person over the course of four years to bring this dissertation to fruition. I wish also to thank Drs. Frances Fox Piven and Charles Tien for serving on my committee. I appreciate the kind patience and incredible support of Dennis J. Shields, who urged me to take a fellowship at the University of Wisconsin-Platteville ("UWP"), where I was able to work and support myself while I successfully wrote the dissertation. Thanks to the members of the Social Science department at UWP, including, importantly, Drs. John Rink and Rosalyn Broussard. The department welcomed me, supported my mission, and treated me like a respected colleague. I appreciate the significant and consistent contributions of my father, Dr. George H. Jones, who was my ever-enthusiastic supporter. My father took the time to discuss with me the many relevant issues, gave me feedback on each chapter, and happily read and re-read drafts as the project progressed, always pleasantly and without complaint. I am ever thankful for the support and good advice of Calvin W. Sharpe, who maintains that I am his "awesome daughter," aka "M.A.D.," and who is an advocate for my greatness and success. I am extremely grateful for the support of Beth Gould and the members of the Brooklyn Salon, Jennifer Lutton, Sangu Iyer, Emily Bass, and Lisa Freedman. Beth masterminded the Salon, so that those of us working on dissertations can complete them. She read and re-read drafts and was more than happy to deposit the dissertation for me. Salon's generous support made me feel like a rock star among peers. The Salonistas reviewed all of the chapters, offered

vi

academic and emotional support, and celebratory congratulations at each of the important milestone moments. "Arms up!" A heartfelt "thank you" to my friends and supporters—Courtney Lang, Dr. Myechia Jordan, Philippe Jean-Bart, Vince Matthews, Manal Aboelata, Curtis English, Dr. Travis Nelson, Dr. Shan Sappleton, Rose Smyrski, Lori Wedig, and my Uncle Fred, for their perpetual encouragement and confident reassurance when times got hard. Thank you to my family—my mother, Jan Jones, Stevie and Hakim Surmon, Moneer Massih-Tehrani, Kabral, Nikki, Isaiah and Zoe Sharpe, and Shirley Daniels. Respect and gratitude to my grandparents (and their parents and their parents' parents, ad infinitum) for the spiritual support and the ancestral success that has enabled me to be in the position to earn such a degree—Bernice I. Jones, George H. Jones, Sr., Emily McCoy, and Frederick McCoy, Sr.— and finally, thanks to Monty "Mo' Better" Mason for his affordable copyediting and careful preparation of the table of contents, footnotes, and bibliography.

My sincerest gratitude to you all. Thank you for helping me to make this happen.

I really appreciate it.

M. Adrienne Jones
2015

Table of Contents

**Chapter One**                                                    **1**
**Introduction**

**Chapter Two**                                                    **17**
**History of Voting and Race in the United States 1776 -1965: Expansion and Contraction**

**Chapter Three**                                                  **36**
**Congress: The Conservative "Long Game" and the VRA**

**Chapter Four**                                                   **61**
**Presidents and the Voting Rights Act, 1970-2013**

**Chapter Five**                                                   **90**
**The Supreme Court and the VRA, 1970-2013: Bending Toward a Colorblind Voting Order**

**Chapter Six**                                                    **125**
**Conclusion: The End Game**

**Bibliography**                                                   **148**

# Chapter 1
# Introduction

*The Problem.* Since 1965, arguments seeking to justify voter discrimination based on race have not been politically viable. The advent of the Voting Rights Act (VRA) brought federal government control over state voter discrimination based on race, an influx of new voters, and apparent ideological consensus that voter discrimination based on race was now patently unacceptable. For nearly fifty years, the federal government, authorized by Congress, enforced by presidents, approved by the federal judiciary — and heeded by state legislatures at the polls and during redistricting — has administered the VRA. Much scholarship, even that which opposes the VRA, proceeds on the presumption that the VRA, its intention, and the sociological theory that underpins it, have earned a permanent place in the fabric of the American voting system.

Until recently, the idea that the VRA was a permanent part of the American political landscape was widely accepted. American geopolitical interests, namely its need to end racial discrimination as part of its effort to maintain its power as a global leader, helped to motivate the United States to administer the Act effectively. The passage of the VRA encountered much opposition, but the end result was a successful law passed by a formidable bipartisan coalition, a coalition that sustained itself through the 1990s, shepherding the legislation through multiple reauthorizations of its most controversial sections. The VRA has had a significant impact on voting rights and legislation since 1965: during the fifty years that it has been in force, the federal government, states, and

1

individuals have taken it into consideration when making determinations about voting regulations and access.

Despite the appearance that the VRA voting order is sacrosanct, it has in reality experienced much resistance, beginning at its inception and continuing since. The law is not and has never been universally accepted at the national level. Initially, the opposition consisted of Southern Democrats and states' rights advocates. But the main driving force over time has been conservative Republicans, and the anti-VRA coalition has found a secure home in the Republican Party. There, attacks on the VRA have been part of a race-based strategy to establish a popular majority grounded in hostility to affirmative steps to promote equality for racial and language minorities. The GOP-based conservative coalition has sharpened its arguments against the VRA into a persuasive ideology, often dubbed "colorblind conservatism," that resonates culturally and politically. This modern conservative ideology has established its own legitimacy, providing a strong counterweight to the liberal consensus that held sway through the 1990s. The argumentation and activities undertaken by conservatives against the VRA have slowly developed into effective challenges to the authority of the VRA and to the letter of the law.

During the long period of apparent VRA hegemony, there has existed a persistent and consistent conservative opposition waged specifically at the federal level. This resistance is far less obvious than recent resistance by state legislatures, pursued through the proposal and passage of voter ID laws and other limitations, all of which will arguably limit minority voter access. At the federal level, between 1965 and 2013, conservatives against the VRA have played a "long game" to influence the governmental

2

institutions at the national level that implement, enforce, and review the VRA. This "long game" opposition is not aimed exclusively at the VRA, instead, it is part of a larger Republican agenda to limit Civil Rights legislation and to establish long-term conservative majorities. (I use the term "long-game" not to imply a strategy consciously crafted to undermine the VRA over time, but rather to capture the persistence of conservatives who grasped any opportunity to undercut the law.) Although the far right has lost most of its battles against the VRA at the federal level, this conservative coalition has exerted some influence over all three of the branches of national government and periodically made important gains. Recently, conservatives have made significant progress against the VRA as a result of the Supreme Court decisions issued by the Roberts Court.

The development of this conservative influence is important because the federal government is responsible for enforcing the VRA. Furthermore, the weakening of the VRA order means the resurgence of race-based partisan voter limitations. This dissertation will discuss this conservative "long game" in detail as it has influenced Congress, the executive branch, and the Supreme Court. Tracking support for the VRA by the Federal Government is critical because it reveals cracks in the VRA support structure that have had, and will continue to have, a significant impact on the existence of a democratic voting system in the United States. Tracking support also makes it clear that the VRA does not provide permanent protection for minority voting rights.

This dissertation argues that the development of a conservative ideology, "colorblind conservatism," has caused friction between the VRA voting order and an emergent so-called Colorblind Voting Order. The inertia once generated by the liberal

3

consensus in favor of the VRA has shifted. Today, the new Colorblind Voting Order strongly challenges that older consensus to such an extent that it arguably now controls voting law and resists changes sought under the VRA at the national level. Analysis of primary and secondary literature will support these arguments. This analysis will be organized into a synthesis that not only describes, but also rationalizes the changes in the responses of the Federal Government to the VRA that have taken place in the last fifty years.

*Intercurrence: The Impact of Overlapping Orders on American Political Development.* The work presented in this dissertation relies significantly on the theory posited by American Political Development scholars Karen Orren and Stephen Skorownek, who argue that political orders in the United States are subject to "intercurrence," the awkward overlapping of old and new orders which produces friction and change."[1]  When we apply this approach to voting rights, we see the development of those rights as a succession of orders and the tensions between them.

The VRA enshrined a new order of voting in 1965. The VRA Order contradicted the previous order of voting, the "Jim Crow" order (the voting law regime from 1877 to 1965), and interrupted the operation of traditional federalist relations between the states and the national government. The VRA Order is also inconsistent with the voting order urged by modern conservatives, who seek to overthrow the VRA Order.

In fact, the push for a Colorblind Voting Order emerged out of resistance to Section 5 of the VRA and from the tension between conservatives and VRA proponents. Proponents of the Jim Crow order were driven to resist the institution of the VRA Order.

---

[1] Orren, Karen and Stephen Skorownek. *The Search for American Political Development*, (Cambridge, UK: Cambridge University Press, 2004).

The change in the law struck at the heart of "states' rights" from the perspective of opponents of the VRA. The oppositional effort did not go smoothly at first. Traditional Jim Crow arguments failed in the mid-1960s and throughout the 1970s, and so conservatives developed new, more persuasive colorblind arguments, which conservative forces directed against the legislation from the mid-1980s onward. This dissertation investigates the application of those arguments at the national branch level. These arguments form the foundation of the tension between the VRA Order and the Colorblind Voting Order.

This dissertation investigates the intercurrence between successive, partly overlapping voting orders over time. In the history chapter, I illuminate intercurrence between the founding of the nation and Reconstruction; Reconstruction and Jim Crow, Jim Crow and the VRA Order, and today, the VRA Order versus the Voting Order. My research assumes the existence of significant friction between these orders. My mission is to identify change precipitated at the Federal Government level by the friction created by the awkward overlapping of the voting orders in the United States.

*Voting Rights in the United States: Analysis of the Relevant Literature.* Scholars have written at great length on race and voting rights in the United States. The seminal piece of literature is V.O. Key's analysis of Southern politics.[2] Key examined a number of states and showed how traditional Democratic Party dominance hindered the development of multiparty democracy in those regions, in large part based on the disenfranchisement of black voters.[3] The idea was that without party competition, blacks lacked the leverage they needed to maintain the right to vote in the face of opposition.

---

[2] Key, Valdimer Orlando. *Southern Politics and Nation* (New York, NY: Vintage Books, 1949).
[3] Corbett, John and Valdimer Orlando Key. "Mapping Southern Politics," *Center for Spatially Integrated Social Science*, accessed April 2015, http://www.csiss.org/classics/content/42.

5

Key wrote his work in 1949, a time when voter discrimination was increasingly under attack. Using a heavy emphasis on spatial modeling, Key determined that the monopoly held by the Democratic Party in the Southern states "assure [d] locally a subordination of the Negro population and, externally…block[ed] threatened interferences from outside with these local arrangements."[4] The VRA's special temporary provisions, Section 5 in particular, sought relief from state voter discrimination by targeting state jurisdictions charged with the worst voting records, the lowest registration, and lowest participation of blacks. The vast majority of these places were in the Southern states Key focused on in his study.

An alternative argument posits that party competition in the South was possible (i.e. there was room for the Republican party to grow in the South and represent blacks in their need for voting rights), but that neither major party was willing to forgo the support of white Southern voters by taking responsibility for black constituents. According to Paul Frymer, post-Reconstruction Republicans pulled out of the South instead of striving to expand the Southern wing of the party by aligning itself with blacks. The Republican Party was not motivated to work earnestly on behalf of blacks for fear of alienating white Southerners, and the Democratic Party thrived by excluding blacks and working against their interests. Frymer concludes that party competition was not exercised and that therefore both parties ignored the needs of the Negro community, which left anti-discrimination legislation unprotected and rendered blacks vulnerable to the onset and entrenchment of the Jim Crow voting order.[5]

---

[4] Key, V.O. *Southern Politics*, 665.
[5] Frymer, Paul. *Uneasy Alliances* (Princeton, NJ: Princeton University Press, 1999), chap. 2 and 49–86.

There are strong similarities between the legislative gains of the civil rights movement and those achieved during Reconstruction. The two eras have a number of features in common. Both periods involved "confrontations between North and South, between white and black, between federal and state government, [and both produced]…the daily evocation of the constitutional amendments, federal laws, government polities and court decisions." [6] Historian C. Vann Woodward coined the phrase "Second Reconstruction," to describe the legislative gains of the civil rights movement in his work comparing the First Reconstruction and the legislation achieved in the 1960s. Woodward's work revealed that Jim Crow laws were not an immediate or inevitable effect of the end of Reconstruction; instead, the phenomenon developed and congealed in the 1890s when states shifted to "legally prescribed, rigidly enforced, state-wide Jim Crowism."[7]  Woodward determined ultimately that the First Reconstruction had failed, but he did not advance a solid explanation for exactly why.[8]

Based on Woodward's understanding of the similarities between the two reconstructions and the potential for disenfranchisement similar to that which occurred after Reconstruction in the 1880s, he warned Congress in 1981 that a weakening of the Section 5 preclearance provision of the VRA might "open the door to a rush of measures to abridge, diminish and dilute if not emasculate the power of the black vote in Southern states…[R]emove that law and the permissiveness will likely become irresistible—in spite of promises to the contrary."[9] Woodward's warning was designed to avoid a counter

---

[6] Woodward, C. Van. *The Future of the Past* (New York, NY: Oxford University Press, 1989), 199.
[7] Woodward, C. Vann. *The Strange Career of Jim Crow* (New York, NY: Oxford Univ. Press, 1974), xii.
[8] Woodward, C. Vann. *The Future of the Past* (New York: Oxford Univ. Press, 1989), 199.
[9] Woodward, C. Vann. "The Danger of Retreating from the Second Reconstruction," *Southern Changes*, accessed March 2015, http://beck.library.emory.edu/southernchanges/article.php?id=sc04-1_003

revolution, perhaps less extreme than that experienced after the First Reconstruction but a counter revolution that would potentially make a Third Reconstruction necessary.[10]

A number of explanations for the failure of the First Reconstruction have been asserted. In his work on the Reconstruction, historian Eric Foner developed a set of explanations for the failure of the First Reconstruction: violence, "the weakening of Northern resolve," the inability of Southern Republicans to develop a long-term appeal to whites, factionalism, corruption within the GOP, the rejection of land reform, and changing patterns in the national and international economic system.[11] Alexander Keyssar's seminal work on the history of enfranchisement reveals that the first era is a history of exclusion, expansion, and retraction. Keyssar,[12] motivated by his work on class participation and the history of enfranchisement in the United States, documented the expansion of the right to vote in the United States and revealed its cyclical nature. Keyssar concluded that democracy in the United States "is less unique than is sometimes claimed,"[13] and that universal suffrage wasn't a reality until two hundred years after the founding (i.e. in 1965). There has been a "long term trend toward greater inclusion but progress has not been smooth or steady and there have been recurrent setbacks."[14] The trend illustrated by Keyssar did not end with the passage of the VRA in 1965; exclusion, expansion, and contraction of voting rights, persists. More recently, Keyssar has noted

---

[10] Woodward, C. Vann. "The Danger of Retreating from the Second Reconstruction in Southern Changes." *Southern Changes*: The Journal of the Southern Regional Council. Vol. 4 No. 1 (1981): 13-15.
[11] Foner, Eric. *Reconstruction: Americas Unfinished Revolution, 1863-1877* (New York: Harper and Row, 1988), 603.
[12] Keyssar, Alexander. *The Right to Vote: The Contested History of Democracy in the United States* (New York, Basic Books, 2000).
[13] Ibid., xxiii.
[14] Keyssar, Alexander, "What Struggles Over the Right To Vote Reveal About American Democracy," *Scholars Strategy Network,* accessed March 2015, http://www.scholarsstrategynetwork.org/sites/default/files/ssn_key_findings_keyssar_on_right_to_vote_0.pdf

the similarity between modern voter ID laws and proposals, and laws proposed and passed during the late 1800s in contravention of the 15th Amendment to the US Constitution.[15]

It may be that institutions and institutional rules were the main forces that shaped race relations in the United States during the First Reconstruction. J. Morgan Kousser has engaged in comparisons of the First and Second Reconstructions, with a focus on politics between approximately 1863 through the turn of the twentieth century. Kousser has aimed to assess why the First Reconstruction failed in an effort to shed light on VRA problems that are "often taken for granted."[16] Kousser argues that institutions and institutional rules were the main force shaping race relations in the United States during the First Reconstruction. In his evaluation of the eleven Ex-Confederate States from Reconstruction through 1908, he shows how in the South, institutions and rules were used to discriminate against minority voters. Kousser notes a striking if underappreciated parallel: the disenfranchisement of blacks resulted in the disenfranchisement of a vast number of poor whites, as well as limiting the partisan choice in the Southern states.

Critical to this inquiry, then, is the question of whether the Second Reconstruction is in fact an unmitigated success. Richard Valelly compares the two reconstructions to determine why the Second Reconstruction, despite its frictions and weak spots, "… is still a relative success."[17] His focus is on how the "activities of the federal courts and the national party system structure influenced the prospects of coalition and movement

---

[15] Keyssar, A. "Voter Suppression Returns," *Harvard Magazine Forum* July-Aug 2012.
[16] Kousser, J. Morgan. "The Voting Rights act and the Two Reconstructions," *Author's Library Cal Tech*, accessed March 2015, http://authors.library.caltech.edu/41064/1/Brook.pdf), 2.
[17] Valelly, Richard M. *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago, IL: University of Chicago Press, 2004), 7.

politics" [18] during the two reconstructions. Valelly argues that the ability of Democratic Party biracial coalitions to expand into "long standing organizations" was far easier during the Second Reconstruction than the "creation of eleven new state-level parties overnight."[19] That last expedient had been necessary for the Republicans during the First Reconstruction, but was attempted unsuccessfully. According to Valelly, the existence of viable biracial coalitions in the South in favor of voting reform, combined with positive review by the federal judiciary at the start of the new legislation, made possible the success of the Second Reconstruction in contrast to the First. [20]

Valelly further argues that the response of the judiciary to voting rights law, especially the Court's initial review, is critical. Valelly states, "If the first decision or set of decisions is unfavorable, the Court's stance thus becomes a new strategic problem for a biracial coalition. The number and difficulty of political tasks that it has to perform suddenly increases."[21] Valelly argues that the institutionalization of enfranchisement through party and jurisprudence building was extremely difficult during the First Reconstruction but "relatively easy" and ultimately successful, during the Second.[22] He avers that the positive initial review of the VRA by the Supreme Court in *South Carolina v. Katzenbach* (1966) helped to secure permanently the new voting order established by the VRA.

In this dissertation, I argue that Valelly is largely, but not entirely, correct. The VRA is better established than similar post-Civil War Reconstruction law, and the legislation has achieved more. The legislation did take hold and has been administered by

---

[18] Ibid., 8.
[19] Ibid., 17.
[20] Ibid., 225.
[21] Valelly, *The Two Reconstructions*, 19.
[22] Ibid., 20.

the federal government. Presidents have enforced the legislation, the Court has upheld it as constitutional (until recently), and Congress has reauthorized the temporary provisions of the law four times. States have taken minority voters into account when redistricting and at the polls. Voting participation by blacks and other minorities has risen significantly as has the number of minority elected officials. Valelly acknowledges that the VRA has encountered "friction and weak spots," but assumes that the political environment will maintain VRA hegemony in perpetuity.[23]

However, the "friction and weak spots" noted by Valelly are far more serious than he suggests. These tensions have developed and congealed into the existence of a strong conservative coalition, which over time has resisted the Act and gained control of the adjudicating ideology of the Supreme Court. The backlash has developed more slowly than was the case during the First Reconstruction, but it is no less detrimental. Since 1965, conservatives have worked a "long game" to influence the national governmental branches that implement the law. While a winning outcome of this offensive was by no means guaranteed, it has exercised a consistent influence, grown significantly, and gained strength. As a result, the future of the VRA is uncertain and at this moment, the legislation arguably wobbles and teeters on the edge of collapse.

The 2013 *Shelby v. Holder* decision struck at the heart of the VRA by essentially removing the power of the Section 5 preclearance provision. As Woodward warned representatives on the floor of Congress in 1981, the removal of the VRA's preclearance power weakens the legislation significantly and could open the door to racially discriminatory voting legislation by states. Recent challenges by states against the VRA

---

[23] Ibid.

11

have arguably been designed to discriminate against voters based on race. The Supreme Court decision in *Shelby* appears to have accelerated that process.[24]

   *Statement of the Argument.* Conservative opposition existed prior to the passage of the VRA and has existed since, but its partisan center has shifted dramatically. During the years between 1965 and today, conservatives have persistently, even systematically, resisted the VRA. Conservatives have reframed their original hackneyed and unpersuasive arguments, which justified race discrimination, into "colorblind" arguments, which seem persuasive, commonplace, and have the patina of fairness. This ideological move has been generated by Republican leaders and institutions allied with the party, including conservative think tanks. Conservatives have thus managed to shift the onus of defending racial distinctions onto their liberal foes. During this period, conservative ideologues have influenced Republican presidents in particular on the VRA, expressed their opinions and postured in Congress, and slowly but surely gained influence over the Supreme Court's consideration of the VRA. This dissertation seeks to answer the questions: Has the conservative movement against the VRA undermined the law? How has the development of a conservative movement against the VRA affected the implementation of the VRA by the national government? Is the effect of the conservative movement at the federal level akin to the activity that caused the end of similar legislation during the First Reconstruction? What are the implications of these questions for the black electorate? To answer these questions, my research examines the conservative influence on the executive, legislative, and judicial branches between 1965 and 2013.

---

[24] Texas and North Carolina immediately enacted voting law changes denied preclearance by the DOJ in response to the *Shelby* decision.

I hypothesize that the GOP-conservative influence on the national government has resulted in the placing of limitations on the legislation, culminating in a decrease in VRA implementation and enforcement. These actions have made the VRA less effective at controlling state efforts to discriminate against voters based on race.

*Chapter Preview.* This dissertation consists of six chapters, including the Introduction and a Conclusion. The second chapter is a history of voting rights in the United States between 1850 and 1970.[25] The third, fourth, and fifth chapters look at the development of the influence of conservatism on the federal government and the VRA in, respectively, Congress, the executive branch, and the judiciary between 1970 and 2013.

The history chapter relies on secondary literature dealing with conservative resistance and full enfranchisement, states' rights, Reconstruction, and the Jim Crow period. The historical section will establish the ongoing existence of two political orders with a stake in voting rights, a VRA Order, committed to increasing minority voter access and representation, and a partisan-based, conservative resistance now dedicated to colorblind conservatism. The chapter is designed to provide the reader with an understanding of the difference between the Jim Crow voting order and the VRA Order, to provide a basis for the motivation of the proponents of the two orders, to show the impact each order has on the relationship between the states and the national government, and to provide a demonstration of the intercurrence principle, discussed above.

The remainder of the dissertation is designed to examine closely the rhetoric, actions, and impact of conservatism on each of the national branches in their treatment of the VRA between 1970 and 2013. In the successive chapters covering Congress, the

---

[25] The history chapter outlines voting orders through the end of the Johnson administration. The dissertation considers the influence of conservatism on the federal government's administration of the VRA from 1970-2013.

executive branch, and the judiciary, I will consider the rhetoric and actions of each branch to assess how conservative resistance to the VRA translated into or failed to translate into authoritative measures that negatively impacted the enforcement of the VRA. I will demonstrate that due to the influence of conservatism, support for the VRA has waned over time in all three branches. I will argue that in fact, the development of the response by each national branch to the VRA has not been linear or continuous, but has followed a more nuanced and circuitous route influenced by unique powers and limitations of the branches of government and the social and political contexts of each administration.

The executive branch chapter will consider whether executive support for the VRA has declined steadily since 1970, regardless of the party affiliation of the executive. My analysis will confirm that Republican presidents have been more resistant to the VRA than the Democratic presidents during the relevant time frame. Nevertheless, because partisan conservative resistance to the VRA has grown more acceptable over time, even Democratic presidents, including Barack Obama, the nation's first black President, have signaled less enthusiasm for, or enforced the Act to a lesser degree, than did President Lyndon Johnson. It is also the case that Republican presidents serving during time periods dominated by a liberal consensus in support of the VRA were more supportive of the law than some of the Democrats. I rely on Department of Justice (DOJ) statistics showing enforcement rates for the VRA, statements by Attorneys General before Congress, news reports, and secondary material in the form of biographies, law review articles, and journal articles. The chapter addresses executive directives to the DOJ,

14

renewal activity, and civil rights policy and statements, as well as relevant appointment activity and DOJ statistics.

Congress has renewed and expanded the VRA each time it has come up for reauthorization, but I seek to show that the legislative success of the VRA by roll call vote masks significant resistance. Specifically, I argue that the partisan Republican campaign against the VRA has adopted different ideological themes during reauthorization debates, and that the newer themes and arguments have gained traction in the form of increasingly robust dissent. To establish a path of ideological themes, I review roll call votes and testimony from the Congressional reauthorization hearings in 1970, 1975, 1982, and 2006, and use journal and law review articles about Congress and the VRA. The purpose will aim to identify arguments waged against the VRA by its opponents and to illuminate action taken by these opponents to decrease the effectiveness of the VRA or to overturn its temporary provisions. My work will demonstrate that debate has become more contentious at each reauthorization session due to the passage of time and resultant fading of the memories of Jim Crow, the improvements in voter access and minority electoral success, and the increased salience of colorblind conservative argumentation.

Judicial support of federal legislation is one of the main criteria for the success of voting rights legislation, according to Valelly. I seek to document the declining support for the VRA-defined voting rights order by the judiciary since 1970. I will consider relevant Supreme Court cases that span the time period. I propose to demonstrate that changes in the Court's membership by Republican appointments have increased judicial support for colorblind conservatism and opposition to the VRA. My work will trace the

incremental shift from complete assent in 1966,[26] to significant doubt,[27] to outright dissent on the constitutionality of the VRA's temporary provisions by 2013.[28]

These substantive chapters on the national government will be followed by a conclusion. The conclusion will summarize my findings and offer suggestions for further research.

---

[26] See *South Carolina v. Katezenbach*, 383 U.S. 301 (1966).
[27] *North Austin Municipal District No. 1 v. Holder*, 557 U.S. 193 (2009).
[28] *Shelby v. Holder*, 133 S. Ct. 2612 (2013).

Chapter 2
History of Voting and Race in the United States 1776-1965:
Expansion and Contraction

In this chapter, I will illustrate the state of race-based voting law and practice in the United States prior to the adoption of the Voting Rights Act. The VRA ushered in a period in the United States where black Americans could vote, unmolested by state government intervention. This was a significant change from the period preceding the Voting Rights Act, during which states systematically restricted blacks from voting based on race. The Act establishes a bright line between the large-scale enfranchisement of blacks and the denial of that right. Because of that bright line, I will refer to race-based voting laws and practice before the VRA as occurring during the "Pre-Modern Period" and assert that the VRA introduced the "Modern Period." In this chapter, I divide the Pre-Modern period into intercurrent voting orders, describe the development of voting laws and practice and provide context for the later discussion of the influence of conservatism on the national branches in their enforcement of the VRA.

The Pre-Modern Voting Regime, encompassing the years 1776-1965, is characterized by the denial of black enfranchisement by state governments[29] and minimal interference by the federal government. However, within the Pre-Modern Voting Regime, there was an expansion and contraction of black voting rights. Orders represent periods of stasis during which regulation of black enfranchisement has definable characteristics that differ from prior and subsequent periods. The Pre-Modern Voting Regime can be divided into three orders, viz. The Establishment Voting Order (EVO)

---

[29] This includes the period of Radical Reconstruction. During that period, large numbers of blacks were registered, voted, and ran for office. Nonetheless, state governments resisted this aspect of the Reconstruction fiercely via their effort to restrict the black franchise; therefore, I describe the entire period as characterized by the denial.

lasting from the country's founding through the end of the Civil War; the Reconstruction Voting Order (RVO), including the period of Radical Reconstruction; and the Jim Crow Voting Order (JCO), which runs from the late 1800s until 1965.

The EVO, 1776-1863, is characterized by state control of the franchise and the denial of the right to vote based on class and race. During this period, there was an initial expansion of black voting rights and a subsequent contraction of those rights as the country progressed. In the late 1700s, the federal government worked toward ending slavery and providing the right to vote to blacks. For example, in 1780, Congress banned slavery in the federal territories. In 1794 slave exportation was banned, as was importation in 1808. "In fact, more progress was made to end slavery and achieve civil rights for blacks in America than was made by any other nation in the world."[30] Most but not all states denied the franchise to blacks. States that did allow blacks to vote overturned their laws as the century progressed and as slavery compromises between the Northern and Southern states collapsed. In 1820 the Missouri Compromise sanctioned slavery in the territories; in 1850, a Fugitive Slave Act was passed. In 1854, the Kansas Nebraska Act opened the possibility of slavery in the Western states. States reversed their voting laws and prohibited blacks from voting. For example, Maryland ended the black franchise in 1809 and North Carolina in 1835.[31]

Legal recognition of slavery and the expansion of the institution were important to the contraction of black voting rights.  The black slave labor system yielded major economic benefits to slave and non-slave states alike and required the subordination of

---

[30] Cobb, Thomas R.R. *An Inquiry into the Law of Negro Slavery in the United States of America* (Philadelphia: T. &T.W. Johnson and Co., 1858), 153, 163, 169.
[31] Hancock, John. *Essays on the Elective Franchise*; or *Who Has the Right to Vote*? (Philadelphia: Merrihew & Son, 1865), 22-23.

blacks. Slave states denied the right to vote as part of a package of repression to maintain the chattel system. Free states denied the right to vote as part of the social hierarchy, which discouraged black citizenship as part of often myriad efforts to dissuade blacks from taking up residence in their states. The denial of the franchise was codified in state constitutions, supported by the U. S. Constitution, and well accepted as part of the social order in both Southern and Northern states.

The Constitution does not provide an affirmative right to vote. Under Article I, the Constitution leaves the administration of the franchise to the states. Section 4 provides that the federal government may take control over federal elections in the event that Congress is dissatisfied with state regulation, but in general, the administration of elections is not an express or implied right of Congress. Furthermore, states were empowered to conduct elections under the 10th Amendment police powers, which reserved rights for states to control law enforcement, marriage, education, and voting. During the EVO, the federal government did not interfere with state denial of the franchise to blacks. The second-class status of blacks was implied by the Constitution, and it provided neither recourse for blacks denied the right to vote nor power for the federal government to provide relief for such a denial. At no point was the federal government persuaded to intercede in state laws, based on arguments made by founding fathers, or white and black abolitionists, who attempted to persuade the federal government to intervene.

White supremacy developed during the 1800s in conjunction with the expansion of slavery and the subordination of blacks. White supremacist ideology included anti-black franchise arguments. Common parlance dictated that blacks were not citizens and

that they were less human than whites. These arguments were supported by eugenic evidence. Blacks were deemed incapable of being responsible or knowledgeable voters. White supremacist arguments provided a cultural base from which to launch social reprisals against blacks who attempted to register or vote and against those who took the vocal position that blacks should be able to vote. The arguments also provided a foundation for the legal denial of the franchise by state governments.

By the 1850s, slave and free state compromise had all but collapsed. The 1857 *Dred Scott* decision that Congress could not control slavery in the territories alarmed northern states, who were particularly concerned about the response of the Buchanan administration to the decision. Southern states maintained ongoing concern about the viability of slavery in the United States, and grew extremely concerned when the anti-slavery Republican Party elected a president and earned a majority in Congress. South Carolina hardliners provoked that state to secede from the Union after the election. Nine states followed. The Civil War ensued. The ongoing free state/slave state conflict led the nation to war and eventually to federal intervention into the institution of slavery. Federal intervention resulted in black citizenship and subsequently opened the franchise to blacks.

The outcome of the Civil War changed the relationship of the federal government to black civil rights and to the black franchise. Abraham Lincoln abolished slavery in Washington D.C. and issued the Emancipation Proclamation. Although the proclamation did not have the force of law in the Confederacy, it precipitated the end of the slave system nonetheless. To end slavery officially and permanently, Lincoln proposed and supported the passage of the 13th Amendment. By emancipating blacks, Lincoln ended

20

the "social death" caused by designation as a slave. Citizenship followed relatively quickly, emerging as a result of the 14th Amendment and a series of Civil Rights Acts.

The 14th Amendment stipulated that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person within its jurisdiction the equal protection of the laws."[32] This is the first appearance of language in the Constitution that specifically obligates states to respect the citizenship of blacks inside their borders. The 13th and 14th Amendments provided a foundation for the establishment of the black franchise.

Black voting quickly became a contested post-war issue. The presidents (Lincoln and Andrew Johnson) and Congress divided over black enfranchisement and whether it should be required of the Southern states to earn readmission to the Union. The relationship of the political parties in Congress was changed as a result of emancipation, and Southern Democrats gained seats as a result of the expansion of their electorate. The Republican Party was eager to gain a foothold in the South to neutralize the homogeneous power of Southern Democrats and to prevent the Southern gentry from regaining power it held prior to the war. As a result, Radical Republicans in Congress pushed hard to require that the South grant the franchise to blacks before readmission.

Presidents Lincoln and Johnson disagreed. The presidents prioritized restoring the Union. Reconstruction plans offered by the presidents did not include a requirement that states enfranchise black voters. Lincoln pledged to recognize any state government where 10% of the number of individuals who voted in the 1860 presidential election took an amnesty oath. President Johnson continued the Lincoln approach. He pardoned many Southern landowners who retook control of state governments, confiscated land

---

[32] U.S. Const. amend. XIV.

dispensed to blacks by the Freedman's Bureau, and refused Congressional urging to require that states adhere to the 14th Amendment dictates on voting. The Amendment did not provide an affirmative right to vote but did order a reduction in the size of the voting delegation of any state that "denied to any of the male inhabitants of such State…reduced in proportion [to the number of men excluded by the state to the whole number of citizens]."[33] Radical Republicans vied with Lincoln and Johnson over the proper contours of Reconstruction.

Radical Republicans gained control of Congress in 1866 and instituted their Radical Reconstruction program in 1867. Congress replaced civilian governments with U.S. Army occupation authority. The army governments conducted elections. Blacks voted in the elections while former Confederates were excluded from the ballot box and prevented from running for office. Integrated legislatures acted to provide the franchise to blacks, to protect those rights by revising state constitutions, and to pass legislation to prohibit segregation, to establish public education, and to open public transportation, state police, and other institutions to blacks.[34]  Blacks were elected to local and state legislatures, state and local offices, and to Congress.

During Radical Reconstruction, Southern Democrats resisted black inclusion and the black franchise vociferously. Southern Democrats wielded intimidation, violence, black codes, and economic reprisals to prevent blacks from political participation.

---

[33] U.S. Const. amend. XIV.
[34] Barton, David, "The History of Black Voting Rights," as reposted in *Wall Builders,* March 3, 2003, accessed March 2015, http://www.wallbuilders.com/libissuesarticles.asp?id=134.

Democratic veterans established the Ku Klux Klan to overthrow Republican dictates and pave the way for Democrats to regain control.[35]

The worst instance of racial violence on record during Reconstruction was waged over objection to black electoral participation. During the 1866 Colfax Massacre, Southern Democrats slaughtered blacks and black sympathizers at the state Republican Convention in Colfax, Louisiana, killing forty blacks, twenty whites, and wounding one hundred fifty people.[36] In the wake of this attack, the Supreme Court held in *United States v. Cruikshank* (1870) that the Enforcement Acts of 1870, designed to punish vigilante violence like that meted out at Colfax, did not apply because the alleged offenders were not state representatives nor were they acting under color of state law.

In response to the massacre, Radical Republicans continued to work to protect black voting rights. Spurred by the intense and ongoing resistance of Southern Democrats, and concerned about how narrowly Ulysses S. Grant was elected to the presidency in 1868, Radicals proposed and passed the 15th Amendment. Although blacks are not mentioned specifically in it, the Radicals intended that the amendment serve to protect the franchise of voters regardless of "race, color, or previous condition of servitude."[37] Southern Democrats continued to resist. The passage of time and the resistance of Southern Democrats eroded Republican support for Radical Reconstruction. Northern Republican support also waned, setting the stage for party compromise in 1876.

When presidential candidates Rutherford B. Hayes and Samuel J. Tilden tied for the post, the parties agreed that in exchange for the removal of military authority in the

---

[35] Smalley, Eugene V. *A Brief History of the Republican Party: From its Organization to the Presidential Campaign of 1884* (New York: John Alden Publishing, 1884), 49-50.
[36] "The Riot in New Orleans," *Harper's Weekly*, Aug. 25, 1866.
[37] US Const. amend. XV.

23

states where it remained (Louisiana, South Carolina, and Florida), Republican Hayes would be granted the presidency. The agreement ended Radical Reconstruction and returned Southern Democrats *en masse* to Congress. The number of enfranchised blacks, particularly in the South, declined precipitously. Blacks were purged from the voter rolls, refused and removed from office, and excluded from polls in local, state, and federal elections. The compromise ended federal intervention into black electoral participation in the South.

The end of Radical Reconstruction legislation and enforcement of the Reconstruction amendments were facilitated by the Supreme Court. Post-Reconstruction decisions weakened future efforts to enforce the right to vote.[38] In the *Slaughter House Cases* (1873) the Court interpreted the 14th Amendment "privileges and immunities" clause as extending only to the federal government. The Court held in practice that the 14th Amendment did not restrict state enforcement of their police powers. The Court noted that the 14th Amendment was designed for the protection of former slaves, yet the limitations imposed on the amendment by the Court allowed discrimination against former slaves.[39] *U.S. v. Reese* (1878), the Court's first voting rights case under the Enforcement Acts of 1870, held that the 15th Amendment did not provide the right to vote; instead it prevented discrimination against those who were granted the right to vote by the state. The *Reese* decision also held that the section of the Enforcement Acts at issue was unconstitutional because it exceeded the scope of the 15th Amendment. These

---

[38] Frymer, *Uneasy Alliances,* 63.
[39] *The Slaughterhouse Cases*, 83 U.S. 36 (1873).

cases provided a legal foundation for state to deny the right to vote in contravention of the Reconstruction Amendments.[40]

The Court continued to publish decisions that interfered with efforts by blacks to maintain citizenship and access to the franchise. The Civil Rights Cases (1883) struck the Civil Rights Act of 1875, which entitled individuals to the use of public facilities. The Court held that the legislation was beyond Congressional authority under the 14th Amendment, which applied to the states and not to private individuals.[41]  But, in *Ex Parte Yarbourgh* (1884), the Court ruled that Congress did have the authority to pass the Enforcement Acts of 1870 and individuals did not have standing to interfere with voting in federal elections.[42]  Nonetheless, in *Plessy v. Ferguson* (1866), the Court legitimized the "separate but equal" doctrine, which provided a legal foundation for the burgeoning Jim Crow regime. The Court ruled that as long as accommodations were equal, they could be separate.[43] Ironically, the dissent in *Plessy* established the basis for colorblind constitutionalism, at issue in this dissertation.[44] In *Williams v. Mississippi* (1898), the Court held that the states' administration of poll taxes and literacy tests were not discriminatory, because they were requirements imposed on all voters.[45]

The 1876 election of President Hayes began a "let alone" policy in the South.[46] Federal troops were removed and Hayes extolled the virtues of states' rights in spite of a high rate of white-on-black violence in the Southern states. Hayes was urged to seek the support of Southern Whigs, which he did in part to move the Republican Party away from

---

[40] *U.S. v. Reese* et al., 92 U.S. 214 (1876).
[41] *The Civil Rights Cases*, 109 U.S. 3 (1883).
[42] *Ex parte Yarbrough*, 110 U.S. 651 (1884).
[43] *Plessy v. Ferguson*, 163 U.S. 537 (1896).
[44] *Plessy*, dissent by Justice John Marshall Harlan.
[45] *Williams v. Mississippi*, 170 U.S. 213 (1898).
[46] Frymer, *Uneasy Alliances*, 63.

25

its affiliation with blacks. Enfranchised blacks remained Republican and disenfranchised blacks could be recruited to the party easily if solicited. Hayes did seek federal funding to enforce the right to vote for blacks but did not push the issue when support was denied. Paul Frymer argues that if Hayes had been able to secure funding, Republicans may well have been able to muster a Southern presence and Republican majorities in Congress in 1878. Hayes opted not to court black voters and instead focused on gaining the support of "disgruntled Southern white Democrats."[47]

As indicated above, *Plessy v. Ferguson* heralded the beginning of the Jim Crow Voting Order (JVO). The JVO persisted for over seven decades, from 1880 to 1965. The vast majority of blacks were barred from voting, and civil rights movements were largely unsuccessful. Denial of the right to vote took on a heightened importance in local social structures and in the relationship between states and the federal government. States desired, in particular, to exercise the right to set voter qualifications and to discriminate at the polls. The national government acquiesced to state control of the franchise and its limitations on black voters. Jim Crow regulations also applied in Washington D.C., the seat of the federal government.

The failure of the federal government to interfere with state voting regulations was in large part due to the inability of civil rights activists to pass legislation in Congress. Southern Democrats maintained significant power in Congress during the Jim Crow period. Once they returned to Congress after Reconstruction, Southern Democrats continued their domination of the South, held seats that were uncontested in state elections, and gained seniority. Seniority allowed Southern Democrats to attain control of committees important to preventing federal intervention in the JVO. Southern Democrats

---

[47] Ibid., 65.

blocked the passage of federal legislation that would provide benefits and protections to blacks. Democrats systematically denied passage of civil rights bills including anti-lynching provisions, integration efforts, and grants of public benefits. The legislative bottleneck made civil rights gains impossible. Because of this state of affairs, the NAACP was motivated to shift their focus away from its legislative program to one that focused on the courts.

Presidents after Hayes eschewed taking action to establish the franchise for black Americans until Harry Truman's effort in the 1940s. While presidents took some action on civil rights, action, which in some cases contributed to the effort toward the black franchise, no president after 1876 and before the 1940s made legislative efforts to secure the franchise for blacks. Presidents named blacks to federal posts, and sought the counsel of individual blacks like Booker T. Washington, but did little to provide benefits and protections on a grand scale. Those benefits that were established by presidents, like the New Deal, were strategically written to exclude blacks.

Truman prized civil rights and began during his presidency to push for civil rights reform. In 1946 Truman established a President's Committee on Civil Rights. On February 2, 1948 Truman delivered a "[d]aring civil rights speech to a joint session of Congress where he urged a civil rights package that included protection against lynching, better protection of the right to vote, and a permanent Fair Employment Practices Commission."[48] But little civil rights legislation actually resulted from Truman's call to action. The Congress, led by Southern Democrats, successfully opposed Truman's recommendations. Truman did use his executive power to end discrimination in federal

---

[48] Truman, President Harry S. "Special Message to the Congress on Civil Rights, February 2, 1948," *The American Presidency Project*, accessed March 2015, www.presidency.ucsb.edu/ws/?pid=13006.

employment and to end segregation in the U.S. military.[49] Indeed, the U.S. military played perhaps an unintended role in black efforts toward empowerment. Black participation in WWII had helped to fuel the civil rights movement, since black American veterans, having generally distinguished themselves in war as well as having encountered European societies less overtly hostile to blacks than in America, resented the poor treatment they encountered on their return to the United States. Blacks began to demonstrate against and to resist Jim Crow laws more actively.

The civil rights movement picked up steam in the 1950s. Martin Luther King, Jr. led the Montgomery Bus Boycotts in 1956. The civil unrest that resulted from civil rights action repeatedly became issues that demanded presidents' attention. Civil rights unrest prompted several executives to take action that further fueled the civil rights effort, and secured the civil rights movement's place on the national and international stage. President Eisenhower sent federal troops to Little Rock, Arkansas, in 1957 to assist black students enrolling at Little Rock High School. Subsequently, the president felt compelled to address the issue of black voting rights. He signed the Civil Rights Act of 1957 to provide voting rights protections, the first civil rights bill since Reconstruction.

The Civil Rights Act of 1957 established both a Civil Rights Commission to investigate voting irregularities and a Civil Rights Division in the Justice Department. The bill empowered the Attorney General and individuals to initiate litigation to provide relief for voting violations and trial by jury for registration obstruction. The power of the legislation was weak, limited by the influence of Southern Democrats in Congress. Ultimately, Eisenhower's actions produced little change in voting in the Jim Crow Voting Order.

---

[49] Executive Order no. 9981, *Desegregation of the Armed Forces*, (1948).

Eisenhower tried again in 1960. Seeking to fill holes in the Civil Rights Act of 1957, the president proposed a bill that assigned stronger penalties for registration and voter obstruction as well as establishing a civil rights commission. Again, the legislation did nothing to impact the status quo. Southern state governments continued to exclude black voters from registration and maintained segregation of schools and public facilities. Eisenhower urged Congress that "every individual regardless of his race, religion, or national origin is entitled to equal protection of the laws."[50] Cumulatively the civil rights acts passed under Eisenhower did improve black voter registration by 3%,[51] though neither bill made a significant impact on voter registration or ballot casting by southern blacks. Nevertheless, the legislative effort was important precisely because it established the White House as a civil rights advocate, helped to develop bipartisan support for black voting rights, and strengthened the platform for civil rights legislation to follow.

President Kennedy was also not motivated to take federal action until forced by incidents of civil rights unrest that he felt he could no longer ignore. Kennedy refused to send federal help to civil rights activists in a number of instances, but he was inclined to respond after a couple of high-impact events occurred. In September 1962, the president sent US Marshals to accompany James Meredith to register at the University of Mississippi by Supreme Court order. In April 1963, Martin Luther King Jr. was jailed while demonstrating in Birmingham, Alabama. In May 1963, Bull Connor ordered Birmingham police to use dogs and water hoses against demonstrators. These events brought national attention to segregation in the South. On the same day that Bull Connor refused to admit black students to the University of Alabama, June 11, 1963, the

---

[50] Miller, James A. "An Inside Look at Eisenhower's Civil Rights Record," *The Boston Globe*, Nov. 21, 2007.
[51] Ibid.

president sent the National Guard to Tuscaloosa and proposed a major civil rights bill to Congress.[52] The bill included voting protections for blacks. Kennedy's assassination in November 1963 made passage of the legislation during his term impossible.

President Johnson used the national grief from Kennedy's assassination to fuel momentum toward furthering the legislative effort for a comprehensive civil rights bill in 1964. Johnson was able to garner bipartisan support and push the bill through Congress. The 1964 act "outlawed discrimination based on race, color, religion, sex, or national origin."[53] Title I of the Act forbade discrimination in registration and voting, and outlawed literacy tests. The Act established a Commission on Equal Employment Opportunity to enforce equity in federal employment.[54] However, the Act did not provide a remedial alternative to that provided by the Civil Rights Acts of 1957 and 1960. Litigation remained the sole method to seek remedial action in voter discrimination cases under the Civil Rights Act of 1964. Accurately described as "the most sweeping civil rights bill passed in a century," the Civil Rights Act of 1964 ironically did not include provisions to prevent states from imposing discrimination at the polls and it did not significantly improve black voter registration or participation.

The civil rights community continued to push forward on the right to vote. Civil rights leaders pressured President Johnson for a comprehensive voting rights bill. Johnson refused. He deemed the request for a voting rights act, so close on the heels of the sweeping Civil Rights Act, unrealistic and unreasonable and asked the black community to be patient. Nonetheless, the president proposed a bill after the violence

---

[52] Smith, Kathy B. *The White House Speaks*, (Westport, CT: Greenwood Publishing Group, 1994),148.
[53] Civil Rights Act of 1964.
[54] "John Kennedy and Civil Rights," *History Learning Site*, accessed March 2015, http://www.historylearningsite.co.uk/john_kennedy_and_civil_rights.html.

30

undertaken by state actors against civil rights demonstrators on a march from Montgomery to Selma, Alabama in 1964. Following an international response to the event, whose horrors were televised around the world, the president gave a speech in support of a voting rights bill to Congress and submitted a proposal.

After the turn of the twentieth century, the Supreme Court had become a more reliable source of civil rights protection than the legislative or executive branches. The process was gradual and not absolute, but many of the Court's voting rights decisions did benefit petitioners seeking inclusion. The Court also encountered a subject matter shift during the Franklin Delano Roosevelt administration. The opinion of the Court gradually changed from non-interventionist and pro-states' rights to one more concerned with the enforcement of the Bill of Rights and the preservation of human and civil rights. In voting rights cases, the Court increasingly made federal intervention more the rule than the exception.[55]

However, the Supreme Court's voting rights decisions did not have an immediate democratizing impact on the franchise. Most of the Court's decisions did not prevent voter discrimination. States and political parties would just pick an alternative method to discriminate against voters. In *Guinn v. United States* (1915), the Court ruled that the grandfather clauses in the Maryland and Oklahoma constitutions violated the Fifteenth Amendment.[56] The decision voided provisions in the constitutions of Alabama, Georgia, Louisiana, North Carolina, and Virginia. In response, the Oklahoma state legislature replaced the grandfather clause with a new statute that allowed discrimination. The

---

[55] Wicker, Tom. "Johnson Urged Congress at Joint Session to Pass Law Insuring Negro Vote," *New York Times*, March 15, 1965.
[56] *Guinn v. United States*, 238 U.S. 347, 358 (1915).

second statute was subsequently struck down, but not until 1939, in *Lane v. Wilson*.[57]

In 1927, the Court ruled in favor of the plaintiff, Dr. L.A. Nixon, when he challenged a Texas state law that prevented him from voting in a Texas primary under the 14th and 15th Amendments.[58] In response to the decision, the Texas legislature adapted a new rule to an existing one that allowed political parties to "in [their] own way determine who shall be qualified to vote."[59] Nixon was once again denied the right to vote under the new rule based on his race, and he sued again. The Court struck down this new rule 5-4 to say that the Democratic executive committee was acting under a grant of state power. State officials, were not allowed to delegate official functions in such a way as to discriminate invidiously between white citizens and black.[60] The Court did not deal with Nixon's claims under the 15th Amendment.

Because the Democratic Party dominated the political systems of all the Southern states after Reconstruction, its state and local primary elections usually determined which candidate would ultimately win office in the general election. Thus, any voters excluded from the Democratic primary were effectively excluded from exercising any meaningful electoral choice. The Court did not provide protection for private action, however. After the *Nixon v. Condon* decision, the Texas Democratic Party adopted a rule banning blacks from primary elections. A Texas resident, R.R. Grovey, sued under the 14th and 15th Amendments. The Court held unanimously that the party rule was constitutional, the

---

[57] *Lane v. Wilson*, 307 U.S. 268 (1939).
[58] *Nixon v. Herndon*, 273 U.S. 536 (1927).
[59] *Nixon v. Condon*, 286 U.S. 73, 82 (1932).
[60] Ibid., at 73.

party was a private organization, which unlike the state, could discriminate against black voters.[61]

The Court eventually changed its position in *Grovey*, eleven years later in *Smith v. Allwright* (1944), another Texas primary case. In *Smith*, the Court overturned the Texas state law that allowed the Democratic Party to set internal rules. The Court held that by delegating its authority to the state party, the state allowed discrimination. Justice Reed explained, that a state cannot "permit a private organization to practice racial discrimination [in elections]."[62] By 1944, the Court had shifted from issuing decisions that established a legal foundation for Jim Crow to regularly issuing decisions that upheld racial equality under the 14th and 15th Amendments, both in public and in private organizations exercising state functions.

In 1954, the Court unanimously ruled that segregation in public education violated the 14th Amendment.[63] The *Brown v. Board of Education* decision did little to motivate integration, but it did establish a moral imperative that contributed to changing attitudes about segregation. The decision also reflected the strong degree to which the Court had become committed to individual rights. The Court applied the 15th Amendment similarly. In 1960 in *Gomillion v. Lightfoot*, the Court held that an Alabama electoral district, drawn with the purpose to disenfranchise black voters, violated the 15th Amendment. The Alabama legislature drew a twenty-eight-sided district, excluding all but a few potential black votes. According to the Court, Alabama's representatives were

---

[61] *Grovey v. Townsend*, 295 U.S. 45 (1935).
[62] *Smith v. Allwright*, 321 U.S. 649, 664 (1944).
[63] *Brown v. Board of Education* (1954).

unable to identify "any countervailing municipal function," which the redistricting was designed to serve and concluded that the sole reason for the district lines was race.[64]

The Court also became more interested in equality in the electorate in general. In *Baker v. Carr* (1962), the Court ruled that redistricting was not a political question and that the Court could evaluate it. As such, the Court ruled on the Tennessee redistricting law that arguably ignored significant growth and population shifts in the district. Two years later, in *Reynolds v. Sims* (1964), an Alabama lawsuit based on the principle of "one person, one vote," the Court held that state legislature districts need to be roughly equal in population. The decision affected many state legislatures that up to that point had not redistricted to take account of population growth disparities in districts.[65] These cases are an aside to the race voting cases, but they do reflect the development of the Court's jurisprudence that increasingly put value on equal access to the franchise. In short, the Court was prepared by the time the VRA was passed to support its unique method of federal intervention and purpose to expand and democratize the electorate. The Court initially supported the Act, much to the benefit of the VRA Order.

All three of the Pre-Modern voting orders described above were characterized by both the exclusion of the black voter from the franchise and by minimal interference by the federal government. Blacks were granted the right to vote after the Civil War, but the period during which blacks exercised the franchise was characterized by strong resistance from Southern Democrats, who restricted Southern blacks from voting after Reconstruction, and for a long period after power was effectively returned to the Southern gentry. The Southern effort was assisted greatly by these Southern Democrats

---

[64] *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).
[65] *Reynolds v. Sims*, 377 U.S. 533 (1964).

who wielded significant power in Congress and wielded the power to block all civil rights measures that would provide federal intervention. The development of the civil rights movement and the agreement of the executive branch to encourage legislative changes to eliminate voter discrimination eventually culminated in the Voting Rights Act.

**Chapter 3**
**Congress: The Conservative "Long Game" and the VRA**

Congress passed the VRA in 1965 and has reauthorized it, including its controversial temporary provisions, four times. Each of the final roll call votes approving the legislation in the House and the Senate garnered strong majorities.[66] However, roll call votes on the VRA or its renewal mask significant and consistent dissent in Congress. Each time the VRA has been considered, dissent has been expressed in one or more ways including: (1) argumentation against the Act; (2) the exercise of delay tactics to prevent consideration of a reauthorization bill; (3) the use of delay tactics to slow or stop deliberation over reauthorization; (4) the maintenance of a space for dissent against the Act, even during the height of the liberal consensus.

These elements have been present at each reauthorization of the VRA. The dissent, both tactical and argumentative, over the life of the Act establishes that the VRA has always commanded less than the full support of Congress. Strong legislative dissent, even though it has failed to prevent reauthorization, has been steady and contributed to the development of increasingly effective opposition to VRA enforcement. This matters because to remain operational and effective at protecting minority voters, the VRA needs the willing support of all three branches of national government. The consistent conservative dissent against the VRA has established Congress as a space in which dissent against the Act can be expressed and developed, and this dissent has had a negative impact on the VRA.

---

[66] Final roll call votes approving the reauthorization of the VRA have included large majorities in favor of reauthorization in the House and the Senate at each of the four reauthorizations. The roll call votes indicate strong, bipartisan support by Congress for the VRA.

36

*The 1970 Reauthorization: Get the Monkey Off Our Backs.* The Voting Rights Act experienced well-publicized success in its first five years. Registration of "nearly one million voters was recorded,"[67] accompanied by a strong increase in the number of blacks elected to office.[68] Because the VRA appeared to work, conservatives in Congress anticipated the possibility of securing the repeal of Section 5 as early as 1970, when the temporary provisions first came up for reauthorization. Harry Dent (SC), the then Republican Party Chairman and a key Congressional proponent of Nixon's Southern Strategy, remarked at a meeting of the Southern GOP state chairmen that "the Voting Rights Act looks like it's coming along pretty good so that the monkey will be off the backs of the South."[69] Dent's comment revealed that conservatives in 1970 were anxious to escape VRA coverage even though the legislation had not been fully enforced and had not achieved all of its aims.

Ironically, the apparent success of and publicity surrounding the Act masked much evidence of its actual failure. Proponents of reauthorization cited the unpublicized record of unsuccessful aspects of the VRA program as support for the argument that the temporary provisions of the VRA ought to be renewed. In 1970, neither black voter registration nor turnout had reached parity with the corresponding situations for white voters. Civil Rights Commission member Frankie Freeman explained, "[A]lthough black

---

[67] Laney, Garrine P. *The Voting Rights Act of 1965, as Amended: Its History and Current Issues* (Nova Science Publishers, Inc., New York, 2008), 19.
[68] Hannah, John A., et al., *U.S. Commission on Civil Rights, Political Participation* (Washington D.C.: U.S. Government Printing Office, 1968).
[69] Panetta, Leon E. and Peter Gall. *Bring Us Together: The Nixon Team and the Civil Rights Retreat* (Lippincott, first edition, 1971), 106.

voter registration is much higher now than it was before the passage of the Voting Rights Act, it still lags well behind white registration in all of the States covered by the act."[70]

Reauthorization proponents produced a bevy of witnesses in Congress to highlight what positive developments there were, to help make the case for reauthorization of the temporary provisions of the VRA. Also, proponents asserted that reauthorization was necessary because the work the Act was intended to do was not complete, and in fact it was hindered by various ongoing state actions.

During the 1970 reauthorization hearings, the Nixon administration led the conservative backlash against reauthorization of the temporary provisions in the House of Representatives. Attorney General John Mitchell pitched an alternative to the simple five-year renewal bill sponsored by Emmanuel Cellar (NY-D), and pushed the alternative bill from the House Judiciary Committee to the floor. The Mitchell bill appealed to conservatives. It called for a limited three-year extension of the Act, removal of the Section 5 preclearance provision, and an end to the use of the 1964 presidential election as the Section 5 trigger for coverage.[71] Republicans in general and Southerners in particular supported the Mitchell bill and worked to secure it as the House bill. Conservatives used delay tactics to help protect the bill. William Colmer (MS-D), a conservative and Chairman of the House Rules Committee, dubbed the Cellar Bill the "civil wrongs bill" and held it up for four months in the Rules Committee, releasing it

---

[70] U.S. Senate. Subcommittee on "Constitutional Rights of the Committee on the Judiciary." 1969 – 1970, Mrs. Frankie Freeman; Bills to Amend the VRA of 1965. 91st Cong., 1st and 2d Sess.,30. Freeman explains in her testimony before the Senate Subcommittee on Constitutional Rights in 1969 that "…there are many individual counties where black registration is especially low." In Alabama, less than half of black voters were registered in twenty-seven of sixty-seven counties; in twenty-four Mississippi counties, black registration was less than half; and fewer than 50% of black voters were registered in most South Carolina counties.

[71] May, Gary. *Bending Toward Justice: The Voting Rights Act and the Transformation of American Democracy* (City, ST: Duke University Press, 2014), 204.

only under the condition that it would be amended to "reflect the proposals embodied in the Mitchell bill."[72] House representatives voted 208-203 to substitute the Mitchell proposal for the Cellar bill and subsequently voted in favor of the Mitchell bill in a final roll call vote.[73] The winning votes came from Southern Democrats—representatives from all of the covered states voted in favor— in conjunction with a number of Northern and Midwestern Republican representatives. "It was the worst defeat for the VRA in legislative history."[74] This is the only time after the establishment of the VRA Order in 1965 that conservatives were successful at passing a version of the VRA that disabled Section 5 in a chamber of Congress.

During the House deliberations, conservatives argued specifically that the VRA had served its purpose, achieved success, and was no longer necessary.  To reauthorize the temporary provisions, they averred, was tantamount to punishing the covered states for achieving "success."[75] Conservative advocates cited statistics to show that registration and participation in some of the covered states exceeded 50%. Reviving lamentations expressed in 1965, opponents of the Act complained that Section 5 of the VRA treated covered states unequally and provided limited and inconvenient forums for federal review of new state voting provisions (the Department of Justice or the District Court of the District of Columbia). Conservatives complained especially about the intervening Supreme Court decisions affirming Section 5, arguing that they were unlawful.[76]

---

[72] May, *Bending Toward Justice*, 205.
[73] Ibid., 179-234.
[74] Ibid., 205.
[75] *To Extend the Voting Rights Act of 1965 with Respect to Discriminatory Use of Tests ad Devices*: *Hearing before Committee on the Judiciary Committee, Subcommittee No. 5*, 91st Cong., 1st sess. May 14, 15; June 19, 26; July 1, 1969 Serial No. 3, 20. (Testimony by Senator Strom Thurman, Committee on the Judiciary Committee).
[76] *South Carolina v. Katzenbach*, 383 US 301 (1966); *Allen v. State Board of Elections*, 393 U.S. 544 (1969), and *Gaston v. U.S.*, 395 U.S. 285 (1969).

Opponents asserted that the temporary provisions were in fact unconstitutional, and that they imposed an "onerous burden" on covered states by the Court. These assertions were made despite contemporaneous Supreme Court rulings affirming the constitutionality of the VRA and of Section 5.

The successful conservative backlash in the House was beaten back in the Senate. Proponents of the VRA in the Senate were able to curb the influence of conservative arguments and the use of delay tactics against the legislation. Philip Hart (MI-D) and Hugh Scott (PA-R) successfully prevented Senate Judiciary chair Sam Ervin's (NC-D) attempt to draw out the hearings past the August expiration date by proposing and securing a March 1 deadline for VRA consideration in the Senate Judiciary Committee.[77] Hart and Scott then proceeded to propose an alternative to the Mitchell bill that they correctly thought could win approval as its substitute. The Hart-Scott bill proposed a five-year extension, imposed a national ban on literacy tests, removed the possibility of nationwide application by retaining Section 5, and included both 1964 and 1968 as trigger years for Section 5 coverage. By keeping the 1964 trigger year, the bill ensured that the original states covered under the Act would still be covered. And by adding 1968 as a trigger year, the bill added additional jurisdictions, some outside the South, to the list of covered territories, which meant that Section 5 coverage, and the associated stigma alleged to accompany it, were no longer limited just to Southern states.

The Senate, without filibuster, adopted the Hart-Scott bill as a substitute for the Mitchell bill. Six Southern senators voted with the majority. Most Southern senators were anxious to appeal to their white electoral base, but they were also aware that they now

---

[77] May, *Bending Toward Justice,* 206.

had to "at least consider the black vote."[78] Senator Earnest Hollings (NC-D) told an aide,

"I'm not going back to my state and explain a filibuster against black voters."[79] The

Senate approved the Hart-Scott bill 64-12.[80]

Representatives in the House who were tentative about the Mitchell bill also

supported the Hart-Scott bill. The measure provided a good alternative to the straight

reauthorization codified in the Cellar bill and meant that Section 5 no longer applied only

to Southern jurisdictions. Representatives who opposed the Mitchell bill also found a

suitable alternative in the Hart-Scott provisions.[81] The House approved the Hart-Scott bill

272-132 forgoing the repeal of Section 5.

The 1970 reauthorization extended the temporary provisions of the VRA for five

years. It prohibited the use of literacy tests nationwide and updated the Section 5 trigger

to the 1964 and 1968 presidential elections. Additionally, the new law shortened the

residency requirements for voting in presidential elections and lowered the voting age to

eighteen.[82]

Conservative contestation of the VRA almost resulted in the loss of Section 5 in

1970. Conservatives entered the reauthorization process in pursuit of a venue to complain

about the provision and later used that space to make arguments against the VRA

generally and to urge limiting the purview of the Act. Finally, opponents used delay

tactics to achieve substantive control over the legislation. These efforts were successful in

the House and influential in the Senate, and reveal strong opposition to the VRA as

---

[78] Ibid., 208.
[79] Ibid., 207.
[80] J. Morgan Kousser, "The Strange Iconic Career of Section 5 of the Voting Rights Act, 1965-2007," *Texas Law Review* 86, (March 2008), 687.
[81] May, *Bending Toward Justice,* 208.
[82] Ibid., p. 208.

41

originally approved by a substantial part of Congress. Put another way, the law retained less than the full support of Congress only five years after its initial passage.

*1975 Reauthorization: Subdued but Substantive Dissent.* The VRA continued to be publicized as successful in 1975; meanwhile, enforcement continued to increase black voter registration. To ensure the institutionalization of the VRA voting order, supporters of the Act proposed extending the VRA's renewable temporary provisions for an additional ten years. Advocates also lobbied to pass amendments that would expand the Act to include protection for bilingual minorities and require some states to provide bilingual voting resources in areas where the number of non-English-speaking citizens was significant. But conservative opposition to the VRA remained active in Congress. Opponents broadened their offensive to include opposition to Section 5 enforcement— begun in 1970—and to the inclusion of bilingual minorities. [83]

By 1975, Supreme Court jurisprudence on the VRA had shifted rightward. Instead of construing Section 5 as a wide net covering "all kinds of voting law changes,"[84] the Burger Court began to establish limits on the purview of preclearance. (See Chapter 5). The executive branch exhibited ostensible support for the legislation but in fact was interested in ending Section 5 coverage. The Ford administration refrained from proposing a bill in Congress designed to neutralize Section 5 and instead expressed support for reauthorization. Attorney General Stanley Pottinger testified in support of

---

[83] By 1975, Section 5 enforcement had been operational for five years. In 1970, the DOJ published Section 5 guidelines and began earnest enforcement of the preclearance requirement.
[84] *Allen v. State Board of Elections*, 393 U.S. 544 (1969).

reauthorization, stating that despite the impressive improvement in voting rights for blacks, "more need[s to] be done."[85] (See Chapter 4.)

Conservative dissent in Congress against the VRA, though more subdued than in 1965 or 1970, remained active. Conservatives took notice of the development of a black electorate and the emergence of a pro-voting-rights consensus in Congress. Representatives opposed to the VRA's temporary provisions worked to counter the efforts of proponents but attempted, at the same time, to appear to be fair, so that they might appeal to both white and black voters.[86] For instance, in the case of South Carolina, voters were split on reauthorization of the temporary provisions, and so the South Carolina Attorney General brought the local president of the NAACP to the House hearings with him so that South Carolina's testimony would reflect the split opinion of South Carolina constituents.[87]

The moderated tone of conservative dissent did not mean that opposition to the VRA had receded. Indeed, conservatives continued working to delay the proceedings and making arguments against the legislation, just as they had previously done. Conservatives complained about the trigger years (1964, 1968) for Section 5 coverage, as well as the limited judicial venues (only in Washington D.C.) available for mandatory preclearance review. Moreover, conservatives added new arguments to include objections to the expansion of the Act to cover and protect bilingual minorities under Sections 2 and 5 and the requirement that certain states provide bilingual ballots. The opposition pushed to

---

[85] U.S. Congress, Senate, Subcommittee on Constitutional Rights of the Committee on the Judiciary United States, Civil Rights Division, 579 Senate 94th Congress, *Hearings on S. 407, S.903, S. 1297, 1409 and 1443*, 1975. (Testimony of J. Stanley Pottinger, Assistant Attorney General).
[86] May, Gary. *Bending Toward Justice*, 209.
[87] U.S. Congress, Senate, House Subcommittee on Constitutional Rights of the Subcommittee on Constitutional Rights, 94th Congress 1st Session, *Hearings on S.407 S.903 S1297 S1409 and S1443*, 1975, 45. (Testimony of Clarence Mitchell).

limit the number of years of reauthorization to five instead of the ten proposed by VRA proponents. Conservatives again asserted statistics to show that all of the covered states had, by 1975, achieved better than 50% black voter registration and turnout. Dissenters presented witnesses who testified that none of the covered states had used literacy tests since 1965, and opponents made arguments in favor of relaxing the bailout provision to make it easier for states to escape coverage.

Just as they had done in 1970, VRA proponents were able to show persuasively in 1975 that despite significant gains, covered states had not yet achieved the level of improvement sought by the legislation.[88] The number of black elected officials remained low and registration had not yet reached parity. After only five years of active Section 5 enforcement, proponents successfully asserted that repeal or limitation of Section 5 coverage could easily result in recidivism.[89] Moreover, there was still much evidence that covered states avoided complying with Section 5 by failing to seek preclearance for voting law changes. Mississippi, for example, refused to repeal its literacy test and continued to require it for voter registration.[90] Furthermore, the Mississippi Attorney General refused to submit laws for Section 5 preclearance unless ordered by the state legislature or court order.[91] Proponents urged Congress to expand coverage over some states where discrimination against bilingual voters was evident, and other states were tasked with providing bilingual ballots for voters for whom English was a second language.[92]

---

[88] Ibid., Honorable Birch Bayh (S-IN),3-4.
[89] Ibid., Hon. Hugh Scott (S-PA),1, 9.
[90] Ibid., Frank Parker,131.
[91] Ibid., Frank Parker,135.
[92] Jordan, Barbara and Shelby Hearon. *A Self Portrait by Barbara Jordan*, (Garden City, NY: Doubleday & Company, 1979), 209.

44

Conservatives worked to resist and delay the reauthorization proceedings in a reprise of tactics employed in 1970. The chair of the Senate Judiciary Committee, James Eastland (D-MS), refused to hold hearings. Senate Majority Leader Mike Mansfield (D-MO) foiled this effort by invoking a parliamentary procedure that forced the chamber to take up the bill unchanged from the House version. Eventually, VRA reauthorization proponents were able to invoke cloture, and by July, a Senate vote seemed probable. Reauthorization was thrown into doubt and delayed again, however, when President Gerald Ford renounced earlier statements urging the reauthorization of the VRA and announced support for a nationwide VRA.[93] The President later reversed this position, and deliberations got back on track. (See Chapter 4). Nevertheless, the executive branch interference resulted in a conservative victory—a decrease in the length of the reauthorization. Instead of the ten-year extension pro-VRA advocates would have secured, the Act was renewed for only seven years.

Again in 1975, both chambers reauthorized the VRA, masking conservative opposition. The Senate voted seventy-seven to twelve in favor. In the House, three hundred forty-six voted in favor to fifty-six opposed.[94] The 1975 bill extended the Act for seven years, added coverage for bilingual minorities, and mandated states covered by the provision to provide bilingual ballots.

*1982 Reauthorization: Outgunned.* By 1982, the pro-voting rights consensus was on the wane. In the 1980s, the nation shifted rightward on civil rights. The tone and intensity of civil rights opposition increased sharply. The Reagan administration openly

---

[93] May, *Bending Toward Justice,* 212. In July, Ford sent a letter to Congressional leaders urging reauthorization, in August, as part of an effort to attract Southern voters, Ford argued for an amendment to the VRA that would remove the stigma from Southern states and apply Section 5 nationwide.
[94] Ibid., 212.

45

opposed affirmative action legislation and pushed an agenda designed to dismantle civil rights protections gained in the 1960s, including the VRA. The Supreme Court continued its movement away from liberal interpretation of the VRA to a more conservative position, limiting the application of Sections 2 and 5 as part of its VRA jurisprudence (See Chapter 5).

In Congress the climate for voting rights had shifted away from tacit consensus and so improved the atmosphere for open debate by the VRA's foes. Many Southern Democrats, in the period between 1965 and 1980, had switched to the Republican Party. Partisanship in Congress also shifted to the right. Far fewer moderate and cross-pressured members, essential to the establishment and maintenance of the VRA Order because of their willingness to compromise on civil rights issues, were in office. As a result of the shift in partisanship, a number of Southern Democratic lawmakers had retired and been replaced by Republicans. In addition, members of Congress on both sides of the aisle had become more ideologically aligned with their respective party centers.[95] The polarization evident in the 2000s began to emerge in the 1980s, though compromise was still commonplace.

Conservatives (now increasingly Republican) made an earnest effort in 1982 to challenge the VRA on traditional grounds and by using newly developed colorblind arguments. Conservatives resumed their use of delay tactics and pressed hard to limit the impact of both Sections 2 and 5 of the VRA during the reauthorization deliberations. Unfortunately for their cause, right-wing Republicans did not have the external support they needed to significantly impede the shape of the VRA legislation. On the other hand,

---

[95] Fleisher, Richard and John R. Bond. "The Shrinking Middle in the US Congress," *British Journal of Political Science* 34 (July 2004): 429-451.

the 1982 argumentation against the VRA got some traction, which prompted conservatives to emphasize said argumentation during later reauthorization hearings.

Despite these changes to the socio-political environment, conservatives had little success opposing the VRA in 1982. Conservatives were outgunned that year by the pro-reauthorization lobby. The pro-VRA lobby was organized under the umbrella of the Leadership Conference ("LC"). Under the LC, one hundred sixty-five civil rights organizations once only loosely affiliated, now joined together to ensure the reauthorization of the VRA. The LC appointed a full time director, opened a central office, prepared in advance suitable proposals for reauthorization, and gathered ample resources for the VRA debate in the House.[96]

The LC was ready and effective. Local affiliates lobbied in affected states and on the Hill, executed mailing campaigns on and off the Hill, and maintained phone banks to allow constituents to inform Congress members of their views.[97] The LC took the lead in writing the primary legislation considered in 1982, H.R. 3112, participated in all negotiating and rewriting, and provided the majority of the witnesses who testified in Congress. In contrast, the conservative bloc had no corresponding external support and lacked a similar well-organized plan of attack.

House conservatives sought support, in particular from the Reagan administration, but it was not forthcoming. Attorney General Edwin Meese agreed several times to testify in the House, but he did not do so. Outside Congress, the administration was silent on voting rights, making no public statements of its view of VRA reauthorization. Conservatives most certainly could have aligned themselves with the executive branch if

---

[96] Boyd, Thomas M. and Stephen J. Markman, "The 1982 Amendments to the Voting Rights Act: A Legislative History," *Washington and Lee Law Review* 40 (Sept. 1982): 1351.
[97] Ibid., 1352.

there had been a clear stance taken by the administration and would have gained leverage as a result. In mid-June, President Reagan intensified the administration's silence when instead of making a position statement, he requested a report from the Attorney General detailing a "comprehensive recommendation [on the VRA not due until] October 1st."[98] The hopes of House conservatives were dashed; there would be no executive support to lend momentum to their effort. The lack of external support, plus the strength of the proponents' presentation in the House, rendered conservatives relatively powerless in the negotiations to reauthorize the VRA.

The 1982 House hearings lasted for eighteen days and included two field days in Montgomery, AL, and Austin, TX. Conservative opponents in 1982 were very interested in preventing the LC's amendment of Section 2 to allow plaintiffs to bring suits under that section based on either evidence of discriminatory intent or discriminatory effect. The amendment was designed to reverse the Supreme Court ruling in the *Mobile v. Bolden* case, which limited Section 2 review to instances where plaintiffs could establish intentional discrimination. Little attention was paid to Section 2 in the House debates. Only one day was spent exclusively on Section 2, as the rest of the time was devoted to Section 5 with commentary on Section 2 sprinkled throughout. Conservatives were able to gain very little leverage against Section 5 and did not attack the proposed amendments to Section 2.

Henry Hyde (R-IL), was the face of the conservative opposition in the House. Over the course of the House hearings, Hyde's opposition to Section 5 softened significantly. In response to testimony presented by the LC, Hyde slowly but surely shifted his position so that it aligned with the views of the pro-VRA lobby. At the start of

---

[98] Boyd, Markman, "The 1982 Amendments," 1364.

48

the House proceedings, Hyde wrote and supported an amendment, H.R. 3198, designed to draw attention away from the VRA proponents' bill, H.R. 3112. The Hyde bill proposed a nationwide plan that would have ended preclearance, and which did not include amendments to Section 2. During the course of the hearings, however, in response to what he learned from the testimony, especially that portion presented during the field hearings, Hyde repeatedly rewrote his legislation, each time changing it to align more closely with the positions of the Leadership Council. Hyde expressed shock when he learned about the high level of intentional discrimination occurring in the Southern states. He thought it unconscionable that polling places were moved to dissuade black voters, that balloting was not conducted in private, and that police were stationed outside polls to take pictures of black voters. By the end of the hearings, Hyde believed that Section 5 coverage was still necessary. Hyde did support a relaxed bailout standard, but now as a device to motivate state actors to cease discrimination against minority voters.[99] Hyde's opposition was not only masked but transformed by the reauthorization process.

　　　　Conservatives had success at delaying the 1982 proceedings in the House, which helped them negotiate an amendment to the bailout provision. By instigating a deadlock over the bailout provision, they were able to force VRA proponents to compromise on the bailout criteria. In a reprise of their 1975 opposition, conservatives argued in favor of independent bailout by jurisdictional subdivisions in covered states. The suggestion to allow independent bailout was a significant change to the original bailout provision. Previously, independent bailout for jurisdictions in states entirely covered by Section 5 was impossible. The amendment provided a process for jurisdictions to bailout if they were able to show the requisite term of racially fair treatment in elections. Anxious to

---

[99] Boyd, Markman, "1982 Amendments," 1357-1362.

49

escape the deadlock and pass the reauthorization bill in the House, proponents agreed to compromise and allow amendment of the bailout provision. Proponents granted conservatives an amendment that allowed bailout for jurisdictions in some instances when the entire state was not eligible for relief from coverage. [100]

The bill arrived in the Senate having gained much momentum and overwhelming support—even from some conservatives—in the House. The Senate sponsors of the bill, Edward Kennedy (D-MA) and Charles Mathias (R-MD), were anxious to maintain the pro-VRA reauthorization momentum. Kennedy and Mathias were aware that the bill could die in the Judiciary Committee, chaired by Strom Thurmond (D-SC). To ensure introduction of the bill to the floor, Mathias invoked the rarely used parliamentary rule XIV, one ordinarily reserved for uncontested legislation, to force the bill onto the Senate calendar. Kennedy and Mathias succeeded at getting the bill scheduled but the conservative opposition was still successful at delaying the deliberations, which were pushed to the start of the second session.[101] At the beginning of December 1982, Kennedy and Mathias had to introduce an identical substitute bill, S. 1992. Sixty-one Senators sponsored the second session bill but some of the strong momentum gained in the House had been lost.

During the second session, conservative opponents were able to mount additional delays[102] and take advantage of administrative support.[103] Breaking his previous silence, President Reagan made a statement during the Senate negotiations expressing support for

---

[100] Herbert, J. Gerald. *An Assessment of the Bailout Provisions of The Voting Rights Act, in Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power,* ed. Ana Henderson (Berkeley, CA: Berkeley Public Policy Press 2007), 261.
[101] Boyd, Markman. "1982 Amendments," 1384.
[102] Ibid., 1388.
[103] Ibid., 1384.

a bailout provision that would allow jurisdictions inside covered states to bailout independently. He also favored an extension of the bilingual bailout provision so that its expiration would be concurrent with the expiration of Sections 4 and 5, and, notably, an intent test under Section 2 instead of the effects test sought by VRA proponents.[104] The Attorney General reiterated these views in his testimony before the Senate.[105]

Due to the belated emergence of external support and strong conservative leadership, conservative opposition had some success in the Senate. Though Senate opposition did not result in amendments desired by the conservatives, they were able to stoke colorblind opposition to the VRA and maintain opposition to the VRA in the halls of the national legislature. Their vigorous resistance was recorded in the *Congressional Record*. Moreover, as previously discussed, conservatives were able to use delay tactics to slow the momentum of the reauthorization proceedings. Orrin Hatch (R-UT) chair of the Senate Subcommittee on the Constitution, led the offensive in the Senate. Hatch did an excellent job of organizing the Senate hearings to promote alarm about the Section 2 amendments and to evoke and repeat controversial criticism that helped to build VRA opposition in Congress. Unlike Representative Hyde, Hatch was not swayed by the proponents' presentation in the Senate.

At the start of the hearings, Hatch vehemently criticized House representatives for failing to sufficiently address the Section 2 amendments and used that failure to focus the Senate hearings on the possible change. Hatch made opposition to the Section 2 amendment the main focus of the Senate inquiry, with intermittent discussion of Section

---

[104] Boyd, Markman, 1982 Amendments," 1387.
[105] U.S. Congress. Senate. "Affirmative Action and Equal Protection." Committee on the Judiciary. Hearings before the Subcommittee . 97th Cong., 1st Sess. (May4, June 11, June 18, July 16, 1981), 69.

5. Hatch and other conservatives stressed the fact that an effects standard under Section 2 might result in the need to establish electoral quotas to promote the election of minority legislators under the VRA. The conservatives insisted that the application of an effects test could potentially result in an imperative of "proportional representation" in districts, where to date minorities had not had the opportunity to elect candidates of their choice.[106]

Proportional representation and quotas were concepts that had already been rendered objectionable to conservatives during the Reagan administration. Hatch made it a point to repeat the arguments against the amendment in his opening statements each day during the hearings, and he used the repetition to inflame opposition against "quotas" and "proportional representation." Hatch also incorporated his arguments into his questioning of witnesses and discussion with other committee members by focusing his inquiries and discussion on the potential for the undesirable outcomes. Hatch rejected the LC assumption that an effects test had traditionally been applied in Section 2 cases and argued that the amended Section 2 standard would introduce a new, unconstitutional, and inherently discriminatory standard of review under the VRA. Hatch's position was representative of conservative dissent in the Senate.

Conservative senators sought nationwide preclearance and a relaxed bailout standard, which would allow jurisdictions in covered states to bail out independently. Senator Thurmond of South Carolina supported the amended bailout provision. Thurmond also argued that nation-wide application of the law would ensure equal protection of the law. Amendments were offered to counter H.R. 3112; a strongly

---

[106] U.S. Congress. Senate. "1982 Voting Rights Act." Subcommittee on the Constitution of the Committee on the Judiciary. 1982 Voting Rights Act. 97th Cong., 2d Sess., HRG-1982-SJS-0071, 3.

52

supported one was submitted by Senator Grassley (R–IA), S.1975. The proposal included a five-year extension, the relaxed bailout provision, and an intent test under Section 2.[107]

Despite the administration's support, the senatorial conservative bloc still lacked the strong external backing enjoyed by proponents of reauthorization in the House. And representatives from covered states expressed less discontent with Section 5 than in previous years, due to familiarity with the Section 5 process, acquiescence to the provision, and concern for minority voter support. Covered states for the most part had learned to "tolerate [Section 5 requirements and constituents in covered states] and so applied virtually no pressure on their elected officials to repeal or weaken it."[108]  HR 3112 passed the House on October 5, 1981, three hundred and eighty-one to twenty-four and was later passed in the Senate, eighty-five to eight. The House subsequently approved the Senate's amended version of the bill in October, 1982.

*2006 Reauthorization: Rebel Warfare.* In 2006, Republican conservatives expressed vehement dissent against the VRA. They argued loudly against extension of the legislation and its temporary provisions, using all available methods. Opponents caused delay during the deliberations and used the *Congressional Record* in an unorthodox manner to register strong opposition to the passage of the reauthorization even after it was approved. Strikingly, these tactics were used by conservatives to oppose the VRA, despite their clear pledge of support for the legislation in advance of the hearings and after a publically announced promise to pass it with minimal debate. Ultimately, the 2006 roll call votes in both houses on the VRA reauthorization were

---

[107] Boyd, Markman, "1982 Amendments," 1388.
[108] Ibid., 1387.

overwhelmingly in favor. Yet the dissent registered during these deliberations was the most intense waged during any reauthorization to date.

By the 109th Congress, the political climate had shifted significantly since the early 1980s. Colorblind conservatism was now a well-developed concept, widely promulgated among Republicans. A trend in the executive branch to end affirmative action measures established during the civil rights era had been strongly supported by several presidential administrations. Congress was now even more conservative and more polarized. Congressional seats lost to retirement or election during that period were now occupied by representatives who were more stridently ideologically aligned with their party bases, removing the earlier flexibility made possible by cross-pressured members of both parties who were willing to compromise.[109] The majority of Southern legislators in the 109th Congress were now staunch Republicans. Republicans controlled both chambers in 2006. The Republican Party had become well established as the center of opposition to civil rights laws passed in the 1960s, including the VRA.

During the 2000s, the Bush administration exercised partisan influence over civil rights enforcement, including the VRA. Publicly, President George W. Bush expressed support for the reauthorization of the VRA and encouraged Republican support of the bill in Congress. Yet in practice, the Bush administration enforced the VRA in a tepid manner. The administration supported what were essentially "reverse discrimination" lawsuits under the VRA and appointed partisan appointees to the Voting Rights Section of the Civil Rights Division, the office that administered Section 5 preclearance applications.[110] The Supreme Court also continued to shift rightward during the 2000s in

---

[109] Fleisher, Bond, "The Shrinking Middle," 429-451.
[110] The Voting Rights Section of the Department of Justice administers Section 5 of the VRA.

its VRA jurisprudence, prompting civil rights advocates to complain that the Court's interpretation of the law was out of alignment with the intention of Sections 2 and 5.

With the 1982 VRA set to expire in 2007, Congress began to consider reauthorization in 2006, a year early. James Sensenbrenner's (R-WI) tenure as chair of the House Judiciary Committee was set to expire. Sensenbrenner wanted the reauthorization to occur on his watch and be part of his legacy.[111] Civil rights proponents were anxious to reauthorize the VRA and its temporary provisions and were concerned about the increasingly hostile atmosphere toward anti-discrimination legislation in the 2000s, manifested by the presidential administrations, the courts, conservative lawmakers, and the general public. Proponents backed the move to consider the legislation early, and Republicans agreed.

At the time the Republican Party was in the midst of a campaign to appeal to black voters. Part of the campaign platform included the reauthorization of the VRA. Of course, Republican Party support for the VRA did not placate conservative opposition to civil rights laws inside the party but it did provide the party a high profile opportunity to woo black voters. On May 2, 2006, in a rare bipartisan event on the steps of the Capitol, Republicans pledged to renew the Act for twenty-five years.[112] The pledge signaled smooth sailing for the reauthorization, since Republicans tended toward extreme party discipline. To avoid contentious debate and to ensure the passage of the bill, both parties agreed to support a straight reauthorization of the VRA in Congress in 2006. It was expected that the VRA reauthorization would proceed quickly and uneventfully.

---

[111] Persily, Nathaniel. "The Promise and Pitfalls of the New Voting Rights Act," *Yale Law Journal* 117 (December 2007): 89.
[112] Hulse, Carl. "By A Vote of 98-0, Senate Approves 25-Year Extension of the Voting Rights Act," *The New York Times*, July 21, 2006.

It did not. A small contingent of mostly Southern dissenters broke from the Republican ranks during a closed GOP meeting just prior to the scheduled House debate. At the meeting, Lynn Westmoreland (R-GA) led the conservative "rebels" and challenged the bipartisan compromise to approve a straight renewal of the VRA. Westmoreland argued that it would discriminate against Southern states, fail to acknowledge improvements made on voting rights since the Act's inception, and be unfair to keep Georgia (for example) under the confines of the law, since the state had significantly improved its voting rights record.[113] The rebels found support among legislators critical of coverage for bilingual minorities under Section 203. Led by Steven King (R-GA), VRA renewal opponents argued for the repeal of Section 203.[114] "What people are really upset about is the bilingual ballots... [t]he American people want this to be an English speaking nation," stated Rep. Charles Whitlow Norwood Jr. (R-GA).[115] The bilingual ballot discussion dovetailed with recent tension over immigration legislation in the House, legislation that Republicans had actively delayed. The meeting became so heated that James Sensenbrenner walked out.[116] The scheduled House debate was delayed indefinitely, but it resumed about a month later. The rebels agreed to resume hearings on the condition that they could propose amendments. Four amendments were introduced, and all four failed.

Despite a strong façade of bipartisanship, consideration of the VRA in the Senate was heated.[117] Hearings were held in the Judiciary Committee and the Subcommittee on

---

[113] Hulse, Carl. "Rebellion Stalls Extension of the VRA" *The New York Times*, June 22, 2006.
[114] Babington, Charles. "GOP Rebellion Stops VRA: Complaints Include Bilingual Ballots and Scope of Justice Department Role in the South," *Washington Post*, June 22, 2006.
[115] Babington, "GOP Rebellion."
[116] Ibid.
[117] Kousser, *The Strange Iconic Career*, 761.

the Constitution. The issues debated in these sessions mirrored those heard in the House. Conservatives complained about Section 5 coverage and repeated the familiar federalism arguments against renewal. Debate over the bilingual provisions was also contentious, fueled by the ongoing immigration debate. At points, it seemed that the reauthorization would be held over until the next session. A potential deadlock was broken by President Bush's July speech to the NAACP. The president expressed support for a straight reauthorization of the VRA for twenty-five years.[118]

The same day as the president's NAACP address, Majority Leader Bill Frist (R-TN) scheduled a Senate vote and refused to allow amendments.[119] Frist substituted the bill on the Senate floor for a bill sanctioned by the Senate Judiciary Committee, which mirrored House Bill 9 exactly, in order to avoid the need for conference committee. The Frist bill was approved by the Senate ninety-eight to zero, on July 21, 2006. The Fannie Lou Hamer, Rosa Parks, Coretta Scott King, César Chávez Voting Rights Act Reauthorization and Amendments Act of 2006 was signed into law the same month.[120]

The 2006 reauthorization extended the life of the VRA temporary provisions for twenty-five years. The content of the bill was very similar to previous bills. The Section 4 coverage formula and Section 5 coverage requirements remained the same, meaning that the same jurisdictions remained covered with no new states or jurisdictions made subject to DOJ oversight.[121] The bill *did* overturn two Supreme Court decisions considered to impose limitations on the VRA.[122]

---

[118] "Bush Addresses NAACP Convention," *CQ Transcripts Wire, Wilson Quarterly*, July 20, 2006.
[119] Hulse, Carl. "House Delays Renewal of Voting Rights Act," *New York Times*, June 21, 2006.
[120] "Bush Signs VRA Extension Amid Midterm Election Season," *Associated Press, USA Today*, July 7, 2006.
[121] Persily, "Promise and Pitfalls," 207-08.
[122] *Reno v. Bossier II*, 528 U.S. 320 (2000) and *Georgia v. Ashcroft*, 539 U.S. 461 (2003). The 2006 law made clear that discriminatory purpose is grounds for preclearance even if the purpose was not designed to

The civil rights lobby was aware of the need to protect Section 5 from a potential court challenge and so focused on building an appropriate record of support that would withstand a constitutional review. VRA proponents did not believe the temporary provisions could survive an attempt to revise the Section 4 formula, and so they focused on creating a record that could support Sections 4 and 5 as written. Proponents were aware that the standard for congressional support had changed. To be constitutional, proponents had to show that the legislation remained "congruent and proportional" to the harm it sought to restrain.[123] To achieve its goal, the Leadership Council provided witnesses to the House Judiciary Committee and the Subcommittee on the Constitution. A foundation-backed Commission on the VRA held hearings around the country. The ACLU compiled an 867-page dossier on Sections 2 and 5. These and additional reports and articles related to renewal were added to the 2006 record.[124] States covered in 1965, 1970, and 1975 remained covered under the 2006 agreement. No new states were added under Section 4 subject to Section 5 coverage despite evidence of voter discrimination in states not covered by Section 5.

In an unprecedented move, Senate Republicans replaced the Senate Report, "A Statement of Joint Views," with a partisan statement and published it after the hearings were complete. Customarily, reports are "published well before a bill is to be discussed on the floor, so that members can fully understand a bill's provisions... and [they are usually] the result of bipartisan participation."[125] In their report, Republicans rejected the

---

make minorities worse off than they were prior (*Bossier II*) and preclearance is required when laws have the effect of reducing the power of minority voters to "elect their preferred candidates of choice." The Congress also reversed *Ashcroft* by restoring the pre-Ashcroft standard for determining whether redistricting plans needed to be submitted for preclearance.
[123] *City of Boerne v. Flores*, 521 U.S. 507 (1997).
[124] Kousser, "The Strange Iconic Career," 754-6
[125] Ibid., 761.

supportive views published in the original report and did not seek Democratic review or contribution before submission.[126] The *ex post facto* report expressed skepticism about the renewal process, calling it "rushed" and criticized the retrogression standard supported by proponents of the reauthorization legislation. Democrats, concerned about the report, stated that it "undermined the case supporting the constitutionality of the law," and concluded that the report was designed as an invitation to challenge in the Supreme Court.[127]

Conservatives were arguably heartened by the idea that a straight reauthorization of the temporary provisions would leave the Section 4 formula and Section 5 intact. By leaving the formula and coverage provisions unchanged, there was a greater likelihood that the section would be challenged and a lesser chance of its surviving Supreme Court review. The Roberts Court was extremely amenable to hearing cases demanding the consideration of civil rights law because part of the Chief Justice's agenda was to limit affirmative action provisions. The Court's conservative wing believed that the contemporary cultural framework demanded amendment or repeal of the VRA and other civil rights protections, thereby allowing state sovereignty to operate freely and therefore limit federal involvement in state police powers.

In fact, six days after the reauthorization was signed into law North West Austin Municipal Utility District (MUD) filed a challenge to the constitutionality of Section 5, in federal court.[128] Ostensibly a request to determine whether a Texas water utility district should be subject to Section 5, the real issue in the case concerned whether or not Section

---

[126] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006.
[127] Persily, "Promise and Pitfalls," 89.
[128] Kousser, "The Strange Iconic Career," 763.

59

5 was constitutional, i.e., whether or not the evidence presented in Congress satisfied the *Boerne* "congruence and proportionality" standard in the 2006 reauthorization hearings. In the MUD decision, the Court implied that Section 5 of the VRA was probably not constitutional without amendment and strongly suggested that Congress adjust the coverage formula to avoid a fatal Supreme Court ruling on the issue in the future.[129]

*Conclusion: The Long Game and External Support.* The available evidence shows clearly that conservatives in Congress worked diligently and repeatedly to erode and impede the reauthorizations of the VRA between 1970 and 2006 but with little success. The end of the 2006 hearings resulted in the reauthorization of the VRA without amendment of Sections 4 or 5. The "new" legislation was challenged and reviewed by a Supreme Court with a new conservative majority. The Court was able to use the fact that the legislation was unrevised to argue that the law needed to be revised and later it was able to strike an important section of the law. (See Chapter 5). This is in part due to the fact that polarization in Congress prevented the revision of Section 5 in 2006. Thus, the success at the Supreme Court was in some degree due to the failure of conservative opponents of the VRA to make progress undermining the Act on the floors of Congress. Congressional conservatives will likely prevent any future revision of Sections 4 and 5 because polarization in Congress has eroded the basis for compromise. At this point, even minor alterations that might revive Section 4 in the eyes of the Supreme Court and make Section 5 operational again, will be very difficult to secure.

---

[129] *North Austin Municipal District No. 1 v. Holder*, 129 S.Ct. 2504 (2009).

**Chapter 4:**
**Presidents and the Voting Rights Act, 1970-2013**

Presidents between 1965 and 2013 have shifted to the right on the enforcement of the Voting Rights Act. Lyndon Johnson brought the law into being, yet even his enforcement effort was limited and reserved. Johnson was concerned about the electoral impact of legislation like the VRA. He is said to have declared that his support of civil rights legislation would cost the Democratic Party its southern support for a generation. He focused his attention on registration, did not operationalize Section 5, and did not use observers at the polls in nearly as many jurisdictions as he might have.

All of the presidents since Johnson have been influenced by conservative opposition in their enforcement of the VRA, especially as the ideology of colorblind conservatism acquired legitimacy. Republican presidents, pursuing a race-oriented strategy to build a durable party majority, have been predisposed to oppose the Act. Some have resisted general enforcement but selectively enforced the Act; others have stood the act on its head by using it to undermine its purpose of restoring and/or ensuring the rights of minority voters. Democratic presidents have been constrained in their enforcement of the Act by the rise of colorblind legal ideology or conservative pushback. On balance, no president since Lyndon Johnson has had the same high level of commitment to the VRA and the opportunity to enforce it as enthusiastically.

This chapter will demonstrate the impact of colorblind conservatism on the enforcement of the VRA by the executive branch. I begin with Republican presidents from 1970 through 2008, exploring their participation in VRA reauthorization, their rhetoric, the activities of the Department of Justice under their administrations, and

Republican presidents' appointments to the executive branch and federal judiciary. Next I examine the VRA legislative activity, rhetoric, actions and appointments of Democratic administrations. I demonstrate that presidents between 1970 and 2013 shifted rightward on the VRA and decreased enforcement in response to the influence of conservatism. When necessary, the discussion will include consideration of presidential treatment of civil rights regulation generally, on the premise that a presidents' civil rights policy includes voting rights.

*The Moderate Republican Era: The Nixon and Ford Administrations.* According to Steven Shull, there was a "clear break" in presidential advocacy of civil rights that began in the late 1960s and lasted until the mid-1970s.[130] Civil rights enforcement once dominated by legislation and court order; now became the responsibility of federal agencies in the executive branch.[131] Republican presidents, responding to the VRA in the early years, were influenced by a moderate conservative platform dedicated to limiting civil rights reform. But these conservative presidents served in the midst of a broadly accepted liberal consensus in favor of affirmative action-based reform of past racial discrimination. In the early 1970s, civil rights legislative remedies were expected to be utilized and Presidents Richard Nixon and Gerald Ford were obligated to instruct the DOJ to administer and enforce affirmative action legislation and the VRA. Constituents demanded the establishment of affirmative action programs and the enforcement of anti-discrimination legislation achieved by the civil rights movement. Both presidents expressed rhetorical opposition to the parts of the VRA Southerners found offensive—part of Nixon's Southern Strategy—and both presidents tried to take legislative action to

---

[130] Shull, Steven A. *American Civil Rights Policy from Truman to Clinton: The Role of Presidential Leadership* (Armonk, NY: ME. Sharpe, 1999), 51-52.
[131] Ibid., 51-52.

neutralize the strength of the offending temporary provisions when the Act came up for reauthorization, but both signed reauthorizations and complied with VRA enforcement in fact.

The civil rights records of the two presidents reveal politically nuanced support of civil rights goals. Both presidents were rhetorically against busing and discouraged the use of affirmative action in employment, but at the same time Nixon and Ford supported and enforced affirmative action measures like the Equal Rights Amendment and the Philadelphia Plan, which set goals for the hiring of minority contractors through the Department of Labor.[132] President Nixon also issued Executive Order 11478, which mandated the institution of affirmative action programs in federal agencies and departments.[133] Nixon and Ford's discussion about/enforcement of the VRA was accomplished in a similar fashion, contrary rhetoric followed by enforcement.

When given the opportunity to influence the substance of the VRA during the reauthorizations of 1970 and 1975, Presidents Nixon and Ford supported limiting or repealing Section 5 of the Voting Rights Act. Both submitted amendments designed to neutralize the power of Section 5 over Southern states, but to little avail. Nixon and Ford signed reauthorizations of the VRA and both enforced the Act. Of the Republican presidents, the Nixon and Ford administrations were influenced least by colorblind conservative principles and were the most vigorous enforcers of civil rights legislation generally and the VRA in particular. If measured by the number of objections issued to state voting laws, Nixon and Ford appear to be the most vigorous of all presidents in

---

[132] Ibid., 37.
[133] Executive Order no. 11478, Section 1, *Equal Opportunity in the Federal Government* (Aug. 8, 1969).

VRA enforcement[134]. Yet this *appearance of vigor* is due in part to the high number of non-conforming jurisdictions in the early years. The Nixon and Ford administrations were characterized by rhetorical opposition to but actual enforcement of the Voting Rights Act.

Nixon's opposition to the VRA arose out of his celebrated "Southern Strategy." The Southern Strategy sought to capitalize on cracks in the Southern wing of the Democratic Party opened by President Johnson's endorsement of civil rights legislation in the 1960s. In his effort to win white voters formerly unreachable by Republicans, Nixon ran his campaign on a "states' rights," "law and order" platform. This anti-affirmative action positioning appealed to those Southerners interested in maintaining traditional racial values and social relations. In the 1972 presidential election, the strategy contributed to Republican victories in five former Confederate states that had long been strongholds of the Democrats. For Nixon, the VRA was objectionable because it stigmatized Southern states for past wrongdoing (wrongdoing supported, of course, by states' rights proponents) and because it demanded that Southern states submit to federal oversight of voting law changes in violation of traditional federalism relations.

The VRA temporary provisions came up for reauthorization for the first time in 1970. The Nixon administration took the opportunity to challenge the legislation. The administration proposed opposition amendments to the VRA that would minimize the

---

[134] This statement does raise the question of standard of measurement. High numbers of objections at the inception of enforcement might not reflect that a president exercised the most stringent and purposeful enforcement of the VRA. Presumably, there were far more non-conforming jurisdictions in the early years and therefore more opportunities for objections. Also, as time progressed, states became more familiar with the VRA process, more cognizant of minority voters, and more responsive to DOJ questions and feedback prior to the issuing of objections.

mandate imposed by Section 5 and remove the stigma imposed on the Southern states.[135]
The Nixon amendments advocated the removal of Section 5 from the VRA, empowering
the attorney general instead to take action against any state (not just the covered states)
that discriminated in its use of voter qualifications and procedures.  The amendments also
made it legal for the Attorney General to bring a VRA action in any federal court rather
than limiting review to the District Court of the District of Columbia.[136] If the Nixon
amendments had been successful, the category of covered states would have been
removed from the statute, to be replaced by a nationwide ban on literacy tests, and the
special venues for voting law review by the federal government would have ended.  The
changes would have removed the stigma imposed on Southern states and also implicated
Northern states guilty of voter discrimination.[137] The amendments also would have
reduced the strength of the VRA by removing federal oversight and preclearance review,
and they would have limited voter discrimination relief to litigation.[138] As noted in the
previous chapter, the Nixon amendments passed the House but failed in the Senate. (See
Chapter 3).

Nixon publicly expressed his reluctance to sign the 1970 VRA re-authorization by
commenting that he only signed the bill "to prevent the Goddamned country from
blowing up!"[139] In the midst of protests over the incursion by U.S. troops into Cambodia,
continuing civil rights protests, and the Kent State shootings, Nixon calculated that a

---

[135] Kotlowski, Dean J. *Nixon's Civil Rights: Politics, Principle and Policy* (Cambridge: Harvard University Press, 2001), 71, 95.
[136] "Voting Rights Act, Nixon Administration Proposal," *Congressional Digest*, Vol. 48 Issue 11 (Nov. 1969): 288.
[137] Kotlowski, *Nixon's Civil Rights*, 71, 95.
[138] Litigation had been the method of relief in the Civil Rights Acts of 1957 and 1969, and it had been determined that litigation alone was not a sufficient method to remedy voter discrimination and to provide seekers relief.
[139] Kotlowski, *Nixon's Civil Rights*, 71.

failure to sign the "most successful piece of civil rights legislation" might have been worse politically than the potential backlash resulting from a deviation from the Southern Strategy. Nixon was forced into a similar conundrum with other affirmative action programming. He rhetorically opposed busing but enforced it in several jurisdictions. He ostensibly opposed affirmative action but established the first federally funded affirmative action program. And, Nixon supported the Equal Rights Amendment. The Nixon administration's contradictory posture toward satisfying his obligation to civil rights legislation was beneficial in the early years of VRA administration.

After initially pledging support for the reauthorization,[140] Gerald Ford opposed renewal of the VRA in 1975. The Ford amendments sought again to remove the bite of Section 5 by "increasing the jurisdiction of the VRA to all 50 states, and the elimination of the need for covered states jurisdictions."[141] Ford also suggested the imposition of a national residency requirement on citizens voting in national elections.[142] Ford did succeed temporarily in creating doubt about what were thought to be easy deliberations to pass the reauthorization. The presidential disruption did influence the 1975 bill. The presidential intrusion resulted in a decrease in the proposed ten-year reauthorization period to seven years. However, the disruption was short-lived and unsuccessful at limiting the controversial sections. Like his predecessor, Ford failed in his attempt to neutralize the controversial substantive aspects of the VRA mandate. The VRA reauthorization passed the House and the Senate. The legislation signed by Ford did not include a national residency requirement, did not limit Section 5, continued the

---

[140] Gerald Ford, "Letter to the Senate Minority Leader Urging Extension of the Voting Rights Act of 1965," *The American Presidency Project*, March 2015, http://www.presidency.ucsb.edu/ws/index.php?pid=5097.
[141] Skrentny, John Davis. *The Ironies of Affirmative Action: Politics, Culture and Justice in America* (Chicago, IL: University of Chicago Press, 1996), 190.
[142] Ibid., 190.

proscription of covered states, extended the VRA for seven years, was expanded to include protections for language minorities, and permanently barred literacy tests nationwide. Ford signed the reauthorization of the legislation and enforced the Act vigorously.

*Enforcement of the VRA by the Moderate Republican Presidents.* The Nixon administration issued Section 5 guidelines in 1970. Prior to 1970, some states refused to submit voting law changes under Section 5 and others were willing but did not understand what to submit. Once the 1970 regulations were in place, Section 5 enforcement began in earnest and covered states became active at submitting voting law changes during the Nixon and Ford administrations. One measure of the strength of enforcement of the VRA is the number of objections issued by the DOJ against state law submissions under Section 5. Under the Nixon administration, objections increased over prior years, when there had been no objections. There were 729 objections issued by the DOJ in 1969-1970 and 6,900 objections filed between 1970 and 1975. The United States Commission on Civil Rights statistics indicates that the peak year for Section 5 objections was 1976. By this measure, Nixon and Ford were the most vigorous presidents, Republican or Democrat, in their enforcement of the most controversial section of the VRA.

*Conservative Republicans and the VRA: Ronald Reagan, George H.W. Bush, and George W. Bush Administrations.* The Reagan and George H.W. Bush ("Bush 41") presidencies were characterized by stronger ideological resistance to anti-discrimination law, including the VRA, but based on the number of DOJ objections, enforcement of the law during these administrations did not decrease significantly in comparison to the

67

presidents who preceded them. One of the Reagan administration's goals was to reduce the enforcement of anti-discrimination protection. Unfortunately for him, the president failed to make the necessary changes in the federal bureaucracy required to produce that shift across all of the agencies responsible for administering civil rights protections. Reagan did make inroads, however, into limiting some protections, and he contributed greatly to building the far-right conservative ideology that supported the dismantling of affirmative action. He also established an effective method to undermine civil rights initiatives later used very successfully by George W. Bush.

George H. W. Bush followed Reagan's lead on civil rights and the VRA, but was more timid about taking stances against civil rights laws because he feared the fallout generated by the Reagan administration's head-on confrontations over civil rights legislation. Reagan and H.W. Bush were more conservative in their administration of the VRA than either Nixon or Ford. Still, both Reagan and Bush did enforce the law in a manner consistent with its authors' intent. Consideration of the Reagan and Bush 41 presidencies reveals that they helped build support for a conservative agenda on civil rights and the VRA, but they could not dislodge the liberal consensus in favor of civil rights.

*The Reagan Administration: Opening the Door to the Republican Right.* Prior to Ronald Reagan, modern Republican presidents could be termed moderate conservatives. Reagan ushered in a renewed focus on conservative resistance to civil rights gains in a "departure from core civil rights legal values."[143] Reagan's agenda incorporated a quasi-

---

[143] Selig, Joel L. "The Reagan Justice Department and Civil Rights: What Went Wrong," *University of Illinois Law Review* 4 (1986). And see the contrasting view of  William Bradford Reynolds, "The Reagan Administration and Civil Rights: Winning the War Against Discrimination, response to Selig," *University*

renewed "Southern Strategy" dedicated to dismantling civil rights' protections established in the 1960s. Reagan was unable to demolish federal anti-discrimination legislation and he was compelled, however reluctantly, to enforce the VRA. On an ideological level, however, Reagan opened the door to a conservative counterrevolution that has since grown considerably in institutional power and popular support. The administration's open disdain for race-based civil rights protections and its attempts to limit their scope helped to legitimize the conservative counterpoint of view. Even though the program as a whole was not immediately successful, it contributed to the long-game against the civil rights gains of the 1960s.

Ronald Reagan challenged civil rights law and ideology head-on. But because Reagan took office "at the height of federal efforts to impose numerical measures of equality," his efforts to oppose the liberal consensus in favor of the VRA faced concerted resistance. [144] Reagan sought to redirect civil rights protection. He openly expressed his ideological stance and confronted established civil rights law.[145] Reagan's predecessors in the Carter administration had increased incentives for minority entrepreneurs, established a number of race- and gender-conscious initiatives that expanded protection, and enforced "traditional" liberal civil rights legislation, including the VRA.[146] Reagan argued publicly that the Carter programs were faulty. He complained that "equal opportunity should not be jeopardized by bureaucratic regulations and decisions which

---

*of Illinois Law Review.* 4 (1987) Selig served as an attorney to the Civil Rights Division of the DOJ from 1969-1973 and 1977-1983; Reynolds was the Assistant AG from 1981-1988.

[144] Devins, Neal. "Reagan Redux: Civil Rights Under Bush," *Notre Dame Law Review* 68 (January 1993): 958.

[145] Ibid., 1000.

[146] Ibid., 958.

rely on quotas, ratios, and numerical requirements to exclude some individuals in favor of others, thereby rendering such regulations . . . discriminatory."[147]

It was difficult for Reagan to make systematic changes to civil rights enforcement due to the interplay of the influence of the liberal consensus and the decentralization of civil rights enforcement across the executive branch. His administration failed to force the broad shift away from vigorous civil rights enforcement that he sought,[148] but the administration made progress on some projects and increased the salience of racial conservatism within large segments of the voting public. Unable to neutralize the liberal consensus as a whole, the president focused on decreasing relief to minorities on only a few civil rights issues: he attempted to return tax exempt status to racially discriminatory schools, to remove Mary Frances Berry and others among her colleagues from the independent bipartisan U.S. Commission on Civil Rights, to lead DOJ attacks on preferential hiring, and to oppose the VRA's use of disparate impact under Section 2 as evidence of discrimination in voting rights cases.

The effort waged in Congress during the 1982 reauthorization to exclude the disparate impact standard applied under Section 2 of the VRA was unsuccessful. The opposing efforts by a strong and well-organized civil rights lobby prevented eradication of the standard. Expressing the established perspective of the civil rights consensus, civil rights advocates sought to renew the Act and secure the right to bring causes of action for discrimination supported by findings of disparate impact. (See Chapter 3.)

The Reagan administration's opposition to the 1982 reauthorization of the VRA was cut short. The administration felt compelled to change its position because it could

---

[147] Ibid., 958-959.
[148] Ibid., 959.

muster very little traction in Congress in the face of a strong minority lobby, which had the power to gather enough votes to pass a liberal version of the legislation. At issue in that session was the reauthorization of Section 5 and a proposed amendment to a permanent provision of the VRA, Section 2. Supporters of the VRA wanted Congress to reauthorize Section 5 and to amend Section 2 to include language explicitly stating that discrimination in Section 2 lawsuits could be established either by evidence of intentional discrimination or by evidence of discriminatory effect. Evidence of discriminatory effect had been excluded as an option for establishing discrimination in a Section 2 lawsuit in the *Mobile v. Bolden* (1980) decision, in which the Supreme Court upheld an at-large election for city commissioners when the plaintiff's proffer of discriminatory effect was rejected. [149] Traditionally, civil rights attorneys had used either evidentiary standard (intent or effect) to establish discrimination in at-large state voting systems. Accordingly, the loss of the discriminatory effect option resulted in what was essentially a moratorium on Section 2 lawsuits.

The Reagan administration expressed concern about the establishment of quotas for minority public officials and opposed the Section 2 amendment during the 1982 reauthorization. The administration's proposals included limiting the preclearance requirement to only specific named offenses under Section 5, shifting the burden of proof of discrimination to the DOJ (so that only laws affirmatively opposed by the DOJ might suffer rejection by the federal government), and retaining the *Mobile v. Bolden* decision as the standard under Section 2. As is discussed in greater detail in Chapter 3, deliberations in Congress were controlled by a well-organized pro-voting rights lobby led

---

[149] Bullock III, Charles and Katherine Ingles Butler."*Voting Rights,*" *in The Reagan Administration and Human Rights,* ed. Tinsley E. Yarbrough (City, State: Praeger Publishers, 1985), 31.

by the Leadership Council. The Council proved to be a formidable opponent of conservative Republicans in Congress on the issue of reauthorization and amendment.

The Reagan administration was unable to overcome the strong liberal coalition in favor of the VRA, and in fact lost its primary "soldier" in the House during the reauthorization hearings. Henry Hyde (R-IL), the face of conservative opposition, began the hearings staunchly convinced that Section 5 should not be renewed but was converted during the House hearings and became a supporter of the reauthorization of Section 5. Support for the VRA was also strong in the Senate. (See Chapter 3). Senator Bob Dole (R-KS) informed the president that a version of the VRA legislation that included Section 5 preclearance and an amended Section 2, would pass despite opposition by the White House.[150] After speaking with Dole, Reagan endorsed that version of the VRA. Reagan may have had concerns about the potential political blowback generated by opposition to the VRA. The Act was extremely popular among and widely supported by minority voters, and the administration was certainly aware that some fifty Republican congressional districts relied on the black vote.[151] Boasting that "[the] legislation proves our unbending commitment to voting rights," Reagan signed a reauthorization of the VRA in 1982, legislation, which strengthened voting rights for minorities.[152]

The Reagan administration did make progress at countering the intent of some civil rights initiatives, using methods subsequently employed by other presidents. In particular, Reagan used his appointment power to resist some anti-discrimination mandates and to lay a foundation for the later repeal of affirmative action programs. For example, in 1982, Reagan appointed Clarence Thomas to the chairmanship of the Equal

---

[150] Bullock, Charles S., III; Katherine I. Butler. "Voting Rights," p. 32.
[151] Ibid.
[152] Plass, *Exploring the Limits*, 171.

72

Employment Opportunity Commission ("EEOC"), which proved to be an effective means of resisting the anti-discrimination mandates established at the EEOC. Thomas adopted a non-confrontational, indirect approach against EEOC enforcement. Instead of speaking out against existing equal employment legislation or attempting to repeal it, Thomas changed the ideological direction of EEOC enforcement within the pre existing guidelines.[153] Reagan and his DOJ faced many attacks from civil rights groups and the media on issues of discrimination but none about the administration of the EEOC. Clarence Thomas was able to advance the goals of the Reagan administration without suffering backlash from interest groups.[154] Thomas changed the priorities of the EEOC, restructured it, and crafted an unassailable justification for the changes,[155] which allowed him to further the aims of conservatives, placate liberals, and avoid complaint and resistance. Thomas "shift[ed] scarce agency resources from disfavored to preferred policy objectives," the agency was able to make conservative policy progress while avoiding direct confrontations with Congress.[156]

Reagan's appointments to the Supreme Court and to lower federal courts helped to lay a foundation for the eventual reversal of some affirmative action programs and the VRA. Appointees Antonin Scalia and Sandra Day O'Connor agreed with Reagan that affirmative action discriminated against whites and that affirmative action was ineffective at combating racism.[157] Scalia subsequently took the helm of the conservative coalition within the Supreme Court and O'Connor provided intermittent, more moderate support of

---

[153] Devins, *Reagan Redux*, 965.
[154] Ibid., 963.
[155] Ibid., 969.
[156] Ibid., 964.
[157] Plass, Stephen. "Exploring the Limits of Executive Civil Rights Policy Making," *Oklahoma Law Review* 61 (Month 2008): 176.

73

limitations on anti-discrimination law. Reagan also appointed William Bradford Reynolds to the position of Assistant Attorney General, Clarence Pendleton to the chair of the Civil Rights Commission, and, as discussed, Clarence Thomas to the chair of the EEOC. Each of these appointments and others like them increased the conservative influence over the activities of the executive branch and the federal courts. This method of changing the personnel and thus ideology of civil rights initiatives was used extremely effectively by George W. Bush during his presidential term.

    *Reagan Administration Enforcement of the VRA.*  The Reagan administration was constrained in its ability to limit enforcement of the VRA. Although critics complained that the enforcement of the VRA under Reagan was "flaccid,"[158] this may be an unfair characterization of the Reagan DOJ. Bullock and Butler show that "[t]he incidence of proposed changes for 1981 and 1982 is similar to that during the last half of the Carter presidency," though the rate of objections during the first two years was lower than the preceding administration."[159] Bullock and Butler surmise that the Carter DOJ may have issued more objections during the first two years of the Carter administration due to the increased responsibility for Latino voters established during the 1975 reauthorization. The Lawyers Committee for Civil Rights noted a record number of VRA objections based on gerrymandering not seen during earlier administrations.[160] The Reagan administration did file fewer cases under the VRA than Carter "though the first few years of each term were similar.[161] The number of observers dispatched under the Reagan administration in 1982, 461, was the highest number ever dispatched for a single

---

[158] Bullock, Butler, "*Voting Rights,*" 33.
[159] Ibid., 34.
[160] Ibid., 34.
[161] Ibid. 34.

74

election."[162] Bullock and Butler aver that "[c]ritics may be correct in saying that more could be done under President Reagan, but a charge that voting rights enforcement has been ignored is not supported. ..."[163]

*George H.W. Bush and the VRA.* George Herbert Walker Bush ("Bush 41") expressed his objections to anti-discrimination law less forcefully than Reagan despite a similar agenda and strong conservative bias. Having seen the difficulties endured by the Reagan administration in its effort to challenge civil rights head on, Bush 41 tried to divorce himself from direct involvement in civil rights issues. As a result, he lost the support of both conservatives and civil rights proponents alike. He vacillated on controversial civil rights issues like the Civil Rights Acts of 1990 and 1991 (seeking to protect against job discrimination and providing the right to jury trial on discrimination claims) and Executive Order 11245 (providing equal employment opportunity). Bush 41 spoke publicly in favor of civil rights but maintained an effort to challenge civil rights legislation. "Bush sought to have it both ways. His brinkmanship, an attempt not to displease the right or the left, was designed to save him from the fires that so consumed the Carter and Reagan administrations."[164]

Yet Bush 41 did expand the influence of conservatism on the federal government. He had the opportunity to replace two justices on the Supreme Court. Both of the departing justices replaced by Bush 41 were liberals, giving him the opportunity to increase the conservative base on the Court. To conservatives, he missed one opportunity to redirect the Court. His selection of Justice David Souter proved to be "one of the

---

[162] Ibid. 34.
[163] Ibid., 34-35.
[164] Devins, *Reagan Redux*, 982.

biggest political blunders of a Republican president in the 20th Century."[165] Souter was an unknown commodity at the time of his appointment, but many perceived him as a true conservative. As his record would show, however, Souter was not a slave to the conservative agenda once he got his seat on the Court. Instead, he became a reliable liberal, at least on civil rights matters. Bush 41 was successful at creating a more conservative Court when he appointed Clarence Thomas, and he has indeed served as a reliable member of the conservative bloc on the Court since his arrival and a strident opponent of Section 5 of the VRA.

*The George W. Bush Administration.* George W. Bush ("Bush 43') was more successful at challenging civil rights protections than his Republican predecessors. His administration benefited from the development of conservative anti-discrimination legislation ideology and popular hostility toward affirmative action programs. Bush 43 combined the conservative posture, the ostensible support of civil rights protections exhibited by his father, and the appointment techniques introduced by Ronald Reagan. By exercising more control over appointees to the various agencies of the Executive Branch responsible for enforcing civil rights, Bush 43 was able to decrease enforcement of the VRA.

Publicly, George W. Bush expressed support for the VRA. His support for reauthorization of the VRA at the 2006 NAACP convention contributed to the passage of the bill. The NAACP speech broke a deadlock on the floor of Congress on VRA reauthorization. The same day of the speech, the bill returned to the House floor and the Speaker maneuvered the bill through the conference committee to avoid further potential

---

[165] "The Bush Legacy: The Supreme Court," January 12, 2009, *ABC News*, accessed March 2015, http://abcnews.go.com/TheLaw/BushLegacy/story?id=6597342&page=2.

delay. The bills emerging from the House and the Senate were identical, except for the titles, and therefore could be adopted easily, absent discussion about the slight differences in the caption.[166] (See Chapter 3).

By contrast, Bush 43 took steps to derail VRA enforcement. Like Reagan, the Bush administration benefited from challenges to civil rights initiatives that operated under the radar. He adopted Clarence Thomas' EEOC approach for the Voting Section of the Department of Justice. Instead of pushing to repeal the VRA or proposing amendments to weaken Section 5, Bush replaced the career personnel at the DOJ who were responsible for enforcing voting rights with political appointees who redirected the focus of the voting rights section away from minority voter protection. The administration supported the proposal and passage of state voter ID laws and other restrictions that worked against the mission of the VRA. The administration also used the law to bring suits to protect white voter claims that challenged VRA enforcement designed to enhance the voting rights of minorities.

Bush 43's approach spurred the departure of 60% of the career employees of the DOJ Voting Rights Section.[167] New appointees to the DOJ were selected for their political viewpoint, and those appointees in turn selected new employees based on political criteria. In one major voting rights case involving Alabama and Georgia, the DOJ filed legal briefs supporting positions rejected by career DOJ employees.[168] Career employees spoke about the significant changes to the Voting Rights Section of the DOJ

---

[166] Karlan, Pamela. "Lessons Learned," *Duke Journal of Law and Public Policy* Vol. 4:17 (Month, 2009): 18.

[167] An Investigation into the Removal of Nine U.S. Attorneys in 2006, US Department of Justice Office of the Inspector General &Office of Professional Responsibility, Sept. 2008.

[168] Pear, Robert. "Justice Department Challenges its Civil Rights Division," *The New York Times*, January 1, 1993. Just before Clinton entered the office of the President, the DOJ opposed the creation of multiple black districts in Alabama. In Georgia, the DOJ ruled that blacks did not have a legal basis to challenge the state commissioner who exercised all legislative and executive power and who was elected at large.

and complained about the refusal of the administration to adhere to the spirit of the law.[169] The administration supported Indiana's voter ID law in an amicus brief. The government's brief argued that voter fraud was a disincentive to lawful voters. At the time of the Indiana case, there were no recorded instances of voter ID fraud in the history of the state.[170] The brief downplayed evidence that support of the ID law was partisan and the fact that most Indiana voters who lacked the necessary identification to vote were poor and minority voters, a state of affairs that the VRA legislation is designed to avoid.[171] John Atlas argues that the Bush (43) administration energized the search for voter fraud as a method of disenfranchisement of minority voters in key battleground states.[172] The Bush administration failed to bring any voting cases under the VRA in the first five years of the administration, except one in support of white voters in Mississippi.[173] The administration precleared laws that would not have been so approved by its predecessors. It also endorsed the "DeLay" Texas redistricting plan, despite the conclusion of career employees that the plan violated Section 5's retrogression standard.[174]

The Bush 43 DOJ filed an amicus brief in favor of the state of Florida when the Brennan Center of New York sued the state under Section 2 of the VRA to ban a law that permanently disenfranchised ex-convicts. Career members of the Bush DOJ and

---

[169] The Voting Rights Section of the Civil Rights Division of the Department of Justice handles the direct administration of VRA preclearance submissions and lawsuits.

[170] *Crawford v. Marion County Election Bd.* 128 S.Ct. 1610, 1613 (2008).

[171] *Crawford v. Marion County Election Bd.* at 1620, Brief for the United States as Amicus Curiae, *Brennan Center for Justice*, accessed March, 2015, https://www.brennancenter.org/sites/default/files/legacy/Democracy/CrawfordvMarionCountyElectionBoard%20-%2012-10-07%20Amicus%20Brief%20of%20the%20United%20States.pdf, 20

[172] John Atlas, "The Struggle Over Voting Rights and the Future of Progressive Politics," *Social Policy* 38 (Spring 2008): 11-17.

[173] *United States v. Noxubee County Dem. Exec. Comm.*, 494 F. Supp. 2d 440 (S.D. Miss. 2007).

[174] Karlan, *Lessons Learned*, 25-25.

newcomers holding a traditional civil rights ideology, such as then Deputy Attorney General Eric Holder and former Solicitor General Seth Waxman, filed amicus briefs in support of the Section 2 lawsuit.[175] The administration was also supportive of ending affirmative action admissions programs in the University of Michigan cases.[176] Additionally, and perhaps tellingly, Bush cut funding to civil rights enforcement.[177]

George W. Bush had a significant impact on the ideology of the Supreme Court. The Bush 43 appointees are solid conservatives who have increased the number of conservative decisions in contrast with the Courts that preceded them. Prior to the Bush administration, seven of the Supreme Court justices had been appointed by Republicans, yet most decisions on issues such as abortion, affirmative action, and individual rights (including voting), disappointed conservatives.[178] On many key cases, the Court ruled five to four, with O'Connor casting the deciding vote in unison with the Court's liberal bloc. Both Rehnquist and O'Connor announced their intention to step down during the Bush 43 administration, which meant that the president had the opportunity not only to name the next Chief Justice, but also, by nominating two conservatives, to change the balance on the Court. Bush named Chief Justice John Roberts and Justice Samuel Alito, both staunch conservatives, to the Court. Since then, on issues of affirmative action and voting rights, the Court's decisions have shifted definitively to the right, including the MUD and *Shelby v. Holder* decisions on the VRA. (See Chapter 5).

---

[175] "The Bush Admin Takes Aim: Civil Rights Under Attack," *Leadership Conference on Civil Rights Education Fund*, 32.
[176] Ibid.,5.
[177] Ibid., 35.
[178] Greenburg, Jan Crawford, "The Bush Legacy: The Supreme Court," *ABC News*, accessed March 2015, http://abcnews.go.com/TheLaw/BushLegacy/story?id=6597342.

*The Democratic Presidents.* On the whole, Democratic presidents from 1970 onward were more supportive of the VRA than their Republican counterparts. None of the Democrats have been responsible for signing a reauthorization of the VRA, so none has had the opportunity to attempt to amend the Act or to defend the reauthorization of the temporary provisions during a high profile reauthorization process. Despite belonging to the Democratic Party, which supports the VRA, Democratic Presidents since 1970 have not shown the level of aggressive support exhibited by Lyndon Johnson or the high level of enforcement exercised by Nixon and Ford. This situation is a direct consequence of the development of conservative opposition to civil rights and its subsequent growth. As the political environment has become more conservative, civil rights protections have come under attack and the movement for civil and voting rights has faded.

*The Carter Administration on Civil Rights.* Before ascending to the presidency, Jimmy Carter had a decent civil rights record as the governor of Georgia. He declared in his gubernatorial inaugural speech that "segregation was over and that racial segregation had no place in the future of the state," marking the first such public commentary from a governor from the Deep South.[179] Carter went on to hire blacks to statewide positions and made more of an effort to support desegregation efforts than his predecessors. Four out of five blacks supported Carter in his election as a result of his civil rights record.[180] As president, "Carter believed in racial equality" and engaged in a policy of civil rights enforcement in large part through executive orders.[181] Carter continued this trend while in

---

[179] "Jimmy Carter and Civil Rights," *Presidential History Geeks*, accessed March 2015, http://potus-geeks.livejournal.com/171526.html.
[180] "Jimmy Carter," *Spartacus Educational*, accessed March 2015, http://www.spartacus.schoolnet.co.uk/USAcarterJ.htm.
[181] Plass, *Exploring the Limits*, 169; Slotnick, Elliot E. "Lowering the Bench: Affirmative Action and Judicial Selection During the Carter Administration," 1 *YALE & L. POL'Y REV.* 270, 275 (1983).

office, appointing more diverse candidates to "federal leadership positions, including cabinet, sub- cabinet, White House, and judiciary positions than any prior president."[182]

*The Clinton Administration and the VRA.* President Bill Clinton recognized the importance of diversity in the nation's population as a political, cultural, and social reality. During his presidential campaign, he highlighted plans to increase diversity in government, improve civil rights enforcement, and break the cycle of poverty.[183] It was clear that while the nation had diversified, there were still "major disparities between whites and minorities in health status, unemployment rates, wages, and other key indicators of overall well being."[184] This state of affairs signaled the need to address civil rights issues less as a moral imperative and increasingly as a practical necessity.

Against this background, Clinton asserted a strong moral and rhetorical stance in favor of civil rights and proposed a strong civil rights agenda and a willingness to address a number of issues that had formerly been neglected. He sought to diversify the federal government and its programs and increase funding for civil rights enforcement.[185] From the outset, the administration alerted its agencies of the importance of "addressing non-compliance with federal civil rights law, including violations involving disparate impact."[186] Clinton was aggressive about using executive orders and memoranda to further civil rights aims. Yet despite his strong stance and agenda, he was unable to

---

[182] Shull, *American Civil Rights Policy*, 40-41.
[183] United States Civil Rights Commission on Civil Rights (USCCCR), *A Report of the Civil Rights Commission on Civil Rights* (USCCCR), "A Bridge to One America: The Civil Rights Performance of the Clinton Administration," Washington, DC: (April 2001):4.
[184] United States Civil Rights Commission on Civil Rights (USCCCR), *A Report of the Civil Rights Commission on Civil Rights,* "The Health Care Challenge: Acknowledging Disparity, Confronting Discrimination and Ensuring Equality," Washington, DC (September 1999); USCCCR, "Overcoming the Past, Focusing on the Future: An Assessment of the U.S. Equal Opportunity Commission's Enforcement Efforts," Washington, DC (September 2000).
[185] USCCR, "A Bridge to One America," vi-vii.
[186] Ibid., v.

81

realize much of his civil rights agenda. His administration found itself stymied by a lack of Congressional support, poor implementation, and poor funding of civil rights enforcement agencies.

Because no VRA reauthorization occurred under Clinton's presidency, he never had the opportunity to take a position on the validity of the temporary provisions or to make proposals to amend the VRA. All the same, the record shows that Clinton supported voting rights. In 1993, he signed the National Voter Registration Act (NVRA), which also sought to reverse the effects of discriminatory and unfair voting laws by expanding the systems available for registration. The NVRA instituted mail-in registration and made it possible to register to vote in conjunction with getting a driver's license.[187]

The Clinton administration's support for the disparate impact standard in the enforcement of civil rights protections affected its support for voting rights. In 1994, Attorney General Janet Reno issued a memo to federal department heads, reiterating the directive to apply the disparate impact standard in civil rights enforcement.[188] The DOJ applied the standard in Section 2 VRA cases in accordance with Reno's directive and the 1982 VRA amendments. As a result, the drawing of majority minority districts became the most common remedy applied in Section 2 challenges to state districting complaints under the VRA.[189] Majority minority districts became the subject of challenge litigation after the 1990 census.

---

[187] Ibid., 54.
[188] Attorney General Janet Reno to Heads of Departments and Agencies that Provide Federal Financial Assistance, July 14, 1994, Office of the Attorney General, Memorandum, re: Use of the Disparate Impact Standard in Administrative Regulations Under Title VI of the Civil Rights Act of 1964.
[189] Cunningham, *Maximization at Any Cost*, 1.

The Clinton administration expressed its support for the districts and the disparate impact standard in its amicus brief in an important 1994 case, *Shaw v. Reno*, and worked through its Department of Justice to uphold the redistricting plans. Resistance to VRA relief plans ensured that voting rights remained a controversial issue at the end of the 1990s. Clinton acknowledged in a 2000 speech that "serious flaws in the mechanics of voting," still existed.[190]

*The Barack Obama Administration and the VRA.* The Obama administration has expressed support for the VRA and a dedication to protecting the law. The administration's approach to VRA enforcement has been contentious, despite the fact that there has been no reauthorization of the VRA during the Obama presidency. The development of a strong conservative opposition to the legislation, not to mention the work of the Republican Party and political entrepreneurs to propose and pass voter ID laws and to challenge the constitutionality of the VRA, have made enforcement of the VRA challenging for the Obama administration. The developments of the 2000s have meant that the Obama administration has had to enforce the Act in a hostile environment, defend the VRA against sustained attack, and ultimately begin to retool race-based voter rights protections after the Supreme Court ruled that Section 4 of the VRA is unconstitutional, effectively removing all states from coverage under Section 5 of the VRA.

By the time Obama entered office, the liberal consensus was no longer the predominant force undergirding voting rights law in the United States. Conservatives based in the Republican Party had, by 2008, developed an ideological basis for

---

[190] President William J. Clinton. "The Unfinished Work of Building One America," Message to Congress, January 15, 2001.

83

challenging the liberal consensus that resonated with the public, had built support around challenging the VRA, and had developed support for their position in the Supreme Court. The election of Barack Obama, the first black president, motivated an increase in conservative resistance to the VRA. Minority voters exhibited strong support for Obama and Republicans became convinced that they could not entice Obama supporters to support the Republican Party. This was a change of view by the Republicans who made an effort to attract minority voters during the late 1990s and early 2000s. That effort subsided by the mid-2000s, and gave way to a push for voter ID laws and constitutional challenges to the VRA.

*State Voter ID Laws and Related Developments.* The conservative campaign to propose and pass voter ID and similar laws began in the early 2000s. In 2005, Indiana passed a voter ID law that was subsequently upheld by a federal court.[191] In 2000, however, the proposal and passage of voter ID laws had not yet become a national trend. Voter ID laws, even in uncovered states like Indiana, pose an issue under the VRA. The laws arguably burden voters who are minorities, poor, and elderly; many of these voters have been shown, in the affected states, to have less access to sources to obtain voter IDs, and are more injured by limitations on early and absentee voting.[192] Republican legislators in favor of voter ID and similar laws argue that the provisions are designed to minimize voter fraud, a hotly contested justification due to overwhelming evidence that

---

[191] "Senate Enrolled Act No. 483," *In Gov Legislative Bills*, accessed March 2015, http://www.in.gov/legislative/bills/2005/SE/SE0483.1.html.
[192] Gaskins, Keesha and Sundeep Iyer. "The Challenge of Obtaining Voter Identification,' *Brennan Center for Justice*, accessed March 2015, http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/Challenge_of_Obtaining_Voter_I D.pdf, 1.

affected states show little or no record of recent voter fraud.[193]  During the first few years of the Obama administration, the DOJ had some success limiting the expansion of voter ID and similar laws in covered states and implementation of the laws. In the wake of two major Supreme Court decisions, it has been harder in recent years for the administration to combat voter ID and similar laws in covered and uncovered states.

*Obama Administration Enforcement of the VRA.*  According to a US Commission on Civil Rights 2010 report, the Obama DOJ Section 5 enforcement has been "apolitical … fair… and consistent."[194] The Commission held that the enforcement methods and statistics were similar to those of the Bush 43 administration. The Commission described the Obama DOJ preclearance process as friendly to redistricting plans, and reported that the administration did not discriminate against Republican-controlled legislatures.[195] In 2011, the DOJ approved every plan submitted—twenty-six nationwide plans submitted by nine states. Six of the submitting states were controlled by Republican legislatures. The only plan challenged by the DOJ was the Texas plan, which was submitted for preclearance not to the DOJ but to federal court.  The cycle marked the first time in history that Georgia and Louisiana received full administrative preclearance on the first attempt.[196]

Between 2011 and 2012 the Obama DOJ issued two effects-based administrative objections and only a few intent-based objections.[197] At the time the report about the 2010 census was written, numbers for 2012 were not available, and so the Commission

---

[193] Fund, John. "How Do You Address A Problem they Insist Doesn't Exist?" *National Review ,*accessed March 2015,  http://www.nationalreview.com/article/375021/dems-voter-fraud-denial-john-fund
[194] US Commission on Civil Rights, "Redistricting and the 2010 Census," 30.
[195] Ibid., 26-27.
[196] Ibid., 28.
[197] Ibid., 44, 65.

refrained from commenting on any trends indicated by these two types of objections. The Commission did indicate that the DOJ followed its own guidelines (though some states, Texas in particular, registered some complaints that the guidelines were not clear.)[198] The Commission report also indicated that the DOJ was applying a similar standard to that used before the 2006 amendments in its assessment of intent-based objections, indicating that the DOJ took a conservative stance on objections to submissions.[199]

The Commission noted that the number of preclearance petitions submitted to the DOJ simultaneously with court filings or by court filing alone increased significantly.[200] The increase was huge compared to past cycles.[201] In 2011, twelve lawsuits were filed for preclearance; between 1972 and 2010 there had been a total of only 28 lawsuits.[202] The Commission discussed a number of reasons for the shift in practice including timing, better discovery, the belief that simultaneous filings would improve the odds of getting DOJ approval, and a belief that the DOJ would not clear the plans from particular states.[203] The report claims that the reason for the shift is not clear. The implication is that states began to resist DOJ oversight in favor of federal court. A court decree under Section 5 would preclude further preclearance by the DOJ under Section 5.

Important to the Commission's report, however, are the numerous statements of dissent by commissioners involved in preparing the report. Several raised the issue of the influence of the "constitutional overhang" of the *Northwest Austin v. Holder* case and the

---

[198] Ibid., 44.
[199] Ibid., 65.
[200] Ibid., 73.
[201] Ibid., 75.
[202] Ibid., 75.
[203] Ibid., 76.

86

pending *Shelby v. Holder* case. The commissioners complained that there was a gag order on the Civil Rights Commission, which prevented commissioners from discussing the constitutionality of Section 5 and the relevance of the upcoming Supreme Court decision. These commissioners did not argue that Section 5 was unconstitutional but indicated that the lawsuits were an important influence on state behavior that was worth mentioning and discussing in the 2010 redistricting report.

*DOJ Enforcement 1970 -2010.* During the course of the VRA's enforcement, relatively few objections have been issued. Since 1965, the number of voting law submissions objected to by the Department of Justice has "declined steadily to the point of relative insignificance."[204] In every category of submission, the number of objections by the DOJ has decreased. Over the same period, the number of submissions has increased drastically. From August 1965 until June 2004, jurisdictions filed 117,057 voting change submissions for administrative review. The department issued objections to 1400 or 1.2%.[205] In a Civil Rights Commission report breaking the relevant period into three sections, 1965-1974, 1975-1982 and 1982-2004, the Commission found that the DOJ interposed objections to 14.2% of submissions during the first period, 3.1% during the second period and 0.7% during the third.[206]

According to the 2006 U.S. Commission on Civil Rights, objections peaked in 1976 or 1986 depending on the metric used. Ninety percent of all voting law changes submitted before 2006 were submitted after 1982.[207] Since 1982 there have been a number of Supreme Court cases clarifying the boundaries of the Section 5 requirement,

---

[204] US Commission on Civil Rights, "Voting Rights Enforcement and Reauthorization," May 2006, 21.
[205] Ibid., 21.
[206] Ibid., 22.
[207] Ibid., 28.

87

which has resulted in more filings.[208] Also after 1982, states and local governments have submitted changes in a timelier manner, as compared with submissions during the 1965-1974 period when submissions were often late or not submitted at all.[209] Most states and local jurisdictions submitted changes to the DOJ; however, during the Obama administration, there has been an upsurge in filings with the district courts. Between 1972 and 2010, covered jurisdictions filed twenty-eight total lawsuits, a rate of about three per year. In 2011, thirteen lawsuits were filed in district court. Some of the redistricting plans at issue in the lawsuits were simultaneously filed with the DOJ.[210]

The statistics reveal that compared to the number of voting law changes, oversight by the federal government has not resulted in a high number of instances in which states must change their laws. The upshot is that interference with state government has been relatively low and likely less of an intrusion than many VRA critics think. White voters are in fact *still privileged* under the VRA Order, despite the improvement in voting power of blacks and other minorities. There has not been a complete abandonment of state sovereignty or majority voters under the VRA. Presidential enforcement of the VRA has not resulted in a complete transfer of control of state voting laws to the federal government.

*Conclusion.*  Notable about the results discussed here is that conservatism has affected the enforcement of the VRA during both Republican and Democratic administrations. The last two administrations, Bush 43 and Obama, are extremely important because the impact of colorblind conservatism is highly visible. Bush 43's

---

[208] Ibid., 28.
[209] Ibid.
[210] US Commission on Civil Rights 2010, "Redistricting and the 2010 Census, Enforcing Section 5 of the Voting Rights Act, US Commission on Civil Rights," 75-79.

contradictory enforcement of the Act by using political appointees and aiming the legislation to remedy discrimination not identified by the Congressional purpose of the VRA resulted in a significant shift in VRA implementation. The government declined to assist minority voters and brought lawsuits under the VRA on behalf of whites. Bush 43's nomination of additional colorblind conservatives to the Court also hindered the application of the Act during and after his terms. In order for federal anti-discrimination laws to be effective, the states must respect it. The activities of the Bush 43 administration reveal that the long game against the VRA at the federal level resulted in a loss of respect for the enforcement of the VRA.

During the Obama administration, the DOJ has had significant difficulty wielding the oversight authorized by Section 5. This prevented the Obama administration from successfully objecting to voting law changes and put the executive branch in the position of having to defend Section 5 at the Supreme Court. State push back against the Act allowed states to maintain and implement regulations that arguably discriminated against minority voters. After the Supreme Court decision in *Shelby v. Holder*, state laws objected to under Section 5 were implemented without recourse by the Obama administration pursuant to the VRA. These changes in enforcement are not readily visible to the public. Because the presidents between 1965 and 2013 are known to have enforced the VRA, the subtle deterioration of the enforcement of the legislation in the executive branch has gone unfelt by the general public.

## Chapter 5
## The Supreme Court and the VRA, 1970-2013:
## Bending Toward a Colorblind Voting Order

Richard Valelly correctly observed that positive initial review by the Supreme Court provides a strong foundation for anti-discrimination law. The Court's first review of the Voting Rights Act in the 1966 decision, *South Carolina v. Katzenbach*, affirmed the constitutionality of the legislation, including the temporary and controversial Section 5.[211] As a result of the *South Carolina v. Katzenbach* decision, the legislation's unique feature mandating federal oversight of state voting law changes in covered states was subsequently treated as "a valid means for carrying out the 15th Amendment."[212] The nod from the Supreme Court fueled the ongoing application of the VRA, motivated full-fledged application of Section 5, and added solidity to the foundation of the VRA Order. But despite Valelly's confident assertion about the enduring impact of positive initial Supreme Court review, it does not assure the ongoing support of the judiciary. As the membership of the Court has become more conservative and colorblind conservative ideology has grown in influence, the Supreme Court's interpretation of the breadth and application of the VRA has narrowed significantly.

The shift to a colorblind conservative interpretation of the VRA by the Court occurred gradually. Early on, the Court began to narrow the application of Section 5, and over time it continued to pull back from broad applicability. Recently the Court disabled the application of Section 5 entirely.[213] The influence of colorblind conservative principles on the VRA resembles the impact of anti-discrimination legislation

---

[211] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).
[212] *South Carolina* v. *Katzenbach*, 383 U.S. 301, 337 (1996).
[213] *Shelby v. Holder*, 133 S.Ct. 2612 (2013).

90

jurisprudence of the Court after Reconstruction. In both instances, the interpretation of voting rights as un-protectable voided statutes designed to enforce the 15th Amendment. The shift by the Court to a restrictive view of the VRA occurred more slowly than the analogous post-Reconstruction review. The Court's jurisprudence has severely limited the VRA, a development that contradicts Valelly's assertion that the VRA became securely entrenched as a result of robust party organization and positive initial review by the Supreme Court. While the Court's decision in *South Carolina v. Katzenbach* benefitted the VRA regime and provided stability, positive initial review did not result in permanence or make the legislation incontestable. In fact, because the legislation received positive initial review, conservatives against the Act were motivated to engage in a long game against it. The opposition has slowly but surely developed and strengthened its position in the Supreme Court, as the Court's members have included more Republican-appointed conservatives, negatively impacting the VRA.

This chapter evaluates the development of Supreme Court VRA rulings between 1966 and 2013, through a review of the Court's major decisions. The chapter is divided by Court—Warren, Burger, Rehnquist, and Roberts—and uses a selection of VRA decisions to illustrate the development of VRA jurisprudence. My study confirms a rightward trajectory in Supreme Court VRA decisions. The study also explores the substance of conservative arguments on the Court, provides insight into how those arguments have changed, and illustrates the relationship of conservative jurists to other political actors on the Right.

*The Warren Court.* The Warren Court was often considered an activist Court in favor of civil liberties. Chief Justice Earl Warren led a liberal majority that regularly used

judicial power to expand civil rights, civil liberties, and judicial and federal power.[214]

Others on the Court, notably William Brennan, Hugo Black, William O. Douglas, Abe

Fortas, and Thurgood Marshall, formed liberal majorities and were able to control

decision making.[215] Cass Sunstein avers that "[t]o many people, the idea of judicial

deference to the elected branches lost much of its theoretical appeal in the 1950s and

1960s, when the Supreme Court, under the leadership of Chief Justice Earl Warren, was

invalidating school segregation (*Brown v. Board of Education*), protecting freedom of

speech (*Brandenburg v. Ohio*) striking down poll taxes (*Harper v. Board of Elections*),

requiring a rule of one person, one vote (*Reynolds v. Sims*), and protecting accused

criminals against police abuse (*Miranda v. Arizona*)."[216] Rebecca Zietlow counters that in

fact the Warren Court was less activist than the Rehnquist Court, since it only struck

down seventeen acts of Congress in contrast to the Rehnquist Court's thirty-three.[217]

Nonetheless, the rulings of the Warren Court were controversial, considered protective of

minorities, counter-majoritarian, and activist. The jurisprudence caused much

consternation in conservative circles.

The Warren Court did not disappoint on the issue of voting rights. In its first VRA

decision, *South Carolina v. Katzenbach,* the Court sanctioned Section 5 as "appropriate

legislation" to enforce the 15th Amendment.[218] In the lawsuit, South Carolina argued that

---

[214] Sunstein, Cass. 2005. "Justice Breyer's Judicial Pragmatism," *John H. Olin Law & Economics Working Paper Series* 267, November 2005, accessed March 2015, http://www.law.uchicago.edu/Lawecon/index.html.
[215] Associate Justices on the Warren Court included: Hugo Black, Stanley Forman Reed, Felix Frankfurter, William O. Douglas, Robert H. Jackson, Harold Hitz Burton, Tom C. Clark, Sherman Minton, John Marshall Harlan II, William J. Brennan, Charles Evans Whittaker, Potter Stewart, Byron White, Arthur Goldberg, Abe Fortas, Thurgood Marshall.
[216] Sunstein, "Justice Breyer," 3-4.
[217] **Zietlow, Rebecca E.** "The Judicial Restraint of the Warren Court (and Why it Matters)" *Ohio State Law Journal* 69 (2008): 259.
[218] *South Carolina v. Katzenbach*, 383 U.S at 337.

92

the VRA's prohibition against the use of "tests and devices" at the polls and the intervention of federal examiners violated states' right to implement and control elections. The Court disagreed. Writing for the majority, Earl Warren opined that the legislation was a legitimate exercise of remedial powers of the federal government to prevent racial discrimination in voting and approved the use of the unique remedy contained in the legislation to respond to the "insidious and pervasive evil" exercised by states to deny blacks the right to vote since the 15th Amendment's adoption in 1870.[219]

The decision was not unanimous. Justice Black concurred with the majority on the constitutionality of the legislation but issued the lone dissent on the validity of Section 5. Black argued that the section's ability to allow the federal government to strike down a state law in the absence of a traditional case or controversy was flawed and that the power violated the federalism boundaries established in the Constitution. Black opined: "Section 5, by providing that some of the states cannot pass state laws or adopt state constitutional amendments without first being compelled to beg federal authorities to approve their policies, so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless...States treated in this way are little more than conquered provinces."[220]

Blacks' dissent did little to minimize the momentum inspired by the majority opinion. The potential negative impact on federalism under the VRA did not dissuade the Court, VRA advocates, or the Department of Justice from moving forward on VRA enforcement. The Johnson administration surged onward with registration drives and federal oversight of some polls.

---

[219] *South Carolina v. Katzenbach,* 383 U.S. at 309.
[220] *South Carolina v. Katzenbach*, Black, dissenting at 359.

Subsequent Warren Court decisions in *Allen v. State Board of Elections* (1969) and *Gaston County v. United States* (1969) augmented the *South Carolina* decision and ensured the applicability of Section 5 to a broad range of state voting law changes.[221] In *Allen,* the Court interpreted Section 5 as applicable to a broad range of voting law issues. The Court affirmed that private litigants could sue pursuant to Section 5 when states approved *any* new voting law. The Court cited Congressional intent to make Section 5 applicable to "subtle as well as obvious state regulations which have the effect of denying the right to vote because of race."[222] Dicta in *Allen* indicated that "any voting change in any covered electoral system" was subject to Section 5 and that continuing electoral discrimination was forbidden and therefore constitutionally regulated by the federal government.[223]

An influx of Section 5 submissions followed.[224] To that point, Section 5 had not been actively enforced. Official guidelines for preclearance submission had yet to be issued and enforcement was not comprehensive. In fact, several covered states and localities intentionally made voting law changes without seeking preclearance review in order to counter the impact of the VRA. The *Allen* decision began a trend toward enforcement and compliance with Section 5.[225] In 1970, the DOJ issued preclearance guidelines and began systematic review of preclearance petitions.[226] The support of the

---

[221] *Gaston County v. United States*, 395 U.S. 285 (1969).
[222] *Allen v. State Board of Elections*, 393 U.S. 544, 565-66 (1969).
[223] Ball, Howard, Dale Krane, and Thomas P Lauth, *Compromised Compliance: Implementation of the Voting Rights Act*, (Westport, CT, Greenwooss,1982), 98.
[224] Cunningham, Maurice T. *Maximization, Whatever the Cost: Race, Redistricting and the Department of Justice,* (Westport, CT, Praeger, 2001), 20.
[225] Preclearance submission is voluntary. Despite the broad approach taken in *Allen,* the Court only deems voting changes submitted pursuant to Section 5 if the state submits it. Submission does not occur just because a citizen makes the Attorney General aware of a legal change. In most instances, failure to submit is not considered "deliberate defiance of the act." See *Allen,* 393 U.S. at 572.
[226] Ball, Krane, Lauth. *Compromised Compliance,* 78.

94

Supreme Court allowed the VRA regime to expand beyond registration drives and federal poll watching and made operational the unique remedy provided by the legislation.[227]

The Supreme Court continued its support of a broadly applied VRA in the 1969 *Gaston County v. United States* decision.[228] The Court in *Gaston* affirmed the district court ruling that it had jurisdiction to consider the use of a literacy test in Gaston County, North Carolina, and the Court affirmed the lower court decision to deny reinstatement of the test. The county had "systematically deprived its black citizens the educational opportunities it granted its white citizens" such that voting age blacks might be unable to negotiate a literacy test, and therefore the provision violated the VRA.

The Warren Court's record of VRA jurisprudence reflects acceptance of the legislation and a relatively liberal interpretation of the statute, more liberal than any of the subsequent Courts. Warren Court decisions affirmed the constitutionality of the legislation and interpreted the intent of Congress to favor broad application. The Court applied the statute's remedial power to a wide range of voting rights changes and voting schema that minority voters alleged discriminated against them under the Act.[229]

*The Burger Court.* The Burger Court was generally supportive of the VRA. They did not question the constitutionality of the legislation and largely upheld the application of Sections 2 and 5 in a manner approved by the liberal consensus. However, the Burger Court was not willing to apply the VRA as liberally as had its predecessor. Under Chief Justice Warren Burger's leadership, the Court narrowed the application of Section 5.

Burger Court VRA jurisprudence shifted squarely away from comprehensive Section 5 coverage of all voting law changes. Thus, not *every* voting law change was

---

[227] Cunningham, Maurice. *Maximization*, 19.
[228] *Gaston County v. United States*, 395 U.S. 285, 297 (1969).
[229] *Allen v. State Board of Elections*, 393 U.S. 544 (1969).

subject to Section 5. In *Connor v. Johnson (1971)* the Burger Court ruled that U.S. District Court decisions related to electoral apportionment could escape subsequent Section 5 review. "A decree of the United States District Court is not within reach of Section 5 of the Act," said the Court. [230] Subsequent *Conner* litigation did provide Section 5 review of laws passed after the litigation, even laws under development during the litigation process, but the decision meant that states could avoid preclearance of apportionment plans by taking preclearance-related litigation to district court. [231] District court orders were now unreviewable by the DOJ even if they caused a negative impact to black voters.

   The Court refused to grant Section 5 relief in an instance when it felt that changes to black voting power were negligible. In *City of Richmond v. United States* (1975), the Court overruled the district court holding that the institution of a ward plan that included an annexation that decreased the black voter population by 10% was racially motivated. [232] The Court approved the ward plan because it left black voters with what it called a "proper share" of political power in Richmond, despite the annexation and resulting decrease in eligible voters. Although the Court had held in the 1971 *Perkins* case that annexations were subject to Section 5, [233] the majority in *Richmond* minimized the significance of the apparent contradiction: "We did not hold in *Perkins* that every annexation effecting a reduction in the percentage of Negros in the city's population is prohibited by Section 5." [234]

---

[230] *Connor v. Johnson*, 402 U.S. 690 (1971).
[231] Ball, Krane, and Lauth. *Compromised Compliance*, 103.
[232] *City of Richmond v. United States*, 422 U.S. 358 (1975).
[233] See Ball, Krane, and Lauth. *Compromised Compliance*, 36. And, note that the Burger Court did rule that annexations were subject to Section 5 in *Perkins v. Matthews*, 400 U.S. 379 (1971).
[234] *Perkins v. United States*, 422 U.S. 358, 368 (1975).

96

In *Richmond*, the Court refused to equate a decrease in the proportion of black voters, where there had been a history of voting discrimination, as *prima facie* violation of Section 5. Rather, the Court held that it was not the intent of Congress to make every state voting law change subject to federal oversight. According to the Court, to rule in the alternative would have set too broad a precedent. A majority of the Court thought that since the Richmond annexation maintained viable electoral power for the district's black residents, the action did not have the effect prohibited by Section 5 and therefore should not be restricted. The dissent in *Richmond* argued the opposite, contending that the annexation was racially motivated, that it was a voting law change, and that Section 5 preclearance should apply.[235]

Following the *Richmond* decision, the Court further clarified its approach to Section 5 in *Beer v. United States* (1976) by establishing the retrogression requirement.[236] In *Beer*, the city of New Orleans complained that the Department of Justice denied its petition for preclearance of the city's 1970 city council districting plan. In its decision, the Burger Court opined that Section 5 denials of preclearance applied only to voting law changes that caused the "retrogression" of black voting power. In other words, unless there was a clear negative impact on black voters, i.e. a marked decline in black voting power, a law was not voidable. State action to *improve* voting opportunity for blacks in the community was not required; state action could only be curtailed when it caused a sufficient decrease in black voting power.

The standard of review established in *Beer* decreased the purview of Section 5 applicability. Only those voting law changes that *significantly* decreased minority-voting

---

[235] *Richmond*, v. *United States*, 422 U.S., Brennan, dissenting, 379-388.
[236] *Beer v. United States*, 425 U.S. 130 (1976).

97

power were disallowed under Section 5. Changes that caused a minimal decline in power, maintained the status quo, or resulted in only a negligible increase in voting power were exempt from interference by the Department of Justice based on the authority provided by the VRA. The Court expressed concern about setting too broad a purview for Section 5. These decisions evidence a retreat from the more comprehensive and liberal standard set by the Court in *Allen v. State Board of Elections*. They also express a contrary view of the intention of Congress to that described in earlier decisions.

On the other hand, many rulings reflected the Burger Court's willingness to abide by the VRA mandate. In *White v. Regester* (1975) the Court agreed nine to zero that a Texas redistricting plan "invidiously excluded" blacks and Mexican Americans from "effective participation in political life, specifically the election of representatives to the Texas House of Representatives."[237] In *White,* the Court upheld a Texas redistricting plan that mandated single member districts to improve minority voter influence.  Mandates to establish single member districts in several covered states benefitted minority voters especially in localities that switched to at-large districts as many jurisdictions had done in response to the passage of the VRA. Similarly, in *United Jewish Organization v. Carey (1977),* the Court upheld as lawful the DOJ's demand that Brooklyn districts be drawn with race as a consideration, despite the loss of voting power of white Hasidic voters in New York City. [238] And, the Burger Court refused to allow individual jurisdictions inside covered states to bail out of Section 5 coverage independently. In *City of Rome v. United States* (1980), petitioners sought to escape from VRA coverage independent of the state

---

[237] *White v. Regester*, 412 U.S. 755, 769 (1975).
[238] Cunningham, *Maximization*, 28.

of Georgia.[239] The Court maintained that individual jurisdictions within a state could not be released from coverage independently when a state was covered under the VRA in its entirety.[240] Conservatives were not happy with the *City of Rome* ruling.[241]

In *United Jewish Organizations (U. J. O.). v. Carey* and *Thornburg v. Gingles,* the Court also approved the drawing of majority minority districts as part of relief pursuant to redistricting plans, viz. creating districts which provided minority voters an improved opportunity to elect the candidates of their choice. In U.J.O.,[242] the Court said that if a majority minority district did not dilute the white vote, "compliance with a Justice Department Voting Rights Act objection is a complete defense to a lawsuit challenging the creation of new majority minority districts."[243] A decade later the Court reaffirmed its sanction of majority minority districts and established a framework to determine whether a district was lawful.

In *Thornburg v. Gingles* (1986) the Court ruled that majority minority districts could be drawn in instances where there had been "severe and persistent racially polarized voting" in the past, worthy of remedy. The Court set baseline requirements to determine whether a district was appropriate. The *Thornburg* decision set "three threshold conditions for establishing a Section 2 violation: (1) the racial group must be sufficiently large and geographically compact to constitute a majority in a single member district; (2) the group must be politically cohesive; and (3) the white majority must vote sufficiently as a bloc to enable [the bloc] to … usually … defeat the minority's preferred

---

[239] *City of Rome v. United States* 446 U.S. 156 (1980).
[240] Section 5 coverage applied to several states in their entirety however many jurisdictions became covered by Section 5 in 1970 and 1975 in states where Section 5 did not apply to the whole state.
[241] Ball, Krane, and Lauth. *Compromised Compliance,* 107.
[242] *United Jewish Organizations of Williamsburgh v. Carey,* 430 U.S. 144 (1977).
[243] Parker, "Shaw," 49.

candidate." The state legislature attempted in *Shaw*, pursuant to DOJ directives, to draw a district that encompassed a voting bloc like that described in *Thornburg* but was denied.

The Burger Court also limited VRA relief under Section 2. In a watershed case, *Mobile v. Bolden* (1980), the Court overturned a precedent that provided Section 2 plaintiffs the option of establishing a case of voter discrimination based on discriminatory intent or discriminatory effect. The *Mobile* decision determined that plaintiffs must show that districts were drawn with discriminatory *intent* in order to provoke constitutional protection under Section 2. In *Mobile*, plaintiffs made a clear showing that the effect of the district system was to prevent blacks from electing candidates of their choice under the city council at-large election system. The Court ruled that "action by a state that is racially neutral on its face violates the Fifteenth Amendment only if it is motivated by a discriminatory purpose."[244] The city of Mobile's at-large election system had been established in 1911 and was arguably not instituted as part of an intentional plan to discriminate against black voters or to evade the dictates of the VRA. The decision was devastating to Section 2 lawsuits nationwide. VRA attorneys, convinced that intentional discrimination was almost impossible to prove, refused to accept new Section 2 litigation, while judges presiding over Section 2 cases stayed the litigation for failure to articulate a case.

The change to Section 2 jurisprudence imposed by the *Mobile* decision set the main agenda for the 1982 reauthorization hearings—the amendment of Section 2. (See Chapter 3). Proponents of the Voting Rights Act Order proposed an amended Section 2 that provided for both forms of proof —intent and effect.  Conservatives argued against overturning *Mobile*. The conservative opposition argued that to allow remedy for

---

[244] *Mobile v. Bolden*, 446 U.S. 55, 62 (1980).

unintentional discrimination was akin to a mandate for "proportional representation," despite the explicit denial of such a mandate in the letter of the amendment.[245] Conservatives made much of the argument that only electoral plans that ensured equal descriptive representation would subsequently pass muster under the Voting Rights Act. (See Chapter 3).

John Roberts, then a special assistant to the Attorney General, was the point person for the Reagan administration's response to the Section 2 amendments. He agreed that an effects test might lead to "quota systems" in electoral politics and did not believe that the "savings clause" in the bill removed that danger. "Just as we oppose quotas in employment and education, so too we oppose them in elections."[246] The idea of proportional representation was abhorrent to conservatives, and created an effective wedge issue. Still, VRA proponents ultimately prevailed and amended Section 2 to include both bases for action.

The Supreme Court promptly heeded the change in the law. In accordance with the 1982 amendment, the Court retreated from the *Bolden* standard. In *Rogers v. Lodge* (1982),[247] which was argued during the 1982 reauthorization process but decided after its conclusion, the Court applied an analysis that was in sync with the new legislative language.[248] Justice White, who dissented in the *Mobile v. Bolden* decision, wrote for the Court to void an at-large election system in Burke County, Georgia. "[A]lthough the state

---

[245] Title 42, Chapter 20, Subchapter I – A, U.S. Code Section 1973, "...*Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

[246] Roberts, John. "Talking Points For White House Meeting on Voting Rights Act," January 26, 1982, *Government Archives*, accessed March 2015, http://www.archives.gov/news/john-roberts/accession-60-88-0498/030-black-binder1/folder030.pdf.

[247] *Rogers v. Lodge*, 458 U.S. 613 (1982).

[248] Rush, Mark E. "*Shaw v. Reno* to *Miller v. Johnson*: Minority Representation and State Compliance with the Voting Rights Act", *Publius* 25 (Summer 1995): 172 fn. 78.

policy behind the at-large electoral system was 'neutral in origin,' the policy was being maintained for invidious purposes in violation of appellees' Fourteenth and Fifteenth Amendment rights." The system prevented blacks from being elected and was maintained in an effort to perpetuate invidious discrimination. Because the law resulted in discrimination against black voters, there was a viable basis for Section 2 relief that the Supreme Court respected.

The Court was also responsive to the 1982 amendments in its *Thornburg v. Gingles* (1985) decision.[249] Filed before the reauthorization, *Thornburg*, a Section 2 case from North Carolina, was heard after the Act had been reauthorized. The issue in *Thornburg* concerned the efficacy of seven districts established in the 1980 redistricting process. In the decision the Court applied a "totality of the circumstances" test to determine that that the majority of the new districts in fact violated Section 2 because in effect they diluted the black vote.

Some have referred to Burger Court VRA jurisprudence, as creating a "foot in the door for the Rehnquist Court's later application of colorblind jurisprudence and the subsequent death of minority voting rights."[250] This seems to go too far in reading subsequent developments back into an earlier period. The Court treated VRA application more sternly than the Warren Court, but was respectful of the liberal consensus and of Congress' adjustments to the legislation.

*Abigail Thernstrom: Colorblind Conservative against the VRA.* The 1980s marked a positive shift in conservative criticism against affirmative action law. "If the 1960s had been a time of opportunity for liberal critics, the 1980s were boom time for

---

[249] *Thornburg v. Gingles*, 478 U.S. 30 (1986).
[250] Hench, Virginia E. "The Death of Voting Rights: The Legal Disenfranchisement of Minority Voters" *Case Western Reserve Law Review* 48 (1998): 727, 752.

critics of liberalism."[251] This criticism included the VRA. The emerging conservative critique of the VRA tracks the career of Abigail Thernstrom, whose scholarship contributed significantly to the development of colorblind conservative theory at the Supreme Court. Her intellectual brief against the VRA presaged arguments subsequently adopted and used by conservative members of the Supreme Court.

In her 1978 book, *The Odd Evolution of the VRA*, Thernstrom argued that the VRA was "odd" because it was no longer being used for its original aims: to remove the traditional roadblocks used to disenfranchise black voters, like poll taxes and literacy tests. Instead it was being applied to make sure that "blacks and language minorities," like Mexicans in Texas, were elected to office based on their numerical strength. Essentially, so Thernstrom argued, the Act had been converted from a tool designed to allow the franchise to serve as a means used to guarantee that minorities could elect the representatives of their choice.[252] Thernstrom maintained that the *Allen* decision changed the VRA into something not contemplated by the Congress under Section 5. *Allen*, said Thernstrom, "permanently blurred the distinction between disenfranchisement and dilution," and created a foundation for a "ward system" of proportional representation.[253] Thernstrom's 1987 work, "Whose Votes Count," became a "veritable bible" for conservative jurists, including five who often formed a majority on the Rehnquist Court in the late 1980s.[254] Thernstrom's arguments have continued to influence the conservative justices on the Roberts Court. Clarence Thomas' first reference in his *Holder v. Hall*

---

[251] Shatz, Adam. "Thernstrom's in Black and White," *The American Prospect*, December 10, 2001.
[252] Thernstrom, Abigail. *Voting Rights and Wrongs: The Elusive Quest for Racially Fair Elections,* (Washington, DC: American Enterprise Institute Press, 2009).
[253] Ibid., Given the opportunity, Thernstrom would have testified against the Section 2 amendment in the 1982 hearings; however, due to some poor political jockeying, she was ostracized and alienated by the Civil Rights community and was effectively barred from the proceedings.
[254] Ibid.

103

concurrence is to Thernstrom,[255] citing her interpretation of the shift in the application of the VRA as both accurate and, as Thernstrom argues, problematic.

Thernstrom's critique of majority minority districts also strongly influenced the Supreme Court.[256] She argued that such districts were essentially improper racial gerrymanders that resulted in proportional representation. This ultimately meant that remedial action under the VRA was an improper use of racial consideration by the state. The Court later adopted this assumption. On this particular subject, Thernstrom's arguments influenced the Court's decision in *Shaw v. Reno* (1994) and VRA jurisprudence to follow.[257] In *Shaw*, as part of relief to white plaintiffs challenging a minority district, the Court rejected the district based on the fact that it was drawn based solely on racial considerations. Applying strict scrutiny to state districting, the Court held that such electoral line drawing was akin to apartheid.[258]

*The Rehnquist Court: Conservatives Begin to Wield Power.* Beginning in 1986 and ending in 2005, the Rehnquist Court bridged the period between the throwback Jim Crow conservatism, largely delegitimized by the civil rights revolution of the 1950s and 1960s, and the emergence and ultimate ascendance of colorblind conservatism between the 1980s and 1990s. The maturation of colorblind conservatism as a respected ideology included arguments directed against the VRA. The threat of proportional representation, stoked at the 1982 reauthorization hearings, provided fuel and justification for colorblind arguments against the VRA in the public sphere and at the Supreme Court.  Even as the Rehnquist Court demonstrated ostensible deference to the VRA, conservative justices

---

[255] *Holder v. Hall*, 512 U.S. 874 (1994) (Thomas concurring).
[256] Thernstrom's theories are echoed and supplemented by others, including Carol Swain and Carl Van Spavorsky of the *National Review*, and Timothy O'Rourke and Hugh Davis Graham.
[257] *Shaw v. Reno*, 509 U.S. 630 (1993).
[258] *Shaw v. Reno*, at 647 (1993).

narrowed its application, and limited allowable remedies. The Supreme Court expressed increasing doubts about such measures as the drawing of majority minority districts, which were required by the DOJ under Section 5 and by lower courts under Section 2. The shift in the Court's jurisprudence became especially pronounced when it began to apply strict scrutiny to state action taken pursuant to the VRA.

Changes in membership resulted in an increasingly conservative Court. Chief Justice William Rehnquist, a proponent of a conservative view of affirmative action prior to his elevation to lead the Court in 1986, penned or signed on to a number of decisions that narrowed the VRA during his tenure as Chief Justice.[259] On the Burger Court, Rehnquist had often been the lone dissenter on voting rights cases. But as a result of appointments to the Court by President Reagan ( Sandra Day O'Connor in 1981, Antonin Scalia in 1986, and Anthony Kennedy in 1988), the views of the majority eventually came into alignment with Rehnquist's. The Rehnquist Court's agenda was facilitated in part by the departure of two justices important to decision making aligned with the liberal consensus. Both Thurgood Marshall and William Brennan Jr. retired from the Court during the Rehnquist years: Brennan in 1990 and Marshall in 1991. Their departure resulted in a marked shift rightward in Supreme Court jurisprudence. By the mid-2000s, a core of conservatives on the Court, including Scalia and Thomas, were often joined by the moderate conservatives (O'Connor and Kennedy) and wielded much power. As Chief, "Rehnquist helped transform a bench preoccupied with the rights of the poor and disenfranchised into one that …[preferred to leave societal problems to the legislature.]" The Court "reduced protections for criminal defendants, curtailed Congress' power in

---

[259] Liptak, Adam. "The Memo That Rehnquist Wrote and Had to Disown*", New York Times Week in Review*, September 11, 2005. In 1952, while a clerk for former Justice Jackson, Chief Justice Rehnquist, wrote a memo arguing against the ultimate decision in *Brown v. Board of Education*.

local affairs, and…made a point of boosting states' rights at the expense of federal power…and limited the Court's role in pushing goals such as school desegregation and prison improvements."[260]

One result of the 1982 Section 2 amendments was a shift in the response of the DOJ to preclearance submissions and a corresponding shift in the Court's response to DOJ mandated remedies, particularly the drawing of majority minority districts in redistricting challenges. In the late 1980s and in the 1990s, the most common DOJ response to redistricting challenges under Section 5 or Section 2 was to order the establishment of majority minority districts.[261] The remedy became especially pronounced after the 1990 census and resulted in the election of a significant number of blacks to Congress. The increase in black elected officials due to districting pursuant to the VRA stoked dissent against the VRA in the public and judicial spheres. "The striking increases in the number of majority-black and majority-Hispanic districts triggered a white backlash that focused on the use of race in drawing majority minority districts and on the shapes of some of the districts."[262] White voters in five Southern states (North Carolina, Louisiana, Georgia, Texas and Florida) alleged that the creation of majority minority districts violated their right to equal protection, and subsequent lawsuits raised the issue in additional jurisdictions.[263] The Court became increasingly intolerant of majority minority districting during the Rehnquist term.

---

[260] Biskupic, Joan. "Rehnquist Left Supreme Court with Conservative Legacy," *USA Today*, September 4, 2005.
[261] Cunningham, *Maximization*, 1.
[262] Parker, Frank R.  *"Shaw v. Reno*: A Constitutional Setback for Minority Representation", *PS: Political Science and Politics* 28 (March 1995): 47.
[263] *Ibid.*

In *Presley v. Etowah County* (1992), after the election of the first black district commissioner in Etowah, Alabama, the Supreme Court held that state officials' decision to decrease the powers of commissioners, removing authority over road maintenance and expenditures in their districts, did not fall under the purview of Section 5.[264] Minority plaintiffs argued that the county had not sought preclearance before it significantly altered commissioner duties. The Court concluded that coverage of each and every electoral change would be overly burdensome to the many districts inside a covered state and would leave federalism "… a mere poetic ideal."[265] Again, we see the Court refusing to apply the *Allen* standard and consider all voting changes under Section 5. The decision penalized the first black officeholder and provided no recourse under the VRA. This was a marked shift away from the purpose of the Act, to open the franchise and its fruits to minorities.

"White backlash" lawsuits became commonplace during the term of the Rehnquist Court. A landmark lawsuit, the North Carolina case, *Shaw v. Reno,* was decided in 1993. Brought under the VRA and the 14th Amendment, the case ultimately was decided under the Equal Protection Clause. White citizens of North Carolina sued to void the districting plan for North Carolina ordered by the DOJ pursuant to Section 5. The plan included the addition of a second majority minority district that was unusually shaped. The shape of the district in particular led the members of the Supreme Court to deem the districting plan design to be based solely on race. The Court denied the constitutionality of the plan, finding that it lacked consideration of traditional redistricting measures. A deeply divided Court agreed that the Equal Protection Clause did not permit

---

[264] *Presley v. Etowah County,* 502 U.S. 491, 509 (1992).
[265] *Presley,* 502 U.S. at 510.

an election law or redistricting plan that ". . . goes beyond what [is] reasonably necessary to avoid retrogression." [266] The Court refused to uphold any districting plan that classified citizens solely on the basis of race.[267]

The Court's belief that the district shape was based on the consideration of race was not unreasonable; the district was drawn to accommodate minority voters. However, the shape of a district is not necessarily indicative of unlawful racial motive. District lines often fail to conform to neat shapes because of geography and because populations are not spread evenly across geographical areas. Also, it seems unreasonable for the Court to use the Equal Protection Clause to void 15th Amendment protection. The purpose of the VRA is to prevent discrimination against minority voters. The VRA was not designed to protect white voters. However, at the crux of colorblind conservatism is the idea that whites should not be discriminated against by civil rights benefits granted to minorities, that is, that civil rights legislation includes whites thereby voiding any "special treatment" of blacks. The Court's decision here and in other cases directly applies colorblind conservatism to the enforcement of the VRA. These decisions change the purview of enforcement and hinder the potential for the enforcement of the Act to improve minority voting rights.

This was a significant departure from precedent,[268] but lawsuits like *Shaw* quickly became relatively commonplace—cases brought by white plaintiffs claiming to have suffered discrimination due to VRA enforcement—and the Court continued its interpretation of the VRA as a tool to protect white voters. Tellingly, white plaintiffs who

---

[266] *Shaw*, 509 U.S. at 655.
[267] Benson, Jocelyn F. "A Shared Existence: The Current Compatibility of the Equal Protection Clause and Section 5 of the Voting Rights Act," *Nebraska Law Review*, 88 (Jan. 2009): 133.
[268] *U.J.O. v. Carey*, 430 U.S. 144 (1977); *Thornburg v. Gingles*, 478 U.S. 30 (1986).

108

lodged lawsuits against majority minority districts *were not required to meet the same standards* as were minority plaintiffs attempting to bring challenges to secure VRA relief. White plaintiffs were neither required to satisfy the *Gingles* criteria nor show injury due to the creation of majority minority districts to their voting power. The fact that the districts were drawn based on race was generally enough to justify the standing of residents to object.

In *Shaw*, the Court essentially ruled that race could be considered as a districting variable but that racial gerrymandering is unconstitutional. The Court did not make clear where the line between consideration and quotas lay, and it used the shape of the district analysis to avoid stating plainly that remedial action under the VRA was considered unconstitutional. [269] According to *Shaw*, any district considered strangely shaped by a federal court judge could be struck due to lack of compactness. Civil rights attorneys complained that *Shaw* chilled states' motivation to settle voting rights cases because the remedies being requested would violate *Shaw*. [270] Mark E. Rush argues that *Shaw* "was a call to Congress to clarify the vision of representation and voting rights that is manifested in the VRA." [271]

The Court continued to issue decisions narrowing the application of the VRA by limiting state action under the Equal Protection Clause, and by reducing the scope of Sections 2 and 5. The Court continued to tolerate suits by white plaintiffs without requiring that those individuals show injuries induced by DOJ-ordered VRA decrees. The shift in the Court's jurisprudence is similar to that which occurred with higher

---

[269] Rush, Mark E. "Shaw," p. 159.
[270] Grofman, Bernard. "*Shaw v. Reno* and the Future of Voting Rights", *PS Political Science and Politics*, 28 March 1995): p. 32.
[271] Rush, Mark E. "Shaw": 172.

education affirmative action case law. Schools once obligated to establish affirmative action policies to facilitate the admission of minority students were barred from considering race exclusively. Instead, under the *Bakke* line of cases, schools could consider race, but never exclusively, in making admissions decisions. Essentially, the "over-consideration" of race as part of an effort to cure past discrimination became unconstitutional. By the mid-1990s, state action under the VRA could take race into account, but it became unlawful to make race alone the primary consideration. The purpose of the VRA became inherently suspect in the eyes of the Court.

In *Holder v. Hall* (1994), the Court disallowed an increase in commissioner seats in a district where no black commissioner had previously had the opportunity to serve and simultaneously narrowed consideration for minority voters sought under a combination of Section 2 and Section 5.[272] The Court rejected the district court decision that the state of Georgia had a responsibility to increase the number of seats on a school board commission from one to five. In fact, the Court held that as a category, challenges to the size of a governing body are not cognizable under Section 2 of the VRA. The Court held respondents (black citizens) accountable for justifying the requested alternative—a five-member commission (the number approved by voters for consideration, but which was later voted down by ballot)—and complained that that there was no clear standard against which to measure the proper size of a commission. Under the pre-existing single-member commission system, solely white commissioners had controlled the county seat since 1912. But the Court held that "there [was] no principled reason why one size of a government authority should be selected over another."[273] The Court resisted opening

---

[272] *Holder v. Hall*, 512 U.S. 874 (1994).
[273] *Holder v. Hall*, 512 U.S. 874, 881 (1994).

110

minority office holding opportunities under the VRA. Furthermore, the Court in applying the *Gingles* standard did not consider that the black community qualified for relief under the Act.

In response to respondents' argument that the change in the size of a commission was reviewable under Section 5, and therefore also under Section 2, the Court averred that though it had indicated in the past that Sections 2 and 5 were essentially the same, the Court had not officially sanctioned the interchangeability of the causes of action pursuant to each. "We do not think that the fact that a change in voting practice must be precleared under Section 5 necessarily means that the voting practice is subject to challenge in a dilution suit under Section 2."[274] The Court went on to analyze the differences in the purposes of Section 2 and 5, starkly distinguished retrogression from dilution. The implication of the decision was that the purposes of the two sections did not overlap. The Court called the distinctions made between the two sections of the VRA "quite unremarkable."[275] Though the jurisprudence of Sections 2 and 5 has varied over time, the purpose of the VRA as a whole is to eradicate race-based voter discrimination. Barring claims arising under Sections 2 or 5 from consideration under the other section, inevitably limited and restricted the purview of the VRA.[276]

The Court did not go as far in *Holder v. Hall* as Justice Thomas would have. Thomas averred that the question should be considered from a statutory perspective. According to Thomas, the plain letter of the law does not cover the size of a commission because that aspect of a governing body is not a "standard, practice, or procedure" within

---

[274] *Holder v. Hall*, at 883.
[275] *Holder v. Hall*, at 884.
[276] The presidential administration was simultaneously encouraging the Voting Rights Section of the DOJ to divorce its consideration of Section 2 and Section 5 when considering preclearance applications.

the terms of Section 2.[277] More important, Thomas objected to voter dilution claims. He argued that they are impossible to adjudicate under Section 2 because the analysis demanded that judges apply political determinations about what constituted dilution.[278] Thomas quoted *Shaw v. Reno* to assert that the application of remedies under Section 2 resulted in the "racial balkanization of the Nation," and he cited Abigail Thernstrom to support his assertion that the VRA had been "converted from its original aim into a device for the regulation, rationing and apportioning of political power among racial and ethnic groups."[279]

The Court also increased the level of review of state action under the VRA, making VRA relief less secure. In *Miller v. Johnson* (1995) the Supreme Court overturned a districting plan designed under DOJ supervision under the VRA.  In *Miller* the Court applied strict scrutiny to the state action taken pursuant to the VRA. Strict scrutiny was used according to the Court because "[r]ace was, as the District Court found, the predominant, overriding factor explaining the General Assembly's decision to attach to the Eleventh District various appendages containing dense majority-black populations." [280] Compliance with an order under the VRA, said the Court, was not valid unless it survived strict scrutiny. In *Miller,* the Court held that the districts at issue were created with an exclusively racial motive, and were therefore unconstitutional. The application of strict scrutiny to state action taken under the VRA served to nullify civil rights legislation designed to provide protection to minority voters.

---

[277] *Holder v. Hall*, at 892 (Thomas concurring).
[278] *Holder v. Hall*, at 894 (Thomas concurring).
[279] *Holder v. Hall*, at 893 (Thomas concurring).
[280] *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

The Court reiterated the strong distinctions between Sections 2 and 5 in *Reno v. Bossier Parish School Board* (1997).[281] There the Court held that a preclearance denial could not be based on a Section 2 violation. Retrogression must be present to justify a preclearance denial; further, since retrogression and vote dilution were not the same, the DOJ could not attempt to mitigate vote dilution as part of a preclearance petition.[282] The Court rejected the DOJs combining Section 2 into Section 5 consideration, as had become the norm in the DOJ Section 5 preclearance process.[283] The Court went on to further limit VRA application in *Reno v. Bossier Parish School Board II* (1999).[284] There, the Court held that Section 5 preclearance may not be denied to a school board plan adopted with discriminatory but non-retrogressive intent.  The Court thereby instructed the DOJ that all apportionment plans were worthy of preclearance (approval) unless they were retrogressive in purpose or effect.[285]  If a redistricting plan maintained the status quo or only modestly improved voting power, then it qualified as constitutional. "Under this new standard, the Department [could not] object to an ameliorative plan even in the face of 'smoking gun' evidence of racial animus on the part of the key decision-makers."[286]

*In Georgia v. Ashcroft* (2003), "[t]he Supreme Court narrowed the scope of sanctionable changes to election laws and procedures that could be found to be retrogressive, dramatically altering the established legal test for evaluating whether certain election laws had a harmful effect on minority voters.[287] Here, a Georgia plan replaced majority minority districts with "influence districts," districts where minority

[281] *Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997).
[282] Benson, Jocelyn. "Shared Existence," 134.
[283] Cunningham, Maurice. *Maximization*, 73.
[284] *Reno v. Parish School Board II*, 528 U.S. 320 (1999).
[285] Benson, Jocelyn. "Shared Existence," 135.
[286] McCrary, Peyton. *Review of Cunningham, Maurice T., Maximization, Whatever The Cost: Race, Redistricting, and the Department of Justice.* H-south, H-Net Reviews. February 2002.
[287] Benson, Jocelyn. "Shared Existence," 136.

voters cannot elect "a member of their group, but do have the opportunity to help choose the winner from among the white or Anglo (and sometimes other candidates) contesting that election."[288] The Court approved of influence districts as non-retrogressive. At the same time that the Court denied coverage for racial gerrymandering pursuant to the VRA, it approved political gerrymandering completed by parties based purely on political motives. But party competition, of course, is strongly tied to race. In a 2004 written ruling by Antonin Scalia, *Vieth v. Jubelier,* the Court ruled that the political gerrymandering alleged in the Pennsylvania case was not unconstitutional. Republicans newly in control of the state legislature redrew lines to assist the party politically and to punish Democrats who had politically gerrymandered the previous districting plan.[289]

VRA cases decided by the Rehnquist Court mark a pronounced shift toward the application of colorblind principles to VRA jurisprudence. During Rehnquist's tenure, the Court applied strict scrutiny to state action designed to comply with VRA orders. It voided remedial plans, narrowed the scope of the Act, and established a strong distinction between relief under Sections 2 and 5 of the VRA. The Court shifted away from the presumption that the VRA was designed to repair the poor state of minority voting and toward the theory, a colorblind one, that *no* voter should be impacted negatively due to the consideration of race in the voting process.

*The Roberts Court.* Colorblind conservatism has had a far greater foothold on the Court's decision making in the 2000s than in previous years. The liberal consensus has faded and colorblind conservative arguments against affirmative action are now

---

[288] Engstrom, Richard L. "Redistricting: Influence Districts — A Note of Caution and A Better Measure," *The Chief Justice Earl Warren Institute on Law and Social Policy*, UC Berkeley Law School, May 2011: 1-8.
[289] *Vieth v. Jubelier*, 541 U.S. 267 (2004).

respected. Never dismissed as camouflaged Jim Crow arguments, colorblind conservative assertions are considered a logical basis for a fair rendering of the Constitution. Chief Justice John Roberts and the other key conservative members of the current Supreme Court, Thomas, Scalia and Alito, subscribe to colorblind principles and apply colorblind logic on affirmative action legislation and programming. The conservative majority believes that affirmative action legislation is outdated and unconstitutional, including the important aspects of the VRA.

The balance between liberals and conservatives on the Roberts Court is the same as that on the Rehnquist Court, despite changes in personnel. George W. Bush replaced Justice Sandra Day O'Connor with Samuel Alito and Chief Justice Rehnquist with John Roberts, after the retirement and death of the former Associate Justice and Chief, respectively. The new conservatives joined the core of conservative justices already on the Court: Scalia and Thomas, and the conservative leaning moderates, Stevens and Kennedy (now the new swing vote after the departure of O'Connor). Barack Obama had the opportunity to maintain the preexisting number of justices on the liberal side, by appointing Sonia Sotomayor (2009) to replace Justice David Souter, and Elena Kagen (2010) to replace Justice John Paul Stevens. Sotomayor and Kagen joined Ginsburg and Breyer, preserving the five-to-four balance, conservative to liberal, on the Court in existence prior to the change in Court leadership.

The Roberts Court is a conservative one, and it is conservative on the VRA. Roberts came to the Court from a career steeped in conservative policy and jurisprudence. A member of the Federalist Society, Roberts clerked for conservative judges, including Justice Rehnquist in the 1980s, and served the Reagan and Bush

115

administrations in various capacities.[290] Roberts also served as a conservative member of the D.C. circuit court. Justices Thomas, Scalia, and Alito also subscribe to colorblind conservative principles, prioritize states' rights, and bring those considerations to bear on affirmative action legislation, including the VRA. Thomas has taken the lead in publishing opinions that claim that Section 5 is unconstitutional.

The Court's affirmative action agenda became clear early in Roberts' tenure. In the *Parents v. Seattle* case in 2006, an equal protection lawsuit, Roberts wrote for the Court to express his dedication to ending race-based remedies. The Court struck down the school districts' rule mandating the consideration of a student's race as a tiebreaker to determine student assignment to local schools due to overcrowding. Roberts relied on the precedent in *Brown v. Board of Education* (1954), which he described as a mandate to exclude race as a consideration in determining school admissions. Roberts asserted that *Brown* pronounced the end to the consideration of race in grade school assignments and that therefore that the Seattle school district acted unconstitutionally. Applying the precedent in *Adarand Constructors* (1994), the Court used strict scrutiny to evaluate the states' use of race as a prerequisite to school assignment and found it unlawful.[291] The state, said Roberts, had not engaged in the "narrowly tailored," good faith consideration of race neutral alternatives required under the 14th Amendment.[292] "The way to end

---

[290] The Federalist Society is a "a group of conservatives and libertarians interested in the legal order founded on the principles that the state exists to preserve freedom, that the separation of governmental powers is central to our Constitution, and that it is emphatically the province and duty of the judiciary to say what the law is, not what it should be." See http://www.fed-soc.org/aboutus/. Samuel Alito, Antonin Scalia, and Clarence Thomas are also members of the Federalist Society.
[291] *Adarand Constructors v. Pena*, 515 U.S. 200 (1995). In *Adarand*, the Court held that all racial classifications must pass strict scrutiny review. Furthermore, past injury does not prima facie show present or future injury. After *Adarand*, even racial classifications designed to remedy past discrimination are subject to the high bar posed by strict scrutiny review.
[292] In fact, the school district considered a number of non-racial factors before assigning a student to a school. The consideration of race was a tiebreaker measure designed to ensure that the racial composition

116

discrimination based on race is to stop discriminating on the basis of race,"[293] Roberts opined. "...[R]ace discrimination in public schools is unconstitutional."[294]

The Roberts Court has applied a similar logic to the Voting Rights Act. It has made significant progress at applying colorblind analysis to narrow VRA protection. In general, the Court has interpreted the law in a manner than does not favor minority voting rights. The Court's decision in *Parents* ended state mandated diversity when there was overcrowding in the Seattle School district. Similarly, the Court's interpretation of the VRA has been detrimental to the ability of the federal government to apply legislation to improve the voting power of minority voters. The Court has taken a hands-off approach to federal oversight of state action on voting law changes, even when those changes might weaken minority voting rights. This conservative approach has culminated in severe restrictions on the VRA's reach. When the Robert's Court struck the Section 4 coverage formula in *Shelby v. Holder* in 2013, it removed all states from Section 5 coverage and ended federal oversight of voting law changes under the VRA.[295]

The Roberts Court's interpretation of the VRA resulted in less protection for minority voters and ironically (or perhaps intentionally) greater protection for the Republican Party under the VRA. In a 2008 decision, *United Latin American Citizens v. Perry* (2008), the Court approved the "Delay" redistricting plan, despite its highly unusual timing — and the fact that it decreased the voting power of Democratic Latinos. The Court held that the political gerrymandering by Republicans, then in control of the

---

of the school was considered when overcrowding forced the assignment of students to schools other than those assigned to them geographically.

[293] *Parents v. Seattle*, 127 S.Ct. 2738, 2768 (2007).

[294] Toobin, Jeffrey. *The Nine: Inside the Secret World of the Supreme Court*, (New York, NY: Anchor Books, 2008), 389.

[295] *Shelby v. Holder*, 133 S.Ct. 2612 (2013).

117

state legislature, was constitutional, despite the unorthodox timing and partisan redrawing of district lines just a few years after the decennial redistricting. The Court held that it was constitutional for Texas Republicans to redraw district lines to benefit the Party, even if it violated Section 2 of the VRA. The Court found a violation of Section 2 in a portion of the disputed Texas' districting plan where it decreased the percentage of Democratic Latino voting strength in the district in question. In that district, the Democratic representative was replaced by a Republican.

Voters seeking a majority minority district were rejected by the Court in *Bartlett v. Strickland* (2009). Based on a totality of the circumstances test, the Court held that district voters did not meet the threshold test in *Thornburg v. Gingles*, so that they might qualify to be considered for a majority minority district. According to the Court, the district was already a "*de facto*" majority minority district, since blacks could secure enough crossover votes to secure the election of their preferred candidate. The Court refused to take action to ensure the improvement of minority voting power. On the contrary, the Court reiterated its belief that Section 2 did not "require state officials to draw election district lines to allow a racial minority that would make up less than 50 percent of the voting age population in the redrawn district to join with crossover voters to elect the minority's candidate of choice."[296] In general, the Roberts Court has deemphasized relief for minority voters pursuant to the VRA.

In 2009, the Court announced its position that Section 5 of the VRA might not be constitutional, the first time a Supreme Court majority openly questioned the validity of the statute since it was passed. Filed in federal court six days after the conclusion of the 2006 reauthorization, but not argued until April 2009, the *Northwest Austin Municipal*

---

[296] *Bartlett v. Strickland*, 556 U.S. 1, 2 (2009).

118

*Utility District No. One v. Holder* (2009) (MUD) lawsuit was based on the presumption that the failure of Congress to amend Section 5 meant that there was a persuasive case to be made that the section was outdated and unconstitutional.

The MUD lawsuit was an action brought by a Texas utility district subject to Section 5 coverage because it was located in a covered state. Northwest Austin Municipal District challenged the constitutionality of Section 5, and in the alternative, asked the Court to rule that Northwest Austin Municipal District be allowed to bail out of Section 5 coverage independent of the state. The majority of the Court stopped short of holding that Section 5 was unconstitutional. But the Court did allow the district to bail out, independent of the state, essentially overturning the Court's decision in *City of Rome v. United States* (1980). The Court went on to explain that subdivisions like the utility district were eligible for bailout and that Section 5 was likely unconstitutional. The Court made clear that for Section 5 to achieve constitutional security, it would be necessary for Congress to revise Section 5 to reflect the significant improvement in voting rights in the covered states. The Court took the opportunity both to reveal its lack of respect for the VRA and state its intention to strike the most important provision in the law.

The Court was likely well aware that the possibility of a congressional compromise to amend Section 5 was impossible. The 2006 reauthorization had just been completed a short three years prior, and the Act, including Section 5, was renewed for twenty-five years. It was no secret that Congress intentionally did not amend Section 5 in 2006 because such an attempt would have made it impossible to pass the reauthorization. (See Chapter 3). The MUD decision was eight to one, including all but Justice Thomas in the majority. The liberal justices on the Court appear to have agreed to the decision in

119

MUD because it staved off consideration of the constitutionality of Section 5, and because it left the legislation intact and unchanged.[297] It is also possible that they overestimated the sanctity of the legislation's status as a crown jewel of the Civil Rights Movement, and like many, thought it unlikely that the Court would overturn the legislation. Clarence Thomas dissented in MUD to insist that the Court should have addressed the constitutionality of Section 5. He argued that that section was unconstitutional because it exceeded the powers of the 15th Amendment.

Thomas, a leader on the Court in publishing decisions that aver that Section 5 is unconstitutional, dissented again in *Perry v. Perez* (2012), to assert that Section 5 was unconstitutional. In that case, the Supreme Court vacated a proposed redistricting plan in Texas, but not to the benefit of minority voters because the original inclusive state district lines could not be re-imposed.[298] Texas district lines still needed to be redrawn after the Court's rejection of the districting plan, by legislators apparently committed to plans that minimized the power of minority voters. As such, the imposition of the preclearance requirement left voters insecure as to how their voting rights would be treated by the state of Texas. The Court ordered a plan that had "neither had the purpose nor [a potential] effect of denying or abridging the right to vote on account of race or color," but the state population had grown and the state legislature remained in control of revising district lines.[299] Justice Thomas dissented to say that Section 5 was unconstitutional and that the

---

[297] Serer, Adam. "'Demeaning Insult' in John Robert's Voting Rights Act Decision," March 19, 2014, *MSNBC*, accessed March 2015, http://www.msnbc.com/msnbc/demeaning-insult-chief-justice-john-roberts-voting-rights-act-decision.
[298] *Perry v. Perez*, 132 S. Ct. 934 (2012).
[299] 42 U.S.C. Section 1973c(a).

"duly enacted redistricting plans should apply…" free of any preclearance requirements.[300]

In *Shelby v. Holder* (2013), the Roberts Court got another opportunity to adjudicate the constitutionality of Section 5, and the Court went still further in its application of colorblind conservative principles.[301] The Court fundamentally restricted the power of the Act's temporary provisions in *Shelby*. Surprisingly, the Shelby Court refrained from holding that Section 5 was unconstitutional. But, the decision was nonetheless successful at removing the Section 5 preclearance power. The Court struck Section 4 of the VRA in *Shelby*. Section 4 outlined the formula by which states covered by Section 5 were identified. By voiding the Section 4 coverage formula, the Court removed all states from coverage, and therefore removed the federal government's power to preclear laws in those states under the VRA. The Court took this action in the face of a polarized Congress that even now remains unwilling and unable to revise the coverage formula. In *Shelby*, the Court removed the most powerful operating aspect of the VRA in preventing race discrimination in voting.

In the decision, Roberts wrote that states had significantly improved their voting records and that the Section 4 criteria no longer accurately identified states exercising discriminatory behavior in the voting arena. Furthermore, Roberts held that the VRA, by applying Section 5 to some states and not others, violated the tradition of "equal sovereignty of the states," singling out some states for federal oversight and not others. [302] Notably, *Shelby v. Holder* is the first decision since *Dred Scott* to invoke the doctrine of

---

[300] *Perry v. Perez*, at 945 (Thomas dissenting).
[301] *Shelby v. Holder*, 133 S. Ct. 2612 (2013).
[302] *Shelby v. Holder*, 133 S. Ct. at 2623.

121

equal sovereignty where the right to vote is involved."[303] By holding Section 4 unconstitutional, the Court was able to achieve its aim of disengaging the VRA without striking Section 5. With no states covered, the Section 5 power was rendered moot. The decision was a boon for the Chief Justice's anti-affirmative action agenda. Richard Hasen, calls "[t][he Chief Justice ... a patient man playing a long game" [to end affirmative action].[304] The *Shelby v. Holder* decision removed the federal government's power over state voting laws and is the biggest conservative victory over the VRA Order to date.

Thomas, joined by Scalia, concurred with the majority that Section 4 was not constitutional and reiterated his opinion that he "would [also] find Section 5 of the VRA unconstitutional..."[305] According to Thomas, the plain discrimination that Section 5 was designed to circumvent no longer existed. It was therefore impossible to justify burdening covered states with responsibilities under and federal oversight pursuant to Section 5. "The extensive pattern of discrimination that led the Court to previously uphold Section 5 as enforcing the 15th Amendment no longer exists."[306] Thomas asserted that even though the Court was willing to leave Section 5 intact, Congress failed its burden to justify a current need for the provision and its expansion in 2006. [307] Thomas thought the Court should have ruled on the constitutionality of Section 5. He argued that "[b]y leaving the

---

[303] Blacksher, James and Lani, Guinier. "Free at Last: Rejecting Equal Sovereignty and Restoring the Constitutional Right to Vote Shelby County v. Holder," *Harvard Law and Policy Review* 8 (Month 2014): 39.
[304] Hasen, Richard. "The Chief Justices Long Game," *New York Times*, June 26, 2013.
[305] *Shelby v. Holder*, 2631 (2013) (Thomas concurring).
[306] *Shelby v. Holder*, 2632 (Thomas concurring).
[307] *Shelby*, Id. (Thomas concurring).

inevitable conclusion unstated, the Court needlessly prolong[ed] the [inevitable] demise of that provision."[308]

Ruth Bader Ginsburg dissented in *Shelby*, joined by Justices Breyer, Sotomayor, and Kagen. According to Ginsburg, Congress has the power to enforce the 14th and 15th Amendments by reauthorizing the VRA. Further, she held that Congress did so, correctly, in 2006, supported by a relevant and ample record. Ginsburg argued that the evidence presented at the 2006 reauthorization justified the reauthorization of the VRA and the constitutionality of Sections 4 and 5. She pointed out that the Court's majority decision disabled the federal government's power under Section 5 at a time when it is uniquely positioned to counter the impact of "second generation" voter discrimination, which is still ongoing in covered states including in Alabama.[309] Ginsburg argued that the law worked to prevent voter discrimination and that it protected against backsliding by states interested in limiting voting rights based on race.  Ginsburg concluded that Section 5 coverage should be maintained as part of the continuing effort to maintain a voting system free of racial discrimination.[310] Furthermore, Ginsburg considered the Court's reliance on "equal sovereignty" to be improperly applied.[311] Ginsburg lamented that "[t]hrowing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet."[312]

Evidence of the damage of the *Shelby* decision to the power of the VRA was almost instantaneously apparent. States previously barred from implementing potentially

---

[308] *Shelby*, Id., (Thomas concurring).
[309] *Shelby*, at 2647 (2013) (Ginsburg dissenting).
[310] *Shelby*, at 2646, (Ginsburg dissenting).
[311] *Shelby*, at 2649, (Ginsburg dissenting).
[312] *Shelby*, at 2650, (Ginsburg, dissenting).

123

discriminatory voter ID laws by the DOJ under Section 5 immediately announced their intention to put those laws into action.[313] Texas and North Carolina both instituted laws previously denied preclearance shortly after the *Shelby* decision was published. Additional states were thus motivated to reinstate efforts to pass or enact voter ID laws and/or to impose laws frozen during the 2012 election. Without the Section 4 criteria to identify covered states, the DOJ is unable to bring Section 5 preclearance to bear on pending law changes in formerly covered states. The unique power provided by the VRA became inoperable.

*Conclusion.* The Roberts Court has driven the VRA to the precipice Richard Valelly theorized was impossible. The Court rendered the unique power of the VRA void and further challenged the hegemony of the VRA Order. The Court's shift to holding parts of the VRA unconstitutional developed out of slow incremental change. Initially the Court indicated full support of the spirit and intent of the VRA. But as early as the late 1960s and early 1970s, the Court shifted to partial support, and by the early 2000s, the Court had graduated to tacit non-support of the law's purpose and objective. The shift tracks the development of colorblind conservatism in the social and political spheres. Today, some support the liberal consensus and many others endorse colorblind conservative principles and consider the VRA to be detrimental to mainstream voters. The conservative siege against the VRA is making headway.

---

[313] Pinckney, Darryl. "Blackballed: The Black Vote and US Democracy," *New York Review of Books* (Month 2014): 62-3. The state of Texas instituted its voter ID law hours after the Shelby decision was announced.

# Chapter 6
## Conclusion:  The End Game

The right to vote is fundamental to American democracy. When the franchise operates effectively, i.e., when people turn out and voice their opinion on issues or in the selection of elected officials *and* their votes are counted, voting is a method by which democratic action can take place. After a long history during which the country denied most blacks the right to vote and blocked their participation in the creation of policy or the election of public officials, the 1965 Voting Rights Act dramatically broadened the franchise in the United States to include minority voters. The passage of the VRA facilitated and supported the right to vote for blacks by empowering the federal government to require states to register voters, oversee state elections, and, in some cases, preclear state voting law changes before they could be put into effect.  Under the effects of the law, a new racial voting order took root, dislodging the Jim Crow Order that had been in place since the end of Reconstruction

This dissertation has evaluated the influence of conservatism, mostly driven by Republican political imperatives, on federal efforts to enforce the Voting Rights Act. The VRA engendered resistance by those who resented the establishment of federal power over state functions left to the states under the Constitution and by virtue of long-established practice. Conservatives resisted the passage of the legislation during deliberations in 1965 and have continued to oppose the Act throughout the almost fifty years that it has been the law. Over time, the conservative long game against the VRA has influenced the federal government, weakening federal application and enforcement of the Act.

Because the VRA has had such a significant impact on voting in the United States, it came to be taken for granted as a new political order. By 1969, the VRA enabled more than eight hundred thousand blacks to register to vote in the seven states to which Section 5 originally applied.[314] The number of black elected officials also increased dramatically, "more than fivefold, rising from 1469 in 1970 to 7370 in 1990."[315] These developments in the electorate, combined with the ongoing application and reauthorization of the VRA's temporary provisions in 1970,1975,1982, and 2006, led many to believe that the remedy was permanent and not subject to erosion.

Yet in fact the law has suffered from the influence of conservatism on the federal government, and that has led to recent deterioration in the VRA Order. Contrary to Richard Valelly's optimistic conclusion in *The Two Reconstructions*, the research presented here shows that the VRA, often called the "crown jewel of the civil rights movement,"[316] did not secure enduring legitimacy in American jurisprudence.[317] Quite the contrary: the legislation is at risk of becoming impotent. As described in detail in Chapter 5, a major section of the law, Section 4, was voided in 2013.[318] That change resulted in a significant weakening of the VRA by undermining Section 5, which had granted the federal government authority to preclear voting law changes in any of the states identified under Section 4. The decision matters because Section 4 identified states in which voting laws still required oversight.

---

[314] U.S. Congress. Senate. Subcommittee on Constitutional rights of the Committee of the Judiciary. 1969 and 1970. "Bills to Amend the VRA of 1965." 91st Cong., 1st and 2nd session.  Charles Mathias (R-MD).
[315] Joint Center for Political and Economic Studies. *Elected Officials 1990: A National Roster*. (Washington, D.C: Joint Center for Political and Economic Studies Press, 1991): 1.
[316] Gerken, Heather. "Goodbye to the Crown Jewel of the Civil Rights Movement: People died to pass Section 5 of the Voting Rights Act, but that Did not Save It from the Supreme Court," *Slate.com*, June 25, 2013.
[317] Valelly, Richard M. *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago, IL: University of Chicago Press, 2004), 19.
[318] *Shelby v. Holder*, 133 S.Ct. 2612 (2013).

126

This is not the first time in American history that anti-discrimination law designed to establish minority access to the franchise has become vulnerable. Lacking persistent support from the national government, the sweeping anti-discrimination provisions established after the Civil War to provide newly freed blacks the right to vote and to neutralize the power of states to deny the franchise eroded and collapsed quickly.[319] Initially these provisions were supported in Congress, where Radical Republicans passed the laws in large part to bolster the Republican Party in the South. But anti-discrimination laws were not backed by the executive branch, which prioritized the restoration of the Union. Nor were they supported by the Supreme Court, whose decisions undercut, voided, and ultimately rendered obsolete anti-discrimination law.[320] By the turn of the 20th century, the Jim Crow Voting Order was in force; states controlled the franchise, and blacks were denied the right to vote.

**Reconsidering Voting Rights Act Scholarship**

*Implications for Political Science Literature.* My research contributes to political science literature, specifically to the study of American politics, public policy, and American political development.  Most directly, this dissertation extends the scholarship of American political development and applies as its framework the principle of "intercurrence," a concept introduced by Karen Orren and Stephen Skowrownek.  The development and enforcement of the VRA have been affected by "the awkward

---

[319] Valelly, *Two Reconstructions,* 19.
[320] *The Slaughterhouse Cases,* 83 U.S. 36 (1973). Beginning with *The Slaughterhouse Cases,* the Supreme Court decided a series of cases between 1873 and the 1880s that weakened anti-discrimination law post-Reconstruction.

127

overlapping of old and new orders, which produces friction and change."[321] Here, I show that intercurrence between the Voting Rights Act Order and the Colorblind Voting Order that vie for hegemony today have influenced the durability of the VRA Order. Political scientists and historians writing before me have largely overlooked this interaction when examining the VRA. Most literature written about the Act has assumed that the law is permanent and that outside forces are not actively eroding it. (To be fair, this decay has become much clearer over time.) My examination of the influence of conservatism on the national government's implementation of the VRA highlights the dynamics of intercurrence and reveals cracks in the VRA foundation that formerly went unrecognized.

My work also explores the relationships of the political parties to each other and to voting rights after the height of the civil rights movement. These connections were examined for the First Reconstruction period by V.O. Key and Paul Frymer. They demonstrate that the failure of either party to support black voting rights post-Reconstruction contributed to the development and maintenance of the Jim Crow Voting Order. In this dissertation I show that voting rights legislation in the modern era is better supported by the Democratic Party. Opposition to VRA-based minority voting rights is located primarily in the Republican Party. My dissertation exposes how Republican officials in all branches of government have argued against and taken action to limit the influence of the VRA.

*Engaging historians on the VRA.* My research also provides a historical analysis of the VRA. Historians have completed significant work that has analyzed the similarities between the First and the Second Reconstructions. Much of the insight of that writing relies on a framework that assumes that the Second Reconstruction succeeded whereas

---

[321] Orren, Skorownek. *The Search for American Political Development.*

the First did not. Historians such as C. Vann Woodward and Eric Foner have compared the Reconstructions to determine the causes for the decline of the First Reconstruction and the rise of Jim Crow laws. Foner ultimately posits a number of factors for the decline of anti-discrimination law post-Reconstruction; Woodward offers insight into the development of Jim Crow laws. As discussed in Chapter One, Woodward's work also established that the two periods were very similar, and he cautioned that the VRA Order could become subject to the same kind of deterioration that occurred in the late 1800s. He warned, in his 1981 Congressional testimony at reauthorization of the VRA, that a weakening of Section 5 might portend a revival of voter discrimination. In the aftermath of the *Shelby v. Holder* Supreme Court decision, Woodward's warning appears to have become fact.

My research extends the work of these historians on the VRA by exploring the near fifty-year life of the Act. From this perspective, it is possible to see that, despite the significant strength of the VRA Order and its successes, the Act is not unassailable. Besides confirming Woodward's warning, my analysis affirms Alexander Keyssar's thesis that voting rights in the U.S. are cyclical, that they expand and contract over time. Voting rights expanded in 1965 at the passage of the VRA; there has been a consistent and ongoing effort to contract those rights since.

*Valelly's The Two Reconstructions.* In my dissertation, I take issue with Richard Valelly's claim in his book, *The Two Reconstructions*, that the Second Reconstruction is a success in contrast to the First. Valelly focuses his work on explaining the relationship of party and jurisprudence building during the First and Second Reconstructions. He argues that the impacts of both party politics and judicial decisions during the second

129

reformation of discrimination law produced a voting order that is more or less permanent. Hence, in his view, the VRA became a durable piece of legislation that has done much to remedy inequality over the course of approximately forty years (he was writing in 2004), in contrast to legislation passed during the First Reconstruction, which was repealed within ten years. Valelly centers his comparison on political party strength and jurisprudence building, and the strategy is persuasive.  His assessment assumes, however, that the fortuitous state of the Democrats' party building and jurisprudential support that existed in the 1960s and 1970s meant that the legislation has not been significantly threatened by time or other pressures. I argue that the conservative movement has undermined the law and that it has produced an effect that is akin to the activity that caused the end of similar legislation during the First Reconstruction. This time, the pressure was more subtle and took longer to have a negative impact.

In fact, in *The Two Reconstructions,* Valelly correctly points out a number of problems facing the VRA. I would argue that all of the challenges Valelly identifies are intertwined with conservative opposition, which is investigated here. However, Valelly does not consider the challenges fatal to the VRA Voting Order. Rather, he concludes that reauthorization of the Act in 2006 would be critical because the Second Reconstruction aims had not yet been achieved and because there was still a need for the remedy to continue to work as a "gradual solvent of economic and educational inequality."[322] Valelly ends his investigation confident that the legislation would be renewed, and that it would continue to exist until the aims of the VRA Order had been accomplished.

---

[322] Valelly, *Two Reconstructions*, 250.

Valelly cites three main issues faced by the VRA—he calls them "warts"—undermining the bipartisan political and judicial support that has heretofore upheld the VRA and its unique provisions.[323] First, he notes that since the passage of the VRA, the Republican Party has used it to mobilize the existing membership and to solicit new members in actual opposition to the Act and other remedies for black and other minority communities. Second, he argues that the GOP has abused the application of the law by using it to benefit white voters; and third, that the Supreme Court has become more conservative and narrowed the application of the Act. In response to the first two issues, Valelly explains that the VRA was indeed something of a "golden goose" for Republican Party mobilization. And he acknowledges that the GOP abused the VRA by the use of Section 2 to redistrict to benefit white voters. But he does not view these problems as potentially fatal to the VRA Order.

Valelly's third "wart" is related to jurisprudence. He argues that the Court had become more conservative and has narrowed the application of both Sections 2 and 5. Still, he is not "convinced that the Court's application of colorblind conservatism has harmed black voters," and he downplays Supreme Court opposition to the VRA as "relatively recent."[324] Valelly cites the twenty-five years of support for the Act following its passage, and the fact that the Court's support was critical to the establishment of a solid voting rights order that fundamentally changed the game for black voters, essentially to assert that trouble from the Supreme Court is unlikely.

Valelly's assumptions are reasonable. In 2004, when Valelly published his work, there had been no significant constitutional challenges to Section 5 at the Supreme Court

---

[323] Ibid., 234.
[324] Valelly, *The Two Reconstructions*, 237.

131

and the Congress had by then repeatedly reauthorized the legislation. Not only that, but, as he notes, when the Court had made changes to the Act that limited its application, Congress amended the VRA to overrule the Court. A direct challenge to Section 5 of the Act was not initiated until 2006, after Congress reauthorized the VRA for twenty-five years. Before the *North Austin Municipal District v. Holder* ruling in 2008, the Voting Rights Act Order did appear safe from desecration by the Supreme Court. From Valelly's perspective, as well as that of a majority of academics and politicos, a Court challenge of the VRA would not be fatal. Clearly, the defiance presented by Republican presidential enforcement (including the nomination of conservative justices) went unrecognized as a major threat to the VRA Order.

The problems are more serious than Valelly acknowledges. The passage of the VRA did provide the Republican Party with a strong issue on which to encourage membership based on race division. Since the 1970s, the Party has grown to include large numbers of whites, in and outside the South, with strong gains among married voters, men, and Catholics.[325] These have added strength to Republican voting rolls, and that strength has increased Republican control of state legislatures and governors' mansions. As a result, arguments generated by conservatives in Congress echo in state and local legislatures and have benefited the conservative long game against the legislation at the national and state levels.

In addition, Republican legislatures have used the VRA to draw district lines that benefit Republicans. The drawing of those lines in the 1990s led to a shift in the composition of state legislatures and subsequent moves to pass voter identification

[325] Abramowitz, Alan I and Kyle L Saunders. "Exploring the Bases of Partisanship in the American Electorate: Social Identity vs. Ideology" *Political Research Quarterly* Vol. 59, No.2 (Sage Publications on behalf of University of Utah), June 2006: 175.

legislation, beginning in the 2000s.  In addition to using the legislation to maximize Republican voting strength, the VRA has also been used by white plaintiffs in voting discrimination lawsuits. The Supreme Court has tolerated these suits, which have resulted in relief for white voters and the denial of relief for voters of color under the law specifically designed to protect minority voters after a long history of voter discrimination.

The "relatively recent" challenges Valelly points to at the Supreme Court are revealed in this dissertation to have, in reality, been "a-long-time-a-coming." Although the Warren Court exercised clear support for the VRA, after 1970, the Court began to limit ever more consistently the application of the law, steadily strengthening the now fifty-year trend of diluting support for the Act and, inevitably, the Act itself. Valelly addresses concerns about the Court by relying on past support and experience. But, unlike past situations, there is no upcoming reauthorization where Congress might amend the Act to reverse Court decisions. Even if there were, Congress is far too polarized today to overrule *Shelby* on the floor. Congress made no changes to the VRA after the MUD decision, and it is highly unlikely to agree to reinstate Section 4. My dissertation shows that the problems Valelly addresses cursorily in his conclusion are far more important than they appear to him.


**Review of the Dissertation Findings: Opposition to the VRA**

Opposition to the VRA has centered on Section 5 of the Act. The Section 5 authorization of federal oversight over state voting law changes struck at the core of federalism relations under the Jim Crow voting order and has continued to offend states

rights' proponents since. Section 2 of the Act has also been contested, but it provides traditional relief, viz., litigation, and so is less a motivator of the intense pushback against the VRA than is Section 5. Section 5 was specifically designed to improve upon litigation as a form of relief, and its intrusion into state sovereignty recalls the passions of the nullification debates over the Alien and Sedition Act or the nation's late 1850s conflicts over slavery. Regardless of the section of the VRA being challenged, when people think VRA, they think Section 5.

*Resistance in Congress.* Congress passed the VRA in 1965 with strong bipartisan majorities, and it renewed the Act at every opportunity, in 1970 1975, 1982, and 2006. But the strong roll call records enjoyed by the VRA at reauthorization masked significant and ongoing dissent in Congress since 1965. Conservative opposition has been expressed in the form of arguments against the Act, attempts to neutralize the Act's provisions, and the exercise of delay and sabotage tactics during reauthorization hearings. Conservative dissent has existed as an important part of each reauthorization of the VRA.

Conservative dissent in Congress has been sustained but has resulted in few clear victories at limiting or repealing the law. Once, in 1970, representatives in the House were able to remove Section 5 from the legislation when the Mitchell bill passed, but the victory was short lived. The measure was replaced by a compromise bill generated in the Senate that included Section 5. On the other hand, Congressional contestation has helped to strengthen and engender public opposition to the VRA and to make it vulnerable to political and legal challenge outside Congress.

Early conservative argumentation against the VRA in Congress was relatively unpersuasive. Articulated in what was considered the outdated language of the traditional

Jim Crow Order, early opposition arguments did not resonate effectively with the liberal consensus of the 1970s, or with the cultural expectation that civil rights legislation would be enforced to democratize voting for many who had experienced discrimination. And, despite the vast improvements in voting fairness, by 1975 parity between white and black voters had not yet been achieved. Moreover, ongoing resistance to the VRA by states was well documented. In 1970 and 1975, proponents were able to show that the Act and its unique provisions should continue. Both reauthorizations resulted in legislation that was stronger than the original bill. In 1975, the legislation was expanded to include bilingual minorities. In both years, Section 5 remained intact. Conservative resistance, though present, was not successful in reversing the law or mitigating Section 5. It seems reasonable to characterize this opposition as the "last gasp" of Jim Grow, originating in the old Democratic Party but gradually becoming untethered from its partisan roots.

As I have observed, the locus and content of conservative opposition shifted during the 1980s and after. The GOP's Southern strategy, aimed at building a durable majority through a commanding margin among the white electorate, paid dividends over time. Conservative argumentation became not just more acceptable to the mainstream media, but also to a growing number of academics, and it became persuasive to large segments of an increasingly conservative white population by the 1980s. But it was still largely unsuccessful at the 1982 reauthorization. In the House, Henry Hyde, who led conservative resistance to the VRA, was won over by the presentation sponsored by VRA supporters. Hyde retreated from his anti-Section 5 proposals over the course of the hearings. In the Senate, Orrin Hatch's campaign against the amendment of Section 2 of the VRA also failed. Hatch made some inroads by associating VRA relief with

135

"proportional representation" and "quotas," concepts particularly objectionable to conservatives, but his campaign did not end the effort to amend Section 2 to ensure plaintiffs the latitude to bring lawsuits based on discriminatory effect. Senate opposition was successful at delaying the momentum of the reauthorization proceedings, and it did motivate an amendment that made it possible for some jurisdictions to bail out of Section 5 coverage independent of the covered state in which they were located. But in general, conservative arguments failed and opponents suffered from a lack of support from the executive branch, which they needed to counter the well organized and strong external support attained by the pro-VRA lobby.

Conservative dissent in Congress had the most impact in 2006, *because* Republican right-wing representatives failed, yet again, to repeal or amend Section 5. That year, there was a bipartisan agreement to pass the law without change. Post agreement, a faction of dissenters in the House argued vehemently on the floor against Section 5 and the bilingual ballot provisions of the Act, and waged what appeared at the time to be a near-fatal delay of the proceedings by causing an indefinite impasse in the deliberations. The impasse was broken, however, and the Act passed in the Senate, and the reauthorization was signed. As part of an effort to discredit the legislation, conservative senators who voted in favor of reauthorization nonetheless broke with tradition and issued a rare Senate Judiciary Committee report, without bipartisan input from Democratic senators, in which they decried the deliberations and the legislation. While these rebellions did not achieve legislative success, the failure to revise Section 5 provided the basis and momentum for the North Austin Municipal District challenge, which was filed a few days after Bush 43 signed the Fannie Lou Hamer, Rosa Parks,

136

Coretta Scott King and César Chávez Voting Rights Act Reauthorization and Amendments into law.[326] Thus, Congressional dissent succeeded to some degree in 2006 by serving up a bill that provided a basis for a Supreme Court challenge. For opponents to the VRA, it was an excellent time to send civil rights legislation to the Supreme Court.

*Mixed Enforcement in the Executive Branch.* The executive branch has exhibited uneven enforcement of the VRA. All of the presidents have enforced the law and all of them, including Lyndon Johnson, have been influenced by conservatism in the process. Johnson was the most enthusiastic in his support for the VRA. Some presidents who opposed the VRA were compelled to enforce it vigorously. Others supported the Act but were forced to exercise enforcement conservatively. Johnson administered the VRA and secured excellent results though his application of the law, but his administration of the law remained cautious. Johnson promoted the law and portrayed it publicly as a positive achievement. His administration registered voters and was responsible for a significant increase in newly registered black voters, whose numbers skyrocketed. Johnson also dispatched examiners and observers to supervise elections in some jurisdictions in the South. On the other hand, the numbers of dispatched examiners and observers was low, and they were reported to have provided little protection against discriminatory voting practices when they occurred at the polls. In addition, Johnson failed to create guidelines for Section 5 preclearance or to wield the remedy at all during his incumbency.

The moderate Republican presidents, Nixon and Ford, both served during VRA reauthorization years and both gave rhetorical support to the VRA even as they worked to weaken it. Both presidents, for example, attempted to limit the power of Section 5, when

---

[326] The Leadership Conference, accessed April 2015, http://www.civilrights.org/voting-rights/northwest-austin-mud/.

given the opportunity to do so during the 1970 and 1975 reauthorizations, as part of their program to entice white Southern voters to the GOP. Nixon was unable to limit the impact of the VRA legislation in 1970. Ford, in contrast, did force a decrease in the number of renewal years applied to the temporary provisions in 1975, but he also failed at limiting Section 5. On the other hand, both Nixon and Ford enforced the Act vigorously. The Nixon and Ford administrations issued the highest number of objections issued in Section 5 enforcement between 1965 and 2013, perhaps because a plethora of offending laws existed when Section 5 was first applied, and perhaps because the liberal consensus successfully demanded enforcement of the Act during its early years.

The conservative Republican presidents, Reagan and the two Bushes, cumulatively pushed VRA enforcement to the right. The Reagan administration waged a head-on challenge to civil rights ideology and the legislation and affirmative action programs established to promote civil rights. The Reagan administration opposed aspects of the VRA in 1982 when the Act was reauthorized, but the administration did not provide sufficient support for congressional conservative opposition to make gains. George H.W. Bush opposed the VRA and other civil rights laws but did so less wholeheartedly than Reagan because he was unwilling to provoke the same kind of resistance encountered by Reagan for his anti-discrimination law agenda.

Yet George W. Bush was successful at mitigating the impact of the VRA, using tactics introduced by Reagan. Bush 43 brought colorblind conservatism to bear on anti-discrimination law, the VRA in particular. While he did not instigate an amendment of the VRA or seek legislative limits on Section 5, his Justice Department used its enforcement power to counter the aims of the VRA. The Bush 43 DOJ refused to bring or

138

support VRA lawsuits on behalf of black plaintiffs, but it did do so on behalf of white voters. The Bush administration fostered an atmosphere of permissiveness for states under the legislation by decreasing enforcement and by replacing long-time employees, in sections of the federal government responsible for voting rights, with political appointees who did not promote the purpose of the Act. Bush 43 also increased the number of conservative justices on the Supreme Court and thereby contributed to an increase in conservative opinions, including opinions on the VRA.

Democratic presidents have supported and enforced the VRA. None of them served during a reauthorization of the VRA. The Carter and Clinton administrations enforced the VRA and attempted to protect minority voters. The Obama administration, despite its clear support for the VRA and attempts to enforce it, has been limited in what it can do. The Obama DOJ found it difficult to bring preclearance objections due to the pending challenges to Section 5 and the potential for lawsuits from states subject to objections. Several states threatened to bring Section 5 challenges in retaliation for executive enforcement of the VRA. More recently, the administration has found the legislation hard to use because Section 5 was rendered moot by the decision in *Shelby v. Holder*, holding that Section 4, which identified covered states, is unconstitutional. Without the power to object, the administration has less ability to prevent the enactment of discriminatory state voting laws.

*Turnabout at the Supreme Court.* The Supreme Court has made a 180-degree shift in its consideration of the VRA, from support to non-support, over the 1970-2013 period. Over the same period, the Supreme Court has become more conservative. George W. Bush's nominees to the Court, in particular, have helped to increase the number of

139

conservative decisions issued. Opinions interpreting the VRA today incorporate colorblind conservative principles and deem the purpose of the VRA to be out-of-sync with the needs of a "post-racial" society.

The quarter of a century of support by the Supreme Court cited by Valelly is more nuanced than he depicts. It is true that the Warren Court did approve the legislation and affirmed the constitutionality of Section 5, including its unique assignment of federal oversight of state voting power in covered states.[327] The Warren Court went on to establish a wide purview for Section 5 application when it held that "all voting law changes" were subject to Section 5.[328] But that level of support did not survive for anywhere near twenty-five years. After 1970, the Burger Court began to set limits on the law, limits that became incrementally greater over time. Prior to the Roberts Court, the justices respected the VRA and Congress's power to pass the VRA, but the Court brought conservatism to bear early, and continued to apply conservative principles over the life of the legislation. In 1982 and 2006, Congress amended the VRA to overturn what it considered to be overly conservative Supreme Court rulings made between reauthorizations. The Roberts Court has exhibited little respect for the legislation or Congress's power to pass it.  The Court removed the underpinnings of the executive branch to exercise the unique power that long defined the VRA.

The Roberts Court brought colorblind principles directly to bear when evaluating recent direct challenges to Section 5, in *North Austin Municipal District No. 1 v. Holder* (2010) and *Shelby v. Holder* (2013). In *MUD,* a challenge to Section 5, the Court sent a strongly worded message to Congress that Section 5 was probably unconstitutional and

---

[327] *South Carolina v. Katzenbach,* 383 U.S. 301(1966).
[328] *Allen v. State Board of Election*, 393 U.S. 544 (1969).

that it would not survive a second challenge without amendment. The Court was aware that Congress would not be able to come to agreement to amend Section 5 because it was common knowledge that the failure to revise Section 5 was what made its reauthorization possible in 2006.

In *Shelby v. Holder*, the Court struck down an important provision of the VRA. It did not hold that Section 5 was unconstitutional, but it did void the equally important Section 4, the section that identifies those states covered by Section 5. By removing all states identified in Section 4 from coverage, the Court rendered Section 5 inoperable, despite the fact that the provision was not ruled unconstitutional. The Court determined that the Section 4 criteria for coverage were no longer relevant or necessary. The dissent, led by Justice Ginsburg, argued that Section 4 was not outdated but in fact provided important protection that helped to maintain fair voting laws and elections. Ginsburg dissented to argue that striking Section 4 was a mistake, and analogized the decision to getting rid of an umbrella in the middle of a rainstorm.[329]

**Conclusions and Consequences**

Conservative ideology and argumentation have consistently if quietly influenced the federal government's implementation of the VRA. In the case of the Supreme Court in particular, support for the law has decreased, and the Court's decisions have had a limiting impact on the VRA. The VRA has the potential to become irrelevant, now that the federal government is no longer able to block the implementation of racially discriminatory voting laws in covered states.  Additionally, the moral imperative imposed by the law has been eroded. It is a testament to the persuasiveness and persistence

---

[329] *Shelby v. Holder*, 133 S.Ct. at 2650. (Ginsburg dissenting).

demonstrated by the conservative long game that the Supreme Court struck Section 5 of

the VRA. As this dissertation reveals, however, it was not an abrupt shift.

In 2006, congressional supporters of the VRA attempted to protect Section 5 from

the Supreme Court attack. Proponents presented extensive evidence to justify the

reauthorization of Section 5. Because the measure was remedial in nature, contemporary

law indicated that Congress had a constitutional power to pass it if the legislation was

"congruent and proportional" to the problem it sought to address. [330] Thousands of pages

of evidence were submitted alongside extensive testimony to show that Section 5 was

still necessary, despite the passage of time since 1965. Members of Congress and

academics heralded the 2006 evidence as satisfying that standard. As noted, the Court

nevertheless struck Section 4 and removed all the states subject to Section 5 from its

jurisdiction.

The end of the Section 5 preclearance power will result in a number of significant

consequences. Covered states that have a history of voter discrimination are no longer

obligated to submit voting law changes to the DOJ, which means that these laws will not

be reviewed to determine if they discriminate against minority voters. The potential for

uncovered states to come under Section 5 has vanished. Covered states are now able to

implement voting laws that the DOJ previously cited as discriminatory. As discussed

above, C. Vann Woodward warned Congress in 1981 that a weakening of the Section 5

preclearance provision might "open the door to a rush of measures to abridge, diminish,

---

[330] *City of Boerne v. Flores*, 521 U.S. 507 (1997). In *City of Boerne*, the Court held that Congress could not
pass laws that lacked "congruence and proportionality" with substantive rights the Court had not defined.
There was some room, however, for Congress to pass laws of a remedial or prophylactic nature when those
remedies were congruent and proportional to the problems they sought to address. The Court also held that
it has exclusive power to determine what rights are protected by the 14th Amendment.

and dilute if not emasculate the power of the black vote in Southern states."[331] Woodward

was convinced that if given the opportunity, states would pass racially discriminatory

voting laws, ones they were prevented from passing while the VRA was in force. Indeed,

in 2013, the states of North Carolina and Texas both promptly passed voter identification

laws after the *Shelby* decision that previously had sparked objections from the Justice

Department pursuant to Section 5.

States now have more freedom to enact and implement voter identification and

similar laws without sanction by the federal government. This increases the potential for

partisan redistricting (which the Court has approved) to the detriment of minority voters

and the dilution and suppression of minority votes. Seeking to maximize its advantage

among white voters, a declining share of the population, the Republican Party has largely

abandoned any efforts to attract minority voters and opted instead to limit the electoral

participation of minority, poor, and elderly voters. Republicans will seek to wrest

presidential control from the Democrats and clearly hope that voter ID legislation will

help to ensure that Republicans have a leg up in future elections.[332]  In so-called

battleground states, minority voters can be the critical margin of difference in an election.

---

[331] U.S. Congress, House of Representatives, Committee on the Judiciary, *Hearings before the Subcommittee on Civil and Constitutional Rights*, 97th Congress, First Session on the Extension of the VRA Serial No. 24, 1999-2001 (1981). (Testimony by Woodward, C. Vann, professor-emeritus, Yale University, New Haven, Conn.)

[332] In his speech on June 23, 2012 before fellow Republican Party lawmakers and supporters, Mike Turzai, Pennsylvania House Republican Leader, enumerated his party's successful steps toward attaining political power, transforming its platform into legislation, and passing new restrictive voter ID laws to gain voter advantage: "...[We have instituted] Voter ID, *which is gonna allow Governor Romney to win the state of Pennsylvania*: Done." [emphasis added] Apparently, Turzai felt comfortable enough among his peers to speak perhaps more truthfully as to the real intent of Voter ID and other minority voter-suppression measures. Indeed, one notes that in trumpeting Pennsylvania's Voter ID laws, Turzai's eschewed any mention of the Party's largely unsubstantiated justifications for such restrictive laws, i.e., supposed "massive voter fraud." See "Turzai: Voter ID Will Allow Romney to Win PA," *YouTube*, accessed March 2015, https://www.youtube.com/watch?v=EuOT1bRYdK8; Turkel, Amanda. "Mike Turzai, GOP Lawmaker Behind Controversial Voter ID Remark, Was Backed by Education Union. *Huffington Post*, accessed March 2015, http://www.huffingtonpost.com/2012/06/27/mike-turzai-gop-voter-id-education-union_n_1630969.html.

143

Republicans accordingly have pursued strategies to deter minority voters from going to the polls, seeking potentially decisive electoral advantages.

The VRA was specifically designed to expand the ability of minority voters to obtain relief from discriminatory voting practices and laws and to end the marginalization of the minority vote. To do this, the VRA provided an additional remedy so that options for relief would not be limited to litigation, always a costly, inefficient, and minimally effective recourse. The end of Section 5 coverage means that recovery under the VRA is limited to Section 2 litigation. The *Shelby v. Holder* decision therefore returned voting rights relief to pre-1965 levels. This is highly unfortunate when today the widespread adoption of voter identification and similar laws threatens to return the U.S. to a voting order that is similar to the JVO, one where the rights of minorities to vote are not guaranteed. Alexander Keyssar has noted the similarities between modern voter ID laws and laws passed during the late 1800s in contravention of the 15th Amendment.[333]

Today many have analogized voter identification laws to poll taxes (because voters need to obtain proper identification that in most states has a cost associated with it). In the last ten years, some states have been accused, not of violence and intimidation, but of mass misinformation about voting and polling places and procedures, which deters minority voters from casting ballots. Recently, it has been claimed that some states have not provided adequate voting stations and have administered the polls so that it takes many hours to vote,[334] which has strained working voters especially in states where

---

[333] Keyssar, Alexander. "Voter Suppression Returns: Voting Rights and Partisan Practices," *Harvard Magazine*, July-Aug 2012.
[334] Flatlow, Nicole. 2014. "New Rule Prohibits Voters in Miami-Dade County From Using the Restroom, No Matter How Long the Line." *Think Progress*, April 10. accessed March 2015, http://thinkprogress.org/justice/2014/04/10/3425252/new-rule-prohibits-voters-in-miami-dade-county-from-using-the-restroom-no-matter-how-long-the-line/.

absentee ballot provisions have been repealed.  Other states have been alleged to have placed inadequate voting equipment in minority neighborhoods and to have failed to include all ballots in final tallies.[335] These offenses do not rise to the level of the Jim Crow Order, with its systematic and wholesale blocking of minority participation.  Still, they do allow for race based partisan manipulation of access to the polls.

It is unlikely that Congress will be able to revive Section 4 of the VRA or establish new legislation that would effectively curtail voter discrimination as Congress was unable to revise Section 5 in 2006. Instead, the Obama administration has begun to investigate the possibility of obligating states to opt in to Section 5 coverage pursuant to Section 3 of the VRA. Section 3 allows a court to "bail-in" a jurisdiction to a preclearance regime similar to what was required under Section 5 before *Shelby*.[336] Under Section 3, jurisdictions are covered for limited time periods for specifically determined types of legal changes.

Congress could conceivably pass some new form of voting rights legislation, but this seems unlikely. Not only is Congress under conservative control, but also the Court has ruled that Section 4 of the Act is no longer necessary in today's so-called "post-racial" environment and barred race-based districting plans. The passage of a new remedy would require states to buy into federal oversight after their fifty years of trying to shed that obligation. Even if a new law had the support of the executive branch and Congress, the Court today has the power to strike the legislation quickly based on current precedent. Obviously, new legislation that did not rely on federal oversight might not

---

[335] Smith, Greg B."NYC Elections 2013: Broken Voting Machines, Mistranslated Ballot Measures Plague Low-Turnout Election." *Daily News*, November 5, 2013.
[336] Mills, Courtney." Is 3 the New 5? The New Focus on Section 3 of the VRA," *Fair Elections Legal Network*, July 30, 2013, accessed March 2015, http://fairelectionsnetwork.com/blog/3-new-5-new-focus-section-3-vra.

require the support of the national government, but traditionally minority voters have only been able to obtain relief from state-controlled discriminatory voting practices when the federal government became involved. Scholars and activists have begun to investigate the potential need for a Third Reconstruction. [337]

*Importance to Current Events.* In addition to its contribution to Political Science literature, the analysis provided by this dissertation is also directly relevant to the current socio-political environment in America. Voting rights remain an important, controversial, and often explosive, issue on the American political scene. Voter identification and similar laws are on the rise, and their purpose is to improve the Republican political advantage by impeding voting by minority, poor, and elderly voters. Voter discrimination will continue to be an important issue in the foreseeable future. Republicans are currently in control of both houses of Congress and the state legislatures and governors mansions in a significant number of states. Opposition to civil rights legislation, including the VRA, has been centered in the Republican Party at the state and national levels. The implementation of voter identification laws and redistricting might well challenge the power of minority voters and impact the outcome of electoral choices in the upcoming presidential and other elections. In the unlikely event that Congress bolsters the power of the VRA or grassroots campaigns are waged to create alternative remedies for the future, it is important, even essential, to understand what has occurred before and how conservatism affected the prior effort. In popular culture and in history books, the VRA is portrayed as effective legislation that took a struggle to obtain but which passed and is at

---

[337] "WATCH: America's Race Problem Will Require New Reconstruction to Solve." *The Nation Magazine,* accessed April 2015, .http://www.thenation.com/article/194553/watch-americas-race-problem-will-require-new-reconstruction-solve# (January 15, 2015).

work. The development of VRA resistance and its outcomes have not heretofore been adequately researched and presented.

*Future Research*. There are questions related to the history of the VRA, which this dissertation has not answered. Future research should, for example, evaluate the number of objections by the Department of Justice from 1965-2013 to assess the degree to which conservatism specifically affected the voting rights section of the DOJ in its administration of Section 5. Application of the VRA should also be evaluated to determine how thorough states have been about their Section 5 submissions over time. The number of objections under Section 5 has historically been extremely low. A possible reason for this is that federalism has constricted VRA enforcement throughout its life, i.e. the Department of Justice has been reserved in its enforcement. I would want to choose two states perhaps to evaluate for a research project such as this. It will also be important to evaluate the impact of the loss of Section 4. What is the discriminatory impact of laws passed in covered states that were in fact, or would potentially have been, objected to by the DOJ if Section 5 were applicable? This question would prove especially interesting if evaluated in conjunction with electoral returns from the 2016 presidential election. And, evaluation of the impact of the *Shelby* decision will do much to illuminate the positive influence of the VRA's unique remedy and/or possibly reveal that the law is no longer necessary.

Bibliography

Abramowitz, Alan I and Kyle L Saunders. "Exploring the Bases of Partisanship in the American Electorate: Social Identity vs. Ideology" *Political Research Quarterly* Vol. 59, No.2 (Sage Publications on behalf of University of Utah), June 2006: 175.

*Adarand Constructors v. Pena*, 515 U.S. 200 (1995).

*Allen v. State Board of Elections*, 393 U.S. 544 (1969).

John Atlas, "The Struggle Over Voting Rights and the Future of Progressive Politics," *Social Policy* 38 (Spring 2008): 11-17.

Babington, Charles. "GOP Rebellion Stops VRA: Complaints Include Bilingual Ballots and Scope of Justice Department Role in the South," *Washington Post*, June 22, 2006.

Ball, Howard, Dale Krane, and Thomas P. Lauth, *Compromised Compliance: Implementation of the Voting Rights Act*, (Westport, CT, Greenwooss,1982), 98.

*Bartlett v. Strickland*, 556 U.S. 1, 2 (2009).

Barton, David, "The History of Black Voting Rights," as reposted in Wall *Builders,* March 3, 2003*,* accessed March 2015, http://www.wallbuilders.com/libissuesarticles.asp?id=134.

*Beer v. United States*, 425 U.S. 130 (1976).

Benson, Jocelyn F. "A Shared Existence: The Current Compatibility of the Equal Protection Clause and Section 5 of the Voting Rights Act," *Nebraska Law Review*, 88 (Jan. 2009): p. 133.

Biskupic, Joan. "Rehnquist Left Supreme Court with Conservative Legacy," *USA Today*, September 4, 2005.

Blacksher, James and Lani, Guinier. "Free at Last: Rejecting Equal Sovereignty and Restoring the Constitutional Right to Vote Shelby County v. Holder," *Harvard Law and Policy Review* 8 (Month 2014): p. 39.

Boyd, Thomas M. and Stephen J. Markman, "The 1982 Amendments to the Voting Rights Act: A Legislative History," *Washington and Lee Law Review* 40 (Sept. 1982): 1351.

*Brown v. Board of Education* (1954).

Bullock III, Charles and Butler, Katherine Ingles ."*Voting Rights," in The Reagan Administration and Human Rights*, ed. Tinsley E. Yarbrough (City, State: Praeger Publishers, 1985), 31.

"Bush Addresses NAACP Convention," *CQ Transcripts Wire, Wilson Quarterly*, July 20, 2006.

"The Bush Admin Takes Aim: Civil Rights Under Attack," *Leadership Conference on Civil Rights Education Fund*, 32.

"The Bush Legacy: The Supreme Court," January 12, 2009, *ABC News*, accessed March 2015, http://abcnews.go.com/TheLaw/BushLegacy/story?id=6597342&page=2.

"Bush Signs VRA Extension Amid Midterm Election Season," *Associated Press, USA Today*, July 7, 2006.

"Jimmy Carter," *Spartacus Educational*, accessed March 2015, http://www.spartacus.schoolnet.co.uk/USAcarterJ.htm.

"Jimmy Carter and Civil Rights," *Presidential History Geeks*, accessed March 2015, http://potus-geeks.livejournal.com/171526.html.

*City of Boerne v. Flores*, 521 U.S. 507 (1997).

Civil Rights Act of 1964.

*The Civil Rights Cases,* 109 U.S. 3 (1883).


*City of Rome v. United States* 446 U.S. 156 (1980).


Cobb, Thomas R.R. *An Inquiry into the Law of Negro Slavery in the United States of America* (Philadelphia: T. &T.W. Johnson and Co., 1858), 153, 163, 169.
*Connor v. Johnson,* 402 U.S. 690 (1971).


Corbett, John and Key, Valdimer Orlando. "Mapping Southern Politics," *Center for Spatially Integrated Social Science,* accessed March 2015, http://www.csiss.org/classics/content/42


*Crawford v. Marion County Election Bd.* 128 S.Ct. 1610, 1613 (2008).


*Crawford v. Marion County Election Bd.* at 1620, Brief for the United States as Amicus Curiae, *Brennan Center for Justice,* accessed March, 2015, https://www.brennancenter.org/sites/default/files/legacy/Democracy/CrawfordvMarionCountyElectionBoard%20-%2012-10-07%20Amicus%20Brief%20of%20the%20United%20States.pdf, 20.


Cunningham, Maurice T. *Maximization, Whatever the Cost: Race, Redistricting and the Department of Justice,* (Westport, CT, Praeger, 2001), 20.


Devins, Neal. "Reagan Redux: Civil Rights Under Bush," *Notre Dame Law Review* 68 (January 1993): 958.


Engstrom, Richard L. "Redistricting: Influence Districts- A Note of Caution and A Better Measure," *The Chief Justice Earl Warren Institute on Law and Social Policy*, UC Berkeley Law School, May 2011.


*Ex parte Yarbrough,* 110 U.S. 651 (1884).


Executive Order no. 9981, *Desegregation of the Armed Forces,* (1948).

Executive Order no. 11478, Section 1, *Equal Opportunity in the Federal Government* (Aug. 8, 1969).

Flatlow, Nicole. 2014. "New Rule Prohibits Voters in Miami-Dade County From Using the Restroom, No Matter How Long the Line." *Think Progress*, April 10. accessed March 2015, http://thinkprogress.org/justice/2014/04/10/3425252/new-rule-prohibits-voters-in-miami-dade-county-from-using-the-restroom-no-matter-how-long-the-line/.

Fleisher, Richard and John R. Bond. "The Shrinking Middle in the US Congress," *British Journal of Political Science* 34 (July 2004): 429-451.

Foner, Eric. *Reconstruction: Americas Unfinished Revolution, 1863-1877* (New York: Harper and Row, 1988), 603.

Ford, Gerald, "Letter to the Senate Minority Leader Urging Extension of the Voting Rights Act of 1965," *The American Presidency Project*, March 2015, http://www.presidency.ucsb.edu/ws/index.php?pid=5097.

42 U.S.C. Section 1973c(a).

Frymer, Paul. *Uneasy Alliances* (Princeton, NJ: Princeton University Press, 1999), chap. 2 and 49–86.

Fund, John. "How Do You Address A Problem they Insist Doesn't Exist?" *National Review, accessed* March 2015, http://www.nationalreview.com/article/375021/dems-voter-fraud-denial-john-fund.

Gaskins, Keesha and Sundeep Iyer. "The Challenge of Obtaining Voter Identification,' *Brennan Center for Justice*, accessed March 2015, http://www.brennancenter.org/sites/default/files/legacy/Democracy/VRE/Challenge_of_Obtaining_Voter_ID.pdf, 1.

*Gaston County v. United States*, 395 U.S. 285 (1969).

*Georgia v. Ashcroft*, 539 U.S. 461 (2003).

Gerken, Heather. "Goodbye to the Crown Jewel of the Civil Rights Movement: People died to pass Section 5 of the Voting Rights Act, but that Did not Save It from the Supreme Court," *Slate.com*, June 25, 2013.

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

Greenburg, Jan Crawford, "The Bush Legacy: The Supreme Court," *ABC News*, accessed March 2015, http://abcnews.go.com/TheLaw/BushLegacy/story?id=6597342.

Grofman, Bernard. "*Shaw v. Reno* and the Future of Voting Rights", *PS Political Science and Politics*, 28 March 1995): 32.

*Grovey v. Townsend* , 295 U.S. 45 (1935).

*Guinn v. United States*, 238 U.S. 347, 358 (1915).

Hancock, John. *Essays on the Elective Franchise*; or *Who Has the Right to Vote?* (Philadelphia: Merrihew & Son, 1865), 22-23.

Hannah, John A., et al., *U.S. Commission on Civil Rights, Political Participation* (Washington D.C.: U.S. Government Printing Office, 1968).

Hasen, Richard. "The Chief Justices Long Game," *New York Times*, June 26, 2013.

Hench, Virginia E. "The Death of Voting Rights: The Legal Disenfranchisement of Minority Voters" *Case Western Reserve Law Review* 48 (1998): 727, 752.

Herbert, J. Gerald. *An Assessment of the Bailout Provisions of The Voting Rights Act, in Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power,* ed. Ana Henderson (Berkeley, CA: Berkeley Public Policy Press 2007), 261.

*Holder v. Hall*, 512 U.S. 874 (1994).

——, 512 U.S. 874 (1994) (Thomas concurring).

Hulse, Carl. "By A Vote of 98-0, Senate Approves 25-Year Extension of the Voting Rights Act," *The New York Times*, July 21, 2006.

——,"Rebellion Stalls Extension of the VRA" *The New York Times*, June 22, 2006.

——, "House Delays Renewal of Voting Rights Act," *New York Times*, June 21, 2006.

An Investigation into the Removal of Nine U.S. Attorneys in 2006, US Department of Justice Office of the Inspector General &Office of Professional Responsibility, Sept. 2008.

J. Morgan Kousser, "The Strange Iconic Career of Section 5 of the Voting Rights Act, 1965-2007," *Texas Law Review* 86, (March 2008), 687.

Jordan, Barbara; Hearon, Shelby. *A Self Portrait by Barbara Jordan*, (Garden City, NY: Doubleday & Company, 1979), 209.

Karlan, Pamela. "Lessons Learned," *Duke Journal of Law and Public Policy* Vol. 4:17 (Month, 2009): 18.

"John Kennedy and Civil Rights," *History Learning Site*, accessed March 2015, http://www.historylearningsite.co.uk/john_kennedy_and_civil_rights.html.
Joint Center for Political and Economic Studies. *Elected Officials 1990: A National Roster*. (Washington, D.C: Joint Center for Political and Economic Studies Press, 1991): 1.

Keyssar, Alexander. *The Right to Vote: The Contested History of Democracy in the United States* (New York, Basic Books, 2000).

——, "What Struggles Over the Right To Vote Reveal About American Democracy," *Scholars Strategy Network*, accessed March 2015, http://www.scholarsstrategynetwork.org/sites/default/files/ssn_key_findings_keyssar_on_right_to_vote_0.pdf

———, "Voter Suppression Returns," "Voter Suppression Returns: Voting Rights and Partisan Practices," *Harvard Magazine*, July-Aug 2012.

Key, Valdimer Orlando. *Southern Politics and Nation* (New York, NY: Vintage Books, 1949).

Kotlowski, Dean J. *Nixon's Civil Rights*: *Politics, Principle and Policy* (Cambridge: Harvard University Press, 2001), 71, 95.

Kousser, J. Morgan. "The Voting Rights act and the Two Reconstructions," *Author's Library Cal Tech*, accessed March 2015, http://authors.library.caltech.edu/41064/1/Brook.pdf), 2.

———, *The Strange Iconic Career*, 754-6, 761.

*Lane v. Wilson*, 307 U.S. 268 (1939).

Laney, Garrine P. *The Voting Rights Act of 1965, as Amended*: *Its History and Current Issues* (Nova Science Publishers, Inc., New York, 2008), 19.

The Leadership Conference, accessed March 2015, http://www.civilrights.org/voting-rights/northwest-austin-mud/.

Liptak, Adam. "The Memo That Rehnquist Wrote and Had to Disown*", New York Times Week in Review*, September 11, 2005. In 1952, while a clerk for former Justice Jackson, Chief Justice Rehnquist, wrote a memo arguing against the ultimate decision in *Brown v. Board of Education.*

May, Gary. *Bending Toward Justice: The Voting Rights Act and the Transformation of American Democracy* (City, ST: Duke University Press, 2014), 204.

McCrary, Peyton. *Review of Cunningham, Maurice T., Maximization, Whatever The Cost: Race, Redistricting, and the Department of Justice.* H-south, H-Net Reviews. February 2002.

Miller, James A. "An Inside Look at Eisenhower's Civil Rights Record," *The Boston Globe*, Nov. 21, 2007.

*Miller v. Johnson*, 515 U.S. 900, 920 (1995).


Mills, Courtney." Is 3 the New 5? The New Focus on Section 3 of the VRA," *Fair Elections Legal Network*, July 30, 2013, accessed March 2015, http://fairelectionsnetwork.com/blog/3-new-5-new-focus-section-3-vra


*Mobile v. Bolden*, 446 U.S. 55, 62 (1980).

*Nixon v. Herndon*, 273 U.S. 536 (1927).


*Nixon v. Condon*, 286 U.S. 73, 82 (1932).


*North Austin Municipal District No. 1 v. Holder*, 557 U.S. 193 (2009).
*North Austin Municipal District No. 1 v. Holder*, 129 S.Ct. 2504 (2009).


Orren, Karen and Skorownek, Stephen. *The Search for American Political Development*, (Cambridge, UK: Cambridge University Press, 2004)


Panetta, Leon E. and Gall, Peter. *Bring Us Together: The Nixon Team and the Civil Rights Retreat* (Lippincott, first edition, 1971), 106.


*Parents v. Seattle*, 127 S.Ct. 2738, 2768 (2007).


Pear, Robert. "Justice Department Challenges its Civil Rights Division," *The New York Times*, January 1, 1993.


*Perkins v. United States*, 422 U.S. 358, 368 (1975).


*Perry v. Perez*, 132 S. Ct. 934 (2012).


——, at 945 (Thomas dissenting).

155

Persily, Nathaniel. "The Promise and Pitfalls of the New Voting Rights Act," *Yale Law Journal* 117 (December 2007): 89.

Plass, Stephen. "Exploring the Limits of Executive Civil Rights Policy Making," *Oklahoma Law Review* 61 (Month 2008): 176.

*Plessy v. Ferguson*, 163 U.S. 537 (1896).

——, dissent by Justice John Marshall Harlan.

Parker, Frank R.  "*Shaw v. Reno*: A Constitutional Setback for Minority Representation", *PS: Political Science and Politics* 28 (March 1995): 47.

Pinckney, Darryl. "Blackballed: The Black Vote and US Democracy*," New York Review of Books* (Month 2014): 62-3. The state of Texas instituted its voter ID law hours after the Shelby decision was announced.

President William J. Clinton. "The Unfinished Work of Building One America," Message to Congress, January 15, 2001.

*Presley v. Etowah County*, 502 U.S. 491, 509 (1992).

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997).

*Reno v. Bossier II*, 528 U.S. 320 (2000).

Janet Reno, Attorney General, to Heads of Departments and Agencies that Provide Federal Financial Assistance, July 14, 1994, Office of the Attorney General, Memorandum, re: Use of the Disparate Impact Standard in Administrative Regulations Under Title VI of the Civil Rights Act of 1964.

*Reynolds v. Sims*, 377 U.S. 533 (1964).

William Bradford Reynolds, "The Reagan Administration and Civil Rights: Winning the War Against Discrimination, response to Selig," *University of Illinois Law Review*. 4

*Richmond*, v. *United States,* 422 U.S., Brennan, dissenting, 379-388.

Roberts, John. "Talking Points For White House Meeting on Voting Rights Act," January 26, 1982, *Government Archives*, accessed March 2015, http://www.archives.gov/news/john-roberts/accession-60-88-0498/030-black-binder1/folder030.pdf.

*Rogers v. Lodge*, 458 U.S. 613 (1982).

"The Riot in New Orleans," *Harper's Weekly*, Aug. 25, 1866.

Rush, Mark E. "*Shaw v. Reno* to *Miller v. Johnson*: Minority Representation and State Compliance with the Voting Rights Act", *Publius* 25 (Summer 1995): 172 fn. 78.

Selig, Joel L. "The Reagan Justice Department and Civil Rights: What Went Wrong," *University of Illinois Law Review* 4 (1986).

"Senate Enrolled Act No. 483," *In Gov Legislative Bills*, accessed March 2015, http://www.in.gov/legislative/bills/2005/SE/SE0483.1.html.

Serer, Adam. "'Demeaning Insult' in John Robert's Voting Rights Act Decision," March 19, 2014, *MSNBC*, accessed March 2015, http://www.msnbc.com/msnbc/demeaning-insult-chief-justice-john-roberts-voting-rights-act-decision.

Shatz, Adam. "Thernstrom's in Black and White," *The American Prospect*, December 10, 2001.

Shull, Steven A. *American Civil Rights Policy from Truman to Clinton: The Role of Presidential Leadership* (Armonk, NY: ME. Sharpe, 1999), 51-52.

Slotnick, Elliot E. "Lowering the Bench: Affirmative Action and Judicial Selection During the Carter Administration," 1 *YALE & L. POL'Y REV*. 270, 275 (1983).

Smalley, Eugene V. *A Brief History of the Republican Party: From its Organization to the Presidential Campaign of 1884* (New York: John Alden Publishing, 1884), 49-50.

*Smith v. Allwright*, 321 U.S. 649, 664 (1944).

Smith, Kathy B. *The White House Speaks*, (Westport, CT: Greenwood Publishing Group, 1994).

Smith, Greg B."NYC Elections 2013: Broken Voting Machines, Mistranslated Ballot Measures Plague Low-Turnout Election." *Daily News*, November 5, 2013.

*Shaw v. Reno*, 509 U.S. 630 (1993).

*Shelby v. Holder*, 133 S. Ct. 2612 (2013).

Skrentny, John Davis. *The Ironies of Affirmative Action: Politics, Culture and Justice in America* (Chicago, IL: University of Chicago Press, 1996), 190.

*The Slaughterhouse Cases*, 83 U.S. 36 (1873).

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

——, Black, dissenting at 359.

Sunstein, Cass. 2005. "Justice Breyer's Judicial Pragmatism," *John H. Olin Law & Economics Working Paper Series* 267, November 2005, accessed March 2015, http://www.law.uchicago.edu/Lawecon/index.html.

Title 42, Chapter 20, Subchapter I – A, U.S. Code Section 1973, "…*Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

Thernstrom, Abigail. *Voting Rights and Wrongs: The Elusive Quest for Racially Fair Elections,* (Washington, DC: American Enterprise Institute Press, 2009).

Thernstrom's theories are echoed and supplemented by others, including Carol Swain and Carl Van Spavorsky of the *National Review*, and Timothy O'Rourke and Hugh Davis Graham.

158

*Thornburg v. Gingles*, 478 U.S. 30 (1986).


Toobin, Jeffrey. *The Nine: Inside the Secret World of the Supreme Court*, (New York, NY: Anchor Books, 2008), p. 389.


Truman, President Harry S. "Special Message to the Congress on Civil Rights, February 2, 1948," *The American Presidency Project*, accessed March 2015, www.presidency.ucsb.edu/ws/?pid=13006.


Turkel, Amanda. "Mike Turzai, GOP Lawmaker Behind Controversial Voter ID Remark, Was Backed by Education Union. *Huffington Post*, accessed March 2015, http://www.huffingtonpost.com/2012/06/27/mike-turzai-gop-voter-id-education-union_n_1630969.html.


"Turzai: Voter ID Will Allow Romney to Win PA," *YouTube*, accessed March 2015, https://www.youtube.com/watch?v=EuOT1bRYdK8


U.S. Congress. Senate. "Affirmative Action and Equal Protection." Committee on the Judiciary. Hearings before the Subcommittee . 97th Cong., 1st Sess. (May4, June 11, June 18, July 16, 1981), 69.

US Const. amend. XV.


——, amend. XIV.


*United Jewish Organizations of Williamsburgh v. Carey*, 430 U.S. 144 (1977).


*United States v. Noxubee County Dem. Exec. Comm.*, 494 F. Supp. 2d 440 (S.D. Miss. 2007).

*U.S. v. Reese* et al., 92 U.S. 214 (1876).


U.S. Congress, House of Representatives, Committee on the Judiciary, "Hearings before the Subcommittee on Civil and Constitutional Rights," 97th Congress, First Session on

the Extension of the VRA Serial No. 24, 1999-2001 (1981). (Testimony by Woodward, C. Vann, professor-emeritus, Yale University, New Haven, Conn.).

U.S. Congress. Senate. "Affirmative Action and Equal Protection." Committee on the Judiciary. Hearings before the Subcommittee . 97th Cong., 1st Sess. (May4, June 11, June 18, July 16, 1981), 69.

——. Subcommittee on "Constitutional Rights of the Committee on the Judiciary." 1969 – 1970, Mrs. Frankie Freeman; Bills to Amend the VRA of 1965. 91st Cong., 1st and 2d Sess.,30.

——. Subcommittee on "Constitutional Rights of the Committee on the Judiciary United States," Civil Rights Division, 579 Senate 94th Congress, "Hearings on S. 407, S.903, S. 1297, 1409 and 1443," 1975. (Testimony of J. Stanley Pottinger, Assistant Attorney General).

——. House Subcommittee on Constitutional Rights of the Subcommittee on Constitutional Rights, 94th Congress 1st Session, "Hearings on S.407 S.903 S1297 S1409 and S1443," 1975, 45. (Testimony of Clarence Mitchell).

——."1982 Voting Rights Act." Subcommittee on the Constitution of the Committee on the Judiciary. 1982 Voting Rights Act. 97th Cong, 2d Sess., HRG-1982-SJS-0071, 3.

United States Civil Rights Commission on Civil Rights (USCCCR), A Report of the Civil Rights Commission on Civil Rights (USCCCR), "A Bridge to One America: The Civil Rights Performance of the Clinton Administration," Washington, DC: (April 2001):4.

——, A Report of the Civil Rights Commission on Civil Rights, "The Health Care Challenge: Acknowledging Disparity, Confronting Discrimination and Ensuring Equality," Washington, DC (September 1999)

——, "Overcoming the Past, Focusing on the Future: An Assessment of the U.S. Equal Opportunity Commission's Enforcement Efforts," Washington, DC (September 2000).

——. Subcommittee on Constitutional rights of the Committee of the Judiciary. 1969 and 1970. "Bills to Amend the VRA of 1965." 91st Cong., 1st and 2nd session.  Charles Mathias (R-MD).

Valelly, Richard M. *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago, IL: University of Chicago Press, 2004), 7.

*Vieth v. Jubelier*, 541 U.S. 267 (2004).

"Voting Rights Act, Nixon Administration Proposal," *Congressional Digest*, Vol. 48 Issue 11 (Nov. 1969): 288.

"WATCH: America's Race Problem Will Require New Reconstruction to Solve." *The Nation Magazine*.http://www.thenation.com/article/194553/watch-americas-race-problem-will-require-new-reconstruction-solve# (January 15, 2015).

*White v. Regester*, 412 U.S. 755, 769 (1975).

Wicker, Tom. "Johnson Urged Congress at Joint Session to Pass Law Insuring Negro Vote," *New York Times*, March 15, 1965.

*Williams v. Mississippi*, 170 U.S. 213 (1898).

Woodward, C. Van. *The Future of the Past* (New York, NY: Oxford University Press, 1989), 199.

—— *The Strange Career of Jim Crow* (New York, NY: Oxford Univ. Press, 1974), xii.

—— "The Danger of Retreating from the Second Reconstruction," *Southern Changes*, accessed March 2015, http://beck.library.emory.edu/southernchanges/article.php?id=sc04-1_003

—— "The Danger of Retreating from the Second Reconstruction in Southern Changes." *Southern Changes*: The Journal of the Southern Regional Council. Vol. 4 No. 1 (1981): 13-15.

**Zietlow, Rebecca E.** "The Judicial Restraint of the Warren Court (and Why it Matters)" *Ohio State Law Journal* 69 (2008): 259.

**DEFENDANTS' EX. 10**

DE GRUYTER                    The Forum 2018; 16(2): 289–312

M. Adrienne Jones*

# When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006

https://doi.org/10.1515/for-2018-0014

**Abstract:** \

## Introduction

In the conclusion of his 2004 book, *The Two Reconstructions: The Struggle for Black Enfranchisement*, written just 2 years before the most recent reauthorization of Section 5 of the Voting Rights Act (VRA) in 2006, Richard Valelly asserted that the "Second Reconstruction" – the legal and programmatic results of the civil rights revolution – was successful, in contrast to the legislation and framework of the First Reconstruction, which evaporated within 15 years after the Reconstruction period. From Valelly's point of view, "despite its frictions and weak spots" the Second Reconstruction effort was "still a relative success," due in large measure to the tremendous benefits to the black electorate and the US as a whole that accrued from the passage and reauthorization of the Voting Rights Act.[1] Although Valelly does not say so explicitly, he and other proponents of the legislation assumed that the "crown jewel of the civil rights movement" would

---

1 Richard M. Valelly, *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago, IL: University of Chicago Press, 2004), 7.

---

*Corresponding author: M. Adrienne Jones, J.D., Ph.D., Morehouse College, Atlanta, GA, USA, e-mail: adrienne.jones@morehouse.edu

be reauthorized in 2006 and remain in effect in perpetuity, or until the issues of discrimination it was designed to prevent had been successfully remedied.[1] Today it is

---

[1] Katherine Tate, "Black Politics, The GOP Southern Strategy, and the Reauthorization of the Voting Rights Act," *The Forum* 4, no. 2 (2006).

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM


DEFENDANT'S
EXHIBIT
10

clear that their assumption was incorrect. In 2013, Section 5, the critical provision of the VRA was struck down by the Supreme Court in *Shelby v. Holder*. As a result, 50 years after the passage of the VRA, state sanctioned, race-based voter discrimination continues, with few remedies available to the affected electorate.[2]

Valelly's position seemed reasonable at the time. Section 5 of the VRA required federal oversight of new state voting laws in "covered" states and jurisdictions to ensure that they did not commit voter discrimination in violation of the 14th and 15th Amendments. The introduction of federal oversight arrived during a moment in history which embraced a liberal consensus and permitted the VRA to successfully interrupt and curtail Jim Crow voter discrimination. The institutionalization of the VRA was made evident by its apparent widespread support, by its continued application, and in particular by repeated Congressional reauthorization of the provision in 1970, 1975, and 1982, with *overwhelming and bipartisan roll call votes*. Indeed, as Valelly and others expected, the VRA was reauthorized again for 25 years in 2006.

In the lead up to the renewal the VRA's temporary provisions, there were, however, some obvious "friction and weak spots," as Valelly indicated. Section 5 was the main one. By 2006, the section had become publically controversial. Scholarship critical of the VRA was available and widely used by its foes. Discussion about the efficacy of preclearance had become acceptable. Spearheaded by Abigail Thernstrom, anti-VRA scholars had developed arguments against the imposition of Section 5 on covered states and jurisdictions. Thernstrom and others argued that

"preclearance" was "outdated" and discriminated against white voters.[3]

These and similar issues came up at the 2006 reauthorization hearings and in some instances were hotly contested. Yet, the GOP voted for the VRARA overwhelmingly. And because the issues were debated and the roll call vote expressed a clear mandate, proponents of the bill came away confident that the legislation was secure and that it maintained the political support necessary to withstand constitutional challenge if necessary. Their analysis was incorrect. The conclusion that the GOP supported the VRARA was incorrect -- Republican members of Congress opposed the bill before and during the hearings and reiterated their complaints after the roll call vote -- and, the law was not impervious to challenge.

A short 7 years later, conservatives won. The jewel of the civil rights movement was extracted from the crown.

GOP members of Congress did nothing to reverse the decision that contradicted legislation they had supported by roll call vote only a few years prior. Why, if the GOP supported the *Shelby v. Holder* decision in 2013, did it reauthorize the VRA temporary provisions in 2006?

---

[2] *Shelby v. Holder*, 133 U.S. 2612 (2013).
[3] Abigail Thernstrom, *Whose Votes Count?: Affirmative Action and Minority Voting Rights* ( Cambridge: Harvard University Press, 1987).

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

I contend that GOP roll call votes in 2006 for the VRARA said "yes" but meant "no." Instead of objecting to the reauthorization of Section 5 at roll call in 2006, the GOP used an alternative tactic. It engaged the multiple instrumentalities of congressional behavior. Schattschneider suggests in *The Semi-Sovereign People* that losers in a political battle often choose to widen the arena of conflict so that they can wage it on a more favorable terrain.[4] Republican congress people operate in a separated political system that includes multiple institutions, and they were shrewd enough in 2006 to recognize that their odds of achieving an end to Section 5 preclearance would be better on more favorable terrain, viz. in the Supreme Court.

To achieve this, it was necessary for Republicans to vote for the VRARA without amendment to the existing formula so that the resulting law would be ripe for constitutional attack under the contemporary standard. The GOP opposed the VRARA in 2006 despite the almost unanimous "yes" roll call votes. By voting yes on the bill, party members avoided political backlash and subsequent resistance, avoided amendment of the preclearance formula, helped to pass a law vulnerable to constitutional attack, and thus provided an opportunity to strike the law. By voting yes, the GOP engaged a clear signaling effort to facilitate the demise of Section 5 by constitutional challenge. That the GOP exercised this strategy is strongly supported by circumstantial evidence. GOP support of the VRARA provided the crucial foundation for the decision in *Shelby v. Holder*, GOP support of the VRARA by roll call vote in 2006 perfectly positioned the Supreme Court and the VRA to overturn the most important provision of the latter.

To illustrate this claim, this paper will begin by explaining the controversial sections of the VRA, Sections 4(b) and 5. Next, the paper will describe the development of conservative opposition to the VRA's temporary provisions in advance of the 2006 reauthorization hearings. The paper will then examine the actions and reactions of the GOP during VRA reauthorization in 2006 as a case study, reflective of the ongoing Republican opposition to the VRA. The paper will also discuss the Supreme Court decisions that followed the 2006 reauthorization. Finally, this paper will provide an analysis that illuminates the GOP's activities as evidence of a clear effort to signal the Supreme Court to accept a challenge to the VRA preclearance program. That analysis leads to the apparently paradoxical, but inevitable conclusion that the Court was able to repeal preclearance *because* the GOP supported the VRARA in 2006.

## The Voting Rights Act and its Controversial Sections

The VRA of 1965 enforced the 14th Amendment and successfully codified the 15th Amendment by prohibiting state sanctioned race based discrimination at the polls.

---

[4] E. E. Schattschneider, *The Semisovereign People: A Realist's View of Democracy in America* (Hinsdale, Illinois: The Dryden Press, 1975), 10.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

Three civil rights acts closely preceded the VRA, each aimed at curbing race-based voter discrimination (the Civil Rights Acts of 1957, 1959 and 1960), but none was successful at integrating black voters into the franchise. Like the first three bills, the VRA provided plaintiffs the opportunity to sue to gain relief from state sponsored voter discrimination. Unlike the other civil rights acts, the VRA contained a unique power that surpassed litigation as a remedy for voter exclusion, the Section 5 preclearance provision. Under Section 5, the Department of Justice was empowered to review new voting laws to assess their potential to discriminate; and an opportunity to block enactment of laws which would "deny or abridge the right to vote based on race or color..."[5] The application of Section 5 meant that, in many cases, litigation was no longer necessary to ensure access to the franchise by black voters in covered states.

The VRA of 1965 was designed to enforce the 14th and 15th Amendments.[6] *Critical to the preclearance program were Sections 4(b) and 5 of the VRA.* Section 4 of the VRA banned the use of literacy tests and other devices to abridge the right to vote in states and jurisdictions identified by 4(b):

> The provisions of subsection (a) shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 percentum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the presidential election of November 1964.[7]

---

[5] "The Constitution of the United States," Amendment 15.

[6] Under Section 2 of the Act, citizens in all jurisdictions were granted standing to sue for discrimination based on the general prohibition against voter discrimination. Section 3 of the Act empowered the Attorney General to appoint and dispatch examiners to the polls, to suspend tests or devices used to deny the right to vote based on race, to take jurisdiction over offending precincts, and to provide equitable relief. Section 6 of the act outlined the responsibilities of examiners and hearing officers (authorized under section 9(a)). Sections 7 and 8 provided for the dispatch of federal examiners to polls under certain conditions. Section 9 provided guidelines to evaluate challenges to voter eligibility, and the right to subpoena witnesses for that purpose. Section 10 prohibited poll taxes. Section 11 forbid state actors from failure to permit voting or ballot counting. Section 12 instituted a fine schedule for VRA violations. Sections 13–19 complete the legislation and include provisions not outlined here. In 1975, Congress extended the Act to some language minorities under Sections 2 and 4(b) (persons of Spanish Heritage, American Indians, Asian Americans, and Alaskan Natives) and Congress added Section 203 which required bilingual elections under specified conditions. In 1982 Congress adopted a more relaxed bailout standard under 4(a) which allowed a political subdivision to bail out of Section 5 coverage separate from its' covered state and allowed plaintiffs to establish a violation of the Section without having to prove discriminatory purpose. In 2006 Congress repealed Sections 6, 7, and 9 that referred to examiners and observers.

[7] Voting Rights Act of 1965 (PL 89-110, 6 August 1965), 79 *United States Statutes at Large*, pp. 437--46. Available from http://www.gpo.gov/fdsys/pkg/STATUTE-79/pdf/STATUTE-79-Pg437. pdf; Accessed 4/27/2014.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

The Section 5 "preclearance" provision required "covered" states and jurisdictions identified by Section 4(b) to obtain permission from the Department of Justice (DOJ) to enact new voter laws. Covered jurisdictions were obligated to submit new voting laws to the Department of Justice for preclearance review. Once submitted, the DOJ was tasked with assessing the discriminatory potential or impact of the law, and for making a determination about whether the law would "deny or abridge the right to vote based on race or color." If the DOJ determined that the law would discriminate it could "object" to the provision or block enactment. If the DOJ determined that the law was neutral, it could "preclear" it. In 1965, the following jurisdictions were covered under Section 5 by the "triggering" provisions of Section 4(b): Alabama, Georgia, Louisiana, Mississippi, South Carolina, Virginia, 39 counties in North Carolina, and specified counties in Arizona and Hawaii.[8]

While some of the VRA provisions are permanent, Section 5 was passed for a limited period. In 1965, Section 5 was set to expire in 1970, 5 years after initial passage of the VRA, to accommodate congressional intent that the provision be retired once voting discrimination ceased. Until then, Congress had the power to renew the temporary provisions and continue their use for as long as they remained necessary. And Section 5 was renewed, every time the temporary provisions came up for reauthorization, in 1970, '75, '82 and '06.

To achieve the reauthorizations, Congress amended the triggering date in Section 4. By extending the expiration date of the preclearance formula, Congress extended the period during which a covered jurisdiction must abstain from the use of a literacy test or similar device, and extending the trigger date identified in the formula. In 1970, Congress made the changes necessary to extend the formula and preclearance for 5 years to cover:

> [A]ny state or political subdivision that used a literacy test for voter registration on November 1, 1968, and in which less than 50% registration or voting occurred in the 1968 presidential election...[9]

A similar set of adjustments has been applied to extend Section 5 preclearance each time the VRA has come up for renewal – for 7 years in 1975, and for 25 years in 1982 and 2006. Each time the preclearance program was renewed the basic 4(b) formula remained the same, except for the adjustments to the applicable dates to extend coverage of Section 5 further into the future. Each time Section 5 was reauthorized,

---

[8] Garrine P. Laney, *The Voting Rights Act of 1965: Historical Background and Current Issues* (New York: Novinka Books, 2003), 12.

[9] Voting Rights Act of 1970 (PL 91-285, 22 June 1970), 84 *United States Statutes at Large*, p. 314. 11 For example, in 1970, Arizona, California, Connecticut, Idaho, Massachusetts, New Hampshire, New York, and Wyoming became covered. See, Garrine P. Laney, *The Voting Rights Act of 1965: Historical Background and Current Issues* (New York: Novinka, 2003), 23.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

additional states and jurisdictions became covered.[11] It is important to note that each time the reauthorization was achieved by overwhelming, bipartisan roll call votes.[10]

The legislation was incredibly successful. By 1969, the VRA enabled more than eight hundred thousand blacks to register to vote in the seven states to which Section 5 originally applied.[11] The number of black elected officials also increased dramatically, "more than fivefold, rising from 1469 in 1970 to 7370" in 1990."[12]

## The Development of VRA Opposition Before the 2006 Reauthorization

Passage of the VRA in 1965 was the result of a hard-fought battle in Congress. Criticism of the legislation did not evaporate after the passage of the bill. Southern Democrats did not appreciate the curtailment of state power, in particular the power of states to control access to the ballot. Controlling access to the vote was key to states' ability to maintain the Jim Crow system and limit the franchise based on race. But, the general popularity of the law suppressed most criticism. The legislation was embraced by the liberal consensus and approved by the Supreme Court. When the law was first challenged, in the fall of 1965, in *South Carolina v. Katzenbach*,[13] the Court held that Section 5 was a constitutional exercise of Congressional authority. The law had a significant impact on the electorate and earned overwhelmingly positive media coverage. However, as time passed a critical analysis of the VRA and room to wield it, did emerge.

Critics' core argument was that the VRA's success over time justified its repeal. States had reformed, were no longer discriminating offenders and were therefore incorrectly targeted for punishment. Beginning with the publication of Thernstrom's 1978 book, *The Odd Evolution of the VRA*, the literature argued that the VRA was "odd" because it was no longer being used for its original aim: to remove the traditional roadblocks used to disenfranchise black voters, like poll taxes and literacy tests. Instead it was being applied to make sure that "blacks and language minorities," like Mexicans in Texas, were elected to office based on their numerical strength. Essentially,

---

[10] In 1970, the VRA reauthorization garnered 333-85 votes in the House and 77-19 in the Senate. In 1975, the House voted 341-70 and the Senate, 77-12. In 1982 the House voted 389-24, the Senate, 85-5. In 2006, the House voted 390-33 and the Senate, 98-0.

[11] U.S. Congress. Senate. Subcommittee on Constitutional rights of the Committee of the Judiciary. 1969 and 1970. *Bills to Amend the VRA of 1965*. 91st Cong., 1st and 2nd session. Charles Mathias (R-MD).

[12] Joint Center for Political and Economic Studies. *Elected Officials 1990: A National Roster*. (Washington, DC: Joint Center for Political and Economic Studies Press, 1991), 1.

[13] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

Thernstrom and others argued, the Act had been converted from a tool designed to extend the franchise to blacks to a tool used to guarantee that minorities could elect the representatives of their choice.[14] Thernstrom alleged that the law encouraged and enforced an objectionable system of "proportional representation."[15]

Thernsrom's 1987 work, *Whose Votes Count*, became a "veritable bible" for conservative jurists, including five who often formed a majority on the Rehnquist Court in the late 1980s[16] and it has been endorsed by five members of the Roberts Court. As early as 1994, Clarence Thomas cited Thernstrom, using her work as a basis for claiming that the application of the VRA had indeed shifted from useful to problematic in the manner she describes and to argue that the law is an impediment to the American electoral system.[17] The Court also adopted Thernstrom's views on minority majority districts.[18]

By 2006, the Supreme Court had a track record of decision making designed to limit the controversial sections of the VRA. The Court had previously limited the law and it had expressed its opposition to Section 5 in previous cases, in *Miller v. Johnson* (1995) (applying strict scrutiny as determined in *Shaw v. Reno* to challenged redistricting plans based on race), *Reno v. Bossier Parish School Board* (2000) (holding that Section 5 only protects redistricting plans against backsliding not against discriminatory purpose) and *Georgia v. Ashcroft* (2003) (reversing the District Court holding that Georgia's redistricting plan was retrogressive because the number of voting age blacks increased in other districts), to cite three examples. Arguably the Court had already conveyed on several occasions that the Section 5 formula was at risk by the time of the 2006 reauthorization hearings.

GOP members of Congress were aware that a lawsuit against Section 5 was likely to be filed in the event that the VRA, including Section 5 was reauthorized with GOP support in 2006.[19] In 2004, Ed Blum established the Project on Fair Representation which he called a "vehicle to persuade Congress and the Bush administration to revisit and revamp the Voting Rights Act."[20] Blum visited the Hill to encourage the GOP to

---

[14] Abigail Thernstrom, *Voting Rights and Wrongs: The Elusive Quest for Racially Fair Elections* (Washington, DC: American Enterprise Institute Press, 2009).

[15] Abigail Thernstrom, *Voting Rights and Wrongs: The Elusive Quest for Racially Fair Elections* (Washington, DC: American Enterprise Institute Press, 2009).

[16] Abigail Thernstrom, *Voting Rights and Wrongs: The Elusive Quest for Racially Fair Elections* (Washington, DC: American Enterprise Institute Press, 2009).

[17] Abigail Thernstrom, *Whose Votes Count?: Affirmative Action and Minority Voting Rights* (Cambridge: Harvard University Press, 1987).

[18] *Holder v. Hall*, 512 U.S. 874 (1994) (Thomas concurring).

[19] Edward Blum, Section 5 of the Voting Rights Act: The Importance of Preclearance, October 25, 2005 House Judiciary Committee Subcommittee on the Constitution, http://www.aei.org/publication/section-5-of-the-voting-rights-act-2/ accessed April 11, 2017.

[20] Amanda Becker, *CQ Weekly*, Voting Rights Act At Risk? Feb 2, 2013. http://public.cq.com/docs/weeklyreport/weeklyreport-000004214386.html, accessed May 1, 2017.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

oppose the renewal of Section 5 which he blamed for his loss of a 1992 Texas Congressional election.[21] Blum testified before Congress and asked the GOP to vote against the VRA. When Blum got no relief there, he turned to the Courts.[24] Blum "put out feelers all over the country" searching for a plaintiff to bring a challenge to Section 5 ultimately settling on North Austin Municipal District in Texas.[22] Even if the GOP was ignorant of the fact that Ed Blum had procured a plaintiff, they were aware that a challenge to Section 5 was imminent.

Before 2006, the standard of Court review for reauthorizations had changed. In 1982, Congress still had broad discretion to exercise its legislative authority to enforce the 14th Amendment by enacting "remedial" or "prophylactic" legislation.[23] But, in a fiercely fought battle between Congress and the Court over religious freedom in the late 1990s, the standard of review to assess Congressional legislative authority over "prophylactic" provisions enforcing the Constitution was checked. In *City of Flores v. Boerne* (1997), the Court ruled that Congress no longer had discretion to determine what constitutional violations might be prevented by legislation that enforced the Constitution. The Court with its power of judicial review declared itself the sole arbiter of constitutionality and held that Congress only had authority to pass prophylactic legislation if it were "congruent and proportional" with its objective to prevent, deter, or correct violations deemed cognizable by the Court.[24] In the decision, the renewal of Section 5 of the VRA was used as the example of a law subject to the *Boerne* guidelines. As soon as the law was signed by President Bush in 2006, it became vulnerable to constitutional attack based on the issue of whether Congress enjoyed the authority to pass the law in the first place.

## GOP Opposition in 2006: Signaling the Court

The 2006 reauthorization process was spearheaded by Jim Sensenbrenner, a Republican from Wisconsin. He was serving his last term as House Judiciary Committee Chair. Sensenbrenner was anxious to receive credit for VRA renewal and concerned that his successor might allow the temporary provisions to expire. To

---

[21]  Blum lost the election to Craig Washington one of the first blacks elected to the Texas House. Blum became convinced that he lost the election due to the establishment of minority majority districts under Section 5 of the VRA. Later, Blum participated in bringing the *Shelby* lawsuit. 24 Ari Berman, *The Nation*, "Why are Conservatives Trying to Destroy the Voting Rights Act?" https://www.thenation.com/article/why-are-conservatives-trying-destroy-voting-rights-act/, accessed May 17, 2017.

[22]  Ari Berman, *The Nation*, "Why Are Conservatives Trying to Destroy the Voting Rights Act?" https://www.thenation.com/article/why-are-conservatives-trying-destroy-voting-rights-act/, accessed May.

[23] *Katzenbach v. Morgan*, 384 U.S. 641 (1944).

[24] *City of Borne v. Flores*, 521 U.S. 507 (1997).

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

achieve this legacy, Sensenbrenner combined forces with Melvin Watt (D-NC) Chair of the Congressional Black Caucus, and proposed that the reauthorization hearings be held in 2006, a year before Section 5 was set to expire. Democrat and GOP members of Congress agreed.[25]

Both parties were aware that Section 5 had the potential to be the sticking point that could derail a successful reauthorization. Thus, the parties agreed to a straight renewal of Section 5, "as is," without debate. Everyone understood that it was likely to be impossible to successfully debate and revise the preclearance framework without bringing reauthorization negotiations to an irreconcilable impasse. With that in mind, a bipartisan coalition coalesced around the issue and made a public pledge of support. On May 2, 2006, in a rare bipartisan event on the steps of the Capitol, Republicans pledged with Democrats to renew Section 5 for the proposed 25 years.

> With great fanfare, the VRARA was introduced bicamerally in the House and the Senate. A bipartisan group of more than two dozen members from both chambers joined together in a press event on the steps of the Capitol. The group was led by Representative John Lewis.

> Lewis and included members from both parties: Senate Majority Leader Bill Frist, Senate Minority Leader Harry Reid, House Speaker Dennis Hastert, and House Minority Leader Nancy Pelosi...The Hill photo opportunity committed party leadership to the bipartisan agreement reached on the VRARA. Republican leadership would be accountable if they broke their promise.[26]

Before the start of the hearings, in a closed door GOP meeting, Representative Lynn Westmoreland (GA) led colleagues from Georgia, Texas, Oklahoma, Michigan, Florida, and Alabama in a demand for debate to express on the record their opposition to the VRA and to preclearance in particular. Westmoreland argued that the reauthorization of Section 5 would fail to acknowledge state improvements in voting rights since the inception of the VRA in 1965. Westmoreland averred that it would be unfair to covered states like Georgia that had significantly improved their voting records under the VRA to reauthorize the preclearance rubric "as is." [27] The Westmoreland contingent gleaned support from additional GOP members who were critical of the bilingual ballot provision that was also being debated on the floor. The closed door meeting became so heated that Jim Sensenbrenner walked out and the originally scheduled hearings were delayed indefinitely.

---

[25] Carl Hulse, "Rebellion Stalls Extension of Voting Rights Act," *The New York Times*, 22 Jun. 2006.
[26] James Thomas Tucker, *The Battle Over Bilingual Ballots: Language Minorities and Political Access Under the Voting Rights Act* (New York: Routledge, 2016), 176.
[27] Carl Hulse, "Rebellion Stalls Extension of the VRA," *The New York Times*, 22 Jun. 2006. 31 Jaime Fuller, "The Fix: Republicans Used to Unanimously Back the Voting Rights Act. Not Any More," *The Washington Post*, 26 Jun. 2014.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

Hearings finally began in June, but only on the condition that the Republican "rebels" be permitted to ignore the pre-existing agreement not to debate and be allowed to propose amendments.[31] Rebels proposed four amendments. Supporters of HR9, the reauthorization bill, referred to the four amendments as "poison pills" and "mean spirited."[28] Supporters of the amendments including Westmoreland, claimed they were attempting to protect the law. According to Westmoreland, it might have looked as if "some old boys from the South" were trying to do away with the civil rights law, but they were actually trying to save it. "These old boys are trying to make it constitutional enough that it will withstand the scrutiny of the Supreme Court."[29]

There were 12 house hearings involving 46 witnesses. Most of the testimony was presented by Democrats and other proponents of the VRARA who worked to ensure that the reauthorized legislation would pass and that the emergent bill could withstand constitutional attack. Proponents of the VRA understood that they needed both to reauthorize Section 5 and to establish a Congressional record that would substantiate Congressional authority to pass it.[30]

Because Section 5 was a prophylactic provision, which prevented discrimination in advance of its occurrence at the polls, the legislation was constitutionally required to be "congruent and proportional" to "the evil it sought to remedy."[31] As indicated above, the 1997 decision, *City of Boerne v. Flores*, meant that Congress was not authorized to pass the law if it did not provide protection from current state action.[32] Again, this had not been the standard at prior reauthorizations.

Out of the desire to satisfy the *Boerne* standard if necessary, the pro-VRA lobby produced a voluminous, comprehensive record. Comprised of 15,000 pages of evidence it included reports from the National Commission on Voting and from the ACLU along with evidence collected during 21 days of hearings. The House Report focused on examples to justify the need for Section 5 coverage under the 4(b) formula based on contemporary election activity.[33] Witnesses relayed recent personal experiences, outlined ongoing sophisticated methods of discrimination, and gave testimony to support the argument that the Section 5 program was "congruent and proportional" to contemporary conditions, and that it provided ongoing protection against contemporary voter discrimination. The House passed the VRARA by a vote of 390-33 on July 13, 2006.

---

[28] Daniel McCool, ed., *The Most Fundamental Right* (Bloomington: Indiana University Press, 2012), 14.

[29] Amanda Becker, Voting Rights Act At Risk? CQ Weekly, Feb 2, 2013.

[30] *City of Flores v. Boerne*, 521 U.S. 507, (1997), laid out the contemporary standard for Congressional enactment of prophylactic law. The provision must be "congruent and proportional" to the evil it sought to remedy.

[31] *City of Flores v. Boerne*, 521 U.S. 507, (1997).

[32] *City of Flores v. Boerne*, 521 U.S. 507, (1997).

[33] Editor, Daniel McCool, The Most Fundamental Right p. 14.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

The entire House record was submitted and included in the Senate record.[34] The Senate Judiciary Committee and its subcommittees held nine hearings and heard from 42 witnesses including House members who encouraged Senators to support the bill.[39] Although a façade of bipartisanship prevailed in the Senate, debate among lawmakers from the regions covered by Section 5 became heated. Hearings in the Senate Judiciary Committee and the Subcommittee on the Constitution included argumentation over the same kinds of issues raised in the House debates. Republican senators complained about the unfairness of Section 5 coverage and raised federalism arguments against renewal. Debate over the bilingual ballot provisions was similarly contentious. Senator Saxby Chambliss (GA-R) complained, "Other states with much less impressive minority progress and less impressive minority participation are not covered, while Georgia still is!

This seems both unfair and unwise."[35]

Debate over Section 5 brought VRARA negotiations in the Senate to a standstill. It appeared that the reauthorization would be held over until the next session. The deadlock was broken by President George W. Bush. In his July 21, 2006, speech to the NAACP, the President voiced unequivocal support for the 25-year reauthorization.[36] The same day, Majority Leader Bill Frist (TN-R) used the momentum provided by the President to schedule the Senate vote on the VRARA. Frist refused to allow amendments. The Majority Leader substituted the bill on the Senate floor with the one sanctioned by the Senate Judiciary Committee since that bill mirrored the House bill exactly and would avoid the need for a conference committee. Frist's bill was approved unanimously by the Senate. The bill renewed Section 5 "as is" and arguably strengthened the VRA by overturning intervening Supreme Court decisions proponents of the Act thought imposed unreasonable limitations on the VRA.[37]

In an unprecedented maneuver after the floor vote, GOP senators revised the Senate Judiciary report to register opposition to the VRARA. On July 26, a full week after the passage of the bill, the night before it was signed by the President, "the chairman of the Senate Judiciary Committee at the time, Pennsylvania Republican Arlen Specter, signed off on a revised committee report that differed substantially from

---

[34] Editor, Daniel McCool, The Most Fundamental Right p. 14. 39
Editor, Daniel McCool The Most Fundamental Right, p. 14.
[35] Fuller, The Fix.
[36] "Bush Addresses NAACP Convention," CQ Transcripts Wire, Wilson Quarterly, July 20, 2006.
[37] *Reno v. Bossier II*, 528 U.S. 320 (2000) and *Georgia v. Ashcroft*, 539 U.S. 461 (2003). The 2006 law made clear that discriminatory purpose is grounds for preclearance even if the purpose was not designed to make minorities worse off than they had been (*Bossier II*) and that preclearance is required when laws have the effect of reducing the power of minority voters to "elect their preferred candidates of choice." The Congress also reversed *Ashcroft* by restoring the pre-*Ashcroft* standard for determining whether redistricting plans needed to be submitted for preclearance. Finally, the bill overturned *West Virginia v. Casey* (1991) which attempted to bar private plaintiff's recovery of expert fees, which had been allowed before the decision.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

the version Democrats had earlier been given."[38] Senate Republicans filed an amended committee report to express reservations about the VRARA and its constitutionality.[39] Customarily, reports are "published well before a bill is to be discussed on the floor, so that members of both parties can fully understand a bill's provisions ... and [the reports are usually] the result of bipartisan participation. Democrats, concerned about the pronouncements, complained that the report "undermined the case supporting the constitutionality of the law," and concluded that the report was designed as an invitation to challenge the VRA at the Supreme Court.[40] Democrats felt compelled to add their own section of "Additional Views," criticizing the amendment of the report without consultation with Democrats and without review by the full Judiciary Committee.[41]

> [S]ome of the same lawmakers who stood by as President George W. Bush proudly signed the reauthorization in a ceremony on the White House grounds just the previous day had signed their names to a revised committee report on the bill that raised serious concerns about the statute and the process by which it had been renewed, even calling the Voting Rights Act a "tool for political and racial gerrymandering.[42]

The GOP added two Additional Views statements to the Senate record both dedicated to exposing why the legislation was arguably unconstitutional.

This set of views was submitted by Senators John Cornyn of Texas and Tom A. Coburn of Oklahoma and comprehensively covered both popular objections to the law and complaints about the hearing process. The Senators claimed that these issues compromised the best practices of the Senate and resulted in a bill that was not as good as what might have been possible if the bill had received a full and fair hearing. They outlined and discussed a list of "significant reservations" that they harbored about the bill they voted for.

> (1) the record of evidence does not appear to reasonably underscore the decision to simply reauthorize the existing Section 5 coverage formula – a formula that is based on 33- to 41-year old data, and (2) the seemingly rushed, somewhat incomplete legislative process involved in passing the legislation prevented the full consideration of numerous suggested improvements to the Act. In short, while we support reauthorization generally, we reluctantly conclude that the final

[38] Amanda Becker, Voting Rights Act at Risk?, CQ Weekly, Feb 2, 2013. http://public.cq.com/docs/weeklyreport/weeklyreport-000004214386.html, accessed May 15, 2017.

[39] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006.

[40] Persily, "Promise and Pitfalls," 89.

[41] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006. p. 54.

[42] Amanda Becker, Voting Rights Act at Risk?, CQ Weekly, Feb 2, 2013. http://public.cq.com/docs/weeklyreport/weeklyreport-000004214386.html, accessed May 15, 2017.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

product is not the best product we might have produced had we engaged in a more thorough debate about possible improvements. We also conclude that it would have been beneficial if the Section 4 coverage formula had been updated in order to adhere to constitutional requirements – an update that would have preserved, strengthened and expanded the Act to ensure its future success.[43]

The Senators argued that because the Section 4(b) formula was not revised, Congress lacked the authority to pass the law based on the record, which was insufficient to substantiate the current formula which remained incompatible with recent election data. Similarly they complained that none of the suggested improvements discussed at the hearings were incorporated into the Section 5 program, and that therefore that the law "failed to adhere to constitutional requirements."[44] Furthermore, they acknowledged their belief that the Court would review the legislation.

> The primary point is not that any of [the methods discussed to revise preclearance coverage] is necessarily the right approach, but that it would have been beneficial for us to have had a full discussion of ways to improve the Act to ensure its important provisions were narrowly tailored and applied in a congruent and proportional way, something the Supreme Court will take into consideration when it considers the new Act. We believe we could have done it had we taken the time to do it.[45]

The Senators claim that a false urgency pervaded the proceedings because the public was misled to believe that blacks would lose their right to vote if the legislation was not revised in 2006. They stated that the hearings were scheduled so that Senators could not attend, and claimed that senators did not get all of their questions addressed during the hearings. They further insisted that the bill's language was a "foregone conclusion," impenetrable by amendments based on Senate testimony or input into the bill or the report.

> Finally, even the production of this committee report -- something that normally is of the utmost significance for such an important, complicated legislation – has been short circuited. ... we remain

---

[43] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006. pgs 25–6.

[44] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006, 26.

[45] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006, 33–4.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

convinced that these views are critical to a full understanding of the legislative process behind enactment and thus include them in the Committee Report.[46]

The Senators concluded by admitting reluctance at casting their votes and by presenting a chart to indicate an alternative application of Section 4 based on current election data, an alternative they believed "should have been given appropriate consideration in the Senate."[47]

Despite the clear exercise of obstructionist tactics, including the GOP's failure to abide by the pre-existing agreement not to debate Section 5 in the House, and the revisions submitted after the close of the hearings that included mention of Court review, the consensus of VRA proponents was that they won the fight. VRA supporters and proponent scholars studying VRA development departed from the renewal confident that the unique power of the VRA was secure.

> "There was a very robust debate, ... with a lot of back and forth [which is what] the legislative process is all about. At the end though, everyone pulled together – from both parties and renewed key voter protections."[48]

The Act's proponents had faith that the law's iconic status combined with the thick Congressional record would establish "congruence and proportionality" and that the overwhelming bipartisan roll call vote in favor of the VRARA would protect Section 5 from being overturned if reviewed by the Supreme Court.

They were wrong.


## The Supreme Court: The Alternative Forum

*Supreme Court Challenges*. On August 4, 2006, 8 days after the close of the reauthorization hearings, a lawsuit challenging the 2006 reauthorization was filed in federal court.[49] A Texas water district, the Northwest Municipal Utility District No. One (MUD), sued to determine whether it was subject to Section 5, with the core issue

---

[46] US Congress, Senate, "Fannie Lou Hamer, Rosa Parks, Coretta Scott, César E. Chávez Rights Reauthorization Act of 2006 Committee on the Judiciary Report Together with Additional Views," July 26, 2006, 35.

[47] Senate Report at 36.

[48] Julie Fernandes, who led the push for the bill for the Leadership Conference on Civil and Human Rights in 2006, cited from Molly Ball, "No, the Voting Rights Act is Not Dead," *The Atlantic*, June 28, 2013. http://www.theatlantic.com/politics/archive/2013/06/no-the-voting-rights-actis-not-dead/277281/, accessed 12/1/2016.

[49] Util. Dist. No.1 (NAMUDNO v. Gonzales) No. 1:06-cv01284-PLF (D.D.C. August 4, 2006). 55 Brennan Center Website page: https://www.brennancenter.org/legal-work/namudno-v-holder 56 *Northwest Austin Municipal Utility District No. 1 v. Holder, 557 U.S. 193* (2009).

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

being the Section's constitutionality.[55] The Supreme Court held unanimously that the District was exempt from coverage despite the commonly applied rule that exemptions not be granted to single districts located in states covered in their entirety.[56] However, the Court refrained from ruling on the constitutionality of Section 5. Instead, the Court used the decision to suggest that Section 5 was unconstitutional and that it violated federalism principles and "the historic  tradition that all the States enjoy equal sovereignty."[50] Furthermore it stressed that

> [v]oter turnout and registrations rates now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels. Finally [the Court questioned] whether the problems that Section 5 meant to address were still "concentrated in the jurisdictions singled out for preclearance.[51]

According to one analyst, "[t]he opinion rea[d] like a rough draft of the opinion the Court would have written had it struck down Section 5."[52]

The *MUD* decision conveyed the Court's opinion that the VRARA was an invalid exercise of Congressional power. The Court did not acknowledge the extensive Congressional reauthorization record as a justification for continuing Section 5 coverage. The Court strongly recommended that amendment of Section 5 would be necessary to ensure its constitutionality. Justice Clarence Thomas, who concurred in part with the opinion, argued that the Court should have addressed the merits of the constitutionality claim directly. According to Thomas, Section 5 exceeded Congress' power to enforce the 15th Amendment, and was therefore unconstitutional.[53]

*MUD* put the ball squarely in Congress' court and it put potential plaintiffs on notice that challenges to Section 5 were welcome. The decision also gave clear information about what a successful challenge to Section 5 would look like – objection to the applicability of Section 5 to current state action. "The Act, announced the Court, imposes current burdens and must be justified by current needs."[54] Republican members of Congress (MOCs) did not make an effort to revise Section 5 to protect the preclearance formula. Democrats and proponents of the VRA remained confident that the record would protect against federal court challenge. After the MUD decision, Congress did not amend Section 5 or the Section 4(b) formula.

The complaint from Shelby, Alabama directly targeted Congressional power to reauthorize Section 5 and the constitutionality of Section 4(b). The main issue was whether Congress had the power to impose the preclearance power on Shelby County when Congress "produced no evidence that covered jurisdictions are engaging in the

---

[50] *Shelby v. Holder*, at 2621.

[51] *Shelby v. Holder*, at 2621 *(Shelby describing MUD)*.

[52] Heather Gerken, *An Uncertain Fate for Voting Rights*, Am. Prospect, June 23, 2009.

[53] *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009), Thomas, concurring and dissenting.

[54] Northwest Austin, 557, U.S., at 203, 129 S.Ct. 2504.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

types of discriminatory voting practices that led to the VRA's enactment in 1965."[55] The Court concluded, Chief Justice John Roberts writing for the majority, that current state action and franchise conditions did not justify continued imposition of federal oversight of state elections under Section 4(b).

In 1966, the Court had found that the violation of federalism imposed by the preclearance provision was appropriate because the law curtailed long and egregious histories of systematic state exclusion at the polls based on race.[56] In *Shelby*, however, the Court held that the exercise of the Section 5 preclearance power was no longer warranted and that it unjustifiably discriminated against southern states and jurisdictions. The Court supported its opinion by citing the House record.

> Significant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress. States legislatures and local elected offices ... .[i]n some circumstances, minorities register to vote and cast ballots at levels that surpass white voters.[57]

The Court determined that the Voting Rights Act was the cause of these improvements, i.e. that the Act had completed its job. The Court held therefore that federal oversight of state voting practices under Section 4(b) was a violation of the 10th Amendment. The Court found that state behavior had improved dramatically since 1965 but that there had not been a corresponding improvement of the Section 4(b) formula. In a country no longer divided along racial lines nor plagued with voter discrimination, the coverage formula had become outdated and was therefore unconstitutional.

To the surprise of many observers, the Court avoided consideration of the constitutionality of Section 5, again. Instead, the Court aimed directly at the 4(b) coverage formula.[58] The panel voted 5-4 to strike Section 4(b), calling it an "unconstitutional exercise of Congressional power."[59] The Court held that 4(b) imposed burdens on covered jurisdictions that were no longer appropriate based on contemporary state action. But, by striking the 4(b) coverage formula, the Court rendered Section 5 void. By removing the formula to identify covered jurisdictions, the Court *removed all jurisdictions from Section 5 coverage*. As a result, the Court

---

[55] Complaint for Declaratory and Injunctive Relief, *Shelby County Alabama v. Eric H. Holder Jr.*, filed April 27, 2010, pg. 17.

[56] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

[57] *Shelby v. Holder* at 2625.

[58] Like Congress, shirking a head on offensive against the unique, controversial and critical section of the VRA.

[59] Again, Justice Thomas concurred to add that Section 5 is also unconstitutional because it no longer provided protection against blatant discrimination as Congress intended in 1965. Thomas argued that Congress did not have the power pursuant to the 15th Amendment to impose Section 5 on covered states.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

effectively struck Section 5 despite failing to hold directly that the provision was unconstitutional.[60]

The Court opined that the 2006 reauthorization record did not justify the legislation. The record failed to portray the same kind of "pervasive, flagrant, widespread, and rampant discrimination" that qualified covered jurisdictions in and before 1965.[61] The Court cast the evidence compiled at the VRARA hearings and the statutory formula as outdated observing that the record "played no role in shaping the statutory formula before us today."[62] While the Court acknowledged that voter discrimination was inappropriate, it required that Congress "ensure that the legislation it passes to remedy the problem speaks to current conditions," explained the Court.[70] Here, according to the Court, the record failed.

The dissenting members of the Court disagreed with the majority's interpretation of the record:

> Congress determined, based on a voluminous record, that the scourge of discrimination was not yet extirpated. The question this case presents is who decides whether, as currently operative, Section 5 remains justifiable, this Court or a Congress charged with the obligation to enforce the post-Civil War Amendments "by appropriate legislation." With overwhelming support in both Houses, Congress concluded that, for two prime reasons, Section 5 should continue in force, unabated. First, continuance would facilitate completion of the impressive gains thus far made; and second, continuance would guard against backsliding. Those assessments were well within Congress' province to make and should elicit this Court's unstinting approbation.[63]

In response to the dissenters, the majority pointed to the *MUD* precedent and remarked that the dissenters must have forgotten about the recent precedent, which it pointed out, was signed by two of the dissenters.[64] The court reminded the dissenters that *MUD* established the "current need" standard applied in *Shelby*. The Court went on essentially to argue that the VRA was not sacrosanct – just because it was 40 years old did not make it rational to uphold the aged formula.[65] The Court explained that out of deference for Acts of Congress, it did not strike Section 5 in *MUD* but had instead warned the legislature. But, Congress failed to update the coverage formula and so the Court's hands were tied. "[Congress'] failure to act leaves us today with no choice but to declare Section 4(b) unconstitutional."[66] The Court pointed out that Congress could still

---

[60] NO, REGULAR SHELBY HERE *Shelby County Ala. v. Holder*, 679 F.3d 848 (2012).

[61] *Shelby County Ala.*, 133 S.Ct. at 2629.

[62] *Shelby County Ala,.* 133 S.Ct. at 2629. **70**
*Shelby County Ala.*, 133 S.Ct. at 2631.

[63] *Shelby*, Ginsburg, dissent, at 2632–33.

[64] *Shelby* at 2630.

[65] Shelby at 2631.

[66] Shelby at 2631.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

establish a new coverage formula if it so choose to since Section 5 had not been held, itself, to be unconstitutional.[67]

*The GOP Congressional Response to Shelby.* After the Shelby decision, members of the GOP expressed support for the decision and evidenced no desire to counter it. Senator Jeff Sessions, who expressed support for reauthorization at the 2006 signing, was enthusiastic about the *Shelby* decision. "It was good news, I think, for the South in that [the court found there was] not sufficient evidence to justify treating them disproportionately than, let's say, Philadelphia or Boston or Los Angeles or Chicago …"[68] Senate Minority Whip John Cornyn, (TX) said he was "honestly ambivalent" about the need for Congress to rewrite the law especially since the formula did not

> [t]ake into account the changes in the country including places like Texas, where now minorities are being elected in greater numbers and minority rights are protected, so it strikes me that we ought to declare victory that Section 5 has worked, that the country has changed dramatically, and now we ought to have a uniform rule for everybody.[69]

When asked about the *Shelby* case John Duncan Jr. (R-TN) remarked, "I hope that the Supreme Court strikes down most of this law, or all of it. It would have gotten much more attention in the Congress if it applied to more states and localities."[78] Duncan voted against HR9 but explained the votes of other members of Congress:

> Most members of the House regard[ed] it as simply a free vote because it didn't really apply to their states or districts … It was just an easy way for members to show their support for civil rights even though they knew, I think almost everybody knew, the law isn't needed any longer and had outlived its time. I think they thought, 'Well, this would look good politically.' … They saw no need to cast a futile vote against it.[70]

Other Republican members of Congress reported that they did not "know enough about the decision to know whether a new formula should be created to resume preclearance."[71]

---

[67] Shelby at 2631.

[68] Meredith Shriner, Can Congress Fix the Voting Rights Act, rollcall.com, June 25, 2013 http://www.rollcall.com/news/can_congress_fix_the_voting_rights_act-225935-1.html accessed May 17, 2017.

[69] http://www.rollcall.com/news/can_congress_fix_the_voting_rights_act-225935-1.html. 78 Corey Dade, Is the Voting Rights Act Outdated? Dec. 1, 2012. http://www.npr.org/2012/12/01/166226641/is-the-voting-rights-act-outdated, accessed May 16, 2017.

[70] Corey Dade, Is the Voting Rights Act Outdated? Dec. 1, 2012. http://www.npr.org/2012/12/01/166226641/is-the-voting-rights-act-outdated, accessed May 16, 2017.

[71] Meridith Shiner, Can Congress Fix the Voting Rights Act, RollCall.com, June 25, 2013, http://www.rollcall.com/news/can_congress_fix_the_voting_rights_act-225935-1.html accessed May 10, 2017.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

After the *Shelby* decision, the majority of Republicans in Congress did not make an effort to support bills that would reinstate preclearance coverage akin to their support of the VRARA roll call votes. In January of 2014, Jim Sensenbrenner (R-WI) and John Conyers (D-MI) and John Lewis (D-GA) introduced legislation, The Voting Rights Amendment Act of 2014, "to revise the criteria for determining which states and political subdivisions are subject to Section 4 of the Act..."[72] The bill died without consideration in the House. GOP leadership refused to support the amendment and "declined to schedule a hearing, let alone a vote, on the bill."[73] In January 2015, at a *Christian Science Monitor* breakfast, House Judiciary Chair Bob Goodlatte (R-VA), who voted in favor of the 2006 bill, stated that he believed the VRA was "sufficient as it stands" when asked about supporting a bill to reactivate preclearance.[74] A second bill was introduced in the House in February 2015.[75] It also failed. Ultimately, GOP MOCs felt no urgency to restore the preclearance program.

## Analysis: Why GOP Yes Roll Call Votes Meant No.

At face value, the evisceration of the Voting Rights Act in 2013 appears to have been the result of a Supreme Court decision, made by a conservative court. In fact, the GOP roll call votes in 2006 provided the basis for the Supreme Court to overturn the law. The basis on which the Court struck the law, that Congress lacked authority to pass the law, was possible because of the reauthorization of the law "as is" in 2006. The *Shelby* decision was the culmination of the GOP's 2006 reauthorization agenda.

Members of the GOP in Congress opposed the law in 2006. That opposition is clear from the record despite the roll call votes. Thirty-three GOP representatives voted against the bill. As evidenced by the Additional Views filings in the Senate Report, at least three GOP Senators disagreed with reauthorization, despite their supportive votes for it. The opposition in the House was strong enough to thwart reauthorization for a time, while the Republican foes in the Senate were strong enough to add language to a report in a highly unusual maneuver. Neither faction could have done this without the tacit approval of their committee colleagues. According to Political Scientist Daniel

[72] Patrick McNeil, In Historic Year, Congress Fails to Act on the Voting Rights Act, Civil Rights Monitor, February 2016. http://www.civilrights.org/monitor/february-2016/in-historic-year-congress.html, accessed May 17, 2017.

[73] Ari Berman, Congressional Democrats Introduce Ambitious New Bill to Restore the Voting Rights Act, The Nation, June 24, 2015.

[74] Athena Jones, Congressional Democrats File Legislation to Update the Voting Rights Act, *CNN Politics*, June 25, 2015.

[75] Patrick McNeil, In Historic Year, Congress Fails to Act on the Voting Rights Act, Civil Rights Monitor, February 2016. http://www.civilrights.org/monitor/february-2016/in-historic-year-congress.html, accessed May 17, 2017.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

McCool, in June 2006 the President made a clear statement that he wished the VRA temporary provisions would be renewed. He indicated in his statement that he was working in conjunction with Congress to extend the Act. "There were some Republicans in the Congress that disagreed ... others who opposed [only] the renewable provisions but felt they could not afford to publically come out against the Act due to the political repercussions."[76]

Members of the GOP knew that it was likely that the Court would be amenable to accepting review of the constitutionality of Section 5. It was common knowledge that a number of the justices were proponents of the repeal of affirmative action law and that they were advocates of popular VRA criticism. Put another way, Republican lawmakers could be confident that their opposition to Section 5 was shared by conservative members of the Supreme Court. The Supreme Court had already handed down decisions limiting the VRA based on commonly used conservative logic. Two of those decisions were overturned by the 2006 VRARA. It was reasonable for members of Congress to expect that the Court would be willing to take a Section 5 challenge.

The strongest evidence that GOP MOCs who voted for the VRARA in 2006 intended for the legislation to be reviewed by the Supreme Court was the unprecedented revision of the Senate Judiciary Report a week after the roll call vote. *This is the only known time that partisan members of Congress have taken the opportunity to revise a Senate report after the close of proceedings.* The hearings, and roll call votes were complete. The purpose of the comments was to document complaints about the bill's passage, and its constitutionality. The report had no additional use in Congress. The Additional Views attacked issues from a constitutional perspective, highlighting the potential of a determination that Congress lacked the authority to pass the law, the exact basis on which the Court had the power to strike the preclearance provision. And the authors acknowledged plainly their belief that the Supreme Court would review the revised law."[77] Law professor and political scientist Nathaniel Persily explained in a Yale law review article, "virtually no one wanted to be on record opposing the legislation," which limited serious debate of the preclearance formula. Instead members of the Senate Judiciary Committee prepared a revised report, and submitted it at the 9th hour in an effort to motivate a legal challenge.[78] Legislators inoculated themselves against negative political attack while signaling the courts in a manner that might placate their conservative constituents.[79]

---

[76] Daniel McCool, Ed., The Most Fundamental Right, p. 17.

[77] Senate Report at 34.

[78] Nathaniel Persily, The Promise and Pitfalls of the New Voting Rights Act, The Yale L.J. 117 Yale L.J. 174 (2007).

[79] Becker, CQ Press VRA at Risk? Several sources familiar with the committee's work now say that a Specter aide, hired to burnish the senator's credentials with conservatives, spearheaded the Republican response, which was significantly more partisan than Specter's own views. In doing so, she started laying the groundwork to weaken the preclearance provision through litigation.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

By voting yes on the VRARA, GOP members of Congress avoided a potential showdown in Congress over Section 5. Party-wide opposition to the VRA and Section 5 on the floor would likely have incited a backlash against GOP representatives during a mid-term election year. The Democratic party and VRA proponents began their offensive for the reauthorization in 2004. Proponents engaged the media to ensure that voters knew the vote was coming and were aware of its importance and potential impact on black voters. Black voters expected Congressional support of the VRARA. The Black press made an issue of the reauthorization as important to black voters beginning in 2003, applied its most intensive coverage in 2005 and framed support on the "theme that the Act was untouchable in light of the blood shed by civil rights activists to win its passage...[the bill was named after three civil rights activists]"[80] "Black members of Congress framed the [reauthorization] issue in a way that the administration [and MOCs] recognized that blacks and minorities would mobilize if VRA renewal was challenged in a significant way."[81] Observers agreed that the specter of black censure during the run up to midterm elections would prevent most GOP representatives from attempting to challenge the bill as written or to challenge it at roll call. A political scientist Katherine Tate observed,

> That black Democrats would mobilize against the GOP if contentious politics erupted over the VRA is why I think the GOP agreed to a quiet and near unanimous extension ... and the [likelihood that the GOP would gain a] moderate level of Black political support ... is ... why reauthorization sailed through Congress.[82]

Not only did voting for the Act prevent backlash at members of Congress, it ensured that after the law was passed, GOP party members' true positions were not scrutinized. Because GOP support was measured by roll call votes, few members of the public were aware of the loud opposition voiced on the floor or in the revised Senate Judiciary report. Once the vote was complete, proponents of the VRA relaxed: having logged Republican support in the reauthorization context, they ceased worry about the need to counter GOP opposition. By voting for the bill members of the GOP who disagreed with it got the opportunity to criticize the legislation, influence the record without recourse, and avoid concern about the influence of the GOP opposition beyond the walls of the Capitol.

By voting for the VRARA Republicans who opposed preclearance avoided compromising on a new formula. Conservatives were not interested in continuing coverage under Section 5, in subjecting new states to coverage, or in passing a bill that

---

[80] Katherine Tate, "Black Politics, The GOP Southern Strategy, and the Reauthorization of the Voting Rights Act," *The Forum*, 4, no. 2 (2006), 4–5.

[81] Katherine Tate, "Black Politics, The GOP Southern Strategy, and the Reauthorization of the Voting Rights Act," *The Forum*, 4, no. 2 (2006), Abstract.

[82] Katherine Tate, "Black Politics, The GOP Southern Strategy, and the Reauthorization of the Voting Rights Act," *The Forum*, 4, no. 2 (2006), 1.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

might withstand constitutional challenge, despite their claims to the contrary. Extended disagreement about the scope and existence of the preclearance formula would have brought attention to the proceedings, and might have forced the GOP to agree to compromise on the formula, a formula that if narrowly tailored to current conditions might have been constitutionally acceptable. By accepting the preliminary agreement, GOP members put constituents at ease, appeared supportive of the law, and passed a bill including a formula that had already been perceived as problematic by the Court.

Finally, by voting yes to support the passage of the VRARA without amendment, the GOP contributed to the passage of a bill that was vulnerable to constitutional attack. Once the 2006 vote was complete, the Supreme Court became empowered to review not just substantively whether Section 5 suited the time period, but importantly whether Congress had the authority to reauthorize the law. Prior to the reauthorization, the Court was reviewing a version of the law which it had already acknowledged as constitutional. But, because the hearings did not produce any changes in the preclearance formula, the Court got to review the existing formula anew. In addition, the failure to amend the formula made it easy for those poised to file a Section 5 challenge before the hearings to do so immediately after. No revisions to a filing petition were necessary to contend with a new formula. Thus, it was not at all surprising that the first challenge to Section 5 was filed almost immediately, just 8 days after the end of the reauthorization hearings.

The Court did not strike the preclearance program at its first opportunity. In *North Austin Municipal District No. 2 v. Holder*, the Court made clear that the responsibility for a constitutional preclearance formula lay with Congress. The Court was able to warn Congress that it needed to revise the Section 5 formula, appearing to give Congress some time to make the change, but then ending the preclearance provision in *Shelby*. When the Court struck Section 4(b) it did so *because* Congress lacked the authority to pass the law in 2006. The passage of the law was possible *because* it was broadly supported in 2016 by its Congressional GOP opponents.

The bottom line is that the GOP roll call votes did not accurately portray the level of support of Republicans for the VRARA in 2006. The fact that the GOP helped to pass that bill provided the motivation for and the foundation on which the Court was later able to strike the preclearance provision in 2013. Thus, the "yes" votes cast for reauthorization did ultimately mean "no" to the support of the VRA by the GOP and the Roberts Supreme Court.

If we take roll call votes at face value, especially on legislation that does not seem contentious, we can miss other agendas that lawmakers pursue through their words as well as their deeds. By standard measures of congressional partisanship, the reauthorization was not partisan. That is, we do not see a majority of the GOP opposing the majority of Democrats. But it would be a mistake to stop the analysis here. If we understand Congress as a difficult forum in which to raise objections to the Voting Rights Act then it becomes clear that GOP challenge to the legislation would have been costlier than Republicans were willing to bear. However, the GOP was serious about

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

its anti-VRA agenda and could, by widening the scope of the conflict, contribute to the extraction of the preclearance provision and the evisceration of the VRA.

Brought to you by | Eastern Kentucky University - EKU
Authenticated Download Date |
8/13/19 2:08 PM

**DEFENDANTS' EX. 11**

**Brooks v. Miller, 158 F.3d 1230 (1998)**

12 Fla. L. Weekly Fed. C 207

158 F.3d 1230
United States Court of Appeals,
Eleventh Circuit.

Tyrone BROOKS, Lanett Stanley,
et al., Plaintiffs–Appellants,

v.

Zell MILLER, Governor of Georgia, Georgia State
Board of Elections, et al., Defendants–Appellees.

No. 96–9284.
|
Oct. 30, 1998.

**Synopsis**

Black Georgia residents and voters brought suit challenging the majority vote requirement for primary elections in Georgia as violative of the Voting Rights Act, as well as the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. The United States District Court for the Northern District of Georgia, No. 1:90-CV-1001-RCF, Richard C. Freeman, J., ruled that the majority vote provision was constitutional and did not violate the Voting Rights Act. Plaintiffs appealed. The Court of Appeals, Dubina, Circuit Judge, held that: (1) evidence supported findings that majority vote requirement was not passed for a discriminatory purpose and did not have a discriminatory effect on black candidates; (2) plaintiffs failed to establish *Gingles* prerequisites in support of Voting Rights Act claim; and (3) evidence supported determination that majority vote requirement would have been enacted even in the absence of any racially discriminatory motives of legislators.

Affirmed.

West Headnotes (16)

**[1]    Federal Courts**
    Elections, voting, and political rights

The issue of whether an election system was established or maintained for a discriminatory purpose was a question of fact subject to the clearly erroneous standard of review.

**[2]    Federal Courts**
    Elections, voting, and political rights

Appellate court reviewed for clear error district court's determination of whether Georgia's majority vote requirement had a discriminatory impact.

**[3]    Election Law**
    Judicial Review or Intervention

In deciding whether an election mechanism leads to discriminatory results, the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minorities.

1 Cases that cite this headnote

**[4]    Federal Courts**
    Scope and Extent of Review

In reviewing district court's decision, appellate court has the power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.

1 Cases that cite this headnote

**[5]    Constitutional Law**
    Fifteenth Amendment

**Election Law**
    Weight and sufficiency

Evidence supported finding that Georgia's majority vote requirement for primary elections, challenged as violative of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments, was not passed for a discriminatory purpose, and that the key supporters of the requirement had good government reasons for their support, despite claim that discriminatory motives behind and earlier majority vote bill should have been imputed to the supporters challenged provision; Governor explained that prior elections had been "in a state of chaos," and that election fraud was pervasive, and other witnesses testified that there was no intent to racially discriminate. U.S.C.A.



DEFENDANT'S
EXHIBIT
11

Const.Amends. 1, 14, 15; Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973; O.C.G.A. § 21–2–501.

1 Cases that cite this headnote

[6]     **Constitutional Law**
⬥ Fifteenth Amendment

**Election Law**
⬥ Weight and sufficiency

Evidence supported finding that Georgia's majority vote requirement for primary elections, challenged as violative of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments, did not have a discriminatory effect on black candidates; requirement caused a net loss of 27 black nominees over 25 years, and there was no negative impact on black candidates in roughly 99 percent of all runoffs during the period at issue. U.S.C.A. Const.Amends. 1, 14, 15; Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973; O.C.G.A. § 21–2–501.

[7]     **Election Law**
⬥ Dilution of voting power in general

**Election Law**
⬥ Vote Dilution

Though the test for violations of § 2 of the Voting Rights Act is generally flexible and fact-intensive, there are three limits on the way violations may be proved: electoral devices such as at-large elections, or a majority vote requirement, do not violate § 2 per se, and those challenging an electoral device must prove that under the totality of the circumstance, the device results in unequal access to the electoral process; violation of § 2 cannot be established by showing the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone; and plaintiffs must prove the existence of racial bloc voting. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973.

1 Cases that cite this headnote

[8]     **Election Law**
⬥ Vote Dilution

The *Gingles* factors of size and geographical compactness, cohesiveness, and majority bloc voting are necessary preconditions for a showing that an electoral scheme impaired minority voters' ability to elect their chosen representatives; once Voting Rights Act plaintiffs establish the three prerequisites, they must go on to show that, under the totality of the circumstances, they have been denied an equal opportunity to elect representatives of their choice. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973.

2 Cases that cite this headnote

[9]     **Election Law**
⬥ Compactness and cohesiveness of minority group

The first *Gingles* prerequisite, size and geographical compactness, essentially asks whether the court can fashion a remedy for a demonstrated abridgement; if the plaintiffs in a § 2 Voting Rights Act case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973.

2 Cases that cite this headnote

[10]    **Election Law**
⬥ Dilution of voting power in general

Evidence supported determination that black Georgia residents and voters asserting a Voting Rights Act § 2 challenge to a majority vote requirement for primary elections failed to prove that any alternative would result in a net increase of black elected officials, as required to satisfy the first *Gingles* prerequisite for establishing a § 2 violation, even though a pure plurality system would have resulted in a net increase in black nominees; such a system could theoretically result in a candidate's winning with 1% of the vote, and the resulting harm was too great to justify ordering such a system. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973; O.C.G.A. § 21–2–501.

Brooks v. Miller, 158 F.3d 1230 (1998)

12 Fla. L. Weekly Fed. C 207

**[11]**  **Election Law**
    🔑 Relief in General

In assessing a plaintiff's proposed remedy in an action asserting a Voting Rights Act §2 violation, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973.

1 Cases that cite this headnote

**[12]**  **Election Law**
    🔑 Dilution of voting power in general

Second and third *Gingles* prerequisites for establishing a violation of § 2 of the Voting Rights Act ask whether voting is racially polarized and, if so, whether the white majority is usually able to defeat the minority bloc's candidates; in the absence of minority political cohesion and significant white bloc voting, it would be difficult, if not impossible, to prove dilution of minority votes in violation of § 2. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973.

**[13]**  **Election Law**
    🔑 Weight and sufficiency

Statistical evidence offered in action asserting that Georgia's majority vote requirement for primary elections violated § 2 of the Voting Rights Act did not support the requisite proposition that the white voting bloc normally defeated the candidate supported by most black voters; runoffs caused by majority vote law occurred in only a small fraction of all primaries, and the majority vote law had no net adverse racial impact on black candidates in roughly 99 percent of all runoffs over a 25 year period. Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973; O.C.G.A. § 21–2–501.

**[14]**  **Constitutional Law**

    🔑 Fifteenth Amendment

**Election Law**
    🔑 Weight and sufficiency

Evidence supported determination that Georgia's majority vote requirement for primary elections, challenged as violative of the First, Fourteenth, and Fifteenth Amendments, would have been enacted even in the absence of any racially discriminatory motives of legislators, thus defeating constitutional claims under the "but for" test; evidence showed that supporters majority vote provisions had ample "good government" reasons. U.S.C.A. Const.Amends. 1, 14, 15; O.C.G.A. § 21–2–501.

1 Cases that cite this headnote

**[15]**  **Election Law**
    🔑 Evidence

Newspaper evidence was not part of the contemporaneous record, so as to be a primary source for ascertaining legislative intent in an action challenging the constitutionality of Georgia's majority vote requirement for primary elections. U.S.C.A. Const.Amends. 1, 14, 15; O.C.G.A. § 21–2–501.

1 Cases that cite this headnote

**[16]**  **Statutes**
    🔑 Purpose

In ascertaining legislative purpose, a trial court operates under the same rules of evidence that control in any case.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1232**  Neil Bradley, Laughlin McDonald, Maha Zaki, American Civil Liberties Union Foundation, Inc., Atlanta, GA, for Plaintiffs–Appellants.

Thurber E. Baker, Atty. Gen., Carol Atha Cosgrove, Asst. Atty. Gen., David F. Walbert, Walbert & Mathis, Atlanta, GA, for Defendants–Appellees.

Brooks v. Miller, 158 F.3d 1230 (1998)

12 Fla. L. Weekly Fed. C 207

Appeal from the United States District Court for the Northern District of Georgia.

Before DUBINA and MARCUS, Circuit Judges, and PROPST[*], Senior District Judge.

**Opinion**

DUBINA, Circuit Judge:

In this voting rights action, Plaintiffs, 27 black Georgia residents and voters, challenge the majority vote requirement for primary elections in Georgia, set forth in O.C.G.A. § 21–2–501. The complaint was certified as a class action on behalf of all present and future black registered voters in Georgia. Plaintiffs contend that the majority vote requirement, also known as the primary runoff requirement, violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, as well as the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. After a bench trial, the district court ruled that Georgia's majority vote provision for primary elections is constitutional and does not violate § 2.

**\*1233 I. FACTS**

O.C.G.A. § 21–2–501 originally required that a candidate in a primary or general election receive a majority of the votes cast in order to be nominated or elected and provided for a runoff election in the event that no candidate received a majority. In 1994, after the filing of this action, Georgia's General Assembly repealed the majority vote requirement for all general elections, except those for certain constitutional offices not at issue here, and replaced it with a 45 percent plurality rule. *See* O.C.G.A. § 21–2–501(b), as amended by Ga. L.1994, p. 279, § 11; O.C.G.A. § 21–2–2(18.1) (defining plurality as 45 percent of the total votes). In this action, Plaintiffs do not challenge the 45 percent plurality rule for general elections or majority voting as it affects multi-member offices such as school boards and county commissions. What Plaintiffs do challenge is the majority vote requirement for primary elections for single member, county-level offices, members of the General Assembly, superior court judges and district attorneys, and judges and justices of the Georgia Court of Appeals and Georgia Supreme Court.[1]

In 1990, after conducting a five-day hearing on Plaintiffs' motion for preliminary injunctive relief, the district court

denied the Plaintiffs' motion. Shortly thereafter, the United States Department of Justice filed a parallel case which was consolidated with this action. Before trial, the United States filed a motion to voluntarily dismiss its complaint which the district court granted.

The district court made extensive findings of fact in this case. The district court relied on testimony presented at the four-day bench trial in 1996 and testimony presented at the hearing held in 1990 on Plaintiffs' motion for preliminary injunctive relief, along with other exhibits and reports submitted by the parties. In order to resolve the Plaintiffs' claims, the district court focused its findings of fact on two key areas. First, the district court examined evidence relating to the process by which the majority vote provision was enacted into law to determine whether it was passed for a racially discriminatory purpose. Second, the district court considered evidence presented on the issue of whether the majority vote law has a discriminatory impact. The following is a summary of the district court's factual findings.

*A. Discriminatory Purpose*

The district court acknowledged Georgia's long history of racial discrimination at all levels of government. The voting strength of blacks has historically been diminished in Georgia in numerous ways, including property ownership requirements, literacy tests, and the use of the county unit system which undermined the voting power of counties with large black populations. The county unit system gave each county twice as many unit votes for the purpose of nominating candidates for statewide office as the county had representatives in the Georgia House. This system had the effect of increasing the voting power of rural counties and diluting that of urban areas. In 1962, a three-judge federal panel struck down Georgia's county unit system as unconstitutional. *See Sanders v. Gray*, 203 F.Supp. 158 (N.D.Ga.1962).

The majority vote provision at issue in this case was enacted as part of a sweeping election reform bill signed into law in 1964 by then-Governor Carl E. Sanders ("Governor Sanders" or "Sanders"). This law was Georgia's first election code. Prior to 1964, Georgia's election system was chaotic. The rules for primary and general elections varied from county to county and election to election. Corruption and manipulation were commonplace. Throughout the state, and particularly in rural counties, groups known as "courthouse crowds" controlled local elections and often manipulated election practices to maintain their own power. Georgia was

**Brooks v. Miller, 158 F.3d 1230 (1998)**

12 Fla. L. Weekly Fed. C 207

essentially a one-party state, and a victory *1234 in a Democratic primary was tantamount to election.

One form of election manipulation used under the plurality system consisted of entering a "stalking horse" into a local race to split the opposition vote and assure victory to courthouse crowd candidates. Governor Sanders experienced this tactic first hand when he ran against Peter Zack Geer in the 1962 lieutenant governor's race. Sanders withdrew from the race after hearing that Geer planned to enter a candidate named Carl F. Sanders in the race to confuse voters and ensure his own victory. Sanders ran for governor instead and won.

When the Georgia legislature created the first Election Laws Study Committee ("ELSC") in 1957 to examine election practices and propose legislation, members of this committee were interested in maintaining the discriminatory status quo through measures such as literacy tests. The first ELSC did not produce any comprehensive election reform. A second ELSC was formed in 1961 but dissolved without taking any action.

In 1963, after the county unit system had been struck down as unconstitutional, Denmark Groover ("Groover"), a state representative known for his staunch segregationist views, attempted to pass a majority vote requirement. There is no doubt that Groover's racism was the product of racial animus. He opposed "bloc voting," a euphemism for black citizens voting in a bloc. Groover's bill passed in the House but died in committee in the Georgia Senate.

Governor Sanders called for the creation of a third ELSC in 1963 for the purpose of drafting an election code. There were more racially moderate members on this committee than on the previous ELSCs. The third ELSC recommended a majority vote requirement, in addition to numerous other measures, as part of a comprehensive election code. The General Assembly adopted most of these recommendations, including the majority vote requirement. The ELSC's recommendations included some discriminatory measures such as a scaled-down version of a literacy test. However, some of the proposals of the third ELSC were either not related to race or promoted increased black participation in elections. For example, the 1964 code required that a voting registrar be present at the county courthouse during all business hours and that voter registration remain open until 50 days before an election.

Many supporters of the 1964 election code's majority vote requirement had legitimate "good government" motives. These backers wanted to reduce the power of the courthouse crowds and to eliminate the use of stalking horses and dummy candidates as a method of election manipulation. Governor Sanders was one of the key supporters of the measure. In the context of Georgia politics in the early 1960's, Sanders was regarded as a moderate on racial issues. He opposed the civil rights movement, yet he was not a militant segregationist. Sanders had considerable power over the General Assembly, enabling him to influence the agenda of the legislature. His power in the legislature was so great that he was able to install his friend and supporter, George T. Smith ("Smith"), as Speaker of the House.

Plaintiffs emphasize the racial antipathy of Groover and attempt to impute the improper motivations behind his proposal of the majority vote in 1963 to the supporters of the 1964 code's majority vote requirement. The district court found that Groover's racist motives were not attributable to the supporters of the 1964 law. Groover supported Sanders' opponent in the governor's race and was not involved in the Sanders administration. He was not a member of the third ELSC, and he had no influence over that committee.

The district court also acknowledged that Sanders favored at-large elections in 1962, when he was president *pro tem* of the Senate, for racially discriminatory reasons as well as some sound government reasons. Again, the district court chose not to impute those discriminatory motives to Sanders's support of the majority vote law in 1964 in the absence of evidence indicating that the 1964 majority vote provision itself was racially motivated.

B. *Discriminatory Impact*
On the question of the effect of the majority vote law, the district court considered *1235 testimony as to the law's impact on individuals considering a run for office as well as statistical analyses of data showing how the law affected actual elections. The district court found that though there was some evidence minimally supporting the theory that black candidates were discouraged from running for office by the prospect of a runoff, the evidence did not enable the court to ascertain how pervasive any deterrent effect had been. In other words, the Plaintiffs failed to prove that the majority vote law improperly discourages potential black candidates. In addition, there was no proof that the law would act as a greater deterrent for black candidates than for white candidates.

Defendants' expert witness supervised the compilation of a database containing information on the effect of the majority vote requirement on Georgia primary elections from 1970 to 1995. During this period, there were a total of 2,798 runoff sequences, and complete data were available for 2,773 of these. Over 90 percent of these runoffs were in Democratic party primaries. Of these 2,773 runoff sequences, there were 278 which involved a black candidate and a white candidate in both the primary election and the runoff. In 85 of the runoffs between a black candidate and a white candidate, the candidate who won a plurality of votes in the initial primary election lost in the runoff. The district court described these 85 runoff elections as "flip" sequences.

In 56 of the flip sequences, the black candidate lost the runoff after receiving a plurality of the votes in the initial primary. In 29 of the flip elections, the white candidate lost the runoff after receiving a plurality of the votes in the initial primary. Thus, the majority vote requirement for primary elections yielded a net result of 27 fewer black candidates than would have been nominated under a pure plurality scheme.[2]

Most of the 27 flip elections adverse to black candidates occurred at the county and local levels. A net loss of 30 black candidates in local and county elections resulted from the majority vote requirement. In state legislature and superior court elections, the primary runoff requirement resulted in a net gain of three black candidates. In state-wide and federal primaries, the net results would have been the same under a plurality scheme as they were under the majority vote requirement.

The district court found that the disparity in outcomes in primary runoff elections was attributable to the relative strength of individual candidates and not to any alleged discriminatory impact of the majority vote requirement. The Defendants' political science expert presented a theory under which a candidate who receives 40 percent or more of the votes in the initial election and who leads his or her opponent by at least five percent is considered a "strong leader." In other words, a "strong leader" is a candidate who soundly wins an election. Runoff winners were overwhelmingly "strong leaders" in their initial primary races. The runoff winners averaged above 40 percent of the initial vote and generally led their nearest opponent by 10 to 12 percentage points. Black "strong leaders" defeated white opponents in runoffs 71 percent of the time. The black candidates who lost in runoffs typically entered the runoff elections in a much weaker

position. The district court concluded that black leaders who lost runoffs were on average weaker candidates than black or white leaders who won runoff elections. On the question of racial polarization, the district court found that the Plaintiffs failed to prove that voting in Georgia was racially polarized.

The district court concluded that, overall, Plaintiffs failed to demonstrate that the majority vote requirement in primary elections had a significant adverse effect on black voters and candidates.

## II. STANDARD OF REVIEW

[1] The issue of whether an election system was established or maintained for a discriminatory purpose is a question of fact subject to the clearly erroneous standard of review. *Rogers v. Lodge,* 458 U.S. 613, 622–23, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). **\*1236** Rule 52(a) of the Federal Rules of Civil Procedure is particularly relevant to our review of the district court's findings on purpose. Rule 52(a) requires that in reviewing the district court's factual findings, we must give due regard to the court's opportunity to judge the credibility of witnesses. Fed.R.Civ.P. 52(a).

[2] [3] [4] We review the district court's determination of whether the majority vote requirement has had a discriminatory impact for clear error. *Thornburg v. Gingles,* 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (stating that "application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law"). Thus, while we review the district court's conclusions of law *de novo, Davis v. Chiles,* 139 F.3d 1414, 1420 (11th Cir.1998), the Supreme Court has clarified that the clearly erroneous standard applies to the district court's ultimate conclusion as to whether an election mechanism leads to discriminatory results. *Gingles,* 478 U.S. at 79, 106 S.Ct. 2752. The trial court "is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open" to minorities. *Id.* (citations and quotations omitted). In conducting our review of the district court's decision, we have the "power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Id.* (citations omitted).

Brooks v. Miller, 158 F.3d 1230 (1998)

12 Fla. L. Weekly Fed. C 207

## III. ANALYSIS OF FACTUAL FINDINGS

### A. *Discriminatory Purpose*

[5]    The district court found that the majority vote requirement was not passed for a discriminatory purpose and that the key supporters of the requirement had good government reasons for their support. There is adequate support in the record for this finding, and we hold that it was not clearly erroneous. The district court credited the testimony of Governor Sanders who explained that prior to the passage of the 1964 election code, Georgia elections were "in a state of chaos." (1st Supp. R., vol.4, 167). Some counties used a plurality system, while others had a majority vote requirement. *Id.* Election fraud was pervasive throughout the state, including the use of "stalking horses" in elections where only a plurality was required for victory. *Id.* at 167–69. In addition, according to Governor Sanders, incumbents frequently attempted to "muddy the water" by getting as many people as possible to run in their races to dilute the opposition vote and win a plurality. *Id.* at 170.

The district court also credited the testimony of other witnesses to the effect that the majority vote requirement was not motivated by an intent to discriminate on the basis of race. Eugene Patterson, an anti-segregationist who was editor of *The Atlanta Constitution* in the early sixties testified that Sanders was not racist in his attitudes and that the 1964 code, including the majority vote provision, was passed for legitimate government reasons and not to discriminate against black voters and candidates. (R., vol.15, 447–49). George T. Smith, Speaker of the House during the Sanders administration, testified that there was no discussion of discrimination against black candidates in connection with the Sanders administration's support for majority voting. (1st Supp. R., vol.5, 77). Melba Williams, a member of the third ELSC, whom no one suggests was racially motivated in her support for majority voting, testified that the committee's decision to include a majority voting provision in the ELSC's proposed code had nothing to do with race. (1st Supp. R., vol.5, 137–40).

Plaintiffs contend that the district court clearly erred in failing to impute the discriminatory motives behind Groover's 1963 majority vote bill to the supporters of the 1964 election code's majority vote provision. However, Governor Sanders testified that Groover, who had supported his opponent in the governor's race, had "nothing to do with" the comprehensive 1964 election reform law. (1st Supp. R., vol.4, 195). This testimony as to Groover's lack of input in the 1964 bill was corroborated by Smith. (1st Supp. R., vol.5, 74–77). It appears that Plaintiffs' emphasis *1237 on the discriminatory intent of Groover in connection with majority voting is necessitated by the lack of evidence that the proponents of the 1964 election code had racially discriminatory motives for their support of the majority vote provision. One of the Plaintiffs' experts admitted on cross examination that in his review of all of the records of the third ELSC that produced the 1964 election code, he did not find any evidence of a "smoking gun," meaning evidence providing a clear link between the majority vote provision in that code and race discrimination. (R., vol.14, p. 187). The Plaintiffs' theory was that a discriminatory purpose behind the 1964 provision could be inferred circumstantially from the improper motives behind Groover's previous majority vote bill, from the third ELSC's proposal of a modified literacy test, and from evidence that Sanders' support of previous measures, such as at-large voting, was racially motivated. The district court did not commit clear error by rejecting this theory and focusing instead on specific evidence concerning how and why the majority vote rule was included in the 1964 election code.

### B. *Discriminatory Impact*

[6]    With respect to Plaintiffs' allegation that the challenged provision discouraged blacks from running for office, the district court heard testimony from three witnesses who had held office in Georgia, including Plaintiff Tyrone Brooks, a state legislator from Atlanta. These witnesses testified to the effect that the majority vote law was a deterrent for many potential black candidates. Although two of these witnesses gave a few specific examples of black individuals they had talked to who said that they were discouraged by the prospect of a primary runoff, the district court found that this evidence gave only minimal support for the theory that black candidates were deterred by the possibility of a runoff before entering an election. This evidence did nothing to bolster the theory that the potential for a runoff was more of a deterrent for black candidates than for white candidates.

On the question of whether the Plaintiffs proved that the majority vote requirement had a significant, adverse effect on black candidates, the district court found that the racial impact of the majority vote requirement has been negligible at most. The court considered the fact that the requirement caused a net loss of 27 black nominees over 25 years and that there was no negative impact on black candidates in roughly 99 percent of all runoffs during this period. The district court's finding that the majority vote law does not have a discriminatory

effect on black candidates has strong support in the record and therefore is not clearly erroneous.

## IV. LEGAL ANALYSIS

### A. *Section 2 of the Voting Rights Act*

With respect to the Plaintiffs' claim under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, the district court concluded that Georgia's majority vote requirement for primary elections does not violate § 2.

#### 1. *Discriminatory Purpose*

Plaintiffs argue that a showing of discriminatory purpose alone is sufficient for a violation of § 2. The Plaintiffs' claim under this theory fails for two reasons. First, as discussed above, we affirm the district court's factual finding that the majority vote requirement contained in the 1964 election code was not motivated by a discriminatory purpose. Second, even if we found clear error in the district court's finding on discriminatory purpose, we are bound by *Johnson v. DeSoto County Bd. of Comm'rs*, 72 F.3d 1556 (11th Cir.1996), which held that discriminatory intent alone, in the absence of a showing of discriminatory effect, is insufficient to establish a violation of § 2. *Id.* at 1561. We will, therefore, focus our discussion on the "results test" for § 2 violations.

#### 2. *Discriminatory Results*

Congress amended § 2 in 1982 to clarify that a violation of this statute may be proved by a showing of discriminatory results alone, thereby superceding *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490 (1980), which held that a plaintiff had to show both a discriminatory purpose and a discriminatory **\*1238** effect to establish a violation. Section 2, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973. The Senate Judiciary Committee Majority Report accompanying the 1982 amendment listed a number of factors that may show a § 2 violation.[3]

**[7]** Though the test for § 2 violations is generally flexible and fact-intensive, the Senate Report placed three limits on the way § 2 violations may be proved. *Gingles*, 478 U.S. at 46, 106 S.Ct. 2752. First, electoral devices such as at-large elections, or in this case, a majority vote requirement, do not violate § 2 per se. *See id.* Those challenging an electoral device must prove that under the totality of the circumstance, the device "result[s] in unequal access to the electoral process." *Id.* Second, a violation of § 2 cannot be established by showing "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone." *Id.* Finally, plaintiffs must prove the existence of racial bloc voting. *Id.* The results test does not assume it. *Id.*

#### a. Applicability of the *Gingles* prerequisites

The *Gingles* case involved a vote dilution claim against the use of multi-member districts. In this context, the Supreme Court developed three prerequisites for a claim of vote dilution. *Gingles*, 478 U.S. at 50, 106 S.Ct. 2752. The Supreme Court has not heard any challenges to majority vote requirements, **\*1239** though such challenges have been presented in lower federal courts.[4] Because the requirement of a majority of the votes in a primary election is distinct from the establishment of a multi-member district such as that at issue in the *Gingles* case, Georgia's majority vote provision does not fit neatly into the analytical framework set out in *Gingles*. *See Whitfield*, 686 F.Supp. at 1374–75 (stating that it "is doubtful" that the *Gingles* prerequisites would be emphasized in a challenge to a runoff requirement).

Brooks v. Miller, 158 F.3d 1230 (1998)

12 Fla. L. Weekly Fed. C 207

Nonetheless, we agree with the district court that, with slight modification, the three prerequisites for the results test set out in *Gingles* are applicable to this case. *Gingles* calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes, and the Court in *Gingles* recognized the "potentially dilutive" effect of majority vote requirements. *See* 478 U.S. at 46, 56, 106 S.Ct. 2752.

### b. Analysis under *Gingles*

[8]   The Court in *Gingles* developed the following three threshold requirements for establishing a violation of § 2: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "the minority group must be able to show that it is politically cohesive;" and (3) "the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50, 106 S.Ct. 2752. These three circumstances are "necessary preconditions" for a showing that an electoral scheme impaired minority voters' ability to elect their chosen representatives. *Id.* Once plaintiffs establish the three prerequisites, they must go on to show that, under the totality of the circumstances, they have been denied an equal opportunity to elect representatives of their choice. *Nipper v. Smith*, 39 F.3d 1494, 1512 (11th Cir.1994).

### i. The first *Gingles* prerequisite

[9]   The first prerequisite essentially "asks whether the court can fashion a remedy for a demonstrated abridgement." *Nipper*, 39 F.3d at 1511. If the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite. *See id.* at 1511 n. 34. In its analysis under the first prerequisite, the district court determined that "[t]he analogous question in the case at bar is whether black voting strength would be 'less diluted' under some workable regime other than a strict majority vote requirement." (R., vol. 12, Tab 165, 22). This is a proper interpretation of the first *Gingles* prerequisite as applied to Georgia's majority vote provision.

[10]   [11]   The district court found that the Plaintiffs failed to establish the first *Gingles* prerequisite because they did not prove that any alternative to the majority vote requirement would result in a net increase of black elected officials. Under a 45 percent plurality rule, like that in place in Georgia's general elections, there would have been a net *loss* of one black primary winner between 1970 and 1995. Although the evidence demonstrated that under a pure plurality system in Georgia primaries, there would have been a net increase of 27 black nominees for political office during the same period, "[i]n assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan." *1240 *Davis v. Chiles*, 139 F.3d 1414, 1419–20 (11th Cir.1998) (citing *Houston Lawyers' Ass'n v. Attorney Gen'l of Tex.*, 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991)). As Defendants pointed out, a pure plurality system such as that suggested by Plaintiffs could theoretically result in a candidate's winning with 1% of the vote if enough candidates entered the race. Obviously, this type of result would seriously undermine the legitimacy of the government, and the state has a substantially compelling interest in preventing this from occurring. Particularly when balanced against the average of only one additional nominee per year statewide over the past twenty-five years that would have resulted from a pure plurality system, the district court could properly conclude that the harm resulting from Plaintiffs' proposed remedy is simply too great to justify ordering such a system. Accordingly we hold that the district court did not err in concluding that Plaintiffs failed to establish an adequate remedy. Because Plaintiffs fail on the first prerequisite, the case under § 2 could end here. *Nipper*, 39 F.3d at 1511 n. 34. Nevertheless, we will review the remainder of the district court's § 2 analysis.

### ii. The second and third *Gingles* prerequisites

[12]   The district court dealt with the second and third *Gingles* factors together, concluding that the Plaintiffs failed to meet either requirement. The second prerequisite requires a showing that the minority group is politically cohesive, while the third calls for proof of majority white bloc voting sufficient to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 50, 106 S.Ct. 2752. In other words, these prerequisites ask whether voting is racially polarized and, if so, whether the white majority is usually able to defeat the minority bloc's candidates. In the absence of minority political cohesion and significant white bloc voting, it would

be difficult, if not impossible, to prove dilution of minority votes in violation of § 2. *See Nipper*, 39 F.3d at 1533.

The district court, while acknowledging Georgia's notorious history of official discrimination against black voters as well as the possibility "that racially polarized voting is the norm in Georgia," found that the Plaintiffs failed to carry their burden of proof on the question of racial polarization. (R., vol. 12, Tab 165, 23). The district court went on to state that even if the Plaintiffs had proven racially polarized voting, they failed to show that the purported white voting bloc "usually" defeated the purported minority bloc's candidates under the majority vote system. *Id.* at 24.

[13]   In discussing the proper legal standard for analysis of racial polarization, the *Gingles* Court explained that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." 478 U.S. at 56, 106 S.Ct. 2752. We agree with the district court that the statistical evidence offered by the Plaintiffs did not support the proposition that the white voting bloc normally defeated the candidate supported by most black voters. Runoffs caused by Georgia's majority vote law occur in only a small fraction of all primaries in the state. Thus, even if there were a significant racial impact in the context of all runoffs, it could not be said that the white majority usually defeats the minority's preferred candidate under Georgia's primary runoff system. Moreover, the majority vote law had no net adverse racial impact on black candidates in roughly 99 percent of all runoffs over a 25 year period. We therefore affirm the district court's conclusion that Plaintiffs failed to prove that white bloc voting "usually" leads to the defeat of black voters' preferred candidates under the majority vote scheme.

Plaintiffs criticize the district court's analysis under the second and third *Gingles* factors as containing "an extraordinary inconsistency." (Plaintiffs' brief at 36.) The alleged inconsistency lies in the following passage of the district court's order:

Rather than demonstrating to the court that black primary winners would be capable of winning general elections, plaintiffs have made every effort to convince the court that voting in Georgia is so polarized that racial minorities cannot win in majority white districts. Accepting their arguments as true, a plurality primary system *1241 would not increase "the potential [of blacks] to elect representatives in the absence of the challenged structure."

(R., vol. 12, Tab. 165, 23 (quoting *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. 2752)). The district court did make a factual finding that the Plaintiffs failed to prove racially polarized voting. We do not, however, agree with the Plaintiffs that the district court's reasoning was logically flawed merely because it assumed, *arguendo*, that voting was as racially polarized as the Plaintiffs attempted to demonstrate for purposes of the second and third *Gingles* prerequisites.

Rather, the Plaintiffs themselves have advocated conflicting positions on the question of racially polarized voting. Georgia maintains the majority vote requirement only for primary elections. To succeed on the first *Gingles* prerequisite, the Plaintiffs must demonstrate that if an alternative system such as a pure plurality were in place, more black candidates would in fact be elected to office. This, however, would require proof of substantial white crossover voting in general elections which is very difficult to achieve in conjunction with a showing, required by the second and third *Gingles* prerequisites, that voting is so racially polarized that the white majority, voting as a bloc, has the ability to defeat the minority's preferred candidates. In an effort to walk that fine line, the Plaintiffs point to the fact that there was "a minimal level of" white crossover voting, to the success of some black candidates in runoffs in majority white jurisdictions, and to the testimony of former Atlanta mayor Maynard Jackson. (Plaintiffs' brief at 36). Jackson testified that in his opinion, if a black candidate could win the primary, he or she would gain the support of the Democratic party, obtaining an advantage in the general election. (R., vol. 13, 79–80.) The district court did not consider this evidence sufficient proof of Plaintiffs' theory that those black candidates who are only capable of winning a primary under a pure plurality system would in fact go on to defeat their opponents in the general election.

Overall, the district court concluded that under the totality of the evidence presented by the parties, Georgia's majority vote requirement does not "eviscerate[ ] the ability of minority voters to elect their candidates of choice." (R., vol. 12, Tab 165, 24 (citing *Nipper*, 39 F.3d at 1512)). Detecting no errors of law in the district court's analysis, we affirm under the clearly erroneous standard the district court's ultimate finding that the majority vote law does not yield racially discriminatory results. *See Gingles*, 478 U.S. at 79, 106 S.Ct. 2752 (stating that clearly erroneous standard applies to ultimate finding of vote dilution).

## B. *Constitutional Claims*

[14] To make out a constitutional claim against the majority vote requirement, which is racially neutral on its face, Plaintiffs must demonstrate that the provision was motivated by a discriminatory purpose under the analysis used by the Supreme Court in *Hunter v. Underwood*, 471 U.S. 222, 225, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). The Court in *Hunter* held that the test set out in *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) applies to the determination of whether voting statutes are unconstitutional because of a discriminatory purpose. *Hunter,* 471 U.S. at 232, 105 S.Ct. 1916. Under this test, a court must first determine whether the discriminatory motive was a "substantial factor" or a "motivating factor" behind a governmental decision. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter,* 471 U.S. at 228, 105 S.Ct. 1916 (quoting *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568).

The district court found that discrimination was not a substantial or motivating factor behind enactment of the majority vote provision. As previously discussed in our factual analysis, we conclude that this finding is not clearly erroneous. The district court explained that although it was evident that "the virus of race-consciousness was in the air," Plaintiffs failed to prove that "the specific measure at issue here—the majority vote **\*1242** requirement in the 1964 election code—was infected thusly." (R., vol. 12, Tab 165, 26).

The court went on to state that even if the Plaintiffs had proven that race-conscious reasons were a substantial or motivating factor behind the challenged law, Defendants have shown that it would have been enacted even in the absence of those reasons. We agree that the Defendants demonstrated that the supporters of the 1964 majority vote provisions had ample "good government" reasons and that the law would have been passed in the absence of any discriminatory motive. Plaintiffs argue that the district court placed too much emphasis on the motivations of Governor Sanders and his administration, in light of the fact that the entire Georgia legislature enacted the code which contained the majority vote provision. However, the Defendants' evidence persuaded the district court that Sanders wielded enough power in the legislature not only to install one of his friends and allies as Speaker of the House, but also to effectuate the passage of the 1964 election code. The Defendants proved that legitimate

"good government" reasons were the primary motivating factor behind the majority vote provision's key proponents, including Sanders, and that the Sanders administration had sufficient power over the legislature to have the 1964 election code enacted. Even if some of the legislators who eventually voted the 1964 code into law had discriminatory reasons for their support, the Plaintiffs' constitutional claims fail under the "but for" test set out in *Hunter* and *Mt. Healthy.*

Plaintiffs critique the district court's fact finding on the question of discriminatory purpose, citing *Arlington Heights* for the proposition that the district court erred in relying heavily on the testimony of decision makers involved in the passage of the majority vote provision. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (stating that in "extraordinary instances the members [of a decision making body] might be called to the stand at trial to testify concerning the purpose of the official action"); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (expressing concern that after-the-fact reconstructions of legislative purpose can be self-serving and unreliable and cautioning that such recollections should be viewed critically). Plaintiffs contend that the district court should have placed more emphasis on the contemporaneous record relating to the legislation. *See Hunter,* 471 U.S. at 228–29, 105 S.Ct. 1916; *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814.

[15] [16] While the Plaintiffs are correct that the contemporaneous record should factor heavily into a trial court's determination of legislative purpose, the district court did in fact consider evidence of the legislative history of the 1964 majority vote provision. To the extent the Plaintiffs contend that newspaper evidence is part of the contemporaneous record and should, therefore, be the primary source for ascertaining legislative intent, we reject this theory. News articles often contain multiple layers of hearsay and do not trump the sworn testimony of eyewitnesses. In ascertaining legislative purpose, a trial court operates under the same rules of evidence that control in any case. The *Arlington Heights* Court explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. 555. In our view, the district court's review of the available evidence constituted the "sensitive inquiry" required by *Arlington Heights.* The court analyzed the history of the 1964 majority

**Brooks v. Miller, 158 F.3d 1230 (1998)**

12 Fla. L. Weekly Fed. C 207

vote provision and considered the ELSC reports, specifically acknowledging that relevant considerations of discriminatory purpose "include the historical background of the challenged act, the 'specific sequence of events' leading up to the act's passage, and the legislative history of the act, 'especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meeting, or reports' " (R. vol. 12, Tab 165, 25 (quoting *Arlington Heights,* 429 U.S. at 266–68, 97 S.Ct. 555)).

Although Plaintiffs offered evidence of racially discriminatory intent from the first two ELSCs appointed by Governor Sanders' predecessors, this evidence did not address why **\*1243** the 1964 code's majority vote provision was passed. The evidence included the unpurged records of the ELSC that proposed the 1964 code, (R. vol. 9, Tab 151, 2), and the Plaintiffs' own expert admitted on the stand that nothing in these records provides a clear link between race and the majority vote provision. (R., vol.14, p. 187). There was evidence of explicit racial considerations on other issues in the third ELSC's records, as well as in the records of the previous ELSC's. However, the clear historical trail of racial purpose on other issues and in previous committees stands in stark contrast with the *absence* of evidence of racial

purpose in connection with the majority vote proposal in the third ELSC's records. This contrast supports the district court's finding that the challenged provision was not racially motivated.

Because we affirm the district court's finding that race was not a substantial purpose behind the majority vote law, we need not address the Plaintiffs' contention that even if the racial impact of the majority vote provision is insignificant, it can be invalidated as unconstitutional and in violation of § 2 of the Voting Rights Act if race was a predominant purpose behind its adoption.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

**All Citations**

158 F.3d 1230, 12 Fla. L. Weekly Fed. C 207

Footnotes

\*   Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1   Georgia is one of nine states with a majority vote requirement for primary elections. *See* Ala.Code § 17–16–36 (1995); Ark.Code Ann. § 7–7–102 (Michie 1993); Fla. Stat. Ann. § 100.061 (West 1982); O.C.G.A. § 21–2–501 (1993 & Supp.1997); La.Rev.Stat. Ann. § 18:511 (West 1979 & Supp.1998); Miss.Code Ann. 23–15–191 (1990); Okla. Stat. Ann. tit. 26, § 1–103 (West 1991); S.C.Code Ann. § 7–17–600 (Law.Co-op.1977); Tex. Elec.Code Ann. § 172.003 (West 1986).

2   Significantly, it does not follow that Georgia would have had 27 additional black office holders because a victory in a primary election does not ensure a win in the general election.

3   The "typical factors" listed in the Senate Report are as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

**Brooks v. Miller, 158 F.3d 1230 (1998)**

12 Fla. L. Weekly Fed. C 207

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 97–417, 97th Cong. 2nd Sess. 28, 28–29 (1982), U.S.Code Cong. & Admin.News 1982, pp. 206–207. The Senate Committee clarified that " 'there is no requirement that any particular number of factors be shown, or that a majority of them point one way or the other.' " *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752 (quoting S.Rep. No. 97–417 at 29).

4  In *Whitfield v. Democratic Party of the State of Arkansas,* 686 F.Supp. 1365 (E.D.Ark.1988), *aff'd by equally divided court without opinion,* 902 F.2d 15 (8th Cir.1990) (en banc), a district court held that Arkansas' majority vote requirement for primary elections did not violate § 2 of the Voting Rights or the Fourteenth and Fifteenth Amendments to the United States Constitution. In another challenge, a three-judge panel held that Arkansas' majority vote provision for general elections was unconstitutional, but rejected the constitutional attack on the majority vote requirement as applied to primary elections. *Jeffers v. Clinton,* 740 F.Supp. 585, 594–95 (E.D.Ark.1990) (reasoning that the primary runoff represents a legitimate means to ensure that the nominee has a majority of party support and that a runoff is not necessary in a general election because there are almost never more than two substantial candidates).

---

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**DEFENDANTS' EX. 12**

Voting locations closed across Georgia after Supreme Court ruling



DEFENDANT'S
EXHIBIT
12

☰



## Voting precincts closed across Georgia since election oversight lifted

**POLITICS** | Aug 31, 2018

By Mark Niesse, Maya T. Prabhu and Jacquelyn Elias, The Atlanta Journal-Constitution

Advertisement



©2019 Cox Media Group. All Rights Reserved. By using this website, you accept the terms of our Visitor Agreement and Privacy Policy, and understand your options regarding Ad Choices. Learn about careers at Cox Media Group.

Need Help?

When a passionate crowd rallied to save polling places in rural Randolph County, it won a high-profile battle for voting access.

But voters trying to preserve their local precincts are losing the war as voting locations are vanishing across Georgia.

Voting locations closed across Georgia after Supreme Court ruling

County election officials have closed 214 precincts across the state since 2012, according to an analysis by The Atlanta Journal-Constitution. That figure means nearly 8 percent of the state's polling places, from fire stations to schools, have shut their doors over the past six years.



Advertiser Content

## Barbecue Meatballs Over Mashed Potatoes

By Publix

## Georgia Precinct Consolidation

From 2012 to 2018, 214 voting precincts have closed throughout the state. **Zoom in to see the changes in precincts over the years.**

| 2012 | 2014 | 2016 |

Voting locations closed across Georgia after Supreme Court ruling

Voting rights activists see the poll closures as an attempt to suppress turnout by African-American voters, but local election officials say they're saving taxpayers' money by consolidating precincts at a time when more Georgians are taking advantage of early voting.

ADVERTISING

InRead invented by Teads

These precincts have been eliminated without federal government oversight. A U.S. Supreme Court ruling in 2013 removed requirements under the Voting Rights Act for some local governments to obtain federal clearance before making changes to voting practices, such as closing precincts. The requirement was created specifically to prevent discrimination in mostly Southern communities with a history of poll taxes and other measures aimed at preventing minorities from voting.

The state doesn't monitor the closure of polling places either. The Georgia Secretary of State's Office did not know how many precincts had been eliminated until told by the AJC.

The counties hit hardest by precinct closures are often in rural, impoverished areas where decisions about voting locations are made without attracting much public attention.

One-third of Georgia's counties — 53 of 159 — have fewer precincts today than they did in 2012, according to the AJC's count.

Of the counties that have closed voting locations, 39 have poverty rates that are higher than the state average. Thirty have significant African-American populations, making up at least 25 percent of residents.

"Look at the areas where they're closing precincts and consolidating. It's usually in areas with poor people and minority communities that have less resources to get to other locations," said Helen Butler, the executive director for the Georgia Coalition for the People's Agenda, a civil rights group.

Local election officials responsible for closing polling places often contend those locations are too expensive, underused or inaccessible to people with disabilities. Under the preclearance provision of the Voting Rights Act, communities would have had to show that changes aimed at saving money would not disenfranchise minorities. Now, there is no such federal protection.

State Sen. Josh McKoon, a Republican from Columbus, said there are many legitimate reasons for counties to consolidate precincts, particularly in rural areas that are struggling financially.

"We need to be careful in ascribing bad motives to people I think, in my opinion, are between a rock and a hard place," said McKoon, who lost his bid this year to be the Republican nominee for secretary of state. "I don't believe I encountered anybody who woke up in the morning and said, 'How can we make it more difficult to vote?' "

But even if they don't intend to suppress voters, that's the outcome, said Hannah Fried, the national director for the All Voting is Local campaign, an advocacy effort to protect and expand voting access.

"It is no coincidence that in places with a history of discrimination in voting we see this as a tactic that's used again and again," she said. All Voting is Local is a project of the Washington-based Leadership Conference Education Fund, a civil rights and human rights organization.

Across the South, hundreds of polling places have closed since the Supreme Court struck down part of the Voting Rights Act five years ago.

At least 868 polling places in seven Southern states have closed since the decision, according to a Leadership Conference Education Fund study in 2016 of some areas previously covered by the Voting Rights Act. About 43 percent of counties included in the study had reduced voting locations. More recent data on precinct closures in those states hasn't been published.

Down in Randolph

A loud public outcry helped stop a consultant's proposal to close seven out of nine precincts in Randolph County, a majority African-American county in southwest Georgia near the Alabama border.

Voting locations closed across Georgia after Supreme Court ruling



Photo: The Atlanta Journal-Constitution

After the plan attracted national attention, the county's volunteer Board of Elections killed it on Aug. 24.

The proposal was billed as a way to ensure the disabled would have accessible facilities at the remaining precincts, and to make elections more efficient. One precinct, Fountain Bridge, had just 17 voters in the May primary election.

But those opposing the closures, such as Bobby Jenkins of the county Democratic Party, saw a more pernicious motive.

"I feel that the real reason was voter suppression. Look at the people who would benefit from the closing of those precincts and decreasing black voting turnout," Jenkins said, referring to Republican candidates.

Republicans, including Georgia Secretary of State Brian Kemp, joined Democrats in denouncing precinct closures when they became contentious. Kemp, who is running for governor against Democrat Stacey Abrams, has emphasized that decisions about polling places are made at the county level, not by his office.

Kemp has said he hasn't encouraged counties to reduce precincts, and he doesn't support the consultant who recommended the closures, Mike Malone. Kemp's office provided Malone's name and two others to the county when it needed to hire a certified elections official on short notice before the May primary election. County officials fired Malone before voting to reject the plan to close precincts.

A six-page document found by the Lawyers' Committee for Civil Rights Under Law, which uses lawsuits to oppose racial discrimination, shows that Kemp's office gave guidance to local election officials about how to close precincts and polling places.

The document, dated February 2015, doesn't recommend closing precincts, but it outlines the reasons local governments can do so, including to cut operating costs and to respond to shrinking numbers of voters. The document says twice that because of the Supreme Court decision on the Voting Rights Act, Shelby County v. Holder, election officials are no longer required to submit precinct changes to the U.S. Department of Justice for preclearance.



Photo: The Atlanta Journal-Constitution

Candice Broce, a spokeswoman for Kemp, said the document clearly explains how local election officials should make decisions on precinct changes.

"The Lawyers' Committee, which only cares about Georgia when there is an election looming, is grasping for straws," Broce said. "This document, which was provided to all elections officials in 2015, urges local elections offices to follow the law and do what is in the best interest of voters. Any suggestion to the contrary is a baseless attack by politically motivated actors."

Finding a pattern

John Powers, an attorney for the Lawyers' Committee, said that while decisions to close precincts are made by independent election boards in each of Georgia's 159 counties, the trend is clear.

Loss of voting access frequently happens in counties with low incomes, small populations and substantial minority populations, he said.

"There's no doubt that there is a pattern statewide. Many of the counties in which consolidations are being considered have substantial numbers of minority voters," Powers said. "These precinct consolidations have a disparate impact on Georgia's most vulnerable citizens."

Election officials say their reasons for closing precincts are legitimate.

Jackson County, north of Athens, had a shortage of voting equipment and poll workers before shrinking from 16 precincts to four last year, Elections Director Jennifer Logan said. Some voting locations had low turnout, while others had lines stretching around buildings.

"Now we have four large locations with the same amount of voters at each location," Logan said. "Nobody wants to suppress voters. We go above and beyond what we're required to do" to get as many people voting as possible.

Victories and defeats

Precinct closures in Jackson, a mostly Republican county that overwhelmingly supported Donald Trump in the 2016 election, show that election officials aren't politically motivated, said Houston Gaines, a Republican candidate for the state House of Representatives.

"We need to recognize that this was not some plot from Republicans to suppress the vote," said Gaines, who lost a special election to Democratic state Rep. Deborah Gonzalez last year. "That narrative being pressed by Stacey Abrams and the Democrats is not true. … This is something that's happening all across the state, and it's not something that's good for voters."

Gonzalez disagreed, saying that even in Republican counties, poll closures disproportionately affect minorities and people with low incomes because they're less likely to have transportation options to get to a precinct on Election Day.

"The closing of polling stations is just another tool used to suppress voters," said Gonzalez, who represents the Athens area. "Anytime you make it harder for someone to vote, you're actually obstructing their rights."

In Macon, a battle over precinct closures three years ago had mixed results.

Election officials had proposed reducing the number of precincts in Macon-Bibb County from 40 to 26, but opposition to the move curtailed it. In the end, Bibb shuttered eight precincts instead of 14. One precinct would have been moved to a sheriff's office, which voting rights activists said would intimidate black voters.

"We were concerned because the closures were in areas of predominantly African-American communities," said Gwen Westbrooks, the president of the NAACP's Macon branch. "It seems like every time there's an election, we see different

Voting locations closed across Georgia after Supreme Court ruling

efforts to either reduce the polling places or purge voters out of the system. It's always something going on to try to impose voter suppression."

Macon-Bibb County Elections Officer Thomas Gillon said precinct closures were necessary to save money for a government with few financial resources. He said reducing the number of polling places saved about $40,000 per election year. The county has a $161 million annual budget that included property tax increases this year to fund libraries, bus and recreation services.

Discouraging voters wasn't part of the equation, he said.

"That was the last thing we would consider as a reason for doing that," Gillon said. "If the county had more money for us, we'd open up more polling places. We'd be happy to do that, but we have a county government whose budget is very strapped right now."



Photo: The Atlanta Journal-Constitution

In Fulton County, which covers most of the city of Atlanta, elections officials reversed a decision last year to close and change the borders of precincts with more than 5,500 voters in predominantly African-American communities. Community leaders said the move would have led to voter confusion, and the American Civil Liberties Union of Georgia sued.

"If engagement is a problem and voter apathy is a problem, why would you restrict access instead of expanding it?" said LaTosha Brown, a co-founder of the Black Voters Matter Fund, a voting rights group.

A few areas, mostly around large cities, have increased voting locations. Seven counties, including Fulton, added a

Voting locations closed across Georgia after Supreme Court ruling

combined total of 34 precincts since 2012, according to the AJC's analysis. Overall, there are 180 fewer precincts in Georgia in 2018 compared with 2012.

Reconciling history

In the late 1800s and early 1900s, Georgia and other states in the South imposed taxes before voterse were allowed to cast ballots, and they used literacy tests to attempt to disqualify voters. Those requirements were often arbitrarily enforced against African-American voters, while white voters weren't always required to pay the tax or were given easy literacy tests

Today's voting battles are more nuanced, said Andra Gillespie, an Emory University political science professor.

Precinct closures can have legitimate reasons but have the result of discouraging voters, she said.

"It's really hard to separate whether this is just partisan trickery or if there's a racial undercurrent" because black voters generally vote for Democrats, Gillespie said. "The history of discrimination in the state and in this region suggests that there have been anti-democratic elements that wanted to deny what now constitutes almost one-third of the population the right to vote."

Tactics such as relocating voting precincts, imposing voter ID laws and proposing limits on voting hours can make a difference in election results, especially in close races, she said.

On the other hand, early voting has given voters the flexibility to cast ballots in the three weeks before an election. In the 2016 presidential election, about 59 percent of ballots were cast in advance, either in person or by mail.

Closing polling places has a direct impact on voter participation, said Michael McDonald, a University of Florida political science professor who manages the United States Elections Project.

"The more difficult it is to vote, the lower your turnout rate. It's a simple cost-benefit analysis," he said. "It's a balancing act. I can understand why a smaller county like Randolph County might wish to close one or two polling locations, but closing seven is suspicious."

---

Support real journalism. Support local journalism. Subscribe to The Atlanta Journal-Constitution today. See offers.

---

By the numbers

2,635: Total voting precincts in Georgia

214: Precincts eliminated in 53 counties since 2012

34: Precincts added in seven counties since 2012

6.7 million: Registered voters in Georgia

2,541: Average voters per precinct

How we got the story

The Atlanta Journal-Constitution analyzed the number of voting precincts in each of Georgia's 159 counties in 2012 and 2018 to find out how many had been closed. The AJC's analysis found that 214 precincts were shuttered in 53 counties, many of them since a U.S. Supreme Court ruling in 2013 lifted federal oversight of changes to voting locations. The numbers also showed that many of these poll closures occurred in counties with high numbers of low-income and minority residents.



Crime | Yesterday

Weeks before fatal shooting,
suspect appeared to taunt polic...



AJC

Atlanta's abundance of trees
means homeowners can be...



Georgia Tech | Yesterday

4-star quarterback Jeff Sims picks
Georgia Tech on signing day



Georgia Bulldogs | 2 days ago

Carson Beck arrives at UGA a
well-seasoned QB



Ajc Homepage | Yesterday

In 2 days, police make 27 arrests
at Perimeter Mall







IcePop |

Newsweek for SmartAsset |

## 25 Colleges That Just Aren't Worth The Tuition
Sponsored

## This Startup is Disrupting the $27T Retirement Industry
Sponsored



Wikibuy |



The Financial Mag |



Whole Foods on Amazon |

How to Order Shake Shack at Burger King Prices
Sponsored

Kathie Lee Gifford Lives In A $7.8M Dream House...
Sponsored

$10 off your first order...
Sponsored

Sponsored









Voting locations closed across Georgia after Supreme Court ruling

HomeAdvisor | *Sponsored*
Hire a Handyman in Newark Today

BridesBlush | *Sponsored*
Dad Takes Photo Of Kid With...

Wolf & Shepherd | *Sponsored*
You Won't Believe How Comfy The...

HowStuffWorks | *Sponsored*
Can our quiz correctly guess...



Work + Money | *Sponsored*
Hardest College to Get In...



US Auto Insurance Now | *Sponsored*
Ohio Drivers With No Tickets in 3 Years Should...



SportsChew | *Sponsored*
Details Of Zion Williamson's $100 Millio...



Atlanta News | 2 days ago

Atlanta man gets 25 years behind bars for raping woman in tent



Crime | 3 days ago

Radio personality sues former APD officer for 2018 tasing



refinery29.com | *Sponsored*
Netflix Saying Goodbye To The...



Stadium Talk | *Sponsored*
Best High Schools for Sports in...



TieBreaker | *Sponsored*
30 Abandoned Stadiums That...



Babbel | *Sponsored*
The App That's Teaching...



Cleverst | *Sponsored*
21 Celebs Who Are Gay - No.13 Will Shock Men



TheFashionBall | *Sponsored*
Triple H's Wife Is Hands Down The Most Beautiful...



Chevrolet Silverado | Search Ads | *Sponsored*
The New Chevrolet Silverado Is Simply...

Voting locations closed across Georgia after Supreme Court ruling



History101 |



Forbes |

New Renderings Show What Historical Figures Actually... *Sponsored*

Top 10 U.S States People Are... *Sponsored*



City Beauty Sculpting Cream |

Harvard Dermatologist Admits: Doing This Can... *Sponsored*



My Deejo |

This New Pocket Knife Will Leave You Speechless ! *Sponsored*



Luxury Cars | Search Ads |

Best Luxury Vehicles for... *Sponsored*



TruthFinder |

One Thing All Liars Have in... *Sponsored*



Blackbeat |

Most Christians can't pass this... *Sponsored*



BiomeMD |

1 Simple Method for Better Gut... *Sponsored*



Oceandraw |

17 Actors You Didn't Know We... *Sponsored*



National World News | 14 days ago

Terrelle Pryor stabbing: Girlfriend of former NFL player denied bail



Crime | 7 days ago

Florida woman charged in $22K Athens fraud was part of gang,...



Crime | 3 days ago

3 more teens arrested in shooting of Kennesaw home



Voting locations closed across Georgia after Supreme Court ruling

NerdWallet |

**Which 5 Travel Cards Have** Sponsored
**The Most Valuable Miles?**

Clipple |

**A Simple Fix For Snoring** Sponsored
**And Dry Mouth at Night**

Because Market |

**See Why These Are The** Sponsored
**Best Incontinence Produc...**



**Atlanta Falcons** | 8 days ago

## What 49ers' coach Kyle Shanahan had to say about the Falcons



**Ajc Homepage** | 13 days ago

## Foster mom granted bond while facing murder charges in 3-yea...



SUV |

**Unsold 2018** Sponsored
**SUVs Going for...**



Total Battle - Online Strategy Game |

**If You Own a** Sponsored
**Computer This...**



History Daily |

**Eerie Last Known** Sponsored
**Photos That...**



Far & Wide |

**Most Charming** Sponsored
**Small Towns in...**



MedCline |

**Newark Loves This Pillow** Sponsored
**For Its Shoulder Relief...**



QuizFactory |

**[Quiz] Can you guess all of** Sponsored
**the countries from their...**



Online Degrees | Search Ads |

**Here's What an Online** Sponsored
**College Degree Should Co...**



Progressive |



Reference |

Voting locations closed across Georgia after Supreme Court ruling

$699 average annual savings for drivers who switch and save. Sponsored

Most Peoples Missed The Giant Blooper In This Iconic 'Gilliga... Sponsored



Topix Offbeat |

If You Pass This Us History Quiz, You're Well-Educated Sponsored



247 Sports |

The NFL's Most Hated... Sponsored

Gundry MD Supplements |

Top Cardiologist: This One Thing Will Properly Flush... Sponsored



eWatch |

The New Budget SmartWatch,... Sponsored



BetterBe |

Warning: 14 Products To... Sponsored



Gundry MD Olive Oil |

Heart Surgeon: How Good Olive... Sponsored



My Smart Gadgets |

These Are The 19 Hottest Gadgets... Sponsored

Footer Logo

About

Sign up for our newsletters

Contact

Subscriptions

Products

 

© 2019 The Atlanta Journal-Constitution. All Rights Reserved. By using this website, you accept the terms of our Visitor Agreement and Privacy Policy, and understand your options regarding Ad Choices. Learn about careers at Cox Enterprises.

**DEFENDANTS' EX.  13**

DEFENDANT'S
EXHIBIT
13
PENGAD 800-631-6989

# Precinct

pre·cinct

*Noun*

O.C.G.A. § 21-2-2 (28)

"Precinct" is synonymous with the term "voting precinct" and means a geographical area, established  in accordance with this chapter, from which all electors vote at one polling place.

# Polling Place

Pohl. Ing    pleys

*Noun*

O.C.G.A. § 21-2-2 (27)

A polling place is the room provided in each precinct for voting at a primary or election.

# Are precincts and polling places synonymous?

No.   A precinct is a geographical area, from which all electors vote at one polling place.  A polling place is the room provided in each precinct for voting at a primary or election.

## When should you begin the plan of consolidation or making changes to precincts or polling places?

Now.  Plan to spend 2015 making all the changes so that you, your county and your voters are ready for the 2016 elections.

## When should you tell your governing authority and voters in your community the new plan?

Now.  Engage everyone today about the goal and plan, make everyone a part of the conservation.  If you plan to make major changes to precincts or poling places,  make sure you talk to your liaison and KSU before you begin.

## What  will help to engage the community ?

The decision concerning drawing or redrawing precinct boundaries is left up to the local election and voter registration officials.  * However, in selecting polling places or drawing precinct boundaries, election officials should take into consideration the convenience of the voters and the public interest.

There are many reasons to consider changing a polling location of a precinct, whether it is a division, re division, alteration, formation or consolidation of precincts.   You will probably be asked to provide information regarding any changes to a polling place or precinct. First gather your data for the last few elections.  Calculate the cost of operating with the current precincts and polling locations.  Calculate the number of voting days and number of voters that voted on each day at each location.  This should  provide the information that  clearly shows whether Early Advance In Person Voting allows significantly more people to vote prior to Election Day, thus negating the need for so many polling locations on Election Day. Create a map showing where the registered voters live, on this map show the proposed Polling Locations.  This map should clearly illustrate the easy accessibly of the Polling Locations.  If you are proposing less rural locations, might we suggest you show the banks,  grocery stores and post office on the map as well.  You can create a professional well thought out presentation showing the map,  how the change can benefit the voters and the public interest.

# Precincts

## What code refers to changes to precincts?

If you are considering making any changes to precincts, please read the following codes sections:

O.C.G.A. § 21-2-260 – O.C.G.A.§ 21-2-264; O.C.G.A. §21-2-226(e); SEB rule 183-1-7-.01

## Who may alter the bounds of any precinct in a county or municipality?

**O.C.G.A. § 21-2-261(a)**  The county superintendent* or the governing authority of a municipality may, as provided in O.C.G.A. § 21-2-262, alter the bounds of any precinct.

**\*O.C.G.A. § 21-2-262(d)**  In any county having a population of more than 250,000 according to the United States decennial census, the powers and duties conferred upon the superintendent by O.C.G.A. § 21-2-261; 21-2-261.1 and 21-2-262 shall be exercised and performed by the governing authority of the county.

## Who may initiate the alteration of precinct boundaries? O.C.G.A. § 21-2-262

- **The superintendent** may direct the board of registrars to investigate altering the bounds of any precinct and report to the superintendent its findings and recommendations.  If the board of registrars finds that a division, redivision, alteration, formation, or consolidation of precincts will promote the convenience of the electors and the public interests, it shall make the recommendation and shall accompany its report with a map, plat, or draft of the new election precinct or precincts proposed by it.
- Upon the petition of **20 electors** or of the **county executive committee of a political party** to the county superintendent, praying for the alteration of the bounds of any precinct, the superintendent shall refer such petition to the board of registrars, which shall make a full investigation of the facts and shall promptly report to the superintendent its findings and recommendations.
- The **board of registrars** may also petition the superintendent for the alteration of the bounds of any precinct, accompanying its petition by a description of the proposed new precincts and by a map, plat, or draft thereof.
- After the presentation of any petition by the board of registrars or upon the filing by the board of its report and recommendations as to any investigation, the superintendents may make such order for the alteration of the bounds of precinct as will, in the superintendent's opinion, promote the convenience of electors and the public interests.

## When can precinct boundaries be altered?

O.C.G.A. §21-2-261(c) Precinct boundaries shall not be altered on election day, or during the period of 60 days prior to any general primary or election, or during the period of 30 days prior to any special primary or election.

## What must be filed with the Secretary of State and the Legislative and Congressional Reapportionment Office when precinct boundaries are altered?   O.C.G.A.§ 21-2-261.1

1. A map reflecting any changes in precincts within 20 days after changes are made.
2. A copy of any communications to or from the United States Department of Justice relating to any precincts within 20 days after such communication is sent or received.
3. A copy of any pleading initiating a court action potentially affecting any precincts within 30 days after it is filed.
4. A copy of any court order affecting any precincts within 20 days after it is entered.
5. For precincts that use the boundaries of a restricted access residential community, a map clearly delineating the boundaries of the community and, clearly depicting the streets contained within such community and the address ranges of such streets.
6. Any other documentation necessary to allow the Secretary of State to maintain a current listing of all precincts in this state.

**As a result of the Shelby vs. Holder Supreme Court decision, you are no longer required to submit precinct changes to the Department of Justice for preclearance.**

## Will I need to go into the Redistricting Module to change the boundaries of a precinct?

Most often, precinct boundaries will need to be made in the Redistricting Module.  Please contact your liaison  and KSU if you plan any changes in to precinct boundaries.

**Who, other than the Secretary of State and the Reapportionment Office, must the county superintendent or the governing authority of a municipality notify of any change in precinct boundaries?**

**O.C.G.A. §21-2-262.1(b)** The board of registrars, within 10 days after such changes are adopted.

**O.C.G.A. §21-2-226(e)** A precinct card shall be issued to the elector, reflecting such changes.

**SEB Rule 183-1-7-.01** When the boundary lines of a precinct are altered, all affected voters shall be notified of the change at least 30 days before the next primary or election.

## What must be published before precinct boundaries are altered?  O.C.G.A. § 21-2-262

The superintendent shall not make any final order for the alteration of precincts until at least 10 days after notice of such change shall have been advertised in the legal organ of the county.  The notice should state briefly the alteration of the precinct boundaries and the date upon which the same will be considered by the superintendent and shall contain a warning that any person objecting thereto must file his or her objections with the superintendent prior to such date.

## Is there a minimum number of voters in a precinct?  O.C.G.A. §21-2-261(b)

No new precinct shall be formed that shall contain less than 100 voters.

## Is there a maximum number of voters allowed in a precinct?  O.C.G.A.§ 21-2-263

No; however, if at the previous general election a precinct contained more than 2,000 electors, and if all those electors desiring to vote had not completed voting one hour following the closing of the polls, the superintendent shall either reduce the size of said precinct so that it shall contain not more than 2,000 electors or provide additional voting equipment or poll workers or both before the next election.

## What are the boundary requirements for precincts?  O.C.G.A. §21-2-261.1

All voting precincts established or altered under the provisions of this article shall consist of areas which are bounded on all sides only by:

1. Visible features which are readily distinguishable upon the ground (such as streets, railroad tracks, streams, lakes, and ridges) and which are indicated upon official Department of Transportation maps, current census maps, city or county planning maps, official municipal maps, official county maps, or any combination of such maps:
2. The boundaries of public parks;
3. The boundaries of public school grounds;
4. The boundaries of churches;
5. The boundaries of counties and incorporated municipalities; or
6. The boundaries of restricted access residential communities.

# Polling Places

## What code refers to changes to polling places?

If you are considering making any changes, please read the following codes sections:

**O.C.G.A. § 21-2-265 – O.C.G.A. § 21-2-270; O.C.G.A. § 21-2-226€**

## Who selects the polling place?

**O.C.G.A.§  21-2-265(a)**  The superintendent of a county or the governing authority of a municipality shall select and fix the polling place within each precinct and may, either on his, her, or its own motion or on petition of ten electors  of a precinct, change the polling place within any  precinct.

## What notice is necessary when a polling place is changed?

**O.C.G.A. § 21-2-265(a); O.C.G.A. § 21-2-226(e)**

- Notice of the proposed change shall be published for once a week for 2 consecutive weeks in the legal organ for the county or municipality in which the polling place is located.
- On the first election day following such change, a notice of the change shall be posted on the previous polling place and at three other places in the immediate vicinity.
- The occupant or owner of the previous polling place, or his or her agent, shall be notified in writing of such change at the time notice is published in the legal organ.
- A precinct card shall be issued to the elector, reflecting such changes.

**As a result of the Shelby vs. Holder Supreme Court decision, you are no longer required to submit polling place changes to the Department of Justice for preclearance.**

## When may a superintendent establish a polling place for a precinct outside the boundaries of the precinct?

**O.C.G.A. § 21-2-265(e)**  The superintendent may establish the polling place for a precinct outside the boundaries of the precinct if there is no suitable facility within the precinct which could be used as a polling place and if, by so doing, such polling place would better serve the needs of the voters.

## What are the requirements for Polling Places?

**O.C.G.A. § 21-2-265(c)**  Provides for the polling place to provide adequate space for all parties conducting their primaries.

**O.C.G.A. § 21-2-265(d)**  Provides for suitable and appropriate access for disabled electors in polling places.

**O.C.G.A. § 21-2-266(a)**  Provides for wherever practicable and consistent with O.C.G.A. 21-2-265(d), using schoolhouses, municipal buildings or rooms, or other public buildings as polling place.

**O.C.G.A. § 21-2-266(b)**  Provides for using portable or movable polling facilities of adequate size for any precinct.

**O.C.G.A. § 21-2-266(c)**  Provides for using boundaries of a restricted access residential community as boundaries for a precinct and a polling place is established within that community.

## What code sections provide that the board of registrars may establish additional sites for the purpose of receiving absentee ballots?

**O.C.G.A. § 21-2-382, O.C.G.A. § 21-2-385, SEB Rule 183-1-14-.08**   The board of registrars may establish additional sites for the purpose of receiving absentee ballots under Code Section § 21-2-381 and for the purpose of voting absentee ballots under O.C.G.A. § 21-2-385.   For definition of government building generally accessible to the public, see SEB Rule 183-1-14-.08

## Will I need to go into the Redistricting Module to change a Polling Place?

Most often, you will NOT need to go into the Redistricting Module to make polling place changes.  If you are making changes to precincts and polling places, you will make the precinct changes first, in Redistricting.  Once you are out of Redistricting, then you will make the polling place changes.   Contact your liaison and KSU  if you plan to make polling place changes.

