# EXHIBIT 1

# In The Matter Of:

*Fair Fight Action v.
Raffensperger*

---

*Dr. Khalilah Brown-Dean
December 11, 2019*

---

*Regency-Brentano, Inc.
13 Corporate Square
Suite 140
Atlanta, Georgia 30329
404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION

3  FAIR FIGHT ACTION, et al.,    )
                           )
4          Plaintiffs,     ) CIVIL ACTION FILE
                           )
5        vs.            ) NO. 1:18-cv-05391-SCJ
                           )
6  BRAD RAFFENSPERGER, in his    )
  official capacity as Secretary )
7  of State of Georgia, et al.,  )
                           )
8          Defendants.     )

9

10       Deposition of KHALILAH L. BROWN-DEAN, PH.D.,

11     taken on behalf of the Defendants, pursuant to

12     the stipulations contained herein, reading and

13     signing of the deposition being reserved, taken

14     in accordance with the Federal Rules of Civil

15     Procedure, before Lynn Van Ry, RPR, Certified

16     Court Reporter, at 1180 West Peachtree Street,

17     Atlanta, Georgia, on December 11, 2019,

18     commencing at 9:33 a.m.

19

20

21

22

23               REGENCY-BRENTANO, INC.
              Certified Court Reporters
               13 Corporate Square
24                 Suite 140
             Atlanta, Georgia  30329
25              (404) 321-3333

Regency-Brentano, Inc.

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiffs:

 3           LESLIE J. BRYAN
             Attorney at Law
 4           Lawrence & Bundy, LLC
             1180 West Peachtree Street, N.W.
 5           Suite 1650
             Atlanta, GA  30309
 6           T:  404.400.3338
             F:  404.609.2504
 7           E:  Leslie.bryan@lawrencebundy.com

 8

 9   On behalf of the Defendants:

10           JOSHUA B. BELINFANTE
             CAREY A. MILLER
11           Attorneys at Law
             Robbins Ross Alloy Belinfante Littlefield, LLC
12           500 14th Street, N.W.
             Atlanta, GA  30318
13           T:  678.701.9381
             F:  404.856.3250
14           E:  Jbelinfante@robbinsfirm.com
             E:  Cmiller@robbinsfirm.com
15

16

17   Also Present:  Laterika Molden, Law Student

18

19                         - - -

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

1            INDEX TO EXAMINATIONS

2                                              Page

3  Examination by Mr. Belinfante              5

4  Examination by Ms. Bryan                   142

5  Further Examination by Mr. Belinfante      145

6

7               INDEX TO EXHIBITS

8  Defendants'        Description       Marked/First
     Exhibit                             Identified
9
     D-1      Second Amended Notice of       7
10            Deposition

11   D-2      CV                             8

12   D-3      11-18-19 Report               16

13   D-4      Diverse article titled "Stacey  36
              Abrams Could Become Nation's
14            First Black Female Governor"

15   D-5      Cover page, copyright page, and  38
              pages 113 and 114 of "Identity
16            Politics in the United States"

17   D-6      Cover page, copyright page, and  40
              page 231 of "Identity Politics
18            in the United States"

19   D-7      Diverse article titled "From Pain  43
              to Power - Higher Education"
20
     D-8      Diverse article titled "Honoring  44
21            Black History Month, in Prison"

22   D-9      Diverse article titled "Five    47
              Things More Effective Than
23            Political Panic"

24   D-10     Diverse article titled "The Stakes  54
              is High - Higher Education"
25

**Regency-Brentano, Inc.**

1                    CONTINUED INDEX TO EXHIBITS

2    Defendants'                Description              Marked/First
       Exhibit                                          Identified
3
         D-11      8-15-19 Report                            61
4
         D-12      Georgia Code Section 21-2-50.2            99
5
         D-13      Georgia Code Section 21-2-99             114
6
         D-14      12-10-19 e-mail from L. Bryan to         125
7                  J. Belinfante

8        D-15      Table 2:  Georgia Statutes              125
                   Outlining the Secretary of
9                  State's Duties

10       D-16      Joint Center report                     140

11       D-17      52 U.S.C.A. Section 20507               149

12

13

14

15

16

17  (Defendants' Exhibits 1 through 17 were attached

18   to the transcript.)

19

20

21

22

23

24

25

**Regency-Brentano, Inc.**

```
 1              MR. BELINFANTE:  This will be the
 2         deposition of Dr. Khalilah Brown-Dean.
 3              Did I pronounce that right?
 4              THE WITNESS:  Yes.
 5              MR. BELINFANTE:  Okay.  It is taken by
 6         Defendant Secretary of State Brad Raffensperger
 7         for the purpose of discovery and all purposes
 8         allowed under the Federal Rules of Civil
 9         Procedure.
10              Leslie, are you okay agreeing that all
11         objections except those going to privilege and
12         the form of the question and the responsiveness
13         of the answer are reserved until trial or first
14         use of the deposition?
15              MS. BRYAN:  Yes, that's fine.
16              MR. BELINFANTE:  Okay, can you swear in
17         the witness, please?
18              KHALILAH L. BROWN-DEAN, PH.D.,
19       having been first duly sworn, was examined and
20                 testified as follows:
21                    EXAMINATION
22   BY MR. BELINFANTE:
23       Q     Good morning, Professor Brown-Dean.
24       A     Good morning.
25       Q     We met just a moment ago.  My name is
```

1   Josh Belinfante.  I'm joined today by Carey Miller.

2   We represent the Secretary of State and State

3   defendants in the lawsuit where you've been asked to

4   testify.

5            Some just general rules of depositions.

6   Have you ever been deposed before?

7        A      I have not.

8        Q      Okay.  The most important person in the

9   room is the court reporter because everything we do

10  here is for that record.  And the worst thing you and

11  I can do is talk over each other.  Same with me and

12  Leslie and anyone else.  So I will certainly do my

13  best not to interrupt you.  I don't anticipate this

14  being an issue, if you could just try not to let -- or

15  let me finish a question and then respond.  That's

16  just easier for the court reporter.

17       A      Uh-huh.

18       Q      Second thing -- and this is the harder

19  one, and I've been deposed, and this is the one that I

20  violate as much as anybody -- when you answer

21  questions, you have to say yes or no, not uh-huh or

22  huh-uh.  And again, that's just for the court reporter

23  on the record.

24            If you want to take a break at any time,

25  that's fine, just let me know.  My only request is

1    that if I've asked a question, you answer the

2    question, and then we take a break from there.

3              And last, I am honestly not trying to

4    confuse you with any questions I ask or ask in any

5    kind of misleading way, so if you don't understand a

6    question, just let me know, and I'll try to rephrase

7    it.

8         A    Okay.

9         Q    Is that all of that agreeable to you?

10        A    Yes.

11        Q    All right.  I'm going to -- and looks

12   like we've only got one copy, Leslie.

13             MS. BRYAN:  That's fine.

14                  (Thereupon, marked for identification,

15        Defendants' Exhibit D-1.)

16   BY MR. BELINFANTE:

17        Q    But I'll attach as Exhibit 1 -- I'll show

18   you what is Exhibit 1, which is our notice -- second

19   amended notice of your deposition.  Have you seen that

20   document before, Professor?

21        A    No, I have not.

22        Q    Okay.  How did you learn that you were

23   going to be deposed today?

24        A    I received an e-mail from the plaintiffs'

25   attorneys.

1    Q        Okay.  Who were you in contact with,
2   which attorney, do you know?
3    A        I believe it was Chandler that sent me
4   the e-mail.
5    Q        All right.  And can you spell your name
6   for the record?
7    A        Sure, it's K-H-A-L-I-L-A-H.  Do you need
8   the last name as well?
9    Q        Yes, please.
10    A        Brown, B-R-O-W-N, hyphen, D-E-A-N.
11              (Thereupon, marked for identification,
12       Defendants' Exhibit D-2.)
13   BY MR. BELINFANTE:
14    Q        All right, I'm going to show you what
15   we've marked as Defendants' Exhibit 2, which is a copy
16   of your CV.  Is this a current copy of your curriculum
17   vitae?
18    A        Yes, it is.
19    Q        All right.  And it was attached to your
20   expert report; correct?
21    A        Yes.
22    Q        Have there been any additions since we
23   received your report in November, the amended report?
24    A        No.
25    Q        Okay.  You have on here, and it's on page

1    2, under education in 1999, Summer Institute in

2    Political Psychology?

3          A      Yes.

4          Q      What is the Summer Institute?

5          A      It is a joint training at the time

6    between The Ohio State University and the University

7    of California to expose both academics and

8    practitioners to the dynamics of political psychology.

9          Q      Tell me, what is political psychology?

10         A      Political psychology is a study of both

11   the affect, so the emotional part of politics, as well

12   as the intellectual part, so how do people feel about

13   the political process, why do they make the choices

14   that they do within that field.

15         Q      And how long was that program?

16         A      It was a four-week program.

17         Q      Was it -- you go through the program and

18   get a certificate, or was there any grading involved

19   or anything?

20         A      So there was not grading.  It was a

21   project.  So it was daily coursework, daily meeting

22   with professors.  There was a group project for the

23   summer, and upon successful completion a certificate

24   was awarded.

25         Q      Okay.  And you received your master's

1    from The Ohio State University; correct?

2        A        Yes, I did.

3        Q        We're still a little bitter at UGA about

4    our quarterback, but congratulations on your season.

5        A        Thank you very much.

6        Q        Tell me, what was your master's thesis

7    about or on?

8        A        My master's thesis was about felon

9    disenfranchisement.

10        Q        In your master's thesis, did you spend

11    any time on Georgia law?

12        A        No.

13        Q        All right, and how about your doctoral

14    thesis?

15        A        My doctoral thesis was also about felon

16    disenfranchisement.

17        Q        And what was -- tell me, just summarize

18    your doctoral thesis if you could.

19        A        So the doctoral thesis looked at the

20    development of disenfranchisement laws since the

21    founding of the United States.  It looked at key

22    changes in those laws and also current challenges or

23    current for the time in 2003 that it was written.

24        Q        And when you say disenfranchisement laws

25    in the United States, are you being -- is that

1  specific to felon disenfranchisement laws?

2      A       So the dissertation looked overall, what

3  are the rules in place that determine who can vote.

4  And the key piece of that dissertation was how felon

5  disenfranchisement fits into that broader picture.

6      Q       I see.  And did any part of your doctoral

7  thesis focus on Georgia law?

8      A       It did.  So it looked at the South, and

9  Georgia was a part of that examination.

10     Q       Okay.  And what time period roughly did

11 it consider for that portion that considered the

12 South?

13     A       So there were two different periods, so

14 one looking at post-reconstruction, one looking at the

15 civil rights movement from the early -- mid 1950s

16 through early 1970s.

17     Q       Okay.  Tell me about under your

18 postgraduate training, the 2017 Tufts University

19 gerrymandering expert witness training.  What was

20 that?

21     A       So that program was bringing together

22 academics, so in terms of professors as well as

23 teachers and researchers to better understand various

24 dynamics of gerrymandering.  That expert witness

25 training was to help participants in that program

1  understand how to make their scholarship relevant to

2  audiences beyond academics.

3      Q      And who would those audiences be?

4      A      It depended on who was in the program.

5  For some people that audience would be their students

6  in terms of high school students.  For others in the

7  program, it was journalists and media.  For others it

8  was policymakers.  So it really depended on who was in

9  the program.

10     Q      I see.  Was one of the aims of the

11  program -- I mean your name certainly would seem to

12  indicate this -- to prepare someone to be an expert

13  witness in gerrymandering cases?

14     A      It was to prepare people to figure out

15  how to translate their research.  So again, it

16  depended on who was in the program.

17     Q      Okay.  And how long was that training?

18     A      The total program was six days.

19     Q      All right.  Was there a certificate

20  issued at the end of that?

21     A      No, there was not.

22     Q      All right.  Now, you are currently at

23  Quinnipiac University; correct?

24     A      Yes.

25     Q      And you are an associate professor there?

1       A       Yes.

2       Q       And you are tenured; is that right?

3       A       Yes.

4       Q       At Quinnipiac, do they have different

5    levels of professor?

6       A       Yes, they do.

7       Q       Okay.  And what is the entry level, if

8    you will, the starting level?

9       A       Well, it depends on the person in

10   question.  For most, the entry level is assistant.

11      Q       All right.  And then is associate next?

12      A       Yes.

13      Q       And then is there one after associate?

14      A       Full professor.

15      Q       And what is the difference between an

16   associate professor and a full professor?

17      A       So there are tenured and untenured

18   associate professors.  The difference between

19   associate and full is a new review process.  And what

20   that entails varies based on your field at the

21   university.

22      Q       I see.  And you're in the political

23   science department; correct?

24      A       I am.

25      Q       What does your new review process in the

1  political science department require to make that move

2  from associate professor to full professor?

3       A       So a professor would apply for that

4  review, depending on where they are in their program,

5  and then that would happen at the departmental level,

6  then the college level, and then the overall

7  university level.

8       Q       I see.  And do you have to provide -- is

9  it similar to a doctoral thesis?  Is there a written

10  product that comes with it?

11       A       No.  So you would provide your CV, you

12  would provide any publications or research that you've

13  completed as a part of that, evaluations of your

14  teaching, and then recommendation letters.

15       Q       Okay.  And the Quinnipiac University, is

16  it one campus or several?

17       A       We're on three campuses.

18       Q       Okay, and you're at the one on Hamden?

19       A       Yes.

20       Q       Okay, is that the main campus?

21       A       That is the main campus.

22       Q       Okay.  Have you applied for full

23  professorship at Quinnipiac?

24       A       I have not.

25       Q       Okay.  And prior to your time at

1    Quinnipiac, you were at Yale; correct?

2        A        Correct.

3        Q        And here I see that you were an assistant

4    professor at Yale?

5        A        Yes.

6        Q        Is that the -- I realize that people

7    could come in at different levels, but is assistant

8    professor kind of an entry level, if you will?

9        A        For most people.

10       Q        Right.

11       A        But again, it varies, based on the

12   candidate.

13       Q        And would the next level at Yale be an

14   associate professor?

15       A        Yale has a different process.

16       Q        Okay.  Tell me about that.

17       A        So many people go from assistant

18   professor to full professor.  Yale does not have a

19   standard tenure process like most of the colleges and

20   universities.

21       Q        Are full professors at Yale always

22   tenured?

23       A        Yes.

24       Q        And how does one move from an assistant

25   professor to a full professor at Yale?

```
 1      A       So one goes through a review process
 2  where again would present information on their
 3  teaching, their scholarship.  They would then solicit
 4  outside references to, you know, be a reference for
 5  that particular candidate.
 6      Q       Okay.  And did you apply for associate
 7  professorship at Yale?
 8      A       I did not.
 9      Q       All right, let's take a look at your
10  report, which we'll mark as Exhibit 3.
11              (Thereupon, marked for identification,
12      Defendants' Exhibit D-3.)
13  BY MR. BELINFANTE:
14      Q       I've got it clipped.  It may be easier if
15  you want, we can I'm sure get it stapled, but however
16  you want to use it.
17      A       Thank you.
18      Q       And this is the one that was filed on
19  November 18th.  Is that an accurate copy of the
20  report?
21      A       Yes.
22      Q       Okay.  Could you turn to page 2 of the
23  report?
24      A       Yes.
25      Q       In the first paragraph, about midway
```

1  through, in describing your background, it says I

2  studied historical and contemporary institutional

3  dynamics surrounding voting rights in the United

4  States.  Do you see that?

5      A      Yes.

6      Q      What do you mean by institutional

7  dynamics?

8      A      So voting rights in this context in terms

9  of what I mean here is not just about the individual

10 decisions that one makes about whether to vote or not.

11 Institutional dynamics relate to the opportunities

12 that people have, who is in charge of administering

13 those opportunities, and also the differences from

14 local to state to federal.

15     Q      Okay.  And do you teach on institutional

16 dynamics on voting rights?

17     A      I do.

18     Q      And do you teach currently on that topic?

19     A      I do.

20     Q      Okay, and in the coursework there, do you

21 focus on Georgia law at all?

22     A      Georgia is a part of what I do.  It's not

23 the call-out for what I do, but it is a part of what I

24 do, yes.

25     Q      Okay.  How representative -- in terms of

1    Georgia being a part of what you do, can you flesh

2    that out for me a little more, just tell me what you

3    mean by that?

4        A        Could you say more about what you mean by

5    fleshing that out?

6        Q        Sure.  You know, in my college days, I

7    mean you could -- I could see taking a class where

8    Georgia is mentioned at one end of the spectrum in a

9    footnote, in an assignment you gave me.  I don't think

10   you're talking about that.  I could see on the other

11   end of the spectrum we spend an entire day lecturing

12   about Georgia's history and voting.  So I'm just

13   trying to figure out somewhere between there how does

14   Georgia come up in your classes on institutional

15   dynamics?

16       A        Georgia comes up in the classes -- we're

17   definitely more in the middle of that spectrum that

18   you just mentioned.  Georgia comes up in understanding

19   history and understanding federalism.  And often when

20   I talk about Georgia, it is in the context of Southern

21   politics.

22       Q        I see.  And when you talk about Georgia

23   and Southern politics, what time frame are you looking

24   at?

25       A        Well, we look at various time frames.  It

1  depends on where we are in the course, so if we're

2  looking at reconstruction and post-reconstruction, if

3  we're looking at the founding of the country, if we're

4  looking at civil rights movement, if we're looking at

5  contemporary U.S. politics.

6      Q    Okay, and define contemporary for me.

7      A    So contemporary in the context of how I

8  teach the course is from 1990 to forward.

9      Q    I see, okay.  Let's go back to your CV if

10  we could, page 2 again, under academic awards, grants,

11  and fellowships.

12      A    Yes.

13      Q    My questions are going to be right now

14  about the Open Society Foundations grants.

15      A    Yes.

16      Q    You received a grant, if I'm reading this

17  correctly, in 2009, 2010, and 2011; is that correct?

18      A    Yes, yes.

19      Q    And the three grants total 200,000?

20      A    It was a three-year time period.

21      Q    I see, okay.  And so when you applied,

22  you were applying for a three-year grant?

23      A    Yes.

24      Q    Okay, and the total of that grant was

25  200,000?

1       A       Yes.

2       Q       Open Society is a George Soros affiliated

3   group; is that correct?

4       A       It is.

5       Q       Okay.  And your research for Open Society

6   was to look at voter registration and mobilization

7   strategies in five areas of Connecticut?

8       A       Yes.

9       Q       In your 2018 through 2016 Provost's

10  Innovation Grants --

11      A       Yes.

12      Q       -- what was that used to study?

13      A       So those innovation grants relate to

14  teaching, to understand how to have students do more

15  applied learning, so not just in classroom.  So those

16  particular grants were to allow my students to create

17  media projects around a topic of their choosing based

18  on the course that we were in.  The earliest grant --

19  that was for '17 and '18.  2016 looked at diversity

20  initiatives at the university.

21      Q       I see, okay.  And for your research

22  grants from 2018 to '12, the Quinnipiac University

23  College of Arts and Sciences faculty research grants,

24  can you tell me what those were for?

25      A       Sure.  So two of those years looked at

1    voting rights efforts across the United States, so

2    looking at ways that communities were mobilizing to

3    understand civic engagement and also beyond elections.

4    The most recent two grants of that research grant

5    series was research as part of my book.

6         Q      Your book, the Identity Politics book?

7         A      Yes.

8         Q      Okay.  And when you say the first ones

9    were -- and I'm trying to use the right words --

10   voting rights efforts to mobilize and understand

11   elections?

12        A      Yes.

13        Q      What do you mean by that?

14        A      So there was an effort on our campus at

15   the time to get more college students involved in

16   politics and involved in elections.  And so part of

17   that research was to look at why young people do or do

18   not choose to participate and whether student groups

19   were being involved in those efforts.

20        Q      Okay, did that focus on Connecticut or

21   Quinnipiac?

22        A      The part of that -- the first part of it

23   looked at Quinnipiac University, and then it expanded

24   out to Connecticut overall.

25        Q      I see.  So Georgia was not a part of

1    that?

2         A         Georgia was not.

3         Q         All right, in your research and teaching

4    interests, which begins on page 3, it goes over to 4,

5    one of the topics is civic engagement.  What do you

6    mean by that?

7         A         Civic engagement is the ways in which

8    people express their political views not just through

9    voting but through music and popular culture, by

10   running for public office, by supporting candidates,

11   or by organizing in other ways to express their

12   political views.

13        Q         Okay.  So that's not, for example,

14   focused on election administration?

15        A         No, that is not.

16        Q         And then you have voting rights and

17   representation?

18        A         Yes.

19        Q         What do you include in that?

20        A         So within voting rights and

21   representation, I look at not just how citizens

22   interact in that way but also how public officials,

23   how election officials are involved in that as well,

24   so what are the challenges and opportunities that

25   people have to participate in the political process

1  via voting, and also representation, being office

2  holding, and administration.

3      Q      And within that do you look at election

4  administration?

5      A      I do, within the voting rights and

6  representation.

7      Q      And do you look at -- do you study

8  Georgia -- other than to prepare your report in this

9  case, have you studied Georgia in your interest in

10  voting rights and representation?

11      A      I have in the past.  So the most recent

12  time I taught this class I did not.

13      Q      The most recent time you taught the class

14  --

15      A      That I taught that particular class, I

16  did not single out Georgia.

17      Q      I see, okay.  When was the last time you

18  taught that class?

19      A      This particular class, the last time I

20  taught was 2012.

21      Q      Okay.  And is it an undergraduate class

22  or a graduate class?

23      A      It is a hybrid class, so we have

24  upper-level undergraduates.

25      Q      Got it.  Those are always fun because

1    they were always in the morning when I went to school.

2    Grad students could get up in the morning.

3    Undergraduates had challenges.

4        A    Uh-huh.

5        Q    Public policy and leadership, is that a

6    class you teach as well?

7        A    It is.

8        Q    And if I were to take a look at the

9    syllabus of that class, what does it teach generally?

10       A    So it is helping students understand what

11   public service entails, the various opportunities for

12   that, and how people who participate in public

13   leadership, whether elected or appointed, how they

14   navigate key public policy challenges in the United

15   States.

16       Q    Okay.  And in the context of that

17   course -- and it is a course; correct?

18       A    It is.

19       Q    Okay.  Do you look at Georgia election

20   administration?

21       A    I do not.

22       Q    Okay.  And I've gone through certainly

23   not all, but I've read your CV on the scholarship,

24   I've not read all of the book.  And clearly you've

25   spent a lot of time and effort researching issues of

1    felon disenfranchisement and felon voting.  How much
2    of your scholarship in -- and can you point me to
3    perhaps an article on election administration outside
4    of the context of felon disenfranchisement?
5        A      So the book chapter that is listed on
6    page 4, the 2015 "Felon Disenfranchisement Ten Years
7    After Bush v. Gore," that particular chapter looks at
8    election administration overall and then centers felon
9    disenfranchisement as a policy area or key area of
10   navigating that.
11       Q      And within that one, that was written by
12   you and then edited by Mr. Alvarez and Mr. Grofman; is
13   that correct?
14       A      Yes.
15       Q      Okay.  And what did you conclude in that
16   article, if anything, on election administration other
17   than felon disenfranchisement?
18       A      So the key conclusion of that chapter was
19   the need to consider how federalism shapes election
20   administration, the need to balance state interests
21   against federal.
22       Q      And tell me what a state -- where would a
23   state interest -- and I realize this is a broad
24   question.  Where would a state interest differ from
25   federal interest in terms of balloting?

1    A        So in terms of balloting, states get to

2   design those ballots and states get to decide the

3   time, place, and manner of elections.  And so within

4   that chapter I talk about that, the need to understand

5   those state level decisions and also the broader

6   national and federal context of that decision-making.

7        Q        Okay.  And is there much dedication to

8   Georgia in that chapter?

9        A        It is not.

10       Q        Okay.  Other than that one, is there an

11  article that -- or scholarship that you've

12  published -- let me back up one second.

13               That chapter, is that considered a

14  peer-reviewed chapter?

15       A        It is, yes.

16       Q        Okay.  And other than that one, can you

17  point me to where you focused on, for peer review,

18  peer review materials, election administration outside

19  of the context of felon disenfranchisement?

20       A        That would be the key piece for

21  peer-reviewed.

22       Q        All right.  Going back to your teaching,

23  how many courses do you teach in a given semester?

24       A        It varies --

25       Q        Sure.

1     A       -- from semester to semester.  This
2   semester I'm teaching two courses.
3     Q       Okay.  Do you know what you're doing next
4   semester?
5     A       Two courses for next semester.
6     Q       Okay.  How many classes have you taught
7   that focus exclusively on election administration?
8     A       I have taught two courses that focus
9   exclusively on election administration.  That would be
10  the voting rights and representation course.  And that
11  has changed in terms of how it's been taught.
12    Q       Can you explain how it's changed?
13    A       So the first iterations of that course
14  were a reading course where basically the students,
15  gave them readings, and we discussed those readings.
16  The newest iteration of that course is more of a
17  lecture discussion based course.
18    Q       All right.  And in that course -- and I
19  probably asked this before, forgive me, but in that
20  course, have you focused on Georgia at any particular
21  time?
22    A       Yes, but not exclusively.
23    Q       Okay.  And this is what we were talking
24  about before, historically in the three periods?
25    A       Yes.

1      Q       Got it, okay.  And when you look at --

2   and I'll leave it to I think your phrase was

3   contemporary period, 1990 forward.

4      A       Uh-huh.

5      Q       And when you look at Georgia, what did

6   you look at specifically in regards to Georgia policy

7   in that course from 1990 forward?

8      A       So one of the key things that we looked

9   at within that course are how Georgia as well as other

10  Southern states that have seen demographic shifts, how

11  those states have responded in terms of mandates

12  around Section 203 of the Voting Rights Act of 1965 as

13  well as more -- more contemporary questions around

14  eligibility and access within Georgia as well as other

15  states.

16     Q       So in that class and in that course do

17  you focus on, for Georgia, and again, in this window

18  of 1990 forward, responsibilities of public officials?

19  And by that specifically I mean the role of the

20  secretary of state versus that of county officials

21  versus that of municipal officials.

22     A       Within that course I focus on the various

23  responsibilities and how they vary based on level of

24  government and also what happens when those levels

25  overlap or diverge.  And again, the sort of center and

1   point there is about federalism within that course and
2   related.
3       Q       Okay.  And do you assign any readings on
4   Georgia for that course?
5       A       Not on Georgia -- well, I have a reading
6   by Charles Bullock that I assign, and that is a part
7   of understanding how these things vary over time.
8       Q       Okay.  And do you know which article from
9   Professor Bullock?
10      A       Not off the top of my head.
11      Q       And does it discuss the role of the
12  secretary of state, or is it more his kind of here's
13  how politics are playing out in Georgia?
14      A       It's not just about politics --
15      Q       Sure.
16      A       -- in general -- in Georgia, but it is
17  not focused on the secretary of state in Georgia.
18      Q       Okay.  All right, looking at policy
19  papers and other publications, are these
20  peer-reviewed, the ones that are listed here?
21      A       Some of them are.
22      Q       Some are?
23      A       Yes.
24      Q       Okay.  And I guess my question is, just
25  generally, what were the different -- when you created

1  your CV, some ended up in this category, some ended up
2  in -- or is policy papers a subsection of scholarship
3  and research publications?
4       A     It is.
5       Q     I see, okay.  All right.  Do any of those
6  works that are listed under policy papers and other
7  publications focus on Georgia?
8       A     So the 2015 publication on page 5, "Fifty
9  Years of the Voting Rights Act:  The State of Race in
10  Politics," that does have Georgia as a part of that.
11       Q     And what does it conclude about Georgia?
12       A     So it concludes -- I look -- we look
13  overall.  We look at various states, we look at
14  various regions.  It concludes overall that the Voting
15  Rights Act of 1965 did have a substantial impact on
16  the key areas that we examine, being registration,
17  turnout, policy responsiveness, and representation.
18       Q     Okay.  Does it focus at all on
19  administration vis-a-vis the secretary of state
20  or county --
21       A     Not via the secretary of state.  It looks
22  at election administration overall, broadly.
23       Q     Okay.  And is that one for the Joint
24  Center, was that peer-reviewed?
25       A     It was not peer-reviewed to the same

1  standard that it would be for an academic publication.

2      Q       Okay.  Now, your degrees are -- I mean

3  you have a master's and a Ph.D. in political science;

4  correct?

5      A       Correct.

6      Q       You do not have a law degree; is that

7  right?

8      A       I do not.

9      Q       Okay, and are you currently enrolled in

10  any law school?

11      A       I am not.

12      Q       Okay.  Bless you.  Have you -- prior to

13  providing your report in this case, have you ever

14  provided a report for purposes of litigation?

15      A       I have not.

16      Q       Okay.  And you've testified earlier

17  you've not been deposed before?

18      A       Correct.

19      Q       Have you testified in any case involving

20  voting or government generally?

21      A       Testified, no, in a case, no.

22      Q       Have you been a consulting expert in any

23  case involving elections?

24      A       I have not.

25      Q       And do you know what I mean by consulting

1  expert?

2       A       Yes.

3       Q       Okay.  Have you read the complaint in

4  this case?

5       A       I've read the amended complaint.

6       Q       All right.  And when did you read the

7  amended complaint, roughly?

8       A       Yesterday.

9       Q       Okay.  So you did not read it when you

10 provided your report?

11      A       No.

12      Q       Okay.  And when did you receive -- first

13 receive the amended complaint?

14      A       Yesterday.

15      Q       I see, okay.  And so is your -- tell me

16 generally in your words, what is this case about?

17      A       So I -- for my report I didn't focus on

18 what the case was about.  I just focused on the

19 question that I was asked to research.

20      Q       But sitting here today, can you tell me

21 generally what your, in your words, what is this case

22 about?

23      A       Based on what I read yesterday, I think

24 this case is about Georgia voters and their access to

25 voting.

1    Q      Okay.  You do not form an opinion as to
2    the merits of the case, in other words, whether the
3    claims are accurate or not; is that right?
4         A      No, I do not.
5         Q      All right.  And you say in your report --
6    and you can go back to that, which is exhibit -- is it
7    3?
8              MR. MILLER:  3.
9              MR. BELINFANTE:  Okay.
10   BY MR. BELINFANTE:
11        Q      On page 3 -- that you were contacted on
12   June 11 of this year under assignment; is that
13   correct?
14        A      Yes.
15        Q      Okay, do you remember who contacted you?
16        A      I believe it was Mr. Chandler who
17   contacted me.
18        Q      Did you know Mr. Chandler prior to this?
19        A      I did not.
20        Q      Did Mr. Chandler provide you with any
21   underlying facts about the litigation?
22        A      No.
23        Q      But he's the one that gave you the topic
24   that people would like you to look at?
25        A      Yes.

1     Q        And what did he say he would like you to
2   study and issue a report on?
3     A        I was asked to address the role of the
4   Georgia Secretary of State within election
5   administration and enforcement.
6     Q        All right.  Did he ask you to make any
7   assumptions --
8     A        No.
9     Q        -- in your research?  Okay.  And would
10  you generally -- was Mr. Chandler your point of
11  contact?
12    A        He was.
13    Q        Okay.  And would you communicate largely
14  by phone or by e-mail?
15    A        By e-mail.
16    Q        Okay.  Were there -- and I'm not asking
17  what was in them, but other than the two reports that
18  we have, the August 1 and the November 1, were there
19  drafts of the report?
20    A        I did draft the report, yes.
21    Q        And did you send drafts to Mr. Chandler?
22    A        I sent two drafts to Mr. Chandler.
23    Q        And did Mr. Chandler provide you with any
24  comments on those drafts?
25    A        No.

1      Q      Okay.  What led you to issue a revised

2    report in November?

3      A      So there was an update around the

4    equipment that was used, and so I updated that report

5    to reflect those changes.  So it increased the number

6    of provisions related, and so the November update

7    focuses on that.

8      Q      All right.  Was there anything else --

9    because I mean there's textual changes, too, and we

10   can get into those.  But were you looking -- I mean

11   other than the equipment, was there a reason that you

12   updated your report?

13     A      No, so that's the only changes there.

14     Q      All right.  Have you met Stacey Abrams?

15     A      I have not.

16     Q      Okay.  You did follow her race for

17   governor, though; correct?

18     A      Yes.

19     Q      And I think you describe yourself as a

20   political junkie; is that right?

21     A      Yes.

22     Q      And do you recall describing her as a,

23   quote, exemplar of public officials who can connect

24   grassroots mobilization with a strategic vision and an

25   ambitious political agenda?

1      A       I believe that was -- I was quoted in an
2  article.
3      Q       That's right.
4      A       Uh-huh.
5      Q       What did you mean by strategic vision?
6      A       So in that particular article the
7  reporter asked me can candidates just run or do they
8  need to have a platform to run.
9      Q       And what did you mean by strategic vision
10 there?  And I'll just give you the article too.
11     A       Okay.
12     Q       I'm not trying to play hide the ball.
13             (Thereupon, marked for identification,
14      Defendants' Exhibit D-4.)
15 BY MR. BELINFANTE:
16     Q       I'll show you what I've marked as Exhibit
17 4.
18     A       Thank you.  So what I was referencing
19 there was the idea of a strategic vision being that
20 candidates need to not just talk in generalities but
21 have a plan for what they want to do and how they
22 would do it.
23     Q       And at this time can you recall what you
24 thought Ms. Abrams' plan was?
25     A       The plan that I was referencing in

1    particular here was around student loan debt and

2    college affordability.

3         Q        Is that the same when you describe her

4    ambitious political agenda, is that roughly the same?

5         A        Yes, yes.  It's not roughly the same, it

6    is the same.

7         Q        I see, okay.  Did you make any financial

8    contributions to Ms. Abrams' campaign?

9         A        I did not.

10        Q        Have you made political contributions in

11   the past five years?

12        A        I have.

13        Q        Have you made any to members of the

14   Democratic Party?

15        A        I have made to a candidate who is a

16   member of the Democratic Party, he's a personal

17   friend, yes.

18        Q        Okay.  Any to any members of the

19   Republican Party, any candidates?

20        A        No.

21        Q        And you don't in your report express an

22   opinion on whether Georgia engaged in intentional

23   voter disenfranchisement in the 2018 gubernatorial

24   election?

25        A        No, I do not make an opinion.

1      Q      We talked about this a moment ago.  You

2  recently published a book on identity policy; is that

3  correct?

4      A      Yes.

5                  (Thereupon, marked for identification,

6        Defendants' Exhibit D-5.)

7  BY MR. BELINFANTE:

8      Q      I will show you what I've marked as

9  Exhibit 5.

10     A      Thank you.

11     Q      What I've tried to do when I -- there's

12 only a few of these -- I'll have the cover of the

13 book, copyright page, so we're all on the same page,

14 in terms of what I'm showing you.  This is page 113

15 and 114 of your book; is that right?

16     A      Yes.

17     Q      All right.  My question is about the last

18 paragraph on page 113.

19     A      Yes.

20     Q      There it's where you mention Ms. Abrams

21 has run for governor, as well as Andrew Gillum and Ben

22 Jealous in Florida and Maryland, respectively.  Do you

23 see that?

24     A      Yes.

25     Q      You write that all three fell short in

1  elections clouded by allegations of voter suppression

2  and racial bias.  Do you see that?

3      A      Yes.

4      Q      Okay.  And as I went back, the citation

5  for Georgia at least is Lopez 2018.  Do you -- I don't

6  have the -- I mean I have the book, we can take a look

7  at it, but I'll represent to you that that was an

8  article in Vox.  I believe his name is German Lopez.

9      A      Okay.

10      Q      Is that familiar to you at all?

11      A      I would have to look at the actual

12  citation.

13      Q      Okay, sure.

14      A      Yes.

15      Q      Okay.  Is it fair, if I'm reading this,

16  when you state that the election was clouded by

17  allegations of voter suppression, that is -- is there

18  anything you base that on other than the Lopez

19  article?

20      A      Well, I based it on the two citations

21  that are there, and it's also why I say allegations.

22      Q      Right.  But if the Thrush and Peters

23  article, for example, does not discuss Georgia and

24  Lopez does, is it safe to presume --

25      A      I would need to reference, yes.

1    Q      Okay, all right, we may be able to help

2    with that.  I'll show you what we'll mark as Exhibit

3    6, which is page 231.

4                    (Thereupon, marked for identification,

5          Defendants' Exhibit D-6.)

6    BY MR. BELINFANTE:

7    Q      My question is on a statement in the

8    second full paragraph that begins with the 116th

9    Congress from page 231.

10    A      Yes.

11    Q      There you say in the second-to-last

12    sentence, And yet the persistence of voter suppression

13    and disenfranchisement in places such as Georgia,

14    Florida, Nevada, Ohio, and Pennsylvania reminds us

15    that mobilization breeds countermobilization.  Do you

16    see that?

17    A      Yes.

18    Q      Okay.  But again, you're not offering any

19    opinion in this case on that statement?

20    A      No, no.

21    Q      Okay.  But it's fair to say if you put it

22    in your book, that you believe that to be an accurate

23    statement?

24    A      Yes.

25    Q      Okay.  All right, let's go back to your

1  report, which is Exhibit 3.  Would you agree with me

2  that the focus, though, of the Identity Politics book

3  is not Georgia?

4      A      No, it is not.

5      Q      Okay.  And the book in fact does not make

6  any analysis on the role of the secretary of state in

7  Georgia elections, does it?

8      A      It does not.

9      Q      Have you made any financial contributions

10 to Fair Fight Action or any --

11     A      I have not.

12     Q      Okay.  Are you familiar with Fair Fight

13 Action?

14     A      Yes, I've heard of Fair Fight.

15     Q      Okay.  Do you have an opinion as to

16 whether it fights for legal equality?

17     A      I believe --

18            MS. BRYAN:  Objection to form.

19 BY MR. BELINFANTE:

20     Q      Let me ask this way.  Do you believe that

21 part of its mission is to fight for legal equality?

22     A      I don't know.

23     Q      Did you attend the 2016 Democratic

24 National Convention?

25     A      I did not.

1      Q       I'll represent to you in your book you

2   describe a scene where Secretary Clinton comes onto

3   the stage at the convention.  Was that just from

4   watching it on TV?

5      A       Yes.

6      Q       Now, obviously you, I mean you rightly, I

7   think, consider yourself a scholar; is that fair to

8   say?

9      A       Yes.

10      Q       Okay.  And you have written that

11   academics generally are trained to approach topics

12   from a detached objective and often quantitative

13   perspective; is that right?

14      A       Yes.

15      Q       But you view your role as something more

16   than that; isn't that right?

17      A       No.

18      Q       Okay.  Do you consider yourself a scholar

19   activist?

20      A       No.  I think it depends on what I'm

21   doing.

22      Q       Okay.  So sometimes you're a scholar

23   activist, sometimes you're not?

24      A       No, I think --

25      Q       And I'm not trying to be cute.  I'm just

1    trying to figure it out.

2         A       I have been described as a scholar

3    activist.  That is not how I define myself.

4         Q       Okay.  Do you urge others to engage in

5    activism?

6         A       Yes.

7         Q       Do you consider yourself an activist?

8         A       No.

9         Q       I'll show you what we'll mark as Exhibit

10   7.

11               (Thereupon, marked for identification,

12       Defendants' Exhibit D-7.)

13   BY MR. BELINFANTE:

14        Q       This is an article you wrote in April of

15   2018; is that correct?

16        A       Yes.

17        Q       And at some point -- and forgive me for

18   not knowing exactly -- you refer to yourself as

19   writing blogs.  Do you deem the Diverse education

20   articles to be your blogs, or is that something

21   different?

22        A       This is considered a blog because Diverse

23   does not have columns.

24        Q       I see.  Is Diverse published in writing,

25   or is it exclusively online?

1      A       It is published both --

2      Q       Okay.

3      A       -- in print and online.

4      Q       In print and online, okay.  Let me turn

5  your attention to page 3, the last page of it.  And

6  feel free to read as much of this as you want.  My

7  question is about the last sentence of the article,

8  let's commit to scholarship and activism that empowers

9  rather than shames.

10     A       Yes.

11     Q       Okay.  So there you are urging, as you

12 said, persons to commit to activism; correct?

13     A       No, what I am saying is that for those

14 who pursue scholarship or for those who pursue

15 activism, that that work should focus on empowering

16 rather than shaming.  I'm not conflating the two.

17     Q       I see.  So you're drawing a distinction

18 there between scholarship and activism?

19     A       Yes.

20     Q       I see, okay.

21             (Thereupon, marked for identification,

22       Defendants' Exhibit D-8.)

23 BY MR. BELINFANTE:

24     Q       All right, I'll show you what I've marked

25 as Exhibit 8.  This is an article you wrote for

1    Diverse in March of 2018; is that right?

2        A        Yes.

3        Q        Let me turn your attention to page 3.

4    And if you want to read the whole thing, certainly

5    feel free.  My questions will be about the first full

6    paragraph on page 3.  Have you had a chance to read

7    it?

8        A        Yes, uh-huh.

9        Q        I'm sorry to be asking about a difficult

10   subject, when your cousin was murdered.  But there you

11   write that Brian's murder shifted my gaze from a

12   detached social scientist analyzing mass incarceration

13   data to an engaged scholar-activist demanding systemic

14   reform that prioritizes justice for victims and

15   families.  Do you see that?

16       A        Yes.

17       Q        What did you mean there by scholar

18   activist?

19       A        So that relates to how that was

20   defined -- if I can take a moment, please.

21       Q        Sure.

22       A        I didn't expect to address this.  I'm

23   sorry.

24       Q        No, no, no, I'm sorry myself.

25       A        This particular piece relates to how what

1  we were doing to honor Brian's memory was described to

2  us, that it was described as you're not just a family,

3  you're an activist because you're advocating for your

4  family member.  So this for me was a way of defining

5  what families could do to honor their loved ones.

6       Q       Okay.  And that would be, in your case,

7  to use your gifts as a scholar to do what?

8       A       To help the language of what I do as a

9  scholar, to make my scholarship accessible beyond the

10  classroom and beyond the academy, to maintain the

11  integrity of that scholarship but use a language that

12  could be accessible beyond those who went to a

13  graduate program.

14      Q       Okay.  Does your scholarship now look at

15  systemic reform generally?

16      A       In certain aspects, yes.

17      Q       Does it look at systemic reform in

18  election administration outside of the context of

19  felon voting?

20      A       Yes.

21      Q       Okay.  And that would be based on what

22  we've already talked about; correct?

23      A       Yes.

24      Q       I'll show you one more article.  We'll

25  mark this as Exhibit 9.

1                    (Thereupon, marked for identification,

2           Defendants' Exhibit D-9.)

3    BY MR. BELINFANTE:

4        Q      Is it fair to say that you don't agree

5    with the policies of the current presidential

6    administration?

7                MS. BRYAN:  Objection to form.

8                I'm sorry, could I have that again?

9    BY MR. BELINFANTE:

10       Q      Is it fair to say you don't agree with

11   the policies of the current presidential

12   administration?

13               MS. BRYAN:  With respect to what?

14               MR. BELINFANTE:  I don't know.  I mean

15         I'm asking broadly.

16       A      No, I don't think that would be fair to

17   say.

18   BY MR. BELINFANTE:

19       Q      Okay.  Let's look at this article on --

20   this is an article you penned in March of 2018 for

21   Diverse as well?

22       A      Yes.

23       Q      Okay.  In the first sentence, third

24   paragraph, As the White House becomes more -- excuse

25   me.  As the White House becomes a revolving --

1        A        Excuse me.

2        Q        Yes.

3        A        You're on page 1?

4        Q        Yes, ma'am.

5        A        Okay, thank you.

6        Q        Uh-huh.  Are you there in that

7    first paragraph?

8        A        Yes, I am.

9        Q        All right.  It reads, As the White House

10   becomes a revolving door of appointees kicked off the

11   island of misfit toys, our democracy seems to be in a

12   death spiral of chaos.  Do you see that?

13       A        Yes, I do.

14       Q        Why do you refer to the White House as

15   the island of misfit toys?

16       A        It actually referenced a statement that

17   was made by the president at the time about the people

18   that he was removing from their positions not being in

19   alignment with that vision, with his vision, and the

20   best interests of the country.

21       Q        Did the president use the phrase island

22   of misfit toys?

23       A        He did not.

24       Q        Okay.  So are you describing there the

25   White House as an island of misfit toys?

1        A        No.

2        Q        Okay, then how does that phrase even work

3    in that sentence?

4        A        Well, it works in the sentence in terms

5    of those who were not doing what they were appointed

6    to do as determined by the president.

7        Q        But it says they were kicked off the

8    island of misfit toys.  What is the island of misfit

9    toys in that sentence?

10       A        Well, the people that I was referencing

11   in that sentence are no longer within public office.

12   They are doing things that have nothing to do with

13   public service.  That's what I reference when I say

14   the island of misfit toys.

15       Q        And so the island in that sentence is

16   public service in the White House; correct?

17       A        Yes.

18       Q        Okay.  What did you mean in our democracy

19   seems to be in a death spiral of chaos?

20       A        What I mean in that sentence is that the

21   country seems incredibly divided, that there is a lack

22   of agreement in many areas, and that's chaotic.

23       Q        Okay.  Turning the page to page 2 of the

24   article, in the last paragraph before the numbered

25   paragraphs, so the third from the top -- or from the

1   bottom, it says, Political panic seems like a natural

2   response to our current state of affairs that rivals

3   any House of Cards meets 1984 plot twist.  What did

4   you mean by that in terms of House of Cards meets

5   1984?

6        A       House of Cards, referencing the show.

7   There is always a state of chaos within that show,

8   that there is no agreement in any area, and that once

9   people get comfortable there seems to be some new

10  controversy or some new challenge.  So that's what I

11  mean by that.

12       Q       Okay.  And what about the current state

13  of political affairs reminds you of 1984?  And I

14  presume there you mean the book by George Orwell?

15       A       I do.

16       Q       Okay.

17       A       The idea that we are seeing people across

18  the political spectrum questioning government and

19  questioning government involvement in their lives.

20       Q       Okay.  So you're not referring to the

21  White House as a big brother figure?

22       A       No.  I'm referencing government and

23  politics overall in reference to how the public is

24  expressing itself.

25       Q       You encourage folks in point 2, secure

1    the bag?

2         A       Yes.

3         Q       The third sentence begins on the bottom

4    of page 2 out of 3, to invest in collective success by

5    donating to organizations such as the NAACP Legal

6    Defense Fund, the Lawyers' Committee for Civil Rights,

7    and the Black Youth Project.  What is it about those

8    groups, the NAACP, Legal Defense Fund, and the

9    Lawyers' Committee for Civil Rights, those two, that

10   earned your support and encouragement?

11        A       It referenced an earlier conversation

12   that was being had amongst Diverse readers about

13   wanting to support organizations that were not

14   partisan in nature and that were focusing on issues

15   and not people and candidates.

16        Q       Okay.  And what issues does the NAACP

17   Legal Defense Fund focus on that you found worth

18   encouraging people to support?

19        A       At issue in this particular article in

20   that time period of when it was written was a broader

21   discussion about public education and about access to

22   public education.

23        Q       All right, and how about the Lawyers'

24   Committee for Civil Rights?

25        A       The Lawyers' Committee for Civil Rights

1  was also working on education, on public education in

2  particular, the debate about charter schools and

3  funding.

4      Q      All right, so this was not a reference to

5  election-based litigation?

6      A      No, no.

7      Q      All right.  In number 3 there, which

8  begins with the heading educate, the second sentence,

9  you write, Push professional associations to invest in

10 public scholarship that can bridge the gap between

11 academics, activists, legislators, and concerned

12 citizens.  Support those willing to take their insight

13 beyond the academy without losing sight of

14 intellectual rigor and integrity.  Do you see that?

15     A      Yes.

16     Q      What do you mean by bridge the gap

17 between academics, and I'll ask here, and activists?

18     A      So I think that academics often work in

19 silos.  And what I was saying here, to bridge the gap

20 is to have conversations, not just with other

21 academics, but with people beyond the academy.

22     Q      And do you frequently engage in

23 conversations with activists?

24     A      I engage in conversations with lots of

25 people as a professor.

1      Q      Sure.  Do you work with activists to
2  further their goals?
3      A      I do not.
4      Q      How about with legislators?
5      A      I have.
6      Q      Okay.  And what issues have you worked
7  with legislators to advance?
8      A      On the death penalty and also public
9  education, access to education.
10      Q      All right.  And do you consider yourself
11  someone who is willing to take your insight beyond the
12  academy without losing sight of intellectual rigor and
13  integrity?
14      A      Very much so.
15      Q      Okay.  And would that include shaping
16  policy?
17      A      That's not my focus.  But if that is a
18  part of what happens, it's -- my focus is on the
19  scholarship that I do, maintaining that rigor and
20  integrity and making that scholarship, or
21  disseminating that scholarship.
22      Q      Okay.  Let me show you what we'll mark as
23  Exhibit 10.
24              (Thereupon, marked for identification,
25         Defendants' Exhibit D-10.)

1    BY MR. BELINFANTE:

2        Q        My question is here on page 2, the

3    second-to-last paragraph that begins with voter

4    turnout in midterm contests.

5        A        Yes.

6        Q        The last two sentences of that paragraph

7    read, Within hours of the Supreme Court's decision to

8    gut the Voting Rights Act of 1965 in Shelby versus

9    Holder, these states adopted new restrictions on early

10   voting, photo identification, and reduced the number

11   of polling places in certain communities.  Do you see

12   that?

13       A        Yes.

14       Q        To your knowledge, did Georgia adopt

15   photo identification laws before the Shelby decision?

16       A        I couldn't speak on that.

17       Q        Okay.  To your knowledge does Georgia --

18   or do you have an opinion on whether the state of

19   Georgia as opposed to local governments reduces the

20   number of polling places in certain communities?

21               MS. BRYAN:  Objection to form.

22               Go ahead.

23       A        I don't have an opinion.

24   BY MR. BELINFANTE:

25       Q        Okay.  And by that -- and I'll just ask a

1  different way so we're all clear.  Do you have an

2  opinion on whether the state government, specifically

3  the secretary of state, or a local government, county

4  government, causes a polling place to close or be

5  consolidated in the state of Georgia?

6        A       I don't have an opinion on that.

7        Q       Okay.  If you wanted to take a break, now

8  may be a good time.  We've been going an hour.  I can

9  keep going or we can take a break, totally up to

10 y'all.

11       A       I would like to take a break.

12       Q       Sure, sure.

13       A       Thank you.

14                       (Recess from 10:32 to 10:40 a.m.)

15 BY MR. BELINFANTE:

16       Q       Professor, I've got one more question for

17 you about Exhibit 10, which is the "The Stakes is

18 High" article.

19       A       Yes.

20       Q       And if I could just draw your attention

21 back to that same -- second-to-last paragraph on page

22 2 --

23       A       Yes.

24       Q       -- discussing Shelby.  You say there

25 that, again, within hours of the Supreme Court's

1  decision to gut the Voting Rights Act of 1965 in

2  Shelby v. Holder, these states adopted new

3  restrictions on early voting.  Do you have an opinion

4  on whether Georgia adopted new restrictions on early

5  voting?

6       A       I don't have an opinion.

7       Q       Okay, do you know whether it did or did

8  not?

9       A       I wouldn't be able to speak to it.

10       Q       Okay.  Going back to your report, I'll

11  just ask you some questions about it generally.  In

12  preparing your report, did you speak, other than the

13  plaintiffs -- an attorney with the plaintiffs' legal

14  team, did you speak to anyone in Georgia when

15  preparing your report?

16       A       I did not.

17       Q       Okay.  Did you speak with anyone from the

18  Lawyers' Committee for Civil Rights?

19       A       I did not.

20       Q       Okay.  Did anyone assist you write the

21  report?

22       A       No.

23       Q       When you performed the work that

24  ultimately led to the report, had you read any

25  depositions taken in this case?

1      A       I had not.

2      Q       Have you today read any of the

3  depositions?

4      A       No.

5      Q       Did you discuss the report with anyone

6  who is not a lawyer associated with the plaintiffs?

7      A       No.

8      Q       Did you have anyone other than

9  Plaintiffs' counsel review the report before?

10     A       No.

11     Q       Okay.  And did you consider any documents

12 other than those cited in the report?

13     A       No.

14     Q       Okay.  And this is a duplicative

15 question, but it's what we do.  Did you consider any

16 documents to your knowledge that were produced in

17 discovery in this case?

18     A       I'm not sure how to respond to that.

19     Q       Okay.  I'm not asking what the documents

20 might be, but did Plaintiff's counsel provide you with

21 any documents for your work in your report?

22     A       The table of statutes that we have that

23 was the first three columns were provided to me.

24     Q       Provided to you, okay.

25     A       Yes.

1        Q        Can you point to me in your
2   November '18 report where you provide your complete
3   statements of all opinions expressed in the report?
4        A        On page 3.
5        Q        Okay.  Is that the summary of opinions?
6        A        Yes.
7        Q        Okay.  And your opinions are based on the
8   law; correct?
9        A        It is based --
10            MS. BRYAN:  Objection to form.
11            You can answer the question if you can.
12       A        I'm sorry, could you repeat the question
13   again?
14   BY MR. BELINFANTE:
15       Q        Sure.  I'll ask it slightly differently.
16   Are your opinions based on Georgia law?
17       A        Not solely based on Georgia law.
18       Q        That's correct.  Are your opinions based
19   on Georgia and federal law?
20       A        Yes.
21       Q        Okay.  And you are offering an opinion on
22   what the law requires; is that correct?
23            MS. BRYAN:  Objection to form.
24       A        No.
25   BY MR. BELINFANTE:

1      Q      Okay.  Tell me what you're offering an

2  opinion on -- well, I'll strike that and come back to

3  it.

4           Do you in this report seek to articulate

5  the legal obligations of the secretary of state in

6  Georgia as it relates to elections?

7      A      No.

8      Q      Okay.  So what are you -- what are you

9  opining on as it relates to the secretary of state?

10     A      So what I am reflecting in my report and

11  in my opinions is that these provisions aren't just

12  legal, that there are also broader considerations that

13  affect not just what legal statutes say but what those

14  implementations are as well.

15     Q      Are you opining on what statutes say?

16     A      No.

17     Q      So in the chart of the 150-some-odd

18  statutes, you're not giving an opinion on what those

19  statutes mean?

20     A      No.  What I do in that chart is classify

21  how those statutes connect to those duties.

22     Q      And tell me what you mean by a duty.

23     A      So each of those statutes contained -- or

24  provisions contained in the chart outline the text

25  from those provisions.  And so what I did was

1    categorize based on interaction with candidates, with

2    voters, and with election officials.

3        Q       And to make that categorization, you had

4    to determine what those statutes mean; correct?

5        A       No.

6        Q       Okay.  Then how did you categorize

7    without knowing what the statute meant?

8        A       So what I did was look at the text of the

9    statutes.  I compared the text of those statutes with

10   the provisions that are included as you see in the

11   report, in the National Voter Registration Act, the

12   Help America Vote Act, and also the Voting Rights Act

13   of 1965.

14       Q       All right, so when you take a statute, a

15   Georgia statute, and you categorize it, tell me what

16   your three categories were again.

17       A       So category one is interaction with

18   candidates, both declared candidates and potential

19   candidates.  Category two is interaction with voters.

20   Category three is interactions with other election

21   officials.

22       Q       And is it your opinion -- or is it your

23   testimony that your opinion is limited to how the

24   Georgia statutes interplay with the three federal

25   statutes you've identified?

1      A      Could you repeat the question, please?

2      Q      Sure.  Is it your testimony that your

3  opinion is limited to how the Georgia statutes you've

4  identified interact with or interplay with the three

5  federal statutes you've identified?

6      A      Yes.

7      Q      Okay.  So you're not opining anything on

8  Georgia law -- let me rephrase that.

9           You're not giving an opinion on anything

10 involving Georgia statutes that do not in some way

11 touch on the Help America Vote Act, the National Voter

12 Registration Act, or the Voting Rights Act of 1965?

13     A      Yes.

14     Q      I'm going to mark for you the report that

15 was filed with the Court on August 15 of this year,

16 which I may refer to as the August report or the first

17 report.

18           (Thereupon, marked for identification,

19      Defendants' Exhibit D-11.)

20           MS. BRYAN:  What number is this?

21           MR. MILLER:  11.

22           MR. BELINFANTE:  11.

23 BY MR. BELINFANTE:

24     Q      And I would ask you to turn to -- and to

25 have the current report, the November '18 report,

1  available.  And just turn to page 3 of the August

2  report and also have with you page 3 of the November

3  report.

4           It appears that your opinion number 1,

5  starting with the right to vote, did not change from

6  August to November; is that correct?

7      A      Correct.

8      Q      All right.  And the second opinion did

9  not change in substance either; is that correct?

10     A      Correct.

11     Q      All right.  But the third opinion did

12 change; right?

13     A      Correct.

14     Q      All right.  Let's start with defining

15 some of the terms that are in that third opinion.

16 What do you mean by a subnational government?  Is that

17 state and local governments or just state?

18     A      State, local, county.

19     Q      Okay.  And what do you mean by harmful

20 election -- excuse me, harmful electoral practices?

21     A      So anything that impedes upon access to

22 free and fair elections.

23     Q      All right.  Do you have an opinion on

24 whether a photo I.D. law impedes on free and fair

25 elections?

1      A       I don't have an opinion on that.

2      Q       Okay.  Do you have an opinion on

3  Georgia's process of what Georgia officials call HAVA

4  match, what the plaintiffs refer to as exact match, do

5  you have an opinion on that policy?

6      A       I don't have an opinion on that.

7      Q       Okay.  And do you have an opinion on what

8  Georgia refers to as voter roll maintenance and what

9  the plaintiffs refer to as purges?

10     A       I don't have an opinion on that.

11     Q       Okay.  You also say there that

12 secretaries need to reconcile undue barriers.  What do

13 you mean by that?

14     A       So I say there that secretaries of state

15 or whoever is appointed as the chief election

16 official, because it varies by state to state and

17 territory to territory, has a responsibility to

18 oversee that to make sure that there are not barriers

19 to free and fair elections, and if so, to address

20 that.

21     Q       And how does the Georgia Secretary --

22 let's hypothetically speaking say the Georgia

23 Secretary of State identifies what he or she deems to

24 be an undue barrier to vote.  Do you have an opinion

25 on how the Georgia Secretary of State is to reconcile

1  that undue barrier?

2      A       I don't have an opinion on the

3  hypothetical.

4      Q       Okay.  Would you agree with me that

5  something can be an undue burden but still not be

6  unlawful?

7      A       It is possible.

8      Q       Okay.  And is it your opinion that chief

9  election officers are required to reconcile undue

10  barriers even if those barriers do not violate a

11  federal or state law, or do you have an opinion?

12     A       I don't have an opinion.

13     Q       Okay.  What prompted you to change your

14  conclusion from the August report to the November

15  report specifically on number 3?

16     A       So I don't think there is a change in

17  conclusion there.  What I did do was edit to tighten

18  language so that it wasn't as clunky.

19     Q       Okay.  So is it your opinion that the

20  substance of the two reports is the same?

21     A       Yes.

22     Q       Okay.  Let's take a look at that.  In the

23  earlier version, the August version, you opine that it

24  is even more important that the chief election officer

25  carry out their responsibilities to address and

1    reconcile undue barriers to voting.  Do you see that?

2         A        Uh-huh.

3         Q        Yet in the November report it shifts, and

4    you write that it is the primary responsibility to

5    prevent subnational governments from implementing

6    harmful electoral practices shifted from the federal

7    government, represented by the attorney general and

8    the department of justice, to state governments.  Do

9    you see that?

10        A        Uh-huh.

11        Q        And you're saying that's the same?

12        A        Yes, because the phrase in the August

13   report of even more important aligns with the phrase

14   on the November report of shifting from federal to

15   state government.

16        Q        Okay.  Is it your opinion that the

17   secretary of state of Georgia has a legal obligation

18   to prevent subnational governments from implementing

19   harmful electoral practices?

20        A        I don't have an opinion.

21        Q        Okay.  So when you say then that the

22   secretary -- well, would you agree that your report

23   says that the secretary of state of Georgia as the

24   chief election officer has a responsibility to prevent

25   subnational governments from implementing harmful

1    electoral practices, you agree with that; correct?

2        A        Yes, yes.

3        Q        So what is the basis of that

4    responsibility?  What is the source of it, so to

5    speak?

6        A        So in terms of the role of the chief

7    election officer and that responsibility, I reference

8    the responsibilities that are included both in the

9    National Voter Registration Act as well as the Help

10   America Vote Act of those responsibilities of the

11   chief election officer to do so.

12       Q        So those are obligations that arise out

13   of statutory law then; correct?

14       A        Yes.

15       Q        Okay.  Is your opinion then limited to --

16   let me -- strike that.

17                Is your opinion that the chief election

18   officers of states have obligations created by federal

19   statutes to enforce those federal statutes in their

20   state?  And those statutes, I mean the NVRA, HAVA, and

21   the Voting Rights Act of 1965.

22       A        Yes.

23       Q        Okay.  Do you have an opinion on the

24   secretary of state's obligation in Georgia to enforce

25   Georgia election law?

1      A       Yes.

2      Q       Okay, and what is that opinion?

3      A       So that opinion then is reflected in the

4   report --

5      Q       Show me where it talks about --

6      A       -- about --

7      Q       Go ahead, I'm sorry.

8      A       I'm sorry.

9      Q       No, no, go ahead, I interrupted you.

10      A       So in point 4 about the chief election

11   officer bearing primary responsibility, that's where

12   it would be reflected.

13      Q       And that's to protect voter access to

14   federal elections.  So your opinion is limited to

15   federal elections; is that correct?

16      A       So my opinion is limited in terms of

17   access to federal elections at the local, county, and

18   state level because the Help America Vote Act, the

19   National Voter Registration Act focuses in on access

20   to federal election.

21      Q       So you're not expressing an opinion on

22   the secretary of state's duties or obligations as it

23   relates to a purely state or local election?

24      A       I am focused in on the federal election

25   access as prescribed.

1      Q       Okay.  So then isn't point 4 duplicative

2   of point 3 in that the secretary's obligations all

3   flow from those federal laws, the Help America Vote

4   Act, the NVRA, and the Voting Rights Act?

5      A       I don't think that it's duplicative.  I

6   think that it elaborates on the prior point.

7      Q       But if the basis of the secretary's

8   obligation are those three federal statutes, where do

9   you opine that the secretary has an obligation to

10  enforce state laws, including the state constitution

11  and regulations, in elections?

12     A       So the basis for my opinion is looking at

13  those three provisions, Voting Rights Act of 1965, the

14  Help America Vote Act, and the National Voter

15  Registration Act.  That is the basis of where I focus.

16  It does not state that the role is limited there.  My

17  focus in terms of the research that I did was looking

18  at those key provisions in addition to.  So looking at

19  what is the federal framework and then how does that

20  flow at the subnational levels.

21     Q       Let me give you another hypothetical.

22  Let's say Georgia passes a law that says all poll

23  workers have to wear blue shirts.  Would you agree

24  with me that that does not implicate anything under

25  the Voting Rights Act, HAVA, or the NVRA?

1      A        I think it would depend on how that was

2    being carried out.  So if I could draw your attention

3    where I talk in the report about not superseding any

4    of those requirements that happen at the federal level

5    or making sure that decisions that are made at the

6    local and state level, so I guess page 19 of the

7    August report.

8      Q        Of the August report?

9      A        Yes, where I talk about at the top of

10    that page of the chief election officer.  So for

11    example, when measures are passed by the legislature,

12    the duty would fall upon election administrators to

13    carry them out in accordance with those guidelines.

14      Q        Right.

15      A        So that's where I would focus, that as

16    long as whatever decision was being made was in

17    accordance with those guidelines and consistent across

18    those guidelines.

19      Q        So going back to my hypothetical, let's

20    just presume for the purpose of the question that

21    there's nothing in the NVRA, HAVA, or the Voting

22    Rights Act of 1965 that addresses dress codes at

23    polling places.  And I don't think there is, but let's

24    just presume that that's the case.

25                  MS. BRYAN:  For poll workers?

1                    MR. BELINFANTE:  For poll workers, yes,

2              not people wearing campaign shirts and so on,

3              but for poll workers.

4    BY MR. BELINFANTE:

5        Q      Let's just presume that, and there's a

6    state law that says poll workers have to wear blue

7    shirts.

8                    Do you have an opinion on whether the

9    secretary is in charge of enforcing that law vis-a-vis

10   poll workers based on state law, or do you have an

11   opinion -- yeah, and I'll leave it at that.

12       A      I don't have an opinion on that.

13       Q      Okay.  And more generally, then, if the

14   Georgia statute at issue does not touch on something

15   in either the NVRA, HAVA, or the Voting Rights Act of

16   1965, you don't have an opinion on it; is that

17   correct?

18       A      No.  I limited the scope to this.

19       Q      Okay.  I think I may have asked a funny

20   question, which I think I understand your answer and I

21   think we're on the same page, but I think it may read

22   differently.

23                   MR. BELINFANTE:  Can you read back to me

24            my question?

25                   I think you said no, and I think what you

1          were trying to say is yes, but I want to

2          clarify just based on how I asked it.

3               (Whereupon, the court reporter read back

4          the previous question and answer.)

5     A     I'm sorry, I don't have an opinion on

6  that.

7  BY MR. BELINFANTE:

8     Q     You don't have an opinion on a situation

9  where the Georgia statute, even if it's in the

10  election code, does not touch upon anything in HAVA,

11  the NVRA, or the Voting Rights Act?

12     A     No, I do not.

13     Q     Okay.  Your opinion in point 3, has that

14  been published in anything that is subject to peer

15  review?

16     A     May I ask which version you're referring

17  to --

18     Q     Sure, that's fine.

19     A     -- just so we're consistent?

20     Q     November's report.

21     A     It is not.

22     Q     And your opinion that is set forth in

23  point 4 of your November report, which is Exhibit 2, I

24  believe, has that been subject to peer review?

25     A     It is not.

1      Q       When you say that -- and I'm on the

2   November report.  When you say that the -- and I may

3   have asked this before.  If I did, forgive me.  When

4   you say that the chief election officer has a primary

5   responsibility, is the basis of that responsibility

6   HAVA, the NVRA, and the Voting Acts Right of 1965?

7      A       Yes.

8      Q       Okay.  And what did you base that opinion

9   on?  And I'll break that up.  Did you base it on any

10  decisions from a court of law?

11     A       No, I did not.

12     Q       Did you base it on a Georgia statute?

13     A       May -- can I take a step back --

14     Q       Sure.

15     A       -- to the first question that you asked?

16     Q       Sure.

17     A       In terms of the decision of a court of

18  law, it was based on the Shelby County decision, but

19  not a subsequent court decision, just to clarify.

20     Q       All right.  So is it your opinion then

21  that the Shelby decision imposed a primary

22  responsibility on chief election officers in states?

23     A       Yes, because my opinion is that the

24  Shelby County decision, by removing that federal

25  oversight then shifted that primary responsibility.

1      Q       Okay.  Is it your opinion that that's
2   something that could be found in the text of the
3   opinion itself, or is it that it is an effect of the
4   opinion?
5      A       It is an effect of the opinion.
6      Q       All right.  And has that conclusion been
7   subjected to peer review?
8      A       No, it has not.
9      Q       All right.  Do you have any -- and when
10  you make that conclusion, on what authority are you
11  relying?
12     A       So I'm basing it on the research that we
13  conducted.  You see it in the 2015 report, the
14  research that we conducted there in terms of how
15  voters have reconciled any issues that they had as
16  well as how other states and election administrators
17  have addressed that responsibility.
18     Q       In the 2015 report, the one for the Joint
19  Center for Political and Economic Studies?
20     A       It is.
21     Q       Okay.  And is that conclusion, when you
22  say in how elected leaders have reached that
23  conclusion, does that include Georgia elected
24  officials?
25     A       Elected and appointed officials, yes.

1          Q          Okay.  And what has been done by a

2     Georgia elected or appointed official to indicate to

3     you agreement with the statement that the chief

4     election officer has the primary responsibility

5     post-Holder to prevent subnational governments from

6     implementing harmful electoral practices?

7          A          I can't address that.

8          Q          Okay.  And let me ask this.  When you

9     talk about harmful electoral practices in your opinion

10    number 3, are you referring to violations of the three

11    federal statutes, HAVA, NVRA, and Voting Rights Act of

12    1965?

13         A          I am referring to things that impede upon

14    access to free and fair elections as prescribed by

15    those three.

16         Q          Okay.  So if something is harmful but not

17    prohibited by those three statutes, it's not included

18    in your opinion?

19         A          I'm only focusing on -- yes.

20         Q          All right.  Are you including

21    constitutional analysis or constitutional violations

22    in what could constitute a harmful electoral practice?

23         A          I am not analyzing constitutional law.

24         Q          You are not offering an opinion on

25    whether there has been voter disenfranchisement in

1    Georgia's 2018 election; correct?

2         A       I am not.

3         Q       And you're not offering an opinion on the

4    role of the state election board in Georgia elections,

5    are you?

6         A       I am not.

7         Q       All right.  You're not offering an

8    opinion on voter technology used in Georgia?

9         A       I am not.

10        Q       No opinion on closing of poll locations

11   in Georgia?

12        A       I am not.

13        Q       All right.  Let's go to your report.  I'm

14   in November -- and just presume, unless I tell you

15   otherwise, we're talking about the November report --

16   under federalism and the right to vote, page 7, second

17   full paragraph.

18        A       Yes.

19        Q       Midway through you write, In most states

20   and territories, the day-to-day duties of election

21   administration are shared between local authorities

22   and state officials.  Do you see that?

23        A       Yes, I do.

24        Q       Is it your opinion that that is also true

25   of Georgia?

1        A        Yes.

2        Q        All right.  Do you have an opinion as to

3   where that line is drawn between what is a state duty

4   and what is a local authority duty in Georgia

5   elections?

6        A        I do not have an opinion on that.

7        Q        Would you agree with me that it would

8   depend on state statutes to decide what is a state

9   responsibility and what is a local responsibility?

10       A        I would agree that that would be one of

11  the determinants.

12       Q        And the others would be the federal

13  statutes, at least that you've named?

14       A        Yes.

15       Q        All right.  Anything else?

16       A        Often it depends on practice.  So it

17  varies based on that.

18       Q        Practice could be if kind of we've always

19  done it this way even if it's not codified, that would

20  be something that would --

21       A        That could be practice.  Funding could

22  also be a part of that practice.

23       Q        All right.  Do you know who in Georgia is

24  required to send out absentee ballots?

25       A        I am not.

Dr. Khalilah Brown-Dean - December 11, 2019          77

1       Q       Do you know what the role of Georgia

2   counties are in terms of voter registration?

3       A       So I through the research in the report

4   have looked at how counties have been a sort of

5   localized hub for registration.

6       Q       Okay.  And tell me, what is the role of

7   the county government in registering voters in

8   Georgia?

9       A       I can't speak to that.

10      Q       All right.  Let's go to citizenship,

11  federalism, and state discretion, page 10.  You write

12  at the -- well, at the paragraph on page 10, I think

13  it's the second full sentence, the preclearance

14  provision required that states and jurisdictions with

15  a documented history of discrimination, section 5,

16  submit proposed electoral changes to the federal

17  officials before they could take effect.

18              Do you see that?

19      A       Yes.

20      Q       All right.  In your opinion -- or do you

21  have an opinion on not the legal significance but --

22  let me ask it this way.

23              What is the significance to you if a

24  practice submitted by a state is precleared by the

25  federal government?  What does that tell you?

1        A       It tells me that if it has been

2    precleared by the federal government, that it can take

3    effect.

4        Q       Okay.  And what does the federal

5    government examine when deciding in pre-Shelby days

6    whether to preclear a state election practice?

7        A       It varies.  It varies based on who's

8    staffing that division.  It varies based on what's

9    been submitted and what's at question -- or what's in

10   question in that case.

11       Q       Do you know if there is a set criteria

12   that they evaluate to determine whether to preclear --

13       A       I can't address that.

14       Q       Okay.  And do you have an opinion if

15   something has been precleared, is that indicative to

16   you that the election practice does not lead to voter

17   disenfranchisement?

18       A       I don't have an opinion.

19       Q       All right.  Do you know a gentleman named

20   Tom Perez or know of him?

21       A       Yes, I do.

22       Q       Okay.  And I believe Mr. Perez is now --

23   I don't know if he's still, but at one time he was

24   head of the Democratic National Committee; correct?

25       A       Correct.

1          Q        And prior to that he was the secretary of
2     labor under President Obama?
3          A        Yes.
4          Q        And prior to that, he was in the
5     department of justice civil rights division; right?
6          A        I don't know that piece of his career.
7          Q        Okay.  Do you have any concern that the
8     justice department under Attorney General Holder did
9     not take its responsibilities or duties under the
10    Voting Rights Act seriously?
11         A        I couldn't address that question.
12         Q        Okay.  No opinion on it?
13         A        No.
14         Q        You said that part of what goes into a
15    preclearance analysis depends on who's there.  Is that
16    fair?
17         A        Yes.
18         Q        Okay.  What do you mean by that?
19         A        Well, I think that it varies based on who
20    is leading the oversight, or leading the effort.
21         Q        And do you have any concerns that
22    persons -- or do you have an opinion on during
23    President Obama's administration how they might view
24    preclearance differently than the George W. Bush
25    administration?

1        A        I don't have an opinion on that.

2        Q        Do you have any concerns that the justice

3   department under President Obama fulfilled its

4   obligations under the Voting Right Act of 1965?

5        A        I don't have an opinion on that.

6        Q        Okay.  So is it fair to say then that

7   your opinion is that different administrations may

8   view the Act differently or interpret it differently

9   but you don't have an opinion on how one

10  administration interpreted it differently from

11  another, is that --

12       A        Yes.

13       Q        Okay.  Is it fair to say, though, that

14  you have confidence in the section 5 preclearance

15  process?

16               MS. BRYAN:  Objection to form.

17               MR. BELINFANTE:  Let me rephrase.

18  BY MR. BELINFANTE:

19       Q        Do you think that the section 5

20  preclearance process was good policy?

21       A        I don't think I can evaluate -- I don't

22  have an opinion on that.

23       Q        Okay.  Independent of what's in your

24  report, do you have a personal opinion as to whether

25  section 5 preclearance was good policy?

1      A       I don't.

2      Q       Okay.  And your report does not take an

3  opinion on whether section 5 was good policy or bad

4  policy?

5      A       It does not.

6      Q       All right, let's go to page 12 where you

7  start the discussion of the National Voter

8  Registration Act of 1993.

9      A       Yes.

10      Q       We agree, don't we, that one of the

11  obligations states have under the NVRA is to maintain

12  a list of all eligible voters; correct?

13              MS. BRYAN:  Objection to form.

14  BY MR. BELINFANTE:

15      Q       Do you agree with me that one of the

16  obligations imposed by the NVRA is that states must

17  maintain a list of eligible voters?

18      A       Yes.

19      Q       Eligible and registered, I should say.

20      A       Registered.

21      Q       Yes.

22      A       Yes.

23      Q       And at least in -- and if you could go to

24  your August report, footnote 44 cites Code Section 52,

25  and it's on page 13, 52 U.S.C.A. Section 20507.

1    That's in the National Voter Registration Act;
2    correct?
3          A       Yes.
4          Q       All right.  Do you know -- if you look at
5    your report in November, footnotes 42, 43, and 44 all
6    cite to different sections of the NVRA --
7          A       Yes.
8          Q       -- section 10, section 6, section 8.  Do
9    you know if Code Section 52 U.S.C.A. 20507 is included
10   in one of those sections?
11         A       I would not be able to determine that.
12         Q       All right.  In your November report, on
13   page 13, in the last sentence of the first paragraph,
14   not the first full one, it says the Act's provisions
15   apply to 44 states, including Georgia and the District
16   of Columbia.  Do you see that?
17         A       Yes.
18         Q       Do you know why some states are subject
19   to those provisions of the NVRA and some are not?
20         A       I am not.  I wouldn't be able to address
21   it.
22         Q       Okay.  Would you agree with me that the
23   secretary of state of Georgia's obligations under the
24   NVRA can be found within the text of that statute and
25   its regulations and any court decision that has

1   applied them?

2       A       I don't know that I can -- can you

3   restate your question?

4       Q       Sure.  And let me try to ask it a much

5   easier way.

6               If something is not -- the NVRA, in order

7   -- let me start.

8               In order for the NVRA to impose an

9   obligation on the Georgia Secretary of State, it has

10  to be found in the text of that statute, in regulation

11  promulgated pursuant to that statute, or in a court

12  case of proper jurisdiction interpreting or applying

13  that statute or regulation; correct?

14      A       Yes.

15      Q       Okay.  So you can't say that the -- you

16  would agree with me that the NVRA doesn't impose an

17  obligation on the secretary of state to help voters

18  register generally, it has to be based on what is

19  actually in the statute as interpreted by the

20  executive branch regulations and the judicial branch

21  of cases; correct?

22              MS. BRYAN:  Objection to form.

23  BY MR. BELINFANTE:

24      Q       Do you understand the question I'm

25  asking?

1      A       I do, but I want to clarify --

2      Q       Please do.

3      A       -- that the points that I'm making here

4  is about what the provisions are for the chief

5  election official, however each state or territory

6  identifies who that person is.

7      Q       Right.  And so I'll presume with you that

8  Georgia has identified the secretary as the chief

9  election officer for purposes of NVRA.

10             Is it your opinion that that imposes a

11  general obligation on the chief election officer, or

12  does any obligation have to be found in the text of a

13  statute, regulation, or court case?

14     A       I would say that it imposes a general

15  obligation.

16     Q       Okay, what is the basis of that opinion?

17     A       So looking at the requirements that are

18  set forth on page 12 --

19     Q       Are you in the November or the --

20     A       In the August report.

21     Q       Okay, got it.

22     A       We could go to November if that's

23  preferred.

24     Q       This is fine.

25     A       Okay.

1      Q        If you still agree with it.

2      A        Yes.

3      Q        Okay.  All right.

4      A        Looking at the requirements that are

5   there on page 12 and 13 about the responsibilities.

6   So on page 13, that first full paragraph, midway

7   through, the chief state election official of a state

8   shall make the forms described available for

9   distribution with particular emphasis on making them

10  available.  That I think speaks to the question of the

11  provision.

12     Q        Okay.  But that goes to my point.  You're

13  there citing provisions of the law that impose an

14  obligation.  There's nothing in the NVRA that makes

15  the chief election officer of the state the sole

16  election official for purposes of election policy;

17  correct?

18     A        No.

19     Q        All right.  And is that also true of

20  HAVA?

21     A        Yes.

22     Q        And is that also true of the Voting

23  Rights Act of 1965?

24     A        It is.

25     Q        All right.  You cite in -- and we can go

1  back to the November report, although it's in both --
2  the Charles Wesley Woods Foundation decision?
3       A       Could you direct me to the page?
4       Q       Sure, page 13.
5       A       Thank you.
6       Q       Uh-huh.  Was that decision provided to
7  you, or did you pull it yourself?
8       A       I pulled that decision.
9       Q       Okay.  And would that be true for the
10  other cases that are cited in your report?
11       A       Yes.
12       Q       Okay.  Let's talk about the Help America
13  Vote Act provision or parts of your report.
14       A       Are we staying in November?
15       Q       Yes, yes.
16       A       Okay, thank you.
17       Q       Thank you.  All right, page 14, you
18  describe part of the purpose of the Help America Vote
19  Act, or HAVA, in that first full paragraph as
20  providing money to the Election Assistance Commission
21  to allow states to carry out the following provisions
22  -- and here I'm quoting -- the creation and
23  maintenance of a computerized state voter registration
24  system, the replacement of punch card and lever voting
25  machines, the distribution of provisional ballots to

1   residents whose registrations are questioned, and

2   enhanced access for voters with disabilities, and

3   assistance in developing plans to secure voting

4   systems.

5            Do you see that?

6   A      Yes.

7   Q      All right.  And you do not express an

8   opinion on the efficacy of Georgia to comply with

9   those items; is that right?

10  A      Correct.

11  Q      And do you express an opinion on whether

12  it is the obligation of the chief election officer in

13  Georgia or local election officials to provide

14  residents with provisional ballots?

15  A      I don't offer an opinion.

16  Q      All right.  And just for the record, too,

17  you do not provide an opinion on the efficacy of the

18  Georgia Secretary of State's efforts to train election

19  officials?

20  A      I do not.

21  Q      All right.  And you do not provide an

22  opinion on whether it is the obligation of the chief

23  election officer here, the Georgia Secretary of State,

24  to train local poll workers; correct?

25  A      I do not offer an opinion.

1      Q      All right.  Now, when a state must -- you

2  would agree with me that both the NVRA and HAVA

3  require states to designate someone to be the chief

4  election officer; correct?

5      A      Correct.

6      Q      All right.  And that designation is for

7  HAVA purposes under HAVA only; right?

8      A      So --

9      Q      Let me -- go ahead, I'm sorry.

10     A      I'm sorry, if you could restate.

11     Q      Yeah, I'll try to restate it.  So when

12  HAVA says you have to designate someone to be your

13  chief election officer, that is to fulfill the

14  obligations imposed by HAVA; right?

15     A      Correct.

16     Q      Okay.  It doesn't reach anything outside

17  of HAVA?

18     A      Correct.

19     Q      All right.  So I could be the chief

20  election officer for purposes of HAVA, that could be

21  one person, but it could be actually a different

22  person who's the chief election officer for the NVRA;

23  is that right?

24     A      It would -- right, it would depend on the

25  jurisdiction.

1       Q       Okay.  And, you know, somebody could be

2    the chief election officer for purposes of HAVA, but

3    in city and county elections, for example, and

4    exclusively city and county elections, there would not

5    even be a chief election officer; is that right?

6       A       Depending on the state or territory.

7       Q       Correct.

8       A       Uh-huh.

9       Q       The federal law doesn't require there to

10   be a chief election officer in cases that are not

11   federal elections; is that right?

12      A       Correct.

13      Q       All right.  And going back to the EAC

14   grants that you discuss in the report, those EAC

15   grants are authorized by HAVA; correct?

16      A       Correct.

17      Q       And they are four things only that are

18   covered by HAVA; is that right?

19      A       Correct.

20      Q       Okay, so I couldn't use an EAC grant, for

21   example, to build a polling location, or polling --

22   yeah, polling location.

23      A       It only relates to things prescribed by

24   HAVA.

25      Q       And the letters that you cite in your

1    report going back and forth between the Georgia

2    Secretary of State and the EAC, those relate to EAC

3    grants for HAVA purposes; right?

4         A        Yes.

5         Q        All right.  Your report on page 17 in

6    November begins the discussion of Shelby County versus

7    Holder.

8         A        Correct.

9         Q        You described in one of the articles we

10   talked about earlier that the Shelby County decision

11   gutted section 5; is that right?

12        A        Correct.

13        Q        But yet you're not taking an opinion on

14   whether that was good or bad policy?

15        A        No, I'm not.

16        Q        Let's look at page 18 of your November

17   report.  And I think this is basically the opinion you

18   reach in number 3, second full paragraph, the sentence

19   beginning second.

20        A        Okay.

21        Q        That sentence is effectively your opinion

22   that we discussed earlier that was number 3 in the

23   summary?

24        A        Correct.

25        Q        Okay.  There's a little bit different

1  language.  I just want to make sure I understand it.

2  When you say on this page 18 that it's the

3  responsibility of state election officials to monitor

4  electoral practices, are you talking about monitoring

5  only those practices that could violate HAVA, the

6  NVRA, or the Voting Rights Act of 1965?

7       A       Yes.

8       Q       All right.  The next sentence there says

9  local officials continue to play a key role in

10  executing various election administration functions in

11  accordance with the mandates of state law and

12  constitutional authority.  Do you see that?

13      A       Yes.

14      Q       And that sentence is specific to Georgia;

15  right?

16      A       No, it is not.

17      Q       Okay.  But it would apply to Georgia?

18      A       It would.

19      Q       All right.  In fact, there you refer to

20  attachment K, which I don't know if I have given you.

21  Oh, it's in your August report, I believe, as

22  attachment K, which is Exhibit 2 -- no, 3.

23              MR. MILLER:  No, August 4 is 11.

24  BY MR. BELINFANTE:

25      Q       August 4 is 11, sorry.  In Exhibit 11

1   there should be an attachment page, which is the

2   Augusta, Richmond County --

3        A       Yes, I have it.  Thank you.

4        Q       Uh-huh.  Was this document provided to

5   you, or did you find it?

6        A       It was not.  I found it.

7        Q       Okay.  Is it online?

8        A       It is.

9        Q       All right.  And if you'll turn to page 2

10  of the document, which if you look at the top, it has

11  the case number and all that.  It's page 139 of 158.

12  Do you see that?

13       A       Yes.

14       Q       All right.  It says on the right the

15  duties of the board in that column.

16       A       Yes.

17       Q       Do you have an opinion as to whether this

18  is correct or not?

19       A       I do not have an opinion on that.

20       Q       Let's go back to your report, page 19.

21       A       Are we back to November?

22       Q       November.

23       A       Okay, thank you.

24       Q       The first full paragraph, first sentence

25  reads, however, this local discretion does not

1   supersede the primary responsibility that now falls

2   upon state election officials to ensure that no

3   procedure, device, or practice adopted at the state or

4   local level impairs the rights and protections

5   afforded at the federal level.  Do you see that?

6        A       Yes.

7        Q       And the rights and protections afforded

8   at the federal level, you're talking about the Voting

9   Rights Act, HAVA, and the NVRA; correct?

10       A       Yes.  And could I just make a point here?

11       Q       Absolutely.

12       A       When I'm speaking there, the rights and

13  protections, I'm speaking of the Voting Rights Act of

14  1965, HAVA, the National Voter Registration Act, as

15  well as those three constitutional amendments that I

16  reference in the document, the two in particular, 14th

17  and 15th.

18       Q       14th and 15th Amendments?

19       A       Yes.

20       Q       Okay.  So I notice there you don't --

21  there's no citation.  And so what is the basis of your

22  statement that the secretary of state -- well,

23  let's -- we agree that for HAVA purposes and NVRA, the

24  secretary is the chief election officer?

25       A       Uh-huh.

1      Q      What is the basis of your opinion that

2    the secretary of state of Georgia has primary

3    authority for enforcing the United States

4    Constitution's 14th and 15th Amendment as it relates

5    to elections?

6      A      So the basis for that is that the federal

7    government and states have always worked together when

8    it comes to access to voting and voting rights.  Given

9    the removal of that primary -- or that federal

10   oversight function related to section 5.  As opposed

11   to having two lines of defense or protection, there is

12   now one line of defense.  And based on that

13   identification of who is the chief elections officer,

14   then for Georgia, by identifying the secretary of

15   state as the chief election officer, then that's why I

16   say that duty falls upon that office.

17     Q      But the designation of chief election

18   officer is for NVRA and HAVA; right?

19     A      It is.

20     Q      Okay.  So why does that then carry over

21   to allegations involving the Voting Rights Act or the

22   United States Constitution?

23     A      So the language of the Constitution as

24   well as the language of the Voting Rights Act of 1965

25   addresses that relationship between state governments

1  and federal governments.

2      Q      I don't disagree there.  I guess my

3  question is more specific.  Why is it that the

4  secretary of state of Georgia is the one that is

5  primarily charged with enforcing the United States

6  Constitution?

7      A      So if I could find the piece of it here,

8  if you'd give me a moment, please, I will reference

9  it.

10      Q      Absolutely.

11      A      There's a piece of the report where I

12  mention the top-down structure for Georgia and how

13  that relates to these sort of shared functions as well

14  as responsibility.

15      Q      For purposes, because I want you to be

16  able to find it, what we'll do is I may come back to

17  that one after we take a break, and I would just ask

18  during the break if you can find what you're referring

19  to.

20      A      Okay.

21      Q      That way we're not -- I'm not taking up

22  your time to look for it here.

23      A      May I make note of that?

24      Q      Absolutely.  Sure.  You probably don't

25  want to write on the actual exhibit.  I'm sure counsel

1    or we can give you a piece of legal paper or Post-It

2    note, whichever.

3          A       Thank you.

4          Q       Thank you.  So let me ask you this

5    hypothetical.  Let's say that a Georgia county enacts

6    a new voting practice that would previously be covered

7    by section 5, not anymore.  Let's say that the

8    secretary of state of Georgia concludes that that new

9    voting practice, whether moving a polling location or

10   anything that's covered -- and I'll limit this one to

11   the Voting Rights Act -- that it would in fact violate

12   the Voting Rights Act.

13               Do you have an opinion on what the

14   secretary of state is to do to remedy that situation?

15         A       I don't have an opinion about that.

16         Q       Do you have an opinion as to whether the

17   secretary has an obligation to affirmatively stop that

18   county from acting in a particular manner?

19         A       I don't have an opinion on that.

20         Q       All right.  And you don't have any

21   opinions in your report about the state election

22   board; correct?

23         A       I do not.

24         Q       All right.  So when you say that the

25   primary responsibility falls on the secretary of state

```
 1   or the chief election officer -- well, let me ask it
 2   this way.  Let me ask this.  Page 19 when you say the
 3   local discretion does not supersede the primary
 4   responsibility that now falls on state election
 5   officials to ensure no procedure, device, or practice
 6   impairs the rights at the federal level, et cetera, do
 7   you believe that that is exclusively the secretary of
 8   state?
 9        A       I think it depends on how that position
10   is formulated.
11        Q       All right.
12        A       So that's why -- again, as I say in the
13   report, that notion of federalism is key here.
14        Q       And so for -- let's presume for the sake
15   of argument that I agree with you, that for purposes
16   of HAVA and the NVRA, the secretary is the chief
17   election officer.  So let's put those aside.
18                Constitutional violations, Voting Rights
19   Act violations, is it your opinion -- I'm just truly
20   trying to figure this out -- that that primary
21   responsibility in the state of Georgia is the
22   secretary of state, or could it be a county official
23   that has a primary responsibility for making sure that
24   no procedure, device, or practice adopted at that
25   local level impairs the rights and protections
```

1  afforded at the federal level?

2      A       I believe there's an oversight function

3  there.

4      Q       Okay, and what is the basis of that

5  opinion?

6      A       So the basis of that opinion is looking

7  at the structure in Georgia that is there within the

8  report in terms, again, back to that top-down

9  structure, the idea of having shared responsibilities.

10     Q       And that's based on the statutes that you

11  cite in the chart; correct?

12     A       Correct.

13     Q       And did you go through the Georgia code

14  and pull those statutes yourself, or were they pulled

15  for you?

16     A       The table was provided -- the first two,

17  as I said -- the first three columns of the table were

18  provided for me.

19     Q       All right.  So you read those statutes

20  and based your analysis on what the statutes said?

21     A       I used that as a foundation.  So I went

22  beyond that to do my own research as well.

23     Q       All right, let's take a look at one of

24  those statutes.  I'll mark it Exhibit 12, which is

25  cited on page 19 of the November report.  It's Code

```
 1    Section 21-2-50.2.
 2                      (Thereupon, marked for identification,
 3            Defendants' Exhibit D-12.)
 4    BY MR. BELINFANTE:
 5        Q       Have you read this statute before?
 6        A       Yes.
 7        Q       Okay.  And this is the statute where
 8    Georgia designates the secretary as the chief election
 9    officer for purposes of HAVA; correct?
10        A       Correct.
11        Q       All right.  Would you agree with me that
12    it doesn't do anything -- it doesn't impose any other
13    obligation on the secretary of state in this statute?
14        A       Correct.
15        Q       All right.  If you'll turn to page 20 of
16    your November report, it starts the discussion about
17    Georgia election administration and authority.  At the
18    time that you wrote this report, and we could go back
19    to August, had you read legislation that passed the
20    Georgia General Assembly in the 2019 session known as
21    House Bill 316?
22        A       I had not read 316.
23        Q       Okay.  Other than the statutes that were
24    provided to you by counsel, did you conduct any
25    independent research on Georgia statutes?
```

1          A          I did not.

2          Q          Okay.  And did the -- other than the

3    regulations which were provided to you by counsel, did

4    you conduct any independent research on Georgia

5    regulations?

6          A          I did not in terms of those statutes, no.

7          Q          Okay.  So on page 20, you write under D,

8    I conducted an extensive review of Georgia statutes

9    and regulations to evaluate the following questions.

10   Do you see that?

11         A          Yes.

12         Q          And that extensive review was based

13   exclusively on the statutes and regulations provided

14   to you by counsel; is that right?

15         A          Yes.

16         Q          All right.  It then says based on the

17   review, you identified a total of 156 duties and

18   responsibilities connecting the secretary of state to

19   election administration.  Do you see that?

20         A          That's correct.

21         Q          All right.  And that's based on you

22   reading the statutes and regulations that were

23   provided to you?

24         A          Yes.

25         Q          All right.  Would you agree with me that

1   a lot of times regulations can just promulgate a

2   statutory duty, in other words, if a statute says poll

3   workers have to wear a blue shirt, then there will be

4   a corresponding regulation that says poll workers have

5   to wear a blue shirt?  Do you agree that that happens?

6        A       It's possible.

7        Q       Okay.  Did you find that to be the case

8   in Georgia?

9        A       I couldn't address that.

10       Q       All right.  Did you pull the actual

11  statutes that were provided to you by counsel, or did

12  you rely on what was quoted in the charts?

13       A       For some of them I pulled.  So for things

14  that may not have been clear or that seemed to

15  overlap, I pulled those statutes to see the language

16  and also the context of where it fell.

17       Q       Okay.  And in doing so, would you say

18  that the majority of statutes you pulled yourself, or

19  was it less than the majority?

20       A       Could you restate that?

21       Q       Yeah.  You just testified that for some

22  statutes, you actually pulled them to read them

23  completely.

24       A       Yes, yes.

25       Q       My question is of the statutes that were

1    provided to you, did you go back and pull a majority

2    of them or did you rely on the chart only for the

3    majority?

4         A       No, I think that slightly less than

5    majority, but I reviewed quite a few of them to go

6    back through.

7         Q       All right.

8         A       Or to go through the binder.

9         Q       And for the state regulations, did you go

10   and pull any of those or did you rely solely on what

11   was provided to you in the chart?

12        A       I believe I relied on what was in the

13   chart.

14        Q       Okay.  If a statute -- I'm sorry, if a

15   regulation just adopts the obligation in a statute, my

16   blue shirt example, did you count both of those as

17   obligations in your 156?

18        A       So I made a -- if you look at page 20 of

19   the November report, I did say that these categories

20   often overlapped --

21        Q       Right.

22        A       -- and that they should not be viewed as

23   mutually exclusive.

24        Q       And I think that answers a different

25   question than the one I asked, but that's on me.

1        A        Okay, could you restate?

2        Q        Yeah.  So if you found an example of a

3    statute and regulation that said the same thing or

4    imposed the same obligation, did you count both of

5    them in getting to your total of 156 duties, or was

6    that deemed one duty even though it was expressed in

7    two different types of law?

8        A        So I tried to refine to be clear when

9    they were distinct duties versus simply restating a

10   duty.

11       Q        All right.  But sitting here today, can

12   you say whether duplicative statutes or regulations

13   were counted each time there was a statute or

14   regulation, or were they counted by duty?

15       A        I would not feel comfortable definitively

16   saying right now at this moment.

17       Q        Okay, that's fair.  For the purpose of

18   your opinion that the secretary of state's obligation

19   has the primary responsibility to ensure that certain

20   federal laws are protected, is it your opinion that

21   the number of obligations or duties matters or that

22   you could do it all in one statute?

23       A        I don't think the number matters in terms

24   of the responsibility.

25       Q        All right.  And you don't have an opinion

1    on whether -- you don't have an opinion on which of

2    the 156 duties and responsibilities that you identify

3    are actually at issue in this case; correct?

4         A        No, I do not have an opinion.

5         Q        All right.  And that's not something you

6    looked for at all?

7         A        No.

8         Q        All right.  Let's go to your August

9    report, page 20.

10        A        August, page 20, okay.

11        Q        The last paragraph on that page talks

12   about the SOS as being the chair of the state election

13   board and what the state election board is statutorily

14   required to do.  Do you see that?

15        A        Yes.

16        Q        That paragraph did not make it into your

17   November report.  Do you know why?

18        A        I do not.

19        Q        All right.  For purposes of this case, is

20   it fair for me to presume that you are not offering an

21   opinion on the state election board?

22        A        I am not.

23        Q        Okay.  Is it also fair for me to presume

24   that you are not offering an opinion on the secretary

25   of state's role regarding the state election board?

1          A        I am not.

2          Q        All right.  Let's look at page 21 of your

3     report, November report.  Under the role of secretary

4     of state, that first paragraph --

5          A        Yes.

6          Q        -- has one citation; correct?

7          A        Yes.

8          Q        And that's to the secretary's website?

9          A        Correct.

10          Q        You would agree with me, though, that the

11     secretary's website imposes no legal obligation on the

12     secretary; correct?

13          A        I would not be able to determine that.

14          Q        All right.  Do you believe that the

15     secretary's website imposes any obligation on the

16     secretary to act or not act in a particular manner?

17          A        I don't have an opinion on that.

18          Q        All right.  So this section then that

19     cites the website, it's more -- what is the value

20     of -- or what is the purpose of this paragraph?

21          A        Well, the purpose of that paragraph was

22     to show what information is publicly available about

23     the role of the secretary of state.  And rather than

24     making that kind of determination, I went to that

25     website to see what is publicly available.

1      Q        All right, so that -- but the website did

2   not factor into any of your opinions; is that correct?

3      A        It did not.

4      Q        All right.  You then go into the chief

5   election officer section and talk about the My Voter

6   Page?

7      A        Yes.

8      Q        And what is the relevance of -- or how

9   does My Voter Page fit into your opinions?

10     A        It does not fit into my opinion.  I offer

11  that piece, again, with the first sentence, that the

12  office of the secretary of state acts as a key

13  resource for voters in the state of Georgia and

14  referencing that portal as an example of that

15  resource.

16     Q        All right.  And so is it your opinion

17  then that -- does the My Voter Page inform your

18  opinions on specifically numbers 3 and 4 about the

19  responsibilities of the secretary of state in Georgia?

20     A        If you look at page 22 of that report

21  where I say that it also contains links to the state's

22  voter ID requirements, the Vote Safe Program, and

23  forms to report allegations of voter fraud, I think

24  that was important to include.

25     Q        But does the My Voter Page impose any

1  responsibility on the secretary of state?

2      A      I don't have an opinion on whether it

3  imposes a responsibility.

4      Q      Okay.  Do you have an opinion as to

5  whether courts -- I'll be more specific.

6              Do you have an opinion as to whether

7  federal courts should provide any deference to a state

8  agency -- and include the secretary of state's office

9  in that -- the state agency's interpretation of a

10  statute?

11      A      I don't have an opinion.

12              MS. BRYAN:  Objection to form.

13  BY MR. BELINFANTE:

14      Q      All right.  Do you have an opinion as to

15  whether federal courts should or do offer any

16  deference to a state agency's interpretation of a

17  state regulation?

18      A      I don't have a --

19              MS. BRYAN:  Objection to form.  I don't

20        think we're here to discuss Chevron deference.

21  BY MR. BELINFANTE:

22      Q      You can answer to the extent -- I don't

23  know if the court reporter got your answer.

24      A      I don't have an opinion.

25      Q      Okay, thanks.  All right, page 21 -- and

1   that may be the August.  Here we are.  Yeah, sorry,

2   let's go back to November, page 22.  You say that

3   several provisions in the Official Code of Georgia and

4   the official compilation of the rules and regulations

5   of the state of Georgia identify the secretary of

6   state as the chief election official.  Do you see

7   that?

8        A     Yes.

9        Q     Okay.  Then it goes on to quote Code

10  Section 21-2-50.2; right?

11       A     Yes.

12       Q     And that's the one we talked about

13  earlier, which is Exhibit 12; correct?

14       A     Correct.

15       Q     And that statute addresses only HAVA;

16  isn't that right?

17       A     Correct.

18       Q     All right.  So when you say that several

19  provisions, do you have anything other than -- or that

20  you're relying on other than Code Section 21-2-50.2 to

21  reach the conclusion that several provisions of the

22  code and regulations identify the secretary as the

23  chief election official?

24       A     I would not be able to address it at this

25  time.

1    Q    And is chief election official, that's a

2  term found in federal law; correct?

3    A    Well, it varies.

4    MS. BRYAN:  Objection to form.  We're

5         looking at it right here.

6  BY MR. BELINFANTE:

7    Q    Okay.  The phrase chief election official

8  is something that is found in HAVA; right?

9    A    It varies.

10   Q    Okay.  But HAVA uses the -- HAVA requires

11 states to designate a chief election official; is that

12 right?

13   A    It does.

14   Q    Okay.  Does the Constitution of the

15 United States require states to designate a chief

16 election official?

17   A    I would not be able to address that.

18   Q    All right.  Does the Voting Rights Act of

19 1965 require states to identify chief election

20 officials?

21   A    I would not be able to address that.

22   Q    All right.  So when you say -- I've asked

23 you that, sorry.  This is what happens when the coffee

24 starts to wear off.

25        Also on page 22, and this is about the

1    MVP page again, it's in that first paragraph that's

2    incomplete --

3         A    Are we still in November?

4         Q    Yes, yes.

5         A    Okay.

6         Q    The second complete sentence in that

7    first paragraph says the site's -- referring to MVP --

8    the site's disclaimer documents that the data provided

9    by the SOS site is extracted from data provided by the

10   various counties of residence.  Do you see that?

11        A    Yes.

12        Q    Do you know whether the information that

13   is used to populate My Voter Page comes from

14   information first received at the county level or the

15   state level?

16        A    I would not be able to address that.

17        Q    All right.  And do you know how voter

18   registration information is collected in Georgia?  Did

19   you consider that?

20        A    I did not.

21        Q    All right.  So let's go to page 23 of the

22   November report.  It says, second sentence, in a

23   broader sense, over 100 of the 156 statutes I examined

24   highlight the key role the state's chief election

25   official must play in coordinating, monitoring, and

1    overseeing the administrative functions of subordinate

2    election administrators.  Do you see that?

3        A       Yes.

4        Q       Does that refer then to the chart?

5        A       Yes.

6        Q       That sentence, I mean.  And you don't

7    have an opinion as to whether the Georgia Secretary of

8    State -- and by that I mean the office, not the

9    individuals -- have lived up to those requirements?

10       A       I don't have an opinion on that.

11       Q       All right.

12       A       May we take a break when you get to a

13   point?

14       Q       Yeah.  Why don't -- I mean I --

15               MS. BRYAN:  Lunch is here if you just

16          want to go ahead and take a lunch break.

17               MR. BELINFANTE:  Yeah, why don't we do

18          that.  Why don't we take a lunch break.

19                   (Lunch recess from 11:54 to 12:56 p.m.)

20   BY MR. BELINFANTE:

21       Q       Professor, if I could draw your attention

22   to your November report on page 23.

23       A       Yes.

24       Q       That first paragraph talks about the

25   secretary of state approving certification programs

1   for training.  Do you see that?

2        A        Yes.

3        Q        And footnote 73 cites to a statute on

4   that; right?

5        A        Yes.

6        Q        And you identify, in fact, quote, that

7   the secretary approves certification for a series of

8   types of persons, election superintendents, chief

9   registrars, absentee ballot clerks, board of elections

10  and registrations, their designee, and that's it.  Do

11  you see that?

12       A        Yes, I do.

13       Q        Okay.  Do you have an opinion as to

14  whether that statute addresses the training of poll

15  workers?

16       A        I don't have an opinion on that.

17       Q        All right.  Let's look at the first

18  sentence under election oversight, the intrastate and

19  interstate officials.

20       A        Yes.

21       Q        There you say that the secretary of state

22  is required to provide multiple training sessions for

23  aforementioned election officials and has the

24  discretion to waive those training requirements for

25  election officials.  Do you see that?

 1       A       I do.

 2       Q       All right, if you could turn to -- and

 3  keep that there and turn to in your August report page

 4  23.

 5       A       Yes.

 6       Q       In that same first paragraph under

 7  election oversight, you have the same sentence, but it

 8  cuts off -- I mean it adds an additional clause.  You

 9  say that the secretary has the discretion to waive

10  training requirements for local election officials, as

11  in the other one.  But this one goes on to say and has

12  the responsibility to ensure that local election

13  officials are adequately training poll workers and

14  others involved in the election process.  Do you see

15  that?

16       A       I do.

17       Q       Is there a reason that clause did not

18  survive into the November report?

19       A       I don't know.

20       Q       And I probably asked this before, but any

21  edits or revisions that are present in the November

22  report versus the August report you did yourself;

23  correct?

24       A       Yes.

25       Q       Okay.  And is it fair to say then that

1    you're no longer opining that the secretary has the

2    responsibility to ensure that local election officials

3    are adequately training poll workers?

4          A       I'm not addressing that in my opinion.

5          Q       Okay.  In your review of state statutes,

6    did you come across Code Section 21-2-99?  And I'll

7    show it to you once I find the stickers.  There they

8    are.  I'll show you what I'll mark as Exhibit 13.

9          A       Thank you.

10                 (Thereupon, marked for identification,

11         Defendants' Exhibit D-13.)

12   BY MR. BELINFANTE:

13         Q       Thank you.  Have you reviewed this

14   statute before?

15         A       I believe so, but I can't confirm at this

16   time.

17         Q       Okay, that's fair.  And sitting here

18   today and looking at paragraph (a) of that code

19   section, who does -- sitting here today -- let me

20   start over.

21                 Sitting here today looking at paragraph

22   (a) of this code section, who do you believe has the

23   obligation to provide training to poll officers and

24   poll workers?

25         A       I would not be able to determine that.

1       Q       Why is that?

2       A       I don't think that's within the purview

3   of what I've been -- I would need to review this.

4       Q       Take your time.  I mean I'm literally

5   asking about a paragraph, so if you want to -- do you

6   need anything other than the statute?  Because I'm

7   only asking about that statute.

8       A       This section says that the election

9   superintendent shall provide adequate training.  I

10  don't see anything in here that says the only or

11  anything of that nature, so that's why I would say I

12  would not be able to address that.

13      Q       Okay.  But you would agree with me this

14  statute does not impose an obligation on the secretary

15  of state to provide poll officer and poll worker

16  training, wouldn't you?

17              MS. BRYAN:  Objection to form.

18  BY MR. BELINFANTE:

19      Q       You can answer.

20      A       I wouldn't be able to address that.

21      Q       And why?

22      A       So from what I just read and from what I

23  just said, that first line saying the election

24  superintendent shall provide, and then later in the

25  paragraph saying that the superintendent shall notify

1    the secretary of state.

2         Q        Right.  But you would -- I mean do you

3    see anything in this code section that requires the

4    secretary of state to train poll workers?

5         A        Not in this section.

6         Q        Okay.  In your review of Georgia law, did

7    you find anything that said that the secretary of

8    state was required to train poll workers?

9         A        I did not.

10        Q        Is it your opinion that -- are you aware

11   of any general obligation that the secretary would

12   have to train poll workers?

13        A        I am not aware.

14        Q        Okay.  All right, if you look at page 24

15   of your August report -- and it's in that same

16   paragraph we were just talking about that starts on

17   page 23 -- under the block quote that starts on page

18   23, you say another example is that the SOS's official

19   website contains poll worker manuals and videos.  Do

20   you see that?

21        A        I do.

22        Q        That sentence also did not make it into

23   the November report, from what I saw.  Is there a

24   reason for that?

25        A        It is not, not that I'm aware of.

1    Q    And you're not expressing an opinion as

2    to whether the secretary of state's decision to

3    provide training materials creates an obligation to

4    train poll workers?

5    A    I am not.  And I just wanted to sort of

6    reiterate.  My opinion is very narrowly focused

7    because I wanted to focus on the things that I felt

8    like I could speak to and speak to directly based on

9    the research and based on the examination overall.  So

10   I don't address -- I don't have an opinion on that.

11   Q    And those things that your narrow focus

12   was limited to, is it fair to say that your focus was

13   limited to obligations imposed by HAVA, the NVRA, and

14   the Voting Rights Act of 1965?

15   A    The Voting Rights Act of 1965, the

16   constitutional provisions that we previously

17   mentioned, and how those things overlap with the

18   duties and requirements reflected for Georgia.

19   Q    Okay.  I notice you did not say HAVA and

20   NVRA there.  Did you mean to include those?

21   A    Voting Rights Act of -- I was just

22   confirming what you had already said.

23   Q    What I said?  Yes, okay.

24   A    So I'll repeat it, I'm sorry.

25   Q    Sure.

1      A       The NVRA, HAVA, the Voting Rights Act of
2  1965, constitutional provisions, and also those
3  Georgia regulations.
4      Q       Okay, all right.  On page 25, you --
5      A       May I ask which?
6      Q       I'm sorry, yes, thank you.  The November
7  report.
8      A       Okay.  Sorry, I just want to make sure
9  we're on the same thing.
10     Q       No, no, no, you're doing the right thing.
11     A       Okay.  Page 25?
12     Q       Uh-huh.
13     A       Thank you.
14     Q       The first full paragraph identifies a
15  list of things that the secretary of state has
16  oversight to do.
17     A       Yes.
18     Q       And you're not expressing an opinion on
19  the efficacy of the secretary of state's efforts in
20  those, are you?
21     A       I am not.
22     Q       If you'll flip back to page 25 of your
23  August report, that same paragraph begins with the
24  sentence that SOS has exclusive powers over various
25  details governing the local administration of

1  elections, including, and goes on to list.  Yet in the

2  November report on page 25 the word exclusive is

3  missing.  Why did you change that?

4      A    I think that the difference between the

5  August and the 11 for me in terms of my work was

6  trying to sharpen my language and making sure that I

7  was clear in what I was saying.

8      Q    Okay.  If we see a conflict like that

9  where something is in the August report and not in the

10 November, was it your intent that the November report

11 replaces in full the August report?

12     A    Yes.  I don't think that -- there were no

13 substantive differences in terms of the two reports,

14 no substantive difference in my opinion or anything of

15 that nature, so yes.

16     Q    Okay.  But I mean you would agree with me

17 that saying the secretary -- would you agree with me

18 that saying the secretary of state has exclusive

19 oversight is different from saying he has oversight?

20     A    I would agree.

21     Q    Okay.  I'm not trying to play semantics

22 with you, but if we see a situation like that, is it

23 your testimony that we should effectively ignore the

24 August report and focus on the November report?

25     A    I would stand by the November report,

1  yes.

2      Q      Okay, thank you.  In your review of

3  Georgia statutes, did you -- or in looking at statutes

4  generally, if a statute expressly imposes an

5  obligation on the secretary of state, you know,

6  secretary of state shall train election

7  superintendents, for example, is it your opinion that

8  that is something the secretary of state must do?

9      A      I wouldn't have an opinion on that.

10      Q      All right.  And why wouldn't you have an

11  opinion on that?

12      A      I think that it, again, varies.  It's

13  hard to make a definitive statement to your -- answer

14  to your question.  I think that it is very clear in

15  terms of what the duties of office are and how those

16  duties vary across the three categories that I mention

17  here in terms of candidate, voter, and election

18  official interaction.

19      Q      Okay.  Do you -- if a statute -- let me

20  ask a slightly different question.  If a statute says

21  the county official shall do "X" but does not mention

22  the secretary of state, do you believe that that

23  statute would impose a duty on the secretary of state?

24      A      I think that there are shared duties.  So

25  again, I think it is difficult to take each statute in

1   isolation or each provision in isolation because of

2   those shared overlapping duties.

3        Q       Is there a duty that the secretary of

4   state would have that would not appear in statute

5   regulation or court case applying those in both

6   federal and state?

7        A       I wouldn't be able to determine that.

8        Q       Okay.  And why would you not be able to

9   determine that?

10       A       I don't think that I have the information

11  before me to be able to make that determination.

12       Q       But you opine that various statutes

13  impose obligations on the secretary; correct?

14       A       They do, yes.

15       Q       Okay.  And so what I guess I'm trying to

16  figure out is if you came across a statute that

17  doesn't mention the secretary of state, says the

18  county shall train poll workers, for example -- not

19  asking you to agree with me or not, but just presume

20  you saw a statute that said that -- would you include

21  that in your list of statutes that imposed duties on

22  the secretary of state?

23       A       If I ran across something -- just to

24  clarify, you said if I ran across something that said

25  the county should do something --

1        Q       Yes.

2        A       -- would I include that in the duties of

3   the secretary of state?

4        Q       Yes.

5        A       No, I would not.

6        Q       Okay.  And you wouldn't because why?

7        A       Because if the statute references the

8   county, then that's where my focus would be for that

9   statute.

10       Q       All right.  Let's go to page 26.  My

11  question is going to be on 28, but that begins a

12  section on election oversight with federal officials.

13       A       Could you tell me which version?

14       Q       Yes, absolutely, November.

15       A       Okay, thank you.

16       Q       Uh-huh.  Page 28, there's reference to

17  correspondence between the secretary and federal

18  officials regarding what can go on a national voter

19  registration mail application.  Do you see that?

20       A       Yes.

21       Q       And the secretary there is acting in his

22  capacity as the chief election officer for purposes of

23  the NVRA; isn't that right?

24       A       Yes.

25       Q       And so that doesn't speak to any duties

1  he has outside of the NVRA; isn't that right?

2      A       In this particular correspondence, no.

3      Q       Okay.  All right, if we can go to page

4  30, your conclusion.

5      A       Yes.

6      Q       You say about halfway down, in Georgia

7  the chief election officer is identified by state

8  statutes as the secretary of state.  Do you see that?

9      A       Yes.

10     Q       And we've already covered this ground,

11  but just to be clear, those state statutes that

12  identify the secretary as the chief election officer

13  are those dealing with the NVRA and HAVA; right?

14     A       There's also -- I believe it's -- I don't

15  know if it's in this table, 21-2-50(b).  And I believe

16  that's the section that starts as the state chief

17  election official.

18     Q       Yes, that's right, uh-huh.  Okay.

19     A       So that does not specify HAVA in that

20  provision.

21     Q       All right.  So you're relying on that one

22  too?

23     A       Yes.  In fact, if I could take a step

24  back to come back to the note that you and I had

25  discussed earlier --

1     Q      Yes.  I think we were talking about

2  top-down approach for the secretary of state?

3     A      You had asked about what other provision

4  I had relied on or have referenced.

5     Q      Fair enough, okay.

6     A      And I think that relates to the question

7  here in the conclusion that you just asked me.

8     Q      All right.  And what does that mean to

9  you, the phrase chief election officer, in Code

10  Section 21-2-50, I believe it was, B?

11     A      Well, my view of that was that it was not

12  just in terms of relationship to HAVA and the NVRA.

13     Q      Okay, but do you have an opinion as to

14  whether Code Section 21-2-50(b) imposes any

15  obligations that are not included in the election

16  code?

17     A      I don't have an opinion on that.

18     Q      Okay.  And that conclusion, that the

19  secretary has broad oversight, enforcement, and

20  responsibilities, you've not published anything on the

21  Georgia Secretary of State?

22     A      I have not.

23            MR. BELINFANTE:  Don't get your hopes up

24        just because I'm turning in the outline.

25            MS. BRYAN:  You're starting on the next

1          outline.

2                    MR. BELINFANTE:  No, no, I'm going to a

3          table.

4                    MR. MILLER:  First out of three.

5                    (Thereupon, marked for identification,

6          Defendants' Exhibits D-14 and D-15.)

7    BY MR. BELINFANTE:

8       Q      I'm going to hand you both an e-mail and

9    a document.  The e-mail is -- you may or may not have

10   seen it, which I've marked as Exhibit 14.

11                   MS. BRYAN:  I love it when my e-mails get

12         attached as exhibits.

13                   MR. BELINFANTE:  Yeah, me too.

14   BY MR. BELINFANTE:

15      Q      This is an e-mail I received yesterday.

16   And it attaches to it what I'm going to mark as

17   Exhibit 15, which I believe is the latest version of

18   the table you discussed.  What was different in the

19   version of the table we got yesterday and the one we

20   received with the November report?  Actually, let me

21   back up.  Do you remember if we received a table with

22   the November report, or was it just with the August

23   report?

24      A      I don't know if you received it.  I know

25   I submitted.  I just don't know what you have.

1      Q       Did you have a separate table with the
2    November report or an edited table?
3      A       So the November report, I believe it was
4    edited.
5      Q       That's right, it was, you're right.
6    Okay, so this is now the third table we've received,
7    the one that is marked Exhibit 15; correct?  We
8    received one with the August report, a separate one
9    with November --
10     A       Yes.
11     Q       -- and then one yesterday?
12     A       Yes.
13     Q       Okay.  What were the changes between the
14   one we received in November and the one we received
15   yesterday?
16     A       I believe the reference was to the voting
17   machines, the DREs, I believe they're called.
18     Q       And is that changes that you made upon
19   review, or was that made in response to something you
20   received?
21     A       I was notified of I think it's called
22   316.
23     Q       House Bill 316?
24     A       House Bill 316.  So I made the revision
25   based on that information.

1        Q        I see, okay.  And you were not provided

2    with House Bill 316 when you first received the table

3    from counsel; correct?

4        A        I was not.

5        Q        Okay.  I'm not going to ask you questions

6    about all of these, but I do want to ask you a

7    question about some of them.

8        A        And you're referring to Exhibit 15?

9        Q        Exhibit 15, yeah.  Mine is just a

10   different one.

11       A        Thank you.

12       Q        But yeah.  On Exhibit 15, there's

13   reference to Code Section 21-2-50(a)(7), which is on

14   page 2.

15       A        Okay.

16       Q        You see that there on the second page?

17       A        Yes.

18       Q        Okay.  The obligation according to the

19   chart of the secretary is to furnish a certified copy

20   of any document in the secretary of state's custody by

21   virtue of this chapter and to fix and charge a fee to

22   cover the cost of furnishing the same.  Do you see

23   that?

24       A        I do.

25       Q        What made you include that as an

1  obligation that fits in as the secretary's obligations

2  to administer elections generally?

3       A       So I saw that as part of the interactions

4  that I see with the -- that I classified with various

5  entities within that process, that it was not unique

6  to or exclusive to but was a part of these host of

7  responsibilities.

8       Q       Okay.  Isn't it true that providing

9  documents is not really an election function as

10 opposed to just a ministerial governmental function?

11      A       I'd say that it depends on what the

12 document is that's being requested or provided.

13      Q       Okay.  If he is providing election -- and

14 this statute would certainly cover that.  I mean if

15 somebody asked for a copy of a ballot prepared for

16 Cobb County, for example, this statute would require

17 them to cover it.  Is it your opinion that that duty

18 is an election administration duty?

19      A       I again think it would depend on what the

20 duty is.

21      Q       Okay.  Well, you included it.

22      A       Yes.

23      Q       So you tell me, why is that an election

24 administration duty?

25      A       So to clarify, what I mean is it would

1   depend on what is being requested, by whom, and for

2   what purpose.  So again, as I outline in the report,

3   there are a number of areas that the secretary of

4   state works within in terms of, for example, on page

5   21 of the report, the professional licensing board's

6   division.

7        Q        Right.

8        A        Anything requested of that would not be

9   related to election administration.

10       Q        Agreed.

11       A        But there are other things that could be.

12       Q        Okay, and I'll concede that this, because

13  it says in the chapter, that that deals with matters

14  that are covered under the election code.  What I'm

15  just trying to determine is, you know, do you view

16  that as an inherent election duty, or is that a

17  ministerial function generally, or is that a

18  distinction without a difference?

19       A        I think it is a function of the secretary

20  of state that covers elections and other areas of

21  responsibility.

22       Q        Okay.  The next one, 21-2-50(a)(8), is

23  just a general statement that the secretary must

24  perform other duties as may be prescribed by law.

25  Would you agree with me that that's not an independent

1  duty, that's just an encapsulation of those that are
2  already in the statute?
3       A       I think it captures -- I would say that
4  it captures a multitude of duties.
5       Q       So there's nothing -- it's counted in
6  your 150 something, but sitting here today, do you
7  agree that it does not create an independent duty?
8               MS. BRYAN:  Objection to form.
9  BY MR. BELINFANTE:
10      Q       You can answer if you can.
11      A       Can you -- I mean I'm not sure what
12  you're asking me.
13      Q       I guess my question is that statute was
14  counted in your 15 -- how many did we end up with?
15      A       156.
16      Q       156.  That statute was counted in your
17  156; right?
18      A       Uh-huh.
19      Q       Okay.  But wouldn't you agree with me
20  that that statute doesn't impose an independent
21  obligation?
22      A       No, and what I say on page 20 of the
23  report is that I focus on primary duties within the
24  three categories that I've created as assignment.  So
25  I am not evaluating degree or, you know, making an

1  opinion on that.  I see that as part of the duties.

2      Q      Well, what duty does this impose that

3  another statute doesn't?

4      A      Well, I think you also see in my

5  categorization that I say the categories often overlap

6  and shouldn't be considered as mutually exclusive.

7  And that also means that there is some overlap in the

8  duties that form and constitute those various.

9      Q      And I know you testified earlier that the

10 number isn't exactly key to your opinion, but doesn't

11 that inflate the number?  I mean if statute A says the

12 secretary shall print ballots and statute B says the

13 secretary shall, you know, provide or do anything

14 necessary to comply with the code, it's not adding a

15 new obligation on the secretary; right?

16     A      I would disagree that it inflates the

17 number.  I think that having the caveat of seeing that

18 many of these functions do overlap and that they

19 should not be viewed in isolation or in a vacuum, I

20 wouldn't see that as conflation.

21     Q      But it is true that the 21-2-50(a)(8) was

22 included as one of the 156; right?

23     A      It was.

24     Q      Okay.  And do you know of other

25 instances, sitting here today, where you had similar

1  statutes that imposed obligations to effectively

2  follow the law?

3       A       I would not be able to definitively say

4  right now.

5       Q       Okay.  If you can take a look on page 3

6  of your chart -- actually, never mind.  All right,

7  sorry, page 4.  There is a regulation cited in the

8  second-to-last box.  Do you see that?

9       A       I do.

10      Q       It's 183-1-6-.02(5)(c).

11      A       Yes, thank you.

12      Q       There it says the secretary may develop

13 and provide to the board of registrars manuals for

14 this instruction.  Do you have an opinion if the word

15 "may" imposes an obligation or not?

16      A       Could you specify?  I'm not sure what

17 you're --

18      Q       Yeah.  When you're reviewing statutes and

19 trying to determine if they actually impose a -- well,

20 one of the things you did for your report is to review

21 a series of statutes and regulations that were

22 provided to you by counsel; correct?

23      A       Uh-huh.

24      Q       And in that review, you were trying to

25 determine if the statute or regulation actually

1  imposed an obligation on the secretary of state; is

2  that right?

3      A       So what I'm looking at, if you look at

4  page 20 of my report and you look at point 3) under D

5  and accordingly, what powers and responsibilities, I

6  think that the wording of powers and responsibilities

7  is different from obligation in terms of my approach

8  here.

9      Q       That's fair.  But then in the next

10 sentence after that, you say based on this review, I

11 identified a total of 156 duties and responsibilities

12 connecting the secretary of state to election

13 administration.  So let's back up then.  Is there a

14 difference between powers and responsibilities and

15 duties and responsibilities?

16     A       No, but I think there's a difference

17 between powers and obligations.

18     Q       All right.  What do you mean by the word

19 duty then?

20     A       So a duty would be an action.  It would

21 be a power as well.  And also, I see it as being

22 linked to responsibility.  I think an obligation is

23 different there.

24     Q       Okay.  So someone -- the secretary of the

25 state of Georgia could have a duty in your opinion

1  that is simply an ability to exercise power, but that

2  would be different from a mandate to exercise power;

3  is that right?

4       A       So if I could reference to the section

5  that you just cited on page 4 --

6       Q       Yes.

7       A       -- the may develop and provide, that

8  would be an example I think of the difference between

9  a power and an obligation.

10      Q       Okay.  But I'm -- and I get that as it

11 relates to paren 3 up there, but I'm focused on the

12 sentence where you say that you identified a total of

13 156 duties and responsibilities.

14      A       Yes.

15      Q       And when you have a regulation or a code

16 section like the one we were talking about,

17 183-1-6-.02(5)(c), does that qualify -- or was it your

18 understanding when you wrote your report that that

19 regulation imposed a duty or a responsibility?

20      A       Yes.

21      Q       Okay.  And that is based on what?

22      A       It is based on my review of this, that by

23 outlining that power of the secretary of state to

24 develop and provide manuals for instruction, it

25 becomes a duty and a responsibility.

1      Q       Would you agree with me that the word may

2   is permissive, in other words, the secretary may have

3   that power but not the obligation?

4      A       Yes.

5      Q       Okay.  And if it is simply a power

6   without an obligation, you still included it in your

7   156 duties and responsibilities?

8      A       I did.

9      Q       Okay.  And that would be true for all of

10  the statutes and regulations that you reviewed; right?

11  I mean there's nothing unique about that role?

12     A       No, I wouldn't say it's unique about that

13  particular one.

14     Q       All right.  Your initial report talks

15  about DREs, which is a type of voting equipment; is

16  that right?

17     A       Yes.

18     Q       Okay.  And sitting here today, are you

19  aware that Georgia is no longer using -- well, that's

20  not fair.  After a municipal runoff on New Year's Eve,

21  are you aware that Georgia will not be using DREs in

22  the future?

23     A       I am aware that it was a part of

24  discussion, but I don't have an opinion on that.

25     Q       And that was a lot of what you were

1   trying to address between the November chart and the

2   one we received yesterday; correct?

3        A        Yes.

4        Q        Okay.  In your review of the secretary's

5   obligations in Georgia law, did you come across a case

6   called United States versus Georgia, dealing with

7   UOCAVA compliance?

8        A        I can't address that at this time.

9        Q        Okay.  And do you know what I mean when I

10  say UOCAVA?

11       A        I do not.

12       Q        Okay.  I will represent to you that it's

13  a federal statute dealing with overseas voting.  I

14  can't tell you exactly what UOCAVA stands for.  I

15  should know.  I'm sure we could find it.  If you could

16  turn to page 15 of Exhibit 15, please.

17       A        Okay.

18       Q        And I should have asked this before, and

19  I think you've covered it, but let me just for a

20  minute while I've got it in front of me.  What you

21  received from counsel is this chart with the first

22  column completed and the second column and the third

23  column; is that right?

24       A        Correct.

25       Q        Okay.  So really, your analysis was to

1  divide these into the categories that we have on the

2  far column?

3       A       That was my addition to this.

4       Q       Your addition, that's right.  And then

5  your analysis was to look at that, those statutes and

6  regulations, and opine on the duties and obligations

7  of the secretary?

8       A       In relationship to Voting Rights Act of

9  1965, HAVA, NVRA, and the constitutional provisions.

10      Q       Okay, thank you.  On that chart there's

11 one entitled voter registration.  It's at 21-2-216(h).

12      A       Okay.

13      Q       What is it here that addresses a duty and

14 responsibility of the secretary of state?

15      A       So what I reference in this particular

16 section there is that the databases are maintained by

17 the secretary of state.

18      Q       Okay.

19      A       And if you look at my report, it also

20 outlines how that information is received by the

21 secretary of state.  So for example, on page 25, that

22 second paragraph about receiving information from

23 federal officials, from state agencies, and also local

24 entities to update the central registration database.

25      Q       Okay.  Looking at that last -- and back

1   on page 25 of your November report, do you have an

2   opinion of who it is that approves a voter

3   registration application in terms of the secretary or

4   local officials?

5       A       I don't have an opinion on that.

6               MR. BELINFANTE:  Off the record for a

7       second.

8                       (Brief moment off the record.)

9   BY MR. BELINFANTE:

10      Q       Okay, can you turn to -- I'm looking for

11  the reference to 21-2-30.  All right, 21-2-30(a) on

12  page 30, the top row.

13      A       Yes.

14      Q       Is the duty and responsibility you're

15  identifying there being a member of the state election

16  board?

17      A       Yes.

18      Q       Okay.

19                      (Brief recess from 1:36 to 1:42 p.m.)

20  BY MR. BELINFANTE:

21      Q       Before I get to Exhibit 16, I think I'd

22  asked why changes were made in the chart from November

23  to yesterday.  There were changes made in the chart

24  from the August report to the November report;

25  correct?

1      A       Correct.

2      Q       All right.  What changes were made there?

3      A       So I think that also related to 316.  And

4  I think the changes from November to yesterday or, you

5  know, that update, was two things that I had not

6  corrected.  So I think there were two oversights that

7  still referenced the DREs.

8      Q       Okay.  Was it your intent to have each

9  chart reflect Georgia law as you understood it at that

10 time?

11     A       Yes.

12     Q       Okay.  And when you made the substantive

13 changes in the report itself, not the chart, but the

14 report itself, from August to November, what prompted

15 that change?

16     A       In terms of --

17             MS. BRYAN:  Objection to form.  I think

18        she said she didn't make substantive changes.

19 BY MR. BELINFANTE:

20     Q       All right, before you issued the November

21 report, tell me how you came about coming to a revised

22 report.  Was it something you decided to do on your

23 own?

24     A       Yes.  So I wanted -- as I -- how do I say

25 this.  I'm rather hard on my writing.  And there were

1  areas that I felt were clunky and that I had not been

2  clear.  So I wanted to be able to do that, if it was

3  possible, for me to be able to be clear in that.

4      Q      I see, okay.  And was that just based on

5  you going back and preparing for your deposition?

6      A      In reviewing it and, you know, looking

7  through what I had written and looking through what I

8  had submitted and looking back at that, wanting to

9  make sure that, you know, it made sense to me with, as

10 we call it, fresh eyes.

11     Q      Understood.  And you are teaching two

12 courses this semester; correct?

13     A      I am.

14     Q      When did this semester begin?

15     A      August, end of August.

16            (Thereupon, marked for identification,

17      Defendants' Exhibit D-16.)

18 BY MR. BELINFANTE:

19     Q      All right.  Let me ask you to turn your

20 attention to what we've marked as Exhibit 16.

21     A      Okay.

22     Q      That's the Joint Center report you've

23 talked about earlier today, isn't it?

24     A      Yes.

25     Q      All right.  And I believe you testified,

1    but please tell me if I'm incorrect, that included in

2    this report is an analysis about Georgia?

3         A       It includes a reference to Georgia.

4         Q       A reference.

5         A       Yes.

6         Q       Fair.  Is that reference found on page 7?

7         A       It's one of the references on page 7.

8         Q       All right.  Other than references

9    generally to the South, is there another reference to

10   Georgia specifically in the report?

11        A       I would need to look back through it.

12        Q       All right.  And on page 7 it says that

13   North Carolina and other states have attempted to roll

14   back early voting on Sunday, and data show black

15   voters accounted for 53 percent of Sunday early voters

16   in North Carolina and Georgia in the 2014 midterm

17   election.

18                As I read that sentence, that is

19   identifying something only that North Carolina did and

20   that Georgia is included just to show the percentage

21   of black voters on Sunday early voting.  Is that fair?

22        A       Could I have a moment to review this?

23        Q       Absolutely.  Sure.

24        A       Thank you.  And then could you restate

25   your question?

1     Q      I guess my question is, now that I've

2  read it again myself, is that sentence describing an

3  act the Georgia legislature took or attempted to take,

4  or is Georgia there just to describe the percentage of

5  black voters on Sunday voting?

6     A      It's looking at percentages of early

7  voters.  It's not referencing anything related to a

8  legislative effort or attempt.

9     Q      Got it.  All right.

10            MR. BELINFANTE:  I know we just took a

11         break, but I think if we can have 5 to 10

12         minutes, I may be done.

13            MS. BRYAN:  Okay.  I'd like to ask -- I

14         never want to say two or three questions, but I

15         want to ask a couple questions.  Do you want me

16         to do that before you break?

17            MR. BELINFANTE:  Yeah, why don't you do

18         that, and I'll suspend and then come back.

19            MS. BRYAN:  Okay.

20                        EXAMINATION

21  BY MS. BRYAN:

22     Q      Dr. Brown-Dean, do you have Exhibit 13

23  there in front of you?

24     A      I do.

25     Q      And this is the statute that

1    Mr. Belinfante asked you about that says the election

2    superintendent shall provide training to poll officers

3    and poll workers?

4          A      Yes.

5          Q      Okay.  But if the secretary of state is

6    the chief election officer in the state of Georgia,

7    does the secretary of state have overall

8    responsibility for ensuring that local officials

9    comply with all federal and state laws?

10         A      Yes.

11                MR. BELINFANTE:  Object to form.

12   BY MS. BRYAN:

13         Q      And that would include ensuring that

14   local officials comply with the Voting Rights Act and

15   the National -- the NVRA, HAVA, and the 13th, 14th,

16   and 15th Amendments; correct?

17         A      Correct.

18         Q      He also asked you -- may I borrow your

19   book?

20                MR. MILLER:  Sure.

21   BY MS. BRYAN:

22         Q      He also asked you about some of the

23   duties that are laid out in O.C.G.A. 21-2-50.

24                MS. BRYAN:  And I guess I need to go to

25        the pocket part?

1           MR. BELINFANTE:  No, that's the 2019

2       edition.

3  BY MS. BRYAN:

4       Q       And he specifically asked you about

5  subparagraph (a)(8), which says that the secretary of

6  state shall perform all duties which shall include the

7  following.  And subsection (8) is to perform such

8  other duties as may be prescribed by law; correct?

9       A       Yes.

10       Q       Does that law, the way you review the

11  statute, include the Voting Rights Act, the Help

12  America Vote Act, the NVRA, and the constitutional

13  amendments that we've discussed?

14       A       Yes.

15       Q       So if a local official -- he also asked

16  you about registering voters.  If a local official had

17  the responsibility to register all voters who are

18  eligible to vote, that is, they're 18, they're

19  residents of the county, they're citizens of the

20  United States, but a particular voter registrar in,

21  say, Chatham County where Savannah is located, if that

22  voter registrar decided that they weren't going to

23  register any Asian Americans, would the secretary of

24  state have power to step in and do something?

25       A       Yes.

1          Q         And how would that happen?

2          A         So it's happened before in other places

3     where the state official has sued a county or a county

4     official on behalf of those voters and responsibility

5     for that.  There have been other cases where the state

6     official has submitted a complaint to the department

7     of justice for that kind of intervention in what's

8     happening in a local or county level.

9          Q         And just to be clear on the record, if a

10    local registrar in Chatham County made the decision

11    not to register Asian Americans, that would be a

12    violation of their right to vote; correct?

13         A         It would be.

14                   MS. BRYAN:  Okay, thank you, that's it.

15                   MR. BELINFANTE:  Why don't you give us

16             that 10 minutes, and then I can try to do it

17             all at once.

18                   MS. BRYAN:  Okay.

19                       (Brief recess from 1:51 to 1:56 p.m.)

20                        FURTHER EXAMINATION

21    BY MR. BELINFANTE:

22         Q         Professor, you just answered a series of

23    questions from Ms. Bryan, one of which said that as

24    the chief election officer, you opined that the

25    secretary has an overall responsibility, I believe was

1    your phrase, to enforce election law.  Is that a fair
2    restatement of your answer?
3         A     Yes.
4         Q     That's not in your opinion -- in your
5    written report, is it?
6         A     No.
7         Q     All right.  In fact, your report focuses
8    only on federal sources of election law; isn't that
9    right?
10        A     Yes.  Well, it focuses on the federal
11   sources as well as the state provision in the report.
12        Q     So is it now your opinion that the
13   secretary of state has an overall responsibility to
14   enforce all state election laws?
15        A     No, my opinion remains as stated there in
16   terms of the federal mandates or the Voting Rights Act
17   of 1965, the National Voter Registration Act, HAVA,
18   and those constitutional provisions that are provided
19   per there.
20        Q     Okay, and you don't have an opinion as to
21   whether the failure to train poll workers constitutes
22   a constitutional violation, do you?
23        A     I don't have an opinion.
24        Q     And you don't have an opinion as to
25   whether not providing sufficient resources to a county

1   for an election constitutes a constitutional violation

2   by the state of Georgia, do you?

3        A        I don't have an opinion.

4        Q        All right, and same question for the

5   Voting Rights Act, you don't have an opinion on

6   whether either of those two things violates the Voting

7   Rights Act?

8        A        I don't have an opinion.

9        Q        All right.  What is the basis of your

10  conclusion in your answer to Ms. Bryan that the

11  secretary has an overall responsibility as the chief

12  election officer to enforce the laws of Georgia, not

13  NVRA, not HAVA?

14       A        So I think in the particular example that

15  was presented to me in terms of not allowing Asian

16  Americans to register to vote in those elections, that

17  is a part of the Voting Rights Act of 1965 in terms

18  of, you know, not looking at particular groups.  And

19  so in that way, it is about that overlap of access to

20  free and fair elections that does not violate those

21  overall provisions in the Constitution and those three

22  other provisions.

23       Q        And in answering that question and that

24  hypothetical specifically, you base that on what

25  you've called as in other places they had sued; do you

1    recall that?

2        A        So when the question was what could a

3    chief officer do, that was when I referenced.

4        Q        Okay, what other places were you

5    referring to?

6        A        So in Wyoming, for example, when there

7    was a question about voting access for American Indian

8    voters living on reservations and off and whether

9    particular counties had not allowed people to vote

10   based on where they lived and based on their tribal

11   affiliation, that was when the state stepped in to

12   decide whether that was something that should be done,

13   handled locally internally, or whether it would

14   trigger a conversation with DOJ.

15       Q        And what did Wyoming do in that case?

16       A        So the question in Wyoming was whether --

17   well, what Wyoming decided to do was it needed to do

18   nothing because once it raised the question, then the

19   county reconsidered its provision and allowed people

20   to register.

21       Q        Okay.  You don't have an opinion on

22   whether the Constitution or the Voting Rights Act

23   imposes an obligation on the chief election officer of

24   a state to train poll workers; is that correct?

25       A        I don't have an opinion, no.

1      Q      Do you have an opinion as to whether the

2   requirement within the -- well, let me ask this.  Do

3   you know if the NVRA requires states to maintain an

4   accurate voter list?

5      A      I would not be able to say with

6   certainty.

7                  (Thereupon, marked for identification,

8         Defendants' Exhibit D-17.)

9   BY MR. BELINFANTE:

10     Q      I'll show you what we've marked as

11  Exhibit 17.  I believe this statute is cited in at

12  least your August report and it is from the National

13  Voter Registration Act.  I would draw your attention

14  to page 2 of the document, paragraph (4)(A) and (B).

15     A      Yes.

16     Q      And that requires, in just reading right

17  under (A), each state shall conduct a general program

18  that makes a reasonable effort to remove the names of

19  ineligible voters from the official lists of eligible

20  voters by reason of death or change in residence of

21  the registrant.  Do you see that?

22     A      Yes.

23     Q      And would that be an obligation imposed

24  by the NVRA on Georgia's chief elections officer?

25     A      I don't have an opinion on that.  When I

1   was looking at this particular statute, if you look

2   under (1)(D) -- I'm sorry, under (2), where it says

3   require the appropriate state election official to

4   send notice to each applicant and all of those that

5   flow from there, so when I was looking at that and

6   seeing where that falls, I was referring again to

7   appropriate state election official based on whatever

8   the provision is.

9        Q       Okay.  Well, sitting here today, do you

10  have any -- I mean would you agree with me that this

11  statute imposes on this chief election official of to

12  state the obligation to remove names of ineligible

13  voters from official lists of eligible voters?

14       A       That it -- I would agree that it imposes

15  the responsibility to make a reasonable effort to

16  remove the names.  And I reference that in my report

17  as well.

18       Q       I think we're done.  Thank you,

19  Professor.

20       A       Thank you very much.

21       Q       Unless Ms. Bryan has anymore.

22               MS. BRYAN:  No, we're done.

23               MR. BELINFANTE:  All right.  Thank you.

24               THE WITNESS:  Thank you.

25                   (Deposition concluded at 2:03 p.m.)

**Regency-Brentano, Inc.**

```
1                          DISCLOSURE

2     STATE OF GEORGIA
      COUNTY OF GWINNETT
3

4          Deposition of KHALILAH L. BROWN-DEAN, PH.D.

5          Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
6     Judicial Council of Georgia, I make the following
      disclosure:
7
           I am a Georgia Certified Court Reporter.  I am
8     here as a representative of Regency-Brentano, Inc.

9          I am not disqualified for a relationship of
      interest under the provisions of O.C.G.A. 9-11-28(c).
10
           Regency-Brentano, Inc., was contacted by the
11    offices of Josh Belinfante, Esq., to provide court
      reporting services for this deposition.
12
           Regency-Brentano, Inc., will not be taking this
13    deposition under any contract that is prohibited by
      O.C.G.A. §15-14-37 (a) and (b).
14
           Regency-Brentano, Inc., has no exclusive
15    contract to provide reporting services with any party
      to the case, any counsel in the case, or any reporter
16    or reporting agency from whom a referral might have
      been made to cover this deposition.
17
           Regency-Brentano, Inc., will charge its usual
18    and customary rates to all parties in the case, and a
      financial discount will not be given to any party to
19    this litigation.

20         This, the 23rd day of December, 2019.

21

22

23

24    _____
      LYNN VAN RY, CCR B-1120
25
```

**Regency-Brentano, Inc.**

```
 1                    E R R A T A   S H E E T

 2          Pursuant to Rule 30(e) of the Federal Rules of
        Civil Procedure and/or O.C.G.A. 9-11-30(e), any
 3      changes in form or substance which you desire to make
        to your deposition testimony shall be entered upon the
 4      deposition with a statement of the reasons given for
        making them.

 5
            To assist you in making any such corrections,
 6      please use the form below.  If supplemental or
        additional pages are necessary, please furnish same
 7      and attach them to this errata sheet.

 8

 9                          - - -

10

            I, the undersigned, KHALILAH L. BROWN-DEAN,
11      PH.D., do hereby certify that I have read the
        foregoing deposition, and that said transcript is true
12      and accurate, with the exception of the following
        changes noted below, if any:

13

14      Page____/Line_____/Should Read:_____

15      _____

16      Reason:_____

17

18      Page____/Line_____/Should Read:_____

19      _____

20      Reason:_____

21

22      Page____/Line_____/Should Read:_____

23      _____

24      Reason:_____

25
```

**Regency-Brentano, Inc.**

```
 1  Page_____/Line_____/Should Read:_____

 2  _____

 3  Reason:_____

 4

 5  Page_____/Line_____/Should Read:_____

 6  _____

 7  Reason:_____

 8

 9  Page_____/Line_____/Should Read:_____

10  _____

11  Reason:_____

12

13  Page_____/Line_____/Should Read:_____

14  _____

15  Reason:_____

16

17  Page_____/Line_____/Should Read:_____

18  _____

19  Reason:_____

20

21                    _____
                       KHALILAH L. BROWN-DEAN, PH.D.
22

23  Sworn to and subscribed before me,

24  _____, Notary Public
    This _____ day of _____, 20____
25  My Commission Expires:_____
```

**Regency-Brentano, Inc.**

```
 1              CERTIFICATE OF REPORTER

 2

 3   STATE OF GEORGIA            )

 4   COUNTY OF GWINNETT          )

 5

 6          I, LYNN VAN RY, the officer before whom the

 7   foregoing deposition was taken, do hereby certify that

 8   the witness whose testimony appears in the foregoing

 9   deposition was duly sworn by me; that the testimony of

10   said witness was taken by me to the best of my ability

11   and thereafter reduced to typewriting under my

12   direction; that I am neither counsel for, related to,

13   nor employed by any of the parties to the action in

14   which this deposition was taken, and further that I

15   am not a relative or employee of any attorney or

16   counsel employed by the parties thereto, nor

17   financially or otherwise interested in the outcome

18   of the action.

19          This, the 23rd day of December, 2019.

20

21

22

23

24   _____
     LYNN VAN RY, CCR, RPR
25   CERT. NO. B-1120
```

**Regency-Brentano, Inc.**

**§**

**§15-14-37 (1)**
151:

**A**

**a8 (1)**
144:5
**ability (2)**
134:1;154:10
**able (20)**
40:1;56:9;82:11,20;
95:16;105:13;108:24;
109:17,21;110:16;
114:25;115:12,20;
121:7,8,11;132:3;
140:2,3;149:5
**Abrams (3)**
3:;35:14;38:20
**Abrams' (2)**
36:24;37:8
**absentee (2)**
76:24;112:9
**Absolutely (5)**
93:11;95:10,24;
122:14;141:23
**academic (2)**
19:10;31:1
**academics (8)**
9:7;11:22;12:2;
42:11;52:11,17,18,21
**academy (4)**
46:10;52:13,21;
53:12
**access (14)**
28:14;32:24;51:21;
53:9;62:21;67:13,17,
19,25;74:14;87:2;
94:8;147:19;148:7
**accessible (2)**
46:9,12
**accordance (4)**
0:14;69:13,17;
91:11
**according (1)**
127:18
**accordingly (1)**
133:5
**accounted (1)**
141:15
**accurate (5)**
16:19;33:3;40:22;
149:4;152:12
**across (9)**
21:1;50:17;69:17;
114:6;120:16;121:16,
23,24;136:5
**Act (62)**
28:12;30:9,15;54:8;
56:1;60:11,12,12;
61:11,12,12;66:9,10,

21;67:18,19;68:4,4,
13,14,15,25;69:22;
70:15;71:11;74:11;
79:10;80:4,8;81:8;
82:1;85:23;86:13,19;
91:6;93:9,13,14;
94:21,24;96:11,12;
97:19;105:16,16;
109:18;117:14,15,21;
118:1;137:8;142:3;
143:14;144:11,12;
146:16,17;147:5,7,17;
148:22;149:13
**acting (2)**
96:18;122:21
**ACTION (7)**
0:3,4;41:10,13;
133:20;154:13,18
**activism (5)**
43:5;44:8,12,15,18
**activist (6)**
42:19,23;43:3,7;
45:18;46:3
**activists (4)**
52:11,17,23;53:1
**Acts (2)**
72:6;106:12
**Act's (1)**
82:14
**actual (3)**
39:11;95:25;101:10
**actually (9)**
48:16;83:19;88:21;
101:22;104:3;125:20;
132:6,19,25
**adding (1)**
131:14
**addition (3)**
68:18;137:3,4
**additional (2)**
113:8;152:
**additions (1)**
8:22
**address (18)**
34:3;45:22;63:19;
64:25;74:7;78:13;
79:11;82:20;101:9;
108:24;109:17,21;
110:16;115:12,20;
117:10;136:1,8
**addressed (1)**
73:17
**addresses (5)**
69:22;94:25;
108:15;112:14;
137:13
**addressing (1)**
114:4
**adds (1)**
113:8
**adequate (1)**
115:9
**adequately (2)**

113:13;114:3
**administer (1)**
128:2
**administering (1)**
17:12
**administration (29)**
22:14;23:2,4;24:20;
25:3,8,16,20,26:18;
27:7,9;30:19,22;34:5;
46:18;47:6,12;75:21;
79:23,25;80:10;
91:10;99:17;100:19;
118:25;128:18,24;
129:9;133:13
**administrations (1)**
80:7
**administrative (1)**
111:1
**administrators (3)**
69:12;73:16;111:2
**adopt (1)**
54:14
**adopted (5)**
54:9;56:2,4;93:3;
97:24
**adopts (1)**
102:15
**advance (1)**
53:7
**advocating (1)**
46:3
**affairs (2)**
50:2,13
**affect (2)**
9:11;59:13
**affiliated (1)**
20:2
**affiliation (1)**
148:11
**affirmatively (1)**
96:17
**affordability (1)**
37:2
**afforded (3)**
93:5,7;98:1
**aforementioned (1)**
112:23
**again (22)**
6:22;12:15;15:11;
16:2;19:10;28:17,25;
40:18;47:8;55:25;
58:13;60:16;97:12;
98:8;106:11;110:1;
120:12,25;128:19;
129:2;142:2;150:6
**against (1)**
25:21
**agencies (1)**
137:23
**agency (2)**
107:8;151:16
**agency's (2)**
107:9,16

agenda (2)
35:25;37:4
**ago (2)**
5:25;38:1
**agree (32)**
41:1;47:4,10;64:4;
65:22;66:1;68:23;
76:7,10;81:10,15;
82:22;83:16;85:1;
88:2;93:23;97:15;
99:11;100:25;101:5;
105:10;115:13;
119:16,17,20;121:19;
129:25;130:7,19;
135:1;150:10,14
**agreeable (1)**
7:9
**Agreed (1)**
129:10
**agreeing (1)**
5:10
**agreement (3)**
49:22;50:8;74:3
**ahead (5)**
54:22;67:7,9;88:9;
111:16
**aims (1)**
12:10
**al (2)**
0:3,7
**alignment (1)**
48:19
**aligns (1)**
65:13
**allegations (5)**
39:1,17,21;94:21;
106:23
**allow (2)**
20:16;86:21
**allowed (3)**
5:8;148:9,19
**allowing (1)**
147:15
**Alloy (1)**
2:
**although (1)**
86:1
**Alvarez (1)**
25:12
**always (6)**
15:21;23:25;24:1;
50:7;76:18;94:7
**ambitious (2)**
35:25;37:4
**Amended (6)**
3:;7:19;8:23;32:5,7,
13
**Amendment (1)**
94:4
**amendments (4)**
93:15,18;143:16;
144:13
**America (9)**

60:12;61:11;66:10;
67:18;68:3,14;86:12,
18;144:12
**American (1)**
148:7
**Americans (3)**
144:23;145:11;
147:16
**amongst (1)**
51:12
**analysis (7)**
41:6;74:21;79:15;
98:20;136:25;137:5;
141:2
**analyzing (2)**
45:12;74:23
**and/or (1)**
152:
**Andrew (1)**
38:21
**answered (1)**
145:22
**anticipate (1)**
6:13
**anymore (2)**
96:7;150:21
**appear (1)**
121:4
**APPEARANCES (1)**
2:1
**appears (2)**
62:4;154:8
**applicant (1)**
150:4
**application (2)**
122:19;138:3
**applied (4)**
14:22;19:21;20:15;
83:1
**apply (4)**
14:3;16:6;82:15;
91:17
**applying (3)**
19:22;83:12;121:5
**appointed (5)**
24:13;49:5;63:15;
73:25;74:2
**appointees (1)**
48:10
**approach (3)**
42:11;124:2;133:7
**appropriate (2)**
150:3,7
**approves (2)**
112:7;138:2
**approving (1)**
111:25
**April (1)**
43:14
**area (3)**
25:9,9;50:8
**areas (6)**
20:7;30:16;49:22;

129:3,20;140:1
**argument (1)**
　97:15
**arise (1)**
　66:12
**around (5)**
　20:17;28:12,13;
　35:3;37:1
**article (25)**
　3:,13,19,22,24;25:3,
　16;26:11;29:8;36:2,6,
　10;39:8,19,23;43:14;
　44:7,25;46:24;47:19,
　20;49:24;51:19;
　55:18;151:5
**articles (2)**
　43:20;90:9
**articulate (1)**
　59:4
**Arts (1)**
　20:23
**Asian (3)**
　144:23;145:11;
　147:15
**aside (1)**
　97:17
**aspects (1)**
　46:16
**Assembly (1)**
　99:20
**assign (2)**
　29:3,6
**assignment (3)**
　18:9;33:12;130:24
**assist (2)**
　56:20;152:
**Assistance (2)**
　86:20;87:3
**assistant (5)**
　13:10;15:3,7,17,24
**associate (9)**
　12:25;13:11,13,16,
　18,19;14:2;15:14;
　16:6
**associated (1)**
　57:6
**associations (1)**
　52:9
**assumptions (1)**
　34:7
**Atlanta (5)**
　0:,2,17;2:,
**attach (2)**
　7:17;152:7
**attached (3)**
　4:17;8:19;125:12
**attaches (1)**
　125:16
**attachment (3)**
　91:20,22;92:1
**attempt (1)**
　142:8
**attempted (2)**

141:13;142:3
**attend (1)**
　41:23
**attention (7)**
　44:5;45:3;55:20;
　69:2;111:21;140:20;
　149:13
**Attorney (5)**
　2:;8:2;56:13;65:7;
　79:8;154:15
**Attorneys (2)**
　2:11;7:25
**audience (1)**
　12:5
**audiences (2)**
　12:2,3
**August (34)**
　34:18;61:15,16;
　62:1,6;64:14,23;
　65:12;69:7,8;81:24;
　84:20;91:21,23,25;
　99:19;104:8,10;
　108:1;113:3,22;
　116:15;118:23;119:5,
　9,11,24;125:22;
　126:8;138:24;139:14;
　140:15,15;149:12
**Augusta (1)**
　92:2
**authorities (1)**
　75:21
**authority (5)**
　73:10;76:4;91:12;
　94:3;99:17
**authorized (1)**
　89:15
**available (5)**
　62:1;85:8,10;
　105:22,25
**awarded (1)**
　9:24
**awards (1)**
　19:10
**aware (6)**
　116:10,13,25;
　135:19,21,23

## B

**B-1120 (2)**
　151:25;154:25
**back (35)**
　19:9;26:12,22;33:6;
　39:4;40:25;55:21;
　56:10;59:2;69:19;
　70:23;71:3;72:13;
　86:1;89:13;90:1;
　92:20,21;95:16;98:8;
　99:18;102:1,6;108:2;
　118:22;123:24,24;
　125:21;133:13;
　137:25;140:5,8;
　141:11,14;142:18

**background (1)**
　17:1
**bad (2)**
　81:3;90:14
**bag (1)**
　51:1
**balance (1)**
　25:20
**ball (1)**
　36:12
**ballot (2)**
　112:9;128:15
**balloting (2)**
　25:25;26:1
**ballots (5)**
　26:2;76:24;86:25;
　87:14;131:12
**barrier (2)**
　63:24;64:1
**barriers (5)**
　63:12,18;64:10,10;
　65:1
**base (5)**
　39:18;72:8,9,12;
　147:24
**based (38)**
　13:20;15:11;20:17;
　27:17;28:23;32:23;
　39:20;46:21;58:7,9,
　16,17,18;60:1;70:10;
　71:2;72:18;76:17;
　78:7,8;79:19;83:18;
　94:12;98:10,20;
　100:12,16,21;117:8,9;
　126:25;133:10;
　134:21,22;140:4;
　148:10,10;150:7
**basically (2)**
　27:14;90:17
**basing (1)**
　73:12
**basis (12)**
　66:3;68:7,12,15;
　72:5;84:16;93:21;
　94:1,6;98:4,6;147:9
**bearing (1)**
　67:11
**Become (1)**
　3:
**becomes (4)**
　47:24,25;48:10;
　134:25
**begin (1)**
　140:14
**beginning (1)**
　90:19
**begins (8)**
　22:4;40:8;51:3;
　52:8;54:3;90:6;
　118:23;122:11
**behalf (4)**
　0:11;2:2,9;145:4
**Belinfante (70)**

2:,10;3:3,5;4:7;5:1,
5,16,22;6:1;7:16;
8:13;16:13;33:9,10;
36:15;38:7;40:6;
41:19;43:13;44:23;
47:3,9,14,18;54:1,24;
55:15;58:14,25;
61:22,23;70:1,4,23;
71:7;80:17,18;81:14;
83:23;91:24;99:4;
107:13,21;109:6;
111:17,20;114:12;
115:18;124:23;125:2,
7,13,14;130:9;138:6,
9,20;139:19;140:18;
142:10,17;143:1,11;
144:1;145:15,21;
149:9;150:23;151:11
**below (2)**
　152:,6
**Ben (1)**
　38:21
**best (3)**
　6:13;48:20;154:10
**better (1)**
　11:23
**beyond (9)**
　12:2;21:3;46:9,10,
　12;52:13,21;53:11;
　98:22
**bias (1)**
　39:2
**big (1)**
　50:21
**Bill (4)**
　99:21;126:23,24;
　127:2
**binder (1)**
　102:8
**bit (1)**
　90:25
**bitter (1)**
　10:3
**Black (6)**
　3:14,21;51:7;
　141:14,21;142:5
**Bless (1)**
　31:12
**block (1)**
　116:17
**blog (1)**
　43:22
**blogs (2)**
　43:19,20
**blue (5)**
　68:23;70:6;101:3,5;
　102:16
**board (11)**
　75:4;92:15;96:22;
　104:13,13,21,25;
　112:9;132:13;138:16;
　151:
**board's (1)**

129:5
**book (15)**
　21:5,6,6;24:24;
　25:5;38:2,13,15;39:6;
　40:22;41:2,5;42:1;
　50:14;143:19
**borrow (1)**
　143:18
**both (11)**
　9:7,10;44:1;60:18;
　66:8;86:1;88:2;
　102:16;103:4;121:5;
　125:8
**bottom (2)**
　50:1;51:3
**box (1)**
　132:8
**BRAD (2)**
　0:6;5:6
**branch (2)**
　83:20,20
**break (13)**
　6:24;7:2;55:7,9,11;
　72:9;95:17,18;
　111:12,16,18;142:11,
　16
**breeds (1)**
　40:15
**Brian's (2)**
　45:11;46:1
**bridge (3)**
　52:10,16,19
**Brief (3)**
　138:8,19;145:19
**bringing (1)**
　11:21
**broad (2)**
　25:23;124:19
**broader (5)**
　11:5;26:5;51:20;
　59:12;110:23
**broadly (2)**
　30:22;47:15
**brother (1)**
　50:21
**Brown (1)**
　8:10
**B-R-O-W-N (1)**
　8:10
**BROWN-DEAN (8)**
　0:10;5:2,18,23;
　142:22;151:4;152:;
　153:
**BRYAN (38)**
　2:3;3:4;4:;5:15;
　7:13;41:18;47:7,13;
　54:21;58:10,23;
　61:20;69:25;80:16;
　81:13;83:22;107:12,
　19;109:4;111:15;
　115:17;124:25;
　125:11;130:8;139:17;
　142:13,19,21;143:12,

21,24;144:3;145:14,
18,23;147:10;150:21,
22
**build (1)**
89:21
**Bullock (2)**
29:6,9
**Bundy (1)**
2:4
**burden (1)**
64:5
**Bush (2)**
25:7;79:24

**C**

**California (1)**
9:7
**call (2)**
63:3;140:10
**called (4)**
126:17,21;136:6;
147:25
**call-out (1)**
17:23
**came (2)**
121:16;139:21
**campaign (2)**
37:8;70:2
**campus (4)**
14:16,20,21;21:14
**campuses (1)**
14:17
**can (48)**
5:16;6:11;8:5;11:3;
16:15;18:1;20:24;
25:2;26:16;27:12;
32:20;33:6;35:10,23;
36:7,23;39:6;45:20;
52:10;55:8,9;58:1,11,
11;64:5;70:23;72:13;
78:2;80:21;82:24;
83:2,2;85:25;95:18;
96:1;101:1;103:11;
107:22;115:19;
122:18;123:3;130:10,
10,11;132:5;138:10;
142:11;145:16
**candidate (4)**
15:12;16:5;37:15;
120:17
**candidates (9)**
22:10;36:7,20;
37:19;51:15;60:1,18,
18,19
**capacity (1)**
0:;122:22
**captures (2)**
130:3,4
**card (1)**
86:24
**Cards (3)**
50:3,4,6

**career (1)**
79:6
**CAREY (2)**
2:;6:1
**Carolina (3)**
141:13,16,19
**carried (1)**
69:2
**carry (4)**
64:25;69:13;86:21;
94:20
**case (29)**
23:9;31:13,19,21,
23;32:4,16,18,21,24;
33:2;40:19;46:6;
56:25;57:17;69:24;
78:10;83:12;84:13;
92:11;101:7;104:3,
19;121:5;136:5;
148:15;151:,,18
**cases (5)**
12:13;83:21;86:10;
89:10;145:5
**categories (4)**
60:16;102:19;
120:16;130:24;131:5;
137:1
**categorization (2)**
60:3;131:5
**categorize (3)**
60:1,6,15
**category (4)**
30:1;60:17,19,20
**causes (1)**
55:4
**caveat (1)**
131:17
**CCR (2)**
151:25;154:
**Center (5)**
4:10;28:25;30:24;
73:19;140:22
**centers (1)**
25:8
**central (1)**
137:24
**CERT (1)**
154:25
**certain (4)**
46:16;54:11,20;
103:19
**certainly (5)**
6:12;12:11;24:22;
45:4;128:14
**certainty (1)**
149:6
**certificate (4)**
9:18,23;12:19;
154:1
**certification (2)**
111:25;112:7
**Certified (4)**
0:15,23;127:19;

151:
**certify (2)**
152:11;154:7
**cetera (1)**
97:6
**chair (1)**
104:12
**challenge (1)**
50:10
**challenges (4)**
10:22;22:24;24:3,
14
**chance (1)**
45:6
**Chandler (8)**
8:3;33:16,18,20;
34:10,21,22,23
**change (8)**
62:5,9,12;64:13,16;
119:3;139:15;149:20
**changed (2)**
27:11,12
**changes (15)**
10:22;35:5,9,13;
77:16;126:13,18;
138:22,23;139:2,4,13,
18;152:,3
**chaos (3)**
48:12;49:19;50:7
**chaotic (1)**
49:22
**chapter (9)**
25:5,7,18;26:4,8,13,
14;127:21;129:13
**charge (4)**
17:12;70:9;127:21;
151:
**charged (1)**
95:5
**Charles (2)**
29:6;86:2
**chart (17)**
59:17,20,24;98:11;
102:2,11,13;111:4;
127:19;132:6;136:1,
21;137:10;138:22,23;
139:9,13
**charter (1)**
52:2
**charts (1)**
101:12
**Chatham (2)**
144:21;145:10
**Chevron (1)**
107:20
**chief (55)**
63:15;64:8,24;
65:24;66:6,11,17;
67:10;69:10;72:4,22;
74:3;84:4,8,11;85:7,
15;87:12,22;88:3,13,
19,22;89:2,5,10;
93:24;94:13,15,17;

97:1,16;99:8;106:4;
108:6,23;109:1,7,11,
15,19;110:24;112:8;
122:22;123:7,12,16;
124:9;143:6;145:24;
147:11;148:3,23;
149:24;150:11
**choices (1)**
9:13
**choose (1)**
21:18
**choosing (1)**
20:17
**citation (4)**
39:4,12;93:21;
105:6
**citations (1)**
39:20
**cite (4)**
82:6;85:25;89:25;
98:11
**cited (6)**
57:12;86:10;98:25;
132:7;134:5;149:11
**cites (3)**
81:24;105:19;112:3
**citing (1)**
85:13
**citizens (3)**
22:21;52:12;144:19
**citizenship (1)**
77:10
**city (2)**
89:3,4
**civic (3)**
21:3;22:5,7
**CIVIL (12)**
0:4,14;5:8;11:15;
19:4;51:6,9,24,25;
56:18;79:5;152:
**claims (1)**
33:3
**clarify (5)**
71:2;72:19;84:1;
121:24;128:25
**class (12)**
18:7;23:12,13,15,
18,19,21,22,23;24:6,
9;28:16
**classes (3)**
18:14,16;27:6
**classified (1)**
128:4
**classify (1)**
59:20
**classroom (2)**
20:15;46:10
**clause (2)**
113:8,17
**clear (9)**
55:1;101:14;103:8;
119:7;120:14;123:11;
140:2,3;145:9

**clearly (1)**
24:24
**clerks (1)**
112:9
**Clinton (1)**
42:2
**clipped (1)**
16:14
**close (1)**
55:4
**closing (1)**
75:10
**clouded (2)**
39:1,16
**clunky (2)**
64:18;140:1
Cmiller@robbinsfirmcom (1)
2:
**Cobb (1)**
128:16
**Code (22)**
4:,;71:10;81:24;
82:9;98:13,25;108:3,
9,20,22;116:4,6,18,22;
116:3;124:9,14,16;
127:13;129:14;
131:14;134:15
**codes (1)**
69:22
**codified (1)**
76:19
**coffee (1)**
109:23
**collected (1)**
110:18
**collective (1)**
51:4
**college (5)**
14:6;18:6;20:23;
21:15;37:2
**colleges (1)**
15:19
**Columbia (1)**
82:16
**column (5)**
92:15;136:22,22,
23;137:2
**columns (3)**
43:23;57:23;98:17
**comfortable (2)**
50:9;103:15
**coming (1)**
139:21
**commencing (1)**
0:18
**comments (1)**
34:24
**Commission (2)**
86:20;153:25
**commit (2)**
44:8,12
**Committee (6)**
51:6,9,24,25;56:18;

78:24

**communicate (1)**
34:13

**communities (3)**
21:2;54:11,20

**compared (1)**
60:9

**compilation (1)**
108:4

**complaint (5)**
32:3,5,7,13;145:6

**complete (2)**
58:2;110:6

**completed (2)**
14:13;136:22

**completely (1)**
101:23

**completion (1)**
9:23

**compliance (1)**
136:7

**comply (4)**
87:8;131:14;143:9,
14

**computerized (1)**
86:23

**concede (1)**
129:12

**concern (1)**
79:7

**concerned (1)**
52:11

**concerns (2)**
79:21;80:2

**conclude (2)**
25:15;30:11

**concluded (1)**
150:25

**concludes (3)**
30:12,14;96:8

**conclusion (12)**
25:18;64:14,17;
73:6,10,21,23;108:21;
123:4;124:7,18;
147:10

**conduct (3)**
99:24;100:4;149:17

**conducted (3)**
73:13,14;100:8

**confidence (1)**
80:14

**confirm (1)**
114:15

**confirming (1)**
117:22

**conflating (1)**
44:16

**conflation (1)**
131:20

**conflict (1)**
119:8

**confuse (1)**
7:4

**congratulations (1)**
10:4

**Congress (1)**
40:9

**connect (2)**
35:23;59:21

**Connecticut (3)**
20:7;21:20,24

**connecting (2)**
100:18;133:12

**consider (9)**
11:11;25:19;42:7,
18;43:7;53:10;57:11,
15;110:19

**considerations (1)**
59:12

**considered (4)**
11:11;26:13;43:22;
131:6

**consistent (2)**
69:17;71:19

**consolidated (1)**
55:5

**constitute (2)**
74:22;131:8

**constitutes (2)**
146:21;147:1

**constitution (7)**
68:10;94:22,23;
95:6;109:14;147:21;
148:22

**constitutional (13)**
74:21,21,23;91:12;
93:15;97:18;117:16;
118:2;137:9;144:12;
146:18,22;147:1

**Constitution's (1)**
94:4

**consulting (2)**
31:22,25

**contact (2)**
8:1;34:11

**contacted (4)**
33:11,15,17;151:

**contained (3)**
0:12;59:23,24

**contains (2)**
106:21;116:19

**contemporary (6)**
17:2;19:5,6,7;28:3,
13

**contests (1)**
54:4

**context (9)**
17:8;18:20;19:7;
24:16;25:4;26:6,19;
46:18;101:16

**continue (1)**
91:9

**CONTINUED (1)**
4:1

**contract (2)**
151:13,15

**contributions (3)**
37:8,10;41:9

**controversy (1)**
50:10

**Convention (2)**
41:24;42:3

**conversation (2)**
51:11;148:14

**conversations (3)**
52:20,23,24

**coordinating (1)**
110:25

**copy (6)**
7:12;8:15,16;16:19;
127:19;128:15

**copyright (3)**
3:15,17;38:13

**Corporate (1)**
0:

**corrected (1)**
139:6

**corrections (1)**
152:

**correctly (1)**
19:17

**correspondence (2)**
122:17;123:2

**corresponding (1)**
101:4

**cost (1)**
127:22

**Council (1)**
151:6

**COUNSEL (14)**
2:1;57:9,20;95:25;
99:24;100:3,14;
101:11;127:3;132:22;
136:21;151:;154:12,
16

**count (2)**
102:16;103:4

**counted (5)**
103:13,14;130:5,
14,16

**countermobilization (1)**
40:15

**counties (4)**
77:2,4;110:10;
148:9

**country (3)**
19:3;48:20;49:21

**county (32)**
28:20;30:20;55:3;
62:18;67:17;72:18,
24;77:7;89:3,4;90:6,
10;92:2;96:5,18;
97:22;110:14;120:21;
121:18,25;122:8;
128:16;144:19,21;
145:3,3,8,10;146:25;
148:19;151:;154:4

**couple (1)**
142:15

**course (18)**
19:1,8;20:18;24:17,
17;27:10,13,14,16,17,
18,20;28:7,9,16,22;
29:1,4

**courses (5)**
26:23;27:2,5,8;
140:12

**coursework (2)**
9:21;17:20

**COURT (19)**
0:1,16,23;6:9,16,
22;61:15;71:3;72:10,
17,19;82:25;83:11;
84:13;107:23;121:5;
151:,,11

**courts (3)**
107:5,7,15

**Court's (2)**
54:7;55:25

**cousin (1)**
45:10

**Cover (7)**
3:15,17;38:12;
127:22;128:14,17;
151:

**covered (6)**
89:18;96:6,10;
123:10;129:14;
136:19

**covers (1)**
129:20

**create (2)**
20:16;130:7

**created (3)**
29:25;66:18;130:24

**creates (1)**
117:3

**creation (1)**
86:22

**criteria (1)**
78:11

**culture (1)**
22:9

**current (8)**
8:16;10:22,23;47:5,
11;50:2,12;61:25

**currently (3)**
12:22;17:18;31:9

**curriculum (1)**
8:16

**custody (1)**
127:20

**customary (1)**
151:18

**cute (1)**
42:25

**cuts (1)**
113:8

**CV (6)**
3:11;8:16;14:11;
19:9;24:23;30:1

**D**

**D-1 (2)**
3:;7:15

**D-10 (2)**
3:24;53:25

**D-11 (2)**
4:;61:19

**D-12 (2)**
4:;99:3

**D-13 (2)**
4:;114:11

**D-14 (2)**
4:;125:6

**D-15 (2)**
4:8;125:6

**D-16 (2)**
4:10;140:17

**D-17 (2)**
4:11;149:8

**D-2 (2)**
3:11;8:12

**D-3 (2)**
3:12;16:12

**D-4 (2)**
3:13;36:14

**D-5 (2)**
3:15;38:6

**D-6 (2)**
3:17;40:5

**D-7 (2)**
3:19;43:12

**D-8 (2)**
3:;44:22

**D-9 (2)**
3:22;47:2

**daily (2)**
9:21,21

**data (4)**
45:13;110:8,9;
141:14

**database (1)**
137:24

**databases (1)**
137:16

**day (4)**
18:11;151:20;153:;
154:19

**days (3)**
12:18;18:6;78:5

**day-to-day (1)**
75:20

**dealing (3)**
123:13;136:6,13

**deals (1)**
129:13

**D-E-A-N (1)**
8:10

**death (4)**
48:12;49:19;53:8;
149:20

**debate (1)**

52:2

**debt (1)**
37:1

**December (3)**
0:17;151:20;154:19

**decide (3)**
26:2;76:8;148:12

**decided (3)**
139:22;144:22;
148:17

**deciding (1)**
78:5

**decision (16)**
54:7,15;56:1;69:16;
72:17,18,19,21,24;
82:25;86:2,6,8;90:10;
117:2;145:10

**decision-making (1)**
26:6

**decisions (4)**
17:10;26:5;69:5;
72:10

**declared (1)**
60:18

**dedication (1)**
26:7

**deem (1)**
43:19

**deemed (1)**
103:6

**deems (1)**
63:23

**Defendant (1)**
5:6

**Defendants (4)**
0:8,11;2:9;6:3

**Defendants' (20)**
3:8;4:2,17;7:15;
8:12,15;16:12;36:14;
38:6;40:5;43:12;
44:22;47:2;53:25;
61:19;99:3;114:11;
125:6;140:17;149:8

**Defense (5)**
51:6,8,17;94:11,12

**deference (3)**
107:7,16,20

**define (2)**
19:6;43:3

**defined (1)**
45:20

**defining (2)**
46:4;62:14

**definitely (1)**
18:17

**definitive (1)**
120:13

**definitively (2)**
103:15;132:3

**degree (2)**
31:6;130:25

**degrees (1)**
31:2

**demanding (1)**
45:13

**democracy (2)**
48:11;49:18

**Democratic (4)**
37:14,16;41:23;
78:24

**demographic (1)**
28:10

**department (7)**
13:23;14:1;65:8;
79:5,8;80:3;145:6

**departmental (1)**
14:5

**depend (5)**
69:1;76:8;88:24;
128:19;129:1

**depended (3)**
12:4,8,16

**depending (2)**
14:4;89:6

**depends (7)**
13:9;19:1;42:20;
76:16;79:15;97:9;
128:11

**deposed (4)**
6:6,19;7:23;31:17

**Deposition (18)**
0:10,13;3:10;5:2,
14;7:19;140:5;
150:25;151:,,4,13;
152:,,4;154:7,9,14

**depositions (3)**
6:5;56:25;57:3

**describe (5)**
35:19;37:3;42:2;
86:18;142:4

**described (5)**
43:2;46:1,2;85:8;
90:9

**describing (4)**
17:1;35:22;48:24;
142:2

**Description (2)**
3:8;4:2

**design (1)**
26:2

**designate (4)**
88:3,12;109:11,15

**designates (1)**
99:8

**designation (2)**
88:6;94:17

**designee (1)**
112:10

**desire (1)**
152:3

**detached (2)**
42:12;45:12

**details (1)**
118:25

**determinants (1)**
76:11

**determination (2)**
105:24;121:11

**determine (11)**
11:3;60:4;78:12;
82:11;105:13;114:25;
121:7,9;129:15;
132:19,25

**determined (1)**
49:6

**develop (3)**
132:12;134:7,24

**developing (1)**
87:3

**development (1)**
10:20

**device (3)**
93:3;97:5,24

**differ (1)**
25:24

**difference (8)**
13:15,18;119:4,14;
129:18;133:14,16;
134:8

**differences (2)**
17:13;119:13

**different (20)**
11:13;13:4;15:7,15;
29:25;43:21;55:1;
80:7;82:6;88:21;
90:25;102:24;103:7;
119:19;120:20;
125:18;127:10;133:7,
23;134:2

**differently (6)**
58:15;70:22;79:24;
80:8,8,10

**difficult (2)**
45:9;120:25

**direct (1)**
86:3

**direction (1)**
154:12

**directly (1)**
117:8

**disabilities (1)**
87:2

**disagree (2)**
95:2;131:16

**disclaimer (1)**
110:8

**disclosure (2)**
151:,1

**discount (1)**
151:

**discovery (2)**
5:7;57:17

**discretion (5)**
77:11;92:25;97:3;
112:24;113:9

**discrimination (1)**
77:15

**discuss (5)**
29:11;39:23;57:5;

89:14;107:20

**discussed (5)**
27:15;90:22;
123:25;125:18;
144:13

**discussing (1)**
55:24

**discussion (6)**
27:17;51:21;81:7;
90:6;99:16;135:24

**disenfranchisement (16)**
10:9,16,20,24;11:1,
5;25:1,4,6,9,17;26:19;
37:23;40:13;74:25;
78:17

**disqualified (1)**
151:9

**disseminating (1)**
53:21

**dissertation (2)**
11:2,4

**distinct (1)**
103:9

**distinction (2)**
44:17;129:18

**distribution (2)**
85:9;86:25

**DISTRICT (3)**
0:,1;82:15

**diverge (1)**
28:25

**Diverse (11)**
3:,13,19,22,24;
43:19,22,24;45:1;
47:21;51:12

**diversity (1)**
20:19

**divide (1)**
137:1

**divided (1)**
49:21

**DIVISION (4)**
0:2;78:8;79:5;
129:6

**doctoral (6)**
10:13,15,18,19;
11:6;14:9

**document (8)**
7:20;92:4,10;93:16;
125:9;127:20;128:12;
149:14

**documented (1)**
77:15

**documents (6)**
57:11,16,19,21;
110:8;128:9

**DOJ (1)**
148:14

**donating (1)**
51:5

**done (6)**
74:1;76:19;142:12;
148:12;150:18,22

**door (1)**
48:10

**down (1)**
123:6

**Dr (2)**
5:2;142:22

**draft (1)**
34:20

**drafts (4)**
34:19,21,22,24

**draw (4)**
55:20;69:2;111:21;
149:13

**drawing (1)**
44:17

**drawn (1)**
76:3

**DREs (4)**
126:17;135:15,21;
139:7

**dress (1)**
69:22

**duly (2)**
5:19;154:9

**duplicative (4)**
57:14;68:1,5;
103:12

**during (2)**
79:22;95:18

**Duties (32)**
4:9;59:21;67:22;
75:20;79:9;92:15;
100:17;103:5,9,21;
104:2;117:18;120:15,
16,24;121:2,21;122:2,
25;129:24;130:4,23;
131:1,8;133:11,15;
134:13;135:7;137:6;
143:23;144:6,8

**duty (26)**
59:22;69:12;76:3,4;
94:16;101:2;103:6,
10,14;120:23;121:3;
128:17,18,20,24;
129:16;130:1,7;
131:2;133:19,20,25;
134:19,25;137:13;
138:14

**dynamics (7)**
9:8;11:24;17:3,7,
11,16;18:15

---

## E

**EAC (5)**
89:13,14,20;90:2,2

**earlier (9)**
31:16;51:11;64:23;
90:10,22;108:13;
123:25;131:9;140:23

**earliest (1)**
20:18

**early (9)**

11:15,16;54:9;56:3,
4;141:14,15,21;142:6
**earned (1)**
51:10
**easier (3)**
6:16;16:14;83:5
**Economic (1)**
73:19
**edit (1)**
64:17
**edited (3)**
25:12;126:2,4
**edition (1)**
144:2
**edits (1)**
113:21
**educate (1)**
52:8
**Education (10)**
3:,;9:1;43:19;51:21,
22;52:1,1;53:9,9
**effect (4)**
73:3,5;77:17;78:3
**Effective (1)**
3:
**effectively (3)**
90:21;119:23;132:1
**efficacy (3)**
87:8,17;118:19
**effort (6)**
21:14;24:25;79:20;
142:8;149:18;150:15
**efforts (5)**
21:1,10,19;87:18;
118:19
**either (3)**
62:9;70:15;147:6
**elaborates (1)**
68:6
**elected (5)**
24:13;73:22,23,25;
74:2
**election (131)**
22:14,23;23:3;
24:19;25:3,8,16,19;
26:18;27:7,9;30:22;
34:4;37:24;39:16;
46:18;60:2,20;62:20;
63:15;64:9,24;65:24;
66:7,11,17,25;67:10,
20,23,24;69:10,12;
71:10;72:4,22;73:16;
74:4;75:1,4,20;78:6,
16;84:5,9,11;85:7,15,
16,16;86:20;87:12,13,
18,23;88:4,13,20,22;
89:2,5,10;91:3,10;
93:2,24;94:15,17;
96:21;97:1,4,17;99:8,
17;100:19;104:12,13,
21,25;106:5;108:6,
23;109:1,7,11,16,19;
110:24;111:2;112:8,

18,23,25;113:7,10,12,
14;114:2;115:8,23;
120:6,17;122:12,22;
123:7,12,17;124:9,15;
128:9,13,18,23;129:9,
14,16;133:12;138:15;
141:17;143:1,6;
145:24;146:1,8,14;
147:1,12;148:23;
150:3,7,11
**election-based (1)**
52:5
**elections (30)**
21:3,11,16;26:3;
31:23;39:1;41:7;59:6;
62:22,25;63:19;
67:14,15,17;68:11;
74:14;75:4;76:5;89:3,
4,11;94:5,13;112:9;
119:1;128:2;129:20;
147:16,20;149:24
**electoral (9)**
62:20;65:6,19;66:1;
74:6,9,22;77:16;91:4
**eligibility (1)**
28:14
**eligible (6)**
81:12,17,19;
144:18;149:19;
150:13
**else (3)**
6:12;35:8;76:15
**e-mail (8)**
4:;7:24;8:4;34:14,
15;125:8,9,15
**e-mails (1)**
125:11
**emotional (1)**
9:11
**emphasis (1)**
85:9
**employed (2)**
154:13,16
**employee (1)**
154:15
**empowering (1)**
44:15
**empowers (1)**
44:8
**enacts (1)**
96:5
**encapsulation (1)**
130:1
**encourage (1)**
50:25
**encouragement (1)**
51:10
**encouraging (1)**
51:18
**end (5)**
12:20;18:8,11;
130:14;140:15
**ended (2)**

30:1,1
**enforce (6)**
66:19,24;68:10;
146:1,14;147:12
**enforcement (2)**
34:5;124:19
**enforcing (3)**
70:9;94:3;95:5
**engage (3)**
43:4;52:22,24
**engaged (2)**
37:22;45:13
**engagement (3)**
21:3;22:5,7
**enhanced (1)**
87:2
**enough (1)**
124:5
**enrolled (1)**
31:9
**ensure (5)**
93:2;97:5;103:19;
113:12;114:2
**ensuring (2)**
143:8,13
**entails (2)**
13:20;24:11
**entered (1)**
152:
**entire (1)**
18:11
**entities (2)**
128:5;137:24
**entitled (1)**
137:11
**entry (3)**
13:7,10;15:8
**equality (2)**
41:16,21
**equipment (3)**
35:4,11;135:15
**errata (1)**
152:7
**Esq (1)**
151:11
**et (3)**
0:3;7:97:6
**evaluate (3)**
78:12;80:21;100:9
**evaluating (1)**
130:25
**evaluations (1)**
14:13
**Eve (1)**
135:20
**even (8)**
49:2;64:10,24;
65:13;71:9;76:19;
89:5;103:6
**exact (1)**
63:4
**exactly (3)**
43:18;131:10;

136:14
**Examination (8)**
3:3,4,5;5:21;11:9;
117:9;142:20;145:20
**EXAMINATIONS (1)**
3:1
**examine (2)**
30:16;78:5
**examined (2)**
5:19;110:23
**example (17)**
22:13;39:23;69:11;
89:3,21;102:16;
103:2;106:14;116:18;
120:7;121:18;128:16;
129:4;134:8;137:21;
147:14;148:6
**except (1)**
5:11
**exception (1)**
152:12
**exclusive (7)**
102:23;118:24;
119:2,18;128:6;
131:6;151:
**exclusively (7)**
27:7,9,22;43:25;
89:4;97:7;100:13
**excuse (3)**
47:24;48:1;62:20
**executing (1)**
91:10
**executive (1)**
83:20
**exemplar (1)**
35:23
**exercise (2)**
134:1,2
**Exhibit (49)**
3:;4:;7:15,17,18;
8:12,15;16:10,12;
33:6;36:14,16;38:6,9;
40:2,5;41:1;43:9,12;
44:22,25;46:25;47:2;
53:23,25;55:17;
61:19;71:23;91:22,
25;95:25;98:24;99:3;
108:13;114:8,11;
125:10,17;126:7;
127:8,9,12;136:16;
138:21;140:17,20;
142:22;149:8,11
**EXHIBITS (5)**
3:7;4:1,17;125:6,12
**expanded (1)**
21:23
**expect (1)**
45:22
**expert (6)**
8:20;11:19,24;
12:12;31:22;32:1
**Expires_ (1)**
153:25

**explain (1)**
27:12
**expose (1)**
9:7
**express (5)**
22:8,11;37:21;87:7,
11
**expressed (2)**
58:3;103:6
**expressing (4)**
50:24;67:21;117:1;
118:18
**expressly (1)**
120:4
**extensive (2)**
100:8,12
**extent (1)**
107:22
**extracted (1)**
110:9
**eyes (1)**
140:10

---

**F**

**fact (6)**
41:5;91:19;96:11;
112:6;123:23;146:7
**factor (1)**
106:2
**facts (1)**
33:21
**faculty (1)**
20:23
**failure (1)**
146:21
**FAIR (30)**
0:3;39:15;40:21;
41:10,12,14;42:7;
47:4,10,16;62:22,24;
63:19;74:14;79:16;
80:6,13;103:17;
104:20,23;113:25;
114:17;117:12;124:5;
133:9;135:20;141:6,
21;146:1;147:20
**fall (1)**
69:12
**falls (5)**
93:1;94:16;96:25;
97:4;150:6
**familiar (2)**
39:10;41:12
**families (2)**
45:15;46:5
**family (2)**
46:2,4
**far (1)**
137:2
**Federal (53)**
0:14;5:8;17:14;
25:21,25;26:6;58:19;
60:24;61:5;64:11;

65:6,14;66:18,19;
67:14,15,17,20,24;
68:3,8,19;69:4;72:24;
74:11;76:12;77:16,
25;78:2,4;89:9,11;
93:5,8;94:6,9;95:1;
97:6;98:1;103:20;
107:7,15;109:2;
121:6;122:12,17;
136:13;137:23;143:9;
146:8,10,16;152:2
**federalism (6)**
    18:19;25:19;29:1;
    75:16;77:11;97:13
**fee (1)**
    127:21
**feel (4)**
    9:12;44:6;45:5;
    103:15
**fell (2)**
    38:25;101:16
**fellowships (1)**
    19:11
**felon (12)**
    10:8,15;11:1,4;
    25:1,1,4,6,8,17;26:19;
    46:19
**felt (2)**
    117:7;140:1
**Female (1)**
    3:14
**few (2)**
    38:12;102:5
**field (2)**
    9:14;13:20
**Fifty (1)**
    30:8
**FIGHT (5)**
    0:3;41:10,12,14,21
**fights (1)**
    41:16
**figure (6)**
    12:14;18:13;43:1;
    50:21;97:20;121:16
**FILE (1)**
    0:4
**filed (2)**
    16:18;61:15
**financial (3)**
    37:7;41:9;151:
**financially (1)**
    154:17
**find (8)**
    92:5;95:7,16,18;
    101:7;114:7;116:7;
    136:15
**fine (5)**
    5:15;6:25;7:13;
    71:18;84:24
**finish (1)**
    6:15
**First (35)**
    3:14;5:13,19;16:25;

21:8,22;27:13;32:12;
45:5;47:23;48:7;
57:23;61:16;72:15;
82:13,14;85:6;86:19;
92:24,24;98:16,17;
105:4;106:11;110:1,
7,14;111:24;112:17;
113:6;115:23;118:14;
125:4;127:2;136:21
**fit (2)**
    106:9,10
**fits (2)**
    11:5;128:1
**Five (3)**
    3:22;20:7;37:11
**fix (1)**
    127:21
**flesh (1)**
    18:1
**fleshing (1)**
    18:5
**flip (1)**
    118:22
**Florida (2)**
    38:22;40:14
**flow (3)**
    68:3,20;150:5
**focus (24)**
    11:7;17:21;21:20;
    27:7,8;28:17,22;30:7,
    18;32:17;41:2;44:15;
    51:17;53:17,18;
    68:15,17;69:15;
    117:7,11,12;119:24;
    122:8;130:23
**focused (8)**
    22:14;26:17;27:20;
    29:17;32:18;67:24;
    117:6;134:11
**focuses (4)**
    35:7;67:19;146:7,
    10
**focusing (2)**
    51:14;74:19
**folks (1)**
    50:25
**follow (1)**
    35:16;132:2
**following (5)**
    86:21;100:9;144:7;
    151:6;152:12
**follows (1)**
    5:20
**footnote (3)**
    18:9;81:24;112:3
**footnotes (1)**
    82:5
**foregoing (3)**
    152:;154:7,8
**forgive (3)**
    27:19;43:17;72:3
**form (20)**
    5:12;33:1;41:18;

47:7;54:21;58:10,23;
80:16;81:13;83:22;
107:12,19;109:4;
115:17;130:8;131:8;
139:17;143:11;152:3,
6
**forms (2)**
    85:8;106:23
**formulated (1)**
    97:10
**forth (3)**
    71:22;84:18;90:1
**forward (1)**
    19:8;28:3,7,18
**found (10)**
    51:17;73:2;82:24;
    83:10;84:12;92:6;
    103:2;109:2,8;141:6
**Foundation (2)**
    86:2;98:21
**Foundations (1)**
    19:14
**founding (2)**
    10:21;19:3
**four (1)**
    89:17
**four-week (1)**
    9:16
**frame (1)**
    18:23
**frames (1)**
    18:25
**framework (1)**
    68:19
**fraud (1)**
    106:23
**free (7)**
    44:6;45:5;62:22,24;
    63:19;74:14;147:20
**frequently (1)**
    52:22
**fresh (1)**
    140:10
**friend (1)**
    37:17
**front (2)**
    136:20;142:23
**fulfill (1)**
    88:13
**fulfilled (1)**
    80:3
**Full (19)**
    13:14,16,19;14:2,
    22;15:18,21,25;40:8;
    45:5;75:17;77:13;
    82:14;85:6;86:19;
    90:18;92:24;118:14;
    119:11
**fun (1)**
    23:25
**function (6)**
    94:10;98:2;128:9,
    10;129:17,19

**functions (4)**
    91:10;95:13;111:1;
    131:18
**Fund (3)**
    51:6,8,17
**funding (2)**
    52:3;76:21
**funny (1)**
    70:19
**furnish (2)**
    127:19;152:
**furnishing (1)**
    127:22
**Further (4)**
    3:5;53:2;145:20;
    154:14
**future (1)**
    135:22

**G**

**GA (2)**
    2:,
**gap (3)**
    52:10,16,19
**gave (3)**
    18:9;27:15;33:23
**gaze (1)**
    45:11
**general (10)**
    6:5;29:16;65:7;
    79:8;84:11,14;99:20;
    116:11;129:23;
    149:17
**generalities (1)**
    36:20
**generally (15)**
    24:9;29:25;31:20;
    32:16,21;34:10;
    42:11;46:15;56:11;
    70:13;83:18;120:4;
    128:2;129:17;141:9
**gentleman (1)**
    78:19
**George (3)**
    20:2;50:14;79:24
**Georgia (144)**
    0:,7,17;4:,,8;10:11;
    11:7,9;17:21,22;18:1,
    8,14,16,18,20,22;
    21:25;22:2;23:8,9,16;
    24:19;26:8;27:20;
    28:5,6,9,14,17;29:4,5,
    13,16,17;30:7,10,11;
    32:24;34:4;37:22;
    39:5,23;40:13;41:3,7;
    54:14,17,19;55:5;
    56:4,14;58:16,17,19;
    59:6;60:15,24;61:3,8,
    10;63:3,8,21,22,25;
    65:17,23;66:24,25;
    68:22;70:14;71:9;
    72:12;73:23;74:2;

75:4,8,11,25;76:4,23;
77:1,8;82:15;83:9;
84:8;87:8,13,18,23;
90:1;91:14,17;94:2,
14;95:4,12;96:5,8;
97:21;98:7,13;99:8,
17,20,25;100:4,8;
101:8;106:13,19;
108:3,5;110:18;
111:7;116:6;117:18;
118:3;120:3;123:6;
124:21;133:25;
135:19,21;136:5,6;
139:9;141:2,3,10,16,
20;142:3,4;143:6;
147:2,12;151:,2,6;
154:3
**Georgia's (5)**
    18:12;63:3;75:1;
    82:23;149:24
**German (1)**
    39:8
**gerrymandering (3)**
    11:19,24;12:13
**gifts (1)**
    46:7
**Gillum (1)**
    38:21
**given (5)**
    26:23;91:20;94:8;
    151:;152:4
**giving (2)**
    59:18;61:9
**goals (1)**
    53:2
**goes (7)**
    16:1;22:4;79:14;
    85:12;108:9;113:11;
    119:1
**Good (7)**
    5:23,24;55:8;80:20,
    25;81:3;90:14
**Gore (1)**
    25:7
**governing (1)**
    118:25
**government (16)**
    28:24;31:20;50:18,
    19,22;55:2,3,4;62:16;
    65:7,15;77:7,25;78:2,
    5;94:7
**governmental (1)**
    128:10
**governments (9)**
    54:19;62:17;65:5,8,
    18,25;74:5;94:25;
    95:1
**Governor (3)**
    3:14;35:17;38:21
**Grad (1)**
    24:2
**grading (2)**
    9:18,20

**graduate (2)**
  23:22;46:13
**grant (6)**
  19:16,22,24;20:18;
  21:4;89:20
**grants (12)**
  19:10,14,19;20:10,
  13,16,22,23;21:4;
  89:14,15;90:3
**grassroots (1)**
  35:24
**Grofman (1)**
  25:12
**ground (1)**
  123:10
**group (2)**
  9:22;20:3
**groups (3)**
  21:18;51:8;147:18
**gubernatorial (1)**
  37:23
**guess (7)**
  29:24;69:6;95:2;
  121:15;130:13;142:1;
  143:24
**guidelines (3)**
  69:13,17,18
**gut (2)**
  54:8;56:1
**gutted (1)**
  90:11
**GWINNETT (2)**
  151:;154:4

                    **H**

**halfway (1)**
  123:6
**Hamden (1)**
  14:18
**hand (1)**
  125:8
**handled (1)**
  148:13
**happen (3)**
  14:5;69:4;145:1
**happened (1)**
  145:2
**happening (1)**
  145:8
**happens (4)**
  28:24;53:18;101:5;
  109:23
**hard (2)**
  120:13;139:25
**harder (1)**
  6:18
**harmful (9)**
  62:19,20;65:6,19,
  25;74:6,9,16,22
**HAVA (43)**
  63:3;66:20;68:25;
  69:21;70:15;71:10;

72:6;74:11;85:20;
86:19;88:2,7,7,12,14,
17,20;89:2,15,18,24;
90:3;91:5;93:9,14,23;
94:18;97:16;99:9;
108:15;109:8,10,10;
117:13,19;118:1;
123:13,19;124:12;
137:9;143:15;146:17;
147:13
**head (2)**
  29:10;78:24
**heading (1)**
  52:8
**heard (1)**
  41:14
**help (13)**
  11:25;40:1;46:8;
  60:12;61:11;66:9;
  67:18;68:3,14;83:17;
  86:12,18;144:11
**helping (1)**
  24:10
**hereby (2)**
  152:11;154:7
**herein (1)**
  0:12
**here's (1)**
  29:12
**hide (1)**
  36:12
**High (3)**
  3:;12:6;55:18
**Higher (2)**
  3:,
**highlight (1)**
  110:24
**historical (1)**
  17:2
**historically (1)**
  27:24
**History (4)**
  3:21;18:12,19;
  77:15
**Holder (4)**
  54:9;56:2;79:8;
  90:7
**holding (1)**
  23:2
**honestly (1)**
  7:3
**honor (2)**
  46:1,5
**Honoring (1)**
  3:
**hopes (1)**
  124:23
**host (1)**
  128:6
**hour (1)**
  55:8
**hours (2)**
  54:7;55:25

**House (14)**
  47:24,25;48:9,14,
  25;49:16;50:3,4,6,21;
  99:21;126:23,24;
  127:2
**hub (1)**
  77:5
**huh-uh (1)**
  6:22
**hybrid (1)**
  23:23
**hyphen (1)**
  8:10
**hypothetical (5)**
  64:3;68:21;69:19;
  96:5;147:24
**hypothetically (1)**
  63:22

                    **I**

**ID (2)**
  62:24;106:22
**idea (3)**
  36:19;50:17;98:9
**identification (19)**
  7:14;8:11;16:11;
  36:13;38:5;40:4;
  43:11;44:21;47:1;
  53:24;54:10,15;
  61:18;94:13;99:2;
  114:10;125:5;140:16;
  149:7
**Identified (10)**
  3:;4:;60:25;61:4,5;
  84:8;100:17;123:7;
  133:11;134:12
**identifies (3)**
  63:23;84:6;118:14
**identify (6)**
  104:2;108:5,22;
  109:19;112:6;123:12
**identifying (3)**
  94:14;138:15;
  141:19
**Identity (5)**
  3:,;21:6;38:2;41:2
**ignore (1)**
  119:23
**impact (1)**
  30:15
**impairs (3)**
  93:4;97:6,25
**impede (1)**
  74:13
**impedes (2)**
  62:21,24
**implementations (1)**
  59:14
**implementing (4)**
  65:5,18,25;74:6
**implicate (1)**
  68:24

**important (4)**
  6:8;64:24;65:13;
  106:24
**impose (11)**
  83:8,16;85:13;
  99:12;106:25;115:14;
  120:23;121:13;
  130:20;131:2;132:19
**imposed (10)**
  72:21;81:16;88:14;
  103:4;117:13;121:21;
  132:1;133:1;134:19;
  149:23
**imposes (11)**
  84:10,14;105:11,
  15;107:3;120:4;
  124:14;132:15;
  148:23;150:11,14
**INC (6)**
  0:;151:,,,,8
**incarceration (1)**
  45:12
**include (12)**
  22:19;53:15;73:23;
  106:24;107:8;117:20;
  121:20;122:2;127:25;
  143:13;144:6,11
**included (10)**
  60:10;66:8;74:17;
  82:9;124:15;128:21;
  131:22;135:6;141:1,
  20
**includes (1)**
  141:3
**including (4)**
  68:10;74:20;82:15;
  119:1
**incomplete (1)**
  110:2
**incorrect (1)**
  141:1
**increased (1)**
  35:5
**incredibly (1)**
  49:21
**Independent (6)**
  80:23;99:25;100:4;
  129:25;130:7,20
**INDEX (3)**
  3:1,7;4:1
**Indian (1)**
  148:7
**indicate (2)**
  12:12;74:2
**indicative (1)**
  78:15
**individual (1)**
  17:9
**individuals (1)**
  111:9
**ineligible (2)**
  149:19;150:12
**inflate (1)**

**131:11**
**inflates (1)**
  131:16
**inform (1)**
  106:17
**information (9)**
  16:2;105:22;
  110:12,14,18;121:10;
  126:25;137:20,22
**inherent (1)**
  129:16
**initial (1)**
  135:14
**initiatives (1)**
  20:20
**Innovation (2)**
  20:10,13
**insight (2)**
  52:12;53:11
**instances (1)**
  131:25
**Institute (2)**
  9:1,4
**institutional (5)**
  17:2,6,11,15;18:14
**instruction (2)**
  132:14;134:24
**integrity (4)**
  46:11;52:14;53:13,
  20
**intellectual (3)**
  9:12;52:14;53:12
**intent (2)**
  119:10;139:8
**intentional (1)**
  37:22
**interact (2)**
  22:22;61:4
**interaction (2)**
  60:1,17,19;120:18
**interactions (2)**
  60:20;128:3
**interest (5)**
  23:9;25:23,24,25;
  151:
**interested (1)**
  154:17
**interests (3)**
  22:4;25:20;48:20
**internally (1)**
  148:13
**interplay (2)**
  60:24;61:4
**interpret (1)**
  80:8
**interpretation (2)**
  107:9,16
**interpreted (2)**
  80:10;83:19
**interpreting (1)**
  83:12
**interrupt (1)**
  6:13

**interrupted (1)**
67:9
**interstate (1)**
112:19
**intervention (1)**
145:7
**into (11)**
11:5;35:10;79:14;
104:16;106:2,4,9,10;
113:18;116:22;137:1
**intrastate (1)**
112:18
**invest (2)**
51:4;52:9
**involved (6)**
9:18;21:15,16,19;
22:23;113:14
**involvement (1)**
50:19
**involving (4)**
31:19,23;61:10;
94:21
**island (8)**
48:11,15,21,25;
49:8,8,14,15
**isolation (3)**
121:1,1;131:19
**issue (6)**
6:14;34:2;35:1;
51:19;70:14;104:3
**issued (2)**
12:20;139:20
**issues (5)**
24:25;51:14,16;
53:6;73:15
**items (1)**
87:9
**iteration (1)**
27:16
**iterations (1)**
27:13

**J**

Jbelinfante@robbinsfirmcom (1)
2:14
**Jealous (1)**
38:22
**joined (1)**
6:1
**Joint (5)**
4:10;9:5;30:23;
73:18;140:22
**Josh (2)**
6:1;151:11
**JOSHUA (1)**
2:10
**journalists (1)**
12:7
**judicial (2)**
83:20;151:6
**June (1)**
33:12

**junkie (1)**
35:20
**jurisdiction (2)**
83:12;88:25
**jurisdictions (1)**
77:14
**justice (6)**
45:14;65:8;79:5,8;
80:2;145:7

**K**

**keep (2)**
55:9;113:3
**key (14)**
10:21;11:4;24:14;
25:9,18;26:20;28:8;
30:16;68:18;91:9;
97:13;106:12;110:24;
131:10
**KHALILAH (6)**
0:10;5:2,18;151:4;
152:;153:
**K-H-A-L-I-L-A-H (1)**
8:7
**kicked (2)**
48:10;49:7
**kind (6)**
7:5;15:8;29:12;
76:18;105:24;145:7
**knowing (2)**
43:18;60:7
**knowledge (3)**
54:14,17;57:16
**known (1)**
99:20

**L**

**labor (1)**
79:2
**lack (1)**
49:21
**laid (1)**
143:23
**language (8)**
46:8,11;64:18;91:1;
94:23,24;101:15;
119:6
**largely (1)**
34:13
**last (12)**
7:3;8:8;23:17,19;
38:17;44:5,7;49:24;
54:6;82:13;104:11;
137:25
**later (1)**
115:24
**Laterika (1)**
2:17
**latest (1)**
125:17
**Law (39)**

2:,11,17;10:11;
11:7;17:21;31:6,10;
58:8,16,17,19,22;
61:8;62:24;64:11;
66:13,25;68:22;70:6,
9,10;72:10,18;74:23;
85:13;89:9;91:11;
103:7;109:2;116:6;
129:24;132:2;136:5;
139:9;144:8,10;
146:1,8
**Lawrence (1)**
2:4
**laws (11)**
10:20,22,24;11:1;
54:15;68:3,10;
103:20;143:9;146:14;
147:12
**lawsuit (1)**
6:3
**lawyer (1)**
57:6
**Lawyers' (5)**
51:6,9,23,25;56:18
**lead (1)**
78:16
**leaders (1)**
73:22
**leadership (2)**
24:5,13
**leading (2)**
79:20,20
**learn (1)**
7:22
**learning (1)**
20:15
**least (4)**
39:5;76:13;81:23;
149:12
**leave (2)**
28:2;70:11
**lecture (1)**
27:17
**lecturing (1)**
18:11
**led (2)**
35:1;56:24
**legal (13)**
41:16,21;51:5,8,17;
56:13;59:5,12,13;
65:17;77:21;96:1;
105:11
**legislation (1)**
99:19
**legislative (1)**
142:8
**legislators (3)**
52:11;53:4,7
**legislature (2)**
69:11;142:3
**LESLIE (4)**
2:3;5:10;6:12;7:12
Lesliebryan@lawrencebundycom (1)

2:7
**less (2)**
101:19;102:4
**letters (2)**
14:14;89:25
**level (22)**
13:7,8,10;14:5,6,7;
15:8,13;26:5;28:23;
67:18;69:4,6;93:4,5,
8;97:6,25;98:1;
110:14,15;145:8
**levels (4)**
13:5;15:7;28:24;
68:20
**lever (1)**
86:24
**licensing (1)**
129:5
**limit (1)**
96:10
**limited (9)**
60:23;61:3;66:15;
67:14,16;68:16;
70:18;117:12,13
**line (3)**
76:3;94:12;115:23
**lines (1)**
94:11
**linked (1)**
133:22
**links (1)**
106:21
**list (6)**
81:12,17;118:15;
119:1;121:21;149:4
**listed (3)**
25:5;29:20;30:6
**lists (2)**
149:19;150:13
**literally (1)**
115:4
**litigation (4)**
31:14;33:21;52:5;
151:19
**little (3)**
10:3;18:2;90:25
**Littlefield (1)**
2:
**lived (2)**
111:9;148:10
**lives (1)**
50:19
**living (1)**
148:8
**LLC (2)**
2:,4
**loan (1)**
37:1
**local (30)**
17:14;54:19;55:3;
62:17,18;67:17,23;
69:6;75:21;76:4,9;
87:13,24;91:9;92:25;

93:4;97:3,25;113:10,
12;114:2;118:25;
137:23;138:4;143:8,
14;144:15,16;145:8,
10
**localized (1)**
77:5
**locally (1)**
148:13
**located (1)**
144:21
**location (3)**
89:21,22;96:9
**locations (1)**
75:10
**long (3)**
9:15;12:17;69:16
**longer (1)**
49:11;114:1;135:19
**look (41)**
16:9;18:25;20:6;
21:17;22:21;23:3,7;
24:8,19;28:1,5,6;
30:12,12,13,13;33:24;
39:6,11;46:14,17;
47:19;60:8;64:22;
82:4;90:16;92:10;
95:22;98:23;102:18;
105:2;106:20;112:17;
116:14;132:5;133:3,
4;137:5,19;141:11;
150:1
**looked (10)**
10:19,21;11:2,8;
20:19,25;21:23;28:8;
77:4;104:6
**looking (30)**
11:14,14;18:23;
19:2,3,4,4;21:2;
29:18;35:10;68:12,
17,18;84:17;85:4;
98:6;109:5;114:18,
21;120:3;133:3;
137:25;138:10;140:6,
7,8;142:6;147:18;
150:1,5
**looks (3)**
7:11;25:7;30:21
**Lopez (4)**
39:5,8,18,24
**losing (2)**
52:13;53:12
**lot (3)**
24:25;101:1;135:25
**lots (1)**
52:24
**love (1)**
125:11
**loved (1)**
46:5
**Lunch (4)**
111:15,16,18,19
**Lynn (4)**

0:15;151:25;154:,6

# M

**ma'am (1)**
48:4
**machines (2)**
86:25;126:17
**mail (1)**
122:19
**main (2)**
14:20,21
**maintain (4)**
46:10;81:11,17;
149:3
**maintained (1)**
137:16
**maintaining (1)**
53:19
**maintenance (2)**
63:8;86:23
**majority (5)**
101:18,19;102:1,3,
5
**makes (3)**
17:10;85:14;149:18
**making (10)**
53:20;69:5;84:3;
85:9;97:23;105:24;
119:6;130:25;152:,
**mandate (1)**
134:2
**mandates (3)**
28:11;91:11;146:16
**manner (3)**
26:3;96:18;105:16
**manuals (3)**
116:19;132:13;
134:24
**many (6)**
15:17;26:23;27:6;
49:22;130:14;131:18
**March (2)**
45:1;47:20
**mark (9)**
16:10;40:2;43:9;
46:25;53:22;61:14;
98:24;114:8;125:16
**marked (24)**
7:14;8:11,15;16:11;
36:13,16;38:5,8;40:4;
43:11;44:21,24;47:1;
53:24;61:18;99:2;
114:10;125:5,10;
126:7;140:16,20;
149:7,10
**Marked/First (2)**
3:8;4:2
**Maryland (1)**
38:22
**mass (1)**
45:12
**master's (5)**

9:25;10:6,8,10;31:3
**match (2)**
63:4,4
**materials (2)**
26:18;117:3
**matters (3)**
103:21,23;129:13
**may (27)**
16:14;40:1;55:8;
61:16;70:19,21;
71:16;72:2,13;80:7;
95:16,23;101:14;
108:1;111:12;118:5;
125:9,9;129:24;
132:12,15;134:7;
135:1,2;142:12;
143:18;144:8
**mean (50)**
12:11;17:6,9;18:3,
4,7;21:13;22:6;28:19;
31:2,25;35:9,10;36:5,
9;39:6;42:6;45:17;
47:14;49:18,20;50:4,
11,14;52:16;59:19,
22;60:4;62:16,19;
63:13;66:20;79:18;
111:6,8,14;113:8;
115:4;116:2;117:20;
119:16;124:8;128:14,
25;130:11;131:11;
133:18;135:11;136:9;
150:10
**means (1)**
131:7
**meant (1)**
60:7
**measures (1)**
69:11
**media (2)**
12:7;20:17
**meeting (1)**
9:21
**meets (2)**
50:3,4
**member (3)**
37:16;46:4;138:15
**members (2)**
37:13,18
**memory (1)**
46:1
**mention (5)**
38:20;95:12;
120:16,21;121:17
**mentioned (3)**
18:8,18;117:17
**merits (1)**
33:2
**met (2)**
5:25;35:14
**mid (1)**
11:15
**middle (1)**
18:17

**midterm (2)**
54:4;141:16
**midway (3)**
16:25;75:19;85:6
**might (3)**
57:20;79:23;151:16
**MILLER (7)**
2:,6:1;33:8;61:21;
91:23;125:4;143:20
**mind (1)**
132:6
**Mine (1)**
127:9
**ministerial (2)**
128:10;129:17
**minute (1)**
136:20
**minutes (2)**
142:12;145:16
**misfit (7)**
48:11,15,22,25;
49:8,8,14
**misleading (1)**
7:5
**missing (1)**
119:3
**mission (1)**
41:21
**mobilization (3)**
20:6;35:24;40:15
**mobilize (1)**
21:10
**mobilizing (1)**
21:2
**Molden (1)**
2:17
**moment (7)**
5:25;38:1;45:20;
95:8;103:16;138:8;
141:22
**money (1)**
86:20
**monitor (1)**
91:3
**monitoring (2)**
91:4;110:25
**Month (1)**
3:21
**More (20)**
3:;18:2,4,17;20:14;
21:15;27:16;28:13,
13;29:12;42:15;
46:24;47:24;55:16;
64:24;65:13;70:13;
95:3;105:19;107:5
**morning (4)**
5:23,24;24:1,2
**most (8)**
6:8;13:10;15:9,19;
21:4;23:11,13;75:19
**move (2)**
14:1;15:24
**movement (2)**

11:15;19:4
**moving (1)**
96:9
**much (8)**
6:20;10:5;25:1;
26:7;44:6;53:14;83:4;
150:20
**multiple (1)**
112:22
**multitude (1)**
130:4
**municipal (2)**
28:21;135:20
**murder (1)**
45:11
**murdered (1)**
45:10
**music (1)**
22:9
**must (5)**
81:16;88:1;110:25;
120:8;129:23
**mutually (2)**
102:23;131:6
**MVP (2)**
110:1,7
**myself (3)**
43:3;45:24;142:2

# N

**NAACP (3)**
51:5,8,16
**name (5)**
5:25;8:5,8;12:11;
39:8
**named (2)**
76:13;78:19
**names (3)**
149:18;150:12,16
**narrow (1)**
117:11
**narrowly (1)**
117:6
**national (15)**
26:6;41:24;60:11;
61:11;66:9;67:19;
68:14;78:24;81:7;
82:1;93:14;122:18;
143:15;146:17;
149:12
**Nation's (1)**
3:
**natural (1)**
50:1
**nature (3)**
51:14;115:11;
119:15
**navigate (1)**
24:14
**navigating (1)**
25:10
**necessary (2)**

131:14;152:
**need (12)**
8:7;25:19,20;26:4;
36:8,20;39:25;63:12;
115:3,6;141:11;
143:24
**needed (1)**
148:17
**neither (1)**
154:12
**Nevada (1)**
40:14
**new (19)**
13:19,25;50:9,10;
54:9;56:2,4;96:6,8;
131:15;135:20
**newest (1)**
27:16
**next (8)**
13:11;15:13;27:3,5;
91:8;124:25;129:22;
133:9
**nor (2)**
154:13,16
**North (3)**
141:13,16,19
**NORTHERN (1)**
0:
**Notary (1)**
153:24
**note (3)**
95:23;96:2;123:24
**noted (1)**
152:
**Notice (6)**
3:;7:18,19;93:20;
117:19;150:4
**notified (1)**
126:21
**notify (1)**
115:25
**notion (1)**
97:13
**November (58)**
8:23;16:19;34:18;
35:2,6;58:2;61:25;
62:2,6;64:14;65:3,14;
71:23;72:2;75:14,15;
82:5,12;84:19,22;
86:1,14;90:6,16;
92:21,22;98:25;
99:16;102:19;104:17;
105:3;108:2;110:3,
22;111:22;113:18,21;
116:23;118:6;119:2,
10,10,24,25;122:14;
125:20,22;126:2,3,9,
14;136:1;138:1,22,
24;139:4,14,20
**November's (1)**
71:20
**number (17)**
35:5;52:7;54:10,20;

61:20;62:4;64:15;
74:10;90:18,22;
92:11;103:21,23;
129:3;131:10,11,17
**numbered (1)**
49:24
**numbers (1)**
106:18
**NVRA (38)**
66:20;68:4,25;
69:21;70:15;71:11;
72:6;74:11;81:11,16;
82:6,19,24;83:6,8,16;
84:9;85:14;88:2,22;
91:6;93:9,23;94:18;
97:16;117:13,20;
118:1;122:23;123:1,
13;124:12;137:9;
143:15;144:12;
147:13;149:3,24
**NW (2)**
2:,12

# O

**Obama (2)**
79:2;80:3
**Obama's (1)**
79:23
**Object (1)**
143:11
**Objection (14)**
41:18;47:7;54:21;
58:10,23;80:16;
81:13;83:22;107:12,
19;109:4;115:17;
130:8;139:17
**objections (1)**
5:11
**objective (1)**
42:12
**obligation (38)**
65:17;66:24;68:8,9;
83:9,17;84:11,12,15;
85:14;87:12,22;
96:17;99:13;102:15;
103:4,18;105:11,15;
114:23;115:14;
116:11;117:3;120:5;
127:18;128:1;130:21;
131:15;132:15;133:1,
7,22;134:9;135:3,6;
148:23;149:23;
150:12
**obligations (20)**
59:5;66:12,18;
67:22;68:2;80:4;
81:11,16;82:23;
88:14;102:17;103:21;
117:13;121:13;
124:15;128:1;132:1;
133:17;136:5;137:6
**obviously (1)**

42:6
**OCGA (4)**
143:23;151:,;152:
**off (8)**
29:10;48:10;49:7;
109:24;113:8;138:6,
8;148:8
**offer (4)**
87:15,25;106:10;
107:15
**offering (8)**
40:18;58:21;59:1;
74:24;75:3,7;104:20,
24
**office (8)**
22:10;23:1;49:11;
94:16;106:12;107:8;
111:8;120:15
**officer (40)**
64:24;65:24;66:7,
11;67:11;69:10;72:4;
74:4;84:9,11;85:15;
87:12,23;88:4,13,20,
22;89:2,5,10;93:24;
94:13,15,18;97:1,17;
99:9;106:5;115:15;
122:22;123:7,12;
124:9;143:6;145:24;
147:12;148:3,23;
149:24;154:6
**officers (5)**
64:9;66:18;72:22;
114:23;143:2
**offices (1)**
151:11
**official (30)**
0:;63:16;74:2;84:5;
85:7,16;97:22;108:3,
4,6,23;109:1,7,11,16;
110:25;116:18;
120:18,21;123:17;
144:15,16;145:3,4,6;
149:19;150:3,7,11,13
**officials (32)**
22:22,23;28:18,20,
21;35:23;60:2,21;
63:3;73:24,25;75:22;
77:17;87:13,19;91:3,
9;93:2;97:5;109:20;
112:19,23,25;113:10,
13;114:2;122:12,18;
137:23;138:4;143:8,
14
**often (6)**
18:19;42:12;52:18;
76:16;102:20;131:5
**Ohio (3)**
9:6;10:1;40:14
**once (4)**
50:8;114:7;145:17;
148:18
**one (65)**
6:19,19;7:12;11:14,

14;12:10;13:13;
14:16,18;15:24;16:1,
18;17:10;18:8;22:5;
25:11;26:10,12,16;
28:8;30:23;33:23;
46:24;55:16;60:17;
73:18;76:10;78:23;
80:9;81:10,15;82:10,
14;88:21;90:9;94:12;
95:4,17;96:10;98:23;
102:25;103:6,22;
105:6;108:12;113:11,
11;123:21;125:19;
126:7,8,8,11,14,14;
127:10;129:22;
131:22;132:20;
134:16;135:13;136:2;
137:11;141:7;145:23
**ones (3)**
21:8;29:20;46:5
**online (1)**
43:25;44:3,4;92:7
**only (15)**
6:25;7:12;35:13;
38:12;74:19;88:7;
89:17,23;91:5;102:2;
108:15;115:7,10;
141:19;146:8
**onto (1)**
42:2
**Open (3)**
19:14;20:2,5
**opine (4)**
64:23;68:9;121:12;
137:6
**opined (1)**
145:24
**opining (4)**
59:9,15;61:7;114:1
**opinion (157)**
33:1;37:22,25;
40:19;41:15;54:18,
23;55:2,6;56:3,6;
58:21;59:2,18;60:22,
23;61:3,9;62:4,8,11,
15,23;63:1,2,5,6,7,10,
24;64:2,8,11,12,19;
65:16,20;66:15,17,23;
67:2,3,14,16,21;
68:12;70:8,11,12,16;
71:5,8,13,22;72:8,20,
23;73:1,3,4,5;74:9,18,
24;75:3,8,10,24;76:2,
6;77:20,21;78:14,18;
79:12,22;80:1,5,7,9,
22,24;81:3;84:10,16;
87:8,11,15,17,22,25;
90:13,17,21;92:17,19;
94:1;96:13,15,16,19;
97:19;98:5,6;103:18,
20,25;104:1,4,21,24;
105:17;106:10,16;
107:2,4,6,11,14,24;

111:7,10;112:13,16;
114:4;116:10;117:1,
6,10;118:18;119:14;
120:7,9,11;124:13,17;
128:17;131:1,10;
132:14;133:25;
135:24;138:2,5;
146:4,12,15,20,23,24;
147:3,5,8;148:21,25;
149:1,25
**opinions (10)**
58:3,5,7,16,18;
59:11;96:21;106:2,9,
18
**opportunities (4)**
17:11,13;22:24;
24:11
**opposed (3)**
54:19;94:10;128:10
**order (2)**
83:6,8
**organizations (2)**
51:5,13
**organizing (1)**
22:11
**Orwell (1)**
50:14
**others (5)**
12:6;7:43:4;76:12;
113:14
**otherwise (2)**
75:15;154:17
**out (19)**
12:14;18:2,5,13;
21:24;23:16;29:13;
43:1;51:4;64:25;
66:12;69:2,13;76:24;
86:21;97:20;121:16;
125:4;143:23
**outcome (1)**
154:17
**outline (4)**
59:24;124:24;
125:1;129:2
**outlines (1)**
137:20
**Outlining (2)**
4:;134:23
**outside (6)**
16:4;25:3;26:18;
46:18;88:16;123:1
**over (7)**
6:11;22:4;29:7;
94:20;110:23;114:20;
118:24
**overall (14)**
11:2;14:6;21:24;
25:8;30:13,14,22;
50:23;117:9;143:7;
145:25;146:13;
147:11,21
**overlap (7)**
28:25;101:15;

117:17;131:5,7,18;
147:19
**overlapped (1)**
102:20
**overlapping (1)**
121:2
**overseas (1)**
136:13
**oversee (1)**
63:18
**overseeing (1)**
111:1
**oversight (11)**
72:25;79:20;94:10;
98:2;112:18;113:7;
118:16;119:19,19;
122:12;124:19
**oversights (1)**
139:6
**own (2)**
98:22;139:23

# P

**page (102)**
3:,2,15,15,17,17;
8:25;16:22;19:10;
22:4;25:6;30:8;33:11;
38:13,13,14,18;40:3,
9;44:5,5;45:3,6;48:3;
49:23,23;51:4;54:2;
55:21;58:4;62:1,2;
69:6,10;70:21;75:16;
77:11,12;81:6,25;
82:13;84:18;85:5,6;
86:3,4,17;90:5,16;
91:2;92:1,9,11,20;
97:2;98:25;99:15;
100:7;102:18;104:9,
10,11;105:2;106:6,9,
17,20,25;107:25;
108:2;109:25;110:1,
13,21;111:22;113:3;
116:14,17,17;118:4,
11,22;119:2;122:10,
16;123:3;127:14,16;
129:4;130:22;132:5,
7;133:4;134:5;
136:16;137:21;138:1,
12;141:6,7,12;149:14
**Page_/Line_/Should (8)**
152:14,18,22;
153:1,5,9,13,17
**pages (2)**
3:,152:
**Pain (1)**
3:19
**Panic (2)**
3:23;50:1
**paper (1)**
96:1
**papers (3)**
29:19;30:2,6

**paragraph (35)**
16:25;38:18;40:8;
45:6;47:24;48:7;
49:24;54:3,6;55:21;
75:17;77:12;82:13;
85:6;86:19;90:18;
92:24;104:11,16;
105:4,20,21;110:1,7;
111:24;113:6;114:18,
21;115:5,25;116:16;
118:14,23;137:22;
149:14

**paragraphs (1)**
49:25

**paren (1)**
134:11

**part (26)**
9:11,12;11:6,9;
14:13;17:22,23;18:1;
21:5,16,22,22,25;
29:6;30:10;41:21;
53:18;76:22;79:14;
86:18;128:3,6;131:1;
135:23;143:25;
147:17

**participants (1)**
11:25

**participate (3)**
21:18;22:25;24:12

**particular (23)**
16:5;20:16;23:15,
19;25:7;27:20;36:6;
37:1;45:25;51:19;
52:2;85:9;93:16;
96:18;105:16;123:2;
135:13;137:15;
144:20;147:14,18;
148:9;150:1

**parties (3)**
151:18;154:13,16

**partisan (1)**
51:14

**parts (1)**
86:13

**Party (5)**
37:14,16,19;151:,
15

**passed (2)**
69:11;99:19

**passes (1)**
68:22

**past (2)**
23:11;37:11

**Peachtree (2)**
0:16;2:

**peer (5)**
26:17,18;71:14,24;
73:7

**peer-reviewed (5)**
26:14,21;29:20;
30:24,25

**penalty (1)**
53:8

**penned (1)**
47:20

**Pennsylvania (1)**
40:14

**people (23)**
9:12;12:5,14;15:6,
9,17;17:12;21:17;
22:8,25;24:12;33:24;
48:17;49:10;50:9,17;
51:15,18;52:21,25;
70:2;148:9,19

**per (1)**
146:19

**percent (1)**
141:15

**percentage (2)**
141:20;142:4

**percentages (1)**
142:6

**Perez (2)**
78:20,22

**perform (3)**
129:24;144:6,7

**performed (1)**
56:23

**perhaps (1)**
25:3

**period (4)**
11:10;19:20;28:3;
51:20

**periods (2)**
11:13;27:24

**permissive (1)**
135:2

**persistence (1)**
40:12

**person (5)**
6:8;13:9;84:6;
88:21,22

**personal (2)**
37:16;80:24

**persons (3)**
44:12;79:22;112:8

**perspective (1)**
42:13

**Peters (1)**
39:22

**PHD (6)**
0:10;5:18;31:3;
151:4;152:11;153:

**phone (1)**
34:14

**photo (3)**
54:10,15;62:24

**phrase (8)**
28:2;48:21;49:2;
65:12,13;109:7;
124:9;146:1

**picture (1)**
11:5

**piece (8)**
11:4;26:20;45:25;
79:6;95:7,11;96:1;

106:11

**place (3)**
11:3;26:3;55:4

**places (7)**
40:13;54:11,20;
69:23;145:2;147:25;
148:4

**Plaintiffs (6)**
0:4;2:2;56:13;57:6;
63:4,9

**plaintiffs' (3)**
7:24;56:13;57:9

**Plaintiff's (1)**
57:20

**plan (3)**
36:21,24,25

**plans (1)**
87:3

**platform (1)**
36:8

**play (4)**
36:12;91:9;110:25;
119:21

**playing (1)**
29:13

**please (10)**
5:17;8:9;45:20;
61:1;84:2;95:8;
136:16;141:1;152:,6

**plot (1)**
50:3

**pm (4)**
111:19;138:19;
145:19;150:25

**pocket (1)**
143:25

**point (17)**
25:2;26:17;29:1;
34:10;43:17;50:25;
58:1;67:10;68:1,2,6;
71:13,23;85:12;
93:10;111:13;133:4

**points (1)**
84:3

**policies (2)**
47:5,11

**policy (17)**
24:5,14;25:9;28:6;
29:18;30:2,6,17;38:2;
53:16;63:5;80:20,25;
81:3,4;85:16;90:14

**policymakers (1)**
12:8

**Political (20)**
3:23;9:2,8,9,10,13;
13:22;14:1;22:8,12,
25;31:3;35:20,25;
37:4,10;50:1,13,18;
73:19

**Politics (13)**
3:,16;9:11;18:21,
23;19:5;21:6,16;
29:13,14;30:10;41:2;

50:23

**poll (27)**
68:22;69:25;70:1,3,
6,10;75:10;87:24;
101:2,4;112:14;
113:13;114:3,23,24;
115:15,15;116:4,8,12,
19;117:4;121:18;
143:2,3;146:21;
148:24

**polling (8)**
54:11,20;55:4;
69:23;89:21,21,22;
96:9

**popular (1)**
22:9

**populate (1)**
110:13

**portal (1)**
106:14

**portion (1)**
11:11

**position (1)**
97:9

**positions (1)**
48:18

**possible (3)**
64:7;101:6;140:3

**postgraduate (1)**
11:18

**post-Holder (1)**
74:5

**Post-It (1)**
96:1

**post-reconstruction (2)**
11:14;19:2

**potential (1)**
60:18

**Power (9)**
3:;133:21;134:1,2,
9,23;135:3,5;144:24

**powers (5)**
118:24;133:5,6,14,
17

**practice (13)**
74:22;76:16,18,21,
22;77:24;78:6,16;
93:3;96:6,9;97:5,24

**practices (8)**
62:20;65:6,19;66:1;
74:6,9;91:4,5

**practitioners (1)**
9:8

**preclear (2)**
78:6,12

**preclearance (6)**
77:13;79:15,24;
80:14,20,25

**precleared (3)**
77:24;78:2,15

**preferred (1)**
84:23

**prepare (3)**

12:12,14;23:8

**prepared (1)**
128:15

**preparing (3)**
56:12,15;140:5

**prescribed (5)**
67:25;74:14;89:23;
129:24;144:8

**Present (3)**
2:17;16:2;113:21

**presented (1)**
147:15

**pre-Shelby (1)**
78:5

**president (6)**
48:17,21;49:6;79:2,
23;80:3

**presidential (2)**
47:5,11

**presume (11)**
39:24;50:14;69:20,
24;70:5;75:14;84:7;
97:14;104:20,23;
121:19

**prevent (4)**
65:5,18,24;74:5

**previous (1)**
71:4

**previously (2)**
96:6;117:16

**primarily (1)**
95:5

**primary (15)**
65:4;67:11;72:4,21,
25;74:4;93:1;94:2,9;
96:25;97:3,20,23;
103:19;130:23

**print (3)**
44:3,4;131:12

**prior (6)**
14:25;31:12;33:18;
68:6;79:1,4

**prioritizes (1)**
45:14

**Prison (1)**
3:21

**privilege (1)**
5:11

**probably (3)**
27:19;95:24;113:20

**Procedure (3)**
0:15;5:9;93:3;97:5,
24;152:

**process (12)**
9:13;13:19,25;
15:15,19;16:1;22:25;
63:3;80:15,20;
113:14;128:5

**produced (1)**
57:16

**product (1)**
14:10

**professional (2)**

52:9;129:5
**Professor (23)**
5:23;7:20;12:25;
13:5,14,16,16;14:2,2,
3;15:4,8,14,18,18,25,
25;29:9;52:25;55:16;
111:21;145:22;
150:19
**professors (4)**
9:22;11:22;13:18;
15:21
**professorship (2)**
14:23;16:7
**program (15)**
9:15,16,17;11:21,
25;12:4,7,9,11,16,18;
14:4;46:13;106:22;
149:17
**programs (1)**
111:25
**prohibited (2)**
74:17;151:13
**project (3)**
9:21,22;51:7
**projects (1)**
20:17
**prompted (2)**
64:13;139:14
**promulgate (1)**
101:1
**promulgated (1)**
83:11
**pronounce (1)**
5:3
**proper (1)**
83:12
**proposed (1)**
77:16
**protect (1)**
67:13
**protected (1)**
103:20
**protection (1)**
94:11
**protections (4)**
93:4,7,13;97:25
**provide (24)**
14:8,11,12;33:20;
34:23;57:20;58:2;
87:13,17,21;107:7;
112:22;114:23;115:9,
15,24;117:3;131:13;
132:13;134:7,24;
143:2;151:11,15
**provided (21)**
31:14;32:10;57:23,
24;86:6;92:4;98:16,
18;99:24;100:3,13,
23;101:11;102:1,11;
110:8,9;127:1;
128:12;132:22;
146:18
**providing (5)**

31:13;86:20;128:8,
13;146:25
**provision (9)**
77:14;85:11;86:13;
121:1;123:20;124:3;
146:11;148:19;150:8
**provisional (2)**
86:25;87:14
**provisions (22)**
35:6;59:11,24,25;
60:10;68:13,18;
82:14,19;84:4;85:13;
86:21;108:3,19,21;
117:16;118:2;137:9;
146:18;147:21,22;
151:
**Provost's (1)**
20:9
**Psychology (4)**
9:2,8,9,10
**public (18)**
22:10,22;24:5,11,
12,14;28:18;35:23;
49:11,13,16;50:23;
51:21,22;52:1,10;
53:8;153:24
**publication (2)**
30:8;31:1
**publications (4)**
14:12;29:19;30:3,7
**publicly (2)**
105:22,25
**published (6)**
26:12;38:2;43:24;
44:1;71:14;124:20
**pull (5)**
86:7;98:14;101:10;
102:1,10
**pulled (6)**
86:8;98:14;101:13,
15,18,22
**punch (1)**
86:24
**purely (1)**
67:23
**purges (1)**
63:9
**purpose (7)**
5:7;69:20;86:18;
103:17;105:20,21;
129:2
**purposes (14)**
5:7;31:14;84:9;
85:16;88:7,20;89:2;
90:3;93:23;95:15;
97:15;99:9;104:19;
122:22
**pursuant (4)**
0:11;83:11;151:5;
152:2
**pursue (2)**
44:14,14
**purview (1)**

115:2
**Push (1)**
52:9
**put (2)**
40:21;97:17

**Q**

**qualify (1)**
134:17
**quantitative (1)**
42:12
**quarterback (1)**
10:4
**Quinnipiac (8)**
12:23;13:4;14:15,
23;15:1;20:22;21:21,
23
**quite (1)**
102:5
**quote (4)**
35:23;108:9;112:6;
116:17
**quoted (2)**
36:1;101:12
**quoting (1)**
86:22

**R**

**Race (2)**
30:9;35:16
**racial (1)**
39:2
**RAFFENSPERGER (2)**
0:6;5:6
**raised (1)**
148:18
**ran (2)**
121:23,24
**rates (1)**
151:18
**rather (4)**
44:9,16;105:23;
139:25
**reach (3)**
88:16;90:18;108:21
**reached (1)**
73:22
**read (25)**
24:23,24;32:3,5,6,9,
23;44:6;45:4,6;54:7;
56:24;57:2;70:21,23;
71:3;98:19;99:5,19,
22;101:22;115:22;
141:18;142:2;152:11
**Read_ (8)**
152:14,18,22;
153:1,5,9,13,17
**readers (1)**
51:12
**reading (7)**
0:12;19:16;27:14;

29:5;39:15;100:22;
149:16
**readings (3)**
27:15,15;29:3
**reads (2)**
48:9;92:25
**realize (2)**
15:6;25:23
**really (3)**
12:8;128:9;136:25
**reason (4)**
35:11;113:17;
116:24;149:20
**Reason_ (8)**
152:16,20,24;
153:3,7,11,15,19
**reasonable (2)**
149:18;150:15
**reasons (1)**
152:4
**recall (3)**
35:22;36:23;148:1
**receive (2)**
32:12,13
**received (18)**
7:24;8:23;9:25;
19:16;110:14;125:15,
20,21,24;126:6,8,14,
14,20;127:2;136:2,
21;137:20
**receiving (1)**
137:22
**recent (3)**
21:4;23:11,13
**recently (1)**
38:2
**Recess (4)**
55:14;111:19;
138:19;145:19
**recommendation (1)**
14:14
**reconcile (4)**
63:12,25;64:9;65:1
**reconciled (1)**
73:15
**reconsidered (1)**
148:19
**reconstruction (1)**
19:2
**record (7)**
6:10,23;8:6;87:16;
138:6,8;145:9
**reduced (2)**
54:10;154:11
**reduces (1)**
54:19
**refer (7)**
43:18;48:14;61:16;
63:4,9;91:19;111:4
**reference (19)**
16:4;39:25;49:13;
50:23;52:4;66:7;
93:16;95:8;122:16;

126:16;127:13;134:4;
137:15;138:11;141:3,
4,6,9;150:16
**referenced (5)**
48:16;51:11;124:4;
139:7;148:3
**references (4)**
16:4;122:7;141:7,8
**referencing (7)**
36:18,25;49:10;
50:6,22;106:14;142:7
**referral (1)**
151:16
**referring (9)**
50:20;71:16;74:10,
13;95:18;110:7;
127:8;148:5;150:6
**refers (1)**
63:8
**refine (1)**
103:8
**reflect (2)**
35:5;139:9
**reflected (3)**
67:3,12;117:18
**reflecting (1)**
59:10
**reform (3)**
45:14;46:15,17
**regarding (2)**
104:25;122:18
**regards (1)**
28:6
**REGENCY-BRENTANO (6)**
0:;151:,,,,8
**regions (1)**
30:14
**register (6)**
83:18;144:17,23;
145:11;147:16;
148:20
**registered (2)**
81:19,20
**registering (2)**
77:7;144:16
**registrant (1)**
149:21
**registrar (1)**
144:20,22;145:10
**registrars (2)**
112:9;132:13
**registration (20)**
20:6;30:16;60:11;
61:12;66:9;67:19;
68:15;77:2,5;81:8;
82:1;86:23;93:14;
110:18;122:19;
137:11,24;138:3;
146:17;149:13
**registrations (2)**
87:1;112:10
**regulation (13)**
83:10,13;84:13;

101:4;102:15;103:3,
14;107:17;121:5;
132:7,25;134:15,19
**regulations (18)**
68:11;82:25;83:20;
100:3,5,9,13,22;
101:1;102:9;103:12;
108:4,22;118:3;
132:21;135:10;137:6;
151:
**reiterate (1)**
117:6
**relate (3)**
17:11;20:13;90:2
**related (7)**
29:2;35:6;94:10;
129:9;139:3;142:7;
154:12
**relates (10)**
45:19,25;59:6,9;
67:23;89:23;94:4;
95:13;124:6;134:11
**relationship (4)**
94:25;124:12;
137:8;151:9
**relative (1)**
154:15
**relevance (1)**
106:8
**relevant (1)**
12:1
**relied (2)**
102:12;124:4
**rely (3)**
101:12;102:2,10
**relying (3)**
73:11;108:20;
123:21
**remains (1)**
146:15
**remedy (1)**
96:14
**remember (2)**
33:15;125:21
**reminds (2)**
40:14;50:13
**removal (1)**
94:9
**remove (3)**
149:18;150:12,16
**removing (2)**
48:18;72:24
**repeat (3)**
58:12;61:1;117:24
**rephrase (3)**
7:6;61:8;80:17
**replacement (1)**
86:24
**replaces (1)**
119:11
**Report (137)**
3:12;4:,10;8:20,23,
23;16:10,20,23;23:8;

31:13,14;32:10,17;
33:5;34:2,19,20;35:2,
4,12;37:21;41:1;
56:10,12,15,21,24;
57:5,9,12,21;58:2,3;
59:4,10;60:11;61:14,
16,17,25,25;62:2,3;
64:14,15;65:3,13,14,
22;67:4;69:3,7,8;
71:20,23;72:2;73:13,
18;75:13,15;77:3;
80:24;81:2,24;82:5,
12;84:20;86:1,10,13;
89:14;90:1,5,17;
91:21;92:20;95:11;
96:21;97:13;98:8,25;
99:16,18;102:19;
104:9,17;105:3,3;
106:20,23;110:22;
111:22;113:3,18,22,
22;116:15,23;118:7,
23;119:2,9,10,11,24,
24,25;125:20,22,23;
126:2,3,8;129:2,5;
130:23;132:20;133:4;
134:18;135:14;
137:19;138:1,24,24;
139:13,14,21,22;
140:22;141:2,10;
146:5,7,11;149:12;
150:16
**Reporter (10)**
0:16;6:9,16,22;
36:7;71:3;107:23;
151:,;154:1
**Reporters (1)**
0:23
**reporting (4)**
151:,,15,16
**reports (3)**
34:17;64:20;119:13
**represent (4)**
6:2;39:7;42:1;
136:12
**representation (7)**
22:17,21;23:1,6,10;
27:10;30:17
**representative (2)**
17:25;151:8
**represented (1)**
65:7
**Republican (1)**
37:19
**request (1)**
6:25
**requested (3)**
128:12;129:1,8
**require (7)**
14:1;88:3;89:9;
109:15,19;128:16;
150:3
**required (6)**
64:9;76:24;77:14;

104:14;112:22;116:8
**requirement (1)**
149:2
**requirements (8)**
69:4;84:17;85:4;
106:22;111:9;112:24;
113:10;117:18
**requires (5)**
58:22;109:10;
116:3;149:3,16
**research (20)**
12:15;14:12;20:5,
21,23;21:4,5,17;22:3;
30:3;32:19;34:9;
68:17;73:12,14;77:3;
98:22;99:25;100:4;
117:9
**researchers (1)**
11:23
**researching (1)**
24:25
**reservations (1)**
148:8
**reserved (2)**
0:13;5:13
**residence (2)**
110:10;149:20
**residents (3)**
87:1,14;144:19
**resource (2)**
106:13,15
**resources (1)**
146:25
**respect (1)**
47:13
**respectively (1)**
38:22
**respond (2)**
6:15;57:18
**responded (1)**
28:11
**response (2)**
50:2;126:19
**responsibilities (20)**
28:18,23;64:25;
66:8,10;79:9;85:5;
98:9;100:18;104:2;
106:19;124:20;128:7;
133:5,6,11,14,15;
134:13;135:7
**responsibility (40)**
63:17;65:4,24;66:4,
7;67:11;72:5,5,22,25;
73:17;74:4;76:9,9;
91:3;93:1;95:14;
96:25;97:4,21,23;
103:19,24;107:1,3;
113:12;114:2;129:21;
133:22;134:19,25;
137:14;138:14;143:8;
144:17;145:4,25;
146:13;147:11;
150:15

**responsiveness (2)**
5:12;30:17
**restate (6)**
83:3;88:10,11;
101:20;103:1;141:24
**restatement (1)**
146:2
**restating (1)**
103:9
**restrictions (3)**
54:9;56:3,4
**review (25)**
13:19,25;14:4;16:1;
26:17,18;57:9;71:15,
24;73:7;100:8,12,17;
114:5;115:3;116:6;
120:2;126:19;132:20,
24;133:10;134:22;
136:4;141:22;144:10
**reviewed (3)**
102:5;114:13;
135:10
**reviewing (2)**
132:18;140:6
**revised (2)**
35:1;139:21
**revision (1)**
126:24
**revisions (1)**
113:21
**revolving (2)**
47:25;48:10
**Richmond (1)**
92:2
**right (185)**
5:3;7:11;8:5,14,19;
10:13;12:19,22;13:2,
11;15:10;16:9;19:13;
21:9;22:3;26:22;
27:18;29:18;30:5;
31:7;32:6;33:3,5;
34:6;35:8,14,20;36:3;
38:15,17;39:22;40:1,
25;42:13,16;44:24;
45:1;48:9;51:23;52:4,
7;53:10;60:14;62:5,8,
11,12,14,23;69:14;
72:6,20;73:6,9;74:20;
75:7,13,16;76:2,15,
23;77:10,20;78:19;
79:5;80:4;81:6;82:4,
12;84:7;85:3,19,25;
86:17;87:7,9,16,21;
88:1,6,7,14,19,23,24;
89:5,11,13,18;90:3,5,
11;91:8,15,19;92:9,
14,14;94:18;96:20,
24;97:11;98:19,23;
99:11,15;100:14,16,
21,25;101:10;102:7,
21;103:11,16,25;
104:5,8,19;105:2,14,
18;106:1,4,16;107:14,

25;108:10,16,18;
109:5,8,12,18,22;
110:17,21;111:11;
112:4,17;113:2;
116:2,14;118:4,10;
120:10;122:10,23;
123:1,3,13,18,21;
124:8;126:5,5;129:7;
130:17;131:15,22;
132:4,6;133:2,18;
134:3;135:10,14,16;
136:23;137:4;138:11;
139:2,20;140:19,25;
141:8,12;142:9;
145:12;146:7,9;
147:4,9;149:16;
150:23
**rightly (1)**
42:6
**rights (62)**
11:15;17:3,8,16;
19:4;21:1,10;22:16,
20;23:5,10;27:10;
28:12;30:9,15;51:6,9,
24,25;54:8;56:1,18;
60:12;61:12;66:21;
68:4,13,25;69:22;
70:15;71:11;74:11;
79:5,10;85:23;91:6;
93:4,7,9,12,13;94:8,
21,24;96:11,12;97:6,
18,25;109:18;117:14,
15,21;118:1;137:8;
143:14;144:11;
146:16;147:5,7,17;
148:22
**rigor (3)**
52:14;53:12,19
**rivals (1)**
50:2
**Robbins (1)**
2:
**role (16)**
28:19;29:11;34:3;
41:6;42:15;66:6;
68:16;75:4;77:1,6;
91:9;104:25;105:3,
23;110:24;135:11
**roll (2)**
63:8;141:13
**room (1)**
6:9
**Ross (1)**
2:
**roughly (4)**
11:10;32:7;37:4,5
**row (1)**
138:12
**RPR (2)**
0:15;154:
**Rule (1)**
152:2
**Rules (7)**

0:14;5:8;6:5;11:3;
108:4;151:5;152:2

**run (3)**
36:7,8;38:21

**running (1)**
22:10

**runoff (1)**
135:20

**Ry (4)**
0:15;151:25;154:,6

## S

**safe (2)**
39:24;106:22

**sake (1)**
97:14

**Same (21)**
6:11;30:25;37:3,4,
5,6;38:13;55:21;
64:20;65:11;70:21;
103:3,4;113:6,7;
116:15;118:9,23;
127:22;147:4;152:

**Savannah (1)**
144:21

**saw (3)**
116:23;121:20;
128:3

**saying (10)**
44:13;52:19;65:11;
103:16;115:23,25;
119:7,17,18,19

**scene (1)**
42:2

**scholar (7)**
42:7,18,22;43:2;
45:17;46:7,9

**scholar-activist (1)**
45:13

**scholarship (16)**
12:1;16:3;24:23;
25:2;26:11;30:2;44:8,
14,18;46:9,11,14;
52:10;53:19,20,21

**school (3)**
12:6;24:1;31:10

**schools (1)**
52:2

**science (3)**
13:23;14:1;31:3

**Sciences (1)**
20:23

**scientist (1)**
45:12

**scope (1)**
70:18

**season (1)**
10:4

**Second (17)**
3:,6:18;7:18;26:12;
40:8;52:8;62:8;75:16;
77:13;90:18,19;

110:6,22;127:16;
136:22;137:22;138:7

**second-to-last (4)**
40:11;54:3;55:21;
132:8

**secretaries (2)**
63:12,14

**Secretary (119)**
0:,4:,5:6;6:2;28:20;
29:12,17;30:19,21;
34:4;41:6;42:2;55:3;
59:5,9;63:21,23,25;
65:17,22,23;66:24;
67:22;68:9;70:9;79:1;
82:23;83:9,17;84:8;
87:18,23;90:2;93:22,
24;94:2,14;95:4;96:8,
14,17,25;97:7,16,22;
99:8,13;100:18;
103:18;104:24;105:3,
12,16,23;106:12,19;
107:1,8;108:5,22;
111:7,25;112:7,21;
113:9;114:1;115:14;
116:1,4,7,11;117:2;
118:15,19;119:17,18;
120:5,6,8,22,23;
121:3,13,17,22;122:3,
17,21;123:8,12;124:2,
19,21;127:19,20;
129:3,19,23;131:12,
13,15;132:12;133:1,
12,24;134:23;135:2;
137:7,14,17,21;138:3;
143:5,7;144:5,23;
145:25;146:13;
147:11

**secretary's (7)**
68:2,7;105:8,11,15;
128:1;136:4

**Section (37)**
4:,11;28:12;77:15;
80:14,19,25;81:3,24,
25;82:8,8,8,9;90:11;
94:10;96:7;99:1;
105:18;106:5;108:10,
20;114:6,19,22;
115:8;116:3,5;
122:12;123:16;
124:10,14;127:13;
134:4,16;137:16

**sections (2)**
82:6,10

**secure (2)**
50:25;87:3

**seeing (3)**
50:17;131:17;150:6

**seek (1)**
59:4

**seem (1)**
12:11

**seemed (1)**
101:14

**seems (5)**
48:11;49:19,21;
50:1,9

**semantics (1)**
119:21

**semester (8)**
26:23;27:1,1,2,4,5;
140:12,14

**send (3)**
34:21;76:24;150:4

**sense (2)**
110:23;140:9

**sent (2)**
8:3;34:22

**sentence (30)**
40:12;44:7;47:23;
49:3,4,9,11,15,20;
51:3;52:8;77:13;
82:13;90:18,21;91:8,
14;92:24;106:11;
110:6,22;111:6;
112:18;113:7;116:22;
118:24;133:10;
134:12;141:18;142:2

**sentences (1)**
54:6

**separate (2)**
126:1,8

**series (4)**
21:5;112:7;132:21;
145:22

**seriously (1)**
79:10

**service (3)**
24:11;49:13,16

**services (2)**
151:,15

**session (1)**
99:20

**sessions (1)**
112:22

**set (3)**
71:22;78:11;84:18

**several (4)**
14:16;108:3,18,21

**shall (14)**
85:8;115:9,24,25;
120:6,21;121:18;
131:12,13;143:2;
144:6,6;149:17;152:

**shames (1)**
44:9

**shaming (1)**
44:16

**shapes (1)**
25:19

**shaping (1)**
53:15

**shared (5)**
75:21;95:13;98:9;
120:24;121:2

**sharpen (1)**
119:6

**sheet (1)**
152:7

**Shelby (9)**
54:8,15;55:24;56:2;
72:18,21,24;90:6,10

**shifted (3)**
45:11;65:6;72:25

**shifting (1)**
65:14

**shifts (2)**
28:10;65:3

**shirt (3)**
101:3,5;102:16

**shirts (3)**
68:23;70:2,7

**short (1)**
38:25

**show (18)**
7:17;8:14;36:16;
38:8;40:2;43:9;44:24;
46:24;50:6,7;53:22;
67:5;105:22;114:7,8;
141:14,20;149:10

**showing (1)**
38:14

**sight (2)**
52:13;53:12

**significance (2)**
77:21,23

**signing (1)**
0:13

**silos (1)**
52:19

**similar (2)**
14:9;131:25

**simply (3)**
103:9;134:1;135:5

**single (1)**
23:16

**site (1)**
110:9

**site's (2)**
110:7,8

**sitting (9)**
32:20;103:11;
114:17,19,21;130:6;
131:25;135:18;150:9

**situation (3)**
71:8;96:14;119:22

**six (1)**
12:18

**slightly (3)**
58:15;102:4;120:20

**social (1)**
45:12

**Society (3)**
19:14;20:2,5

**sole (1)**
85:15

**solely (2)**
58:17;102:10

**solicit (1)**
16:3

**somebody (2)**
89:1;128:15

**someone (5)**
12:12;53:11;88:3,
12;133:24

**sometimes (2)**
42:22,23

**somewhere (1)**
18:13

**Soros (1)**
20:2

**sorry (19)**
45:9,23,24;47:8;
58:12;67:7,8;71:5;
88:9,10;91:25;
102:14;108:1;109:23;
117:24;118:6,8;
132:7;150:2

**sort (4)**
28:25;77:4;95:13;
117:5

**SOS (3)**
104:12;110:9;
118:24

**SOS's (1)**
116:18

**source (1)**
66:4

**sources (2)**
146:8,11

**South (3)**
11:8,12;141:9

**Southern (1)**
18:20,23;28:10

**speak (10)**
54:16;56:9,12,14,
17;66:5;77:9;117:8,8;
122:25

**speaking (3)**
63:22;93:12,13

**speaks (1)**
85:10

**specific (4)**
11:1;91:14;95:3;
107:5

**specifically (8)**
28:6,19;55:2;64:15;
106:18;141:10;144:4;
147:24

**specify (2)**
123:19;132:16

**spectrum (4)**
18:8,11,17;50:18

**spell (1)**
8:5

**spend (2)**
10:10;18:11

**spent (1)**
24:25

**spiral (2)**
48:12;49:19

**Square (1)**
0:

**Stacey (2)**
3:13;35:14
**staffing (1)**
78:8
**stage (1)**
42:3
**Stakes (2)**
3:24;55:17
**stand (1)**
119:25
**standard (2)**
15:19;31:1
**stands (1)**
136:14
**stapled (1)**
16:15
**start (4)**
62:14;81:7;83:7;
114:20
**starting (3)**
13:8;62:5;124:25
**starts (5)**
99:16;109:24;
116:16,17;123:16
**State (166)**
0:7;5:6;6:2,2;9:6;
10:1;17:14;25:20,22,
23,24;26:5;28:20;
29:12,17;30:9,19,21;
34:4;39:16;41:6;50:2,
7,12;54:18;55:2,3,5;
59:5,9;62:17,17,18;
63:14,16,16,23,25;
64:11;65:8,15,17,23;
66:20;67:18,23;
68:10,10,16;69:6;
70:6,10;75:4,22;76:3,
8,8;77:11,24;78:6;
82:23;83:9,17;84:5;
85:7,7,15;86:23;
87:23;88:1;89:6;90:2;
91:3,11;93:2,3,22;
94:2,15,25;95:4;96:8,
14,21,25;97:4,8,21,
22;99:13;100:18;
102:9;104:12,13,21,
25;105:4,23;106:12,
13,19;107:1,7,9,16,
17;108:5,6;110:15;
111:8,25;112:21;
114:5;115:15;116:1,
4,8;118:15;119:18;
120:5,6,8,22,23;
121:4,6,17,22;122:3;
123:7,8,11,16;124:2,
21;129:4,20;133:1,12,
25;134:23;137:14,17,
21,23;138:15;143:5,6,
7,9;144:6,24;145:3,5;
146:11,13,14;147:2;
148:11,24;149:17;
150:3,7,12;151:2;
154:3

**stated (1)**
146:15
**statement (9)**
40:7,19,23;48:16;
74:3;93:22;120:13;
129:23;152:4
**statements (1)**
58:3
**STATES (39)**
0:1;3:16,18;10:21,
25;17:4;21:1;24:15;
26:1,2;28:10,11,15;
30:13;54:9;56:2;
66:18;72:22;73:16;
75:19;77:14;81:11,
16;82:15,18;86:21;
88:3;94:3,7,22;95:5;
109:11,15,15,19;
136:6;141:13;144:20;
149:3
**State's (12)**
4:9;66:24;67:22;
87:18;103:18;104:25;
106:21;107:8;110:24;
117:2;118:19;127:20
**statute (55)**
60:7,14,15;70:14;
71:9;72:12;82:24;
83:10,11,13,19;84:13;
99:5,7,13;101:2;
102:14,15;103:3,13,
22;107:10;108:15;
112:3,14;114:14;
115:6,7,14;120:4,19,
20,23,25;121:4,16,20;
122:7,9;128:14,16;
130:2,13,16,20;131:3,
11,12;132:25;136:13;
142:25;144:11;
149:11;150:1,11
**Statutes (54)**
4:8;57:22;59:13,15,
18,19,21,23;60:4,9,9,
24,25;61:3,5,10;
66:19,19,20;68:8;
74:11,17;76:8,13;
98:10,14,19,20,24;
99:23,25;100:6,8,13,
22;101:11,15,18,22,
25;103:12;110:23;
121:12,21;123:8,11;
132:1,18,21;135:10;
137:5
**statutorily (1)**
104:13
**statutory (2)**
66:13;101:2
**staying (1)**
86:14
**step (3)**
72:13;123:23;
144:24

**stepped (1)**
148:11
**stickers (1)**
114:7
**still (7)**
10:3;64:5;78:23;
85:1;110:3;135:6;
139:7
**stipulations (1)**
0:12
**stop (1)**
96:17
**strategic (4)**
35:24;36:5,9,19
**strategies (1)**
20:7
**Street (3)**
0:16;2:,12
**strike (2)**
59:2;66:16
**structure (3)**
95:12;98:7,9
**Student (3)**
2:17;21:18;37:1
**students (8)**
12:5,6;20:14,16;
21:15;24:2,10;27:14
**studied (2)**
17:2;23:9
**Studies (1)**
73:19
**study (4)**
9:10;20:12;23:7;
34:2
**subject (4)**
45:10;71:14,24;
82:18
**subjected (1)**
73:7
**submit (1)**
77:16
**submitted (5)**
77:24;78:9;125:25;
140:8;145:6
**subnational (6)**
62:16;65:5,18,25;
68:20;74:5
**subordinate (1)**
111:1
**subparagraph (1)**
144:5
**subscribed (1)**
153:23
**subsection (2)**
30:2;144:7
**subsequent (1)**
72:19
**substance (3)**
62:9;64:20;152:3
**substantial (1)**
30:15
**substantive (4)**
119:13,14;139:12,

18
**success (1)**
51:4
**successful (1)**
9:23
**sued (2)**
145:3;147:25
**sufficient (1)**
146:25
**Suite (2)**
0:24;2:5
**summarize (1)**
10:17
**summary (2)**
58:5;90:23
**Summer (3)**
9:1,4,23
**Sunday (4)**
141:14,15,21;142:5
**superintendent (4)**
115:9,24,25;143:2
**superintendents (2)**
112:8;120:7
**supersede (2)**
93:1;97:3
**superseding (1)**
69:3
**supplemental (1)**
152:6
**support (4)**
51:10,13,18;52:12
**supporting (1)**
22:10
**suppression (3)**
39:1,17;40:12
**Supreme (2)**
54:7;55:25
**Sure (34)**
8:7;16:15;18:6;
20:25;26:25;29:15;
39:13;45:21;53:1;
55:12,12;57:18;
58:15;61:2;63:18;
69:5;71:18;72:14,16;
83:4;86:4;91:1;95:24,
25;97:23;117:25;
118:8;119:6;130:11;
132:16;136:15;140:9;
141:23;143:20
**surrounding (1)**
17:3
**survive (1)**
113:18
**suspend (1)**
142:18
**swear (1)**
5:16
**sworn (3)**
5:19;153:23;154:9
**syllabus (1)**
24:9
**system (1)**
86:24

**systemic (1)**
45:13;46:15,17
**systems (1)**
87:4

---

# T

**Table (13)**
4:8;57:22;98:16,17;
123:15;125:3,18,19,
21;126:1,2,6;127:2
**talk (10)**
6:11;18:20,22;26:4;
36:20;69:3,9;74:9;
86:12;106:5
**talked (5)**
38:1;46:22;90:10;
108:12;140:23
**talking (8)**
18:10;27:23;75:15;
91:4;93:8;116:16;
124:1;134:16
**talks (4)**
67:5;104:11;
111:24;135:14
**taught (8)**
23:12,13,15,18,20;
27:6,8,11
**teach (6)**
17:15,18;19:8;24:6,
9;26:23
**teachers (1)**
11:23
**teaching (7)**
14:14;16:3;20:14;
22:3;26:22;27:2;
140:11
**team (1)**
56:14
**technology (1)**
75:8
**tells (1)**
78:1
**Ten (1)**
25:6
**tenure (1)**
15:19
**tenured (3)**
13:2,17;15:22
**term (1)**
109:2
**terms (33)**
11:22;12:6;17:8,25;
25:25;26:1;27:11;
28:11;38:14;49:4;
50:4;62:15;66:6;
67:16;68:17;72:17;
73:14;77:2;98:8;
100:6;103:23;119:5,
13;120:15,17;124:12;
129:4;133:7;138:3;
139:16;146:16;
147:15,17

territories (1)
75:20
territory (4)
63:17,17;84:5;89:6
testified (7)
5:20;31:16,19,21;
101:21;131:9;140:25
testify (1)
6:4
testimony (6)
60:23;61:2;119:23;
152:;154:8,9
textual (1)
35:9
thanks (1)
107:25
thereafter (1)
154:11
thereto (1)
154:16
Thereupon (16)
7:14;8:11;16:11;
36:13;38:5;40:4;
43:11;44:21;47:1;
53:24;61:18;99:2;
114:10;125:5;140:16;
149:7
thesis (9)
10:6,8,10,14,15,18,
19;11:7;14:9
third (7)
47:23;49:25;51:3;
62:11,15;126:6;
136:22
though (5)
35:17;41:2;80:13;
103:6;105:10
thought (1)
36:24
three (21)
14:17;19:19;27:24;
38:25;57:23;60:16,
20,24;61:4;68:8,13;
74:10,15,17;93:15;
98:17;120:16;125:4;
130:24;142:14;
147:21
three-year (2)
19:20,22
Thrush (1)
39:22
tighten (1)
64:17
times (1)
101:1
titled (5)
3:,13,19,22,24
today (13)
6:1;7:23;32:20;
57:2;103:11;114:18,
19,21;130:6;131:25;
135:18;140:23;150:9
together (2)

11:21;94:7
Tom (1)
78:20
took (2)
142:3,10
top (5)
29:10;49:25;69:9;
92:10;138:12
top-down (3)
95:12;98:8;124:2
topic (3)
17:18;20:17;33:23
topics (2)
22:5;42:11
total (7)
12:18;19:19,24;
100:17;103:5;133:11;
134:12
totally (1)
55:9
touch (3)
61:11;70:14;71:10
toys (7)
48:11,15,22,25;
49:8,9,14
train (10)
87:18,24;116:4,8,
12;117:4;120:6;
121:18;146:21;
148:24
trained (1)
42:11
training (17)
9:5;11:18,19,25;
12:17;112:1,14,22,24;
113:10,13;114:3,23;
115:9,16;117:3;143:2
transcript (2)
4:18;152:
translate (1)
12:15
trial (1)
5:13
tribal (1)
148:10
tried (2)
38:11;103:8
trigger (1)
148:14
true (8)
75:24;85:19,22;
86:9;128:8;131:21;
135:9;152:
truly (1)
97:19
try (5)
6:14;7:6;83:4;
88:11;145:16
trying (15)
7:3;18:13;21:9;
36:12;42:25;43:1;
71:1;97:20;119:6,21;
121:15;129:15;

132:19,24;136:1
Tufts (1)
11:18
turn (12)
16:22;44:4;45:3;
61:24;62:1;92:9;
99:15;113:2,3;
136:16;138:10;
140:19
Turning (2)
49:23;124:24
turnout (2)
30:17;54:4
TV (1)
42:4
twist (1)
50:3
two (24)
11:13;20:25;21:4;
27:2,5,8;34:17,22;
39:20;44:16;51:9;
54:6;60:19;64:20;
93:16;94:11;98:16;
103:7;119:13;139:5,
6;140:11;142:14;
147:6
type (1)
135:15
types (2)
103:7;112:8
typewriting (1)
154:11

U

UGA (1)
10:3
ultimately (1)
56:24
under (29)
5:8;9:1;11:17;
19:10;30:6;33:12;
68:24;75:16;79:2,8,9;
80:3,4;81:11;82:23;
88:7;100:7;105:3;
112:18;113:6;116:17;
129:14;133:4;149:17;
150:2,2;151:,13;
154:11
undergraduate (1)
23:21
undergraduates (2)
23:24;24:3
underlying (1)
33:21
undersigned (1)
152:
understood (2)
139:9;140:11
undue (6)
63:12,24;64:1,5,9;
65:1
unique (3)

128:5;135:11,12
UNITED (14)
0:1;3:16,18;10:21,
25;17:3;21:1;24:14;
94:3,22;95:5;109:15;
136:6;144:20
universities (1)
15:20
University (11)
9:6,6;10:1;11:18;
12:23;13:21;14:7,15;
20:20,22;21:23
unlawful (1)
64:6
unless (2)
75:14;150:21
untenured (1)
13:17
UOCAVA (3)
136:7,10,14
up (8)
18:14,16,18;24:2;
26:12;30:1,1;55:9;
72:9;95:21;111:9;
124:23;125:21;
130:14;133:13;
134:11
update (4)
35:3,6;137:24;
139:5
updated (2)
35:4,12
upon (9)
9:23;62:21;69:12;
71:10;74:13;93:2;
94:16;126:18;152:
upper-level (1)
23:24
urge (1)
43:4
urging (1)
44:11
USCA (3)
4:11;81:25;82:9
use (8)
5:14;16:16;21:9;
46:7,11;48:21;89:20;
152:6
used (5)
20:12;35:4;75:8;
98:21;110:13
uses (1)
109:10
using (2)
135:19,21
usual (1)
151:

V

vacuum (1)
131:19
value (1)

105:19
Van (4)
0:15;151:25;154:,6
varies (12)
13:20;15:11;26:24;
63:16;76:17;78:7,7,8;
79:19;109:3,9;120:12
various (12)
11:23;18:25;24:11;
28:22;30:13,14;
91:10;110:10;118:24;
121:12;128:4;131:8
vary (3)
28:23;29:7;120:16
version (6)
64:23,23;71:16;
122:13;125:17,19
versus (7)
28:20,21;54:8;90:6;
103:9;113:22;136:6
via (2)
23:1;30:21
victims (1)
45:14
videos (1)
116:19
view (5)
42:15;79:23;80:8;
124:11;129:15
viewed (2)
102:22;131:19
views (2)
22:8,12
violate (5)
6:20;64:10;91:5;
96:11;147:20
violates (1)
147:6
violation (3)
145:12;146:22;
147:1
violations (4)
74:10,21;97:18,19
virtue (1)
127:21
vis-a-vis (2)
30:19;70:9
vision (6)
35:24;36:5,9,19;
48:19,19
vitae (1)
8:17
vote (19)
11:3;17:10;60:12;
61:11;62:5;63:24;
66:10;67:18;68:3,14;
75:16;86:13,18;
106:22;144:12,18;
145:12;147:16;148:9
voter (38)
20:6;37:23;39:17;
40:12;54:3;60:11;
61:11;63:8;66:9;

67:13,19;68:14;
74:25;75:8;77:2;
78:16;81:7;82:1;
86:23;93:14;106:5,9,
17,22,23,25;110:13,
17;120:17;122:18;
137:11;138:2;144:20,
22;146:17;149:4,13
**voters (23)**
32:24;60:2,19;
73:15;77:7;81:12,17;
83:17;87:2;106:13;
141:15,15,21;142:5,7;
144:16,17;145:4;
148:8;149:19,20;
150:13,13
**voting (74)**
17:3,8,16;18:12;
21:1,10;22:9,16,20;
23:1,5,10;25:1;27:10;
28:12;30:9,14;31:20;
32:25;46:19;54:8,10;
56:1,3,5;60:12;61:12;
65:1;66:21;68:4,13,
25;69:21;70:15;
71:11;72:6;74:11;
79:10;80:4;85:22;
86:24;87:3;91:6;93:8,
13;94:8,8,21,24;96:6,
9,11,12;97:18;
109:18;117:14,15,21;
118:1;126:16;135:15;
136:13;137:8;141:14,
21;142:5;143:14;
144:11;146:16;147:5,
6,17;148:7,22
**Vox (1)**
39:8
**vs (1)**
0:5

**W**

**waive (2)**
112:24;113:9
**watching (1)**
42:4
**way (13)**
7:5;22:22;41:20;
46:4;55:1;61:10;
76:19;77:22;83:5;
95:21;97:2;144:10;
147:19
**ways (3)**
21:2;22:7,11
**wear (5)**
68:23;70:6;101:3,5;
109:24
**wearing (1)**
70:2
**website (7)**
105:8,11,15,19,25;
106:1;116:19

**weren't (1)**
144:22
**Wesley (1)**
86:2
**West (2)**
0:16;2:
**what's (5)**
78:8,9,9;80:23;
145:7
**Whereupon (1)**
71:3
**whichever (1)**
96:2
**White (7)**
47:24,25;48:9,14,
25;49:16;50:21
**whole (1)**
45:4
**who's (3)**
78:7;79:15;88:22
**whose (2)**
87:1;154:8
**willing (2)**
52:12;53:11
**window (1)**
28:17
**within (22)**
9:14;22:20;23:3,5;
25:11;26:3;28:9,14,
22;29:1;34:4;49:11;
50:7;54:7;55:25;
82:24;98:7;115:2;
128:5;129:4;130:23;
149:2
**without (5)**
52:13;53:12;60:7;
129:18;135:6
**WITNESS (8)**
5:4,17;11:19,24;
12:13;150:24;154:8,
10
**Woods (1)**
86:2
**word (4)**
119:2;132:14;
133:18;135:1
**wording (1)**
133:6
**words (6)**
21:9;32:16,21;33:2;
101:2;135:2
**work (7)**
44:15;49:2;52:18;
53:1;56:23;57:21;
119:5
**worked (2)**
53:6;94:7
**worker (2)**
115:15;116:19
**workers (21)**
68:23;69:25;70:1,3,
6,10;87:24;101:3,4;
112:15;113:13;114:3,

24;116:4,8,12;117:4;
121:18;143:3;146:21;
148:24
**working (1)**
52:1
**works (3)**
30:6;49:4;129:4
**worst (1)**
6:10
**worth (1)**
51:17
**write (9)**
38:25;45:11;52:9;
56:20;65:4;75:19;
77:11;95:25;100:7
**writing (3)**
43:19,24;139:25
**written (7)**
10:23;14:9;25:11;
42:10;51:20;140:7;
146:5
**wrote (4)**
43:14;44:25;99:18;
134:18
**Wyoming (4)**
148:6,15,16,17

**Y**

**Yale (8)**
15:1,4,13,15,18,21,
25;16:7
**y'all (1)**
55:10
**year (2)**
33:12;61:15
**years (4)**
20:25;25:6;30:9;
37:11
**Year's (1)**
135:20
**Yesterday (10)**
32:8,14,23;125:15,
19;126:11,15;136:2;
138:23;139:4
**young (1)**
21:17
**Youth (1)**
51:7

**1**

**1 (7)**
4:17;7:17,18;34:18,
18;48:3;62:4
**1:18-cv-05391-SCJ (1)**
0:5
**1:36 (1)**
138:19
**1:42 (1)**
138:19
**1:51 (1)**
145:19

**1:56 (1)**
145:19
**10 (7)**
53:23;55:17;77:11,
12;82:8;142:11;
145:16
**10:32 (1)**
55:14
**10:40 (1)**
55:14
**100 (1)**
110:23
**10B (1)**
151:5
**11 (8)**
0:17;33:12;61:21,
22;91:23,25;119:5
**11:54 (1)**
111:19
**11-18-19 (1)**
3:12
**113 (3)**
3:;38:14,18
**114 (3)**
3:;4:;38:15
**116th (1)**
40:8
**1180 (2)**
0:16;2:
**12 (6)**
20:22;81:6;84:18;
85:5;98:24;108:13
**12:56 (1)**
111:19
**12-10-19 (1)**
4:
**125 (2)**
4:,8
**13 (8)**
0:;81:25;82:13;
85:5,6;86:4;114:8;
142:22
**139 (1)**
92:11
**13th (1)**
143:15
**14 (2)**
86:17;125:10
**140 (2)**
0:24;4:10
**142 (1)**
3:4
**145 (1)**
3:5
**149 (1)**
4:11
**14th (5)**
2:12;93:16,18;94:4;
143:15
**15 (9)**
61:15;125:17;
126:7;127:8,9,12;
130:14;136:16,16

**150 (1)**
130:6
**150-some-odd (1)**
59:17
**156 (12)**
100:17;102:17;
103:5;104:2;110:23;
130:15,16,17;131:22;
133:11;134:13;135:7
**158 (1)**
92:11
**15th (4)**
93:17;18;94:4;
143:16
**16 (3)**
3:12;138:21;140:20
**1650 (1)**
2:5
**17 (4)**
4:17;20:19;90:5;
149:11
**18 (6)**
20:19;58:2;61:25;
90:16;91:2;144:18
**183-1-6-025c (2)**
132:10;134:17
**18th (1)**
16:19
**19 (4)**
69:6;92:20;97:2;
98:25
**1950s (1)**
11:15
**1965 (24)**
28:12;30:15;54:8;
56:1;60:13;61:12;
66:21;68:13;69:22;
70:16;72:6;74:12;
80:4;85:23;91:6;
93:14;94:24;109:19;
117:14,15;118:2;
137:9;146:17;147:17
**1970s (1)**
11:16
**1984 (3)**
50:3,5,13
**1990 (4)**
19:8;28:3,7,18
**1993 (1)**
81:8
**1999 (1)**
9:1
**1D (1)**
150:2

**2**

**2 (16)**
4:8;8:15;9:1;16:22;
19:10;49:23;50:25;
51:4;54:2;55:22;
71:23;91:22;92:9;
127:14;149:14;150:2

**2:03 (1)**
   150:25
**20 (7)**
   99:15;100:7;
   102:18;104:9,10;
   130:22;133:4
**20_ (1)**
   153:
**200,000 (2)**
   19:19,25
**2003 (1)**
   10:23
**2009 (1)**
   19:17
**2010 (1)**
   19:17
**2011 (1)**
   19:17
**2012 (1)**
   23:20
**2014 (1)**
   141:16
**2015 (4)**
   25:6;30:8;73:13,18
**2016 (3)**
   20:9,19;41:23
**2017 (1)**
   11:18
**2018 (8)**
   20:9,22;37:23;39:5;
   43:15;45:1;47:20;
   75:1
**2019 (5)**
   0:17;99:20;144:1;
   151:20;154:19
**203 (1)**
   28:12
**20507 (3)**
   4:11;81:25;82:9
**21 (3)**
   105:2;107:25;129:5
**21-2-216h (1)**
   137:11
**21-2-30 (1)**
   138:11
**21-2-30a (1)**
   138:11
**21-2-50 (2)**
   124:10;143:23
**21-2-50.2 (4)**
   4:;99:1;108:10,20
**21-2-50a7 (1)**
   127:13
**21-2-50a8 (2)**
   129:22;131:21
**21-2-50b (2)**
   123:15;124:14
**21-2-99 (2)**
   4:;114:6
**22 (3)**
   106:20;108:2;
   109:25
**23 (5)**

110:21;111:22;
   113:4;116:17,18
**231 (3)**
   3:;40:3,9
**23rd (2)**
   151:20;154:19
**24 (1)**
   116:14
**25 (6)**
   118:4,11,22;119:2;
   137:21;138:1
**26 (1)**
   122:10
**28 (2)**
   122:11,16

---

**3**

**3 (25)**
   16:10;22:4;33:7,8,
   11;41:1;44:5;45:3,6;
   51:4;52:7;58:4;62:1,
   2;64:15;68:2;71:13;
   74:10;90:18,22;
   91:22;106:18;132:5;
   133:4;134:11
**30 (2)**
   123:4;138:12
**30309 (1)**
   2:
**30318 (1)**
   2:
**30329 (1)**
   0:
**30e (1)**
   152:2
**316 (7)**
   99:21,22;126:22,
   23,24;127:2;139:3
**321-3333 (1)**
   0:25
**36 (1)**
   3:13
**38 (1)**
   3:15

---

**4**

**4 (11)**
   22:4;25:6;36:17;
   67:10;68:1;71:23;
   91:23,25;106:18;
   132:7;134:5
**40 (1)**
   3:17
**404 (1)**
   0:25
**404.400.3338 (1)**
   2:6
**404.609.2504 (1)**
   2:
**404.856.3250 (1)**
   2:

**42 (1)**
   82:5
**43 (2)**
   3:19;82:5
**44 (4)**
   3:;81:24;82:5,15
**47 (1)**
   3:22
**4A (1)**
   149:14

---

**5**

**5 (12)**
   3:3;30:8;38:9;
   77:15;80:14,19,25;
   81:3;90:11;94:10;
   96:7;142:11
**500 (1)**
   2:12
**52 (4)**
   4:11;81:24,25;82:9
**53 (1)**
   141:15
**54 (1)**
   3:24

---

**6**

**6 (2)**
   40:3;82:8
**61 (1)**
   4:
**678.701.9381 (1)**
   2:13

---

**7**

**7 (6)**
   3:;43:10;75:16;
   141:6,7,12
**73 (1)**
   112:3

---

**8**

**8 (4)**
   3:11;44:25;82:8;
   144:7
**8-15-19 (1)**
   4:

---

**9**

**9 (1)**
   46:25
**9:33 (1)**
   0:18
**9-11-28c (1)**
   151:
**9-11-30e (1)**
   152:
**99 (1)**

4:

# DEFENDANTS' EX. 1



DEFENDANT'S
EXHIBIT
1
PV 12-1-19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,

      Plaintiffs

v.

BRAD RAFFENSPERGER, in his official
Capacity as Secretary of State of Georgia;
*et al.*,

      Defendants.

Civil Action File

No. 1:18-cv-05391-SCJ

TO:  **Dr. Khalilah L. Brown-Dean**
      **Quinnipiac University**
      **Department of Political Science and Philosophy**
      **275 Mt. Carmel Avenue**
      **CL-AC3**
      **Hamden, CT 06518**

### SECOND AMENDED NOTICE OF DEPOSITION
### OF DR. KHALILAH L. BROWN-DEAN

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of

Civil Procedure, counsel for Defendants Brad Raffensperger, et al., will take the

oral deposition of **Dr. Khalilah L. Brown-Dean** at the office of **Lawrence &**

**Bundy, LLC, 1180 W Peachtree St., NE #1650, Atlanta, GA  30309** on

**December 11, 2019**, beginning at **9:30 a.m.** and continuing thereafter until

completed.

The deposition shall be taken before a Notary Public or some other officer authorized by law to administer oaths for use at trial.  The deposition will be taken by oral examination with a written and/or sound and visual record made thereof (*e.g.,* videotape, LiveNote, etc.).  The deposition will be taken for the purposes of cross-examination, discovery, and for all other purposes permitted under the Federal Rules of Civil Procedure or other applicable law.

This 10th day of December, 2019.

Josh B. Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Andrew M. Swindle
Georgia Bar No. 522156
aswindle@robbinsfirm.com

Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318

Telephone:  (678) 701-9381
Facsimile:    (404) 856-3250

Christopher M. Carr
Attorney General
GA Bar No. 112505
Annette M. Cowart
Deputy Attorney General
GA Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
GA Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle - Suite 200
Atlanta, Georgia 30339
Telephone:  (678) 336-7249

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 10, 2019, I caused to be served the

foregoing **SECOND AMENDED NOTICE OF DEPOSITION OF DR.**

**KHALILAH L. BROWN-DEAN** by sending it via email and U.S. Mail, postage

prepaid, and addressed as follows:

**Lawrence & Bundy LLC**
Allegra Lawrence-Hardy
Leslie J. Bryan
Maia J. Cogen
Suzanne Smith Williams
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Allegra.Lawrence-
Hardy@lawrencebundy.com
Leslie.Bryan@lawrencebundy.com
Maia.Cogen@lawrencebundy.com
Suzanne.williams
@lawrencebundy.com

**KaiserDillon PLLC**
Matthew G. Kaiser
Sarah R. Fink
Scott S. Bernstein
Norman G. Anderson
1099 14th Street, NW
8th Floor West
Washington, DC 20005
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

**Lawrence & Bundy, LLC**
Thomas R. Bundy
8115 Maple Lawn Blvd.
Suite 350
Fulton, MD 20759
Thomas.Bundy@lawrencebundy.com

Elizabeth Vranicar Tanis
John A. Chandler
957 Springdale Road, N.E.
Atlanta, GA 30306
beth.tanis@gmail.com
jachandler@gmail.com

**Sandler Reiff Lamb Rosenstein &**
**Birkenstock, P.C.**
Dara Lindenbaum
1090 Vermont Ave, NW, Suite 750
Washington, DC 20005
lindenbaum@sandlerreiff.com

**Kastorf Law, LLC**
Kurt G. Kastorf
Suite 100
1387 Iverson Street, N.E.
Atlanta, GA 30307
kurt@kastorflaw.com

**Jenner & Block LLP**
Kali Nneka Bracey
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
KBracey@jenner.com

**Jenner & Block LLP**
Jeremy H. Ershow
919 Third Avenue
New York, New York 10022
jershow@jenner.com

**Miller & Chevalier Chartered**
Andrew D. Herman
Nina C. Gupta
900 16th St. NW
Washington, DC 20006
aherman@milchev.com
ngupta@milchev.com

**DuBose Miller LLC**
Von A. DuBose
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
dubose@dubosemiller.com

Brian E. Lake
Georgia Bar No. 575966

# DEFENDANTS' EX. 2

DEFENDANT'S
EXHIBIT
2
EV 12-11-19

# DR. KHALILAH L. BROWN-DEAN
## (Pronounced Ka-Lie-La)

Quinnipiac University
Department of Political Science and Philosophy
275 Mt. Carmel Avenue
CL-AC3
Hamden, CT 06518
(203) 582-6406 (Voice) § (203) 582-3471 (Fax) Khalilah.brown-dean@quinnipiac.edu

## PROFESSIONAL EMPLOYMENT

### *Quinnipiac University*

Advisory Board, Ronald W. Walters Leadership and Public Policy Center at Howard University (2019-)

Advisory Board, *Issues in Race and Society* journal (2019-)

Board Chair, The Community Foundation *for* Greater New Haven (2019-)

Member, Quinnipiac University Strategic Plan Committee (2018)

Member, American Political Science Association Ralph Bunche Summer Institute Advisory Committee (2016-)

Faculty Researcher, Urban League of Southern Connecticut and Quinnipiac University State of Urban Connecticut Project (2016-)

Affiliated Faculty, The Prison Project at Quinnipiac University (2016-)

Co-Chair, College of Arts and Sciences Faculty Scholarships and Grants Committee (2015-2018)

Member, College Evaluation (Tenure and Promotion) Committee (2015-2018)

Co-Coordinator, Frank M. Netter School of Medicine Health Policy and Advocacy Concentration (2015-2016)

Co-Leader, University Academic Seminar Series and Advisory Board (2013-2014)

Co-Organizer, Dilemmas of Justice Speakers Series (2013)

Exploratory Committee, African American Studies Minor/Civil Rights Institute (2013-2014)

Chair, College of Arts and Sciences Scholars Working Group (2013)

Associate Professor of Political Science, 2011-Present

*Yale University*

    Peter Strauss Family Assistant Professor of Political Science and African American Studies (2006-2011)

    Director of Undergraduate Studies for the Department of African American Studies (2009-2010)

    Assistant Professor of Political Science and African American Studies (2003-2006)

# EDUCATION

2003 The Ohio State University, Ph.D., Political Science

2001 The Ohio State University, M.A., Political Science

1999 Summer Institute in Political Psychology, Certificate, Political Psychology

1998 The University of Virginia, B.A., Government

# POST-GRADUATE TRAINING

2017 Tufts University Metric Geometry and Gerrymandering Summer Program
2017 Tufts University Gerrymandering Expert Witness Training

# ACADEMIC AWARDS, GRANTS, AND FELLOWSHIPS

2018, 2017, 2016 Quinnipiac University Provost's Innovation Grants ($15,000)

2018-2012 Quinnipiac University College of Arts and Sciences Faculty Research Grants ($30,000)

2017 Top 25 Women Making a Difference in Higher Education Award, Presented by *Diverse: Issues in Higher Education*

2014 National Conference of Black Political Scientists Julia R. Hight Summer Writing Fellowship

2010 National Conference of Black Political Scientists Rodney Higgins Award for Best Faculty Paper

2009-2011 The Open Society Foundations Justice Advocacy Senior Fellowship ($200,000)

2008-2010 Ford Foundation Difficult Dialogues Initiative ($200,000)

2005 American Political Science Association Best Dissertation Award (Race, Ethnicity, and Politics Section)

2005 Yale Center for International and Area Studies ($10,000)

2005 Social Science Research Fund ($5,000)

2005 Yale University Center for the Study of American Politics ($50,000)

2005 The College Board/AP Scholars Program Fellow ($7,000)

## AWARDS FOR PUBLIC SCHOLARSHIP AND SERVICE

2017 Game Changer Award in Public Safety and Criminal Justice, Presented by the Connecticut NAACP State Conference Youth and College Division

2017 Education Award, Presented by the Delta Iota Sigma Chapter of Phi Beta Sigma Fraternity, Incorporated

2016 Fannie Lou Hamer Award for Outstanding Community Service, Presented by the National Conference of Black Political Scientists

2015 Outstanding Community Leadership Award, Presented by the Connecticut State Martin Luther King, Jr. Commission

2014 Legacy Award, Presented by the National Association of Blacks in Law Enforcement

Walt Everitt Humanitarian Award, Presented by the Connecticut Network to Abolish the Death Penalty

Forty Under Forty Award, Presented by *Connecticut Magazine*

2007 Wilma Holmes Tootle Education Advancement Award, Presented by the North Atlantic Region of Alpha Kappa Alpha Sorority, Incorporated

## PRIOR AWARDS AND ACHIEVEMENTS

2002 National Conference of Black Political Scientists Sammy R. Young Best Student Conference Paper Award

2002 The Ohio State University Alumni Grant for Graduate Research and Scholarship ($2,000)

2002 The Ohio State University Madison F. Scott Research Grant ($2,000)

2001 The Ohio State University Madison F. Scott Research Grant ($1,500)

2000 The American Political Science Association Advanced Graduate Student Travel Grant ($500)

2000 Carl Albert Center for Congressional Research Stipend ($500)

2000 The Ohio State University Program for the Enhancement of Graduate Studies Summer Research Fellowship ($4,000)

1999 The Ohio State University Madison F. Scott Research Grant ($1,500)

1998 The Ohio State University Graduate Enrichment Fellowship ($30,000)

1997 American Political Science Association Ralph Bunche Summer Institute Fellow

## RESEARCH AND TEACHING INTERESTS

Civic Engagement; Racial and Ethnic Politics; Urban Politics and Policy; Voting Rights and Representation; The Politics of Punishment and Crime Control Policy; Mass Political Behavior; Political Psychology; Public Policy and Leadership

## SCHOLARSHIP AND RESEARCH PUBLICATIONS
### *Books*
Brown-Dean, Khalilah L. September 2019. *Identity Politics in the United States*. London: Polity Press. ISBN: 9780745654119

Duffy, Sean, Timothy Dansdill, Jill Shahverdian, Aileen Dever, Khalilah L. Brown-Dean, and Julia Giblin, eds., 2014. *The Individual in the Community*. Pearson. 8th Edition.

### *Refereed Book Chapters and Journal Articles*
Brown-Dean, Khalilah L. *Forthcoming.* "Monumental Promises, Incremental Gains: Criminal Justice Reform in the Obama Era." In *After Obama: African American Politics in a Post-Obama Era*. Edited by Todd C. Shaw, Robert Brown, and Joseph McCormick III. New York, NY: NYU Press.

Brown-Dean, Khalilah L. 2016. "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation." In *Urban Citizenship and American Democracy*. Edited by Amy Bridges and Michael Javin Fortner. Albany, NY: SUNY Press.

Brown-Dean, Khalilah L. 2015. "Felon Disenfranchisement Ten Years After *Bush v. Gore.* " In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore*. Co-Edited by Michael Alvarez and Bernard Grofman. Cambridge: Cambridge University Press.

Brown-Dean, Khalilah L. and Benjamin E. Jones. 2015. "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." *Politics, Groups, and Identities*.

Alexander-Floyd, Nikol C., Byron D'Andra Orey, and Khalilah L. Brown-Dean. 2015. "Professional Conferences and the Challenges of Studying Black Politics." *PS: Political Science and Politics*.

Brown-Dean, Khalilah L. 2015. "Emphasizing the Scholar in Public Scholarship." *PS: Political Science and Politics*.

Wilson, David C. and Khalilah L. Brown-Dean. 2012. "Great[er] Expectations: Group Interests, Deracialization, and Candidate Evaluations." *National Political Science Review*.

Brown-Dean, Khalilah. L. 2009. "Do Classes Matter?: Evaluating the Impact of College Courses on Tolerance." *Journal of the Institution for Social and Policy Studies*.

Brown-Dean, Khalilah L. 2007. "Permanent Outsiders: Felon Disenfranchisement and the Breakdown of Black Politics." *National Political Science Review*.

Brown-Dean, Khalilah L. 2005. "Trading *Brown* for Prison Orange: Reflections on Race and Justice Fifty Years after *Brown v. Board.*" *Journal of the Institution for Social and Policy Studies*.

## POLICY PAPERS AND OTHER PUBLICATIONS

Brown-Dean, Khalilah L. and Don C. Sawyer, III. 2019. "The State of Education in Urban Connecticut." In *The State of Urban Connecticut,* edited by Robert Brown, III. New Haven, CT: The Urban League of Southern Connecticut.

Brown-Dean, Khalilah L. 2018. "Fighting From a Powerless Space: Black Women and the Criminal Justice System." In *State of Black Women in the U.S. and Key States,* edited by Avis A. Jones-DeWeever. Washington, DC: National Coalition on Black Civic Participation.

Brown-Dean, Khalilah L. 2017. Book Review of *Sisters in the Statehouse* by Nadia Brown. *Journal of Race, Ethnicity, and Politics.*

Brown-Dean, Khalilah L., Zoltan Hajnal, Christina Rivers, and Ismail White. 2015. "Fifty Years of the Voting Rights Act: The State of Race in Politics." *Joint Center for Political and Economic Studies.*

Brown-Dean, Khalilah L. November 2013. "In the Final Analysis: On Nick Nelson's Contributions to the Study of Black Politics." *Politics, Groups, and Identities.*

Brown-Dean, Khalilah L. 2012. Cited in the Connecticut State Judiciary Committee's Favorable Report for SB-280: An Act Revising Penalties for Capital Felonies. https://www.cga.ct.gov/2012/JFR/S/2012SB-00280-R00JUD-JFR.htm

Brown-Dean, Khalilah L. 2010. Book Review of *The Perils of Federalism: Race, Poverty, and the Politics of Crime Control* by Lisa L. Miller. *Political Science Quarterly.*

Brown-Dean, Khalilah L. et al. 2008. "Lift Every Voice: Democracy, Voting Rights, and Electoral Reform." Published in conjunction with the Advisory Committee on Social Witness Policy (ACSWP) and the Advocacy Committee for Racial Ethnic Concerns (ACREC).

## WORKS IN PROGRESS

Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context (journal manuscript with David C. Wilson and TaLisa Carter)

From Pain to Power: Centering Victims' Voices in Criminal Justice Reform Movements (book manuscript)

Negotiating Voting Rights Policy in the Post-*Shelby* Era (journal manuscript)

Whose Lives Matter?: Inmate Labor and Post-Disaster Recovery (with Randolph Burnside)

The Beautiful Struggle: Essays on Politics, Pop Culture, and Political Progress (book manuscript)

## PUBLIC SCHOLARSHIP
### 2019

Brown-Dean, Khalilah L. "Why Victims of Crime Deserve a Voice." *The Hill*
Brown-Dean, Khalilah L. "Yes Virginia, There is a Choice." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Defining Political Progress." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "On the Meaning of Survival." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "First STEP or First Stumble?" *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Myth of Meritocracy." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Fallacy of NOT Seeing Race." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Dr. King Deserves More." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Sorority Life as an Act of Resistance." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Teaching Through Trauma." *Diverse: Issues in Higher Education*


**2018**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."
Brown-Dean, Khalilah L. "Civics 101 Podcast: The Fifteenth Amendment." New Hampshire Public Radio
Brown-Dean, Khalilah L. "Giving Thanks Amid Political Uncertainty." *Diverse: Issues in Higher Ed*
Brown-Dean, Khalilah L. "On Citizenship and Voting." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Hate We Give: Voting Against Violence." *Diverse: Issues in Higher Ed*
Brown-Dean, Khalilah L. "Still Separate, Still Unequal: American Indians and Election 2018." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Feminism, Womanism, and Election 2018." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Stakes is High." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Aretha Franklin, John McCain, and the Meaning of Legacy." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Opposite of Progress." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "As American as Apple Pie." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "For Colored Folks Who Have Considered Suicide." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Why We Celebrate." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Mothering Behind Bars." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Bill Cosby Isn't a Victim." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "It's Time to Secure the Vote." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "From Pain to Power." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Reclaiming the 'Fierce Urgency of Now'." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "The Politics of Mental Health." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Not Yet Just, Not Yet Free." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Five Things More Effective Than Political Panic." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Honoring Black History Month, In Prison." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "In Defense of Youth Organizing." *Diverse: Issues in Higher Education*
Brown-Dean, Khalilah L. "Art as Political Resistance." *Diverse: Issues in Higher Education*


**2017**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."


**2016**

Brown-Dean, Khalilah L. "Can She Do It? Women in Politics Remain Dogged By Gender Stereotypes." *New York Daily News.*

Brown-Dean, Khalilah L. "Justice Trump'd? The Path Toward Criminal Justice Reform Post-Obama." WEAA Radio.

**2015**

Brown-Dean, Khalilah L. "Leaving Victims Behind is Unjust." *New Haven Register.*

**2014**

Brown-Dean, Khalilah L. "Saying Farewell to Maya Angelou." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Who Fights For Black Girls?" *Ebony Magazine.*

**2013**

Brown-Dean, Khalilah L. Documentary Feature: "The Color of Justice."

Brown-Dean, Khalilah L. "Kids and Families: The REAL Victims of the GOP Shutdown." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Primary Offers Opportunity to Move New Haven Forward." *New Haven Register.*

Brown-Dean, Khalilah L. "An End to the War on Weed?: Not Likely." *Ebony Magazine.*

Brown-Dean, Khalilah L. "What Do the Supreme Court's Decisions Mean For Blacks?" *Ebony Magazine.*

**2012**

Akinwole-Bandele, Lumumba and Khalilah L. Brown-Dean. "Beyond Troy Davis: Why We Cannot Wait." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Beyond Barack Obama: Is America Ready For a New Political Party?" *Dominion of New York Magazine.*

**2011**

Brown-Dean, Khalilah L. "Are HBCU's Still Relevant?" *Uptown Magazine.*

Brown-Dean, Khalilah L. "If Black Men Live Longer in Prison It's Time For Change." *TheGrio.*

## INVITED TALKS AND CONFERENCE PRESENTATIONS
"The 400th Anniversary of Jamestown and the Arrival of Enslaved Africans in Virginia." American Political Science Association Annual Meeting. Washington, DC. August 2019.

"The Future of American Democracy." Quinnipiac University Presidential Inauguration. May 2019.

"A New Vision of Criminal Justice Reform." Quinnipiac University Admissions Preview. March 2019.

"Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context." David C. Wilson, TaLisa Carter, and Khalilah L. Brown-Dean. National Conference of Black Political Scientists Annual Meeting. Baton Rouge, Louisiana. March 2019.

"Fighting from a Powerless Space: Women of Color in the Criminal Justice System." Feminism and Incarceration Conference. University of North Carolina-Greensboro. February 2019.

"The Continuing Struggle for Voting Rights in the United States." Wiggin & Dana Law Firm. February 2019.

"Not Yet Just, Not Yet Free: Black Women, Political Freedom, and the 2018 Midterm Elections." Connecticut College. October 2018.

"A Letter to the Free: Reimagining Justice and Democracy in the Trump Era." University of Bridgeport Necessary Voices Lecture Series. February 2018.

"Freedom in the Era of Reform." Cheshire (CT) Correctional Institute. February 2018.

"On the Meaning of Justice and Reform." College of William and Mary. February 2018.

"A Conversation on Justice and Freedom." University of Connecticut School of Social Work. February 2018.

"Redefining Civil Rights Post-Obama." NAACP Albuquerque Civil Rights and Diversity Conference. September 2017.

"The Legacy of the 15th Amendment Post-*Shelby.*" Duke University's Samuel DuBois Cook Center Research Symposium on the Social and Economic Outcomes of the 13th, 14th, and 15th Amendments. March 2017.

"Race, Representation, and Disenfranchisement: As American As Apple Pie." Pace University. March 2017.

"The Public Spectacle: Exploring Anger and Political Transformations." William Paterson University. October 2016.

"The State of Race and Policing in America." Texas A&M University Bush School for Public Service. September 2016.

"Contemporary Challenges to Voting Rights in the United States." University of Connecticut. March 2016.

"The Black Predicament and the 2016 Elections." National Conference of Black Political Scientists. Jackson, Mississippi. March 2016.

"Beyond Ferguson: Reimagining Race and Social Justice in the United States." Walker-Horizon Lecture. Depauw University. February 2016.

"Counter-Emancipation and the Voting Rights Act of 1965." University of Illinois-Springfield. June 2015.

"Fifty Years of the Voting Rights Act: The State of Race in American Politics." Selma Public Library for the 50th Anniversary Celebration of the Bloody Sunday March. March 2015.

"Why We Cannot Wait: Reclaiming the Fierce Urgency of Now." Claflin College. February 2015.

"Lessons From the Past, Prospects For the Future: Voting Rights Post *Shelby v. Holder*." US Attorney's Office. February 2015.

"Beyond Ferguson: Understanding the Nexus of Incarceration and Disenfranchisement." Connecticut Court Support Services. February 2015.

"The Mass Incarceration of Women of Color." Harvard University. March 2014.

"45 Years: A Retrospective on NCOBPS and the Work of William E. Nelson, Jr." Presented at the National Conference of Black Political Scientists Annual Meeting. Wilmington, Delaware. March 2014.

"The Role of Community Mobilization Within Social Justice Movements." U.S. Human Rights Network. December 2013.

"From Painful to Powerful: How Crime Victims Persuaded Legislators to Reform the Death Penalty in Connecticut and Maryland." Presented at the American Political Science Association Annual Meeting, Chicago, Illinois. August 2013.

"Public Scholarship vs. Public Intellectualism." Women of Color in Political Science Mini-Conference, American Political Science Association. Chicago, Illinois. August 2013.

"How the Affected and Underrepresented Are Ending the Death Penalty." Yale University Law School Rebellious Lawyering Conference. New Haven, Connecticut. February 2013.

"Building Authentic Power: An Examination of Connecticut's Death Penalty Repeal Campaign." Presented at the Southern Political Science Association Annual Meeting. Orlando, Florida. January 2013.

"The Relationship Between Perceptions of Justice and Grassroots Mobilization." Maryland State Conference of NAACP Branches. October 2012.

"Beyond Troy Davis: Understanding the Death Penalty Abolition Movement in the United States." William Paterson University. September 2012.

"A Tale of Two States: Death Penalty Reform in Connecticut and Maryland." Soros Institute/Open Society Foundations. July 2012.

"From Pain to Power: A New Model of Social Justice Organizing." National Conference on Race and Education in Higher Education. May 2012.

"Redefining Citizenship in a 'Post Racial' America." Carter G. Woodson Lecture Series. Central Connecticut State University. New Britain, CT February 2012.

"Race and Domestic Policy." George Mason University School of Public Policy. October 2011.

"Three-Fifths Revisited: The Census and Inmate Enumeration." Presented at the Drexel Summer

Conference on the City. June 2011.

"Concentrating Punishment." Presented at the Princeton University Imprisonment of a Race Conference. March 2011.

"From Exclusion to Inclusion: Promoting Civic Engagement When Times are Always Hard." Paper presented at the American Political Science Association Annual Meeting, Washington, DC. September 2010.

"Greater Expectations: Perceptions of Racial Group Interests and Candidate Evaluations." (with David C. Wilson). Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, IL. April 2010.

"The Future of Post-Racial Politics." Presented at the "From Slavery to Freedom to the White House: Race in Twenty-First Century America, A Conference in Honor of John Hope Franklin." Sponsored by the Duke University School of Law. April 2010.

"Race, Representation, and Punitive Politics." Presented at "The Challenge of Racial Inequality in a Post-Racial World: Race, Rights, and Public Policy in the Age of Obama." Sponsored by Rutgers and Princeton Universities. March 2010.

"Identity Politics in the Age of Obama." 15th Annual Multicultural Lecture Series. University of Rhode Island. February 2010.

"Identity Politics in the Age of Obama." University of Rochester Two Icons Lecture Series. February 2009.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Presented at the UCLA Center for the Study of Race and Ethnicity in the Americas. February 2008.

"Reforming the State: Assessing Recent Changes in State Felon Disenfranchisement Laws." Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada. September 2009.

"Race, Crime, and Political Inequality." Presented to The University of North Carolina, Chapel Hill American Politics Research Group. November 2007.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois. September 2007.
"Once Convicted, Forever Doomed: The Politics of Punishment in the United States." The University of Michigan Distinguished Speakers Series. September 2007.

"Contemporary Challenges to the Voting Rights Act." Presented for the National Presbyterian Church Voting Rights and Electoral Reform Committee. Washington, DC April 2007.

"Once Convicted, Forever Doomed: Understanding the Political Consequences of Mass Incarceration." University of Kentucky. March 2007.

"Inmate Enumeration and Political Representation: *Reynolds v. Sims* Revisited." University of Kentucky Law School. March 2007.

"Race, Religion, and Attitudes Toward Criminal Justice Policy." The University of Texas Conference on Race, Religion, and Politics. March 2007.

"Race and the Politics of Punishment in the United States." Presented at Oxford University, Nuffield College. Oxford, England February 2007.

"Voting Rights Policy in the Post-Civil Rights Era." The Ohio State University Law and Democracy Forum. February 2007.

"African American Communities and the Politics of Incarceration." Presented to the Black Solidarity Conference, Yale University. New Haven, CT October 2006.

"Fighting from a Powerless Space: The Impact of Criminal Justice Policy on Women of Color." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2006.

"The Politics of Incarceration." African American Research Collaborative. Philadelphia, PA. August 2006.

"Is the Voting Rights Act Still Relevant?" Morning at Yale Program sponsored by the Association of Yale Alumni. May 2006.

"Inmate Enumeration and the Return of the Three-Fifths Clause." Paper presented at the National Conference of Black Political Scientists Annual Meeting, Atlanta, GA. March 2006.

"New Considerations in Redistricting and Minority Representation." Presented at the "Who Draws the Lines?: The Politics of Redistricting Conference." University of North Carolina at Chapel Hill School of Law. Chapel Hill, NC February 2006.

"The Race, Education, and Incarceration Nexus." Twentieth Century American Politics and Society Workshop. Columbia University. November 2005.

"Contemporary Challenges to the Voting Rights Act of 1965." Presented at Virginia State University. September 2005.

"Race, Crime, and American Political Inequality." Presented at Oxford University, Pembroke College. Oxford, England. March 2005.

"Trading Brown for Prison Orange: The Link Between Race, Education, and Incarceration." Reflections: 50 Years after *Brown v. Board* Symposium. Central Connecticut State University. New Britain, CT. September 2004.

"Racial Disparities in Sentencing." Panel sponsored by the Greater New Haven NAACP. "Narrowing the Gap: Reducing Access Inequality for (Ex)Felons." Crime, Inequality, and Justice Symposium, The Ohio Criminal Justice Research Center. Columbus, OH. August 2004.

"Stolen Democracy: The Consequences of Felon Disenfranchisement Laws for Black and Latino

Communities." Florida State of Black Studies Conference, Miami, FL. April 2004.

"Women of Color and the American Prison System," with J. Perez-Monforti. Paper presented at the Western Political Science Association Annual Meeting, Portland, OR. March 2004.

"The Impact of Elite Framing on Public Attitudes Toward Disenfranchisement." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Paper presented at the Midwest Political Science Association Conference, Chicago, Illinois. April 2003.

"Racial Profiling or Racist Profiling?: Perception and Opinion on the Profiling of Arabs and Blacks," with Thomas E. Nelson, Ray Block, Jr. and Javonne A. Paul. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts. September 2002.

"Ignorance or Intolerance?: An Analysis of Public Attitudes Toward Felon Disenfranchisement Laws." Paper presented at the Edward F. Hayes Graduate Research Forum, Columbus, Ohio. February 2002.

"One Lens, Different Views: An Examination of Public Opinion on Felon Disenfranchisement Laws." Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002. *Recipient of the Sammy R. Young Best Conference Paper Award*.

"The Effects of Crisis-Related Imagery on Public Opinion about Racial Profiling," with Ray Block, Jr. and Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002.

"Heritage or Hate?: An Analysis of Public Attitudes Toward the Confederate Flag," with B. D"Andra Orey. Paper presented at the Southern Political Science Association, Atlanta, Georgia. January 2001.

"Shades of Discontent: Minority Group Competition and Attitudes Toward the Elian Gonzalez Issue," with J. Perez-Monforti. Paper presented at the National Conference of Black Political Scientists, Richmond, Virginia. *Nominated for the Sammy R. Young Best Conference Paper Award*. March 2001.

"Toeing the Party Line, Toeing the Color Line: African American Women in Congress and the Impeachment Process." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 2000.

"Stolen Democracy: Felony Disenfranchisement Laws and the Future of Black America," with Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Washington, D.C. *Recipient of the Francis Aumann Award for the Best Graduate Student Conference Paper*. March 2000.

"African American Female Legislators and the Clinton Impeachment Process." Women Transforming Congress: Gender Analyses of Institutional Life Conference, Carl Albert Center for Congressional Research. April 2000.

"The Influence of Politically Active Black Churches on Community Activism among African Americans." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 1997.

## KEYNOTE ADDRESSES AND PANEL DISCUSSIONS

"Not Yet Just, Not Yet Free: Women and Social Justice." Keynoted address presented to Southern Connecticut State University Women's Conference. May 2019.

"The Future of Voting Rights in the United States." Keynote address presented to the Sphex Club of Virginia. May 2019.

"The State of Justice Reform." Whitneyville United Church of Christ Social Justice Symposium. May 2019.

"The State of Urban Connecticut." Urban League of Southern Connecticut and Quinnipiac University. April 2019.

"School/Gun Violence: An Interdisciplinary Concern." Quinnipiac University School of Education. April 2018.

"A New Vision of Freedom and Democracy." Keynote Address presented to the Farmington Valley Links, Incorporated. Mark Twain House. February 2018.

"To Build the Beloved Community in the Face of Chaos." Annual Martin Luther King, Jr. Breakfast Keynote Address. Lynchburg, VA. January 2018.

"Women Leading Change: Promoting and Sustaining Women in Leadership Roles." Southern Connecticut State University Sustainability Initiative. November 2017.

"Gender, Voting, and the Voting Rights Act." Community Foundation for Greater New Haven. October 2017.

"We Who Believe in Freedom." Keynote Address presented to the Connecticut Department of Children and Families Region 6 Foster Youth Celebration. May 2017.

"Community Conversation on the Thirteenth Documentary." Greater New Haven Branch of the NAACP. April 2017.

"Women, Media, and the Gender Lens." University of New Haven Women's Leadership Conference. April 2017.

"A Day After the Election...Now What?" Quinnipiac University. November 2016.

"Bridging the Past and the Future: 30 years of the Ralph Bunche Summer Institute and the Intellectual Legacy of Dr. Ralph Bunche." American Political Science Association. October 2016.

"Chaos or Community?" Southern New England Community Action Conference. September 2016.

"A Community Conversation on Race in America." With Congressman Jim Himes. July 2016.

"Reflections on Voting Rights in the U.S." With Congressman Jim Himes. April 2016.

"To Whom Much is Given." National Association of Negro Business Women and Professionals Club. New Haven, CT. March 2016.

"Reclaiming the Fierce Urgency of Now." Frontiers International Keynote Address. Springfield, Illinois. January 2016.

"One Person, One Vote: Voting Rights 50 Years Later." Harriett Beecher Stowe Center. November 2015.

"A Call to Leadership." Keynote Address for the North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated's Undergraduate Luncheon. April 2012.

"Taking the L.E.A.D.: Social Media and Contemporary Youth Movements." Keynote Address for the C.H.A.P. Youth Leadership Conference. March 2012.

"Post-Racial or Post-Racism? New Directions in the Quest for Equality." Presented to the United States Department of Agriculture. February 2011.

"Fractured Citizenship and the Politics of Punishment." Presented to inmates at the Cheshire State Correctional Institution. Sponsored by Wesleyan University Center for Prison Education. May 2010.

"Managing the Politics of Diversity." Keynote Address for the Virginia Community Dialogue on Race and Racism. January 2008.

Panelist, "The Politics of Hate." Yale University. New Haven, CT March 2008.

Panelist, "Strategies for Strengthening Your Voice in the Political Process." North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated. March 2008.

"The Political Impact of American Criminal Justice Policy." Presented at the *New York Times* Center New York, NY November 2008.

"Empowerment Through Education." Keynote Address presented for the Links, Incorporated Scholarship Luncheon. May 2006.

"To Whom Much is Given, Much is Required: The Need for Youth Leadership." Keynote Address presented to the Hyde Leadership Academy. February 2006.

"Lessons from the Past, Prospects for the Future: Reflections on the Voting Rights Act of 1965." Association of Yale Alumni. October 2005.

"Dismantling the Hierarchy of Oppression: The Common Political Fate of Black Women and Latinas." Co-Sponsored by the Xi Omicron Chapter of Alpha Kappa Alpha Sorority, Inc. and Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. April 2005.

"Lest We Forget." Keynote Address, African American Women's Summit. March 2005.

"Criminal Justice Expenditures and the Public Health Crisis." Frantz Fanon Lecture Series, Yale University School of Medicine. February 2005.

"The Spirit of Sankofa." Keynote Address, The New Haven Club. New Haven, CT. February 2005.

"On Heroism: Honoring the Legacy of Rosa Parks." Roundtable panelist, Afro-American Cultural Center at Yale. January 2005.

"For God and For Country: The Role of Religious Values in the 2004 Presidential Election." Yale University Election Post-Mortem. November 2004.

"The Politics of Power: Public Policy and Justice in the Black Community. "Panel in honor of the 35th Anniversary of the Afro-American Cultural Center at Yale. October 2004.

"Assessing the Limits of Democracy Via Felon Disenfranchisement Laws." Washington University Department of Political Science, St. Louis, Missouri; Wesleyan University, Middletown, Connecticut.

"Just Being Here Is Not Enough!: Recognizing Your Role in Community Development." Yale University Afro-American Cultural Center Student Achievement Dinner. May 2004.

International Festival of Art and Ideas. May 2004.

"To Whom Much is Given: Communal Responsibility and the Challenges of Black Politics." Mental Pabulum Series, Yale University. February 2004.

"Power, Pride, and Patriotism: Reflections on the Political Significance of Veterans" Day." Holcomb Rock Baptist Church. November 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Invited presentations for Yale University, Texas A&M University, Emory University, Hunter College, and Indiana University-Indianapolis. 2002.

## OTHER CONFERENCE PARTICIPATION
Served as a Section Head, Panelist, Discussant, Chair, and Organizer for numerous panels at national conferences such as the American Political Science Association, National Conference of Black Political Scientists, Southern Political Science Conference, and Midwest Political Science Conference.

## TEACHING EXPERIENCE
Designing Political Inquiry (Undergraduate Lecture/Seminar); Senior Thesis in American Politics (Undergraduate Seminar); American Political Movements (Undergraduate Lecture/Seminar); Introduction to American Politics (Undergraduate Lecture); The Politics of Intimacy (Undergraduate Seminar); The Politics of Community (Undergraduate Seminars); Race, Ethnicity, and Citizenship (Undergraduate Seminar); Ethnic Politics in the United States (Undergraduate Lecture); Voting Rights and Representation (Undergraduate Seminar); The Individual and the Community (Undergraduate Seminar); Power, Politics, and Punishment (Graduate/Undergraduate Seminar); Public Opinion (Graduate Seminar); Race and Ethnicity in American Politics (Graduate Seminar); Race and Ethnicity in American Politics (Undergraduate Seminar) African American Politics (Undergraduate Seminar); Black and Jewish Community Politics (Undergraduate Lecture/Seminar)

## FACULTY ADVISING AND SUPERVISION
Responsible for advising approximately 20 undergraduate students in the Quinnipiac University College of Arts and Sciences each semester
Dissertation Committee Member/Reader: Andra Gillespie (Emory University); Rachel Milstein Sondheimer (United States Military Academy at West Point); Shatema Threadcraft (Rutgers University); Joanna Mosser (Drake University)

Research Supervision: Sheree Bennett and Luke Thompson (Difficult Dialogues Graduate Research Assistants); Kayla Vinson and Adrea Hernandez (Mellon Mays Undergraduate Fellows); Brandee Blocker and Christopher Pagliarella (undergraduate research assistant)

## PROFESSIONAL MEMBERSHIPS

American Political Science Association; International Society of Political Psychology; Midwest Political Science Association; National Conference of Black Political Scientists; Pi Sigma Alpha National Political Science Honor Fraternity; National Association for Ethnic Studies

## PROFESSIONAL SERVICE

Executive Council Member, National Conference of Black Political Scientists (2016-2018)
Section Chair, Undergraduate Research Section of the National Conference of Black Political Scientists (2017)
Board Member, Association for Ethnic Studies/National Association for Ethnic Studies (2015-Present)
Section Chair, Public Opinion and Political Participation Section of the National Conference of Black Political Scientists Annual Meeting (2014-2015)
Parliamentarian, National Conference of Black Political Scientists (2014-2016)
Section Head, Race, Ethnicity, and Gender Section of the Southern Political Science Association Conference (2012-2013)
Section Head, Race, Class, and Ethnicity Section of the Midwest Political Science Association Conference (2011-2012)
Executive Council, Public Policy Section of the American Political Science Association (2010-2012).
Executive Council, Urban Politics Section of the American Political Science Association (2010-2012).
Executive Council, Race and Ethnic Politics Section of the American Political Science Association (2009-2011).
Research Advisor, The National Presbyterian Church Voting Rights and Electoral Reform Committee (2006-2009).
Selection Committee, The Southwest Political Science Association's Jewel L. Prestage Award for the Best Paper on the Intersection of Race, Gender, Ethnicity, and Political Behavior (2006).
Selection Committee, Warren E. Miller Prize for an Outstanding Career and Intellectual Accomplishment in the field of Elections, Public Opinion, and Voting Behavior (Elections, Public Opinion, and Voting Behavior Section of the American Political Science Association) (2007).
Conference Director, "Lessons From the Past, Prospects for the Future: Honoring the Fortieth Anniversary of the Voting Rights Act of 1965." Co-Sponsored by the Yale University Center for American Politics and Institution for Social and Policy Studies (2004-2005).
Selection Committee, American Political Science Association Ralph Bunche Book Award (2004)
Secretary, Race and Ethnic Politics Section of the American Political Science Association (2003-2005).

## REVIEWER

National Science Foundation; *American Journal of Political Science; Journal of Race and Politics; Law and Social Inquiry; The Journal of Conflict Resolution; Politics and Gender; Journal of Politics; Russell Sage; Political Research Quarterly;* Yale University Press; *DuBois Review; Political Behavior; Urban Affairs Review; The Political Chronicle;* Palgrave-McMillan; *SOULS Journal; DuBois Review; Politics, Groups, and Identities; Election Law Journal; Journal of the Center for Policy Analysis and Research; Election Law Journal.*

## MEDIA COMMENTARY

Over 400 media outlets including *New York Times; Washington Post;* Fox News Radio; Democracy Now; American Urban Radio Network; WTNH; *The Forum; The Hill;* CNN; WURD; Minnesota Public Radio; WHYY; WNPR; CPTV; *Ebony.com;* Google; NPR; WFSB TV; CBS Radio; AP News; *Wall Street Journal.*

**RELATED PUBLIC SERVICE**
**Board Chair,** The Community Foundation *for* Greater New Haven (2019-)
> -Manages over $570 million in charitable assets and disburses approximately $28.5 million in annual grants and scholarships

**Board Member,** The New Haven Pearls of Excellence Foundation (2018-)
**Board Member,** The Community Foundation for Greater New Haven (2015-)
> -Chaired the Community Strategy and Knowledge Committee

**Appointed Member,** 2018 Transition Team for Connecticut Governor Ned Lamont (Women and Girls Policy)
**President,** Theta Epsilon Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated (2017-2018)
**Board Member,** Prison Policy Initiative (2015-2016)


**PROFESSIONAL REFERENCES**
Dr. David C. Wilson
Associate Dean for the Social Sciences
College of Arts & Sciences
University of Delaware
4 Kent Way
Newark, DE 19716
Email: dcwilson@udel.edu
Phone: 302-831-2793, Fax: 302-831-6398

Dr. Michael Fauntroy
Associate Professor of Political Science
Howard University
Douglass Hall Room 144
Washington, DC 20059
Email: Michael.Fauntroy@howard.edu
Phone: 202-806-6720

Professor Spencer Overton
Director, Joint Center for Political & Economic Studies & Professor of Law
George Washington University
633 Pennsylvania Ave NW
Washington, DC 20004
Email: spenceroverton@jointcenter.org

# DEFENDANTS' EX. 3

*Fair Fight Action, Inc.; ACTION, Inc.; Care in Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia Highland Church, Inc.; The Sixth Episcopal District, Inc.; and Plaintiffs v. Brad Raffensperger*

Expert Report
Dr. Khalilah L. Brown-Dean



DEFENDANT'S
EXHIBIT
3
LN 12-11-19
Brown-Dean

**EXPERT REPORT**
KHALILAH L. BROWN-DEAN, Ph.D.
Original Report July 19, 2019
Revised Report November 15, 2019

<u>BACKGROUND</u>

I am a tenured Associate Professor of Political Science at Quinnipiac University. I received a Bachelor of Arts in Government from the University of Virginia, and a Master's and Ph.D. in Political Science from The Ohio State University. I received advanced training in the Tufts University Metric Geometry and Gerrymandering Summer Program. I specialize in American Politics with an emphasis on elections, political behavior, and public policy. I study historical and contemporary institutional dynamics surrounding voting rights in the United States. In 2015, I co-authored a policy report for the non-partisan, nonprofit, public policy research organization the Joint Center for Political and Economic Studies titled, "Fifty Years of the Voting Rights Act: The State of Race in Politics."[1] The report combined extensive archival, quantitative, and qualitative data to examine the impact of the Voting Rights Act on registration, turnout, representation, and policy responsiveness.

My research on various aspects of voting rights, election administration, and political representation is published in peer-reviewed journals (e.g. *Politics, Groups, and Identities; National Political Science Review*), books, and policy reports. In 2015, Cambridge University Press published a chapter I authored in *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* that was co-edited by Michael Alvarez and Bernard Grofman.[2] In it I examine the changing landscape of electoral reform and its impact on civic engagement and institutional accountability. In September 2019, Polity Press will publish my book *Identity Politics in the United States*

---

[1] Khalilah L. Brown-Dean, Zoltan Hajnal, Christina Rivers, and Ismail White, "Fifty Years of the Voting Rights Act: The State of Race in Politics" (Washington, DC: Joint Center for Political and Economic Studies, 2015), *available via* http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

[2] Khalilah L. Brown-Dean, "Felon Disenfranchisement Ten Years After *Bush v. Gore.*" In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore*. Co-Edited by Michael Alvarez and Bernard Grofman (Cambridge: Cambridge University Press, 2015).

that traces historical and contemporary tensions surrounding the rights and privileges of American citizenship. It concludes that the defining feature of American democracy-federalism- both shapes and is shaped by Americans' ability to fully exercise the franchise. I highlight the delicate balance between federal provisions and state discretion in administering electoral functions. My witness report reflects the research I have conducted on federalism, voting rights, and election administration since 2003. A copy of my full CV including publications over the last ten years is included in the Appendix of this report. I attest to its truth and accuracy. I am being compensated at a rate of $400/hour in this case. However, my opinions rendered in this report are in no way influenced by or contingent upon monies owed to me for my services.

## ASSIGNMENT

On June 11th, I was asked by the plaintiffs' attorneys to address the role of the Georgia Secretary of State in the domain of election administration and enforcement. I have not been asked to opine about the specific claims made in this particular case. My opinions reflect on the office of the Secretary of State, not the individual holding that position.

## SUMMARY OF OPINIONS

1) The right to vote is enshrined in the Federal Constitution with the primary responsibility for enforcement and administrative oversight resting at the state level. Federalism, or the division of power, extends to states the unique power to set the "time, place, and manner" of elections. Federalism recognizes the discretion of subordinate governments, while asserting the primacy of state provisions for outlining the duties and responsibilities of various offices and officers.

2) The federal mandates contained in the Voting Rights Act of 1965 (hereafter VRA), the National Voter Registration Act of 1993[3] (hereafter NVRA), and the Help America Vote Act of 2002[4] (hereafter HAVA) affirm the responsibility of each state and territory's Chief Election Officer to oversee the process of voter participation in federal elections.

3) In the wake of the Supreme Court's decision in *Shelby County v. Holder* (2013), the primary responsibility to prevent subnational governments from implementing harmful electoral practices shifted from the federal government (represented by the Attorney General and the Department of Justice) to state governments

---

[3] https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

[4] https://www.eac.gov/about/help-america-vote-act/

(represented by the Chief Election Officer). Accordingly, the post-*Shelby County* era heightens the Chief Election Officer's responsibility to address and reconcile undue barriers to voting within the state where s/he is elected or appointed to serve.

4) Based on the State Constitution, Official Code of Georgia, and the Official Compilation of Rules and Regulations of the State of Georgia, the Secretary of State is the Chief Election Officer bearing primary responsibility for protecting voter access to federal elections at the local, county, and state level. This role is affirmed, in practice, by the Secretary of State's formal interactions with voters, candidates, and various local, county, state, and federal officials.

## ANALYSES

### A. BACKGROUND: FEDERALISM AND THE RIGHT TO VOTE

The United States is comprised of an intricate patchwork of laws and provisions governing the right to vote. Federalism, defined as the division of power and authority between a central government and regional governments, is key to understanding the administration, enforcement, and oversight of voting rights in the U.S.[5] In Kentucky, for example, those convicted of felonies face a lifetime ban on voting while formerly incarcerated residents of Mississippi may petition members of the state legislature to have their rights restored.[6] Georgia residents must complete their prison sentence, pay all fines and restitution, and be free from parole and/or probation before they can vote again.[7] By comparison, Maine and Vermont are the only two states in the U.S. that allow

---

[5] J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill: University of North Carolina Press, 1999).

[6] Jeff Manza and Christopher Uggen, *Locked Out: Felon Disenfranchisement and American Democracy* (Oxford: Oxford University Press, 2008).

[7] Article II, Section I, Paragraph III of the Georgia State Constitution provides that, "No person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence." Also see O.C.G.A. § 21-2-216(b), "In addition to the qualifications in subsection (a) of this Code section, no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence and no person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed."

prison inmates to vote. Determining to whom voting rights should be extended,[8] the methods for exercising this right,[9] and how to best navigate a complicated maze of regulations has been a highly contested calculation since the country's founding.[10]

In drafting the Constitution, the Framers took special care to strengthen the federal government without impairing the power of state governments that were already in place. Indeed much of the debate over what form of government would be most desirable rested on demands to balance federal interests against state traditions.[11] States had the power to limit access to voting based on various characteristics such as race, gender, property ownership, moral fitness, religious identity, and residency.[12] Virginia, for example, required men to possess at least 50 acres of land without structures, or 25 acres of land with structures.[13] In other states like Rhode Island, citizenship- and by extension, voting- was limited to Christians and excluded those who identified as Catholic or Jewish.[14] Georgia's 1777 state constitution restricted suffrage to

---

[8] Bernard Grofman, Lisa Handley, and Richard Niemi, *Minority Representation and the Quest for Voting Equality* (Cambridge: Cambridge University Press, 1992).

[9] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974).

[10] Richard C. Vallely, *The Two Reconstructions: The Struggle for Black Enfranchisement* (Chicago: University of Chicago Press, 2004).

[11] Rogers Smith, *Civic Ideals: Conflicting Visions of Citizenship in American History* (New Haven: Yale University Press, 1999).

[12] See Donald W. Rogers, *Voting and the Spirit of American Democracy: Essays on the History of Voting and Voting Rights in America* (Champaign, IL: University of Illinois Press, 1992).

[13] For a detailed table of suffrage requirements by state from 1776-1790, See Table A.2 of Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States.* (New York: Basic Books, 2009).

[14] James H. Kettner, *The Development of American Citizenship, 1608-1870* (Chapel Hill: University of North Carolina Press, 1978).

5

white men who "possessed in his own right of 10 pounds value, and liable to pay tax in this State, or being of any mechanic trade."[15] Those eligible to vote were also required to have at least six months residency in the state. The variation in voter eligibility requirements often mapped onto the variation in state demographics.[16]

The new Constitution allowed states to maintain their own eligibility provisions while guaranteeing that those deemed eligible for full citizenship at the state level, could participate in federal elections.[17] Throughout earlier periods, federal eligibility for full citizenship explicitly barred certain groups such as American Indians,[18] women,[19] enslaved Africans,[20] and immigrants from certain countries.[21]

---

[15] Kirk Porter, *A History of Suffrage in the United States* (Chicago: University of Chicago Press, 1918).

[16] See V.O. Key, *Southern Politics in State and Nation* (New York: Knopf, 1949).

[17] Citizenship in the United States is built upon three key conceptions. The first, *jus soli,* automatically confers citizenship upon anyone born on U.S. soil. This status did not apply to African Americans, whether enslaved or free, until the adoption of the Thirteenth Amendment (1865). The second conception, *jus sanguinis,* grants citizenship to those who have at least one parent with U.S. citizenship. The last conception, naturalization, allows those born elsewhere to pursue citizenship. For a detailed discussion of the various dimensions of U.S. citizenship see Chapter 2 of Khalilah L. Brown-Dean, *Identity Politics in the United States* (Cambridge: Polity Press, 2019).

[18] See *Elk v. Wilkins,* 112 U.S. 94 (1884) and Laughlin McDonald, *American Indians and the Fight for Equal Voting Rights* (Oklahoma City: University of Oklahoma Press, 2011) for a detailed understanding of the challenges for defining citizenship and voting rights for Native Americans.

[19] See Corrinne McConnaughy, *The Woman Suffrage Movement in America: A Reassessment* (Cambridge: Cambridge University Press, 2013).

[20] See C. Vann Woodward, *The Strange Career of Jim Crow* (New York: Oxford University Press, 1974).

[21] Ron Hayduk, *Democracy For All: Restoring Immigrant Voting Rights in the United States* (New York: Routledge Press, 2006).

6

Article 1, Section 4 of the Constitution contains the Elections Clause that delineates the division of power between the federal government- specifically Congress- and the states in the domain of voting rights. It provides that "the Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except to the Place of Chusing (sic) Senators."[22] The principle of federalism underlies a bifurcated system allowing each level of government (federal, state, local/county) to adopt its own provisions related to things such as voter registration, polling hours, the siting of voting apparatus, the removal of individuals from voting rolls, and the tabulation of votes.

The Elections Clause does not specify which state office and/or officer(s) is responsible for overseeing election administration. Nor does it mandate that each state or territory adopt a uniform structure or central chain of command to govern how elections are administered across the state. Rather, it defers to state statutes to outline this function, task a chief administrator, and define his/her accompanying responsibilities. In most states and territories, the day-to-day duties of election administration are shared between local authorities and state officials. To be certain, local administrators have the most direct contact with voters and potential voters and most be acutely aware of the laws governing the electoral process. The Constitution grants Congress the unique and exclusive authority to enact federal laws designed to ensure state residents have fair and unfettered access to voting.[23] Therefore, it is necessary to examine state provisions coupled with federal mandates to determine where the responsibility for elections oversight and enforcement lies.

## B. CITIZENSHIP, FEDERALISM, AND STATE DISCRETION

Congress adopted three key Amendments designed to carve out broader protections of citizenship and its accompanying benefits. Together, the Thirteenth,

---

[22] The 1813 ratification of the Seventeenth Amendment provided for the direct election of U.S. Senators.

[23] See "The Scope of Congressional Authority in Election Administration" (Washington, DC: General Accounting Office, 2001); Karen Shanton, "The State and Local Role in Election Administration: Duties and Structures" (Washington, DC: Congressional Research Service, 2019); R. Sam Garrett, "Federal Role in U.S. Campaigns and Elections: An Overview" (Washington, DC: Congressional Research Service, 2019).

Fourteenth, and Fifteenth Amendments abolished slavery, granted citizenship to all who were born or naturalized in the United States,[24] and extended the franchise to African American males.[25] These new provisions led to a dramatic, yet brief, increase in the number of previously disenfranchised groups who were registering, voting, and running for elected office.[26]

The expansion of citizenship and voting rights at the federal level prompted numerous state constitutional conventions between 1890 and 1910 to adopt new restrictions. The concern for many state legislators was that these new protections at the federal level would undermine the distribution of power at the local level. This was particularly true for communities across the South with sizeable minority communities. These new federal guarantees of citizenship and voting rights enhanced the potential for minority groups to convert their numerical presence into political influence. In turn, the new state guidelines were constructed in such a way that upheld the federal Constitution's explicit ban on race-based disenfranchisement, while still retaining the state's power to define which groups were desirable as full citizens. To do so, most states based their disenfranchisement provisions on behaviors and attributes most commonly associated with certain groups rather than specifying such groups by name. For example, delegates to Georgia's 1908 constitutional convention adopted a cumulative poll tax, grandfather clause, and literacy tests that effectively eliminated the bulk of Black voters and most Whites who were poor. The Georgia state constitution allowed counties to hold white-only primaries and adopt additional disenfranchising techniques to meet their local interests. These institutional measures coupled with documented instances of racial violence significantly deterred many residents from

---

[24] The 14th Amendment did not explicitly address the unique standing of Native Americans and people of Asian descent who pursued citizenship.

[25] The Fourteenth Amendment prohibited states from making or enforcing laws that abridged the privileges and immunities of citizenship and provided that "all persons born or nationalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

[26] Much of the focus on the path of American political development has focused on race-based exclusions that disenfranchised African Americans. It is important to note, however, that many of the restrictions also limited the number of non-landowning White men and ethnic immigrants who were barred from voting. Therefore, we see an overall increase in electoral participation rates across racial/ethnic groups after passage of the Civil War Amendments.

even attempting to register.[27] As Figure 1 illustrates, the legacies of these restrictions effectively eliminated Black voters for nearly 30 years.

Even as federal legislative and judicial decisions struck down state provisions such as white-only primaries,[28] poll taxes,[29] and grandfather clauses,[30] they did not translate into substantial gains in registration and turnout. Local and state elected officials retained significant power to limit access to voting using both legal and extralegal means.[31] It wasn't until the passage of the Voting Rights Act of 1965 (VRA) that the federal government took a more aggressive approach to protecting state residents against arbitrary barriers imposed at the state and local level.

---

[27] See W. Fitzhugh Brundage, *Lynching in the New South: Georgia and Virginia, 1880-1930* (Champaign, IL: University of Illinois Press, 1983); Adam Przeworski,"Conquered or Granted? A History of Suffrage Extensions" *British Journal of Political Science* Volume 39, Issue 2 (April 2009, pp. 291-321); Kimberley Johnson, *Reforming Jim Crow: Southern Politics and State in the Age Before Brown* (Oxford: Oxford University Press, 2010); Jay Corzine, James Creech, and Lin Corzine, "Black Concentration and Lynchings in the South: Testing Blalock's Power-Threat Hypothesis" *Social Forces* Volume 61, Issue 3 (March 1983, pp. 774–796); Brad Epperly, Christopher Witko, Ryan Strickler, and Paul White, "Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S." *Perspectives on Politics*, pp. 1-14 doi:10.1017/S1537592718003584.

[28] See *United States v. Classic* 313 U.S. 299 (1941) and *Smith v. Allwright* 321 U.S. 649 (1944).

[29] The 24th Amendment was ratified in 1964.

[30] See *Guinn v. United States* 238 U.S. 347 (1915).

[31] The Civil Rights Act of 1957 created a Civil Rights Division within the Department of Justice. The Division is tasked with providing federal oversight of voting rights violations. The U.S. Department of Justice filed a total of 71 voting rights lawsuits in the Deep South before 1965. However, the depth of state discretion allowed local officials to devise new methods that circumvented these protections and continued to limit civic participation. See Barry E. Hawk & John J. Kirby, Jr., "Federal Protection of Negro Voting Rights," *Virginia Law Review* 51, no. 6 (Oct, 1965):1093-96.

The Act contained numerous provisions for strengthening federal protection of voting rights.[32] Most notably, the VRA allowed for federal elections monitors and created an outlet for the federal government (the DOJ) or private parties to bring lawsuits to prevent racially discriminatory laws and policies from taking effect. The "preclearance" provision required that states and jurisdictions with a documented history of discrimination (Section 5) submit proposed electoral changes to federal officials before they could take effect.[33] The preclearance provision identified as covered jurisdictions those areas (all or parts of states) with discriminatory tests or devices and low turnout or registration in the 1964 presidential election. Section 5 covered nine states (Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia) in their entirety. Georgia was identified as a covered jurisdiction on August 7, 1965 based on data from its November 1, 1964 election and its use of devices such as the poll tax (adopted in 1802), grandfather clause (adopted in 1908), and literacy test (adopted in 1908).[34] By shifting the responsibility to states and localities to prove to federal officials that the proposed changes were not discriminatory, the preclearance process avoided the delays and expenses of litigation, and prevented discriminatory laws before they were used in elections. In 1982, Congress amended the Act to clarify that discriminatory *purpose* was not required to bring a lawsuit to invalidate election procedures that *result* in discrimination.

## C. Federal Changes and Heightened State Accountability

---

[32] Section 2 of the Voting Rights Act is a permanent provision that prohibits "any voting standard, practice, or procedure that results in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group." See https://www.justice.gov/crt/section-2-voting-rights-act.

[33] The coverage provision was originally scheduled to expire after five years. Congress extended the provisions and made additional updates to the VRA in 1970, 1975, 1982, and 2006. The ban on discriminatory devices was made permanent in 1975 in addition to extending preclearance requirements to areas with large concentrations of certain language minorities and low registration and turnout rates.

[34] Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-01 (Aug. 7, 1965).

The impact of the Voting Rights Act of 1965 was immediate. Its protections coupled with federal oversight of potential violations translated into increased rates of registration, turnout, representation, and policy responsiveness for various communities across the United States (See Figures 1 and 2). This success provided a foundation for additional federal provisions that increased state responsibility in ensuring their electoral policies and procedures did not conflict.

Figure 1: Black and White Voter Registration Rates in Louisiana and the Former Confederate States, 1878-2010[35]



[35] Confederate states' data are self-reported turnout of each year's voting age population. Data from 1956 to 1968 are from the American National Election Study. Data from 1972 to 2012 are from the United States Census, Current Population Survey, Voter Supplement File. See Khalilah L. Brown-Dean, Zoltan Hajnal, Christina Rivers, and Ismail White, "Fifty Years of the Voting Rights Act: The State of Race in Politics" (Washington, DC: Joint Center for Political and Economic Studies, 2015), *available via* http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

Figure 2: Black and White Presidential Election Voter Turnout in Former Confederate States, 1956-2012. (Percent of Voting Age Population)



## NATIONAL VOTER REGISTRATION ACT

Congress passed the National Voter Registration Act of 1993 (NVRA)[36] to make it easier for eligible American citizens to register to vote and to streamline the processing and maintenance of voter registration applications. The NVRA sets requirements for state compliance in *federal* elections; not state or local elections. Those requirements include offering voter registration opportunities at motor vehicle offices,[37] social services offices and agencies that accommodate those with disabilities,[38] facilitate mail-

[36] 42 U.S.C. §§ 1973gg – 1973gg-10.

[37] Section 1973gg-3 Simultaneous Application for Voter Registration and Application for Motor Vehicle Driver's License.

[38] Section 1973gg-5 Voter Registration Agencies.

12

in registration,[39] and regulate how registration lists are to be maintained.[40] The NVRA also created a uniform federal registration form that every state and territory is required to recognize. The Act's provisions apply to 44 states (including Georgia) and the District of Columbia.[41]

The NVRA both affirmed and heightened the responsibility of state election officials to ensure compliance with federal provisions governing various aspects of election administration. Section 10 of the Act requires that, "Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[42] The NVRA does not mandate what state officer is responsible for this coordination; only that each state identify this individual based on its own constitution. Other parts of the NVRA outline the responsibilities of the state-designated chief election official, "The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."[43] In addition, "On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 10 of the State of the person's residence."[44]

In *Charles H. Wesley Education Foundation, Inc. v. Cathy Cox et al.*, 408 F.3d 1349 (11th Cir. 2005), the Court ruled that the State of Georgia violated the provisions of the NVRA by rejecting 64 mail-in voter applications bundled and submitted by a local non-

[39] Section 1973gg-4 Mail Registration.

[40] Section 1973gg-6 Requirements With Respect to Administration of Voter Registration.

[41] See the amici curiae briefs filed by the State of Georgia and 14 other states accompanying *Husted v. Randolph* ___ U.S. ___, 138 S.Ct. 1833 (2018) seeking clarification of state responsibilities in adhering to the National Voter Registration Act.

[42] Section 10, National Voter Registration Act.

[43] Section 6, National Voter Registration Act.

[44] See Section 8, Requirements with Respect to Administration of Voter Registration for the full list of responsibilities for the chief election officer as required by Section 10 of the NVRA.

profit organization.[45] Additional challenges to Georgia's compliance with the NVRA address the relationship between proof of citizenship and voting and the maintenance of voter lists.[46] Section 5 of the National Voter Registration Act provides that voter registration applications may only require the minimum amount of information necessary for a state to determine applicants' eligibility to register to vote and to perform its registration duties.

## HELP AMERICA VOTE ACT

In the wake of overwhelming concerns about voter access, voting equipment, and disenfranchisement allegations during the 2000 Presidential election, the Help America Vote Act (HAVA) of 2002 provides federal resources to help states and local governments streamline, strengthen, and enhance election administration. The Act created a bipartisan, independent Election Assistance Commission (EAC) and allocated $3.65 billion to help states carry out the following provisions: The creation and maintenance of a computerized state voter registration system,[47] the replacement of punch card and lever voting machines,[48] the distribution of provisional ballots to residents whose registrations are questioned,[49] enhanced access for voters with disabilities,[50] and assistance in developing plans to secure voting systems. HAVA

---

[45] The lead defendant in that case, Cathy Cox, was the Georgia Secretary of State at the time.

[46] See *Georgia Coalition for the People's Agenda, Inc. et al. v. Brian Kemp* 347 F. Supp. 3d 1251 (N.D. Ga. 2018); and *Morales v. Handel* No. 1:08-CV-3172m 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) for cases challenging Georgia's compliance with the mandates of the National Voter Registration Act. In each of those cases the named defendant was acting in his/her official capacity as Secretary of the State of Georgia.

[47] Pub. Law 107-252 § 303(a); 42 U.S.C. § 14853(a).

[48] Pub. Law 107-252 § 102(a); 42 U.S.C. § 15302(a). States could be exempted from this requirement if they received a waiver.

[49] Pub. Law 107-252 § 302; 42 U.S.C. § 15482. HAVA allows for provisional ballots to be tabulated according to the provisions established in each state or territory.

[50] Pub. Law 107-252 § 301; 42 U.S.C. § 15481.

required that states replace their voting machines with one of three forms: Direct-Recording Electronic Voting (DRE), Optical Scans, or Ballot Marking Devices (BMD). The State of Georgia, along with 17 other states, opted to create a uniform voting system where all voting equipment is purchased at the state level.[51] Table 1 below illustrates the types of voting machines used in Georgia during the 2000 election as well as accompanying information regarding the number of counties using each type of machine and the estimated number of spoiled ballots.

### Table 1: Georgia Voting Equipment Performance
### (2000 General Election)[52]

| Voting System | Introduced in Georgia | Counties Using System | Under Vote Percentage | Votes Not Counted |
|---|---|---|---|---|
| Paper Ballot | 1900 | 2 | 3.3 | 113 |
| Punch Card | 1964 | 17 | 4.6 | 38,065 |
| Lever Machine | 1959 | 73 | 4.2 | 16,926 |
| Optical-Scan | 1986 | 67 | 2.7 | 38,195 |
|    Central Count | _____ | _____ | 4.2 | 21,999 |
|    Precinct Count | _____ | _____ | 4.7 | 16,196 |

---

[51] Other states with uniform voting systems include Alabama, Alaska, Connecticut, Delaware, Hawaii, Louisiana, Maine, Maryland, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, Utah, and Vermont.

[52] Publication of State Plan Pursuant to the Help America Vote Act, 73 Fed. Reg. 54141-02 (Sept. 18, 2008). Precinct count optical-scans scan paper ballots at the polling place and provide opportunities for voters to be notified of and correct a ballot error or receive a new ballot. Central count scans collect ballots that are scanned and counted at an offsite, central location. This process does not allow individual voters to correct any errors. I was unable to find data on the number of counties using central or precinct count scans in 2000. See Charles S. Bullock, III and M.V. Hood, III, "One Person-No Vote; One Vote; Two Votes: Voting Methods, Ballot Types, and Undervote Frequency in the 2000 Presidential Election" *Social Sciences Quarterly* Volume 83, No. 4 (December 2002, pp. 981-993).

The provisions of HAVA, via the Election Assistance Commission in particular, affirm the important interaction between state and local officials involved in election administration. The EAC's Standards Board is comprised of 55 state elections officials and 55 local officials. While the EAC provides a range of technical assistance to local election officials, HAVA's statutes specify that each State's Chief Election Officer has primary oversight responsibility in overseeing the proper implementation and compliance with its provisions. As with the National Voter Registration Act, HAVA relies on each state or territory to identify a Chief Election Officer. The Federal Register publishes state plans, pursuant to the Help America Vote Act, as submitted to the Election Assistance Commission. As part of my research for this case I reviewed the Federal Registers from 2018 (Vol. 83, No. 104), 2014 (Vol. 79, No. 127), 2010 (Vol. 75, No. 234), 2008 (Vol. 73, No. 182), 2006 (Vol. 71, No. 8), and 2004 (Vol. 69, No. 57). The 2018 lists the Chief Election Officer for each state. I examined that document and noted that the Chief Election Officer for the State of Georgia is listed as the Secretary of State.[53] The information contained in the 2018 Federal Register is consistent with other publications of the Federal Record I researched for the years listed above.

I reviewed EAC allocations to states for the same years. In my research of recent EAC allocations to states, I found that in April 2018 the Georgia Secretary of State's Office accepted a $10,305,783 grant allocation from the U.S. Election Assistance Commission to "improve the administration of elections for Federal office, including to enhance election technology and make election security improvements."[54] The modular

---

[53] There is no federal requirement that the Secretary of State serve as the Chief Election Officer; this designation is specified in each state constitution or charter. In Delaware, for example, the Chief Election Officer is the Commissioner of Elections while Kentucky's Chief Elections Officer is the Executive Director of the State Board of Elections.

[54] 52 U.S. Code § 20901 specifies that, "Not later than 45 days after October 29, 2002, the Administrator of General Services (in this subchapter referred to as the "Administrator") shall establish a program under which the Administrator shall make a payment to each State in which the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after October 29, 2002, that the State intends to use the payment in accordance with this section." See the Attached Memo and Grant Budget from Chris Harvey, identified as the Elections Director in the Office of Georgia

budget and federal financial report (see Attachment C) accompanying the grant memo includes a 5% state match to improve "election security, simplicity, and accessibility" for a total award of $10,821,072.[55] Some of the proposed uses included purchasing secure devices that produce a verifiable paper ballot, improving voter registration database management, and updating the online voter registration page. In April 2018, then-Secretary of State Brian Kemp established Georgia's Secure, Accessible, and Fair (SAFE) Elections Commission to study and propose options for the state's election system. I reviewed the report containing the final recommendations the commission submitted to the General Assembly on January 10, 2019. Page five of the document notes that, "Georgia implemented its current uniform voting system that uses DRE systems for in-person voting. Georgia has a 'top-down' election system where ballots are constructed by the Center for Elections System, which was previously a part of Kennesaw State University, but is now part of the Office of the Secretary of State."[56] Many of report's proposals reflect the provisions covered by HAVA and thus eligible for funding from the Elections Assistance Commission, and compliance with its mandates.[57]

### Shelby County v. Holder

In 2010, election officials from Shelby County, Alabama sued the US Attorney General to challenge the constitutionality of Sections 4(b) and 5 of the Voting Rights Act

---

Secretary of State Brian P. Kemp, addressed to Brian Newby, Executive Director of the U.S. Election Assistance Commission.

[55] §15403 of the Help America Vote Act outlines the condition for receipt of funds, "a state is eligible to receive a requirements payment for a fiscal year if the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, has filed with the Commission a statement certifying that the State is in compliance with the requirements referred to in subsection (b) of this section."

[56] See "Secure, Accessible, and Fair Elections (SAFE) Commission Report," submitted to the General Assembly, January 10, 2019. Commission Co-Chairs Secretary of State Robyn Crittenden and State Representative Barry A. Fleming.

[57]

https://sos.ga.gov/index.php/elections/secure_accessible__fair_elections_safe_commission.

of 1965. In a 5-4 ruling, the Supreme Court struck down the coverage formula (Section 4) used to identify covered jurisdictions that were previously required to submit proposed election rule changes (Section 5) to the Department of Justice, "Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned nationwide for over 40 years. And voter registration and turnout numbers in the covered States have risen dramatically."[58]

While the ruling in *Shelby County* did not eliminate the VRA, it significantly weakened federal oversight of election administration. Previously covered jurisdictions in Texas, North Carolina, Florida, Mississippi, Alabama, and Georgia introduced new measures regulating voter access following the ruling. *Shelby County* allowed local election officials to make decisions such as consolidating polling places, purging voters, adopting stricter voter id requirements, changing election dates, and eliminating early voting without first submitting those proposed changes for federal review. The ruling heightened concerns from some groups that these facially neutral restrictions could disproportionately impact minority groups who necessitated the original passage of the Voting Rights Act of 1965.[59]

*Shelby County* reaffirmed the importance of federalism outlined in earlier passages of this report. First, it placed the onus on Congress to exercise its Constitutional authority to create a new Section 4 formula based on more contemporary data. Second, in the absence of federal authority to prevent discriminatory policies from taking effect, *Shelby County* shifted the responsibility to state election officials to both monitor and remediate electoral practices that undermine the rights enshrined in the Federal Constitution and protected by other sections (most notably Section 2) of the Voting Rights Act of 1965. Local officials continue to play a key role in executing various election administration functions in accordance with the mandates of state law and constitutional authority. For example, in researching the duties and functions of various county election boards in Georgia I noted the charge of the Augusta-Richmond County Board of Elections, "To make and issue rules, regulations, and instructions,

---

[58] *Shelby County v. Holder*, 133 S.Ct. 2612, 2627-28 (2013).

[59] See for example, Thurgood Marshall Institute at the NAACP Legal Defense and Education Fund, "Democracy Diminished: State and Local Threats to Voting Post *Shelby County v. Holder*" (New York: NAACP LDF, 2018).

Dear Secretary Kemp:

Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that EAC revise the Georgia state-specific instructions by making the following changes:

1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:

   • Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship

2. Revision of the mailing address as follows:

Elections Division
Office of the Secretary of State
2 Martin Luther King, Jr. Drive
Suite 802 Floyd West Tower
Atlanta, GA 30334


Finally, I attach copies of correspondence between Secretary Kemp and EAC Director Newby regarding the state's requests to make changes to Georgia-specific information on the federal voter registration form related to agency address and proof of citizenship (Attachments F, G, and H). This correspondence illustrates the important role Georgia's Chief Election Official plays in overseeing election administration on behalf of the state's residents.

The U.S. Election Assistance Commission conducts a biennial Election Administration and Voting Survey (EAVS) to gather state-level data on various aspects such as the number of military personnel registering to vote, voting technology, and the frequency of provisional voting. The comprehensive data is used to ensure compliance with the various mandates of both HAVA and NVRA and to improve election administration. The official federal report lists Georgia as one of 38 states in the country with what it terms a "top-down" voter registration process where the chief election official "gathers and aggregates information from local jurisdictions' voter registration databases."[87] Each state's election office works in conjunction with local officials to gather the data, which is then submitted to the EAC. I reviewed the 2018 Comprehensive Report to the 116th Congress that was published in June 2019 to gain a

---

[87] See United States Election Assistance Commission, "Election Administration and Voting Survey 2018: Comprehensive Report to the 116th Congress," (Silver Spring, MD: EAC, 2019). https://www.eac.gov/assets/1/6/2018 EAVS Report.pdf.

list. As specified in Georgia law, the public list does not contain a registered voter's driver's license number, Social Security number, month and day of birth, site of voter registration, phone number or email address."[86] The Secretary of State complied with the federal request while withholding personal information (e.g. social security numbers, phone numbers, and email addresses) as required by Georgia state law.

The Appendix to this report includes official memos I researched documenting interactions between the Secretary of State, acting in his official capacity as the Chief Election Official, and the Chair of the federal Election Assistance Commission (EAC). Of note is a series of memos from 2013 and 2014 requesting permission to make changes to the National Voter Registration Mail Application Form. Although *Shelby v. Holder* means that states are no longer required to submit proposed changes for federal approval, the mandates of the National Voter Registration Act are still intact and require pre-approval for state changes to the federal information forms and requirements. A memo (Attachment D) written to Ms. Alice Miller, Acting Executive Director of the EAC, from Secretary of State Brian P. Kemp dated August 1, 2013 begins as follows:

Dear Ms. Miller,

As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

Attachment E includes Miller's subsequent responses (2) to Secretary Kemp:

---

[86] Coverage of this official press release from the Secretary of State's Office can be found here https://www.11alive.com/article/news/politics/national-politics/georgia-to-release-data-to-trump-election-commission/85-453342487

27

The Office of the Secretary of State also plays a key role in ensuring election integrity by notifying other states of new Georgia residents' status, "Any person who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence."[82]

Relatedly, the Secretary of State is the central point of contact for notifying counties and municipalities within the state of changes to residence, "Any person, who is registered to vote in another country or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, at the time of making application to register to vote in that county or municipality, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence."[83]

*Election Oversight with Federal Officials*

As the Chief Election Official for the State of Georgia, the Secretary of State represents the state in official interactions with the federal government related to election administration. For example, in May 2017, President Donald J. Trump signed Executive Order 13799 establishing the Presidential Advisory Commission on Election Integrity to study registration and voting procedures in order "to promote fair and honest Federal elections.[84]" Commission Vice-Chair Kris Kobach sent a request to each state's chief election official for "publicly-available data from state voter rolls and feedback on how to improve election integrity."[85] The Georgia Secretary of State's Office responded to this federal request in its official capacity as the state's chief election officer, "The Georgia Secretary of State's Office will provide the publicly available voter

---

[82] O.C.G.A. § 21-2-218(a).

[83] Ibid.

[84] Executive Order, https://www.whitehouse.gov/presidential-actions/presidential-executive-order-establishment-presidential-advisory-commission-election-integrity/.

[85] Ibid.

state laws. These relate to updating voter information and removing ineligible persons from the voter lists.[77]

The Secretary of State has oversight powers for various details governing the local administration of elections including determining the size and shape of the envelopes used to submit absentee ballots,[78] designing and supplying tally sheets, voting rights posters, oaths of assisted electors, and poll officers.[79] The Secretary of State receives election results from election superintendents of the various counties and certifies the votes. Election results for each of Georgia's 159 counties are tabulated and made available via the Secretary's official website pursuant to O.C.G.A. § 21-2-499. In addition, "in the case of primaries, elections, and runoffs for county, state, and federal office, the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State, within seven days following a primary, election, or runoff."[80]

The Secretary of State acts as the central point of contact for receiving information regarding voter eligibility of Georgia residents. The Office receives information from federal officials (e.g. Georgia residents who have been convicted of federal felonies and thus ineligible to vote while incarcerated or on parole or probation), state agencies (e.g. natural resources and the Department of Driver Services), and local entities (e.g. probate court). The SOS is responsible for using this data to update the central registration database that local superintendents and election officials use to verify registrations, "prior to approving the application of a person to register to vote, the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State."[81]

---

[77] p. 4.

[78] O.C.G.A. § 21-2-384(b).

[79] O.C.G.A. § 21-2-400(a).

[80] Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9).

[81] O.C.G.A. § 21-2-216(h).

My review of the official website for the Secretary of State's Office shows a wealth of information and resources to assist various state and local agencies (e.g. public high schools and colleges; the Georgia Department of Natural Resources; and public libraries) in carrying out the federal voter registration provisions required by the NVRA.[75] For example, the Election Connection tab contains links to a document for agencies entitled, "Implementing NVRA in Designated Agencies." The document's preface states:

> *Implementing NVRA in Designated Agencies* is to be used as a guide for the administration of voter registration conducted by Georgia Agencies under the National Voter Registration Act of 1993 (NVRA). This manual is not intended to be used as a substitute for the Georgia Constitution, relevant statutes, or applicable case law. Whenever there is a question regarding the interpretation of information contained in this guide, or of a particular section of the Election Code, or any other statute, the user should contact competent legal counsel or the Office of the Secretary of State, Elections Division.[76]

The "Implementing NVRA" guide also outlines the Role of the Secretary of State's Office:

> The NVRA requires that each state designate a chief election official to be responsible for coordination of the state responsibilities under this act. The Secretary of State has been named the chief election official for Georgia. Under state law, the Secretary of State is charged with establishing and maintaining a statewide voter registration system. The system must be capable of meeting federal requirements for maintaining lists of eligible active voters and those voters considered inactive. The Secretary of State is responsible for overseeing statewide list maintenance activities and functions required under federal and

---

[75] https://sos.ga.gov/index.php/Elections/election_connection.

[76] http://sos.ga.gov/admin/files/Implementing_NVRA_DHS_v.1_2011_.pdf.

Together these two provisions create an oversight function of the Secretary of State in ensuring compliance with the mandates of the Help America Vote Act. In a broader sense, over 100 of the 156 statutes I examined highlight the key role the State's Chief Election Official must play in coordinating, monitoring, and overseeing the administrative functions of subordinate election administrators. For example, the Secretary of State approves the certification program for "all county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by completing a certification program approved by the Secretary of State by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections."[73]


*Election Oversight with Intrastate and Interstate Officials*

The Secretary of State is required to provide multiple training sessions for the aforementioned election officials, and has the discretion to waive training requirements for local election officials:

> A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State.[74]

---

note, "The specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State."

[73] O.C.G.A. § 21-2-101(a).

[74] O.C.G.A. § 21-2-100(c).

23

the SOS's Office. The MVP portal enables Georgia voters to review their voter registration status, locate early voting and poll locations, check the status of mail-in applications, view sample ballots, and review the status of their provisional ballots.[68] The site's disclaimer documents that the data provided by the SOS site is extracted from data provided by the various counties of residence. The portal also contains links to the state's Election Advisory Council, the state's voter identification requirements,[69] the VoteSafe program,[70] and a form to report allegations of voter fraud.[71]

Several provisions in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia identify the Secretary of State as the Chief Election Official. Most notably, O.C.G.A. § 21-2-50.2(a) provides that:

> The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.

Accordingly, O.C.G.A. § 21-2-50.2(b) states:

> As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.[72]

---

[68] https://www.mvp.sos.ga.gov/MVP/mvp.do.

[69] O.C.G.A § 21-2-417.

[70] https://sos.ga.gov/index.php/elections/votesafe.

[71] https://sos.ga.gov/cgi-bin/EMailStopVoterFraud.asp.

[72] Title III of HAVA refers to the Uniform and Non-Discriminatory Technology and Administration Requirements. It guarantees provisional ballots to electors whose registration is disputed, requires appropriate voting systems, mandates a centralized voter registration database, and allows for absentee ballots. Section 305 is of particular

officials. An example of Category 3 is "The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State. The board of registrars shall provide each deputy registrar with a copy of the manual."[66]

In Table 3 (see Attachment B) I juxtapose the NVRA, HAVA, and VRA requirements with the Georgia statutes regulating the duties of the Chief Election Official. In the space below I highlight some of the major provisions governing the Secretary of State's responsibilities for election administration.

*The Role of the Secretary of State*

The Secretary of State for Georgia is an elected position tasked with numerous duties such as housing the Professional Licensing Boards Division, implementing and enforcing the Georgia Uniform Securities Act of 2008, registering charitable organizations, and of specific interest to this report, "The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, municipal, state, county, and federal elections. They are responsible for certification of election results as well as certifying the qualification of candidates and preparation of ballots and election forms and materials. The Elections Division provides Great Seal certification for authentication of public documents for foreign use for non-Hague countries. Along with those duties, the Elections Division maintains the Statewide Voter Registration Database to ensure that voter registration lists are current statewide. **They are also accountable for investigating election fraud and enforcing state election laws.**"[67] (emphasis added).

*Chief Election Officer*

The Office of the Secretary of State acts as a key resource for voters in the State of Georgia. For example, I analyzed the My Voter Page (MVP) portal that is maintained by

---

[66] Ga. Comp. R. & Regs. 183-1-6-.03(3)(n).

[67] https://sos.ga.gov/index.php/elections.

consistent with law as deemed necessary for the guidance of poll officers and voter registration officers."[60]

However, this local discretion does not supersede the primary responsibility that now falls upon state election officials to ensure no procedure, device, or practice adopted at the local or state level, impairs the rights and protections afforded at the federal level. The Chief Election Officer may exercise this oversight in a number of ways. For example, the Official Code of Georgia instructs the Secretary of State, "to develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state."[61] Similarly, "the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002."[62]

Under *Shelby County*, the Chief Election Officer must now work closely with other government officials to ensure state residents have fair and consistent access to the electoral process. When measures are passed by the legislature, for example, the duty falls upon election administrators to carry them out in accordance with the previously described federal guidelines. A decision by a state legislature to raise the minimum voting age to 21, for example, should not be carried out by state election officials because it imposes a more stringent age qualification than what is required by the Twenty-Sixth Amendment. However, a state election officer could legally carry out a legislative plan to lower the minimum age to 17 for state and local elections. It should be noted that Georgia is one of seven states where election management is handled by both a Chief Election Official and a State Board. However, the federal mandates of the National Voter Registration Act and the Help America Vote Act vest authority with the singular Chief Election Official identified by the state. In Georgia, that official is the Secretary of State.[63]

In sum, *Shelby County* significantly heightened the responsibility of each State's Chief Election Officer to oversee and enforce election administration to ensure state compliance with the protections embedded in the Federal Constitution and affirmed by

---

[60] See Attachment K.

[61] O.C.G.A. § 21-2-50(a)(15).

[62] O.C.G.A. § 21-2-50.2(c).

[63] O.C.G.A. § 21-2-50.2(a).

the Voting Rights Act of 1965, the National Voter Registration Act, and the Help America Vote Act. Barring direct federal oversight of compliance, the principle of federalism shifts that responsibility to state election officials.

### D. GEORGIA STATE PROVISIONS FOR ELECTION ADMINISTRATION AND AUTHORITY

With these federal requirements in mind, I conducted an extensive review of Georgia statutes and regulations to evaluate the following questions:

1) What, if anything, is the role of the Secretary of State (SOS) with respect to voting and elections?
2) What is the statutory authority identifying the Secretary of State as the Chief Election Officer?
3) And accordingly, what powers and responsibilities are assigned to the Chief Election Officer?

Based on this review, I identified a total of 156 duties and responsibilities connecting the Secretary of State to election administration. These 156 duties are found in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia. I organized those 156 provisions into three key categories of election administration: 1) Interaction With Candidates for Public Office 2) Interaction With Voters, and 3) Interaction With Election Officials. These categories often overlap and should not be considered as mutually exclusive. Rather, I focus on the primary duties in each provision when assigning to categories. Table 2 (see Attachment A) contains all 156 provisions, as well as my categorizations. There are few, but important statements outlining the Secretary of State's interactions with (potential) candidates for public office. An example of Category 1 is the Secretary of State's duty to "receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State in accordance with this chapter."[64] Category 2, interactions with voters, most closely aligns with educating and protecting voters' rights. An example of Category 2 is the obligation to "prepare and furnish information for citizens on voter registration and voting."[65] I noted in my research that the bulk of Georgia's provisions defining the role of the Secretary of State in election administration falls under Category 3; defining her/his duties to guide and oversee the actions of local

---

[64] O.C.G.A. § 21-2-50(a)(3).

[65] O.C.G.A. § 21-2-50(a)(13).

Taken together the state statutes, memos, press releases, grant acknowledgements, NVRA implementation guide for state agencies, website resources, federal reports and bulletins I researched affirm the practical ways the Georgia Secretary of State acts in his/her official capacity as the Chief Election Official responsible for administering, enforcing, and reconciling key functions at the local, state, and federal level.

### E. CONCLUSION

The federal provisions found in the Constitution guarantee that all eligible citizens have unfettered access to voting in federal elections. The principle of federalism allows state discretion in defining fair and consistent standards for determining eligibility. However, the mandates of the National Voter Registration Act and the Help America Vote Act, coupled with *Shelby County v. Holder*'s removal of federal oversight in preclearing or preventing potentially harmful electoral changes and procedures amplify the importance of each state's Chief Election Officer in overseeing election administration across the entire state. In Georgia, the Chief Election Officer is identified by state statutes as the Secretary of State. That position is tasked with over 156 duties establishing broad oversight, enforcement, and correction responsibilities to ensure Georgia residents may effectively exercise the right to vote. The evidence contained in this report is consistent with my research into voting rights and election administration in various states and the nation as a whole.

better understanding of the information provided on behalf of the State of Georgia and by whom. Unfortunately, several key measures were not provided by Georgia officials such as the number of poll workers. Of relevance to my report, however, was the official data provided by Georgia's Secretary of State indicating the number and form of new voter registration applications and the use and rejection of provisional ballots. Tables 4 and 5 below provide this data.[88]

### Table 4: Georgia Voter Registration Applications*

| Total | Mail, Fax, Email | In-Person | Online | Motor Vehicle Offices | Public Assistance Offices | Disability Services Office | Armed Forces | Other Agencies | Registration Drives- Advocacy Groups or Parties | Other Sources | Not Categorized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,498,331 | 280,957 (6.25%) | 102,468 (2.28%) | 357,491 (7.95%) | 3,596,384 (79.95%) | 23,656 (.53%) | 30,914 (.69%) | 97 (0%) | _____ | _____ | 106,634 (2.36%) | 0 0% |

* Indicates requests for which the state did not submit data

### Table 5: Georgia Provisional Voting*

| Total Provisional Ballots Submitted | Full Ballots Counted | Partial Ballots Counted | Rejected Ballots | Other |
|---|---|---|---|---|
| 21,604 | 11,905 (55.1%) | _____ – _____ – | 9,699 (44.9%) | _____ _____ |

* Indicates requests for which the state did not submit data

---

[88] Ibid.

## LIST OF ATTACHMENTS AND APPENDIXES

ATTACHMENT A: Georgia Statutes Outlining the Secretary of State's Duties (Table 2)

ATTACHMENT B: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State (Table 3)

ATTACHMENT C: 2018 HAVA Election Security Grant Award Letter from Georgia Secretary of State to the U.S. Election Assistance Commission (July 10, 2018)

Correspondence between the U.S. Election Assistance Commission and the Georgia Secretary of State
- August 1, 2013 ATTACHMENT D
- August 15, 2013 ATTACHMENT E
- January 17, 2014 ATTACHMENT F
- January 29, 2016 ATTACHMENT G
- September 12, 2016 ATTACHMENT H

ATTACHMENT I: Federal Financial Report for Grant Received by the Georgia Secretary of State's Office (December 27, 2018)

ATTACHMENT J: Federal Voter Registration Guide and Form with Georgia-Specific Information

ATTACHMENT K: Augusta-Richmond County Georgia Board of Elections Pamphlet (March 2018)

APPENDIX A: Brown-Dean Curriculum Vitae

APPENDIX A:  Curriculum Vitae for Khalilah L. Brown-Dean

## ACADEMIC EMPLOYMENT

*Quinnipiac University*
  Associate Professor of Political Science, 2011-Present

*Yale University*
  Peter Strauss Family Assistant Professor of Political Science and African American Studies
  (2006-2011)

  Director of Undergraduate Studies for the Department of African American Studies (2009-2010)

  Assistant Professor of Political Science and African American Studies (2003-2006)

## EDUCATION

2003 The Ohio State University, Ph.D., Political Science (American Politics and Political Psychology)
Dissertation: "One Lens, Multiple Views: Felon Disenfranchisement Laws and American Political
Inequality" *APSA Race, Ethnicity, and Politics Section Best Dissertation Award (2005)*

2001 The Ohio State University, M.A., Political Science

1998 The University of Virginia, B.A., Government

## ADDITIONAL EDUCATION AND TRAINING

2017 Tufts University Metric Geometry and Gerrymandering Summer Program
2017 Tufts University Gerrymandering Expert Witness Training
1999 Summer Institute in Political Psychology, Certificate, Political Psychology

## SCHOLARSHIP AND RESEARCH PUBLICATIONS

### Books

Brown-Dean, Khalilah L. September 2019. *Identity Politics in the United States.* London: Polity
Press. ISBN: 9780745654119

Duffy, Sean, Timothy Dansdill, Jill Shahverdian, Aileen Dever, Khalilah L. Brown-Dean, and
Julia Giblin, eds., 2014. *The Individual in the Community.* Pearson. 8th Edition.

## *Refereed Articles*

Brown-Dean, Khalilah L. and Benjamin E. Jones. 2015. "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." *Politics, Groups, and Identities.*

Alexander-Floyd, Nikol C., Byron D'Andra Orey, and Khalilah L. Brown-Dean. 2015. "Professional Conferences and the Challenges of Studying Black Politics." *PS: Political Science and Politics.*

Brown-Dean, Khalilah L. 2015. "Emphasizing the Scholar in Public Scholarship." *PS: Political Science and Politics.*

Wilson, David C. and Khalilah L. Brown-Dean. 2012. "Great[er] Expectations: Group Interests, Deracialization, and Candidate Evaluations." *National Political Science Review.*

Brown-Dean, Khalilah. L. 2009. "Do Classes Matter?: Evaluating the Impact of College Courses on Tolerance." *Journal of the Institution for Social and Policy Studies.*

Brown-Dean, Khalilah L. 2007. "Permanent Outsiders: Felon Disenfranchisement and the Breakdown of Black Politics." *National Political Science Review.*

Brown-Dean, Khalilah L. 2005. "Trading *Brown* for Prison Orange: Reflections on Race and Justice Fifty Years after *Brown v. Board.*" *Journal of the Institution for Social and Policy Studies.*

## *Book Chapters*

Brown-Dean, Khalilah L. *Forthcoming.* "Monumental Promises, Incremental Gains: Criminal Justice Reform in the Obama Era." In *After Obama: African American Politics in a Post-Obama Era.* Edited by Todd C. Shaw, Robert Brown, and Joseph McCormick III. New York, NY: NYU Press.

Brown-Dean, Khalilah L. 2016. "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation." In *Urban Citizenship and American Democracy.* Edited by Amy Bridges and Michael Javin Fortner. Albany, NY: SUNY Press.

Brown-Dean, Khalilah L. 2015. "Felon Disenfranchisement Ten Years After *Bush v. Gore.*" In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore.* Co-Edited by Michael Alvarez and Bernard Grofman. Cambridge: Cambridge University Press.

## *Policy Papers and Other Publications*

Brown-Dean, Khalilah L. and Don C. Sawyer, III. 2019. "The State of Education in Urban Connecticut." In *The State of Urban Connecticut,* edited by Robert Brown, III. New Haven, CT: The Urban League of Southern Connecticut.

34

Brown-Dean, Khalilah L. 2018. "Fighting From a Powerless Space: Black Women and the Criminal Justice System." In *State of Black Women in the U.S. and Key States,* edited by Avis A. Jones-DeWeever. Washington, DC: National Coalition on Black Civic Participation.

Brown-Dean, Khalilah L. 2017. Book Review of *Sisters in the Statehouse* by Nadia Brown. *Journal of Race, Ethnicity, and Politics.*

Brown-Dean, Khalilah L., Zoltan Hajnal, Christina Rivers, and Ismail White. 2015. "Fifty Years of the Voting Rights Act: The State of Race in Politics." *Joint Center for Political and Economic Studies.*

Brown-Dean, Khalilah L. November 2013. "In the Final Analysis: On Nick Nelson's Contributions to the Study of Black Politics." *Politics, Groups, and Identities.*

Brown-Dean, Khalilah L. 2012. Cited in the Connecticut State Judiciary Committee's Favorable Report for SB-280: An Act Revising Penalties for Capital Felonies. https://www.cga.ct.gov/2012/JFR/S/2012SB-00280-R00JUD-JFR.htm

Brown-Dean, Khalilah L. 2010. Book Review of *The Perils of Federalism: Race, Poverty, and the Politics of Crime Control* by Lisa L. Miller. *Political Science Quarterly.*

Brown-Dean, Khalilah L. et al. 2008. "Lift Every Voice: Democracy, Voting Rights, and Electoral Reform." Published in conjunction with the Advisory Committee on Social Witness Policy (ACSWP) and the Advocacy Committee for Racial Ethnic Concerns (ACREC).

## WORKS IN PROGRESS

Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context (journal manuscript with David C. Wilson and TaLisa Carter)

Centering Victims' Voices in Criminal Justice Reform Movements (book manuscript)

Negotiating Voting Rights Policy in the Post-*Shelby* Era (journal manuscript)

Inmate Labor and Post-Disaster Recovery (journal manuscript with Randolph Burnside)

## ACADEMIC AWARDS, GRANTS, AND FELLOWSHIPS

2018, 2017, 2016 Quinnipiac University Provost's Innovation Grants ($15,000)

2018-2012 Quinnipiac University College of Arts and Sciences Faculty Research Grants ($30,000)

2017 Top 25 Women Making a Difference in Higher Education Award, Presented by *Diverse: Issues in Higher Education*

2014 National Conference of Black Political Scientists Julia R. Hight Summer Writing Fellowship

2010 National Conference of Black Political Scientists Rodney Higgins Award for Best Faculty Paper

2009-2011 The Open Society Foundations Justice Advocacy Senior Fellowship ($200,000)

2008-2010 Ford Foundation Difficult Dialogues Initiative ($200,000)

2005 American Political Science Association Best Dissertation Award (Race, Ethnicity, and Politics Section)

2005 Yale Center for International and Area Studies ($10,000)

2005 Social Science Research Fund ($5,000)

2005 Yale University Center for the Study of American Politics ($50,000)

2005 The College Board/AP Scholars Program Fellow ($7,000)

## AWARDS FOR PUBLIC SCHOLARSHIP AND SERVICE

2017 Game Changer Award in Public Safety and Criminal Justice, Presented by the Connecticut NAACP State Conference Youth and College Division

2017 Education Award, Presented by the Delta Iota Sigma Chapter of Phi Beta Sigma Fraternity, Incorporated

2016 Fannie Lou Hamer Award for Outstanding Community Service, Presented by the National Conference of Black Political Scientists

2015 Outstanding Community Leadership Award, Presented by the Connecticut State Martin Luther King, Jr. Commission

2014 Legacy Award, Presented by the National Association of Blacks in Law Enforcement

Walt Everitt Humanitarian Award, Presented by the Connecticut Network to Abolish the Death Penalty

Forty Under Forty Award, Presented by *Connecticut Magazine*

2007 Wilma Holmes Tootle Education Advancement Award, Presented by the North Atlantic Region of Alpha Kappa Alpha Sorority, Incorporated

## PRIOR AWARDS AND ACHIEVEMENTS

2002 National Conference of Black Political Scientists Sammy R. Young Best Student Conference Paper Award

2002 The Ohio State University Alumni Grant for Graduate Research and Scholarship ($2,000)

2002 The Ohio State University Madison F. Scott Research Grant ($2,000)

2001 The Ohio State University Madison F. Scott Research Grant ($1,500)

2000 The American Political Science Association Advanced Graduate Student Travel Grant ($500)

2000 Carl Albert Center for Congressional Research Stipend ($500)

2000 The Ohio State University Program for the Enhancement of Graduate Studies Summer Research Fellowship ($4,000)

1999 The Ohio State University Madison F. Scott Research Grant ($1,500)

1998 The Ohio State University Graduate Enrichment Fellowship ($30,000)

1997 American Political Science Association Ralph Bunche Summer Institute Fellow

## RESEARCH AND TEACHING INTERESTS

Civic Engagement; Racial and Ethnic Politics; Urban Politics and Policy; Voting Rights and Representation; The Politics of Punishment and Crime Control Policy; Mass Political Behavior; Political Psychology; Public Policy and Leadership

## PUBLIC SCHOLARSHIP

**2019**
    Brown-Dean, Khalilah L. "Why Victims of Crime Deserve a Voice." *The Hill*
    Brown-Dean, Khalilah L. "Yes Virginia, There is a Choice." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Defining Political Progress." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "On the Meaning of Survival." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "First STEP or First Stumble?" *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Myth of Meritocracy." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "The Fallacy of NOT Seeing Race." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Dr. King Deserves More." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Sorority Life as an Act of Resistance." *Diverse: Issues in Higher Education*
    Brown-Dean, Khalilah L. "Teaching Through Trauma." *Diverse: Issues in Higher Education*

**2018**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."

Brown-Dean, Khalilah L. "Civics 101 Podcast: The Fifteenth Amendment." New Hampshire Public Radio

Brown-Dean, Khalilah L. "Giving Thanks Amid Political Uncertainty." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "On Citizenship and Voting." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Hate We Give: Voting Against Violence." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "Still Separate, Still Unequal: American Indians and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Feminism, Womanism, and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Stakes is High." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Aretha Franklin, John McCain, and the Meaning of Legacy." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Opposite of Progress." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "As American as Apple Pie." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "For Colored Folks Who Have Considered Suicide." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Why We Celebrate." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Mothering Behind Bars." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Bill Cosby Isn't a Victim." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "It's Time to Secure the Vote." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "From Pain to Power." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Reclaiming the 'Fierce Urgency of Now'." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Politics of Mental Health." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Not Yet Just, Not Yet Free." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Five Things More Effective Than Political Panic." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Honoring Black History Month, In Prison." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "In Defense of Youth Organizing." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Art as Political Resistance." *Diverse: Issues in Higher Education*

**2016**

Brown-Dean, Khalilah L. "Can She Do It? Women in Politics Remain Dogged By Gender Stereotypes." *New York Daily News.*

Brown-Dean, Khalilah L. "Justice Trump'd? The Path Toward Criminal Justice Reform Post-Obama." WEAA Radio.

**2015**

Brown-Dean, Khalilah L. "Leaving Victims Behind is Unjust." *New Haven Register.*

**2014**

Brown-Dean, Khalilah L. "Saying Farewell to Maya Angelou." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Who Fights For Black Girls?" *Ebony Magazine.*

**2013**

Case 1:18-cv-05391-SCJ   Document 138   Filed 11/18/19   Page 39 of 99

Brown-Dean, Khalilah L. Documentary Feature: "The Color of Justice."

Brown-Dean, Khalilah L. "Kids and Families: The REAL Victims of the GOP Shutdown." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Primary Offers Opportunity to Move New Haven Forward." *New Haven Register.*

Brown-Dean, Khalilah L. "An End to the War on Weed?: Not Likely." *Ebony Magazine.*

Brown-Dean, Khalilah L. "What Do the Supreme Court's Decisions Mean For Blacks?" *Ebony Magazine.*

**2012**

Akinwole-Bandele, Lumumba and Khalilah L. Brown-Dean. "A Call to Community: Why We Cannot Wait for the Next Troy Davis." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Beyond Barack Obama: Is America Ready For a New Political Party?" *Dominion of New York Magazine.*

**2011**

Brown-Dean, Khalilah L. "Are HBCU's Still Relevant?" *Uptown Magazine.*

Brown-Dean, Khalilah L. "If Black Men Live Longer in Prison It's Time For Change." *TheGrio.*

## INVITED TALKS AND PRESENTATIONS

"The 400th Anniversary of Jamestown and the Arrival of Enslaved Africans in Virginia." American Political Science Association Annual Meeting. Washington, DC. August 2019.

"The Future of American Democracy." Quinnipiac University Presidential Inauguration. May 2019.

"A New Vision of Criminal Justice Reform." Quinnipiac University Admissions Preview. March 2019.

"Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context." David C. Wilson, TaLisa Carter, and Khalilah L. Brown-Dean. National Conference of Black Political Scientists Annual Meeting. Baton Rouge, Louisiana. March 2019.

"Fighting from a Powerless Space: Women of Color in the Criminal Justice System." Feminism and Incarceration Conference. University of North Carolina-Greensboro. February 2019.

"The Continuing Struggle for Voting Rights in the United States." Wiggin & Dana Law Firm. February 2019.

"Not Yet Just, Not Yet Free: Black Women, Political Freedom, and the 2018 Midterm Elections." Connecticut College. October 2018.

"A Letter to the Free: Reimagining Justice and Democracy in the Trump Era." University of Bridgeport Necessary Voices Lecture Series. February 2018.

"Freedom in the Era of Reform." Cheshire (CT) Correctional Institute. February 2018.

"On the Meaning of Justice and Reform." College of William and Mary. February 2018.

"A Conversation on Justice and Freedom." University of Connecticut School of Social Work. February 2018.

"Redefining Civil Rights Post-Obama." NAACP Albuquerque Civil Rights and Diversity Conference. September 2017.

"The Legacy of the 15th Amendment Post-*Shelby.*" Duke University's Samuel DuBois Cook Center Research Symposium on the Social and Economic Outcomes of the 13th, 14th, and 15th Amendments. March 2017.

"Race, Representation, and Disenfranchisement: As American As Apple Pie." Pace University. March 2017.

"The Public Spectacle: Exploring Anger and Political Transformations." William Paterson University. October 2016.

"The State of Race and Policing in America." Texas A&M University Bush School for Public Service. September 2016.

"Contemporary Challenges to Voting Rights in the United States." University of Connecticut. March 2016.

"The Black Predicament and the 2016 Elections." National Conference of Black Political Scientists. Jackson, Mississippi. March 2016.

"Beyond Ferguson: Reimagining Race and Social Justice in the United States." Walker-Horizon Lecture. Depauw University. February 2016.

"Counter-Emancipation and the Voting Rights Act of 1965." University of Illinois-Springfield. June 2015.

"Fifty Years of the Voting Rights Act: The State of Race in American Politics." Selma Public Library for the 50th Anniversary Celebration of the Bloody Sunday March. March 2015.

"Why We Cannot Wait: Reclaiming the Fierce Urgency of Now." Claflin College. February 2015.

"Lessons From the Past, Prospects For the Future: Voting Rights Post *Shelby v. Holder.*" US Attorney's Office. February 2015.

"Beyond Ferguson: Understanding the Nexus of Incarceration and Disenfranchisement." Connecticut Court Support Services. February 2015.

"The Mass Incarceration of Women of Color." Harvard University. March 2014.

"45 Years: A Retrospective on NCOBPS and the Work of William E. Nelson, Jr." Presented at the National Conference of Black Political Scientists Annual Meeting. Wilmington, Delaware. March 2014.

"The Role of Community Mobilization Within Social Justice Movements." U.S. Human Rights Network. December 2013.

"From Painful to Powerful: How Crime Victims Persuaded Legislators to Reform the Death Penalty in Connecticut and Maryland." Presented at the American Political Science Association Annual Meeting, Chicago, Illinois. August 2013.

"Public Scholarship vs. Public Intellectualism." Women of Color in Political Science Mini-Conference, American Political Science Association. Chicago, Illinois. August 2013.

"How the Affected and Underrepresented Are Ending the Death Penalty." Yale University Law School Rebellious Lawyering Conference. New Haven, Connecticut. February 2013.

"Building Authentic Power: An Examination of Connecticut's Death Penalty Repeal Campaign." Presented at the Southern Political Science Association Annual Meeting. Orlando, Florida. January 2013.

"The Relationship Between Perceptions of Justice and Grassroots Mobilization." Maryland State Conference of NAACP Branches. October 2012.

"Beyond Troy Davis: Understanding the Death Penalty Abolition Movement in the United States." William Paterson University. September 2012.

"A Tale of Two States: Death Penalty Reform in Connecticut and Maryland." Soros Institute/Open Society Foundations. July 2012.

"From Pain to Power: A New Model of Social Justice Organizing." National Conference on Race and Education in Higher Education. May 2012.

"Redefining Citizenship in a 'Post Racial' America." Carter G. Woodson Lecture Series. Central Connecticut State University. New Britain, CT February 2012.

"Race and Domestic Policy." George Mason University School of Public Policy. October 2011.

"Three-Fifths Revisited: The Census and Inmate Enumeration." Presented at the Drexel Summer Conference on the City. June 2011.

"Concentrating Punishment." Presented at the Princeton University Imprisonment of a Race Conference. March 2011.

"From Exclusion to Inclusion: Promoting Civic Engagement When Times are Always Hard." Paper presented at the American Political Science Association Annual Meeting, Washington, DC. September 2010.

"Greater Expectations: Perceptions of Racial Group Interests and Candidate Evaluations." (with David C. Wilson). Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, IL. April 2010.

"The Future of Post-Racial Politics." Presented at the "From Slavery to Freedom to the White House: Race in Twenty-First Century America, A Conference in Honor of John Hope Franklin." Sponsored by the Duke University School of Law. April 2010.

"Race, Representation, and Punitive Politics." Presented at "The Challenge of Racial Inequality in a Post-Racial World: Race, Rights, and Public Policy in the Age of Obama." Sponsored by Rutgers and Princeton Universities. March 2010.

"Identity Politics in the Age of Obama." 15th Annual Multicultural Lecture Series. University of Rhode Island. February 2010.

"Identity Politics in the Age of Obama." University of Rochester Two Icons Lecture Series. February 2009.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Presented at the UCLA Center for the Study of Race and Ethnicity in the Americas. February 2008.

"Reforming the State: Assessing Recent Changes in State Felon Disenfranchisement Laws." Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada. September 2009.

"Race, Crime, and Political Inequality." Presented to The University of North Carolina, Chapel Hill American Politics Research Group. November 2007.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois. September 2007.
"Once Convicted, Forever Doomed: The Politics of Punishment in the United States." The University of Michigan Distinguished Speakers Series. September 2007.

"Contemporary Challenges to the Voting Rights Act." Presented for the National Presbyterian Church Voting Rights and Electoral Reform Committee. Washington, DC April 2007.

"Once Convicted, Forever Doomed: Understanding the Political Consequences of Mass Incarceration." University of Kentucky. March 2007.

"Inmate Enumeration and Political Representation: *Reynolds v. Sims* Revisited." University of Kentucky Law School. March 2007.

"Race, Religion, and Attitudes Toward Criminal Justice Policy." The University of Texas Conference on Race, Religion, and Politics. March 2007.

"Race and the Politics of Punishment in the United States." Presented at Oxford University, Nuffield College. Oxford, England February 2007.

"Voting Rights Policy in the Post-Civil Rights Era." The Ohio State University Law and Democracy Forum. February 2007.

"African American Communities and the Politics of Incarceration." Presented to the Black Solidarity

Conference, Yale University. New Haven, CT October 2006.

"Fighting from a Powerless Space: The Impact of Criminal Justice Policy on Women of Color." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2006.

"The Politics of Incarceration." African American Research Collaborative. Philadelphia, PA. August 2006.

"Is the Voting Rights Act Still Relevant?" Morning at Yale Program sponsored by the Association of Yale Alumni. May 2006.

"Inmate Enumeration and the Return of the Three-Fifths Clause." Paper presented at the National Conference of Black Political Scientists Annual Meeting, Atlanta, GA. March 2006.

"New Considerations in Redistricting and Minority Representation." Presented at the "Who Draws the Lines?: The Politics of Redistricting Conference." University of North Carolina at Chapel Hill School of Law. Chapel Hill, NC February 2006.

"The Race, Education, and Incarceration Nexus." Twentieth Century American Politics and Society Workshop. Columbia University. November 2005.

"Contemporary Challenges to the Voting Rights Act of 1965." Presented at Virginia State University. September 2005.

"Race, Crime, and American Political Inequality." Presented at Oxford University, Pembroke College. Oxford, England. March 2005.

"Trading Brown for Prison Orange: The Link Between Race, Education, and Incarceration." Reflections: 50 Years after *Brown v. Board* Symposium. Central Connecticut State University. New Britain, CT. September 2004.

"Racial Disparities in Sentencing." Panel sponsored by the Greater New Haven NAACP. "Narrowing the Gap: Reducing Access Inequality for (Ex)Felons." Crime, Inequality, and Justice Symposium, The Ohio Criminal Justice Research Center. Columbus, OH. August 2004.

"Stolen Democracy: The Consequences of Felon Disenfranchisement Laws for Black and Latino Communities." Florida State of Black Studies Conference, Miami, FL. April 2004.

"Women of Color and the American Prison System," with J. Perez-Monforti. Paper presented at the Western Political Science Association Annual Meeting, Portland, OR. March 2004.

"The Impact of Elite Framing on Public Attitudes Toward Disenfranchisement." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Paper presented at the Midwest Political Science Association Conference, Chicago, Illinois. April 2003.

"Racial Profiling or Racist Profiling?: Perception and Opinion on the Profiling of Arabs and Blacks," with Thomas E. Nelson, Ray Block, Jr. and Javonne A. Paul. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts. September 2002.

"Ignorance or Intolerance?: An Analysis of Public Attitudes Toward Felon Disenfranchisement Laws." Paper presented at the Edward F. Hayes Graduate Research Forum, Columbus, Ohio. February 2002.

"One Lens, Different Views: An Examination of Public Opinion on Felon Disenfranchisement Laws." Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002. *Recipient of the Sammy R. Young Best Conference Paper Award.*

"The Effects of Crisis-Related Imagery on Public Opinion about Racial Profiling," with Ray Block, Jr. and Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002.

"Heritage or Hate?: An Analysis of Public Attitudes Toward the Confederate Flag," with B. D"Andra Orey. Paper presented at the Southern Political Science Association, Atlanta, Georgia. January 2001.

"Shades of Discontent: Minority Group Competition and Attitudes Toward the Elian Gonzalez Issue," with J. Perez-Monforti. Paper presented at the National Conference of Black Political Scientists, Richmond, Virginia. *Nominated for the Sammy R. Young Best Conference Paper Award.* March 2001.

"Toeing the Party Line, Toeing the Color Line: African American Women in Congress and the Impeachment Process." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 2000.

"Stolen Democracy: Felony Disenfranchisement Laws and the Future of Black America," with Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Washington, D.C. *Recipient of the Francis Aumann Award for the Best Graduate Student Conference Paper.* March 2000.

"African American Female Legislators and the Clinton Impeachment Process." Women Transforming Congress: Gender Analyses of Institutional Life Conference, Carl Albert Center for Congressional Research. April 2000.

"The Influence of Politically Active Black Churches on Community Activism among African Americans." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 1997.

KEYNOTE ADDRESSES AND PANEL DISCUSSIONS

"Not Yet Just, Not Yet Free: Women and Social Justice." Keynoted address presented to Southern Connecticut State University Women's Conference. May 2019.

"The Future of Voting Rights in the United States." Keynote address presented to the Sphex Club of Virginia. May 2019.

44

"The State of Justice Reform." Whitneyville United Church of Christ Social Justice Symposium. May 2019.

"The State of Urban Connecticut." Urban League of Southern Connecticut and Quinnipiac University. April 2019.

"School/Gun Violence: An Interdisciplinary Concern." Quinnipiac University School of Education. April 2018.

"A New Vision of Freedom and Democracy." Keynote Address presented to the Farmington Valley Links, Incorporated. Mark Twain House. February 2018.

"To Build the Beloved Community in the Face of Chaos." Annual Martin Luther King, Jr. Breakfast Keynote Address. Lynchburg, VA. January 2018.

"Women Leading Change: Promoting and Sustaining Women in Leadership Roles." Southern Connecticut State University Sustainability Initiative. November 2017.

"Gender, Voting, and the Voting Rights Act." Community Foundation for Greater New Haven. October 2017.

"We Who Believe in Freedom." Keynote Address presented to the Connecticut Department of Children and Families Region 6 Foster Youth Celebration. May 2017.

"Community Conversation on the Thirteenth Documentary." Greater New Haven Branch of the NAACP. April 2017.

"Women, Media, and the Gender Lens." University of New Haven Women's Leadership Conference. April 2017.

"A Day After the Election…Now What?" Quinnipiac University. November 2016.

"Bridging the Past and the Future: 30 years of the Ralph Bunche Summer Institute and the Intellectual Legacy of Dr. Ralph Bunche." American Political Science Association. October 2016.

"Chaos or Community?" Southern New England Community Action Conference. September 2016.

"A Community Conversation on Race in America." With Congressman Jim Himes. July 2016.

"Reflections on Voting Rights in the U.S." With Congressman Jim Himes. April 2016.

"To Whom Much is Given." National Association of Negro Business Women and Professionals Club. New Haven, CT. March 2016.

"Reclaiming the Fierce Urgency of Now." Frontiers International Keynote Address. Springfield, Illinois. January 2016.

"One Person, One Vote: Voting Rights 50 Years Later." Harriett Beecher Stowe Center. November 2015.

"A Call to Leadership." Keynote Address for the North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated's Undergraduate Luncheon. April 2012.

"Taking the L.E.A.D.: Social Media and Contemporary Youth Movements." Keynote Address for the C.H.A.P. Youth Leadership Conference. March 2012.

"Post-Racial or Post-Racism? New Directions in the Quest for Equality." Presented to the United States Department of Agriculture. February 2011.

"Fractured Citizenship and the Politics of Punishment." Presented to inmates at the Cheshire State Correctional Institution. Sponsored by Wesleyan University Center for Prison Education. May 2010.

"Managing the Politics of Diversity." Keynote Address for the Virginia Community Dialogue on Race and Racism. January 2008.

Panelist, "The Politics of Hate." Yale University. New Haven, CT March 2008.

Panelist, "Strategies for Strengthening Your Voice in the Political Process." North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated. March 2008.

"The Political Impact of American Criminal Justice Policy." Presented at the *New York Times* Center New York, NY November 2008.

"Empowerment Through Education." Keynote Address presented for the Links, Incorporated Scholarship Luncheon. May 2006.

"To Whom Much is Given, Much is Required: The Need for Youth Leadership." Keynote Address presented to the Hyde Leadership Academy. February 2006.

"Lessons from the Past, Prospects for the Future: Reflections on the Voting Rights Act of 1965." Association of Yale Alumni. October 2005.

"Dismantling the Hierarchy of Oppression: The Common Political Fate of Black Women and Latinas." Co-Sponsored by the Xi Omicron Chapter of Alpha Kappa Alpha Sorority, Inc. and Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. April 2005.

"Lest We Forget." Keynote Address, African American Women's Summit. March 2005.

"Criminal Justice Expenditures and the Public Health Crisis." Frantz Fanon Lecture Series, Yale University School of Medicine. February 2005.

"The Spirit of Sankofa." Keynote Address, The New Haven Club. New Haven, CT. February 2005.

"On Heroism: Honoring the Legacy of Rosa Parks." Roundtable panelist, Afro-American Cultural Center at Yale. January 2005.

"For God and For Country: The Role of Religious Values in the 2004 Presidential Election." Yale University Election Post-Mortem. November 2004.

"The Politics of Power: Public Policy and Justice in the Black Community." Panel in honor of the 35th Anniversary of the Afro-American Cultural Center at Yale. October 2004.

 "Assessing the Limits of Democracy Via Felon Disenfranchisement Laws." Washington University Department of Political Science, St. Louis, Missouri; Wesleyan University, Middletown, Connecticut.

"Just Being Here Is Not Enough!: Recognizing Your Role in Community Development." Yale University Afro-American Cultural Center Student Achievement Dinner. May 2004.

International Festival of Art and Ideas. May 2004.

 "To Whom Much is Given: Communal Responsibility and the Challenges of Black Politics." Mental Pabulum Series, Yale University. February 2004.

"Power, Pride, and Patriotism: Reflections on the Political Significance of Veterans" Day." Holcomb Rock Baptist Church. November 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Invited presentations for Yale University, Texas A&M University, Emory University, Hunter College, and Indiana University-Indianapolis. 2002.

## OTHER CONFERENCE PARTICIPATION

Served as a Section Head, Panelist, Discussant, Chair, and Organizer for numerous panels at national conferences such as the American Political Science Association, National Conference of Black Political Scientists, Southern Political Science Conference, and Midwest Political Science Conference.

## TEACHING EXPERIENCE

Designing Political Inquiry (Undergraduate Lecture/Seminar); Senior Thesis in American Politics (Undergraduate Seminar); American Political Movements (Undergraduate Lecture/Seminar); Introduction to American Politics (Undergraduate Lecture); The Politics of Intimacy (Undergraduate Seminar); The Politics of Community (Undergraduate Seminars); Race, Ethnicity, and Citizenship (Undergraduate Seminar); Ethnic Politics in the United States (Undergraduate Lecture); Voting Rights and Representation (Undergraduate Seminar); The Individual and the Community (Undergraduate Seminar); Power, Politics, and Punishment (Graduate/Undergraduate Seminar); Public Opinion (Graduate Seminar); Race and Ethnicity in American Politics (Graduate Seminar); Race and Ethnicity in American Politics (Undergraduate Seminar) African American Politics (Undergraduate Seminar); Black and Jewish Community Politics (Undergraduate Lecture/Seminar)

## FACULTY ADVISING AND SUPERVISION

Responsible for advising approximately 20 undergraduate students in the Quinnipiac University College of Arts and Sciences each semester

Previously advised health policy and advocacy scholars in the Netter School of Medicine
Dissertation Committee Member/Reader: Andra Gillespie (Emory University); Rachel Milstein
Sondheimer (United States Military Academy at West Point); Shatema Threadcraft (Rutgers University);
Joanna Mosser (Drake University)
Research Supervision: Sheree Bennett and Luke Thompson (Difficult Dialogues Graduate Research
Assistants); Kayla Vinson and Adrea Hernandez (Mellon Mays Undergraduate Fellows); Brandee Blocker
and Christopher Pagliarella (undergraduate research assistant)

## PROFESSIONAL MEMBERSHIP

American Political Science Association; International Society of Political Psychology; Midwest Political
Science Association; National Conference of Black Political Scientists; Pi Sigma Alpha National Political
Science Honor Fraternity; National Association for Ethnic Studies

## PROFESSIONAL SERVICE

Advisory Board, Ronald W. Walters Leadership and Public Policy Center (2019-)
Advisory Board, *Issues in Race and Society* journal (2019-)
Member, American Political Science Association Rules and Elections Committee (2019-)
Chair, National Conference of Black Political Scientists Fannie Lou Hamer Award Committee (2019-)
Executive Council Member, National Conference of Black Political Scientists (2016-2018)
Member, American Political Science Association Ralph Bunche Summer Institute Advisory Committee
(2016-)
Section Chair, Undergraduate Research Section of the National Conference of Black Political Scientists
(2017)
Board Member, Association for Ethnic Studies/National Association for Ethnic Studies (2015-Present)
Section Chair, Public Opinion and Political Participation Section of the National Conference of Black
Political Scientists Annual Meeting (2014-2015)
Parliamentarian, National Conference of Black Political Scientists (2014-2016)
Section Head, Race, Ethnicity, and Gender Section of the Southern Political Science Association
Conference (2012-2013)
Section Head, Race, Class, and Ethnicity Section of the Midwest Political Science Association
Conference (2011-2012)
Executive Council, Public Policy Section of the American Political Science Association (2010-2012).
Executive Council, Urban Politics Section of the American Political Science Association (2010-2012).
Executive Council, Race and Ethnic Politics Section of the American Political Science Association
(2009-2011).
Research Advisor, The National Presbyterian Church Voting Rights and Electoral Reform Committee
(2006-2009).
Selection Committee, The Southwest Political Science Association's Jewel L. Prestage Award for the
Best Paper on the Intersection of Race, Gender, Ethnicity, and Political Behavior (2006).
Selection Committee, Warren E. Miller Prize for an Outstanding Career and Intellectual
Accomplishment in the field of Elections, Public Opinion, and Voting Behavior (Elections, Public
Opinion, and Voting Behavior Section of the American Political Science Association) (2007).
Conference Director, "Lessons From the Past, Prospects for the Future: Honoring the Fortieth
Anniversary of the Voting Rights Act of 1965." Co-Sponsored by the Yale University Center for
American Politics and Institution for Social and Policy Studies (2004-2005).

Selection Committee, American Political Science Association Ralph Bunche Book Award (2004)
Secretary, Race and Ethnic Politics Section of the American Political Science Association (2003-2005).

## UNIVERSITY SERVICE

Member, Quinnipiac University Strategic Plan Committee (2018)
Faculty Researcher, Urban League of Southern Connecticut and Quinnipiac University State of Urban Connecticut Project (2016-)
Affiliated Faculty, The Prison Project at Quinnipiac University (2016-)
Co-Chair, College of Arts and Sciences Faculty Scholarships and Grants Committee (2015-2018)
Member, College Evaluation (Tenure and Promotion) Committee (2015-2018)
Co-Coordinator, Frank M. Netter School of Medicine Health Policy and Advocacy Concentration (2015-2016)
Co-Leader, University Academic Seminar Series and Advisory Board (2013-2014)
Co-Organizer, Dilemmas of Justice Speakers Series (2013)
Exploratory Committee, African American Studies Minor/Civil Rights Institute (2013-2014)
Chair, College of Arts and Sciences Scholars Working Group (2013)

## REVIEWER

National Science Foundation; *American Journal of Political Science; Journal of Race and Politics; Law and Social Inquiry; The Journal of Conflict Resolution; Politics and Gender; Journal of Politics; Russell Sage; Political Research Quarterly;* Yale University Press; *DuBois Review; Political Behavior; Urban Affairs Review; The Political Chronicle;* Palgrave-McMillan; *SOULS Journal; DuBois Review; Politics, Groups, and Identities; Election Law Journal; Journal of the Center for Policy Analysis and Research; Election Law Journal.*

## MEDIA COMMENTARY

Over 400 media outlets including *New York Times; Washington Post;* Fox News Radio; Democracy Now; American Urban Radio Network; WTNH; *The Forum; The Hill;* CNN; WURD; Minnesota Public Radio; WHYY; WNPR; CPTV; *Ebony.com;* Google; NPR; WFSB TV; CBS Radio; AP News; *Wall Street Journal.*

## RELATED PUBLIC SERVICE

Board Chair, The Community Foundation *for* Greater New Haven (2019-)
Board Member, The New Haven Pearls of Excellence Foundation (2018-)
Board Member, The Community Foundation for Greater New Haven (2015-2021)
Appointed Member, 2018 Transition Team for Connecticut Governor Ned Lamont (Women & Girls Policy)
President, Theta Epsilon Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated (2017-2018)
Board Member, Prison Policy Initiative (2015-2016)

TABLE 2: Georgia Statutes Outlining the Secretary of State's Duties
CATEGORY 1: Candidate Interaction
CATEGORY 2: Voter Interaction
CATEGORY 3: Election Official Interaction

| Duty | Text | Source | Function Classification |
|---|---|---|---|
| Powers and duties of the SOS | To determine the forms of nomination petitions, ballots, and other forms the Secretary of State is required to determine under this chapter | O.C.G.A. § 21-2-50(a)(1) | Category 1 Category 3 |
| Powers and duties of the SOS | To receive registration statements from political parties and bodies and to determine their sufficiency prior to filing, in accordance with this chapter, and to settle any disputes concerning such statements; | O.C.G.A. § 21-2-50(a)(2) | Category 1 Category 3 |
| Powers and duties of the SOS | To receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State in accordance with this chapter; | O.C.G.A. § 21-2-50(a)(3) | Category 1 |
| Powers and duties of the SOS | To certify to the proper superintendent official lists of all the political party candidates who have been certified to the Secretary of State as qualified candidates for the succeeding primary and to certify to the proper superintendent official lists of all the candidates who have filed their notices of candidacy with the Secretary of State, both such certifications to be in substantially the form of the ballots to be used in the primary or election. The Secretary of State shall add to such form the language to be used in submitting any proposed constitutional amendment or other question to be voted upon at such election; | O.C.G.A. § 21-2-50(a)(4) | Category 1 Category 3 |
| Powers and duties of the SOS | To furnish to the proper superintendent all blank forms, including tally and return sheets, numbered lists of voters, cards of instructions, notices of penalties, instructions for marking ballots, tally sheets, precinct returns, recap sheets, consolidated returns, oaths of managers and clerks, oaths of assisted electors, voters certificates and binders, | O.C.G.A. § 21-2-50(a)(5) | Category 3 |

1

| | applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries. Such forms shall have printed thereon appropriate instructions for their use; | | |
|---|---|---|---|
| Powers and duties of the SOS | **To receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions,** as required by this chapter; | O.C.G.A. § 21-2-50(a)(6) | Category 3 |
| Powers and duties of the SOS | **To furnish upon request a certified copy of any document in the Secretary of State's custody by virtue of this chapter and to fix and charge a fee to cover the cost of furnishing same;** | O.C.G.A. § 21-2-50(a)(7) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To perform such other duties as may be prescribed by law;** | O.C.G.A. § 21-2-50(a)(8) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To determine and approve the form of ballots for use in special elections;** | O.C.G.A. § 21-2-50(a)(9) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To prepare and provide a notice to all candidates for federal or state office advising such candidates of such information, to include requirements of this chapter, as may, in the discretion of the Secretary of State, be conducive to the fair, legal, and orderly conduct of primaries and elections.** A copy of such notice shall be provided to each superintendent for further distribution to candidates for county and militia district offices; | O.C.G.A. § 21-2-50(a)(10) | Category 1 Category 3 |
| Powers and duties of the SOS | **To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections;** | O.C.G.A. § 21-2-50(a)(11) | Category 3 |

| Powers and duties of the SOS | To prepare and publish, in the manner provided in this chapter, all notices and advertisements in connection with the conduct of elections which may be required by law; | O.C.G.A. § 21-2-50(a)(12) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Powers and duties of the SOS | To prepare and furnish information for citizens on voter registration and voting; | O.C.G.A. § 21-2-50(a)(13) | Category 2 |
| Powers and duties of the SOS | To maintain the official list of registered voters for this state and the list of inactive voters required by this chapter; | O.C.G.A. § 21-2-50(a)(14) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state. | O.C.G.A. § 21-2-50(a)(15) | Category 3 |
| Extension or postponement of qualifying periods and primaries and elections in even of state of emergency or disaster | In the event the Governor declares that a state of emergency or disaster exists pursuant to Code Section 38-3-51 or a federal agency declares that a state of emergency or disaster exists, **the Secretary of State is authorized to postpone or extend the qualifying periods** provided in this chapter for the qualification of candidates seeking municipal, county, or state-wide office and to postpone the date of any primary, special primary, election, or special election in the affected area. | O.C.G.A. § 21-2-50.1 | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | **The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(a) | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | As the chief election official, **the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.** | O.C.G.A. § 21-2-50.2(b) | Category 1 Category 2 Category 3 |

| Responsibilities under HAVA | Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby **the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(c) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars** to determine the eligibility of the applicant and, if found eligible, **to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |
| Instruction and training of private entities | **The Secretary of State may develop and provide to the boards of registrars manuals for this instruction.** The Secretary of State may also make such manuals available to the public, including via electronic means on the Secretary of State's website. Until such time as the Secretary of State develops such manuals, boards of registrars shall utilize such materials as will meet the training requirements of this rule. | Ga. Comp. R. & Regs. 183-1-6-.02(5)(c) | Category 1 Category 2 Category 3 |
| Rules and Regulations for Voter Registration by Registrars and Deputy Registrars | **The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State.** The board of registrars shall provide each deputy registrar with a copy of the manual. | Ga. Comp. R. & Regs. 183-1-6-.03(3)(n) | Category 3 |

4

| Accessibility for Elderly and Disabled Voters | Polling Places. The election superintendent of each county and municipality shall conduct, or cause to be conducted, an on-site inspection of each polling place located within the county or municipality to determine if the polling place is accessible. **This inspection shall be reported to the Secretary of State on forms prepared by the Secretary of State at such times as the Secretary of State shall prescribe.** Any polling place found not to be accessible shall either be made accessible prior to its use in a primary or election or shall not be used as a polling place. | Ga. Comp. R. & Regs. 183-1-6-.04(5)(a) | Category 3 |
| Accessibility for Elderly and Disabled Voters | Printed Instructions. The Secretary of State shall provide instructions for use by election superintendents at polling places and registrars at voter registration places, printed in large type, to assist visually and hearing impaired electors in voting and registering to vote. | Ga. Comp. R. & Regs. 183-1-6-.04(7) | Category 3 |
| Conduct of Elections: Voting Machines—Vote Recorders | Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia **shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State.** In addition, absentee balloting shall be conducted through the use of optical scan ballots which **shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**; provided, however, that the **use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.** | Ga. Comp. R. & Regs. 183-1-12-.01 | Category 1<br>Category 2<br>Category 3 |
| Direct Recording Electronic | Acceptance tests. Upon the receipt of each new direct recording electronic voting unit (DRE), **the election superintendent of the county is responsible to ensure that an acceptance test is** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(a) | Category 3 |

| Voting Equipment | **performed on the device in accordance with standards issued by the Secretary of** State. No DRE unit shall be accepted by the county or placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | The election superintendent of the county **shall maintain the DRE units in accordance with** the requirements of this rule, **the directives of the Secretary of State,** and the specifications and requirements of the manufacturer. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(b)(1) | Category 3 |
| Direct Recording Electronic Voting Equipment | Software security. The software contained in each DRE unit, regardless of whether the unit is owned by the county or the state, and **the software used to program the unit and to tabulate and consolidate election results shall not be modified, upgraded, or changed in any way without the specific approval of the Secretary of State. No other software shall be loaded onto or maintained or used on computers on which the GEMS software is located except as specifically authorized by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(c) | Category 3 |
| Direct Recording Electronic Voting Equipment | The GEMS server shall not be moved or relocated for educational or training purposes. Should it become necessary to relocate the GEMS server or any of its components from one facility to another, the election superintendent shall notify the Secretary of State in writing of the reason for the relocation and the proposed new location. **Under no circumstances shall the GEMS server or any of its components be relocated unless and until written authorization for the relocation is received from the Secretary of State** except in the event of an emergency situation beyond the control of the election superintendent. | Ga. Comp. R. & Regs.183-1-12-.02(2)(g)(3) | Category 3 |
| Direct Recording Electronic Voting Equipment | The poll manager shall sign a receipt for all supervisor cards, encoders, voter access cards, memory cards, and DRE unit keys assigned to such poll manager's precinct. Upon returning election supplies to the election superintendent's office | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(4) | Category 3 |

6

| | | | |
|---|---|---|---|
| | following the close of the polls, the poll manager shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | | |
| Direct Recording Electronic Voting Equipment | All supervisor cards, encoders, voter access cards, memory cards, DRE unit keys, and other equipment assigned to designated county election technicians shall be accounted for on the night of a primary, election, or runoff and shall be returned to storage. Each technician shall sign a receipt for all such items issued to such technician and, upon returning such items to the election superintendent's office following the close of the polls, the technician shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | **The election superintendent shall notify the Secretary of State** of any instances of unaccounted for DRE units, optical scanner devices, voter access cards, supervisor cards, memory cards, DRE unit keys, voting system software, and encoders at the completion of certification by delivering such notification to the Secretary of State when the certified election results are delivered to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(6) | Category 3 |
| Direct Recording Electronic Voting Equipment | After placing the memory card (PCMCIA card) in the DRE unit, the DRE unit shall have such internal diagnostic tests performed as shall be directed by the Secretary of State or the election superintendent. | Ga. Comp. R. & Regs. 183-1-12-.02(3)(b)(1)(ii) | Category 3 |
| Direct Recording Electronic | The poll officers shall affix a card of instructions for voting within each voting booth and **shall place at least two printed sample ballots and at least two voting instructions posters** | Ga. Comp. R. & Regs. 183-1-12-.02(3)(d)(7) | Category 1 Category 2 Category 3 |

| Voting Equipment | approved or provided by the Secretary of State outside the enclosed space at the polling place for the information of the voters. **Prior to voters entering the enclosed space, the poll officers may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | In the case of primaries, elections, and runoffs for county, state, and federal office, **the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State,** within seven days following a primary, election, or runoff. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | Electronic Transmission of Precinct Results to Central Office. The election superintendent shall transmit to the Secretary of State unofficial election results for all races for state offices in any primary, election, or runoff as soon as possible after the closing of the polls for such primary, election, or runoff. **Such results shall be transmitted in a format prescribed by the Secretary of State.** At a minimum, the results shall be transmitted upon one third of the precincts reporting results, upon two thirds of the precincts reporting results, and upon all precincts reporting results, including absentee ballots within all precincts. Except upon notice to and consultation with the Secretary of State, no election superintendent shall conclude the tabulation of votes on election night in any primary, election, or runoff in which there are contested races for federal and state offices until and unless all such unofficial results, including absentee ballots, have been transmitted to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(d) | Category 3 |
| Direct Recording Electronic Voting Equipment | **In the event of any malfunction or problem with DRE units, the county election superintendent shall document the problem and its resolution and shall provide such information to the Secretary of State.** The documentation | Ga. Comp. R. & Regs. 183-1-12-.02(8)(b) | Category 3 |

| | shall include a detailed description of the malfunction or problem, the steps taken to correct the malfunction or problem, and the cause of such malfunction or problem if a cause can be determined. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | Use of Equipment by Municipalities. The county election superintendent is authorized to permit any municipality within the county to conduct its election with the DRE equipment through a written intergovernmental agreement between the county and the municipality; provided that the municipality agrees to maintain and operate the equipment in accordance with law, these rules and regulations, and the manufacturer's guidelines and specifications and provided further that the municipality trains all of its election personnel and poll workers in the proper operation and conduct of elections utilizing such equipment **through a training program conducted by or approved by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | The registrars of each county shall complete the entry of new and updated voter registrations **on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.** | Ga. Comp. R. & Regs. 183-1-12-.07(4) | Category 3 |
| Direct Recording Electronic Voting Equipment | Prior to each primary or election **as specified by the Secretary of State, the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the GEMS database for the county.** | Ga. Comp. R. & Regs. 183-1-12-.07(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | The county election superintendent and the registrars **shall notify the Secretary of State or his or her designee of any changes to the voter registration file** for the county or the GEMS database that occur after the process for creating ExpressPoll flash cards begins. | Ga. Comp. R. & Regs. 183-1-12-.07(6) | Category 3 |

9

| | | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | Upon the conclusion of each primary, election, or runoff, the poll officers shall return the ExpressPoll units with the other election materials from the precinct to the election superintendent. **The registrars and election superintendent shall coordinate the return of the flash cards from the ExpressPoll units to the Secretary of State** such that the cards are returned in the same time period as the official election returns. | Ga. Comp. R. & Regs. 183-1-12-.07(9) | Category 3 |
| Use of DRE Units for Absentee Balloting | On the first day of the absentee voting period, prior to any votes being cast on the DRE units, the registrars shall verify that the seal for each DRE unit is intact and that there is no evidence or indication of any tampering with the seal or the unit. The registrars shall verify that the number of the seal matches the number of the seal recorded for that unit when such unit was prepared by the election superintendent for the primary, election, or runoff. If a seal number does not match or if there is any evidence or indication of tampering with the seal or unit, **the Secretary of State and the election superintendent shall be immediately notified and such unit shall not be used until such matters are resolved by agreement of the Secretary of State, the election superintendent, and the registrars.** The set up shall be performed in public and the public may view the set up subject to such reasonable rules and regulations as the registrars may deem appropriate to protect the security of the DRE units and to prevent interference with the duties of the registrars, except that the public view shall not be obstructed. The registrars shall run a zero tape on each DRE unit prior to the beginning of absentee voting on such units. The registrars shall, without removing the tape from the unit, verify that all vote registers shown on the zero tape are set to zero and that there are no votes showing on the unit and shall sign the tape in the space provided. If the zero tape does not show that all vote registers are set to zero and that there are votes on the unit, the election superintendent shall be immediately notified and such unit shall not be used until the unit is cleared and the matter is resolved by agreement of the election superintendent and the registrars. After verifying and | Ga. Comp. R. & Regs. 183-1-14-.02(6) | Category 1 Category 2 Category 3 |

10

| | | | |
|---|---|---|---|
| | signing the zero tape, the registrars shall securely lock the tape compartment leaving the zero tape in place on the unit and shall configure the unit for voting. The registrars shall verify that the election counter on each DRE unit is set at zero. If the election counter is not set to zero, the election superintendent shall be immediately notified and such unit shall not be used until the election counter is set to zero and the matter is resolved by agreement of the election superintendent and the registrars. The registrars shall verify that there is no unauthorized matter affixed to the DRE units or present in the cases or voting booths. The registrars shall affix a card of instructions for voting within each voting booth. **Prior to voters entering the voting booth, the registrars may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** Each DRE unit shall be clearly marked with a unique designation that is visible on the exterior of the unit. | | |
| Use of DRE Units for Absentee Balloting | At the close of business each day during the absentee voting period, the registrars shall document the election counter number on the daily recap sheet. Each DRE unit used for in-person absentee voting shall then be turned off and closed. The memory card (PCMCIA card) shall remain in the unit at all times during the absentee balloting period until the polls close on the day of the primary, election, or runoff. Each DRE unit shall then be sealed and the seal number and the time of sealing shall be recorded on the daily recap sheet. Each DRE unit shall then be secured overnight. In addition, all voter access cards shall be securely stored overnight and when not in use. If a DRE unit is used to program voter access cards, the registrars shall make a notation of the election counter number on the daily recap sheet. **If such number is not zero, the registrars shall notify the Secretary of State immediately and shall ascertain the reason for the discrepancy and shall make a notation of such discrepancy and the reason for it on the daily recap sheet. Such DRE unit shall not be used for creation of voter access cards unless and until the unit is fully tested and reconfigured and the election counter reset** | Ga. Comp. R. & Regs. 183-1-14-.02(8) | Category 3 |

| | at zero pursuant to procedures established by the Secretary of State. The DRE unit shall be turned off and secured for the night. | | |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | Each morning during the absentee balloting period, the registrars shall publicly verify the seal numbers on each DRE unit to be used for absentee voting with the number of the seal recorded on the daily recap sheet from the previous day of absentee voting and shall verify that the seal and DRE unit do not show any signs of tampering. If the seal number corresponds to the entry on the daily recap sheet and there is no evidence of tampering, the DRE unit shall be opened and turned on. **If the numbers do not match or there is evidence of tampering, the Secretary of State shall be notified immediately and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** After opening and turning on the unit, the registrars shall verify the election counter number with the number recorded on the daily recap sheet from the previous day of absentee voting. **If the numbers do not match, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** The election counter number shall then be entered onto the daily recap sheet for that day. If a DRE unit is to be used for programming voter access cards, the registrars shall open and turn on the power for such unit. The registrars shall then verify that the election counter is set on zero. **If the election counter is not set at zero, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** A notation shall be made on the daily recap sheet of the election counter number and the unit shall be configured to create voter access cards. | Ga. Comp. R. & Regs. 183-1-14-.02(9) | Category 3 |

| Reporting Requirements for Absentee Ballots | **The registrars of each county shall on the 32nd day prior to each statewide general primary and general election submit to the Secretary of State on a form provided by the Secretary of State information concerning absentee ballots requested by electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended.** Such report shall include the number of absentee ballots requested by each such category of absentee voter, the date on which the absentee ballots were available in the registrars' office, and the date on which the ballots requested by such voters were sent to the voters. **The Secretary of State may request further information related to the application for and the transmittal of such ballots.** | Ga. Comp. R. & Regs. 183-1-14-.04(1) | Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | **The Secretary of State shall design a state write-in absentee ballot for use in runoff primaries and runoff elections** by an elector of this state who resides outside the county or the municipality in which the election is being conducted and is: (1) a member of the armed forces of the United States, a member of the merchant marine of the United States, a member of the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration, or a spouse or dependent of such member residing with or accompanying said member; or (2) A citizen of the United States residing outside the United States. | Ga. Comp. R. & Regs. 183-1-14-.05(a) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | **The Secretary of State shall prepare and print instructions for completing and returning such ballot that shall also be enclosed with such ballot.** The state write-in absentee ballot, the envelopes for returning it, and the instructions shall be enclosed with the regular absentee ballot, envelopes, and instructions for completing and returning the regular absentee ballot. | Ga. Comp. R. & Regs. 183-1-14-.05(d) | Category 1 Category 2 Category 3 |

13

| State Write-In Absentee Ballot | **Additionally, the Secretary of State and the county registrars shall provide for the transmission of such blank ballots by facsimile transmission and electronic mail transmission to electors.** Instructions for voting such ballots shall be included on the website and shall accompany any facsimile and electronic mail ballot transmissions. Voted ballots shall not be returned by facsimile or electronic mail. | Ga. Comp. R. & Regs. 183-1-14-.05(e) | Category 1<br>Category 2<br>Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | As soon as practicable after a general primary or general election, **the Secretary of State shall cause to be published on the official website of the Secretary of State a list of all federal offices and state offices in which there will be a runoff primary or runoff election**, as the case may be, along with the names of the candidates who will be on the ballot in such runoff. | Ga. Comp. R. & Regs. 183-1-14-.05(f) | Category 1<br>Category 2<br>Category 3 |
| State Write-In Absentee Ballot | If an elector obtains the ballot by facsimile or by downloading from electronic mail or the Secretary of State's website, the elector shall return the ballot by mail using two envelopes. The elector shall enclose and seal the ballot in a plain envelope and insert that envelope into another envelope for transmission to the registrars. The elector shall copy and sign the appropriate oath onto the back of the outer envelope. **The Secretary of State shall provide a sample envelope and oath form on the Secretary of State's website in such a manner that such form may be used by an elector to print out the forms for the purpose of pasting or attaching such forms to an envelope for returning the ballot or for printing an envelope for returning the ballot.** | Ga. Comp. R. & Regs. 183-1-14-.05(g) | Category 1<br>Category 2<br>Category 3 |
| Secretary of State designated chief state election official | **The Secretary of State is designated as the chief state election** official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8. | O.C.G.A. § 21-2-210 | Category 1<br>Category 2<br>Category 3 |
| Official list of electors; | **The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state** | O.C.G.A. § 21-2-211(a) | Category 1<br>Category 2 |

| equipment to access list | which shall be the official list of electors for use in all elections in this state conducted under this title. | | Category 3 |
|---|---|---|---|
| Official list of electors; equipment to access list | **The Secretary of State is authorized to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State pursuant to this Code section,** provided that funds are specifically appropriated by the General Assembly for that purpose. | O.C.G.A. § 21-2-211(b)(2) | Category 3 |
| Voter registration | **The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.** | O.C.G.A. § 21-2-216(g)(7) | Category 2 Category 3 |
| Voter registration | Prior to approving the application of a person to register to vote, **the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State.** | O.C.G.A. § 21-2-216(h) | Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.** | O.C.G.A. § 21-2-218(a) | Category 2 Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making | O.C.G.A. § 21-2-218(b) | Category 2 Category 3 |

| | application to register to vote in that county or municipality, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.** | | |
|---|---|---|---|
| Change of residence of elector | In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. **The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's** present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail. | O.C.G.A. § 21-2-218(d) | Category 2 Category 3 |
| Change of residence of elector | In the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, **the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the address previously provided to the board of registrars.** The registrars shall correct the elector's registration record to reflect the correct address. | O.C.G.A. § 21-2-218(g) | Category 2 Category 3 |

| Registration cards; absentee regulations | The registration cards for use by persons in making application to register to vote shall be **in a form as specified by the Secretary of State**, which shall include printed forms, forms made available through electronic means, or otherwise. Except as provided in subsection (b) of this Code section and Code Section 21-2-221.2, only registration cards issued or authorized for use by the Secretary of State or the national voter registration card promulgated under the provisions of the National Voter Registration Act of 1993, 42 U.S.C. Section 1973gg-7, shall be accepted for purposes of voter registration. | O.C.G.A. § 21-2-219(a) | Category 2 Category 3 |
|---|---|---|---|
| Registration cards; absentee regulations | **The office of the Secretary of State is designated as the office, under the federal Help America Vote Act, to be responsible for providing information on registration and absentee ballot procedures for use by absent uniformed services and overseas voters, including the use of the federal write-in absentee ballot.** | O.C.G.A. § 21-2-219(f) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The Secretary of State shall** within 90 days after a general election in which federal candidates were on the ballot **report to the federal Election Assistance Commission**, on such form as may be prescribed by such commission, **the combined number of absentee ballots transmitted to absent uniformed services and overseas voters in such election and the combined number of such ballots that were returned by such voters and cast in such election.** | O.C.G.A. § 21-2-219(h) | Category 3 |
| Application for driver's license; service as application for voter registration | The commissioner of driver services and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.** | O.C.G.A. § 21-2-221(b) | Category 3 |
| Application for driver's license; service as | The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of** | O.C.G.A. § 21-2-221(e) | Category 3 |

| | | | |
|---|---|---|---|
| application for voter registration | **registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | | |
| Application for driver's license; service as application for voter registration | The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-221(f) | Category 3 |
| Application for driver's license; service as application for voter registration | **The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221(h) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Board of Natural Resources and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section,** including without limitation procedures applicable to processing of applications received by persons approved as license agents for the Department of Natural Resources pursuant to Code Section 27-2-2. | O.C.G.A. § 21-2-221.1(b) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-221.1(f) | Category 3 |

| | | | |
|---|---|---|---|
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-221.1(g) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | **The Secretary of State and the Board of Natural Resources shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221.1(i) | Category 3 |
| Electronic voter registration | A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. **The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.** | O.C.G.A. § 21-2-221.2(a) | Category 2 Category 3 |
| Electronic voter registration | Upon the submission of an application through the website pursuant to this Code section, **the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:**<br><br>(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the | O.C.G.A. § 21-2-221.2(c) | Category 3 |

19

| | number for the applicant's driver's license or identification card that is on file with the Department of Driver Services; <br><br> (2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and <br> (3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services. <br><br> If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected. | | |
| --- | --- | --- | --- |
| Electronic voter registration | If all of the items enumerated in subsection (c) of this Code section are verified, **the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services.** The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. | O.C.G.A. § 21-2-221.2(d) | Category 3 |
| Electronic voter registration | **The Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically pursuant to this Code section.** | O.C.G.A. § 21-2-221.2(f) | Category 3 |
| Offices designated as voter registration agencies | In addition to the offices listed in subsection (b) of this Code section, **the Secretary of State shall designate other offices within the state as designated voter registration offices.** | O.C.G.A. § 21-2-222(c) | Category 2 <br> Category 3 |

| Offices designated as voter registration agencies | **Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week,** except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-222(i) | Category 3 |
| Offices designated as voter registration agencies | Each office shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-222(j) | Category 3 |
| Offices designated as voter registration agencies | **The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-222(l) | Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the** | O.C.G.A. § 21-2-223(a) | Category 1<br>Category 2<br>Category 3 |

|  | | | |
|---|---|---|---|
|  | appropriate county board of registrars to determine the **eligibility of the applicant** and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
| Mail voter registration application forms | The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public **shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.** | O.C.G.A. § 21-2-223(b) | Category 1<br>Category 2<br>Category 3 |
| What data [sic] available for public inspection | **It shall be the duty of the Secretary of State to furnish copies of such data as may be collected and maintained on electors whose names appear on the list of electors maintained by the Secretary of State pursuant to this article, within the limitations provided in this article, on electronic media or computer run list or both.**<br>Notwithstanding any other provision of law to the contrary, the Secretary of State shall establish the cost to be charged for such data. The Secretary of State may contract with private vendors to make such data available in accordance with this subsection. Such data may not be used by any person for commercial purposes. | O.C.G.A. § 21-2-225(c) | Category 1<br>Category 2<br>Category 3 |
| Confidentiality of voter addresses | **The Secretary of State shall provide by procedure, rule, or regulation for the mechanism by which such information shall be made confidential on the voter registration data base and may provide for forms for use in making such requests and for the use of alternate addresses** for electors who file requests for the confidentiality of their residence addresses. | O.C.G.A. § 21-2-225.1(d) | Category 1<br>Category 2<br>Category 3 |

| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; issuance of cards to electors | Each elector found eligible to be registered to vote by the board of registrars shall be issued a card which shall contain the elector's name and address, a block or space for the elector's signature, the date of the elector's registration, the name and location of the elector's polling place or polling places if the county and municipal polling places are not the same, and the designation of the elector's congressional district; state Senate district; state House district; county commission district, if any; county or independent board of education district, if any; and municipal governing authority district, if any, and such other voting districts, if any. On the reverse side of the card, there shall be printed instructions which shall indicate the procedure to be followed in the event of the change of address of the elector. In the event an elector changes residences within the county in which an elector is registered to vote, the elector may change such elector's address by returning the card to the board of registrars of such county indicating the new address. Upon receipt of such card, the board of registrars shall make the necessary changes in the elector's registration records and issue a new card to the elector. In the event that an elector's precinct, polling place, or voting district or districts change, a new card shall be issued to the elector reflecting such changes. When the boundaries of a precinct are changed, all affected electors shall be sent a new card prior to the next primary or election. **The form of such cards shall be determined by the Secretary of State.** The issuance of such cards shall be sufficient as a notification of the disposition of an application for voter registration under this Code section, provided that such cards are sent by nonforwardable, first-class mail. | O.C.G.A. § 21-2-226(e) | Category 2 Category 3 |
| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; | In the event that the registrars are required to issue voters new cards under subsection (e) of this Code section due to changes in districts or precincts as a result of reapportionment or court order, the registrars may apply to the Secretary of State prior to June 30 of each year for reimbursement of the costs of postage with respect to mailing such cards during the 12 month period ending on June 30 of that year. **The Secretary of State shall receive all such applications and** | O.C.G.A. § 21-2-226(f) | Category 3 |

| | | | |
|---|---|---|---|
| issuance of cards to electors | shall, no later than June 30 of each year, reimburse the counties for such costs from funds specifically appropriated for that purpose. In the event that the total amount of the requests for reimbursement exceeds the funds appropriated for reimbursement, the Secretary of State shall reimburse the counties on a pro rata basis. In the event that no funds are specifically appropriated for reimbursement, no such reimbursement shall be made. | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State and The Council of Superior Court Clerks of Georgia a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, the Secretary of State and The Council of Superior Court Clerks of Georgia shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available. | O.C.G.A. § 21-2-231(a) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county. | O.C.G.A. § 21-2-231(a.1) | Category 3 |

| Georgia; removal of persons from list of electors | | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. | O.C.G.A. § 21-2-231(b) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | (1) Upon receipt of the lists described in subsections (a.1) and (b) of this Code, **the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.** (2) Upon receipt of the list described in subsection (a) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 52 U.S.C. Section 20507(g), **the Secretary of State shall transmit the names of such persons whose names appear on the lists of electors to the appropriate county board of registrars who shall mail a notice to the last known address of each such person by first-class mail, stating that the board of registrars has received information that such person has been convicted of a felony and will be removed from the list of electors 30 days after the** | O.C.G.A. § 21-2-231(c) | Category 3 |

| | date of the notice unless such person requests a hearing before the board of registrars on such removal. | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county.** The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. | O.C.G.A. § 21-2-231(d) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsection (d) of this Code section, **the Secretary of State or his or her designated agent shall remove all such names of deceased persons from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.** | O.C.G.A. § 21-2-231(e) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | **The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235.** Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for | O.C.G.A. § 21-2-231(g) | Category 3 |

| | | | |
|---|---|---|---|
| Georgia; removal of persons from list of electors | maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes. | | |
| Removal of elector's name from list of electors upon request of elector or upon removal of elector from county | (1) When an elector of this state moves to another state and registers to vote and the registration officials in such state send a notice of cancellation reflecting the registration of the elector in the other state, which includes a copy of such elector's voter registration application bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall remove such elector's name from the list of electors.** It shall not be necessary to send a confirmation notice to the elector in such circumstances.<br><br>(2) When an elector of this state moves to another state and the registration officials in such other state or a nongovernmental entity as described in subsection (d) of Code Section 21-2-225 sends a notice of cancellation or other information indicating that the elector has moved to such state but such notice or information does not include a copy of such elector's voter registration application in such other state bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall send a confirmation notice to the elector as provided in Code Section 21-2-234.** | O.C.G.A. § 21-2-232(b) | Category 3 |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where | **The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service** through its licensees periodically for the purpose of identifying those electors whose addresses have changed. | O.C.G.A. § 21-2-233(a) | Category 3 |

| elector has moved | | | |
|---|---|---|---|
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235. | O.C.G.A. § 21-2-233(c) | Category 2<br>Category 3 |
| Identification of electors with whom there has been no contact for three years; confirmation notice | In the first six months of each odd-numbered year, **the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding five calendar years and who were not identified as changing addresses under Code Section 21-2-233.** The confirmation notice described in this Code section shall be sent to each such elector during each odd- | O.C.G.A. § 21-2-234(a)(2) | Category 3 |

| | numbered year. Such notices shall be sent by forwardable, first-class mail. | | |
|---|---|---|---|
| Identification of electors with whom there has been no contact for three years; confirmation notice | If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** | O.C.G.A. § 21-2-234(d) | Category 2<br>Category 3 |
| Inactive list of electors | **In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors.** Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records. | O.C.G.A. § 21-2-235(a) | Category 3 |

| SOS on the SEB | **There is created a state board to be known as the State Election Board, to be composed of the Secretary of State**, an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board. | O.C.G.A. § 21-2-30(a) | Category 3 |
| --- | --- | --- | --- |
| SOS Chairperson of the SEB | **The Secretary of State shall be the chairperson of the board.** Three members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure. | O.C.G.A. § 21-2-30(d) | Category 3 |
| Superintendents to Election returns to be provided to Secretary of State in electronic format | **The Secretary of State is authorized to prescribe by rule or regulation the type of electronic format for the provision of such election returns.** | O.C.G.A. § 21-2-77(c) | Category 3 |
| Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll workers not to serve | The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent | O.C.G.A. § 21-2-99(a) | Category 3 |

| | shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. **Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction.** For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction. | | |
|---|---|---|---|
| Training of local election officials | The election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board **shall attend a minimum of 12 hours' training annually as may be selected by the Secretary of State.** The election superintendent and at least one registrar of each municipality shall attend a minimum of **12 hours' training biennially as may be selected by the Secretary of State.** | O.C.G.A. § 21-2-100(a) | Category 3 |
| Training of local election officials | **A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State,** upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-100(c) | Category 3 |
| Certification of local election officials | All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by **completing a certification program** | O.C.G.A. § 21-2-101(a) | Category 3 |

31

| | | | |
|---|---|---|---|
| | **approved by the Secretary of State** by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections. The local government employing the superintendent or designee shall cover the costs, if any, incurred by such superintendent's or designee's participation in the certification program. **Such certification programs shall be offered by the Secretary of State** on multiple occasions before December 31 of the year in which such superintendents or designees are appointed and shall not exceed 64 hours of classroom, online, **and practical instruction as authorized and approved by the Secretary of State.** | | |
| Certification of local election officials | **A full, partial, or conditional waiver of the certification requirement may be granted by the Secretary of State, in the discretion of the Secretary of State,** upon the presentation of evidence by the election superintendent or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-101(c)(1) | Category 3 |
| Certification of local election officials | In the event that a municipality authorizes a county to conduct its elections pursuant to Code Section 21-2-45, **the municipality may be granted by the Secretary of State, in the discretion of the Secretary of State, a waiver of the certification requirement,** provided that the superintendent in charge of running the municipal election shall have previously completed a certification program approved by the Secretary of State and has demonstrated a proficiency in the operation of the voting equipment used in said municipality. | O.C.G.A. § 21-2-101(c)(2) | Category 3 |

| | | | |
|---|---|---|---|
| Form of ballots; printing ballots; stubs; numbers | **(2) Ballots for direct recording electronic voting systems shall be designed as prescribed by the Secretary of State to ensure easy reading by electors.**<br>**(3) Ballots printed by an electronic ballot marker shall be designed as prescribed by the Secretary of State to ensure ease of reading by electors.** | O.C.G.A. § 21-2-286(b) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | **(1) The equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.**<br><br>**(2) As soon as possible, once such equipment is certified by the Secretary of State as safe and practicable for use, all federal, state, and county general primaries and general** elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector.<br><br>**(3) The state shall furnish a uniform system of electronic ballot markers and ballot scanners for use in each county as soon as possible...**<br><br>(4) Notwithstanding any provision of law to the contrary, **the Secretary of State is authorized to conduct pilot programs to test and evaluate the use of electronic ballot markers and ballot scanners in primaries and elections in this state.** | O.C.G.A. § 21-2-300(a) | Category 3 |
| Uniform election equipment | **The Secretary of State shall be responsible for the development, implementation, and provision of a continuing** | O.C.G.A. § 21-2-300(d) | Category 1<br>Category 2 |

| | | | |
|---|---|---|---|
| throughout state; education of voters, election officials, and poll officers in operation of election equipment | **program to educate voters, election officials, and poll workers in the proper use of such voting equipment.** Each county shall bear the costs, including transportation, subsistence, and lodging, incurred by its election and registration officials in **attending courses taught by or arranged by the Secretary of State for instruction in the use of the voting equipment.** | | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Counties shall be authorized to contract with municipal governments for the use of such voting equipment in municipal elections **under terms and conditions specified by the Secretary of State to assure that the equipment is properly used and kept secure.** | O.C.G.A. § 21-2-300(e)(1) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Each county shall, prior to being provided with voting equipment by the state, provide or contract for adequate technical support for the installation, set up, and operation of such voting equipment for each primary, election, and special primary and special election **as the Secretary of State shall determine by rule or regulation.** | O.C.G.A. § 21-2-300(c) | Category 3 |
| Examination and approval of voting machines by Secretary of State | Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine **may request the Secretary of State to examine the machine.** Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. | O.C.G.A. § 21-2-324(a) | Category 1 Category 2 Category 3 |

| | Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $250.00. **The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine.** | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The Secretary of State shall thereupon require such machine to be examined or reexamined** by three examiners whom he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall require of them a written report on such machine, attested by their signatures; **and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-324(b) | Category 3 |
| Examination and approval of voting machines by Secretary of State | No kind of voting machine not so approved shall be used at any primary or election and if, upon the reexamination of any voting machine previously approved, it shall appear that the machine so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate **votes, the approval of the same shall immediately be revoked by the Secretary of State;** and no such voting machine shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-324(c) | Category 3 |

| Examination and approval of voting machines by Secretary of State | At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, **the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State.** | O.C.G.A. § 21-2-324(d) | Category 3 |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The compensation of each examiner appointed under this Code section shall be fixed and paid by the Secretary of State.** | O.C.G.A. § 21-2-324(h) | Category 3 |
| Form of ballots on voting machines | If the construction of the machine shall require it, the ballot label for each candidate, group of candidates, political party or body, or question to be voted on shall bear the designating letter or number of the counter on the voting machine which will register or record votes therefor. Each question to be voted on shall appear on the ballot labels in brief form. Unless otherwise provided by law, proposed constitutional amendments so submitted shall be in brief form as directed by the General Assembly and, **in the failure to so direct, the form shall be determined by the Secretary of State.** Unless otherwise provided by law, any other state-wide questions or questions to be presented to the electors of more than one county so submitted shall be printed in brief form as directed by the General Assembly and, **in the event of a failure to so direct, the form shall be determined by the Secretary of State** and shall include a short title or heading in bold face at the beginning of each such question on the ballot and any local questions so submitted shall be printed in brief form as directed by the General Assembly and, in the event of a failure to so direct, the form shall be determined by the superintendent. In the case of questions to be voted on by the electors of a municipality, the governing authority shall determine the brief form of the questions. | O.C.G.A. § 21-2-325(b) | Category 3 |

| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | The superintendent shall appoint one custodian of voting machines and such deputy custodians as may be necessary, whose duty it shall be to prepare the machines to be used at the primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the municipality such compensation as shall be fixed by the governing authority of the municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the voting machines as required by this chapter, and he or she and the deputy custodians, whose duty it shall be to assist him or her in the discharge of his or her duties, shall serve at the pleasure of the superintendent. **Each custodian shall take an oath of office framed by the Secretary of State, which shall be filed with the superintendent.** | O.C.G.A. § 21-2-327(b) | Category 3 |
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | **In every primary or election, the superintendent shall furnish, at the expense of the municipality, all ballot labels, forms of certificates, and other papers and supplies which are required under this chapter and which are not furnished by the Secretary of State, all of which shall be in the form and according to the specifications prescribed from time to time by the Secretary of State.** In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such primary. | O.C.G.A. § 21-2-327(f) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system.** Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning voting system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable | O.C.G.A. § 21-2-368(a) | Category 3 |

37

| | | | |
|---|---|---|---|
| | expenses of such examination. **The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system.** | | |
| Examination and approval of optical scanning voting systems by Secretary of State | **The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors** at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-368(b) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | No kind of optical scanning voting system not so approved shall be used at any primary or election and if, upon the reexamination of any optical scanning voting system previously approved, it shall appear that the optical scanning voting system so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, **the approval of the same shall immediately be revoked by the Secretary of State;** and no such optical scanning voting system shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-368(c) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any vendor who completes a sale of optical scanning voting system that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia,** plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have authority to impose such penalty upon a finding that such a sale has occurred. | O.C.G.A. § 21-2-368(e) | Category 3 |

| Form and arrangement of ballots for optical scanning voting systems | The form and arrangement of ballots shall be prescribed by the Secretary of State and prepared by the superintendent | O.C.G.A. § 21-2-369(c) | Category 3 |
|---|---|---|---|
| Write-in ballots | In elections, electors shall be permitted to cast write-in votes. The design of the ballot shall permit the superintendents, in counting the write-in votes, to determine readily whether an elector has cast any write-in vote not authorized by law. **The Secretary of State, in specifying the form of the ballot, and the State Election Board, in promulgating rules and regulations respecting the conduct of elections, shall provide for ballot secrecy** in connection with write-in votes. | O.C.G.A. § 21-2-373 | Category 2 Category 3 |
| Form and arrangement of ballots for DRE voting systems; write-in votes | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the election superintendent | O.C.G.A. § 21-2-379.4 | Category 3 |
| Appearance, form, and arrangement of ballots | **The form and arrangement of ballots marked and printed by an electronic ballot marker shall be prescribed by the Secretary of State.** | O.C.G.A. § 21-2-379.23(b) | Category 1 Category 2 Category 3 |
| Examination requests; sale of unapproved devices | (a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any electronic ballot marker may request that the Secretary of State examine the device. **Any ten or more electors of this state may, at any time, request that the Secretary of State reexamine any such device previously examined and approved by him or her.** Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination or reexamination. **The Secretary of State shall publish and maintain on his or her website the cost of such examination** | O.C.G.A. § 21-2-379.24(a)-(d) | Category 1 Category 2 Category 3 |

| | or reexamination. The Secretary of State may, at any time, in his or her discretion, reexamine any such device.<br><br>**(b) The Secretary of State shall thereupon examine or reexamine such device and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of device so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If this report states that the device can be so used, the device shall be deemed approved, and devices of its kind may be adopted for use at primaries and elections as provided in this chapter.<br><br>(c) Any device that is not so approved shall not be used at any primary or election and if, upon reexamination, a previously approved device appears to be no longer safe or accurate for use by electors at primaries or elections as provided in this chapter because of an inability to accurately record votes, the approval of the same **shall immediately be revoked by the Secretary of State**, and no such device shall thereafter be used or purchased for use in this state.<br><br>(d) Any vendor who completes a sale of an electronic ballot marker that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia, plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have the authority to impose such penalty upon a finding that such a sale has occurred. | | |
| Programming proper design and style of ballots; custodian of electronic ballot | The superintendent may appoint, with the approval of the county or municipal governing authority, as appropriate, a custodian of the electronic ballot markers, and deputy custodians as may be necessary, whose duty shall be to prepare the devices to be used in the county or municipality at the primaries and elections to be held therein. Each custodian and | O.C.G.A. § 21-2-379.25(b) | Category 3 |

| markers; testing of electronic ballot markers | deputy custodian shall receive from the county or municipality such compensation as shall be fixed by the governing authority of such county or municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the devices as required by this chapter. **The custodian and deputy custodians shall serve at the pleasure of the superintendent and each shall take an oath of office prepared by the Secretary of State before each primary or election, which shall be filed with the superintendent.** | | |
|---|---|---|---|
| Storage and security of electronic ballot markers | **All electronic ballot markers and related equipment, when not in use, shall be properly stored and secured under conditions as shall be specified by the Secretary of State.** | O.C.G.A. § 21-2-379.26(a) | Category 3 |
| Application for ballot | If found ineligible, the clerk or the board of registrars shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility, a copy of which notification should be retained on file in the office of the board of registrars or absentee ballot clerk for at least one year. However, an absentee ballot application shall not be rejected due to an apparent mismatch between the signature of the elector on the application and the signature of the elector on file with the board of registrars. **In such cases, the board of registrars or absentee ballot clerk shall send the elector a provisional absentee ballot with the designation "Provisional Ballot" on the outer oath envelope and information prepared by the Secretary of State as to the process to be followed to cure the signature discrepancy.** If such ballot is returned to the board of registrars or absentee ballot clerk prior to the closing of the polls on the day of the primary or election, the elector may cure the signature discrepancy by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21-2-417 before the close of the period for verifying provisional | O.C.G.A. § 21-2-381(b)(3) | Category 2 Category 3 |

| | ballots contained in subsection (c) of Code Section 21-2-419. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient, the absentee ballot shall be counted as other absentee ballots. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be insufficient, then the procedure contained in Code Section 21-2-386 shall be followed for rejected absentee ballots. | | |
|---|---|---|---|
| State write-in absentee ballots | **The Secretary of State shall design a state write-in absentee ballot for federal offices and state offices** that are voted upon on a state-wide basis for use in a primary runoff or election runoff by an eligible absentee elector who lives outside the county or municipality in which the election is held and who is: | O.C.G.A. § 21-2-381.2(a) | Category 2 Category 3 |
| State write-in absentee ballots | **The Secretary of State shall establish a website which such eligible absentee electors may access to determine if there is a primary runoff or election runoff for a federal office or a state office that is voted upon on a state-wide basis.** The address of such website shall be included in the instructions for voting such state write-in absentee ballot. | O.C.G.A. § 21-2-381.2(d) | Category 2 Category 3 |
| Official absentee ballots | **The form for either ballot shall be determined and prescribed by the Secretary of State,** except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent. | O.C.G.A. § 21-2-383(a) | Category 3 |
| Preparation and delivery of absentee ballots; mailing ballots to absentee voters; oaths; assistance; master list; transmission to | Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope addressed to the elector, the superintendent, board of registrars, or absentee **ballot clerk shall provide two envelopes for each official absentee ballot,** of such **size and shape as shall be determined by the Secretary of State,** in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words "Official Absentee Ballot" and nothing else. | O.C.G.A. § 21-2-384(b) | Category 3 |

| uniformed and overseas citizens | On the back of the larger of the two envelopes to be enclosed within the mailing envelope shall be printed the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21-2-409, and the penalties provided for in Code Sections 21-2-568, 21-2-573, 21-2-579, and 21-2-599 for violations of oaths; and on the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. The larger of the two envelopes shall also display the elector's name and voter registration number. **The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, provisional absentee ballot information, if necessary, and a notice in the form provided by the Secretary of State** of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. | | |
| Voting by absentee electors; penalties | The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. **In addition, the registrars or absentee ballot clerk shall notify the Secretary of State in the manner prescribed by the Secretary of State of the times, dates, and locations at which advance voting will be conducted.** | O.C.G.A. § 21-2-385(d)(2) | Category 3 |

| Pilot program | **The Secretary of State shall develop and implement a pilot program** for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, for use in a primary or a general election. | O.C.G.A. § 21-2-387(a) | Category 3 |
|---|---|---|---|
| Cards of instructions and supplies; sample ballots and ballot labels | Prior to each primary and election, **the superintendent shall obtain from the Secretary of State a sufficient number of cards of instruction for guidance of electors.** Such cards of instruction **shall include such portions of this chapter as deemed necessary by the Secretary of State** and shall be printed for the type of voting equipment or ballots used in the county or municipality. **The superintendent shall also obtain from the Secretary of State a sufficient number of blank forms of oaths of poll officers, voter's certificates, voting rights posters, notices of penalties, oaths of assisted electors, numbered list of voters, tally sheets, return sheets, and such other forms and supplies required by this chapter, in each precinct of the county or municipality.** | O.C.G.A. § 21-2-400(a) | Category 3 |
| Delivery of ballots and supplies to managers | The superintendent shall provide at the polling place copies of the sample or facsimile ballots for such primary or election as well as a list of the certified write-in candidates for such election **in the form as provided by the Secretary of State or appropriate municipal official pursuant to** Code Section 21-2-133. | O.C.G.A. § 21-2-401(d) | Category 3 |
| Voter's certificates | At each primary and election, **the Secretary of State shall prepare and furnish to each superintendent a suitable number of voter's certificates** which shall be in substantially the following form: | O.C.G.A. § 21-2-402(a) | Category 3 |
| Voter identification cards | **The Secretary of State shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.** | O.C.G.A. § 21-2-417.1(g) | Category 3 |

| Casting of provisional ballots | Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State.** The person shall also present the identification required by Code Section 21-2-417. | O.C.G.A. § 21-2-418(b) | Category 2 Category 3 |
| Method of voting and counting provisional ballots | The board of registrars shall complete a report **in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted** in the primary or election. | O.C.G.A. § 21-2-419(e) | Category 3 |
| Absentee ballots | Ballots in a precinct using optical scanning voting equipment for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked "Official Absentee Ballot" and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or ballot scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed on the face thereof the following: "I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." **The form for either ballot** | O.C.G.A. § 21-2-482 | Category 3 |

45

| | shall be determined and prescribed by the Secretary of State. | | |
|---|---|---|---|
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | Each county and municipal superintendent shall prepare four copies of the consolidated return of the primary to be **certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-496(a) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **The Secretary of State is authorized to provide a method by which the election superintendent can file the results of primaries and elections electronically.** Once the Secretary of State provides such a method of filing, **the election superintendent shall file a copy of the election returns electronically in the manner prescribed by the Secretary of State** in addition to the filing provided in subsection (a) of this Code section. **The Secretary of State is authorized to promulgate such rules and regulations as necessary to provide for such an electronic filing.** | O.C.G.A. § 21-2-496(b) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such primary.** | O.C.G.A. § 21-2-496(c) | Category 3 |
| Consolidated certified returns of elections; returns forwarded to | Each county and municipal superintendent shall prepare four copies of the consolidated return of the election **to be certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-497(a) | Category 3 |

| Secretary of State | | | |
|---|---|---|---|
| Consolidated certified returns of elections; returns forwarded to Secretary of State | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election.** | O.C.G.A. § 21-2-497(b) | Category 3 |
| Precertification tabulation audits; rules and regulations; risk-limiting audit pilot program | **The Secretary of State shall conduct a risk-limiting audit pilot program with a risk limit of not greater than 10 percent in one or more counties by December 31, 2021. The Secretary of State shall review the results of the pilot program and, within 90 days following the election in which such pilot program is used, shall provide the members of the General Assembly with a comprehensive report, including a plan on how to implement risk-limiting audits state wide.** If such risk-limiting audit is successful in achieving the specified confidence level within five business days following the election for which it was conducted, then all audits performed pursuant to this Code section shall be similarly conducted, beginning not later than November 1, 2024. | O.C.G.A. § 21-2-498(e) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | Upon receiving the certified returns of any election from the various superintendents, **the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast for all candidates** described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall thereupon certify and file in his or her office the tabulation thereof. In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county** | O.C.G.A. § 21-2-499(a) | Category 3 |

47

| | | | |
|---|---|---|---|
| | **submitting the incorrect returns and direct the county to correct and recertify such returns.** Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results and shall file the same in his or her office. | | |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | **The Secretary of State shall also, upon receiving the certified returns for presidential electors, proceed to tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them before the Governor.** Not later than 5:00 P.M. on the seventeenth day following the date on which such election was conducted, the Secretary of State shall certify the votes cast for all candidates described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall no later than that same time lay the returns for presidential electors before the Governor. The Governor shall enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes. The Governor shall certify the slates of presidential electors no later than 5:00 P.M. on the eighteenth day following the date on which such election was conducted. Notwithstanding the deadlines specified in this Code section, such times may be altered for just cause by an order of a judge of superior court of this state. | O.C.G.A. § 21-2-499(b) | Category 3 |
| Certificates of election; commissions; proclamations | *Governor and other constitutional officers.* Upon completing the tabulation of any election for Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of Agriculture, or Commissioner of Labor, **the Secretary of State shall lay the same before the Governor upon his or her oath of office as Governor**; and the Governor, upon the other constitutional officers taking their oaths of office, shall issue a commission under the great seal of the State of Georgia signed by the Governor and countersigned by the | O.C.G.A. § 21-2-502(a) | Category 3 |

| | Secretary of State, to each such person. **The Secretary of State shall issue the commission to the person elected Governor.** | | |
|---|---|---|---|
| Certificates of election; commissions; proclamations | *United States senators; representatives in Congress; members of the General Assembly.*<br>(1) Upon completing the tabulation of any election for United States senator or representative in Congress, **the Secretary of State shall lay the same before the Governor,** who shall immediately issue certificates of election and commissions under the seal of the state, duly signed by the Governor and attested by the Secretary of State and deliver the same to the candidates receiving the required number of votes to be elected to the respective offices.<br>(2) **The Secretary of State shall issue certificates of election to the persons elected members of the Senate and the House of Representatives** of the General Assembly and, between the hours of 12:00 Noon and 1:00 P.M. on the second Monday in January of each odd-numbered year, present before the Senate and the House of Representatives the several returns of the elections of members of the respective houses. **In case of a special election the Secretary of State shall issue a certificate of election to each person so elected,** and the Secretary of State shall present the returns of such election to the proper house as soon as received and tabulated by the Secretary of State. Immediately upon their taking the oath of office, each member of the Senate and the House of Representatives shall be issued **a commission under the great seal of the State of Georgia, signed by the Secretary of State.** | O.C.G.A. § 21-2-502(b) | Category 3 |
| Certificates of election; commissions; proclamations | *Justices of the Supreme Court, Judges of the Court of Appeals, Commissioners of the Georgia Public Service Commission, judges of the superior court, judges of the juvenile court, and district attorneys.* Upon completion of the tabulation **the Secretary of State shall certify the result of each election of Justices of the Supreme Court, of Judges of the Court of Appeals, of Commissioners of the Georgia Public Service Commission, of judges of the superior court, of judges of the** | O.C.G.A. § 21-2-502(c) | Category 3 |

| | juvenile court where elected, and of district attorneys to the **Governor and shall issue a certificate of election to each person so elected.** The Governor shall, upon each such person taking the oath of office, immediately issue a commission under the great seal of the State of Georgia, signed by the Governor and **countersigned by the Secretary of State,** to each such person. | | |
|---|---|---|---|
| Certificates of election; commissions; proclamations | *Presidential electors.* **The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor,** who shall enumerate and ascertain the number | O.C.G.A. § 21-2-502(e) | Category 3 |

50

# DEFENDANTS' EX. 4

# Stacey Abrams Could Become Nation's First Black Female Governor

**D** diverseeducation.com/article/116950/

DEFENDANT'S EXHIBIT 4
NGAD 800-831-6989
LV 12-11-19
Brown Dez

May 23, 2018

Stacey Abrams, the 44-year-old Spelman graduate, shocked the political establishment when she beat out her opponent, former state Rep. Stacey Evans, to win the Georgia Democratic gubernatorial primary.

Abrams, will now face off against a Republican in the general election in November. If she is successful, she will become the nation's first Black female governor.

"We are writing the next chapter of Georgia history, where no one is unseen, no one is unheard and no one is uninspired," said Abrams, a 1995 graduate of the historically Black women's college in Atlanta.

Prior to her run for office, Abrams served as the minority leader of the Georgia Statehouse and garnered the support of Hillary Clinton and presidential hopefuls Cory Booker, Bernie Sanders, and Kamala Harris.

Still, Abrams has an uphill battle. A Democrat has not held the governor's mansion since 2003.

It is unclear who Abrams will run against. Lt. Gov Casey Cagle won the Republican primary on Tuesday, but will face Georgia's secretary of state Brian Kemp in a run-off on July 24.





Stacey Abrams

1/3

Dr. Khalilah L. Brown-Dean, an associate

"The strength of Abrams' victory in the primary rests on her ability to take her message directly to voters and communities who have traditionally been exercised out of the political process," said Brown-Dean "In plain language and with a stellar resume she has connected with voters for whom student loan debt feels like a behemoth they can't shake. Working class people see in her, a candidate who shares their values that aren't bound by urban versus rural versus suburban distinctions."

Brown-Dean said that the path to victory in the general election will be tenuous and no one should assume that her win on Tuesday signals the end of vicious battles over race, class, and gender that have long characterized Georgia politics.

"Quite the contrary," said Brown-Dean. "Instead Abrams rests not as an anomaly but as an exemplar of public officials who can connect grassroots mobilization with a strategic vision and an ambitious political agenda."

Dr. Ravi Perry, associate professor and chair of the Department of Political Science at Virginia Commonwealth University said that Abrams' win is significant, adding that while her victory was not a surprise to pollsters and close campaign observers, her margin of victory with 53% suggests that she and her message has broad appeal.

"Her strategy has significant implications for a state, region, and country where race has been central to its politics from the beginning," said Perry. "Her campaign has sought to mobilize Black voters rather than reaching out to moderate swing voters. This strategy worked for Obama. It worked in Alabama for U.S. Senator Doug Jones. It worked in Virginia state elections last November (where the chamber in the capital of the confederacy was one vote shy of a Democratic majority – the largest turnover in seats in the state legislature in several generations), and it worked in a number of southern cities in the south enjoying Black progressive leadership, including Atlanta. Birmingham, Jackson, Charlotte, New Orleans, and Richmond to name a few."

Perry said that Abrams has not run from either wing of the Democratic Party – suggesting that a unified Party can win big in regions where the population is diverse in every way – from liberal city dwellers to rural farmers.

"She has made a point to acknowledge the Clintons, the Obamas, and Senator [Bernie] Sanders," said Perry. "With this approach, she both minimizes the differences, and brings everyone in the Party that has struggled for a Trump era identity, together."

Perry said that Abrams has been successful in galvanizing the young vote as well.

"Her ability to understand, relate to, and energize young voters is central to her chances of winning," he said. "And, her candidacy highlights how much progress the Democratic Party can make by investing in younger candidates for public office."

# DEFENDANTS' EX. 5

DEFENDANT'S
EXHIBIT
5
FENGAD 800-631-6989
LV 121149
Brown-Dean



# IDENTITY POLITICS
## IN THE UNITED STATES

### KHALILAH L. BROWN-DEAN

Copyright © Khalilah Brown-Dean 2019

The right of Khalilah Brown-Dean to be identified as Author of this Work
has been asserted in accordance with the UK Copyright, Designs and
Patents Act 1988.

First published in 2019 by Polity Press

Polity Press
65 Bridge Street
Cambridge CB2 1UR, UK

Polity Press
101 Station Landing
Suite 300
Medford, MA 02155, USA

All rights reserved. Except for the quotation of short passages for the
purpose of criticism and review, no part of this publication may be
reproduced, stored in a retrieval system or transmitted, in any form
or by any means, electronic, mechanical, photocopying, recording or
otherwise, without the prior permission of the publisher.

ISBN-13: 978-0-7456-5411-9
ISBN-13: 978-0-7456-5412-6 (pb)

A catalogue record for this book is available from the British Library.

Library of Congress Cataloging-in-Publication Data
Names: Brown-Dean, Khalilah L., author.
Title: Identity politics in the United States / Khalilah Brown-Dean.
Description: Cambridge, UK ; Medford, MA : Polity Press, 2019. | Includes
  bibliographical references and index.
Identifiers: LCCN 2019008489 (print) | LCCN 2019019979 (ebook) | ISBN
  9781509538829 (Epub) | ISBN 9780745654119 (hardback) | ISBN 9780745654126
  (pbk.)
Subjects: LCSH: Identity politics–United States. | Political
  participation–Social aspects–United States. | Race–Political
  aspects–United States. | Ethnicity–Political aspects–United States. |
  Gender identity–Political aspects–United States. | Identification
  (Religion)–Political aspects–United States.
Classification: LCC JK1764 (ebook) | LCC JK1764 .B77 2019 (print) | DDC
  320.97308–dc23
LC record available at https://lccn.loc.gov/2019008489

Typeset in 10/13pt Swift Light by
Servis Filmsetting Ltd, Stockport, Cheshire
Printed and bound in Great Britain by TJ International Limited

The publisher has used its best endeavours to ensure that the URLs for
external websites referred to in this book are correct and active at the
time of going to press. However, the publisher has no responsibility for
the websites and can make no guarantee that a site will remain live or
that the content is or will remain appropriate.

Every effort has been made to trace all copyright holders, but if any have
been overlooked the publisher will be pleased to include any necessary
credits in any subsequent reprint or edition.

For further information on Polity, visit our website: politybooks.com

the Senate today has more than doubled: from about five in the 1970s, by the time of the 116th Congress there were fifteen Asian and Pacific Islander members of Congress – three Senators and twelve members of the House (all Democrats) – plus one nonvoting Republican delegate from American Samoa. Some members, such as Senator Kamala Harris (D-CA), joined both the Asian and Pacific Islander caucus and the Congressional Black Caucus.

In 2018, voters dramatically increased the diversity of the congressional delegation while still falling short of proportional representation. Although Hispanics comprise roughly 19 percent of the total US population, they form less than 10 percent of the US House. Two candidates, Deb Haaland of New Mexico and Sharice Davids of Kansas, became the first American Indian women ever elected to Congress. Their entry would come over 190 years after Hiram Revels of the Lumbee tribe was elected as the first African American and first American Indian to enter the legislature. The number of American Indian members of Congress doubled in the 116th Congress. Currently, there are four American Indian members: two Republicans, both representing the state of Oklahoma in the House (Markwayne Mullin and Tom Cole), and the two newly elected Democratic women.

## State Growth

In terms of raw numbers, growth has been most remarkable at the state level. Over the past fifty years the nation's fifty legislatures have been transformed from institutions that were almost completely white into more diverse bodies that have begun to reflect their respective populations. Figure 5.6 plots the ethnoracial diversity of state legislatures.

The proportion of African Americans, Latinos, and Asian Americans in state legislatures still falls below their proportion in the general population. Blacks have made the greatest gains – from holding 2 percent of all state legislative seats in 1969 to about 8.5 percent of all seats in 2009. The Latino share has likewise grown, from 1 percent in 1973 to almost 5 percent today. For Asian Americans the growth has been less steady and less robust: from a low of 1 percent in the 1970s, Asian Americans still hold under 2 percent of all state legislative seats. Whites hold over 85 percent of all seats at the state level, despite accounting for just under 75 percent of all US voters and 62 percent of the total population (Brown-Dean et al. 2015).

Deval Patrick (D-MA), who left office in early 2015, was the last Black governor elected to office. In 2018, three African American candidates – Ben Jealous of Maryland, Stacy Abrams of Georgia, and Andrew Gillum of Florida – launched bids to become governor of their respective states, but all three fell short in elections clouded by allegations of voter suppression and racial bias (Lopez 2018; Thrush and Peters 2018). Latinos started from a lower base – there

114                       *Ethnic Identity: Demography and Destiny*



**Figure 5.6** Increase in diversity in state legislatures, 1969–2015
Source: Brown-Dean et al. (2015).

were only sixty-eight Hispanic state legislators in 1973 – but have experienced growth at a roughly equal pace over time. In 2018, across the fifty states, there were 334 Hispanic state legislators as well as two Latino governors, both of whom had left office by the start of 2019.

Once again, we see growth in the number of Asian American elected officials but at a slightly slower pace; there were sixty-three in 1968 and there are 116 today. In 2018, Idaho State Representative Paulette Jordan failed in her attempt to become the first governor in US history from an Indian tribe.

For underrepresented groups, developing political organizations to foster networking and training are critical for successfully navigating political terrain. For example, the National Caucus of Native American State Legislators was created to "provide research, training, and educational services to American Indian, Alaska Native, and Native Hawaiian state legislators."[15] Although there are fewer Indian legislators, the caucus has played an instrumental role in shaping state legislative debates regarding issues of potential concern to tribes, including health care, law enforcement, gaming, and natural resources.

## The Ongoing Underrepresentation of Communities of Color

The fact that enormous change has occurred is incontrovertible. Rapid growth in the number of elected officials from diverse communities across the country

# DEFENDANTS' EX. 6



DEFENDANT'S
EXHIBIT
6
LV 12-11-19
Brown-Dean

# IDENTITY POLITICS
## IN THE UNITED STATES

### KHALILAH L. BROWN-DEAN

Copyright © Khalilah Brown-Dean 2019

The right of Khalilah Brown-Dean to be identified as Author of this Work has been asserted in accordance with the UK Copyright, Designs and Patents Act 1988.

First published in 2019 by Polity Press

Polity Press
65 Bridge Street
Cambridge CB2 1UR, UK

Polity Press
101 Station Landing
Suite 300
Medford, MA 02155, USA

All rights reserved. Except for the quotation of short passages for the purpose of criticism and review, no part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior permission of the publisher.

ISBN-13: 978-0-7456-5411-9
ISBN-13: 978-0-7456-5412-6 (pb)

A catalogue record for this book is available from the British Library.

Library of Congress Cataloging-in-Publication Data
Names: Brown-Dean, Khalilah L., author.
Title: Identity politics in the United States / Khalilah Brown-Dean.
Description: Cambridge, UK ; Medford, MA : Polity Press, 2019. | Includes bibliographical references and index.
Identifiers: LCCN 2019008489 (print) | LCCN 2019019979 (ebook) | ISBN 9781509538829 (Epub) | ISBN 9780745654119 (hardback) | ISBN 9780745654126 (pbk.)
Subjects: LCSH: Identity politics–United States. | Political participation–Social aspects–United States. | Race–Political aspects–United States. | Ethnicity–Political aspects–United States. | Gender identity–Political aspects–United States. | Identification (Religion)–Political aspects–United States.
Classification: LCC JK1764 (ebook) | LCC JK1764 .B77 2019 (print) | DDC 320.97308–dc23
LC record available at https://lccn.loc.gov/2019008489

Typeset in 10/13pt Swift Light by
Servis Filmsetting Ltd, Stockport, Cheshire
Printed and bound in Great Britain by TJ International Limited

The publisher has used its best endeavours to ensure that the URLs for external websites referred to in this book are correct and active at the time of going to press. However, the publisher has no responsibility for the websites and can make no guarantee that a site will remain live or that the content is or will remain appropriate.

Every effort has been made to trace all copyright holders, but if any have been overlooked the publisher will be pleased to include any necessary credits in any subsequent reprint or edition.

For further information on Polity, visit our website: politybooks.com

ind were branded
)eing "SOB's" who
: professional and
nen's soccer team
team, to kneel in

uprisings spread
hood streets over
ns of color. While
nporary conflicts,
ices such as Watts
: think that we've
id, what is it that
ces of the unheard
resist laws crimi-
i. It inspired Bree
est a symbol that
sire to address the
iinst sexual assault
d it motivated pro-
the Indians of All
)ast movements for
i important part of

have imagined that
vernor and attorney
yearbooks wearing
:s prompted conver-
standing, this latest
[ also couldn't have
decision to separate
iple expressed shock
they resembled the
cecutive Order 9066
man descent. To be
re American citizens
ver, deciding which
are included within

One of the greatest arenas for gauging perceptions of group threat and "Americanness" is in the realm of electoral politics. Historically, access to voting and office-holding was reserved for those thought independent enough to participate. For the vast majority of US history, that standard excluded groups such as women, young people, people of color, and poor people. This denial of one of the most fundamental rights of US citizenship fueled a persistent quest for full citizenship via the franchise. Through a series of political movements, legal challenges, and constitutional amendments, the diversity among voters has increased while that of legislators has been more constrained. The results of the 2018 midterm elections highlight the possibility that many voters are ready to change that.

The 116th Congress is the most diverse in the history of the people's branch. While it is true that the number of women, African Americans, Latinx, and LGBTQI members of the legislature has increased, we also witnessed greater diversity along the lines of gender identity, religion, and age. And yet, even as some celebrated these victories, longstanding institutional norms and structures continue to shape their ability to translate those demographic changes into a more substantive representation of group interests. For some elected officials, their very presence in a legislative body that once denied their citizenship is evidence of democracy's promise. The changing demographic landscape of the United States, coupled with our increasingly polarized political space, means that candidates from underrepresented groups now have the potential to challenge traditional conventions. For example, Georgia voters chose Lucy McBath (D-Georgia) to unseat a Republican incumbent in a district once represented by former Speaker of the House Newt Gingrich. In conservative Mississippi, former US Agriculture Secretary Mike Espy stunned observers by narrowly losing the Senate race to frontrunner Susan Hyde-Smith. And yet the persistence of voter suppression and disenfranchisement in places such as Georgia, Florida, Nevada, Ohio, and Pennsylvania reminds us that mobilization breeds countermobilization. Those institutional attacks coupled with candidates' use of racial dog whistles in 2018 suggest that maneuvering the politics of identity in the twenty-first century is often marred by early twentieth-century tactics.

Beyond the electoral arena, I couldn't have predicted that the release of blockbuster films *Crazy Rich Asians* and *Black Panther* would capture theater audiences in record numbers while stimulating broader conversations about authentic representations of ethnic identities in film and culture. Likewise, the heightened tensions between the United States and other countries such as North Korea elevated concerns about military threats while shaping renewed calls to define "America first." These dimensions of foreign policy and international standing help shape domestic debates over which groups are, and which are not, included within that collective national identity. And yet, even as voters sift through rapidly changing news cycles and the increasingly

# DEFENDANTS' EX. 7

# From Pain to Power - Higher Education

**D** diverseeducation.com/article/114259/

Khalilah L. Brown-Dean

April 12, 2018



DEFENDANT'S
EXHIBIT
7
 1211-19

**Celebrating 35 Years**

# Diverse

ISSUES IN HIGHER EDUCATION

# TOP 100

# ASSOCIATE
# DEGREE PRODUCERS

I've spent the last 15 years researching and writing about the impact of punishment on various aspects of American politics.

I've written about the concept of civil death and how the collateral consequences of a conviction limit opportunities for the formerly incarcerated to engage as full citizens.

I've written about the impact of hyperincarceration and punishment on children and families confronted with the generational effects of living on the periphery of inclusion.

I've worked with organizations and programs designed to elevate the voices of the formerly incarcerated within policymaking spaces.

I've even studied the relationship between punishment and gerrymandering.

Over time, we've witnessed a concerted effort to denounce the undeniable racial disparities resulting from America's addiction to punishment.

As the junior senator from Illinois seeking the Democratic presidential nomination, Barack Obama called for a new criminal justice system based on transparency, fairness, justice and equity. Central to that push was denouncing a failed war on drugs that led the U.S. to lock up more people, per incident, than any other country in the world.

Organizations such as the Equal Justice Initiative emerged to protect human rights and end excessive punishment. Ava DuVernay's gripping documentary, *13th*, exposed the depths of mass incarceration in a way that "Orange is the New Black" never could. And now, Black women and Latinas comprise the fastest-growing prison population in this country. Certainly those stats should give us pause and motivate action.

What often is missing from that focus, however, is an emphasis on the voices and experiences of victims and their families, particularly victims of color whose needs become marginalized in multiple policy spaces. And families who often are stigmatized and overlooked within mainstream society and

within their home community.

I look back on my scholarship and I'm almost embarrassed to admit that so little of that work has focused on those most affected by the criminal justice system. Even among those of us who think we get it – who think that we are aware of and sensitive to how oppression and privilege work, who can trace the lineage of the Combahee River Collective's focus on intersectionality or who now realize that referring to yourself as "woke" usually means you aren't – there is always more to learn and explore.

Too often, our scholarship surrounding the criminal justice system focuses only on those accused or convicted of a crime. We study how the collateral consequences of a conviction hamper re-entry. We debate whether taxpayer dollars should go toward providing access to education and vocational training programs for the incarcerated. We collect data on changing demographic trends and analyze its relationship to political representation.

All of that has its place. But the myopic focus, solely on what offenders need, fails to address what victims deserve.

How do we begin to reestablish normalcy for people who have lost everything? How do we create programs that address the loss of income, innocence and faith that many families face? How do we craft public policies and laws that don't revictimize those who have been harmed?

And as the recent public outbursts by Stephon Clark's brother Stevante illustrate, we need to address the impact of perpetual traumatic stress for community members constantly exposed to loss and grief.

Quite simply, there is no "how to" best-practices primer for families attempting to navigate private loss amid public scrutiny, a scrutiny that places greater emphasis on expressions of grief rather than what motivates it.

To fully understand the dynamics of community, power and privilege, our research must address how certain lives are deemed more valuable than others. The arbitrary way in which we decide which lives are more important leaves us with a system that is far from just.

Too often, victims are treated as defendants whose backgrounds are dissected to prove that they are worthy of our collective outrage. It's imperative that political movements address the notion that certain families are less worthy of justice because of the circumstances of their loved one's death. As scholars from various fields deepen their research interests in the policy implications of gun violence, it's necessary to address the everyday banal losses of life that don't go viral or capture national headlines.

To families like my own, whose innocence has been shattered in an instant, every loss is heinous. None is less painful than another, regardless of the circumstances.

As academics, we are trained to approach these topics from a detached, objective and often quantitative perspective. But on February 20, 2011, that boundary was erased when my 21-year-old cousin, Brian Anthony Patterson, was murdered at a party in Virginia.

A 19-year-old stood over Brian and fired 9 shots into his body. Brian was a son. A brother. And a beloved cousin. His life was significant. Amid the feelings of hurt, anger, confusion and yes, shame, our family was left feeling as if his loss was dismissed by others as just another "urban narrative."

In states across the U.S., victims and their families are organizing political campaigns to change the narrative and eliminate bias in every aspect of the criminal justice system. They are forming interest groups and lobbying legislators to enact policy changes that will protect access to physical and mental health services for victims.

One such measure is the Crime Victims Fund, also called the VOCA (Victims of Crime Act) Fund, which collects criminal fines and uses the money to provide medical care, compensation for property damage and trauma treatment for crime victims, including survivors of domestic violence, family members of murder victims and child victims of abuse. Victims and their families are pushing through their pain to move toward power.

My colleague Ben Jones and I explore the political engagement of victims and families in an article published by the *Politics, Groups, and Identities* journal called "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." In it, we offer a concept we called authentic power to capture the extent that a group harmed by a policy can get policymakers and other government officials to acknowledge this harm and, ultimately, change the policy to the group's benefit.

Death is inevitable. For many families, however, that inevitability seems premature. Let's commit to scholarship and activism that empowers rather than shames.

*Dr. Khalilah L. Brown-Dean is an associate professor of Political Science at Quinnipiac University, where she writes about American politics, political psychology and public policy. You can follow her on Twitter @KBDPHD.*

# DEFENDANTS' EX. 8

DEFENDANT'S
EXHIBIT
8
CV 12-11-19

# Honoring Black History Month, in Prison

**diverseeducation.com/article/111323/**

Khalilah L. Brown-Dean

March 4, 2018

Black History Month is often referred to by my fellow Blackademics as "the high season." Schools and organizations across the country seek us out for obligatory assemblies and programs. Though the shortest month, February is the most popular time of the year for scholars of color to situate our scholarship within longstanding questions of freedom and justice.

Last month was a dizzying whirlwind for me filled with twelve speaking engagements that literally stretched from Feb. 1 to Feb. 28. I began Black History Month in conversation with graduate students at the University of Connecticut's School of Social Work discussing the relationship between community development and what I term concentrated punishment.



Concentrated punishment exists in communities with disproportionate rates of surveillance, incarceration and disenfranchisement that undermine stability. The urban concentration of these communities, coupled with their distinct racial and ethnic diversity, creates a perpetual gap between the principle and practice of American democracy. It's fitting then, that I ended the month honoring Black History Month in prison.

The Cheshire Correctional Institute is a level 4, high-security facility. There are bars and barbed wire, double windows and striped lines on the floor to clearly distinguish between inmate and outsider. Most inmates wear state-issued khakis and a plain white shirt with sneakers. Some have to wear brightly colored jumpsuits to mark them as high-risk.

Two sets of reinforced doors separate the small entry room where visitors are ID'd, sent through a metal detector and forced to leave scarves, jackets and car keys in grey lockers. Cell phones aren't allowed in any part of the building. Even when you have the ability to leave of your own volition, entering a prison is a visual and visceral reminder of boundaries both real and imagined.

Cheshire's Black History Month program featured Reginald Dwayne Betts and me in conversation. Betts is a poet, Yale Law graduate and father who was sentenced to prison at the age of 16 for a carjacking in Virginia. We met years ago on the beach in Puerto Rico as our kids played together.

The tension in Dwayne's voice is palpable. He's quick to reject the tired "felon made good" trope and admonishes those who label him as an "ex-felon" in some obtuse effort to distance him from the 60 inmates who sit across from us on the other side of the sunken floor. We sit at a crooked table in hard plastic chairs with a few sheets of blank paper, two books of Dwayne's poetry and a blue pen that we share. A poet and a professor.

Two men sing the Negro National Anthem to start the second half of the program:

Stony the road we trod, bitter the chast'ning rod,
Felt in the days when hope unborn had died;
Yet with a steady beat, have not our weary feet,
Come to the place for which our fathers sighed?
We have come over a way that with tears has been watered,
We have come, treading our path through the blood of the slaughtered;
Out from the gloomy past, 'til now we stand at last
Where the white gleam of our bright star is cast.

Walking into a room filled with Black and Brown faces during a Black History Month program is usually expected. But this particular time, seeing so many people who look like me is maddening. Without a cell phone, I can't capture the images I want to embed into my consciousness. Every cracked ceiling tile darkened by water damage. Every frayed electrical cord held together with duct tape and wishes. Every clouded view through dirty windows obscured by barbed wire and bricks.

Even though "re-entry" is a popular buzzword among scholars and grant makers, most of the people sitting in this room were never entered into society to begin with.

I don't want to forget the guilt I felt after taking a millisecond pause when the first inmate extended his hand to shake mine. Moments later, a young man asked what can be done to reverse the Supreme Court's 2013 Shelby v. Holder decision. Sharp minds. I realize I am

safer in this space filled with both officers and protective inmates than I am walking down the street of my tree-lined neighborhood. Even among those of us who think ourselves "woke", this space is a perpetual reminder of the blind spots created by freedom.

I'm not here as a naïve interloper unaware that there are men in this room convicted of murder, drug crimes and sexual assaults. But I am here knowing that eight years prior, my family buried our 21-year-old cousin, Brian Anthony Patterson. Brian's murder shifted my gaze from a detached social scientist analyzing mass incarceration data to an engaged scholar-activist demanding systemic reform that prioritizes justice for victims and families.

Brian's death, followed by the execution of Troy Davis in Georgia, propelled my work to abolish the death penalty in Connecticut. It was built on the belief that true justice depends on our ability to extend humanity to others – even as they deny it in themselves.

There's a running joke that everyone in prison says they're innocent. Not here. The inmates we spend time with in the T.R.U.E. unit learn to take full responsibility for their crimes. T.R.U.E. stands for Truthfulness, Respectfulness, Understanding and Elevating. There's a brightly colored mantra etched onto a chalkboard that says, "Don't make excuses. Make improvements."

The unit is comprised of men ages 18 to 25 from different neighborhoods across the state. They speak of the psychological toll of reconciling the harm they've caused others with the personal goals they want to achieve. Inmates serving life sentences work as mentors developing a comprehensive curriculum called the Reflections program. They work alongside counselors to emphasize that forgiveness happens on the timeline of the person harmed. There's a dedicated focus on respect and self-awareness, connection and commitment.

Tomorrow begins a new month on the unit. T.R.U.E. residents will take turns entering a small office to pay their monthly fees. Another opportunity to practice accountability. After four hours at Cheshire, I walk away from the T.R.U.E. unit wondering whether having access to this kind of positive intergenerational development would have prevented some of these men from getting locked up in the first place. The unusually long drive home gives me time to ponder how the success of this unit can be replicated in other facilities. Most people on the unit will eventually return home to neighborhoods where struggle remains a constant.

More than 650,000 people are released from prisons in the United States each year. Many are people of color returning to urban communities that are already grappling with the effects of crime, poverty, violence and inferior education – all of the socioeconomic indicators that significantly reduce one's life chances. Community members struggle to secure access to housing, education and employment. This struggle is intensified for those leaving prisons and attempting to return to community.

The collateral consequences of a conviction limit opportunities for the formerly incarcerated to support their families and make positive contributions. These restrictions have a disproportionate impact on groups already struggling to define their place in American society. For example, over 25% of African Americans and about 20% of Latinos live below the federally established poverty line. The bulk of these communities – the neighborhoods to which the formerly incarcerated return – are concentrated in urban areas that face the additional challenge of reconciling high demands for services with limited resources.

It begs two questions: To what will they return? And what must be done to prepare them for life after prison?

*Dr. Khalilah L. Brown-Dean is an associate professor of political science at Quinnipiac University, where she writes about American Politics, political psychology and public policy. You can follow her on Twitter @KBDPHD.*

# DEFENDANTS' EX. 9

DEFENDANT'S
EXHIBIT
9
12-1-19
Brown Dean

# Five Things More Effective Than Political Panic

**D** diverseeducation.com/article/112219/

Khalilah L. Brown-Dean

March 14, 2018

I have a confession to make: I'm a nerd. I mean, a hardcore nerd fascinated by all things political. Not the well-crafted veneer of politics that casual observers see, but the messy behind-the-scenes contestations over power that make perfection in government an impossible goal.

As a Political Scientist, I'm enthralled by process as much as the output. I watch Fox News, MSNBC, CNN and DemocracyNow. I read four newspapers a day and devour sites like *Al Jazeera*, *Vice*, *The Guardian* and, of course, *Diverse: Issues In Higher Education*. I've long believed that politics shapes everything around us from the curriculum offered in public schools to how streets are prioritized for clearing after a Nor'easter. Lately, it's become nearly impossible to keep up.



As the White House becomes a revolving door of appointees kicked off the island of misfit toys, our democracy seems to be in a death spiral of chaos. The constant "breaking news" disruptions of our momentary respites from political controversy leave me ready to disengage from politics as an investment in self-care.

Frankly, that worries me. Now, more than ever, we can ill-afford to retreat from a process that literally shapes our ability to live, learn and earn. While we were distracted by tweets and playground taunts, state agencies across the country wasted months scrambling to craft contingency plans as Congress debated whether to pass a long-term funding solution for the Children's Health Insurance Program (CHIP) that provides coverage to 9 million

children. Parents already overwhelmed by the task of caring for a sick child faced the added stressor of wondering whether the treatments their children rely on would become even more unaffordable.

And now, as President Trump and Education Secretary Betsy DeVos advocate for arming teachers with guns, teachers in West Virginia are just returning to the classroom after an historic nine-day strike protesting efforts to weaken teachers' health coverage by requiring them to wear tracking devices. Dystopian, indeed.

Communities in greatest need of effective, accountable and efficient political representation can't afford to be distracted from the very real issues that are decided not at the national level, but in city halls and state legislative chambers.

My students know that my favorite concept in the whole of American politics is federalism. The division of power across multiple levels of government structures a policy space where voters can determine whether their state allows medical marijuana, provides in-state tuition for undocumented students or protects pensions for public employees.

Indeed it's within city halls and state legislatures where residents can help craft effective measures to eliminate school violence without ballooning the school-to-prison pipeline that finds Black children three times as likely to be suspended for the same offense as their White peers.

Federalism provides the means to hold people accountable for failing to provide residents of Flint, Mich. with unfettered access to clean, safe drinking water. Federalism tests the limits of balancing economic development with the demand for affordable housing. And this fall, federalism will bring voters to the polls to decide whether 1.5 million formerly incarcerated people in the state of Florida will be allowed to vote again. More on that later.

Political panic seems like a natural response to our current state of political affairs that rivals any House of Cards meets 1984 plot twist. But panic can only be a temporary response to a long-festering challenge. Below, I offer five things more effective than political panic:

1) **PRIORITIZE.** Whenever I present my research on dismantling the politics of punishment, someone will invariably ask, "Where do we start?" My answer is always the same. "Start where you are." Tackling a massive nest of interrelated policy challenges can be overwhelming, so overwhelming that it can be paralyzing. Prioritize issue areas based on your own set of interests and resources. Recognize that no one person, organization or interest has all the answers. Progress doesn't require unanimous consent.

2) **SECURE THE BAG.** Fannie Lou Hamer famously said, "Whether you have a Ph.D., D.D., or No D we are all in this bag together." Lend your professional expertise to civic organizations with shared policy priorities. Invest in collective success by donating to organizations such

as the NAACP Legal Defense Fund, the Lawyers' Committee for Civil Rights and the Black Youth Project. Support local community groups and indigenous institutions that fight for political, socio-economic and legal equity.

3) **EDUCATE.** Resist the lure of social media prophets who undermine power and agency. Remind them that Roy Moore lost his bid for the U.S. Senate by less than two percentage points. Push professional associations to invest in public scholarship that can bridge the gap between academics, activists, legislators and concerned citizens. Support those willing to take their insight beyond the academy without losing sight of intellectual rigor and integrity. Organize panels and roundtables at professional conferences and organizational meetings that reflect these policy priorities.

4) **DEMAND.** In 2018, all 435 members of the U.S. House of Representatives will be up for reelection. Candidates in 36 states will compete in gubernatorial races with important elections at the local and county level, as well. The last two years have been marked by political unrest stretching from college campuses to the public square to the halls of Congress. Don't just vote based on loyalty to a party or ideology. Demand tangible answers to the difficult policy questions that matter to you, your family and your community. Candidates who don't have practical answers, no matter how long they've been in office, don't deserve your votes.

5) **PREPARE.** Meaningful civic engagement must be sustained and sustainable. Rather than just reacting to political storms, we have to prepare to face them in advance. For example, now is the time to prepare communities for the 2020 Census. The results of the decennial process will shape the allocation of more than $675 billion in resources. That allocation covers programs aiding vulnerable populations such as the elderly, the poor and victims of domestic violence. The census outcome also will determine whether public officials will have the resources they need to confront local challenges.

Our vision of freedom must be greater than what we see right now. Our collective power is greater than we acknowledge. Don't hit the panic button – yet.

*Dr. Khalilah L. Brown-Dean is an associate professor of Political Science at Quinnipiac University, where she writes about American politics, political psychology and public policy. You can follow her on Twitter @KBDPHD.*

# DEFENDANTS' EX. 10

DEFENDANT'S
EXHIBIT
10
CJ 12-11-19

# "The Stakes is High" - Higher Education

**D** diverseeducation.com/article/128581/

Khalilah L. Brown-Dean

October 3, 2018

In 1996, hip-hop trio De La Soul released their third studio album, "The Stakes Is High." Fans weren't sure whether to embrace the album because it marked such a dramatic departure from the lighthearted lyrics of their previous body of work. But a good artist is always committed to evolving. The group prided itself on being an eclectic alternative to mainstream rap groups that celebrated consumerism. As members of the famed Native Tongue collective, De La Soul mused on diverse topics like the state of pop culture, the notorious O.J. Simpson trial, and gender politics.



The album featured guest spots by emcees Common and Mos Def and R&B group Zhane. It also included a prominent sample of jazz great Ahmad Jamal's song "Swahililand." Beyond the guest artists and distinct melody, the signature track introduced the phrase, "Stakes Is High," into popular lexicon to reflect the mix of political, social, and economic challenges facing various groups. De La Soul quips, "a meteor has more rights than my people, who be wasting time screaming who they've hated, that's why the native tongues have been reinstated."

As we stand just one month away from the 2018 midterm elections, it is imperative to remind people that perhaps now more than ever, "the stakes is high." Voters will have the opportunity to raise their voices on myriad issues of mutual concern. From setting the tone for U.S. foreign policy that will address global terrorism and economic security, to installing prosecutors and law enforcement officials who will uphold civil rights protections for all citizens, the stakes is high. From the opportunity to elect public officials who adequately mirror the country's rapidly changing diversity, to rules changes that challenge two party

dominance over U.S. elections, the stakes is high. From compliance with language access protections, to disrupting the schools to prison pipeline, the stakes is high. Sidenote: Apologies to all my grammar teachers who cringe over the lack of subject-verb agreement in that phrase, but context is key.



Keeping up with the rapidly changing nature of U.S. politics may seem impossible. Even for self-professed political junkies like myself this current political moment—some would say crisis–makes it difficult to adequately appreciate the magnitude of policy threats that don't always capture the headlines. Beyond the horse race style of media reporting that tells us who's up and who's behind, many of us feel trapped in a vortex of massive upheaval on one hand, and a deep entrenchment of the status quo on the other. Each week leading up to the election my blog posts will focus on various issues, people, and policies that voters should consider as they head to the polls. To be sure, heading to the polls is imperative. Although the United States holds more elections than other democratic nations, we also have a notoriously low rate of voter turnout in midterm elections.

A new report issued by the Pew Center indicates that less than 14 percent of registered voters cast a ballot in the 2014 midterm primaries. In contrast, voter turnout in the 2018 primaries increased by 56 percent in gubernatorial, House, and Senate primaries. These results are promising. A similar study found that voter enthusiasm in this midterm season is higher than any other midterm in over twenty years. At the national level, concerns about health care, the economy, and Supreme Court appointments dominate the public's calculus. While state level contests focus on taxes, gun policy, immigration, and racial/ethnic relations.

Voter turnout in midterm contests is particularly low amongst Latino voters in key battleground states like Texas, Arizona, Florida and Nevada. Voters in these states with higher concentrations of voters of color also experienced greater institutional barriers to voting during the 2016 Presidential election. Within hours of the Supreme Court's decision to gut the Voting Rights Act of 1965 in *Shelby v. Holder,* these states adopted new restrictions on early voting, photo identification, and reduced the number of polling places in certain communities. These efforts dramatically increased wait times while discouraging turnout amongst groups in greatest need of effective representation.

Last week millions of people watched with rapt attention as Dr. Christine Blasey Ford testified before the Senate Judiciary Committee. At times measured but always sincere, Ford recounted a sexual assault she alleges happened at the hands of Supreme Court nominee

Brett Kavanaugh. To say the hearing proceedings were bizarre is an understatement. Republican Senators chose to hire a sex crimes prosecutor from Arizona to field questions on their behalf rather than asking them of Dr. Ford directly. A month ago we watched a teary Sen. Lindsey Graham of South Carolina lament the loss of his longtime friend Sen. John McCain. Graham applauded McCain's commitment to civility and his ability to reach across the aisle and embrace a mutual sense of respect and commitment to country, "Country first means that even if it's inconvenient for you and it makes you uncomfortable, you do it anyway," Graham said. "Country first hurts, but it's the right way to go." It's a nice sentiment. But one that Graham and many of his colleagues fail to embrace. What are the political consequences of putting party over principle and how might this effect the upcoming midterms?  My next blog post will explore this question. Stay tuned.

*Dr. Khalilah L. Brown-Dean is an associate professor of Political Science at Quinnipiac University where she writes about American Politics, political psychology, and public policy. You can follow her on Twitter @KBDPHD.*

# DEFENDANTS' EX. 11

*--Fair Fight Action, Inc.; ACTION, Inc.; Care in Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia Highland Church, Inc.; The Sixth Episcopal District, Inc.; and Plaintiffs v. Brad Raffensperger*

Expert Report
Dr. Khalilah L. Brown-Dean



1

**EXPERT REPORT**
KHALILAH L. BROWN-DEAN, Ph.D.
August 15, 2019

## BACKGROUND

I am a tenured Associate Professor of Political Science at Quinnipiac University. I received a Bachelor of Arts in Government from the University of Virginia, and a Master's and Ph.D. in Political Science from The Ohio State University. I received advanced training in the Tufts University Metric Geometry and Gerrymandering Summer Program. I specialize in American Politics with an emphasis on elections, political behavior, and public policy. I study historical and contemporary institutional dynamics surrounding voting rights in the United States. In 2015, I co-authored a policy report for the non-partisan, nonprofit, public policy research organization the Joint Center for Political and Economic Studies titled, "Fifty Years of the Voting Rights Act: The State of Race in Politics."[1] The report combined extensive archival, quantitative, and qualitative data to examine the impact of the Voting Rights Act on registration, turnout, representation, and policy responsiveness.

My research on various aspects of voting rights, election administration, and political representation is published in peer-reviewed journals (e.g. *Politics, Groups, and Identities; National Political Science Review*), books, and policy reports. In 2015, Cambridge University Press published a chapter I authored in *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* that was co-edited by Michael Alvarez and Bernard Grofman.[2] In it I examine the changing landscape of electoral reform and its impact on civic engagement and institutional accountability. In September 2019, Polity Press will publish my book *Identity Politics in the United States* that traces historical and contemporary tensions surrounding the rights and privileges of American citizenship. It concludes that the defining feature of American

---

[1] Brown-Dean, K.L., Hajnal, Z., Rivers, C., & White, I. (2015). *Fifty Years of the Voting Rights Act: The State of Race in Politics*. Washington, DC: Joint Center for Political and Economic Studies. Available at http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm%29%28updated%29.pdf.

[2] *See* Brown-Dean, K.L. (2015). *Felon Disenfranchisement Ten Years After Bush v. Gore*. In Michael Alvarez and Bernard Grofman (Eds.), *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore* (pp. 199-211). at 199-211. Cambridge: Cambridge University Press.

2

democracy—federalism—both shapes and is shaped by Americans' ability to fully exercise the franchise. I highlight the delicate balance between federal provisions and state discretion in administering electoral functions. My witness report reflects the research I have conducted on federalism, voting rights, and election administration since 2003. A copy of my full curriculum vitae including publications over the last ten years is included in the Appendix of this report. I attest to its truth and accuracy. I am being compensated at a rate of $400/hour in this case. However, my opinions rendered in this report are in no way influenced by or contingent upon monies owed to me for my services.

## ASSIGNMENT

On June 11th, I was asked by the plaintiffs' attorneys to address the role of the Georgia Secretary of State in the domain of election administration and enforcement. I have not been asked to opine about the specific claims made in this particular case. My opinions reflect on the office of the Secretary of State, not the individual holding that position.

## SUMMARY OF OPINIONS

1) The right to vote is enshrined in the Federal Constitution with the primary responsibility for enforcement and administrative oversight resting at the state level. Federalism, or the division of power, extends to states the unique power to set the "time, place, and manner" of elections. Federalism recognizes the discretion of subordinate governments, while asserting the primacy of state provisions for outlining the duties and responsibilities of various offices and officers.

2) The federal mandates contained in the Voting Rights Act of 1965 (hereafter "VRA"), the National Voter Registration Act of 1993[3] (hereafter "NVRA"), and the Help America Vote Act of 2002[4] (hereafter "HAVA") affirm the responsibility of each state and territory's Chief Election Officer to oversee the process of voter participation in federal elections.

3) In the wake of the Supreme Court's decision in *Shelby County v. Holder* (2013), it is even more important that state Chief Election Officers carry out their

---

[3] National Voter Registration Act of 1993, 52 U.S.C.A. §§ 20501-20511, available at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

[4] Help America Vote Act, 52 U.S.C.A. §§ 20901-21145, available at https://www.eac.gov/about/help-america-vote-act/.

responsibilities to address and reconcile undue barriers to voting within the state and to prevent harmful electoral practices from being implemented.

4) Based on the State Constitution, Official Code of Georgia, and the Official Compilation of Rules and Regulations of the State of Georgia, the Secretary of State is the Chief Election Officer bearing primary responsibility for protecting voter access to federal elections at the local, county, and state level. This role is affirmed, in practice, by the Secretary of State's formal interactions with voters, candidates, and various local, county, state, and federal officials.

## ANALYSES

### A. BACKGROUND: FEDERALISM AND THE RIGHT TO VOTE

The United States is comprised of an intricate patchwork of laws and provisions governing the right to vote. Federalism, defined as the division of power and authority between a central government and regional governments, is key to understanding the administration, enforcement, and oversight of voting rights in the United States.[5] In Kentucky, for example, those convicted of felonies face a lifetime ban on voting while formerly incarcerated residents of Mississippi may petition members of the state legislature to have their rights restored.[6] Georgia residents must complete their prison sentence, pay all fines and restitution, and be free from parole and/or probation before they can vote again.[7] By comparison, Maine and Vermont are the only two states in the United States that allow prison inmates to vote. Determining to whom voting rights

---

[5] Kousser, J.M. (1999). *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* Chapel Hill: University of North Carolina Press.

[6] Manza, J.,& Uggen, C. (2008). *Locked Out: Felon Disenfranchisement and American Democracy.* Oxford: Oxford University Press.

[7] The Georgia State Constitution provides that, "No person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence." Ga. Const. art. II, § I, ¶ III(a); *see also* O.C.G.A. § 21-2-216(b) ("In addition to the qualifications in subsection (a) of this Code section, no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence and no person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed.").

4

should be extended,[8] the methods for exercising this right,[9] and how to best navigate a complicated maze of regulations has been a highly contested calculation since the country's founding.[10]

In drafting the Constitution, the Framers took special care to strengthen the federal government without impairing the power of state governments that were already in place. Indeed much of the debate over what form of government would be most desirable rested on demands to balance federal interests against state traditions.[11] States had the power to limit access to voting based on various characteristics such as race, gender, property ownership, moral fitness, religious identity, and residency.[12] Virginia, for example, required men to possess at least 50 acres of land without structures, or 25 acres of land with structures.[13] In other states like Rhode Island, citizenship—and by extension, voting—was limited to Christians and excluded those who identified as Catholic or Jewish.[14] Georgia's 1777 state constitution restricted suffrage to white men who "possessed in his own right of 10 pounds value, and liable

---

[8] Grofman, B., Handley, L., & Niemi, R. (1992). *Minority Representation and the Quest for Voting Equality*. Cambridge: Cambridge University Press.

[9] Kousser, J.M. (1974). *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910*. New Haven: Yale University Press.

[10] Vallely, R.C. (2004). *The Two Reconstructions: The Struggle for Black Enfranchisement*. B.I. Page (Ed.). Chicago: University of Chicago Press.

[11] Smith, R.M. (1999). *Civic Ideals: Conflicting Visions of Citizenship in U.S. History*. New Haven: Yale University Press.

[12] *See* Rogers, D.W. (1992). *Voting and the Spirit of American Democracy: Essays on the History of Voting and Voting Rights in America*. Champaign, IL: University of Illinois Press.

[13] For a detailed table of suffrage requirements by state from 1776-1790, *see* Table A.1 of Keyssar, A. (2009). *The Right to Vote: The Contested History of Democracy in the United States* (rev. ed.) (pp. 306) New York: Basic Books.

[14] Kettner, J.H. (1978). *The Development of American Citizenship, 1608-1870*. Chapel Hill: University of North Carolina Press.

to pay tax in this State, or being of any mechanic trade."[15] Those eligible to vote were also required to have at least six months residency in the state.  The variation in voter eligibility requirements often mapped onto the variation in state demographics.[16]

The new Constitution allowed states to maintain their own eligibility provisions while guaranteeing that those deemed eligible for full citizenship at the state level, could participate in federal elections.[17] Throughout earlier periods, federal eligibility for full citizenship explicitly barred certain groups such as American Indians,[18] women,[19] enslaved Africans,[20] and immigrants from certain countries.[21]

Article 1, section 4 of the U.S. Constitution contains the Elections Clause that delineates the division of power between the federal government—specifically

---

[15] Porter, K.H. *A History of Suffrage in the United States*. (1918). Chicago: University of Chicago Press.

[16] *See* Key, V.O. (1949). *Southern Politics in State and Nation*. New York: Knopf.

[17] Citizenship in the United States is built upon three key conceptions. The first, *jus soli*, automatically confers citizenship upon anyone born on U.S. soil. This status did not apply to African Americans, whether enslaved or free, until the adoption of the Thirteenth Amendment (1865). The second conception, *jus sanguinis*, grants citizenship to those who have at least one parent with U.S. citizenship. The last conception, naturalization, allows those born elsewhere to pursue citizenship. For a detailed discussion of the various dimensions of U.S. citizenship, *see* Brown-Dean, K.L. (2019). *Identity Politics in the United States* (ch. 2). Cambridge: Polity Press.

[18] *See Elk v. Wilkins*, 112 U.S. 94 (1884) and McDonald, L. (2011). *American Indians and the Fight for Equal Voting Rights*. Oklahoma City: University of Oklahoma Press. for a detailed understanding of the challenges for defining citizenship and voting rights for Native Americans.

[19] *See* McConnaughy, C. (2013). *The Woman Suffrage Movement in America: A Reassessment*. Cambridge: Cambridge University Press.

[20] *See* Woodward, C.V. (1974). *The Strange Career of Jim Crow*. New York: Oxford University Press.

[21] Hayduk, R. (2006). *Democracy For All: Restoring Immigrant Voting Rights in the United States*. New York: Routledge Press.

Congress—and the states in the domain of voting rights. It provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except to the Place of Chusing (sic) Senators."[22] The principle of federalism underlies a bifurcated system allowing each level of government (federal, state, local/county) to adopt its own provisions related to things such as voter registration, polling hours, the siting of voting apparatus, the removal of individuals from voting rolls, and the tabulation of votes.

The Elections Clause does not specify which state office and/or officer(s) is responsible for overseeing election administration. Nor does it mandate that each state or territory adopt a uniform structure or central chain of command to govern how elections are administered across the state. Rather, it defers to state statutes to outline this function, task a chief administrator, and define his/her accompanying responsibilities. In most states and territories, the day-to-day duties of election administration are shared between local authorities and state officials. To be certain, local administrators have the most direct contact with voters and potential voters and must be acutely aware of the laws governing the electoral process. The Constitution grants Congress the unique and exclusive authority to enact federal laws designed to ensure state residents have fair and unfettered access to voting.[23] Therefore, it is necessary to examine state provisions coupled with federal mandates to determine where the responsibility for elections oversight and enforcement lies.

## B. CITIZENSHIP, FEDERALISM, AND STATE DISCRETION

Congress adopted three key Amendments designed to carve out broader protections of citizenship and its accompanying benefits. Together, the Thirteenth, Fourteenth, and Fifteenth Amendments abolished slavery, granted citizenship to all

---

[22] The 1813 ratification of the Seventeenth Amendment provided for the direct election of U.S. Senators.

[23] See *The Scope of Congressional Authority in Election Administration* (2001). Washington, DC: General Accounting Office. Available at https://www.gao.gov/new.items/d01470.pdf.; Shanton, K. (2019). *The State and Local Role in Election Administration: Duties and Structures.* Washington, DC: Congressional Research Service. Available at https://fas.org/sgp/crs/misc/R45549.pdf.; Garrett, R.S. (2019). *Federal Role in U.S. Campaigns and Elections: An Overview.* Washington, DC: Congressional Research Service. Available at https://fas.org/sgp/crs/misc/R45302.pdf.

who were born or naturalized in the United States,[24] and extended the franchise to African American males.[25] These new provisions led to a dramatic, yet brief, increase in the number of previously disenfranchised groups who were registering, voting, and running for elected office.[26]

The expansion of citizenship and voting rights at the federal level prompted numerous state constitutional conventions between 1890 and 1910 to adopt new restrictions. The concern for many state legislators was that these new protections at the federal level would undermine the distribution of power at the local level. This was particularly true for communities across the South with sizeable minority communities. These new federal guarantees of citizenship and voting rights enhanced the potential for minority groups to convert their numerical presence into political influence. In turn, the new state guidelines were constructed in such a way that upheld the federal Constitution's explicit ban on race-based disenfranchisement, while still retaining the state's power to define which groups were desirable as full citizens. To do so, most states based their disenfranchisement provisions on behaviors and attributes most commonly associated with certain groups rather than specifying such groups by name. For example, delegates to Georgia's 1908 constitutional convention adopted a cumulative poll tax, grandfather clause, and literacy tests that effectively eliminated the bulk of Black voters and most Whites who were poor. The Georgia state constitution allowed counties to hold white-only primaries and adopt additional disenfranchising techniques to meet their local interests. These institutional measures coupled with documented instances of racial violence significantly deterred many residents from

---

[24] The Fourteenth Amendment did not explicitly address the unique standing of Native Americans and people of Asian descent who pursued citizenship.

[25] The Fourteenth Amendment prohibited states from making or enforcing laws that abridged the privileges and immunities of citizenship and provided that "[a]ll persons born or nationalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." *See* U.S. Const. amend XIV, § 1.

[26] Much of the focus on the path of American political development has focused on race-based exclusions that disenfranchised African Americans. It is important to note, however, that many of the restrictions also limited the number of non-landowning white men and ethnic immigrants who were barred from voting. Therefore, we see an overall increase in electoral participation rates across racial/ethnic groups after passage of the Civil War Amendments.

8

even attempting to register.[27] Below, as Figure 1 illustrates, the legacies of these restrictions effectively eliminated Black voters for nearly 30 years.

Even as federal legislative and judicial decisions struck down state provisions such as white-only primaries,[28] poll taxes,[29] and grandfather clauses,[30] they did not translate into substantial gains in registration and turnout. Local and state elected officials retained significant power to limit access to voting using both legal and extralegal means.[31] It wasn't until the passage of the VRA that the federal government took a more aggressive approach to protecting state residents against arbitrary barriers imposed at the state and local level.

---

[27] *See* Brundage, W.F. (1993). *Lynching in the New South: Georgia and Virginia, 1880-1930.* Champaign, IL: University of Illinois Press.; Przeworski, A. (2009). Conquered or Granted? A History of Suffrage Extensions. *British Journal of Political Science*, 39(2), 291–321.; Johnson, K. (2010). *Reforming Jim Crow: Southern Politics and State in the Age Before Brown.* Oxford: Oxford University Press.; Corzine, J., Creech, J. & Corzine, L. (1983). Black Concentration and Lynchings in the South: Testing Blalock's Power-Threat Hypothesis, *Social Forces*, 61(3), 774–96.; Epperly, B., Witko, C., Strickler, R., & White, P. (2019). Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S. *Perspectives on Politics*, 1-14.

[28] *See Smith v. Allwright*, 321 U.S. 649 (1944); *United States v. Classic*, 313 U.S. 299 (1941) and.

[29] The Twenty-fourth Amendment was ratified in 1964.

[30] *See Guinn v. United States*, 238 U.S. 347 (1915).

[31] The Civil Rights Act of 1957 created a Civil Rights Division within the Department of Justice. *See* Pub. L. No. 85-195, 71 Stat. 472 (1957). The Division is tasked with providing federal oversight of voting rights violations. The U.S. Department of Justice filed a total of 71 voting rights lawsuits in the Deep South before 1965. However, the depth of state discretion allowed local officials to devise new methods that circumvented these protections and continued to limit civic participation. *See* Hawk, B.E., & Kirby, J.J. (1965). *Federal Protection of Negro Voting Rights. Virginia Law Review*, 51(6), 1093–96.

The Act contained numerous provisions for strengthening federal protection of voting rights.[32] Most notably, the VRA allowed for federal elections monitors and created an outlet for the federal government (the U.S. Dep't of Justice) or private parties to bring lawsuits to prevent racially discriminatory laws and policies from taking effect. The "preclearance" provision required that states and jurisdictions with a documented history of discrimination (section 5) submit proposed electoral changes to federal officials before they could take effect.[33] The preclearance provision identified as covered jurisdictions those areas (all or parts of states) with discriminatory tests or devices and low turnout or registration in the 1964 presidential election. Section 5 covered nine states (Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia) in their entirety. Georgia was identified as a covered jurisdiction on August 7, 1965 based on data from its November 1, 1964 election and its use of devices such as the poll tax (adopted in 1802), grandfather clause (adopted in 1908), and literacy test (adopted in 1908).[34] By shifting the responsibility to states and localities to prove to federal officials that the proposed changes were not discriminatory, the preclearance process avoided the delays and expenses of litigation, and prevented discriminatory laws before they were used in elections. In 1982, Congress amended the Act to clarify that discriminatory *purpose* was not required to bring a lawsuit to invalidate election procedures that *result* in discrimination.

## C. FEDERAL CHANGES AND HEIGHTENED STATE ACCOUNTABILITY

The impact of the Voting Rights Act of 1965 was immediate. Its protections coupled with federal oversight of potential violations translated into increased rates of

---

[32] VRA § 2 is a permanent provision that prohibits "any voting standard, practice, or procedure that results in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group." *See* https://www.justice.gov/crt/section-2-voting-rights-act#sec2.

[33] The coverage provision was originally scheduled to expire after five years. Congress extended the provisions and made additional updates to the VRA in 1970, 1975, 1982, and 2006. The ban on discriminatory devices was made permanent in 1975 in addition to extending preclearance requirements to areas with large concentrations of certain language minorities and low registration and turnout rates.

[34] Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897-01 (Aug. 7, 1965).

registration, turnout, representation, and policy responsiveness for various
communities across the United States (*see* Figures 1 and 2). This success provided a
foundation for additional federal provisions that increased state responsibility in
ensuring their electoral policies and procedures did not conflict.

Figure 1: Black and White Voter Registration Rates in Louisiana and the Former
Confederate States, 1878-2010[35]



[35] Confederate states' data are self-reported turnout of each year's voting age
population. Data from 1956 to 1968 are from the American National Election Study.
Data from 1972 to 2012 are from the United States Census, Current Population Survey,
Voter Supplement File. *See* Brown-Dean, K.L., Hajnal, Z., Rivers, C., & White, I. (2015).
*Fifty Years of the Voting Rights Act: The State of Race in Politics*. Washington, DC: Joint
Center for Political and Economic Studies. Available at
http://jointcenter.org/sites/default/files/VRA%20report%2C%208.5.15%20%28540%20pm
%29%28updated%29.pdf.

Figure 2: Black and White Presidential Election Voter Turnout in Former Confederate States, 1956-2012. (Percent of Voting Age Population)



## NATIONAL VOTER REGISTRATION ACT

Congress passed the NVRA[36] to make it easier for eligible American citizens to register to vote and to streamline the processing and maintenance of voter registration applications. The NVRA sets requirements for state compliance in *federal* elections; not state or local elections. Those requirements include offering voter registration opportunities at motor vehicle offices,[37] social services offices and agencies that accommodate those with disabilities,[38] facilitate mail-in registration,[39] and regulate how

---

[36] 52 U.S.C.A. §§ 20501 – 20511.

[37] *Id.* § 20504(c)(1) Simultaneous Application for Voter Registration and Application for Motor Vehicle Driver's License.

[38] *Id.* § 20506(4)(B) Voter Registration Agencies.

[39] 52 U.S.C.A. § 2505 Mail Registration.

12

registration lists are to be maintained.[40] The NVRA also created a uniform federal registration form that every state and territory is required to recognize. The Act's provisions apply to 44 states (including Georgia) and the District of Columbia.[41]

The NVRA both affirmed and heightened the responsibility of state election officials to ensure compliance with federal provisions governing various aspects of election administration. Section 10 of the Act requires that, "Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this Act."[42] The NVRA does not mandate what state officer is responsible for this coordination; only that each state identify this individual based on its own constitution. Other parts of the NVRA outline the responsibilities of the state-designated chief election official, "The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."[43] In addition, "On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 10 of the State of the person's residence."[44]

In *Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005), the court ruled that the State of Georgia violated the provisions of the NVRA by rejecting 64 mail-in voter applications bundled and submitted by a local non-profit organization.[45]

---

[40] *Id.* § 20507 Requirements With Respect to Administration of Voter Registration.

[41] *See* the amici curiae briefs filed by the State of Georgia and 14 other states, on September 22, 2017, accompanying *Husted v. Randolph* ___ U.S. ___, 138 S. Ct. 1833 (2018) seeking clarification of state responsibilities in adhering to the National Voter Registration Act.

[42] 52 U.S.C.A. § 20509.

[43] *Id.* § 20505.

[44] *See* 52 U.S.C.A. § 20507, Requirements with Respect to Administration of Voter Registration for the full list of responsibilities for the chief election officer as required by, *id.* § 20509, of the NVRA.

[45] The lead defendant in that case, Cathy Cox, was the Georgia Secretary of State at the time.

13

Additional challenges to Georgia's compliance with the NVRA address the relationship between proof of citizenship and voting and the maintenance of voter lists.[46] Section 5 of the NVRA provides that voter registration applications may only require the minimum amount of information necessary for a state to determine applicants' eligibility to register to vote and to perform its registration duties.

## HELP AMERICA VOTE ACT

In the wake of overwhelming concerns about voter access, voting equipment, and disenfranchisement allegations during the 2000 Presidential election, the Help America Vote Act of 2002 ("HAVA") provides federal resources to help states and local governments streamline, strengthen, and enhance election administration. The Act created a bipartisan, independent Election Assistance Commission ("EAC") and allocated $3.65 billion to help states carry out the following provisions: The creation and maintenance of a computerized state voter registration system,[47] the replacement of punch card and lever voting machines,[48] the distribution of provisional ballots to residents whose registrations are questioned,[49] enhanced access for voters with disabilities,[50] and assistance in developing plans to secure voting systems. HAVA required that states replace their voting machines with one of three forms: Direct-Recording Electronic Voting ("DRE"), Optical Scans, or Ballot Marking Devices ("BMD"). The State of Georgia, along with 17 other states, opted to create a uniform voting system where all voting equipment is purchased at the state level.[51] Table 1

---

[46] *See Georgia Coal. for the People's Agenda, Inc v. Kemp,* 347 F. Supp. 3d 1251 (N.D. Ga. 2018); *Morales v. Handel,* No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) for cases challenging Georgia's compliance with the mandates of the NVRA. In each of those cases the named defendant was acting in his/her official capacity as Secretary of the State of Georgia.

[47] 52 U.S.C.A. § 21083.

[48] *Id.* § 20902. States could be exempted from this requirement if they received a waiver.

[49] *Id.* § 21082. HAVA allows for provisional ballots to be tabulated according to the provisions established in each state or territory.

[50] 52 U.S.C.A. § 21081.

[51] Other states with uniform voting systems include Alabama, Alaska, Connecticut, Delaware, Georgia, Hawaii, Louisiana, Maine, Maryland, Nevada, New Hampshire,

below illustrates the types of voting machines used in Georgia during the 2000 election as well as accompanying information regarding the number of counties using each type of machine and the estimated number of spoiled ballots.

### Table 1: [Georgia] Voting Equipment Performance (2000 General Election)[52]

| Voting System | Introduced in Georgia | Counties Using System | Under Vote Percentage | Votes Not Counted |
|---|---|---|---|---|
| Paper Ballot | 1900 | 2 | 3.3 | 113 |
| Punch Card | 1964 | 17 | 4.6 | 38, 065 |
| Lever Machine | 1959 | 73 | 4.2 | 16,926 |
| Optical-Scan | 1986 | 67 | 2.7 | 38,195 |
|    Central Count | _____ | _____ | 4.2 | 21,999 |
|    Precinct Count | _____ | _____ | 4.7 | 16,196 |

The provisions of HAVA, via the Election Assistance Commission in particular, affirm the important interaction between state and local officials involved in election administration. The EAC's Standards Board is comprised of 55 state elections officials and 55 local officials. While the EAC provides a range of technical assistance to local election officials, HAVA's statutes specify that each State's Chief Election Officer has primary oversight responsibility in overseeing the proper implementation and compliance with its provisions. As with the NVRA, HAVA relies on each state or territory to identify a Chief Election Officer. The Federal Register publishes state plans, pursuant to the HAVA, as submitted to the EAC. As part of my research for this case, I reviewed the Federal Registers from 2018 (Vol. 83, No. 104), 2014 (Vol. 79, No. 127), 2010 (Vol. 75, No. 234), 2008 (Vol. 73, No. 182), 2006 (Vol. 71, No. 8), and 2004 (Vol. 69, No. 57). The 2018 lists the Chief Election Officer for each state. I examined that document and noted that the Chief Election Officer for the State of Georgia is listed as the

---

New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, Utah, and Vermont.

[52] Publication of State Plan Pursuant to the Help America Vote Act, 73 Fed. Reg. 54141-02 (Sept. 18, 2008).

Secretary of State.[53] The information contained in the 2018 Federal Register is consistent with other publications of the Federal Record I researched for the years listed above.

I reviewed EAC allocations to states for the same years. In my research of recent EAC allocations to states, I found that in April 2018 the Georgia Secretary of State's Office accepted a $10,305,783 grant allocation from the U.S. Election Assistance Commission to "improve the administration of elections for Federal office, including to enhance election technology and make election security improvements."[54] The modular budget and federal financial report (see Attachment C) accompanying the grant memorandum includes a 5% state match to improve "election security, simplicity, and accessibility" for a total award of $10,821,072.[55] Some of the proposed uses included purchasing secure devices that produce a verifiable paper ballot, improving voter registration database management, and updating the online voter registration page. In April 2018, then-Secretary of State Brian Kemp established Georgia's Secure, Accessible, and Fair (SAFE) Elections Commission to study and propose options for the state's election system. I reviewed the report containing the final recommendations the commission submitted to the General Assembly on January 10, 2019. Page five of the

---

[53] There is no federal requirement that the Secretary of State serve as the Chief Election Officer; this designation is specified in each state constitution or charter. In Delaware, for example, the Chief Election Officer is the Commissioner of Elections while Kentucky's Chief Elections Officer is the Executive Director of the State Board of Elections.

[54] See Attachment C, Memorandum and Grant Budget from Chris Harvey, Elecs. Dir. in the Office of Ga. Sec'y of State Brian P. Kemp, to Brian Newby, Exec. Dir. of the U.S. Elec. Assistance Comm'n (July 10, 2018). 52 U.S.C. § 20901(a) specifies that, "[n]ot later than 45 days after October 29, 2002, the Administrator of General Services (in this subchapter referred to as the 'Administrator') shall establish a program under which the Administrator shall make a payment to each State in which the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after October 29, 2002, that the State intends to use the payment in accordance with this section.".

[55] 52 U.S.C.A. § 21003(a) of the HAVA outlines the condition for receipt of funds, "a state is eligible to receive a requirements payment for a fiscal year if the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, has filed with the Commission a statement certifying that the State is in compliance with the requirements referred to in subsection (b)."

document notes that, "Georgia implemented its current uniform voting system that uses DRE systems for in-person voting. Georgia has a 'top-down' election system where ballots are constructed by the Center for Elections System, which was previously a part of Kennesaw State University, but is now part of the Office of the Secretary of State."[56] Many of report's proposals reflect the provisions covered by HAVA and thus eligible for funding from the Elections Assistance Commission, and compliance with its mandates.[57]

*Shelby County v. Holder*

In 2010, election officials from Shelby County, Alabama sued the US Attorney General to challenge the constitutionality of Sections 4(b) and 5 of the Voting Rights Act of 1965. In a 5-4 ruling, the Supreme Court struck down the coverage formula (Section 4) used to identify covered jurisdictions that were previously required to submit proposed election rule changes (Section 5) to the Department of Justice, "Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned nationwide for over 40 years. And voter registration and turnout numbers in the covered States have risen dramatically . . . ."[58]

While the ruling in *Shelby County* did not eliminate the VRA, it significantly weakened federal oversight of election administration. Previously covered jurisdictions in Texas, North Carolina, Florida, Mississippi, Alabama, and Georgia introduced new measures regulating voter access following the ruling. *Shelby County* allowed local election officials to make decisions such as consolidating polling places, purging voters, adopting stricter voter id requirements, changing election dates, and eliminating early voting without first submitting those proposed changes for federal review. The ruling heightened concerns from some groups that these facially neutral restrictions could

---

[56] *See Secure, Accessible, and Fair Elections (SAFE) Commission Report,* submitted to the Ga. Gen. Assemb. (Jan. 10, 2019), available at https://sos.ga.gov/admin/uploads/SAFE_Commission_Report_FINAL_(1-10-18).pdf (Comm'n Co-Chairs: Secy of State Robyn Crittenden and State Rep Barry A. Fleming).

[57] *Id.*

[58] *Shelby Cty v. Holder*, 133 S. Ct. 2612, 2627-28 (2013).

disproportionately impact minority groups who necessitated the original passage of the VRA.[59]

*Shelby County* reaffirmed the importance of federalism outlined in earlier passages of this report. First, it placed the onus on Congress to exercise its Constitutional authority to create a new Section 4 formula based on more contemporary data. Second, in the absence of federal authority to prevent discriminatory policies from taking effect, *Shelby County* increased the importance of state election officials carrying out their responsibility to both monitor and remediate electoral practices that undermine the rights enshrined in the Federal Constitution and protected by other sections (most notably Section 2) of the VRA. Local officials continue to play a key role in executing various election administration functions in accordance with the mandates of state law and constitutional authority. For example, in researching the duties and functions of various county election boards in Georgia I noted the charge of the Augusta-Richmond County Board of Elections, "[t]o make and issue rules, regulations, and instructions, consistent with law as deemed necessary for the guidance of poll officers and voter registration officers."[60]

However, this local discretion does not supersede the primary responsibility that now falls more heavily upon state election officials to ensure no procedure, device, or practice adopted at the local or state level impairs the rights and protections afforded at the federal level. The Chief Election Officer may exercise this oversight in a number of ways. For example, the Official Code of Georgia instructs the Secretary of State, "to develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in the state."[61] Similarly, "the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002."[62]

---

[59] *See, e.g.,* Thurgood Marshall Institute at the NAACP Legal Defense and Education Fund. (2018). *Democracy Diminished: State and Local Threats to Voting Post Shelby County v. Holder.*New York: NAACP LDF. Available at https://www.naacpldf.org/wp-content/uploads/Democracy-Diminished-State-and-Local-Threats-to-Voting-Post-Shelby-County-Alabama-v.-Holder.pdf.

[60] *See* Attachment K at 2.

[61] O.C.G.A. § 21-2-50(a)(15).

[62] O.C.G.A. § 21-2-50.2(c).

Under *Shelby County*, the Chief Election Officer must now work closely with other government officials to ensure state residents have fair and consistent access to the electoral process. When measures are passed by the legislature, for example, the duty falls upon election administrators to carry them out in accordance with the previously described federal guidelines. A decision by a state legislature to raise the minimum voting age to 21, for example, should not be carried out by state election officials because it imposes a more stringent age qualification than what is required by the Twenty-Sixth Amendment. However, a state election officer could legally carry out a legislative plan to lower the minimum age to 17 for state and local elections. It should be noted that Georgia is one of seven states where election management is handled by both a Chief Election Official and a State Board. However, the federal mandates of the NVRA and the HAVA vest authority with the singular Chief Election Official identified by the state. In Georgia, that official is the Secretary of State.[63]

In sum, *Shelby County* significantly heightened the need for each State's Chief Election Officer to oversee and enforce election administration to ensure state compliance with the protections embedded in the Federal Constitution and affirmed by the Voting Rights Act of 1965, the National Voter Registration Act, and the Help America Vote Act. Barring direct federal oversight of compliance leaves that responsibility to state election officials.

### D. GEORGIA STATE PROVISIONS FOR ELECTION ADMINISTRATION AND AUTHORITY

I conducted an extensive review of Georgia statutes and regulations to evaluate the following questions:

1) What, if anything, is the role of the Secretary of State ("SOS") with respect to voting and elections?
2) What is the statutory authority identifying the SOS as the Chief Election Officer?
3) And accordingly, what powers and responsibilities are assigned to the Chief Election Officer?

Based on this review, I identified a total of 151 duties and responsibilities connecting the SOS to election administration. These 151 duties are found in the Official Code of Georgia and the Official Compilation of Rules and Regulations of the State of Georgia. I organized those 151 provisions into three key categories of election administration: 1) Interaction With Candidates for Public Office, 2) Interaction With Voters, and 3) Interaction With Election Officials. These categories often overlap and should not be considered as mutually exclusive. Rather, I focus on the primary duties in each

---

[63] O.C.G.A. § 21-2-50.2(a).

provision when assigning to categories. Table 2 (*see* Attachment A) contains all 151 provisions, as well as my categorizations. There are few, but important statements outlining the Secretary of State's interactions with (potential) candidates for public office. An example of Category 1 is the Secretary of State's duty to "receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the SOS in accordance with this chapter."[64] Category 2, interactions with voters, most closely aligns with educating and protecting voters' rights. An example of Category 2 is the obligation to "prepare and furnish information for citizens on voter registration and voting."[65] I noted in my research that the bulk of Georgia's provisions defining the role of the SOS in election administration falls under Category 3; defining her/his duties to guide and oversee the actions of local officials. An example of Category 3 is:

> The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State. The board of registrars shall provide each deputy registrar with a copy of the manual.[66]

The SOS, by statute[67], is also the chair of the State Election Board. The State Election Board, in turn, is statutorily required to "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers and other officials, as well as the legality and purity in all primaries and elections."[68]

---

[64] O.C.G.A. § 21-2-50(a)(3).

[65] O.C.G.A. § 21-2-50(a)(13).

[66] Ga. Comp. R. & Regs. 183-1-6-.03(3)(n).

[67] O.C.G.A. § 21-2-30(d).

[68] O.C.G.A. § 21-2-31(1). *See also* O.C.G.A. § 21-2-31(10) (stating the State Board has the duty to take "such other action, consistent with the law, as the board may determine to be conducive to the fair, legal, orderly conduct of primaries and elections").

In Table 3 (*see* Attachment B), I juxtapose the NVRA, HAVA, and VRA requirements with the Georgia statutes regulating the duties of the Chief Election Official. In the space below I highlight some of the major provisions governing the Secretary of State's responsibilities for election administration.

*The Role of the Secretary of State*

The SOS for Georgia is an elected position tasked with numerous duties such as housing the Professional Licensing Boards Division, implementing and enforcing the Georgia Uniform Securities Act of 2008, registering charitable organizations, and of specific interest to this report,

> The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, municipal, state, county, and federal elections. They are responsible for certification of election results as well as certifying the qualification of candidates and preparation of ballots and election forms and materials. The Elections Division provides Great Seal certification for authentication of public documents for foreign use for non-Hague countries. Along with those duties, the Elections Division maintains the Statewide Voter Registration Database to ensure that voter registration lists are current statewide. **They are also accountable for investigating election fraud and enforcing state election laws.**[69]

(emphasis added).

*Chief Election Officer*

Several provisions in the Official Code of Georgia identify the SOS as the Chief Election Official.[70]  Further, as stated above, the SOS is also the chair of the State Election Board, which has the responsibility to take action, including the promulgation of rules, to obtain uniformity in the practices and proceedings of local elections officials and to ensure that primaries and elections are fair, legal and orderly.[71]

---

[69] *See* Ga. Sec'y of State, *Elections*, available at https://sos.ga.gov/index.php/elections.

[70] *E.g.*,O.C.G.A. §§ 21-2-10 and 21-2-50 (14

[71] O.C.G.A. § 21-2-31(1).  *See also* O.C.G.A. § 21-2-31(10) (stating the State Board has the duty to take "such other action, consistent with the law, as the board may determine to be conducive to the fair, legal, orderly conduct of primaries and elections"); *Grizzle v. Kemp*, 634 F.3d 1314, 1319, 1326 (11th Cir. 2011) (stating the SOS  has the "duty and

In the particular context of HAVA, O.C.G.A. § 21-2-50.2(a) provides that:

> The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.

Accordingly, O.C.G.A. § 21-2-50.2(b) states:

> As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.[72]

These two provisions, as well as the SOS's overall responsibility to ensure that elections in Georgia are legal, fair and orderly, create an oversight function of the SOS in ensuring compliance with the mandates of HAVA. In a broader sense, over 100 of the 151 statutes I examined highlight the key role the State's Chief Election Official must play in coordinating, monitoring, and overseeing the administrative functions of subordinate election administrators. For example, the SOS approves the certification program for:

> All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by completing a certification program approved by the Secretary of State by no later than December 31 of the year in which they are appointed. Such program may

power to enforce the State's election code" and to "ensure that the entities [such as local election officials] charged with those responsibilities comply with Georgia's election code in carrying out those tasks.")

[72] Title III (*see* 52 U.S.C.A. §§ 21081-21085, 21101) of HAVA refers to the Uniform and Non-Discriminatory Technology and Administration Requirements. It guarantees provisional ballots to electors whose registration is disputed, requires appropriate voting systems, mandates a centralized voter registration database, and allows for absentee ballots. 52 U.S.C.A. § 21085 is of particular note, "[t]he specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State."

include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections.[73]

The Office of the SOS acts as a key resource for voters in the State of Georgia. For example, I analyzed the My Voter Page ("MVP") portal that is maintained by the SOS's Office. The MVP portal enables Georgia voters to review their voter registration status, locate early voting and poll locations, check the status of mail-in applications, view sample ballots, and review the status of their provisional ballots.[74] The site's disclaimer documents that the data provided by the SOS site is extracted from data provided by the various counties of residence. The portal also contains links to the state's Election Advisory Council, the state's voter identification requirements,[75] the VoteSafe program,[76] and a form to report allegations of voter fraud.[77]

*Election Oversight with Intrastate and Interstate Officials*

The SOS is required to provide multiple training sessions for the aforementioned election officials, has the discretion to waive training requirements for local election officials, and has the responsibility to ensure that local election officials are adequately training poll workers and others involved in the election process.  As just one example of the SOS being involved in local training efforts, the Georgia Election Code provides :

> A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to

---

[73] O.C.G.A. § 21-2-101(a).

[74] Ga. Sec'y of State, *My Voter Page,* available at https://www.mvp.sos.ga.gov/MVP/mvp.do.

[75] O.C.G.A § 21-2-417.

[76] Ga. Sec'y of State, *VoteSafe,* available at https://sos.ga.gov/index.php/elections/votesafe.

[77] Ga. Sec'y of State, *Elections Division,* available at https://sos.ga.gov/cgi-bin/EMailStopVoterFraud.asp.

complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State.[78]

Another example is that the SOS's official website contains poll worker manuals and videos.

My review of the official website for the Secretary of State's Office also shows information and resources to assist various state and local agencies (e.g. public high schools and colleges; the Georgia Department of Natural Resources; and public libraries) in carrying out the federal voter registration provisions required by the NVRA.[79] For example, the Election Connection tab contains links to a document for agencies entitled, "Implementing NVRA in Department of Human Services." The document's preface states:

> Implementing NVRA in Department of Human Services is to be used as a guide for the administration of voter registration conducted by Georgia Agencies under the National Voter Registration Act of 1993 (NVRA). This manual is not intended to be used as a substitute for the Georgia Constitution, relevant statutes, or applicable case law. Whenever there is a question regarding the interpretation of information contained in this guide, or of a particular section of the Election Code, or any other statute, the user should contact competent legal counsel or the Office of the Secretary of State, Elections Division.[80]

The "Implementing NVRA" guide also outlines the Role of the Secretary of State's Office:

> The NVRA requires that each state designate a chief election official to be responsible for coordination of the state responsibilities under this act. The Secretary of State has been named the chief election official for the State of Georgia. Under state law, the Secretary of State is charged with establishing

---

[78] O.C.G.A. § 21-2-100(c). *See also* O.C.G.A. § 21-2-50 (11); Ga. Comp. R. & Regs. 183-1-6-.03(3)(m).

[79] Ga. Sec'y of State, *Election Connection*, available at https://sos.ga.gov/index.php/Elections/election_connection.

[80] Ga. Sec'y of State: Elecs. Div., *Implementing NVRA: Dep't of Human Servs.*, Preface (ver. 1 2001), available at http://sos.ga.gov/admin/files/Implementing_NVRA_DHS_v.1_2011_.pdf.

and maintaining a statewide voter registration system. The system must be capable of meeting federal requirements for maintaining lists of both eligible active voters and those voters considered inactive. The Secretary of State is responsible for overseeing statewide list maintenance activities and functions required under federal and state laws. These relate to updating voter information and removing ineligible persons from the voter lists.[81]

The SOS has exclusive powers over various details governing the local administration of elections including determining the size and shape of the envelopes used to submit absentee ballots[82] and designing and supplying tally sheets, voting rights posters, and oaths of assisted electors and poll officers.[83] The SOS receives election results from election superintendents of the various counties and certifies the votes. Election results for each of Georgia's 159 counties are tabulated and made available via the Secretary's official website pursuant to O.C.G.A. § 21-2-499. In addition,

> In the case of primaries, elections, and runoffs for county, state, and federal office, the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State, within seven days following a primary, election, or runoff.[84]

The SOS acts as the central point of contact for receiving information regarding voter eligibility of Georgia residents. The Office receives information from federal officials (e.g. Georgia residents who have been convicted of federal felonies and thus ineligible to vote while incarcerated or on parole or probation), state agencies (e.g. natural resources and the Department of Driver Services), and local entities (e.g. probate court). The SOS is responsible for using this data to update the central registration database that local superintendents and election officials use to verify registrations, "prior to approving the application of a person to register to vote, the

---

[81] *See supra* note 76, *Implementing NVRA: Dep't of Human Servs.* at 1.

[82] O.C.G.A. § 21-2-384(b).

[83] O.C.G.A. § 21-2-400(a).

[84] Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9).

registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State."[85]

The Office of the SOS also plays a key role in ensuring election integrity by notifying other states of new Georgia residents' status:

> Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.[86]

Relatedly, the SOS is the central point of contact for notifying counties and municipalities within the state of changes to residence:

> Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making application to register to vote in that county or municipality, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.[87]

*Election Oversight with Federal Officials*

As the Chief Election Official for the State of Georgia, the SOS represents the state in official interactions with the federal government related to election administration. For example, in May 2017, President Donald J. Trump signed Executive Order 13799 establishing the Presidential Advisory Commission on Election Integrity to study registration and voting procedures in order "to promote fair and honest Federal elections.[88]" Commission Vice-Chair Kris Kobach sent a request to each state's chief

---

[85] O.C.G.A. § 21-2-216(h).

[86] O.C.G.A. § 21-2-218(a).

[87] *Id.*

[88] Executive Order 13799, 82 Fed. Reg. 22389 (May 11, 2017).

election official for "publicly-available data from state voter rolls and feedback on how to improve election integrity."[89] The Georgia Secretary of State's Office responded to this federal request in its official capacity as the state's chief election officer, "The Georgia Secretary of State's Office will provide the publicly available voter list. As specified in Georgia law, the public list does not contain a registered voter's driver's license number, Social Security number, month and day of birth, site of voter registration, phone number, or email address."[90] The SOS complied with the federal request while withholding personal information (e.g. social security numbers, phone numbers, and email addresses) as required by Georgia state law.

The Appendix to this report includes official memoranda I researched documenting interactions between the Secretary of State, acting in his official capacity as the Chief Election Official, and the Chair of the federal EAC. Of note is a series of memoranda from 2013 and 2014 requesting permission to make changes to the National Voter Registration Mail Application Form. Although *Shelby v. Holder* means that states are no longer required to submit proposed changes for federal approval, the mandates of the National Voter Registration Act are still intact and require pre-approval for state changes to the federal information forms and requirements. A memorandum (Attachment D) written to Ms. Alice Miller, Acting Executive Director of the EAC, from Secretary of State Brian P. Kemp dated August 1, 2013 begins as follows:

Dear Ms. Miller,

As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

---

[89] https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election

[90] *Georgia to release data to Trump election commission*, 11Alive, June 30, available at https://www.11alive.com/article/news/politics/national-politics/georgia-to-release-data-to-trump-election-commission/85-453342487

Attachment E includes Miller's subsequent responses (2) to Secretary Kemp:

> Dear Secretary Kemp:
>
> Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).
>
> You requested that EAC revise the Georgia state-specific instructions by making the following changes:
>
> 1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:
>
>    • Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship
>
> 2. Revision of the mailing address as follows:
>
>    Elections Division
>    Office of the Secretary of State
>    2 Martin Luther King, Jr. Drive
>    Suite 802 Floyd West Tower
>    Atlanta, GA 30334

Finally, I attach copies of correspondence between Secretary Kemp and EAC Director Newby regarding the state's requests to make changes to Georgia-specific information on the federal voter registration form related to agency address and proof of citizenship (Attachments F, G, and H). This correspondence illustrates the important role Georgia's Chief Election Official plays in overseeing election administration on behalf of the state's residents.

The U.S. Election Assistance Commission conducts a biennial Election Administration and Voting Survey ("EAVS") to gather state-level data on various aspects such as the number of military personnel registering to vote, voting technology, and the frequency of provisional voting. The comprehensive data is used to ensure compliance with the various mandates of both HAVA and NVRA and to improve election administration. The official federal report lists Georgia as one of 38 states in the country with what it terms a "top-down" voter registration process where the chief election official "gathers and aggregates information from local jurisdictions' voter registration databases."[91] Each state's election office works in conjunction with local officials to gather the data, which is then submitted to the EAC. I reviewed the 2018 Comprehensive Report to the 116th Congress that was published in June 2019 to gain a better understanding of the information provided on behalf of the State of Georgia and by whom. Unfortunately, several key measures were not provided by Georgia officials

---

[91] *See* U.S. Elec. Assistance Comm'n. (2019). *Election Administration and Voting Survey 2018: Comprehensive Report to the 116th Congress.* Silver Spring, MD: EAC, 2019. (pp. 119) Available at https://www.eac.gov/assets/1/6/2018_EAVS_Report.pdf.

such as the number of poll workers. Of relevance to my report, however, was the official data provided by Georgia's SOS indicating the number and form of new voter registration applications and the use and rejection of provisional ballots. Tables 4 and 5 below provide this data.[92]

Table 4: Georgia Voter Registration Applications*

| Total | Mail, Fax, Email | In-Person | Online | Motor Vehicle Offices | Public Assistance Offices | Disability Services Office | Armed Forces | Other Agencies | Registration Drives- Advocacy Groups or Parties | Other Sources | Not Categorized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,498,331 | 280,957 (6.25%) | 102,468 (2.28%) | 357,491 (7.95%) | 3,596,384 (79.95%) | 23,656 (.53%) | 30,914 (.69%) | 97 (0%) | —— | ——— | 106,634 (2.36%) | 0 0% |

* Indicates requests for which the state did not submit data

Table 5: Georgia Provisional Voting*

| Total Provisional Ballots Submitted | Full Ballots Counted | Partial Ballots Counted | Rejected Ballots | Other |
|---|---|---|---|---|
| 21,604 | 11,905 (55.1%) | — ——— — | 9,699 (44.9%) | ——— ——— |

* Indicates requests for which the state did not submit data

Taken together the state statutes, memos, press releases, grant acknowledgements, NVRA implementation guide for state agencies, website resources, federal reports and bulletins I researched affirm the practical ways the Georgia SOS acts in his/her official

---

[92] Ibid.

29

capacity as the Chief Election Official responsible for administering, enforcing, and reconciling key functions at the local, state, and federal level.

### E.  CONCLUSION

The federal provisions found in the Constitution guarantee that all eligible citizens have unfettered access to voting in federal elections. The principle of federalism allows state discretion in defining fair and consistent standards for determining eligibility. However, the mandates of the National Voter Registration Act and the Help America Vote Act, coupled with *Shelby County v. Holder*'s removal of federal oversight in preclearing or preventing potentially harmful electoral changes and procedures amplify the importance of each state's Chief Election Officer in overseeing election administration across the entire state. In Georgia, the Chief Election Officer is identified by state statutes as the Secretary of State. That position is tasked with over 151 duties establishing broad oversight, enforcement, and correction responsibilities to ensure Georgia residents may effectively exercise the right to vote. The evidence contained in this report is consistent with my research into voting rights and election administration in various states and the nation as a whole.

# LIST OF ATTACHMENTS AND APPENDIXES

ATTACHMENT A: Georgia Statutes Outlining the Secretary of State's Duties (Table 2)

ATTACHMENT B: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State (Table 3)

ATTACHMENT C: 2018 HAVA Election Security Grant Award Letter from Georgia Secretary of State to the U.S. Election Assistance Commission (July 10, 2018)

Correspondence between the U.S. Election Assistance Commission and the Georgia Secretary of State
- August 1, 2013 ATTACHMENT D
- August 15, 2013 ATTACHMENT E
- January 17, 2014 ATTACHMENT F
- January 29, 2016 ATTACHMENT G
- September 12, 2016 ATTACHMENT H

ATTACHMENT I: Federal Financial Report for Grant Received by the Georgia Secretary of State's Office (December 27, 2018)

ATTACHMENT J: Federal Voter Registration Guide and Form with Georgia-Specific Information

ATTACHMENT K: Augusta-Richmond County Georgia Board of Elections Pamphlet (March 2018)

APPENDIX A: Brown-Dean Curriculum Vitae

# ATTACHMENT A

TABLE 2: Georgia Statutes Outlining the Secretary of State's Duties
CATEGORY 1: Candidate Interaction
CATEGORY 2: Voter Interaction
CATEGORY 3: Election Official Interaction

| Duty | Text | Source | Function Classification |
|---|---|---|---|
| Powers and duties of the SOS | To determine the forms of nomination petitions, ballots, and other forms the Secretary of State is required to determine under this chapter | O.C.G.A. § 21-2-50(a)(1) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To receive registration statements from political parties and bodies and to determine their sufficiency prior to filing, in accordance with this chapter, and to settle any disputes concerning such statements; | O.C.G.A. § 21-2-50(a)(2) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State in accordance with this chapter; | O.C.G.A. § 21-2-50(a)(3) | Category 1 |
| Powers and duties of the SOS | To certify to the proper superintendent official lists of all the political party candidates who have been certified to the Secretary of State as qualified candidates for the succeeding primary and to certify to the proper superintendent official lists of all the candidates who have filed their notices of candidacy with the Secretary of State, both such certifications to be in substantially the form of the ballots to be used in the primary or election. The Secretary of State shall add to such form the language to be used in submitting any proposed constitutional amendment or other question to be voted upon at such election; | O.C.G.A. § 21-2-50(a)(4) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To furnish to the proper superintendent all blank forms, including tally and return sheets, numbered lists of voters, cards of instructions, notices of penalties, instructions for marking ballots, tally sheets, precinct returns, recap sheets, consolidated returns, oaths of managers and clerks, oaths of assisted electors, voters certificates and binders, | O.C.G.A. § 21-2-50(a)(5) | Category 3 |

1

| | applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries. Such forms shall have printed thereon appropriate instructions for their use; | | |
|---|---|---|---|
| Powers and duties of the SOS | **To receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions,** as required by this chapter; | O.C.G.A. § 21-2-50(a)(6) | Category 3 |
| Powers and duties of the SOS | **To furnish upon request a certified copy of any document in the Secretary of State's custody by virtue of this chapter and to fix and charge a fee to cover the cost of furnishing same;** | O.C.G.A. § 21-2-50(a)(7) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To perform such other duties as may be prescribed by law;** | O.C.G.A. § 21-2-50(a)(8) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To determine and approve the form of ballots for use in special elections;** | O.C.G.A. § 21-2-50(a)(9) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | **To prepare and provide a notice to all candidates for federal or state office advising such candidates of such information, to include requirements of this chapter, as may, in the discretion of the Secretary of State, be conducive to the fair, legal, and orderly conduct of primaries and elections. A** copy of such notice shall be provided to each superintendent for further distribution to candidates for county and militia district offices; | O.C.G.A. § 21-2-50(a)(10) | Category 1 Category 3 |
| Powers and duties of the SOS | **To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections;** | O.C.G.A. § 21-2-50(a)(11) | Category 3 |

| Powers and duties of the SOS | To prepare and publish, in the manner provided in this chapter, all notices and advertisements in connection with the conduct of elections which may be required by law; | O.C.G.A. § 21-2-50(a)(12) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Powers and duties of the SOS | To prepare and furnish information for citizens on voter registration and voting; | O.C.G.A. § 21-2-50(a)(13) | Category 2 |
| Powers and duties of the SOS | To maintain the official list of registered voters for this state and the list of inactive voters required by this chapter; | O.C.G.A. § 21-2-50(a)(14) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state. | O.C.G.A. § 21-2-50(a)(15) | Category 3 |
| Extension or postponement of qualifying periods and primaries and elections in even of state of emergency or disaster | In the event the Governor declares that a state of emergency or disaster exists pursuant to Code Section 38-3-51 or a federal agency declares that a state of emergency or disaster exists, the Secretary of State is authorized to postpone or extend the qualifying periods provided in this chapter for the qualification of candidates seeking municipal, county, or state-wide office and to postpone the date of any primary, special primary, election, or special election in the affected area. | O.C.G.A. § 21-2-50.1 | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002. | O.C.G.A. § 21-2-50.2(a) | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act. | O.C.G.A. § 21-2-50.2(b) | Category 1 Category 2 Category 3 |

3

| Responsibilities under HAVA | Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby **the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(c) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars** to determine the eligibility of the applicant and, if found eligible, **to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |
| Instruction and training of private entities | **The Secretary of State may develop and provide to the boards of registrars manuals for this instruction.** The Secretary of State may also make such manuals available to the public, including via electronic means on the Secretary of State's website. Until such time as the Secretary of State develops such manuals, boards of registrars shall utilize such materials as will meet the training requirements of this rule. | Ga. Comp. R. & Regs. 183-1-6-.02(5)(c) | Category 1 Category 2 Category 3 |
| Rules and Regulations for Voter Registration by Registrars and Deputy Registrars | **The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State.** The board of registrars shall provide each deputy registrar with a copy of the manual. | Ga. Comp. R. & Regs. 183-1-6-.03(3)(n) | Category 3 |

| Accessibility for Elderly and Disabled Voters | Polling Places. The election superintendent of each county and municipality shall conduct, or cause to be conducted, an on-site inspection of each polling place located within the county or municipality to determine if the polling place is accessible. **This inspection shall be reported to the Secretary of State on forms prepared by the Secretary of State at such times as the Secretary of State shall prescribe.** Any polling place found not to be accessible shall either be made accessible prior to its use in a primary or election or shall not be used as a polling place. | Ga. Comp. R. & Regs. 183-1-6-.04(5)(a) | Category 3 |
| Accessibility for Elderly and Disabled Voters | Printed Instructions. The Secretary of State shall provide instructions for use by election superintendents at polling places and registrars at voter registration places, printed in large type, to assist visually and hearing impaired electors in voting and registering to vote. | Ga. Comp. R. & Regs. 183-1-6-.04(7) | Category 3 |
| Conduct of Elections: Voting Machines—Vote Recorders | Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia **shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State.** In addition, absentee balloting shall be conducted through the use of optical scan ballots which **shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**; provided, however, that the **use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.** | Ga. Comp. R. & Regs. 183-1-12-.01 | Category 1 Category 2 Category 3 |
| Direct Recording Electronic | Acceptance tests. Upon the receipt of each new direct recording electronic voting unit (DRE), **the election superintendent of the county is responsible to ensure that an acceptance test is** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(a) | Category 3 |

| Voting Equipment | **performed on the device in accordance with standards issued by the Secretary of** State. No DRE unit shall be accepted by the county or placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | The election superintendent of the county **shall maintain the DRE units in accordance with** the requirements of this rule, **the directives of the Secretary of State,** and the specifications and requirements of the manufacturer. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(b)(1) | Category 3 |
| Direct Recording Electronic Voting Equipment | Software security. The software contained in each DRE unit, regardless of whether the unit is owned by the county or the state, and **the software used to program the unit and to tabulate and consolidate election results shall not be modified, upgraded, or changed in any way without the specific approval of the Secretary of State. No other software shall be loaded onto or maintained or used on computers on which the GEMS software is located except as specifically authorized by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(c) | Category 3 |
| Direct Recording Electronic Voting Equipment | The GEMS server shall not be moved or relocated for educational or training purposes. Should it become necessary to relocate the GEMS server or any of its components from one facility to another, the election superintendent shall notify the Secretary of State in writing of the reason for the relocation and the proposed new location. **Under no circumstances shall the GEMS server or any of its components be relocated unless and until written authorization for the relocation is received from the Secretary of State** except in the event of an emergency situation beyond the control of the election superintendent. | Ga. Comp. R. & Regs.183-1-12-.02(2)(g)(3) | Category 3 |
| Direct Recording Electronic Voting Equipment | The poll manager shall sign a receipt for all supervisor cards, encoders, voter access cards, memory cards, and DRE unit keys assigned to such poll manager's precinct. Upon returning election supplies to the election superintendent's office | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(4) | Category 3 |

6

| | following the close of the polls, the poll manager shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | All supervisor cards, encoders, voter access cards, memory cards, DRE unit keys, and other equipment assigned to designated county election technicians shall be accounted for on the night of a primary, election, or runoff and shall be returned to storage. Each technician shall sign a receipt for all such items issued to such technician and, upon returning such items to the election superintendent's office following the close of the polls, the technician shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | **The election superintendent shall notify the Secretary of State** of any instances of unaccounted for DRE units, optical scanner devices, voter access cards, supervisor cards, memory cards, DRE unit keys, voting system software, and encoders at the completion of certification by delivering such notification to the Secretary of State when the certified election results are delivered to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(6) | Category 3 |
| Direct Recording Electronic Voting Equipment | After placing the memory card (PCMCIA card) in the DRE unit, the DRE unit shall have such internal diagnostic tests performed as shall be directed by the Secretary of State or the election superintendent. | Ga. Comp. R. & Regs. 183-1-12-.02(3)(b)(1)(ii) | Category 3 |
| Direct Recording Electronic | The poll officers shall affix a card of instructions for voting within each voting booth and **shall place at least two printed sample ballots and at least two voting instructions posters** | Ga. Comp. R. & Regs. 183-1-12-.02(3)(d)(7) | Category 1 Category 2 Category 3 |

| Voting Equipment | approved or provided by the Secretary of State outside the enclosed space at the polling place for the information of the voters. **Prior to voters entering the enclosed space, the poll officers may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | In the case of primaries, elections, and runoffs for county, state, and federal office, **the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State**, within seven days following a primary, election, or runoff. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | Electronic Transmission of Precinct Results to Central Office. The election superintendent shall transmit to the Secretary of State unofficial election results for all races for state offices in any primary, election, or runoff as soon as possible after the closing of the polls for such primary, election, or runoff. **Such results shall be transmitted in a format prescribed by the Secretary of State.** At a minimum, the results shall be transmitted upon one third of the precincts reporting results, upon two thirds of the precincts reporting results, and upon all precincts reporting results, including absentee ballots within all precincts. Except upon notice to and consultation with the Secretary of State, no election superintendent shall conclude the tabulation of votes on election night in any primary, election, or runoff in which there are contested races for federal and state offices until and unless all such unofficial results, including absentee ballots, have been transmitted to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(d) | Category 3 |
| Direct Recording Electronic Voting Equipment | **In the event of any malfunction or problem with DRE units, the county election superintendent shall document the problem and its resolution and shall provide such information to the Secretary of State.** The documentation | Ga. Comp. R. & Regs. 183-1-12-.02(8)(b) | Category 3 |

8

| | shall include a detailed description of the malfunction or problem, the steps taken to correct the malfunction or problem, and the cause of such malfunction or problem if a cause can be determined. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | Use of Equipment by Municipalities. The county election superintendent is authorized to permit any municipality within the county to conduct its election with the DRE equipment through a written intergovernmental agreement between the county and the municipality; provided that the municipality agrees to maintain and operate the equipment in accordance with law, these rules and regulations, and the manufacturer's guidelines and specifications and provided further that the municipality trains all of its election personnel and poll workers in the proper operation and conduct of elections utilizing such equipment **through a training program conducted by or approved by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | The registrars of each county shall complete the entry of new and updated voter registrations **on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.** | Ga. Comp. R. & Regs. 183-1-12-.07(4) | Category 3 |
| Direct Recording Electronic Voting Equipment | Prior to each primary or election **as specified by the Secretary of State, the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the GEMS database for the county.** | Ga. Comp. R. & Regs. 183-1-12-.07(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | The county election superintendent and the registrars **shall notify the Secretary of State or his or her designee of any changes to the voter registration file** for the county or the GEMS database that occur after the process for creating ExpressPoll flash cards begins. | Ga. Comp. R. & Regs. 183-1-12-.07(6) | Category 3 |

9

| Direct Recording Electronic Voting Equipment | Upon the conclusion of each primary, election, or runoff, the poll officers shall return the ExpressPoll units with the other election materials from the precinct to the election superintendent. **The registrars and election superintendent shall coordinate the return of the flash cards from the ExpressPoll units to the Secretary of State** such that the cards are returned in the same time period as the official election returns. | Ga. Comp. R. & Regs. 183-1-12-.07(9) | Category 3 |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | On the first day of the absentee voting period, prior to any votes being cast on the DRE units, the registrars shall verify that the seal for each DRE unit is intact and that there is no evidence or indication of any tampering with the seal or the unit. The registrars shall verify that the number of the seal matches the number of the seal recorded for that unit when such unit was prepared by the election superintendent for the primary, election, or runoff. If a seal number does not match or if there is any evidence or indication of tampering with the seal or unit, **the Secretary of State and the election superintendent shall be immediately notified and such unit shall not be used until such matters are resolved by agreement of the Secretary of State, the election superintendent, and the registrars.** The set up shall be performed in public and the public may view the set up subject to such reasonable rules and regulations as the registrars may deem appropriate to protect the security of the DRE units and to prevent interference with the duties of the registrars, except that the public view shall not be obstructed. The registrars shall run a zero tape on each DRE unit prior to the beginning of absentee voting on such units. The registrars shall, without removing the tape from the unit, verify that all vote registers shown on the zero tape are set to zero and that there are no votes showing on the unit and shall sign the tape in the space provided. If the zero tape does not show that all vote registers are set to zero and that there are votes on the unit, the election superintendent shall be immediately notified and such unit shall not be used until the unit is cleared and the matter is resolved by agreement of the election superintendent and the registrars. After verifying and | Ga. Comp. R. & Regs. 183-1-14-.02(6) | Category 1<br>Category 2<br>Category 3 |

| | signing the zero tape, the registrars shall securely lock the tape compartment leaving the zero tape in place on the unit and shall configure the unit for voting. The registrars shall verify that the election counter on each DRE unit is set at zero. If the election counter is not set to zero, the election superintendent shall be immediately notified and such unit shall not be used until the election counter is set to zero and the matter is resolved by agreement of the election superintendent and the registrars. The registrars shall verify that there is no unauthorized matter affixed to the DRE units or present in the cases or voting booths. The registrars shall affix a card of instructions for voting within each voting booth. **Prior to voters entering the voting booth, the registrars may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** Each DRE unit shall be clearly marked with a unique designation that is visible on the exterior of the unit. | | |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | At the close of business each day during the absentee voting period, the registrars shall document the election counter number on the daily recap sheet. Each DRE unit used for in-person absentee voting shall then be turned off and closed. The memory card (PCMCIA card) shall remain in the unit at all times during the absentee balloting period until the polls close on the day of the primary, election, or runoff. Each DRE unit shall then be sealed and the seal number and the time of sealing shall be recorded on the daily recap sheet. Each DRE unit shall then be secured overnight. In addition, all voter access cards shall be securely stored overnight and when not in use. If a DRE unit is used to program voter access cards, the registrars shall make a notation of the election counter number on the daily recap sheet. **If such number is not zero, the registrars shall notify the Secretary of State immediately and shall ascertain the reason for the discrepancy and shall make a notation of such discrepancy and the reason for it on the daily recap sheet. Such DRE unit shall not be used for creation of voter access cards unless and until the unit is fully tested and reconfigured and the election counter reset** | Ga. Comp. R. & Regs. 183-1-14-.02(8) | Category 3 |

11

| | at zero pursuant to procedures established by the Secretary of State. The DRE unit shall be turned off and secured for the night. | | |
| --- | --- | --- | --- |
| Use of DRE Units for Absentee Balloting | Each morning during the absentee balloting period, the registrars shall publicly verify the seal numbers on each DRE unit to be used for absentee voting with the number of the seal recorded on the daily recap sheet from the previous day of absentee voting and shall verify that the seal and DRE unit do not show any signs of tampering. If the seal number corresponds to the entry on the daily recap sheet and there is no evidence of tampering, the DRE unit shall be opened and turned on. **If the numbers do not match or there is evidence of tampering, the Secretary of State shall be notified immediately and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** After opening and turning on the unit, the registrars shall verify the election counter number with the number recorded on the daily recap sheet from the previous day of absentee voting. **If the numbers do not match, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** The election counter number shall then be entered onto the daily recap sheet for that day. If a DRE unit is to be used for programming voter access cards, the registrars shall open and turn on the power for such unit. The registrars shall then verify that the election counter is set on zero. **If the election counter is not set at zero, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** A notation shall be made on the daily recap sheet of the election counter number and the unit shall be configured to create voter access cards. | Ga. Comp. R. & Regs. 183-1-14-.02(9) | Category 3 |

| Reporting Requirements for Absentee Ballots | **The registrars of each county shall on the 32nd day prior to each statewide general primary and general election submit to the Secretary of State on a form provided by the Secretary of State information concerning absentee ballots requested by electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended.** Such report shall include the number of absentee ballots requested by each such category of absentee voter, the date on which the absentee ballots were available in the registrars' office, and the date on which the ballots requested by such voters were sent to the voters. **The Secretary of State may request further information related to the application for and the transmittal of such ballots.** | Ga. Comp. R. & Regs. 183-1-14-.04(1) | Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | **The Secretary of State shall design a state write-in absentee ballot for use in runoff primaries and runoff elections** by an elector of this state who resides outside the county or the municipality in which the election is being conducted and is: (1) a member of the armed forces of the United States, a member of the merchant marine of the United States, a member of the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration, or a spouse or dependent of such member residing with or accompanying said member; or (2) A citizen of the United States residing outside the United States. | Ga. Comp. R. & Regs. 183-1-14-.05(a) | Category 1<br>Category 2<br>Category 3 |
| State Write-In Absentee Ballot | **The Secretary of State shall prepare and print instructions for completing and returning such ballot that shall also be enclosed with such ballot.** The state write-in absentee ballot, the envelopes for returning it, and the instructions shall be enclosed with the regular absentee ballot, envelopes, and instructions for completing and returning the regular absentee ballot. | Ga. Comp. R. & Regs. 183-1-14-.05(d) | Category 1<br>Category 2<br>Category 3 |

13

| State Write-In Absentee Ballot | **Additionally, the Secretary of State and the county registrars shall provide for the transmission of such blank ballots by facsimile transmission and electronic mail transmission to electors.** Instructions for voting such ballots shall be included on the website and shall accompany any facsimile and electronic mail ballot transmissions. Voted ballots shall not be returned by facsimile or electronic mail. | Ga. Comp. R. & Regs. 183-1-14-.05(e) | Category 1<br>Category 2<br>Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | As soon as practicable after a general primary or general election, **the Secretary of State shall cause to be published on the official website of the Secretary of State a list of all federal offices and state offices in which there will be a runoff primary or runoff election,** as the case may be, along with the names of the candidates who will be on the ballot in such runoff. | Ga. Comp. R. & Regs. 183-1-14-.05(f) | Category 1<br>Category 2<br>Category 3 |
| State Write-In Absentee Ballot | If an elector obtains the ballot by facsimile or by downloading from electronic mail or the Secretary of State's website, the elector shall return the ballot by mail using two envelopes. The elector shall enclose and seal the ballot in a plain envelope and insert that envelope into another envelope for transmission to the registrars. The elector shall copy and sign the appropriate oath onto the back of the outer envelope. **The Secretary of State shall provide a sample envelope and oath form on the Secretary of State's website in such a manner that such form may be used by an elector to print out the forms for the purpose of pasting or attaching such forms to an envelope for returning the ballot or for printing an envelope for returning the ballot.** | Ga. Comp. R. & Regs. 183-1-14-.05(g) | Category 1<br>Category 2<br>Category 3 |
| Secretary of State designated chief state election official | **The Secretary of State is designated as the chief state election** official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8. | O.C.G.A. § 21-2-210 | Category 1<br>Category 2<br>Category 3 |
| Official list of electors; | **The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state** | O.C.G.A. § 21-2-211(a) | Category 1<br>Category 2 |

| equipment to access list | which shall be the official list of electors for use in all elections in this state conducted under this title. | | Category 3 |
|---|---|---|---|
| Official list of electors; equipment to access list | The Secretary of State is authorized to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State pursuant to this Code section, provided that funds are specifically appropriated by the General Assembly for that purpose. | O.C.G.A. § 21-2-211(b)(2) | Category 3 |
| Voter registration | The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship. | O.C.G.A. § 21-2-216(g)(7) | Category 2 Category 3 |
| Voter registration | Prior to approving the application of a person to register to vote, the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State. | O.C.G.A. § 21-2-216(h) | Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence. | O.C.G.A. § 21-2-218(a) | Category 2 Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making | O.C.G.A. § 21-2-218(b) | Category 2 Category 3 |

| | application to register to vote in that county or municipality, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.** | | |
|---|---|---|---|
| Change of residence of elector | In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. **The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's** present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail. | O.C.G.A. § 21-2-218(d) | Category 2 Category 3 |
| Change of residence of elector | In the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, **the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the address previously provided to the board of registrars.** The registrars shall correct the elector's registration record to reflect the correct address. | O.C.G.A. § 21-2-218(g) | Category 2 Category 3 |

| Registration cards; absentee regulations | The registration cards for use by persons in making application to register to vote shall be **in a form as specified by the Secretary of State,** which shall include printed forms, forms made available through electronic means, or otherwise. Except as provided in subsection (b) of this Code section and Code Section 21-2-221.2, only registration cards issued or authorized for use by the Secretary of State or the national voter registration card promulgated under the provisions of the National Voter Registration Act of 1993, 42 U.S.C. Section 1973gg-7, shall be accepted for purposes of voter registration. | O.C.G.A. § 21-2-219(a) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The office of the Secretary of State is designated as the office, under the federal Help America Vote Act, to be responsible for providing information on registration and absentee ballot procedures for use by absent uniformed services and overseas voters, including the use of the federal write-in absentee ballot.** | O.C.G.A. § 21-2-219(f) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The Secretary of State shall** within 90 days after a general election in which federal candidates were on the ballot **report to the federal Election Assistance Commission,** on such form as may be prescribed by such commission, **the combined number of absentee ballots transmitted to absent uniformed services and overseas voters in such election and the combined number of such ballots that were returned by such voters and cast in such election.** | O.C.G.A. § 21-2-219(h) | Category 3 |
| Application for driver's license; service as application for voter registration | The commissioner of driver services and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.** | O.C.G.A. § 21-2-221(b) | Category 3 |
| Application for driver's license; service as | The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of** | O.C.G.A. § 21-2-221(e) | Category 3 |

17

| | | | |
|---|---|---|---|
| application for voter registration | registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
| Application for driver's license; service as application for voter registration | The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State. | O.C.G.A. § 21-2-221(f) | Category 3 |
| Application for driver's license; service as application for voter registration | The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221(h) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Board of Natural Resources and the Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section, including without limitation procedures applicable to processing of applications received by persons approved as license agents for the Department of Natural Resources pursuant to Code Section 27-2-2. | O.C.G.A. § 21-2-221.1(b) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | O.C.G.A. § 21-2-221.1(f) | Category 3 |

| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State**. | O.C.G.A. § 21-2-221.1(g) | Category 3 |
|---|---|---|---|
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | **The Secretary of State and the Board of Natural Resources shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221.1(i) | Category 3 |
| Electronic voter registration | A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. **The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.** | O.C.G.A. § 21-2-221.2(a) | Category 2 Category 3 |
| Electronic voter registration | Upon the submission of an application through the website pursuant to this Code section, **the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:**<br><br>(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the | O.C.G.A. § 21-2-221.2(c) | Category 3 |

19

| | number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;<br><br>(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and<br>(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.<br><br>If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected. | | |
|---|---|---|---|
| Electronic voter registration | If all of the items enumerated in subsection (c) of this Code section are verified, **the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services.** The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. | O.C.G.A. § 21-2-221.2(d) | Category 3 |
| Electronic voter registration | **The Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically pursuant to this Code section.** | O.C.G.A. § 21-2-221.2(f) | Category 3 |
| Offices designated as voter registration agencies | In addition to the offices listed in subsection (b) of this Code section, **the Secretary of State shall designate other offices within the state as designated voter registration offices.** | O.C.G.A. § 21-2-222(c) | Category 2<br>Category 3 |

| Offices designated as voter registration agencies | **Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week**, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-222(i) | Category 3 |
| Offices designated as voter registration agencies | Each office shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-222(j) | Category 3 |
| Offices designated as voter registration agencies | **The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-222(l) | Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the** | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |

| | appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
|---|---|---|---|
| Mail voter registration application forms | The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public **shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.** | O.C.G.A. § 21-2-223(b) | Category 1 Category 2 Category 3 |
| What data [sic] available for public inspection | **It shall be the duty of the Secretary of State to furnish copies of such data as may be collected and maintained on electors whose names appear on the list of electors maintained by the Secretary of State pursuant to this article, within the limitations provided in this article, on electronic media or computer run list or both.** Notwithstanding any other provision of law to the contrary, the Secretary of State shall establish the cost to be charged for such data. The Secretary of State may contract with private vendors to make such data available in accordance with this subsection. Such data may not be used by any person for commercial purposes. | O.C.G.A. § 21-2-225(c) | Category 1 Category 2 Category 3 |
| Confidentiality of voter addresses | **The Secretary of State shall provide by procedure, rule, or regulation for the mechanism by which such information shall be made confidential on the voter registration data base and may provide for forms for use in making such requests and for the use of alternate addresses** for electors who file requests for the confidentiality of their residence addresses. | O.C.G.A. § 21-2-225.1(d) | Category 1 Category 2 Category 3 |

| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; issuance of cards to electors | Each elector found eligible to be registered to vote by the board of registrars shall be issued a card which shall contain the elector's name and address, a block or space for the elector's signature, the date of the elector's registration, the name and location of the elector's polling place or polling places if the county and municipal polling places are not the same, and the designation of the elector's congressional district; state Senate district; state House district; county commission district, if any; county or independent board of education district, if any; and municipal governing authority district, if any, and such other voting districts, if any. On the reverse side of the card, there shall be printed instructions which shall indicate the procedure to be followed in the event of the change of address of the elector. In the event an elector changes residences within the county in which an elector is registered to vote, the elector may change such elector's address by returning the card to the board of registrars of such county indicating the new address. Upon receipt of such card, the board of registrars shall make the necessary changes in the elector's registration records and issue a new card to the elector. In the event that an elector's precinct, polling place, or voting district or districts change, a new card shall be issued to the elector reflecting such changes. When the boundaries of a precinct are changed, all affected electors shall be sent a new card prior to the next primary or election. **The form of such cards shall be determined by the Secretary of State.** The issuance of such cards shall be sufficient as a notification of the disposition of an application for voter registration under this Code section, provided that such cards are sent by nonforwardable, first-class mail. | O.C.G.A. § 21-2-226(e) | Category 2 Category 3 |
| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; | In the event that the registrars are required to issue voters new cards under subsection (e) of this Code section due to changes in districts or precincts as a result of reapportionment or court order, the registrars may apply to the Secretary of State prior to June 30 of each year for reimbursement of the costs of postage with respect to mailing such cards during the 12 month period ending on June 30 of that year. **The Secretary of State shall receive all such applications and** | O.C.G.A. § 21-2-226(f) | Category 3 |

Case 1:18-cv-05391-SCJ Document 51 Filed 08/15/19 Page 90 of 158

| | | | |
|---|---|---|---|
| issuance of cards to electors | shall, no later than June 30 of each year, reimburse the counties for such costs from funds specifically appropriated for that purpose. In the event that the total amount of the requests for reimbursement exceeds the funds appropriated for reimbursement, the Secretary of State shall reimburse the counties on a pro rata basis. In the event that no funds are specifically appropriated for reimbursement, no such reimbursement shall be made. | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State and The Council of Superior Court Clerks of Georgia a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, the Secretary of State and The Council of Superior Court Clerks of Georgia shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available. | O.C.G.A. § 21-2-231(a) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of | The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county. | O.C.G.A. § 21-2-231(a.1) | Category 3 |

| Georgia; removal of persons from list of electors | | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. | O.C.G.A. § 21-2-231(b) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsections (a), (a.1), and (b) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 42 U.S.C. Section 1973gg-6(g), **the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.** | O.C.G.A. § 21-2-231(c) | Category 3 |
| Monthly transmittal of information to Secretary of State and The | **Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the** | O.C.G.A. § 21-2-231(d) | Category 3 |

| Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Secretary of State, who died during the preceding calendar month in the county.** The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsection (d) of this Code section, **the Secretary of State or his or her designated agent shall remove all such names of deceased persons from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.** | O.C.G.A. § 21-2-231(e) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235.** Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes. | O.C.G.A. § 21-2-231(g) | Category 3 |
| Removal of elector's name | When an elector of this state moves to another county or state and registers to vote and the registration officials send a notice of cancellation reflecting the registration of the elector in the | O.C.G.A. § 21-2-232(b) | Category 3 |

| from list of electors upon request of elector or upon removal of elector from county | other county or state, **the Secretary of State or the board** of registrars, as the case may be, shall remove such elector's name from the list of electors. It shall not be necessary to send a confirmation notice to the elector in such circumstances. | | |
|---|---|---|---|
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | **The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service** through its licensees periodically for the purpose of identifying those electors whose addresses have changed. | O.C.G.A. § 21-2-233(a) | Category 3 |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is** | O.C.G.A. § 21-2-233(c) | Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | located and the registrars of the county of the new address **shall update the voter registration list to reflect the change of address.** If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235. | | |
| Identification of electors with whom there has been no contact for three years; confirmation notice | In the first six months of each odd-numbered year, **the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233.** The confirmation notice described in this Code section shall be sent to each such elector during each odd-numbered year. Such notices shall be sent by forwardable, first-class mail. | O.C.G.A. § 21-2-234(a)(2) | Category 3 |
| Identification of electors with whom there has been no contact for three years; confirmation notice | If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** | O.C.G.A. § 21-2-234(d) | Category 2 Category 3 |
| Inactive list of electors | **In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors.** Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be | O.C.G.A. § 21-2-235(a) | Category 3 |

28

| | | | |
|---|---|---|---|
| | counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records. | | |
| SOS on the SEB | **There is created a state board to be known as the State Election Board, to be composed of the Secretary of State,** an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board. | O.C.G.A. § 21-2-30(a) | Category 3 |
| SOS Chairperson of the SEB | **The Secretary of State shall be the chairperson of the board.** Three members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure. | O.C.G.A. § 21-2-30(d) | Category 3 |

| Superintendents to Election returns to be provided to Secretary of State in electronic format | **The Secretary of State is authorized to prescribe by rule or regulation the type of electronic format for the provision of such election returns.** | O.C.G.A. § 21-2-77(c) | Category 3 |
|---|---|---|---|
| Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll workers not to serve | The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. **Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction.** For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction. | O.C.G.A. § 21-2-99(a) | Category 3 |
| Training of local election officials | The election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board **shall attend a minimum of 12 hours' training annually as may be selected by the Secretary** | O.C.G.A. § 21-2-100(a) | Category 3 |

| | | | |
|---|---|---|---|
| | of State. The election superintendent and at least one registrar of each municipality shall attend a minimum of **12 hours' training biennially as may be selected by the Secretary of State.** | | |
| Training of local election officials | **A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of** State, upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-100(c) | Category 3 |
| Certification of local election officials | All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board shall become certified by **completing a certification program approved by the Secretary of State** by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections. The local government employing the superintendent or designee shall cover the costs, if any, incurred by such superintendent's or designee's participation in the certification program. **Such certification programs shall be offered by the Secretary of State** on multiple occasions before December 31 of the year in which such superintendents or designees are appointed and shall not exceed 64 hours of classroom, online, **and practical instruction as authorized and approved by the Secretary of State.** | O.C.G.A. § 21-2-101(a) | Category 3 |

| Certification of local election officials | **A full, partial, or conditional waiver of the certification requirement may be granted by the Secretary of State, in the discretion of the Secretary of State,** upon the presentation of evidence by the election superintendent or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-101(c)(1) | Category 3 |
|---|---|---|---|
| Certification of local election officials | In the event that a municipality authorizes a county to conduct its elections pursuant to Code Section 21-2-45, **the municipality may be granted by the Secretary of State, in the discretion of the Secretary of State, a waiver of the certification requirement,** provided that the superintendent in charge of running the municipal election shall have previously completed a certification program approved by the Secretary of State and has demonstrated a proficiency in the operation of the voting equipment used in said municipality. | O.C.G.A. § 21-2-101(c)(2) | Category 3 |
| Form of ballots; printing ballots; stubs; numbers | **Ballots for direct recording electronic voting systems shall be designed as prescribed by the Secretary of State to ensure easy reading by electors.** | O.C.G.A. § 21-2-286(b)(2) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Provided that the General Assembly specifically appropriates funding to the Secretary of State to implement this subsection, **the equipment used for casting and counting votes in county, state, and federal elections shall, by the July, 2004, primary election and afterwards, be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.** | O.C.G.A. § 21-2-300(a) | Category 3 |
| Uniform election equipment throughout state; education of | **The Secretary of State shall be responsible for the development, implementation, and provision of a continuing program to educate voters, election officials, and poll workers in the proper use of such voting equipment. Each** | O.C.G.A. § 21-2-300(d) | Category 1 Category 2 Category 3 |

| voters, election officials, and poll officers in operation of election equipment | county shall bear the costs, including transportation, subsistence, and lodging, incurred by its election and registration officials in **attending courses taught by or arranged by the Secretary of State for instruction in the use of the voting equipment.** | | |
|---|---|---|---|
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Counties shall be authorized to contract with municipal governments for the use of such voting equipment in municipal elections **under terms and conditions specified by the Secretary of State to assure that the equipment is properly used and kept secure.** | O.C.G.A. § 21-2-300(e)(1) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Each county shall, prior to being provided with voting equipment by the state, provide or contract for adequate technical support for the installation, set up, and operation of such voting equipment for each primary, election, and special primary and special election **as the Secretary of State shall determine by rule or regulation.** | O.C.G.A. § 21-2-300(c) | Category 3 |
| Examination and approval of voting machines by Secretary of State | Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine **may request the Secretary of State to examine the machine.** Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or | O.C.G.A. § 21-2-324(a) | Category 1 Category 2 Category 3 |

33

| | reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $250.00. **The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine.** | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The Secretary of State shall thereupon require such machine to be examined or reexamined** by three examiners whom he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall require of them a written report on such machine, attested by their signatures; **and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-324(b) | Category 3 |
| Examination and approval of voting machines by Secretary of State | No kind of voting machine not so approved shall be used at any primary or election and if, upon the reexamination of any voting machine previously approved, it shall appear that the machine so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate **votes, the approval of the same shall immediately be revoked by the Secretary of State**; and no such voting machine shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-324(c) | Category 3 |
| Examination and approval of | At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, | O.C.G.A. § 21-2-324(d) | Category 3 |

| voting machines by Secretary of State | the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State. | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | The compensation of each examiner appointed under this Code section shall be fixed and paid by the Secretary of State. | O.C.G.A. § 21-2-324(h) | Category 3 |
| Form of ballots on voting machines | If the construction of the machine shall require it, the ballot label for each candidate, group of candidates, political party or body, or question to be voted on shall bear the designating letter or number of the counter on the voting machine which will register or record votes therefor. Each question to be voted on shall appear on the ballot labels in brief form. Unless otherwise provided by law, proposed constitutional amendments so submitted shall be in brief form as directed by the General Assembly and, **in the failure to so direct, the form shall be determined by the Secretary of State**. Unless otherwise provided by law, any other state-wide questions or questions to be presented to the electors of more than one county so submitted shall be printed in brief form as directed by the General Assembly and, **in the event of a failure to so direct, the form shall be determined by the Secretary of State** and shall include a short title or heading in bold face at the beginning of each such question on the ballot and any local questions so submitted shall be printed in brief form as directed by the General Assembly and, in the event of a failure to so direct, the form shall be determined by the superintendent. In the case of questions to be voted on by the electors of a municipality, the governing authority shall determine the brief form of the questions. | O.C.G.A. § 21-2-325(b) | Category 3 |
| Preparation of voting machines by | The superintendent shall appoint one custodian of voting machines and such deputy custodians as may be necessary, whose duty it shall be to prepare the machines to be used at the | O.C.G.A. § 21-2-327(b) | Category 3 |

| superintendents; duties of custodians and deputy custodians | primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the municipality such compensation as shall be fixed by the governing authority of the municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the voting machines as required by this chapter, and he or she and the deputy custodians, whose duty it shall be to assist him or her in the discharge of his or her duties, shall serve at the pleasure of the superintendent. **Each custodian shall take an oath of office framed by the Secretary of State, which shall be filed with the superintendent**. | | |
|---|---|---|---|
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | **In every primary or election, the superintendent shall furnish, at the expense of the municipality, all ballot labels, forms of certificates, and other papers and supplies which are required under this chapter and which are not furnished by the Secretary of State, all of which shall be in the form and according to the specifications prescribed from time to time by the Secretary of State**. In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such primary. | O.C.G.A. § 21-2-327(f) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system**. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning voting system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. **The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system**. | O.C.G.A. § 21-2-368(a) | Category 3 |

| Examination and approval of optical scanning voting systems by Secretary of State | **The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors** at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-368(b) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | No kind of optical scanning voting system not so approved shall be used at any primary or election and if, upon the reexamination of any optical scanning voting system previously approved, it shall appear that the optical scanning voting system so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, **the approval of the same shall immediately be revoked by the Secretary of State**; and no such optical scanning voting system shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-368(c) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any vendor who completes a sale of optical scanning voting system that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia,** plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have authority to impose such penalty upon a finding that such a sale has occurred. | O.C.G.A. § 21-2-368(e) | Category 3 |
| Form and arrangement of | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the superintendent | O.C.G.A. § 21-2-369(c) | Category 3 |

| ballots for optical scanning voting systems | | | |
|---|---|---|---|
| Write-in ballots | In elections, electors shall be permitted to cast write-in votes. The design of the ballot shall permit the superintendents, in counting the write-in votes, to determine readily whether an elector has cast any write-in vote not authorized by law. **The Secretary of State, in specifying the form of the ballot, and the State Election Board, in promulgating rules and regulations respecting the conduct of elections, shall provide for ballot secrecy** in connection with write-in votes. | O.C.G.A. § 21-2-373 | Category 2 Category 3 |
| Form and arrangement of ballots for DRE voting systems; write-in votes | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the election superintendent | O.C.G.A. § 21-2-379.4 | Category 3 |
| State write-in absentee ballots | **The Secretary of State shall design a state write-in absentee ballot for federal offices and state offices** that are voted upon on a state-wide basis for use in a primary runoff or election runoff by an eligible absentee elector who lives outside the county or municipality in which the election is held and who is: | O.C.G.A. § 21-2-381.2(a) | Category 2 Category 3 |
| State write-in absentee ballots | **The Secretary of State shall establish a website which such eligible absentee electors may access to determine if there is a primary runoff or election runoff for a federal office or a state office that is voted upon on a state-wide basis.** The address of such website shall be included in the instructions for voting such state write-in absentee ballot. | O.C.G.A. § 21-2-381.2(d) | Category 2 Category 3 |
| Official absentee ballots | **The form for either ballot shall be determined and prescribed by the Secretary of State**, except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent. | O.C.G.A. § 21-2-383(a) | Category 3 |

| Preparation and delivery of absentee ballots; mailing ballots to absentee voters; oaths; assistance; master list; transmission to uniformed and overseas citizens | Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope, the superintendent, board of registrars, or absentee **ballot clerk shall provide two envelopes for each official absentee ballot**, of such **size and shape as shall be determined by the Secretary of State**, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words "Official Absentee Ballot" and nothing else. On the back of the larger of the two envelopes to be enclosed within the mailing envelope shall be printed the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21-2-409, and the penalties provided for in Code Sections 21-2-568, 21-2-573, 21-2-579, and 21-2-599 for violations of oaths; and on the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. **The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, and a notice in the form provided by the Secretary of State** of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. | O.C.G.A. § 21-2-384(b) | Category 3 |
| Voting by absentee electors; penalties | The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. **In addition, the registrars or absentee ballot clerk shall notify** | O.C.G.A. § 21-2-385(d)(2) | Category 3 |

| | | | |
|---|---|---|---|
| | the Secretary of State in the manner prescribed by the Secretary of State of the times, dates, and locations at which advance voting will be conducted. | | |
| Pilot program | **The Secretary of State shall develop and implement a pilot program** for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, for use in a primary or a general election. | O.C.G.A. § 21-2-387(a) | Category 3 |
| Cards of instructions and supplies; sample ballots and ballot labels | Prior to each primary and election, **the superintendent shall obtain from the Secretary of State a sufficient number of cards of instruction for guidance of electors.** Such cards of instruction **shall include such portions of this chapter as deemed necessary by the Secretary of State** and shall be printed for the type of voting equipment or ballots used in the county or municipality. **The superintendent shall also obtain from the Secretary of State a sufficient number of blank forms of oaths of poll officers, voter's certificates, voting rights posters, notices of penalties, oaths of assisted electors, numbered list of voters, tally sheets, return sheets, and such other forms and supplies required by this chapter, in each precinct of the county or municipality.** | O.C.G.A. § 21-2-400(a) | Category 3 |
| Delivery of ballots and supplies to managers | The superintendent shall provide at the polling place copies of the sample or facsimile ballots for such primary or election as well as a list of the certified write-in candidates for such election **in the form as provided by the Secretary of State or appropriate municipal official pursuant to** Code Section 21-2-133. | O.C.G.A. § 21-2-401(d) | Category 3 |
| Voter's certificates | At each primary and election, **the Secretary of State shall prepare and furnish to each superintendent a suitable number of voter's certificates** which shall be in substantially the following form: | O.C.G.A. § 21-2-402(a) | Category 3 |

| Voter identification cards | **The Secretary of State shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.** | O.C.G.A. § 21-2-417.1(g) | Category 3 |
|---|---|---|---|
| Casting of provisional ballots | Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State.** The person shall also present the identification required by Code Section 21-2-417. | O.C.G.A. § 21-2-418(b) | Category 2 Category 3 |
| Method of voting and counting provisional ballots | The board of registrars shall complete a report **in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted** in the primary or election. | O.C.G.A. § 21-2-419(e) | Category 3 |
| Absentee ballots | Ballots in a precinct using optical scanning voting equipment for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked "Official Absentee Ballot" and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or optical scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed | O.C.G.A. § 21-2-482 | Category 3 |

| | on the face thereof the following: "I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." **The form for either ballot shall be determined and prescribed by the Secretary of State.** | | |
|---|---|---|---|
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | Each county and municipal superintendent shall prepare four copies of the consolidated return of the primary to be **certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-496(a) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **The Secretary of State is authorized to provide a method by which the election superintendent can file the results of primaries and elections electronically.** Once the Secretary of State provides such a method of filing, **the election superintendent shall file a copy of the election returns electronically in the manner prescribed by the Secretary of State** in addition to the filing provided in subsection (a) of this Code section. **The Secretary of State is authorized to promulgate such rules and regulations as necessary to provide for such an electronic filing.** | O.C.G.A. § 21-2-496(b) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such primary.** | O.C.G.A. § 21-2-496(c) | Category 3 |

| Consolidated certified returns of elections; returns forwarded to Secretary of State | Each county and municipal superintendent shall prepare four copies of the consolidated return of the election **to be certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-497(a) | Category 3 |
|---|---|---|---|
| Consolidated certified returns of elections; returns forwarded to Secretary of State | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election.** | O.C.G.A. § 21-2-497(b) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | Upon receiving the certified returns of any election from the various superintendents, **the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast for all candidates** described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall thereupon certify and file in his or her office the tabulation thereof. In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns.** Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results and shall file the same in his or her office. | O.C.G.A. § 21-2-499(a) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and | **The Secretary of State shall also, upon receiving the certified returns for presidential electors, proceed to tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them** | O.C.G.A. § 21-2-499(b) | Category 3 |

| certify certain returns | **before the Governor**. Not later than 5:00 P.M. on the fourteenth day following the date on which such election was conducted, the Secretary of State shall certify the votes cast for all candidates described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall no later than that same time lay the returns for presidential electors before the Governor. The Governor shall enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes. The Governor shall certify the slates of presidential electors no later than 5:00 P.M. on the fifteenth day following the date on which such election was conducted. Notwithstanding the deadlines specified in this Code section, such times may be altered for just cause by an order of a judge of superior court of this state. | | |
|---|---|---|---|
| Certificates of election; commissions; proclamations | *Governor and other constitutional officers.* Upon completing the tabulation of any election for Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of Agriculture, or Commissioner of Labor, **the Secretary of State shall lay the same before the Governor upon his or her oath of office as Governor**; and the Governor, upon the other constitutional officers taking their oaths of office, shall issue a commission under the great seal of the State of Georgia signed by the Governor and countersigned by the Secretary of State, to each such person. **The Secretary of State shall issue the commission to the person elected Governor.** | O.C.G.A. § 21-2-502(a) | Category 3 |
| Certificates of election; commissions; proclamations | *United States senators; representatives in Congress; members of the General Assembly.* (1) Upon completing the tabulation of any election for United States senator or representative in Congress, **the Secretary of State shall lay the same before the Governor,** who shall immediately issue certificates of election and commissions under the seal of the state, duly signed by the Governor and | O.C.G.A. § 21-2-502(b) | Category 3 |

| | | | |
|---|---|---|---|
| | attested by the Secretary of State and deliver the same to the candidates receiving the required number of votes to be elected to the respective offices.<br><br>(2) **The Secretary of State shall issue certificates of election to the persons elected members of the Senate and the House of Representatives** of the General Assembly and, between the hours of 12:00 Noon and 1:00 P.M. on the second Monday in January of each odd-numbered year, present before the Senate and the House of Representatives the<br>several returns of the elections of members of the respective houses. **In case of a special election the Secretary of State shall issue a certificate of election to each person so elected**, and the Secretary of State shall present the returns of such election to the proper house as soon as received and tabulated by the Secretary of State. Immediately upon their taking the oath of office, each member of the Senate and the House of Representatives shall be issued **a commission under the great seal of the State of Georgia, signed by the Secretary of State.** | | |
| Certificates of election; commissions; proclamations | *Justices of the Supreme Court, Judges of the Court of Appeals, Commissioners of the Georgia Public Service Commission, judges of the superior court, judges of the juvenile court, and district attorneys.* Upon completion of the tabulation **the Secretary of State shall certify the result of each election of Justices of the Supreme Court, of Judges of the Court of Appeals, of Commissioners of the Georgia Public Service Commission, of judges of the superior court, of judges of the juvenile court where elected, and of district attorneys to the Governor and shall issue a certificate of election to each person so elected**. The Governor shall, upon each such person taking the oath of office, immediately issue a commission under the great seal of the State of Georgia, signed by the Governor and **countersigned by the Secretary of State**, to each such person. | O.C.G.A. § 21-2-502(c) | Category 3 |
| | | | |

| Certificates of election; commissions; proclamations | *Presidential electors.* **The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor,** who shall enumerate and ascertain the number | O.C.G.A. § 21-2-502(c) | Category 3 |

# ATTACHMENT B

Table 3: NVRA, HAVA, and VRA Provisions Addressed by Georgia Statutes Within Purview of Secretary of State

| NVRA PROVISIONS | Related Georgia Provision(s) |
|---|---|
| Section 5 Voter Registration<br>**What voter registration opportunity is required by Section 5 of the NVRA?**<br>Each State motor vehicle driver's license application (including any renewal application) submitted to a State motor vehicle authority must serve as a simultaneous voter registration application unless the applicant fails to sign the voter registration application. This application for voter registration must be considered as updating any previous voter registration by the applicant.<br><br>In addition, any change of address form submitted for State driver's license purposes must also serve as notification of change of address for voter registration purposes unless the registrant states on the form that the change of address is not for voter registration purposes. This means that all changes of address submitted to State motor vehicle offices must be forwarded to election authorities unless the registrant affirmatively requests otherwise by opting out on the form.<br><br>**Does Section 5 of the NVRA mandate the use by States of any particular forms or procedures?**<br><br>Yes. Each State must include a voter registration form as part of an application for a State driver's license and any application for driver's license renewal.<br><br>The voter registration portion of the application may not require any information that duplicates information required on the driver's license portion of the application and may require only the minimum amount of information necessary to prevent duplicate voter registrations and permit State officials both to determine the eligibility of the applicant to vote and to administer the voting process. | **O.C.G.A. § 21-2-221(b)**<br>The commissioner of driver services and the Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.<br><br>**O.C.G.A. § 21-2-221(e)**<br>The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.<br><br>**O.C.G.A. § 21-2-216(g)(7)**<br>The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.<br><br>**O.C.G.A. § 21-2-221(h)**<br>The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application.<br><br>**O.C.G.A. § 21-2-221(f)** |

The voter registration application must state each voter eligibility requirement (including citizenship), contain an attestation that the applicant meets each requirement, state the penalties provided by law for submission of a false voter registration application and require the signature of the applicant under penalty of perjury. In addition, the application shall also include statements specifying that: 1) if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and 2) if an applicant does register to vote, the identity of the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

When a state contracts with a private entity to administer services in an agency that is required to offer voter registration, the ultimate responsibility for ensuring provision of voter registration services remains with the state, and the voter registration requirements under the NVRA remain the same.

**What is a motor vehicle agency required to do with completed voter registration applications accepted at its offices?**

Completed voter registration applications accepted at a motor vehicle agency must be transmitted to the appropriate State election official no later than ten days after acceptance. However, if an application is accepted at a motor vehicle agency within five days of a voter registration deadline for an election, the application must be transmitted to election officials no later than five days after acceptance. The agency providing voter-registration services may not require a registrant to mail in the form himself or herself or discourage him or her in any manner from submitting the form to the agency. Similarly, if it is agency practice to make sure that agency forms are completed and signed when submitted by an applicant, the same practice should apply to a voter registration application submitted by that applicant.

The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State.

**O.C.G.A. § 21-2-221.2(a)**
A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.

**O.C.G.A. § 21-2-221.2(c)**
Upon the submission of an application through the website pursuant to this Code section, the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:
(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;
(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and
(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.
If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected.

**O.C.G.A. § 21-2-221.2(d)**
If all of the items enumerated in subsection (c) of this Code section are verified, the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services. The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the

2

| | application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. |
|---|---|
| **Section 6 Mail Registration**<br>**What are the requirements for voter registration by mail provided by Section 6 of the NVRA?**<br>Section 6 of the NVRA requires each State to accept and use the federal mail voter registration application form developed by the U.S. Election Assistance Commission. This form is available on the EAC's web site at http://www.eac.gov/program-areas/national-voter-registration-form. In addition to containing a voter-registration application, this EAC application booklet describes certain state-specific requirements. The national form and booklet have been developed by the EAC in consultation with the States.<br><br>**Can a State develop its own mail voter registration application?**<br>Yes. Section 6 of the NVRA also provides that, in addition to accepting and using the federal mail application, a State may develop and use its own mail voter registration form, if it meets all of the same criteria the NVRA requires for the EAC's national mail voter registration application.<br><br>**What are the requirements for the national mail voter registration application?** | **O.C.G.A. § 21-2-218(d)**<br>In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail.<br><br>**O.C.G.A. § 21-2-223(a)**<br>The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the |

Section 9 of the NVRA provides that the national mail voter registration application may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

The application also must include a statement that specifies each eligibility requirement (including citizenship), contain an attestation that the applicant meets each such requirement and require the signature of the applicant under penalty of perjury. The mail application must also include a statement of the penalties provided by law for submission of a false voter registration application.

The mail application must also include statements specifying that: 1) if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and 2) if an applicant does register to vote, the identity of the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes. The mail application may not include any requirement for notarization or other formal authentication.

Section 303(b) of the Help America Vote Act of 2002 (HAVA) also requires that the national mail application include certain additional information: First, the question "Are you a citizen of the United States of America?" and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States. Second, the question "Will you be 18 years of age on or before election day?" and boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day. Third, the statement, "If you checked 'no' in response to either of these questions, do not complete this form." Fourth, a statement informing the individual that if the form is submitted by mail and the individual is registering for the first time, the appropriate identification required by HAVA must be submitted with the mail-in registration form to avoid the additional identification

form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.

**O.C.G.A. § 21-2-223(b)**

The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.

requirements upon voting for the first time. (See Question 11 below for a list of these forms of identification).

**Does the NVRA require States to make mail voter registration applications available?**

Yes. The chief election official of each State must make mail voter registration applications available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs. Most states satisfy these requirements by, among other things, making applications available at local registrar offices, driver license offices, public assistance offices and disability-service offices, to groups doing voter registration drives, and through the internet on the website of the chief election official. These forms are also available on the website of the U.S. Election Assistance Commission.

**What requirements does federal law place on first-time voters who register to vote by mail?**

If a person registers to vote by mail and has not previously voted in a federal election in a State, Section 303(b) of the Help America Vote Act of 2002 established new requirements.

Where a person registers to vote by mail and has not previously voted in a federal election in a State, if the voter does not qualify for one of the exemptions in Section 303(b)(3) of HAVA (described below), then he or she must submit one of the forms of identification required by Section 303(b)(2)(A) of HAVA the first time that he or she votes in a federal election. These forms of identification are: 1) a current and valid photo identification; or 2) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. If the voter does not present the required identification, Section 303(b)(2)(B) of HAVA provides that he or she may nonetheless cast a provisional ballot.

Sections 303(b)(3)(A)-(C) of HAVA create certain exemptions from these identification requirements. An applicant who provides the specified

| | |
|---|---|
| identification documents with his or her registration application (or otherwise provides such documentation to election officials before Election Day), is exempt from the requirement to show identification the first time he or she votes in a federal election. Likewise, an applicant who provides his or her driver's license number or last four digits of his or her social security number, and the State is able to match this information against an existing State record, is exempt from the requirement to show identification the first time he or she votes in a federal election. In addition, persons entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act, or entitled to vote other than in person under the Voting Accessibility for the Elderly and Handicapped Act or other federal law, are exempt from HAVA's identification requirements. | |
| **Section 7 Voter Registration Agencies**<br>**Under Section 7 of the NVRA, which offices must offer voter-registration services?**<br>Any office in a covered State that provides either public assistance or state-funded programs primarily engaged in providing services to persons with disabilities must offer voter-registration services. Armed Forces recruitment offices must also provide voter registration services. In addition, a State must designate other offices in the State as voter-registration agencies. (See Question 15 below for a description of these other offices).<br><br>**What is an office that provides public assistance under Section 7?**<br>"Public assistance" offices that must offer voter-registration services under Section 7 of the NVRA include each agency and office in a State that administers or provides services or assistance under any public assistance programs. This includes any of the following federal public assistance programs: the Supplemental Nutrition Assistance Program (SNAP, formerly the Food-Stamp Program), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the | **O.C.G.A. § 21-2-222(c)**<br>In addition to the offices listed in subsection (b) of this Code section, the Secretary of State shall designate other offices within the state as designated voter registration offices.<br><br>**O.C.G.A. § 21-2-222(i)**<br>Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.<br><br>**O.C.G.A. § 21-2-222(j)**<br>Each office shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State. |

Temporary Assistance for Needy Families (TANF) program (formerly the Aid to Families with Dependent Children or AFDC program), the Medicaid program, and the State Children's Health Insurance Program (SCHIP). This also includes state public assistance programs.

**What is an office that provides state-funded programs primarily engaged in providing services to persons with disabilities?**
Offices that provide state-funded programs primarily engaged in providing services to persons with disabilities include offices providing vocational rehabilitation, transportation, job training, education counseling, rehabilitation, or independent-living services for persons with disabilities. Because States vary greatly in the manner in which they provide services to persons with disabilities, each State must identify the specific offices and agencies that fit this definition. In doing so, States may want to consult with offices that deal with issues related to persons with disabilities, such as the protection and advocacy offices and client assistance program offices within that State. A list of such offices for each State is available at: http://www.napas.org/aboutus/PA_CAP.htm. Section 7 also requires that if an office provides services to a person with disabilities at the person's home, the office must provide the opportunity to register to vote at home. Offices serving persons with disabilities often offer specialized assistance in completing the agency service or benefit application forms, and Section 7 requires such offices to offer voter registration applicants the same degree of assistance in completing voter registration forms as is offered in completing the agency's own application forms.

**Does Section 7 require designation of other offices as voter registration agencies?**
Yes. In addition to offices providing public assistance and services to persons with disabilities, States are also required by Section 7 to designate "other offices" within a State as voter-registration agencies. A State is free to determine which other agencies/offices should be designated, according to its needs and preferences, but it must make

O.C.G.A. § 21-2-222(l)
The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application.

additional designations. Such other agency designations may include State or local government offices such as public libraries, public schools, State colleges, universities and community colleges, city and county clerks offices, marriage license offices, fishing and hunting license offices, government revenue offices, and unemployment compensation offices. Offices not otherwise covered under the NVRA that provide services to persons with disabilities may also be designated. In addition, with the agreement of such entities, States may designate as voter-registration agencies nongovernmental offices (such as private colleges) or Federal government offices.

**Do armed forces recruitment offices have to provide voter-registration services?**
Yes. The NVRA provides that all federal Armed Forces recruitment offices in each State subject to the NVRA must provide voter registration services. Within the Department of Defense, the Federal Voting Assistance Program (FVAP) maintains a web site that contains information concerning voter registration at Armed Forces recruitment offices: http://www.fvap.gov/reference/laws/nat-vote-reg-act.html and http://www.fvap.gov/reference/milinfo.html.

**What voter-registration services must be made available?**
Each office designated as a voter registration agency under Section 7 that provides service or assistance in addition to conducting voter registration must do the following:
1. distribute voter-registration application forms;
2. provide an "information" form that contains information on the voter-registration process (see Question 21 below for a description of the "information" form);
3. provide the same level of assistance to all applicants in completing voter-registration application forms as is provided with respect to every other service or application for benefits (unless the applicant specifically refuses such assistance);

8

4.  accept completed voter-registration forms from applicants; and
5.  transmit each completed voter-registration application to the appropriate State election official within a prescribed time frame.

**What persons must be provided the opportunity to register to vote by Section 7 designated offices and agencies?**
Designated agencies must provide the opportunity to register to vote to persons when: (1) applying for the agency's assistance or services; (2) seeking recertification or renewal of those services; and (3) changing address for the assistance or services.

**What does Section 7 require with regard to distribution of voter registration forms and information forms?**
Each office designated under Section 7 that provides services or assistance must distribute to each applicant for services or assistance, and each applicant for recertification, renewal or change of address with respect to such services or assistance, one of the voter registration application forms described in Question 20 below. In addition, each such office also must distribute to each applicant a form, known as an information form, described in Question 21 below.

**What types of voter-registration forms can be distributed to applicants?**
Section 7 agencies must distribute one of the three voter-registration forms listed below:
6.  National Mail Voter Registration Form — The agency may use this federal form, which has been developed by the U.S. Election Assistance Commission. This form is available on the EAC's web site at http://www.eac.gov/program-areas/national-voter-registration-form. In addition to containing a voter-registration application, this document lists certain state-specific voting requirements.

7. State mail voter-registration form — The agency may use its State mail voter-registration form, so long as it meets the requirements of Section 9 of the NVRA. This State form would not be as lengthy as the federal form, which contains information about voter registration in each state. Such a form should be easier for applicants to navigate and easier for agencies and election officials to process.

8. Designated agency's own form — The agency also may use its own version of a voter-registration form, if it is equivalent to the federal form and has been approved by the State. This type of form may lead to more efficient voter-registration transactions at designated agencies that provide services or assistance, since it could be made a seamless part of the forms normally used by the designated agency. As an example, where agency assistance/services forms are generated by computer during the process of interviewing the applicant, the voter-registration form likewise might be generated during this same process, pre-populated with information already provided by the applicant. Or a perforated voter-registration application might be attached at the bottom of a State services form, so that it can be easily completed, detached, and transmitted to the appropriate election official.

**What is the "information form," and what should States put on it?**
Section 7 requires that designated offices provide each applicant for services or assistance an information form containing specific information concerning the individual's opportunity to register to vote. This form, which may be part of or separate from the voter-registration form, must include the following information:

9. the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

10. if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

11. boxes for the applicant to check to indicate whether the applicant would like to register to vote or declines to register to vote, together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME." (Failure to check either box is deemed a declination to register for purposes of receiving assistance in registration but is not deemed a written declination to receive an application);

12. the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

13. the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _ _ _ _ _." The blank should be filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed.

No information relating to a declination to register to vote may be used for any purpose other than voter registration. If the information form is separate from the voter-registration form, it is recommended that a statement regarding this non-use of declination information be included

on the voter-registration form, as well as a statement that if the applicant registers to vote, information submitted will be used only for voter-registration purposes.

**Are Section 7 agencies required to assist persons in completing a voter-registration application?**

Yes. Section 7 agencies must provide to each applicant the same degree of assistance in completing the voter-registration application form as is provided by the office in completing its own agency forms, unless the applicant declines to register to vote or declines such assistance.

As an example, if it is the practice of a Section 7 agency for its employees to take time to explain to each applicant the various forms involved in the agency application, recertification or other process and answer applicant questions before the applicant completes the forms, this type of assistance must also be given at that time to such applicants with regard to the voter registration application process. Similarly, if it is agency practice to make sure that agency forms are completed and signed when submitted by an applicant, the same practice should apply to a voter registration application submitted by that applicant.

Offices serving persons with disabilities often offer specialized assistance in completing the agency service or benefit application forms. Section 7 requires such offices to offer voter registration applicants the same degree of assistance in completing voter registration forms as is offered in completing the agency's own application forms.

**Does Section 7 put any restrictions on how office staff may interact with applicants?**

Yes. Any person who provides voter-registration services at a Section 7 agency is prohibited from: 1) seeking to influence an applicant's political preference or party registration; 2) displaying any political preference or party allegiance; 3) taking any action or making any statement to an applicant to discourage the applicant from registering to vote; or 4) taking any action or making any statement that may lead the applicant to

believe that a decision to register or not to register has any bearing on the availability of services or benefits.

**Do the voter registration requirements of Section 7 of the NVRA apply to all application, renewal, recertification and change of address transactions with designated offices?**
Yes. The NVRA requires that voter registration opportunities be provided with respect to all application, renewal, recertification and change of address transactions regarding service and assistance with Section 7 offices. Many Section 7 designated agencies/offices routinely provide services/assistance such as application for, or renewal of, services or change-of-address notification through the internet, by telephone, or by mail. States should ensure the availability of voter-registration opportunities to individuals using such remote service/assistance opportunities from designated agencies. Thus, for all such internet transactions, States should advise of the opportunity to register to vote, and should provide some online capability to download or request a voter-registration form. For phone transactions, designated-agency personnel should advise applicants of the opportunity to register to vote and to request a voter registration form. Materials sent by mail to individuals completing phone or internet transactions (such as statements confirming a phone transaction, or renewal or change-of-address forms) should contain a voter-registration form.
In all such internet, phone, and mail transactions, individuals should be given a toll-free phone number, where possible, to call for information and instruction on how to complete the voter-registration process. Where feasible, as is done at many motor-vehicle agencies, States may consider providing for a simultaneous voter-registration opportunity through the electronic portal when individuals apply for services or assistance at a designated agency by that means. In addition, where possible, agencies may consider assisting the applicant in registering to vote by automatically filling in appropriate fields on voter-registration applications with information previously provided by the applicant in order to make the registration process easier and more efficient.

<table>
<tr><td>

When upgrading technology related to the application/recertification/change of address process at Section 7 agencies, States should ensure that such upgrade includes the voter registration process.

When a state contracts with a private entity to administer services in an agency that is required to offer voter registration, the ultimate responsibility for ensuring provision of voter registration services remains with the state, and the voter registration requirements under the NVRA remain the same.

**What is a Section 7 agency required to do with completed voter registration applications accepted at its offices?**
The designated agency must submit the completed voter-registration application to the appropriate State or local election official within a prescribed period of time unless the applicant desires to submit it himself or herself. The agency providing voter-registration services may not require a registrant to mail in the form himself or herself or discourage him or her in any manner from submitting the form to the agency. When an applicant submits a completed voter-registration application to an agency, the agency must transmit the form to the appropriate State or local election official within ten days. However, if the agency receives a completed voter-registration application within five days before the last day to register to vote in an election, the application must be transmitted to the appropriate State or local election official within five days.

</td><td>

</td></tr>
<tr><td>

**Section 8 Administration of Voter Registration**
**What does Section 8 of the NVRA require States to do?**
Section 8 mandates certain action by States concerning the administration of voter registration for elections for federal office. These requirements involve important issues such as the date by which valid voter registration applications must be accepted and eligible persons registered, rules for changing a registrant's address information, rules for removing names from the voter registration list, and administration of a

</td><td>

O.C.G.A. § 21-2-222(i)
Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week, except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.

</td></tr>
</table>

14

uniform, nondiscriminatory voter registration list maintenance program that complies with the Voting Rights Act.

**Does Section 8 impose a time deadline on States for accepting voter registration applications and registering eligible applicants?**
Yes. States must set a voter registration cutoff for federal elections of no more than 30 days before the election. A valid voter registration application from an eligible applicant is considered timely and the State has to ensure that the applicant is registered to vote if it is: 1) submitted not later than the lesser of 30 days, or the period provided by State law, before the date of a federal election to a driver's license office, designated public assistance or disability office, other designated office, or an appropriate State or local election official, or 2) postmarked not later than the lesser of 30 days, or the period provided by State law, before a federal election when submitted by mail.  States can set a voter registration deadline for federal elections shorter than 30 days, and a number of States do so, but cannot set a longer deadline.

**Are States required to let an applicant know what has happened to his or her application?**
Yes. Section 8 requires State election officials to notify each applicant of the disposition of his or her registration application, e.g., a voter registration card if the application is accepted or a notice of rejection if the application is not accepted.
Where a notice of disposition for a mail voter registration application is sent by nonforwardable mail and returned as undeliverable, Section 6 of the NVRA provides that local election officials may proceed in accordance with the provisions of Section 8(d) of the NVRA (see Question 35 below).

**Under the NVRA, what are the circumstances under which a State can remove a person's name from the voter registration rolls?**
Section 8 permits States to remove the name of a person from the voter registration rolls upon the request of the registrant, and, if State law so

**Ga. Comp. R. & Regs. 183-1-12-.07(4)**
The registrars of each county shall complete the entry of new and updated voter registrations on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.

**O.C.G.A. § 21-2-231(a)**
Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State and The Council of Superior Court Clerks of Georgia a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, the Secretary of State and The Council of Superior Court Clerks of Georgia shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available.

**O.C.G.A. § 21-2-231(a.1)**
The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who identify themselves as not being citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county.

| provides, for mental incapacity or for criminal conviction. The Act also requires States to conduct a general voter registration list maintenance program that makes a reasonable effort to remove ineligible persons from the voter rolls by reason of the person's death, or a change in the residence of the registrant outside of the jurisdiction, in accordance with procedures set forth in the NVRA. The list maintenance program must be uniform, nondiscriminatory and in compliance with the Voting Rights Act. | **O.C.G.A. § 21-2-231(b)**<br>The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. |
|---|---|
| **Does the NVRA contain any prohibitions on removal of persons' names from the voter registration list?**<br>Yes. Section 8 of the NVRA prohibits removing registrants from the voter registration list solely because of a failure to vote. It also places restrictions of notice and timing on removals from the voter registration list based on a change of residence. | **O.C.G.A. § 21-2-231(c)**<br>Upon receipt of the lists described in subsections (a), (a.1), and (b) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 42 U.S.C. Section 1973gg-6(g), the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail. |
| **What is "removal at the request of the registrant" under Section 8?**<br>A "removal at the request of the registrant" under the NVRA involves first-hand information from a registrant that can originate in at least three ways: 1) a registrant requesting to remove his or her name from the voting registration list, 2) a registrant completing and returning a notice card indicating an address change outside the jurisdiction, or 3) a registrant submitting a new application registering to vote a second time in a new jurisdiction, and providing information regarding the registrant's prior voter registration address on the new application, which the State can treat as a request to cancel or transfer his or her prior registration. A registrant advising of a new address within the same jurisdiction, or registering to vote a second time at a new address within the same jurisdiction, should trigger an updating of the original registration, rather than its cancellation. | **O.C.G.A. § 21-2-231(d)**<br>Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county. The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. |
| **Are there any required procedures in the NVRA concerning removal of a person's name from the voter registration rolls for mental incapacity, criminal conviction or death?** | **O.C.G.A. § 21-2-231(e)**<br>Upon receipt of the lists described in subsection (d) of this Code section, the Secretary of State or his or her designated agent shall remove all such names of deceased persons |

16

The NVRA does not require any particular process for removing persons who have been disqualified from voting pursuant to State law based upon a criminal conviction or an adjudication of mental incapacity. Moreover, while the NVRA requires States to make reasonable efforts to remove persons who have died, it does not require any particular process for doing so. States can follow whatever State law process exists for doing this. Section 303(a) of HAVA adds an additional requirement for NVRA covered States to coordinate the statewide voter registration database with State records on felony status and death. HAVA provides that list maintenance on the statewide database shall be done on a regular basis in accordance with the requirements of the NVRA.

In those States where state law provides for removals from the voter rolls based on mental incapacity or criminal conviction, state laws generally provide for election officials to rely on court determinations to identify the individuals who are subject to removal. Section 8 of the NVRA also provides for the U.S. Attorney Offices to forward information regarding felony criminal convictions in federal courts to chief state election officials.

**Under what circumstances does the NVRA allow States to remove a person from the voting rolls based on change of residence?**
A State may remove the name of a person from the voter registration list due to a change of residence upon 1) the person's written confirmation of a change of residence to a place outside the jurisdiction, or 2) completion of the notice process described in Section 8(d) of the NVRA.

**What does the NVRA notice process require to remove a person from the voting rolls based on a change of residence?**
In the absence of a written confirmation from a registrant of a change of address outside the jurisdiction, Section 8(d) of the NVRA sets forth a process for removing a person based on change of residence. This process requires sending a forwardable notice, in the form of a postage-prepaid and pre-addressed return card, on which the person may state his or her current address. The notice must include the language required by

from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death.

**O.C.G.A. § 21-2-231(g)**
The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and 21-2-235. Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes.

**O.C.G.A. § 21-2-232(b)**
When an elector of this state moves to another county or state and registers to vote and the registration officials send a notice of cancellation reflecting the registration of the elector in the other county or state, the Secretary of State or the board of registrars, as the case may be, shall remove such elector's name from the list of electors. It shall not be necessary to send a confirmation notice to the elector in such circumstances.

**O.C.G.A. § 21-2-233(a)**
The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed.

**O.C.G.A. § 21-2-233(c)**
If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or

17

Section 8(d)(2) of the NVRA. For example, the notice must advise (1) that if the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should complete and return the card not later than the voter registration deadline for the next election; (2) that if the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice; and (3) that if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

The jurisdiction may designate the registrant as inactive if the registrant fails to return the card by the voter registration deadline for the next election after the notice is sent.

The jurisdiction may remove the registrant from the voter rolls after sending the notice in two circumstances. First, if the registrant confirms in writing, such as by completing and returning the notice card, that the registrant has changed residence to a place outside the jurisdiction then the registrant can be removed from the list immediately. Second, if the registrant fails to respond to the notice and fails to vote or to appear to vote in an election beginning on the date the notice is sent and ending on the day after the date of the second federal general election after the notice is sent, then the registrant can be removed from the list after that second federal general election.

**Does the NVRA create a "safe harbor" procedure under which States can satisfy their obligation to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the voter rolls due to a change of residence?**

Yes. The NVRA gives one example of a safe harbor procedure. Under that procedure, States may utilize change-of-address information supplied by the United States Postal Service through its National Change of Address

municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address. If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235.

**O.C.G.A. § 21-2-234(a)(2)**
In the first six months of each odd-numbered year, the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233. The confirmation notice described in this Code section shall be sent to each such elector during each odd-numbered year. Such notices shall be sent by forwardable, first-class mail.

**O.C.G.A. § 21-2-234(d)**
If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. The Secretary of State or the registrars

18

program (NCOA) to identify registrants who may have changed residences and then take one of two actions.

1. If it appears from the NCOA information that the person has moved to a different residence in the same registrar's jurisdiction, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid, pre-addressed return form by which the registrant may verify or correct the address information.

2. If it appears that the registrant has moved to a residence outside the registrar's jurisdiction, the registrar uses the NVRA's Section 8(d) notice process and may remove the registrant from the voter rolls after satisfying all requirements of that process.

**Do States have to use the NCOA process to initiate the notice process?**
No. States do not have to use the NCOA process. Under the NVRA, States must have a general program that makes a reasonable effort to identify and remove the names of voters who have become ineligible to vote by means of a change of address. The program has to be uniform, non-discriminatory, in compliance with the Voting Rights Act and must be completed 90 days before a federal election. States otherwise have discretion under the NVRA and HAVA in how they design their general program, and States currently undertake a variety of approaches to how they initiate the notice process.

For example, some general programs involve a State undertaking a uniform mailing of a voter registration card, sample ballot, or other election mailing to all voters in a jurisdiction, and then using information obtained from returned non-deliverable mail as the basis for correcting voter registration records (for apparent moves within a jurisdiction) or for initiating the notice process (for apparent moves outside a jurisdiction or non-deliverable mail with no forwarding address noted).

Another example involves general programs where States initiate the notice process based on information showing that a voter has not voted

shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.

**O.C.G.A. § 21-2-235(a)**
In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors. Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records.

in elections nor made contact with a registrar over some period of time. This is <u>not</u> prohibited by the NVRA and its bar on removing voters from the list solely for failure to vote, since it relies on the NVRA notice process, and thus utilizes both a notice and a waiting period of two federal general elections.

**Does Section 8 impose any time restrictions on States as to when a general list maintenance program can be conducted?**
Yes. Section 8 requires States to complete any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters not later than 90 days prior to the date of a primary election or general election for federal office. This 90 day deadline applies to state list maintenance verification activities such as general mailings and door to door canvasses. This 90 day deadline does not, however, preclude removal of names at the request of the registrant, removal due to death of the registrant, removal due to criminal conviction or mental incapacity of the registrant as provided by State law, nor does the deadline preclude correction of a registrant's information.

**Are there any protections in the NVRA for those eligible registered voters who have changed address to another location within a registrar's jurisdiction, or are otherwise on an inactive voter list, but have not notified the registrar prior to the date of a federal election?**
Yes. The NVRA contains fail-safe provisions to enable such persons who show up to vote on a federal election day to update their registration and to vote in that election even though they have not notified the registrar of the address change:

       3.   An eligible registered voter who has moved to an address in an area covered by the same polling place as his or her previous address is permitted to vote at that same polling place upon oral or written affirmation by the registrant of the change of address at the polling place;

4.  An eligible registered voter who has moved to an address in an area covered by a different polling place from the polling place for his or her previous address, but within the same registrar's jurisdiction and the same congressional district, at the option of the registrant:

    1.  shall be permitted to correct the voting records and vote at the old polling place upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

    2.  shall be permitted to correct the voting records and vote at a designated central location within the same registrar's jurisdiction, upon written affirmation by the registrant of the new address on a standard form provided by the registrar; or

    3.  shall be permitted to correct the voting records for purposes of future elections at the new polling place, and shall be permitted vote in the current election at that polling place if allowed under State law, upon confirmation by the registrant of the new address by such means as are required by law.

A central voting location need not be made available by the registrar if State law allows the person to vote at either the old or new polling place in the current election upon oral or written affirmation of the address change.

The failsafe provisions of Section 8 draw a distinction between the registrant's need for "affirmation" or "confirmation" of a new address, depending upon the circumstances in which the failsafe voting occurs.

**What if a mistake has been made, and registration records indicate that a person has moved from an address covered by a polling place when that person has in fact not moved?**

If a person has not moved, but the registration records indicate that a person has moved from an address covered by a polling place, that person shall be permitted to vote at that polling place upon oral or written affirmation by the registrant that the registrant continues to reside at his or her address previously known to the registrar.

**Are States required to keep records of their voter registration activities under the NVRA?**
Yes. Section 8 of the NVRA requires that States keep and make available for public inspection, for a period of at least two years, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered. The records to be kept shall include lists of the names and addresses of all persons to whom Section 8(d) notices are sent, and information concerning whether or not each such person has responded to the notice, as of the date that inspection of the records is made.
In addition, an independent requirement in 52 U.S.C. 20701 mandates that all records and papers relating to any application, registration, or other act requisite to voting in any election for federal office, be preserved for a period of twenty-two months from that federal election. Since voter registration is unitary and permanent, this obligation is ongoing, such that registration records must be preserved as long as the voter registration to which they pertain is considered an "active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active." Hence, States should maintain all written records related to applications to register to vote as well as declinations to register to vote. The Department of Justice can require that such records be produced for inspection and copying through a written demand, and a lawsuit to enforce such demand.

## COORDINATION, REPORTING, AND ENFORCEMENT

**What are the State's obligations to coordinate voter registration activities?**

The State is responsible for ensuring compliance with the NVRA. The NVRA requires each State to designate a State officer or employee as the chief State election official to be responsible for coordinating State responsibilities under the Act. Because of the importance of monitoring compliance with the NVRA's voter registration requirements, States should consider employing a person at the State level to serve as the NVRA coordinator for the State. This person could be responsible for coordinating and overseeing all NVRA activity at designated voter-registration agencies/offices in the State. In addition, States may consider employing a person at each designated voter-registration agency, and at each designated agency office, whose ongoing responsibility would be coordinating and overseeing the conduct of all voter registration activities in that agency/office. This person's responsibilities could include ensuring that the voter registration responsibilities are carried out, ensuring that the voter registration system is administered in a uniform and non-discriminatory manner, reviewing monthly data of voter-registration activity at voter registration offices, monitoring voter-registration activities, training new employees and providing for training updates at periodic intervals, ensuring an adequate supply of forms, and resolving voter-registration coordination issues that arise between State and local officials.

**Are States required to report on their NVRA voter-registration and list maintenance efforts?**

Yes. States must report various voter registration information to the U.S. Election Assistance Commission (EAC), in response to the EAC survey, every two years. This includes the number of voter-registration applications by mail and from motor vehicle offices, public-assistance offices, offices providing state-funded programs primarily serving persons with disabilities, Armed Forces recruitment offices, and other state-designated offices and agencies. Likewise, States must report voter

registration list maintenance information in response to the EAC survey
every two years.

These biennial NVRA reports are available on the EAC web site at the
following link: http://www.eac.gov/program-areas/research-resources-
and-reports/completed-research-and-reports/ national-voter-registration-
act-studies.

States should ensure that the NVRA data provided to the EAC is
complete and accurate. The Department of Justice carefully considers this
data, among other information, in determining how it will carry out its
enforcement responsibilities.

To facilitate accurate NVRA data reporting to the EAC, states should
consider having a system in place to track the number of voter
registration applications from each designated voter registration agency.
Barcodes or other coding could be included on voter registration
applications to designate the agency from which the form originated.
Such coding can be implemented in such a way that also allows states to
comply with the obligation not to disclose the office at which any
particular individual has registered to vote.

**For jurisdictions covered by the language minority provisions of the
Voting Rights Act, what obligations do such jurisdictions have to
ensure voter registration access under the NVRA to covered limited-
English proficient citizens?**

Certain States and local jurisdictions are covered by the language
minority requirements of the Voting Rights Act (VRA) for specific
language minority groups. The VRA requires that when covered states
and jurisdictions provide voter registration or voting notices, forms,
instructions, assistance, or other materials or information relating to the
electoral process, including ballots, they must provide them in the
language of the applicable minority group as well as in the English
language. The NVRA provides that its requirements do not supersede,
restrict, or limit the application of the requirements of the VRA. Thus,
each State or jurisdiction covered by the language minority requirements
of the VRA should consider how to ensure that NVRA voter registration
opportunities are conducted so as to provide language access to covered

limited-English proficient language minority citizens so that they have equal access to the voter registration process.

To assist covered States and jurisdictions, extensive information regarding the language minority requirements is available on the Voting Section's website:
http://www.justice.gov/crt/voting/sec_203/activ_203.php. Various language resources are also available on the EAC website. These include versions of the national mail voter registration form translated into Spanish, Chinese, Japanese, Korean, Tagalog, and Vietnamese. http://www.eac.gov/voter/Register to Vote. These resources also include translated versions of a voter's guide to federal elections. http://www.eac.gov/voter/voters-guides. And these resources also include a glossary of election terms in six languages. http://www.eac.gov/voter/language-accessibility-program-1.

**What agency is responsible for enforcement of the NVRA?**
The U.S. Department of Justice has enforcement responsibility under the NVRA. The Department undertakes activities designed to ensure compliance with the NVRA, including monitoring state compliance, conducting investigations and, filing litigation in federal court to enforce the NVRA's requirements. Private parties may also bring litigation in federal court to enforce the NVRA. The U.S. Election Assistance Commission is responsible for administration of the national voter registration form, as well as State reporting under the NVRA.

**What are some examples of the Department's activities to enforce the provisions of the NVRA?**
An extensive description of the Department's NVRA enforcement activities can be found on the Voting Section's website: http://www.justice.gov/crt/voting/litigation/caselist.php#nvra_cases. In particular, significant NVRA decisions or settlements have been obtained by the Department in litigation with the State of Tennessee (Sections 5 and 7 of the NVRA) http://www.justice.gov/crt/voting/nvra/tn_cd.pdf; and the State

| of New York (Section 7 of the NVRA), http://www.justice.gov/crt/voting/nvra/nynvra_order.pdf.<br><br>**How can I contact the Department of Justice about the NVRA's voter registration requirements?**<br>As a general matter, the Department of Justice does not issue advisory opinions concerning the statutes that it enforces. The Department will certainly consider inquiries from State officials concerning the NVRA, however, in the hope of providing assistance. Within the Department of Justice, the responsibility for NVRA enforcement is committed to the Voting Section of the Civil Rights Division. You may reach the Voting Section at its toll-free telephone number, 800-253-393 | |

# ATTACHMENT C



# The Office of Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

2 Martin Luther King Jr. Drive
802 West Tower
Atlanta, Georgia 30334

*Chris Harvey*
ELECTIONS DIRECTOR

July 10, 2018

Brian Newby, Executive Director
U.S. Election Assistance Commission
1335 East-West Highway, Suite 4300
Silver Spring, MD 20910

Dear Mr. Newby:

This letter is to certify that the Georgia Secretary of State's Office will use the funds provided under the 2018 HAVA Election Security Grant award #GA18101001 from the U.S. Election Assistance Commission to improve the administration of elections for Federal office, including to enhance election technology and make election security improvements.

I have reviewed the terms of this award, and I accept the terms as described in the Notice of Grant Award dated April 17, 2018. I have also provided a signed copy of the Certification Regarding Lobbying.

These funds will be used in a manner consistent with the laws described in Section 906 of HAVA, and the funds will not be used in a manner inconsistent with the requirements of Title III of HAVA.

We request $10,305,783 at this time. We will develop the program narrative as follows:

The Georgia Secretary of State's Office is ready to use these funds for a list of projects to enhance voting in Georgia by increasing election security, simplicity, and accessibility. We are considering these funds for the following uses:

- Purchase secure voting devices that produce a voter-verifiable paper ballot;

- Provide a screen-readable, ADA-compliant online sample ballot for all voters;

- Purchase MS-ISAC Cyber Security Sensors for each of Georgia's 159 county election offices;

- Purchase cyber security services, such as diagnostics and testing assessments;

- Improve and enhance our online voter self-service page "My Voter Page" (MVP) in order to be mobile-adaptable with enhanced features;

- Purchase new Electronic Poll Books;

- Enhance and update our Online Voter Registration Page to be optimized for mobile use and allow for multiple ballot options for voters who are eligible to participate in multiple pending elections;

- Obtain new reports that allow improved demographic reporting for voter registration in our voter registration database;

- Pay for re-design of voter precinct cards to become fully compatible with USPS mailing standards and optimize delivery of cards to voters;

- Improve voter registration database management and access control;

- Enhance the state's "Petitions Module" and high speed scanners for more efficient and secure processing; and

- Engage an outside firm to conduct election audits and testing.

If you have any questions about this request, please contact me at (404) 657-5380 or charvey@sos.ga.gov.

Sincerely,

Chris Harvey, Elections Director
Office of Georgia Secretary of State Brian P. Kemp

## 2018 HAVA ELECTION SECURITY GRANT

| Budget Information | | CFDA # 90.404 | Non-Construction Program |
|---|---|---|---|

**Name of Organization:** Georgia Secretary of State

**Budget Period Start:** 3/23/2018 — SECTION A - BUDGET SUMMARY

**Budget Period End:** 3/22/2023 — FEDERAL & NON-FEDERAL FUNDS (Match)

*(Consolidated Budget for total project term-- up to 5 years as defined by grantee)*

|  | PROGRAM CATEGORIES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BUDGET CATEGORIES | (a) Voting Equipment | (b) Election Auditing | (c) Voter Registration Systems | (d) Cyber Security | (e) Communications | (f) Other | (g) Other | TOTALS | % Fed Total |
| 1. PERSONNEL (including fringe) | | | | | | | | $ - | 0% |
| 2. EQUIPMENT | $ 5,395,247.00 | | | | | | | $ 5,395,247.00 | 52% |
| 3. SUBGRANTS- to local voting jurisdictions | | | | | | | | $ - | 0% |
| 4. TRAINING | | | | $ 50,000.00 | | | | $ 50,000.00 | 0% |
| 5. All OTHER COSTS | | $ 500,000.00 | | $ 4,360,536.00 | | | | $ 4,860,536.00 | 47% |
| 6. TOTAL DIRECT COSTS (1-6) | $ 5,395,247.00 | $ 500,000.00 | $ - | $ 4,410,536.00 | $ - | $ - | $ - | $ 10,305,783.00 | |
| 7. INDIRECT COSTS (if applied) | | | | | | | | $ - | 0% |
| 8. Total Federal Budget | $ 5,395,247.00 | $ 500,000.00 | $ - | $ 4,410,536.00 | $ - | $ - | $ - | $ 10,305,783.00 | |
| 11. Non-Federal Match | $ 515,290.00 | | | | | | | $ 515,290.00 | |
| 12. Total Program Budget | $ 5,910,537.00 | $ 500,000.00 | $ - | $ 4,410,536.00 | $ - | $ - | $ - | $ 10,821,073.00 | |
| 13. Percentage By Category | 52% | 5% | 0% | 43% | 0% | 0% | 0% | | |

| Proposed State Match | 5.0% |
|---|---|

A. Do you have an Indirect Cost Rate Agreement approved by the Federal government or some other non-federal entity?
If yes, please provide the following information:

B. Period Covered by the Indirect Cost Rate Agreement (mm/dd/yyyy-mm/dd/yyyy):

C. Approving Federal agency:

D. If other than Federal agency, please specify:

E. The Indirect Cost Rate is:

# ATTACHMENT D



# The Office of the Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

August 1, 2013

Ms. Alice Miller
Acting Executive Director
Election Assistance Commission
1201 New York Ave., NW
Washington, DC 20005

Dear Ms. Miller,

As the chief state election official for the State of Georgia, I am writing to request that the Election Assistance Commission ("EAC") revise the state-specific instructions for Georgia in the National Voter Registration Mail Application Form (the "Federal Form"). In addition to updating the mailing address for my office's Elections Division, the Federal Form needs to be altered to include information that the State of Georgia has deemed necessary to enable state election officials to assess the eligibility of an applicant and to administer voter registration.

Specifically, I am requesting that the EAC alter the state-specific instructions for Georgia in the Federal Form as follows:

1. In Georgia, a person is not qualified to vote unless such person is registered as an elector in the manner prescribed by Georgia law, a citizen of the State of Georgia and of the United States, and possess all other qualifications set by law. O.C.G.A. § 21-2-216(a). Act 143 of the 2009 Georgia General Assembly, codified at O.C.G.A. § 21-2-216(g), along with the implementing regulations contained in Ga. Comp. R. & Regs. r. 183-1-6-.06 and Ga. Comp. R. & Regs. r. 590-8-1-.02, directs applicants for voter registration to provide satisfactory evidence of United States citizenship so that the board of registrars can determine the applicant's eligibility. Upon the receipt of an application without satisfactory evidence of citizenship, the board of registrars shall accept the application and notify the applicant in writing of the requirement to provide satisfactory evidence of citizenship. Failure to respond to such request will result in the rejection of the application.

    Accordingly, we request the insertion of an additional bullet after the last bullet in the "Signature" section with the following text: "be found eligible to vote by supplying satisfactory evidence of U.S. citizenship."

2. Additionally, the mailing address for the Elections Division in the Federal Form should be revised as follows: Elections Division, Office of the Secretary of State, 2 Martin Luther King Jr. Drive, Suite 802 Floyd West Tower, Atlanta, Georgia 30334.

Alice Miller
Election Assistance Commission
Page | 2


     Since this information is necessary to enable state election officials to assess the eligibility of an applicant, your prompt consideration of this request is appreciated. In the event we do not receive the EAC's response to this request in the next ten (10) days, we will understand that to mean the EAC is unable to make a determination on our request. Thank you in advance for your attention to this request, and please contact me if you have any questions.


                Sincerely,

                Brian P. Kemp
                Secretary of State

# ATTACHMENT E



**U.S. Election Assistance Commission**
**1201 New York Ave. NW – Suite 300**
**Washington, DC 20005**

August 15, 2013

Honorable Brian P. Kemp
Secretary of State
214 State Capitol
Atlanta, GA 30334

Dear Secretary Kemp:

Thank you for your correspondence dated August 1, 2013 to this office requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that EAC revise the Georgia state-specific instructions by making the following changes:

1. Insertion of an additional bullet after the last bullet in the "Signature" section with the following text:

   - Be found eligible to vote by supplying satisfactory evidence of U.S. citizenship

2. Revision of the mailing address as follows:

   Elections Division
   Office of the Secretary of State
   2 Martin Luther King, Jr. Drive
   Suite 802 Floyd West Tower
   Atlanta, GA 30334

EAC staff is authorized to approve the change related to mailing address and will accordingly make the change to the Georgia instructions on the Federal Form. However, as you know, EAC currently has four vacancies on the Commission. EAC staff is authorized to process State requests to modify state-specific instructions on the Federal Form but according to current procedures must defer any requests that raise "issues of broad policy concern to more than one state" until EAC has a quorum. I have attached a copy of the memo to former EAC Commissioners Donetta Davidson and Gineen Bresso from former Executive Director Thomas Wilkey, November 9, 2011 which delineates the process EAC staff must follow when receiving State requests to modify their state-specific instructions on the Federal Form.

Your correspondence states that

   Upon receipt of an application without satisfactory evidence of citizenship, the board of registrars shall accept the application and notify the applicant in writing of the requirement to provide satisfactory evidence of citizenship. *Failure to respond to such request will result in the rejection of the application.*

(Emphasis added).

Honorable Brian P. Kemp
August 15, 2013

Thus the result would be that the Federal Form would be rejected in Georgia without the proper citizenship documentation. Failure to "accept and use" the Federal Form has broad policy impact that could affect more than one State.

In addition, citizenship documentation is not addressed in the National Voter Registration Act of 1993 or the Help America Vote Act of 2002 and the inclusion of such information with the Federal Form constitutes a policy question which EAC Commissioners must decide. EAC staff has no authority to establish policy for the EAC.

The requested modification to the state-specific instruction on the Federal Form regarding citizenship documentation appears to raise issues of broad policy concern to more than one state. EAC staff is therefore constrained to defer the request until EAC has a quorum.

If you have any questions on this matter, please do not hesitate to contact me.

Sincerely,

Alice Miller,
Acting Executive Director &
Chief Operating Officer

# ATTACHMENT F



**U. S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD 20910

January 17, 2014

Honorable Brian P. Kemp
Secretary of State
214 State Capitol
Atlanta, Georgia 30334

**Re:    Docket No. EAC-2013-004: State Requests to Include Additional Proof of
Citizenship Instructions on the National Mail Voter Registration Form**

Dear Secretary Kemp:

I write in reference to your request dated August 1, 2013 for the U.S. Election Assistance
Commission ("EAC") to modify the state-specific instructions of the National Mail Voter
Registration Form ("Federal Form") to include instructions mandating that, as a precondition
to registering to vote in federal elections in Georgia, applicants must provide additional proof
of their United States citizenship not otherwise required by the Federal Form.

As you know, the EAC initially deferred consideration of your request pending the
reestablishment of a quorum of EAC commissioners, in accordance with the EAC's internal
procedures.  On December 13, 2013, the EAC was ordered by the United States District
Court for the District of Kansas to render final agency action by January 17, 2014 in regard
to requests submitted by the states of Arizona and Kansas which are similar to your request.
Because the requests are similar, the EAC has determined that it would render a final
determination on your request as well. The EAC solicited public comments regarding all
three requests, *see* 78 Fed. Reg. 77666 (Dec. 24, 2013), and has reviewed those comments.
The agency did not receive any comments from state officials in Georgia.

For the reasons discussed in the attached Memorandum of Decision, the Commission denies
your request to modify the Federal Form's state-specific instructions.  The attached decision
constitutes final agency action with respect to your request, in accordance with 5 U.S.C.
§ 704.

Sincerely,

*[signature]*

Alice Miller
Acting Executive Director &
Chief Operating Officer

# ATTACHMENT G



**U.S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD 20910

January 29, 2016

Honorable Brian P. Kemp
Georgia Secretary of State
214 State Capitol
Atlanta, GA 30334

Dear Secretary Kemp:

This letter is a follow-up to correspondence to the U.S. Election Assistance Commission requesting modification of instructions relative to Georgia on the national mail voter registration form (Federal Form).

You requested that the EAC revise the Georgia State-Specific Instructions by making the following changes *(in italics)*:

Revision of the mailing address is as follows:
> **Mailing address:**
> Election Division
> Office of the Secretary of State
> *Suite 802 Floyd West Tower*
> *2 Martin Luther King, Jr. Drive*
> *Atlanta, GA 30334*

Insertion of an additional bullet after the last bullet in the Signature section with the following text:

**9. Signature.** To register in Georgia you must:
- be a citizen of the United States
- be a legal resident of Georgia and of the county in which you want to vote
- be 18 years old within six months after the day of registration, and be 18 years old to vote
- not be serving a sentence for having been convicted of a felony
- not have been judicially determined to be mentally incompetent, unless the disability has been removed
- *be found eligible to vote by supplying satisfactory evidence of U.S. citizenship*

On August 15, 2013, Acting Executive Director Alice Miller opined that the EAC was authorized to approve the change related to the mail address and accordingly made that change to the Georgia instructions on the Federal Form. Her August 15, 2013, letter further opined that EAC staff was constrained to defer the request regarding citizenship documentation until EAC had a quorum of Commissioners.

Upon review of your request, I write to inform you that all of the changes requested to the State of Georgia instructions on the national mail voter registration form (Federal form) have been made and are posted on the EAC website.

If the changes do not accurately reflect your request, please notify me immediately. Further, we have begun a systematic process with all states to update State-Specific Instruction Changes regularly. Please look for a separate mailing from us in the coming days and notify us if any additional State-Specific Instructions are in need of modernization or further calibration with your procedures.

If you have any questions on this matter, please do not hesitate to contact me at 301-563-3959 or at bnewby@eac.gov.

Sincerely,

Brian D. Newby
Executive Director

# ATTACHMENT H



**U.S. ELECTION ASSISTANCE COMMISSION**
1335 East West Highway, Suite 4300
Silver Spring, MD  20910

September 12, 2016

Honorable Brian P. Kemp
Georgia Secretary of State
214 State Capitol
Atlanta, GA  303334

Re:     United States Court of Appeals Case #16-5196
        League of Women Voters, et al, v. Brian D. Newby, et al

Dear Secretary Kemp:

This letter is to advise you that the United States Court of Appeals for the District of Columbia Circuit has reversed the denial of a preliminary injunction regarding State-Specific Instructions of the Federal Voter Registration Form.  I have attached a copy of the Order for your reference.

The order requires that the Election Assistance Commission "take all actions necessary to restore the status quo ante, pending a determination of the merits, including promptly removing from the state-specific instructions those requirements directing voter registration applicants to submit proof of their citizenship." These changes were made on our website the day of the Order, September 9, 2016.

The order also requires that the EAC inform you that, "Federal Form applications filed since January 29, 2016 should be treated as if they did not contain the now-stricken state-specific instructions."

If you know how many applications have been filed in Georgia using the federal form since January 29, 2016, we would appreciate knowing that information.

If you have any questions on this matter, please do not hesitate to contact me at 301-563-3959 or at bnewby@eac.gov.

Sincerely,

Brian D. Newby
Executive Director

enc.

Case 1:18-cv-05391-SCJ   Document 387-1   Filed 06/24/20   Page 455 of 602
Case 1:18-cv-05391-SCJ   Document 91   Filed 08/15/19   Page 124 of 158

USCA Case #16-5196      Document #1635095      Filed: 09/09/2016      Page 1 of 3

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 16-5196**                                    **September Term, 2016**

FILED: SEPTEMBER 9, 2016

LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, ET AL.,
 APPELLANTS

v.

BRIAN D. NEWBY, IN HIS CAPACITY AS THE EXECUTIVE DIRECTOR OF THE UNITED STATES
ELECTION ASSISTANCE COMMISSION, ET AL.,
 APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00236)

---

Before: ROGERS, *Circuit Judge*, and WILLIAMS and RANDOLPH*, *Senior Circuit Judges*

### J U D G M E N T

This case came to be heard on the record of the United States District Court and was argued by counsel. On consideration thereof, and as will be explained more fully in opinions to be filed at a later date, it is

**ORDERED and ADJUDGED** that the order of the District Court denying the motion for a preliminary injunction be reversed. Appellants have demonstrated irreparable harm, a likelihood of success on the merits, that the balance of equities tips in their favor, and that an injunction is in the public interest. It is

**FURTHER ORDERED** that the United States Election Assistance Commission ("the Commission"), and anyone acting on its behalf, be enjoined from giving effect to the January 29, 2016, decisions of its Executive Director, Brian D. Newby, approving requests by Kansas, Alabama, and Georgia to add a proof of citizenship requirement to the state-specific instructions that accompany the National Mail Voter Registration Form (the "Federal Form"). It is

Case 1:18-cv-05391-SCJ   Document 387-1   Filed 06/24/20   Page 456 of 602
Case 1:18-cv-05391-SCJ   Document 91   Filed 08/15/19   Page 125 of 158

USCA Case #16-5196   Document #1635095   Filed: 09/09/2016   Page 2 of 3

**FURTHER ORDERED** that the Commission take all actions necessary to restore the status quo ante, pending a determination on the merits, including promptly removing from the state-specific instructions those requirements directing voter registration applicants to submit proof of their United States citizenship, informing Kansas, Alabama, and Georgia that Federal Form applications filed since January 29, 2016 should be treated as if they did not contain the now-stricken state-specific instructions, and promptly posting on the Commission's website the modified version of the Federal Form.

Our dissenting colleague claims that a Constitutional issue "would arise if a court issued a final injunction in this case forbidding the Commission from including the states' requirements." But that issue is not presented in this case because the Leagues seek only to enjoin the Commission (or its agents) from giving effect to the January 29, 2016 decisions of Executive Director Newby. Neither this preliminary injunction nor a final judgment would forbid the Commission from including a proof-of-citizenship requirement if it determined that such a requirement was necessary to "effectuate [the States'] citizenship requirement[s]." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2260 (2013). Like Arizona after *ITCA*, the States here remain free to renew their "request[s] that the [Commission] alter the Federal Form to include information the State[s] deem[] necessary to determine eligibility." *Id.* If the Commission refuses those requests (or fails to act timely), the States here (like Arizona) will have the "opportunity to establish in a reviewing court" that their proof-of-citizenship requirements are necessary to enable them to assess eligibility. *Id.*; see 52 U.S.C. § 20508(b)(1). Because they have yet to do so, our review of the agency action here presents no Constitutional issue.

<u>Per Curiam</u>

FOR THE COURT:
Mark J. Langer, Clerk

BY:   /s/
Amy Yacisin
Deputy Clerk

* Senior Circuit Judge Randolph would affirm the order denying the preliminary injunction. A separate dissenting statement by Senior Circuit Judge Randolph is attached.

Randolph, *Senior Circuit Judge*, dissenting:

I would affirm the District Court's denial of a preliminary injunction on the ground that appellants have not demonstrated irreparable harm.

The Supreme Court in *Arizona v. Inter Tribal Council of Arizona, Inc.* recognized that under Article I, § 2, cl. 1, and the Seventeenth Amendment to the Constitution, the states – not the federal government – have the power to establish "voting requirements" in federal elections. 133 S.Ct. 2247, 2258-59 (2013).

The Court also held that it would "raise serious constitutional doubts" if the Election Assistance Commission prevented a state from "enforcing its voter qualifications" and that the Commission may be "under a nondiscretionary duty to include [a state's proof of citizenship requirements] on the Federal Form." *Id.* at 2259-60. That issue is not presented because the Commission's Executive Director granted the requests of Kansas, Georgia and Alabama to include their requirements on the Federal Form. But the issue would arise if a court issued a final injunction in this case forbidding the Commission from including the states' requirements.

# ATTACHMENT I

## Federal Financial Report
(Follow form instructions)

OMB Number: 4040-0014
Expiration Date: 01/31/2019

| 1. Federal Agency and Organizational Element to Which Report is Submitted | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency (To report multiple grants, use FFR Attachment) |
|---|---|
| Election Assistance Commission | Title 1, Section 101 2018 |

**3. Recipient Organization (Name and complete address including Zip code)**

Recipient Organization Name: Georgia Secretary of State

| | |
|---|---|
| Street1: | 214 State Capitol |
| Street2: | |
| City: | Atlanta |
| County: | Fulton |
| State: | GA: Georgia |
| Province: | |
| Country: | USA: UNITED STATES |
| ZIP / Postal Code: | 30334-160014 |

| 4a. DUNS Number | 4b. EIN | 5. Recipient Account Number or Identifying Number (To report multiple grants, use FFR Attachment) |
|---|---|---|
| | | 10142 |

| 6. Report Type | 7. Basis of Accounting | 8. Project/Grant Period | 9. Reporting Period End Date |
|---|---|---|---|
| ☐ Quarterly | ☒ Cash | From: 02/01/2018 | 09/30/2018 |
| ☐ Semi-Annual | ☐ Accrual | To: 09/30/2018 | |
| ☒ Annual | | | |
| ☐ Final | | | |

| 10. Transactions | Cumulative |
|---|---|
| *(Use lines a-c for single or multiple grant reporting)* | |
| **Federal Cash (To report multiple grants, also use FFR attachment):** | |
| a. Cash Receipts | 0.00 |
| b. Cash Disbursements | 0.00 |
| c. Cash on Hand (line a minus b) | 0.00 |
| *(Use lines d-o for single grant reporting)* | |
| **Federal Expenditures and Unobligated Balance:** | |
| d. Total Federal funds authorized | 10,305,783.00 |
| e. Federal share of expenditures | 0.00 |
| f. Federal share of unliquidated obligations | 0.00 |
| g. Total Federal share (sum of lines e and f) | 0.00 |
| h. Unobligated balance of Federal Funds (line d minus g) | 10,305,783.00 |
| **Recipient Share:** | |
| i. Total recipient share required | 515,289.00 |
| j. Recipient share of expenditures | 0.00 |
| k. Remaining recipient share to be provided (line i minus j) | 515,289.00 |
| **Program Income:** | |
| l. Total Federal program income earned | 0.00 |
| m. Program income expended in accordance with the deduction alternative | 0.00 |
| n. Program income expended in accordance with the addition alternative | 0.00 |
| o. Unexpended program income (line l minus line m or line n) | 0.00 |

| 11. Indirect Expense | | | | | | |
|---|---|---|---|---|---|---|
| a. Type | b. Rate | c. Period From | Period To | d. Base | e. Amount Charged | f. Federal Share |
| | | | | | | |
| | | | | | | |
| | | | g. Totals: | | | |

**12. Remarks:** Attach any explanations deemed necessary or information required by Federal sponsoring agency in compliance with governing legislation:

[Add Attachment] [Delete Attachment] [View Attachment]

**13. Certification:** By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729-3730 and 3801-3812).

**a. Name and Title of Authorized Certifying Official**

Prefix: |___|   First Name: Phyllis   Middle Name: |___|

Last Name: Studdard   Suffix: |___|

Title: Accounting Manager

**b. Signature of Authorized Certifying Official**

*Phyllis Studdard*

**c. Telephone** (Area code, number and extension)

**d. Email Address**

**e. Date Report Submitted**
12/27/2018

**14. Agency use only:**

Standard Form 425

# ATTACHMENT J



# General Instructions

## Who Can Use this Application
If you are a U.S. citizen who lives or has an address within the United States, you can use the application in this booklet to:
- Register to vote in your State,
- Report a change of name to your voter registration office,
- Report a change of address to your voter registration office, or
- Register with a political party.

## Exceptions
Please do not use this application if you live outside the United States and its territories and have no home (legal) address in this country, *or* if you are in the military stationed away from home. Use the Federal Postcard Application available to you from military bases, American embassies, or consular offices.

**New Hampshire** town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form.
**North Dakota** does not have voter registration.
**Wyoming** law does not permit mail registration.

## How to Find Out If You Are Eligible to Register to Vote in Your State
Each State has its own laws about who may register and vote. Check the information under your State in the State Instructions. All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election. You **cannot** be registered to vote in more than one place at a time.

## How to Fill Out this Application
Use both the Application Instructions and State Instructions to guide you in filling out the application.
- First, read the Application Instructions. These instructions will give you important information that applies to everyone using this application.
- Next, find your State under the State Instructions. Use these instructions to fill out Boxes 6, 7, and refer to these instructions for information about voter eligibility and any oath required for Box 9.

## When to Register to Vote
Each State has its own deadline for registering to vote. Check the deadline for your State on the last page of this booklet.

## How to Submit Your Application
Mail your application to the address listed under your State in the State Instructions. Or, deliver the application in person to your local voter registration office. The States that are required to accept the national form will accept copies of the application printed from the computer image on regular paper stock, signed by the applicant, and mailed in an envelope with the correct postage.

## First Time Voters Who Register by Mail
If you are registering to vote for the first time in your jurisdiction and are mailing this registration application, Federal law requires you to show proof of identification the first time you vote. Proof of identification includes:
- A current and valid photo identification or
- A current utility bill, bank statement, government check, paycheck or government document that shows your name and address.

Voters may be exempt from this requirement if they submit a **COPY** of this identification with their mail in voter registration form. If you wish to submit a **COPY**, please keep the following in mind:
- Your state may have additional identification requirements which may mandate you show identification at the polling place even if you meet the Federal proof of identification.
- Do not submit original documents with this application, only **COPIES**.

---

### If You Were Given this Application in a State Agency or Public Office
If you have been given this application in a State agency or public office, it is your choice to use the application. If you decide to use this application to register to vote, you can fill it out and leave it with the State agency or public office. The application will be submitted for you. Or, you can take it with you to mail to the address listed under your State in the State Instructions. You also may take it with you to deliver in person to your local voter registration office.
Note: The name and location of the State agency or public office where you received the application will remain confidential. It will not appear on your application. Also, if you decide not to use this application to register to vote, that decision will remain confidential. It will not affect the service you receive from the agency or office.

# Application Instructions

Before filling out the body of the form, please answer the questions on the top of the form as to whether you are a United States citizen and whether you will be 18 years old on or before Election Day. If you answer no to either of these questions, you may not use this form to register to vote. However, state specific instructions may provide additional information on eligibility to register to vote prior to age 18.

**Box 1 — Name**
Put in this box your full name in this order — Last, First, Middle. Do not use nicknames or initials.
*Note:* If this application is for a change of name, please tell us in **Box A** *(on the bottom half of the form)* your full name before you changed it.

**Box 2 — Home Address**
Put in this box your home address (legal address). Do **not** put your mailing address here if it is different from your home address. Do **not** use a post office box or rural route without a box number. Refer to state-specific instructions for rules regarding use of route numbers.

*Note:* If you were registered before but this is the first time you are registering from the address in Box 2, please tell us in **Box B** *(on the bottom half of the form)* the address where you were registered before. Please give us as much of the address as you can remember.

*Also Note:* If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C *(at the bottom of the form)*.

**Box 3 — Mailing Address**
If you get your mail at an address that is different from the address in Box 2, put your mailing address in this box. If you have no address in Box 2, you **must** write in Box 3 an address where you can be reached by mail.

**Box 4 — Date of Birth**
Put in this box your date of birth in this order — Month, Day, Year. *Be careful not to use today's date!*

**Box 5 — Telephone Number**
Most States ask for your telephone number in case there are questions about your application. However, you do not have to fill in this box.

**Box 6 — ID Number**
Federal law requires that states collect from each registrant an identification number. You must refer to your state's specific instructions for item 6 regarding information on what number is acceptable for your state. If you have neither a drivers license nor a social security number, please indicate this on the form and a number will be assigned to you by your state.

**Box 7 — Choice of Party**
In some States, you must register with a party if you want to take part in that party's primary election, caucus, or convention. To find out if your State requires this, see item 7 in the instructions under your State.

If you want to register with a party, print in the box the full name of the party of your choice.

If you do not want to register with a party, write "no party" or leave the box blank. Do not write in the word "independent" if you mean "no party," because this might be confused with the name of a political party in your State.
*Note:* If you do not register with a party, you can still vote in general elections and nonpartisan (nonparty) primary elections.

**Box 8 — Race or Ethnic Group**
A few States ask for your race or ethnic group, in order to administer the Federal Voting Rights Act. To find out if your State asks for this information, see item 8 in the instructions under your State. If so, put in Box 8 the choice that best describes you from the list below:

- American Indian *or* Alaskan Native
- Asian or Pacific Islander
- Black, *not* of Hispanic Origin
- Hispanic
- Multi-racial
- White, *not* of Hispanic Origin
- Other

**Box 9 — Signature**
Review the information in item 9 in the instructions under your State. Before you sign or make your mark, make sure that:

(1) You meet your State's requirements, and
(2) You understand **all** of Box 9.

Finally, sign your **full** name or make your mark, and print today's date in this order — Month, Day, Year. If the applicant is unable to sign, put in **Box D** the name, address, and telephone number (optional) of the person who helped the applicant.

# Voter Registration Application

Case 1:18-cv-05391-SCJ Document 287-1 Filed 06/24/20 Page 134 of 158

**Before completing this form, review the General, Application, and State specific instructions.**

| | |
|---|---|
| Are you a citizen of the United States of America? ☐ Yes ☐ No<br>Will you be 18 years old on or before election day? ☐ Yes ☐ No<br>**If you checked "No" in response to either of these questions, do not complete this form.**<br>(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.) | This space for office use only. |

**1** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

**2** Home Address | Apt. or Lot # | City/Town | State | Zip Code

**3** Address Where You Get Your Mail If Different From Above | City/Town | State | Zip Code

**4** Date of Birth ___ ___ ___ Month Day Year | **5** Telephone Number (optional) | **6** ID Number - (See item 6 in the instructions for your state)

**7** Choice of Party (see item 7 in the instructions for your State) | **8** Race or Ethnic Group (see item 8 in the instructions for your State)

**9** I have reviewed my state's instructions and I swear/affirm that:
- I am a United States citizen
- I meet the eligibility requirements of my state and subscribe to any oath required.
- The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States.

Please sign full name (or put mark) ▲

Date: ___ / ___ / ___ Month Day Year

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## Please fill out the sections below if they apply to you.

If this application is for a **change of name,** what was your name before you changed it?

**A** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

If you were **registered before but this is the first time you are registering from the address in Box 2,** what was your address where you were registered before?

**B** Street (or route and box number) | Apt. or Lot # | City/Town/County | State | Zip Code

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

**C**
- Write in the names of the crossroads (or streets) nearest to where you live.
- Draw an X to show where you live.
- Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.

NORTH ↑

Example

Route #2

● Grocery Store

Woodchuck Road

Public School ● X

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

**D**

## Mail this application to the address provided for your State.

# State Instructions

## Georgia

Updated: 08-15-2013

**Registration Deadline —** The fifth Monday before any general primary, general election, or presidential preference primary, or regularly scheduled special election pursuant to the Georgia Election Code. In the event that a special election is scheduled on a date other that those dates prescribed by the Georgia Election Code, registration would close on the 5th day after the call.

**6. ID Number.** Federal law requires you to provide your full GA Drivers License number or GA State issued ID number. If you do not have a GA Drivers License or GA ID you must provide the last 4 digits of your Social Security number. Providing your full Social Security number is optional. Your Social Security number will be kept confidential and may be used for comparison with other state agency databases for voter registration identification purposes. If you do not possess a GA Drivers License or Social Security number, a unique identifier will be provided for you.

**7. Choice of Party.** You do not have to register with a party to take part in that party's primary, caucus or convention.

**8. Race or Ethnic Group.** You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).

**9. Signature.** To register in Georgia you must:
• be a citizen of the United States
• be a legal resident of Georgia and of the county in which you want to vote

• be 18 years old within six months after the day of registration, and be 18 years old to vote
• not be serving a sentence for having been convicted of a felony
• not have been judicially determined to be mentally incompetent, unless the disability has been removed

**Mailing address:**
Elections Division
Office of the Secretary of State
2 Martin Luther King Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334

## Hawaii

Updated: 06-18-2018

**Registration Deadline —** 30 days before the election.

**6. ID Number.** When you register to vote, you must provide your Hawaii driver's license or State identification number, if you have one. If you do not have a driver's license or ID number, you must provide the last four digits of your Social Security Number (SSN). If you do not have any of this information, the Clerk's Office will issue you a unique identification number, which will serve to identify you for voter registration purposes.

**7. Choice of Party.** A "choice of party" is not required for voter registration.

**8. Race or Ethnic Group.** Race or ethnic group information is not required for voter registration.

**9. Signature.** To register in Hawaii you must:
• be a citizen of the United States
• be a resident of the State of Hawaii

• be at least 16 years old (you must be 18 years old by election day in order to vote)
• not be incarcerated for a felony conviction
• not be adjudicated by a court as "non compos mentis"

**Mailing address:**
Office of Elections
State of Hawaii
802 Lehua Avenue
Pearl City, HI 96782

## Idaho

Updated: 03-01-2006

**Registration Deadline —** 25 days before the election.

**6. ID Number.** Enter your driver's license number. If you have no driver's license, enter the last 4 digits of your social security number.

**7. Choice of Party.** You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Idaho you must:
• be a citizen of the United States
• have resided in Idaho and in the county for 30 days prior to the day of election
• be at least 18 years old
• not have been convicted of a felony, and without having been restored to the rights of citizenship, or confined in prison on conviction of a criminal offense

**Mailing address:**
Secretary of State
P.O. Box 83720
State Capitol Bldg.
Boise, ID 83720-0080

# State Instructions

## Illinois

**Updated: 08-14-2012**

**Registration Deadline — 28 days** prior to each election.

**6. ID Number.** Your driver's license number is required to register to vote. If you do not have a driver's license, at least the last four digits of your social security number are required. If you have neither, please write "NONE" on the form. A unique identifier will be assigned to you by the State.

**7. Choice of Party.** Party registration or preference is not required for voter registration. However, when you apply for a primary ballot, you must indicate your party preference for that election.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** A signature is required. If signature is missing from registration form, you will be notified your registration is incomplete.

To register in Illinois you must:
• be a citizen of the United States
• be a resident of Illinois and of your election precinct at least 30 days before the next election
• be at least 18 years old on or before the next election
• not be in jail for a felony conviction
• not claim the right to vote anywhere else

**Mailing address:**
State Board of Elections
2329 S. MacArthur Boulevard
Springfield, IL 62704

## Indiana

**Updated: 03-01-2006**

**Registration Deadline — 29 days** before the election.

**6. ID Number.** Your state voter ID number is your ten digit Indiana issued driver's license number. If you do not possess an Indiana driver's license then provide the last four digits of your social security number. Please indicate which number was provided. (Indiana Code 3-7-13-13)

**7. Choice of Party.** Leave blank.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Indiana you must:
• be a citizen of the United States
• have resided in the precinct at least 30 days before the next election
• be at least 18 years of age on the day of the next general election
• not currently be in jail for a criminal conviction

**Mailing address:**
Election Division
Office of the Secretary of State
302 West Washington Street,
Room E-204
Indianapolis, IN 46204-2743

## Iowa

**Updated: 03-28-2008**

**Registration Deadline — Must be** delivered by 5 p.m. 10 days before the election, if it is a state primary or general election; 11 days before all others.* Registration forms which are postmarked 15 or more days before an election are considered on time even if received after the deadline.

*If you fail to meet the voter registration deadlines above you can register and vote by following the guidelines for election day registration. You can find these on the Iowa Secretary of State's website: www.sos.state.ia.us/pdfs/elections/EDRbrochure.pdf.

**6. ID Number.** Your ID number is your Iowa driver's license number (or Iowa non-driver identification number) if you have one, if not then the last four digits of your social security number. The ID number you provide will be verified with the Iowa Department of Transportation or the Social Security Administration.

**7. Choice of Party.** You may, but do not have to, register with a party in advance if you want to take part in that party's primary election. You may change or declare a party affiliation at the polls on primary election day.

**8. Race or Ethnic Group.** Leave blank.

**9. Signature.** To register in Iowa you must:
• be a citizen of the United States
• be a resident of Iowa
• be at least 17-1/2 years old (you must be 18 to vote)
• not have been convicted of a felony (or have had your rights restored)
• not currently be judged by a court to be "incompetent to vote"
• not claim the right to vote in more than one place
• give up your right to vote in any other place

**Mailing address:**
Elections Division
Office of the Secretary of State
Lucas Building-1st Floor
321 E. 12th Street
Des Moines, IA 50319

# ATTACHMENT K

# HISTORY OF THE BOARD

- Created in 1973 for the purpose of conducting elections and voter registration

- Prior to 1973, elections were conducted by the Probate Court and voter registration was conducted in the Voter Registrar's Office.

- The first office in local government to be consolidated with voter registration records for Richmond County and the City of Augusta being consolidated in 1947.

- First Executive Director appointed in 1973. Linda Beazley served as Director from 1973 until 1993.

- Current Executive Director is Lynn Bailey who was appointed in 1993.

# CONTACT INFORMATION

- Board of Elections Office
  535 Telfair St., Suite 500
  Augusta, GA  30901

- Phone:  (706) 821-2340

- Fax:  (706) 821-2814

- Web:  www.augustaga.gov

# MEETING INFORMATION

- The Board of Elections conducts its Regular Monthly Meeting the 2nd Monday of each month at 6:00 PM.  The location varies.  Contact the Office for more information.

- The meetings are open to the public.

# AUGUSTA-RICHMOND COUNTY, GEORGIA



# Ensuring That Every Eligible Voter's Ballot Is Accurately Counted

# WHAT IS THE BOARD OF ELECTIONS?

- The Board of Elections was created in 1973 for the purpose of performing all duties relating to elections and voter registration.

- The Board is made up of five voting members.

- Two of the Board Members are appointed by the local Democratic Party.

- Two of the Board Members are appointed by the local Republican Party.

- The Chair is a nonpartisan individual appointed by the Augusta Commission from a list of three names submitted to them by the local Legislative Delegation.

# MEMBERS OF THE BOARD

- Timothy McFalls, Chair
  Nonpartisan
  Appointed February 2016
  Term Exp. March 31, 2017

- Terence Dicks, Vice Chair
  Democratic Appointee
  Appointed April 1, 2015
  Term Exp. March 31, 2019

- Bob Finnegan, Secretary
  Republican Appointee
  Appointed April 1, 2017
  Term Exp. March 31, 2021

- Sherry T. Barnes
  Republican Appointee
  Appointed April 1, 2015
  Term Exp. March 31, 2019

- L. C. Myles
  Democratic Appointee
  Appointed April 1, 2013
  Term Exp. March 31, 2017

# DUTIES OF THE BOARD

- To conduct all elections in accordance with State law and in such manner as to guarantee the secrecy of the ballot.

- To make and issue rules, regulations, and instructions, consistent with law as deemed necessary for the guidance of poll officers and voter registration officers.

- To provide oversight in the appointment of poll officers

- To select and equip polling places and to provide for the security of all voting equipment.

- To provide oversight in the development of the Board of Elections annual budget.

- To manage and, if necessary, to hire and fire the Executive Director.

Revised March 2018

APPENDIX A:  Curriculum Vitae for Khalilah L. Brown-Dean

## ACADEMIC EMPLOYMENT

*Quinnipiac University*
    Associate Professor of Political Science, 2011-Present

*Yale University*
    Peter Strauss Family Assistant Professor of Political Science and African American Studies (2006-2011)

    Director of Undergraduate Studies for the Department of African American Studies (2009-2010)

    Assistant Professor of Political Science and African American Studies (2003-2006)

## EDUCATION

2003 The Ohio State University, Ph.D., Political Science (American Politics and Political Psychology) Dissertation: "One Lens, Multiple Views: Felon Disenfranchisement Laws and American Political Inequality" *APSA Race, Ethnicity, and Politics Section Best Dissertation Award (2005)*

2001 The Ohio State University, M.A., Political Science

1998 The University of Virginia, B.A., Government

## ADDITIONAL EDUCATION AND TRAINING

2017 Tufts University Metric Geometry and Gerrymandering Summer Program
2017 Tufts University Gerrymandering Expert Witness Training
1999 Summer Institute in Political Psychology, Certificate, Political Psychology

## SCHOLARSHIP AND RESEARCH PUBLICATIONS

### *Books*

    Brown-Dean, Khalilah L. September 2019. *Identity Politics in the United States.* London: Polity Press. ISBN: 9780745654119

    Duffy, Sean, Timothy Dansdill, Jill Shahverdian, Aileen Dever, Khalilah L. Brown-Dean, and Julia Giblin, eds., 2014. *The Individual in the Community.* Pearson. 8th Edition.

33

## Refereed Articles

Brown-Dean, Khalilah L. and Benjamin E. Jones. 2015. "Building Authentic Power: A Study of the Campaign to Repeal Connecticut's Death Penalty." *Politics, Groups, and Identities*.

Alexander-Floyd, Nikol C., Byron D'Andra Orey, and Khalilah L. Brown-Dean. 2015. "Professional Conferences and the Challenges of Studying Black Politics." *PS: Political Science and Politics*.

Brown-Dean, Khalilah L. 2015. "Emphasizing the Scholar in Public Scholarship." *PS: Political Science and Politics*.

Wilson, David C. and Khalilah L. Brown-Dean. 2012. "Great[er] Expectations: Group Interests, Deracialization, and Candidate Evaluations." *National Political Science Review*.

Brown-Dean, Khalilah. L. 2009. "Do Classes Matter?: Evaluating the Impact of College Courses on Tolerance." *Journal of the Institution for Social and Policy Studies*.

Brown-Dean, Khalilah L. 2007. "Permanent Outsiders: Felon Disenfranchisement and the Breakdown of Black Politics." *National Political Science Review*.

Brown-Dean, Khalilah L. 2005. "Trading *Brown* for Prison Orange: Reflections on Race and Justice Fifty Years after *Brown v. Board*." *Journal of the Institution for Social and Policy Studies*.

## Book Chapters

Brown-Dean, Khalilah L. *Forthcoming*. "Monumental Promises, Incremental Gains: Criminal Justice Reform in the Obama Era." In *After Obama: African American Politics in a Post-Obama Era*. Edited by Todd C. Shaw, Robert Brown, and Joseph McCormick III. New York, NY: NYU Press.

Brown-Dean, Khalilah L. 2016. "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation." In *Urban Citizenship and American Democracy*. Edited by Amy Bridges and Michael Javin Fortner. Albany, NY: SUNY Press.

Brown-Dean, Khalilah L. 2015. "Felon Disenfranchisement Ten Years After *Bush v. Gore.*" In *Election Administration in the United States: The State of Reform Ten Years After Bush v. Gore*. Co-Edited by Michael Alvarez and Bernard Grofman. Cambridge: Cambridge University Press.

## Policy Papers and Other Publications

Brown-Dean, Khalilah L. and Don C. Sawyer, III. 2019. "The State of Education in Urban Connecticut." In *The State of Urban Connecticut*, edited by Robert Brown, III. New Haven, CT: The Urban League of Southern Connecticut.

Brown-Dean, Khalilah L. 2018. "Fighting From a Powerless Space: Black Women and the Criminal Justice System." In *State of Black Women in the U.S. and Key States,* edited by Avis A. Jones-DeWeever. Washington, DC: National Coalition on Black Civic Participation.

Brown-Dean, Khalilah L. 2017. Book Review of *Sisters in the Statehouse* by Nadia Brown. *Journal of Race, Ethnicity, and Politics.*

Brown-Dean, Khalilah L., Zoltan Hajnal, Christina Rivers, and Ismail White. 2015. "Fifty Years of the Voting Rights Act: The State of Race in Politics." *Joint Center for Political and Economic Studies.*

Brown-Dean, Khalilah L. November 2013. "In the Final Analysis: On Nick Nelson's Contributions to the Study of Black Politics." *Politics, Groups, and Identities.*

Brown-Dean, Khalilah L. 2012. Cited in the Connecticut State Judiciary Committee's Favorable Report for SB-280: An Act Revising Penalties for Capital Felonies. https://www.cga.ct.gov/2012/JFR/S/2012SB-00280-R00JUD-JFR.htm

Brown-Dean, Khalilah L. 2010. Book Review of *The Perils of Federalism: Race, Poverty, and the Politics of Crime Control* by Lisa L. Miller. *Political Science Quarterly.*

Brown-Dean, Khalilah L. et al. 2008. "Lift Every Voice: Democracy, Voting Rights, and Electoral Reform." Published in conjunction with the Advisory Committee on Social Witness Policy (ACSWP) and the Advocacy Committee for Racial Ethnic Concerns (ACREC).

## WORKS IN PROGRESS

Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context (journal manuscript with David C. Wilson and TaLisa Carter)

Centering Victims' Voices in Criminal Justice Reform Movements (book manuscript)

Negotiating Voting Rights Policy in the Post-*Shelby* Era (journal manuscript)

Inmate Labor and Post-Disaster Recovery (journal manuscript with Randolph Burnside)

## ACADEMIC AWARDS, GRANTS, AND FELLOWSHIPS

2018, 2017, 2016 Quinnipiac University Provost's Innovation Grants ($15,000)

2018-2012 Quinnipiac University College of Arts and Sciences Faculty Research Grants ($30,000)

2017 Top 25 Women Making a Difference in Higher Education Award, Presented by *Diverse: Issues in Higher Education*

2014 National Conference of Black Political Scientists Julia R. Hight Summer Writing Fellowship

2010 National Conference of Black Political Scientists Rodney Higgins Award for Best Faculty Paper

2009-2011 The Open Society Foundations Justice Advocacy Senior Fellowship ($200,000)

2008-2010 Ford Foundation Difficult Dialogues Initiative ($200,000)

2005 American Political Science Association Best Dissertation Award (Race, Ethnicity, and Politics Section)

2005 Yale Center for International and Area Studies ($10,000)

2005 Social Science Research Fund ($5,000)

2005 Yale University Center for the Study of American Politics ($50,000)

2005 The College Board/AP Scholars Program Fellow ($7,000)

## AWARDS FOR PUBLIC SCHOLARSHIP AND SERVICE

2017 Game Changer Award in Public Safety and Criminal Justice, Presented by the Connecticut NAACP State Conference Youth and College Division

2017 Education Award, Presented by the Delta Iota Sigma Chapter of Phi Beta Sigma Fraternity, Incorporated

2016 Fannie Lou Hamer Award for Outstanding Community Service, Presented by the National Conference of Black Political Scientists

2015 Outstanding Community Leadership Award, Presented by the Connecticut State Martin Luther King, Jr. Commission

2014 Legacy Award, Presented by the National Association of Blacks in Law Enforcement

Walt Everitt Humanitarian Award, Presented by the Connecticut Network to Abolish the Death Penalty

Forty Under Forty Award, Presented by *Connecticut Magazine*

2007 Wilma Holmes Tootle Education Advancement Award, Presented by the North Atlantic Region of Alpha Kappa Alpha Sorority, Incorporated

## PRIOR AWARDS AND ACHIEVEMENTS

2002 National Conference of Black Political Scientists Sammy R. Young Best Student Conference Paper Award

2002 The Ohio State University Alumni Grant for Graduate Research and Scholarship ($2,000)

2002 The Ohio State University Madison F. Scott Research Grant ($2,000)

2001 The Ohio State University Madison F. Scott Research Grant ($1,500)

2000 The American Political Science Association Advanced Graduate Student Travel Grant ($500)

2000 Carl Albert Center for Congressional Research Stipend ($500)

2000 The Ohio State University Program for the Enhancement of Graduate Studies Summer Research Fellowship ($4,000)

1999 The Ohio State University Madison F. Scott Research Grant ($1,500)

1998 The Ohio State University Graduate Enrichment Fellowship ($30,000)

1997 American Political Science Association Ralph Bunche Summer Institute Fellow

## RESEARCH AND TEACHING INTERESTS

Civic Engagement; Racial and Ethnic Politics; Urban Politics and Policy; Voting Rights and Representation; The Politics of Punishment and Crime Control Policy; Mass Political Behavior; Political Psychology; Public Policy and Leadership

## PUBLIC SCHOLARSHIP

**2019**
 Brown-Dean, Khalilah L. "Why Victims of Crime Deserve a Voice." *The Hill*
 Brown-Dean, Khalilah L. "Yes Virginia, There is a Choice." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "Defining Political Progress." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "On the Meaning of Survival." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "First STEP or First Stumble?" *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "The Myth of Meritocracy." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "The Fallacy of NOT Seeing Race." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "Dr. King Deserves More." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "Sorority Life as an Act of Resistance." *Diverse: Issues in Higher Education*
 Brown-Dean, Khalilah L. "Teaching Through Trauma." *Diverse: Issues in Higher Education*

**2018**

Brown-Dean, Khalilah L. Documentary Feature: "Extinction: The Disappearance of Black Male Educators."

Brown-Dean, Khalilah L. "Civics 101 Podcast: The Fifteenth Amendment." New Hampshire Public Radio

Brown-Dean, Khalilah L. "Giving Thanks Amid Political Uncertainty." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "On Citizenship and Voting." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Hate We Give: Voting Against Violence." *Diverse: Issues in Higher Ed*

Brown-Dean, Khalilah L. "Still Separate, Still Unequal: American Indians and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Feminism, Womanism, and Election 2018." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Stakes is High." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Aretha Franklin, John McCain, and the Meaning of Legacy." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Opposite of Progress." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "As American as Apple Pie." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "For Colored Folks Who Have Considered Suicide." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Why We Celebrate." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Mothering Behind Bars." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Bill Cosby Isn't a Victim." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "It's Time to Secure the Vote." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "From Pain to Power." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Reclaiming the 'Fierce Urgency of Now'." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "The Politics of Mental Health." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Not Yet Just, Not Yet Free." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Five Things More Effective Than Political Panic." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Honoring Black History Month, In Prison." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "In Defense of Youth Organizing." *Diverse: Issues in Higher Education*

Brown-Dean, Khalilah L. "Art as Political Resistance." *Diverse: Issues in Higher Education*

**2016**

Brown-Dean, Khalilah L. "Can She Do It? Women in Politics Remain Dogged By Gender Stereotypes." *New York Daily News.*

Brown-Dean, Khalilah L. "Justice Trump'd? The Path Toward Criminal Justice Reform Post-Obama." WEAA Radio.

**2015**

Brown-Dean, Khalilah L. "Leaving Victims Behind is Unjust." *New Haven Register.*

**2014**

Brown-Dean, Khalilah L. "Saying Farewell to Maya Angelou." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Who Fights For Black Girls?" *Ebony Magazine.*

**2013**

Brown-Dean, Khalilah L. Documentary Feature: "The Color of Justice."

Brown-Dean, Khalilah L. "Kids and Families: The REAL Victims of the GOP Shutdown." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Primary Offers Opportunity to Move New Haven Forward." *New Haven Register.*

Brown-Dean, Khalilah L. "An End to the War on Weed?: Not Likely." *Ebony Magazine.*

Brown-Dean, Khalilah L. "What Do the Supreme Court's Decisions Mean For Blacks?" *Ebony Magazine.*

**2012**

Akinwole-Bandele, Lumumba and Khalilah L. Brown-Dean. "A Call to Community: Why We Cannot Wait for the Next Troy Davis." *Ebony Magazine.*

Brown-Dean, Khalilah L. "Beyond Barack Obama: Is America Ready For a New Political Party?" *Dominion of New York Magazine.*

**2011**

Brown-Dean, Khalilah L. "Are HBCU's Still Relevant?" *Uptown Magazine.*

Brown-Dean, Khalilah L. "If Black Men Live Longer in Prison It's Time For Change." *TheGrio.*

## INVITED TALKS AND PRESENTATIONS

"The 400th Anniversary of Jamestown and the Arrival of Enslaved Africans in Virginia." American Political Science Association Annual Meeting. Washington, DC. August 2019.

"The Future of American Democracy." Quinnipiac University Presidential Inauguration. May 2019.

"A New Vision of Criminal Justice Reform." Quinnipiac University Admissions Preview. March 2019.

"Factors Affecting Support for Felon Voting Rights: Personal Beliefs, Felon Attributes, and Political Context." David C. Wilson, TaLisa Carter, and Khalilah L. Brown-Dean. National Conference of Black Political Scientists Annual Meeting. Baton Rouge, Louisiana. March 2019.

"Fighting from a Powerless Space: Women of Color in the Criminal Justice System." Feminism and Incarceration Conference. University of North Carolina-Greensboro. February 2019.

"The Continuing Struggle for Voting Rights in the United States." Wiggin & Dana Law Firm. February 2019.

"Not Yet Just, Not Yet Free: Black Women, Political Freedom, and the 2018 Midterm Elections." Connecticut College. October 2018.

"A Letter to the Free: Reimagining Justice and Democracy in the Trump Era." University of Bridgeport Necessary Voices Lecture Series. February 2018.

"Freedom in the Era of Reform." Cheshire (CT) Correctional Institute. February 2018.

"On the Meaning of Justice and Reform." College of William and Mary. February 2018.

"A Conversation on Justice and Freedom." University of Connecticut School of Social Work. February 2018.

"Redefining Civil Rights Post-Obama." NAACP Albuquerque Civil Rights and Diversity Conference. September 2017.

"The Legacy of the 15th Amendment Post-*Shelby.*" Duke University's Samuel DuBois Cook Center Research Symposium on the Social and Economic Outcomes of the 13th, 14th, and 15th Amendments. March 2017.

"Race, Representation, and Disenfranchisement: As American As Apple Pie." Pace University. March 2017.

"The Public Spectacle: Exploring Anger and Political Transformations." William Paterson University. October 2016.

"The State of Race and Policing in America." Texas A&M University Bush School for Public Service. September 2016.

"Contemporary Challenges to Voting Rights in the United States." University of Connecticut. March 2016.

"The Black Predicament and the 2016 Elections." National Conference of Black Political Scientists. Jackson, Mississippi. March 2016.

"Beyond Ferguson: Reimagining Race and Social Justice in the United States." Walker-Horizon Lecture. Depauw University. February 2016.

"Counter-Emancipation and the Voting Rights Act of 1965." University of Illinois-Springfield. June 2015.

"Fifty Years of the Voting Rights Act: The State of Race in American Politics." Selma Public Library for the 50th Anniversary Celebration of the Bloody Sunday March. March 2015.

"Why We Cannot Wait: Reclaiming the Fierce Urgency of Now." Claflin College. February 2015.

"Lessons From the Past, Prospects For the Future: Voting Rights Post *Shelby v. Holder.*" US Attorney's Office. February 2015.

"Beyond Ferguson: Understanding the Nexus of Incarceration and Disenfranchisement." Connecticut Court Support Services. February 2015.

"The Mass Incarceration of Women of Color." Harvard University. March 2014.

"45 Years: A Retrospective on NCOBPS and the Work of William E. Nelson, Jr." Presented at the National Conference of Black Political Scientists Annual Meeting. Wilmington, Delaware. March 2014.

"The Role of Community Mobilization Within Social Justice Movements." U.S. Human Rights Network. December 2013.

"From Painful to Powerful: How Crime Victims Persuaded Legislators to Reform the Death Penalty in Connecticut and Maryland." Presented at the American Political Science Association Annual Meeting, Chicago, Illinois. August 2013.

"Public Scholarship vs. Public Intellectualism." Women of Color in Political Science Mini-Conference, American Political Science Association. Chicago, Illinois. August 2013.

"How the Affected and Underrepresented Are Ending the Death Penalty." Yale University Law School Rebellious Lawyering Conference. New Haven, Connecticut. February 2013.

"Building Authentic Power: An Examination of Connecticut's Death Penalty Repeal Campaign." Presented at the Southern Political Science Association Annual Meeting. Orlando, Florida. January 2013.

"The Relationship Between Perceptions of Justice and Grassroots Mobilization." Maryland State Conference of NAACP Branches. October 2012.

"Beyond Troy Davis: Understanding the Death Penalty Abolition Movement in the United States." William Paterson University. September 2012.

"A Tale of Two States: Death Penalty Reform in Connecticut and Maryland." Soros Institute/Open Society Foundations. July 2012.

"From Pain to Power: A New Model of Social Justice Organizing." National Conference on Race and Education in Higher Education. May 2012.

"Redefining Citizenship in a 'Post Racial' America." Carter G. Woodson Lecture Series. Central Connecticut State University. New Britain, CT February 2012.

"Race and Domestic Policy." George Mason University School of Public Policy. October 2011.

"Three-Fifths Revisited: The Census and Inmate Enumeration." Presented at the Drexel Summer Conference on the City. June 2011.

"Concentrating Punishment." Presented at the Princeton University Imprisonment of a Race Conference. March 2011.

"From Exclusion to Inclusion: Promoting Civic Engagement When Times are Always Hard." Paper presented at the American Political Science Association Annual Meeting, Washington, DC. September 2010.

"Greater Expectations: Perceptions of Racial Group Interests and Candidate Evaluations." (with David C. Wilson). Paper presented at the Midwest Political Science Association Annual Meeting, Chicago, IL. April 2010.

41

"The Future of Post-Racial Politics." Presented at the "From Slavery to Freedom to the White House: Race in Twenty-First Century America, A Conference in Honor of John Hope Franklin." Sponsored by the Duke University School of Law. April 2010.

"Race, Representation, and Punitive Politics." Presented at "The Challenge of Racial Inequality in a Post-Racial World: Race, Rights, and Public Policy in the Age of Obama." Sponsored by Rutgers and Princeton Universities. March 2010.

"Identity Politics in the Age of Obama." 15th Annual Multicultural Lecture Series. University of Rhode Island. February 2010.

"Identity Politics in the Age of Obama." University of Rochester Two Icons Lecture Series. February 2009.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Presented at the UCLA Center for the Study of Race and Ethnicity in the Americas. February 2008.

"Reforming the State: Assessing Recent Changes in State Felon Disenfranchisement Laws." Paper presented at the American Political Science Association Annual Meeting, Toronto, Canada. September 2009.

"Race, Crime, and Political Inequality." Presented to The University of North Carolina, Chapel Hill American Politics Research Group. November 2007.

"Counting Bodies, Not Ballots: The Impact of Mass Incarceration on Political Representation." Paper presented at the American Political Science Association Annual Meeting, Chicago, Illinois. September 2007.

"Once Convicted, Forever Doomed: The Politics of Punishment in the United States." The University of Michigan Distinguished Speakers Series. September 2007.

"Contemporary Challenges to the Voting Rights Act." Presented for the National Presbyterian Church Voting Rights and Electoral Reform Committee. Washington, DC April 2007.

"Once Convicted, Forever Doomed: Understanding the Political Consequences of Mass Incarceration." University of Kentucky. March 2007.

"Inmate Enumeration and Political Representation: *Reynolds v. Sims* Revisited." University of Kentucky Law School. March 2007.

"Race, Religion, and Attitudes Toward Criminal Justice Policy." The University of Texas Conference on Race, Religion, and Politics. March 2007.

"Race and the Politics of Punishment in the United States." Presented at Oxford University, Nuffield College. Oxford, England February 2007.

"Voting Rights Policy in the Post-Civil Rights Era." The Ohio State University Law and Democracy Forum. February 2007.

"African American Communities and the Politics of Incarceration." Presented to the Black Solidarity Conference, Yale University. New Haven, CT October 2006.

"Fighting from a Powerless Space: The Impact of Criminal Justice Policy on Women of Color." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2006.

"The Politics of Incarceration." African American Research Collaborative. Philadelphia, PA. August 2006.

"Is the Voting Rights Act Still Relevant?" Morning at Yale Program sponsored by the Association of Yale Alumni. May 2006.

"Inmate Enumeration and the Return of the Three-Fifths Clause." Paper presented at the National Conference of Black Political Scientists Annual Meeting, Atlanta, GA. March 2006.

"New Considerations in Redistricting and Minority Representation." Presented at the "Who Draws the Lines?: The Politics of Redistricting Conference." University of North Carolina at Chapel Hill School of Law. Chapel Hill, NC February 2006.

"The Race, Education, and Incarceration Nexus." Twentieth Century American Politics and Society Workshop. Columbia University. November 2005.

"Contemporary Challenges to the Voting Rights Act of 1965." Presented at Virginia State University. September 2005.

"Race, Crime, and American Political Inequality." Presented at Oxford University, Pembroke College. Oxford, England. March 2005.

"Trading Brown for Prison Orange: The Link Between Race, Education, and Incarceration." Reflections: 50 Years after *Brown v. Board* Symposium. Central Connecticut State University. New Britain, CT. September 2004.

"Racial Disparities in Sentencing." Panel sponsored by the Greater New Haven NAACP. "Narrowing the Gap: Reducing Access Inequality for (Ex)Felons." Crime, Inequality, and Justice Symposium, The Ohio Criminal Justice Research Center. Columbus, OH. August 2004.

"Stolen Democracy: The Consequences of Felon Disenfranchisement Laws for Black and Latino Communities." Florida State of Black Studies Conference, Miami, FL. April 2004.

"Women of Color and the American Prison System," with J. Perez-Monforti. Paper presented at the Western Political Science Association Annual Meeting, Portland, OR. March 2004.

"The Impact of Elite Framing on Public Attitudes Toward Disenfranchisement." Paper presented at the American Political Science Association Annual Meeting, Philadelphia, PA. September 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Paper presented at the Midwest Political Science Association Conference, Chicago, Illinois. April 2003.

"Racial Profiling or Racist Profiling?: Perception and Opinion on the Profiling of Arabs and Blacks," with Thomas E. Nelson, Ray Block, Jr. and Javonne A. Paul. Paper presented at the American Political Science Association Annual Meeting, Boston, Massachusetts. September 2002.

"Ignorance or Intolerance?: An Analysis of Public Attitudes Toward Felon Disenfranchisement Laws." Paper presented at the Edward F. Hayes Graduate Research Forum, Columbus, Ohio. February 2002.

"One Lens, Different Views: An Examination of Public Opinion on Felon Disenfranchisement Laws." Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002. *Recipient of the Sammy R. Young Best Conference Paper Award.*

"The Effects of Crisis-Related Imagery on Public Opinion about Racial Profiling," with Ray Block, Jr. and Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Atlanta, Georgia. March 2002.

"Heritage or Hate?: An Analysis of Public Attitudes Toward the Confederate Flag," with B. D"Andra Orey. Paper presented at the Southern Political Science Association, Atlanta, Georgia. January 2001.

"Shades of Discontent: Minority Group Competition and Attitudes Toward the Elian Gonzalez Issue," with J. Perez-Monforti. Paper presented at the National Conference of Black Political Scientists, Richmond, Virginia. *Nominated for the Sammy R. Young Best Conference Paper Award.* March 2001.

"Toeing the Party Line, Toeing the Color Line: African American Women in Congress and the Impeachment Process." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 2000.

"Stolen Democracy: Felony Disenfranchisement Laws and the Future of Black America," with Javonne A. Paul. Paper presented at the National Conference of Black Political Scientists, Washington, D.C. *Recipient of the Francis Aumann Award for the Best Graduate Student Conference Paper.* March 2000.

"African American Female Legislators and the Clinton Impeachment Process." Women Transforming Congress: Gender Analyses of Institutional Life Conference, Carl Albert Center for Congressional Research. April 2000.

"The Influence of Politically Active Black Churches on Community Activism among African Americans." Poster presented at the American Political Science Association Annual Meeting, Washington, DC. September 1997.

### KEYNOTE ADDRESSES AND PANEL DISCUSSIONS

"Not Yet Just, Not Yet Free: Women and Social Justice." Keynoted address presented to Southern Connecticut State University Women's Conference. May 2019.

"The Future of Voting Rights in the United States." Keynote address presented to the Sphex Club of Virginia. May 2019.

"The State of Justice Reform." Whitneyville United Church of Christ Social Justice Symposium. May 2019.

"The State of Urban Connecticut." Urban League of Southern Connecticut and Quinnipiac University. April 2019.

"School/Gun Violence: An Interdisciplinary Concern." Quinnipiac University School of Education. April 2018.

"A New Vision of Freedom and Democracy." Keynote Address presented to the Farmington Valley Links, Incorporated. Mark Twain House. February 2018.

"To Build the Beloved Community in the Face of Chaos." Annual Martin Luther King, Jr. Breakfast Keynote Address. Lynchburg, VA. January 2018.

"Women Leading Change: Promoting and Sustaining Women in Leadership Roles." Southern Connecticut State University Sustainability Initiative. November 2017.

"Gender, Voting, and the Voting Rights Act." Community Foundation for Greater New Haven. October 2017.

"We Who Believe in Freedom." Keynote Address presented to the Connecticut Department of Children and Families Region 6 Foster Youth Celebration. May 2017.

"Community Conversation on the Thirteenth Documentary." Greater New Haven Branch of the NAACP. April 2017.

"Women, Media, and the Gender Lens." University of New Haven Women's Leadership Conference. April 2017.

"A Day After the Election…Now What?" Quinnipiac University. November 2016.

"Bridging the Past and the Future: 30 years of the Ralph Bunche Summer Institute and the Intellectual Legacy of Dr. Ralph Bunche." American Political Science Association. October 2016.

"Chaos or Community?" Southern New England Community Action Conference. September 2016.

"A Community Conversation on Race in America." With Congressman Jim Himes. July 2016.

"Reflections on Voting Rights in the U.S." With Congressman Jim Himes. April 2016.

"To Whom Much is Given." National Association of Negro Business Women and Professionals Club. New Haven, CT. March 2016.

"Reclaiming the Fierce Urgency of Now." Frontiers International Keynote Address. Springfield, Illinois. January 2016.

"One Person, One Vote: Voting Rights 50 Years Later." Harriett Beecher Stowe Center. November 2015.

"A Call to Leadership." Keynote Address for the North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated's Undergraduate Luncheon. April 2012.

"Taking the L.E.A.D.: Social Media and Contemporary Youth Movements." Keynote Address for the C.H.A.P. Youth Leadership Conference. March 2012.

"Post-Racial or Post-Racism? New Directions in the Quest for Equality." Presented to the United States Department of Agriculture. February 2011.

"Fractured Citizenship and the Politics of Punishment." Presented to inmates at the Cheshire State Correctional Institution. Sponsored by Wesleyan University Center for Prison Education. May 2010.

"Managing the Politics of Diversity." Keynote Address for the Virginia Community Dialogue on Race and Racism. January 2008.

Panelist, "The Politics of Hate." Yale University. New Haven, CT March 2008.

Panelist, "Strategies for Strengthening Your Voice in the Political Process." North Atlantic Regional Conference of Alpha Kappa Alpha Sorority, Incorporated. March 2008.

"The Political Impact of American Criminal Justice Policy." Presented at the *New York Times* Center New York, NY November 2008.

"Empowerment Through Education." Keynote Address presented for the Links, Incorporated Scholarship Luncheon. May 2006.

"To Whom Much is Given, Much is Required: The Need for Youth Leadership." Keynote Address presented to the Hyde Leadership Academy. February 2006.

"Lessons from the Past, Prospects for the Future: Reflections on the Voting Rights Act of 1965." Association of Yale Alumni. October 2005.

"Dismantling the Hierarchy of Oppression: The Common Political Fate of Black Women and Latinas." Co-Sponsored by the Xi Omicron Chapter of Alpha Kappa Alpha Sorority, Inc. and Sigma Lambda Upsilon/Señoritas Latinas Unidas Sorority, Inc. April 2005.

"Lest We Forget." Keynote Address, African American Women's Summit. March 2005.

"Criminal Justice Expenditures and the Public Health Crisis." Frantz Fanon Lecture Series, Yale University School of Medicine. February 2005.

"The Spirit of Sankofa." Keynote Address, The New Haven Club. New Haven, CT. February 2005.

"On Heroism: Honoring the Legacy of Rosa Parks." Roundtable panelist, Afro-American Cultural Center at Yale. January 2005.

"For God and For Country: The Role of Religious Values in the 2004 Presidential Election." Yale University Election Post-Mortem. November 2004.

"The Politics of Power: Public Policy and Justice in the Black Community." Panel in honor of the 35th Anniversary of the Afro-American Cultural Center at Yale. October 2004.

"Assessing the Limits of Democracy Via Felon Disenfranchisement Laws." Washington University Department of Political Science, St. Louis, Missouri; Wesleyan University, Middletown, Connecticut.

"Just Being Here Is Not Enough!: Recognizing Your Role in Community Development." Yale University Afro-American Cultural Center Student Achievement Dinner. May 2004.

International Festival of Art and Ideas. May 2004.

"To Whom Much is Given: Communal Responsibility and the Challenges of Black Politics." Mental Pabulum Series, Yale University. February 2004.

"Power, Pride, and Patriotism: Reflections on the Political Significance of Veterans" Day." Holcomb Rock Baptist Church. November 2003.

"Culture, Context, and Competition: Explaining State Variation in Felon Disenfranchisement Laws." Invited presentations for Yale University, Texas A&M University, Emory University, Hunter College, and Indiana University-Indianapolis. 2002.

## OTHER CONFERENCE PARTICIPATION

Served as a Section Head, Panelist, Discussant, Chair, and Organizer for numerous panels at national conferences such as the American Political Science Association, National Conference of Black Political Scientists, Southern Political Science Conference, and Midwest Political Science Conference.

## TEACHING EXPERIENCE

Designing Political Inquiry (Undergraduate Lecture/Seminar); Senior Thesis in American Politics (Undergraduate Seminar); American Political Movements (Undergraduate Lecture/Seminar); Introduction to American Politics (Undergraduate Lecture); The Politics of Intimacy (Undergraduate Seminar); The Politics of Community (Undergraduate Seminars); Race, Ethnicity, and Citizenship (Undergraduate Seminar); Ethnic Politics in the United States (Undergraduate Lecture); Voting Rights and Representation (Undergraduate Seminar); The Individual and the Community (Undergraduate Seminar); Power, Politics, and Punishment (Graduate/Undergraduate Seminar); Public Opinion (Graduate Seminar); Race and Ethnicity in American Politics (Graduate Seminar); Race and Ethnicity in American Politics (Undergraduate Seminar) African American Politics (Undergraduate Seminar); Black and Jewish Community Politics (Undergraduate Lecture/Seminar)

## FACULTY ADVISING AND SUPERVISION

Responsible for advising approximately 20 undergraduate students in the Quinnipiac University College of Arts and Sciences each semester

47

Previously advised health policy and advocacy scholars in the Netter School of Medicine
Dissertation Committee Member/Reader: Andra Gillespie (Emory University); Rachel Milstein
Sondheimer (United States Military Academy at West Point); Shatema Threadcraft (Rutgers University);
Joanna Mosser (Drake University)
Research Supervision: Sheree Bennett and Luke Thompson (Difficult Dialogues Graduate Research
Assistants); Kayla Vinson and Adrea Hernandez (Mellon Mays Undergraduate Fellows); Brandee Blocker
and Christopher Pagliarella (undergraduate research assistant)

## PROFESSIONAL MEMBERSHIP

American Political Science Association; International Society of Political Psychology; Midwest Political
Science Association; National Conference of Black Political Scientists; Pi Sigma Alpha National Political
Science Honor Fraternity; National Association for Ethnic Studies

## PROFESSIONAL SERVICE

Advisory Board, Ronald W. Walters Leadership and Public Policy Center (2019-)
Member, American Political Science Association Rules and Ethics Committee (2019-)
Chair, National Conference of Black Political Scientists Fannie Lou Hamer Outstanding Community
Service Awards Committee (2019-)
Advisory Board, *Issues in Race and Society* journal (2019-)
Executive Council Member, National Conference of Black Political Scientists (2016-2018)
Member, American Political Science Association Ralph Bunche Summer Institute Advisory Committee
(2016-)
Section Chair, Undergraduate Research Section of the National Conference of Black Political Scientists
(2017)
Board Member, Association for Ethnic Studies/National Association for Ethnic Studies (2015-Present)
Section Chair, Public Opinion and Political Participation Section of the National Conference of Black
Political Scientists Annual Meeting (2014-2015)
Parliamentarian, National Conference of Black Political Scientists (2014-2016)
Section Head, Race, Ethnicity, and Gender Section of the Southern Political Science Association
Conference (2012-2013)
Section Head, Race, Class, and Ethnicity Section of the Midwest Political Science Association
Conference (2011-2012)
Executive Council, Public Policy Section of the American Political Science Association (2010-2012).
Executive Council, Urban Politics Section of the American Political Science Association (2010-2012).
Executive Council, Race and Ethnic Politics Section of the American Political Science Association
(2009-2011).
Research Advisor, The National Presbyterian Church Voting Rights and Electoral Reform Committee
(2006-2009).
Selection Committee, The Southwest Political Science Association's Jewel L. Prestage Award for the
Best Paper on the Intersection of Race, Gender, Ethnicity, and Political Behavior (2006).
Selection Committee, Warren E. Miller Prize for an Outstanding Career and Intellectual
Accomplishment in the field of Elections, Public Opinion, and Voting Behavior (Elections, Public
Opinion, and Voting Behavior Section of the American Political Science Association) (2007).
Conference Director, "Lessons From the Past, Prospects for the Future: Honoring the Fortieth
Anniversary of the Voting Rights Act of 1965." Co-Sponsored by the Yale University Center for

American Politics and Institution for Social and Policy Studies (2004-2005).
Selection Committee, American Political Science Association Ralph Bunche Book Award (2004)
Secretary, Race and Ethnic Politics Section of the American Political Science Association (2003-2005).

UNIVERSITY SERVICE

Member, Quinnipiac University Strategic Plan Committee (2018)
Faculty Researcher, Urban League of Southern Connecticut and Quinnipiac University State of Urban Connecticut Project (2016-)
Affiliated Faculty, The Prison Project at Quinnipiac University (2016-)
Co-Chair, College of Arts and Sciences Faculty Scholarships and Grants Committee (2015-2018)
Member, College Evaluation (Tenure and Promotion) Committee (2015-2018)
Co-Coordinator, Frank M. Netter School of Medicine Health Policy and Advocacy Concentration (2015-2016)
Co-Leader, University Academic Seminar Series and Advisory Board (2013-2014)
Co-Organizer, Dilemmas of Justice Speakers Series (2013)
Exploratory Committee, African American Studies Minor/Civil Rights Institute (2013-2014)
Chair, College of Arts and Sciences Scholars Working Group (2013)

## REVIEWER

National Science Foundation; *American Journal of Political Science; Journal of Race and Politics; Law and Social Inquiry; The Journal of Conflict Resolution; Politics and Gender; Journal of Politics; Russell Sage; Political Research Quarterly;* Yale University Press; *DuBois Review; Political Behavior; Urban Affairs Review; The Political Chronicle;* Palgrave-McMillan; *SOULS Journal; DuBois Review; Politics, Groups, and Identities; Election Law Journal; Journal of the Center for Policy Analysis and Research; Election Law Journal.*

## MEDIA COMMENTARY

Over 400 media outlets including *New York Times; Washington Post;* Fox News Radio; Democracy Now; American Urban Radio Network; WTNH; *The Forum; The Hill;* CNN; WURD; Minnesota Public Radio; WHYY; WNPR; CPTV; *Ebony.com;* Google; NPR; WFSB TV; CBS Radio; AP News; *Wall Street Journal.*

## RELATED PUBLIC SERVICE

Board Chair, The Community Foundation *for* Greater New Haven (2019-)
Board Member, The New Haven Pearls of Excellence Foundation (2018-)
Board Member, The Community Foundation for Greater New Haven (2015-2021)
Appointed Member, 2018 Transition Team for Connecticut Governor Ned Lamont (Women & Girls Policy)
President, Theta Epsilon Omega Chapter of Alpha Kappa Alpha Sorority, Incorporated (2017-2018)
Board Member, Prison Policy Initiative (2015-2016)

49

## CERTIFICATE OF SERVICE

I hereby certify that on this the 15th day of August 2019, I caused to be electronically filed the foregoing Expert Report of Dr. Khalilah L. Brown-Dean with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Chris Carr, Esq.**
Attorney General
**Dennis Dunn, Esq.**
Deputy Attorney General
**Russell Willard, Esq.**
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Email: ccarr@law.ga.gov
Email: ddunn@law.ga.gov
Email: rwillard@law.ga.gov

**Joshua Barrett Belinfante, Esq.**
**Brian Edward Lake, Esq.**
**Carey Allen Miller, Esq.**
**Vincent Robert Russo, Jr., Esq.**
**Kimberly Anderson, Esq.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com
Email: blake@robbinsfirm.com
Email: cmiller@robbinsfirm.com
Email: vrusso@robbinsfirm.com
Email: kanderson@robbinsfirm.com

**Bryan P. Tyson, Esq.**
Special Assistant Attorney General
**Bryan Jacoutot, Esq.**
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Email: btyson@taylorenglish.com
Email: bjacoutot@taylorenglish.com
404-856-3260
Fax: 404-856-3250


*/s/Allegra J. Lawrence*
Allegra J. Lawrence
Georgia Bar No. 439797

# DEFENDANTS' EX. 12

West's Code of Georgia Annotated
 Title 21. Elections (Refs & Annos)
  Chapter 2. Elections and Primaries Generally (Refs & Annos)
   Article 2. Supervisory Boards and Officers
    Part 2. Secretary of State

Ga. Code Ann., § 21-2-50.2

§ 21-2-50.2. Responsibilities designated under the federal Help America Vote Act

Currentness

(a) The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, [1] shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002.

(b) As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act.

(c) Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.

**Credits**
Laws 2003, Act 209, § 4, eff. July 1, 2003.

Footnotes
1     52 U.S.C.A. § 20901
Ga. Code Ann., § 21-2-50.2, GA ST § 21-2-50.2
The statutes and Constitution are current through acts passed during the 2019 Session of the General Assembly. Some statute sections may be more current, see credits for details. The statutes are subject to changes by the Georgia Code Commission.

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.



# DEFENDANTS' EX. 13

| West's Code of Georgia Annotated |
| --- |
| Title 21. Elections (Refs & Annos) |
| Chapter 2. Elections and Primaries Generally (Refs & Annos) |
| Article 2. Supervisory Boards and Officers |
| Part 4. Poll Officers (Refs & Annos) |

Ga. Code Ann., § 21-2-99

§ 21-2-99. Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll workers not to serve

Currentness

(a) The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction. For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction.

(b) No poll officer or poll worker shall serve at any primary or election unless he or she shall have received instructions, as described in subsection (a) of this Code section; shall have been found qualified to perform his or her duties in connection with the type of voting equipment to be used in that jurisdiction; and shall have received a certificate to that effect from the superintendent; provided, however, that this shall not prevent the appointment of a poll officer or poll worker to fill a vacancy arising on the day of a primary or election or on the preceding day.

**Credits**

Laws 1964, Ex. Sess., p. 26, § 1; Laws 1983, p. 140, § 1; Laws 1998, p. 295, § 1; Laws 2001, p. 240, § 4; Laws 2002, p. 437, § 1; Laws 2005, Act 53, § 10, eff. July 1, 2005.

**Formerly** Code 1933, § 34-509.

DEFENDANT'S
EXHIBIT
13

Ga. Code Ann., § 21-2-99, GA ST § 21-2-99
The statutes and Constitution are current through acts passed during the 2019 Session of the General Assembly. Some statute sections may be more current, see credits for details. The statutes are subject to changes by the Georgia Code Commission.

# DEFENDANTS' EX. 14

## Josh Belinfante

| | |
|---|---|
| **From:** | Leslie Bryan <Leslie.Bryan@lawrencebundy.com> |
| **Sent:** | Tuesday, December 10, 2019 1:57 PM |
| **To:** | Josh Belinfante |
| **Subject:** | FW: PDFs |
| **Attachments:** | 2019.12.10 Brown_Dean attachment (corrected) (clean).pdf; 2019.12.10 Brown_Dean attachment (corrected).pdf |

Josh – in preparing for Dr. Brown-Dean's deposition, I discovered two typos in her chart (still contained reference to DREs in statute). Attached are redlined and clean versions.

**From:** Pascha Shepard <Pascha.Shepard@lawrencebundy.com>
**Sent:** Tuesday, December 10, 2019 1:49 PM
**To:** Leslie Bryan <Leslie.Bryan@lawrencebundy.com>
**Subject:** PDFs

Pascha Shepard
Legal Specialist

LAWRENCE&BUNDY LLC

1180 West Peachtree Street, NW
Suite 1650
Atlanta, GA 30309
404-400-3350 main
404-609-2504 fax
pascha.shepard@lawrencebundy.com
www.lawrencebundy.com





This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential. If you are not an intended recipient, you may not review, copy, or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

1

# DEFENDANTS' EX. 15

TABLE 2: Georgia Statutes Outlining the Secretary of State's Duties
CATEGORY 1: Candidate Interaction
CATEGORY 2: Voter Interaction
CATEGORY 3: Election Official Interaction



| Duty | Text | Source | Function Classification |
|------|------|--------|------------------------|
| Powers and duties of the SOS | To determine the forms of nomination petitions, ballots, and other forms the Secretary of State is required to determine under this chapter | O.C.G.A. § 21-2-50(a)(1) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To receive registration statements from political parties and bodies and to determine their sufficiency prior to filing, in accordance with this chapter, and to settle any disputes concerning such statements; | O.C.G.A. § 21-2-50(a)(2) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To receive and determine the sufficiency of nomination petitions of candidates filing notice of their candidacy with the Secretary of State in accordance with this chapter; | O.C.G.A. § 21-2-50(a)(3) | Category 1 |
| Powers and duties of the SOS | To certify to the proper superintendent official lists of all the political party candidates who have been certified to the Secretary of State as qualified candidates for the succeeding primary and to certify to the proper superintendent official lists of all the candidates who have filed their notices of candidacy with the Secretary of State, both such certifications to be in substantially the form of the ballots to be used in the primary or election. The Secretary of State shall add to such form the language to be used in submitting any proposed constitutional amendment or other question to be voted upon at such election; | O.C.G.A. § 21-2-50(a)(4) | Category 1<br>Category 3 |
| Powers and duties of the SOS | To furnish to the proper superintendent all blank forms, including tally and return sheets, numbered lists of voters, cards of instructions, notices of penalties, instructions for marking ballots, tally sheets, precinct returns, recap sheets, consolidated returns, oaths of managers and clerks, oaths of assisted electors, voters certificates and binders, | O.C.G.A. § 21-2-50(a)(5) | Category 3 |

| | applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries. Such forms shall have printed thereon appropriate instructions for their use; | | |
|---|---|---|---|
| Powers and duties of the SOS | To receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions, as required by this chapter; | O.C.G.A. § 21-2-50(a)(6) | Category 3 |
| Powers and duties of the SOS | To furnish upon request a certified copy of any document in the Secretary of State's custody by virtue of this chapter and to fix and charge a fee to cover the cost of furnishing same; | O.C.G.A. § 21-2-50(a)(7) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To perform such other duties as may be prescribed by law; | O.C.G.A. § 21-2-50(a)(8) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To determine and approve the form of ballots for use in special elections; | O.C.G.A. § 21-2-50(a)(9) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To prepare and provide a notice to all candidates for federal or state office advising such candidates of such information, to include requirements of this chapter, as may, in the discretion of the Secretary of State, be conducive to the fair, legal, and orderly conduct of primaries and elections. A copy of such notice shall be provided to each superintendent for further distribution to candidates for county and militia district offices; | O.C.G.A. § 21-2-50(a)(10) | Category 1 Category 3 |
| Powers and duties of the SOS | To conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections; | O.C.G.A. § 21-2-50(a)(11) | Category 3 |

| Powers and duties of the SOS | To prepare and publish, in the manner provided in this chapter, all notices and advertisements in connection with the conduct of elections which may be required by law; | O.C.G.A. § 21-2-50(a)(12) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Powers and duties of the SOS | To prepare and furnish information for citizens on voter registration and voting; | O.C.G.A. § 21-2-50(a)(13) | Category 2 |
| Powers and duties of the SOS | To maintain the official list of registered voters for this state and the list of inactive voters required by this chapter; | O.C.G.A. § 21-2-50(a)(14) | Category 1 Category 2 Category 3 |
| Powers and duties of the SOS | To develop, program, build, and review ballots for use by counties and municipalities on voting systems in use in the state. | O.C.G.A. § 21-2-50(a)(15) | Category 3 |
| Extension or postponement of qualifying periods and primaries and elections in even of state of emergency or disaster | In the event the Governor declares that a state of emergency or disaster exists pursuant to Code Section 38-3-51 or a federal agency declares that a state of emergency or disaster exists, the Secretary of State is authorized to postpone or extend the qualifying periods provided in this chapter for the qualification of candidates seeking municipal, county, or state-wide office and to postpone the date of any primary, special primary, election, or special election in the affected area. | O.C.G.A. § 21-2-50.1 | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002. | O.C.G.A. § 21-2-50.2(a) | Category 1 Category 2 Category 3 |
| Responsibilities under HAVA | As the chief election official, the Secretary of State is authorized to promulgate rules and regulations to establish administrative complaint procedures as required under Section 402 of Title IV of the federal Help America Vote Act of 2002, which prescribes a process to remedy only those grievances filed under Title III of such federal act. | O.C.G.A. § 21-2-50.2(b) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| Responsibilities under HAVA | Election related complaints filed with the Secretary of State alleging violations of Title III of the federal Help America Vote Act of 2002 shall not be subject to hearing procedures of Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," but shall be resolved pursuant to rules and regulations promulgated under subsection (b) of this Code section whereby **the Secretary of State shall have the authority to issue a final order for complaints filed under the federal Help America Vote Act of 2002.** | O.C.G.A. § 21-2-50.2(c) | Category 1<br>Category 2<br>Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars of the person's county of residence. The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars** to determine the eligibility of the applicant and, if found eligible, **to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-223(a) | Category 1<br>Category 2<br>Category 3 |
| Instruction and training of private entities | **The Secretary of State may develop and provide to the boards of registrars manuals for this instruction.** The Secretary of State may also make such manuals available to the public, including via electronic means on the Secretary of State's website. Until such time as the Secretary of State develops such manuals, boards of registrars shall utilize such materials as will meet the training requirements of this rule. | Ga. Comp. R. & Regs. 183-1-6-.02(5)(c) | Category 1<br>Category 2<br>Category 3 |
| Rules and Regulations for Voter Registration by Registrars and Deputy Registrars | **The Secretary of State shall provide the board of registrars of each county manuals for the use of deputy registrars which include simple instructions on the rules and procedures for the proper conduct of voter registration. The form and content of these manuals shall be determined by the Secretary of State.** The board of registrars shall provide each deputy registrar with a copy of the manual. | Ga. Comp. R. & Regs. 183-1-6-.03(3)(n) | Category 3 |

| | | | |
|---|---|---|---|
| Accessibility for Elderly and Disabled Voters | Polling Places. The election superintendent of each county and municipality shall conduct, or cause to be conducted, an on-site inspection of each polling place located within the county or municipality to determine if the polling place is accessible. **This inspection shall be reported to the Secretary of State on forms prepared by the Secretary of State at such times as the Secretary of State shall prescribe.** Any polling place found not to be accessible shall either be made accessible prior to its use in a primary or election or shall not be used as a polling place. | Ga. Comp. R. & Regs. 183-1-6-.04(5)(a) | Category 3 |
| Accessibility for Elderly and Disabled Voters | Printed Instructions. The Secretary of State shall provide instructions for use by election superintendents at polling places and registrars at voter registration places, printed in large type, to assist visually and hearing impaired electors in voting and registering to vote. | Ga. Comp. R. & Regs. 183-1-6-.04(7) | Category 3 |
| Conduct of Elections: Voting Machines—Vote Recorders | Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia **shall be conducted at the polls through the use of direct recording electronic (DRE) voting units supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State.** In addition, absentee balloting shall be conducted through the use of optical scan ballots which **shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State**; provided, however, that the **use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.** | Ga. Comp. R. & Regs. 183-1-12-.01 | Category 1 Category 2 Category 3 |
| Direct Recording Electronic | Acceptance tests. Upon the receipt of each new direct recording electronic voting unit (DRE), **the election superintendent of the county is responsible to ensure that an acceptance test is** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(a) | Category 3 |

| Voting Equipment | **performed on the device in accordance with standards issued by the Secretary of** State. No DRE unit shall be accepted by the county or placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | The election superintendent of the county **shall maintain the DRE units in accordance with** the requirements of this rule, **the directives of the Secretary of State,** and the specifications and requirements of the manufacturer. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(b)(1) | Category 3 |
| Direct Recording Electronic Voting Equipment | Software security. The software contained in each DRE unit, regardless of whether the unit is owned by the county or the state, and **the software used to program the unit and to tabulate and consolidate election results shall not be modified, upgraded, or changed in any way without the specific approval of the Secretary of State. No other software shall be loaded onto or maintained or used on computers on which the GEMS software is located except as specifically authorized by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(c) | Category 3 |
| Direct Recording Electronic Voting Equipment | The GEMS server shall not be moved or relocated for educational or training purposes. Should it become necessary to relocate the GEMS server or any of its components from one facility to another, the election superintendent shall notify the Secretary of State in writing of the reason for the relocation and the proposed new location. **Under no circumstances shall the GEMS server or any of its components be relocated unless and until written authorization for the relocation is received from the Secretary of State** except in the event of an emergency situation beyond the control of the election superintendent. | Ga. Comp. R. & Regs.183-1-12-.02(2)(g)(3) | Category 3 |
| Direct Recording Electronic Voting Equipment | The poll manager shall sign a receipt for all supervisor cards, encoders, voter access cards, memory cards, and DRE unit keys assigned to such poll manager's precinct. Upon returning election supplies to the election superintendent's office | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(4) | Category 3 |

| | following the close of the polls, the poll manager shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | All supervisor cards, encoders, voter access cards, memory cards, DRE unit keys, and other equipment assigned to designated county election technicians shall be accounted for on the night of a primary, election, or runoff and shall be returned to storage. Each technician shall sign a receipt for all such items issued to such technician and, upon returning such items to the election superintendent's office following the close of the polls, the technician shall account for all such items and shall certify that all such items have been returned or shall describe any missing items and explain why such items have not been returned. **The Secretary of State shall prepare and provide a chain of custody sheet for this purpose.** | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | **The election superintendent shall notify the Secretary of State** of any instances of unaccounted for DRE units, optical scanner devices, voter access cards, supervisor cards, memory cards, DRE unit keys, voting system software, and encoders at the completion of certification by delivering such notification to the Secretary of State when the certified election results are delivered to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(2)(g)(6) | Category 3 |
| Direct Recording Electronic Voting Equipment | After placing the memory card (PCMCIA card) in the DRE unit, the DRE unit shall have such internal diagnostic tests performed as shall be directed by the Secretary of State or the election superintendent. | Ga. Comp. R. & Regs. 183-1-12-.02(3)(b)(1)(ii) | Category 3 |
| Direct Recording Electronic | The poll officers shall affix a card of instructions for voting within each voting booth and **shall place at least two printed sample ballots and at least two voting instructions posters** | Ga. Comp. R. & Regs. 183-1-12-.02(3)(d)(7) | Category 1 Category 2 Category 3 |

| Voting Equipment | **approved or provided by the Secretary of State** outside the enclosed space at the polling place for the information of the voters. **Prior to voters entering the enclosed space, the poll officers may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | In the case of primaries, elections, and runoffs for county, state, and federal office, **the county election superintendent shall transmit to the Secretary of State the election returns by precinct for the county in electronic format or by electronic means, as may be specified by the Secretary of State,** within seven days following a primary, election, or runoff. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(c)(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | Electronic Transmission of Precinct Results to Central Office. The election superintendent shall transmit to the Secretary of State unofficial election results for all races for state offices in any primary, election, or runoff as soon as possible after the closing of the polls for such primary, election, or runoff. **Such results shall be transmitted in a format prescribed by the Secretary of State.** At a minimum, the results shall be transmitted upon one third of the precincts reporting results, upon two thirds of the precincts reporting results, and upon all precincts reporting results, including absentee ballots within all precincts. Except upon notice to and consultation with the Secretary of State, no election superintendent shall conclude the tabulation of votes on election night in any primary, election, or runoff in which there are contested races for federal and state offices until and unless all such unofficial results, including absentee ballots, have been transmitted to the Secretary of State. | Ga. Comp. R. & Regs. 183-1-12-.02(5)(d) | Category 3 |
| Direct Recording Electronic Voting Equipment | **In the event of any malfunction or problem with DRE units, the county election superintendent shall document the problem and its resolution and shall provide such information to the Secretary of State.** The documentation | Ga. Comp. R. & Regs. 183-1-12-.02(8)(b) | Category 3 |

| | shall include a detailed description of the malfunction or problem, the steps taken to correct the malfunction or problem, and the cause of such malfunction or problem if a cause can be determined. | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | Use of Equipment by Municipalities. The county election superintendent is authorized to permit any municipality within the county to conduct its election with the DRE equipment through a written intergovernmental agreement between the county and the municipality; provided that the municipality agrees to maintain and operate the equipment in accordance with law, these rules and regulations, and the manufacturer's guidelines and specifications and provided further that the municipality trains all of its election personnel and poll workers in the proper operation and conduct of elections utilizing such equipment **through a training program conducted by or approved by the Secretary of State.** | Ga. Comp. R. & Regs. 183-1-12-.02(9) | Category 3 |
| Direct Recording Electronic Voting Equipment | The registrars of each county shall complete the entry of new and updated voter registrations **on a timely basis as required by the Secretary of State and shall notify the Secretary of State upon the completion of all such data entry after a registration deadline.** | Ga. Comp. R. & Regs. 183-1-12-.07(4) | Category 3 |
| Direct Recording Electronic Voting Equipment | Prior to each primary or election **as specified by the Secretary of State, the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the GEMS database for the county.** | Ga. Comp. R. & Regs. 183-1-12-.07(5) | Category 3 |
| Direct Recording Electronic Voting Equipment | The county election superintendent and the registrars **shall notify the Secretary of State or his or her designee of any changes to the voter registration file** for the county or the GEMS database that occur after the process for creating ExpressPoll flash cards begins. | Ga. Comp. R. & Regs. 183-1-12-.07(6) | Category 3 |

9

| | | | |
|---|---|---|---|
| Direct Recording Electronic Voting Equipment | Upon the conclusion of each primary, election, or runoff, the poll officers shall return the ExpressPoll units with the other election materials from the precinct to the election superintendent. **The registrars and election superintendent shall coordinate the return of the flash cards from the ExpressPoll units to the Secretary of State** such that the cards are returned in the same time period as the official election returns. | Ga. Comp. R. & Regs. 183-1-12-.07(9) | Category 3 |
| Use of DRE Units for Absentee Balloting | On the first day of the absentee voting period, prior to any votes being cast on the DRE units, the registrars shall verify that the seal for each DRE unit is intact and that there is no evidence or indication of any tampering with the seal or the unit. The registrars shall verify that the number of the seal matches the number of the seal recorded for that unit when such unit was prepared by the election superintendent for the primary, election, or runoff. If a seal number does not match or if there is any evidence or indication of tampering with the seal or unit, **the Secretary of State and the election superintendent shall be immediately notified and such unit shall not be used until such matters are resolved by agreement of the Secretary of State, the election superintendent, and the registrars.** The set up shall be performed in public and the public may view the set up subject to such reasonable rules and regulations as the registrars may deem appropriate to protect the security of the DRE units and to prevent interference with the duties of the registrars, except that the public view shall not be obstructed. The registrars shall run a zero tape on each DRE unit prior to the beginning of absentee voting on such units. The registrars shall, without removing the tape from the unit, verify that all vote registers shown on the zero tape are set to zero and that there are no votes showing on the unit and shall sign the tape in the space provided. If the zero tape does not show that all vote registers are set to zero and that there are votes on the unit, the election superintendent shall be immediately notified and such unit shall not be used until the unit is cleared and the matter is resolved by agreement of the election superintendent and the registrars. After verifying and | Ga. Comp. R. & Regs. 183-1-14-.02(6) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | signing the zero tape, the registrars shall securely lock the tape compartment leaving the zero tape in place on the unit and shall configure the unit for voting. The registrars shall verify that the election counter on each DRE unit is set at zero. If the election counter is not set to zero, the election superintendent shall be immediately notified and such unit shall not be used until the election counter is set to zero and the matter is resolved by agreement of the election superintendent and the registrars. The registrars shall verify that there is no unauthorized matter affixed to the DRE units or present in the cases or voting booths. The registrars shall affix a card of instructions for voting within each voting booth. **Prior to voters entering the voting booth, the registrars may also distribute to such voters a card of instructions for voting on the DRE unit that has been approved or provided by the Secretary of State.** Each DRE unit shall be clearly marked with a unique designation that is visible on the exterior of the unit. | | |
| Use of DRE Units for Absentee Balloting | At the close of business each day during the absentee voting period, the registrars shall document the election counter number on the daily recap sheet. Each DRE unit used for in-person absentee voting shall then be turned off and closed. The memory card (PCMCIA card) shall remain in the unit at all times during the absentee balloting period until the polls close on the day of the primary, election, or runoff. Each DRE unit shall then be sealed and the seal number and the time of sealing shall be recorded on the daily recap sheet. Each DRE unit shall then be secured overnight. In addition, all voter access cards shall be securely stored overnight and when not in use. If a DRE unit is used to program voter access cards, the registrars shall make a notation of the election counter number on the daily recap sheet. **If such number is not zero, the registrars shall notify the Secretary of State immediately and shall ascertain the reason for the discrepancy and shall make a notation of such discrepancy and the reason for it on the daily recap sheet. Such DRE unit shall not be used for creation of voter access cards unless and until the unit is fully tested and reconfigured and the election counter reset** | Ga. Comp. R. & Regs. 183-1-14-.02(8) | Category 3 |

| | at zero pursuant to procedures established by the Secretary **of State.** The DRE unit shall be turned off and secured for the night. | | |
|---|---|---|---|
| Use of DRE Units for Absentee Balloting | Each morning during the absentee balloting period, the registrars shall publicly verify the seal numbers on each DRE unit to be used for absentee voting with the number of the seal recorded on the daily recap sheet from the previous day of absentee voting and shall verify that the seal and DRE unit do not show any signs of tampering. If the seal number corresponds to the entry on the daily recap sheet and there is no evidence of tampering, the DRE unit shall be opened and turned on. **If the numbers do not match or there is evidence of tampering, the Secretary of State shall be notified immediately and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** After opening and turning on the unit, the registrars shall verify the election counter number with the number recorded on the daily recap sheet from the previous day of absentee voting. **If the numbers do not match, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** The election counter number shall then be entered onto the daily recap sheet for that day. If a DRE unit is to be used for programming voter access cards, the registrars shall open and turn on the power for such unit. The registrars shall then verify that the election counter is set on zero. **If the election counter is not set at zero, the Secretary of State shall be immediately notified and the unit shall not be used until such discrepancy is resolved to the satisfaction of the Secretary of State, the election superintendent, and the registrars.** A notation shall be made on the daily recap sheet of the election counter number and the unit shall be configured to create voter access cards. | Ga. Comp. R. & Regs. 183-1-14-.02(9) | Category 3 |

12

| Reporting Requirements for Absentee Ballots | **The registrars of each county shall on the 32nd day prior to each statewide general primary and general election submit to the Secretary of State on a form provided by the Secretary of State information concerning absentee ballots requested by electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended.** Such report shall include the number of absentee ballots requested by each such category of absentee voter, the date on which the absentee ballots were available in the registrars' office, and the date on which the ballots requested by such voters were sent to the voters. **The Secretary of State may request further information related to the application for and the transmittal of such ballots.** | Ga. Comp. R. & Regs. 183-1-14-.04(1) | Category 3 |
|---|---|---|---|
| State Write-In Absentee Ballot | **The Secretary of State shall design a state write-in absentee ballot for use in runoff primaries and runoff elections** by an elector of this state who resides outside the county or the municipality in which the election is being conducted and is: (1) a member of the armed forces of the United States, a member of the merchant marine of the United States, a member of the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration, or a spouse or dependent of such member residing with or accompanying said member; or (2) A citizen of the United States residing outside the United States. | Ga. Comp. R. & Regs. 183-1-14-.05(a) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | **The Secretary of State shall prepare and print instructions for completing and returning such ballot that shall also be enclosed with such ballot.** The state write-in absentee ballot, the envelopes for returning it, and the instructions shall be enclosed with the regular absentee ballot, envelopes, and instructions for completing and returning the regular absentee ballot. | Ga. Comp. R. & Regs. 183-1-14-.05(d) | Category 1 Category 2 Category 3 |

13

| | | | |
|---|---|---|---|
| State Write-In Absentee Ballot | **Additionally, the Secretary of State and the county registrars shall provide for the transmission of such blank ballots by facsimile transmission and electronic mail transmission to electors.** Instructions for voting such ballots shall be included on the website and shall accompany any facsimile and electronic mail ballot transmissions. Voted ballots shall not be returned by facsimile or electronic mail. | Ga. Comp. R. & Regs. 183-1-14-.05(e) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | As soon as practicable after a general primary or general election, **the Secretary of State shall cause to be published on the official website of the Secretary of State a list of all federal offices and state offices in which there will be a runoff primary or runoff election,** as the case may be, along with the names of the candidates who will be on the ballot in such runoff. | Ga. Comp. R. & Regs. 183-1-14-.05(f) | Category 1 Category 2 Category 3 |
| State Write-In Absentee Ballot | If an elector obtains the ballot by facsimile or by downloading from electronic mail or the Secretary of State's website, the elector shall return the ballot by mail using two envelopes. The elector shall enclose and seal the ballot in a plain envelope and insert that envelope into another envelope for transmission to the registrars. The elector shall copy and sign the appropriate oath onto the back of the outer envelope. **The Secretary of State shall provide a sample envelope and oath form on the Secretary of State's website in such a manner that such form may be used by an elector to print out the forms for the purpose of pasting or attaching such forms to an envelope for returning the ballot or for printing an envelope for returning the ballot.** | Ga. Comp. R. & Regs. 183-1-14-.05(g) | Category 1 Category 2 Category 3 |
| Secretary of State designated chief state election official | **The Secretary of State is designated as the chief state election** official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8. | O.C.G.A. § 21-2-210 | Category 1 Category 2 Category 3 |
| Official list of electors; | **The Secretary of State shall establish and maintain a list of all eligible and qualified registered electors in this state** | O.C.G.A. § 21-2-211(a) | Category 1 Category 2 |

14

| equipment to access list | **which shall be the official list of electors for use in all elections in this state conducted under this title.** | | Category 3 |
|---|---|---|---|
| Official list of electors; equipment to access list | **The Secretary of State is authorized to procure and provide all of the necessary equipment to permit the county boards of registrars to access and utilize the official list of electors maintained by the Secretary of State pursuant to this Code section**, provided that funds are specifically appropriated by the General Assembly for that purpose. | O.C.G.A. § 21-2-211(b)(2) | Category 3 |
| Voter registration | **The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.** | O.C.G.A. § 21-2-216(g)(7) | Category 2 Category 3 |
| Voter registration | Prior to approving the application of a person to register to vote, **the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State.** | O.C.G.A. § 21-2-216(h) | Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another state and who moves such person's residence from that state to this state, shall, at the time of making application to register to vote in this state, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in this state and to cancel such person's registration in the former place of residence.** | O.C.G.A. § 21-2-218(a) | Category 2 Category 3 |
| Change of residence of elector | Any person, who is registered to vote in another county or municipality in this state and who moves such person's residence from that county or municipality to another county or municipality in this state, shall, at the time of making | O.C.G.A. § 21-2-218(b) | Category 2 Category 3 |

| | application to register to vote in that county or municipality, **provide such information as specified by the Secretary of State in order to notify such person's former voting jurisdiction of the person's application to register to vote in the new place of residence and to cancel such person's registration in the former place of residence.** | | |
|---|---|---|---|
| Change of residence of elector | In the event that an elector moves to a residence within the county or municipality but into a different precinct or who moves to a residence in the same precinct but at a different address and fails to notify the board of registrars of such fact by the fifth Monday prior to an election or primary such elector shall vote in the precinct of such elector's former residence for such election or primary and for any runoffs resulting therefrom. **The superintendent of an election shall make available at each polling place forms furnished by the Secretary of State which shall be completed by each such elector to reflect such elector's** present legal residence. Such forms may also be used to notify the board of registrars of a change in an elector's name. The board of registrars shall thereafter place the elector in the proper precinct and voting districts and correct the list of electors accordingly. If the elector is placed in a precinct other than the one in which such elector has previously been voting, such elector shall be notified of the new polling place by first-class mail. | O.C.G.A. § 21-2-218(d) | Category 2 Category 3 |
| Change of residence of elector | In the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, **the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the address previously provided to the board of registrars.** The registrars shall correct the elector's registration record to reflect the correct address. | O.C.G.A. § 21-2-218(g) | Category 2 Category 3 |

| Registration cards; absentee regulations | The registration cards for use by persons in making application to register to vote shall be **in a form as specified by the Secretary of State**, which shall include printed forms, forms made available through electronic means, or otherwise. Except as provided in subsection (b) of this Code section and Code Section 21-2-221.2, only registration cards issued or authorized for use by the Secretary of State or the national voter registration card promulgated under the provisions of the National Voter Registration Act of 1993, 42 U.S.C. Section 1973gg-7, shall be accepted for purposes of voter registration. | O.C.G.A. § 21-2-219(a) | Category 2 Category 3 |
| --- | --- | --- | --- |
| Registration cards; absentee regulations | **The office of the Secretary of State is designated as the office, under the federal Help America Vote Act, to be responsible for providing information on registration and absentee ballot procedures for use by absent uniformed services and overseas voters, including the use of the federal write-in absentee ballot.** | O.C.G.A. § 21-2-219(f) | Category 2 Category 3 |
| Registration cards; absentee regulations | **The Secretary of State shall** within 90 days after a general election in which federal candidates were on the ballot **report to the federal Election Assistance Commission**, on such form as may be prescribed by such commission, **the combined number of absentee ballots transmitted to absent uniformed services and overseas voters in such election and the combined number of such ballots that were returned by such voters and cast in such election.** | O.C.G.A. § 21-2-219(h) | Category 3 |
| Application for driver's license; service as application for voter registration | The commissioner of driver services and the **Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section.** | O.C.G.A. § 21-2-221(b) | Category 3 |
| Application for driver's license; service as | The Department of Driver Services shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of** | O.C.G.A. § 21-2-221(e) | Category 3 |

17

| application for voter registration | registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
|---|---|---|---|
| Application for driver's license; service as application for voter registration | The Department of Driver Services shall maintain such statistical records on the number of registrations and declinations as requested by the Secretary of State. | O.C.G.A. § 21-2-221(f) | Category 3 |
| Application for driver's license; service as application for voter registration | The Secretary of State and the commissioner of driver services shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically. Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221(h) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Board of Natural Resources and the Secretary of State shall agree upon and design such procedures and forms as will be necessary to comply with this Code section, including without limitation procedures applicable to processing of applications received by persons approved as license agents for the Department of Natural Resources pursuant to Code Section 27-2-2. | O.C.G.A. § 21-2-221.1(b) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall transmit the completed applications for voter registration to the Secretary of State at the conclusion of each business day. The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | O.C.G.A. § 21-2-221.1(f) | Category 3 |

| | | | |
|---|---|---|---|
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | The Department of Natural Resources shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-221.1(g) | Category 3 |
| Applications for resident hunting, fishing, or trapping license; service as application for voter registration | **The Secretary of State and the Board of Natural Resources shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-221.1(i) | Category 3 |
| Electronic voter registration | A person who is qualified to register to vote in this state and who has a valid Georgia driver's license or identification card may submit a voter registration application on the Internet website of the Secretary of State. **The Secretary of State shall, in conjunction with the Department of Driver Services, design and implement a system to allow for such electronic voter registration.** | O.C.G.A. § 21-2-221.2(a) | Category 2 Category 3 |
| Electronic voter registration | Upon the submission of an application through the website pursuant to this Code section, **the software used by the Secretary of State for processing applications through the website shall provide for immediate verification of all of the following:**<br><br>(1) That the applicant has a valid Georgia driver's license or identification card and that the number for that driver's license or identification card provided by the applicant matches the | O.C.G.A. § 21-2-221.2(c) | Category 3 |

19

| | number for the applicant's driver's license or identification card that is on file with the Department of Driver Services;<br><br>(2) That the date of birth provided by the applicant matches the date of birth that is on file with the Department of Driver Services; and<br><br>(3) That the applicant is a citizen of the State of Georgia and of the United States and that the information provided by the applicant matches the information on file with the Department of Driver Services.<br><br>If any of these items do not match or if the application is incomplete, the application shall be void and shall be rejected and the applicant shall be notified of such rejection either electronically or by mail within five days after such application is rejected. | | |
|---|---|---|---|
| Electronic voter registration | If all of the items enumerated in subsection (c) of this Code section are verified, **the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or identification card on file with the Department of Driver Services.** The application shall then be processed in the same manner as applications under Code Section 21-2-221. Except as otherwise provided by this Code section, the application shall be deemed to have been made as of the date that the information was provided by the applicant through the Internet website. | O.C.G.A. § 21-2-221.2(d) | Category 3 |
| Electronic voter registration | **The Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically pursuant to this Code section.** | O.C.G.A. § 21-2-221.2(f) | Category 3 |
| Offices designated as | In addition to the offices listed in subsection (b) of this Code section, **the Secretary of State shall designate other offices within the state as designated voter registration offices.** | O.C.G.A. § 21-2-222(c) | Category 2<br>Category 3 |

| voter registration agencies | | | |
|---|---|---|---|
| Offices designated as voter registration agencies | **Each office shall transmit the completed voter registration application forms to the Secretary of State at least once per week,** except that, during the 15 days leading up to a registration deadline for a primary or election, such applications shall be transmitted to the Secretary of State at the conclusion of each business day. **The Secretary of State shall forward the applications to the appropriate county board of registrars to determine the eligibility of the applicant and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts.** | O.C.G.A. § 21-2-222(i) | Category 3 |
| Offices designated as voter registration agencies | Each office shall maintain such statistical records on the number of registrations and declinations **as requested by the Secretary of State.** | O.C.G.A. § 21-2-222(j) | Category 3 |
| Offices designated as voter registration agencies | **The Secretary of State shall have the authority to promulgate rules and regulations to provide for the transmission of voter registration applications and signatures electronically from public assistance offices, offices which provide state funded programs primarily engaged in providing services to persons with disabilities, and recruitment offices of the armed forces of the United States located within this state.** Such electronically transmitted signatures shall be valid as signatures on the voter registration application and shall be treated in all respects as a manually written original signature and shall be recognized as such in any matter concerning the voter registration application. | O.C.G.A. § 21-2-222(l) | Category 3 |
| Mail voter registration application forms | **The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State or to the board of registrars** | O.C.G.A. § 21-2-223(a) | Category 1 Category 2 Category 3 |

| | of the person's county of residence. **The Secretary of State shall forward the applications that he or she receives to the appropriate county board of registrars to determine the eligibility of the applicant** and, if found eligible, to add the applicant's name to the list of electors and to place the applicant in the correct precinct and voting districts. | | |
|---|---|---|---|
| Mail voter registration application forms | The county boards of registrars shall obtain and maintain a supply of mail voter registration application forms for distribution and for voter registration. In addition, each state, county, and municipal office, except an office which is a designated voter registration office under Code Section 21-2-222, which has regular contact with the public **shall obtain a supply of mail voter registration application forms from the Secretary of State and make such applications available for use by citizens to register to vote.** | O.C.G.A. § 21-2-223(b) | Category 1 Category 2 Category 3 |
| What data [sic] available for public inspection | **It shall be the duty of the Secretary of State to furnish copies of such data as may be collected and maintained on electors whose names appear on the list of electors maintained by the Secretary of State pursuant to this article, within the limitations provided in this article, on electronic media or computer run list or both.** Notwithstanding any other provision of law to the contrary, the Secretary of State shall establish the cost to be charged for such data. The Secretary of State may contract with private vendors to make such data available in accordance with this subsection. Such data may not be used by any person for commercial purposes. | O.C.G.A. § 21-2-225(c) | Category 1 Category 2 Category 3 |
| Confidentiality of voter addresses | **The Secretary of State shall provide by procedure, rule, or regulation for the mechanism by which such information shall be made confidential on the voter registration data base and may provide for forms for use in making such requests and for the use of alternate addresses** for electors who file requests for the confidentiality of their residence addresses. | O.C.G.A. § 21-2-225.1(d) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| Duties of registrars as to determination of eligibility to vote and placement in voting district and precinct; issuance of cards to electors | Each elector found eligible to be registered to vote by the board of registrars shall be issued a card which shall contain the elector's name and address, a block or space for the elector's signature, the date of the elector's registration, the name and location of the elector's polling place or polling places if the county and municipal polling places are not the same, and the designation of the elector's congressional district; state Senate district; state House district; county commission district, if any; county or independent board of education district, if any; and municipal governing authority district, if any, and such other voting districts, if any. On the reverse side of the card, there shall be printed instructions which shall indicate the procedure to be followed in the event of the change of address of the elector. In the event an elector changes residences within the county in which an elector is registered to vote, the elector may change such elector's address by returning the card to the board of registrars of such county indicating the new address. Upon receipt of such card, the board of registrars shall make the necessary changes in the elector's registration records and issue a new card to the elector. In the event that an elector's precinct, polling place, or voting district or districts change, a new card shall be issued to the elector reflecting such changes. When the boundaries of a precinct are changed, all affected electors shall be sent a new card prior to the next primary or election. **The form of such cards shall be determined by the Secretary of State.** The issuance of such cards shall be sufficient as a notification of the disposition of an application for voter registration under this Code section, provided that such cards are sent by nonforwardable, first-class mail. | O.C.G.A. § 21-2-226(e) | Category 2 Category 3 |
| Duties of registrars as to determination of eligibility to vote and placement in voting district | In the event that the registrars are required to issue voters new cards under subsection (e) of this Code section due to changes in districts or precincts as a result of reapportionment or court order, the registrars may apply to the Secretary of State prior to June 30 of each year for reimbursement of the costs of postage with respect to mailing such cards | O.C.G.A. § 21-2-226(f) | Category 3 |

| | | | |
|---|---|---|---|
| and precinct; issuance of cards to electors | during the 12 month period ending on June 30 of that year. **The Secretary of State shall receive all such applications and shall, no later than June 30 of each year, reimburse the counties for such costs from funds specifically appropriated for that purpose. In the event that the total amount of the requests for reimbursement exceeds the funds appropriated for reimbursement, the Secretary of State shall reimburse the counties on a pro rata basis. In the event that no funds are specifically appropriated for reimbursement, no such reimbursement shall be made.** | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State** and The Council of Superior Court Clerks of Georgia **a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State** or The Council of Superior Court Clerks of Georgia, **who were convicted of a felony in this state since the preceding reporting period. The Secretary of State or The Council of Superior Court Clerks of Georgia may, by agreement with the commissioner of corrections and the commissioner of community supervision, obtain criminal information** relating to the conviction, sentencing, and completion of sentencing requirements of felonies. Additionally, **the Secretary of State** and The Council of Superior Court Clerks of Georgia **shall be authorized to obtain such criminal information relating to Georgia electors convicted of a felony in another state, if such information is available.** | O.C.G.A. § 21-2-231(a) | Category 3 |
| Monthly transmittal of information to Secretary of State and The | The clerk of the superior court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who identify themselves as not being | O.C.G.A. § 21-2-231(a.1) | Category 3 |

24

| | | | |
|---|---|---|---|
| Council of Superior Court Clerks of Georgia; removal of persons from list of electors | citizens of the United States during their qualification to serve as a juror during the preceding calendar month in that county. | | |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | The judge of the probate court of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, **in a format prescribed by the Secretary of State**, a complete list of all persons, including addresses, ages, and other identifying information **as prescribed by the Secretary of State**, who were declared mentally incompetent during the preceding calendar month in the county and whose voting rights were removed. | O.C.G.A. § 21-2-231(b) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | (1) Upon receipt of the lists described in subsections (a.1) and (b) of this Code, **the Secretary of State shall transmit the names of such persons whose names appear on the list of electors to the appropriate county board of registrars who shall remove all such names from the list of electors and shall mail a notice of such action and the reason therefor to the last known address of such persons by first-class mail.** (2) Upon receipt of the list described in subsection (a) of this Code section and the lists of persons convicted of felonies in federal courts received pursuant to 52 U.S.C. Section 20507(g), **the Secretary of State shall transmit the names of such persons whose names appear on the lists of electors to the appropriate county board of registrars who shall mail a notice to the last known address of each such person by first-class mail, stating that the board of registrars has received information** | O.C.G.A. § 21-2-231(c) | Category 3 |

| | that such person has been convicted of a felony and will be removed from the list of electors 30 days after the date of the notice unless such person requests a hearing before the board of registrars on such removal. | | |
|---|---|---|---|
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Unless otherwise notified by the Secretary of State, the local registrar of vital statistics of each county shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State, in a format prescribed by the Secretary of State, a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county. The Secretary of State may, by agreement with the commissioner of public health, obtain such information from the state registrar of vital statistics. Additionally, the Secretary of State is authorized to obtain such lists of deceased Georgia electors, if possible, from other states. | O.C.G.A. § 21-2-231(d) | Category 3 |
| Monthly transmittal of information to Secretary of State and The Council of Superior Court Clerks of Georgia; removal of persons from list of electors | Upon receipt of the lists described in subsection (d) of this Code section, the Secretary of State or his or her designated agent shall remove all such names of deceased persons from the list of electors and shall notify the registrar in the county where the deceased person was domiciled at the time of his or her death. | O.C.G.A. § 21-2-231(e) | Category 3 |
| Monthly transmittal of information to Secretary of State and The | The Secretary of State shall provide to The Council of Superior Court Clerks of Georgia not later than the last day of each month all information enumerated in subsections (b) through (d) of this Code section and Code Section 21-2-232 and a list of voters who have failed to vote and inactive voters, as identified pursuant to Code Sections 21-2-234 and | O.C.G.A. § 21-2-231(g) | Category 3 |

| Council of Superior Court Clerks of Georgia; removal of persons from list of electors | **21-2-235.** Such data shall only be used by the council, the council's vendors, superior court clerks, and jury clerks for maintenance of state-wide master jury lists and county master jury lists. Such data shall be provided to the council or its vendors in the electronic format required by the council for such purposes. | | |
|---|---|---|---|
| Removal of elector's name from list of electors upon request of elector or upon removal of elector from county | (1) When an elector of this state moves to another state and registers to vote and the registration officials in such state send a notice of cancellation reflecting the registration of the elector in the other state, which includes a copy of such elector's voter registration application bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall remove such elector's name from the list of electors.** It shall not be necessary to send a confirmation notice to the elector in such circumstances.<br><br>(2) When an elector of this state moves to another state and the registration officials in such other state or a nongovernmental entity as described in subsection (d) of Code Section 21-2-225 sends a notice of cancellation or other information indicating that the elector has moved to such state but such notice or information does not include a copy of such elector's voter registration application in such other state bearing the elector's signature, **the Secretary of State or the board of registrars, as the case may be, shall send a confirmation notice to the elector as provided in Code Section 21-2-234.** | O.C.G.A. § 21-2-232(b) | Category 3 |
| Comparison of official list of electors with information supplied | **The Secretary of State is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service** through its licensees periodically for the purpose of identifying those electors whose addresses have changed. | O.C.G.A. § 21-2-233(a) | Category 3 |

| | | | |
|---|---|---|---|
| by United States Postal Service; procedure where elector has moved | | | |
| Comparison of official list of electors with information supplied by United States Postal Service; procedure where elector has moved | If it appears from the change of address information supplied by the licensees of the United States Postal Service that an elector whose name appears on the official list of electors has moved to a different address outside of the boundaries of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice as provided in Code Section 21-2-234 at the old address of the elector. The registrars may also send a confirmation notice to the elector's new address. If the elector confirms the change of address to an address outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms the change of address to an address outside of the boundaries of the county or municipality in which the elector is presently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors at the elector's current address. If the elector fails to respond to the notice within 30 days after the date of the notice, the elector shall be transferred to the inactive list provided for in Code Section 21-2-235. | O.C.G.A. § 21-2-233(c) | Category 2 Category 3 |
| Identification of electors with whom there has been no contact | In the first six months of each odd-numbered year, **the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact during the preceding five calendar years and who** | O.C.G.A. § 21-2-234(a)(2) | Category 3 |

| | | | |
|---|---|---|---|
| for three years; confirmation notice | **were not identified as changing addresses under Code Section 21-2-233.** The confirmation notice described in this Code section shall be sent to each such elector during each odd-numbered year. Such notices shall be sent by forwardable, first-class mail. | | |
| Identification of electors with whom there has been no contact for three years; confirmation notice | If the elector returns the card and shows that he or she has changed residence to a place outside of the State of Georgia, the elector's name shall be removed from the appropriate list of electors. If the elector confirms his or her change of address to an address outside of the boundaries of the county or municipality in which the elector is currently registered, but still within the State of Georgia, the elector's registration shall be transferred to the new county or municipality. **The Secretary of State or the registrars shall forward the confirmation card to the registrars of the county in which the elector's new address is located, and the registrars of the county of the new address shall update the voter registration list to reflect the change of address.** | O.C.G.A. § 21-2-234(d) | Category 2 Category 3 |
| Inactive list of electors | **In addition to the official list of electors, the Secretary of State shall also maintain an inactive list of electors.** Notwithstanding any other provision of law to the contrary, the names of electors on the inactive list of electors shall not be counted in computing the number of ballots required for an election, the number of voting devices needed for a precinct, the number of electors required to divide or constitute a precinct, or the number of signatures needed on any petition. However, any elector whose name appears on the inactive list shall be eligible to sign a petition and such petition signature, if valid and regardless of the validity of the petition as a whole, shall be sufficient to return the elector to the official list of electors if the elector still resides at the address listed on the elector's registration records and shall be grounds to proceed under Code Section 21-2-234 to confirm the change of address of the elector if the elector provides a different address from the address which appears on the elector's registration records. | O.C.G.A. § 21-2-235(a) | Category 3 |

| | | | |
|---|---|---|---|
| SOS on the SEB | **There is created a state board to be known as the State Election Board, to be composed of the Secretary of State,** an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board. | O.C.G.A. § 21-2-30(a) | Category 3 |
| SOS Chairperson of the SEB | **The Secretary of State shall be the chairperson of the board.** Three members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure. | O.C.G.A. § 21-2-30(d) | Category 3 |
| Superintendents to Election returns to be provided to Secretary of State in electronic format | **The Secretary of State is authorized to prescribe by rule or regulation the type of electronic format for the provision of such election returns.** | O.C.G.A. § 21-2-77(c) | Category 3 |
| Instruction of poll officers and poll workers in election procedures; certifications; unqualified poll officers and poll | The election superintendent shall provide adequate training to all poll officers and poll workers regarding the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith prior to each general primary and general election and each special primary and special election; provided, however, such training shall not be required for a special election held between | O.C.G.A. § 21-2-99(a) | Category 3 |

| | | | |
|---|---|---|---|
| workers not to serve | the date of the general primary and the general election. Upon successful completion of such instruction, the superintendent shall give to each poll officer and poll worker a certificate to the effect that such person has been found qualified to conduct such primary or election with the particular type of voting equipment in use in that jurisdiction. **Additionally, the superintendent shall notify the Secretary of State on forms to be provided by the Secretary of State of the date when such instruction was held and the number of persons attending and completing such instruction.** For the purpose of giving such instructions, the superintendent shall call such meeting or meetings of poll officers and poll workers as shall be necessary. Each poll officer shall, upon notice, attend such meeting or meetings called for his or her instruction. | | |
| Training of local election officials | The election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board **shall attend a minimum of 12 hours' training annually as may be selected by the Secretary of State.** The election superintendent and at least one registrar of each municipality shall attend a minimum of 12 **hours' training biennially as may be selected by the Secretary of State.** | O.C.G.A. § 21-2-100(a) | Category 3 |
| Training of local election officials | **A waiver of the requirement of minimum training, either in whole or in part, may be granted by the Secretary of State, in the discretion of the Secretary of State,** upon the presentation of evidence by the election superintendent, registrar, or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-100(c) | Category 3 |
| Certification of local election officials | All county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee | O.C.G.A. § 21-2-101(a) | Category 3 |

31

| | of such board charged with the daily operations of such board shall become certified by **completing a certification program approved by the Secretary of State** by no later than December 31 of the year in which they are appointed. Such program may include instruction on, and may require the superintendent to demonstrate proficiency in, the operation of the state's direct recording electronic voting equipment, the operation of the voting equipment used in such superintendent's jurisdiction, and in state and federal law and procedures related to elections. The local government employing the superintendent or designee shall cover the costs, if any, incurred by such superintendent or designee's participation in the certification program. **Such certification programs shall be offered by the Secretary of State** on multiple occasions before December 31 of the year in which such superintendents or designees are appointed and shall not exceed 64 hours of classroom, online, **and practical instruction as authorized and approved by the Secretary of State.** | | |
|---|---|---|---|
| Certification of local election officials | **A full, partial, or conditional waiver of the certification requirement may be granted by the Secretary of State, in the discretion of the Secretary of State,** upon the presentation of evidence by the election superintendent or board that the individual was unable to complete such training due to medical disability, providential cause, or other reason deemed sufficient by the Secretary of State. | O.C.G.A. § 21-2-101(c)(1) | Category 3 |
| Certification of local election officials | In the event that a municipality authorizes a county to conduct its elections pursuant to Code Section 21-2-45, **the municipality may be granted by the Secretary of State, in the discretion of the Secretary of State, a waiver of the certification requirement,** provided that the superintendent in charge of running the municipal election shall have previously completed a certification program approved by the Secretary of State and has demonstrated a proficiency in the operation of the voting equipment used in said municipality. | O.C.G.A. § 21-2-101(c)(2) | Category 3 |

| | | | |
|---|---|---|---|
| Form of ballots; printing ballots; stubs; numbers | **(2) Ballots for direct recording electronic voting systems shall be designed as prescribed by the Secretary of State to ensure easy reading by electors.**<br>**(3) Ballots printed by an electronic ballot marker shall be designed as prescribed by the Secretary of State to ensure ease of reading by electors.** | O.C.G.A. § 21-2-286(b) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | **(1) The equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.**<br><br>**(2) As soon as possible, once such equipment is certified by the Secretary of State as safe and practicable for use, all federal, state, and county general primaries and general elections as well as special primaries and special elections** in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector.<br><br>**(3) The state shall furnish a uniform system of electronic ballot markers and ballot scanners for use in each county as soon as possible...**<br><br>(4) Notwithstanding any provision of law to the contrary, **the Secretary of State is authorized to conduct pilot programs to test and evaluate the use of electronic ballot markers and ballot scanners in primaries and elections in this state.** | O.C.G.A. § 21-2-300(a) | Category 3 |

| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | **The Secretary of State shall be responsible for the development, implementation, and provision of a continuing program to educate voters, election officials, and poll workers in the proper use of such voting equipment.** Each county shall bear the costs, including transportation, subsistence, and lodging, incurred by its election and registration officials in **attending courses taught by or arranged by the Secretary of State for instruction in the use of the voting equipment.** | O.C.G.A. § 21-2-300(d) | Category 1 Category 2 Category 3 |
|---|---|---|---|
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Counties shall be authorized to contract with municipal governments for the use of such voting equipment in municipal elections **under terms and conditions specified by the Secretary of State to assure that the equipment is properly used and kept secure.** | O.C.G.A. § 21-2-300(e)(1) | Category 3 |
| Uniform election equipment throughout state; education of voters, election officials, and poll officers in operation of election equipment | Each county shall, prior to being provided with voting equipment by the state, provide or contract for adequate technical support for the installation, set up, and operation of such voting equipment for each primary, election, and special primary and special election **as the Secretary of State shall determine by rule or regulation.** | O.C.G.A. § 21-2-300(c) | Category 3 |
| Examination and approval of voting machines | Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine **may request the Secretary of State to examine the machine.** Any ten or more electors of this state may, at any | O.C.G.A. § 21-2-324(a) | Category 1 Category 2 Category 3 |

| by Secretary of State | time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $250.00. **The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine.** | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | **The Secretary of State shall thereupon require such machine to be examined or reexamined** by three examiners whom he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall require of them a written report on such machine, attested by their signatures; **and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-324(b) | Category 3 |
| Examination and approval of voting machines by Secretary of State | No kind of voting machine not so approved shall be used at any primary or election and if, upon the reexamination of any voting machine previously approved, it shall appear that the machine so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate **votes, the approval of the same shall immediately be revoked by the Secretary of State;** and | O.C.G.A. § 21-2-324(c) | Category 3 |

| | no such voting machine shall thereafter be purchased for use or be used in this state. | | |
|---|---|---|---|
| Examination and approval of voting machines by Secretary of State | At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, **the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State.** | O.C.G.A. § 21-2-324(d) | Category 3 |
| Examination and approval of voting machines by Secretary of State | **The compensation of each examiner appointed under this Code section shall be fixed and paid by the Secretary of State.** | O.C.G.A. § 21-2-324(h) | Category 3 |
| Form of ballots on voting machines | If the construction of the machine shall require it, the ballot label for each candidate, group of candidates, political party or body, or question to be voted on shall bear the designating letter or number of the counter on the voting machine which will register or record votes therefor. Each question to be voted on shall appear on the ballot labels in brief form. Unless otherwise provided by law, proposed constitutional amendments so submitted shall be in brief form as directed by the General Assembly and, **in the failure to so direct, the form shall be determined by the Secretary of State.** Unless otherwise provided by law, any other state-wide questions or questions to be presented to the electors of more than one county so submitted shall be printed in brief form as directed by the General Assembly and, **in the event of a failure to so direct, the form shall be determined by the Secretary of State** and shall include a short title or heading in bold face at the beginning of each such question on the ballot and any local questions so submitted shall be printed in brief form as directed by the General Assembly and, in the event of a failure to so direct, the form shall be determined by the superintendent. In the case of questions to be voted on by the electors of a | O.C.G.A. § 21-2-325(b) | Category 3 |

| | municipality, the governing authority shall determine the brief form of the questions. | | |
|---|---|---|---|
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | The superintendent shall appoint one custodian of voting machines and such deputy custodians as may be necessary, whose duty it shall be to prepare the machines to be used at the primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the municipality such compensation as shall be fixed by the governing authority of the municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the voting machines as required by this chapter, and he or she and the deputy custodians, whose duty it shall be to assist him or her in the discharge of his or her duties, shall serve at the pleasure of the superintendent. **Each custodian shall take an oath of office framed by the Secretary of State, which shall be filed with the superintendent.** | O.C.G.A. § 21-2-327(b) | Category 3 |
| Preparation of voting machines by superintendents; duties of custodians and deputy custodians | **In every primary or election, the superintendent shall furnish, at the expense of the municipality, all ballot labels, forms of certificates, and other papers and supplies which are required under this chapter and which are not furnished by the Secretary of State, all of which shall be in the form and according to the specifications prescribed from time to time by the Secretary of State.** In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such primary. | O.C.G.A. § 21-2-327(f) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | **Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system.** Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning | O.C.G.A. § 21-2-368(a) | Category 3 |

| | voting system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. **The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system.** | | |
|---|---|---|---|
| Examination and approval of optical scanning voting systems by Secretary of State | **The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors** at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter. | O.C.G.A. § 21-2-368(b) | Category 3 |
| Examination and approval of optical scanning voting systems by Secretary of State | No kind of optical scanning voting system not so approved shall be used at any primary or election and if, upon the reexamination of any optical scanning voting system previously approved, it shall appear that the optical scanning voting system so reexamined can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, **the approval of the same shall immediately be revoked by the Secretary of State**; and no such optical scanning voting system shall thereafter be purchased for use or be used in this state. | O.C.G.A. § 21-2-368(c) | Category 3 |
| Examination and approval of optical scanning voting systems | **Any vendor who completes a sale of optical scanning voting system that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia,** plus | O.C.G.A. § 21-2-368(e) | Category 3 |

| by Secretary of State | reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have authority to impose such penalty upon a finding that such a sale has occurred. | | |
|---|---|---|---|
| Form and arrangement of ballots for optical scanning voting systems | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the superintendent | O.C.G.A. § 21-2-369(c) | Category 3 |
| Write-in ballots | In elections, electors shall be permitted to cast write-in votes. The design of the ballot shall permit the superintendents, in counting the write-in votes, to determine readily whether an elector has cast any write-in vote not authorized by law. **The Secretary of State, in specifying the form of the ballot, and the State Election Board, in promulgating rules and regulations respecting the conduct of elections, shall provide for ballot secrecy** in connection with write-in votes. | O.C.G.A. § 21-2-373 | Category 2 Category 3 |
| Form and arrangement of ballots for voting systems; write-in votes | **The form and arrangement of ballots shall be prescribed by the Secretary of State** and prepared by the election superintendent | O.C.G.A. § 21-2-379.4 | Category 3 |
| Appearance, form, and arrangement of ballots | **The form and arrangement of ballots marked and printed by an electronic ballot marker shall be prescribed by the Secretary of State.** | O.C.G.A. § 21-2-379.23(b) | Category 1 Category 2 Category 3 |
| Examination requests; sale of unapproved devices | (a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any electronic ballot marker may request that the Secretary of State examine the device. **Any ten or more electors of this state may, at any time, request that the Secretary of State reexamine any such device previously examined and approved by him or her.** Before any such examination or reexamination, the person, persons, or organization requesting | O.C.G.A. § 21-2-379.24(a)-(d) | Category 1 Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination or reexamination. **The Secretary of State shall publish and maintain on his or her website the cost of such examination or reexamination. The Secretary of State may, at any time, in his or her discretion, reexamine any such device.**<br><br>**(b) The Secretary of State shall thereupon examine or reexamine such device and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of device so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter.** If this report states that the device can be so used, the device shall be deemed approved, and devices of its kind may be adopted for use at primaries and elections as provided in this chapter.<br><br>(c) Any device that is not so approved shall not be used at any primary or election and if, upon reexamination, a previously approved device appears to be no longer safe or accurate for use by electors at primaries or elections as provided in this chapter because of an inability to accurately record votes, the approval of the same **shall immediately be revoked by the Secretary of State,** and no such device shall thereafter be used or purchased for use in this state.<br><br>(d) Any vendor who completes a sale of an electronic ballot marker that has not been certified by the Secretary of State to a governmental body in this state shall be subject to a penalty of $100,000.00, payable to the State of Georgia, plus reimbursement of all costs and expenses incurred by the governmental body in connection with the sale. The State Election Board shall have the authority to impose such penalty upon a finding that such a sale has occurred. | | |
| Programming proper design | The superintendent may appoint, with the approval of the county or municipal governing authority, as appropriate, a | O.C.G.A. § 21-2-379.25(b) | Category 3 |

| | | | |
|---|---|---|---|
| and style of ballots; custodian of electronic ballot markers; testing of electronic ballot markers | custodian of the electronic ballot markers, and deputy custodians as may be necessary, whose duty shall be to prepare the devices to be used in the county or municipality at the primaries and elections to be held therein. Each custodian and deputy custodian shall receive from the county or municipality such compensation as shall be fixed by the governing authority of such county or municipality. Such custodian shall, under the direction of the superintendent, have charge of and represent the superintendent during the preparation of the devices as required by this chapter. **The custodian and deputy custodians shall serve at the pleasure of the superintendent and each shall take an oath of office prepared by the Secretary of State before each primary or election, which shall be filed with the superintendent.** | | |
| Storage and security of electronic ballot markers | **All electronic ballot markers and related equipment, when not in use, shall be properly stored and secured under conditions as shall be specified by the Secretary of State.** | O.C.G.A. § 21-2-379.26(a) | Category 3 |
| Application for ballot | If found ineligible, the clerk or the board of registrars shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility, a copy of which notification should be retained on file in the office of the board of registrars or absentee ballot clerk for at least one year. However, an absentee ballot application shall not be rejected due to an apparent mismatch between the signature of the elector on the application and the signature of the elector on file with the board of registrars. **In such cases, the board of registrars or absentee ballot clerk shall send the elector a provisional absentee ballot with the designation "Provisional Ballot" on the outer oath envelope and information prepared by the Secretary of State as to the process to be followed to cure the signature discrepancy.** If such ballot is returned to the board of registrars or absentee ballot clerk prior to the closing of the polls on the day of the primary or election, the elector may cure the signature | O.C.G.A. § 21-2-381(b)(3) | Category 2 Category 3 |

| | | | |
|---|---|---|---|
| | discrepancy by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21-2-417 before the close of the period for verifying provisional ballots contained in subsection (c) of Code Section 21-2-419. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient, the absentee ballot shall be counted as other absentee ballots. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be insufficient, then the procedure contained in Code Section 21-2-386 shall be followed for rejected absentee ballots. | | |
| State write-in absentee ballots | **The Secretary of State shall design a state write-in absentee ballot for federal offices and state offices** that are voted upon on a state-wide basis for use in a primary runoff or election runoff by an eligible absentee elector who lives outside the county or municipality in which the election is held and who is: | O.C.G.A. § 21-2-381.2(a) | Category 2 Category 3 |
| State write-in absentee ballots | **The Secretary of State shall establish a website which such eligible absentee electors may access to determine if there is a primary runoff or election runoff for a federal office or a state office that is voted upon on a state-wide basis.** The address of such website shall be included in the instructions for voting such state write-in absentee ballot. | O.C.G.A. § 21-2-381.2(d) | Category 2 Category 3 |
| Official absentee ballots | **The form for either ballot shall be determined and prescribed by the Secretary of State,** except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent. | O.C.G.A. § 21-2-383(a) | Category 3 |
| Preparation and delivery of absentee ballots; mailing ballots to absentee | Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope addressed to the elector, the superintendent, board of registrars, or absentee **ballot clerk shall provide two envelopes for each official absentee ballot,** of such **size and shape as shall be determined by the Secretary of State,** in | O.C.G.A. § 21-2-384(b) | Category 3 |

42

| voters; oaths; assistance; master list; transmission to uniformed and overseas citizens | order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words "Official Absentee Ballot" and nothing else. On the back of the larger of the two envelopes to be enclosed within the mailing envelope shall be printed the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21-2-409, and the penalties provided for in Code Sections 21-2-568, 21-2-573, 21-2-579, and 21-2-599 for violations of oaths; and on the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. The larger of the two envelopes shall also display the elector's name and voter registration number. **The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, provisional absentee ballot information, if necessary, and a notice in the form provided by the Secretary of State** of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. | | |
| Voting by absentee electors; penalties | The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. **In addition, the registrars or absentee ballot clerk shall notify the Secretary of State in the manner prescribed by the** | O.C.G.A. § 21-2-385(d)(2) | Category 3 |

| | Secretary of State of the times, dates, and locations at which advance voting will be conducted. | | |
|---|---|---|---|
| Pilot program | **The Secretary of State shall develop and implement a pilot program** for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, for use in a primary or a general election. | O.C.G.A. § 21-2-387(a) | Category 3 |
| Cards of instructions and supplies; sample ballots and ballot labels | Prior to each primary and election, **the superintendent shall obtain from the Secretary of State a sufficient number of cards of instruction for guidance of electors.** Such cards of instruction **shall include such portions of this chapter as deemed necessary by the Secretary of State** and shall be printed for the type of voting equipment or ballots used in the county or municipality. **The superintendent shall also obtain from the Secretary of State a sufficient number of blank forms of oaths of poll officers, voter's certificates, voting rights posters, notices of penalties, oaths of assisted electors, numbered list of voters, tally sheets, return sheets, and such other forms and supplies required by this chapter, in each precinct of the county or municipality.** | O.C.G.A. § 21-2-400(a) | Category 3 |
| Delivery of ballots and supplies to managers | The superintendent shall provide at the polling place copies of the sample or facsimile ballots for such primary or election as well as a list of the certified write-in candidates for such election **in the form as provided by the Secretary of State or appropriate municipal official pursuant to** Code Section 21-2-133. | O.C.G.A. § 21-2-401(d) | Category 3 |
| Voter's certificates | At each primary and election, **the Secretary of State shall prepare and furnish to each superintendent a suitable number of voter's certificates** which shall be in substantially the following form: | O.C.G.A. § 21-2-402(a) | Category 3 |

| Voter identification cards | **The Secretary of State shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.** | O.C.G.A. § 21-2-417.1(g) | Category 3 |
|---|---|---|---|
| Casting of provisional ballots | Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State.** The person shall also present the identification required by Code Section 21-2-417. | O.C.G.A. § 21-2-418(b) | Category 2 Category 3 |
| Method of voting and counting provisional ballots | The board of registrars shall complete a report **in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted** in the primary or election. | O.C.G.A. § 21-2-419(e) | Category 3 |
| Absentee ballots | Ballots in a precinct using optical scanning voting equipment for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked "Official Absentee Ballot" and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or ballot scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed | O.C.G.A. § 21-2-482 | Category 3 |

45

| | on the face thereof the following: "I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." **The form for either ballot shall be determined and prescribed by the Secretary of State.** | | |
|---|---|---|---|
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | Each county and municipal superintendent shall prepare four copies of the consolidated return of the primary to be **certified by the superintendent on forms furnished by the Secretary of State,** such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-496(a) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **The Secretary of State is authorized to provide a method by which the election superintendent can file the results of primaries and elections electronically.** Once the Secretary of State provides such a method of filing, **the election superintendent shall file a copy of the election returns electronically in the manner prescribed by the Secretary of State** in addition to the filing provided in subsection (a) of this Code section. **The Secretary of State is authorized to promulgate such rules and regulations as necessary to provide for such an electronic filing.** | O.C.G.A. § 21-2-496(b) | Category 3 |
| Consolidated certified returns of primaries; returns forwarded to Secretary of State; electronic filing | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such primary.** | O.C.G.A. § 21-2-496(c) | Category 3 |

| Consolidated certified returns of elections; returns forwarded to Secretary of State | Each county and municipal superintendent shall prepare four copies of the consolidated return of the election **to be certified by the superintendent on forms furnished by the Secretary of State**, such consolidated returns to be filed immediately upon certification as follows | O.C.G.A. § 21-2-497(a) | Category 3 |
|---|---|---|---|
| Consolidated certified returns of elections; returns forwarded to Secretary of State | **Each county and municipal superintendent shall, upon certification, furnish to the Secretary of State in a manner determined by the Secretary of State a final copy of each ballot used for such election.** | O.C.G.A. § 21-2-497(b) | Category 3 |
| Precertification tabulation audits; rules and regulations; risk-limiting audit pilot program | **The Secretary of State shall conduct a risk-limiting audit pilot program with a risk limit of not greater than 10 percent in one or more counties by December 31, 2021. The Secretary of State shall review the results of the pilot program and, within 90 days following the election in which such pilot program is used, shall provide the members of the General Assembly with a comprehensive report, including a plan on how to implement risk-limiting audits state wide.** If such risk-limiting audit is successful in achieving the specified confidence level within five business days following the election for which it was conducted, then all audits performed pursuant to this Code section shall be similarly conducted, beginning not later than November 1, 2024. | O.C.G.A. § 21-2-498(e) | Category 3 |
| Secretary of State to tabulate, compute, canvass, and certify certain returns | Upon receiving the certified returns of any election from the various superintendents, **the Secretary of State shall immediately proceed to tabulate, compute, and canvass the votes cast for all candidates** described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall | O.C.G.A. § 21-2-499(a) | Category 3 |

47

| | thereupon certify and file in his or her office the tabulation thereof. In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, **the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns**. Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results and shall file the same in his or her office. | | |
|---|---|---|---|
| Secretary of State to tabulate, compute, canvass, and certify certain returns | **The Secretary of State shall also, upon receiving the certified returns for presidential electors, proceed to tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them before the Governor.** Not later than 5:00 P.M. on the seventeenth day following the date on which such election was conducted, the Secretary of State shall certify the votes cast for all candidates described in subparagraph (a)(4)(A) of Code Section 21-2-497 and upon all questions voted for by the electors of more than one county and shall no later than that same time lay the returns for presidential electors before the Governor. The Governor shall enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes. The Governor shall certify the slates of presidential electors no later than 5:00 P.M. on the eighteenth day following the date on which such election was conducted. Notwithstanding the deadlines specified in this Code section, such times may be altered for just cause by an order of a judge of superior court of this state. | O.C.G.A. § 21-2-499(b) | Category 3 |
| Certificates of election; commissions; proclamations | *Governor and other constitutional officers.* Upon completing the tabulation of any election for Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of | O.C.G.A. § 21-2-502(a) | Category 3 |

| | | | |
|---|---|---|---|
| | Agriculture, or Commissioner of Labor, **the Secretary of State shall lay the same before the Governor upon his or her oath of office as Governor**; and the Governor, upon the other constitutional officers taking their oaths of office, shall issue a commission under the great seal of the State of Georgia signed by the Governor and countersigned by the Secretary of State, to each such person. **The Secretary of State shall issue the commission to the person elected Governor.** | | |
| Certificates of election; commissions; proclamations | *United States senators; representatives in Congress; members of the General Assembly.* (1) Upon completing the tabulation of any election for United States senator or representative in Congress, **the Secretary of State shall lay the same before the Governor,** who shall immediately issue certificates of election and commissions under the seal of the state, duly signed by the Governor and attested by the Secretary of State and deliver the same to the candidates receiving the required number of votes to be elected to the respective offices. (2) **The Secretary of State shall issue certificates of election to the persons elected members of the Senate and the House of Representatives** of the General Assembly and, between the hours of 12:00 Noon and 1:00 P.M. on the second Monday in January of each odd-numbered year, present before the Senate and the House of Representatives the several returns of the elections of members of the respective houses. **In case of a special election the Secretary of State shall issue a certificate of election to each person so elected,** and the Secretary of State shall present the returns of such election to the proper house as soon as received and tabulated by the Secretary of State. Immediately upon their taking the oath of office, each member of the Senate and the House of Representatives shall be issued **a commission under the great seal of the State of Georgia, signed by the Secretary of State.** | O.C.G.A. § 21-2-502(b) | Category 3 |
| Certificates of election; | *Justices of the Supreme Court, Judges of the Court of Appeals, Commissioners of the Georgia Public Service Commission,* | O.C.G.A. § 21-2-502(c) | Category 3 |

| | | | |
|---|---|---|---|
| commissions; proclamations | *judges of the superior court, judges of the juvenile court, and district attorneys*. Upon completion of the tabulation **the Secretary of State shall certify the result of each election of Justices of the Supreme Court, of Judges of the Court of Appeals, of Commissioners of the Georgia Public Service Commission, of judges of the superior court, of judges of the juvenile court where elected, and of district attorneys to the Governor and shall issue a certificate of election to each person so elected.** The Governor shall, upon each such person taking the oath of office, immediately issue a commission under the great seal of the State of Georgia, signed by the Governor and **countersigned by the Secretary of State**, to each such person. | | |
| Certificates of election; commissions; proclamations | *Presidential electors.* **The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor**, who shall enumerate and ascertain the number | O.C.G.A. § 21-2-502(e) | Category 3 |

# DEFENDANTS' EX. 16



DEFENDANT'S
EXHIBIT
16
LV 12-11-19



# JOINT CENTER
### FOR POLITICAL AND ECONOMIC STUDIES



# 50 YEARS OF THE VOTING RIGHTS ACT
## The State of Race in Politics

Khalilah Brown-Dean, PhD
Zoltan Hajnal, PhD
Christina Rivers, PhD
Ismail White, PhD

# President's Message



This year marks the 50th anniversary of the historic "Bloody Sunday" on March 7, 1965, in Selma, Alabama, and the enactment of the Voting Rights Act on August 6, 1965.

As black voters were added to the election rolls, their ballots changed the composition of many legislatures, commissions, and councils. The Joint Center was founded five years after the Voting Rights Act of 1965 to support those newly elected officials of color.

How much progress have we made since 1965? How much more work is there to do?

These are contested questions, subject to ideology and opinion. A study published in *Perspectives on Psychological Science*, for example, shows that on average whites and African Americans differ on the amount of racial progress we have made, with whites now believing anti-white bias is more prevalent than anti-black bias. We have elected an African American president, but studies have shown that some government officials are less likely to respond to inquiries from citizens with seemingly black or Latino names. The questions are also at the core of many ongoing debates about voting rights in the U.S. Supreme Court and Congress, as well as in many states, counties, and municipalities.

Four prominent political scientists—Professors Khalilah Brown-Dean, Zoltan Hajnal, Christina Rivers, and Ismail White—provide empirical data that offer important answers in this report. I hope you enjoy it.

Regards,

Spencer Overton

# Executive Summary

This report examines minority voter registration and turnout, racially polarized voting, policy outcomes by race, and the number and share of minority elected officials from the enactment of the Voting Rights Act of 1965 until today. This information is essential in thinking about the future of race, politics, and voting rights.

Key findings in this study show:

- **Since 1965, the black/white racial gap in voter turnout has decreased dramatically in presidential elections.** Turnout among black Southerners exceeded that of their white counterparts in four of the twelve presidential elections since 1965, and nationwide black turnout clearly exceeded white turnout in presidential elections in 2012 and perhaps in 2008.

- **Local election turnout is lower and possibly less diverse.** Presidential general election turnout is generally 60% of the voting-age population, but local election turnout averages 27% and in some cases is less than 10%. As overall turnout declines in local elections, the electorate may become less representative of the racial diversity of the community as a whole.

- **Latino and Asian American turnout increased but remains low.** Turnout rates among both Asian Americans and Hispanic Americans in presidential elections remain 10 to 15 percentage points below black Americans and 15 to 20 points below white Americans.

- **Party politics is increasingly polarized by race.** Since 1960, the party identification and partisan voting patterns of blacks and whites have become sharply divided.

- **Race is the most significant factor in urban local elections.** In urban local elections, race is a more decisive factor than income, education, political ideology, religion, sexual orientation, age, gender, and political ideology. The 38 point racial gap exceeds even the 33 point gap between Democratic and Republican voters.

- **Based on available data from 1972 to 2010, blacks were the least advantaged group in America in terms of policy outcomes.** Blacks were policy winners only 31.9% of the time, compared with 37.6% for whites. This difference

seems small, but it is ten times larger than the 0.5 point difference between high- and low-income earners.

- **Since 1965, the number of elected officials of color has grown enormously.** Over this period, African Americans went from holding fewer than 1,000 elected offices nationwide to over 10,000, Latinos from a small number of offices to over 6,000, and Asian Americans from under a hundred documented cases to almost 1,000.

- **People of color remain underrepresented in elected office.** Based on the most recent data, African Americans are 12.5% of the citizen voting age population, but they make up a smaller share of the U.S. House (10%), state legislatures (8.5%), city councils (5.7%), and the U.S. Senate (2%). Latinos make up 11% of the citizen voting age population, but they are a smaller share of the U.S. House (7%), state legislatures (5%), the U.S. Senate (4%), and city councils (3.3%). Asian Americans are 3.8% of the citizen voting age population but a smaller share of the U.S. House (2%), state legislatures (2%), the U.S. Senate (1%), and city councils (0.4%).

# Introduction: The Origins and Evolution of the Voting Rights Act

In 1965, over half the population of Dallas County, Alabama, was African American, but only 156 of the county's 15,000 voting-eligible African Americans were registered.[1] In contrast, two-thirds of the county's white population was registered. White politicians held all elected positions and maintained their power by requiring that applicants for registration pass an oral exam about the U.S. Constitution and possess "good character."

Four years earlier, Justice Department lawyers had filed a lawsuit against the Dallas County registrars, and after thirteen months of procedural wrangling, the case came to trial. By that time, the county registrars had resigned and the trial judge refused to ban tests because the newly hired county registrars had not yet discriminated against blacks. After an appeal, federal courts finally ordered county registrars to stop requiring voters to interpret the *federal* constitution. The county registrars then added a new test that required voters to demonstrate an "understanding" of the *state* constitution. After additional legal filings by the Justice Department, federal courts finally banned the new test. Yet during the four years the lawsuit was working its way through the courts, only 383 of the 15,000 eligible black citizens registered.

Dallas County was not alone. Throughout Alabama, only 19.4% of African Americans were registered, and in Mississippi only 6.4% of African Americans were registered. Since the 1870s, white elected officials in many parts of the South had used violence, literacy tests, interpretation tests, poll taxes, and other devices to exclude African Americans.[2] The Justice Department filed 71 voting rights lawsuits in the Deep South before 1965, but cases were typically complex, time-consuming, and

*In early 1965, the registration rate for African Americans was less than 20% in Alabama and less than 7% in Mississippi.*

expensive. When a court struck down one type of discriminatory device, local officials simply erected a different device that effectively excluded most African Americans.

On March 7, 1965, state troopers attacked a group of peaceful demonstrators on the Edmund Pettus Bridge in Selma, Alabama (the seat of Dallas County government). Television networks broadcast images of the attack around the world, attracting widespread attention and demonstrations in support of the voting rights cause. These events—as well as the deaths of activists Jimmy Lee Jackson, Viola Liuzzo, and James Reeb in Selma—produced sufficient public pressure for Congress to pass the Voting Rights Act, which President Lyndon Johnson signed into law on August 6, 1965.

The Act suspended literacy and interpretation tests, and it allowed federal officials to register voters and monitor local elections in particular jurisdictions. The Act also had a nationwide, permanent provision that allowed private parties or the Justice Department to bring lawsuits to stop racially discriminatory election laws and electoral plans.

Further, the "preclearance" provision of the new Act required that jurisdictions with a history of discrimination submit new election rules or plans to federal officials. State and local officials could implement a proposed election rule or plan only after federal officials approved it. By shifting the burden to states and localities to prove to federal officials that changes were not discriminatory, the preclearance process avoided the delays and expenses of litigation, and it stopped discriminatory laws before they were used in elections. The preclearance provision applied to jurisdictions that had tests or devices and low turnout or registration in the 1964 presidential election (all or parts of 11 states), and it was originally scheduled to expire in five years.

Congress extended the preclearance provision and updated the Act in other ways in 1970, 1975, 1982, and 2006.[3] In 1970, new states were added to the coverage formula, and the ban on tests and devices was expanded nationwide.

During the 1975 renewal, Congress made the ban on tests and devices permanent. Congress also expanded preclearance to cover jurisdictions with large numbers of language minority groups (e.g., speakers of Spanish, Asian, American Indian/Native Alaskan languages) that had English-only voting materials and low registration or turnout. Further, the 1975 renewal required language assistance (e.g.,

> *The Voting Rights Act's preclearance process avoided the delays and expenses of litigation, and it stopped discriminatory election rules before they were used.*

bilingual ballots, registration forms) in jurisdictions with large numbers of language minority groups with limited proficiency in English.[4] In 1982, Congress amended the Act to clarify that discriminatory *purpose* was not required to bring a lawsuit to invalidate election procedures that *result* in discrimination.

In 2013, the U.S. Supreme Court struck down the coverage formula that determined which jurisdictions must preclear new election rules and plans, which effectively rolled back preclearance.[5] Writing for five members of the Court (four justices dissented), Chief Justice John Roberts indicated that the coverage formula was outdated because flagrant discrimination no longer persisted in covered jurisdictions and the "country has changed."

Subsequently, Representatives John Lewis (D-GA) and Jim Sensenbrenner (R-WI) co-sponsored a bill to update the Act. The proposed legislation would apply preclearance to jurisdictions with a record of voting rights violations within the previous 15 years, would make it easier for courts

to block discriminatory rules before they are used in elections and harm voters, and would require disclosure of voting changes nationwide.[6]

In a comprehensive report providing evidentiary support for updating the Act, the National Commission on Voting Rights collected contemporary instances of structural dilution of minority votes in the context of at-large elections and redistricting plans.[7] The Commission also documented the emergence of various restrictions on voting, such as proof of citizenship, voter purges, felony disenfranchisement, voter identification, voter challenges, and restrictions on registration drives. Further, the Commission's report chronicled failures to provide adequate language assistance materials, failures to provide registration at public assistance agencies, and attempts to roll back early in-person voting and same-day registration.

Others have also written on contemporary election structures that adversely affect minority voters. For example, many states disenfranchise former offenders after they have completed their sentences, and as a result, 7.7% of black adults are disenfranchised nationally, including 22% of black adults in Kentucky and 23% in Florida.[8] By counting inmates as residents of the jurisdiction where they are incarcerated rather than as residents of their home prior to incarceration, many states inflate the voting strength of populations who live near prisons (often rural areas) and diminish the voting strength of non-incarcerated people in the prisoners' home communities.[9] Many states have adopted restrictive identification laws, and the General Accounting Office reported that 84% of registered white voters possess a valid driver's license, compared with only 63% of registered black voters.[10] North Carolina and other states have attempted to roll back early voting on Sunday, and data show black voters accounted for 53% of Sunday early voters in North Carolina and Georgia in the 2014 midterm election.[11]

While analyzing contemporary election practices that diminish minority voting is critical, we also need facts about minority turnout, racially polarized voting, policy outcomes, and the number of minority elected officials to fully understand our progress since 1965 and to look toward the future.

# Registration & Turnout

In this section we assess the Voting Rights Act's effectiveness in increasing rates of registration and voter turnout among racial minorities in the United States. We examine changes in black, Latino, and Asian American registration and turnout following the passage of the Voting Rights Act in 1965.[12] Most notably, since the Voting Rights Act's 1965 passage, African Americans residing in former Confederate states have gone from near total disenfranchisement to registration and turnout rates that equal or surpass those of whites in the same states, at least in presidential general election contests. Latino and Asian American registration and turnout rates, however, continue to trail those of other groups significantly.

## African American Registration and Voting Before and After the Voting Rights Act

Passage of the Voting Rights Act marked what political scientist Richard Valley has called the "Second Reconstruction"—an active re-inclusion of African Americans into the American state made necessary by nearly a century of Southern political suppression. To illuminate the significance of the Voting Rights Act as a Second Reconstruction, this section uses official registration data from the state of Louisiana, which has kept voting records by race since the Reconstruction era. This section also uses survey data from both the U.S. Census and the American National Election Study for coverage of registration and turnout patterns across the former Confederacy. The data show that the Voting Rights Act was the most significant action taken since the post-Civil War Reconstruction Acts to overcome Southern suppression of black voters.

The first Reconstruction followed the Civil War, ushered in by Congress's 1867 passage of the Reconstruction Acts. The Acts made readmission of former Confederate states to the Union contingent upon redrafting their constitutions and ratification of the Fourteenth Amendment to the U.S. Constitution, and placed Union troops in Southern jurisdictions to enforce compliance with newly established black suffrage rights. This first Reconstruction produced a dramatic increase in the number of black voters in the former Confederate states. In some Southern states black male voter registration exceeded 90%, which resulted in the election of many of the nation's first black federal officeholders and a large number of black state and local officials throughout the South.

The political will of Reconstruction, however, ended with the disputed presidential election of 1876. Southern states freed from federal constraints reverted to active denial of the citizenship and voting rights of African Americans within their borders. Between 1890 and 1910, nearly all of the former Confederate states rewrote their constitutions to introduce voting restrictions

that disenfranchised black voters.[13] For example, in Louisiana, Reconstruction had brought voter registration among black men in the state to over 90% by 1880. In 1898, a new constitution instituted a statewide poll tax and literacy and property requirements, alongside a "grandfather clause" that effectively exempted only whites from these requirements. Black male voter registration in the state plummeted, falling to only 3% by the next major election (see Figure 1 below).

For the next 30 years, blacks in most of the former Confederate states remained almost totally excluded from electoral politics. Supreme Court decisions delivered some incremental reprieve, outlawing first the grandfather clause in 1915 (*Guinn v. United States*) and the whites-only primary in the 1940s (*United States v. Classic* in 1941 and *Smith v. Allright* in 1944). As Figure 1 illustrates with the case of Louisiana, black voter registration increased from virtually non-existent to 20% of the adult population by the end of the 1940s.

**Figure 1: Black and White Voter Registration Rates in Louisiana and Former Confederate States, 1878-2010[14]**



Data from 1970 to 2010 are from the United States Census, Current Population Survey, Voter Supplement File.[15]

Still, black voter registration in Louisiana and the rest of the South continued to lag significantly behind that of white Southerners. As highlighted in Figure 2 below, the racial gap in self-reported voter registration in the former Confederate states at the start of the 1960s was still nearly 30 percentage points.

Only in the wake of the Voting Rights Act did black voter registration in the South begin to approach that of whites. Five years after the passage of the Act, the racial gap in voter registration in the former Confederate states had closed to single digits. By the start of the 1970s, the black/white registration gap across the Southern states was little more than 8 percentage points. In Louisiana, the gap between black and white voter registration rates decreased by nearly 30 percentage points from 1960 to the end of 1970s, and it continued to decrease over the next three decades. By 2010, black registration rates in the state of Louisiana and many of the other former Confederate states had exceeded white registration rates for the first time since Reconstruction. The Voting Rights Act had delivered a Second Reconstruction.

Figure 2: Black and White Presidential Election Voter Turnout in Former Confederate States, 1956-2012. (Percent of Voting Age Population)[16]



The Voting Rights Act enabled similar gains in African American voter turnout. Figure 2 tracks self-reported turnout in presidential elections from 1952 to 2012 among blacks and whites living in former Confederate states. At the time of the 1956 presidential election, turnout among blacks who lived in former Confederate states was roughly 50 percentage points lower than that of whites in these states.

However, the racial gap in turnout decreased dramatically following the passage of the Voting Rights Act in 1965. Indeed, self-reported turnout among black Southerners exceeded that of their white counterparts in four of the twelve presidential elections following the passage of the Voting Rights Act. The 1988, 1992, and 2008 elections are particularly notable given that nationwide black turnout rates in presidential elections did not appear to exceed white turnout rates until the 2008 presidential election.[17]

**Figure 3: Black and White Midterm Election Voter Turnout in Former Confederate States, 1998-2012 (Voting Age Population)[18]**



Since the passage of the Voting Rights Act, the racial gap in midterm elections has also decreased significantly, though not to the point of black voters expressing higher turnout than similarly situated whites. Figure 3 describes midterm election turnout (self-reported) from 1958 to 2010 among blacks and whites living in former Confederate states.

As we move from 1958 to 1970, we can see a sharp reduction in the turnout gap between blacks and whites. Over this time period we can see the gap decline from roughly 33 percentage points to 10 percentage points following the passage of the Voting Rights Act. While we can still observe a racial gap in most midterm elections, the gap is minimal and can likely be accounted for by socio-economic differences between blacks and whites in these states.

## African American Turnout in Local Elections

While it is important that we focus on closing a black/white turnout gap in federal elections,[19] we should not ignore disparities in local elections. Local elections are fundamentally different. Presidential general election turnout is typically 60% of the voting-age population, but local election turnout averages 27% and in some cases is less than 10%.[20]

Most local offices are non-partisan, and political parties generally lack incentives to invest significant resources on turnout for local elections, most of which are held on different dates than federal and state general elections. As overall turnout declines in local elections, the electorate may become less representative of the racial diversity of the community as a whole.[21]

For example, in 2014, when there was great unrest over a police officer's killing of Michael Brown, African Americans made up 67% of residents of Ferguson, Missouri. In 2012, a solid 100% of Ferguson precincts went for President Obama,[22] but during Ferguson's municipal off-cycle elections voters selected Ferguson's Republican mayor and six city council members, all of whom except one were white. Some have speculated that the drop in turnout from the 2012 November presidential election (54% turnout) to the 2013 April municipal election (12% turnout) produced a much less diverse electorate, with lower turnout among African Americans.[23]

Questions of low turnout among African Americans in local elections deserve further study. Local officials make up the vast bulk of all elected officials nationwide, and they oversee local police, court systems, schools, economic development, and the allocation of over $1.6 trillion per year.[24] As discussed below, African Americans are extremely underrepresented in local offices (they account for 12.5% of the citizen voting age population but only 5.7% of city council seats).[25]

As of the 2010 census, more than half of African Americans, Latinos, and Asian Americans in large metro areas live in the suburbs,[26] and these recent demographic changes may contribute to a mismatch between suburban elected officials and suburban residents.

## Hispanic and Asian American Registration and Voting

In 1975, Congress amended the Voting Rights Act to add protections for language minority citizens in jurisdictions with significant numbers of speakers of Spanish or a single Asian, American Indian, or Alaskan Native language.  While available evidence demonstrates that the Voting Rights Act facilitated the (re-)integration of African Americans into electoral politics, its impact on Latino and Asian American communities is less clear.

Figure 4: Reported Registration by Race, Hispanic Origin: November 1980 to 2012 (Citizen Population)[27]



Despite being two of the fastest growing pools of eligible voters in the United States, the registration rates of Asian and Hispanic U.S. citizens have consistently lagged behind those of both black and white Americans.  As we can see in Figure 4, for the past 35 years the rates of registration among both Asian Americans and Hispanic Americans have consistently been 10

and 15 percentage points less than those of black Americans and 15 to 20 percentage points lower than those of white Americans.  The lack of effective language accommodation, younger-than-average populations, unenthusiastic mobilization efforts on the part of political parties and candidates, and discrimination are but a few of the many likely explanations for these racial differences.

Similar gaps characterize the turnout behavior of Asian and Latino citizens.  Figure 5 describes reported voting by race in presidential elections from 1980 to 2012.  Here we see that the racial gap in turnout between Hispanics and non-Hispanic whites has for the most part held steady for the past 30 years, fluctuating between 16 and 20 percentage points.  We also see that Asian American turnout exhibits similar variability.  Despite having data only from 1992 to 2012, the gap between Asian American and white turnout also varies between 16 and 23 percentage points.  Figure 6 shows turnout by race in midterm elections from 1978 to 2010, and here we see more of the same—large turnout differences between whites on one hand and Hispanic and Asian citizens on the other.

Figure 5: Reported Voting in Presidential Election by Race, Hispanic Origin: 1980 to 2012 (Citizen Population)



Figure 6:  Reported Voting in Midterm Elections by Race, Hispanic Origin: 1978 to 2010 (Citizen Population)[28]



# Racially Polarized Voting

Despite discussions about the declining significance of race, over the past few decades, racial divides along partisan lines have actually grown, as Figure 7 shows.  African Americans have increasingly favored Democrats, and recently Latinos and Asian Americans have become more loyal to the Democratic Party as well.  The shift to the left has been particularly pronounced for Asian Americans (Hajnal and Lee 2012).

On the other side, whites have moved slowly and unevenly—but inexorably—to the Republican Party.  Fifty years ago, the Democratic Party dominated the white vote.  Today, nationwide, whites are more apt to favor the Republican Party.



**Figure 7**

As a result, our party politics are now sharply divided by race.  In recent national contests for the presidency, the House, and the Senate, the racialized nature of the vote was very pronounced. [29]  Division is a normal and healthy part of democracy, but when a core dividing line in a nation becomes so closely aligned with race and ethnicity, larger concerns about inequality, conflict, and discrimination emerge.

In the 2014 congressional elections, the gap between white Americans, who gave 62% of their votes to Republican congressional candidates, and African Americans, who bestowed only 10% of their votes on Republican candidates, is a whopping 52 points.  The Asian American-white and Latino-white divides were not as extreme but still sizable—28 points and 25 points,

respectively.  In all three cases a majority of whites opposed the majority of the minority group. As Figure 8 below shows, race dominated all other demographic factors (e.g., education, income, age, gender) in shaping the 2014 House elections.



**Figure 8**

The 2012 presidential election was also extraordinarily polarized by race.  That contest pitted 93% of blacks, 73% of Asian Americans, and 71% of Latinos on the Democratic side against the clear majority of whites (at 59%) on the Republican side.  Recent Senate and gubernatorial contests have been similar.

The same racial divide is also evident if we focus on party identification.  Our most recent figures show that of those who identify with a major party, 96% of blacks, 74% of Latinos, and 71% of Asian Americans choose the Democratic Party.[30]  By contrast, a slight majority of white identifiers—52%—identify as Republican.

## Urban Local Elections:  Race is More Central than Party

Race seems to divide voters more than other characteristics.  The electorate is shaped in part by race, class, religion, sexuality, age, gender, party identification, political ideology, and a host of other measures.  But a study of local elections in five major American cities shows that race seems to be more central and more decisive than all of these other factors.[31]

Most accounts of politics at the local or national level point to party identification or ideology as the main driving forces in American politics,[32] but the data suggest race is a more significant factor.  In our study of local elections in five cities—most of which were nonpartisan—the 38 point racial gap in urban elections studied exceeds the average 27.4 point gap between liberal and conservative voters and the average 33 point gap between Democratic and Republican voters (see Table 1).[33]

*If the white majority cohesively and consistently votes against a united minority, it is unlikely that minorities will regularly win elections or have real influence over policy.  They may have the vote, but that vote may be of little consequence.*

In less than a third of the elections is the partisan or ideological divide greater than the racial divide. Party identification certainly matters, and ideology helps to predict vote choice.  But in local democracy, it is race—more than party identification or political ideology—that dominates voter decision making.

While some maintain that class is the main driving force in politics, in most urban or local elections class divides are typically much smaller than racial divides.  The average income gap in the vote is 19.6 percentage points—sizable but only about half of the typical 38 point racial divide. Educational divides are also generally half the size of racial divides.  Differences across gender, employment status, marital status, union membership, and parental status are all dwarfed by racial divides.

TABLE 1: *RACIAL, DEMOGRAPHIC AND POLITICAL DIVISIONS IN URBAN ELECTIONS*

| | Average Divide in Vote for Winning Candidate (%) |
|---|---|
| **Race** | 38.3 |
| **Class** | |
| Income | 19.6 |
| Education | 18.2 |
| Employment status | 8.3 |
| **Other demographics** | |
| Age | 21.4 |
| Gender | 5.8 |
| Religion | 29.9 |
| Sexuality | 14.9 |
| Marital status | 6.4 |
| Union membership | 7.1 |
| Children | 5.1 |
| **Political orientation** | |
| Liberal/conservative | 27.4 |
| Party identification | 33.0 |

Source: Exit Poll Data Set—Elections for mayor, council, advocate, comptroller, clerk, city attorney, and ballot propositions in New York, Los Angeles, Chicago, Houston, and Detroit.

# Policy Outcomes

While understanding voting patterns is important, an ultimate measure of how well a democracy represents any group is policy decisions. Do policies that government pursues follow the preferences of racial and ethnic minorities more or less than the preferences of white members of the public?

Using data and analysis from Griffin, et al (2015),[34] we gauge the congruence between individual-level policy preferences and policy outcomes. We should caution that the most accessible data—surveys of hundreds of thousands of Americans during the period between 1972 and 2010 to measure individual policy preferences—do not include data during most of the Obama Administration. Thus, this analysis offers few clues into whether or not President Obama's presence was beneficial to people of color in terms of policy outcomes.

We do, however, examine 38 out of the 50 years that the Voting Rights Act was in existence. Specifically, we looked to see whether individual Americans wanted more or less spending on eleven core policy areas. We then looked to see if government spending in each policy area went up or down in the year following the survey.[35] Combining individual preferences and governmental spending patterns, we were able to observe whose policy preferences were enacted by government—and whose were not. If, for example, a particular individual favored a decline in federal government welfare spending and the federal government chose to significantly decrease welfare spending in the following year, that individual is a policy "winner."

> *Whites appear to be the most privileged voters in American democracy. When election results have been posted, their preferences are much more likely to triumph than end up in defeat.*

In Table 2 below, we present the percentage of cases in which individuals in various demographic categories were policy winners. Again, this is the most basic indicator of representation—*did government do what the individual wanted?* One conclusion that can be drawn from the table is that differences in policy representation are not that large.[36] There is some unevenness in who gets what they want from government, but government responds to all groups to some degree. Women "win" about as often as men (37.1% compared with 36.7%), while those over 65 win only slightly more often than those under 30 (37.8% compared with 37.2%). Differences across income are slight as well. We could conclude that government policy is relatively open to all.

There is, however, one important exception: *race*.

**TABLE 2: *POLICY RESPONSIVENESS BY GROUP*[37]**

|  | % winning |
|---|---|
| **Race** | |
| White | 37.6 |
| Black | 31.9 |
| Hispanic | 37.0 |
| Asian American | 40.9 |
| **Class** | |
| Income – high | 36.6 |
| Income – low | 36.1 |
| Education – high | 38.9 |
| Education – low | 35.8 |
| **Gender** | |
| Male | 36.7 |
| Female | 37.1 |
| **Age** | |
| Age – Over 65 | 37.2 |
| Age – Under 30 | 37.8 |

By far the largest differences between groups are in the race category. Blacks were the least advantaged by a considerable margin. Blacks were winners in only 31.9% of cases, compared with 37.6% for whites. This 5.7 point difference is roughly ten times larger than the 0.5 point difference between high- and low-income earners.

Although the data are far more limited because the surveys we use only began to inquire about Hispanic ethnicity and Asian heritage in 2000, we can offer some preliminary conclusions about these two groups. Over the ten year period between 2000 and 2010, Hispanics won in 37.0% of cases, just slightly below the figure for whites for the same period (38.1%), suggesting that Hispanics could have less influence than whites over policy. By contrast, Asian Americans won at higher rates than whites (40.9%) and might therefore be viewed as privileged in the political system.[38] From 2000 to 2010, blacks were winners in 32.5% of the cases.

The results to this point suggest that black voices are less equal than others when it comes to policy.  In response, a skeptic could argue that blacks lose more simply because they represent a smaller share of the electorate.  A minority should not have as much influence as a majority.  But this does not explain why blacks win less than all of the other small minorities we examine (such as the poor, those without a high school degree, young Americans, or religious minorities).

Other skeptics might claim that blacks lose disproportionately because they are largely "liberal" and Democratic in their political preferences in a nation that leans to the political right.  Yet, after rubbing our eyes and repeating the analysis, we controlled results for the political party and political leaning of each respondent in our surveys.  Outcomes from both attempts were nearly identical.  Black disadvantage could not be explained by their partisanship, ideological orientation, or preferences for greater spending.  There was something much deeper and culturally inimical.

At the end of the day, it is important to remember that these differences in responsiveness are not massive.  It is equally critical, however, to recognize that differences do exist.  When government shapes policy, it is more likely to ignore black voices than the voices of any other racial or ethnic group.  That gap may be small, but given the high stakes, any inequality in policy responsiveness is worth highlighting and eventually addressing.

# The Number and Share of Elected Offices Held by Minorities

One primary goal of the Voting Rights Act was to enable racial and ethnic minorities to elect political representatives of their choice.  From the beginning of the 20th century to the passage of the Voting Rights Act in 1965, few African Americans and almost no Latinos and Asian Americans held elected office.  Along with the Act's passage was a collective hope that it would significantly increase minority representation in office, and that improved social, economic, legal, and political conditions for minorities—particularly African Americans—would follow.

In this section we examine the impact of the Voting Rights Act on minority representation.  We offer two contrasting perspectives on minority representation:  *Numbers* and *Share*.  Each leads to different conclusions.

We first assess the gains in the *number* of minorities in office.  Here an important question is posed:  *Did the Voting Rights Act help to expand minority representation in office?*  The answer, based on pure numbers, is an unequivocal yes.

> *Did the Voting Rights Act help to expand minority representation in office?  The answer is an unequivocal yes.  Have minority gains led to proportional representation in office?  The answer is an unequivocal no.*

We then shift to examining the *share* of all elected officials who are racial and ethnic minorities.  Here the question is:  *Have minority gains led to proportional representation in office?*  The answer is an unequivocal no.

We also recognize the most significant election in American racial history:  the election of President Barack Obama in 2008.  While President Obama's success counts as only one instance of minority representation, it clearly was a grand symbolic and substantive achievement for minority communities, as well as a major sign of how much racial politics have changed since 1965.

## The Growth of Minority Elected Officials After 1965

In the years following the passage of the Voting Rights Act, the three largest racial and ethnic minority populations—African Americans, Latinos, and Asian Americans—went from having

almost no representation in elected office to holding large numbers of seats at almost every level of the political arena.

***Federal Growth***

Looking first at minority representation in Congress in Figure 9, gains for blacks, Latinos, and Asian Americans have been substantial.[39]  When the Act was passed in 1965, there were only five African Americans in the U.S. House and Senate combined.  Today there are 46—including 44 members of the House and two Senators (43 Democrats, three Republicans).

The growth for Latinos has been similarly impressive.  Until 1980, Latinos seldom held more than five seats at the federal level.  That figure has since increased more than fivefold.  In 2015, there were four Hispanic Senators and 30 Hispanic U.S. House members, including one non-voting delegate from Puerto Rico (24 Democrats, ten Republicans, split into two partisan-oriented caucuses).

The growth in the number of Asian American elected officials has been less robust—but it is still evident. The number of Asian Americans in the U.S. House and the Senate today has more than doubled from about five in the 1970s.  In 2015, there were 14 Asian and Pacific Islander members of Congress, including one U.S. Senator, 12 members of the U.S. House, and one non-voting delegate from American Samoa (all are Democrats except for the Republican American Samoa delegate).



**Figure 9**

***State Growth***

In terms of raw numbers, growth has been even more remarkable at the state level.  Over the past 50 years, the nation's 50 legislatures have been transformed from institutions that were almost completely white into more diverse bodies that have begun to reflect their respective populations.

Figure 10, which plots the number of minorities in state legislatures, illustrates that the number of African American legislators rose from under 200 in the late 1960s to well near 700 today. Deval Patrick (D-MA), who left office in early 2015, was the last black governor.

Latinos started at a lower base—there were only 68 Hispanic state legislators in 1973—but have experienced growth at a roughly equal pace over time.  Today, across the 50 states, there are 334 Hispanic state legislators, as well as two Latino governors.

Once again, we see growth in the number of Asian American elected officials but at a slightly slower pace.  The number of Asian American state legislators has grown from 63 in 1968 to 116 today.  Particularly noteworthy is the fact that there are now three Asian American governors – Nikki Haley (R) in South Carolina, Bobby Jindal (R) in Louisiana, and David Ige (D) in Hawaii.



**Figure 10**

### Case Study: *Alabama*

*The number of black elected officials in Alabama has grown greatly since the passage of the Voting Rights Act.  In 1970, there were only 86 black elected officials across the entire state.  There were no black Senators or Representatives to Congress, there were no state senators, and only three black state representatives.*

*Since that time, the number of black elected officials in the state has grown almost tenfold to 757.  African Americans now hold one congressional seat, 35 seats in the state legislature, and the mayoralty of 40 cities, including Birmingham.*

*Blacks have not, however, achieved proportional representation in the state.  Today, blacks represent 26.4% of the population but only 16.7% of elected offices.  There has never been an African American governor or senator.  A white majority and severe racial bloc voting have helped ensure this ongoing disparity.  For example, in the 2012 presidential contest, 84% of whites in Alabama voted for Mitt Romney while 95% of black voters favored Barack Obama.*

### Case Study:  *Mississippi*

*The political change, in pure numbers, is arguably most dramatic in Mississippi, a Southern, highly segregated state.  In 1964, before the Voting Rights Act, Mississippi was, by most accounts, a paragon of white resistance (Parker 1990).  Despite the fact that African Americans made up 32% of the state's population, African Americans were virtually shut out of the political process.  Only 6.7% of black adults in the state were registered to vote.  Across the entire state there were only six black elected officials.  There were no black members of Congress, no black state legislators, and no black supervisors (Parker 1990).  Aiding in this political exclusion was an array of institutional barriers erected by the white state legislature.*

*From poll taxes to literacy tests and residency requirements, Mississippi had used almost every available tactic to exclude blacks from the political process.  Even after the Voting Rights Act's passage, the state attempted to continue excluding blacks through gerrymandering districts, switching to at-large elections, eliminating electoral offices, and a range of other institutional maneuvers.*

*Fortunately, Mississippi's black residents were ultimately able to use the Voting Rights Act and the courts to strike down many of those barriers.  Over the course of 50 years, black representation grew steadily.  By 2000, blacks held more than 900 offices across the state.*

*There was a black member of Congress, ten state senators, 35 state representatives, and 52 mayors—including the mayor of Jackson, the state's largest city. A state where blacks had been effectively barred from politics became one where blacks had a significant voice in their own political affairs.*

### Local Growth

All three groups have experienced substantial gains in representation on the local level (as shown in Figure 11 below),[40] with much faster growth for blacks and Latinos than for Asian Americans. Blacks, in particular, went from holding only 715 local elected offices around the country in 1970 to garnering 5,753 positions by 2002.

Similarly, Latino local office holding expanded from only 899 positions in 1983 to 2,313 offices in 2014. The figures for Asian Americans are 52 local elected officials in 1978 and 441 in 2013.



Figure 11

The net change across these and all other offices is enormous.  Over this time period, African Americans went from holding fewer than 1,000 offices nationwide to now holding over 10,000 positions across the county.[41]  Likewise, Latinos went from a small number of offices to over 6,000 elected officials nationwide.  And Asian American representation grew from under a hundred documented cases to almost a thousand offices.

> *Since 1965, African Americans went from holding fewer than 1,000 elected offices to over 10,000, Latinos from a small number to over 6,000, and Asian Americans from under a hundred to almost a thousand.*

These numbers are impressive, but in many ways they do not give justice to the dramatic changes that have occurred over the past 50 years.  They fail to show the exorbitant social, economic, and political cost of these gains and how important many of these victories were to countless racial and ethnic minorities.

## The Ongoing Underrepresentation of Racial and Ethnic Minorities in Office

The fact that enormous change has occurred is incontrovertible.  Rapid growth in the number of minority elected officials across the country over the past 50 years is a development that should be applauded.  Each of these electoral victories is meaningful.  But viewed from a different lens, the *gains* that minorities have made are less significant.  If we compare the number of racial and ethnic minorities in office to the number of whites in office, it becomes abundantly clear that the political leadership of the nation remains overwhelmingly white and that racial and ethnic minorities are greatly underrepresented at almost every level of government.

When discussing the "underrepresentation" of minorities in elected office, we do not assume that voters should cast ballots for candidates of their own race, or that the racial composition of elected officials should match the racial composition of the population precisely.  Instead, the share of elected offices held by people of color—when considered along with voter turnout, racially polarized voting, policy outcomes, election structures, and other variables—is one relevant factor in understanding the state of race in American politics.

*Federal Elected Officials*

The overall pattern of underrepresentation is least pronounced at the congressional level. As illustrated by Figure 12 below, in the U.S. House, blacks and Latinos have both greatly increased their share of seats. African Americans have gone from holding about 1% of House seats in 1965 to roughly 10% in 2015. The Hispanic share of seats has likewise grown from about 1% in 1975 to 7% today. The House is, in fact, the place where both blacks and Latinos have come the closest to proportional representation.

By contrast, Asian American gains in the House are less noticeable. The Asian American share of the House has hovered around 1% for most of the period and shows only a slight uptick to about 2% in the past few years.

Gains for all three minority groups are generally much less pronounced in the Senate. The share of African Americans in the Senate has fluctuated between 0% and 1% over the past 50 years. Likewise, the Asian American share of the Senate has been largely flat. The only group that has made appreciable gains in the Senate is Latinos; their share of representation has grown from zero in the late 1970s and early '80s to about 4% today.



**Figure 12**

Figure 12 makes abundantly clear that despite gains, minorities remain underrepresented in both the U.S. House and U.S. Senate.  In fact, while minorities overall represent nearly 40% of the nation's population combined—counting blacks, Latinos, Asian and Pacific Islanders, and Native Americans—they are only 17% of the current 114th Congress, according to a recent Pew Research Center analysis.[42]

Although African Americans represent about 12.5% of the citizen voting age population, they hold 10% of seats in the House and only 2% of all seats in the Senate.  The Latino share of the total population (16%) and citizen voting age population (about 11%) also far outweigh the Latino share of the House, at 7%, and Senate, at 4%.

Likewise, Asian Americans account for 5% of the population and 3.8% of the citizen voting age population, but only 2% of the House and 1% of the Senate.  Senate underrepresentation is much more severe than House underrepresentation (a pattern that is worth further exploration, particularly considering statewide elections and voting patterns), but in no case does a minority's group representation match its population size.

As a consequence, whites are greatly overrepresented in office at the federal level.  Non-Hispanic whites, who constitute about 62% of the population, make up 81% of the U.S. House and 94% of the U.S. Senate.

---

**Case Study:** *Black Mayors*

*The stories of the first black mayors highlight the deeper nature of change on the local level.  In places like Gary, Indiana, and Cleveland, Ohio, where Richard Hatcher and Carl Stokes ran to become the first big city black mayors in 1967, white opposition to these two black candidates was almost unanimous, and white turnout reached record levels.  African American candidates were able to win only by turning out African American voters in equally high numbers and forging an equally unified vote (Hajnal 2007).*

*The euphoria has, at times, been enormous. As one black voter in New Orleans stated on the night of Dutch Morial's historic election as New Orleans' first black mayor:  "It was almost like the feeling you have when you see your first-born—a sense of accomplishment, of utter elation" (quoted in Donze 1998:A14).  In Birmingham, Alabama, according to one New York Times reporter, "jubilation swept much of the city" when Richard Arrington became that city's first black mayor (Stuart 1981).*

*Hard-fought historic firsts continued well into the 1990s.  When Willie Herenton became the mayor of Memphis, Tennessee, in 1991, he overcame the opposition of 97% of white voters and record white turnout to become the first black mayor of the city.  He won—where a dozen other black candidates had failed—because African Americans had grown to become the majority of the population, because blacks turned out in historically high numbers, and because blacks gave him 98% of their votes (Wright 1996, Hajnal 2007).  Over time, these mayoral firsts have added up.  Black mayors have presided over the nation's five largest cities, and most major American cities have had a black mayor.*

---

### State Elected Officials

The share of African Americans, Latinos, and Asian Americans in state legislatures also falls below their share in the general population.  As illustrated by Figure 13 below, blacks have made the greatest gains—increasing from 2% of all state legislative seats in 1969 to about 8.5% of all seats in 2009.

The Latino share has likewise grown from 1% in 1973 to almost 5% today.  For Asian Americans the growth has been less steady and less robust.  Asian Americans only represent less than 2% of all state legislative seats, which is not a great improvement from their 1% share in the 1970s.

Whites account for over 85% of all seats at the state level, despite accounting for just under 75% of all U.S. voters and 62% of the total U.S. population.



**Figure 13**

### Local Elected Officials

The underrepresentation of blacks, Latinos, and Asian Americans is probably the most pronounced at the local level. The local level numbers should be read with some caution, as it is difficult to retrieve complete and comparable counts of white and non-white elected officials at the local level.

Nevertheless, it is clear that all three groups are seriously underrepresented in local politics. Despite real gains for all three racial and ethnic groups, whites still hold well over 90% of all local offices.

The most recent data—seen in Figure 14 below—suggest that blacks currently hold only 3% of local offices, Latinos 1%, and Asian Americans well under 1%. If we focus specifically on city council positions—the figures for which we have the most complete and comparable data—the numbers are slightly better but still show severe underrepresentation. On city councils nationwide in 2011, blacks held 5.7% of all seats, Latinos held 3.3%, and Asian Americans held 0.4%.



**Figure 14**

**Case Study: *Mississippi***

*While gains in minority representation in Mississippi have been profound, the larger picture is that blacks in the state remain severely underrepresented in office. Blacks represent almost a third of the state's population but less than 20% all of elected officials in the state. This means that even when blacks win office, they are in the minority. In the state legislatures, for example, blacks account for only 26% of the seats. With both legislatures controlled by Republicans and blacks overwhelmingly on the Democratic side, blacks can be shut out of the governing process. While black legislators sometimes have been an important swing vote shaping state policies, the more typical pattern is one of ongoing exclusion (Parker 1994). Today, blacks and other minorities have a seat at the table but lack influence commensurate with their numbers in the population.*

# Conclusion

Policymakers, judges, pundits, and advocates of various backgrounds speculate and wrangle over racial progress in politics. In this report, we have attempted to examine empirical data to provide an assessment of how much things have changed—and how far we have to go.

In the past 50 years, thanks in large part to the Voting Rights Act, the raw numbers of minority voters and minority elected officials have increased significantly, especially among African Americans. In the former Confederate states, white registration rates were almost 30 percentage points higher than those of African Americans at the start of the 1960s and fell to gap of a little more than 8 points by the start of the 1970s. By 2010, black registration rates surpassed white registration rates in many of these states. There are now over 10,000 black elected officials (including a president), over 6,000 Latino elected officials, and almost 1,000 Asian American elected officials.

Other important challenges, however, remain or have intensified. Since 1965, voting has become increasingly racially polarized along party lines, and race is more decisive than income, education, ideology, and other key factors in local elections. This polarization obstructs opportunities for cross-racial coalitions and increases incentives for incumbent politicians to manipulate election procedures. Latino and Asian American voter turnout in presidential elections trails that of whites and blacks. More study is needed to fully understand local elections, which have lower turnout electorates that may be less diverse than general presidential electorates. Latinos, Asian Americans, and African Americans all remain underrepresented in federal, state, and local elected offices.

Since the passage of the Voting Rights Act in 1965, the nation has made enormous strides. The gains in minority representation have been very real and should not be overlooked. Nevertheless, the overall story is very much one of both progress and ongoing disparities, and the nation's political leadership is still overwhelmingly white.

# Acknowledgments

The Joint Center for Political and Economic Studies would like to thank Professors **Khalilah Brown-Dean**, **Zoltan Hajnal**, **Christina Rivers**, and **Ismail White**, who generously donated their time and expertise to this important report.  The Joint Center also thanks **Keturah Brown**, **Tyler Cole**, **Charles Ellison**, **Sanessa Griffiths**, **Barbara Johnson**, **Cynthia Overton**, **Spencer Overton**, **Dianne Pinderhughes**, **Mark Posner**, **Robert Raben**, **Lavina Ramchandani**, **Christina Royster**, **Solomon Scott**, and **The George Washington University Law School**.

# About the Authors



**Khalilah L. Brown-Dean, PhD** is an Associate Professor of Political Science at Quinnipiac University in Connecticut. She is a frequent contributor to the Washington Post, CNN, Ebony.com, Fox News Radio, WNPR, AURN, CTV, and other outlets. Her work stands at the intersections of law, politics, and policy with specializations in American Politics, mass political behavior, crime and punishment, and political psychology. Professor Brown-Dean's current research agenda focuses on the political dynamics surrounding the American criminal justice system. She is author of "Felon Disenfranchisement after *Bush v. Gove:* Changes and Trends*,"* in *Election Administration in the United States: The State of Reform After Bush v. Gore* and "Counting Bodies and Ballots: Prison Gerrymandering and the Paradox of Urban Political Representation" forthcoming in *Urban Citizenship and American Democracy: The Historical and Institutional Roots of Local Politics and Policy.*



 **Zoltan Hajnal, PhD** is Professor of Political Science at the University of California, San Diego.  A scholar of racial and ethnic politics, urban politics, immigration, and political behavior, Dr. Hajnal is the author of a number of books including: *White Backlash: Immigration, Race, and American Politics* (forthcoming); *Why Americans Don't Join the Party: Race, Immigration, and the Failure of Political Parties to Engage the Electorate*; *America's Uneven Democracy: Race, Turnout, and Representation in City Politics*; and *Changing White Attitudes toward Black Political Leadership*. He has published in the *American Political Science Review*, the *American Journal of Political Science*, the *Journal of Politics*, *Perspective on Politics* and numerous other journals, edited volumes, and newspaper editorial pages.  He has received numerous honors for his research and writing including Best Book and Best Paper awards in Urban Politics and Race/Ethnicity from the American Political Science Association.



**Christina Rivers, PhD** is an Associate Professor of Political Science at DePaul University. Her areas of expertise focus on the intersection of race and law in American politics, including voting rights law and equal protection law, as well as black political thought from abolition through the civil rights movement. She teaches courses on American politics, race politics, black political thought, civil rights and voting rights law, along with interdisciplinary courses such as multiculturalism and the '60s, and a freshman seminar on Martin Luther King, Jr. and Malcolm X. She is also author of book *The Congressional Black Caucus, Minority Voting Rights, and the U.S. Supreme Court.*



**Ismail White, PhD** is an Associate Professor of Political Science at the George Washington University.  He studies American politics with a focus on African American politics, public opinion, and political participation. Professor White's research agenda focuses on two distinct, but inter-related areas. The first centers on understanding the role that groups play in citizens' political attitudes and behaviors. Within this area he leverages the exceptionality of the case of black Americans to redefine how we think group-based politics work.  His second area of study engages the tools of causal inference, endeavoring to improve the measurement, design, and analytic strategies used to study central questions of mass political behavior. His work has appeared in the *American Political Science Review*, *American Journal of Political Science*, *Journal of Politics*, *Public Opinion Quarterly*, *Journal of Black Studies*, and *Race and Social Problems*.

**Contact Information**

For more information or media inquiries, please contact: press@jointcenter.org

Opinions expressed in Joint Center publications are those of the authors and do not necessarily reflect the views of the staff, officers, or governors of the Joint Center for Political and Economic Studies or of the organizations that support the Joint Center and its research.

© Copyright 2015
All rights reserved.

Joint Center for Political and Economic Studies
info@jointcenter.org
www.jointcenter.org
@JointCenter

# Endnotes

**Introduction**

[1] Portions of this background are adapted with permission from the author from Spencer Overton, *Stealing Democracy:  The New Politics of Voter Suppression* (W.W. Norton, 2006) (citing Samuel Issacharoff, Pamela S. Karlan, Richard H. Pildes, *The Law of Democracy:  Legal Structure of the Political Process*, 2nd rev. ed.   (New York: Foundation, 2002), 90, 117-24; 546-47; Morgan Kousser, *The Shaping of Southern Politics:  Suffrage Restrictions and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974), 63-72; Barry E. Hawk & John J. Kirby, Jr., "Federal Protection of Negro Voting Rights," *Virginia Law Review* 51, no. 6 (Oct, 1965):1093-96; John Lewis, *Walking with the Wind:  A Memoir of the Movement*, (New York:  Harcourt Brace & Company, 1998), 300-362; C. Vann Woodward, *The Strange Career of Jim Crow*, (New York, Oxford University Press, 1955)).

[2] The 24th Amendment to the U.S. Constitution, ratified in 1964, banned poll taxes in elections for federal offices.

[3] The Voting Rights Act's Section 203 language assistance provision was also amended in 1992.

[4] Just two months after signing the Voting Rights Act of 1965 into law, President Lyndon B. Johnson signed the Hart-Cellar Immigration Act eliminating national origin quotas that favored immigrants from Northern Europe, instead allocating 170,000 visas to countries in the Eastern Hemisphere and 120,000 to countries in the Western Hemisphere.  Pub.L. 89-236, 79 Stat. 911 (1965).  By easing national origin quotas, the Hart-Cellar Act transformed America's racial and ethnic composition.   Since 1970, more than 27 million immigrants have arrived from countries in Latin America, Asia, the Caribbean, and Africa.  *See* 2012 Yearbook of Immigration Statistics, Dep't of Homeland Security (July 2013), 8-12 (Table 2) (author's calculations).  Across the United States, more than 37.6 million people speak Spanish at home and seventy percent of Asian Americans speak a language other than English at home.  Camille Ryan, *Language Use in the United States: 2011*, US Census Bureau (2011) 3 (table 1); *A Community of Contrasts, Asian Americans in the United States: 2011*, Asian American Ctr. for Advancing Justice (2011) 24. Some 25 million Americans are classified as possessing limited English proficiency. Monica Whatley & Jeanne Batalova, *Limited English Proficient Population of the United States*, Migration Policy Inst. (July 25, 2013).

[5] *Shelby v. Holder,* 133 S.Ct. 2612 (2013).

[6] H.R. 3899, 113th Cong. (2014); H.R. 885, 113th Cong. (2013).


[7] See, e.g., National Commission on Voting Rights, Protecting Minority Voters: Our Work is Not Done (2014) (comprehensive 272 report finding extensive voting discrimination in Texas, Georgia, Louisiana, Mississippi, South Carolina, and other states).


[8] Felony Disenfranchisement: A Primer, The Sentencing Project 2 (April 2014).

[9] Ben Peck, The Census Count and Prisoners, Testimony Before the National Advisory Committee on Racial, Ethnic, and Other Populations of the U.S. Census Bureau, Demos, October 22, 2012.

[10] "Elections: Issues Related to State Voter Identification Laws," *United States Government Accountability Office*, (Washington, DC: 2012), 25, (internal citations omitted).

[11] Nate Cohn, The Big Role of Black Churches in Two Senate Races, The New York Times, October 29, 2014.


**Registration & Turnout**

[12] This report will focus on black, Latino, and Asian American voters, recognizing that current data on American Indian and Native Alaskan voting trends are not as readily available. American Indian and Native Alaskan populations face significant voting challenges, however, and we encourage the collection of data from these communities. Laughlin McDonald, American Indians and the Fight for Equal Voting Rights (Univ. of Okla. Press 2010); Daniel McCool, Susan M. Olson, and Jennifer L. Robinson, Native Vote: American Indians, the Voting Rights Act, and the Right to Vote (Cambridge Univ. Press 2007).

[13] Morgan J. Kousser, "The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South," (1974), 1880-1910; David P. Currie, *The Reconstruction Congress*, 75 U. Chi. L. Rev. 383, 408-11 (2008).


[14] David R. James, "The Transformation of the Southern Racial State: Class and Race Determinants of Local-State," *American Sociological Review*, vol. 53, no. 2 (1988): 191-208. Discrepancies exist between 1890 census numbers and official registration records from the state of Louisiana resulting in the 1890 census indicating greater than one hundred percent registration for black men. Other researchers have observed similarly high registration rates

(James 1988). Louisiana data are taken from official state voter registration records and calculated from the adult voting age population in that decade. Confederate states' data are self-reported registration rates of each year's current voting age population. Data from 1950 to 1960 are from the American National Election Study.

[15] Brian D. Silver, Barbara A. Anderson and Paul R. Abramson. 1986. "Who Overreports Voting?" *The American Political Science Review,* vol. 80, No. 2 (Jun., 1986), pp. 613-624. As with all self-reported registration and turnout data, registration and turnout estimates from the American National Election Study and the United States Census, Current Population Survey, Voter Supplement File are subject to over-reporting as citizens seek conform to norms of civic participation. While there is some reason to suspect that African Americans may be slightly more likely to over-report voting than whites (Silver, Anderson and Abramson 1986), the size and significance of this effect remains unclear.

[16] Confederate states' data are self-reported turnout of each year's voting age population. Data from 1956 to 1968 are from the American National Election Study. Data from 1972 to 2012 are from the United States Census, Current Population Survey, Voter Supplement File.

[17] It is important to note that three of these elections, 1988, 2008 and 2012, featured viable black candidates in either the primary or run-off election.

[18] Confederate states' data are self-reported turnout of each year's voting age population. Data from 1958 to 1966 are from the American National Election Study. Data from 1970 to 2010 are from the United States Census, Current Population Survey, Voter Supplement File.

[19] See, e.g., The National Urban League, One Nation Underemployed: Jobs Rebuild America— 2014 State of Black America 30 (2014); Shelby County, Ala. v. Holder, 133 S.Ct. 2612, 2619 (2013) (emphasizing that in many places "African American voter turnout has come to exceed white voter turnout" and citing November 2012 turnout rates).

[20] Zoltan Hajnal, America's Uneven Democracy: Race, Turnout, and Representation in City Politics 35-36 (2010); Zoltan L. Hajnal and Paul G. Lewis, *Municipal Institutions and Voter Turnout in Local Elections*, 38 Urban Affairs Review 645, 655-659 (2003). While local election turnout averaged 52% in 1962, it has declined over time (e.g., 45% in 1975, 39% in 1986).

[21] Zoltan Hajnal, America's Uneven Democracy: Race, Turnout, and Representation in City Politics 72-74 (2010).

[22] St. Louis County Election Results, Nov. 2012, *available at* http://www.stlouisco.com/portals/8/docs/document%20library/elections/eresults/el121106/twnfer.htm

[23] Brian Schaffner, Wouter Van Erve and Ray LaRaja, *How Ferguson Exposes the Racial Bias in Local Elections*, The Monkey Cage, August 15, 2014 (asserting, based on inconclusive data from an algorithm produced by Catalist that predicts race based on individuals' names, ages, and geographic locations, that white and African American residents of Ferguson were almost equally likely to vote in the 2012 presidential elections (55% and 54% respectively), but that whites were almost three times more likely (17%) than African Americans (6%) to vote in the April 2013 municipal elections).  Low black turnout is not the only variable in the Ferguson analysis.  The availability of alternative candidates who are the candidates of choice of African American voters is also relevant.

[24]  2012 Census of Governments:  Finance-State and Local Government Summary Report 8 (2014)

[25]  Zoltan Hajnal, America's Uneven Democracy: Race, Turnout, and Representation in City Politics 49 (2010).  See also Richard Fausset, *Mostly Black Cities, Mostly White City Halls*, NY Times, Sept. 28, 2014 (observing that "among 340 American cities where more than 20 percent of the population is black, two had councils on which blacks were overrepresented compared with their population; 209 were within one seat of their population, and 129 underrepresented blacks by more than one seat.") citing data and analysis provided by International City/County Management Association and Professor Jessica Trounstine; Zoltan Hajnal, America's Uneven Democracy: Race, Turnout, and Representation in City Politics 79 (2010) (showing that in cities where they represent 5 percent or more of the population, Latino representation on city councils averages 13 points below parity, Asian American 9 points below, and African Americans 8 points below).

[26] William H. Frey, Melting Pot Cities and Suburbs:  Racial and Ethnic Change in Metro America in the 2000s (2011) (the share of metro-area African Americans in suburbs rose from 37% in 1990, to 44% in 2000, to 51% in 2010).

[27] Data are from the United States Census, Current Population Survey, Voter Supplement File and are self-reported registration rates among the voting eligible population for each year. Registration data are not available for Hispanic Americans before 1980 and Asian Americans before 1992.

[28] Data are from the United States Census, Current Population Survey, Voter Supplement File and are self-reported registration rates among the voting eligible population for each year. Midterm election turnout data are not available for Hispanic Americans before 1978 and Asian Americans before 1990.

**Racially Polarized Voting**

[29] Data are from New York Times and Voter News Service Exit Polls except for the 2014 Asian American vote, which is from an Asian American Decisions Poll.

[30] Authors' analysis of the 2012 Cooperative Congressional Election Study. Analysis only includes major party identifiers. It is important to also note that large shares of the population – particularly Asian Americans and Latinos – describe themselves as nonpartisan or independent (Hajnal and Lee 2012).

[31] See Zoltan Hajnal and Jessica Trounstine, What Underlies Urban Politics? Race, Class, Ideology, Partisanship, and the Urban Vote, Urban Affairs Review (2014).  To ensure that we had a broad sample, we assembled data from every available exit poll in large American cities. That effort led to a data set that includes the vote choice for 56,000 respondents across 63 elections for different local offices in five cities (New York, Los Angeles, Chicago, Houston, and Detroit) between 1985 and 2005.  While the five cities are relatively representative of large American cities in most economic characteristics and represent different regions, different racial mixes, and different socioeconomic circumstances, the five cities are generally larger and less white than the national urban population. Thus, our results cannot confidently be generalized to the entire urban arena.

[32] Campbell et al. 1960; Green et al. 2002; Miller and Shanks 1996.

[33] The fact that most of these elections are nonpartisan does not mean that partisanship is inconsequential. Democrats vote significantly differently from Republicans even in non-partisan elections. After instituting a range of controls, race remains the most robust factor in the urban electoral arena but political dimensions like party and ideology also very strongly shape the vote.

**Policy Outcomes**

[34] John Griffin, Zoltan Hajnal, Brian Newman, and David Searle "Political Inequality in America: Who Loses and What Can Be Done About It?" Paper Under Review at the *American Political Science Review*, 2015.

[35] Specifically, using the General Social Survey (GSS), Griffin et al (2015) compiled the spending preferences (increase, decrease, no change) for individual Americans on 11 core policy areas for

the years 1972 to 2010.  The policy areas are welfare, national defense, education, foreign aid, parks and recreation, law enforcement, improving and protecting the nation's health, solving the problems of big cities, improving and protecting the environment, the space exploration program, and highways and bridges. Fortunately, these 11 policy areas match up nicely with 'functions' defined in the federal budget, enabling us to observe whether the public's preferences for spending on a given issue match up with actual government behavior.

[36] Looking across the entire table, we also see that for no group does policy responsiveness exceed 50 percent.  This may at first be somewhat surprising.  But it is more understandable when one considers that there are three different possible spending preferences (increase, decrease, no change) and three different spending outcomes (increase, decrease, no change) so it is unlikely that the two will be perfectly aligned. Also, the fact that governments have limited funds while citizens favor spending increases twice as often as spending decreases suggests that there will often be mismatches between preferences and spending.

[37] Asian American and Hispanic data are from 2000-2010 only.

[38] The patterns presented here also match the findings of Griffin and Newman (2010).


**The Number and Share of Elected Offices Held by Minorities**

[39] Figures on black representation are generally from the Joint Center for Political Studies (JCPS 1974-2001). Latino representation is derived largely from the National Roster of (NALEO 1984-2011).  Numbers on Asian American representation are produced by UCLA Asian American Studies Center (APALC 1978-2014).  Congressional figures have been supplemented with data from The Brookings Institute (Brookings 2013). Data on city council positions are from a 2011 survey of city clerks conducted by the International City/County Management Association (ICMA 2011).  For black data before 1970 And Latino data prior to 1984 see Garcia (1986). Mississippi figures for 1964 are from Parker (1984). Data on the total number of elected officials by office across the nation comes from the Census of Governments (Census of Governments 1966-1992).

[40] Local offices include most elected positions at the municipal or county level although there is some variation in terms of which positions are included in the different racial counts.

[41] The municipal/local graphs above do not include judicial/law enforcement and educational and county numbers.  In 2000, for example, for African Americans there were 1930 education, 1037 judicial and law enforcement, and 953 county elected officials.  The most recent Census data on popularly elected officials counts over 500,000 elected officials in the United States,

including federal, state, county, municipal, town, township, school district, special-purpose, and other sub-county officials.

[42] Jens Manuel Krogstad "114th Congress is Most Diverse Ever" Fact Tank at Pew Research Center, January 12, 2015, *available at* http://www.pewresearch.org/fact-tank/2015/01/12/114th-congress-is-most-diverse-ever/

# DEFENDANTS' EX. 17



KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

| United States Code Annotated |
| Title 52. Voting and Elections (Refs & Annos) |
| Subtitle II. Voting Assistance and Election Administration |
| Chapter 205. National Voter Registration |

52 U.S.C.A. § 20507

Formerly cited as 42 USCA § 1973gg-6

§ 20507. Requirements with respect to administration of voter registration

Currentness

**(a) In general**

In the administration of voter registration for elections for Federal office, each State shall--

**(1)** ensure that any eligible applicant is registered to vote in an election--

**(A)** in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

**(B)** in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

**(C)** in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

**(D)** in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except--

(A) at the request of the registrant;

(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) inform applicants under sections 20504, 20505, and 20506 of this title of--

(A) voter eligibility requirements; and

(B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

(b) **Confirmation of voter registration**

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office--

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.); and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--

(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c) Voter removal programs**

(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which--

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that--

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

**(B)** Subparagraph (A) shall not be construed to preclude--

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

(ii) correction of registration records pursuant to this chapter.

**(d) Removal of names from voting rolls**

**(1)** A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

**(A)** confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

**(B)(i)** has failed to respond to a notice described in paragraph (2); and

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

**(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

**(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

**(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered,

information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

**(e) Procedure for voting following failure to return card**

(1) A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

(2)(A) A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant--

(i) shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

(ii)(I) shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or

(II) shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

(B) If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

(3) If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

**(f) Change of voting address within a jurisdiction**

In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

**(g) Conviction in Federal court**

(1) On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 20509 of this title of the State of the person's residence.

(2) A notice given pursuant to paragraph (1) shall include--

  (A) the name of the offender;

  (B) the offender's age and residence address;

  (C) the date of entry of the judgment;

  (D) a description of the offenses of which the offender was convicted; and

  (E) the sentence imposed by the court.

(3) On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

(4) If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

(5) The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender

resides of the information received under this subsection.

**(h) Omitted**

**(i) Public disclosure of voter registration activities**

**(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

**(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**(j) "Registrar's jurisdiction" defined**

For the purposes of this section, the term "registrar's jurisdiction" means--

**(1)** an incorporated city, town, borough, or other form of municipality;

**(2)** if voter registration is maintained by a county, parish, or other unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

**(3)** if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated municipalities or other geographic units.

## CREDIT(S)

(Pub.L. 103-31, § 8, May 20, 1993, 107 Stat. 82; Pub.L. 107-252, Title IX, § 903, Oct. 29, 2002, 116 Stat. 1728.)

52 U.S.C.A. § 20507, 52 USCA § 20507

§ 20507. Requirements with respect to administration of voter..., 52 USCA § 20507

Current through P.L. 116-73. Some statute sections may be more current, see credits for details.

End of Document                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.