# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia, *et al.*, <br><br> Defendants. | Civil Action File <br><br> No. 1:18-cv-05391-SCJ |

### DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF
### DR. LORRAINE CAROL MINNITE AND BRIEF IN SUPPORT

Pursuant to Federal Rule of Evidence 702, Defendants Secretary Raffensperger, the State Election Board, and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le (collectively "Defendants"), individually and collectively submit this Motion to Exclude the Testimony of Lorraine Carol Minnite, Ph.D. ("Dr. Minnite"). This Motion seeks to exclude Dr. Minnite's testimony at trial and for this Court's consideration of Defendants' Motions for Summary Judgment. See Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (providing that only admissible evidence can be considered on a motion for summary judgment).

## I. Introduction

Dr. Minnite is an Associate Professor of Public Policy at the Camden Campus of Rutgers, the State University of New Jersey. Doc. [80 at 126]. She has never testified on behalf of the government, and she has only provided testimony to parties looking to challenge state action, particularly legislation regarding photo identification. See Doc. [80 at 136]. She believes, as Plaintiffs allege but have not shown, that Republicans have "waged a coordinated fight at the state level for political supremacy by voter suppression," though she cannot recall if she was referring to Georgia when she wrote that. (Dr. Minnite's deposition is attached hereto as **Exhibit 1**; Minnite Dep. at 50:18-51:12, Ex. 9.)

Dr. Minnite is not a neutral party – she has written on the need for what she calls "movement politics" and "electoral politics" to achieve the goals of the political left. (Minnite Dep. 53:22-56:13; Ex. 11.) She has also written for the *Red Pepper* magazine, which seeks "to be a space for debate on the left, a resource for movements for social justice, and a home for open-minded anti-capitalists." (Minnite Dep. 42:21-24; Ex. 6.) Dr. Minnite's mentor is Dr. Frances Fox Piven, from whom Dr. Minnite "learned everything." (Minnite Dep. 56:2.) Dr. Minnite agreed with a New York Times description of Dr. Piven as one who argues that working "within the system is terribly

misplaced … since it's rigged by leagues against the poor. What is needed is a sense of crisis that will force change and that [Dr. Piven] insists can be achieved only by means of the mass defiance of a disruptive protest movement." (Id. at 60:8-15.)

Her report reaches two conclusions: (1) voter fraud is "exceedingly rare, both nationally, and in Georgia;" and (2) there are "no cases of voter impersonation at the polling place … [and] minimal evidence" of intentional voter fraud perpetuated by voters (or potential voters) themselves. Doc. [148 at 3]. Her testimony should be excluded for two reasons: first, it is wholly irrelevant to the issues before this Court, and, second, it is based on an unreliable method.

## II. Facts: Dr. Minnite's Testimony.

Dr. Minnite's report suggests that she will testify to the existence of a limited number of "voter fraud" cases in Georgia. (Id.) Importantly, Dr. Minnite offers no opinion or testimony about:

- The efficacy of Georgia's voter registration system (Minnite Dep. 40);

- The motivation or intent of Georgia legislators in policymaking (id. at 51);

-3-

- The changes brought by House Bill 316 (<u>id</u>. at 87);

- The purposes of House Bill 316 (<u>id</u>.);

- The so-called "exact-match" policy (<u>id</u>. at 109);

- Voter technology (<u>id</u>. at 119);

- The role of the Secretary of State (as opposed to county governments) in elections (<u>id</u>. at 119);

- Voter rolls (<u>id</u>. at 119); or

- Polling locations (<u>id</u>. at 120).

In other words, Dr. Minnite does not testify about any of the policies or procedures raised in Plaintiffs' Amended Complaint.

Instead of focusing on the allegations in the Amended Complaint, Dr. Minnite's research focused on incidents of "voter fraud" that employed a very narrow definition of the term: "the intentional corruption of the electoral process by voters." (Minnite Dep. at 34.) Her definition necessarily excludes voter registration fraud committed by third parties (e.g., registering phantom voters). (<u>Id</u>. at 36.) It also excludes the kind of conduct from North Carolina's Ninth Congressional District (during the 2016 and 2018 elections), which resulted in at least one indictment for fraud associated with absentee ballots. (Minnite Dep. at 68-70; <u>see</u> <u>also</u> Eli Portillo and Jim Morrill, *Bladen County operative at center of NC election fraud investigation indicted,*

*arrested*, RALEIGH NEWS & OBSERVER (Feb. 27, 2019), https://www.news observer.com/news/politics-government/article226864674.html (describing indictment).

