# EXHIBIT 1

# In The Matter Of:

*Fair Fight Action v. Raffenensperger*

---

*Dr. Lorraine Carol Minnite*
*December 13, 2019*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
*Certified Court Reporters*

Min-U-Script® with Word Index

1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                 ATLANTA DIVISION

 3                  - - - - -

 4
    FAIR FIGHT ACTION, et al.,     NO. 1:18-cv-05391-SCJ
 5           Plaintiffs,

 6
             vs.
 7

 8  BRAD RAFFENSPERGER, in his
    official capacity as Secretary of
 9  State of Georgia; et al.,
             Defendants.
10
                    - - - - -
11

12        Friday, December 13, 2019

13
                    - - - - -
14

15        Oral Deposition of DR. LORRAINE CAROL

16  MINNITE, taken at the Study Hotel at University

17  City, 20 South 33rd Street, Philadelphia,

18  Pennsylvania, commencing at 8:53 a.m., by and before

19  Robin L. Clark, Registered Professional Reporter and

20  Notary Public in and for the Commonwealth of

21  Pennsylvania.

22                  - - - - -

23

24

25
```

```
 1   APPEARANCES:

 2
             LAWRENCE & BUNDY, LLC
 3           BY:  LESLIE J. BRYAN, ESQ.
             1180 West Peachtree Street, N.W.
 4           Suite 1650
             Atlanta, Georgia 30309
 5           404-400-3350
             leslie.bryan@lawrencebundy.com
 6                   For the Plaintiffs

 7

 8           ROBBINS ROSS ALLOY BELINFANTE
             LITTLEFIELD, LLC
 9           BY:  JOSH B. BELINFANTE, ESQ.
             500 14th Street, N.W.
10           Atlanta, Georgia 30318
             678-701-9381
11           jbelinfante@robbinsfirm.com
                     For the Defendants
12

13                   - - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

```
 1                    I N D E X

 2   WITNESS                                PAGE

 3   DR. LORRAINE CAROL MINNITE
        BY MR. BELINFANTE:                    6
 4

 5                   E X H I B I T S

 6   NUMBER          DESCRIPTION          MARKED

 7   Minnite
```

 8   Exhibit 1      Notice of Deposition      8

 9   Exhibit 2      Curriculum Vitae         13

10   Exhibit 3      Faculty Listing          19

11   Exhibit 4      Biography                20

12   Exhibit 5      In These Times Article   41

13   Exhibit 6      Red Pepper Article       42

14   Exhibit 7      Propaganda and the Voter ID   45
                    Campaign Article
15
     Exhibit 8      Scholars Strategy Network     49
16                  Article

17   Exhibit 9      New Labor Forum Article  50

18   Exhibit 10     Movements Need Politicians   53
                    and Vice Versa Article
19
     Exhibit 11     Excerpt from The Myth of   56
20                  Voter Fraud book

21   Exhibit 12     Excerpt from The Myth of   61
                    Voter Fraud book
22
     Exhibit 13     Excerpt from The Myth of   62
23                  Voter Fraud book

24   Exhibit 14     Excerpt from The Myth of   62
                    Voter Fraud book
25
     Exhibit 15     Expert Report            64

**Regency-Brentano, Inc.**

4

Exhibit 16    GAO Report dated September    103
              2014

Exhibit 17    Expert Disclosure                140

```
 1            DEPOSITION SUPPORT INDEX

 2                     - - - - -

 3

 4   Direction to Witness Not to Answer

 5   Page  Line

 6   NONE

 7   Request for Production of Documents

 8   Page  Line

 9   NONE

10   Question Marked

11   Page  Line

12   NONE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

```
 1                    - - - - -
 2              DR. LORRAINE CAROL MINNITE, having
 3         been duly sworn, was examined and
 4         testified as follows:
 5                    - - - - -
 6                    MR. BELINFANTE:  My name is
 7         Josh Belinfante and this will be the
 8         deposition of Dr. Lorraine Minnite
 9         taken by the Defendant, Secretary of
10         State Brad Raffensperger for the
11         purpose of discovery and for all
12         purposes allowed under the Federal
13         Rules of Civil Procedure.  Leslie,
14         would you agree that all objections
15         except those going to privilege and the
16         form of the question will be reserved
17         until trial or first use at a
18         deposition?
19                    MS. BRYAN:  Yes.
20  BY MR. BELINFANTE:
21         Q.   And, Dr. Minnite, do you prefer I
22  call you doctor or Professor Minnite, or does
23  it matter?
24         A.   It doesn't matter.
25         Q.   You have been deposed before?
```

```
1         A.   Yes.
2         Q.   Okay.  And so you know the basic
3    rules of -- I will certainly do my best not to
4    interrupt you and I would ask you not to do the
5    same, not because I'll get offended, but just
6    because it's easier for the court reporter that
7    way.
8              Also, if you could answer
9    questions with a "yes" or "no," not shaking
10   your head or "uh-huh" or "uh-uh," again, for
11   the record.  And if you need to take a break at
12   any time, just let me know, we'll break.  The
13   only thing I would ask is that if I ask a
14   question, if you could answer that question and
15   then we take a break after that.  Is that fair?
16        A.   Yes.
17        Q.   And also, if I ask you anything
18   that is in any way confusing, just let me know
19   and I'll try to reask it.  Otherwise, I'll
20   presume you understand the question.  Is that
21   also fair?
22        A.   Yes.
23        Q.   I've already put in front of you
24   the Notice of Deposition for this case --
25   excuse me, for this deposition, have you seen
```

1  that document before?

2         A.   No.

3                  - - - - -

4             (Notice of Deposition marked

5         Minnite Exhibit 1 for identification.)

6                  - - - - -

7  BY MR. BELINFANTE:

8         Q.   Okay.  What did you do to prepare

9  for today's deposition?

10        A.   I reread my expert report.

11        Q.   Anything else?

12        A.   No.

13        Q.   Okay.  And for your work in this

14 case, you are compensated at $250 an hour; is

15 that right?

16        A.   Yes.

17        Q.   Do you know sitting here today how

18 much time you spent preparing your report?

19        A.   No.

20        Q.   Okay.  Do you know how much time

21 you spent preparing for today's deposition?

22        A.   A few hours.

23        Q.   All right.  And did the Plaintiff's

24 counsel reach out to you in this case or did

25 you read about it and reach out to the

```
 1  Plaintiff's counsel?

 2       A.   The Plaintiff's counsel reached out

 3  to me.

 4       Q.   Do you know approximately when that

 5  happened?

 6       A.   I think it was in the spring of

 7  this year.

 8       Q.   Of this year.  And do you know who

 9  you spoke with?

10       A.   Yes.

11       Q.   Who was that individual?

12       A.   Jeremy, I don't know how to

13  pronounce his last name, Ershow.

14       Q.   Okay.

15            MS. BRYAN:  Ershow, yes.

16            THE WITNESS:  Ershow.

17  BY MR. BELINFANTE:

18       Q.   Do you know what law firm Jeremy is

19  with?

20       A.   I believe Jenner & Block.

21       Q.   What did Mr. Ershow ask you to

22  write a report or opine on?

23       A.   The incidence of voter fraud in

24  Georgia in recent years.

25       Q.   Did he provide you with any data or
```

```
 1   documents?
 2          A.   Are you talking about at the time
 3   he first reached out to me?
 4          Q.   At any time.  I'm sorry, at any
 5   time since he reached out to you.  If you-all
 6   had a preexisting relationship, I'm not
 7   interested, but as it relates to this case, did
 8   he provide you with any data or documents?
 9          A.   Yes.
10          Q.   Did he ask you to make any
11   assumptions --
12          A.   No.
13          Q.   -- in your report?  Have you read
14   the Amended Complaint in this case?
15          A.   Yes.  Excuse me, I read the
16   Complaint, I'm not positive it was an Amended
17   Complaint, but so.
18          Q.   I think for your purposes, it
19   doesn't make much of a difference, but --
20          A.   Right.
21          Q.   Have you read any of the
22   depositions taken in this case?
23          A.   Yes.
24          Q.   Whose deposition have you read?
25          A.   Mr. Chris Harvey.
```

```
 1           Q.   All right.
 2                     MS. BRYAN:  And to be clear,
 3           I believe the deposition she read was
 4           his 30(b)(6) deposition, not the one
 5           that was taken last week.
 6                     MR. BELINFANTE:  Okay.
 7                     MS. BRYAN:  You don't know
 8           he's been deposed again.
 9   BY MR. BELINFANTE:
10           Q.   Have you read Mr. Harvey's
11   deposition in the last two weeks -- or let me
12   back up.  Let me ask it this way.  In preparing
13   your report, at the time you prepared your
14   report, had you read Mr. Harvey's deposition?
15           A.   I'm trying to remember the timing
16   of it.
17           Q.   Sure.
18           A.   Probably it was right around the
19   time I was finalizing the report.
20           Q.   All right.  And in your own words,
21   can you tell me what you believe this case is
22   about?
23           A.   I believe this case is a challenge
24   to Georgia election law and Georgia's election
25   procedures and there's a constitutional element
```

```
 1  to the challenge as well.
 2         Q.    Does that complete your answer?
 3         A.    Yes.
 4         Q.    Okay.  Do you believe that
 5  Georgia's photo identification law is at issue
 6  in this lawsuit?
 7         A.    It's part of the complex of
 8  procedures that are sort of collectively
 9  challenged.
10         Q.    Have you read any of the briefs
11  that have been filed in this case?
12         A.    Just the Complaint.
13         Q.    Okay.  Have you read, and this may
14  sound repetitive, but have you read any of
15  Judge Jones' orders in this case?
16         A.    No.
17         Q.    As part of your research for your
18  report in this case, did you speak to anyone
19  other than Plaintiff's counsel that are in
20  Georgia?  In other words, let me ask it a
21  different way.  In preparation of your report
22  and in conducting your research, did you talk
23  to any Georgians about election law matters?
24         A.    No.
25         Q.    Did you talk to any Georgians about
```

```
 1   voter fraud or allegations of voter fraud in
 2   Georgia?
 3        A.   Other than the lawyers, no.
 4        Q.   Okay.  I'm going to hand you --
 5        A.   I mean, I'm not always sure who is
 6   not a Georgian by birth.
 7        Q.   I mean Georgia officials, district
 8   attorneys, someone other than Plaintiff's
 9   counsel?
10        A.   Sure.
11        Q.   I'll show you what we'll mark as
12   Exhibit 2, which is the CV attached to your
13   report.
14                  - - - - -
15             (Curriculum Vitae marked Minnite
16        Exhibit 2 for identification.)
17                  - - - - -
18   BY MR. BELINFANTE:
19        Q.   Is this curriculum vitae still
20   accurate?
21        A.   I know I updated it in November,
22   this one is dated July, but it would be almost
23   identical in November, so.
24        Q.   Any substantive update?
25        A.   No.
```

1          Q.    Your doctoral thesis, what was it?

2     I'm trying to find it again, can you tell me

3     what that was about?

4          A.    Yes.  It was a study of the

5     redistricting of the New York City Council in

6     the early 1990s.

7          Q.    All right.  And your master's

8     thesis, can you briefly describe what it was

9     about?

10          A.    Yes.  It was a critique of the work

11     of William Julius Wilson, who is a socialist.

12          Q.    He started -- or at some point, he

13     was at Chicago and then he went to Harvard; is

14     that right?

15          A.    That's correct.

16          Q.    Neither one of those writings had

17     to do with Georgia at all, did it?

18          A.    No.

19          Q.    Let's talk about your time at

20     Barnard.  Am I pronouncing that correctly?

21          A.    Yes.

22          Q.    Barnard College at Columbia.  When

23     someone first becomes a professor at Barnard,

24     are there different titles that you have in

25     terms of kind of tiers of professors, if you

Dr. Lorraine Carol Minnite - December 13, 2019          15

1    will or seniority?

2          A.    Yes.

3          Q.    And what is its entry level title?

4          A.    Assistant professor.

5          Q.    What's the next step in

6    professorship?

7          A.    Associate professor.

8          Q.    Okay.  And then is there one higher

9    than associate?

10         A.    Yes.

11         Q.    And what would that be?

12         A.    Full professor.

13         Q.    How does one go from being an

14   assistant professor to an associate professor

15   at Columbia, Barnard College specifically?

16         A.    Usually when you go up for tenure,

17   you also go up for promotion, so promotion

18   would follow tenure.

19         Q.    And did you seek tenure at Barnard

20   Columbia?

21         A.    Yes.

22         Q.    Was it denied?

23         A.    Yes.

24         Q.    Tell me about Rutgers at Camden,

25   Rutgers is the state University of New Jersey,

1  correct?

2          A.   Yes.

3          Q.   And it has campuses, Camden is not

4  the main campus, is it?

5          A.   No.

6          Q.   Where is the main campus?

7          A.   New Brunswick, New Jersey.

8          Q.   That's right.  And there you're an

9  associate professor?

10          A.   Yes.

11          Q.   And you're also department chair of

12  urban development?

13          A.   Yes.

14          Q.   I'm sorry, I presumed urban

15  development, what is the department you're

16  chair of?

17          A.   It's the department of public

18  policy and administration.

19          Q.   Is associate professor the same

20  kind of second tier at Rutgers?

21          A.   Yes.  That distinction of

22  assistant, associate, and full is pretty

23  standard across U.S. universities.

24          Q.   All right.  Going back to your time

25  at Barnard, one of the classes you taught was

1   "Participation in Democracy;" is that right?

2           A.   That's right.

3           Q.   What was that class about?

4           A.   That class was about the

5   intersection of social movements in the United

6   States and electoral politics.

7           Q.   Did it focus on election

8   administration at all?

9           A.   It involved elements of election

10  administration, because election administration

11  is part of the study of electoral politics.

12          Q.   Did it consider Georgia election

13  administration at all?

14          A.   No.

15          Q.   All right.  What was -- and you

16  also taught a course "Urban Myths and the

17  American City"?

18          A.   Yes.

19          Q.   And can you tell me briefly what

20  that course was about?

21          A.   That was a first year seminar for

22  students and it was kind of an examination of

23  the idea of the city in American literature.

24          Q.   Okay.  While you were at Barnard

25  Columbia, were there any classes that you

1  taught on election administration specifically?

2          A.   No.

3          Q.   All right.  And at Rutgers, are you

4  currently teaching any classes on elections?

5          A.   No.

6          Q.   All right.  Let's take a look, you

7  have taught an honors college seminar there

8  called "The Right to Vote"?

9          A.   Yes, and I'll be teaching that in

10 the spring again.

11         Q.   Tell me what that course is about?

12         A.   It's pretty transparent.  It's

13 about the right to vote in the United States,

14 although I do a little bit of comparative

15 instruction, if you will, on the idea of the

16 vote historically in England and in other parts

17 of the world, but it's primarily focused on the

18 struggle for the right to vote in the United

19 States.

20         Q.   How much of it is focused on modern

21 times and by modern for this purpose, I'll say

22 1990 forward?

23         A.   At least 75 percent.

24         Q.   Do you spend much time on Georgia

25 in that class?

1          A.   No.

2          Q.   I'm going to show you what we'll

3    mark as Exhibit 3.

4                     - - - - -

5               (Faculty Listing marked Minnite

6          Exhibit 3 for identification.)

7                     - - - - -

8    BY MR. BELINFANTE:

9          Q.   This is a printout I got from the

10   Rutgers website.  Your biography or your

11   section is on page 4 of the document.  Does

12   this document accurately reflect your current

13   courses?

14         A.   It reflects courses that I've

15   taught.  It's actually not updated with The

16   Right to Vote course.

17         Q.   Okay.  Other than that, is it

18   missing any courses that you teach or have

19   taught in the last, say, three or four years?

20         A.   Yes, it's missing another one and

21   it's called "Theories in History of Community

22   Development."

23         Q.   Does that course examine elections

24   at all?

25         A.   No.

```
 1          Q.    Is the research interests on here
 2   up to date?
 3          A.    Pretty much.
 4          Q.    Let me show you what we'll mark as
 5   Exhibit 4.
 6                    - - - - -
 7                (Biography marked Minnite Exhibit 4
 8           for identification.)
 9                    - - - - -
10   BY MR. BELINFANTE:
11          Q.    This is also on Rutgers website.
12   Is it an accurate representation of your work
13   and scholarship?
14          A.    It's probably out of date, but it
15   looks, it's accurate.
16          Q.    Okay.  It says, well, if it's out
17   of date, what would you add?  And let me be
18   more specific, would you add anything about
19   election administration?
20          A.    I don't know.  I was just looking
21   at the last sentence where it says "She is on
22   sabbatical for the 2014 to 2015 academic year."
23   So that's why I know it's out of date.
24          Q.    I didn't catch that.  All right.
25   Let me ask about a sentence that's about midway
```

Regency-Brentano, Inc.

1    through.  It says "Dr. Minnite has served as an

2    expert witness on several voting rights cases,

3    and consulted with various labor, advocacy,

4    academic and governmental organizations and

5    political campaigns which have relied on her

6    skills as a political analyst and researcher

7    and her expertise in public policy."  Do you

8    see that?

9            A.   Yes.

10           Q.   Did you write this, by the way?

11           A.   Yes.

12           Q.   So when you say "expertise in

13   public policy" on this document, what were you

14   referring to?

15           A.   Well, I have consulted, for

16   example, with immigrant rights groups on -- and

17   this is in the past, this isn't really

18   recent -- on issues related to immigration

19   policy, for example.

20           Q.   Okay.  Anything else?

21           A.   I have consulted with and, again,

22   in the past, with organizations working on

23   community organizing and issues that they have

24   been concerned with regarding social programs,

25   for example.

1          Q.    Okay.  Anything else?

2          A.    Probably, but I'm not doing any of

3     that work right now, because I'm chair of my

4     department and I have very little time even for

5     my own work.

6          Q.    Understood.  It also says where

7     you've provided advice to political campaigns,

8     do you know which political campaigns you've

9     provided advice to?

10          A.    It would be the ones on my CV.

11          Q.    And is that Mayor Dinkins?

12          A.    Yes.

13          Q.    And the city councilman,

14     Mr. McCabe, is it Mr. or Ms., I don't know?

15          A.    Ms.

16          Q.    Okay, Ms. McCabe?

17          A.    Uh-huh.

18          Q.    Are those the two that that refers

19     to?

20          A.    Yes.

21          Q.    Thanks.  Have you taught any

22     classes either at Rutgers or at Columbia that

23     focus exclusively on election administration?

24          A.    No.

25          Q.    Have you taught any classes that

 1   have focused on Georgia election law?

 2        A.   No.

 3        Q.   And let me ask another way or

 4   another question.  Have you taught any classes

 5   that focus on Georgia elections as opposed to

 6   election law which was the first question?

 7        A.   A whole class on Georgia elections?

 8        Q.   Sure.

 9        A.   No.

10        Q.   Have you taught classes that

11   dedicate a lecture to Georgia elections?

12        A.   No.

13        Q.   All right.  Let's go back to your

14   CV.  From 2010 to 2011, you were the research

15   director for Project Vote; is that right?

16        A.   Yes.

17        Q.   Okay.  Do you maintain any

18   affiliation with Project Vote today?

19        A.   That organization doesn't exist

20   anymore.

21        Q.   I see.  When did it stop or cease

22   to exist?

23        A.   Several years ago.

24        Q.   Do you know what happened or why it

25   ceased to exist?

1          A.    No.

2          Q.    Project Vote at the time was an

3    organization that had as one of its goals to

4    see state governments play a leading role in

5    registering Americans to vote.  Does that sound

6    right?

7          A.    Yes.

8          Q.    Do you know why the focus was on

9    state governments?

10         A.    Yes.

11         Q.    And why is that?

12         A.    Part of the work of Project Vote

13   was to monitor the implementation of a National

14   Voter Registration Act at the state level,

15   because that federal legislation gives an

16   important role to state election officials to

17   implement the mandates of the National Voter

18   Registration Act.  And so Project Vote would

19   monitor how well the NVRA was being implemented

20   in specifically social service agencies,

21   sometimes called core-serving agencies where

22   there was contact between state employees and

23   the public to see if they were doing what they

24   were supposed to do under federal law, which is

25   to offer people the opportunity to register to

```
 1    vote.
 2            Q.   And that would be, the agencies
 3    you're describing would be agencies that
 4    deliver SNAP benefits?
 5            A.   A range of both federal and state
 6    social services primarily.
 7            Q.   And Project Vote participated in
 8    litigation during your time there; is that
 9    right?
10            A.   That's correct.
11            Q.   Okay.  Did you assist Project Vote
12    with any litigation projects during your time
13    with the organization?
14            A.   I was the research director and for
15    only a short period of time, there was one case
16    that they hadn't -- I think they had just kind
17    of started within that period in Louisiana, and
18    part of the work that Project Vote would do
19    before they would bring litigation was to try
20    to see if they could collect information by
21    clients of these agencies and get, you know,
22    find out if they had been offered the
23    opportunity to vote.  So I, partly because of
24    my expertise in survey research, I participated
25    in helping design a little research project
```

```
 1    that would collect data, if there was data to

 2    be collected, that would give the organization

 3    a sense of whether the state was correctly

 4    implementing the law.

 5         Q.   Okay.

 6                   MR. BELINFANTE:  Off the

 7         record.

 8                   - - - - -

 9         (Discussion was held off the record.)

10                   - - - - -

11    BY MR. BELINFANTE:

12         Q.   Back on the record.  You just

13    described one project you had with Project

14    Vote.  Is that generally what you would do as

15    research director?

16         A.   Yes.  The organization wanted an

17    associate scientist to help them design

18    research projects that would allow them to

19    collect data that would inform the kind of work

20    that they were trying to do.  I mean, you asked

21    what their focus was, their focus really was to

22    increase the participation of poor people in

23    the electoral process and that meant trying to

24    increase their rates of voter registration

25    among low income Americans.
```

```
 1          Q.   And would you deem it an advocacy
 2    group?
 3          A.   Yes.  They were a 501(c)(3)
 4    nonprofit group.  Nonpartisan, nonprofit group.
 5          Q.   Have you met Stacey Abrams?
 6          A.   No.
 7          Q.   Are you familiar with an
 8    organization known as Fair Fight or Fair Fight
 9    Action?
10          A.   Only through this litigation.
11          Q.   Okay.  Have you made any
12    contributions to Fair Fight Action?
13          A.   No.
14          Q.   According to your CV and what I've
15    seen, you've testified in several election
16    cases, correct?
17          A.   That's correct.
18          Q.   All right.  And none of those cases
19    have been on behalf of the government; is that
20    right?
21          A.   I'm sorry?
22          Q.   None of those cases where you've
23    provided testimony have been on behalf of the
24    government; is that correct?
25          A.   That's correct.
```

1          Q.    All right.

2          A.    I've never been asked by counsel

3    for government to participate in litigation and

4    I don't look for clients, if you will, so.

5          Q.    Okay.  Fair enough.  You testified

6    as a fact witness in a case known as ACORN

7    versus and I don't know how to pronounce his

8    name, Bysiewicz?

9          A.    Bysiewicz.

10          Q.    Can you tell me what that case was

11    about?

12          A.    That case was a challenge to

13    Connecticut's law that cut off voter

14    registration two weeks before an election.

15          Q.    What was the outcome of that case?

16          A.    The state prevailed in that case.

17          Q.    And that's the one where you were a

18    fact witness, correct?

19          A.    That's correct.

20          Q.    Okay.  What was your testimony

21    about?

22          A.    My testimony was about a table that

23    I had compiled that summarized newspaper

24    articles that had appeared regarding election,

25    allegations of voter fraud in elections in

```
 1   Connecticut.
 2         Q.   Okay.  Were you ever a member of
 3   any -- let me ask this first.  Did ACORN have
 4   members?
 5         A.   Yes.
 6         Q.   Were you a member?
 7         A.   ACORN, you're talking about the
 8   national group?
 9         Q.   The national group?
10         A.   Or the chapters?
11         Q.   Well, can you explain to me how
12   ACORN was organized rather than me trying to do
13   it?
14                   MS. BRYAN:  Objection to
15            form.  If you know.
16                   MR. BELINFANTE:  And I don't
17            mean its corporate form, but you just
18            raised they're chapters and there was a
19            national group.  Can you tell me how
20            was it organized in relation to those
21            two types of groups within ACORN?
22                   THE WITNESS:  Well, I don't
23            know that much about that, but I do
24            know that there were local chapters
25            across the country and then there was a
```

```
 1            national office that there was some
 2            relationship between those local
 3            chapters and the national office.
 4  BY MR. BELINFANTE:
 5       Q.   And were you a member of ACORN?
 6       A.   No.
 7       Q.   You acknowledge though that ACORN
 8  had issues with volunteers illegally
 9  registering voters?
10                 MS. BRYAN:  Objection to
11            form.
12  BY MR. BELINFANTE:
13       Q.   And are you aware that ACORN had
14  issues with volunteers, at least allegedly,
15  registering voters?
16       A.   They weren't volunteers.  They were
17  paid canvassers.
18       Q.   And tell me what you know about
19  those allegations?
20       A.   Well, there were many, many, many,
21  many allegations, lots of allegations, but very
22  little in the way of actual crimes being
23  committed, if you will, in terms of forged
24  voter registration applications, so I'm not
25  sure if I understand your question.  The
```

 1    allegations, you know, were explosive.  The

 2    United States was collapsing and so forth,

 3    because of this.  But that's separate from what

 4    actually happened.

 5          Q.    Tell me what you know about what

 6    actually happened?

 7          A.    What actually happened is that

 8    there were people who were hired to work on

 9    voter registration drives, because we don't

10    have a system of automatic voter registration.

11    So we have a system whereby citizens when they

12    want to vote, they have to register themselves

13    and there are third-party, if you will,

14    organizations that try to to to get people to

15    register to vote.  ACORN was engaged in that

16    kind of work and to do that it's very labor

17    intensive in those days, you know, computers

18    may have changed things a little bit, but in

19    those days, which weren't that long ago, a

20    voter registration drive would engage many

21    people and they would knock on doors or have

22    some other kind of strategy for finding people

23    who weren't registered to vote and would

24    encourage them to register to vote.  So in the

25    ACORN case, I think you're referencing

1    unless -- you know, I hope we're talking about

2    the same thing.

3        Q.    I think we are and I'm just asking

4    what you know, so you can set the parameters.

5        A.    Yes.  ACORN hired canvassers to

6    help with the voter registration drive and

7    there were a handful of people who did not do

8    the work correctly.  There was some evidence of

9    forgery of the forms, but you know, really

10   those people defrauded the organization itself,

11   because there was training involved, there was

12   supervision involved, but there were a handful

13   of folks who didn't do the work correctly and

14   that resulted in voter registration

15   applications being turned in because, I'm

16   thinking here of the case in Missouri and other

17   states have laws that say, of course, the voter

18   registration application is an official

19   government document, so it has to be turned in.

20   And the organization knew that there were

21   problems with some forms and they flagged those

22   forms to let the election officials know that

23   they said, hey, we know there's a problem with

24   these forms, but the law compels us to turn

25   these forms into you.  And that was, I believe

1   there were -- I don't know offhand, I don't

2   remember offhand how many people this was, but

3   it was a handful of all of the people that they

4   hired to work on this nationally.

5        Q.   Based on your experience, is it

6   your position that organizations like ACORN and

7   others that seek to get people registered to

8   vote should engage in training the individuals

9   that actual interact with voters?

10       A.   Yes.

11       Q.   And you spoke and you said we don't

12  have automatic registration generally.  Do you

13  support the idea of having automatic voter

14  registration?  And let me ask more

15  specifically, do you support having someone

16  automatically register to vote when they apply

17  for a driver's license?

18       A.   I support the idea that it should

19  be as easy as possible for American citizens to

20  vote and I could support automatic voter

21  registration.  It may not be the best method,

22  but it's probably a better method than leaving

23  people unregistered, so I don't have a -- or

24  let's say, I haven't done research on automatic

25  voter registration to know if it's sort of the

```
 1    best method we could develop.
 2          Q.    That's fair.  Skipping ahead a
 3    little bit, you define -- or can you tell me
 4    your definition of voter fraud for the purpose
 5    of your report?
 6          A.    Yes.  Voter fraud is the
 7    intentional corruption of the electoral process
 8    by voters.
 9          Q.    So what you described as the
10    problem in a handful of circumstances with
11    ACORN, that would not constitute voter fraud
12    under your definition; is that right?
13          A.    We have to be careful here, you
14    know, as a social scientist, one of the things
15    that you need to do is very clearly define
16    concepts for purposes of measurements.  So
17    you're asking me about voter fraud, because I
18    was trying to very carefully measure voter
19    fraud, but when I'm trying to do that, that is
20    to say measure voter fraud, I need to look
21    widely at what's going on.  With the cases of
22    canvassers forging voter registration
23    applications, for my purposes of looking at
24    voter fraud, those cases wouldn't necessarily
25    be called voter fraud, but I would register the
```

```
 1   fact that there had been forged voter
 2   registration applications and then what that
 3   would make me do is make me say did any of them
 4   turn into illegal votes.  And in the case, in
 5   the ACORN case, none of them turned into --
 6   there's -- into illegal votes.  There was no
 7   evidence that any of that turned into any kind
 8   of fraudulent voting, if you will.  So,
 9   technically, registration fraud, I would kind
10   of categorize separately, but I'm very
11   cognizant of different forms of fraud that may
12   have a bearing on whether there was any fraud
13   committed by voters.
14        Q.   And so let me try to articulate
15   something and you tell me if it's a fair
16   representation of how it would be counted in
17   your report.  If Georgia convicted someone of
18   voter registration fraud and by that, I'll give
19   an example, they filled out a fraudulent voter
20   registration form for Mickey Mouse and
21   submitted it to the government, that alone
22   would not get counted, but if you saw evidence
23   that Mickey Mouse voted in the election, that
24   act would be counted as an instance of voter
25   fraud; is that fair?
```

 1        A.    Yes, but I don't, I want to be,

 2    again, very careful about the counting you're

 3    asking me about, because I don't get into

 4    always, it's not always possible to count as

 5    accurately as I think you're implying.  So the

 6    registration fraud, I would take note, I would

 7    say, of what happened.  The reason I wouldn't

 8    call it voter fraud for purposes of measurement

 9    is because a voter didn't do that.

10        Q.    Right.

11        A.    So the elements of the definition

12    go to who is the perpetrator and what role do

13    they have in the electoral process.  And the

14    reason for that is because we want to generate

15    rational, fair, good public policy and to do

16    that, we have to have a very accurate

17    understanding of what the problem is.  So if

18    the problem is knuckleheads, you know, filling

19    out forms, we don't, voter ID doesn't have

20    anything really to do with that.  If that's the

21    problem, that says, hey, there's something

22    about the way we register voters that we should

23    address, because we've created a situation

24    where people may need help registering to vote.

25    That may be a problem.  Why do they need help

1   registering to vote?  And we open up, you know,

2   the possibility that somebody could forge a

3   form.  If we don't want people forging voter

4   registration forms, then we should address the

5   registration system.  So I'm always looking at

6   what the reform policy proposals are and saying

7   is that reform based on good analysis of what

8   the problem is.  So that's why I define voter

9   registration the way I do with the elements of

10  who is doing it, what is that actor in the

11  process able to do in the electoral process.

12  And then, you know, is it a problem?  Then we

13  have to address it, or we should address it.

14         Q.   Okay.  Let me ask this question

15  then.  You would not consider for the

16  definition you've used in your report, and I

17  think you've answered this, but you would not

18  consider that act of submitting a fraudulent

19  voter registration as voter registration under

20  your definition, because if the voter is not

21  doing it, would you agree with me on that?

22         A.   In a very technical way, yes.  I

23  just want to make clear that there's a context

24  around the definition and a kind of, you know,

25  motivated analysis or logic to the definition

1    that goes to the question of public policy.

2        Q.   Okay.  And but would you agree with

3    me that if someone filled out a ballot and, you

4    know, before I used Mickey Mouse, that's

5    absurd, if something filled out for Jeremy

6    Belinfante, and to my knowledge, there's no

7    Jeremy Belinfantes in Georgia, would you agree

8    that photo ID could at least prevent somebody

9    from voting as Jeremy Belinfante if they're

10   voting in person, a photo ID requirement?

11                   MS. BRYAN:   Objection to

12       form.

13   BY MR. BELINFANTE:

14       Q.   I'll try to rephrase it.  If

15   someone has fraudulently registered to vote,

16   made up a name, Jeremy Belinfante, made up the

17   address, et cetera, the registration goes

18   through and then that person goes to vote as

19   Jeremy Belinfante in Georgia where we have a

20   photo ID requirement -- and I'm talking about

21   in-person voting -- would you agree with me

22   that a photo ID requirement could at least help

23   prevent that person from voting?

24       A.   Not necessarily.

25       Q.   But it could?

1          A.    It depends.  I mean, a person who

2    is motivated enough to risk legal penalty,

3    fine, misdemeanor crime, whatever, by

4    fraudulently registering, if they're that

5    motivated, they could be motivated enough to

6    produce a fake ID and it's unlikely that the

7    poll worker knows whether that ID with somebody

8    else's face on it is, I'm sorry, with, you

9    know, impersonating somebody, they don't have

10   photos of people's faces at the polling place,

11   so just looking at the face doesn't seem like

12   it would prevent the kind of crime that you're

13   describing.

14         Q.    In your work, have you seen a case

15   where somebody has gone so far as to create a

16   fake identification for the purpose of voting?

17         A.    I don't think so.

18         Q.    You also just a moment ago said if

19   you're looking at things like voter

20   registration, one of the things policy makers

21   perhaps ought to do is to address the voter

22   registration system; is that a fair statement?

23                  MS. BRYAN:  Same.

24                  THE WITNESS:  Yes.

25

**Regency-Brentano, Inc.**

1  BY MR. BELINFANTE:

2       Q.   Do you have an opinion on ways that

3  the voter registration system -- let me ask you

4  this.  Have you studied the voter registration

5  system in Georgia?

6       A.   To a certain extent to understand

7  in general what the rules are in Georgia for

8  registering and voting.

9       Q.   Your report does not take an

10  opinion one way or the other on the efficacy of

11  Georgia's voter registration, does it?

12       A.   No, my report is responding to the

13  question of the incidence of voter fraud in

14  Georgia.

15       Q.   Do you have anything that you deem

16  best practices for a good voter registration

17  system?

18       A.   I'm not prepared to discuss that

19  today.  I thought we were mainly going to be

20  focusing on the analysis or the report itself.

21       Q.   Fair enough.  You've written for

22  and your CV shows an area of other publications

23  and so on, and journalism, a good deal of

24  articles for various organizations and

25  magazines, correct?

```
 1          A.    Probably not enough.   There are
 2   some listed there.
 3          Q.    Okay.  One of them is In These
 4   Times; is that right?
 5          A.    Yes.
 6          Q.    All right.  Let me show you what
 7   I'll mark as Exhibit 5.
 8                    - - - - -
 9               (In These Times Article marked
10           Minnite Exhibit 5 for identification.)
11                    - - - - -
12   BY MR. BELINFANTE:
13          Q.    I'll represent to you that I got
14   this, and you can see the website address down
15   at the bottom, from their website.  Can you
16   turn to page 3 of Exhibit 5, it says there in
17   the second sentence, "Through five presidential
18   In These Times has adhered to the belief that
19   to thrive a progressive political movement
20   needs its own media to inform, educate and
21   orient itself."  Do you see that?
22          A.    Yes.
23          Q.    Is that one of your goals, to have
24   a progressive political movement thrive?
25          A.    I don't see where my political
```

```
 1   views are relevant to this.  I mean, we could
 2   have a discussion about politics, but I'm not
 3   going to opine on that.
 4         Q.   So you're not, it's a simple
 5   question, do you seek to have progressive
 6   political movements thrive?  I'm not asking for
 7   your opinion --
 8         A.   I am a small d Democrat.  I believe
 9   in democracy.  And progressive movements
10   promote democracy, so I'll just say that
11   that's, to the extent that I talk about my
12   political views, which I really don't think are
13   relevant here, I'm happy, I'm proud to say that
14   I believe in democracy as an ideal for our
15   country and for the world.
16                   - - - - -
17              (Red Pepper Article marked Minnite
18         Exhibit 6 for identification.)
19                   - - - - -
20   BY MR. BELINFANTE:
21         Q.   All right.  Let me show you another
22   one.  You have written for the journal Red
23   Pepper; is that right?
24         A.   Just an article.  Always unpaid.
25         Q.   All the work that has ever gotten
```

```
 1   me in any trouble in my life has been unpaid.

 2   Not this being any trouble.

 3                 This is another one I pulled off

 4   of Red Pepper's website.  The first sentence or

 5   the second sentence says "We seek to be a space

 6   for debate on the left, a resource for

 7   movements for social justice, and a home for

 8   open-minded anti-capitalists."  Do you see

 9   that?

10        A.   Yes.

11        Q.   Would you describe yourself as an

12   open-minded anti-capitalist?

13                 MS. BRYAN:  I'm going to

14            object to form.  This isn't relevant to

15            the opinion she's offering.

16                 MR. BELINFANTE:  It goes to

17            bias.

18                 MS. BRYAN:  I'm making my

19            objection.

20                 MR. BELINFANTE:  I'm sorry,

21            we're not in a court.

22                 MS. BRYAN:  I'm making my

23            objection.

24                 THE WITNESS:  I told you

25            what my bias is.  My bias is that I
```

```
 1              believe in democracy and I believe that
 2              in it as a goal, I believe most people
 3              will thrive in a democratic equal and
 4              just society.  And I don't hide that at
 5              all.
 6    BY MR. BELINFANTE:
 7          Q.   And so I guess I'm asking more --
 8    well, I'll leave it at that.  That's fine.  You
 9    know an individual named Hans von Spakovsky,
10    correct?
11          A.   Yes.
12          Q.   I'm going to show you an article,
13    and I think I've read in one of your prior
14    depositions when this was presented to you, I
15    could not find the actual article where it was
16    published, so this is what I found.  I think it
17    was a same situation in another deposition.
18    But there was an article you wrote called
19    "Propaganda and the Voter ID Campaign."  I'm
20    not asking you much about the article.
21          A.   I don't, I've seen this before and
22    I think I said before, I don't know where this
23    comes from in terms of a publication or an
24    excerpt thing, or I don't even know what this
25    is.  I've seen it before.  With the internet,
```

 1   people can grab things and then publish them on

 2   their website, so.

 3                    - - - - -

 4              (Propaganda and the Voter ID

 5         Campaign Article marked Minnite Exhibit

 6         7 for identification.)

 7                    - - - - -

 8   BY MR. BELINFANTE:

 9        Q.    Right.  Have you in fact written an

10   article called "Propaganda and the Voter ID

11   Campaign" in and around September 2011?

12        A.    No, I mean I don't know the title.

13   I'm trying to see if it's, you know, a lot of

14   these things have a similar title, but I don't

15   remember that title and I certainly don't know

16   what this Reclaimed Democracy is, if that's the

17   website.

18        Q.    That's where it was pulled from,

19   but let me ask you a question and you can tell

20   me if it's something you recall writing or not.

21   In the fourth paragraph, it says "Von

22   Spakovsky's Brooklyn tale plays a role in the

23   expansive propaganda campaign promoted by

24   Republican Party operatives to stoke the anger

25   of the party's right wing base via the code

```
 1   word fraud, and to soften up a mostly
 2   disinterested public skeptical of
 3   backward-moving restrictions on the franchise,
 4   like the requirement to show a current
 5   government-issued ID to vote."  Do you see
 6   that?
 7            A.   Yes.
 8            Q.   Do you recall writing that?
 9            A.   I don't.  Like I said, I don't
10   actually know what this is.  I did write about
11   this.  I'm not sure where this is coming from.
12            Q.   Okay.
13            A.   So I'm not denying that I didn't,
14   but these aren't my words.
15            Q.   They're not your words?
16            A.   It's a little out of context.
17            Q.   They're not your words?
18            A.   No, I'm saying that I don't deny
19   that they are my words.
20            Q.   I'm sorry, I misunderstood.
21            A.   There were many things that I've
22   written and I don't know if it came from
23   something, I was trying to think, like I
24   remember writing something for what -- I
25   honestly just don't know where this has come
```

1    from.

2          Q.    Okay.

3          A.    But like I said, we can, if you

4    want me to --

5          Q.    No, I guess --

6          A.    Go ahead.

7          Q.    Sure.  My question is when you say

8    "via the code word fraud" or when the document

9    at least says "via the code word fraud," what

10   does that mean to you?  Like, what is fraud a

11   code word for?

12         A.    Well, I do discuss this in my book

13   and in my book, the first task was to try to

14   empirically measure voter fraud, and as I

15   explain in the book in great detail, that was

16   very difficult, it took many years, et cetera,

17   as I explained in the report, my expert report

18   as well, and so I had to try to figure out,

19   well, if the empirical record shows very little

20   voter fraud in the United States, why do people

21   think there's a lot of voter fraud in the

22   United States?  And I write about the way in

23   which the word "fraud" taps into what I called

24   myths.  So, for example, the myth of Tammany

25   Hall.  There's a reality and then there are the

1  stories that develop over the generations, and

2  there's some colorful figures that have shown

3  up in movies and things like that that

4  contribute to a kind of mythic element.  So the

5  code word "fraud" is central to the idea that

6  voter fraud as a huge problem in the United

7  States is a myth.

8          Q.   So there's nothing, because when

9  you hear code word a lot these days, it's

10 interchangeable with dog whistle or something

11 like that, are you implying in this or in your

12 study that fraud is somehow a code word for

13 racism or -- I'll leave it at that.

14         A.   It doesn't have to be, it could be,

15 but it doesn't have to be only racism.

16         Q.   And when you talk about, you know,

17 there's a myth, for example, of Tammany Hall

18 and what may have been something small turns

19 into something huge, do you believe that people

20 could genuinely believe that the myth is true?

21         A.   Oh, sure.

22         Q.   All right.  I'll show you an

23 article that at least printed better from the

24 Scholars Strategy Network.  Do you recall

25 writing this article?

```
 1          A.   Yes.

 2                    - - - - -

 3               (Scholars Strategy Network Article

 4          marked Minnite Exhibit 8 for

 5          identification.)

 6                    - - - - -

 7   BY MR. BELINFANTE:

 8          Q.   In the second full paragraph under

 9   the heading of "Fraud of Individual Voters is

10   Almost Nonexistent."  The first sentence reads

11   "Today, social scientific research on fraud is

12   difficult because there are no officially

13   compiled national or state statistics."  Do you

14   see that?

15          A.   Yes.

16          Q.   And this was written in

17   January 2014; is that right?

18          A.   That sounds right.

19          Q.   Yeah, it's on the back.

20          A.   Uh-huh.

21          Q.   Is that statement true sitting here

22   today in 2019?

23          A.   Yes.

24          Q.   I'll show you another article which

25   we'll mark as Exhibit 9, which is the New Labor
```

```
 1    Forum in the spring of 2012.  This is one you
 2    wrote with Frances Fox Piven, correct?
 3            A.    That's correct.
 4                    - - - - -
 5                (New Labor Forum Article marked
 6            Minnite Exhibit 9 for identification.)
 7                    - - - - -
 8    BY MR. BELINFANTE:
 9            Q.    And is it, does she go by Dr. Fox
10    Piven, professor?
11            A.    Frances.
12            Q.    Okay.
13            A.    Retired.
14            Q.    I wanted to be respectful, so I
15    wanted to get the right title, and I read her
16    stuff when I was in college too.  On page --
17    it's 36 at the bottom, it's the second page of
18    the article.  The second full paragraph says in
19    the second sentence, "since 2000, with the two
20    major parties so evenly matched at the national
21    level, the GOP has waged a coordinated fight at
22    the state level for political supremacy by
23    voter suppression."  Do you see that?
24            A.    Yes.
25            Q.    Now, there's no citation there, but
```

1    do you know what states you were looking at

2    when that was written?

3          A.   Well, there were many states

4    involved, because there are state parties,

5    party organizations.  But also, state

6    legislators who were passing laws that have,

7    very likely have a suppressive effect on

8    voting.

9          Q.   And 2012, when you were writing

10   that, did you consider Georgia as one of those

11   states?

12         A.   I don't remember.

13         Q.   Your report does not opine on

14   Georgia legislators' motivations for passing

15   election laws, does it?

16         A.   I don't think so.  I will say in my

17   report, I very briefly mention the fact that in

18   the first federal challenge to Georgia's photo

19   ID law, 2005, 2006, Judge Murphy found that it

20   functioned as a poll tax.

21         Q.   And the legislature addressed that,

22   right?

23         A.   Yes.

24         Q.   And ultimately, Georgia's voter ID

25   was upheld?

1      A.   That's right.

2      Q.   And the Supreme Court actually

3  cited Georgia's photo ID law as -- at least is

4  one that has some advantages to it, because of

5  the free photo ID card, correct?

6      A.   I don't remember the very specifics

7  of it, but it was upheld.

8      Q.   And did you also follow the case

9  before the state supreme court involving

10  Georgia's photo ID?

11      A.   Yes.

12      Q.   And are you aware that that case,

13  the state also prevailed?

14      A.   Yes.

15      Q.   And that was because the plaintiffs

16  could not find someone who could not -- who did

17  not have a government-issued photo ID; is that

18  right?

19      A.   I don't remember that detail, I

20  remember it was upheld on a kind of technical

21  issue.

22      Q.   Are you familiar with the phrase

23  "standing" as it relates to legal cases?

24      A.   Yes.

25      Q.   Do you know if standing was part of

1  the issue in the --

2       A.   As you're saying that, that may be

3  the issue in that case.

4       Q.   Okay.

5       A.   As I recall.

6       Q.   All right.  You wrote another

7  article with Dr. Fox Piven in October 2012

8  entitled "Movements Need Politicians and Vice

9  Versa;" is that right?

10      A.   Yes.

11      Q.   I'll hand you a copy of that.

12              MS. BRYAN:  What number is

13        this?

14              MR. BELINFANTE:  That was

15        number ten.

16              MS. BRYAN:  Thank you.

17              - - - - -

18        (Movements Need Politicians and

19        Vice Versa Article marked Minnite

20        Exhibit 10 for identification.)

21              - - - - -

22  BY MR. BELINFANTE:

23      Q.   In the first paragraph you write

24  "The familiar question of whether we work on

25  electoral politics or on movement politics is

1    fraught with emotion and argument about whether

2    movement or electoral politics is more

3    effective for the left."  Do you see that?

4          A.   Yes.

5          Q.   What's the difference between

6    movement politics and electoral politics?

7          A.   That is a very big question.

8          Q.   Let me, can you define for me,

9    let's do it this way, what movement politics

10   are?  I kind of get electoral politics, I'll

11   give you a chance to define that too, but I

12   think I understand that one better.

13         A.   It goes to the kind of strategy

14   that people might pursue to pursue their

15   interests.  Electoral politics, as you say, is

16   fairly obvious, you work through the electoral

17   system, you elect candidates of your choice,

18   you press them to pass legislation that you may

19   be interested in.  In movement politics, the

20   goal is not usually or not necessarily to get

21   somebody elected.

22         Q.   What is the goal of movement

23   politics generally?

24         A.   It's, there isn't a single goal,

25   it's a very diffuse kind of politics, but there

```
 1   could be many goals, if you will, out of it.
 2   One of them, for example, might be to raise an
 3   issue that isn't being raised or communicate a
 4   demand that isn't being recognized.
 5        Q.   So is it fair that while electoral
 6   politics seeks to elect candidates and
 7   hopefully change policy in some way, change a
 8   statute, change a regulation, movement
 9   politics, as you say, is to focus attention on
10   an issue and have that issue come to light?  Is
11   that a fair way to put it, or is it more than
12   that?
13        A.   That's very, very simplified, but
14   it's basically right.  Because one of the
15   things that I teach about in different courses
16   and certainly in this Right to Vote course is
17   in the history of the United States, a kind of
18   exception to that separation, say, of movement,
19   social movements or electoral politics, which
20   things should we do, a very salient, important
21   exception is the Black Freedom Movement.  And
22   the Black Freedom Movement has, and I call
23   that, I call it the Black Freedom Movement
24   rather than the civil rights movement, because
25   it extended well before the rise of the civil
```

1  rights movement in the 1950s and has continued

2  after the great victory of the civil rights

3  movement and the passage of the 1965 Voting

4  Rights Act.

5            So it's as long as the history of

6  Africans in America.  And that movement over

7  time has always tried to bring these things

8  together, that is to say, electoral campaigns

9  are often engaged in as, in the same way in

10  which movements operate.  There's a kind of

11  intersection of a movement politics along with

12  electoral, an electoral goal, if you will, to

13  get somebody elected.

14                  - - - - -

15            (Excerpt from The Myth of Voter

16        Fraud book marked Minnite Exhibit 11

17        for identification.)

18                  - - - - -

19  BY MR. BELINFANTE:

20       Q.   Okay.  I think I get the

21  difference.  Let's talk about, and you're

22  probably wondering why we haven't done it yet,

23  let's talk about your book, The Myth of Voter

24  Fraud.  I read on your CV, I think, that you

25  had another book that was forthcoming; is that

1  right, or that you're working on?

2          A.   Well, I have an edited book called

3  "Keeping Down the Black Vote."  Not edited --

4  excuse me, coauthored.

5          Q.   Coauthored, I was thinking -- I

6  thought I read that you had another one, but I

7  could be confusing it with one of the other

8  depositions I need to take.  I'm going to show

9  you, and what I did just for the record

10  purposes, I would photocopy the title page, the

11  copyright and then various excerpts.  So I'll

12  give you several copies of excerpts from the

13  book.  The text behind it is different.  In the

14  acknowledgments, three paragraphs down, you say

15  "My greatest scholarly debts are to Frances Fox

16  Piven and Chandler Davidson."  What scholar --

17  tell me what you meant as it relates to Dr. Fox

18  Piven?

19          A.   Well, she's kind of a giant --

20          Q.   She is.

21          A.   -- in American political sociology

22  in the second half of the 20th century and her

23  influences are vast on me.  They go to my

24  interests and my training as a social scientist

25  and the sort of ethics of being a professor.

1  I've learned everything from her.

2      Q.   Okay.  Have you learned methodology

3  methods from her?

4      A.   To a certain extent.  She uses

5  historical sources and some case studies.  For

6  example, Poor People's Movements has four case

7  studies of movements in the 1930s and the

8  1960s.

9      Q.   I think that's the one I read.  You

10  also identify in here an individual named Myrna

11  Perez.  It's at the bottom second to last line.

12      A.   Yes.

13      Q.   Have you spoken with Ms. Perez

14  about this litigation?

15      A.   No.

16      Q.   Have you spoken with her about

17  Georgia?

18      A.   No.

19      Q.   Could you go back to your CV,

20  please, which I believe is Exhibit 2.  And on

21  page -- hang on a second, I'll find it, I'm

22  going to ask the question, and I may be able to

23  find it.  Oh, it's page 13, sorry.  Under

24  professional, it says the second -- after the

25  "I have reviewed numerous journal articles,"

1   the second entry under that paragraph is you

2   that you are a co-organizer for Insurgency from

3   Below and the Future of American Democracy:  A

4   Conference in Celebration of the Work of

5   Frances Fox Piven and Richard A. Cloward.  Do

6   you see that?

7          A.   Yes.

8          Q.   What did you mean by insurgency

9   from below?

10         A.   Well, the idea was to try to

11  capture the big themes in Piven and Cloward's

12  work.  This was a conference that we organized

13  when Frances Piven retired from City University

14  of New York.

15         Q.   And can you tell me just, while I'm

16  personally familiar with some of her work, for

17  purposes of the record, can you tell me what

18  you mean when you say you were trying to

19  capture parts of her work, what is insurgency

20  from below?  How does that relate to her work,

21  that phrase?

22         A.   Well, so, I mean, her work is all

23  about improving our democracy, achieving social

24  justice and equality, and so she studies the

25  movements of poor people who are often

1  voiceless, unrepresented in politics,

2  mistreated, exploited.  So, you know, that has

3  been her central focus for her whole career.

4        Q.    I'm going to read you, and I've got

5  the article if you would like to see it, but

6  I'm going to read a statement that the New York

7  Times wrote about Dr. Fox Piven, which is, they

8  said "Trying to work within the system is

9  terribly misplaced, Miss Piven argues, since

10  it's rigged by leagues against the poor.  What

11  is needed is a sense of crisis that will force

12  change and that she insists can be achieved

13  only by the mass defiance of a disruptive

14  protest movement."  Does that sound like an

15  accurate statement --

16        A.    Yes.

17        Q.    -- of Ms. Piven?

18        A.    Are you saying that's a quote in

19  the Times?

20        Q.    That's a quote in the Times, but

21  does that sound like an accurate statement of

22  her beliefs and her work?

23        A.    Yes.

24        Q.    And let's see.  Going back to your

25  book, it's true, is it not, that Georgia is not

1   a real focus of your book, The Myth of Voter

2   Fraud?

3           A.    It's not a focus, but I did include

4   knowledge that I gained and the research that I

5   did for the book, I gained some knowledge about

6   Georgia, but it's not a focus of the book.

7           Q.    I'm going to show you what we'll

8   mark as Exhibit 12, which is an excerpt from

9   the index of the book.

10                  - - - - -

11              (Excerpt from The Myth of Voter

12          Fraud book marked Minnite Exhibit 12

13          for identification.)

14                  - - - - -

15  BY MR. BELINFANTE:

16          Q.    And Georgia appears there at the

17  top and those are the citations to it.  Would

18  you agree with me perhaps even looking at that

19  that to the extent Georgia is mentioned, the

20  bulk of it is on the photo identification

21  requirement?

22          A.    By page number.

23          Q.    Yes.  And I'm not sure why these

24  two came out as two separate exhibits, but I'll

25  show you both, what we'll mark as Exhibit 13

1  and 14, and while I'm doing that, your report

2  relies heavily on your book; isn't that right,

3  your report in this case?

4                    MS. BRYAN:  Objection to

5          form.

6                    - - - - -

7          (Excerpt from The Myth of Voter

8          Fraud book marked Minnite Exhibits 13

9          and 14 for identification.)

10                   - - - - -

11  BY MR. BELINFANTE:

12         Q.   Does your report cite to and rely

13  significantly on the book the Myth of Voter

14  Fraud?

15         A.   It does rely on the book, yes.

16         Q.   These are two pages of the book

17  that I'm showing you, it's pages 206 and 207,

18  but for some reason we created them as two

19  separate exhibits.  So forgive me for that.

20  And in these two pages of the book, what were

21  you trying to, I mean, obviously, the Georgia

22  election code is larger than the statute cited

23  here, but what were you trying to convey in

24  these two parts in terms of the selection --

25  how did you select these statutes and those

```
 1    cases to be included in the book?
 2          A.    This came out of the earlier work
 3    that I did, a report called "Securing the Vote"
 4    that was put out by Demos in 2003 where I
 5    looked at, I looked at about 12 states as -- it
 6    wouldn't be a full-blown case study, but 12
 7    states that I picked to be, to cover all the
 8    regions of the United States or big states,
 9    small states, and I came up with essentially a
10    sample of 12 of the 50 states and Georgia was
11    one of them.  And I read every states, I read
12    all 50 states election codes, but in this
13    exercise pulled out for Georgia part of the
14    election code that pointed to what we might
15    call voter fraud.  And then I had assistance
16    from a law student to search Georgia case law
17    for cases that might speak to the issue of
18    voter fraud and that -- I pulled that together
19    in an appendix here in the book.  I had put
20    this out earlier, but it appears as an appendix
21    in the book to give sort of an overview of the
22    set of states and the laws that speak
23    specifically to defining the issue of voter
24    fraud.
25          Q.    Okay.  And so really what you're
```

Dr. Lorraine Carol Minnite - December 13, 2019          64

1  looking at here are statutes and cases that

2  address criminal penalties as opposed to

3  election administration generally; is that

4  fair?

5          A.   For voter fraud, yes.

6                    MR. BELINFANTE:  Right.  We

7          have been going about an hour, I'm at a

8          decent stopping point if you-all want

9          to take a break, or we can keep going?

10                   MS. BRYAN:  Totally up to

11         you.

12                   THE WITNESS:  I'm fine to

13         keep going.

14  BY MR. BELINFANTE:

15         Q.   I'm going to hand you your report

16  which we'll mark as Exhibit 15.

17                   - - - - -

18         (Expert Report marked Minnite

19         Exhibit 15 for identification.)

20                   - - - - -

21  BY MR. BELINFANTE:

22         Q.   This is the report that you filed

23  in this case, correct?

24         A.   Yes.

25         Q.   Did you write the report all

Dr. Lorraine Carol Minnite - December 13, 2019          65

1  yourself?

2          A.    Yes.

3          Q.    And did you send Plaintiff's

4  counsel any drafts before it became final form?

5          A.    Yes.

6          Q.    Did you revise the report after you

7  sent drafts to Plaintiff's counsel?

8          A.    I think there was some typos, and

9  reading it over today, I found a few more.  But

10 if that's a revision, yeah.

11         Q.    Nothing substantive?

12         A.    No.

13         Q.    In the process of writing the

14 report, did you start with a prior report that

15 you had written or did you write this all new,

16 so to speak?

17         A.    No, I mean, the first part of it, I

18 have --

19         Q.    Is that highlighted?

20         A.    Yeah.

21         Q.    What I sent you?

22         A.    Yes.

23         Q.    Let me see, I'm sorry.  Hang on.

24               MS. BRYAN:  Mine is

25          highlighted too.

1              MR. BELINFANTE:  Let me see

2         these real quick.  We may have to

3         figure out something.

4              MS. BRYAN:  You don't have a

5         plain copy, do you?

6              THE WITNESS:  I think so.

7              MR. BELINFANTE:  I have an

8         electronic copy.

9              MS. BRYAN:  Are you okay

10        with that?

11   BY MR. BELINFANTE:

12        Q.   Yes.  Is your copy marked up,

13   professor?

14        A.   I don't think so.  Do you want to

15   take a look at it?

16        Q.   No, you can, it's better me than

17   you.  I would suggest if it is marked up, we

18   can stipulate that the one filed with the court

19   is the Exhibit 15.

20        A.   When I reread it yesterday, I was

21   just exhausted, so I didn't have, I was in bed

22   and I didn't have a pen to make the couple

23   little typo corrections here, so I didn't write

24   it.

25        Q.   As Leslie will tell you, I'm not

1    offended by typos.  My work has plenty of them.

2    Thank you for that.  I'm sorry for that.  All

3    right.  I think I interrupted you, you were

4    saying that you, my question was did you start

5    from a prior report or did you type everything

6    in new again?

7            A.   Well, I drew from prior reports for

8    the historical analysis at the beginning of the

9    report, because that doesn't change.  But for

10   the most part, for example, summary of

11   opinions, the analysis of the incidence of

12   voter fraud in contemporary U.S. elections, the

13   evidence and analysis of voter fraud in

14   Georgia, and conclusion certainly are all new.

15           Q.   And can you point to me in the

16   report where you provide the complete statement

17   of opinions?

18           A.   The summary of opinions is on

19   page 1.

20           Q.   Okay.  Paragraph B in that summary

21   of opinions says that "A review of available

22   evidence in Georgia finds no cases of voter

23   impersonation at the polling place."  You spend

24   a fair amount of time in the report describing

25   the evidence that you considered and you cite a

1    wealth of evidence in the report.  Is there

2    anything you considered that is not cited or

3    otherwise referred to in the report?

4          A.    Anything else, what do you mean?

5          Q.    Yes, I mean, so in other words, did

6    you, you know, and I know you said you didn't

7    call anyone in Georgia, so just presume, did

8    you, if you were to have called a district

9    attorney, had a conversation about voter fraud

10   cases, and it's not cited in your report, was

11   it somehow still relied on?  I'm just trying to

12   make sure that anything you relied on I can

13   look up and find basically.

14         A.    Yes.

15         Q.    Okay.  Page 7 is where you identify

16   or define voter fraud.  It's at the bottom of

17   the page; is that right?

18         A.    Yes.

19         Q.    All right.  And I think we've gone

20   through this a little bit in terms of what

21   would constitute voter fraud for purposes of

22   this report, understanding that there may be

23   different definitions and purposes.  But are

24   you familiar with the case in North Carolina, I

25   believe it was District 9 that had the

1    congressman who engaged in, I believe, you

2    would call it election fraud as opposed to

3    voter fraud?

4                    MS. BRYAN:  You're talking

5            about from the 2018 election?

6    BY MR. BELINFANTE:

7        Q.   From the 2018 election, yes.

8        A.   Yes.

9        Q.   Now, that too, that case would not

10   be considered voter fraud under your

11   definition, because it was done by a third

12   party.  It was not -- the criminal activity or

13   at least alleged criminal activity was done by

14   a third party and not the voter; isn't that

15   right?

16       A.   Well, there's more to it than that.

17   There was --

18       Q.   Tell me.

19       A.   There was money involved.  There

20   was a kind of, if you will, not maybe technical

21   conspiracy, but there was an organization or

22   organizational effort to corrupt the election.

23       Q.   And can you tell me generally what

24   your understanding of what happened in North

25   Carolina District 9 was?

1          A.    In general, it was a case of

2    manipulation of absentee balloting process.

3          Q.    And as I understand it, individuals

4    backing the Republican would go collect

5    absentee ballot requests and not turn them in?

6          A.    That could be.  My memory of the

7    details of that are a little foggy.

8          Q.    Okay.  But would it be fair to say

9    that sitting here today, you would not classify

10   North Carolina's issues in District 9 as voter

11   fraud for purposes of this report?

12                    MS. BRYAN:  Objection to

13          form.

14   BY MR. BELINFANTE:

15          Q.    In other words, that conduct

16   doesn't meet your definition of voter fraud as

17   outlined in this report; is that right?

18          A.    That's correct.

19          Q.    Okay.

20          A.    Although, it's certainly an

21   important kind of corruption that we should pay

22   attention to.

23          Q.    No disagreement.  And you

24   acknowledge that the Election Assistance

25   Commission has a different definition of voter

1  fraud than you do?

2          A.   Can you point to that definition?

3  I don't remember it.

4          Q.   I can.  I'll get back to it.  But

5  let me ask this way, you would acknowledge that

6  different laws, let's just stick with federal

7  for a moment, can define voter fraud

8  differently?

9          A.   Well, there are very few laws that

10  define voter fraud.  They set out practices

11  that are illegal, that make them illegal, like

12  double voting, repeat voting, in Georgia,

13  things like that, but they don't tend to use,

14  they don't say here's the statute on voter

15  fraud, this is what it is.

16          Q.   There are, and I believe your

17  report acknowledges this, there are criminal

18  activities that take place in the context of

19  elections that are broader than what you're

20  looking at as your definition of voter fraud;

21  is that a fair way to put it?

22          A.   Yes, when politicians, for example,

23  pay people or steal ballots or things like

24  that, that's broader than focusing on the

25  activity of individual voters.

```
 1        Q.   And another example of something
 2   like that I think you referred to in what may
 3   or may not be your article about Hans von
 4   Spakovsky and the Brooklyn tale is that what
 5   you call it, that's where people were sitting
 6   up, staying up in the voter poll and then
 7   manipulating the ballot boxes; is that right?
 8        A.   It's not exactly right.  They went
 9   into the Board of Elections in Brooklyn and
10   they went up into the ceiling through the
11   bathroom and they waited for the office to
12   close, and then they came back down in and at
13   that time to vote in New York, you would
14   have -- they would keep a portion of the voter
15   registration application.  It was like a -- it
16   was actually quite long, like a legal-sized
17   page, it was two-sided and you had to sign both
18   sides and they would tear that off and they
19   would keep those cards in order in the
20   precincts where you were registered.  They used
21   to call them buff cards, because they were like
22   oak tag color.  And so this fraud involved
23   people trying to help a candidate win
24   committing this kind of a crime and then
25   forging the buff cards and then claiming that
```

1  there was fraud in this candidate's

2  registration.  You know, they had committed the

3  fraud, but then they were alleging that Major

4  Owens who was an -- became elected there, a

5  congressman from Brooklyn, that his campaign

6  had participated in fraudulent voter

7  registration drives.

8          Q.   And that would not -- and so

9  doesn't meet your definition for purposes of

10  this report, right?

11          A.   Right.

12          Q.   And did I read that you found that

13  most election-related crimes come from someone

14  working on behalf of a campaign or a third

15  party and not voters themselves?

16          A.   Well, certainly the second part of

17  what you said, not voters themselves.

18          Q.   Okay.  And your report is largely

19  focused on and historically your research has

20  been focused on photo ID requirements; is that

21  correct?

22          A.   No, my research is on voter fraud.

23          Q.   Okay.  But it's when you've

24  provided testimony has been to opine that voter

25  fraud as you define it is low to nonexistent

1    and therefore, you should not enact a photo ID

2    requirement to vote?

3          A.    Well, the rise of the photo ID

4    policy across the states is relatively recent

5    and so a lot of the election challenges have

6    focused on that particular rule.

7          Q.    Have you been involved in

8    litigation in matters other than in election

9    matters, other than photo ID requirements?

10          A.    Yes.

11          Q.    And what other cases or what other

12    challenges have been brought that you were

13    involved in?

14          A.    Well, there was a case called

15    DNC/RNC --

16          Q.    Oh yeah, yeah.

17          A.    -- where I was an expert witness

18    and I testified in that case.

19          Q.    What did you testify to in that

20    case?

21          A.    It was the same question about the

22    incidence of voter fraud.  Because voter fraud

23    is typically, frequently, commonly alleged as

24    the reason why we need this reform, you know,

25    fill in the blank, and it has been photo ID in

1  recent years, but it's certainly not limited to

2  justifying photo ID laws.

3          Q.    And the DNC/RNC, was that the one

4  that started years ago and RNC just came out

5  of?

6          A.    Yes, that's the case actually in

7  New Jersey that involved the RNC in a massive

8  kind of voter suppression campaign.

9          Q.    And you testified in support of the

10  DNC in that case?

11          A.    Well, the case, that case had many,

12  I don't know what the word is, there were many

13  court proceedings related to that case over the

14  years and in this particular case when I

15  testified, the RNC was appealing to the judge

16  to be released from the consent order.

17          Q.    And you provided testimony that was

18  used to try to prevent the RNC from being

19  released from the consent order; is that

20  correct?

21          A.    The DNC was arguing that the RNC

22  should not be allowed to come out of the

23  consent order.

24          Q.    And your testimony was used in

25  support of that position; is that correct?

1          A.    Yes.  Well, it was because the RNC

2     was claiming that they needed to be freer to

3     organize what they called ballot security

4     programs.  The consent order required the RNC

5     to go to the judge and say, this is what we

6     want to do, because we think there's going to

7     be voter fraud.  So I guess the judge was

8     interested to know whether that actually was a

9     threat and it went to the question in the case

10    about, or the challenge and the response about

11    whether the RNC should be free to design

12    whatever quote, unquote, "ballot security

13    program" that they wanted to design.

14          Q.    And some of that went to in that

15    case coordination between the national RNC and

16    state Republican parties, is that --

17          A.    Yeah, I don't remember in that

18    particular, again, that proceeding itself, but

19    at some point in the case, over the years,

20    there was a question about what the

21    relationship was between the RNC and the state

22    parties, because in Ohio, a state party had

23    organized a ballot security program and so I

24    guess it was a legal issue about whether the

25    state parties were in the consent decree and I

1    think, I'm just, you know, trying to remember.

2    So I don't want to -- I guess I am sworn to it,

3    but I know that was an issue and I believe the

4    resolution was that the state parties were not

5    in the consent order, just the national RNC.

6         Q.    Got it.  All right.  On page 2 of

7    your report, there's a series of bullet points.

8    The first says you looked at "more than 60

9    different Georgia newspapers and other news

10   sources, focusing my analysis on articles

11   appearing over the last 15 years."  Do you see

12   that?

13        A.    Yes.

14        Q.    What search terms did you use in

15   pulling up news articles, or that may be too

16   specific, but what were you looking for in

17   those news articles?

18        A.    So, I used a Boolean search

19   technique that involved voter or vote or

20   election and then all of that and fraud.  So if

21   you're familiar with how to construct those

22   kinds of searches, those were the terms that I

23   used.

24        Q.    Okay.  And I truly may have missed

25   it, but were those articles cited in your

1  report?

2          A.   No.  I mean, I don't, they're not

3  cited as a group.  I don't recall whether I

4  cited any specific articles that I came across

5  through that method.

6          Q.   Okay.  In your review, did you look

7  at or consider legislative debates -- let me

8  back up.  Are you aware that in 2019 the

9  Georgia General Assembly enacted House Bill

10  316, which was a significant revision to

11  Georgia's election code?

12          A.   I'm not familiar with that.

13          Q.   In your research or your study, did

14  you look at any legislative debates from the

15  2019 legislative session?

16          A.   No.

17          Q.   Okay.  Do you recall reading any

18  articles about election law changes in Georgia

19  during the 2019 legislative session?

20          A.   Vaguely.

21          Q.   Okay.  So sitting here today -- let

22  me ask this way, your report does not opine on

23  the purposes that the Georgia General Assembly

24  used to pass legislation in 2019; is that fair?

25          A.   That's fair.

1         Q.   Do you have any reason sitting here
2    today to believe that anyone in the Georgia
3    General Assembly from the date of your book,
4    The Myth of Voter Fraud, through today has read
5    or relied on your work?
6         A.   I have no idea.
7         Q.   Okay.  Similarly, do you know if
8    anyone in the Georgia Secretary of State's
9    office has read or relied on your work?
10        A.   Same, I don't have any knowledge of
11   that.
12        Q.   And you're familiar with an entity
13   known as the Georgia State Election Board?
14        A.   Can you say that again?
15        Q.   Are you familiar that Georgia has a
16   governing entity known as the State Election
17   Board?
18        A.   Yes.
19        Q.   And do you have any knowledge as to
20   whether any member of the Georgia State
21   Election Board has read or reviewed your work
22   on voter fraud?
23        A.   I don't know.
24             MS. BRYAN:  Since they
25          haven't reviewed the statutes on their

```
 1            duties, I doubt they've reviewed her
 2            book.
 3  BY MR. BELINFANTE:
 4        Q.   I'll go off the record to respond
 5  to that, but we're not off the record, sorry.
 6  And then lastly, do you have any reason to
 7  believe anyone in the Georgia governor's office
 8  has read or relied on your work on voter fraud?
 9        A.   I really don't know anyone in the
10  Georgia governor's office.
11        Q.   Okay.  In your report, you -- and I
12  guess it's the first bullet point.  Let me go
13  back to page 2.  I'm sorry, the last bullet
14  point, you indicate that you read "news and
15  press releases from the Georgia Attorney
16  General's Office,"' did you speak to anyone in
17  the Georgia Attorney General's Office when
18  preparing this report?
19        A.   No.
20        Q.   Next bullet point is "discusses
21  press releases from U.S. Attorney's Office from
22  the Northern, Middle, and Southern Districts of
23  Georgia."  Did you speak to anyone in the U.S.
24  Attorney's Office in those three districts when
25  preparing your report?
```

1          A.    No.

2          Q.    Do you know how cases of voter

3    fraud -- or let me start over.  Do you know who

4    has jurisdiction in Georgia to prosecute

5    someone for voter fraud, whether -- and by

6    that, I'm looking specifically at state law, so

7    do you know if the Attorney General has the

8    jurisdiction to prosecute voter fraud?

9          A.    I don't believe so.

10          Q.    Who do you believe has jurisdiction

11    to prosecute voter fraud in Georgia?

12          A.    The local district attorneys,

13    prosecutors.

14          Q.    You also cite in the third bullet

15    point on page 3 of your report that you read

16    materials from the Billups case.  What was the

17    Billups case about?

18          A.    And I don't know if I'm always

19    citing court cases correctly when their names

20    change, but this was the federal court case and

21    challenge to the 2005 photo ID law.

22          Q.    Okay.  And that was the one in

23    front of Judge Murphy?

24          A.    Yes.

25          Q.    And why did you look at Billups?

1          A.    Well, the question of voter fraud

2     was raised in that case as well, so I wanted to

3     try to refresh my memory about how it may have

4     come into the -- any of the testimony or the

5     opinion.

6          Q.    All right.  On page 4 of your

7     report, in the second full paragraph, you cite

8     an "1873 Georgia law that permitted local

9     registrars to close their books to new

10    registrants except during the planting and

11    harvesting months, or in other words, during

12    the time of year that African-American farm

13    workers most likely would not be able to make

14    the trip to the county seat to register to

15    vote."  Do you see that?

16         A.    Yes.

17         Q.    Was that just to provide historical

18    context, or do you believe that that law has

19    any relevance to today?

20         A.    Well, it provides historical

21    context, but history, of course, is relevant

22    for today.

23         Q.    Do you believe that the Georgia

24    General Assembly -- or let me ask this way.

25    Does your report opine that the Georgia General

1    Assembly is enacting laws similar to those like

2    the 1873 one that you have identified?

3          A.    Today the Georgia General Assembly?

4          Q.    Yes.

5          A.    No.  I mean the full answer is I

6    don't opine on that in the report.

7          Q.    Okay.  If you could turn to page 5

8    in the last paragraph, the second sentence says

9    "In some places, corrupt politicians used the

10   police to 'colonize' closely contested

11   elections with fraudulently registered voters."

12   Do you see that?

13         A.    Yes.

14         Q.    What did you mean by "colonize

15   closely contested elections"?

16         A.    That was a term used back then

17   related to an allegation, allegations that the

18   police would bring criminals out of jail and

19   get them to cast illegal ballots, because they

20   were the police, so they should be ensuring

21   that the election laws were being upheld, but

22   they would be corrupt, and so they --

23   sometimes, this happened.

24         Q.    And that comes from it looks like

25   Professor McCormick's work?

```
 1          A.    Yes.

 2          Q.    And it is limited to New York

 3   State?

 4          A.    In this book, yes.

 5          Q.    In your section defining voter

 6   fraud, which begins on page 6, my questions are

 7   going to be based on page 8 in the second full

 8   paragraph reads "Innocent administrative errors

 9   on the part of election officials and confusion

10   on the part of voters can cause technically

11   invalid ballots to be cast, however, there is

12   an important distinction to be made between

13   invalid registration and ballots, and

14   fraudulent registration and ballots."  Do you

15   see that?

16          A.    Yes.

17          Q.    Would the opposite also be true,

18   that innocent administrative errors and perhaps

19   voter confusion could cause someone who is

20   eligible to vote and attempts to vote, to vote

21   incorrectly and that vote doesn't count, for

22   example?

23                    MS. BRYAN:  Objection to

24        form.

25                    THE WITNESS:  Yeah, I don't
```

1          think I understand your question.

2     BY MR. BELINFANTE:

3          Q.   Okay.  Your sentence talks about a

4     vote could be counted that shouldn't be

5     counted, right?

6          A.   Well, it says technically invalid

7     ballots to be cast.  So, I'm still, I'm

8     confused about what you're asking me.

9          Q.   Well, a technically invalid ballot

10    is still an invalid ballot, right?

11         A.   Yes, I mean, what I meant by that

12    was, it may be a ballot cast by somebody who

13    wasn't actually under the law ineligible to

14    vote, but due to confusion on that person's

15    part or the election official's part, the

16    ballot was cast and then once it was cast, it

17    was counted.

18         Q.   Okay.

19         A.   And I have an example of that in my

20    book with somebody that I interviewed in

21    Milwaukee who represented that very example.

22    It was a person who was not eligible to vote

23    because he was still under state supervision

24    from a felony conviction, and he went to

25    register and the election or the poll worker,

1   because they have Election Day registration in

2   Wisconsin, the poll worker used his prison ID

3   number to validate that he was eligible to

4   vote.  He thought he was.  She thought he was.

5   He cast a ballot, but under Wisconsin law, he

6   was not eligible to vote, so that's an invalid

7   ballot, because there wasn't an effort to

8   deceive the election -- the poll worker and

9   that was evidenced by the fact that he actually

10  turned over his prison ID, which indicated that

11  he was ineligible to vote.

12      Q.    Right.  And so I guess my question

13  is couldn't the same be true in reverse, where

14  you have someone who is eligible to vote and by

15  confusion on behalf of that voter, they show up

16  at the wrong precinct, for example, and then

17  they can't vote, but that's an innocent

18  mistake, correct?

19      A.    Well, you have to investigate, you

20  know, what happened.  For example, somebody who

21  was deliberately misled about where they were

22  supposed to vote showing up at the wrong place,

23  there is a kind of -- there could be a kind of

24  corruption behind that process.  For example,

25  sending out flyers and telling people

1  Republicans vote on Tuesday, Democrats vote on

2  Wednesday.

3      Q.   You have been scanning my Facebook

4  page, haven't you?

5      A.   But I get your point that there can

6  be ineligible people who vote and there can be

7  eligible people who are prevented from voting

8  and there can be an intent to stop them from

9  voting or not.  It could be confusion.  It

10  could be administrative error.

11      Q.   And so it really comes down to

12  showing what that person's intent was on the --

13  in a case, in both cases really, right?

14      A.   Generally, yes.  Mostly, you know,

15  I'm focusing on whether voters are trying to

16  deceive election officials about their

17  eligibility in my work.

18      Q.   And you don't opine on whether

19  Georgia election officials have intentionally

20  denied or deprived someone the opportunity to

21  vote in Georgia elections; is that right?

22      A.   That's correct.

23      Q.   And have you studied whether, and

24  it's a flip side of kind of your analysis here,

25  but have you conducted studies on whether when

Dr. Lorraine Carol Minnite - December 13, 2019                88

1   persons are denied the opportunity to vote and

2   they shouldn't be, you know, they're an

3   eligible voter, they try to vote, but something

4   happens, ballot lost in the mail, sent to the

5   wrong address, things like that, have you

6   conducted any studies on the prevalence of

7   that?

8        A.   Well, my coauthored book, which as

9   I mentioned, is called "Keeping Down the Black

10  Vote" is about voter suppression, so I have

11  studied the phenomenon of deliberate efforts to

12  prevent eligible people from voting, but I

13  haven't attempted to quantify that or measure

14  that in the same way that I try to look at the

15  incidence of voter fraud.

16       Q.   In the section of your report that

17  begins on page 8, "Analysis of the Incidence of

18  Voter Fraud in Contemporary U.S. Elections."

19  This section does not focus on Georgia; isn't

20  that right?

21       A.   That's right.

22       Q.   Now, your methodology in looking at

23  voter fraud counts only actual convictions; is

24  that right?

25       A.   No, that's a -- it seems to be a

1  persistent misunderstanding, and I don't know

2  if it's just coming from people who are not

3  reading the book, I think, but that's not

4  correct.  I don't only rely on convictions.

5      Q.    All right.  So what do you rely on

6  beyond convictions when assessing the volume of

7  voter fraud cases in a given state?

8      A.    I look at a broader context and I

9  use a more mixed-methods approach in looking at

10  as many possible data points that I can find

11  and what the mixed-method concept is that where

12  you don't have something like a really good,

13  officially collected, accurate database to work

14  with and you're trying to answer a question and

15  you don't have that data that's already

16  measured the phenomenon you're trying to look

17  for, a mixed-methods approach might be useful

18  and valid, because you've got all these

19  partially collected datasets, if you will, or

20  maybe sometimes you have to collect your own.

21  And to increase the validity and reliability of

22  the data that you're analyzing, you have

23  disparate kind of data, you're looking for

24  patterns of convergence or contradiction, if

25  you will, in the data.  So you're not relying

1   on anyone's single database, for example.

2   That's why I say that, you know, it's

3   inaccurate to say that I rely on convictions

4   for my conclusions, when I draw my conclusions.

5              So when I am looking at a state,

6   I will try to draw from as many sources as I

7   can.  And then I look for whether there are

8   disparities.  One data source is showing no

9   cases or very few incidents, but there's like a

10  lot of news reporting that makes you think that

11  there's a lot of voter fraud going on.  You

12  have to resolve that conflict between the data

13  sources to be able to draw valid inferences

14  from the data.

15       Q.   And so can you give me an example

16  of a type of voter fraud that you would count

17  as an incident of voter fraud, but is short of

18  a conviction?

19       A.   Well, it goes to an understanding

20  of the process of how the data is essentially

21  established or created, what the record, the

22  empirical record might be, because -- and,

23  parenthetically, I want to say, I'm an

24  empiricist.  I'm an empirical social scientist.

25  So I'm looking at evidence.  Evidence may be

1   dealt with differently in the courts, but in

2   social science, we're looking for evidence in

3   all different kinds of ways, as I mentioned.

4   And so I might start with, is there a record of

5   allegations?  You know, what has come into the

6   source, the agency, the legal body, the

7   District Attorney's office or whatever, what

8   has come in, in terms of concerns about voter

9   fraud, because that might start a chain of

10  investigation that will then leave a record of

11  whether that incident was a case of voter

12  fraud.  So I have to step back from kind of the

13  final outcome and say, you know, how do you get

14  there.  Let's start with the allegations, that

15  might be one place, you know, to start.  And

16  then try to trace, trace it through to see what

17  happened.

18       Q.   Okay.  And so to do that here, you

19  looked at SEB, sorry, State Election Board

20  minutes and meeting notes that you got online;

21  is that right?

22       A.   Yes.

23       Q.   And so if an investigator with the

24  State Election Board or the Secretary of

25  State's Office made a decision not to bring an

1    allegation of voter fraud to the State Election

2    Board, that would not be discovered by that

3    method, correct?

4            A.    Well, I'm not sure, there could be

5    a reason given within the process of producing

6    an investigation that would be relevant that

7    would say, well, you know, there's no evidence

8    of this or we haven't been able to find

9    evidence of this, or the allegation is patently

10   false.  And that's why we're not bringing it

11   forth or there could be, you know, other

12   reasons.

13           Q.    Sure.

14           A.    But it's a useful place to look.

15           Q.    No doubt.  And I'm just trying to

16   determine of the cases that are referred to the

17   SEB, but not brought -- or referred to an

18   investigator, but not brought to the State

19   Election Board, reviewing the minutes of the

20   State Election Board would not uncover that;

21   isn't that correct?

22           A.    Probably not in the formal

23   discussion.  My understanding from reading the

24   Chris Harvey deposition that I read was that

25   there's an internal process prior to you

```
 1   starting the investigation in which there's an
 2   assessment of an allegation before it gets
 3   turned into an investigation.  So there's some
 4   evidence of what's going on before it shows up
 5   in the formal minutes of the SEB and an
 6   investigation brought by the investigations
 7   division.
 8        Q.   And what in your research would
 9   have revealed that kind of, in the situation
10   you identified, investigators determine there's
11   not credible evidence or they just won't be
12   able to make a case?
13        A.   Well, I also looked at documents
14   that were made available, I guess, to the
15   Plaintiffs fairly recently regarding the Stop
16   Voter Fraud website that the Secretary of State
17   established several years ago to collect public
18   concerns.  People fill out a form and that
19   produces an email kind of a document with
20   the -- capturing the description of the
21   person's concern.  That can be, I mean that was
22   only available for the recent election.  I
23   mean, that's all I looked at was for the 2018
24   election.  But that was, that evidence, if you
25   will, can be triangulated with the minutes from
```

```
1   the state board and can look for whether any of
2   that turned into an investigation.  So there's
3   a bit of a black box in between those two
4   things.  But that's an example of the kind of,
5   I guess, kind of detective work you're trying
6   to do in doing this kind of research.
7        Q.   Sure.  But do you acknowledge that
8   voter complaints about voter fraud can arrive
9   at the Secretary of State's office without
10  going through the email?
11       A.   As I understand from Mr. Harvey's
12  deposition, there could be multiple ways that
13  they came in, but I think he said somewhere
14  that -- I think he said something like
15  90 percent of the kinds of complaints they get
16  come through that website.
17       Q.   Mr. Harvey's deposition is not
18  cited in your report, is it?
19       A.   No.
20       Q.   Yet did you rely on it to form your
21  opinions?
22       A.   No, I didn't rely on it, but it
23  didn't contradict my opinion.  That would be,
24  in a short time frame, that was a concern.
25       Q.   Okay.  And understanding that some
```

```
 1    of the documents were recently produced, are
 2    there other documents that you have received
 3    after the submission of your report that you
 4    used to evaluate the case, other than the ones
 5    you just identified, the 2018 emails regarding
 6    the election?
 7         A.   No.
 8         Q.   Okay.  Similarly, we talked about a
 9    State Election Board.  If the Attorney
10    General -- would you agree with me that if the
11    Attorney General is not bringing a case for
12    voter fraud, they're not going to issue a press
13    release on it, right?  Because I know you said
14    you looked at press releases from the Attorney
15    General's Office.
16         A.   It depends, if it was a case that
17    was in the news and people wanted to know what
18    the outcome was and there was a sense that it
19    was a big kind of criminal conspiracy going on
20    and the Attorney General found nothing, I would
21    hope the Attorney General would be able to make
22    a statement if that's the right agency.  I know
23    they're not necessarily going to be prosecuting
24    that case, but it would probably be a benefit
25    to the public to know that in fact after this
```

```
 1   was all investigated, we found nothing and
 2   that, you know, I think that would help improve
 3   trust in government.
 4           Q.   But you don't know if that's how
 5   the Attorney General operates or not, right?
 6           A.   I don't know about the current
 7   Attorney General, no.
 8           Q.   If I'm correct, chapters 3 and 4 in
 9   your book rely on the BAVII data; is that
10   correct?
11           A.   I think so.  I don't have the book
12   in front of me.  I don't recall.
13           Q.   I've got it.  But is it fair to
14   say --
15           A.   I don't think chapters are only
16   about that.
17           Q.   Is it fair to say that your book
18   relies on or do people call it BAVII or BAVII
19   or B-A-V-I-I?
20           A.   They usually -- I don't know.  I
21   don't have too many discussions about it.  But
22   Ballot Access and Voting Integrity Initiative.
23           Q.   And what was that?
24           A.   That was a program that was
25   organized inside the U.S. Department of Justice
```

```
 1   after the 2000 election, and basically it was a
 2   training program that brought attorneys from
 3   the civil rights division together with
 4   attorneys from the criminal division, which as
 5   I understand it back then, I don't know if it's
 6   currently the case, there is very little
 7   interaction between attorneys on those two
 8   divisions of the Justice Department and the
 9   feeling was that the attorneys in the civil
10   rights division are the ones who prosecute
11   civil cases under the Voting Rights Act,
12   whereas in the criminal division, the public
13   integrity section, which is the part of the
14   criminal division that focuses on public
15   corruption, and they had an election crimes
16   branch that those attorneys would have skills
17   and knowledge about criminal prosecution of
18   election fraud that would be useful to bring
19   the two sides, if you will, together around
20   election integrity.  And when it was announced
21   it was not just about election integrity, it
22   was also about whether there was voter
23   intimidation, which would be more in the civil
24   rights division, so it was a kind of a training
25   program that brought all U.S. Attorneys or
```

1  their designated election officers to

2  Washington to receive this kind of background,

3  training, what to look for, what federal law

4  is, what state law is, when federal officials

5  can prosecute if it's a local election, for

6  example.  Things like that.  And I had used the

7  Freedom of Information Act to acquire those

8  training materials, so I have a sense of what

9  that program was.

10      Q.   Okay.  So they didn't release data,

11  you know, showing incidence of voter crime, or

12  is that what was in the training materials?

13      A.   That's correct, they never produced

14  kind of a comprehensive report or an annual

15  report.

16      Q.   Okay.  All right.

17      A.   I think that's because they didn't

18  find any, as I detail in my book in, you know,

19  in great detail.

20      Q.   Well, they looked at, as I

21  understand it, the sources they looked at were

22  federal crimes, right?

23      A.   Yes, but there is federal

24  jurisdiction in local elections in some cases.

25      Q.   In some cases?

1          A.    You know, in some ways.

2          Q.    And then they looked at state

3    prosecutions in California and Minnesota and

4    New Hampshire and Oregon; is that right?

5          A.    No.

6          Q.    That's something different than --

7          A.    Are you referring to what I report

8    on in my book?

9          Q.    Maybe that's it, I'll come back to

10   that.  Because I think I've got some questions

11   on stuff like that later.  You don't doubt

12   though, do you, that the risk of voter fraud is

13   real, meaning it can happen, even as you define

14   it?

15         A.    I've never said that it never

16   happens.

17         Q.    And is it your opinion that Georgia

18   has an interest in combating the risk of voter

19   fraud?

20         A.    Well, I think all states and

21   probably almost all election officials at the

22   state and local level want to ensure the

23   integrity of the ballot.  So in that regard,

24   Georgia wouldn't be any different from any

25   other state.

1                    MR. BELINFANTE:  If we can,

2          can we take about a ten-minute break?

3                    MS. BRYAN:  Yes.

4                    MR. BELINFANTE:  Great.

5                    - - - - -

6          (A recess was taken at this time.)

7                    - - - - -

8     BY MR. BELINFANTE:

9          Q.   All right.  Let me go back, I think

10    I found what I was looking for before.  If you

11    could turn in your report to page 11.  There's

12    a sentence there that starts the first full

13    paragraph "In the absence of reliable or

14    official data, I gathered by my own from a wide

15    range of sources."  Do you see that?

16         A.   Yes.

17         Q.   Footnote 33, I think this is what I

18    was looking at before, you describe a lot of

19    the data that you had gone through and looked

20    at and then it says, it includes about, I don't

21    know, a third, two-thirds of the way down,

22    "State legislatures and state government

23    agencies, i.e. data from Elections Fraud

24    Investigations Unit of the California Secretary

25    of State's Office, a public complaints file

1  from the Minnesota Secretary of State's Office

2  established to comply with the federal Help

3  America Vote Act of 2002; a report from a broad

4  investigation of allegations of voter fraud by

5  the New Hampshire Attorney General's Office."

6  Do you see that?

7          A.   Yes.

8          Q.   That's describing some of the state

9  sources that you reviewed or you consulted when

10  writing your book, The Myth of Voter Fraud,

11  right?

12          A.   Yes.

13          Q.   And that's not exclusive to your

14  report here; is that right?  You considered

15  other Georgia factors that we've identified?

16          A.   Later.

17          Q.   Later?

18          A.   Right.

19          Q.   In this one?  And you do discuss

20  communications you had with Dennis Dunn at the

21  Georgia Attorney General's Office back in, I

22  believe, it was 2006; is that right?

23          A.   Yes.

24          Q.   And that was for ultimately --

25  well, I guess it was perhaps for the Demos

1    project first and then used in your book; is

2    that right?

3         A.   It was for my book.

4         Q.   Other than your communications that

5    are, other than those things that are discussed

6    in this report, your communications with

7    Mr. Dunn and your communications with the

8    general counsel in the Secretary of State's

9    office, whose name is escaping me right now,

10   under Secretary Cox, were there any specific

11   Georgia individuals that you spoke to when

12   writing your book that you can recall?

13        A.   I can't recall.  If there were, it

14   would only have been one or two -- you know, a

15   small number, but I don't remember.

16        Q.   Okay.  Can you turn to page 9 of

17   your report.  Here you cite to a 2014 GAO

18   report about halfway through the page.  Do you

19   see that?

20        A.   Yes.

21        Q.   Okay.  Do you find that report to

22   be credible?

23        A.   Yes.

24        Q.   All right.  Let me hand you some

25   excerpts from that report.  What I did here,

1   and we'll mark it as Exhibit 16.  What I did

2   here was just photocopy the cover and then the

3   excerpts on pages 62 to 64.

4                    - - - - -

5              (GAO Report dated September 2014

6           marked Minnite Exhibit 16 for

7           identification.)

8                    - - - - -

9   BY MR. BELINFANTE:

10       Q.   On page 62, the last sentence says

11  "even when crime data are centrally collected,

12  the true incidence of crime can be difficult to

13  determine due to potential for crimes not to be

14  reported."  Do you see that?

15       A.   Yes.

16       Q.   Do you agree with that statement?

17       A.   In general, I think all crime

18  statistics are probably not capturing

19  100 percent exactly the total number of crimes

20  that they're measuring.

21       Q.   In fact, many crime statistics

22  aren't capturing the actual incidence of

23  crimes, because many crimes go unreported; is

24  that fair?

25       A.   I know crimes go unreported, yeah.

1          Q.    Do you have any way to evaluate

2    percentages of crimes that are committed that

3    go unreported?  And I'll limit it to voter

4    fraud.

5          A.    That's a good question.  And I

6    thought about it quite a lot, and it goes back

7    to the methodology of triangulating different

8    types of data to be able to draw inferences

9    from the data when you don't have the exact

10    measure.  So It's very hard to have a measure

11    of how much you're missing, obviously, because

12    you're missing it.  But that doesn't end the

13    inquiry, because then the next question is

14    well, how likely is it that I'm missing, you

15    know -- that I'm only capturing, say,

16    50 percent of the real number or even

17    20 percent of the real number.  And there are

18    ways in which you can kind of get at whether

19    you're missing a huge amount that's not being

20    reported or whether you're just missing some

21    that's, obviously, you know, that would be, I

22    would imagine every crime database, as I said,

23    isn't necessarily capturing every single

24    incident of that crime.  But then the concern

25    is how much are you missing.  And with respect

1    to voter fraud, to try to answer your question,

2    I'm very confident that the statistics in this

3    case referring to crimes and, as I said, I

4    don't only rely on that by any means, but if

5    we're just evaluating that measure, that that

6    measure is a good one to give us a sense of the

7    degree to which individual voters may be

8    corrupting the electoral process.  And I

9    have -- well, let me let you ask the question.

10   There's always the tendency to offer more as a

11   teacher.

12        Q.   Occupational hazard.  Well, and to

13   that point, and I'm beginning to understand the

14   method, the mixed method is what you called it,

15   to that point, that's why you looked at things

16   that are identified for Georgia at least on

17   pages 2 and 3 of your report as bullet points,

18   right?

19        A.   Do you want to point me to

20   something?

21        Q.   Because you can't rely just on

22   crime databases, that's why you looked at, for

23   example, news articles, first bullet point?

24        A.   That's correct.

25        Q.   And State Election Board materials

1    and press releases, all of those things in

2    bullet points, that's what you looked at to

3    compensate that there may be an undercount on

4    crime data, correct?

5          A.    That's correct.

6          Q.    Back to the GAO report on footnote

7    91, which appears on page 63, it says in the

8    first sentence "Like other crimes, instances of

9    in-person voter fraud may occur that are never

10   identified by or reported to officials."  Do

11   you agree with that statement?

12         A.    Yes.

13         Q.    It goes on to say "This is due, in

14   part, to challenges associated with identifying

15   this type of fraud, as both successful fraud

16   and deterred fraud may go undetected."  Do you

17   agree with that statement?

18         A.    Yes.

19         Q.    The GAO report actually considers

20   your book in its study, doesn't it?

21         A.    Yes.

22         Q.    And that's on page 64, footnote 96?

23         A.    There's a reference to my book

24   there, yes.

25         Q.    Okay.  And the sentence there

1    though says that "The studies we reviewed

2    identified few instances of in-person voter

3    fraud, and while they provide information on

4    efforts to estimate in-person voter fraud,

5    limitations in the populations studied and

6    sources used make it difficult to use these

7    studies to determine a complete estimate of

8    incidence of in-person voter fraud."  Do you

9    see that?

10        A.   Was that the paragraph above?  I

11   think I was looking at something else when you

12   were reading.

13        Q.   I'm sorry, it's actually the

14   sentence right before the citation.

15                 MS. BRYAN:  It's the

16           sentence that leads to the footnote.

17                 THE WITNESS:  Okay.

18   BY MR. BELINFANTE:

19        Q.   And then the footnote comes in, "In

20   particular, we reviewed five research studies,

21   five research studies by state agencies, and

22   information provided by DOJ."

23        A.   Yes.

24        Q.   So my question is do you agree with

25   the first sentence in the first full paragraph

1  that begins with "the studies" and ends with

2  "voter fraud"?

3          A.   You're asking me whether I agree

4  with that full sentence there which is about

5  seven lines long?

6          Q.   Yes, yes.

7          A.   Yes.

8                  MS. BRYAN:  I'm going to

9            object to the use of this document on

10           the grounds of the rule of

11           completeness.

12                  MR. BELINFANTE:  I'm happy

13           to get you a complete copy.  In fact,

14           it's online and I'll give you that

15           information.

16                  MS. BRYAN:  I'm sure it is.

17           I'm just objecting, because the table

18           is not attached.

19                  MR. BELINFANTE:  Fair.

20                  THE WITNESS:  They

21           interviewed me also by telephone, which

22           I don't remember if they reported that

23           or not.

24  BY MR. BELINFANTE:

25          Q.   Let's go back to your report,

1    page 11.  The paragraph, I'm sorry, the

2    footnote 32 about midway down, there's a

3    sentence that reads "Under HAVA, states are

4    also required to select either driver's license

5    numbers or the last four digits of voter

6    registration applicants' Social Security

7    numbers for purposes of verifying application

8    and information.  Federal law allows states to

9    determine what constitutes a match."  Do you

10   see that?

11         A.   Yes.

12         Q.   And you're not for purposes of your

13   report here opining on Georgia's determination

14   of what constitutes a match, correct?

15         A.   That's correct.

16         Q.   All right.  Do you believe that --

17   never mind, strike that.  All right, if you

18   could turn to footnote 48 in your report, which

19   is on page 15.  And I will acknowledge I'm

20   about to enter into a world of math, which is

21   highly dangerous.  There you cite a working

22   paper from Sharad Goel, is that how you

23   pronounce it?

24         A.   I don't know, it sounds right.  I

25   don't know him or her.

```
 1          Q.   The second or third sentence there
 2     says "They estimate that at most one in 4,000
 3     votes cast in the 2012 were double votes, with
 4     measurement error in turnout records possibly
 5     explaining a significant portion, if not all,
 6     of this.  In other words, 1 in 4,000 votes
 7     could have been double votes, or the 2012
 8     election could have an administrative error
 9     rate producing the appearance of duplicate
10     votes of roughly .025 percent."  Do you see
11     that?
12          A.   Yes.
13          Q.   As I read that, what I understand
14     that to mean is either -- well, before I do
15     that, what would be an administrative error?
16     What is the error that you're describing there?
17          A.   The error could be in the records
18     themselves in that you have administrative
19     records related to the voter registration
20     databases, and you can have matches that are
21     not accurate and producing a kind of false
22     positive, if you will, what looks like a
23     duplicate vote, but it's actually two different
24     people.
25          Q.   But wouldn't they, I mean, to be a
```

```
 1   false positive -- I guess you could end up in a
 2   situation where would a false positive be if a,
 3   you know, my son, this is not his name, but if
 4   his name was Josh Belinfante, he's 18 and we
 5   reside in the same house, we both go vote.  It
 6   picks up as two Josh Belinfantes, even though
 7   he's junior, I'm not.  Is that an example of
 8   that?
 9        A.    Because he could have gone into the
10   polling place and voted on your line, it
11   isn't -- you know, poll books are in
12   alphabetical order, so that happens frequently,
13   you have a father/son and one of them votes on
14   the wrong line and then maybe the other one
15   comes in, maybe they figure it out, maybe they
16   don't, but it might look like a duplicate vote.
17        Q.    I see.  Okay.  One in -- but if the
18   number they come up with though by
19   administrative error or by actual duplicate
20   votes is 1 in 4,000, is their analysis of the
21   votes based on the 2012 election; is that
22   right?  Am I reading that correctly?
23        A.    Yes.
24        Q.    So do you recall the number of
25   votes in Florida in the 2000 presidential
```

 1  election?

 2          A.    The total number of votes cast?

 3          Q.    Yes.

 4          A.    No.

 5          Q.    I'm going to represent to you that

 6  it was 5,963,110.

 7                    MS. BRYAN:  That seems low.

 8          I'll believe you.

 9                    MR. BELINFANTE:  Yeah, and

10          President Bush eeked out by about I

11          think it was 500 votes over Vice

12          President Gore.

13                    THE WITNESS:  Well, that was

14          at the point that the Supreme Court

15          stopped the recount, and so the

16          official, I forget what the word is,

17          but when the Secretary of State makes

18          the official move to certify the

19          election, George Bush had 537 more

20          votes than Al Gore.

21  BY MR. BELINFANTE:

22          Q.    And if I applied the math, and if

23  you want to calculator or a phone or something,

24  feel free, but if I applied the math, I may

25  have done it incorrectly, but I divided 1 by

1  4,000, multiplied that by that 5.9 million

2  number and got 14,907 votes.  Does that sound

3  reasonable in terms of math, or just take my

4  word for it kind of thing?

5        A.   I take your word for it.

6        Q.   But using their number, 1 in 4,000,

7  applying it to Florida in 2000, that could have

8  swayed the election, could it not?

9        A.   Well, this is where faulty

10 reasoning and a lack of understanding about

11 statistics comes in.

12       Q.   Let me hear.

13       A.   So and I talk about this in the

14 report.  The list matching kind of analysis

15 that is done here in this paper and is done in

16 a few other papers cannot tell you whether

17 there's any fraud.

18       Q.   Am I off?

19              MS. BRYAN:  I think you are.

20              MR. BELINFANTE:  Well, go

21         ahead and we'll work the math.

22              MS. BRYAN:  What's the large

23         number, how many votes do you think are

24         cast?

25              MR. BELINFANTE:  5,963,110

1          in the presidential.

2                    MS. BRYAN:  And your math is

3          to divide 1 by 4,000 and multiply the

4          resulting percentage times 59?

5                    MR. BELINFANTE:  5.9, yeah.

6          While we're doing that, go ahead and

7          continue your answer.

8                    THE WITNESS:  I want to make

9          the point that that kind of calculation

10         that you just made is a fool's errand,

11         because it's not based on the correct

12         understanding of this paper and the

13         analysis they're doing or the election

14         administration process.  So it doesn't

15         make any sense to do what you just did.

16    BY MR. BELINFANTE:

17         Q.   And why is it not based on what

18    they've done in their paper, and "they" meaning

19     Sharad Goel and colleagues?

20         A.   Because, as they say, with

21    measurement error and turnout records possibly

22    explaining a significant portion, if not all of

23    this, that means they're dealing with an error

24    rate which you have to understand in terms of

25    statistics.

1          Q.    Right.

2          A.    And the error rate gives you a

3    sense of what's the probability that the answer

4    we're getting is within a range, right?  So

5    it's possible what they're saying here is that

6    there could be enough mistakes in the data,

7    this specific calculation is inaccurate.  That

8    the real number is in a range and they will

9    give you what's called a margin of error, which

10   is usually like a plus or minus number.

11         Q.    Right, sure.

12         A.    And then you have kind of a

13   probability of what's the likelihood that the

14   real number, if we could know it, was in that

15   plus or minus range around the finding.  So

16   they're basically saying, hey, it could be 1 in

17   4,000 or it could be zero.

18         Q.    That's their margin of error, 1 in

19   4,000 to zero?

20         A.    Well, they're saying, as they say,

21   at most, with measurement error and turnout

22   records possibly explaining a significant

23   portion, if not all of this.  So my point being

24   that first, the first point is that what comes

25   out of a list-matching exercise is not fraud.

1   There's no -- it can't tell you, if you will,
2   that fraud has been committed.  What you have
3   to ask yourself is how do we explain that, how
4   do we explain that 1 in 4,000 number?  One
5   hypothesis could be it's fraud.  You know, we
6   could say, well, those election records, we
7   know, we feel very confident they're
8   100 percent accurate.  And therefore, when you
9   do your statistical analysis of the
10  administrative data and you find something like
11  double votes, that means every time they found
12  a match between two names, every single time
13  they found it, it actually was one person who
14  voted twice.  So that's way on one extreme.
15  That's the 1 in 4,000.  But you have to rule
16  out administrative error and one thing we know,
17  if we know anything since the 2000 election,
18  there's a lot of administrative error in voting
19  records.  Now, voting records are live, they're
20  dynamic.  They're changing all the time,
21  because people are registering, people are
22  dying, election administrative officials are
23  cleaning them up or not cleaning them up.  So
24  they're only ever a snapshot in time that you
25  get that database.

1              But the first point here is that
2    it's a misreading, a misunderstanding to
3    extrapolate from a finding in this paper in the
4    way that you just did, because you're not
5    ruling out the fact that administrative records
6    explains that number that they came up, and you
7    have to do that before you can presume that
8    it's anywhere near accurate.  So it's also kind
9    of a misunderstanding about the error rate, if
10   you want to call it, in voter administrative
11   data.  And in fact, nobody has studied that,
12   which is why I'm working on that right now.  I
13   am working on a paper that is trying to
14   estimate kind of an administrative error rate
15   that we might be able to look at in voting
16   records.
17              MS. BRYAN:  And, Josh, for
18         the record, I think you're suggesting
19         the number is close to 15,000?  I think
20         it's close to 1500.
21              MR. BELINFANTE:  Is that it?
22         Okay.  Okay.  Well, the point is still
23         there and I understand your criticism
24         of the analysis, but there were 537
25         that separated the president and vice

```
 1              -- well, the governor at the time, and
 2          the president.  And we'll go through
 3          the math, if you want.  I'm sure you
 4          may does some questions, but the point
 5          is well taken.
 6                    MS. BRYAN:  I'm not the math
 7          expert.
 8   BY MR. BELINFANTE:
 9          Q.   This is what I get for doing this
10   stuff late at night.  And I understand your
11   criticism of that method, Professor, but I
12   guess you would say it is conceivable, but
13   unlikely, that that ratio of 1 to 4,000
14   represents true all double voting, because you
15   have to account for administrative errors
16   between Josh Belinfante Jr. and Sr.; is that a
17   fair summation?
18          A.   Yes, but I wouldn't say -- I mean I
19   don't know, again, we're perhaps parsing words
20   here.  I am much more of the opinion that it's
21   probably not likely, not that it's conceivable
22   that there's 1 in 4,000 votes recorded are
23   double votes.  I think that's probably way off
24   balance.
25          Q.   All right.  Let's talk about your
```

Dr. Lorraine Carol Minnite - December 13, 2019        119

1    evidence and analysis of voter fraud in

2    Georgia, which begins on page 16 of your

3    report.  You are not an attorney, correct?

4            A.    That's correct.

5            Q.    And you're not currently taking any

6    classes in law or anything of that nature,

7    correct?

8            A.    No.

9            Q.    All right.  So you're not opining

10   on the role of the Secretary of State in

11   Georgia elections versus say county officials?

12           A.    No.

13           Q.    And you're not opining on voting

14   technology in Georgia?

15           A.    Say that again.

16           Q.    You're not opining on voter

17   technology in Georgia, election machines and

18   whatnot?

19           A.    No.

20           Q.    And we've already talked about

21   that.  You're not opining on Georgia's methods

22   to maintain accurate voter rolls pursuant to

23   the NVRA or anything like that; is that

24   correct?

25           A.    That's correct.

1        Q.    You're not opining on who is
2   responsible for closing or consolidating
3   polling locations?
4        A.    No.
5        Q.    And you're not opining on the
6   efficacy of Georgia's election administration
7   generally; is that correct?
8        A.    Correct.
9        Q.    And you're not opining on whether
10  Georgia law has disenfranchised voters; is that
11  correct?
12       A.    Correct.
13       Q.    And you're not opining also on
14  whether Georgia policymakers actually seek to
15  disenfranchise voters; is that correct?
16       A.    That's correct.
17       Q.    Pages 17 and 18, you talk about
18  activity that you did in 2006 and some
19  communications you've had with Dennis Dunn in
20  the state law department with the Attorney
21  General's Office and seeking open records
22  requests from him.  Did you seek any Open
23  Records Act requests from any Georgia
24  government to complete the report you've
25  submitted in this case --

1        A.    No.

2        Q.    -- since 2006?

3        A.    No.  Well, I, back then, I also

4   sent surveys to every district attorney in the

5   United States.  That included Georgia.

6        Q.    How many Georgia district attorneys

7   recorded, do you remember?

8        A.    It was a small number, which is why

9   I didn't use the data, because I didn't have

10  the ability to do the kind of second, third

11  requests that would be required by good

12  practice in that kind of research.

13        Q.    Okay.  And I believe you said this

14  earlier, but you did not send any requests for

15  district attorneys since being engaged by the

16  Plaintiffs in this case; is that correct?

17        A.    That's correct.

18        Q.    Take a look, if you will, at

19  footnote 61 on page 19.  You have that footnote

20  talks about the debate around Georgia's voter

21  ID law, do you agree?

22        A.    Yes, Act 53, the 2005 Photo ID Act.

23        Q.    Footnote 61, I'm sorry, page 19.

24        A.    Yes.

25        Q.    The fact that it was partisan,

1    that's not relevant to your analysis, is it?

2          A.    My analysis of what?

3          Q.    Of Georgia's, of whether there's

4    incidence of voter fraud in Georgia.

5          A.    The way it comes in is the way I

6    described before, which is, there's a lot of

7    allegations are generated, which I have come to

8    the conclusion that these allegations are

9    politically motivated.  But we still take them

10   seriously and try to see if in fact there's

11   some kind of problem that is being alleged with

12   voter fraud.  So in that sense, it's part of my

13   analysis, but it doesn't bear on the question

14   of what is the -- I mean, it doesn't, how do I

15   say this, it's a little bit separate from

16   trying to actually empirically document whether

17   there is a lot of voter fraud.

18         Q.    Okay.  On page 20, you talk about

19   Heritage Foundation, their website on voter

20   fraud.  And as I've seen it, you can go online,

21   you pull up a specific state and it will show

22   you incidence of voter fraud in that state; is

23   that fair?

24         A.    That's correct.

25         Q.    Do you, I know you've got some

1  criticisms of the Heritage Foundation website

2  outlined in your report, do you question

3  whether the information in the Heritage

4  Foundation report is accurate?

5          A.   Not the individual cases that they

6  identify, I think that is accurate.

7          Q.   Okay.  And similarly, with News 21

8  and that database, do you question whether the

9  information provided there is accurate?

10          A.   No.

11          Q.   Generally speaking, and we talked a

12  little bit about this early on, is it fair to

13  say that you believe one of the reasons that

14  voter fraud is rare is because it's an

15  irrational crime to commit?

16          A.   Yes.

17          Q.   Why is it -- but you agree that

18  voter registration, or would you agree that

19  voter registration fraud, things like North

20  Carolina 9, is more prevalent than how you

21  define voter fraud?

22          A.   Are you referring specifically to

23  an absentee ballot form?

24          Q.   It could be that.  It could be

25  voter registration, the discussion we had about

1  ACORN, the discussion we had involving North

2  Carolina 9 where folks have filled out, you

3  know, improper absentee or improper voter

4  registration forms.  So let's just focus on

5  that first and then we may talk about absentee.

6  But would you agree that cases of voter

7  registration, improper voter registration are

8  more prevalent than cases of voter fraud, as

9  you have defined it?

10      A.   I mean, I think it's an empirical

11  question.  The logic behind the rationality of

12  committing voter fraud can apply that same

13  logic to the question of voter registration

14  fraud.  It goes to what's the motivation and

15  what might be the calculation of cost and

16  benefits that motivate that behavior.

17           And so in the case of North

18  Carolina 9, you had a political campaign that

19  wanted to win.  Voter -- or in the case of

20  registration, workers falsifying forms, maybe

21  because they want to get paid without doing any

22  work.  So there's a kind of motivation for

23  that.  In other words, they don't want to have

24  to do the heavy work, the hard work of knocking

25  on doors and, you know, walking around for long

```
 1    hours.  They would rather sit in Starbucks and
 2    fill out forms and still get paid.  So that
 3    same logic still applies to those other kinds
 4    of fraud, which suggests that you might expect
 5    that kind of fraud to be more prevalent, but I
 6    go back to, let's try to measure exactly how
 7    much of that there is.
 8         Q.   Okay.  So I think I understand your
 9    answer then.  And you don't measure or quantify
10    voter registration, improper voter registration
11    in Georgia in your report, do you?
12         A.   No.
13         Q.   Do you believe that voters can be
14    responsive to political advertising campaign
15    ads?  Does it influence voters?
16         A.   I don't understand.
17                   MS. BRYAN:  I'm sorry, I'll
18          object to form.
19    BY MR. BELINFANTE:
20         Q.   Okay.  Do you believe that campaign
21    ads can influence voters to act in a particular
22    manner?
23         A.   They could.
24         Q.   Are you aware of an ad that ran in
25    Georgia in 2006 involving the Fulton County
```

1    chairman's race?

2          A.    No.

3          Q.    I'm going to describe part of the

4    ad to you and then just ask you some questions.

5    In that ad, you had Congressman John Lewis,

6    Ambassador Andy Young, and then mayor of

7    Atlanta, Shirley Franklin.  And there was --

8    she was going to be the chair of Fulton County.

9    The Republican was Lee Morris.  The Democrat --

10         A.    Can I stop you for one second?

11         Q.    Yes.

12         A.    It was an election for what?

13         Q.    County chairman.

14         A.    Oh, county chairman.

15         Q.    In Fulton County.

16         A.    Okay.

17         Q.    And the Republican was Lee Morris,

18   I think by all accounts, a very moderate

19   Republican, used to be Democratic, and was on

20   the Atlanta City Council.  And John Eaves, by

21   all accounts, truly a moderate Democrat as

22   well.  Lee Morris was white.  John Eaves is

23   African-American.  In the ad featuring

24   Congressman Lewis, Mary Franklin and Ambassador

25   Young, John Lewis concludes the ad with --

1    well, the ad is open with a description of

2    Birmingham and dogs and fire hoses, et cetera,

3    and concludes with John Lewis saying "Vote for

4    John Eaves.  Your very life may depend on it."

5    Okay.  Presume that's true.  I think it is, but

6    I'm paraphrasing, but I know that last part was

7    true.  Do you believe that someone hearing that

8    ad could have a rational belief that they have

9    to go vote for John Eaves?

10         A.    Probably not.

11         Q.    Okay.  So when does, and is that

12   just because the Fulton County chairman is not

13   going to cause anyone to die?

14         A.    Well, you know, I guess, again, if

15   you want to answer that question, and as a sort

16   of social scientist with a research question

17   like that, you should have polled voters

18   afterward to ask them what motivated them and

19   see if they mentioned that ad.  So, I mean, I

20   answered your question about whether could

21   they, it's possible, but we don't -- we don't

22   know and we don't know in what way it

23   influences them.

24         Q.    Okay.  You describe in your method

25   of voter fraud, a phenomenon known as a

1  Rashomon effect.  Are you familiar with that?

2          A.    Yes.

3          Q.    Can you tell me what the Rashomon

4  effect is?

5          A.    It refers to a very famous movie by

6  the Japanese film director -- I don't remember

7  his name.

8          Q.    Akira?

9          A.    Akira Kurosawa called Rashomon.

10  And it was about the samurai, but the effect

11  where we get that term from is in the movie,

12  the same set of events were presented by --

13  through the lens of different people.  So it

14  was showing how something could happen and you

15  could have these really different, maybe

16  conflicting experiences of an event happening.

17          Q.    Okay.  And you've applied that in

18  some cases to elections, correct?

19          A.    Yes, but not in a serious way.

20          Q.    No, no, but tell me -- by analogy,

21  perhaps, can you tell me how you describe the

22  Rashomon effect on the context of elections?

23          A.    Well, I think it was a little bit

24  of a one-off in the book somewhere about the

25  idea that it's possible that people can be

1   responding to different or to the same words in

2   different ways or the same understanding, or

3   the same events in different ways through their

4   experiences and what they bring to that

5   interpretation.

6        Q.    So let me ask you this, if this is

7   a fair analogy or a fair example.  Someone,

8   there's someone loses an election.  They see

9   the same numbers as the person who won, the

10  person that loses says, it must be voter fraud.

11  The person that wins says no, it was good voter

12  registration and outreach.  Is that an example

13  of the Rashomon effect?

14       A.    Well, I would apply it more to

15  people who are a little more removed from that.

16  Because political actors being politically

17  motivated, you know, want to win.  So often

18  like we just saw in the governor's race in

19  Kentucky, they hint around and they sort of

20  suggest there's nefarious activity and that's

21  why they lost.  I'm referring more to how

22  people might respond to that happening in the

23  news, right?  On the other hand, there's an

24  election, it's a somewhat close election,

25  there's a winner.  If it's not the person you

1  wanted to win, you might be persuaded by the

2  statements of the outgoing governor that there

3  was something nefarious going on, because you

4  wanted the outgoing governor to win.

5           If you were on the other side,

6  you may not even pay attention to that.  So

7  it's kind of shaped by your experiences and

8  perhaps even, you know, the way you see the

9  world.  It's at that abstract level that I

10  tried to explain what I was getting at when I

11  mentioned this Rashomon effect.

12      Q.   Sure.  In your book, you compare

13  voter fraud to other types of fraud, I think in

14  response to the argument that fraud is tough to

15  prove.  And so you compare it to tax fraud,

16  false claims cases; is that accurate?

17      A.   Do you have, like, a page you can

18  point me to?

19      Q.   I probably can if we take a break.

20  But let me ask you this, you've responded to

21  criticism that one of the reasons that there's

22  not a high number of reported cases of voter

23  fraud is because prosecutors determine that its

24  tough to prove.  You've heard that criticism,

25  haven't you?

1          A.    I've heard that criticism

2   generally, yeah.

3          Q.    And you have responded to that

4   criticism as well, haven't you?

5          A.    Well, I want you to point to me, to

6   point to where you're looking at, because I

7   want to know what you're referring to.  It's

8   kind of like that article you pulled out

9   earlier where I said, you know, I don't know

10  exactly where this is coming from, but it helps

11  me get a context --

12         Q.    That's fine.

13         A.    -- to answer your question.

14         Q.    And we're going to take a break in

15  just a little bit, because I'm winding down and

16  may be done pretty soon.  Let me ask it this

17  way.  Sitting here today when you hear that

18  criticism, tell me what your response is?

19         A.    State the criticism again.

20         Q.    The criticism is one of the reasons

21  that there's not a high number of voting fraud

22  convictions is that prosecutors determine that

23  voter fraud is difficult to prove and

24  therefore, they don't bring cases.  That's the

25  criticism and you've heard that, correct?

1        A.    Yes.

2        Q.    Sitting here today, what is your

3   response to that?

4        A.    Well, I actually have a response to

5   that in my report, which I would like to take a

6   minute to find.

7        Q.    Sure.

8        A.    So this is the section about the

9   U.S. Department of Justice's Ballot Access and

10  Voting Integrity Initiative.  That discussion

11  starts on page 12 and it goes on into the next

12  page.  And the second paragraph there is kind

13  of addressing the issue that you raise.

14       Q.    The paragraph that begins "after

15  numerous attempts"?

16       A.    Yes.  Again, I say, look, if you're

17  going to point the finger at prosecutors and

18  say they don't bring cases, you should have

19  some evidence of that before you kind of imply

20  that they're not doing their job.  And here I

21  give an example at the federal level and the

22  justice department where there was a very

23  vigorous effort to root out voter fraud in the

24  United States in federal elections.  And

25  through the use of the U.S. Attorney's Office,

1    all across the country, all 91 U.S. Attorneys

2    were supposed to be looking for, being

3    available, raising the issue, getting it -- you

4    know, part of that Ballot Access and Voting

5    Integrity Initiative involved U.S. Attorneys

6    putting out press releases saying, hey, we're

7    here on Election Day.  We're listening.  Bring

8    your complaints.  If you see anything, say

9    something, that sort of thing.  So it was a

10   vigorous effort to prosecute it and the results

11   were puny relative to the number of votes that

12   were actually cast just in federal elections in

13   2002 and 2004.

14              And I offer it because I want to

15   make the point that we have examples of

16   vigorous enforcement of looking on the part of

17   law enforcement for cases of voter fraud and we

18   still find nothing.  So I feel like the burden

19   should be on those who want to claim that

20   prosecutors are not doing their job to show us

21   that and show us that it's a systematic or

22   systemic problem.

23       Q.   And I guess and I think that's

24   encapsulated too in the last paragraph of

25   page 14?

1       A.   Yes, this is a little bit of a

2  different point, which is that we know we may

3  have some error in crime statistics.  We've

4  already talked about that.  We know that no

5  reliable statistician would say or person who

6  collects this data at the government level in

7  these agencies, or the FBI would say that we

8  know these numbers for the homicide that we

9  calculate a homicide rate for, we know these

10  rates are 100 percent accurate.  There isn't

11  another homicide in the United States that

12  happened that we don't know about.  We know

13  that crime statistics are not a complete,

14  perfect measure of the actual incidence of the

15  crime.  But, you know, you may have some

16  problems in collecting that data.  When those

17  problems are consistent over time, you can

18  still look at rates.  You can still look at

19  what happened between 2002, 2004, 2006, 2008.

20  In each of those instances, you still have the

21  same problem.  We know that that is not

22  100 percent, that figure is not 100 percent

23  capturing the number of crimes committed, but

24  we are always facing the same challenge of not

25  being able to capture the exact number.  So

1    there's kind of a consistency in the error rate

2    that allows you to compare one year to the

3    next.  And I'm simply saying here that even

4    when we know we have imperfect measures of

5    crime, we still use those data.  We still talk

6    about the murder rate, the crime rate, the

7    robbery rate, and so forth.  And we use them in

8    a way that affects public policy.

9                  So I'm saying here we use the

10   same -- if we use the same standard for judging

11   voter fraud crime rates as we do for measuring

12   other crimes, which, as we say, we acknowledge

13   this isn't a perfect measure, but we might be

14   able to compare it from year to year and if

15   it's looking kind of consistent, we can still

16   rely on it for making decisions about how we

17   might address the problem.  And I say, "which

18   is to assess the incidence of crime using law

19   enforcement statistics on arrests, indictments

20   and convictions, we must conclude that the

21   scant evidence of arrests, indictments or

22   convictions for any of the practices defined as

23   voter fraud means that little fraud is being

24   committed relative to the millions of votes

25   cast each year in state, local and federal

1    elections."

2          Q.   And if I'm correct, the basis of

3    that comparative analysis is federal

4    prosecutions, correct?

5          A.   It's never one data point.  It's,

6    again, back to this methodology of looking at

7    incomplete or imperfect sources of data and

8    evidence and in this case, very different kinds

9    of evidence and looking for inconsistencies in

10   the patterns in which the phenomenon you're

11   looking for is showing up.  So if we look at

12   these different kinds of sources, we look at

13   how many allegations are there, how many

14   investigations are there, how many actual

15   prosecutions are there, how many -- you know,

16   what's being reported in the press, we're

17   missing something.  Let's talk to people.

18   Let's do interviews and so forth.  And the

19   range, as I said, the range of everything I

20   looked at from my book, which I do rely on for

21   this paper, this expert report, when we look at

22   all of that disparate data, that disparate,

23   incomplete data, and we don't see anywhere

24   evidence that's inconsistent, we find

25   continuously small numbers or even in, like I

1    say, in the news research, it's showing very

2    little.  You're looking there, you know, you

3    could criticize that as a source.  That's

4    exactly why I don't ever rely on one source.  I

5    have to triangulate the data, look for the

6    inconsistencies, and then I can draw a more

7    reliable inference from that collection of

8    evidence.

9          Q.    You did not look at incidence of

10   fraud prosecution generally in Georgia, right?

11         A.    I looked at the --

12                MS. BRYAN:  Objection to

13          form.  Voter fraud prosecution?

14   BY MR. BELINFANTE:

15         Q.    No.  And thank you for that,

16   actually.  You did not consider prosecutions

17   for fraud in Georgia outside of voter fraud; is

18   that right?

19         A.    I'm not sure why I would do that if

20   I'm studying voter fraud.

21         Q.    Because you're saying

22   comparatively, voter fraud is prosecuted less

23   than other types of fraud, right?  And you rely

24   on federal data to reach that claim that's in

25   the head of the U.S. Department of Justice --

1         A.    I don't think I say that here,
2    unless you can point to me what you're
3    referring to.
4         Q.    The last paragraph on page 14.
5         A.    I compared what I find relative to
6    the millions of votes cast.
7         Q.    Right.  But using the same standard
8    for judging voter fraud crime rates as we do
9    for measuring other crimes, you didn't measure
10   the rate of other crimes in Georgia, did you,
11   because this is all referring to federal law?
12        A.    That's not the point.  That's not a
13   correct interpretation of that sentence.  The
14   point comes after this discussion of, in this
15   section of the federal government's efforts,
16   that's correct.  But my point isn't really
17   about whether it's federal or state data, it's
18   about the argument that crime rates or rates of
19   different types of crime, that somehow if you
20   calculated a rate of voter fraud crime, which
21   is what I think you're trying to get me to do
22   by focusing on convictions, and maybe I could
23   even do that, if I wanted to, because I could
24   say let's compare to how many votes are cast,
25   you come up with a crime rate, it's dismissed,

1   because the argument is that the law

2   enforcement effort that generated the

3   convictions is faulty, so the rate doesn't

4   matter.

5              And I'm simply saying here that

6   the way in which other kinds of crime are

7   measured are not so easily dismissed in the

8   same way.  That in other words, we're applying

9   a different standard to the idea that the

10  finding of little fraud relative -- especially

11  relative to the number of votes cast, that that

12  finding is irrelevant.  Yes, I'm defending the

13  argument that it's not irrelevant and I'm

14  saying it's not irrelevant, because we don't do

15  that with other crime rates even when we know

16  those crime rates don't capture the full amount

17  of the crimes being committed.  That's really

18  the point there.

19       Q.   And I'm not necessarily

20  disagreeing.  I'm just asking, did you consider

21  Georgia crime data other than voter fraud for

22  the purpose of your report?

23       A.   No, because it's not relevant to

24  what I was doing in this report.

25                 MR. BELINFANTE:  Okay.

1            Leslie, are you going to have

2        questions?

3                    MS. BRYAN:  No.

4                    MR. BELINFANTE:  If you-all

5        will give me five to ten minutes, I

6        could wrap this up.

7                    - - - - -

8        (A recess was taken at this time.)

9                    - - - - -

10  BY MR. BELINFANTE:

11        Q.   I'm going to show you what we'll

12  mark as Exhibit 17, which is your report in the

13  case of Bettye Jones versus Judge David

14  Deininger.

15                    - - - - -

16            (Expert Disclosure marked Minnite

17        Exhibit 17 for identification.)

18                    - - - - -

19  BY MR. BELINFANTE:

20        Q.   Is this an accurate copy of your

21  report provided in the case that's styled Jones

22  versus Deininger from the Eastern District of

23  Wisconsin?

24        A.   It looks like it.

25        Q.   What was this case about, do you

1  remember?

2      A.  Yes, it was a case challenging

3  Wisconsin's photo ID law.

4      Q.  If you could turn to paragraph 26,

5  which is on page 15.  And just read that

6  paragraph to familiarize yourself with it.

7  Have you read it?

8      A.  Yes.

9      Q.  I think this is what I was thinking

10  about earlier when I was asking some questions.

11  When you talk about the head of the Elections

12  Crime Branch of the Criminal Division's Public

13  Integrity Section, that is the United States

14  Department of Justice, correct?

15      A.  That's correct.

16      Q.  All right.  And they told the EAC

17  researchers, EAC is the Election Assistance

18  Commission?

19      A.  Yes.

20      Q.  That the pilot projects focused on,

21  one, felon voters in Milwaukee, two, alien

22  voters in the Southern District of Florida and,

23  three, double-voters in a variety of

24  jurisdictions.  Do you see that?

25      A.  Yes.

1        Q.    Tell me the difference between what

2    you talked about earlier, the BAVII effort, the

3    combining or the coordination between the

4    criminal division and the civil rights division

5    in these pilot projects, if you can?

6        A.    Yes, the election crimes --

7    Elections Crime Branch director, Craig

8    Donsanto, gave interviews to the two

9    researchers hired by the Election Assistance

10   Commission to study incidence of voter fraud

11   and voter intimidation, and so this is coming

12   from his statement, his interview with those

13   researchers.  And he is arguing or not arguing,

14   he was relating how the BAVII, the Ballot

15   Access and Voting Integrity Initiative project,

16   wanted to try to test what worked for juries,

17   because the public integrity section, when it

18   prosecuted election crime prior to this, prior

19   to 2002, focused mostly on conspiracies and so

20   most of what the federal government prosecuted

21   in the area of election crime or election fraud

22   were vote-buying cases, and the justice

23   department had not prosecuted individual

24   voters, because they felt that conspiracies

25   were more of a threat to the integrity of the

```
 1    elections than individual voters may have been.
 2    So they were changing that policy in the Bush
 3    administration in the justice department to go
 4    after individual voters, but they wanted to see
 5    what might work with juries.  So they focused
 6    this effort or doubled down, if you will, on
 7    the effort to find voter fraud through this
 8    focusing on felon voters in Milwaukee, alien
 9    voters in the Southern District of Florida, and
10    double-voters in a variety of jurisdictions.
11         Q.   Do you know if that variety of
12    jurisdictions included Georgia?
13         A.   I don't know but I don't think so.
14              MR. BELINFANTE:  All right.
15         Unless Ms. Bryan has any questions, and
16         reserve the right to reconvene if
17         there's an amended report, I will
18         conclude the deposition.
19              MS. BRYAN:  I do not have
20         any questions.
21              MR. BELINFANTE:  Great.  All
22         right.  Thank you very much.
23              THE WITNESS:  You're
24         welcome.
25                   - - - - -
```

1            (Whereupon, the deposition was

2        concluded at 12:05 p.m.)

3                - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T I O N

 2

 3

 4            I HEREBY CERTIFY that the proceedings and

 5    evidence are contained fully and accurately in the

 6    stenographic notes taken by me upon the foregoing

 7    matter on December 13, 2019, and that this is a

 8    correct transcript of same.

 9

10

11

12

13

14    _____

15            Robin L. Clark
      Registered Professional Reporter
16

17

18

19

20

21            (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means unless under the direct control

24    and/or supervision of the certifying reporter.)

25
```

146

```
1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10             You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25
```

147

- - - - -

E R R A T A

- - - - -

| PAGE | LINE | CHANGE |
|------|------|--------|
| 14 | 11 | "sociologist" not "socialist" |
| 19 | 21 | "Theory and History of Community Development" |
| 24 | 21 | "poor-serving" not "coreserving" |
| 26 | 16 | "a" not "an" |
| 26 | 17 | "social," not "associate" |
| 31 | 14 | delete extra "to" "to" |
| 37 | 9 | "fraud" not "registration" |
| 63 | 11 | "statute" not "states" |
| 85 | 13 | "was" not "wasn't" |

Regency-Brentano, Inc.

148

ACKNOWLEDGMENT OF DEPONENT

     I, DR. LORRAINE C. MINNITE, do hereby

certify that I have read the foregoing pages

and that the same is a correct

transcription of the answers given by me to

the questions therein propounded, except for

the corrections or changes in form or

substance, if any, noted in the attached

Errata Sheet.

2/24/2020                     _Lorraine C. Minnite_

DATE                           SIGNATURE

Subscribed and sworn to before me this

24th day of Feb.            ,2020

~~2019.~~

My commission expires: 09 | 05 | 2021

Notary Public

_J. Balgobin_

                          JEFF R BALGOBIN
                 NOTARY PUBLIC-STATE OF NEW YORK
                      No. 01BA6364104
                 Qualified in Westchester County
             My Commission Expires 09-06-2021

Regency-Brentano, Inc.

**$**

**$250 (1)**
8:14

**A**

**ability (1)**
121:10
**able (11)**
37:11;58:22;82:13;
90:13;92:8;93:12;
95:21;104:8;117:15;
134:25;135:14
**above (1)**
107:10
**Abrams (1)**
27:5
**absence (1)**
100:13
**absentee (5)**
70:2,5;123:23;
124:3,5
**abstract (1)**
130:9
**absurd (1)**
38:5
**academic (2)**
20:22;21:4
**Access (4)**
96:22;132:9;133:4;
142:15
**According (1)**
27:14
**account (1)**
118:15
**accounts (2)**
126:18,21
**accurate (18)**
13:20;20:12,15;
36:16;60:15,21;
89:13;110:21;116:8;
117:8;119:22;123:4,
6,9;130:16;134:10;
140:20;146:17
**accurately (3)**
19:12;36:5;145:5
**achieved (1)**
60:12
**achieving (1)**
59:23
**acknowledge (6)**
30:7;70:24;71:5;
94:7;109:19;135:12
**acknowledges (1)**
71:17
**ACKNOWLEDGMENT (1)**
148:1
**acknowledgments (1)**
57:14
**ACORN (15)**
28:6;29:3,7,12,21;

30:5,7,13;31:15,25;
32:5;33:3,6;34:11;35:5;
124:1
**acquire (1)**
98:7
**across (5)**
16:23;29:25;74:4;
78:4;133:1
**Act (12)**
24:14,18;35:24;
37:18;56:4;97:11;
98:7;101:3;120:23;
121:22,22;125:21
**ACTION (3)**
1:;27:9,12
**activities (1)**
71:18
**activity (5)**
69:12,13;71:25;
120:18;129:20
**actor (1)**
37:10
**actors (1)**
129:16
**actual (8)**
30:22;33:9;44:15;
88:23;103:22;111:19;
134:14;136:14
**actually (20)**
19:15;31:4,6,7;
46:10;52:2;72:16;
75:6;76:8;85:13;86:9;
106:19;107:13;
110:23;116:13;
120:14;122:16;132:4;
133:12;137:16
**ad (8)**
125:24;126:4,5,23,
25;127:1,8,19
**add (2)**
20:17,18
**address (10)**
36:23;37:4,13,13;
38:17;39:21;41:14;
64:2;88:5;135:17
**addressed (1)**
51:21
**addressing (1)**
132:13
**adhered (1)**
41:18
**administration (12)**
16:18;17:8,10,10,
13;18:1;20:19;22:23;
64:3;114:14;120:6;
143:3
**administrative (15)**
84:8,18;87:10;
110:8,15,18;111:19;
116:10,16,18,22;
117:5,10,14;118:15
**ads (2)**
125:15,21

**advantages (1)**
52:4
**advertising (1)**
125:14
**advice (2)**
22:7,9
**advocacy (2)**
21:3;27:1
**affects (1)**
135:8
**affiliation (1)**
23:18
**African-American (2)**
82:12;126:23
**Africans (1)**
56:6
**afterward (1)**
127:18
**again (15)**
7:10;11:8;14:2;
18:10;21:21;36:2;
67:6;76:18;79:14;
118:19;119:15;
127:14;131:19;
132:16;136:6
**against (1)**
60:10
**agencies (8)**
24:20,21;25:2,3,21;
100:23;107:21;134:7
**agency (2)**
91:6;95:22
**ago (5)**
23:23;31:19;39:18;
75:4;93:17
**agree (16)**
6:14;37:21;38:2,7,
21;61:18;95:10;
103:16;106:11,17;
107:24;108:3;121:21;
123:17,18;124:6
**ahead (4)**
34:2;47:6;113:21;
114:6
**Akira (2)**
128:8,9
**al (3)**
1:;9;112:20
**alien (2)**
141:21;143:8
**allegation (4)**
83:17;92:1,9;93:2
**allegations (13)**
13:1;28:25;30:19,
21,21;31:1;83:17;
91:5,14;101:4;122:7,
8;136:13
**alleged (3)**
69:13;74:23;122:11
**allegedly (1)**
30:14
**alleging (1)**
73:3

**allow (1)**
26:18
**allowed (2)**
6:12;75:22
**allows (2)**
109:8;135:2
**ALLOY (1)**
2:8
**almost (3)**
13:22;49:10;99:21
**alone (1)**
35:21
**along (1)**
56:11
**alphabetical (1)**
111:12
**although (2)**
18:14;70:20
**always (9)**
13:5;36:4,4;37:5;
42:24;56:7;81:18;
105:10;134:24
**Ambassador (2)**
126:6,24
**Amended (3)**
10:14,16;143:17
**America (2)**
56:6;101:3
**American (5)**
17:17,23;33:19;
57:21;59:3
**Americans (2)**
24:5;26:25
**among (1)**
26:25
**amount (3)**
67:24;104:19;
139:16
**analogy (2)**
128:20;129:7
**analysis (19)**
37:7,25;40:20;67:8,
11,13;77:10;87:24;
88:17;111:20;113:14;
114:13;116:9;117:24;
119:1;122:1,2,13;
136:3
**analyst (1)**
21:6
**analyzing (1)**
89:22
**and/or (1)**
145:24
**Andy (1)**
126:6
**anger (1)**
45:24
**announced (1)**
97:20
**annual (1)**
98:14
**answered (2)**
37:17;127:20

**anti-capitalist (1)**
43:12
**anti-capitalists (1)**
43:8
**anymore (1)**
23:20
**appealing (1)**
75:15
**appearance (1)**
110:9
**APPEARANCES (1)**
2:1
**appeared (1)**
28:24
**appearing (1)**
77:11
**appears (3)**
61:16;63:20;106:7
**appendix (2)**
63:19,20
**applicants' (1)**
109:6
**application (2)**
32:18;72:15;109:7
**applications (4)**
30:24;32:15;34:23;
35:2
**applied (3)**
112:22,24;128:17
**applies (1)**
125:3
**apply (4)**
33:16;124:12;
129:14;145:22
**applying (2)**
113:7;139:8
**approach (2)**
89:9,17
**appropriate (1)**
146:5
**approximately (1)**
9:4
**area (2)**
40:22;142:21
**argues (1)**
60:9
**arguing (3)**
75:21;142:13,13
**argument (5)**
54:1;130:14;
138:18;139:1,13
**around (8)**
11:18;37:24;45:11;
97:19;115:15;121:20;
124:25;129:19
**arrests (2)**
135:19,21
**arrive (1)**
94:8
**Article (26)**
3:,,12,13,16,17;
41:9;42:17,24;44:12,
15,18,20;45:5,10;

48:23,25;49:3,24;
50:5,18;53:7,19;60:5;
72:3;131:8
**articles (10)**
28:24;40:24;58:25;
77:10,15,17,25;78:4,
18;105:23
**articulate (1)**
35:14
**Assembly (6)**
78:9,23;79:3;82:24;
83:1,3
**assess (1)**
135:18
**assessing (1)**
89:6
**assessment (1)**
93:2
**assist (1)**
25:11
**assistance (4)**
63:15;70:24;
141:17;142:9
**Assistant (3)**
15:4,14;16:22
**Associate (7)**
15:7,9,14;16:9,19,
22;26:17
**associated (1)**
106:14
**assumptions (1)**
10:11
**ATLANTA (5)**
1:2;2:,10;126:7,20
**attached (4)**
13:12;108:18;
146:12;148:
**attempted (1)**
88:13
**attempts (2)**
84:20;132:15
**attention (3)**
55:9;70:22;130:6
**attorney (17)**
68:9;80:15,17;81:7;
95:9,11,14,20,21;
96:5,7;101:5,21;
119:3;120:20;121:4;
146:14
**attorneys (12)**
13:8;81:12;97:2,4,
7,9,16,25;121:6,15;
133:1,5
**Attorney's (4)**
80:21,24;91:7;
132:25
**automatic (5)**
31:10;33:12,13,20,
24
**automatically (1)**
33:16
**available (4)**
67:21;93:14,22;

133:3
**aware (4)**
30:13;52:12;78:8;
125:24

**B**

**back (23)**
11:12;16:24;23:13;
26:12;49:19;58:19;
60:24;71:4;72:12;
78:8;80:13;83:16;
91:12;97:5;99:9;
100:9;101:21;104:6;
106:6;108:25;121:3;
125:6;136:6
**background (1)**
98:2
**backing (1)**
70:4
**backward-moving (1)**
46:3
**balance (1)**
118:24
**ballot (19)**
38:3;70:5;72:7;
76:3,12,23;85:9,10,
12,16;86:5,7;88:4;
96:22;99:23;123:23;
132:9;133:4;142:14
**balloting (1)**
70:2
**ballots (6)**
71:23;83:19;84:11,
13,14;85:7
**Barnard (7)**
14:20,22,23;15:15,
19;16:25;17:24
**base (1)**
45:25
**Based (6)**
33:5;37:7;84:7;
111:21;114:11,17
**basic (1)**
7:2
**basically (4)**
55:14;68:13;97:1;
115:16
**basis (1)**
136:2
**bathroom (1)**
72:11
**BAVII (5)**
96:9,18,18;142:2,
14
**B-A-V-I-I (1)**
96:19
**bear (1)**
122:13
**bearing (1)**
35:12
**became (2)**
65:4;73:4

**becomes (1)**
14:23
**bed (1)**
66:21
**beginning (2)**
67:8;105:13
**begins (5)**
84:6;88:17;108:1;
119:2;132:14
**behalf (4)**
27:19,23;73:14;
86:15
**behavior (1)**
124:16
**behind (3)**
57:13;86:24;124:11
**belief (2)**
41:18;127:8
**beliefs (1)**
60:22
**BELINFANTE (73)**
2:8,9;3:;6:6,7,20;
8:7;9:17;11:6,9;
13:18;19:8;20:10;
26:6,11;29:16;30:4,
12;38:6,9,13,16,19;
40:1;41:12;42:20;
43:16,20;44:6;45:8;
49:7;50:8;53:14,22;
56:19;61:15;62:11;
64:6,14,21;66:1,7,11;
69:6;70:14;80:3;85:2;
100:1,4,8;103:9;
107:18;108:12,19,24;
111:4;112:9,21;
113:20,25;114:5,16;
117:21;118:8,16;
125:19;137:14;
139:25;140:4,10,19;
143:14,21
**Belinfantes (2)**
38:7;111:6
**Below (3)**
59:3,9,20
**benefit (1)**
95:24
**benefits (2)**
25:4;124:16
**best (4)**
7:3;33:21;34:1;
40:16
**better (4)**
33:22;48:23;54:12;
66:16
**Bettye (1)**
140:13
**beyond (1)**
89:6
**bias (3)**
43:17,25,25
**big (4)**
54:7;59:11;63:8;
95:19

**Bill (1)**
78:9
**Billups (3)**
81:16,17,25
**Biography (3)**
3:11;19:10;20:7
**Birmingham (1)**
127:2
**birth (1)**
13:6
**bit (10)**
18:14;31:18;34:3;
68:20;94:3;122:15;
123:12;128:23;
131:15;134:1
**Black (6)**
55:21,22,23;57:3;
88:9;94:3
**blank (1)**
74:25
**Block (1)**
9:20
**Board (12)**
72:9;79:13,17,21;
91:19,24;92:2,19,20;
94:1;95:9;105:25
**body (1)**
91:6
**book (47)**
3:,20,23;47:12,13,
15;56:16,23,25;57:2,
13;60:25;61:1,5,6,9,
12;62:2,8,13,15,16,
20;63:1,19,21;79:3;
80:2;84:4;85:20;88:8;
89:3;96:9,11,17;
98:18;99:8;101:10;
102:1,3,12;106:20,23;
128:24;130:12;
136:20
**books (2)**
82:9;111:11
**Boolean (1)**
77:18
**both (6)**
25:5;61:25;72:17;
87:13;106:15;111:5
**bottom (4)**
41:15;50:17;58:11;
68:16
**box (1)**
94:3
**boxes (1)**
72:7
**BRAD (2)**
1:8;6:10
**branch (3)**
97:16;141:12;142:7
**break (7)**
7:11,12,15;64:9;
100:2;130:19;131:14
**briefly (3)**
14:8;17:19;51:17

**briefs (1)**
12:10
**bring (9)**
25:19;56:7;83:18;
91:25;97:18;129:4;
131:24;132:18;133:7
**bringing (2)**
92:10;95:11
**broad (1)**
101:3
**broader (3)**
71:19,24;89:8
**Brooklyn (4)**
45:22;72:4,9;73:5
**brought (6)**
74:12;92:17,18;
93:6;97:2,25
**Brunswick (1)**
16:7
**BRYAN (38)**
2:3;6:19;9:15;11:2,
7;29:14;30:10;38:11;
39:23;43:13,18,22;
53:12,16;62:4;64:10;
65:24;66:4,9;69:4;
70:12;79:24;84:23;
100:3;107:15;108:8,
16;112:7;113:19,22;
114:2;117:17;118:6;
125:17;137:12;140:3;
143:15,19
**buff (2)**
72:21,25
**bulk (1)**
61:20
**bullet (8)**
77:7;80:12,13,20;
81:14;105:17,23;
106:2
**BUNDY (1)**
2:
**burden (1)**
133:18
**Bush (3)**
112:10,19;143:2
**Bysiewicz (2)**
28:8,9

**C**

**calculate (1)**
134:9
**calculated (1)**
138:20
**calculation (3)**
114:9;115:7;124:15
**calculator (1)**
112:23
**California (2)**
99:3;100:24
**call (11)**
6:22;36:8;55:22,23;
63:15;68:7;69:2;72:5,

21;96:18;117:10
**called (16)**
18:8;19:21;24:21;
34:25;44:18;45:10;
47:23;57:2;63:3;68:8;
74:14;76:3;88:9;
105:14;115:9;128:9
**Camden (2)**
15:24;16:3
**came (9)**
46:22;61:24;63:2,9;
72:12;75:4;78:4;
94:13;117:6
**Campaign (11)**
3:;44:19;45:5,11,
23;73:5,14;75:8;
124:18;125:14,20
**campaigns (4)**
21:5;22:7,8;56:8
**campus (2)**
16:4,6
**campuses (1)**
16:3
**can (65)**
11:21;14:2,8;17:19;
28:10;29:11,19;32:4;
34:3;41:14,15;45:1,
19;47:3;54:8;59:15,
17;60:12;64:9;66:16,
18;67:15;68:12;
69:23;71:2,4,7;79:14;
84:10;87:5,6,8;89:10;
90:7,15;93:21,25;
94:1,8;98:5;99:13;
100:1,2;102:12,16;
103:12;104:18;
110:20;117:7;122:20;
124:12;125:13,21;
126:10;128:3,21,25;
130:17,19;134:17,18;
135:15;137:6;138:2;
142:5
**candidate (1)**
72:23
**candidates (2)**
54:17;55:6
**candidate's (1)**
73:1
**canvassers (3)**
30:17;32:5;34:22
**capacity (1)**
1:
**capture (4)**
59:11,19;134:25;
139:16
**capturing (6)**
93:20;103:18,22;
104:15,23;134:23
**card (1)**
52:5
**cards (3)**
72:19,21,25
**career (1)**

60:3
**careful (2)**
34:13;36:2
**carefully (2)**
34:18;146:3
**CAROL (3)**
1:15;3:3;6:2
**Carolina (5)**
68:24;69:25;
123:20;124:2,18
**Carolina's (1)**
70:10
**case (68)**
7:24;8:14,24;10:7,
14,22;11:21,23;12:11,
15,18;25:15;28:6,10,
12,15,16;31:25;
32:16;35:4,5;39:14;
52:8,12;53:3;58:5,6;
62:3;63:6,16;64:23;
68:24;69:9;70:1;
74:14,18,20;75:6,10,
11,11,13,14;76:9,15,
19;81:16,17,20;82:2;
87:13;91:11;93:12;
95:4,11,16,24;97:6;
105:3;120:25;121:16;
124:17,19;136:8;
140:13,21,25;141:2
**cases (32)**
21:2;27:16,18,22;
34:21,24;52:23;63:1,
17;64:1;67:22;68:10;
74:11;81:2,19;87:13;
89:7;90:9;92:16;
97:11;98:24,25;
123:5;124:6,8;
128:18;130:16,22;
131:24;132:18;
133:17;142:22
**cast (15)**
83:19;84:11;85:7,
12,16,16;86:5;110:3;
112:2;113:24;133:12;
135:25;138:6,24;
139:11
**catch (1)**
20:24
**categorize (1)**
35:10
**cause (3)**
84:10,19;127:13
**cease (1)**
23:21
**ceased (1)**
23:25
**ceiling (1)**
72:10
**Celebration (1)**
59:4
**central (2)**
48:5;60:3
**centrally (1)**

103:11
**century (1)**
57:22
**certain (2)**
40:6;58:4
**certainly (7)**
7:3;45:15;55:16;
67:14;70:20;73:16;
75:1
**certification (1)**
145:21
**certify (3)**
112:18;145:4;148:
**certifying (1)**
145:24
**cetera (4)**
38:17;47:16;127:2
**chain (1)**
91:9
**chair (4)**
16:11,16;22:3;
126:8
**chairman (3)**
126:13,14;127:12
**chairman's (1)**
126:1
**challenge (7)**
11:23;12:1;28:12;
51:18;76:10;81:21;
134:24
**challenged (1)**
12:9
**challenges (3)**
74:5,12;106:14
**challenging (1)**
141:2
**chance (1)**
54:11
**Chandler (1)**
57:16
**change (7)**
55:7,7,8;60:12;
67:9;81:20;147:4
**changed (1)**
31:18
**changes (3)**
78:18;146:11;148:
**changing (2)**
116:20;143:2
**chapters (6)**
29:10,18,24;30:3;
96:8,15
**Chicago (1)**
14:13
**choice (1)**
54:17
**Chris (2)**
10:25;92:24
**circumstances (1)**
34:10
**citation (2)**
50:25;107:14
**citations (1)**

61:17
**cite (6)**
62:12;67:25;81:14;
82:7;102:17;109:21
**cited (8)**
52:3;62:22;68:2,10;
77:25;78:3,4;94:18
**citing (1)**
81:19
**citizens (2)**
31:11;33:19
**City (7)**
1:17;14:5;17:17,23;
22:13;59:13;126:20
**Civil (9)**
6:13;55:24,25;56:2;
97:3,9,11,23;142:4
**claim (2)**
133:19;137:24
**claiming (2)**
72:25;76:2
**claims (1)**
130:16
**Clark (2)**
1:19;145:15
**class (4)**
17:3,4;18:25;23:7
**classes (8)**
16:25;17:25;18:4;
22:22,25;23:4,10,
119:6
**classify (1)**
70:9
**cleaning (2)**
116:23,23
**clear (2)**
11:2;37:23
**clearly (1)**
34:15
**clients (2)**
25:21;28:4
**close (5)**
72:12;82:9;117:19,
20;129:24
**closely (2)**
83:10,15
**closing (1)**
120:2
**Cloward (1)**
59:5
**Cloward's (1)**
59:11
**coauthored (3)**
57:4,5;88:8
**code (10)**
45:25;47:8,9,11;
48:5,9,12;62:22;
63:14;78:11
**codes (1)**
63:12
**cognizant (1)**
35:11
**collapsing (1)**

31:2
**colleagues (1)**
114:19
**collect (6)**
25:20;26:1,19;70:4;
89:20;93:17
**collected (4)**
26:2;89:13,19;
103:11
**collecting (1)**
134:16
**collection (1)**
137:7
**collectively (1)**
12:8
**collects (1)**
134:6
**College (4)**
14:22;15:15;18:7;
50:16
**colonize (1)**
83:14
**colonize' (1)**
83:10
**color (1)**
72:22
**colorful (1)**
48:2
**Columbia (5)**
14:22;15:15,20;
17:25;22:22
**combating (1)**
99:18
**combining (1)**
142:3
**coming (4)**
46:11;89:2;131:10;
142:11
**commencing (1)**
1:18
**Commission (4)**
70:25;141:18;
142:10;148:16
**commit (1)**
123:15
**committed (8)**
30:23;35:13;73:2;
104:2;116:2;134:23;
135:24;139:17
**committing (2)**
72:24;124:12
**commonly (1)**
74:23
**Commonwealth (1)**
1:20
**communicate (1)**
55:3
**communications (5)**
101:20;102:4,6,7;
120:19
**Community (2)**
19:21;21:23
**comparative (2)**

Fair Fight Action v.
Raffenensperger

Dr. Lorraine Carol Minnite
December 13, 2019

18:14;136:3
**comparatively (1)**
137:22
**compare (5)**
130:12,15;135:2,
14;138:24
**compared (1)**
138:5
**compels (1)**
32:24
**compensate (1)**
106:3
**compensated (1)**
8:14
**compiled (2)**
28:23;49:13
**Complaint (4)**
10:14,16,17;12:12
**complaints (4)**
94:8,15;100:25;
133:8
**complete (6)**
12:2;67:16;107:7;
108:13;120:24;
134:13
**completeness (1)**
108:11
**complex (1)**
12:7
**comply (1)**
101:2
**comprehensive (1)**
98:14
**computers (1)**
31:17
**conceivable (2)**
118:12,21
**concept (1)**
89:11
**concepts (2)**
34:16
**concern (3)**
93:21;94:24;104:24
**concerned (1)**
21:24
**concerns (2)**
91:8;93:18
**conclude (2)**
135:20;143:18
**concluded (1)**
144:2
**concludes (2)**
126:25;127:3
**conclusion (2)**
67:14;122:8
**conclusions (2)**
90:4,4
**conduct (1)**
70:15
**conducted (2)**
87:25;88:6
**conducting (1)**
12:22

**Conference (2)**
59:4,12
**confident (2)**
105:2;116:7
**conflict (1)**
90:12
**conflicting (1)**
128:16
**confused (1)**
85:8
**confusing (2)**
7:18;57:7
**confusion (5)**
84:9,19;85:14;
86:15;87:9
**congressman (4)**
69:1;73:5;126:5,24
**Connecticut (1)**
29:1
**Connecticut's (1)**
28:13
**consent (6)**
75:16,19,23;76:4,
25;77:5
**consider (7)**
17:12;37:15,18;
51:10;78:7;137:16;
139:20
**considered (4)**
67:25;68:2;69:10;
101:14
**considers (1)**
106:19
**consistency (1)**
135:1
**consistent (2)**
134:17;135:15
**consolidating (1)**
120:2
**conspiracies (2)**
142:19,24
**conspiracy (2)**
69:21;95:19
**constitute (2)**
34:11;68:21
**constitutes (2)**
109:9,14
**constitutional (1)**
11:25
**construct (1)**
77:21
**consulted (4)**
21:3,15,21;101:9
**contact (1)**
24:22
**contained (1)**
145:5
**contemporary (2)**
67:12;88:18
**contested (2)**
83:10,15
**context (8)**
37:23;46:16;71:18;

82:18,21;89:8;
128:22;131:11
**continue (1)**
114:7
**continued (1)**
56:1
**continuously (1)**
136:25
**contradict (1)**
94:23
**contradiction (1)**
89:24
**contribute (1)**
48:4
**contributions (1)**
27:12
**control (1)**
145:23
**convergence (1)**
89:24
**conversation (1)**
68:9
**convey (1)**
62:23
**convicted (1)**
35:17
**conviction (2)**
85:24;90:18
**convictions (9)**
88:23;89:4,6;90:3;
131:22;135:20,22;
138:22;139:3
**coordinated (1)**
50:21
**coordination (2)**
76:15;142:3
**co-organizer (1)**
59:2
**copies (1)**
57:12
**copy (6)**
53:11;66:5,8,12;
108:13;140:20
**copyright (1)**
57:11
**core-serving (1)**
24:21
**corporate (1)**
29:17
**corrections (4)**
66:23;146:4,6;148:
**correctly (6)**
14:20;26:3;32:8,13;
81:19;111:22
**corrupt (4)**
69:22;83:9,22
**corrupting (1)**
105:8
**corruption (4)**
34:7;70:21;86:24;
97:15
**cost (1)**
124:15

**Council (2)**
14:5;126:20
**councilman (1)**
22:13
**counsel (9)**
8:24;9:1,2;12:19;
13:9;28:2;65:4,7;
102:8
**count (3)**
36:4;84:21;90:16
**counted (6)**
35:16,22,24;85:4,5,
17
**counting (1)**
36:2
**country (3)**
29:25;42:15;133:1
**counts (1)**
88:23
**county (8)**
82:14;119:11;
125:25;126:8,13,14,
15;127:12
**couple (1)**
66:22
**course (8)**
17:16,20;18:11;
19:16,23;32:17;
55:16;82:21
**courses (4)**
19:13,14,18;55:15
**COURT (11)**
1:1;7:6;43:21;52:2,
9;66:18;75:13;81:19,
20;112:14;146:18
**courts (1)**
91:1
**cover (2)**
63:7;103:2
**Cox (1)**
102:10
**Craig (1)**
142:7
**create (1)**
39:15
**created (3)**
36:23;62:18;90:21
**credible (2)**
93:11;102:22
**crime (33)**
39:3,12;72:24;
98:11;103:11,12,17,
21;104:22,24;105:22;
106:4;123:15;134:3,
13,15;135:5,6,11,18;
138:8,18,19,20,25;
139:6,15,16,21;
141:12;142:7,18,21
**crimes (18)**
30:22;73:13;97:15;
98:22;103:13,19,23,
23,25;104:2;105:3;
106:8;134:23;135:12;

138:9,10;139:17;
142:6
**criminal (11)**
64:2;69:12,13;
71:17;95:19;97:4,12,
14,17;141:12;142:4
**criminals (1)**
83:18
**crisis (1)**
60:11
**criticism (10)**
117:23;118:11;
130:21,24;131:1,4,18,
19,20,25
**criticisms (1)**
123:1
**criticize (1)**
137:3
**critique (1)**
14:10
**current (1)**
19:12;46:4;96:6
**currently (1)**
18:4;97:6;119:5
**Curriculum (3)**
3:9;13:15,19
**cut (1)**
28:13
**CV (7)**
13:12;22:10;23:14;
27:14;40:22;56:24;
58:19

**D**

**dangerous (1)**
109:21
**data (38)**
9:25;10:8;26:1,1,
19;89:10,15,22,23,25;
90:8,12,14,20;96:9;
98:10;100:14,19,23;
103:11;104:8,9;
106:4;115:6;116:10;
117:11;121:9;134:6,
16;135:5;136:5,7,22,
23;137:5,24;138:17;
139:21
**database (5)**
89:13;90:1;104:22;
116:25;123:8
**databases (2)**
105:22;110:20
**datasets (1)**
89:19
**date (7)**
20:2,14,17,23;79:3;
146:9;148:11
**dated (3)**
4:;13:22;103:5
**David (1)**
140:13
**Davidson (1)**

57:16
**Day (3)**
86:1;133:7;148:
**days (4)**
31:17,19;48:9;
146:15
**deal (1)**
40:23
**dealing (1)**
114:23
**dealt (1)**
91:1
**debate (2)**
43:6;121:20
**debates (2)**
78:7,14
**debts (1)**
57:15
**deceive (2)**
86:8;87:16
**December (2)**
1:12;145:7
**decent (1)**
64:8
**decision (1)**
91:25
**decisions (1)**
135:16
**decree (1)**
76:25
**dedicate (1)**
23:11
**deem (2)**
27:1;40:15
**deemed (1)**
146:17
**Defendant (1)**
6:9
**Defendants (2)**
1:;2:
**defending (1)**
139:12
**defiance (1)**
60:13
**define (11)**
34:3,15;37:8;54:8,
11;68:16;71:7,10;
73:25;99:13;123:21
**defined (2)**
124:9;135:22
**defining (2)**
63:23;84:5
**definition (13)**
34:4,12;36:11;
37:16,20,24,25;69:11;
70:16,25;71:2,20;
73:9
**definitions (1)**
68:23
**defrauded (1)**
32:10
**degree (1)**
105:7

**Deininger (2)**
140:14,22
**deliberate (1)**
88:11
**deliberately (1)**
86:21
**deliver (1)**
25:4
**demand (1)**
55:4
**Democracy (8)**
17:1;42:9,10,14;
44:1;45:16;59:3,23
**Democrat (3)**
42:8;126:9,21
**democratic (2)**
44:3;126:19
**Democrats (1)**
87:1
**Demos (2)**
63:4;101:25
**denied (3)**
15:22;87:20;88:1
**Dennis (2)**
101:20;120:19
**deny (1)**
46:18
**denying (1)**
46:13
**department (13)**
16:11,15,17;22:4;
96:25;97:8;120:20;
132:9,22;137:25;
141:14;142:23;143:3
**depend (1)**
127:4
**depends (2)**
39:1;95:16
**DEPONENT (1)**
148:1
**deposed (2)**
6:25;11:8
**deposing (1)**
146:14
**Deposition (25)**
1:15;3:8;5:1;6:8,
18;7:24,25;8:4,9,21;
10:24;11:3,4,11,14;
44:17;92:24;94:12,
17;143:18;144:1;
146:3,12,15,17
**depositions (3)**
10:22;44:14;57:8
**deprived (1)**
87:20
**describe (6)**
14:8;43:11;100:18;
126:3;127:24;128:21
**described (3)**
26:13;34:9;122:6
**describing (5)**
25:3;39:13;67:24;
101:8;110:16

**DESCRIPTION (3)**
3:6;93:20;127:1
**design (4)**
25:25;26:17;76:11,
13
**designated (1)**
98:1
**detail (4)**
47:15;52:19;98:18,
19
**details (1)**
70:7
**detective (1)**
94:5
**determination (1)**
109:13
**determine (7)**
92:16;93:10;
103:13;107:7;109:9;
130:23;131:22
**deterred (1)**
106:16
**develop (2)**
34:1;48:1
**development (3)**
16:12,15;19:22
**die (1)**
127:13
**difference (4)**
10:19;54:5;56:21;
142:1
**different (24)**
12:21;14:24;35:11;
55:15;57:13;68:23;
70:25;71:6;77:9;91:3;
99:6,24;104:7;
110:23;128:13,15;
129:1,2,3;134:2;
136:8,12;138:19;
139:9
**differently (2)**
71:8;91:1
**difficult (5)**
47:16;49:12;
103:12;107:6;131:23
**diffuse (1)**
54:25
**digits (1)**
109:5
**Dinkins (1)**
22:11
**direct (1)**
145:23
**Direction (1)**
5:4
**director (5)**
23:15;25:14;26:15;
128:6;142:7
**disagreeing (1)**
139:20
**disagreement (1)**
70:23
**Disclosure (2)**

4:3;140:16
**discovered (1)**
92:2
**discovery (1)**
6:11
**discuss (3)**
40:18;47:12;101:19
**discussed (1)**
102:5
**discusses (1)**
80:20
**Discussion (7)**
26:9;42:2;92:23;
123:25;124:1;132:10;
138:14
**discussions (1)**
96:21
**disenfranchise (1)**
120:15
**disenfranchised (1)**
120:10
**disinterested (1)**
46:2
**dismissed (2)**
138:25;139:7
**disparate (3)**
89:23;136:22,22
**disparities (1)**
90:8
**disruptive (1)**
60:13
**distinction (2)**
16:21;84:12
**DISTRICT (15)**
1:,1;13:7;68:8,25;
69:25;70:10;81:12;
91:7;121:4,6,15;
140:22;141:22;143:9
**Districts (2)**
80:22,24
**divide (1)**
114:3
**divided (1)**
112:25
**DIVISION (10)**
1:2;93:7;97:3,4,10,
12,14,24;142:4,4
**divisions (1)**
97:8
**Division's (1)**
141:12
**DNC (2)**
75:10,21
**DNC/RNC (2)**
74:15;75:3
**doctor (1)**
6:22
**doctoral (1)**
14:1
**document (9)**
8:1;19:11,12;21:13;
32:19;47:8;93:19;
108:9;122:16

**Documents (6)**
5:7;10:1,8;93:13;
95:1,2
**dog (1)**
48:10
**dogs (1)**
127:2
**DOJ (1)**
107:22
**done (9)**
33:24;56:22;69:11,
13;112:25;113:15,15;
114:18;131:16
**Donsanto (1)**
142:8
**doors (2)**
31:21;124:25
**double (6)**
71:12;110:3,7;
116:11;118:14,23
**doubled (1)**
143:6
**double-voters (2)**
141:23;143:10
**doubt (3)**
80:1;92:15;99:11
**down (10)**
41:14;57:3,14;
72:12;87:11;88:9;
100:21;109:2;131:15;
143:6
**DR (11)**
1:15;3:3;6:2,8,21;
21:1;50:9;53:7;57:17;
60:7;148:
**drafts (2)**
65:4,7
**draw (5)**
90:4,6,13;104:8;
137:6
**drew (1)**
67:7
**drive (2)**
31:20;32:6
**driver's (2)**
33:17;109:4
**drives (2)**
31:9;73:7
**due (3)**
85:14;103:13;
106:13
**duly (1)**
6:3
**Dunn (3)**
101:20;102:7;
120:19
**duplicate (4)**
110:9,23;111:16,19
**during (5)**
25:8,12;78:19;
82:10,11
**duties (1)**
80:1

dying (1)
  116:22
dynamic (1)
  116:20

**E**

EAC (2)
  141:16,17
earlier (6)
  63:2,20;121:14;
  131:9;141:10;142:2
early (2)
  14:6;123:12
easier (1)
  7:6
easily (1)
  139:7
Eastern (1)
  140:22
easy (1)
  33:19
Eaves (4)
  126:20,22;127:4,9
edited (2)
  57:2,3
educate (1)
  41:20
eeked (1)
  112:10
effect (7)
  51:7;128:1,4,10,22;
  129:13;130:11
effective (1)
  54:3
efficacy (2)
  40:10;120:6
effort (8)
  69:22;86:7;132:23;
  133:10;139:2;142:2;
  143:6,7
efforts (3)
  88:11;107:4;138:15
either (3)
  22:22;109:4;110:14
elect (2)
  54:17;55:6
elected (3)
  54:21;56:13;73:4
election (84)
  11:24,24;12:23;
  17:7,9,10,12;18:1;
  20:19;22:23;23:1,6;
  24:16;27:15;28:14,
  24;32:22;35:23;
  51:15;62:22;63:12,
  14;64:3;69:2,5,7,22;
  70:24;74:5,8;77:20;
  78:11,18;79:13,16,21;
  83:21;84:9;85:15,25;
  86:1,8;87:16,19;
  91:19,24;92:1,19,20;
  93:22,24;95:6,9;97:1,

15,18,20,21;98:1,5;
  99:21;105:25;110:8;
  111:21;112:1,19;
  113:8;114:13;116:6,
  17,22;119:17;120:6;
  126:12;129:8,24,24;
  133:7;141:17;142:6,
  9,18,21,21
election-related (1)
  73:13
elections (24)
  18:4;19:23;23:5,7,
  11;28:25;67:12;
  71:19;72:9;83:11,15;
  87:21;88:18;98:24;
  100:23;119:11;
  128:18,22;132:24;
  133:12;136:1;141:11;
  142:7;143:1
electoral (18)
  17:6,11;26:23;34:7;
  36:13;37:11;53:25;
  54:2,6,10,15,16;55:5,
  19;56:8,12,12;105:8
electronic (1)
  66:8
element (2)
  11:25;48:4
elements (3)
  17:9;36:11;37:9
eligibility (1)
  87:17
eligible (8)
  84:20;85:22;86:3,6,
  14;87:7;88:3,12
else (5)
  8:11;21:20;22:1;
  68:4;107:11
else's (1)
  39:8
email (2)
  93:19;94:10
emails (1)
  95:5
emotion (1)
  54:1
empirical (4)
  47:19;90:22,24;
  124:10
empirically (2)
  47:14;122:16
empiricist (1)
  90:24
employees (1)
  24:22
enact (1)
  74:1
enacted (1)
  78:9
enacting (1)
  83:1
encapsulated (1)
  133:24

encourage (1)
  31:24
end (2)
  104:12;111:1
ends (1)
  108:1
enforcement (4)
  133:16,17;135:19;
  139:2
engage (2)
  31:20;33:8
engaged (4)
  31:15;56:9;69:1;
  121:15
England (1)
  18:16
enough (6)
  28:5;39:2,5;40:21;
  41:1;115:6
ensure (1)
  99:22
ensuring (1)
  83:20
enter (1)
  109:20
entitled (1)
  53:8
entity (2)
  79:12,16
entry (2)
  15:3;59:1
equal (1)
  44:3
equality (1)
  59:24
errand (1)
  114:10
errata (5)
  146:6,8,11,14;148:
error (19)
  87:10;110:4,8,15,
  16,17;111:19;114:21,
  23;115:2,9,18,21;
  116:16,18;117:9,14;
  134:3;135:1
errors (3)
  84:8,18;118:15
Ershow (4)
  9:13,15,16,21
escaping (1)
  102:9
especially (1)
  139:10
ESQ (2)
  2:3,9
essentially (2)
  63:9;90:20
established (3)
  90:21;93:17;101:2
estimate (4)
  107:4,7;110:2;
  117:14
et (5)

1:,9;38:17;47:16;
  127:2
ethics (1)
  57:25
evaluate (2)
  95:4;104:1
evaluating (1)
  105:5
even (13)
  22:4;44:24;61:18;
  99:13;103:11;104:16;
  111:6;130:6,8;135:3;
  136:25;138:23;
  139:15
evenly (1)
  50:20
event (1)
  128:16
events (2)
  128:12;129:3
evidence (23)
  32:8;35:7,22;67:13,
  22,25;68:1;90:25,25;
  91:2;92:7,9;93:4,11,
  24;119:1;132:19;
  135:21;136:8,9,24;
  137:8;145:5
evidenced (1)
  86:9
exact (2)
  104:9;134:25
exactly (5)
  72:8;103:19;125:6;
  131:10;137:4
examination (1)
  17:22
examine (1)
  19:23
examined (1)
  6:3
example (26)
  21:16,19,25;35:19;
  47:24;48:17;55:2;
  58:6;67:10;71:22;
  72:1;84:22;85:19,21;
  86:16,20,24;90:1,15;
  94:4;98:6;105:23;
  111:7;129:7,12;
  132:21
examples (1)
  133:15
except (3)
  6:15;82:10;148:
exception (2)
  55:18,21
Excerpt (9)
  3:,21,24;44:24;
  56:15;61:8,11;62:7
excerpts (4)
  57:11,12;102:25;
  103:3
exclusive (1)
  101:13

exclusively (1)
  22:23
excuse (2)
  7:25;10:15;57:4
exercise (2)
  63:13;115:25
exhausted (1)
  66:21
Exhibit (44)
  3:,,,8,9,10,11,12,13,
  14,17,18,21,24;4:,3;
  8:5;13:12,16;19:3,6;
  20:5,7;41:7,10,16;
  42:18;45:5;49:4,25;
  50:6;53:20;56:16;
  58:20;61:8,12,25;
  64:16,19;66:19;
  103:1,6;140:12,17
exhibits (3)
  61:24;62:8,19
exist (3)
  23:19,22,25
expansive (1)
  45:23
expect (1)
  125:4
experience (1)
  33:5
experiences (3)
  128:16;129:4;130:7
Expert (9)
  4:3;8:10;21:2;
  47:17;64:18;74:17;
  118:7;136:21;140:16
expertise (3)
  21:7,12;25:24
expires (1)
  148:16
explain (5)
  29:11;47:15;116:3,
  4;130:10
explained (1)
  47:17
explaining (3)
  110:5;114:22;
  115:22
explains (1)
  117:6
exploited (1)
  60:2
explosive (1)
  31:1
extended (1)
  55:25
extent (4)
  40:6;42:11;58:4;
  61:19
extrapolate (1)
  117:3
extreme (1)
  116:14

Fair Fight Action v.
Raffenensperger

Dr. Lorraine Carol Minnite
December 13, 2019

# F

**face (2)**
39:8,11
**Facebook (1)**
87:3
**faces (1)**
39:10
**facing (1)**
134:24
**fact (13)**
28:6,18;35:1;45:9;
51:17;86:9;95:25;
103:21;108:13;117:5,
11;121:25;122:10
**factors (1)**
101:15
**Faculty (2)**
3:10;19:5
**fail (1)**
146:16
**FAIR (30)**
1:;7:15,21;27:8,8,
12;28:5;34:2;35:15,
25;36:15;39:22;
40:21;55:5,11;64:4;
67:24;70:8;71:21;
78:24,25;96:13,17;
103:24;108:19;
118:17;122:23;
123:12;129:7,7
**fairly (2)**
54:16;93:15
**fake (2)**
39:6,16
**false (5)**
92:10;110:21;
111:1,2;130:16
**falsifying (1)**
124:20
**familiar (10)**
27:7;52:22;53:24;
59:16;68:24;77:21;
78:12;79:12,15;128:1
**familiarize (1)**
141:6
**famous (1)**
128:5
**far (1)**
39:15
**farm (1)**
82:12
**father/son (1)**
111:13
**faulty (2)**
113:9;139:3
**FBI (1)**
134:7
**featuring (1)**
126:23
**Federal (23)**
6:12;24:15,24;25:5;

51:18;71:6;81:20;
98:3,4,22,23;101:2;
109:8;132:21,24;
133:12;135:25;136:3;
137:24;138:11,15,17;
142:20
**feel (3)**
112:24;116:7;
133:18
**feeling (1)**
97:9
**felon (2)**
141:21;143:8
**felony (1)**
85:24
**felt (1)**
142:24
**few (6)**
8:22;65:9;71:9;
90:9;107:2;113:16
**FIGHT (5)**
1:;27:8,8,12;50:21
**figure (4)**
47:18;66:3;111:15;
134:22
**figures (1)**
48:2
**file (1)**
100:25
**filed (3)**
12:11;64:22;66:18
**fill (3)**
74:25;93:18;125:2
**filled (4)**
35:19;38:3,5;124:2
**filling (1)**
36:18
**film (1)**
128:6
**final (2)**
65:4;91:13
**finalizing (1)**
11:19
**find (17)**
14:2;25:22;44:15;
52:16;58:21,23;
68:13;89:10;92:8;
98:18;102:21;116:10;
132:6;133:18;136:24;
138:5;143:7
**finding (5)**
31:22;115:15;
117:3;139:10,12
**finds (1)**
67:22
**fine (4)**
39:3;44:8;64:12;
131:12
**finger (1)**
132:17
**fire (1)**
127:2
**firm (1)**

9:18
**first (24)**
6:17;10:3;14:23;
17:21;23:6;29:3;43:4;
47:13;49:10;51:18;
53:23;65:17;77:8;
80:12;100:12;102:1;
105:23;106:8;107:25,
25;115:24,24;117:1;
124:5
**five (4)**
41:17;107:20,21;
140:5
**flagged (1)**
32:21
**flip (1)**
87:24
**Florida (4)**
111:25;113:7;
141:22;143:9
**flyers (1)**
86:25
**focus (13)**
17:7;22:23;23:5;
24:8;26:21,21;55:9;
60:3;61:1,3,6;88:19;
124:4
**focused (9)**
18:17,20;23:1;
73:19,20;74:6;
141:20;142:19;143:5
**focuses (1)**
97:14
**focusing (6)**
40:20;71:24;77:10;
87:15;138:22;143:8
**foggy (1)**
70:7
**folks (2)**
32:13;124:2
**follow (2)**
15:18;52:8
**follows (1)**
6:4
**fool's (1)**
114:10
**Footnote (10)**
100:17;106:6,22;
107:16,19;109:2,18;
121:19,19,23
**force (1)**
60:11
**foregoing (3)**
145:6,21;148:
**forge (1)**
37:2
**forged (2)**
30:23;35:1
**forgery (1)**
32:9
**forget (1)**
112:16
**forging (3)**

34:22;37:3;72:25
**forgive (1)**
62:19
**form (18)**
6:16;29:15,17;
30:11;35:20;37:3;
38:12;43:14;62:5;
65:4;70:13;84:24;
93:18;94:20;123:23;
125:18;137:13;148:
**formal (2)**
92:22;93:5
**forms (11)**
32:9,21,22,24,25;
35:11;36:19;37:4;
124:4,20;125:2
**forth (4)**
31:2;92:11;135:7;
136:18
**forthcoming (1)**
56:25
**Forum (3)**
3:17;50:1,5
**forward (1)**
18:22
**found (9)**
44:16;51:19;65:9;
73:12;95:20;96:1;
100:10;116:11,13
**Foundation (3)**
122:19;123:1,4
**four (3)**
19:19;58:6;109:5
**fourth (1)**
45:21
**Fox (7)**
50:2,9;53:7;57:15,
17;59:5;60:7
**frame (1)**
94:24
**Frances (5)**
50:2,11;57:15;59:5,
13
**franchise (1)**
46:3
**Franklin (2)**
126:7,24
**Fraud (155)**
3:,,20,23;9:23;13:1,
1;28:25;34:4,6,11,17,
19,20,24,25;35:9,11,
12,18,25;36:6,8;
40:13;46:1;47:8,9,10,
14,20,21,23;48:5,6,
12;49:9,11;56:16,24;
61:2,12;62:8,14;
63:15,18,24;64:5;
67:12,13;68:9,16,21;
69:2,3,10;70:11,16;
71:1,7,10,15,20;
72:22;73:1,3,22,25;
74:22,22;76:7;77:20;
79:4,22;80:8;81:3,5,8,

11;82:1;84:6;88:15,
18,23;89:7;90:11,16,
17;91:9,12;92:1;
93:16;94:8;95:12;
97:18;99:12,19;
100:23;101:4,10;
104:4;105:1;106:9,
15,15,16;107:3,4,8;
108:2;113:17;115:25;
116:2,5;119:1;122:4,
12,17,20,22;123:14,
19,21;124:8,12,14;
125:4,5;127:25;
129:10;130:13,13,14,
15,23;131:21,23;
132:23;133:17;
135:11,23,23;137:10,
13,17,17,20,22,23;
138:8,20;139:10,21;
142:10,21;143:7
**fraudulent (5)**
35:8,19;37:18;73:6;
84:14
**fraudulently (3)**
38:15;39:4;83:11
**fraught (1)**
54:1
**free (3)**
52:5;76:11;112:24
**Freedom (4)**
55:21,22,23;98:7
**freer (1)**
76:2
**frequently (2)**
74:23;111:12
**Friday (1)**
1:12
**front (3)**
7:23;81:23;96:12
**Full (11)**
15:12;16:22;49:8;
50:18;82:7;83:5;84:7;
100:12;107:25;108:4;
139:16
**full-blown (1)**
63:6
**fully (1)**
145:5
**Fulton (4)**
125:25;126:8,15;
127:12
**functioned (1)**
51:20
**Future (1)**
59:3

# G

**gained (2)**
61:4,5
**GAO (5)**
4:;102:17;103:5;
106:6,19

gathered (1)
100:14
gave (1)
142:8
general (17)
40:7;70:1;78:9,23;
79:3;81:7;82:24,25;
83:3;95:10,11,20,21;
96:5,7;102:8;103:17
generally (10)
26:14;33:12;54:23;
64:3;69:23;87:14;
120:7;123:11;131:2;
137:10
General's (6)
80:16,17;95:15;
101:5,21;120:21
generate (1)
36:14
generated (2)
122:7;139:2
generations (1)
48:1
genuinely (1)
48:20
George (1)
112:19
GEORGIA (83)
1:,9;2:,10;9:24;
11:24;12:20;13:2,7;
14:17;17:12;18:24;
23:1,5,7,11;35:17;
38:7,19;40:5,7,14;
51:10,14;58:17;
60:25;61:6,16,19;
62:21;63:10,13,16;
67:14,22;68:7;71:12;
77:9;78:9,18,23;79:2,
8,13,15,20;80:7,10,
15,17,23;81:4,11;
82:8,23,25;83:3;
87:19,21;88:19;
99:17,24;101:15,21;
102:11;105:16;119:2,
11,14,17;120:10,14,
23;121:5,6;122:4;
125:11,25;137:10,17;
138:10;139:21;
143:12
Georgian (1)
13:6
Georgians (2)
12:23,25
Georgia's (13)
11:24;12:5;40:11;
51:18,24;52:3,10;
78:11;109:13;119:21;
120:6;121:20;122:3
gets (1)
93:2
giant (1)
57:19
given (3)

89:7;92:5;148:

## H

half (1)
57:22
halfway (1)
102:18
Hall (2)
47:25;48:17
Hampshire (2)
99:4;101:5
hand (5)
13:4;53:11;64:15;
102:24;129:23
handful (4)
32:7,12;33:3;34:10
hang (2)
58:21;65:23
Hans (2)
44:9;72:3
happen (2)
99:13;128:14
happened (12)
9:5;23:24;31:4,6,7;
36:7;69:24;83:23;
86:20;91:17;134:12,
19
happening (2)
128:16;129:22
happens (3)
88:4;99:16;111:12
happy (2)
42:13;108:12
hard (2)
104:10;124:24
Harvard (1)
14:13
harvesting (1)
82:11
Harvey (2)
10:25;92:24
Harvey's (4)
11:10,14;94:11,17
HAVA (1)
109:3
hazard (1)
105:12
head (3)
7:10;137:25;141:11
heading (1)
49:9
hear (3)
48:9;113:12;131:17
heard (3)
130:24;131:1,25
hearing (1)
127:7
heavily (1)
62:2
heavy (1)
124:24
held (1)
26:9

gives (2)
24:15;115:2
goal (5)
44:2;54:20,22,24;
56:12
goals (3)
24:3;41:23;55:1
Goel (2)
109:22;114:19
goes (10)
38:1,17,18;43:16;
54:13;90:19;104:6;
106:13;124:14;
132:11
good (9)
36:15;37:7;40:16,
23;89:12;104:5;
105:6;121:11;129:11
GOP (1)
50:21
Gore (2)
112:12,20
governing (1)
79:16
government (10)
27:19,24;28:3;
32:19;35:21;96:3;
100:22;120:24;134:6;
142:20
governmental (1)
21:4
government-issued (2)
46:5;52:17
governments (2)
24:4,9
government's (1)
138:15
governor (3)
118:1;130:2,4
governor's (3)
80:7,10;129:18
grab (1)
45:1
great (5)
47:15;56:2;98:19;
100:4;143:21
greatest (1)
57:15
grounds (1)
108:10
group (7)
27:2,4,4;29:8,9,19;
78:3
groups (2)
21:16;29:21
guess (14)
44:7;47:5;76:7,24;
77:2;80:12;86:12;
93:14;94:5;101:25;
111:1;118:12;127:14;
133:23

help (8)
26:17;32:6;36:24,
25;38:22;72:23;96:2;
101:2
helping (1)
25:25
helps (1)
131:10
HEREBY (2)
145:4;148:
here's (1)
71:14
Heritage (3)
122:19;123:1,3
hey (4)
32:23;36:21;
115:16;133:6
hide (1)
44:4
high (2)
130:22;131:21
higher (1)
15:8
highlighted (2)
65:19,25
highly (1)
109:21
hint (1)
129:19
hired (4)
31:8;32:5;33:4;
142:9
historical (4)
58:5;67:8;82:17,20
historically (2)
18:16;73:19
History (4)
19:21;55:17;56:5;
82:21
home (1)
43:7
homicide (3)
134:8,9,11
honestly (1)
46:25
honors (1)
18:7
hope (2)
32:1;95:21
hopefully (1)
55:7
hoses (1)
127:2
Hotel (1)
1:16
hour (2)
8:14;64:7
hours (2)
8:22;125:1
House (2)
78:9;111:5
huge (3)
48:6,19;104:19

hypothesis (1)
116:5

## I

ID (30)
3:14;36:19;38:8,10,
20,22;39:6,7;44:19;
45:4,10;46:5;51:19,
24;52:3,5,10,17;
73:20;74:1,3,9,25;
75:2;81:21;86:2,10;
121:21,22;141:3
idea (9)
17:23;18:15;33:13,
18;48:5;59:10;79:6;
128:25;139:9
ideal (1)
42:14
identical (1)
13:23
identification (19)
8:5;12:5;13:16;
19:6;20:8;39:16;
41:10;42:18;45:6;
49:5;50:6;53:20;
56:17;61:13,20;62:9;
64:19;103:7;140:17
identified (7)
83:2;93:10;95:5;
101:15;105:16;
106:10;107:2
identify (3)
58:10;68:15;123:6
identifying (1)
106:14
ie (1)
100:23
illegal (5)
35:4,6;71:11,11;
83:19
illegally (1)
30:8
imagine (1)
104:22
immigrant (1)
21:16
immigration (1)
21:18
imperative (1)
146:13
imperfect (2)
135:4;136:7
impersonating (1)
39:9
impersonation (1)
67:23
implement (1)
24:17
implementation (1)
24:13
implemented (1)
24:19

implementing (1)
26:4
imply (1)
132:19
implying (2)
36:5;48:11
important (4)
24:16;55:20;70:21;
84:12
improper (4)
124:3,3,7;125:10
improve (1)
96:2
improving (1)
59:23
inaccurate (2)
90:3;115:7
incidence (16)
9:23;40:13;67:11;
74:22;88:15,17;
98:11;103:12,22;
107:8;122:4,22;
134:14;135:18;137:9;
142:10
incident (3)
90:17;91:11;104:24
incidents (1)
90:9
include (1)
61:3
included (3)
63:1;121:5;143:12
includes (1)
100:20
income (1)
26:25
incomplete (2)
136:7,23
inconsistencies (2)
136:9;137:6
inconsistent (1)
136:24
incorrectly (2)
84:21;112:25
increase (3)
26:22,24;89:21
INDEX (1)
5:1;61:9
indicate (1)
80:14
indicated (1)
86:10
indictments (2)
135:19,21
individual (10)
9:11;44:9;49:9;
58:10;71:25;105:7;
123:5;142:23;143:1,4
individuals (3)
33:8;70:3;102:11
ineligible (5)
85:13;86:11;87:6
inference (1)

137:7
inferences (2)
90:13;104:8
influence (2)
125:15,21
influences (2)
57:23;127:23
inform (2)
26:19;41:20
information (8)
25:20;98:7;107:3,
22;108:15;109:8;
123:3,9
Initiative (4)
96:22;132:10;
133:5;142:15
Innocent (3)
84:8,18;86:17
in-person (5)
38:21;106:9;107:2,
4,8
inquiry (1)
104:13
inside (1)
96:25
insists (1)
60:12
instance (1)
35:24
instances (3)
106:8;107:2;134:20
instruction (1)
18:15
INSTRUCTIONS (1)
146:1
Insurgency (3)
59:2,8,19
Integrity (11)
96:22;97:13,20,21;
99:23;132:10;133:5;
141:13;142:15,17,25
intensive (1)
31:17
intent (2)
87:8,12
intentional (1)
34:7
intentionally (1)
87:19
interact (1)
33:9
interaction (1)
97:7
interchangeable (1)
48:10
interest (1)
99:18
interested (3)
10:7;54:19;76:8
interests (3)
20:1;54:15;57:24
internal (1)
92:25

internet (1)
44:25
interpretation (2)
129:5;138:13
interrupt (1)
7:4
interrupted (1)
67:3
intersection (2)
17:5;56:11
interview (1)
142:12
interviewed (2)
85:20;108:21
interviews (2)
136:18;142:8
intimidation (2)
97:23;142:11
into (17)
32:25;35:4,5,6,7;
36:3;47:23;48:19;
72:9,10;82:4;91:5;
93:3;94:2;109:20;
111:9;132:11
invalid (6)
84:11,13;85:6,9,10;
86:6
investigate (1)
86:19
investigated (1)
96:1
investigation (7)
91:10;92:6;93:1,3,
6;94:2;101:4
investigations (3)
93:6;100:24;136:14
investigator (2)
91:23;92:18
investigators (1)
93:10
involved (11)
17:9;32:11,12;51:4;
69:19;72:22;74:7,13;
75:7;77:19;133:5
involving (3)
52:9;124:1;125:25
irrational (1)
123:15
irrelevant (3)
139:12,13,14
issue (14)
12:5;52:21;53:1,3;
55:3,10,10;63:17,23;
76:24;77:3;95:12;
132:13;133:3
issues (5)
21:18,23;30:8,14;
70:10

J

jail (1)
83:18

January (1)
49:17
Japanese (1)
128:6
jbelinfante@robbinsfirmcom (1)
2:11
Jenner (1)
9:20
Jeremy (7)
9:12,18;38:5,7,9,16,
19
Jersey (3)
15:25;16:7;75:7
job (2)
132:20;133:20
John (7)
126:5,20,22,25;
127:3,4,9
Jones (2)
140:13,21
Jones' (1)
12:15
JOSH (6)
2:9;6:7;111:4,6;
117:17;118:16
journal (2)
42:22;58:25
journalism (1)
40:23
Jr (1)
118:16
Judge (7)
12:15;51:19;75:15;
76:5,7;81:23;140:13
judging (2)
135:10;138:8
Julius (1)
14:11
July (1)
13:22
junior (1)
111:7
juries (2)
142:16;143:5
jurisdiction (4)
81:4,8,10;98:24
jurisdictions (3)
141:24;143:10,12
justice (9)
43:7;59:24;96:25;
97:8;132:22;137:25;
141:14;142:22;143:3
Justice's (1)
132:9
justifying (1)
75:2

K

keep (4)
64:9,13;72:14,19
Keeping (2)
57:3;88:9

Kentucky (1)
129:19
kind (56)
14:25;16:20;17:22;
25:16;26:19;31:16;
22;35:7,9;37:24;
39:12;48:4;52:20;
54:10,13,25;55:17;
56:10;57:19;69:20;
70:21;72:24;75:8;
86:23,23;87:24;
89:23;91:12;93:9,19;
94:4,5,6;95:19;97:24;
98:2,14;104:18;
110:21;113:4,14;
114:9;115:12;117:8,
14;121:10,12;122:11;
124:22;125:5;130:7;
131:8;132:12,19;
135:1,15
kinds (7)
77:22;91:3;94:15;
125:3;136:8,12;139:6
knew (1)
32:20
knock (1)
31:21
knocking (1)
124:24
knowledge (6)
38:6;61:4,5;79:10,
19;97:17
known (3)
27:8;28:6;79:13,16;
127:25
knows (1)
39:7
knuckleheads (1)
36:18
Kurosawa (1)
128:9

L

Labor (5)
3:17;21:3;31:16;
49:25;50:5
lack (1)
113:10
large (1)
113:22
largely (1)
73:18
larger (1)
62:22
last (14)
9:13;11:5,11;19:19;
20:21;58:11;77:11;
80:13;83:8;103:10;
109:5;127:6;133:24;
138:4
lastly (1)
80:6

**late (1)**
118:10
**later (3)**
99:11;101:16,17
**law (33)**
9:18;11:24;12:5,23;
23:1,6;24:24;26:4;
28:13;32:24;51:19;
52:3;63:16,16;78:18;
81:6,21;82:8,18;
85:13;86:5;98:3,4;
109:8;119:6;120:10,
20;121:21;133:17;
135:18;138:11;139:1;
141:3
**LAWRENCE (1)**
2:
**laws (9)**
32:17;51:6,15;
63:22;71:6,9;75:2;
83:1,21
**lawsuit (1)**
12:6
**lawyers (1)**
13:3
**leading (1)**
24:4
**leads (1)**
107:16
**leagues (1)**
60:10
**learned (2)**
58:1,2
**least (9)**
18:23;30:14;38:8,
22;47:9;48:23;52:3;
69:13;105:16
**leave (3)**
44:8;48:13;91:10
**leaving (1)**
33:22
**lecture (1)**
23:11
**Lee (3)**
126:9,17,22
**left (2)**
43:6;54:3
**legal (4)**
39:2;52:23;76:24;
91:6
**legal-sized (1)**
72:16
**legislation (3)**
24:15;54:18;78:24
**legislative (4)**
78:7,14,15,19
**legislators (1)**
51:6
**legislators' (1)**
51:14
**legislature (1)**
51:21
**legislatures (1)**

100:22
**lens (1)**
128:13
**LESLIE (4)**
2:3;6:13;66:25;
140:1
lesliebryan@lawrencebundycom (1)
2:
**less (1)**
137:22
**level (8)**
15:3;24:14;50:21,
22;99:22;130:9;
132:21;134:6
**Lewis (4)**
126:5,24,25;127:3
**license (2)**
33:17;109:4
**life (2)**
43:1;127:4
**light (1)**
55:10
**likelihood (1)**
115:13
**likely (4)**
51:7;82:13;104:14;
118:21
**limit (1)**
104:3
**limitations (1)**
107:5
**limited (2)**
75:1;84:2
**Line (7)**
5:5,8,11;58:11;
111:10,14;147:4
**lines (1)**
108:5
**list (1)**
113:14
**listed (1)**
41:2
**listening (1)**
133:7
**Listing (2)**
3:10;19:5
**list-matching (1)**
115:25
**literature (1)**
17:23
**litigation (7)**
25:8,12,19;27:10;
28:3;58:14;74:8
**little (21)**
18:14;22:4;25:25;
30:22;31:18;34:3;
46:16;47:19;66:23;
68:20;70:7;97:6;
122:15;123:12;
128:23;129:15;
131:15;134:1;135:23;
137:2;139:10
**LITTLEFIELD (1)**

2:
**live (1)**
116:19
**LLC (2)**
2:,
**local (8)**
29:24;30:2;81:12;
82:8;98:5,24;99:22;
135:25
**locations (1)**
120:3
**logic (4)**
37:25;124:11,13;
125:3
**long (5)**
31:19;56:5;72:16;
108:5;124:25
**look (26)**
18:6;28:4;34:20;
66:15;68:13;78:6,14;
81:25;88:14;89:8,16;
90:7;92:14;94:1;98:3;
111:16;117:15;
121:18;132:16;
134:18,18;136:11,12,
21;137:5,9
**looked (16)**
63:5,5;77:8;91:19;
93:13,23;95:14;
98:20,21;99:2;
100:19;105:15,22;
106:2;136:20;137:11
**looking (28)**
20:20;34:23;37:5;
39:11,19;51:1;61:18;
64:1;71:20;77:16;
81:6;88:22;89:9,23;
90:5,25;91:2;100:10,
18;107:11;131:6;
133:2,16;135:15;
136:6,9,11;137:2
**looks (4)**
20:15;83:24;
110:22;140:24
**LORRAINE (5)**
1:15;3:3;6:2,8;148:
**loses (2)**
129:8,10
**lost (2)**
88:4;129:21
**lot (11)**
45:13;47:21;48:9;
74:5;90:10,11;
100:18;104:6;116:18;
122:6,17
**lots (1)**
30:21
**Louisiana (1)**
25:17
**low (3)**
26:25;73:25;112:7

2:
**M**

**machines (1)**
119:17
**magazines (1)**
40:25
**mail (1)**
88:4
**main (2)**
16:4,6
**mainly (1)**
40:19
**maintain (2)**
23:17;119:22
**major (2)**
50:20;73:3
**makers (1)**
39:20
**makes (2)**
90:10;112:17
**making (3)**
43:18,22;135:16
**mandates (1)**
24:17
**manipulating (1)**
72:7
**manipulation (1)**
70:2
**manner (1)**
125:22
**many (24)**
30:20,20,20,21;
31:20;33:2;46:21;
47:16;51:3;55:1;
75:11,12;89:10;90:6;
96:21;103:21,23;
113:23;121:6;136:13,
13,14,15;138:24
**margin (2)**
115:9,18
**mark (10)**
13:11;19:3;20:4;
41:7;49:25;61:8,25;
64:16;103:1;140:12
**MARKED (20)**
3:6;5:10;8:4;13:15;
19:5;20:7;41:9;42:17;
45:5;49:4;50:5;53:19;
56:16;61:12;62:8;
64:18;66:12,17;
103:6;140:16
**Mary (1)**
126:24
**mass (1)**
60:13
**massive (1)**
75:7
**master's (1)**
14:7
**match (3)**
109:9,14;116:12
**matched (1)**

50:20
**matches (1)**
110:20
**matching (1)**
113:14
**materials (4)**
81:16;98:8,12;
105:25
**math (8)**
109:20;112:22,24;
113:3,21;114:2;
118:3,6
**matter (4)**
6:23,24;139:4;
145:7
**matters (3)**
12:23;74:8,9
**may (34)**
12:13;31:18;33:21;
35:11;36:24,25;
48:18;53:2;54:18;
58:22;66:2;68:22;
72:2,3;77:15,24;82:3;
85:12;90:25;105:7;
106:3,9,16;112:24;
118:4;124:5;127:4;
130:6;131:16;134:2,
15;143:1;146:17,18
**maybe (9)**
69:20;89:20;99:9;
111:14,15,15;124:20;
128:15;138:22
**Mayor (2)**
22:11;126:6
**McCabe (2)**
22:14,16
**McCormick's (1)**
83:25
**mean (27)**
13:5,7;26:20;29:17;
39:1;42:1;45:12;
47:10;59:8,18,22;
62:21;65:17;68:4,5;
78:2;83:5,14;85:11;
93:21,23;110:14,25;
118:18;122:14;
124:10;127:19
**meaning (2)**
99:13;114:18
**means (5)**
105:4;114:23;
116:11;135:23;
145:23
**meant (3)**
26:23;57:17;85:11
**measure (13)**
34:18,20;47:14;
88:13;104:10,10;
105:5,6;125:6,9;
134:14;135:13;138:9
**measured (2)**
89:16;139:7
**measurement (4)**

36:8;110:4;114:21;
115:21
**measurements (1)**
34:16
**measures (1)**
135:4
**measuring (3)**
103:20;135:11;
138:9
**media (1)**
41:20
**meet (2)**
70:16;73:9
**meeting (1)**
91:20
**member (4)**
29:2,6;30:5;79:20
**members (1)**
29:4
**memory (2)**
70:6;82:3
**mention (1)**
51:17
**mentioned (5)**
61:19;88:9;91:3;
127:19;130:11
**met (1)**
27:5
**method (9)**
33:21,22;34:1;78:5;
92:3;105:14,14;
118:11;127:24
**methodology (4)**
58:2;88:22;104:7;
136:6
**methods (2)**
58:3;119:21
**Mickey (3)**
35:20,23;38:4
**Middle (1)**
80:22
**midway (2)**
20:25;109:2
**might (18)**
54:14;55:2;63:14,
17;89:17;90:22;91:4,
9,15;111:16;117:15;
124:15;125:4;129:22;
130:1;135:13,17;
143:5
**million (1)**
113:1
**millions (2)**
135:24;138:6
**Milwaukee (3)**
85:21;141:21;143:8
**mind (1)**
109:17
**Mine (1)**
65:24
**Minnesota (2)**
99:3;101:1
**MINNITE (25)**

1:16;3:3,7;6:2,8,21,
22;8:5;13:15;19:5;
20:7;21:1;41:10;
42:17;45:5;49:4;50:6;
53:19;56:16;61:12;
62:8;64:18;103:6;
140:16;148:
**minus (2)**
115:10,15
**minute (1)**
132:6
**minutes (5)**
91:20;92:19;93:5,
25;140:5
**misdemeanor (1)**
39:3
**misled (1)**
86:21
**misplaced (1)**
60:9
**misreading (1)**
117:2
**Miss (1)**
60:9
**missed (1)**
77:24
**missing (9)**
19:18,20;104:11,
12,14,19,20,25;
136:17
**Missouri (1)**
32:16
**mistake (1)**
86:18
**mistakes (1)**
115:6
**mistreated (1)**
60:2
**misunderstanding (3)**
89:1;117:2,9
**misunderstood (1)**
46:20
**mixed (1)**
105:14
**mixed-method (1)**
89:11
**mixed-methods (2)**
89:9,17
**moderate (2)**
126:18,21
**modern (2)**
18:20,21
**moment (2)**
39:18;71:7
**money (1)**
69:19
**monitor (2)**
24:13,19
**months (1)**
82:11
**more (21)**
20:18;33:14;44:7;
54:2;55:11;65:9;

69:16;77:8;89:9;
97:23;105:10;112:19;
118:20;123:20;124:8;
125:5;129:14,15,21;
137:6;142:25
**Morris (3)**
126:9,17,22
**most (7)**
44:2;67:10;73:13;
82:13;110:2;115:21;
142:20
**mostly (3)**
46:1;87:14;142:19
**motivate (1)**
124:16
**motivated (7)**
37:25;39:2,5,5;
122:9;127:18;129:17
**motivation (2)**
124:14,22
**motivations (1)**
51:14
**Mouse (3)**
35:20,23;38:4
**move (1)**
112:18
**movement (19)**
41:19,24;53:25;
54:2,6,9,19,22;55:8,
18,21,22,23,24;56:1,
3,6,11;60:14
**Movements (12)**
3:18;17:5;42:6,9;
43:7;53:8,18;55:19;
56:10;58:6,7;59:25
**movie (2)**
128:5,11
**movies (1)**
48:3
**much (13)**
8:18,20;10:19;
18:20,24;20:3;29:23;
44:20;104:11,25;
118:20;125:7;143:22
**multiple (1)**
94:12
**multiplied (1)**
113:1
**multiply (1)**
114:3
**murder (1)**
135:6
**Murphy (2)**
51:19;81:23
**must (2)**
129:10;135:20
**Myrna (1)**
58:10
**Myth (16)**
3:,,21,24;47:24;
48:7,17,20;56:15,23;
61:1,11;62:7,13;79:4;
101:10

**mythic (1)**
48:4
**Myths (2)**
17:16;47:24

**N**

**name (8)**
6:6;9:13;28:8;
38:16;102:9;111:3,4;
128:7
**named (2)**
44:9;58:10
**names (2)**
81:19;116:12
**National (11)**
24:13,17;29:8,9,19;
30:1,3;49:13;50:20;
76:15;77:5
**nationally (1)**
33:4
**nature (1)**
119:6
**near (1)**
117:8
**necessarily (6)**
34:24;38:24;54:20;
95:23;104:23;139:19
**necessary (1)**
146:4
**Need (10)**
3:18;7:11;34:15,20;
36:24,25;53:8,18;
57:8;74:24
**needed (2)**
60:11;76:2
**needs (1)**
41:20
**nefarious (2)**
129:20;130:3
**Neither (1)**
14:16
**Network (3)**
3:;48:24;49:3
**New (18)**
3:17;14:5;15:25;
16:7,7;49:25;50:5;
59:14;60:6;65:15;
67:6,14;72:13;75:7;
82:9;84:2;99:4;101:5
**news (10)**
77:9,15,17;80:14;
90:10;95:17;105:23;
123:7;129:23;137:1
**newspaper (1)**
28:23
**newspapers (1)**
77:9
**next (5)**
15:5;80:20;104:13;
132:11;135:3
**night (1)**
118:10

**nobody (1)**
117:11
**NONE (6)**
5:6,9,12;27:18,22;
35:5
**Nonexistent (2)**
49:10;73:25
**Nonpartisan (1)**
27:4
**nonprofit (2)**
27:4,4
**North (6)**
68:24;69:24;70:10;
123:19;124:1,17
**NORTHERN (2)**
1:;80:22
**Notary (2)**
1:20;148:20
**note (1)**
36:6
**noted (2)**
146:11;148:
**notes (2)**
91:20;145:6
**Notice (3)**
3:8;7:24;8:4
**November (2)**
13:21,23
**NUMBER (28)**
3:6;53:12,15;61:22;
86:3;102:15;103:19;
104:16,17;111:18,24;
112:2;113:2,6,23;
115:8,10,14;116:4;
117:6,19;121:8;
130:22;131:21;
133:11;134:23,25;
139:11
**numbers (5)**
109:5,7;129:9;
134:8;136:25
**numerous (2)**
58:25;132:15
**NVRA (2)**
24:19;119:23
**NW (2)**
2:,

**O**

**oak (1)**
72:22
**object (3)**
43:14;108:9;125:18
**objecting (1)**
108:17
**Objection (9)**
29:14;30:10;38:11;
43:19,23;62:4;70:12;
84:23;137:12
**objections (1)**
6:14
**obvious (1)**

54:16
**obviously (3)**
62:21;104:11,21
**Occupational (1)**
105:12
**occur (1)**
106:9
**October (1)**
53:7
**Off (9)**
26:6,9;28:13;43:3;
72:18;80:4,5;113:18;
118:23
**offended (2)**
7:5;67:1
**offer (3)**
24:25;105:10;
133:14
**offered (1)**
25:22
**offering (1)**
43:15
**offhand (2)**
33:1,2
**office (20)**
30:1,3;72:11;79:9;
80:7,10,17,21,24;
91:7,25;94:9;95:15;
100:25;101:1,5,21;
102:9;120:21;132:25
**Office' (1)**
80:16
**officers (1)**
98:1
**official (5)**
1:;32:18;100:14;
112:16,18
**officially (2)**
49:12;89:13
**officials (11)**
13:7;24:16;32:22;
84:9;87:16,19;98:4;
99:21;106:10;116:22;
119:11
**official's (1)**
85:15
**often (3)**
56:9;59:25;129:17
**Ohio (1)**
76:22
**once (1)**
85:16
**one (54)**
11:4;13:22;14:16;
15:8,13;16:25;19:20;
24:3;25:15;26:13;
28:17;34:14;39:20;
40:10;41:3,23;42:22;
43:3;44:13;50:1;
51:10;52:4;54:12;
55:2,14;57:6,7;58:9;
63:11;66:18;75:3;
81:22;83:2;90:8;

91:15;101:19;102:14;
105:6;110:2;111:13,
14,17;116:4,13,14,16;
123:13;126:10;
130:21;131:20;135:2;
136:5;137:4;141:21
**one-off (1)**
128:24
**ones (3)**
22:10;95:4;97:10
**online (3)**
91:20;108:14;
122:20
**only (13)**
7:13;25:15;27:10;
48:15;60:13;88:23;
89:4;93:22;96:15;
102:14;104:15;105:4;
116:24
**open (4)**
37:1;120:21,22;
127:1
**open-minded (2)**
43:8,12
**operate (1)**
56:10
**operates (1)**
96:5
**operatives (1)**
45:24
**opine (8)**
9:22;42:3;51:13;
73:24;78:22;82:25;
83:6;87:18
**opining (9)**
109:13;119:9,13,
16,21;120:1,5,9,13
**opinion (8)**
40:2,10;42:7;43:15;
82:5;94:23;99:17;
118:20
**opinions (5)**
67:11,17,18,21;
94:21
**opportunity (4)**
24:25;25:23;87:20;
88:1
**opposed (2)**
23:5;64:2;69:2
**opposite (1)**
84:17
**Oral (1)**
1:15
**order (7)**
72:19;75:16,19,23;
76:4;77:5;111:12
**orders (1)**
12:15
**Oregon (1)**
99:4
**organization (9)**
23:19;24:3;25:13;
26:2,16;27:8;32:10,

20;69:21
**organizational (1)**
69:22
**organizations (6)**
21:4,22;31:14;33:6;
40:24;51:5
**organize (1)**
76:3
**organized (5)**
29:12,20;59:12;
76:23;96:25
**organizing (1)**
21:23
**orient (1)**
41:21
**original (1)**
146:14
**others (1)**
33:7
**Otherwise (2)**
7:19;68:3
**ought (1)**
39:21
**out (38)**
8:24,25;9:2;10:3,5;
20:14,16,23;25:22;
35:19;36:19;38:3,5;
46:16;47:18;55:1;
61:24;63:2,4,13,20;
66:3;71:10;75:4,22;
83:18;86:25;93:18;
111:15;112:10;
115:25;116:16;117:5;
124:2;125:2;131:8;
132:23;133:6
**outcome (3)**
28:15;91:13;95:18
**outgoing (2)**
130:2,4
**outlined (2)**
70:17;123:2
**outreach (1)**
129:12
**outside (1)**
137:17
**over (11)**
48:1;56:6;65:9;
75:13;76:19;77:11;
81:3;86:10;112:11;
134:17;146:3
**overview (1)**
63:21
**Owens (1)**
73:4
**own (5)**
11:20;22:5;41:20;
89:20;100:14

---

**P**

**PAGE (44)**
3:2;5:5,8,11;19:11;
41:16;50:16,17;

57:10;58:21,23;
61:22;67:19;68:15,
17;72:17;77:6;80:13;
81:15;82:6;83:7;84:6,
7;87:4;88:17;100:11;
102:16,18;103:10;
106:7,22;109:1,19;
119:2;121:19,23;
122:18;130:17;
132:11,12;133:25;
138:4;141:5;147:4
**pages (7)**
62:16,17,20;103:3;
105:17;120:17;148:
**paid (3)**
30:17;124:21;125:2
**paper (7)**
109:22;113:15;
114:12,18;117:3,13;
136:21
**papers (1)**
113:16
**paragraph (19)**
45:21;49:8;50:18;
53:23;59:1;67:20;
82:7;83:8;84:8;
100:13;107:10,25;
109:1;132:12,14;
133:24;138:4;141:4,6
**paragraphs (1)**
57:14
**parameters (1)**
32:4
**paraphrasing (1)**
127:6
**parenthetically (1)**
90:23
**parsing (1)**
118:19
**part (21)**
12:7,17;17:11;
24:12;25:18;52:25;
63:13;65:17;67:10;
73:16;84:9,10;85:15,
15;97:13;106:14;
122:12;126:3;127:6;
133:4,16
**partially (1)**
89:19
**participate (1)**
28:3
**participated (3)**
25:7,24;73:6
**Participation (2)**
17:1;26:22
**particular (5)**
74:6;75:14;76:18;
107:20;125:21
**parties (6)**
50:20;51:4;76:16,
22,25;77:4
**partisan (1)**
121:25

**partly (1)**
25:23
**parts (3)**
18:16;59:19;62:24
**Party (6)**
45:24;51:5;69:12,
14;73:15;76:22
**party's (1)**
45:25
**pass (2)**
54:18;78:24
**passage (1)**
56:3
**passing (2)**
51:6,14
**past (2)**
21:17,22
**patently (1)**
92:9
**patterns (2)**
89:24;136:10
**pay (3)**
70:21;71:23;130:6
**Peachtree (1)**
2:
**pen (1)**
66:22
**penalties (1)**
64:2
**penalty (1)**
39:2
**Pennsylvania (2)**
1:18,21
**people (39)**
24:25;26:22;31:8,
14,21,22;32:7,10;
33:2,3,7,23;36:24;
37:3;44:2;45:1;47:20;
48:19;54:14;59:25;
71:23;72:5,23;86:25;
87:6,7;88:12;89:2;
93:18;95:17;96:18;
110:24;116:21,21;
128:13,25;129:15,22;
136:17
**people's (2)**
39:10;58:6
**Pepper (3)**
3:13;42:17,23
**Pepper's (1)**
43:4
**percent (10)**
18:23;94:15;
103:19;104:16,17;
110:10;116:8;134:10,
22,22
**percentage (1)**
114:4
**percentages (1)**
104:2
**Perez (2)**
58:11,13
**perfect (2)**

134:14;135:13
**perhaps (7)**
39:21;61:18;84:18;
101:25;118:19;
128:21;130:8
**period (2)**
25:15,17
**permitted (1)**
82:8
**perpetrator (1)**
36:12
**persistent (1)**
89:1
**person (11)**
38:10,18,23;39:1;
85:22;116:13;129:9,
10,11,25;134:5
**personally (1)**
59:16
**persons (1)**
88:1
**person's (3)**
85:14;87:12;93:21
**persuaded (1)**
130:1
**phenomenon (4)**
88:11;89:16;
127:25;136:10
**Philadelphia (1)**
1:17
**phone (1)**
112:23
**photo (20)**
12:5;38:8,10,20,22;
51:18;52:3,5,10,17;
61:20;73:20;74:1,3,9,
25;75:2;81:21;
121:22;141:3
**photocopy (2)**
57:10;103:2
**photos (1)**
39:10
**phrase (2)**
52:22;59:21
**picked (1)**
63:7
**picks (1)**
111:6
**pilot (2)**
141:20;142:5
**Piven (11)**
50:2,10;53:7;57:16,
18;59:5,11,13;60:7,9,
17
**place (7)**
39:10;67:23;71:18;
86:22;91:15;92:14;
111:10
**places (1)**
83:9
**plain (1)**
66:5
**Plaintiffs (5)**

1:5;2:6;52:15;
93:15;121:16
**Plaintiff's (7)**
8:23;9:1,2;12:19;
13:8;65:3,7
**planting (1)**
82:10
**play (1)**
24:4
**plays (1)**
45:22
**please (3)**
58:20;146:3,8
**plenty (1)**
67:1
**plus (2)**
115:10,15
**pm (1)**
144:2
**point (33)**
14:12;64:8;67:15;
71:2;76:19;80:12,14,
20;81:15;87:5;
105:13,15,19,23;
112:14;114:9;115:23,
24;117:1,22;118:4;
130:18;131:5,6;
132:17;133:15;134:2;
136:5;138:2,12,14,16;
139:18
**pointed (1)**
63:14
**points (4)**
77:7;89:10;105:17;
106:2
**police (3)**
83:10,18,20
**policy (12)**
16:18;21:7,13,19;
36:15;37:6;38:1;
39:20;55:7;74:4;
135:8;143:2
**policymakers (1)**
120:14
**political (14)**
21:5,6;22:7,8;
41:19,24,25;42:6,12;
50:22;57:21;124:18;
125:14;129:16
**politically (2)**
122:9;129:16
**Politicians (5)**
3:18;53:8,18;71:22;
83:9
**politics (19)**
17:6,11;42:2;53:25,
25;54:2,6,6,9,10,15,
19,23,25;55:6,9,19;
56:11;60:1
**poll (7)**
39:7;51:20;72:6;
85:25;86:2,8;111:11
**polled (1)**

127:17
**polling (4)**
39:10;67:23;
111:10;120:3
**poor (4)**
26:22;58:6;59:25;
60:10
**populations (1)**
107:5
**portion (4)**
72:14;110:5;
114:22;115:23
**position (2)**
33:6;75:25
**positive (4)**
10:16;110:22;
111:1,2
**possibility (1)**
37:2
**possible (6)**
33:19;36:4;89:10;
115:5;127:21;128:25
**possibly (3)**
110:4;114:21;
115:22
**potential (1)**
103:13
**practice (1)**
121:12
**practices (3)**
40:16;71:10;135:22
**precinct (1)**
86:16
**precincts (1)**
72:20
**preexisting (1)**
10:6
**prefer (1)**
6:21
**preparation (1)**
12:21
**prepare (1)**
8:8
**prepared (2)**
11:13;40:18
**preparing (5)**
8:18,21;11:12;
80:18,25
**presented (2)**
44:14;128:12
**President (4)**
112:10,12;117:25;
118:2
**presidential (3)**
41:17;111:25;114:1
**press (8)**
54:18;80:15,21;
95:12,14;106:1;
133:6;136:16
**presume (4)**
7:20;68:7;117:7;
127:5
**presumed (1)**

16:14
**pretty (4)**
16:22;18:12;20:3;
131:16
**prevailed (2)**
28:16;52:13
**prevalence (1)**
88:6
**prevalent (3)**
123:20;124:8;125:5
**prevent (5)**
38:8,23;39:12;
75:18;88:12
**prevented (1)**
87:7
**primarily (2)**
18:17;25:6
**printed (1)**
48:23
**printout (1)**
19:9
**prior (7)**
44:13;65:14;67:5,7;
92:25;142:18,18
**prison (2)**
86:2,10
**privilege (1)**
6:15
**probability (2)**
115:3,13
**Probably (14)**
11:18;20:14;22:2;
33:22;41:1;56:22;
92:22;95:24;99:21;
103:18;118:21,23;
127:10;130:19
**problem (13)**
32:23;34:10;36:17,
18,21,25;37:8,12;
48:6;122:11;133:22;
134:21;135:17
**problems (3)**
32:21;134:16,17
**Procedure (1)**
6:13
**procedures (2)**
11:25;12:8
**proceeding (1)**
76:18
**proceedings (2)**
75:13;145:4
**process (13)**
26:23;34:7;36:13;
37:11,11;65:13;70:2;
86:24;90:20;92:5,25;
105:8;114:14
**produce (1)**
39:6
**produced (2)**
95:1;98:13
**produces (1)**
93:19
**producing (3)**

92:5;110:9,21
**Production (1)**
5:7
**Professional (3)**
1:19;58:24;145:
**Professor (14)**
6:22;14:23;15:4,7,
12,14,14;16:9,19;
50:10;57:25;66:13;
83:25;118:11
**professors (1)**
14:25
**professorship (1)**
15:6
**program (6)**
76:13,23;96:24;
97:2,25;98:9
**programs (2)**
21:24;76:4
**progressive (4)**
41:19,24;42:5,9
**Project (13)**
23:15,18;24:2,12,
18;25:7,11,18,25;
26:13,13;102:1;
142:15
**projects (4)**
25:12;26:18;
141:20;142:5
**promote (1)**
42:10
**promoted (1)**
45:23
**promotion (2)**
15:17,17
**pronounce (3)**
9:13;28:7;109:23
**pronouncing (1)**
14:20
**Propaganda (5)**
3:14;44:19;45:4,10,
23
**proposals (1)**
37:6
**propounded (1)**
148:
**prosecute (6)**
81:4,8,11;97:10;
98:5;133:10
**prosecuted (4)**
137:22;142:18,20,
23
**prosecuting (1)**
95:23
**prosecution (3)**
97:17;137:10,13
**prosecutions (4)**
99:3;136:4,15;
137:16
**prosecutors (5)**
81:13;130:23;
131:22;132:17;
133:20

**protest (1)**
60:14
**proud (1)**
42:13
**prove (3)**
130:15,24;131:23
**provide (5)**
9:25;10:8;67:16;
82:17;107:3
**provided (8)**
22:7;9;27:23;73:24;
75:17;107:22;123:9;
140:21
**provides (1)**
82:20
**Public (17)**
1:20;16:17;21:7,13;
24:23;36:15;38:1;
46:2;93:17;95:25;
97:12,14;100:25;
135:8;141:12;142:17;
148:20
**publication (1)**
44:23
**publications (1)**
40:22
**publish (1)**
45:1
**published (1)**
44:16
**pull (1)**
122:21
**pulled (5)**
43:3;45:18;63:13,
18;131:8
**pulling (1)**
77:15
**puny (1)**
133:11
**purpose (5)**
6:11;18:21;34:4;
39:16;139:22
**purposes (14)**
6:12;10:18;34:16,
23;36:8;57:10;59:17;
68:21,23;70:11;73:9;
78:23;109:7,12
**pursuant (1)**
119:22
**pursue (2)**
54:14,14
**put (5)**
7:23;55:11;63:4,19;
71:21
**putting (1)**
133:6

**Q**

**quantify (2)**
88:13;125:9
**quick (1)**
66:2

**quite (2)**
72:16;104:6
**quote (3)**
60:18,20;76:12

**R**

**race (2)**
126:1;129:18
**racism (2)**
48:13,15
**RAFFENSPERGER (2)**
1:8;6:10
**raise (2)**
55:2;132:13
**raised (3)**
29:18;55:3;82:2
**raising (1)**
133:3
**ran (1)**
125:24
**range (7)**
25:5;100:15;115:4,
8,15;136:19,19
**rare (1)**
123:14
**Rashomon (6)**
128:1,3,9,22;
129:13;130:11
**rate (14)**
110:9;114:24;
115:2;117:9,14;
134:9;135:1,6,6,7;
138:10,20,25;139:3
**rates (9)**
26:24;134:10,18;
135:11;138:8,18,18;
139:15,16
**rather (3)**
29:12;55:24;125:1
**ratio (1)**
118:13
**rational (2)**
36:15;127:8
**rationality (1)**
124:11
**reach (3)**
8:24,25;137:24
**reached (3)**
9:2;10:3,5
**read (33)**
8:25;10:13,15,21,
24;11:3,10,14;12:10,
13,14;44:13;50:15;
56:24;57:6;58:9;60:4,
6;63:11,11;73:12;
79:4,9,21;80:8,14;
81:15;92:24;110:13;
141:5,7;146:3;148:
**reading (6)**
65:9;78:17;89:3;
92:23;107:12;111:22
**reads (3)**

49:10;84:8;109:3
**real (7)**
61:1;66:2;99:13;
104:16,17;115:8,14
**reality (1)**
47:25
**really (13)**
21:17;26:21;32:9;
36:20;42:12;63:25;
80:9;87:11,13;89:12;
128:15;138:16;
139:17
**reask (1)**
7:19
**reason (8)**
36:7,14;62:18;
74:24;79:1;80:6;92:5;
146:5
**reasonable (1)**
113:3
**reasoning (1)**
113:10
**reasons (4)**
92:12;123:13;
130:21;131:20
**recall (10)**
45:20;46:8;48:24;
53:5;78:3,17;96:12;
102:12,13;111:24
**receipt (1)**
146:15
**receive (1)**
98:2
**received (1)**
95:2
**recent (5)**
9:24;21:18;74:4;
75:1;93:22
**recently (2)**
93:15;95:1
**recess (2)**
100:6;140:8
**Reclaimed (1)**
45:16
**recognized (1)**
55:4
**reconvene (1)**
143:16
**record (14)**
7:11;26:7,9,12;
47:19;57:9;59:17;
80:4,5;90:21,22;91:4,
10;117:18
**recorded (2)**
118:22;121:7
**records (12)**
110:4,17,19;
114:21;115:22;116:6,
19,19;117:5,16;
120:21,23
**recount (1)**
112:15
**Red (4)**

3:13;42:17,22;43:4
**redistricting (1)**
14:5
**reference (1)**
106:23
**referencing (1)**
31:25
**referred (4)**
68:3;72:2;92:16,17
**referring (8)**
21:14;99:7;105:3;
123:22;129:21;131:7;
138:3,11
**refers (2)**
22:18;128:5
**reflect (1)**
19:12
**reflects (1)**
19:14
**reform (3)**
37:6,7;74:24
**refresh (1)**
82:3
**regard (1)**
99:23
**regarding (4)**
21:24;28:24;93:15;
95:5
**regions (1)**
63:8
**register (9)**
24:25;31:12,15,24;
33:16;34:25;36:22;
82:14;85:25
**Registered (7)**
1:19;31:23;33:7;
38:15;72:20;83:11;
145:
**registering (8)**
24:5;30:9,15;36:24;
37:1;39:4;40:8;
116:21
**registrants (1)**
82:10
**registrars (1)**
82:9
**Registration (52)**
24:14,18;26:24;
28:14;30:24;31:9,10,
20;32:6,14,18;33:12,
14,21,25;34:22;35:2,
9,18,20;36:6;37:4,5,9,
19,19;38:17;39:20,
22;40:3,4,11,16;
72:15;73:2,7;84:13,
14;86:1;109:6;
110:19;123:18,19,25;
124:4,7,7,13,20;
125:10,10;129:12
**regulation (1)**
55:8
**relate (1)**
59:20

**related (4)**
21:18;75:13;83:17;
110:19
**relates (3)**
10:7;52:23;57:17
**relating (1)**
142:14
**relation (1)**
29:20
**relationship (3)**
10:6;30:2;76:21
**relative (5)**
133:11;135:24;
138:5;139:10,11
**relatively (1)**
74:4
**release (2)**
95:13;98:10
**released (2)**
75:16,19
**releases (5)**
80:15,21;95:14;
106:1;133:6
**relevance (1)**
82:19
**relevant (7)**
42:1,13;43:14;
82:21;92:6;122:1;
139:23
**reliability (1)**
89:21
**reliable (3)**
100:13;134:5;137:7
**relied (6)**
21:5;68:11,12;79:5,
9;80:8
**relies (2)**
62:2;96:18
**rely (14)**
62:12,15;89:4,5;
90:3;94:20,22;96:9;
105:4,21;135:16;
136:20;137:4,23
**relying (1)**
89:25
**remember (16)**
11:15;33:2;45:15;
46:24;51:12;52:6,19,
20;71:3;76:17;77:1;
102:15;108:22;121:7;
128:6;141:1
**removed (1)**
129:15
**repeat (1)**
71:12
**repetitive (1)**
12:14
**rephrase (1)**
38:14
**Report (89)**
4:;8:10,18;9:22;
10:13;11:13,14,19;
12:18,21;13:13;34:5;

35:17;37:16;40:9,12,
20;47:17,17;51:13,
17;62:1,3,12;63:3;
64:15,18,22,25;65:6,
14,14;67:5,9,16,24;
68:1,3,10,22;70:11,
17;71:17;73:10,18;
77:7;78:1,22;80:11,
18,25;81:15;82:7,25;
83:6;88:16;94:18;
95:3;98:14,15;99:7;
100:11;101:3,14;
102:6,17,18,21,25;
103:5;105:17;106:6,
19;108:25;109:13,18;
113:14;119:3;120:24;
123:2,4;125:11;
132:5;136:21;139:22,
24;140:12,21;143:17
**reported (6)**
  103:14;104:20;
  106:10;108:22;
  130:22;136:16
**Reporter (4)**
  1:19;7:6;145:,24
**reporting (1)**
  90:10
**reports (1)**
  67:7
**represent (2)**
  41:13;112:5
**representation (2)**
  20:12;35:16
**represented (1)**
  85:21
**represents (1)**
  118:14
**reproduction (1)**
  145:22
**Republican (6)**
  45:24;70:4;76:16;
  126:9,17,19
**Republicans (1)**
  87:1
**Request (1)**
  5:7
**requests (5)**
  70:5;120:22,23;
  121:11,14
**required (3)**
  76:4;109:4;121:11
**requirement (6)**
  38:10,20,22;46:4;
  61:21;74:2
**requirements (2)**
  73:20;74:9
**reread (2)**
  8:10;66:20
**research (22)**
  12:17,22;20:1;
  23:14;25:14,24,25;
  26:15,18;33:24;
  49:11;61:4;73:19,22;

78:13;93:8;94:6;
  107:20,21;121:12;
  127:16;137:1
**researcher (1)**
  21:6
**researchers (3)**
  141:17;142:9,13
**reserve (1)**
  143:16
**reserved (1)**
  6:16
**reside (1)**
  111:5
**resolution (1)**
  77:4
**resolve (1)**
  90:12
**resource (1)**
  43:6
**respect (1)**
  104:25
**respectful (1)**
  50:14
**respond (2)**
  80:4;129:22
**responded (2)**
  130:20;131:3
**responding (2)**
  40:12;129:1
**response (5)**
  76:10;130:14;
  131:18;132:3,4
**responsible (1)**
  120:2
**responsive (1)**
  125:14
**restrictions (1)**
  46:3
**resulted (1)**
  32:14
**resulting (1)**
  114:4
**results (1)**
  133:10
**Retired (2)**
  50:13;59:13
**return (1)**
  146:13
**revealed (1)**
  93:9
**reverse (1)**
  86:13
**review (2)**
  67:21;78:6
**reviewed (7)**
  58:25;79:21,25;
  80:1;101:9;107:1,20
**reviewing (1)**
  92:19
**revise (1)**
  65:6
**revision (2)**
  65:10;78:10

**Richard (1)**
  59:5
**rigged (1)**
  60:10
**right (106)**
  8:15,23;10:20;11:1,
  18,20;14:7,14;16:8,
  24;17:1,2,15;18:3,6,8,
  13,18;19:16;20:24;
  22:3;23:13,15;24:6;
  25:9;27:18,20;28:1;
  34:12;36:10;41:4,6;
  42:21,23;45:9,25;
  48:22;49:17,18;
  50:15;51:22;52:1,18;
  53:6,9;55:14,16;57:1;
  62:2;64:6;67:3;68:17,
  19;69:15;70:17;72:7,
  8;73:10,11;77:6;82:6;
  85:5,10;86:12;87:13,
  21;88:20,21,24;89:5;
  91:21;95:13,22;96:5;
  98:16,22;99:4;100:9;
  101:11,14,18,22;
  102:2,9,24;105:18;
  107:14;109:16,17,24;
  111:22;115:1,4,11;
  117:12;118:25;119:9;
  129:23;137:10,18,23;
  138:7;141:16;143:14,
  16,22
**rights (11)**
  21:2,16;55:24;56:1,
  2,4;97:3,10,11,24;
  142:4
**rise (2)**
  55:25;74:3
**risk (3)**
  39:2;99:12,18
**RNC (11)**
  75:4,7,15,18,21;
  76:1,4,11,15,21;77:5
**robbery (1)**
  135:7
**ROBBINS (1)**
  2:8
**Robin (2)**
  1:19;145:15
**role (5)**
  24:4,16;36:12;
  45:22;119:10
**rolls (1)**
  119:22
**root (1)**
  132:23
**ROSS (1)**
  2:8
**roughly (1)**
  110:10
**rule (3)**
  74:6;108:10;116:15
**Rules (3)**
  6:13;7:3;40:7

**ruling (1)**
  117:5
**Rutgers (7)**
  15:24,25;16:20;
  18:3;19:10;20:11;
  22:22

**S**

**sabbatical (1)**
  20:22
**salient (1)**
  55:20
**same (28)**
  7:5;16:19;32:2;
  39:23;44:17;56:9;
  74:21;79:10;86:13;
  88:14;111:5;124:12;
  125:3;128:12;129:1,
  2,3,9;134:21,24;
  135:10,10;138:7;
  139:8;145:8,23;
  146:10;148:
**sample (1)**
  63:10
**samurai (1)**
  128:10
**saw (2)**
  35:22;129:18
**saying (15)**
  37:6;46:18;53:2;
  60:18;67:4;115:5,16,
  20;127:3;133:6;
  135:3,9;137:21;
  139:5,14
**scanning (1)**
  87:3
**scant (1)**
  135:21
**scholar (1)**
  57:16
**scholarly (1)**
  57:15
**Scholars (3)**
  3:;48:24;49:3
**scholarship (1)**
  20:13
**science (1)**
  91:2
**scientific (1)**
  49:11
**scientist (5)**
  26:17;34:14;57:24;
  90:24;127:16
**search (3)**
  63:16;77:14,18
**searches (1)**
  77:22
**seat (1)**
  82:14
**SEB (3)**
  91:19;92:17;93:5
**second (20)**

16:20;41:17;43:5;
  49:8;50:17,18,19;
  57:22;58:11,21,24;
  59:1;73:16;82:7;83:8;
  84:7;110:1;121:10;
  126:10;132:12
**Secretary (12)**
  1:;6:9;79:8;91:24;
  93:16;94:9;100:24;
  101:1;102:8,10;
  112:17;119:10
**section (9)**
  19:11;84:5;88:16,
  19;97:13;132:8;
  138:15;141:13;
  142:17
**Securing (1)**
  63:3
**security (4)**
  76:3,12,23;109:6
**seek (6)**
  15:19;33:7;42:5;
  43:5;120:14,22
**seeking (1)**
  120:21
**seeks (1)**
  55:6
**seem (1)**
  39:11
**seems (2)**
  88:25;112:7
**select (2)**
  62:25;109:4
**selection (1)**
  62:24
**seminar (2)**
  17:21;18:7
**send (2)**
  65:3;121:14
**sending (1)**
  86:25
**seniority (1)**
  15:1
**sense (8)**
  26:3;60:11;95:18;
  98:8;105:6;114:15;
  115:3;122:12
**sent (4)**
  65:7,21;88:4;121:4
**sentence (20)**
  20:21,25;41:17;
  43:4,5;49:10;50:19;
  83:8;85:3;100:12;
  103:10;106:8,25;
  107:14,16,25;108:4;
  109:3;110:1;138:13
**separate (4)**
  31:3;61:24;62:19;
  122:15
**separated (1)**
  117:25
**separately (1)**
  35:10

**separation (1)**
55:18
**September (3)**
4:,45:11;103:5
**series (1)**
77:7
**serious (1)**
128:19
**seriously (1)**
122:10
**served (1)**
21:1
**service (1)**
24:20
**services (1)**
25:6
**session (2)**
78:15,19
**set (4)**
32:4;63:22;71:10;
128:12
**seven (1)**
108:5
**several (5)**
21:2;23:23;27:15;
57:12;93:17
**shaking (1)**
7:9
**shaped (1)**
130:7
**Sharad (2)**
109:22;114:19
**sheet (5)**
146:6,9,11,14;148:
**Shirley (1)**
126:7
**short (3)**
25:15;90:17;94:24
**show (17)**
13:11;19:2;20:4;
41:6;42:21;44:12;
46:4;48:22;49:24;
57:8;61:7,25;86:15;
122:21;133:20,21;
140:11
**showing (8)**
62:17;86:22;87:12;
90:8;98:11;128:14;
136:11;137:1
**shown (1)**
48:2
**shows (3)**
40:22;47:19;93:4
**side (2)**
87:24;130:5
**sides (2)**
72:18;97:19
**sign (2)**
72:17;146:8
**SIGNATURE (1)**
148:11
**significant (4)**
78:10;110:5;

114:22;115:22
**significantly (1)**
62:13
**signing (1)**
146:10
**similar (2)**
45:14;83:1
**Similarly (3)**
79:7;95:8;123:7
**simple (1)**
42:4
**simplified (1)**
55:13
**simply (2)**
135:3;139:5
**single (4)**
54:24;90:1;104:23;
116:12
**sit (1)**
125:1
**sitting (8)**
8:17;49:21;70:9;
72:5;78:21;79:1;
131:17;132:2
**situation (4)**
36:23;44:17;93:9;
111:2
**skeptical (1)**
46:2
**skills (2)**
21:6;97:16
**Skipping (1)**
34:2
**small (6)**
42:8;48:18;63:9;
102:15;121:8;136:25
**SNAP (1)**
25:4
**snapshot (1)**
116:24
**social (14)**
17:5;21:24;24:20;
25:6;34:14;43:7;
49:11;55:19;57:24;
59:23;90:24;91:2;
109:6;127:16
**socialist (1)**
14:11
**society (1)**
44:4
**sociology (1)**
57:21
**soften (1)**
46:1
**somebody (10)**
37:2;38:8;39:7,9,
15;54:21;56:13;
85:12,20;86:20
**somehow (3)**
48:12;68:11;138:19
**someone (5)**
13:8;14:23;33:15;
35:17;38:3,15;52:16;

73:13;81:5;84:19;
86:14;87:20;127:7;
129:7,8
**sometimes (3)**
24:21;83:23;89:20
**somewhat (1)**
129:24
**somewhere (2)**
94:13;128:24
**son (1)**
111:3
**soon (1)**
131:16
**sorry (16)**
10:4;16:14;27:21;
39:8;43:20;46:20;
58:23;65:23;67:2;
80:5,13;91:19;
107:13;109:1;121:23;
125:17
**sort (7)**
12:8;33:25;57:25;
63:21;127:15;129:19;
133:9
**sound (5)**
12:14;24:5;60:14,
21;113:2
**sounds (2)**
49:18;109:24
**source (4)**
90:8;91:6;137:3,4
**sources (10)**
58:5;77:10;90:6,13;
98:21;100:15;101:9;
107:6;136:7,12
**South (1)**
1:17
**Southern (3)**
80:22;141:22;143:9
**space (2)**
43:5;146:6
**Spakovsky (2)**
44:9;72:4
**Spakovsky's (1)**
45:22
**speak (6)**
12:18;63:17,22;
65:16;80:16,23
**speaking (1)**
123:11
**specific (6)**
20:18;77:16;78:4;
102:10;115:7;122:21
**specifically (7)**
15:15;18:1;24:20;
33:15;63:23;81:6;
123:22
**specifics (1)**
52:6
**spend (2)**
18:24;67:23
**spent (2)**
8:18,21

**spoke (3)**
9:9;33:11;102:11
**spoken (2)**
58:13,16
**spring (3)**
9:6;18:10;50:1
**Sr (1)**
118:16
**Stacey (1)**
27:5
**standard (4)**
16:23;135:10;
138:7;139:9
**standing (2)**
52:23,25
**Starbucks (1)**
125:1
**start (7)**
65:14;67:4;81:3;
91:4,9,14,15
**started (3)**
14:12;25:17;75:4
**starting (1)**
93:1
**starts (2)**
100:12;132:11
**State (56)**
1:9;6:10;15:25;
24:4,9,14,16,22;25:5;
26:3;28:16;49:13;
50:22;51:4,5;52:9,13;
76:16,21,22,25;77:4;
79:13,16,20;81:6;
84:3;85:23;89:7;90:5;
91:19,24;92:1,18,20;
93:16;94:1;95:9;98:4;
99:2,22,25;100:22,22;
101:8;105:25;107:21;
112:17;119:10;
120:20;122:21,22;
131:19;135:25;
138:17;146:5
**statement (11)**
39:22;49:21;60:6,
15,21;67:16;95:22;
103:16;106:11,17;
142:12
**statements (1)**
130:2
**STATES (30)**
1:1;17:6;18:13,19;
31:2;32:17;47:20,22;
48:7;51:1,3,11;55:17;
63:5,7,8,8,9,10,11,12,
22;74:4;99:20;109:3,
8;121:5;132:24;
134:11;141:13
**State's (6)**
79:8;91:25;94:9;
100:25;101:1;102:8
**statistical (1)**
116:9
**statistician (1)**

134:5
**statistics (9)**
49:13;103:18,21;
105:2;113:11;114:25;
134:3,13;135:19
**statute (3)**
55:8;62:22;71:14
**statutes (3)**
62:25;64:1;79:25
**staying (1)**
72:6
**steal (1)**
71:23
**stenographic (1)**
145:6
**step (2)**
15:5;91:12
**stick (1)**
71:6
**still (16)**
13:19;68:11;85:7,
10,23;117:22;122:9;
125:2,3;133:18;
134:18,18,20;135:5,5,
15
**stipulate (1)**
66:18
**stoke (1)**
45:24
**stop (4)**
23:21;87:8;93:15;
126:10
**stopped (1)**
112:15
**stopping (1)**
64:8
**stories (1)**
48:1
**Strategy (5)**
3:,31:22;48:24;
49:3;54:13
**Street (3)**
1:17;2:,
**strike (1)**
109:17
**struggle (1)**
18:18
**student (1)**
63:16
**students (1)**
17:22
**studied (5)**
40:4;87:23;88:11;
107:5;117:11
**studies (10)**
58:5,7;59:24;87:25;
88:6;107:1,7,20,21;
108:1
**Study (8)**
1:16;14:4;17:11;
48:12;63:6;78:13;
106:20;142:10
**studying (1)**

137:20
**stuff (3)**
50:16;99:11;118:10
**styled (1)**
140:21
**subject (1)**
146:10
**submission (1)**
95:3
**submitted (2)**
35:21;120:25
**submitting (1)**
37:18
**Subscribed (1)**
148:
**substance (1)**
148:
**substantive (2)**
13:24;65:11
**successful (1)**
106:15
**suggest (2)**
66:17;129:20
**suggesting (1)**
117:18
**suggests (1)**
125:4
**Suite (1)**
2:4
**summarized (1)**
28:23
**summary (3)**
67:10,18,20
**summation (1)**
118:17
**supervision (3)**
32:12;85:23;145:24
**SUPPORT (7)**
5:1;33:13,15,18,20;
75:9,25
**supposed (3)**
24:24;86:22;133:2
**suppression (3)**
50:23;75:8;88:10
**suppressive (1)**
51:7
**supremacy (1)**
50:22
**Supreme (3)**
52:2,9;112:14
**Sure (19)**
11:17;13:5,10;23:8;
30:25;46:11;47:7;
48:21;61:23;68:12;
92:4,13;94:7;108:16;
115:11;118:3;130:12;
132:7;137:19
**survey (1)**
25:24
**surveys (1)**
121:4
**swayed (1)**
113:8

**sworn (3)**
6:3;77:2;148:
**system (9)**
31:10,11;37:5;
39:22;40:3,5,17;
54:17;60:8
**systematic (1)**
133:21
**systemic (1)**
133:22

## T

**table (2)**
28:22;108:17
**tag (1)**
72:22
**tale (2)**
45:22;72:4
**talk (15)**
12:22,25;14:19;
42:11;48:16;56:21,
23;113:13;118:25;
120:17;122:18;124:5;
135:5;136:17;141:11
**talked (5)**
95:8;119:20;
123:11;134:4;142:2
**talking (5)**
10:2;29:7;32:1;
38:20;69:4
**talks (2)**
85:3;121:20
**Tammany (2)**
47:24;48:17
**taps (1)**
47:23
**task (1)**
47:13
**taught (10)**
16:25;17:16;18:1,7;
19:15,19;22:21,25;
23:4,10
**tax (2)**
51:20;130:15
**teach (2)**
19:18;55:15
**teacher (1)**
105:11
**teaching (2)**
18:4,9
**tear (1)**
72:18
**technical (3)**
37:22;52:20;69:20
**technically (4)**
35:9;84:10;85:6,9
**technique (1)**
77:19
**technology (2)**
119:14,17
**telephone (1)**
108:21

**telling (1)**
86:25
**ten (2)**
53:15;140:5
**tend (1)**
71:13
**tendency (1)**
105:10
**ten-minute (1)**
100:2
**tenure (3)**
15:16,18,19
**term (2)**
83:16;128:11
**terms (10)**
14:25;30:23;44:23;
62:24;68:20;77:14,
22;91:8;113:3;114:24
**terribly (1)**
60:9
**test (1)**
142:16
**testified (6)**
6:4;27:15;28:5;
74:18;75:9,15
**testify (1)**
74:19
**testimony (5)**
27:23;28:20,22;
73:24;75:17,24;82:4
**Thanks (1)**
22:21
**themes (1)**
59:11
**Theories (1)**
19:21
**therefore (3)**
74:1;116:8;131:24
**therein (1)**
148:
**thesis (2)**
14:1,8
**thinking (3)**
32:16;57:5;141:9
**third (7)**
69:11,14;73:14;
81:14;100:21;110:1;
121:10
**third-party (1)**
31:13
**thirty (1)**
146:15
**though (5)**
30:7;99:12;107:1;
111:6,18
**thought (5)**
40:19;57:6;86:4,4;
104:6
**threat (2)**
76:9;142:25
**three (4)**
19:19;57:14;80:24;
141:23

**thrive (4)**
41:19,24;42:6;44:3
**tier (1)**
16:20
**tiers (1)**
14:25
**Times (9)**
3:12;18:21;41:4,9,
18;60:7,19,20;114:4
**timing (1)**
11:15
**title (6)**
15:3;45:12,14,15;
50:15;57:10
**titles (1)**
14:24
**today (15)**
8:17;23:18;40:19;
49:11,22;65:9;70:9;
78:21;79:2,4;82:19,
22;83:3;131:17;132:2
**today's (2)**
8:9,21
**together (4)**
56:8;63:18;97:3,19
**told (2)**
43:24;141:16
**took (1)**
47:16
**top (1)**
61:17
**total (2)**
103:19;112:2
**Totally (1)**
64:10
**tough (2)**
130:14,24
**trace (2)**
91:16,16
**training (8)**
32:11;33:8;57:24;
97:2,24;98:3,8,12
**transcript (4)**
145:8,22;146:16,17
**transcription (1)**
148:
**transparent (1)**
18:12
**trial (1)**
6:17
**triangulate (1)**
137:5
**triangulated (1)**
93:25
**triangulating (1)**
104:7
**tried (2)**
56:7;130:10
**trip (1)**
82:14
**trouble (2)**
43:1,2
**true (9)**

48:20;49:21;60:25;
84:17;86:13;103:12;
118:14;127:5,7
**truly (2)**
77:24;126:21
**trust (1)**
96:3
**try (18)**
7:19;25:19;31:14;
35:14;38:14;47:13,
18;59:10;75:18;82:3;
88:3,14;90:6;91:16;
105:1;122:10;125:6;
142:16
**trying (24)**
11:15;14:2;26:20,
23;29:12;34:18,19;
45:13;46:23;59:18;
60:8;62:21,23;68:11;
72:23;77:1;87:15;
89:14,16;92:15;94:5;
117:13;122:16;
138:21
**Tuesday (1)**
87:1
**turn (9)**
32:24;35:4;41:16;
70:5;83:7;100:11;
102:16;109:18;141:4
**turned (7)**
32:15,19;35:5,7;
86:10;93:3;94:2
**turnout (3)**
110:4;114:21;
115:21
**turns (1)**
48:18
**twice (1)**
116:14
**two (20)**
11:11;22:18;28:14;
29:21;50:19;61:24,
24;62:16,18,20,24;
94:3;97:7,19;102:14;
110:23;111:6;116:12;
141:21;142:8
**two-sided (1)**
72:17
**two-thirds (1)**
100:21
**type (3)**
67:5;90:16;106:15
**types (5)**
29:21;104:8;
130:13;137:23;
138:19
**typically (1)**
74:23
**typo (1)**
66:23
**typos (2)**
65:8;67:1

# U

**uh-uh (1)**
7:10
**ultimately (2)**
51:24;101:24
**uncover (1)**
92:20
**under (15)**
6:12;24:24;34:12;
37:19;49:8;58:23;
59:1;69:10;85:13,23;
86:5;97:11;102:10;
109:3;145:23
**undercount (1)**
106:3
**Understood (1)**
22:6
**undetected (1)**
106:16
**Unit (1)**
100:24
**UNITED (14)**
1:1;17:5;18:13,18;
31:2;47:20,22;48:6;
55:17;63:8;121:5;
132:24;134:11;
141:13
**universities (1)**
16:23
**University (3)**
1:16;15:25;59:13
**unless (4)**
32:1;138:2;143:15;
145:23
**unlikely (2)**
39:6;118:13
**unpaid (2)**
42:24;43:1
**unquote (1)**
76:12
**unregistered (1)**
33:23
**unreported (3)**
103:23,25;104:3
**unrepresented (1)**
60:1
**up (32)**
11:12;15:16,17;
20:2;37:1;38:16,16;
46:1;48:3;63:9;64:10;
66:12,17;68:13;72:6,
6,10;77:15;78:8;
86:15,22;93:4;111:1,
6,18;116:23,23;
117:6;122:21;136:11;
138:25;140:6
**update (1)**
13:24
**updated (2)**
13:21;19:15
**upheld (4)**

51:25;52:7,20;
83:21
**upon (1)**
145:6
**urban (3)**
16:12,14;17:16
**use (12)**
6:17;71:13;77:14;
89:9;107:6;108:9;
121:9;132:25;135:5,
7,9,10
**used (17)**
37:16;38:4;72:20;
75:18,24;77:18,23;
78:24;83:9,16;86:2;
95:4;98:6;102:1;
107:6;126:19;146:18
**useful (3)**
89:17;92:14;97:18
**uses (1)**
58:4
**using (3)**
113:6;135:18;138:7
**Usually (4)**
15:16;54:20;96:20;
115:10

# V

**Vaguely (1)**
78:20
**valid (2)**
89:18;90:13
**validate (1)**
86:3
**validity (1)**
89:21
**variety (3)**
141:23;143:10,11
**various (3)**
21:3;40:24;57:11
**vast (1)**
57:23
**verifying (1)**
109:7
**Versa (3)**
3:;53:9,19
**versus (4)**
28:7;119:11;
140:13,22
**via (3)**
45:25;47:8,9
**Vice (5)**
3:;53:8,19;112:11;
117:25
**victory (1)**
56:2
**views (2)**
42:1,12
**vigorous (3)**
132:23;133:10,16
**Vitae (3)**
3:9;13:15,19

**voiceless (1)**
60:1
**volume (1)**
89:6
**volunteers (3)**
30:8,14,16
**von (3)**
44:9;45:21;72:3
**Vote (62)**
18:8,13,16,18;
19:16;23:15,18;24:2,
5,12,18;25:1,7,11,18,
23;26:14;31:4,12,5,23,
24;33:8,16,20;36:24;
37:1;38:15,18;46:5;
55:16;57:3;63:8;
72:13;74:2;77:19;
82:15;84:20,20,20,21;
85:4,14,22;86:4,6,11,
14,17,22;87:1,1,6,21;
88:1,3,10;101:3;
110:23;111:5,16;
127:3,9
**vote-buying (1)**
142:22
**voted (3)**
35:23;111:10;
116:14
**Voter (182)**
3:,,14,20,23;9:23;
13:1,1;24:14,17;
26:24;28:13,25;
30:24;31:9,10,20;
32:6,14,17;33:13,20,
25;34:4,6,11,17,18,
20,22,24,25;35:1,18,
19,24;36:8,9,19;37:3,
8,19,19,20;39:19,21;
40:3,4,11,13,16;
44:19;45:4,10;47:14,
20,21;48:6;50:23;
51:24;56:15,23;61:1,
11;62:7,13;63:15,18,
23;64:5;67:12,13,22;
68:9,16,21;69:3,10,
14;70:10,16,25;71:7,
10,14,20;72:6,14;
73:6,22,24;74:22,22;
75:8;76:7;77:19;79:4,
22;80:8;81:2,5,8,11;
82:1;84:5,19;86:15;
88:3,10,15,18,23;
89:7;90:11,16,17;
91:8,11;92:1;93:16;
94:8;95:12;97:22;
98:11;99:12,18;
101:4,10;104:3;
105:1;106:9;107:2,4,
8;108:2;109:5;
110:19;117:10;119:1,
16,22;121:20;122:4,
12,17,19,22;123:14,
18,19,21,25;124:3,6,

7,8,12,13,19;125:10,
10;127:25;129:10,11;
130:13,22;131:23;
132:23;133:17;
135:11,23;137:13,17,
20,22;138:8,20;
139:21;142:10,11;
143:7
**voters (27)**
30:9,15;33:9;34:8;
35:13;36:22;49:9;
71:25;73:15,17;
83:11;84:10;87:15;
105:7;120:10,15;
125:13,15,21;127:17;
141:21,22;142:24;
143:1,4,8,9
**votes (24)**
35:4,6;110:3,3,6,7,
10;111:13,20,21,25;
112:2,11,20;113:2,23;
116:11;118:22,23;
133:11;135:24;138:6,
24;139:11
**voting (26)**
21:2;35:8;38:9,10,
21,23;39:16;40:8;
51:8;56:3;71:12,12;
87:7,9;88:12;96:22;
97:11;116:18,19;
117:15;118:14;
119:13;131:21;
132:10;133:4;142:15
**vs (1)**
1:

# W

**waged (1)**
50:21
**waited (1)**
72:11
**walking (1)**
124:25
**Washington (1)**
98:2
**way (35)**
7:7,18;11:12;12:21;
21:10;23:3;30:22;
36:22;37:9,22;40:10;
47:22;54:9;55:7,11;
56:9;71:5,21;78:22;
82:24;88:14;100:21;
104:1;116:14;117:4;
118:23;122:5,5;
127:22;128:19;130:8;
131:17;135:8;139:6,8
**ways (7)**
40:2;91:3;94:12;
99:1;104:18;129:2,3
**wealth (1)**
68:1
**website (11)**

19:10;20:11;41:14,
15;43:4;45:2,17;
93:16;94:16;122:19;
123:1
**Wednesday (1)**
87:2
**week (1)**
11:5
**weeks (2)**
11:11;28:14
**welcome (1)**
143:24
**weren't (3)**
30:16;31:19,23
**West (1)**
2:
**whatnot (1)**
119:18
**What's (10)**
15:5;34:21;54:5;
93:4;113:22;115:3,9,
13;124:14;136:16
**whereas (1)**
97:12
**whereby (1)**
31:11
**Whereupon (1)**
144:1
**whistle (1)**
48:10
**white (1)**
126:22
**whole (2)**
23:7;60:3
**Whose (2)**
10:24;102:9
**wide (1)**
100:14
**widely (1)**
34:21
**William (1)**
14:11
**Wilson (1)**
14:11
**win (5)**
72:23;124:19;
129:17;130:1,4
**winding (1)**
131:15
**wing (1)**
45:25
**winner (1)**
129:25
**wins (1)**
129:11
**Wisconsin (3)**
86:2,5;140:23
**Wisconsin's (1)**
141:3
**within (6)**
25:17;29:21;60:8;
92:5;115:4;146:15
**without (2)**

94:9;124:21
**WITNESS (19)**
3:2;5:4;9:16;21:2;
28:6,18;29:22;39:24;
43:24;64:12;66:6;
74:17;84:25;107:17;
108:20;112:13;114:8;
143:23;146:1
**won (1)**
129:9
**wondering (1)**
56:22
**word (12)**
46:1;47:8,9,11,23;
48:5,9,12;75:12;
112:16;113:4,5
**words (14)**
11:20;12:20;46:14,
15,17,19;68:5;70:15;
82:11;110:6;118:19;
124:23;129:1;139:8
**work (40)**
8:13;14:10;20:12;
22:3,5;24:12;25:18;
26:19;31:8,16;32:8,
13;33:4;39:14;42:25;
53:24;54:16;59:4,12,
16,19,20,22;60:8,22;
63:2;67:1;79:5,9,21;
80:8;83:25;87:17;
89:13;94:5;113:21;
124:22,24,24;143:5
**worked (1)**
142:16
**worker (4)**
39:7;85:25;86:2,8
**workers (2)**
82:13;124:20
**working (6)**
21:22;57:1;73:14;
109:21;117:12,13
**world (4)**
18:17;42:15;
109:20;130:9
**wrap (1)**
140:6
**write (8)**
9:22;21:10;46:10;
47:22;53:23;64:25;
65:15;66:23
**writing (8)**
45:20;46:8,24;
48:25;51:9;65:13;
101:10;102:12
**writings (1)**
14:16
**written (7)**
40:21;42:22;45:9;
46:22;49:16;51:2;
65:15
**wrong (4)**
86:16,22;88:5;
111:14

**wrote (4)**
44:18;50:2;53:6;
60:7

**Y**

**year (9)**
9:7,8;17:21;20:22;
82:12;135:2,14,14,25
**years (10)**
9:24;19:19;23:23;
47:16;75:1,4,14;
76:19;77:11;93:17
**yesterday (1)**
66:20
**York (5)**
14:5;59:14;60:6;
72:13;84:2
**you-all (3)**
10:5;64:8;140:4
**Young (2)**
126:6,25

**Z**

**zero (2)**
115:17,19

**0**

**025 (1)**
110:10

**1**

**1 (14)**
3:8;8:5;67:19;
110:6;111:20;112:25;
113:6;114:3;115:16,
18;116:4,15;118:13,
22
**1:18-cv-05391-SCJ (1)**
1:
**10 (2)**
3:18;53:20
**100 (5)**
103:19;116:8;
134:10,22,22
**103 (1)**
4:
**11 (4)**
3:;56:16;100:11;
109:1
**1180 (1)**
2:
**12 (7)**
3:21;61:8,12;63:5,
6,10;132:11
**12:05 (1)**
144:2
**13 (7)**
1:12;3:,9;58:23;
61:25;62:8;145:7

**14 (5)**
3:24;62:1,9;133:25;
138:4
**14,907 (1)**
113:2
**140 (1)**
4:3
**14th (1)**
2:
**15 (6)**
64:16,19;66:19;
77:11;109:19;141:5
**15,000 (1)**
117:19
**1500 (1)**
117:20
**16 (4)**
4:;103:1,6;119:2
**1650 (1)**
2:4
**17 (4)**
4:3;120:17;140:12,
17
**18 (2)**
111:4;120:17
**1873 (2)**
82:8;83:2
**19 (3)**
3:10;121:19,23
**1930s (1)**
58:7
**1950s (1)**
56:1
**1960s (1)**
58:8
**1965 (1)**
56:3
**1990 (1)**
18:22
**1990s (1)**
14:6

**2**

**2 (7)**
3:9;13:12,16;58:20;
77:6;80:13;105:17
**20 (4)**
1:17;3:11;104:17;
122:18
**2000 (5)**
50:19;97:1;111:25;
113:7;116:17
**2002 (4)**
101:3;133:13;
134:19;142:19
**2003 (1)**
63:4
**2004 (2)**
133:13;134:19
**2005 (3)**
51:19;81:21;121:22
**2006 (6)**

51:19;101:22;
120:18;121:2;125:25;
134:19
**2008 (1)**
134:19
**2010 (1)**
23:14
**2011 (2)**
23:14;45:11
**2012 (6)**
50:1;51:9;53:7;
110:3,7;111:21
**2014 (5)**
4:2;20:22;49:17;
102:17;103:5
**2015 (1)**
20:22
**2018 (4)**
69:5,7;93:23;95:5
**2019 (8)**
1:12;49:22;78:8,15,
19,24;145:7;148:
**206 (1)**
62:17
**207 (1)**
62:17
**20th (1)**
57:22
**21 (1)**
123:7
**26 (1)**
141:4

**3**

**3 (7)**
3:10;19:3,6;41:16;
81:15;96:8;105:17
**30 (1)**
146:15
**30309 (1)**
2:
**30318 (1)**
2:10
**30b6 (1)**
11:4
**316 (1)**
78:10
**32 (1)**
109:2
**33 (1)**
100:17
**33rd (1)**
1:17
**36 (1)**
50:17

**4**

**4 (6)**
3:11;19:11;20:5,7;
82:6;96:8
**4,000 (12)**

110:2,6;111:20;
113:1,6;114:3;
115:17,19;116:4,15;
118:13,22
**404-400-3350 (1)**
2:5
**41 (1)**
3:12
**42 (1)**
3:13
**45 (1)**
3:14
**48 (1)**
109:18
**49 (1)**
3:

**5**

**5 (5)**
3:12;41:7,10,16;
83:7
**5,963,110 (2)**
112:6;113:25
**5.9 (2)**
113:1;114:5
**50 (4)**
3:17;63:10,12;
104:16
**500 (2)**
2:;112:11
**501c3 (1)**
27:3
**53 (2)**
3:18;121:22
**537 (2)**
112:19;117:24
**56 (1)**
3:
**59 (1)**
114:4

**6**

**6 (4)**
3:,13;42:18;84:6
**60 (1)**
77:8
**61 (3)**
3:21;121:19,23
**62 (4)**
3:,24;103:3,10
**63 (1)**
106:7
**64 (2)**
103:3;106:22
**678-701-9381 (1)**
2:

**7**

**7 (3)**
3:14;45:6;68:15

**75 (1)**
  18:23

**8**

**8 (5)**
  3:,8;49:4;84:7;
  88:17
**8:53 (1)**
  1:18

**9**

**9 (10)**
  3:17;49:25;50:6;
  68:25;69:25;70:10;
  102:16;123:20;124:2,
  18
**90 (1)**
  94:15
**91 (2)**
  106:7;133:1
**96 (1)**
  106:22

# DEFENDANTS' EX. 1



EXHIBIT
1
12-13-19 KL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,

      Plaintiffs

v.

BRAD RAFFENSPERGER, in his official
Capacity as Secretary of State of Georgia;
*et al.*,

      Defendants.

Civil Action File

No. 1:18-cv-05391-SCJ

TO:   DR. LORRAINE CAROL MINNITE

## NOTICE OF DEPOSITION OF DR. LORRAINE CAROL MINNITE

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of

Civil Procedure, counsel for Defendants Brad Raffensperger, et al., will take the

oral deposition of **Dr. Lorraine Carol Minnite** at the Study Hotel at University

City, 20 South 33rd Street, Philadelphia, PA 19104, on **Friday, December 13,**

**2019**, beginning at **9:00 a.m.** and continuing thereafter until completed.

The deposition shall be taken before a Notary Public or some other officer

authorized by law to administer oaths for use at trial. The deposition will be taken

by oral examination with a written and/or sound and visual record made thereof

(*e.g.,* videotape, LiveNote, etc.). The deposition will be taken for the purposes of cross-examination, discovery, and for all other purposes permitted under the Federal Rules of Civil Procedure or other applicable law.

This 9th day of December, 2019.

Josh B. Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Andrew M. Swindle
Georgia Bar No. 522156
aswindle@robbinsfirm.com

Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

Christopher M. Carr
Attorney General
GA Bar No. 112505

2

Annette M. Cowart
Deputy Attorney General
GA Bar No. 191199
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
GA Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle - Suite 200
Atlanta, Georgia 30339
Telephone:  (678) 336-7249

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 9, 2019, I caused to be served the

foregoing NOTICE OF DEPOSITION OF DR. LORRAINE CAROL MINNITE

by sending it via email and U.S. Mail, postage prepaid, and addressed as follows:

**Lawrence & Bundy LLC**
Allegra Lawrence-Hardy
Leslie J. Bryan
Maia J. Cogen
Suzanne Smith Williams
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Allegra.Lawrence-
Hardy@lawrencebundy.com
Leslie.Bryan@lawrencebundy.com
Maia.Cogen@lawrencebundy.com
Suzanne.williams
@lawrencebundy.com

**KaiserDillon PLLC**
Matthew G. Kaiser
Sarah R. Fink
Scott S. Bernstein
Norman G. Anderson
1099 14th Street, NW
8th Floor West
Washington, DC 20005
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

**Lawrence & Bundy, LLC**
Thomas R. Bundy
8115 Maple Lawn Blvd.
Suite 350
Fulton, MD 20759
Thomas.Bundy@lawrencebundy.com

**Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.**
Dara Lindenbaum
1090 Vermont Ave, NW, Suite 750
Washington, DC 20005
lindenbaum@sandlerreiff.com

Elizabeth Vranicar Tanis
John A. Chandler
957 Springdale Road, N.E.
Atlanta, GA 30306
beth.tanis@gmail.com
jachandler@gmail.com

**Kastorf Law, LLC**
Kurt G. Kastorf
Suite 100
1387 Iverson Street, N.E.
Atlanta, GA 30307
kurt@kastorflaw.com

**Jenner & Block LLP**
Kali Nneka Bracey
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
KBracey@jenner.com

**Jenner & Block LLP**
Jeremy H. Ershow
919 Third Avenue
New York, New York 10022
jershow@jenner.com

**Miller & Chevalier Chartered**
Andrew D. Herman
Nina C. Gupta
900 16th St. NW
Washington, DC 20006
aherman@milchev.com
ngupta@milchev.com

**DuBose Miller LLC**
Von A. DuBose
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
dubose@dubosemiller.com

Josh Belinfante

# DEFENDANTS' EX. 2

# LORRAINE CAROL MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526



EXHIBIT
2
12-13-19 RC
PENGAD 800-631-6989

## EDUCATION

**The Graduate School and University Center of the City University of New York**
**Ph.D.** in Political Science, 2000
*Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
*Honors:* Distinction

**M.Phil.** in Political Science, 1994
*Major field:* American Politics
*Minor field:* Public Policy

**M.A.** in Political Science, 1992
*Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
**B.A.** in History, 1983
*Area of Concentration:* American Civilization

## ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development, and undergraduate courses in urban studies and voting rights.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**
*Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.*
Worked on various research projects for Prof. Marilyn Gittell.

# OTHER EMPLOYMENT

**Research Director**
*Project Vote, 2010 to 2011.*
Developed a research program and conducted research for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

**Issues Director**
*The Committee for David N. Dinkins, II, New York City, 1991 to 1993.*
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

**Campaign Manager**
*McCabe for City Council, Brooklyn, New York, 1991.*
Organized and administered a successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

**Union Organizer**
*District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.*
Participated in the planning and implementation of a union organizing campaign; served as editor of a union local's newsletter; assisted negotiating committee in contract negotiations.

# ACADEMIC AND PROFESSIONAL HONORS

Distinguished Alumni Award, Department of Political Science, CUNY Graduate School, 2014
Jay Sigler Award for Teaching Excellence, Rutgers-Camden Public Administration Student Association, 2013
Affiliated Faculty, Center for Community Leadership, Rutgers-Camden, 2013 to present
Affiliated Faculty, Center for Urban Research and Education, Rutgers-Camden, 2012 to present
Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Selected a "Top Wonk" in Democracy and Elections, The Agenda Project, 2012
2011 *Choice* Magazine "Outstanding Academic Title" for *The Myth of Voter Fraud*
Carnegie Corporation of New York Special Opportunities Fund Award ($50,000), 2007
Senior Fellow, Dēmos – A Network for Ideas and Action, 2006 to 2014
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award ($1,500), Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship ($10,000), 1996-1997

# PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
Association for Public Policy Analysis and Management
Scholars Strategy Network
Social Science History Association
Southern Political Science Association
Urban Affairs Association

# TEACHING ACTIVITIES

2

**Doctoral Supervision: Chair**

*Rutgers-Camden*
Lew Bivona, *in-progress*
Jackie Bradley-McFarlane, *in progress*
Shaina Gaines, *in-progress*
Peggy Jean Craig McCaffery, *in-progress*
Dan Tarng, *in-progress*
Rasheda Weaver, *completed 5/17*
Curtis Williams, *in-progress*
Zachary Wood, *completed 5/18*

**Doctoral Supervision: Committee Member**

*Rutgers-Camden*
Spencer Clayton, *completed 5/18*
Ashley Nickels, *completed 5/16*
Wendy Osefo, *completed 7/16*
Jason Rivera, *completed 7/15*

**External Examiner (Ph.D.)**

*Fielding Graduate School*
Gregory Williams, *completed 10/18*

**Courses Taught**

*Rutgers University-Camden (Graduate)*
Alternative Development Strategies for Distressed Cities (Ph.D.)
Civic Engagement, Nonprofits and Community Development (Ph.D.)
Foundations of Policy Analysis (MPA and Executive MPA)
Politics of Community Development (Ph.D.)
Practicum in Community Development (Ph.D.)
Research Workshop (MPA)
Theory and History of Community Development (Ph.D.)
Urbanism and Sustainable Development in Cuba (Undergraduate and Graduate-level Study Trip)

*Rutgers University-Camden (Undergraduate)*
Honors College Seminar: The Right to Vote
Poverty and the Urban Environment

*Barnard College, Columbia University (Undergraduate)*
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

*New York University (Undergraduate)*
The Crisis of the Modern American City

**Graduate Committee Examiner**

Rutgers University, Ph.D. Program in Public Affairs/Community Development, Dissertation Committees (see above)
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.

CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

# PEER-REVIEWED PUBLICATIONS

*Books*

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

*Journal Articles*

"New Challenges in the Study of Right-wing Propaganda: Priming the Populist Backlash to 'Hope and Change,'" *New Political Science* 34:4 (2012), 506-526.

"Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

"Models, Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

*Chapters in Edited Volumes*

"Voter Suppression," in Levon Chorbajian and Daniel Egan, eds., *Power and Inequality: Critical Readings for a New Era*, New York: Routledge, *forthcoming*; co-authored with Frances Fox Piven.

"Competing Concepts of Social Class: Implications and Applications for Community Development," in Mae Shaw and Marjorie Mayo, eds., *Class, Inequality and Community Development*, Bristol, UK: Policy Press at the University of Bristol, 2016; co-authored with Frances Fox Piven.

"The Voter Fraud Myth," in Benjamin E. Griffith, ed., *America Votes! Challenges to Election Law and Voting Rights*, Chicago: American Bar Association, 2016.

"Making Policy in the Streets," in James DeFilippis, ed., *Urban Policy in the Time of Obama*, Minneapolis: University of Minnesota Press, 2016; co-authored with Frances Fox Piven.

"Poor People's Politics," in David Brady and Linda Burton, eds., *Oxford Handbook of the Social Science of Poverty*, New York: Oxford University Press, 2016; co-authored with Frances Fox Piven.

"Crisis, Convulsion and the Welfare State," in Kevin Farnsworth and Zoë Irving, eds. *Social Policy in an Age of Austerity*, Policy Press, 2015; co-authored with Frances Fox Piven.

"Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd Ed., New York: Routledge, 2012.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between White and Black: Asian and Latino Political Participation in the 2000 Presidential Election in New York City," in William E. Nelson, Jr. and Jessica Lavariega Monforti, eds., *Black and Latino/a Politics: Issues in Political*

4

*Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.

## OTHER PUBLICATIONS

### *Chapter in Conference Proceedings*

"The Political Participation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 2000 Annual National Legal Conference on Immigration and Refugee Policy*, Vol. XXIII. New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

### *Encyclopedia Entries*

"Voter Participation," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008, online version, 2013; co-authored with Frances Fox Piven.

"The Underclass," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Paul J. Jargowsky.

"Welfare," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Joan Maya Mazelis.

"The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

### *Book Reviews*

*Waiting for the Cemetery Vote,* by Tom Glaze, *American Review of Politics*, (Spring/Summer 2012).

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can A Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

### *Research Reports, Memoranda and Briefs*

*The Misleading Myth of Voter Fraud in American Elections*, Key Findings Brief, Scholars Strategy Network, February 2014.

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network

(NYLARNet) at The University of Albany, Fall 2011.

*Research Memo: First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election,* Project Vote, Washington, D.C., November 2010.

*Research Memo: Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters,* Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security,* Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud,* Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud,* Dēmos – A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

### Journalism

My expertise on elections and voter fraud was sought and widely cited and I was quoted in print and broadcast media in every federal election since 2008, including, for example, in the following: *The New Yorker Magazine, The New Yorker Radio Hour, The New Republic, Mother Jones, The Wall Street Journal, In These Times, American Prospect, Washington Monthly, Monthly Review, New Left Review, The New York Times, The Washington Post, The Christian Science Monitor, Associated Press,* McClatchy, Al Jazeera English (*Fault Lines,* Washington, D.C.), WZBC (*News,* Boston), WBAI (*Democracy Now!,* New York), WNYC (*The Brian Lehrer Show,* New York), WHYY (*Radio Times,* Philadelphia), NPR (*Morning Edition,* Washington, D.C.), CBS News, ABC News Radio, Salon.com, Talking Points Memo, Alternet, The Huffington Post, Slate Magazine, and CQ Researcher, among many others.

"Why the Democrats and Movements Need Each Other," *In These Times* (cover story), October 17, 2017; co-authored with Frances Fox Piven.

"The Power of Disruption: An Interview with Frances Fox Piven," *Global Dialogue: Newsletter for the International Sociological Association* 5(4): December 2015.

"The Myth of Voter Fraud," BillMoyers.com, March 9, 2015.

"Movements Need Politicians – And Vice Versa," *The Nation,* October 22, 2012; co-authored with Frances Fox Piven.

"The Other Campaign: Who Gets To Vote," *New Labor Forum,* May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times,* April 22, 2010; co-authored with Frances Fox Piven.

"Re-Drawing the Map of U.S. Politics," *Red Pepper,* April, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer,* Charlotte, North Carolina, July 18, 2007.

"They Are Arriving: Immigrants Are Gaining Power in New York's Voting Booths," *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

### Works in Progress

"*Demosprudence* and Grassroots Struggles to Protect and Expand the Right to Vote"

"Does Concentration Worsen Poverty? The Case of Philadelphia"

"Human Error in Election Administration"

"Felony Disfranchisement and the New Three-Fifths Rule"

"The Voting Rights of the Poor"

*Conference Participation, Papers and Invited Presentations*

"Human Error in Election Administration," paper presented at the 89th Annual Meeting of the Southern Political Science Association, New Orleans, January 4-6, 2018.

Invited Panelist, "Impasses: Beyond Social Democracy," Transcending Pessimism, Reimagining Democracy: A Conference in Honor of Leo Panitch, York University, Toronto, October 6-7, 2017.

Invited Lecture, "The Politics of Voting: Who Shall Be the Electors?" Saul O. Sidore Lecture Series, Centers on Race, Class and Gender in a Divided America, University of New Hampshire-Manchester, Manchester, New Hampshire, March 21, 2017.

"Deadwood and Disenfranchisement: Maintaining Election Lists in the United States," paper presented at the 87th Annual Meeting of the Southern Political Science Association, New Orleans, January 12-14, 2017; co-authored with Margaret Groarke.

Invited Speaker, "Defending Democracy: How Political Scientists Are Engaging in the Fight Over Voting Rights (And Why You and Your Dept. Should Too)," roundtable presented by the Scholars Strategy Network at the 112th Annual Meeting of the American Political Science Association, Philadelphia, September 1-4, 2016.

Invited Panelist, "Beyond Neoliberalism: Social Justice after the Welfare State," Symposium Sponsored by the Center for the Study of Social Difference, Women Creating Change, the Heyman Center for the Humanities, and the History Department at Columbia University, New York City, April 2, 2016.

Invited Panelist, "Voting Rights at 50," 22nd Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 7, 2015.

Panel Organizer and Chair, "Electoral Rules, Voting and Turnout: New Pathways for Research," panel at the 111th Annual Meeting of the American Political Science Association, San Francisco, September 3-6, 2015.

"Community and Class in a Neoliberal Age," paper presented at the 110th Annual Meeting of the American Sociological Association, Chicago, August 22-25, 2015; co-authored with Frances Fox Piven.

"Black Urban Liberalism: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2010," paper presented at the 45th Annual Meeting of the Urban Affairs Association, Miami, April 8-11, 2015.

Invited Speaker, "Does Concentration Worsen Poverty? The Philadelphia Case," Center for Urban Research and Education, Rutgers University, Camden, December 12, 2014.

Invited Speaker, "The State of Voting Rights," sponsored by the Atlanta Chapter of the Scholars Strategy Network, Atlanta, December 2, 2014.

"The Poverty of Politics in a Northern City: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2000," paper presented at the 39th Annual Meeting of the Social Science History Association, Toronto, November 6-9, 2014.

"Crisis, Convulsion and the Welfare State," roundtable presentation at the 109th Annual Meeting of the American Sociological Association, San Francisco, August 16-19, 2014; co-authored with Frances Fox Piven.

"Making Policy in the Streets," paper presented at the 44th Annual Meeting of the Urban Affairs Association, San Antonio, March 20, 2014; co-authored with Frances Fox Piven.

Invited Panelist, "Voter Suppression, Equal Rights, and the Promise of Democracy," sponsored by the Scholars Strategy Network, the Center for American Political Studies, and the Malcolm Wiener Center for Social Policy, Harvard University, March 6, 2014.

"Crisis, Convulsion and the Welfare State," paper presented at the 11th Annual Meeting of the European Sociological Association, Torino, Italy, August 28-31, 2013; co-authored with Frances Fox Piven.

Invited Panelist, "Anatomy of A Public Interest Lawsuit: Voter ID Legislation – A Public Interest Legal Challenge," sponsored by Penn Law Clinical Programs, Lawyering in the Public Interest, Toll Public Interest Center, American Constitution Society and the Civil Rights Law Project, University of Pennsylvania Law School, Philadelphia, Pennsylvania, November 5, 2012.

Invited Panelist, "Disenfranchise This: The Cost of Voter Suppression," 19th Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 3, 2012.

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium, Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, Virginia, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the 69th Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," 82nd Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the 67th Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience -- Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the 8th Annual State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral

Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31-September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1-4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1-4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 – September 2, 2001; co-authored with John H. Mollenkopf.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," paper presented at the 96th Annual Meeting of the American Political

Science Association, Washington, D.C., August 31-September 3, 2000; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference,* sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City,* seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on *Integration of Immigrants and Their Descendents,* Center for Migration Studies 20th Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab Americans in New York City,* symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"The Political Incorporation of Immigrants in New York," paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999; co-authored with Jennifer Holdaway and Ronald Hayduk.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999; co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election: A Comparison of Ecological Regression Techniques and Exit Poll Data," paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998; co-authored with David K. Park and Daniel M. Slotwiner.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

***Research Reports***

*How to Think About Voter Participation,* White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud,* White Paper, Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative,* Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey,* with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers,* Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

***Expert Participation in Federal and State Voting Rights Cases***

Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018.

Expert Witness, *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018.

Expert Witness, *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016.

Expert Witness, *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016.

Expert Witness, *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015.

Expert Witness, *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016.

Expert Witness, *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015.

Expert Witness, *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

Expert Witness, *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania, 2012-2013.

Expert Report, *Rutgers University Student Assembly et al. v. Middlesex County Board of Elections*, Superior Court of New Jersey/Middlesex County, 2011.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

***Amicus Filings and Congressional and Other Testimony***

U.S. Commission on Civil Rights Briefing, "An Assessment of Minority Voting Rights Obstacles in the United States," Raleigh, North Carolina, February 2, 2018 (oral and written testimony).

*Shelby County, Alabama v. Holder*; U.S. Supreme Court, Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents, February 1, 2013 (signatory).

*League of Women Voters v. Rokita;* Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November 2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (invited written testimony).

Expert Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation *in Support of Petitioners*, November 2007.

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* of Historians and Other Scholars *in Support of Petitioners*, November 2007 (signatory).

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.

11

# RESEARCH AND OTHER GRANTS

*Principle Investigator*, "Camden City Exit Poll," Rutgers Research Council Award, 2018-2019 ($2,000).

*Co-Recipient*, Rutgers University Centers for Global Advancement and International Affairs, 2016 ($10,000).

*Recipient,* Rutgers-Camden Learning Abroad Office, Course Development Grant, 2015 ($1,000).

*Principle Investigator*, "The Political Exclusion of the Urban Poor," Rutgers Research Council Award, 2013-2014 ($3,000).

*Recipient*, RU FAIR ADVANCE (NSF) Rutgers-Camden Travel Award, March/April 2013 ($1,590).
Funded by the Rutgers University Office for the Promotion of Women in Science, Engineering, and Mathematics (SciWomen) Institutional Transformation grant from the ADVANCE program of the National Science Foundation.

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000). Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000). Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700). Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000). Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800). Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University. Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University. Funded by the Ford Foundation.

# SERVICE

*College and University*

Invited Panelist, "Voting Law in the 2016 Election: Perspectives from Political Science, Public Policy and Public Law," Rutgers University, Camden, New Jersey, December 7, 2016.
Member, Steering Committee, Rutgers University-Camden International Conference on Sustainable Community Development and STEAM Fields: What We Can Learn from A Changing Cuba," October 31 -- November 3, 2016.
Chair, Department of Public Policy and Administration, Rutgers-Camden, 2016 to present.
Member, Advisory Committee, Continuing Education Program in Historic Preservation, Rutgers-Camden, 2016 to present.
Member, Global Research and Education Committee, Rutgers-Camden, 2016-2017.
Member, Tenure and Third-Year Review Committees, Department of Political Science, Rutgers-Camden, 2015 to present.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Committee, 2014-present.
Co-Organizer, "Symposia on Urban Poverty and Inequality," Rutgers University-Camden, February 4, February 19, April 2, and April 22, 2014.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Exam (Theory) Committee, 2013-present.
Member, General Education Committee, Subcommittee on Engaged Civic Learning, Rutgers-Camden, 2013-2014, 2015.

Marshal, Rutgers-Camden Commencement, 2013, 2014.
Member, Rutgers-Camden Department of Political Science Search Committee, 2013.
Member, Rutgers-Camden Department of Public Policy & Administration Search Committee, 2012, 2013.
Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011 to 2016.
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.
Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.
Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.
Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.
Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.
Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).
Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).
Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).
Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.
Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.
Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.
Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.
Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.
Member, Columbia University Seminar on the City, 2001 to 2011.
Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.
Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.
First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.
One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

*Professional*

I have reviewed numerous journal articles for the *American Political Science Review, American Journal of Political Science, American Review of Politics, British Journal of Industrial Relations, Community Development Journal, Election Law Journal, Ethnic and Racial Studies, Journal of Electoral Studies, Journal of Ethnic and Migration Studies, Law and Society Review, New Political Science, Perspectives on Politics, Political Behavior, Political Communication, Political Research Quarterly, Political Science Quarterly, Public Opinion Quarterly, Urban Affairs Review*, and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., New York University Press, and The New Press.

Chair, Social Science History Association President's Book Award Selection Committee, 2018.
Co-Organizer, "Insurgency from Below and the Future of American Democracy: A Conference in Celebration of the Work of Frances Fox Piven and Richard A. Cloward," Graduate School and University Center of the City University of New York, New York City, October 11, 2017.
Member, Social Science History Association President's Book Award Selection Committee, 2017.
Invited Speaker, Voting Rights Institute Expert Witness Training Conference, sponsored by The Campaign Legal Center, the American Constitution Society and Harvard University Center for Governmental and International Studies, Cambridge, September 14, 2016.
Dissertation Fellowship Reviewer, Center for Engaged Scholarship, 2016-present.
Faculty Presenter, American Bar Association, "The Voter Fraud Myth, Voter ID, Immigration and Voting Rights, and State Legislative Reapportionment," February 18, 2016 (1.5 CLE credits).
Co-Chair, Scholars Strategy Network, New Jersey Chapter, 2015 to present.
Consulting Expert, U.S. Government Accountability Office, Issues Related to State Voter Identification Laws, May 2013.
Guest Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.
Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011, 2012-2013.
Executive Council Member, Urban Section, American Political Science Association, 2005-2006, 2008-2010.
Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.
Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.
Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.
Nominating Committee, Urban Section, American Political Science Association, 2006-2007.
Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association,

13

2005-6.
Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.
Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.
Grant Reviewer, Research Award Program, The City University of New York, 2003.
Member, New York Colloquium on American Political Development, 2001 to 2011.

*Community*

Invited Speaker, National Organization for Women, South Jersey 'Alice Paul' Chapter, Moorestown, New Jersey,
   February 14, 2018.
Invited Speaker, Annual Fall Meeting of the Mercer County Division of Elections, Clerks Workshop, October 3, 2017.
Invited Keynote Speaker, League of Women Voters of Burlington County, New Jersey, Annual Fall Conference,
   Moorestown Friends, Moorestown, New Jersey, September 18, 2017.
Poll Worker, Gloucester County Board of Elections, (Republican Party Representative), 2017 to present.
Faculty Adviser and Organizer, Graduate Student Conference on State and Local Economic Development Policy, The
   Neighborhood Center, Camden, New Jersey, April 17, 2016; March 28, 2017.
Invited Panelist, "Voting Fraud, Voter Suppression: Myths and Realities," League of Women Voters of Connecticut
   Education Fund Annual Fall Conference, Darien Library, Darien, Connecticut, October 24, 2015.
Member, Participatory Budgeting in New York City Research Board, Community Development Project of the Urban
   Justice Center, 2013-2015.
Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.
Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month
   Celebration, Atlantic City, New Jersey, February 15, 2012.
Organizer, "National Teach-in on Debt, Austerity and How People Are Fighting Back," Judson Memorial Church, New
   York City, April 11, 2011.
Host Committee, New York State Immigrant Action Fund, 2010.
Board Member, The Left Forum, 2009 to 2013.
Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.
Board Member, Project Vote, 2008-2009.
Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19,
   2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17,
   2005; New York City Central Labor Council, New York City, April 28, 2004.
Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25,
   2004.
Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.

# PAID CONSULTANTSHIPS

*American Civil Liberties Union Voting Rights Project, 2016-2018*
Wrote expert reports and testified at trial for plaintiffs in *Fish v. Kobach*, U.S. District Court for the District of Kansas.

*Perkins Coie, LLP, 2015-2018.*
Wrote expert reports and testified at trial for plaintiffs in *Ohio Democratic Party v. Husted*, U.S. District Court for the
Southern District of Ohio, Eastern Division; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern
District in Virginia, Richmond Division; and *One Wisconsin v. Wisconsin Government Accountability Board* in the U.S.
District of the Western District of Wisconsin; and wrote expert report for plaintiffs in *League of Women Voters of New
Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough SS., Southern District.

*Kirkland & Ellis, LLP, 2014-2016.*
Wrote expert reports and testified at trial for plaintiffs in *North Carolina State Conference of NAACP v. McCrory*, U.S.
District Court for the Middle District of North Carolina.

*Dechert, LLP, 2014*
Wrote expert report for plaintiffs and testified at trial in *Veasey v. Perry*, U.S. District Court for the Southern District of
Texas.

*Arnold & Porter LLP, 2012-2013.*
Wrote expert reports for plaintiffs (2012, 2013) and testified (2012) at trial in *Applewhite v. Commonwealth of
Pennsylvania*, Commonwealth Court of Pennsylvania.

*New York City Charter Revision Commission, 2010.*
Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

*New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.*
Analyzed survey and other data and wrote report on Latino political participation in New York City and New York State in the 2008 presidential election.

*New York Immigration Coalition, New York, New York, 2006.*
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

*Brennan Center for Justice at New York University School of Law, 2004-2005.*
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz,* Civil Action No. 3:04-CV-1624 (MRK), U.S. District Court for the District of Connecticut.

*Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.*
Consulted on survey design for a project on the efficacy of community-based organizations.

*Dēmos, New York, New York, 2001 to 2002.*
Researched and wrote a study of voter fraud in contemporary American politics.

*1199 Child Care Fund, New York, New York, 2000 to 2002.*
Prepared demographic data for Fund-eligible union members and their children.

(7/19)

15

Case 1:18-cv-05391-SCJ   Document 292-1   Filed 06/25/20   Page 193 of 355
Case 1:16-cv-05391-SCJ   Document 80   Filed 07/15/19   Page 141 of 189

18

# DEFENDANTS' EX. 3

# Department of Public Policy and Administration

# Faculty

EXHIBIT

3

12-13-19 RC

PENGAD 800-631-6989



**Gloria Bonilla-Santiago**
**Office:** 501 Cooper St.
**Phone:** (856) 225-6348
**Web:** bonilla-santiago.camden.rutgers.edu

**Degree School**: City University of New York
**Field of Degree**: Ph.D. Sociology
**Position**: Board of Governors Service Professor of Public Policy and Administration, and Director, Community Leadership Center.
**Research Interests**: leadership, school leadership and partnerships, charter schools, communities and poverty, children and families, early childhood and literacy, migration and migrant workers, women and leadership
**Courses**: Leadership and Communication Skills, Directed Study, Creating a Culture of Continuous Improvement in Schools, Theory and History of Community Development



**Melanie Bowers**
*(On Leave Spring 2020)*
**Office:** 401 Cooper St.
**Phone:** (856) 225-6070
**Web:** melaniebowers.weebly.com
**Email:** melanie.bowers@rutgers.edu

**Degree School:** Michigan State University
**Field of Degree:** Ph.D. Political Science
**Position:** Assistant Professor of Political Science and Public Policy and Administration (joint appointment)
**Research Interests**: Housing and Homelessness Policy; Economic Development Policy; LGBTQIA+ Politics and Policy; Teaching and Learning
**Courses:** Immigrants and Community Development, Urban and Regional Economic Development, Research Design

**Marie Isabelle Chevrier**
**Office:** 401 Cooper St., Room 201
**Phone:** (856) 225-2973
**Web:** chevrier.camden.rutgers.edu



**Degree School**: Harvard University

**Field of Degree**: Ph.D. Public Policy

**Position**: Professor of Public Policy and Administration, and Undergraduate Director of the Urban Studies program

**Research Interests**: arms control, chemical and biological weapons policy, international negotiations, conflict and conflict resolution

**Courses**: International Negotiations, International Conflict and Conflict Resolution, Negotiations for Effective Management, Public Management



**Stephen Danley**

*(On sabbatical Spring 2020)*

**Office:** 401 Cooper St., Room 202

**Phone:** (856) 225-6343

**Web:** danley.camden.rutgers.edu

**Degree School:** University of Oxford, Nuffield College

**Field of Degree:** D.Phil. Social Policy

**Position:** Assistant Professor Public Policy and Administration, and Graduate Director of the Public Affairs program

**Research Interests:** local knowledge, informal organizations, local networks, urban neighborhoods, urban policy, New Orleans, Camden, Philadelphia

**Courses:** Local Knowledge: City Policy in New Orleans and Camden, International Economic Development, Qualitative Research Methods, Camden and the Greater Philadelphia Region



**Maureen M. Donaghy**

**Office:** 401 Cooper St., Room 109

**Phone:** (856) 225-6131

**Web:** donaghy.camden.rutgers.edu

**Degree School**: University of Colorado

**Field of Degree:** Ph.D. Political Science

**Position:** Associate Professor of Political Science and Public Policy (joint appointment)

**Research Interests**: development and civil society, with an emphasis on participatory governance, urban politics and Latin America

**Courses:** International Economic Development, Colloquium on Poverty Alleviation Strategies, IPSD Capstone, Introduction to Global Urbanization

**Richard A. Harris**

**Office:** 401 Cooper St., Room 106

**Phone:** (856) 225-6339



**Degree School**: University of Pennsylvania

**Field of Degree:** Ph.D. Political Science

**Position**: Professor of Political Science and Public Policy and Administration (joint appointment)

**Research Interests:** government/business relations, regulatory policy, environmental policy

**Courses:** Foundations of Policy Analysis, Law and Public Policy, Environmental Policy, Regulatory Policy, Logic of Social Inquiry, Research Design



**Michael Hayes**

**Office:** 401 Cooper St., Room 208

**Phone:** (856) 225-6561

**Web:** hayes.camden.rutgers.edu

**Degree School:** American University

**Field of Degree:** Ph.D. in Public Administration and Policy

**Position:** Assistant Professor of Public Policy and Administration

**Research Interests:** public finance and budgeting, education finance and policy, public management, tax policy

**Courses:** Foundations of Policy Analysis, Financial Management of Public Programs



**Paul Jargowsky**

**Office:** 321 Cooper St.

**Phone:** (856) 225-2729

**Web:** jargowsky.camden.rutgers.edu

**Degree School:** Harvard University

**Field of Degree:** Ph.D. Public Policy

**Position:** Professor of Public Policy, and Director, Center for Urban Research and Education (CURE)

**Research Interests:** inequality, geographic concentration of poverty, residential segregation by race and class, educational attainment and economic mobility

**Courses:** Quantitative Methods I, Quantitative Methods II, Limited and Categorical Dependent Variables



**Patrice M. Mareschal**

**Office:** 401 Cooper St., Room 305

**Phone:** (856) 225-6859

**Web:** mareschal.camden.rutgers.edu

**Degree School**: University of Oklahoma

**Field of Degree**: Ph.D. Political Science

**Position**: Associate Professor of Public Policy and Administration

**Research Interests**: conflict resolution, labor unions, public policy

**Courses**: Labor Management Relations, Human Resource Management, Organizational Behavior, Ethics in Public and

Nonprofit Sectors, Research Methods, Foundations of Policy Analysis, Colloquium in Conflict Resolution, Colloquium in Program Evaluation



**Angie McGuire**
**Office:** 401 Cooper St., Room 210
**Phone:** (732) 932-6998 Ext. 603

**Degree School**: Rutgers University
**Field of Degree**: Ph.D. Public Administration
**Position**: MPA Graduate Program Director and Associate Teaching Professor of Public Policy and Administration
**Research Interests**: economic development, local government
**Courses**: Public and Nonprofit Management, Research Workshop, Leadership & Communication



**Lorraine C. Minnite**
**Office:** 321 Cooper St., Room 301
**Phone:** (856) 225-2526
**Web:** minnite.camden.rutgers.edu

**Degree School:** City University of New York
**Field of Degree:** Ph.D. Political Science
**Position:** Associate Professor of Public Policy and Department Chair
**Research Interests:** inequality and poverty; American and urban politics and policy; voting rights; social movements; race, ethnicity and class; immigration
**Courses:** Foundations of Policy Analysis, Politics of Community Development, Alternative Development Strategies for Distressed Cities, Poverty and the Urban Environment, Research Workshop



**Adam Okulicz-Kozaryn**
**Office:** 321 Cooper St., Room 302
**Phone:** (856) 225-6353
**Web:** https://sites.google.com/site/adamokuliczkozaryn/

**Degree School:** University of Texas at Dallas
**Field of Degree:** Ph.D. Public Policy and Political Economy
**Position:** Associate Professor of Public Policy
**Research Interests:** inequality, preferences for redistribution, urban and rural issues, cultural, values and religion, happiness, quality of life, life satisfaction
**Courses:** Data Management | Quantitative Methods I, Quantitative Methods II, Research Methods, Urban and Regional Economic Development, Introduction to Geographic Information Systems

**Beth Rabinowitz**
*(On sabbatical Spring 2020)*

Faculty | Department of Public Policy and Administration



**Office:** 401 Cooper St., Room 101
**Phone:** (856) 225-2971
**Web:** https://rabinowitz.camden.rutgers.edu/

**Degree School:** University of California, Berkeley
**Field of Degree:** Ph.D. Political Science

**Position:** Associate Professor of Political Science and Public Policy and Administration (joint appointment)
**Research Interests:** regime strategies and political stability in sub-Saharan Africa, with a particular focus on rural alliances
**Courses:** International Economic Development, Logic of Social Inquiry, Urbanization in the Developing World



**Erin M. Robinson**
**Office:** 401 Cooper Street, Suite 301
**Phone:** (856) 225-6079

**Degree School:** Texas A&M University
**Field of Degree:** Ph.D., Political Science

**Position:** Visiting Assistant Professor of Public Administration
**Research Interests:** race, ethnicity, and public administration; diversity management; representative bureaucracy; race and ethnic politics; education policy
**Courses:** Foundations of Policy Analysis, Human Resources Management, Research Workshop

# Affiliated Faculty



**Natasha O. Fletcher**
*(On Leave 2019-2020)*
**Office:** 321 Cooper St.
**Phone:** (856) 225-6797
**Web:** tursi.camden.rutgers.edu

**Degree School:** Rutgers University
**Field of Degree:** Ph.D. Public Policy
**Position:** Associate Director, Center for Urban Research and Education (CURE), and Lecturer
**Research Interests:** housing and poverty
**Courses:** Housing Policy, Poverty and Urban Environment

# Adjunct Faculty

**Louis Bezich, M.P.P.**
Senior Vice President of Strategic Alliances, Cooper University Health Care
Lecturer, MPA Program

**Sean Hadley, J.D.**

Associate Director of Government Relations, N.J.E.A.

Lecturer, MPA Program

**Patricia Nolfi, Ed.D.**

Lecturer, EMPA Program

**Angel Osorio, J.D.**

CEO, Camden District Council Collaborative Board

Lecturer, Urban Studies Program

**Joseph G. Serico, Ed.D.**

Lecturer and Internship Supervisor, MPA Program

**Bethany Welch, Ph.D.**

Lecturer, Urban Studies Program

**Alan Zalkind**

Director, Rutgers University Center for Government Services

Lecturer, EMPA Program

# Staff

**B.A. in Urban Studies:**

Lisa Alston

Phone: (856) 225-2936

Fax: (856) 225-6085

la266@camden.rutgers.edu

**M.P.A., Executive M.P.A., M.S., Ph.D. Programs:**

Lisa Vargas-Long

Phone: (856) 225-6337

Fax: (856) 225-6559

lavargas@camden.rutgers.edu

## CONTACT B.A. IN URBAN STUDIES

401 Cooper Street

Camden, NJ 08102

**Undergraduate Director**

Dr. Marie Chevrier

**Department Secretary**

Lisa Alston

Phone: (856) 225-2936
Fax: (856) 225-6085

## CONTACT M.P.A., E.M.P.A., M.S., PH.D. PROGRAMS:

401 Cooper Street
Camden, NJ 08102

Lisa Vargas-Long
Phone: (856) 225-6337
Fax: (856) 225-6559

Request Info

Copyright © Rutgers, The State University of New Jersey. All rights reserved.

Page last updated by Department of Public Policy and Administration at 2:02 pm December 5, 2019.

This page was printed from http://dppa.camden.rutgers.edu/faculty/ at 12:20 AM Thursday, December 12, 2019.

# DEFENDANTS' EX. 4

Lorraine Minnite | Rutgers University

# RUTGERS

# Lorraine Minnite

## About Lorraine Minnite

Ph.D., City University of New York
Political Science, Concentration in American Politics, and Urban and Public Policy

Lorraine C. Minnite's research is concerned with issues of inequality, social and racial justice, political conflict and institutional change. She is the author and co-author of two books on electoral rules and racial and class politics in the U.S., *The Myth of Voter Fraud,* published by Cornell University Press in 2010, and *Keeping Down the Black Vote: Race and the Demobilization of American Voters*, published by The New Press in 2009, and co-authored with Frances Fox Piven and Margaret Groarke. An experienced survey researcher, Dr. Minnite has also published on various aspects of political participation, immigration, voting behavior and urban politics. She has taught at New York University and Barnard College/Columbia University, and served as Associate Director of the Center for Urban Research and Policy at Columbia University, and as Research Director for the voting rights and policy organization, Project Vote. Dr. Minnite has served as an expert witness on several voting rights cases, and consulted with various labor, advocacy, academic and governmental organizations and political campaigns which have relied on her skills as a political analyst and researcher and her expertise in public policy. She has been awarded grants by the Carnegie Corporation of New York, the Ford Foundation, the Russell Sage Foundation, the New York Foundation, the Columbia University Institute of Social and Economic Research and Policy, the Center for Urban Research at the CUNY Graduate Center, and the New York Latino Research and Resources Network at The University of Albany. Dr. Minnite holds a B.A. in History from Boston University, and a Masters degrees and a Ph.D. in Political Science from the City University of New York. She is on sabbatical for the 2014-2015 academic year.

Lorraine Minnite

321 Cooper Street, Rm. 301
Camden, New Jersey 08102
(856) 225-2526
lori.minnite@rutgers.edu



EXHIBIT
4
12 13 19 RC

Copyright © 2019 Rutgers, The State University of New Jersey. All rights reserved. Page last updated at 1:40 pm November 18, 2014.
This page was printed from minnite.camden.rutgers.edu/ on Thursday, December 12, 2019.

# DEFENDANTS' EX. 5

EXHIBIT

5

12-13-19 RR

PENGAD 800-631-6989

[      ] SEARCH

**HOME**      **POLITICS**      **ACT LOCALLY**      **LABOR**

CULTURE      VIDEO      MAGAZINE      DONATE

# ABOUT US



## MISSION STATEMENT

*In These Times*, an independent, nonprofit magazine, is dedicated to advancing democracy and economic justice, informing movements for a more humane world, and providing an accessible forum for debate about the policies that shape our future.

## HISTORY



James Weinstein

In 1976, author and historian James Weinstein founded *In These Times* with the mission to "identify and clarify the struggles against corporate power now multiplying in American society."

**FOUNDING EDITOR & PUBLISHER**
*James Weinstein (1926-2005)*

**EDITOR & PUBLISHER**
Joel Bleifuss

**EXECUTIVE PUBLISHER**
Christopher Hass

**EXECUTIVE EDITOR**
Jessica Stites

**MANAGING EDITOR**
Diana Babineau

**ASSOCIATE EDITOR**
Dayton Martindale

**WEB EDITORS**
Miles Kampf-Lassin, Sarah Lazare

**COPY EDITOR**
Bob Miller

**PROOFREADERS (volunteer)**
Sharon Bloyd-Peshkin, Amelia Diehl, Thomas Gaulkin, Rochelle Lodder

**Climate Change Is Fueling a Farming Boom in Alaska**

**Restorative Justice: A Much-Needed Alternative to Mass Incarceration**

**The New Deal Funded the Arts. The Green New Deal Should, Too.**

**Reagan Lives On in Biden**

VIEW FULL CONTENTS

SUBSCRIBE TO IN THESE TIMES

### MOST READ

1. $44,000 for an Ambulance, Hour-Long Drives to an ER: The Impossible Cost of Healthcare in Appalachia

2. Trump's Labor Dept. Has Declared War on Tipped Workers

3. BREAKING: Elizabeth Warren Joins Bernie Sanders in Opposing Trump's Massive War Budget

4. Black Women, Let Your Anger Out

5. MSNBC Is the Most Influential Network Among

About In These Times

Weinstein (1926-2005) was joined in establishing this independent magazine of news, culture and opinion by noted intellectuals Daniel Ellsberg, E.P. Thompson, Noam Chomsky, Barbara Ehrenreich, Julian Bond and Herbert Marcuse, all of whom were among the original sponsors of the magazine (see full list of founding sponsors below). Thirty-four years later, those sponsors now number in the thousands--as a not-for-profit publication, *In These Times*, like all political magazines on both the left and the right, has survived with the help of readers who make donations above and beyond the cost of their subscriptions.

**INVESTIGATIVE FELLOWS**
Branko Marcetic, Christine MacDonald, Chandra Thomas Whitfield

**SENIOR EDITORS**
Terry J. Allen, Patricia Aufderheide, Susan J. Douglas, David Moberg, Salim Muwakkil, David Sirota, Kurt Vonnegut (1922-2007)

**CONTRIBUTING WRITERS**
Kate Aronoff, Theo Anderson, Michael Atkinson, Frida Berrigan, Michelle Chen, Sady Doyle, Pete Karman, Jane Miller, Shaun Richman, Cole Stangler, Slavoj Žižek

**CONTRIBUTING EDITORS**
Dean Baker, Frida Berrigan, Barbara Ehrenreich, Jeremy Gantz, Naomi Klein, John Nichols, Rick Perlstein, Micah Uetricht

**CREATIVE DIRECTOR**
Rachel K. Dooley

**CARTOONS EDITOR**
Matt Bors

**CARTOONISTS**
Terry LaBan, Dan Perkins

Liberals—And It's Ignoring Bernie Sanders

GET THE LATEST NEWS & UPDATES

Email [_____]    SUB

**POLITICS »**

**READ MORE**
BREAKING: Elizabeth Warren Joins Bernie Sanders in Opposing Trump's Massive War Budget
Centrists Don't Want "Party Unity"—They Want to Defend the Wealthy

**THE MOVEMENT »**
"Quite Divorced From Reality": Climate Scientist, Activists Call Out Shell Exec at UN Conference
The New Deal Funded the Arts. The Green New Deal Should, Too.

**LABOR »**
Southern Workers Unite Around Medicare for All: "A Tremendous Liberation From Your Boss"
Want To Build the Labor Movement? Get a Job at a Union Workplace.

**CULTURE »**
The New Deal Funded the Arts. The Green New Deal Should, Too.



**Volume 1, Issue 1**

Three decades after its founding, *In These Times* remains committed to covering the controversial issues of our time. Through five presidential administrations, *In These Times* has adhered to the belief that to thrive, a progressive political movement needs its own media to inform, educate and orient itself.

A strong democracy depends on healthy debate, and *In These Times* is one of only a handful of independent media projects fighting to widen the terms of national discussion. *In These Times* has frequently scooped the mainstream media on stories

**DEVELOPMENT DIRECTOR**
Lauren Kostoglanis

**DEVELOPMENT COORDINATOR**
Jamie Hendry

**PUBLISHING ASSISTANT**
Caroline Reid

**CIRCULATION DIRECTOR**
Rebecca Sterner

**FALL EDITORIAL INTERNS**
Ria Bhagwat, Juan Caicedo, Isabel Carter, Madeline Cruz, Will Kang, Indigo Olivier

**IN THESE TIMES PUBLISHING CONSORTIUM**
Grant Abert, Theresa Alt, Aris Anagnos, Stuart Anderson, Dan and Samantha Collins, Leonard C. Goodman, Matt Groening, Collier Hands, James Harkin, Lorraine Honig, Polly Howells and Eric Werthman, Gloria Jarecki, Betsy Krieger and David Kandel, Nancy Kricorian and James Schamus, Lisa Lee, Chris Lloyd, Beth Maschinot, Bruce Merrill, Nancy Fleck Myers, Richard L. Pearlstone, Dave Rathke, Abby Rockefeller and Lee

When We Talk About Cultural Appropriation, We Should Be Talking About Power



**SUBSCRIBE NOW AND RECEIVE 12 MONTHLY ISSUES FOR JUST $20.00—THAT'S 53% OFF THE COVER PRICE, OR JUST $1.67 PER ISSUE**

SUBSCRIBE NOW





ranging from the first coverage of global warming and extensive investigative reporting on the Iran Contra scandal in the '80s to early in-depth coverage of the genocide in the Sudan in 2004. Such reporting has earned *In These Times* more Project Censored awards than any other magazine.

# "If it weren't for *In These Times,* I'd be a man without a country."

## --KURT VONNEGUT

A dedication to independent journalism based on progressive values is one of the primary characteristics separating *In These Times* from the conventional, corporate and increasingly embedded media. Over the last 28 years, *In These Times* has distinguished itself by producing high-quality journalism that treats women, communities of color, working people and other groups ignored by the mainstream media as legitimate audiences, sources and subjects for the news.

Halprin, Perry Rosenstein and Gladys Miller Rosenstein, T.M. Scruggs, Lois Sontag, Lewis and Kitty Steel, Ellen Stone Belic, Jenny and Trevor Tomkins

**IN THESE TIMES BOARD OF DIRECTORS**
M. Nieves Bolanos, Toby Chow, Kevin Creighan, Dan Dineen, James Harkin, Robert Kraig, Paul Olsen, Rick Perlstein, Margaret Rung, Steven Saltzman, David Taber, James Thindwa, William Weaver

**WEBSITE DEVELOPMENT**
Bandelier Design and Gridwork Design

Over the years, *In These Times* has published the work of a wide range of noted writers, including fiction by Alice Walker and <u>Kurt Vonnegut</u>; reporting by Clinton speechwriter David Kusnet, former *New Republic* editor Andrew Sullivan, and *Salon* Editor-at-Large Joan Walsh; and political commentary by former presidential candidate George McGovern, environmentalist Sandra Steingraber, the late Democratic Sen. Paul Wellstone of Minnesota, novelists Barbara Kingsolver and Dorothy Allison, and a number of contemporary members of the House of Representatives who contributed to the magazine's "House Call" column. (For a list of notable contributors to the magazine, see "In These Times Alumni" section below.)

The late Sen. Paul Wellstone, one of the first subscribers to *In These Times*, put it this way: "Meaningful democracy cannot survive without the free flow of information, even

(or especially) when that information threatens the privileged and the powerful. At a time of growing media concentration, *In These Times* is an invaluable source of news and information that the corporate media would too often prefer to ignore."

*IN THESE TIMES* ALUMNI

Craig Aaron, Eric Alterman, Dean Baker, Sidney Blumenthal, Monika Bauerlein, Sara Corbett, David Corn, Ana Marie Cox, Barbara Ehrenreich, Ben Ehrenreich, Laura Flanders, Tom Frank, Amy Goodman, Juan Gonzales, Miles Harvey, Christopher Hayes, John Judis, Naomi Klein, Robert W. McChesney, Harold Myerson, Jim Naureckas, Craig Nelson, John Nichols, Sal Paolantonio, Christian Parenti, Michael Paterniti, Jeff Sharlet, Ken Silverstein, Jeffrey St. Clair, Ilan Stavans, Andrew Sullivan, Tracy Van Slyke, Kurt Vonnegut, Alice Walker, Joan Walsh

**FOUNDING SPONSORS**

Robert Allen, Julian Bond, Noam
Chomsky, Barry Commoner, Al
Curtis, Hugh DeLacy (1910-1986),
G. William Domhoff, Douglas
Dowd, David Du Bois, Barbara
Ehrenreich, Daniel Ellsberg,
Frances Putnam Fritchman,
Stephen Fritchman, Barbara
Garson, Eugene D. Genovese,
Emily Gibson, Michael Harrington
(1928-1989), Dorothy Healey
(1914-2006), David Horowitz, Paul
Jacobs (1918-1978), Arthur Kinoy,
Ann J. Lane, Elinor Langer, Jesse
Lemisch, Salvador Luria (1912-
1991), Staughton Lynd, Harry
Magdoff (1913-2006), Herbert
Marcuse (1898-1979), Carey
McWilliams (1905-1980), David
Montgomery, Carlos Munoz,
Harvey O'Connor (1897-1987),
Jessie Lloyd O'Connor (1904-
1988), Earl Ofari, Ronald Radosh,
Paul Schrade, Derek Shearer, Stan
Steiner (1925-1987), Warren
Susman (1927-1985), Paul Sweezy
(1910-2004), E.P. Thompson
(1924-1993), Naomi Weisstein,

About In These Times

William A. Williams (1921-1990),
John Womack Jr.

**EDITORIAL INDEPENDENCE POLICY**

*In These Times* is a reader-
supported, independent nonprofit
news organization. We subscribe
to standards of editorial
independence adopted by the
Institute for Nonprofit News:

Our organization retains full
authority over editorial content to
protect the best journalistic and
business interests of our
organization. We maintain a
firewall between news coverage
decisions and sources of all
revenue. Acceptance of financial
support does not constitute
implied or actual endorsement of
donors or their products, services
or opinions.

We accept gifts, grants and
sponsorships from individuals and
organizations for the general
support of our activities, but our
news judgments are made
independently and not on the basis
of donor support.

Our organization may consider donations to support the coverage of particular topics, but our organization maintains editorial control of the coverage. We will cede no right of review or influence of editorial content, nor of unauthorized distribution of editorial content.

**DONOR TRANSPARENCY**

*In These Times* is committed to transparency in every aspect of funding our organization.

Accepting financial support does not mean we endorse donors or their products, services or opinions.

We accept gifts, grants and sponsorships from individuals, organizations and foundations to help with our general operations, coverage of specific topics, and special projects. Our news judgments are made independently—not based on or influenced by donors. We do not give supporters the rights to assign, review or edit content.

*In These Times* will make public all donors who give a total of $500 or more per year as part of <u>our annual report</u>.

---

| ABOUT US | NEWSLETTERS/RSS | CONTACT US | REPRINTS |
| ARCHIVES | SUBMISSIONS | DONATE | LEAVE A LEGACY |
| SPONSORSHIPS | ADVERTISE | PRESS | PRIVACY POLICY |
| SUBSCRIBE | GIVE A GIFT | INTERNSHIPS/JOBS | INVESTIGATIVE INSTITUTE |

COPYRIGHT ©2019 IN THESE TIMES AND THE INSTITUTE FOR PUBLIC AFFAIRS. ALL RIGHTS RESERVED

---

# DEFENDANTS' EX. 6

About Red Pepper | Red Pepper



# About Red Pepper

*Red Pepper* is a quarterly magazine and website of left politics and culture. We're a socialist publication drawing on feminist, green and libertarian politics. We seek to be a space for debate on the left, a resource for movements for social justice, and a home for open-minded anti-capitalists.

*Red Pepper* is completely independent, and while not rejecting party politics, seeks to help build the kind of pluralistic, dynamic movements which can fundamentally challenge our economic system, with its entrenched injustice, structures of power and oppression, and tendency towards war and environmental destruction. Although based in London, we have links around Britain, and have always covered events and perspectives from outside the capital.

We're a non-profit magazine and we operate on a shoestring. We think the left needs publications which are non-sectarian yet unafraid to take a stand, radical yet non-dogmatic, and thoughtful yet orientated on real-world activism. If you think so too, please consider becoming a subscriber.

Subscribe to *Red Pepper* – you choose how much to pay.

---

**MORE ABOUT RED PEPPER**

About · Frequently asked questions · Red Pepper's history · Our editorial charter · Get involved

# DEFENDANTS' EX. 7

<u>Reclaim Democracy!</u>

Restoring Citizen Authority over Corporations



- <u>Home</u>
- <u>Donate</u>
- <u>Merchandise</u>
- <u>Archive</u>
- <u>Primers</u>
- <u>About</u>
- <u>Contact</u>
- Search this website …    Search

# Propaganda and the Voter ID Campaign

*By Lorraine Minnite*
*First Published September, 2011*

**Editor's Note:** *The cried of "voter fraud" has duped citizens in many states to accept needless barriers to voting. Here, Rutgers University professor Lorraine Minnite, author of <u>"The Myth of Voter Fraud,</u>" debunks the nonsense spread by the leading perpetrator of voting fraud myths, Hans von Spakovsky.*

Propaganda is playing a crucial role in the fast-moving campaign to enact more onerous voter identification (ID) laws in the states. In this short blog post I want to show how the discussions of the issue of voter photo ID exhibit some of the salient features of political propaganda to obscure the real rationale for these laws: partisan political advantage.

As an example, consider the puzzling re-emergence of a sordid tale of election shenanigans from some three decades ago. The scene is a series of Democratic primary races, and the locale is Brooklyn, New York, circa the 1970s and early 1980s. In a 2008 <u>Heritage Foundation legal memo</u> on the case and countless <u>other reports</u>, <u>op-eds</u>, <u>blog postings,</u> and <u>government testimony</u> advocating for stricter voter ID laws, Hans von Spakovsky, the controversial former Georgia GOP county leader and one-time U.S. Justice Department official, has called this story "the best-documented case of widespread and continuing voter identity or impersonation fraud" in "living memory." It stands as a much-cited rebuttal to the critics who reject claims of an epidemic of voter fraud as unsupported by evidence.

Von Spakovsky's source for this story is a <u>1984 Brooklyn grand jury report</u>, and his abuse of this report is striking. He takes historical events and twists them so that they point to the wrong set of villains. The grand jury investigated an egregious case of political corruption committed by politicians and election workers, but he says the case is about voter impersonation fraud. The findings and recommendations of the grand jury were sensible, but von Spakovsky distorts them to promote the call for more restrictive voter ID rules. The grand jury did not come to these conclusions.

Von Spakovsky's Brooklyn tale plays a role in the expansive propaganda campaign promoted by Republican Party operatives to stoke the anger of the party's rightwing base (via the code word "fraud"), and to soften up a mostly disinterested public skeptical of backward-moving restrictions on the franchise -- like the requirement to show a current government-issued ID to vote. As I've argued elsewhere, central to this campaign is <u>the myth of voter fraud</u>.

Propaganda is a communications strategy that relies on specific rhetorical devices and methods of presenting information to persuade and influence the opinions of others in order to control their actions. Propagandists distort the truth through selective storytelling, logical fallacies, unwarranted extrapolation, and repetition of false

Propaganda and the Voter ID Campaign

conclusions, providing a basis for hidden political agendas and fear-mongering. In the contemporary discussions about voter ID, what could be more misleading than to go back 27 years to obscure events in Brooklyn documented in <u>an almost impossible to find</u> grand jury report? Unknowing readers could think von Spakovsky is plucking the example out of a vast trove of evidence when he's not.

## Selective Storytelling
The 1984 Brooklyn grand jury report that is the source of von Spakovsky's 2008 Heritage Foundation memo documents the results of an investigation by the Brooklyn D.A. into a pattern of corruption by a de-throned state senator named Vander Beatty and his allies within the ranks of the Kings County Democratic Party organization.

The Grand Jury found that over a period of 14 years, a group of people committed blatant voter registration and voting fraud to defeat opponents who challenged the status quo control of electoral politics in the borough. <u>The struggle</u> reflected a conflict between an established black political class, supported by an older white ethnic-dominated political machine, and a black reform movement emerging from the public school-based battles for community control in Central Brooklyn.

The fraud was flagrant and could not have been committed without the assistance of elections officials who knowingly accepted bogus registration cards, violated state laws in the handling of registration cards, and attempted to conceal forged registration documents.

The culminating event occurred when the machine-backed Beatty lost a congressional primary for retiring Shirley Chisholm's U.S. House seat to the reformer Major Owens. Beatty's gang snuck into the Board of Elections, hid in a bathroom ceiling until the employees went home for the day, and then tampered with voter registration cards to manufacture the appearance of fraud on the part of the Owens campaign. The fraudulent fraud discovered, Beatty then used the forged evidence to charge Owens with fraud and to demand that the results of the election be thrown out. He almost got away with this scandalous ploy.

## Logical Fallacies
Von Spakovsky tells a disembodied version of this story and demonstrates a complete lack of understanding of the larger context that framed the corruption. Moreover, to distract the reader from the fact that these events occurred a quarter-century ago, he ignores how rules and procedures have changed since 1984 (even in Brooklyn!). von Spakovsky exploits the ambiguity of the word "fraud" to commit a major logical fallacy. He claims this 27-year old story of internecine political warfare among Brooklyn Democrats presents the best-documented case of widespread and continuing voter identity or impersonation fraud that could be prevented with voter photo ID. But since his premise is wrong, so is his conclusion.

The Grand Jury's recommendations barely touched on voter ID. Grand Jury members were sensitive to the danger of their report being used to justify the tightening up of access to registration and voting. The report flatly states, "The Grand Jury is not advocating that existing electoral rights be restricted or unduly encumbered, but that safeguards be created to protect those rights from being undermined by fraud" (p. 3).

For the Grand Jury, since the main problem was document tampering, forgery, and corrupt politicians plotting conspiracies to rig elections, these safeguards largely took the form of a plea to improve administrative procedures, address under-staffing and training of Board of Elections personnel, and especially, to make changes to way the Board of Elections secured its facilities. Von Spakovsky conveniently does not mention these recommendations, despite the fact that a discussion about the use of closed circuit televisions cameras, security mirrors, and alarm systems "to protect against illegal use of or entry into the facilities" (p. 26) takes up several pages of the report.

In addition, the grand jury called on the Governor and the State Legislature to "promptly study the problems of election fraud identified in this report…and evaluate various proposals and strike a balance between solving the problem of election fraud and continuing the recent gains in facilitating unimpeded access to the ballot box" (p. 21). One proposal the grand jury thought worthy of study was to require identification from voters at the time of registration (which New York now does) and voting (which New York does not do). More importantly,

however, was the grand jury's own recommendation to require identification of persons seeking admission to the Board of Elections .

Von Spakovsky commits another logical fallacy in setting up this story to justify his preference for stricter ID laws. He argues that the reason why there is so little evidence of voter impersonation fraud (and, perhaps why we have to resort to an example from Brooklyn in the 1970s) is because, "Election officials cannot discover an impersonation if they are denied the very tool needed to detect it – an identification requirement" (p. 1). But the ID requirement can both prevent fraud and make it detectable. Advocates of government-issued photo voter ID, including von Spakovsky, have never marshaled reliable evidence of contemporary voter impersonation fraud. If we have no evidence of voter impersonation fraud before the enactment of voter ID laws, and no evidence of voter impersonation fraud after the enactment of voter ID laws, how is it possible that voter ID laws are both preventing voter fraud and making it more detectable? This is circular reasoning – if voter ID eliminates voter impersonation fraud, which is hard to do since there is virtually no evidence that it actually exists, how then does it make fraud detectable?

**Unwarranted Extrapolation**
Von Spakovsky states that, "Even though it led to no indictments, the New York investigation still serves a valuable purpose. Most clearly, it demonstrates that voter impersonation is a real problem and one that is nearly impossible for election officials to detect given the weak tools usually at their disposal" (p. 7).

This is not correct. A 27-year old grand jury report does not demonstrate that voter impersonation is a real problem today. Nor does it "provide good reason to believe that [the...] conspiracy...could not have occurred if voters had been required to present photo identification when they voted" (p. 7). Von Spakovsky incorrectly assumes that people this intent on stealing elections could be thwarted by a photo ID requirement (see this recent Washington Post article for the growing ease with which "untold thousands" of flawless fraudulent drivers licenses have flowed into the U.S. recently from a single source in China).

Von Spakovsky states that, "More recent cases provide evidence of what may be a wider problem that is very difficult to detect in jurisdictions that do not require voter identification" (p. 5).

What is that evidence? Not much. Von Spakovsky tells us that a college professor testified in 2006 before the U.S. Commission on Civil Rights that he was not able to vote once because someone else voted in his name. The professor wasn't able to find out why this occurred, what error was made, "and the polling place," he said, "didn't keep any record of it" (p. 7). In 2007, U.S. Justice Department litigation against Noxubee, Mississippi Democratic Party leader, Ike Brown, unearthed a former deputy sheriff who said he saw Brown "outside the door of the precinct talking to a young black lady...and heard him tell her to go in there and vote, to use any name, and that no one was going to say anything" (p. 7-8). Von Spakovsky's third piece of evidence comes from a 2007 city council run-off election in Hoboken, New Jersey, where a homeless man living in a shelter said he was paid $10 to vote for a specific person. No vote was actually cast because an alert election challenger suspected something fishy was afoot and physically chased the man away, calling the police who apprehended him. Hoboken has non-partisan local elections, but the shenanigans appear to have been the product of yet another factional dispute within a local Democratic Party organization.

This is hardly evidence upon which one can erect a persuasive claim of widespread if undetectable fraud.

**Fear-mongering**
Von Spakovsky's re-telling of a story about political corruption among Brooklyn Democrats of yore is peppered with references to "widespread impersonation fraud" and "a vote-fraud conspiracy that had been successfully carried out without detection for 14 years," in which "thousands of fraudulent votes went undetected for 14 years." In fact, while egregious, the Brooklyn grand jury did not find that the corruption unveiled by the investigation was widespread in the way von Spakovsky implies. Their report states that the corruption was committed by " a group of individuals...in a limited geographic area of Kings County from 1968 to 1982" (emphasis added, see p. 1-2).

No matter. Propaganda does not hew close to the facts. It seeks to manipulate emotion by selectively filtering and framing those facts. It draws on myth and symbols where facts are inconvenient. Even old Boss Tweed as a precursor to Ike Brown gets a mention in von Spakovsky's memo. And although "illegal aliens" never made an appearance in the Brooklyn saga, von Spakovsky throws them in as a looming threat to free elections. He implies they are somehow eager to vote and asserts that this nefarious conduct can be thwarted with government-issued ID ("…requiring a government-issued photo ID can prevent illegal aliens from voting," p. 8).

**Repetition**

Having carefully framed a story of petty political corruption from long ago as a cautionary tale of great relevance for our democracy today – and drawn the wrong conclusions – von Spakovsky distracts the reader from the big problems with his argument by repetitively asserting a link between his vastly exaggerated characterization of the problem of voter fraud and his preferred solution, restrictive voter photo ID requirements.

For example, on the first page of his Heritage Foundation memo, he lists "Talking Points," one of which says, "Voter-ID requirements directly target in-person voting fraud. An ID requirement would have defeated all the fraudulent practices employed by the New York vote-fraud conspiracy," which isn't true.

Referring to litigation that enjoined Ohio from implementing certain restrictions on voter registration drives (Project Vote v. Blackwell), he states, "Even if the court rulings were legally correct (a questionable conclusion), that is all the more reasons for a state to correct for potential fraud by requiring some form of reasonable voter ID at the polls," (p. 7) as if states currently have no protections against potential fraud.

Two paragraphs later, von Spakovsky sums up the Brooklyn case: "…the investigation provides good reason to believe that this 14-year-long conspiracy to submit thousands (if not tens of thousands) of fraudulent votes in New York City could not have occurred if voters had been required to present photo identification when they voted," (p. 7) a claim that is simply unsupported by the case he presents.

Finally, on the last page of his memo, von Spakovsky makes this false claim: "In states without identification requirements, election officials have no way to prevent bogus votes from being cast by unscrupulous individuals based on fictitious voter registrations, by impersonators, or by non-citizens who are registered to vote – another growing problem." For the statement to be true, states that do not require ID documents also would have no rules and checks in place to guard against fraudulent registrations, not the case in any state.

**Conclusion**

In the age of the Internet, the expanding use of propaganda techniques in American politics is one of the most important, if overlooked, developments of the early 21 st century. Hans von Spakovsky's repeated reference to an obscure 27-year old Brooklyn grand jury report as the best evidence of the contemporary scourge of voter impersonation fraud is a kind of fraud itself. Instead of evidence of fraud, he gives us evidence of the propaganda being used to distort the truth about fraud . As good as it is, however, the propaganda about voter fraud can't conceal everything. The lack of concern among voter ID proponents like von Spakovsky for the likely ill effects of these new laws on the electoral participation of vulnerable citizens lacking the requisite ID makes the ugly politics of the ongoing voter ID campaign all the more apparent.

Rutgers University professor Lorraine Minnite is the author of The Myth of Voter Fraud.

© 2011 Lorraine Minnite

| f Facebook | ⑤ Reddit | 🐦 Twitter | 🅿 Pinterest | G+ Google |

**Subscribe to Newsletter**

State

Email*

Submit

## Our Mission

Reclaim Democracy! is dedicated to restoring democratic authority over corporations, reviving grassroots democracy, and establishing appropriate limits on corporate influence. We work for systemic change, instead of reacting to corporate agendas. More about us.

## See Corporate Logo Flags and Other Message Items



## Follow Us



## Issues

- Corporate Personhood
- Citizens United
- Independent Business
- Transforming Politics
- Walmart
- All Topics

## Resources

- Merchandise

- Presentations and Workshops
- What You Can Do
- Sobre Nosotros
- Quotes Archive

**Weekly Quote**

*"Small scale is critical to local life, to the ability of local people to control what happens where they live."*
-Paul Weyrich
Contact Us ·

Return to top of page

Copyright © 2019 · Minimum Theme on Genesis Framework · WordPress · Log in

# DEFENDANTS' EX. 8





EXHIBIT
8
12-13-19 RC
PENGAD 800-631-6989

# KEY FINDINGS

# THE MISLEADING MYTH OF VOTER FRAUD IN AMERICAN ELECTIONS

*by Lorraine C. Minnite, Rutgers University-Camden*

Are fraudulent voters undermining U.S. elections? The simple answer is no. Rather, the threat comes from the *myth* of voter fraud used to justify rules that restrict full and equal voting rights.

A concerted partisan campaign to erect more restrictive voting rules is apace in many states, with Republicans pushing new limits on access and Democrats objecting. Thousands of changes to state election codes have been proposed since the contested presidential election of 2000. Far fewer have been signed into law, but those put in place – such as rules that people have a certain kind of photo identification card available from specific government offices – are making it more difficult for many citizens to cast ballots, including longtime voters as well as new ones.

In a democracy, reducing access to the ballot is difficult to justify. Political motives and strategies to discourage voting by particular groups such as racial minorities cannot be openly announced. That's where the myth of criminal voters comes in – as proponents of new rules cite the supposed threat of votes fraudulently cast by foreigners, noncitizens, immigrants, felons, and imposters who supposedly travel around to vote in many precincts. Mythical threats that stoke social prejudices are used to make new restrictions seem reasonable.

## Fraud by Individual Voters is Almost Nonexistent

The earliest reliable studies of election fraud in the 1920s and 1930s found that individual voters almost never committed fraud on their own. Conspiracies by politicians or election officials were behind most violations. Voter registration laws were put in place to reduce such organized fraud.

Today, social scientific research on fraud is difficult because there are no officially compiled national or state statistics. Researchers must painstakingly piece together evidence from news reports, court proceedings, law enforcement agencies, election officials, and interviews with experts and other sources. After ten years of such research, I found that intentional fraud by individual voters is exceedingly rare. Other investigations have reached the same conclusion.

- Replicating my methodology, 24 journalism students at twelve universities reviewed some 2,000 public records and identified just six cases of voter impersonation between 2000 and 2012.

- Under Republican President George W. Bush, the U.S. Justice Department searched for voter fraud. But in the first three years of the program, just 26 people were convicted or pled guilty to illegal registration or voting. Out of 197,056,035 votes cast in the two federal elections held during that period, the rate of voter fraud was a miniscule 0.00000132 percent!

- No state considering or passing restrictive voter identification laws has documented an actual problem with voter fraud. In litigation over the new voter identification laws in Wisconsin, Indiana, Georgia and Pennsylvania, election officials testified they have never seen cases of voter impersonation at the polls. Indiana and Pennsylvania stipulated in court that they had experienced zero instances of voter fraud.

- When federal authorities challenged voter identification laws in South Carolina and Texas, neither state provided any evidence of voter impersonation or any other type of fraud that could be deterred by requiring voters to present photo identification at the polls.

## Mistakes in a Confusing System are the Real Issue

When voter fraud accusations are tracked down to their specifics, irregularities almost always turn out to be simple mistakes by election officials or voters.

- In the contested 2004 Washington state gubernatorial election, a Superior Court judge ruled invalid just 25 ballots, constituting 0.0009 percent of the 2,812,675 cast. Many were absentee ballots mailed as double votes or in the names of deceased people, but the judge did not find all were fraudulently cast. When King County prosecutors charged seven defendants, the lawyer for one 83-year old woman said his client "simply did not know what to do with the absentee ballot after her husband of 63 years, Earl, passed away" just before the election, so she signed his name and mailed the ballot.

- A leaked report from the Milwaukee Police Department found that data entry errors, typographical errors, procedural missteps, misapplication of the rules, and the like accounted for almost all reported problems during the 2004 presidential election.

- When the South Carolina State Election Commission investigated a list of 207 allegedly fraudulent votes in the 2010 election, it found simple human errors in 95 percent of the cases the state's highest law enforcement official had reported as fraud.

- A study by the Northeast Ohio Media Group of 625 reported voting irregularities in Ohio during the 2012 election found that nearly all cases forwarded to county prosecutors were caused by voter confusion or errors by poll workers.

## The Reforms We Really Need

Voters acting on their own have no rational cause to vote fraudulently. The odds of casting a deciding vote are miniscule and cheaters risk criminal prosecution under state laws on the books for decades. The costs of fraudulent voting are steep and the benefits practically non-existent. Spurious, politically-motivated allegations of voter fraud are a distraction from the real problems in U.S. elections. Overly complicated rules need to be simplified and election administration professionalized. Nonpartisan officials and poll workers must be well-trained and supported in their efforts to help people cast ballots that are accurately counted. In every major election, millions of eligible Americans do not participate, in large part because of unnecessary hurdles to registration and voting. The United States needs a reinvigorated movement to expand voting rights and access. To build confidence in our democracy, we should look for ways to fix actual election problems – and recognize that individual voter fraud is not one of them.

---

Read more in Lorraine C. Minnite, *The Myth of Voter Fraud* (Cornell University Press, 2010).

# DEFENDANTS' EX. 9





PROJECT MUSE

---

The Other Campaign: Who Gets to Vote?

Lorraine C. Minnite, Frances Fox Piven

New Labor Forum, Volume 21, Issue 2, Spring 2012, pp. 35-40 (Article)

Published by The Murphy Institute/City University of New York



➡ For additional information about this article

https://muse.jhu.edu/article/476685

---

Access provided at 23 Sep 2019 20:50 GMT from Northern Kentucky University (+1 other institution account)

By Lorraine C. Minnite and Frances Fox Piven

# THE OTHER CAMPAIGN
## *Who Gets to Vote?*

AS UNIONS GEAR UP FOR THE ELECTION OF 2012, THEY SHOULD TAKE A LESSON from the electoral contests of 2008 and 2010. These elections were won by strategic moves to reshape the electorate as much as, or more than, by the usual approaches to campaigning. At the highest levels of the political parties, the focus continues to be not only on persuading voters, but on who gets to vote.

The remarkable 2008 triumph of Barack Obama was the result of a surge into the electorate of youth, people of color, and the poor, many of them voting for the first time. In fact, first-time voters may have determined the outcome. Exit polls found that approximately ten million new voters (68.7 percent of all new voters) cast their ballots for Obama, quite possibly exceeding his margin of victory over John McCain by as many as one million votes.[1]

Turnout among new voters in 2008 reflected the work of non-partisan organizations to increase voter registration among low-income, people-of-color, and youth constituencies,[2] as well as the targeting and mobilization efforts of the Obama campaign.[3] As a result, the percentage of people-of-color and low-income groups voting for the first time expanded. In 2004, 17 percent of all black voters told survey researchers they were voting for the first time; in 2008, that number was 19 percent. This represents an estimated increase of about six hundred thousand more first-time black voters in 2008 compared to 2004, or about 40 percent of the increase in the overall number of first-time voters. Even more impressive, among Latinos, some 28 percent voted for the first time in 2008, compared to 22 percent who said they were voting for the first time four years earlier.[4]

But the most significant (and encouraging) change in the "first-time" voter group occurred along class lines. First-time voters among the lowest income group, those with annual family income of $15,000 a year or less,[5] nearly doubled their proportion among all voters in this income category, from 18 percent in 2004 to 34 percent in 2008. Among the least educated group, those with a high school diploma or less, first-time voters also increased their relative share, from 18 percent in 2004 to 22 percent in 2008, with most of the expansion occurring among those lacking a high school diploma.

New Labor Forum 21(2): 35–40, Spring 2012
Copyright © Joseph S. Murphy Institute, CUNY
ISSN: 1095-7960/12 print, DOI: 10.4179/NLF212.0000006

No other income or education groups among first-time voters showed these rates of change in their patterns of electoral participation.

## Big victories in 2010 gave the GOP new opportunities for changing electoral rules in ways that burden the most vulnerable of voters.

The story of the constituencies that turned out to vote in such unusually large numbers in 2008 (and what they expect from government) was mostly missed in the popular discussion of that historic election. It was not missed, however, by Obama's opponents in the Republican Party. Big victories in statewide elections in 2010 gave the GOP new opportunities for changing electoral rules in ways that burden the most vulnerable of voters who, the GOP surmises, won't vote for them.

The parties have long competed by manipulating electoral rules. Since 2000, with the two major parties so evenly matched at the national level, the GOP has waged a coordinated fight at the state level for political supremacy by voter suppression. The Tea Party victories of 2010, which consolidated the GOP's unified control of government in twenty states (twenty-one now if we include Virginia in 2011), have resulted in an onslaught of legislation making it harder to register or to vote. According to the Brennan Center for Justice at New York University School of Law and the National Conference of State Legislatures, in 2011 at least thirty-four states introduced legislation mandating that voters show photo identification to vote, with seven states passing these laws. At the time, only two states already had such laws on the books. Alabama, Kansas, and Tennessee joined Arizona and Georgia to pass laws requiring proof of citizenship, such as a birth certificate, to register to vote. At least thirteen states introduced legislation attacking rules designed to facilitate registration and voting like election-day and same-day registration and early voting.[6] In Florida, where about a third of all voters casting ballots on the Sunday before Election Day in 2008 were black, and a quarter Latino, the Republican legislature and newly-elected Tea Party-backed governor eliminated early voting on that particular Sunday, reducing the early voting period from fourteen to eight days. The same law, HB 1355, prohibits address changes at the polls and also restricts third-party voter registration drives in ways that will surely dampen efforts to reach youth, people of color, and low-income earners.

## In 2011, at least thirty-four states introduced legislation mandating that voters show photo identification to vote.

Add to this the impact of felony disenfranchisement laws, which increased with the skyrocketing imprisonment rates of black and Latino men. As a result, 2.3 million incarcerated Americans are currently stripped of voting rights, as are another nearly five million people on parole or probation, most of them also poor black and Latino men.[7] Moreover, ex-felons are sure to remain poor because American prisons—which deny inmates rehabilitation, strip them of work and educational opportunities, and scar them with violence—are poverty-producing machines. In so many cases, ex-felons return to impoverished communities

where they are subjected to the tangle of obstacles and bureaucratic rules that reduce voting among the poor. The damaging impact of incarceration on voting rights stems not only from felony disenfranchisement laws but also from the malapportionment that results when district representation is determined by including a population that cannot vote. This practice is a modern-day reenactment of the three-fifths clause of the U.S. Constitution (abrogated by the Civil War Amendments) that counted three-fifths of a state's slave population for apportioning representation in Congress, while denying slaves the vote.

## Florida's HB 1355 prohibits address changes at the polls and restricts third-party voter registration drives.

Beyond specific laws and practices, there is a deep institutional logic in the U.S. two-party, winner-take-all system which continually multiplies techniques for suppressing the vote. The winner in a two-party plurality system needs only one vote more than the loser to win it all, which means that the smaller the margin between the two candidates, the greater the strategic incentive for the loser to try to shift just enough votes to win, sometimes by any means necessary. Thus, party competition in a winner-take-all two-party system creates strong incentives for one side to suppress the votes on the other side, especially when electoral contests are close. In a residence-based electoral system in which citizens vote based on where they live, racial residential segregation also facilitates racial voter suppression efforts. Since partisanship and voting are racially polarized in the U.S., residential segregation makes it easy

to find Democratic voters in black and Latino neighborhoods.

The pride that Americans take in our standing as the world exemplar of democracy is rooted in the right to vote. Or as V. O. Key, the eminent political scientist, said more than half a century ago, "The electorate occupies, at least in the mystique of [democratic] orders, the position of the principal organ of governance."[8] Consistently, the steady expansion of the right to vote is at the center of the celebration story of American democracy. The story gains traction from the history of constitutional amendments which extended voting rights first to African-Americans after the Civil War, then (in the twentieth century) to women, and finally to eighteen-year-olds. Political scientists generally accept the story. Indeed, E. E. Schattschneider, also an eminent political scientist, advanced the proposition that an expanding electorate was rooted in the logic of competitive parties. "Once party organization becomes active in the

## 2.3 million incarcerated Americans are currently stripped of voting rights, as are another nearly five million people on parole or probation.

electorate, a vast field for extension and intensification of effort is opened up, the extension of the franchise to new social classes, for example. The natural history of the parties is a story of

continuous expansion and intensification...to a larger and larger electorate."9

This story has occasionally been correct, but it is more often false. For one thing, the electoral universe described by constitutional voting rights has always been much larger than the actual voting population, and the discrepancy between legal rights and actual rights is much larger in the U.S. than in other comparable democracies. For another, the actual electorate substantially underrepresents marginal groups: young people, people of color, and poor people. So Schattschneider's faith that competitive parties are propelled to enlarge voter participation is misplaced.

In fact, a closer look at the intricacies of American electoral practices shows that even while formal rights were being extended, the very groups who were the ostensible beneficiaries were being disenfranchised, not by constitutional proclamation, but by myriad procedural changes in the rules and practices of electoral machinery. The classic example is the post–Civil War South, where changes in law and the administration of elections actually nullified the Fifteenth Amendment (granting the freedmen the right to vote). The toolkit of disenfranchising tactics pioneered in the South in the nineteenth century came to be widely used everywhere in the United States, and these tactics are being deployed again as the 2012 election approaches.

Disenfranchising works by elaborating and enforcing bureaucratic rules that make registration and balloting more difficult and intimidating. This inevitably has a larger effect on poorer and less educated people who are also the natural targets of disenfranchising tactics by the right. One can get a sense of the class and electoral dynamics that underlie what might otherwise appear simply to be bureaucratic intransigence and incompetence by looking at the revealing history of a recent effort to extend voting rights to the poor—the National Voter Registration Act (NVRA) of 1993.

The legislation is popularly known as the "Motor Voter" law because one of its provisions makes it possible to register to vote in the course of getting or renewing a driver's license. Implementation of this part of the law went relatively smoothly. But another part of the reform motivated the poverty and civil rights groups that pushed for it. Agencies that provided services to the poor or the disabled would be required to offer their clients the opportunity to register to vote, and also to provide them with help in completing the registration application. The hope was that this "agency-based" registration system would circumvent age-old procedural hurdles maintained by local election officials. The legislation was not championed by either political party: Democrats were lukewarm, and the opposition from Republicans was strident and persistent. Congressional opposition first forced the bill's advocates to agree to drop unemployment agencies from the registration service requirement, and to weaken the mandate for registration in public assistance agencies, and then (later) to agree to drop a provision for election-day registration. Thus crippled, but not irrelevant, the bill passed.

The requirements for agency-based registration, however, were poorly implemented and not enforced by the Justice Department.10 Some states ignore the annual reporting requirements in the law, and other states are content simply to report "0" registrations at the various agencies covered by the law. Only recently—prompted by lawsuits initiated by voting rights advocates Project Vote, Demos, and the Lawyers' Committee for Civil Rights Under Law—have a handful of states actually stepped up implementation efforts. The results are suggestive of what might have been. In Missouri, for example, registrations collected at public assistance agencies had fallen to fewer than eight thousand applications a year by

2005 and 2006. A decade earlier, the state was a national leader in the implementation of the NVRA's agency-based registration requirements, collecting some 143,000 applications from public assistance recipients in the first two years of the NVRA. In 2008, advocates filed a lawsuit against the state alleging violations of the NVRA, and a federal judge agreed, ordering the state to immediately comply with the law. Within six weeks, more than twenty-six thousand Missourians registered at public assistance agencies. Missouri has continued to produce between eight thousand and eighteen thousand voter registration applications collected at public assistance offices per month.[11]

During the fight to pass the NVRA, organized labor was nominally supportive, but the unions of workers in the public agencies covered by the Act remained aloof from actual implementation efforts, unwilling to brook the hostility that could be aroused among already resentful workers who were being asked to do more work. Only something like a movement-style rallying of their members by the unions could have mobilized these workers to champion the voting rights of the poor. Maybe the current moment will be different.

A deep recession, growing numbers of workers falling into poverty, mounting attacks on the public sector (and especially public sector workers), along with growing evidence of corruption and thievery at the very top—all this has prompted enthusiasm for movement politics instead of electoral politics. We, too, are enthused by the signs of a growing movement associated with Occupy Wall Street.

But the election of 2012 will go forward in any case—it will grip most Americans and the unions will, as usual, pour money and effort into the campaign. Maybe their electoral efforts would be more effective if unions like CWA, AFSCME, and the SEIU took the initiative in a campaign to enforce a law that is already on the books, registering the clients of the poor-serving agencies of America.

We could even call it a "work-to-rule" campaign. We could try to shape outcomes by taking advantage of existing laws to include huge swaths of the American working class, like the ten million adults who now use the food stamp program. Why not try to match, or exceed, right-wing efforts to shape election outcomes by working to construct a more inclusive electorate?

**Notes**

1. The first three paragraphs are drawn from Lorraine C. Minnite, *First-Time Voters in the 2008 Election* (Washington, D.C.: Project Vote, April 2011), available at www.projectvote.org/images/publications/Reports%20on%20the%20Electorate/FINAL%20First-Time-Voters-in-2008-Election.pdf. According to the officially certified results of the 2008 election, Barack Obama's margin of victory over John McCain was 9,550,176 votes. See Statistics of the Presidential and Congressional Election of November 4, 2008 (compiled by Lorraine C. Miller, Clerk of the House of Representatives, July 10, 2009), available at http://clerk.house.gov/member_info/electionInfo/2008election.pdf. Because exit polls are samples of the electorate,

sampling error must be taken into account, which means that the estimate of the number of ballots cast for Obama by first-time voters falls within a range of possible estimates of at least two to four percentage points higher or lower than 10.5 million ballots.

2. An independent analysis of non-partisan voter registration drives conducted in 2007 and 2008 found that there were 31,870,856 new registrants appearing on the voter rolls between January 1, 2007 and the end of 2008; one out of every eight of these newly registered voters was signed up through the efforts of about thirty non-partisan organizations. Ethan Roeder, "Voter Registration Analysis '08: Evaluating Independent Voter Registration Efforts from the 2008 Election

Cycle" (unpublished report, New Organizing Institute, Washington, D.C., December 10, 2009).

3. Larry J. Sabato, ed., *The Year of Obama: How Barack Obama Won the White House* (New York: Longman, 2009).

4. The certified vote count in 2004 was 122,349,480. See Statistics of the Presidential and Congressional Election of November 2, 2004 (compiled by Jeff Trandahl, Clerk of the House of Representatives, June 7, 2005), available at http://clerk.house.gov/member_info/electionInfo/2004election.pdf.

5. National median income for a family of four in 2009 was $62,363. See U.S. Census Bureau, "2005-2009 5-Year Estimates," Table S1901, "Income in the Past 12 Months (in 2009 Inflation-Adjusted Dollars)," http://factfinder.census.gov/servlet/STTable?_bm=y&-geo_id=01000US&-qr_name=ACS_2009_5YR_G00_S1901&-ds_name=ACS_2009_5YR_G00_ (accessed March 20, 2011).

6. See Wendy R. Weiser and Lawrence Norden, *Voting Law Changes in 2012* (New York: Brennan Center for Justice, 2011), available at www.brennancenter.org/content/resource/voting_law_changes_in_2012; and the NCSL's website on voter identification requirements, www.

ncsl.org/default.aspx?tabid=16602 (accessed January 5, 2012).

7. Paul Guerino, Paige M. Harrison, and William J. Sabol, *Prisoners in 2010* (U.S. Department of Justice, Bureau of Justice Statistics, December 2011), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf.

8. V.O. Key, "A Theory of Critical Elections," *Journal of Politics* 17, no. 1 (February 1955): 3.

9. E. E. Schattschneider, *Party Government* (New York: Holt, Rinehart and Winston, 1942), 47.

10. See Douglas R. Hess and Scott Novakowski, *Unequal Access: Neglecting the National Voter Registration Act, 1995-2007* (Washington, D.C. and New York: Project Vote and Demos, February 2008), available at www.projectvote.org/images/publications/NVRA/Unequal_Access_Final.pdf.

11. *Voter Registration Services at Public Assistance Agencies* (Washington, D.C.: Project Vote, April 2010), available at www.projectvote.org/images/publications/2010%20Issues%20in%20Election%20Administration/Public-Agency-Policy-Paper-April2010.pdf.

# DEFENDANTS' EX. 10

# Movements Need Politicians—and Vice Versa

## Where their interests overlap, progressive politics can thrive.

### By Frances Fox Piven and Lorraine C. Minnite

### October 2, 2012


EXHIBIT
10
12-13-19

*A protest against "Money and politics" near the venue for the Democratic National Convention in Charlotte, North Carolina September 2, 2012. Reuters/Adrees Latif*

The familiar question of whether we work on electoral politics or on movement politics is fraught with emotion and argument about whether movement or electoral politics is more effective for the left. We think it is the wrong question. Both are needed, and without both, neither is effective.

In historical fact, movement politics and electoral politics are continuously intertwined. The fundamental dynamic is triggered when politicians have to deal with voter blocs composed of the same people to whom movements direct their appeals. We can see this dynamic on both the right and the left. The Tea Party picked up steam when Republicans eager for re-election began to repeat its slogans. So did the labor movement of the 1930s gain momentum from Franklin Roosevelt's rhetorical appeals to the "common man," just as the civil rights movement was energized by Lyndon Johnson's echo of the movement refrain "We shall overcome." When politicians echo a movement's demands, they signal a degree of vulnerability to its constituency, and the movement gains traction.

It's also worth remembering that when politicians are dependent on electoral blocs that are also movement constituencies, they will often hesitate to use the full arsenal of the state's repressive capacities against movement actions and may even make uncertain efforts to protect movements—as when Robert Kennedy, as attorney general, grudgingly tried to protect the Freedom Riders.

Moreover, movements make gains when an electoral regime is forced to offer concessions to heal the widening rifts that the movement is causing in its electoral base. The demonstrations and marches against the beginning of the war in Iraq are often cited as a measure of the impotence of movement politics. We think rather that the problem was that the antiwar movement did not speak to an antiwar voter bloc that Bush and the Republicans depended on, so they could simply ignore the protests. By contrast, a smaller immigrant rights movement has pressured Barack Obama, who depends on Latino votes, to use presidential authority to void the deportation of undocumented youth. Similarly, looking to LGBT voters, Obama responded to the gay rights movement's demands, ordering the end of "don't ask, don't tell" and reversing his position on gay marriage. And in one of the environmental movement's most important recent victories, Obama denied a permit to build the Keystone XL pipeline after activists staged months of mass nonviolent civil disobedience in front of the White House.

This is why the diverse protests we call Occupy need a Democratic victory in 2012: not because Democrats on their own will magically implement the movement's agenda, but because Democrats depend on some of the same constituencies that the movement represents and to whom it directs its appeals. The overlap creates space for movements to grow and thrive. They win policy reform to the degree that they are able to leverage these electoral opportunities. Progressive hopes for a bolder second Obama term thus depend on the vigor of the Occupy movement and the degree to which it sparks activism and defiance among the other great movements for social justice that have always been important in American politics.

To be clear, we don't think Occupy activists should drop their work on foreclosures or student debt or worker rights in favor of joining the election campaign by knocking on doors or staffing the phone banks or whatever. After all, not only is it unlikely that many Occupy activists, disgusted as they are by the hypocrisy and corruption of electoral politics, would do so, but their movement work is actually a contribution to the campaign. Think of the impact of Occupy on the national discussion, with its slogans about Wall Street and the 99 percent, along with its encampments and general assemblies and twinkling fingers! It has made extreme inequality an issue no one can ignore. Even the Republicans are campaigning as the party of jobs and economic recovery.

**Other Replies to Deepak Bhargava's "Why Obama?"**

DORIAN T. WARREN: "Go for the Jugular"
SAKET SONI: "We Need More than a New President"
BILL FLETCHER JR.: "Defeat the Reactionary White Elite"
TOM HAYDEN: "Obama's Legacy is Our Leverage"
AI-JEN POO: "A Politics of Love"
ROBERT L. BOROSAGE: "Re-elect Obama—But Reject His Austerity"
ILYSE HOGUE: "Time to Rewire"

**And this web-only article:**
MICHAEL BRUNE: "For the Climate, Obama Needs Another Four Years"

Frances Fox PivenFrances Fox Piven is on the faculty of the Graduate Center of the City University of New York. She is the author, most recently, of *Challenging Authority: How Ordinary People Change America*.

Lorraine C. MinniteLorraine C. Minnite is the director of the urban studies program at Rutgers University–Camden.

# DEFENDANTS' EX. 11

# The Myth of Voter Fraud

## Lorraine C. Minnite

Cornell University Press
Ithaca and London



EXHIBIT

*11*

12-13-19 *RC*

PENGAD 800-631-6989

Copyright © 2010 by Cornell University

All rights reserved. Except for brief quotations in a review, this
book, or parts thereof, must not be reproduced in any form
without permission in writing from the publisher. For information,
address Cornell University Press, Sage House, 512 East State
Street, Ithaca, New York 14850.

First published 2010 by Cornell University Press

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Minnite, Lorraine Carol.
   The myth of voter fraud / Lorraine C. Minnite.
      p. cm.
   Includes bibliographical references and index.
   ISBN 978-0-8014-4848-5 (cloth : alk. paper)
   1. Elections—Corrupt practices—United States.  2. Political
corruption—United States.  3. Voting—United States.  4. United
States—Politics and government.  I. Title.

JK 1994.M66 2010
324.6'60973—dc22

                                        2009052783

Cornell University Press strives to use environmentally responsible
suppliers and materials to the fullest extent possible in the publishing
of its books. Such materials include vegetable-based, low-VOC
inks and acid-free papers that are recycled, totally chlorine-free, or
partly composed of nonwood fibers. For further information, visit
our website at www.cornellpress.cornell.edu.

Cloth printing        10  9  8  7  6  5  4  3  2  1

# Acknowledgments

In late 2001, David Callahan of the research and advocacy organization Demos asked me to conduct a study of voter fraud. After the 2000 election and calls for election reform, he and Miles Rapoport, Demos's president and a former Connecticut legislator and secretary of state, astutely saw the need for an empirical examination of the basis for claims about voter fraud that were shaping the policy debate. I am grateful to them and to Demos for giving me the opportunity to begin the research that led to the writing of this book.

Later, in 2006, Mike Slater at Project Vote asked me to write a report on voter fraud that drew on the research for this book. I thank him for his Midwestern optimism and get-up-and-go, and most of all for his deep commitment to an inclusive democracy.

My greatest scholarly debts are to Frances Fox Piven and Chandler Davidson. This book would not have been written without Frances's intellectual influence and also her gift of friendship. Chandler patiently prodded me to better develop the empirical basis for my claims, and his mentoring has made this a better book. Any shortcomings in the area of research design, of course, are my own.

My association with election reformers and voting rights advocates has convinced me of the value and integrity of engaged scholarship. At Demos, I thank David Callahan, Steve Carbó, Allegra Chapman, Stuart Comstock-Gay, Lisa Danetz, Regina Eaton, Scott Novakowski, Miles Rapoport, Tim Rusch, Tova Wang, and Brenda Wright for their expertise and friendship. At the Brennan Center for Justice at New York University Law School, Justin Levitt, Myrna Perez, Jennifer Weiser, and Wendy Weiser provoked me to extend my research by inviting me to participate in litigation. At Project Vote,

*viii   Acknowledgments*

I benefitted from the work and camaraderie of Doug Hess, Jody Herman, Teresa James, Nicole Kovite, Brian Mellor, Estelle Rogers, and Mike Slater. Lillie Coney, at the Electronic Privacy Information Center and Eleanor Smith, counsel to the Leadership Conference on Civil Rights shared documents obtained through the Freedom of Information Act while I waited for the Justice Department to respond to my own public records request.

Many in the voting rights community know Carnegie Corporation U.S. Democracy Program Director Geri Mannion as a dedicated advocate of civic engagement and democratic reform. The financial support Carnegie provided freed me for a semester of the gratifying but demanding job of teaching Barnard undergraduates. Indeed, Barnard College provided a congenial setting to carry out this project. I am especially grateful to Provost Liz Boylan for her support through a family crisis and beyond, and to the many students who assisted with my research: Liz Aloi, Josh Bardavid, Nadia Bulkin, Cecila Culverhouse, Elizabeth Kraushar, Vanessa Perez, Julia Richardson, Christopher Ro, and Iris Rodriguez.

Scores of election administrators, public officials, lawyers, activists, scholars, and journalists set aside time to share their knowledge with me. I am enormously grateful for their willingness to take my calls, meet with me, answer my queries, provide data, comment on my work, or help in other ways. And spirited debate about voter fraud with an eclectic community of election junkies, law professors, political scientists, advocates, and reformers of every political stripe who populate Rick Hasen's election law listserv has helped sharpen my arguments.

Lastly, I want to thank the editors at Cornell University Press and anonymous reviewers whose comments improved the final version of this book. I am especially grateful to Peter Wissoker for his early enthusiastic response to my book proposal. To my family and friends, especially Cyndi and Steve, Barbara, Jennifer, Adrienne, David, and Manny, I hope you know how appreciative I am of your love, support, and forbearance.

# DEFENDANTS' EX. 12



EXHIBIT

1 Z

12-13-19

# The Myth of Voter Fraud

## Lorraine C. Minnite

Cornell University Press
Ithaca and London

Copyright © 2010 by Cornell University

All rights reserved. Except for brief quotations in a review, this
book, or parts thereof, must not be reproduced in any form
without permission in writing from the publisher. For information,
address Cornell University Press, Sage House, 512 East State
Street, Ithaca, New York 14850.

First published 2010 by Cornell University Press

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Minnite, Lorraine Carol.
    The myth of voter fraud / Lorraine C. Minnite.
        p. cm.
    Includes bibliographical references and index.
    ISBN 978-0-8014-4848-5 (cloth : alk. paper)
    1. Elections—Corrupt practices—United States.  2. Political
corruption—United States.  3. Voting—United States.  4. United
States—Politics and government.   I. Title.

JK 1994.M66 2010
324.6'60973—dc22
                                                2009052783

Cornell University Press strives to use environmentally responsible
suppliers and materials to the fullest extent possible in the publishing
of its books. Such materials include vegetable-based, low-VOC
inks and acid-free papers that are recycled, totally chlorine-free, or
partly composed of nonwood fibers. For further information, visit
our website at www.cornellpress.cornell.edu.

Cloth printing        10  9  8  7  6  5  4  3  2  1

294    *Index*

Georgia
  election codes and case law, 206–7
  election laws in, 251n50
  identification requirements, 141, 144, 148,
      153–54, 282n76
  2002 election and, 2
Gephardt, Richard, 260n66
Gillespie, Ed, 12
Ginsberg, Benjamin, *56*
Goddard, Tim, 116
Goldberg, Robert, 20
*Gooch v. Hendrix*, 204
Gore, Al, 45–46, 49
Gores, Jack, 65
Gorton, Slade, 113
Graber, Rick, 104
Green, Donald, 89
Gregoire, Christine, and Washington's
      2004 gubernatorial election, *95, 96,*
      282n76
  aftermath, 125–28, 275nn146,149
  election day, 113–16
  first recount, 116–20
  second recount, 120–25, 275n143
Gumbel, Andrew, 279n32

Hall, Thad, 21
Harris, Joseph P.
  study of election laws, 42–43
  study of registration laws, 40–42, 152
Harris, Katherine, 46
Harris, William, 24
Hastings, Richard "Doc," 126
Hawaii, identification requirements, 144
Hearne, Mark F. "Thor," 11, 14, 101, 102,
      249n37
Help America Vote Act (HAVA) of 2002,
      1, 5, 95–96, 261n7
  identification requirements, 134–35,
      279n32
  Minnesota complaints under, 61–66,
      261n8
  political parties and election law reforms,
      132
  protection by exclusion as consequence of
      allegations, 139–41, 150–53
Hermandad Mexicana Nacional, 50–51
Hoyer, Steny, 51
Huennekens, Bill, 157, 275n143
Hyde, Susan, 21

Idaho
  identification requirements, 153
  registration laws, 41

Identification requirements
  HAVA and protection by exclusion,
      139–41, 150–53
  partisanship and, 153–58
  photographic, 154–56
  states with, before HAVA, 142–47
  *see also specific states*
Iglesias, David, 10, 248n10
Illegal Immigration Reform and Immigrant
      Responsibility Act of 1996, 26, 253n28
Illinois
  allegations of voter fraud in ACVR report,
      172
  election codes and case law, 207–8
Imai, Kosuke, 264n39
Immigration and Naturalization Service (INS)
  citizenship program in Orange County,
      California, 50, 53–54, 259nn61,64
  databases, 54
*In re The Matter Of The Protest Of Election
      Returns And Absentee Ballots In The
      November 4, 1997 Election For The
      City Of Miami, Florida,*, 205
Indiana
  identification requirements, 148, 153,
      154–58, 282n76
  registration laws, 41
Iowa, registration laws, 42

Jacobson, Richard J., 64–66
Jenkins, Jeffrey, 49
Jensen, Richard, 257n32
Johnson, Sam, 9
Johnson, Tim, 3
Jones, Valarie, 9
Joseph, Nancy, 109–10, 112
*Judkins v. Hill*, 15
Justice Department. *See* U.S. Department
      of Justice

Kennedy, Kevin, 102–3
Kentucky
  allegations of voter fraud in ACVR report,
      172–73
  identification requirements, 144
  registration laws, 41
Kerry, John, *95*, 102, 113, 121–22
Kim, Brian, 278n29
King, Gary, 264n39
King, James Lawrence, 98
King, Jim, 115
King, Steven, 9
Kolodny, Evan, 249n28
Kousser, J. Morgan, 24, 39, 86, 87

# DEFENDANTS' EX. 13



EXHIBIT

13

12-13-19 Re

# The Myth of Voter Fraud

## Lorraine C. Minnite

Cornell University Press
Ithaca and London

Copyright © 2010 by Cornell University

All rights reserved. Except for brief quotations in a review, this book, or parts thereof, must not be reproduced in any form without permission in writing from the publisher. For information, address Cornell University Press, Sage House, 512 East State Street, Ithaca, New York 14850.

First published 2010 by Cornell University Press

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Minnite, Lorraine Carol.
    The myth of voter fraud / Lorraine C. Minnite.
        p. cm.
    Includes bibliographical references and index.
    ISBN 978-0-8014-4848-5 (cloth : alk. paper)
    1. Elections—Corrupt practices—United States.   2. Political corruption—United States.   3. Voting—United States.   4. United States—Politics and government.   I. Title.

JK 1994.M66 2010
324.6'60973—dc22
                                                    2009052783

Cornell University Press strives to use environmentally responsible suppliers and materials to the fullest extent possible in the publishing of its books. Such materials include vegetable-based, low-VOC inks and acid-free papers that are recycled, totally chlorine-free, or partly composed of nonwood fibers. For further information, visit our website at www.cornellpress.cornell.edu.

Cloth printing          10  9  8  7  6  5  4  3  2  1

In *Boardman v. Esteva*, 323 So. 2d 259 (1975), the court stated:

> In determining the effect of irregularities on the validity of absentee ballots cast, the following factors shall be considered: (a) the presence or absence of fraud, gross negligence, or intentional wrongdoing; (b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and (c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.

The history of Florida case law appears to be teeming with cases of alleged election fraud.[9]

## Georgia
### Statutory

Article II of the Georgia Election Law establishes the State Election Board led by the secretary of state. The State Election Board has the responsibility, among other things, for investigating "when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution."[10]

The Georgia law has over forty possible criminal offenses directly associated with election fraud (§§ 21-2-560 to 21-2-602). Some, but not all, the felonies punishable by one to ten years and up to a $10,000 fine are falsely registering oneself or another, or registering under a false name;[11] bribing, accepting a bribe, or participating in a conspiracy to bribe someone in return for voting for a certain candidate;[12] voting more than once in an election;[13] counterfeiting ballot cards;[14] and various "frauds" by poll officers (such as intentionally miscounting votes and tampering with voting machines).[15]

Any registered voter in the state may challenge, prior to an election and in writing, the registration of another voter. On receiving written notice, the Board of Registrars (a subdivision of the State Election Board) must hold a hearing on the matter. The burden of proof is on the person making the challenge who must show "that the person being challenged is not qualified to remain on the list of electors."[16] The board has authority to subpoena and examine witnesses and evidence, as well as reach a final decision (although the decision can be appealed to state court).[17]

Article 13 of the code governs postelection contests. § 21-2-522.1 states that there is a rebuttable presumption that any vote cast in an election is a valid vote. This places the burden on the challenger to rebut the presumption (i.e., prove that it was an invalid or illegal vote). All issues are to be decided by a judge, unless the contestant specifically requests a jury trial. The court has great discretion on what remedy to use. It can declare the true winner based solely

# DEFENDANTS' EX. 14



EXHIBIT

14

12-13.19

# The Myth of Voter Fraud

## Lorraine C. Minnite

Cornell University Press
Ithaca and London

Copyright © 2010 by Cornell University

All rights reserved. Except for brief quotations in a review, this
book, or parts thereof, must be not be reproduced in any form
without permission in writing from the publisher. For information,
address Cornell University Press, Sage House, 512 East State
Street, Ithaca, New York 14850.

First published 2010 by Cornell University Press

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Minnite, Lorraine Carol.
   The myth of voter fraud / Lorraine C. Minnite.
      p. cm.
   Includes bibliographical references and index.
   ISBN 978-0-8014-4848-5 (cloth : alk. paper)
   1. Elections—Corrupt practices—United States.  2. Political
corruption—United States.  3. Voting—United States.  4. United
States—Politics and government.  I. Title.

JK 1994.M66 2010
324.6'60973—dc22
                                                 2009052783

Cornell University Press strives to use environmentally responsible
suppliers and materials to the fullest extent possible in the publishing
of its books. Such materials include vegetable-based, low-VOC
inks and acid-free papers that are recycled, totally chlorine-free, or
partly composed of nonwood fibers. For further information, visit
our website at www.cornellpress.cornell.edu.

Cloth printing        10  9  8  7  6  5  4  3  2  1

on the legal votes, it can discard entire precincts (in the case of misconduct by poll officers), or if "the election . . . is so defective as to the nomination, office, or eligibility in contest as to place in doubt the result of the entire election . . . [the] court shall declare the primary, election, or runoff to be invalid."[18]

### Case law

A Georgia Appellate Court stated in *Nichols v. Acree*, 112 Ga. App. 287 (1965), that a new election should be held "[i]f the contestant can sustain his charges, or enough of them to cast doubt upon whether the election was fairly and lawfully conducted. . . . If he cannot, the election should stand." Recently, the Georgia Supreme Court overturned a lower court decision to invalidate an election in *Middleton v. Smith*, 273 Ga. 202 (2000). In that case, the court stated that to carry the burden necessary to overturn an election, the challenger must show "a specific number of illegal or irregular ballots—and that number must be sufficient to cast doubt on the result of the election. It is not sufficient to show irregularities which simply erode confidence in the outcome of the election. Elections cannot be overturned on the basis of mere speculation, or an appearance of impropriety in the election procedures." Nonetheless, Georgia seems to have a history of overturning more elections than most states, probably as a result of the great discretion that the statutes give the courts.[19]

### Illinois

### Statutory

Article 1A of the Illinois Election Code establishes a State Board of Elections, with the secretary of state at the helm, to, among other things, "[r]eview and inspect procedures and records relating to conduct of elections and registration as may be deemed necessary, and to report violations of election laws to the appropriate State's Attorney."[20]

§ 10 ILCS 5/3-1 states that all U.S. citizens eighteen years of age or older who have resided in the state for at least thirty days prior to an election are eligible to vote. But § 10 ILCS 5/3-5 specifically excludes from eligibility those residents who, at the time of the election, are incarcerated as a consequence of a felony conviction.

Article 29 of the Illinois Election Code criminalizes various acts associated with election fraud. Included in the prohibitions are buying or selling votes, voting more than once, voting when not a validly registered voter, registering under false information (name, address, or age), "ballot box stuffing," participating in a conspiracy to commit fraud, or preventing a validly registered voter from voting. The majority of crimes under these statutes are felonies.

§ 10 ILCS 5/23-2 gives the legislature jurisdiction to hear election contests for its own seats. For all other elections, the state courts have jurisdiction. Under § 10 ILCS 5/23-1.2a, an election may be contested:

# DEFENDANTS' EX. 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## EXPERT REPORT OF LORRAINE C. MINNITE



EXHIBIT
1 S
12-13-19 RC

# TABLE OF CONTENTS

I.     Summary of Opinions ...................................................................................1

II.    Background and Qualifications.....................................................................1

III.   Discussion .....................................................................................................3

       A. Brief History of Voting Restrictions ..................................................3

       B. Defining "Voter Fraud"......................................................................6

       C. Analysis of the Incidence of Voter Fraud in Contemporary U.S. Elections ..................8

       D. Evidence and Analysis of Voter Fraud in Georgia .......................16

IV.    Conclusion ...................................................................................................22

Appendix     *Curriculum Vitae*

Attachment   2006 Correspondence with Georgia Attorney General and Secretary of State

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

## I.    SUMMARY OF OPINIONS[1]

I have been retained by the Plaintiffs in the above-captioned case to provide expert analyses and opinions regarding the incidence of voter fraud in elections in the United States, both nationally, and in Georgia.[2] Based on my extensive research and analysis on contemporary voter fraud in U.S. elections, I conclude:

A.    The empirical evidence makes clear that fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare, both nationally, and in Georgia.

B.    A review of available evidence in Georgia finds no cases of voter impersonation at the polling place.  In addition, there is minimal evidence of other forms of fraud intentionally committed by voters, such as 'repeat' voting, or voting when knowing one is ineligible to vote.

The facts and data I considered in forming my opinions are set forth below.  In Section II, I discuss my educational and professional background and qualifications.  In Section III.A, I briefly discuss the historical background of voting requirements to set the context for my discussion of voter fraud nationally and in Georgia.  In Section III.B, I examine the electoral process and define voter fraud as "the intentional corruption of the voting process by voters."  Next, in Section III.C, I review the research conducted for my 2010 book on voter fraud, *The Myth of Voter Fraud*, and demonstrate that voter fraud does not pose a threat to elections, as some claim.  I update the conclusions of my book with a review of new research on voter fraud in U.S. elections.  In Section III.D, I analyze the available data of specific cases of alleged voter fraud in Georgia over the last two decades; I then conclude the report.

## II.    BACKGROUND AND QUALIFICATIONS

I am an associate professor and chair of the Department of Public Policy and Administration at Rutgers University-Camden.  I received a Bachelor of Arts degree in History from Boston University, and two Master's Degrees and a Ph.D. in Political Science from the City University of New York.  One of my areas of expertise is American Politics with a specialization in elections and the political process.  Specifically, I study the incidence and effect of voter fraud in American elections.

In 2003, I co-authored a study of voter fraud with David Callahan for the public policy research and advocacy organization, Demos, titled, "Securing the Vote: An Analysis of Voter

---

[1] This report is based on information that is currently available for my review.  I reserve the right to update my report and opinions upon review of any additional documents or information produced in discovery and previously unavailable to me.

[2] I am being compensated for my work at the rate of $250 per hour.

Fraud." I updated this study with new material in 2007.[3]  At that time, Demos published a preliminary report I wrote on voter fraud and same-day registration,[4] and in March of 2007, I published a report, "The Politics of Voter Fraud," for Project Vote, a national nonpartisan, nonprofit voting rights organization.[5]  In June 2010, Cornell University Press published *The Myth of Voter Fraud*, my full-length scholarly treatment of the subject and the politics surrounding the uses of voter fraud allegations to shape electoral policy.  The book analyzes the evidence of voter fraud and concludes that the widespread allegation that voter fraud is a rampant problem of unknown proportions in contemporary U.S. elections is unsupported by evidence, and that actual voter fraud is extremely rare.  In *The Myth of Voter Fraud*, I argue and provide evidence to show that having no basis in fact, these allegations are motivated by political interests, and are designed to make voting harder for certain populations.  I provide an analysis of the role of the voter fraud myth in the contemporary voter identification debate in "Voter Identification Laws: The Controversy over Voter Fraud," published by Routledge in 2012 book edited by Matthew J. Streb titled, *Law and Election Politics*.

This report incorporates all of the research I have conducted on the subject of voter fraud and voter ID laws since 2001, cited above and published in peer-reviewed books and journals.[6]  To expand my research on supposed recent evidence of voter fraud in Georgia, I analyzed the following:

- Articles appearing in more than 60 different Georgia newspapers and other news sources, focusing my analysis on articles appearing over the last fifteen years;

- Materials produced by the Georgia State Board of Elections, including transcribed meeting minutes from SEB meetings held from February 12, 2010, through August 21, 2019;

- All news and press releases by the Georgia Attorney General's Office, from August 29, 1997 to November 21, 2019, and any other relevant documents I could find on the Attorney General's website, including official, unofficial, and modified opinions (some dating back to 1992);

---

[3] Lorraine C. Minnite, "An Analysis of Voter Fraud," (New York: Demos, 2007), *available at* http://www.demos.org/publication/analysis-voter-fraud-united-states-adapted-2003-report-securing-vote (last accessed November 24, 2019).

[4] Lorraine C. Minnite, "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security," (New York: Demos, 2007), *available at* https://www.issuelab.org/resource/election-day-registration-a-study-of-voter-fraud-allegations-and-findings-on-voter-roll-security.html (last accessed November 24, 2019).

[5] Lorraine C. Minnite, "The Politics of Voter Fraud," (Washington, D.C.: Project Vote, 2007), *available at* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwjc_tPstYPmAhXNvZ4K HXTUC8AQFjAAegQIBRAC&url=http%3A%2F%2Fwww.projectvote.org%2Fwp-content%2Fuploads%2F2007%2F03%2FPolitics_of_Voter_Fraud_Final.pdf&usg=AOvVaw1jUdV8sW1HtHfxbtXs m66W (last accessed November 24, 2019).

[6] A complete list of my peer reviewed publications is set forth in my *Curriculum Vitae* in the Appendix of this report.

2

- Press releases from the U.S. Attorney's Office for the Northern, Middle and Southern Districts of Georgia;

- Other materials produced by U.S. federal agencies, including the Government Accountability Office, and the Public Integrity Section of the Justice Department's Criminal Division;

- Briefs and materials in evidence in *Common Cause/Georgia et al. v. Billups and State Election Board*, U.S. District Court for the Northern District of Georgia, Rome Division, Civil Action, 4:05-CV-HLM, 2005-2007;

- Other materials produced by U.S. federal agencies, including the Government Accountability Office, and the Public Integrity Section of the Justice Department's Criminal Division;

- Additional blog posts, press releases and reports by advocacy groups, including but not limited to, the ACLU of Georgia, Facing South, the Heritage Foundation, Media Matters, the Republican National Lawyers Association, and True the Vote;

- Additional materials, as cited in the footnotes.

## III.  DISCUSSION

### A.  Brief History of Voting Restrictions

The history of voting in the United States is generally told as a story of enfranchisement, as first property and tax-paying requirements fell away in the early decades of the nineteenth century,[7] and prohibitions against race, gender, and age discrimination were incorporated into the U.S. Constitution.[8] As a matter of formal constitutional protections and rights there is truth to the story. But the United States also has a long history of using electoral laws to suppress voting. Prior to the late nineteenth century, there were very limited voter registration requirements placed upon eligible voters.[9] The earliest of registration laws put the obligation on the government to

---

[7] Chilton Williamson, *American Suffrage from Property to Democracy, 1760-1860* (Princeton: Princeton University Press, 1960).

[8] Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the U.S.* (New York: Basic Books, 2000).

[9] Keyssar, *The Right to Vote*, 151; Joseph P. Harris, *The Registration of Voters in the United States* (Baltimore: Lord Baltimore Press, 1929), 65-66; *see also*, John Mark Hansen, et al., "Voter Registration," Reports of The Task Force on the Federal Election System (to accompany the Report of the National Commission on Election Reform, *To Assure Pride and Confidence in the Electoral Process*), National Commission on Federal Election Reform, August 2001, 2 (on file with author).

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

enroll qualified voters, and allowed voters to register on Election Day.[10] The pool of eligible voters vastly expanded in the nineteenth century when property and tax-paying requirements for voter eligibility were mostly eliminated. By the end of the century, a competitive national party system was helping to produce the highest rates of voter turnout in U.S. history. At the same time, however, as the population of the United States swelled through the mass immigration of southern and eastern Europeans that gave rise to a new industrial proletariat, states began adopting more onerous voter registration and voting laws, supplanting the restrictive effects of property requirements and shifting the burden of establishing voter eligibility away from the government to the individual.[11]

Following the emancipation of African Americans and the enfranchisement of black men by the Civil War Amendments, a reactionary, white supremacist counter-movement in the South arose to re-erect a system of racial subordination. By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the southern states, at first by the use of violent intimidation and trickery, and later by the introduction or reintroduction of a series of superficially color-blind requirements intended to circumvent the Fourteenth and Fifteenth Amendments.[12]

Voter registration requirements were especially important because of the degree to which they ceded discretion to local registrars and election officials. Thus, an 1873 Georgia law permitted local registrars to close their books to new registrants except during the planting and harvesting months, or in other words, during the time of the year that African American farm workers most likely would not be able to make the trip to the county seat to register to vote. Once word of the effectiveness of this stratagem and other election administration techniques to disfranchise blacks spread, similar laws followed in North Carolina[13] and Alabama.

---

[10] Charles Edward Merriam and Harold Foote Gosnell, *The American Party System: An Introduction to the Study of Political Parties in the United States* (New York: The Macmillan Company, 1929); Harris, *Registration of Voters*, xi.

[11] Dayna L. Cunningham, "Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States," *Yale Law and Policy Review* 9, no. 2 (1991): 370-404.

[12] *See* Frances Fox Piven, Lorraine C. Minnite, and Margaret Groarke, *Keeping Down the Black Vote: Race and the Demobilization of American Voters* (New York: The New Press, 2009). The authoritative work on this subject is J. Morgan Kousser, *The Shaping of the Southern Politics: Suffrage Restriction and the Establishment of the One-Party South* (New Haven: Yale University Press, 1974). See also, Laughlin McDonald, Michael B. Binford, and Ken Johnson, "Georgia," Chapter 3 in *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990,* eds. Chandler Davidson and Bernard Grofman (Princeton: Princeton University Press, 1994), 67-102.

[13] Logan writes of the suffrage qualification laws passed in North Carolina during the 1876-1877 legislative session: "The most thorough and wide sweeping of these enactments was the act to regulate elections. The wide, almost autocratic powers granted to the registrars and judges of elections, the residence requirements, and the right of one voter to challenge another – all of these pointed to the intent of the framers to disfranchise or reduce the number of Negro voters." *See* Frenise A. Logan, *The Negro in North Carolina, 1876-1894,* UNC Enduring Edition (Chapel Hill, N.C.: University of North Carolina Press, [1964] 2011), 55. For more on North Carolina's election law of 1877, *see* chapter 5 "Fusion Election Law," in Helen G. Edmonds, *Negro and Fusion Politics in North Carolina, 1894-1901* (Chapel Hill, N.C.: University of North Carolina Press, [1951] 1979).

4

Laws requiring voters to show their registration certificates before they were permitted to cast ballots were also effective in disenfranchising African Americans in the South. Most states adopting personal registration closed registration periods long before an election, and it would not be uncommon for illiterate and impoverished migrant farm workers to lose track of paperwork. In addition, this rule made blacks doubly vulnerable to harassment and attack as they made their way to the polling place. There are numerous accounts from the period of blacks walking to the county seat to vote and being set upon by white mobs who robbed them of their registration papers. For example, in November 1876, the Republican governor of Louisiana wrote to Republican National Committee officials in New York:

> Dispatches from Ouachita and Morehouse Parishes, near the Arkansas line, and West Feliciana near the Mississippi line, report that their parishes are now patrolled by the White League, reinforced by armed bodies from Arkansas and Mississippi. Most of the Republican leaders have been driven away or murdered. Under the State law voters are entitled to vote at any poll in the parish in which they reside. The colored people generally are attempting to reach the parish seats of those parishes in order to vote under the protection of the authorities. Numbers of them have been intercepted by the White League pickets, and their registration papers destroyed.[14]

Election fraud documented by early election reformers was not primarily committed by individual voters, who are the target of election reforms to widen the franchise, but instead by election officials and politicians.[15] In some places, corrupt politicians used the police to "colonize" closely contested elections with fraudulently registered voters.[16] Prior to the widespread adoption of the secret ballot in the late 1880s,[17] party agents arguably used "inflationary" corruption by buying votes and recycling voters.[18] Afterward, parties also pursued "deflationary" corruption by paying opponents to stay home or otherwise defeating their efforts to vote, using devices such as poll taxes, literacy tests, long residency periods and other onerous requirements for voter registration to further their goals. Reformers justified the enactment of voter registration as a

[14] "The Close of the Canvass," *New York Times*, November 7, 1876, 1.

[15] *See* Joseph P. Harris, *Election Administration in the United States* (Washington, D.C.: The Brookings Institution, 1934), 375-376 ("Isolated, individual cases of election frauds are uncommon and unimportant. Election frauds cannot be carried on successfully and upon a wide scale without protection, without the pre-arrangement of election officers who will 'deliver' if necessary, and without the backing of a powerful political organization.")

[16] Richard L. McCormick, *From Realignment to Reform: Political Change in New York State, 1893-1910* (Ithaca: Cornell University Press, 1981), 44.

[17] In 1888, Kentucky experimented with the "Australian" or secret ballot in a Louisville municipal election and Massachusetts became the first state to legislate the reform. Over the next four years, another 36 states rapidly passed similar laws, with all but two adopting the secret ballot by 1910. See Lionel E. Fredman, *The Australian Ballot: The Story of an American Reform* (East Lansing: Michigan State University Press, 1968).

[18] Gary W. Cox and J. Morgan Kousser, "Turnout and Rural Corruption: New York as a Test Case," *American Journal of Political Science* 25, no. 4 (November 1981), 646-63.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

means to subdue broader electoral fraud, yet it remains unclear whether the reforms played any part in reducing it.[19]

No conclusive tie between enfranchising reform and voter fraud has ever been proven. And yet, at each significant effort to protect and extend the right to vote since the great victories of the Civil Rights Movement, franchising opponents have argued that reduced barriers would lead to voter fraud. For example, the alleged fraud threat was taken up by congressional opponents time and time again in the debates over the Voting Rights Act of 1965, the Universal Voter Registration Act of 1977, and the National Voter Registration Act of 1993:[20] The political usefulness of the voter fraud myth however, has not been limited to national reform efforts. In the recent period of what one scholar has called "the voting wars"[21] leading to a flurry of restrictive new voting rules adopted at the state level, the alleged threat of voter fraud has been a common refrain.

### B. Defining "Voter Fraud"

Most statutes criminalizing what we might think of as voter fraud do not specifically define the term. Instead, nefarious election-related practices are prevented by state laws making "double voting" or "falsifying records," or "voting by unqualified elector," and the like illegal.[22] Nevertheless, the process of formulating precise definitions is critical in the social sciences

---

[19] Paul Kleppner, *Who Voted? The Dynamics of Voter Turnout 1870-1980*, American Political Party and Election Series (New York: Greenwood Publishing Group, Inc., 1982), 59-60.

[20] *See, e.g.*, U.S. Congress, Senate Committee on the Judiciary, "To Enforce the 15th Amendment to the Constitution of the United States: Hearings on S.1564," 89th Cong., 1st sess., 1965; U.S. Congress, House Committee on House Administration, "To Establish a Universal Voter Registration Program, and for Other Purposes: Hearings on H.R. 5400," 95th Cong., 1st sess., 1977; and U.S. Congress, House Committee on House Administration, Subcommittee on Elections, "Hearing on Voter Registration," 103rd Cong., 1st sess., January 26, 1993. For an important account of the movement to reform voter registration laws leading to the passage of the National Voter Registration Act of 1993, *see* Frances Fox Piven and Richard A. Cloward, *Why Americans Don't Vote and Why Politicians Want It That Way* (Boston: Beacon Press, 2000); *see also*, Piven, et al., *Keeping Down the Black Vote*.

[21] Richard L. Hasen, *The Voting Wars: From Florida 2000 to the Next Election Meltdown* (New Haven, Conn.: Yale University Press, 2013).

[22] For example, in Georgia, "Any person who votes or attempts to vote at any primary or election, knowing that such person does not possess all the qualifications of an elector at such primary or election, as required by law, or…who knowingly gives false information to poll officers in an attempt to vote in any primary or election…" commits a felony. O.C.G.A. § 21-2-571 (2010). In Texas it is a third degree felony to "vote or attempt to vote in an election in which the person knows the person is not eligible to vote; knowingly votes or attempts to vote more than once in an election; or knowingly impersonates another person and votes as the impersonated person." Tex. Elec. Code Ann. § 64.012 (2003). California prohibits specific election related activity like fraudulent registration, voting in an election which one is not entitled to vote in, voting more than once or to try to buy a vote with the promise of a job. Cal. Elec. Code § 18520 (1994). In Minnesota, it is a felony to submit more than one absentee ballot or to assist another in submitting more than one absentee ballot, or alter another's absentee ballot. Minn. Stat. § 203B.03 (1999). In New Jersey, it is a third degree crime to "fraudulently vote…or in any manner so interfere…with the voters lawfully exercising their rights of voting at the election, as to prevent the election or canvass from being fairly had and lawfully conducted." N.J. Stat. Ann. § 19:34-11 (2011).

6

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

because it is necessary for accurate measurement of empirical phenomena.[23] To develop the definition of voter fraud for my research on the incidence of voter fraud in contemporary U.S. elections published in *The Myth of Voter Fraud*, I examined the electoral process and looked at the capacity of actors in the political process to impact the outcome and integrity of elections. Various actors with that capacity include, but are not limited to, voters, campaign officials, elected officials, and election poll workers.

I examined the parts of the political process that different actors could corrupt, and found a distinction between what voters can corrupt given their role and access to the electoral process, compared to what other electoral actors can corrupt. Voters are only capable of corrupting that part of the electoral process to which they have access. To wit, voters cannot corrupt the election count because they do not count the ballots; only an official with broad access to the counting process can corrupt an entire count. But, individual voters can corrupt their registration process and balloting by falsifying their records or identity on a registration application and/or fraudulently misrepresenting themselves to poll workers.

In the U.S., people commit voter fraud when they knowingly provide false information concerning their own voter eligibility credentials (i.e., citizenship status, age, permanent address), or when they knowingly cast more than one ballot ("double voting"), or cast a ballot knowing that they are not eligible to vote. With some exceptions (i.e, laws concerning age, felon disfranchisement and mental incompetence), voter eligibility requirements are fairly standard across the states: one must be alive when casting a ballot, 18 years of age, a U.S. citizen, and not under state supervision for a conviction of a felony crime. In our geographically-based system of representation, voters are required to vote in the jurisdiction in which they live.

People who *knowingly* abrogate eligibility rules commit voter fraud. This may include so-called "non-citizen" voting by individuals who know they are not eligible to vote because they are not U.S. citizens, or so-called "felon" voting by people who have been convicted of a felony and not had their voting rights restored as required by state law. Voting in the name of a dead person is fraudulent when the person casting the ballot intentionally impersonates the dead voter. The voter fraud outlined here can be committed in person at the polls or early voting sites, or through the use of absentee or mail-in ballots.

By breaking up the electoral process according to its various stages and the actors that participate, I can derive a definition of voter fraud that centers on the behavior of individual voters, of primary interest in the current policy debates over new state laws restricting access to the ballot. Accordingly, my definition of voter fraud is "the *intentional corruption* of the *voting process* by *voters*." This definition is specific to the elements I research.[24]

---

[23] W. Phillips Shively, *The Craft of Political Research*, 5th ed. (Upper Saddle River, New Jersey: Prentice Hall, 2002), 30-8.

[24] The U.S. Department of Justice prosecutes election crimes committed when there is a federal candidate on the ballot, or in cases where there is jurisdiction to enforce federal criminal laws that potentially apply to both federal and non-federal elections when there is no federal candidate on the ballot. The federal government's definition of "election fraud" centers on the corruption of "the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters," and is over-broad for the purpose of measuring election crime committed by voters because it includes acts of official malfeasance, such as ballot box stuffing or corruption of the

I emphasize the importance of intent in my definition, distinguishing election errors such as misspelled names and recording mistakes. I do this to keep the definition of voter fraud consistent with the legal concept of fraud and also, with principles of election administration.

Innocent administrative errors on the part of election officials and confusion on the part of voters can cause technically invalid ballots to be cast, however, there is an important distinction to be made between *invalid* registration and ballots, and *fraudulent* registration and ballots. Fraudulent registration and ballots are illegal; but not all invalid registration and ballots are fraudulent. Thus, in measuring the incidence of voter fraud, it is important to first determine the validity of registrations and ballots, and then, to identify, if possible, the intent on the part of the registrant or voter to register and vote and whether the ineligible or invalid registrant or voter knew that it was illegal to do so.

The research strategy outlined above is the one I have used in all of my work on the incidence of voter fraud over the last nearly twenty years. Because voter fraud is illegal, and because the available evidence for analyzing the incidence of voter fraud is not always conclusive on the question of intent, it is also important to research and understand the context and circumstances surrounding the behavior and the bare facts of alleged fraud.

The reasoning and logic I use to derive a definition of voter fraud for purposes of measuring the phenomenon lead to the following conclusions:

1) it is important to identify who is committing the fraud – the electoral process is complex and multi-staged; not all actors in the process have access to all parts of the process; therefore, not all forms of electoral fraud may be committed by all actors in the process;

2) thus, there is an important distinction to be made between *voter* fraud and broader *election* fraud; voter fraud is the intentional corruption of the electoral process by voters; election fraud encompasses all other forms of intentional corruption of the electoral process;

3) invalid registration and balloting, which may be detected as anomalies or irregularities in electoral mechanics, may not be fraudulent; therefore, there are competing explanations for electoral anomalies and irregularities: invalid registration and balloting may be caused by simple human error, confusion and mistakes.

## C. Analysis of the Incidence of Voter Fraud in Contemporary U.S. Elections

There are no officially compiled national or statewide statistics reliably reporting the instances of voter fraud. Therefore, assessing the degree to which voter fraud is a "problem" in

---

count. *See*, Richard C. Pilger, ed., *Federal Prosecution of Election Offenses*, 8th ed., U.S. Department of Justice, Criminal Division, Public Integrity Section (Washington, D.C.: Government Printing Office, 2017, 22-26; *available at* https://www.justice.gov/criminal/file/1029066/download). Because *voters* do not have access, those activities are not included in my definition of voter fraud.

contemporary U.S. elections, either because it frequently mars the outcomes of elections, or because it may not occur with regular frequency but is highly likely to undermine elections for significant state or federal offices, is not easy. In fact, I spent nearly ten years collecting and analyzing data and evidence using a wide variety of social science methods for my study of the contemporary incidence of voter fraud, *The Myth of Voter Fraud*, the first and only systematic, full scholarly treatment of the subject.

The two most important sources of evidence of voter fraud are social scientific studies and official government investigations and reports.

Social scientific research finds very little evidence of voter fraud in contemporary U.S. elections. In 2014, the U.S. Government Accountability Office published a performance audit of issues related to state voter identification laws.[25] Part of the study involved a review of "academic literature, organizational studies, peer-reviewed journals, books, and other regularly cited research published from January 2004 through April 2014 to identify studies that attempted to estimate in-person voter fraud, using a documented methodology."[26] More than 300 studies were reviewed and analyzed by GAO staff to determine whether they contained data on in-person voter fraud and provided an adequate description of the methodology used for collecting the data. Studies based on anecdotal reports of in-person voter fraud were excluded from the analysis. Only five studies, including my 2010 book, *The Myth of Voter Fraud*, met the criteria.[27] While all of the studies had various limitations for estimating a complete count of cases of in-person voter impersonation, two GAO analysts and a GAO statistician reviewed each of the studies and determined that "the design, implementation, and analyses of the studies were sufficiently sound to support the studies' results and conclusions based on generally accepted social science principles."[28]

The five scientifically sound studies identified by the GAO find very little evidence of voter fraud in contemporary U.S. elections. Three of these studies use quantitative methods to identify anomalies in registration and voting data as proxies for voter fraud, finding very little fraud.[29] The News21 project (discussed in more detail below) and *The Myth of Voter Fraud* do

---

[25] GAO, "Elections: Issues Related to State Voter Identification Laws." For this report, the GAO was tasked only with identifying the challenges to determining a complete measure of in-person voter fraud, not with estimating the incidence of voter fraud overall.

[26] *Ibid.*, 7.

[27] John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election: Evidence from a Survey List Experiment," *Election Law Journal* 13(4): 460-475; Ray Christensen and Thomas J. Schultz, "Identifying Election Fraud Using Orphan and Low Propensity Voters," *American Politics Research*, vol. 42 (2): 311-345; M.V. Hood III and William Gillespie, "They Just Do Not Vote Like They Used To: A Methodology to Empirically Assess Election Fraud," *Social Science Quarterly*, 93(1): 76-94; Lorraine C. Minnite, *The Myth of Voter Fraud* (Ithaca: Cornell University Press, 2010); and Corbin Carson, "Exhaustive Database of Voter Fraud Cases Turns Up Scant Evidence That It Happens," News21, August 12, 2012, *available at* https://votingrights.news21.com/article/election-fraud-explainer/ (last accessed September 12, 2019).

[28] GAO, "Elections: Issues Related to State Voter Identification Laws," 3-4.

[29] Hood and Gillespie performed an audit of the 2006 general election in Georgia "to ascertain the extent to which deceased registrants are being used in a fraudulent manner." Using a data mining technique, they initially identified 66 suspect ballots out of a total of approximately 2.1 million cast. Only four of the suspect ballots were cast in-

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

not rely solely on quantitative methodologies, focusing instead on identifying actual instances of voter fraud in recent elections.

*The Myth of Voter Fraud*

I spent nearly ten years collecting and analyzing hard data and evidence using a wide variety of social science methods for *The Myth of Voter Fraud*, the first and only peer-reviewed book on the subject of voter fraud in contemporary U.S. elections. My main research question was, what is the incidence of voter fraud – defined as the intentional corruption of the electoral process by voters – in contemporary U.S. elections? After analyzing original data and concluding that voter fraud is exceedingly rare, I asked, what then explains the persistent and growing chorus of evidence-free allegations that voter fraud is in fact an unchecked threat to the integrity of U.S. elections? In other words, my book also addresses the question of how we might make sense of the disjuncture between stubborn claims that voter fraud is a significant threat to the integrity of U.S. elections, and the contradictory facts.

To answer these questions I used what is known in the social sciences as a "mixed methods" or "multimethod" research approach.[30] This intuitive methodology, which has been called the "third methodological movement" in the social sciences following the developments of quantitative ("traditionalist") and then qualitative ("revolutionary") methodologies,[31] integrates quantitative, and qualitative and archival styles of evidence and modes of analysis, to triangulate independent and imperfect sources of information from which the researcher then draws inferences. It is particularly suited to research projects where the sources of evidence are scattered and incomplete, or where any one source is otherwise too limited on its own to serve as the basis for reliable analysis and valid inference.

Mixed methods is, therefore, the best methodological approach for the kind of research problems I faced. Since the publication of *The Myth of Voter Fraud*, other political scientists, including those whose work was reviewed by the GAO, and a few others, have used mostly

---

person. Further research determined conclusively that none of the in-person ballots and almost none of the absentee ballots (57 of the remaining 62 suspect ballots) were fraudulently cast. Hood and Gillespie were not able to obtain enough information from county registrars to make a determination one way or the other about five of the absentee ballots. They found "no evidence that election fraud was committed under the auspices of deceased registrants" in Georgia's 2006 election (Hood and Gillespie, "They Just Do Not Vote Like They Used To," 76). Ahlquist, Mayer and Jackman use a different technique to search for proxies for voter impersonation in the 2012 national general election, finding "no evidence of systematic voter impersonation" in that election (Ahlquist *et al.*, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election," 30). Christensen and Schultz use yet another quantitative methods technique to search for anomalies in election returns that might indicate the presence of fraud. Their findings "…support the conclusion that electoral fraud, if it occurs, is an isolated and rare occurrence in modern U.S. elections" (Christensen and Schultz, "Identifying Election Fraud Using Orphan and Low Propensity Voters," 313).

[30] See John W. Creswell and Vicki L. Plano Clark, eds., *Designing and Conducting Mixed Methods Research*, 3rd Ed., (Los Angeles: Sage Publications, Inc., 2017).

[31] Charles Teddlie and Abbas Tashakkori, "Major Issues and Controversies in the Use of Mixed Methods in the Social and Behavioral Sciences," in Abbas Tashakkori and Charles Teddlie, eds., *Handbook of Mixed Methods in Social and Behavioral Research* (Thousand Oaks, Calif.: Sage Publications, Inc., 2003), 5.

10

quantitative methods to study election fraud. While I believe that such methods can be useful in detecting anomalous patterns in registration lists or other sources of electoral data, the most that we can learn from such studies is that anomalous patterns may (or may not) exist in the data.[32] Moreover, the mere existence of anomalous data is insufficient to demonstrate actual voter fraud.

In the absence of reliable or official data, I gathered my own from a wide range of sources.[33] My conclusions in *The Myth of Voter Fraud* about the rarity of voter fraud relies on all of this data,

---

[32] Important improvements to election administration in recent years have been centered on applying computer-based information technologies across a range of record-keeping and administrative functions important to maintaining election integrity. One of these functions is what is referred to as 'list maintenance,' or maintaining accurate voter rolls, as mandated by state and federal laws. Section 8 of the federal National Voter Registration Act of 1993, sets a regulatory floor for maintaining registration lists, and governs conditions under which voter records may be removed. In addition, Section 303 of the Help America Vote Act of 2002, sets basic requirements for computerized list maintenance, including coordination with state agency death and felon records and the removal of duplicates from the files. Under HAVA, states are also required to collect either driver's license numbers or the last four digits of voter registration applicants' Social Security numbers for purposes of verifying application information. Federal law allows states to determine what constitutes a "match." List matching is also used by election agencies such as the North Carolina State Board of Elections, to audit elections and flag irregularities for review by agency personnel, and where appropriate, law enforcement. List matching alone cannot identify fraud, and poor execution will produce bad data. Indeed, there is an advanced statistical science of record linkage that incorporates probability theory, the construction and use of algorithms, data parsing and imputation strategies, and sophisticated methods for estimating error that make list matching exercises treacherous terrain for the amateur. For an overview, see William E. Winkler, "Overview of Record Linkage and Current Research Directions," Statistical Research Division, U.S. Census Bureau, Research Report Series, Statistics #2006-2, February 8, 2006. See also, Ivan P. Fellegi and Alan B. Sunter, "A Theory of Record Linkage," *Journal of the American Statistical Association*, 64(328): 1183-1210; Wendy Alvey and Bettye Jamerson, eds. *Record Linkage Techniques – 1997*, Proceedings of An International Record Linkage Workshop and Exposition, March 20-21, 1997, Arlington, Virginia; *available at* https://nces.ed.gov/FCSM/pdf/RLT97.pdf; and Peter Christen, *Data Matching: Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection* (New York: Springer, 2014).

[33] These included, but not limited to: a review of all of the scholarly literature by historians, political scientists, and legal scholars on voter fraud in American history (of which, given the extensive literature on American elections and electoral behavior, there is very little); review and analysis of all pertinent federal and state election statutes erected to ensure the integrity of elections and criminalizing certain behaviors; broad and deep database searches of hundreds of news sources across the U.S. at the state and local levels (including wire services); searches of legal databases and case law, and review of relevant legal materials and opinions at the state and federal levels; documents and material produced through public records requests sent to thousands of election and law enforcement officials in every state; Freedom of Information Act requests to various agencies within the U.S. Department of Justice; analysis of a longitudinal data set produced by the Administrative Office of the United States Courts; analysis of voluminous records of contested federal and state elections; interviews with a wide range of people with relevant expertise, including, but not limited to, prosecutors, defense lawyers, election officials, voters, academics, and advocates working on voter registration drives; in-depth case studies in four states of the worst alleged cases of voter fraud since 2000; and collection and review of a wide range of reports, evaluations, studies, testimony and the like produced by the federal government (i.e., audits by the U.S. Government Accountability Office; reports to Congress by the Congressional Research Service; reports produced by the U.S. Elections Commission and the U.S. Commission on Civil Rights; transcripts and materials from congressional hearings), state legislatures and state government agencies (i.e., data from the Elections Fraud Investigations Unit of the California Secretary of State's Office; a public complaints file from the Minnesota Secretary of State's Office established to comply with the federal Help America Vote Act of 2002; a report from a broad investigation of allegations of voter fraud by the New Hampshire Attorney General's Office), national election reform task forces (i.e., the Commission on Federal Election Reform, the Social Science Research Council National Research Commission on Elections and Voting), and a wide range of organizations, including party groups, good government and civic organizations, and other advocacy organizations, especially those claiming to find alarming evidence of voter fraud (i.e., a report by an

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

including a record of federal indictments generated during the first three years of a special program at the George W. Bush Administration's Department of Justice called the Ballot Access and Voting Integrity Initiative (BAVII). This initiative was specifically aimed at rooting out alleged voter fraud in federal elections. To be clear, it would not have been good social science to rely on only one source of evidence given the nature of my research questions and the lack of available data to examine the problems I set out to study. My conclusions about the incidence of voter fraud in contemporary U.S. elections most certainly do not rest solely upon prosecution records, as some have mistakenly claimed, but prosecution records are, nevertheless, an important indicator of the extent of the problem. Before I conclude this section with a discussion of social science research findings on the incidence of voter fraud since the publication of *The Myth of Voter Fraud*, I want to briefly review the book's analysis of the outcomes of the Justice Department's BAVII program. Those outcomes strongly challenge a common refrain from critics who without evidence claim that voter fraud is a large and looming problem demanding a policy response such as more stringent voter identification requirements, and that statistics drawn from law enforcement efforts against voter fraud crime are misleading because the law enforcement effort is allegedly so weak.

*The U.S. Department of Justice's Ballot Access and Voting Integrity Initiative, 2002-2005*

In March 2001, United States Attorney General John Ashcroft announced the creation of a Ballot Access and Voting Integrity Initiative ("BAVII").[34] The BAVII brought together civil rights and criminal division lawyers of the Justice Department for an Election Day program, the stated purpose of which was to help attorneys recognize election fraud and voter intimidation, and to provide their services to voters who make complaints of the same. In 2008, the long-time director of the Election Crimes branch of the Justice Department's Public Integrity Section stated, that at the time, "the investigation and prosecution of election crimes...was outranked [in official agency prioritization] only by crimes involving terrorism and espionage."[35]

After numerous attempts at locating information regarding voter fraud from the BAVII, including a Freedom of Information Act request made to four different units of the U.S. Department of Justice,[36] I found a case list of indictments brought under the program buried in the

---

organization called the American Center for Voting Rights that claimed to be "the most comprehensive and authoritative review of the facts surrounding allegations of vote fraud, intimidation and suppression made during the 2004 presidential election:" reports compiled by the conservative Heritage Foundation and the Public Interest Legal Foundation).

[34] U.S. Department of Justice, press conference, Washington, D.C., March 7, 2001, *available at* http://www.justice.gov/archive/ag/speeches/2001/0307civilrightspressconf.htm. *See also*, Dan Eggen and David A. Vise, "Ashcroft Takes On Voting Issues; Enforcement, Monitoring of Election Laws to Be Increased," *Washington Post*, March 8, 2001, A19.

[35] Craig C. Donsanto, "Corruption of the Election Process under U.S. Federal Law," in *Election Fraud: Detecting and Deterring Electoral Manipulation*, ed. R. Michael Alvarez, Thad E. Hall, and Susan D. Hyde (Washington, D.C.: Brookings Institution, 2008), 34.

[36] The Justice Department stonewalled my request. It took more than two years, formal appeals of various denials, and the intervention of my U.S. Senator before any materials were released to me.

12

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

records of a congressional hearing held in 2006.[37]  The list, which was prepared by the U.S. Department of Justice, records 95 people indicted or charged by information over the first three years of the program (FY2003 to FY2005).  I concluded that this was a complete list of indictments brought under the BAVII for those three years by comparing it to Justice Department press releases announcing numbers of indictments brought under the program.[38]  I researched the BAVII indictments and concluded that only 40 of the 95 people indicted were in-person voters;[39] the other 55 people were associated with elections in other ways, for example, serving as campaign, party or election officials.  Of the 40 voters indicted, 26 pleaded or were found guilty by a jury.  More than 200 million votes were cast in the 2002 and 2004 federal elections combined.  Thus, we have an important example in which prosecutors vigorously pursued voter fraud cases, and yet almost no voter fraud was actually found or prosecuted.

More recent findings from a study by the U.S. Government Accountability Office (GAO) examining the federal enforcement effort against election fraud are consistent with my findings regarding the scant record of voter fraud in the 2002 and 2004 federal elections uncovered by the BAVII program.  The GAO analyzed data for the period 2001 through 2017, drawn from two different U.S. Department of Justice case management systems used by the two Department components responsible for prosecuting election fraud, the Criminal Division's Public Integrity Section, and the U.S. Attorneys' Office.  Again, as noted above, the federal government defines election fraud broadly to include the corruption of "the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters."[40]  The data analyzed by the GAO goes beyond my careful and precise definition of voter fraud to include crimes committed by public officials, politicians and their campaigns, and fraud committed through voter intimidation, such as vote-buying conspiracies in which the powerful use money and other inducements to lure the powerless into selling their votes.[41]  The GAO assessed the reliability of

---

[37] U.S. Congress, House Committee on House Administration, "Hearing on 'You Don't Need Papers to Vote?': Non-Citizen Voting and ID Requirements in U.S. Elections," 109th Congress, 2d Sess., June 22, 2006, 245-54.

[38] A recent report by the U.S. Government Accountability Office examined proprietary data maintained by the Public Integrity Section of the U.S. Department of Justice's Criminal Division, and the Executive Office for United States Attorneys to respond to queries regarding election fraud by several U.S. Senators.  The GAO's study period extends beyond the period I examined for *The Myth of Voter Fraud*, but their findings for FY2002 through FY2005 are consistent with my own.  See U.S. Government Accountability Office, "Voter Registration: Information on Federal Enforcement Efforts and State and Local List Management," Report to Requesters GAO-19-485 (June 2019).

[39] None of the 40 indictments of voters were brought against voters in Georgia.

[40] See note 24.

[41] "Public Integrity Section officials stated the Section did not focus its efforts on particular types of election fraud, but vote buying...was the most frequent type of election fraud related crime the Section prosecuted during the period of our review.  Officials said vote buying is the most common type of election fraud related crime that has come to their attention in recent decades and noted that it tends to occur in communities that are more insular and isolated and have higher levels of poverty.  For example, officials observed that in rural communities with high levels of poverty, some residents may be more vulnerable to vote-buying efforts due to their difficult circumstances or the power of local officials who seek to buy votes to provide or cut off needed services."  GAO, "Voter Registration," 34-35.

the databases and "found the data sufficiently reliable to provide information on the nature and characteristics of DOJ's efforts to address potential instances of election fraud."[42] Keeping in mind that the GAO's analysis is overbroad for the purpose of this report, their principle findings are consistent with my findings in *The Myth of Voter Fraud*, that voter fraud is exceedingly rare:

> 1) Over the period of fiscal years 2001 through 2017, the Public Integrity Section initiated 1,408 criminal investigations or "matters," filing charges in 695 cases.[43] Of the total number of matters initiated, about two percent (33 matters) were categorized by Section attorneys as election fraud-related; of the total number of cases filed as a result of the Section's investigations, 19 cases involving 37 individual defendants were election fraud-related;[44]

> 2) Over the same study period, U.S. Attorneys' Offices initiated more than 2.2 million criminal investigations, of which 525 were election fraud-related, two one-hundredths of a percent of their overall criminal matters. The U.S. Attorneys' Office filed just over one million criminal cases during this time period; of these, 185 cases were election fraud-related, or the same two one-hundredths of a percent of their overall caseload. Fifteen of these cases were jointly filed by the U.S. Attorneys Offices and the Public Integrity Section (and double counted in the Public Integrity Section equivalent category cited above);[45]

> 3) In sum, "[A]ccording to officials from EOUSA [the Executive Office of the U.S. Attorneys], which provides guidance, direction, and oversight to the U.S. Attorneys' Offices, election fraud was one of the least frequent crimes addressed by U.S. Attorneys' Offices." The GAO report continues: "Officials further noted that *election fraud related cases were taken seriously and thoroughly investigated when facts supporting such charges were uncovered*" (emphasis added).[46]

Using the same standard for judging voter fraud crime rates as we do for measuring other crimes, which is to assess the incidence of crime using law enforcement statistics on arrests, indictments and convictions, we must conclude that the scant evidence of arrests, indictments or convictions for any of the practices defined as voter fraud means that little fraud is being committed relative to the millions of votes cast each year in state, local and federal elections. This is one reliable way to think about how much voter fraud is being committed, even if we are not able to conclusively determine a complete measure of actual voter fraud.

---

[42] *Ibid.*, 4.

[43] "A matter is defined as an activity, such as an investigation, that has not yet resulted in the filing of a complaint, indictment, or information in court." *Ibid.*, 3, n3.

[44] *Ibid.*, 29-30.

[45] *Ibid.*, 35-36.

[46] *Ibid.*, 36.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*Current Social Scientific Evidence*

Since the publication of *The Myth of Voter Fraud*, there have been only a handful of social scientific studies published on the incidence of voter fraud in contemporary U.S. elections. These include the three academic papers flagged by the GAO in their 2014 audit and mentioned above;[47] and two additional academic papers.[48] All of these papers rely only on quantitative methodologies and proxy measures to estimate the probability of fraud; only two, the papers by Ahlquist, *et al.*, and Christensen and Shultz, address potential voter impersonation.[49]

*State Government Investigations and Reports*

---

[47] Ahlquist, Mayer and Jackman, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election;" Christensen and Schulz, "Identifying Election Fraud Using Orphan and Low Propensity Voters;" and Hood and Gillespie, "They Just Do Not Vote Like They Used To."

[48] In a 2019 working paper, Sharad Goel and colleagues use statistical techniques to look for proxy evidence of double voting in the 2012 presidential election. They find that "double voting is not currently carried out in such a systematic way that it presents a threat to the integrity of American elections." They estimate that "at most," one in 4,000 votes cast in 2012 were double votes, "with measurement error in turnout records possibly explaining a significant portion, if not all, of this." In other words, 1 in 4,000 votes could have been double votes, or the 2012 election could have had an administrative error rate producing the appearance of duplicates votes of roughly .025 percent. See, Sharad Goel, Marc Meredith, Michael Morse, David Rothschild, and Houshmand Shirani-Mehr, "One Person, One Vote: Estimating the prevalence of Double Voting in U.S. Presidential Elections," unpublished working paper, January 17, 2019, 26-27. A second paper by Cottrell, Herron and Westwood, investigates claims made by President Donald J. Trump that his election in 2016 was tainted by massive voter fraud. The researchers use a variety of statistical modeling techniques and county-level election returns, census data, and other federal and state government data to estimate the likelihood of invalid non-citizen voting in that election. "Our empirical results share a common theme," they write. "[T]hey are inconsistent with fraud allegations made by Trump. The results are, however, consistent with various state-level investigations conducted in the initial months of 2017, all of which have failed to find any evidence of widespread voter fraud in the 2016 General Election." See, David Cottrell, Michael C. Herron, and Sean J. Westwood, "An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election," *Electoral Studies* 51 (2018): 123-142, 140.

[49] Not included in this discussion is a set of methodology papers addressing various elections forensics techniques, including anomalous digit distributions in election data as a means for detecting election fraud. See, for example, Bernd Beber and Alexandra Scacco, "What the Numbers Say: A Digit-Based Test for Election Fraud," *Political Analysis* 20(2):211-234; C. Breunig and A. Goerres, "Searching for Electoral Irregularities in an Established Democracy: Applying Benford's Law Tests to Bundestag Elections in Unified Germany," *Electoral Studies* 30(3): 534-545; Joseph Deckert, Mikhail Myagkov, and Peter C. Ordeshook, "Benford's Law and the Detection of Election Fraud," *Political Analysis* 19(3): 245-268; Walter Mebane, "Election Forensics: The Second Digit Benford's Law Test and Recent American Presidential Elections," in R. Michael Alvarez, Thad E. Hall, and Susan D. Hyde, *Election Fraud* (Washington, D.C.: Brookings Institution, 2008); Juraj Medzihorsky, "Election Fraud: A Latent Class Framework for Digit-Based Tests," *Political Analysis* 23(4): 506-517; Jacob M. Montgomery, *et al.*, "An Informed Forensics Approach to Detecting Vote Irregularities," *Political Analysis* 23(4): 488-505. Most of this work addresses the detection of fraud in national elections and at the national level. In addition, I exclude a discredited paper published in 2014 in the peer-reviewed journal, *Electoral Studies*, by Richman, Chattha, and Earnest that analyzes survey data and concludes that "non-citizens participate in U.S. elections, and that this participation has been large enough to change meaningful election outcomes including Electoral College votes, and Congressional elections." The methodology used by the authors was widely criticized as faulty, including by the political scientists who generated the survey data. See, Jesse T. Richman, Gulshan A. Chattha, and David C. Earnest, "Do Non-citizens Vote in U.S. Elections?" *Electoral Studies* 36 (2014): 149-157; and rebuttal, Stephen Ansolabehere, Samantha Luks, and Brian F. Schaffner, "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys," *Electoral Studies* 40 (2015):" 409-410.

Other important sources of data for analyzing the incidence of voter fraud in U.S. elections are studies conducted by state agencies responsible for the administration of elections, and state law enforcement and auditing agencies. I review several such reports in *The Myth of Voter Fraud*,[50] and also in several subsequent expert reports prepared for plaintiffs in litigation challenging various election laws.[51] Despite variation in the context, scope, type of fraud examined, time period covered, and investigating agency involved, these studies demonstrate a clear and consistent pattern of findings: very little voter fraud, and irregularities and anomalies in the data more likely the result of administrative or voter error or confusion than they are voter fraud.[52]

### D.    Evidence and Analysis of Voter Fraud in Georgia

The recent record of voter fraud in Georgia is consistent with the recent record of voter fraud elsewhere in the U.S., which is to say there is very little evidence of voters intentionally corrupting the electoral process in Georgia. In fact, I have been unable to identify a single criminal conviction for voter impersonation at the polls in Georgia over the last decade. My findings are based on the record of state and local news reporting on the subject;[53] my prior research on voter

---

[50] For example, as a result of public records requests sent to all Attorneys General and Secretaries of State, I obtained and analyzed all election fraud complaints referred to the California Secretary of State's Office for the period of 1994 to 2007; voter complaints collected by the Minnesota Secretary of State's Office from 2005 to 2006; investigation logs maintained by the Election Division of the Oregon Secretary of State's Office for all election law complaints for the period of 1991 to 2006; and a report of a broad investigation by the New Hampshire Attorney General's Office into concerns about voter fraud in the 2004 general election. See chapter 4 of *The Myth of Voter Fraud*.

[51] See my expert reports in Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018; *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018; *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016; *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015; *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016; *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015; and *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

[52] A number of states in recent years have conducted investigations of alleged voter fraud including those cited earlier in footnote 33, and in some of my expert reports cited in footnote 51, and others, for example: A multi-year investigation by the Iowa Secretary of State resulted in 27 prosecutions out of approximately 1.6 million votes cast; see Iowa Secretary of State Matt Schultz, "DCI Voter Fraud Investigations Report," May 8, 2014, available at http://publications.iowa.gov/16874/1/DCI%20Voter%20Fraud%20Report%205-8-14.pdf (last accessed September 12, 2019); a 2013 voter fraud investigation by the Colorado Secretary of State alleged 155 non-citizens had illegally voted, however, upon further investigation by local prosecutors, almost none were charged (four people were charged, but only one man was eventually convicted of a false registration charge (see, "Gessler Voter Sting Nets 1 Conviction Despite Accusation of Widespread Fraud," *The Sentinel*, March 13, 2015, available at https://sentinelcolorado.com/news/gessler-voter-sting-nets-1-conviction-despite-accusation-widespread-fraud/ (last accessed September 12, 2019)).

[53] In keeping with my general methodology for analyzing the incidence of voter fraud, I usually begin with an overview of the news coverage of election and voter fraud in a particular place, in this case, the state of Georgia. I searched NewsBank's Access World News Georgia State File, which contains full-text content for 61 Georgia newspapers and the Associated Press State Wire Service, using the Boolean search term, "voter fraud" OR "election

fraud in Georgia; efforts by a nonprofit journalism project at Arizona State University, and by the Heritage Foundation to compile the record of voter fraud in Georgia over the last roughly two decades; and a selective review of minutes from meetings of the Georgia State Board of Elections, which has a central role in investigating complaints about fraud and voting irregularities in primary and general elections statewide.

Georgia election law establishes the State Election Board (SEB) and grants it significant power to oversee, promulgate and enforce laws and policies governing the electoral process in the state.[54] The SEB consists of the Secretary of State, who chairs the body, an elector chosen by majority vote of the General Assembly, an elector chosen by majority vote in the Senate, and electors nominated by each political party[55] and appointed by the Governor.[56] One of the SEB's statutory duties is,

> ...to investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution.[57]

In the early years of my research on voter fraud, I sent public records requests to all Secretaries of State and Attorneys General of the U.S. requesting copies of records related to cases or complaints of voter fraud.[58] In his February 10, 2006, reply letter to me, Deputy Attorney General Dennis Dunn explained the process of enforcement of Georgia's Election Code, noting that between 2000 and early 2006, the State Board of Elections had referred 39 cases to the Attorney General's Office for the conduct of administrative hearings. Deputy Attorney General Dunn explained further that the records of these proceedings were not categorized by any particular statute or offense, and, "there could by any number of reasons why a matter would be administratively referred to our office." He understood my request to ask for records of criminal prosecutions of voter fraud, and because the Attorney General's Office" is not authorized to pursue general criminal law violations in Georgia," the Department of Law had "no records responsive to [my] request."

---

fraud" OR "vote fraud," for the period January 1, 2010 through November 19, 2019. For *The Myth of Voter Fraud*, and an earlier report, "Securing the Vote: An Analysis of Election Fraud" (published by Demos in 2003; and updated four years later as "An Analysis of Voter Fraud; see note 2 above) I carefully tracked news articles about voter fraud in Georgia going back to 1992.

[54] O.C.G.A. § 21-2-31. See also, Karen C. Handel and Wesley B. Tailor, "Election Law in Georgia: What City and County Attorneys Need to Know," September 2008, available at http://pentz.com/NoIncinerator/GA_election_law.pdf (last accessed November 19, 2019).

[55] "Political party" is defined by Georgia statute at O.C.G.A. § 21-2-2.

[56] O.C.G.A. § 21-2-30.

[57] O.C.G.A. § 21-2-31(5).

[58] See the Attachment at the end of this report for copies of my letters to Georgia Secretary of State Cathy Cox, and Attorney General Thurbert Baker, and the responses I received from their offices.

With a better understanding of the election law enforcement process in Georgia at hand, on October 1, 2006, I sent a more specific request for records related to cases or complaints of voter fraud to Secretary of State Cox. Assistant Director of Legal Affairs Clifford D. Tatum replied to me by email and we scheduled a telephone interview for October 16, 2006, to discuss the request (the written notes of this interview are appended). Mr. Tatum wanted to clarify what I was looking for because he thought the fees for providing the copies of the records I was seeking would run into the hundreds of dollars. Similar to Deputy Attorney Dunn, Mr. Tatum noted that there is no general "voter fraud" statute in Georgia and that the meaning of "voter fraud" could be broadly defined. He wanted to be sure, for example, that I was interested in absentee ballot fraud, which he said was the main type of fraud dealt with by his office. He asked me if I was interested in cases where there was a technical violation of law, such as the mishandling of an absentee ballot by an unauthorized person, even if there was no intent to commit fraud. I told him that I was. I asked about cases of "double" or duplicate voting. Mr. Tatum related that he could recall only two cases in the previous couple of years where people filed an absentee ballot and then showed up in person to vote. The first case involved a person on medication who was confused about his voting activities. In the second case, Mr. Tatum said he believed the person was trying to "test" the system, and the matter was referred for prosecution (although later, not prosecuted).

As a result of my interview with Mr. Tatum, I revised my public records request to the Georgia Secretary of State to case summaries of alleged incidents of absentee ballot irregularities and polling place irregularities investigated by the Secretary of State's Office for the two-year period covered of 2004 and 2005.

I received those records in early December of 2006 (by this time, Mr. Tatum had become the Interim Director of the Elections Division of the Secretary of State's Office). The file contained eight case summaries for 2004, and nine for 2005. Of the 17 cases, all but four involved a variety of allegations of manipulation or outright violation of the absentee balloting process, usually by people running for local office, their campaigns, or in some instances, local election staff (supervisors, registrars, absentee ballot clerks, etc.). The other cases alleged mismanagement of the voting process by election workers, voters casting ballots in precincts where they no longer lived (i.e., the son of an opponent in a school board race voting where he did not live to help his mother in her race against the complainant), and racial discrimination by election officials toward people of color. The picture that emerges from these cases is of voters as victims rather than perpetrators of election fraud. (I note that the innocence or guilt of the alleged violators was not established in the case files.)

My inquiries and communications with Georgia officials regarding the incidence of voter fraud in the state occurred shortly after Georgia adopted one of the first restrictive photo identification laws in the U.S.[59] Unlike most states at the time, Georgia already had an

---

[59] Indiana passed a restrictive photo identification law in 2005, just prior to Georgia (Voter Identification Statute, Public Law No. 109-2005, codified in several sections of the Indiana Code, including Sections 3-5-2-40.5, 3-10-1-7.2, 3-11-8-25.1, and 3-11.7-5.2.5). In 2007, I filed a joint amicus brief in the U.S. Supreme Court case, *Crawford v. Marion County Election Board*, a constitutional challenge to the Indiana law; see "Brief of Amici Curiae the Brennan Center for Justice; Demos: A Network for Ideas & Action; Lorraine C. Minnite; Project Vote; and People for the American Way Foundation in Support of Petitioners," November 13, 2007 (finding that Indiana had no record of voter impersonation fraud at the polls, and that there is no more evidence that polling place impersonation

identification requirement for polling place voting. The new law reduced the number of acceptable forms of identification from 17 to six, and loosened the requirements for absentee balloting.[60] The Georgia legislature's actions were controversial, generating numerous legal challenges and modifications of the law over the next several years.[61]

At the time of its passage, the Georgia Secretary of State strongly objected to the law, urging the governor to veto the legislation. In her April 8, 2005, letter to Governor Sonny Perdue, Secretary of State Cathy Cox wrote of her concerns that the bill would impose an undue burden on many Georgia voters, especially the poor and elderly who are less likely to own or drive a car and therefore, lacking of the basic form of identification privileged by the bill, a driver's license.[62] Secretary Cox also stated her belief that existing Georgia practices and procedures were working very well to prevent voter fraud, the justification for the photo identification requirement, which Secretary Cox called a "pretext."

---

fraud is a problem outside Indiana than there is in Indiana; author's files).

[60] O.C.G.A. § 21-2-417.

[61] The debate in the Georgia Assembly over photo identification was highly partisan, with Republican Party proponents of the legislation arguing that it was only intended to combat the potential for voter fraud, and Democrats charging intentional racial discrimination in voting. Most of the state's black legislators walked out of the Capitol when the bill passed the Senate. Four months after Georgia Governor Sonny Perdue signed HB 244 into law (Act No. 53, The 2005 Photo ID Act, an amendment to O.C.G.A. § 21-2-417), which requires Georgia voters to present a valid photo identification in order to vote, opponents filed a federal lawsuit claiming the law violated the First and Fourteenth Amendments to the U.S. Constitution, the Georgia constitution, was a poll tax in violation of the Twenty-Fourth Amendment and Equal Protection Clause, and violated the Civil Rights Act of 1964 and section 2 of the Voting Rights Act of 1965. The U.S. Department of Justice had "precleared" the law under requirements of the Voting Rights Act, although later, the disclosure of an internal memorandum leaked to the *Washington Post* indicated that the decision to preclear was unusual because it was in contradistinction to the recommendations of the Voting Section's professional staff analysis, finding a likely retrogressive racially discriminatory effect of the law. U.S. District Court Judge Harold Murphy found that the photo identification requirement was an unconstitutional poll tax, and blocked its enforcement. Meanwhile, the Georgia Assembly revised the law to provide a free state-issued photo identification, but in July 2006, Judge Murphy again blocked enforcement, finding the revised law continues to discriminate against people lacking driver's licenses, passports or other forms of government-issued identification. A year later, a separate state challenge is dismissed by the Georgia Supreme Court, which found that the plaintiff in the case, Rosalind Lake, lacked standing to sue. The Court dodged the state constitutional question. In late summer 2007, Georgia Secretary of State launched an outreach effort to educate Georgia citizens on the photo identification requirement, and in September, Judge Murphy finds the law constitutional. It takes effect for the first time in municipal elections in about two dozen Georgia counties, and faces its first statewide test in the 2008 presidential preference primary.

[62] Letter from Georgia Secretary of State Cathy Cox to the Honorable Sonny Perdue, Governor, State of Georgia, dated April 8, 2005, available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/exhibitd_000.pdf. Secretary Cox sent a similar memorandum to the Members of the Georgia State Senate, urging the senators to consider what the Secretary saw as contradiction in the bill (HB 244), which on the one hand would impose a restrictive photo identification requirement to vote, and on the other loosen access to absentee ballots, which the Secretary saw as creating "staggering opportunities for voter fraud" (available at https://moritzlaw.osu.edu/electionlaw/litigation/documents/motionforleavetofilesecondamendedcomplaintexhibit6.pdf).

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

> I cannot recall one documented case of voter fraud during my tenure as Secretary of State
> or Assistant Secretary of State that specifically related to the impersonation of a registered
> voter at voting polls.[63]

Secretary Cox served in those positions for about a decade, from 1996, when she relinquished her
seat in the Georgia House of Representatives to become Assistant Secretary of State, to 1998 when
she became Georgia's first female Secretary of State, serving two terms ending in 2006.  Though
her statements were made some fourteen years ago, I subsequently have found no evidence that
would contradict Secretary Cox's claims today.  There still is no evidence of voter impersonation
in recent Georgia elections, and very little evidence of any other kind of fraud perpetrated by
voters.

Since 2006, and the publication of *The Myth of Voter Fraud* in 2010, other researchers have
attempted to compile the record of voter fraud in Georgia.  For example, the Heritage Foundation
has created an online, publicly accessible database of what it calls "Election Fraud Cases from
Across the United States."[64]  There is no explanation of the methodology used to create the
database or the criteria for inclusion of cases, and the website for the database contains a disclaimer
that "this database is not an exhaustive or comprehensive list, but is intended to demonstrate the
many ways in which fraud is committed," although specific numbers of "proven instances of voter
fraud," criminal convictions, civil penalties, diversion programs are tallied and reported on the
database homepage.

Users can search and select cases by state.  The Georgia file contains 19 cases of election
fraud involving 23 people, going back to 1998.  None involve voter impersonation.  In fact, only
two of the 23 people appear to be voters.  Both were found guilty by the SEB of an administrative
violation of the voter registration rules by registering to vote at addresses where they did not live.
The other 21 people are candidates for local office or supporters of candidates found guilty by
either the SEB or in some cases, federal prosecutors for a variety of election law violations related
to vote buying, double or what Georgia election law terms "repeat" voting[65] (one case – former
Dodge County Sheriff Michael Douglas, Jr. in his first election for sheriff in 2004), illegal
possession of absentee ballots, improper assistance to absentee ballot voters (10 of the 23 people),
ballot petition fraud, and submitting false voter registration cards.

The same record of evidence of very little voter fraud is corroborated by the research
conducted by the News21 journalism project at the Walter J. Cronkite School of Journalism and

---

[63] It should be noted that Secretary Cox provided nearly identical statements under oath in her 2005 deposition in the
litigation challenging Georgia's photo identification law and at trial (see U.S. District Court Judge Harold Murphy's
order in *Common Cause v. Billups*, U.S. District Court for the Northern District of Georgia, Rome Division, Civil
Action No. 4:05-CV-0201-HLM, October 18, 2005).

[64] See, the Heritage Foundation's website, (https://www.heritage.org/voterfraud), last accessed November 19, 2019.

[65] O.C.G.A. § 21-2-572 (Repeat Voting in Same Primary or Election), states, "Any person who votes in more than
one precinct in the same primary or election or otherwise fraudulently votes more than once at the same primary or
election shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than
one nor more than ten years or to pay a fine not to exceed $100,000.00, or both."

Mass Communications at Arizona State University. The year-long project compiled cases of alleged voter fraud in the United States between 2000 and 2012, replicating the data collection methodology I used in *The Myth of Voter Fraud*, by sending out more than 2,000 public records requests to state elections and law enforcement authorities in every state, and the U.S. Department of Justice (and FBI).[66] The student journalists followed up these document requests with phone calls and emails, and reviewed more than 5,000 court documents, official records and media reports. They found just over 2,000 alleged cases of a variety of forms of election or voter fraud nationwide, including ten cases of alleged voter impersonation over the twelve-year study period – or fewer than one case of voter impersonation across the nation per year.

Like the Heritage Foundation database, the News21 database may be searched and sorted by state. It contains records for 48 individuals found guilty of various forms of voter or election fraud related to violations of absentee balloting procedures, double or repeat voting, voter registration fraud, or voting by persons ineligible to cast ballots. Of these 48 people, three were either candidates for office or assisting candidates for office. About half of the cases (25) resulted in illegal ballots being cast. None of the cases researched by the News21 project involve voter impersonation.

The time periods covered by the Heritage Foundation and the News21 project overlap between 2000 and 2012, however, they share only one case in common.[67] If we focus the analysis on ordinary voters violating the rules for proper and valid voter registration and balloting, we find a total of 47 cases in Georgia documented by the Heritage Foundation and News21, about half of which resulted in invalid votes, over the last two decades. Without knowing more about these cases, it is difficult to assess whether any of them are cases of fraud because the information presented by the two organizations is too limited to draw solid conclusions. Nevertheless, if we assume all of them *are* cases of intentional corruption of the electoral process by voters, and not mistakes absent the intent to defraud the people of Georgia, the data suggest no more than two to three cases of voter fraud per year have occurred. Again, there is no other evidence that I am aware of that would contradict a finding and conclusion that voter fraud, defined as the intentional corruption of the voting process by voters, is exceedingly rare in Georgia, consistent with patterns found in other U.S. states.

In addition to these sources, I conducted an initial scan for mentions of 'fraud' in the thousands of pages of minutes of the last nearly 50 meetings of the SEB going back to 2010. This review yielded only a few cases of voter fraud among the hundreds handled by the SEB over the period. I then reviewed the minutes in more detail to gain a better understanding of the nature of the cases of alleged fraud referred to the SEB. With respect to cases dealing with the registration

---

[66] See the project's website, "Who Can Vote?," for more information, https://votingrights.news21.com/ (last visited September 5, 2019). I served as an (unpaid) consultant on the research design and conducted a seminar for the students on the research methodology I used for *The Myth of Voter Fraud*. Their work replicates my approach and produces similar results with respect to a documented low incidence of voter fraud in contemporary U.S. elections.

[67] This is the case of former Twiggs County Sheriff Doyle Stone and his son Greg Stone, and their mishandling of four absentee ballots in Greg Stone's 2008 primary election for sheriff. Greg Stone lost the election by a wide margin, and he and his father eventually agreed to pay civil fines in a consent order with the SEB.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

or voting process, I found the same pattern of irregularity noted some years ago by Secretary Cox, of abuse of the absentee ballot process, and virtually no fraud committed by voters.

## IV.    CONCLUSION

Voters can only influence the part of the electoral process to which they have access, namely registering themselves to vote and casting their own votes.  In my review of the available evidence of the last two decades or so, I found virtually no evidence that would suggest voters are systematically intentionally corrupting the electoral process, either nationally or in Georgia.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Executed on:  November 24, 2019

Lorraine C. Minnite

22

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

## Appendix

## LORRAINE CAROL MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526

# EDUCATION

**The Graduate School and University Center of the City University of New York**
**Ph.D.** in Political Science, 2000
*Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
*Honors:* Distinction

**M.Phil.** in Political Science, 1994
*Major field:* American Politics
*Minor field:* Public Policy

**M.A.** in Political Science, 1992
*Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
**B.A.** in History, 1983
*Area of Concentration:* American Civilization

# ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development, and undergraduate courses in urban studies and voting rights.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

1

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**
*Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.*
Worked on various research projects for Prof. Marilyn Gittell.

## OTHER EMPLOYMENT

**Research Director**
*Project Vote, 2010 to 2011.*
Developed a research program and conducted research for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

**Issues Director**
*The Committee for David N. Dinkins, II, New York City, 1991 to 1993.*
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

**Campaign Manager**
*McCabe for City Council, Brooklyn, New York, 1991.*
Organized and administered a successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

**Union Organizer**
*District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.*
Participated in the planning and implementation of a union organizing campaign; served as editor of a union local's newsletter; assisted negotiating committee in contract negotiations.

## ACADEMIC AND PROFESSIONAL HONORS

Distinguished Alumni Award, Department of Political Science, CUNY Graduate School, 2014
Jay Sigler Award for Teaching Excellence, Rutgers-Camden Public Administration Student Association, 2013
Affiliated Faculty, Center for Community Leadership, Rutgers-Camden, 2013 to present
Affiliated Faculty, Center for Urban Research and Education, Rutgers-Camden, 2012 to present
Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Selected a "Top Wonk" in Democracy and Elections, The Agenda Project, 2012
2011 *Choice* Magazine "Outstanding Academic Title" for *The Myth of Voter Fraud*
Carnegie Corporation of New York Special Opportunities Fund Award ($50,000), 2007
Senior Fellow, Dēmos – A Network for Ideas and Action, 2006 to 2014
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award ($1,500), Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship ($10,000), 1996-1997

## PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
Association for Public Policy Analysis and Management
Scholars Strategy Network
Social Science History Association
Southern Political Science Association

2

Urban Affairs Association

## TEACHING ACTIVITIES

**Doctoral Supervision: Chair**

*Rutgers-Camden*
Lew Bivona, *in-progress*
Jackie Bradley-McFarlane, *in progress*
Shaina Gaines, *in-progress*
Peggy Jean Craig McCaffery, *in-progress*
Dan Tarng, *in-progress*
Rasheda Weaver, *completed 5/17*
Curtis Williams, *in-progress*
Zachary Wood, *completed 5/18*

**Doctoral Supervision: Committee Member**

*Rutgers-Camden*
Spencer Clayton, *completed 5/18*
Ashley Nickels, *completed 5/16*
Wendy Osefo, *completed 7/16*
Jason Rivera, *completed 7/15*

**External Examiner (Ph.D.)**

*Fielding Graduate School*
Gregory Williams, *completed 10/18*

**Courses Taught**

*Rutgers University-Camden (Graduate)*
Alternative Development Strategies for Distressed Cities (Ph.D.)
Civic Engagement, Nonprofits and Community Development (Ph.D.)
Foundations of Policy Analysis (MPA and Executive MPA)
Politics of Community Development (Ph.D.)
Practicum in Community Development (Ph.D.)
Research Workshop (MPA)
Theory and History of Community Development (Ph.D.)
Urbanism and Sustainable Development in Cuba (Undergraduate and Graduate-level Study Trip)

*Rutgers University-Camden (Undergraduate)*
Honors College Seminar: The Right to Vote
Poverty and the Urban Environment

*Barnard College, Columbia University (Undergraduate)*
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

*New York University (Undergraduate)*
The Crisis of the Modern American City

**Graduate Committee Examiner**

Rutgers University, Ph.D. Program in Public Affairs/Community Development, Dissertation Committees (see above)

3

Fielding Graduate University, Program in Human and Organizational Development, External Examiner, 12/18.
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.
CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

# PEER-REVIEWED PUBLICATIONS

### Books

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

### Journal Articles

"New Challenges in the Study of Right-wing Propaganda: Priming the Populist Backlash to 'Hope and Change,'" *New Political Science* 34:4 (2012), 506-526.

"Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

"Models, Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

### Chapters in Edited Volumes

"Voter Suppression," in Levon Chorbajian and Daniel Egan, eds., *Power and Inequality: Critical Readings for a New Era*, New York: Routledge, *forthcoming*; co-authored with Frances Fox Piven.

"Competing Concepts of Social Class: Implications and Applications for Community Development," in Mae Shaw and Marjorie Mayo, eds., *Class, Inequality and Community Development*, Bristol, UK: Policy Press at the University of Bristol, 2016; co-authored with Frances Fox Piven.

"The Voter Fraud Myth," in Benjamin E. Griffith, ed., *America Votes! Challenges to Election Law and Voting Rights*, Chicago: American Bar Association, 2016.

"Making Policy in the Streets," in James DeFilippis, ed., *Urban Policy in the Time of Obama*, Minneapolis: University of Minnesota Press, 2016; co-authored with Frances Fox Piven.

"Poor People's Politics," in David Brady and Linda Burton, eds., *Oxford Handbook of the Social Science of Poverty*, New York: Oxford University Press, 2016; co-authored with Frances Fox Piven.

"Crisis, Convulsion and the Welfare State," in Kevin Farnsworth and Zoë Irving, eds. *Social Policy in an Age of Austerity*, Policy Press, 2015; co-authored with Frances Fox Piven.

"Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd Ed., New York: Routledge, 2012.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between White and Black: Asian and Latino Political Participation in the 2000 Presidential Election in New York City," in William E. Nelson, Jr. and Jessica Lavariega Monforti, eds., *Black and Latino/a Politics: Issues in Political Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.

## OTHER PUBLICATIONS

*Chapter in Conference Proceedings*

"The Political Participation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 2000 Annual National Legal Conference on Immigration and Refugee Policy*, Vol. XXIII. New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

*Encyclopedia Entries*

"Voter Participation," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008, online version, 2013; co-authored with Frances Fox Piven.

"The Underclass," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Paul J. Jargowsky.

"Welfare," in *The International Encyclopedia of Social and Behavioral Sciences*, 2nd Ed., Waltham, Mass.: Elsevier, 2016; co-authored with Joan Maya Mazelis.

"The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

*Book Reviews*

*Waiting for the Cemetery Vote*, by Tom Glaze, *American Review of Politics*, (Spring/Summer 2012).

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can A Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

*Research Reports, Memoranda and Briefs*

5

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*The Misleading Myth of Voter Fraud in American Elections*, Key Findings Brief, Scholars Strategy Network, February 2014.

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network (NYLARNet) at The University of Albany, Fall 2011.

*Research Memo: First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election*, Project Vote, Washington, D.C., November 2010.

*Research Memo: Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters*, Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security*, Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud*, Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud*, Dēmos -- A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

### *Journalism*

My expertise on elections and voter fraud was sought and widely cited and I was quoted in print and broadcast media in every federal election since 2008, including, for example, in the following: *The New Yorker Magazine*, *The New Yorker Radio Hour*, *The New Republic*, *Mother Jones*, *The Wall Street Journal*, *In These Times*, *American Prospect*, *Washington Monthly*, *Monthly Review*, *New Left Review*, *The New York Times*, *The Washington Post*, *The Christian Science Monitor*, *Associated Press*, McClatchy, Al Jazeera English (*Fault Lines*, Washington, D.C.), WZBC (*News*, Boston), WBAI (*Democracy Now!*, New York), WNYC (*The Brian Lehrer Show*, New York), WHYY (*Radio Times*, Philadelphia), NPR (*Morning Edition*, Washington, D.C.), CBS News, ABC News Radio, Salon.com, Talking Points Memo, Alternet, The Huffington Post, Slate Magazine, and CQ Researcher, among many others.

"Why the Democrats and Movements Need Each Other," *In These Times* (cover story), October 17, 2017; co-authored with Frances Fox Piven.

"The Power of Disruption: An Interview with Frances Fox Piven," *Global Dialogue: Newsletter for the International Sociological Association* 5(4): December 2015.

"The Myth of Voter Fraud," BillMoyers.com, March 9, 2015.

"Movements Need Politicians – And Vice Versa," *The Nation*, October 22, 2012; co-authored with Frances Fox Piven.

"The Other Campaign: Who Gets To Vote," *New Labor Forum*, May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times*, April 22, 2010; co-authored with Frances Fox Piven.

"Re-Drawing the Map of U.S. Politics," *Red Pepper*, April, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer*, Charlotte, North Carolina, July 18, 2007.

"They Are Arriving: Immigrants Are Gaining Power in New York's Voting Booths," *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

### *Works in Progress*

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"*Demosprudence* and Grassroots Struggles to Protect and Expand the Right to Vote"

"Does Concentration Worsen Poverty? The Case of Philadelphia"

"Human Error in Election Administration"

"Felony Disfranchisement and the New Three-Fifths Rule"

"The Voting Rights of the Poor"

### *Conference Participation, Papers and Invited Presentations*

Discussant, "Local Election Officials and Election Management," Conference Within a Conference, 91st Annual Meeting of the Southern Political Science Association, San Juan, Puerto Rico, January 9-11, 2020.

"Human Error in Election Administration," paper presented at the 89th Annual Meeting of the Southern Political Science Association, New Orleans, January 4-6, 2018.

Invited Panelist, "Impasses: Beyond Social Democracy," Transcending Pessimism, Reimagining Democracy: A Conference in Honor of Leo Panitch, York University, Toronto, October 6-7, 2017.

Invited Lecture, "The Politics of Voting: Who Shall Be the Electors?" Saul O. Sidore Lecture Series, Centers on Race, Class and Gender in a Divided America, University of New Hampshire-Manchester, Manchester, New Hampshire, March 21, 2017.

"Deadwood and Disenfranchisement: Maintaining Election Lists in the United States," paper presented at the 87th Annual Meeting of the Southern Political Science Association, New Orleans, January 12-14, 2017; co-authored with Margaret Groarke.

Invited Speaker, "Defending Democracy: How Political Scientists Are Engaging in the Fight Over Voting Rights (And Why You and Your Dept. Should Too)," roundtable presented by the Scholars Strategy Network at the 112th Annual Meeting of the American Political Science Association, Philadelphia, September 1-4, 2016.

Invited Panelist, "Beyond Neoliberalism: Social Justice after the Welfare State," Symposium Sponsored by the Center for the Study of Social Difference, Women Creating Change, the Heyman Center for the Humanities, and the History Department at Columbia University, New York City, April 2, 2016.

Invited Panelist, "Voting Rights at 50," 22nd Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 7, 2015.

Panel Organizer and Chair, "Electoral Rules, Voting and Turnout: New Pathways for Research," panel at the 111th Annual Meeting of the American Political Science Association, San Francisco, September 3-6, 2015.

"Community and Class in a Neoliberal Age," paper presented at the 110th Annual Meeting of the American Sociological Association, Chicago, August 22-25, 2015; co-authored with Frances Fox Piven.

"Black Urban Liberalism: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2010," paper presented at the 45th Annual Meeting of the Urban Affairs Association, Miami, April 8-11, 2015.

Invited Speaker, "Does Concentration Worsen Poverty? The Philadelphia Case," Center for Urban Research and Education, Rutgers University, Camden, December 12, 2014.

Invited Speaker, "The State of Voting Rights," sponsored by the Atlanta Chapter of the Scholars Strategy Network, Atlanta, December 2, 2014.

"The Poverty of Politics in a Northern City: A Case Study of Democratic Inclusion and Economic Exclusion in Philadelphia, 1970-2000," paper presented at the 39th Annual Meeting of the Social Science History Association, Toronto, November 6-9, 2014.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"Crisis, Convulsion and the Welfare State," roundtable presentation at the 109th Annual Meeting of the American Sociological Association, San Francisco, August 16-19, 2014; co-authored with Frances Fox Piven.

"Making Policy in the Streets," paper presented at the 44th Annual Meeting of the Urban Affairs Association, San Antonio, March 20, 2014; co-authored with Frances Fox Piven.

Invited Panelist, "Voter Suppression, Equal Rights, and the Promise of Democracy," sponsored by the Scholars Strategy Network, the Center for American Political Studies, and the Malcolm Wiener Center for Social Policy, Harvard University, March 6, 2014.

"Crisis, Convulsion and the Welfare State," paper presented at the 11th Annual Meeting of the European Sociological Association, Torino, Italy, August 28-31, 2013; co-authored with Frances Fox Piven.

Invited Panelist, "Anatomy of A Public Interest Lawsuit: Voter ID Legislation – A Public Interest Legal Challenge," sponsored by Penn Law Clinical Programs, Lawyering in the Public Interest, Toll Public Interest Center, American Constitution Society and the Civil Rights Law Project, University of Pennsylvania Law School, Philadelphia, Pennsylvania, November 5, 2012.

Invited Panelist, "Disenfranchise This: The Cost of Voter Suppression," 19th Annual First Monday Celebration, Eric R. Neisser Public Interest Program, Rutgers School of Law, Newark, New Jersey, October 3, 2012.

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium, Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, Virginia, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the 69th Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," 82nd Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the 67th Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience – Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the 8th Annual State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31-September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1-4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1-4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 -- September 2, 2001; co-authored with John H. Mollenkopf.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," paper presented at the 96th Annual Meeting of the American Political Science Association, Washington, D.C., August 31-September 3, 2000; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference*, sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City*, seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on *Integration of Immigrants and Their Descendents*, Center for Migration Studies 20th Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab Americans in New York City*, symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"The Political Incorporation of Immigrants in New York," paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999; co-authored with Jennifer Holdaway and Ronald Hayduk.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999; co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election:  A Comparison of Ecological Regression Techniques and Exit Poll Data," paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998; co-authored with David K. Park and Daniel M. Slotwiner.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

### *Research Reports*

*How to Think About Voter Participation*, White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud*, White Paper, Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative*, Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey*, with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers*, Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

### Expert Participation in Federal and State Voting Rights Cases

Expert Witness, *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough, SS, Southern District, 2018.

Expert Witness, *Fish v. Kobach*, U.S. District Court for the District of Kansas, 2016-2018.

Expert Witness, *One Wisconsin Institute v. Nichols et al.*, U.S. District Court for the Western District of Wisconsin, 2016.

Expert Witness, *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District of Virginia, 2016.

Expert Witness, *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, 2015.

Expert Witness, *North Carolina State Conference of the NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina, 2014-2016.

Expert Witness, *Veasey v. Perry*, U.S. District Court for the Southern District of Texas, 2014-2015.

Expert Witness, *Frank v. Walker/LULAC (formerly Jones) et al. v. Deininger*, U.S. District Court for the Eastern District of Wisconsin, 2012-2013.

Expert Witness, *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania, 2012-2013.

Expert Report, *Rutgers University Student Assembly et al. v. Middlesex County Board of Elections*, Superior Court of New Jersey/Middlesex County, 2011.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

### Amicus Filings and Congressional and Other Testimony

U.S. Commission on Civil Rights Briefing, "An Assessment of Minority Voting Rights Obstacles in the United States," Raleigh, North Carolina, February 2, 2018 (oral and written testimony).

*Shelby County, Alabama v. Holder*; U.S. Supreme Court, Brief of Historians and Social Scientists as *Amici Curiae* in Support of Respondents, February 1, 2013 (signatory).

*League of Women Voters v. Rokita*; Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November 2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (invited written testimony).

Expert Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation *in Support of Petitioners*, November 2007.

11

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.; U.S. Supreme Court,* Brief of *Amici Curiae* of Historians and Other Scholars *in Support of Petitioners*, November 2007 (signatory).

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.

## RESEARCH AND OTHER GRANTS

*Principle Investigator*, "Camden City Exit Poll," Rutgers Research Council Award, 2018-2019 ($2,000).

*Co-Recipient*, Rutgers University Centers for Global Advancement and International Affairs, 2016 ($10,000).

*Recipient*, Rutgers-Camden Learning Abroad Office, Course Development Grant, 2015 ($1,000).

*Principle Investigator*, "The Political Exclusion of the Urban Poor," Rutgers Research Council Award, 2013-2014 ($3,000).

*Recipient*, RU FAIR ADVANCE (NSF) Rutgers-Camden Travel Award, March/April 2013 ($1,590). Funded by the Rutgers University Office for the Promotion of Women in Science, Engineering, and Mathematics (SciWomen) Institutional Transformation grant from the ADVANCE program of the National Science Foundation.

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000). Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000). Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700). Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000). Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800). Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University. Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University. Funded by the Ford Foundation.

## SERVICE

### College and University

Invited Panelist, "Voting Law in the 2016 Election: Perspectives from Political Science, Public Policy and Public Law," Rutgers University, Camden, New Jersey, December 7, 2016.
Member, Steering Committee, Rutgers University-Camden International Conference on Sustainable Community Development and STEAM Fields: What We Can Learn from A Changing Cuba," October 31 – November 3, 2016.
Chair, Department of Public Policy and Administration, Rutgers-Camden, 2016 to present.
Member, Advisory Committee, Continuing Education Program in Historic Preservation, Rutgers-Camden, 2016 to present.
Member, Global Research and Education Committee, Rutgers-Camden, 2016-2017.
Member, Tenure and Third-Year Review Committees, Department of Political Science, Rutgers-Camden, 2015 to present.

12

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Committee, 2014-present.
Co-Organizer, "Symposia on Urban Poverty and Inequality," Rutgers University-Camden, February 4, February 19, April 2, and April 22, 2014.
Member, Rutgers-Camden Department of Public Policy & Administration Ph.D. Exam (Theory) Committee, 2013-present.
Member, General Education Committee, Subcommittee on Engaged Civic Learning, Rutgers-Camden, 2013-2014, 2015.
Marshal, Rutgers-Camden Commencement, 2013, 2014.
Member, Rutgers-Camden Department of Political Science Search Committee, 2013.
Member, Rutgers-Camden Department of Public Policy & Administration Search Committee, 2012, 2013.
Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011 to 2016.
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.
Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.
Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.
Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.
Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.
Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).
Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).
Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).
Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.
Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.
Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.
Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.
Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.
Member, Columbia University Seminar on the City, 2001 to 2011.
Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.
Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.
First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.
One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

### *Professional*

I have reviewed numerous journal articles for the *American Political Science Review, American Journal of Political Science, American Review of Politics, British Journal of Industrial Relations, Community Development Journal, Election Law Journal, Ethnic and Racial Studies, Journal of Electoral Studies, Journal of Ethnic and Migration Studies, Law and Society Review, New Political Science, Perspectives on Politics, Political Behavior, Political Communication, Political Research Quarterly, Political Science Quarterly, Public Opinion Quarterly, Urban Affairs Review,* and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., New York University Press, and The New Press.

Chair, Social Science History Association President's Book Award Selection Committee, 2018.
Co-Organizer, "Insurgency from Below and the Future of American Democracy: A Conference in Celebration of the Work of Frances Fox Piven and Richard A. Cloward," Graduate School and University Center of the City University of New York, New York City, October 11, 2017.
Member, Social Science History Association President's Book Award Selection Committee, 2017.
Invited Speaker, Voting Rights Institute Expert Witness Training Conference, sponsored by The Campaign Legal Center, the American Constitution Society and Harvard University Center for Governmental and International Studies, Cambridge, September 14, 2016.
Dissertation Fellowship Reviewer, Center for Engaged Scholarship, 2016-present.
Faculty Presenter, American Bar Association, "The Voter Fraud Myth, Voter ID, Immigration and Voting Rights, and State Legislative Reapportionment," February 18, 2016 (1.5 CLE credits).
Co-Chair, Scholars Strategy Network, New Jersey Chapter, 2015 to present.
Consulting Expert, U.S. Government Accountability Office, Issues Related to State Voter Identification Laws, May 2013.
Guest Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.
Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011, 2012-2013.
Executive Council Member, Urban Section, American Political Science Association, 2005-2006, 2008-2010.

Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.
Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.
Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.
Nominating Committee, Urban Section, American Political Science Association, 2006-2007.
Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association, 2005-6.
Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.
Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.
Grant Reviewer, Research Award Program, The City University of New York, 2003.
Member, New York Colloquium on American Political Development, 2001 to 2011.

*Community*

Invited Speaker, National Organization for Women, South Jersey 'Alice Paul' Chapter, Moorestown, New Jersey, February 14, 2018.
Invited Speaker, Annual Fall Meeting of the Mercer County Division of Elections, Clerks Workshop, October 3, 2017.
Invited Keynote Speaker, League of Women Voters of Burlington County, New Jersey, Annual Fall Conference, Moorestown Friends, Moorestown, New Jersey, September 18, 2017.
Poll Worker, Gloucester County Board of Elections, (Republican Party Representative), 2017 to present.
Faculty Adviser and Organizer, Graduate Student Conference on State and Local Economic Development Policy, The Neighborhood Center, Camden, New Jersey, April 17, 2016; March 28, 2017.
Invited Panelist, "Voting Fraud, Voter Suppression: Myths and Realities," League of Women Voters of Connecticut Education Fund Annual Fall Conference, Darien Library, Darien, Connecticut, October 24, 2015.
Member, Participatory Budgeting in New York City Research Board, Community Development Project of the Urban Justice Center, 2013-2015.
Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.
Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month Celebration, Atlantic City, New Jersey, February 15, 2012.
Organizer, "National Teach-in on Debt, Austerity and How People Are Fighting Back," Judson Memorial Church, New York City, April 11, 2011.
Host Committee, New York State Immigrant Action Fund, 2010.
Board Member, The Left Forum, 2009 to 2013.
Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.
Board Member, Project Vote, 2008-2009.
Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19, 2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17, 2005; New York City Central Labor Council, New York City, April 28, 2004.
Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25, 2004.
Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.

## PAID CONSULTANTSHIPS

*American Civil Liberties Union Voting Rights Project, 2016-2018*
Wrote expert reports and testified at trial for plaintiffs in *Fish v. Kobach*, U.S. District Court for the District of Kansas.

*Perkins Coie, LLP, 2015-2018.*
Wrote expert reports and testified at trial for plaintiffs in *Ohio Democratic Party v. Husted*, U.S. District Court for the Southern District of Ohio, Eastern Division; *Lee v. Virginia State Board of Elections*, U.S. District Court for the Eastern District in Virginia, Richmond Division; and *One Wisconsin v. Wisconsin Government Accountability Board* in the U.S. District of the Western District of Wisconsin; and wrote expert report for plaintiffs in *League of Women Voters of New Hampshire v. Gardner*, State of New Hampshire Superior Court, Hillsborough SS., Southern District.

*Kirkland & Ellis, LLP, 2014-2016.*
Wrote expert reports and testified at trial for plaintiffs in *North Carolina State Conference of NAACP v. McCrory*, U.S. District Court for the Middle District of North Carolina.

*Dechert, LLP, 2014*
Wrote expert report for plaintiffs and testified at trial in *Veasey v. Perry*, U.S. District Court for the Southern District of Texas.

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

*Arnold & Porter LLP, 2012-2013.*
Wrote expert reports for plaintiffs (2012, 2013) and testified (2012) at trial in *Applewhite v. Commonwealth of Pennsylvania*, Commonwealth Court of Pennsylvania.

*New York City Charter Revision Commission, 2010.*
Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

*New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.*
Analyzed survey and other data and wrote report on Latino political participation in New York City and New York State in the 2008 presidential election.

*New York Immigration Coalition, New York, New York, 2006.*
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

*Brennan Center for Justice at New York University School of Law, 2004-2005.*
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz*, Civil Action No. 3:04-CV-1624 (MRK), U.S. District Court for the District of Connecticut.

*Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.*
Consulted on survey design for a project on the efficacy of community-based organizations.

*Dēmos, New York, New York, 2001 to 2002.*
Researched and wrote a study of voter fraud in contemporary American politics.

*1199 Child Care Fund, New York, New York, 2000 to 2002.*
Prepared demographic data for Fund-eligible union members and their children.

(11/19)

15

EXPERT REPORT OF LORRAINE C. MINNITE, PH.D

# Attachment



February 1, 2006

Mr. Thurbert E. Baker
Attorney General of the State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334

Dear Attorney General Baker:

Pursuant to the state open records law, Ga. Code Ann. Secs. 50-18-70 to 50-18-77, I write to respectfully request access to and a copy of records related to cases of voter fraud investigated and prosecuted by the Georgia Attorney General's office since 2000. Specifically, I request copies of records of referrals of voter fraud cases from the Georgia Secretary of State or district attorneys' offices, and records of investigations of those cases of voter fraud so referred, including the locality where the alleged fraud took place, since 2000. I realize that open investigations may be privileged and may fall under one of the numerous legal exceptions to disclosure; where investigations are still open, therefore, I request segregable information regarding the alleged violation of Georgia election law. In other words, to respect confidentiality and discovery rules, I request only information regarding the nature and type of violation of all pending investigations of voter fraud, and the county and city in which the alleged fraud took place. In addition, I request copies of records of charges of violations of Georgia election law for voter fraud made by the Attorney General's office, and records of indictments obtained by the Attorney General since 2000. Finally, I request copies of records of settlements in voter fraud cases brought by the Attorney General since 2000, including plea bargains, guilty pleas, and cases in which charges were dropped.

If you choose to deny this request, please provide a written explanation for the denial including a reference to the specific statutory exemption(s) upon which you rely.

If possible, I would like to receive all requested information on electronic media (CDROM). If your agency does not maintain these public records, please let me know who does and include the proper custodian's name and address. I agree to pay any reasonable copying and postage fees up to $100. If the cost would be greater than this amount, please notify me, my phone number is 212-854-4385. Please provide a receipt indicating the charges for each document.

Thank you for your assistance.

Sincerely,

Lorraine C. Minnite
Assistant Professor



**Department of Law**
**State of Georgia**

THURBERT E. BAKER
ATTORNEY GENERAL

40 CAPITOL SQUARE SW
ATLANTA. GA 30334-1300
Writer's Direct Dial:
404-656-5614
Fax 404-657-9932

February 10, 2006

Dr. Lorraine C. Minnite
Assistant Professor
Department of Political Science
Barnard College
3009 Broadway
New York, NY 10027-6598

RE:  Open Records Request for Information Related to "Voter Fraud" Cases.

Dear Dr. Minnite:

This is to acknowledge receipt on February 7 of your letter of February 1, 2006.  You have requested pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq.*:

> [C]opies of records of referrals of voter fraud cases from the Georgia Secretary of state or district attorneys' offices, and records of investigations of those cases of voter fraud so referred, including the locality where the alleged fraud took place, since 2000. . . . In addition, I request copies of records of charges of violations of Georgia election law for voter fraud made by the Attorney General's office, and records of indictments obtained by the Attorney General since 2000.  Finally, I request copies of records of settlements in voter fraud cases brought by the Attorney General since 2000, including plea bargains, guilty pleas, and cases in which charges were dropped.

You have requested this information on electronic media and have offered to pay up to $100 for reasonable copying and postage fees.

Georgia has no election code offense for "voter fraud".  *See, e.g.,* O.C.G.A. § 21-2-560 *et seq.* (Election law offenses).  Matters could be referred to our office for any number of alleged statutory or rule violations.  As such, we cannot identify any such records which are within the custody of the Department of Law which are specifically responsive to your inquiry.

You may wish to review the Georgia laws relating to the process of enforcement of the Election Code.  The State Election Board is created by statute and has the power to enforce provisions of the Code.  O.C.G.A. § 21-2-30 *et seq.*  That entity is separate and distinct from the Office of the Secretary of State.  On occasion, the Board may refer matters to the Office of the Attorney General for the conduct of administrative hearings.  Since January 1, 2000, the Board has referred approximately 39 files for

Dr. Lorraine C. Minnite
February 10, 2006
Page 2

administrative hearings. The records of those proceedings are not categorized by us in relation to any
statute or offense. As noted above, there could be any number of reasons why a matter would be
administratively referred to our office.

The Office of the Attorney General is not authorized to pursue general criminal law violations in Georgia.
Criminal cases are usually presented and tried in local courts by the appropriate prosecuting officials.
The Office of the Attorney General does not routinely maintain records of those local criminal
prosecutions and is not charged with pursuing criminal cases in election related matters. Such records
would be maintained by the individual local jurisdictions. Therefore the Department has no records
responsive to your request for documents in relation to criminal prosecutions.

Were the Department in possession of any identifiable records responsive to your inquiry, as you noted,
matters involved in pending investigations would be exempt from disclosure under O.C.G.A. § 50-18-
72(a)(4). Additionally any specific records that were exempt from disclosure under O.C.G.A. § 50-18-72
would not be released, including documents that are covered either by the attorney-client privilege or
those which represent attorney work product. Specific exemptions could be determined only upon
identifying and inspecting the individual records.

Under Georgia law, the Open Records Act provides that covered records be made available for public
inspection. O.C.G.A. § 50-18-70(b). The custodian of records is not required to create documents that
are not otherwise in existence when the request is made. O.C.G.A. § 50-18-70(d). The Office of the
Attorney General does not maintain its case files in electronic format. The files are all usually hard copy
papers.

The first quarter hour time spent in responding to any open records request is done at no charge.
O.C.G.A. § 50-18-71(d). The response to this letter provides that first quarter hour response time. If the
Department were to provide copies of documents in the future, there will be a charge of 25 cents per page
for paper copies of documents. Additionally, there will be assessed a reasonable charge for the search,
retrieval and other direct administrative costs involved in complying with your request. O.C.G.A. § 50-
18-71(d). You will be charged an hourly rate not to exceed the salary of the lowest paid full-time
employee who, in the discretion of the Office, has the necessary skill and training to perform the request.
*Id.*

I hope this has been responsive to your inquiry.

Sincerely,

DENNIS R. DUNN
Deputy Attorney General

DRD/me

U.S. Postal Service
CERTIFIED MAIL・RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

ATLANTA GA 30334

| Postage | $ | $0.39 | 0266 |
| Certified Fee | | $2.40 | 05 |
| Return Receipt Fee (Endorsement Required) | | $1.85 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $4.64 | 09/30/2006 |

Sent To   Cox
Street, Apt. No.; or PO Box No.
City, State, 4   GA

PS Form 3800, June 2002                See Reverse for Instructions

7004 2890 0004 1366 7603

October 1, 2006

Hon. Cathy Cox
Secretary of State
State capitol, Room 214
Atlanta, Georgia 30334

Dear Secretary of State Cox:

I write to ask for your assistance. I am a political scientist conducting non-partisan research on the U.S. electoral system's vulnerabilities to fraud in the voting process.

I am compiling statistics on voter registration fraud, illegal voting, and absentee ballot fraud. State laws governing "voter fraud" vary widely, although all states criminalize the provision of false information to register or vote, double or multiple voting, the mishandling of absentee ballots, and various forms of vote buying. Given the variation and the local nature of election administration, there are no existing standard measures of voter fraud and no official statistics. The Public Integrity Section of the U.S. Department of Justice is charged with investigating and aiding in the prosecution of voter fraud when it involves elections for federal office, but they do not produce data that can be independently analyzed.

Pursuant to the state open records law, Ga. Code Ann. Secs. 50-18-70 to 50-18-77, I write to respectfully request a copy of records related to cases or complaints of voter fraud, defined as a violation of Ga. Code Ann. Secs. 21-2-560, 21-2-561, 21-2-562, 21-2-570, 21-2-571, 21-2-572, 21-2-573, or 21-2-603 (2005). Specifically, I request copies of any and all records of referrals of voter fraud cases to U.S. Attorneys, the Georgia Attorney General or local prosecutors since 2000 (or as far back to 2000 as possible). The Congress passed major election reform legislation, the Help America Vote Act, in 2002, and allocated over $4 billion for the upgrading of the nation's electoral machinery to enhance the integrity of the voting process. Given these kinds of investments there is an important public interest in knowing whether voter fraud is corrupting elections. Your cooperation in this project is critical to the public interest.

If your agency does not maintain these public records, please let me know who does and include the proper custodian's name and address. I agree to pay any reasonable copying and postage fees up to $100. If the cost would be greater than this amount, please notify me, my phone number is 212-854-4385, and please provide a receipt indicating the charges for each document.

Thank you for your assistance.

Sincerely,

Lorraine C. Minnite
Assistant Professor
lcm25@columbia.edu

Open records request

**Subject:** Open records request
**From:** "Tatum, Clifford" <ctatum@sos.state.ga.us>
**Date:** Thu, 12 Oct 2006 17:42:37 -0400
**To:** <lcm25@columbia.edu>

Dear Professor Minnite,

At your convenience please contact me at the telephone number below regarding your open records request to the Georgia Secretary of State.  I would like to clarify what you are looking for, discuss the volume of records that may exist, and determine what to provide for inspection.

Sincerely,

Clifford


Clifford D. Tatum
Assistant Director of Legal Affairs
State Elections Division
2 MLK Jr. Drive, Suite 1104 West Tower
Atlanta, Georgia 30334
404-657-5352

Notes from conversation with Clifford D. Tatum, Assistant Director of
Legal Affairs, State Elections Division, Georgia (404-657-5352);
October 16, 2006

Upon receipt of my open records request of October 1, 2006, Mr. Tatum
emailed me asking me to call him to discuss the request.  I reached him
today.  He wanted to clarify my request because he thought the fees
would run into the hundred of dollars.  He noted that "voter fraud" had
a broad meaning and he wanted to be sure I was interested in absentee
ballot fraud because he said that was the main type voter fraud dealt
with by his office.  He asked me if I was interested in cases where
there was a technical violation of law, such as the mishandling of an
absentee ballot by an unauthorized person, even if there was no intent
to commit fraud.  I told him that I did want to know about such cases.
I asked him about double voting and other irregularities at the polling
place and he said that they just didn't see that kind of fraud.  As for
double voting, he could recall only two cases in the last couple of
years where people 'double voted,' and both of them involved cases
where people filed an absentee ballot and then showed up in person to
vote.  In the first case, it turned out that the person was taking
medication and did not remember filing an absentee ballot.  This person
then tried to vote in person after he had stopped taking the
medication.  The second case involved the same form of double voting
(first filing an absentee ballot and then casting a ballot at the
polling place on election day).  In this case, Mr. Tatum said that he
felt the person was trying to "test the system."  His case was referred
for prosecution because the SOS's office believed they had found
someone trying to commit fraud, but in the end, the case was not
prosecuted.  I agreed to revise my request for case summaries of
alleged incidents of absentee ballot irregularities and polling place
irregularities and to narrow the time period covered by the request to
2004 and 2005 (letter mailed today).

Mr. Tatum further explained the process for dealing with allegations of
voter fraud: when an allegation is made to the SOS's office, they do an
initial investigation and write it up for referral to the State
Elections Board (this document is usually about ten pages long).  The
State Elections Board takes the next step and decides what to do,
whether, for example, to refer the matter to a local district attorney
for investigation and prosecution, or to send it to an administrative
law judge, or they may deal with the matter themselves (issuing a
warning or admonition but not seeking prosecution).  The SOS's office
tracks cases because once they are dealt with by other authorities,
they return to the SOS's office which then closes them.  The case files
typically run 15-20 pages but can be longer because they may include
documentation.  The case summaries are usually shorter, two to five
pages long, but they include the pertinent information regarding the
nature of the allegation and whether the SOS's office found a violation
of law.

I agreed to write a new letter revising my request and forwarding $100
so that the office could get started in pulling the records together.
The total fee (with associated labor costs) should be about $300, based
on Mr. Tatum's guess that they would have about 20 cases for each year,
running about ten pages long (photocopies cost $.25 per page), plus
about eight hours of work at $20 per hour (the rate charged is the rate
of the lowest paid professional staff person in the office).

October 16, 2006

Mr. Clifford D. Tatum
Assistant Director of Legal Affairs
State Elections Division
2 MLK Jr. Drive, Suite 1104 West Tower
Atlanta, Georgia 30334

Dear Mr. Tatum:

Thank you for speaking with me today regarding my open records request of October 1, 2006. Pursuant to our conversation, I am revising that request to narrow it to records related to cases of absentee ballot irregularities and polling place irregularities referred to and investigated by your office for 2004 and 2005. As we discussed, I request copies of the case summaries your office prepares for each such case file.

I am enclosing a check for $100 so that your staff can begin the research and photocopying involved in preparing these records. It is my understanding that you will bill me for any fees and labor costs exceeding this initial payment.

Thank you for your assistance in this matter.

Sincerely,


Lorraine C. Minnite
Assistant Professor
lcm25@columbia.edu

Mr. Clifford D. Tatum
Interim Director
Secretary of State, Elections Division
Suite 1104, West Tower
2 Martin Luther King, Jr. Drive, S.E.
Atlanta, Georgia 30334-1505

Dear Mr. Tatum:

Thank you for your assistance with my open records request.  As per your directions, I enclose payment of $100 for photocopying and labor fees associated with this request, and a copy of your letter, dated December 4, 2006.

Once I review the documents you have provided I will contact you with any further questions should they arise.  I appreciate your time and cooperation in assisting me with my research.

Sincerely yours,

Lori Minnite
Assistant Professor



**Secretary of State**
Elections Division
Suite 1104, West Tower
2 Martin Luther King, Jr. Drive, S.E.
Atlanta, Georgia 30334-1505
www.sos.state.ga.us

**Cathy Cox**
SECRETARY OF STATE

CLIFFORD D. TATUM
INTERIM DIRECTOR
(404) 656-2871
FAX (404) 651-9531
ctatum@sos.state.ga.us

December 4, 2006

Lorraine C. Minnite
Assistant Professor
Department of Political Science
Barnard College
3009 Broadway
New York, NY 10027-6598

Dear Prof. Minnite:

Our office has received your open records request for absentee voting cases investigated by our office from 2004 to 2005. Pursuant to O.C.G.A. § 50-18-70, this letter serves as a response to that request. We are, of course, willing to make available to you for personal inspection all appropriate documents in so far as they exist.

As you know, the Georgia Open Records Act provides that reasonable charges may be assessed "for search, retrieval, and other administrative costs associated for complying with you request including 25¢ per page for copying (O.C.G.A. § 50-18-71). The cost of copying the enclosed 88 pages is $22. The cost associated to the appropriate staff to review the requested documents and prepare for your inspection comes to $78. The total fee due for your request is $100.

The documents associated with your request are enclosed. Please make your check payable to the Secretary of State, and include a copy of this letter with your check for our records. If I may be of any further assistance, please call 404-656-2871.

Sincerely,

Clifford D. Tatum
Interim Director

Encl
CT:rlm

| Case # | County/City | Complaint/Violation | # of Ballots | Respondents | Resolution | Comments |
|---|---|---|---|---|---|---|
| 2004-000021 | Oglethorpe/Macon | election official | undetermined | 3 respondents | referred for Admin. Hearing | |
| 2004-000022 | Homerville/Clinch | unlawful possession of absentee ballots | 3 | 3 respondents | case closed | |
| 2004-000029 | Warren County | voter registration | 2 | 2 respondents | referred to OSAH | |
| 2004-000046 | Pearson/Atkinson | absentee ballots, voter registration | 7 | 1 respondent | Referred to ALJ | |
| 2004-000048 | Crawford County | unlawful possession & mishandling of absentee ballots | 50 | 2 respondents | Referred to OSAH for hearing | |
| 2004-000050 | Treutlen County | absentee ballots | 3 | 3, then 2 | Referred to OSAH for hearing | |
| 2004-000052 | Montgomery County | absentee ballot concerns | 1 | 1 respondent | referred for Admin. Hearing | |
| 2004-000070 | | campaign literature | undetermined | 1 respondent | referred for Admin. Hearing | |
| 2004-000083 | Brantley County | absentee ballots | | | | TRACKING |
| 2005-000034 | Clayton/Rabun | unauthorized assistance at poll | undetermined | 3 respondents | referred to AG for admin. Hearing | |
| 2005-000054 | Milledgeville/Baldwin | absentee ballots | undetermined | 2 respondents | referred to AG for admin. Hearing | |
| 2005-000055 | Americus/Sumter | absentee ballots | undetermined | 1 respondent | bound over for Admin hearing | |
| 2005-000056 | Sumter County | irregularities by election official | undetermined | 1 respondent | case closed | |
| 2005-000057 | Auburn/Barrow | unlawful possession & mishandling of absentee ballots | 2 | 1 respondent | referred to AG for admin. Hearing | |
| 2005-000061 | Lumber City/Telfair | absentee ballots | | | case pending | Still under investigation; no summary. Will be closed soon. |
| 2005-000062 | Ft. Oglethorpe/Catoosa | absentee ballot concerns | undetermined | 1 respondent | bound over for Admin hearing | |

| 2005-000063 | Moultrie/Colquitt | absentee ballot and application mishandling | undetermined | 1 respondent | referred to AG to negotiate cease and desist order | |
| 2005-000065 | Chickamauga/Walker | miscounting absentee ballots | 57 | 2 respondents | bound over for Admin hearing | |
| 2005-000067 | Commerce/Jackson | absentee ballot and application mishandling | 6 | 1 respondent | | |
| 2005-000069 | Pavo/Brooks | irregularities by election official | undetermined | 1 respondent | referred to AG to negotiate consent order | |

# DEFENDANTS' EX. 16



**United States Government Accountability Office**

Report to Congressional Requesters

September 2014

# ELECTIONS

# Issues Related to State Voter Identification Laws

This report was revised on February 27, 2015, to clarify information about one source of data on voter records on pages 83 and 161. This clarification had no impact on the conclusions of our report.



EXHIBIT

16

12-13-19 RR

PENGAD 800-631-6989

Notes: Entries in parentheses are 95 percent margins of error (e.g., +/- 0.047 percentage points). This table analyzes data from jurisdictions that provided data in response to the EAVS in both 2008 and 2012. The full EAVS data sets for 2008 and 2012 include jurisdictions that did not report data in 1 or both years. Those jurisdictions that did not provide data in both years have been excluded from the analysis.

[a]"Pooled" rates of provisional ballot use reflect the grouped states' combined total provisional ballots divided by the grouped states' combined total ballots cast. Because of the quasi-experimental design of our study, we assume that the comparison states are interchangeable and thus can be pooled together to create an additional group for analysis. The larger size of this pooled group reduces the statistical uncertainty of our estimates.

In addition, we analyzed the EAVS data to determine how provisional ballot rates changed over time in our treatment and comparison states using data reported by all jurisdictions in those states (e.g., to include all jurisdictions responding to the EAVS in either 2008 or 2012). We conducted this additional analysis to determine if missing data affected the results of our analysis in which we excluded jurisdictions that did not report data for both the 2008 and 2012 EAVS. In our second analysis, we obtained results similar to those in our first analysis, indicating that our exclusion of jurisdictions with missing data did not affect our conclusion that provisional ballot usage increased in Kansas and Tennessee from the 2008 to the 2012 general election relative to comparison states. Appendix VII provides more detailed information on the results of this additional analysis.

## Challenges Exist in Using Available Information to Estimate the Incidence of In-Person Voter Fraud

A variety of factors affect efforts to estimate the incidence of in-person voter fraud, making it difficult to produce complete estimates.[90] For the purposes of this report, incidence is defined as the number of separate times a crime is committed for a specific time period. Estimating the incidence of crime generally involves using information on the number of crimes known to law enforcement authorities—such as crime data submitted to a central repository within states based on uniform offense definitions—to generate a reliable set of crime statistics. However, even when crime data are centrally collected, the true incidence of crime can be difficult to determine due to the potential for crimes not to be

---

[90]For the purposes of this report, we have defined "in-person voter fraud" as involving a person who (1) attempts to vote or votes; (2) in person at the polling place; and (3) asserts an identity that is not the person's own, whether it be that of a fictional registered voter, dead registered voter, a false identity, or whether the voter uses a fraudulent identification. In-person voter fraud is also often referred to as "voter impersonation fraud."

reported.[91] We have reported that crimes of fraud, in particular, are difficult to detect, as those involved are engaged in intentional deception.[92] For example, in the areas of Medicare fraud and Internal Revenue Service refund fraud involving identity theft, we have reported that reliable estimates of the extent of such fraud are not known.[93] In addition, with regard to identity fraud, in March 2002 we reported that no single hotline or database captured the universe of identity theft victims and that it was difficult to fully or accurately measure the prevalence of identity theft.[94] Although not necessarily the same as other types of fraud, the incidence of in-person voter fraud can be difficult to estimate. We reviewed studies conducted by academic researchers and others on efforts to identify instances of in-person voter fraud. We also reviewed information from federal and state agencies on election fraud. Based on our review of these information sources, we found that various challenges and limitations in information available for estimating the incidence of in-person voter fraud make it difficult to determine a complete estimate of

[91]Like other crimes, instances of in-person voter fraud may occur that are never identified by or reported to officials. This is due, in part, to challenges associated with identifying this type of fraud, as both successful fraud and deterred fraud may go undetected. In addition, it has been suggested that without a personal identification requirement it is difficult to detect in-person voter fraud. *See, e.g., Crawford v. Marion Cnty. Election. Bd.*, 472 F.3d 949, 953 (7th Cir. 2007); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 740 N.W.2d 444, 457-58 (Mich. 2007). However, others have suggested that in-person voter fraud in particular may be more easily detectible. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 227 (2008) (Souter, J., dissenting) (stating that "there is reason to think that impersonation of voters is the most likely type of fraud to be discovered") (internal citations omitted).

[92]GAO, *Medicare: Progress Made to Deter Fraud, but More Could Be Done*, GAO-12-801T (Washington, D.C.: June 8, 2012).

[93]GAO-12-801T and GAO, *Identity Theft: Total Extent of Refund Fraud Using Stolen Identities is Unknown*, GAO-13-132T (Washington, D.C.: Nov. 29, 2012).

[94]GAO, *Identity Theft: Prevalence and Cost Appear to be Growing*, GAO-02-363 (Washington, D.C.: Mar. 1, 2002).

such fraud.[95] For example, based on our own review of federal and state information sources, we identified challenges such as there is no single source of information on possible instances of in-person voter fraud and variation exists among federal and state sources in the extent to which they collect information on election fraud.

The studies we reviewed identified few instances of in-person voter fraud, and while they provide information on efforts to estimate in-person voter fraud, limitations in the populations studied and sources used make it difficult to use these studies to determine a complete estimate of the incidence of in-person voter fraud. In particular, we reviewed five research studies,[96] five studies by state agencies, and information provided by DOJ. The five studies by researchers we reviewed as part of our literature review used various methods and sources of information to identify instances of in-person voter fraud. Table 7 describes the approaches used in each study and the limitations we or the studies' authors identified.

---

[95]We conducted a literature review to identify studies that attempted to identify instances of in-person voter fraud among the populations studied and sources used. We reviewed more than 300 studies and determined that five attempted to collect data on in-person voter fraud using a systematic methodology. The remaining studies either did not provide sufficient information about the methodology used for us to evaluate it, or relied on anecdotal examples of fraud as their basis for analysis. One study we reviewed but did not include among the five profiled here attempted to determine the extent to which reports submitted to the Supreme Court in defendants' and amicus briefs in *Crawford v. Marion County Election Board,* 553 U.S. 181, contained supporting evidence for allegations of in-person voter fraud but the description of the study's methodology did not provide sufficient information for us to evaluate the methods used. (Justin Levitt, "Election Deform: The Pursuit of Unwarranted Electoral Regulation," *Election Law Journal,* vol. 11 (1), 2012). For additional detail regarding our methodology, see app. II.

[96]The five studies include John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012 U.S. General Election: Evidence from a Survey List Experiment," October 30, 2013, forthcoming. *Election Law Journal;* Ray Christensen and Thomas J. Schultz, "Identifying Election Fraud Using Orphan and Low Propensity Voters," *American Politics Research,* vol. 42 (2), 2014; M.V. Hood III and William Gillespie, "They Just Do Not Vote Like They Used To: A Methodology to Empirically Assess Election Fraud," *Social Science Quarterly,* vol. 93 (1), 2012; Lorraine C. Minnite, *The Myth of Voter Fraud.* Ithaca: Cornell University Press, 2010; and Corbin Carson, "Exhaustive Database of Voter Fraud Cases Turns Up Scant Evidence That It Happens," News21, Aug. 12, 2012, http://votingrights.news21.com/article/election-fraud-explainer/, accessed July 24, 2014.

# DEFENDANTS' EX. 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

BETTYE JONES, et al.,

                Plaintiffs,

    v.

JUDGE DAVID G. DEININGER, et al, (all
sued in their official capacity),

                Defendants.

Case No. 2:12-cv-00185-LA

EXHIBIT
17
12-13-19 RC
PENGAD 800-631-6989

## EXPERT DISCLOSURE FOR
## LORRAINE C. MINNITE

Lorraine C. Minnite submits this expert disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2);

    1.      The Declaration of Lorraine C. Minnite (Exhibit A to this Disclosure) provides a complete statement of all opinions I plan to express, the basis and reasons for them, and the facts and data I considered in forming those opinion.

    2.      I do not at present intend to use an exhibit to summarize my opinions.  Should I form such an intention, I will promptly make that exhibit available.

    3.      My *Curriculum Vitae* (Exhibit B to this Disclosure) provides a statement of my qualifications, including a list of all publications authored in the previous 10 years.

    4.      The only cases in which I have testified as an expert (at trial or by deposition) are identified in Paragraph 1 of my Declaration (Exhibit A).

    5.      I am not being compensated for my time in connection with my Declaration and testimony in this matter.  I will be compensated for my reasonable out-of-pocket expenses.

Dated:  April 19, 2012

_Lorraine C. Minnite_
Lorraine C. Minnite

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

BETTYE JONES, et al.,

       Plaintiffs,

   v.

JUDGE DAVID G. DEININGER, et
al., (all sued in their
official capacity),

       Defendants.

Case No. 2:12-cv-00185-LA

## DECLARATION OF LORRAINE C. MINNITE

I, Lorraine C. Minnite, of full age, hereby declare as follows:

1.   I am an associate professor in the Department of Public Policy and Administration at Rutgers, The State University of New Jersey-Camden.  I received a Bachelor of Arts degree in History from Boston University, and two Master's Degrees and a Ph.D. in Political Science from the City University of New York.  My area of expertise is American Politics with a specialization in elections and the political process.  Specifically, I study the incidence and effect of voter fraud in American elections.  I have testified in three (3) other trials or hearings, including as an expert witness in Democratic National Committee, et al. v.

Republican National Committee, et al.;[1] as a witness in the U.S.
House Committee on the Judiciary, Subcommittee on the
Constitution, Civil Rights and Civil Liberties, Oversight Hearing
on Voter Suppression, February 26, 2008 (oral and written
testimony); and as a fact witness in ACORN et al. v. Bysiewicz.[2]

In 2003, I co-authored a study of voter fraud with David
Callahan for the public policy research and advocacy
organization, Demos, titled, "Securing the Vote:  An Analysis of
Voter Fraud," and I updated this report with new material in
2007.[3]  At that time, Demos published a preliminary report I
wrote on voter fraud and same-day registration,[4] and in March of
2007, I published a report, "The Politics of Voter Fraud," for
Project Vote, a national nonpartisan, nonprofit voting rights
organization.[5]  In June 2010, Cornell University Press published
The Myth of Voter Fraud, my full-length scholarly treatment of
the subject.  The book analyzes the evidence of voter fraud and
concludes that the widespread allegation that in-person voter
fraud is a rampant problem of unknown proportions in contemporary
U.S. elections is unsupported by evidence, and that actual voter

---

[1] 671 F. Supp. 2d 575 (D.N.J. 2009).
[2] 413 F. Supp. 2d. 119 (Conn. 2005).
[3] Lorraine C. Minnite, "An Analysis of Voter Fraud," (New York: Demos, 2007), available at: http://www.demos.org/publication/analysis-voter-fraud-united-states-adapted-2003-report-securing-vote.
[4] Lorraine C. Minnite, "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security," (New York: Demos, 2007), available at: http://www.demos.org/publication/election-day-registration-study-voter-fraud-allegations-and-findings-voter-roll-security.
[5] Lorraine Minnite, "The Politics of Voter Fraud," (Washington, D.C.: Project Vote, 2007), available at: http://www.projectvote.org/newsreleases/222-new-

fraud is extremely rare.  I conclude and provide evidence to show that having no basis in fact, these allegations are motivated by partisan political interests and are designed to make voting harder for certain populations.

2.  Based on my extensive research on contemporary voter fraud in U.S. elections, I conclude that stringent photo identification requirements to vote are not justified by claims that such requirements are needed to reduce or prevent voter impersonation forms of election fraud because as the empirical record makes clear, fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare.

3.  Prior to the late nineteenth century, there were very limited voter registration requirements placed upon eligible voters.[6]  The earliest of registration laws put the obligation on the government to enroll qualified voters, and allowed voters to register on Election Day.[7]  The pool of eligible voters vastly expanded in the nineteenth century when property and tax-paying

---

report-examines-qthe-politics-of-voter-fraudq.html.
[6] Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the U.S. (New York: Basic Books, 2000), 151;  Joseph P. Harris, The Registration of Voters in the United States (Baltimore: Lord Baltimore Press, 1929), 65-66; see also, John Mark Hansen, et al., "Voter Registration," Reports of The Task Force on the Federal Election System (to accompany the Report of the National Commission on Election Reform, To Assure Pride and Confidence in the Electoral Process), National Commission on Federal Election Reform, August 2001, 2 (on file with author).
[7] Charles Edward Merriam and Harold Foote Gosnell, The American Party System: An Introduction to the Study of Political Parties in the United States (New

4

requirements for voter eligibility were mostly eliminated.  By the end of the century, a competitive party system was helping to produce the highest rates of voter turnout in U.S. history. However, at the same time, states began adopting more and more onerous voter registration and voting laws, supplanting the restrictive effects of property requirements and shifting the burden of establishing voter eligibility away from the government to the individual.[8]

4.  We as a country have a long history of using electoral rules to suppress voting.  My co-authors and I review some of this history in Keeping Down the Black Vote: Race and the Demobilization of American Voters.[9]  Following the emancipation of African Americans and the enfranchisement of black men by the Civil War Amendments, a reactionary, white supremacist counter-movement in the South arose to re-erect a system of total racial subordination.

5.  By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the southern states,

---

York: The Macmillan Company, 1929); Harris, Registration of Voters, xi.
[8] Dayna L. Cunningham, "Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States," Yale Law and Policy Review 9, no. 2 (1991): 370-404.
[9] See Frances Fox Piven, Lorraine C. Minnite, and Margaret Groarke, Keeping Down the Black Vote: Race and the Demobilization of American Voters (New York: The New Press, 2009).  The authoritative work on this subject is J. Morgan Kousser, The Shaping of the Southern Politics: Suffrage Restriction and the Establishment of the One-Party South (New Haven: Yale University Press, 1974).

at first by the use of violent intimidation and trickery, later by the introduction or reintroduction of a series of superficially color-blind requirements intended to circumvent the Fourteenth and Fifteenth Amendments.

6.  Voter registration requirements were especially important because of the degree to which they ceded discretion to local registrars and election officials.  Thus, an 1873 Georgia law permitted local registrars to close their books to new registrants except during the planting and harvesting months, or in other words, during the only time African American farmworkers might be able to make the sometimes many miles trip to the county seat to register to vote.  Once word of the effectiveness of this strategem to disfranchise blacks spread, similar laws in North Carolina and Alabama followed.

7.  Laws requiring voters to show their registration certificates before they were permitted to cast ballots were also effective in disfranchising African Americans in the South.  Most states adopting personal registration closed registration periods long before an election, and it would not be uncommon for illiterate and impoverished migrant farmers to lose track of paperwork.

8.  In addition, this rule made blacks doubly vulnerable to

harassment and attack as they made their way to the polling place. There are numerous accounts from the period of blacks walking to the county seat to vote and being set upon by white mobs who robbed them of their registration papers. For example, in November 1876, the Republican governor of Louisiana wrote to Republican National Committee officials in New York:

> Dispatches from Ouachita and Morehouse Parishes, near the Arkansas line, and West Feliciana near the Mississippi line, report that their parishes are now patrolled by the White League, reinforced by armed bodies from Arkansas and Mississippi. Most of the Republican leaders have been driven away or murdered. Under the State law voters are entitled to vote at any poll in the parish in which they reside. The colored people generally are attempting to reach the parish seats of those parishes in order to vote under the protection of the authorities. Numbers of them have been intercepted by the White League pickets, and their registration papers destroyed.[10]

9.    Election fraud documented by early election reformers was not primarily committed by individual voters, who are the target of election reforms to widen the franchise, but instead by election officials and politicians engaging in conspiracies who are unaffected by these types of reforms.[11] In some places, corrupt politicians used the police to "colonize" closely

---

[10] "The Close of the Canvass," New York Times, November 7, 1876, 1.
[11] See Joseph P. Harris, Election Administration in the United States (Washington, D.C.: The Brookings Institution, 1934), 375-376 ("…Isolated, individual cases of election frauds are uncommon and unimportant. Election frauds cannot be carried on successfully and upon a wide scale without protection, without the pre-arrangement of election officers who will 'deliver' if necessary, and without the backing of a powerful political organization.")

contested elections with fraudulently registered voters.[12] Reformers enacted voter registration as a means to subdue broader electoral fraud, yet it remains unclear whether the reforms played any part in reducing it.[13]

10.  The Civil Rights Era in American history marked a time of activism to promote, amongst other goals, voting rights.  At each significant effort to protect and extend the right to vote, franchising opponents argued that reduced barriers would lead to voter fraud.  This threat has been taken up by congressional opponents time and time again, for example, in debates over the Voting Rights Act of 1965, the Universal Voter Registration Act of 1977, and the National Voter Registration Act of 1993.[14] However, no conclusive tie between enfranchising reform and voter fraud has ever been proven.  Prior to the widespread adoption of the secret ballot, party agents arguably used "inflationary"

---

[12] Richard L. McCormick, From Realignment to Reform: Political Change in New York State, 1893-1910 (Ithaca: Cornell University Press, 1981), 44.
[13] Paul Kleppner, Who Voted? The Dynamics of Voter Turnout 1870-1980, American Political Party and Election Series (New York: Greenwood Publishing Group, Inc.,1982), 59-60.
[14] See, for example, U.S. Congress, Senate Committee on the Judiciary, "To Enforce the 15th Amendment to the Constitution of the United States: Hearings on S.1564," 89th Cong., 1st sess., 1965; U.S. Congress, House Committee on House Administration, "To Establish a Universal Voter Registration Program, and for Other Purposes: Hearings on H.R. 5400," 95th Cong., 1st sess., 1977; and U.S. Congress, House Committee on House Administration, Subcommittee on Elections, "Hearing on Voter Registration," 103rd Cong., 1st sess., January 26, 1993. For an important account of the movement to reform voter registration laws leading to the passage of the National Voter Registration Act of 1993, see Frances Fox Piven and Richard A. Cloward, Why Americans Don't Vote and Why Politicians Want It That Way (Boston: Beacon Press, 2000); see also, Piven, et al., Keeping Down the Black Vote.

corruption by buying votes and recycling voters.[15]  Afterward,
parties pursued "deflationary" corruption by paying opponents to
stay home or otherwise defeating their efforts to vote, using
devices such as poll taxes, literacy tests, long residency
periods and other onerous requirements for voter registration to
further their means.

11.  No statute exists specifically defining "voter fraud."
Instead, nefarious election-related practices are prevented by
state laws making "double voting" or "falsifying records," etc.,
illegal.[16]  Nevertheless, the process of formulating precise
definitions is critical in the social sciences because it allows
accurate measurement of empirical phenomena.[17]  To develop the
definition of voter fraud, I examined the electoral process and
looked at the capacity of various actors in the political process
to impact the outcome and integrity of elections.  Various actors

---

[15] Gary W. Cox and J. Morgan Kousser, "Turnout and Rural Corruption: New York
as a Test Case," American Journal of Political Science 25, no. 4 (November
1981), 646-63.
[16] For example, in Texas it is a third degree felony to "vote or attempt to
vote in an election in which the person knows the person is not eligible to
vote; knowingly votes or attempts to vote more than once in an election; or
knowingly impersonates another person and votes as the impersonated person."
TEX. ELEC. CODE ANN. § 64.012 (2003).  California prohibits specific election
related activity like fraudulent registration, voting in an election which one
isn't entitled to vote in, voting more than once or to try to buy a vote with
the promise of a job.  CAL. ELEC. CODE § 18520 (1994).  In Minnesota, it is a
felony to submit more than one absentee ballot or to assist another in
submitting more than one absentee ballot, or alter another's absentee ballot.
 MINN. STAT.§ 203B.03 (1999).  In New Jersey, it is a third degree crime to
"fraudulently vote…or in any manner so interfere…with the voters lawfully
exercising their rights of voting at the election, as to prevent the election
or canvass from being fairly had and lawfully conducted." N.J. STAT. ANN. §
19:34-11 (2011).
[17] W. Phillips Shively, The Craft of Political Research, 5th ed. (Upper Saddle

with that capacity include, but are not limited to, voters, campaign officials, elected officials, and election poll workers.[18]

12.  I examined what part of the political process different actors could corrupt, and found a distinction between what voters can corrupt compared to what other electoral actors can corrupt. Voters are only capable of corrupting that part of the electoral process to which they have access.  For example, voters cannot corrupt the election count; only an official with broad access could corrupt an entire count.  But, individual voters can corrupt their registration process and balloting by falsifying their records or identity on a registration application and/or fraudulently misrepresenting themselves to poll workers.

13.  By breaking up the electoral process according to its various stages and the actors that participate, I can tailor my fraud definition to the data that I study: the behavior of individual voters.  Accordingly, my definition of voter fraud is 'the intentional corruption of the voting process by voters.'

14.  This definition is specific to the elements I research.  The next best definition I found is provided by the United States

---

River, New Jersey: Prentice Hall, 2002, 30-8.
[18] The rest of this expert report draws on my research published in The Myth

Department of Justice.  Their definition of "election fraud" is over-broad because it includes acts to intimidate voters and covers official malfeasance, such as ballot box stuffing or corruption of the count.[19]  Because voters do not have access to those activities, they should not be included in an accurate definition of voter fraud.

15.  I emphasize the importance of intent in my definition, distinguishing election errors such as misspelled names and recording mistakes.  Although these mistakes can produce irregularities that may look like fraud, they should not be included in a definition of fraud that limits itself to nefarious acts intentionally committed by voters.

16.  In studying and measuring the contemporary incidence of voter fraud, I use a "mixed method" research approach, which is common in the social sciences.  This method includes qualitative, quantitative and archival research.

17.  In the course of my research, I interviewed a wide range of

---

of Voter Fraud.
[19] Craig C. Donsanto and Nancy L. Simmons, <u>Federal Prosecution of Election Offenses</u>, 7th ed., U.S. Department of Justice, Criminal Division, Public Integrity Section (Washington, D.C.: Government Printing Office, 2007).  See also, U.S. Department of Justice, "Fact Sheet: Protecting Voting Rights and Preventing Election Fraud," July 2, 2008, available at: http://www.justice.gov/opa/pr/2008/July/08-crt-585.html.

people.   These interviews included, but were not limited to: prosecutors, defense lawyers, election officials, voters, academics, and people working on voter registration drives.

18.   The basis of my quantitative research comes from a data set produced by the Administrative Office of the United States Courts that is available to researchers through the ICPSR (Inter-University Consortium for Political and Social Research).[20]   This data set is a complete and total record of all indictments tried annually in federal courts (district and appellate, including the Supreme Court).

19.   In addition, I relied on the record of federal indictments generated during the first three years of a special program at the U.S. Department of Justice.   In March 2001, United States Attorney General John Ashcroft announced the Ballot Access and Voting Integrity Initiative or "BAVII."[21]   BAVII was initiated by Attorney General Ashcroft to bring together civil rights and criminal lawyers of the Justice Department for an Election Day program.   The stated purpose of this program was to help

---

[20] The ICPSR is an international consortium of about 700 academic institutions and research organizations that maintains a data archive of more than half a million files of research in the social sciences.  See their website (www.icpsr.umich.edu) for more information.
[21] U.S. Department of Justice, press conference, Washington, D.C., March 7, 2001, available at
http://www.justice.gov/archive/ag/speeches/2001/0307civilrightspressconf.htm.
 See also, Dan Eggen and David A. Vise, "Ashcroft Takes On Voting Issues; Enforcement, Monitoring of Election Laws to Be Increased," Washington Post,

attorneys recognize election fraud and voter intimidation and to provide their services to voters to receive complaints of the same. [22]

20.   After numerous unsuccessful attempts at locating information regarding voter fraud from the BAVII, including a Freedom of Information Act request, I found a case list of indictments brought under the program in the records of a congressional hearing held in 2006.[23]   The list, which was prepared by the U.S. Department of Justice, records 95 indictments.   I concluded that this was a complete list of BAVII-related indictments brought under the BAVII by comparing it to Justice Department press releases announcing numbers of indictments.   I researched the BAVII indictments and concluded that only 40 of the 95 people indicted were voters; the other 55 people were associated with elections in other ways, serving as campaign, party or election officials.   Of the 40 voters indicted, 14 were from the city of Milwaukee.

---

March 8, 2001, A19.
[22] In a letter to Attorney General Ashcroft, the Leadership Conference on Civil Rights ("LCCR") and about two dozen other civil rights and public interest groups voiced concern about this program, noting the "long experience of the civil rights community that overly aggressive 'voting integrity' efforts, instead of reducing fraud, tend to intimidate lawful voters and ultimately suppress voter turnout." Letter from LCCR and sign-on groups to John D. Ashcroft, October 25, 2002 (on file with author).
[23] U.S. Congress, House Committee on House Administration, "Hearing on 'You Don't Need Papers to Vote?': Non-Citizen Voting and ID Requirements in U.S. Elections," 109th Congress, 2nd Sess., June 22, 2006, 245-54.

21.    Following the 2004 presidential election, the (Milwaukee) _Journal-Sentinel_ reviewed Milwaukee's voting records.  The most troubling finding from the detailed computer analysis made by the newspaper was that as many as 1,242 votes, three-quarters of them cast by people registering on-site on election day, appeared to have come from invalid addresses.  Another 1,305 registration cards with discernible flaws, such as missing addresses or missing names, were accepted on election day from voters who were then allowed to vote.[24]

22.    The newspaper opined on its own investigation and reporting: "Republicans are quick to jump on the discrepancies, real or imagined, in voting data in Milwaukee as proof of widespread fraud in the big city. In their minds, the _Journal Sentinel's_ findings fit that pattern.  A more plausible explanation, however, is that the findings reflect the unfortunate tendency of voting systems throughout America to err."[25]

23.    By the end of January 2005, the mayor had appointed an internal task force to review the city's electoral procedures, and federal, county and city law enforcement agencies began a

---

[24] Greg J. Borowski, "Over 1,200 Voters Addresses Found Invalid; Some Mistakes Easily Explained, but Milwaukee Flaws Raise Concerns about Shoddy Record Keeping, Possible Fraud," _Milwaukee Journal Sentinel_, January 25, 2005, A1; Greg J. Borowski, "Fraud or Bumbling, Voter Problems Still Unnerving to Public," _Milwaukee Journal Sentinel_, January 30, 2005, A1.
[25] "Widen Election Day Focus" [Editorial], _Milwaukee Journal Sentinel_, January

14

joint investigation into whether breakdowns in procedure, poor record-keeping, human error, or fraud explained the discrepancies.  On February 10, the bipartisan Joint Legislative Audit Committee of the state legislature voted unanimously to direct auditors to review voter registration and address verification procedures in Wisconsin.

24.  As election officials in the city and state struggled to meet the challenges of fixing Milwaukee's election system after the 2004 election, the city was designated by the U.S. Justice Department for a pilot program on prosecuting individuals for voter fraud.  This was new territory for the Justice Department.  According to a 2006 U.S. Election Commission (EAC)'s 2006 report, under the banner of the BAVII, the Justice Department designed three pilot programs "to determine what works in developing the cases and obtaining convictions and what works with juries in such matters to gain convictions."[26]

25.  The report states: "Since 2002, the department has brought more cases against alien voters, felon voters, and double voters than ever before. Previously, cases were only brought against

---

26, 2005, A14.
[26] Interview with Craig Donsanto, director, Elections Crimes Branch, Public Integrity Section, U.S. Justice Department, January 13, 2006, in U.S. Elections Assistance Commission, "EAC Summary of Expert Interviews for Voting Fraud-Voter Intimidation Research," 2-4, available at: http://www.eac.gov/program-areas/research-resources-and-

conspiracies to corrupt the process rather than individual offenders acting alone.  For deterrence purposes, the Attorney General decided to add the pursuit of individuals who vote when not eligible to vote (noncitizens, felons) or who vote more than once.  Prior to this, the Justice Department did not go after individual isolated instances of fraud or cases which that would not have a big impact and, therefore, a deterrent effect."[27]

26.  The head of the Elections Crime Branch of the Criminal Division's Public Integrity Section told the EAC researchers that the pilot projects focused on: (1) felon voters in Milwaukee;[28] (2) alien voters in the Southern District of Florida,; and (3) double-voters in a variety of jurisdictions.  The Justice Department's record of indictments fits this description: thirty-five of the forty voters indicted between October 2002 and September 2005 were among the three groups targeted by the pilot projects.  This includes ten alleged felon voters in Milwaukee; 16 alleged alien voters in the Southern District of Florida; and nine alleged double-voters, including four people in Milwaukee, and five people in Missouri and Kansas.

---

[27] reports/copy_of_docs/2006-election-crimes-appendix-3/attachment_download/file. Ibid.

[28] In an in-person interview I conducted on June 22, 2007, U.S. Attorney Steven Biskupic neither confirmed nor denied the pilot project investigating individual felon voters in Milwaukee.  He stated that his office became involved in voter fraud prosecutions in 2005 at the request of the Milwaukee

27. For the Milwaukee case study research reporting on in my book, The Myth of Voter Fraud, I reviewed records from the U.S. Department of Justice's BAVII; analyzed data from the Administrative Office of U.S. Courts;[29] and conducted interviews with the U.S. Attorney for the Eastern District of Wisconsin, the Executive Director of the Milwaukee Board of Election Commissioners, several attorneys representing most of the 14 people indicted in Milwaukee by the federal government after the 2004 election, one of whom now serves as a U.S. Magistrate Judge in the Eastern District of Wisconsin, and two of the indicted voters. I also completed extensive event history analysis in using newspaper accounts of the events as they unfolded in Milwaukee.

28. The Joint Task force that included the U.S. Attorney, the District Attorneys of Milwaukee County and the City of Milwaukee, and the Milwaukee Police Department looked into allegations of fraud in the city's 2004 election and found that a large majority of the reported irregularities were due to data entry errors, typographical errors, procedural missteps, and misapplication of

---

District Attorney.
[29] The results of this analysis are described in The Myth of Voter Fraud, 47, and appendices 3-5, 218-40. They confirm the findings of my review of federal prosecution records of a scant record of voter fraud in Wisconsin and nationally. The data from the Administrative Office of U.S. Courts covers the period of 1996 to 2005.

the rules by poll workers.[30]  Out of over 73,000 same day
registrants studied, the task force investigators found fewer
than 100 invalid voters, resulting in the 14 indictments for
alleged voter fraud cited above.  Only five of these resulted in
convictions or guilty pleas.[31]  Even assuming that all of the
roughly 100 invalid votes were fraudulent rather than instances
of poll worker or voter error, that is less than one seventh of
one percent.

29.  In late February 2008, the Milwaukee Police Department (MPD)
leaked an internal report prepared by the Special Investigations
Unit for the U.S. Attorney's Joint Task Force.[32]  A thorough
reading of this report drives home its principle conclusion, that
systemic problems in the administration of the 2004 election and
not fraud were almost entirely responsible for the irregularities
discovered and extensively reported on by the local media.

---

[30] Milwaukee Police Department, Special Investigations Unit, "Report of the
Investigation into the November 2, 2004 General Election in the City of
Milwaukee," February 26, 2008 (on file with author).
[31] In The Myth of Voter Fraud, I discuss voter fraud allegations made
regarding Milwaukee voters during the 2004 election and review the prosecution
record, finding that only 14 people were prosecuted for illegal voting – 10
for voting while ineligible to do so under the state's felon disfranchisement
law, and four for voting twice.  Only five people were found or pled guilty
for voting while still under state supervision for a felony conviction.  See
Minnite, The Myth of Voter Fraud, 106-107, and note 92 of appendix 1.  See,
also, Spencer Overton, "Voter Identification," Michigan Law Review 105, no. 4
(February 2007): 645-647.
[32] Greg J. Borowski, "Tighter Voting Laws Urged: Milwaukee Police Report
Findings From Probe into 2004 Polling," Milwaukee Journal-Sentinel, February
26, 2008; Daniel Bice, "Report's Stealthy Release Irks Police Chief,"
Milwaukee Journal-Sentinel, March 1, 2008; John Diedrich, "Chief Flynn Says

30.   During U.S. House Judiciary hearings on the Bush
Administration's firing of seven of its U.S. Attorneys on
December 6, 2006, it was revealed that state Republican Party
operatives, including in Wisconsin, had compiled local media
reports for the White House, and used these reports as the basis
of complaints that certain U.S. Attorneys were not pursuing voter
fraud cases aggressively enough.   The MPD Special Investigations
Unit report contradicts claims that reports of irregularities in
the 2004 election were evidence of voter fraud.   Instead, over
and over again, the MPD investigators found that data entry
errors, typographical errors, procedural missteps, misapplication
of the rules, and the like, accounted for almost all of the
problems observed by the media and complained about to the White
House by Republican party operatives.   For example, in
investigating the August 4, 2005, formal complaint of the
Republican Party of Wisconsin that 60 persons had voted more than
once in the November 2004 general election, the report found that
only 21 people were listed twice in the electors database due to
"data entry errors by employees of the Milwaukee Election
Commission;" moreover, "none of these people voted twice."[33]   In
investigating another complaint by the Republican Party of
Wisconsin that nine more people had voted twice, the report found
more mistakes.   Describing in detail their findings regarding

_____

MPD Vote Fraud Unit on the Job," Milwaukee Journal-Sentinel, November 4, 2008.
[33] Milwaukee Police Department, "Report of the Investigation," 35.

this batch of allegations, they state:

> This appears to be a mistaken entry by the Election
> Commission employees...This appears to be a mistaken entry
> by the Election Commission employees...It appears that
> these voters are a father and son...it appears that there
> was an error by a Poll Inspector on Election Day...again,
> this appears to be an error at the poll site...these are
> not the same person. It appears that they are father and
> son...These are not the same person and it appears that the
> two may be father and son...This appears to be another
> mistaken entry at the poll site...the remaining three
> persons have closely matching names but are not the same
> person.[34]

31. The scrutiny from federal, state, and local law enforcement
and elections officials produced several reports, an intensive
review of voter registration practices in a number of Wisconsin
cities, many recommendations for improving election
administration and voter registration procedures, several later-
vetoed photo identification bills in the state legislature, a
variety of other legislative proposals, and very little
conclusive evidence of voter fraud.  For example, the state audit
of 150 Wisconsin municipalities authorized by the legislature
found, "105 instances of potentially improper or fraudulent
voting in the November 2004 elections" in six jurisdictions.  The
overwhelming majority of the irregularities, however, were cases

---

[34] Ibid., 33-34.  In my book, The Myth of Voter Fraud, and in a forthcoming
book chapter, I show how allegations of voter fraud based on media accounts
typically fall apart under scrutiny, and how human error, administrative
complexity and mistakes are often the best explanation for election
irregularities of the kind too quickly seized upon as evidence of voter fraud.
 See, Lorraine C. Minnite, "Voter Identification Laws: The Political
Controversy Over Voter Fraud," in Law and Election Politics, 2nd ed., edited
by Matthew J. Streb (New York: Routledge, 2012).

of potential felon voting; intentional fraud was not confirmed.[35]

32.   The Joint Task Force also found that there may have been cases of illegal votes by felons who served their prison time but were still under state supervision and therefore, under Wisconsin law, ineligible to vote.

33.   The Wisconsin felony disenfranchisement laws are more restrictive than those in 20 other states.[36]  Individuals with felony convictions are barred from voting while in prison, on probation, or on parole.[37]  Because 60 percent of those convicted of felonies do not serve their sentences in jail, an ineligible felon voter can register and vote if officials allow it.[38] Alleged illegal felon voting constitutes nearly all of the "voter fraud" reported by the media in Wisconsin.[39]  Wisconsin election crime laws require the establishment of a willful effort to defraud.[40]  Most of those identified as ineligible have not been prosecuted because they were never informed that they lost their

---

[35] Of the 105 irregularities, 98 were identified as "felons who may have voted." See Wisconsin State Legislative Audit Bureau, "An Evaluation: Voter Registration," Report 05-12, Madison, September 16, 2005, 6.
[36] "Felony Disfranchisement in Wisconsin," American Civil Liberties Union, n.d., available at: http://www.aclu.org/pdfs/votingrights/wi_flyer.pdf.
[37] WIS. STATS. § 6.03.1b (2011) (disqualified from voting is "any person convicted of treason, felony or bribery, unless the person's right to vote is restored through a pardon or under s.304.078(3).")
[38] "Felony Disfranchisement in Wisconsin."
[39] Over two federal election cycles, from 2002 to 2005, only ten cases of felon voting in Wisconsin were prosecuted by the federal government, and only five people were convicted or pleaded guilty.
[40] WIS. STATS § 12.13 (2011) (Election fraud: "Whoever intentionally does any of the following violates this chapter...")

voting rights until they had completed their entire sentence, meaning were released from probation or parole.[41]

34.  Wisconsin's felon disfranchisement law is not well understood as evidenced by the fact that one of the instances of alleged voter fraud in the 2004 election involved a man registering to vote using his state offender ID card.[42]  Had the poll worker who registered this man been properly informed of Wisconsin law, the felon would not have been able to register or to vote, and had the felon understood that his voting rights had been taken away and not yet restored, he would not have attempted to vote.[43]  Considering that the felon provided proof of his recent incarceration as proof of his identity, he clearly did not realize what he was doing as wrong, and did not intend to commit fraud.[44]  It is unlikely that Wisconsin's new voter photo identification law, Act 23, would have prevented the illegal vote implicated in this case from being cast.  The voter presented a government-issued photo ID.  The poll worker inspected that ID closely enough to write down the ID number on the voter's registration application.  The voter also presented a letter from his parole officer to verify his address.  The voter was allowed

---

[41] Until recently, the Wisconsin voter registration application form did not clearly indicate that felons on probation or parole were ineligible to vote.
[42] Gina Barton, "A Felon But Not a Fraud: No Charges for Voter With Prison I.D.," Milwaukee Journal-Sentinel, March 17, 2006.
[43] I interviewed this individual, his lawyer and the U.S. Attorney for the Eastern District of Wisconsin regarding this case.  See, Minnite, The Myth of

to register to vote and cast a ballot.  The case illustrates how errors in election administration can cause "irregularities" that partisans misrepresent as fraud.

35.  There are no officially compiled national or statewide statistics reliably reporting the instances of voter fraud.  The lack of an accurate centralized tracking system is evidence that voter fraud is not as large a threat to elections as some claim.  Using the same standard for judging voter fraud crime rates as we do for other crimes, (which is to calculate the incidence of crime from law enforcement statistics on arrests, indictments and convictions) we must conclude that the scant evidence of arrests, indictments or convictions for any of the practices defined as voter fraud means that little fraud is being committed relative to the millions of votes cast each year in state, local and federal elections.

36.  Some argue that crime statistics are an invalid measure of the extent of voter fraud.  Proponents of this view typically offer two reasons for this: 1) prosecutors are biased and do not pursue voter fraud cases; and 2) voter fraud as fraud escapes detection.  Neither of these arguments stand on evidence.

---

Voter Fraud, 102–112.
[44] Ibid.

37.  First, as described above, the federal government designed a
program to root out voter fraud in federal elections.  In its
first three years, under vigorous prosecution by the Bush
Administration, this program produced just 40 indictments of
voters, 26 of who pleaded or were found guilty.  More than 200
million votes were cast in the 2002 and 2004 elections
(combined).  We have another important example in which it can
not be said that prosecutors do not pursue voter fraud cases, and
yet almost no voter fraud was prosecuted.  County district
attorneys in the state of Minnesota are required by law to
investigate complaints of voter fraud at risk of losing their
jobs.  My research into voter fraud in Minnesota between 1999 and
2005, turned up one (rather flagrant) case.[45]

38.  Second, is voter fraud less detectable than Social Security
fraud, or counterfeiting, or tax evasion, or postal or wire
fraud?  These forms of fraud share qualities with voter fraud.
For example, Social Security fraud can involve impersonation and
making false claims about eligibility; counterfeiting can involve
forgery and making false claims about identify; tax evasion can
involve false claims of residence; and mail fraud statutes have
been used to prosecute voter fraud.  In federal fiscal year 2005,
there were 183,284 criminal indictments brought in the federal

---

[45] See, The Myth of Voter Fraud, 61-6.

courts.[46]  Among these we find the following:

| Criminal charge[47] | FY2005 |
|---|---|
| Election fraud violations[48] | 60 |
| Other fraud violations | |
|     Citizenship fraud | 776 |
|     Social Security fraud | 1,980 |
|     False claims and statements | 6,658 |
|     Counterfeiting | 3,161 |
|     Postal, Internet, and wire fraud | 6,929 |
|     Tax evasion | 781 |
| Total criminal defendants | 183,284 |

39.  This data suggest that the claim against a methodology relying on measures of law enforcement to assess the threat of voter fraud to the integrity of U.S. elections is of little merit.

40.  Nationwide and in jurisdictions where close elections and recounts provide the best documented cases of the operations of

[46] Federal Judicial Center, Federal Court Cases: Integrated Database, 1997, 2005 [computer file], conducted by the Federal Judicial Center, ICPSR04306, ICPSR04382, Ann Arbor, Mich.: Inter-University Consortium for Political and Social Research [producer and distributor]; author's calculations.
[47] At least one of the top five filing charges for each defendant falls into crime category.
[48] The Federal Court Cases Integrated Database (FCCID), which purports to be "the official public record of the business of the U.S. courts," does not code indictments for voter fraud. Instead, it includes a category of "election law violations," following the coding scheme of the Administrative Office of the U.S. Courts which is responsible for compiling this data. I created a category of "election fraud violations" by excluding indictments for campaign finance violations, however, I was not able to further exclude non-voters. This measure, therefore, is not directly comparable to other sources of data on federal investigations and prosecutions of voter fraud cases cited in this report. On the FCCID, see Federal Judicial Center, "Description," Federal Court Cases Integrated Database, 2005, conducted by the Federal Judicial Center ICPSR04382 (Ann Arbor, Mich.: Inter-University Consortium for Political and Social Research).

election administration, the statistics of voter fraud in polling locations are virtually zero. For example, Chelan County Superior Court Judge, The Honorable John E. Bridges, concluded that, in a hotly contested gubernatorial election (involving a recount), 25 ballots or .0009 percent of the total 2,812,675 ballots cast in the 2004 Washington State gubernatorial election were invalid because they were either cast in the names of deceased voters or were double votes.[49] Many of these ballots were mailed in for absentee voters, and the judge made no determination that all were fraudulently cast. Even in cases where the federal authorities are focused on observing fraud in the polling places, there have been very few indictments across the board.[50]

41. A review of hundreds of news reports alleging voter fraud over a recent two year period found that, with few exceptions, the allegations fell into one of the three following categories: unsubstantiated or false allegations of voter fraud made by the losers of close elections,[51] mischief, and claims that later

---

[49] "Final Judgment Dismissing Election Contest with Prejudice and Confirming Certification of Election of Christine Gregoire," Timothy Borders, et al. v. King County et al., Case No. 05-2-00027-3, Superior Court of the State of Washington for Chelan County, June 24, 2005.
[50] As detailed above: in the first three years of the BAVII, the Justice Department brought a total of 95 indictments against an array of voters, election workers, and party and public officials. See the BAVII cast list, U.S. Department of Justice, Criminal Division, Public Integrity Section, "Election Fraud Prosecutions and Convictions: Ballot Access and Voting Integrity Initiative, Oct. 2002 – Sept. 2005, n.d. (on file with author).
[51] For a discussion of fraud and the sore loser, see generally Michelle L.

turned out to be based upon cases of voter error or
administrative mistakes, but not fraud.[52]

42.  The public is often misled by allegations of voter fraud
which are used as an intimidation tactic to shape the electorate.
This is accomplished by manipulating the rules and procedures
that govern access to voting.  For example, in the wake of false
and erroneous allegations against the community organization
ACORN,[53] a Florida law was passed carrying stiff penalties for
organizations failing to turn in voter registration applications
within ten days of receiving them.[54]  This law, later declared
unconstitutional by a federal judge, caused the League of Women
Voters to end 77 years of voter registration activity in Florida
for fear that it would be unable to comply.[55]

---

Robertson, "Election Fraud – Winning at All Costs: Election Fraud in the Third
Circuit (Marks v. Stinson)," Villanova Law Review 40, no. 3 (1995): 869-925.
[52] Minnite, "The Politics of Voter Fraud," 12-13.  I also reviewed hundreds of
news articles cited in a report by the now defunct American Center for Voting
Rights, which purported to be "the most comprehensive and authoritative review
of the facts surrounding allegations of vote fraud, intimidation and
suppression made during the 2004 presidential election."  From this review I
concluded that "among the more than one hundred cases cited of alleged voter
fraud implicating nearly 300,000 potentially fraudulent votes in the 2004
election cycle, only about 185 votes could be confirmed as possibly tainted by
fraud [emphasis added]."  See also, Minnite, The Myth of Voter Fraud, 12.
[53] ACORN was a non-profit grassroots organization of low and moderate income
families that engaged in issue and ballot initiative campaigns and voter
registration drives.  In Mac Stuart v. ACORN, plaintiff, an ex-employee of
ACORN, accused the organization of failing to submit some 179 registration
applications.  ACORN denied, and plaintiff failed to produce evidence of this
allegation.  The matter was dismissed with prejudice by a federal judge,
exonerating ACORN of any and all wrongdoing.  See Minnite, The Myth of Voter
Fraud, 96-99; and Joni James, "Voter Fraud Charges Collapse," St. Petersburg
Times, December 15, 2005.
[54] FLA. STAT. §§ 97.021(36), 97.0575 (2005).
[55] League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314, 1325, (S.D.
Florida, 2006).

43. Voters can only influence the part of the electoral process to which they have access. There is very little available evidence suggesting that voters are intentionally corrupting the electoral process.

44. Accordingly, I conclude that stringent photo identification requirements to vote are not justified by claims that such requirements are needed to reduce or prevent voter impersonation forms of election fraud because as the empirical record makes clear, fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare.

44. I declare under penalty of perjury that the foregoing is true and correct. Executed on April 19, 2012 in Camden, New Jersey.

_Lorraine C. Minnite_
Lorraine C. Minnite

Exhibit B

# LORRAINE CAROL MINNITE

Rutgers, State University of New Jersey-Camden
Dept. of Public Policy & Administration
401 Cooper Street, Rm. 305
Camden, New Jersey 08102
lcm130@camden.rutgers.edu
Tel. (856) 225-2526

## EDUCATION

**The Graduate School and University Center of the City University of New York**
   **Ph.D.** in Political Science, 2000
   *Dissertation:* "Identity, Voting Rights and the Remapping of Political Representation in New York City"
   *Honors:* Distinction

   **M.Phil.** in Political Science, 1994
   *Major field:* American Politics
   *Minor field:* Public Policy

   **M.A.** in Political Science, 1992
   *Master's Thesis:* "The Ecology of the Underclass: William Julius Wilson and the Chicago School"

**Boston University, College of Liberal Arts**
   **B.A.** in History, 1983
   *Area of Concentration:* American Civilization
   *Honors:* Cum Laude

## ACADEMIC EXPERIENCE

**Associate Professor**
*Rutgers, The State University of New Jersey – Camden Campus, 2011 to present.*
Teach graduate courses in public policy and community development.

**Assistant Professor**
*Barnard College, Columbia University, January 2000 to 2011.*
Taught undergraduate courses in American politics and urban studies.

**Associate Director**
*The Center for Urban Research and Policy, Columbia University, December 1993 to 2000.*
Responsible for the day-to-day management of the Center; wrote grant proposals and helped secure funding from government and private sources for all activities totaling nearly $2,000,000.

**Instructor and Research Associate**
*Metropolitan Studies Department, New York University, Spring 1991.*
Designed and taught a core course for undergraduates on the political and economic development of post-war American cities.

**Assistant Program Director**
*Borough of Manhattan Community College, City University of New York, 1987 to 1990.*
Assisted the Director in all administrative aspects of the BMCC Summer Immersion Program, a non-traditional, intensive, remedial education program.

**Research Assistant and Data Analyst**
*CUNY Data Service, The Graduate School, City University of New York, 1987 to 1991.*
Programmed and analyzed large data sets from the 1980 STF and PUMS (microdata) Census files, and the New York City Housing and Vacancy Surveys.

**Research Assistant**
*Department of Political Science, The Graduate School, City University of New York, 1985 to 1987.*

## OTHER EMPLOYMENT

**Research Director**
*Project Vote, 2010 to 2011.*
Conduct research and develop a research program for a non-profit organization that runs voter registration drives, litigates violations of the National Voter Registration Act of 1993, and advocates for the voting rights of minorities, youth and the poor.

**Issues Director**
*The Committee for David N. Dinkins, II, New York City, 1991 to 1993.*
Conducted research for Mayor David N. Dinkins' campaign committee on a wide range of public policy issues and problems facing New York City.

**Campaign Manager**
*McCabe for City Council, Brooklyn, New York, 1991.*
Organized and administered the successful campaign for the Democratic Party nomination and the New York City Council seat in the 38th Council District.

**Union Organizer**
*District 65/UAW, (AFL-CIO), Northeast Regional Office, Boston, Massachusetts, 1984 to 1985, Summer 1986.*
Participated in the planning and implementation of a union organizing campaign; served as editor of union local's newsletter; assisted negotiating committee in contract negotiations.

## ACADEMIC AND PROFESSIONAL HONORS

Civic Engagement Faculty Fellow, Rutgers-Camden, 2012
Grant Recipient, Special Opportunities Fund, Carnegie Corporation of New York, 2007
Senior Fellow, Democracy Program, Dēmos – A Network for Ideas and Action, 2006 to present
Member, Working Group on Immigration Challenges, The Century Foundation Homeland Security Project, 2004
Faculty Fellow, Institute for Social and Economic Research and Policy, Columbia University, 2002 to 2011
Member, Working Group on New York's Recovery from 9-11, Russell Sage Foundation, 2002 to 2005
Curriculum Development Award, Barnard Project on Diaspora and Migration, 2000
CUNY Graduate School Dissertation Year Fellowship, 1996-1997

## PROFESSIONAL AFFILIATIONS

American Political Science Association
American Sociological Association
American Association of Public Opinion Research
Midwest Political Science Association
New York Chapter, AAPOR
Social Science History Association
Southern Political Science Association
Urban Affairs Association

## COURSES

*Rutgers-Camden*
Civic Engagement, Nonprofits and Community Development
Foundations of Policy Analysis
Research Workshop

*Barnard College*
American Urban Politics
Contemporary Urban Problems
Dynamics of American Politics
Independent Study in American Politics
Participation and Democracy
Senior Research Seminar in American Politics
Urban Myths and the American City

*New York University*
The Crisis of the Modern American City

*Graduate Committees (Examiner)*
Columbia University Ph.D. Program in Political Science, Dissertation Committee, 12/00, 5/03, 5/09.
Columbia University School of Architecture, Planning and Preservation, Dissertation Proposal Committee, 2/08.
Columbia University School of Architecture, Planning and Preservation, Dissertation Committee, 4/10.
CUNY Graduate Center Ph.D. Program in Political Science, Dissertation Committee, 4/05, 5/06, 8/06.
CUNY Graduate Center Ph.D. Program in Political Science, Oral Doctoral Exam, 12/00.

## PEER-REVIEWED PUBLICATIONS

*Books*

*The Myth of Voter Fraud*, Ithaca, New York: Cornell University Press, 2010.

*Keeping Down the Black Vote: Race and the Demobilization of American Voters*, New York: The New Press, 2009; co-authored with Frances Fox Piven and Margaret Groarke.

*Journal Articles*

"Modeling Problems in the Voter ID-Voter Turnout Debate," *Election Law Journal* 8:2 (2009), 85-102; co-authored with Robert S. Erikson.

"Model Assumptions, and Model Checking in Ecological Regressions," *Journal of the Royal Statistical Society* 164, Part 1 (2001), 101-118; co-authored with Andrew Gelman, David K. Park, Stephen Ansolabehere, and Phillip N. Price.

*Chapters in Edited Volumes*

"Poverty and Social Movements," in *The Oxford Handbook of Poverty and Society*, edited by David Brady and Linda M. Burton, Oxford University Press, 2013, co-authored with Frances Fox Piven; *forthcoming*.

"Voter Identification Laws: The Controversy Over Voter Fraud," in Matthew J. Streb, ed., *Law and Election Politics*, New York: Routledge, 2012, *forthcoming*.

"Lost in Translation? A Critical Reappraisal of the Concept of Immigrant Political Incorporation," in Jennifer Hochschild and John H. Mollenkopf, eds., *Bringing Outsiders In: Transatlantic Perspectives on Immigrant Political Incorporation*, Ithaca, New York: Cornell University Press, 2009.

"Environmental Risk and Childhood Disease in an Urban Working Class Caribbean Neighborhood," in Sherrie L. Baver and Barbara Lynch Deutsch, ed., *Beyond Sun and Sand: Caribbean Environmentalisms*, New Brunswick, NJ: Rutgers University Press, 2006; co-authored with Immanuel Ness.

"Outside the Circle: The Impact of Post-9/11 Responses on the Immigrant Communities of New York City," in John H. Mollenkopf, ed., *Contentious City: The Politics of Recovery in New York City*, New York: Russell Sage Foundation, 2005.

"Between Anglo and Black: Asian and Latina/o Political Participation in New York City," in William E. Nelson, Jr. and Jessica Perez-Monforti, eds., *Black and Latino/a Politics: Issues in Political Development in the United States*, Miami: Barnhardt and Ash, 2005; co-authored with John Mollenkopf.

"The Changing Arab New York Community," in Kathleen Benson and Philip M. Kayal, eds., *A Community of Many Worlds: Arab Americans in New York City*, Syracuse: Syracuse University Press, 2002; co-authored with Louis Abdellatif Cristillo.

"Social Capital, Political Participation and the Urban Community," in Susan Saegert, J. Phillip Thompson, and Mark Warren, eds., *Social Capital and Poor Communities*, New York: Russell Sage Foundation, 2001; co-authored with Ester R. Fuchs and Robert Y. Shapiro.

"Patterns of Neighborhood Change," in John H. Mollenkopf and Manuel Castells, eds., *Dual City: Restructuring New York*, New York: Russell Sage, 1991; co-authored with Frank F. DeGiovanni.


# OTHER (NON-PEER-REVIEWED) PUBLICATIONS

### Chapter in Conference Proceedings

"The Political Incorporation of Immigrants in New York," in *In Defense of the Alien: Proceedings of the 23rd Annual National Legal Conference on Immigration and Refugee Policy*, New York: Center for Migration Studies, 2001; co-authored with Jennifer Holdaway and Ronald Hayduk.

### Encyclopedia Entries

"Voter Education," in *The Encyclopedia of Social Work*, 20th ed., New York: Oxford University Press, 2008; co-authored with Frances Fox Piven.

"The Working Families Party," in Immanuel Ness, ed. *The Encyclopedia of American Third Parties*, Armonk, New York: M.E. Sharpe, Inc., 2000.

### Book Reviews

*Waiting for the Cemetery Vote*, by Tom Glaze, *American Review of Politics, forthcoming*.

*Election Fraud: Detecting and Deterring Electoral Manipulation* edited by R. Michael Alvarez, Thad Hall and Susan D. Hyde, *Election Law Journal* 8:3 (2009).

*Governing From Below: Urban Regions and the Global Economy* by Jefferey M. Sellers, Cambridge University Press, 2002, in *Political Science Quarterly* Vol. 118, No. 4 (Winter 2003-2004).

*Social Class, Politics, and Urban Markets: The Makings of Bias in Policy Outcomes* by Herman L. Boschken, Stanford, CA: Stanford University Press, 2002, in *The International Journal of Urban and Regional Research*, Vol. 27, No. 4 (December 2003).

*The Miami Fiscal Crisis: Can a Poor City Regain Prosperity?* by Milan J. Dluhy and Howard A. Frank, Westport, Connecticut: Praeger Publishers, 2002, in *Political Science Quarterly* Vol. 117, No. 4 (Winter 2002-2003).

### Research Reports

*Latino New Yorkers in the 2008 Presidential Election: The New Americans Exit Poll,* New York Latino Research Network (NYLARNet) at The University of Albany, *forthcoming.*

Research Memo: *First-time Voters in the 2008 Election,* Project Vote, Washington, D.C., April 2011.

*An Analysis of Who Voted (And Who Didn't Vote) in the 2010 Election,* Project Vote, Washington, D.C., November 2010.

Research Memo: *Debunking the Tea Party's Election Night Message,* Project Vote, Washington, D.C., October 26, 2010.

*What Happened to Hope and Change? A Poll of 2008 Voters,* Project Vote, Washington, D.C., September 2010.

*Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security,* Dēmos – A Network for Ideas and Action, New York, November 2007.

*The Politics of Voter Fraud,* Project Vote, Washington, D.C., March 2007.

*Securing the Vote: An Analysis of Election Fraud,* Dēmos – A Network for Ideas and Action, 2003, New York; updated 2007; co-authored with David Callahan.

### *Journalism*

My expertise on elections and voter fraud was sought and widely cited and quoted in print and broadcast media during the 2008, 2010 and 2012 election seasons.

"The Other Campaign: Who Gets To Vote," *New Labor Forum,* May 2012; co-authored with Frances Fox Piven.

"Why We Need ACORN," *Los Angeles Times,* April 22, 2010; co-authored with Frances Fox Piven.

"What Obama Means," *Red Pepper Magazine,* April-May, 2008; co-authored with Frances Fox Piven.

"N.C. Rejects Politics of Fear," *The Charlotte Observer,* Charlotte, North Carolina, July 18, 2007.

"Politicians, Beware!" *New York Daily News,* New York, July 24, 2005.

"Albany's Making Bad Elections Worse," *New York Daily News,* New York, August 22, 2004.

## UNPUBLISHED PAPERS, PRESENTATIONS AND REPORTS

### *Works in Progress*

"Is Political Polarization Good or Bad for Democracy?"

"Propaganda and the Resurgent Right in American Electoral Politics"

"Are Latino New York Voters Distinctive in Their Political Attitudes and Vote Choices?"

"Can We Use Election Forensic Techniques to Detect Illegal Purging of Registered Voters?"

"The Policy Consequences of Class Bias in the Electorate"

"The National Voter Registration Act of 1993: A Case Study of the Politics of Policy Implementation Failure"

### *Conference Participation, Papers and Invited Presentations*

Invited Panelist, "The Voting Rights Act: Where Do We Go From Here?" Rutgers University Law Review Symposium, Trenton, New Jersey, April 13, 2012.

Invited Panelist, "Voting Rights," Civil Rights Law Society, Columbia University Law School, New York City, March 20, 2012.

Invited Panelist, "Race and Public Policy," conference at George Mason University School of Public Policy, Arlington, VA, October 10, 2011.

Invited Panelist, "Organizing the Poor for Rights: The Work of Frances Fox Piven," 107th Annual Meeting of the American Political Science Association, Seattle, September 1-4, 2011.

"Is Political Polarization Good or Bad for Democracy?," paper presented at the Annual Meeting of the Midwest Political Science Association, Chicago, March 30-April 2, 2011.

Invited Roundtable Participant, "Voter Disenfranchisement in American Politics," Annual Meeting of the Southern Political Science Association, New Orleans, January 6-8, 2011.

Invited Panelist, "Voter Participation," New York City Charter Revision Commission, New York City, June 2, 2010.

Discussant, "Immigrant Voters: Asian Americans and the 2008 Election," Immigration Seminar Series, Graduate School and University Center of the City University of New York, May 4, 2009.

"Purging Voters Under the NVRA," paper presented at the Annual Meeting of the Midwest Political Science Association, Chicago, April 2-5, 2009; co-authored with Margaret Groarke.

Invited Panelist, "Democracy in America: The African-American Experience -- Then, Now and Future," U.S. Mission to the United Nations, New York, March 17, 2009.

Invited Speaker, "Voter Suppression in the 2008 Presidential Election," Funders Committee for Civic Participation, Washington, D.C., December 9, 2008.

Invited Panelist, "Stealing the Vote in 2008," A Panel Discussion at New York University, October 16, 2008.

Invited Panelist, "Keeping Down the Vote: Vote Suppression and the 2008 Election," Sarah Lawrence College, September 23, 2008.

"Modeling Problems in the Voter ID-Voter Turnout Debate," paper presented at the State Politics and Policy Conference, Temple University, Philadelphia, May 30-31, 2008; co-authored with Robert S. Erikson.

Panelist, "Keeping Down the Black Voter: Race and the Demobilization of American Voters," *Left Forum 2008*, New York, March 16, 2008.

Panel Discussant, "Group Mobilization, Partisanship, Ideas, and Leadership: The Los Angeles and New York Mayoral Elections of 2005," 102nd Annual Meeting of the American Political Science Association, Philadelphia, August 31—September 3, 2006.

"Re-thinking Immigrant Political Incorporation," paper presented at the 36th Annual Meeting of the Urban Affairs Association, Montreal, Canada, April 19-22, 2006.

"Immigrant Politics in an Age of Terror," paper presented at the 101st Annual Meeting of the American Political Science Association, Washington, D.C., September 1 – September 4, 2005.

Panel Discussant, "Immigrants As Local Political Actors," 100th Annual Meeting of the American Political Science Association, Chicago, September 1–4, 2004.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, August 5, 2004.

"The Impact of 9/11 on Immigrant Politics in New York, With a Focus on Arab, Muslim, and South Asian Immigrant Communities," Columbia University Seminar on the City, New York City, March 23, 2004.

Invited Participant, "The Impact of Post-9/11 Immigration and Law Enforcement Policies," The Century Foundation, New York City, February 4, 2004.

Workshop Participant, Multi-race Study Group, *Harvard CAPS Workshop on Methodologies to Study Immigrant Political Incorporation*, Harvard University, Cambridge, October 30-31, 2003.

Invited Lecturer, "Literature of Immigration," New Jersey Council for the Humanities Teacher Institute, Monmouth University, Long Branch, New Jersey, July 10, 2003.

Panelist, "Rebuilding Post-War Iraq: Domestic and International Implications;" Community Forum, Barnard College, New York City, April 21, 2003.

"Political Participation and the Neglected Role of Spatial Form;" paper presented at the 33rd Annual Meeting of the Urban Affairs Association, Cleveland, Ohio, March 27-30, 2003.

Invited Speaker, "Teach-In on Iraq;" Barnard College, New York City, November 8, 2002.

Panelist, "Colloquium on Responding to Violence," in honor of Virginia C. Gildersleeve Lecturer, Jody Williams, Barnard Center for Research on Women, Barnard College, New York City, October 25, 2002.

Panel Moderator, "Who is Brooklyn?" at *The Future of Brooklyn* Conference, Brooklyn College, June 7, 2002.

"Asian and Latino Participation in New York City: The 2000 Presidential Election," co-authored with John H. Mollenkopf; paper presented at the 97th Annual Meeting of the American Political Science Association, San Francisco, August 29 – September 2, 2001.

Organizer and Panelist, *The Changing Face of New York's Electorate: The Immigrant Vote in 2000 and Beyond*, A Panel Discussion and Media Briefing sponsored by the New York Immigration Coalition and Barnard College, New York City, May 2, 2001.

Organizer and Panelist, *The Muslim Communities in New York City Project; A One-Day Conference*, sponsored by the Center for Urban Research and Policy and the Middle East Institute at the School of International and Public Affairs, Columbia University, New York City, April 30, 2001.

Panelist, *Democratizing New York City; Re-imagining City Government*, sponsored by the Center for Humanities, CUNY Graduate Center, New York City, March 27, 2001.

Organizer and Panel Moderator, *Independent Politics in A Global World*, sponsored by the Independent Politics Group, CUNY Graduate Center, New York City, October 6-7, 2000.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 96th Annual Meeting of the American Political Science Association, Washington, D.C., August 31 – September 3, 2000.

"The Political Participation of Immigrants in New York," at *Immigrant Political Participation in New York City; A One-Day Working Conference*, sponsored by the Center for Urban Research/CUNY and the International Center for Migration, Ethnicity, and Citizenship, New York City, June 16, 2000

"The Muslim Community in New York City Project," with Louis Abdellatif Cristillo; *Muslims in New York: An Educational Program for Religious Leaders in New York City*, seminar on faith traditions in New York; sponsored by the Interfaith Center of New York and the Imans Council of New York, New York City, June 14, 2000.

"The Political Participation of Immigrants in New York," Session VI on "Integration of Immigrants and Their Descendents," Center for Migration Studies 23rd Annual National Legal Conference on Immigration and Refugee Policy, Washington, D.C., March 30-31, 2000.

"The Changing Arab New York Community," with Louis Abdellatif Cristillo; *A Community of Many Worlds: Arab Americans in New York City*, symposium sponsored by the Museum of the City of New York, New York City, February 5-6, 2000.

"Model Assumptions, and Model Checking in Ecological Regressions," co-authored with Andrew Gelman, Stephen Ansolabehere, Phillip N. Price and David K. Park; paper presented at the Royal Statistical Society conference on the Analysis and Interpretation of Disease Clusters and Ecological Studies, London, December 16-17, 1999.

"The Political Incorporation of Immigrants in New York," co-authored with Jennifer Holdaway and Ronald Hayduk; paper presented at the 95th Annual Meeting of the American Political Science Association, Atlanta, September 1-4, 1999.

"Political Capital and Political Participation," co-authored with Ester R. Fuchs and Robert Y. Shapiro; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"Racial and Ethnic and Urban/Suburban Differences in Public Opinion and Policy Priorities," co-authored with Ester R. Fuchs, Robert Y. Shapiro, and Gustavo Cano; paper presented at the 58th Annual Meeting of the Midwest Political Science Association, Chicago, April 15-17, 1999.

"The Importance of Full Disclosure of Non-response Due to Refusals and the Nature of Potential Bias in Phone Surveys," with Robert Y. Shapiro, evening workshop presentation to the New York City chapter of the American Association for Public Opinion Research, New York City, March 9, 1999.

"White, Black and Latino Voter Turnout in the 1993 New York City Mayoral Election: A Comparison of Ecological Regression Techniques and Exit Poll Data," co-authored with David K. Park and Daniel M. Slotwiner; paper presented at the 94th Annual Meeting of the American Political Science Association, Boston, September 4, 1998.

Panel Discussant, "Race, Rights, and American Politics;" panel at the 27th Annual Meeting of the Northeastern Political Science Association and International Studies Association-Northeast, Newark, New Jersey, November 9-11, 1995.

"Assessing the Quality of Political Reform: Redistricting and the Case of New York City," paper presented at the Annual Meeting of the New York State Political Science Association, Albany, New York, April 22, 1994.

*Research Reports*

*How to Think About Voter Participation*, White Paper, New York City Charter Revision Commission, July 2010.

*The Myth of Voter Fraud*, A Report to Dēmos – A Network for Ideas and Action, May 2002.

*Evaluation of the New York Immigration Coalition's '200,000 in 2000: New Americans Pledging to Strengthen Democracy and New York' Initiative,* Final Report to the New York Foundation, with John H. Mollenkopf, August 2001.

*A Study of Attitudes Among Low-Income Parents Toward Environmental Health Risks and Childhood Disease: The Brooklyn College COPC Survey*, with Immanuel Ness, June 2001.

*Political Participation and Political Representation in New York City; With a Special Focus on Latino New Yorkers*, Report of the Columbia University/Hispanic Education and Legal Fund Opinion Research Project, co-authored with Robert Y. Shapiro and Ester R. Fuchs, December 1997.

*Congressional Testimony, U.S. Federal Court Amicus Filings and Testimony*

*League of Women Voters v. Rokita;* Supreme Court of Indiana, Brief of *Amici Curiae* Lonna Rae Atkeson, Matt A. Barreto, Lorraine C. Minnite, Jonathan Nagler, Stephen A. Nuño and Gabriel Ramon Sanchez in Opposition to Defendant's Petition to Transfer, November 2009.

Expert Witness, *Democratic National Committee, et al. v. Republican National Committee, et al.*, U.S. District Court in the District of New Jersey, 2008-2009.

U.S. Senate Committee on Rules and Administration, *Hearing on In-Person Voter Fraud: Myth and Trigger for Voter Disenfranchisement?*, March 12, 2008 (written testimony).

Witness, U.S. House Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Civil Liberties, *Oversight Hearing on Voter Suppression*, February 26th, 2008 (oral and written testimony).

*William Crawford, et al. v. Marion County Election Board, et al.; Indiana Democratic Party, et al. v. Todd Rokita et al.;* Brief of *Amici Curiae* of The Brennan Center for Justice, Demos: A Network for Ideas and Action, Lorraine C. Minnite, Project Vote, and People for the American Way Foundation, November 2007.

Fact Witness, *ACORN et al. v. Bysiewicz*, U.S. District Court in the District of Connecticut, 2004-2005.

## RESEARCH GRANTS

*Principal Investigator*, "University Collaborative Exit Poll," November 2008 to October 2009 ($30,000). Funded by Columbia University Institute of Social and Economic Research and Policy, Center for Urban Research at the Graduate School and University Center of the City University of New York, and the New York Latino Research and Resources Network at the University of Albany, State University of New York.

*Recipient*, Research Grant, Special Opportunities Fund, February 1, 2007 to January 31, 2008 ($50,000). Funded by the Carnegie Corporation of New York.

*Co-Principal Investigator*, "2006 New Americans Exit Poll," November 2006 to October 2007 ($10,000). Funded by the Graduate School of Arts and Sciences, Columbia University.

*Recipient*, Special Assistant Professor Leave Travel Grant, September 2003 to September 2005 ($7,700). Funded by the Provost's Office, Winston Fund, Barnard College.

*Recipient*, Conference Grant, September 2003 to September 2005 ($3,000). Funded by the Provost's Office, Forman Fund, Barnard College.

*Member*, Working Group on New York's Recovery from September 11th, June 2002 to June 2005 ($30,000). Funded by the Russell Sage Foundation.

*Principal Investigator*, "2002 New Americans Exit Poll," December 2002 to March 2003 ($1,800). Funded by the Faculty Research Fund of Barnard College.

*Principal Investigator*, "Evaluation of the New York Immigration Coalition's '200,000 in 2000' Campaign," July 2000 to July 2001 ($40,000). Barnard College, Columbia University. Funded by the New York Foundation.

*Co-Principal Investigator*, "Muslim Communities in New York City," July 1998 to July 2001 ($350,000). The Center for Urban Research and Policy, Columbia University. Funded by the Ford Foundation.

## SERVICE

*College and University*

Director, Undergraduate Urban Studies Program, Rutgers-Camden, 2011-2012
Member, Ford Faculty Seminar on Inequality in New York, Barnard College, 2009-2010.
Panelist, "Obama and the Immigrant Vote," Barnard Forum on Migration, October 30, 2008.
Panel Moderator, "Is Democracy Democratic?" at the Thirty-Third Annual *The Scholar and the Feminist Conference*, Barnard College, March 11, 2008.
Participant, Mellon 23 Assembly, Macalester College, St. Paul, Minnesota, February 15-17, 2008.
Panelist, "Election Reflections: The Bush Legacy and the Coming Presidential Elections," Barnard College, Oct. 8, 2007.
Member, *The Scholar and the Feminist Conference* Planning Committee, Barnard Center for Research on Women, 2006.
Member, Faculty Programs and Governance Committee, 2005-2007 (on leave Spring 2007).

Member, Faculty Committee, Barnard Leadership Initiative, 2005-2007 (on leave Spring 2007).
Member, Medalist Committee, Barnard College, 2004-2006, 2007-2009 (on leave Spring 2007).
Member, Columbia University Seminar in Political and Social Thought, 2004 to 2011.
Faculty Mentor, Francene Rodgers Scholarship Program, Barnard College, Summer 2004.
Panel Moderator, "Governance by the Media: Feminists and the Coming Election," at the Twenty-Ninth Annual *The Scholar and the Feminist Conference*, Barnard College, April 3, 2004.
Member, Ph.D. Subcommittee in Urban Planning, Columbia University School of Architecture, Planning and Preservation, 2003 to 2011.
Member, Columbia University Seminar on Globalization, Labor, and Popular Struggles, 2001 to 2011.
Member, Columbia University Seminar on the City, 2001 to 2011.
Faculty Mentor, Columbia University Graduate School of Arts and Sciences Summer Research Program, 2001.
Advisory Board Member, Barnard Center for Research on Women, 2000 to 2011.
First Year Adviser, Barnard College, 2000 to 2004, 2009 to 2011.
One-Year Replacement Member, Committee on Programs and Academic Standing, Barnard College, 2000-2001.

### Professional

I have reviewed numerous journal articles for the *American Political Science Review, American Journal of Political Science, American Review of Politics, British Journal of Industrial Relations, Ethnic and Racial Studies, Journal of Ethnic and Migration Studies, Law and Society Review, Perspectives on Politics, Political Research Quarterly, Political Science Quarterly, Urban Affairs Review*, and *Working U.S.A.: The Journal of Labor and Society*; and book proposals and manuscripts for Blackwell Publishers, Lexington Books, Routledge, M.E. Sharpe, Inc., and The New Press.

Seminar Speaker, Carnegie-Knight News21 Initiative Reporting Seminar on Voting Rights, The Walter Cronkite School of Journalism and Mass Communication, Arizona State University, February 2, 2012.
Member, Best Book Committee, Urban Section, American Political Science Association, 2010-2011.
Executive Council Member, Urban Section, American Political Science Association, 2008-2010.
Member, Charles A. McCoy Career Achievement Award, New Politics Section, APSA, 2008-2009.
Member, Best Dissertation Committee, Urban Section, American Political Science Association, 2008-2009.
Co-chair, Local Host Committee, American Sociological Association Annual Conference, 2006-2007.
Nominating Committee, Urban Section, American Political Science Association, 2006-2007.
Chair, Piven and Cloward Award Committee, New Political Science Section, American Political Science Association, 2005-6.
Executive Council Member, Urban Section, American Political Science Association, 2005-2007.
Member, Best Paper Committee, Urban Section, American Political Science Association, 2005-2006.
Editorial Board Member, *Working USA: The Journal of Labor and Society*, 2004 to present.
Grant Reviewer, Research Award Program, The City University of New York, 2003.
Member, New York Colloquium on American Political Development, 2001 to present.

### Community

Invited Speaker, Registrar's of Voters Association of Connecticut, Annual Meeting, Cromwell, CT, April 12, 2012.
Keynote Speaker, Federal Aviation Administration William J. Hughes Technical Center 2012 Black History Month Celebration, Atlantic City, New Jersey, February 15, 2012.
Host Committee, New York State Immigrant Action Fund, 2010.
Board Member, The Left Forum, 2009 to present.
Member, New York City Comptroller-Elect John Liu Transition Committee Working Group on External Affairs, 2009.
Board Member, Project Vote, 2008-2009.
Speaker, "The Immigrant Voter in New York City," New York Voter Assistance Commission, New York City, May 19, 2005; Citizens Union, New York City, May 18, 2005; New York Immigration Coalition, New York City, February 17, 2005; New York City Central Labor Council, New York City, April 28, 2004.
Speaker, "The Post-9/11 Crackdown on Immigrants," Coney Island Avenue Project, Brooklyn, New York, March 25, 2004.
Volunteer, *New York Immigration Coalition*, Voter Registration at INS Naturalization Ceremonies, 1998 to 2002.

# CONSULTANTSHIPS

*New York City Charter Revision Commission, 2010.*

Analyzed the problem of voter participation in New York City and possible solutions for consideration by Commissioners as they prepared ballot referenda to be placed before the voters in 2010.

*New York Latino Research and Resources Network at the University of Albany, State University of New York, 2008.*
Analyzed survey and other data and wrote two reports on Latino political participation in New York City and New York State in the 2008 presidential election.

*New York Immigration Coalition, New York, New York, 2006.*
Provided technical assistance to a three-city exit poll survey project for the 2006 national midterm elections.

*Brennan Center for Justice at New York University School of Law, 2004-2005.*
Provided expert report on voter fraud and testified as a fact witness in *ACORN, et al. v. Bysiewicz* (Civil Action No. 3:04-CV-1624 (MRK)).

*Howard Samuels State Management and Policy Center, Graduate School and University Center of CUNY, 2002.*
Consulted on survey design for a project on the efficacy of community-based organizations.

*Dēmos, New York, New York, 2001 to 2002.*
Researched and wrote a study of voter fraud in contemporary American politics.

*1199 Child Care Fund, New York, New York, 2000 to 2002.*
Prepare demographic data for Fund-eligible union members and their children.

(4/12)