## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia, *et al.*,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)        Civil Action File<br><br>        No. 1:18-cv-05391-SCJ |

## DEFENDANTS' MOTION TO EXCLUDE
## TESTIMONY OF DR. KENNETH R. MAYER
## AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Evidence 702, Defendants, Secretary Raffensperger (the "Secretary"), the State Election Board, and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le (collectively "Defendants"), submit this Motion to Exclude the Testimony of Kenneth R. Mayer, Ph.D. ("Dr. Mayer"). This Motion applies for trial and this Court's consideration of Defendants' Motions for Summary Judgment. *See Chapman v. Procter & Gamble Distrib., LLC,* 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (providing that only admissible evidence can be considered on a motion for summary judgment).

## I.    Introduction.

Dr. Mayer is a professor of political science at the University of Wisconsin, Madison. [Doc. 238 at 36.[1]] Dr. Mayer has testified as an expert witness on the subject of state voter identification laws but has not previously testified on the subject of voter verification. (Mayer Dep. at 14:1-15:18.[2]) When testifying in election cases, he usually does so in support of parties challenging state action.

Dr. Mayer's report concludes that Georgia's voter-verification process disproportionately affects registrants who are racial minorities. [Doc. 238 at 31-32.] It also concludes that the implementation of voter-verification processes varies from county to county. [*Id.* at 32.] Finally, it concludes that employees in the Secretary's office do not understand voter-verification policies, and that training materials from the Secretary's office "contain inaccurate and ambiguous information that will likely lead to errors in election administration." [*Id.*]

---

[1] For clarity, citations herein to specific pages of Dr. Mayer's report, [Doc. 238], are to the docket pages indicated at the top of each page.
[2] A copy of the transcript of Dr. Mayer's deposition is attached as **Exhibit A**.

His testimony should be excluded because it is neither relevant nor reliable.  His conclusions do not consider current Georgia election law or voter experiences thereunder and otherwise is lacking in Georgia-specific knowledge.  Additionally, serious methodological flaws arising out of a confluence of unhelpful data regurgitations and comparisons and gaps in knowledge render his opinions at best speculative and, in any event, too unreliable to be admissible.

## II.     Facts: Dr. Mayer's Testimony.

Dr. Mayer's report indicates that he will testify about the administration of the portion of Georgia's voter-verification law requiring a newly registered voter whose identifying information provided during registration does not match the identifying information for that registered voter on file with the Georgia Department of Driver Services ("DDS") or United States Social Security Administration ("SSA") to present proof of identity before voting. *See* O.C.G.A. § 21-2-220.1(b).[3]  Georgia electoral parlance refers to this category of registered voters as "Missing ID Required" or "MIDR," but even if a voter is classified as "MIDR," the voter is placed on the rolls as an active voter if otherwise qualified to register to vote. *See*

---

[3] Plaintiffs refer to this statutory provision as the State's "exact match" policy.

O.C.G.A. § 21-2-220.1(b) ("In the event that the name, driver's license number, social security number, or date of birth provided by the person registering to vote on the voter registration form does not match information about the applicant on file at [DDS] or the federal [SSA], the applicant shall nevertheless be registered to vote but shall be required to produce proof of his or her identity . . . at or before the time that such applicant requests a ballot for the first time in any federal, state, or local election."). The forms of identification that a voter in MIDR status can provide are the same types of identification required for a non-MIDR to vote. *See* O.C.G.A. § 21-2-417 (describing the acceptable forms of proof of voter identity for these purposes).

Separately, an applicant may be placed in "pending" status if information on file indicates that the applicant is not a United States citizen. *See* O.C.G.A. § 21-2-216(g) (describing process where an application for registration is not accompanied by evidence of United States citizenship). The types of satisfactory evidence of citizenship include, among other things, a birth certificate, a naturalization certificate, and the number of the applicant's Georgia driver's license or identification card issued by the DDS if the applicant has provided satisfactory evidence of citizenship to DDS. *See* O.C.G.A. § 21-2-216(g)(2).

"The key empirical quantity of interest," Dr. Mayer wrote in his report, "is the number of otherwise eligible people incorrectly placed in 'MIDR' status because their registration information did not exactly match with information in state driver's license files maintained by the DDS or national Social Security files . . . or because they were flagged as noncitizens." [Doc. 238 at 6.] In both his report and deposition testimony, Dr. Mayer admitted he does not have the answer to his "key empirical" question. [*Id.* at 7-8.] (Mayer Dep. at 41:24-43:2.)

