# EXHIBIT A

# In The Matter Of:

*Fair Fight Action v.*
*Raffensperger*

---

*Kenneth Mayer, Ph.D.*
*February 26, 2020*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3    _____

 4   FAIR FIGHT ACTION, INC., et al.,

 5            Plaintiffs,

 6        vs.                    Case No. 1:18-CV-5391-SCJ

 7   BRAD RAFFENSPERGER, et al.,

 8            Defendants.

 9    _____

10

11

12

13                    DEPOSITION OF

14                 Kenneth R. Mayer

15                 Madison, Wisconsin
                   February 26, 2020
16                9:27 a.m. to 2:51 p.m.

17

18          Laura L. Kolnik, RPR/RMR/CRR

19

20

21

22

23

24

25
```

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4           MILLER & CHEVALIER, by

5           Mr. Andrew D. Herman

6           900 16th Street NW

7           Washington, D.C. 20006

8           aherman@milchev.com

9

10

11  FOR THE DEFENDANTS:

12          ROBBINS ROSS ALLOY BELINFANTE

13          LITTLEFIELD, LLC, by

14          Mr. Vincent R. Russo

15          500 14h Street, NW

16          Atlanta, Georgia  30318

17          vrusso@robbinsfirm.com

18

19

20

21

22

23

24

25

3

1                        **I N D E X**

2   Kenneth R. Mayer                              PAGE

3            By Mr. Russo                            4

4


5                      **E X H I B I T S**

6   Exhibit 1      Plaintiffs' Initial Expert Disclosures
7   Exhibit 2      Expert Report of Kenneth R. Mayer
    Exhibit 3      List of documents
8   Exhibit 4      Georgia Code 21-2-220.1
    Exhibit 5      Georgia Code 21-2-417
9   Exhibit 6      SSA Quick Response Evaluation
    Exhibit 7      Spreadsheets
10  Exhibit 8      Georgia Code 21-2-216

11

12

13

14

15

16

17
    (Original transcript supplied to Attorney Russo.)
18
    (Original exhibits attached to original transcript with
19  scanned copies provided to counsel.)

20

21

22

23

24

25

**Regency-Brentano, Inc.**

```
1                        P R O C E E D I N G S
2              KENNETH R. MAYER, called as a witness herein,
3         after having been first duly sworn, was examined and
4         testified as follows:
5                            EXAMINATION
6    BY MR. RUSSO:
7    Q.    Dr. Mayer --
8              MR. RUSSO:  Oh, this is the deposition of
9         Dr. Kenneth Mayer taken by Defendant Secretary of
10        State Brad Raffensperger for the purpose of
11        discovery purposes allowed under the Rules of --
12        Federal Rules of Civil Procedure.  All objections to
13        those -- except those going to privilege and the
14        form of the question and responsiveness of the
15        answer are reserved until trial or first use of
16        deposition.  Is that good with you, Andrew?
17             MR. HERMAN:  That's fine.
18             MR. RUSSO:  Okay.
19             MR. RUSSO:  And for the -- I guess everyone can
20        identify themselves for the record, of course.
21        Vincent Russo for the defendants.
22             MR. HERMAN:  Andrew Herman for the plaintiffs.
23   BY MR. RUSSO:
24   Q.    Now, Mr. -- or excuse me, Dr. Mayer, you've been
25        deposed before, correct?
```

```
 1   A.   That's correct.
 2   Q.   And just -- so you're familiar obviously with the
 3        general ground rules, but I'll try not to speak over
 4        you, and please do the same when I'm asking a
 5        question.
 6             If at any time you need to take a break, of
 7        course let me know.  It sounds like I may be the one
 8        with my back issues that needs to take a break more
 9        often than you.
10             Please try to avoid the, you know, uh-huhs and
11        hu-huhs for the answers and just affirmative and
12        negative answers would be best, yes or no.  If any
13        of my questions are confusing, it's likely my fault
14        and just ask me to rephrase it, and I'll be happy to
15        do that.
16             So Dr. Mayer, what all did you do to prepare
17        for the deposition today?
18   A.   I reviewed my report.  I reviewed some of the
19        materials that I used as sources for my report.
20   Q.   And were those materials that you used as sources,
21        are those the sources that are referenced in your
22        report?
23   A.   Mostly.  There were a few more recent things that I
24        didn't refer to my report.
25   Q.   And would -- Are any of the sources materials that
```

```
 1          would change any opinions in your report?
 2   A.     No.
 3   Q.     And do you -- what were those -- or what are those
 4          sources?
 5   A.     Primarily an updated version of the registrar
 6          certification course that -- I don't know precisely
 7          what the title is, but there's one -- it's an
 8          updated version of the -- of the presentation or the
 9          training that I cited in my report.
10   Q.     Okay.  So that was -- that was a document that was
11          produced by the defendants in this case?
12   A.     That's correct.
13   Q.     Okay.  And for your work in this matter, you're
14          being compensated at $350 an hour?
15   A.     That's correct.
16   Q.     And have you submitted any invoices to the
17          plaintiffs for your work in this case?
18   A.     I have.
19   Q.     And have you been paid for -- on it -- paid on any
20          of those invoices?
21   A.     Some of them.
22   Q.     And do you know how much you have been paid so far?
23   A.     Not off the top of my head, no.
24   Q.     Has it been over $10,000?
25   A.     No.
```

1  Q.  Now, you agreed to provide an opinion for the

2      plaintiffs in this case, correct?

3  A.  I agreed to provide an answer to the empirical

4      question, so I offered some conclusions.

5  Q.  By agreeing to prepare that opinion, you did expect

6      to get paid for your work, right?

7  A.  That's correct.

8  Q.  And if you declined the engagement, of course you

9      wouldn't be paid, correct?

10 A.  That's correct.

11 Q.  Most of your services as an expert witness have come

12     within the last ten years or so would you say?

13 A.  Yes.

14 Q.  Is that -- Have you seen an uptick in redistricting

15     and voting rights litigation over the past ten

16     years?

17 A.  In terms of my work?  Yes.

18 Q.  So this is -- that's -- that's provided you with

19     more opportunities of course to serve as an expert

20     witness?

21 A.  That's correct.

22        (Exhibit No. 1 marked for identification.)

23 Q.  Dr. Mayer, I'm showing you what's been marked as

24     Plaintiffs' Exhibit 1.  These are plaintiffs'

25     initial disclosures.  Have you seen this before?

1   A.   I have not.

2   Q.   If you flip to -- turn to page 4 of the document,

3        you'll see it states at item 6 or number 6 is

4        Dr. Kenneth Mayer.  It states that you're expected

5        to testify on the impact of the exact match policy.

6             Is this your understanding that you would be

7        testifying on the impact of the exact match policy?

8   A.   In part.

9   Q.   Okay.  And what do you mean by -- by that?

10  A.   My report goes into some related areas that are --

11       go specifically beyond the exact match, but some of

12       the -- the consequences of the -- of the

13       verification process and the -- the processes, the

14       administrative processing, processes of handling

15       voters or registrants who failed the verification

16       process.

17  Q.   And you say that -- related areas, so can you expand

18       upon that?

19  A.   Well, I would have to look at my report to

20       completely pin down all of the things, but the

21       conclusions that I offered were related or began

22       with the verification process, which was based on

23       exact match at its core.  So the -- the conclusions

24       that are offered were -- were related to the exact

25       match process but were not entirely specifically

```
 1          about the precise exact match process.
 2    Q.    Okay.  And when you refer and the reference here
 3          to -- in Plaintiffs' Initial Expert Disclosures to
 4          quote/unquote exact match policy, just to ensure
 5          we're talking about the same thing, are you
 6          referring to Georgia's statutes on voter
 7          verification for voter registration purposes and the
 8          Help America Vote Act match process?
 9    A.    Not precisely.  I was referring to the process that
10          was described by the officials in the Secretary of
11          State's office about how they had implemented the
12          registration, the registration and verification
13          process for registration, which my understanding
14          from their testimony was based on the -- the rules
15          that they had issued or the policies they had
16          issued, which were not specifically required by the
17          statute.
18    Q.    Okay.  And did you -- did you read the statute, I
19          believe it's official credit Georgia annotated
20          21-2-220.1?
21    A.    I read the statute and the changes that were made
22          through HB 316.  I don't know if I could cite the
23          specific section of the code.
24    Q.    And when you refer to other policies for
25          implementing, what -- what policies are you
```

```
 1            referring to?
 2   A.   Well, again it's based on the -- the descriptions
 3        offered by officials in the Secretary of State's
 4        office where they described that it was -- it was
 5        their internal policies for the specific
 6        requirements of the verification process, how they
 7        handled registrants who had failed verification, and
 8        the -- the internal processes they had to conduct
 9        the verification process and -- and deal with the
10        outcomes of that process.
11   Q.   Okay.  So are you -- are these internal policies,
12        did -- are these training materials that you're
13        referring to?  Are they actual, you know, policies
14        and procedure documents?
15   A.   Well, again working from the testimony of the -- of
16        the officials, there aren't a lot of written policy
17        documents that they -- that they talked about.  So
18        it was based on their description, it was based on
19        the training materials that I reviewed, and it was
20        based on the data in the voter file at the state and
21        county level.
22   Q.   Okay.  So you're referring to depositions in this
23        case when you talk about their testimony on the
24        internal policies?
25   A.   That's correct.
```

```
1   Q.   Now, you said it's their policies for conducting the
2        voter verification?
3   A.   Their description of that process.
4   Q.   The Secretary of State's office of course doesn't
5        handle voter registration, right?
6   A.   Well, they are involved in that in setting the
7        practices and training the actual process.  My
8        understanding is it's conducted by county registrars
9        based on guidance and support they receive from the
10       Secretary of State's office.
11  Q.   So other than depositions, voter registration data,
12       and training materials, did you conduct any other
13       research on Georgia's policies?
14  A.   There were some materials in the academic literature
15       that I reviewed on Georgia.
16  Q.   And were those academic materials on Georgia in
17       regard to Georgia's exact match policy?
18  A.   Some of them were about the voter verification
19       process.  There were articles on voter ID, but if I
20       relied on it as part of forming my opinion, it's
21       cited in my report.
22  Q.   So any academic literature that you relied on
23       regarding Georgia's voter verification process would
24       be in that -- the sources that you relied on?
25  A.   That's correct.
```

1  Q.  And now when you refer to voter ID, you're -- you're

2      not referring to Georgia's voter verification

3      process, right?

4  A.  No.  On voter ID it is -- it's about the specific

5      Georgia voter ID statute or practices, policies.

6  Q.  Uh-huh.  And we call that photo ID in Georgia, but

7      you're talking about showing a photo ID when you go

8      to vote, right?

9  A.  That's correct.

10 Q.  Okay.  So these are individuals who are already

11     active registrants?

12 A.  That's generally correct, but as I noted in my

13     report, there are -- there are some possible

14     ambiguities.

15 Q.  Okay.  And who were you first contacted in

16     connection with this case?

17 A.  Can you repeat the question?

18 Q.  When were you first contacted in connection with

19     this case?

20 A.  I don't remember precisely.  I think it was in

21     the -- in the summer of 2019.

22 Q.  Do you recall who contacted you?

23 A.  I believe it was Mr. Herman.

24 Q.  And did he call you?

25 A.  Yes.

1  Q.  And did you discuss this -- this engagement at that

2      time?

3  A.  I believe so.

4  Q.  And prior to that contact, did you have any

5      familiarity with Georgia's voter verification

6      process?

7  A.  In general I was familiar with it but had not

8      drilled down specifically into the details.

9  Q.  So did he contact you after HB 316 had been enacted?

10 A.  Yes.

11 Q.  And did you have any -- you said you had some

12     understanding of the legal issues.  What about the

13     facts, the facts in this case?

14 A.  At the time that I was contacted, no.

15 Q.  And did he indicate his -- his role in this case?

16 A.  By role, what do you mean?

17 Q.  Whom he represents.

18 A.  I believe so.

19 Q.  Okay.  And what -- what all -- What did he say to

20     you during that initial contact?

21 A.  Well, I -- I don't remember every detail of it.  I

22     believe we talked or he described the -- the nature

23     of the action and what I would -- the questions they

24     would want me to analyze and whether I'd be able and

25     available to do the work.

1    Q.    You've never testified on this -- this issue before,
2          correct?
3    A.    On the issue of voter verification?
4    Q.    Correct.
5    A.    I have done work on registration and ID and
6          citizenship which is related to verification
7          processes.
8    Q.    And what -- was it in connection with litigation?
9    A.    Yes.
10   Q.    What -- what case was that?
11   A.    One was a state case in Wisconsin, the Milwaukee
12         chapter of the NAACP versus Walker.  One was a
13         voting rights case in Wisconsin which was -- I
14         believe it was One Wisconsin versus -- I don't
15         remember the -- the name of the defendant.  It was
16         the -- the person at the Government Accountability
17         Board.  So in both of those cases I was engaged and
18         actually looked at the file linking and matching
19         processes in order to develop estimates of the
20         number of registrants who possessed a driver's
21         license or state ID in Wisconsin.
22   Q.    And the issue in those two cases involved
23         Wisconsin's photo ID law, right?
24   A.    That's correct.
25   Q.    They -- they didn't involve HAVA verification?  And

```
 1         HAVA is Help America Vote Act.
 2    A.   No.
 3    Q.   And did they -- did Wisconsin -- or excuse me.  Did
 4         any issues in the case involve a matching process
 5         for voter registration purposes?
 6    A.   No.
 7    Q.   So you were looking at data sets to determine
 8         whether individuals had a driver's license for
 9         purposes of the photo ID law in Wisconsin, the
10         challenge to that law?
11    A.   That's correct.
12    Q.   Have you had any other cases involving citizenship
13         verification for voter registration?
14    A.   No.
15    Q.   What about any -- any cases regarding HAVA
16         verification?  And I'm talking about the HAVA
17         verification, the HAVA match process.
18    A.   No.
19    Q.   What did you -- what did you -- what did you say
20         when Mr. Herman contacted you on your -- on your
21         phone call I'm referring to?
22    A.   Well, again it's been six or eight months, but I
23         said I was available to -- to do the work.
24    Q.   Did you tell him you'd never provided expert
25         services for a case involving voter registration?
```

```
1   A.   Well, I'm not sure that's -- that's true, but I
2        don't recall telling him that.
3   Q.   And which -- which case -- you said you're not sure
4        that's true.  What do you mean you're not sure
5        that's true?
6   A.   Well, I've done work on examining statewide voter
7        files and have done academic work looking at
8        compliance with HAVA reporting requirements.
9   Q.   Do you -- do you have an understanding -- or how was
10       Mr. Herman referred to you?  Do you have an
11       understanding of that?
12  A.   I don't know.
13  Q.   Do you have any prior relationship working with the
14       attorneys for the plaintiffs in this case?
15  A.   No.
16  Q.   Now, on that phone call did you discuss the
17       financial terms of your arrangement?
18  A.   I imagine I told him what my -- what my hourly rate
19       was.
20  Q.   Now, you said you've submitted a few invoices.  Do
21       you know how much time you've spent so far preparing
22       your opinions in this case?
23  A.   Not off the top of my head, no.
24  Q.   Do you know how much time you've spent preparing for
25       this deposition today?
```

```
1    A.   Well, depending on what you count as preparation,
2         I'd probably say somewhere in the neighborhood of
3         five to seven hours.
4    Q.   And when -- when Mr. Herman contacted you, what did
5         he say he want -- that the plaintiffs wanted you to
6         examine?
7    A.   My recollection is that they wanted me to look at
8         the -- the results of the verification process and
9         how the -- the state was handling voters who failed
10        the verification process.
11   Q.   And did he mention HB 316 at that time?
12   A.   At that time I don't believe so.
13   Q.   So it was a pretty new law, right?
14   A.   I believe it was enacted in March of 2019 and went
15        into effect -- actually may not have been actually
16        in effect when -- when we talked.  So -- but he did
17        not mention it.
18   Q.   Had he mentioned that -- mentioned to you on that
19        call that the law had not been in effect, would that
20        have changed your response to his request for you to
21        be able to provide an opinion on the verification
22        process?
23   A.   I'm sorry, can you -- can you say that again?
24   Q.   Had the -- Had you known at that time whether HB 316
25        was in effect, would you have -- would that have
```

1           changed your ability to agree to provide an opinion

2           at that time?

3   A.     No.

4   Q.     Did -- Plaintiffs' counsel has provided you with

5           data in this case?

6   A.     That's correct.

7   Q.     And what -- what data has been provided to you?

8   A.     Received data in several batches.  There was a --

9           some data that I received I believe in September

10          that included data through July of 2019 on the --

11          what was presented to me as pending lists of voters

12          in pending status.  I received another batch of

13          files in December of 2019 which included versions of

14          the statewide voter file.  And then in January of

15          2020 I received another batch of data which included

16          county-level registration files, which included both

17          voter status and whether a voter was in MIDR or

18          missing ID required status at the county level.

19  Q.     And in terms of the versions of the statewide voter

20          file, what versions are you referring to?

21  A.     In that sense by version I mean the date at which

22          the file was generated.

23  Q.     And do you recall what dates for those files you

24          had?

25  A.     So I believe -- I think there was one in September

1    of 2019.  I'm not sure I received the statewide
2    voter file at that point.  I did receive two
3    statewide voter files, I believe one was dated
4    December 27th and one was dated December 30th.  And
5    then the third batch was in addition to the
6    statewide voter file, the 159 county level files in
7    January.  I don't recall what the precise date.  I
8    think it was in the first or second week of January.
9  Q.  And you mentioned December 27th and December 30th.
10   That's 2019?
11 A.  Correct.
12 Q.  Okay.  So the oldest file would be -- that you
13   received, voter registration file would have been
14   September 2019?
15 A.  Well, that was the first date.  The files were
16   frequently dated earlier.  There were some files
17   from 2018, some files from earlier in 2019.
18 Q.  Okay.  So those were snap -- And I'm just trying to
19   understand what universe of information you were
20   looking at here.  So those were snapshots of the
21   voter registration database from 2018.  Is that what
22   you're saying?
23 A.  I'm not sure if it was the full voter registration
24   database in 2018, but all of the data sources I
25   listed in my report.

```
 1   Q.   Did they provide you with any information or any
 2        data on the -- the -- the rates of voter
 3        registration by demographics?
 4   A.   Can you define what you mean by rates of voter
 5        registration?
 6   Q.   Sure.  So increases, increases or the rates at which
 7        different, you know, groups of folks are
 8        registering.
 9   A.   So the -- the percentage of different populations
10        that registered.  I don't believe I examined that.
11   Q.   What about any data related to whether individuals
12        voted -- or registered by mail or some other way?
13   A.   I did not examine that data.
14   Q.   Did plaintiffs' counsel ask you to make any
15        assumptions in forming your opinion?
16   A.   No.
17   Q.   And have you read the amended complaint in this
18        case?
19   A.   I'm not sure.  I don't know what date the amended
20        complaint was filed.
21   Q.   Have you read any of the complaints in this case?
22   A.   Yes.
23   Q.   Do you recall -- Well, in your own words can you
24        tell me what the --
25   A.   I recall reading the complaint probably in the late
```

```
 1          summer or early fall.
 2   Q.    Okay.  And you've of course read some depositions in
 3          this -- in this case, right?
 4   A.    That's correct.
 5   Q.    And you read the deposition of Chris Harvey?
 6   A.    I believe he gave two so I've read both of them.
 7   Q.    Okay.  And Ron Germany?
 8   A.    Yes.
 9   Q.    And he's the general counsel for the Secretary of
10          State's office, right?
11   A.    That's my understanding.
12   Q.    And you also referenced the deposition of Kevin
13          Rayburn?
14   A.    That's correct
15   Q.    Did you read any other depositions in this case?
16   A.    No.
17   Q.    What about briefs.  Have you read any of the briefs
18          filed in this case?
19   A.    No.
20   Q.    Do you know, you know, what this case is about?
21   A.    In general.
22   Q.    What -- what do you -- What's your general
23          understanding?
24   A.    My understanding is challenging a number of
25          practices related to registration and voting
```

```
 1            practices in the state.
 2      Q.    Now, as part of your -- your research, did you
 3            contact anyone other than plaintiffs' counsel?
 4      A.    No.
 5      Q.    So you did not -- Did you speak with anybody in
 6            Georgia about this case?
 7      A.    No.
 8      Q.    What about did you speak with anyone in Georgia
 9            about the voter verification process?
10      A.    No.
11      Q.    Did you speak with anyone in Georgia about any of
12            the issues discussed in your report?
13      A.    No.
14      Q.    Did you speak with any -- anyone at all about --
15            other than plaintiffs' counsel about the contents of
16            your opinion?
17      A.    No.
18                  (Exhibit No. 2 marked for identification.)
19      Q.    Handing you what's been marked as Mayer Exhibit 2.
20                  MR. HERMAN:   Thank you.
21      Q.    I've handed you what's been marked as Mayer Exhibit
22            2, and that's your expert report?
23      A.    That's correct.
24      Q.    You can flip through it if you need to.  Now, your
25            CV is attached an an addendum, Addendum A?
```

```
 1   A.   That's correct.
 2   Q.   Is this -- is this CV still accurate?
 3   A.   I believe this is the most recent one that I have --
 4        that I have done.
 5   Q.   Does this -- I'll let you finish looking through it.
 6   A.   Okay.  Yeah, this is the most recent version.
 7   Q.   And does it -- It reflects all of your recent
 8        activities?
 9   A.   Yes.
10   Q.   So you don't have any additions to make to your CV?
11   A.   No.
12   Q.   Dr. Mayer, do you have any qualifications that
13        are -- excuse me, any credentials that would qualify
14        you to serve as an expert in this case that are not
15        reflected in your CV?
16   A.   That are not reflected in my CV?  Some of the work
17        that I have done is -- is -- is not entirely
18        reflected on this because some of the activity with
19        the Government Accountability Board was through
20        grants that were actually other people were the
21        principal and primary -- or principal investigators
22        so I don't list those grants on my CV.  But in terms
23        of the publications and work, this is -- this has
24        the work that I have done on election administration
25        and registration that qualifies me as an expert
```

```
 1        witness.
 2   Q.   And the reports, the grants that you're referring
 3        to, is that -- you're referring to the 2008 report
 4        for GAB?
 5   A.   That's correct.  There was a large grant that had
 6        come from the Government Accountability Board and
 7        the Election Assistance Commission that I was not a
 8        PI on the applicant, but the work that -- a number
 9        of pieces of work was done through that process.
10   Q.   And that -- that grant was looking at how ** VAC
11        money was being spent?
12   A.   The -- the nature of the project was there was a
13        group of four of us at the university, three
14        political scientists and one person at the public
15        policy school, to help the Government Accountability
16        Board evaluate their compliance with HAVA, Help
17        America Vote Act reporting, compliance and the
18        election administration issues generally.
19   Q.   Okay.  And are you -- are you currently teaching any
20        courses at the university?
21   A.   Yes.
22   Q.   And what -- what courses are you teaching?
23   A.   If you -- do you mean this semester or the last --
24   Q.   Sure, we'll just go with this.
25   A.   So this semester I'm teaching an upper division
```

1      course on the American presidency, and I'm also

2      teaching a senior seminar on electoral integrity.

3   Q.  What's the course on American presidency -- what's

4      the agenda for that course for the semester?

5   A.  It's a pretty typical course on the -- the history

6      of the presidency, the evolution of presidential

7      power, presidential elections, presidential

8      administrative structures and different policy

9      areas.

10  Q.  Have any students complained about that -- that

11     course?

12  A.  This semester, no.

13  Q.  Last semester or ever?

14  A.  There have been -- there was a complaint last

15     semester that was ultimately -- I guess it was not

16     formally made to the university, but the complaint

17     was eventually withdrawn about what the -- what the

18     issue was purported to be.

19  Q.  Where -- where was -- You say the complaint was not

20     formally made to the university.  Where was it made?

21  A.  It was made on Fox News.

22  Q.  So there was actually -- there was no real -- there

23     was not a legal complaint or a, you know, compliance

24     complaint against you, it was just a PR complaint;

25     is that what you're saying?

```
1   A.   There was no formal complaint lodged with the
2        university.
3   Q.   What about classes.  Have you ever taught any
4        classes on election administration?
5   A.   Yes.
6   Q.   And which -- which classes have you taught on
7        election administration?
8   A.   It's a seminar that I have taught several times.  I
9        think the last time I taught it was in the fall of
10       2017.
11  Q.   And what -- you recall -- you said it was a seminar.
12       What was the name of the seminar, if you recall?
13  A.   I believe it was just called Election
14       Administration.
15  Q.   And do you recall what -- what topics were taught in
16       that class about election administration?
17  A.   It was the full range of topics, ranged from voting
18       rights, electoral practices, registration,
19       redistricting, voting technologies.  I used a -- a
20       law -- I used a case book on election
21       administration.  One of the -- There were a couple
22       of major case books, and I used one of them.
23  Q.   This was also at the University of Wisconsin?
24  A.   That's correct.
25  Q.   Was the focus on Wisconsin law and federal law?
```

1    A.    Mostly on federal and state administrative

2          practices.  It wasn't focused on Wisconsin.

3    Q.    Your CV cites 14 cases, is that correct, that you've

4          been an expert witness on?

5    A.    That's correct.

6    Q.    The Andrew Goodman Foundation v. Bostelmann.  Is

7          that the most recent case?

8    A.    That's correct.

9    Q.    Have you ever not been qualified as an expert in any

10         case in which you've been offered to give an

11         opinion?

12   A.    No.

13   Q.    Have you ever been qualified over -- over an

14         objection?

15   A.    Yes.

16   Q.    And do you recall which case that was?

17   A.    I believe it was the Milwaukee NAACP versus walker,

18         which was the 2012 voter ID case in Wisconsin

19         Circuit Court.

20   Q.    Now, the Andrew Goodman Foundation, what are the --

21         what are the claims in that case?

22   A.    That case is about the voter ID practices that apply

23         specifically to college and university students in

24         Wisconsin.

25   Q.    And so that's again just the requirement to show a

```
 1        certain type of photo ID when a student goes to
 2        vote?
 3   A.   That's correct.
 4   Q.   Plaintiffs' counsel in the case is Marc Elias
 5        Perkins Coie?
 6   A.   I don't know who the counsel of record is.  That's
 7        not who I've been communicating with.
 8   Q.   Who have you been communicating with?
 9   A.   An attorney named Amanda Callais.
10   Q.   And you've -- you've worked with Amanda Callais in
11        other cases, right?
12   A.   No, this is the first time I've been an expert
13        witness on a case where I communicated with her.
14   Q.   Okay.  And you served as -- You were retained by
15        Perkins Coie in the case in Georgia, right?
16   A.   That's correct.
17   Q.   And that's the Dwight --
18   A.   Dwight versus Raffensperger.
19   Q.   And that's a redistricting case, right?
20   A.   That's correct.
21   Q.   That's the only case in Georgia that you've had
22        previously, right?
23   A.   Yes.
24   Q.   And the Dwight case, that case you said was
25        restricting.  It did not, though, involve any voter
```

```
 1          registration challenges, right?
 2     A.   My work did not.
 3     Q.   Okay.  Priorities U.S.A. versus Missouri.  That's
 4          a -- another photo ID case?
 5     A.   That's correct.
 6     Q.   And then you have it appears what, three -- three
 7          cases in Texas involving independent school
 8          districts; is that right?
 9     A.   That's correct.
10     Q.   And those -- Are the claims in those cases limited
11          to challenges to the at-large elections for school
12          boards?
13     A.   That's correct.
14     Q.   Those -- those cases do not involve voter
15          registration, right?
16     A.   No.
17     Q.   Whitford v. Gill, is that -- is that case still
18          ongoing?
19     A.   No.
20     Q.   What happened after it was remanded?
21     A.   I believe the sequence was after the Supreme Court
22          in Rucho versus Common Cause declared partisan
23          gerrymandering a non-judiciable issue, that the case
24          was withdrawn.  I don't know exactly what the --
25          what the procedure would be, but I believe the case
```

1          was resolved.

2     Q.   And you were retained to give an opinion on the

3          efficiency gap; is that right?

4     A.   In part.  My role, my opinion in that case was in

5          addition to examining the efficiency gap, drawing a

6          demonstration plan, demonstration assembly

7          redistricting plan with a more neutral efficiency

8          gap metric.

9     Q.   And the plaintiffs in that case, they identify

10         themselves as supporters of public policies espoused

11         by the Democratic party and of Democratic party

12         candidates.  Is that your understanding?

13    A.   I'm not -- I -- I don't know if that language came

14         from the complaint, but I am aware that the

15         plaintiffs were largely Democrats.

16    Q.   And that case went up to the U.S. Supreme Court,

17         right?

18    A.   That's correct.

19    Q.   And what -- what did -- What is your understanding

20         of the Supreme Court's holding in that case?

21    A.   My understanding of the holding in that case is that

22         they -- they remanded it on issues of standing; that

23         the plaintiffs had not demonstrated the necessary

24         standing to actually file or to be a party to that

25         case.

1  Q.   Did the Supreme Court make any findings on the

2       metrics and the efficiency gap measure that was

3       presented by the plaintiffs?

4  A.   Not in the majority opinion, not -- not that I

5       recall.

6  Q.   Do you recall whether the Supreme Court made any --

7       any finding related to your -- your opinion?

8  A.   I -- I think there was a mention in the dissent, but

9       I'm -- there was -- I don't believe there was any

10      specific discussion of my work in the majority

11      opinion.

12 Q.   So you don't think you were mentioned in the

13      majority opinion.  Have you read the majority

14      opinion?

15 A.   Yes.

16 Q.   And Professor Simon Jackman also opined on the

17      efficiency gap measure in that case?

18 A.   That's correct.

19 Q.   And ultimately that decision was vacated there,

20      right?

21 A.   I believe that's right.

22 Q.   Now, what -- let's go to page --

23 A.   Can I refill my water?

24           MR. HERMAN:  Off the record for a second.

25           MR. RUSSO:  Yes, we can go off the record.

```
 1              (Discussion held off the record.)
 2              MR. RUSSO:  We'll go back on the record.
 3    BY MR. RUSSO:
 4    Q.   Flip to page -- page 2 of the report.  And when I
 5         give you a page number, I'm going to refer to the --
 6         the page at the bottom of your report, not the
 7         filing page.
 8    A.   Understood.
 9    Q.   Now, you -- you state that -- Let's see, you
10         reference your work in election administration.
11         What did -- What do you mean by election
12         administration there?
13    A.   In this context election administration refers to
14         the full range of practices involved in conducting
15         elections, everything from the registration process
16         through maintaining voter rolls through conducting
17         the election, processes for absentee ballots and
18         actually the voter experience at the -- polls
19         through the counting of ballots and recounts.
20    Q.   And you mentioned earlier that you have published on
21         topics involving the Help America Vote Act.  Have
22         any of those publications also involved the match --
23         the match process in the voter verification --
24         excuse me, in HAVA?  And you mentioned a 2008 report
25         with that.
```

| | | |
|---|---|---|
| 1 | A. | It's been awhile since I looked at it, but I think |
| 2 | | the -- the evaluation report discussed the HAVA |
| 3 | | processes, but I don't believe that discussed the -- |
| 4 | | the verification process in Wisconsin. |
| 5 | Q. | Which -- which paper -- Which papers did involve |
| 6 | | HAVA verification, if you recall? |
| 7 | A. | So I'm not sure that any of the articles were |
| 8 | | specifically about the verification process, but I |
| 9 | | recall that that was part of a number of different |
| 10 | | articles.  And my recollection is that the -- the |
| 11 | | HAVA processes informed that analysis, but I |
| 12 | | don't -- I don't -- I have not published a specific |
| 13 | | article on the HAVA verification process. |
| 14 | Q. | And do you recall which of the -- which ones would? |
| 15 | | I don't know which page you're on, but -- |
| 16 | A. | Well, I'm looking at pages 4 and 5.  There were a |
| 17 | | lot of these that were written over the last ten or |
| 18 | | 12 years, so I, sitting here, can't point to a |
| 19 | | specific one. |
| 20 | Q. | And well, putting aside whether you pointed to a |
| 21 | | specific one, how -- how would your work on those |
| 22 | | publications you have referenced, although you |
| 23 | | mentioned they're not specific to the HAVA |
| 24 | | verification process, how -- how have they provided |
| 25 | | you with the expertise to offer an opinion on the |

1        precise issues in this case regarding the

2        quote/unquote exact match?

3    A.  These administrative practices -- I mean it's not

4        magic.  There is a well-established academic

5        literature on the matching process that is used in

6        voting.  I've done it myself in several cases I

7        served as an expert witness on.  I'm familiar with

8        the -- the practices that are used and alternatives

9        through ERIC, the Electronic Registration

10       Information Center.  So I do have specific knowledge

11       that pertains to that specific issue.

12   Q.  Okay.  Now, turning to -- well, more generally I

13       suppose in your report.  Were any portions of the

14       report prepared by anyone other than you?

15   A.  No.

16   Q.  Did you use any -- any research assistants?

17   A.  No.

18   Q.  Did -- did any -- did anyone other than you

19       conduct -- outside -- other than the sources you've

20       cited in here, research that you relied on in

21       drafting this report?

22   A.  Only to the extent that I relied on the academic

23       literature that I cited.

24   Q.  And what information did you review before arriving

25       at your opinion in this report?

```
 1   A.   The -- the data and sources that I relied on are

 2        listed on --

 3   Q.   Page 2?

 4   A.   -- page 1 --

 5   Q.   Page 1, I'm sorry.

 6   A.   -- of my expert report under the Scope of

 7        Assignment.

 8   Q.   So other than the seven items listed here on page 1,

 9        you did not review any of these -- any other

10        materials before arriving at your opinion?

11   A.   Other than looking at some of the training materials

12        that were provided, which I actually don't see on

13        this list, but no, there were -- there were no other

14        data sources that I examined before arriving at my

15        conclusions.

16   Q.   Flipping to, let's see -- let's stay on page 1 under

17        scope of assignment.  It states, I've been asked by

18        plaintiffs' counsel to offer opinions about the

19        voter registration and voter verification processes

20        in Georgia.

21            Outside of what you have in this -- what's in

22        this report, do you have any additional opinions

23        about the voter registration and voter verification

24        processes in Georgia?

25   A.   Outside the scope of this report?
```

```
 1   Q.    Yeah, outside of what is in your report.
 2   A.    In terms of this case or -- no.
 3   Q.    Have you -- have you been asked to provide any
 4         additional -- any additional opinions for this case?
 5   A.    No.
 6   Q.    Do you intend to provide any additional opinions in
 7         this case?
 8   A.    I don't know.
 9   Q.    And you say you don't know.  But there have been no
10         discussions about providing additional opinions?
11   A.    No.
12   Q.    Do you intend to perform any additional expert
13         services in this case?
14   A.    In terms of testifying or -- I don't know what that
15         expert services, what that would encompass.
16   Q.    Will you provide non-testifying expert services
17         also?
18   A.    I have not been asked to do any of that.
19   Q.    Are the -- are the opinions in your report, are
20         those your complete opinion?
21   A.    So I'm not sure I understand the question.
22   Q.    Do you -- is this -- Is your report an exhaustive
23         report on your opinion on expert -- excuse me, on
24         exact match?
25   A.    Sitting here today, yes.
```

 1              (Exhibit No. 3 marked for identification.)
 2  Q.   I hand you what's been marked as Mayer 3.  This is
 3       a -- a printout of all the documents that were
 4       provided by plaintiffs' counsel as either your
 5       sources that you relied on or the analysis that you
 6       created.  And I'm more interested in regards to the
 7       analysis piece.  But are there any -- are there any
 8       files outside of the ones on this list that you
 9       developed for your opinion?
10  A.   The -- the program code, the dot DO files, that's
11       code that uses the state-level voter files or
12       county-level voter files to generate -- to generate
13       statewide files.  Those were enormous, somewhere
14       between 8 and 15 gigabytes.  And so this code allows
15       you to generate those files, which are essentially
16       processing the voter files to extract data or
17       combining the voter files to allow you to look at --
18       to actually link the different -- different files.
19              So the -- it doesn't include the underlying
20       data that was provided to me, and it doesn't include
21       the files that I produced using this code simply
22       because they were -- they were too large, and
23       someone who was familiar with this data would be
24       able to use that to generate them.
25  Q.   So you -- so I understand, you had received -- were

```
 1          they Excel spreadsheets?
 2   A.     They were either Excel spreadsheets or -- or text
 3          files.
 4   Q.     And -- and the -- let's just take the first one,
 5          county file append dot DO.  That is the -- tell me
 6          what would be in that file.
 7   A.     I received 159 spreadsheets, one from each county in
 8          the state, that included all the registrants.  I
 9          think it was as of January 14th or 15th, but it was
10          in January, which included the voter status, and it
11          included whether the voter was a -- was in missing
12          ID required or MIDR status.  And in order to analyze
13          that, I needed to take those 159 spreadsheets and
14          combine them into a single file.  And that's what
15          this code does.  It generates a single statewide
16          file from all 159 county files.
17   Q.     And did you do any -- any checks to make sure there
18          were no -- that the data converted over into this --
19          this file correctly?
20   A.     Yes, I did.
21   Q.     Did you find any issues that -- with the -- with the
22          conversion that made you have to do it again or
23          cause -- called into question whether they've been
24          combined accurately?
25   A.     Yes, I did.  Or yes, there were.
```

```
 1    Q.    And what -- what were those issues?
 2    A.    The issue -- it's a technical issue that involves
 3          how STATA-- that's a S-T-A-T-A -- reads in files,
 4          that most of the counties had voters in pending
 5          status and so there was a field of the voter status,
 6          and as you read the data in, if there was one value
 7          of that that said pending, it was recorded as a txt
 8          because it was all characters and so STATA read it
 9          as a txt file.
10                There were some counties, particularly some
11          smaller counties with only a few thousand
12          registrants, that didn't have any pending voters.
13          And rather than reading it -- reading those files in
14          with that field as just a blank, STATA read them as
15          a missing value or number, which was a different
16          format.  And so that created an error that I, when I
17          realized that it was happening, I included some code
18          that converted the fields before I appended them,
19          which eliminated that error.
20    Q.    And did you confirm that when you -- you said you
21          created some coding to eliminate that error, that
22          the fields were then populated accurately?
23    A.    That's correct.
24    Q.    Did you conduct any -- well, you have -- I'll go
25          down.  There's one file called MIDR pending
```

```
 1        analysis.do.  Did -- other -- is that file -- do you
 2        have any analysis in that file other than simply
 3        combining spreadsheets?
 4   A.   That code does something different.  That code takes
 5        the -- the result of the appending -- of the append
 6        file, so I now have a statewide voter file, and then
 7        that -- that file or that code processes the file
 8        to -- to produce the data that I then analyze to
 9        generate the data for the tables in the report.
10   Q.   Okay.  And the tables in the report, those are the
11        tables that are in the pending analysis January 2020
12        Excel file here?
13   A.   That Excel file was what I used to actually format
14        the tables, so that -- that Excel file takes the
15        output of the -- of the STATA file and it just is a
16        matter of convenience because Excel has some
17        formatting features that allows you to generate
18        tables that are -- that are more readable and that
19        STATA doesn't do very well.
20   Q.   Okay.  Now, Section 4 of your report on page 5
21        estimating -- titled Estimating the Quantity of
22        Interest, you state that the key empirical quantity
23        of interest is the number of otherwise eligible
24        people incorrectly placed in MIDR status because
25        their registration information did not exactly match
```

1          with information in state driver's license files

2          maintained by DDS or national social security files,

3          the verification process, or because they were

4          flagged as non-citizens.

5              Do you still maintain that that is the key

6          empirical quantity of interest?

7    A.    That's the basic one that you would then use to

8          generate some of the other estimates looking at the

9          demographics of registrants in that status.

10   Q.    Now, your -- your report does not -- actually --

11         Well, you do not actually determine the key

12         empirical quantity of interest, correct?

13   A.    Well, as I -- as I note that that is unobservable.

14   Q.    And -- and why is that?

15   A.    Because as I note in the report, what I see or what

16         we observe is the -- the number of people who are in

17         that status.  What is not observable is whether

18         someone is in that status and shouldn't be because

19         they actually were in the DDS files or they are

20         citizens, but because of errors or the nature of the

21         match process, they are kicked out as -- as failing

22         verification or non-citizens when they actually

23         shouldn't have.

24   Q.    So there's -- You're not opining on any number of

25         individuals that were incorrectly placed into MIDR

```
 1         or pending status?
 2    A.   Well, I am absolutely certain that the number is
 3         greater than zero, but I -- it is not possible to
 4         point to a specific number and say this is the exact
 5         quantity, this is the exact number of people who
 6         were incorrectly placed in this status.
 7    Q.   So your report lists a number of different statuses
 8         but doesn't show that anyone was wrongfully placed
 9         in those statuses, although you believe there's at
10         least one person?
11    A.   Well, it's not a matter of belief, it's a matter of
12         certainty.  But there is nothing in the data that
13         specifically indicates that this person was
14         incorrectly placed in -- in status.  You would have
15         to infer that from the nature of the process and
16         looking at people who were originally -- or at some
17         point were in pending status but then were
18         ultimately moved to the active file.  And I have
19         data on that, and that's -- that's -- that's a
20         quantity that you can use to draw a more general
21         inference.
22    Q.   And that's the same for -- for non -- for the
23         non-citizens, right?  You state that you can't
24         observe the number of pending registrants who are
25         incorrectly flagged as non-citizens, though you are
```

1          certain that the number is -- is non-zero?
2    A.    That's correct.
3    Q.    Now, what's -- what is the -- what is the value
4          of -- of this inference for purposes of your -- your
5          report if we don't know that anybody was actually
6          incorrectly flagged?
7    A.    Well, that's -- that's the foundation of inference
8          is that you examine the data that you can observe,
9          and you use that to reach an informed view of what
10         you cannot directly observe.  And that's used
11         universally in social science.  Any time somebody
12         makes a forecast, that's an inference.  Any time
13         someone is making a population estimate by using a
14         sample, any survey is a kind of inference, and so
15         it's not this sort of obscure mystic process where I
16         am trying to define what I can't observe.  It's the
17         basic element of social science reasoning that you
18         are interested in something that you cannot directly
19         observe and so you examine the data that you -- that
20         you can observe and draw inferences based on that of
21         what the underlying characteristics or the
22         underlying values are.
23   Q.    And so your inference is based on the voter
24         registration file, the pending registrant file, and
25         the county registration files that you combined?

```
 1   A.    In part.  That's not the -- that's not the -- the
 2         only data or the only things that I relied on in
 3         drawing that inference.
 4   Q.    What additional -- what additional data then did you
 5         rely on?
 6   A.    Well, it was my knowledge of how the matching
 7         process works, the -- the literature on matching,
 8         what is known about the use of driver's license
 9         files to verify citizenship.  So again we're looking
10         at what we -- what we know and applying that to this
11         data to generate an estimate or an inference about
12         what the -- what the underlying values are.
13   Q.    And you said it's also based on you said the
14         driver's license -- your understanding of the
15         driver's license files.  Have you done any research
16         on Georgia's driver's license files?
17   A.    That's based on -- so no, but that's based on the
18         descriptions of how the verification process worked
19         by Mr. Rayburn, Mr. Harvey, and Mr. Germany.
20   Q.    And you mentioned the SSA file also and you drawing
21         inferences from that.  What -- what do you know
22         about the SSA file that states have access to for
23         the HAVA verification?
24   A.    Again I'm working with the description that the
25         officials in the Secretary of State office, the
```

```
 1          descriptions that they gave from working with the
 2          Inspector General report that the Social Security
 3          Administration produced in 2009, I believe, and
 4          there is data in the -- in at least some of the
 5          pending files about what the -- the responses that
 6          the Social Security Administration gave to the
 7          specific records that were submitted to them.
 8               And you can also track through the Election
 9          Assistance Commission, I believe it's the EAC that
10          produces data on the -- the specific numbers of
11          registration records that are submitted to the
12          Social Security Administration that are -- that are
13          verified, what the response rates are, and what
14          percentage of the records that are submitted to them
15          are actually verified.
16   Q.     And the reports that you've mentioned and the
17          testimony, none -- none of those reports and none of
18          the testimony indicate what information is available
19          through SSA, right?  They state what information is
20          put on the request that goes to SSA, but they don't
21          state what information SSA holds, correct?
22   A.     Well, we know what information goes to the
23          administration, and we know what the Social Security
24          Administration responds, so the -- I don't have
25          access to the Social Security Administration files
```

```
 1          or to the driver's license files.
 2   Q.     All right.  And you mentioned in different areas of
 3          your report checking citizenship through SS --
 4          through the SSA portion of the match, right?
 5   A.     That's correct.
 6   Q.     And is it your understanding that SSA maintains
 7          citizenship information in that -- in the database
 8          that the states -- the HAVA verification matches
 9          against?
10   A.     So is there citizenship data in the Social Security
11          Administration files?
12   Q.     That's a little broader than my -- my question.  My
13          question is is there citizenship information that
14          states get access to from SSA in the HAVA
15          verification?
16   A.     Yes.
17   Q.     And you're -- you're positive about that?
18   A.     That's the reason the Social Security Administration
19          provides the citizenship check.
20   Q.     And so is it your understanding that the Social
21          Security Administration provides the citizenship
22          check for HAVA?
23   A.     I don't know if that's specifically for HAVA, but
24          I -- from my recollection of what the data that's
25          actually in the secretary's -- in the voter file,
```

1          that there is citizen information that is obtained

2          from the Social Security Administration.

3    Q.    So your understanding is based on the -- the file

4          that you received in this case?

5    A.    It's the -- the files that I received in this case,

6          the -- the descriptions of the officials, and my

7          more general knowledge of the -- of the voter

8          registration and verification processes.

9    Q.    You state that there's a lack of clarity in the

10         verification process.  What do you mean by -- what

11         did you mean by that?  And I'm looking at Section 5

12         of your report.

13              MR. HERMAN:  Page 7.

14              MR. RUSSO:  Page 7.  Correct.

15              THE WITNESS:  The Help America Vote Act

16         requires states to conduct a verification process by

17         comparing the information that a registrant provides

18         to either the driver's license or state ID files,

19         which is the Department of Transportation, or in the

20         case of Georgia the Department of Driver Services,

21         and/or the Social Security Administration to confirm

22         identities and citizenship.  The precise nature of

23         how states go through that process varies.  States

24         have wide discretion in deciding what information

25         they are going to submit, what counts as a match or

1     non-match to Department of Driver Services or

2     Department of Transportation, or what they will

3     accept as -- as confirmation of an individual's

4     identity and citizenship.

5          In Georgia, again based on the descriptions of

6     high-ranking officials in the Secretary of State's

7     Elections Division, they didn't appear to understand

8     how it actually worked, what counted as a match,

9     what fields were submitted, what was required to

10    match, and the descriptions that they gave were

11    inconsistent or they said they really didn't know

12    how the verification process worked.

13  BY MR. RUSSO:

14  Q.   Now, I think are you referring to the testimony of I

15       believe Mr. Germany where he mentioned first letter

16       of a first name matching or not matching?

17  A.   That's one of the -- of the issues.

18  Q.   What -- what other -- you mentioned that they don't

19       know the data.  Where -- where was that?

20  A.   Well, as I believe it's footnote -- footnote 7

21       through 11.  In Mr. Harvey's deposition he was asked

22       whether a mismatched space character, so again exact

23       match means a character-for-character match between

24       two fields in different databases.  So it is

25       possible that a -- a misplaced space in a name or

1    that there's a space in one record or one file and

2    that field doesn't have a space in the other file,

3    whether that would trigger a non-match.  Mr. Harvey

4    said it would.  Mr. Rayburn said he didn't know.

5            Another question is whether a hyphen in one

6    data set and not another would trigger a non-match.

7    Mr. Germany didn't know.  The director of elections

8    said that matching is done on last name, first name,

9    date of birth, and last four of social, presumably

10   social security number.  The general counsel said

11   that the match is only done on the first initial of

12   the last name.  And that even though that was the

13   policy of the Secretary of State's office, there

14   were some counties that were incorrectly using the

15   entire first name to match.

16           So there's inconsistency in how the people who

17   are making and enforcing policy described the

18   matching process and evidence that the counties were

19   not doing the matching process in the manner that

20   the Secretary of State said they should be doing the

21   matching process.  And that's -- I look at that and

22   that's information or that's evidence that the

23   people who are in charge of making and enforcing

24   policy didn't really understand how the process

25   actually worked.

```
 1   Q.   Now, is it your -- you're not -- It's not your
 2        opinion that the process actually changes based on
 3        what one official says versus another?  I mean it's
 4        a computer -- it's a matching process run by DDS,
 5        right?
 6   A.   That's my understanding.  It's certainly possible
 7        that the administrative practices -- in fact,
 8        there's evidence that the administrative practices
 9        that are used in state and counties actually do
10        vary, but the fact that these officials didn't
11        really know how the process works is material
12        because these are the officials who are ultimately
13        responsible for either making, implementing, or
14        enforcing the policy.  I mean they couldn't describe
15        it with 100 percent certainty or couldn't describe
16        the elements.
17   Q.   Well, the -- the elements, they all -- you're saying
18        that none of them -- that none of them could
19        describe the actual policy or they just didn't
20        understand the technical piece?
21   A.   There were elements of both because I recall -- I
22        didn't cite this in my -- my report, but I believe
23        it was Mr. Harvey's deposition where he said
24        there -- in a number of these areas there were no
25        written policies.  It's just sort of practices that
```

```
1        were used.  So -- and the technical process actually
2        matters because the Division of Elections or the
3        Secretary of State's office or the counties submit
4        the -- submit the information to DDS.  They get an
5        answer back, and it's actually up to -- it's within
6        the discretion of states to decide how they
7        interpret that information.
8             So it strikes me as important for the -- the
9        people who are running elections to understand the
10       technical details of that process.
11   Q.  And do you know if the Secretary of State's office
12       has any other employees that handle the technical
13       piece of the process?  You referred to the general
14       counsel of the entire agency, Ryan Germany, so not
15       just the elections division, but another attorney in
16       the office, Kevin Rayburn, and then the rest of the
17       entire elections division.  And so those are three
18       employees who -- you're right, they are in
19       high-level positions.  They are not the computer --
20       the computer folks within the office.
21            Are you aware of whether any of the technical
22       employees that handle the computer side and
23       interface with DDS, whether they don't know the
24       process?
25   A.  I don't know.
```

```
1   Q.   Now, you state that -- that any non-match in any

2        field such as a hyphen would create -- would create

3        a non-match or create an additional burden on the

4        voter.  What do you mean by additional burden on the

5        voter?

6   A.   So the way that the process operates, and this is

7        working from the descriptions and the actual

8        training materials that are provided to county

9        registrars, that a person who match -- a person who

10       registers and who is verified, meaning that their

11       information matches, they're sent their precinct

12       card, their registration is complete, they show up,

13       comply with the other elements of what they need to

14       do to vote; they vote.

15            Someone who fails verification either because

16       their name or birth date doesn't match exactly or

17       they get a value returned indicating that DDS or

18       social security agency thinks they're non-citizens,

19       that triggers a separate administrative process that

20       they get a letter saying that you need to provide

21       additional information.  If you are a -- if you --

22       verification process results in you being a

23       non-citizen or a return value of non-citizen, you

24       have to appear or provide citizenship documents,

25       which there is a separate administrative step.
```

1            It turns out that the letter that county
2       officials send to voters who fail the verification
3       process appears to have incorrect information about
4       what they need to do or what they would have to do
5       at the -- at the polling place when they show up on
6       election day.
7            And so it -- it triggers a set of actions that
8       a registrant has to take.  Now, if this is someone
9       who failed the verification process because of a
10      mismatch or a false non-citizenship flag, meaning
11      that the error existed in the underlying data or
12      there was an error made by registration officials,
13      the burden is on the voter or registrant to correct
14      that.  That's the basis for the -- the conclusion at
15      the top of page 11.
16  Q.  And if -- if the voter -- and we'll use the scenario
17      where an individual has to present ID when they go
18      to vote, right, because of a non-match, and would
19      you agree it's an individual that has a non-match
20      and doesn't provide ID also at the time of
21      registration under the statute?
22  A.  So can you say that again?
23  Q.  So the statute -- an individual who's a non-match,
24      if they provide their ID with their voter
25      registration, they would not have an additional step

```
 1            at the -- at the poll, an additional burden, as you
 2            put it, correct?
 3    A.      Based on the descriptions of the officials, that a
 4            registrant who provides a photo ID at the time they
 5            register, that would override a non-match, and they
 6            would not show up, and they would just be an active
 7            voter.  They wouldn't show up in MIDR status.
 8    Q.      Is it -- I mean you -- you're not -- you're not
 9            saying that an individual who just doesn't match is
10            also not an active voter, right?
11    A.      They are an active voter -- well, they -- assuming
12            that the information was entered completely by
13            registration officials, if the -- the only reason
14            that they were in MIDR status was that there was a
15            non-match, they would still be -- they would be
16            recorded as an active voter on the rolls.
17    Q.      And you say assuming that the election official
18            enters the information completely.  What do you
19            mean?
20    A.      So my understanding is that someone, for example,
21            who registers online, that they can't complete the
22            registration process unless they have entered
23            complete information, although they could still
24            trigger a non-match if they made a mistake entering
25            their name.
```

```
 1            The -- For a voter who registers in person or
 2      voter who registers by mail, there's a paper form
 3      that they fill out, and someone in the county
 4      registrar takes that information and manually enters
 5      it into the electronic voter registration system.
 6      So there are a variety of ways that people interact
 7      with the -- with the registration system.
 8            And if someone registers in person or provides
 9      a copy of their ID or their driver's license number
10      matches, that would override a non-match in a name
11      or date of birth field, and they would just be
12      placed on the voter rolls as active with no -- no
13      notation that they had to provide ID to complete the
14      process.
15 Q.   So -- and backing up I guess to my question about
16      election officials not entering information
17      completely.  That -- If information wasn't entered
18      completely, if there's a typo, that would be a -- a
19      non-match?  That would not be a place them in a
20      pending status, though, correct?
21 A.   My understanding if it was just a typo in a name, in
22      a name field, that that would not result in someone
23      being placed in pending status, although if it was
24      an error in an address, that could trigger pending
25      status because the -- the address doesn't show up as
```

```
 1        a -- as a residence.
 2   Q.   Okay.  So if there was missing information, in other
 3        words, so if there was not -- if there was -- if
 4        there was an address -- well, and I'm not so sure
 5        that would put someone in pending status, but if
 6        there was entire fields that were missing required
 7        of information, that would -- that would put someone
 8        in a pending status is your understanding?
 9   A.   That's my understanding.
10   Q.   Versus if the voter -- so if the voter didn't
11        complete their name, that may put them in a pending
12        status versus the voter has, you know, handwriting
13        is not legible and the election official puts it in,
14        has a typo, that would not put someone in a pending
15        status in and of itself?
16   A.   If it was in a name field, would not put them in
17        pending status.  If it were, there are a number of
18        records that have missing addresses or address
19        verification -- I'd have  -- so there are records
20        where there is an address but it is -- that people
21        are pending because the address is not verified
22        or -- but a typo in a name or birth date or social
23        security number triggering a non-match would not
24        result in a voter being placed in pending status.
25   Q.   So if a voter puts in an address that doesn't exist,
```

1        in other words, that -- there may be an address that
2        is put in the field, in a spreadsheet, but the
3        individual's actually in pending status because
4        there's -- there's no such address that exists?
5    A.   That's my understanding.
6    Q.   You would not -- you would not know where to -- what
7        districts to put the individual in, right, that's
8        correct?
9    Q.   You wouldn't know where the person goes to vote?
10       You couldn't assign them to a precinct, correct?
11   A.   That's correct.
12            MR. HERMAN:  Can we take a break?
13            MR. RUSSO:  Sure.
14            MR. HERMAN:  Of course.
15            MR. RUSSO:  Go right ahead.
16            (Break taken.)
17            MR. RUSSO:  Back on.
18   BY MR. RUSSO:
19   Q.   Before the break, Dr. Mayer, you mentioned that you
20       were talking about SSA and citizenship information
21       that's provided.  If SSA didn't provide citizenship
22       information to the states, would that alter your
23       opinion any?
24   A.   No.
25   Q.   I want to show you what's been previously marked as

1          Exhibit 116 Germany.  And I only have one copy.
2               MR. HERMAN:  That's fine.  I've memorized that.
3          Do you want -- Oh, so it's been marked.
4               MR. RUSSO:  It's been marked before.
5     BY MR. RUSSO:
6     Q.   Is this the three -- the webinar that you were
7          referring to, the webinar materials?  And I believe
8          it's a compilation actually of multiple webinars.  I
9          don't -- I don't think there was a cite to the Bates
10         numbers in your report.
11              MR. HERMAN:  Here.  Look at page 20, although
12         there's a different date on there.
13    BY MR. RUSSO:
14    Q.   That's the -- that is the -- the report.  I mean
15         that is a -- I'm not trying to confuse you guys
16         here.  The -- the Germany Exhibit 116, that is a
17         compilation of all of the webinars.  So if you flip
18         to about Bates page defendant 0008885 or so, you'll
19         see the cover page, I believe.  Should be right
20         around there, maybe is one off.  The page I'm going
21         to go to ultimately is 8899.  But there's not the --
22    A.   Okay.  So 8854 is felon process change.
23    Q.   8884.
24    A.   8884.
25    Q.   I'm just doing some math here based on the page that

1          I'm going to ultimately go to, but the page number
2          of the -- are you on 884?
3     A.   So 8884, which is page 31.
4     Q.   85.  I'm sorry.  Flip one more.  I'm sorry, and it
5          might even be 86.  There you go.
6     A.   Oh, all right.  So this --
7               MR. HERMAN:  Yeah.
8               THE WITNESS:  Got it.
9     Q.   And so that's the report here you're referring to?
10    A.   Yes, the -- the date and title match.
11    Q.   Okay.  And if you flip -- if you will flip to 8899,
12         this is -- it states Special Topics of the Month,
13         Verification Changes Due to HB 316.  And we're going
14         to look at 8899 through 88 -- 8912 if you want to
15         flip through it real quick and see if that's what
16         you had reviewed.
17    A.   Okay.
18    Q.   Okay.  Now, this is what you reviewed --
19    A.   Yes.
20    Q.   -- on the MIDR --
21    A.   Yes, in terms of that -- that paragraph, that's
22         correct.
23    Q.   Okay.  Now, I want to flip to -- there's some
24         scenarios listed on 8901, scenarios -- it says
25         Scenarios for Verification Process.  And for the

1    next three pages there's six scenarios presented,

2    and I just want to go through these to see if

3    you're -- if it's your opinion that what's being

4    presented here is inaccurate.

5        So scenario 1 is application presented with

6    IDs.  All identifiers pass verification.  ID

7    provided.  Citizenship verified by process.  Voters

8    move to active status with ID provided as yes.  And

9    it says not MIDR.

10        Do you -- do you disagree with any part of

11    that -- that hypothetical?

12  A.    So I'm not -- on what basis would I disagree with

13    that?

14  Q.    That's what I'm asking.  I'm trying to --

15  A.    So the way that -- I mean that is consistent with

16    the -- with my understanding of the -- of the

17    verification process and the MIDR status process.

18  Q.    And number 2 is application presented without ID.

19    All identifiers pass verification process.  ID not

20    provided.  Citizenship is verified by process.

21    Voter is moved to active status with ID provided as

22    yes.  Not MIDR.

23        So do you -- do you agree or disagree that

24    under this scenario where an individual's

25    information is -- is matched, although an ID is not

1          provided, that the individual's not in MIDR status?

2    A.    So again, I don't mean to quibble unnecessarily, but

3          I would have no basis for disagreeing that this is

4          how the process occurs, and there's -- the data

5          that -- that I have examined is consistent with

6          this.

7    Q.    If you'll flip the page to 8902, number -- the third

8          scenario is application presented with ID.  One or

9          more identifiers do not pass verification process.

10         ID provided.  Citizenship is verified by process.

11         Voter is moved to active status with ID provided as

12         yes.  Not MIDR.  Go ahead.

13   A.    That's consistent with the descriptions.  That's

14         consistent with my understanding of the verification

15         process.

16   Q.    Okay.  Number 4 is application presented without ID.

17         One or more identifiers pass verification process.

18         ID not provided.  Citizenship is verified by

19         process.  Voter is moved to active status with MIDR

20         status.

21             Is this consistent with your -- your

22         understanding of the process?

23   A.    Yes.

24   Q.    Okay.  And so in number -- in this scenario the

25         individual would have to show ID when he or she goes

1        to vote, correct?

2   A.   So we're talking about number 4?

3   Q.   Uh-huh.

4   A.   So my understanding and my review of the materials

5        suggests that there is an ambiguity here, which is

6        what ID the MIDR status registrant would have to

7        produce at the polling place in order to -- in order

8        to vote.

9   Q.   And what do you mean by -- Can you elaborate on what

10       the ambiguity is here?

11  A.   The ambiguity stems from a couple of things.  One is

12       that, as I note in the report, I saw at least three

13       different descriptions of what a MIDR registrant

14       would have to do in order to vote, depending on who

15       was describing it.

16            There's also inconsistencies in some other more

17       recent training materials about how voters or how a

18       registrant would resolve this at a polling place.

19       And also on page 19 when it gives an example of a

20       MIDR letter, it actually leaves open a -- a question

21       about whether a voter in MIDR status has to show

22       photo ID at all in order to vote.

23            So my -- my conclusion from this is that this

24       is actually a confusing administrative process that

25       could lead a voter to be unsure of what they

```
1         actually need to do to move their registration
2         status into -- to non-MIDR status so they can
3         actually cast a ballot.
4    Q.   And you refer to this letter on page 19, and you
5         said there's some confusion possibly about what ID
6         could be shown.  Is this -- Are you referring to the
7         HAVA, the HAVA process for first-time -- the
8         requirement of Help America Vote Act for first-time
9         voters who register by mail and do not provide an ID
10        with their registration?
11   A.   That's part of it.  It's also possible that a voter
12        may register in person without showing a voter --
13        without showing an ID.  And as I read this letter,
14        this letter would apply to a voter who voted by mail
15        or registered by mail without providing an ID.  And
16        there is a provision under HAVA and under Georgia
17        law that someone who registered by mail without
18        providing ID actually should be able to vote without
19        showing a photo ID if they present one of the forms
20        of HAVA-compliant ID on the right side, one of those
21        four different forms of -- of ID.
22             But if this is the -- if I registered in
23        person, and I get this letter, it's confusing
24        because this refers to someone who registered for
25        the first time in Georgia who mails in a voter
```

1     registration form, and I would not -- if that's not

2     how I presented at the registration office, that --

3     that would be confusing.

4          So this -- this letter doesn't actually address

5     Scenario 4 if someone registers in person rather

6     than submitting a mail application.

7  Q.  And you referred to someone who registers in person.

8     What would be a -- What is your understanding of

9     when a -- someone would register in person under

10    Georgia law?

11 A.  My understanding someone who appears at a -- at a

12    registration -- at the county clerk's office or at

13    the officials who were -- who actually -- someone

14    who appears at the office to register in person.

15 Q.  Okay.  And when someone does that, they turn in, do

16    you know how they go about submitting an

17    application?  Is it similar to DDS when you're on a

18    computer, or is it similar to online registration

19    when you're doing it electronically, or -- or do you

20    turn in a mail application?

21 A.  That I don't know specifically.

22 Q.  So if an individual went to -- under your scenario

23    to register in person by going to the registrar's

24    office and turns in a mail application, does that

25    change your opinion any?

```
 1   A.   Well, I'm not -- I don't recall from actually
 2        looking at the registration application whether it
 3        distinguishes between if I hand -- if I fill it out
 4        by hand and I turn it over to someone at a clerk's
 5        office, whether that's counted as a registration by
 6        mail.  I don't know specifically how that is
 7        recorded by registration method.
 8   Q.   Uh-huh.  So -- But back to my question is if it is
 9        recorded as -- or treated the same as any other
10        paper application, would -- would that change your
11        understanding of this process?
12   A.   No, because I -- I still maintain that that would be
13        confusing for a registrant who gets a letter saying
14        they registered by mail when they didn't register by
15        mail, which would imply that I put it in an envelope
16        and I stick it in a mailbox.
17   Q.   Uh-huh.  And again, it's -- your -- your analysis
18        was based on your understanding that in-person
19        registrations are more than simply registering at
20        DDS?
21   A.   Well, DDS would be through Motor Voter when someone
22        obtains a driver's license or ID and they -- but I
23        regarded this as someone who goes to a clerk's
24        office and registers in person that way.
25   Q.   Okay.  And again you didn't -- you didn't do any
```

1    research to determine whether that paper, whether an

2    application that is submitted at a registrar's

3    office is a different application from one that is

4    submitted to a voter registration organization to

5    turn in or one that's mailed in?

6  A.  Well, it should be the same application, whether

7    it's recorded as --

8  Q.  Okay.

9  A.  -- mail or in person.  No, I did not do research

10    specifically on that question.

11  Q.  Okay.  And you did just mention the Motor Voter law

12    and registering at DDS.  Do you know if individuals

13    who register at DDS, how they're processed through

14    the verification process?

15  A.  I don't know specifically.  I imagine it would be

16    the same process.

17  Q.  So somebody who -- so somebody who registers at DDS

18    would -- Is it your opinion that someone who

19    registers at DDS could ever come up as a non-match?

20  A.  I think it would be likely because they would

21    register with their driver's license or ID number

22    which would override a non-match.  So unless that

23    number was somehow erroneously entered, that should

24    not result in an MIDR status for someone who

25    registers through the Motor Voter process.

```
 1   Q.   So if -- if we assume that anybody who registered
 2        through DDS is never going to be flagged for, or I
 3        don't think they'd ever come up as a non-match or as
 4        a non-citizen, right?  Because citizenship would be
 5        checked when you register to vote at DDS also,
 6        right?
 7   A.   Well, there are cases of Department of
 8        Transportation where a clerk asks someone if they
 9        want to register someone to vote even though they
10        don't want to or they're not a citizen.  But
11        presumably if someone registers through Motor Voter,
12        there should be no difference between their voter
13        registration data and the DDS data because they're
14        both entered at the same time through the same
15        process.  So I would think it would have to be some
16        type of administrative failure if that process
17        resulted in someone being in MIDR pending status.
18   Q.   So the universe of applicants that we're ultimately
19        looking at for purposes of the verification process
20        are individuals who do not -- who register somewhere
21        other than DDS, right?
22   A.   That's my understanding.  I mean we can observe how
23        many people are in MIDR status.
24   Q.   What do you mean by that?
25   A.   Well, we can look at the voter file, and we have a
```

```
1        table that count the number of people who are in
2        MIDR status, and I think it's somewhere in the
3        neighborhood of 60,000 people.
4   Q.   And -- but you don't -- you don't know if those
5        individuals registered at DDS or if they submitted a
6        paper application, right?
7   A.   There's no data in the files about what method
8        someone used to register.
9   Q.   That's all I was trying to ask.  Okay.  So going
10       back to scenario -- Scenario 4, the individual under
11       Scenario 4 would not be pending due to citizenship.
12       Would you agree?
13  A.   If their citizenship was verified, they would not be
14       pending for citizenship.
15  Q.   And so they aren't, but this individual would be an
16       active -- in active status with MIDR status.  And
17       you mentioned the ID that the person would have to
18       show at the -- at the poll, right?  Is the ID other
19       than a first-time registrant who registers by mail
20       and does not provide an ID?  So other than somebody
21       who falls under HAVA, do you know if the -- the ID
22       that would have to be presented when the individual
23       goes to vote is any different than what a voter
24       would have to present under Georgia's photo ID law?
25  A.   It shouldn't because the only other situations would
```

1        be someone who had previously registered in Georgia

2        and for some reason their registration was either

3        cancelled through inactivity or they had moved to

4        another state, established residency, and then moved

5        back and reregistered.  And my understanding, in

6        that circumstance they would not qualify under HAVA

7        because they were not a first-time registrant.

8             So it would have to be people who were

9        registering in Georgia and who had not previously

10       been registered.

11   Q.  So it seems like though somebody who's a first-time

12       registrant who registers by mail and does not

13       provide ID actually has more options to -- more

14       types of ID that the person can provide at the

15       polling place than someone else?

16   A.  Well, that's what this letter suggests, although

17       there's other training materials that say that

18       that's not true, that what someone needs to do would

19       be to show a HAVA ID to complete the registration

20       process and then show a photo ID as required

21       under -- under Georgia's photo ID law.

22   Q.  And what -- what -- what training material?  Is that

23       cited in your paper?

24   A.  That's a more recent version of the Georgia

25       registration course.

1   Q.   Okay.  And do you know --

2   A.   It's not cited in my report.

3   Q.   And do you have a date or anything about that

4        document that we can help you find it?

5   A.   Not off the top of my head, in part because the

6        registration course, they actually don't have dates

7        on them.

8   Q.   Is there Bates -- is there a Bates number on it?

9   A.   I -- I don't know, but I can -- actually I think

10       there's a Bates number.

11  Q.   How did you know it was a more recent registration

12       material if it doesn't have dates on it?

13  A.   Because it referred to -- it referred to recent --

14       more recent events than the previous course.

15            MR. HERMAN:  Can we go off the record for one

16       second?

17            MR. RUSSO:  Uh-huh.

18            (Discussion held off the record.)

19            THE WITNESS:  Back on the record?  So this

20       is -- so that's the Bates number there, that 00?

21            MR. HERMAN:  Yeah.  Yep.

22            THE WITNESS:  So the number is 00105899, and

23       then there's a document number which is 136884.

24  BY MR. RUSSO:

25  Q.   Okay.  And so that's the document -- that document

1          you've recently reviewed and you're stating a local

2          registrar --

3     A.   So this is -- it's called the -- it's the general

4          registration online -- or it's training materials

5          that are provided for registration officials or

6          county clerks, and then at the end it tells them how

7          to take the certification test.  And it provides --

8          it gives information about the -- the full range of

9          registration and voting.  And again there's a

10         version that I referred to in the report, but again

11         as far as I could see it didn't have a date on it so

12         you had to sort of triangulate to identify the

13         sequence.

14    Q.   Let me just show you real quickly the --

15              MR. RUSSO:  We can mark them for ease.

16              (Exhibits Nos. 4 and 5 marked for

17         identification.)

18    BY MR. RUSSO:

19    Q.   Mayer Exhibit 4 and that --

20    A.   Are we done with this?

21    Q.   Keep that out.  Here, I have --

22    A.   Oh, we have two different documents.

23    Q.   That's right.  These are just the statutes.  Are

24         these the Georgia statutes that you -- did you

25         review these statutes in preparing your opinion?

1   A.   In general, yes.

2   Q.   What do you mean in general?

3   A.   So I don't -- I don't think I cite them in the

4        report, but I did review them.

5   Q.   Okay.  That's all I'm asking is you actually

6        reviewed the law when coming up with -- these laws,

7        you reviewed them?  I don't know if they're cited

8        either, but I'm just asking if you reviewed it?

9   A.   Yes, I did.

10  Q.   Okay.  And 21-2-220.1, this is voter registration

11       documentation requirements.  Do you -- This is the

12       state's voter verification statute, right?

13  A.   This looks like the language in HB 316.

14  Q.   And if you turn to subsection (c), it states, "Proof

15       of the applicant's identity as set forth in

16       subsection (b) of this code section shall be the

17       forms of identification listed in subsection (c) of

18       Code Section 21-2-417."

19            Do you see that?

20  A.   Yes.

21  Q.   Okay.  And so the forms of ID under the statute,

22       would you agree, are those that are allowed under

23       subsection (c) of 21-2-417?

24  A.   That's what it says.

25  Q.   And subsection (c), did you -- did you get a chance

1           to read -- read this in your preparation?
2    A.     Yes.
3    Q.     Now, this -- this subsection indicates that -- it
4           says an elector who registered to vote by mail but
5           did not comply with subsection (c) of Code Section
6           21-2-220, and who votes for the first time in the
7           state, shall present to the poll workers either one
8           of the forms of identification listed in subsection
9           (a) of this code section, or copy of a current
10          utility bill, bank statement, government check,
11          paycheck or other government document that shows the
12          name of the -- the name and address of the elector.
13               The -- a current utility bill, bank statement,
14          government check, paycheck, or other government
15          document, that tracks what's in HAVA, right?
16   A.     I believe so.
17   Q.     And that would be a -- and HAVA only applies to
18          first-time registrants by mail, right?
19   A.     That's my understanding.
20   Q.     Okay.  So -- so an individual who doesn't -- an
21          individual who doesn't provide ID under the
22          verification process could provide one of those,
23          correct?
24   A.     That's correct.
25   Q.     And an individual -- and then it refers to

1    subsection (a), says, you know, that -- who votes
2    for the first time in this state shall present to
3    the poll workers either one of the forms of
4    identification listed in subsection (a).  So that's
5    the other option.  Subsection (a), this is Georgia's
6    photo ID law, right?
7  A.  Correct.
8  Q.  And that lists the various forms of ID that can --
9    can be shown, right?
10 A.  That's correct.
11 Q.  Okay.  So I guess I want to go back to earlier you
12    said that there was an individual who is put in MIDR
13    status.  So in Scenario 4 here, that individual has
14    an additional burden.  And I'm still just not
15    understanding what you mean by there's an additional
16    burden.
17 A.  So one of the ways to think about that is it's an
18    extra administrative step that a registrant is
19    required to navigate.  And a burden can be something
20    specific that they have to do.  It could also be an
21    informational burden that they have to understand
22    and process additional information.  And this letter
23    that voters receive, it's actually kind of
24    confusing.
25 Q.  Well, I'm just talking about statute.  The letter --

1          We'll put the letter to the side.  I understand that

2          you think that it's confusing regarding what is a

3          mail registration.  But I want to focus on the

4          additional administrative burden because from

5          looking at these two statutes, I'm not able to see

6          what this additional step is because it's a step

7          that would be performed regardless.  Right?

8     A.   But that's true, but again, the -- there is an

9          additional step that now as a -- as a registrant,

10         you have -- there are -- there are now two separate

11         processes that stream into one, which is, you know,

12         according to the Secretary of State officials, a

13         voter will see no difference.  They show up, they

14         show their ID to vote, and they are -- actually

15         at -- the -- the way that I believe both Chris

16         Harvey and Kevin Rayburn describe it is that the

17         only interaction would be when a voter presents

18         their ID under Georgia's photo ID law, they would be

19         allowed to vote.

20              Whoever is at the polling place would make a

21         notation that they have provided ID and that they're

22         no longer in MIDR status.

23    Q.   So the voter would never even know then that they

24         have this what you call administrative step, an

25         additional administrative step even though it's the

1     same one when those two paths that you just

2     mentioned converge, it's the same step?

3  A.  But it's not the same step because a voter who is in

4     MIDR will get this letter or a letter like this, and

5     now this suggests that the -- there is a possible

6     earlier step where the voter has to complete the

7     registration process in some way, which is actually

8     what the training materials say.

9         And again the notion of a burden doesn't

10    necessarily mean a physical burden.  I have to

11    travel some place or I have to perform an additional

12    act.  That -- a burden could be informational that

13    now a voter has to navigate these separate

14    processes, and a voter could easily look at this and

15    think Georgia has a photo ID law and why do I -- why

16    do I just need to show up with a bank statement?

17        And so there's a -- there's an informational

18    burden.  And then there's -- there is extensive

19    literature on administrative burdens, some of which

20    I've actually done, that say that voters can be --

21    voters find these complicated letters and procedures

22    and that it's confusing.

23 Q.  So it's the -- your administrative burden is tied to

24    the letter?  You're not -- you're not -- you're not

25    opining that the actual process of going to vote

1        is -- and what is provided at the polling place is

2        an additional burden?

3    A.  It certainly could be because there's reason to

4        think that the way in which the MIDR processes are

5        carried out at the polling place, that that's not

6        going to be uniform across the state.  And it's also

7        possible that poll workers could be confused about

8        what they need to do.

9            So it is -- as far as I am aware -- actually I

10       know that there hasn't been a statewide election

11       that has been held.  There have been a couple of

12       special elections, but it is -- I think it's likely

13       that there is going to be confusion at the polling

14       place on the part of both voters and poll workers

15       about how this process actually works.

16   Q.  And this process, do you know -- do you know if the

17       process for Georgia's photo ID and the HAVA

18       first-time voter, has that changed?  Did that change

19       under HB 316?

20   A.  No.

21   Q.  So that process is actually still the same?

22   A.  I believe so.

23   Q.  And -- and did you look at -- Did you do any

24       research on elections that have occurred since HB

25       316?  There have been elections, right?

1   A.   There have been two or a couple of local special

2        elections.

3   Q.   What about municipal elections?  Do you know if this

4        applies to municipal elections also?

5   A.   This should apply to any election held in the state.

6   Q.   And you're aware that 2019 is a year that some

7        municipalities hold elections in Georgia, right?

8   A.   Yes.

9   Q.   But not all of them.  So did you find any -- did you

10       find any -- any evidence of confusion at the polls

11       on this -- this particular issue regarding what ID

12       could be acceptable that -- from the 2019 elections?

13  A.   I did not conduct an investigation of that.

14  Q.   Okay.  So you just assume that there's going to --

15       there could be confusion, and as a result that would

16       be an additional -- that would be an administrative

17       burden at the polling place on a voter?

18  A.   I would -- I would call it an inference rather than

19       an assumption, but yes.

20  Q.   Well, and what data are you basing this inference on

21       that there would be -- there's going to be confusion

22       if you never looked at it?

23  A.   Based on my experience studying election

24       administration, based on the confusion among

25       election officials, based on information in the

```
 1         training materials that -- that from what I can
 2         observe, even the people who are responsible for
 3         carrying out this law are not entirely clear on how
 4         it's going to work.
 5    Q.   And the -- the confusion and the training materials,
 6         that's again -- you're referring to this document
 7         that state defendants -- labeled state defendants'
 8         00105899 that you just mentioned, that's --
 9    A.   Well, but it's also -- it's also this.  It's also
10         the material that I cite in my report.
11    Q.   And expand upon that for me because I don't think
12         there is any confusion on which IDs were acceptable
13         in your -- in your report.
14    A.   But it's not simply a question of which IDs are
15         acceptable.  It's a question of how voters are going
16         to experience this process and the information and
17         instructions they receive.  It's not -- it's not
18         completely clear.
19    Q.   So a voter who may not know whether there's any
20         additional step because there isn't one may feel an
21         administrative burden?  That's another -- that's
22         another burden that you're referring to?  I'm just
23         trying to make sure I understand all the
24         administrative burdens that you're -- you're opining
25         on here.
```

1   A.   So again the -- the key here in this particular

2        example is that there's an informational burden,

3        that a voter who --

4   Q.   You don't disagree that any of those forms of ID,

5        though, are acceptable, right?

6   A.   No.

7   Q.   Okay.

8   A.   But we know -- I know from work that I've done that

9        voters are frequently confused about voter ID laws

10       because they are administratively complex.

11  Q.   And now you're not opining on Georgia's photo ID law

12       in this case, right?

13  A.   That's correct.

14  Q.   And you're aware that Georgia's photo ID law has

15       been held up in -- by the 11th Circuit Court of

16       Appeals?

17  A.   I am.

18  Q.   So really, again the -- you're administrative burden

19       and their confusion, the voter registration process,

20       although the individual is already in active status,

21       so there's just some confusion that you are

22       contending may occur tied to photo ID but as a

23       result the MIDR process?

24  A.   Not exactly.  So I'm not making an argument that

25       the -- that the issue here is the Georgia's photo ID

1      law.  That's -- that's a separate question.  My

2      position or my conclusion is that this -- the MIDR

3      process that places someone in active status is

4      different than someone who's just placed in active

5      status because now a voter gets this letter and is

6      instructed that they have to do some things in order

7      to vote that a -- a voter who's just in active

8      status would not experience.

9  Q.  What about a voter who is in active status who's a

10     first-time -- any first-time voter?  They would

11     be -- What IDs would they be able to show?

12  A.  I believe that the -- Well, my understanding is that

13     the only registrants who would get this letter would

14     be those who are in MIDR status.  So if I registered

15     and I -- to take the scenario -- I don't know

16     exactly which scenario it was, but I show up, I

17     register without providing an ID, but all of my

18     information matches, I think that's Scenario 3.

19  Q.  No, I believe it's maybe 2.

20  A.  Okay.  Two.  So I'm a registrant in Scenario 2.  All

21     of my information matches.  I get my precinct card.

22  Q.  You get a precinct card regardless if you're in

23     active status?

24  A.  That's correct.

25  Q.  Everybody's getting a precinct card --

1   A.   Who --

2   Q.   -- who's in active status?

3   A.   Who's in active status.  But again my understanding

4        is that this letter only goes out to voters who are

5        in MIDR status.

6   Q.   So again an individual under Scenario 2 who doesn't

7        provide the ID but all identifiers pass, they're

8        active status, and they're non-MIDR, that individual

9        goes to vote, the ID that -- that individual still

10       has to comply with photo ID, right?

11  A.   That's correct, because they've already -- their

12       identity under HAVA has already been taken care of.

13  Q.   Which is one form of ID, any of those under 417 that

14       a voter in MIDR status can provide, right?

15  A.   That's correct.

16  Q.   Okay.  But that individual could not show the bank

17       statement, the utility bill, the -- is that -- is

18       that what you're telling me?  Or that person could

19       still do it because they are -- because HAVA still

20       applies to that individual, right?  They might not

21       be in MIDR status, but they would still be able to

22       provide --

23  A.   So that's correct, but under the statute that --

24       under (b) of the 220.1, it's someone who doesn't

25       verify, in the event that their name, driver's

```
 1        license, social security number or date of birth
 2        does not match information, then the applicant shall
 3        nevertheless be registered to vote and shall be
 4        required to produce proof of his or her identity.
 5             And proof of the applicant's identity is set
 6        forth in Section (b) of this code shall be forms of
 7        identification -- So as I read this and look at this
 8        letter, that someone who failed the verification
 9        process would get this letter and be able to confirm
10        their identity through a HAVA document.
11   Q.   And -- and somebody who is not in MIDR status but
12        registered to vote by mail for the first time and
13        did not provide an ID, they could also still use the
14        same HAVA documents, right, under 417?
15   A.   So again the -- the voter ID statute refers to
16        voters who registered by mail -- by mail but did not
17        comply with Section (c), so they haven't provided
18        identification.  So as I read this, someone who's
19        identity has been verified through the verification
20        process actually simply skipped that first part and
21        vote by showing a photo ID.
22   Q.   They -- they could use a photo ID or -- or a bank
23        statement; isn't that right?
24   A.   I don't know.
25   Q.   Okay.  But that's what HAVA would -- HAVA would
```

1          provide, right?

2    A.   Yes.  But HAVA applies to a particular circumstance

3         of verifying identity through the registration

4         process.  So states can add their own requirements

5         on top of that like photo ID.

6    Q.   Sure.  I mean HAVA is -- HAVA -- and I'm simply

7         referring to the provision of HAVA that says where

8         an individual's a first-time registrant by mail who

9         does not provide ID with the registration is

10        required to show one of several forms of ID provided

11        under HAVA, bank statement -- they're not photo IDs,

12        they're just what HAVA deems to be IDs, or what a

13        state may also allow, which in Georgia of course

14        it's the photo IDs listed in 417(a).  You would

15        agree with that, right?

16   A.   That's correct.

17   Q.   Okay.  I mean I'm basically saying here that the

18        individual who's in MIDR status who is -- who's -- I

19        mean, excuse me, who is not in MIDR status, an

20        individual who did not provide ID, first-time

21        registrants, they fall under HAVA, they're not in

22        MIDR status if everything matched, right?

23   A.   That's correct.

24   Q.   But for purposes of HAVA, they -- and 417, they

25        could -- that person would still be able to show --

1          they still have to present ID under HAVA, it would

2          be a bank statement or a utility bill or what

3          else -- anything else the state allows them to

4          provide, which are the forms of photo ID under (a).

5          And so that individual falls in the same bucket.

6     A.   Well the --

7     Q.   The only difference that you're telling me is they

8          don't get a letter.  And so we're getting down to

9          the scenario which it's a letter is what you're

10         saying is the -- the letter is the burden?

11    A.   Well, it's an informational burden because the --

12         the process has -- the process is different.

13    Q.   But it's not a -- it's an informational burden.  It

14         is not a burden on you can't show -- or you have to

15         show additional forms of ID that you would otherwise

16         not have to show, right?

17    A.   That's correct.

18    Q.   Okay.

19              MR. RUSSO:  I'm about to move into another

20         topic on the data.

21              THE WITNESS:  This would be a good time to take

22         a lunch.

23              MR. HERMAN:  Okay.

24              THE WITNESS:  Is that okay?

25              MR. RUSSO:  I figure we'll be chatting about

1          the data for a little while and then I'll be pretty

2          close to done.

3                 (Lunch break taken.)

4                 MR. RUSSO:  Back on the record.

5     BY MR. RUSSO:

6     Q.    Dr. Mayer, we discussed briefly I believe earlier in

7          the day on page 13 of your report you refer to a

8          paper by Hood and Bullock from 2008, and your report

9          states license and ID possession rates among

10         minority populations are lower than for non-Hispanic

11         whites, both generally and in Georgia.  And you cite

12         to Hood and Bullock paper.

13                Did you -- did you conduct any follow-up

14         research on that paper to see if those -- if the

15         rates of the license and ID possession rates among

16         minority populations have -- has changed any in

17         Georgia?

18    A.    Not in Georgia, but generally data from 2012 through

19         2016 suggested a general pattern of lower ID

20         possession rates among minority populations.

21    Q.    And is the -- the general connection there and the

22         voting context that photo ID is going to cause lower

23         voter turnout or registration by minorities?

24    A.    The evidence is that it does reduce turnout.  The

25         evidence of registration is -- is not quite as clear

1          about what the effects are.

2     Q.    And I guess Georgia must be somewhat of an anomaly

3          with our voter -- voter turnout rates having gone up

4          so high over the last decade since photo ID among

5          minority voters.  I don't know if you've looked at

6          that or not.

7     A.    I'm sorry, say that again.

8     Q.    Turnout amongst minority voters has increased

9          significantly in Georgia since implementation of

10          photo ID.

11    A.    So the -- most studies of aggregate turnout find

12          that that doesn't happen, but the -- the issue with

13          voter ID is not only turnout generally but whether

14          an otherwise qualified individual has their access

15          to the voting booth impeded through voter ID laws.

16          And the evidence there I think is quite clear that

17          it does.

18    Q.    But again, you don't -- I mean as to Georgia, I

19          realize we're not here to discuss photo ID.  You

20          haven't looked at that in Georgia?

21    A.    So I'm not offering an opinion about the effect of

22          voter ID on turnout in this report.

23    Q.    You go on to mention the Social Security

24          Administrator's OIG report from 2009.  I assume you

25          reviewed that report prior to writing your -- your

```
 1        report?
 2   A.   I did.
 3   Q.   And in that report it states that Georgia's -- the
 4        percentage of non-matches through SSA for Georgia at
 5        that time was 14 percent?
 6   A.   I don't know if that specific citation refers to
 7        Georgia.  I did look at data from the Social
 8        Security Administration that found over half of the
 9        records sent by the state to the social security
10        agency for matching, over half of them failed to --
11        failed to match.  And also if you look at the -- the
12        data that was actually submitted through, for
13        example, the pending files, that a very small
14        percentage actually was returned as this person
15        matched and we can verify their identity.  The
16        majority were either no match was found or there
17        were invalid input data.
18   Q.   Invalid input data would be somebody's four digits
19        didn't -- didn't match, or would it be they didn't
20        have -- so the state submitted it or DDS submitted
21        it because I believe that's actually DDS that does
22        that through HAVA and their contract with SSA,
23        the -- a field was left blank that's required?
24   A.   Or something -- the problem was with the data
25        submitted, not that the data did not match.
```

```
1   Q.   All right?
2   A.   Because if they were able to bring the data in and
3        run whatever matching algorithm they use, it would
4        show up as no match found, not invalid input data.
5   Q.   And you state in here in your paper that the
6        nine-digit security number would be a better
7        identifier to use than the four digit, right?
8   A.   Well, the nine-digit social security number is
9        unique for each individual, and so if you have that,
10       there would be no question that you were dealing
11       with the same person.  And I note that the
12       combination of the last four digits, if you account
13       for combinations that the Social Security
14       Administration doesn't allow, you can call it 10,000
15       times 365.  There are only a few million
16       combinations so that's far less than the number of
17       people that are in the social security database.  So
18       that combination is not unique to an individual.
19  Q.   So again the State of Georgia allows individuals
20       provide a nine-digit, it's voluntary, though, but
21       federal law of course prohibits them from requiring
22       the nine-digit as I'm sure you already know that?
23  A.   That's correct.
24  Q.   Are you familiar with the Schwier v Cox case?
25  A.   No.
```

1    Q.   Which is the case out of Georgia that -- in which it
2         was overseen under the privacy act for collecting
3         the nine-digit social security number that enforced
4         Georgia -- HAVA, there's an exemption for HAVA,
5         right, for states to collect the nine-digit social
6         security number.  Are you aware of that?
7    A.   Not all of the -- the details.
8    Q.   I'll mark this as --
9              (Exhibit No. 6 marked for identification.)
10   Q.   Exhibit 6, that's the social security report that
11        you are referring to?  And I apologize the staple is
12        on the wrong side.
13   A.   So this is the report.
14   Q.   Uh-huh.  And if you flip to Appendix C of the
15        report, it is the fourth or fifth last page, this --
16        it's Appendix C, Verification Request for Top Ten
17        States; shows Georgia actually had nearly 1.95
18        million transactions and 14 percent of those
19        transactions were non -- non-matches.
20             And then in your report you then refer to a
21        file that you just pulled, the HAV running list
22        spreadsheet, and you indicate that it shows since
23        2011 half -- over half of the records, 53.4 percent
24        sent by the state to SSA end up as a non-match.
25             Do you -- do you know -- did you have -- Have

1           you ever looked into why that change?

2    A.    Why that changed from 14 percent to 53 percent?

3    Q.    Uh-huh.

4    A.    I don't.  I have not.

5    Q.    On page 15 of your report, it appears -- I guess you

6          did look at some -- some names, and you said you

7          came up with mismatches from the State of Georgia

8          from the data that you reviewed in this case?

9    A.    That's correct.

10   Q.    And tell me -- tell me how you -- it looks like you

11         combined a couple files here, pending 2018 file and

12         a pending 2014 to 2019, and you pulled -- you merged

13         the files, pulled out some individuals, and you came

14         up with 19 individuals non -- with non-matching

15         names?

16   A.    So what I did in that case is that there were two

17         pending files.  One I believe was everyone who was

18         in pending status in February of 2018.  And then

19         there was a second file that included everyone who

20         was in pending status between I believe it was

21         January 2014 and July 2019.  All of those records in

22         both files had Georgia a voter registration number,

23         which is a -- I think it's an eight-digit number

24         that actually should be unique for the individuals.

25               Because I had a unique identifier, it was a

```
1          simple matter to merge the files.  And so I had all
2          of the data for each individual in both files.  And
3          it showed that even in this case that there were
4          people -- that this was the same data should have
5          been entered in a similar or the same process, that
6          there were still names that didn't match, either
7          first name or last name, either because of a one
8          character difference in -- in spelling, an
9          apostrophe in one file and no apostrophe in another
10         or typographical errors.
11              And so this was just demonstrating that even
12         for the same individuals, that we know they're the
13         same individuals, that exact matching on names can
14         produce false non-matches.
15    Q.   Now, this -- the registration number for those
16         individuals, they had the same registration number,
17         right?  So they were in both files with the same
18         registration number?
19    A.   That's correct.
20    Q.   So it wasn't -- for example, you have someone named
21         Malaya, M-A-L-A-Y-A and Melaya, M-E-L-A-Y-A.  Is
22         that -- there -- but there's only one person, right?
23    A.   That's correct.  I looked at the records, and it was
24         usually the same last name, same address and so it
25         was -- and even if it wasn't, the -- the voter
```

```
 1           registration number should be unique.
 2   Q.    And did -- did you -- We don't know I guess whether
 3         that pending file that you looked at, whether there
 4         was an error somewhere within that file that caused
 5         the person's name to be spelled one way in one file
 6         and one way in the other?
 7   A.    So if it was a -- an error in the production of the
 8         file?  It could have been, but that -- that wouldn't
 9         matter if you were using exact matching because it
10         would still be a character-by-character match on the
11         field even if the -- the error was related to the
12         process of -- sort of the internal processes of
13         generating that file.
14   Q.    Okay.  So these were just two pending list files,
15         and there's an error -- do we know if the person
16         tried to register twice and that was that their name
17         was on both files for that reason?  I'm just -- It
18         doesn't make sense to me why there would be -- so
19         there's a 2018 pending list and a large be pending
20         list, right?  And I guess they were merged -- some
21         data was pulled at some point, and someone's name --
22         that person doesn't show up twice in the same list?
23   A.    As a rule that's correct.  So these are the same
24         individuals.
25   Q.    I get that part.  I'm just trying to understand how
```

1          this data is -- it seems like if it's -- you're

2          pulling the data from a pending list, unless

3          somebody tried to register twice.

4     A.   Or someone may have reregistered.

5     Q.   Yeah.  It doesn't -- that's right.

6     A.   Or updated their information.

7     Q.   Did it indicate in the file -- And I apologize.  I

8          didn't mean to cut you off.

9     A.   No, I was finished.

10    Q.   Did it indicate the reason for the non -- I guess it

11         was a person pending.  Well, why was the person

12         pending status?  Did you look at that?

13    A.   I did not look at the reason they were in pending.

14         I was interested in looking at the relationship

15         between exact matching and what happened for

16         individuals who were in the same type of data set

17         produced by the same agencies at different times.

18    Q.   Do you know when those data sets were -- were

19         actually pulled?

20    A.   I believe they were pulled at the point that the

21         file -- the files were generated in February 2018

22         and July 2019.

23    Q.   And are there any reasons that -- other reasons that

24         may exist as to why someone is being pulled from

25         presumably the same population, the same data set at

```
 1        different times, why their name could have been
 2        spelled differently?
 3             So in other words, you pull somebody, you pull
 4        his data set in late 2019 or mid 2019, and this
 5        person has been -- was on it since whenever, I guess
 6        2018; is that right?  And then if you had pulled
 7        that same list in 2018 -- more of a technical issue
 8        I guess with how the data sets were pulled?
 9   A.   Well, the -- the purpose of this exercise was to
10        sort of explore the -- the consequences of exact
11        character-for-character matching techniques.  So I
12        am not certain why the errors existed.  I don't know
13        why a name was spelled this way in one data set and
14        a different way in a different data set.
15             But for these purposes that doesn't matter.
16        The important thing is that there was a difference,
17        that an exact matching technique would not -- would
18        falsely not connect -- not link these records and
19        would not consider them the same person if you were
20        matching on name fields.
21   Q.   Okay.  So I understand.  So you're just trying --
22        You're trying to point out that an exact match of
23        these characters -- now, we don't know if maybe this
24        person tried to register twice, right, and one time
25        spelled the name M-A-L-A-Y-A or maybe spelled it
```

1       M-E-L-A-Y-A once and was sloppy with their

2       handwriting and it picked up as M-A-L another time.

3       I mean if they were registering twice, I guess that

4       would make sense if they submitted two registrations

5       why, but you're saying you didn't review the file

6       for that purpose?

7   A.  So there was no indication --

8   Q.  No.

9   A.  -- of why the errors occurred.

10  Q.  Gotcha.

11          (Exhibit No. 7 marked for identification.)

12  Q.  Handing you what's been marked as Exhibit Mayer 7.

13      This is the -- a printout of the pending -- you see

14      the name of the file at the bottom of the page,

15      Pending Analysis January 2020.xlsx file.  Does this

16      look like your spreadsheet?

17  A.  Yes, it does.

18  Q.  And I can tell you that's -- that's what it --

19      that's what it is.  And it's each of the sheets that

20      were in that file.  Now, on the first page you have

21      table 1 at the bottom, shows the number of active

22      registrants as of December 2019, and then the

23      column -- at the top are columns that fall under

24      pending less age January 2020, pending less age

25      January 2020 including pending verification.  The --

1      and those are -- those are the numbers that you

2      pulled from the 2020 data set that you compiled from

3      the counties?

4  A.  The top tables, yes.

5  Q.  Now, you -- you mention in your report that the

6      differences in the, you know, the aggregation, the

7      county files for the 2020 data sets produced nearly

8      identical data that is not material.  That is not

9      material?

10 A.  That is correct.

11 Q.  And I'm looking -- looking at it, it looks -- it

12     appears that in column B at row 10, that the number

13     of black, not of Hispanic origin, voters as of

14     January 2020, you have 2,065,722 active voters; is

15     that right?

16 A.  I believe that's right.

17 Q.  And if you look at column G on under -- it's

18     actually got a different number.  Do you know why

19     there's a difference in those numbers?

20 A.  So the -- the column G includes a separate category

21     of pending verifications, and there weren't that --

22 Q.  I thought H is the pending verification column.

23 A.  So there were -- so that number is -- is different

24     by a hundred and -- 115.  The -- the total is the

25     same.  So there -- there are a few people in that

```
 1        category.  You can see the other numbers are
 2        different as well probably because there were --
 3        there may have been people in more than one
 4        category.  But again those -- those differences are
 5        not -- are not significant.  We're talking about 100
 6        people out of -- out of 2 million.
 7   Q.   But you were working off the same files?  That's --
 8   A.   That's correct.  These were -- these were the same
 9        files.
10   Q.   So I realize that it's not a large number between --
11        the difference -- I was trying to get an
12        understanding as to maybe why there was a difference
13        there.  And in addition to the other -- the other
14        categories if you are pulling it all from the same
15        data set.
16   A.   These were pulled from the same data set, so this
17        was a function of the data that was actually in the
18        file.
19   Q.   And when you put -- placed it into this -- this
20        pending analysis spreadsheet, I mean was there
21        some -- would there have been an issue with how it
22        was copied over?  Is that why it was different?
23   A.   No, it shouldn't.  What this means is that there
24        were -- so if you look at the --
25   Q.   Seems like the total should still be the same no
```

```
 1          matter what.
 2   A.     And they are.  If you look at the -- the total
 3          number of people.  So what this indicates is that
 4          there were a small number of people in some
 5          categories that were -- that have had different
 6          reasons for being pending.  And there were a small
 7          number of people, looks like about 200 people who
 8          were in the file for the reasons of pending
 9          verification.  And I -- I can't remember exactly why
10          I considered that informative.
11   Q.     And I'm just looking at columns B and G.  I realize
12          that some -- that H and -- columns H and C are going
13          to be a little bit different because you're adding
14          pending verification, so you're --
15   A.     So what this means if you add up B and C and G and
16          H, those numbers are the same.  So there are some
17          people who moved from --
18   Q.     Right.  I got that.  I got that.  I was wondering
19          why B and G would be different.  It's the same for
20          row 4, American Indians have the same number --
21          anyway, it's -- it's fine.  I get that they're
22          different, and it sounds like you're not quite --
23          quite sure why there would be, you know, looking at
24          row 7, for example, 7B, 165,014 active Asian or
25          Pacific Islander voters under that demographic, and
```

1          then row 7G which shows 164,979 active registrants

2          as -- that are Asian or Pacific Islander.  And it's

3          a --

4     A.   So given that we're talking about 200 people, these

5          might be registrants whose information has not yet

6          been submitted or has been submitted but they don't

7          have an answer back.

8     Q.   Oh.

9     A.   So that could be it.

10    Q.   And I do think that individuals in pending

11         verification status, that is probably true.  That is

12         what pending verification means.

13              Now, looking at the totals in table 1 in the

14         bottom left-hand corner, there's row 33B.  There's I

15         guess the end of December or sometime in December

16         there's 2,011,116 African-American active

17         registrants in Georgia.  And then, you know, back to

18         row 10, column B, as of January gone up about

19         55,000; is that right?

20    A.   That's correct.

21    Q.   So the number of registrants between December and

22         January, that increased for African-American voters

23         presumably about 55,000, right?

24    A.   That's correct.

25    Q.   And then for white voters, which is row 22B and row

```
 1         32B, there was in December 2019 about 3,594,048
 2         active registrants who are white, non-Hispanic.  And
 3         then January looking at -- of 2020 looking at row
 4         22, column B, there is about 3,619,336 white
 5         non-Hispanic active voters in Georgia.  So about 20
 6         -- what is that, about 25,000?
 7    A.   That looks about right.
 8    Q.   So the -- the rate of registration between December
 9         of 2019 and January of 2020 of African-American
10         voters versus white voters, they're -- it's about a
11         little more than two-to-one rate; is that right?
12    A.   Well, I would be very careful about drawing a
13         conclusion from what amounts to probably three weeks
14         of registration data in an off year.  So it is true
15         that there were more African Americans who were on
16         the active rolls in January than there were in
17         December, but I don't regard those differences as
18         informative.
19    Q.   Well, you're saying over that three-week period, I
20         mean are you saying that maybe there was -- it could
21         be even higher number for the rest of January?
22    A.   The number of people who registered, if you looked
23         at it now, would almost certainly be higher than in
24         this for most if not all of these groups.
25    Q.   Of course because all these people are registering
```

1          to vote.  I'm talking about the rate of
2          registration.
3      A.  Calculated how?
4      Q.  Well, just looking at the totals from your report.
5      A.  So the number of new registrants divided by the
6          total number of registrants?
7      Q.  The -- I guess you could, yeah, you could calculate
8          that rate that way.
9      A.  So by that standard the rate of African-American
10          registration was higher than it was for non-Hispanic
11          whites.
12      Q.  Right.  And looking at your table, table 4, I
13          believe, you calculated -- you calculated the rate
14          of like -- I guess the likelihood of MIDR status
15          statewide in table 4, but basically it's the rate at
16          which registrants are in MIDR status.  That's what
17          you're -- you appear to be doing, and that rate --
18          How did you come up with that rate?
19      A.  That was the number of registrants in MIDR status
20          for each demographic group divided by the total
21          number of registrants.
22      Q.  And you -- you didn't look at the number of
23          applications coming in over that certain time frame,
24          though, in coming up with this -- this rate?  I mean
25          it's just applied to the whole population?

1   A.   Each sub group.  That's correct.

2   Q.   Uh-huh.  Now, would your -- would your opinion

3        change if the rate at which African-American voters,

4        for example, were registering as, you know, over two

5        times as many for a given period as whites, you

6        would expect them to have more potential -- have

7        more people potentially in MIDR status, right?

8   A.   Not necessarily.

9   Q.   And why is that?

10  A.   Because here we are looking at the -- the percentage

11       of people who are in a category as a percentage of

12       the whole, and you would have to start with the --

13       you would have to make the assumption that there's

14       some difference between types of registrants or the

15       likelihood that someone was going to be in MIDR

16       status based on when they registered.  But if we

17       look at the entire period over which voters were --

18       were or should have been placed in active status and

19       MIDR, we're not just looking at a three-week period.

20       We're actually looking at almost a year because

21       the -- the point at which the -- the change was

22       supposed to have taken place was in April 2019.

23            So this -- the rate or the likelihood that a

24       registrants is in MIDR status is actually looking at

25       a much longer time period rather than just a

1          difference between December 27th or December 30th

2          and the middle of January.  So this encompasses much

3          more data.

4                So even if it were true that people who

5          registered in January for some reason, African

6          Americans, were more likely to trigger an MIDR

7          match, that would be -- that would not explain the

8          magnitude of this difference, which is we're talking

9          about a factor of ten.

10    Q.    But your -- you're looking at it, though, for all

11          time?  I mean you didn't apply the -- the number of

12          individuals in pending or MIDR status from April of

13          2019 to -- to, you know, the day that you did the --

14          you did the report or that the numbers were from?  I

15          mean you looked at -- so would it be more accurate

16          then -- I get that December/January may be a shorter

17          time frame.  You mentioned that you were looking at

18          pending voters from the end of April through

19          January, but you didn't -- you didn't look at the

20          number of registrants during that -- that period as

21          a total.  So if --

22    A.    So --

23    Q.    So if African Americans are still registering at --

24          let's assume that they registered at a, you know,

25          two to one to white non-Hispanic registrants from

```
 1         the beginning of that pending list, wouldn't that be
 2         the appropriate comparison?
 3   A.    You could do that.  I don't think there's any reason
 4         to think that the numbers would be that different
 5         because if I'm -- if I have a certain probability of
 6         triggering an MIDR match, that the absolute number
 7         of people who register won't effect that percentage.
 8         It will affect the number of people, but this is --
 9         this is not based -- this is not a function of the
10         number of people who register.  There are more
11         people who registered that I wouldn't expect that to
12         change this dramatically because I'm dividing the
13         number of people in a sub category by the number of
14         people in the population.
15             So if you have more people registering and the
16         underlying probabilities of triggering MIDR are the
17         same, that you wouldn't expect any different result
18         in this table.
19   Q.    So if -- if -- and looking at your spreadsheet, you
20         have -- and I guess we could just use your -- we'll
21         use pending verification for now.  I believe
22         that's -- you have about, what, 39.4 percent for
23         black non-Hispanic voters in pending status; is that
24         right?
25   A.    So that -- that reflects that about 39. -- actually
```

1          39.4 percent of the registrants in pending status --

2     Q.   Right.

3     A.   -- are African-American.

4     Q.   Uh-huh.  And then, you know, you take that number,

5          and you're comparing it to the demographics of the

6          entire -- of all active registrants in Georgia,

7          right?

8     A.   Well, no, we're actually -- you're comparing apples

9          and oranges here because the spreadsheet is talking

10         about voters in pending status.  Table 4 is talking

11         about --

12    Q.   Oh.

13    A.   -- people in MIDR status.

14    Q.   Sorry.  I was not referring to table 4.  I was just

15         referring to what you did in your report.  You

16         compared that number 39.4 as, you know, the number

17         of individuals who are black non-Hispanic in pending

18         status, right?  So of the total number of voters in

19         pending status as of January 2020, 39.4 percent of

20         those voters are individuals who are

21         African-American, right?

22    A.   That's correct.

23    Q.   And you concluded that since the number of

24         percentage of active registrants in Georgia of

25         African Americans and as of December 2019 was 29.6

```
 1        percent, then there's a disproportionate number of
 2        registrants being placed in pending status who are
 3        African-American, correct?
 4   A.   That's correct.
 5   Q.   However, and what I'm asking, what we were just
 6        discussing is if -- if the number of registrants
 7        from the beginning of when this pending list is --
 8        was created, which is I guess April of 2019 through
 9        January 2020, if African Americans were registering
10        at a rate of say 60 -- 60 percent of the total
11        number of individuals who registered from that time
12        period, then it wouldn't be disproportionate,
13        correct?
14   A.   So if there were more African Americans who
15        registered, and they were more likely to be in
16        pending status --
17   Q.   Well, I'm not saying more likely or not.  I mean
18        we're just comparing the percentages, you know.  I
19        think it's more apples to apples at this point
20        versus what the his -- you know, there are obviously
21        folks who are in that 29.6 percent of active
22        registrants who registered long before any of these
23        policies were put in place.
24   A.   So it is possible that the number of people in
25        pending -- pending status would be a function of the
```

1      number of people who register.  But in terms of

2      the -- the burden, that doesn't matter because you

3      still have people who are in pending status and so

4      the -- the -- the percentage of people in that

5      category would be a function of the number of people

6      who registered and the likelihood that they are in

7      pending status.

8           But you still have the -- I think if you

9      calculated that in a different time period, you

10     would still find that minority registrants are

11     disproportionately in pending status in a magnitude

12     that wouldn't be explained by the differences in

13     registration rates or the numbers of people in each

14     group who registered.

15  Q.  Well, if during that time, this time period we're

16     discussing, so if we're if talking about April 2nd

17     of 2019 through this -- the date on this -- you

18     know, this file, sometime in January, we're going to

19     assume it's the end of January for our purposes of

20     discussion, if there were 60 percent of the

21     registrants from that time period that were

22     African-American or 50 percent or anything above

23     39.4 percent, there wouldn't be a dis -- you'd agree

24     there wouldn't be a disproportionate number of

25     African Americans in pending status, right?

```
 1   A.   Well, in one sense perhaps, but the -- the number of
 2        people in pending status is not simply a function of
 3        who registered between December 27th and January
 4        15th.  This pending list actually goes way back.
 5        For people who were in pending status in February
 6        2018, unless they have resolved whatever issue
 7        placed them in pending status, they are still going
 8        to be in pending status in January of 2020.
 9             So you're looking at essentially a three-week
10        period and trying to draw an inference about these
11        numbers of people in pending status when the number
12        of people in pending status is a function of
13        practices that go much farther back than between
14        January and December.
15   Q.   Right.  But after -- after HB 316, the number of
16        individuals in pending status changed significantly
17        because individuals who didn't have a match were
18        not nec -- were not -- they were automatically in
19        active status, correct?  You couldn't look back to
20        people in pending status -- to all pending status
21        voters from the time that this policy was actually
22        started, which I think was probably, you know,
23        sometime maybe in 2009 or '8 or '10, you wouldn't --
24        you couldn't look at that entire universe of
25        applicants because HB 316 wiped most of -- a lot of
```

1        those folks would never be in pending status under

2        HB 316?

3    A.  I'd have to check.  I'm not sure how evenly it was

4        applied retroactively, but I would have to check.

5    Q.  You would agree, though, if you could be -- if an

6        applicant would go into pending status prior to HB

7        316 due to having a name not match -- I'm just going

8        to use this hypothetical, of course, but for a name

9        not matching, and the person prior to 316 would go

10       into pending status, after 316 the person goes into

11       active status, right?

12   A.  If they register after 316.

13   Q.  So -- Right.  So you wouldn't -- it wouldn't -- you

14       couldn't look at all the entire history of pending

15       status voters because there's a -- after 316 there's

16       a number of those individuals that may not ever

17       be -- they would never be in pending status.

18       They're automatically in active status post 316.  So

19       that's why I'm using that as the time for viewing

20       this rate.

21   A.  So I would have to check.  I don't think there's any

22       reason to expect these numbers to be dramatically

23       different if you limited the -- the population of

24       people in pending status after April 2nd, but I

25       can't sit here and tell you what that number is.

```
 1   Q.   But if that number -- if the number of registrants
 2        after HB 316 was -- number of African-American
 3        registrants after 316 constitutes 40 percent of the
 4        total active registrants in that period, then
 5        there -- the number of individuals in pending status
 6        is not disproportionate to the reg -- to the
 7        registration numbers?
 8   A.   I think that would be right.
 9   Q.   Okay.  And that would be the same across any group,
10        right?  If -- if your percentage of individuals in
11        pending status -- so let's take whites.  White
12        non -- not of Hispanic origin.  14.68 percent of the
13        individuals in pending status are -- are white,
14        correct?
15   A.   That's correct.
16   Q.   And if the number of individuals, the percentage of
17        registrants from 316, enactment of 316, to whenever
18        these numbers were pulled, was greater than 14.68,
19        there would be a disproportionate number of
20        registrants being flagged or being placed in pending
21        status who are white?
22   A.   So if we looked at a specific period?
23   Q.   Same exact thing that we just went over.
24   A.   I think that's correct.
25   Q.   Okay.  Is there a reason why you didn't look at the
```

```
 1          numbers from post 316?
 2     A.   No.  I was interested in the -- the total numbers of
 3          people in the -- in the status.
 4     Q.   And you'll agree though then that your conclusion,
 5          if we do look at the -- the number of registrants
 6          from that period, your conclusion that no matter how
 7          the data are aggregated, the verification process
 8          disproportionately affects minority registrants,
 9          that would be incorrect?
10     A.   I don't think that would be incorrect.
11     Q.   Why?
12     A.   I think the marginals might change, but just
13          eyeballing it, there's no reason to think that the
14          overall conclusion of minority voters being
15          disproportionately affected would change.
16     Q.   Well, if -- and that's disproportionate, which in
17          your conclusion you're referring to disproportionate
18          to white voters, right?
19     A.   Disproportionate to their makeup in the voting
20          population.
21     Q.   And if -- again, if the number of voters who
22          registered after 316, that -- the number of let's
23          say white voters is greater than 14.68, then -- then
24          you'd conclude that the white voters are being put
25          in pending status at a disproportionate rate, right?
```

1  A.    That would be direct.

2  Q.    And if the number of black voters who register

3        during that same period is 40 percent of the total

4        voters, then you would say that the number of voters

5        placed in pending status who are black is not

6        disproportionate?

7  A.    Well, so as I'm thinking about this, that could be

8        true, but it depends on when someone was placed in

9        pending status.  If we were looking at only the

10       people who registered between say April 1st and

11       January of 2020, then the number of people -- number

12       of African Americans in pending status would be

13       different from this because you're sort of assuming

14       that everybody in pending status registered after

15       this date, after April 2nd.  And I don't know that

16       that's true.  So there are -- there are several

17       moving parts.  But if you looked at a -- a

18       particular registration period and looked at the

19       people who registered and the number of people who

20       are in each group and the number of people in each

21       group who were placed in pending status, that would

22       tell you how many people -- and calculated the

23       percentages, you could reach a conclusion about

24       effects on registrants who registered in that

25       period.

1   Q.   Okay.  And -- and if some -- you know, you say if

2        you looked farther back, I suppose because there's

3        some individuals who may have been in pending status

4        prior to 316, after 316 they didn't come out of

5        pending status because they were still, say they

6        were still missing information, right, or for any

7        reason that somebody would go into to be in pending

8        status currently, they wouldn't have changed their

9        status.  You're saying, you know, maybe you need to

10       look back farther.  It actually wouldn't -- wouldn't

11       that skew the numbers even more such that this --

12       that there may be even fewer -- there may be even

13       more white non-Hispanic voters that are in pending

14       status in proportion to the total number of

15       registrants and vice versa for again

16       African-American voters where maybe there was 50

17       percent actually of the active registrants during

18       whatever period you were going to go back to, you'd

19       go back to so the number could be even greater,

20       right?

21  A.   It's possible, but there are two moving pieces here.

22       One is the number of people who register and the

23       other is the number of people who are in pending

24       status among new registrants so I would have to go

25       examine the data to see if that was happening.

```
 1            But again I -- it might affect the -- some of
 2       the marginal percentages, but there's no reason to
 3       think that the effect on minority registrants in the
 4       aggregate would be significantly different.
 5   Q.  So you though applied it to the entire -- compared
 6       it to the entire percentage of African -- you would
 7       agree with me though that that is less accurate than
 8       looking at the number -- the voters for the
 9       applicable, the narrower applicable time frame,
10       right?
11   A.  So that --
12   Q.  It inflates the results -- it inflates the -- the
13       results?
14   A.  I don't know that it inflates the results.  It could
15       change the results, but I -- again, it might affect
16       the percentages for African Americans, but given the
17       total number of people who likely registered between
18       these two periods, I don't think there's any chance
19       that the results wouldn't show that minority
20       registrants are disproportionately affected.  I
21       don't think that the percentage of white registrants
22       in pending status would go from 14 percent to 50
23       percent.
24   Q.  I'm not saying the percentage of white registrants,
25       I'm saying -- yes, I guess that would be right, the
```

```
1            percentage of white registrants in pending status,
2            or any minority.  Pick any group.  I think it
3            applies across the board, the analysis.  So if it
4            did, though, would you -- would you agree that your
5            opinion is -- is incorrect?
6       A.   Well, if the results were -- showed that --
7       Q.   Well, if the numbers were -- percentages were
8            equal -- let's just take every group except for the
9            white group, white non-Hispanics.  I think that was
10           the only one that in your analysis went the other
11           direction.  If -- if the number or percentage of
12           active registrants for this period, say for Asian --
13           Asian or Pacific Islanders is greater than 16.83
14           percent, then that would not -- the number of Asian
15           Pacific Islanders in pending status as of January
16           2020 would not be disproportionate?
17      A.   If that's what the data showed, but I don't think
18           that's what the data would show.
19      Q.   But if it did, you would agree?
20      A.   Well, my conclusions are based on the data.
21      Q.   Well, you didn't look at this data, right?
22      A.   I didn't look at that particular data.
23      Q.   Now, you did look at -- at individuals in non --
24           that are -- or registrants that are in pending
25           status due to non-citizenship, right?  And table 5
```

1    of your report, page 22, and table 6, now these two

2    reports you're looking -- excuse me, tables --

3    you're -- you're looking at percentages of

4    individuals who are in pending status as

5    non-citizen, and you're taking their -- by race, and

6    then in table 6 you are looking at just the

7    percentage of individuals who are voting age

8    naturalized citizens living in Georgia according to

9    the 2014-2018 five-year American Community survey,

10   right?

11        And if I'm -- if I'm following this correctly,

12   the -- let's take Hispanics in table 6.  20.9

13   percent of the voting age naturalized citizens

14   living in Georgia are Hispanic, and you say that in

15   table 5 there's 20.9 percent in pending status as

16   flagged, so you wouldn't say there's a

17   disproportionate effect there?

18 A.  Well, I'm not arguing for -- Again we're comparing

19   two different numbers.  The point of table 6 is to

20   demonstrate that there are, in fact, hundreds of

21   thousands of naturalized foreign-born citizens

22   living in Georgia.

23 Q.  Uh-huh.

24 A.  And combined with the known inaccuracies of relying

25   on driver's license data to verify citizenship

1    because it's rarely updated or frequently not

2    updated, this shows that among the people who are

3    registered who are flagged as non-citizens, I mean I

4    am certain that there are actual citizens on that --

5    in -- on that list of people.  I don't know how

6    many, but I can express certainty that the number is

7    greater than zero.

8        So that means that some of these individuals

9    are actually citizens, and because of a flaw in the

10   underlying verification process, they are flagged as

11   non-citizens and will have to go through a separate

12   process.

13       And the point of table 6 is not to say that

14   those numbers of -- you know, the percentage --

15   Q.  Okay.

16   A.  -- of naturalized foreign-born African-American --

17   Q.  Right.

18   A.  -- people in Georgia should be the same as that

19   number.

20   Q.  I understand that.

21   A.  It's just that there are --

22   Q.  It's a little different.  It's not the same analysis

23   that we were just looking at regarding the total?

24   A.  That's correct.

25   Q.  Now, you said that there are the flaws in the

1           registration process as it applies to verifying

2           citizenship.  You're aware of course that it's --

3           citizenship is compared to the information in DDS's

4           database, right?

5    A.    That's correct.

6    Q.    And it's your position that that information may be

7           outdated, right?

8    A.    That's correct.

9    Q.    Now, what is your understanding of how that

10          information gets -- gets updated?  So an individual

11          who's a non-citizen but able to have a license, and

12          it ends up thus there in the DDS database, and when

13          that person would then change over to be in the DDS

14          database as a citizen.

15   A.    My understanding is it would require affirmative --

16          an affirmative step by the registrant to change

17          their status at DDS.  It doesn't automatically

18          update when someone naturalizes.

19   Q.    So right.  So USCIS doesn't provide naturalization

20          information automatically to the states to say these

21          people have been naturalized, update your driver's

22          license database?

23   A.    That's my understanding.

24   Q.    So it's all self-reporting.  So if somebody's

25          flagged as a non-citizen and in pending status, but

```
 1          they are -- but that person is a citizen, it would
 2          be because that person hasn't updated their
 3          information in DDS's database?
 4     A.   That's my understanding.
 5     Q.   And is it your understanding that -- Do you know if
 6          SSA provides naturalization information to states
 7          whenever they run the HAVA match?
 8     A.   My understanding is that information that is --
 9          there is voter information provided to the social
10          security administration for the purposes of
11          citizenship match because if I register using my
12          social security number and don't have a driver's
13          license number, I mean there's really nothing to --
14          nothing to match, and --
15     Q.   What do you mean?
16     A.   -- if all I did was report my name and birth date,
17          that's unlikely to produce a match in DDS because
18          there are just too many possible combinations.
19     Q.   But non-citizens can still have a social security
20          number, right?
21     A.   That's correct.
22     Q.   So you could have somebody who matches -- You could
23          have somebody who could be in SSA's database with
24          the first name, last name, date of birth, last four
25          digits and be a non-citizen, right?
```

1   A.   That's correct.

2   Q.   And you don't know whether SSA would then say okay,

3        we have a match, but this person is actually a

4        non-citizen, a non-citizen?

5   A.   I believe it does because there is a code in the --

6        in the files that reports the results of the Social

7        Security Administration verification process.

8   Q.   And I believe it's in one of these reports also, but

9        just for -- I guess it's easier -- Okay.

10       So if we go to -- I don't remember what number

11       we marked as the SSA report.

12  A.   It's six.

13  Q.   Exhibit 6, page 2.  There's a -- a chart here, table

14       1, HAVV responses, and it states -- and see midway

15       through the charts says types of match verification

16       responses:  single match alive, single match

17       deceased, multiple match alive, multiple match

18       deceased, multiple match mixed.

19       Now, do you know if -- if these are -- this is

20       the accurate match verification responses that --

21  A.   So my recollection is that there was a separate code

22       that the Social Security Administration provides

23       that they do their own citizenship test.  I would

24       have to go back and look at the -- look at the data.

25       But in the pending files there are separate fields

```
 1        for DDS citizenship and social security
 2        verification.  And I -- I recall that there -- that
 3        there is a separate verification code for social
 4        security citizenship verification.
 5   Q.   Now, if we go to the -- the training materials
 6        exhibit, that Ryan Germany 116, I believe, that --
 7        that we discussed earlier.  If you flip to page
 8        Bates 8832.  Okay.  This document, it's -- it says
 9        dashboard verification responses to review.  DDS
10        will provide a quote/unquote Y or quote/unquote N
11        value for each field that is reviewed.  SSA provides
12        a single response code.  All of the possible
13        responses are listed in the table below.  No match
14        found -- and I -- and no match found is a Z.; Y
15        response is single match deceased; X is single match
16        alive; W multiple matches, at least one alive and at
17        least one deceased; V, multiple matches all alive; T
18        multiple match all deceased; S invalid input data,
19        and 9 system error, unable to process at this time.
20             And so it's your -- you believe that -- you
21        contend that there's actually another response code
22        that SSA would provide on citizenship?
23   A.   So I would have to go back, and I could be
24        misremembering, but my recollection is that in the
25        files there's a separate field for citizenship based
```

1        on Social Security Administration responses.  But I

2        would have to look specifically at the files to

3        confirm that.

4  Q.  And so if -- if there is no confirmation by SSA, you

5        would agree that this statement in your report

6        that -- regarding SSA citizenship verification is

7        incorrect, right?

8  A.  If they don't do it, then I have misremembered that.

9  Q.  Now, back to your pending analysis spreadsheet.  If

10     entries that -- I guess really the fourth group --

11     or excuse me, the third data set down beginning at

12     row L -- excuse me, column L.  You have MIDR under

13     M, and then beginning at column R you have ID

14     required January 20.  So the MIDR section, and I

15     don't -- I don't know what -- how else to describe

16     it quite honestly, but beginning at column L, from L

17     to P, what is that data set?

18  A.  So that -- from L to P, that is a table of the --

19     whether a registrant is in MIDR status.  So that's

20     everyone in the -- in the voter files.

21  Q.  Okay.  And then S or R to U?

22  A.  So R to U is looking at the voters in MI -- so there

23     is the -- January 2014 to July 2019 is a list of

24     everyone who was in pending status, and that

25     includes voters who were in MIDR status because at

1          that point they were pending.

2    Q.    Say that again, I'm sorry.

3    A.    So in July 2019 everyone who was in MIDR status --

4    Q.    Uh-huh.

5    A.    -- was pending.  They were not on the active rolls.

6    Q.    So after 316 had been enacted but prior to anybody

7          whose prior -- prior pending status due to a name --

8          a name mismatch, for example --

9    A.    Correct, and the reason is --

10   Q.    -- possibly, they hadn't run that --

11   A.    The software had not -- yeah, the software had not

12         been updated until -- this apparently was generated

13         before that change was made to the system.  So not

14         everybody in pending status was MIDR, but everybody

15         who was MIDR was in pending status.

16              I compared -- I took all the registrants who

17         were in MIDR in that pending file and then looked in

18         the January 2020 file to see whether that voter was

19         still in MIDR status, so -- using the voter

20         registration, the unique voter registration number.

21         And it -- so the way to interpret that table is if

22         you look at column U, there were 1,999 registrants

23         who were in the July 2019 pending file who were also

24         in the 2020 voter file.  So we know --

25   Q.    Which column are you looking at again?

1    A.    I'm looking at column U, row 7.

2    Q.    Okay.  The S column, the one thousand -- no.

3    A.    1,999.

4    Q.    Okay.

5    A.    So that's everybody in the July pending file in MIDR

6          status, so that -- who was in the --

7    Q.    Okay.  I understand.

8    A.    -- the January 20th.

9    Q.    And if it's a no -- go ahead.

10   A.    So if -- and column S, if --

11   Q.    I gotcha.

12   A.    If they -- yes for in column R is whether they were

13         in pending status in July 2019.

14   Q.    Okay.

15   A.    Column S and T, row 2 was whether they were in

16         pending status or whether they were in MIDR status

17         in January 2020.  So if we look at the cell S7 --

18   Q.    Uh-huh.

19   A.    -- those 479 people --

20   Q.    Very good.

21   A.    -- were in MIDR status in July but were not in MIDR

22         status in January, so they had taken whatever steps

23         they needed to to -- to cure or to correct that MIDR

24         status.  And so it means about 24 percent of the

25         people who were on MIDR status were able to get that

1          resolved presumably by providing the necessary ID or

2          correcting the information that resulted them --

3          resulted in them being placed in MIDR status.

4     Q.   Okay.  And this is -- on page 24 of your report,

5          you -- this is -- that is the analysis you were

6          discussing at the top of page 24, right?  Say of the

7          3,672 MIDR pending registrants in July 2019, only

8          429, 13 percent, had provided identification to

9          registrars and were restored to active non-MIDR

10         status by 2020.  Is that --

11    A.   So I think there's a typo there.  I think it should

12         be 479 in the report.

13    Q.   Uh-huh.

14    A.   But that doesn't dramatically change.  That raises

15         it from 13 to --

16    Q.   Sure.

17    A.   -- 14 percent.

18    Q.   And the 3,672 MIDR, so that is -- I'm trying to see

19         what number that correlates to in your --

20    A.   Well, that includes people who were not -- who were

21         in the January file but -- or I'm sorry, were in the

22         July file but didn't show up in the January file so

23         they had been --

24    Q.   The total?

25    A.   -- removed, were no longer in the file.

```
 1   Q.   Okay.  And the no column, so I guess that's R -- S4?
 2   A.   Yes.
 3   Q.   And T4?  What is -- what is S4 and what's that --
 4   A.   S4 would be someone who was not in MIDR status in
 5        July and not in MIDR status in January.  So it's
 6        people who were --
 7   Q.   Never in MIDR?
 8   A.   -- never in MIDR status but they were in the pending
 9        file.
10   Q.   Okay.  So -- Gotcha.  So somebody who is -- had been
11        flagged for being a non-citizen, for example, or
12        missing information.  Any pending status?
13   A.   That's correct.
14   Q.   All right.  And of that you state in your report
15        only 429 or 479 voters had been -- had provided
16        identification to registrars and were restored to
17        active non-MIDR by January 2020.  You would -- you
18        would agree that it's most likely an individual
19        who's in MIDR status, they're going to -- they're
20        always in active status -- well, not always.  I
21        don't want to say that.  An individual who's active
22        MIDR, it's likely that they're going to move from
23        that MIDR status when they go to -- when they go to
24        vote, right?
25   A.   It's possible.
```

1    Q.   And that's kind of what the statute contemplates

2         because it's tied to showing your ID, the photo ID

3         requirement, which is what you show when you go to

4         vote?

5    A.   That's the claim.

6    Q.   Somebody I suppose could come off -- could go to the

7         registrar and show that ID, although they're not

8         going to vote, because there's no -- they might do

9         that whenever, it's not an election that's going on,

10        and clear that MIDR status up, right?

11   A.   That's possible.

12   Q.   But it's most likely people are going to do it when

13        they go to vote?

14   A.   That's -- that's the claim.

15   Q.   And so -- so this 429 number, I mean are you -- are

16        you saying here that that is -- that number is only

17        13 percent because of -- for some -- some reason

18        other than there weren't elections for those -- for

19        these other individuals last year?

20   A.   So it -- that -- the percentage of people who were

21        able to resolve it, it does not distinguish between

22        people who resolved it by going to the -- a clerk's

23        office or providing the ID and those who did it at

24        the polls.  We'll have to see what happens in March

25        after the statewide primary to see whether that

1           changes.

2    Q.    You mean the May statewide primary?

3    A.    May statewide prime.

4    Q.    And you didn't look to see whether any of those

5           individuals who had come off -- or back -- Scratch

6           that.

7                You didn't look at whether the entire

8           population, that 3,672, what number those folks

9           actually had elections last year that they could

10          have voted in?

11   A.    I don't know.  I did not have access to a 2019 voter

12          history file.

13   Q.    And but conceivably you could have looked -- you

14          could look then and see whether these individuals

15          had elections.  It may not even be in their voter

16          file whether they had an election to go vote in and

17          just didn't and stayed in MIDR status or not, right?

18   A.    So if I had a -- a comprehensive set of voter

19          history files, because I think in Georgia they

20          produce them election by election.

21   Q.    But I don't think they show if somebody didn't vote.

22          It'll only show if you did vote.

23   A.    Well, if you registered and didn't vote -- I mean if

24          you were in the voter file at a point and were not

25          in the voter history file, the conclusion is that

```
1            you didn't vote.
2     Q.    Okay.  I understand what voter -- I was referring to
3            an individual's voter history file, not a
4            compiled -- we would call it voter history file in
5            Georgia; you know, my personal history.  So my voter
6            history file is -- would show what elections I voted
7            in?
8     A.    Okay.  I mean --
9     Q.    Does that make sense?
10    A.    Yes.
11    Q.    So semantics, but I understand what you're saying.
12    A.    The ones that are provided.
13    Q.    In one election.
14    A.    You have to request them election by election.
15    Q.    I understand what you're saying.
16    A.    I'm going to grab some more water.
17    Q.    Going back to your pending analysis spreadsheet --
18           and what -- I'm sorry, what did we mark that as?
19           What exhibit?
20    A.    Seven.
21    Q.    Going back to Exhibit 7, the -- the number in column
22           N for MIDR, now that's -- that's really just
23           everybody in pending status, right?
24    A.    No.  That's -- that is taken from the January voter
25           file.  So this includes people who are in pending or
```

```
1            active status as MIDR.
2    Q.     Okay.  As of January?
3    A.     So it is possible for someone in pending status to
4           be MIDR, but most of them are not.
5    Q.     And it looks like -- yeah, we'll go row -- so row N,
6           I guess -- excuse me, row 13, column N, there's --
7           there are 3,432 registrants.  Well, some may be
8           active.  We don't know because if they're pending,
9           they wouldn't be in active status, but some
10          proportion of that number is all -- is active, and
11          there may be some people in pending, right?
12   A.     I think most of them are in active status.
13   Q.     Okay.  And of course we know that as a result of HB
14          316 an MIDR could still be in active status.  Only
15          someone in pending status for a limited reason, you
16          know, limited reasons would not be in active status?
17   A.     That's correct.
18   Q.     Okay.  So the 3,432 people, so that is the number of
19          Hispanic registrants in MIDR status total as of
20          January 2020?
21   A.     That's correct.
22   Q.     Okay.  And so -- and that's, what, 5.67 percent of
23          the total regis -- total individuals in MIDR status,
24          right?
25   A.     That's correct.
```

1   Q.   Okay.  And we discussed -- discussed a little bit

2        earlier about MIDR and, you know, you said someone

3        who goes and registers at DDS would most like -- you

4        know, I don't want to say would never because you

5        had a few scenarios where maybe there was a data

6        input issue, you said, but it's highly unlikely that

7        anybody who registers at DDS is ever going to be in

8        MIDR status, right?

9   A.   I think that's probably true.

10  Q.   So these individuals had to have registered some

11       other -- they submitted an application for

12       registration some other way.  Do you know if an

13       individual who vote -- excuse me, who registers

14       using Georgia's online voter registration system,

15       whether that individual would ever be MIDR?

16  A.   I think it could happen if there were an error that

17       were -- that was made.  I don't know the voter

18       file -- or the voter registration file does not

19       include any -- that I saw includes any data about

20       the mode or how someone registered.

21  Q.   And what kind of -- you said if some kind of error

22       was made.  What kind of error do you mean?

23  A.   I would think that a -- a typographical error in a

24       field, I'm not sure if it corrects it immediately,

25       or when someone enters their driver's license or ID

```
 1         number.
 2    Q.   Because you have to have a driver's license or ID to
 3         register online, right?
 4    A.   I believe that's true.
 5    Q.   So you would never have anybody registering online
 6         being in MIDR status due to name mismatch because
 7         they would always have to have a driver's license or
 8         ID match, otherwise they'd never get found?
 9    A.   I think that's probably right.  I did not go through
10         the online registration process because I'm not a
11         resident of Georgia, and I didn't want to start down
12         that road so --
13    Q.   Well, and I'm just trying to understand if there's
14         some -- you know, if -- so we're looking at the
15         numbers of individuals here who are in MIDR, and it
16         seems relevant to know what methods of registration
17         are being used by these individuals, and if the
18         method of registration is for one reason or another
19         having a role in the numbers.
20    A.   That could be --
21    Q.   I mean it could be part of the cause, right?
22    A.   That could be informative.  It doesn't answer every
23         question because there might be particular reasons
24         why someone was not able to register online:  they
25         didn't have a computer, they don't have the
```

1          ability --
2    Q.    And I'm not talking about just online.  I'm just
3          saying why people are in MIDR status.  If it's
4          relevant to know that say every single person who's
5          in MIDR status is someone who submitted an
6          application by paper, that would probably -- that
7          would be relevant to your -- your analysis, right?
8    A.    That's correct.
9    Q.    And I mean you would agree that paperless
10         registration is more accurate than paper -- using
11         paper forms, paper registration applications, right?
12   A.    I would say that's true.
13   Q.    And there are studies that I've seen --
14   A.    That's correct.
15   Q.    -- that find that.
16              So but you did not look at the -- the mode of
17         registration in this?
18   A.    I did not have access to that data.
19   Q.    And if -- if certain -- in fact, have you -- so have
20         you ever looked at census data on voter
21         registration?
22   A.    Yes.
23   Q.    And census data for -- regarding voter registration
24         does include information about the estimates I
25         suppose about the mode of registration for different

1        demographics, right?

2    A.   So that's not quite true.  There is a -- a survey

3         that is done by the census bureau called the current

4         population survey, and they usually -- they do a

5         survey, it's called the November voting and

6         registration supplement, so there is -- there is

7         survey data about the mode of registration that you

8         could --

9    Q.   It wouldn't be exact, but it's just -- I'm just

10        asking if you --

11   A.   No, I have not looked at that.

12   Q.   And if certain -- so let's say if -- and you have --

13        what's that row -- row 10L is the black not of

14        Hispanic origin, right?  Yeah, African-American

15        registrants, 41,946 individuals as of January who

16        are in pending -- or not pending, excuse me, who are

17        in MIDR.  Now, if -- if African-American registrants

18        were more likely to or did register, you know, maybe

19        through organizations, for example, it would be more

20        likely that you'd have some greater percentage of

21        those -- those registrants in MIDR status simply

22        because of the numbers, right?

23   A.   It's possible, but that by itself doesn't eliminate

24        the question of whether there is a particular

25        disproportionate effect because if some groups use a

```
 1          mode of registration that is more likely to trigger
 2          MIDR status, you still have a -- you still have a
 3          consequential effect.
 4    Q.    Right.  And I guess again I'm just look -- I'm
 5          thinking about it or looking at it in terms of the
 6          total.  If there was -- the numbers would match --
 7          you would expect the numbers to still be higher one
 8          way or the other.  There may be other reasons.
 9          There could be -- I'm not -- you know, there could
10          still be typographical areas in putting it into the
11          system, for example, right?
12    A.    It's possible.
13    Q.    But if the numbers are greater, then it's more
14          likely you're going to have more -- a greater
15          percentage from a -- and I'm not -- I'm not saying
16          just voter registration groups.  For any reason,
17          right?  If some group is more ** precedent in a mail
18          registration, that could inflate the numbers there
19          without it actually being a flaw in the system?
20    A.    So I would agree with the first part of the
21          question, not necessarily with the second because it
22          is possible that the way that the registration
23          system is structured leads to different groups using
24          different modes.  And if a -- if African-Americans
25          for any one of a number of reasons use a form of
```

1           registration that is more likely to produce an

2           erroneous MIDR, I would conclude that that's still a

3           consequential effect.

4    Q.    Now, remind me, you testified earlier about the --

5           the rates of having driver's licenses amongst the

6           different -- different populations?

7    A.    Correct.

8    Q.    You said you hadn't looked at Georgia, though, to

9           determine whether there was a significantly greater

10          rate of African-American voters versus any other --

11          or any group, the rates of any -- any group for

12          their -- I'm butchering this question.  I'm sorry --

13               The rate of having a license or ID issued by

14          DDS, you did not look at -- at that.  You looked at

15          the Bullock report from -- Hood and Bullock paper

16          from '08, I believe, but nothing else?

17   A.    I have not looked at --

18   Q.    Okay.

19   A.    -- recent data on driver's license or ID possession

20          rates in Georgia.

21   Q.    Because even a group that's, you know, somebody --

22          any individual that's filling out a paper form, I

23          believe HAVA requires if an individual has a

24          driver's license or social security number, they

25          have to use one of those on the application?

1    A.    That's what the application says.

2    Q.    And you would agree that online voter registration

3          where you have to use an ID number or driver's

4          license number would -- would be more accurate than

5          submitting applications to begin with?

6    A.    That's correct.

7    Q.    Now, on -- on page 25 of your report --

8                MR. RUSSO:  Andrew, you're still doing okay,

9          time for you?

10               MR. HERMAN:  Fine.

11               THE WITNESS:  Can I take a quick break?

12               MR. RUSSO:  Go right ahead.

13               (Discussion held off the record.)

14   BY MR. RUSSO:

15   Q.    On page 25 of your report you refer to data errors,

16         and it's a section -- Section 9, data errors and

17         potential non-uniform administration.  You've given

18         some examples of anomalies that are -- that you

19         noticed in the voter registration system or that you

20         noticed in the files that you reviewed.  Excuse me.

21               Did you conduct any kind of research or review

22         to determine if maybe records were entered -- these

23         weren't really errors and records were just entered

24         a certain way for a certain reason that way?

25   A.    So I've worked with a lot of voter databases and a

1          lot of large databases, and my experience is that

2          they all contain some errors.  And it is possible

3          that some of them, some of these values are default

4          values, that when a state moved to -- to a statewide

5          system and imported records, that there might be an

6          error introduced there.  But we know that these are

7          errors.  We know that there is no one -- no

8          registered voter in Georgia who is 119 years old or

9          that someone cannot have a birth date or birth year

10         after their registration date.

11              And so in a very real sense it doesn't matter

12         why these errors occurred, whether it was a input

13         error or it was an issue in producing the files in a

14         certain way.  I think it's likely -- again this is

15         based on my experience in working with files like

16         this that it is a combination of entry error and

17         default values.

18    Q.   And is it possible that it's -- that a -- someone

19         who has a birth date in -- you're looking at

20         individuals who are registered voters who had a

21         birth date of 18 -- earlier than 1901, for example?

22    A.   So in the file there -- it's actually not a birth

23         date.  It's a birth year.

24    Q.   Right.

25    A.   In part because the files have -- they have privacy

1          protections that -- that I'm quite sure that the

2          date of birth exists.

3     Q.   That's fine.  I was just reading.  You used birth

4          date in your report.

5     A.   Birth year.

6     Q.   You meant birth year.  So and you were looking at I

7          think you had 1,857 records have a birth date, you

8          meant birth year of 1901 or earlier, including 17

9          with a birth date in 1800.  Those individuals, they

10         weren't individuals in -- were they in pending

11         status?

12    A.   I did not look.

13    Q.   Presumably not.  Okay.  Well, but did you look to

14         see if they were in active status?  You were looking

15         at the voter registration file, right?

16    A.   That was the December 30, 30th, 2019 voter file.

17    Q.   And is it possible that -- Now, you said you've

18         worked with a lot of different voting systems,

19         the --

20    A.   Voter files.

21    Q.   -- databases?

22    A.   Correct.

23    Q.   And voter files, are you referring to a file or like

24         a -- the actual type of software that a state may

25         use, whatever -- I don't know what Wisconsin uses,

1          but certain software to input information into the

2          system?

3    A.    So I was working with files that were produced --

4    Q.    Okay.

5    A.    -- and provided to me, not with the -- not with --

6          in this case not with the ENet system.

7    Q.    And so -- that's -- so ENet is what's used

8          currently.  Is it possible that, you know, you

9          mentioned a conversion could be an error, possible

10         that a -- someone actually intended to put -- a

11         registrar intended to put someone's date as 1800

12         just as a flag because maybe software doesn't allow

13         a -- wouldn't allow a registration application to be

14         processed without a date of birth or year of birth?

15         So an 1800 date may just be an identifier that well,

16         we didn't get this person's year of birth, but we've

17         got to put something in to put in the system so use

18         a number that is clearly not, you know, going to be

19         a -- a real year of birth?

20   A.    It's possible.

21   Q.    And I'm not saying ENet -- and I don't believe ENet

22         does that currently, but my understanding is that

23         old systems maybe had those issues?

24   A.    Although I would say that most databases that I've

25         used, a missing value would be something different.

1       Instead of 1800 it would be 9999 or something that
2       clearly is not a -- is not a date.  So but again
3       it's possible that those were entered intentionally.
4   Q.  And we don't know when -- and we don't even know
5       when those -- You didn't look at the dates of
6       registration for those individuals so we don't know
7       how far back, you know, this -- this birth date of,
8       you know, you mentioned 17 people with a birth date
9       in 1800, you didn't look to see if that -- those 17
10      people registered within the last six months or a
11      year or might be somebody who registered whatever
12      decade ago?
13  A.  I did not.
14  Q.  Now, you mentioned that you drew an inference from
15      the data that administration's not uniform across
16      the state.  Again this -- this is on page 26 of your
17      report.  Your -- This goes back to the document that
18      you mentioned earlier that you reviewed after you
19      read this report?
20  A.  That's in part, but it's also based on the -- the
21      underlying voter file, the data in the file.
22  Q.  And but did you -- Well, what data in the file did
23      you view that would indicate that there's
24      non-uniform administration?
25  A.  That would be --

1  Q.  Are you referring to depositions again?

2  A.  No, the specific would be -- would be figures 1 and

3      2 that looks at the percentage of registrants in

4      MIDR status by county and in pending status by

5      county as a function of the underlying demographics

6      of the -- of the county.

7  Q.  Now you -- you -- figure 1 you have -- let's see,

8      you're on page 29, I suppose?

9  A.  Correct.

10 Q.  Okay.  The five counties that you refer to here as

11     having 69.5 percent of the total registrants in MIDR

12     status is Fulton, DeKalb, Clayton, Gwinnett and

13     Chatham counties, right?

14 A.  I would have to check the specific counties.  Oh, in

15     footnote 33.  That's correct.

16 Q.  Now, those are -- Fulton County is the county with

17     the highest number of voter registrations, correct?

18 A.  That's correct.

19 Q.  And Gwinnett is the second, and DeKalb is -- has the

20     third highest voter registration in the state, and

21     Chatham is the fifth, and Clayton's the sixth.  And

22     the number based on my calculation of registered

23     voters in those five counties is two point --

24     2,218,159.  So does that sound about -- you must

25     have calculated a number.

1    A.    I did, but sitting here I can't remember those

2          numbers off the top of my head.

3    Q.    Okay.  And did you look at what counties -- the

4          numbers that some of the smaller counties had for

5          voter registration totals?

6    A.    I did.  So in this chart the size of each circle is

7          proportional to the population -- the number of

8          registered voters in the county.  So the smaller the

9          circle, the fewer people there are.

10   Q.    And obviously you would -- you would agree with me

11         that where the larger urban centers of the state

12         are, you're likely to have more voter registrations,

13         right?  They have higher populations?

14   A.    Higher populations would be associated with more

15         voter registration.

16   Q.    Okay.  That's true.  And in Georgia there are,

17         what -- City of Atlanta, of course, is the largest

18         city?

19   A.    Correct.

20   Q.    Which is -- and you -- are you -- you know that it's

21         Fulton County, DeKalb County, Clayton County and

22         Gwinnett are all part of the greater Atlanta area,

23         right?

24   A.    Right.

25   Q.    And Chatham County is where Savannah is located,

```
 1         right?
 2   A.    Now we're getting into the details of geography.  I
 3         think that's right, but I'm not completely sure.
 4   Q.    And did you -- did you look at -- well, we know they
 5         have a greater percentage of voters -- the number of
 6         voter registration applications those counties are
 7         receiving?
 8   A.    I -- So I did not look at the number of applications
 9         over a particular period of time.
10   Q.    If they were -- they were receiving more
11         applications, it could be for any -- any number of
12         reasons, there could be a big mayor's race or some
13         other reason why or simply just because maybe voter
14         registration efforts are in one county or one city
15         versus another, would you agree that if there are
16         more applications coming in, and again we're talking
17         about MIDR status, so paper applications, the -- the
18         number of voters in MIDR status may not be a --
19         support an inference that election administration
20         laws are being applied differently?
21   A.    That's not necessarily true because you do see
22         variation that is a function of things other than
23         population.  So it's not the case that every large
24         county has a high rate of MIDR, nor is it true that
25         there are no small counties that have small rates of
```

1    MIDR.

2         So as I noted in the report, that if you had

3    uniform application, which also applies to the

4    methods and implementation, you would expect the

5    rates of key variables to be either uncorrelated or

6    they would vary in ways that weren't systematic.

7         So the fact that the percentage of voters --

8    and again the percentage is a function of something

9    more than just the absolute numbers.  The fact --

10   what these chart show is that the -- the rate of

11   voters who were placed in either pending or MIDR

12   status is pretty strongly associated with the -- the

13   racial demographics of a -- of a county, that the

14   higher percentage of non-Hispanic whites a county is

15   in population, the less likely you are to have a

16   significant number of voters in either MIDR or

17   pending status.

18        And we know from the literature on election

19   administration that there really is no doubt that

20   election laws, election practices, election

21   administration is affected by the race of voters,

22   that there is discriminatory implementation that is

23   biased against minority voters.  So these charts are

24   consistent with that, that it's a function of

25   implementation, it's a function of the -- of the

1        rules, it's a function of the error rates in

2        which -- of the different methods that voters use to

3        engage with the process.

4              So and we also know from the testimony of

5        election officials that I believe it was Mr. Rayburn

6        who said that the match only occurs on the first

7        letter of the first name, but there were still

8        counties that were doing matching on the full name.

9              So what that suggests, what that indicates is

10       that there is variation in how counties and

11       localities implement the what are supposed to be

12       uniform statewide practices.

13  Q.   And so -- and again this is for -- we're really kind

14       of focusing on your inference from the data that

15       there's non-uniform administration of this -- of

16       these laws.  And we've already discussed other

17       reasons that may be factors into why more

18       individuals are placed -- more mail-in applications

19       get submitted in one area versus another.  Your --

20       your -- are you -- Are you testifying that a

21       registrar in Atlanta, the city of Atlanta is

22       inputting application information into the system at

23       a higher error rate than someone in Polk County or

24       some other -- some other county?

25  A.   It's possible.  It's possible that the -- again we

1    know from the testimony of Harvey Rayburn and

2    Germany that the counties have discretion in how

3    they audit their results and whether or not they

4    correct information, and they are not required.

5    It's described as a best practice.

6        So again we can be quite sure that the

7    administrative practices are -- they differ between

8    counties.  It can be a function of size.  It can be

9    a function of a number of different things, but we

10   know that administration will vary.

11   Q.  Well, is it your testimony that there are that

12       many -- you said that some counties will audit

13       their, so to speak, the inputs if somebody comes

14       back as a non-match on first name, for example, and

15       DL doesn't match, right?  If the DL matches, then

16       that takes the person out anyway, right?

17   A.  That's what the testimony is, yes.

18   Q.  And what's what the lawsuits indicate, too, right?

19   A.  That's what the materials and --

20   Q.  So you're not contesting that.  But if somebody's

21       first name is -- maybe there's a misspelling so a

22       voter registration application comes in, registrar

23       in Fulton County is inputting, and the individual's

24       name is Vincent and it gets spelled, you know,

25       V-I-N-E-E-N-T instead of V-I-N-C-E-N-T, some

1          counties may go back and say, oh, that looks like an

2          input error; let's check and make sure, versus

3          others?

4    A.    That's --

5    Q.    And that -- go ahead.

6    A.    Okay.  That's -- that's certainly --

7    Q.    Right.

8    A.    -- one type of variation.

9    Q.    And but you're not -- you're not saying that that

10         one type of variation is going to create this

11         disproportionate number of voters in MIDR, being put

12         in MIDR status for say any of these five counties

13         versus another county?

14   A.    I don't have information about the specific

15         practices in a county, and we're looking -- I'm

16         looking at outcomes here.

17   Q.    Uh-huh.  And again so I mean this is for your

18         inference.  You did not have any evidence of one

19         county doing -- having a different election

20         administration than another -- than another?

21   A.    Well, other than --

22   Q.    You have the --

23   A.    Other than the evidence that there are different

24         practices, I did not have evidence about the

25         specifics and how one county, a particular county

1          differed from another county.

2  Q.    So you don't know, and again back to this double

3          checking the spelling of a name issue, you know,

4          whether these five counties are the only five

5          counties in the state at that don't double check

6          someone's -- I mean you don't know which counties

7          do -- do what -- you just understand that maybe some

8          counties have a few different variations in how they

9          administer this -- this MIDR piece?

10 A.    Again the first part of that is true, that I don't

11         have information about the specifics.  The second

12         part, you know, I am quite confident that there are

13         differences, but again I don't have information

14         about this county does it this way, Fulton County

15         does it that way, DeKalb County does it a different

16         way.

17 Q.    Okay.  Now, you go on to say that there's another

18         possible reason for variation is that training

19         materials provided to county election officials

20         include some basic errors.  This is on page 27.  And

21         on 28 you -- well, you say, for example, last

22         paragraph on 27, for example, the Georgia

23         Registration Official Certification Registrar Course

24         No. 4, which is intended to, quotes, server -- serve

25         as the foundation to build on your legal and

```
1         procedural expertise of the process of voter
2         registration, sets out the qualifications of an
3         elector in Georgia.
4              And then on page 28, at the top it says the --
5         to register to vote in the State of Georgia, an
6         elector must be, and it sets out three bullet points
7         of qualifications.
8              Then you go on to say this information is
9         incorrect as, quote, a citizen of Georgia is not a
10        meaningful term.  What do you mean a citizen of
11        Georgia is not a meaningful term?
12   A.   What that means is that -- citizenship is based on
13        sovereignty.  So far as I'm aware there's no such
14        thing as a citizen of Georgia.  There are residents
15        of Georgia and citizens of the United States.  So I
16        just found it very odd that the official training
17        materials would contain something like this which --
18        I mean I'm not a citizen of Wisconsin.  I'm a
19        resident of Wisconsin.  I'm a citizen of the United
20        States.
21             I also note that that information on the slide
22        is different than the information of -- provided by
23        the Georgia Secretary of State voter registration
24        page.
25   Q.   Now, have you ever done any research on -- you said
```

1          you know for sure that you're not a citizen of
2          Wisconsin.  You're just a citizen of the United
3          States.  Have you ever looked to see if there's such
4          a concept of citizen of a state?
5     A.   There is in the 14th Amendment, but it's not a
6          concept that in my experience has any meaning for
7          election administration --
8     Q.   I see.
9     A.   -- because the key is residency and citizenship of
10         the United States.  Those are the key quantities or
11         the key factors.
12    Q.   So, yeah, you're right, the Constitution does
13         indicate that an individual who's a resident and
14         citizen, citizen of the United States and of the
15         state in which he or she resides, right?
16    A.   It's true.  I would be astounded if the person who
17         wrote this had the 14th Amendment in mind when he or
18         she wrote this slide.
19    Q.   All right.  Have you ever looked at Georgia's
20         Constitution regarding citizenship of individuals in
21         Georgia?
22    A.   No.
23    Q.   So you don't know whether Georgia's Constitution
24         contemplates, you know, that an individual could be
25         a citizen of Georgia and of the United States?

1    A.    It's possible, but -- I suppose it's possible, but

2          then I find it quite curious that it's -- the only

3          time I've ever seen this is in the -- in this

4          training material and not in the -- the registration

5          site where you actually engage with the registration

6          process.

7                (Exhibit No. 8 marked for identification.)

8    Q.    I'm going hand you what is Exhibit -- marked as

9          Exhibit 8.  Now, this is Section 21-2-216 of the

10         Georgia law, Georgia election code, and its titled

11         Elector's Qualifications.  Did you read this -- this

12         statute?

13   A.    I did not.

14   Q.    And you'll see Section A right up front says no

15         person shall vote in any primary or election held in

16         the state unless such person shall be, one,

17         registered as an elector in the manner prescribed by

18         law; two, a citizen of this state and of the United

19         States.

20                Do you see that?

21   A.    I do.

22   Q.    And that's exactly the same language that's -- that

23         you're referencing here in your report from -- from

24         the training materials.

25   A.    Well, then my question would be where does the

1          definition of a citizen of the state -- and, you

2          know, even if this is copied and pasted from that,

3          it's still incomplete as it doesn't -- I mean is it

4          possible for someone to be a citizen of Wisconsin

5          and a resident of Georgia?  I guess I don't -- in

6          terms of election administration, I see residents --

7          citizenship has been demonstrated to a board of

8          registrars.

9    Q.   Well, you said -- you wrote in your report that this

10         was a basic -- that this was an error when, in fact,

11         this phrase is taken directly out of the code, the

12         law in Georgia, and -- and did no research on

13         whether individual -- Georgia's Constitution may

14         state who a citizen of Georgia is or some other

15         section of the law.

16              So you'd agree with me, though, that that is

17         not an error?

18   A.   It looks to me that it's -- as I'm reading this

19         section of the statute, that citizenship and

20         residents are defined, are used synonymously and,

21         you know, even at this point is incorrect.  And I

22         have never seen it in any other context except here.

23         The information is still incomplete.

24   Q.   Well, but you -- Would you agree with me that

25         quoting the law in a training material would not

1          suggest an inconsistent administration of the law in
2          and of itself?
3    A.    Not in this particular instance.
4    Q.    Okay.  Now, you then go on to -- to look at, what,
5          Walton -- is it Walton County, and you mention voter
6          data also suggests inconsistent administration.  You
7          point out to -- to the January 2020 voter file 22
8          registrants in pending status because of a pending
9          hearing.  And then you refer to Statute 21-2-229
10         that allows an individual to be challenged -- a
11         registrant's eligibility to be challenged.  But you
12         infer that since Walton County has -- that there are
13         21 of these 22 pending hearing statuses, that that
14         in and of itself is a -- you infer that there's some
15         inconsistent administration, right?
16   A.    Well, the term that I used is suggestive.
17   Q.    Suggestive.  And did you do any kind of research
18         into anything that may be happening in Walton County
19         that would indicate a reason why maybe registrants
20         were being challenged?
21   A.    I did.  I did do some searching.  I was not able to
22         find anything that gave me information about why
23         this might be happening.
24   Q.    And what -- what did you -- what did you search?
25   A.    I looked at news sources within the county;

```
 1          wasn't -- wasn't a terribly detailed search, but I
 2          was interested in whether something might be going
 3          on that could explain why it happened in this one
 4          relatively small municipality and county but not
 5          anyplace else.
 6    Q.    You would agree that there may be some -- some
 7          reason why in one county, or particularly, you know,
 8          within -- in a single municipality within a county
 9          there may be an uptick due to -- and challenges to a
10          voter's -- are I shouldn't say voter's, excuse me,
11          to a registrant's eligibility?
12    A.    It's possible.
13    Q.    Of course as you -- you probably know, you know,
14          there's different municipal related issues such as
15          becoming a -- when an area wants to become a city,
16          for example, right?  And I don't know if you've
17          ever -- I'm sure you're familiar with some of this.
18    A.    Annexations occur in Wisconsin.
19    Q.    Uh-huh.  And a lot of times it may be that the
20          number, percentage of voters to annex -- to be
21          annexed or to leave a particular city and want to
22          create their own city may be based on the -- the
23          total number of registrants at the time of the
24          referendum.  I don't know if you ever -- Have you
25          ever looked at any of these issue?
```

1   A.   Not in Georgia.

2   Q.   Okay.  And so that might be one issue.  But there

3        could be any.  You didn't look -- Did you call

4        the -- the registrar?

5   A.   I did not.

6   Q.   Okay.  What about the superintendent?

7   A.   No, I didn't talk to anybody in Walton county.

8   Q.   Now, you state -- apologies.  One second.

9            Going back to footnote 25, and you -- you state

10       that -- in your report that use of driver's license

11       files screens citizenship as well as produces

12       false -- or false non-citizenship flags with error

13       rates that approach near 100 percent.  You also cite

14       to this report out of -- out of Florida.

15           And of course you know a lot of folks in

16       Georgia would take great offense to being -- being

17       compared to the State of Florida, but Florida has

18       different voter registration laws and policies,

19       right?

20  A.   That's correct.

21  Q.   Than Georgia.  And you didn't conduct any analysis

22       to see whether this report on the State of Florida

23       and their -- the number of registrants that were

24       falsely identified as non-citizens, whether Georgia

25       has -- Georgia's policy is different or the same as

1          that policy, right?

2     A.   Well, the method in Florida was the same in Georgia,

3          which is looking at the voter registration files,

4          matching or linking that file into the driver's

5          license file and flagging people who were not

6          citizens.  And that was the basis of the official

7          claim in the Secretary of State's office.

8               And it's also happened in Texas, it's happened

9          in a number of places where there is a claim that

10         there were non-citizens who were registered to vote

11         based on driver's license files.  And these reports

12         turn out to be wildly exaggerated because of this

13         known issue with driver's license files, that the

14         citizenship information is not automatically updated

15         when someone naturalizes.

16              So there may be different underlying

17         registration requirements, but the -- the reliance

18         on driver's license data to verify citizenship is --

19         is the same.

20    Q.   And it's self-reporting in those states also?

21    A.   My understanding is that it's self-reporting in

22         Florida and Texas.

23    Q.   So your -- your opinion is based on reports from

24         other states?

25    A.   Well, it's based on what is understood about the

1          method of relying on driver's license data.

2    Q.    Looking at the -- the conclusions in your report,

3          have any of those conclusions changed?

4    A.    No.

5    Q.    And your -- your analysis -- You didn't conduct any

6          causal analysis for your report, right?

7    A.    Causal in terms of?

8    Q.    Well, why an individual may be -- yeah, the cause

9          and effect, why an individual may be in MIDR status.

10         You looked -- Your report is based on inferences

11         solely?

12   A.    That's generally true.

13   Q.    I mean you state in your -- in your report --

14   A.    Right, so I don't have information about any

15         particular individuals.

16   Q.    So your report is -- is based on limited

17         information?

18   A.    It's -- There was information that I did not have

19         access to.

20   Q.    And are the opinions that we've discussed today,

21         yours -- are those opinions in this deposition and

22         in your report your complete opinion in this case?

23   A.    I would say yes.  I mean this is -- these are the

24         conclusions I reached based on the data that I have

25         had, that I have access to.

```
1   Q.    And if those conclusions or those opinions change,

2         of course, I assume you'll submit a supplemental

3         report, right?

4   A.    I would expect that.

5   Q.    Okay.

6               MR. RUSSO:  I have no further questions.

7               MR. HERMAN:  Okay.  Let just chat for a second.

8               (Discussion held off the record.)

9               MR. HERMAN:  Back on the record.  We don't have

10        any -- anything we want to add right now.

11              MR. RUSSO:  Okay.  Dr. Mayer, I appreciate your

12        time today.

13              THE WITNESS:  Thank you.

14              MR. RUSSO:  And thanks.  Thanks for your time

15        here.  We conclude the deposition.

16              (Deposition ended at 2:51 p.m.)

17

18

19

20

21

22

23

24

25
```

1    STATE OF WISCONSIN    }

2                          }  SS:

3    COUNTY OF WALWORTH    }

4

5         I, LAURA L. KOLNIK, Registered Professional
     Reporter and Notary Public in and for the State of
     Wisconsin, do hereby certify that the foregoing
6    deposition was taken before me.

7         That the appearances were as noted initially.

8         That said witness, before testifying, was first
     duly sworn by me to testify the truth, the whole truth
9    and nothing but the truth relative to said cause.

10         I further certify that I am neither counsel for,
     related to, nor employed by any of the parties to the
11   action in which this proceeding was taken; and, further,
     that I am not a relative or employee of any attorney or
12   counsel employed by the parties hereto, nor financially
     interested, or otherwise, in the outcome of this action.

13

14         That the foregoing proceedings are true and correct
     as reflected by my original machine shorthand notes taken
15   at said time and place.

16         Dated this 4th day of March 2020

17

18         LAURA L. KOLNIK, RPR/RMR/CRR
           Notary Public
           State of Wisconsin
19         My commission expires
           February 23, 2022

20

21

22

23

24

25

**$**

**$10,000 (1)**
6:24
**$350 (1)**
6:14

**\***

**\*\* (2)**
24:10;136:17

**A**

**ability (2)**
18:1;134:1
**able (15)**
13:24;17:21;37:24;
63:18;75:5;81:11;
82:21;83:9;84:25;
89:2;119:11;125:25;
128:21;133:24;
155:21
**above (1)**
108:22
**absentee (1)**
32:17
**absolute (2)**
105:6;146:9
**absolutely (1)**
42:2
**academic (6)**
11:14,16,22;16:7;
34:4,22
**accept (1)**
48:3
**acceptable (4)**
78:12;79:12,15;
80:5
**access (8)**
44:22;45:25;46:14;
87:14;129:11;134:18;
159:19,25
**according (2)**
75:12;117:8
**account (1)**
89:12
**Accountability (4)**
14:16;23:19;24:6,
15
**accurate (6)**
23:2;104:15;115:7;
121:20;134:10;138:4
**accurately (2)**
38:24;39:22
**across (4)**
77:6;111:9;116:3;
142:15
**Act (8)**
9:8;15:1;24:17;
32:21;47:15;63:8;
76:12;90:2

**action (1)**
13:23
**actions (1)**
53:7
**active (53)**
12:11;42:18;54:6,
10,11,16;55:12;60:8,
21;61:11,19;68:16,
16;80:20;81:3,4,7,9,
23;82:2,3,8;96:21;
97:14;99:24;100:1,
16;101:2,5,16;
103:18;106:6,24;
107:21;109:19;
110:11,18;111:4;
114:17;116:12;124:5;
126:9;127:17,20,21;
131:1,8,9,10,12,14,
16;140:14
**activities (1)**
23:8
**activity (1)**
23:18
**actual (7)**
10:13;11:7;50:19;
52:7;76:25;118:4;
140:24
**actually (69)**
14:18;17:15,15;
23:20;25:22;30:24;
32:18;35:12;37:18;
40:13;41:10,11,19,22;
43:5;45:15;46:25;
48:8;49:25;50:2,9;
51:1,5;57:3;58:8;
62:20,24;63:1,3,18;
64:4,13;65:1;69:13;
70:6,9;72:5;74:23;
75:14;76:7,20;77:9,
15,21;83:20;88:12,14,
21;90:17;91:24;
94:19;97:18;98:17;
103:20,24;105:25;
106:8;109:4,21;
114:10,17;118:9;
121:3;122:21;129:9;
136:19;139:22;
141:10;153:5
**add (3)**
84:4;99:15;160:10
**addendum (2)**
22:25,25
**adding (1)**
99:13
**addition (3)**
19:5;30:5;98:13
**additional (25)**
35:22;36:4,4,6,10,
12;44:4,4;52:3,4,21;
53:25;54:1;74:14,15,
22;75:4,6,9,25;76:11;
77:2;78:16;79:20;
85:15

**additions (1)**
23:10
**address (12)**
55:24,25;56:4,18,
20,21,25;57:1,4;64:4;
73:12;92:24
**addresses (1)**
56:18
**administer (1)**
150:9
**administration (41)**
23:24;24:18;26:4,7,
14,16,21;32:10,12,13;
45:3,6,12,23,24,25;
46:11,18,21;47:2,21;
78:24;88:8;89:14;
120:10;121:7,22;
123:1;138:17;142:24;
145:19;146:19,21;
147:15;148:10;
149:20;152:7;154:6;
155:1,6,15
**administration's (1)**
142:15
**administrative (21)**
8:14;25:8;27:1;
34:3;50:7,8;52:19,25;
62:24;67:16;74:18;
75:4,24,25;76:19,23;
78:16;79:21,24;
80:18;148:7
**administratively (1)**
80:10
**Administrator's (1)**
87:24
**affect (3)**
105:8;115:1,15
**affected (3)**
112:15;115:20;
146:21
**affects (1)**
112:8
**affirmative (3)**
5:11;119:15,16
**African (10)**
101:15;104:5,23;
106:25;107:9,14;
108:25;113:12;115:6,
16
**African-American (15)**
100:16,22;101:9;
102:9;103:3;106:3,
21;107:3;108:22;
111:2;114:16;118:16;
135:14,17;137:10
**African-Americans (1)**
136:24
**again (49)**
10:2,15;15:22;
17:23;27:25;38:22;
44:9,24;48:5,22;
53:22;61:2;65:17,25;
71:9,10;75:8;76:9;

79:6;80:1,18;82:3,6;
83:15;87:7,18;89:19;
98:4;112:21;114:15;
115:1,15;117:18;
124:2,25;136:4;
139:14;142:2,16;
143:1;145:16;146:8;
147:13,25;148:6;
149:17;150:2,10,13
**against (3)**
25:24;46:9;146:23
**age (4)**
96:24,24;117:7,13
**agencies (1)**
94:17
**agency (3)**
51:14;52:18;88:10
**agenda (1)**
25:4
**aggregate (2)**
87:11;115:4
**aggregated (1)**
112:7
**aggregation (1)**
97:6
**ago (1)**
142:12
**agree (22)**
18:1;53:19;60:23;
68:12;72:22;84:15;
108:23;110:5;112:4;
115:7;116:4,19;
123:5;127:18;134:9;
136:20;138:2;144:10;
145:15;154:16,24;
156:6
**agreed (2)**
7:1,3
**agreeing (1)**
7:5
**ahead (5)**
57:15;61:12;125:9;
138:12;149:5
**algorithm (1)**
89:3
**alive (5)**
121:16,17;122:16,
16,17
**allow (5)**
37:17;84:13;89:14;
141:12,13
**allowed (3)**
4:11;72:22;75:19
**allows (5)**
37:14;40:17;85:3;
89:19;155:10
**almost (2)**
101:23;103:20
**alter (1)**
57:22
**alternatives (1)**
34:8
**although (10)**

79:6;80:1,18;82:3,6;
83:15;87:7,18;89:19;
98:4;112:21;114:15;
115:1,15;117:18;
124:2,25;136:4;
139:14;142:2,16;
143:1;145:16;146:8;
147:13,25;148:6;
149:17;150:2,10,13
**33:22;42:9;54:23;**
**55:23;58:11;60:25;**
**69:16;80:20;128:7;**
**141:24**
**always (3)**
127:20,20;133:7
**Amanda (2)**
28:9,10
**ambiguities (1)**
12:14
**ambiguity (3)**
62:5,10,11
**amended (2)**
20:17,19
**Amendment (2)**
152:5,17
**America (6)**
9:8;15:1;24:17;
32:21;47:15;63:8
**American (4)**
25:1,3;99:20;117:9
**Americans (9)**
101:15;104:6,23;
106:25;107:9,14;
108:25;113:12;
115:16
**among (7)**
78:24;86:9,15,20;
87:4;114:24;118:2
**amongst (2)**
87:8;137:5
**amounts (1)**
101:13
**analysis (18)**
33:11;37:5,7;40:2,
11;65:17;96:15;
98:20;116:3,10;
118:22;123:9;126:5;
130:17;134:7;157:21;
159:5,6
**analysisdo (1)**
40:1
**analyze (3)**
13:24;38:12;40:8
**and/or (1)**
47:21
**Andrew (5)**
4:16,22;27:6,20;
138:8
**annex (1)**
156:20
**Annexations (1)**
156:18
**annexed (1)**
156:21
**annotated (1)**
9:19
**anomalies (1)**
138:18
**anomaly (1)**
87:2
**anyplace (1)**
156:5

**apologies (1)**
157:8
**apologize (2)**
90:11;94:7
**apostrophe (2)**
92:9,9
**apparently (1)**
124:12
**Appeals (1)**
80:16
**appear (3)**
48:7;52:24;102:17
**appears (6)**
29:6;53:3;64:11,14;
91:5;97:12
**append (2)**
38:5;40:5
**appended (1)**
39:18
**appending (1)**
40:5
**Appendix (2)**
90:14,16
**apples (3)**
106:8;107:19,19
**applicable (2)**
115:9,9
**applicant (3)**
24:8;83:2;110:6
**applicants (2)**
67:18;109:25
**applicant's (2)**
72:15;83:5
**application (22)**
60:5,18;61:8,16;
64:6,17,20,24;65:2,
10;66:2,3,6;68:6;
132:11;134:6;137:25;
138:1;141:13;146:3;
147:22;148:22
**applications (9)**
102:23;134:11;
138:5;145:6,8,11,16,
17;147:18
**applied (4)**
102:25;110:4;
115:5;145:20
**applies (7)**
73:17;78:4;82:20;
84:2;116:3;119:1;
146:3
**apply (4)**
27:22;63:14;78:5;
104:11
**applying (1)**
44:10
**appreciate (1)**
160:11
**approach (1)**
157:13
**appropriate (1)**
105:2
**April (8)**

103:22;104:12,18;
107:8;108:16;110:24;
113:10,15
**area (3)**
144:22;147:19;
156:15
**areas (6)**
8:10,17;25:9;46:2;
50:24;136:10
**arguing (1)**
117:18
**argument (1)**
80:24
**around (1)**
58:20
**arrangement (1)**
16:17
**arriving (3)**
34:24;35:10,14
**article (1)**
33:13
**articles (3)**
11:19;33:7,10
**Asian (5)**
99:24;100:2;
116:12,13,14
**aside (1)**
33:20
**assembly (1)**
30:6
**assign (1)**
57:10
**Assignment (2)**
35:7,17
**Assistance (2)**
24:7;45:9
**assistants (1)**
34:16
**associated (2)**
144:14;146:12
**assume (6)**
67:1;78:14;87:24;
104:24;108:19;160:2
**assuming (3)**
54:11,17;113:13
**assumption (2)**
78:19;103:13
**assumptions (1)**
20:15
**astounded (1)**
152:16
**Atlanta (4)**
144:17,22;147:21,
21
**at-large (1)**
29:11
**attached (1)**
22:25
**attorney (2)**
28:9;51:15
**attorneys (1)**
16:14
**audit (2)**

148:3,12
**automatically (5)**
109:18;110:18;
119:17,20;158:14
**available (3)**
13:25;15:23;45:18
**avoid (1)**
5:10
**aware (8)**
30:14;51:21;77:9;
78:6;80:14;90:6;
119:2;151:13
**awhile (1)**
33:1

**B**

**back (32)**
5:8;32:2;51:5;
57:17;65:8;68:10;
69:5;70:19;74:11;
86:4;100:7,17;109:4,
13,19;114:2,10,18,19;
121:24;122:23;123:9;
129:5;130:17,21;
142:7,17;148:14;
149:1;150:2;157:9;
160:9
**backing (1)**
55:15
**ballot (1)**
63:3
**ballots (2)**
32:17,19
**bank (7)**
73:10,13;76:16;
82:16;83:22;84:11;
85:2
**based (36)**
8:22;9:14;10:2,18,
18,20;11:9;43:20,23;
44:13,17,17;47:3;
48:5;50:2;54:3;58:25;
65:18;78:23,24,25;
103:16;105:9;116:20;
122:25;139:15;
142:20;143:22;
151:12;156:22;
158:11,23,25;159:10,
16,24
**basic (4)**
41:7;43:17;150:20;
154:10
**basically (2)**
84:17;102:15
**basing (1)**
78:20
**basis (4)**
53:14;60:12;61:3;
158:6
**batch (3)**
18:12,15;19:5
**batches (1)**

18:8
**Bates (7)**
58:9,18;70:8,8,10,
20;122:8
**become (1)**
156:15
**becoming (1)**
156:15
**began (1)**
8:21
**begin (1)**
138:5
**beginning (5)**
105:1;107:7;
123:11,13,16
**belief (1)**
42:11
**below (1)**
122:13
**best (2)**
5:12;148:5
**better (1)**
89:6
**beyond (1)**
8:11
**biased (1)**
146:23
**big (1)**
145:12
**bill (4)**
73:10,13;82:17;
85:2
**birth (26)**
49:9;52:16;55:11;
56:22;83:1;120:16,
24;139:9,9,19,21,22,
23;140:2,3,5,6,7,8,9;
141:14,14,16,19;
142:7,8
**bit (2)**
99:13;132:1
**black (6)**
97:13;105:23;
106:17;113:2,5;
135:13
**blank (2)**
39:14;88:23
**Board (6)**
14:17;23:19;24:6,
16;116:3;154:7
**boards (1)**
29:12
**book (1)**
26:20
**books (1)**
26:22
**booth (1)**
87:15
**Bostelmann (1)**
27:6
**both (12)**
14:17;18:16;21:6;
50:21;67:14;75:15;

77:14;86:11;91:22;
92:2,17;93:17
**bottom (5)**
32:6;96:14,21;
100:14
**Brad (1)**
4:10
**break (7)**
5:6,8;57:12,16,19;
86:3;138:11
**briefly (1)**
86:6
**briefs (2)**
21:17,17
**bring (1)**
89:2
**broader (1)**
46:12
**bucket (1)**
85:5
**build (1)**
150:25
**bullet (1)**
151:6
**Bullock (4)**
86:8,12;137:15,15
**burden (25)**
52:3,4;53:13;54:1;
74:14,16,19,21;75:4;
76:9,10,12,18,23;
77:2;78:17;79:21,22;
80:2,18;85:10,11,13,
14;108:2
**burdens (2)**
76:19;79:24
**bureau (1)**
135:3
**butchering (1)**
137:12

**C**

**calculate (1)**
102:7
**Calculated (6)**
102:3,13,13;108:9;
113:22;143:25
**calculation (1)**
143:22
**call (10)**
12:6,24;15:21;
16:16;17:19;75:24;
78:18;89:14;130:4;
157:3
**Callais (2)**
28:9,10
**called (7)**
4:2;26:13;38:23;
39:25;71:3;135:3,5
**came (3)**
30:13;91:7,13
**can (43)**
4:19;8:17;12:17;

17:23,23;20:4,23;
22:24;31:23,25;
42:20;43:8,20;45:8;
53:22;57:12;62:9;
63:2;67:22,25;69:14;
70:4,9,15;71:15;74:8,
9,19;76:20;79:1;
82:14;84:4;88:15;
89:14;92:13;96:18;
98:1;118:6;120:19;
138:11;148:6,8,8
**cancelled (1)**
69:3
**candidates (1)**
30:12
**card (4)**
52:12;81:21,22,25
**care (1)**
82:12
**careful (1)**
101:12
**carried (1)**
77:5
**carrying (1)**
79:3
**case (68)**
6:11,17;7:2;10:23;
12:16,19;13:13,15;
14:10,11,13;15:4,25;
16:3,14,22;18:5;
20:18,21;21:3,15,18,
20;22:6;23:14;26:20,
22;27:7,10,16,18,21,
22;28:4,13,15,19,21,
24,24;29:4,17,23,25;
30:4,9,16,20,21,25;
31:17;34:1;36:2,4,7,
13;47:4,5,20;80:12;
89:24;90:1;91:8,16;
92:3;141:6;145:23;
159:22
**cases (11)**
14:17,22;15:12,15;
27:3;28:11;29:7,10,
14;34:6;67:7
**cast (1)**
63:3
**categories (2)**
98:14;99:5
**category (6)**
97:20;98:1,4;
103:11;105:13;108:5
**causal (2)**
159:6,7
**Cause (5)**
29:22;38:23;86:22;
133:21;159:8
**caused (1)**
93:4
**cell (1)**
125:17
**census (3)**
134:20,23;135:3

**Center (1)**
34:10
**centers (1)**
144:11
**certain (13)**
28:1;42:2;43:1;
95:12;102:23;105:5;
118:4;134:19;135:12;
138:24,24;139:14;
141:1
**certainly (4)**
50:6;77:3;101:23;
149:6
**certainty (3)**
42:12;50:15;118:6
**certification (3)**
6:6;71:7;150:23
**challenge (1)**
15:10
**challenged (3)**
155:10,11,20
**challenges (3)**
29:1,11;156:9
**challenging (1)**
21:24
**chance (2)**
72:25;115:18
**change (17)**
6:1;58:22;64:25;
65:10;77:18;91:1;
103:3,21;105:12;
112:12,15;115:15;
119:13,16;124:13;
126:14;160:1
**changed (8)**
17:20;18:1;77:18;
86:16;91:2;109:16;
114:8;159:3
**changes (4)**
9:21;50:2;59:13;
129:1
**chapter (1)**
14:12
**character (2)**
48:22;92:8
**character-by-character (1)**
93:10
**character-for-character (2)**
48:23;95:11
**characteristics (1)**
43:21
**characters (2)**
39:8;95:23
**charge (1)**
49:23
**chart (3)**
121:13;144:6;
146:10
**charts (2)**
121:15;146:23
**chat (1)**
160:7
**Chatham (3)**

143:13,21;144:25
**chatting (1)**
85:25
**check (10)**
46:19,22;73:10,14;
110:3,4,21;143:14;
149:2;150:5
**checked (1)**
67:5
**checking (2)**
46:3;150:3
**checks (1)**
38:17
**Chris (2)**
21:5;75:15
**circle (2)**
144:6,9
**Circuit (2)**
27:19;80:15
**circumstance (2)**
69:6;84:2
**citation (1)**
88:6
**cite (7)**
9:22;50:22;58:9;
72:3;79:10;86:11;
157:13
**cited (7)**
6:9;11:21;34:20,23;
69:23;70:2;72:7
**cites (1)**
27:3
**citizen (19)**
47:1;67:10;119:14;
120:1;151:9,10,14,18,
19;152:1,2,4,14,14,
25;153:18;154:1,4,14
**citizens (8)**
41:20;117:8,13,21;
118:4,9;151:15;158:6
**citizenship (40)**
14:6;15:12;44:9;
46:3,7,10,13,19,21;
47:22;48:4;52:24;
57:20,21;60:7,20;
61:10,18;67:4;68:11,
13,14;117:25;119:2,
3;120:11;121:23;
122:1,4,22,25;123:6;
151:12;152:9,20;
154:7,19;157:11;
158:14,18
**City (7)**
144:17,18;145:14;
147:21;156:15,21,22
**Civil (1)**
4:12
**claim (4)**
128:5,14;158:7,9
**claims (2)**
27:21;29:10
**clarity (1)**
47:9

**class (1)**
26:16
**classes (3)**
26:3,4,6
**Clayton (2)**
143:12;144:21
**Clayton's (1)**
143:21
**clear (5)**
79:3,18;86:25;
87:16;128:10
**clearly (2)**
141:18;142:2
**clerk (1)**
67:8
**clerks (1)**
71:6
**clerk's (4)**
64:12;65:4,23;
128:22
**close (1)**
86:2
**code (8)**
9:23;37:10,11,14,
21;38:15;39:17;40:4,
4,7;72:16,18;73:5,9;
83:6;121:5,21;122:3,
12,21;153:10;154:11
**coding (1)**
39:21
**Coie (2)**
28:5,15
**collect (1)**
90:5
**collecting (1)**
90:2
**college (1)**
27:23
**column (20)**
96:23;97:12,17,20,
22;100:18;101:4;
123:12,13,16;124:22,
25;125:1,2,10,12,15;
127:1;130:21;131:6
**columns (3)**
96:23;99:11,12
**combination (3)**
89:12,18;139:16
**combinations (3)**
89:13,16;120:18
**combine (1)**
38:14
**combined (4)**
38:24;43:25;91:11;
117:24
**combining (2)**
37:17;40:3
**coming (4)**
72:6;102:23,24;
145:16
**Commission (2)**
24:7;45:9
**Common (1)**

29:22
**communicated (1)**
28:13
**communicating (2)**
28:7,8
**Community (1)**
117:9
**compared (3)**
106:16;115:5;
119:3;124:16;157:17
**comparing (5)**
47:17;106:5,8;
107:18;117:18
**comparison (1)**
105:2
**compensated (1)**
6:14
**compilation (2)**
58:8,17
**compiled (2)**
97:2;130:4
**complained (1)**
25:10
**complaint (11)**
20:17,20,25;25:14,
16,19,23,24,24;26:1;
30:14
**complaints (1)**
20:21
**complete (9)**
36:20;52:12;54:21,
23;55:13;56:11;
69:19;76:6;159:22
**completely (7)**
8:20;54:12,18;
55:17,18;79:18;145:3
**complex (1)**
80:10
**compliance (4)**
16:8;24:16,17;
25:23
**complicated (1)**
76:21
**comply (4)**
52:13;73:5;82:10;
83:17
**comprehensive (1)**
129:18
**computer (6)**
50:4;51:19,20,22;
64:18;133:25
**conceivably (1)**
129:13
**concept (2)**
152:4,6
**conclude (3)**
112:24;137:2;
160:15
**concluded (1)**
106:23
**conclusion (10)**
53:14;62:23;81:2;
101:13;112:4,6,14,17;

113:23;129:25
**conclusions (9)**
  7:4;8:21,23;35:15;
  116:20;159:2,3,24;
  160:1
**conduct (10)**
  10:8;11:12;34:19;
  39:24;47:16;78:13;
  86:13;138:21;157:21;
  159:5
**conducted (1)**
  11:8
**conducting (3)**
  11:1;32:14,16
**confident (1)**
  150:12
**confirm (4)**
  39:20;47:21;83:9;
  123:3
**confirmation (2)**
  48:3;123:4
**confuse (1)**
  58:15
**confused (2)**
  77:7;80:9
**confusing (8)**
  5:13;62:24;63:23;
  64:3;65:13;74:24;
  75:2;76:22
**confusion (10)**
  63:5;77:13;78:10,
  15,21,24;79:5,12;
  80:19,21
**connect (1)**
  95:18
**connection (4)**
  12:16,18;14:8;
  86:21
**consequences (2)**
  8:12;95:10
**consequential (2)**
  136:3;137:3
**consider (1)**
  95:19
**considered (1)**
  99:10
**consistent (6)**
  60:15;61:5,13,14,
  21;146:24
**constitutes (1)**
  111:3
**Constitution (4)**
  152:12,20,23;
  154:13
**contact (4)**
  13:4,9,20;22:3
**contacted (6)**
  12:15,18,22;13:14;
  15:20;17:4
**contain (2)**
  139:2;151:17
**contemplates (2)**
  128:1;152:24

**contend (1)**
  122:21
**contending (1)**
  80:22
**contents (1)**
  22:15
**contesting (1)**
  148:20
**context (3)**
  32:13;86:22;154:22
**contract (1)**
  88:22
**convenience (1)**
  40:16
**converge (1)**
  76:2
**conversion (2)**
  38:22;141:9
**converted (2)**
  38:18;39:18
**copied (2)**
  98:22;154:2
**copy (3)**
  55:9;58:1;73:9
**core (1)**
  8:23
**corner (1)**
  100:14
**correcting (1)**
  126:2
**correctly (2)**
  38:19;117:11
**corrects (1)**
  132:24
**correlates (1)**
  126:19
**counsel (11)**
  18:4;20:14;21:9;
  22:3,15;28:4,6;35:18;
  37:4;49:10;51:14
**count (2)**
  17:1;68:1
**counted (2)**
  48:8;65:5
**counties (27)**
  39:4,10,11;49:14,
  18;50:9;51:3;97:3;
  143:10,13,14,23;
  144:3,4;145:6,25;
  147:8,10;148:2,8,12;
  149:1,12;150:4,5,6,8
**counting (1)**
  32:19
**counts (1)**
  47:25
**county (49)**
  10:21;11:8;18:18;
  19:6;38:5,7,16;43:25;
  52:8;53:1;55:3;64:12;
  71:6;97:7;143:4,5,6,
  16,16;144:8,21,21,21,
  25;145:14,24;146:13,
  14;147:23,24;148:23;

149:13,15,19,25,25;
  150:1,14,14,15,19;
  155:5,12,18,25;156:4,
  7,8;157:7
**county-level (2)**
  18:16;37:12
**couple (5)**
  26:21;62:11;77:11;
  78:1;91:11
**course (27)**
  4:20;5:7;6:6;7:8,
  19;11:4;21:2;25:1,3,
  4,5,11;57:14;69:25;
  70:6,14;84:13;89:21;
  101:25;110:8;119:2;
  131:13;144:17;
  150:23;156:13;
  157:15;160:2
**courses (2)**
  24:20,22
**Court (6)**
  27:19;29:21;30:16;
  31:1,6;80:15
**Court's (1)**
  30:20
**cover (1)**
  58:19
**Cox (1)**
  89:24
**create (5)**
  52:2,2,3;149:10;
  156:22
**created (4)**
  37:6;39:16,21;
  107:8
**credentials (1)**
  23:13
**credit (1)**
  9:19
**cure (1)**
  125:23
**curious (1)**
  153:2
**current (3)**
  73:9,13;135:3
**currently (4)**
  24:19;114:8;141:8,
  22
**cut (1)**
  94:8
**CV (7)**
  22:25;23:2,10,15,
  16,22;27:3

38:18;39:6;40:8,9;
  42:12,19;43:8,19;
  44:2,4,11;45:4,10;
  46:10,24;48:19;49:6;
  53:11;61:4;67:13,13;
  68:7;78:20;85:20;
  86:1,18;88:7,12,17,
  18,24,25;89:2,4;91:8;
  92:2,4;93:21;94:1,2,
  16,18,25;95:4,8,13,
  14;97:2,7,8;98:15,16,
  17;101:14;104:3;
  112:7;114:25;116:17,
  18,20,21,22;117:25;
  121:24;122:18;
  123:11,17;132:5,19;
  134:18,20,23;135:7;
  137:19;138:15,16;
  142:15,21,22;147:14;
  155:6;158:18;159:1,
  24
**database (10)**
  19:21,24;46:7;
  89:17;119:4,12,14,22;
  120:3,23
**databases (5)**
  48:24;138:25;
  139:1;140:21;141:24
**date (32)**
  18:21;19:7,15;
  20:19;49:9;52:16;
  55:11;56:22;58:12;
  59:10;70:3;71:11;
  83:1;108:17;113:15;
  120:16,24;139:9,10,
  19,21,23;140:2,4,7,9;
  141:11,14,15;142:2,7,
  8
**dated (3)**
  19:3,4,16
**dates (4)**
  18:23;70:6,12;
  142:5
**day (3)**
  53:6;86:7;104:13
**DDS (29)**
  41:2,19;50:4;51:4,
  23;52:17;64:17;
  65:20,21;66:12,13,17,
  19;67:2,5,13,21;68:5;
  88:20,21;119:12,13,
  17;120:17;122:1,9;
  132:3,7;137:14
**DDS's (2)**
  119:3;120:3
**deal (1)**
  10:9
**dealing (1)**
  89:10
**decade (2)**
  87:4;142:12
**deceased (5)**
  121:17,18;122:15,

17,18
**December (18)**
  18:13;19:4,4,9,9;
  96:22;100:15,15,21;
  101:1,8,17;104:1,1;
  106:25;109:3,14;
  140:16
**December/January (1)**
  104:16
**decide (1)**
  51:6
**deciding (1)**
  47:24
**decision (1)**
  31:19
**declared (1)**
  29:22
**declined (1)**
  7:8
**deems (1)**
  84:12
**default (2)**
  139:3,17
**Defendant (3)**
  4:9;14:15;58:18
**defendants (3)**
  4:21;6:11;79:7
**defendants' (1)**
  79:7
**define (2)**
  20:4;43:16
**defined (1)**
  154:20
**definition (1)**
  154:1
**DeKalb (4)**
  143:12,19;144:21;
  150:15
**Democratic (2)**
  30:11,11
**Democrats (1)**
  30:15
**demographic (2)**
  99:25;102:20
**demographics (6)**
  20:3;41:9;106:5;
  135:1;143:5;146:13
**demonstrate (1)**
  117:20
**demonstrated (2)**
  30:23;154:7
**demonstrating (1)**
  92:11
**demonstration (2)**
  30:6,6
**Department (5)**
  47:19,20;48:1,2;
  67:7
**depending (2)**
  17:1;62:14
**depends (1)**
  113:8
**deposed (1)**

## D

**dashboard (1)**
  122:9
**data (102)**
  10:20;11:11;15:7;
  18:5,7,8,9,10,15;
  19:24;20:2,11,13;
  35:1,14;37:16,20,23;

4:25
**deposition (11)**
  4:8,16;5:17;16:25;
  21:5,12;48:21;50:23;
  159:21;160:15,16
**depositions (5)**
  10:22;11:11;21:2,
  15;143:1
**describe (5)**
  50:14,15,19;75:16;
  123:15
**described (5)**
  9:10;10:4;13:22;
  49:17;148:5
**describing (1)**
  62:15
**description (3)**
  10:18;11:3;44:24
**descriptions (10)**
  10:2;44:18;45:1;
  47:6;48:5,10;52:7;
  54:3;61:13;62:13
**detail (1)**
  13:21
**detailed (1)**
  156:1
**details (4)**
  13:8;51:10;90:7;
  145:2
**determine (5)**
  15:7;41:11;66:1;
  137:9;138:22
**develop (1)**
  14:19
**developed (1)**
  37:9
**differ (1)**
  148:7
**differed (1)**
  150:1
**difference (11)**
  67:12;75:13;85:7;
  92:8;95:16;97:19;
  98:11,12;103:14;
  104:1,8
**differences (5)**
  97:6;98:4;101:17;
  108:12;150:13
**different (57)**
  20:7,9;25:8;33:9;
  37:18,18;39:15;40:4;
  42:7;46:2;48:24;
  58:12;62:13;63:21;
  66:3;68:23;71:22;
  81:4;85:12;94:17;
  95:1,14,14;97:18,23;
  98:2,22;99:5,13,19,
  22;105:4,17;108:9;
  110:23;113:13;115:4;
  117:19;118:22;
  134:25;136:23,24;
  137:6,6;140:18;
  141:25;147:2;148:9;

149:19,23;150:8,15;
  151:22;156:14;
  157:18,25;158:16
**differently (2)**
  95:2;145:20
**digit (1)**
  89:7
**digits (3)**
  88:18;89:12;120:25
**direct (1)**
  113:1
**direction (1)**
  116:11
**directly (3)**
  43:10,18;154:11
**director (1)**
  49:7
**dis (1)**
  108:23
**disagree (4)**
  60:10,12,23;80:4
**disagreeing (1)**
  61:3
**disclosures (2)**
  7:25;9:3
**discovery (1)**
  4:11
**discretion (3)**
  47:24;51:6;148:2
**discriminatory (1)**
  146:22
**discuss (3)**
  13:1;16:16;87:19
**discussed (9)**
  22:12;33:2,3;86:6;
  122:7;132:1,1;
  147:16;159:20
**discussing (3)**
  107:6;108:16;126:6
**discussion (6)**
  31:10;32:1;70:18;
  108:20;138:13;160:8
**discussions (1)**
  36:10
**disproportionate (14)**
  107:1,12;108:24;
  111:6,19;112:16,17,
  19,25;113:6;116:16;
  117:17;135:25;
  149:11
**disproportionately (4)**
  108:11;112:8,15;
  115:20
**dissent (1)**
  31:8
**distinguish (1)**
  128:21
**distinguishes (1)**
  65:3
**districts (2)**
  29:8;57:7
**divided (2)**
  102:5,20

dividing (1)
  105:12
**division (5)**
  24:25;48:7;51:2,15,
  17
**DL (2)**
  148:15,15
**document (12)**
  6:10;8:2;70:4,23,
  25,25;73:11,15;79:6;
  83:10;122:8;142:17
**documentation (1)**
  72:11
**documents (6)**
  10:14,17;37:3;
  52:24;71:22;83:14
**done (17)**
  14:5;16:6,7;23:4,
  17,24;24:9;34:6;
  44:15;49:8,11;71:20;
  76:20;80:8;86:2;
  135:3;151:25
**dot (2)**
  37:10;38:5
**double (2)**
  150:2,5
**doubt (1)**
  146:19
**down (6)**
  8:20;13:8;39:25;
  85:8;123:11;133:11
**Dr (10)**
  4:7,9,24;5:16;7:23;
  8:4;23:12;57:19;86:6;
  160:11
**drafting (1)**
  34:21
**dramatically (3)**
  105:12;110:22;
  126:14
**draw (3)**
  42:20;43:20;109:10
**drawing (4)**
  30:5;44:3,20;
  101:12
**drew (1)**
  142:14
**drilled (1)**
  13:8
**Driver (2)**
  47:20;48:1
**driver's (29)**
  14:20;15:8;41:1;
  44:8,14,15,16;46:1;
  47:18;55:9;65:22;
  66:21;82:25;117:25;
  119:21;120:12;
  132:25;133:2,7;
  137:5,19,24;138:3;
  157:10;158:4,11,13,
  18;159:1
**Due (7)**
  59:13;68:11;110:7;

116:25;124:7;133:6;
  156:9
**duly (1)**
  4:3
**during (5)**
  13:20;104:20;
  108:15;113:3;114:17
**Dwight (5)**
  28:17,18,24

---

**E**

**EAC (1)**
  45:9
**earlier (12)**
  19:16,17;32:20;
  74:11;76:6;86:6;
  122:7;132:2;137:4;
  139:21;140:8;142:18
**early (1)**
  21:1
**ease (1)**
  71:15
**easier (1)**
  121:9
**easily (1)**
  76:14
**effect (12)**
  17:15,16,19,25;
  87:21;105:7;115:3;
  117:17;135:25;136:3;
  137:3;159:9
**effects (2)**
  87:1;113:24
**efficiency (5)**
  30:3,5,7;31:2,17
**efforts (1)**
  145:14
**eight (1)**
  15:22
**eight-digit (1)**
  91:23
**either (15)**
  37:4;38:2;47:18;
  50:13;52:15;69:2;
  72:8;73:7;74:3;88:16;
  92:6,7;146:5,11,16
**elaborate (1)**
  62:9
**election (40)**
  23:24;24:7,18;26:4,
  7,13,16,20;32:10,11,
  13,17;45:8;53:6;
  54:17;55:16;56:13;
  77:10;78:5,23,25;
  128:9;129:16,20,20;
  130:13,14,14;145:19;
  146:18,20,20,20;
  147:5;149:19;150:19;
  152:7;153:10,15;
  154:6
**elections (21)**
  25:7;29:11;32:15;

48:7;49:7;51:2,9,15,
  17;77:12,24,25;78:2,
  3,4,7,12;128:18;
  129:9,15;130:6
**elector (5)**
  73:4,12;151:3,6;
  153:17
**electoral (2)**
  25:2;26:18
**Elector's (1)**
  153:11
**Electronic (2)**
  34:9;55:5
**electronically (1)**
  64:19
**element (1)**
  43:17
**elements (4)**
  50:16,17,21;52:13
**Elias (1)**
  28:4
**eligibility (2)**
  155:11;156:11
**eligible (1)**
  40:23
**eliminate (2)**
  39:21;135:23
**eliminated (1)**
  39:19
**else (6)**
  69:15;85:3,3;
  123:15;137:16;156:5
**empirical (4)**
  7:3;40:22;41:6,12
**employees (3)**
  51:12,18,22
**enacted (3)**
  13:9;17:14;124:6
**enactment (1)**
  111:17
**encompass (1)**
  36:15
**encompasses (1)**
  104:2
**end (5)**
  71:6;90:24;100:15;
  104:18;108:19
**ended (1)**
  160:16
**ends (1)**
  119:12
**ENet (4)**
  141:6,7,21,21
**enforced (1)**
  90:3
**enforcing (3)**
  49:17,23;50:14
**engage (2)**
  147:3;153:5
**engaged (1)**
  14:17
**engagement (2)**
  7:8;13:1

enormous (1)
37:13
ensure (1)
9:4
entered (9)
54:12,22;55:17;
66:23;67:14;92:5;
138:22,23;142:3
entering (2)
54:24;55:16
enters (3)
54:18;55:4;132:25
entire (11)
49:15;51:14,17;
56:6;103:17;106:6;
109:24;110:14;115:5,
6;129:7
entirely (3)
8:25;23:17;79:3
entries (1)
123:10
entry (1)
139:16
envelope (1)
65:15
equal (1)
116:8
ERIC (1)
34:9
erroneous (1)
137:2
erroneously (1)
66:23
error (25)
39:16,19,21;53:11,
12;55:24;93:4,7,11,
15;122:19;132:16,21,
22,23;139:6,13,16;
141:9;147:1,23;
149:2;154:10,17;
157:12
errors (11)
41:20;92:10;95:12;
96:9;138:15,16,23;
139:2,7,12;150:20
espoused (1)
30:10
essentially (2)
37:15;109:9
established (1)
69:4
estimate (2)
43:13;44:11
estimates (3)
14:19;41:8;134:24
estimating (2)
40:21,21
evaluate (1)
24:16
evaluation (1)
33:2
even (21)
49:12;59:5;67:9;

evenly (1)
110:3
event (1)
82:25
events (1)
70:14
eventually (1)
25:17
everybody (5)
113:14;124:14,14;
125:5;130:23
Everybody's (1)
81:25
everyone (6)
4:19;91:17,19;
123:20,24;124:3
evidence (10)
49:18,22;50:8;
78:10;86:24,25;
87:16;149:18,23,24
evolution (1)
25:6
exact (21)
8:5,7,11,23,24;9:1,
4;11:17;34:2;36:24;
42:4,5;48:22;92:13;
93:9;94:15;95:10,17,
22;111:23;135:9
exactly (7)
29:24;40:25;52:16;
80:24;81:16;99:9;
153:22
exaggerated (1)
158:12
EXAMINATION (1)
4:5
examine (5)
17:6;20:13;43:8,19;
114:25
examined (4)
4:3;20:10;35:14;
61:5
examining (2)
16:6;30:5
example (16)
54:20;62:19;80:2;
88:13;92:20;99:24;
103:4;124:8;127:11;
135:19;136:11;
139:21;148:14;
150:21,22;156:16
examples (1)
138:18
Excel (6)
38:1,2;40:12,13,14,
16
except (3)
4:13;116:8;154:22

excuse (14)
4:24;15:3;23:13;
32:24;36:23;84:19;
117:2;123:11,12;
131:6;132:13;135:16;
138:20;156:10
exemption (1)
90:4
exercise (1)
95:9
exhaustive (1)
36:22
Exhibit (20)
7:22,24;22:18,19,
21;37:1;58:1,16;
71:19;90:9,10;96:11,
12;121:13;122:6;
130:19,21;153:7,8,9
Exhibits (1)
71:16
exist (2)
56:25;94:24
existed (2)
53:11;95:12
exists (2)
57:4;140:2
expand (2)
8:17;79:11
expect (8)
7:5;103:6;105:11,
17;110:22;136:7;
146:4;160:4
expected (1)
8:4
experience (7)
32:18;78:23;79:16;
81:8;139:1,15;152:6
expert (16)
7:11,19;9:3;15:24;
22:22;23:14,25;27:4,
9;28:12;34:7;35:6;
36:12,15,16,23
expertise (2)
33:25;151:1
explain (2)
104:7;156:3
explained (1)
108:12
explore (1)
95:10
express (1)
118:6
extensive (1)
76:18
extent (1)
34:22
extra (1)
74:18
extract (1)
37:16
eyeballing (1)
112:13

excuse (14)

F

fact (7)
50:7,10;117:20;
134:19;146:7,9;
154:10
factor (1)
104:9
factors (2)
147:17;152:11
facts (2)
13:13,13
fail (1)
53:2
failed (7)
8:15;10:7;17:9;
53:9;83:8;88:10,11
failing (1)
41:21
fails (1)
52:15
failure (1)
67:16
fall (4)
21:1;26:9;84:21;
96:23
falls (2)
68:21;85:5
false (4)
53:10;92:14;
157:12,12
falsely (2)
95:18;157:24
familiar (6)
5:2;13:7;34:7;
37:23;89:24;156:17
familiarity (1)
13:5
far (7)
6:22;16:21;71:11;
77:9;89:16;142:7;
151:13
farther (3)
109:13;114:2,10
fault (1)
5:13
features (1)
40:17
February (3)
91:18;94:21;109:5
Federal (4)
4:12;26:25;27:1;
89:21
feel (1)
79:20
felon (1)
58:22
few (7)
5:23;16:20;39:11;
89:15;97:25;132:5;
150:8
fewer (2)

114:12;144:9
field (13)
39:5,14;49:2;52:2;
55:11,22;56:16;57:2;
88:23;93:11;122:11,
25;132:24
fields (7)
39:18,22;48:9,24;
56:6;95:20;121:25
fifth (2)
90:15;143:21
figure (2)
85:25;143:7
figures (1)
143:2
file (85)
10:20;14:18;18:14,
20,22;19:2,6,12,13;
30:24;38:5,6,14,16,
19;39:9,25;40:1,2,6,6,
7,7,12,13,14,15;
42:18;43:24,24;
44:20,22;46:25;47:3;
49:1,2;67:25;90:21;
91:11,19;92:9;93:3,4,
5,8,13;94:7,21;96:5,
14,15,20;98:18;99:8;
108:18;124:17,18,23,
24;125:5;126:21,22,
22,25;127:9;129:12,
16,24,25;130:3,4,6,
25;132:18,18;139:22;
140:15,16,23;142:21,
21,22;155:7;158:4,5
filed (2)
20:20;21:18
files (68)
16:7;18:13,16,23;
19:3,6,15,16,17;37:8,
10,11,12,13,15,16,17,
18,21;38:3,3;39:3,
13;41:1,2,19;43:25;
44:9,15,16;45:5,25;
46:1,11;47:5,18;68:7;
88:13;91:11,13,17,22;
92:1,2,17;93:14,17;
94:21;97:7;98:7,9;
121:6,25;122:25;
123:2,20;129:19;
138:20;139:13,15,25;
140:20,23;141:3;
157:11;158:3,11,13
filing (1)
32:7
fill (2)
55:3;65:3
filling (1)
137:22
financial (1)
16:17
find (10)
38:21;70:4;76:21;
78:9,10;87:11;

108:10;134:15;153:2;
155:22
**finding (1)**
31:7
**findings (1)**
31:1
**fine (5)**
4:17;58:2;99:21;
138:10;140:3
**finish (1)**
23:5
**finished (1)**
94:9
**first (27)**
4:3,15;12:15,18;
19:8,15;28:12;38:4;
48:15,16;49:8,11,15;
63:25;73:6;74:2;
83:12,20;92:7;96:20;
120:24;136:20;147:6,
7;148:14,21;150:10
**first-time (11)**
63:7,8;68:19;69:7,
11;73:18;77:18;
81:10,10;84:8,20
**five (6)**
17:3;143:10,23;
149:12;150:4,4
**five-year (1)**
117:9
**flag (2)**
53:10;141:12
**flagged (10)**
41:4;42:25;43:6;
67:2;111:20;117:16;
118:3,10;119:25;
127:11
**flagging (1)**
158:5
**flags (1)**
157:12
**flaw (2)**
118:9;136:19
**flaws (1)**
118:25
**flip (12)**
8:2;22:24;32:4;
58:17;59:4,11,11,15,
23;61:7;90:14;122:7
**Flipping (1)**
35:16
**Florida (6)**
157:14,17,17,22;
158:2,22
**focus (2)**
26:25;75:3
**focused (1)**
27:2
**focusing (1)**
147:14
**folks (6)**
20:7;51:20;107:21;
110:1;129:8;157:15

**following (1)**
117:11
**follows (1)**
4:4
**follow-up (1)**
86:13
**footnote (4)**
48:20,20;143:15;
157:9
**forecast (1)**
43:12
**foreign-born (2)**
117:21;118:16
**form (6)**
4:14;55:2;64:1;
82:13;136:25;137:22
**formal (1)**
26:1
**formally (2)**
25:16,20
**format (2)**
39:16;40:13
**formatting (1)**
40:17
**forming (2)**
11:20;20:15
**forms (13)**
63:19,21;72:17,21;
73:8;74:3,8;80:4;
83:6;84:10;85:4,15;
134:11
**forth (2)**
72:15;83:6
**found (7)**
88:8,16;89:4;
122:14,14;133:8;
151:16
**Foundation (4)**
27:6,20;43:7;
150:25
**four (7)**
24:13;49:9;63:21;
88:18;89:7,12;120:24
**fourth (2)**
90:15;123:10
**Fox (1)**
25:21
**frame (3)**
102:23;104:17;
115:9
**frequently (3)**
19:16;80:9;118:1
**front (1)**
153:14
**full (5)**
19:23;26:17;32:14;
71:8;147:8
**Fulton (5)**
143:12,16;144:21;
148:23;150:14
**function (14)**
98:17;105:9;
107:25;108:5;109:2,

12;143:5;145:22;
146:8,24,25;147:1;
148:8,9
**further (1)**
160:6

**G**

**GAB (1)**
24:4
**gap (5)**
30:3,5,8;31:2,17
**gave (5)**
21:6;45:1,6;48:10;
155:22
**general (15)**
5:3;13:7;21:9,21,
22;42:20;45:2;47:7;
49:10;51:13;71:3;
72:1,2;86:19,21
**generally (7)**
12:12;24:18;34:12;
86:11,18;87:13;
159:12
**generate (8)**
37:12,12,15,24;
40:9,17;41:8;44:11
**generated (3)**
18:22;94:21;124:12
**generates (1)**
38:15
**generating (1)**
93:13
**geography (1)**
145:2
**Georgia (74)**
9:19;11:15,16;12:5,
6;22:6,8,11;28:15,21;
35:20,24;47:20;48:5;
63:16,25;64:10;69:1,
9,24;71:24;76:15;
78:7;84:13;86:11,17,
18;87:2,9,18,20;88:4,
7;89:19;90:1,4,17;
91:7,22;100:17;
101:5;106:6,24;
117:8,14,22;118:18;
129:19;130:5;133:11;
137:8,20;139:8;
144:16;150:22;151:3,
5,9,11,14,15,23;
152:21,25;153:10,10;
154:5,12,14;157:1,16,
21,24;158:2
**Georgia's (21)**
9:6;11:13,17,23;
12:2;13:5;44:16;
68:24;69:21;74:5;
75:18;77:17;80:11,
14,25;88:3;132:14;
152:19,23;154:13;
157:25
**Germany (9)**

21:7;44:19;48:15;
49:7;51:14;58:1,16;
122:6;148:2
**gerrymandering (1)**
29:23
**gets (5)**
65:13;81:5;119:10,
10;148:24
**gigabytes (1)**
37:14
**Gill (1)**
29:17
**given (4)**
100:4;103:5;
115:16;138:17
**gives (2)**
62:19;71:8
**goes (14)**
8:10;28:1;45:20,22;
57:9;61:25;65:23;
68:23;82:4,9;109:4;
110:10;132:3;142:17
**good (3)**
4:16;85:21;125:20
**Goodman (2)**
27:6,20
**Gotcha (3)**
96:10;125:11;
127:10
**Government (8)**
14:16;23:19;24:6,
15;73:10,11,14,14
**grab (1)**
130:16
**grant (2)**
24:5,10
**grants (3)**
23:20,22;24:2
**great (1)**
157:16
**greater (12)**
42:3;111:18;
112:23;114:19;
116:13;118:7;135:20;
136:13,14;137:9;
144:22;145:5
**ground (1)**
5:3
**group (15)**
24:13;102:20;
103:1;108:14;111:9;
113:20,21;116:2,8,9;
123:10;136:17;
137:11,11,21
**groups (5)**
20:7;101:24;
135:25;136:16,23
**guess (24)**
4:19;25:15;55:15;
74:11;87:2;91:5;93:2,
20;94:10;95:5,8;96:3;
100:15;102:7,14;
105:20;107:8;115:25;

121:9;123:10;127:1;
131:6;136:4;154:5
**guidance (1)**
11:9
**guys (1)**
58:15
**Gwinnett (3)**
143:12,19;144:22

**H**

**half (4)**
88:8,10;90:23,23
**hand (4)**
37:2;65:3,4;153:8
**handed (1)**
22:21
**Handing (2)**
22:19;96:12
**handle (3)**
11:5;51:12,22
**handled (1)**
10:7
**handling (2)**
8:14;17:9
**handwriting (2)**
56:12;96:2
**happen (2)**
87:12;132:16
**happened (5)**
29:20;94:15;156:3;
158:8,8
**happening (4)**
39:17;114:25;
155:18,23
**happens (1)**
128:24
**happy (1)**
5:14
**Harvey (5)**
21:5;44:19;49:3;
75:16;148:1
**Harvey's (2)**
48:21;50:23
**HAV (1)**
90:21
**HAVA (47)**
14:25;15:1,15,16,
17;16:8;24:16;32:24;
33:2,6,11,13,23;
44:23;46:8,14,22,23;
63:7,7,16;68:21;69:6,
19;73:15,17;77:17;
82:12,19;83:10,14,25,
25;84:2,6,6,7,11,12,
21,24;85:1;88:22;
90:4,4;120:7;137:23
**HAVA-compliant (1)**
63:20
**HAVV (1)**
121:14
**HB (14)**
9:22;13:9;17:11,24;

59:13;72:13;77:19,
24;109:15,25;110:2,
6;111:2;131:13
**head (4)**
6:23;16:23;70:5;
144:2
**hearing (2)**
155:9,13
**held (8)**
32:1;70:18;77:11;
78:5;80:15;138:13;
153:15;160:8
**Help (8)**
9:8;15:1;24:15,16;
32:21;47:15;63:8;
70:4
**herein (1)**
4:2
**HERMAN (21)**
4:17,22,22;12:23;
15:20;16:10;17:4;
22:20;31:24;47:13;
57:12,14;58:2,11;
59:7;70:15,21;85:23;
138:10;160:7,9
**high (2)**
87:4;145:24
**higher (8)**
101:21,23;102:10;
136:7;144:13,14;
146:14;147:23
**highest (2)**
143:17,20
**high-level (1)**
51:19
**highly (1)**
132:6
**high-ranking (1)**
48:6
**Hispanic (5)**
97:13;111:12;
117:14;131:19;
135:14
**Hispanics (1)**
117:12
**history (9)**
25:5;110:14;
129:12,19,25;130:3,4,
5,6
**hold (1)**
78:7
**holding (2)**
30:20,21
**holds (1)**
45:21
**honestly (1)**
123:16
**Hood (3)**
86:8,12;137:15
**hour (1)**
6:14
**hourly (1)**
16:18

**hours (1)**
17:3
**hu-huhs (1)**
5:11
**hundred (1)**
97:24
**hundreds (1)**
117:20
**hyphen (2)**
49:5;52:2
**hypothetical (2)**
60:11;110:8

**I**

**ID (112)**
11:19;12:1,4,5,6,7;
14:5,21,23;15:9;
18:18;27:18,22;28:1;
29:4;38:12;47:18;
53:17,20,24;54:4;
55:9,13;60:6,8,18,19,
21,25;61:8,10,11,16,
18,25;62:6,22;63:5,9,
13,15,18,19,20,21;
65:22;66:21;68:17,
18,20,21,24;69:13,14,
19,20,21;72:21;
73:21;74:6,8;75:14,
18,18,21;76:15;
77:17;78:11;80:4,9,
11,14,22,25;81:17;
82:7,9,10,13;83:13,
15,21,22;84:5,9,10,
20;85:1,4,15;86:9,15,
19,22;87:4,10,13,15,
19,22;123:13;126:1;
128:2,2,7,23;132:25;
133:2,8;137:13,19;
138:3
**identical (1)**
97:8
**identification (14)**
7:22;22:18;37:1;
71:17;72:17;73:8;
74:4;83:7,18;90:9;
96:11;126:8;127:16;
153:7
**identified (1)**
157:24
**identifier (3)**
89:7;91:25;141:15
**identifiers (5)**
60:6,19;61:9,17;
82:7
**identify (3)**
4:20;30:9;71:12
**identities (1)**
47:22
**identity (9)**
48:4;72:15;82:12;
83:4,5,10,19;84:3;
88:15

**IDs (7)**
60:6;79:12,14;
81:11;84:11,12,14
**imagine (2)**
16:18;66:15
**immediately (1)**
132:24
**impact (2)**
8:5,7
**impeded (1)**
87:15
**implement (1)**
147:11
**implementation (4)**
87:9;146:4,22,25
**implemented (1)**
9:11
**implementing (2)**
9:25;50:13
**imply (1)**
65:15
**important (2)**
51:8;95:16
**imported (1)**
139:5
**inaccuracies (1)**
117:24
**inaccurate (1)**
60:4
**inactivity (1)**
69:3
**include (5)**
37:19,20;132:19;
134:24;150:20
**included (9)**
18:10,13,15,16;
38:8,10,11;39:17;
91:19
**includes (5)**
97:20;123:25;
126:20;130:25;
132:19
**including (2)**
96:25;140:8
**incomplete (2)**
154:3,23
**inconsistencies (1)**
62:16
**inconsistency (1)**
49:16
**inconsistent (4)**
48:11;155:1,6,15
**incorrect (7)**
53:3;112:9,10;
116:5;123:7;151:9;
154:21
**incorrectly (7)**
40:24;41:25;42:6,
14,25;43:6;49:14
**increased (2)**
87:8;100:22
**increases (2)**
20:6,6

**independent (1)**
29:7
**Indians (1)**
99:20
**indicate (9)**
13:15;45:18;90:22;
94:7,10;142:23;
148:18;152:13;
155:19
**indicates (4)**
42:13;73:3;99:3;
147:9
**indicating (1)**
52:17
**indication (1)**
96:7
**individual (41)**
53:17,19,23;54:9;
57:7;61:25;64:22;
68:10,15,22;73:20,21,
25;74:12,13;80:20;
82:6,8,9,16,20;84:18,
20;85:5;87:14;89:9,
18;92:2;119:10;
127:18,21;132:13,15;
137:22,23;152:13,24;
154:13;155:10;159:8,
9
**individuals (48)**
12:10;15:8;20:11;
41:25;66:12;67:20;
68:5;89:19;91:13,14,
24;92:12,13,16;
93:24;94:16;100:10;
104:12;106:17,20;
107:11;109:16,17;
110:16;111:5,10,13,
16;114:3;116:23;
117:4,7;118:8;
128:19;129:5,14;
131:23;132:10;
133:15,17;135:15;
139:20;140:9,10;
142:6;147:18;152:20;
159:15
**individual's (7)**
48:3;57:3;60:24;
61:1;84:8;130:3;
148:23
**infer (3)**
42:15;155:12,14
**inference (15)**
42:21;43:4,7,12,14,
23;44:3,11;78:18,20;
109:10;142:14;
145:19;147:14;
149:18
**inferences (3)**
43:20;44:21;159:10
**inflate (1)**
136:18
**inflates (3)**
115:12,12,14

**information (68)**
19:19;20:1;34:10,
24;40:25;41:1;45:18,
19,21,22;46:7:13;
47:1,17,24;49:22;
51:4,7;52:11,21;53:3;
54:12,18,23;55:4,16,
17;56:2,7;57:20,22;
60:25;71:8;74:22;
78:25;79:16;81:18,
21;83:2;94:6;100:5;
114:6;119:3,6,10,20;
120:3,6,8,9;126:2;
127:12;134:24;141:1;
147:22;148:4;149:14;
150:11,13;151:8,21,
22;154:23;155:22;
158:14;159:14,17,18
**informational (6)**
74:21;76:12,17;
80:2;85:11,13
**informative (3)**
99:10;101:18;
133:22
**informed (2)**
33:11;43:9
**initial (4)**
7:25;9:3;13:20;
49:11
**in-person (1)**
65:18
**input (8)**
88:17,18;89:4;
122:18;132:6;139:12;
141:1;149:2
**inputs (1)**
148:13
**inputting (2)**
147:22;148:23
**Inspector (1)**
45:2
**instance (1)**
155:3
**Instead (2)**
142:1;148:25
**instructed (1)**
81:6
**instructions (1)**
79:17
**integrity (1)**
25:2
**intend (2)**
36:6,12
**intended (3)**
141:10,11;150:24
**intentionally (1)**
142:3
**interact (1)**
55:6
**interaction (1)**
75:17
**Interest (4)**
40:22,23;41:6,12

**interested (5)**
37:6;43:18;94:14;
112:2;156:2
**interface (1)**
51:23
**internal (5)**
10:5,8,11,24;93:12
**interpret (2)**
51:7;124:21
**into (24)**
8:10;13:8;17:15;
38:14,18,23;41:25;
55:5;63:2;75:11;
85:19;91:1;98:19;
110:6,10,10;114:7;
136:10;141:1;145:2;
147:17,22;155:18;
158:4
**introduced (1)**
139:6
**invalid (4)**
88:17,18;89:4;
122:18
**investigation (1)**
78:13
**investigators (1)**
23:21
**invoices (3)**
6:16,20;16:20
**involve (5)**
14:25;15:4;28:25;
29:14;33:5
**involved (4)**
11:6;14:22;32:14,
22
**involves (1)**
39:2
**involving (4)**
15:12,25;29:7;
32:21
**Islander (2)**
99:25;100:2
**Islanders (2)**
116:13,15
**issue (20)**
14:1,3,22;25:18;
29:23;34:11;39:2,2;
78:11;80:25;87:12;
95:7;98:21;109:6;
132:6;139:13;150:3;
156:25;157:2;158:13
**issued (3)**
9:15,16;137:13
**issues (12)**
5:8;13:12;15:4;
22:12;24:18;30:2;
34:1;38:21;39:1;
48:17;141:23;156:14
**item (1)**
8:3
**items (1)**
35:8

## J

**Jackman (1)**
31:16
**January (44)**
18:14;19:7,8;38:9,
10;40:11;91:21;
96:15,24,25;97:14;
100:18,22;101:3,9,16,
21;104:2,5,19;
106:19;107:9;108:18,
19;109:3,8,14;
113:11;116:15;
123:14,23;124:18;
125:8,17,22;126:21,
22;127:5,17;130:24;
131:2,20;135:15;
155:7
**July (12)**
18:10;91:21;94:22;
123:23;124:3,23;
125:5,13,21;126:7,22;
127:5

## K

**Keep (1)**
71:21
**KENNETH (3)**
4:2,9;8:4
**Kevin (3)**
21:12;51:16;75:16
**key (8)**
40:22;41:5,11;80:1;
146:5;152:9,10,11
**kicked (1)**
41:21
**kind (9)**
43:14;74:23;128:1;
132:21,21,22;138:21;
147:13;155:17
**knowledge (3)**
34:10;44:6;47:7
**known (4)**
17:24;44:8;117:24;
158:13

## L

**labeled (1)**
79:7
**lack (1)**
47:9
**language (3)**
30:13;72:13;153:22
**large (6)**
24:5;37:22;93:19;
98:10;139:1;145:23
**largely (1)**
30:15
**larger (1)**
144:11

**largest (1)**
144:17
**last (20)**
7:12;24:23;25:13,
14;26:9;33:17;49:8,9,
12;87:4;89:12;90:15;
92:7,24;120:24,24;
128:19;129:9;142:10;
150:21
**late (2)**
20:25;95:4
**law (28)**
14:23;15:9,10;
17:13,19;26:20,25,25;
63:17;64:10;66:11;
68:24;69:21;72:6;
74:6;75:18;76:15;
79:3;80:11,14;81:1;
89:21;153:10,18;
154:12,15,25;155:1
**laws (7)**
72:6;80:9;87:15;
145:20;146:20;
147:16;157:18
**lawsuits (1)**
148:18
**lead (1)**
62:25
**leads (1)**
136:23
**least (5)**
42:10;45:4;62:12;
122:16,17
**leave (1)**
156:21
**leaves (1)**
62:20
**left (1)**
88:23
**left-hand (1)**
100:14
**legal (3)**
13:12;25:23;150:25
**legible (1)**
56:13
**less (5)**
89:16;96:24,24;
115:7;146:15
**letter (26)**
48:15;52:20;53:1;
62:20;63:4,13,14,23;
64:4;65:13;69:16;
74:22,25;75:1;76:4,4,
24;81:5,13;82:4;83:8,
9;85:8,9,10;147:7
**letters (1)**
76:21
**level (3)**
10:21;18:18;19:6
**license (32)**
14:21;15:8;41:1;
44:8,14,15,16;46:1;
47:18;55:9;65:22;

66:21;83:1;86:9,15;
117:25;119:11,22;
120:13;132:25;133:2,
7;137:13,19,24;
138:4;157:10;158:5,
11,13,18;159:1
**licenses (1)**
137:5
**likelihood (4)**
102:14;103:15,23;
108:6
**likely (18)**
5:13;66:20;77:12;
104:6;107:15,17;
115:17;127:18,22;
128:12;135:18,20;
136:1,14;137:1;
139:14;144:12;
146:15
**limited (5)**
29:10;110:23;
131:15,16;159:16
**link (2)**
37:18;95:18
**linking (2)**
14:18;158:4
**list (15)**
23:22;35:13;37:8;
90:21;93:14,19,20,22;
94:2;95:7;105:1;
107:7;109:4;118:5;
123:23
**listed (9)**
19:25;35:2,8;59:24;
72:17;73:8;74:4;
84:14;122:13
**lists (3)**
18:11;42:7;74:8
**literature (7)**
11:14,22;34:5,23;
44:7;76:19;146:18
**litigation (2)**
7:15;14:8
**little (6)**
46:12;86:1;99:13;
101:11;118:22;132:1
**living (3)**
117:8,14,22
**local (2)**
71:1;78:1
**localities (1)**
147:11
**located (1)**
144:25
**lodged (1)**
26:1
**long (1)**
107:22
**longer (2)**
75:22;103:25;
126:25
**look (51)**
8:19;17:7;37:17;

49:21;58:11;59:14;
67:25;76:14;77:23;
83:7;88:7,11;91:6;
94:12,13;96:16;
97:17;98:24;99:2;
102:22;103:17;
104:19;109:19,24;
110:14;111:25;112:5;
114:10;116:21,22,23;
121:24,24;123:2;
124:22;125:17;129:4,
7,14;134:16;136:4;
137:14;140:12,13;
142:5,9;144:3;145:4,
8;155:4;157:3
**looked (26)**
14:18;33:1;78:22;
87:5;20;91:1;92:23;
93:3;101:22;104:15;
111:22;113:17,18;
114:2;124:17;129:13;
134:20;135:11;137:8,
14,17;152:3,19;
155:25;156:25;
159:10
**looking (50)**
15:7;16:7;19:20;
23:5;24:10;33:16;
35:11;41:8;42:16;
44:9;47:11;65:2;
67:19;75:5;94:14;
97:11,11;99:11,23;
100:13;101:3,3;
102:4,12;103:10,19,
20,24;104:10,17;
105:19;109:9;113:9;
115:8;117:2,3,6;
118:23;123:22;
124:25;125:1;133:14;
136:5;139:19;140:6,
14;149:15,16;158:3;
159:2
**looks (9)**
72:13;91:10;97:11;
99:7;101:7;131:5;
143:3;149:1;154:18
**lot (8)**
10:16;33:17;
109:25;138:25;139:1;
140:18;156:19;
157:15
**lower (3)**
86:10,19,22
**lunch (2)**
85:22;86:3

## M

**magic (1)**
34:4
**magnitude (2)**
104:8;108:11
**mail (23)**

20;12;55:2;63:9,14,
15,17;64:6,20,24;
65:6,14,15;66:9;
68:19;69:12;73:4,18;
75:3;83:12,16,16;
84:8;136:17
**mailbox (1)**
65:16
**mailed (1)**
66:5
**mail-in (1)**
147:18
**mails (1)**
63:25
**maintain (2)**
41:5;65:12
**maintained (1)**
41:2
**maintaining (1)**
32:16
**maintains (1)**
46:6
**major (1)**
26:22
**majority (5)**
31:4,10,13,13;
88:16
**makes (1)**
43:12
**makeup (1)**
112:19
**making (5)**
43:13;49:17,23;
50:13;80:24
**M-A-L (1)**
96:2
**Malaya (1)**
92:21
**M-A-L-A-Y-A (2)**
92:21;95:25
**manner (2)**
49:19;153:17
**manually (1)**
55:4
**many (6)**
67:23;103:5;
113:22;118:6;120:18;
148:12
**Marc (1)**
28:4
**March (2)**
17:14;128:24
**marginal (1)**
115:2
**marginals (1)**
112:12
**mark (3)**
71:15;90:8;130:18
**marked (17)**
7:22,23;22:18,19,
21;37:1,2;57:25;58:3,
4;71:16;90:9;96:11,
12;121:11;153:7,8

**match (62)**
8:5,7,11,23,25;9:1,
4,8;11:17;15:17;
32:22,23;34:2;36:24;
40:25;41:21;46:4;
47:25;48:8,10,23,23;
49:11,15;52:9,16;
54:9;59:10;83:2;
88:11,16,19,25;89:4;
92:6;93:10;95:22;
104:7;105:6;109:17;
110:7;120:7,11,14,17;
121:3,15,16,16,17,17,
18,20;122:13,14,15,
15,18;133:8;136:6;
147:6;148:15
**matched (3)**
60:25;84:22;88:15
**matches (9)**
46:8;52:11;55:10;
81:18,21;120:22;
122:16,17;148:15
**matching (23)**
14:18;15:4;34:5;
44:6,7;48:16,16;49:8,
18,19,21;50:4;88:10;
89:3;92:13;93:9;
94:15;95:11,17,20;
110:9;147:8;158:4
**material (8)**
50:11;69:22;70:12;
79:10;97:8,9;153:4;
154:25
**materials (24)**
5:19,20,25;10:12,
19;11:12,14,16;35:10,
11;52:8;58:7;62:4,17;
69:17;71:4;76:8;79:1,
5;122:5;148:19;
150:19;151:17;
153:24
**math (1)**
58:25
**matter (11)**
6:13;40:16;42:11,
11;92:1;93:9;95:15;
99:1;108:2;112:6;
139:11
**matters (1)**
51:2
**may (38)**
5:7;17:15;56:11;
57:1;63:12;79:19,20;
80:22;84:13;94:4,24;
98:3;104:16;110:16;
114:3,12,12;119:6;
129:2,3,15;131:7,11;
136:8;140:24;141:15;
145:18;147:17;149:1;
154:13;155:18;156:6,
9,19,22;158:16;159:8,
9
**maybe (18)**

58:20;81:19;95:23,
25;98:12;101:20;
109:23;114:9,16;
132:5;135:18;138:22;
141:12,23;145:13;
148:21;150:7;155:19
**MAYER (16)**
4:2,7,9,24;5:16;
7:23;8:4;22:19,21;
23:12;37:2;57:19;
71:19;86:6;96:12;
160:11
**mayor's (1)**
145:12
**mean (53)**
8:9;13:16;16:4;
18:21;20:4;24:23;
32:11;34:3;47:10,11;
50:3,14;52:4;54:8,19;
58:14;60:15;61:2;
62:9;67:22,24;72:2;
74:15;76:10;84:6,17,
19;87:18;94:8;96:3;
98:20;101:20;102:24;
104:11,15;107:17;
118:3;120:13,15;
128:15;129:2,23;
130:8;132:22;133:21;
134:9;149:17;150:6;
151:10,18;154:3;
159:13,23
**meaning (3)**
52:10;53:10;152:6
**meaningful (2)**
151:10,11
**means (7)**
48:23;98:23;99:15;
100:12;118:8;125:24;
151:12
**meant (2)**
140:6,8
**measure (2)**
31:2,17
**Melaya (1)**
92:21
**M-E-L-A-Y-A (2)**
92:21;96:1
**memorized (1)**
58:2
**mention (7)**
17:11,17;31:8;
66:11;87:23;97:5;
155:5
**mentioned (21)**
17:18,18;19:9;
31:12;32:20,24;
33:23;44:20;45:16;
46:2;48:15,18;57:19;
68:17;76:2;79:8;
104:17;141:9;142:8,
14,18
**merge (1)**
92:1

**merged (2)**
91:12;93:20
**method (5)**
65:7;68:7;133:18;
158:2;159:1
**methods (3)**
133:16;146:4;147:2
**metric (1)**
30:8
**metrics (1)**
31:2
**MI (1)**
123:22
**mid (1)**
95:4
**middle (1)**
104:2
**MIDR (105)**
18:17;38:12;39:25;
40:24;41:25;54:7,14;
59:20;60:9,17,22;
61:1,12,19;62:6,13,
20,21;66:24;67:17,
23;68:2,16;74:12;
75:22;76:4;77:4;
80:23;81:2,14;82:5,
14,21;83:11;84:18,19,
22;102:14,16,19;
103:7,15,19,24;104:6,
12;105:6,16;106:13;
123:12,14,19,25;
124:3,14,15,17,19;
125:5,16,21,21,23,25;
126:3,7,18;127:4,5,7,
8,19,22,23;128:10;
129:17;130:22;131:1,
4,14,19,23;132:2,8,
15;133:6,15;134:3,5;
135:17,21;136:2;
137:2;143:4,11;
145:17,18,24;146:1,
11,16;149:11,12;
150:9;159:9
**midway (1)**
121:14
**might (13)**
59:5;82:20;100:5;
112:12;115:1,15;
128:8;133:23;139:5;
142:11;155:23;156:2;
157:2
**million (3)**
89:15;90:18;98:6
**Milwaukee (2)**
14:11;27:17
**mind (1)**
152:17
**minorities (1)**
86:23
**minority (12)**
86:10,16,20;87:5,8;
108:10;112:8,14;
115:3,19;116:2;

146:23
**mismatch (3)**
53:10;124:8;133:6
**mismatched (1)**
48:22
**mismatches (1)**
91:7
**misplaced (1)**
48:25
**misremembered (1)**
123:8
**misremembering (1)**
122:24
**missing (9)**
18:18;38:11;39:15;
56:2,6,18;114:6;
127:12;141:25
**Missouri (1)**
29:3
**misspelling (1)**
148:21
**mistake (1)**
54:24
**mixed (1)**
121:18
**mode (5)**
132:20;134:16,25;
135:7;136:1
**modes (1)**
136:24
**money (1)**
24:11
**Month (1)**
59:12
**months (2)**
15:22;142:10
**more (53)**
5:8,23;7:19;30:7;
34:12;37:6;40:18;
42:20;47:7;59:4;61:9,
17;62:16;65:19;
69:13,13,24;70:11,14;
95:7;98:3;101:11,15;
103:6,7;104:3,6,15;
105:10,15;107:14,15,
17,19;114:11,13;
130:16;134:10;
135:18,19;136:1,13,
14,17;137:1;138:4;
144:12,14;145:10,16;
146:9;147:17,18
**Most (14)**
7:11;23:3,6;27:7;
39:4;87:11;101:24;
109:25;127:18;
128:12;131:4,12;
132:3;141:24
**Mostly (2)**
5:23;27:1
**Motor (4)**
65:21;66:11,25;
67:11
**move (4)**

60:8;63:1;85:19;
127:22
**moved (8)**
42:18;60:21;61:11,
19;69:3,4;99:17;
139:4
**moving (2)**
113:17;114:21
**much (6)**
6:22;16:21,24;
103:25;104:2;109:13
**multiple (7)**
58:8;121:17,17,18;
122:16,17,18
**municipal (3)**
78:3,4;156:14
**municipalities (1)**
78:7
**municipality (2)**
156:4,8
**must (3)**
87:2;143:24;151:6
**myself (1)**
34:6
**mystic (1)**
43:15

**N**

**NAACP (2)**
14:12;27:17
**name (44)**
14:15;26:12;48:16,
25;49:8,8,12,15;
52:16;54:25;55:10,
21,22;56:11,16,22;
73:12,12;82:25;92:7,
7,24;93:5,16,21;95:1,
13,20,25;96:14;110:7,
8;120:16,24,24;124:7,
8;133:6;147:7,8;
148:14,21,24;150:3
**named (2)**
28:9;92:20
**names (4)**
91:6,15;92:6,13
**narrower (1)**
115:9
**national (1)**
41:2
**naturalization (2)**
119:19;120:6
**naturalized (5)**
117:8,13,21;
118:16;119:21
**naturalizes (2)**
119:18;158:15
**nature (5)**
13:22;24:12;41:20;
42:15;47:22
**navigate (2)**
74:19;76:13
**near (1)**

157:13
**nearly (2)**
90:17;97:7
**nec (1)**
109:18
**necessarily (4)**
76:10;103:8;
136:21;145:21
**necessary (2)**
30:23;126:1
**need (9)**
5:6;22:24;52:13,20;
53:4;63:1;76:16;77:8;
114:9
**needed (2)**
38:13;125:23
**needs (2)**
5:8;69:18
**negative (1)**
5:12
**neighborhood (2)**
17:2;68:3
**neutral (1)**
30:7
**nevertheless (1)**
83:3
**new (3)**
17:13;102:5;114:24
**News (2)**
25:21;155:25
**next (1)**
60:1
**nine-digit (6)**
89:6,8,20,22;90:3,5
**non (6)**
42:22;90:19;91:14;
94:10;111:12;116:23
**non-citizen (10)**
52:23,23;67:4;
117:5;119:11,25;
120:25;121:4,4;
127:11
**non-citizens (10)**
41:4,22;42:23,25;
52:18;118:3,11;
120:19;157:24;
158:10
**non-citizenship (3)**
53:10;116:25;
157:12
**none (5)**
45:17,17,17;50:18,
18
**non-Hispanic (9)**
86:10;101:2,5;
102:10;104:25;
105:23;106:17;
114:13;146:14
**non-Hispanics (1)**
116:9
**non-judiciable (1)**
29:23
**non-match (19)**

48:1;49:3,6;52:1,3;
53:18,19,23;54:5,15,
24;55:10,19;56:23;
66:19,22;67:3;90:24;
148:14
**non-matches (3)**
88:4;90:19;92:14
**non-matching (1)**
91:14
**non-MIDR (4)**
63:2;82:8;126:9;
127:17
**non-testifying (1)**
36:16
**non-uniform (3)**
138:17;142:24;
147:15
**non-zero (1)**
43:1
**nor (1)**
145:24
**Nos (1)**
71:16
**notation (2)**
55:13;75:21
**note (5)**
41:13,15;62:12;
89:11;151:21
**noted (2)**
12:12;146:2
**noticed (2)**
138:19,20
**notion (1)**
76:9
**November (1)**
135:5
**number (146)**
8:3;14:20;21:24;
24:8;32:5;33:9;39:15;
40:23;41:16,24;42:2,
4,5,7,24;43:1;49:10;
50:24;55:9;56:17,23;
59:1;60:18;61:7,16,
24;62:2;66:21,23;
68:1;70:8,10,20,22,
23;83:1;89:6,8,16;
90:3,6;91:22,23;
92:15,16,18;93:1;
96:21;97:12,18,23;
98:10;99:3,4,7,20;
100:21;101:21,22;
102:5,6,19,21,22;
104:11,20;105:6,8,10,
13,13;106:4,16,16,18,
23;107:1,6,11,24;
108:1,5,24;109:1,11,
15;110:16,25;111:1,1,
2,5,16,19;112:5,21,
22;113:2,4,11,11,19,
20;114:14,19,22,23;
115:8,17;116:11,14;
118:6,19;120:12,13,
20;121:10;124:20;

126:19;128:15,16;
129:8;130:21;131:10,
18;133:1;136:25;
137:24;138:3,4;
141:18;143:17,22,25;
144:7;145:5,8,11,18;
146:16;148:9;149:11;
156:20,23;157:23;
158:9
**numbers (29)**
45:10;58:10;97:1,
19;98:1;99:16;
104:14;105:4;108:13;
109:11;110:22;111:7,
18;112:1,2;114:11;
116:7;117:19;118:14;
133:15,19;135:22;
136:6,7,13,18;144:2,
4;146:9

**O**

**objection (1)**
27:14
**objections (1)**
4:12
**obscure (1)**
43:15
**observable (1)**
41:17
**observe (9)**
41:16;42:24;43:8,
10,16,19,20;67:22;
79:2
**obtained (1)**
47:1
**obtains (1)**
65:22
**obviously (3)**
5:2;107:20;144:10
**occur (2)**
80:22;156:18
**occurred (3)**
77:24;96:9;139:12
**occurs (2)**
61:4;147:6
**odd (1)**
151:16
**off (17)**
6:23;16:23;31:24,
25;32:1;58:20;70:5,
15,18;94:8;98:7;
101:14;128:6;129:5;
138:13;144:2;160:8
**offense (1)**
157:16
**offer (2)**
33:25;35:18
**offered (5)**
7:4;8:21,24;10:3;
27:10
**offering (1)**
87:21

**office (20)**
9:11;10:4;11:4,10;
21:10;44:25;49:13;
51:3,11,16,20;64:2,
12,14,24;65:5,24;
66:3;128:23;158:7
**official (7)**
9:19;50:3;54:17;
56:13;150:23;151:16;
158:6
**officials (19)**
9:10;10:3,16;44:25;
47:6;48:6;50:10,12;
53:2,12;54:3,13;
55:16;64:13;71:5;
75:12;78:25;147:5;
150:19
**often (1)**
5:9
**OIG (1)**
87:24
**old (2)**
139:8;141:23
**oldest (1)**
19:12
**once (1)**
96:1
**one (81)**
5:7;6:7;14:11,12,
14;18:25;19:3,4;23:3;
24:14;26:21,22;
33:19,21;38:4,7;39:6,
25;41:7;42:10;48:17;
49:1,1,5;50:3;58:1,
20;59:4;61:8,17;
62:11;63:19,20;66:3,
5;70:15;73:7,22;74:3,
17;75:11;76:1;79:20;
82:13;84:10;91:17;
92:7,9,22;93:5,5,6;
95:13,24;98:3;
104:25;109:1;114:22;
116:10;121:8;122:16,
17;125:2;130:13;
133:18;136:7,25;
137:25;139:7;145:14,
14;147:19;149:8,10,
18,25;153:16;156:3,
7;157:2,8
**ones (3)**
33:14;37:8;130:12
**ongoing (1)**
29:18
**online (10)**
54:21;64:18;71:4;
132:14;133:3,5,10,24;
134:2;138:2
**only (27)**
28:21;34:22;39:11;
44:2,2;49:11;54:13;
58:1;68:25;73:17;
75:17;81:13;82:4;
85:7;87:13;89:15;

92:22;113:9;116:10;
126:7;127:15;128:16;
129:22;131:14;147:6;
150:4;153:2
**open (1)**
  62:20
**operates (1)**
  52:6
**opined (1)**
  31:16
**opining (4)**
  41:24;76:25;79:24;
  80:11
**opinion (32)**
  7:1,5;11:20;17:21;
  18:1;20:15;22:16;
  27:11;30:2,4;31:4,7,
  11,13,14;33:25;
  34:25;35:10;36:20,
  23;37:9;50:2;57:23;
  60:3;64:25;66:18;
  71:25;87:21;103:2;
  116:5;158:23;159:22
**opinions (11)**
  6:1;16:22;35:18,22;
  36:4,6,10,19;159:20,
  21;160:1
**opportunities (1)**
  7:19
**option (1)**
  74:5
**options (1)**
  69:13
**oranges (1)**
  106:9
**order (7)**
  14:19;38:12;62:7,7,
  14,22;81:6
**organization (1)**
  66:4
**organizations (1)**
  135:19
**origin (3)**
  97:13;111:12;
  135:14
**originally (1)**
  42:16
**others (1)**
  149:3
**otherwise (4)**
  40:23;85:15;87:14;
  133:8
**out (23)**
  41:21;53:1;55:3;
  65:3;71:21;77:5;79:3;
  82:4;90:1;91:13;
  95:22;98:6,6;114:4;
  137:22;148:16;151:2,
  6;154:11;155:7;
  157:14,14;158:12
**outcomes (2)**
  10:10;149:16
**outdated (1)**

119:7
**output (1)**
  40:15
**outside (5)**
  34:19;35:21,25;
  36:1;37:8
**over (20)**
  5:3;6:24;7:15;
  27:13,13;33:17;
  38:18;65:4;87:4;88:8,
  10;90:23;98:22;
  101:19;102:23;103:4,
  17;111:23;119:13;
  145:9
**overall (1)**
  112:14
**override (3)**
  54:5;55:10;66:22
**overseen (1)**
  90:2
**own (4)**
  20:23;84:4;121:23;
  156:22

**P**

**Pacific (4)**
  99:25;100:2;
  116:13,15
**page (44)**
  8:2;31:22;32:4,4,5,
  6,7;33:15;35:3,4,5,8,
  16;40:20;47:13,14;
  53:15;58:11,18,19,20,
  25;59:1,3;61:7;62:19;
  63:4;86:7;90:15;91:5;
  96:14,20;117:1;
  121:13;122:7;126:4,
  6;138:7,15;142:16;
  143:8;150:20;151:4,
  24
**pages (2)**
  33:16;60:1
**paid (5)**
  6:19,19,22;7:6,9
**paper (17)**
  33:5;55:2;65:10;
  66:1;68:6;69:23;86:8,
  12,14;89:5;134:6,10,
  11,11;137:15,22;
  145:17
**paperless (1)**
  134:9
**papers (1)**
  33:5
**paragraph (2)**
  59:21;150:22
**part (19)**
  8:8;11:20;22:2;
  30:4;33:9;44:1;60:10;
  63:11;70:5;77:14;
  83:20;93:25;133:21;
  136:20;139:25;

142:20;144:22;
150:10,12
**particular (12)**
  78:11;80:1;84:2;
  113:18;116:22;
  133:23;135:24;145:9;
  149:25;155:3;156:21;
  159:15
**particularly (2)**
  39:10;156:7
**partisan (1)**
  29:22
**parts (1)**
  113:17
**party (3)**
  30:11,11,24
**pass (5)**
  60:6,19;61:9,17;
  82:7
**past (1)**
  7:15
**pasted (1)**
  154:2
**paths (1)**
  76:1
**pattern (1)**
  86:19
**paycheck (2)**
  73:11,14
**pending (141)**
  18:11,12;39:4,7,12,
  25;40:11;42:1,17,24;
  43:24;45:5;55:20,23,
  24;56:5,8,11,14,17,
  21,24;57:3;67:17;
  68:11,14;88:13;
  91:11,12,17,18,20;
  93:3,14,19,19;94:2,
  11,12,13;96:13,15,24,
  24,25;97:21,22;
  98:20;99:6,8,14;
  100:10,12;104:12,18;
  105:1,21,23;106:1,10,
  17,19;107:2,7,16,25,
  25;108:3,7,11,25;
  109:2,4,5,7,8,11,12,
  16,20,20;110:1,6,10,
  14,17,24;111:5,11,13,
  20;112:25;113:5,9,12,
  14,21;114:3,5,7,13,
  23;115:22;116:1,1,5,
  24;117:4,15;119:25;
  121:25;123:9,24;
  124:1,5,7,14,15,17,
  23;125:5,13,16;
  126:7;127:8,12;
  130:17,23,25;131:3,8,
  11,15;135:16,16;
  140:10;143:4;146:11,
  17;155:8,8,13
**people (80)**
  23:20;40:24;41:16;
  42:5,16;49:16,23;

51:9;55:6;56:20;
67:23;68:1,3;69:8;
79:2;89:17;92:4;
97:25;98:3,6;99:3,4,7,
7,17;100:4;101:22,
25;103:7,11;104:4;
105:7,8,10,11,13,14,
15;106:13;107:24;
108:1,3,4,5,13;109:2,
5,11,12,20;110:24;
112:3;113:10,11,19,
19,20,22;114:22,23;
115:17;118:2,5,18;
119:21;125:19,25;
126:20;127:6;128:12,
20,22;130:25;131:11,
18;134:3;142:8,10;
144:9;158:5
**percent (31)**
  50:15;88:5;90:18,
  23;91:2,2;105:22;
  106:1,19;107:1,10,21;
  108:20,22,23;111:3,
  12;113:3;114:17;
  115:22,23;116:14;
  117:13,15;125:24;
  126:8,17;128:17;
  131:22;143:11;
  157:13
**percentage (27)**
  20:9;45:14;88:4,14;
  103:10,11;105:7;
  106:24;108:4;111:10,
  16;115:6,21,24;116:1,
  11;117:7;118:14;
  128:20;135:20;
  136:15;143:3;145:5;
  146:7,8,14;156:20
**percentages (6)**
  107:18;113:23;
  115:2,16;116:7;117:3
**perform (2)**
  36:12;76:11
**performed (1)**
  75:7
**perhaps (1)**
  109:1
**period (20)**
  101:19;103:5,17,
  19,25;104:20;107:12;
  108:9,15,21;109:10;
  111:4,22;112:6;
  113:3,18,25;114:18;
  112:6;145:9
**periods (1)**
  115:18
**Perkins (2)**
  28:5,15
**person (43)**
  14:16;24:14;42:10,
  13;52:9,9;55:1,8;
  57:9;63:12,23;64:5,7,
  9,14,23;65:24;66:9;

68:17;69:14;82:18;
84:25;88:14;89:11;
92:22;93:15,22;
94:11,11;95:5,19,24;
110:9,10;119:13;
120:1,2;121:3;134:4;
148:16;152:16;
153:15,16
**personal (1)**
  130:5
**person's (2)**
  93:5;141:16
**pertains (1)**
  34:11
**phone (2)**
  15:21;16:16
**photo (32)**
  12:6,7;14:23;15:9;
  28:1;29:4;54:4;62:22;
  63:19;68:24;69:20,
  21;74:6;75:18;76:15;
  77:17;80:11,14,22,25;
  82:10;83:21,22;84:5,
  11,14;85:4;86:22;
  87:4,10,19;128:2
**phrase (1)**
  154:11
**physical (1)**
  76:10
**PI (1)**
  24:8
**Pick (1)**
  116:2
**picked (1)**
  96:2
**piece (4)**
  37:7;50:20;51:13;
  150:9
**pieces (2)**
  24:9;114:21
**pin (1)**
  8:20
**place (13)**
  53:5;55:19;62:7,18;
  69:15;75:20;76:11;
  77:1,5,14;78:17;
  103:22;107:23
**placed (20)**
  40:24;41:25;42:6,8,
  14;55:12,23;56:24;
  81:4;98:19;103:18;
  107:2;109:7;111:20;
  113:5,8,21;126:3;
  146:11;147:18
**places (2)**
  81:3;158:9
**plaintiffs (9)**
  4:22;6:17;7:2;
  16:14;17:5;30:9,15,
  23;31:3
**plaintiffs' (10)**
  7:24,24;9:3;18:4;
  20:14;22:3,15;28:4;

35:18;37:4
**plan (2)**
  30:6,7
**please (2)**
  5:4,10
**pm (1)**
  160:16
**point (16)**
  19:2;33:18;42:4,17;
  93:21;94:20;95:22;
  103:21;107:19;
  117:19;118:13;124:1;
  129:24;143:23;
  154:21;155:7
**pointed (1)**
  33:20
**points (1)**
  151:6
**policies (14)**
  9:15,24,25;10:5,11,
  13,24;11:1,13;12:5;
  30:10;50:25;107:23;
  157:18
**policy (15)**
  8:5;7;9:4;10:16;
  11:17;24:15;25:8;
  49:13,17,24;50:14,19;
  109:21;157:25;158:1
**political (1)**
  24:14
**Polk (1)**
  147:23
**poll (6)**
  54:1;68:18;73:7;
  74:3;77:7,14
**polling (9)**
  53:5;62:7,18;69:15;
  75:20;77:1,5,13;
  78:17
**polls (3)**
  32:18;78:10;128:24
**populated (1)**
  39:22
**population (11)**
  43:13;94:25;
  102:25;105:14;
  110:23;112:20;129:8;
  135:4;144:7;145:23;
  146:15
**populations (7)**
  20:9;86:10,16,20;
  137:6;144:13,14
**portion (1)**
  46:4
**portions (1)**
  34:13
**position (2)**
  81:2;119:6
**positions (1)**
  51:19
**positive (1)**
  46:17
**possessed (1)**

14:20
**possession (4)**
  86:9,15,20;137:19
**possible (31)**
  12:13;42:3;48:25;
  50:6;63:11;76:5;77:7;
  107:24;114:21;
  120:18;122:12;
  127:25;128:11;131:3;
  135:23;136:12,22;
  139:2,18;140:17;
  141:8,9,20;142:3;
  147:25,25;150:18;
  153:1,1;154:4;156:12
**possibly (2)**
  63:5;124:10
**post (2)**
  110:18;112:1
**potential (2)**
  103:6;138:17
**potentially (1)**
  103:7
**power (1)**
  25:7
**PR (1)**
  25:24
**practice (1)**
  148:5
**practices (19)**
  11:7;12:5;21:25;
  22:1;26:18;27:2,22;
  32:14;34:3,8;50:7,8,
  25;109:13;146:20;
  147:12;148:7;149:15,
  24
**precedent (1)**
  136:17
**precinct (5)**
  52:11;57:10;81:21,
  22,25
**precise (4)**
  9:1;19:7;34:1;
  47:22
**precisely (3)**
  6:6;9:9;12:20
**preparation (2)**
  17:1;73:1
**prepare (2)**
  5:16;7:5
**prepared (1)**
  34:14
**preparing (3)**
  16:21,24;71:25
**prescribed (1)**
  153:17
**present (6)**
  53:17;63:19;68:24;
  73:7;74:2;85:1
**presentation (1)**
  6:8
**presented (10)**
  18:11;31:3;60:1,4,
  5,18;61:8,16;64:2;

68:22
**presents (1)**
  75:17
**presidency (3)**
  25:1,3,6
**presidential (3)**
  25:6,7,7
**presumably (6)**
  49:9;67:11;94:25;
  100:23;126:1;140:13
**pretty (4)**
  17:13;25:5;86:1;
  146:12
**previous (1)**
  70:14
**previously (4)**
  28:22;57:25;69:1,9
**Primarily (1)**
  6:5
**primary (4)**
  23:21;128:25;
  129:2;153:15
**prime (1)**
  129:3
**principal (2)**
  23:21,21
**printout (2)**
  37:3;96:13
**prior (9)**
  13:4;16:13;87:25;
  110:6,9;114:4;124:6,
  7,7
**Priorities (1)**
  29:3
**privacy (2)**
  90:2;139:25
**privilege (1)**
  4:13
**probabilities (1)**
  105:16
**probability (1)**
  105:5
**probably (10)**
  17:2;20:25;98:2;
  100:11;101:13;
  109:22;132:9;133:9;
  134:6;156:13
**problem (1)**
  88:24
**procedural (1)**
  151:1
**Procedure (3)**
  4:12;10:14;29:25
**procedures (1)**
  76:21
**process (112)**
  8:13,16,22,25;9:1,8,
  9,13;10:6,9,10;11:3,7,
  19,23;12:3;13:6;15:4,
  17;17:8,10,22;22:9;
  24:9;32:15,23;33:4,8,
  13,24;34:5;41:3,21;
  42:15;43:15;44:7,18;

47:10,16,23;48:12;
  49:18,19,21,24;50:2,
  4,11;51:1,10,13,24;
  52:6,19,22;53:3,9;
  54:22;55:14;58:22;
  59:25;60:7,17,17,19,
  20;61:4,9,10,15,17,
  19,22;62:24;63:7;
  65:11;66:14,16,25;
  67:15,16,19;69:20;
  73:22;74:22;76:7,25;
  77:15,16,17,21;79:16;
  80:19,23;81:3;83:9,
  20;84:4;85:12,12;
  92:5;93:12;112:7;
  118:10,12;119:1;
  121:7;122:19;133:10;
  147:3;151:1;153:6
**processed (2)**
  66:13;141:14
**processes (16)**
  8:13,14;10:8;14:7,
  19;32:17;33:3,11;
  35:19,24;40:7;47:8;
  75:11;76:14;77:4;
  93:12
**processing (2)**
  8:14;37:16
**produce (7)**
  40:8;62:7;83:4;
  92:14;120:17;129:20;
  137:1
**produced (6)**
  6:11;37:21;45:3;
  94:17;97:7;141:3
**produces (2)**
  45:10;157:11
**producing (1)**
  139:13
**production (1)**
  93:7
**Professor (1)**
  31:16
**program (1)**
  37:10
**prohibits (1)**
  89:21
**project (1)**
  24:12
**Proof (3)**
  72:14;83:4,5
**proportion (2)**
  114:14;131:10
**proportional (1)**
  144:7
**protections (1)**
  140:1
**provide (32)**
  7:1,3;17:21;18:1;
  20:1;36:3,6,16;52:20,
  24;53:20,24;55:13;
  57:21;63:9;68:20;
  69:13,14;73:21,22;

82:7,14,22;83:13;
  84:1,9,20;85:4;89:20;
  119:19;122:10,22
**provided (30)**
  7:18;15:24;18:4,7;
  33:24;35:12;37:4,20;
  52:8;57:21;60:7,8,20,
  21;61:1,10,11,18;
  71:5;75:21;77:1;
  83:17;84:10;120:9;
  126:8;127:15;130:12;
  141:5;150:19;151:22
**provides (9)**
  46:19,21;47:17;
  54:4;55:8;71:7;120:6;
  121:22;122:11
**providing (6)**
  36:10;63:15,18;
  81:17;126:1;128:23
**provision (2)**
  63:16;84:7
**public (2)**
  24:14;30:10
**publications (3)**
  23:23;32:22;33:22
**published (2)**
  32:20;33:12
**pull (2)**
  95:3,3
**pulled (12)**
  90:21;91:12,13;
  93:21;94:19,20,24;
  95:6,8;97:2;98:16;
  111:18
**pulling (2)**
  94:2;98:14
**purported (1)**
  25:18
**purpose (3)**
  4:10;95:9;96:6
**purposes (10)**
  4:11;9:7;15:5,9;
  43:4;67:19;84:24;
  95:15;108:19;120:10
**put (20)**
  45:20;54:2;56:5,7,
  11,14,16;57:2,7;
  65:15;74:12;75:1;
  98:19;107:23;112:24;
  141:10,11,17,17;
  149:11
**puts (2)**
  56:13,25
**putting (2)**
  33:20;136:10

**Q**

**qualifications (4)**
  23:12;151:2,7;
  153:11
**qualified (3)**
  27:9,13;87:14

**qualifies (1)**
23:25
**qualify (2)**
23:13;69:6
**quantities (1)**
152:10
**Quantity (6)**
40:21,22;41:6,12;
42:5,20
**quibble (1)**
61:2
**quick (2)**
59:15;138:11
**quickly (1)**
71:14
**quite (10)**
86:25;87:16;99:22,
23;123:16;135:2;
140:1;148:6;150:12;
153:2
**quote (1)**
151:9
**quote/unquote (4)**
9:4;34:2;122:10,10
**quotes (1)**
150:24
**quoting (1)**
154:25

**R**

**race (3)**
117:5;145:12;
146:21
**racial (1)**
146:13
**Raffensperger (2)**
4:10;28:18
**raises (1)**
126:14
**range (3)**
26:17;32:14;71:8
**ranged (1)**
26:17
**rarely (1)**
118:1
**rate (21)**
16:18;101:8,11;
102:1,8,9,13,15,17,18,
24;103:3,23;107:10;
110:20;112:25;
137:10,13;145:24;
146:10;147:23
**rates (17)**
20:2,4,6;45:13;
86:9,15,15,20;87:3;
108:13;137:5,11,20;
145:25;146:5;147:1;
157:13
**rather (4)**
39:13;64:5;78:18;
103:25
**Rayburn (7)**

21:13;44:19;49:4;
51:16;75:16;147:5;
148:1
**reach (2)**
43:9;113:23
**reached (1)**
159:24
**read (20)**
9:18,21;20:17,21;
21:2,5,6,15,17;31:13;
39:6,8,14;63:13;73:1,
1;83:7,18;142:19;
153:11
**readable (1)**
40:18
**reading (5)**
20:25;39:13,13;
140:3;154:18
**reads (1)**
39:3
**real (5)**
25:22;59:15;71:14;
139:11;141:19
**realize (3)**
87:19;98:10;99:11
**realized (1)**
39:17
**really (10)**
48:11;49:24;50:11;
80:18;120:13;123:10;
130:22;138:23;
146:19;147:13
**reason (24)**
46:18;54:13;69:2;
77:3;93:17;94:10,13;
104:5;105:3;110:22;
111:25;112:13;114:7;
115:2;124:9;128:17;
131:15;133:18;
136:16;138:24;
145:13;150:18;
155:19;156:7
**reasoning (1)**
43:17
**reasons (10)**
94:23,23;99:6,8;
131:16;133:23;136:8,
25;145:12;147:17
**recall (18)**
12:22;16:2;18:23;
19:7;20:23,25;26:11,
12,15;27:16;31:5,6;
33:6,9,14;50:21;65:1;
122:2
**receive (4)**
11:9;19:2;74:23;
79:17
**Received (10)**
18:8,9,12,15;19:1,
13;37:25;38:7;47:4,5
**receiving (2)**
145:7,10
**recent (11)**

5:23;23:3,6,7;27:7;
62:17;69:24;70:11,
13,14;137:19
**recently (1)**
71:1
**recollection (5)**
17:7;33:10;46:24;
121:21;122:24
**record (14)**
4:20;28:6;31:24,25;
32:1,2;49:1;70:15,18,
19;86:4;138:13;
160:8,9
**recorded (5)**
39:7;54:16;65:7,9;
66:7
**records (14)**
45:7,11,14;56:18,
19;88:9;90:23;91:21;
92:23;95:18;138:22,
23;139:5;140:7
**recounts (1)**
32:19
**redistricting (4)**
7:14;26:19;28:19;
30:7
**reduce (1)**
86:24
**refer (11)**
5:24;9:2,24;12:1;
32:5;63:4;86:7;90:20;
138:15;143:10;155:9
**reference (2)**
9:2;32:10
**referenced (3)**
5:21;21:12;33:22
**referencing (1)**
153:23
**referendum (1)**
156:24
**referred (6)**
16:10;51:13;64:7;
70:13,13;71:10
**referring (24)**
9:6,9;10:1,13,22;
12:2;15:21;18:20;
24:2,3;48:14;58:7;
59:9;63:6;79:6,22;
84:7;90:11;106:14,
15;112:17;130:2;
140:23;143:1
**refers (5)**
32:13;63:24;73:25;
83:15;88:6
**refill (1)**
31:23
**reflected (3)**
23:15,16,18
**reflects (2)**
23:7;105:25
**reg (1)**
111:6
**regard (2)**

11:17;101:17
**regarded (1)**
65:23
**regarding (9)**
11:23;15:15;34:1;
75:2;78:11;118:23;
123:6;134:23;152:20
**regardless (2)**
75:7;81:22
**regards (1)**
37:6
**regis (1)**
131:23
**register (28)**
54:5;63:9,12;64:9,
14,23;65:14;66:13,
21;67:5,9,20;68:8;
81:17;93:16;94:3;
95:24;105:7,10;
108:1;110:12;113:2;
114:22;120:11;133:3,
24;135:18;151:5
**registered (45)**
20:10,12;63:15,17,
22,24;65:14;67:1;
68:5;69:1,10;73:4;
81:14;83:3,12,16;
101:22;103:16;104:5,
24;105:11;107:11,15,
22;108:6,14;109:3;
112:22;113:10,14,19,
24;115:17;118:3;
129:23;132:10,20;
139:8,20;142:10,11;
143:22;144:8;153:17;
158:10
**registering (11)**
20:8;65:19;66:12;
69:9;96:3;101:25;
103:4;104:23;105:15;
107:9;133:5
**registers (17)**
52:10;54:21;55:1,2,
8;64:5,7;65:24;66:17,
19,25;67:11;68:19;
69:12;132:3,7,13
**registrant (18)**
43:24;47:17;53:8,
13;54:4;62:6,13,18;
65:13;68:19;69:7,12;
74:18;75:9;81:20;
84:8;119:16;123:19
**registrants (66)**
8:15;10:7;12:11;
14:20;38:8;39:12;
41:9;42:24;73:18;
81:13;84:21;96:22;
100:1,5,17,21;101:2;
102:5,6,16,19,21;
103:14,24;104:20,25;
106:1,6,24;107:2,6,
22;108:10,21;111:1,3,
4,17,20;112:5,8;

113:24;114:15,17,24;
115:3,20,21,24;116:1,
12,24;124:16,22;
126:7;131:7,19;
135:15,17,21;143:3,
11;155:8,19;156:23;
157:23
**registrant's (2)**
155:11;156:11
**registrar (9)**
6:5;55:4;71:2;
128:7;141:11;147:21;
148:22;150:23;157:4
**registrars (5)**
11:8;52:9;126:9;
127:16;154:8
**registrar's (2)**
64:23;66:2
**registration (119)**
9:7,12,12,13;11:5,
11,14:5;15:5,13,25;
18:16;19:13,21,23;
20:3,5;21:25;23:25;
26:18;29:1,15;32:15;
34:9;35:19,23;40:25;
43:24,25;45:11;47:8;
52:12;53:12,21,25;
54:13,22;55:5,7;63:1,
10;64:1,2,12,18;65:2,
5,7;66:4;67:13;69:2,
19,25;70:6,11;71:4,5,
9;72:10;75:3;76:7;
80:19;84:3,9;86:23,
25;91:22;92:15,16,
18;93:1;101:8,14;
102:2,10;108:13;
111:7;113:18;119:1;
124:20,20;132:12,14,
18;133:10,16,18;
134:10,11,17,21,23,
25;135:6,7;136:1,16,
18,22;137:1;138:2,
19;139:10;140:15;
141:13;142:6;143:20;
144:5,15;145:6,14;
148:22;150:23;151:2,
23;153:4,5;157:18;
158:3,17
**registrations (4)**
65:19;96:4;143:17;
144:12
**related (10)**
8:10,17,21,24;14:6;
20:11;21:25;31:7;
93:11;156:14
**relationship (2)**
16:13;94:14
**relatively (1)**
156:4
**relevant (3)**
133:16;134:4,7
**reliance (1)**
158:17

**relied (8)**
11:20,22,24;34:20,
22;35:1;37:5;44:2
**rely (1)**
44:5
**relying (2)**
117:24;159:1
**remanded (2)**
29:20;30:22
**remember (6)**
12:20;13:21;14:15;
99:9;121:10;144:1
**remind (1)**
137:4
**removed (1)**
126:25
**repeat (1)**
12:17
**rephrase (1)**
5:14
**report (91)**
5:18,19,22,24;6:1,
9;8:10,19;11:21;
12:13;19:25;22:12,
22;24:3;32:4,6,24;
33:2;34:13,14,21,25;
35:6,22,25;36:1,19,
22,23;40:9,10,20;
41:10,15;42:7;43:5;
45:2;46:3;47:12;
50:22;58:10,14;59:9;
62:12;70:2;71:10;
72:4;79:10,13;86:7,8;
87:22,24,25;88:1,3;
90:10,13,15,20;91:5;
97:5;102:4;104:14;
106:15;117:1;120:16;
121:11;123:5;126:4,
12;127:14;137:15;
138:7,15;140:4;
142:17,19;146:2;
153:23;154:9;157:10,
14,22;159:2,6,10,13,
16,22;160:3
**reporting (2)**
16:8;24:17
**reports (8)**
24:2;45:16,17;
117:2;121:6,8;
158:11,23
**represents (1)**
13:17
**request (4)**
17:20;45:20;90:16;
130:14
**require (1)**
119:15
**required (12)**
9:16;18:18;38:12;
48:9;56:6;69:20;
74:19;83:4;84:10;
88:23;123:14;148:4
**requirement (3)**

27:25;63:8;128:3
**requirements (5)**
10:6;16:8;72:11;
84:4;158:17
**requires (2)**
47:16;137:23
**requiring (1)**
89:21
**reregistered (2)**
69:5;94:4
**research (13)**
11:13;22:2;34:16,
20;44:15;66:1,9;
77:24;86:14;138:21;
151:25;154:12;
155:17
**reserved (1)**
4:15
**residence (1)**
56:1
**residency (2)**
69:4;152:9
**resident (4)**
133:11;151:19;
152:13;154:5
**residents (3)**
151:14;154:6,20
**resides (1)**
152:15
**resolve (2)**
62:18;128:21
**resolved (4)**
30:1;109:6;126:1;
128:22
**responds (1)**
45:24
**response (5)**
17:20;45:13;
122:12,15,21
**responses (7)**
45:5;121:14,16,20;
122:9,13;123:1
**responsible (2)**
50:13;79:2
**responsiveness (1)**
4:14
**rest (2)**
51:16;101:21
**restored (2)**
126:9;127:16
**restricting (1)**
28:25
**result (8)**
40:5;55:22;56:24;
66:24;78:15;80:23;
105:17;131:13
**resulted (3)**
67:17;126:2,3
**results (10)**
17:8;52:22;115:12,
13,14,15,19;116:6;
121:6;148:3
**retained (2)**

28:14;30:2
**retroactively (1)**
110:4
**return (1)**
52:23
**returned (2)**
52:17;88:14
**review (8)**
34:24;35:9;62:4;
71:25;72:4;96:5;
122:9;138:21
**reviewed (15)**
5:18,18;10:19;
11:15;59:16,18;71:1;
72:6,7,8;87:25;91:8;
122:11;138:20;
142:18
**right (147)**
7:6;11:5;12:3,8;
14:23;17:13;21:3,10;
28:11,15,19,22;29:1,
8,15;30:3,17;31:20,
21;42:23;45:19;46:2,
4;50:5;51:18;53:18;
54:10;57:7,15;58:19;
59:6;63:20;67:4,6,21;
68:6,18;71:23;72:12;
73:15,18;74:6,9;75:7;
77:25;78:7;80:5,12;
82:10,14,20;83:14,23;
84:1,15,22;85:16;
89:1,7;90:5;92:17,22;
93:20;94:5;95:6,24;
97:15,16;99:18;
100:19,23;101:7,11;
102:12;103:7;104:24;
106:2,7,18,21;108:25;
109:15;110:11,13;
111:8;10;112:18,25;
114:6,20;115:10,25;
116:21,25;117:10;
118:17;119:4,7,19;
120:20,25;123:7;
126:6;127:14,24;
128:10;129:17;
130:23;131:11,24;
132:8;133:3,9,21;
134:7,11;135:1,14,22;
136:4,11,17;138:12;
139:24;140:15;
143:13;144:13,23,24;
145:1,3;148:15,16,18;
149:7;152:12,15,19;
153:14;155:15;
156:16;157:19;158:1;
159:6,14;160:3,10
**rights (3)**
7:15;14:13;26:18
**road (1)**
133:12
**role (4)**
13:15,16;30:4;
133:19

**rolls (5)**
32:16;54:16;55:12;
101:16;124:5
**Ron (1)**
21:7
**row (17)**
97:12;99:20,24;
100:1,14,18,25,25;
101:3;123:12;125:1,
15;131:5,5,6;135:13,
13
**Rucho (1)**
29:22
**rule (1)**
93:23
**Rules (5)**
4:11,12;5:3;9:14;
147:1
**run (4)**
50:4;89:3;120:7;
124:10
**running (2)**
51:9;90:21
**RUSSO (32)**
4:6,8,18,19,21,23;
31:25;32:2,3;47:14;
48:13;57:13,15,17,18;
58:4,5,13;70:17,24;
71:15,18;85:19,25;
86:4,5;138:8,12,14;
160:6,11,14
**Ryan (2)**
51:14;122:6

## S

**S4 (3)**
127:1,3,4
**S7 (1)**
125:17
**same (50)**
5:4;9:5;42:22;65:9;
66:6,16;67:14,14;
76:1,2,3;77:21;83:14;
85:5;89:11;92:4,5,12,
13,16,17,24,24;93:22,
23;94:16,17,25,25;
95:7,19;97:25;98:7,8,
14,16,25;99:16,19,20;
105:17;111:9,23;
113:3;118:18,22;
153:22;157:25;158:2,
19
**sample (1)**
43:14
**Savannah (1)**
144:25
**saw (2)**
62:12;132:19
**saying (22)**
19:22;25:25;50:17;
52:20;54:9;65:13;
84:17;85:10;96:5;

101:19,20;107:17;
114:9;115:24,25;
128:16;130:11,15;
134:3;136:15;141:21;
149:9
**scenario (17)**
53:16;60:5,24;61:8,
24;64:5,22;68:10,10,
11,74:13;81:15,16,18,
20;82:6;85:9
**scenarios (5)**
59:24,24,25;60:1;
132:5
**school (3)**
24:15;29:7,11
**Schwier (1)**
89:24
**science (2)**
43:11,17
**scientists (1)**
24:14
**Scope (3)**
35:6,17,25
**Scratch (1)**
129:5
**screens (1)**
157:11
**search (2)**
155:24;156:1
**searching (1)**
155:21
**second (9)**
19:8;31:24;70:16;
91:19;136:21;143:19;
150:11;157:8;160:7
**Secretary (15)**
4:9;9:9;10:10;3;11:4,
10;21:9;44:25;48:6;
49:13,20;51:3,11;
75:12;151:23;158:7
**secretary's (1)**
46:25
**section (16)**
9:23;40:20;47:11;
72:16,18;73:5,9;83:6,
17;123:14;138:16,16;
153:9,14;154:15,19
**security (34)**
41:2;45:2,6,12,23,
25;46:10,18,21;47:2,
21;49:10;52:18;
56:23;83:1;87:23;
88:8,9;89:6,8,13,17;
90:3,6,10;120:10,12,
19;121:7,22;122:1,4;
123:1;137:24
**seems (4)**
69:11;94:1;98:25;
133:16
**self-reporting (3)**
119:24;158:20,21
**semantics (1)**
130:11

**semester (6)**
  24:23,25;25:4,12,
  13,15
**seminar (4)**
  25:2;26:8,11,12
**send (1)**
  53:2
**senior (1)**
  25:2
**sense (6)**
  18:21;93:18;96:4;
  109:1;130:9;139:11
**sent (3)**
  52:11;88:9;90:24
**separate (11)**
  52:19,25;75:10;
  76:13;81:1;97:20;
  118:11;121:21,25;
  122:3,25
**September (3)**
  18:9,25;19:14
**sequence (2)**
  29:21;71:13
**serve (3)**
  7:19;23:14;150:24
**served (2)**
  28:14;34:7
**server (1)**
  150:24
**services (7)**
  7:11;15:25;36:13,
  15,16;47:20;48:1
**set (15)**
  49:6;53:7;72:15;
  83:5;94:16,25;95:4,
  13,14;97:2;98:15,16;
  123:11,17;129:18
**sets (6)**
  15:7;94:18;95:8;
  97:7;151:2,6
**setting (1)**
  11:6
**seven (3)**
  17:3;35:8;130:20
**several (5)**
  18:8;26:8;34:6;
  84:10;113:16
**shall (8)**
  72:16;73:7;74:2;
  83:2,3,6;153:15,16
**sheets (1)**
  96:19
**shorter (1)**
  104:16
**show (36)**
  27:25;42:8;52:12;
  53:5;54:6,7;55:25;
  57:25;61:25;62:21;
  68:18;69:19,20;
  71:14;75:13,14;
  76:16;81:11,16;
  82:16;84:10,25;
  85:14,15,16;89:4;

**showed (3)**
  92:3;116:6,17
**showing (7)**
  7:23;12:7;63:12,13,
  19;83:21;128:2
**shown (2)**
  63:6;74:9
**shows (6)**
  73:11;90:17,22;
  96:21;100:1;118:2
**side (4)**
  51:22;63:20;75:1;
  90:12
**significant (2)**
  98:5;146:16
**significantly (4)**
  87:9;109:16;115:4;
  137:9
**similar (3)**
  64:17,18;92:5
**Simon (1)**
  31:16
**simple (1)**
  92:1
**simply (9)**
  37:21;40:2;65:19;
  79:14;83:20;84:6;
  109:2;135:21;145:13
**single (9)**
  38:14,15;121:16,
  16;122:12,15,15;
  134:4;156:8
**sit (1)**
  110:25
**site (1)**
  153:5
**sitting (3)**
  33:18;36:25;144:1
**situations (1)**
  68:25
**six (4)**
  15:22;60:1;121:12;
  142:10
**sixth (1)**
  143:21
**size (2)**
  144:6;148:8
**skew (1)**
  114:11
**skipped (1)**
  83:20
**slide (2)**
  151:21;152:18
**sloppy (1)**
  96:1
**small (6)**
  88:13;99:4,6;
  145:25,25;156:4
**smaller (3)**

39:11;144:4,8
**snap (1)**
  19:18
**snapshots (1)**
  19:20
**social (36)**
  41:2;43:11,17;45:2,
  6,12,23,25;46:10,18,
  20;47:2,21;49:9,10;
  52:18;56:22;83:1;
  87:23;88:7,9;89:8,13,
  17;90:3,5,10;120:9,
  12,19;121:6,22;122:1,
  3;123:1;137:24
**software (5)**
  124:11,11;140:24;
  141:1,12
**solely (1)**
  159:11
**somebody (17)**
  43:11;66:17,17;
  68:20;69:11;83:11;
  94:3;95:3;114:7;
  120:22,23;127:10;
  128:6;129:21;137:21;
  142:11;148:13
**somebody's (3)**
  88:18;119:24;
  148:20
**somehow (1)**
  66:23
**someone (58)**
  37:23;41:18;43:13;
  52:15;53:8;54:20;
  55:3,8,22;56:5,7,14;
  63:17,24;64:5,7,9,11,
  13,15;65:4,21,23;
  66:18,24;67:8,9,11,
  17;68:8;69:1,15,18;
  81:3,4;82:24;83:8,18;
  92:20;94:4,24;
  103:15;113:8;119:18;
  127:4;131:3,15;
  132:2,20,25;133:24;
  134:5;139:9,18;
  141:10;147:23;154:4;
  158:15
**someone's (3)**
  93:21;141:11;150:6
**sometime (3)**
  100:15;108:18;
  109:23
**somewhat (1)**
  87:2
**somewhere (5)**
  17:2;37:13;67:20;
  68:2;93:4
**sorry (10)**
  17:23;35:5;59:4,4;
  87:7;106:14;124:2;
  126:21;130:18;
  137:12
**sort (6)**

43:15;50:25;71:12;
  93:12;95:10;113:13
**sound (1)**
  143:24
**sounds (2)**
  5:7;99:22
**sources (12)**
  5:19,20,21,25;6:4;
  11:24;19:24;34:19;
  35:1,14;37:5;155:25
**sovereignty (1)**
  151:13
**space (4)**
  48:22,25;49:1,2
**speak (6)**
  5:3;22:5,8,11,14;
  148:13
**Special (3)**
  59:12;77:12;78:1
**specific (19)**
  9:23;10:5;12:4;
  31:10;33:12,19,21,23;
  34:10,11;42:4;45:7,
  10;74:20;88:6;
  111:22;143:2,14;
  149:14
**specifically (13)**
  8:11,25;9:16;13:8;
  27:23;33:8;42:13;
  46:23;64:21;65:6;
  66:10,15;123:2
**specifics (2)**
  149:25;150:11
**spelled (6)**
  93:5;95:2,13,25,25;
  148:24
**spelling (2)**
  92:8;150:3
**spent (5)**
  16:21,24;24:11
**spreadsheet (8)**
  57:2;90:22;96:16;
  98:20;105:19;106:9;
  123:9;130:17
**spreadsheets (5)**
  38:1,2,7,13;40:3
**SS (1)**
  46:3
**SSA (20)**
  44:20,22;45:19,20,
  21;46:4,6,14;57:20,
  21;88:4,22;90:24;
  120:6;121:2,11;
  122:11,22;123:4,6
**SSA's (1)**
  120:23
**standard (1)**
  102:9
**standing (2)**
  30:22,24
**staple (1)**
  90:11
**start (2)**

103:12;133:11
**started (1)**
  109:22
**STATA (4)**
  39:8,14;40:15,19
**STATA- (1)**
  39:3
**S-T-A-T-A (1)**
  39:3
**State (56)**
  4:10;10:20;14:11,
  21;17:9;22:1;27:1;
  32:9;38:8;40:22;41:1;
  42:23;44:25;45:19,
  21;47:9,18;49:20;
  50:9;52:1;69:4;73:7;
  74:2;75:12;77:6;78:5;
  79:7,7;84:13;85:3;
  88:9,20;89:5,19;
  90:24;91:7;127:14;
  139:4;140:24;142:16;
  143:20;144:11;150:5;
  151:5,23;152:4,15;
  153:16,18;154:1,14;
  157:8,9,17,22;159:13
**state-level (1)**
  37:11
**statement (8)**
  73:10,13;76:16;
  82:17;83:23;84:11;
  85:2;123:5
**states (30)**
  8:3,4;35:17;44:22;
  46:8,14;47:16,23,23;
  51:6;57:22;59:12;
  72:14;84:4;86:9;88:3;
  90:5,17;119:20;
  120:6;121:14;151:15,
  20;152:3,10,14,25;
  153:19;158:20,24
**State's (11)**
  9:11;10:3;11:4,10;
  21:10;48:6;49:13;
  51:3,11;72:12;158:7
**statewide (16)**
  16:6;18:14,19;19:1,
  3,6;37:13;38:15;40:6;
  77:10;102:15;128:25;
  129:2,3;139:4;147:12
**stating (1)**
  71:1
**status (186)**
  18:12,17,18;38:10,
  12;39:5,5;40:24;41:9,
  17,18;42:1,6,14,17;
  54:7,14;55:20,23,25;
  56:5,8,12,15,17,24;
  57:3;60:8,17,21;61:1,
  11,19,20;62:6,21;
  63:2,2;66:24;67:17,
  23;68:2,16,16;74:13;
  75:22;80:20;81:3,5,8,
  9,14,23;82:2,3,5,8,14,

21;83:11;84:18,19,
22;91:18,20;94:12;
100:11;102:14,16,19;
103:7,16,18,24;
104:12;105:23;106:1,
10,13,18,19;107:2,16,
25;108:3,7,11,25;
109:2,5,7,8,11,12,16,
19,20,20;110:1,6,10,
11,15,17,18,24;111:5,
11,13,21;112:3,25;
113:5,9,12,14,21;
114:3,5,8,9,14,24;
115:22;116:1,15,25;
117:4,15;119:17,25;
123:19,24,25;124:3,7,
14,15,19;125:6,13,16,
16,21,22,24,25;126:3,
10;127:4,5,8,12,19,
20,23;128:10;129:17;
130:23;131:1,3,9,12,
14,15,16,19,23;132:8;
133:6;134:3,5;
135:21;136:2;140:11,
14;143:4,4,12;145:17,
18;146:12,17;149:12;
155:8;159:9

**statuses (3)**
42:7,9;155:13
**statute (15)**
9:17,18,21;12:5;
53:21,23;72:12,21;
74:25;82:23;83:15;
128:1;153:12;154:19;
155:9
**statutes (5)**
9:6;71:23,24,25;
75:5
**stay (1)**
35:16
**stayed (1)**
129:17
**stems (1)**
62:11
**step (13)**
52:25;53:25;74:18;
75:6,6,9,24,25;76:2,3,
6;79:20;119:16
**steps (1)**
125:22
**stick (1)**
65:16
**still (37)**
23:2;29:17;41:5;
54:15,23;65:12;
74:14;77:21;82:9,19,
19,21;83:13;84:25;
85:1;92:6;93:10;
98:25;104:23;108:3,
8,10;109:7;114:5,6;
120:19;124:19;
131:14;136:2,2,7,10;
137:2;138:8;147:7;

154:3,23
**stream (1)**
75:11
**strikes (1)**
51:8
**strongly (1)**
146:12
**structured (1)**
136:23
**structures (1)**
25:8
**student (1)**
28:1
**students (2)**
25:10;27:23
**studies (2)**
87:11;134:13
**studying (1)**
78:23
**sub (2)**
103:1;105:13
**submit (4)**
47:25;51:3,4;160:2
**submitted (19)**
6:16;16:20;45:7,11,
14;48:9;66:2,4;68:5;
88:12,20,20,25;96:4;
100:6,6;132:11;
134:5;147:19
**submitting (3)**
64:6,16;138:5
**subsection (11)**
72:14,16,17,23,25;
73:3,5,8;74:1,4,5
**suggest (1)**
155:1
**suggested (1)**
86:19
**suggestive (2)**
155:16,17
**suggests (5)**
62:5;69:16;76:5;
147:9;155:6
**summer (2)**
12:21;21:1
**superintendent (1)**
157:6
**supplement (1)**
135:6
**supplemental (1)**
160:2
**support (2)**
11:9;145:19
**supporters (1)**
30:10
**suppose (6)**
34:13;114:2;128:6;
134:25;143:8;153:1
**supposed (2)**
103:22;147:11
**Supreme (5)**
29:21;30:16,20;
31:1,6

**sure (26)**
16:1,3,4;19:1,23;
20:6,19,24;24:33:7;
36:21;38:17;56:4;
57:13;79:23;84:6;
89:22;99:23;110:3;
126:16;132:24;140:1;
145:3;148:6;149:2;
152:1;156:17
**survey (6)**
43:14;117:9;135:2,
4,5,7
**sworn (1)**
4:3
**synonymously (1)**
154:20
**system (14)**
55:5,7;122:19;
124:13;132:14;
136:11,19,23;138:19;
139:5;141:2,6,17;
147:22
**systematic (1)**
146:6
**systems (2)**
140:18;141:23

**T**

**T4 (1)**
127:3
**table (20)**
68:1;96:21;100:13;
102:12,12,15;105:18;
106:10,14;116:25;
117:1,6,12,15,19;
118:13;121:13;
122:13;123:18;
124:21
**tables (7)**
40:9,10,11,14,18;
97:4;117:2
**talk (2)**
10:23;157:7
**talked (3)**
10:17;13:22;17:16
**talking (15)**
9:5;12:7;15:16;
57:20;62:2;74:25;
98:5;100:4;102:1;
104:8;106:9,10;
108:16;134:2;145:16
**taught (5)**
26:3,6,8,9,15
**teaching (4)**
24:19,22,25;25:2
**technical (7)**
39:2;50:20;51:1,10,
12,21;95:7
**technique (1)**
95:17
**techniques (1)**
95:11

**technologies (1)**
26:19
**telling (3)**
16:2;82:18;85:7
**tells (1)**
71:6
**ten (5)**
7:12,15;33:17;
90:16;104:9
**term (3)**
151:10,11;155:16
**terms (11)**
7:17;16:17;18:19;
23:22;36:2,14;59:21;
108:1;136:5;154:6;
159:7
**terribly (1)**
156:1
**test (2)**
71:7;121:23
**testified (3)**
4:4;14:1;137:4
**testify (1)**
8:5
**testifying (3)**
8:7;36:14;147:20
**testimony (10)**
9:14;10:15,23;
45:17,18;48:14;
147:4;148:1,1,11,17
**Texas (3)**
29:7;158:8,22
**Thanks (2)**
160:14,14
**thinking (2)**
113:7;136:5
**third (4)**
19:5;61:7;123:11;
143:20
**though (18)**
28:25;42:25;49:12;
55:20;67:9;69:11;
75:25;80:5;89:20;
102:24;104:10;110:5;
112:4;115:5,7;116:4;
137:8;154:16
**thought (1)**
97:22
**thousand (2)**
39:11;125:2
**thousands (1)**
117:21
**three (9)**
24:13;29:6,6;51:17;
58:6;60:1;62:12;
101:13;151:6
**three-week (3)**
101:19;103:19;
109:9
**thus (1)**
119:12
**tied (3)**
76:23;80:22;128:2

**times (6)**
26:3;89:15;94:17;
95:1;103:5;156:19
**title (2)**
6:7;59:10
**titled (2)**
40:21;153:10
**today (5)**
5:17;16:25;36:25;
159:20;160:12
**told (1)**
16:18
**took (1)**
124:16
**top (11)**
6:23;16:23;53:15;
70:5;84:5;90:16;
96:23;97:4;126:6;
144:2;151:4
**topic (1)**
85:20
**topics (4)**
26:15,17;32:21;
59:12
**total (21)**
97:24;98:25;99:2;
102:6,20;104:21;
106:18;107:10;111:4;
112:2;113:3;114:14;
115:17;118:23;
126:24;131:19,23,23;
136:6;143:11;156:23
**totals (3)**
100:13;102:4;144:5
**track (1)**
45:8
**tracks (1)**
73:15
**training (20)**
6:9;10:12,19;11:7,
12;35:11;52:8;62:17;
69:17,22;71:4;76:8;
79:1,5;122:5;150:18;
151:16;153:4,24;
154:25
**transactions (2)**
90:18,19
**Transportation (3)**
47:19;48:2;67:8
**travel (1)**
76:11
**treated (1)**
65:9
**trial (1)**
4:15
**triangulate (1)**
71:12
**tried (3)**
93:16;94:3;95:24
**trigger (6)**
49:3,6;54:24;55:24;
104:6;136:1
**triggering (3)**

56:23;105:6,16
**triggers (2)**
52:19;53:7
**true (20)**
16:1,4,5;69:18;
75:8;100:11;101:14;
104:4;113:8,16;
132:9;133:4;134:12;
135:2;144:16;145:21,
24;150:10;152:16;
159:12
**try (2)**
5:3,10
**trying (13)**
19:18;43:16;58:15;
60:14;68:9;79:23;
93:25;95:21,22;
98:11;109:10;126:18;
133:13
**turn (7)**
8:2;64:15,20;65:4;
66:5;72:14;158:12
**turning (1)**
34:12
**turnout (7)**
86:23,24;87:3,8,11,
13,22
**turns (2)**
53:1;64:24
**twice (3)**
93:16,22;94:3;
95:24;96:3
**two (21)**
14:22;19:2;21:6;
48:24;71:22;75:5,10;
76:1;78:1;81:20;
91:16;93:14;96:4;
103:4;104:25;114:21;
115:18;117:1,19;
143:23;153:18
**two-to-one (1)**
101:11
**txt (2)**
39:7,9
**type (6)**
28:1;67:16;94:16;
140:24;149:8,10
**types (3)**
69:14;103:14;
121:15
**typical (1)**
25:5
**typo (5)**
55:18,21;56:14,22;
126:11
**typographical (3)**
92:10;132:23;
136:10

**U**

**uh-huhs (1)**
5:10

**ultimately (7)**
25:15;31:19;42:18;
50:12;58:21;59:1;
67:18
**unable (1)**
122:19
**uncorrelated (1)**
146:5
**under (36)**
4:11;35:6,16;53:21;
60:24;63:16,16;64:9,
22;68:10,21,24;69:6,
21,21;72:21,22;
73:21;75:18;77:19;
82:6,12,13,23,24;
83:14;84:11,21;85:1,
4;90:2;96:23;97:17;
99:25;110:1;123:12
**underlying (10)**
37:19;43:21,22;
44:12;53:11;105:16;
118:10;142:21;143:5;
158:16
**Understood (2)**
32:8;158:25
**uniform (4)**
77:6;142:15;146:3;
147:12
**unique (6)**
89:9,18;91:24,25;
93:1;124:20
**United (7)**
151:15,19;152:2,
10,14,25;153:18
**universally (1)**
43:11
**universe (3)**
19:19;67:18;109:24
**university (7)**
24:13,20;25:16,20;
26:2,23;27:23
**unless (5)**
54:22;66:22;94:2;
109:6;153:16
**unlikely (2)**
120:17;132:6
**unnecessarily (1)**
61:2
**unobservable (1)**
41:13
**unsure (1)**
62:25
**up (30)**
30:16;51:5;52:12;
53:5;54:6,7;55:15,25;
66:19;67:3;72:6;
75:13;76:16;80:15;
81:16;87:3;89:4;
90:24;91:7,14;93:22;
96:2;99:15;100:18;
102:18,24;119:12;
126:22;128:10;
153:14

**update (2)**
119:18,21
**updated (9)**
6:5,8;94:6;118:1,2;
119:10;120:2;124:12;
158:14
**upon (2)**
8:18;79:11
**upper (1)**
24:25
**uptick (2)**
7:14;156:9
**urban (1)**
144:11
**USA (1)**
29:3
**USCIS (1)**
119:19
**use (23)**
4:15;34:16;37:24;
41:7;42:20;43:9;44:8;
53:16;83:13,22;89:3,
7;105:20,21;110:8;
135:25;136:25;
137:25;138:3;140:25;
141:17;147:2;157:10
**used (18)**
5:19,20;26:19,20,
22;34:5,8;40:13;
43:10;50:9;51:1;68:8;
133:17;140:3;141:7,
25;154:20;155:16
**uses (2)**
37:11;140:25
**using (10)**
37:21;43:13;49:14;
93:9;110:19;120:11;
124:19;132:14;
134:10;136:23
**usually (2)**
92:24;135:4
**utility (4)**
73:10,13;82:17;
85:2

**V**

**VAC (1)**
24:10
**vacated (1)**
31:19
**value (7)**
39:6,15;43:3;52:17,
23;122:11;141:25
**values (5)**
43:22;44:12;139:3,
4,17
**variables (1)**
146:5
**variation (5)**
145:22;147:10;
149:8,10;150:18
**variations (1)**

150:8
**varies (1)**
47:23
**variety (1)**
55:6
**various (1)**
74:8
**vary (3)**
50:10;146:6;148:10
**verification (78)**
8:13,15,22;9:7,12;
10:6,7,9;11:2,18,23;
12:2;13:5;14:3,6,25;
15:13,16,17;17:8,10,
21,22;9:32:23;33:4,6,
8,13,24;35:19,23;
41:3,22;44:18,23;
46:8,15;47:8,10,16;
48:12;52:15,22;53:2,
9;56:19;59:13,25;
60:6,17,19;61:9,14,
17;66:14;67:19;
72:12;73:22;83:8,19;
90:16;96:25;97:22;
99:9,14;100:11,12;
105:21;112:7;118:10;
121:7,15,20;122:2,3,
4,9;123:6
**verifications (1)**
97:21
**verified (10)**
45:13,15;52:10;
56:21;60:7,20;61:10,
18;68:13;83:19
**verify (5)**
44:9;82:25;88:15;
117:25;158:18
**verifying (2)**
84:3;119:1
**versa (1)**
114:15
**version (6)**
6:5,8;18:21;23:6;
69:24;71:10
**versions (3)**
18:13,19,20
**versus (16)**
14:12,14;27:17;
28:18;29:3,22;50:3;
56:10,12;101:10;
107:20;137:10;
145:15;147:19;149:2,
13
**vice (1)**
114:15
**view (2)**
43:9;142:23
**viewing (1)**
110:19
**Vincent (2)**
4:21;148:24
**V-I-N-C-E-N-T (1)**
148:25

**V-I-N-E-E-N-T (1)**
148:25
**voluntary (1)**
89:20
**Vote (43)**
9:8;12:8;15:1;
24:17;28:2;32:21;
47:15;52:14,18;
53:18;57:9;62:1,8,14,
22;63:8,18;67:5,9;
68:23;73:4;75:14,19;
76:25;81:7;82:9;83:3,
12,21;102:1;127:24;
128:4,8,13;129:16,21,
22,23;130:1;132:13;
151:5;153:15;158:10
**voted (4)**
20:12;63:14;
129:10;130:6
**voter (163)**
9:6,7;10:20;11:2,5,
11,18,19,23;12:1,2,4,
5;13:5;14:3;15:5,13,
25;16:6;18:14,17,17,
19;19:2,3,6,13,21,23;
20:2,4,22;9:27:18,22;
28:25;29:14;32:16,
18,23;35:19,19,23,23;
37:11,12,16,17;38:10,
11;39:5;40:6;43:23;
46:25;47:7;52:4,5;
53:13,16,24;54:7,10,
11,16;55:1,2,5,12;
56:10,10,12,24,25;
60:21;61:11,19;
62:21,25;63:11,12,14,
25;65:21;66:4,11,25;
67:11,12,25;68:23;
72:10,12;75:13,17,23;
76:3,6,13,14;77:18;
78:17;79:19;80:3,9,
19;81:5,7,9,10;82:14;
83:15;86:23;87:3,3,
13,15,22;91:22;
92:25;120:9;123:20;
124:18,19,20,24;
129:11,15,18,24,25;
130:2,3,4,5,24;
132:14,17,18;134:20,
23;136:16;138:2,19,
25;139:8;140:15,16,
20,23;142:21;143:17,
20;144:5,12,15;145:6,
13;148:22;151:1,23;
155:5,7;157:18;158:3
**voters (64)**
8:15;17:9;18:11;
39:4,12;53:2;60:7;
62:17;63:9;74:23;
76:20,21;77:14;
79:15;80:9;82:4;
83:16;87:5,8;97:13,
14;99:25;100:22,25;

101:5,10,10;103:3,17;
104:18;105:23;
106:10,18,20;109:21;
110:15;112:14,18,21,
23,24;113:2,4,4;
114:13,16;115:8;
123:22,25;127:15;
137:10;139:20;
143:23;144:8;145:5,
18;146:7,11,16,21,23;
147:2;149:11;156:20
**voter's (2)**
156:10,10
**votes (2)**
73:6;74:1
**voting (14)**
7:15;14:13;21:25;
26:17,19;34:6;71:9;
86:22;87:15;112:19;
117:7,13;135:5;
140:18

## W

**Walker (2)**
14:12;27:17
**Walton (5)**
155:5,5,12,18;
157:7
**wants (1)**
156:15
**water (2)**
31:23;130:16
**way (23)**
20:12;52:6;60:15;
65:24;75:15;76:7;
77:4;93:5,6;95:13,14;
102:8;109:4;124:21;
132:12;136:8,22;
138:24,24;139:14;
150:14,15,16
**ways (3)**
55:6;74:17;146:6
**webinar (2)**
58:6,7
**webinars (2)**
58:8,17
**week (1)**
19:8
**weeks (1)**
101:13
**well-established (1)**
34:4
**weren't (5)**
97:21;128:18;
138:23;140:10;146:6
**what's (17)**
7:23;21:22;22:19,
21;25:3,3;35:21;37:2;
43:3;57:25;60:3;
73:15;96:12;127:3;
135:13;141:7;148:18
**whenever (4)**

95:5;111:17;120:7;
128:9
**white (17)**
100:25;101:2,4,10;
104:25;111:11,13,21;
112:18,23,24;114:13;
115:21,24;116:1,9,9
**whites (5)**
86:11;102:11;
103:5;111:11;146:14
**Whitford (1)**
29:17
**whole (2)**
102:25;103:12
**who's (15)**
53:23;69:11;81:4,7,
9;82:2,3;83:18;84:18,
18;119:11;127:19,21;
134:4;152:13
**whose (2)**
100:5;124:7
**wide (1)**
47:24
**wildly (1)**
158:12
**wiped (1)**
109:25
**Wisconsin (18)**
14:11,13,14,21;
15:3,9;26:23,25;27:2,
18,24;33:4;140:25;
151:18,19;152:2;
154:4;156:18
**Wisconsin's (1)**
14:23
**withdrawn (2)**
25:17;29:24
**within (8)**
7:12;51:5,20;93:4;
142:10;155:25;156:8,
8
**without (10)**
60:18;61:16;63:12,
13,15,17,18;81:17;
136:19;141:14
**witness (15)**
4:2;7:11,20;24:1;
27:4;28:13;34:7;
47:15;59:8;70:19,22;
85:21,24;138:11;
160:13
**wondering (1)**
99:18
**words (4)**
20:23;56:3;57:1;
95:3
**work (20)**
6:13,17;7:6,17;
13:25;14:5;15:23;
16:6,7;23:16,23,24;
24:8,9;29:2;31:10;
32:10;33:21;79:4;
80:8

**worked (7)**
28:10;44:18;48:8,
12;49:25;138:25;
140:18
**workers (4)**
73:7;74:3;77:7,14
**working (8)**
10:15;16:13;44:24;
45:1;52:7;98:7;
139:15;141:3
**works (3)**
44:7;50:11;77:15
**writing (1)**
87:25
**written (3)**
10:16;33:17;50:25
**wrong (1)**
90:12
**wrongfully (1)**
42:8
**wrote (3)**
152:17,18;154:9

## Y

**year (14)**
78:6;101:14;
103:20;128:19;129:9;
139:9,23;140:5,6,8;
141:14,16,19;142:11
**years (4)**
7:12,16;33:18;
139:8
**Yep (1)**
70:21

## Z

**zero (2)**
42:3;118:7

## 0

**00 (1)**
70:20
**0008885 (1)**
58:18
**00105899 (2)**
70:22;79:8
**08 (1)**
137:16

## 1

**1 (12)**
7:22,24;35:4,5,8,
16;60:5;96:21;
100:13;121:14;143:2,
7
**1,857 (1)**
140:7
**1,999 (2)**
124:22;125:3

**1.95 (1)**
90:17
**10 (3)**
97:12;100:18;
109:23
**10,000 (1)**
89:14
**100 (3)**
50:15;98:5;157:13
**10L (1)**
135:13
**11 (2)**
48:21;53:15
**115 (1)**
97:24
**116 (3)**
58:1,16;122:6
**119 (1)**
139:8
**11th (1)**
80:15
**12 (1)**
33:18
**13 (5)**
86:7;126:8,15;
128:17;131:6
**136884 (1)**
70:23
**14 (6)**
27:3;88:5;90:18;
91:2;115:22;126:17
**14.68 (3)**
111:12,18;112:23
**14th (3)**
38:9;152:5,17
**15 (2)**
37:14;91:5
**159 (4)**
19:6;38:7,13,16
**15th (2)**
38:9;109:4
**16.83 (1)**
116:13
**164,979 (1)**
100:1
**165,014 (1)**
99:24
**17 (3)**
140:8;142:8,9
**18 (1)**
139:21
**1800 (5)**
140:9;141:11,15;
142:1,9
**19 (3)**
62:19;63:4;91:14
**1901 (2)**
139:21;140:8
**1st (1)**
113:10

## 2

**2 (13)**
22:18,19,22;32:4;
35:3;60:18;81:19,20;
82:6;98:6;121:13;
125:15;143:3
**2,011,116 (1)**
100:16
**2,065,722 (1)**
97:14
**2,218,159 (1)**
143:24
**2:51 (1)**
160:16
**20 (3)**
58:11;101:5;123:14
**20.9 (2)**
117:12,15
**200 (2)**
99:7;100:4
**2008 (3)**
24:3;32:24;86:8
**2009 (3)**
45:3;87:24;109:23
**2011 (1)**
90:23
**2012 (2)**
27:18;86:18
**2014 (3)**
91:12,21;123:23
**2014-2018 (1)**
117:9
**2016 (1)**
86:19
**2017 (1)**
26:10
**2018 (10)**
19:17,21,24;91:11,
18;93:19;94:21;95:6,
7;109:6
**2019 (30)**
12:21;17:14;18:10,
13;19:1,10,14,17;
78:6,12;91:12,21;
94:22;95:4,4;96:22;
101:1,9;103:22;
104:13;106:25;107:8;
108:17;123:23;124:3,
23;125:13;126:7;
129:11;140:16
**2020 (21)**
18:15;40:11;96:24,
25;97:2,7,14;101:3,9;
106:19;107:9;109:8;
113:11;116:16;
124:18,24;125:17;
126:10;127:17;
131:20;155:7
**2020xlsx (1)**
96:15
**20th (1)**
125:8
**21 (1)**
155:13

**21-2-216 (1)**
153:9
**21-2-220 (1)**
73:6
**21-2-220.1 (2)**
9:20;72:10
**21-2-229 (1)**
155:9
**21-2-417 (2)**
72:18,23
**22 (4)**
101:4;117:1;155:7,
13
**220.1 (1)**
82:24
**22B (1)**
100:25
**24 (3)**
125:24;126:4,6
**25 (3)**
138:7,15;157:9
**25,000 (1)**
101:6
**26 (1)**
142:16
**27 (2)**
150:20,22
**27th (4)**
19:4,9;104:1;109:3
**28 (2)**
150:21;151:4
**29 (1)**
143:8
**29.6 (2)**
106:25;107:21
**2nd (3)**
108:16;110:24;
113:15

**3**

**3 (3)**
37:1,2;81:18
**3,432 (2)**
131:7,18
**3,594,048 (1)**
101:1
**3,619,336 (1)**
101:4
**3,672 (3)**
126:7,18;129:8
**30 (1)**
140:16
**30th (4)**
19:4,9;104:1;
140:16
**31 (1)**
59:3
**316 (27)**
9:22;13:9;17:11,24;
59:13;72:13;77:19,
25;109:15,25;110:2,7,
9,10,12,15,18;111:2,

3,17,17;112:1,22;
114:4,4;124:6;131:14
**32B (1)**
101:1
**33 (1)**
143:15
**33B (1)**
100:14
**365 (1)**
89:15
**39 (1)**
105:25
**39.4 (5)**
105:22;106:1,16,
19;108:23

**4**

**4 (17)**
8:2;33:16;40:20;
61:16;62:2;64:5;
68:10,11;71:16,19;
74:13;99:20;102:12,
15;106:10,14;150:24
**40 (2)**
111:3;113:3
**41,946 (1)**
135:15
**417 (3)**
82:13;83:14;84:24
**417a (1)**
84:14
**429 (3)**
126:8;127:15;
128:15
**479 (3)**
125:19;126:12;
127:15

**5**

**5 (6)**
33:16;40:20;47:11;
71:16;116:25;117:15
**5.67 (1)**
131:22
**50 (3)**
108:22;114:16;
115:22
**53 (1)**
91:2
**53.4 (1)**
90:23
**55,000 (2)**
100:19,23

**6**

**6 (10)**
8:3,3;90:9,10;
117:1,6,12,19;118:13;
121:13
**60 (3)**

107:10,10;108:20
**60,000 (1)**
68:3
**69.5 (1)**
143:11

**7**

**7 (8)**
47:13,14;48:20;
96:11,12;99:24;
125:1;130:21
**7B (1)**
99:24
**7G (1)**
100:1

**8**

**8 (4)**
37:14;109:23;
153:7,9
**85 (1)**
59:4
**86 (1)**
59:5
**88 (1)**
59:14
**8832 (1)**
122:8
**884 (1)**
59:2
**8854 (1)**
58:22
**8884 (3)**
58:23,24;59:3
**8899 (3)**
58:21;59:11,14
**8901 (1)**
59:24
**8902 (1)**
61:7
**8912 (1)**
59:14

**9**

**9 (2)**
122:19;138:16
**9999 (1)**
142:1

# DEFENDANTS' EX. 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## PLAINTIFFS' INITIAL EXPERT DISCLOSURES

In accordance with the Court's direction at the July 11, 2019, Scheduling

Conference and with the Court's Scheduling Order of the same date (ECF No. 78),

and consistent with their obligations pursuant to Federal Rule Civil Procedure

26(a)(2), Plaintiffs hereby disclose their expected witnesses whom they may use at

trial to present evidence under Federal Rule of Evidence 702, 703, or 705. In this

disclosure, and for each person disclosed, Plaintiffs will provide brief biographical

information, a curriculum vitae, and a summary of the area of the expert's expected

testimony. Then, in accordance with the Court's July 11, 2019, Order, on August

16, 2019, Plaintiffs will provide a written report—compliant with the requirements

of Federal Rule of Civil Procedure 26(a)(2)(B)—that discloses a complete

statement of all of the opinions the witness will express and the bases therefore; the

facts or data that the expert has considered in forming his or her opinions; the

- 1 -



witness's qualifications (including a list of publications authored in the previous ten years); a list of cases in which the witnesses has testified in the previous four years; and a statement of the compensation the expert has received in connection with his or her services in this case.

Plaintiffs reserve the right to supplement this list with additional experts and in response to Defendants' disclosure of expert witnesses.

1.    Dr. Khalilah L. Brown-Dean – Dr. Brown-Dean is an associate professor at Quinnipiac University. She holds a PhD and an MS in political science from Ohio State University. She received her undergraduate degree from the University of Virginia. A copy of her curriculum vitae is attached as Exhibit A. Dr. Brown-Dean is expected to testify, generally, about the elections-related duties of the secretary of state under Georgia law and under federal law.

2.    Dr. Stephen Graves – Dr. Graves is a professor at the MIT Sloan School of Management. Dr. Graves holds a PhD in operations research and an MS from the University of Rochester. He received his undergraduate degree and an MBA from Dartmouth College. A copy of his curriculum vitae is attached as Exhibit B. Dr. Graves is expected to testify about  comparative wait times in lines.

3.    Dr. J. Alex Halderman – Dr. Halderman is a professor at the University of Michigan. Dr. Halderman holds a PhD in computer science from Princeton

University. He received his undergraduate degree from Princeton University. A

copy of his curriculum vitae is attached as Exhibit C. Dr. Halderman is expected to

testify about voting machine infrastructure, with a focus on hacking vulnerabilities.

4.      Dr. Michael Herron – Dr. Herron is a professor and chair of the Program in

Quantitative Social Science at Dartmouth College. He holds a PhD in business

political economics from Stanford University. He received his undergraduate

degree from Carnegie Mellon University, an MS in statistics from Stanford

University, and an MA in political science from the University of Dayton. A copy

of his curriculum vitae is attached as Exhibit D. Dr. Herron is expected to testify

on changes in Georgia's precincts during recent elections, including in advance of

the 2018 general election, and the use and effect of the "use it or lose it" statute,

O.C.G.A. § 21-2-234.

5.      Dr. Adrienne Jones – Dr. Jones is an assistant professor at Morehouse

College. She holds a PhD in political science from the City University of New

York Graduate Center. She received her undergraduate degree from Brown

University, her JD from the University of California, Berkeley, and an MS from

the City University of New York Graduate Center. A copy of her curriculum vitae

is attached as Exhibit E. Dr. Jones is expected to testify, generally, about the

history of voting and voter suppression throughout the country with an emphasis

on suppression in the state of Georgia.

6.      Dr. Kenneth Mayer – Dr. Mayer is a professor at the University of Wisconsin–Madison. He holds a PhD and an MA in political science from Yale University. He received his undergraduate degree from the University of California at San Diego. A copy of his curriculum vitae is attached as Exhibit F. Dr. Mayer is expected to testify on the impact of the "exact match" policy.

7.      Dr. Peyton McCrary – Dr. McCrary is a professorial lecturer at the George Washington University of Law School. He holds a PhD in history from Princeton University. He received his undergraduate degree and an MA from the University of Virginia. He served as a historian for the U.S. Department of Justice, Civil Rights Division, Voting Section from 1990-2016. A copy of his curriculum vitae is attached as Exhibit G. Dr. McCrary is expected to testify on voting procedures proposed, adopted and implemented in Georgia that have placed discriminatory burdens on minority voters; the totality of the circumstances test in Section 2 of the Voting Rights Act; and factors identified by the U.S. Congress in amending Section 2 of the Voting Rights Act in 1982 as applicable to enforcing the totality of the circumstances test.

8.      Dr. Lorraine Minnite – Dr. Minnite is an associate professor at Rutgers, The State University of New Jersey-Camden. Dr. Minnite holds a PhD in political science from the City University of New York Graduate Center. She received her undergraduate degree from Boston University and an MS from the City University

- 4 -

of New York Graduate Center. A copy of her curriculum vitae is attached as Exhibit H. Dr. Minnite is expected to testify about the incidence and frequency of voter fraud in Georgia and the impact, if any, of Defendants' policies and practices on voter fraud frequency.

9.     Dr. Daniel Smith – Dr. Smith is a professor and chair of the Political Science Department at the University of Florida. He holds a PhD and an MA in political science from the University of Wisconsin–Madison. He received his undergraduate degree from Pennsylvania State University. A copy of his curriculum vitae is attached as Exhibit I. Dr. Smith is expected to testify on provisional and absentee ballot use in Georgia during recent elections, including the 2018 general election.

This the 15th day of July, 2019.

*/s/Allegra J. Lawrence*

Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: 240-786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**THE SUMMERVILLE FIRM, LLC**
1226 Ponce de Leon Avenue, NE
Atlanta, GA 30306
Telephone: (770) 635-0030
kurt@summervillefirm.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com

Andrew D. Herman (Admitted *pro hac vice*)
Sarah Dowd (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
sdowd@milchev.com

Kali Bracey (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com

Jeremy H. Ershow (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jershow@jenner.com

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 15th day of July 2019, I caused to be electronically filed the foregoing Plaintiffs' Initial Expert Disclosures with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon Counsel of Record:

**Chris Carr, Esq.**
Attorney General
**Dennis Dunn, Esq.**
Deputy Attorney General
**Russell Willard, Esq.**
Senior Assistant Attorney General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Email: ccarr@law.ga.gov
Email: ddunn@law.ga.gov
Email: rwillard@law.ga.gov

**Joshua Barrett Belinfante, Esq.**
**Brian Edward Lake, Esq.**
**Carey Allen Miller, Esq.**
**Vincent Robert Russo, Jr., Esq.**
**Kimberly Anderson, Esq.**
Robbins Ross Alloy Belinfante Littlefield, LLC -Atl
500 Fourteenth Street, NW
Atlanta, GA 30318
678-701-9381
Fax: 404-856-3250
Email: jbelinfante@robbinsfirm.com
Email: blake@robbinsfirm.com
Email: cmiller@robbinsfirm.com
Email: vrusso@robbinsfirm.com
Email: kanderson@robbinsfirm.com

**Bryan P. Tyson, Esq.**
Special Assistant Attorney General
**Bryan Jacoutot, Esq.**
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Email: btyson@taylorenglish.com
Email: bjacoutot@taylorenglish.com
404-856-3260
Fax: 404-856-3250

*/s/Allegra J. Lawrence*
Allegra J. Lawrence
Georgia Bar No. 439797

Exhibit F

## Kenneth R. Mayer

Department of Political Science                    Phone:  608-263-2286
Affiliate, La Follette School of Public Affairs    Cell:     608-216-6554
110 North Hall / 1050 Bascom Mall                  Email: krmayer@wisc.edu
University of Wisconsin – Madison
Madison, WI  53706

### Education
Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

### Positions Held
University of Wisconsin, Madison. Department of Political Science.
   Professor, July 2000-present.
   Associate Professor, June 1996-June 2000.
   Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra, ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994.  Conducted study of acquisition reform, and the effects of acquisition policy on the defense industrial base. Performed computer simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986.  Responsible for cost and price analysis, contract negotiation, and contract administration for aerial target missile programs in the $5 million - $100 million range.

### Honors and Awards
American Political Science Association, State Politics and Policy Section.  Award for best Journal Article Published in the *American Journal of Political Science* in 2014.  Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting.  Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award.  Awarded by the Presidency Research Group of the American Political Science Association, for the best book published on the American presidency in 2001.  Awarded for *With the Stroke of a Pen: Executive Orders and Presidential Power*.
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student Association, March 1992.
Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

**Service as an Expert Witness**

*Dwight et al. v Kemp*, No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).

*Priorities U.S.A.et al. v. Missouri et al.,* No. 19AC-CC00226 (Circuit Court of Cole County, MO), voter ID (2018).

*Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Texas), voting rights (2018).

*League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich.), redistricting (2018).

*One Wisconsin Institute, Inc., et al. v. Nichol, et al.*, 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).

*Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).

*Milwaukee NAACP et al. v. Scott Walker et. al*, N.W.2d 262 (Dane County WI Circuit Court), voter ID (2012).

*Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).

*County of Kenosha v. City of Kenosha,* No. 22-CV-1813 *(*Kenosha County WI Circuit Court) municipal redistricting (2011).

*McComish et al. v Brewer et al.*. 2010 WL 2292213 (D. Ariz.), campaign finance (2009).

*Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).


**Grants and Research Awards**

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin."  Dane County (WI) Clerk, $44,157.  November 2016-December 2017.  Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

"How do You Know?  The Structure of Presidential Advising and Error Correction in the White House."  Graduate School Research Committee, University of Wisconsin, $18,941.  July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs."  $43,234.  Co-PI. With Barry C. Burden  (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI).  October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute.  September 2009-December 2010.  $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI.  October 2008-September 2009.  Pew Charitable Trusts.  $49,400.  With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188.  January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative  Elections." JEHT Foundation, New York, NY.  $84,735.  November 2006-November 2007.

"Does Public Election Funding Change Public Policy?  Evaluating the State of Knowledge."  JEHT Foundation, New York, NY.  $42,291.  October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and  Policy Communities."  Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June  2005

WebWorks Grant (implementation of web-based instructional technologies), Division of  Information Technology, UW-Madison, $1,000.  November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election."  Joyce Foundation, Chicago, IL. $15,499.

April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000. March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000. May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School Research Committee, University of Wisconsin, $21,965. Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein). June 1993-January 1995. $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992. $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995. National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee at the University of Wisconsin, $2,600. MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500

## Professional and Public Service

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair, Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).

Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).

Chair, Blue Ribbon Commission on Clean Elections (Madison), August 2007-April 2011.

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana, Minnesota, and Wisconsin, 2006-2011.

Section head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin,      November 2003-December 2009.

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board, September 2002-present.

Book Review Editor, *Congress and the Presidency*, 2001-2006.

Editorial Board, *American Political Science Review*, September 2004- September 2007.

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform. State of Wisconsin. 1997.

## PUBLICATIONS

## Books

*Presidential Leadership: Politics and Policymaking*, 10th edition. Lanham, MD: Rowman and Littlefield, 2018. With George C. Edwards, III, and Stephen J. Wayne.

*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amnon Cavari and Richard J. Powell.

*The Enduring Debate: Classic and Contemporary Readings in American Government.* 8th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous

3

editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013).

*Faultlines: Readings in American Government*, 5th ed. New York: W.W. Norton & Co.  2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th (2013).

*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.

*Readings in American Government*, 7th edition.  New York: W.W. Norton & Co. 2002.  Co-edited with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

*With the Stroke of a Pen: Executive Orders and Presidential Power*.  Princeton, NJ: Princeton University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies Group of the American Political Science Association, for the Best Book on the Presidency Published in 2001.

*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*.  Boulder, CO: Westview Press. 1999.  With David T. Canon.

*The Political Economy of Defense Contracting*.  New Haven: Yale University Press. 1991.

## Monographs

*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009.  With  Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*. September 1999.

*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research Foundation, April 1998 .

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of  Wisconsin).  February 1998.  Portions reprinted in Anthony Corrado, Thomas E. Mann,  Daniel Ortiz, Trevor Potter, and Frank J. Sorauf, ed., *Campaign Finance  Reform: A Sourcebook*. Washington, D.C.: Brookings Institution, 1997.

"Does Public Financing of Campaigns Work?"  *Trends in Campaign Financing*.  Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA.  1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND  Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*.  N-4624-AF. Santa Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodilly, Frank Camm, and Timothy J. Webb.

## Articles

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018).  With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart III.

"The Complicated Partisan Effects of State Election Laws." *Political Research Quarterly* 70:549-563 (No. 3, September 2017).  With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public Administration Review* 77:354-364 (No. 3, May/June 2017).  With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election  Evidence from a Survey List Experiment." *Election Law Journal*  13:460-475 No.4, December 2014). With John S. Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science*, 58:95-109 (No. 1, January 2014). With Barry C. Burden, David T. Canon, and Donald P. Moynihan. Winner of the State Politics and Politics Section of the American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law Review* 2014:821-841 (No. 4).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485 (No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2, 2011). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December 2009).

"Does Australia Have a Constitution? Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008). With Howard Schweber.

"Does Australia Have a Constitution? Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008). With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007). With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials*. Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005). With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May 2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002). With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Institutionalization of Power." In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds. *Presidential Power: Forging the Presidency for the 21st Century*. New York: Columbia University Press, 2000. With Thomas J. Weko.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions  and Processes."
      *Public Administration Review*  56:180-190 (1996).  With Anne Khademian.

"Closing Military Bases (Finally):  Solving Collective Dilemmas Through  Delegation." *Legislative
      Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level  Evidence from the
      1988 and 1992 Presidential Elections." *American Journal of  Political Science* 40:162-185
      (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from  Wisconsin, 1964-
      1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional  Micromanagement of the
      Department of Defense." *Public Administration Review*  53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an
      Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

### Book Chapters

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016
      Presidential Elections: The Causes and Consequences of an Electoral Earthquake.* Lanham,
      MD: Lexington Press, 2017. Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election.  In Amnon Cavari,
      Richard J. Powell, and Kenneth R. Mayer, eds.*The 2012 Presidential Election: Forecasts,
      Outcomes, and Consequences.* Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action."  George C. Edwards, III, and William G. Howell, *Oxford  Handbook of the
      American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional  Presidency.* Baltimore:
      Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance  Reform." In  Gerald
      C. Lubenow, ed., *A User's Guide to Campaign Finance Reform.*  Lanham, MD: Rowman &
      Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and
      Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the  Presidency in the Age of
      Political Spectacle.* New York: New York University Press. 2001. With David T. Canon.

"Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In  *Downsizing
      Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In
      Alex Mintz, ed.  *The Political Economy of Military Spending.* London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed.,  *Arms, Politics,
      and  the Economy: Contemporary and Historical Perspectives*. New York:  Holmes and
      Meier. 1990.

### Other

"Campaign Finance: Some Basics."  Prepared for the Bauer-Ginsberg Campaign Finance Task Force,
      Stanford University.  September 2017.  With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington
      Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart,
      III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military
      Relations. The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and  Raymond J. La Raja, *Small
      Change: Money, Political Parties, and Campaign Finance Reform. The Forum*  6 (No. 1,
      2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*, Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*, David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval Office*, Adam L. Warber. In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power in the U.S. and Australia), manuscript, February 2007.

"Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring 2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives." *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book*. Project Vote Smart. 2006. With Meghan Condon.

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia, Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King? Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book*. Project Vote Smart. 2004. With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart. 2002. With Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief*. December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J. Rozell. *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani Guinier. *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993).

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles*

*Times*, July 8, 1988.


**Conference Papers**

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the
2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8,
2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA,
August 30, 2017, and at the 2017 Annual Meeting of the American Political Science
Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere,
Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the
Polls." Conference on New Research on Election Administration and Reform, Massachusetts
Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon,
Donald P. Moynihan, and Jake R Neiheisel.

"Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration
on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science
Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles."
Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4,
2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election."
Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4,
2011. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform."
2010 Annual Meeting of the American Political Science Association, Washington, DC,
September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P.
Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest
Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the
Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin,
Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the
2008 Elections." Annual Meeting of the American Political Science Association, Toronto,
Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P.
Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral
Commission?" Annual Meeting of the American Political Science Association, Chicago, IL,
August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative
Elections." Annual Meeting of the American Political Science Association, Chicago, IL,
August 29-September 1, 2007. With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the
Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy
Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days." Annual Meeting of the American Political Science Association, Philadelphia,
PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Citizens'
Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies,
University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.

## Talks and Presentations

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017. With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017. With Michael DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?" Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom" Geometry of Redistricting Conference, University of Wisconsin-Madison October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February 19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers." American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013, Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008." Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power. University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31,2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives. *Hearing on Executive Order and Presidential Power*, Washington, DC. March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI. August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17,1992.

Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH, September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

## University and Department Service

Athletic Board, 2014-present.

General Education Requirements Committee (Letters and Science), 1997-1998.

Communications-B Implementation Committee(Letters and Science), 1997-1999

Verbal Assessment Committee (University) 1997-1998.

College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).

Committee on Information Technology, Distance Education and Outreach, 1997-98.

Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.

Department Computer Committee, 1996-1997; 1997-1998, 2005-2006. Chair, 2013-present.

Faculty Senate, 2000-2001, 2001-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.

Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.

Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.

Department Honors Advisor, 1991-1993.

Brown-bag Seminar Series on Job Talks (for graduate students), 1992.
Keynote speaker, Undergraduate Honors Symposium, April 13 1991.
Undergraduate Curriculum Committee, Department of Political Science, 1990-1991; 1991-1992; 1993-1994.
Individual Majors Committee, College of Letters and Sciences, 1990-1991.
Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

**Teaching**
Undergraduate
Introduction to American Government (regular and honors)
The American Presidency
Campaign Finance
Election Law
Classics of American Politics
Presidential Debates
Comparative Electoral Systems
Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

Graduate
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process

11

# DEFENDANTS' EX. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FAIR FIGHT ACTION, et al.,   )
                  )
    Plaintiffs,       )
                  )
v.                  )    Civ. Action No. 1:18-cv-05391-SCJ
                  )
BRAD RAFFENSPERGER,   )
in his official capacity as   )
Secretary of State of the   )
State of Georgia, et al.,     )
                  )
    Defendants.      )

## EXPERT REPORT OF KENNETH R. MAYER

Professor of Political Science
University of Wisconsin-Madison
201 D North Hall
1050 Bascom Mall
Madison, WI 53706

February 18, 2020

Kenneth R. Mayer, Ph.D.



## I.    **Scope of Assignment**

I have been asked by Plaintiffs' counsel to offer opinions about the voter registration and voter verification processes in Georgia.

This report contains my opinions on these matters. To develop these opinions, I relied upon technical and specialized knowledge I gained from my education, training, and experience; widely accepted and reliable statistical methods; and my knowledge of the academic literature on elections and voting rights. My opinions are based on the review and analysis of the following information and materials:

1. The Georgia statewide voter file, with a last recorded action on December 20, 2019;

2. A list of voters in pending status on February 22, 2018;

3. A list of voters registering between January 2, 2014, and July 24, 2019, who were still in pending status as of July 24, 2019;

4. County files of registered voters as of January 28, 2020, including fields identifying voters in pending status and those in Missing ID Required status;[1]

5. The 2014-2018 American Community Survey;

6. Depositions of Chris Harvey (Director of Elections, Office of the Secretary of State), August 16, 2019 and December 5, 2019; Kevin Rayburn (Deputy Counsel, Office of Secretary of State), December 6, 2019; and Ryan Germany (General Counsel, Office of Secretary of State), December 11, 2019.

7. The academic literature cited in this report.

I conducted all data handling and analysis using Stata/SE v. 15.1

---

[1] Bates numbers STATE-DEFENDANTS-00154046 to 00154204.

## II.    Background and Qualifications

I have a Ph.D. in political science from Yale University, where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego, where I majored in political science and minored in applied mathematics. I have been on the faculty of the political science department at the University of Wisconsin-Madison since August 1989. My curriculum vitae is attached to this report as Appendix A.

All publications that I have authored and published in the past ten years appear in my curriculum vitae. Those publications include the following peer-reviewed journals: *Journal of Politics, American Journal of Political Science, Election Law Journal, Legislative Studies Quarterly, Presidential Studies Quarterly, American Politics Research, Congress and the Presidency, Public Administration Review, Political Research Quarterly*, and *PS: Political Science and Politics*. I have also published in law reviews, including the *Richmond Law Review*, the *UCLA Pacific Basin Law Journal*, and the *University of Utah Law Review*. My work on campaign finance has been published in *Legislative Studies Quarterly, Regulation, PS: Political Science and Politics, Richmond Law Review*, the Democratic Audit of Australia, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My research on campaign finance has been cited by the U.S. Government Accountability Office, and by legislative research offices in Connecticut and Wisconsin.

My work on election administration has been published in the *Election Law Journal, American Journal of Political Science, Public Administration Review, Political Research Quarterly*, and *American Politics Research*. I was part of a research group retained by the Wisconsin Government Accountability Board to review their compliance with federal mandates and reporting systems under the Help America Vote Act, and to survey local election officials throughout the state. I serve on the Steering Committee of the Wisconsin Elections Research Center, a unit with the UW-Madison College of Letters and Science. In 2012, I was retained by the United States Department of Justice to analyze data and methods regarding Florida's efforts to identify and remove claimed ineligible noncitizens from the statewide file of registered voters.

In the past nine years, I have testified as an expert witness in trial, deposition, or report in the following cases:

Federal: *Kumar v. Frisco Independent School District*, No. 4:19-cv-00284 (E.D.

Tex. 2019); *Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Tex. 2019); *Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Tex. 2018); *Dwight, et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga. 2018); *League of Women Voters of Mich., et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich. 2018); *One Wis. Inst., Inc. v. Thomsen* 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012).

State:   *Priorities U.S.A, et al. v. Missouri, et al.,* No. 18AC-CC00226 (Cir. Ct. of Cole Cty., Mo. 2018); *Milwaukee Branch of NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Kenosha Cty. v. City of Kenosha*, No. 11-CV-1813 (Wis. Cir. Ct., Kenosha Cty., Wis. 2011).

Courts consistently have accepted my expert opinions, and the basis for those opinions. No court has ever excluded my expert opinion under *Daubert* or any other standard. Courts have cited my expert opinions in their decisions, finding my opinions reliable and persuasive. *See Priorities U.S.A. v. State,* No. 18AC-CC00226, 2018 WL 6031529, at *3 (Cir. Ct. Cole Cty., Mo. Oct. 23, 2018), *aff'd*, __S.W.3d __, 2020 WL 203129 (Mo. Jan. 14, 2020); *see generally Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 953-54 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 856-58 (E.D. Wis. 2012); *Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 290-91, 297-98 (Wis. 2014); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

I am being compensated at a rate of $350 per hour. I am independent and impartial. My compensation is not dependent on either the substance of my opinion or the outcome of this case.

## III.    Summary of Findings

- At nearly every level, and at every combination of status, no matter when individuals registered, registrants in the pending file are disproportionately minority: this includes registrants in pending status, registrants in "Missing ID Required" (MIDR) status, registrants flagged as noncitizens, registrants who failed the Georgia Department of Driver Services (DDS) or Social Security Administration (SSA) verification process, registrants whose names did not match into DDS or SSA records, and pending registrants who were not moved to the active voter file. The only category of registrants not disproportionately minority are those who are pending because of age.

- The verification process is opaque, subject to a wide exercise of discretion by county registrars, and not uniformly implemented. Staff from the Secretary of State's office did not know all of the details, and their description of the process did not always match the data in the pending or active voter files. The evidence suggests strongly that election officials do not know how the verification process actually operates in practice.

- The verification process, particularly the algorithm for matching names across voter registration and DDS files and the process of flagging potential noncitizens, relies on methods known to produce both false verification failures and false noncitizenship flags. These methods also produce higher verification failure rates and noncitizenship flags for minority registrants compared to non-Hispanic White registrants.

- One noteworthy example of data errors is the following: non-U.S. citizens are eligible for a Georgia driver's license or state ID card if they are legally present in the country (this applies to Real ID as well). If a noncitizen obtains a license or ID, their noncitizenship status at that time is recorded in DDS files. If that person later naturalizes, they are not required to update their information with DDS, but will continue to be flagged as noncitizens by the DDS verification process if they register to vote unless they present naturalization documents at the time they register. According to the 2014-2018 American Community Survey, there were nearly 460,000 naturalized citizens over 18 in Georgia in 2017, over 80% of whom were members of minority groups (only 16.9% were non-Hispanic Whites).

- Georgia has only recently implemented changes to the verification process through HB 316, and the new procedures have yet to be tested in a statewide election. Given the ambiguities and errors in the policies and training materials that I have reviewed, the probability of election-day mistakes and confusion remains very high.

- Claims by election officials that registrants in MIDR status will experience no difference in how they are treated at a polling place are likely incorrect. Based on the testimony of state election officials and materials I have reviewed, I have seen three different descriptions of what MIDR status means: (1) that voters in MIDR status can show any photo ID that qualifies under Georgia's voter ID requirement; (2) that voters will have to show a HAVA-compliant photo ID; and (3) that voters who registered in Georgia for the first time will not have to show a photo ID in order to vote.

- Adding registrants to the active voter file with an MIDR requirement does not eliminate the burden on registrants. It is possible, even likely, that voters, local election officials and poll workers may be confused about what a registrant in MIDR must do in order to vote.

- While the percentages of individuals in the active voter file in MIDR status or pending status is not large (on the order of 1% of registered voters), the absolute number of individuals flagged is not trivial (over 60,000) and will certainly grow larger when registration increases as the March presidential primary and November general election approach.

## IV.    Estimating the Quantity of Interest

The key empirical quantity of interest is the number of otherwise eligible people incorrectly placed in "MIDR" status because their registration information did not exactly match with information in state driver's license files maintained by the DDS or national Social Security files (the "verification" process), or because they were flagged as noncitizens.

Prior to April 2, 2019, registrants who failed the verification process were put in "pending status" and required to provide additional documentation to election officials before being placed on the active voter rolls. Officials in the Secretary of State's office stated in deposition testimony that since that date registrants who fail the verification process were either placed on the active rolls with an "MIDR"

notation (Missing ID Required), or placed in pending status and not added to the voter rolls if they are "flagged by DDS records as potential noncitizens."[2]

The defining character of these registrants is that their voter registration was either held up (prior to April 2, 2019, or afterwards if their citizenship is questioned), or they face an additional administrative step at the polling place (after April 2, 2019), because their registration information did not exactly match records held by either DDS or the United States Social Security Administration (SSA), in an unclear "verification" process that even election officials have difficulty explaining.

These individuals are flagged even if the verification failure was the result of:

- a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error;
- errors made by Georgia election officials manually entering information from paper registration forms;
- incorrect data in the verification files, such as outdated citizenship or name data in Georgia DDS or SSA files;
- differences in data entered for the same individual in voter registration, DDS, or Social Security Administration files, such as a different spelling of a first or last name in the files or a nickname in one file and a formal name in another (e.g., "Rob" in one file and "Robert" in the other).

*All* of these issues are known issues in exact match methods and the use of driver's license files to verify registration and citizenship, and will produce both false non-matches and false matches (see below).

This quantity – the total number of burdened registrants – is not completely and directly observable with the available data. I cannot observe the number of pending registrants who are incorrectly flagged as noncitizens, though I am certain that the number is nonzero.

Similarly, I do not know how many registrants in non-MIDR status were previously in that status but were able to provide additional identification to election officials. I can calculate how many registrants who were in MIDR status in July 2019 had resolved the issue by January 2020.

---

[2] Letter from Bryan Tyson to John Chandler (Aug. 27, 2019).

Moreover, I do not have access to DDS or Social Security Administration data and therefore do not know the specific reason *why* a registrant did not match with these files and is in MIDR status, only that a non-match existed and the general category of the non-match in July 2019.[3] In the July 2019 and February 2018 pending files, some registrants whose data are forwarded to DDS[4] and returned as not matching have separate fields recording whether a match occurred on the first name, last name, date of birth, driver's license number, and social security number and whether they are flagged as potential noncitizens. I do not know if the match failure was the result of a typographical error, nickname, spelling variation, transposition, or other known issue with exact matching algorithms. The Social Security Administration verification process produces only a one-letter code (signifying a match, no match, multiple matches, invalid data, or system error).

Nevertheless, I am able to reach conclusions about the verification process, by analyzing patterns in the pending data and determining how many formerly pending voters were added to the active voter rolls. I am certain that the verification process imposes a burden on eligible individuals by incorrectly flagging citizens as noncitizens, failing to verify individuals because of false non-matches into DDS or SSA files, or errors in the data entry process. The evidence is conclusive that these burdens fall disproportionately on racial or ethnic minority registrants who are members of protected classes of voters under Section II of the Voting Rights Act.

## V.    Lack of Clarity in the Verification Process

The Help America Vote Act (HAVA) requires states to maintain statewide lists of registered voters and implement a process to verify the eligibility of new registrants through state driver's license records or Social Security Administration data. New registrants must either provide a GA driver's license or ID number if they have one, or the last four digits of their social security number. This

---

[3] The February 2018 pending file and the January-July 2019 file use one or more the following categories for pending status: citizenship verification, DDS verification, incomplete address, incomplete DOB, incomplete name, missing information, no signature, pending age, pending hearing, SSN verification, or verification.

[4] This excludes registrants who are listed as having incomplete information, missing address, or a signature.

information is compared (or "matched") to data in DDS or SSA records to verify the identity of those registrants.

States may set their own definitions of what constitutes verification, or evidence that the registrant is in either driver's license or SSA files, including what fields are used and how closely the data across various files must match:

> States have considerable discretion to decide for themselves the criteria to be used for matching, although these criteria cannot be used to disenfranchise legitimate voters. Some states will use fuzzy matching and others exact matching for checking any given data field. States also vary in the fields that they check—for example, some will compare addresses and others will not. In general, some election offices may be using match criteria without sufficient consideration of possible false-positive and false negative error rates associated with different variants of the methods (National Research Council 2010, 67).

Georgia *appears* to use an exact matching process using a registrant's first name, last name, date of birth, and either driver's license number or last for digits of social security number. I use the word *appears* intentionally, as the details of the verification process are not clear, the descriptions given by officials in the Secretary of State's office indicate that even they are not sure how the process operates, and those descriptions do not accurately describe the data in the voter file or whether registrants in pending status are moved to active status.

Based on the descriptions in the depositions of Chris Harvey and Kevin Rayburn, the process appears to involve the following steps:

1. When an individual registers to vote, the voter's first name, last name, date of birth, and either a driver's license/state ID number or last four digits of the social security number are forwarded to DDS. If a voter registers using a paper form, county registrars manually enter the data into the state's "eNet" electronic voter registration system.

2. DDS compares eNet information to its database of driver's licenses and state IDs. If the name, date of birth, ID number and social security number fields do not all *exactly* match the data in the DDS file – meaning every character in every field, including spaces, hyphens and apostrophes – the record is

8

returned as a non-match. A non-match in any field results in a non-match for the record.

3. If a registrant used a Georgia driver's license or state ID number to register and showed the photo-ID to county registrars, a match on the ID number overrides non-matches on name and date of birth fields.[5] It is not clear how often this occurs.

4. A record with a driver's license or ID number that matches in DDS files is flagged if DDS records indicate that the registrant is a potential noncitizen. It does not appear that these records are forwarded to the Social Security Administration to verify citizenship status.[6]

5. For records using the last four digits of a social security number to register instead of a driver's license or ID number, DDS forwards the information to the Social Security Administration (though this does not always appear to happen). SSA returns a code indicating whether a match exists, and whether an individual is flagged as a noncitizen.

6. Based on steps 2-5, DDS informs county registrars whether or not a match exists, and in cases of non-matches which fields did not match (license or ID number, name, date of birth, social security number). DDS also reports whether the registrant is flagged as a potential noncitizen.

7. For registrants failing the verification process, county registrars have discretion in correcting typographical errors and resubmitting to records to DDS, but there is no uniform policy. The data files do not indicate if registrants had their information corrected and resubmitted.

---

[5] Dep. of Chris Harvey, 233:20-235:22 (Aug. 16, 2019): "Okay. Somebody registers to vote and the law requires that they provide their driver's license number, if they have one, or the last four of the social, if they have one. If they don't – if they have one or the other, if they don't provide a driver's license and they provide photo ID when they register to vote, they are automatically registered and active to vote. They still go through the DDS verification. However, by checking they provided ID, it overrides any DDS failure that might happen."
[6] In the July 2019 pending file, 2,655 registrants were flagged by DDS as noncitizens. Only 22 (0.8%) have an SSA response code, and all failed verification with a code of "invalid input data."

8. Registrants who fail the verification process (post April 2, 2019) are added to the active voter rolls and flagged with MIDR (Missing ID Required).

9. Registrants who are flagged as noncitizens by either DDS or SSA must provide documentation of citizenship before they are added to the active voter rolls.

The keys in this process are (1) the definition of what constitutes a "match" into driver's license or Social Security data, and how often false verification failures occur; (2) how often false noncitizen flags occur; and (3) the precise implications of being in MIDR status.

In requiring that records submitted for verification match all fields (first name, last name, date of birth, license number, or social security number), Georgia imposes a strict match definition that is *guaranteed* to produce false non-matches, false noncitizen flags, and erroneous verification failures.

Even so, the precise details of how the matching process operates is unclear. In depositions, staff of the Georgia Secretary of State Office gave conflicting information about the process and were not always sure about how it worked. For example, one official said that a mismatched space character between DDS and voter registration records would trigger a non-match.[7] Another said he was not sure.[8] The General Counsel did not know whether a hyphen in one data set but not the other would result in a verification failure.[9] The Director of Elections testified that matching is done on "last name, first name, date of birth, and last four of social,"[10] but the General Counsel testified that the match is only done on the first letter of the first name (and that some counties were using the entire first name).[11] There are no indications that either county registrars or DDS take any steps to standardize name fields or remove nonalphanumeric characters. It appears that the actual matching is conducted within DDS.

---

[7] Dep. of Chris Harvey, 244:1-16 (Aug. 16, 2019).
[8] Dep. of Kevin Rayburn, 187:13-188:15 (Dec. 6, 2019).
[9] Dep. of Ryan Germany, 146:4-22 (Dec. 11, 2019).
[10] Dep. of Chris Harvey, 238:7-18 (Aug. 16, 2019).
[11] Dep. of Ryan Germany, 143:24-144:23 (Dec. 11, 2019).

Changes to the verification process (via HB 316, which went into effect on April 2, 2019)[12] do not eliminate the burden on affected individuals. As I explain below, registrants who do not have a photo ID will be placed in MIDR status if they fail the verification process. Moreover, registrants remaining in pending status because of outdated citizenship information in DDS files are required to present evidence of citizenship before being permitted to vote. As far as I am able to determine, neither DDS nor the Secretary of State's Office attempts to obtain updated naturalization data before placing a registrant in pending status.

## VI.    The Data Used for Verification Are Not Suited to "Exact Matching"

The Georgia Secretary of State relies on "exact matching" to verify voter registrations. While the precise nature of that process, as I noted above, is opaque, the available evidence is that it requires voter registration information (first name, last name, birthdate, and either driver's license number or last four digits of the social security number) to match character-for-character to entries in either DDS driver's license files or federal Social Security Administration files.

This is an example of data linkage – attempting to match a record in one data set to a record in a second data set, in an effort to link data about the same entity, usually an individual, who is in both data sets. The process is also referred to as data matching or data merging. In the present instance, information about an individual in the voter registration files – last name, first name, data of birth, driver's license number, and the last for digits of a social security number – is linked to data in DDS files or SSA files, in a process designed to verify that an individual registering is the *same individual* in either the DDS or SSA files, and obtain citizenship information about that individual.

Data linkage is straightforward when there is a unique identifier for each individual in both data sets (Christen 2012, 5). A classic example is a full nine-digit Social Security number (SSN), which is unique for each person.[13] In this case, assuming that the full number is accurately recorded in both data sets, we are certain that the individual with an SSN in one data set is the same individual with that SSN in the other. The links between the two data sets are direct and unambiguous, as long as no errors exist in the identifiers.

---

[12] http://www.legis.ga.gov/legislation/en-US/Display/20192020/HB/316 (last visited Feb. 13, 2020).
[13] https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (last visited Feb. 13, 2020).

11

In the data sets linked in the voter verification process, however, there is no unique identifier in both data sets. While voters using their Georgia driver's license or DDS ID card will have their license number in both files, not every voter who registers will have a Georgia driver's license or, if they have one, use it for registration or display it to county registrars (something that purportedly overrides match failures on other fields).[14] The last four digits of a social security number will not be unique, even when combined with the date of birth.

### A.    Voter Verification Through Exact Matching Is Certain to Produce Errors

When no unique identifier is present in both linked data sets, linkage requires some combination of other attributes available in both data sets. Two immediate problems are that there may not be an available combination of data attributes that is unique, or there may be differences in data formats in the two data sets, either of which will complicate efforts to match fields. Both of these problems exist in the process of linking voter registration data to DDS or SSA data.

The two types of errors in data linkage are false matches, when an individual in one data set is linked to a different individual in the other; and false non-matches, when an individual present in both files is not linked, because of a difference in data attributes between the files or an error in how the data are recorded. In voter verification, false non-matching is the more important problem, since it will result in an eligible registrant being placed in MIDR status.

Exact-match linkage using combined data attributes is likely to produce false non-matches, particularly when alphanumeric data are used, and even more likely when *names* are used. Numeric data attributes have only 10 character options (0-9), have no non-alphabetical characters (dashes, spaces, apostrophes), and are relatively short in the case of Georgia driver's licenses (nine digits) and voter registration numbers (a maximum of eight digits). A Georgia driver's license or voter registration number that has a nonnumeric character is immediately and obviously recognizable as erroneous.

---

[14] Under the Help America Vote Act, individuals who do not use their driver's licenses to register may use the last four digits of their social security number. The 9-digit Georgia driver's license number is a unique identifier.

In contrast, name fields are unstandardized, can be long, may contain non-alphanumeric characters, can vary over the course of an individual's life, and frequently differ in various data sets even for the same individual:

> All these issues make data matching or deduplication using personal names a challenging undertaking, because the name values for the same individual might differ across two databases, or even within a single database. In our increasingly multicultural world where people are more mobile than ever before, where international travels and living in a country different to one's home country are common, and with the globalisation of businesses, the appropriate cleaning and standardization of names in databases used for data matching are crucial components to achieve accurate matching results (Christen 2012, 44).

The result is that exact matching will incorrectly result in registrants not matching into DDS and SSA data because of minor differences in spelling, formatting, or errors. The burden will fall most heavily on individuals without a Georgia driver's license or ID. License and ID possession rates among minority populations are lower than for non-Hispanic Whites, both generally (Stewart 2013, 25) and in Georgia (Hood and Bullock 2008).

Shortly after HAVA went into effect, an audit conducted by the Social Security Administration highlighted flaws in matching processes – particularly exact match – used to verify voter registrations. In 2009, the Social Security Administration's Office of the Inspector General identified problems in the Help America Vote Verification (HAVV) system:

> Our review found the HAVV program did not always provide States with accurate verification responses for individuals who were registering to vote. We determined the HAVV program had a significantly higher no-match response rate when compared to other verification programs used by States and employers. HAVV's no-match response rate was 31 percent, while the no-match response rate for other verification programs used by States and employers ranged from 6 to 15 percent. Additionally, we determined the HAVV program did not provide consistent verification responses to the States when the same applicant data were entered into the program. For example, States were provided responses for at least 356 applicants that initially indicated a match response but subsequently the States were provided a no-match response when the same data (name, SSN, DoB, and last four digits of the SSN) were entered into the verification program (SSA OIG 2009, 4).

The analysis noted that one reason for high non-match rates was the use of exact matching, which "may indicate a no-match when a match does in fact exist in SSA records." *Id.*[15]

A 2004 audit of New York City registration record found that 20% of records in voter registration files failed to match into state driver's license files because of typographical errors by election officials (Levitt, Weiser, and Muñoz 2006, 4-5).

Data from the Social Security Administration show that since January 2011, over half (53.4%) of records sent by the state of Georgia failed to match into the SSA database using name, date of birth, and last four digits of the social security number.[16]

The result is that a high percentage of verification failures using DDS or SSA data are likely to be false non-matches, and incorrectly flag individuals as not verified when they are in fact present in the verification data.

### B.   The Pending Files Contain Name Mismatches for the Same Individuals

To give a clear example of how exact matching on name fields produces false non-matches, I linked the two pending files (Pending February 2018, and Pending January 2014 to July 24, 2019) to identify every individual in both, using the unique voter registration number as the identifier. 5,543 individuals were in both files. For each merged record I have all fields in both files, including the first name and last name entered in both data sets. All of the information in both files should be identical for each individual: we know that they are the same person, all information was entered via the same processes, and the data are used for the same purposes.

---

[15] The HAVV matching process "does not allow flexibility with matching and DoB to its records to compensate for typographical errors, other common database errors, and mistakes because it does not use the full SSN. Because of the limitations of the matching criteria established by the legislation, HAVV may be provided a high number of false negative responses to the States, which may lead to applicants having difficulty while registering to vote" (SSA OIG 2009, 5).

[16] https://www.ssa.gov/open/havv/#representation (last visited Feb. 13, 2020). Data are in the downloadable spreadsheet HAVV-running-list.xlsx.

Yet even in these files, which consisted of the same underlying data, there were *still* records in which first or last names for the same person did not match between the two files. Some involved trivial differences between the two files in spelling ("Malaya" and "Melaya"; "Jenkins" and "Jankins"), apostrophes in one file but not the other ("ONeal" and O'Neal"), middle names added to the first name field, name changes, and obvious typographical errors. However, even though we know that these are in fact the same people because they have the same unique voter registration number, matching methods using exact matches on names failed to link them.

The number of non-matching names is not large (a total of 19 out of 5,543), but nevertheless demonstrates that even in databases based on the same underlying data, false non-matches still occur when exact matching is used.

Of the 19 false non-matches on first or last name, 89% belong to minority groups (eight are African American, four are Asian, four are Hispanic, and one is Other/two or more). Only one is non-Hispanic White.

## C. <u>Alternatives to Exact Matching</u>

The problems with exact matching methods in the absence of unique identifiers are well known (Christen 2012; Enamorado, Fifield, and Imai 2019). The method is especially inappropriate in the context of voter registration, when an incorrectly unmatched record places a burden on a registrant to provide additional documentation and may impede the ability to vote.

The Electronic Registration Information Center (ERIC), an organization that helps participating states track registrants who move to another state, uses a "contextual" matching algorithm that allows for small and predictable variations in names, birthdates, and addresses. For example, in Washington the Department of Licensing (DOL) requires full legal names, while voter registration forms permit people to use nicknames. An internal matching process would probably make mistakes in linking people who provide different name variants to different agencies, while the ERIC technology is better able to account for such disparities. State officials lack the time and resources to connect such records by hand, so they appreciate that ERIC's contextual matching process will identify matches even when names are not identical across files (Bland and Burden 2013, 22).

## VII.  Composition of Electorate

Table 1 shows the breakdown of active Georgia registrants, as of December 30, 2019 by race.[17]

| Table 1 | | |
|---|---|---|
| Active Registrants, December 2019 | | |
| **Race** | **Number of Active Registrants** | **% Active Registrants** |
| **White Non-Hispanic** | 3,594,048 | 52.9% |
| **African American** | 2,011,116 | 29.6% |
| **Hispanic** | 224,119 | 3.3% |
| **Asian or Pacific Islander** | 161,944 | 2.4% |
| **Other/2 or More** | 113,878 | 1.7% |
| **Unknown** | 693,383 | 10.2% |
| **Total** | 6,798,488 | 100 |

These totals are based on self-identification by registrants at the time they register.[18] The largest demographic group consists of non-Hispanic White registrants (52.9% of all registrants), followed by African Americans (29.6%), Hispanics (3.3%) and Asians (2.4%). Minorities comprise 36.9% of registered voters.[19]

---

[17] The January 2020, aggregation of county files produce nearly identical data, and the differences between the two are not material.

[18] The 10.2% of registrants who do not record their race on the registration forms do not affect any substantive conclusions, as nondisclosure is not related to the underlying demographics of registrants.

[19] There is no relationship between the percentage of registrants of unknown race and the underlying demographics of a geography, so this figure does not affect any of my substantive conclusions.

I use this breakdown of active registrants as a baseline, to analyze the effect of administrative processes on the racial composition of other aggregations of registrants.

## VIII. **Characteristics of Pending and MIDR Registrants**

I received 159 separate files, one from each county, containing all registered voters, their status, and whether they were flagged as MIDR status. Combining them in to a single statewide file permits the calculation of summary statistics for the entire state.

### A. **Pending Registrants**

Excluding those under 18, registrants in pending status have the following demographic characteristics:[20]

| Table 2 Pending Registrations, January 2020 Excluding Pending Age | | |
|---|---|---|
| Race | Number | Percent |
| African American | 1,847 | 39.4% |
| White Non-Hispanic | 688 | 14.7% |
| Hispanic | 719 | 15.3% |
| Asian or Pacific Islander | 789 | 16.8% |
| Other/2 or More | 220 | 4.7% |
| Unknown | 425 | 9.1% |
| Total | 4,688 | 100% |

It is immediately apparent that voters in pending status are disproportionately minority compared to the overall composition of active registrants. Only 14.7% of

---

[20] This includes registrants whose status is listed as either "Pending" or "Pending Verification."

pending registrants are non-Hispanic White, a rate far below their share of active registered voters (52.9%). Over three-fourths of those in pending status are members of minority groups (76.3%), far exceeding the share of overall minority registrants (37.0%). Hispanic and Asian registrants are massively overrepresented among pending voters: while these groups comprise only 5.7% of active registrants, they make up 31.2% of registrants in pending status.

Excluding those under 18, most registrants in pending status (65.6%) have failed citizenship verification. Most of the remaining 34.4% are in pending status because of missing information. 5.8% of nonactive registrants are recorded as "Pending Verification" status, with no specific reason given for that status.

### B.    Registrants in MIDR Status

Post HB 316, registrants who fail the verification process should be added to the voter rolls in active status with an MIDR (missing ID required) flag. Registrants in MIDR status have the following demographic characteristics:[21]

| Table 3 Registrants in MIDR Status | | |
|---|---|---|
| Race | Number | Percent |
| African American | 41,946 | 69.4% |
| White Non-Hispanic | 6,878 | 11.4% |
| Hispanic | 3,432 | 5.7% |
| Asian or Pacific Islander | 1,968 | 3.3% |
| Other/2 or More | 2,043 | 3.4% |
| Unknown | 4,210 | 7.0 % |
| Total | 60,477 | 100 |

---

[21] Because the quantity of interest here is the total number of registrants who are flagged, and who face additional identification requirements, I include both active and pending registrants, as well as those under age 18.

Here as well, MIDR registrants are disproportionately minority. African Americans make up over 2/3 of registrants in MIDR status, well over twice their percentage of all registrants (29.6%). Hispanic and Asian registrants are also overrepresented in this group. Non-Hispanic White registrants, who comprise over half of all registrants, make up only 11.4% of MIDR registrants.

The differences become even more stark if we examine the *rate* at which registrants are in MIDR status. Table 4 shows the results for each racial or ethnic group (with the percentage calculated as the number of registrants in MIDR status for each group divided by the total number of registrants in that group):

| Table 4 Likelihood of MIDR Status Statewide | |
|---|---|
| Race | Percentage of Registrants in MIDR Status |
| African American | 2.03% |
| White Non-Hispanic | 0.19% |
| Hispanic | 1.50% |
| Asian or Pacific Islander | 1.19% |
| Other/2 or More | 1.71% |

Minority registrants are between 6 and 10 times more likely to be in MIDR status than non-Hispanic White registrants.

A key question is what happens when a registrant in MIDR status presents at the polls. Director of Elections Chris Harvey testified that MIDR status in fact does not trigger any additional process, because all voters must present a photo ID that qualifies under Georgia's voter ID statute. [22] But there are reasons to doubt this. According to Harvey and training materials created by the Secretary of State's office, a person who registers without providing a Georgia driver's license or state-

---

[22] Dep. of Chris Harvey 235:3-22 (Aug. 16, 2019).

issued ID card, and who fails the verification process by failing to exactly match into either DDS or SSA files is placed in MIDR status as an active registrant.[23] While officials claim that voters in MIDR status will see no difference in treatment at the polls, the data offer little confidence that this is actually true. The HB 316 regime has not been tested in a statewide election, and there appears to be confusion among officials about the difference between a person who registers by mail without providing ID, and someone who registers *in person* without showing ID. In addition, the academic literature on election administration establishes that the exercise of discretion by administrative personnel adversely affects non-white individuals.

For example, a June 27, 2019 3T Webinar presented by Melanie Frechette, Elections Training Administrator in the Secretary of State's Office provided an example of a post-HB 316 MIDR letter that will be sent to voters who fail the verification process (those who are in MIDR status). However, the slide that presents this information – Titled "SPECIAL TOPICS OF THE MONTH – Verification Changes due to HB 316" – displays a letter that refers specifically to a voter who registered for the first time in Georgia by mail without providing an ID, *not* to a voter who attempted to register in person but who failed the verification process.

## C.    Registrants Flagged as Noncitizens

The main reason registrants are placed in pending status – and considered not registered – is because they appear in DDS or SSA records as noncitizens. Noncitizens rarely register to vote, and claims of widespread illegal registration by noncitizens invariably turn out to be wildly exaggerated.

Georgia permits noncitizens legally present in the U.S. to obtain a driver's license or state ID, (in fact, noncitizens who establish residency in Georgia are required to obtain a license).[24] An applicant's citizenship status is recorded at the time and does not update if the applicant later naturalizes unless the naturalized citizen self-reports to DDS. The use of driver's license files to screen for citizenship is well-

---

[23] These individuals would have to provide the last four digits of their social security number in order to register.

[24] https://dds.georgia.gov/information-non-us-citizens (last visited Feb. 13, 2020).

known to produce false noncitizenship flags (with error rates that approach 100%).[25]

In the January 2020, voter files, 3,073 registrations were in pending status because of a citizenship flag. These registrants have the following demographic characteristics:

| Table 5 Registrants in Pending Status Flagged as Noncitizens | | |
|---|---|---|
| Race | Number | Percent |
| African American | 972 | 31.6% |
| White Non-Hispanic | 400 | 13.0% |
| Hispanic | 642 | 20.9% |
| Asian or Pacific Islander | 714 | 23.2% |
| Other/2 or More | 159 | 5.2% |
| Unknown | 186 | 6.1% |
| Total | 3,073 | 100 |

The voter file does not indicate which of these registrations failed DDS citizenship verification, and which failed SSA verification. However, I can draw inferences from the earlier files of voters in pending status, which do show the results of DDS and SSA verification.

The file "Pending January 2014 to July 24 2019," contains registrants in pending status prior to the date when registrants failing DDS verification were added to the active rolls in MIDR status. It includes data on the results of DDS and SSA verification, and whether a registrant was flagged as a noncitizen.

[25] In 2012, the State of Florida officials claimed that 182,000 noncitizens were registered to vote, relying on citizenship data in driver's license files. In the end only 40 registrants were ultimately identified as noncitizens (almost certainly the result of administrative error or confusion), an error rate of 99.98% (Weiner 2020).

There are 2,920 registrants in this file who are recorded as noncitizens. Of these, only 22 were identified through the Social Security Administration Data. Over 99% of noncitizen flags were generated using DDS data.

While I do not have information on which of these individuals flagged for noncitizenship were, in fact, citizens, and were incorrectly flagged because of outdated DDS information, the number is certain to be nonzero.[26] Georgia has a large population of naturalized foreign-born US citizens, many of whom may have obtained a driver's license or ID card before they naturalized.

According to the 2014-2018 5-year American Community Survey, there are 457,179 voting age naturalized citizens living in Georgia. These citizens have the following demographic characteristics:

| Table 6 Voting Age Population, Naturalized Foreign Born 2014-2018 American Community Survey | | |
|---|---|---|
| | Number | Percent |
| African American | 105,324 | 23.0% |
| White Non-Hispanic | 77,488 | 16.9% |
| Hispanic | 95,735 | 20.9% |
| Asian or Pacific Islander | 141,580 | 31.0% |
| Other/2 or more | 37,052 | 8.1% |
| Total | 457,179 | |

---

[26] There is an option in eNET that allows a registrar to override citizenship verification if a registrant presents citizenship documentation at time of registration. I do not have data on what percentage of naturalized citizens provide such documentation.

### D.    Registrants in Pending Status for Reasons Other than Citizenship Verification

1,343 registrants are in pending status for reasons other than citizenship verification, usually because of missing information or a lack of signature. These registrants have the following demographic composition:

| Table 7 Registrants in Pending Status for Reasons Other than Citizenship Verification | | |
|---|---|---|
| Race | Number | Percent |
| African American | 751 | 55.9% |
| White Non-Hispanic | 209 | 15.6% |
| Hispanic | 62 | 4.6% |
| Asian or Pacific Islander | 40 | 3.0% |
| Other | 54 | 4.0% |
| Unknown | 227 | 16.9% |
| Total | 1,343 | 100 |

Again, the effects of this measure of pending status falls most heavily on minority registrants. Over half are African American (55.9%), and over two thirds (67.5%) are members of minority groups. Only 15.6% are non-Hispanic White.

### E.    Pending to Active Status

In the file of individuals in pending status as of July 2019, 3,672 were listed as MIDR and 2,671 were pending because of a noncitizenship flag. By merging the pending file with the January 2020 statewide aggregation of county files using registration numbers, I can identify those registrants who were able to resolve their identification or citizenship status.

23

Of the 3,672 MIDR pending registrants in July 2019, only 429 – 13% – had provided identification to registrars and were restored to active non-MIDR status by January 2020.

Of the 2,671 registrants who were pending in July 2019 because of a noncitizenship flag, only 630 – 23.6% – had been restored to active status by January 2020. An additional 1,032 individuals who were not in the July 2019 pending file, most of whom attempted to register after June 1, 2019, remained in pending status because of citizenship verification.

**F.    Summary**

When combined, these data show a compelling pattern (table 8). Without exception, minority registrants are disproportionately present in every category of pending or MIDR status. In some cases, the disparities are stark:  Asian and Pacific Islanders comprise only 2.4% of all active registrants, but are 16.8% of pending voters and 23.2% of registrants flagged as noncitizens. Hispanic registrants are 3.3% of all active registrants, but are 15.3% of pending registrants and 20.9% of registrants flagged as noncitizens. African Americans are 29.6% of active registrants, but are 69.4% of those in MIDR status and 55.9% of those in pending status for reasons other than citizenship verification.

Non-Hispanic Whites make up over half of all registrants, but are only 14.7% of pending, 13.0% of flagged noncitizens, 11.4% of MIDR status, and 15.6% of pending for reasons other than citizenship verification.

24

| Table 8 Summary of Data on Registration, Pending, and MIDR Status | | | | | |
|---|---|---|---|---|---|
| Race | All Active Registrants | Pending | MIDR | Flagged Noncitizen | Pending for Other Reasons |
| African American | 29.6% | 39.4% | 69.4% | 31.6% | 55.9% |
| White Non-Hispanic | 52.9% | 14.7% | 11.4% | 13.0% | 15.6% |
| Hispanic | 3.3% | 15.3% | 5.7% | 20.9% | 4.6% |
| Asian or Pacific Islander | 2.4% | 16.8% | 3.3% | 23.2% | 3.0% |
| Other/ 2 or More | 1.7% | 4.7% | 3.4% | 5.2% | 4.0% |
| Unknown | 10.2% | 9.1% | 7.0% | 6.1% | 16.9% |

## IX.    Data Errors and Potential Nonuniform Administration

It is apparent that the voter registration data contain errors. To give some examples from the December 30, 2019, voter file:

- Eight records have a date added value of January 1, 1900.
- One record has a date changed value of September 21, 2021.
- Seven records have a registration date recorded in the year 1900.
- 28 records have birthdate occurring after the registration date
- 1,857 records have a birthdate of 1901 or earlier, including 17 with a birthdate in 1800.
- 203 records have a registration date recorded after the last contact date.

The January 2020 voter files from Georgia counties did not include a birth year field, but contain 14 records with a registration date of January 1, 1901 or earlier (including one with a registration date of October 11, 520).

25

Large data sets almost inevitably contain some errors, but these are immediately obvious and should be caught. According to Ryan Germany, General Counsel of the Elections Division in the Secretary of State's Office, it is not possible for the voter file to record a registration date after a "last contact date" (the last contact date should be updated when registration occurs), because internal validity checking would prevent it.[27]

What this indicates is a degree of administrative error in the registration process, ineffective and lax data checking protocols, and a lack of familiarity among agency heads about how their internal procedures actually operate.

A second inference that I draw from the data is that administration is not uniform across the state. If registration requirements and verification processes are administered uniformly, we would expect to see regularity across the state in the probabilities that registration are placed in pending or MIDR status. If, however, there were differences in how county officials handle registrations – by, for example, adopting different practices for identifying and correcting typographical errors in applications – there may be large variation in these probabilities between counties.

The testimony of election officials in the Secretary of State's office leads me to conclude that there will in fact be differences across counties – the geographic administrative unit responsible for voter registration and election administration. Chris Harvey, the State Elections Director, noted that county election officials

---

[27] In his December 2019 Germany said the following:
"I'm not sure exactly what fields are included on the list that we – so when we ask our vendor to create the list, there's a field in eNet that says Last Contact. So you use that date. So, you know, if that last [contact] date is after whatever the date would be, then the process shouldn't pick up that voter. So that's one of the checks is to make sure the process did what it was supposed to do, that it didn't pick up any other voters. And the other checks we run are to make sure that a contact date is accurate. So I think checks that have been run in the past have been like well, *you can't have a – this is – I might not get this exactly right. You can't have a registration date after your contact date. To us, that would be a sign that something didn't work properly. So we run checks like that to make sure that the logic makes sense and that the process is working correctly.*" (emphasis added). Dep. of Ryan Germany, 39:3-40:4 (Dec. 11, 2019).

might – or might not – correct typographical errors in voter registrations that failed the verification process and resubmit them.[28]

The academic literature on election administration has authoritatively established that implementation of election laws varies considerably even in the same jurisdictions, frequently in ways that are biased against minority voters (Atkeson, et al. 2009; Cobb 2012; Page and Pitts 2009; Porter and Rogowski 2018; Tokaji 2004; White, Nathan and Faller 2015). There is every reason to expect a degree of variation and inconsistency between Georgia counties in how voter registration and election administration is conducted, and to expect that this discretion will result in discrimination against voters of color.

One possible reason for variation is that training materials provided to county election officials include some basic errors. For example, the Georgia Registration Official Certification Registrar Course No. 4 (Registration Basics), which is intended to "server (*sic*) as the foundation to build on your legal and procedural expertise of (*sic*) the process of voter registration,"[29] sets out the qualifications of an elector in Georgia:

---

[28] Dep. of Chris Harvey, 241:4-242:3, 243:3-24 (Aug. 16, 2019).
[29] GROC Registrar Course No. 4, *Registration Basics*, slide 4, STATE-DEFENDANTS-00008401.

To register to vote in the state of Georgia, an elector must be:

- A resident of this state and of the county or municipality in which he or she seeks to vote
- A citizen of this state and of the United States
- At least 17 ½ years of age[30]

This information is incorrect, as "[a] citizen of [Georgia]" is not a meaningful term. While this might mean "[a] *resident* of this state and a citizen of the United States," the residency requirement is specified immediately above this line and defined elsewhere in the training materials. Whether these errors reflect a fundamental misunderstanding of the law or are typographical mistakes, the fact that such misinformation is provided in training documents indicates a lack of rigor in how materials are vetted and how local election officials are trained.[31]

Further, the voter data suggest inconsistent administration. While the numbers are not large, in the January 2020 voter file 22 registrants are in pending status because of a "pending hearing" (no further explanation is provided). This could be the result of a provision in Georgia law (O.C.G.A. § 21-2-229) that allows a registrant to challenge the eligibility of another registrant in the same county. Such a challenge can trigger a hearing held by county registration officials. Nearly all of the registrants in this status (21 out of 22) are in Walton County, and 13 of these are in a single municipality (Monroe).[32] The fact that there are no "pending

---

[30] *Id.*, slide 5.

[31] In addition, the information in this slide differs from the requirements specified on the Georgia Secretary of State voter registration page:  In order "[t]o register to vote you must:

- Be a citizen of the United States
- Be a legal resident of the county
- Be at least 17 1/2 years of age to register and 18 years of age to vote
- Not be serving a sentence for conviction of a felony involving moral turpitude
- Have not been found mentally incompetent by a judge"

https://sos.ga.gov/index.php/Elections/register_to_vote (last visited Feb. 13, 2020).

[32] The other "pending hearing" registrant is in Barrow County.

hearing" registrants anywhere else in the state is suggestive of atypical administrative practices in these areas.

The geographic distribution of voters in MIDR status also suggests uneven application of registration laws at the county level. More than 2/3 of MIDR status registrants (69.5%) are in five counties that contain less than one-third of all registrants.[33] The highest rate of voters in MIDR status (Fulton County, 3.22%) is 135 times larger than the lowest rate (Treutlen County, 0.024%).

Figure 1 shows the county-level percentage of voters in MIDR status plotted by the percentage of registrants who are non-Hispanic White. The size of each circle is proportional to the overall number of registrants in each county. The data show a clear pattern: counties with higher percentages of non-Hispanic White registrants are much less likely to place voters in MIDR status. Once the percentage of registrants who are non-Hispanic White exceeds 60%, MIDR rates virtually disappear. With the exception of one very small county (Chattahoochee County, which has 3,480 registrants), every county with a MIDR rate greater than 1% is majority-minority.



Figure 1
Percentage of Registrants in MIDR Status
By County

---

[33] Fulton, DeKalb, Clayton, Gwinnett, and Chatham Counties.

Figure 2 plots the percentage of registrants in each county in pending status against the percentage of registrants who are non-Hispanic White. The relationship between the racial composition of a county and the rate of pending registrations is apparent here as well. With the exception of a handful of small counties, the rate of pending registrations increases as the percentage of African American registrants goes up.



Figure 2
Percentage of Registrants in Pending Status (excl. age)
By County

### G.    Conclusions

These data tell a clear story.

- The Georgia verification process is premised on a flawed methodology known to produce inaccurate results. By requiring exact matching on multiple fields in DDS and SSA data, the verification process *guarantees* that otherwise qualified voters will be flagged as MIDR because of outdated information and incorrect verification failures These failures occur even if the failure to match was the result of mistakes by registration officials, or due to errors in the underlying data.

- The use of DDS data to verify citizenship will result in eligible voters being inaccurately flagged as noncitizens, because of outdated information in DDS files.

- No matter how the data are aggregated, the verification process disproportionately affects minority registrants, who are more likely to have their registration placed in pending status; more likely to be flagged as noncitizens; and more likely to be in MIDR status. The rates at which minority registrants are placed in MIDR, pending, or noncitizen status are up to 10 times higher than the rates for non-Hispanic White registrants.

- The rates at which registrants are placed in MIDR and pending status vary widely by county, suggesting nonuniform implementation of administrative practices. The election administration literature has repeatedly demonstrated that election rules are not applied neutrally, and that discriminatory application against minority voters and registrants is commonplace.

- Invalid and obviously incorrect data values in the voter files – including mistakes that should not be possible – indicate administrative errors and failure to verify data.  To the extent that the verification process relies on these entries, it will result in verification  failures that are not the fault of the registrant.

- The data suggest that officials in the Secretary of State's office do not understand their own policies and procedures. These officials could not fully describe the matching process used in verification, and their description of how registrants were moved from pending to active status post-HB 316 did not always match the data in the pending and active files. The training materials I reviewed contain inaccurate and ambiguous information that will likely lead to errors in election administration.

## Sources

Ansolabehere, Stephen and Eitan D. Hersh. 2017. "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name." *Statistics and Public Policy* 4:1-10.

Atkeson, Lonna Rae, Lisa A. Bryant, Thad E. Hall, Kyle L. Sanders, and R. Michael Alvarez. 2009. "A New Barrier to Participation: Heterogenous Application of Voter Identification Policies." *Electoral Studies* 29:66-73.

Bland, Gary and Barry C. Burden 2013. *Electronic Registration Information Center (ERIC) State 1 Evaluation.* Report to the Pew Charitable Trusts. December 13.

Christen, Peter. 2012. *Data Matching: Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection.* New York: Springer-Verlag.

Cobb, Rachel V. 2012. "Can Voter ID Laws Be Administered in a Race-Neutral Manner? Evidence from the City of Boston in 2008." *Quarterly Journal of Political Science* 7:1-33.

Enamorado, Ted, Benjamin Fifield, and Kosuka Imai. 2019. "Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records." *American Political Science Review* 113:353-371.

Hood, M.V. III and Charles S. Bullock III. 2008. "Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36:555-579.

National Research Council. 2010. *Improving State Voter Registration Databases: Final Report.* Washington, DC: National Academies Press. https://doi.org/10.17226/12788.

Page, Anthony and Michael J. Pitts. 2009. "Poll Workers, Election Administration, and the Problem of Implicit Bias." *Michigan Journal of Race & Law* 15:1-56.

Porter, Ethan and Jon C. Rogowski. 2018. "Partisanship, Bureaucratic Responsiveness, and Election Administration: Evidence from a Field

Experiment." *Journal of Public Administration Research and Theory* 28:602-617.

Social Security Administration, Office of the Inspector General. 2009. *Quick Response Evaluation: Accuracy of the Help America Vote Verification Program Responses*. A-03-09-29115. June. Cited as (SSA OIG 2009). https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-03-09-29115.pdf

Stewart, Charles III. 2013. "Voter ID: Who Has Them? Who Shows Them?" *Oklahoma Law Review* 66:21-52.

Tokaji, Daniel P. 2004. "Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act." *George Washington Law Review* 73:1206.

Weiner, Rachel. 2012. "Florida's Voter Purge Explained." *Washington Post*, June 18.

White, Ariel R, Noah L. Nathan, and Julie K. Faller. 2015. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *American Political Science Review* 109:129-142.

# APPENDIX A

## Kenneth R. Mayer

Department of Political Science
Affiliate, La Follette School of Public Affairs
110 North Hall / 1050 Bascom Mall
University of Wisconsin – Madison
Madison, WI 53706

Phone: 608-263-2286
Email: krmayer@wisc.edu

**Education**

Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

**Positions Held**

University of Wisconsin, Madison. Department of Political Science.
  Professor, July 2000-present.
  Associate Professor, June 1996-June 2000.
  Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra, ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994. Conducted study of acquisition reform, and the effects of acquisition policy on the defense industrial base. Performed computer simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986. Responsible for cost and price analysis, contract negotiation, and contract administration for aerial target missile programs in the $5 million - $100 million range.

**Awards**

American Political Science Association, State Politics and Policy Section. Award for best Journal Article Published in the *American Journal of Political Science* in 2014. Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting. Awarded for Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award. Awarded by the Presidency Research Group of the American Political Science Association, for the best book published on the American presidency in 2001. Awarded for *With the Stroke of a Pen: Executive Orders and Presidential Power.*
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student Association, March 1992.
Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

**Service as an Expert Witness**

*The Andrew Goodman Foundation v. Bostelmann*, No. 19-cv-955 (W.D. Wisc.), voter ID (2020)

*Suresh Kumar v. Frisco Independent School District et al.*, No,4:19-cv-00284 (E.D. Tex.), voting rights (2019)

*Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Texas), voting rights (2019).

*Dwight et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).

*Priorities U.S.A.et al. v. Missouri et al.,* No. 19AC-CC00226 (Circuit Court of Cole County, MO), voter ID (2018).

*Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Texas), voting rights (2018).

*League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich.), redistricting (2018).

*One Wisconsin Institute, Inc., et al. v. Nichol, et al.*, 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).

*Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).

*Milwaukee NAACP et al. v. Scott Walker et. al*, N.W.2d 262 (Dane County WI Circuit Court), voter ID (2012).

*Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).

*County of Kenosha v. City of Kenosha,* No. 22-CV-1813 (Kenosha County WI Circuit Court) municipal redistricting (2011).

*McComish et al. v Brewer et al.*. 2010 WL 2292213 (D. Ariz.), campaign finance (2009).

*Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).

**Grants**

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin." Dane County (WI) Clerk, $44,157. November 2016-December 2017. Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

"How do You Know? The Structure of Presidential Advising and Error Correction in the White House." Graduate School Research Committee, University of Wisconsin, $18,941. July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs." $43,234. Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI). October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute. September 2009-December 2010. $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008- September 2009. Pew Charitable Trusts. $49,400. With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188. January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY. $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy? Evaluating the State of Knowledge." JEHT Foundation, New York, NY. $42,291. October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?"
Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information
Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499.
April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services,
University of Wisconsin. $5,000.  March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens'
Research Foundation, Los Angeles, CA, $2,000.  May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science
Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School
Research Committee, University of Wisconsin, $21,965.  Additional support provided by the
Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S.
Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M.
Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein).  June 1993-
January 1995.  $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin
(with John M. Wood). 1992.  $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995.
National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee
at the University of Wisconsin, $2,600.  MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500

**Professional and Public Service**

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair,
Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide
speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).

Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).

Chair, Blue Ribbon Commission on Clean Elections (Madison, WI), August 2007-April 2011.

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana,
Minnesota, and Wisconsin, 2006-2011.

Section Head, Presidency Studies, 2006 Annual Meeting of the American Political Science
Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December
2009.

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political
Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board,
September 2002-present.

Book Review Editor, *Congress and the Presidency*, 2001-2006.

Editorial Board, *American Political Science Review*, September 2004-September 2007.

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform (Wisconsin), 1997.

## PUBLICATIONS
### Books

*Presidential Leadership: Politics and Policymaking*, 11th edition. Lanham, MD: Rowman and Littlefield, forthcoming 2019. With George C. Edwards, III and Steven J. Wayne. Previous editions 10th (2018).

*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amnon Cavari and Richard J. Powell.

*The Enduring Debate: Classic and Contemporary Readings in American Government*. 8th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013).

*Faultlines: Readings in American Government*, 5th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th (2013).

*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.

*Readings in American Government*, 7th edition. New York: W.W. Norton & Co. 2002. Co-edited with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

*With the Stroke of a Pen: Executive Orders and Presidential Power*. Princeton, NJ: Princeton University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies Group of the American Political Science Association, for the Best Book on the Presidency Published in 2001.

*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*. Boulder, CO: Westview Press. 1999. With David T. Canon.

*The Political Economy of Defense Contracting*. New Haven: Yale University Press. 1991.

### Monographs

*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009. With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*. September 1999.

*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research Foundation, April 1998.

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of Wisconsin). February 1998. Portions reprinted in Anthony Corrado, Thomas E. Mann, Daniel Ortiz, Trevor Potter, and Frank J. Sorauf, ed., *Campaign Finance Reform: A Sourcebook*. Washington, D.C.: Brookings Institution, 1997.

"Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*. Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA. 1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*. N-4624-AF. Santa Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodilly, Frank Camm, and Timothy J. Webb.

### Articles

"Voter Identification and Nonvoting in Wisconsin - Evidence from the 2016 Election." *Election Law Journal* 18:342-359 (2019). With Michael DeCrescenzo.

"Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study." *Political Research Quarterly* 71(2019). With Robert M. Stein, Christopher Mann, Charles Stewart III, et al.

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018). With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"The Complicated Partisan Effects of State Election Laws." *Political Research Quarterly* 70:549-563 (No. 3, September 2017). With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public Administration Review* 77:354-364 (No. 3, May/June 2017). With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election  Evidence from a Survey List Experiment." *Election Law Journal* 13:460-475 No.4, December 2014). With John S. Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science*, 58:95-109 (No. 1, January 2014). With Barry C. Burden, David T. Canon, and Donald P. Moynihan. Winner of the State Politics and Politics Section of the American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law Review* 2014:821-841 (No. 4, 2014).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485 (No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2, 2011). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December 2009).

"Does Australia Have a Constitution?  Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008). With Howard Schweber.

"Does Australia Have a Constitution?  Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008). With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007). With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials*. Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005). With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May

2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002). With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review* 56:180-190 (1996). With Anne Khademian.

"Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185 (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense." *Public Administration Review* 53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

## Book Chapters

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election. In Amnon Cavari, Richard J. Powell, and Kenneth R. Mayer, eds.*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency*. Baltimore: Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." In Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform*. Lanham, MD: Rowman & Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle*. New York: New York University Press. 2001. With David T. Canon.

"The Institutionalization of Power." In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds. *Presidential Power: Forging the Presidency for the 21st Century*. New York: Columbia University Press, 2000. With Thomas J. Weko.

"Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In *Downsizing Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In Alex Mintz, ed. *The Political Economy of Military Spending*. London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed., *Arms, Politics, and the Economy: Contemporary and Historical Perspectives*. New York: Holmes and Meier.

1990.

**Other**

"Campaign Finance: Some Basics." Bauer-Ginsberg Campaign Finance Task Force, Stanford
    University.  September 2017.  With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington
    Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart,
    III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military
    Relations. The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small
    Change: Money, Political Parties, and Campaign Finance Reform. The Forum*  6 (No. 1,
    2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*,
    Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*,
    David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval
    Office*, Adam L. Warber.  In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center
    for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power
    in the U.S. and Australia), manuscript, February 2007.

"Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring
    2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives."
    *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education;
    Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book.*  Project Vote Smart.
    2006.  With Meghan Condon.

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia,
    Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King?  Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy;
    Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book.*  Project
    Vote Smart.  2004.  With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a
    Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget
    and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart.  2002.
    With Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief.*  December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J.
    Rozell.  *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani
    Guinier.  *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993).

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles Times*, July 8, 1988.

## Conference Papers

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the 2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8, 2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA, August 30, 2017, and at the 2017 Annual Meeting of the American Political Science Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the Polls." Conference on New Research on Election Administration and Reform, Massachusetts Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R Neiheisel.

"Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011.    With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin, Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Annual Meeting of the American Political Science Association, Chicago, IL,

August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007.  With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days."  Annual Meeting of the American Political Science Association, Philadelphia, PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform."  Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.

**Talks and Presentations**

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017.  With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017.  With Michael DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?"  Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom"  Geometry of Redistricting Conference, University of Wisconsin-Madison   October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers."  American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013, Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008."

Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power.  University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31, 2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives.  *Hearing on Executive Order and Presidential Power*, Washington, DC.  March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI.  August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17, 1992.

Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH,  September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

**University and Department Service**

Cross-Campus Human Research Protection Program (HRPP) Advisory Committee, 2019-present.
Athletic Board, 2014-present.
General Education Requirements Committee (Letters and Science), 1997-1998.
Communications-B Implementation Committee(Letters and Science), 1997-1999
Verbal Assessment Committee (University) 1997-1998.
College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).
Committee on Information Technology, Distance Education and Outreach, 1997-98.
Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.
Department Computer Committee, 1996-1997; 1997-1998, 2005-2006.  Chair, 2013-present.
Faculty Senate, 2000-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.
Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.
Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.
Department Honors Advisor, 1991-1993.
Brown-bag Seminar Series on Job Talks (for graduate students), 1992.
Keynote speaker, Undergraduate Honors Symposium, April 13 1991.
Undergraduate Curriculum Committee, Department of Political Science, 1990-1992; 1993-1994.
Individual Majors Committee, College of Letters and Sciences, 1990-1991.
Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

**Teaching**

Undergraduate
Introduction to American Government (regular and honors)
The American Presidency
Campaign Finance
Election Law
Classics of American Politics
Presidential Debates
Comparative Electoral Systems
Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

Graduate
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 18, 2020, I caused to be served the

foregoing **REPORT OF PLAINTIFFS' EXPERT WITNESS KENNETH**

**MAYER** by filing it through the Court's ECF system, which will serve the

following counsel:

> Chris Carr, Esq.
> Attorney General
> Dennis Dunn, Esq.
> Deputy Attorney General
> Russell Willard, Esq.
> Senior Assistant Attorney General
> **Georgia Office of the Attorney General**
> 40 Capitol Square
> Atlanta, GA 30334
> ccarr@law.ga.gov
> ddunn@law.ga.gov
> rwillard@law.ga.gov
>
> Joshua Barrett Belinfante, Esq.
> Vincent Robert Russo, Jr., Esq.
> Brian Edward Lake, Esq.
> Carey Allen Miller, Esq.
> Alexander Denton, Esq.
> Special Assistant Attorneys General
> **Robbins Ross Alloy Belinfante Littlefield, LLC**
> 500 Fourteenth St., N.W.
> Atlanta, GA 30318
> Telephone: (678) 701-9381
> Fax: (404) 856-3250
> jbelinfante@robbinsfirm.com
> blake@robbinsfirm.com
> vrusso@robbinsfirm.com
> cmiller@robbinsfirm.com
> adenton@robbinsfirm.com

Bryan P. Tyson, Esq.
Bryan F. Jacoutot, Esq.
Diana LaRoss, Esq.
Special Assistant Attorneys General
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com
bjacoutout@taylorenglish.com
dlaross@taylorenglish.com

*/s/ Leslie J. Bryan*
Leslie J. Bryan
Georgia Bar No. 091175

# DEFENDANTS' EX. 3



# LAWRENCE & BUNDY LLC

DEFDOXONLY  |  Mayer Materials

- Create Folder
- Download
- User Options
- Search
- Paste
- Upload
- Rename
- Delete
- Add To Basket
- Show Basket
- Logout

Add files...      Drag & drop files and folders here to upload

Filter:      Clear   Select   Show 100 items on page      Thumbnail View   Tree View

19 Items (19 Files)

| Name | Size | Modified | Keywords |
|---|---|---|---|
| Ansolabehere Hirsch 2017 (1).pdf | 483.6 KB | 02/18/20 | |
| Atkeson et al 2009 (1).pdf | 230.5 KB | 02/18/20 | |
| Bland Burden 2013 (1).pdf | 0.8 MB | 02/18/20 | |
| Christen 2012 (1).pdf | 5.2 MB | 02/18/20 | |
| Cobb 2012 (1).pdf | 267.7 KB | 02/18/20 | |
| County File Append.do | 0.7 KB | 02/18/20 | |
| County Summary File.dta | 41.9 KB | 02/18/20 | |
| Enamorado et al 2019.pdf | 2.1 MB | 02/18/20 | |
| Heterogeneous Application of Voter ID Laws.pdf | 230.5 KB | 02/18/20 | |
| Hood Bullock 2008.pdf | 188.9 KB | 02/18/20 | |
| MIDR pending analysis.do | 2.5 KB | 02/18/20 | |
| Page Pitts 2009.pdf | 3.4 MB | 02/18/20 | |
| Pending Analysis January 2020.xlsx | 18.5 KB | 02/18/20 | |
| Pending to Active July 19 Jan 20.do | 0.7 KB | 02/18/20 | |
| Porter Rogowski 2018.pdf | 1.2 MB | 02/18/20 | |
| Stewart 2013.pdf | 1.6 MB | 02/18/20 | |
| Text of Stata Code.docx | 14.0 KB | 02/18/20 | |
| Tokaji 2004.pdf | 3.0 MB | 02/18/20 | |
| White et al 2015.pdf | 353.6 KB | 02/18/20 | |

Logged in : DEFDOXONLY (Session timeout in 9 min, 13 secs.)   Back to top



EXHIBIT
Mayer
3
2-26-20

# DEFENDANTS' EX. 4

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

| West's Code of Georgia Annotated |
| Title 21. Elections (Refs & Annos) |
| Chapter 2. Elections and Primaries Generally (Refs & Annos) |
| Article 6. Registration of Voters (Refs & Annos) |

Ga. Code Ann., § 21-2-220.1

§ 21-2-220.1. Voter registration documentation requirements

Effective: April 2, 2019

Currentness

(a) Any person applying to register to vote shall provide his or her Georgia driver's license number or identification card number for an identification card issued pursuant to Article 5 of Chapter 5 of Title 40 on the voter registration application. If a person does not have a Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40, such person shall provide the last four digits of his or her social security number on the voter registration application. If a person does not have a Georgia driver's license, a Georgia identification card issued pursuant to Article 5 of Chapter 5 of Title 40, or a social security number, the person shall affirm this fact in the manner prescribed in the voter registration application upon penalty of law and such application shall be processed without regard to the procedures outlined in subsections (b), (c), and (d) of this Code section.

(b) In the event that the name, driver's license number, social security number, or date of birth provided by the person registering to vote on the voter registration form does not match information about the applicant on file at the Department of Driver Services or the federal Social Security Administration, the applicant shall nevertheless be registered to vote but shall be required to produce proof of his or her identity to a county registrar, a deputy county registrar, a poll manager, or a poll worker at or before the time that such applicant requests a ballot for the first time in any federal, state, or local election.

PENGAD 800-631-6989

EXHIBIT
Moyer
4
2-26-20 W

(c) Proof of the applicant's identity as set forth in subsection (b) of this Code section shall be the forms of identification listed in subsection (c) of Code Section 21-2-417.

**Credits**

Laws 2017, Act 250, § 8, eff. July 1, 2017; Laws 2019, Act 24, § 6, eff. April 2, 2019.

Notes of Decisions (1)

Ga. Code Ann., § 21-2-220.1, GA ST § 21-2-220.1
The statutes and Constitution are current through Laws 2020, Act 322. Some statute sections may be more current, see credits for details. The statutes are subject to changes by the Georgia Code Commission.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# DEFENDANTS' EX. 5

§ 21-2-417. Proper identification; presentation to poll worker;..., GA ST § 21-2-417

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedValidity Called into Doubt by Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups, N.D.Ga., July 14, 2006
KeyCite Yellow Flag - Negative TreatmentProposed Legislation

| West's Code of Georgia Annotated |
| Title 21. Elections (Refs & Annos) |
| Chapter 2. Elections and Primaries Generally (Refs & Annos) |
| Article 11. Preparation for and Conduct of Primaries and Elections (Refs & Annos) |
| Part 1. General Provisions |

Ga. Code Ann., § 21-2-417

§ 21-2-417. Proper identification; presentation to poll worker; provisional ballots; false affirmation; penalty

Effective: January 26, 2006

Currentness

(a) Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:

(1) A Georgia driver's license which was properly issued by the appropriate state agency;

(2) A valid Georgia voter identification card issued under Code Section 21-2-417.1 or other valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;



(3) A valid United States passport;

(4) A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A valid United States military identification card, provided that such identification card contains a photograph of the elector; or

(6) A valid tribal identification card containing a photograph of the elector.

(b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

(c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21-2-220, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a

felony, and the penalty shall be distinctly set forth on the face of the statement.

## Credits

Laws 1997, p. 662, § 3; Laws 1998, p. 295, § 1; Laws 2001, p. 230, § 15; Laws 2003, Act 209, § 48, eff. July 1, 2003; Laws 2005, Act 53, § 59, eff. July 1, 2005; Laws 2006, Act 432, § 2, eff. Jan. 26, 2006.

Notes of Decisions (23)

Ga. Code Ann., § 21-2-417, GA ST § 21-2-417
The statutes and Constitution are current through Laws 2020, Act 322. Some statute sections may be more current, see credits for details. The statutes are subject to changes by the Georgia Code Commission.

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# DEFENDANTS' EX. 6



## SOCIAL SECURITY

**MEMORANDUM**

Date:   June 22, 2009                                    Refer To:

To:   The Commissioner

From:   Inspector General

Subject:   Quick Evaluation Response:   Accuracy of the Help America Vote Verification Program
Responses (A-03-09-29115)

The attached final Quick Response Evaluation presents the results of our review.   Our
objective was to assess the accuracy of the verification responses provided by the Help
America Vote Verification (HAVV) program.

If you wish to discuss the final report, please call me or have your staff contact
Steven L. Schaeffer, Assistant Inspector General for Audit, at (410) 965-9700.

Patrick P. O'Carroll, Jr.

Attachment



# *QUICK RESPONSE EVALUATION*

## *Accuracy of the Help America Vote Verification Program Responses*

### A-03-09-29115



June 2009

## Mission

By conducting independent and objective audits, evaluations and investigations, we inspire public confidence in the integrity and security of SSA's programs and operations and protect them against fraud, waste and abuse. We provide timely, useful and reliable information and advice to Administration officials, Congress and the public.

## Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

- Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
- Promote economy, effectiveness, and efficiency within the agency.
- Prevent and detect fraud, waste, and abuse in agency programs and operations.
- Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
- Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

- Independence to determine what reviews to perform.
- Access to all information necessary for the reviews.
- Authority to publish findings and recommendations based on the reviews.

## Vision

We strive for continual improvement in SSA's programs, operations and management by proactively seeking new ways to prevent and deter fraud, waste and abuse. We commit to integrity and excellence by supporting an environment that provides a valuable public service while encouraging employee development and retention and fostering diversity and innovation.

# *Background*

## OBJECTIVE

Our objective was to assess the accuracy of the verification responses provided by the Help America Vote Verification (HAVV) program.

## BACKGROUND

On October 29, 2002, the President signed Public Law Number (Pub. L. No.) 107-252,[1] the *Help America Vote Act of 2002 (HAVA)*, which mandates that States verify the information of newly registered voters. HAVA places certain requirements on the Social Security Administration (SSA) for verifying information to be used in each State's voter registration process. Section 303 requires that each State establish a computerized State-wide voter registration list and verify voter information with the State's motor vehicle authority or SSA. The States are required to first verify the driver's license number (if one exists) against the State's Motor Vehicle Administration (MVA) database. In situations where no driver's license exists, the States are to verify the applicant's name, date of birth (DoB), and the last four digits of the applicant's SSN with SSA. In addition, SSA is required to report whether its records indicate an applicant is deceased.

To comply with the section 303 requirement for SSA to verify information using the last four digits of the SSN, SSA developed HAVV, an online system that allows the MVAs to submit the required voter applicant information for verification.[2] SSA receives the verification information from the American Association of Motor Vehicle Administrators (AAMVA), which receives the data from each State's MVA.[3] HAVV uses the last four digits of the SSN to perform the initial match against the Alphident, a database that allows SSA to search the Agency's master file of all assigned SSNs based on name and DoB information. Then the resulting matched record(s) are compared with SSA's Numident File, which is the repository of all issued SSNs.[4]

---

[1] Pub. L. No. 107-252 § 303, 42 U.S.C. §§ 15483, 405(r)(8).

[2] See Appendix D for a flowchart of the HAVV process.

[3] The entity assists all MVAs and SSA by serving as an electronic information conduit between them.

[4] The Numident is a record of identifying information (such as name, DoB, date of death, mother's maiden name, etc.) provided by the applicant on his or her *Application for a Social Security Number* (Form SS-5) for an original SSN card and subsequent applications for replacement SSN cards. Each record is housed in the Numident Master File.

---

As of December 2008, we found 46 States and territories' MVAs had signed user agreements with SSA to use the HAVV system when a voter registration applicant who does not have a driver's license number provides the last four digits of their SSN for verification purposes. In Fiscal Year (FY) 2008, 41 of the 46 States and territories submitted about 7.7 million verification requests. Of the 7.7 million verification requests, SSA provided a "match" response for 5.3 million (69 percent) of the items and a "no-match" response for 2.4 million (31 percent) of the items. While 69 percent of the verification requests matched SSA records, SSA provided match responses that indicated there were single and multiple matches. This occurs because the last four digits of the SSN is not a unique identifier. A single match indicates that the input data matched only one record in SSA's database. However, a multiple match indicates that two or more individuals in SSA's records were determined to have the same characteristics—name, DoB, and last four digits of the SSN (see Table 1 below).

### Table 1: HAVV Responses

| Verification Responses | Counts |
|---|---|
| Unprocessed (invalid data provided) | 3,824 |
| No-Matches | 2,366,922 |
| Matches | 5,323,408 |
| Total HAVV Transactions | 7,694,154 |
| Types of Match Verification Responses | |
| Single Match Alive | 5,266,119 |
| Single Match Deceased | 56,054 |
| Multiple Match Alive[1] | 1,077 |
| Multiple Match Deceased[2] | 5 |
| Multiple Match Mixed[3] | 153 |
| Subtotal: | 5,323,408 |

Note 1:  A multiple match alive response indicates that SSA records include two or more individuals with the same characteristics and they are alive.

Note 2:  A multiple match deceased response indicates that SSA records include two or more individuals with the same characteristics and they are deceased.

Note 3:  A multiple match mixed response indicates that SSA records include two or more individuals with the same characteristics but at least one individual is alive and the other is deceased.

## OTHER VERIFICATION PROGRAMS

SSA has implemented several other verification programs that allow State agencies, employers, and third-party submitters to match the names and SSNs of individuals in SSA's records.[5]

---

[5] See Appendix E for a complete description of these verification programs.

- **Social Security Online Verification** (SSOLV) allows State MVAs to verify names and SSNs for applicants for drivers' licenses and State identification cards. SSOLV transactions are routed to SSA through AAMVA. Currently, 48 States are registered to use SSOLV.

- **Social Security Number Verification Service** (SSNVS) is an online program, with a batch option, that allows employers and third party submitters to verify employees' names and SSNs. SSNVS ensures employees' names and SSNs match SSA records before their wage reports are submitted to SSA. As of March 2009, about 167,000 employers had approximately 221,000 employees registered to use SSNVS.

- **E-Verify**, formerly known as the Basic Pilot/Employment Eligibility Verification, is a joint initiative administered by the Department of Homeland Security (DHS) to verify the employment eligibility of newly hired employees. Participating employers register online with DHS to use the voluntary program. The information the employer submits to DHS is sent to SSA to verify the name, SSN, and DoB match SSA's records. SSA also provides DHS with work eligibility information based on data in SSA records. DHS confirms the current employment-authorization for non-citizens. As of December 4, 2008, more than 96,000 employers had registered to use E-Verify.[6]

---

[6] United States Department of Homeland Security Office of Citizenship & Immigration Services Ombudsman, *Observations on the E-Verify Experience in Arizona & Recommended Customer Service Enhancements*, p. 3  December 22, 2008.

# *Results of Review*

SSA's HAVV program was established to assist States with verifying the accuracy of voter information for newly registered voters. Our review found the HAVV program did not always provide States with accurate verification responses for individuals who were registering to vote. We determined the HAVV program had a significantly higher no-match response rate when compared to other verification programs used by States and employers. HAVV's no-match response rate was 31 percent, while the no-match response rate for other verification programs used by States and employers ranged from 6 to 15 percent. Additionally, we determined the HAVV program did not provide consistent verification responses to the States when the same applicant data were entered into the program. For example, States were provided responses for at least 356 applicants that initially indicated a match response but subsequently the States were provided a no-match response when the same data (name, SSN, DoB, and last four digits of the SSN) were entered into the verification program.[7]

We believe the high no-match response rate and the inconsistent verification responses can be attributed to the lack of (1) a unique identifier (full SSN), (2) flexible matching criteria, and (3) testing to assess the accuracy of the verification responses. Because of the limitations of the matching criteria established by the legislation, the HAVV program may indicate a no-match when a match does in fact exist in SSA records. SSA does alert the States of some of the inherent problems in attempting verifications using only the last four digits of an SSN. The User Agreements between the State, MVA and SSA, state ". . . because SSA's enumeration records are based on a complete and unique 9 digit SSN, verification using only the last 4 digits of that number are inherently a partial rather than the full '9 digit' verification and may result in multiple positive matches or false positive matches of information." However, the high no-match response rate and the inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote.

## HELP AMERICA VOTE VERIFICATION MATCHING CRITERA

Our comparison of the FY 2008 verification responses for HAVV and three other verification programs used by the States and employers[8]—SSNVS, E-Verify, and SSOLV—showed that HAVV had a significantly higher no-match response rate (see Table 2). The three verification systems were developed for different purposes and use varying tolerances because they require the full nine-digit SSN for verification. HAVV, on the other hand, does not use these same tolerances because it requires use of the last four digits of the SSN as mandated by the legislation.

---

[7] See page 7 for more details about the inconsistent verification responses.

[8] See Appendix E for a description of SSA other verification programs.

---

The no-match response rate for the three other programs ranged from 6 to 15 percent, whereas HAVV's no-match response rate was 31 percent. Therefore, HAVV's no-match response rate was about two to five times higher than the no-match response rate for the other three programs. For example, the HAVV no-match response rate was 5 times higher than the no-match response rate for SSA's SSNVS program, which is an SSN verification program used by employers to ensure accurate wage reporting. In FY 2008, the no-match response rate for SSNVS was 6 percent.

There could be several factors that contribute to the higher than expected no-match response rate for HAVV, such as individuals deliberately providing the States with invalid information (name, DoB, last four digits of the SSN). However, another contributing factor is the limitation of the HAVV matching criteria. As stated previously, HAVV does not use a truly unique identifier, such as the full SSN to match voter information to its records. In addition, the HAVV program does not allow flexibility with matching the name and DoB to its records to compensate for typographical errors, other common database errors, and mistakes because it does not use the full SSN. Because of the limitations of the matching criteria established by the legislation, HAVV may be providing a high number of false negative responses to the States, which may lead to applicants having difficulty while registering to vote.[9]

**Table 2: Comparison of SSA Verification Programs—Verification Requests (millions)**

| Verification Response | SSNVS | Percent | E-Verify[1] | Percent | SSOLV | Percent | HAVV | Percent |
|---|---|---|---|---|---|---|---|---|
| Matched | 89.1 | 94 | 6.0 | 86 | 17.9 | 89 | 5.3 | 69 |
| No Match | 6.0 | 6 | 0.6 | 9 | 2.3 | 11 | 2.4 | 31 |
| Citizenship | N/A | | 0.4 | 6 | N/A | | N/A | |
| Total Transactions | 95.1 | 100 | 7.0 | 100 | 20.2 | 100 | 7.7 | 100 |

Note 1:    Since E-Verify is the only verification program that includes citizenship as a verification factor, we separately identified the citizenship no match responses. As such, E-Verify's total no match response rate is 15 percent for name, SSN, and citizenship. By comparison, E-Verify's no match response rate is less that half of HAVV even though E-Verify used more verification factors.

### Full Social Security Number

HAVV is the only SSA verification program that does not use the full SSN to perform the match to SSA records. HAVA mandates that SSA verify the last four digits of the SSN along with the name and DoB if the voter applicant has not been issued a driver's license, which is an inherent limitation because the last four digits of the SSN is not a unique identifier. Since SSA is limited to using the last four digits of the SSN, it has to

---

[9] We plan to conduct a separate review that will focus on States' use of the HAVV program. It will cover actions taken by States when they received a no-match response from SSA.

use two databases, Alphident and Numident, to verify the HAVV input data.  However, for SSNVS, E-Verify, and SSOLV, SSA only uses the Numident to match input data because the full SSN is provided.  For HAVV, initially SSA matches the last four digits of the SSN against the Alphident, which is a database that contains records that allow SSA to search its master file of all assigned SSNs using the individual's name and DoB. To match against the Alphident, HAVV uses a soundex code based on the last name,[10] a portion of the first name, and the month and year of birth.  The resulting matched record(s) are then compared with SSA's Numident—the repository of all issued SSNs— using the full first and last names.

As SSA does not receive the full SSN for verification, it is possible it will provide States with a verification response that indicates more than one person met the criteria. According to SSA, this occurs because up to 40,000 numberholders possibly share SSNs that have the same last four digits, which could result in duplicate matches for the HAVV program.  For example, in FY 2008, SSA provided about 1,200 multiple responses to the States, which meant 2 or more individuals were determined to have the same characteristics--name, DoB, and last four digits of the SSN (see Table 1).  In fact, for 153 of these cases, the response indicated that individuals with the same characteristics were both alive and deceased.

### Name Tolerances

The name-matching criteria for the HAVV program are more rigid than SSOLV, SSNVS, and the E-verify verification program.  We found that the other verification programs used at least seven name tolerances to determine whether a name matches SSA's records, because of the inherent risk with matching information to large databases.  For example, the three programs will match based on a portion of the last name and the first and middle initials.  The name tolerances allow flexibility in matching the input data to account for typographical errors and other mistakes that generally exist within large databases.  HAVV on the other hand, searches for exact matches on the full first and last name, which is problematic because it does not consider possible human error (that is, data entry errors, transpositions, and nicknames).  For example, the HAVV program would provide a no-match response for the common errors shown in Table 3 below. However, the other three verification programs would have provided a positive match response for the same data.  We found that about 83,000 of the 2.4 million HAVV no-match responses were provided because of errors associated with first or last names.

---

[10] Soundexing is the idea of indexing information by how it sounds rather than spelled.  HAVV uses the first letter of the input last name in conjunction with the American Soundex System.

Table 3:  Example of Common Errors with Names

| Type of Error or Complex Name | Voter Information | Numident Information |
|---|---|---|
| Transposition | Mary Simth | Mary Smith |
| Missing letters | Mary Smth | Mary Smith |
| Extraneous letters | Mary Smmith | Mary Smith |
| Nicknames | Greg Smith | Gregory Smith |

In addition, HAVV does not recognize compound names that do not exactly match the Numident.  For example, if a compound name is reported as Mary Jones-Smith but the Numident includes Mary Smith, HAVV would provide a no match response.  However, SSNVS, E-Verify, and SSOLV would provide a match response for the same data.  We found that about 65,000 of the 2.4 million HAVV no-match responses related to compound names.

**Date of Birth Tolerances**

HAVV does not allow for variations in the DoB unlike the other three verification programs.  Under HAVV, the DoB must match SSA's records exactly or a no-match response is provided.[11]  However, the other verification programs allow for a variation in the DoB to receive a positive match response.  For example, if the Numident showed the DoB was January 10, 1990 and January 1, 1991 was input into the E-Verify program by mistake, a positive match response would be provided.  However, HAVV would have provided a no-match response in this instance.

**INCONSISTENT VERIFICATION RESPONSES**

We found the HAVV program did not always provide consistent verification responses to the States when the same applicant data were entered into the HAVV program.  We identified at least 356 applicants for whom HAVV initially provided a match response and later provided a no-match response when the same data (name, SSN, DoB, and last 4 digits of the SSN) were entered.  These responses were provided to nine different States, as shown in Figure 1.  Ohio received 244 (69 percent) of the inconsistent responses followed by Alabama with 80 inconsistent responses (22 percent).

---

[11] For the DoB, SSA uses only the month and year of birth as part of the matching criteria.



Figure 1: Number of Voter Applicants from Each State that Received Different Verification Responses

According to SSA officials, the inconsistent verification responses occurred because of a conversion issue that arose in the 1970s. When SSN records were converted from computer cards to tapes in 1972, a conversion indicator was entered on records where certain conditions existed. One of those conditions was a mismatch between the Alphident and Numident. The mismatch could relate to instances where a Numident record existed but an Alphident record did not or vice versa. SSA estimated there were about 4 million records assigned the conversion indicator. During the initial development of the HAVV program, SSA decided to provide a no-match response to the States for the records that contained the conversion indicator.

However, in October 2007 when SSA converted the Numident from the Master Data Access Method (MADAM)[12] to a relational database, the Alphident file ceased to exist as a separate database and became part of the Numident. During that transition, SSA did not copy the conversion indicators to the new system. As a result, the Agency provided a match response to the States for the records that contained a mismatch between the Alphident and Numident. SSA realized this error, and the conversion indicator was reinstated by April 2008. SSA officials believed the extent of this anomaly was minor because the time the condition existed was limited to late October 2007 to early April 2008. In addition, they believed the potential universe of affected SSNs marked with a conversion indicator represented about 4 million (less than 1 percent) of the 455 million Numident records.

---

[12] MADAM is an in-house access method designed to access SSA's major master records.

## TESTING LIMITATIONS

Although HAVV is the only SSN verification program that does not use the full SSN as part of the matching criteria, SSA has not conducted any tests or studies that assessed the accuracy of the HAVV verification responses provided to the States. The agency has conducted integration testing with each State MVA prior to providing them access to HAVV to ensure proper network connection. Further, the agency has conducted internal validation testing when making any coding changes to the HAVV system. One reason SSA did not assess the accuracy of verification responses because it did not have the capability to submit sample data through the HAVV program. As part of our review, we requested access to the HAVV program to submit sample data to determine whether the high no-match response rate was appropriate. However, Agency staff informed us that when the HAVV program was designed, the Agency did not build an in-house test facility. Therefore, if they were to submit sample data through the HAVV program, they would need to coordinate with 1 of the 46 States and territories registered to use HAVV. We believe by not conducting any tests or studies to determine the accuracy rate, the Agency does not know whether the program is providing the States a high or low rate of false positives or false negatives. In addition, we believe the inconsistent responses and the higher than expected no-match response rate demonstrates that the HAVV responses were not always accurate.

## FEASBILITY STUDY FOR USING SSNs FOR VOTER REGISTRATION

The Congress was interested in learning whether the verification of applicants' data against SSA records were appropriate for establishing the voter registration list. As part of HAVA, the Congress had requested that the Election Assistance Commission (EAC), a new agency created under HAVA, in consultation with SSA, determine the feasibility and advisability of using SSNs or other information to establish voter registration. Specifically, Section 244 (b)[13] of HAVA states,

> Not later than 18 months after the date on which section 303(a)(5) takes effect, the Commission, in consultation with the Commissioner of Social Security, shall study and report to Congress on the feasibility and advisability of using Social Security identification numbers or other information compiled by the Social Security Administration to establish voter registration or other election law eligibility or identification requirements, including the matching of relevant information specific to an individual voter, the impact of such use on national security issues, and whether adequate safeguards or waiver procedures exist to protect the privacy of an individual voter.

We found that as of May 31, 2009, the EAC had not prepared or submitted the mandated report, which was due to the Congress in July 2005. After consulting with the EAC and SSA, we learned that the report had not been submitted to the Congress because the EAC had terminated a contract it awarded in 2006 to a vendor to conduct

---

[13] Pub. L. No. 107-252 § 244(b), 42 U.S.C. § 15384(b).

the feasibility study on its behalf.  In late 2007, the EAC contacted SSA to request the Agency conduct the feasibility study.  In January 2008, SSA informed the EAC that it did not believe the Congress intended for SSA to conduct the feasibility study and report. SSA informed the EAC that it would be inappropriate for SSA to conduct this study since Congress intended that the independent Commission conduct an objective assessment of the use of Social Security information for elections in relation to other issues such as national security and privacy, areas in which SSA itself would have to rely on outside expertise.  As required by HAVA, SSA did inform the EAC it would fulfill the consultation requirement mandated by the legislation by providing the EAC with (1) the status of State HAVA agreement execution and sample agreements, (2) HAVA verification data for participating States and territories, (3) systematic descriptions of the HAVA verification process, and (4) other background information for the report relevant to SSA's role in the HAVA verification process.  In November 2008, an EAC representative informed us that to satisfy the reporting requirement for HAVA, they expect to issue a policy memorandum to the Congress in 2009 with the assistance of SSA.[14]  We believe SSA should work with the EAC to prepare the policy memorandum for the Congress and encourage the EAC to ensure the memorandum addresses the limitations and potential risks (risk of providing a high rate of false positives or false negatives to the States) of using the last four digits of the SSN to verify the identity of an individual registering to vote.

---

[14] See Appendix F for concerns expressed by House committee members regarding HAVA requirements and its impact on eligible voters.

# *Matters for Consideration*

Based on our review of SSA's HAVV matching criteria and verification responses, SSA did not always provide the States with accurate verification responses because of the limitation of using the last four digits of the SSN to match data to its records.  Since SSA is mandated to use the last four digits of the SSN, the HAVV program provided the States with responses that may have prevented eligible individuals from registering to vote and allowed ineligible individuals to vote.  Given that the HAVV verification responses are used as part of the process to approve or deny an applicant's right to vote, SSA should consider working with the States to develop an acceptable level of false negative or false positive verification responses for HAVV that would provide assurance to the States of the reliability of the data.

Furthermore, SSA should continue to work with the EAC to allow the EAC to provide the Congress with the mandated report.  As part of this process, the Agency should ensure that the EAC is aware of the limitations and potential risks (risk of providing a high rate of false positives or false negatives to the States) of using the last four digits of the SSN to verify the identity of an individual registering to vote.

# *Appendices*

APPENDIX A – Acronyms

APPENDIX B – Scope and Methodology

APPENDIX C – Verification Requests for Top 10 States

APPENDIX D – Help America Vote Verification Flowchart

APPENDIX E – Verification Programs

APPENDIX F – House Committee Members Concerns Regarding the *Help America Vote Act of 2002*

APPENDIX G – OIG Contacts and Staff Acknowledgments

*Appendix A*

# Acronyms

| | |
|---|---|
| AAMVA | American Association of Motor Vehicle Administrators |
| BSO | Business Services Online |
| DHS | Department of Homeland Security |
| DoB | Date of Birth |
| EAC | Election Assistance Commission |
| EIN | Employer Identification Number |
| EIF | Employer Identification File |
| FY | Fiscal Year |
| HAVA | *Help America Vote Act of 2002* |
| HAVV | Help America Vote Verification |
| IEA | Information Exchange Agreement |
| MADAM | Master Data Access Method |
| MVA | Motor Vehicle Administration |
| PIN | Personal Identification Number |
| Pub. L. No. | Public Law Number |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| SSNVS | Social Security Number Verification Service |
| SSOLV | Social Security Online Verification |
| TNC | Tentative Nonconfirmation |

# Scope and Methodology

To accomplish our objective, we:

- Reviewed pertinent sections of the Social Security Administration's (SSA) policies and procedures as well as other relevant Federal laws and regulations.

- Reviewed Office of the Inspector General reports, Government Accountability Office reports and other relevant documents.

- Obtained and analyzed Help America Vote Verification (HAVV) transactions processed in Fiscal Year (FY) 2008.

- Obtained and reviewed FY 2008 management information reports for the HAVV, E-Verify, Social Security Number Verification Service (SSNVS), and Social Security Online Verification (SSOLV).

- Obtained and analyzed the matching criteria SSA uses for the following verification programs:  HAVV, E-Verify, SSNVS, and SSOLV.

- Spoke with staff from SSA and the Election Assistance Commission to gain a better understanding of the *Help America Vote Act of 2002* requirements.

Because of time constraints, we did not review the internal controls over the HAVV program.  We conducted limited testing to determine whether the data provided were reliable for the purpose of our review.  The entities audited were the Offices of Earnings, Enumeration and Administrative Systems within the Office of the Deputy Commissioner for Systems and Financial Policy and Operations within the Office of the Deputy Commissioner of Operations.  We performed our review in Philadelphia, Pennsylvania, between January and March 2009 in accordance with the President's Council on Integrity and Efficiency's[1] *Quality Standards for Inspections.*

---

[1] In January 2009, the President's Council on Integrity and Efficiency was superseded by the Council of the Inspectors General on Integrity and Efficiency, *Inspector General Reform Act of 2008,* Pub. L. No. 110-409 § 7, 5 U.S.C. App. 3 § 11.

*Appendix C*

# Verification Requests for Top 10 States

In Fiscal Year (FY) 2008, 41 States and territories submitted about 7.7 million verification requests for Help America Vote Verification (HAVV) program. Of the 7.7 million verification requests, the Social Security Administration (SSA) provided a match response for 5.3 million (69 percent) and a no-match response for 2.4 million (31 percent). The top 10 States that submitted verification requests accounted for approximately 85 percent of the 7.7 million transactions submitted during FY 2008. We found that Georgia submitted the most verification requests (about 2 million), and Nevada received the highest number of no-match responses (about 716,000), which represented 96 percent of its total verification requests, see Table 1 below.

**Table 1: Verification Requests for Top 10 States**
**Fiscal Year 2008**

|    | State | Transactions | Matches | No Matches | Percent of No Matches |
|----|-------|-------------|---------|------------|----------------------|
| 1  | Georgia | 1,956,464 | 1,690,773 | 265,691 | 14 |
| 2  | Alabama | 1,037,372 | 910,901 | 123,929 | 12 |
| 3  | Nevada | 744,913 | 28,661 | 716,252 | 96 |
| 4  | Ohio | 741,132 | 450,833 | 289,603 | 39 |
| 5  | Indiana | 415,517 | 357,477 | 57,887 | 14 |
| 6  | California | 410,777 | 118,409 | 292,324 | 71 |
| 7  | North Carolina | 395,155 | 320,297 | 74,797 | 19 |
| 8  | New York | 337,940 | 243,366 | 94,561 | 28 |
| 9  | Pennsylvania | 262,054 | 189,770 | 72,137 | 28 |
| 10 | New Jersey | 205,300 | 136,332 | 68,939 | 34 |
|    | Total | 6,506,624 | 4,446,819 | 2,056,120 | 32 |

*Appendix D*

# Help America Vote Verification Flowchart

The Help America Vote Verification (HAVV) is an online program that allows States' Motor Vehicle Administrations (MVA) to submit the required voter applicant information for verification. The Social Security Administration (SSA) receives the verification information from the American Association of Motor Vehicle Administrators (AAMVA), which receives the data from each State's MVA. The entity jointly serves the interests of all MVAs and SSA by serving as an electronic information conduit between the MVAs and SSA. HAVV uses the last four digits of the Social Security number (SSN) to perform the initial match against the Alphident. Then, HAVV matches the first six characters of the first name, the first eight characters of the last name, and the month and year of the date of birth. The resulting matched record(s) are then compared with SSA's Numident—the repository of all issued SSNs—using the full first and last names. Based on these matches, SSA provides verification responses to the States that indicate the following: (1) single match alive, (2) single match deceased, (3) multiple matches alive, (4) multiple matches deceased, (5) multiple matches mixed, (6) no match, or (7) invalid input data, system error.



*Appendix E*

# Verification Programs

The Social Security Administration (SSA) has implemented several verification programs that allow State agencies, employers, and third-party submitters to match the names and Social Security numbers (SSN) of individuals with SSA's records. Below, we describe (1) two verification programs offered to State Agencies-the Help America Vote Verification (HAVV), and Social Security Online Verification (SSOLV) and (2) two verification programs offered to employers and third-party submitters-the Social Security Number Verification Service (SSNVS) and E-Verify

**HAVV**

SSA developed HAVV, which is an online program that allows States' Motor Vehicle Administrations (MVA) to verify new voter applicant[1] information.[2] HAVV uses the last four digits of the SSN to perform the initial match against the Alphident.[3] Then, HAVV matches the first six characters of the first name, the first eight characters of the last name, and the month and year of the date of birth (DoB). The resulting matched record(s) are then compared with SSA's Numident—the repository of all issued SSNs—using the full first and last names. Based on these matches, SSA provides verification responses to the States that indicate the following: (1) single match, (2) single match deceased, (3) multiple matches, (4) multiple matches deceased, (5) multiple mixed, (6) no-match, or (7) unprocessed. Forty-six States have executed reimbursable Help American Vote Act Information Exchange Agreements (IEA) with SSA.

**SSOLV**

SSOLV allows State MVAs to verify names and SSNs of applicants for drivers' licenses and State identification cards. SSOLV transactions are routed to SSA through a nationwide MVA hub organization, known as American Association of Motor Vehicle Administrators (AAMVA). Currently, 48 States have executed reimbursable SSOLV IEAs with SSA.

---

[1] HAVV only verifies individuals who do not have a State drivers' license or identification card.

[2] SSA receives the verification information from AAMVA, which receives the data from each State's MVA. SSA determined it was most appropriate for SSA to provide the required verification services by interacting electronically with only one entity. The entity assists all MVAs and SSA by serving as an electronic information conduit between them.

[3] The Alphident is a database that contains records that allow SSA to search its master file of all assigned SSNs.

---

**SSNVS**

SSNVS is an online program, with a batch option, that allows employers and third party submitters to verify employees' names and SSNs.  The purpose of SSNVS is to ensure employees' names and SSNs match SSA's records before their wage reports are submitted to SSA.[4]  Employers and third-parties must first register online at SSA's Business Services Online (BSO) website to use this service.  Following registration, SSA will mail an activation code,[5] which is a code needed to gain access to SSNVS, directly to the company's address shown in SSA's Employer Identification File (EIF).[6] Once the registered users activate SSNVS using their personal identification number (PIN)[7] and the activation code, they can start submitting verifications.  Registered users can:

- Submit up to 10 employee names and SSNs (per screen) via the online SSNVS and receive immediate results.

- Upload files containing up to 250,000 employee names and SSNs and usually receive verification results the next government business day.  This bulk procedure allows employers to verify an entire payroll database or verify at one time the names and SSNs of a large number of newly hired workers.

SSA will return a verification code to the employer for each employee whose information does not match SSA's record.  In addition to the verification code, SSA provides a death indicator if the employee's Numident[8] record includes a date of death.

**E-Verify**

E-Verify, formerly known as the Basic Pilot/Employment Eligibility Verification, is a Department of Homeland Security (DHS) program whereby participating employers verify whether newly-hired employees are authorized to work in the United States under immigration law.  SSA supports DHS in operating this program.  Employers must

---

[4] Before June 2, 2005, SSNVS was a pilot that was restricted to a limited number of employers.

[5] The activation code is an alphanumeric code sent by SSA to the employer or registered PIN holder (if self-employed) when access to certain services is requested.  This code must be entered on the *Activate Access to BSO Service* web page to enable the user to access the requested service.

[6] The EIF is an Internal Revenue Service file that contains the Employer Identification Number of a business and the employer name and address associated with each Employer Identification Number.

[7] The PIN is a unique value issued by SSA to the applicant at registration, which must be entered to gain access to SSNVS.

[8] The Numident is a record of identifying information (such as name, DoB, date of death, mother's maiden name, etc.) provided by the applicant on his or her *Application for a Social Security Number* (Form SS-5) for an original SSN and subsequent applications for replacement SSN cards.  Each record is housed in the Numident Master File in SSN order.

---

register with DHS to access E-Verify.  Participating employers input information about the new hire, including the new hire's name, DoB, SSN, and whether the new hire claims to be a U.S. citizen or work-authorized noncitizen (for noncitizens, the DHS-issued alien or admission number is also entered), into the E-Verify program.

The information the employer submits via E-Verify is sent to SSA to verify the name, SSN, and DoB against SSA's Numident records.  SSA also provides DHS an indication of U.S. citizenship, as recorded in SSA records.  DHS confirms the current employment-authorization for non-citizens.

If the data input by the employer do not match the Numident, SSA sends a response to E-Verify which, in turn, generates a message for the employer indicating there is a discrepancy with SSA's records.  This discrepancy is called an SSA Tentative Nonconfirmation (TNC).  The SSA TNC means that the information submitted by the employer does not match SSA's records.  At this stage of the process, the nonconfirmation is tentative because the new hire may contest the SSA TNC.[9]  To contest an SSA TNC, the new hire must go to the SSA field office within 8 Federal workdays to resolve the Numident discrepancy.

---

[9] An SSA TNC does not necessarily mean that the new hire is not authorized to work in the U.S.  An SSA TNC could be generated for a U.S. citizen or a work-authorized alien as well as an undocumented worker.

*Appendix F*

# House Committee Members Concerns Regarding the Help America Vote Act of 2002

On October 28, 2008, House Judiciary Committee Chairman John Conyers, Jr., House Administration Committee Chairman Robert Brady, and respective Subcommittee Chairs Jerrold Nadler and Zoe Lofgren sent correspondence to each State's Secretary of State regarding voting issues.[1]  The letters highlighted their concerns about the Help America Vote Act (HAVA)[2] requirements and its impact on eligible voters.  Specifically, the letter stated the following.

> The Help America Vote Act (HAVA) requires states to implement statewide voter registration databases to ensure updated and accurate registration lists. Many problems exist with voter registration list maintenance, as most states update registration lists against change of address lists, the Department of Motor Vehicles records, the Social Security Administration records, and death and felon records, for example.  Rigid matching requirements often result in erroneous removal of otherwise legitimate voters for clerical errors or incorrect information, misspellings, and hyphenated names, when processing voter registration data.  There are reports that some of the new state registration systems are removing voters when discrepancies surface between their registration information and other official records, often because of errors outside voters' control.

---

[1] *State Preparation for the 2008 Election*, Letter to the Honorable Max Maxfield, Secretary of State of Wyoming, co-signed by John Conyers, Jr., Chairman of the Judiciary Committee; Robert Brady, Chairman of the House Administration Committee; Jerrold Naddler, Chairman of the Subcommittee on the Constitution, Civil Rights and Civil Liberties; and Zoe Lofgren, Chairwoman of the Subcommittee on Elections, October 28, 2008.

[2] Pub. L. No. 107-252 § 303, 42 U.S.C. §§ 15483, 405(r)(8).

*Appendix G*

# OIG Contacts and Staff Acknowledgments

## OIG Contacts

Cylinda McCloud-Keal, Director

Carol Madonna, Audit Manager

## Acknowledgments

In addition to those named above:

Virginia Harada, Auditor-in-Charge

For additional copies of this report, please visit our web site at www.socialsecurity.gov/oig or contact the Office of the Inspector General's Public Affairs Staff Assistant at (410) 965-4518.  Refer to Common Identification Number A-03-09-29115.

# DISTRIBUTION SCHEDULE

Commissioner of Social Security

Office of Management and Budget, Income Maintenance Branch

Chairman and Ranking Member, Committee on Ways and Means

Chief of Staff, Committee on Ways and Means

Chairman and Ranking Minority Member, Subcommittee on Social Security

Majority and Minority Staff Director, Subcommittee on Social Security

Chairman and Ranking Minority Member, Committee on the Budget, House of Representatives

Chairman and Ranking Minority Member, Committee on Oversight and Government Reform

Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives

Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations,
   House of Representatives

Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, U.S. Senate

Chairman and Ranking Minority Member, Committee on Finance

Chairman and Ranking Minority Member, Subcommittee on Social Security Pensions and Family Policy

Chairman and Ranking Minority Member, Senate Special Committee on Aging

Social Security Advisory Board

## Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of an Office of Audit (OA), Office of Investigations (OI), Office of the Counsel to the Inspector General (OCIG), Office of External Relations (OER), and Office of Technology and Resource Management (OTRM). To ensure compliance with policies and procedures, internal controls, and professional standards, the OIG also has a comprehensive Professional Responsibility and Quality Assurance program.

## Office of Audit

OA conducts financial and performance audits of the Social Security Administration's (SSA) programs and operations and makes recommendations to ensure program objectives are achieved effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present SSA's financial position, results of operations, and cash flow. Performance audits review the economy, efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term management reviews and program evaluations on issues of concern to SSA, Congress, and the general public.

## Office of Investigations

OI conducts investigations related to fraud, waste, abuse, and mismanagement in SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third parties, or SSA employees performing their official duties. This office serves as liaison to the Department of Justice on all matters relating to the investigation of SSA programs and personnel. OI also conducts joint investigations with other Federal, State, and local law enforcement agencies.

## Office of the Counsel to the Inspector General

OCIG provides independent legal advice and counsel to the IG on various matters, including statutes, regulations, legislation, and policy directives. OCIG also advises the IG on investigative procedures and techniques, as well as on legal implications and conclusions to be drawn from audit and investigative material. Also, OCIG administers the Civil Monetary Penalty program.

## Office of External Relations

OER manages OIG's external and public affairs programs, and serves as the principal advisor on news releases and in providing information to the various news reporting services. OER develops OIG's media and public information policies, directs OIG's external and public affairs programs, and serves as the primary contact for those seeking information about OIG. OER prepares OIG publications, speeches, and presentations to internal and external organizations, and responds to Congressional correspondence.

## Office of Technology and Resource Management

OTRM supports OIG by providing information management and systems security. OTRM also coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In addition, OTRM is the focal point for OIG's strategic planning function, and the development and monitoring of performance measures. In addition, OTRM receives and assigns for action allegations of criminal and administrative violations of Social Security laws, identifies fugitives receiving benefit payments from SSA, and provides technological assistance to investigations.

# DEFENDANTS' EX. 7

**Pending Less Age January 2020**

| Race | 0 | 1 | Total |
|---|---|---|---|
| American I | 12,437 | 26 | 12,463 |
| | 99.79 | 0.21 | 100 |
| Asian or Pa | 165,014 | 754 | 165,768 |
| | 99.55 | 0.45 | 100 |
| Black not c | 2,065,722 | 1,723 | 2,067,445 |
| | 99.92 | 0.08 | 100 |
| Hispanic | 228,419 | 704 | 229,123 |
| | 99.69 | 0.31 | 100 |
| Other | 106,908 | 187 | 107,095 |
| | 99.83 | 0.17 | 100 |
| Unknown | 658,818 | 413 | 659,231 |
| | 99.94 | 0.06 | 100 |
| White not | 3,619,336 | 609 | 3,619,945 |
| | 99.98 | 0.02 | 100 |
| Total | 6,856,654 | 4,416 | 6,861,070 |
| | 99.94 | 0.06 | 100 |

**Pending Less Age January 2020, Inc Pending Verification**

| Race | 0 | 1 | Total | Factor |
|---|---|---|---|---|
| American Indian | 12,437 | 26 | 12,463 | |
| | 0.18 | 0.55 | 0.18 | 3.055556 |
| Asian or Pacific | 164,979 | 789 | 165,768 | |
| | 2.41 | 16.83 | 2.42 | 6.954545 |
| Black not of Hisp | 2,065,598 | 1,847 | 2,067,445 | |
| | 30.13 | 39.40 | 30.13 | 1.307667 |
| Hispanic | 228,404 | 719 | 229,123 | |
| | 3.33 | 15.34 | 3.34 | 4.592814 |
| Other | 106,901 | 194 | 107,095 | |
| | 1.56 | 4.14 | 1.56 | 2.653846 |
| Unknown | 658,806 | 425 | 659,231 | |
| | 9.61 | 9.07 | 9.61 | 0.943809 |
| White not of His | 3,619,257 | 688 | 3,619,945 | |
| | 52.79 | 14.68 | 52.76 | 0.278241 |
| Total | 6,856,382 | 4,688 | 6,861,070 | |
| | 100 | 100 | 100 | |

**midr**

| Race | 0 | 1 | Total | Factor |
|---|---|---|---|---|
| American Indian | 12,217 | 246 | 12,463 | |
| | 0.18 | 0.41 | 0.18 | 2.277778 |
| Asian or Pacific | 163,800 | 1,968 | 165,768 | |
| | 2.41 | 3.25 | 2.42 | 1.342975 |
| Black not of Hisp | 2,025,499 | 41,946 | 2,067,445 | |
| | 29.78 | 69.36 | 30.13 | 2.302025 |
| Hispanic | 225,691 | 3,432 | 229,123 | |
| | 3.32 | 5.67 | 3.34 | 1.697605 |
| Other | 105,298 | 1,797 | 107,095 | |
| | 1.55 | 2.97 | 1.56 | 1.903846 |
| Unknown | 655,021 | 4,210 | 659,231 | |
| | 9.63 | 6.96 | 9.61 | 0.724246 |
| White not of His | 3,613,067 | 6,878 | 3,619,945 | |
| | 53.13 | 11.37 | 52.76 | 0.215504 |
| Total | 6,800,593 | 60,477 | 6,861,070 | |
| | 100 | 100 | 100 | |

**ID Reqired (Jan 20)**

| MIDR (July 19) | NO | YES | Total |
|---|---|---|---|
| NO | 9,450 | 2 | 9,452 |
| | 99.98 | 0.02 | 100 |
| YES | 479 | 1,520 | 1,999 |
| | 23.96 | 76.04 | 100 |
| Total | 9,929 | 1,522 | 11,451 |
| | 86.71 | 13.29 | 100 |

**Table 1**
**Active Registrants, December 2019**

| Race | Number of Active Registrants | % Active Registrants |
|---|---|---|
| White Non-Hispanic | 3,594,048 | 52.90% |
| African American | 2,011,116 | 29.60% |
| Hispanic | 224,119 | 3.30% |
| Asian or Pacific Islander | 161,944 | 2.40% |
| Other | 113,878 | 1.70% |
| Unknown | 693,383 | 10.20% |
| Total | 6,798,488 | 100 |
| | | 37.00% |
| | | 5.70% |

Pending Analysis January 2020.xlsx

EXHIBIT
Mayer
2-26-20

Summary

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | Summary of Data on Registration, Pending, and MIDR Status | | | | | |
| 3 | | Race | All Active Registrants | Pending | MIDR | Flagged Noncitizen | Pending for Other Reasons |
| 4 | | African American | 29.60% | 39.40% | 69.40% | 31.60% | 55.90% |
| 5 | | White Non-Hispanic | 52.90% | 14.70% | 11.40% | 13.00% | 15.60% |
| 6 | | Hispanic | 3.30% | 15.30% | 5.70% | 20.90% | 4.60% |
| 7 | | Asian or Pacific Islander | 2.40% | 16.80% | 3.30% | 23.20% | 3.00% |
| 8 | | Other/ 2 or More | 1.70% | 4.70% | 3.40% | 5.20% | 4.00% |
| 9 | | Unknown | 10.20% | 9.10% | 7.00% | 6.10% | 16.90% |

Pending Analysis

Voter Status

|  | A | B | C | D |
|---|---|---|---|---|
| 1 |  |  |  |  |
| 2 | STATUSREASON1 | Freq. | Percent | Cum. |
| 3 |  |  |  |  |
| 4 | CITIZENSHIP VERIFICATION | 3,073 | 65.6% | 65.6% |
| 5 | DDS | 1 | 0.0% | 65.6% |
| 6 | INCOMPLETE ADDRESS | 532 | 11.4% | 77.0% |
| 7 | INCOMPLETE DOB | 41 | 0.9% | 77.8% |
| 8 | INCOMPLETE NAME | 1 | 0.0% | 77.8% |
| 9 | MISSING INFORMATION | 678 | 14.5% | 92.3% |
| 10 | NO SIGNATURE | 66 | 1.4% | 93.7% |
| 11 | PENDING HEARING | 22 | 0.5% | 94.2% |
| 12 | (pending verification) | 272 | 5.8% | 100.0% |
| 13 |  |  |  |  |
| 14 | Total | 4,686 | 100 |  |
| 15 |  |  |  |  |
| 16 | missing info |  | 26.7% |  |

Pending Verification

|  | A | B | C |
|---|---|---|---|
| 1 | COUNTY NAME | Freq. | Percent |
| 2 |  |  |  |
| 3 | FULTON | 65 | 23.9 |
| 4 | DEKALB | 52 | 19.12 |
| 5 | BIBB | 39 | 14.34 |
| 6 | CLARKE | 13 | 4.78 |
| 7 | CHATHAM | 12 | 4.41 |
| 8 | COLUMBIA | 9 | 3.31 |
| 9 | BARROW | 7 | 2.57 |
| 10 | CLAYTON | 7 | 2.57 |
| 11 | COOK | 6 | 2.21 |
| 12 | FAYETTE | 5 | 1.84 |
| 13 | BRYAN | 4 | 1.47 |
| 14 | CARROLL | 4 | 1.47 |
| 15 | COWETA | 4 | 1.47 |
| 16 | DOUGHERT | 4 | 1.47 |
| 17 | EMANUEL | 4 | 1.47 |
| 18 | APPLING | 3 | 1.1 |
| 19 | EFFINGHAM | 3 | 1.1 |
| 20 | RICHMOND | 3 | 1.1 |
| 21 | TOOMBS | 3 | 1.1 |
| 22 | WASHINGT | 3 | 1.1 |
| 23 | WILKES | 3 | 1.1 |
| 24 | BACON | 2 | 0.74 |
| 25 | CRISP | 2 | 0.74 |
| 26 | DOUGLAS | 2 | 0.74 |
| 27 | LOWNDES | 2 | 0.74 |
| 28 | BARTOW | 1 | 0.37 |
| 29 | CAMDEN | 1 | 0.37 |
| 30 | CHATTOOG | 1 | 0.37 |
| 31 | COBB | 1 | 0.37 |
| 32 | ELBERT | 1 | 0.37 |
| 33 | FORSYTH | 1 | 0.37 |
| 34 | GLYNN | 1 | 0.37 |
| 35 | HENRY | 1 | 0.37 |
| 36 | JACKSON | 1 | 0.37 |
| 37 | TROUP | 1 | 0.37 |
| 38 | WARE | 1 | 0.37 |
| 39 |  |  |  |
| 40 | Total | 272 | 100 |

Pending Citizenship

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | |
| 2 | | Citizenship | | | | | | Other than citizenship | | | |
| 3 | | Race | Freq. | Percent | Cum. | | | Race | Freq. | Percent | Cum. |
| 4 | | | | | | | | | | | |
| 5 | | American Indian or Alaskan N | 24 | 0.78 | 0.78 | | | American I | 2 | 0.15 | 0.15 |
| 6 | | Asian or Pacific Islander | 714 | 23.23 | 24.02 | | | Asian or Pa | 40 | 2.98 | 3.13 |
| 7 | | Black not of Hispanic Origin | 972 | 31.63 | 55.65 | | | Black not o | 751 | 55.92 | 59.05 |
| 8 | | Hispanic | 642 | 20.89 | 76.54 | | | Hispanic | 62 | 4.62 | 63.66 |
| 9 | | Other | 135 | 4.39 | 80.93 | | | Other | 52 | 3.87 | 67.54 |
| 10 | | Unknown | 186 | 6.05 | 86.98 | | | Unknown | 227 | 16.9 | 84.44 |
| 11 | | White not of Hispanic Origin | 400 | 13.02 | 100 | | | White not | 209 | 15.56 | 100 |
| 12 | | | | | | | | | | | |
| 13 | | Total | 3,073 | 100 | | | | Total | 1,343 | 100 | |

Pending Analysis January 2020.xlsx

# DEFENDANTS' EX. 8

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Code of Georgia Annotated
  Title 21. Elections (Refs & Annos)
    Chapter 2. Elections and Primaries Generally (Refs & Annos)
      Article 6. Registration of Voters (Refs & Annos)

Ga. Code Ann., § 21-2-216

§ 21-2-216. Elector's qualifications; applicants acquiring age qualifications within six months permitted to register; electors not required to reregister; electors moving to another state

Effective: April 2, 2019

Currentness

(a) No person shall vote in any primary or election held in this state unless such person shall be:

  (1) Registered as an elector in the manner prescribed by law;

  (2) A citizen of this state and of the United States;

  (3) At least 18 years of age on or before the date of the primary or election in which such person seeks to vote;

  (4) A resident of this state and of the county or municipality in which he or she seeks to vote; and

  (5) Possessed of all other qualifications prescribed by law.

(b) In addition to the qualifications in subsection (a) of this Code section, no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote

except upon completion of the sentence and no person who has been judicially determined to be mentally incompetent may register, remain registered, or vote unless the disability has been removed.

(c) Any person who possesses the qualifications of an elector except that concerning age shall be permitted to register to vote if such person will acquire such qualification within six months after the day of registration; provided, however, that such person shall not be permitted to vote in a primary or election unless such person shall be at least 18 years of age on or before the date of the primary or election in which such person seeks to vote.

(d) Notwithstanding any other provision of this article, any person who was qualified and registered to vote on June 24, 1964, shall not be required to reregister under the terms of this article unless such person shall have become or becomes disqualified to vote by reason of having been purged from the list of electors or for any other reason whatsoever, in which event such person shall, in order to become registered to vote, reregister under the terms of this article.

(e) If any citizen of this state begins residence in another state after the thirtieth day next preceding any election for President and Vice President and, for that reason, does not satisfy the registration requirements of that state, such citizen shall be allowed to vote for presidential and vice presidential electors, in that election, in person in this state if such citizen satisfied, as of the date of such citizen's change of residence, the requirements to vote in this state, or by absentee ballot in this state if such citizen satisfies, but for such citizen's nonresident status and the reason for such citizen's absence, the requirements for absentee voting in this state.

(f) No person shall remain an elector longer than such person shall retain the qualifications under which such person registered.

(g)(1) On and after January 1, 2010, an application for registration under this chapter shall be accompanied by satisfactory evidence of United States citizenship. Upon the receipt of an application without satisfactory evidence of citizenship, the board of registrars shall notify the applicant in writing of the requirement to provide satisfactory evidence of citizenship. The board of registrars shall not determine the eligibility of the applicant until and unless satisfactory evidence of citizenship is supplied by the applicant. If the initial application is received without satisfactory evidence of citizenship prior to the close of voter registration preceding an election, but the applicant supplies satisfactory evidence of citizenship on or prior to the date of such election and the applicant is found eligible to vote, the applicant shall be permitted to vote in the election and any run-off elections resulting therefrom and subsequent elections; provided, however, that those electors who register to vote for the first time in this state by mail also shall

supply current and valid identification as required in subsection (c) of Code Section 21-2-220. In the event the applicant does not respond to the request for the missing information within 30 days following the sending of notification to provide satisfactory evidence of citizenship, the application shall be rejected.

(2) Satisfactory evidence of citizenship shall include any of the following:

(A) The number of the applicant's Georgia driver's license or identification card issued by the Department of Driver Services if the applicant has provided satisfactory evidence of United States citizenship to the Department of Driver Services or a legible photocopy of the applicant's driver's license or identification card issued by an equivalent government agency of another state if the agency indicates on the driver's license or identification card that the applicant has provided satisfactory evidence of United States citizenship to the agency;

(B) A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the board of registrars;

(C) A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the board of registrars of the applicant's United States passport;

(D) A presentation to the board of registrars of a legible copy of the applicant's United States naturalization documents or the alien registration number from the applicant's naturalization documents. If only the applicant's alien registration number is provided, the applicant shall not be found eligible to vote until the applicant's alien registration number is verified with the United States Citizenship and Immigration Services by the board of registrars;

(E) Other documents or methods of proof that are established pursuant to the federal Immigration Reform and Control Act of 1986 (P. L. 99-603);

(F) The applicant's Bureau of Indian Affairs card, tribal treaty card, or tribal enrollment card; and

(G) For residents of this state who are United States citizens but are not in possession of any of the documents or methods of proof enumerated under subparagraphs (A) through (F) of this paragraph, other documents or methods of proof for establishing evidence of United States citizenship which shall be promulgated by rule and regulation of the State Election Board.

(3) Notwithstanding any provision of this subsection, any person who is registered in this state on December 31, 2009, shall be deemed to have provided satisfactory evidence of citizenship and shall not be required to submit evidence of citizenship.

(4) After citizenship has been demonstrated to a board of registrars, an elector shall not be required to resubmit satisfactory evidence of citizenship in that or any other county in this state so long as the person continuously remains an elector of this state.

(5) For the purposes of this subsection, proof of voter registration from another state shall not be satisfactory evidence of citizenship.

(6) After a person has submitted satisfactory evidence of citizenship, the board of registrars shall indicate such information on the elector's voter registration record. After two years, the board of registrars may destroy all documents that were submitted as evidence of citizenship.

(7) The Secretary of State shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship.

(h) Prior to approving the application of a person to register to vote, the registrars may check the data bases of persons convicted of felonies and deceased persons maintained by the Secretary of State.

## Credits

Laws 1994, p. 1443, § 3; Laws 1998, p. 295, § 1; Laws 2009, Act 143, § 1, eff. July 1, 2009; Laws 2011, Act 240, § 6, eff. July 1, 2011; Laws 2017, Act 250, § 7, eff. July 1, 2017; Laws 2019, Act 24, § 5, eff. April 2, 2019.