IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action File |
| BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia, *et al.*, | ) No. 1:18-cv-05391-SCJ ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY OF DR. STEPHEN C. GRAVES
AND SUPPORTING MEMORANDUM OF LAW**

Defendants Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia (the "Secretary"), the State Election Board, and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le, also named in their official capacities, (collectively, the "Defendants"), submit this Motion to Exclude the Testimony of Dr. Stephen C. Graves pursuant to Federal Rule of Evidence 702. This Motion seeks to exclude Dr. Graves' testimony at trial and for this Court's consideration of Defendants' Motions for Summary Judgment. See Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (only admissible evidence can be considered on a motion for summary judgment).

## I. Introduction and Facts

Plaintiffs offer the testimony of Dr. Stephen C. Graves in an attempt to prove that polling place wait times in Georgia disproportionately impact voters of color. See Doc. [80] at 2; Doc. [166] at 3. Dr. Graves is a professor at the MIT Sloan School of Management; he focuses his scholarship on operations management and applied operations research generally. (Graves Dep. 11:14-17).[1] Dr. Graves has never taught a course on elections or elections management, and the only elections-related publication to his name was his contribution to a group report regarding the 2000 presidential election; Dr. Graves cannot recall the name of that report. (Id. 12:19-21; 12:22-25; 13:1-6).

The report Dr. Graves provided to the Court in this case is barely three pages long. Doc. [166]. His report relies on the data and findings of a different report (to which Dr. Graves did not contribute) by the Bipartisan Policy Center entitled The 2018 Voting Experience: Polling Place Lines and published in November of 2019 (the "BPC Report"). Id. at 9. Dr. Graves admitted that his own report was conducted in a vacuum because he did not speak with anyone who authored the BPC Report when preparing his own. (Graves Dep. 11:3-8). In fact, other than the BPC Report, the only data he

---

[1] A copy of the transcript of Dr. Graves' deposition is attached as **Exhibit 1**.

analyzed seems to have been data provided by Plaintiff's counsel. (Id. at 9: 17-22).

Dr. Graves' report offers one main conclusion: the BPC Report accurately found that Fulton County, Georgia, had the longest polling place wait times in the country during the 2018 midterm elections. Doc. [166] at 3. He also concludes that the average wait time for Black majority[2] sites in Georgia on election day during the 2018 general election was 1.6 minutes longer than it was for non-Black majority sites. Id. at 5.

Rendering his report and testimony irrelevant, Dr. Graves did not conduct any causal analysis on why wait times were comparatively long in some Fulton County precincts. (Graves Dep. at 20:15-18). He is not testifying about the intent of State or Fulton County policymakers. (Id. at 20:15-24). Nor is Dr. Graves opining on whether county or state officials are responsible for the "design of the polling site" or the "type of resources that will go into a polling location." (Id. at 20:25-21:11). Indeed, Dr. Graves was not even offering an opinion on Fulton County generally. (Id. 24:11-23).

---

[2] Dr. Graves defines "Black Majority sites" as the polling sites in which the "percent of Black registered voters was more . . . than 50%." Doc. [166] at 2.

## II.     Rule 702 and the Daubert Standard.

### A.     Standard for Admitting Expert Testimony

"Under Rule 702 and Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)], district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) The testimony is based on sufficient facts or data; (c) The testimony is the product of reliable principles or methods; and (d) The expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  Pursuant to Rule 702, the Court:

> can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.

Sumner v. Biomet, Inc., No. 7:08-CV-98, 2010 WL 4736320, at *3 (M.D. Ga. Nov. 16, 2010) (citing McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)).  These requirements apply to opinion testimony by

both scientific and non-scientific expert witnesses. Bowers v. Norfolk Southern Corp., 537 F.Supp. 2d 1343, 1350 (M.D. Ga. 2007).

The primary purpose of the Court's gatekeeping function is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Am. Gen. Life & Acc. Ins. Co. v. Ward, 530 F.Supp. 2d 1306, 1312 (N.D. Ga. 2008) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)). The proponent of the expert testimony has the burden to satisfy each of these elements by a preponderance of the evidence. Rink, 400 F.3d at 1292.

## III.  Analysis

Dr. Graves' report is not admissible under Federal Rule of Evidence 702 for two reasons.  First, Dr. Graves' report is not relevant to the issues before this Court and the prospective jury.  Plaintiffs' lawsuit makes allegations about Georgia elections generally and state policymakers specifically.  See generally Doc. [41] (Amended Complaint).  Dr. Graves' report focuses exclusively on a handful of precincts in Fulton County, even though Fulton County's election officials are not on trial.  Further, Dr. Graves does not attempt to extrapolate the information from the Fulton County precincts to make a conclusion on State elections generally.

