# EXHIBIT A



Deposition of:

## J. Alex Halderman , Ph.D.

*February 25, 2020*

In the Matter of:

## Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                     ATLANTA DIVISION

4

5        FAIR FIGHT ACTION, et al.,

6                       Plaintiffs,

7          -vs-                    Case No. 1:18-cv-05391-SCJ

8        BRAD RAFFENSPERGER, in his

9        official capacity as Secretary

10       of State of the State of

11       Georgia, et al.,

12                      Defendants.

13       _____/

14

15

16

17          THE DEPOSITION OF J. ALEX HALDERMAN, Ph.D.

18          Taken at 31500 Wick Road

19          Romulus, Michigan

20          Commencing at 9:27 a.m.

21          Tuesday, February 25, 2020

22          Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 2

1       APPEARANCES:

2       MR. ANDREW D. HERMAN

3       Miller & Chevalier

4       900 16th Street NW

5       Washington, D.C.  20006

6       (202) 626-5869

7       aherman@milchev.com

8            Appearing on behalf of the plaintiffs.

9

10      MR. BRYAN P. TYSON

11      Taylor English Duma, LLP

12      1600 Parkwood Circle, Suite 200

13      Atlanta, Georgia  30339

14      (678) 336-7249

15      btyson@taylorenglish.com

16           Appearing on behalf of the defendants.

17

18

19

20

21

22

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 3

1                    INDEX TO EXAMINATIONS

2

3         WITNESS                                    PAGE

4    J. ALEX HALDERMAN, Ph.D.

5          EXAMINATION BY MR. TYSON                      6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 4

1                              EXHIBITS

2        DEPOSITION EXHIBIT                                       PAGE

3          Exhibit 1     Notice of Deposition              9

4          Exhibit 2     Expert Report                     10

5          Exhibit 3     Supplement to Expert Report       10

6          Exhibit 4     EVN Website                        25

7          Exhibit 5     EVN Website -                      27

8                        Affiliated Organizations

9          Exhibit 6     Dr. Halderman's written            29

10                       statement to House

11                       Appropriations Subcommittee

12                       on Financial Service and

13                       General Government in 2019

14         Exhibit 7     Dr. Halderman's written            37

15                       statement to US Senate

16                       Select Committee on

17                       Intelligence

18         Exhibit 8     Report of the Select               43

19                       Committee on Intelligence

20         Exhibit 9     New York Times story, I            52

21                       Hacked an Election.  So Can

22                       the Russians

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 5

1          Exhibit 10    The Washington Post article,    55
2                        Here's How to Keep Russian
3                        Hackers From Attacking the
4                        2018 Elections.
5          Exhibit 11    Medium article, Want to Know    56
6                        if the Election was Hacked?
7                        Look at the Ballots
8          Exhibit 12    Michigan Alumnus article,       60
9                        Hacking the Vote:  It's
10                       Easier than you Think
11         Exhibit 13    Patent 8,033,463 B2             69
12         Exhibit 14    Verified Voting Foundation:     97
13                       Principles for New Voting
14                       Systems
15         Exhibit 15    Study by University of         182
16                       Michigan, Can Voters Detect
17                       Malicious Manipulation of
18                       Ballot Marking Devices?
19
20         (Exhibits attached.)
21
22
23
24
25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 6

1          Romulus, Michigan

2          Tuesday, February 25, 2020

3          About 9:27 a.m.

4                              *   *   *

5                    J. ALEX HALDERMAN, Ph.D.,

6                    having been first duly sworn,

7                was examined and testified as follows:

8                              *   *   *

9              MR. TYSON:  This will be the

10             deposition of Dr. Alex Halderman taken by

11             Defendant Secretary of State Brad

12             Raffensperger for the purpose of discovery

13             and all purposes allowed under the Federal

14             Rules of Civil Procedure.  And we'll

15             reserve all objections except form and

16             privilege and responsiveness until trial

17             or first use, if that's acceptable.

18                 MR. HERMAN:  That's acceptable.

19                            EXAMINATION

20     BY MR. TYSON:

21     Q.   All right.  Well, good morning, Dr. Halderman.

22     A.   Good morning.

23     Q.   Brian Tyson.  We met before.  It's good to see you

24          again.

25     A.   Good to see you again too.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 7

1    Q.    So I want to go over a couple ground rules just as we

2          get started today.  Have you had a chance to have

3          your deposition taken before?

4    A.    I have.

5    Q.    Okay.  And so you're going to be familiar with this.

6          For our court reporter's sake, it's best that we

7          don't talk over each other.  In conversations,

8          sometimes that's easy to do.  Sometimes you will know

9          where I'm going with a question before I get to the

10         question mark.  It's best for everybody if you can

11         wait until I get to the question mark, then answer.

12              It's best also for a yes and no, instead of

13         uh-huh and huh-uh, just because that makes for a

14         clearer better transcript.

15              And we can take breaks whenever you want to

16         along the way.  My only request is that you would

17         answer the last question I asked prior to taking a

18         break.

19              And there have been times, and it happens

20         in every deposition, where we get to the question

21         mark of a sentence, I don't know what I'm asking, you

22         don't know what I'm asking, no one is -- it's totally

23         confusing.  Let me know if that happens, and I'll

24         rephrase the question.  So will that work for you?

25   A.    Yes, I understand.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 8

1    Q.    Perfect.  All right.  So what I want to do is first

2          talk through some pieces of kind of how you got ready

3          for today.  Then we'll move into your background and

4          experience and then get to the report.  That's kind

5          of the general flow we'll be working with for the

6          day.

7                     So what did you do to get ready for your

8          deposition today?

9    A.    So for the deposition today, I reviewed -- I reviewed

10         material that was produced by Dominion to the

11         plaintiffs that the plaintiffs provided to me that

12         was about -- that was several thousand pages of

13         documentation.  And I'm also familiar with the

14         contours of Georgia's system more generally from work

15         that I've done in the past.

16   Q.    So in terms of documents you reviewed, documents from

17         Dominion, did you review any other documents to get

18         ready for today?

19   A.    Other documents beyond what I'm generally familiar

20         with.  Let me see.  I went back and looked at

21         documentation prepared in testing the Dominion

22         equipment in California, as well as the Poll Pads in

23         California.  I reviewed certifications from

24         Pennsylvania regarding the Poll Pads and the Dominion

25         equipment, I think documentation from Texas, and a

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 9

1          number of other resources that are cited in my

2          report.

3    Q.    Did you review any documents that are not cited in

4          your report to get ready for your deposition today?

5    A.    I don't believe so.  Not specifically for the

6          deposition today.  Perhaps the order from the Curling

7          case.  I reviewed that.

8    Q.    And that would be the 2019 order?

9    A.    Judge Totenberg's order in 2019.  That's correct.

10   Q.    Got it.  And did you talk with anybody about your

11         deposition today?

12   A.    I spoke to -- I spoke to Andrew and to Kurt, the

13         attorneys for the plaintiffs.

14   Q.    Anybody at the university who's not an attorney that

15         you spoke to?

16   A.    No.

17   Q.    Anyone else who's not one of the attorneys that you

18         talked to about your deposition today?

19   A.    No.  No.

20                  (Exhibit No. 1 marked.)

21   BY MR. TYSON:

22   Q.    Okay.  I'm going to hand you what we've marked as

23         Exhibit 1, the Notice of deposition.  I'm assuming

24         you've seen that document before.

25   A.    Yes, I have.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                                    Page 10

1    Q.    Okay.  That's just your notice.  Then what I'm going

2          to do is go ahead and mark your reports.  That way we

3          can refer to it as we're going through the

4          biographical details.  That will be easy enough on

5          that.  So I'll hand you what we've marked as Exhibit

6          2.

7                        (Exhibit No. 2 marked.)

8    BY MR. TYSON:

9    Q.    I'll ask if that's the report that you filed in this

10         case.

11   A.    Yes.

12                   MR. HERMAN:  Can I just note for one

13            second, this is the unsigned version.

14                   MR. TYSON:  Right.  I'm going to hand

15            him --

16                   (Exhibit No. 3 marked.)

17   BY MR. TYSON:

18   Q.    So I'll hand you, make it complete, what I've marked

19         as Exhibit 3.

20   A.    Yes.

21   Q.    Is that the signature page for the report that is

22         Exhibit 2?

23   A.    Yes.

24   Q.    Okay.  Wonderful.

25                   MR. HERMAN:  I underestimated you.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 11

1              I'm sorry.

2                   MR. TYSON:   Totally fine.

3    BY MR. TYSON:

4    Q.   All right.  So, Dr. Halderman, in paragraph 13 of

5         your report, you indicate that you're being

6         compensated at a rate of $750 an hour for your work

7         on this case, correct?

8    A.   That's correct.

9    Q.   And is that -- you indicate that's your customary

10        rate.  Do you provide discounts for your expert

11        services in other cases, or is that what you charge

12        for all services?

13   A.   I generally don't provide discounts.

14   Q.   And when you say you generally don't, are there

15        specific situations where you have?

16   A.   There's -- I can think of one other situation I have

17        where work involved -- work involved a large amount

18        of rote technical work that I could do on an

19        arbitrary timeline, in which case I have.

20   Q.   And is the rate of $750 an hour generally what you

21        charge when you're working on a technical review for

22        a state or other sorts of work like that?

23   A.   Well, it depends on the circumstances.  The work that

24        I would do for a state might be anywhere from pro

25        bono to the $750 rate.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 12

1    Q.    Do you know approximately how much time you spent

2          preparing your report?

3    A.    I don't recall exactly how much time.

4    Q.    And have you sent a bill in this case?

5    A.    I haven't yet.

6    Q.    Okay.  And you plan to?

7    A.    I plan to.

8    Q.    Okay.  And you don't have a current estimate of what

9          that amount will be?

10   A.    No, I haven't prepared the bill yet.

11   Q.    All right.  So let's talk a little bit about how you

12         got involved in this lawsuit.  Did someone contact

13         you about providing a report in this litigation, or

14         how did you get started being an expert in this case?

15   A.    I was contacted by Plaintiffs' Attorneys I suppose

16         approximately a year ago.  I'd have to go back and

17         check.

18   Q.    And when you were contacted, did anyone give you

19         direction about what you were supposed to examine

20         beyond what you've described in your report?

21   A.    No, I don't believe so.

22   Q.    Did Plaintiffs' Counsel provide you with any data or

23         documents for purposes of this report?

24   A.    Yes.  They provided me with material that they --

25         that was the result of a subpoena to Dominion.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 13

1    Q.    And I should have asked.  Beyond the Dominion

2          subpoena documents, did Plaintiffs' Counsel provide

3          you any other data or documents that you relied on?

4    A.    Nothing beyond what's in the docket.

5    Q.    And did Plaintiffs' Counsel ask you to make any

6          assumptions about facts in this case for your report?

7    A.    No, they didn't.

8    Q.    Have you read the amended complaint in this case?

9    A.    Yes, I have.

10   Q.    Have you read any of the depositions that were taken

11         in this case?

12   A.    I don't believe so.

13   Q.    You indicated some docket information.  Have you read

14         any of the briefs that were filed in this case?

15   A.    I have -- I've skimmed through the docket, and I've

16         read some of the materials.  I'm not sure I've read

17         any of the briefs in full.

18   Q.    I'm not asking for your legal opinion here.  But in

19         your own words, do you have a description of what you

20         believe this case is about?

21   A.    So this case is broadly about whether election

22         practices in the state of Georgia have violated the

23         rights of Georgia voters or had discriminatory

24         effects.

25   Q.    And for your report and your work in this case,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                          Page 14

1          you're not alleging any racial component to any of

2          the problems that you've identified in your report,

3          correct?

4     A.   Well, the problems that I have discussed in my report

5          certainly could have a racial effect, especially if

6          an attacker seeking to so discord or alter the

7          outcome of an election targeted specific candidates

8          or racial groups for that effect.

9     Q.   For purposes of this report, though, you have not

10         examined any racial impacts that -- you can speculate

11         about there might be one.  But for purposes of your

12         report here, you're not alleging there are any racial

13         impacts, correct?

14    A.   I haven't gone back to examine racial data.

15    Q.   Okay.

16    A.   But certainly one of the risks, the problems that I

17         identify in this report could have is racially

18         disparate impacts.

19    Q.   And the opinions that you've authored in this report

20         in Exhibit 2 do not address the potential racial

21         impact, correct?  You're not analyzing -- let me

22         start over again.

23              The opinions you're expressing in Exhibit 2

24         are not an analysis of any racial effect of

25         particular methods of attack.  Is that a fair

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 15

1          statement?

2     A.   Well, they raise the possibility that -- and describe

3          methods by which an attack could occur that I think

4          it's clear could have a racial impact.  Do I analyze

5          exactly what that impact would be?  I think that

6          depends on what the attacker is hoping to achieve.

7     Q.   Maybe I can put a finer point on this.  In the

8          opinions you're expressing in your report, you're not

9          alleging that Georgia has selected particular voting

10         machines or voting practices to have a racially

11         disparate impact, are you?

12    A.   I'm not alleging intention.

13    Q.   And you're not expressing any opinion about

14         intention; is that correct?

15    A.   No, I don't go to intention.

16    Q.   As part of your work on your report, have you spoken

17         to anyone in Georgia to obtain any information that

18         you later used in your report beyond Plaintiffs'

19         Counsel?

20    A.   I have had past conversations with people in Georgia

21         that have informed my -- that have informed my

22         overall knowledge about Georgia election systems.

23    Q.   And who would those individuals be?

24    A.   I've spoken to Dr. Richard DeMillo at Georgia Tech

25         and Dr. Wenke Lee at Georgia Tech.  That's just two

J. Alex Halderman , Ph.D.                              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 16

1      individuals.  And I have -- those would be probably

2      the two primary people who have informed my -- helped

3      inform my general knowledge about Georgia elections.

4   Q.  Have you spoken to any county election officials in

5      Georgia?

6   A.  No, I don't believe so.

7   Q.  Have you spoken with anyone in the Secretary of

8      State's office that resulted in information that was

9      included in your report?

10  A.  No.  But I'm generally familiar with their testimony

11     and the Curling matter and earlier litigation.

12  Q.  And when you refer to earlier litigation, beyond

13     Curling, what are you referring to there?

14  A.  Boy, all of this litigation has been going on for a

15     while, hasn't it?  I think there was -- am I correct

16     there was a state matter that -- before the Curling

17     federal matter in which there was additional

18     testimony?

19  Q.  Does Favirito versus Handel as a state court matter

20     ring a bell?  If not, that's fine.  I just thought I

21     could help identify it for you.  But if not, that's

22     fine.

23  A.  I'm sorry.

24  Q.  No problem.  Let's talk a little bit about your kind

25     of journey to here, starting with your undergraduate

J.  Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 17

```
 1        work at Princeton.  I know that you had your CV

 2        attached to your report.  So I just want to walk

 3        through a few questions on that.

 4              Your thesis for undergraduate work you

 5        indicate was titled Investigating Security Failures

 6        and Their Causes, An Analytic Approach to Computer

 7        Security.

 8              Can you tell me a little bit about how you

 9        arrived at that topic?  I'm sorry.  That was your

10        Ph.D. thesis.  I misspoke on that.

11   A.   How I arrived at that topic?  Can you -- what do you

12        want to know?

13   Q.   Sure.  So you focus obviously on computer security

14        and those types of issues.  How is it that you

15        arrived at wanting to study or studying this

16        particular area, cybersecurity?

17   A.   I see.  I started working on studying security

18        questions even when I was an undergrad at Princeton.

19        So you'd have to go back even farther.  But I suppose

20        what interested me most about security was that it

21        bridged both technical problems that were of

22        significant technical interest and problems involving

23        human beings and their lives, and there was an

24        opportunity in security to -- there was an

25        opportunity in security to bridge both the technical
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 18

 1          and the human elements.

 2     Q.   And I know from a timing perspective we're looking at

 3          kind of post-2000 election.  I'm assuming that the

 4          rise in electronic voting around the same time

 5          period, was that also a factor, seeing the changes in

 6          the growth there?

 7     A.   I'm not sure that that is what initially attracted me

 8          to the security field.  I had already been working in

 9          the area, but the rise of electronic voting at the

10          time was certainly one of the challenging new

11          research problems that was exciting.

12     Q.   I see you finished up in Princeton in 2009.  And then

13          where did you go from there before arriving at the

14          University of Michigan?

15     A.   I came directly to the University of Michigan.

16     Q.   Oh, I see.  I'm sorry.  I was looking at the top line

17          there.  As an assistant professor?

18     A.   That's right.

19     Q.   And so are you currently tenured at the University of

20          Michigan?

21     A.   I am.

22     Q.   And your entire academic career as a professor has

23          been at the University of Michigan, correct?

24     A.   That's correct.

25     Q.   And was there a particular item or issue that led you

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 19

 1      from Princeton to Michigan?

 2   A.  Not really.  Michigan -- Michigan has a very

 3      well-ranked computer science department and has one

 4      of the best computing systems groups in the country,

 5      which is the broader area in which most security

 6      research lies.

 7   Q.  And so in terms of courses that you are teaching, you

 8      list some of those on there.  You've taught courses

 9      on election, cybersecurity.  It's fair to say that

10      your focus really has been on cybersecurity in the

11      election context; is that a fair statement?

12   A.  That has been one of the large focuses of my work.

13      But my work is about computer security and

14      cybersecurity broadly, also work about encryption

15      technology, about securing devices attached to the

16      internet, and so on.

17   Q.  And based on the courses you have in your CV, ethics

18      is also a part of the questions you have to deal

19      with; is that correct?

20   A.  Yes.  That's correct.

21   Q.  And so in terms of kind of general principles of

22      ethical implications involved with cybersecurity

23      work, what are some topics that you cover with your

24      students on those areas?

25   A.  Questions like responsible disclosure, that is

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 20

```
 1           informing manufacturers of vulnerabilities in a way
 2           that helps get the vulnerabilities fixed.  Questions
 3           about when is it right or lawful or not to conduct an
 4           assessment of a particular system, etcetera.
 5   Q.      And when you say when it's right or lawful to conduct
 6           an assessment of a particular system, can you
 7           elaborate on that for me real quick?
 8   A.      Well, there are sometimes when there are some
 9           vulnerabilities in systems that are too dangerous to
10           investigate without the cooperation of the people
11           running a system because by virtue of investigating
12           them, you might disrupt the system in a way that
13           causes broader damage.  For instance, trying to
14           without permission demonstrate ways that you could
15           hack into a hospital, which might have the effect of
16           causing people to die.  That's probably not an
17           ethical exercise in hacking.  If there are safer
18           alternatives, it would be preferred to attempt those
19           safer alternatives.
20   Q.      And then do you do any consulting or offer services
21           to companies that want you to investigate potential
22           vulnerabilities that they have?
23   A.      I have a startup company that I founded that is in
24           the business of helping companies understand the
25           vulnerabilities in their internet-facing systems.
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 21

1    Q.    And so I'm assuming the business model is a company

2          would retain your services through your

3          corporation -- through your company to help them

4          evaluate that?

5    A.    No.  It's not so much about retaining my services.

6          But we produce application software that helps

7          companies understand their exposure.

8    Q.    And what is the name of your company?

9    A.    It's called Censys, C-e-n-s-y-s.

10   Q.    And do you sell the software that helps companies

11         understand their exposure?

12   A.    It's kind of an annual license model.

13   Q.    And then after a company understands its exposure,

14         does Censys offer services to help it mitigate those

15         risks?

16   A.    Yes, essentially.

17   Q.    And is that more on a consulting basis as opposed to

18         the annual license model?

19   A.    No.  It's not really a consulting model.  We help to

20         point out what the vulnerabilities are and help you

21         understand which ones are important to mitigate.

22   Q.    And I'm assuming in your work with Censys and then

23         your work at the University of Michigan you never

24         encountered a system with zero vulnerabilities.  Is

25         that safe to say?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 22

1    A.    Yes.  I think that's probably safe to say, that
2          computing systems in general of more than trivial
3          complexity as a rule have vulnerabilities.
4    Q.    And in your work with Censys, are there situations
5          where a company is not able to mitigate all the
6          vulnerabilities you identify?
7    A.    Well, not able is a bit of a tricky statement.  So I
8          think it's a question of -- all of the
9          vulnerabilities that we identify are things that can
10         be mitigated.
11   Q.    And then it's up to the company to choose whether or
12         not they want to mitigate those vulnerabilities,
13         right?
14   A.    That's right.  Nobody forces anyone to mitigate
15         vulnerabilities in general.
16   Q.    And so ultimately, I guess maybe this is too general
17         of a statement, but there are companies that choose
18         to encounter a level of risk for some reason known to
19         them?
20   A.    Well, that's right.  And sometimes -- sometimes
21         that's clearly irresponsible.
22   Q.    Can you tell me about ISRG and what that is.
23   A.    Sure.  ISRG, the Internet Security Research Group, is
24         a not-for-profit company that I co-founded.
25   Q.    And what type of work does ISRG do?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 23

```
 1   A.   So ISRG runs some of the critical security

 2        infrastructure for the internet.  It runs a service

 3        called Let's Encrypt, which is a certificate

 4        authority.  That means that it vouches for the

 5        identity of websites.  So if you connect to a website

 6        that has https, one of the crucial steps that's going

 7        on behind the scenes before you make that connection

 8        is that some trusted authority has vouched for the

 9        identity of the site so that your computer knows it's

10        talking to the real website and not to an attacker.

11        So ISRG and Let's Encrypt are the worlds largest

12        certificate authority.  They've issued a billion

13        certificates as of this week for several hundreds of

14        millions of websites.

15   Q.   Have you ever seen a situation where an attacker

16        attempted to appear to be a certificate authority to

17        gain access to a system.

18   A.   Yes.

19   Q.   Is that a fairly typical method of trying to attack

20        or hack a system?

21   A.   To pretend to be a certificate authority?  It's one

22        of the attacks that we as a security community spend

23        a lot of time trying to make sure it doesn't happen.

24   Q.   But it is a potential risk --

25   A.   Yes.
```

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 24

1   Q.   -- correct?  Are you paid for your services with

2        ISRG?

3   A.   No.  I only receive compensation for my travel.

4   Q.   And I'm assuming you are paid for the services Censys

5        provides, correct?

6   A.   Yes, I am.

7   Q.   So you benefit when there is a -- having visibility

8        about exposing vulnerabilities is a benefit to you as

9        advertising for Censys.  Is that fair to say?

10  A.   I suppose.  It depends on what the context of that

11       vulnerability is.

12  Q.   You indicate in your CV that in 2011 you received the

13       Election Verification Network's John Gideon Memorial

14       Award.  Do you recall that?

15  A.   Yes.

16  Q.   And what is the Election Verification Network?

17  A.   The Election Verification Network is a -- is a group

18       of election technology experts and election officials

19       and -- who are -- who work in the topic area of

20       increasing the security of elections.

21  Q.   And I'm assuming you've participated in EVN

22       conferences in the past?

23  A.   I have, yes.

24  Q.   And what does the John Gideon Memorial Award

25       recognize?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 25

1    A.    I think it's scoped as recognizing contributions to

2          election integrity.

3                      (Exhibit No. 4 marked.)

4    BY MR. TYSON:

5    Q.    Dr. Halderman, I'm going to hand you what we've

6          marked as Exhibit 4.  And this is the -- appears to

7          be -- well, it's from the website of EVN for the 2019

8          conference.  And if you could turn over to the third

9          physical page.

10   A.    Page 3?

11   Q.    Yes.

12   A.    All right.

13   Q.    There's a 1:45 p.m. session on usability and voter

14         verification.  Are you with me on that?

15   A.    Yes.

16   Q.    And was this one of the panels for EVN on which you

17         appeared?

18   A.    I don't believe I appeared on that panel, no.

19   Q.    Okay.

20   A.    But I'm not listed as a panelist, and I don't recall

21         being on that panel.

22   Q.    At the -- I see your name right there.  I see Josh

23         Benaloh from Microsoft, Michelle Bishop, and then J.

24         Alex Halderman.

25   A.    Excuse me.  I was looking at the 11:45.  You mean the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 26

1          1:45 panel?

2     Q.   Got it.  My apologies.

3     A.   Yes.  That panel I did speak on.

4     Q.   And can you tell me a little bit about what usability

5          and voter verification, what topics this panel

6          covered?

7     A.   Yes.  So this panel was about -- this panel was in

8          part about ballot marking devices and the issues of

9          usability and accessibility connected to them.  It

10         was also in part about what are called end-to-end

11         verifiable voting protocols and accessibility and

12         usability attributes connected to them.

13    Q.   And maybe I can get some definitions of terms.  So

14         when you say the usability attributes of a system,

15         what is that referring to?

16    A.   It refers to -- it refers to how humans interact with

17         the technology and whether they're able to use it

18         correctly and securely.

19    Q.   And accessibility as a topic, what does that cover?

20    A.   Potential -- primarily that covers problems that may

21         involve voters or other users who have certain

22         disabilities, such as physical disabilities, and

23         their ability to use the technology.

24    Q.   And when you refer to end-to-end encryption, can you

25         describe that a little bit, please.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                                Page 27

 1    A.    So end-to-end verifiable voting protocols are a

 2          family of technologies that use advanced encryption

 3          methods to provide assurance that the election

 4          results were correct essentially.

 5    Q.    And that's an area that's still being researched, or

 6          are there products available today that provide that?

 7    A.    There are products available today that provide that.

 8          But it certainly is still actively being researched,

 9          and there were some significant limitations to the

10          products that provide it today.

11    Q.    Let me hand you next what will be marked as Exhibit

12          5.

13                (Exhibit No. 5 marked.)

14    BY MR. TYSON:

15    Q.    And this is from the EVN website affiliated

16          organizations.  Are you aware of affiliated

17          participating organizations within EVN?

18    A.    I'm aware of some organizations that are affiliated

19          or participating, but I'm not sure that I've seen

20          this list before.

21    Q.    Okay.  And my main question, I see organizations like

22          the South Carolina Progressive Network, Common Cause,

23          the Brennan Center, the Advancement Project.  And

24          I -- my question is just going to be, do you know if

25          there are any conservative lean organizations

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 28

1          affiliated with EVN?  If you don't, that's fine.

2     A.   I don't know the politics of each of these

3          organizations.  I'm sorry.

4     Q.   Easy enough.  So let's talk a little bit about the

5          expertise here.  You're an expert in cybersecurity.

6          You focused on elections, as we've talked about.

7                    Do you consider yourself an expert in

8          election administration?

9     A.   In election administration?  The subset of election

10         administration that concerns securing elections I do

11         consider myself an expert.

12    Q.   Okay.  But not in election administration broadly?

13    A.   Not in all aspects of election administration.

14    Q.   And so one of those areas within election

15         administration where you would not be an expert is

16         on, for example, best practices on chain of custody

17         for paper ballots; is that true?

18    A.   That concerns security.  So I do think I have some

19         expertise there.

20    Q.   Okay.  Which components of election administration do

21         not involve security that you would not consider

22         yourself an expert in?

23    A.   Well, I suppose not being an expert, I can't identify

24         all of the expert -- the areas that I lack expertise

25         in.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 29

1    Q.    Well, and the reason why I ask is in terms of

2          designing an election system, ultimately every piece

3          of design of an election system has to touch on

4          security in one way or another.  Is that fair to say?

5    A.    Probably significant amounts of the design of an

6          election system do.  I wouldn't say that every part

7          does.

8    Q.    And we have stories of, I'm sure you've heard, of

9          paper ballots being thrown into rivers, being

10         transported various methods between polling places

11         and central offices.  Do you consider yourself an

12         expert on the design of those components of handling

13         paper ballots?

14   A.    Yes, I do have expertise that's in that area.

15   Q.    And do you consider yourself an expert in the design

16         of auditing practices for elections?

17   A.    Yes.  Yes, I do.

18   Q.    Let's talk next about your testimony to congress.

19         I'll start with your most recent testimony.  You

20         testified to the House Appropriations Subcommittee on

21         Financial Service and General Government in 2019.  Do

22         you recall that testimony?

23   A.    Yes, I do.

24                   (Exhibit No. 6 marked.)

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 30

1    BY MR. TYSON:

2    Q.    I'll hand you what we've marked as Exhibit 6.  I'll

3          ask if this is your written testimony for that

4          committee.

5    A.    Yes, it appears to be.

6    Q.    And almost a year ago almost to the day, not quite.

7          So --

8    A.    Has it really been only a year?

9    Q.    2019 was a long year.

10                MR. HERMAN:  Wait until 2020.

11   BY MR. TYSON:

12   Q.    All right.  So in the second paragraph beginning

13         three years ago, you reference hackers penetrating or

14         manipulating efforts and targeting election

15         infrastructure, including voter registration systems

16         in at least 18 states.  Was Georgia one of those 18

17         states?

18   A.    Yes, it was.

19   Q.    Okay.  And so it's your testimony that hackers

20         targeted Georgia's voter registration system?

21   A.    So it's my testimony that subsequent to what I -- to

22         my written testimony from a year ago, the Senate

23         Intelligence Committee investigation has concluded

24         that the Russian -- the scope of the Russian attacks

25         was likely all 50 states, which would include

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 31

1       Georgia.

2   Q.  And it's your testimony that that included Russian

3       attacks on Georgia's voter registration system, not

4       just on other components of the election system?

5   A.  I think that it's a fair inference from the findings

6       of the Senate Intelligence Committee that parts of

7       the system that are exposed to the internet like the

8       registration system were among those that the

9       Russians were targeting.

10  Q.  And when you say a system was targeted, you're not

11      necessarily saying it was accessed, correct?

12  A.  Not necessarily.

13  Q.  And not necessarily that it was manipulated in any

14      way, correct?

15  A.  Certainly not that -- you certainly can't conclude

16      from that that it was successfully manipulated.  No.

17  Q.  In the next paragraph, the end of that paragraph you

18      say, we were spared such a blow to the foundations of

19      American democracy only because Russia chose not to

20      pull the trigger.

21  A.  That's right.

22  Q.  And so would that be consistent with targeting but

23      not manipulating, that those are two different

24      things?

25  A.  So what we know is also, again, this is from the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 32

1          bipartisan findings of the Senate Intelligence

2          Committee, is that in one or more states, Russia had

3          the technical ability to manipulate or destroy voter

4          registration data.

5     Q.   But it's not your testimony that Russia had that

6          ability as to Georgia's voter registration system; is

7          that correct?

8     A.   Well, so it's not my testimony that the Senate

9          Intelligence Committee has concluded that Russia had

10         that ability in Georgia.  Could Russia have done that

11         in Georgia?  I think it's very likely.

12    Q.   Okay.  But you don't have any personal knowledge or

13         anything that would indicate to you that Georgia's

14         voter registration system was accessed or could have

15         been accessed by the Russians?

16    A.   Could have been accessed by the Russians?  I think

17         based on what I know about the security posture of

18         the Georgia voter registration system and about the

19         capabilities of the Russian attackers, I do think

20         it's likely that they could have accessed it.

21    Q.   Okay.  But you don't have any personal knowledge that

22         it was, in fact, accessed?

23    A.   No, I don't.

24    Q.   On the second --

25    A.   When do you think your section will be done just

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 33

1          so -- I think we're getting kind of closer to an

2          hour.

3     Q.   Sure.  Maybe five, ten minutes.  Do you want to take

4          a break now?

5     A.   All right.  We'll take a break after that.  Let me

6          stretch.

7     Q.   Sure.  We can finish this document, we can do that.

8     A.   Of course.

9     Q.   So on the second physical page, you identify three

10         essential measures to protect and defend our election

11         infrastructure.  And the first you indicate is to

12         replace obsolete and vulnerable voting systems, such

13         as paperless systems with optical scanners and paper

14         ballots.

15              Are you including ballot marking device

16         systems in that as an option that we should look to

17         move to or exclusively hand-marked paper ballots?

18    A.   Ballot marking devices are important in any system

19         that uses paper ballots in order to provide an

20         independent accessible voting option for voters with

21         disabilities.  But crucially, the risk of using

22         ballot marking devices becomes very substantial when

23         they're used for all voters, as Georgia does, as

24         opposed to just for voters who request them, for

25         instance, a smaller fraction of voters.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 34

1    Q.    Would you say it's better from a security standpoint

2          for a state to replace a paperless system with a

3          system that involves at least some paper?

4    A.    Depends what they do with that paper.  If they don't

5          look at that paper or they're not looking at enough

6          of that paper, then the paper isn't serving the

7          purpose.

8    Q.    And that's true of a hand-marked paper ballot system

9          or a ballot marking device system, correct?

10   A.    If they don't look at it, that's right.  It's that

11         the paper isn't serving a purpose.

12   Q.    And which leads us to the second piece there,

13         advocating looking at the paper.  And you advocate

14         what's best -- what's known as a risk-limiting audit;

15         is that correct?

16   A.    Yes.  I recommend RLAs.

17   Q.    So an RLA, you recommend that whether a state is

18         using hand-marked ballots or ballot marking device

19         ballots, correct?

20   A.    Yes, I do.

21   Q.    On the next page, page 3, you point out that paper

22         ballots, manual audits, and security best practices

23         are endorsed by a lot of folks, including the

24         National Academies of Science, Engineering, and

25         Medicine.  I know we had this discussion previously.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 35

1      But you disagree with the National Academy of
2      Sciences as to ballot marking devices; is that right?
3   A. No, I wouldn't say that I disagree.  The National
4      Academies' report called specifically for further
5      research.  And to the question of validation on voter
6      verification of ballot marking devices and ballots
7      that they produce, substantial subsequent research,
8      including research that my own group has conducted,
9      has led to further understanding of the security
10     risks of ballot marking devices.
11  Q. At this point, the National Academy of Sciences has
12     not changed its recommendation recommending that
13     states use either hand-marked paper ballots or ballot
14     marking devices, correct?
15  A. I believe they'd have to go through a new consensus
16     report process in order to change what they've
17     written, and that's a process that hasn't happened
18     yet.
19  Q. So that's a no, they haven't changed their
20     recommendation yet?
21  A. They have not changed the published report.  They
22     haven't released the new recommendation.
23  Q. Down at the bottom of page 3, you indicate that many
24     states would like to replace vulnerable and obsolete
25     equipment, but they are struggling to figure out how

J. Alex Halderman , Ph.D.              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 36

1         to pay for it.  So you would agree with me that there

2         are a lot of considerations for states in looking at

3         replacing voting equipment, including financial,

4         correct?

5    A.   Yes.

6    Q.   Then on the bottom of page 4, you refer to

7         voter-verifiable paper audit trails, VVPATs.

8    A.   Yes.

9    Q.   And you indicate those are badly inferior to paper

10        ballots.  Are they inferior to ballot marking device

11        paper ballots as well?

12   A.   Let me see what I've written here.  Excuse me just a

13        minute.

14   Q.   Take your time.

15   A.   So VVPATs are inferior to certain kinds of ballot

16        marking device ballots, but they do share some of the

17        problems of ballot marking device ballots.

18   Q.   I'm assuming that VVPATs and ballot marking device

19        ballots, they are both superior to paperless DREs?

20   A.   When combined with rigorous audits, they're both an

21        improvement.  The limitation is -- one of the key

22        limitations has to do with particularly close

23        elections and whether the verifiable paper trail in

24        either case accurately reflects voters' intentions.

25   Q.   Okay.  All right.  That's all I have for that

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 37

1        exhibit.  So we can go ahead and take a break for a

2        few minutes.

3   A.   Okay.

4                 (Recess taken.)

5   BY MR. TYSON:

6   Q.   Dr. Halderman, next I want us to talk about your

7        testimony to the Senate Intelligence Committee in

8        2017.  How were you invited to attend the US Senate

9        Intelligence Committee, if you recall?

10  A.   How was I invited?  One of the -- one of the

11       committee staffers e-mailed me and invited me to

12       testify.

13                 (Exhibit No. 7 marked.)

14  BY MR. TYSON:

15  Q.   I'm going to hand you what we've marked as Exhibit 7.

16       Is that your statement to the Senate Select Committee

17       on Intelligence?

18  A.   This is my written statement.

19  Q.   If you could turn with me to page 2.  You talk about

20       in the second paragraph that optical scanners and DRE

21       voting machines are computers.  Then the third

22       sentence you say, fundamentally, they suffer from

23       security weaknesses similar to those of other

24       computer devices.

25                 You'd agree that anything that is a

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 38

1              computer has possible security vulnerabilities?

2    A.    Yes, in general.

3    Q.    And I think, as we talked about earlier, that's true

4          of any computer.  There's going to be some

5          vulnerability that a dedicated researcher could find.

6          Fair to say?

7    A.    Yes, that's fair to say.  That's why there's some

8          applications in which we shouldn't blindly trust

9          computers to function correctly.

10   Q.    And you mention optical scanners in this group.  Is

11         that why you advocate for audits even for hand-marked

12         paper ballots counted by optical scanners?

13   A.    Yes.  Essentially that because optical scanners can

14         be hacked so that they count incorrectly, it's

15         important to verify that the election outcome is

16         correct through physical inspection of the records

17         that match the voters' intent.

18   Q.    On the third page, first full paragraph, you mention

19         that vulnerabilities are endemic throughout our

20         election system.

21              If a jurisdiction was using exclusively

22         DREs and then moved to a hand-marked paper ballot

23         system counted by optical scanners but did not

24         utilize any audits whatsoever, would you consider

25         that more or less secure as an environment?

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 39

1   A.   But did not utilize any audits.  I would characterize

2        it as a small improvement, although still a

3        significant security risk, such as such a system

4        could withstand, for instance, the total sabotage of

5        the optical scanners and still produce an election

6        result.

7   Q.   But it could not withstand a hacking of the optical

8        scanners that was never discovered because there were

9        no audits, correct?

10  A.   That's correct.

11  Q.   If you could turn with me to page 5.  The very top of

12       page 5 and then the first full paragraph on page 5

13       discuss the Russians being in a position to sabotage

14       equipment causing the failure of voting machines,

15       resulting in long lines, and then putting the

16       Russians in a position to spread an attack and

17       potentially steal votes.

18            Is there any evidence that the scenarios

19       outlined in those first two paragraphs on page 5

20       occurred in an election?

21  A.   There is evidence that Russia did attack one or more

22       vendors of election technology and attempt to spread

23       from there to the systems of municipalities.  There

24       is -- I think it's a remaining question whether they

25       got any farther than that.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 40

1   Q.   And so is there any evidence that the Russians have

2        sabotaged equipment on election day?

3   A.   So there are failures of equipment on election day

4        that there is I think it's fair to say substantial

5        question whether that failure is the result of an

6        attack or just of other forms of human error.

7   Q.   But sitting here today, you don't have any evidence

8        that equipment failure on election day was caused by

9        a Russian attack, correct?

10  A.   How would we have evidence one way or another?

11       most -- there have been few or no examinations of

12       polling place equipment since 2016 that would reveal

13       one way or another conclusively whether attacks had

14       been successful.

15  Q.   So let me ask again.  So sitting here today, you

16       don't have any evidence that any failure of equipment

17       on election day was caused by Russians, correct?

18  A.   No.  I cannot say that with high certainty that

19       failures were caused by Russia.

20  Q.   And you're not testifying to the Senate Intelligence

21       Committee or in your report here that -- I should

22       strike that.  Let me go to the next one.

23            And you don't have any evidence sitting

24       here today that the Russians have stolen votes as a

25       result of an attack on voting machines, correct?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 41

1    A.    No, there is no evidence to my knowledge that that

2          did take place.  It's -- the problem is that there

3          was nothing technical stopping that from taking place

4          in certain jurisdictions.

5    Q.    But as we discussed in your prior testimony, just

6          because you have the ability to aim the gun doesn't

7          mean you're going to pull the trigger, correct?

8    A.    No, that's right.  As I say, Vladimir Putin

9          apparently decided not to pull the trigger, and

10         that's what stopped massive chaos in 2016.

11   Q.    And in the third full paragraph on page 5 you say you

12         don't know how far the Russians got in their effort

13         to penetrate our election infrastructure, nor whether

14         they interfered with equipment on election day.  And

15         sitting here today, you still don't know how far they

16         got, correct?

17   A.    Unfortunately, that is correct.  There are still

18         large areas of election infrastructure that have not

19         been -- that have not been analyzed since 2016 in a

20         way that would allow us to know.  We may never know

21         how far the Russians got.

22   Q.    On page 6 you're reiterating the points of what you

23         recommend for safeguarding elections, and this

24         testimony obviously is in 2017.  So in the first

25         bullet when you advocate optical scanners and paper

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 42

1          ballots, at this time in 2017, were you also

2          including ballot marking devices for all voters or

3          only for those with disabilities?

4     A.   I don't say one way or another in this testimony.

5          And I think that at that time, I still would have

6          said the safer thing to do is to limit the use of

7          ballot marking devices to less than all voters.

8     Q.   Have you had a change of your view of ballot marking

9          devices between 2016 and today based on the research

10         you've conducted, or have you always taken the

11         position that ballot marking devices for less than

12         all voters is the best system?

13    A.   I think that my view has gone from one of the

14         conservative positions that ballot marking devices

15         are less safe than hand-marking to one that is the

16         strong research supported conclusion is that ballot

17         marking devices are far less safe.  But I think -- I

18         think at the time that this was written back in 2017,

19         I would have acknowledged that we don't yet have

20         enough evidence to conclude strongly one way or the

21         other about ballot marking devices.

22    Q.   In your CV, you also reference five congressional

23         briefings between May 2017 and September 2019.  What

24         did those briefings involve?

25    A.   Those briefings involved generally public meetings on

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 43

1          Capital Hill somewhere in which I tried to educate

2          members of congress and their staff about some of the

3          security risks involved in elections.

4     Q.   And were those briefings focused on the

5          vulnerabilities inherent in DREs, or did you discuss

6          other topics related to election security?

7     A.   I discussed other topics too.

8     Q.   And do you recall what those other topics would have

9          been?

10    A.   Well, in general, the threats of -- threats of

11         tampering with other kinds of voting machines, like

12         optical scanners or ballot marking devices.  They

13         would have covered risks in other components of the

14         election infrastructure like registration or

15         reporting.

16    Q.   Have you reviewed the Senate Intelligence Committee's

17         report on Russia specifically involving the efforts

18         to interfere with election infrastructure?

19    A.   Yes.

20    Q.   I'm going to hand you what we've marked as Exhibit 8.

21              (Exhibit No. 8 marked.)

22    BY MR. TYSON:

23    Q.   And I'll ask is this a report from the Senate

24         Intelligence Committee that you have reviewed

25         previously?

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 44

1    A.   Yes, I have reviewed this.

2    Q.   I just want to ask a few questions, kind of walk

3         through this.  If you could turn first to page 3.

4         Under the heading that indicates findings, the first

5         paragraph obviously redacted on a number of points.

6         Then the unredacted last sentence, the committee has

7         seen no evidence that any votes were changed or that

8         any voting machines were manipulated.

9              You'd agree that the committee had access

10        to more information than you had access to in terms

11        of Russia's activities, right?

12   A.   I would.  Although, I would note that this is

13        carefully phrased, that they've seen no evidence.  So

14        it's, again, acknowledging the limits of the

15        capabilities of the intelligence community to acquire

16        such evidence, especially from systems that just

17        don't generate that kind of evidence.

18   Q.   And it's not your testimony that votes were changed

19        in any election, right?

20   A.   No, it's not.

21   Q.   And it's not your testimony that any voting machine

22        used in an election was manipulated, correct?

23   A.   No, it's not my testimony that any voting machine was

24        manipulated.  It's my testimony that the possibility

25        was there and that in significant cases if it had

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 45

1          occurred, we might not know it.

2     Q.   If you could turn next to page 11.  Are you familiar

3          with Dr. Liles who testified to the committee?

4     A.   I'm sorry.  Where are you referring to?

5     Q.   Page 11.

6                    MR. HERMAN:  At the top.

7                    THE WITNESS:  Oh, I see.  I see.

8     BY MR. TYSON:

9     Q.   First bullet at the top.  Do you know who Dr. Liles

10         is?

11    A.   I don't recall who Dr. Liles is actually.

12    Q.   Okay.  Let me ask about the quote that's there.

13         Scanning for vulnerabilities, quoted in the report,

14         is analogous to someone walking down the street and

15         looking to see if you are home.  A small number of

16         systems were unsuccessfully exploited as though

17         someone had rattled the doorknob but wasn't able to

18         get in.  However, a small number of the networks were

19         successfully exploited.  They made it through the

20         door.

21                    Do you agree with that quote that's there

22         in terms of the activities that you're aware of in

23         the 2016 election?

24    A.   With regard to the voter registration system

25         activities, I do agree with that characterization.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 46

1   Q.   Do you agree with -- would you use this description

2        for any other systems beyond the voter registration

3        systems?

4   A.   I'm not sure I would use this description for other

5        systems beyond voter registration.

6   Q.   And why is that?

7   A.   Because the pattern of activities that involved

8        attempts to infiltrate vendor systems and then spread

9        to municipalities, those don't have this form of just

10       rattling the door.  Those were -- those were a

11       different shape of attack.

12  Q.   Okay.  Let's go next to the next page, page 12.

13       Right before the extensive series of redactions,

14       there's a statement that intelligence developed later

15       in 2018 bolstered Mr. Daniel's assessment that all 50

16       states were targeted.

17            Is that consistent with your understanding

18       of Russia's activities in the 2016 election?

19  A.   Yes, it is.

20  Q.   And as we've discussed, targeting is not necessarily

21       the same as manipulating or accessing.

22  A.   That's right.  It's probably step one.

23  Q.   Let's go now to towards the very end, page 59.

24  A.   Oh, 59.

25  Q.   Yeah.  Way towards the back.  So the page immediately

J. Alex Halderman , Ph.D.                  February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 47

1     prior, just for context, the recommendations of the
2     committee to secure the vote itself.  The first
3     bullet there recommends the purchase of more secure
4     voting machines and recommends that any machine going
5     forward should have a voter-verified paper trail and
6     remove or render inert any wireless networking
7     capability.  Do you agree with that recommendation?
8  A.  You're talking about the first bullet here?
9  Q.  Yes.
10 A.  On page 59.  I'm just making sure I'm looking at the
11     right -- I would go farther than that recommendation,
12     but I think that -- but I don't disagree with that as
13     it stands.
14 Q.  And as I understand your testimony so far, you would
15     say that this recommendation is not true of Georgia's
16     new voting system; is that correct?  Or is it true of
17     Georgia's new voting system?
18 A.  So I think this does apply to Georgia's new voting
19     system.  But as I said, I think just this
20     recommendation by itself is not enough to render the
21     voting system secure, and I would certainly go
22     farther.
23 Q.  So to make sure I have that right, you believe
24     Georgia's system complies with the recommendation of
25     this first bullet of the committee's recommendations,

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 48

1          but you would go further than the committee, correct?

2     A.   Yes.  Based on the science that's happened since 2017

3          or since -- since the committee received its

4          testimony that's the basis of this.  Yes.

5     Q.   And the second bullet on that page indicates that

6          states should require that machines purchased from

7          this point forward are either EAC certified or comply

8          with the VVSG standards.  That's true of Georgia's

9          new system as well, correct?

10    A.   Yes.  I believe that is true of Georgia's system.

11    Q.   The third bullet recommends that --

12    A.   Although, actually, pardon me, I'm not sure about the

13         remainder of that bullet, whether Georgia's

14         contracting satisfies that.  So if you're talking

15         about the whole recommendation, my answer is I don't

16         know.

17    Q.   Got it.  So as to the first sentence, yes.  As to the

18         second sentence, you don't have enough information to

19         know.

20    A.   Not at this -- at this time.

21    Q.   The third bullet there indicates an effort to secure

22         the chain of custody for paper ballots, and there's a

23         recommendation related to time stamping when ballots

24         are scanned.  Do you see that recommendation?

25    A.   Yes.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 49

1    Q.    And do you know if Georgia's new system includes any

2          safeguards against the insertion of fraudulent paper

3          ballots?

4    A.    Any safeguards against the insertion of fraudulent

5          paper ballots?  I think there are some safeguards.

6    Q.    The fourth bullet recommends audits, as we've

7          discussed a little bit already.  And there's an

8          indication that as of August 2018, five states

9          conducted no post-election audit and fourteen do not

10         do a complete post-election audit.  Do you see that

11         statement?

12   A.    Yes, I do.

13   Q.    And in terms of the adoption of risk limiting audits

14         on a statewide level, do you know how many states

15         currently do a statewide risk-limiting audit?

16   A.    It's a small number.  It depends how you want to

17         define it exactly.  But perhaps two or three require

18         one at this point.

19   Q.    And when you say it depends on how you want to define

20         it, are there different definitions of risk limiting

21         audits?

22   A.    There are -- there are several complexities to RLA

23         legislation.  The question is also about when the

24         audit is required to be performed.

25   Q.    So some of the factors would be whether the audit is

J. Alex Halderman , Ph.D.                   February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 50

1       pre-certification or post-certification, correct?

2   A.  Yes.

3   Q.  And some of the factors would be what level of risk

4       limit is set for the audit?

5   A.  Yes.

6   Q.  And so those variabilities affect how robust the

7       audit is.  Is that a fair way to characterize that?

8   A.  Those are among the factors that affect whether it's

9       likely to discover an attack, if one occurs.

10  Q.  And are you aware of Georgia's statutory requirements

11      related to risk limiting audits?

12  A.  Yes, I am.

13  Q.  And what do you -- I'm sorry.  You're aware that that

14      requires a pilot risk-limiting audit, correct?

15  A.  I'm aware that it does require a pilot by 2021, I

16      believe.

17  Q.  Are you aware whether Georgia has already conducted a

18      pilot risk-limiting audit of any kind?

19  A.  Yes.  On the county level.

20  Q.  And you're aware of the Georgia statutory requirement

21      that an audit be performed of the November 2020

22      election, correct?

23  A.  Yes.  Though, not a risk-limiting audit.  So there is

24      potential arbitrary risk that the audit could fail to

25      detect outcome changing fraud.

J. Alex Halderman , Ph.D.                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 51

1    Q.   But it is possible that Georgia may choose to conduct

2         a risk-limiting audit in November 2020, correct?

3    A.   I suppose it's possible that Georgia could make

4         whatever changes it wants to its election system

5         between now and November.

6    Q.   The reason I ask is -- and, again, I'm not asking for

7         your legal opinion on this.  But is it consistent

8         with your understanding that the requirement for

9         November 2020 is there must be an audit but not

10        requirements beyond that?

11   A.   That's consistent with my understanding.

12   Q.   If you could turn to page 61 of the recommendations.

13        The first bullet there indicates that states -- well,

14        I guess it's recommendations about grant funds.  But

15        it recommends improvements in cybersecurity like

16        hiring additional IT staff, updating software,

17        contracting with vendors to provide cybersecurity

18        services.  Is it your understanding those things are

19        happening in the State of Georgia related to

20        elections, or do you know?

21   A.   It's my understanding that those are happening to

22        some extent.  But you can tell from the way that this

23        is written that it's not simply a box to be checked.

24        These words mean -- these words imply a large range

25        of activities that if done with sufficient diligence

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 52

1           will help, but it's more than simply having hired

2           someone.

3     Q.    All right.  So next I want to move to some of the

4           work that you've done in the public space.  I'm using

5           this next exhibit as a placeholder to talk about the

6           New York Times video.

7                     (Exhibit No. 9 marked.)

8     BY MR. TYSON:

9     Q.    So let me hand you what we've marked as No. 9.  And

10          this is a printout of New York Times story titled I

11          Hacked an Election.  So Can the Russians.  A video of

12          a part of a series on voting in America.  Do you

13          recall participating in this video series for the New

14          York Times?

15    A.    Yes, I do.

16    Q.    And can you describe generally what the videos in

17          this series involved?

18    A.    I actually haven't seen the other videos in the

19          series.  So I can only tell you about the video that

20          I participated in.

21    Q.    We'll start with yours then.  Why don't you tell us

22          about that video that you participated in?

23    A.    Right.  So that video was about risks to election

24          security that involve attacks on voting machines and

25          the potential for malicious software on voting

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 53

1          machines to change the way votes are counted.

2    Q.    And were you approached by the New York Times, or did

3          you approach them to create this video?

4    A.    I was approached by them.

5    Q.    Okay.  And it's fair to say that the focus of the

6          video you participated in was to bring attention to

7          your area of research, correct?

8    A.    Was to bring attention to the risks to elections that

9          my research touches on.  Yes.

10   Q.    And ultimately bringing attention to that was part of

11         the goal to influence policymakers to abandon

12         electronic voting systems?

13   A.    Well, to influence general improvements to election

14         security.  That's right.

15   Q.    And one of those improvements to election security

16         would be abandoning electronic voting machines

17         without a paper trail, correct?

18   A.    Well, would be -- would be adopting machines that are

19         able to generate evidence where that evidence is

20         actually reviewed sufficiently in order for risks of

21         the equipment being hacked no longer to be a concern.

22   Q.    We talked earlier about the ethical implications of

23         certain types of hacking, hospitals and those kinds

24         of things.  Have you done any research or published

25         any research or given thought to the ethical

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 54

1           implications of saying elections could be hacked and

2           what that may mean for our system of government?

3    A.     Yes, I have given attention to that.

4    Q.     Have you published any papers on that topic?

5    A.     Yes, I have.

6    Q.     And could you point me to those in your CV?

7    A.     There's a paper entitled ethical implications of

8           electronic voting research or something like that,

9           which if you'll give me a copy of my CV, I can point

10          you to.

11   Q.     It's actually Exhibit 2.

12   A.     Thank you.  Oh, is that attachment to Exhibit 2 here.

13   Q.     Yes.

14   A.     Oh, where is that?  It would be reference 82 on page

15          57 of this document, page 13 of the CV.

16   Q.     And I'm assuming in that paper you've concluded that

17          it is ethical to discuss the security of election

18          systems, correct?

19   A.     It's a long discussion of various scenarios, but we

20          do touch on that topic, I believe.  It's been a long

21          time.

22   Q.     Now, in addition to your New York Times video, you've

23          also written an editorial in The Washington Post

24          about election security, correct?

25   A.     That's right.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 55

1    Q.    I'm going to hand you what we've marked as Exhibit

2          10.

3                    (Exhibit No. 10 marked.)

4    BY MR. TYSON:

5    Q.    And I'll ask if that's your Washington Post

6          editorial.

7    A.    Yes.

8    Q.    And if you could turn with me to the fourth page

9          there.  The top of that page begins one simple answer

10         is that lawmakers need a straightforward policy

11         agenda to fix the system.

12                    So you were offering up a policy solution

13         that was recommended by your research; is that fair

14         to say?

15   A.    Well, so my research coupled with the political and

16         legislative dynamics.

17   Q.    And what political and legislative dynamics are you

18         referring to?

19   A.    Well, so this is recommending federal policy, and

20         there are certain questions about what's the

21         strongest level of security recommendation, for

22         instance, that would be likely to be passed by the

23         congress and signed by the president.  So it's

24         possible that the political compromises involved

25         there will result in a solution that's less than

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 56

1           perfectly effective.

2      Q.    So you were advocating against or kind of in favor of

3           more secure voting systems and made these

4           recommendations based on what you thought was a

5           reasonable path forward politically; is that fair to

6           say?

7      A.    Or a plausible path forward politically in part.

8      Q.    Okay.  And so those recommendations include the

9           second paragraph there, replacing paperless voting

10          machines with systems that include a good old

11          fashioned paper ballot.

12     A.    Indeed.

13     Q.    And you personally believe that the best system would

14          replace paperless DRE machines and be a good old

15          fashioned paper ballot, correct?

16     A.    I do, in the sense of a ballot that is hand-marked by

17          those who are able to.

18     Q.    And you also wrote an article on the online platform

19          Medium about hacked elections in 2016.  Do you recall

20          that article?

21     A.    I do.

22                 (Exhibit No. 11 marked.)

23     BY MR. TYSON:

24     Q.    So first of all, the reason for the article indicates

25          you wanted to set the record straight about

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

1      something.  Let me hand you what we've marked as

2      Exhibit 11.  I'll ask you first is that the article

3      that you wrote on Medium?

4   A.  Yes.

5   Q.  Okay.  So on the first page there, you indicate that

6      you wanted to set the record straight about what you

7      had been saying to the Clinton campaign and everyone

8      else who's willing to listen; is that right?

9   A.  That's right.

10  Q.  And so what record needed to be set straight?

11  A.  Right.  So there had been an article in New York

12      magazine that incorrectly attributed to me -- and

13      this is in the immediate aftermath of the 2016

14      election -- the view that I suppose that I thought

15      that the election had been -- result had been changed

16      my hacking.

17  Q.  Okay.  So on the second page then, underneath the

18      map, if you want to turn to that second page, there's

19      a statement in that paragraph right under the map,

20      were these year's deviations from pre-election polls

21      the result of a cyberattack?  Probably not.  I

22      believe the most likely explanation is that the polls

23      were systematically wrong, rather than that the

24      election was hacked.

25  A.  That's right.  At the time I think I would have said

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 58

```
 1         I think there's only, say, a 20 percent chance that
 2         the result had been changed due to hacking of
 3         election systems and an 80 percent chance that it was
 4         due to the polling differences, but the implication
 5         is a 20 percent chance is still pretty high and
 6         someone probably ought to check.
 7    Q.   And today do you still believe that kind of 80/20
 8         possibilities of what resulted in the 2016 election
 9         results?
10    A.   No.  I think that there was substantial more evidence
11         in favor of the election result being correct that
12         was gained because of the recounts that were
13         partially completed in Wisconsin and Michigan.
14    Q.   So if you could turn over to page 4.  The bottom of
15         that second paragraph before the headline in the next
16         section you say that many states continue to use
17         machines that are known to be insecure, sometimes
18         with software that is a decade or more out of date,
19         because they simply don't have the money to replace
20         those machines.  So would you take the position that
21         a state that did not replace its machines was
22         intentionally trying to make its elections
23         vulnerable?
24    A.   Well, it depends on -- it depends on the
25         circumstances.  And I think here and in other places
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 59

 1      where I am writing about states needing to replace

 2      their machines, one thing that you'll see I keep

 3      doing is mentioning that states need more funding,

 4      and that is one of the policy goals that I've

 5      consistently supported helping to make sure that

 6      states like Georgia were getting additional funding.

 7   Q.  So this was part of the effort -- the overall

 8      advocacy effort to move away from more insecure

 9      machines, get federal funding, help states see the

10      need.  Fair to say?

11   A.  I think my policy recommendations in those terms have

12      been consistent.

13   Q.  And then in the next -- the third paragraph under the

14      headline, you mention that we use two main kinds of

15      paper systems in the US.  And you reference first a

16      hand-marked paper ballot and second, a system that

17      prints a record on a piece of paper.  And so that

18      would refer to -- I'm sorry.  And then at the end of

19      the paragraph, you indicate that there's a record

20      that can't later be modified.  So at this time, were

21      you still advocating for ballot marking devices, or

22      was this still just only a subset for disabled

23      voters?

24   A.  I certainly wasn't advocating for ballot marking

25      devices.  But I think the keyword in that assessment

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 60

1           is can't later be modified and the risk with many

2           ballot marking devices is that the record might be

3           modified before it gets printed and not noticed by

4           the voter.  And it's the same with VVPAT systems.

5                      (Recess taken.)

6    BY MR. TYSON:

7    Q.    All right.  Dr. Halderman, I'm going to hand you what

8          we've marked as Exhibit 12.

9                      (Exhibit No. 12 marked.)

10   BY MR. TYSON:

11   Q.    And this is a profile in apparently Michigan Alumnus

12         magazine.

13   A.    Oh, yes.

14   Q.    Have you seen this before?

15   A.    I have, yes.

16   Q.    So I'm assuming you were interviewed for this

17         publication.

18   A.    I was.

19   Q.    So if you could look with me at the first -- I'm

20         sorry, the second page titled Hacking the Vote, It's

21         Easier Than You Think.

22   A.    Yes.

23   Q.    Then the subhead line indicates that professor

24         J. Alex Halderman has made a career studying

25         electronic voting security.  His research has changed

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 61

1          the concept of stolen elections from theory to

2          reality.  Would you agree with that assessment that

3          elections have actually been stolen?

4     A.   Well, of course elections have been stolen.

5     Q.   Through hacking electronic voting machines?

6     A.   I think it's probably true that there have been

7          elections that have been altered as a result of a

8          cyberattack.  I can't point to one that successfully

9          was because if it was successfully altered, we

10         probably wouldn't know about it.

11    Q.   Okay.  Can you point to an unsuccessful example?

12    A.   Yes.

13    Q.   What is that?

14    A.   Well, one example is the 1994 election of Nelson

15         Mandela in South Africa where votes were tabulated by

16         electronic means.  And according to the UN and other

17         officials who were there at the time, somebody

18         successfully hacked into the computer network where

19         voters -- votes were being counted and attempted to

20         disadvantage Mandela's party, and that was detected.

21         But the interesting thing is the election officials

22         swore everyone to secrecy, and it wasn't until around

23         the time of Mandela's death that some of the

24         international officials involved started writing

25         about it in their memoirs.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 62

1                    Another example would be the 2014 election

2          in Ukraine where attackers linked to Russia

3          reportedly attempted to -- reportedly did compromise

4          the election reporting system and rigged it to report

5          the wrong outcome, and that was apparently only

6          detected in the nick of time.

7    Q.    So let me rephrase my question then.  Are you saying

8          that any election in the United States has ever been

9          stolen through a hack of an electronic voting

10         machine?

11   A.    I can't point to a specific one.  But again, I think

12         there's substantial risk that one has that we don't

13         know about.

14   Q.    But sitting here today, you can't identify a single

15         election in the US that has had the result changed

16         through a hack of electronic voting systems?

17   A.    No.  Although, as I say, we probably wouldn't know.

18         That's one of the problems with electronic voting

19         systems.

20   Q.    If you could turn to page 9 of this profile.  And

21         that first full paragraph begins with -- let me just

22         read it.  The only reason there's no evidence of

23         whether voting machines or vote tabulating equipment

24         was hacked in the 2016 presidential election,

25         Halderman insists, is because nobody allowed him or

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 63

1          anyone else to check.  And that's consistent with

2          what you've described earlier in terms of not being

3          able to do full recounts or analysis of electronic

4          voting machines after the 2016 election?

5     A.   Well, it's also referring to forensics on voting

6          systems and so forth.  Yes.

7     Q.   And so is it your testimony that there is evidence

8          that machines were hacked, and that if you looked,

9          you would find that, or you just don't know?

10    A.   If machines were hacked, there's a possibility that

11         evidence could be found by doing forensics of

12         individual machines.  That's my testimony.

13    Q.   Okay.  And the next sentence begins, this is the core

14         of his advocacy regarding electronic voting machines

15         and vote tabulators.  Would you agree with that

16         description of you as an advocate regarding

17         electronic voting machines and vote tabulators?

18    A.   I suppose it depends what you mean.  I certainly do

19         recommend specific policy measures that are necessary

20         to secure election systems.

21    Q.   The next page over, one, two, third full paragraph,

22         it talks about your preparation process for

23         testifying to the US senate committee with a murder

24         board.  Always a delightfully-named function.

25    A.   Indeed.  I'm not seeing where you mean.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 64

```
 1    Q.    Right about in the middle of the page, third full
 2          paragraph.
 3    A.    It begins it was remarkable?
 4    Q.    Yes.
 5    A.    I see.  Yes.
 6    Q.    And the last sentence of that paragraph says, the aim
 7          was for Halderman to avoid seeming partisan.  Is
 8          there a concern that election security issues are a
 9          partisan issue at this point?
10    A.    They're certainly a non-partisan issue at this point,
11          as I think you can see by the broad bipartisan
12          support in congress for things like the Secure
13          Elections Act and the bill that Mark Meadows
14          introduced to adopt very similar protections.  But
15          there's always a risk in discussion of elections that
16          partisan politics will come into play.
17    Q.    But at this point, you are not aware of partisan
18          politics around the adoption of hand-marked paper
19          ballots?
20    A.    I was aware that -- I was aware, and I believe there
21          still is a risk that partisan politics will -- will
22          override the very real technical issues and make it
23          difficult to have strong security legislation.
24    Q.    Are you aware of the partisan breakdown of votes in
25          the Georgia General Assembly about hand-marked paper
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 65

1        ballots versus ballot marking devices as an election

2        system?

3   A.   No, I'm not aware.

4   Q.   Would it surprise you if those were partisan votes?

5   A.   I think most votes are pretty partisan.

6   Q.   So it wouldn't surprise you?

7   A.   So it wouldn't surprise me.  Although, I'm not sure

8        which way the partisan politics would work out in

9        this particular issue in Georgia.

10  Q.   Going up that page just a little bit.  We talked

11       about your Medium essay, and this is a portion

12       discussing that.  You indicated that after you wrote

13       your Medium essay, you had come to a point of greater

14       confidence that the polling information was wrong

15       versus the election was hacked based on the partial

16       recounts that were conducted.  On that third

17       paragraph there, it indicates that the effort to

18       conduct recounts didn't succeed, and recounts were

19       only conducted in Wisconsin with minimal changes and

20       nobody was able to inspect any of the equipment.

21            What is it about the recount process that

22       changed your view from your Medium essay to now about

23       the 2016 election?

24  A.   That the recount involved in large parts of Wisconsin

25       and in parts of Michigan involved manual inspection

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                              Page 66

1          of ballots that had been marked by hand served to

2          provide additional evidence for the correctness of

3          the election results and that those manual

4          inspections of hand-marked records didn't reveal a

5          systematic deviation from the reported results.

6     Q.   There's also a reference in that paragraph that on

7          cable news and social media, you were dubbed a Stein

8          puppeteer trying to steal the election for Hillary

9          Clinton.  Is that an example of the partisan politics

10         that you discussed that could enter into those

11         questions?

12    A.   Yes.  I think that -- that experts being labeled

13         partisans merely because their views are inconvenient

14         for the views of a political group is a substantial

15         part of the risk.

16    Q.   There's also a great account in this article about

17         you meeting a man in a trench coat to obtain a

18         contraband voting machine.  Do you recall that event?

19    A.   I do.

20    Q.   And do you recall what kind of voting machine that

21         was?

22    A.   It was an AccuVote TS DRE.

23    Q.   That's the kind used in the State of Georgia up until

24         the end of 2019, right?

25    A.   That's correct.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 67

1    Q.    And on page 5 is where I am.  It's not necessarily

2          relevant.  It just mentions that you posted a video

3          about -- of the machine being hacked in a mock

4          election between Benedict Arnold and George

5          Washington.  Is that the same hacking demonstration

6          you performed for Judge Totenberg in 2018?

7    A.    I performed a similar demonstration.

8    Q.    But it wasn't the same type of hack demonstration?

9    A.    No.  Actually, it was using a different but also

10         effective way of hacking the AccuVote TS and TSX.

11   Q.    Okay.  And the demonstration that you did in the

12         YouTube video, would that have been untraceable to

13         someone looking at the voting machine?  Just in terms

14         of the main files, if they didn't dig into the system

15         architecture and just reviewed the reported files,

16         would that have been detectable in any way?

17   A.    No, it wouldn't have been detectable.

18   Q.    And just to stick with the 2016 recount piece for a

19         moment --

20   A.    You mean the Michigan Alumnus piece?

21   Q.    I'm sorry.  No.  Just the concept of doing recounts

22         following the 2016 election.  Not the exhibit.  We're

23         finished with the exhibit.

24               You assisted with the efforts to obtain

25         recounts in Michigan, Wisconsin, and Pennsylvania in

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 68

1        2016; is that right?

2   A.   Yes.

3   Q.   And were you retained by the Stein campaign or the

4        Clinton campaign?

5   A.   I was retained by the Stein campaign.

6   Q.   And did you assist with recounts in any other states

7        in 2016?

8   A.   No, just those three.

9   Q.   And all three of those states were won by President

10       Trump in 2016, correct?

11  A.   Yes.  That's correct.

12  Q.   And were these efforts you undertook pro bono, or

13       were you being paid by the campaign?

14  A.   I was being paid.

15  Q.   Have you ever worked as a staffer on any political

16       campaign?

17  A.   No, I haven't.

18  Q.   Have you ever been retained by political campaigns

19       beside the Stein campaign?

20  A.   No.  Oh, actually, strike that.  Yes, I have.  I have

21       on one other occasion.

22  Q.   And what campaign was that?

23  A.   That's the current political campaign for the

24       presidency of the Dominican Republic.

25  Q.   So I can clarify that quickly.  In the United States,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 69

1         you've not been retained by any other candidate or

2         campaign?

3    A.    No.

4    Q.    Okay.  Now, you hold at least one patent; is that

5         correct?

6    A.    Yes, that's correct.

7    Q.    I want to hand you what we've marked as Exhibit 13.

8              (Exhibit No. 13 marked.)

9    BY MR. TYSON:

10   Q.    I'll ask if this is a patent that you hold as an

11        inventor.

12   A.    Yes, it is.

13   Q.    And what does this patent involve?

14   A.    This is a system for efficiently auditing elections

15        by using a high-speed scanner to review

16        electronically paper ballots and then using

17        statistical sampling similar to an RLA to confirm the

18        results.

19   Q.    Now, do you retain any financial interest in the use

20        of this patent going forward?

21   A.    No.  In fact, Princeton has dedicated it to the

22        public domain at my request.

23   Q.    If you could turn to the -- I guess it's the one,

24        two, three, fourth, fifth physical page.  The top

25        begins System and Method For Machine-Assisted

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 70

1          Electronic Auditing.

2     A.    I'm sorry.  Can you repeat the page?

3     Q.    Sure.  The fifth physical page.

4     A.    The fifth -- the marked column 5 here?

5                MR. HERMAN:  The actual.

6     BY MR. TYSON:

7     Q.    Yeah.  The actual fifth page.

8     A.    The pages I don't think are numbered.

9     Q.    Oh, I see.  The columns are numbered.  My apologies.

10          I'm not a patent lawyer.  If you could look at column

11          2, down where line 25 is.

12    A.    Yes.

13    Q.    There's an indication that the primary weakness of a

14          particular method you're referring to and discussing

15          is establishing a link between electronic and paper

16          ballots at the time votes are cast.  Is this issue of

17          voter privacy, that if we kind of sequentially number

18          every ballot as it's collected and could tie that

19          back to voters that are voting at particular times a

20          common issue you encounter in the design of audits

21          for election systems?

22    A.    Excuse me.  Let me just review those two paragraphs.

23    Q.    Certainly.  Yes.

24    A.    Yes.  Sequential numbering of ballots is a common

25          issue in audits and in the design of voting systems

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 71

1        more generally and creates privacy risks.

2    Q.  The way I've thought about it is I've tried to think

3        about it in the past.  If we could maintain the link

4        between the person and the ballot, auditing would

5        probably be pretty simple I'm guessing at that point.

6        We could use some sort of log method for that.  But

7        the importance of the secret ballot that we have to

8        separate those two pieces of information, is it

9        correct to say that's what leads to a lot of the

10       challenges around how we handle ballots and how we do

11       audits?

12   A.  I would say that, more broadly than that, that the

13       need for a secret ballot complicates much of election

14       security.

15   Q.  Okay.

16   A.  If we could just print everyone's name and vote in

17       the newspaper, it would be much easier.

18   Q.  From a security standpoint, but not from a

19       constitutional or administrative standpoint, correct?

20   A.  In fact, it would be bad from a security standpoint

21       too because the secret ballot is an important defense

22       against certain attacks.

23   Q.  So printing everybody's votes in the newspaper would

24       help with some attacks but would lead to other

25       possible attacks.  Is that what you're saying?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 72

1    A.    That's right.

2    Q.    So in the election field, do you consistently find

3          these kinds of trade-offs, that doing one thing may

4          solve one problem but create a host of other

5          problems?

6    A.    That's right.  That's why we need to be -- that's why

7          only certain technological approaches achieve a high

8          level of security all around.

9    Q.    But you'd agree with me that if, for example, the

10         United States of America decided that the secret

11         ballot was no longer an important consideration as

12         just a policy matter, that would change the mix of

13         technology in what we used going forward, right?  I

14         know that's a wild hypothetical.

15   A.    That's a wild hypothetical.  If it was actually true,

16         contrary to reality, that the secret ballot wasn't

17         important, it would be easier to design secure

18         election systems.

19   Q.    Just out of curiosity, I'm sure you followed what's

20         happened with the Iowa caucuses.

21   A.    I have.

22   Q.    Is it possible there's some kind of hacking for that

23         system, or do you have -- have you done any research

24         or have any opinions about that system?

25   A.    On the Iowa caucus system?  What part of it do you

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 73

1     mean?

2  Q.  I'm only going on news accounts that there have been

3      problems with the tabulation and an app that was

4      being used.

5  A.  Right.  Do you have a specific question?

6  Q.  It was just my own personal curiosity.  We can move

7      on.  Sorry.

8  A.  What a mess.  Let me just say what a mess.

9  Q.  All right.  So it's fair to say that you believe

10     electronic voting brings a host of problems to the

11     election system; is that fair to say?

12 A.  Yes.  It exposes the election system to several

13     different kinds of attacks.

14 Q.  Is there any circumstance besides disabled voters

15     where you would support the use of electronic

16     machines over hand-marked paper ballots?

17 A.  You mean ballot marking devices over hand-marked

18     paper ballots?

19 Q.  Any type of electronic ballot marker, whether done

20     through a DRE, through a ballot marking device, any

21     scenario.

22 A.  I see.  Is there any scenario?  In general, no.

23 Q.  So are you thinking of something besides disabled

24     voters where you might be willing to support

25     electronic voting?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 74

1  A.  Well, I'm thinking, for instance, in some extreme

2      emergency, would it be -- would I be -- would I say I

3      would support it?  Well, it's hard to say.  It really

4      depends on the facts of the situation.

5  Q.  And it's fair to say that setting aside disabled

6      voters, you believe that hand-marked paper ballots

7      that are fully audited is the best method of

8      administering elections, right?

9  A.  I think from a security perspective, that's correct.

10 Q.  From an administerability standpoint, do you not

11     think that's correct, or is there a perspective where

12     you would disagree with that?  The reason why I

13     ask -- I can clarify.  I know you're trying to figure

14     out what I asked.

15             You clarified your answer with that you

16     believe from a security perspective that hand-marked

17     paper ballots with full audit to be the best method

18     of administering elections.  So my question is why

19     only from that perspective.

20 A.  Oh, I see what you mean.  There are -- there may be

21     administrative reasons to prefer other systems in

22     certain circumstances.  Although, I think the

23     alternatives do create a large and uncovered risk of

24     attacks to the election system.

25 Q.  So there may be policy reasons for using some

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 75

1      electronic components, is that what you're saying,

2      but it creates a security risk in the process?

3   A.  Yes.

4   Q.  I'm assuming that you don't believe that hand

5      counting all ballots is the best possible system.

6   A.  That's correct.

7   Q.  And why is that?

8   A.  Because hand counting all ballots -- hand counting

9      all ballots would take a very long time.  Hand

10      counting we know also creates its own set of security

11      risks.

12            My perspective is that the best way to

13      administer and secure elections is to count ballots

14      electronically, but to confirm the results of the

15      electronic counting through manual follow-up.

16   Q.  So if we had a system that involved hand-marked

17      ballots that were hand counted, would you still think

18      audits were required in that scenario?

19   A.  Some kind of audit I would say would still be

20      required.  But it wouldn't be the same kind of audit

21      that would be an RLA, for instance, designed to

22      specifically detect errors in a machine count because

23      you wouldn't have a machine count.

24   Q.  And when you mentioned that hand counting can bring

25      other challenges, would that include election

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 76

 1          officials overvoting a ballot, for example, during a

 2          hand count?

 3     A.   That's a potential risk.  If the election officials

 4          are dishonest, they could potentially make changes to

 5          the ballots during counting.  That's right.

 6     Q.   And you think it would be best for the State of

 7          Georgia to have a system of hand-marked paper ballots

 8          as the primary means of voting, right?

 9     A.   Yes, I do.

10     Q.   I'm going to change direction a little bit.  Are you

11          good to keep ongoing?

12     A.   Yeah.  Let's keep on going a little bit.  I assume

13          we're thinking of lunch at some point.

14     Q.   Eventually, yes.  Probably have a good stopping point

15          here in a little bit.

16               I want to talk about some general things

17          about your report, Exhibit 2.  If you want to get

18          that in front of you.  Talk about some high level

19          pieces to it first, and then move through some of the

20          specifics.

21               All right.  So through your report, is

22          there a particular section of your report that

23          summarizes the opinions that you offer in it?

24     A.   I'm not sure there's a particular section that does.

25     Q.   If you could go with me to paragraph 20.  When I was

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 77

1        looking for it, it seems paragraphs 20 and 23 seems

2        to summarize things well.  If you want to get there,

3        it's on page 6 on the bottom, 7 on the top.

4    A.   Okay.

5    Q.   So in this -- in paragraph 20 to start with, you

6        identify your opinion about a variety of scenarios of

7        what could happen based on Georgia's election system

8        facing a high risk of being targeted.  Is that a fair

9        statement?

10   A.   Yes.

11   Q.   So you say, first sentence, that there's a high risk

12       of being targeted by sophisticated adversaries.

13       Second, those adversaries could attempt to hack the

14       election system.  Third, they could sabotage BMDs or

15       optical scanners.  Fourth, they could infiltrate BMDs

16       and optical scanners.  And fifth, those attacks could

17       succeed despite efforts that Georgia has put in

18       place.

19              Is that a fair list of things that you

20       think are the main problems from Georgia's

21       perspective?

22   A.   With the new system, I think it's fair to say that's

23       a good summary of much of what's in my opinion --

24   Q.   Okay.

25   A.   -- in my report.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 78

1    Q.    And you're not saying that these scenarios definitely

2          will happen or have happened.  You're just saying

3          they might happen, correct?

4    A.    I'm not saying they definitely will happen.  I'm

5          saying that there's a high risk that they might

6          happen.

7    Q.    You'd agree with me that every election system used

8          by every state is subject to the potential targeting

9          by sophisticated adversaries, right?

10   A.    Yes.  That's why in every election system in every

11         state things like hand-marked paper ballots and risk

12         limiting audits are an important defense.

13   Q.    And you'd agree with me that every election system

14         used by every state has the potential to be hacked,

15         right?

16   A.    Indeed.  Again, that's why these protections are so

17         essential.

18   Q.    And you'd agree with me that attackers could sabotage

19         components of the election system used in every

20         state, right?

21   A.    That's right.  Again, why these defenses are so

22         important.

23   Q.    And you'd agree with me that attackers could place

24         malicious software on BMDs or optical scanners in the

25         election system of every state, right?

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 79

1   A.   Where those components are used, that's right.  Very

2        few states use BMDs for all voters.

3   Q.   But all states use optical scanners, right?

4   A.   At least somewhere.  Not in all jurisdictions in all

5        states unfortunately.  There are still some paperless

6        jurisdictions.

7   Q.   And you'd agree with me that the kind of attacks that

8        we've outlined here could also succeed in other

9        states too, right?

10  A.   Yes.

11  Q.   So in approaching your opinion about Georgia's

12       election system, what kind of specialized knowledge

13       are you using to come up with these potential

14       scenarios if they could apply to every states'

15       election system?

16  A.   What do you mean by specialized knowledge?

17  Q.   Does it require any special training or experience to

18       be able to outline the scenarios you've outlined in

19       paragraph 20?

20  A.   Yes.  Yes, it does.

21  Q.   And what -- I'm sorry.  Finish.

22  A.   Yes, it does.  So I've been studying security risks

23       to electronic voting systems for getting close to 20

24       years now.  And so I think that kind of specialized

25       knowledge is important in assessing both the threat

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 80

1        and the level of risk.

2    Q.  And so you do have specialized knowledge about kind

3        of the potential vectors of attack, I think as we

4        refer to them, on computers that are used in the

5        election system.  Fair to say?

6    A.  Yes.

7    Q.  And your focus has been primarily on the cyber

8        vulnerabilities of an election system, the computers

9        that are involved, not on the potential manipulation

10       of paper ballots through kind of old school methods.

11       We've referred to overvoting a ballot, for example.

12       Your research is focused primarily on the cyber

13       risks, right?

14   A.  I would say primarily.  But it also considers those

15       other risks, and I teach about them.  And auditing or

16       other defensive methods that I talk about are

17       designed with those risks in mind too.

18   Q.  So in reaching your opinions about Georgia's election

19       system, you are evaluating all the potential risks,

20       not only the cyber risks but also other possible

21       security risks?

22   A.  Well, I have thought about other potential security

23       risks, but the opinion here is primarily about the

24       risks of cyber attacks.

25   Q.  And in reaching your conclusion about Georgia's

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 81

1          election system facing a high risk, is that including

2          the other security risks beyond cyber, or is that

3          limited to a cyber risk for the State of Georgia?

4    A.    Here I'm talking about the risks of attack by

5          sophisticated adversaries like hostile governments in

6          the context of attacks on computer system.

7    Q.    Okay.  And so in reaching your opinions in your

8          report, you've obviously used your specialized

9          knowledge to come up with a series of scenarios of

10         things that could happen.  And then you're assessing

11         how likely or unlikely those scenarios are to happen,

12         or are you just identifying these are possible

13         attacks?

14   A.    I'm also assessing the level of risk.

15   Q.    Okay.  And have you ever evaluated comparative risks

16         of an entirely paper ballot election system versus a

17         system that uses some electronic components?

18   A.    Of an entirely -- you mean a hypothetical?

19   Q.    Excepting disabled voters.  A hand-marked paper

20         ballot system for the comparative risk of that system

21         versus a system that uses electronic components.

22   A.    I have evaluated the risks in hand-marked paper

23         ballot systems, including for the Secretary of State

24         of Michigan.  So yes.

25   Q.    And what is the method you've used to evaluate the

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 82

1          comparative risks of those types of systems?  If
2          you're trying to compare one system's risks with
3          another, what is the method you'd used to evaluate
4          that comparative risk?
5     A.   So the method is basically what are -- examining the
6          differences between those voting systems and which
7          new attack vectors they make possible and how likely
8          are those vectors to be exploited.
9     Q.   So you essentially say okay, for system one, let's
10         say hand-marked paper ballot system with ballot
11         marking devices for disabled voters, electronically
12         tabulated using optical scanners, here's the list of
13         possible risks we face with that system?
14    A.   Of cybersecurity risks and which ones are enabled by
15         this change of technology.
16    Q.   And then we look at a system, ballot marking device
17         system for all voters, what are the risks with that
18         system.  So my question is, how do you then decide
19         which system is more or less secure based on that
20         list of risks?  Is there a specific method you use
21         for that?
22    A.   Sure.  So, for instance, in the ballot marking device
23         study that I published in January, we have a
24         quantitative method.  There was an equation in there
25         that will tell you based on the proportion of voters

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 83

1          who are using a ballot marking device versus a

2          hand-marked system, what is the additional risk

3          that's created by -- that outcome changing fraud will

4          go undetected.

5     Q.   And that's specifically related to voters verifying

6          their paper ballots, right?

7     A.   Right.  Which is one of the very significant defenses

8          in an election system is voter verification.  That's

9          the premise of BMD security, that voters will

10         successfully verify.

11    Q.   And it's not your testimony that there exists one

12         perfectly secure voting system, right?

13    A.   There are voting systems that have greater or lesser

14         risk for certain important categories of attacks and

15         ones that have no risk of certain categories of

16         attacks.  So I think the -- which is more secure or

17         not is pretty clear.

18    Q.   You say which is more secure or not is pretty clear.

19         Would that be as to overall policy reasons for one

20         system or another, or which one is more or less

21         secure from a cybersecurity standpoint?

22    A.   Well, I'm speaking specifically from a cybersecurity

23         standpoint.

24    Q.   And as we covered earlier, there are scenarios where

25         policymakers may have interest beyond cybersecurity

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 84

1        in selecting a particular election system, correct?

2    A.  There are other interests that come to play.  I

3        believe that there -- but I don't think that the

4        other interests, as they are practically manifested,

5        outweigh the cybersecurity advantages or

6        disadvantages that are part of that equation.

7    Q.  And you've gotten where I was trying to get to

8        earlier.  So then what is the way that you determine

9        whether the other policy reasons outweigh the

10       cybersecurity risks?

11   A.  Well, we could talk about that in the context of

12       specific policy questions that are coming to bear.

13       The question is to me the methodology that I would

14       apply is what are the alternative ways of achieving

15       this policy goal and are there practical

16       cybersecurity techniques that we could use to achieve

17       security under those circumstances.  And when the

18       outcome turns out to be no, we either have a system

19       that is at high risk of attack or not, I think that

20       the policy -- the policy balance outcome is pretty

21       clear.

22   Q.  And, again, the methods you're using to make that

23       policy balance outcome that you see is so clear is

24       you are looking at possibly alternative policies that

25       could have less cyber risk; is that a fair way to say

J. Alex Halderman , Ph.D.                     February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 85

1        that?

2   A.   Well, possible -- can you repeat the question?

3   Q.   Sure.  I'm just trying to understand how you weigh

4        the policy options of the other policy reasons why a

5        jurisdiction may have for other systems versus the

6        cyber basis.  And particularly I'm looking for what

7        method are you using to conclude that hand-marked

8        paper ballots are the right election system to be

9        used.  You're reaching a conclusion they are.

10  A.   I see.

11  Q.   That's what I'm trying to understand.  What method

12       are you using for that evaluation?

13  A.   There's a very stark cybersecurity difference between

14       the hand-marked system and/or hypothetical or not

15       hypothetical BMD for all system.  And so given the

16       sort of starkness of that contrast, the question is

17       can you achieve those same -- the question to me is

18       can you achieve the same policy objectives well with

19       the hand-marked system.  Right?  And if you can

20       achieve those policy objectives well with the system

21       that is significantly more secure, then I believe on

22       the basis of that reasoning it's the -- it's the

23       superior choice.

24  Q.   And it's a policy interest of a state, is it not, to

25       have voter intent be clear?  Could that be a policy

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 86

1          interest for a state?

2     A.   That could be a policy interest.

3     Q.   And in that policy interest, you'd agree with me that

4          ballot marking devices are superior to hand-marked

5          paper ballots, right?

6     A.   Not necessarily.  So hand-marked paper ballots.  You

7          can also have the optical scanner reject ballots that

8          the scanner determines are not clearly marked, and

9          that's a feature of the Dominion system, in fact.

10    Q.   And in those scenarios, have you ever talked to

11         election officials about what voter behavior happens

12         when a scanner rejects an improperly marked hand

13         paper ballot?

14    A.   I have talked to election officials about that, yes.

15    Q.   What have they told you?

16    A.   Some election officials have told me, in fact, that

17         when -- some election officials have told me that

18         they worry about delay that's caused by that

19         scenario.  But other election officials have told me

20         that they already have their scanners programmed to

21         work in that way and it's fine.

22    Q.   And election officials may have concerns about voters

23         becoming frustrated in the process.  Have you heard

24         that from election officials?

25    A.   I've heard that about BMD-based elections as well as

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 87

1        hand-marked elections.  So that is a concern either
2        way.
3   Q.   And those would be other policy interests that might
4        underlie the selection of one system over another
5        unrelated to cybersecurity, correct?
6   A.   There are other important considerations.
7   Q.   So you'd agree with me that it's not possible to
8        eliminate every attack vector against an election
9        system, right?
10  A.   Not every attack vector.  I mean, someone could cut
11       the power to the entire state somehow and just render
12       absolute chaos.  But in terms of attack vectors that
13       involve -- that involve hacking the computer systems
14       that are used to administer the election or that are
15       in the polling place, it's possible to reduce the
16       risks to a minimal level.
17  Q.   And when you say reduce the risks to a minimum level,
18       how are you categorizing minimal risk versus other
19       types of risk?  What method are you using to arrive
20       at this is a minimal risk system?
21  A.   Well, let me be more clear than that.  It's possible
22       to eliminate the risk that hacking polling place
23       equipment is going to be able to change the election
24       outcome or cause significant disruption through a
25       well-designed system.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 88

1    Q.    But it's not possible to eliminate all the risks.  I

2          think we talked about earlier every election system

3          is subject to being targeted by sophisticated

4          adversaries.  Every election system could have some

5          components of it hacked.  Every election system could

6          have software put on optical scanners.  So I guess

7          I'm trying to understand where you're concluding

8          there's minimal risk if there's always going to be

9          these vulnerabilities for any election system.

10   A.    Well, at the point where we can have a high and

11         quantifiable statistical probability of detecting and

12         correcting attacks of that form, I would say the risk

13         has been well constrained.

14   Q.    And ultimately, though, isn't that a policy decision

15         of what level of risk someone is willing to

16         encounter?

17   A.    Well, it's a policy decision -- is it a policy

18         decision?  Can you repeat the question?

19   Q.    So we're talking about all these different interests

20         that go into elections.  You can reduce it to a

21         statistically quantifiable number that we can have

22         confidence in a particular outcome.  But maybe in the

23         process, we're going to create long lines to do that.

24         There's all these competing policy interests in the

25         space of the design of an election system.  So what

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 89

1        I'm trying to get to is at what point is it a policy

2        decision and at what point is it a scientific process

3        you're using to arrive at your conclusions in this

4        report.

5    A.  Well, I reject the notion that it's actually a

6        trade-off between long lines and good security.  But,

7        I mean, if there's a policy decision that we would

8        like the election system to be at high risk of attack

9        by foreign governments, I suppose that is a policy

10       decision too, but I don't think it's a policy

11       decision that I as someone who is an expert in

12       election cybersecurity would get behind.

13   Q.  Do you use online banking?

14   A.  I do.

15   Q.  And I'm sure -- I do too.  And there are risks, of

16       course, that online banking is subject to

17       manipulation, hacking, targeted by foreign powers,

18       right?

19   A.  Yes.  And, in fact, there are billions of dollars of

20       fraud every year reportedly in the financial sector

21       due to hacking.

22   Q.  But obviously you've chosen, I've chosen to use a

23       system that has some risk for the sake of

24       convenience; is that fair to say?

25   A.  Well, I think the risks in online banking are fairly

J. Alex Halderman , Ph.D.        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 90

1          well constrained for consumers because of things like

2          FDIC protection, and most fundamentally, because if

3          the money is gone, we're going few notice.  The same

4          can't be said unfortunately of election systems.  If

5          the result is wrong, it's not necessarily going to be

6          apparent to anyone.

7     Q.   And I believe I saw you have a cellphone.

8     A.   I do.  It's right here.

9     Q.   I do too.  And cellphones are subject to

10         manipulation, hacking, targeting by foreign powers,

11         right?

12    A.   Potentially.

13    Q.   And yet, we use those because we've chosen to

14         encounter a degree of risk for the sake of

15         convenience, right?

16    A.   Well, so, again, if my cellphone is hacked, we

17         won't -- that will not end up causing something like

18         a national election outcome to be wrong, I hope.  But

19         there are good reasons, including the vulnerability

20         of cellphones, that we don't, for instance, let you

21         vote using an app on your cellphone in elections in

22         Georgia.  That's because the risks are substantial.

23    Q.   So I guess thinking about those examples, is your

24         ultimate opinion in your report that Georgia

25         policymakers have chosen to take too great a risk by

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 91

1          using an all ballot marking device system election

2          system?

3    A.    So my opinion is that it's a very, very substantial

4          risk.  And if -- and yes, I would say that the

5          process in Georgia that has led to this risk has

6          resulted in an undesirable outcome from the

7          perspective of protecting the votes of the people of

8          Georgia.

9    Q.    So it's your opinion that Georgia policymakers have

10         chosen a path with too much risk to use for

11         elections, right?

12   A.    Yes, I think it's too risky a path.

13   Q.    And that opinion lines up with your personal views on

14         election administration, right?

15   A.    With my personal views?  How do you distinguish from

16         my professional views in this case?

17   Q.    I believe you said earlier that you believe the best

18         system for administering elections is a hand-marked

19         paper ballot system with ballot marking devices for

20         disabled voters.

21   A.    I see.  Yes, I think it's consistent with that.  It's

22         totally consistent with that, yes.

23   Q.    And so what scientific method are you using to

24         determine that Georgia policymakers have taken a path

25         with too great a risk?  There's obviously a point

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 92

1    that you cross over a threshold.  What method do you

2    use scientifically to determine where that tipping

3    point is?

4    A.   Where that tipping point is?  Oh, I see.  Well, I

5    think the -- I think the tipping point -- that

6    question, it comes down to a -- it comes down to

7    applying the expertise that I have from evaluating

8    voting systems to ask the question, is this system

9    actually going to provide a strong defense or not.

10   And so there's -- it's a matter of -- it's a matter

11   of comparatively assessing those risks.

12   Q.   Are there published studies about evaluating

13   acceptable degrees of risk in the election context?

14   A.   Probably there are.  So if you look at, for instance,

15   the California top-to-bottom review studies that were

16   commissioned in 2007, those studies technically are

17   focused on vulnerabilities in specific pieces of

18   election equipment but come out with the policy

19   recommendation that they not be used because the risk

20   is unacceptable.

21   Q.   And that was a policy recommendation as the result of

22   that analysis, correct?

23   A.   That's right.

24   Q.   So you have the California top-to-bottom review.

25   Have you ever published papers on determining what

J. Alex Halderman , Ph.D.          February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 93

1          the acceptable degree of risk in election systems is?

2     A.   Acceptable degree of risk.

3     Q.   And the reason why I ask is, again, you're saying

4          that Georgia policymakers have taken too much risk.

5          So how -- have you ever published a paper evaluating

6          the acceptable degree of risk?

7     A.   So the ballot marking device paper that I published

8          in January tries to assess some of that in part by

9          trying to quantify whether -- whether in a given

10         system attacks are going to be detected or not,

11         what's the probability that an attack would be

12         detected.  If the system is achieving an acceptable

13         degree of risk, that probability is going to be high

14         for plausible attacks.  If it's not, it's going to be

15         low.  You can indeed quantify some of these things.

16    Q.   Did you determine the exact percentage at which you

17         cross that threshold in your study of ballot marking

18         devices?

19    A.   No.  But it's quite often the case in science that

20         rather than a clean threshold, you just have a

21         breakdown between scenarios that result in a low

22         output value and a high output value.

23    Q.   And so beyond the BMD paper, you can't think of any

24         other papers you've published looking at the

25         acceptable degree of risk in an election system?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 94

1    A.    I think that's the most quantitative one.

2    Q.    But you can't think of any others?

3    A.    Not off the top of my head.  But I have published a

4          lot of papers in this area, so it's quite possible.

5    Q.    Sure.  Is the field of determining an acceptable

6          degree of risk in non-election context, are you aware

7          of that being a discipline that people study what --

8          when people encounter certain degrees of risk?

9    A.    That's quite often a question that comes up in

10         matters of public policy and science.

11   Q.    But you didn't rely on any papers outside the

12         election context about assessing acceptable degrees

13         of risks in forming your opinions in this report,

14         right?

15   A.    No, I didn't.

16   Q.    A couple other global questions, and I think we'll

17         probably be at a good stopping point for lunch.

18         We'll dig into the details of the report after that.

19              Kind of globally throughout the report

20         there's terms potentially, possibly, could happen.

21         There's a lot of scenarios of what might happen along

22         the way.  And I believe we covered this already.  But

23         you are not aware of anyone who's ever documented an

24         actual compromise of an election system using

25         electronic voting equipment in an actual US election,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 95

1          correct?  And I know I added a bunch of qualifiers on

2          there.

3     A.   You mean a hostile compromise?

4     Q.   Any compromise --

5     A.   Any compromise?

6     Q.   -- in a US election system of an electronic voting

7          machine.

8     A.   Sure.  There are plenty of voting machines in US

9          elections used in US elections that have been

10         actually demonstratively compromised.

11    Q.   And what are some examples of those?

12    A.   The previous voting machines used in Georgia, the TS

13         and TSX that I personally compromised, those kinds of

14         machines.

15    Q.   My question was that were being used in an actual

16         election.

17    A.   Those machines were used in actual elections in

18         Georgia from 2002 until 2019.

19    Q.   What I'm trying to get to is not a machine generally,

20         a model type that is being used in an election, but

21         an actual machine in a precinct on election day in a

22         US election.

23    A.   I see.

24    Q.   Has anyone ever documented a case of one of those

25         machines ever being compromised?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 96

1    A.    I don't believe so.

2               MR. HERMAN:   Okay.   Off the record

3          for a second.

4               (Recess taken.)

5               MR. TYSON:   Back on the record.

6    BY MR. TYSON:

7    Q.    All right.   Dr. Halderman, before lunch, I said we

8          were going to turn to your report.   I apologize.   I

9          do have one more thing I wanted to ask before we go

10         there.

11   A.    Yes.

12   Q.    You're on the board of advisors for the Verified

13         Voting Foundation; is that right?

14   A.    I am.

15   Q.    And can you briefly describe what the Verified Voting

16         Foundation is.

17   A.    The Verified Voting -- the Verified Voting Foundation

18         is a group that advocates for stronger election

19         security.

20   Q.    And when you say stronger election security, is it

21         primarily the cybersecurity component that you -- the

22         field that you work in?

23   A.    Yes.   Primarily.   It's a group that was founded

24         originally by computer scientists, and that's the

25         focus of their activity.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 97

1    Q.    Got it.  Were you involved in developing the

2          principles for new voting systems from the Verified

3          Voting Foundation?

4    A.    I don't think so.  No.

5    Q.    Okay.  I'm going to hand you what I've marked as

6          Exhibit 14.

7                    (Exhibit No. 14 marked.)

8    BY MR. TYSON:

9    Q.    Have you seen this document before?

10   A.    Yes.  Well, actually, wait.  No.  There's a new set

11         of principles since -- since 2015, I believe.

12   Q.    Okay.

13   A.    Or a new set of positions that I have seen, but I

14         don't think I've seen this version.

15   Q.    And this is the one I got off the website.  So I

16         might have gotten the wrong one.

17                    I wanted to ask about a couple of these

18         principles.  So No. 1, the system should use human

19         readable marks on paper as the official record of

20         voter preferences and as the official medium to store

21         votes.  Does the Verified Voting Foundation, to your

22         knowledge, accept ballot marking device ballots as a

23         valid way of voting, or is it only hand-marked

24         ballots?

25   A.    I believe that their current set of -- their current

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 98

1          set of positions on these issues point to elevated

2          risk with ballot marking devices.

3    Q.    Let me ask about No. 7.  One of the other principles

4          is to use commercial off-the-shelf hardware and

5          open-source software.  Do you agree with that

6          principle of security in voting systems?

7    A.    Yes, I think all else being equal, that's probably

8          something that is at least somewhat preferred,

9          although commercial off-the-shelf hardware and

10         open-source software can also still have significant

11         security risks.

12   Q.    Okay.  Is there a reason just from a cybersecurity

13         perspective to prefer commercial off-the-shelf

14         hardware versus custom-built hardware?

15   A.    There is a reason to prefer it.  Again, all else

16         being equal, in general, developing hardware is

17         difficult and off-the-shelf hardware is more likely

18         to have been well tested than hardware that is

19         proprietary.  But it really depends on the specific

20         case whether it actually achieves security benefits

21         or not.

22   Q.    And does the same set of principles apply to

23         open-source software versus I'm assuming

24         custom-designed software?

25   A.    Yes.  Although, open-source software has the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 99

1        additional benefit of making the code available to
2        others to review, which carries with it additional
3        security benefits since it's open to broader scrutiny
4        for problems.
5   Q.   And so since it's open to broader scrutiny, people
6        could find vulnerabilities and notify whoever they
7        need to to repair them; is that the general
8        principle?
9   A.   Well, that's right.  And so it's -- in addition, it
10       makes it easier to I think credibly assess the likely
11       level of security of the piece of software.  When
12       it's closed, it can be more challenging.
13  Q.   What is the role of kind of trade secret in voting
14       software particularly versus an open-source approach?
15       Are there pros and cons security-wise to each, or is
16       one always preferred over the other?
17  A.   I would say there are pros and cons.
18  Q.   And can you give me some examples of what the pros of
19       trade secret and what the pros of open source would
20       be?
21  A.   Well, the broader principle is that in a system that
22       is important for security, the parts that need to
23       remain secret for security should be well defined.
24       This is called Kerckhoffs' principle.  It's sort of a
25       foundation principle in security.  And it's easier to

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 100

1       achieve that in an open-source system than a

2       closed-source sytem because in the closed-source

3       sytem, everything is being kept secret.  You might

4       not be able to compartmentalize the pieces that need

5       to be kept secret.  But yes, there's a need to keep

6       some secrets secret in basically any secure system.

7       But they should be limited to things like

8       cryptographic keys that are well defined and narrow.

9       That's the principle.

10  Q.  All right.  Well, let's go ahead and turn to your

11      report.  And the good news, we can skip ahead to

12      paragraph 14.  So we'll start on page 3.  What I

13      wanted to do primarily, just kind of walk through the

14      report and ask about some of the conclusions you've

15      reached and some of the decisions or the opinions

16      that you've offered in this case.

17              So first of all, you indicate in paragraph

18      14 that you were asked to opine on the security of

19      Georgia's election system following the

20      implementation of the new system.  Is it your

21      understanding that the Dominion voting system and the

22      KnowInk system is at issue in this case?

23  A.  Yes, it's my understanding that it's at issue in this

24      case.

25  Q.  And you walk through the various components of that,

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 101

1          the ballot marking devices, the ICX component, the

2          ICP precinct scanners, the ICC central-count

3          scanners.  Have you personally observed and tested an

4          ICX ballot marking device?

5     A.   No, I have not.

6     Q.   Have you personally observed and tested an ICP

7          precinct-count scanner?

8     A.   No, I have not.

9     Q.   Have you personally observed and tested an ICC

10         central-count scanner?

11    A.   No, I have not.

12    Q.   Have you personally observed and tested the Democracy

13         Suite election management system?

14    A.   No, I have not.

15    Q.   And have you personally examined and tested any Poll

16         Pad electronic poll books?

17    A.   No, I haven't.  My views on the systems are based on

18         the experience that I've had over the last nearly 20

19         years with other electronic voting systems and the

20         design of the systems as documented by Dominion and

21         the tests that have been conducted in other states.

22    Q.   Okay.  So it's not based on any personal evaluation.

23         It's based on your knowledge, tests of others, and

24         understanding of the system from Dominion itself?

25    A.   That's right.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 102

1    Q.    Okay.  And I believe in 15 we've already covered that

2          you reviewed the documents the plaintiffs provided to

3          you from Dominion.  Let's go to paragraph 16 about

4          the eNet software.

5    A.    Yes.

6    Q.    And eNet is Georgia's voter registration database,

7          correct?

8    A.    That's correct.  It's the software that runs the

9          voter registration database and some associated

10         administrative functions.

11   Q.    Do you know approximately how many states use eNet?

12         Is it a widely-used piece of software?

13   A.    There are versions of eNet used in other states.  I

14         know that.

15   Q.    Are there other voter registration database software

16         that is more widely used than eNet, or is eNet kind

17         of one of the main players in this space?

18   A.    It certainly is a player in this space.  But there

19         are different versions of the software that are used

20         in other states, some of which are relatively better

21         protected.

22   Q.    Okay.  And have you evaluated the protection of

23         Georgia's version of eNet versus the versions in

24         other states?

25   A.    So I am familiar with the -- I have personally

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 103

1          evaluated vulnerabilities in the MVP and OVR system

2          compared to other states as a component of the

3          broader eNet platform.

4     Q.   Is it your testimony that MVP and OVR are part of the

5          eNet system?

6     A.   Are interfaced with it.  That's right.

7     Q.   And when you say interfaced with it, what do you mean

8          interfaced with it?

9     A.   I mean that data from those systems feeds into the

10         overall voter registration system and vice versa.

11    Q.   And does that happen without human intervention, or

12         is there a human intervention component for either of

13         those MVP and OVR systems to alter the voter

14         registration database?

15    A.   There may be a human component for the -- some of the

16         data that's fed back in.  I think the data that comes

17         out is read out by a computer process.

18    Q.   You say in paragraph 16 -- actually, before we go to

19         that, you said you evaluated the MVP and OVR

20         components.  Have you evaluated the eNet version used

21         by Georgia versus the eNet versions used by other

22         states?  For eNet specifically, not for other

23         associated applications.

24    A.   No, I have not.

25    Q.   You say in the second sentence of paragraph 16 that

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

1          election officials use eNet to manage voter

2          registration data.  Which election officials use eNet

3          to manage voter registration data in Georgia?

4    A.    I'm not sure in Georgia's practice.

5    Q.    And do you know which election officials export eNet

6          data to electronic poll books?

7    A.    I don't know.  I think that happens at the Secretary

8          of State's office.  That's my understanding, but I --

9          but I'm willing to be corrected.

10   Q.    In the next sentence you talk about interface of MVP

11         and OVR and say that those systems allow voters to

12         view and update their voter registration data.  Can

13         you explain to me how those systems update voters'

14         voter registration data in eNet?

15   A.    So the voter can fill in updated information through

16         the voter -- or an updated -- or fill out a voter

17         registration -- a voter registration form on those

18         systems.  It gets uploaded to the server.  And then

19         through back-end processes, which may or may not

20         require human intervention, I'm not sure, the data is

21         updated in the voter registration database.

22   Q.    So you don't know if a voter registrar is required to

23         review information and changes to voter registration

24         data before those changes are made in eNet?

25   A.    You know, I'm not sure that it makes a significant

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 105

```
 1         difference to the security of the system overall.

 2         Even attacks that could affect -- attacks could

 3         affect voter registration in plausible ways that a

 4         registrar would approve.

 5    Q.   So it's your testimony that there's really no

 6         security difference whether the input of a registrar

 7         is required before changes are made?

 8    A.   It matters to some kinds of attacks, but I don't

 9         think to plausible attacks that could affect -- to

10         certain plausible attacks that could affect the --

11         could affect the ability of Georgia voters to cast

12         their votes on an election day.

13    Q.   And then we'll come back around to that in a little

14         bit more later on.  In paragraph 17, the bottom of

15         that page 4 you indicate absentee voters will not use

16         BMDs.  That is for people who vote absentee by mail;

17         is that right?

18    A.   That's my understanding.

19    Q.   And voters who vote absentee in person, do you have

20         an understanding of whether they will use BMDs or

21         not?

22    A.   I think absentee in person is a BMD process.  Yes.

23    Q.   In paragraph 18, you indicate in the second sentence

24         that the Secretary of State will transmit the

25         election programming files to county officials.  Do
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 106

1        you know how that transmission is made?

2   A.   I'm not sure whether the process has been changed

3        from the process that was used prior to the

4        introduction of the Dominion system or not.  But the

5        process prior to the transmission via CD ROM has

6        significant security downsides.

7   Q.   Okay.  But you don't know the current setup that's

8        being used, correct?

9   A.   I'm not sure that it makes a difference for the kinds

10       of attacks that I'm worried about.  But I don't know

11       for sure the current process.  I'm not sure that

12       that's been documented publicly yet.

13  Q.   So it's your testimony that the method of

14       transmission doesn't really matter to the types of

15       attacks you're concerned about?

16  A.   To some of the attacks I'm concerned about.  That's

17       correct.

18  Q.   But it does matter to other types of attacks you're

19       concerned about?

20  A.   That's right.  There can be attacks that depend on

21       the specific method of transmission, and there are

22       other attacks that only depend on the fact of

23       transmission.

24  Q.   So in evaluating the relative risks to Georgia's

25       election system, you didn't consider the method of

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                          Page 107

1        transmission as informing that part of risk
2        assessment, correct?
3    A.   I think the method of transmission -- excuse me.
4              (Discussion off the record.)
5    BY MR. TYSON:
6    Q.   So in reaching your conclusions about the risks faced
7        by Georgia's election system, you did not -- since
8        you did not know the method of transmission, you
9        didn't take the method of transmission into account
10       in making that assessment; is that right?
11   A.   Well, I think that's right.  The method of
12       transmission might change the level of risk around
13       the edges, but it's not likely to be a night and day
14       difference.
15   Q.   So it's not important to your overall conclusions; is
16       that right?
17   A.   No, I don't think it affects the overall conclusion.
18   Q.   Okay.  At the bottom of 18 you indicate that election
19       workers will install a memory card or USB stick into
20       each BMD and ICP scanner prior to the start of
21       voting.  Do you know which election officials or
22       workers will do that?
23   A.   My understanding is that in Georgia that usually
24       happens at the county, but I'm not completely sure.
25   Q.   Okay.  And then the removal in paragraph 19 of the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 108

1      memory cards for return, do you know which election

2      workers those would be?

3   A.  I think that happens at the polling place in Georgia,

4      but I'm not entirely sure.

5   Q.  And you don't mention what happens to the paper

6      ballots after an election.  Is that -- I'm assuming

7      that's not relevant to your analysis either.

8   A.  Well, not primarily to the cyber -- well, actually,

9      that is something that is relevant to the analysis.

10     I just don't mention it here.

11  Q.  So what is the method that the paper ballots are

12     returned back to a county official?

13  A.  I don't know.  But I'm assuming for purposes of this

14     analysis that the paper ballots are going to be

15     returned through an adequate chain of custody because

16     otherwise the security situation is even worse.

17  Q.  Okay.  So then you're assuming that paper ballots are

18     returned through an adequate chain of custody as part

19     of reaching your conclusions about the relative risks

20     of Georgia's system, right?

21  A.  Well, that's right, because those risks are even

22     worse if the chain of custody is not adequate.

23  Q.  And since you don't know exactly who's installing

24     memory cards, who's removing memory cards, I'm

25     assuming that's not part of your analysis either as

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 109

1          far as reaching your conclusions about relative risk.

2     A.   I tried to make generous assumptions about those

3          risks where I don't know the answer, ones that the

4          level of risk doesn't depend on it being the worst

5          possible way it could be done.

6     Q.   Again, so likely paper ballot transmission, you

7          assumed then that qualified election workers are

8          going to handle memory cards at all stages with the

9          proper chain of custody; is that fair to say?

10    A.   That's right.  Even though there are still

11         limitations to effectively what you can achieve with

12         that kind of chain of custody.

13    Q.   And --

14    A.   And also, I do -- okay.  That's fine.

15    Q.   We've already covered paragraph 20 I think pretty

16         thoroughly.  I just wanted to ask, on this point, the

17         high risk of attack that you're concerned about for

18         Georgia elections, would you say that Georgia's new

19         election system faces the same level of risk as the

20         DREs, a greater level of risk, or less risk?

21    A.   I think for very important -- for probably the most

22         important category of risk, which is the risk of

23         nation state attacks against close elections, the

24         risk is not substantially reduced.  I think for other

25         scenarios, there are some benefits to security from

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 110

1        the change.  But sort of the thing that we all should

2        be most worried about, the security of the new system

3        is not -- is not such that those attacks are strongly

4        prevented.

5    Q.  So it's your testimony that Georgia faces basically

6        the same amount of risk from a nation state attacker

7        with its new voting system as it faced with the DRE

8        system; is that right?

9    A.  Unfortunately largely because of the lack of strong

10       auditing and the difficulty of verifying -- of voters

11       actually verifying their ballots well.

12   Q.  If Georgia implemented proper, as you would

13       categorize them, robust auditing procedures, would

14       the security situation from a nation state attacker

15       be improved over the DREs?

16   A.  Well, the problems are both the lack of robust

17       auditing and the lack of -- and the lack of a

18       strongly voter-verified paper record.  If both of

19       those things were corrected, then I think the

20       relative risk would be lower than in the DRE system.

21   Q.  And you used a distinction there that I want to hone

22       in on for a minute.  You refer to a voter-verified

23       paper record.  Can you describe the difference in a

24       voter-verifiable paper record and a voter-verified

25       paper record?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 111

1    A.    Sure.  So with the caveat that those terms are often

2          not used precisely in the literature and people for

3          years kind of use them interchangeably but without

4          really addressing the question of whether things that

5          were verifiable would be verified.  But a

6          voter-verifiable record is one that in principle the

7          voter could verify.  A voter-verified record is one

8          the voter actually has verified and ensured is

9          correct.

10   Q.    And so in recommendations, there has been a lot of

11         terminology thrown around of voter-verifiable paper

12         records.  Voters have the option of verifying their

13         records in that situation, which distinguishes it

14         from a DRE where there would be no record; is that

15         correct?

16   A.    From a paperless DRE where there would be no record.

17   Q.    Yes.  I'm sorry.  Good clarification.  When I think

18         of DRE, I've only ever voted on a paperless DRE in

19         Georgia.  So thank you for that.

20               In paragraph 21, you say that there is no

21         doubt that Russia and other adversaries will strike

22         again.  On what basis are you saying that there is

23         absolutely no doubt they will strike again?  I'm

24         assuming you've not talked to President Putin or Vigo

25         Carpathian or somebody about this, right?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 112

1   A.   No.  But I follow very closely the assessments of the

2        intelligence community and DHS and the federal

3        government on these questions.  And there's every

4        indication that Russia continues at this very minute

5        to be attempting to interfere in the election.

6   Q.   And election interference we can draw as a distinct

7        concept from vote manipulation.  Wouldn't you agree

8        those are distinct concepts?  Maybe one includes the

9        other?

10  A.   Yeah, maybe one includes the other.

11  Q.   So election interference could include manipulating

12       votes.  But merely interfering could be spreading

13       false messages on social media, visiting websites of

14       county boards, scanning for vulnerabilities in a

15       system.  Would that be a fair distinction to draw?

16  A.   I think that's fair.

17  Q.   And so in terms of, you know, no doubt that Russia

18       will strike again, I think we covered earlier we

19       don't have any evidence that Russia manipulated votes

20       in any election in the US, correct?

21  A.   That's right.  Even though there were significant

22       gaps in the visibility that would make that evidence

23       available.

24  Q.   Over on the next page, page 7, you indicate that the

25       report found that these foreign agents were

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 113

1          successful in attacking at least one state.  Was that

2          one state Georgia?

3    A.    No.  Not the state that is referred to in the report.

4    Q.    In the last paragraph you indicate that Georgia was

5          among the states Russia targeted.  And as we

6          discussed earlier, targeting doesn't necessarily mean

7          manipulation or compromise, right?

8    A.    No.  It's just the first step, but it does -- it does

9          speak to -- towards the intent.

10   Q.    And like the Senate Intelligence Committee, the

11         special counsel never found any votes were actually

12         compromised, right?

13   A.    That's right.  But again, there were very serious

14         limitations to the available evidence that would, if

15         the votes were compromised, allow us to reach that

16         conclusion.  So the best I think that they could say

17         is well, essentially there's no evidence votes have

18         been compromised.

19   Q.    Is it your personal belief that Russia has

20         compromised votes in elections in the US?

21   A.    I don't know.

22   Q.    In paragraph 22, you talk about some examples.  I

23         believe we discussed earlier the Ukrainian

24         presidential election.  And Ukrain's vote counting

25         infrastructure that you reference there, that was a

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 114

1        system directly connected to the internet; isn't that

2        right?

3    A.   Yes, it was.

4    Q.   At the end of paragraph 22 you say, other adversarial

5        governments and various things might target future

6        Georgia elections.  And sitting here, you don't have

7        any evidence that other adversarial governments

8        absolutely will target Georgia elections, do you?

9    A.   No.  But there's no reason to doubt that other

10       governments have something at stake in the outcome of

11       future US elections and have the cybersecurity

12       offensive capabilities that they would need in order

13       to -- in order to do that.

14   Q.   But as we talked about, there's a difference in

15       aiming a gun and pulling the trigger, correct?

16   A.   That's correct.

17   Q.   And so you don't have any evidence they will

18       definitely pull the trigger to attack Georgia

19       elections?

20   A.   No, I can't speak to that.

21   Q.   To paragraph 23.  This is another kind of summary

22       opinion piece.  It's your opinion that Georgia's new

23       voting technology does not achieve the level of

24       security necessary to withstand an attack by a

25       sophisticated adversary, such as a hostile foreign

J. Alex Halderman , Ph.D.         February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 115

1    government.  Isn't that statement true of every

2    states' voting technology?

3  A.  So no, I don't think that it is true of every -- of

4    every states' voting technology, at least not in the

5    same sense, because in states that really do have a

6    hand-marked ballot and are or are intending to audit

7    the paper trail rigorously, the attacks that I'm most

8    concerned about, ones that would actually change the

9    election outcome, would not be likely to succeed.

10  Q.  So in your opinion, the necessary preconditions to

11    have the level of security necessary to withstand an

12    attack by a foreign government are hand-marked paper

13    ballots and robust audits; is that fair to say?

14  A.  Those are two of the most important, and there are

15    other components of resiliency that are important

16    too.

17  Q.  So do you have an estimate on what percentage of

18    jurisdictions currently have sufficiently robust

19    audits and hand-marked paper ballots to withstand

20    that kind of attack?

21  A.  It's just a few percent of jurisdictions

22    unfortunately.  There's still a lot of work to do

23    nationally.  But there are degrees.

24  Q.  So would it be fair to say then that 90 percent of

25    jurisdictions don't have the level of security

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

1      necessary to withstand an attack by a hostile foreign

2      government?

3   A.   I'm not sure about 90 percent, but it is a high

4      percentage.

5   Q.   Higher than 80?

6   A.   Probably.

7   Q.   Okay.  Now, you have a lab where you do work related

8      to election technology and cyber vulnerabilities,

9      right?

10  A.   I do.

11  Q.   And do you believe your lab has the level of security

12     necessary to withstand an attack by a sophisticated

13     adversary such as a hostile foreign government?

14  A.   No, absolutely not.  We are -- we are definitely not,

15     however, running an election system for any state out

16     of our lab.

17  Q.   You do have technology in your lab that could be used

18     to compromise voting systems that are currently in

19     use, though, right?

20  A.   Yes, we do.  We try to take the best steps that we

21     can to prevent that.  But unfortunately, the reality

22     is that sophisticated nation states have -- hostile

23     nation states have extremely sophisticated cyber

24     offensive capabilities.  And the question is more a

25     question of do they really want to attack us, than

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 117

1       can we withstand the determined attack.

2   Q.  So then in the subparagraphs under 23, you provide

3       some scenarios under which attackers could

4       potentially subvert the election technology.  And the

5       first is infiltration of the voter registration

6       database to extract, change, or erase records.  Do

7       you see that?

8   A.  Yes.

9   Q.  Do you have any evidence that that has ever happened

10      to the State of Georgia's voter registration

11      database?

12  A.  No, I don't.

13  Q.  And it's true that attackers could infiltrate the

14      voter registration database of any state if they were

15      a sophisticated hostile foreign government, right?

16  A.  That's probably true.  Although, Georgia's system has

17      specific technical risks that lead me to believe that

18      the risk is higher in the State of Georgia than in

19      other states.

20  Q.  And how many other states' voter registration

21      databases have you studied for potential risks?

22  A.  How many?  That's a good question.  A handful of

23      other states.  Certainly Michigan in great detail.

24  Q.  And when you say a handful, less than five?

25  A.  Probably less than five in detail.

Case 1:18-cv-05391-SCJ    Document 401-1    Filed 06/27/20    Page 120 of 243
J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 118

```
1   Q.   So you've evaluated five states or less of the voter
2        registration databases.  And of those, your
3        conclusion is that Georgia is the most vulnerable of
4        those five?
5   A.   I'm not sure that I've specifically ranked or
6        quantified, but I would say Georgia is significantly
7        more vulnerable than it needs to be.
8   Q.   As compared to those five other states?
9   A.   And as compared to some other states that I've
10       studied.  It's certainly more vulnerable that
11       Michigan's.
12  Q.   And what other states have you studied?
13  A.   Where else have I studied?  I've looked at the voter
14       registration technology in Pennsylvania and in
15       California to some degree.  I would have to go back
16       and check.
17  Q.   Okay.  And your analysis of the relative risk level
18       is based on -- what kind of factors are you reviewing
19       when you're evaluating the risk to the voter
20       registration databases?
21  A.   Some of the most important factors are things like
22       the age and brittleness of the software involved, who
23       is maintaining it, and what the results of security
24       assessments have been and whether the problems found
25       in those assessments have been completely mitigated.
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 119

1    Q.    And have Michigan, Pennsylvania, California conducted
2          sophisticated threat assessments by cybersecurity
3          vendors of their voter registration databases?
4    A.    Michigan has.  I don't know about the other states.
5    Q.    And did those -- for Michigan, did they find any
6          potential vulnerabilities in the database?
7    A.    They did.
8    Q.    And did Michigan then mitigate those and correct
9          those?
10   A.    They did.
11   Q.    And did they correct all of them?
12   A.    To my knowledge, they did, yes.  In fact, they
13         replaced the entire software system as a result of
14         those analyses.
15   Q.    What software system does Michigan use today?
16   A.    The Michigan software system is one that is called
17         the -- give me just a second.  Changing states.  It's
18         called the Qualified Voter File database or QVF.
19   Q.    And is QVF a vendor in this space?
20   A.    No.  QVF is custom software for the state.
21   Q.    So Michigan decided to build its own software for
22         voter registration database?
23   A.    That's right.
24   Q.    You indicate that the attacks could cause voters to
25         receive the wrong ballot or be prevented from casting

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 120

1           a regular ballot.  Are you familiar with the

2           provisional balloting process?

3    A.     I am.

4    Q.     And if there was an attack like the attack you're

5           describing in 23(a), you'd expect to see an increase

6           in provisional ballots for people who weren't in the

7           registration database, right?

8    A.     That's probably right.

9    Q.     Are you aware if there's been such an increase in

10          Georgia from 2016 to 2018?

11   A.     I don't know.

12   Q.     You indicate that they could also be used to steal

13          information that could be used to impersonate voters.

14          You're aware that Georgia has a photo ID requirement

15          for voting?

16   A.     I am.  But that doesn't apply to absentee by mail.

17   Q.     So your reference to voter impersonation here refers

18          to absentee by mail impersonation, not in-person

19          impersonation?

20   A.     Not in-person impersonation.

21   Q.     Which is much more of a tongue twister than I

22          realized it was going to be.

23   A.     That's right.  Absentee by mail or to access voter

24          registration records.

25   Q.     The second type of attack that you propose, attackers

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 121

1          could sabotage polling place equipment and prevent

2          them from functioning on election day.  Do you have

3          any evidence that any sabotage of polling place

4          equipment that kept it from functioning has happened

5          in Georgia?

6     A.   No.  Although, the new equipment has only been in use

7          for a very short period of time.

8     Q.   Do you have any knowledge of the physical security

9          requirements for state election board rules

10         surrounding the new system?

11    A.   I haven't reviewed them in detail.

12    Q.   And I'm assuming you haven't visited any counties to

13         review their inspection of how they're maintaining

14         the election equipment.

15    A.   No.  Although, I have -- I'm familiar with reports

16         from others who have visited Georgia counties in the

17         past and have seen some of the physical security

18         mechanisms in place.

19    Q.   And was that before or after the purchase of the new

20         system?

21    A.   That was before the purchase of the new system.

22    Q.   So today you don't know what physical security

23         requirements might be available to mitigate an attack

24         outlined in 23(b); is that right?

25    A.   23(b) is referring not specifically to attacks that

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 122

1        require physical security compromise, but ones that

2        involve compromise of the software and data running

3        in the system by any means, including by remote

4        cyberattack.

5    Q.  Okay.  So it's your testimony that the Dominion

6        system is subject to remote cyberattack that could

7        compromise its functioning?

8    A.  Potentially, yes.

9    Q.  You say at the end of that that the attacker could

10       target such sabotage at jurisdictions that strongly

11       favor a particular candidate and cause a partisan

12       shift.  You don't have any evidence that that's ever

13       happened in Georgia, do you?

14   A.  No, I don't.  Though, again, the system has only been

15       in use a few weeks.

16   Q.  23(c), you talk about the manipulation of optical

17       scanners or EMS systems to report fraudulent

18       outcomes.  Do you have any evidence that's ever

19       happened in an election in Georgia on the new system

20       or any system?

21   A.  No, I don't.  Although, the new system is new.  And

22       the old system, I don't think anyone has ever done

23       the kind of analysis of the optical scanners and EMS

24       servers that would be required in order to make a

25       strong statement about whether it had happened.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 123

1   Q.   You reviewed the GEMS databases for the state's old

2        system, though, correct?

3   A.   Yes, I have.

4   Q.   Have you discovered any malware compromise in that

5        review?

6   A.   No.  But the GEMS databases themselves are no

7        substitute for reviewing the actual software running

8        and installed on the servers.

9   Q.   But you don't know if anybody has undertaken that

10       kind of review in the last six months, say?

11  A.   No, I don't think so.

12  Q.   You indicate that at 23(c), attack could alter all

13       digital records of the election results.  And that's

14       where, again, you're coming back to the rigorous

15       manual audit or a recount of the paper ballots.  Then

16       you say, Georgia law doesn't currently require that.

17       What is your understanding of what Georgia law does

18       require?

19  A.   So my understanding of what Georgia law requires is

20       that it requires an audit this year but not a risk

21       limiting one.  It requires an audit pilot by the end

22       of 2021.  And that after that, the requirement

23       depends on the outcome of the pilot.

24  Q.   And you don't know what Georgia's current plans are

25       related to auditing of ballots going forward on the

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 124

1         new system, correct?

2    A.   Auditing ballots on the new system.  My understanding

3         is that Georgia does not require -- does not

4         currently plan to require a rigorous audit.

5    Q.   Have you reviewed any state election board rules

6         related to audits in Georgia?

7    A.   I have reviewed some state board election rules

8         related to audits in Georgia, but I can't -- I'm not

9         prepared to tell you exactly what the -- which set of

10        rules those were.  I just don't remember.

11   Q.   Are you aware that Georgia is working with Verified

12        Voting on the development of its audit processes?

13   A.   I'm aware that they were -- that they have been

14        working together in the past.

15   Q.   And do you support that kind of collaborative effort

16        to develop audits for jurisdictions?

17   A.   Well, look, I support work to implement robust

18        audits, but you have to actually get there in order

19        to have the benefit.

20   Q.   Do you based on your expertise in the design of

21        audits believe that piloting audits is a helpful

22        practice before you implement a full audit procedure

23        in a jurisdiction?

24   A.   Yes, I do.  But you have to actually implement the

25        full audit procedure in the jurisdiction.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 125

1    Q.    And the type of attack you outline in 23(c) is also

2          true of a hand-marked paper ballot system; is that

3          correct?

4    A.    Yes, that's correct.

5    Q.    In 23(d) you talk about an infiltration to sometimes

6          print ballots differing from a voter's onscreen

7          selections.  And it's basically (d) and (e), the way

8          I read them, are two types of attack, one that

9          changes only the bar code, one that changes the bar

10         code and the human readable text.  Again, you

11         indicate that a 23(d) attack must be rigorously

12         audited or else it could go undetected.  Is that a

13         fair statement?

14   A.    That's right.

15   Q.    And so it's your testimony that a sufficient audit

16         would mitigate against the 23(d) style of attack,

17         right?

18   A.    That's right.  But it would have to be an audit that

19         was more rigorous than any audit that I understand to

20         be planned in Georgia.

21   Q.    But you don't currently know what's being planned in

22         Georgia; is that right?

23   A.    Well, I know what's being -- what's been publicly

24         talked about in Georgia, and I told you what my

25         understanding of the legal requirement is.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 126

1    Q.    Have you ever seen a, and this is going to be in any

2          context, lab or otherwise, a virus or malware that

3          would alter only the ballot bar code on a Dominion

4          system?

5    A.    On a Dominion system, no, I have not.

6    Q.    Have you ever seen in the lab or otherwise a piece of

7          malware or virus that would alter both the bar code

8          and the human readable text on a Dominion system?

9    A.    No.  Although, on other systems I have.

10   Q.    In 23(e) when you say research shows that few voters

11         carefully review their printed ballots, you're

12         referring to the two studies you cite later in your

13         report; is that right?

14   A.    Yes, I am.

15   Q.    And no other studies beyond those?

16   A.    I'm referring to those two studies.

17   Q.    And you say that the fraud sufficient to change the

18         winner of a close race might go undetected.  One

19         thing I've always wondered about these kind of

20         possible scenarios is how would an attacker know what

21         will be a close race?

22   A.    Right.  So usually by pre-election polling is one way

23         that an attacker can potentially conclude that a race

24         is likely to be close.

25   Q.    And in races where there's not regular polling, for

J. Alex Halderman , Ph.D.             February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 127

1      example, smaller races, are there other methods

2      someone could try to use to determine what they would

3      need to alter?

4  A.  I'm sorry.  Can I actually turn this off?

5  Q.  Sure.

6              (Recess taken.)

7              THE WITNESS:  I'm sorry.  Can you

8          repeat your question, please.

9  BY MR. TYSON:

10 Q.  Sure.  So in a race that is a smaller jurisdiction

11     where there's not regular polling, for example, of a

12     race, state house race, county commission race, how

13     would an attacker go about determining what would be

14     a close race that they could try to throw in that

15     context?

16 A.  Well, they could cheat anyway just in case it's

17     close, right?  So they don't necessarily need to know

18     for sure that it's going to be close in order to

19     attempt an attack and succeed if it is, in fact,

20     close.

21 Q.  And then in 23(e) you indicate that no audit or

22     recount could detect that kind of attack because the

23     digital and paper records would be wrong.  And the

24     only way -- now this is me.  Is it correct that the

25     only way a 23(e) attack would be detected is if a

J. Alex Halderman , Ph.D.                February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 128

1          sufficient number of voters carefully reviewed their

2          printed ballots?

3     A.   That's the only surefire way that such an attack

4          would be detected, and then also assuming that there

5          was a careful audit of the paper trail.

6     Q.   So the way I read this, the attacks you outline in

7          (c), (d), and (e) could be mitigated or detected by

8          sufficiently rigorous audits with voters carefully

9          reviewing their printed ballots in a sufficient

10         number.  Is that fair to say?

11    A.   I think that's fair to say.

12    Q.   And the attack outlined in (a) would be mitigated by

13         the use of provisional ballots, right, and possibly

14         detected through a spike in provisional ballots

15         there?

16    A.   Well, all right, wait a minute because it's -- it

17         matters a lot what we mean by mitigated.  That attack

18         in (a) would at least be detected as a result of a

19         spike in ballots.  But if it's already caused there

20         to be long lines or other chaos at the polling place,

21         there's no way that you can go back and fix it.

22    Q.   Okay.

23    A.   These other attacks in I think you said (c), (d), and

24         (e) were mitigated by a combination of voters

25         robustly verifying -- or rigorously verifying their

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 129

1          ballots and a sufficiently robust audit.  Although

2          that's true, I don't think that there is any -- that

3          there is sufficient evidence to conclude that it's

4          possible to induce voters to rigorously verify their

5          ballots to the necessary level in an all BMD context.

6     Q.   And you made an important distinction.  So there are

7          methods by which (a), (c), (d), and (e) can be

8          detected, and then there will be at least some basis

9          to go and investigate further what actually happened.

10         Is that fair to say?

11    A.   So we have to -- we should probably make a diagram

12         about that or something like that to distinguish

13         exactly which circumstance detection versus

14         correction is possible.

15    Q.   Why don't we try it this way?  Under (a), you can

16         detect an attack outlined in 23(a) by a spike in the

17         provisional ballots for individuals not in the voter

18         registration database.

19    A.   Depending on which variation of this attack.  But for

20         plausible variations, I would agree with you.

21    Q.   And then for (b), I'm assuming that would be

22         relatively obvious because things are not working.

23         So that would be a very detectable type of attack?

24    A.   Yes.  Hard to recover from, but one that you know

25         chaos is happening.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 130

1    Q.    And (c) can be detected through a sufficiently robust

2          audit or a recount, correct?

3    A.    Yes.

4    Q.    And (d) can be detected through a sufficiently

5          rigorous audit.

6    A.    Yes.

7    Q.    And then (e) can be detected --

8    A.    Although, (d) cannot necessarily be corrected by a

9          sufficiently rigorous audit.

10   Q.    That's why I'm asking specifically just the detection

11         question for each of these.

12   A.    Yes.  Okay.

13   Q.    And then for (e), it can be detected through

14         sufficient number of voters carefully reviewing their

15         printed ballot and sufficiently rigorous audits.

16   A.    Yes.

17   Q.    Okay.  And in each of those scenarios, there would

18         then be a basis to conduct a further investigation to

19         find evidence of the types of attacks that have been

20         outlined, right?

21   A.    Well, it depends.  So in some of those scenarios,

22         it's too late.  The election has already been

23         disrupted.  In other cases, in other cases, if you

24         detect that something is wrong, you don't have any

25         information available by which to go back and correct

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 131

1         the changes that have happened.

2    Q.   You're familiar, I'm assuming, with the process of an

3         election contest?

4    A.   Yes.

5    Q.   And so there already exists provisions in Georgia law

6         and I'm sure other states as well that if, for

7         example, people who were ineligible incorrectly vote,

8         there's a provision to handle that through an

9         election contest.  Are you aware of that?

10   A.   Yes.

11   Q.   And so you said it's too late in terms of, you know,

12        once we detect it.  But if we detect it and an

13        election contest is filed, the election can be

14        re-run, just like it would be if ineligible people

15        were voting, right?

16   A.   That's true.  I would hate it -- I would hate to be

17        Georgia if we have to re-run the 2020 presidential

18        election because of Georgia's voting system.

19   Q.   And it's your testimony that you don't have any

20        evidence that any of the attacks in (a) through (e)

21        have ever occurred in an actual election in the

22        United States, right?

23   A.   No.  But election systems in many jurisdictions in

24        the United States don't produce the kind of evidence

25        that we'd need in order to know that these attacks

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 132

1      have happened.

2   Q.  In paragraph 24, you begin discussing malware,

3       malicious software that could be introduced into the

4       election equipment.  You don't have any evidence that

5       malware has been introduced into election equipment

6       in use in elections in Georgia, do you?

7   A.  No, I don't.  Although, to my knowledge, no one has

8       done the kind of forensics to any piece of election

9       equipment in Georgia that would be the most probable

10      way to detect such malware intrusion if it occurred.

11  Q.  And the list of introduction of methods of malware

12      introduction in 24, that's true in every state,

13      correct?  You could introduce malware if you had

14      these types of things into optical scanners, for

15      example, in every state system or election management

16      system?

17  A.  Yes.  That is true.

18  Q.  In paragraph 25, you begin with a little bit more

19      detailed discussion of the pieces connected to the

20      internet.

21  A.  Could we maybe take a break at some point soon?

22  Q.  Certainly.  I'm fine to take a break now, if you'd

23      like to.

24  A.  All right.  If we could.

25  Q.  Absolutely.  Thank you.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 133

1                    (Recess taken.)

2    BY MR. TYSON:

3    Q.   So turning to paragraph 25, we talk about some

4         components oven the system that are directly

5         connected to the internet.

6    A.   That's right.

7    Q.   Now, we've discussed a little bit the MVP and OVR

8         systems.  What is your understanding of how the MVP

9         system is connected to the eNet database?

10   A.   Well, let me see if I can remember for this

11        specifically for the MVP.  The MVP -- the MVP I know

12        receives information from the eNet database and I

13        believe contains a way to update that information.

14        But that may be in the OVR system.  It's been a while

15        since I've looked at them independently.

16   Q.   And so the OVR system, do you understand how that is

17        connected with the election system?

18   A.   Well, it generates voter registration requests that I

19        understand have to be reviewed by a person, but that

20        data then is fed into the database.

21   Q.   And are you recommending that no voter registration

22        information be put online for security purposes?

23   A.   No.  But what I'm recommending is that especially

24        heightened security precautions should be taken for

25        the components that are online because they create a

J. Alex Halderman , Ph.D.                      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 134

1           path by which an attacker could potentially come from

2           anywhere in the world and access the system.

3      Q.   In the third sentence of paragraph 25, though, the

4           criticism seems to be just that they are connected to

5           the internet.

6      A.   This isn't a criticism.  This is an expression of --

7           an expression of the nature of the risk.

8      Q.   And so this is a risk that there's at least a good

9           policy reason to encounter because we want voters to

10          have information about their voting information?

11     A.   Perhaps.  And it's a risk that -- but it's also a

12          risk that is especially heightened in Georgia due to

13          the nature of the problems that have already been

14          detected in the eNet system and the reviews that have

15          happened so far.

16     Q.   You don't have any evidence that Georgia's eNet

17          system has been directly targeted by malicious

18          actors, do you?

19     A.   Just the broad conclusion of the Mueller

20          investigation and the Senate Intelligence Committee

21          that Georgia was among the states whose systems were

22          targeted by Russia in 2016.  And I think it's a

23          inference that the online components of the

24          registration system were among those targeted.

25     Q.   Do you know how Georgia maintains backups of its eNet

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 135

1          registration system or if it does?

2    A.    I believe it does, but I don't know the specifics

3          about how those backups are maintained.  And it's a

4          good thing that it does.

5    Q.    In paragraph 26, you talk about components that are

6          not connected to the internet that could be targeted.

7          And one of the ways is removable media.  And you cite

8          the Stuxnet computer virus.  Are you with me on that?

9    A.    Yes.

10   Q.    And it's your testimony that that was attacked

11         through removable media and not through programming

12         at the manufacturer?

13   A.    Stuxnet was designed to, among other things, spread

14         through removable media.

15   Q.    Did the initial infection of Stuxnet come through

16         removable media?

17   A.    I think I've seen conflicting reports and conclusions

18         about that, but the way that the Stuxnet malware was

19         designed was able to spread to disconnected systems

20         by a removable media.

21   Q.    And in the next sentence you say that attackers could

22         employ this method to infect state or county EMS and

23         spread from there to scanners and BMDs when workers

24         program them for the next election.  Do you have any

25         evidence that this has ever happened to a Dominion

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 136

1      system?

2   A.  No, I do not.  Although, the Dominion system is very

3       new.

4   Q.  So let's talk about the Dominion system.  That leads

5       up to paragraph 27.  And your opinions in this

6       section about the Dominion components, I think we've

7       discussed, came from your review of the technical

8       documentation, the California and other evaluations

9       of it, not from your personal review, correct?

10  A.  That's correct.  They're based on my experience with

11      other similarly designed voting systems as well.

12  Q.  Now, you in paragraph 27 say, Dominion does not

13      dispute that its devices can be hacked by

14      sufficiently sophisticated adversaries.  And that's

15      not really that remarkable of a statement, is it?  I

16      mean, can't any computer, we've already discussed, be

17      hacked by sufficiently sophisticated adversaries?

18  A.  I think that's actually a critically important point

19      because this is the entire reason that we need the

20      paper trail, the paper trail to reflect accurately

21      voters' intentions and the paper trail to be

22      rigorously audited.

23  Q.  So you would agree that that's not really a

24      remarkable statement, though, because it's a computer

25      that can be hacked, which is basically every

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 137

1           computer?

2     A.    I agree that it's basically every computer that can

3           be attacked.  But again, that's really a core part of

4           why Georgia even has a new voting system right now,

5           that all computer systems can be hacked, and we need

6           to be very, very careful to make sure that, you know,

7           voting system context, the correct outcome is going

8           to be determined even if the systems are successfully

9           attacked.

10    Q.    The first reason you cite, you say one reason why

11          this is true.  So you're going to give, I guess, a

12          couple of reasons why it can be hacked.  I guess

13          isn't the first reason why it's true is because it's

14          a computer?

15    A.    I suppose so.

16    Q.    Okay.  You first cite the complexity of the software,

17          though.  Have you compared Dominion's software with

18          the number of source code lines in other BMD systems?

19    A.    In other voting systems.  Not -- I'm not sure it's

20          specifically in other BMD systems.

21    Q.    And is it your testimony that the number of lines of

22          code is higher in the Dominion system than other

23          voting systems?

24    A.    It's ten times as much code as Georgia's previous

25          voting system.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 138

1   Q.   And compared to other ballot marking device systems?

2   A.   I don't know.  It's probably similar, but I can't --

3        I can't estimate exactly how much.  Probably -- yeah.

4        I can't estimate how much.

5   Q.   The ICP scanner you indicate has 475,000 lines of

6        source code.  The ICP scanner is the optical scanner,

7        right?

8   A.   The precinct-based optical scanner as opposed to the

9        central count.

10  Q.   And is that similar to the number of lines of code

11       for other precinct-based scanners you've evaluated?

12  A.   It's more code than for other precinct-based scanners

13       that I've evaluated by something like a factor of

14       three or four.

15  Q.   And you indicate that the software is written in

16       C/C++, and you say that that programming language is

17       particularly susceptible.  Is that true of all

18       software written in C/C++, that it's more vulnerable

19       than other software?

20  A.   It's extremely difficult to write software in C and

21       C++ that is even reasonably secure to the point that

22       I'm advocating that my department stop teaching those

23       programming languages to undergrads.

24  Q.   Are those programing languages used in commercial

25       applications today?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 139

1    A.    They are.  Although, decreasingly so because of the
2          security risks.
3    Q.    And the security risks on the C, C++ front on the
4          precinct scanner are there for hand-marked paper
5          ballot systems too, correct?
6    A.    Yes.  That's part of the reason that the system needs
7          to be audited.
8    Q.    You say in paragraph 29 that software the size and
9          complexity of Dominion code inevitably has
10         exploitable vulnerabilities.  So is it true then that
11         just having a large number of lines of code always
12         leads to exploitable vulnerabilities?
13   A.    In practice, yes.
14   Q.    The quote at the end of 29 from the California study,
15         if the system were secure, it would be the first
16         computing system of this complexity that is fully
17         secure.  Would you ever categorize any computing
18         system as fully secure?
19   A.    There are some simple computer systems for which you
20         could plausibly make such a statement, but they're
21         very simple computing systems.
22   Q.    Like an Atari-level computing system?
23   A.    Probably not even that.
24   Q.    And so when you reference nation state attackers in
25         29 discovering and exploiting novel vulnerabilities

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 140

1       in complex software, that basically is pretty much

2       every piece of software has exploitable

3       vulnerabilities, right?

4    A.  That's right.  It's another way of saying that if the

5       Russian government decides to target Georgia's

6       elections in 2020, they're likely to succeed.

7    Q.  And ultimately, that's not a function of a Dominion

8       system, a function of the lines of code.  It's just a

9       function of it being a computer that's programmed by

10      software, isn't it?

11   A.  And a function of the lack of things like a

12      strongly -- a paper trail that voters -- a paper

13      trail that we can be sure reflects voter intent even

14      in the face of attack and a question of whether there

15      is a rigorous enough audit.

16   Q.  And so essentially it's your testimony that there is

17      no way we can ever secure any computerized voting

18      system adequately, which is why you advocate for a

19      hand-marked system primarily?

20   A.  I'm not opposed to the use of technology in voting in

21      general, but that technology has to be used in ways

22      where we don't have to trust that the technology is

23      functioning correctly in order to be sure the

24      election outcome is right.

25   Q.  But you would never place a piece of technology

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 141

1          between a nondisabled voter and the ballot?

2     A.   I think it's unwise to do that if there were

3          alternatives, and hand-marked paper ballots are such

4          an alternative.

5     Q.   In paragraph 30, you talk about using outdated

6          off-the-shelf software modules.  Isn't that a

7          relatively common practice when designing software?

8     A.   It's actually not a common practice among

9          well-written software.  Well-written software today

10         tends to use automated methods to make sure that the

11         dependencies are up to date.

12    Q.   And so when we discussed earlier the use of

13         open-source software and off-the-shelf hardware,

14         you're saying it's not a good idea to use

15         off-the-shelf software; is that fair?

16    A.   I'm saying if you're going to use off-the-shelf

17         software, you have to make sure that it's up to date

18         every time that you're shipping a new version of your

19         product and you have to ship a new version of your

20         product every time there's security updates to those

21         downstream dependencies.  That's a critical part of

22         the modern software development, of modern software

23         development practices that isn't reflected in the

24         Dominion system.

25    Q.   And every EAC-certified system has to have its

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 142

1      software certified and maintained by the EAC; is that

2      correct?

3   A.  Tautologically every EAC-certified system has to have

4      its software certified.  That's right.

5   Q.  And the certification process includes the EAC

6      maintaining a gold disc of that version of the

7      software that is the certified version; is that

8      correct?

9   A.  That -- essentially, yes.

10  Q.  And so any time a software manufacturer wishes to

11     make any change, including a security update, they'd

12     have to get their software recertified by the EAC,

13     right?

14  A.  That's part of the problem with the Georgia voting

15     system, that, in fact, its software is out of date

16     because a new version -- if there were security

17     updates needed, they're likely going to have to go

18     through further certification before they can be

19     used.

20  Q.  So that's a yes, it has to be recertified if there's

21     changes for security?

22  A.  It depends on quite what the changes are.  But

23     sometimes it has to go through a complete

24     recertification.

25  Q.  In paragraph 31 you say, outdated software components

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 143

1        are a security risk because they have these

2        documented vulnerabilities, and you cite, for

3        example, a list of 254 known vulnerabilities.  Is a

4        vulnerability always an exploitable vulnerability?

5        How are you using the term vulnerability in this

6        paragraph?

7    A.  Whether it's exploitable or not in this context

8        depends on what the -- depends on the specifics of

9        the particular problem and what the attacker is

10       trying to do.

11   Q.  So the fact that an Android operating system has 254

12       known vulnerabilities is just like saying it's a

13       piece of software, right, because every software has

14       vulnerabilities?

15   A.  Well, no, not exactly.  The problem is that it's a

16       much stronger statement than simply it's a piece of

17       software.  This is a piece of software that's already

18       been analyzed, people understand where many of the

19       vulnerabilities are, and I can provide a recipe to

20       make it even easier for an attacker to get in or to

21       allow less sophisticated attackers to successfully

22       compromise the system that don't have the resources

23       of a nation state.

24   Q.  So the fact that there are 254, does that tell you

25       anything about the relative risks of the use of this

J. Alex Halderman , Ph.D.        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 144

1        particular version of Android?

2    A.   As compared to --

3    Q.   In the election contest, I should say.

4    A.   As compared to newer versions of Android?

5    Q.   As compared to anything.  Does the fact of the number

6        of known vulnerabilities tell you how vulnerable a

7        piece of software actually is?

8    A.   It's a good indicator.  It's certainly an indicator

9        of the level of vulnerability.  And 254 unpatched

10       vulnerabilities is a very bad situation to be in.

11   Q.   And is that number higher or lower than the number of

12       known vulnerabilities in other BMD systems?

13   A.   I don't know the number of known vulnerabilities in

14       other specific BMD systems off the top of my head,

15       but I can tell you that in absolute terms that's

16       pretty high.

17   Q.   Your next paragraph, 32, talks about a cheap security

18       officer position that was vacant.  How is this

19       paragraph 32 informing your analysis of the relative

20       risk faced by Georgia?  And the reason why I ask that

21       is, from our discussions so far, it sounds like it's

22       a piece of software, it's a computer, it's going to

23       be vulnerable.  How is the existence or not of a

24       chief security officer informing your analysis?

25   A.   Well, this is informing whether Dominion is following

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 145

1           best practices in its security and its software
2           development and maintenance.  And not having a chief
3           security officer in place, I think is a sign of a
4           general -- is a sign of a general perhaps difficulty
5           in achieving security best practice.
6     Q.    So are you opining that Dominion does not take
7           security seriously?
8     A.    That the position is still vacant does not speak
9           highly of Dominion's security posture.  I'm opining
10          that there is -- that this is -- that this is a sign
11          of lax security practice.
12    Q.    And it's your testimony that the Dominion software is
13          not secure software, right?
14    A.    Yes.
15    Q.    And it's also your testimony that every ballot
16          marking device software is not secure software,
17          right?
18    A.    It is my testimony that no ballot marking device is
19          likely to be able to withstand a sophisticated nation
20          state attack, and that's why it's so important that
21          we have -- that all jurisdictions practice -- that
22          all jurisdictions -- that's why it's so important
23          that ballot marking devices be -- that the scope of
24          use of ballot marking devices be limited.
25    Q.    And you haven't done a full comparison of every

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 146

1           ballot marking device that's currently available,

2           right?

3    A.     That's right.

4    Q.     And you haven't asked Dominion who has responsibility

5           for security development and implementation of

6           security in Georgia?

7    A.     No, I haven't.  It's unclear who, if anyone.

8    Q.     In paragraph 33 you say, Georgia certified the system

9           without performing its own security testing or source

10          code review.  The system Georgia used is certified by

11          the EAC, right?

12   A.     Yes.  So were versions of Georgia's old system.

13   Q.     And part of the EAC's review for certification

14          involves security, correct?

15   A.     A very limited kind of security testing

16          unfortunately.  It's not rigorous.

17   Q.     So it's your testimony a state can never rely on EAC

18          certification for cybersecurity issues?

19   A.     I think it would be very foolish to rely only on the

20          EAC certification for security.  That's right.

21   Q.     In beginning of paragraph 34 we begin a walk through

22          the California test, which is a different version

23          than the version used in Georgia, right?

24   A.     It's a more recent version.

25   Q.     And I believe we've already covered this.  But you

J. Alex Halderman , Ph.D.                   February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 147

1          weren't involved in any of the California review of

2          the Dominion system, right?

3     A.   No, I was not.

4     Q.   You say in paragraph 35 that, like all security

5          testing, California's tests were necessarily limited

6          and could not be expected to find all exploitable

7          vulnerabilities.  Can you tell me about what you mean

8          by that sentence?

9     A.   Right.  So security testing -- security testing can

10         expose the existence of vulnerabilities.  It can't in

11         general prove that systems have no vulnerabilities.

12    Q.   So you can't prove a negative basically.  I can't

13         prove there are no vulnerabilities?

14    A.   Not with the normal means of security testing.

15    Q.   And is that why the security testing is necessarily

16         limited in scope, because it's just not possible to

17         find everything?

18    A.   Well, in part.  And there's also a question of the

19         rigor involved.  For instance, the California

20         top-to-bottom review of the -- in 2007 of the

21         equipment that Georgia has just gotten rid of spent

22         something like a man year of effort per system doing

23         code review, right, a very high level, an intensive

24         level of review.  Security testing of the kind I

25         understand that California does now, it's a much more

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 148

1          limited time and scale.  There's a quantifiable --
2          there's sort of a quantifiable difference as well.
3     Q.   So ultimately it's a policy decision how much effort
4          a state wants to put into its security testing.  Is
5          that fair to say?  California chose at one point to
6          do a massive amount of it.  Now it chooses to do
7          something less.
8     A.   I suppose you could characterize that as a policy
9          decision.
10    Q.   Would you characterize it as something different?
11    A.   No.  Again, I suppose you could characterize it as a
12         policy distinction.  I'm not sure I would
13         characterize it differently.
14    Q.   So in paragraph 35 you kind of distinguish the two
15         versions to say more recent versions of software tend
16         to contain fewer security vulnerabilities.  But you
17         haven't done any comparison, and to your knowledge no
18         one has, to know if that's the case, right, if
19         there's more or less vulnerabilities?
20    A.   Right.  Unfortunately, Georgia didn't do its own
21         security testing of a similar kind to California.  So
22         we don't have a direct comparison.
23    Q.   And you haven't -- I'm sorry.
24    A.   But in general, it's true that as software evolves,
25         vulnerabilities are corrected at a higher rate than

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 149

1            they're introduced.

2       Q.   And you have not done any security assessment of

3            vulnerabilities in Georgia's Dominion system, right?

4       A.   No.  I haven't had the access to do that.

5       Q.   The next paragraph talks about the installation --

6            software installation files and a belief that it was

7            possible to inject things into the system.  And you

8            say, this implies that attackers could modify

9            Dominion installation files.  But I'm assuming you've

10           never tried to do that, right?

11      A.   No.  I have not had the access to try to do that

12           myself.  This is based on what California's testers

13           found.

14      Q.   And California's testers, again, looked at the

15           antivirus available.  Do you know if that same

16           antivirus is used in Georgia's system, or not?

17      A.   Yes, it is.

18      Q.   And you reference that the ballot marking device and

19           the precinct optical scanners have no antivirus

20           software at all.  Would you expect to find antivirus

21           software on a precinct scanner?

22      A.   Some precinct scanners can have antivirus software.

23           It depends -- it depends on the specific scanner.

24      Q.   And so are there particular manufacturers that

25           install antivirus software on precinct scanners?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 150

1    A.    Yes.  So let me see.  No.  I can't -- I can't recall
2          off the top of my head.  But yes.
3    Q.    And so then the end of paragraph 37 you're saying,
4          malware that infected the Dominion components could
5          evade antivirus protection.  Again, that's possible,
6          but you don't know for sure, right?
7    A.    Well, with California's -- what California's test
8          found was, in fact, they tried to see if the
9          antivirus would detect malware samples, and in some
10         cases it failed to do that.  So that's the basis for
11         that conclusion.
12   Q.    And that was just specifically for the EMS server and
13         not for -- California didn't run those tests on the
14         BMD or the optical scanners, right?
15   A.    Well, the BMDs and optical scanners don't have
16         antiviruses.  So tautologically malware could evade
17         antivirus detection in those components.
18   Q.    And are you aware whether Georgia requires any other
19         components on the EMS server that would address
20         malware antivirus software different than California?
21   A.    I'm not.  But it would invalidate the EAC
22         certification for them to install such components.
23   Q.    So the EAC certification extends to the antivirus
24         components of the EMS server?
25   A.    Yes.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 151

1    Q.    Paragraph 38 there's a discussion of physical access

2          to a USB port.  And you say, this implies that no

3          secret passwords or keys would be needed to exploit

4          the problem, given physical access.  Isn't that a

5          huge given under the circumstances that you don't

6          know what physical access requirements exist for

7          Georgia BMDs?

8    A.    It's very difficult to have a physical access regime

9          that would prevent any physical access under any

10         circumstances by an attacker.  So I think it's quite

11         significant that someone with physical access could

12         potentially alter the software running on these

13         devices.

14   Q.    If I gave you an unencrypted computer, physical

15         access to an unencrypted computer, no matter what

16         security measures I had on there, you could hack that

17         computer, right?

18   A.    Oh, definitely.

19   Q.    So doesn't physical access matter a lot then, the

20         protocols around physical access?

21   A.    The protocols around physical access are important.

22         But there's the question of, for instance, is the

23         computer actually encrypted.  If it is encrypted,

24         it's going to be more difficult to do something

25         hopefully for someone with physical access.

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 152

```
 1   Q.   But ultimately since you were not aware of Georgia's
 2        physical access and physical security requirements,
 3        the statement in paragraph 38 doesn't really add much
 4        to your analysis because we don't know what type of
 5        physical access or what would be involved in someone
 6        gaining physical access in Georgia, right?
 7   A.   I'm not sure that I would agree with that.  I think
 8        whatever the level of physical access protection that
 9        Georgia has, the fact that given physical access
10        without any kind of secret information someone could
11        exploit the problem that the California reviewers
12        found creates significantly greater risks than if the
13        system had been designed without that problem.
14   Q.   So you say at the end of 39, these problems indicate
15        that the Dominion system was designed without
16        sufficient attention to security.  And so that's, I
17        guess, consistent with what you said previously.  You
18        don't believe there was any attention given to
19        secure -- sufficient attention given to security.
20        But ultimately, isn't it true that you find these
21        kind of vulnerabilities or problems with every
22        computer?  I guess what I'm trying to understand is,
23        you're opining about Georgia's Dominion system, but
24        really you're opining about ballot marking devices
25        generally.  I'm at a loss to see if you can never
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 153

1        sufficiently secure these systems, why is Dominion's

2        system any different than any other ballot marking

3        device being used today?

4    A.  So there are things that are true about all software

5        and all ballot marking devices, and there's further

6        evidence that these things are true about Georgia's

7        system specifically.  And, in fact, some of this is

8        what California's finding helps to suggest even more

9        specific recipes by which an attacker could strike

10       the Georgia Dominion system.  And this all gets back

11       to, once again, why the lack of sufficiently robust

12       audits and the universal use of BMDs for in-person

13       voters lead to such significantly heightened risks.

14   Q.  And that's true whether it's a Dominion system or any

15       other system if you're using BMDs for all voters,

16       right?

17   A.  Many of the same problems would in here.

18   Q.  And going to paragraph 40, ultimately California

19       chose to certify the Dominion system, right?

20   A.  They did.

21   Q.  And you know that they imposed much more stringent

22       security conditions than those in Georgia.  How do

23       you know that Georgia didn't adopt or utilize any of

24       the security conditions that California recommended?

25   A.  Based on -- based on my knowledge to date about what

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 154

1          procedures, publically available procedures Georgia

2          has promulgated.

3     Q.   So the statement that California imposed

4          certification or more stringent security conditions

5          than those in Georgia is based on the Dominion

6          documentation you reviewed?

7     A.   Yes, in part.  In part on the California

8          documentation I reviewed, and in part on the overall

9          security posture of the Dominion system as used in

10         Georgia.

11    Q.   And you disagree with California's decision to

12         certify the Dominion system, right?

13    A.   In part.

14    Q.   What do you mean in part?

15    A.   In part.  I think the -- so the -- California,

16         because it has more stringent auditing requirements

17         than Georgia, faces somewhat less risk.  And

18         California does not -- most California jurisdictions

19         don't use the BMDs for all voters.  And in those

20         cases, they don't suffer from the same risks from

21         BMD-based attacks.  So I think the risk is less in

22         California than in Georgia.  I still think that

23         there's a risk in some California jurisdictions if

24         they're going to use BMDs for all voters.  But I

25         think the way that the system is used in most of

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 155

1        California is less risky than Georgia.

2    Q.   Is it your opinion that a California county that uses

3         BMDs for all voters with these more stringent

4         security conditions has an acceptable level of risk?

5    A.   No.

6    Q.   So ultimately, even if Georgia agreed to every

7         security condition in California and imposed that for

8         all its BMDs, the fact that it's using BMDs for all

9         voters would be the thing that would -- that you

10        would say that's the security risk; is that right?

11   A.   Yes.  I think the BMDs for all voters, coupled --

12        they would need both the BMDs -- they would need both

13        sufficiently rigorous audits and not -- and to be

14        using BMDs for only a smaller fraction of voters in

15        order for the Dominion system with any set of

16        security precautions to be adequately safe.

17   Q.   So there is no situation where BMDs are used for all

18        voters, based on your current understanding of the

19        landscape, that you would say that was an appropriate

20        level of risk in an election system.  Is that right?

21   A.   I think that's probably safe to say.  Though, there

22        are matters of degree within that level of risk.

23   Q.   Which gets back to, I guess, our earlier discussion

24        about acceptable levels of risk.  Sitting here, do

25        you have a way by which you would determine the

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

1    acceptable level of risk for a BMD-for-all system?

2  A.  Yes.  So in part, this is based on empirical

3       observations about voters' likelihood of catching

4       errors as in our January study, right?  And you can

5       use that to estimate for a given BMD deployment and

6       what fraction of voters are using it what -- how much

7       evidence you would have of systemic error for a

8       particular closeness of an election result.  That's

9       one way of evaluating in a very quantifiable way the

10      relative risk.

11 Q.  And I apologize if I'm just not grasping the concept.

12      This is probably me, not you, so don't take this the

13      wrong way.

14 A.  It's probably me.

15 Q.  I just am trying to understand.  Ballot marking

16      devices for all voters is a scenario that you say

17      imposes a high risk such that it's too much risk.

18      You can point to the voters verifying at a level.

19      And so is it that if voters verified 90 percent of

20      their ballots, you would then say that's an

21      acceptable degree of risk for a BMD-for-all system?

22 A.  So the analysis is basically of the form, given this

23      fraction of voters using the system, is there -- is

24      it -- is it at all likely that election officials are

25      going to notice systematic fraud sufficient to change

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 157

1        the outcome of a close election if attackers are able

2        to compromise the machines.  And if the answer is

3        yes, it's very likely, then that's probably an

4        acceptable risk.  If the answer is no, it's quite

5        unlikely, then that's an unacceptable risk.  So

6        there's some gray area in between, but we're not in

7        that gray area with Georgia's machines.

8   Q.   And when you say we're not in that gray area with

9        Georgia's machines, I know we're not for the voter

10       certification.  Are you saying the security

11       vulnerabilities alone take us out of the voter

12       verification question?

13  A.   No.  The overall posture of deployment takes us out

14       of the -- out of the gray area there.  That they are

15       used by all -- that they are used by all voters

16       unfortunately takes us out of that gray area.

17  Q.   So it is correct then that if BMDs are used for all,

18       we're out of the range of acceptable risk under any

19       construct?

20  A.   At least for BMDs that are available today.  It's

21       possible that future BMDs, some very different design

22       might result in different verifiability properties,

23       that voters would have a much easier time verifying

24       them.  Or perhaps someone will discover eventually a

25       way to get voters to reliably verify everything on

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 158

1           the ballot, but it seems extremely unlikely to me at

2           this point.

3      Q.   So let's move to voter registration database.  And

4           you talk about a cyber risk assessment of eNet from

5           two years ago.  Is that correct?

6      A.   That's right.

7      Q.   And I'm assuming you are relying on the publically

8           available information from the Curling case for

9           paragraph 41 and 42.

10     A.   Yes.

11     Q.   Okay.  You say that the PCC assessment or the

12          assessment of PCC software was limited in scope.  But

13          didn't we just say in 35 that all security testing is

14          limited in scope?

15     A.   This was particularly limited in scope.

16     Q.   Okay.  So too limited?

17     A.   It was particularly limited in scope.  The 2018

18          assessment, if I'm recalling correctly, was basically

19          just a functional assessment and didn't even get into

20          the inner workings of the code.

21     Q.   And you've not personally examined Georgia's security

22          environment for eNet or the software that Georgia --

23          or the eNet software itself in Georgia, correct?

24     A.   No.  Although, I'm familiar with the risk assessments

25          that Georgia commissioned in that environment.

J. Alex Halderman , Ph.D.              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 159

```
 1   Q.   In paragraph 42, you state that transferring the
 2        operations does not mitigate the full range of
 3        issues, and then you say the state has -- there's no
 4        evidence the state has taken other steps to address
 5        them.  What is your basis for that knowledge today?
 6        This is -- you know, we're what, eight months past
 7        the hearing where these issues were discussed.  Is it
 8        your understanding that Georgia still has not
 9        mitigated these?
10   A.   I'm aware of a -- I'm aware today of a very recent
11        status update in the Curling case where Georgia
12        asserts that it has taken some steps.  Although, I'll
13        note that update is devoid of sufficient technical
14        detail to have -- to conclude that the progress is
15        substantial.  It just says that some things have been
16        mitigated and others are still in process, which
17        based on previous testimony in the Curling case about
18        vulnerabilities that would have led someone to
19        believe that vulnerabilities were corrected in these
20        systems when they had not been corrected, I think
21        leaves me with significant reason for doubt.
22   Q.   You don't know sitting here today whether Georgia has
23        contracted with any cybersecurity vendor for any of
24        the more detailed security assessments that you
25        recommend, right?
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 160

1    A.    I'm not sure.

2    Q.    And you don't know if Georgia's review of its

3          mitigation steps for the security assessment that

4          were outlined has been reviewed by its outside

5          cybersecurity vendors, do you?

6    A.    No, I don't.

7    Q.    And if all of those -- the full range of issues had

8          been fully mitigated, as recommended by the

9          cybersecurity vendor, would you have greater

10         confidence in the secure of Georgia's voter

11         registration database?

12   A.    I think it would also require further assessment and

13         source code review and mitigation of the things found

14         as a result of that before I would say I had further

15         confidence.  And the level of further confidence

16         would depend on the details of those analyses.

17   Q.    And those types of analyses cost money, don't they?

18   A.    Yes, they do.

19   Q.    In paragraph 43 you talk about attempts to infiltrate

20         the voter registration system.  And we've

21         discussed -- I think we discussed that piece already

22         about the internet connection.  But you say serious

23         vulnerabilities in the MVP website were discovered on

24         the eve of the November 2018 election.  What were

25         those serious vulnerabilities?

J. Alex Halderman , Ph.D.        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 161

1    A.    Yes.  So there were vulnerabilities in the websites

2          that would have allowed an attacker to access the

3          voter registration data of many individuals without

4          their cooperation or knowledge and that would have

5          allowed an attacker to access system files on the

6          server that were not intended to be exposed,

7          potentially critical components of the inner working

8          of the services.

9    Q.    Georgia's voter registration information about

10         identifying information on voters is public record,

11         isn't it?

12   A.    I don't believe that everything in the file is a

13         public record.

14   Q.    And you say in the next sentence, unauthorized

15         parties could have exploited these vulnerabilities to

16         access sensitive system configuration files and voter

17         registration data.  What's the basis for the

18         statement that they could have accessed -- I'm sorry.

19         I meant to ask about the next sentence.

20               This information would have allowed

21         attackers to fraudulently change voter registrations

22         through the OVR system.  What is the basis for that

23         statement?

24   A.    That the information contained in the My Voter Page

25         was sufficient to authenticate as a voter to the --

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 162

1     to the service that allows you to update your voter

2     information, like where you live.  And so it would be

3     possible for an attacker to use that information to

4     change the records of voters and cause them to be

5     registered in the wrong jurisdiction, for instance.

6   Q.   Is it your testimony that this type of attack could

7        have immediately updated the eNet system without

8        going through a registrar?

9   A.   No.  Although, I'm not sure that there is evidence

10       either that registrars would have spotted this attack

11       had it taken place.

12  Q.   And there's no evidence that this type of attack

13       occurred and that any registrations were ever

14       changed, correct?

15  A.   That's correct.  But I think it speaks to the level

16       of security preparedness of the voter registration

17       system.

18  Q.   Is it your understanding that the voter registration

19       system is at issue in this case?

20  A.   These are components of the voter registration system

21       by the definition used in basically every state.

22  Q.   And my question was, is it your understanding that

23       the voter registration system is at issue in the Fair

24       Fight Action case?

25  A.   Yes, I do understand that it is at issue.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 163

1   Q.   Next we move to the electronic poll books in

2        paragraph 44.  And we covered you have not personally

3        reviewed the Poll Pad e-poll book, correct?

4   A.   That's correct.  I'm relying on the information

5        provided by Dominion, which included technical

6        documentation for the Poll Pad and on the analyses

7        done in other states and my expertise.

8   Q.   Are you aware whether Georgia requires the wireless

9        and internet capabilities of Poll Pads to be

10       disabled?

11  A.   I understand that it requires that during the process

12       of voting while polls are open, but that's -- that

13       the WiFi be disabled.  But I don't believe that it

14       requires that to be disabled at other points.

15  Q.   Do you know if Georgia has taken any steps to

16       permanently disable that access on Poll Pads?

17  A.   I don't know.

18  Q.   In paragraph 45, you discuss an attack to alter voter

19       registration data in the Poll Pads.  Are you aware

20       that Georgia requires paper records of all registered

21       voters in a precinct at each precinct?

22  A.   Yes, I suppose I do know that.

23  Q.   So if an attacker altered voter registration data or

24       disabled the Poll Pads, Georgia election officials

25       would have a way for voting to continue, correct?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 164

1    A.    To continue, although possibly at a much slower rate,

2          which could cause chaos on the ground.

3    Q.    But you haven't assessed what the rate of check-in

4          would be with a paper list versus an electronic list?

5    A.    I haven't.  But it's fairly easy to -- I think it's a

6          reasonable conclusion that it would be slower without

7          the use of the technology.

8    Q.    And so ultimately it was a policy decision Georgia

9          made to include technology for this purpose possibly

10         to speed up the check-in process?

11   A.    Or to decrease the cost of the check-in process.

12   Q.    You say in paragraph 46 that Georgia -- to your

13         knowledge, Georgia has not performed any security

14         testing of the Poll Pads.  It's possible they

15         performed that and you don't know, right?

16   A.    I suppose it's possible that they performed their own

17         testing and didn't tell anyone about it.  But that

18         would seem -- but I've been following the case with

19         the Georgia system carefully, and to my knowledge,

20         they have not.

21   Q.    Do you know if Georgia relied on the California

22         review when it made the selection or decided to go

23         with the Poll Pads?

24   A.    I don't know.

25   Q.    And in 47 you indicate that California conditionally

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 165

```
 1          certified the Poll Pads subject to 19 terms and

 2          limitations.  Do you know if Georgia adopted any of

 3          those terms and limitations?

 4    A.    I don't know.  But one of the most important ones was

 5          that the Poll Pad not be used to program or encode

 6          smart cards that would interface with the BMDs, and

 7          it's my understanding that Georgia has not adopted

 8          that one.

 9    Q.    And Pennsylvania also conditionally certified the

10          Poll Pad, right?

11    A.    That's right.

12    Q.    And they had some additional conditions and security

13          recommendations.  And you don't know if Georgia has

14          adopted those at any point in its implementation of

15          the Poll Pad, right?

16    A.    I don't -- I don't know.  Although, again, one of the

17          most important ones in Pennsylvania was the

18          prohibition on encoding smart cards from the Poll Pad

19          because that creates a path from the Poll Pad system

20          to the BMDs.  And Georgia does encode voter access

21          cards from the Poll Pad is my understanding.

22    Q.    If Georgia adopted all of the terms, limitations, and

23          security recommendations imposed by California and

24          Pennsylvania, would you still recommend against the

25          use of the Poll Pad?
```

Case 1:18-cv-05391-SCJ    Document 401-1    Filed 06/27/20    Page 168 of 243

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 166

1    A.    It would certainly further reduce the risk.

2    Q.    Would it reduce it to an acceptable level?

3    A.    Perhaps.  It's subject to -- subject to other

4          security conditions as well.  So that alone would not

5          necessarily be enough.

6    Q.    So when you say subject to other security conditions,

7          what other security conditions would it be subject

8          to?

9    A.    Well, I think it would take some time to do a full

10         analysis of that question.

11   Q.    And what process are you using to determine the

12         relative level of risk of the Poll Pads with and

13         without the California and Pennsylvania conditions,

14         or are you using one?

15   A.    So this is -- to determine the relative risk in that

16         case, this is what would -- what I'm doing to

17         determine that is modeling the different paths by

18         which an attacker might attempt to spread

19         infiltration through the voting system.  And so one

20         of the critical differences between the Georgia and

21         California and Pennsylvania models of using the Poll

22         Pad is the existence or not of this path from the

23         Poll Pads to the ballot marking devices.

24   Q.    In my hypothetical I asked you to assume that we

25         adopted all the Pennsylvania and California

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 167

1         conditions, which would include the prohibition on
2         that path.
3    A.   That's right.
4    Q.   How would you evaluate the level of acceptable risk
5         given the adoption of all those conditions?
6    A.   Well, I think it would involve a security analysis of
7         what the remaining modes of infiltration were and
8         what the -- what the full set of protection measures
9         allowed for or required in terms of a fail-safe.
10   Q.   And you haven't conducted that kind of analysis here,
11        right?
12   A.   Not in your hypothetical, no.
13   Q.   And you haven't conducted it as part of your report,
14        correct?
15   A.   I don't really need to in terms of this report
16        because the significant risk of the infection
17        spreading from Poll Pads to the BMD systems is
18        itself -- is itself the focus of my analysis here.
19   Q.   So the fact that items are being taken from the Poll
20        Pad to the BMD is a sufficient basis to determine
21        that is an unacceptable level of risk to encounter in
22        an election system, correct?
23   A.   That was sufficient to convince California and
24        Pennsylvania to prohibit that functionality entirely.
25   Q.   I'm --

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 168

1    A.    I agree with that prohibition.

2    Q.    I just want to make sure I'm clear because you're

3          here opining that Georgia is taking an unacceptable

4          level of risk with its Poll Pads as well as part of

5          the structure of the election system.  Am I correct

6          about that?

7    A.    Yes.

8    Q.    And so what is the determination?  Is it the fact

9          that there's a card moving from the Poll Pad to the

10         BMD that makes it an unacceptable level of risk and

11         that distinguishes California and Pennsylvania, or is

12         there something else on which you're basing your

13         analysis that this degree of risk in using the Poll

14         Pads is unacceptable?

15   A.    So I'm basing that -- I'm basing that opinion on the

16         overall vulnerability of the Poll Pads and that

17         additional link between the Poll Pads and the BMDs,

18         and those are the primary -- that's the primary basis

19         for that assessment.

20   Q.    Okay.  And sitting here today, you can't say whether

21         or not California and Pennsylvania's use of the Poll

22         Pads is an acceptable or unacceptable level of risk;

23         is that correct?

24   A.    That's right.  I can't say that.  I haven't fully

25         evaluated that.

J. Alex Halderman , Ph.D.          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 169

1   Q.   Let's move next to supply chain threats.  You don't

2        have any evidence in paragraph 50 that attackers have

3        infiltrated the software development process of

4        Dominion KnowInk, PCC, or their suppliers, right?

5   A.   No.  I'm talking about the risk that that could

6        happen.

7   Q.   Right.  But you don't have any evidence it has

8        happened?

9   A.   I don't.  And I'm not sure that there would be such

10       evidence available if it had happened successfully.

11  Q.   And then in paragraph 51, you talk about the design

12       of several components overseas.  Is it your testimony

13       that Serbian programmers, that automatically means

14       that this is going to be accessed by the Russians or

15       influenced by the Russians in some way?

16  A.   No.  Not that it will automatically be, just that the

17       risk is even higher than if the software were

18       developed domestically in a facility that was not in

19       a location of a government closely aligned with

20       Russia.

21  Q.   And the EMS runs an antivirus software made by a

22       Czech company, you say, which earlier we said was the

23       Avast Antivirus file shield system; is that right?

24  A.   Avast, like a pirate.

25  Q.   And is Avast a widely-used antivirus software?

Veritext Legal Solutions
800.808.4958                                              770.343.9696

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 170

1    A.    It is.

2    Q.    Why mention that it's a Czech company in that

3          scenario?  Does that increase the risk if it's a

4          widely-used piece of software?

5    A.    It creates further risks because the -- although a

6          widely-used piece of software -- although it is a

7          widely used piece of software, it's still true that

8          if attackers were to infiltrate that company, they

9          could spread -- spread malicious functionality into

10         the election management system.

11   Q.    And so it's your testimony that the antivirus is both

12         a terrible system because it doesn't track stuff and

13         it grants this Czech company access to the server?

14   A.    It can be simultaneously true that it introduces new

15         risks and doesn't adequately mitigate other risks.

16   Q.    And your reliance for this section of your report is

17         from this Computer World article, right?

18   A.    I'm sorry.

19   Q.    I'm sorry.  Let me rephrase that.  In paragraph 51

20         the statement about Dominion using Serbian

21         programmers is based on this Computer World article,

22         correct?

23   A.    Yes.  Although, I'm aware that that has been reported

24         elsewhere.  I'm not sure where.

25   Q.    And this is a system that has been certified by the

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 171

1          EAC since 2016, right?

2     A.   Yes.  Although, again, the EAC certification process

3          is not a -- it has significant limitations to its

4          security review.  It's not a rigorous security

5          review.

6     Q.   And your statement that a hostile government might

7          attempt to plant an agent at any of these companies,

8          black male honest employees, or hack into the

9          software development environments, that's true of

10         every election system and even ballot printing

11         services, right?

12    A.   I think it's an increased risk in foreign

13         jurisdictions, especially jurisdictions that are

14         aligned with potentially hostile governments.

15    Q.   So it's a true statement.  But you think that

16         Georgia's selection of Dominion led to an increased

17         risk of the -- of that sentence happening; is that a

18         fair statement?

19    A.   Yes.

20    Q.   And how are you evaluating the increased risk by

21         using foreign contractors versus domestic

22         contractors?

23    A.   This is -- well, it's just -- it's well known that --

24         it's well known among the -- among the -- in the --

25         it's well known in the study of supply chain risk

J. Alex Halderman , Ph.D.                February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 172

1        that extra jurisdictional supply chains create

2        additional risks that are not -- that are more

3        greater in kind than the risks of domestically

4        produced and domestically sourced equipment.

5    Q.  So there's not a kind of scientific evaluation of

6        that.  It's just it is what it is, right?

7    A.  It's not quantified.  It's very difficult to

8        quantify.

9    Q.  Got it.  Paragraph 52, you say that the measures

10       being taken to safeguard are not sufficient, and then

11       you go through kind of some of these examples.  First

12       of all, the AuditMark process.  Have you ever done

13       research about how the AuditMark process works

14       specifically in Dominion software?

15   A.  I've reviewed Dominion's technical documentation

16       about it.

17   Q.  And in paragraph 54 you indicate that you have

18       designed malware that runs on an optical scanner that

19       can manipulate digital ballot images.  And that's

20       true of a hand-marked system or a ballot marking

21       device system, right?

22   A.  That's right.

23   Q.  And that was not in the Dominion system.  That was on

24       a different manufacturer; is that right?

25   A.  It works against Dominion-style ballots, among

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 173

1          others.

2     Q.   Have you tested it on Dominion's ICP and ICC

3          scanners?

4     A.   No.  But based on the way that the malware works, I

5          have no reason to doubt that it would function on

6          those scanners.

7     Q.   Would it take physical access to install the malware

8          on the scanners?

9     A.   No.

10    Q.   In paragraph 56 you indicate that the tampering

11         wouldn't be detected by the election software.  And

12         I'm assuming since that's not unique to BMDs.  This

13         is another reason why you urge audits because it

14         would be found in an audit, correct?

15    A.   It would be found in an audit that reviewed the

16         physical paper ballots as opposed to the digital

17         ballots, ballot images.

18    Q.   Do you know which method Georgia is going to use,

19         paper or digital images?

20    A.   So, again, this is talking specifically about

21         AuditMark itself as a mitigation, like the AuditMark

22         mitigation is insufficient -- sufficiently robust

23         audits, and I do believe that Georgia intends to do

24         its audits by going back to physical paper ballots,

25         could detect an attack like this.  The question is

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 174

1        whether those audits are going to be sufficiently

2        robust.

3    Q.  And then the next section discusses hash comparisons,

4        and you say that Georgia may employ a method of hash

5        comparisons.  Do you know for sure whether or not it

6        will or not?

7    A.  I don't know for sure whether it will or not.

8    Q.  And hashing a value of a software versus a known good

9        hash value is used in a lot of computer security

10       contexts, correct?

11   A.  Yes.

12   Q.  And at the end of paragraph 60 you say that a

13       sophisticated attacker could conceal the presence of

14       malware even if officials practiced hash comparisons

15       according to Dominion's instructions.  Would a better

16       hash compare process be a more secure process?

17   A.  Potentially, yes.

18   Q.  Okay.

19   A.  Can we take a break sometime soon?

20   Q.  Sure.  Yeah.  We can go ahead and take a break now,

21       if you'd like to.

22   A.  Okay.

23                   (Recess taken.)

24   BY MR. TYSON:

25   Q.  All right.  Dr. Halderman, you mention in paragraph

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 175

1         61 -- I think we've already covered antivirus
2         software and end-point protection software provides
3         only a limited defense.  So it's your testimony no
4         matter what antivirus or end-point protection a BMD
5         or a precinct scanner had on it, that's not going to
6         protect them against a sophisticated nation state
7         attack, right?
8    A.   Yes.
9    Q.   In paragraph 62 you talk about one safeguard used in
10        Georgia is tamper-evident seals.  Are you aware of
11        those used on the new ballot marking devices?
12   A.   No, I'm not.  But I'm aware of fairly extensive
13        research on many different tamper-evident seals used
14        in different kinds of election systems, and none of
15        them offer strong security.
16   Q.   And so for physical security, your testimony is that
17        a tamper-evident seal is not going to provide any
18        real physical security; is that fair to say?
19   A.   No.  Not against a remotely capable adversary.
20   Q.   Would it provide some security against a locally
21        working adversary?
22   A.   Maybe against an adversary who didn't Google for how
23        to break the seals.
24   Q.   And so is there any value then to using seals on
25        voting equipment?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 176

1    A.    I don't say that there is no value to using seals,

2          but they don't protect against the kinds of attackers

3          that are at issue in -- in my report, which are ones

4          who are sophisticated hostile adversaries.

5    Q.    So there may be good reasons to use seals for just

6          kind of administration or documenting purposes, but

7          not to rely on those seals for purposes of protecting

8          against sophisticated attacks; is that a fair

9          statement?

10   A.    Yes.

11   Q.    And you have not reviewed the rules generally on

12         physical security or on the use of seals in Georgia

13         going forward, right?

14   A.    I have not seen those rules.

15   Q.    Okay.

16   A.    But this is generally true of seals used in voting.

17   Q.    Uh-huh.  And in considering other elements of

18         physical security, you didn't consider other elements

19         of physical security for Georgia ballot marking

20         devices, only seals in reaching your conclusions for

21         this report, right?

22   A.    I've considered what I've known about Georgia

23         physical security procedures in the past.  But if

24         they have been changed, then I'm unaware of what

25         other protections are in place.

J. Alex Halderman , Ph.D.           February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 177

1   Q.   Next we call logic and accuracy testing.  Are you

2        aware what the logic and accuracy protocols are for

3        Georgia's new ballot marking devices?

4   A.   I'm not, but it doesn't matter.  No logic and

5        accuracy testing protocol is going to provide strong

6        protection against the kinds of attacks that I'm

7        discussing.

8   Q.   And you're not aware of any research that shows how a

9        piece of software could distinguish between a test

10       voter and an actual voter based on, for example, the

11       rate at which people vote; is that correct?

12  A.   It's certainly possible, and I've written malware

13       that attempts to do that.  And, in fact, our ballot

14       marking device study published in January discusses

15       some ways that malware could use different features

16       to try to distinguish between different categories of

17       voters, which I think touches on the subject of test

18       votes versus non.

19  Q.   And for parallel testing in paragraph 65, are you

20       aware of what Georgia's protocols are going to be for

21       parallel testing with the new ballot marking devices?

22  A.   I don't believe Georgia has made those public.  I'm

23       not aware.  But in general, it's impossible for

24       parallel testing to definitively or even reliably

25       detect misbehavior by a ballot marking device.

J. Alex Halderman , Ph.D.                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 178

1    Q.    And that's true even if at a random point in the

2          middle of the day every county went to every ballot

3          marking device and generated a certain number of

4          ballots?

5    A.    Yes.  Unfortunately it is true in that case.  And the

6          mathematical derivation is in the paper I cite.

7    Q.    You say at the end of paragraph 67, to your

8          knowledge, the state does not maintain sufficient

9          quantities of pre-printed ballots to allow voting to

10         continue under such a circumstance when the BMDs

11         fail.  Have you reviewed the state election board

12         rules regarding back-up ballots and what's required?

13   A.    I haven't reviewed them, but that's my understanding

14         from evidence that's come to light in the Curling

15         case about Georgia's current plans.

16   Q.    And do those include the changes that were made last

17         month to Georgia's rules regarding the number of

18         paper ballots?

19   A.    I don't know.  I don't know the timing.

20   Q.    So it's possible then that the state is now going to

21         require counties to maintain sufficient quantities to

22         allow voting to continue if the BMDs go out, and you

23         just don't know if that's the case, right?

24   A.    My understanding is that the -- the state plans to

25         have a very limited number of ballots available and

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 179

1          to print more on demand, if necessary.  But the

2          problem is if all of the BMDs across a large region

3          were to be sabotaged, as is possible by a malicious

4          software spreading from say a county election

5          management system, then you'd have a simultaneous

6          failure and require a very large number of ballots

7          sufficient for all voters, which would be impossible

8          to produce on -- and distribute in time.

9   Q.    You say in the post-election audit portion that

10         officials could potentially detect certain kinds of

11         attacks by a rigorous audit of paper ballots.

12         Actually, before I get to that, that footnote at the

13         bottom of page 28, the Philip Stark paper.

14  A.    Yes.

15  Q.    Is that a peer-reviewed paper?

16  A.    I don't know whether he's had the paper since

17         peer-reviewed.  I have independently -- I have

18         assessed myself the correctness of the -- of Stark's

19         result, but I don't know if it's gone through formal

20         peer review or not.

21  Q.    So next we have sufficient audits.  And I think we've

22         talked through the various categories of how audits

23         can detect things already.  The good thing is we've

24         covered a lot of this, so I can move through here.

25                     All right.  So let's skip ahead to

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 180

1        paragraph 72.  You say that the ballot marking

2        devices are computers, run outdated and vulnerable

3        software, must be programmed using the election

4        management system before every election.  This is --

5        kind of unlike DREs, this is an election system,

6        recommended by the National Academy of Sciences.  I

7        know that DREs were certified by the EAC -- certified

8        by the US Election Assistance Commission.  Why are

9        you taking the position that these are -- should

10       never be used by all voters in an election?

11  A.   Right.  So I'm taking that position based on

12       subsequent research that was called for by the

13       national academies in their study that has -- that

14       has established that the rate at which voters review

15       and catch errors in BMD-printed ballots is very low

16       and is, in fact, likely to be so low that an attack

17       on the BMDs in a close election wouldn't be detected

18       by election officials.

19  Q.   And so the subsequent research you're relying on are

20       the two studies about the rate of voter verification

21       of BMD ballots, right?

22  A.   That's right.  Although, there is previous work on

23       VVPATs systems that was highly suggestive that there

24       might well be a problem with BMDs.  So these new

25       results confirm and extend the problems with VVPATs

J. Alex Halderman , Ph.D.              February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 181

1        to BMD-based systems.

2   Q.   And those prior studies with VVPATs were prior to the

3        National Academy of Science's recommendation, right?

4   A.   That's right.  But there was still at least some

5        substantial question about whether the findings would

6        apply with equal certainty or equal force to BMD

7        systems, but now there's now strong evidence that the

8        same problems occur.

9   Q.   All right.  So let's get to those two studies.  If

10       you want to jump ahead with me to paragraph 81.  So

11       the first study that you cite about the rate at which

12       voters verify or look at their ballot marking device

13       printed ballots was a study by Dr. DeMillo,

14       Robert Kadel, and Marilyn Marks; is that right?

15  A.   That's correct.

16  Q.   And you'd agree with me that Ms. Marks is an activist

17       for hand-marked paper ballots; is that a fair

18       assessment of her?

19  A.   Well, I'd agree that she's an election integrity

20       activist.

21  Q.   And she opposes electronic voting as a policy matter,

22       right?

23  A.   I'm not sure she opposes all electronic voting, but

24       she opposes paperless electronic voting.

25  Q.   Does she -- do you know, she opposes ballot marking

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 182

1          devices for all people?

2     A.   I believe she does, yes.

3     Q.   And this study has not been peer-reviewed, has it?

4     A.   No, that study has not.

5     Q.   And when voters in the study spent only four seconds

6          reviewing their ballots, how many races were they

7          looking at, do you know?

8     A.   I don't know.  I don't know off the top of my head.

9     Q.   And do you know if that study evaluated the use of

10         signs or verbal cues or other things to ask voters to

11         verify their ballots?

12    A.   No.  That we evaluate -- that my research group

13         evaluated in the other study I cite.

14    Q.   So let's go to that one.  Paragraph 82 you have a

15         realistic simulated election.  Were the candidate

16         names in the election something that individuals

17         would recognize?

18    A.   Yes.

19    Q.   And what were the candidate names?

20    A.   The candidate names were the names of the candidates

21         from the most recent Michigan midterm.

22    Q.   Let me hand you what we've marked as 15.

23               (Exhibit No. 15 marked.)

24    BY MR. TYSON:

25    Q.   And is this your study with Mr. Bernard?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 183

1    A.    Yes.  And five other authors.

2    Q.    And Mr. Bernard is a student of yours, correct?

3    A.    Yes.  He's a Ph.D. student.

4    Q.    And have you found him to be reliable and a good

5          student?

6    A.    Yes.

7    Q.    Now, in the various scenarios that are outlined here,

8          you found that verbal prompting increased the number

9          of voters who were reviewing their ballots, correct?

10   A.    I did.

11   Q.    And you found that verbal prompting accompanied by

12         kind of identification of candidates on a slate

13         significantly increased the number of voters who

14         reviewed their ballots, right?

15   A.    Yes, it did.

16   Q.    And so in terms of a policy recommendation going

17         forward, is it your position that there is no way a

18         state can increase the number of voters verifying

19         their ballot marked device ballots based on your

20         research?

21   A.    The question is whether the increase is likely to be

22         significant enough that the state will have a high

23         chance of detecting attacks against a close election.

24         And the problem is that the magnitude of increase

25         that we found even with the best verbal prompts was

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 184

1          relatively small.  And the magnitude, though, larger
2          that we found with the use of slates only applies to
3          the subset of voters who actually use slates.  So
4          unless use of slates can be the vast majority of
5          voters, even under the best of conditions, that
6          mitigation would not result in a high probability of
7          detecting attacks on close elections.
8     Q.   And this is the first peer-reviewed study of its
9          kind, studying this specific question of voter
10         verification and ballot marking devices, right?
11    A.   Yes.  Though I understand there are others now under
12         review that will be published soon.
13    Q.   And are you aware whether Georgia requires poll
14         workers to give verbal prompts to voters?
15    A.   I know that Georgia law requires signs, which we find
16         are not effective.  There may -- I don't know if
17         there are recently issued rules that also require a
18         verbal prompt.
19    Q.   So if the state election board issued rules requiring
20         a verbal prompt, that would at least move up the
21         chain a little bit in terms of verification, right?
22    A.   It would likely move it up.  But again, the rate
23         that -- the rate that would be required in order to
24         cause a significant -- excuse me.  In order to have a
25         high likelihood of detecting fraud even in close

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 185

1        elections is something like ten times the improvement

2        that we measured in the study from verbal prompts

3        alone.  So there's a lot more work that would need to

4        be done or a lot more increase that would be needed

5        in addition to verbal prompts.

6    Q.  But ultimately it's fair to say that the study found

7        that a well-designed procedure can have a significant

8        impact on the rates of voters checking their ballots,

9        right?

10   A.  Significant in the sense of statistically significant

11       or reliably measurable, but not necessarily in terms

12       of adequate.

13   Q.  And the paper also concludes that more research is

14       needed in this area.  Do you agree with that, right?

15   A.  I do.

16   Q.  And you welcome additional research on this topic?

17   A.  I do.

18   Q.  And if you -- if that later research demonstrates

19       that voters check their ballots at a high enough

20       rate, as you've outlined in this paper from a

21       mathematical perspective, would that change your view

22       of the use of ballot marking devices?

23   A.  Yes.

24   Q.  You opine in paragraph 87 that election officials are

25       unlikely to take disruptive actions unless there's a

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 186

1          certain or a fraction of BMD voters that are

2          reporting problems.  What are you basing the fact

3          that election officials are unlikely to take

4          disruptive actions on?

5     A.   In part the fact that there are a certain number of

6          reports of problems and inconsistencies in every

7          election.  And so election officials don't as a

8          general rule say we're going to have to take all of

9          our machines aside and study them just because there

10         was some sporadic reports of problems that could be

11         explained away by other things.  The rate would have

12         to be elevated in a way that stood out and was

13         unmistakable in order to take drastic action.

14    Q.   And your issue focused particularly on the margin of

15         victory being relevant to this consideration, right?

16         The analysis, the mathematical analysis.

17    A.   I'm sorry.

18    Q.   Let me rephrase that question.  In determining the

19         mathematical analysis you outline in this report, the

20         margin of victory was significant, right?

21    A.   Yes.

22    Q.   And so in a larger margin of victory, would that mean

23         fewer voters would have to report a problem?  Where

24         does the scale go in terms of larger margin of

25         victory versus smaller margin of victory?

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 187

1    A.    I see.  If the margin of victory is smaller, then

2          it's easier to attack the system, if that's the --

3          the question you're asking.

4    Q.    Yeah.  Thank you.

5    A.    It takes us back to the election official's prayer,

6          please let it not be close.

7    Q.    That's right.  And the election lawyer's prayer

8          usually as well.

9    A.    And the election security researcher's prayer.

10   Q.    Okay.  Paragraph 88.  Now we get to the question of

11         the DREs.

12   A.    I'm sorry.  Paragraph --

13   Q.    We can put aside the exhibit.  Yeah.  Exhibit 15 is

14         finished.  So paragraph 88 of your report.

15   A.    Okay.

16   Q.    We move to the DRE machines, correct?

17   A.    Yes.  Okay.

18   Q.    And you're aware DREs are never going to be used in

19         Georgia again, right?

20   A.    Yes.  Thank goodness.

21   Q.    And those were decertified by the Secretary of State

22         at the end of 2019?

23   A.    That's right, as my research suggested in 2006.

24   Q.    And you state at the bottom of 88 that the DRE system

25         was highly susceptible to cyber attacks.  But as

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 188

1      we've discussed, there's no evidence that any of the

2      DREs in Georgia were ever actually compromised,

3      right?

4    A.   That's right.  But again, I don't think anyone has

5      ever actually inspected the software running in any

6      of those DREs.

7    Q.   And you cite the broad scientific consensus about

8      DREs not providing adequate security and you cite to

9      the Securing the Vote from the National Academy of

10     Science's report, right?

11   A.   Yes.

12   Q.   But you don't rely on that report for its

13     recommendations about ballot marking devices because

14     of the subsequent reports we've discussed, right?

15   A.   That's right.  The science about ballot marking

16     devices has moved.  There has not been any movement

17     in the scientific consensus of -- regarding DREs.

18   Q.   And the virus that you reference and discuss kind of

19     from 90 to 93, you've never tested that virus on the

20     version of software used in Georgia on the DREs,

21     right?

22   A.   No.  But actually, that's a good question.  It would

23     be -- so I have tested viral software on the previous

24     version and the subsequent version of the firmware

25     used in the DREs but not on the firmware version used

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 189

1          in Georgia because that was not available to me until

2          recently.

3     Q.   But it is available to you now?

4     A.   In the Curling matter.

5     Q.   And you have not yet made any analysis of that at

6          this point?

7     A.   It didn't occur to me until you asked the question

8          that that would be possible to do.

9     Q.   And how did you obtain access to that version of the

10         software in the Curling matter?

11    A.   It is in the -- it's contained in the FBI image from

12         Kennesaw State University Center For Election

13         Systems.  At least I believe that's correct.  I -- I

14         may be mistaken about that, but I do believe that the

15         firmware is there.  If my recollection is correct --

16    Q.   Got it.

17    A.   -- that analysis is not complete.

18    Q.   In paragraph 95 you reference the GEMS and

19         vulnerabilities in GEMS and BallotStation.  And I

20         know we talked about the election management servers

21         before.  But you've looked at the GEMS databases for

22         Georgia and have not found any infiltration or any

23         sort of manipulation of those databases, right?

24    A.   Yes.  The data -- the databases themselves is

25         distinct from the full contents of the server

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 190

1        computers, which are -- which would be the -- the

2        more complete way to -- a more reliable way to look

3        for an infiltration.

4   Q.   And in 99 you say, in your opinion, an attacker who

5        infiltrated the SOS GEMS system could have spread

6        malware to the county GEMS servers be infecting the

7        CDs used to distribute the files.  And you have not

8        in your review of those CDs or any of the GEMS

9        databases found where that has occurred, right?

10  A.   I haven't had -- I don't have access to the CDs that

11       were distributed, only to the GEMS databases.  So I

12       can't assess whether the CDs actually did contain

13       malware, just that that is a viable threat factor.

14  Q.   And at the end of paragraph 100 when you say that

15       Georgia's election security countermeasures were

16       inadequate to doing these various things, the last

17       one is altering election outcomes.  It's not your

18       testimony that Georgia election outcomes have been

19       altered, is it?

20  A.   It's my testimony that we don't know and that the

21       election system did not generate adequate evidence,

22       at least any evidence that has been reviewed to date

23       to conclude that past election results were, in fact,

24       accurate.

25  Q.   Is it your testimony that we should doubt the results

J. Alex Halderman , Ph.D.                      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 191

1         of the November 2018 election in Georgia?

2    A.   I wouldn't go that far.  I don't want to -- I don't

3         want to go that far.  But I do think that there is --

4         I think all of the ingredients were there for an

5         attacker to access the voting machines in polling

6         places and change the results.  The question is did

7         anyone actually do that or not.  And we wouldn't be

8         able to tell the difference from the evidence that is

9         outwardly visible one way or the other.  That's an

10        unfortunate consequence of the way the election

11        system was designed and operated.

12   Q.   So then why not doubt the November 2018 election

13        results.

14   A.   Because the election has been decided and history has

15        moved on.

16   Q.   So in your opinion, there's no value to go back and

17        try to do forensic analyses and dig up whether we

18        should rely on those results or not?

19   A.   Actually, I think that is very valuable because that

20        will teach us more about how Georgia needs to secure

21        the 2020 election.

22   Q.   How would it help with that question if it's

23        analyzing a system that's never going to be used

24        again?

25   A.   Because not all components of the system are being

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 192

1              replaced.

2       Q.     Which components of the system are not being

3              replaced?

4       A.     The eNet system, the general network infrastructure

5              and computing infrastructure at the Secretary of

6              State, other infrastructure at the county level that

7              is used by election administrators.

8       Q.     So if history needs to move on and the election has

9              been decided, why not just do forensic analyses of

10             eNet, the network infrastructure of the Secretary of

11             State, the network infrastructure of county offices?

12      A.     That's going to be a less reliable way and much more

13             complicated way of trying to answer some of the

14             similar questions.

15      Q.     And you referenced the design of Georgia's election

16             system.  You're not testifying that anyone

17             intentionally designed a system that would be

18             vulnerable to hacking, are you?

19      A.     Intentionally designed, no.  Negligently maintained?

20             In my opinion, yes.

21                  MR. TYSON:  Off the record for just a

22                minute.

23                  (Recess taken.)

24                  MR. TYSON:  All right.  Back on.

25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 193

1    BY MR. TYSON:

2    Q.   Dr. Halderman, thank you for your time today.  I

3         don't have any further questions.

4    A.   Thank you.

5                   MR. HERMAN:  All right.

6                   (Deposition concluded at 3:37 p.m.)

7                            *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Alex Halderman , Ph.D.                    February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 194

```
 1                    CERTIFICATE OF NOTARY PUBLIC

 2        STATE OF MICHIGAN )

 3                         )

 4        COUNTY OF LENAWEE )

 5            I, Trisha Cameron, Certified Shorthand Reporter

 6        and Notary Public in and for the State of Michigan, do

 7        hereby certify that the witness whose attached

 8        deposition was taken before me in the above cause was

 9        first duly sworn or affirmed to testify to the truth,

10        the whole truth, and nothing but the truth; that the

11        testimony contained herein was by me reduced to writing

12        in the presence of the witness by means of Stenography;

13        afterwards transcribed by means of computer-aided

14        transcription; and that the deposition is a true and

15        complete transcript of the testimony given by the

16        witness to the best of my ability.  I further certify I

17        am not connected by blood or marriage with any of the

18        parties, their attorneys or agents; that I am not an

19        employee of either of them; and that I am not

20        interested directly, indirectly, or financially in the

21        matter of controversy.

22

23

24            Trisha Cameron, RDR, RMR, CRR, RPR, CSR

              Notary Public, Lenawee County, Michigan

25            My Commission Expires 5-24-24
```

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[& - 82]**                                                              Page 1

**&**

**&**   2:3

**0**

**05391**   1:7

**1**

**1**   4:3 9:20,23
97:18
**10**   4:4,5 5:1 55:2,3
**100**   190:14
**11**   5:5 45:2,5
56:22 57:2
**11:45**   25:25
**12**   5:8 46:12 60:8
60:9
**13**   5:11 11:4 54:15
69:7,8
**14**   5:12 97:6,7
100:12,18
**15**   5:15 102:1
182:22,23 187:13
**16**   102:3 103:18,25
**1600**   2:12
**16th**   2:4
**17**   105:14
**18**   30:16,16 105:23
107:18
**182**   5:15
**19**   107:25 165:1
**1994**   61:14
**1:18**   1:7
**1:45**   25:13 26:1

**2**

**2**   4:4 10:6,7,22
14:20,23 37:19
54:11,12 70:11
76:17
**20**   58:1,5 76:25
77:1,5 79:19,23
101:18 109:15

**200**   2:12
**2000**   18:3
**20006**   2:5
**2002**   95:18
**2006**   187:23
**2007**   92:16 147:20
**2009**   18:12
**2011**   24:12
**2014**   62:1
**2015**   97:11
**2016**   40:12 41:10
41:19 42:9 45:23
46:18 56:19 57:13
58:8 62:24 63:4
65:23 67:18,22
68:1,7,10 120:10
134:22 171:1
**2017**   37:8 41:24
42:1,18,23 48:2
**2018**   5:4 46:15
49:8 67:6 120:10
158:17 160:24
191:1,12
**2019**   4:13 9:8,9
25:7 29:21 30:9
42:23 66:24 95:18
187:22
**202**   2:6
**2020**   1:21 6:2
30:10 50:21 51:2
51:9 131:17 140:6
191:21
**2021**   50:15 123:22
**21**   111:20
**22**   113:22 114:4
**23**   77:1 114:21
117:2 120:5
121:24,25 122:16
123:12 125:1,5,11
125:16 126:10
127:21,25 129:16

**24**   132:2,12
**25**   1:21 4:6 6:2
70:11 132:18
133:3 134:3
**254**   143:3,11,24
144:9
**26**   135:5
**27**   4:7 136:5,12
**28**   179:13
**29**   4:9 139:8,14,25

**3**

**3**   4:5 10:16,19
25:10 34:21 35:23
44:3 100:12
**30**   141:5
**30339**   2:13
**31**   142:25
**31500**   1:18
**32**   144:17,19
**33**   146:8 194:23
**336-7249**   2:14
**34**   146:21
**35**   147:4 148:14
158:13
**37**   4:14 150:3
**38**   151:1 152:3
**39**   152:14
**3:37**   193:6

**4**

**4**   4:6 25:3,6 36:6
58:14 105:15
**40**   153:18
**41**   158:9
**42**   158:9 159:1
**43**   4:18 160:19
**44**   163:2
**45**   163:18
**46**   164:12
**47**   164:25

**475,000**   138:5

**5**

**5**   4:7 27:12,13
39:11,12,12,19
41:11 67:1 70:4
**5-24-24**   194:25
**50**   30:25 46:15
169:2
**51**   169:11 170:19
**52**   4:20 172:9
**54**   172:17
**55**   5:1
**56**   5:5 173:10
**57**   54:15
**59**   46:23,24 47:10

**6**

**6**   3:5 4:9 29:24
30:2 41:22 77:3
**60**   5:8 174:12
**61**   51:12 175:1
**62**   175:9
**626-5869**   2:6
**65**   177:19
**67**   178:7
**678**   2:14
**69**   5:11

**7**

**7**   4:14 37:13,15
77:3 98:3 112:24
**72**   180:1
**750**   11:6,20,25

**8**

**8**   4:18 43:20,21
**8,033,463**   5:11
**80**   58:3 116:5
**80/20**   58:7
**81**   181:10
**82**   54:14 182:14

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[87 - advocate]**                                                        Page 2

| | | | |
|---|---|---|---|
| 87   185:24 | accept  97:22 | achieves  98:20 | administer  75:13 |
| 88   187:10,14,24 | acceptable   6:17,18 | achieving  84:14 | 87:14 |
| **9** | 92:13 93:1,2,6,12 | 93:12 145:5 | administerability |
| 9   4:3,20 52:7,9 | 93:25 94:5,12 | acknowledged | 74:10 |
| 62:20 | 155:4,24 156:1,21 | 42:19 | administering |
| 90   115:24 116:3 | 157:4,18 166:2 | acknowledging | 74:8,18 91:18 |
| 156:19 188:19 | 167:4 168:22 | 44:14 | administration |
| 900   2:4 | access   23:17 44:9 | acquire  44:15 | 28:8,9,10,12,13,15 |
| 93   188:19 | 44:10 120:23 | act  64:13 | 28:20 91:14 176:6 |
| 95   189:18 | 134:2 149:4,11 | action   1:5 162:24 | administrative |
| 97   5:12 | 151:1,4,6,8,9,11 | 186:13 | 71:19 74:21 |
| 99   190:4 | 151:15,19,20,21 | actions   185:25 | 102:10 |
| 9:27   1:20 6:3 | 151:25 152:2,5,6,8 | 186:4 | administrators |
| **a** | 152:9 161:2,5,16 | actively  27:8 | 192:7 |
| | 163:16 165:20 | activist  181:16,20 | adopt  64:14 |
| a.m.   1:20 6:3 | 170:13 173:7 | activities  44:11 | 153:23 |
| abandon   53:11 | 189:9 190:10 | 45:22,25 46:7,18 | adopted  165:2,7 |
| abandoning   53:16 | 191:5 | 51:25 | 165:14,22 166:25 |
| ability   26:23 32:3 | accessed   31:11 | activity  96:25 | adopting  53:18 |
| 32:6,10 41:6 | 32:14,15,16,20,22 | actors  134:18 | adoption  49:13 |
| 105:11 194:16 | 161:18 169:14 | actual   70:5,7 | 64:18 167:5 |
| able   22:5,7 26:17 | accessibility  26:9 | 94:24,25 95:15,17 | advanced  27:2 |
| 45:17 53:19 56:17 | 26:11,19 | 95:21 123:7 | advancement |
| 63:3 65:20 79:18 | accessible  33:20 | 131:21 177:10 | 27:23 |
| 87:23 100:4 | accessing  46:21 | add  152:3 | advantages  84:5 |
| 135:19 145:19 | accompanied | added  95:1 | adversarial  114:4 |
| 157:1 191:8 | 183:11 | addition  54:22 | 114:7 |
| absentee   105:15 | account   66:16 | 99:9 185:5 | adversaries  77:12 |
| 105:16,19,22 | 107:9 | additional   16:17 | 77:13 78:9 81:5 |
| 120:16,18,23 | accounts   73:2 | 51:16 59:6 66:2 | 88:4 111:21 |
| absolute   87:12 | accuracy   177:1,2 | 83:2 99:1,2 | 136:14,17 176:4 |
| 144:15 | 177:5 | 165:12 168:17 | adversary  114:25 |
| absolutely   111:23 | accurate   190:24 | 172:2 185:16 | 116:13 175:19,21 |
| 114:8 116:14 | accurately   36:24 | address   14:20 | 175:22 |
| 132:25 | 136:20 | 150:19 159:4 | advertising  24:9 |
| academic   18:22 | accuvote   66:22 | addressing  111:4 | advisors  96:12 |
| academies   34:24 | 67:10 | adequate  108:15 | advocacy  59:8 |
| 35:4 180:13 | achieve   15:6 72:7 | 108:18,22 185:12 | 63:14 |
| academy   35:1,11 | 84:16 85:17,18,20 | 188:8 190:21 | advocate  34:13 |
| 180:6 181:3 188:9 | 100:1 109:11 | adequately  140:18 | 38:11 41:25 63:16 |
| | 114:23 | 155:16 170:15 | 140:18 |

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[advocates - asked]                                                        Page 3

advocates 96:18
advocating 34:13
  56:2 59:21,24
  138:22
affect 50:6,8 105:2
  105:3,9,10,11
affiliated 4:8
  27:15,16,18 28:1
affirmed 194:9
africa 61:15
aftermath 57:13
age 118:22
agenda 55:11
agent 171:7
agents 112:25
  194:18
ago 12:16 30:6,13
  30:22 158:5
agree 36:1 37:25
  44:9 45:21,25
  46:1 47:7 61:2
  63:15 72:9 78:7
  78:13,18,23 79:7
  86:3 87:7 98:5
  112:7 129:20
  136:23 137:2
  152:7 168:1
  181:16,19 185:14
agreed 155:6
ahead 10:2 37:1
  100:10,11 174:20
  179:25 181:10
aherman 2:7
aided 194:13
aim 41:6 64:6
aiming 114:15
al 1:5,11
alex 1:17 3:4 6:5
  6:10 25:24 60:24
aligned 169:19
  171:14

alleging 14:1,12
  15:9,12
allow 41:20
  104:11 113:15
  143:21 178:9,22
allowed 6:13
  62:25 161:2,5,20
  167:9
allows 162:1
alter 14:6 103:13
  123:12 126:3,7
  127:3 151:12
  163:18
altered 61:7,9
  163:23 190:19
altering 190:17
alternative 84:14
  84:24 141:4
alternatives 20:18
  20:19 74:23 141:3
alumnus 5:8 60:11
  67:20
amended 13:8
america 52:12
  72:10
american 31:19
amount 11:17
  12:9 110:6 148:6
amounts 29:5
analogous 45:14
analyses 119:14
  160:16,17 163:6
  191:17 192:9
analysis 14:24
  63:3 92:22 108:7
  108:9,14,25
  118:17 122:23
  144:19,24 152:4
  156:22 166:10
  167:6,10,18
  168:13 186:16,16

186:19 189:5,17
analytic 17:6
analyze 15:4
analyzed 41:19
  143:18
analyzing 14:21
  191:23
andrew 2:2 9:12
android 143:11
  144:1,4
annual 21:12,18
answer 7:11,17
  48:15 55:9 74:15
  109:3 157:2,4
  192:13
antivirus 149:15
  149:16,19,20,22
  149:25 150:5,9,17
  150:20,23 169:21
  169:23,25 170:11
  175:1,4
antiviruses 150:16
anybody 9:10,14
  123:9
anyway 127:16
apologies 26:2
  70:9
apologize 96:8
  156:11
app 73:3 90:21
apparent 90:6
apparently 41:9
  60:11 62:5
appear 23:16
appearances 2:1
appeared 25:17,18
appearing 2:8,16
appears 25:6 30:5
application 21:6
applications 38:8
  103:23 138:25

applies 184:2
apply 47:18 79:14
  84:14 98:22
  120:16 181:6
applying 92:7
approach 17:6
  53:3 99:14
approached 53:2
  53:4
approaches 72:7
approaching
  79:11
appropriate
  155:19
appropriations
  4:11 29:20
approve 105:4
approximately
  12:1,16 102:11
arbitrary 11:19
  50:24
architecture 67:15
area 17:16 18:9
  19:5 24:19 27:5
  29:14 53:7 94:4
  157:6,7,8,14,16
  185:14
areas 19:24 28:14
  28:24 41:18
arnold 67:4
arrive 87:19 89:3
arrived 17:9,11,15
arriving 18:13
article 5:1,5,8
  56:18,20,24 57:2
  57:11 66:16
  170:17,21
aside 74:5 186:9
  187:13
asked 7:17 13:1
  74:14 100:18

J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[asked - audits]                                                    Page 4

146:4 166:24
189:7
**asking** 7:21,22
13:18 51:6 130:10
187:3
**aspects** 28:13
**assembly** 64:25
**asserts** 159:12
**assess** 93:8 99:10
190:12
**assessed** 164:3
179:18
**assessing** 79:25
81:10,14 92:11
94:12
**assessment** 20:4,6
46:15 59:25 61:2
107:2,10 149:2
158:4,11,12,18,19
160:3,12 168:19
181:18
**assessments** 112:1
118:24,25 119:2
158:24 159:24
**assist** 68:6
**assistance** 180:8
**assistant** 18:17
**assisted** 67:24
69:25
**associated** 102:9
103:23
**assume** 76:12
166:24
**assumed** 109:7
**assuming** 9:23
18:3 21:1,22 24:4
24:21 36:18 54:16
60:16 75:4 98:23
108:6,13,17,25
111:24 121:12
128:4 129:21

131:2 149:9 158:7
173:12
**assumptions** 13:6
109:2
**assurance** 27:3
**atari** 139:22
**atlanta** 1:3 2:13
**attached** 5:20 17:2
19:15 194:7
**attachment** 54:12
**attack** 14:25 15:3
23:19 39:16,21
40:6,9,25 46:11
50:9 80:3 81:4
82:7 84:19 87:8
87:10,12 89:8
93:11 109:17
114:18,24 115:12
115:20 116:1,12
116:25 117:1
120:4,4,25 121:23
123:12 125:1,8,11
125:16 127:19,22
127:25 128:3,12
128:17 129:16,19
129:23 140:14
145:20 162:6,10
162:12 163:18
173:25 175:7
180:16 187:2
**attacked** 135:10
137:3,9
**attacker** 14:6 15:6
23:10,15 110:6,14
122:9 126:20,23
127:13 134:1
143:9,20 151:10
153:9 161:2,5
162:3 163:23
166:18 174:13
190:4 191:5

**attackers** 32:19
62:2 78:18,23
117:3,13 120:25
135:21 139:24
143:21 149:8
157:1 161:21
169:2 170:8 176:2
**attacking** 5:3
113:1
**attacks** 23:22
30:24 31:3 40:13
52:24 71:22,24,25
73:13 74:24 77:16
79:7 80:24 81:6
81:13 83:14,16
88:12 93:10,14
105:2,2,8,9,10
106:10,15,16,18
106:20,22 109:23
110:3 115:7
119:24 121:25
128:6,23 130:19
131:20,25 154:21
176:8 177:6
179:11 183:23
184:7 187:25
**attempt** 20:18
39:22 77:13
127:19 166:18
171:7
**attempted** 23:16
61:19 62:3
**attempting** 112:5
**attempts** 46:8
160:19 177:13
**attend** 37:8
**attention** 53:6,8
53:10 54:3 152:16
152:18,19
**attorney** 9:14

**attorneys** 9:13,17
12:15 194:18
**attracted** 18:7
**attributed** 57:12
**attributes** 26:12
26:14
**audit** 34:14 36:7
49:9,10,15,24,25
50:4,7,14,18,21,23
50:24 51:2,9
74:17 75:19,20
115:6 123:15,20
123:21 124:4,12
124:22,25 125:15
125:18,19 127:21
128:5 129:1 130:2
130:5,9 140:15
173:14,15 179:9
179:11
**audited** 74:7
125:12 136:22
139:7
**auditing** 29:16
69:14 70:1 71:4
80:15 110:10,13
110:17 123:25
124:2 154:16
**auditmark** 172:12
172:13 173:21,21
**audits** 34:22 36:20
38:11,24 39:1,9
49:6,13,21 50:11
70:20,25 71:11
75:18 78:12
115:13,19 124:6,8
124:16,18,21,21
128:8 130:15
153:12 155:13
173:13,23,24
174:1 179:21,22

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[august - believe]                                                    Page 5

| | | | |
|---|---|---|---|
| **august** 49:8 | 105:13 108:12 | 177:3,13,21,25 | **based** 19:17 32:17 |
| **authenticate** | 118:15 123:14 | 178:2 180:1 | 42:9 48:2 56:4 |
| 161:25 | 128:21 130:25 | 181:12,25 183:19 | 65:15 77:7 82:19 |
| **authored** 14:19 | 153:10 155:23 | 184:10 185:22 | 82:25 86:25 |
| **authority** 23:4,8 | 173:24 178:12 | 188:13,15 | 101:17,22,23 |
| 23:12,16,21 | 187:5 191:16 | **balloting** 120:2 | 118:18 124:20 |
| **authors** 183:1 | 192:24 | **ballots** 5:7 28:17 | 136:10 138:8,11 |
| **automated** 141:10 | **background** 8:3 | 29:9,13 33:14,17 | 138:12 149:12 |
| **automatically** | **backups** 134:25 | 33:19 34:18,19,22 | 153:25,25 154:5 |
| 169:13,16 | 135:3 | 35:6,13 36:10,11 | 154:21 155:18 |
| **available** 27:6,7 | **bad** 71:20 144:10 | 36:16,17,19 38:12 | 156:2 159:17 |
| 99:1 112:23 | **badly** 36:9 | 42:1 48:22,23 | 170:21 173:4 |
| 113:14 121:23 | **balance** 84:20,23 | 49:3,5 64:19 65:1 | 177:10 180:11 |
| 130:25 146:1 | **ballot** 5:18 26:8 | 66:1 69:16 70:16 | 181:1 183:19 |
| 149:15 154:1 | 33:15,18,22 34:8,9 | 70:24 71:10 73:16 | **basically** 82:5 |
| 157:20 158:8 | 34:18 35:2,6,10,13 | 73:18 74:6,17 | 100:6 110:5 125:7 |
| 169:10 178:25 | 36:10,15,17,18 | 75:5,8,9,13,17 | 136:25 137:2 |
| 189:1,3 | 38:22 42:2,7,8,11 | 76:5,7 78:11 | 140:1 147:12 |
| **avast** 169:23,24,25 | 42:14,16,21 43:12 | 80:10 83:6 85:8 | 156:22 158:18 |
| **avoid** 64:7 | 56:11,15,16 59:16 | 86:5,6,7 97:22,24 | 162:21 |
| **award** 24:14,24 | 59:21,24 60:2 | 108:6,11,14,17 | **basing** 168:12,15 |
| **aware** 27:16,18 | 65:1 70:18 71:4,7 | 110:11 115:13,19 | 168:15 186:2 |
| 45:22 50:10,13,15 | 71:13,21 72:11,16 | 120:6 123:15,25 | **basis** 21:17 48:4 |
| 50:17,20 64:17,20 | 73:17,19,20 76:1 | 124:2 125:6 | 85:6,22 111:22 |
| 64:20,24 65:3 | 80:11 81:16,20,23 | 126:11 128:2,9,13 | 129:8 130:18 |
| 94:6,23 120:9,14 | 82:10,10,16,22 | 128:14,19 129:1,5 | 150:10 159:5 |
| 124:11,13 131:9 | 83:1 86:4,13 91:1 | 129:17 141:3 | 161:17,22 167:20 |
| 150:18 152:1 | 91:19,19 93:7,17 | 156:20 172:25 | 168:18 |
| 159:10,10 163:8 | 97:22 98:2 101:1 | 173:16,17,24 | **bear** 84:12 |
| 163:19 170:23 | 101:4 109:6 115:6 | 178:4,9,12,18,25 | **becoming** 86:23 |
| 175:10,12 177:2,8 | 119:25 120:1 | 179:6,11 180:15 | **beginning** 30:12 |
| 177:20,23 184:13 | 125:2 126:3 | 180:21 181:13,17 | 146:21 |
| 187:18 | 130:15 138:1 | 182:6,11 183:9,14 | **begins** 55:9 62:21 |
| | 139:5 141:1 | 183:19 185:8,19 | 63:13 64:3 69:25 |
| **b** | 145:15,18,23,24 | **ballotstation** | **behalf** 2:8,16 |
| **b** 121:24,25 | 146:1 149:18 | 189:19 | **behavior** 86:11 |
| 129:21 | 152:24 153:2,5 | **banking** 89:13,16 | **beings** 17:23 |
| **b2** 5:11 | 156:15 158:1 | 89:25 | **belief** 113:19 |
| **back** 8:20 12:16 | 166:23 171:10 | **bar** 125:9,9 126:3 | 149:6 |
| 14:14 17:19 42:18 | 172:19,20 173:17 | 126:7 | **believe** 9:5 12:21 |
| 46:25 70:19 96:5 | 175:11 176:19 | | 13:12,20 16:6 |
| 103:16 104:19 | | | |

J. Alex Halderman , Ph.D.                                        February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

25:18 35:15 47:23
48:10 50:16 54:20
56:13 57:22 58:7
64:20 73:9 74:6
74:16 75:4 84:3
85:21 90:7 91:17
91:17 94:22 96:1
97:11,25 102:1
113:23 116:11
117:17 124:21
133:13 135:2
146:25 152:18
159:19 161:12
163:13 173:23
177:22 182:2
189:13,14
**bell** 16:20
**benaloh** 25:23
**benedict** 67:4
**benefit** 24:7,8 99:1
124:19
**benefits** 98:20
99:3 109:25
**bernard** 182:25
183:2
**best** 7:6,10,12 19:4
28:16 34:14,22
42:12 56:13 74:7
74:17 75:5,12
76:6 91:17 113:16
116:20 145:1,5
183:25 184:5
194:16
**better** 7:14 34:1
102:20 174:15
**beyond** 8:19 12:20
13:1,4 15:18
16:12 46:2,5
51:10 81:2 83:25
93:23 126:15

**bill** 12:4,10 64:13
**billion** 23:12
**billions** 89:19
**biographical** 10:4
**bipartisan** 32:1
64:11
**bishop** 25:23
**bit** 12:11 16:24
17:8 22:7 26:4,25
28:4 49:7 65:10
76:10,12,15
105:14 132:18
133:7 184:21
**black** 171:8
**blindly** 38:8
**blood** 194:17
**blow** 31:18
**bmd** 83:9 85:15
86:25 93:23
105:22 107:20
129:5 137:18,20
144:12,14 150:14
154:21 156:1,5,21
167:17,20 168:10
175:4 180:15,21
181:1,6 186:1
**bmds** 77:14,15
78:24 79:2 105:16
105:20 135:23
150:15 151:7
153:12,15 154:19
154:24 155:3,8,8
155:11,12,14,17
157:17,20,21
165:6,20 168:17
173:12 178:10,22
179:2 180:17,24
**board** 63:24 96:12
121:9 124:5,7
178:11 184:19

**boards** 112:14
**bolstered** 46:15
**bono** 11:25 68:12
**book** 163:3
**books** 101:16
104:6 163:1
**bottom** 35:23 36:6
58:14 77:3 92:15
92:24 105:14
107:18 147:20
179:13 187:24
**box** 51:23
**boy** 16:14
**brad** 1:8 6:11
**break** 7:18 33:4,5
37:1 132:21,22
174:19,20 175:23
**breakdown** 64:24
93:21
**breaks** 7:15
**brennan** 27:23
**brian** 6:23
**bridge** 17:25
**bridged** 17:21
**briefings** 42:23,24
42:25 43:4
**briefly** 96:15
**briefs** 13:14,17
**bring** 53:6,8 75:24
**bringing** 53:10
**brings** 73:10
**brittleness** 118:22
**broad** 64:11
134:19 188:7
**broader** 19:5
20:13 99:3,5,21
103:3
**broadly** 13:21
19:14 28:12 71:12
**bryan** 2:10

**btyson** 2:15
**build** 119:21
**built** 98:14
**bullet** 41:25 45:9
47:3,8,25 48:5,11
48:13,21 49:6
51:13
**bunch** 95:1
**business** 20:24
21:1

c

**c** 21:9 122:16
123:12 125:1
128:7,23 129:7
130:1 138:16,16
138:18,18,20,21
139:3,3
**cable** 66:7
**california** 8:22,23
92:15,24 118:15
119:1 136:8
139:14 146:22
147:1,19,25 148:5
148:21 150:13,20
152:11 153:18,24
154:3,7,15,18,18
154:22,23 155:1,2
155:7 164:21,25
165:23 166:13,21
166:25 167:23
168:11,21
**california's** 147:5
149:12,14 150:7,7
153:8 154:11
**call** 177:1
**called** 21:9 23:3
26:10 35:4 99:24
119:16,18 180:12
**cameron** 1:22
194:5,24

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

campaign 57:7
68:3,4,5,13,16,19
68:22,23 69:2
campaigns 68:18
candidate 69:1
122:11 182:15,19
182:20
candidates 14:7
182:20 183:12
capabilities 32:19
44:15 114:12
116:24 163:9
capability 47:7
capable 175:19
capacity 1:9
capital 43:1
card 107:19 168:9
cards 108:1,24,24
109:8 165:6,18,21
career 18:22 60:24
careful 128:5
137:6
carefully 44:13
126:11 128:1,8
130:14 164:19
carolina 27:22
carpathian 111:25
carries 99:2
case 1:7 9:7 10:10
11:7,19 12:4,14
13:6,8,11,14,20,21
13:25 36:24 91:16
93:19 95:24 98:20
100:16,22,24
127:16 148:18
158:8 159:11,17
162:19,24 164:18
166:16 178:5,15
178:23
cases 11:11 44:25
130:23,23 150:10

154:20
cast 70:16 105:11
casting 119:25
catch 180:15
catching 156:3
categories 83:14
83:15 177:16
179:22
categorize 110:13
139:17
categorizing 87:18
category 109:22
caucus 72:25
caucuses 72:20
cause 27:22 87:24
119:24 122:11
162:4 164:2
184:24 194:8
caused 40:8,17,19
86:18 128:19
causes 17:6 20:13
causing 20:16
39:14 90:17
caveat 111:1
cd 106:5
cds 190:7,8,10,12
cellphone 90:7,16
90:21
cellphones 90:9,20
censys 21:9,14,22
22:4 24:4,9
center 27:23
189:12
central 29:11
101:2,10 138:9
certain 26:21
36:15 41:4 53:23
55:20 71:22 72:7
74:22 83:14,15
94:8 105:10 178:3
179:10 186:1,5

certainly 14:5,16
18:10 27:8 31:15
31:15 47:21 59:24
63:18 64:10 70:23
102:18 117:23
118:10 132:22
144:8 166:1
177:12
certainty 40:18
181:6
certificate 23:3,12
23:16,21 194:1
certificates 23:13
certification 50:1
50:1 142:5,18
146:13,18,20
150:22,23 154:4
157:10 171:2
certifications 8:23
certified 48:7
141:25 142:1,3,4,7
146:8,10 165:1,9
170:25 180:7,7
194:5
certify 153:19
154:12 194:7,16
chain 28:16 48:22
108:15,18,22
109:9,12 169:1
171:25 184:21
chains 172:1
challenges 71:10
75:25
challenging 18:10
99:12
chance 7:2 58:1,3
58:5 183:23
change 35:16 42:8
53:1 72:12 76:10
82:15 87:23
107:12 110:1

115:8 117:6
126:17 142:11
156:25 161:21
162:4 185:21
191:6
changed 35:12,19
35:21 44:7,18
57:15 58:2 60:25
62:15 65:22 106:2
162:14 176:24
changes 18:5 51:4
65:19 76:4 104:23
104:24 105:7
125:9,9 131:1
142:21,22 178:16
changing 50:25
83:3 119:17
chaos 41:10 87:12
128:20 129:25
164:2
characterization
45:25
characterize 39:1
50:7 148:8,10,11
148:13
charge 11:11,21
cheap 144:17
cheat 127:16
check 12:17 58:6
63:1 118:16 164:3
164:10,11 185:19
checked 51:23
checking 185:8
chevalier 2:3
chief 144:24 145:2
choice 85:23
choose 22:11,17
51:1
chooses 148:6
chose 31:19 148:5
153:19

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[chosen - computer]                                                    Page 8

chosen 89:22,22
  90:13,25 91:10
circle 2:12
circumstance
  73:14 129:13
  178:10
circumstances
  11:23 58:25 74:22
  84:17 151:5,10
cite 126:12 135:7
  137:10,16 143:2
  178:6 181:11
  182:13 188:7,8
cited 9:1,3
civil 6:14
clarification
  111:17
clarified 74:15
clarify 68:25
  74:13
clean 93:20
clear 15:4 83:17
  83:18 84:21,23
  85:25 87:21 168:2
clearer 7:14
clearly 22:21 86:8
clinton 57:7 66:9
  68:4
close 36:22 79:23
  109:23 126:18,21
  126:24 127:14,17
  127:18,20 157:1
  180:17 183:23
  184:7,25 187:6
closed 99:12 100:2
  100:2
closely 112:1
  169:19
closeness 156:8
closer 33:1

coat 66:17
code 99:1 125:9,10
  126:3,7 137:18,22
  137:24 138:6,10
  138:12 139:9,11
  140:8 146:10
  147:23 158:20
  160:13
collaborative
  124:15
collected 70:18
column 70:4,10
columns 70:9
combination
  128:24
combined 36:20
come 64:16 65:13
  79:13 81:9 84:2
  92:18 105:13
  134:1 135:15
  178:14
comes 92:6,6 94:9
  103:16
coming 84:12
  123:14
commencing 1:20
commercial 98:4,9
  98:13 138:24
commission
  127:12 180:8
  194:25
commissioned
  92:16 158:25
committee 4:16,19
  30:4,23 31:6 32:2
  32:9 37:7,9,11,16
  40:21 43:24 44:6
  44:9 45:3 47:2
  48:1,3 63:23
  113:10 134:20

committee's 43:16
  47:25
common 27:22
  70:20,24 141:7,8
community 23:22
  44:15 112:2
companies 20:21
  20:24 21:7,10
  22:17 171:7
company 20:23
  21:1,3,8,13 22:5
  22:11,24 169:22
  170:2,8,13
comparative
  81:15,20 82:1,4
comparatively
  92:11
compare 82:2
  174:16
compared 103:2
  118:8,9 137:17
  138:1 144:2,4,5
comparison
  145:25 148:17,22
comparisons
  174:3,5,14
compartmentalize
  100:4
compensated 11:6
compensation
  24:3
competing 88:24
complaint 13:8
complete 10:18
  49:10 142:23
  189:17 190:2
  194:15
completed 58:13
completely 107:24
  118:25

complex 140:1
complexities 49:22
complexity 22:3
  137:16 139:9,16
complicated
  192:13
complicates 71:13
complies 47:24
comply 48:7
component 14:1
  96:21 101:1 103:2
  103:12,15
components 28:20
  29:12 31:4 43:13
  75:1 78:19 79:1
  81:17,21 88:5
  100:25 103:20
  115:15 133:4,25
  134:23 135:5
  136:6 142:25
  150:4,17,19,22,24
  161:7 162:20
  169:12 191:25
  192:2
compromise 62:3
  94:24 95:3,4,5
  113:7 116:18
  122:1,2,7 123:4
  143:22 157:2
compromised
  95:10,13,25
  113:12,15,18,20
  188:2
compromises
  55:24
computer 17:6,13
  19:3,13 23:9
  37:24 38:1,4
  61:18 81:6 87:13
  96:24 103:17
  135:8 136:16,24

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[computer - correct]**                                                    Page 9

137:1,2,5,14
139:19 140:9
144:22 151:14,15
151:17,23 152:22
170:17,21 174:9
194:13
**computerized**
140:17
**computers** 37:21
38:9 80:4,8 180:2
190:1
**computing** 19:4
22:2 139:16,17,21
139:22 192:5
**conceal** 174:13
**concept** 61:1
67:21 112:7
156:11
**concepts** 112:8
**concern** 53:21
64:8 87:1
**concerned** 106:15
106:16,19 109:17
115:8
**concerns** 28:10,18
86:22
**conclude** 31:15
42:20 85:7 126:23
129:3 159:14
190:23
**concluded** 30:23
32:9 54:16 193:6
**concludes** 185:13
**concluding** 88:7
**conclusion** 42:16
80:25 85:9 107:17
113:16 118:3
134:19 150:11
164:6
**conclusions** 89:3
100:14 107:6,15

108:19 109:1
135:17 176:20
**conclusively** 40:13
**condition** 155:7
**conditionally**
164:25 165:9
**conditions** 153:22
153:24 154:4
155:4 165:12
166:4,6,7,13 167:1
167:5 184:5
**conduct** 20:3,5
51:1 65:18 130:18
**conducted** 35:8
42:10 49:9 50:17
65:16,19 101:21
119:1 167:10,13
**conference** 25:8
**conferences** 24:22
**confidence** 65:14
88:22 160:10,15
160:15
**configuration**
161:16
**confirm** 69:17
75:14 180:25
**conflicting** 135:17
**confusing** 7:23
**congress** 29:18
43:2 55:23 64:12
**congressional**
42:22
**connect** 23:5
**connected** 26:9,12
114:1 132:19
133:5,9,17 134:4
135:6 194:17
**connection** 23:7
160:22
**cons** 99:15,17

**consensus** 35:15
188:7,17
**consequence**
191:10
**conservative**
27:25 42:14
**consider** 28:7,11
28:21 29:11,15
38:24 106:25
176:18
**consideration**
72:11 186:15
**considerations**
36:2 87:6
**considered** 176:22
**considering**
176:17
**considers** 80:14
**consistent** 31:22
46:17 51:7,11
59:12 63:1 91:21
91:22 152:17
**consistently** 59:5
72:2
**constitutional**
71:19
**constrained** 88:13
90:1
**construct** 157:19
**consulting** 20:20
21:17,19
**consumers** 90:1
**contact** 12:12
**contacted** 12:15
12:18
**contain** 148:16
190:12
**contained** 161:24
189:11 194:11
**contains** 133:13

**contents** 189:25
**contest** 131:3,9,13
144:3
**context** 19:11
24:10 47:1 81:6
84:11 92:13 94:6
94:12 126:2
127:15 129:5
137:7 143:7
**contexts** 174:10
**continue** 58:16
163:25 164:1
178:10,22
**continues** 112:4
**contours** 8:14
**contraband** 66:18
**contracted** 159:23
**contracting** 48:14
51:17
**contractors**
171:21,22
**contrary** 72:16
**contrast** 85:16
**contributions** 25:1
**controversy**
194:21
**convenience** 89:24
90:15
**conversations** 7:7
15:20
**convince** 167:23
**cooperation** 20:10
161:4
**copy** 54:9
**core** 63:13 137:3
**corporation** 21:3
**correct** 9:9 11:7,8
14:3,13,21 15:14
16:15 18:23,24
19:19,20 24:1,5
27:4 31:11,14

J. Alex Halderman , Ph.D.                                      February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[correct - database]**                                                    Page 10

32:7 34:9,15,19
35:14 36:4 38:16
39:9,10 40:9,17,25
41:7,16,17 44:22
47:16 48:1,9 50:1
50:14,22 51:2
53:7,17 54:18,24
56:15 58:11 66:25
68:10,11 69:5,6
71:9,19 74:9,11
75:6 78:3 84:1
87:5 92:22 95:1
102:7,8 106:8,17
107:2 111:9,15
112:20 114:15,16
119:8,11 123:2
124:1 125:3,4
127:24 130:2,25
132:13 136:9,10
137:7 139:5 142:2
142:8 146:14
157:17 158:5,23
162:14,15 163:3,4
163:25 167:14,22
168:5,23 170:22
173:14 174:10
177:11 181:15
183:2,9 187:16
189:13,15
**corrected**  104:9
  110:19 130:8
  148:25 159:19,20
**correcting**  88:12
**correction**  129:14
**correctly**  26:18
  38:9 140:23
  158:18
**correctness**  66:2
  179:18
**cost**  160:17 164:11

**counsel**  12:22 13:2
  13:5 15:19 113:11
**count**  38:14 75:13
  75:22,23 76:2
  101:2,7,10 138:9
**counted**  38:12,23
  53:1 61:19 75:17
**countermeasures**
  190:15
**counties**  121:12,16
  178:21
**counting**  75:5,8,8
  75:10,15,24 76:5
  113:24
**country**  19:4
**county**  16:4 50:19
  105:25 107:24
  108:12 112:14
  127:12 135:22
  155:2 178:2 179:4
  190:6 192:6,11
  194:4,24
**couple**  7:1 94:16
  97:17 137:12
**coupled**  55:15
  155:11
**course**  33:8 61:4
  89:16
**courses**  19:7,8,17
**court**  1:1 7:6
  16:19
**cover**  19:23 26:19
**covered**  26:6
  43:13 83:24 94:22
  102:1 109:15
  112:18 146:25
  163:2 175:1
  179:24
**covers**  26:20
**create**  53:3 72:4
  74:23 88:23

133:25 172:1
**created**  83:3
**creates**  71:1 75:2
  75:10 152:12
  165:19 170:5
**credibly**  99:10
**critical**  23:1
  141:21 161:7
  166:20
**critically**  136:18
**criticism**  134:4,6
**cross**  92:1 93:17
**crr**  1:22 194:24
**crucial**  23:6
**crucially**  33:21
**cryptographic**
  100:8
**csr**  1:22 194:24
**cues**  182:10
**curiosity**  72:19
  73:6
**curling**  9:6 16:11
  16:13,16 158:8
  159:11,17 178:14
  189:4,10
**current**  12:8 68:23
  97:25,25 106:7,11
  123:24 155:18
  178:15
**currently**  18:19
  49:15 115:18
  116:18 123:16
  124:4 125:21
  146:1
**custody**  28:16
  48:22 108:15,18
  108:22 109:9,12
**custom**  98:14,24
  119:20
**customary**  11:9

**cut**  87:10
**cv**  1:7 17:1 19:17
  24:12 42:22 54:6
  54:9,15
**cyber**  80:7,12,20
  80:24 81:2,3
  84:25 85:6 108:8
  116:8,23 158:4
  187:25
**cyberattack**  57:21
  61:8 122:4,6
**cybersecurity**
  17:16 19:9,10,14
  19:22 28:5 51:15
  51:17 82:14 83:21
  83:22,25 84:5,10
  84:16 85:13 87:5
  89:12 96:21 98:12
  114:11 119:2
  146:18 159:23
  160:5,9
**czech**  169:22
  170:2,13

| d |
|---|

**d**  2:2 125:5,7,11
  125:16 128:7,23
  129:7 130:4,8
**d.c.**  2:5
**damage**  20:13
**dangerous**  20:9
**daniel's**  46:15
**data**  12:22 13:3
  14:14 32:4 103:9
  103:16,16 104:2,3
  104:6,12,14,20,24
  122:2 133:20
  161:3,17 163:19
  163:23 189:24
**database**  102:6,9
  102:15 103:14
  104:21 117:6,11

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[database - determining]**                                    Page 11

117:14 119:6,18
119:22 120:7
129:18 133:9,12
133:20 158:3
160:11
**databases**  117:21
118:2,20 119:3
123:1,6 189:21,23
189:24 190:9,11
**date**  58:18 141:11
141:17 142:15
153:25 190:22
**day**  8:6 30:6 40:2
40:3,8,17 41:14
95:21 105:12
107:13 121:2
178:2
**deal**  19:18
**death**  61:23
**decade**  58:18
**decertified**  187:21
**decide**  82:18
**decided**  41:9
72:10 119:21
164:22 191:14
192:9
**decides**  140:5
**decision**  88:14,17
88:18 89:2,7,10,11
148:3,9 154:11
164:8
**decisions**  100:15
**decrease**  164:11
**decreasingly**
139:1
**dedicated**  38:5
69:21
**defend**  33:10
**defendant**  6:11
**defendants**  1:12
2:16

**defense**  71:21
78:12 92:9 175:3
**defenses**  78:21
83:7
**defensive**  80:16
**define**  49:17,19
**defined**  99:23
100:8
**definitely**  78:1,4
114:18 116:14
151:18
**definition**  162:21
**definitions**  26:13
49:20
**definitively**
177:24
**degree**  90:14 93:1
93:2,6,13,25 94:6
118:15 155:22
156:21 168:13
**degrees**  92:13 94:8
94:12 115:23
**delay**  86:18
**delightfully**  63:24
**demand**  179:1
**demillo**  15:24
181:13
**democracy**  31:19
101:12
**demonstrate**
20:14
**demonstrates**
185:18
**demonstration**
67:5,7,8,11
**demonstratively**
95:10
**department**  19:3
138:22
**depend**  106:20,22
109:4 160:16

**dependencies**
141:11,21
**depending**  129:19
**depends**  11:23
15:6 24:10 34:4
49:16,19 58:24,24
63:18 74:4 98:19
123:23 130:21
142:22 143:8,8
149:23,23
**deployment**  156:5
157:13
**deposition**  1:17
4:2,3 6:10 7:3,20
8:8,9 9:4,6,11,18
9:23 193:6 194:8
194:14
**depositions**  13:10
**derivation**  178:6
**describe**  15:2
26:25 52:16 96:15
110:23
**described**  12:20
63:2
**describing**  120:5
**description**  13:19
46:1,4 63:16
**design**  29:3,5,12
29:15 70:20,25
72:17 88:25
101:20 124:20
157:21 169:11
192:15
**designed**  75:21
80:17 87:25 98:24
135:13,19 136:11
152:13,15 172:18
185:7 191:11
192:17,19
**designing**  29:2
141:7

**despite**  77:17
**destroy**  32:3
**detail**  117:23,25
121:11 159:14
**detailed**  132:19
159:24
**details**  10:4 94:18
160:16
**detect**  5:16 50:25
75:22 127:22
129:16 130:24
131:12,12 132:10
150:9 173:25
177:25 179:10,23
**detectable**  67:16
67:17 129:23
**detected**  61:20
62:6 93:10,12
127:25 128:4,7,14
128:18 129:8
130:1,4,7,13
134:14 173:11
180:17
**detecting**  88:11
183:23 184:7,25
**detection**  129:13
130:10 150:17
**determination**
168:8
**determine**  84:8
91:24 92:2 93:16
127:2 155:25
166:11,15,17
167:20
**determined**  117:1
137:8
**determines**  86:8
**determining**  92:25
94:5 127:13
186:18

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[develop - documents]**                                        Page 12

develop   124:16
developed   46:14
    169:18
developing   97:1
    98:16
development
    124:12 141:22,23
    145:2 146:5 169:3
    171:9
deviation   66:5
deviations   57:20
device   33:15 34:9
    34:18 36:10,16,17
    36:18 73:20 82:16
    82:22 83:1 91:1
    93:7 97:22 101:4
    138:1 145:16,18
    146:1 149:18
    153:3 172:21
    177:14,25 178:3
    181:12 183:19
devices   5:18 19:15
    26:8 33:18,22
    35:2,6,10,14 37:24
    42:2,7,9,11,14,17
    42:21 43:12 59:21
    59:25 60:2 65:1
    73:17 82:11 86:4
    91:19 93:18 98:2
    101:1 136:13
    145:23,24 151:13
    152:24 153:5
    156:16 166:23
    175:11 176:20
    177:3,21 180:2
    182:1 184:10
    185:22 188:13,16
devoid   159:13
dhs   112:2
diagram   129:11

die   20:16
difference   85:13
    105:1,6 106:9
    107:14 110:23
    114:14 148:2
    191:8
differences   58:4
    82:6 166:20
different   31:23
    46:11 49:20 67:9
    73:13 88:19
    102:19 146:22
    148:10 150:20
    153:2 157:21,22
    166:17 172:24
    175:13,14 177:15
    177:16
differently   148:13
differing   125:6
difficult   64:23
    98:17 138:20
    151:8,24 172:7
difficulty   110:10
    145:4
dig   67:14 94:18
    191:17
digital   123:13
    127:23 172:19
    173:16,19
diligence   51:25
direct   148:22
direction   12:19
    76:10
directly   18:15
    114:1 133:4
    134:17 194:20
disabilities   26:22
    26:22 33:21 42:3
disable   163:16
disabled   59:22
    73:14,23 74:5

81:19 82:11 91:20
    163:10,13,14,24
disadvantage
    61:20
disadvantages
    84:6
disagree   35:1,3
    47:12 74:12
    154:11
disc   142:6
discipline   94:7
disclosure   19:25
disconnected
    135:19
discord   14:6
discounts   11:10,13
discover   50:9
    157:24
discovered   39:8
    123:4 160:23
discovering
    139:25
discovery   6:12
discriminatory
    13:23
discuss   39:13 43:5
    54:17 163:18
    188:18
discussed   14:4
    41:5 43:7 46:20
    49:7 66:10 113:6
    113:23 133:7
    136:7,16 141:12
    159:7 160:21,21
    188:1,14
discusses   174:3
    177:14
discussing   65:12
    70:14 132:2 177:7
discussion   34:25
    54:19 64:15 107:4

132:19 151:1
    155:23
discussions   144:21
dishonest   76:4
disparate   14:18
    15:11
dispute   136:13
disrupt   20:12
disrupted   130:23
disruption   87:24
disruptive   185:25
    186:4
distinct   112:6,8
    189:25
distinction   110:21
    112:15 129:6
    148:12
distinguish   91:15
    129:12 148:14
    177:9,16
distinguishes
    111:13 168:11
distribute   179:8
    190:7
distributed   190:11
district   1:1,2
division   1:3
docket   13:4,13,15
document   9:24
    33:7 54:15 97:9
documentation
    8:13,21,25 136:8
    154:6,8 163:6
    172:15
documented   94:23
    95:24 101:20
    106:12 143:2
documenting
    176:6
documents   8:16
    8:16,17,19 9:3

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[documents - election]**                                        Page 13

12:23 13:2,3
102:2
**doing**  59:3 63:11
67:21 72:3 147:22
166:16 190:16
**dollars**  89:19
**domain**  69:22
**domestic**  171:21
**domestically**
169:18 172:3,4
**dominican**  68:24
**dominion**  8:10,17
8:21,24 12:25
13:1 86:9 100:21
101:20,24 102:3
106:4 122:5 126:3
126:5,8 135:25
136:2,4,6,12
137:22 139:9
140:7 141:24
144:25 145:6,12
146:4 147:2 149:3
149:9 150:4
152:15,23 153:10
153:14,19 154:5,9
154:12 155:15
163:5 169:4
170:20 171:16
172:14,23,25
**dominion's**  137:17
145:9 153:1
172:15 173:2
174:15
**door**  45:20 46:10
**doorknob**  45:17
**doubt**  111:21,23
112:17 114:9
159:21 173:5
190:25 191:12
**downsides**  106:6

**downstream**
141:21
**dr**  4:9,14 6:10,21
11:4 15:24,25
25:5 37:6 45:3,9
45:11 60:7 96:7
174:25 181:13
193:2
**drastic**  186:13
**draw**  112:6,15
**dre**  37:20 56:14
66:22 73:20 110:7
110:20 111:14,16
111:18,18 187:16
187:24
**dres**  36:19 38:22
43:5 109:20
110:15 180:5,7
187:11,18 188:2,6
188:8,17,20,25
**dubbed**  66:7
**due**  58:2,4 89:21
134:12
**duly**  6:6 194:9
**duma**  2:11
**dynamics**  55:16
55:17

**e**

**e**  21:9 37:11 125:7
126:10 127:21,25
128:7,24 129:7
130:7,13 131:20
163:3
**eac**  48:7 141:25
142:1,3,5,12
146:11,17,20
150:21,23 171:1,2
180:7
**eac's**  146:13
**earlier**  16:11,12
38:3 53:22 63:2

83:24 84:8 88:2
91:17 112:18
113:6,23 141:12
155:23 169:22
**easier**  5:10 60:21
71:17 72:17 99:10
99:25 143:20
157:23 187:2
**easy**  7:8 10:4 28:4
164:5
**edges**  107:13
**editorial**  54:23
55:6
**educate**  43:1
**effect**  14:5,8,24
20:15
**effective**  56:1
67:10 184:16
**effectively**  109:11
**effects**  13:24
**efficiently**  69:14
**effort**  41:12 48:21
59:7,8 65:17
124:15 147:22
148:3
**efforts**  30:14
43:17 67:24 68:12
77:17
**eight**  159:6
**either**  35:13 36:24
48:7 84:18 87:1
103:12 108:7,25
162:10 194:19
**elaborate**  20:7
**election**  4:21 5:6
13:21 14:7 15:22
16:4 18:3 19:9,11
24:13,16,17,18,18
25:2 27:3 28:8,9,9
28:12,13,14,20
29:2,3,6 30:14

31:4 33:10 38:15
38:20 39:5,20,22
40:2,3,8,17 41:13
41:14,18 43:6,14
43:18 44:19,22
45:23 46:18 49:9
49:10 50:22 51:4
52:11,23 53:13,15
54:17,24 57:14,15
57:20,24 58:3,8,11
61:14,21 62:1,4,8
62:15,24 63:4,20
64:8 65:1,15,23
66:3,8 67:4,22
70:21 71:13 72:2
72:18 73:11,12
74:24 75:25 76:3
77:7,14 78:7,10,13
78:19,25 79:12,15
80:5,8,18 81:1,16
83:8 84:1 85:8
86:11,14,16,17,19
86:22,24 87:8,14
87:23 88:2,4,5,9
88:25 89:8,12
90:4,18 91:1,14
92:13,18 93:1,25
94:6,12,24,25 95:6
95:16,20,21,22
96:18,20 100:19
101:13 104:1,2,5
105:12,25 106:25
107:7,18,21 108:1
108:6 109:7,19
112:5,6,11,20
113:24 115:9
116:8,15 117:4
121:2,9,14 122:19
123:13 124:5,7
126:22 130:22
131:3,9,13,13,18

J. Alex Halderman , Ph.D. February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[election - evidence] Page 14

131:21,23 132:4,5
132:8,15 133:17
135:24 140:24
144:3 155:20
156:8,24 157:1
160:24 163:24
167:22 168:5
170:10 171:10
173:11 175:14
178:11 179:4,9
180:3,4,5,8,10,17
180:18 181:19
182:15,16 183:23
184:19 185:24
186:3,7,7 187:5,7
187:9 189:12,20
190:15,17,18,21
190:23 191:1,10
191:12,14,21
192:7,8,15
**elections** 5:4 16:3
24:20 28:6,10
29:16 36:23 41:23
43:3 51:20 53:8
54:1 56:19 58:22
61:1,3,4,7 64:13
64:15 69:14 74:8
74:18 75:13 86:25
87:1 88:20 90:21
91:11,18 95:9,9,17
109:18,23 113:20
114:6,8,11,19
132:6 140:6 184:7
185:1
**electronic** 18:4,9
53:12,16 54:8
60:25 61:5,16
62:9,16,18 63:3,14
63:17 70:1,15
73:10,15,19,25
75:1,15 79:23

81:17,21 94:25
95:6 101:16,19
104:6 163:1 164:4
181:21,23,24
**electronically**
69:16 75:14 82:11
**elements** 18:1
176:17,18
**elevated** 98:1
186:12
**eliminate** 87:8,22
88:1
**emergency** 74:2
**empirical** 156:2
**employ** 135:22
174:4
**employee** 194:19
**employees** 171:8
**ems** 122:17,23
135:22 150:12,19
150:24 169:21
**enabled** 82:14
**encode** 165:5,20
**encoding** 165:18
**encounter** 22:18
70:20 88:16 90:14
94:8 134:9 167:21
**encountered** 21:24
**encrypt** 23:3,11
**encrypted** 151:23
151:23
**encryption** 19:14
26:24 27:2
**endemic** 38:19
**endorsed** 34:23
**enet** 102:4,6,11,13
102:16,16,23
103:3,5,20,21,22
104:1,2,5,14,24
133:9,12 134:14
134:16,25 158:4

158:22,23 162:7
192:4,10
**engineering** 34:24
**english** 2:11
**ensured** 111:8
**enter** 66:10
**entire** 18:22 87:11
119:13 136:19
**entirely** 81:16,18
108:4 167:24
**entitled** 54:7
**environment**
38:25 158:22,25
**environments**
171:9
**equal** 98:7,16
181:6,6
**equation** 82:24
84:6
**equipment** 8:22
8:25 35:25 36:3
39:14 40:2,3,8,12
40:16 41:14 53:21
62:23 65:20 87:23
92:18 94:25 121:1
121:4,6,14 132:4,5
132:9 147:21
172:4 175:25
**erase** 117:6
**error** 40:6 156:7
**errors** 75:22 156:4
180:15
**especially** 14:5
44:16 133:23
134:12 171:13
**essay** 65:11,13,22
**essential** 33:10
78:17
**essentially** 21:16
27:4 38:13 82:9
113:17 140:16

142:9
**established** 180:14
**establishing** 70:15
**estimate** 12:8
115:17 138:3,4
156:5
**et** 1:5,11
**etcetera** 20:4
**ethical** 19:22
20:17 53:22,25
54:7,17
**ethics** 19:17
**evade** 150:5,16
**evaluate** 21:4
81:25 82:3 167:4
182:12
**evaluated** 81:15
81:22 102:22
103:1,19,20 118:1
138:11,13 168:25
182:9,13
**evaluating** 80:19
92:7,12 93:5
106:24 118:19
156:9 171:20
**evaluation** 85:12
101:22 172:5
**evaluations** 136:8
**eve** 160:24
**event** 66:18
**eventually** 76:14
157:24
**everybody** 7:10
**everybody's** 71:23
**everyone's** 71:16
**evidence** 39:18,21
40:1,7,10,16,23
41:1 42:20 44:7
44:13,16,17 53:19
53:19 58:10 62:22
63:7,11 66:2

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[evidence - fair]**                                                      Page 15

112:19,22 113:14
113:17 114:7,17
117:9 121:3
122:12,18 129:3
130:19 131:20,24
132:4 134:16
135:25 153:6
156:7 159:4 162:9
162:12 169:2,7,10
178:14 181:7
188:1 190:21,22
191:8
**evident** 175:10,13
175:17
**evn** 4:6,7 24:21
25:7,16 27:15,17
28:1
**evolves** 148:24
**exact** 93:16
**exactly** 12:3 15:5
49:17 108:23
124:9 129:13
138:3 143:15
**examination** 3:5
6:19
**examinations** 3:1
40:11
**examine** 12:19
14:14
**examined** 6:7
14:10 101:15
158:21
**examining** 82:5
**example** 28:16
61:11,14 62:1
66:9 72:9 76:1
80:11 127:1,11
131:7 132:15
143:3 177:10
**examples** 90:23
95:11 99:18

113:22 172:11
**excepting** 81:19
**exciting** 18:11
**exclusively** 33:17
38:21
**excuse** 25:25
36:12 70:22 107:3
184:24
**exercise** 20:17
**exhibit** 4:2,3,4,5,6
4:7,9,14,18,20 5:1
5:5,8,11,12,15
9:20,23 10:5,7,16
10:19,22 14:20,23
25:3,6 27:11,13
29:24 30:2 37:1
37:13,15 43:20,21
52:5,7 54:11,12
55:1,3 56:22 57:2
60:8,9 67:22,23
69:7,8 76:17 97:6
97:7 182:23
187:13,13
**exhibits** 4:1 5:20
**exist** 151:6
**existence** 144:23
147:10 166:22
**exists** 83:11 131:5
**expect** 120:5
149:20
**expected** 147:6
**experience** 8:4
79:17 101:18
136:10
**expert** 4:4,5 11:10
12:14 28:5,7,11,15
28:22,23,24 29:12
29:15 89:11
**expertise** 28:5,19
28:24 29:14 92:7
124:20 163:7

**experts** 24:18
66:12
**expires** 194:25
**explain** 104:13
**explained** 186:11
**explanation** 57:22
**exploit** 151:3
152:11
**exploitable** 139:10
139:12 140:2
143:4,7 147:6
**exploited** 45:16,19
82:8 161:15
**exploiting** 139:25
**export** 104:5
**expose** 147:10
**exposed** 31:7
161:6
**exposes** 73:12
**exposing** 24:8
**exposure** 21:7,11
21:13
**expressing** 14:23
15:8,13
**expression** 134:6,7
**extend** 180:25
**extends** 150:23
**extensive** 46:13
175:12
**extent** 51:22
**extra** 172:1
**extract** 117:6
**extreme** 74:1
**extremely** 116:23
138:20 158:1

**f**

**face** 82:13 140:14
**faced** 107:6 110:7
144:20
**faces** 109:19 110:5
154:17

**facility** 169:18
**facing** 20:25 77:8
81:1
**fact** 32:22 69:21
71:20 86:9,16
89:19 106:22
119:12 127:19
142:15 143:11,24
144:5 150:8 152:9
153:7 155:8
167:19 168:8
177:13 180:16
186:2,5 190:23
**factor** 18:5 138:13
190:13
**factors** 49:25 50:3
50:8 118:18,21
**facts** 13:6 74:4
**fail** 50:24 167:9
178:11
**failed** 150:10
**failure** 39:14 40:5
40:8,16 179:6
**failures** 17:5 40:3
40:19
**fair** 1:5 14:25 19:9
19:11 24:9 29:4
31:5 38:6,7 40:4
50:7 53:5 55:13
56:5 59:10 73:9
73:11 74:5 77:8
77:19,22 80:5
84:25 89:24 109:9
112:15,16 115:13
115:24 125:13
128:10,11 129:10
141:15 148:5
162:23 171:18
175:18 176:8
181:17 185:6

J. Alex Halderman , Ph.D.                          February 25, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[fairly - fully]**                                                    Page 16

**fairly** 23:19 89:25
164:5 175:12
**false** 112:13
**familiar** 7:5 8:13
8:19 16:10 45:2
102:25 120:1
121:15 131:2
158:24
**family** 27:2
**far** 41:12,15,21
42:17 47:14 109:1
134:15 144:21
191:2,3
**farther** 17:19
39:25 47:11,22
**fashioned** 56:11
56:15
**favirito** 16:19
**favor** 56:2 58:11
122:11
**fbi** 189:11
**fdic** 90:2
**feature** 86:9
**features** 177:15
**february** 1:21 6:2
**fed** 103:16 133:20
**federal** 6:13 16:17
55:19 59:9 112:2
**feeds** 103:9
**fewer** 148:16
186:23
**field** 18:8 72:2
94:5 96:22
**fifth** 69:24 70:3,4
70:7 77:16
**fight** 1:5 162:24
**figure** 35:25 74:13
**file** 119:18 161:12
169:23
**filed** 10:9 13:14
131:13

**files** 67:14,15
105:25 149:6,9
161:5,16 190:7
**fill** 104:15,16
**financial** 4:12
29:21 36:3 69:19
89:20
**financially** 194:20
**find** 38:5 63:9 72:2
99:6 119:5 130:19
147:6,17 149:20
152:20 184:15
**finding** 153:8
**findings** 31:5 32:1
44:4 181:5
**fine** 11:2 16:20,22
28:1 86:21 109:14
132:22
**finer** 15:7
**finish** 33:7 79:21
**finished** 18:12
67:23 187:14
**firmware** 188:24
188:25 189:15
**first** 6:6,17 8:1
33:11 38:18 39:12
39:19 41:24 44:3
44:4 45:9 47:2,8
47:25 48:17 51:13
56:24 57:2,5
59:15 60:19 62:21
76:19 77:11
100:17 113:8
117:5 137:10,13
137:16 139:15
172:11 181:11
184:8 194:9
**five** 33:3 42:22
49:8 117:24,25
118:1,4,8 183:1

**fix** 55:11 128:21
**fixed** 20:2
**flow** 8:5
**focus** 17:13 19:10
53:5 80:7 96:25
167:18
**focused** 28:6 43:4
80:12 92:17
186:14
**focuses** 19:12
**folks** 34:23
**follow** 75:15 112:1
**followed** 72:19
**following** 67:22
100:19 144:25
164:18
**follows** 6:7
**foolish** 146:19
**footnote** 179:12
**force** 181:6
**forces** 22:14
**foreign** 89:9,17
90:10 112:25
114:25 115:12
116:1,13 117:15
171:12,21
**forensic** 191:17
192:9
**forensics** 63:5,11
132:8
**form** 6:15 46:9
88:12 104:17
156:22
**formal** 179:19
**forming** 94:13
**forms** 40:6
**forth** 63:6
**forward** 47:5 48:7
56:5,7 69:20
72:13 123:25
176:13 183:17

**found** 63:11
112:25 113:11
118:24 149:13
150:8 152:12
160:13 173:14,15
183:4,8,11,25
184:2 185:6
189:22 190:9
**foundation** 5:12
96:13,16,17 97:3
97:21 99:25
**foundations** 31:18
**founded** 20:23
22:24 96:23
**four** 138:14 182:5
**fourteen** 49:9
**fourth** 49:6 55:8
69:24 77:15
**fraction** 33:25
155:14 156:6,23
186:1
**fraud** 50:25 83:3
89:20 126:17
156:25 184:25
**fraudulent** 49:2,4
122:17
**fraudulently**
161:21
**front** 76:18 139:3
**frustrated** 86:23
**full** 13:17 38:18
39:12 41:11 62:21
63:3,21 64:1
74:17 124:22,25
145:25 159:2
160:7 166:9 167:8
189:25
**fully** 74:7 139:16
139:18 160:8
168:24

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[function - going]**                                    Page 17

**function** 38:9
  63:24 140:7,8,9,11
  173:5
**functional** 158:19
**functionality**
  167:24 170:9
**functioning** 121:2
  121:4 122:7
  140:23
**functions** 102:10
**fundamentally**
  37:22 90:2
**funding** 59:3,6,9
**funds** 51:14
**further** 35:4,9
  48:1 129:9 130:18
  142:18 153:5
  160:12,14,15
  166:1 170:5 193:3
  194:16
**future** 114:5,11
  157:21

**g**

**gain** 23:17
**gained** 58:12
**gaining** 152:6
**gaps** 112:22
**gems** 123:1,6
  189:18,19,21
  190:5,6,8,11
**general** 4:13 8:5
  16:3 19:21 22:2
  22:15,16 29:21
  38:2 43:10 53:13
  64:25 73:22 76:16
  98:16 99:7 140:21
  145:4,4 147:11
  148:24 177:23
  186:8 192:4
**generally** 8:14,19
  11:13,14,20 16:10

42:25 52:16 71:1
  95:19 152:25
  176:11,16
**generate** 44:17
  53:19 190:21
**generated** 178:3
**generates** 133:18
**generous** 109:2
**george** 67:4
**georgia** 1:2,11
  2:13 13:22,23
  15:9,17,20,22,24
  15:25 16:3,5
  30:16 31:1 32:10
  32:11,18 33:23
  50:17,20 51:1,3,19
  59:6 64:25 65:9
  66:23 76:7 77:17
  81:3 90:22,24
  91:5,8,9,24 93:4
  95:12,18 103:21
  104:3 105:11
  107:23 108:3
  109:18 110:5,12
  111:19 113:2,4
  114:6,8,18 117:18
  118:3,6 120:10,14
  121:5,16 122:13
  122:19 123:16,17
  123:19 124:3,6,8
  124:11 125:20,22
  125:24 131:5,17
  132:6,9 134:12,21
  134:25 137:4
  142:14 144:20
  146:6,8,10,23
  147:21 148:20
  150:18 151:7
  152:6,9 153:10,22
  153:23 154:1,5,10
  154:17,22 155:1,6

158:22,23,25
  159:8,11,22 163:8
  163:15,20,24
  164:8,12,13,19,21
  165:2,7,13,20,22
  166:20 168:3
  173:18,23 174:4
  175:10 176:12,19
  176:22 177:22
  184:13,15 187:19
  188:2,20 189:1,22
  190:18 191:1,20
**georgia's** 8:14
  30:20 31:3 32:6
  32:13 47:15,17,18
  47:24 48:8,10,13
  49:1 50:10 77:7
  77:20 79:11 80:18
  80:25 100:19
  102:6,23 104:4
  106:24 107:7
  108:20 109:18
  114:22 117:10,16
  123:24 131:18
  134:16 137:24
  140:5 146:12
  149:3,16 152:1,23
  153:6 157:7,9
  158:21 160:2,10
  161:9 171:16
  177:3,20 178:15
  178:17 190:15
  192:15
**getting** 33:1 59:6
  79:23
**gideon** 24:13,24
**give** 12:18 54:9
  99:18 119:17
  137:11 184:14
**given** 53:25 54:3
  85:15 93:9 151:4

151:5 152:9,18,19
  156:5,22 167:5
  194:15
**global** 94:16
**globally** 94:19
**go** 7:1 10:2 12:16
  15:15 17:19 18:13
  35:15 37:1 40:22
  46:12,23 47:11,21
  48:1 76:25 83:4
  88:20 96:9 100:10
  102:3 103:18
  118:15 125:12
  126:18 127:13
  128:21 129:9
  130:25 142:17,23
  164:22 172:11
  174:20 178:22
  182:14 186:24
  191:2,3,16
**goal** 53:11 84:15
**goals** 59:4
**going** 7:5,9 9:22
  10:1,3,14 16:14
  23:6 25:5 27:24
  37:15 38:4 41:7
  43:20 47:4 55:1
  60:7 65:10 69:20
  72:13 73:2 76:10
  76:12 87:23 88:8
  88:23 90:3,5 92:9
  93:10,13,14 96:8
  97:5 108:14 109:8
  120:22 123:25
  126:1 127:18
  137:7,11 141:16
  142:17 144:22
  151:24 153:18
  154:24 156:25
  162:8 169:14
  173:18,24 174:1

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[going - higher]**                                                    Page 18

175:5,17 176:13
177:5,20 178:20
183:16 186:8
187:18 191:23
192:12
**gold** 142:6
**good** 6:21,22,23
6:25 56:10,14
76:11,14 77:23
89:6 90:19 94:17
100:11 111:17
117:22 134:8
135:4 141:14
144:8 174:8 176:5
179:23 183:4
188:22
**goodness** 187:20
**google** 175:22
**gotten** 84:7 97:16
147:21
**government** 4:13
29:21 54:2 112:3
115:1,12 116:2,13
117:15 140:5
169:19 171:6
**governments** 81:5
89:9 114:5,7,10
171:14
**grant** 51:14
**grants** 170:13
**grasping** 156:11
**gray** 157:6,7,8,14
157:16
**great** 66:16 90:25
91:25 117:23
**greater** 65:13
83:13 109:20
152:12 160:9
172:3
**ground** 7:1 164:2

**group** 22:23 24:17
35:8 38:10 66:14
96:18,23 182:12
**groups** 14:8 19:4
**growth** 18:6
**guess** 22:16 51:14
69:23 88:6 90:23
137:11,12 152:17
152:22 155:23
**guessing** 71:5
**gun** 41:6 114:15

## h

**hack** 20:15 23:20
62:9,16 67:8
77:13 151:16
171:8
**hacked** 4:21 5:6
38:14 52:11 53:21
54:1 56:19 57:24
61:18 62:24 63:8
63:10 65:15 67:3
78:14 88:5 90:16
136:13,17,25
137:5,12
**hackers** 5:3 30:13
30:19
**hacking** 5:9 20:17
39:7 53:23 57:16
58:2 60:20 61:5
67:5,10 72:22
87:13,22 89:17,21
90:10 192:18
**halderman** 1:17
3:4 6:5,10,21 11:4
25:5,24 37:6 60:7
60:24 62:25 64:7
96:7 174:25 193:2
**halderman's** 4:9
4:14
**hand** 9:22 10:5,14
10:18 25:5 27:11

30:2 33:17 34:8
34:18 35:13 37:15
38:11,22 42:15
43:20 52:9 55:1
56:16 57:1 59:16
60:7 64:18,25
66:1,4 69:7 73:16
73:17 74:6,16
75:4,8,8,9,16,17
75:24 76:2,7
78:11 81:19,22
82:10 83:2 85:7
85:14,19 86:4,6,12
87:1 91:18 97:5
97:23 115:6,12,19
125:2 139:4
140:19 141:3
172:20 181:17
182:22
**handel** 16:19
**handful** 117:22,24
**handle** 71:10
109:8 131:8
**handling** 29:12
**happen** 23:23 77:7
78:2,3,4,6 81:10
81:11 94:20,21
103:11 169:6
**happened** 35:17
48:2 72:20 78:2
117:9 121:4
122:13,19,25
129:9 131:1 132:1
134:15 135:25
169:8,10
**happening** 51:19
51:21 129:25
171:17
**happens** 7:19,23
86:11 104:7
107:24 108:3,5

**hard** 74:3 129:24
**hardware** 98:4,9
98:14,14,16,17,18
141:13
**hash** 174:3,4,9,14
174:16
**hashing** 174:8
**hate** 131:16,16
**head** 94:3 144:14
150:2 182:8
**heading** 44:4
**headline** 58:15
59:14
**heard** 29:8 86:23
86:25
**hearing** 159:7
**heightened** 133:24
134:12 153:13
**help** 16:21 21:3,14
21:19,20 52:1
59:9 71:24 191:22
**helped** 16:2
**helpful** 124:5
**helping** 20:24 59:5
**helps** 20:2 21:6,10
153:8
**herman** 2:2 6:18
10:12,25 30:10
45:6 70:5 96:2
193:5
**high** 40:18 58:5
69:15 72:7 76:18
77:8,11 78:5 81:1
84:19 88:10 89:8
93:13,22 109:17
116:3 144:16
147:23 156:17
183:22 184:6,25
185:19
**higher** 116:5
117:18 137:22

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[higher - individuals]                                                        Page 19

144:11 148:25 169:17
**highly** 145:9 180:23 187:25
**hill** 43:1
**hillary** 66:8
**hired** 52:1
**hiring** 51:16
**history** 191:14 192:8
**hold** 69:4,10
**home** 45:15
**hone** 110:21
**honest** 171:8
**hope** 90:18
**hopefully** 151:25
**hoping** 15:6
**hospital** 20:15
**hospitals** 53:23
**host** 72:4 73:10
**hostile** 81:5 95:3 114:25 116:1,13 116:22 117:15 171:6,14 176:4
**hour** 11:6,20 33:2
**house** 4:10 29:20 127:12
**https** 23:6
**huge** 151:5
**huh** 7:13,13 176:17
**human** 17:23 18:1 40:6 97:18 103:11 103:12,15 104:20 125:10 126:8
**humans** 26:16
**hundreds** 23:13
**hypothetical** 72:14,15 81:18 85:14,15 166:24 167:12

**i**
**icc** 101:2,9 173:2
**icp** 101:2,6 107:20 138:5,6 173:2
**icx** 101:1,4
**idea** 141:14
**identification** 183:12
**identified** 14:2
**identify** 14:17 16:21 22:6,9 28:23 33:9 62:14 77:6
**identifying** 81:12 161:10
**identity** 23:5,9
**image** 189:11
**images** 172:19 173:17,19
**immediate** 57:13
**immediately** 46:25 162:7
**impact** 14:21 15:4 15:5,11 185:8
**impacts** 14:10,13 14:18
**impersonate** 120:13
**impersonation** 120:17,18,19,20
**implement** 124:17 124:22,24
**implementation** 100:20 146:5 165:14
**implemented** 110:12
**implication** 58:4
**implications** 19:22 53:22 54:1,7

**implies** 149:8 151:2
**imply** 51:24
**importance** 71:7
**important** 21:21 33:18 38:15 71:21 72:11,17 78:12,22 79:25 83:14 87:6 99:22 107:15 109:21,22 115:14 115:15 118:21 129:6 136:18 145:20,22 151:21 165:4,17
**imposed** 153:21 154:3 155:7 165:23
**imposes** 156:17
**impossible** 177:23 179:7
**improperly** 86:12
**improved** 110:15
**improvement** 36:21 39:2 185:1
**improvements** 51:15 53:13,15
**inadequate** 190:16
**include** 30:25 56:8 56:10 75:25 112:11 164:9 167:1 178:16
**included** 16:9 31:2 163:5
**includes** 49:1 112:8,10 142:5
**including** 30:15 33:15 34:23 35:8 36:3 42:2 81:1,23 90:19 122:3 142:11

**inconsistencies** 186:6
**inconvenient** 66:13
**incorrectly** 38:14 57:12 131:7
**increase** 120:5,9 170:3 183:18,21 183:24 185:4
**increased** 171:12 171:16,20 183:8 183:13
**increasing** 24:20
**independent** 33:20
**independently** 133:15 179:17
**index** 3:1
**indicate** 11:5,9 17:5 24:12 32:13 33:11 35:23 36:9 57:5 59:19 100:17 105:15,23 107:18 112:24 113:4 119:24 120:12 123:12 125:11 127:21 138:5,15 152:14 164:25 172:17 173:10
**indicated** 13:13 65:12
**indicates** 44:4 48:5,21 51:13 56:24 60:23 65:17
**indication** 49:8 70:13 112:4
**indicator** 144:8,8
**indirectly** 194:20
**individual** 63:12
**individuals** 15:23 16:1 129:17 161:3 182:16

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[induce - isrg]**                                                    Page 20

induce  129:4
ineligible  131:7,14
inert  47:6
inevitably  139:9
infect  135:22
infected  150:4
infecting  190:6
infection  135:15
 167:16
inference  31:5
 134:23
inferior  36:9,10,15
infiltrate  46:8
 77:15 117:13
 160:19 170:8
infiltrated  169:3
 190:5
infiltration  117:5
 125:5 166:19
 167:7 189:22
 190:3
influence  53:11,13
influenced  169:15
inform  16:3
information  13:13
 15:17 16:8 44:10
 48:18 65:14 71:8
 104:15,23 120:13
 130:25 133:12,13
 133:22 134:10,10
 152:10 158:8
 161:9,10,20,24
 162:2,3 163:4
informed  15:21,21
 16:2
informing  20:1
 107:1 144:19,24
 144:25
infrastructure
 23:2 30:15 33:11
 41:13,18 43:14,18

113:25 192:4,5,6
 192:10,11
ingredients  191:4
inherent  43:5
initial  135:15
initially  18:7
inject  149:7
inner  158:20
 161:7
input  105:6
insecure  58:17
 59:8
insertion  49:2,4
insists  62:25
inspect  65:20
inspected  188:5
inspection  38:16
 65:25 121:13
inspections  66:4
install  107:19
 149:25 150:22
 173:7
installation  149:5
 149:6,9
installed  123:8
installing  108:23
instance  20:13
 33:25 39:4 55:22
 74:1 75:21 82:22
 90:20 92:14
 147:19 151:22
 162:5
instructions
 174:15
insufficient  173:22
integrity  25:2
 181:19
intelligence  4:17
 4:19 30:23 31:6
 32:1,9 37:7,9,17
 40:20 43:16,24

44:15 46:14 112:2
 113:10 134:20
intended  161:6
intending  115:6
intends  173:23
intensive  147:23
intent  38:17 85:25
 113:9 140:13
intention  15:12,14
 15:15
intentionally
 58:22 192:17,19
intentions  36:24
 136:21
interact  26:16
interchangeably
 111:3
interest  17:22
 69:19 83:25 85:24
 86:1,2,3
interested  17:20
 194:20
interesting  61:21
interests  84:2,4
 87:3 88:19,24
interface  104:10
 165:6
interfaced  103:6,7
 103:8
interfere  43:18
 112:5
interfered  41:14
interference  112:6
 112:11
interfering  112:12
international
 61:24
internet  19:16
 20:25 22:23 23:2
 31:7 114:1 132:20
 133:5 134:5 135:6

160:22 163:9
intervention
 103:11,12 104:20
interviewed  60:16
introduce  132:13
introduced  64:14
 132:3,5 149:1
introduces  170:14
introduction
 106:4 132:11,12
intrusion  132:10
invalidate  150:21
inventor  69:11
investigate  20:10
 20:21 129:9
investigating  17:5
 20:11
investigation
 30:23 130:18
 134:20
invited  37:8,10,11
involve  26:21
 28:21 42:24 52:24
 69:13 87:13,13
 122:2 167:6
involved  11:17,17
 12:12 19:22 42:25
 43:3 46:7 52:17
 55:24 61:24 65:24
 65:25 75:16 80:9
 97:1 118:22 147:1
 147:19 152:5
involves  34:3
 146:14
involving  17:22
 43:17
iowa  72:20,25
irresponsible
 22:21
isrg  22:22,23,25
 23:1,11 24:2

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[issue - leaves]**                                                    Page 21

issue  18:25 64:9
 64:10 65:9 70:16
 70:20,25 100:22
 100:23 162:19,23
 162:25 176:3
 186:14
issued  23:12
 184:17,19
issues  17:14 26:8
 64:8,22 98:1
 146:18 159:3,7
 160:7
item  18:25
items  167:19

**j**

j  1:17 3:4 6:5
 25:23 60:24
january  82:23
 93:8 156:4 177:14
john  24:13,24
josh  25:22
journey  16:25
judge  9:9 67:6
jump  181:10
jurisdiction  38:21
 85:5 124:23,25
 127:10 162:5
jurisdictional
 172:1
jurisdictions  41:4
 79:4,6 115:18,21
 115:25 122:10
 124:16 131:23
 145:21,22 154:18
 154:23 171:13,13

**k**

kadel  181:14
keep  5:2 59:2
 76:11,12 100:5

kennesaw  189:12
kept  100:3,5 121:4
kerckhoffs  99:24
key  36:21
keys  100:8 151:3
keyword  59:25
kind  8:2,4 16:24
 18:3 19:21 21:12
 33:1 44:2,17
 50:18 56:2 58:7
 66:20,23 70:17
 72:22 75:19,20
 79:7,12,24 80:2,10
 94:19 99:13
 100:13 102:16
 109:12 111:3
 114:21 115:20
 118:18 122:23
 123:10 124:15
 126:19 127:22
 131:24 132:8
 146:15 147:24
 148:14,21 152:10
 152:21 167:10
 172:3,5,11 176:6
 180:5 183:12
 184:9 188:18
kinds  36:15 43:11
 53:23 59:14 72:3
 73:13 95:13 105:8
 106:9 175:14
 176:2 177:6
 179:10
know  5:5 7:8,21
 7:22,23 12:1 17:1
 17:12 18:2 27:24
 28:2 31:25 32:17
 34:25 41:12,15,20
 41:20 45:1,9
 48:16,19 49:1,14
 51:20 61:10 62:13

62:17 63:9 72:14
 74:13 75:10 95:1
 102:11,14 104:5,7
 104:22,25 106:1,7
 106:10 107:8,21
 108:1,13,23 109:3
 112:17 113:21
 119:4 120:11
 121:22 123:9,24
 125:21,23 126:20
 127:17 129:24
 131:11,25 133:11
 134:25 135:2
 137:6 138:2
 144:13 148:18
 149:15 150:6
 151:6 152:4
 153:21,23 157:9
 159:6,22 160:2
 163:15,17,22
 164:15,21,24
 165:2,4,13,16
 173:18 174:5,7
 178:19,19,23
 179:16,19 180:7
 181:25 182:7,8,8,9
 184:15,16 189:20
 190:20
knowink  100:22
 169:4
knowledge  15:22
 16:3 32:12,21
 41:1 79:12,16,25
 80:2 81:9 97:22
 101:23 119:12
 121:8 132:7
 148:17 153:25
 159:5 161:4
 164:13,19 178:8
known  22:18
 34:14 58:17 143:3

143:12 144:6,12
 144:13 171:23,24
 171:25 174:8
 176:22
knows  23:9
kurt  9:12

**l**

lab  116:7,11,16,17
 126:2,6
labeled  66:12
lack  28:24 110:9
 110:16,17,17
 140:11 153:11
landscape  155:19
language  138:16
languages  138:23
 138:24
large  11:17 19:12
 41:18 51:24 65:24
 74:23 139:11
 179:2,6
largely  110:9
larger  184:1
 186:22,24
largest  23:11
late  130:22 131:11
law  123:16,17,19
 131:5 184:15
lawful  20:3,5
lawmakers  55:10
lawsuit  12:12
lawyer  70:10
lawyer's  187:7
lax  145:11
lead  71:24 117:17
 153:13
leads  34:12 71:9
 136:4 139:12
lean  27:25
leaves  159:21

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[led - malware]**                                                      Page 22

led   18:25 35:9
  91:5 159:18
  171:16
lee   15:25
legal   13:18 51:7
  125:25
legislation   49:23
  64:23
legislative   55:16
  55:17
lenawee   194:4,24
lesser   83:13
level   22:18 49:14
  50:3,19 55:21
  72:8 76:18 80:1
  81:14 87:16,17
  88:15 99:11
  107:12 109:4,19
  109:20 114:23
  115:11,25 116:11
  118:17 129:5
  139:22 144:9
  147:23,24 152:8
  155:4,20,22 156:1
  156:18 160:15
  162:15 166:2,12
  167:4,21 168:4,10
  168:22 192:6
levels   155:24
license   21:12,18
lies   19:6
light   178:14
likelihood   156:3
  184:25
liles   45:3,9,11
limit   42:6 50:4
limitation   36:21
limitations   27:9
  36:22 109:11
  113:14 165:2,3,22
  171:3

limited   81:3 100:7
  145:24 146:15
  147:5,16 148:1
  158:12,14,15,16
  158:17 175:3
  178:25
limiting   34:14
  49:13,15,20 50:11
  50:14,18,23 51:2
  78:12 123:21
limits   44:14
line   18:16 60:23
  70:11
lines   39:15 88:23
  89:6 91:13 128:20
  137:18,21 138:5
  138:10 139:11
  140:8
link   70:15 71:3
  168:17
linked   62:2
list   19:8 27:20
  77:19 82:12,20
  132:11 143:3
  164:4,4
listed   25:20
listen   57:8
literature   111:2
litigation   12:13
  16:11,12,14
little   12:11 16:24
  17:8 26:4,25 28:4
  49:7 65:10 76:10
  76:12,15 105:13
  132:18 133:7
  184:21
live   162:2
lives   17:23
llp   2:11
locally   175:20

location   169:19
log   71:6
logic   177:1,2,4
long   30:9 39:15
  54:19,20 75:9
  88:23 89:6 128:20
longer   53:21 72:11
look   5:7 33:16
  34:5,10 60:19
  70:10 82:16 92:14
  124:17 181:12
  190:2
looked   8:20 63:8
  118:13 133:15
  149:14 189:21
looking   18:2,16
  25:25 34:5,13
  36:2 45:15 47:10
  67:13 77:1 84:24
  85:6 93:24 182:7
loss   152:25
lot   23:23 34:23
  36:2 71:9 94:4,21
  111:10 115:22
  128:17 151:19
  174:9 179:24
  185:3,4
low   93:15,21
  180:15,16
lower   110:20
  144:11
lunch   76:13 94:17
  96:7

**m**

machine   44:21,23
  47:4 62:10 66:18
  66:20 67:3,13
  69:25 75:22,23
  95:7,19,21
machines   15:10
  37:21 39:14 40:25

43:11 44:8 47:4
  48:6 52:24 53:1
  53:16,18 56:10,14
  58:17,20,21 59:2,9
  61:5 62:23 63:4,8
  63:10,12,14,17
  73:16 95:8,12,14
  95:17,25 157:2,7,9
  186:9 187:16
  191:5
magazine   57:12
  60:12
magnitude   183:24
  184:1
mail   105:16
  120:16,18,23
mailed   37:11
main   27:21 59:14
  67:14 77:20
  102:17
maintain   71:3
  178:8,21
maintained   135:3
  142:1 192:19
maintaining
  118:23 121:13
  142:6
maintains   134:25
maintenance
  145:2
majority   184:4
making   47:10 99:1
  107:10
male   171:8
malicious   5:17
  52:25 78:24 132:3
  134:17 170:9
  179:3
malware   123:4
  126:2,7 132:2,5,10
  132:11,13 135:18

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[malware - method]                                                    Page 23

150:4,9,16,20
172:18 173:4,7
174:14 177:12,15
190:6,13
**man** 66:17 147:22
**manage** 104:1,3
**management**
101:13 132:15
170:10 179:5
180:4 189:20
**mandela** 61:15
**mandela's** 61:20
61:23
**manifested** 84:4
**manipulate** 32:3
172:19
**manipulated**
31:13,16 44:8,22
44:24 112:19
**manipulating**
30:14 31:23 46:21
112:11
**manipulation** 5:17
80:9 89:17 90:10
112:7 113:7
122:16 189:23
**manual** 34:22
65:25 66:3 75:15
123:15
**manufacturer**
135:12 142:10
172:24
**manufacturers**
20:1 149:24
**map** 57:18,19
**margin** 186:14,20
186:22,24,25
187:1
**marilyn** 181:14
**mark** 7:10,11,21
10:2 64:13

**marked** 9:20,22
10:5,7,16,18 25:3
25:6 27:11,13
29:24 30:2 33:17
34:8,18 35:13
37:13,15 38:11,22
43:20,21 52:7,9
55:1,3 56:16,22
57:1 59:16 60:8,9
64:18,25 66:1,4
69:7,8 70:4 73:16
73:17 74:6,16
75:16 76:7 78:11
81:19,22 82:10
83:2 85:7,14,19
86:4,6,8,12 87:1
91:18 97:5,7,23
115:6,12,19 125:2
139:4 140:19
141:3 172:20
181:17 182:22,23
183:19
**marker** 73:19
**marking** 5:18 26:8
33:15,18,22 34:9
34:18 35:2,6,10,14
36:10,16,17,18
42:2,7,8,11,14,15
42:17,21 43:12
59:21,24 60:2
65:1 73:17,20
82:11,16,22 83:1
86:4 91:1,19 93:7
93:17 97:22 98:2
101:1,4 138:1
145:16,18,23,24
146:1 149:18
152:24 153:2,5
156:15 166:23
172:20 175:11
176:19 177:3,14

177:21,25 178:3
180:1 181:12,25
184:10 185:22
188:13,15
**marks** 97:19
181:14,16
**marriage** 194:17
**massive** 41:10
148:6
**match** 38:17
**material** 8:10
12:24
**materials** 13:16
**mathematical**
178:6 185:21
186:16,19
**matter** 16:11,16
16:17,19 72:12
92:10,10 106:14
106:18 151:15,19
175:4 177:4
181:21 189:4,10
194:21
**matters** 94:10
105:8 128:17
155:22
**meadows** 64:13
**mean** 25:25 41:7
51:24 54:2 63:18
63:25 67:20 73:1
73:17 74:20 79:16
81:18 87:10 89:7
95:3 103:7,9
113:6 128:17
136:16 147:7
154:14 186:22
**means** 23:4 61:16
76:8 122:3 147:14
169:13 194:12,13
**meant** 161:19

**measurable**
185:11
**measured** 185:2
**measures** 33:10
63:19 151:16
167:8 172:9
**mechanisms**
121:18
**media** 66:7 112:13
135:7,11,14,16,20
**medicine** 34:25
**medium** 5:5 56:19
57:3 65:11,13,22
97:20
**meeting** 66:17
**meetings** 42:25
**members** 43:2
**memoirs** 61:25
**memorial** 24:13
24:24
**memory** 107:19
108:1,24,24 109:8
**mention** 38:10,18
59:14 108:5,10
170:2 174:25
**mentioned** 75:24
**mentioning** 59:3
**mentions** 67:2
**merely** 66:13
112:12
**mess** 73:8,8
**messages** 112:13
**met** 6:23
**method** 23:19
69:25 70:14 71:6
74:7,17 81:25
82:3,5,20,24 85:7
85:11 87:19 91:23
92:1 106:13,21,25
107:3,8,9,11
108:11 135:22

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[method - newspaper]                                          Page 24

173:18 174:4
**methodology**
84:13
**methods** 14:25
15:3 27:3 29:10
80:10,16 84:22
127:1 129:7
132:11 141:10
**michelle** 25:23
**michigan** 1:19 5:8
5:16 6:1 18:14,15
18:20,23 19:1,2,2
21:23 58:13 60:11
65:25 67:20,25
81:24 117:23
119:1,4,5,8,15,16
119:21 182:21
194:2,6,24
**michigan's** 118:11
**microsoft** 25:23
**middle** 64:1 178:2
**midterm** 182:21
**milchev.com** 2:7
**miller** 2:3
**millions** 23:14
**mind** 80:17
**minimal** 65:19
87:16,18,20 88:8
**minimum** 87:17
**minute** 36:13
110:22 112:4
128:16 192:22
**minutes** 33:3 37:2
**misbehavior**
177:25
**misspoke** 17:10
**mistaken** 189:14
**mitigate** 21:14,21
22:5,12,14 119:8
121:23 125:16
159:2 170:15

**mitigated** 22:10
118:25 128:7,12
128:17,24 159:9
159:16 160:8
**mitigation** 160:3
160:13 173:21,22
184:6
**mix** 72:12
**mock** 67:3
**model** 21:1,12,18
21:19 95:20
**modeling** 166:17
**models** 166:21
**modern** 141:22,22
**modes** 167:7
**modified** 59:20
60:1,3
**modify** 149:8
**modules** 141:6
**moment** 67:19
**money** 58:19 90:3
160:17
**month** 178:17
**months** 123:10
159:6
**morning** 6:21,22
**move** 8:3 33:17
52:3 59:8 73:6
76:19 158:3 163:1
169:1 179:24
184:20,22 187:16
192:8
**moved** 38:22
188:16 191:15
**movement** 188:16
**moving** 168:9
**mueller** 134:19
**municipalities**
39:23 46:9
**murder** 63:23

**mvp** 103:1,4,13,19
104:10 133:7,8,11
133:11,11 160:23

**n**

**n** 21:9
**name** 21:8 25:22
71:16
**named** 63:24
**names** 182:16,19
182:20,20
**narrow** 100:8
**nation** 109:23
110:6,14 116:22
116:23 139:24
143:23 145:19
175:6
**national** 34:24
35:1,3,11 90:18
180:6,13 181:3
188:9
**nationally** 115:23
**nature** 134:7,13
**nearly** 101:18
**necessarily** 31:11
31:12,13 46:20
67:1 86:6 90:5
113:6 127:17
130:8 147:5,15
166:5 185:11
**necessary** 63:19
114:24 115:10,11
116:1,12 129:5
179:1
**need** 55:10 59:3,10
71:13 72:6 99:7
99:22 100:4,5
114:12 127:3,17
131:25 136:19
137:5 155:12,12
167:15 185:3

**needed** 57:10
142:17 151:3
185:4,14
**needing** 59:1
**needs** 118:7 139:6
191:20 192:8
**negative** 147:12
**negligently** 192:19
**nelson** 61:14
**network** 24:16,17
27:22 61:18 192:4
192:10,11
**network's** 24:13
**networking** 47:6
**networks** 45:18
**never** 21:23 39:8
41:20 113:11
140:25 146:17
149:10 152:25
180:10 187:18
188:19 191:23
**new** 4:20 5:13
18:10 35:15,22
47:16,17,18 48:9
49:1 52:6,10,13
53:2 54:22 57:11
77:22 82:7 97:2
97:10,13 100:20
109:18 110:2,7
114:22 121:6,10
121:19,21 122:19
122:21,21 124:1,2
136:3 137:4
141:18,19 142:16
170:14 175:11
177:3,21 180:24
**newer** 144:4
**news** 66:7 73:2
100:11
**newspaper** 71:17
71:23

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

nick 62:6
night 107:13
non 64:10 94:6
  177:18
nondisabled 141:1
normal 147:14
northern 1:2
notary 194:1,6,24
note 10:12 44:12
  159:13
notice 4:3 9:23
  10:1 90:3 156:25
noticed 60:3
notify 99:6
notion 89:5
novel 139:25
november 50:21
  51:2,5,9 160:24
  191:1,12
number 9:1 44:5
  45:15,18 49:16
  70:17 88:21 128:1
  128:10 130:14
  137:18,21 138:10
  139:11 144:5,11
  144:11,13 178:3
  178:17,25 179:6
  183:8,13,18 186:5
numbered 70:8,9
numbering 70:24
nw 2:4

**o**

objections 6:15
objectives 85:18
  85:20
observations
  156:3
observed 101:3,6
  101:9,12
obsolete 33:12
  35:24

obtain 15:17 66:17
  67:24 189:9
obvious 129:22
obviously 17:13
  41:24 44:5 81:8
  89:22 91:25
occasion 68:21
occur 15:3 181:8
  189:7
occurred 39:20
  45:1 131:21
  132:10 162:13
  190:9
occurs 50:9
offensive 114:12
  116:24
offer 20:20 21:14
  76:23 175:15
offered 100:16
offering 55:12
office 16:8 104:8
officer 144:18,24
  145:3
offices 29:11
  192:11
official 1:9 97:19
  97:20 108:12
official's 187:5
officials 16:4
  24:18 61:17,21,24
  76:1,3 86:11,14,16
  86:17,19,22,24
  104:1,2,5 105:25
  107:21 156:24
  163:24 174:14
  179:10 180:18
  185:24 186:3,7
offs 72:3
oh 18:16 45:7
  46:24 54:12,14
  60:13 68:20 70:9

74:20 92:4 151:18
okay 7:5 9:22 10:1
  10:24 12:6,8
  14:15 25:19 27:21
  28:12,20 30:19
  32:12,21 36:25
  37:3 45:12 46:12
  53:5 56:8 57:5,17
  61:11 63:13 67:11
  69:4 71:15 77:4
  77:24 81:7,15
  82:9 96:2 97:5,12
  98:12 101:22
  102:1,22 106:7
  107:18,25 108:17
  109:14 116:7
  118:17 122:5
  128:22 130:12,17
  137:16 158:11,16
  168:20 174:18,22
  176:15 187:10,15
  187:17
old 56:10,14 80:10
  122:22 123:1
  146:12
once 131:12
  153:11
ones 21:21 82:14
  83:15 109:3 115:8
  122:1 165:4,17
  176:3
ongoing 76:11
online 56:18 89:13
  89:16,25 133:22
  133:25 134:23
onscreen 125:6
open 98:5,10,23
  98:25 99:3,5,14,19
  100:1 141:13
  163:12

operated 191:11
operating 143:11
operations 159:2
opine 100:18
  185:24
opining 145:6,9
  152:23,24 168:3
opinion 13:18
  15:13 51:7 77:6
  77:23 79:11 80:23
  90:24 91:3,9,13
  114:22,22 115:10
  155:2 168:15
  190:4 191:16
  192:20
opinions 14:19,23
  15:8 72:24 76:23
  80:18 81:7 94:13
  100:15 136:5
opportunity 17:24
  17:25
opposed 21:17
  33:24 138:8
  140:20 173:16
opposes 181:21,23
  181:24,25
optical 33:13
  37:20 38:10,12,13
  38:23 39:5,7
  41:25 43:12 77:15
  77:16 78:24 79:3
  82:12 86:7 88:6
  122:16,23 132:14
  138:6,8 149:19
  150:14,15 172:18
option 33:16,20
  111:12
options 85:4
order 9:6,8,9
  33:19 35:16 53:20
  114:12,13 122:24

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[order - part]                                                    Page 26

124:18 127:18
131:25 140:23
155:15 184:23,24
186:13
**organizations** 4:8
27:16,17,18,21,25
28:3
**originally** 96:24
**ought** 58:6
**outcome** 14:7
38:15 50:25 62:5
83:3 84:18,20,23
87:24 88:22 90:18
91:6 114:10 115:9
123:23 137:7
140:24 157:1
**outcomes** 122:18
190:17,18
**outdated** 141:5
142:25 180:2
**outline** 79:18
125:1 128:6
186:19
**outlined** 39:19
79:8,18 121:24
128:12 129:16
130:20 160:4
183:7 185:20
**output** 93:22,22
**outside** 94:11
160:4
**outwardly** 191:9
**outweigh** 84:5,9
**oven** 133:4
**overall** 15:22 59:7
83:19 103:10
105:1 107:15,17
154:8 157:13
168:16
**override** 64:22

**overseas** 169:12
**overvoting** 76:1
80:11
**ovr** 103:1,4,13,19
104:11 133:7,14
133:16 161:22

**p**

**p** 2:10
**p.m.** 25:13 193:6
**pad** 101:16 163:3
163:6 165:5,10,15
165:18,19,21,25
166:22 167:20
168:9
**pads** 8:22,24 163:9
163:16,19,24
164:14,23 165:1
166:12,23 167:17
168:4,14,16,17,22
**page** 3:3 4:2 10:21
25:9,10 33:9
34:21,21 35:23
36:6 37:19 38:18
39:11,12,12,19
41:11,22 44:3
45:2,5 46:12,12,23
46:25 47:10 48:5
51:12 54:14,15
55:8,9 57:5,17,18
58:14 60:20 62:20
63:21 64:1 65:10
67:1 69:24 70:2,3
70:7 77:3 100:12
105:15 112:24,24
161:24 179:13
**pages** 8:12 70:8
**paid** 24:1,4 68:13
68:14
**panel** 25:18,21
26:1,3,5,7,7

**panelist** 25:20
**panels** 25:16
**paper** 28:17 29:9
29:13 33:13,17,19
34:3,4,5,6,6,8,11
34:13,21 35:13
36:7,9,11,23 38:12
38:22 41:25 47:5
48:22 49:2,5
53:17 54:7,16
56:11,15 59:15,16
59:17 64:18,25
69:16 70:15 73:16
73:18 74:6,17
76:7 78:11 80:10
81:16,19,22 82:10
83:6 85:8 86:5,6
86:13 91:19 93:5
93:7,23 97:19
108:5,11,14,17
109:6 110:18,23
110:24,25 111:11
115:7,12,19
123:15 125:2
127:23 128:5
136:20,20,21
139:4 140:12,12
141:3 163:20
164:4 173:16,19
173:24 178:6,18
179:11,13,15,16
181:17 185:13,20
**paperless** 33:13
34:2 36:19 56:9
56:14 79:5 111:16
111:18 181:24
**papers** 54:4 92:25
93:24 94:4,11
**paragraph** 11:4
30:12 31:17,17
37:20 38:18 39:12

41:11 44:5 56:9
57:19 58:15 59:13
59:19 62:21 63:21
64:2,6 65:17 66:6
76:25 77:5 79:19
100:12,17 102:3
103:18,25 105:14
105:23 107:25
109:15 111:20
113:4,22 114:4,21
132:2,18 133:3
134:3 135:5 136:5
136:12 139:8
141:5 142:25
143:6 144:17,19
146:8,21 147:4
148:14 149:5
150:3 151:1 152:3
153:18 158:9
159:1 160:19
163:2,18 164:12
169:2,11 170:19
172:9,17 173:10
174:12,25 175:9
177:19 178:7
180:1 181:10
182:14 185:24
187:10,12,14
189:18 190:14
**paragraphs** 39:19
70:22 77:1
**parallel** 177:19,21
177:24
**pardon** 48:12
**parkwood** 2:12
**part** 15:16 19:18
26:8,10 29:6
52:12 53:10 56:7
59:7 66:15 72:25
84:6 93:8 103:4
107:1 108:18,25

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[part - point]**                                        Page 27

137:3 139:6
141:21 142:14
146:13 147:18
154:7,7,8,13,14,15
156:2 167:13
168:4 186:5
**partial** 65:15
**partially** 58:13
**participated** 24:21
52:20,22 53:6
**participating**
27:17,19 52:13
**particular** 14:25
15:9 17:16 18:25
20:4,6 65:9 70:14
70:19 76:22,24
84:1 88:22 122:11
143:9 144:1
149:24 156:8
**particularly** 36:22
85:6 99:14 138:17
158:15,17 186:14
**parties** 161:15
194:18
**partisan** 64:7,9,10
64:16,17,21,24
65:4,5,8 66:9
122:11
**partisans** 66:13
**parts** 31:6 65:24
65:25 99:22
**party** 61:20
**passed** 55:22
**passwords** 151:3
**patent** 5:11 69:4
69:10,13,20 70:10
**path** 56:5,7 91:10
91:12,24 134:1
165:19 166:22
167:2

**paths** 166:17
**pattern** 46:7
**pay** 36:1
**pcc** 158:11,12
169:4
**peer** 179:15,17,20
182:3 184:8
**penetrate** 41:13
**penetrating** 30:13
**pennsylvania** 8:24
67:25 118:14
119:1 165:9,17,24
166:13,21,25
167:24 168:11
**pennsylvania's**
168:21
**people** 15:20 16:2
20:10,16 91:7
94:7,8 99:5
105:16 111:2
120:6 131:7,14
143:18 177:11
182:1
**percent** 58:1,3,5
115:21,24 116:3
156:19
**percentage** 93:16
115:17 116:4
**perfect** 8:1
**perfectly** 56:1
83:12
**performed** 49:24
50:21 67:6,7
164:13,15,16
**performing** 146:9
**period** 18:5 121:7
**permanently**
163:16
**permission** 20:14
**person** 71:4
105:19,22 120:18

120:20 133:19
153:12
**personal** 32:12,21
73:6 91:13,15
101:22 113:19
136:9
**personally** 56:13
95:13 101:3,6,9,12
101:15 102:25
158:21 163:2
**perspective** 18:2
74:9,11,16,19
75:12 77:21 91:7
98:13 185:21
**ph.d.** 1:17 3:4 6:5
17:10 183:3
**philip** 179:13
**photo** 120:14
**phrased** 44:13
**physical** 25:9
26:22 33:9 38:16
69:24 70:3 121:8
121:17,22 122:1
151:1,4,6,8,9,11
151:14,19,20,21
151:25 152:2,2,5,6
152:8,9 173:7,16
173:24 175:16,18
176:12,18,19,23
**piece** 29:2 34:12
59:17 67:18,20
99:11 102:12
114:22 126:6
132:8 140:2,25
143:13,16,17
144:7,22 160:21
170:4,6,7 177:9
**pieces** 8:2 71:8
76:19 92:17 100:4
132:19

**pilot** 50:14,15,18
123:21,23
**piloting** 124:21
**pirate** 169:24
**place** 40:12 41:2,3
77:18 78:23 87:15
87:22 108:3 121:1
121:3,18 128:20
140:25 145:3
162:11 176:25
**placeholder** 52:5
**places** 29:10 58:25
191:6
**plaintiffs** 1:6 2:8
8:11,11 9:13
12:15,22 13:2,5
15:18 102:2
**plan** 12:6,7 124:4
**planned** 125:20,21
**plans** 123:24
178:15,24
**plant** 171:7
**platform** 56:18
103:3
**plausible** 56:7
93:14 105:3,9,10
129:20
**plausibly** 139:20
**play** 64:16 84:2
**player** 102:18
**players** 102:17
**please** 26:25 127:8
187:6
**plenty** 95:8
**point** 15:7 21:20
34:21 35:11 48:7
49:18 54:6,9 61:8
61:11 62:11 64:9
64:10,17 65:13
71:5 76:13,14
88:10 89:1,2

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[point - primarily]**                                                        Page 28

91:25 92:3,4,5
94:17 98:1 109:16
132:21 136:18
138:21 148:5
156:18 158:2
165:14 175:2,4
178:1 189:6
**points** 41:22 44:5
163:14
**policies** 84:24
**policy** 55:10,12,19
59:4,11 63:19
72:12 74:25 83:19
84:9,12,15,20,20
84:23 85:4,4,18,20
85:24,25 86:2,3
87:3 88:14,17,17
88:24 89:1,7,9,10
92:18,21 94:10
134:9 148:3,8,12
164:8 181:21
183:16
**policymakers**
53:11 83:25 90:25
91:9,24 93:4
**political** 55:15,17
55:24 66:14 68:15
68:18,23
**politically** 56:5,7
**politics** 28:2 64:16
64:18,21 65:8
66:9
**poll** 8:22,24
101:15,16 104:6
163:1,3,3,6,9,16
163:19,24 164:14
164:23 165:1,5,10
165:15,18,19,21
165:25 166:12,21
166:23 167:17,19
168:4,9,13,16,17

168:21 184:13
**polling** 29:10
40:12 58:4 65:14
87:15,22 108:3
121:1,3 126:22,25
127:11 128:20
191:5
**polls** 57:20,22
163:12
**port** 151:2
**portion** 65:11
179:9
**position** 39:13,16
42:11 58:20
144:18 145:8
180:9,11 183:17
**positions** 42:14
97:13 98:1
**possibilities** 58:8
**possibility** 15:2
44:24 63:10
**possible** 38:1 51:1
51:3 55:24 71:25
72:22 75:5 80:20
81:12 82:7,13
85:2 87:7,15,21
88:1 94:4 109:5
126:20 129:4,14
147:16 149:7
150:5 157:21
162:3 164:14,16
177:12 178:20
179:3 189:8
**possibly** 84:24
94:20 128:13
164:1,9
**post** 5:1 18:3 49:9
49:10 50:1 54:23
55:5 179:9
**posted** 67:2

**posture** 32:17
145:9 154:9
157:13
**potential** 14:20
20:21 23:24 26:20
50:24 52:25 76:3
78:8,14 79:13
80:3,9,19,22
117:21 119:6
**potentially** 39:17
76:4 90:12 94:20
117:4 122:8
126:23 134:1
151:12 161:7
171:14 174:17
179:10
**power** 87:11
**powers** 89:17
90:10
**practical** 84:15
**practically** 84:4
**practice** 104:4
124:22 139:13
141:7,8 145:5,11
145:21
**practiced** 174:14
**practices** 13:22
15:10 28:16 29:16
34:22 141:23
145:1
**prayer** 187:5,7,9
**pre** 50:1 57:20
126:22 178:9
**precautions**
133:24 155:16
**precinct** 95:21
101:2,7 138:8,11
138:12 139:4
149:19,21,22,25
163:21,21 175:5

**precisely** 111:2
**preconditions**
115:10
**prefer** 74:21 98:13
98:15
**preferences** 97:20
**preferred** 20:18
98:8 99:16
**premise** 83:9
**preparation** 63:22
**prepared** 8:21
12:10 124:9
**preparedness**
162:16
**preparing** 12:2
**presence** 174:13
194:12
**presidency** 68:24
**president** 55:23
68:9 111:24
**presidential** 62:24
113:24 131:17
**pretend** 23:21
**pretty** 58:5 65:5
71:5 83:17,18
84:20 109:15
140:1 144:16
**prevent** 116:21
121:1 151:9
**prevented** 110:4
119:25
**previous** 95:12
137:24 159:17
180:22 188:23
**previously** 34:25
43:25 152:17
**primarily** 26:20
80:7,12,14,23
96:21,23 100:13
108:8 140:19

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[primary - publicly]                                    Page 29

**primary** 16:2
70:13 76:8 168:18
168:18
**princeton** 17:1,18
18:12 19:1 69:21
**principle** 98:6
99:8,21,24,25
100:9 111:6
**principles** 5:13
19:21 97:2,11,18
98:3,22
**print** 71:16 125:6
179:1
**printed** 60:3
126:11 128:2,9
130:15 178:9
180:15 181:13
**printing** 71:23
171:10
**printout** 52:10
**prints** 59:17
**prior** 7:17 41:5
47:1 106:3,5
107:20 181:2,2
**privacy** 70:17 71:1
**privilege** 6:16
**pro** 11:24 68:12
**probability** 88:11
93:11,13 184:6
**probable** 132:9
**probably** 16:1
20:16 22:1 29:5
46:22 57:21 58:6
61:6,10 62:17
71:5 76:14 92:14
94:17 98:7 109:21
116:6 117:16,25
120:8 129:11
138:2,3 139:23
155:21 156:12,14
157:3

**problem** 16:24
41:2 72:4 142:14
143:9,15 151:4
152:11,13 179:2
180:24 183:24
186:23
**problems** 14:2,4
14:16 17:21,22
18:11 26:20 36:17
62:18 72:5 73:3
73:10 77:20 99:4
110:16 118:24
134:13 152:14,21
153:17 180:25
181:8 186:2,6,10
**procedure** 6:14
124:22,25 185:7
**procedures** 110:13
154:1,1 176:23
**process** 35:16,17
63:22 65:21 75:2
86:23 88:23 89:2
91:5 103:17
105:22 106:2,3,5
106:11 120:2
131:2 142:5
159:16 163:11
164:10,11 166:11
169:3 171:2
172:12,13 174:16
174:16
**processes** 104:19
124:12
**produce** 21:6 35:7
39:5 131:24 179:8
**produced** 8:10
172:4
**product** 141:19,20
**products** 27:6,7,10
**professional** 91:16

**professor** 18:17,22
60:23
**profile** 60:11
62:20
**profit** 22:24
**program** 135:24
165:5
**programing**
138:24
**programmed**
86:20 140:9 180:3
**programmers**
169:13 170:21
**programming**
105:25 135:11
138:16,23
**progress** 159:14
**progressive** 27:22
**prohibit** 167:24
**prohibition**
165:18 167:1
168:1
**project** 27:23
**prompt** 184:18,20
**prompting** 183:8
183:11
**prompts** 183:25
184:14 185:2,5
**promulgated**
154:2
**proper** 109:9
110:12
**properties** 157:22
**proportion** 82:25
**propose** 120:25
**proprietary** 98:19
**pros** 99:15,17,18
99:19
**protect** 33:10
175:6 176:2

**protected** 102:21
**protecting** 91:7
176:7
**protection** 90:2
102:22 150:5
152:8 167:8 175:2
175:4 177:6
**protections** 64:14
78:16 176:25
**protocol** 177:5
**protocols** 26:11
27:1 151:20,21
177:2,20
**prove** 147:11,12
147:13
**provide** 11:10,13
12:22 13:2 27:3,6
27:7,10 33:19
51:17 66:2 92:9
117:2 143:19
175:17,20 177:5
**provided** 8:11
12:24 102:2 163:5
**provides** 24:5
175:2
**providing** 12:13
188:8
**provision** 131:8
**provisional** 120:2
120:6 128:13,14
129:17
**provisions** 131:5
**public** 42:25 52:4
69:22 94:10
161:10,13 177:22
194:1,6,24
**publically** 154:1
158:7
**publication** 60:17
**publicly** 106:12
125:23

J. Alex Halderman , Ph.D.                           February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[published - recognize]**                                         Page 30

**published** 35:21
53:24 54:4 82:23
92:12,25 93:5,7,24
94:3 177:14
184:12
**pull** 31:20 41:7,9
114:18
**pulling** 114:15
**puppeteer** 66:8
**purchase** 47:3
121:19,21
**purchased** 48:6
**purpose** 6:12 34:7
34:11 164:9
**purposes** 6:13
12:23 14:9,11
108:13 133:22
176:6,7
**put** 15:7 77:17
88:6 133:22 148:4
187:13
**putin** 41:8 111:24
**putting** 39:15

**q**

**qualified** 109:7
119:18
**qualifiers** 95:1
**quantifiable** 88:11
88:21 148:1,2
156:9
**quantified** 118:6
172:7
**quantify** 93:9,15
172:8
**quantitative** 82:24
94:1
**quantities** 178:9
178:21
**question** 7:9,10,11
7:17,20,24 22:8
27:21,24 35:5

39:24 40:5 49:23
62:7 73:5 74:18
82:18 84:13 85:2
85:16,17 88:18
92:6,8 94:9 95:15
111:4 116:24,25
117:22 127:8
130:11 140:14
147:18 151:22
157:12 162:22
166:10 173:25
181:5 183:21
184:9 186:18
187:3,10 188:22
189:7 191:6,22
**questions** 17:3,18
19:18,25 20:2
44:2 55:20 66:11
84:12 94:16 112:3
192:14 193:3
**quick** 20:7
**quickly** 68:25
**quite** 30:6 93:19
94:4,9 142:22
151:10 157:4
**quote** 45:12,21
139:14
**quoted** 45:13
**qvf** 119:18,19,20

**r**

**race** 126:18,21,23
127:10,12,12,12
127:14
**races** 126:25 127:1
182:6
**racial** 14:1,5,8,10
14:12,14,20,24
15:4
**racially** 14:17
15:10

**raffensperger** 1:8
6:12
**raise** 15:2
**random** 178:1
**range** 51:24
157:18 159:2
160:7
**ranked** 19:3 118:5
**rate** 11:6,10,20,25
148:25 164:1,3
177:11 180:14,20
181:11 184:22,23
185:20 186:11
**rates** 185:8
**rattled** 45:17
**rattling** 46:10
**rdr** 1:22 194:24
**reach** 113:15
**reached** 100:15
**reaching** 80:18,25
81:7 85:9 107:6
108:19 109:1
176:20
**read** 13:8,10,13,16
13:16 62:22
103:17 125:8
128:6
**readable** 97:19
125:10 126:8
**ready** 8:2,7,18 9:4
**real** 20:7 23:10
64:22 175:18
**realistic** 182:15
**reality** 61:2 72:16
116:21
**realized** 120:22
**really** 19:2,10
21:19 30:8 74:3
98:19 105:5
106:14 111:4
115:5 116:25

136:15,23 137:3
152:3,24 167:15
**reason** 22:18 29:1
51:6 56:24 62:22
74:12 93:3 98:12
98:15 114:9 134:9
136:19 137:10,10
137:13 139:6
144:20 159:21
173:5,13
**reasonable** 56:5
164:6
**reasonably** 138:21
**reasoning** 85:22
**reasons** 74:21,25
83:19 84:9 85:4
90:19 137:12
176:5
**recall** 12:3 24:14
25:20 29:22 37:9
43:8 45:11 52:13
56:19 66:18,20
150:1
**recalling** 158:18
**receive** 24:3
119:25
**received** 24:12
48:3
**receives** 133:12
**recertification**
142:24
**recertified** 142:12
142:20
**recess** 37:4 60:5
96:4 127:6 133:1
174:23 192:23
**recipe** 143:19
**recipes** 153:9
**recognize** 24:25
182:17

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[recognizing - replaced]**                                    Page 31

**recognizing** 25:1
**recollection**
  189:15
**recommend** 34:16
  34:17 41:23 63:19
  159:25 165:24
**recommendation**
  35:12,20,22 47:7
  47:11,15,20,24
  48:15,23,24 55:21
  92:19,21 181:3
  183:16
**recommendations**
  47:1,25 51:12,14
  56:4,8 59:11
  111:10 165:13,23
  188:13
**recommended**
  55:13 153:24
  160:8 180:6
**recommending**
  35:12 55:19
  133:21,23
**recommends** 47:3
  47:4 48:11 49:6
  51:15
**record** 56:25 57:6
  57:10 59:17,19
  60:2 96:2,5 97:19
  107:4 110:18,23
  110:24,25 111:6,7
  111:14,16 161:10
  161:13 192:21
**records** 38:16 66:4
  111:12,13 117:6
  120:24 123:13
  127:23 162:4
  163:20
**recount** 65:21,24
  67:18 123:15
  127:22 130:2

**recounts** 58:12
  63:3 65:16,18,18
  67:21,25 68:6
**recover** 129:24
**redacted** 44:5
**redactions** 46:13
**reduce** 87:15,17
  88:20 166:1,2
**reduced** 109:24
  194:11
**refer** 10:3 16:12
  26:24 36:6 59:18
  80:4 110:22
**reference** 30:13
  42:22 54:14 59:15
  66:6 113:25
  120:17 139:24
  149:18 188:18
  189:18
**referenced** 192:15
**referred** 80:11
  113:3
**referring** 16:13
  26:15 45:4 55:18
  63:5 70:14 121:25
  126:12,16
**refers** 26:16,16
  120:17
**reflect** 136:20
**reflected** 141:23
**reflects** 36:24
  140:13
**regard** 45:24
**regarding** 8:24
  63:14,16 178:12
  178:17 188:17
**regime** 151:8
**region** 179:2
**registered** 162:5
  163:20

**registrar** 104:22
  105:4,6 162:8
**registrars** 162:10
**registration** 30:15
  30:20 31:3,8 32:4
  32:6,14,18 43:14
  45:24 46:2,5
  102:6,9,15 103:10
  103:14 104:2,3,12
  104:14,17,17,21
  104:23 105:3
  117:5,10,14,20
  118:2,14,20 119:3
  119:22 120:7,24
  129:18 133:18,21
  134:24 135:1
  158:3 160:11,20
  161:3,9,17 162:16
  162:18,20,23
  163:19,23
**registrations**
  161:21 162:13
**regular** 120:1
  126:25 127:11
**reiterating** 41:22
**reject** 86:7 89:5
**rejects** 86:12
**related** 43:6 48:23
  50:11 51:19 83:5
  116:7 123:25
  124:6,8
**relative** 106:24
  108:19 109:1
  110:20 118:17
  143:25 144:19
  156:10 166:12,15
**relatively** 102:20
  129:22 141:7
  184:1
**released** 35:22

**relevant** 67:2
  108:7,9 186:15
**reliable** 183:4
  190:2 192:12
**reliably** 157:25
  177:24 185:11
**reliance** 170:16
**relied** 13:3 164:21
**rely** 94:11 146:17
  146:19 176:7
  188:12 191:18
**relying** 158:7
  163:4 180:19
**remain** 99:23
**remainder** 48:13
**remaining** 39:24
  167:7
**remarkable** 64:3
  136:15,24
**remember** 124:10
  133:10
**remote** 122:3,6
**remotely** 175:19
**removable** 135:7
  135:11,14,16,20
**removal** 107:25
**remove** 47:6
**removing** 108:24
**render** 47:6,20
  87:11
**repair** 99:7
**repeat** 70:2 85:2
  88:18 127:8
**rephrase** 7:24
  62:7 170:19
  186:18
**replace** 33:12 34:2
  35:24 56:14 58:19
  58:21 59:1
**replaced** 119:13
  192:1,3

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[replacing - right]**                                                    Page 32

**replacing** 36:3
  56:9
**report** 4:4,5,18 8:4
  9:2,4 10:9,21 11:5
  12:2,13,20,23 13:6
  13:25 14:2,4,9,12
  14:17,19 15:8,16
  15:18 16:9 17:2
  35:4,16,21 40:21
  43:17,23 45:13
  62:4 76:17,21,22
  77:25 81:8 89:4
  90:24 94:13,18,19
  96:8 100:11,14
  112:25 113:3
  122:17 126:13
  167:13,15 170:16
  176:3,21 186:19
  186:23 187:14
  188:10,12
**reported** 66:5
  67:15 170:23
**reportedly** 62:3,3
  89:20
**reporter** 194:5
**reporter's** 7:6
**reporting** 43:15
  62:4 186:2
**reports** 10:2
  121:15 135:17
  186:6,10 188:14
**republic** 68:24
**request** 7:16 33:24
  69:22
**requests** 133:18
**require** 48:6 49:17
  50:15 79:17
  104:20 122:1
  123:16,18 124:3,4
  160:12 178:21
  179:6 184:17

**required** 49:24
  75:18,20 104:22
  105:7 122:24
  167:9 178:12
  184:23
**requirement**
  50:20 51:8 120:14
  123:22 125:25
**requirements**
  50:10 51:10 121:9
  121:23 151:6
  152:2 154:16
**requires** 50:14
  123:19,20,21
  150:18 163:8,11
  163:14,20 184:13
  184:15
**requiring** 184:19
**research** 18:11
  19:6 22:23 35:5,7
  35:8 42:9,16 53:7
  53:9,24,25 54:8
  55:13,15 60:25
  72:23 80:12
  126:10 172:13
  175:13 177:8
  180:12,19 182:12
  183:20 185:13,16
  185:18 187:23
**researched** 27:5,8
**researcher** 38:5
**researcher's** 187:9
**reserve** 6:15
**resiliency** 115:15
**resources** 9:1
  143:22
**responsibility**
  146:4
**responsible** 19:25
**responsiveness**
  6:16

**result** 12:25 39:6
  40:5,25 55:25
  57:15,21 58:2,11
  61:7 62:15 90:5
  92:21 93:21
  119:13 128:18
  156:8 157:22
  160:14 179:19
  184:6
**resulted** 16:8 58:8
  91:6
**resulting** 39:15
**results** 27:4 58:9
  66:3,5 69:18
  75:14 118:23
  123:13 180:25
  190:23,25 191:6
  191:13,18
**retain** 21:2 69:19
**retained** 68:3,5,18
  69:1
**retaining** 21:5
**return** 108:1
**returned** 108:12
  108:15,18
**reveal** 40:12 66:4
**review** 8:17 9:3
  11:21 69:15 70:22
  92:15,24 99:2
  104:23 121:13
  123:5,10 126:11
  136:7,9 146:10,13
  147:1,20,23,24
  160:2,13 164:22
  171:4,5 179:20
  180:14 184:12
  190:8
**reviewed** 8:9,9,16
  8:23 9:7 43:16,24
  44:1 53:20 67:15
  102:2 121:11

  123:1 124:5,7
  128:1 133:19
  154:6,8 160:4
  163:3 172:15
  173:15 176:11
  178:11,13 179:15
  179:17 182:3
  183:14 184:8
  190:22
**reviewers** 152:11
**reviewing** 118:18
  123:7 128:9
  130:14 182:6
  183:9
**reviews** 134:14
**richard** 15:24
**rid** 147:21
**rigged** 62:4
**right** 6:21 8:1
  10:14 11:4 12:11
  18:18 20:3,5
  22:13,14,20 25:12
  25:22 30:12 31:21
  33:5 34:10 35:2
  36:25 41:8 44:11
  44:19 46:13,22
  47:11,23 52:3,23
  53:14 54:25 57:8
  57:9,11,19,25 60:7
  64:1 66:24 68:1
  72:1,6,13 73:5,9
  74:8 76:5,8,21
  78:9,15,20,21,25
  79:1,3,9 80:13
  83:6,7,12 85:8,19
  86:5 87:9 89:18
  90:8,11,15 91:11
  91:14 92:23 94:14
  96:7,13 99:9
  100:10 101:25
  103:6 105:17

Veritext Legal Solutions

J. Alex Halderman , Ph.D.                                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[right - sabotaged]**                                                    Page 33

106:20 107:10,11
107:16 108:20,21
109:10 110:8
111:25 112:21
113:7,12,13 114:2
116:9,19 117:15
119:23 120:7,8,23
121:24 125:14,17
125:18,22 126:13
126:22 127:17
128:13,16 130:20
131:15,22 132:24
133:6 137:4 138:7
140:3,4,24 142:4
142:13 143:13
145:13,17 146:2,3
146:11,20,23
147:2,9,23 148:18
148:20 149:3,10
150:6,14 151:17
152:6 153:16,19
154:12 155:10,20
156:4 158:6
159:25 164:15
165:10,11,15
167:3,11 168:24
169:4,7,23 170:17
171:1,11 172:6,21
172:22,24 174:25
175:7 176:13,21
178:23 179:25
180:11,21,22
181:3,4,9,14,22
183:14 184:10,21
185:9,14 186:15
186:20 187:7,19
187:23 188:3,4,10
188:14,15,21
189:23 190:9
192:24 193:5

**rights** 13:23
**rigor** 147:19
**rigorous** 36:20
    123:14 124:4
    125:19 128:8
    130:5,9,15 140:15
    146:16 155:13
    171:4 179:11
**rigorously** 115:7
    125:11 128:25
    129:4 136:22
**ring** 16:20
**rise** 18:4,9
**risk** 22:18 23:24
    33:21 34:14 39:3
    49:13,15,20 50:3
    50:11,14,18,23,24
    51:2 60:1 62:12
    64:15,21 66:15
    74:23 75:2 76:3
    77:8,11 78:5,11
    80:1 81:1,3,14,20
    82:4 83:2,14,15
    84:19,25 87:18,19
    87:20,22 88:8,12
    88:15 89:8,23
    90:14,25 91:4,5,10
    91:25 92:13,19
    93:1,2,4,6,13,25
    94:6,8 98:2 107:1
    107:12 109:1,4,17
    109:19,20,20,22
    109:22,24 110:6
    110:20 117:18
    118:17,19 123:20
    134:7,8,11,12
    143:1 144:20
    154:17,21,23
    155:4,10,20,22,24
    156:1,10,17,17,21
    157:4,5,18 158:4

158:24 166:1,12
166:15 167:4,16
167:21 168:4,10
168:13,22 169:5
169:17 170:3
171:12,17,20,25
**risks** 14:16 21:15
    35:10 43:3,13
    52:23 53:8,20
    71:1 75:11 79:22
    80:13,15,17,19,20
    80:21,23,24 81:2,4
    81:15,22 82:1,2,13
    82:14,17,20 84:10
    87:16,17 88:1
    89:15,25 90:22
    92:11 94:13 98:11
    106:24 107:6
    108:19,21 109:3
    117:17,21 139:2,3
    143:25 152:12
    153:13 154:20
    170:5,15,15 172:2
    172:3
**risky** 91:12 155:1
**rivers** 29:9
**rla** 34:17 49:22
    69:17 75:21
**rlas** 34:16
**rmr** 1:22 194:24
**road** 1:18
**robert** 181:14
**robust** 50:6
    110:13,16 115:13
    115:18 124:17
    129:1 130:1
    153:11 173:22
    174:2
**robustly** 128:25
**role** 99:13

**rom** 106:5
**romulus** 1:19 6:1
**rote** 11:18
**rpr** 1:22 194:24
**rule** 22:3 186:8
**rules** 6:14 7:1
    121:9 124:5,7,10
    176:11,14 178:12
    178:17 184:17,19
**run** 131:14,17
    150:13 180:2
**running** 20:11
    116:15 122:2
    123:7 151:12
    188:5
**runs** 23:1,2 102:8
    169:21 172:18
**russia** 31:19 32:2
    32:5,9,10 39:21
    40:19 43:17 62:2
    111:21 112:4,17
    112:19 113:5,19
    134:22 169:20
**russia's** 44:11
    46:18
**russian** 5:2 30:24
    30:24 31:2 32:19
    40:9 140:5
**russians** 4:22 31:9
    32:15,16 39:13,16
    40:1,17,24 41:12
    41:21 52:11
    169:14,15

|    s    |
|---------|

**s** 21:9,9
**sabotage** 39:4,13
    77:14 78:18 121:1
    121:3 122:10
**sabotaged** 40:2
    179:3

Veritext Legal Solutions

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[safe - see]**                                                              Page 34

**safe**  21:25 22:1
  42:15,17 155:16
  155:21 167:9
**safeguard**  172:10
  175:9
**safeguarding**
  41:23
**safeguards**  49:2,4
  49:5
**safer**  20:17,19
  42:6
**sake**  7:6 89:23
  90:14
**samples**  150:9
**sampling**  69:17
**satisfies**  48:14
**saw**  90:7
**saying**  31:11 54:1
  57:7 62:7 71:25
  75:1 78:1,2,4,5
  93:3 111:22 140:4
  141:14,16 143:12
  150:3 157:10
**says**  64:6 159:15
**scale**  148:1 186:24
**scanned**  48:24
**scanner**  69:15
  86:7,8,12 101:7,10
  107:20 138:5,6,6,8
  139:4 149:21,23
  172:18 175:5
**scanners**  33:13
  37:20 38:10,12,13
  38:23 39:5,8
  41:25 43:12 77:15
  77:16 78:24 79:3
  82:12 86:20 88:6
  101:2,3 122:17,23
  132:14 135:23
  138:11,12 149:19
  149:22,25 150:14

**scanning**  45:13
  112:14
**scenario**  73:21,22
  75:18 86:19
  156:16 170:3
**scenarios**  39:18
  54:19 77:6 78:1
  79:14,18 81:9,11
  83:24 86:10 93:21
  94:21 109:25
  117:3 126:20
  130:17,21 183:7
**scenes**  23:7
**school**  80:10
**science**  19:3 34:24
  48:2 93:19 94:10
  188:15
**science's**  181:3
  188:10
**sciences**  35:2,11
  180:6
**scientific**  89:2
  91:23 172:5 188:7
  188:17
**scientifically**  92:2
**scientists**  96:24
**scj**  1:7
**scope**  30:24
  145:23 147:16
  158:12,14,15,17
**scoped**  25:1
**scrutiny**  99:3,5
**seal**  175:17
**seals**  175:10,13,23
  175:24 176:1,5,7
  176:12,16,20
**second**  10:13
  30:12 32:24 33:9
  34:12 37:20 48:5
  48:18 56:9 57:17

57:18 58:15 59:16
  60:20 77:13 96:3
  103:25 105:23
  119:17 120:25
**seconds**  182:5
**secrecy**  61:22
**secret**  71:7,13,21
  72:10,16 99:13,19
  99:23 100:3,5,6
  151:3 152:10
**secretary**  1:9 6:11
  16:7 81:23 104:7
  105:24 187:21
  192:5,10
**secrets**  100:6
**section**  32:25
  58:16 76:22,24
  136:6 170:16
  174:3
**sector**  89:20
**secure**  38:25 47:2
  47:3,21 48:21
  56:3 63:20 64:12
  72:17 75:13 82:19
  83:12,16,18,21
  85:21 100:6
  138:21 139:15,17
  139:18 140:17
  145:13,16 152:19
  153:1 160:10
  174:16 191:20
**securely**  26:18
**securing**  19:15
  28:10 188:9
**security**  17:5,7,13
  17:17,20,24,25
  18:8 19:5,13
  22:23 23:1,22
  24:20 28:18,21
  29:4 32:17 34:1
  34:22 35:9 37:23

38:1 39:3 43:3,6
  52:24 53:14,15
  54:17,24 55:21
  60:25 64:8,23
  71:14,18,20 72:8
  74:9,16 75:2,10
  79:22 80:21,22
  81:2 83:9 84:17
  89:6 96:19,20
  98:6,11,20 99:3,11
  99:15,22,23,25
  100:18 105:1,6
  106:6 108:16
  109:25 110:2,14
  114:24 115:11,25
  116:11 118:23
  121:8,17,22 122:1
  133:22,24 139:2,3
  141:20 142:11,16
  142:21 143:1
  144:17,24 145:1,3
  145:5,7,9,11 146:5
  146:6,9,14,15,20
  147:4,9,9,14,15,24
  148:4,16,21 149:2
  151:16 152:2,16
  152:19 153:22,24
  154:4,9 155:4,7,10
  155:16 157:10
  158:13,21 159:24
  160:3 162:16
  164:13 165:12,23
  166:4,6,7 167:6
  171:4,4 174:9
  175:15,16,18,20
  176:12,18,19,23
  187:9 188:8
  190:15
**see**  6:23,25 8:20
  17:17 18:12,16
  25:22,22 27:21

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[see - software]**                                                    Page 35

36:12 45:7,7,15
48:24 49:10 59:2
59:9 64:5,11 70:9
73:22 74:20 84:23
85:10 91:21 92:4
95:23 117:7 120:5
133:10 150:1,8
152:25 187:1
**seeing** 18:5 63:25
**seeking** 14:6
**seen** 9:24 23:15
27:19 44:7,13
52:18 60:14 97:9
97:13,14 121:17
126:1,6 135:17
176:14
**select** 4:16,18
37:16
**selected** 15:9
**selecting** 84:1
**selection** 87:4
164:22 171:16
**selections** 125:7
**sell** 21:10
**senate** 4:15 30:22
31:6 32:1,8 37:7,8
37:16 40:20 43:16
43:23 63:23
113:10 134:20
**sense** 56:16 115:5
185:10
**sensitive** 161:16
**sent** 12:4
**sentence** 7:21
37:22 44:6 48:17
48:18 63:13 64:6
77:11 103:25
104:10 105:23
134:3 135:21
147:8 161:14,19
171:17

**separate** 71:8
**september** 42:23
**sequential** 70:24
**sequentially** 70:17
**serbian** 169:13
170:20
**series** 46:13 52:12
52:13,17,19 81:9
**serious** 113:13
160:22,25
**seriously** 145:7
**served** 66:1
**server** 104:18
150:12,19,24
161:6 170:13
189:25
**servers** 122:24
123:8 189:20
190:6
**service** 4:12 23:2
29:21 162:1
**services** 11:11,12
20:20 21:2,5,14
24:1,4 51:18
161:8 171:11
**serving** 34:6,11
**session** 25:13
**set** 50:4 56:25 57:6
57:10 75:10 97:10
97:13,25 98:1,22
124:9 155:15
167:8
**setting** 74:5
**setup** 106:7
**shape** 46:11
**share** 36:16
**shelf** 98:4,9,13,17
141:6,13,15,16
**shield** 169:23
**shift** 122:12

**ship** 141:19
**shipping** 141:18
**short** 121:7
**shorthand** 194:5
**shows** 126:10
177:8
**sign** 145:3,4,10
**signature** 10:21
194:23
**signed** 55:23
**significant** 17:22
27:9 29:5 39:3
44:25 83:7 87:24
98:10 104:25
106:6 112:21
151:11 159:21
167:16 171:3
183:22 184:24
185:7,10,10
186:20
**significantly** 85:21
118:6 152:12
153:13 183:13
**signs** 182:10
184:15
**similar** 37:23
64:14 67:7 69:17
138:2,10 148:21
192:14
**similarly** 136:11
**simple** 55:9 71:5
139:19,21
**simply** 51:23 52:1
58:19 143:16
**simulated** 182:15
**simultaneous**
179:5
**simultaneously**
170:14
**single** 62:14

**site** 23:9
**sitting** 40:7,15,23
41:15 62:14 114:6
155:24 159:22
168:20
**situation** 11:16
23:15 74:4 108:16
110:14 111:13
144:10 155:17
**situations** 11:15
22:4
**six** 123:10
**size** 139:8
**skimmed** 13:15
**skip** 100:11
179:25
**slate** 183:12
**slates** 184:2,3,4
**slower** 164:1,6
**small** 39:2 45:15
45:18 49:16 184:1
**smaller** 33:25
127:1,10 155:14
186:25 187:1
**smart** 165:6,18
**social** 66:7 112:13
**software** 21:6,10
51:16 52:25 58:18
78:24 88:6 98:5
98:10,23,24,25
99:11,14 102:4,8
102:12,15,19
118:22 119:13,15
119:16,20,21
122:2 123:7 132:3
137:16,17 138:15
138:18,19,20
139:8 140:1,2,10
141:6,7,9,9,13,15
141:17,22,22
142:1,4,7,10,12,15

Case 1:18-cv-05391-SCJ    Document 401-1    Filed 06/27/20    Page 232 of 243

J. Alex Halderman , Ph.D.                          February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[software - states]                                          Page 36

142:25 143:13,13
143:17,17 144:7
144:22 145:1,12
145:13,16,16
148:15,24 149:6
149:20,21,22,25
150:20 151:12
153:4 158:12,22
158:23 169:3,17
169:21,25 170:4,6
170:7 171:9
172:14 173:11
174:8 175:2,2
177:9 179:4 180:3
188:5,20,23
189:10
**solution**  55:12,25
**solve**  72:4
**somebody**  61:17
  111:25
**somewhat**  98:8
  154:17
**soon**  132:21
  174:19 184:12
**sophisticated**
  77:12 78:9 81:5
  88:3 114:25
  116:12,22,23
  117:15 119:2
  136:14,17 143:21
  145:19 174:13
  175:6 176:4,8
**sorry**  11:1 16:23
  17:9 18:16 28:3
  45:4 50:13 59:18
  60:20 67:21 70:2
  73:7 79:21 111:17
  127:4,7 148:23
  161:18 170:18,19
  186:17 187:12

**sort**  71:6 85:16
  99:24 110:1 148:2
  189:23
**sorts**  11:22
**sos**  190:5
**sounds**  144:21
**source**  98:5,10,23
  98:25 99:14,19
  100:1,2,2 137:18
  138:6 141:13
  146:9 160:13
**sourced**  172:4
**south**  27:22 61:15
**space**  52:4 88:25
  102:17,18 119:19
**spared**  31:18
**speak**  26:3 113:9
  114:20 145:8
**speaking**  83:22
**speaks**  162:15
**special**  79:17
  113:11
**specialized**  79:12
  79:16,24 80:2
  81:8
**specific**  11:15 14:7
  62:11 63:19 73:5
  82:20 84:12 92:17
  98:19 106:21
  117:17 144:14
  149:23 153:9
  184:9
**specifically**  9:5
  35:4 43:17 75:22
  83:5,22 103:22
  118:5 121:25
  130:10 133:11
  137:20 150:12
  153:7 172:14
  173:20

**specifics**  76:20
  135:2 143:8
**speculate**  14:10
**speed**  69:15
  164:10
**spend**  23:22
**spent**  12:1 147:21
  182:5
**spike**  128:14,19
  129:16
**spoke**  9:12,12,15
**spoken**  15:16,24
  16:4,7
**sporadic**  186:10
**spotted**  162:10
**spread**  39:16,22
  46:8 135:13,19,23
  166:18 170:9,9
  190:5
**spreading**  112:12
  167:17 179:4
**staff**  43:2 51:16
**staffer**  68:15
**staffers**  37:11
**stages**  109:8
**stake**  114:10
**stamping**  48:23
**standards**  48:8
**standpoint**  34:1
  71:18,19,20 74:10
  83:21,23
**stands**  47:13
**stark**  85:13 179:13
**stark's**  179:18
**starkness**  85:16
**start**  14:22 29:19
  52:21 77:5 100:12
  107:20
**started**  7:2 12:14
  17:17 61:24

**starting**  16:25
**startup**  20:23
**state**  1:10,10 6:11
  11:22,24 13:22
  16:16,19 34:2,17
  51:19 58:21 66:23
  76:6 78:8,11,14,20
  78:25 81:3,23
  85:24 86:1 87:11
  105:24 109:23
  110:6,14 113:1,2,3
  116:15 117:10,14
  117:18 119:20
  121:9 124:5,7
  127:12 132:12,15
  135:22 139:24
  143:23 145:20
  146:17 148:4
  159:1,3,4 162:21
  175:6 178:8,11,20
  178:24 183:18,22
  184:19 187:21,24
  189:12 192:6,11
  194:2,6
**state's**  16:8 104:8
  123:1
**statement**  4:10,15
  15:1 19:11 22:7
  22:17 37:16,18
  46:14 49:11 57:19
  77:9 115:1 122:25
  125:13 136:15,24
  139:20 143:16
  152:3 154:3
  161:18,23 170:20
  171:6,15,18 176:9
**states**  1:1 30:16,17
  30:25 32:2 35:13
  35:24 36:2 46:16
  48:6 49:8,14
  51:13 58:16 59:1

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[states - supposed]**                                                    Page 37

59:3,6,9 62:8 68:6
68:9,25 72:10
79:2,3,5,9,14
101:21 102:11,13
102:20,24 103:2
103:22 113:5
115:2,4,5 116:22
116:23 117:19,20
117:23 118:1,8,9
118:12 119:4,17
131:6,22,24
134:21 163:7
**statewide** 49:14,15
**statistical** 69:17
  88:11
**statistically** 88:21
  185:10
**status** 159:11
**statutory** 50:10,20
**steal** 39:17 66:8
  120:12
**stein** 66:7 68:3,5
  68:19
**stenography**
  194:12
**step** 46:22 113:8
**steps** 23:6 116:20
  159:4,12 160:3
  163:15
**stick** 67:18 107:19
**stolen** 40:24 61:1,3
  61:4 62:9
**stood** 186:12
**stop** 138:22
**stopped** 41:10
**stopping** 41:3
  76:14 94:17
**store** 97:20
**stories** 29:8
**story** 4:20 52:10

**straight** 56:25
  57:6,10
**straightforward**
  55:10
**street** 2:4 45:14
**stretch** 33:6
**strike** 40:22 68:20
  111:21,23 112:18
  153:9
**stringent** 153:21
  154:4,16 155:3
**strong** 42:16 64:23
  92:9 110:9 122:25
  175:15 177:5
  181:7
**stronger** 96:18,20
  143:16
**strongest** 55:21
**strongly** 42:20
  110:3,18 122:10
  140:12
**structure** 168:5
**struggling** 35:25
**student** 183:2,3,5
**students** 19:24
**studied** 117:21
  118:10,12,13
**studies** 92:12,15
  92:16 126:12,15
  126:16 180:20
  181:2,9
**study** 5:15 17:15
  82:23 93:17 94:7
  139:14 156:4
  171:25 177:14
  180:13 181:11,13
  182:3,4,5,9,13,25
  184:8 185:2,6
  186:9
**studying** 17:15,17
  60:24 79:22 184:9

**stuff** 170:12
**stuxnet** 135:8,13
  135:15,18
**style** 125:16
  172:25
**subcommittee**
  4:11 29:20
**subhead** 60:23
**subject** 78:8 88:3
  89:16 90:9 122:6
  165:1 166:3,3,6,7
  177:17
**subparagraphs**
  117:2
**subpoena** 12:25
  13:2
**subsequent** 30:21
  35:7 180:12,19
  188:14,24
**subset** 28:9 59:22
  184:3
**substantial** 33:22
  35:7 40:4 58:10
  62:12 66:14 90:22
  91:3 159:15 181:5
**substantially**
  109:24
**substitute** 123:7
**subvert** 117:4
**succeed** 65:18
  77:17 79:8 115:9
  127:19 140:6
**successful** 40:14
  113:1
**successfully** 31:16
  45:19 61:8,9,18
  83:10 137:8
  143:21 169:10
**suffer** 37:22
  154:20

**sufficient** 51:25
  125:15 126:17
  128:1,9 129:3
  130:14 152:16,19
  156:25 159:13
  161:25 167:20,23
  172:10 178:8,21
  179:7,21
**sufficiently** 53:20
  115:18 128:8
  129:1 130:1,4,9,15
  136:14,17 153:1
  153:11 155:13
  173:22 174:1
**suggest** 153:8
**suggested** 187:23
**suggestive** 180:23
**suite** 2:12 101:13
**summarize** 77:2
**summarizes** 76:23
**summary** 77:23
  114:21
**superior** 36:19
  85:23 86:4
**supplement** 4:5
**suppliers** 169:4
**supply** 169:1
  171:25 172:1
**support** 64:12
  73:15,24 74:3
  124:15,17
**supported** 42:16
  59:5
**suppose** 12:15
  17:19 24:10 28:23
  51:3 57:14 63:18
  89:9 137:15 148:8
  148:11 163:22
  164:16
**supposed** 12:19

J. Alex Halderman , Ph.D.                                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[sure - takes]**                                                      Page 38

| | | | |
|---|---|---|---|
| **sure**  13:16 17:13 | 72:25 73:11,12 | 147:22 149:3,7,16 | 104:13,18 116:18 |
| 18:7 22:23 23:23 | 74:24 75:5,16 | 152:13,15,23 | 122:17 126:9 |
| 27:19 29:8 33:3,7 | 76:7 77:7,14,22 | 153:2,7,10,14,15 | 131:23 133:8 |
| 46:4 47:10,23 | 78:7,10,13,19,25 | 153:19 154:9,12 | 134:21 135:19 |
| 48:12 59:5 65:7 | 79:12,15 80:5,8,19 | 154:25 155:15,20 | 136:11 137:5,8,18 |
| 70:3 72:19 76:24 | 81:1,6,16,17,20,20 | 156:1,21,23 | 137:19,20,23 |
| 82:22 85:3 89:15 | 81:21 82:9,10,13 | 160:20 161:5,16 | 138:1 139:5,19,21 |
| 94:5 95:8 104:4 | 82:16,17,18,19 | 161:22 162:7,17 | 144:12,14 147:11 |
| 104:20,25 106:2,9 | 83:2,8,12,20 84:1 | 162:19,20,23 | 153:1 159:20 |
| 106:11,11 107:24 | 84:18 85:8,14,15 | 164:19 165:19 | 167:17 175:14 |
| 108:4 111:1 116:3 | 85:19,20 86:9 | 166:19 167:22 | 180:23 181:1,7 |
| 118:5 127:5,10,18 | 87:4,9,20,25 88:2 | 168:5 169:23 | 189:13 |
| 131:6 137:6,19 | 88:4,5,9,25 89:8 | 170:10,12,25 | **sytem**  100:2,3 |
| 140:13,23 141:10 | 89:23 91:1,2,18,19 | 171:10 172:20,21 | |
| 141:17 148:12 | 92:8 93:10,12,25 | 172:23 179:5 | **t** |
| 150:6 152:7 160:1 | 94:24 95:6 97:18 | 180:4,5 187:2,24 | **tabulated**  61:15 |
| 162:9 168:2 169:9 | 99:21 100:1,6,19 | 190:5,21 191:11 | 82:12 |
| 170:24 174:5,7,20 | 100:20,21,22 | 191:23,25 192:2,4 | **tabulating**  62:23 |
| 181:23 | 101:13,24 103:1,5 | 192:16,17 | **tabulation**  73:3 |
| **surefire**  128:3 | 103:10 105:1 | **system's**  82:2 | **tabulators**  63:15 |
| **surprise**  65:4,6,7 | 106:4,25 107:7 | **systematic**  66:5 | 63:17 |
| **surrounding** | 108:20 109:19 | 156:25 | **take**  7:15 33:3,5 |
| 121:10 | 110:2,7,8,20 | **systematically** | 36:14 37:1 41:2 |
| **susceptible**  138:17 | 112:15 114:1 | 57:23 | 58:20 75:9 90:25 |
| 187:25 | 116:15 117:16 | **systemic**  156:7 | 107:9 116:20 |
| **swore**  61:22 | 119:13,15,16 | **systems**  5:14 | 132:21,22 145:6 |
| **sworn**  6:6 194:9 | 121:10,20,21 | 15:22 19:4 20:9 | 156:12 157:11 |
| **system**  8:14 20:4,6 | 122:3,6,14,19,20 | 20:25 22:2 30:15 | 166:9 173:7 |
| 20:11,12 21:24 | 122:21,22 123:2 | 33:12,13,16 39:23 | 174:19,20 185:25 |
| 23:17,20 26:14 | 124:1,2 125:2 | 44:16 45:16 46:2 | 186:3,8,13 |
| 29:2,3,6 30:20 | 126:4,5,8 131:18 | 46:3,5,8 53:12 | **taken**  1:18 6:10 |
| 31:3,4,7,8,10 32:6 | 132:15,16 133:4,9 | 54:18 56:3,10 | 7:3 13:10 37:4 |
| 32:14,18 33:18 | 133:14,16,17 | 58:3 59:15 60:4 | 42:10 60:5 91:24 |
| 34:2,3,8,9 38:20 | 134:2,14,17,24 | 62:16,19 63:6,20 | 93:4 96:4 127:6 |
| 38:23 39:3 42:12 | 135:1 136:1,2,4 | 70:21,25 72:18 | 133:1,24 159:4,12 |
| 45:24 47:16,17,19 | 137:4,7,22,25 | 74:21 79:23 81:23 | 162:11 163:15 |
| 47:21,24 48:9,10 | 139:6,15,16,18,22 | 82:1,6 83:13 85:5 | 167:19 172:10 |
| 49:1 51:4 54:2 | 140:8,18,19 | 87:13 90:4 92:8 | 174:23 192:23 |
| 55:11 56:13 59:16 | 141:24,25 142:3 | 93:1 97:2 98:6 | 194:8 |
| 62:4 65:2 67:14 | 142:15 143:11,22 | 101:17,19,20 | **takes**  157:13,16 |
| 69:14,25 72:23,24 | 146:8,10,12 147:2 | 103:9,13 104:11 | 187:5 |

J. Alex Halderman , Ph.D.                                February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[talk - think]**                                                    Page 39

| | | | |
|---|---|---|---|
| **talk** 7:7 8:2 9:10 12:11 16:24 28:4 29:18 37:6,19 52:5 76:16,18 80:16 84:11 104:10 113:22 122:16 125:5 133:3 135:5 136:4 141:5 158:4 160:19 169:11 175:9 | **taylor** 2:11 **taylorenglish.com** 2:15 **teach** 80:15 191:20 **teaching** 19:7 138:22 **tech** 15:24,25 **technical** 11:18,21 17:21,22,25 32:3 41:3 64:22 117:17 136:7 159:13 163:5 172:15 | 63:2 67:13 87:12 94:20 111:1 112:17 131:11 144:15 165:1,3,22 167:9,15 183:16 184:21 185:11 186:24 **terrible** 170:12 **test** 146:22 150:7 177:9,17 **tested** 98:18 101:3 101:6,9,12,15 173:2 188:19,23 | 164:14,17 177:1,5 177:19,21,24 **tests** 101:21,23 147:5 150:13 **texas** 8:25 **text** 125:10 126:8 **thank** 54:12 111:19 132:12 187:4,20 193:2,4 **theory** 61:1 **thesis** 17:4,10 **thing** 42:6 59:2 61:21 72:3 96:9 110:1 126:19 135:4 155:9 179:23 |
| **talked** 9:18 28:6 38:3 53:22 65:10 86:10,14 88:2 111:24 114:14 125:24 179:22 189:20 | **technically** 92:16 **techniques** 84:16 **technological** 72:7 **technologies** 27:2 **technology** 19:15 24:18 26:17,23 39:22 72:13 82:15 114:23 115:2,4 116:8,17 117:4 118:14 140:20,21 140:22,25 164:7,9 | **testers** 149:12,14 **testified** 6:7 29:20 45:3 **testify** 37:12 194:9 **testifying** 40:20 63:23 192:16 **testimony** 16:10 16:18 29:18,19,22 30:3,19,21,22 31:2 32:5,8 37:7 41:5 41:24 42:4 44:18 44:21,23,24 47:14 | **things** 22:9 31:24 51:18 53:24 64:12 76:16 77:2,19 78:11 81:10 90:1 93:15 100:7 110:19 111:4 114:5 118:21 129:22 132:14 135:13 140:11 149:7 153:4,6 |
| **talking** 23:10 47:8 48:14 81:4 88:19 169:5 173:20 **talks** 63:22 144:17 149:5 **tamper** 175:10,13 175:17 **tampering** 43:11 173:10 | **tell** 17:8 22:22 26:4 51:22 52:19 52:21 82:25 124:9 143:24 144:6,15 147:7 164:17 191:8 **ten** 33:3 137:24 185:1 | 48:4 63:7,12 83:11 103:4 105:5 106:13 110:5 122:5 125:15 131:19 135:10 137:21 140:16 145:12,15,18 146:17 159:17 162:6 169:12 | 159:15 160:13 179:23 182:10 186:11 190:16 **think** 5:10 8:25 11:16 15:3,5 16:15 22:1,8 25:1 28:18 31:5 32:11 32:16,19,25 33:1 |
| **target** 114:5,8 122:10 140:5 **targeted** 14:7 30:20 31:10 46:16 77:8,12 88:3 89:17 113:5 134:17,22,24 135:6 | **tend** 148:15 **tends** 141:10 **tenured** 18:19 **term** 143:5 **terminology** 111:11 | 170:11 175:3,16 190:18,20,25 194:11,15 **testing** 8:21 146:9 146:15 147:5,9,9 147:14,15,24 148:4,21 158:13 | 38:3 39:24 40:4 42:5,13,17,18 47:12,18,19 49:5 57:25 58:1,10,25 59:11,25 60:21 61:6 62:11 64:11 65:5 66:12 70:8 |
| **targeting** 30:14 31:9,22 46:20 78:8 90:10 113:6 **taught** 19:8 **tautologically** 142:3 150:16 | **terms** 8:16 19:7,21 26:13 29:1 44:10 45:22 49:13 59:11 | | |

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[think - trying]**                                                    Page 40

71:2 74:9,11,22
75:17 76:6 77:20
77:22 79:24 80:3
83:16 84:3,19
88:2 89:10,25
91:12,21 92:5,5
93:23 94:1,2,16
97:4,14 98:7
99:10 103:16
104:7 105:9,22
107:3,11,17 108:3
109:15,21,24
110:19 111:17
112:16,18 113:16
115:3 122:22
123:11 128:11,23
129:2 134:22
135:17 136:6,18
141:2 145:3
146:19 151:10
152:7 154:15,21
154:22,25 155:11
155:21 159:20
160:12,21 162:15
164:5 166:9 167:6
171:12,15 175:1
177:17 179:21
188:4 191:3,4,19
**thinking** 73:23
74:1 76:13 90:23
**third** 25:8 37:21
38:18 41:11 48:11
48:21 59:13 63:21
64:1 65:16 77:14
134:3
**thoroughly** 109:16
**thought** 16:20
53:25 56:4 57:14
71:2 80:22
**thousand** 8:12

**threat** 79:25 119:2
190:13
**threats** 43:10,10
169:1
**three** 30:13 33:9
49:17 68:8,9
69:24 138:14
**threshold** 92:1
93:17,20
**throw** 127:14
**thrown** 29:9
111:11
**tie** 70:18
**time** 12:1,3 18:4
18:10 23:23 36:14
42:1,5,18 48:20,23
54:21 57:25 59:20
61:17,23 62:6
70:16 75:9 121:7
141:18,20 142:10
148:1 157:23
166:9 179:8 193:2
**timeline** 11:19
**times** 4:20 7:19
52:6,10,14 53:2
54:22 70:19
137:24 185:1
**timing** 18:2
178:19
**tipping** 92:2,4,5
**titled** 17:5 52:10
60:20
**today** 7:2 8:3,8,9
8:18 9:4,6,11,18
27:6,7,10 40:7,15
40:24 41:15 42:9
58:7 62:14 119:15
121:22 138:25
141:9 153:3
157:20 159:5,10
159:22 168:20

193:2
**told** 86:15,16,17
86:19 125:24
**tongue** 120:21
**top** 18:16 39:11
45:6,9 55:9 69:24
77:3 92:15,24
94:3 144:14
147:20 150:2
182:8
**topic** 17:9,11
24:19 26:19 54:4
54:20 185:16
**topics** 19:23 26:5
43:6,7,8
**total** 39:4
**totally** 7:22 11:2
91:22
**totenberg** 67:6
**totenberg's** 9:9
**touch** 29:3 54:20
**touches** 53:9
177:17
**track** 170:12
**trade** 72:3 89:6
99:13,19
**trail** 36:23 47:5
53:17 115:7 128:5
136:20,20,21
140:12,13
**trails** 36:7
**training** 79:17
**transcribed**
194:13
**transcript** 7:14
194:15
**transcription**
194:14
**transferring** 159:1
**transmission**
106:1,5,14,21,23

107:1,3,8,9,12
109:6
**transmit** 105:24
**transported** 29:10
**travel** 24:3
**trench** 66:17
**trial** 6:16
**tricky** 22:7
**tried** 43:1 71:2
109:2 149:10
150:8
**tries** 93:8
**trigger** 31:20 41:7
41:9 114:15,18
**trisha** 1:22 194:5
194:24
**trivial** 22:2
**true** 28:17 34:8
38:3 47:15,16
48:8,10 61:6
72:15 115:1,3
117:13,16 125:2
129:2 131:16
132:12,17 137:11
137:13 138:17
139:10 148:24
152:20 153:4,6,14
170:7,14 171:9,15
172:20 176:16
178:1,5 194:14
**trump** 68:10
**trust** 38:8 140:22
**trusted** 23:8
**truth** 194:9,10,10
**try** 116:20 127:2
127:14 129:15
149:11 177:16
191:17
**trying** 20:13 23:19
23:23 58:22 66:8
74:13 82:2 84:7

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[trying - use]**                                                    Page 41

85:3,11 88:7 89:1
93:9 95:19 143:10
152:22 156:15
192:13
**ts** 66:22 67:10
95:12
**tsx** 67:10 95:13
**tuesday** 1:21 6:2
**turn** 25:8 37:19
39:11 44:3 45:2
51:12 55:8 57:18
58:14 62:20 69:23
96:8 100:10 127:4
**turning** 133:3
**turns** 84:18
**twister** 120:21
**two** 15:25 16:2
31:23 39:19 49:17
59:14 63:21 69:24
70:22 71:8 115:14
125:8 126:12,16
148:14 158:5
180:20 181:9
**type** 22:25 67:8
73:19 95:20
120:25 125:1
129:23 152:4
162:6,12
**types** 17:14 53:23
82:1 87:19 106:14
106:18 125:8
130:19 132:14
160:17
**typical** 23:19
**tyson** 2:10 3:5 6:9
6:20,23 9:21 10:8
10:14,17 11:2,3
25:4 27:14 30:1
30:11 37:5,14
43:22 45:8 52:8
55:4 56:23 60:6

60:10 69:9 70:6
96:5,6 97:8 107:5
127:9 133:2
174:24 182:24
192:21,24 193:1

**u**

**uh** 7:13,13 176:17
**ukrain's** 113:24
**ukraine** 62:2
**ukrainian** 113:23
**ultimate** 90:24
**ultimately** 22:16
29:2 53:10 88:14
140:7 148:3 152:1
152:20 153:18
155:6 164:8 185:6
**un** 61:16
**unacceptable**
92:20 157:5
167:21 168:3,10
168:14,22
**unauthorized**
161:14
**unaware** 176:24
**unclear** 146:7
**uncovered** 74:23
**underestimated**
10:25
**undergrad** 17:18
**undergrads**
138:23
**undergraduate**
16:25 17:4
**underlie** 87:4
**underneath** 57:17
**understand** 7:25
20:24 21:7,11,21
47:14 85:3,11
88:7 125:19
133:16,19 143:18
147:25 152:22

156:15 162:25
163:11 184:11
**understanding**
35:9 46:17 51:8
51:11,18,21
100:21,23 101:24
104:8 105:18,20
107:23 123:17,19
124:2 125:25
133:8 155:18
159:8 162:18,22
165:7,21 178:13
178:24
**understands** 21:13
**undertaken** 123:9
**undertook** 68:12
**undesirable** 91:6
**undetected** 83:4
125:12 126:18
**unencrypted**
151:14,15
**unfortunate**
191:10
**unfortunately**
41:17 79:5 90:4
110:9 115:22
116:21 146:16
148:20 157:16
178:5
**unique** 173:12
**united** 1:1 62:8
68:25 72:10
131:22,24
**universal** 153:12
**university** 5:15
9:14 18:14,15,19
18:23 21:23
189:12
**unmistakable**
186:13

**unpatched** 144:9
**unredacted** 44:6
**unrelated** 87:5
**unsigned** 10:13
**unsuccessful**
61:11
**unsuccessfully**
45:16
**untraceable** 67:12
**unwise** 141:2
**update** 104:12,13
133:13 142:11
159:11,13 162:1
**updated** 104:15,16
104:21 162:7
**updates** 141:20
142:17
**updating** 51:16
**uploaded** 104:18
**urge** 173:13
**usability** 25:13
26:4,9,12,14
**usb** 107:19 151:2
**use** 6:17 26:17,23
27:2 35:13 42:6
46:1,4 58:16
59:14 69:19 71:6
73:15 79:2,3
82:20 84:16 89:13
89:22 90:13 91:10
92:2 97:18 98:4
102:11 104:1,2
105:15,20 111:3
116:19 119:15
121:6 122:15
127:2 128:13
132:6 140:20
141:10,12,14,16
143:25 145:24
153:12 154:19,24
156:5 162:3 164:7

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[use - voters]**                                              Page 42

165:25 168:21
173:18 176:5,12
177:15 182:9
184:2,3,4 185:22
**users** 26:21
**uses** 33:19 81:17
81:21 155:2
**usually** 107:23
126:22 187:8
**utilize** 38:24 39:1
153:23

**v**

**vacant** 144:18
145:8
**valid** 97:23
**validation** 35:5
**valuable** 191:19
**value** 93:22,22
174:8,9 175:24
176:1 191:16
**variabilities** 50:6
**variation** 129:19
**variations** 129:20
**variety** 77:6
**various** 29:10
54:19 100:25
114:5 179:22
183:7 190:16
**vast** 184:4
**vector** 87:8,10
**vectors** 80:3 82:7
82:8 87:12
**vendor** 46:8
119:19 159:23
160:9
**vendors** 39:22
51:17 119:3 160:5
**verbal** 182:10
183:8,11,25
184:14,18,20
185:2,5

**verifiability**
157:22
**verifiable** 26:11
27:1 36:7,23
110:24 111:5,6,11
**verification** 24:13
24:16,17 25:14
26:5 35:6 83:8
157:12 180:20
184:10,21
**verified** 5:12 47:5
96:12,15,17,17
97:2,21 110:18,22
110:24 111:5,7,8
124:11 156:19
**verify** 38:15 83:10
111:7 129:4
157:25 181:12
182:11
**verifying** 83:5
110:10,11 111:12
128:25,25 156:18
157:23 183:18
**versa** 103:10
**version** 10:13
97:14 102:23
103:20 141:18,19
142:6,7,16 144:1
146:22,23,24
188:20,24,24,25
189:9
**versions** 102:13,19
102:23 103:21
144:4 146:12
148:15,15
**versus** 16:19 65:1
65:15 81:16,21
83:1 85:5 87:18
98:14,23 99:14
102:23 103:21
129:13 164:4

171:21 174:8
177:18 186:25
**viable** 190:13
**vice** 103:10
**victory** 186:15,20
186:22,25,25
187:1
**video** 52:6,11,13
52:19,22,23 53:3,6
54:22 67:2,12
**videos** 52:16,18
**view** 42:8,13 57:14
65:22 104:12
185:21
**views** 66:13,14
91:13,15,16
101:17
**vigo** 111:24
**violated** 13:22
**viral** 188:23
**virtue** 20:11
**virus** 126:2,7
135:8 188:18,19
**visibility** 24:7
112:22
**visible** 191:9
**visited** 121:12,16
**visiting** 112:13
**vladimir** 41:8
**vote** 5:9 47:2
60:20 62:23 63:15
63:17 71:16 90:21
105:16,19 112:7
113:24 131:7
177:11 188:9
**voted** 111:18
**voter** 25:13 26:5
30:15,20 31:3
32:3,6,14,18 35:5
36:7 45:24 46:2,5
47:5 60:4 70:17

83:8 85:25 86:11
97:20 102:6,9,15
103:10,13 104:1,3
104:12,14,15,16
104:16,17,21,22
104:23 105:3
110:18,22,24,24
111:6,7,7,8,11
117:5,10,14,20
118:1,13,19 119:3
119:18,22 120:17
120:23 129:17
133:18,21 140:13
141:1 157:9,11
158:3 160:10,20
161:3,9,16,21,24
161:25 162:1,16
162:18,20,23
163:18,23 165:20
177:10,10 180:20
184:9
**voter's** 125:6
**voters** 5:16 13:23
26:21 33:20,23,24
33:25 36:24 38:17
42:2,7,12 59:23
61:19 70:19 73:14
73:24 74:6 79:2
81:19 82:11,17,25
83:5,9 86:22
91:20 104:11,13
105:11,15,19
110:10 111:12
119:24 120:13
126:10 128:1,8,24
129:4 130:14
134:9 136:21
140:12 153:13,15
154:19,24 155:3,9
155:11,14,18
156:3,6,16,18,19

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[voters - wireless]**                                                      Page 43

156:23 157:15,23
157:25 161:10
162:4 163:21
177:17 179:7
180:10,14 181:12
182:5,10 183:9,13
183:18 184:3,5,14
185:8,19 186:1,23
**votes** 39:17 40:24
  44:7,18 53:1
  61:15,19 64:24
  65:4,5 70:16
  71:23 91:7 97:21
  105:12 112:12,19
  113:11,15,17,20
  177:18
**voting** 5:12,13
  15:9,10 18:4,9
  26:11 27:1 33:12
  33:20 36:3 37:21
  39:14 40:25 43:11
  44:8,21,23 47:4,16
  47:17,18,21 52:12
  52:24,25 53:12,16
  54:8 56:3,9 60:25
  61:5 62:9,16,18,23
  63:4,5,14,17 66:18
  66:20 67:13 70:19
  70:25 73:10,25
  76:8 79:23 82:6
  83:12,13 92:8
  94:25 95:6,8,12
  96:13,15,17,17
  97:2,3,21,23 98:6
  99:13 100:21
  101:19 107:21
  110:7 114:23
  115:2,4 116:18
  120:15 124:12
  131:15,18 134:10
  136:11 137:4,7,19

137:23,25 140:17
140:20 142:14
163:12,25 166:19
175:25 176:16
178:9,22 181:21
181:23,24 191:5
**vouched** 23:8
**vouches** 23:4
**vs** 1:7
**vulnerabilities**
  20:1,2,9,22,25
  21:20,24 22:3,6,9
  22:12,15 24:8
  38:1,19 43:5
  45:13 80:8 88:9
  92:17 99:6 103:1
  112:14 116:8
  119:6 139:10,12
  139:25 140:3
  143:2,3,12,14,19
  144:6,10,12,13
  147:7,10,11,13
  148:16,19,25
  149:3 152:21
  157:11 159:18,19
  160:23,25 161:1
  161:15 189:19
**vulnerability**
  24:11 38:5 90:19
  143:4,4,5 144:9
  168:16
**vulnerable** 33:12
  35:24 58:23 118:3
  118:7,10 138:18
  144:6,23 180:2
  192:18
**vvpat** 60:4
**vvpats** 36:7,15,18
  180:23,25 181:2
**vvsg** 48:8

**W**

**wait** 7:11 30:10
  97:10 128:16
**walk** 17:2 44:2
  100:13,25 146:21
**walking** 45:14
**want** 5:5 7:1,15
  8:1 17:2,12 20:21
  22:12 33:3 37:6
  44:2 49:16,19
  52:3 57:18 69:7
  76:16,17 77:2
  110:21 116:25
  134:9 168:2
  181:10 191:2,3
**wanted** 56:25 57:6
  96:9 97:17 100:13
  109:16
**wanting** 17:15
**wants** 51:4 148:4
**washington** 2:5
  5:1 54:23 55:5
  67:5
**way** 7:16 10:2
  20:1,12 29:4
  31:14 40:10,13
  41:20 42:4,20
  46:25 50:7 51:22
  53:1 65:8 67:10
  67:16 71:2 75:12
  84:8,25 86:21
  87:2 94:22 97:23
  109:5 125:7
  126:22 127:24,25
  128:3,6,21 129:15
  132:10 133:13
  135:18 140:4,17
  154:25 155:25
  156:9,9,13 157:25
  163:25 169:15
  173:4 183:17

186:12 190:2,2
191:9,10 192:12
192:13
**ways** 20:14 84:14
  105:3 135:7
  140:21 177:15
**we've** 9:22 10:5
  25:5 28:6 30:2
  37:15 43:20 46:20
  49:6 52:9 55:1
  57:1 60:8 69:7
  79:8 80:11 90:13
  102:1 109:15
  133:7 136:6,16
  146:25 160:20
  175:1 179:21,23
  182:22 188:1,14
**weakness** 70:13
**weaknesses** 37:23
**website** 4:6,7 23:5
  23:10 25:7 27:15
  97:15 160:23
**websites** 23:5,14
  112:13 161:1
**week** 23:13
**weeks** 122:15
**weigh** 85:3
**welcome** 185:16
**wenke** 15:25
**went** 8:20 178:2
**whatsoever** 38:24
**wick** 1:18
**widely** 102:12,16
  169:25 170:4,6,7
**wifi** 163:13
**wild** 72:14,15
**willing** 57:8 73:24
  88:15 104:9
**winner** 126:18
**wireless** 47:6
  163:8

Veritext Legal Solutions

J. Alex Halderman , Ph.D.                    February 25, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[wisconsin - zero]**                                              Page 44

| | |
|---|---|
| **wisconsin** 58:13 | **worry** 86:18 |
| 65:19,24 67:25 | **worse** 108:16,22 |
| **wise** 99:15 | **worst** 109:4 |
| **wishes** 142:10 | **write** 138:20 |
| **withstand** 39:4,7 | **writing** 59:1 61:24 |
| 114:24 115:11,19 | 194:11 |
| 116:1,12 117:1 | **written** 4:9,14 |
| 145:19 | 30:3,22 35:17 |
| **witness** 3:3 45:7 | 36:12 37:18 42:18 |
| 127:7 194:7,12,16 | 51:23 54:23 |
| **won** 68:9 | 138:15,18 141:9,9 |
| **wondered** 126:19 | 177:12 |
| **wonderful** 10:24 | **wrong** 57:23 62:5 |
| **words** 13:19 51:24 | 65:14 90:5,18 |
| 51:24 | 97:16 119:25 |
| **work** 7:24 8:14 | 127:23 130:24 |
| 11:6,17,17,18,22 | 156:13 162:5 |
| 11:23 13:25 15:16 | **wrote** 56:18 57:3 |
| 17:1,4 19:12,13,14 | 65:12 |
| 19:23 21:22,23 | |
| 22:4,25 24:19 | **y** |
| 52:4 65:8 86:21 | |
| 96:22 115:22 | **y** 21:9 |
| 116:7 124:17 | **yeah** 46:25 70:7 |
| 180:22 185:3 | 76:12 112:10 |
| **worked** 68:15 | 138:3 174:20 |
| **workers** 107:19,22 | 187:4,13 |
| 108:2 109:7 | **year** 12:16 30:6,8 |
| 135:23 184:14 | 30:9,22 89:20 |
| **working** 8:5 11:21 | 123:20 147:22 |
| 17:17 18:8 124:11 | **year's** 57:20 |
| 124:14 129:22 | **years** 30:13 79:24 |
| 161:7 175:21 | 101:19 111:3 |
| **workings** 158:20 | 158:5 |
| **works** 172:13,25 | **york** 4:20 52:6,10 |
| 173:4 | 52:14 53:2 54:22 |
| **world** 134:2 | 57:11 |
| 170:17,21 | **youtube** 67:12 |
| **worlds** 23:11 | |
| **worried** 106:10 | **z** |
| 110:2 | **zero** 21:24 |

Veritext Legal Solutions

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.