IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia, *et al.*, <br><br> Defendants. | Civil Action File <br><br> No. 1:18-cv-05391-SCJ |

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF
DR. MICHAEL MCDONALD AND SUPPORTING BRIEF**

Pursuant to Federal Rule of Evidence 702, Defendants Secretary Raffensperger, the State Election Board, and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le (collectively "Defendants"), submit this Motion to Exclude the Testimony of Michael P. McDonald, Ph.D. ("Dr. McDonald"). This Motion applies for trial and this Court's consideration of Defendants' Motions for Summary Judgment. *See Chapman v. Procter & Gamble Distrib., LLC,* 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (providing that only admissible evidence can be considered on a motion for summary judgment).

## I. Introduction.

Dr. McDonald is an Associate Professor of Political Science at the University of Florida. [Doc. 240, p.1]. Defendants do not contest Dr. McDonald's expertise in the area of election administration generally or his qualifications to testify in this matter. Dr. McDonald's opinions in this case that are based on the analysis of two voter list vendors, however, are grounded in speculation, do not "rest on a reliable foundation," and fail to satisfy the threshold requirement for admissibility of expert testimony under *Daubert v. Merrill,* 509 U.S. 579 (1993).

## II. Dr. McDonald's reports and testimony.

Dr. McDonald has filed three reports in this case. Plaintiffs offered his first report in support of their Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. 84]. On February 17, 2020, he issued a second report and testified at his February 28 deposition[1] regarding the findings in that report. [Doc. 240]. Dr. McDonald later provided a supplemental report April 7, 2020, responding to the report of Defendants' expert Dr. Thomas Brunell and evaluating additional evidence he reviewed concerning Georgia's voter-list-maintenance process. [Doc. 293].

---

[1] A copy of the transcript of Dr. McDonald's deposition is attached as Ex. A to this motion.

### A.   Dr. McDonald's preliminary-injunction testimony and report.

In December 2019, Dr. McDonald provided his first report in this case and testified in support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. At that time, he was asked to analyze the 120,000 voter registrants that the State had "flagged for having no contact with election officials and to find evidence of actual contact between election officials and these registered voters." Transcript of Dec. 19, 2019 Hearing ("Tr."), 22:8-17. He testified that he was "not able to determine what the criteria was that the state applied to generate that list." *Id.* at 23:9-13. This was because he was not sure what the fields in the data files meant:

> we determined that earlier that I don't know what these fields, you know, with certainty are capturing and there's some anomalies in this registration date, so I am not exactly certain what that information is that's contained within that file, that field.[2]

*Id.* at 37:1-5.

He further testified that he was "speculating" as to what the various fields of data on the voter file meant, namely, "Last Voted", "Registration Date," and "Last Contact Date" and was not sure if the "Last Voted" category

---

[2] Notably, Dr. McDonald does not indicate whether he ever learned any additional information regarding what these fields and/or numbers represent in his second report or his supplemental report.

3

included absentee ballots. *Id*. at 35:2-18. He confirmed that he was not opining about the appropriateness of any one moving from the "active to the inactive list" or "to the cancelled list." *Id*. at 37:22-38:2.

    *B.    Dr. McDonald's second report.*

Plaintiffs filed a second report by Dr. McDonald covering the areas in in their expert disclosures that "Dr. McDonald is expected to testify about the Secretary of State's purge or cancellation of registered voters in Georgia, the bases for such action, and the identity and status of those registered voters affected by such action." [Doc. 193, p. 2]. More specifically, Dr. McDonald was asked to "investigate the reliability of the list of 313,243[3] registrants whom the Georgia Secretary of State's office scheduled for removal from the state's voter registration database." [Doc. 240, p.3]. As Professor McDonald testified, and this Court made clear, these registrants were not "purged" from the database, but rather, simply were moved to cancelled status and remain in the State's voter database. [Doc. 188, p.1, n.1]; McDonald Dep., 25:9-27:5.

Dr. McDonald opined that "the Georgia Secretary of State's office cancelled the registrations of, conservatively estimated, 59,866 No Contact

---

[3] Since some registrants were reinstated as active voters before the date of Dr. McDonald's report, the number of registrants he discusses was reduced to 290,134. [Doc. 240, p. 6].

4

registrants who continue to live" at their registration address and "nearly 14,732 registrants" who were "cancelled based upon the alleged NCOA match" not found by the list vendors. [Doc. 240, p. 18]. Dr. McDonald does not conclude that the list is unreliable.

