# EXHIBIT A



Deposition of:

# Michael McDonald , PhD

*February 28, 2020*

In the Matter of:

# Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3
4    FAIR FIGHT ACTION, INC., et
     al.,
5
             Plaintiffs,
6                                   CIVIL ACTION FILE
         vs.
7                                   NO. 1:18-cv-05391-SCJ
     BRAD RAFFENSPERGER, in his
8    official Capacity as Secretary
     of State of Georgia, et al.,
9
             Defendants.
10
11               DEPOSITION OF
12            MICHAEL MCDONALD, PhD
13            February 28, 2020
14                9:33 a.m.
15           Lawrence & Bundy, LLC
16         1180 West Peachtree Street
17               Suite 1650
18             Atlanta, Georgia
19     Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 2

1                    INDEX TO EXHIBITS

2    EXHIBIT   DESCRIPTION                          PAGE

3    For the Defendants:

4    Exhibit 1   Notice of Deposition                 7

5    Exhibit 2   Expert Report of Michael P. McDonald   7

6    Exhibit 3   Early Voting in 28 States Has

7               Surpassed 2014 Levels               100

8    Exhibit 4   Tweet by @ElectProject             101

9    Exhibit 5   The Untold Story of American

10              Non-Voters                          103

11

12                   INDEX TO EXAMINATION           PAGE

13   By Mr. Tyson                                    5

14

15

16

17

18

19

20

21

22

23

24

25

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3              JEREMY M. CREELAN, ESQ.

4              Jenner & Block

5              919 Third Avenue

6              New York, New York  10022

7              jcreelan@jenner.com

8    -and-

9              KATHRYN WYNBRANDT, ESQ.

10             Jenner & Block

11             1099 New York Avenue, NW

12             Suite 900

13             Washington, DC  20001

14             kwynbrandt@jenner.com

15   -and-

16             LESLIE J. BRYAN, ESQ.

17             Lawrence & Bundy, LLC

18             1180 West Peachtree Street, NW

19             Suite 1650

20             Atlanta, Georgia  30309

21             leslie.bryan@lawrencebundy.com

22

23

24

25

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 4

1    APPEARANCES (Continued):

2    On behalf of the Defendants:

3              BRYAN TYSON, ESQ.

4              Taylor English Duma LLP

5              1600 Parkwood Circle

6              Suite 200

7              Atlanta, Georgia  30339

8              btyson@taylorenglish.com

9

10             (Pursuant to Article 10(B) of the Rules

11   and Regulations of the Georgia Board of Court

12   Reporting, a written disclosure statement was

13   submitted by the court reporter to all counsel

14   present at the proceeding.)

15

16

17

18

19

20

21

22

23

24

25

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                      Page 5

1            MR. TYSON:  This will be the deposition of

2    Dr. Michael McDonald taken by the Defendant,

3    Secretary of State Brad Raffensperger for the

4    purposes of discovery and all purposes allowed under

5    the Federal Rules of Civil Procedure.  As we

6    discussed, Mr. Creelan, we'll reserve all objections

7    except those going to privilege and form and

8    responsiveness until trial or first used; is that

9    correct?

10           MR. CREELAN:  Agreed.

11           MR. TYSON:  Could you please swear the

12   witness.

13              MICHAEL MCDONALD, PhD,

14   having been first duly sworn, was examined and

15   testified as follows:

16                  EXAMINATION

17   BY MR. TYSON:

18       Q    Good morning, Mr. McDonald.  I'm sure

19   you've been deposed many times before; is that

20   correct?

21       A    Yes, it is.

22       Q    You're familiar with our basic ground

23   rules of not talking over each other, giving yes or

24   no answers.  If you need breaks, that's totally

25   fine.  And I have a habit probably unique in this

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 6

1    deposition from other ones of sometimes I'll get to

2    the question mark and you don't know what I've

3    asked, nobody knows what I've asked.  Let me know

4    that, and I'll try to rephrase it in a way that

5    makes sense.

6          A    I understand all that, yes.

7          Q    Thank you.

8               Let's just jump right in and talk about

9    kind of what you did to get ready for the deposition

10   today, and then we'll talk about -- we'll go into

11   your report in a minute, but can you tell me what

12   you did to get ready for your deposition?

13         A    I reviewed the materials in the case.  I

14   discussed those with the plaintiff's counsel in

15   three sessions before we have met today.

16         Q    And were those three sessions consecutive,

17   were they today, yesterday, how frequently were

18   those meetings?

19         A    Correct, they were consecutive.  They were

20   broken apart.  We did them remotely, so by phone and

21   by videoconference.

22         Q    Okay.  And beyond plaintiff's counsel,

23   have you spoken with anyone else about your

24   deposition today?

25         A    I have not.

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 7

1          Q     And if you'll take a look at what's in
2      front of you as Defendant's Exhibit 1.
3                (Defendant's Exhibit 1 was marked for
4      identification.)
5      BY MR. TYSON:
6          Q     Have you seen this notice of deposition
7      before?
8          A     I have not.
9          Q     That's totally fine.  We can set that
10     aside.  That's what we're here for today.
11               MR. CREELAN:  Exhibit 1?
12               MR. TYSON:  Exhibit 1.
13               (Defendant's Exhibit 2 was marked for
14     identification.)
15     BY MR. TYSON:
16         Q     And I'll hand you what we've marked
17     Exhibit 2, the report.  Is this the report that you
18     filed in this case?
19         A     It appears to be so.
20         Q     Great.
21               I think, as we talked about, we're going
22     to kind of go a little bit different order than I
23     would typically go and jump into your report this
24     morning.
25               How did you come to be involved in this

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 8

1    lawsuit as an expert witness?

2        A    Mr. Creelan gave me a phone call and was

3    inquiring about my interest in participating in the

4    lawsuit.

5        Q    And that was in December before the

6    preliminary injunction hearing; is that correct?

7        A    I don't remember, like, when -- I don't

8    know when the -- well, you mean the preliminary

9    injunction hearing where I testified, is that --

10       Q    Yes.

11       A    Okay.  Yes, it happened before that date.

12       Q    And then you were initially asked to

13   prepare a report for the preliminary injunction

14   filing; is that right?

15       A    That's correct.

16       Q    And then subsequent to that injunction

17   hearing and the order, were you asked to prepare an

18   additional report, or was this report as Exhibit 2

19   part and parcel of the initial conversation?

20       A    This -- I was directed to do this --

21   conduct this report and study around that after the

22   preliminary injunction hearing.

23       Q    Have you read the amended complaint in

24   this case?

25       A    I have.

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 9

1      Q      And so can you tell me not as a legal

2    analysis but in your own words kind of what

3    generally this case is about?

4      A      Well, I did not read it in full -- in

5    terms of, like, the whole full scope of it.  I

6    really concentrated on the part that I'm responsible

7    for.  So as I understand it there's a challenge to

8    this -- what I call the purge list or what the

9    Secretary of State's office calls note to general

10   elections or NGE list, and about particularly the

11   use of no contact as a means to remove people from

12   the voter registration file in Georgia.

13     Q      Is your understanding that plaintiffs are

14   challenging that no contact method or all methods of

15   list maintenance?

16           MR. CREELAN:   Objection as to form.

17     A      I understand they're challenging all

18   forms.

19   BY MR. TYSON:

20     Q      Have you read any of the depositions that

21   were taken in this case?

22     A      I have not.

23     Q      Have you read any of the briefs that were

24   filed in this case?

25     A      I have not.

Michael McDonald , PhD              February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 10

1      Q    Did you read Judge Jones's order about the
2   preliminary injunction?
3      A    I have not.
4      Q    In preparing your report, did you contact
5   anyone in Georgia to obtain information for what's
6   in your report?
7      A    I contacted the Secretary of State's
8   office to obtain a voter registration file that's
9   used in my report.  It's also through the survey
10  that we conducted, we contacted registered voters
11  within the state of Georgia who appear on the NGE
12  list.
13     Q    Let's go ahead and turn to the first page
14  of your report there, jump in.  On the first actual
15  physical page, I see that you're at the University
16  of Florida.  Do you have any professional
17  relationship with Dan Smith?
18     A    Yes, I do.
19     Q    And what position does he hold relative to
20  you in the political science department at Florida?
21     A    He is the chair of my department.
22     Q    And how long have you known Professor
23  Smith?
24     A    15 or 20 years.  I've known him for a long
25  time.  Even before I was at the University of

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 11

1    Florida.

2         Q    So on page 1 of your report, you say that

3    your expertise is in election administration.  Could

4    you talk to me a little bit about what expertise in

5    election administration involves?

6              MR. CREELAN:  Objection as to form.

7         A    Yes.  Widely, I would say -- broadly, I

8    would say that involves the general way in which the

9    elections are conducted.  And I can give you

10   examples of the sorts of things that I've done

11   working with election officials to improve the way

12   in which they manage their elections and the sort of

13   research that I've done, published research in that

14   area.  So -- but that's just broadly.  We can get

15   into more detail about the specifics.

16   BY MR. TYSON:

17        Q    I'm assuming that part of the expertise in

18   election administration involves voter lists and

19   kind of the management and maintenance of voter

20   lists; is that fair to say?

21        A    That's correct, yes.

22        Q    I'm assuming in that role you're also

23   familiar generally, I'm not asking for your legal

24   opinion, but as to the requirements of the National

25   Voter Registration Act on list maintenance; is that

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 12

1    right?

2        A    That would be correct, yes.

3        Q    Can you just describe generally your

4    understanding if you were visiting an election

5    official as an election administration expert about

6    what voter list maintenance is required by the NVRA?

7             MR. CREELAN:  Objection.

8        A    Not a legal opinion.

9    BY MR. TYSON:

10        Q    Certainly.

11        A    It's been a while since I've reviewed NVRA

12    requirements, but generally NVRA requires that if a

13    voter has not voted in two federal general elections

14    that they -- election officials may then send them a

15    piece of mail to verify that they continue to be

16    residing at the current address, and if that

17    confirmation mail either comes back with a negative

18    where someone tells that they've moved or if there's

19    no -- in that case election officials can take

20    action on the proper disposition of that

21    registration.

22             If that comes back as a negative, then

23    that can allow the election officials to remove the

24    registered voters from the voter registration list.

25        Q    Again, not asking for a legal opinion, but

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 13

1    if you were visiting a local election official where
2    there were situations that they were required to
3    conduct list maintenance, would you advise them that
4    those exist?
5                MR. CREELAN:  Objection to form.
6        A    Yes.  Yes, they do.
7    BY MR. TYSON:
8        Q    Can you give me some examples of those?
9        A    We just discussed one with respect to
10   federal law, and there are other instances depending
11   upon state law as to whether or not there will be
12   different forms of list maintenance.
13              So, for example, if a state has a felony
14   disenfranchisement provision, you may check your
15   voter registration list against the list of felons
16   and take action as needed on those individuals.  All
17   jurisdictions in the country also check their voter
18   registration lists against lists of deceased
19   individuals, so that's another instance where
20   there's routine list maintenance that's happening.
21       Q    In the election administration arena, are
22   there best practices involving list maintenance?
23       A    Sort of a broad question, so I'm having a
24   little bit of trouble answering it.  There are
25   certainly -- beyond following the law, there are --

Michael McDonald , PhD            February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 14

1   there is an organization called the Electronic

2   Registration Information Center.  I've made

3   presentations to them in the past about the way in

4   which they do their maintenance, and that

5   organization attempts to match voter registration

6   files against other states' voter registration

7   files.  And they do other requirements, but broadly

8   this is what they do, and in that -- they're trying

9   to, again, get at the question whether or not

10  individuals have moved between states.

11          And so the Electronic Registration

12  Information Center, it's also known by its acronym

13  ERIC, E-R-I-C, generally I believe that they have a

14  good procedure that's in place.  I do think there

15  are some issues with it, and I've talked with

16  election officials about the issues they've had with

17  ERIC, but it's -- it's probably as -- being

18  responsive to your question about good list

19  maintenance procedures, what ERIC does is generally

20  regarded in the election administration community as

21  a gold standard or something close to it in terms of

22  sort of best practices beyond what you might find in

23  the law.

24      Q     That's helpful.  Thank you.

25            Do you know if the state of Georgia

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 15

1   participates in ERIC?

2       A    It's my understanding that there's an

3   agreement, but I don't know if -- I think that's a

4   recent agreement, so I don't know all of the details

5   about Georgia's implementation and participation

6   within the ERIC system.

7       Q    You indicate that you are being

8   compensated at a rate of $400 per hour.  Is that

9   your typical rate for expert work?

10      A    Yes, it is.

11      Q    So the plaintiffs aren't being provided a

12  discount off any other rate that you would provide?

13      A    No, they aren't.

14      Q    Do you know roughly how long it took you

15  to put together this report?

16      A    Roughly to put together this report -- I'm

17  having to do some calculations in my head, so just

18  bear with me for a second.  It's been about roughly

19  40 to 50 hours.

20      Q    And have you sent a bill for this case

21  yet?

22      A    I have sent one bill, but that was for the

23  preliminary injunction work, so I have not sent the

24  next bill that's related to this work.

25      Q    Do you recall approximately what that bill

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 16

1  was for the PI work?

2        A    As I recall, it was roughly $10,000.

3        Q    Let's get into Roman numeral I, the

4  summary paragraph.  You say that you were asked by

5  the plaintiff's counsel to investigate the

6  reliability of a list of registrants.  In what sense

7  are you using the word "reliability" here?

8        A    I'm using it in the sense that -- whether

9  or not that list is accurately reflective of people

10  who are otherwise still residing at the address that

11  they find on their voter registration record.

12        Q    So basically assessing, among the 313,000

13  people, how many have moved and how many haven't; is

14  that a fair approximation?

15        A    For the purposes of this report, yes.  I

16  would say yes, that's true.

17        Q    And then are you offering opinions about

18  if the list isn't reliable that the removals were

19  not appropriate?

20        A    That's a legal question, so -- I'm just

21  providing you the evidence of what I've looked at,

22  so I can't provide a legal opinion on that.

23        Q    So it's fair to say then you've analyzed

24  this list, and the legal effect, you're not

25  commenting on that.  You're just saying this is what

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 17

1    I have discovered factually about the list.

2         A    Correct.

3         Q    I know that you utilized a survey for part

4    of this process, and we'll get to that.  Are there

5    other specialized procedures or methods that you

6    used beyond the survey to conduct your analysis in

7    this report?

8         A    Yes.  So I analyzed the data itself that

9    is on the NGE list, matched that with the voter

10   registration file, so that takes some degree of

11   specialized knowledge in addition to the survey, and

12   then, additionally, when we commissioned or when I

13   commissioned the conduction of the survey, I had our

14   organization that ran the survey, an organization

15   called Latino Decisions, request phone numbers from

16   two list vendors.  And those list vendors, in

17   addition to providing phone numbers, also did a

18   national change of address, or NCOA is the acronym,

19   match of the NGE list against the post office's NCOA

20   database, and I also analyzed that in this report as

21   well.

22        Q    So you say in the third paragraph under

23   summary that -- you discuss additional evidence that

24   the purge list includes many thousands of registered

25   voters who continue to reside at their addresses

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 18

1    where they were registered to vote, and ultimately

2    that's -- the evidence of that fact is what your

3    report is about; is that correct?

4              MR. CREELAN:  Objection as to form.

5        A    Yes, primarily that is what the report is

6    trying to address is whether or not the list

7    maintenance purposes or processes in Georgia are

8    indeed identifying people who have moved from their

9    registration address.

10   BY MR. TYSON:

11       Q    And you're not opining on the intent

12   behind Georgia's voter list maintenance procedures?

13       A    Yes, I don't have any knowledge of the

14   intent of the Secretary of State's office behind

15   their list maintenance procedures.

16       Q    Next bullet on the top of page 3 talks

17   about the national change of address matches and

18   compares that with the no contact registrants.  Can

19   you explain a little bit more about what that bullet

20   is summarizing?  I know we'll get into some of the

21   meat of it in a little bit, but maybe just a

22   high-level summary?

23             MR. CREELAN:  Objection as to form.

24       A    Yeah --

25   BY MR. TYSON:

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 19

1      Q    And if you want to wait until we get to

2   the meat of the report, that's fine too.

3      A    That might be the best way to handle that

4   because I am otherwise going to refer you to tables

5   within the report so that I can explain exactly what

6   it is that that bullet point is summarizing.

7      Q    Great.  That makes a lot of sense, so

8   we'll dig in on those particular points along the

9   way.

10          Before we leave page 3, in Footnote 8 you

11   talk about the NCOA form and not responding in 30

12   days.  The way I read this, you're just summarizing

13   the -- your understanding of the law in Georgia; is

14   that correct as to that footnote?

15      A    That is correct.

16      Q    Over to page 4, second paragraph talking

17   about data sources, you reference a statewide voter

18   registration file from November 15th, 2019?

19      A    Correct.

20      Q    Is there a particular reason why that date

21   and not any other dates on the voter registration

22   file?

23      A    That is the date that I obtained a voter

24   registration file that is closest to the date of the

25   production of the October 30th NGE list.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                           Page 20

1        Q     Okay.  I believe we covered this at the

2    hearing, but you obtained that file as part of your

3    work in another case; is that right?

4        A     That is correct, yes.

5        Q     And that was the Georgia Coalition for the

6    Peoples' Agenda case?

7        A     Yes, that is correct.

8        Q     In terms of the data source on your phone

9    survey, have you or do you have full cross tabs on

10   the responses to all questions to that survey?

11       A     Yes, I do, and I provided in discovery the

12   raw data, and I also provided a pared down data file

13   that looks directly at the no contact people who are

14   under contest in this lawsuit, so it's possible to

15   re-create all those cross tabs from the raw data.

16       Q     Backing up briefly to the paragraph above

17   that, can you explain to me the difference in a

18   business, family, and individual NCOA form?

19       A     This is the first bullet point under

20   section 3, just to make sure I understand what

21   you're addressing?

22       Q     I'm sorry, I'm still at the top of page 4,

23   third paragraph, "The third data source is the

24   result," that paragraph.  It references a business,

25   family or individual form.

Page 21

1    A    Okay.  Can you please restate your
2    question for me now that I found the --
3    Q    Sure.
4    A    -- where you were referencing?
5    Q    Absolutely, and I apologize.
6    A    That's okay.
7    Q    My question is just can you explain to me
8    the difference in what a business, family, and
9    individual form NCOA is?
10    A    From my understanding a business NCOA is a
11    move of a business from one address to another, a
12    family NCOA is a move of an entire family covered --
13    everybody covered at that address under that family
14    NCOA, and then the individual would be for an
15    individual's move from a family.
16    Q    Thank you.
17         Let's move into Roman numeral III.  So you
18    list out three different inactive reasons on the
19    purge list.  You say it's your understanding that
20    these inactive reasons refer to the following.  From
21    where did you gain this understanding?
22    A    From the title headings of the NGE list
23    and interpreting what NCOA, no contact, and returned
24    mail might mean.
25    Q    And so you took your knowledge of election

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                          Page 22

1    administration to know what these various fields

2    were?

3         A     That's correct.

4         Q     Let's turn over to page 5.  First you

5    noted a discrepancy at the top of the page of 213

6    records between the records in the purge list and

7    those from the voter file.  Are you not concerned

8    about that difference, or is that too small to make

9    a difference in records of this size?

10              MR. CREELAN:  Objection as to form.

11        A     First, I just want to be very careful

12   about describing what I'm looking at, so I wanted to

13   be sure that you had understood exactly what it was

14   that I was doing for my report, and I'm not

15   concerned about the redaction of 213 records out of

16   313,000 because it's unlikely that that -- that's a

17   large enough number that it would affect the

18   substantive conclusions from my report.

19   BY MR. TYSON:

20        Q     And is that conclusion that it wouldn't

21   affect -- sorry.

22              Is that expectation that those wouldn't

23   affect your conclusion due to the number relative to

24   the whole list?

25              MR. CREELAN:  Objection as to form.

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 23

1       A     Could you restate that for me, please?

2   BY MR. TYSON:

3       Q     Let me try.  I just want to make sure I

4   understand.  I'm not a political scientist, and I

5   know you conduct these kind of data analyses.  So if

6   you're missing 213 records, is it that those 213

7   records you can't draw conclusion based on those,

8   are they not going to affect your conclusion?  I'm

9   trying to understand why you're saying that the

10  absence of those records will not substantively

11  affect your analysis or opinions.

12            MR. CREELAN:  Objection as to form.

13      A     So it's more of the latter that you

14  discussed, which is that these are not a large

15  enough number to substantively affect the

16  percentages that I'm looking at or drawing

17  conclusions from in my report.

18  BY MR. TYSON:

19      Q     Thank you.

20            And you would not conclude, based on the

21  mismatch, that there was any problem with Georgia's

22  voter registration database?

23            MR. CREELAN:  Objection as to form.

24      A     Based on the mismatch, no, I do not draw

25  any conclusions about a problem with the voter

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 24

1    registration database.  As I mentioned in the

2    report, there are valid reasons why those records

3    may be missing in the database.

4    BY MR. TYSON:

5        Q    So then we start our math problems, which

6    are always the challenge for me, so I'll admit that

7    at the outset.  So we take the 313,030 registrants,

8    and we then subtract 293 and further subtract 22,603

9    to get to the universe that you analyzed; is that

10   right?

11       A    Not quite.  There's another 293 I have to

12   subtract out as well.

13       Q    Okay.  And are those the Lowndes County,

14   Georgia, group?

15       A    That's correct, yes.

16       Q    And so the remaining list that you

17   analyzed includes individuals who were on the purge

18   list for NCOA, no contact, and returned mail, and

19   represent the universe of people who were purged

20   from the voter file; is that correct?

21            MR. CREELAN:  Objection.

22       A    Can we break that one down, please?

23   BY MR. TYSON:

24       Q    Sure.  I just want to make sure I got all

25   the pieces.

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 25

1       A    Yeah.  Yeah.

2       Q    So the thing we're discussing, the purge

3  list is the list of people who actually had their

4  status moved from inactive to canceled.  Is that the

5  correct group?

6       A    It is my understanding that the 290,134

7  would be, yes, those people -- inclusive of those

8  people, yes.

9       Q    And it's your understanding that no one is

10 ever removed from the voter file, just that their

11 voting status has changed to canceled, correct?

12           MR. CREELAN:  Objection.

13      A    Yes.  There is a canceled file that exists

14 as well, so information about records that have been

15 canceled are retained within the election management

16 database within Georgia.

17 BY MR. TYSON:

18      Q    Based on your experience in election

19 administration, would you say voters who are on a

20 canceled list are no longer on the -- no longer in

21 the voter registration database?

22      A    No, they are still in the database, it's

23 just that they have a different status than other

24 people who are recorded within the database.

25      Q    And what I'm trying to understand there --

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                              Page 26

1    I know that the term "purge" is used extensively in

2    the litigation and in your report.  Purge, I would

3    understand, is the records are gone, but what you're

4    saying is on the purge list, those individuals are

5    still in the voter registration database, they're

6    just not eligible to vote.

7              MR. CREELAN:  Objection as to form.

8        A    Correct, they are still in the database.

9    They still have a record -- persistent record within

10   the database, yes.  So if we wanted to restore them,

11   it would be possible to restore those records.

12   BY MR. TYSON:

13       Q    Is there a reason why you chose the term

14   "purge list"?

15       A    It's what I just consider what we're

16   talking about here to be the process of removals

17   from active status or inactive status to a canceled

18   status.

19       Q    And have you consistently referred to

20   individuals being moved to a canceled status in

21   other states as a purge?

22             MR. CREELAN:  Objection as to form.

23       A    Yes, when I speak with reporters or speak

24   at -- to election administrators at various events,

25   I generally use the shorthand "purge."

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 27

1    BY MR. TYSON:

2        Q    By using the term "purge," are you

3    implying that something wrong was done?

4            MR. CREELAN:  Objection as to form.

5        A    No.

6    BY MR. TYSON:

7        Q    Let's begin next looking at the

8    characteristics of the registrants on the purge

9    list.  First of all, you're reporting the statistics

10   based on kind of the reason someone was put in

11   inactive status; is that correct?

12           MR. CREELAN:  Objection as to form.

13       A    Correct, so in -- as I understand what the

14   NGE list was at the time that it was generated was

15   that these are individuals who are in inactive

16   status, and it was not -- that was in October 30th,

17   and it wasn't until December that they were actually

18   moved from an inactive status to a canceled status

19   within the database.  So at the time that the list

20   was generated, these would be people who were in an

21   inactive status.

22   BY MR. TYSON:

23       Q    So let me give you a hypothetical.  I'm a

24   registered voter; I'm an active voter.  How would

25   I -- what are the steps that would be necessary for

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 28

1    me to arrive on your purge list with an inactive

2    reason of NCOA?

3             MR. CREELAN:  Objection as to form.

4        A    Footnote 8 on page 3.  So from what I

5    understand referring back to this footnote, which

6    has some of the code -- and we would need to look

7    back into that code to get the specific language, so

8    if I mischaracterize that language at all, it's just

9    a faulty memory, it's not that I purposely am trying

10   to mischaracterize it.