Most of Dr. Minnite's scholarship has centered around allegations of voter fraud that are used to justify photo identification laws, which she wrongly believes are "part of the complex of procedures that [Plaintiffs] collectively challenged." (Minnite Dep. 12:7-9); see also Doc. [148 at 20-22 (discussing Georgia's photo identification law)]. In truth, Plaintiffs do not challenge Georgia's photo identification law, which is reasonable given that the Eleventh Circuit upheld the statutory framework in Common Cause/Georgia v. Billups, 554 F.3d 1340, 1355 (11th Cir. 2009).

Dr. Minnite's opinion is a regurgitation of her 2010 book on voter fraud entitled The Myth of Voter Fraud, which itself borrows heavily from research she conducted in 2006. Doc. [148 at 3 ("I review the research conducted for my 2010 book on voter fraud.")]. The research she conducted on Georgia specifically, Doc. [148 at 18-24], is largely a review of her work from 2006 and 2010. (Id. at 18-22.) At that time, Dr. Minnite: (1) "sent public records requests to all Secretaries of State and Attorneys General of the U.S.;" (2) "spoke with [then Georgia] Deputy Attorney General Dennis Dunn;" (3) interviewed then-Georgia Secretary of State Cathy Cox's "Assistant Director

of Legal Affairs[,] Clifford D. Tatum;" and (4) reviewed the debate in the Georgia General Assembly "over photo identification." Doc. [148 at 19-21].

However, Dr. Minnite took none of those steps when preparing her report in this case. (Minnite Dep. at 12 (no contact with anyone in Georgia); 80-81 (no discussions with Attorney General's Office).) This time around, Dr. Minnite confined her research on Georgia to "Boolean searches" of Georgia newspapers and sources, materials produced in litigation from the State Election Board meeting, news releases of the Attorney General's and United States Attorneys' offices (in Georgia), "other materials" produced by federal sources, briefs in the <u>Billups</u> case about photo identification, and various blog posts. Doc. [148 at 4-5]. With regard to the State Election Board, Dr. Minnite "conducted an initial scan for mentions of 'fraud'" in minutes of the State Election Board, and she read the minutes of responsive meetings to "gain a better understanding of the nature of the cases of alleged fraud." Doc. [148 at 23].

Dr. Minnite also reviewed reports on election fraud from the Heritage Foundation and a News 21 project. Doc. [148 at 23]. Dr. Minnite does not question the accuracy of the information provided by either organization, (<u>id</u>. at 122:25-123:10), but she claims that the information provided by the organizations is insufficient "to draw solid conclusions." Doc. [168 at 23].

She concedes, however, that if the two organizations' cited cases utilize Dr. Minnite's limited definition of "voter fraud," it would "suggest no more than two to three cases of voter fraud per year have occurred." (Id.)

## III.   Analysis

Under Rule 702, courts provide an important "gatekeeping" function by limiting expert opinion testimony to that which is sufficiently reliable. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999). A Rule 702 or Daubert analysis requires the party putting forth the expert testimony to establish reliability and relevance. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999). The "reliability" analysis considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Id. (citation omitted). The relevance prong requires the party offering the testimony to show that the proffered testimony "logically advances a material aspect of the proposing party's case." Id. The burden of establishing that Dr. Minnite's testimony satisfies these requirements lies exclusively with the Plaintiffs. Thomas v. Publix Super Markets, Inc., No. 1:09-cv-01933-SCJ, 2011 WL 13177240 at *2 (N.D.Ga. Jul. 22, 2011).

Dr. Minnite's testimony and report fail both prongs of the <u>Daubert</u> test. First, it is totally irrelevant to the issues raised in the Amended Complaint. Second, if the Court looks beyond this prong, Dr. Minnite's methodology is too limited to be reliable.

A.   <u>Relevance</u>.

The clearest reason to exclude Dr. Minnite's testimony is that it has virtually nothing to do with the allegations before this Court. To the extent that incidents of voter fraud matter, it has typically been to justify policymakers' decisions to enact certain photo identification legislation. Doc. [148 at 21]. Dr. Minnite offers no opinion on Georgia policymakers' intent or knowledge, and she did not even review the debates surrounding the most recent election law overhaul: House Bill 316 from 2019. (Minnite Dep. at 78: 6-12; 87:18-22.)