Dr. Mayer also admitted he does not know the reasons why certain voters appeared on one of the MIDR lists he examined, or even what method of registration these voters used. [Doc. 238 at 8.] (Mayer Dep. at 68:4- :8, 94:10- :13, 134:16- :18, 159:5- :15.) He did not examine any DDS or SSA records. [Doc. 238 at 8.] (Mayer Dep. at 44:13-46:1.) And he admitted that he may have misstated in his report the type of information provided by SSA. (*Id.* at 121:13-123:8.) He acknowledged that he did not conduct a causal analysis on the central question of his report—i.e., why voters ended up in pending or MIDR status—and based his conclusions solely on inferences. (*Id.* at 159:5- :15. *See id.* at 41:24-43:2.)

In ascribing consequences to Georgia's voter-verification law, Dr. Mayer acknowledged he did so not by reference to the law itself but to the

descriptions of the voter-verification process he read in the transcripts of Plaintiffs' counsel's depositions of three officials in the Secretary's office. (Mayer Dep. at 9:2-11:3, 21:2- :16.) He did this even though he understands that county officials, not the Secretary, handle the voter-registration process. (*Id.* at 11:4- :10.) The only people Dr. Mayer actually spoke to were Plaintiffs' attorneys; he did not talk to anyone else in Georgia about the case, Georgia's voter-verification process, or any of the related issues discussed in his report. (*Id.* at 22:2- :17, 157:2- :7.)

Further, even though Georgia's legislature amended the voter-verification law in 2019 with H.B. 316, Dr. Mayer did not investigate whether voters experienced any confusion attributable to the voter-verification law in Georgia elections held after the effective date of H.B. 316. (*Id.* at 77:16-78:13. *See id.* at 111:25-112:2 (stating there was no reason why he did not look at the post-H.B. 316 numbers).) He also relied on Georgia racial demographic information about possession of Georgia driver's licenses and state identification cards that had not been updated since at least 2008. (*Id.* at 86:6- :18, 137:4- :20.)

Dr. Mayer also admitted that knowing whether voters in MIDR status submitted paper voter registration applications or registered through a paperless process would be relevant to his analysis. (*Id.* at 134:2-8.)  As Dr.

Mayer agreed, paperless voter registration is more accurate than paper voter registration applications. (*Id.* at 134:9-14.) However, Dr. Mayer did not examine data regarding the mode of registration used by voters in concluding that minorities are disproportionately affected by the voter verification process. (*Id.* 134:16-18.)

Perhaps most significantly, with regard to his race-based conclusions about outcomes of Georgia's voter-verification law, Dr. Mayer was not able to account for the racial composition of the input set of voters; in other words, he compared the racial demographics of the list of pending voters during two arbitrarily selected times with the racial demographics of the entire electorate rather than those of the corresponding subset of registrants. (*Id.* at 105:12- :14, 106:4-107:4; 116:21- :22.) He nevertheless acknowledged that if the proportion of registrants of a particular race in a given period matched the proportion of voters of that race in pending status for the corresponding period, there would *not* be a racially disproportionate effect. (*Id.* at 111:1- :24, 135:12- :23.)

## III.    Analysis.

### A.    The *Daubert* Standard

Under Rule 702, courts provide an important "gatekeeping" function by limiting expert opinion testimony to that which is sufficiently reliable.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999).  A Rule 702 or *Daubert* analysis has three components—(1) qualification of the expert in the subject matter; (2) reliable methodology; and (3) helpfulness, through the application of specialized expertise, to the trier of fact—and requires the party putting forth the expert testimony to establish the qualification, reliability, and relevance or helpfulness of the opinion testimony.  *Allison v McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

The "reliability" analysis considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community."  *Id.* (citation omitted).  The relevance prong requires the party offering the testimony to show that the proffered testimony "logically advances a material aspect of the proposing party's case."  *Id.*

The burden of establishing that Dr. Mayer's testimony satisfies these requirements lies exclusively with the Plaintiffs.  *Thomas v. Publix Super Markets, Inc.*, No. 1:09-cv-01933-SCJ, 2011 WL 13177240 at *2 (N.D. Ga. Jul. 22, 2011).

Dr. Mayer's testimony fails both the relevance and reliability prongs of the *Daubert* test.

B.    <u>Relevance</u>.

Dr. Mayer's testimony is not relevant to the allegations before the Court because his conclusions do not account for present realities in Georgia.

Georgia amended the voter-verification law in 2019 through the enactment of H.B. 316. *See* O.C.G.A. § 21-2-220.1. Even if Dr. Mayer is aware of that fact, he has not investigated the effects of the law as amended by H.B. 316 or whether voters experienced any confusion attributable to the voter-verification law in Georgia elections held after the effective date of H.B. 316. (Mayer Dep. at 77:16-78:13. *See id.* at 111:25-112:2 (stating there was no reason why he did not look at the post-H.B. 316 numbers).)  The as-amended law is the one that governs in this case, and Dr. Mayer's reliance on pre-H.B. 316 data for his analysis renders his conclusions irrelevant.