Dr. Graves' report and testimony also are not relevant to Plaintiffs' allegations of racial discrimination. As Dr. Graves notes, he does not assert that there is a statistically significant relationship between precinct wait times and the percentage of the associated electorate that is African American. Doc. [208] at 2. Nor does he contend that the State of Georgia's decisions have anything to do with wait times at the polls.

Second, Dr. Graves' methodology is not reliable, because the sample size he analyzed is insufficient to come to any significant conclusion. Further, Defendants' expert conducted tests on Dr. Graves' data and did not come to the same conclusions as Dr. Graves, suggesting that such conclusions are unreliable. For these reasons, the Court should exclude the testimony and report of Dr. Graves.

A. Dr. Graves' Opinion Testimony Is Irrelevant.

To be admissible under Rule 702, expert testimony must have a "connection to the disputed facts." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999). Evidence is inadmissible if it will not "help the trier of fact decide the case at bar." Rindfleisch v. Gentiva Health Servs., Inc., No. 1:10-CV-3288-SCJ, 2015 WL 12552053 at *4 (N.D. Ga. Dec. 23, 2015) (excluding expert testimony). Dr. Graves' testimony fails to satisfy Rule 702's relevance requirement.

Prospective jurors in this case will decide questions of fact relating to <u>State</u> policymakers' decisions and whether those decisions amounted to intentional discrimination to the rights of Georgians in elections.  Dr. Graves' testimony will not aid in reaching answers to these questions for three reasons: (1) the acts or omissions of Fulton County election officials are not on trial here; (2) Dr. Graves reviewed data from only a single Georgia county during a single election; and (3) there is no testimony to suggest that the 1.6 minute difference in wait times for voters in majority African-American polling locations is statistically significant.

**1.   Dr. Graves' Report Does Not Speak to State Action.**

Dr. Graves' examination of a few precincts in Fulton County does not address the State's actions, and he offers no opinion on whether Georgia's State government or its counties make decisions about the resources provided at individual polling locations.  (Graves Dep. 21:6-11).  The Georgia Election Code empowers only counties with the ability to "instruct poll officers and others in their duties . . . select and equip polling places," and engage in a host of other activities.  O.C.G.A. § 21-2-70.  Since Georgia's counties are tasked with the decisions that could lead to longer or shorter wait times at the polls, and Plaintiffs' allegations are against the State, Dr. Graves'

opinions about the line length at polling locations, which counties control, are irrelevant to the claims before the Court.

### 2.     Dr. Graves Examines Only One Election.

Even if this Court disagrees, Dr. Graves' testimony remains irrelevant. He only opines on the wait times during the 2018 general election in Fulton County – one of Georgia's 159 counties (or 0.62% of the counties) during one election. Doc. [166] at 1. More startling still, Dr. Graves only analyzed the wait times in 68 of the 373 (18%) polling sites in Fulton County. Id. at 1; Graves Dep. 25:2-26:23-25). Indeed, Dr. Graves testified that he was not even "trying to make a conclusion about Fulton County [elections] in general." (Graves Dep. at 24:17-18). In fact, Dr. Graves' analysis considered only 59,000 of the 425,139 ballots cast in Fulton County (or 7.2%). November 6, 2018 General and Special Election, CLARITY ELECTIONS, https://results.enr.clarityelections.com/GA/Fulton/91700/Web02.221448/#/turnout. Whatever the wait times in these handful of precincts in a single county during a single election, they are irrelevant to wait times for the State as a whole. See generally Doc. [41]. At the very least, Dr. Graves makes no attempt to apply these numbers statewide.

### 3. Dr. Graves Does Not Address Notice.

Relatedly, binding precedent provides that Plaintiffs' failure-to-train claims require Plaintiffs to show that Georgia election officials had notice of alleged deficiencies. AFL-CIO v City of Miami, 637 F.3d 1178, 1189 (11th Cir. 2011). Yet Dr. Graves only reviewed and opined on data from the 2018 General Election in one county. (Graves Dep. 21:12-13). Thus, his testimony cannot be used to show any notice on the part of State officials about problems with lines across the State in all elections.

### 4. Dr. Graves Does Not Quantify His Analysis.

Next, Dr. Graves states that his study showed that "[t]he average [voting line] wait time for Black majority sites was 18.8 minutes, versus 17.2 minutes for non-Black majority sites, a difference of 1.6 minutes." Doc. [166] at 5 (emphasis added); Graves Dep. 40: 19-25). Dr. Graves admitted that he "made no factual finding that there is a statistically significant relationship between the percentage of African American share and the wait time at the polls." (Graves Dep. 43:24-44:1-5); Doc. [208] at 2. This 1.6 minute difference is not suggestive of a disparate impact on voters of color – and Dr. Graves does not make such a suggestion – which makes this conclusion irrelevant to this case.