In his investigation of the "reliability" of the State's voter maintenance list, the criteria Dr. McDonald employed was "whether or not that list is reflective of people who are otherwise still residing at the address that they find on their voter registration record." McDonald Dep., 16:3-11. Dr. McDonald focused primarily on two categories of registrants on that list, namely, the "No Contact" registrants and the NCOA registrants (explained below). This case, however, is "the first time" Dr. McDonald has ever "had an opportunity to do an analysis like this." *Id.* at 32:3-9

   1. Dr. McDonald's data sources.

Dr. McDonald's February report is based on four data sources:

(1) The Georgia Secretary of State's "2019 List Maintenance" list "found on the Secretary's website as dated October 30, 2019[4];

---

[4] Despite acknowledging that voters on this list are not "purged" from the Secretary's database but rather, are assigned a different status, Dr. McDonald refers to this list as the "Purge List," a designation this Court has stated was inaccurate [Doc.188, p. 1, n. 1]. Defendants shall refer to this list as the "voter-list maintenance file".

(2) Georgia's statewide voter registration file comprised of a total of 7,424,275 registrants and generated by the Secretary of State for November 15, 2019, referred to by Dr. McDonald as the "Voter File";

(3) The result of a match of the alleged "Purge List" prepared by two data vendors directed by Dr. McDonald "that includes information on whether or not a registrant filed a national change of address ("NCOA") with the US Post Office and the type of form, namely, business, family or individual form and available phone numbers of the registrants; and

(4) A phone survey of registrants on the voter maintenance list Dr. McDonald directed.

[Doc. 240, pp. 4-5]. Dr. McDonald notes that the voter-list-maintenance file is divided into three "Inactive Reasons":

(1) NCOA – "a match of the Voter File records with the United States Post Office's National Change of Address database";

(2) No Contact – "registrants who have not had any contact with Georgia election officials after January 1, 2012"; and

(3) Returned Mail – mail addressed to a registrant returned by the post office as undeliverable.

[Doc. 240, p. 5].

    2.    <u>Dr. McDonald's methodology.</u>

Dr. McDonald merged the voter-list-maintenance file with the Voter File, matching the voter registration numbers common to both data sets. *Id.* He eliminated several groups of registrants to arrive at the list set to be moved from inactive to cancelled status. [Doc. 240, p. 5]. Dr. McDonald then

6

categorized the registrants in terms of race, age and gender. Defendants do not contest Dr. McDonald's analysis of these demographic characteristics of the voter-list-maintenance file.

Dr. McDonald then employed the services of two data vendors to match the voter maintenance list against the US Postal Service's national change of address (NCOA) file. Based upon the matching results from the vendors, Dr. McDonald concluded that 60% of the "No Contact" registrants still live at their voter registration address, but based on an important qualifier:

> ***If the list vendors' NCOA match is accurate***, it is my opinion that Georgia Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact voters who continue to reside at their voter registration address.

[Doc. 240, p. 18] (emphasis added). He goes on to opine "that the Georgia Secretary of State's matching procedures ***may*** identify too many registrants as having filed an NCOA with the US Post Office" and that Georgia "***may***" have been too aggressive in identifying NCOA" registrants. *Id.* In particular, the data vendors identified 14,732 registered voters (13.6%) appearing on the voter-list-maintenance file by reason of NCOA who were not on the Post Office's NCOA list. [Doc. 240, p. 14]. Dr. McDonald, however, admitted that

7

he did not have enough information about Georgia's NCOA process to assess the reasons why these voters appeared on the voter-list-maintenance file.[5] *Id.*

Dr. McDonald "focus[ed] the remainder of [his] report on these No Contact registrants," the 59,866 No Contact registrants identified by the list vendors who are also the subject of the survey performed by the list vendors under his direction. [Doc. 240, p. 14].

Dr. McDonald explained in his deposition that "in order to do any sort of list matching on names and addresses, you would take a name, put it into a standardized format that the post office has, and then you do a match against that database the post office has to look for matches." McDonald Dep., 49:1-7. Yet, "wherever you're doing list matching, you can end up with errors essentially in the matching procedure that you're dealing with." *Id.* at 49:15-19. Referring to the analysis performed by the vendors, Dr. McDonald he goes on to explain that "[a]gain, understanding the nuances of purging procedures and the temporal timing of everything else, that's a guess as to

---

[5] Dr. McDonald later indicated in his supplemental report that he reviewed additional information but still could not reach a level of certainty, saying that all it did was strengthen his "opinion that Georgia's NCOA process ***may*** incorrectly identify people who have not moved." [Doc. 293, p. 6] (emphasis added).

how many that would be there, but those individuals may not have -- be subjected to the list maintenance procedures of Georgia." *Id*. at 81:13-82:21.