11            My understanding is that the Secretary of

12   State's office has -- commissions a list vendor of

13   some sort to run an NCOA check on their database,

14   and that check then, if it comes back positive the

15   election officials send out a notice to the

16   registered voter at the old address and the new

17   address that's on file from the NCOA change.  And if

18   the response -- if the person is nonresponsive to

19   that mailing, then they are placed into an NCOA

20   designation.  If they are responsive, well, then,

21   that's counted as a contact, and that's just people

22   updating their address through a contact that

23   they've had with election officials.

24            This -- from what I also understand, this

25   is conducted periodically, so it's not conducted on

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 29

1    an ongoing basis, this NCOA match being what "this"

2    is, and from what I understand, the last NCOA match

3    was conducted sometime either around or after the

4    2016 general election.

5    BY MR. TYSON:

6         Q    And how does a person end up on the purge

7    list with an inactive reason of no contact?

8         A    From what I understand is that after a

9    certain period of time, again, I apologize for not

10   having the explicit statutes in front of me -- I

11   don't suppose you have them that I can read them?

12        Q    I'm sorry, I don't.  I'm just looking for

13   your general understanding.

14        A    So, again, trying to characterize what the

15   statutes say, not having the laws in front of me to

16   explicitly look at it, if there's been no contact

17   for a period of time, then once there's an elapsed

18   period of time of no contact, then that will trigger

19   someone to be put into this no contact designation.

20             Contacts can include what we were just

21   discussing, if there's some sort of communication

22   between a voter and an election office.  A contact

23   also includes voting in an election because that

24   would be another point where there's been

25   essentially a communication between the voter and

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 30

1    the elections office.

2        Q    And then how does someone end up on the

3    purge list with an inactive reason of returned mail?

4        A    Again, not having the precise language in

5    front of me, my understanding is generally this is

6    if an elections office has attempted a communication

7    with a registrant via mail and that piece of mail

8    has been returned to the identify as undeliverable,

9    basically returned mail, then that leads to that

10    individual appearing on the no contact list --

11    excuse me, the NGE list for that reason.

12            NGE, as I understand it, there's more of a

13    global thing -- criteria that's going on, means no

14    contact for two general elections, and it's been

15    shorthanded to NGE, no general election.  So there's

16    another overall overarching requirement about once

17    the process has been triggered here that would land

18    you into one of these designations, there still is

19    another period of time that's occurring where you --

20    where the election officials would place a person

21    upon the NGE list.

22        Q    Thank you.

23            So let's start working through our

24    demographic statistics.  So first of all in the

25    first table you make the comment that the race

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 31

1   distribution for the three inactive reasons

2   generally follows the distribution in the voter

3   file.  Can you explain that to me, please?

4       A    Can you point -- I think I see it.  It's

5   in the second paragraph --

6       Q    Yes, sir, second paragraph.

7       A    -- under A, race?

8            Yes, and then I follow that with the next

9   sentence, saying that I note the three largest

10  differences of where those patterns don't follow.

11           So generally what I'm saying is that if

12  you look at the racial characteristics of

13  individuals who are on that November 15th voter

14  registration file and then compare that to the

15  individuals who are on the NGE list, I'm looking

16  within each of the three designations within the NGE

17  list, I'm looking at the racial distribution on that

18  list.  I'm going to do this again both for gender

19  and age.  So this is a general approach that I'm

20  using here that'll apply to all three of them -- of

21  the demographic characteristics that you find on the

22  voter registration file in Georgia.

23           And so here I'm saying it's -- there's

24  general agreement; however, there are some

25  differences that do appear in terms of the race

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 32

1  distribution, and then I note those in the next

2  paragraph.

3       Q    In your work as an election administration

4  expert, do you typically see purged lists matching

5  the general distribution for race in a voter file?

6            MR. CREELAN:  Objection as to form.

7       A    This is the first time I've had an

8  opportunity to do an analysis like this, so I really

9  can't speak to that question generally.

10 BY MR. TYSON:

11      Q    Have you done analyses in the past where a

12 voter list did not match the racial distribution of

13 the voter file in a state?

14           MR. CREELAN:  Objection as to form.

15      A    Are you talking about any other list?

16 BY MR. TYSON:

17      Q    Yes, any sort of database analysis that

18 you've conducted, have you found --

19           MR. CREELAN:  Objection.  Sorry.

20 BY MR. TYSON:

21      Q    -- have you found disparities between the

22 racial makeup in the voter file and the racial

23 makeup of the subset that you were analyzing?

24           MR. CREELAN:  Objection as to form.

25      A    So, yes, I have, and that -- an example of

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 33

1   that would be in the state of Georgia.  So I was

2   involved with plaintiffs in the challenge to the

3   exact match procedures that the state had, and there

4   was a list that the state generated of people who

5   had failed the exact match criteria.

6          Using a very similar sort of methodology

7   of looking at the racial characteristics of those

8   registered voters on this list of people who failed

9   the exact match procedure and comparing that to the

10  voter file, I found significant racial disparities

11  between those two lists.

12  BY MR. TYSON:

13     Q    Speaking of that comparison on the exact

14  match, did you opine in that case that the racial

15  disparity showed some sort of discriminatory effect

16  or intent?

17     A    I did not.  I wasn't tasked to look at

18  intent or draw legal conclusions.

19     Q    Generally speaking, if you find a racial

20  disparity in a dataset, can you draw conclusions

21  about racial intent just in a vacuum, or do you need

22  more information?

23          MR. CREELAN:  Objection as to form.

24     A    Yeah, and by the way, I'm just thinking

25  through the answer to your last question, so I

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 34

1    apologize for going out of order.

2    BY MR. TYSON:

3        Q    Sure.  Yeah.

4        A    I don't know If I said discriminatory

5    effect.  I might have said something to the effect

6    of disparate racial impact or something to that

7    effect in that report.  I would need to look at the

8    specific report to see what language that I used

9    there to make sure -- you're asking me to recall a

10   report that if you have it available, I'd love to

11   take a look at it and respond more precisely about

12   the language that I used in that report, but there

13   was descriptive language about the disparities that

14   were evident between the two databases in terms of

15   their racial characteristics.

16       Q    Thank you.  I'm not trying to play gotcha

17   to figure out what you said in which report.

18           I am interested in the term "disparate

19   impact."  Is that a term of art in the political

20   science world?

21           MR. CREELAN:  Objection as to form.

22       A    I have used it, so I -- I can't really

23   speak -- like, generally is that a term of art?  I

24   have seen other people use it in their writings, so

25   I suppose that it is in that respect, but it's a

Michael McDonald , PhD          February 28, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 35

1    little vague about what is a term of art.

2    BY MR. TYSON:

3        Q    Let me ask it this way to be clearer:

4    When you used the term "disparate impact" in your

5    description a minute ago, what do you mean when you

6    write disparate impact in an expert report referring

7    to racial analysis?

8              MR. CREELAN:  Objection.  For clarity, I

9    don't think he testified that he actually used the

10   phrase "disparate impact" in the report.  I think he

11   said that he didn't recall the language that he

12   used, so...

13             MR. TYSON:  I can set it up.

14   BY MR. TYSON:

15       Q    Have you used the term "disparate impact"

16   in an analysis of racial database -- racial data in

17   the past?

18       A    Again, I think that I might have, but I'd

19   have to look back at the report specifically.  There

20   were certainly discrepancies that I noted in that

21   report, so I don't know, again, if we're using

22   precise language.

23       Q    Maybe we can dig in on this point and help

24   us with that.  So you found the bottom of page 6

25   that there are 2.0 percentage points more white not

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 36

1    of Hispanic origin registrants on the purge list as

2    compared to the voter file.  Are you with me on

3    that?

4         A     Yes.

5         Q     And so is that a disparate impact on white

6    voters?

7              MR. CREELAN:  Objection as to form.  I

8    have to -- I have to clarify my objection because

9    it'll come up again for the record so it's clear.

10   He's already testified his report doesn't and he's

11   not here to opine on the legal significance of the

12   statistics that he's talking about.  So when you ask

13   a question that asks about the disparate impact,

14   which is, of course -- has legal significance, I

15   think it assumes something that he's already

16   disclaimed in his responses.

17             So I could keep objecting, but I think it

18   might help you for me to clarify that so you can

19   tailor your question to that.

20             MR. TYSON:  Thank you.

21   BY MR. TYSON:

22        Q     Let me try to ask it this way:  The

23   sentence about 2.0 percentage points more white not

24   of Hispanic origin registrants on the purge list,

25   does that mean that more -- does that mean that

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 37

1    there are more white voters on the purge list than

2    there are in the overall voter registration

3    database?

4         A    Yes, that is correct.

5         Q    And likewise, in the next paragraph that

6    there are 2.9 percentage points fewer black not of

7    Hispanic origin registrants on the purge list as

8    compared to the voter file, does that mean there are

9    fewer black voters on the purge list than their

10   share of the voter file?

11        A    On the overall purge list, that is

12   correct.  There are some subcategories of those

13   lists where that does not hold true, so -- and as I

14   understand with respect to the no contact list

15   that -- well, in particular, not as I understand,

16   but in particular with respect to the no contact

17   list there are -- this tendency is actually reversed

18   for those that we find a greater share of

19   African-Americans on the no contact -- list for the

20   reason for no contact than on the overall NGE list.

21        Q    Can you explain that to me, the difference

22   there because I see that it still says there are 1.0

23   percentage points fewer registrants for no contact

24   as compared with the voter file for black not

25   Hispanic, so if you could walk me through what you

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 38

1    just described, I'd appreciate it.

2          A    Right.  So if we look at Table 1 on page

3    9, what I'm trying to explain here is that although

4    there are correctly a greater share of whites not of

5    Hispanic origin on the overall NGE list or purge

6    list, if you look within the racial categories

7    African-Americans are showing up under the no

8    contact designation at a higher percentage than they

9    are in the NCOA designation or the returned mail

10   designation is the gist of what I'm saying here.

11         Q    But you'd agree with me that

12   African-American registrants as a percentage for the

13   no contact list is still lower than the overall

14   percentage of African-Americans in the November 15th

15   voter file, correct?

16         A    That is correct.

17         Q    And I believe you've testified you're not

18   drawing any conclusions as to cause of why that

19   might be, right?

20              MR. CREELAN:  Objection as to form.

21         A    In terms of the racial demographic

22   characteristics, no, I'm not drawing any

23   conclusions.

24   BY MR. TYSON:

25         Q    Let me keep working through the tables

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 39

1    here.  So in Table 2, what is the relevance of the

2    age of the registrants on the purge list to your

3    overall analysis?

4        A    This will matter later on when we look at

5    the survey and look at the representativeness of the

6    survey.  At this point in terms of the analysis --

7    analyses within this section, I'm just trying to be

8    complete and descriptive of everything that's

9    evident on the file, so that's primarily the purpose

10   at this point.

11       Q    And for the gender of registrants, is it

12   also just to provide the information about that,

13   it's not to draw any conclusions about the gender of

14   registrants on the purge list?

15       A    I do note the statistics, so I'm not --

16   but in terms of the overall going back to the

17   summary points that I make at the beginning and the

18   end of the report, these statistics are not central

19   to the opinions that I have within -- expressed in

20   the report.

21       Q    You noted earlier the difference in

22   African-American percentages for no contact versus

23   NCOA and returned mail in Table 1.  When you look at

24   Table 3, that same pattern exists for male voters.

25   And when I say that same pattern, I'm referring to a

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 40

1    higher percentage captured by no contact than by

2    NCOA and returned mail.  Am I reading that right?

3         A    That is correct.

4         Q    So when you noted a higher percentage of

5    black voters for no contact versus other methods,

6    that's just an observation, correct, it's not

7    anything beyond that?

8              MR. CREELAN:  Objection as to form.

9         A    I'm not -- I wasn't asked to provide an

10   opinion as to the significance of that, so I am

11   simply noting the statistics as they exist within

12   the NGE list and on the voter file.

13   BY MR. TYSON:

14        Q    Let's turn next to page 11 and your NCOA

15   match analysis.

16        A    I'm there.

17        Q    Okay.  So you contacted the firm Latino

18   Decisions -- I guess I was a little unclear.  Did

19   Latino Decisions engage L2 and TargetSmart or did

20   you engage them for the phone number match and then

21   provide that information to Latino Decisions?

22        A    I directed Latino Decisions to engage L2

23   and TargetSmart to do the NCOA match and produce

24   phone numbers for people who are on the NGE list.

25        Q    And do you recall the cost for Latino

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 41

1    Decisions to engage in that exercise with L2 and

2    TargetSmart?

3         A    I do not know.  That was all handled

4    through other channels through legal counsel, so I

5    don't know the cost of any of the conduct of the

6    survey or the matching that we did.

7         Q    And when you say that they were to provide

8    phone numbers for registrants on the purge list, do

9    you know if that included cell phone numbers or only

10   land lines?

11        A    It did include cell phone numbers.

12        Q    You indicate that the vendors also

13   appended the results of the matches they performed

14   against the NCOA database.  Do you know what process

15   the vendors used to check the NCOA database against

16   the purge list?

17        A    Yes, I do.

18        Q    What process is that?

19        A    The two vendors had different processes.

20   L2 did a match, as I understand it, against the -- a

21   one-time match as of the time that we requested it

22   against the NCOA database from the post office.

23            TargetSmart has a comprehensive database

24   of matches they conduct on a bimonthly schedule

25   going back to 2012, and so they provided any NCOA

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 42

1    match that they had against all of their routine

2    matching they have been doing for a number of years.

3        Q    So just so I understand, the current NCOA

4    database, is that going to include, if I moved in

5    2012, 2016, and 2017, would include each of those

6    moves, or would it only include the last move that I

7    made?

8            MR. CREELAN:  Objection as to form.

9        A    As I understand it, the NCOA database

10   that's maintained by the post office is good for 48

11   months after an individual has filed an NCOA form,

12   and so this was conduct -- that's four years, 12 --

13   48 divided by 12 is four years.  And so --

14   BY MR. TYSON:

15       Q    Thank you for helping me with the math, by

16   the way.  Don't assume I know the math, that's for

17   sure.

18       A    My pleasure.  I have to keep it straight

19   as well.

20            So these were matches that were conducted

21   in January of 2020, so we would go back four years.

22            The L2 matches would cover essentially the

23   calendar year of 2016.  The TargetSmart list goes

24   back to 2012 at least, looking at the inclusive

25   nature in the way in which they do their matching.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                      Page 43

1        Q    Are there people on the purge list who
2    would have moved prior to 2012 -- or filed an NCOA,
3    I'm sorry, prior to 2012?
4              MR. CREELAN:  Objection as to form.
5        A    It's possible that there were, and there's
6    evidence in the survey -- we probed when people
7    moved and when they filed an NCOA form, and there's
8    evidence when we look at that much more deeply,
9    which is not in the report.
10             So I'm being responsive to your question
11   in that way, but, yes, there's evidence from the
12   survey we had as well as just the practical
13   implication thinking about when people might file an
14   NCOA that, yes, there are people prior to that who
15   may have filed an NCOA from an address other than
16   the one that they currently reside at or are
17   registered to vote at from a prior address.
18   BY MR. TYSON:
19       Q    So in the fourth paragraph on page 11
20   where you say the NCOA matches only 86.4 percent of
21   the registrants on the purge list for the reason of
22   NCOA, one possible explanation for why that's not a
23   hundred percent is there may be additional people
24   prior to 2012 who filed an NCOA but were not
25   captured by your matching process, right?

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 44

1             MR. CREELAN:  Objection as to form.

2         A     From what I understand of when Georgia

3    conducted their NCOA match, which was in 2016, that

4    would have been going back into TargetSmart's

5    history they would have conducted, and in their

6    legacy NCOA matches covered 2016.  So that would

7    likely not be a source of discrepancy between these

8    numbers.

9             If anything, I'm giving you a conservative

10   estimate, an upward estimate because of the

11   different phenomenon, which is that, again, as I

12   understand the NCOA matching procedures and policies

13   of Georgia, I am also capturing people who would

14   have filed an NCOA after 2016 who are showing up as

15   filed one in this NCOA matching.  So that 86 percent

16   is likely a higher number than what the true number

17   of people who would have been -- who would have

18   qualified under the list maintenance procedures of

19   Georgia.

20   BY MR. TYSON:

21        Q    So it's your testimony that the

22   individuals who are on the purge list for the reason

23   NCOA, that no one who filed an NCOA form prior to

24   2016 was on the purge list for that prior-filed

25   NCOA?

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 45

1              MR. CREELAN:  Objection as to form.

2        A    So no one on the purge list for NCOA was

3    on the file before 2016.  As I understand how these

4    procedures work, that would be correct, but I have

5    to qualify that answer because I haven't been able

6    to analyze the data that was provided by the list

7    vendor to the Secretary of State's office in

8    Georgia, so I'm merely characterizing what I think

9    they would have done.  I don't know if they looked

10   further back in time.  I don't know about their

11   policies and procedures about how they did their

12   NCOA match.

13             So absent knowing more information about

14   the Georgia policy and procedure, I can't say

15   anything about -- other than what I think that they

16   would have followed the law and policies within

17   Georgia, but as far as I know they could have had a

18   policy similar to -- mechanism similar to

19   TargetSmart, have a longer history of NCOAs that

20   they were matching against.

21             So in some respects I need more

22   information about what's going on within Georgia to

23   understand more fully why the numbers that we had

24   from our list vendors were different from the list

25   that Georgia had.

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 46

1    BY MR. TYSON:

2        Q    So if you could turn to the top of page

3    13, just to kind of close off this point.  You say

4    in the middle of that paragraph:  It may be that

5    Georgia's Secretary of State's office uses a list

6    matching procedure that is too aggressive in

7    identifying NCOA.  But I believe, based on what

8    you've just said, you don't have enough information

9    to know whether the procedure is too aggressive or

10    not; is that correct?

11              MR. CREELAN:  Objection as to form.

12        A    I used the permissive "may" in that

13    sentence to qualify what I can see.  The reason why

14    I draw that conclusion is that the exercise that I

15    had two list vendors do, and we took both of those

16    NCOA matches and we combined them -- or I combined

17    them together, it's not even we, I combined them

18    together so that I was being as inclusive as I

19    possibly could be of any NCOA match that we had from

20    two separate list vendors, and I still fall short of

21    the number that the Secretary of State's office is

22    providing.

23              And so, again, that estimate is probably

24    that 86.4 percent that we found a match on the NCOA

25    database that's consistent with the Secretary of

Michael McDonald , PhD            February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 47

1    State's designation of NCOA, it's -- it may be an

2    overestimate because we're including those folks who

3    have moved and filed since then, and they would not

4    be covered under Georgia law's list maintenance

5    procedures as I understand them, so I'm trying to

6    understand why that is and giving an opinion about

7    that.

8            What other piece of information that I

9    have in here that gives me some pause is that there

10   are -- now, it's a very small number, but there are

11   people who have a business change of address that we

12   found in the NCOA that are showing up in the NGE

13   list for NCOA reasons.

14           Again, without knowing the character of

15   the matches that the Secretary of State's office was

16   looking at, if they were looking at business change

17   of address, that might explain one dynamic.

18           Another is that I've extensively written

19   on list matching in general, and it's possible that

20   we are -- there's some mechanism in the way in which

21   the list vendor that the Secretary of State's office

22   maintains is something about that procedure which is

23   being more inclusive than -- so, for example, again,

24   without knowing what's going on here, so I'm just

25   guessing, and I wish I had more information, what if

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 48

1    an individual was being applied to the entire

2    household NCOA, or what if there was some sort of

3    fuzzy matching algorithm that was being employed by

4    the list vendor to look for name variance or some

5    other way of not doing exact matching.  Those could

6    also inflate the numbers.

7             Again, I don't know the reason, that's why

8    there's the permissive "may" in there, but there is

9    a discrepancy in noting it.  I'm using as -- being

10   as generous and conservative as I can to -- on the

11   upward bound on what I think is going on within this

12   matching exercise, and I'm -- I'm just sort of at a

13   loss at this point as to what is actually happening

14   absent having that additional information about

15   what's going on within the list matching procedures

16   that the vendor the Secretary of State's office is

17   using.

18   BY MR. TYSON:

19       Q    How does L2 match against the -- its NCOA

20   database?

21       A    As I understand they do an exact match and

22   what any list vendor would do just typically to do a

23   match against the post office NCOA database because

24   that database contains, as I -- if I recall

25   correctly 160 million records, so it's a large

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 49

1  database.  And in order to do any sort of list

2  matching on names and addresses, you would take a

3  name, put it into a standardized format, take an

4  address, put it into a standardized format that the

5  post office has, and then you do a match against

6  that database the post office has to look for

7  matches.

8            As an example, and this is something that

9  I found in other situations, since we don't have a

10 birth date here to match against, it's possible that

11 there is a senior, junior pair, and you can find

12 false matches in those sort of situations where

13 you're not fully looking at all the full name

14 information that you have.

15           It's just one sort of example of the sorts

16 of things that could happen where whenever you're

17 doing list matching, you can end up with errors

18 essentially in the matching procedure that you're

19 dealing with.

20    Q    Is the process of matching an exact match?

21 Does it match a certain number of characters per

22 field?  What is the method that the match takes

23 place between those two databases?

24           MR. CREELAN:  Objection as to form.

25    A    As I understand their procedure as I just

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 50

1    described to you, this is an exact match.  So they

2    are looking at the information that's in the name

3    and the address and standardizing that into the

4    format that the post office uses, and then they do

5    an exact match of that information versus the post

6    office database.

7    BY MR. TYSON:

8        Q    And does TargetSmart use the same process

9    you've just described with the exact match against

10   the standardized database?

11       A    Correct.  And as I said before, they do

12   theirs on a bimonthly schedule of doing NCOA

13   matches.  The L2 match was a one-time match.

14       Q    Is L2 a firm that works primarily with

15   candidates of one party or another?

16       A    I really don't know their list of clients

17   fully, so I really can't speak to that one with L2.

18       Q    Does TargetSmart tend to work with

19   candidates of one party or another?

20       A    My understanding is TargetSmart works

21   primarily with Democrats, but they may have some

22   nonpartisan clients.  And it may be, I don't know,

23   they may have some Republican clients as well, but

24   I -- my general understanding is TargetSmart is

25   certainly on the left of the sphere of these list

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 51

1    vendors.

2        Q    In -- your experience in the election

3    administration space are list vendors like L2 and

4    TargetSmart tend to be either for one party or the

5    other or primarily for one party or the other?

6            MR. CREELAN:   Objection as to form.

7        A    Some may, and some may not.  For example,

8    with L2, I worked with them on a survey that was

9    completely an apolitical survey, so it may -- and

10   there was just a recent survey about nonvoters, for

11   example, that was in the news quite a bit that also

12   relied on L2.  My impression is L2 is more in the

13   middle in that respect than TargetSmart is, but,

14   again, I don't know their full client list.

15           I do know that I see TargetSmart quite a

16   bit on the left spectrum of the scale, but, again,

17   this is my impression.  I don't have their full

18   client list to tell you exactly where they land.

19   BY MR. TYSON:

20       Q    How about firm Latino Decisions, do they

21   have -- are they generally viewed as being on one

22   side of the political equation or the other?

23       A    Their primary interest is polling about

24   Latino public opinion.  That said, I understand that

25   they've come out of working for -- the Clinton

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 52

1    campaign in the 2016 election is really where they

2    had their start.  So I -- my impression of them is

3    that they are more left-leaning, but, again, they do

4    a lot of nonpartisan polls for media and others that

5    are strictly about Latino positions on policies and

6    not necessarily favoring one political party or the

7    other.

8           And early on when I did some work with

9    Latino Decisions -- oh, I'm sorry, when I say the

10   Clinton campaign, I should have said 2008, not 2016.

11   Two Clinton campaigns.  I worked with them in

12   promoting some work that they had done in Virginia,

13   and it was actually favorable of conservative

14   position, and this is when I was at George Mason

15   University.

16          So I -- some of what they say are

17   certainly -- in terms of immigration, for example,

18   you actually find that Latinos are surprisingly more

19   militant, who are people who are naturalized

20   citizens here on immigration than what the general

21   media and public perceptions are, and that's what

22   their surveys find.

23          So I have confidence that they are

24   providing unvarnished numbers, and my experience of

25   working with them in Virginia reminds me that they

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 53

1   were -- they were trying to gauge as best they could

2   the public opinion.

3        Q    That's helpful.  Thank you.  That took

4   care of a couple additional questions I had.

5            MR. CREELAN:  Bryan, when you're at a

6   convenient stopping point, do you want to take a

7   break?

8            MR. TYSON:  Yeah, why don't we take a

9   break now.  This is a good point.

10           (Recess 10:46-10:59 a.m.)

11   BY MR. TYSON:

12       Q    If you could turn with me over to page 13

13   of the report.