Further, because she has no idea if anyone in Georgia has actually reviewed her work, it cannot be used to establish a type of deliberate indifference to known facts. (Minnite Dep. at 79:1-6); <u>see</u> <u>Lane v. Philbin</u>, 835 F.3d 1302, 1308 (11th Cir. 2016) (addressing requirement of plaintiffs alleging Eighth Amendment violations to show defendants had knowledge as an element of deliberate indifference standard). Dr. Minnite's testimony is not just limited as to policymakers' knowledge or intent; she provides no

opinion or analysis on any of the issues that are actually before this Court ranging from the old DRE voting system to the so-called "exact match" policy. See generally Doc. [41 (Amended Complaint); 148].

Thus, even if Dr. Minnite were correct that there are very few incidents of voter fraud (as she defines it in Georgia), her testimony has not indicated that policymakers know of her conclusion(s), which means her testimony does not establish any kind of pretext on the part of policymakers. Consequently, Dr. Minnite's scholarship could be completely accurate and it would not assist the trier of fact in any way, and it should be excluded.

That Dr. Minnite conducted no research and offers no opinion on the current controlling laws or the legislative debates that led to their passage buttresses this point. (Minnite Dep. at 78:6-16.) Her testimony has no "connection to the disputed facts," Allison, 184 F.3d at 1312, and it will not "help the trier of fact decide the case at bar." Rindfleisch v. Gentiva Health Servs., Inc., No. 1:10-CV-3288-SCJ, 2015 WL 12552053 at *4 (N.D.Ga. Dec. 23, 2015) (excluding expert testimony). In fact, other federal courts have limited her ability to testify as to the intent of legislators. Lee v. Virginia State Board of Elections, 3:15CV357-HEH, 2016 WL 554829, at *2 (E.D. Va. Feb. 10, 2016).

The bottom line is that Dr. Minnite's testimony has been offered most frequently in cases involving photo identification or allegations of voter fraud as the basis to support such policies. This is not the case here. See [Doc. 41]. Whatever the issue in those cases, a question before the jury here will be the intent of policymakers, not the actual prevalence of voter fraud. But again, as noted, Dr. Minnite's testimony speaks nothing of the issue of intent.

Moreover, to the extent that the State's policy in preventing voter fraud becomes pertinent, it is at least conceivable—if not highly probable—that policymakers have a bona fide and good faith belief that voter fraud exists. After all, the Supreme Court of the United States has already held that the prevention of voter fraud is an important government interest. Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 195-96 (2008). Thus, Dr. Minnite's report and testimony are irrelevant and should be excluded.

B. Methodology.

Dr. Minnite's methodology contains at least two recognizable flaws: (1) her definition of voter fraud is so narrow as to be virtually meaningless; and (2) her methodology for identifying voter fraud incidents in Georgia was unreasonably narrow.

Dr. Minnite's own definition of voter fraud – "the intentional corruption of the electoral process by voters" – is quite distinct from election fraud

generally, a fact she acknowledges. (Minnite Dep. at 34:13-35:13.) Whereas, election fraud could include some conduct that has been at issue in this case (e.g., voter registration fraud), Dr. Minnite's definition of "voter fraud" excludes that altogether. (Id.) Indeed, Dr. Minnite's definition excludes some of the most famous cases of fraud to date, including ACORN v. Bysiewicz (where Dr. Minnite testified on behalf of ACORN) and North Carolina's Ninth Congressional District. (Minnite Dep. at 28:5-29:1 (discussing ACORN); 68-70 (discussing North Carolina).) It is certainly reasonable that concerns about voter registration problems could motivate legislators to pass a myriad of legislation, including the challenged policies and laws in this case. Yet, Dr. Minnite's methodology is far too limited to address those concerns (even if she opined on the policymakers' knowledge and motives, which she does not).

Even if this Court accepted Dr. Minnite's definition of voter fraud, her methodology for identifying voter fraud incidents in Georgia was unreasonably narrow. As a threshold matter, she spoke with no one in Georgia about her current report. (Minnite Dep. at 12:17-13:3.) This means she did not verify or even attempt to quantify cases brought by local, state, or federal prosecutors since 2010. Dr. Minnite must recognize this shortcoming, as she spoke to several individuals—in the Attorney General's office and the

-11-

Secretary of State's office—when preparing her analysis in 2006. Doc. [48 at 18-22]. Why she chose not to do so here undermines the very methodology she utilized when reaching her conclusions.

Dr. Minnite's limited efforts are particularly relevant to the Daubert analysis, because she has no way of considering crimes that go unreported. (Minnite Dep. 104:1-105:11.) By not considering unreported crimes, Dr. Minnite could be significantly understating the prevalence of actual voter fraud in the country and in Georgia.