Even Dr. Mayer's conclusions under Georgia's old law are not relevant, because Dr. Mayer reached them not by reference to the law itself but to the descriptions of the voter-verification process he read in deposition transcripts of the Secretary's staff, who, Dr. Mayer understands, do not process voter registration applications or conduct the verification process.  (*Id.* at 9:2-11:10, 21:2- :16.)  Dr. Mayer did not talk to anyone in Georgia about the case or the voter-verification process except Plaintiffs' attorneys. (*Id.* at 22:2- :17, 157:2- :7.)  And, the information he does have on racial breakdowns of possession of

driver's licenses or identification cards, a common focus of his work outside of this case, is, for Georgians, more than a decade out of date, thus rendering his conclusions on MIDR voters' ability to present identification at the polls irrelevant to current conditions in the state.  (*Id.* at 86:6- :18, 137:4- :20.)

The consequence of these problems is that Dr. Mayer's testimony lacks a "connection to the disputed facts." *Allison*, 184 F.3d at 1312.  Put differently, Dr. Mayer's testimony will not "help the trier of fact decide the case at bar." *Rindfleisch v. Gentiva Health Servs., Inc.*, No. 1:10-CV-3288-SCJ, 2015 WL 12552053 at *4 (N.D. Ga. Dec. 23, 2015) (excluding expert testimony).

The bottom line is that Dr. Mayer's testimony has been offered most frequently in cases involving voter photo ID laws, and Georgia's is not at issue in this case.  Dr. Mayer's attempt to port his prior work into a discussion of Georgia's voter-verification law accounts for neither current Georgia law nor current, pertinent realities in the state.  The testimony therefore does not assist the trier of fact and should be excluded.

C.    Methodology.

Dr. Mayer's methodology underlying all of his conclusions contains a series of critical flaws, rendering his testimony too unreliable to be considered in this case.

First, Dr. Mayer conceded that he does not have the actual answer to the "key empirical" question his testimony presents: the number of otherwise eligible voters incorrectly placed in MIDR status because of an "exact match" failure or a noncitizen "flag." [Doc. 238 at 6-8.] (Mayer Dep. at 41:24-43:2.)  In other words, he does not know who was in the group of registered voters required to show identification at the polls but should not have been in that group.

Next, Dr. Mayer acknowledged he did not conduct a causal analysis on this central question, and he admittedly does not know why any particular voter's name appeared on the MIDR lists he examined, nor does he even know what method of registration those voters used.  (Mayer Dep. at 68:4- :8, 94:10- :13, 134:16- :18, 159:5- :15. *See id.* at 41:24-43:2.)  Perhaps unsurprisingly in light of the foregoing, Dr. Mayer testified that all of his conclusions are based solely on inferences.  (*Id.* at 159:5- :15.)  Dr. Mayer's unfounded extrapolations from the limited data sets that he cites thus are not reliable.

Dr. Mayer's exclusive reliance on inferences is particularly problematic because he did not review key source material, namely the DDS and SSA records against which voter-registration information is checked for a "match." (Mayer Dep. at 44:13-46:1.)

Moreover, in inferring that non-white voters disproportionately comprise the group of pending-status voters, he relies almost entirely on two arbitrarily selected lists of pending-status voters. The particularly troublesome flaw in this approach is that Dr. Mayer compares the racial demographics of these two lists not against those of the registrants during the relevant periods—to see whether non-white registrants disproportionately landed in pending status—but instead against those of all Georgia voters.

The obvious consequence of choosing the wrong baseline data set is a failure to account for the possibility that the racial demographics of the pool of registrants during those periods also varied from those of the state's electorate as a whole. (*Id.* at 105:12- :14, 106:4-107:4; 116:21- :22.) Such a possibility even may be a probability in light of the record numbers of non-whites who registered to vote in Georgia in the leadup to the November 2018 election in this state. And Dr. Mayer agreed: if the proportion of *registrants* of a particular race in a given period matched the proportion of voters of that race in pending status for the corresponding period, there would not be a racially disproportionate effect. (*Id.* at 111:1- :24, 135:12- :23.)

Compounding this comparison problem is a similar, substantive methodological error: Dr. Mayer's admitted ignorance of the registration

method used by different voters on the MIDR lists he examined caused an additional mismatch in his analysis.  [Doc. 238 at 8.] (Mayer Dep. at 68:4- :8, 94:10- :13, 134:16- :18, 159:5- :15.)  As Dr. Mayer acknowledged, the only registrants who might appear on an MIDR list are those using paper registration forms, whether submitted by mail or in-person (collectively referred to in Georgia election parlance as "registration by mail" or "mail-in registrations").[4]  (*Id.* at 20:11- :13, 67:18- :23).   He therefore should have compared the racial demographics of the voters on the MIDR lists he examined with the racial demographics of those registrants who registered by mail.  Like his other comparison problem, this one fails to consider the possibility that the demographics of registrants using mail-in registrations is different from those of the state's entire electorate.