### B. Dr. Graves' Methodology is Unreliable.

Even if Dr. Graves' testimony were relevant, his methods are unreliable. The Court should exclude expert testimony unless "the methodology used by the expert to reach his conclusions is sufficiently reliable" and if "[t]he testimony is the product of reliable principles or methods." FED. R. EVID. 702; Rink, 400 F.3d at 1291 (11th Cir. 2005); Sumner, No. 7:08-CV-98, 2010 WL 4736320, at *3. The "reliability" analysis considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Allison, 184 F.3d at 1312. "Thus, the question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable." Coggon v. Fry's Elecs., Inc., No. 1:17-CV-03189-SCJ, 2019 WL 2137465, at *2 (N.D. Ga. Feb. 6, 2019) (citations omitted). Importantly, a court can deem an expert report unreliable where its analysis focuses on a small sample size and the report does "not explain whether it [i]s statistically meaningful to extrapolate from such a small sample size." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1337 (11th Cir. 2010).

The small data set that Dr. Graves examined in his report makes his conclusions unreliable. See Kilpatrick, 613 F.3d at 1337. As explained previously, Dr. Graves only analyzed data from the 2018 general election for one of Georgia's 159 counties – and he only examined the wait times from 18% of that county's precincts. Doc. [166] at 1; (Graves Dep. 25:2-26:23-25). Thus, Dr. Graves' conclusion that Black majority polling sites in Fulton County in 2018 had longer wait times than non-Black majority sites is not only irrelevant, it is unreliable. This is particularly true where Dr. Graves himself admitted that (1) he "made no factual finding that there is a statistically significant relationship between the percentage of African American share and the wait time at the polls" and that (2) he did not analyze whether the 68 polling locations he studied even accurately reflect the racial demographics of Fulton County voters even though any conclusion based on racial differences should be based on a sample set that reflect the county's demographics at large. (Graves Dep. 28:20-29:11; 29:18-22; 43:24-44:1-5); Doc. [208] at 2. See Kilpatrick, 613 F.3d at 1337.

Defendants' expert, Sean P. Trende (who, unlike Dr. Graves, is an expert in elections, focusing on "tracking, analyzing, and writing about elections") agrees that Dr. Graves' report is unreliable, and he came to

different conclusions than Dr. Graves did when testing the same data. Doc. [195] at 2-3. Specifically, Trende conducted his own analysis to assess the following question: "assuming . . . there was actually no relationship between the African American share of registered voters and wait times, how likely is it that we would see an outcome such [as] we saw in 2018[?]" Id. at 9. To test this question, Trende ran a regression analysis (which estimates the relationship between variables) to determine the p-value, which he explained is the "statistic that is typically used for this sort of" inquiry. Id. The p-value "represents the probability that we would see the data we have if there were no relationship between the predictors and response (here, African American share of registered voters and wait times)." Id. Trende determined that the p-value was .329. Id. at 10. When the p-value is greater than .1, he explains, there is "little or no evidence" against the null hypothesis, here, "that there is no relationship between the African American share of registered voters and turnout." Id. Thus, according to Trende's analysis, he would "not conclude, based upon [the] data, that there is an association between African American share of registered voters and wait times in Fulton County." Id. Indeed, "the evidence from Fulton County, Georgia in 2018 is insufficient to support a conclusion that an increased African-American share of registered voters was associated with greater wait times." Id. at 11.

Finally, in addition to conducting a weighted t-test like Dr. Graves, Trende conducted a Wilcoxon test on Dr. Graves' data to determine if African American majority precincts experienced longer wait times than White majority precincts during the 2018 general election. Doc. [195] at 10-11. Trende explained that the Wilcoxon test, a nonparametric test, is appropriate where, as here, "we do not know whether wait times follow a normal distribution." Id. at 11. The Wilcoxon test Trende ran resulted in a p-value of .2266, which, as explained previously, indicates that the data "are insufficient to conclude that [there] is any difference between wait times in the median majority-White precinct and the median majority-Black district." Id. In other words, the evidence is not "sufficient to support a conclusion that the average (or median) African American-majority precinct, weighted by population, experienced a longer wait time than the average (or median) White-majority precinct")). Id.

## IV. Conclusion

The Court should exclude Dr. Graves' testimony under Rule 702 for two reasons – Dr. Graves' report is irrelevant, and his methodology is not reliable.

Respectfully submitted this 26th day of June, 2020.

>    */s/ Josh Belinfante*
>    Josh Belinfante
>    Georgia Bar No. 047399

jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing **DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. STEPHEN C. GRAVES** was prepared double-spaced in 13-point Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

*/s/ Josh Belinfante*
Josh Belinfante