    C.    *Dr. McDonald's supplemental report.*

In his supplemental report, Dr. McDonald discusses a document entitled "NCOA List Maintenance Process" which was not a part of his previous analysis, but which he says "further strengthens my opinion that Georgia's NCOA process *may* incorrectly identify people who have not moved." [Doc. 293, p. 7]. Based upon this document, he identifies four possible reasons why NCOA registrants might have been placed on the inactive voter list to support his belief that the "Secretary of State's NCOA match process systematically casts too wide a net and does so unnecessarily" based upon a discrepancy between the State's NCOA match and that of his vendors. [Doc. 293, p. 6].

Dr. McDonald identifies four possible reasons why the 14,732 registrants on Georgia voter maintenance list are not on the US Post Office's NCOA list according to his list vendors:

    1) the use of mailing addresses instead of residential addresses;

    2) the use of first and last names for individual matches;

    3) first names not incorporated into family matches; and

    4) some business moves *may* be treated as residential moves.

9

[Doc. 293, pp. 7-9]. But Dr. McDonald does not identify how many registrants were affected by these possible reasons nor can he say with certainty that Georgia's NCOA process improperly identifies non-movers.

### III. Legal argument.

*A.   The requirements for expert evidence under* Daubert.

Rule 702 of the Federal Rules of Evidence and the standards set forth in *Daubert v. Merrill,* 509 U.S. 579 (1993) govern the admission of testimony by experts:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)**   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)**   the testimony is based on sufficient facts or data;
> **(c)**   the testimony is the product of reliable principles and methods; and
> **(d)**   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702. Expert evidence under Rule 702 is admissible when:

> (1) the expert is qualified to testify competently regarding the matters he contends to address;
> (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

10

*City of Tuscaloosa v. Harcros Chem., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998). As discussed above, Defendants do not challenge Dr. McDonald's expertise in election administration. Rather, Defendants challenge the reliability of Dr. McDonald's methodology and his reliance on the work performed by the two voter list vendors he utilized in his analysis. An expert's scientific testimony must be based on "scientific knowledge" and not just the expert's "subjective belief or unsupported speculation." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1319 n.23 (11th Cir. 1999).

"[T]he task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*". *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005). Under *Daubert*, as the gatekeepers of expert testimony, district courts are obliged to "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Expert evidence must be "genuinely scientific, as distinct from being unscientific speculation by a genuine scientist." *Allison*, 184 F.3d at 1316 (citation omitted). The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert. *Allison,* 184 F.3d at 1306.

> B.   *Dr. McDonald methodology is based on speculation and is fatally flawed under* Daubert.

Dr. McDonald's conclusions that tens of thousands of No Contact registrants reside at their registration address and that thousands of registrants were incorrectly identified by the Secretary of State's office as having filed an NCOA form amount to nothing more than his "subjective belief or unsupported speculation" which is not enough to qualify under *Daubert*. *Allison,* 184 F.3d at 1319 n.23. "[T]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) quoting Fed. R. Evid. 702 advisory committee's note (internal quotations omitted).

Dr. McDonald, by his own admission, is unable to confirm the accuracy of the match list he procured from his list vendors, because his entire conclusion rests on whether a process he did not control is accurate. As he explained:

> ***If the list vendors' NCOA match is accurate***, it is my opinion that the Georgia Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact registrants who continue to reside at their current voter registration address.

[Doc. 240, p. 18] (emphasis added). In addition, according to Dr. McDonald, the Georgia "Secretary of State's NCOA matching procedures ***may*** identify

12

too many registrants as having filed an NCOA form with the U.S. Post Office" and indicates that the number of these voters is again dependent on the analysis by the list vendors. [Doc. 240, p. 18].

In his second report and his deposition testimony, Dr. McDonald is very clear—he cannot confirm the accuracy of the vendors' match lists versus Georgia's processes, which is the foundation on which he bases his opinions. Dr. McDonald testified that he was unable to "analyze the data that was provided by the list vendor to the Secretary of State's office," McDonald Dep. at 45:13-25, that he did not have enough information to know the Secretary's "policies and procedures about how they did their NCOA match," *id.*, that he would need "additional information about what's going on with the list matching procedures that the vendor the Secretary of State is using" and was "just sort of at a loss at this point as to what was actually happening," *id.* at 48:7-17. This is consistent with Dr. McDonald's testimony at the preliminary-injunction hearing wherein he also offered a guess as to what the various fields of data on the report meant. Tr. at 35:2-21.