14       A    Yes, I'm there.

15       Q    Okay.  Let's talk briefly about Table 4.

16   And this is just the -- if I'm understanding this

17   correctly, Table 4 shows the comparison for the

18   information from the data vendors' NCOA match.

19   There's not a question there yet, but essentially

20   we're looking at the various reasons why someone may

21   be in an inactive status, inactive reason, and

22   whether or not there was an NCOA match from the

23   vendor match you described; is that correct?

24           MR. CREELAN:  Objection to form.

25       A    This is on page 12 of the report, and,

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 54

1  yes, this table is describing the results of the

2  NCOA match that L2 and TargetSmart did versus the

3  three inactive reasons why people appear on the NGE

4  list.

5  BY MR. TYSON:

6      Q    You earlier referenced that only 86.4

7  percent of the people on the list for inactive

8  reason NCOA had an NCOA match from the vendors, but

9  I see that there are also a significant number of

10  matches to the NCOA for people who were inactive

11  reason, no contact, and returned mail.  Do you have

12  an understanding of why that may be, or are you just

13  reporting that this is what it is?

14          MR. CREELAN:  Objection as to form.

15      A    I'm doing both things.  So I am reporting

16  the statistics as we have them, and I did provide

17  those to you in discovery so you can check over that

18  work.  The -- I do also have some reason to

19  describe, like, why those 38.6 percent, for example,

20  NCOA matches on the no contact list versus why they

21  are not -- would not be on the NCOA designation, and

22  I believe this has to do with the temporal timing of

23  when the NCOA matches were conducted versus the list

24  maintenance procedures that the state of Georgia

25  follows.  And so there are some people who have an

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 55

1    NCOA match that would be after the NCOA match

2    procedures that were -- Georgia was following, and

3    so that's -- that's what I primarily deduce as the

4    reason why we're having 38.6 percent.  These would

5    have been people who may have filed an NCOA after

6    the timing of when the state of Georgia was

7    conducting its NCOA match.

8    BY MR. TYSON:

9        Q    So just so I understand, someone could

10   have already been moved to inactive -- to the

11   inactive list because of no contact and then later

12   filed an NCOA?

13       A    That is possible, yes.

14            MR. CREELAN:  Objection.

15   BY MR. TYSON:

16       Q    And it's possible that someone could have

17   had mail returned, gone to inactive list for that

18   reason, and then later filed an NCOA?

19       A    Correct.  That is possible, yes.

20       Q    Let's go over to page 13.  You're

21   describing Table 4 in the second paragraph there.

22   Those who have an inactive reason of no contact but

23   also have now an NCOA match, that's the group of

24   people you are excluding from the survey you

25   conducted; is that right?

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 56

1              MR. CREELAN:  Objection as to form.

2         A    No, that is incorrect.

3    BY MR. TYSON:

4         Q    Can you help me understand how you arrived

5    from the 97,000 to the survey universe, or was that

6    the entire survey universe?

7              MR. CREELAN:  Objection as to form.

8         A    Are you asking what the survey universe

9    is?

10   BY MR. TYSON:

11        Q    Yes.

12        A    Perhaps we can start there, and that'll

13   illuminate the answer of the question you're asking.

14             So we matched the NGE list against the

15   databases of L2 and TargetSmart to obtained phone

16   numbers, and then we called through those list of

17   phone numbers, and we did not exclude any of the

18   three categories when we -- when we were doing the

19   survey.

20   BY MR. TYSON:

21        Q    So the universe of the survey was the

22   290,134 who matched on Table 4?

23        A    Thank you for clarifying on that.  So this

24   goes back to the original paring down of the voter

25   registration or the NGE list to remove those

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 57

1   individuals who either are no longer a contest in

2   this election or the smaller number that I was

3   unable to match against the voter registration file.

4        Q    And so is that number on Table 4 the

5   correct universe for the survey, 290,134?

6        A    Correct.  290,134, correct.

7        Q    In the third paragraph on page 13, you

8   discussed the individuals who have a returned mail

9   reason but do not have an NCOA match, and you make

10  the statement:  It would not be surprising if having

11  a piece of mail returned undeliverable is a less

12  reliable indicator that a registrant has moved from

13  their voter registration address than an NCOA match.

14  Why is that?

15       A    Because you're relying upon a -- the

16  delivery of a piece of mail rather than a file

17  that's been filled out by an individual that's

18  expressively noting that they have moved.  So you're

19  relying on a process that could have error for

20  various reasons on why a piece of mail was unable to

21  be delivered.

22       Q    Even people who fill out an NCOA may not

23  have necessarily moved their residence, correct?

24       A    Person -- if I understand the question

25  correctly, yes, it's possible that there are people

Michael McDonald , PhD              February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 58

1    who have temporarily moved, and they may wish to

2    have their mail forwarded during that period of

3    time, and then they move back to that address.

4    There are -- when we looked into the survey and

5    looked at reasons why people moved, there were --

6    there was one individual that we surveyed that had

7    filed individual NCOA and reported to us that they

8    moved temporarily outside the state of Georgia for

9    business reason.  So it's certainly possible, and

10   the evidence directly in the survey would point to

11   that possibility that there are people who have

12   moved temporarily, but they haven't really changed

13   their residence -- what they consider to be their

14   primary residence.

15        Q    And so when you say in the last sentence

16   of that third paragraph:  Accordingly, a substantial

17   number of the voters canceled for this reason

18   (returned mail) may not have, in fact, moved at all,

19   that's true of every inactive reason on the purge

20   list, correct?

21             MR. CREELAN:  Objection as to form.

22        A    It's true to varying degrees would be my

23   opinion based on the evidence I have before me that

24   there are people who continue to reside at their

25   address in all three categories, yes.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 59

1    BY MR. TYSON:

2        Q    And the evidence that you have before you

3    on that point is the survey you conducted?

4        A    It's the NCOA match that we did plus the

5    survey is the evidence I'm looking at for my report.

6        Q    And for the opinion you just enunciated?

7        A    Correct.

8        Q    I think this next paragraph on page 13 is

9    what led to my conclusion about the survey universe.

10   You indicate that 59,866 no contact registrants do

11   not have an NCOA match.  You say you focused the

12   remainder of your report on these no contact

13   registrants.  What is that referring to?

14       A    Yeah, I can understand your confusion

15   then.  "These" is really referring to the entire

16   universe of the no contact registrants, not the --

17   not the narrow number who did not have an NCOA

18   match, so I apologize for the confusion that you

19   have on that.

20       Q    No problem.  I'm glad we got it cleared

21   up.

22            So ultimately we start with 313,000

23   records on the purge list, we've taken out almost

24   22-, 23,000, we're down to 290, then of that 97,577

25   are no contact, and then a percentage of those,

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 60

1   there is some evidence that they have moved because

2   they filed an NCOA; is that correct?  Am I getting

3   my sequence right on that?

4            MR. CREELAN:  Objection as to form.

5        A    There is some evidence through the NCOA

6   filings that they may have moved.  The survey is

7   going to provide some evidence as well.  I just want

8   to be careful to say that because you -- the way in

9   which you phrase that, it sounds like you're saying

10  that the report is getting narrowed down to a

11  certain segment.

12            What I mean by this remainder of the

13  report is focused on these no contact registrants

14  does not exclude that I have opinions about the

15  other categories of people on the NGE list, it's

16  just that the remainder of the report is going to be

17  focused on this group of people.

18  BY MR. TYSON:

19       Q    In preparing the survey, how many phone

20  numbers did you have out of the 290,000 individuals

21  in the survey universe?

22       A    We had roughly 190,000 phone numbers,

23  either land lines or cell phones.

24       Q    And how many attempts -- how many

25  attempted calls were made for the survey?

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 61

1              MR. CREELAN:  Objection as to form.

2         A    There were roughly 48,000 contact --

3    attempted contacts.  There were -- of those some

4    were multiple contacts to the same number.  If you

5    look at unique numbers that were attempted to

6    contact, I do have a more precise number for that

7    for you.  It's 47,470.

8    BY MR. TYSON:

9         Q    And how long was this survey in the field?

10        A    It was in the field from January 24th

11   through February 1st.

12        Q    All live operator calls?

13        A    Yes.

14        Q    And out of 47,770 unique phone numbers,

15   you completed 204 interviews?

16        A    That is correct.

17        Q    Then I see just -- again, math and me

18   don't necessarily get along, so make sure I'm

19   following this right -- we had 204 complete

20   interviews, we took 25 people out because they had

21   been restored to active status, so the further

22   analysis here is of the 178 completed surveys; am I

23   reading that right?

24        A    You are reading it right, but there is

25   an -- a math error, so I can also have problems with

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 62

1    math sometimes.  So this is -- it should be 179

2    because 204 minus 25 is 179.

3         Q    You know what, I hadn't even noticed that.

4    Thank you for that.

5         A    I do want to correct the report because

6    that is an error that is in the report, so I wish to

7    correct that.

8         Q    Certainly.  So is 179 completed surveys a

9    sufficient survey for preparing a political science

10   paper for a journal?

11              MR. CREELAN:  Objection as to form.

12        A    It can be.  And it is -- it can be valid.

13   It depends on precisely what it is that you're

14   attempting to understand about the nature of the

15   population that you're surveying.

16   BY MR. TYSON:

17        Q    It just struck me as a very small sample

18   size out of the entire universe, and I understand

19   that we can wait and do all the various things with

20   polling.  What is the typical size of a survey in a

21   political science journal?

22              MR. CREELAN:  Objection as to form.

23        A    Well, there's wide variation there.  So I

24   have seen surveys that have been conducted with even

25   fewer number of respondents than this, so it's not

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 63

1   uncommon, and there are ways for us to look

2   statistically at the properties of the responses

3   that we get and say with some statistical certainty

4   what it is that we're trying to say about the

5   population from the survey.

6          So, again, it really depends on the

7   situation that you're in and what it is that you're

8   trying to characterize about the population from the

9   survey that would make inferences valid or invalid.

10  BY MR. TYSON:

11      Q    If you could turn with me to the back of

12  your report.  I just want to clarify the attachment

13  B, page 37 is the survey script; is that correct?

14  Starting on page 37, I mean.

15      A    Yes, attachment B.  I'm at attachment B.

16  Yes, this is the survey script, correct.

17      Q    In the first question, if someone

18  responded to the disposition code name on list does

19  not live there, are you counting that as a completed

20  survey or not?

21      A    No, I'm not.

22      Q    Isn't it relevant if you call a number and

23  you're trying to determine if the person lives there

24  that you would want to include the response that

25  someone doesn't live there in your analysis of the

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 64

1    statistical weighting of your final survey results?

2            MR. CREELAN:  Objection as to form.

3        A    In this case I would say not because what

4    we have is a phone number, and that phone number

5    comes from various sources.

6            I've been involved as a survey researcher,

7    so I worked at a survey firm, I've worked for the

8    national exit poll organization, I've conducted my

9    own survey, I've worked with Pew survey research to

10   run a poll, and so in my experience of running

11   surveys, you just get bad phone numbers.

12           And so I couldn't say with any certainty

13   just because we call a phone number and we are told

14   that the person doesn't live there, we don't know

15   whether or not that's an indicator that the person

16   has ever lived there or if it's just a bad phone

17   number, and we're just getting a bad number matched

18   against another individual that's on the voter --

19   that's similar for whatever reason to the number

20   that L2 is -- and TargetSmart has provided that

21   might be the person that's on the voter registration

22   database, but it's not actually that individual.

23           I said that very poorly, so I --

24   BY MR. TYSON:

25       Q    I follow you, though.  Yes.

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 65

1      A     I apologize for the phrasing of all that.

2      Q     That makes sense.

3            And I guess this is the thing I'm trying

4      to figure out, if we have 47,770 unique phone

5      numbers, it makes logical sense to me that you got

6      completed surveys from people who, yes, are still

7      likely at the address because they're still there,

8      but if you were not able to get a completed survey,

9      that would tend to indicate the person's not there.

10     How am I missing on my analysis in that respect?

11           MR. CREELAN:  Objection as to form.

12     A     It goes back to the same issue that you

13     just raised, which was that I can't say with

14     certainty just because we failed to do the phone --

15     completed phone interview with that individual

16     whether or not that says anything about whether that

17     person is at that address.

18           So I -- I can't make any inferential

19     statement about that based on whether or not we had

20     that completed call or not.  Could be the phone

21     number is bad.  It's not necessarily the person

22     isn't at that address.

23     BY MR. TYSON:

24     Q     When you're designing political science

25     surveys, are you generally -- have you ever designed

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 66

1    a survey before where you were trying to determine

2    if someone still lived at an address?

3         A    Yes, I have.

4         Q    What are some of those examples or what is

5    a past example?

6         A    I ran a survey, it was an internal survey

7    that we ran at the University of Florida, so

8    internal funding, that looked -- we were interested

9    in validating the information that was found on the

10   voter registration file in Florida to find out if

11   that information was accurate.

12        Q    And did you use a similar process to the

13   survey here or was it a different process?

14        A    We used a similar set of questions that

15   are found in this questionnaire.  Some of them.

16   Some of these questions, though, are probing

17   specifically at the circumstances that are involved

18   in Georgia.

19        Q    Now, in terms of the demographic

20   characteristics, you point out that white voters are

21   overrepresented in the responses, correct?

22             MR. CREELAN:  Objection as to form.

23        A    Do you want to understand how I arrived at

24   that conclusion first, and then we can talk about

25   that conclusion?

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 67

1    BY MR. TYSON:

2         Q    We can.  Whatever makes the most sense on

3    that, yes.

4         A    So I think that will help illuminate the

5    answer to the question.

6         Q    Okay.

7         A    So we have the voter registration number

8    of the individuals because we sampled from the NGE

9    list, and it has a voter registration number on it.

10   The race characteristics, age, and gender are not

11   found on the NGE file, but they are found on the

12   voter registration file, and these people were still

13   on that voter registration file, excepting the small

14   number that we discussed earlier.

15              And so that information about the race,

16   gender, and age characteristics are available on the

17   voter registration file, so I can match the voter

18   registration number of the survey respondents to the

19   voter registration record and look at their race,

20   gender, and age characteristics.  So that's how I

21   can deduce the representativeness of the sample

22   versus the universe of people that we were looking

23   at on the NGE list.

24        Q    So you note that the respondents were

25   notably older than the individuals on the no contact

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 68

1    purge list.  Is that referring -- that's the bottom

2    of that big paragraph on page 14.  Is that referring

3    to only this 142 no contact registrants?  I just

4    want to make sure I'm understanding which subgroups

5    we're talking about of the survey respondents.

6              MR. CREELAN:  Objection as to form.

7        A    So it might be good again to talk about

8    the 142 versus the 179 and how we get to that point.

9    So we're on the second paragraph on the top of page

10   14.  I'm noting that most of our contacts or

11   completed surveys were with individuals who were on

12   the no contact list, so 142 of 179 were on the no

13   contact list.  We only have 19 from the NCOA list

14   and 17 from the returned mail list.

15             That's too small to look at to draw

16   reliable inferences from.  142 is still fine

17   depending on the question that I'm asking, and I can

18   explore further, which I do in the survey, that

19   doesn't give me pause at this point, but I would

20   have pause on drawing reliable inferences from 19

21   individuals or 17 individuals and making inferences

22   about the population.

23             So looking at the responses that we had to

24   the survey, I decided the most prudent way forward

25   to do the analysis was to discard the responses that

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 69

1  we had from the 19 and the 17 people on the NCOA and

2  returned mail list respectively and focus then on

3  the 142 that were on the no contact list.

4          So that first describes that, and if you

5  want to ask your question again, I think that will

6  help us answer your question.

7  BY MR. TYSON:

8      Q    That does help me.  Thank you.

9          So when you note that 51.4 percent of the

10  survey respondents are age 60 plus, is the survey

11  respondents there then the 142 no contact

12  registrants or the entire completed survey universe?

13      A    Yeah, we're -- at this point I'm focusing

14  on that 142 solely, and when I make comparisons as

15  well to the population on the NGE list, I'm going to

16  compare to the similar group of people who are in

17  the NGE list for the reason that they have no

18  contact.

19      Q    So let's turn to the next page.  This has

20  the breakdown -- I guess this answers my question

21  right here in Table 6 about by age.  So we only have

22  14 individuals 18 to 29, 18 individuals between 30

23  to 44.  You said you wouldn't be comfortable making

24  or drawing conclusions from numbers of 19 and 17 for

25  NCOA returned mail.  I'm assuming you wouldn't be

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 70

1    comfortable drawing conclusions about these age

2    subgroups either.

3              MR. CREELAN:  Objection as to form.

4        A    I do not do that in my report, but I

5    haven't done the analysis.  Again, if all 14 were a

6    certain way that might be -- provide some evidence,

7    but, again, most likely without looking at the data

8    I couldn't make strong inferential statements

9    looking at subpopulations.

10   BY MR. TYSON:

11       Q    So then we get to the analysis of the no

12   contact purge list survey respondents.  You select a

13   single question from the response, does a Respondent

14   live at the address associated with their voter

15   registration record.  Are you with me on that page?

16       A    Yes.

17             MR. CREELAN:  Objection as to form.

18   BY MR. TYSON:

19       Q    If you could turn with me to page 38.

20   Hold your place there.  I just want to see the

21   question.

22             MR. CREELAN:  Page numbers are at the top.

23   That's what he's referring to.

24       A    That helps quite a bit.

25   BY MR. TYSON:

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 71

```
 1        Q     Sorry about that, yes.  The beauty of ECF
 2    is you have often one set of numbers at the bottom
 3    and one set of numbers at the top that don't match,
 4    so it's a great --
 5              MR. CREELAN:  ECF is lawyer's language.
 6    BY MR. TYSON:
 7        Q     Yes, I'm sorry, case filing system.
 8              Are you with me page 38 at the top,
 9    Dr. McDonald?
10        A     Yes, I am.
11        Q     So question 6.  Is question 6 the question
12    you're referencing on page -- the top of section 7
13    of your analysis?
14              MR. CREELAN:  Objection as to form.
15        A     Yes, correct, that is the -- question 6 is
16    the question that is referenced in Footnote 14 on
17    page 16.
18    BY MR. TYSON:
19        Q     So the question asks:  Is this the address
20    at which you are currently registered to vote.  And
21    when I first read this my first thought was wouldn't
22    the question be is this the address where you
23    currently reside.
24              MR. CREELAN:  Objection as to form.  I'm
25    not sure what -- if there was a question, but object
```

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 72

1    to it.

2              MR. TYSON:  Covered you either way.

3              MR. CREELAN:  Again, I'm not sure if there

4    was a question.  Could you read the question back?

5              (The record was read by the reporter as

6    follows:

7              "Q    So the question asks:  Is this the

8         address at which you are currently registered

9         to vote.  And when I first read this my first

10        thought was wouldn't the question be is this

11        the address where you currently reside.")

12             MR. CREELAN:  That's the question, okay.

13   I'm not sure there is a question.  I'm going to

14   object to form.

15   BY MR. TYSON:

16       Q    Why is that not the question?

17             MR. CREELAN:  Objection.

18       A    I believe that a reasonable person would

19   understand the question to be asking whether or not

20   they reside at that address, but we did ask some

21   follow-up questions as well to determine if indeed

22   that's how people were interpreting what the content

23   of the question was.  So we did ask people if they

24   had moved and when they had moved, and that is

25   indeed -- in my opinion looking at how the patterns

Michael McDonald , PhD            February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 73

1    of responses we had to those questions, follow-up

2    questions, it does indeed appear that's how people

3    were interpreting the question.

4    BY MR. TYSON:

5        Q    So when you report in section 7 that 122

6    individuals reported living at the address

7    associated with their voter registration record, is

8    that number different than the number who responded

9    yes to question 6, or are the additional questions

10   you asked part of that analysis to reach that

11   number?

12       A    That is the response to the people who are

13   on this list, so that -- response to that question,

14   I should say.  And you asked a compound question.

15       Q    Yes, I did.

16       A    I'll answer the second part of your

17   question, which is that, yes, my additional analysis

18   leads me to believe that that's how people were

19   interpreting this question is that it's asking if

20   they are living at their current address,

21   registration address.

22            I would also add this is where this

23   previous analysis of the NCOA comes into play in

24   forming my overall opinion because we can see that

25   the predominant majority of the people who are on

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 74

1    the no contact list also don't have an NCOA match as

2    well, so it's -- my opinions are taken as a whole

3    from all the pieces of evidence that are here.

4        Q    And so of the 122 that reported living at

5    the address associated with their voter registration

6    record, did you check back to the purge list or the

7    voter file to determine if they had an NCOA filed?

8        A    Well, I can't look at the -- this is in

9    the no contact bucket, so I can't look at the NGE

10   list to make that determination.

11       Q    Could you look back at your lists from L2

12   and TargetSmart to make that determination?

13       A    I can, yes.

14       Q    And did you?

15       A    Yes, I did.

16       Q    So did every one of the 122 people not

17   have an NCOA filed?

18       A    Of the 122, there were two people that had

19   an NCOA filed.  Now, for the reasons that we

20   discussed previously, it's unclear whether or not

21   those two individuals would have been in the NCOA

22   bucket under the provisions of Georgia law.  One of

23   these two people is an individual who filed -- who

24   reported in a subsequent question that they had

25   temporarily moved outside of the state for a

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 75

1    business reason and then had moved back, and they

2    had filed one of these NCOAs as well.

3              So we had that prior discussion about why

4    that may be true in the deposition, so that's

5    reaffirming again what I said previously.

6         Q    The other thing that struck me reading

7    through the survey was some of the questions that

8    you didn't ask.  And so you didn't ask whether

9    someone recalled receiving a notice from the

10   Secretary of State or their Board of Elections about

11   the status of their voter registration, right?

12        A    That's correct.

13        Q    Add you didn't ask if someone had updated

14   the address on their driver's license and whether

15   they had checked to update their voter registration

16   or uncheck that box.

17        A    That is correct.

18        Q    When you were conducting your analysis, at

19   any point did you look at the larger voter

20   registration database to determine if any of the

21   individuals you surveyed possibly had a duplicate

22   registration in the voter registration database?

23             MR. CREELAN:  Objection as to form.

24        A    I did not.

25   BY MR. TYSON:

Page 76

1      Q     Then you calculate a margin of error for
2    your population.  This I know is a math problem, but
3    can you walk me through how you calculate a margin
4    of error for a statistical survey like this?
5      A     So the mathematical formula is you first
6    calculate what's called a standard error, and then
7    you multiply that by essentially -- typically it
8    would be essentially a number 2, but it changes a
9    little bit depending on the size of your population,
10   so keep that in mind.  And that formula for the
11   standard error is -- bear with me -- the square root
12   of the proportion that you're looking at times 1
13   minus that proportion divided by n, so the square
14   root of that quantity.
15          I used a calculator that you can find
16   online to do this.  I didn't actually do that
17   calculation myself.  I have no reason to suspect
18   that that calculator is providing inaccurate
19   information, and this margin of error looks similar
20   to what I would expect for survey this size of 142
21   individuals.
22     Q     I know the -- when you're conducting
23   surveys generally, the larger the pool of
24   respondents, is it generally true that the margin of
25   error is smaller?

Michael McDonald , PhD                    February 28, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 77

1                MR. CREELAN:  Objection.

2        A     Right, you're dividing through by the

3    square root of n.  So -- I teach this, so it is

4    something I know quite a bit of.  Interestingly, it

5    doesn't decrease linearly, it decreases by the

6    square root of n.  So if you had twice the

7    population in your survey, that actually doesn't

8    reduce the margin of error by a half.  So it's an

9    interesting dynamic of surveys that you divide

10   through by the square root of n when you're -- in

11   response to your question.

12   BY MR. TYSON:

13       Q     And when you refer to a 95 percent

14   confidence, is that referring to what's referred to

15   as a confidence interval?

16       A     Correct, or the margin of error of the

17   poll, yes.

18       Q     And is the 95 percent confidence level

19   sufficient for publication in a political science

20   journal, a survey of this type?

21               MR. CREELAN:  Objection as to form.

22       A     These are industry standard and academic

23   standard confidence intervals, yes, that's correct.

24   BY MR. TYSON:

25       Q     Just so I'm clear, you say the margin of

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 78

1    error for 142 respondents drawn from a population of

2    97,577, and we did the survey of the entire

3    universe, the 190,000, but since we're breaking down

4    these are the respondents with no contact, is that

5    why you're shrinking from the 190,000 to the 97,577

6    to calculate the margin of error?

7         A    That is correct.

8              MR. CREELAN:  Objection to form.

9         A    Yes, that's correct, that's the -- 97,577

10   is the number that's on page 12 of my report, Table

11   4 under the no contact, so that is where that number

12   comes from.

13   BY MR. TYSON:

14        Q    Did you calculate the margin of error of

15   179 completed surveys out of the 290,134 number?

16             MR. CREELAN:  Objection as to form.

17        A    I did not.

18   BY MR. TYSON:

19        Q    Based on your experience, would you expect

20   the margin of error to be higher or lower than 5.9

21   percent?