Federal sources have identified this shortcoming as well: "the true incidence of [election] crime can be difficult to determine due to potential for crimes not reported." (Minnite Dep. 102:16-23; Ex. 16.) Specifically, Dr. Minnite's report cites to a 2014 Government Accountability Office ("GAO") report that Dr. Minnite deems "credible." (Minnite Dep. 102:16-23.) The GAO Report concludes that studies reviewed by the GAO, including Dr. Minnite's book, "identified few instances of in-person voter fraud, and while they provide information on efforts to estimate in-person voter fraud, limitations in the populations studied and sources used make it difficult to use these studies to determine a complete estimate of in-person voter fraud." (Minnite Dep., Ex. 16 n. 96.) Dr. Minnite agrees with this statement, which undermines the credibility of a key component of her methodology—citing the

absence of crime statistics as evidence of the "myth" of voter fraud.[1]  Her earlier work countered this problem by at least calling and interviewing State and local prosecutors, which she did not do when preparing her testimony for this lawsuit.  Doc. [148 at 19-21 (prior research)]; (see generally Minnite Dep. at pgs. 12:17-24; 80:4-81:1 (current efforts).)

Dr. Minnite's methodology here is not saved by her other searches.  For example, when considering decisions of the State Election Board, her analysis was necessarily limited to minutes reflecting reported incidents of voter fraud.[2]  The same is true of her internet searches of news stories and press releases; each always used the word "fraud."  (Minnite Dep. at 77:18-23.)  If a reporter were, therefore, to use phrases like "scheme," or "criminal," or "indict," it may not pick up the cases.  Indeed, Dr. Minnite's own testimony demonstrates that at least the Heritage Foundation and News21 located cases that she did not.  Doc. [168 at 23].

This Court would not be the first to find Dr. Minnite's methods to be too restrictive.  See Lee, at *2 (E.D. Va. Feb. 10, 2016).  In Lee, the Eastern

---

[1] That Dr. Minnite's book, The Myth of Voter Fraud, was published is not dispositive: "'[p]ublication … is not a *sine qua non* of admissibility.'"  Allison, 184 F.3d at 1316 (quoting Daubert, 509 U.S. at 593).

[2] As importantly, Dr. Minnite's means of identifying relevant or responsive State Election Board meetings was equally limited: she searched only for the word "fraud." Doc. [148 at n. 53].

District of Virginia decided that Dr. Minnite's "statistical base marginalizes allegations which do not result in prosecution." Id.  As mentioned, Dr. Minnite utilized the same method for Georgia when conducting research for her book and an even less thorough analysis when preparing her report for this case.  While the Lee court allowed Dr. Minnite to testify about some things, it did limit her testimony. See generally Lee.

In sum, Dr. Minnite did very little to review activity in Georgia since 2010.  Her methods are too restrictive, and they do not provide a reliable basis to conclude anything about the rates of attempted or actual voter fraud in Georgia.  In fact, her bare-bones internet searches, review of press releases, and review of State Election Board minutes yield no knowledge beyond what an "untrained layman" could determine on his or her own. McSweeney v. Kahn, No. 4:05-CV-0132-HLM, 2007 WL 9718935, at *5 (N.D. Ga. Feb. 15, 2007) (courts should use the "common sense inquiry whether the untrained laymen would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."). Therefore, Dr. Minnite's report and testimony should be excluded.

## IV. Conclusion

Dr. Minnite's testimony has been used mostly in cases involving photo identification laws, which are not at issue in this lawsuit. Moreover, despite previous research and questions posed to Georgia policymakers and prosecutors, Dr. Minnite confined her Georgia-specific research for this case to some generic internet searches, review of press releases, and consideration of State Election Board minutes. Her opinion—that incidents of voter fraud are low in Georgia—does not speak to any issue in dispute in this lawsuit, and her methods are overly narrow. The testimony should be excluded under Federal Rule of Evidence 702.

Respectfully submitted this 25th day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com

Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbins Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

-16-

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing MOTION TO EXCLUDE TESTIMONY OF DR. LORRAINE CAROL MINNITE AND BRIEF IN SUPPORT was prepared double-spaced in 13-point Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

                                         */s/Josh Belinfante*
                                         Josh Belinfante
                                         GA Bar No. 047399

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. LORRAINE CAROL MINNITE AND BRIEF IN SUPPORT with the Clerk of Court using the CM/ECF system, which will send e-mail notification of such filing to all counsel of record.

This 25th day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
GA Bar No. 047399