Dr. Mayer's use of full-electorate racial demographics as a benchmark, rather than the demographics of the pool of people who actually could have appeared on the MIDR lists he referenced thus represents a clear methodological error that renders his conclusion unreliable.

---

[4] Someone who registers to vote through DDS never will appear on an MIDR list, because that person's voter-registration information and the information in the person's DDS file are one and the same and therefore will not be mismatched.

As previously described, on two important aspects, Dr. Mayer bases his analysis on data that is not current, which goes to both relevance and reliability. He has not analyzed whether his conclusions apply in elections held after the effective date of H.B. 316. And, in attempting to bootstrap his more familiar voter identification work into a voter-verification analysis, he relies on a 2008 article that is based on 2006 data and conducted no follow-up work on that issue in Georgia.[5] (*Id.* at 86:6- :18, 137:4- :20.) The absence of current data used to support Dr. Mayer's conclusions render them unreliable.

Also as previously described, Dr. Mayer's testimony is lacking Georgia bona fides. Dr. Mayer did not speak to anyone in Georgia (besides Plaintiffs' lawyers) about this case. (*Id.* at 22:2- :17, 157:2- :7.)

Nor did Dr. Mayer base his conclusions on a direct examination of the state's election code law. Instead of relying on the (current or former) text of the voter-verification statute, he used only the responses of a few high-level officials in the Secretary's Office to deposition questions from Plaintiffs' counsel to form his understanding of pertinent Georgia law. (*Id.* at 9:2-11:3, 21:2- :16.) That is not a helpful way to provide legal analysis, nor does it support his conclusion that these state-level officials do not understand voter-

---

[5] A copy of this article is attached as **Exhibit B**.

verification policies and that training materials from the Secretary's office

"contain inaccurate and ambiguous information that will likely lead to errors

in election administration." [See Doc. 238 at 32.] That these deponents may

not have described the law and its administration by county-level officials in

identical terms does not mean they do not have a sufficient understanding of

it, nor does it mean that those state and county-level officials who actually

work with the technological process on a regular basis do not understand it.[6]

Regarding his conclusion about the training materials, Dr. Mayer's

testimony betrayed his own unfamiliarity with Georgia election law, which

was the actual reason why he thought the training materials were incorrect;

in fact, they accurately cited Georgia law. (Mayer Dep. at 154:24-155:3.)

Dr. Mayer's testimony on the supposed uneven geographic distribution

of Georgia voters in pending status is not evidence of inconsistent

administration of the state's voter-verification law at the county level. He

---

[6] Dr. Mayer's methodological decision to eschew reading the Georgia Code itself also raises serious practical questions about his ability to render a conclusion that the deponents from the Secretary's office do not understand statutory provisions Dr. Mayer has not read. Indeed, Dr. Mayer's deposition testimony revealed his conclusion's shortcomings in this area when he criticized the appearance of a particular legal phrase in training materials without realizing the phrase came directly from the applicable Georgia statute, which Dr. Mayer admitted he did not read. (Mayer Dep. at 150:17-155:3)

apparently failed to account for the fact that the population of registered Georgia voters is not distributed evenly across all of the state's 159 counties. (Mayer Dep. at 143:10-145:10.)

Dr. Mayer has spent many years in Wisconsin working on voter photo ID issues, but it is apparent from his testimony that he has not spent meaningful time understanding Georgia's (current or former) voter-verification law and its effects on Georgia voters today. It is evident from his unawareness of voter responses to the current voter verification law. It is evident from his unawareness of the operation of the law itself. It is evident from his unawareness of how those actually responsible for the implementation of the law in fact implement it. It is evident from his unawareness that training materials from the Secretary's office actually reflect Georgia law. And it is evident from his unawareness of the distribution of the population of registered voters across Georgia's counties. For this constellation of reasons, his testimony is not reliable.

## IV.    Conclusion.

Dr. Mayer's testimony is neither relevant to the issues before the Court nor a reliable aid to the trier of fact in this case, and Defendants therefore ask the Court to exclude it under Federal Rule of Evidence 702.

Respectfully submitted this 25th day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbin Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:(404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com

Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

MOTION TO EXCLUDE TESTIMONY OF DR. KENNETH MAYER was

prepared double-spaced in 13-point Century Schoolbook font, approved by the

Court in Local Rule 5.1(C).


*/s/Josh Belinfante*
Josh Belinfante