Similarly, in his deposition, Dr. McDonald continued to confess his lack of knowledge about Georgia's processes for list matching were, explaining that he would:

13

> have to qualify that answer because I haven't been able to analyze the data that was provided by the list vendor to the Secretary of State's office in Georgia, so I'm merely characterizing what I think they would have done. ***I don't know if they looked further back in time.*** I don't know about their policies and procedures about how they did their NCOA match.

McDonald Dep., 45:4-12 (emphasis added). He explains that "[i]t is likely that the L2 and the TargetSmart NCOA match results include registrants who should not be included according to Georgia law." [Doc. 240, p. 12]. But, again, Dr. McDonald still cannot say who he says was improperly on the list or how many names on the list may not be eligible.

Dr. McDonald attempts, unsuccessfully, to cure the deficiency in his NCOA analysis in his supplemental report. Despite additional information, he still utilizes the qualifying word "may" and concludes that the information merely "strengthens [his] opinion that Georgia's NCOA process ***may*** incorrectly identify people who have not moved." [Doc. 293, p. 7] (emphasis added). He admits he "cannot definitively determine every reason for this discrepancy" namely, why 14,732 registrants listed on Georgia's voter maintenance list were not identified as having filed an NCOA form by his list vendors. *Id.* at p. 6. Again, Dr. McDonald cannot say how many people on the list were improperly on the list or identify any particular registrant so

14

affected. Dr. McDonald's supplemental report compounds the *Daubert* deficiencies in his methodology rather than curing them.

*Daubert* requires "good grounds for each step in the analysis – [meaning] that *any* step that renders the analysis unreliable" is fatal to the expert's testimony *Daubert. McClain,* 401 F.3d at 1245; *see also In re Abilify Prods. Liab. Litig.,* 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018) ("[A]n expert cannot merely aggregate various categories of otherwise unreliable evidence to form a reliable theory").

### C. Dr. McDonald's testimony would prejudice the jury and should be excluded.

"The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison,* 184 F.3d at 1311-12. Expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595. "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 exercises more control over experts than over lay witnesses." *Id.* This is precisely the reason why this role is left to the judge and not the jury. While the Court noted that it would be able to

"separate what's different between fact and what [Dr. McDonald] can say expert-wise," a jury in this case is not likely to be able do so. Tr., at 21:10-14.

The criteria Dr. McDonald used to analyze the reliability of the No Contact list is whether the registrants have remained at their registration address. Yet, under Georgia law, "No Contact" does not necessarily mean that a person has not moved. Rather, "No Contact" means that the registrant had no contact with election officials for a specified period and has failed to respond to notices from election officials. O.C.G.A. §§ 21-2-234, -235(b). By connecting individuals placed on the inactive list for reason of "No Contact" data with NCOA data, which reflects movers, Dr. McDonald's analysis would create a scenario where the jury may become confused about the list-maintenance process. Additionally, Dr. McDonald's consistent references to the voter-list-maintenance file as the "Purge List" could lead the jury to incorrectly conclude that once a registrant's status is either moved from active to inactive or inactive to cancelled, they are eliminated entirely from Georgia's voter rolls.

Rather than "dumping a barrage of questionable scientific evidence on a jury, who would more likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be

awestruck by the expert's mystique," *Allison*, 184 F.3d at 1310, this Court should exclude Dr. McDonald's report from consideration in this case.

## IV. Conclusion.

Dr. McDonald's expert opinions are based upon unverified, speculative data. As such, his methodology is not sufficiently reliable, is inadmissible under *Daubert* and should be excluded.

Respectfully submitted this 27th day of June, 2020.

>Josh Belinfante
>Georgia Bar No. 047399
>jbelinfante@robbinsfirm.com
>Vincent Russo
>Georgia Bar No. 242628
>vrusso@robbinsfirm.com
>Carey Miller
>Georgia Bar No. 976240
>cmiller@robbinsfirm.com
>Brian Lake
>Georgia Bar No. 575966
>blake@robbinsfirm.com
>Alexander Denton
>Georgia Bar No. 660632
>adenton@robbinsfirm.com
>**Robbin Ross Alloy Belinfante Littlefield LLC**
>500 14th Street NW
>Atlanta, GA 30318
>Telephone: (678) 701-9381
>Facsimile: (404) 856-3250

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249


Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. MICHAEL MCDONALD AND SUPPORTING BRIEF was prepared double-spaced in 13-point Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

                                           */s/Bryan P. Tyson*
                                           Bryan P. Tyson