22        A    It should be slightly lower.

23        Q    Just so I understand, 179 surveys drawn

24   from a population of 290,000 is only going to have a

25   slightly lower margin of error than 142 drawn from a

Michael McDonald , PhD            February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 79

1    population of 97,577?

2        A    That's correct, it has to do with that

3    dividing through by the square root of n, so you're

4    not actually getting as much of a reduction as you

5    might otherwise think if you were just dividing

6    through by the number of responses that you had.

7        Q    So let's look at the conclusion next.  You

8    begin your conclusion with a qualifying statement:

9    If the list vendors' NCOA match is accurate.

10            Why is that qualifying statement ahead of

11   your opinions in the conclusion?

12            MR. CREELAN:  Objection.

13       A    This has also to do with another

14   qualifying phrase in this sentence, which is

15   "conservatively estimated."  So I am trying to be as

16   conservative as I possibly can and say if all of

17   these NCOAs are accurate following the law in

18   Georgia and the procedures for list maintenance, and

19   given all the discussion that we've had prior about

20   the temporal timing of when these NCOAs were

21   conducted and how they may not align properly with

22   the purging procedures in Georgia, the number that I

23   have is probably an overestimate most likely that

24   I'm reporting in my report of NCOA matches versus

25   the -- certainly the matches that are in the NCOA

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 80

1  list, and then it's unclear if any at all are -- in

2  the other two categories would be individuals who

3  would qualify under the list maintenance procedures

4  in Georgia.

5         So that's why that language is in there.

6  I'm just trying to be accurate as I can in

7  expressing my uncertainty and confidence in the

8  numbers so that I give the Secretary of State's

9  office as much benefit of the doubt as I possibly

10 can about what it is that my NCOA match is telling

11 us about what the Secretary of State's office did.

12 BY MR. TYSON:

13    Q    To arrive at the 59,866 no contact

14 registrants, am I correct that that is 85.3 percent

15 times 97,577?

16    A    That number is taken from Table 4 on page

17 12 of my report under the no contact designation

18 59,866, and there's a calculation there.  So these

19 would be all the individuals that did not have an

20 NCOA match from L2 or TargetSmart, and that is --

21 then I calculate the percentage of that over the

22 total number of the 97,577 again with the caveats

23 that we have gone over before about that number

24 because that number is actually smaller than the NGE

25 list for the reasons that we prior discussed.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                        Page 81

1       Q    So I appreciate your clarification on

2   that.  So it is not your -- you're not relying on

3   the survey to -- really to arrive at that 59,866,

4   correct?

5            MR. CREELAN:  Objection as to form.

6   BY MR. TYSON:

7       Q    In terms of just the number.  We'll get to

8   the opinion in a minute.

9       A    Yeah, in terms of the number, yeah, this

10  particular statement is about what the NCOA match of

11  the no contact list may tell us, yes, that's

12  correct.

13      Q    And so your opinion is no contact voters

14  who did not file an NCOA continue to reside at their

15  current voter registration address, correct?

16           MR. CREELAN:  Objection as to form.

17      A    Again, understanding the nuances of

18  purging procedures and the temporal timing of

19  everything else, that's a guess as to how many that

20  would be there, but those individuals may not

21  have -- be subjected to the list maintenance

22  procedures of Georgia.

23           Again, my understanding, because we

24  discussed this at the very beginning, just to be

25  clear because I don't want my opinion to be taken

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 82

1   out of context to say that they are no longer at

2   their address, there is a -- if these people were

3   flagged for NCOA by the Secretary of State's office,

4   there would be a confirmation letters that were sent

5   to them and an opportunity for those people to

6   address the fact that they had moved.  And then as I

7   understand it under NVRA, if they have done a recent

8   move they may still be eligible depending on how

9   they moved, whether it was within a county or

10  outside a county move, they may still be eligible to

11  vote at either -- and I don't know the specifics of

12  Georgia law on this, but I do know federal law says

13  you can either vote at your former precinct of

14  residence or new precinct of residence.

15         So it may be that even if these people

16  have moved that they are still eligible either

17  through the purging procedures or list maintenance

18  procedures of Georgia or under the National Voter

19  Registration Act procedures that would allow people

20  who have moved to vote despite the move that

21  happened since the last election.

22  BY MR. TYSON:

23      Q    And, again, just so I'm clear, the survey

24  results are support to your conclusion about the

25  number of cancellations of those who continue to

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 83

1    reside at their current voter registration address.

2    That's one piece of evidence that supports your

3    conclusion, correct?

4        A    Yes, there are three pieces of evidence

5    here, yes.

6        Q    The next piece of evidence you cite is the

7    surveyors were far more able to reach and survey

8    members of this group of voters on the purge list

9    than they were the returned mail or NCOA registrants

10   on that list.  And when you say reach and survey, it

11   means completed surveys, not necessarily we could

12   have reached them, and they refused to complete a

13   survey, right?

14            MR. CREELAN:  Objection.

15       A    Correct, by reach and survey meaning that

16   we had a completed interview with that individual.

17   BY MR. TYSON:

18       Q    And you said earlier you would not be

19   drawing conclusions based on the low number of

20   responses from NCOA or returned mail respondents,

21   but it looks like here you are drawing a conclusion

22   based on that low number of responses.

23            MR. CREELAN:  Objection as to form.

24       A    Yeah, earlier when we were having that

25   discussion I was talking about making inferential

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 84

1    statements about the population of NCOA or returned

2    mail.  So that was, at least as I understood the

3    context of our prior discussion, that was how I was

4    attempting to answer your questions.

5    BY MR. TYSON:

6        Q    Hypothetically -- consider the following

7    hypothetical:  Your survey showed that only 15

8    percent of the no contact registrants -- no contact

9    respondents to the survey still lived at their voter

10   registration address.  Would you still reach the

11   same opinion regarding the cancellation of no

12   contact registrants who lack an NCOA match?

13           MR. CREELAN:  Sorry, can you just reread

14   the question back?

15       A    I'm actually having trouble understanding

16   that one as well.

17   BY MR. TYSON:

18       Q    Why don't I just try again.  Let me do it

19   that way.  I want you to assume the following for

20   this hypothetical:  The number of no contact

21   individuals who do not have an NCOA match is the

22   same, 59,866.  You with me so far?

23       A    Restate that one more time --

24           MR. CREELAN:  Yeah.

25       A    -- just so I can follow it.  I'm trying to

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 85

1   follow along.  I apologize.  I really do.

2          MR. CREELAN:  You don't have to apologize.

3   Let him ask his questions.

4   BY MR. TYSON:

5      Q    I'm going to try to ask as clear as I can,

6   so it's definitely on me, not on you.

7          MR. CREELAN:  Just wait for the question.

8   BY MR. TYSON:

9      Q    So assume for purposes of this

10  hypothetical that Table 4 remains exactly the

11  same --

12     A    Okay.

13     Q    -- the number of inactive reason no

14  contact individuals who also did not have a match to

15  NCOA is 59,866.

16     A    Okay.

17     Q    We good so far?

18     A    Yeah.

19     Q    Okay.  Next assume that your survey

20  resulted in 15 percent of the no contact respondents

21  living at the address associated with their voter

22  registration record.

23     A    Okay.

24     Q    With me on that?

25     A    Yes.

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 86

1      Q    Would you still reach the same conclusion

2    that the Georgia Secretary of State's office

3    canceled the registrations of conservatively

4    estimated 59,866 no contact registrants who continue

5    to reside at their current registration address?

6              MR. CREELAN:   Objection as to form.

7      A    Again, these are conservative estimates,

8    and we've been having some discussions prior about

9    other responses that we've had from individuals.   So

10   some of these individuals on our survey, the 15

11   percent that you're referencing, we asked those

12   individuals, for example, have they temporarily

13   moved outside the state of Georgia, and three of the

14   respondents -- we've talked about one of them was a

15   business move, temporarily filed an NCOA.   So we

16   have at least one person in the 37,711 who had an

17   NCOA filed in the no contact bucket who was a

18   business person and moved outside of the state and

19   moved back.   All right.

20              There were actually -- there were three

21   people of that 15 percent that reported moving

22   outside the state and back.   Two of them were

23   business people, and one was a military move.

24              So I can't -- I can't say with certainty

25   that that 15 percent is capturing everybody who

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 87

1    is -- has moved away from their voter registration

2    address.  We had some responses within the survey to

3    suggest these were people who were making temporary

4    moves.

5             There were also people who reported moving

6    within the state of Georgia.  I can imagine, since

7    I'm at a university, that there are students who are

8    temporarily moving, and for them their thinking is

9    they have moved temporarily, but their registration

10   address is their permanent address.  And I think

11   there's quite a debate about that among election

12   administrators, but the law would say that they get

13   to determine their residence, but if they are -- if

14   that's how they're interpreting where they live,

15   then legitimately they and other people who are

16   temporarily moving for whatever purpose, be it

17   school, business, military, that these individuals

18   would -- may have a permanent registration address

19   that's different than their current residence.

20   BY MR. TYSON:

21       Q    What I'm trying to understand is how

22   important the survey is to your conclusion in the

23   first sentence of your conclusion.

24             MR. CREELAN:  Objection as to form.

25             MR. TYSON:  I'll get to my question.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 88

1              MR. CREELAN:   Sorry.

2    BY MR. TYSON:

3       Q    I wanted you to understand what I'm trying

4    to understand from your analysis at this point.

5              So let's assume that Table 4, all that

6    information is unchanged.  If you do not conduct any

7    survey and have no survey results, I want you to

8    assume those two things for this hypothetical, would

9    you still reach the same conclusion in sentence --

10   the first sentence of your conclusion?

11             MR. CREELAN:   Objection as to form.

12      A    I may if I had no survey.  Again, I just

13   want to point out that this is given all the caveats

14   we've discussed before, which is to say about the

15   timing and the nature of these NCOAs.

16             So I'm trying -- again, I'm trying to give

17   the Secretary of State's office as much of a benefit

18   of the doubt on an upward bound on what I think is

19   going on here, but there are other complications

20   here.  So I'm just acknowledging that and trying to

21   look through the survey, which brings into bear some

22   more supportive evidence of what's going on with

23   these no contact individuals.

24   BY MR. TYSON:

25      Q    I'll ask you one last hypothetical, then

Michael McDonald , PhD              February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 89

1    I'll leave the hypotheticals alone.

2         A    Hypotheticals are hard to answer.

3         Q    They are, I know.

4              Let's assume again Table 4 remains

5    unchanged, you conduct your survey, 0 percent of the

6    respondents for no contact report living at the

7    address associated with their registration record,

8    and none have moved temporarily.  Would you still

9    reach the same conclusion in the first sentence of

10   your conclusion?

11             MR. CREELAN:  Objection.

12        A    I don't believe that I would have written

13   the report at that point.  I think I would have

14   reported to the plaintiffs that the evidence didn't

15   support their contentions about the nature of the no

16   contact list.

17             And just to point this out, I have

18   actually testified against my plaintiff's wishes

19   before on that.  So if I didn't think -- to the

20   contrary there was anything in here that supported

21   your position, I would tell you honestly about that.

22   BY MR. TYSON:

23        Q    What are you referencing that you've

24   testified contrary to the plaintiffs before?

25        A    There was a voting rights case in New York

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 90

1    against the state senate districts.  I was brought

2    in to do a racial block voting analysis for the

3    plaintiffs.  The -- it was all last minute because

4    the analysis that they had hired for -- their other

5    expert had given nonsensical results, and they

6    needed to have someone come in and do more rigorous

7    methods to determine what was going on.  Very

8    unusual case.

9            And ultimately the results did not support

10   the plaintiff's contentions, and I -- it was --

11   trial was scheduled, and I showed up at trial, and I

12   honestly stated in my report and to the court

13   that -- what the nature of the results were.  So

14   yes, I have done that in that case.

15       Q    Thank you.

16            Next paragraph you reach an opinion again

17   with a qualifying "may" about the NCOA form.

18            MR. CREELAN:  I'm sorry, which paragraph

19   are you referring to?

20            MR. TYSON:  Second paragraph of the

21   conclusion.

22   BY MR. TYSON:

23       Q    Is the opinion you're identifying in the

24   first sentence of paragraph 2 based solely on the

25   second sentence in that paragraph that two data

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 91

1    vendors cannot find NCOA matches for nearly 14,732

2    registrants whom the Secretary of State's office

3    canceled based upon an alleged NCOA match?

4         A    That is correct.

5         Q    At any point in your analysis, did you

6    take into account Fair Fight Actions's efforts to

7    contact voters who were on the purge list?

8              MR. CREELAN:  Objection.

9         A    No, I was not provided any of that

10   information.

11   BY MR. TYSON:

12        Q    And you don't know if the lists that were

13   prepared by L2 and TargetSmart were used for any

14   phone calls that Fair Fight Action or others made to

15   people on the purge list?

16             MR. CREELAN:  Objection.

17        A    I have no knowledge of that.

18             MR. TYSON:  Let's go off the record for a

19   minute.

20             (Recess 11:57 a.m.-12:28 p.m.)

21   BY MR. TYSON:

22        Q    Turn to your CV.

23        A    I'm there, yes.

24        Q    Dr. McDonald, before lunch we were

25   wrapping up with your expert report and wanted to

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 92

1    move to the CV attached to that.  I just wanted to

2    walk through your background and experience and

3    start out with your bachelor's at the California

4    Institute of Technology.  I saw you were an

5    economics major.  How did you get into political

6    science from economics?

7         A     Well, economics is really the only social

8    science field that they have at California Institute

9    of Technology, so it was really -- that's their

10   social science equivalent degree at the -- at that

11   institution, but I worked with professors who did

12   political research, for example, Bruce Cain, and

13   he's a political scientist.  So I was really

14   studying under people like him who were political

15   science, but I also studied under some economists as

16   well.

17        Q     Then what did you do between earning your

18   bachelor's and working towards your PhD?  Was there

19   a gap or did you go directly from one to the next?

20        A     So two years I worked at a political

21   consulting firm called Pactech Data and Research.

22   And, among other things that they do, they manage

23   the elections and reapportionment database for the

24   state legislature in California.

25        Q     And have you been a map drawer in

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 93

1    reapportionment efforts over time?

2         A    I have drawn maps for redistricting

3    authorities, yes, I have done that.

4         Q    And are you a Maptitude guy, ArcGIS?

5         A    I do use Maptitude, but you can see

6    further down under my awards, and it's also in my

7    grant work, I'm part of a team that created an

8    application called DistrictBuilder, and it's an open

9    source web-based platform for drawing districts, and

10   I received several awards for the work in that area.

11        Q    Great.  The reason why I ask is before --

12   I was in law school, and before law school I drew

13   redistricting maps here in Georgia, so that's kind

14   of how I got my entree into the political law space.

15        A    I would be happy to talk with the

16   Secretary of State's office about deploying

17   DistrictBuilder for use.  We've been talking with

18   other states about doing that, so it's -- it's free

19   and available for everybody.  And just as an aside,

20   we are going to deploy a version for Georgia for

21   every state that will have the state legislative and

22   congressional district data preloaded into it, so it

23   will actually be available for everybody to use

24   publicly, so yeah.

25        Q    Very cool.  Good to know.  Thank you.

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 94

1    Been a while since I've done that, but I still have

2    fond memories of drawing maps.

3            Then you got your PhD at the University of

4    California in 1999.  What was your thesis topic?

5        A    It was on redistricting, and it was how

6    redistricting reduces the number of competitive

7    districts.

8        Q    If we could turn over to talk about your

9    work history, page 32.

10       A    Yes.

11           MR. CREELAN:  32 at the top.

12   BY MR. TYSON:

13       Q    Sorry, 12 at the bottom, 32 at the top.

14       A    I understand the dynamic now.

15       Q    The joys of the filing system.

16           So looks like post -- I guess your

17   postdoctoral research Harvard MIT Data Center, and

18   your first professorship was at Vanderbilt

19   University?

20       A    Correct, I was visiting assistant

21   professor there, so non-tenure track at Vanderbilt.

22       Q    I'm assuming teaching political science

23   courses?

24       A    Correct.

25       Q    Then was your position at University of

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 95

1    Illinois, Springfield, also a non-tenure track?

2        A    That was my first tenure track job.

3        Q    And, again, teaching primarily political

4    science topics?

5        A    Yes.

6        Q    And then at George Mason went from

7    assistant to associate professor, and I have to

8    confess my ignorance, I don't know the difference in

9    those two.

10       A    That's tenure.  So assistant would be in

11   the United States a non-tenured individual by and

12   large; associate is tenured by and large.  There are

13   some institutions where you can be associate without

14   being tenured, but, I mean, here this was mark of

15   being tenured.

16       Q    Did you apply for tenure when you were at

17   George Mason?

18       A    That is correct, yes.

19       Q    Were you awarded tenure at George Mason?

20       A    Yes.

21       Q    Then you went from there to the University

22   of Florida.  How did you come to the University of

23   Florida?

24       A    They had a position in what's called

25   informatics.  It's people who do big data, and they

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 96

1    had a number of positions, and they were looking to

2    fill one in the social science or political science

3    realm.  The work that I had done on DistrictBuilder,

4    which we discussed before, was one of the -- I gave

5    a talk on that work that we had done, and so that

6    was one of the reasons why I received that job at

7    the -- job offer at the University of Florida.

8         Q    And was Professor Smith already there at

9    the time you came?

10        A    Yes, he was.

11        Q    And was he involved in your hiring

12   process?

13        A    He was not chair at the time, and I don't

14   know if he was on the search committee.  Certainly,

15   I had contact with him about the position.  He

16   encouraged me to apply to it.  I do recall that.

17        Q    If you could turn to the next physical

18   page, we have the beginning of the expert witness

19   work in Georgia on down at the bottom of that page.

20   Are you with me on that?

21        A    Yes, I am.

22        Q    And for each of the cases in Georgia on

23   page 13 on the bottom and page 14 where you served

24   as an expert witness you served for the plaintiffs

25   challenging state laws, correct?

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 97

1        A     That is correct.

2        Q     And in the other cases on this list

3    outside of the state of Georgia, have you always

4    testified as an expert on behalf of plaintiffs?

5        A     No.

6        Q     Can you point me to where you were

7    testifying as a defense expert, if you recall?

8        A     As we go down the list if you -- sixth

9    bullet point, Arizona Libertarian Party versus

10   Reagan, I was retained by the Attorney General's

11   office in Arizona to defend that case.

12             As we go down further, the Beaumont

13   Independent School District was -- although that

14   never went to trial, it was more of a -- it was a

15   Section 5, Section 2 claim that the DOJ wanted more

16   information from Beaumont, so I worked with the

17   locality on that case.  Legal matter, I guess, might

18   be the better way to phrase that.

19             As we go down the list further, the Healey

20   versus State, et al., which is almost about three

21   quarters of the way down, that's a claim that

22   plaintiffs brought against the Rhode Island

23   government, and I worked for the Attorney General's

24   office in Rhode Island to defend that case.

25             And as we go down the list on the top of

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 98

1    page 15, first one there, that was -- plaintiffs

2    were challenging work of the Arizona Redistricting

3    Commission, and I had been a consultant, and

4    actually the primary allegations that were being

5    made in that case were related to the work that I

6    did for the commission, so I worked for the

7    commission defending their work in that case.

8              Going down the list further, the In Re

9    Redistricting Cases is a challenge by plaintiffs to

10   the Alaskan Apportionment Commission Board's work,

11   and I worked for the apportionment board in that

12   case defending their work.

13             And then this United States versus Upper

14   San Gabriel Valley Municipal Water District, that's

15   a case where I was retained by that municipal water

16   district.  That was not -- did not go to trial,

17   again, but I filed a report, and there was a

18   settlement on that, so we never moved beyond that.

19             So in some of these cases on all my list

20   some of them I worked for a state, but it was not

21   necessarily the case that I necessarily was deposed

22   or testified at trial.

23        Q    Okay.  And back one page the other Georgia

24   reference I wanted to ask you about was as a

25   consulting expert to Bondurant, Mixson & Elmore,

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 99

1    Review of Georgia's state legislative and

2    congressional redistricting Section 5 submission,

3    about the middle of the page there --

4        A    Yes.

5        Q    -- did that result in any sort of court,

6    or was that just in an advisory capacity?

7        A    I produced a report for the -- it wasn't

8    really plaintiffs, it was -- well, it was plaintiffs

9    because -- but it was an intervening group.  So it

10   wasn't the plaintiffs, it was an intervening group,

11   and as I recall this was the State Legislative Black

12   Caucus that was the group that commissioned the

13   work.  And I produced a report, we presented that

14   report to the Department of Justice, and we were

15   making an argument in that case about whether or not

16   the Department of Justice needed to request more

17   information from the state regarding the -- their

18   Section 5 submission.

19           And that was a Section 5 submission that

20   was going -- you may recall if you were involved in

21   this, this was going through the court system, not

22   through the Department of Justice.  This was a

23   different process in that round of redistricting

24   than typically had been done in the past.

25       Q    Thank you.  Very helpful.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 100

1           Are you personally opposed to cancellation

2    of voter registrations for no contact?

3           MR. CREELAN:   Objection.

4      A    Am I personally opposed.  I mean, so I'm

5    not forming an opinion about that in my case -- or

6    in my report, so that's -- I can see circumstances

7    where if someone hasn't had contact for a hundred

8    years probably should remove them.  So I don't want

9    to say never, but I think that it would have to

10   follow the legal requirements in order to be a valid

11   removal reason.

12   BY MR. TYSON:

13     Q    The last page of your CV there you list

14   some campaigns where you worked as a political

15   consultant.

16     A    Yes.

17     Q    All of those campaigns were partisan for

18   Democrats?

19     A    That is correct.

20     Q    Now, one of the things I know from looking

21   at your scholarship, things that you study is the

22   issue of kind of voter turnout nationwide; is that

23   correct?

24     A    Yes, that is correct.

25           (Defendant's Exhibit 3 was marked for

Michael McDonald , PhD              February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 101

1    identification.)

2    BY MR. TYSON:

3        Q    Hand you what I marked as Exhibit 3 and

4    ask if you recall this New York Times story.

5              MR. CREELAN:  Objection.

6        A    I do not recall it.

7    BY MR. TYSON:

8        Q    Why don't we turn to the second physical

9    page, and you see the first full paragraph there,

10   there's a quote purporting to be from Michael P.

11   McDonald.  Is that a quote from you?

12       A    I assume that it is because I don't know

13   of another Michael P. McDonald who studied this

14   issue.

15       Q    You'd agree that the voter turnout in the

16   2018 election was very large compared to other

17   midterm elections, right?

18       A    Yes.

19       Q    And you operate the Twitter account

20   ElectProject; is that correct?

21       A    That is correct.

22             (Defendant's Exhibit 4 was marked for

23   identification.)

24   BY MR. TYSON:

25       Q    Hand you what we marked as Exhibit 4.  And

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 102

1    this is a tweet from ElectProject, appears to be a

2    few days ago, talking about turnout assumptions.  Do

3    you recall what this tweet was in reference -- first

4    of all, is this a tweet that you sent out through

5    ElectProject?

6          A     Yes.  That is correct, yes.

7          Q     And do you recall what this tweet was in

8    reference to?

9          A     The original tweet that I'm quoting is a

10   study that analyzes youth turnout in making

11   projections on what a pair of researchers believe

12   are the projected turnout rates of young people in

13   the 2020 election, and I was objecting here to the

14   notion that we would think about a realistic --

15   quote/unquote realistic turnout assumption from what

16   we had seen 2018 turnout in midterm election be so

17   unusually high that what may happen in 2020 may also

18   be unusually high.  I've been on record in multiple

19   media outlets saying that we should be prepared for

20   an unusually high 2020 turnout election.

21         Q     Why is it necessary to prepare for

22   unusually high turnout elections?

23         A     There have been examples in the past where

24   election officials have made preparations for lower

25   turnout than they actually get, and what actually

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 103

1    happens, and as a consequence of that there may be

2    long lines because the election officials have

3    reduced the number of polling locations or don't

4    have enough ballots on hand.  That's actually

5    happened in some cases where there weren't enough

6    ballots.

7              And so people need to be -- election

8    administrators need to just be prudently aware we

9    can be seeing in November an unusually high

10   election, and so we just need to make proper

11   preparations so we can manage the flow of people who

12   are coming to vote.

13             (Defendant's Exhibit 5 was marked for

14   identification.)

15   BY MR. TYSON:

16        Q    Hand you what we marked as Exhibit 5 and

17   ask if you recognize this document.

18        A    I have not read it, but I have seen news

19   reports about the -- about this story, and I have

20   spoken with reporters about this report.

21        Q    So on the second physical page there's a

22   statement that:  In 2016, nearly 100 million

23   eligible Americans did not cast a vote for President

24   representing 43 percent of the eligible voting age

25   population.  Looks like it's citing your data for

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 104

1    that.  Do you see that?

2         A    Yes.

3         Q    When you have spoken with media outlets

4    about this report, what types of topics are the

5    reporters interested in?

6         A    They're interested --

7              MR. CREELAN:  Objection.

8         A    They're interested to know the veracity of

9    the report.

10   BY MR. TYSON:

11        Q    And you said you haven't read this report,

12   so you can't really say anything about the data

13   itself or the research itself?

14        A    Yeah, I've seen the summaries of the

15   report, but I haven't read the report in detail and

16   looked at all its methodology, yeah.

17        Q    Made short work of that one.

18        A    I think I was preparing and --

19             MR. CREELAN:  Wait for the question.

20   BY MR. TYSON:

21        Q    What's that?

22        A    -- writing a report and...

23        Q    Dr. McDonald, have you ever personally

24   worked as an election administrator?

25        A    I have not other than being a poll worker.

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 105

1      Q    Which on behalf of all voters, thank you

2  for serving as a poll worker.  Anybody who serves as

3  a poll worker I say thank you.  It's an important

4  job.

5           Have you ever taught a class specifically

6  on Georgia election procedures?

7      A    I have not.

8      Q    Have you ever spoken to any local election

9  officials in Georgia regarding election procedures?

10     A    I have.

11     Q    And who are those local election

12 officials?

13     A    This is a long time ago, so I can't

14 remember his name, and I can't even remember which

15 jurisdiction he was in.  I want to say out of

16 Savannah.  And he had done -- he was -- had an

17 engineering background, I don't know if you know the

18 person I'm talking about, but he had been using GIS

19 to locate the early vote centers and try to manage

20 the location of the early vote centers to best

21 accommodate voters, so he was doing some innovative

22 things about using GIS to better the functioning of

23 elections.  So I do recall having that conversation

24 with him, but this was many years ago.

25     Q    Have you spoken -- ever spoken to

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 106

1    Secretary of State officials regarding Georgia's

2    voter registration database?

3         A    I have requested the file.  I have

4    requested documentation on the file.  Those are the

5    primary contacts that I've had with the Secretary of

6    State's office regarding the voter registration

7    database.

8              MR. TYSON:  Go off the record for just a

9    second.

10             (Recess 12:51-12:52 p.m.)

11   BY MR. TYSON:

12        Q    Dr. McDonald, thanks for your time today.

13   I don't have any further questions.

14        A    Thank you.

15             (Deposition concluded at 12:52 p.m.)

16             (Signature reserved.)

17

18

19

20

21

22

23

24

25

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 107

1          The following reporter and firm
disclosures were presented by me at this proceeding
2    for review by counsel:
3               REPORTER DISCLOSURES
4          The following representations and
disclosures are made in compliance with Georgia Law,
5    more specifically:
6          Article 10 (B) of the Rules and
Regulations of the Board of Court Reporting
(disclosure forms)
7          OCGA Section 9-11-28 (c) (disqualification
of reporter for financial interest)
8          OCGA Sections 15-14-37 (a) and (b)
(prohibitions against contracts except on a
9    case-by-case basis).
10   - I am a certified court reporter in the State of
Georgia.
11   - I am a subcontractor for Veritext.
- I have been assigned to make a complete and
12   accurate record of these proceedings.
- I have no relationship of interest in the matter
13   on which I am about to report which would disqualify
me from making a verbatim record or maintaining my
14   obligation of impartiality in compliance with the
Code of Professional Ethics.
15   - I have no direct contract with any party in this
action, and my compensation is determined solely by
16   the terms of my subcontractor agreement.
17
18               FIRM DISCLOSURES
19   - Veritext was contacted to provide reporting
services by the noticing or taking attorney in this
20   matter.
- There is no agreement in place that is prohibited
21   by OCGA 15-14-37 (a) and (b).  Any case-specific
discounts are automatically applied to all parties,
22   at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as
23   produced will be a true, correct, and complete
record of the colloquies, questions, and answers as
24   submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits
25   as submitted by the reporter, attorneys, or
witnesses.

Michael McDonald , PhD                    February 28, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 108

1    - Password-Protected Access:  Transcripts and

     exhibits relating to this proceeding will be

2    uploaded to a password-protected repository, to

     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 109

```
 1                      CERTIFICATE
 2    STATE OF GEORGIA:
      COUNTY OF FULTON:
 3
 4           I hereby certify that the foregoing
      transcript was taken down, as stated in the caption,
 5    and the colloquies, questions and answers were
      reduced to typewriting under my direction; that the
 6    transcript is a true and correct record of the
      evidence given upon said proceeding.
 7           I further certify that I am not a relative
      or employee or attorney of any party, nor am I
 8    financially interested in the outcome of this
      action.
 9           I have no relationship of interest in this
      matter which would disqualify me from maintaining my
10    obligation of impartiality in compliance with the
      Code of Professional Ethics.
11           I have no direct contract with any party
      in this action and my compensation is based solely
12    on the terms of my subcontractor agreement.
             Nothing in the arrangements made for this
13    proceeding impacts my absolute commitment to serve
      all parties as an impartial officer of the court.
14
15           This the 13th day of March, 2020.
16
17
18
19           ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25
```

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 110

1   To: Jeremy Creelan, Esq.

2   Re: Signature of Deponent Michael McDonald, PhD

3   Date Errata due back at our offices: 4/13/20

4

5   Greetings:

6   This deposition has been requested for read and sign
    by the deponent.  It is the deponent's

7   responsibility to review the transcript, noting any
    changes or corrections on the attached PDF Errata.

8   The deponent may fill out the Errata electronically
    or print and fill out manually.

9

    Once the Errata is signed by the deponent and

10  notarized, please mail it to the offices of Veritext
    (below).

11

    When the signed Errata is returned to us, we will

12  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies

13  of the Errata to all ordering parties.

14  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the

15  court without the signature of the deponent.

16

17  Please send completed Errata to:

18  Veritext Production Facility

19  20 Mansell Court, Suite 300

20  Roswell, GA 30076

21  (770) 343-9696

22

23

24

25

Michael McDonald , PhD          February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 111

1    ERRATA for ASSIGNMENT #
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that

3

4    ___ There are no changes noted.
5    ___ The following changes are noted:
6

     Pursuant to Rule 30(7)(e) of the Federal Rules of
7    Civil Procedure and/or OCGA 9-11-30(e), any changes
     in form or substance which you desire to make to
8    your testimony shall be entered upon the deposition
     with a statement of the reasons given for making
9    them.  To assist you in making any such corrections,
     please use the form below.  If additional pages are
10   necessary, please furnish same and attach.
11   Page No._____Line No._____Change to_____
12   _____
13   Reason for change_____
14   Page No._____Line No._____Change to_____
15   _____
16   Reason for change_____
17   Page No._____Line No._____Change to_____
18   _____
19   Reason for change_____
20   Page No._____Line No._____Change to_____
21   _____
22   Reason for change_____
23   Page No._____Line No._____Change to_____
24   _____
25   Reason for change_____

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 112

1   Page No._____Line No._____Change to_____

2   _____

3   Reason for change_____

4   Page No._____Line No._____Change to_____

5   _____

6   Reason for change_____

7   Page No._____Line No._____Change to_____

8   _____

9   Reason for change_____

10  Page No._____Line No._____Change to_____

11  _____

12  Reason for change_____

13  Page No._____Line No._____Change to_____

14  _____

15  Reason for change_____

16  Page No._____Line No._____Change to_____

17  _____

18  Reason for change_____

19

                    _____

20                      DEPONENT'S SIGNATURE

21  Sworn to and subscribed before me this____day of

    _____, 20__.

22

23  _____

    NOTARY PUBLIC

24

25  My Commission Expires:_____

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[& - 770]**                                                    Page 1

| & |
|---|
| **&**   1:15 3:4,10,17 98:25 |

| 0 |
|---|
| **0**   89:5 |
| **05391**   1:7 |

| 1 |
|---|
| **1**   2:4 7:2,3,11,12 11:2 38:2 39:23 76:12 |
| **1.0**   37:22 |
| **10**   4:10 107:5 |
| **10,000**   16:2 |
| **100**   2:7 103:22 |
| **10022**   3:6 |
| **101**   2:8 |
| **103**   2:10 |
| **1099**   3:11 |
| **10:46-10:59**   53:10 |
| **11**   40:14 43:19 |
| **1180**   1:16 3:18 |
| **11:57**   91:20 |
| **12**   42:12,13 53:25 78:10 80:17 94:13 |
| **122**   73:5 74:4,16 74:18 |
| **12:28**   91:20 |
| **12:51-12:52** 106:10 |
| **12:52**   106:15 |
| **13**   46:3 53:12 55:20 57:7 59:8 96:23 |
| **13609**   109:18 |
| **13th**   109:15 |
| **14**   68:2,10 69:22 70:5 71:16 96:23 |
| **14,732**   91:1 |
| **142**   68:3,8,12,16 69:3,11,14 76:20 |

**78:1,25**
**15**   10:24 84:7 85:20 86:10,21,25 98:1
**15-14-37**   107:8,21
**15th**   19:18 31:13 38:14
**16**   71:17
**160**   48:25
**1600**   4:5
**1650**   1:17 3:19
**17**   68:14,21 69:1 69:24
**178**   61:22
**179**   62:1,2,8 68:8 68:12 78:15,23
**18**   69:22,22
**19**   68:13,20 69:1 69:24
**190,000**   60:22 78:3 78:5
**1999**   94:4
**1:18**   1:7
**1st**   61:11

| 2 |
|---|
| **2**   2:5 7:13,17 8:18 39:1 76:8 90:24 97:15 |
| **2.0**   35:25 36:23 |
| **2.9**   37:6 |
| **20**   10:24 110:19 112:21 |
| **200**   4:6 |
| **20001**   3:13 |
| **2008**   52:10 |
| **2012**   41:25 42:5,24 43:2,3,24 |
| **2014**   2:7 |
| **2016**   29:4 42:5,23 44:3,6,14,24 45:3 52:1,10 103:22 |

**2017**   42:5
**2018**   101:16 102:16
**2019**   19:18
**2020**   1:13 42:21 102:13,17,20 109:15
**204**   61:15,19 62:2
**213**   22:5,15 23:6,6
**2138**   1:19 109:19
**22**   59:24
**22,603**   24:8
**23,000**   59:24
**24th**   61:10
**25**   61:20 62:2
**28**   1:13 2:6
**29**   69:22
**290**   59:24
**290,000**   60:20 78:24
**290,134**   25:6 56:22 57:5,6 78:15
**293**   24:8,11

| 3 |
|---|
| **3**   2:6 18:16 19:10 20:20 28:4 39:24 100:25 101:3 |
| **30**   19:11 69:22 111:6 |
| **300**   110:19 |
| **30076**   110:20 |
| **30309**   3:20 |
| **30339**   4:7 |
| **30th**   19:25 27:16 |
| **313,000**   16:12 22:16 59:22 |
| **313,030**   24:7 |
| **32**   94:9,11,13 |
| **343-9696**   110:21 |
| **37**   63:13,14 |

**37,711**   86:16
**38**   70:19 71:8
**38.6**   54:19 55:4

| 4 |
|---|
| **4**   2:8 19:16 20:22 53:15,17 55:21 56:22 57:4 78:11 80:16 85:10 88:5 89:4 101:22,25 |
| **4/13/20**   110:3 |
| **40**   15:19 |
| **400**   15:8 |
| **43**   103:24 |
| **44**   69:23 |
| **47,470**   61:7 |
| **47,770**   61:14 65:4 |
| **48**   42:10,13 |
| **48,000**   61:2 |

| 5 |
|---|
| **5**   2:9,13 22:4 97:15 99:2,18,19 103:13,16 |
| **5.9**   78:20 |
| **50**   15:19 |
| **51.4**   69:9 |
| **59,866**   59:10 80:13 80:18 81:3 84:22 85:15 86:4 |

| 6 |
|---|
| **6**   35:24 69:21 71:11,11,15 73:9 |
| **60**   69:10 |

| 7 |
|---|
| **7**   2:4,5 71:12 73:5 111:6 |
| **770**   110:21 |

Michael McDonald , PhD                                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[8 - appreciate]**                                                    Page 2

| **8** |
| --- |

**8**   19:10 28:4
**85.3**   80:14
**86**   44:15
**86.4**   43:20 46:24
54:6

| **9** |
| --- |

**9**   38:3
**9-11-28**   107:7
**9-11-30**   111:7
**900**   3:12
**919**   3:5
**95**   77:13,18
**97,000**   56:5
**97,577**   59:24 78:2
78:5,9 79:1 80:15
80:22
**9:33**   1:14

| **a** |
| --- |

**a.m.**   1:14 53:10
91:20
**able**   45:5 65:8
83:7
**absence**   23:10
**absent**   45:13
48:14
**absolute**   109:13
**absolutely**   21:5
**academic**   77:22
**access**   108:1,2
**accommodate**
105:21
**account**   91:6
101:19
**accurate**   66:11
79:9,17 80:6
107:12
**accurately**   16:9
**acknowledging**
88:20

**acronym**   14:12
17:18
**act**   11:25 82:19
**action**   1:4,6 12:20
13:16 91:14
107:15 109:8,11
**actions's**   91:6
**active**   26:17 27:24
61:21
**actual**   10:14
**add**   73:22 75:13
**addition**   17:11,17
**additional**   8:18
17:23 43:23 48:14
53:4 73:9,17
111:9
**additionally**   17:12
**address**   12:16
16:10 17:18 18:6
18:9,17 21:11,13
28:16,17,22 43:15
43:17 47:11,17
49:4 50:3 57:13
58:3,25 65:7,17,22
66:2 70:14 71:19
71:22 72:8,11,20
73:6,20,21 74:5
75:14 81:15 82:2
82:6 83:1 84:10
85:21 86:5 87:2
87:10,10,18 89:7
**addresses**   17:25
49:2
**addressing**   20:21
**administration**
11:3,5,18 12:5
13:21 14:20 22:1
25:19 32:3 51:3
**administrator**
104:24

**administrators**
26:24 87:12 103:8
**admit**   24:6
**advise**   13:3
**advisory**   99:6
**affect**   22:17,21,23
23:8,11,15
**african**   37:19 38:7
38:12,14 39:22
**age**   31:19 39:2
67:10,16,20 69:10
69:21 70:1 103:24
**agenda**   20:6
**aggressive**   46:6,9
**ago**   35:5 102:2
105:13,24
**agree**   38:11
101:15
**agreed**   5:10
**agreement**   15:3,4
31:24 107:16,20
109:12
**ahead**   10:13 79:10
**al**   1:4,8 97:20
**alaskan**   98:10
**algorithm**   48:3
**align**   79:21
**allegations**   98:4
**alleged**   91:3
**allow**   12:23 82:19
**allowed**   5:4
**amended**   8:23
**american**   2:9
38:12 39:22
**americans**   37:19
38:7,14 103:23
**analyses**   23:5
32:11 39:7
**analysis**   9:2 17:6
23:11 32:8,17
35:7,16 39:3,6

40:15 61:22 63:25
65:10 68:25 70:5
70:11 71:13 73:10
73:17,23 75:18
88:4 90:2,4 91:5
**analyze**   45:6
**analyzed**   16:23
17:8,20 24:9,17
**analyzes**   102:10
**analyzing**   32:23
**answer**   33:25 45:5
56:13 67:5 69:6
73:16 84:4 89:2
**answering**   13:24
**answers**   5:24
69:20 107:23
109:5
**anybody**   105:2
**apart**   6:20
**apolitical**   51:9
**apologize**   21:5
29:9 34:1 59:18
65:1 85:1,2
**appear**   10:11
31:25 54:3 73:2
**appearances**   3:1
4:1
**appearing**   30:10
**appears**   7:19
102:1
**appended**   41:13
**application**   93:8
**applied**   48:1
107:21
**apply**   31:20 95:16
96:16
**apportionment**
98:10,11
**appreciate**   38:1
81:1

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[approach - broken]**                                                      Page 3

**approach** 31:19
**appropriate** 16:19
**approximately** 15:25
**approximation** 16:14
**arcgis** 93:4
**area** 11:14 93:10
**arena** 13:21
**argument** 99:15
**arizona** 97:9,11 98:2
**arrangements** 109:12
**arrive** 28:1 80:13 81:3
**arrived** 56:4 66:23
**art** 34:19,23 35:1
**article** 4:10 107:5
**aside** 7:10 93:19
**asked** 6:3,3 8:12 8:17 16:4 40:9 73:10,14 86:11
**asking** 11:23 12:25 34:9 56:8 56:13 68:17 72:19 73:19
**asks** 36:13 71:19 72:7
**assessing** 16:12
**assigned** 107:11
**assignment** 111:1
**assist** 111:9
**assistant** 94:20 95:7,10
**associate** 95:7,12 95:13
**associated** 70:14 73:7 74:5 85:21 89:7

**assume** 42:16 84:19 85:9,19 88:5,8 89:4 101:12
**assumes** 36:15
**assuming** 11:17,22 69:25 94:22
**assumption** 102:15
**assumptions** 102:2
**atlanta** 1:2,18 3:20 4:7
**attach** 111:10
**attached** 92:1 110:7
**attachment** 63:12 63:15,15
**attempted** 30:6 60:25 61:3,5
**attempting** 62:14 84:4
**attempts** 14:5 60:24
**attorney** 97:10,23 107:19 109:7 110:12
**attorneys** 107:25
**authorities** 93:3
**automatically** 107:21
**available** 34:10 67:16 93:19,23
**avenue** 3:5,11
**awarded** 95:19
**awards** 93:6,10
**aware** 103:8

**b**

**b** 1:19 4:10 63:13 63:15,15 107:5,8 107:21 109:19

**bachelor's** 92:3,18
**back** 12:17,22 28:5,7,14 35:19 39:16 41:25 42:21 42:24 44:4 45:10 56:24 58:3 63:11 65:12 72:4 74:6 74:11 75:1 84:14 86:19,22 98:23 110:3
**background** 92:2 105:17
**backing** 20:16
**bad** 64:11,16,17 65:21
**ballots** 103:4,6
**based** 23:7,20,24 25:18 27:10 46:7 58:23 65:19 78:19 83:19,22 90:24 91:3 93:9 109:11
**basic** 5:22
**basically** 16:12 30:9
**basis** 29:1 107:9
**bear** 15:18 76:11 88:21
**beaumont** 97:12 97:16
**beauty** 71:1
**beginning** 39:17 81:24 96:18
**behalf** 3:2 4:2 97:4 105:1
**believe** 14:13 20:1 38:17 46:7 54:22 72:18 73:18 89:12 102:11
**benefit** 80:9 88:17
**best** 13:22 14:22 19:3 53:1 105:20

**better** 97:18 105:22
**beyond** 6:22 13:25 14:22 17:6 40:7 98:18
**big** 68:2 95:25
**bill** 15:20,22,24,25
**bimonthly** 41:24 50:12
**birth** 49:10
**bit** 7:22 11:4 13:24 18:19,21 51:11,16 70:24 76:9 77:4
**black** 37:6,9,24 40:5 99:11
**block** 3:4,10 90:2
**board** 4:11 75:10 98:11 107:6
**board's** 98:10
**bondurant** 98:25
**bosworth** 1:19 109:19
**bottom** 35:24 68:1 71:2 94:13 96:19 96:23
**bound** 48:11 88:18
**box** 75:16
**brad** 1:7 5:3
**break** 24:22 53:7,9
**breakdown** 69:20
**breaking** 78:3
**breaks** 5:24
**briefly** 20:16 53:15
**briefs** 9:23
**brings** 88:21
**broad** 13:23
**broadly** 11:7,14 14:7
**broken** 6:20

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[brought - comes]                                              Page 4

brought 90:1
97:22
bruce 92:12
bryan 3:16 4:3
53:5
btyson 4:8
bucket 74:9,22
86:17
bullet 18:16,19
19:6 20:19 97:9
bundy 1:15 3:17
business 20:18,24
21:8,10,11 47:11
47:16 58:9 75:1
86:15,18,23 87:17

c

c 14:13 107:7
cain 92:12
calculate 76:1,3,6
78:6,14 80:21
calculation 76:17
80:18
calculations 15:17
calculator 76:15
76:18
calendar 42:23
california 92:3,8
92:24 94:4
call 8:2 9:8 63:22
64:13 65:20
called 14:1 17:15
56:16 76:6 92:21
93:8 95:24
calls 9:9 60:25
61:12 91:14
campaign 52:1,10
campaigns 52:11
100:14,17
canceled 25:4,11
25:13,15,20 26:17
26:20 27:18 58:17

86:3 91:3
cancellation 84:11
100:1
cancellations
82:25
candidates 50:15
50:19
capacity 1:8 99:6
caption 109:4
captured 40:1
43:25
capturing 44:13
86:25
care 53:4
careful 22:11 60:8
case 6:13 7:18
8:24 9:3,21,24
12:19 15:20 20:3
20:6 33:14 64:3
71:7 89:25 90:8
90:14 97:11,17,24
98:5,7,12,15,21
99:15 100:5 107:9
107:9,21
cases 96:22 97:2
98:9,19 103:5
cast 103:23
categories 38:6
56:18 58:25 60:15
80:2
caucus 99:12
cause 38:18
caveats 80:22
88:13
ccr 1:19 109:19
cell 41:9,11 60:23
center 14:2,12
94:17
centers 105:19,20
central 39:18

certain 29:9 49:21
60:11 70:6
certainly 12:10
13:25 35:20 50:25
52:17 58:9 62:8
79:25 96:14
certainty 63:3
64:12 65:14 86:24
certificate 109:1
certified 107:10
107:24
certify 109:4,7
111:2
chair 10:21 96:13
challenge 9:7 24:6
33:2 98:9
challenging 9:14
9:17 96:25 98:2
change 17:18
18:17 28:17 47:11
47:16 111:11,13
111:14,16,17,19
111:20,22,23,25
112:1,3,4,6,7,9,10
112:12,13,15,16
112:18
changed 25:11
58:12
changes 76:8
107:24 110:7
111:4,5,7
channels 41:4
character 47:14
characteristics
27:8 31:12,21
33:7 34:15 38:22
66:20 67:10,16,20
characterize 29:14
63:8
characterizing
45:8

characters 49:21
check 13:14,17
28:13,14 41:15
54:17 74:6
checked 75:15
chose 26:13
circle 4:5
circumstances
66:17 100:6
cite 83:6
citing 103:25
citizens 52:20
civil 1:6 5:5 111:7
claim 97:15,21
clarification 81:1
clarify 36:8,18
63:12
clarifying 56:23
clarity 35:8
class 105:5
clear 36:9 77:25
81:25 82:23 85:5
cleared 59:20
clearer 35:3
client 51:14,18
clients 50:16,22,23
clinton 51:25
52:10,11
close 14:21 46:3
closest 19:24
coalition 20:5
code 28:6,7 63:18
107:14 109:10
colloquies 107:23
109:5
combined 46:16
46:16,17
come 7:25 36:9
51:25 90:6 95:22
comes 12:17,22
28:14 64:5 73:23

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[comes - correct]**                                                    Page 5

78:12
comfortable 69:23
70:1
coming 103:12
comment 30:25
commenting 16:25
commission 98:3,6
98:7,10 112:25
commissioned
17:12,13 99:12
commissions
28:12
commitment
109:13
committee 96:14
communication
29:21,25 30:6
community 14:20
compare 31:14
69:16
compared 36:2
37:8,24 101:16
compares 18:18
comparing 33:9
comparison 33:13
53:17
comparisons
69:14
compensated 15:8
compensation
107:15 109:11
competitive 94:6
complaint 8:23
complete 39:8
61:19 83:12
107:11,23
completed 61:15
61:22 62:8 63:19
65:6,8,15,20 68:11
69:12 78:15 83:11
83:16 110:17

completely 51:9
compliance 107:4
107:14 109:10
complications
88:19
compound 73:14
comprehensive
41:23
concentrated 9:6
concerned 22:7,15
conclude 23:20
concluded 106:15
conclusion 22:20
22:23 23:7,8
46:14 59:9 66:24
66:25 79:7,8,11
82:24 83:3,21
86:1 87:22,23
88:9,10 89:9,10
90:21
conclusions 22:18
23:17,25 33:18,20
38:18,23 39:13
69:24 70:1 83:19
conduct 8:21 13:3
17:6 23:5 41:5,24
42:12 88:6 89:5
conducted 10:10
11:9 28:25,25
29:3 32:18 42:20
44:3,5 54:23
55:25 59:3 62:24
64:8 79:21
conducting 55:7
75:18 76:22
conduction 17:13
confess 95:8
confidence 52:23
77:14,15,18,23
80:7

confirmation
12:17 82:4
confusion 59:14
59:18
congressional
93:22 99:2
consecutive 6:16
6:19
consequence
103:1
conservative 44:9
48:10 52:13 79:16
86:7
conservatively
79:15 86:3
consider 26:15
58:13 84:6
consistent 46:25
consistently 26:19
consultant 98:3
100:15
consulting 92:21
98:25
contact 9:11,14
10:4 18:18 20:13
21:23 24:18 28:21
28:22 29:7,16,18
29:19,22 30:10,14
37:14,16,19,20,23
38:8,13 39:22
40:1,5 54:11,20
55:11,22 59:10,12
59:16,25 60:13
61:2,6 67:25 68:3
68:12,13 69:3,11
69:18 70:12 74:1
74:9 78:4,11
80:13,17 81:11,13
84:8,8,12,20 85:14
85:20 86:4,17
88:23 89:6,16

91:7 96:15 100:2
100:7
contacted 10:7,10
40:17 107:19
contacts 29:20
61:3,4 68:10
106:5
contains 48:24
content 72:22
contentions 89:15
90:10
contest 20:14 57:1
context 82:1 84:3
continue 12:15
17:25 58:24 81:14
82:25 86:4
continued 4:1
contract 107:15
109:11
contracts 107:8
contrary 89:20,24
convenient 53:6
conversation 8:19
105:23
cool 93:25
copies 110:12
correct 5:9,20
6:19 8:6,15 11:21
12:2 17:2 18:3
19:14,15,19 20:4,7
22:3 24:15,20
25:5,11 26:8
27:11,13 37:4,12
38:15,16 40:3,6
45:4 46:10 50:11
53:23 55:19 57:5
57:6,6,23 58:20
59:7 60:2 61:16
62:5,7 63:13,16
66:21 71:15 75:12
75:17 77:16,23

Michael McDonald , PhD                                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[correct - description]**                                                    Page 6

78:7,9 79:2 80:14
81:4,12,15 83:3,15
91:4 94:20,24
95:18 96:25 97:1
100:19,23,24
101:20,21 102:6
107:23 109:6
**corrections** 110:7
111:9
**correctly** 38:4
48:25 53:17 57:25
**cost** 40:25 41:5
**counsel** 3:1 4:13
6:14,22 16:5 41:4
107:2
**counted** 28:21
**counting** 63:19
**country** 13:17
**county** 24:13 82:9
82:10 109:2
**couple** 53:4
**course** 36:14
**courses** 94:23
**court** 1:1 4:11,13
90:12 99:5,21
107:6,10,24
109:13 110:15,19
**cover** 42:22
**covered** 20:1
21:12,13 44:6
47:4 72:2
**crc** 1:19 109:19
**create** 20:15
**created** 93:7
**creelan** 3:3 5:6,10
7:11 8:2 9:16 11:6
12:7 13:5 18:4,23
22:10,25 23:12,23
24:21 25:12 26:7
26:22 27:4,12
28:3 32:6,14,19,24

33:23 34:21 35:8
36:7 38:20 40:8
42:8 43:4 44:1
45:1 46:11 49:24
51:6 53:5,24
54:14 55:14 56:1
56:7 58:21 60:4
61:1 62:11,22
64:2 65:11 66:22
68:6 70:3,17,22
71:5,14,24 72:3,12
72:17 75:23 77:1
77:21 78:8,16
79:12 81:5,16
83:14,23 84:13,24
85:2,7 86:6 87:24
88:1,11 89:11
90:18 91:8,16
94:11 100:3 101:5
104:7,19 110:1
**criteria** 30:13 33:5
**cross** 20:9,15
**crr** 1:19 109:19
**current** 12:16 42:3
73:20 81:15 83:1
86:5 87:19
**currently** 43:16
71:20,23 72:8,11
**cv** 1:7 91:22 92:1
100:13

**d**

**dan** 10:17
**data** 17:8 19:17
20:8,12,12,15,23
23:5 35:16 45:6
53:18 70:7 90:25
92:21 93:22 94:17
95:25 103:25
104:12
**database** 17:20
23:22 24:1,3

25:16,21,22,24
26:5,8,10 27:19
28:13 32:17 35:16
37:3 41:14,15,22
41:23 42:4,9
46:25 48:20,23,24
49:1,6 50:6,10
64:22 75:20,22
92:23 106:2,7
**databases** 34:14
49:23 56:15
**dataset** 33:20
**date** 8:11 19:20,23
19:24 49:10 110:3
**dates** 19:21
**day** 109:15 112:21
**days** 19:12 102:2
**dc** 3:13
**dealing** 49:19
**debate** 87:11
**deceased** 13:18
**december** 8:5
27:17
**decided** 68:24
**decisions** 17:15
40:18,19,21,22
41:1 51:20 52:9
**decrease** 77:5
**decreases** 77:5
**deduce** 55:3 67:21
**deeply** 43:8
**defend** 97:11,24
**defendant** 5:2
**defendant's** 7:2,3
7:13 100:25
101:22 103:13
**defendants** 1:9 2:3
4:2
**defending** 98:7,12
**defense** 97:7

**definitely** 85:6
**degree** 17:10
92:10
**degrees** 58:22
**delivered** 57:21
**delivery** 57:16
**democrats** 50:21
100:18
**demographic**
30:24 31:21 38:21
66:19
**department** 10:20
10:21 99:14,16,22
**depending** 13:10
68:17 76:9 82:8
**depends** 62:13
63:6
**deploy** 93:20
**deploying** 93:16
**deponent** 110:2,6
110:8,9,15
**deponent's** 110:6
112:20
**deposed** 5:19
98:21
**deposition** 1:11
2:4 5:1 6:1,9,12
6:24 7:6 75:4
106:15 110:6
111:8
**depositions** 9:20
**describe** 12:3
54:19
**described** 38:1
50:1,9 53:23
**describes** 69:4
**describing** 22:12
54:1 55:21
**description** 2:2
35:5

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[descriptive - elections]**                                      Page 7

descriptive  34:13
  39:8
designation  28:20
  29:19 38:8,9,10
  47:1 54:21 80:17
designations  30:18
  31:16
designed  65:25
designing  65:24
desire  111:7
despite  82:20
detail  11:15
  104:15
details  15:4
determination
  74:10,12
determine  63:23
  66:1 72:21 74:7
  75:20 87:13 90:7
determined
  107:15
difference  20:17
  21:8 22:8,9 37:21
  39:21 95:8
differences  31:10
  31:25
different  7:22
  13:12 21:18 25:23
  41:19 44:11 45:24
  66:13 73:8 87:19
  99:23
dig  19:8 35:23
direct  107:15
  109:11
directed  8:20
  40:22
direction  109:5
directly  20:13
  58:10 92:19
discard  68:25

disclaimed  36:16
disclosure  4:12
  107:6
disclosures  107:1
  107:3,4,18
discount  15:12
  107:22
discounts  107:21
discovered  17:1
discovery  5:4
  20:11 54:17
discrepancies
  35:20
discrepancy  22:5
  44:7 48:9
discriminatory
  33:15 34:4
discuss  17:23
discussed  5:6 6:14
  13:9 23:14 57:8
  67:14 74:20 80:25
  81:24 88:14 96:4
discussing  25:2
  29:21
discussion  75:3
  79:19 83:25 84:3
discussions  86:8
disenfranchisem...
  13:14
disparate  34:6,18
  35:4,6,10,15 36:5
  36:13
disparities  32:21
  33:10 34:13
disparity  33:15,20
disposition  12:20
  63:18
disqualification
  107:7
disqualify  107:13
  109:9

distribution  31:1
  31:2,17 32:1,5,12
district  1:1,1
  93:22 97:13 98:14
  98:16
districtbuilder
  93:8,17 96:3
districts  90:1 93:9
  94:7
divide  77:9
divided  42:13
  76:13
dividing  77:2 79:3
  79:5
division  1:2
document  103:17
documentation
  106:4
doing  22:14 42:2
  48:5 49:17 50:12
  54:15 56:18 93:18
  105:21
doj  97:15
doubt  80:9 88:18
dr  5:2 71:9 91:24
  104:23 106:12
draw  23:7,24
  33:18,20 39:13
  46:14 68:15
drawer  92:25
drawing  23:16
  38:18,22 68:20
  69:24 70:1 83:19
  83:21 93:9 94:2
drawn  78:1,23,25
  93:2
drew  93:12
driver's  75:14
due  22:23 110:3
duly  5:14

duma  4:4
duplicate  75:21
dynamic  47:17
  77:9 94:14

e

e  14:13 111:6,7
earlier  39:21 54:6
  67:14 83:18,24
early  2:6 52:8
  105:19,20
earning  92:17
ecf  71:1,5
economics  92:5,6
  92:7
economists  92:15
effect  16:24 33:15
  34:5,5,7
efforts  91:6 93:1
either  12:17 29:3
  51:4 57:1 60:23
  70:2 72:2 82:11
  82:13,16
elapsed  29:17
election  11:3,5,11
  11:18 12:4,5,14,19
  12:23 13:1,21
  14:16,20 21:25
  25:15,18 26:24
  28:15,23 29:4,22
  29:23 30:15,20
  32:3 51:2 52:1
  57:2 82:21 87:11
  101:16 102:13,16
  102:20,24 103:2,7
  103:10 104:24
  105:6,8,9,11
elections  9:10 11:9
  11:12 12:13 30:1
  30:6,14 75:10
  92:23 101:17
  102:22 105:23

Michael McDonald , PhD February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[electproject - file]** Page 8

electproject 2:8
101:20 102:1,5
electronic 14:1,11
electronically
110:8
eligible 26:6 82:8
82:10,16 103:23
103:24
elmore 98:25
employed 48:3
employee 109:7
encouraged 96:16
engage 40:19,20
40:22 41:1
engineering
105:17
english 4:4
entered 111:8
entire 21:12 48:1
56:6 59:15 62:18
69:12 78:2
entree 93:14
enunciated 59:6
equation 51:22
equivalent 92:10
eric 14:13,17,19
15:1,6
errata 110:3,7,8,9
110:11,13,14,17
111:1
error 57:19 61:25
62:6 76:1,4,6,11
76:19,25 77:8,16
78:1,6,14,20,25
errors 49:17
esq 3:3,9,16 4:3
110:1
essentially 29:25
42:22 49:18 53:19
76:7,8

estimate 44:10,10
46:23
estimated 79:15
86:4
estimates 86:7
et 1:4,8 97:20
ethics 107:14
109:10
events 26:24
everybody 21:13
86:25 93:19,23
evidence 16:21
17:23 18:2 43:6,8
43:11 58:10,23
59:2,5 60:1,5,7
70:6 74:3 83:2,4,6
88:22 89:14 109:6
evident 34:14 39:9
exact 33:3,5,9,13
48:5,21 49:20
50:1,5,9
exactly 19:5 22:13
51:18 85:10
examination 2:12
5:16
examined 5:14
example 13:13
32:25 47:23 49:8
49:15 51:7,11
52:17 54:19 66:5
86:12 92:12
examples 11:10
13:8 66:4 102:23
excepting 67:13
exclude 56:17
60:14
excluding 55:24
excuse 30:11
exercise 41:1
46:14 48:12

exhibit 2:2,4,5,6,8
2:9 7:2,3,11,12,13
7:17 8:18 100:25
101:3,22,25
103:13,16
exhibits 2:1
107:24,24 108:1
exist 13:4 40:11
exists 25:13 39:24
exit 64:8
expect 76:20 78:19
expectation 22:22
experience 25:18
51:2 52:24 64:10
78:19 92:2
expert 2:5 8:1
12:5 15:9 32:4
35:6 90:5 91:25
96:18,24 97:4,7
98:25
expertise 11:3,4
11:17
expires 112:25
explain 18:19 19:5
20:17 21:7 31:3
37:21 38:3 47:17
explanation 43:22
explicit 29:10
explicitly 29:16
explore 68:18
expressed 39:19
expressing 80:7
expressively 57:18
extensively 26:1
47:18

**f**

facility 110:18
fact 18:2 58:18
82:6
factually 17:1

failed 33:5,8 65:14
fair 1:4 11:20
16:14,23 91:6,14
fall 46:20
false 49:12
familiar 5:22
11:23
family 20:18,25
21:8,12,12,13,15
far 45:17 83:7
84:22 85:17
faulty 28:9
favorable 52:13
favoring 52:6
february 1:13
61:11
federal 5:5 12:13
13:10 82:12 111:6
felons 13:15
felony 13:13
fewer 37:6,9,23
62:25
field 49:22 61:9,10
92:8
fields 22:1
fight 1:4 91:6,14
figure 34:17 65:4
file 1:6 9:12 10:8
17:10 19:18,22,24
20:2,12 22:7
24:20 25:10,13
28:17 31:3,14,22
32:5,13,22 33:10
36:2 37:8,10,24
38:15 39:9 40:12
43:13 45:3 57:3
57:16 66:10 67:11
67:12,13,17 74:7
81:14 106:3,4
110:12

Michael McDonald , PhD     February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[filed - georgia's]**

Page 9

filed   7:18 9:24
42:11 43:2,7,15,24
44:14,15,23,24
47:3 55:5,12,18
58:7 60:2 74:7,17
74:19,23 75:2
86:15,17 98:17
110:14
files   14:6,7
filing   8:14 71:7
94:15
filings   60:6
fill   57:22 96:2
110:8,8
filled   57:17
final   64:1
financial   107:7
financially   109:8
find   14:22 16:11
31:21 33:19 37:18
49:11 52:18,22
66:10 76:15 91:1
fine   5:25 7:9 19:2
68:16
firm   40:17 50:14
51:20 64:7 92:21
107:1,18
first   5:8,14 10:13
10:14 20:19 22:4
22:11 27:9 30:24
30:25 32:7 63:17
66:24 69:4 71:21
71:21 72:9,9 76:5
87:23 88:10 89:9
90:24 94:18 95:2
98:1 101:9 102:3
flagged   82:3
florida   10:16,20
11:1 66:7,10
95:22,23 96:7

flow   103:11
focus   69:2
focused   59:11
60:13,17
focusing   69:13
folks   47:2
follow   31:8,10
64:25 72:21 73:1
84:25 85:1 100:10
followed   45:16
following   13:25
21:20 55:2 61:19
79:17 84:6,19
107:1,4 111:5
follows   5:15 31:2
54:25 72:6
fond   94:2
footnote   19:10,14
28:4,5 71:16
foregoing   109:4
form   5:7 9:16 11:6
13:5 18:4,23
19:11 20:18,25
21:9 22:10,25
23:12,23 26:7,22
27:4,12 28:3 32:6
32:14,24 33:23
34:21 36:7 38:20
40:8 42:8,11 43:4
43:7 44:1,23 45:1
46:11 49:24 51:6
53:24 54:14 56:1
56:7 58:21 60:4
61:1 62:11,22
64:2 65:11 66:22
68:6 70:3,17
71:14,24 72:14
75:23 77:21 78:8
78:16 81:5,16
83:23 86:6 87:24
88:11 90:17 111:7

111:9
format   49:3,4 50:4
former   82:13
forming   73:24
100:5
forms   9:18 13:12
107:6
formula   76:5,10
forward   68:24
110:12
forwarded   58:2
found   21:2 32:18
32:21 33:10 35:24
46:24 47:12 49:9
66:9,15 67:11,11
four   42:12,13,21
fourth   43:19
free   93:18
frequently   6:17
front   7:2 29:10,15
30:5
full   9:4,5 20:9
49:13 51:14,17
101:9
fully   45:23 49:13
50:17
fulton   109:2
functioning
105:22
funding   66:8
furnish   111:10
further   24:8 45:10
61:21 68:18 93:6
97:12,19 98:8
106:13 109:7
fuzzy   48:3

**g**

ga   110:20
gabriel   98:14
gain   21:21

gap   92:19
gauge   53:1
gender   31:18
39:11,13 67:10,16
67:20
general   9:9 11:8
12:13 29:4,13
30:14,15 31:19,24
32:5 47:19 50:24
52:20
general's   97:10,23
generally   9:3
11:23 12:3,12
14:13,19 26:25
30:5 31:2,11 32:9
33:19 34:23 51:21
65:25 76:23,24
generated   27:14
27:20 33:4
generous   48:10
george   52:14 95:6
95:17,19
georgia   1:1,8,18
3:20 4:7,11 9:12
10:5,11 14:25
18:7 19:13 20:5
24:14 25:16 31:22
33:1 44:2,13,19
45:8,14,17,22,25
47:4 54:24 55:2,6
58:8 66:18 74:22
79:18,22 80:4
81:22 82:12,18
86:2,13 87:6
93:13,20 96:19,22
97:3 98:23 105:6
105:9 107:4,10
109:2
georgia's   15:5
18:12 23:21 46:5
99:1 106:1

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[getting - indicator]                                        Page 10

**getting** 60:2,10
  64:17 79:4
**gis** 105:18,22
**gist** 38:10
**give** 11:9 13:8
  27:23 68:19 80:8
  88:16
**given** 79:19 88:13
  90:5 109:6 111:8
**gives** 47:9
**giving** 5:23 44:9
  47:6
**glad** 59:20
**global** 30:13
**go** 6:10 7:22,23
  10:13 42:21 55:20
  91:18 92:19 97:8
  97:12,19,25 98:16
  106:8
**goes** 42:23 56:24
  65:12
**going** 5:7 7:21
  19:4 23:8 30:13
  31:18 34:1 39:16
  41:25 42:4 44:4
  45:22 47:24 48:11
  48:15 60:7,16
  69:15 72:13 78:24
  85:5 88:19,22
  90:7 93:20 98:8
  99:20,21
**gold** 14:21
**good** 5:18 14:14
  14:18 42:10 53:9
  68:7 85:17 93:25
**gotcha** 34:16
**government** 97:23
**grant** 93:7
**great** 7:20 19:7
  71:4 93:11

**greater** 37:18 38:4
**greetings** 110:5
**ground** 5:22
**group** 24:14 25:5
  55:23 60:17 69:16
  83:8 99:9,10,12
**guess** 40:18 65:3
  69:20 81:19 94:16
  97:17
**guessing** 47:25
**guy** 93:4

**h**

**habit** 5:25
**half** 77:8
**hand** 7:16 101:3
  101:25 103:4,16
**handle** 19:3
**handled** 41:3
**happen** 49:16
  102:17
**happened** 8:11
  82:21 103:5
**happening** 13:20
  48:13
**happens** 103:1
**happy** 93:15
**hard** 89:2
**harvard** 94:17
**head** 15:17
**headings** 21:22
**healey** 97:19
**hearing** 8:6,9,17
  8:22 20:2
**help** 35:23 36:18
  56:4 67:4 69:6,8
**helpful** 14:24 53:3
  99:25
**helping** 42:15
**helps** 70:24
**high** 18:22 102:17
  102:18,20,22

103:9
**higher** 38:8 40:1,4
  44:16 78:20
**hired** 90:4
**hiring** 96:11
**hispanic** 36:1,24
  37:7,25 38:5
**history** 44:5 45:19
  94:9
**hold** 10:19 37:13
  70:20
**honestly** 89:21
  90:12
**hour** 15:8
**hours** 15:19
**household** 48:2
**hundred** 43:23
  100:7
**hypothetical**
  27:23 84:7,20
  85:10 88:8,25
**hypothetically**
  84:6
**hypotheticals** 89:1
  89:2

**i**

**identification** 7:4
  7:14 101:1,23
  103:14
**identify** 30:8
**identifying** 18:8
  46:7 90:23
**ignorance** 95:8
**iii** 21:17
**illinois** 95:1
**illuminate** 56:13
  67:4
**imagine** 87:6
**immigration**
  52:17,20

**impact** 34:6,19
  35:4,6,10,15 36:5
  36:13
**impacts** 109:13
**impartial** 109:13
**impartiality**
  107:14 109:10
**implementation**
  15:5
**implication** 43:13
**implying** 27:3
**important** 87:22
  105:3
**impression** 51:12
  51:17 52:2
**improve** 11:11
**inaccurate** 76:18
**inactive** 21:18,20
  25:4 26:17 27:11
  27:15,18,21 28:1
  29:7 30:3 31:1
  53:21,21 54:3,7,10
  55:10,11,17,22
  58:19 85:13
**include** 29:20
  41:11 42:4,5,6
  63:24
**included** 41:9
**includes** 17:24
  24:17 29:23
**including** 47:2
**inclusive** 25:7
  42:24 46:18 47:23
**incorrect** 56:2
**independent** 97:13
**index** 2:1,12
**indicate** 15:7
  41:12 59:10 65:9
**indicator** 57:12
  64:15

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[individual - law]                                              Page 11

**individual** 20:18 20:25 21:9,14 30:10 42:11 48:1 57:17 58:6,7 64:18,22 65:15 74:23 83:16 95:11
**individual's** 21:15
**individuals** 13:16 13:19 14:10 24:17 26:4,20 27:15 31:13,15 44:22 57:1,8 60:20 67:8 67:25 68:11,21,21 69:22,22 73:6 74:21 75:21 76:21 80:2,19 81:20 84:21 85:14 86:9 86:10,12 87:17 88:23
**industry** 77:22
**inferences** 63:9 68:16,20,21
**inferential** 65:18 70:8 83:25
**inflate** 48:6
**informatics** 95:25
**information** 10:5 14:2,12 25:14 33:22 39:12 40:21 45:13,22 46:8 47:8,25 48:14 49:14 50:2,5 53:18 66:9,11 67:15 76:19 88:6 91:10 97:16 99:17
**initial** 8:19
**initially** 8:12
**injunction** 8:6,9 8:13,16,22 10:2 15:23

**innovative** 105:21
**inquiring** 8:3
**instance** 13:19
**instances** 13:10
**institute** 92:4,8
**institution** 92:11
**institutions** 95:13
**intent** 18:11,14 33:16,18,21
**interest** 8:3 51:23 107:7,12 109:9
**interested** 34:18 66:8 104:5,6,8 109:8
**interesting** 77:9
**interestingly** 77:4
**internal** 66:6,8
**interpreting** 21:23 72:22 73:3,19 87:14
**interval** 77:15
**intervals** 77:23
**intervening** 99:9 99:10
**interview** 65:15 83:16
**interviews** 61:15 61:20
**invalid** 63:9
**investigate** 16:5
**involved** 7:25 33:2 64:6 66:17 96:11 99:20
**involves** 11:5,8,18
**involving** 13:22
**island** 97:22,24
**issue** 65:12 100:22 101:14
**issues** 14:15,16
**it'll** 36:9

**j**

**j** 3:16
**january** 42:21 61:10
**jcreelan** 3:7
**jenner** 3:4,10
**jenner.com** 3:7,14
**jeremy** 3:3 110:1
**job** 95:2 96:6,7 105:4
**jones's** 10:1
**journal** 62:10,21 77:20
**joys** 94:15
**judge** 10:1
**jump** 6:8 7:23 10:14
**junior** 49:11
**jurisdiction** 105:15
**jurisdictions** 13:17
**justice** 99:14,16,22

**k**

**kathryn** 3:9
**keep** 36:17 38:25 42:18 76:10
**kind** 6:9 7:22 9:2 11:19 23:5 27:10 46:3 93:13 100:22
**know** 6:2,3 8:8 14:25 15:3,4,14 17:3 18:20 22:1 23:5 26:1 34:4 35:21 41:3,5,9,14 42:16 45:9,10,17 46:9 48:7 50:16 50:22 51:14,15 62:3 64:14 76:2 76:22 77:4 82:11

82:12 89:3 91:12 93:25 95:8 96:14 100:20 101:12 104:8 105:17,17
**knowing** 45:13 47:14,24
**knowledge** 17:11 18:13 21:25 91:17
**known** 10:22,24 14:12
**knows** 6:3
**kwynbrandt** 3:14

**l**

**l2** 40:19,22 41:1 41:20 42:22 48:19 50:13,14,17 51:3,8 51:12,12 54:2 56:15 64:20 74:11 80:20 91:13
**lack** 84:12
**land** 30:17 41:10 51:18 60:23
**language** 28:7,8 30:4 34:8,12,13 35:11,22 71:5 80:5
**large** 22:17 23:14 48:25 95:12,12 101:16
**larger** 75:19 76:23
**largest** 31:9
**latino** 17:15 40:17 40:19,21,22,25 51:20,24 52:5,9
**latinos** 52:18
**law** 13:10,11,25 14:23 19:13 45:16 74:22 79:17 82:12 82:12 87:12 93:12 93:12,14 107:4

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[law's - making]**                                                    Page 12

**law's** 47:4
**lawrence** 1:15
  3:17
**lawrencebundy....**
  3:21
**laws** 29:15 96:25
**lawsuit** 8:1,4
  20:14
**lawyer's** 71:5
**leads** 30:9 73:18
**leaning** 52:3
**leave** 19:10 89:1
**led** 59:9
**left** 50:25 51:16
  52:3
**legacy** 44:6
**legal** 9:1 11:23
  12:8,25 16:20,22
  16:24 33:18 36:11
  36:14 41:4 97:17
  100:10
**legislative** 93:21
  99:1,11
**legislature** 92:24
**legitimately** 87:15
**leslie** 3:16
**leslie.bryan** 3:21
**letters** 82:4
**level** 18:22 77:18
**levels** 2:7
**libertarian** 97:9
**license** 75:14
**likewise** 37:5
**line** 111:11,14,17
  111:20,23 112:1,4
  112:7,10,13,16
**linearly** 77:5
**lines** 41:10 60:23
  103:2
**list** 9:8,10,15
  10:12 11:25 12:6

12:24 13:3,12,15
13:15,20,22 14:18
16:6,9,18,24 17:1
17:9,16,16,19,24
18:6,12,15 19:25
21:18,19,22 22:6
22:24 24:16,18
25:3,3,20 26:4,14
27:9,14,19 28:1,12
29:7 30:3,10,11,21
31:15,17,18 32:12
32:15 33:4,8 36:1
36:24 37:1,7,9,11
37:14,17,19,20
38:5,6,13 39:2,14
40:12,24 41:8,16
42:23 43:1,21
44:18,22,24 45:2,6
45:24,24 46:5,15
46:20 47:4,13,19
47:21 48:4,15,22
49:1,17 50:16,25
51:3,14,18 54:4,7
54:20,23 55:11,17
56:14,16,25 58:20
59:23 60:15 63:18
67:9,23 68:1,12,13
68:13,14 69:2,3,15
69:17 70:12 73:13
74:1,6,10 79:9,18
80:1,3,25 81:11,21
82:17 83:8,10
89:16 91:7,15
97:2,8,19,25 98:8
98:19 100:13
**lists** 11:18,20
  13:18,18 32:4
  33:11 37:13 74:11
  91:12
**litigation** 26:2

**little** 7:22 11:4
  13:24 18:19,21
  35:1 40:18 76:9
**live** 61:12 63:19,25
  64:14 70:14 87:14
**lived** 64:16 66:2
  84:9
**lives** 63:23
**living** 73:6,20 74:4
  85:21 89:6
**llc** 1:15 3:17
**llp** 4:4
**local** 13:1 105:8,11
**locality** 97:17
**locate** 105:19
**location** 105:20
**locations** 103:3
**logical** 65:5
**long** 10:22,24
  15:14 61:9 103:2
  105:13
**longer** 25:20,20
  45:19 57:1 82:1
**look** 7:1 28:6
  29:16 31:12 33:17
  34:7,11 35:19
  38:2,6 39:4,5,23
  43:8 48:4 49:6
  61:5 63:1 67:19
  68:15 74:8,9,11
  75:19 79:7 88:21
**looked** 16:21 45:9
  58:4,5 66:8
  104:16
**looking** 22:12
  23:16 27:7 29:12
  31:15,17 33:7
  42:24 47:16,16
  49:13 50:2 53:20
  59:5 67:22 68:23
  70:7,9 72:25

76:12 96:1 100:20
**looks** 20:13 76:19
  83:21 94:16
  103:25
**loss** 48:13
**lot** 19:7 52:4
**love** 34:10
**low** 83:19,22
**lower** 38:13 78:20
  78:22,25 102:24
**lowndes** 24:13
**lunch** 91:24

**m**

**m** 3:3
**mail** 12:15,17
  21:24 24:18 30:3
  30:7,7,9 38:9
  39:23 40:2 54:11
  55:17 57:8,11,16
  57:20 58:2,18
  68:14 69:2,25
  83:9,20 84:2
  110:10
**mailing** 28:19
**maintained** 42:10
**maintaining**
  107:13 109:9
**maintains** 47:22
**maintenance** 9:15
  11:19,25 12:6
  13:3,12,20,22 14:4
  14:19 18:7,12,15
  44:18 47:4 54:24
  79:18 80:3 81:21
  82:17
**major** 92:5
**majority** 73:25
**makeup** 32:22,23
**making** 68:21
  69:23 83:25 87:3
  99:15 102:10

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[making - ncoa]**                                                    Page 13

107:13 111:8,9
**male** 39:24
**manage** 11:12
  92:22 103:11
  105:19
**management**
  11:19 25:15
**mansell** 110:19
**manually** 110:8
**map** 92:25
**maps** 93:2,13 94:2
**maptitude** 93:4,5
**march** 109:15
**margin** 76:1,3,19
  76:24 77:8,16,25
  78:6,14,20,25
**mark** 6:2 95:14
**marked** 7:3,13,16
  100:25 101:3,22
  101:25 103:13,16
**mason** 52:14 95:6
  95:17,19
**match** 14:5 17:19
  29:1,2 32:12 33:3
  33:5,9,14 40:15,20
  40:23 41:20,21
  42:1 44:3 45:12
  46:19,24 48:19,21
  48:23 49:5,10,20
  49:21,22 50:1,5,9
  50:13,13 53:18,22
  53:23 54:2,8 55:1
  55:1,7,23 57:3,9
  57:13 59:4,11,18
  67:17 71:3 74:1
  79:9 80:10,20
  81:10 84:12,21
  85:14 91:3
**matched** 17:9
  56:14,22 64:17

**matches** 18:17
  41:13,24 42:20,22
  43:20 44:6 46:16
  47:15 49:7,12
  50:13 54:10,20,23
  79:24,25 91:1
**matching** 32:4
  41:6 42:2,25
  43:25 44:12,15
  45:20 46:6 47:19
  48:3,5,12,15 49:2
  49:17,18,20
**materials** 6:13
**math** 24:5 42:15
  42:16 61:17,25
  62:1 76:2
**mathematical**
  76:5
**matter** 39:4 97:17
  107:12,20 109:9
**mcdonald** 1:12 2:5
  5:2,13,18 71:9
  91:24 101:11,13
  104:23 106:12
  110:2
**mean** 8:8 21:24
  35:5 36:25,25
  37:8 60:12 63:14
  95:14 100:4
**meaning** 83:15
**means** 9:11 30:13
  83:11
**meat** 18:21 19:2
**mechanism** 45:18
  47:20
**media** 52:4,21
  102:19 104:3
**meetings** 6:18
**members** 83:8
**memories** 94:2

**memory** 28:9
**mentioned** 24:1
**merely** 45:8
**met** 6:15
**method** 9:14 49:22
**methodology** 33:6
  104:16
**methods** 9:14 17:5
  40:5 90:7
**michael** 1:12 2:5
  5:2,13 101:10,13
  110:2
**middle** 46:4 51:13
  99:3
**midterm** 101:17
  102:16
**militant** 52:19
**military** 86:23
  87:17
**million** 48:25
  103:22
**mind** 76:10
**minus** 62:2 76:13
**minute** 6:11 35:5
  81:8 90:3 91:19
**mischaracterize**
  28:8,10
**mismatch** 23:21
  23:24
**missing** 23:6 24:3
  65:10
**mit** 94:17
**mixson** 98:25
**months** 42:11
**morning** 5:18 7:24
**move** 21:11,12,15
  21:17 42:6 58:3
  82:8,10,20 86:15
  86:23 92:1
**moved** 12:18
  14:10 16:13 18:8

25:4 26:20 27:18
  42:4 43:2,7 47:3
  55:10 57:12,18,23
  58:1,5,8,12,18
  60:1,6 72:24,24
  74:25 75:1 82:6,9
  82:16,20 86:13,18
  86:19 87:1,9 89:8
  98:18
**moves** 42:6 87:4
**moving** 86:21 87:5
  87:8,16
**multiple** 61:4
  102:18
**multiply** 76:7
**municipal** 98:14
  98:15

|        n        |
|:---------------:|

**n** 76:13 77:3,6,10
  79:3
**name** 48:4 49:3,13
  50:2 63:18 105:14
**names** 49:2
**narrow** 59:17
**narrowed** 60:10
**national** 11:24
  17:18 18:17 64:8
  82:18
**nationwide** 100:22
**naturalized** 52:19
**nature** 42:25
  62:14 88:15 89:15
  90:13
**ncoa** 17:18,19
  19:11 20:18 21:9
  21:10,12,14,23
  24:18 28:2,13,17
  28:19 29:1,2 38:9
  39:23 40:2,14,23
  41:14,15,22,25
  42:3,9,11 43:2,7

800.808.4958                                                    770.343.9696

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[ncoa - officials]**                                           Page 14

43:14,15,20,22,24
44:3,6,12,14,15,23
44:23,25 45:2,12
46:7,16,19,24 47:1
47:12,13 48:2,19
48:23 50:12 53:18
53:22 54:2,8,8,10
54:20,21,23 55:1,1
55:5,7,12,18,23
57:9,13,22 58:7
59:4,11,17 60:2,5
68:13 69:1,25
73:23 74:1,7,17,19
74:21 79:9,24,25
80:10,20 81:10,14
82:3 83:9,20 84:1
84:12,21 85:15
86:15,17 90:17
91:1,3
**ncoas** 45:19 75:2
79:17,20 88:15
**nearly** 91:1 103:22
**necessarily** 52:6
57:23 61:18 65:21
83:11 98:21,21
**necessary** 27:25
102:21 111:10
**need** 5:24 28:6
33:21 34:7 45:21
103:7,8,10
**needed** 13:16 90:6
99:16
**negative** 12:17,22
**never** 97:14 98:18
100:9
**new** 3:6,6,11 28:16
82:14 89:25 101:4
**news** 51:11 103:18
**nge** 9:10 10:11
17:9,19 19:25
21:22 27:14 30:11

30:12,15,21 31:15
31:16 37:20 38:5
40:12,24 47:12
54:3 56:14,25
60:15 67:8,11,23
69:15,17 74:9
80:24
**non** 2:10 94:21
95:1,11
**nonpartisan** 50:22
52:4
**nonresponsive**
28:18
**nonsensical** 90:5
**nonvoters** 51:10
**northern** 1:1
**notably** 67:25
**notarized** 110:10
**notary** 112:23
**note** 9:9 31:9 32:1
39:15 67:24 69:9
**noted** 22:5 35:20
39:21 40:4 111:4
111:5
**notice** 2:4 7:6
28:15 75:9
**noticed** 62:3
**noticing** 107:19
**noting** 40:11 48:9
57:18 68:10 110:7
**notion** 102:14
**november** 19:18
31:13 38:14 103:9
**nuances** 81:17
**number** 22:17,23
23:15 40:20 42:2
44:16,16 46:21
47:10 49:21 54:9
57:2,4 58:17
59:17 61:4,6
62:25 63:22 64:4

64:4,13,17,17,19
65:21 67:7,9,14,18
73:8,8,11 76:8
78:10,11,15 79:6
79:22 80:16,22,23
80:24 81:7,9
82:25 83:19,22
84:20 85:13 94:6
96:1 103:3
**numbers** 17:15,17
40:24 41:8,9,11
44:8 45:23 48:6
52:24 56:16,17
60:20,22 61:5,14
64:11 65:5 69:24
70:22 71:2,3 80:8
**numeral** 16:3
21:17
**nvra** 12:6,11,12
82:7
**nw** 3:11,18

**o**

**object** 71:25 72:14
**objecting** 36:17
102:13
**objection** 9:16
11:6 12:7 13:5
18:4,23 22:10,25
23:12,23 24:21
25:12 26:7,22
27:4,12 28:3 32:6
32:14,19,24 33:23
34:21 35:8 36:7,8
38:20 40:8 42:8
43:4 44:1 45:1
46:11 49:24 51:6
53:24 54:14 55:14
56:1,7 58:21 60:4
61:1 62:11,22
64:2 65:11 66:22
68:6 70:3,17

71:14,24 72:17
75:23 77:1,21
78:8,16 79:12
81:5,16 83:14,23
86:6 87:24 88:11
89:11 91:8,16
100:3 101:5 104:7
**objections** 5:6
**obligation** 107:14
109:10
**observation** 40:6
**obtain** 10:5,8
**obtained** 19:23
20:2 56:15
**occurring** 30:19
**ocga** 107:7,8,21
111:7
**october** 19:25
27:16
**offer** 96:7
**offering** 16:17
**office** 9:9 10:8
18:14 28:12 29:22
30:1,6 41:22
42:10 45:7 46:5
46:21 47:15,21
48:16,23 49:5,6
50:4,6 80:9,11
82:3 86:2 88:17
91:2 93:16 97:11
97:24 106:6
**office's** 17:19
**officer** 109:13
**offices** 110:3,10
**official** 1:8 12:5
13:1
**officials** 11:11
12:14,19,23 14:16
28:15,23 30:20
102:24 103:2
105:9,12 106:1

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[oh - permissive]                                                    Page 15

oh 52:9
okay 6:22 8:11
  20:1 21:1,6 24:13
  40:17 53:15 67:6
  72:12 85:12,16,19
  85:23 98:23
old 28:16
older 67:25
once 29:17 30:16
  110:9
ones 6:1
ongoing 29:1
online 76:16
open 93:8
operate 101:19
operator 61:12
opine 33:14 36:11
opining 18:11
opinion 11:24 12:8
  12:25 16:22 40:10
  47:6 51:24 53:2
  58:23 59:6 72:25
  73:24 81:8,13,25
  84:11 90:16,23
  100:5
opinions 16:17
  23:11 39:19 60:14
  74:2 79:11
opportunity 32:8
  82:5
opposed 100:1,4
order 7:22 8:17
  10:1 34:1 49:1
  100:10
ordering 108:2
  110:13
organization 14:1
  14:5 17:14,14
  64:8
origin 36:1,24
  37:7 38:5

original 56:24
  102:9 110:12,14
outcome 109:8
outlets 102:19
  104:3
outset 24:7
outside 58:8 74:25
  82:10 86:13,18,22
  97:3
overall 30:16 37:2
  37:11,20 38:5,13
  39:3,16 73:24
overarching 30:16
overestimate 47:2
  79:23
overrepresented
  66:21

p

p 2:5 101:10,13
p.m. 91:20 106:10
  106:15
pactech 92:21
page 2:2,12 10:13
  10:15 11:2 18:16
  19:10,16 20:22
  22:4,5 28:4 35:24
  38:2 40:14 43:19
  46:2 53:12,25
  55:20 57:7 59:8
  63:13,14 68:2,9
  69:19 70:15,19,22
  71:8,12,17 78:10
  80:16 94:9 96:18
  96:19,23,23 98:1
  98:23 99:3 100:13
  101:9 103:21
  111:11,14,17,20
  111:23 112:1,4,7
  112:10,13,16
pages 111:9

pair 49:11 102:11
paper 62:10
paragraph 16:4
  17:22 19:16 20:16
  20:23,24 31:5,6
  32:2 37:5 43:19
  46:4 55:21 57:7
  58:16 59:8 68:2,9
  90:16,18,20,24,25
  101:9
parcel 8:19
pared 20:12
paring 56:24
parkwood 4:5
part 8:19 9:6
  11:17 17:3 20:2
  73:10,16 93:7
participates 15:1
participating 8:3
participation 15:5
particular 19:8,20
  37:15,16 81:10
particularly 9:10
parties 107:21
  108:2 109:13
  110:13
partisan 100:17
party 50:15,19
  51:4,5 52:6 97:9
  107:15,22 109:7
  109:11
password 108:1,2
pattern 39:24,25
patterns 31:10
  72:25
pause 47:9 68:19
  68:20
pdf 110:7
peachtree 1:16
  3:18

people 9:11 16:9
  16:13 18:8 20:13
  24:19 25:3,7,8,24
  27:20 28:21 33:4
  33:8 34:24 40:24
  43:1,6,13,14,23
  44:13,17 47:11
  52:19 54:3,7,10,25
  55:5,24 57:22,25
  58:5,11,24 60:15
  60:17 61:20 65:6
  67:12,22 69:1,16
  72:22,23 73:2,12
  73:18,25 74:16,18
  74:23 82:2,5,15,19
  86:21,23 87:3,5,15
  91:15 92:14 95:25
  102:12 103:7,11
peoples 20:6
percent 43:20,23
  44:15 46:24 54:7
  54:19 55:4 69:9
  77:13,18 78:21
  80:14 84:8 85:20
  86:11,21,25 89:5
  103:24
percentage 35:25
  36:23 37:6,23
  38:8,12,14 40:1,4
  59:25 80:21
percentages 23:16
  39:22
perceptions 52:21
performed 41:13
period 29:9,17,18
  30:19 58:2
periodically 28:25
permanent 87:10
  87:18
permissive 46:12
  48:8

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[persistent - procedure]                                              Page 16

**persistent** 26:9
**person** 28:18 29:6
  30:20 57:24 63:23
  64:14,15,21 65:17
  65:21 72:18 86:16
  86:18 105:18
**person's** 65:9
**personally** 100:1,4
  104:23
**pew** 64:9
**phd** 1:12 5:13
  92:18 94:3 110:2
**phenomenon**
  44:11
**phone** 6:20 8:2
  17:15,17 20:8
  40:20,24 41:8,9,11
  56:15,17 60:19,22
  61:14 64:4,4,11,13
  64:16 65:4,14,15
  65:20 91:14
**phones** 60:23
**phrase** 35:10 60:9
  79:14 97:18
**phrasing** 65:1
**physical** 10:15
  96:17 101:8
  103:21
**pi** 16:1
**piece** 12:15 30:7
  47:8 57:11,16,20
  83:2,6
**pieces** 24:25 74:3
  83:4
**place** 14:14 30:20
  49:23 70:20
  107:20
**placed** 28:19
**plaintiff's** 6:14,22
  16:5 89:18 90:10

**plaintiffs** 1:5 3:2
  9:13 15:11 33:2
  89:14,24 90:3
  96:24 97:4,22
  98:1,9 99:8,8,10
**platform** 93:9
**play** 34:16 73:23
**please** 5:11 21:1
  23:1 24:22 31:3
  110:10,17 111:9
  111:10
**pleasure** 42:18
**plus** 59:4 69:10
**point** 19:6 20:19
  29:24 31:4 35:23
  39:6,10 46:3
  48:13 53:6,9
  58:10 59:3 66:20
  68:8,19 69:13
  75:19 88:4,13
  89:13,17 91:5
  97:6,9
**points** 19:8 35:25
  36:23 37:6,23
  39:17
**policies** 44:12
  45:11,16 52:5
**policy** 45:14,18
**political** 10:20
  23:4 34:19 51:22
  52:6 62:9,21
  65:24 77:19 92:5
  92:12,13,14,20
  93:14 94:22 95:3
  96:2 100:14
**poll** 64:8,10 77:17
  104:25 105:2,3
**polling** 51:23
  62:20 103:3
**polls** 52:4

**pool** 76:23
**poorly** 64:23
**population** 62:15
  63:5,8 68:22
  69:15 76:2,9 77:7
  78:1,24 79:1 84:1
  103:25
**position** 10:19
  52:14 89:21 94:25
  95:24 96:15
**positions** 52:5
  96:1
**positive** 28:14
**possibility** 58:11
**possible** 20:14
  26:11 43:5,22
  47:19 49:10 55:13
  55:16,19 57:25
  58:9
**possibly** 46:19
  75:21 79:16 80:9
**post** 17:19 41:22
  42:10 48:23 49:5
  49:6 50:4,5 94:16
**postdoctoral**
  94:17
**practical** 43:12
**practices** 13:22
  14:22
**precinct** 82:13,14
**precise** 30:4 35:22
  61:6
**precisely** 34:11
  62:13
**predominant**
  73:25
**preliminary** 8:6,8
  8:13,22 10:2
  15:23
**preloaded** 93:22

**preparations**
  102:24 103:11
**prepare** 8:13,17
  102:21
**prepared** 91:13
  102:19
**preparing** 10:4
  60:19 62:9 104:18
**present** 4:14
**presentations** 14:3
**presented** 99:13
  107:1
**president** 103:23
**previous** 73:23
**previously** 74:20
  75:5
**primarily** 18:5
  39:9 50:14,21
  51:5 55:3 95:3
**primary** 51:23
  58:14 98:4 106:5
**print** 110:8
**prior** 43:2,3,14,17
  43:24 44:23,24
  75:3 79:19 80:25
  84:3 86:8
**privilege** 5:7
**probably** 5:25
  14:17 46:23 79:23
  100:8
**probed** 43:6
**probing** 66:16
**problem** 23:21,25
  59:20 76:2
**problems** 24:5
  61:25
**procedure** 5:5
  14:14 33:9 45:14
  46:6,9 47:22
  49:18,25 111:7

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

procedures 14:19
  17:5 18:12,15
  33:3 44:12,18
  45:4,11 47:5
  48:15 54:24 55:2
  79:18,22 80:3
  81:18,22 82:17,18
  82:19 105:6,9
proceeding 4:14
  107:1,22 108:1
  109:6,13
proceedings
  107:12
process 17:4 26:16
  30:17 41:14,18
  43:25 49:20 50:8
  57:19 66:12,13
  96:12 99:23
processes 18:7
  41:19
produce 40:23
produced 99:7,13
  107:23
production 19:25
  110:18
professional 10:16
  107:14 109:10
professor 10:22
  94:21 95:7 96:8
professors 92:11
professorship
  94:18
prohibited 107:20
prohibitions 107:8
projected 102:12
projections 102:11
promoting 52:12
proper 12:20
  103:10
properly 79:21

properties 63:2
proportion 76:12
  76:13
protected 108:1,2
provide 15:12
  16:22 39:12 40:9
  40:21 41:7 54:16
  60:7 70:6 107:19
provided 15:11
  20:11,12 41:25
  45:6 64:20 91:9
providing 16:21
  17:17 46:22 52:24
  76:18
provision 13:14
provisions 74:22
prudent 68:24
prudently 103:8
public 51:24 52:21
  53:2 112:23
publication 77:19
publicly 93:24
published 11:13
purge 9:8 17:24
  21:19 22:6 24:17
  25:2 26:1,2,4,14
  26:21,25 27:2,8
  28:1 29:6 30:3
  36:1,24 37:1,7,9
  37:11 38:5 39:2
  39:14 41:8,16
  43:1,21 44:22,24
  45:2 58:19 59:23
  68:1 70:12 74:6
  83:8 91:7,15
purged 24:19 32:4
purging 79:22
  81:18 82:17
purporting 101:10
purpose 39:9
  87:16

purposely 28:9
purposes 5:4,4
  16:15 18:7 85:9
pursuant 4:10
  111:6
put 15:15,16 27:10
  29:19 49:3,4

q

qualified 44:18
qualify 45:5 46:13
  80:3
qualifying 79:8,10
  79:14 90:17
quantity 76:14
quarters 97:21
question 6:2 13:23
  14:9,18 16:20
  21:2,7 32:9 33:25
  36:13,19 43:10
  53:19 56:13 57:24
  63:17 67:5 68:17
  69:5,6,20 70:13,21
  71:11,11,11,15,16
  71:19,22,25 72:4,4
  72:7,10,12,13,16
  72:19,23 73:3,9,13
  73:14,17,19 74:24
  77:11 84:14 85:7
  87:25 104:19
questionnaire
  66:15
questions 20:10
  53:4 66:14,16
  72:21 73:1,2,9
  75:7 84:4 85:3
  106:13 107:23
  109:5
quite 24:11 51:11
  51:15 70:24 77:4
  87:11

quote 101:10,11
  102:15
quoting 102:9

r

r 14:13
race 30:25 31:7,25
  32:5 67:10,15,19
racial 31:12,17
  32:12,22,22 33:7
  33:10,14,19,21
  34:6,15 35:7,16,16
  38:6,21 90:2
raffensperger 1:7
  5:3
raised 65:13
ran 17:14 66:6,7
rate 15:8,9,12
rates 102:12
raw 20:12,15
reach 73:10 83:7
  83:10,15 84:10
  86:1 88:9 89:9
  90:16
reached 83:12
read 8:23 9:4,20
  9:23 10:1 19:12
  29:11 71:21 72:4
  72:5,9 103:18
  104:11,15 110:6
  111:2
reading 40:2
  61:23,24 75:6
ready 6:9,12
reaffirming 75:5
reagan 97:10
realistic 102:14,15
really 9:6 32:8
  34:22 50:16,17
  52:1 58:12 59:15
  63:6 81:3 85:1
  92:7,9,13 99:8

Michael McDonald , PhD                                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[really - report]**                                                        Page 18

104:12

**realm**  96:3

**reapportionment**
92:23 93:1

**reason**  19:20
26:13 27:10 28:2
29:7 30:3,11
37:20 43:21 44:22
46:13 48:7 53:21
54:8,11,18 55:4,18
55:22 57:9 58:9
58:17,19 64:19
69:17 75:1 76:17
85:13 93:11
100:11 111:13,16
111:19,22,25
112:3,6,9,12,15,18

**reasonable**  72:18

**reasons**  21:18,20
24:2 31:1 47:13
53:20 54:3 57:20
58:5 74:19 80:25
96:6 111:8

**recall**  15:25 16:2
34:9 35:11 40:25
48:24 96:16 97:7
99:11,20 101:4,6
102:3,7 105:23

**recalled**  75:9

**received**  93:10
96:6

**receives**  107:22

**receiving**  75:9

**recess**  53:10 91:20
106:10

**recognize**  103:17

**record**  16:11 26:9
26:9 36:9 67:19
70:15 72:5 73:7
74:6 85:22 89:7
91:18 102:18

**recorded**  25:24

**records**  22:6,6,9
22:15 23:6,7,10
24:2 25:14 26:3
26:11 48:25 59:23

**redaction**  22:15

**redistricting**  93:2
93:13 94:5,6 98:2
98:9 99:2,23

**reduce**  77:8

**reduced**  103:3
109:5

**reduces**  94:6

**reduction**  79:4

**refer**  19:4 21:20
77:13

**reference**  19:17
98:24 102:3,8

**referenced**  54:6
71:16

**references**  20:24

**referencing**  21:4
71:12 86:11 89:23

**referred**  26:19
77:14

**referring**  28:5
35:6 39:25 59:13
59:15 68:1,2
70:23 77:14 90:19

**reflective**  16:9

**refused**  83:12

**regarded**  14:20

**regarding**  84:11
99:17 105:9 106:1
106:6

**registered**  10:10
12:24 17:24 18:1
27:24 28:16 33:8
43:17 71:20 72:8

**registrant**  30:7
57:12

**registrants**  16:6
18:18 24:7 27:8
36:1,24 37:7,23
38:12 39:2,11,14
41:8 43:21 59:10
59:13,16 60:13
68:3 69:12 80:14
83:9 84:8,12 86:4
91:2

**registration**  9:12
10:8 11:25 12:21
12:24 13:15,18
14:2,5,6,11 16:11
17:10 18:9 19:18
19:21,24 23:22
24:1 25:21 26:5
31:14,22 37:2
56:25 57:3,13
64:21 66:10 67:7
67:9,12,13,17,18
67:19 70:15 73:7
73:21 74:5 75:11
75:15,20,22,22
81:15 82:19 83:1
84:10 85:22 86:5
87:1,9,18 89:7
106:2,6

**registrations**  86:3
100:2

**regulations**  4:11
107:6

**related**  15:24 98:5

**relating**  108:1

**relationship**  10:17
107:12 109:9

**relative**  10:19
22:23 109:7

**relevance**  39:1

**relevant**  63:22

**reliability**  16:6,7

**reliable**  16:18
57:12 68:16,20

**relied**  51:12

**relying**  57:15,19
81:2

**remainder**  59:12
60:12,16

**remaining**  24:16

**remains**  85:10
89:4

**remember**  8:7
105:14,14

**reminds**  52:25

**remotely**  6:20

**removal**  100:11

**removals**  16:18
26:16

**remove**  9:11 12:23
56:25 100:8

**removed**  25:10

**rephrase**  6:4

**report**  2:5 6:11
7:17,17,23 8:13,18
8:18,21 10:4,6,9
10:14 11:2 15:15
15:16 16:15 17:7
17:20 18:3,5 19:2
19:5 22:14,18
23:17 24:2 26:2
34:7,8,10,12,17
35:6,10,19,21
36:10 39:18,20
43:9 53:13,25
59:5,12 60:10,13
60:16 62:5,6
63:12 70:4 73:5
78:10 79:24 80:17
89:6,13 90:12
91:25 98:17 99:7

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[report - scj]**                                                    Page 19

99:13,14 100:6
103:20 104:4,9,11
104:15,15,22
107:13
**reported** 58:7 73:6
74:4,24 86:21
87:5 89:14
**reporter** 4:13 72:5
107:1,3,7,10,24,25
**reporters** 26:23
103:20 104:5
**reporting** 4:12
27:9 54:13,15
79:24 107:6,19
**reports** 103:19
**repository** 108:2
**represent** 24:19
**representations**
107:4
**representativeness**
39:5 67:21
**representing**
103:24
**republican** 50:23
**request** 17:15
99:16
**requested** 41:21
106:3,4 110:6
**required** 12:6 13:2
**requirement**
30:16
**requirements**
11:24 12:12 14:7
100:10
**requires** 12:12
**reread** 84:13
**research** 11:13,13
64:9 92:12,21
94:17 104:13
**researcher** 64:6

**researchers**
102:11
**reserve** 5:6
**reserved** 106:16
**reside** 17:25 43:16
58:24 71:23 72:11
72:20 81:14 83:1
86:5
**residence** 57:23
58:13,14 82:14,14
87:13,19
**residing** 12:16
16:10
**respect** 13:9 34:25
37:14,16 51:13
65:10
**respectively** 69:2
**respects** 45:21
**respond** 34:11
**responded** 63:18
73:8
**respondent** 70:13
**respondents** 62:25
67:18,24 68:5
69:10,11 70:12
76:24 78:1,4
83:20 84:9 85:20
86:14 89:6
**responding** 19:11
**response** 28:18
63:24 70:13 73:12
73:13 77:11
**responses** 20:10
36:16 63:2 66:21
68:23,25 73:1
79:6 83:20,22
86:9 87:2
**responsibility**
110:7
**responsible** 9:6

**responsive** 14:18
28:20 43:10
**responsiveness** 5:8
**restate** 21:1 23:1
84:23
**restore** 26:10,11
**restored** 61:21
**result** 20:24 99:5
**resulted** 85:20
**results** 41:13 54:1
64:1 82:24 88:7
90:5,9,13
**retained** 25:15
97:10 98:15
**returned** 21:23
24:18 30:3,8,9
38:9 39:23 40:2
54:11 55:17 57:8
57:11 58:18 68:14
69:2,25 83:9,20
84:1 110:11,14
**reversed** 37:17
**review** 99:1 107:2
110:7
**reviewed** 6:13
12:11
**rhode** 97:22,24
**right** 6:8 8:14 12:1
20:3 24:10 38:2
38:19 40:2 43:25
55:25 60:3 61:19
61:23,24 69:21
75:11 77:2 83:13
86:19 101:17
**rights** 89:25
**rigorous** 90:6
**robyn** 1:19 109:19
**role** 11:22
**roman** 16:3 21:17
**root** 76:11,14 77:3
77:6,10 79:3

**roswell** 110:20
**roughly** 15:14,16
15:18 16:2 60:22
61:2
**round** 99:23
**routine** 13:20 42:1
**rpr** 1:19 109:19
**rule** 111:6
**rules** 4:10 5:5,23
107:5 111:6
**run** 28:13 64:10
**running** 64:10

**s**

**sample** 62:17
67:21
**sampled** 67:8
**san** 98:14
**savannah** 105:16
**saw** 92:4
**saying** 16:25 23:9
26:4 31:9,11,23
38:10 60:9 102:19
**says** 37:22 65:16
82:12
**scale** 51:16
**schedule** 41:24
50:12
**scheduled** 90:11
**scholarship**
100:21
**school** 87:17 93:12
93:12 97:13
**science** 10:20
34:20 62:9,21
65:24 77:19 92:6
92:8,10,15 94:22
95:4 96:2,2
**scientist** 23:4
92:13
**scj** 1:7

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[scope - state's]                                                    Page 20

**scope** 9:5
**script** 63:13,16
**seal** 110:12
**search** 96:14
**second** 15:18
  19:16 31:5,6
  55:21 68:9 73:16
  90:20,25 101:8
  103:21 106:9
**secretary** 1:8 5:3
  9:9 10:7 18:14
  28:11 45:7 46:5
  46:21,25 47:15,21
  48:16 75:10 80:8
  80:11 82:3 86:2
  88:17 91:2 93:16
  106:1,5
**section** 20:20 39:7
  71:12 73:5 97:15
  97:15 99:2,18,19
  107:7
**sections** 107:8
**see** 10:15 31:4
  32:4 34:8 37:22
  46:13 51:15 54:9
  61:17 70:20 73:24
  93:5 100:6 101:9
  104:1
**seeing** 103:9
**seen** 7:6 34:24
  62:24 102:16
  103:18 104:14
**segment** 60:11
**select** 70:12
**senate** 90:1
**send** 12:14 28:15
  110:12,17
**senior** 49:11
**sense** 6:5 16:6,8
  19:7 65:2,5 67:2

**sent** 15:20,22,23
  82:4 102:4
**sentence** 31:9
  36:23 46:13 58:15
  79:14 87:23 88:9
  88:10 89:9 90:24
  90:25
**separate** 46:20
**sequence** 60:3
**serve** 109:13
**served** 96:23,24
**serves** 105:2
**services** 107:19
**serving** 105:2
**sessions** 6:15,16
**set** 7:9 35:13 66:14
  71:2,3
**settlement** 98:18
**share** 37:10,18
  38:4
**short** 46:20 104:17
**shorthand** 26:25
**shorthanded**
  30:15
**showed** 33:15 84:7
  90:11
**showing** 38:7
  44:14 47:12
**shows** 53:17
**shrinking** 78:5
**side** 51:22
**sign** 110:6
**signature** 106:16
  109:18 110:2,15
  112:20
**signed** 110:9,11,14
**significance** 36:11
  36:14 40:10
**significant** 33:10
  54:9

**similar** 33:6 45:18
  45:18 64:19 66:12
  66:14 69:16 76:19
**simply** 40:11
**single** 70:13
**sir** 31:6
**situation** 63:7
**situations** 13:2
  49:9,12
**sixth** 97:8
**size** 22:9 62:18,20
  76:9,20
**slightly** 78:22,25
**small** 22:8 47:10
  62:17 67:13 68:15
**smaller** 57:2 76:25
  80:24
**smith** 10:17,23
  96:8
**social** 92:7,10 96:2
**solely** 69:14 90:24
  107:15 109:11
**sorry** 20:22 22:21
  29:12 32:19 43:3
  52:9 71:1,7 84:13
  88:1 90:18 94:13
**sort** 11:12 13:23
  14:22 28:13 29:21
  32:17 33:6,15
  48:2,12 49:1,12,15
  99:5
**sorts** 11:10 49:15
**sounds** 60:9
**source** 20:8,23
  44:7 93:9
**sources** 19:17 64:5
**space** 51:3 93:14
**speak** 26:23,23
  32:9 34:23 50:17
**speaking** 33:13,19

**specialized** 17:5
  17:11
**specific** 28:7 34:8
  107:21
**specifically** 35:19
  66:17 105:5 107:5
**specifics** 11:15
  82:11
**spectrum** 51:16
**sphere** 50:25
**spoken** 6:23
  103:20 104:3
  105:8,25,25
**springfield** 95:1
**square** 76:11,13
  77:3,6,10 79:3
**standard** 14:21
  76:6,11 77:22,23
**standardized** 49:3
  49:4 50:10
**standardizing**
  50:3
**start** 24:5 30:23
  52:2 56:12 59:22
  92:3
**starting** 63:14
**state** 1:8 5:3 10:11
  13:11,13 14:25
  32:13 33:1,3,4
  54:24 55:6 58:8
  74:25 75:10 86:13
  86:18,22 87:6
  90:1 92:24 93:21
  93:21 96:25 97:3
  97:20 98:20 99:1
  99:11,17 106:1
  107:10 109:2
**state's** 9:9 10:7
  18:14 28:12 45:7
  46:5,21 47:1,15,21
  48:16 80:8,11

Michael McDonald , PhD                February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[state's - taylorenglish.com]**                                            Page 21

82:3 86:2 88:17
91:2 93:16 106:6
**stated** 90:12 109:4
**statement** 4:12
57:10 65:19 79:8
79:10 81:10
103:22 111:8
**statements** 70:8
84:1
**states** 1:1 2:6 14:6
14:10 26:21 93:18
95:11 98:13
**statewide** 19:17
**statistical** 63:3
64:1 76:4
**statistically** 63:2
**statistics** 27:9
30:24 36:12 39:15
39:18 40:11 54:16
**status** 25:4,11,23
26:17,17,18,20
27:11,16,18,18,21
53:21 61:21 75:11
**statutes** 29:10,15
**steps** 27:25
**stopping** 53:6
**story** 2:9 101:4
103:19
**straight** 42:18
**street** 1:16 3:18
**strictly** 52:5
**strong** 70:8
**struck** 62:17 75:6
**students** 87:7
**studied** 92:15
101:13
**study** 8:21 100:21
102:10
**studying** 92:14
**subcategories**
37:12

**subcontractor**
107:11,16 109:12
**subgroups** 68:4
70:2
**subjected** 81:21
**submission** 99:2
99:18,19
**submitted** 4:13
107:24,25
**subpopulations**
70:9
**subscribed** 112:21
**subsequent** 8:16
74:24
**subset** 32:23
**substance** 111:7
**substantial** 58:16
**substantive** 22:18
**substantively**
23:10,15
**subtract** 24:8,8,12
**sufficient** 62:9
77:19
**suggest** 87:3
**suite** 1:17 3:12,19
4:6 110:19
**summaries** 104:14
**summarizing**
18:20 19:6,12
**summary** 16:4
17:23 18:22 39:17
**support** 82:24
89:15 90:9
**supported** 89:20
**supportive** 88:22
**supports** 83:2
**suppose** 29:11
34:25
**sure** 5:18 20:20
21:3 22:13 23:3
24:24,24 34:3,9

42:17 61:18 68:4
71:25 72:3,13
**surpassed** 2:7
**surprising** 57:10
**surprisingly** 52:18
**survey** 10:9 17:3,6
17:11,13,14 20:9
20:10 39:5,6 41:6
43:6,12 51:8,9,10
55:24 56:5,6,8,19
56:21 57:5 58:4
58:10 59:3,5,9
60:6,19,21,25 61:9
62:9,20 63:5,9,13
63:16,20 64:1,6,7
64:9,9 65:8 66:1,6
66:6,13 67:18
68:5,18,24 69:10
69:10,12 70:12
75:7 76:4,20 77:7
77:20 78:2 81:3
82:23 83:7,10,13
83:15 84:7,9
85:19 86:10 87:2
87:22 88:7,7,12,21
89:5
**surveyed** 58:6
75:21
**surveying** 62:15
**surveyors** 83:7
**surveys** 52:22
61:22 62:8,24
64:11 65:6,25
68:11 76:23 77:9
78:15,23 83:11
**suspect** 76:17
**swear** 5:11
**sworn** 5:14 112:21
**system** 15:6 71:7
94:15 99:21

**t**

**table** 30:25 38:2
39:1,23,24 53:15
53:17 54:1 55:21
56:22 57:4 69:21
78:10 80:16 85:10
88:5 89:4
**tables** 19:4 38:25
**tabs** 20:9,15
**tailor** 36:19
**take** 7:1 12:19
13:16 24:7 34:11
49:2,3 53:6,8 91:6
**taken** 5:2 9:21
59:23 74:2 80:16
81:25 109:4
**takes** 17:10 49:22
**talk** 6:8,10 11:4
19:11 53:15 66:24
68:7 93:15 94:8
96:5
**talked** 7:21 14:15
86:14
**talking** 5:23 19:16
26:16 32:15 36:12
68:5 83:25 93:17
102:2 105:18
**talks** 18:16
**targetsmart** 40:19
40:23 41:2,23
42:23 45:19 50:8
50:18,20,24 51:4
51:13,15 54:2
56:15 64:20 74:12
80:20 91:13
**targetsmart's** 44:4
**tasked** 33:17
**taught** 105:5
**taylor** 4:4
**taylorenglish.com**
4:8

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[teach - tyson]                                          Page 22

teach 77:3
teaching 94:22
  95:3
team 93:7
technology 92:4,9
tell 6:11 9:1 51:18
  81:11 89:21
telling 80:10
tells 12:18
temporal 54:22
  79:20 81:18
temporarily 58:1
  58:8,12 74:25
  86:12,15 87:8,9,16
  89:8
temporary 87:3
tend 50:18 51:4
  65:9
tendency 37:17
tenure 94:21 95:1
  95:2,10,16,19
tenured 95:11,12
  95:14,15
term 26:1,13 27:2
  34:18,19,23 35:1,4
  35:15
terms 9:5 14:21
  20:8 31:25 34:14
  38:21 39:6,16
  52:17 66:19 81:7
  81:9 107:16
  109:12
testified 5:15 8:9
  35:9 36:10 38:17
  89:18,24 97:4
  98:22
testifying 97:7
testimony 44:21
  111:2,8
thank 6:7 14:24
  21:16 23:19 30:22

34:16 36:20 42:15
  53:3 56:23 62:4
  69:8 90:15 93:25
  99:25 105:1,3
  106:14
thanks 106:12
theirs 50:12
thesis 94:4
thing 25:2 30:13
  65:3 75:6
things 11:10 49:16
  54:15 62:19 88:8
  92:22 100:20,21
  105:22
think 7:21 14:14
  15:3 31:4 35:9,10
  35:18 36:15,17
  45:8,15 48:11
  59:8 67:4 69:5
  79:5 87:10 88:18
  89:13,19 100:9
  102:14 104:18
thinking 33:24
  43:13 87:8
third 3:5 17:22
  20:23,23 57:7
  58:16
thought 71:21
  72:10
thousands 17:24
three 6:15,16
  21:18 31:1,9,16,20
  54:3 56:18 58:25
  83:4 86:13,20
  97:20
time 10:25 27:14
  27:19 29:9,17,18
  30:19 32:7 41:21
  41:21 45:10 50:13
  58:3 84:23 93:1
  96:9,13 105:13

106:12 107:22
  110:14
times 5:19 76:12
  80:15 101:4
timing 54:22 55:6
  79:20 81:18 88:15
title 21:22
today 6:10,15,17
  6:24 7:10 106:12
told 64:13
top 18:16 20:22
  22:5 46:2 68:9
  70:22 71:3,8,12
  94:11,13 97:25
topic 94:4
topics 95:4 104:4
total 80:22
totally 5:24 7:9
track 94:21 95:1,2
transcript 107:22
  109:4,6 110:7,12
  110:14 111:2
transcripts 107:22
  108:1
trial 5:8 90:11,11
  97:14 98:16,22
trigger 29:18
triggered 30:17
trouble 13:24
  84:15
true 16:16 37:13
  44:16 58:19,22
  75:4 76:24 107:23
  109:6
try 6:4 23:3 36:22
  84:18 85:5 105:19
trying 14:8 18:6
  23:9 25:25 28:9
  29:14 34:16 38:3
  39:7 47:5 53:1
  63:4,8,23 65:3

66:1 79:15 80:6
  84:25 87:21 88:3
  88:16,16,20
turn 10:13 22:4
  40:14 46:2 53:12
  63:11 69:19 70:19
  91:22 94:8 96:17
  101:8
turnout 100:22
  101:15 102:2,10
  102:12,15,16,20
  102:22,25
tweet 2:8 102:1,3
  102:4,7,9
twice 77:6
twitter 101:19
two 12:13 17:16
  30:14 33:11 34:14
  41:19 46:15,20
  49:23 52:11 74:18
  74:21,23 80:2
  86:22 88:8 90:25
  92:20 95:9
type 77:20
types 104:4
typewriting 109:5
typical 15:9 62:20
typically 7:23 32:4
  48:22 76:7 99:24
tyson 2:13 4:3 5:1
  5:11,17 7:5,12,15
  9:19 11:16 12:9
  13:7 18:10,25
  22:19 23:2,18
  24:4,23 25:17
  26:12 27:1,6,22
  29:5 32:10,16,20
  33:12 34:2 35:2
  35:13,14 36:20,21
  38:24 40:13 42:14
  43:18 44:20 46:1

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[tyson - voters]**                                        Page 23

48:18 50:7 51:19
53:8,11 54:5 55:8
55:15 56:3,10,20
59:1 60:18 61:8
62:16 63:10 64:24
65:23 67:1 69:7
70:10,18,25 71:6
71:18 72:2,15
73:4 75:25 77:12
77:24 78:13,18
80:12 81:6 82:22
83:17 84:5,17
85:4,8 87:20,25
88:2,24 89:22
90:20,22 91:11,18
91:21 94:12
100:12 101:2,7,24
103:15 104:10,20
106:8,11

**u**

ultimately   18:1
  59:22 90:9
unable   57:3,20
uncertainty   80:7
unchanged   88:6
  89:5
uncheck   75:16
unclear   40:18
  74:20 80:1
uncommon   63:1
undeliverable
  30:8 57:11
undersigned   111:2
understand   6:6
  9:7,17 20:20 23:4
  23:9 25:25 26:3
  27:13 28:5,24
  29:2,8 30:12
  37:14,15 41:20
  42:3,9 44:2,12
  45:3,23 47:5,6

48:21 49:25 51:24
55:9 56:4 57:24
59:14 62:14,18
66:23 72:19 78:23
82:7 87:21 88:3,4
94:14
understanding
  9:13 12:4 15:2
  19:13 21:10,19,21
  25:6,9 28:11
  29:13 30:5 50:20
  50:24 53:16 54:12
  68:4 81:17,23
  84:15
understood   22:13
  84:2
unique   5:25 61:5
  61:14 65:4
united   1:1 95:11
  98:13
universe   24:9,19
  56:5,6,8,21 57:5
  59:9,16 60:21
  62:18 67:22 69:12
  78:3
university   10:15
  10:25 52:15 66:7
  87:7 94:3,19,25
  95:21,22 96:7
unquote   102:15
untold   2:9
unusual   90:8
unusually   102:17
  102:18,20,22
  103:9
unvarnished
  52:24
update   75:15
updated   75:13
updating   28:22

uploaded   108:2
upper   98:13
upward   44:10
  48:11 88:18
use   9:11 26:25
  34:24 50:8 66:12
  93:5,17,23 111:9
uses   46:5 50:4
utilized   17:3

**v**

vacuum   33:21
vague   35:1
valid   24:2 62:12
  63:9 100:10
validating   66:9
valley   98:14
vanderbilt   94:18
  94:21
variance   48:4
variation   62:23
various   22:1 26:24
  53:20 57:20 62:19
  64:5
varying   58:22
vendor   28:12 45:7
  47:21 48:4,16,22
  53:23
vendors   17:16,16
  41:12,15,19 45:24
  46:15,20 51:1,3
  53:18 54:8 79:9
  91:1
veracity   104:8
verbatim   107:13
verify   12:15
veritext   107:11,19
  110:10,18
version   93:20
versus   39:22 40:5
  50:5 54:2,20,23
  67:22 68:8 79:24

97:9,20 98:13
videoconference
  6:21
viewed   51:21
virginia   52:12,25
visiting   12:4 13:1
  94:20
vote   18:1 26:6
  43:17 71:20 72:9
  82:11,13,20
  103:12,23 105:19
  105:20
voted   12:13
voter   9:12 10:8
  11:18,19,25 12:6
  12:13,24 13:15,17
  14:5,6 16:11 17:9
  18:12 19:17,21,23
  22:7 23:22,25
  24:20 25:10,21
  26:5 27:24,24
  28:16 29:22,25
  31:2,13,22 32:5,12
  32:13,22 33:10
  36:2 37:2,8,10,24
  38:15 40:12 56:24
  57:3,13 64:18,21
  66:10 67:7,9,12,13
  67:17,17,19 70:14
  73:7 74:5,7 75:11
  75:15,19,22 81:15
  82:18 83:1 84:9
  85:21 87:1 100:2
  100:22 101:15
  106:2,6
voters   2:10 10:10
  12:24 17:25 25:19
  33:8 36:6 37:1,9
  39:24 40:5 58:17
  66:20 81:13 83:8
  91:7 105:1,21

Michael McDonald , PhD                    February 28, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[voting - youth]**                                                    Page 24

**voting**  2:6 25:11
  29:23 89:25 90:2
  103:24
**vs**  1:6

### w

**wait**  19:1 62:19
  85:7 104:19
**walk**  37:25 76:3
  92:2
**want**  19:1 22:11
  23:3 24:24 53:6
  60:7 62:5 63:12
  63:24 66:23 68:4
  69:5 70:20 81:25
  84:19 88:7,13
  100:8 105:15
**wanted**  22:12
  26:10 88:3 91:25
  92:1 97:15 98:24
**washington**  3:13
**water**  98:14,15
**way**  6:4 11:8,11
  14:3 19:3,9,12
  33:24 35:3 36:22
  42:16,25 43:11
  47:20 48:5 60:8
  68:24 70:6 72:2
  84:19 97:18,21
**ways**  63:1
**we've**  7:16 59:23
  79:19 86:8,9,14
  88:14 93:17
**web**  93:9
**weighting**  64:1
**went**  95:6,21
  97:14
**west**  1:16 3:18
**white**  35:25 36:5
  36:23 37:1 66:20
**whites**  38:4

**wide**  62:23
**widely**  11:7
**wish**  47:25 58:1
  62:6
**wishes**  89:18
**witness**  5:12 8:1
  96:18,24
**witnesses**  107:25
**word**  16:7
**words**  9:2
**work**  15:9,23,24
  16:1 20:3 32:3
  45:4 50:18 52:8
  52:12 54:18 93:7
  93:10 94:9 96:3,5
  96:19 98:2,5,7,10
  98:12 99:13
  104:17
**worked**  51:8 52:11
  64:7,7,9 92:11,20
  97:16,23 98:6,11
  98:20 100:14
  104:24
**worker**  104:25
  105:2,3
**working**  11:11
  30:23 38:25 51:25
  52:25 92:18
**works**  50:14,20
**world**  34:20
**wrapping**  91:25
**write**  35:6
**writing**  104:22
**writings**  34:24
**written**  4:12 47:18
  89:12
**wrong**  27:3
**wynbrandt**  3:9

### y

**yeah**  18:24 25:1,1
  33:24 34:3 53:8
  59:14 69:13 81:9
  81:9 83:24 84:24
  85:18 93:24
  104:14,16
**year**  42:23
**years**  10:24 42:2
  42:12,13,21 92:20
  100:8 105:24
**yesterday**  6:17
**york**  3:6,6,11
  89:25 101:4
**young**  102:12
**youth**  102:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.