# EXHIBIT 1

# PART 1

# In The Matter Of:

*Fair Fight Action v.*
*Raffensperger*

---

*Kevin Kennedy*
*March 31, 2020*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3
    FAIR FIGHT ACTION, INC.,        )
 4  et al.,                         )
                                    )
 5              Plaintiffs,         ) CIVIL ACTION FILE
                                    )
 6         vs.                      ) NO. 1:18-cv-05391-SCJ
                                    )
 7  BRAD RAFFENSPERGER, in his      )
    official Capacity as Secretary  )
 8  of State of Georgia; et al.,    )
                                    )
 9              Defendants.         )
    _____)
10

11

12            Telephonic deposition of KEVIN J.

13       KENNEDY, taken on behalf of the Defendants,

14       pursuant to Notice and agreement of counsel,

15       in accordance with the Federal Rules of Civil

16       Procedure, before Cynthia B. Gatewood,

17       Certified Court Reporter, at 41 Rough Lee

18       Court, Madison, Wisconsin, on the 31st day of

19       March 2020, commencing at the hour of

20       9:01 a.m. CST.

21
    _____
22
                     REGENCY-BRENTANO, INC.
23                  Certified Court Reporters
                      13 Corporate Square
24                         Suite 140
                    Atlanta, Georgia 30329
25                      (404) 321-3333
```

Regency-Brentano, Inc.

1                           INDEX TO EXAMINATIONS

2    EXAMINATION                                                PAGE

3    Cross-Examination by Mr. Belinfante                          4

4

5                            INDEX TO EXHIBITS

6    DEFENDANTS'
      EXHIBIT              DESCRIPTION                           PAGE
7

       D-1        Expert Report of Kevin J. Kennedy            10
8
       D-2        One Wisconsin Institute, Inc. v.             20
9                 Thomsen, 198 F.Supp.3d 896 (2016)

10     D-3        2015 Wisconsin Act 118                       29

11     D-4        Wisconsin 5.05, Elections                    37
                  commission; powers and duties
12
       D-5        Georgia 21-2-50, Powers and                  59
13                duties of Secretary of State

14     D-6        Georgia 21-2-70, Powers and                  66
                  duties of superintendents
15
       D-7        Georgia 21-2-99, Instruction of              67
16                poll officers and poll workers in
                  election procedures
17
       D-8        Wisconsin 7.15, Municipal clerks             76
18
       D-9        2018 Poll Worker Manual                     108
19
       D-10       Georgia 21-2-31, Duties of the              115
20                board

21     D-11       Georgia 21-2-100, Training of                116
                  local election officials
22
       D-12       Email dated 11/4/2019                       135
23
       D-13       U.S. Census Quick Facts                     152
24

25

```
 1   APPEARANCES OF COUNSEL (via telephone):

 2
     On behalf of the Plaintiffs:
 3
             ELIZABETH V. TANIS
 4           JOHN A. CHANDLER
             Attorneys at Law
 5           957 Springdale Road NE
             Atlanta, Georgia 30306
 6           Phone:  (404) 771-2275
             Email:  beth.tanis@gmail.com
 7           Email:  jachandler@gmail.com

 8
     On behalf of the Defendants:
 9
             JOSH B. BELINFANTE
10           MELANIE JOHNSON
             Attorneys at Law
11           Robbins Ross Alloy Belinfante Littlefield LLC
             500 14th Street NW
12           Atlanta, Georgia 30318
             Phone:  (678) 701-9381
13           Fax:    (404) 856-3250
             Email:  jbelinfante@robbinsfirm.com
14           Email:  mjohnson@robbinsfirm.com

15

16

17                             -   -   -

18

19

20

21

22           (Whereupon, disclosure as required by the

23      Georgia Board of Court Reporting was made by the

24      court reporter, a written copy of which is

25      attached hereto.)
```

**Regency-Brentano, Inc.**

1              MR. BELINFANTE:  This is the deposition of

2       Kevin J. Kennedy taken by the defendant, Secretary

3       of State Brad Raffensperger, for the purposes of

4       discovery and all purposes allowed under the

5       Federal Rules of Civil Procedure.  The deposition

6       is proceeding by telephone given the current

7       public health situation.  And by agreement of

8       counsel, the witness will be sworn and counsel

9       will treat that effective.  Is that agreeable,

10      Beth?

11             MS. TANIS:  Yes, that's agreeable.

12             MR. BELINFANTE:  Okay.  Will you go ahead

13      and swear the witness, then.

14                   KEVIN J. KENNEDY,

15  having been first duly sworn, was examined and

16  testified as follows:

17                   CROSS-EXAMINATION

18  BY MR. BELINFANTE:

19      Q.    Great.  Thank you.  Again, Mr. Kennedy, my

20  name is Josh Belinfante.  I represent the defendants in

21  this case.  I'm joined on the phone, not in the same

22  room, by Melanie Johnson.  And I want to say for the

23  record thank you to plaintiffs counsel and thank you to

24  you as well.  This deposition was originally scheduled

25  for, I believe, last Friday.  And per my request, we

1    had moved it to today, so thank you again for that.

2         A.    You're welcome.

3              MR. BELINFANTE:  Beth, would you -- I

4         presume we're going to -- or you're going to

5         reserve all objections except those going to

6         privilege and the form of the question and

7         responsiveness of the answer until trial or first

8         use of the deposition.  Is that agreeable?

9              MS. TANIS:  Yes.  And I construe privilege

10        there to include work product.

11             MR. BELINFANTE:  Sure, absolutely.

12   BY MR. BELINFANTE:

13        Q.    Mr. Kennedy, have you been deposed before?

14        A.    Yes, I have.

15        Q.    Okay.  In what cases were you deposed, do

16   you recall?

17        A.    I don't remember all of the cases.  As

18   Wisconsin's chief election officer for over 30 years, I

19   was a defendant in any number of cases where I was

20   deposed.  Probably the two most recent cases in which I

21   had a deposition, my last case in my capacity I was

22   deposed in the One Wisconsin Now case, which you have a

23   copy of the order.  And I was last almost -- well,

24   about nine months ago I was deposed in a case in North

25   Carolina for a circuit court case in which I'm an

1    expert witness, which is the Bouvier case, which again

2    you have at least the amended complaint for.

3         Q.    Okay.  So you know then the general rules,

4    and I think we're all -- at least me, given this

5    format, we're all swimming a little bit in some new

6    waters.  But, as you know, we can't talk over one

7    another just because that makes it hard for the court

8    reporter.  You'll need to answer questions yes or no as

9    opposed to huh-uh or uh-huh because that too will make

10   for a cleaner record.  If you need to take a break at

11   any time, just let me know.  We'll take a break.  The

12   only question -- or the only request I have is that if

13   there's a question on the floor, you can answer the

14   question, and then we can take a break after that.  Is

15   that agreeable?

16        A.    Yes, it is.

17        Q.    Great.  And then last, I may ask questions

18   today that sound confusing.  I promise you I'm not

19   trying to confuse you.  So if a question is unclear to

20   you, will you just let me know, and I'll try to

21   rephrase it.

22        A.    Yes.

23        Q.    Great.  All right.  What did you do to

24   prepare for today's deposition?

25        A.    I reviewed my report a number of times.  I

1    went back and looked at the depositions of Chris

2    Harvey.  There were three different depositions that he

3    provided in this case.  Since my report, I've looked at

4    expert witness depositions that were taken after my

5    report, notably the depositions of Ken Mayer, Dan

6    Smith, Michael McDonald.  There were two other

7    professors, one from I think Dartmouth.

8         Q.    Was that Dr. Herron?

9         A.    Yes, yes, Dr. Herron.

10        Q.    Okay.

11        A.    And looked at a large number of training

12   materials that were produced since my report and

13   complaints from the 2017 and 2018 elections.  Obviously

14   met with counsel just to go over my report and their

15   expectations of what they thought might be asked today.

16        Q.    Sure.  Okay.  And in looking at the

17   additional training materials, do you know if you

18   looked at the 2020 poll worker manual as it's called?

19        A.    No.  In fact, I made a specific request

20   about that and was advised that it had not been

21   produced.

22        Q.    Okay.  Do you know about when you made that

23   request?

24        A.    Within the last two weeks.

25        Q.    Okay.

1          MS. TANIS:  Josh, has it been produced?

2          MR. BELINFANTE:  My understanding is that it

3     was produced on about the 13th or the 15th, one of

4     those.

5          MS. TANIS:  Oh, okay.  I'm sorry.  Well, I'm

6     unaware of that, so --

7          MR. BELINFANTE:  Maybe the -- it's somewhere

8     before the 20th and after the 10th.  How's that?

9          MS. TANIS:  Okay.

10   BY MR. BELINFANTE:

11        Q.    Okay.  Do you know, Mr. Kennedy, roughly how

12   much time you spent preparing your report?

13        A.    I would be guessing.  I put in quite a bit

14   of effort looking at a lot of materials, so I don't

15   know the exact amount of hours that I've put in.

16   Probably more than I billed for, I'm sure.

17        Q.    And do you know when you started working on

18   your report?

19        A.    Again, I don't recall exactly.  I was

20   originally contacted in late September and had a number

21   of conversations in October with different -- and began

22   looking at materials.  And this is all in 2017.  The

23   bulk of the work was done in November and early

24   December.  Again, it --

25        Q.    You just said 2017.  Did you mean 2019?

```
1        A.     I did mean 2019.

2        Q.     Okay.

3        A.     It was definitely 2019.

4        Q.     All right.  I was going to give plaintiffs'

5   counsel a real strong kudos for some real foresight,

6   but all right.  We'll go with 2019.  Okay.  And who

7   first contacted you about providing expert services in

8   this litigation, do you recall?

9        A.     John Chandler.

10       Q.     Okay.  And what were you asked to provide an

11  opinion on?

12       A.     Well, I lay it out at the beginning and the

13  end of my report, but basically to opine on what the

14  basic policies, procedures, practices that should be in

15  place for -- by the State Elections Board and the

16  Secretary of State's office for the training of local

17  election officials, including county officials, poll

18  workers, and other participants in the process, to

19  ensure that they are able -- that they are carrying out

20  their responsibilities and to ensure that there is

21  compliance with federal and state laws regarding the

22  administration of elections in the state of Georgia.

23       Q.     All right.  Not asking what the data was,

24  but can you tell me if you were provided with any data

25  or documents from plaintiffs' counsel?
```

1      A.    Yes, I was provided with a large volume of

2  materials from plaintiffs' counsel that was made

3  available to them through discovery.

4      Q.    Were you asked by plaintiffs' counsel to

5  make any assumptions in terms of your analysis?

6      A.    I was not.

7      Q.    Let's go ahead and enter into as an exhibit

8  Exhibit 1, which is your report with the document

9  number 167 at the top.  And, Mr. Kennedy, just let me

10 know when you have that in front of you.

11            (Whereupon, Defendants' Exhibit Number D-1

12        was marked for identification.)

13     A.    Okay.  I have a written copy of it in front

14 of me.  I can also pull it up on my tablet, if

15 necessary.  And some of the documents that you proposed

16 that I look at I will have to access that way.

17 BY MR. BELINFANTE:

18     Q.    Okay.  And just let me know what I can do to

19 make it easier as well.  What I've tried to do is, when

20 I refer to a page number, refer to the court's page

21 number, which is about a page ahead sometimes of where

22 the page number on the bottom is.  But I'll, for the

23 record, use both, and we'll go that way.

24            Let me start with what is identified as

25 Appendix A to your report.  It's page 31 of 35 of

1    Document 167.  Appendix A starts a new page number 1 at

2    the bottom.

3         A.    Yes.

4         Q.    Other than the information that you

5    described at the beginning, including additional

6    depositions of Chris Harvey and the expert reports of

7    Drs. Mayer, Smith, McDonald, and Herron, additional

8    training materials and complaints, does Appendix A

9    accurately reflect the universe of documents you

10   considered for the purposes of your report?

11        A.    Yes, it does.

12        Q.    Okay.  And I notice that one of the

13   documents read was plaintiffs' amended complaint.  Can

14   you just tell me in your words what you believe this

15   lawsuit is about?

16        A.    I believe that the plaintiffs from the

17   complaint have a number of voting rights claims,

18   Section 1983 claims against the practices of

19   administering elections in Georgia as they're carried

20   out under the direction of the State Elections Board

21   and the Secretary of State.

22        Q.    In looking at page 3 of Appendix A, page 33

23   of Document 167, under other materials there are three

24   interviews listed there.  Do you see where I'm talking

25   about?

1       A.    Yes.

2       Q.    Okay.  Since this has been done, have you

3   talked to anyone else about this lawsuit other than

4   plaintiffs' counsel and those persons identified on

5   page 3 of Appendix A?

6       A.    The only conversations that I've had about

7   the lawsuit other than this deposition today or

8   something to my wife --

9       Q.    I won't ask about that.

10      A.    Yeah, or other individuals was a

11  recognition, I'm not sure, a couple of months ago that

12  one of the organizations on which I sit on the board is

13  also doing work for the Georgia Secretary of State.

14  And I had a discussion with David Becker of the Center

15  for Election Innovation & Research to make it clear

16  that we would not -- and we set out the protocols to

17  make sure that there would be no discussion about the

18  case.

19      Q.    Okay.

20      A.    So that would be the extent of that.

21      Q.    Okay.

22      A.    Talked to our counsel on that as well

23  obviously.

24      Q.    Sure.  What did you talk about with Tammy

25  Patrick from Arizona?

1        A.    Basically Tammy Patrick is a long-time

2    colleague who currently -- I'm trying to think what the

3    organization she works for now is, but she was a member

4    of the president's commission that was formed after the

5    2012 election, and she's very knowledgeable in general

6    about the landscape.  And I talked to her about

7    resources that might be available assessing training

8    across the United States just to get a sense of the

9    places I could be looking for more information that

10   gave a broader perspective on training in the states.

11       Q.    Do you recall what resources she identified?

12       A.    Well, she basically said that they had

13   worked when she was with the Bipartisan Policy Center

14   to put together sort of a document compiling it.  But

15   she didn't have a lot of confidence in the quality of

16   it, so I never looked at it.  She said that it just

17   wasn't done in a very -- good job.  So I really did not

18   get any additional materials to draw on other than my

19   experience that I've had over the past 40 years dealing

20   with election administration in the country.

21       Q.    Okay.  How about Matt Masterson, do you

22   recall your conversation with him?

23       A.    I do.  Matt is a former --

24       Q.    And --

25       A.    Go ahead.

1          Q.    No, no, go ahead.

2          A.    I was going to say Matt is a former

3    commissioner on the U.S. Election Assistance

4    Commission.  He now works for the Department of

5    Homeland Security, also a long-time colleague.  He's a

6    former -- he was an employee of the U.S. Election

7    Assistance Commission.  He also worked for the Ohio

8    Secretary of State's office before he became a

9    commissioner.  And basically my conversations with him

10   were to get the contact information for Merle King

11   because he wrote an article and I wanted to confirm the

12   information I had was current.

13         Q.    And about how long did you talk to Merle

14   King, do you recall?

15         A.    Could have been about an hour.

16         Q.    What were the topics, do you remember?

17         A.    Basically I was just trying to make sure I

18   understood the history of Kennesaw State's role in

19   elections with the Secretary of State.  I was quite

20   familiar with it.  I've known Merle and people he's

21   worked with for quite a long time.  He's -- he was

22   usually the convenor of some of our election technology

23   conferences that were held across the country.  And,

24   again, just wanted to make sure I had a good

25   understanding of what the role was and how it had

1    transitioned into the Secretary of State's office.

2         Q.    All right.  Let's turn to your CV, which is

3    part of Document 167 beginning on page 28.  It is

4    separately paginated at the bottom.

5         A.    Okay.

6         Q.    You are an attorney; correct?

7         A.    I am.

8         Q.    Are you admitted in any states other than

9    Wisconsin?

10        A.    I am not admitted in any states other than

11   Wisconsin but have several federal credentials.

12        Q.    Sure.  I'm sorry.  Admitted as a member of

13   the bar anywhere other than Wisconsin?

14        A.    No.

15        Q.    Okay.  Have you ever issued an opinion on

16   Georgia law before?

17        A.    I have not.

18        Q.    When was the last -- and when you were in

19   private practice, or today, have you represented

20   clients in litigation?

21        A.    I have.

22        Q.    When is the last time you represented a

23   client in an active litigation?  And by active

24   litigation, I mean a lawsuit was actually filed.

25        A.    Well, I'm not sure exactly.  I was the

1    general counsel for the Wisconsin Government

2    Accountability Board.  I obviously had attorneys

3    working for me, so probably the last legal action that

4    I did in that respect was to file an amicus brief that

5    I signed and was actively involved in writing in front

6    of the Wisconsin state supreme court, which would have

7    been in 2015.

8        Q.    Okay.  What case was that, do you recall?

9        A.    It was -- it involved a John Doe proceeding

10   in which we were involved, so there's not much I can

11   share about it.  I know it starts out our main

12   petitioner would be Schmitz I believe is the name of

13   the case.  A lot of the rest of it is sealed.

14       Q.    Understood.  Okay.  Did that involve

15   elections, or was that part of the campaign finance

16   side of GAB?

17       A.    That was campaign finance.

18       Q.    Okay.  Other than your time with the state

19   for either the Government Accountability Board, which

20   I'll refer to sometimes as GAB, or its predecessor

21   organization, have you represented a client in private

22   practice in active litigation, again, meaning there's

23   an actual complaint that's been filed?

24       A.    I have.  I had a number of clients when I

25   was in private practice in Madison.  I was an assistant

1   district attorney before that where I represented the

2   state in traffic, misdemeanor, and felony cases.

3        Q.    Okay.  How about since leaving state, and by

4   that I mean GAB, have you represented anyone in active

5   litigation since then?

6        A.    No, I have not.

7        Q.    All right.  In your current -- you currently

8   work with or are employed by, own, Kennedy Election Law

9   Services; is that right?

10        A.    That's right.

11        Q.    And does it have a website?

12        A.    It does not.

13        Q.    How many -- I read the CV, but what type of

14   entities are clients of Kennedy Election Services?

15        A.    Well, basically I've done -- I've provided

16   expert witness testimony in this case and in the North

17   Carolina case.  I have worked for the District of

18   Columbia on a campaign finance matter, along with a

19   colleague of mine, former colleague of mine, basically

20   independent contractors working for the District of

21   Columbia to review their public funding program.  That

22   work ended last summer.  I give a lot -- I give a lot

23   of talks and presentations as, you know, a result of my

24   continuing involvement in election administration.  And

25   that's basically it.

1      Q.    All right.  You say your continuing

2   involvement in election administration.  Tell me what

3   you mean by that.

4      A.    Well, I sit on the board of two election

5   related organizations, the Center for Election

6   Innovation & Research, the U.S. Vote Foundation.  I'm

7   also on the advisory board for MIT's Election Data Lab.

8   I participate in conferences for the Election Science

9   and Research, which has annual meetings, you know,

10   where I will review papers and comment on them.  And

11   I've continued to work for the City of Madison as a

12   poll worker.

13      Q.    All right.  For the organizations you

14   identified, for any of those have you been asked to

15   advise or consult with state governments on election

16   administration?

17      A.    I have not.

18      Q.    And I think you answered this, but just to

19   be clear, has Kennedy Election Services been retained

20   by any state government for advice or consultation on

21   election administration?

22      A.    No.

23      Q.    Let's talk about the case for a minute that

24   you identified.  And I think I'm pronouncing it right,

25   Bouvier versus Porter?

1       A.      Yes.

2       Q.      That's a North Carolina case in state court;

3   correct?

4       A.      That's right.

5       Q.      And tell me what that case is about in your

6   words.

7       A.      There are a number of individuals in North

8   Carolina that were aggrieved by election complaints

9   that were filed against them claiming that they had

10  violated North Carolina and federal law by voting more

11  than once in the 20 -- I believe it was the 2016

12  gubernatorial election.  And they brought a defamation

13  case, and I was asked to look at the matching process

14  that the defendants used to identify these individuals

15  as multiple voters and to comment on the efficacy of

16  that matching process.

17      Q.      Okay.  What is the status of that case now?

18  Is it still pending?

19      A.      It is still pending.  I know that they were

20  in a mediation or negotiation -- a mandated period

21  where they were supposed to be trying to resolve the

22  case.  My understanding is it hasn't been resolved and

23  trial may occur this summer.

24      Q.      Do you know -- and I don't know North

25  Carolina civil procedure, but has your expert

1    designation been challenged by the defendant in that

2    case?

3         A.    It has not, to my knowledge.

4         Q.    All right.  Okay.  And the next one is the

5    One Wisconsin Institute versus Thomsen decision.  Let's

6    go ahead and mark that one Exhibit 2.  And for the

7    record, I'm referring to the opinion which is at 198 F.

8    Supp. 3d 896 from the Western District of Wisconsin in

9    2016.

10             (Whereupon, Defendants' Exhibit Number D-2

11        was marked for identification.)

12   BY MR. BELINFANTE:

13        Q.    In your words, what was that -- or go ahead,

14   sir.

15        A.    I was just going to advise you I haven't

16   pulled it up yet.  And I know that when I printed it

17   out, it was very difficult to read and review.  I have

18   another copy that's a PDF version of that that I can

19   look at.

20        Q.    Okay.

21        A.    If that's all right with you, I will -- I

22   will pull that one up because it's the one that I got

23   after the decision was released.  It doesn't have the

24   West case headnotes and things like that in it.

25        Q.    Sure.

1      A.    If you're comfortable with that, that's the
2  one I will pull up.
3      Q.    Absolutely.
4      A.    And then just give me a second to get that
5  in front of me.
6      Q.    Sure.  Just let me know when you have it.
7      A.    I did not want to print 119 pages.
8      Q.    Understood.
9      A.    All right.  I have that in front of me.
10     Q.    Okay.  In your words, can you just tell me
11 what that case was about?
12     A.    This was an action brought by a -- by two
13 different voting rights groups and a number of
14 individual plaintiffs against -- originally against the
15 Government Accountability Board and two of its
16 officers, including myself and my elections division
17 administrator.  So I was one of the named defendants in
18 the original action, and it was brought challenging a
19 series of laws that were enacted by the legislature in
20 the 2011-2012 and 2013-2014 session that made a number
21 of changes to the administration of laws -- election
22 laws in the state of Wisconsin.
23     Q.    And when were those laws passed?
24     A.    There was probably eight or nine separate
25 acts that were passed over a four-year period.  The

1    first --

2        Q.    Okay.

3        A.    The first one was May 25th of 2011, which is

4    the state's new voter ID law.  And that included some

5    additional changes, and that proceeded well into the

6    fall of 2013.  There may have been some things in the

7    spring of 2014.  The legislative session usually ends

8    around March of an even-numbered year.

9        Q.    All right.  The court describes your

10   testimony starting at the end of page 924 as I have it.

11   It's in the section under (c), other challenged

12   provisions.

13       A.    Give me a second to find it.

14       Q.    Sure.  It's at a paragraph that begins, "The

15   acknowledged impetus for this law was the sight of long

16   lines of Milwaukee citizens voting after hours."

17       A.    Sorry.  I'm just scrolling through looking

18   for headings.

19       Q.    Sure.  There's a block quote with your --

20       A.    Yeah, I remember the quote.  I remember the

21   quote, but I want to have it in front of me before we

22   talk about it.

23       Q.    Oh, absolutely.  Yes, yes.

24       A.    You say it's under other challenged

25   provisions?

1    Q.    Yes, little (c).  I guess it's big C,

2   intentional discrimination, then little (c), other

3   challenged provisions.

4    A.    Yes, okay.  "The acknowledged impetus for

5   this law was the sight of long lines," et cetera?

6    Q.    Yes.

7    A.    And then there's a block quote, which is --

8    Q.    Yes.

9    A.    -- attributed to -- yes.

10   Q.    All right.  So my question is with that last

11  sentence that introduces the block quote, it says, "At

12  trial, Kevin Kennedy, director of the GAB, confirmed

13  that the purpose of reducing the hours for in-person

14  absentee voting was to restrain voting in Milwaukee."

15  Do you see that?

16   A.    I do.

17   Q.    Do you agree with that characterization of

18  your testimony?

19   A.    I think that's a fair characterization of

20  the testimony.

21   Q.    All right.  And the block quote that's there

22  appears to quote from the transcript of the trial.  I

23  don't expect you to recall if that is an accurate

24  statement word for word, but generally is that block

25  quote consistent with your testimony?

1      A.    Yes.
2      Q.    Okay.  And you were a witness in that case.
3  You were a fact witness and not an expert witness;
4  correct?
5      A.    That -- I guess that's a fair
6  characterization.  I was a defendant.  The plaintiffs
7  called me adversely as the first witness in their
8  trial.
9      Q.    I see.  Okay.  So you were not -- you were
10 not testifying in any case as an expert in election
11 administration.
12     A.    Well --
13     Q.    Let me ask it this way.  Were you qualified
14 as an expert witness in the One Wisconsin Institute
15 case?
16     A.    No, I was not qualified as an expert.
17     Q.    Okay.
18         MS. TANIS:  Josh, and what you mean by
19     qualified as an expert was actually like getting
20     the court saying, yes, he's an expert witness and
21     he's qualified to be an expert witness?
22         MR. BELINFANTE:  Yes.
23         THE WITNESS:  And that was my understanding
24     of your question as well.
25  /  /  /

1    BY MR. BELINFANTE:

2        Q.    Okay.  Great.  So we're on the same page.

3    Have you been qualified as an expert, as Ms. Tanis just

4    defined it, in any litigation involving election

5    administration?

6        A.    I have not.  I've testified primarily as a

7    fact witness because of my expertise, but obviously

8    that does not mean that we went through the process of

9    qualifying me as an expert.  I believe there were cases

10   where the court recognized that expertise.  They tended

11   to be trial cases in Wisconsin.

12       Q.    And did they involve -- and forgive me if

13   what I'm about to ask is a painfully obvious question,

14   but you understand the process we're in.  Those cases

15   in Wisconsin, did they involve questions of Wisconsin

16   election administration?

17       A.    Yes.

18       Q.    Okay.  If you can turn in your report,

19   again, Document 167, the substantive report itself,

20   page 2 of the court filing beginning on page 1 of the

21   report, there's a heading synopsis that goes over to

22   page 2 or page 3 of the court document.

23       A.    Yes.

24       Q.    Does that portion synopsis reflect the

25   opinions that you are offering in this report?

1      A.    Yes, it does.

2      Q.    Okay.  So let me ask a series of questions

3  about things to see -- to make sure that effectively

4  what you're not opining on.  Are you giving an opinion

5  on what is referred to by the plaintiffs as the use it

6  or lose it statute?

7      A.    I certainly looked at the allegations

8  concerning that in the various information in there,

9  and that informed my opinions about training and

10  procedures related to administration of law.  But it

11  was not something, the practice itself, that I provided

12  an opinion on.

13      Q.    All right.  And you're not providing an

14  opinion on the policy of what plaintiffs refer to as

15  exact match; is that correct?

16      A.    Again, I certainly looked at the allegations

17  concerning that, the materials related to that in

18  looking at training and enforcement and complaints that

19  were filed, but I did not prepare an opinion on the

20  exact match policy.

21      Q.    And I know throughout your report you cite

22  several provisions in Georgia law.  Did you happen to

23  look at legislation passed in 2019 known as House Bill

24  316 to see what changes were made, or did you just go

25  statute by statute as identified in your report?

1      A.    I looked at the statutes that were

2  available, which would have been after the law was

3  passed.  In my preparation there were a lot of

4  questions in the depositions about changes that House

5  Bill 316 made.  I did not look at the legislation

6  itself.  But, you know, there were materials that were

7  presented that summarized House Bill 316 that were part

8  of the materials presented to the county election

9  official conferences, so in that sense I had somewhat

10  of a familiarity with the changes.

11     Q.    All right.  Are you offering an opinion on

12  whether any state officials have acted with intentional

13  discrimination towards voters of color?

14     A.    Again, I looked at allegations concerning

15  that, materials related to that, but I'm not offering

16  an opinion specifically on that, no.

17     Q.    All right.  Okay.  Let's talk briefly about

18  your time with the Government Accountability Board in

19  Wisconsin and its predecessor organization.  Who

20  appointed you as the director of the GAB?

21     A.    The Government Accountability Board itself

22  appointed me.  They are six former judges who were

23  appointed by the governor from a list that was

24  recommended to the governor by state court of appeals

25  judges based on applications they reviewed, and then

1    they were confirmed.  The initial board was -- half of

2    it was confirmed by the assembly and half by the

3    senate.  Following that initial appointment, members

4    were confirmed by the senate only.

5         Q.    All right.  Are judicial positions in

6    Wisconsin partisan?

7         A.    They are not.

8         Q.    All right.  On Document 167 again, your

9    report, page 3 for the court and page 2, you write

10   under the professional background, second paragraph,

11   last sentence, you held the position -- that position,

12   meaning director and general counsel for the GAB, until

13   the dissolution of the GAB on June 29th, 2016.  Do you

14   see that?

15        A.    Yes.

16        Q.    The GAB was dissolved by an act of the

17   legislature; is that correct?

18        A.    That's right.

19        Q.    And was that Wisconsin Act 118 of the 2015

20   assembly?

21        A.    Yes, it was.

22        Q.    Okay.  Do you have a copy of that with you?

23        A.    I can pull up a copy by pulling up the link

24   that you provided.

25        Q.    Okay.  Let's go ahead and mark that as

 1   Exhibit 3.

 2              (Whereupon, Defendants' Exhibit Number D-3

 3      was marked for identification.)

 4   BY MR. BELINFANTE:

 5       Q.    I may not have any real questions from it,

 6   so we'll just go ahead and mark it while we're there.

 7   Why, in your opinion, did the legislature dissolve --

 8   well, let me ask this first.  How were the functions of

 9   the GAB -- let me start over.  Act 118, as I understand

10   it, broke out the campaign finance functions of the GAB

11   from the election functions, and there are now two

12   different boards, one governing elections and one

13   governing campaign finance.  Is that accurate?

14       A.    Not entirely, no.

15       Q.    Okay.  But -- go ahead.

16       A.    The fact is the GAB was responsible not only

17   for campaign finance and elections but also ethics and

18   lobbying regulation.  And ethics and lobbying

19   regulation originally had been under a state ethics

20   board, and elections and campaign finance had been

21   under a state elections board before the creation of

22   the GAB.  And I was in charge of the State Elections

23   Board, which had elections and campaign finance.

24              When the GAB was created, two divisions were

25   created, an elections division and an ethics and

1    accountability division, which had ethics, campaign
2    finance, and lobbying as its responsibilities.  When
3    the GAB was dissolved and two new commissions were
4    created, one was an elections commission, and the other
5    was an ethics commission which has responsibilities for
6    campaign finance, lobbying, and ethics.
7        Q.    Got it.  Okay.  Why, in your opinion, did
8    the legislature make that decision?
9        A.    The legis -- well, if you look at the
10   structure of the agencies, it's reflected in the fact
11   that the legislature chafed under the existence of an
12   independent executive branch agency that was not part
13   of the governor's cabinet.  It was an independent
14   agency created by the legislature again in 2007, but it
15   was a sense, from my opinion, that the legislature
16   wanted more control of this executive branch agency
17   which regulated election administration, campaign
18   finance, ethics, and lobbying, all actions that touch
19   very clearly on the operations of the legislature.
20             And if you look at the structure of the two
21   new commissions, even though it's technically an
22   executive branch agency, four of the members are direct
23   appointees of the legislature, and the other two
24   commissioners that are appointed by the governor come
25   from lists submitted by the legislature, one Democratic

1    list of former clerks or a Republican list of former

2    clerks that the governor has to choose from for the

3    elections commission and a separate list of I believe

4    former judges for the ethics commission.

5          Q.    Okay.  And does the elections commission

6    have an executive director today?

7          A.    They call it an administrator is the title

8    for the position.

9          Q.    That's right.  And who is the administrator

10   today?

11         A.    Today it is Meagan Wolfe.

12         Q.    Did she work with you at the GAB?

13         A.    She did.

14         Q.    Okay.  And who appoints the administrator?

15         A.    The commission appoints the administrator

16   subject to confirmation by the senate.

17         Q.    All right.  Okay.  Looking at again your

18   report, Document 167, at pages 28 -- that's not right.

19   Hang on one second.  I'll tell you what.  I'll come

20   back to that.  Actually, I'll just ask this.  While you

21   were the executive director of the GAB, one of the

22   things you were responsible for was directing the

23   implementation of federal mandates under the Help

24   America Vote Act of 2002, or HAVA; is that correct?

25         A.    That's correct, although let me clarify that

1    my title in the statute was legal counsel for the

2    board.  The working title that the board adopted when I

3    was hired was director and general counsel because they

4    saw me as the chief of staff for the organization but

5    recognized I was also the lead counsel for the agency.

6         Q.    I see.  Okay.

7         A.    So --

8         Q.    And -- go ahead.

9         A.    I was going to say so, for example, when

10   you're looking at Wisconsin Act 118, you know, the

11   statutory record of my position would be legal counsel.

12   That position was --

13        Q.    I gotcha.  Okay.

14        A.    -- dropped and replaced by administrator.

15        Q.    All right.  Oh, I found where I was looking.

16   It's on your CV.  So it's correct that it's

17   Document 167, page 28 and 29 of the court document.

18   It's at the bottom of page 1 and 2 for your CV.

19        A.    Yes.

20        Q.    When you say there at the bottom that you

21   were responsible for directing and implementation of

22   the HAVA mandates, what does that mean?  What did that

23   entail?

24        A.    Well, first of all, it recognizes the fact

25   that HAVA requires that there be a chief state election

```
 1   official who's ultimately responsible for the
 2   implementation and administration of the Help America
 3   Vote Act in that state.
 4        Q.    Yep.
 5        A.    And since that was passed in 2002, it meant
 6   making sure that the state complied with the mandatory
 7   requirements of Title III, which basically dealt with
 8   accessible voting equipment, voting equipment
 9   standards, establishing a statewide voter registration
10   system, establishing a system of provisional ballots,
11   establishing an independent complaint process.  Those
12   were the basic requirements of the Help America Vote
13   Act that the chief election officer and, in my case, I
14   would have been responsible for implementing for the
15   state of Wisconsin and continuing to administer and
16   would be accountable for its responsibilities.  That's
17   carried over obviously to this day.  It would now be
18   Meagan Wolfe's responsibility since that's the role she
19   plays on that.
20             It also meant responsible for the proper --
21   acceptance and proper use of the federal funds that
22   came with the Help America Vote Act, and there's been
23   continuing funds distributed even as recently as 2019
24   to the states under the provisions of the Help America
25   Vote Act, mostly for election security, but there's now
```

1  something that was passed with the stimulus package

2  that provided $400 million to the states under the

3  auspices of the Help America Vote Act to assist dealing

4  with the breakout.

5      Q.    Okay.  And in your role also at the GAB,

6  were you responsible for implementing any federal

7  mandates arising out of The Uniformed and Overseas

8  Citizens Absentee Voting Act or UOCAVA?

9      A.    Yes, I was.

10     Q.    And do you deem your efforts in implementing

11 UOCAVA to have been successful in Wisconsin?

12     A.    They have been generally successful.  I

13 think they -- you know, it's an area that requires

14 constant vigilance.  But, yes, they were successful.

15 We spent quite a bit of time in litigation with the

16 U.S. Department of Justice.

17     Q.    And those are lawsuits that the Department

18 of Justice brought against Wisconsin?

19     A.    That's right.

20     Q.    All right.  And there was a consent decree

21 entered in at least one of those cases; right?

22     A.    Yes.

23     Q.    And is it true that the department alleged

24 that there was not uniformity across Wisconsin's

25 cities, towns, and villages in the implementation of

1    UOCAVA?

2         A.    That might be how they characterized

3    individual clerks' failures to comply with it.

4         Q.    How would you characterize what the DOJ

5    was -- had sued the state over?

6         A.    Well, there was some disagreement about the

7    interpretation of the law and the application of the

8    law that got resolved in that, but there was also a

9    recognition that there were a handful of the 1850 -- at

10   that time probably 1854 municipal clerks who did not

11   meet the state or federal requirements for the timing

12   of getting ballots to the clerks.  And we had to ensure

13   that there was extraordinary action taken to cover

14   those handful of cases, a little small number of cases.

15        Q.    To your knowledge, has that consent decree

16   been lifted?

17        A.    I do not know.

18        Q.    Let me ask this.  What is the difference in

19   Wisconsin between a city, a town, and a village?

20        A.    Basically they are three individual

21   governmental units.  Cities and villages are

22   incorporated and have certain degrees of power.  Towns

23   are an individual unit of government.  Most of you

24   would think of them as rural county areas, I think.

25   They are part of the 6 by 6 square mile grid within

1    each county, which obviously that basic territory can

2    be reduced by natural landmarks such as rivers, lakes,

3    and annexations by cities.  There may be a village

4    incorporated within the boundaries of the town on that.

5              But basically when Wisconsin was

6    established, there was a grid -- all of the towns got

7    divided into roughly 6 by 6 squares, and they were

8    given autonomy as the town -- electing a town board, a

9    treasurer, a clerk.  They could elect a constable.  But

10   it is a unit of government with its own taxation, its

11   own administration requirements.  And the town clerk

12   was responsible for running elections just like a

13   village clerk or a city clerk would be.

14        Q.    Okay.  So each one of those units, village,

15   town, city, run elections within their jurisdiction; is

16   that correct?

17        A.    That's right.

18        Q.    Okay.  And if there's a statewide election,

19   those three entities, village, town, and cities, will

20   still be implementing or administering the elections in

21   those jurisdictions; is that right?

22        A.    That's correct.

23        Q.    Okay.  If you could go ahead and pull

24   Wisconsin Statute Section 5 dash -- or, excuse me,

25   5.05, the elections commission statute.  And we'll go

1    ahead and mark -- sure.  We'll mark that Exhibit 4.

2              (Whereupon, Defendants' Exhibit Number D-4

3         was marked for identification.)

4         A.    So I have the PDF for Chapter 5 available

5    that then breaks it down into sections.

6    BY MR. BELINFANTE:

7         Q.    Okay.  That's fine.  I'm looking at 5.05.

8         A.    Okay.

9         Q.    And specifically -- I don't know if you'd

10   call it subsection 7 which has got the heading

11   "Administrative meetings and conferences."

12        A.    Yes.

13        Q.    Okay.  Would you agree with me that Section

14   7 is the only time that training appears in Code

15   Section 5.05?

16        A.    I'm not entirely sure because there are --

17   there's a voter education provision below that in

18   Section 12.  There's a section in 14 that requires the

19   commission to gather information from county and

20   municipal clerks, all of which -- there's a policies

21   and procedures section in sub 16 and the sub 15 under

22   the registration.  Most all are going to implicate

23   training.  But as far as a specific charge goes, that

24   is the directive for the commission.

25        Q.    I see.  All right.  And Section 5.05,

1    subparagraph (7), that's where the commission at least

2    has its authority to conduct regular information and

3    training meetings on elections; is that correct?

4        A.    That's right.

5        Q.    All right.  The Section 5.05(1)(d) -- let me

6    know when you get there.  It's the one that begins "sue

7    for injunctive relief."

8        A.    Oh, okay.  Yes.

9        Q.    Okay.  That one says effectively that the --

10   now the election commission can "sue for injunctive

11   relief, a writ of mandamus or prohibition, or other

12   such legal or equitable relief as may be appropriate to

13   enforce any law regulating the conduct of elections or

14   election campaigns, other than laws relating to [sic]

15   campaign financing, or to ensure its proper

16   administration."  Do you see that?

17       A.    Yes.

18       Q.    Okay.  As I went through Act 118, which

19   amended Section 5.05 in 2015, the only change that I

20   saw to that paragraph was the insertion of the language

21   "other than laws regulating campaign financing."  Would

22   you agree with that?

23       A.    Yes, I would.

24       Q.    Okay.  So while you were with the GAB, it

25   could bring these lawsuits to enforce the conduct of

1    elections or election campaigns.  Maybe other stuff

2    too, but that's what I'm focused on.  Is that right?

3        A.    Yes.

4        Q.    Okay.  How frequently did the GAB bring a

5    lawsuit to enforce the conduct of elections or election

6    campaigns during your tenure?

7        A.    Well, I'm thinking that the -- I can only

8    think of one specific occasion that we did that, and

9    that was actually done under the auspices of the

10   Wisconsin State Elections Board where we brought a

11   lawsuit to ensure because the town board did not have

12   enough people to appoint a clerk and we needed to make

13   sure that there were individuals available to run an

14   election in that municipality.  So we brought a lawsuit

15   for the purposes of having a court appoint someone to

16   run elections because there was no active town board

17   that could carry that out.  That's the one case I can

18   remember.

19           It certainly was something that we were

20   aware of and kept under consideration for things such

21   as our authority if we needed it in addition to other

22   requirements to ensure that local election officials

23   were complying with the law.  There were other

24   provisions that we had that were probably more

25   effective than bringing a lawsuit.

1    Q.    Like what?

2    A.    I'm sorry.  Did you ask a question?

3    Q.    Yeah.  I'm sorry.  What would you deem to be

4    more effective than filing a lawsuit, other tools you

5    had, other powers?

6    A.    Section 5.06 of the statute basically

7    provided that any complaint about the administration

8    again was -- it was primarily limited to elections but

9    allowed the fact you could not -- an outside party

10   could not bring an action against a local election

11   official without coming to us first under 5.06.  And

12   that gave us the power to conduct the investigation and

13   to issue orders to conform their conduct to law.  That

14   tended to be much more effective.

15   Q.    How frequently did that happen?

16   A.    We had cases every year, mostly dealt with

17   overseeing ballot access decisions that local officials

18   made that didn't comply with the law.

19   Q.    Roughly how many?  And I realize -- and let

20   me -- I'll try to narrow it for you.  For the time that

21   the GAB was in place, so from 2007 to 2016, do you

22   recall on average how many a year of cases like that

23   you would see that were pursuant to Wisconsin Statute

24   5.06?

25   A.    There would be more in odd-numbered years

1    because there would be more local elections, offices

2    for local -- offices up for consideration in that time

3    period, so odd-numbered years would often generate

4    more, although presidential years in Milwaukee offices

5    were apt to generate some.  But eight to ten cases

6    would be usually under our purview.

7         Q.    All right.  Do you know where I could find

8    information that identified those cases?

9         A.    You would probably have to contact the

10   current public information officer with the Wisconsin

11   Elections Commission and make an open records request

12   for opinions and orders that were issued under 5.06 for

13   a particular period of time.

14             One of the things that the Wisconsin

15   Elections Commission did was take down for all

16   practical purposes the historical government

17   accountability voter website.  Obviously they converted

18   a lot of information and documents to their own use,

19   but a lot of the historical actions, which are required

20   to be preserved under Wisconsin's open records law,

21   would have to be accessed probably through -- she would

22   probably be able to help you find those on something

23   you're going to find available anymore.

24        Q.    Okay.  All right.  Let me ask you to take a

25   look in that same Code Section 5.05(2)(m), which is

1   enforcement.

2        A.    Yes.

3        Q.    All right.  And 2(m), paragraph (a), says

4   that "The commission shall investigate violations of

5   the law administered by the commission and may

6   prosecute alleged civil violations of those laws," and

7   then it goes on to talk about how.  How often during

8   your tenure with the GAB -- so, again, 2007 to 2016 --

9   did the commission engage in investigating violations?

10       A.    Well, this statute was used primarily for

11  campaign finance and lobbying law at the time.

12       Q.    Okay.

13       A.    If you look at Act 118, you can see that

14  Section 2(m) was essentially lifted and copied over in

15  Chapter 19 under the responsibilities of the ethics

16  commission.  I can recall specifically one case that

17  was brought investigating elections.  Most of what we

18  did under this section, again, was campaign finance,

19  ethics and lobbying.  And, you know, when the GAB was

20  created, this section was created then to really direct

21  the broad investigative authority -- the powers that

22  the agency had.

23             There really aren't any civil penalties in

24  Wisconsin for violating election laws or local election

25  officials like Georgia has where they can be what we

1    would call a forfeiture.  I think you call them a fine,

2    but it's not a criminal monetary penalty.  We don't

3    specifically have that.  I've talked to local DAs who

4    think there's some general catchall provisions where

5    they could do that.  But, again, most of our compliance

6    probably would have gone under 5.06 for election

7    issues.  But we did use this section in 2011 to

8    investigate the actions of a county clerk that

9    generated a statewide recount.

10        Q.    Tell me about that.  What -- well, let me

11   just ask it this way.  What was the underlying issue

12   that caused there to be a recount?

13        A.    Well, on election night it looked like the

14   incumbent supreme court justice, who had been appointed

15   by the governor, was losing by a couple of hundred

16   votes out of 1-1/2 million votes cast.  And this was

17   sort of a referendum on the new actions for the

18   governor who had put in place some -- this led to a

19   very politically turbulent time in Wisconsin between

20   2011 and 2015 where the governor and the legislature

21   essentially stripped collective bargaining rights of

22   public employees and --

23        Q.    Yep.  Okay.

24        A.    That was really one of the issues in this

25   supreme court race, not directly, but it was viewed as

1  that.  And it looked like the incumbent justice who was

2  facing his first election after being appointed was

3  going to lose.  And then when the county canvass in

4  Waukesha County was conducted, the county clerk gave me

5  a call right before holding a press conference to say

6  they had, quote, found 7,500 votes for the incumbent.

7          And that switched the results of the

8  election obviously and actually to a point where people

9  who had been flying in from around the country to

10 conduct this recount packed up and went home.  We still

11 conducted the recount, and Waukesha County got a lot of

12 scrutiny.  The losing candidate filed a complaint with

13 our office claiming that the clerk had violated the

14 law.  We conducted a pretty thorough investigation on

15 that.

16     Q.    What was the conclusion of the

17 investigation?

18     A.    The conclusion was that the clerk did not

19 carry out her responsibilities effectively.  I mean,

20 the bottom line was rather than following established

21 procedures for canvassing election results, the clerk

22 had basically not noticed that a whole municipality had

23 not reported their results when it posted the

24 unofficial results after the election.  And so for one

25 of the cities in Waukesha County, there would have

1    been, had she paid attention when she was posting the

2    results, 24 zeros from the 24 reporting units in the

3    municipality.

4         But because it was a very large turnout, the

5    vote totals on election night seemed to make sense to

6    her.  But, again, she did not have someone assisting

7    her in entering the reported results, and so that whole

8    municipality was missed.  We basically documented it

9    was not an intentional error, but there was significant

10   negligence on behalf of the clerk on that.  And we, of

11   course, pointed out both the errors, including

12   criticizing the fact that she knew about these things

13   for two days before disclosing them.

14        Q.   Was there any fine issued against the clerk

15   or the county?

16        A.   There was no fine issued because, again,

17   there was no identification of a criminal violation.

18   And what would have happened under 5.05(2)(m) would

19   have been a referral to the district attorney for

20   prosecution had there been probable cause to believe

21   that she'd actually committed a crime as opposed to,

22   you know, basic negligence.  You know, it was clearly

23   not intentional on her part in terms of the mistake

24   that was made.  But the failure to disclose was

25   technically not, you know, something that was perceived

1    by the board as a criminal coverup or anything like

2    that.

3         Q.    Was the clerk ordered to have any kind of

4    extra training?

5         A.    Yes, we did some significant followup for

6    training.  That was also a lesson learned that we could

7    share with our other election officials, most of whom

8    were shaking their heads that it even happened.

9         Q.    Okay.  Was there a statewide training that

10   occurred as a result of this or just in that county

11   with that clerk?  I guess I should say that city,

12   right, because it was a city administered position

13   or --

14        A.    The mistake was made by the county clerk.

15        Q.    I get it.  Okay.

16        A.    The city reported its results to the county,

17   and it's the county's job to take the results and at

18   the County Board of Canvassers certify to us the

19   results within the county for state and federal

20   campaigns, state and federal elections.  But the error

21   was clearly on the county.

22              And so I believe there was an order issued

23   by the board directing changes.  Obviously the county

24   was pretty proactive in this as well in terms of

25   asserting the more control.  The county is an -- the

1    county clerk is an elected official, so there could be

2    some tension between the county -- Waukesha County has

3    a county executive, and so there could be some tension

4    between two countywide elected officials as a result.

5              It was a politically sensitive issue within

6    Waukesha County.  And it was, you know, an example of

7    where we, you know, identified a problem with the vote

8    on that in our training throughout the state.  And we

9    did -- what we did do was make sure that there was what

10   we called a training module developed from the County

11   Board of Canvassers, the people who certify the results

12   in the county, state, and federal elections.  It's the

13   step that occurs after the election when all of the

14   results are reported in going over all the

15   documentation that they have to review and put

16   together.

17             You know, it gave us a good opportunity to

18   ensure that there were -- another module that local

19   election officials could have to say these are the

20   expectations that we have for county clerks and their

21   staff and the County Board of Canvassers.

22        Q.   Okay.  During your time with the GAB, it was

23   required to file annual reports.  I believe it was with

24   the legislature; is that correct?

25        A.   No.  That was a change that came.  Again,

1   you know, 118 put an awful lot more legislative control

2   over these two independent agencies, from the

3   appointment of the commissioners to some very specific

4   reporting requirements directly to the legislature.

5   Prior to that, all state agencies, including Government

6   Accountability Board and before that the State

7   Elections Board were required to file what are known as

8   biannual reports that are a summary of their reporting

9   activity, their operational activity over that two-year

10  period.

11           And we were on a different schedule because

12  of the election cycle, so we actually did a calendar

13  year report as opposed to a fiscal year report.  Most

14  agencies' biannual report would be -- correspond to the

15  biannual budget from July 1st of an odd-numbered year

16  through July 30th of an even-numbered year, whereas we

17  would be January 1st of an odd-numbered year through

18  December 31st of an even-numbered year for our report.

19  That was one of the few exceptions, but it had more to

20  do with the recognition of the operational cycle for

21  elections.  The campaign finance agency would be

22  different than your standard state agency that

23  operates -- derives most of its authority based on the

24  biannual budget.

25       Q.    All right.  Section 5.05, paragraph 5(s),

1  access to records.

2      A.    I'm sorry.  When you say paragraph 5 --

3      Q.    Yes, 5(s) as in Sam.  So 5.05(5)(s).

4      A.    Oh, 5(s).  Okay.  I missed the 5.

5      Q.    Yeah, which is the access to records piece.

6  That appears to be largely similar to when you were at

7  GAB; is that correct?

8      A.    That's right.

9      Q.    Okay.  I will tell you, and I may have done

10  it -- well, let me ask this.  Do you know if I can go

11  on to the current Wisconsin election board's campaign

12  site and download training materials?

13     A.    I don't think you can.

14     Q.    Yeah, I couldn't, so I didn't know if I was

15  looking at it the wrong way.

16     A.    Well, I haven't been -- there's a difference

17  from when I was in charge of the agency that might --

18     Q.    Okay.

19     A.    -- be part of an expanded portfolio.  I have

20  not followed up with my former colleagues to see about

21  that.  I know under Wisconsin public records law you

22  would be entitled to see that information, and people

23  regularly accessed our training materials.  But we did

24  not -- I mean, we were developing protected access

25  during my time there similar to what is there now and

1    what I understand is in place for Firefly in Georgia.

2         Q.    So when you say you were developing

3    protective access, what do you mean by that?

4         A.    Well, we were expanding our scope of our

5    training, and we were trying to -- so one of the things

6    that we were looking at and we had started working on

7    was -- what's pretty much in place now was a portfolio

8    of training materials that election officials could use

9    for training that involved different platforms,

10   interactive videos, guided reviews, things like that.

11   And since most of the training was conducted either by

12   our staff or the county officials or municipal

13   officials, it also allowed people to have direct access

14   to that.

15             And, for example, now as a poll worker, I

16   don't have an access code, but before each election I'm

17   required to have training.  And I can go to an

18   in-person training session, which all have been

19   canceled for next week's election, or I can access it

20   online.  But also as a chief inspector, there's usually

21   an in-person training, which would be -- which will be

22   accessible online.

23        Q.    And so I guess while you were at GAB,

24   somebody could access the training documents, putting

25   aside things about technology and ways to hook up the

1   machines and all that kind of stuff.

2        A.    That's right.

3        Q.    But any person could access, for example,

4   training on provisional ballots; is that correct?

5        A.    That's right.  We would have had -- at least

6   most of the basic information would be directly

7   available off the website and be easily downloaded and

8   often was.

9        Q.    I think we lost him for a minute.

10       A.    I just said --

11       Q.    Mr. Kennedy?

12       A.    -- often was.  I can hear you.  Can you hear

13   me?

14       Q.    Oh, yeah.  I thought you said option one,

15   and then I didn't hear anything.

16       A.    No.  What I said was anyone could access the

17   information, you know, training manuals for various

18   materials and even videos, and they often did do that.

19   And I know they often did that because part of our

20   meetings with the Government Accountability Board and

21   before that the State Elections Board, people would

22   come in to ask questions about that or make

23   recommendations about the training material.

24       Q.    Okay.  I'm going to ask you about Section

25   5.05(5)(t), which is called "Guidance following binding

1    court decisions."

2         A.    Yes.

3         Q.    It looks like that provision remained

4    unchanged as a result of Act 118.

5         A.    It was fairly recent.  I'm wondering if it

6    actually came into place as a result of the campaign

7    finance law changes.

8         Q.    No, no, no.  Yeah, I'm wrong.  I was reading

9    the bill incorrectly.  (5)(t) was created as part of

10   Act 118.

11        A.    Okay.  And that --

12        Q.    So let me ask this -- go ahead.

13        A.    And that makes sense from my understanding

14   of the political dynamics around that time.

15        Q.    Okay.  How would -- while you were at the

16   GAB, if there was a binding court decision that came

17   down impacting elections across the state, how would

18   the GAB communicate that to election officials?

19        A.    There would be a number of different ways

20   that we would do that.  I mean, we had the email

21   contacts for all of our election officials.  We have a

22   corner on our website that was actually a publicly

23   available corner called the Clerk's Corner.  We would

24   issue a press release so that things got covered on

25   this, but we would communicate directly to the local

1    election officials via email.  We would post the

2    information in the Clerk's Corner.  Depending on the

3    nature of that court decision, you know, there would be

4    training materials that would be revised.

5              In the case some of the UOCAVA litigation,

6    we were in direct communication by telephone with

7    clerks.  Usually, again, we were dealing with people

8    who hadn't conformed their conduct to law more than

9    anything else.  And that limitation was not just

10   municipal clerks.  We would communicate to county

11   clerks on this as well, even though their

12   responsibility on elections is different than municipal

13   clerks.  But they often want to take a leadership role

14   in organizing their county, making sure that they're

15   uniform, so we certainly encourage that.

16        Q.    Okay.

17        A.    Obviously this -- (inaudible) requirement,

18   so --

19        Q.    I didn't understand that, sir.  I'm sorry.

20        A.    I just said, you know, that language was a

21   new requirement that really didn't impact any of --

22   anything that I did, so what I gave you was the

23   description of how we handled the various court cases

24   as we experienced them.

25        Q.    Right.  Yeah, and that's -- yeah, that's

1  perfect.  That's what I asked.  I'm now looking for
2  what is currently 5.05(6)(a), which is the advisory
3  opinion piece.
4        A.    Yes.
5        Q.    And I can't tell right now if that was an
6  addition from Act 118.  Do you know offhand?
7        A.    No.  6(a) was created with the 2007
8  Wisconsin Act 1, the creation of the Government
9  Accountability Board.  There was -- there was a formal
10  opinion process that was (6) prior to that that was a
11  little less detailed about opinions.  And (6)(a), I
12  think, to a certain extent reflected some of the
13  requirements that applied to the ethics board with
14  respect to their ethics opinions, which had a different
15  impact than ours did under elections prior to the
16  creation of the GAB.
17        Q.    Okay.  How frequently would the GAB issue
18  advisory opinions for elections during your tenure?
19        A.    You know, not that often.  It depended.
20  Most of the opinions tended to be campaign finance
21  related rather than election related.  There were -- I
22  mean, we had -- the opinions we issued in a given year
23  were -- you know, would vary, but most of them tended
24  to be campaign finance opinions that continued under
25  the Government Accountability Board.  So if we did 20

1  opinions, then we had two or three, if any, that were
2  related to election administration.
3      Q.   Okay.  And do you think I could get those
4  from the PIO at the campaign commission -- or, excuse
5  me, the election commission?
6      A.   I think that's your best bet.  That's where
7  I would be going.
8      Q.   All right.
9      A.   I mean, they used to be published.  You
10  know, the state law library, they historically stored
11  some of those documents as well.  The biannual reports
12  that you referred to contained a summary of all of
13  those documents.
14      Q.   Oh, okay.  All right.  I've got one more
15  question on this statute.  Then it's probably a good
16  idea to take a short break, if that's okay with
17  everybody.  And specifically it's with one that we
18  talked about before, which is 5.05(7), which is the
19  administrative meetings and conferences provision.
20      A.   Yes.
21      Q.   My question is how often would those
22  training meetings take place?
23      A.   More often in odd-numbered years than in
24  even-numbered years.  The way Wisconsin's election
25  schedule is set up, we have four elections in an

1  even-numbered year and just the spring elections in the

2  odd-numbered years, which are primarily local offices

3  and judicial offices and school boards.  And so a lot

4  of the training went on between May and October of

5  odd-numbered years.

6          It took a number of different forms.  We

7  played around with the format over the years, but as a

8  general rule we would hold regional meetings, and there

9  could be anywhere from 20 to 40 meetings across the

10  state.  During that time period, we at one point tried

11  to hold two very large meetings where we expected like

12  a thousand people to be present, one in Madison, one in

13  Milwaukee.  We learned very quickly we needed to be in

14  the northern part of the state, that that wasn't going

15  to be good enough for a day-long presentation.  Most of

16  our meetings tended to be a half-day meeting when we

17  did these meetings, and they were primarily related to

18  election administration.

19          And we also -- we didn't count this as this,

20  but we had the Wisconsin County clerks meet three times

21  a year, and we always had anywhere from one to three

22  hours of their agenda at all of those meetings.  The

23  Wisconsin Municipal Clerks Association met -- had

24  regional meetings that we would often send

25  representatives to.  And that occurred much more often

1    after 2000 than it did prior to that time, although it
2    did occur prior to that time.  The Wisconsin Towns
3    Association had an annual conference that we always had
4    at least a half-day if not two half-day presentations.
5    And there's some overlap in the sense that some members
6    of the Town Association would be members of the
7    Municipal Clerks, but the Towns conference was for all
8    town officers, and it was a fairly large meeting.  I
9    mean, there are 1200 towns in the state, so we
10   generally would have a fairly large meeting.
11           And the League of Wisconsin Municipalities
12   also had an annual institute for their clerks and
13   treasurers that we would participate in those
14   conferences.  Those were in addition to those annual --
15   those other meeting provisions.  I mean, that was just
16   part of the relationships that we established with the
17   professional organizations that represented various
18   levels of government in the state.
19           MR. BELINFANTE:  Okay.  Well, folks, I think
20       we've been going now for about an hour and a half.
21       If y'all want to take just a five- to ten-minute
22       break, does that agree with everybody?
23           THE WITNESS:  So the plan would be to at
24       11:45 your time, because I'm going to disconnect
25       my phone during this period of time and call back

1          in?

2                    MR. BELINFANTE:  Sure.  That's fine.

3                    THE WITNESS:  Okay.  So I'll plan on dialing

4          back in at 11:45 Eastern.

5                    MS. TANIS:  Okay.

6                    MR. BELINFANTE:  Okay.  I'm just going to

7          mute mine and keep the line open.  Thanks

8          everybody.

9                    MS. TANIS:  Thanks.

10                   (Thereupon, a recess was taken.)

11     BY MR. BELINFANTE:

12         Q.    As part of your report, you reviewed a

13     significant number of Georgia statutes under our

14     election code; correct?

15         A.    Yes.

16         Q.    And you opine on what those statutes mean;

17     is that fair?

18         A.    Yes.

19         Q.    All right.  And did you read any Georgia

20     cases?  And by Georgia cases, I mean cases decided by

21     Georgia courts.

22         A.    I did not.  I read a number of federal court

23     decisions that came out of, I think, actions that

24     prompted House Bill 316.

25         Q.    Okay.  And those cases are the ones

1   identified on Appendix A in your expert report;

2   correct?

3        A.    Yes.

4        Q.    Okay.  If you could, let's turn to Georgia

5   Code Section 2 dash -- or, excuse me, 21-2-50.

6        A.    Okay.

7        Q.    And just let me know when you get there.

8        A.    21-2-50.  Okay.

9        Q.    Yes.

10       A.    And I'm looking at a printed version of

11  this, just so you're aware.

12       Q.    Okay.  From the Westlaw?

13       A.    It's West's Code of Georgia Annotated,

14  Westlaw --

15       Q.    That's it.  Okay.  Let's go and -- go ahead.

16       A.    Sorry.  I had point 2.  Let me just -- let

17  me back up a minute.  Okay.  Dash 50.

18       Q.    All right.  Let's go ahead and mark Georgia

19  Code 21-2-50 as Exhibit 5.

20            (Whereupon, Defendants' Exhibit Number D-5

21       was marked for identification.)

22  BY MR. BELINFANTE:

23       Q.    All right.  Subsection (a) there reads that

24  "The secretary shall exercise all powers granted to the

25  Secretary of State by this chapter and shall perform

1    all duties imposed by this chapter, which include the

2    following."  So you would agree with me then that this

3    code section is discussing the powers of the Secretary

4    of State; right?

5         A.    That's right.

6         Q.    Okay.  And paragraph (a)(11) addresses

7    training.  Do you see (a)(11) there?

8         A.    Just a second.  Two pages.

9         Q.    Sure.

10        A.    Yes, I see that.

11        Q.    Okay.  And would you agree with me that

12   (a)(11) empowers the secretary to conduct training

13   sessions for the training of registrars and

14   superintendents of elections?

15        A.    Yes.

16        Q.    And the word poll watchers or the phrase

17   poll watchers is not present in that statute.  Isn't

18   that right?

19        A.    It is not, but I would assume that if you're

20   training the clerks and the superintendents that you'd

21   be training them about poll watchers as that's part of

22   what they have to manage and it falls within the role

23   of the election officer.

24        Q.    Well, let's break that down.  Is it your

25   opinion that anything in that statute authorizes or

1   mandates the Secretary of State to train poll watchers

2   directly?

3        A.    Poll watchers?  No.

4        Q.    Okay.  And so you said that the -- is it

5   your opinion that the Secretary of State is legally

6   obligated to directly train poll watchers?

7        A.    I think that -- I mean, you used the term

8   poll watchers.  I'm trying to understand.  Is a poll

9   watcher different from a person who runs the voting

10  operations?  To me a poll watcher is someone who is

11  observing the polls, and I don't think the term poll

12  watcher in terms of statutes refers to poll managers or

13  the various people that do the work in carrying out

14  elections.

15       Q.    I'm sorry.  Yeah, no, you made a good point.

16  I mean poll workers, so let me ask the question again.

17  Is it your opinion that the Georgia Secretary of State

18  is legally obligated to directly train poll workers?

19       A.    I think the Georgia Secretary of State is

20  legally responsible for the actions of poll workers,

21  which means that in the Secretary of State's training

22  the Secretary of State is going to have to ensure that

23  poll workers are adequately trained because their

24  responsibility is for their actions.

25       Q.    And what is the basis of your opinion that

```
 1   the Secretary of State is legally responsible for the
 2   acts of poll workers?
 3       A.    It says a number of things.  One, other
 4   portions of Georgia statute designate that individual
 5   as the chief election officer.  The State Elections
 6   Board, which the Secretary of State is the chair, has
 7   to establish rules and procedures to ensure that
 8   elections are conducted uniformly, which means they're
 9   reaching down to the election level, not just the
10   county level.  If they're directly training county
11   people, they have to give them the tools and
12   information to train the people on the ground as
13   opposed to in the office.
14           There are a number of federal provisions
15   that specifically put the chief election officer --
16   which the Secretary of State is designated in the
17   statutes under various provisions to be the chief
18   election officer responsible for federal law, notably
19   the National Voter Registration Act, the Help America
20   Vote Act, and I believe there are now provisions under
21   UOCAVA that direct that.
22           I know from my experience and the experience
23   working with other people administering elections in
24   other states that it is the state election officer
25   that's going to get sued under failure to comply with
```

 1   UOCAVA, Help America Vote Act, the NVRA, or even the

 2   Voting Rights Act.  You're going to go through that.

 3   So the responsibility is going to put on a duty to

 4   ensure that the people who are doing the work have the

 5   information, the tools, and the resources to do it to

 6   conform to the law.

 7        Q.    Is it therefore your opinion that the NVRA

 8   expressly imposes a legal obligation on the

 9   secretary -- or on the chief election officer of states

10   to train poll workers?

11        A.    The NVRA holds that chief election officer

12   responsible.  You can't be responsible for the actions

13   of the locals if you haven't trained them.  You know,

14   there's not an express command that I recall, but there

15   certainly is a tie between the responsibility that the

16   chief election officer has, which in this case is the

17   Secretary of State, and the performance of those duties

18   which are actually going to be carried out by polling

19   place level workers, county and state level workers,

20   advanced voting location based workers.

21        Q.    And is that the same analysis for the HAVA,

22   the Help America Vote Act?

23        A.    Yes.

24        Q.    All right.  And same analysis for UOCAVA?

25        A.    Yes.

1      Q.    All right.  You also said, I believe, that

2  there are other portions of the Georgia code that

3  render the Secretary of State legally responsible for

4  the acts of poll workers, and can you tell me what

5  those are, in your opinion?

6      A.    Well, the fact that you have requirements

7  to -- and these primarily come through the -- excuse

8  me.  They come through the state elections boards'

9  requirements for uniformity, fairness, and

10 effectiveness with the statutes that deal with setting

11 out those guidelines.  And the fact that the Secretary

12 of State is the one that's then conducting the training

13 down the road on this, the fact that the statutes say

14 he -- say that office is the chief election officer

15 including, you know, the general restriction that the

16 Secretary of State can't be involved in political

17 campaigns because of that person's role as the chief

18 election officer, you know, certainly creates that --

19 you know, that responsibility.

20     Q.    And would you agree with me that the

21 responsibility you're describing -- or let me ask this.

22 Is it your opinion that the responsibility you're

23 describing is implicit in the statute and not explicit

24 in Georgia statutes?

25     A.    Well, there's explicit requirements for the

1   training.  And while the training may not specifically

2   talk about every actor, the responsibilities that are

3   going to generate that training, you know, are

4   certainly implicit in the definition of the secretary

5   as the chief election officer and the assignment of

6   that under various federal laws.

7        Q.    Were you able to identify a single Georgia

8   statute that expressly authorized and/or required the

9   Georgia Secretary of State to train poll watchers --

10  or, excuse me, poll workers?

11       A.    The Georgia Secretary of State has to

12  receive proof that they've been trained, although it

13  doesn't name them.  It just requires a number.  So

14  there are links tying the Secretary of State to the

15  training of poll workers in that the counties have to

16  certify that on such and such a date I trained this

17  many people.

18       Q.    Right.  And you would agree with me, though,

19  that's different in terms of receiving evidence that

20  someone has been trained from actually providing the

21  training, wouldn't you?

22       A.    That's right.

23       Q.    Okay.  So, given that, would you -- were you

24  able to identify any Georgia statute that imposed an

25  obligation on the Secretary of State, an express

1    obligation, to directly train poll workers?

2        A.    I think the obligation is implicit within

3    the responsibilities of the Secretary of State.  It's

4    not an -- you're correct, it's not an express one

5    because it runs down through the counties in terms of

6    the training.

7        Q.    All right.  So with that in mind, let's look

8    at Code Section 21-2-70, we'll mark as Exhibit 6.

9            (Whereupon, Defendants' Exhibit Number D-6

10       was marked for identification.)

11       A.    Okay.

12   BY MR. BELINFANTE:

13       Q.    And isn't it true that this code section

14   addresses the powers of superintendents, election

15   superintendents in cities and counties?

16       A.    The powers and duties, yes.

17       Q.    All right.  And one of those duties in

18   paragraph 8 is to instruct poll officers and others in

19   their duties.  Do you see that?

20       A.    Yes, I do.

21       Q.    Okay.  So is it your opinion that Georgia

22   law imposes a duty on city and county election

23   superintendents to train poll officers?

24       A.    Yes.

25       Q.    And indeed one of the obligations imposed on

1    those city and county superintendents in that same

2    paragraph (a)(8) is to conduct that training so that

3    elections are, quote, uniformly conducted, uniformly

4    conducted being the last two words of that statutory

5    provision.

6         A.    That's right.

7         Q.    Okay.  If you could turn to Code Section

8    21-2-99, and we'll go ahead and mark that Exhibit 7.

9              (Whereupon, Defendants' Exhibit Number D-7

10        was marked for identification.)

11   BY MR. BELINFANTE:

12        Q.    Just let me know when you get there.

13        A.    I'm there.

14        Q.    Okay.  Great.  Would you agree with me that

15   this code section imposes the duty on election

16   superintendents to, quote, provide adequate training to

17   all poll officers and poll workers?

18        A.    Yes, it does.

19        Q.    And the only time the Secretary of State is

20   mentioned in this code section is where the

21   superintendent has to notify the secretary of training,

22   who attended and who completed.

23        A.    That's right.

24        Q.    Is it your opinion that Code Section 21-2-99

25   is the most specific statute with regards to the

1    training of poll officers and poll workers in the

2    Georgia election code?

3        A.    It's more specific than the last statute.

4    It doesn't tell them the content -- you know, the

5    specific content.  It just tells them what their duty

6    is, so the superintendent still has to know what they

7    have to provide.  In terms of the content of the

8    training, it just says it's their responsibility to get

9    it done.  And then the --

10       Q.    Were you -- were you able to identify a more

11   specific statute that speaks to the training of poll

12   officers and poll workers in the Georgia election code?

13       A.    I did not find one.

14       Q.    Okay.  Let's turn back to your report, which

15   is Exhibit 1, and specifically on page 2.  Sorry.  I'm

16   looking for my phone notes.  Okay.  Sorry.  The first

17   paragraph on page 2 of Document 167, page 1 on the

18   individually numbered one, the first paragraph that

19   starts "I've been asked to opine."

20       A.    Yes.

21       Q.    Okay.  Can you read through the first -- or

22   to the first semicolon just for the court reporter on

23   that one.

24       A.    "I have been asked to opine on the basic

25   policies, procedures, and practices that the Georgia

1    Secretary of State and the State Election Board must

2    have in place in order to train county election

3    superintendents, registrars, and poll workers to carry

4    out their duties."

5         Q.    Is that phrase, are those your words?  Is

6    that something that you put together?

7         A.    I put that together.  It was my

8    understanding of what I was asked to do, but I don't

9    recall that I got a specific written directive on this.

10        Q.    Okay.  When you say that the Georgia

11   Secretary of State must have in place, what do you mean

12   by must?

13        A.    I mean that they have a responsibility in

14   order to carry out their duties under various state and

15   federal laws to have policies, procedures, and

16   practices in place to ensure that election officials at

17   all levels of government are trained so that they can

18   carry out their responsibilities.

19        Q.    And is a responsibility in what you just

20   described the same as a legal obligation?

21        A.    Well, it's a legal obligation in that you

22   can be held accountable for failure to carry out that

23   responsibility or the consequences of the failure to

24   carry out that responsibility.  It may not flow from a

25   direct statutory command.  It may flow from the

1    responsibilities that you hold as the chief of -- or

2    the person holds as the chief election officer.

3         Q.    You've used that phrase a lot, chief

4    election officer.  And I know it's in the Georgia Code,

5    and we'll get there, but would you agree with me that

6    the election code, the Georgia election code, does not

7    define the term chief election officer?

8         A.    It simply assigns that responsibility to a

9    particular office.

10        Q.    And that word or that phrase, chief election

11   officer, comes from at least HAVA where HAVA requires

12   states to designate for purposes of HAVA a chief

13   election officer; isn't that right?

14        A.    It's part of federal law.  It's -- I think

15   the first provision that I saw it in was the National

16   Voter Registration Act of 1993.  I believe it wasn't in

17   the original Uniformed and Overseas Citizens Voting

18   Act, but that has been amended a number of times,

19   including in the MOVE Act provisions after that in

20   which the concept of a chief election officer has been

21   incorporated.

22              I think, while I don't know if the term has

23   been used in any of these court cases enforcing the

24   Voting Rights Act, but that binds the holding states

25   accountable for compliance with the Voting Rights Act,

1    and those generally went through the person in charge

2    of administering the state's elections.  That wasn't

3    necessarily something that you saw the poll workers

4    being called into court for.  So I think the term and

5    the concept certainly predates HAVA on this, but I

6    think a lot of states -- there was a big change in

7    election administration after 2000 in terms of holding

8    states accountable through their states' chief election

9    officer.

10            I mean, it changed the relationship, I

11   think, between in most cases counties and the states,

12   some places like Wisconsin and Michigan and the New

13   England states municipalities and counties and the

14   states to make it clear that in order to achieve the

15   goals of federal legislation, which really grew out of

16   a sense of a need for uniformity and accountability,

17   that it would be the states that would be standing in

18   their shoes for the responsibility to make sure those

19   laws got carried out.

20        Q.    All right.  But somebody -- it's

21   conceivable, at least, that a state could designate one

22   person to be the chief election officer for various

23   federal statutes and still have a different person at

24   the state level who is responsible for all training.

25   Is that -- is that fair?

1      A.    I think they can make those designations.  I

2  think there's a lot of different structures even within

3  the secretary of states' offices.  You have 37 states,

4  I believe, where the person in charge of elections is

5  the Secretary of State, but that person isn't always an

6  elected official.  Sometimes they're appointed by the

7  legislature, sometimes by the governor.  Sometimes they

8  work with the board, and there are various divisions of

9  duties that occur.

10           You have a handful of states where it's the

11  lieutenant governor that is the chief election officer

12  and a handful of states where an agent of the board,

13  such as my role I played.  In other states, such as

14  Illinois and Maryland and East Washington, D.C., where

15  there was a board without a secretary of state

16  responsible for that and a key person was designated

17  for that, and that was the individual who would be held

18  accountable for failure to comply with those

19  provisions.

20      Q.    Also on page 2, which is page 1 of your

21  report, Exhibit 1, you write that you have drawn on

22  your experience and expertise as an administrator,

23  consultant, and attorney actively involved in election

24  administration at the state, local, and national level.

25  Your experience as an administrator of elections is

1    limited to Wisconsin; isn't that right?

2        A.    I wouldn't say that that is true because as

3    an administrator I also was involved with my colleagues

4    across the state, worked very closely.  So I had

5    experience not administering their elections but

6    certainly working with the administrators,

7    understanding the challenges that they faced, the

8    problems they had, the innovations.

9             So I would not limit my experience in

10   administering elections just to the day-to-day

11   activities that I did in my role in Wisconsin.  It was

12   certainly informed and enhanced by the interactions

13   with my colleagues, my role with professional

14   organizations that brought those together.

15            Then there was the National Association of

16   State Election Directors in which I served as president

17   in 2006.  There was the Elections Center where I

18   co-chaired national committees consisting of states and

19   local election directors.  So my experience is informed

20   by a lot more than just my day-to-day duties carrying

21   out Wisconsin's elections.

22       Q.    Sure.  And I guess my question was a little

23   more simple than that.  You've never held any positions

24   of authority to administer an election in a state other

25   than Wisconsin; is that right?

```
 1        A.    That's right.
 2        Q.    Okay.  And as a consultant, have you
 3   directly consulted any states regarding the
 4   administration of elections?
 5        A.    I have not been compensated for that at this
 6   point, no.
 7        Q.    If you could turn to page 4, Document 167,
 8   Exhibit 1.  I've got a question.  It's on the last
 9   paragraph of that page.  It's page 3 of the report.
10        A.    So this is my report you're referring to.
11        Q.    Yes, yes.
12        A.    Okay.
13        Q.    That last paragraph -- oh, go ahead.  I'm
14   sorry.
15        A.    I just wanted to be clear to you I have not
16   written the exhibit numbers on my report.
17        Q.    Okay.  Yeah, the entirety of your report,
18   including the CV, is Exhibit 1, just for the record.
19        A.    Okay.  And which page again now that
20   we're --
21        Q.    Sure.  It's page -- on the report itself,
22   it's page 3.  For the court filing, it's Document 167,
23   page 4.
24        A.    Okay.
25        Q.    The last paragraph on that page, the first
```

1  sentence reads, "Wisconsin law requires the state

2  elections agency, initially the State Elections Board

3  and then the Government Accountability Board and now

4  the Wisconsin Elections Commission, to conduct regular

5  information and training meetings at various locations

6  in the state for county and municipal clerks and other

7  election officials."  Do you see that?

8      A.    Yes.

9      Q.    I believe that quotes back generally to

10  Wisconsin Code Section 5.05, paragraph 7.  And my

11  question is what is -- or who is included in other

12  election officials?

13      A.    I think it covers a large number of people.

14  It would definitely include poll workers such as -- you

15  know, who in Wisconsin we now call inspectors, that's

16  the person in charge of the polling station, and the

17  chief inspector.  It includes special registration

18  deputies, people who have been deputized by municipal

19  clerks.  At one time the Government Accountability

20  Board could appoint those individuals.

21          It includes other -- basically anyone who

22  has a role in a governmental capacity.  I mean, they

23  could be private citizens who have been appointed.

24  Obviously poll workers, many of them are employees, but

25  they're appointed by the local governing bodies.  The

1    clerk could appoint various people with different

2    election day responsibilities, voting machine

3    technicians, for example.

4        Q.    Uh-huh (affirmative).

5        A.    So the idea I believe -- I mean, this

6    language has been there, as far as I know, since at

7    least the time that elections were removed from the

8    office of the Secretary of State, which is 1974.  And

9    the idea was to give the agency in charge of elections

10   a broad range of authority in terms that it would make

11   sure that it was doing some level of training.

12       Q.   Okay.  And the selection of poll workers, is

13   that done at the city, town, and village level?

14       A.    Yes, it is.

15       Q.   Okay.  And let me ask you, if you can, to

16   look at Wisconsin Statute 7.15, which we'll mark as

17   Exhibit 8.

18            (Whereupon, Defendants' Exhibit Number D-8

19       was marked for identification.)

20       A.    I have 7.15.

21   BY MR. BELINFANTE:

22       Q.   Okay.  Here, the first paragraph, paragraph

23   1, says, "Each municipal clerk has charge and

24   supervision of elections and registration in the

25   municipality."  It may be that there's a code section

```
 1   specifically on towns and villages, or is it that this
 2   municipal clerk would be defined as including the
 3   clerks in towns and villages?
 4        A.   I think if you were to go to the definitions
 5   in 5.01, it would define a municipal clerk as a town,
 6   city, or village clerk.  And it would include for
 7   election purposes the director of the Milwaukee City
 8   Board of Election Commissioners, but there's a separate
 9   parallel statute to 7.15 related to Milwaukee.
10        Q.   Okay.  Got it.  And so paragraph -- in this
11   Code Section 7.15, paragraph 1(e) as in Edward,
12   identifies one of the duties of these municipal clerks
13   as training election officials in their duties.  Do you
14   agree with that?
15        A.   Yes.
16        Q.   So in Wisconsin you have expressed statutory
17   language both in 5.05(7) and 7.15 that empowers and/or
18   mandates both the state and the municipal governments,
19   and I mean that as defined in Wisconsin, to train poll
20   workers.  Is that an accurate statement?
21        A.   Well, I would not say that it's explicit
22   that Wisconsin has to train poll workers.  I think it's
23   implicit with the other election officials, but it's
24   clearly a responsibility that encompasses poll workers.
25        Q.   I see.  Okay.  I'll pull it up at some
```

1    point, but you may know off the top of your head.  Does

2    the Wisconsin Statute 5.01 define the term other --

3    hang on, sorry -- other election officials or election

4    officials?

5        A.    I think there might be a definition for

6    election officials.

7        Q.    Okay.

8        A.    But I don't -- again, I'd have to pull it

9    back up.

10       Q.    Yeah.  Okay.  But during your time at the

11   GAB, at least you interpreted other election officials

12   to include poll workers?

13       A.    I did.

14       Q.    Okay.  On page -- going back to your report,

15   page 5 of the court document, page 4 of your report --

16   I'm looking for it, but let me just ask the question

17   while I'm still looking because you probably don't even

18   need to refer to it.  At one point in your report you

19   talk about an article or paper that you helped write

20   with the National Academies of Sciences, Engineering,

21   and Medicine titled "Securing the Vote."  Your

22   involvement with that paper or article, there were

23   several other individuals who assisted with that;

24   correct?

25       A.    That's right.  There were -- the National

1    Academies of Sciences had brought in a number of

2    academics, and there were three election officials on

3    that, including myself.

4        Q.    Okay.  Was there a part of that paper or

5    that report that you focused on?

6        A.    Well, I focused on all of it.

7        Q.    Okay.

8        A.    At one point as we were preparing the final

9    report, we had broken it down into various areas.  And

10   I vetted two different sections that I and Professor

11   Juan Gilbert from Florida were responsible for putting

12   together.  I authored the initial drafts of those.

13   That was commented on by Professor Gilbert, and then I

14   took those comments, incorporated them.  And he

15   contributed to some of the examples that went into the

16   two sections of the report.

17           The full Committee on the Future of Voting

18   it was called, you know, vetted that entire report.  So

19   we had, you know, political scientists at Stanford and

20   MIT and computer scientists looking at that as well,

21   the whole committee.  And this was -- this report was

22   put together after about five days of meetings of

23   gathered information from election officials and

24   national security officials and individuals.  I mean,

25   we spent about a year and a half gathering the

1    information and then putting this together.  So a

2    lot --

3        Q.    Which sections -- which sections of the

4    report did you write?  What were the topics?

5        A.    Election training was one, and I think

6    ballot design was the other.  I know for sure -- yeah,

7    those were the two.

8            MR. BELINFANTE:  Okay.  Let me do this, if I

9        could.  I'll go off the record for half a second.

10           (Thereupon, an off-the-record discussion was

11       held between the parties.)

12   BY MR. BELINFANTE:

13       Q.    Mr. Kennedy, I'm looking at page 5 of your

14   report, page 5 being the court's designation, page 4

15   being the one at the bottom of the page.  And -- no, I

16   lied.  Page 5 is the one at the bottom of the page and

17   page 6 is the report designation in your report.  And

18   my question is based on the second to last paragraph.

19   The second sentence reads, "However, state and federal

20   law, along with the evolution of election

21   administration since the 2000 presidential election,

22   suggest that there is a threshold foundation for

23   training and holding election officials accountable

24   that must be in place under the direction of the chief

25   state election official to ensure elections are

1  administered in a fair, uniform, and transparent

2  manner."  Do you see that?

3      A.    I see that.

4      Q.    Okay.  You say that "state and federal law,

5  along with the election" -- excuse me -- "evolution of

6  election administration since 2000's presidential

7  election suggests there's a threshold foundation."

8  What there did you mean by suggest?

9      A.    I mean that experience has taught us and the

10  laws that have been put into place and modified during

11  this time have raised, I think, the awareness of

12  necessity for people like the election officer to have

13  a more rigorous accountable training program in place

14  for all the election officials within that state to

15  ensure that you are protecting the voting rights of the

16  citizens, which is usually the whole reason why you

17  have elections is to permit the citizens to participate

18  in the selection of the individuals who are going to be

19  running their government.

20          And I mentioned this before, but there was a

21  sea change in what happened in 2000.  Part of it was a

22  reaction to the failure of the states to effectively

23  respond to the 1993 NVRA.  The 2000 election was really

24  a watershed in showing the problems that occurred with

25  local election officials not carrying out their

1  responsibilities, the lack of uniformity in a number of
2  states, which we saw this in I think the general
3  awakening of perception across the country that they
4  don't do things the same in Florida as they do in
5  Michigan.
6              And it was something that Congress responded
7  to, but in election officials there was a recognition
8  that you have to really face the responsibility.  There
9  were a whole range of commissions that were put
10 together.  There was the Carter-Baker Commission, for
11 example, that put together a whole series of
12 recommendations on how to improve elections.
13             As I indicated, I served as the co-chair of
14 two organizations -- or two different committees in
15 2001 and 2005 that put together a report on what this
16 meant as we saw the changes coming by the development
17 of the Help America Vote Act, which imposed
18 responsibilities.  And one of the big things it did is
19 it changed, you know, in a formalized manner the
20 relationship between state government and local
21 election officials to ensure that they were going to be
22 accountable for this.  And I've made reference to this
23 throughout the day.
24             And this is, you know, part of my experience
25 working on these past boards, working with members of

1    Congress and their staff with the Help America Vote Act
2    that we put together to recognize that we're going to
3    look at elections differently.  It's still been my
4    experience in Wisconsin -- I mean, prior to 2000 my
5    focus was campaign finance enforcement.  We ran
6    elections, but it did not get the same level of
7    attention that it gets now.
8         Q.    But would you agree with me that there's
9    nothing in the express language of the Help America
10   Vote Act that imposes an obligation on chief election
11   officers to train poll workers?
12        A.    No, I would not.
13        Q.    Okay.  Where is that?
14        A.    HAVA Section 101 specifically provides
15   funding for that purpose, to train officials.  I can't
16   give you the exact cite because I'm so used to speaking
17   about it in terms of the HAVA section.  It is
18   referenced, though, in my report where I --
19        Q.    Yeah.
20        A.    And the footnote will give you the exact
21   U.S. code cite to that.  But it provides that -- in
22   order to implement the Help America Vote Act, it
23   provided enough money so that you can train, and it's
24   the whole range of election officials, including poll
25   workers.

1      Q.    Right.  But it doesn't -- I mean, you also

2   describe in that same section we're looking at that

3   there's a threshold in foundation.  Help me -- how does

4   one identify what that threshold --

5      A.    How does one identify what that threshold

6   is?  You look at the requirements in the state code of

7   what needs to be done to carry out an election.  You

8   look at the federal framework that surrounds that, the

9   National Voter Registration Act, the Voting Rights Act,

10   the Help America Vote Act, the UOCAVA, the

11   Accessibility Act for the Elderly and Handicapped.

12   That gives you the foundation of what needs to get done

13   and establishes your threshold of what the

14   responsibilities are going to be.  And --

15      Q.    But -- go ahead.

16      A.    Well, I think I've made my point.

17      Q.    Is there a single document or gold standard

18   promulgated by an organization that sets forth, you

19   know, what -- if I'm looking to get the gold standard

20   in training and I'm looking to follow -- define what

21   that threshold in foundation is, is there a singular

22   document I can go to or a standard, or is there not?

23      A.    I don't think that there is -- I mean, I

24   have not -- I mean, this is why I was talking with

25   various people I know who are involved in this to see

1    if someone had synthesized these things differently

2    from my experience on this.  You know, as chief

3    election officials, we see our vulnerabilities in the

4    lawsuits.  We see our responsibilities in the duties

5    that we have to carry out, and that's, you know, what

6    informs us.  You know, it's a very diverse group, and

7    it's also state specific.  So --

8              THE REPORTER:  I'm sorry.  You're cutting

9         out on me.

10   A.    I'm sorry.  I said it's a very diverse group

11   of election officials from across the country, and it's

12   also going to be very state specific as far as how they

13   carry that out.  But what I'm doing as an expert

14   witness here is gathering my experience over 40 years

15   recognizing what the responsibilities that we all share

16   are as chief election officer based on my experience,

17   based on what I've seen in other states, based upon

18   what I've learned from my colleagues, based on what

19   I've gotten feedback from, whether it's elected

20   representatives at the state level or the congressional

21   level.

22             And my opinion is there is a threshold

23   basis, and it consists of establishing a very rigorous

24   program that touches every election official under

25   the -- you know, within that structure, from the chief

 1  election officer, the board members, down to the people

 2  who carry out the actual duties on election day,

 3  because it's the chief election officer that's going to

 4  get sued.

 5          It was not unusual for me when I'd get

 6  pushback from the locals to say, "If I'm in court,

 7  you're going to be sitting next to me," because the

 8  people who would be holding my feet to the fire legally

 9  were usually not doing it for -- they may be doing it

10  for institutional provisions I didn't have in place,

11  but they would be doing it for specific failures that

12  may occur right down to the polling place or advanced

13  voting location.

14          And it's that accumulation of what's

15  occurred since 2000, I think, that establishes the

16  threshold in foundation when you're looking for what

17  should be in place.  And I think this is something

18  that's embraced in practice across the country.  I

19  don't know if everybody gets it done right or they get

20  it mostly right, but they certainly are trying to make

21  sure that they are taking the lead.  When you're the

22  chief election officer, you're not just a figurehead.

23  You are a leader, and you need to set the tone for how

24  elections are going to be conducted within that space.

25      Q.    I think you just said that the training has

1   to be rigorous.  Are there metrics to determine that?

2   I mean, it's one thing to say it needs to be rigorous.

3   It's another thing to figure out how to measure it, and

4   I guess my question is on that second point.

5       A.    Well, one of the best ways to measure it is

6   to look at the complaints that you receive and what you

7   do with those complaints when you receive them.  And we

8   talked about the problem in Waukesha County at the

9   county level and how we responded with a more detailed

10  explanation other than just the statutory language

11  about what the duties were for the county clerk and the

12  County Board of Canvassers in certifying election

13  results after an election.

14          So, I mean, I don't think we have IEEE

15  standards like you might have for a number of these

16  across the country, but you certainly -- I mean, that's

17  part of the reason why the Election Center exists was

18  to broaden election officials' exposures to what's

19  essential in conducting training.

20          THE REPORTER:  Can you repeat that last

21     sentence?

22      A.    I said part of the reason why the Election

23  Center exists is to broaden election officials'

24  exposure to the essential elements of a training

25  program so that that can be implemented within their

```
 1   jurisdiction.
 2   BY MR. BELINFANTE:
 3       Q.    Is it your opinion that Georgia has a
 4   rigorous training program in place?
 5       A.    They have a -- they have a fairly large
 6   portfolio, but it seems to be pretty descriptive.  My
 7   observation of what Georgia does is it says this is
 8   what you're supposed to do, this is how you do it.  It
 9   doesn't -- I don't think it gets very detailed except
10   on the technical aspects of it.  You know, I only say
11   that based on screenshots.  I think -- but even that's
12   not necessarily very detailed other than here's an
13   example.
14            I don't think, and I said this in the
15   report, that the training really provides a context for
16   that training, in other words, why are we doing what
17   we're doing and who are we doing this for.  It's
18   missing the what in the how to do it.  There is a lot
19   of that description, but what are the consequences if
20   we don't do it, why is this important, and who are the
21   beneficiaries of this, who -- what's our goal to
22   accomplish here is not part of it.  It's more get it
23   done.
24       Q.    In that same sentence that we talked about,
25   you talk about that election -- chief election --
```

1    excuse me -- chief state election officials need to

2    ensure that elections are administered in a fair,

3    uniform, and transparent manner.  My question is on

4    uniform.  Is it -- do you believe that there's always

5    going to be some level of variance in a statewide

6    election?

7        A.    It depends on what we're talking about in

8    terms of variance.  I mean, a person who comes to a

9    polling place in the most rural area or who comes to a

10   polling place in the most urban area with the same

11   problem ought to be getting treated in the same manner.

12   If they show up at the wrong location or whatever it

13   is, there should be clear instructions about what's to

14   happen, or if the forms that they've had to complete,

15   whether it's for an absentee ballot, a provisional

16   ballot, or the sign-in procedures or the type of

17   identification need to be handled uniformly.  How you

18   access the polling place may vary in terms of the

19   design of the location.

20           So the variance can't go to the assessment

21   of someone's eligibility or the treatment of their

22   documents.  It probably has to go to more practical

23   aspects.  I mean, one example is observers at a polling

24   place might be treated differently because of the

25   structure of the polling place.

1          You know, one of the legal changes that was

2    contested and was talked about in that One Wisconsin

3    lawsuit was how far should an election observer be from

4    the poll worker where the poll worker is interacting

5    with a voter to observe what's going on.  And there was

6    a dispute about what was put together by the State

7    Elections Board and then the Government Accountability

8    Board based on the consultations of observer groups

9    from political parties and local election officials on

10   what the legislature deemed to be appropriate, and that

11   came up in the lawsuit.  And, you know, there was a

12   recognition that there's a difference on how you treat

13   observers in different polling places based on where

14   you put them or --

15          (Thereupon, an off-the-record discussion was

16       held between the parties.)

17   BY MR. BELINFANTE:

18       Q.    Were you done with your answer?

19       A.    I believe so.

20       Q.    Okay.  All right.  In your experience in

21   Wisconsin when you were legal counsel and administrator

22   to the GAB, other than what we've talked about with

23   UOCAVA, were there other incidents where counties would

24   have some variance in a substantive issue, I mean, even

25   whether it's how a provisional ballot was treated or

1  how something else was done differently in one county

2  or one city versus another?

3      A.    There were some practices that were

4  different.  When you ask that question, I'm trying to

5  find out are you talking about for people who didn't

6  comply with what the legal requirements were or for

7  people who did something slightly different because it

8  made more sense to them?

9      Q.    Well, let's start with the second, they did

10 something slightly different because it made more sense

11 to them.  Did that happen?

12     A.    That happened, and it was actually something

13 that we recognized in our training.  Probably the best

14 example of that would be the check-in process for

15 voters.  We encouraged it.  It wasn't required.  The

16 statute did not authorize it, but we had many

17 municipalities that would have one of their poll

18 workers serve as a greeter.  In other words, when some

19 -- as people came in or lines formed, this person's

20 sole responsibility was to try and get the voters

21 organized as they come in, if they needed to register

22 at the polls -- because Wisconsin has election day

23 registration -- get them identified, make sure that

24 they have the information, make sure they're at the

25 right polling place.  That wasn't required anywhere,

1    but it was -- it varied among municipalities, and

2    people liked it.

3            Checking in itself, in Wisconsin you have to

4    come in in front of two poll workers and identify

5    yourself and show the identification.  And depending on

6    the size of the polling place, they may break the poll

7    books down, so A to L and M to Z or A to H and I to R

8    and S to Z.  They were allowed to do that.  Sometimes

9    there was a second person who checked the ID sitting

10   between the two people who are checking the voters in.

11   But these were process issues, not -- they were not

12   differences to the, you know, is this a valid ID to

13   show at the polling place.

14       Q.    Did you ever have in your experience there

15   differences in substance, not just process?  I'll give

16   you as a hypothetical somebody would require a

17   provisional at one polling place where the other they

18   did not for some reason.  I mean, that's just an

19   example, but you get the idea, something more

20   substantive?

21       A.    Yes.  And that's why I asked you to make the

22   distinction originally because there were times before

23   we had photo ID requirement, we had people asking for

24   photo ID when they shouldn't have asked for photo ID.

25       Q.    And in your -- go ahead.

1        A.    It was forbidden under the law at the time,

2    and so that was something that we had to address.  If

3    we got a complaint on that, we followed up on that

4    immediately.  There were probably bigger issues that

5    would, you know, come out of an election where we would

6    focus -- we would take that information and try and

7    address it.

8              Hopefully we could adapt it statewide if

9    necessary, such as the example I gave you with the

10   County Board of Canvassers, but it's an evolving

11   process with election administration to identify the

12   problems.  Yes, poll workers made mistakes.  County

13   election officials made mistake.  Our office made

14   mistakes.

15             And once those were identified, the idea was

16   to make sure that they were corrected and that they

17   were acted on and that that was something that involved

18   the whole range of the election community, and we

19   wanted to make sure that the public knew that those

20   issues had been corrected.  Following the recall

21   elections in 2012 -- I'm sorry.  I'm talking like you

22   would know what a turbulent time we had in Wisconsin in

23   2011 and 2014.

24       Q.    Yeah, I remember from afar.

25       A.    Yeah.  Well, I mean, our capitol was

1    surrounded by a hundred thousand people protesting some

2    of the political issues there, and we were in the

3    middle of that.  That drove that supreme court election

4    we were talking about, and it drove a series of recall

5    elections later that year and then the recall of other

6    officials, including the governor the following year.

7    But my testimony that you've cited came out of the

8    recall election.

9            But in the conduct of some of those

10   elections we found problems in Racine County, for

11   example, that got a lot of attention.  And we were back

12   in Racine County immediately after that election to do

13   specific training for those poll workers to work with

14   the officials on ensuring that they had a better

15   training program in place and observing future

16   elections, and we made sure that the public knew that

17   we had acted on that.

18       Q.    And is it your opinion that those variances

19   or errors or decisions rendered those elections

20   unconstitutional?

21       A.    Well, in some cases there was a deprivation

22   of someone's right to vote, which gave them rise to a

23   lawsuit on that.  I mean, probably a better example of

24   that was when I first started before we had HAVA and

25   the NVRA and we had poll workers who were asking for

1    proof of citizenship because someone didn't look

2    American.  And the person did the next best American

3    thing when they couldn't cast their ballot.  They hired

4    a lawyer, and they sued the poll workers and the town

5    of Neenah and the State Elections Board on that.  And

6    that became an opportunity to train on how do you

7    handle concerns about a voter's qualifications, whether

8    it's citizenship, age, residence.

9            So the answer is yes.  It may not void the

10   election, because that power is going to rest with the

11   courts generally.  But it certainly, you know, puts our

12   office in liability for what they did.  Now, we

13   happened to have training material that told them how

14   to handle that process, and the court found no

15   responsibility on our end.  But it didn't change what

16   we did with that information, which was to ensure that

17   this didn't happen again.

18       Q.   All right.  Is it fair that your report

19   basically compares how things were done in Georgia to

20   how things are done or were done in Wisconsin under

21   your tenure at the GAB?

22       A.   No, I would not characterize it as a

23   comparison between the two states.  I would say that --

24   and I made a lot of references to Wisconsin law because

25   that informed my opinion as an expert as to why things

1  need to be done or how they could be done better.  The

2  fact that there's slight variances in the law, I mean,

3  the two training texts that we compared were not that

4  different between Georgia and Wisconsin in terms of

5  telling the chief election officer to call officials

6  together at various locations within their discretion.

7  But, I mean, what I learned in that experience, along

8  with others, was how you get to what's the basic

9  foundation for a comprehensive training program and

10  what are the thresholds you have to get to to ensure

11  that as a chief election officer you're doing your job,

12  not just your state statutes.

13            Obviously, I mean, I thought I did a fairly

14  good review of Georgia's requirements, and I've lived

15  with Wisconsin's requirements as they've changed over

16  the years.  And it basically informs my opinion as to

17  where Georgia measures up and where it falls short, and

18  that's what my opinion comes from.  It's not a

19  comparison between Georgia and Wisconsin.  It's drawing

20  on my experience from Wisconsin.

21            And, as I've pointed out, there's a lot of

22  other areas of experience involving training to say

23  that Georgia does not have in place a training program

24  that ultimately is going to protect voters.  And that's

25  manifested in the complaints I've looked at, you know,

1  and manifested in some of the expert reports that I

2  looked at.

3          Both Ken Mayer and Dan Smith, you know,

4  specifically faulted the Georgia Secretary of State

5  training protocols with their county officials with

6  respect to the quality of the statewide voter

7  registration system.  And the complaints I looked at, a

8  large number of them had to do with am I registered to

9  vote or how do I cancel my registration or where do I

10 vote, which is going to flow through to the counties or

11 to the polling places.

12     Q.   Well, I guess I'm looking at the cite of

13 authorities, and I'm seeing Wisconsin statutes, federal

14 statutes, Georgia statutes, and then some websites.  So

15 what other states did you take into comparison when

16 looking to determine whether Georgia's training is

17 sufficient?

18     A.   I did not specifically look at the training

19 programs in other states to compare them to Wisconsin

20 or to compare them to Georgia.  I did draw on what I

21 learned at the Election Center going through the

22 certified election registration and the administrator

23 certification process.  I looked at a wide range of

24 training information that we were exposed to with the

25 National Academy of Sciences.  I looked at my

1    interaction with other states and their training

2    programs.

3              In the National Association of State

4    Election Directors, one of the big topics we had after

5    2000 is what are we doing to implement training.  I

6    mean, I was very familiar with how Georgia involved

7    Kennesaw State in 2002 with getting a -- establishing a

8    uniform voting system, which by necessity requires a

9    very detailed training from poll workers all the way up

10   to the Secretary of State's office on how that system

11   is going to work and various accountability mechanisms

12   that need to be put into place.  A lot of --

13        Q.    Where was the -- go ahead.  I'm sorry.

14        A.    I was going to say --

15        Q.    No, no, go ahead.

16        A.    -- I looked at Georgia as a starting point

17   at that point, whether that would be something that

18   would help them with their training.  I mean, I know we

19   looked at whether or not even incorporating our

20   technical colleges, particularly in terms of voting

21   equipment support for local election officials.

22        Q.    All right.  Let me ask this, and I'll try to

23   ask it in a relatively clear way.  Is it your opinion

24   that the training provided in Georgia by the state

25   itself violates the United States Constitution?

1      A.    I think the consequences of the shortcomings

2   of the program lead to voters losing their opportunity

3   to participate in the elections.  And that comes

4   through in the complaints that people have, and I think

5   it certainly flows from the fact that not enough

6   information and not enough focus is given to how do we

7   treat provisional ballots and absentee ballots and how

8   do I properly manage my responsibilities -- by my, I

9   mean the county official -- with respect to the Georgia

10  voter registration system.

11          The outcomes that surprised me are any

12  complaints I got about I can't find that information,

13  about I just registered at the Department of Driver

14  Services, or whatever the DDS acronym is for, and now

15  the information --

16      Q.    Hu?

17      A.    -- doesn't show up on the website or I've

18  been registered, now I'm told I'm not there anymore,

19  what happened.  There's an awful lot of those

20  complaints consistently throughout the process.  And I

21  look at the expert reports that point out the failings

22  in that area, and that directly impacts people's

23  constitutionally protected right to vote.

24      Q.    Anything other than voter registration

25  errors that you believe training has led to an

1  unconstitutional result?

2      A.    I talked about the treatment of absentee

3  voting, provisional ballots.  I mean, those seem to be

4  issues that came up -- excuse me -- in the complaints.

5      Q.    And when you say the complaints, I probably

6  should have clarified this earlier.  You're referring

7  to complaints coming in to the State Election Board?

8      A.    That's right.  Chris Harvey said that all

9  complaints went through him.  There were a large number

10  of complaints.  I'm sure I didn't see all of them by

11  any means, but I had a pretty good flavor after looking

12  at hundreds of them and that, you know, this person was

13  complaining about this too.  I did look at a number of

14  the things also that -- you know, the minutes and

15  agendas that were in front of the State Elections Board

16  with respect to some investigations that were being

17  conducted and the reports that were being made.

18      Q.    Would you agree with me that even if a state

19  implemented the most perfect -- or I shouldn't say

20  that.  Would you agree with me that even if a state

21  implemented unquestionably gold standard training that

22  there could still be errors in an election system?

23      A.    Well, the election system is run by a human.

24  And I've said this often in my training that, you know,

25  you expect that there are going to be errors, which is

1    why you do the best you can with the training.  You try

2    to make it as thorough and rigorous and redundant, if

3    necessary, as possible.  And it's how you respond to

4    those that is going to be -- to the failure that's

5    going to be a key.  You build on that to make sure that

6    it doesn't happen again.

7              People are going to make mistakes.  I think

8    no election is going to be perfect.  But, you know, our

9    role as the chief election officer is to lead in that

10   area and make that the goal and give the election

11   officials working in your state the tools and the

12   resources and the confidence to take care of that.  I

13   think I've acknowledged a number of shortcomings that I

14   experienced in Wisconsin at the local and county level.

15        Q.   We covered that.  On page 7 at the top of

16   the page, page 6 at the bottom of the page of your

17   report -- and I think you've largely answered this, but

18   in the second to last paragraph, I guess the last full

19   paragraph, the last sentence reads, "A comprehensive

20   training program for election officials and poll

21   workers is essential for ensuring voting rights are

22   protected."  Do you see that?

23        A.   Yes.

24        Q.   All right.  And, again, is there a specific

25   statute that says that, or is that a conclusion you

1  were drawing from the statutes that you identify?

2      A.    Well, it comes from the statutes that I

3  identified.  It comes from my experience on this.  It

4  comes from -- we've talked about the complaints, or

5  I've talked about the complaints that have filtered up

6  to the Georgia Secretary of State's office, the

7  complaints I experienced in my office, and even the

8  fact that the Help America Vote Act put an emphasis on

9  training following the 2000 election debacle where we

10  saw big failures.

11          And it wasn't just the voting equipment in

12  Florida.  One of the biggest issues that came out of

13  the 2000 election was the failure to properly register

14  voters under the National Voter Registration Act and to

15  account for people who claimed they were registered and

16  showed up at the polling place.  That was a big issue

17  that, you know, in the 2000 election didn't get quite

18  the national news media that people looking at punch

19  card voting got in Florida.

20      Q.    Yeah, I guess my question is a little more

21  specific than that, and it's when you say that it's

22  essential to ensuring voting rights are protected and

23  those rights are arising out of the statutes you've

24  identified, do those statutes, do those acts, Voting

25  Rights Act, the National Voter Registration Act,

1    UOCAVA, HAVA, the Voting Accessibility for the Elderly
2    and Handicapped Act, do any of those statutes expressly
3    say that there must be training done or that without
4    such training there would be a violation of those
5    statutes?
6         A.    They don't expressly say that.  But without
7    the training, you know there will be a violation
8    because people won't know what they're supposed to do
9    or they'll do it incorrectly.  So without the training,
10   you're going to have a violation.  I mean --
11        Q.    In your work with Congress on the Help
12   America Vote Act, did you try to get an express
13   training requirement into the statute?
14        A.    No, I did not.  I didn't.
15        Q.    Page 8 of the report using the court's
16   designation, page 7 for yours, the last paragraph says,
17   "Poll workers do their work a few times a year.  They
18   need to be thoroughly trained in their election day
19   responsibility and brought up to date on changes since
20   the last time they worked."  Do you see that?
21        A.    I do.
22        Q.    My question is on the word thoroughly and
23   how specifically does a state determine if the training
24   they're providing is sufficiently thorough to satisfy
25   what you're articulating here.

1    A.    Well, a state looks at what are the duties

2   that the poll worker has.  It looks at what's the

3   training that's been in place.  It looks at where have

4   the errors been with respect to those processes and

5   what has changed in that process.  That's how you

6   determine -- those are all elements of determining the

7   thoroughness of the training.

8    Q.    What are the metrics the state can use to

9   know if its done a good job?

10   A.    There's a number of metrics that they can

11  use.  They're probably qualitative than more

12  quantitative.  One quantitative one is the measure of

13  complaints that come out of a particular activity,

14  whether the complaint's related to the quality of voter

15  data in the county, what are the complaints about, how

16  elections were conducted in a particular polling place

17  or a particular county, that's definitely going to be

18  one of the biggest quantitative measures that you can

19  look at.

20       You can look at the quality of the

21  paperwork, is it properly completed and well

22  documented.  You look at observations that you can make

23  either directly or through other observers as to how

24  things perform.  So there's a wide range of ways that

25  you can assess that.  You can look at the accuracy of

1    the data.  We see that -- you know, in Wisconsin one of

2    the things we did, we had three different measures of

3    the number of voters that came out of a polling place

4    which gave us an indication of how well the poll

5    workers were doing their jobs.

6         Q.    And is there a -- I would normally say

7    industry wide, but I realize we're not talking about an

8    industry per se.  But is there a standard or is there

9    scholarship that you turn to or regulations to come up

10   with these different metrics, or is this just something

11   that -- not just, but is this something that you've

12   done on your own based on your experience?

13        A.    Well, it's based on my experience, but it's

14   also based on what I've learned in, you know, the

15   classes that I've taken through the Election Center

16   that are actually taught by Auburn professors.  It's

17   drawn on what I've learned from other election

18   officials at the National Association of State Election

19   Directors.

20             I have read -- and I can't point to a

21   specific paper on training, but I've read a lot of

22   research papers working with the Election Science and

23   Research conferences that I've participated in in

24   Madison and Philadelphia, and there's one in Florida

25   coming up this summer maybe.  The original one was in

1    Portland in 2017 looking at my work with the Pew Center

2    on the States.  And we developed not only the

3    Electronic Registration Information Center protocols

4    but the performance index of elections that's now run

5    by MIT that was developed working on committees there.

6    All of those provide insight to me and which I don't

7    think I would be the only person who's been in this

8    business for a while who would come up with these kind

9    of strategies or analysis.

10        Q.    Can you cite me to some others that would

11   and have published on it?

12        A.    I think you could look at the Election Law

13   Journal to see if there's anything involved.  I can't

14   point specifically to any articles there.  But, I mean,

15   there's a raft of publication on election

16   administration that has come out.  I did not go looking

17   for that for these purposes.  I really focused on what

18   was in front of me, the Georgia statutes, the Georgia

19   practices, the materials that were available to me, and

20   drew on my 40 years of experience.

21        Q.    I tell you what.  I am at a decent stopping

22   point.  I don't know if you want to -- it's 1:15.  I

23   think that puts it at about where you said you wanted

24   to break for lunch, but I could be wrong, so I'll just

25   raise it.

1        A.     We are right there, right where I suggested.

2               MR. BELINFANTE:  Okay.  Sure.  Do y'all want

3        to call back in at let's say 2:05 Eastern Time?

4               THE WITNESS:  That's fine.

5               MS. TANIS:  Yeah, that works for me.

6               MR. BELINFANTE:  Okay.  All right.  We'll do

7        that then.  That way we don't get the star message

8        until a little while later, but thanks everybody.

9               (Thereupon, a recess was taken.)

10   BY MR. BELINFANTE:

11       Q.     Let's go to page, your report, Exhibit

12   Number 1, Document 167, page 9, the court page 8 at the

13   bottom of the page.  Third paragraph, the last sentence

14   reads, "The information in user manuals will have to be

15   distilled into checklists and step-by-step instructions

16   to ensure election officials and poll workers can

17   easily do their work and resolve problems."  Do you see

18   that?

19       A.     I do.

20       Q.     Okay.  What was the basis of that opinion?

21       A.     Basis of that opinion is based on my

22   experience working with training materials for local

23   election officials where you have to convey to them,

24   whether it's the use of voting equipment or handling of

25   processes such as absentee voting, that you can't

1    simply give them the manual.  You can't just give them

2    the statutory language.  If you want them to understand

3    it, you have to really break it down into something

4    that they can use quickly that is going to be

5    reasonably sufficient.

6           Checklists are a very good idea.  An example

7    of that is I opened my absentee ballot on the break and

8    inside, in addition to the requirements of state law

9    for the uniform instructions, was a checklist that

10   mirrored instructions that the voter can use, in this

11   case me, to make sure that I follow all the steps to

12   make sure my ballot will be completed properly so that

13   it will get counted on election day.

14        Q.    All right.  Do you have the 2018 Georgia

15   poll worker manual with you?

16        A.    I do.

17        Q.    Okay.  Let's go ahead and mark that as

18   Exhibit 9; is that right?

19           (Whereupon, Defendants' Exhibit Number D-9

20        was marked for identification.)

21   BY MR. BELINFANTE:

22        Q.    If you'd turn, Mr. Kennedy, to page looks

23   like 13 of the Georgia 2018 poll worker manual.  Is

24   that an example of a checklist or step-by-step

25   instruction?

1        A.     13 and 14 look to be part of a flow chart.

2        Q.     Right.

3        A.     And with various points in time on that, and

4   then there's -- there are steps on that.  I had

5   mentioned flow charts as an example.  This would be

6   one.  I don't know how practical it is when it spans

7   two pages.

8        Q.     But you would agree with me that this

9   portion at least of the manual has step-by-step

10  instructions.  Even on the flow chart itself looking

11  specifically at the oath provision, for example, has

12  step-by-step instructions.

13       A.     Yes.  And I think I included that in my

14  description of what was in the manual.

15       Q.     All right.  And I'm going down further.  It

16  looks like page 15 has step-by-step instructions for

17  the voting unit.

18       A.     Old voting unit.

19       Q.     Would you agree?

20       A.     It does.

21       Q.     And going down to page 61 to 62, that has a

22  series of times that a provisional ballot could be

23  used; right?

24       A.     Yes.

25       Q.     And it's broken down into easy -- there's no

1    statutory language there.  It's easy to digest.  Would

2    you agree with that?

3         A.    Yes, I would.

4         Q.    All right.  You also talk about in your

5    report on page 9 at the top the court's designation,

6    your designation page 8, that "there also have to be

7    accountability mechanisms included as part of the

8    training program if the program is to be effective."

9    What do you mean by accountability mechanisms?

10        A.    Well, they range -- there's a number of

11   items that you can use for accountability mechanisms

12   which could also double as assessment methods.  A test

13   that's administered as part of the training or separate

14   from the training is probably the most common one,

15   required feedback during the training to ensure that

16   voters -- or that election officials, whether they're

17   poll workers or others, understand what you're giving,

18   the information that -- understand the information

19   you're transmitting, reviewing performance after the

20   training on the actual matters to see how they actually

21   conduct the tasks as part of an accountability

22   mechanism and even evaluating how someone does -- you

23   know, performs a task as part of the training that

24   might be physical, such as watching them set up the

25   voting equipment to make sure that they do it right and

```
 1   providing feedback would be examples that can be
 2   incorporated in training to get that accountability
 3   that what you're doing is proper, also record keeping
 4   as to who's taking the training, when they've taken the
 5   training, and what the results of your assessment were.
 6        Q.    All right.  Do you know how many states
 7   roughly do a test of their election officials'
 8   training?
 9        A.    I don't know how many do.  I know that a lot
10   of the online training sort of gives you a -- that's
11   been designed in different states because I've seen
12   examples of it, and I believe that's included in
13   Wisconsin to give you a chance to answer questions to
14   evaluate your performance in terms of that.  So it's
15   built into the online platform.
16        Q.    Do you know how many states require feedback
17   during a training session?
18        A.    I don't know how many implement a feedback
19   mechanism in the training, no.
20        Q.    Okay.  How about how many states do hands-on
21   training as part of the training process?
22        A.    Again, I don't have a number on that.  I
23   know from, you know, experience that people will talk
24   about it and tell me that that's what they've done.  I
25   know that we have done that in our training sessions.
```

1        Q.    And you have not attended a meeting of the

2   Voter Registrars Association of Georgia, have you?

3        A.    I have not.

4        Q.    All right.  And have you attended any

5   conferences where Georgia election officials, and I use

6   that term as broadly as possible, are receiving

7   training?

8        A.    Yes.

9        Q.    What meetings have those been?

10        A.    The National Association of State Election

11   Directors.

12        Q.    Uh-huh (affirmative).

13        A.    At the National Association of State

14   Election Directors training was provided, although I

15   guess that's a broad description of what happens at

16   those meetings.  At NASED -- not NASED -- at Election

17   Center conferences there have been Georgia election

18   officials in attendance, and in the classes that I've

19   taken there have been Georgia election officials in the

20   same classes that I've been in.

21        Q.    All right.  Let's see.  We talked about

22   training protocols.  Oh, did you know that the -- at

23   least the 2018 poll worker manual was available online?

24        A.    I was not able to find it online.

25        Q.    Okay.

```
 1              MS. TANIS:  Josh, I don't think it's
 2        accessible to anybody who doesn't have the sign-in
 3        credentials.
 4              MR. BELINFANTE:  I googled Georgia poll
 5        worker training and got a link to it.
 6              MS. TANIS:  When?  Because, if so, it's very
 7        recent.
 8              MR. BELINFANTE:  I've done it before today.
 9        I did it again today, but I've done it -- I mean,
10        I can't remember the first time I've done it, but
11        -- and I think y'all had it in the motion to
12        dismiss, a link to it.  But okay.
13              MS. TANIS:  Is 2020 available there too and
14        2019?
15              MR. BELINFANTE:  I've not found 2020, no.
16              MS. TANIS:  Okay.
17   BY MR. BELINFANTE:
18        Q.    All right.  Let's see.  If you could look at
19   the bottom of page 8 in your report.  Page 9 is the
20   court's designation of it.  And there it says, "The
21   State Election Board is required to promulgate rules
22   and regulations to ensure uniformity in the practices
23   and proceedings of superintendents, registrars, deputy
24   registrars, poll officers, and other election
25   officials."  Do you see that?
```

1        A.    Yes.

2        Q.    Okay.  And when you say they're required to,

3    that is -- you mean a requirement in law; right?

4        A.    There's a Georgia citation right after, the

5    21-2-31(1).

6        Q.    Uh-huh, yeah.  Okay.  But so, I mean, you

7    are making a legal conclusion though; right?

8        A.    Yes.

9        Q.    Okay.  You indicate in Exhibit -- excuse me

10   -- Appendix A that you read Dr. Brown-Dean's

11   deposition.  Do you recall her deposition?

12       A.    No.  I read her report, not her deposition.

13       Q.    I'm sorry.  That's what I meant, her report.

14   Did you reach any of your conclusions on Georgia law

15   based on that report?

16       A.    Well, I looked at -- I mean, she had a -- as

17   I recall her report, it was a pretty -- it was

18   basically a descriptive set of things.  It certainly

19   informed me on that, but it was not my sole reference.

20   It's sort of an introduction to me about Georgia law by

21   reading that, and it also had 50 pages of tables and

22   citations --

23       Q.    Okay.

24       A.    -- in it as well.  And it looks like it had

25   been updated to reflect the changes in 316.

1     Q.    All right.  But did you make independent
2  conclusions on the law in your report?
3     A.    Yes, I did.  I mean, I looked at -- in fact,
4  all the statutes that I cite, I've already read them
5  for this case.  I can't remember if there's a rule
6  specifically cited on that.  I've looked at those.  I
7  mean, I have a printout of the -- you call it Chapter
8  21 and have gone through that.
9     Q.    All right.  Let's turn to, if you have it,
10  Code Section 21-2-31, Georgia Code Section.  We'll mark
11  that as Exhibit 10.
12          (Whereupon, Defendants' Exhibit Number D-10
13      was marked for identification.)
14  BY MR. BELINFANTE:
15     Q.    And just let me know when you're there.
16     A.    21-2-31?
17     Q.    21-2-31, yes.
18     A.    Okay.
19     Q.    This is one of the statutes you read;
20  correct?
21     A.    Yes.
22     Q.    All right.  And would you agree with me that
23  nothing in this statute expressly requires the State
24  Election Board to train election officials?
25     A.    It doesn't expressly require it.  But if you

1  specify a duty and you have to -- and later on the
2  board is going to have authority to apply penalties or
3  issue directives, letters of instruction I guess
4  they're called, it's implied there needs to be a
5  mechanism to communicate that information.  And I do
6  know that the statutes require the board to deliver
7  their rules to the Secretary of State and to the
8  county.
9       Q.   Okay.  Next let's look at Code Section
10 21-2-100.  I think we already have.  Hang on a second.
11 No, we did 70.  Yeah, if you could turn to 21-2-100,
12 I'm sorry, and we'll mark that as Exhibit 11.
13      A.   All right.
14           (Whereupon, Defendants' Exhibit Number D-11
15      was marked for identification.)
16 BY MR. BELINFANTE:
17      Q.   This is one you read as well; isn't that
18 right?
19      A.   That's right.
20      Q.   Okay.  And here it references the State
21 Election Board in subparagraph (e).  Do you see that?
22      A.   Yes.
23      Q.   And there the reference is that the State
24 Election Board can fine a superintendent or registrar
25 if they do not attend the training required in the code

1   section.  Do you see that?

2       A.    I see that.

3       Q.    All right.  Did you find any cases from the

4   State Election Board where a superintendent or

5   registrar was fined for failing to attend the training

6   required?

7       A.    I don't recall any.

8       Q.    Okay.  Do you have any reason to believe

9   that a superintendent or registrar, in fact, did fail

10  to attend a training as required by this code section,

11  or by Code Section 21-2-100?

12      A.    I wouldn't be surprised if that happens as

13  we talked about human nature or the human driven

14  activity, but I don't have any reason other than these

15  things do happen.

16      Q.    Okay.  Similarly here, it's the duty of the

17  Secretary of State to select the training.  And I'm

18  looking at subparagraph (a).  Do you see that?

19      A.    Yes.

20      Q.    All right.  And then, you know, the

21  Secretary is empowered to waive the training

22  requirement.  That's subparagraph (c).  But even here

23  this is talking about training for election

24  superintendents and not poll workers.  Do you agree?

25      A.    Superintendents and registrars, right.

1          Q.    Okay.  I realize -- because I think it was

2    done after you submitted your report.  Did you happen

3    to read the deposition of Governor Kemp?

4          A.    I did.

5          Q.    Okay.  Did that deposition change in any way

6    the opinions that you formed in your report?

7          A.    Did not.

8          Q.    All right.  Did any of the depositions that

9    you read after the filing of your report change the

10   opinions in your report?

11         A.    In some cases they reaffirmed my positions.

12   I think I've mentioned Professor Smith and Professor

13   Mayer.  Their comments seemed to underscore what I

14   concluded.

15         Q.    All right.  But did anything cause you to --

16         A.    Nothing caused me to change my report.

17         Q.    Okay.  How frequently while you were in

18   Wisconsin did the GAB meet on an annual basis?

19         A.    Eight to ten times a year.

20         Q.    How many of those meetings were dedicated to

21   elections?  Or were they --

22         A.    All of them --

23         Q.    Go ahead.

24         A.    Excuse me.  I'm sorry.  All of them included

25   elections.  The elections part of the meetings were

1    public, other than status reports that we provided by

2    division in discussion.  The ethics, campaign finance,

3    and lobbying were conducted in closed session if they

4    dealt with issuing opinions, investigations.  I mean,

5    there might have been an election in closed session,

6    but almost all of the open session was devoted to

7    election administration.

8        Q.    And typically how long in terms of hours

9    would the meetings of the GAB go those eight to ten

10   times a year?

11       A.    They generally started at 9:30 and ended

12   around 5:00.  The closed sessions might start around

13   1:00 or 2:00 in the afternoon, and it varied based on

14   the agenda and the contents.

15       Q.    Sure.  And so is it fair to say that -- I

16   presume you would take a break for lunch in those

17   meetings?

18       A.    We did, although we did not go out for

19   lunch.  We had lunch brought in so that we were not

20   gone for long periods of time.  That's something I

21   learned very quickly.  When board members go out for

22   lunch, they go out for an hour and a half to two hours.

23       Q.    Right, right.  So is it fair to say that the

24   portion of those meetings that would cover elections

25   would typically be two and a half, three hours?

1        A.    At least, yeah.

2        Q.    What would the average be that was dedicated

3   to elections, do you know?

4        A.    I'd be speculating again, and it would

5   definitely vary depending on the agenda for the

6   meeting.

7        Q.    All right.

8        A.    And if you're able to, all of those meetings

9   are videotaped.  They were broadcast on Wisconsin Eye,

10  which is a separate entity that you might be able to

11  access some of those meetings through the Wisconsin Eye

12  website.  I'd just --

13       Q.    Okay.

14       A.    -- do that rather than give you the site --

15       Q.    Sure.

16       A.    -- since I don't know it.  But it would

17  probably be in their archives.

18       Q.    Okay.  And I'm sorry for the long pauses.

19  I'm going through stuff that we've already covered, so

20  I'm actually moving faster than anticipated.  On page

21  11 of your report, that's the top page, the court's

22  designated page, page 10 down below, it says in the

23  fourth paragraph from the bottom, the last sentence

24  reads, "The State Election Board and the Secretary of

25  State cannot be confident these laws are administered

1    in a consistent and uniform manner unless county

2    election officials and poll workers are effectively

3    trained in the requirements of these critical federal

4    laws."  Do you see that?

5         A.    Now, you said it's on page 11 as numbered in

6    my report?

7         Q.    No, 10 in your report.  I'm sorry.

8         A.    Okay.

9         Q.    And then it's the fourth paragraph from the

10   bottom.

11        A.    I guess my paperwork got shuffled a little

12   bit.  Bear with me.  The appendix has got mixed in.

13   Okay.  I have page 10.

14        Q.    The last --

15        A.    That's right.

16        Q.    Do you see that sentence?

17        A.    Right.  Right above the bold statement?

18        Q.    Yes, exactly, exactly.  In terms of

19   measuring the efficacy of the training that you

20   describe here, I think we've already covered the

21   ground, but I just want to be clear that when we're

22   looking at training for compliance with the statute you

23   identified, would it be any different from training

24   with compliance for state laws?  In other words, are

25   the methods going to be the same if the training is on

1    state law versus if the training is on federal law?

2        A.    It's going to be the same.  You're going to

3    be looking at the same types of metrics or indicators

4    on whether or not you're having issues.

5        Q.    All right.  And you've identified those

6    metrics and indicators for me previously as -- this is

7    when we talked about the number of complaints, the

8    quality of paperwork, observations from observers, and

9    accuracy of data; is that correct?

10        A.    Yes, it is.

11        Q.    All right.  Okay.  Page 12 at the top, page

12    11 of your report, I've got a series of questions on

13    the first full paragraph.  The last sentence says,

14    "There are no statewide meetings designed to reach poll

15    workers, and the Secretary of State does not do

16    anything to ensure information from these conferences

17    reach those frontline election officials."  Do you see

18    that?

19        A.    I do.

20        Q.    Okay.  Have you attended -- I asked a

21    similar question earlier.  I don't think I asked this

22    one.  Have you ever attended a Georgia Elections

23    Official Association meeting?

24        A.    I have not.

25        Q.    All right.  And other than Mr. King, have

1  you spoken to anyone in Georgia about elections

2  administration in Georgia?

3      A.    I had a number of conversations with the

4  election director, Kathy Rogers.  She was vice

5  president of NASED while I was president.  And she

6  would have been -- you know, she would have left that

7  role in 2006, at the end of 2006, and I continued to

8  talk with her.  She worked for I believe Elections

9  Systems & Software, which was a voting equipment

10  vendor.  Her staff counsel was Cliff Tatum, who stayed

11  on at the Secretary of State's office after that, so

12  I've had conversations with both of them about election

13  administration in Georgia over the years.

14      Q.    Okay.  How about Chris Harvey, have you ever

15  had a conversation with Chris Harvey?

16      A.    I don't recall that I've ever had a

17  conversation with Mr. Harvey.  I do note that our

18  tenure as election members of NASED overlapped for

19  about a year.  He came out sometime in 2015 is my

20  understanding, and I was there.  You know, it's

21  possible we would have been at the 2015 and 2016

22  meetings together.

23      Q.    Okay.  Have you ever had a conversation, to

24  your recollection, with Kevin Rayburn?

25      A.    I have not.

1      Q.     Okay.  Or Ryan Germany?

2      A.     No.

3      Q.     How about Governor Kemp?

4      A.     No.

5      Q.     And Secretary Raffensperger?

6      A.     No.

7      Q.     All right.  Did you consider any information

8  regarding how any of Georgia's 159 counties train their

9  poll workers?

10     A.     I noted one example that came out of the

11 depositions of Chris Harvey that there were errors in

12 separately designed poll worker manuals in Gwinnett

13 County and that they hadn't been rectified over the

14 course of two election cycles and they repeated

15 themselves according to that deposition.  And maybe it

16 was Mr. Worley, the board member, who was involved in

17 that.  It may have shown up in his deposition as well.

18             I did see examples.  I think Lowndes County

19 had a PowerPoint that was presented at one of the

20 conferences of their training for poll workers.  And

21 there may have been some other poll training in the

22 PowerPoints that I looked at from the various

23 conferences, but not -- the only one that really stood

24 out was the one from Lowndes County.

25     Q.     All right.  And forgive me if this question

1  is duplicative, but in preparing your report did you

2  speak to anyone -- or I'm sorry.  I know who you talked

3  to in preparation of the report.  Prior to the

4  preparation of your report, in your experience do you

5  recall discussing election administration with any

6  county election superintendents from Georgia?

7       A.    I don't recall that.  As a member of the

8  Election Center, I certainly recognize some of the

9  names of people who got their CERA, C-E-R-A,

10  certifications along with me.  But I would not recall

11  the specific conversations, but it was not unusual in

12  the classes or in the three types of meeting events

13  that they had that conversations would occur about

14  administrative issues or practices.  But I can't

15  specifically recall because that's happened over, you

16  know, a period of several years, and the last was in

17  2016.

18       Q.    Going to the Lowndes County presentation, do

19  you have any specific criticism of Lowndes County's

20  training for poll workers?

21       A.    What I saw was a good example of things that

22  could be done.  I think this is, you know, some of the

23  things that I think are essential in training.  Lowndes

24  County, it seemed that it was very participatory

25  feedback at the PowerPoint that I recall.  And it

1   showed how you can incorporate that with information

2   that was available to the Secretary of State and

3   available to other county officials.

4        Q.   All right.  And just so I'm clear, you did

5   not actually see Gwinnett County's training materials.

6   You saw where it was referred to in Mr. Harvey and

7   Mr. Worley's depositions; is that accurate?

8        A.   Talking about the poll worker manual?

9        Q.   Yes.

10       A.   I just saw the references to the errors,

11  yes.

12       Q.   Okay.  So, I mean, is it fair to say that

13  your report then does not have an opinion on the

14  efficacy of county training materials for poll workers?

15       A.   I'm just trying to think how to answer that

16  question because what I learned from looking at the

17  materials is there were some good examples, such as

18  Lowndes County.  There were concerns that were raised

19  that came out of -- if you look at the complaints, I

20  have to question how good the training was if people

21  are constantly concerned about whether or not they had

22  provisional ballots or absentee ballots counted or the

23  confusion that they encountered at a polling place.  So

24  looking at the overall training -- I mean, my opinion

25  was directed toward the overall training, primarily

1    focused on the Secretary of State.  But, you know, it's

2    clear that what was being conveyed down the line wasn't

3    effective given the large number of complaints that

4    were coming out of the election.

5        Q.    But I guess my question is a little bit more

6    specific than that, which is do you have an opinion

7    on -- or does your report have an opinion on county

8    training manuals for poll workers?

9        A.    It does not have a specific opinion on that,

10   no.

11       Q.    Okay.  And your criticisms that you just

12   spoke of regarding the complaint, you're presuming the

13   facts in the complaint are true.  Is that fair?

14       A.    That's fair.

15       Q.    All right.

16       A.    I think there's a reasonable basis for that

17   given the number of the same types of issues recurring

18   in these complaints.

19       Q.    Well, let's talk about that for a minute.

20   How much -- do you have an opinion or does your report

21   have an opinion on how many errors of a similar kind

22   need to happen in order for something to be systemic?

23   I didn't see your report address that, and that's my

24   question is whether your report does.

25       A.    My report doesn't quantify it.  It talks

1    about that as a measure for, you know, like the canary

2    in the coal mine.  It tells you there's an issue and

3    spurs you to respond to that issue.

4         Q.    Sure.  But you had extensive experience with

5    poll workers, certainly at least -- and, in fact, you

6    are one in Wisconsin; right?

7         A.    That's right.

8         Q.    And in your experience are poll workers

9    trying to do the right thing by voters?

10        A.    In my experience, they generally are.

11   There's occasionally a rogue poll worker that you sort

12   of wonder given their personalities what's driving

13   them.  My dad was a poll worker, and the guy who was

14   the chief inspector used to drive me nuts when I'd stop

15   by to visit that polling place.

16        Q.    But those folks -- I'm sorry.  Go ahead.

17        A.    No.  I was just giving an example that, yes,

18   they are trying to do that.  But we know that mistakes

19   are made, and you want to minimize those and certainly

20   mitigate the impact of those mistakes.

21        Q.    Sure.  And do you have any reason to believe

22   that at least as it relates to that standard, and by

23   that I mean trying to assist the voter and coming at it

24   from a position of goodwill, that the majority of poll

25   workers in Georgia are different from those in

1    Wisconsin?

2        A.    I have no reason to think that they would

3    be.  I guess one of the things I didn't see was, you

4    know, sort of a leadership direction that focused on

5    the reason for your job is to facilitate the

6    participation of voters to ensure that they're able to

7    do what they're legally entitled to.

8        Q.    Would you -- you've presented at numerous

9    conferences.  You've attended numerous conferences.

10   Would you agree with me that there's a significant

11   difference in what someone takes away from training

12   materials if they're present at the conference versus

13   just reading the PowerPoint?

14       A.    Well, obviously you might miss the context.

15   There's going to be discussion around that, so the

16   PowerPoint gives you a sense of what was covered on

17   that.  It doesn't -- most people looking at a videotape

18   of a presentation, you're not going to get a -- you're

19   really not going to see what was said, how it was said,

20   other than that's just the direction.  So those are the

21   points that they were trying to get across.

22       Q.    And wouldn't it also be true that to the

23   extent that there are audio learners in the audience,

24   and by that I mean people who learn better by hearing

25   rather than reading, being present at the conference

```
 1   would be more effective for them than just reading
 2   materials cold?
 3        A.   Yeah.  I talked about the fact that you need
 4   to -- any training has to have several different
 5   channels because you're going to have a diverse
 6   audience, and the different channels reaffirm points
 7   that you've made.  I mean, that's the idea of a
 8   PowerPoint is to give you a visual illustration.  I
 9   think we've all been at conferences where someone just
10   reads a PowerPoint.
11        Q.   Yeah.  Those are the ones where the coffee
12   sells out quickly.  I've been to plenty.  Page 13 of
13   the court's document, number 167, page 12 of yours,
14   there's a discussion a little bit about Firefly.  At
15   the time that you completed your report, were you given
16   any documents that showed the files that are available
17   on Firefly?
18        A.   I don't recall any documents.  There was
19   some descriptions in the depositions.  I don't recall
20   seeing a document that listed everything that was
21   there, but --
22        Q.   Okay.  Have you since seen a document like
23   that?
24        A.   No.
25        Q.   All right.  Are you aware that other states
```

1    and groups have come to Georgia to study Firefly

2    because they find it to be effective?

3         A.    I'm not aware of that.

4         Q.    All right.  Also on page 13 of the court's

5    number, page 12 of your report, there's a discussion of

6    the Election Center, which you've talked about some

7    thus far.  Is the Election Center -- poll workers

8    typically don't go take classes at the Election Center;

9    is that correct?

10        A.    Very few do, right.

11        Q.    Okay.  It's more for supervisors and other

12   trainers; is that fair?

13        A.    Yeah, generally -- I mean, you'll have a

14   mixture of state and local officials, more local

15   officials than state.

16        Q.    Uh-huh (affirmative).

17        A.    And by local I mean the administrators, not

18   the election day officials.

19        Q.    Okay.  Let me ask you on that page 12 of

20   your report, page 13 of the court's page numbers,

21   there's a reference to Appendix B in your report, and I

22   did not -- I didn't see where I got a copy of Appendix

23   B.  Mine ends with Appendix A, page 3.

24              MR. BELINFANTE:  Beth, do you know if that

25        was -- if maybe I printed the wrong copy or if it

1      was not included?
2              MS. TANIS:  I don't know of anything in
3      Kevin's report that is not in what you have.  I'm
4      trying to find this reference because you're
5      pointing out something that I didn't catch.  Where
6      is it on page -- you said page 13 of the original
7      report?
8              MR. BELINFANTE:  Yeah, page 13 of the
9      original report.  That's the court's number, page
10     13.  And it's the third paragraph from the bottom.
11             MS. TANIS:  Oh, page 12.
12             MR. BELINFANTE:  Yeah, page 12 of the
13     report.
14             MS. TANIS:  Oh, yeah.  Okay.  The third
15     paragraph from the bottom.  All right.
16             MR. BELINFANTE:  I mean, I think I was able
17     to at least get a good sense of it online.  But if
18     there is an Appendix B, could somebody just email
19     that to us at some point?
20             MS. TANIS:  Yes.  I'm not aware of there
21     being an Appendix B.  If Kevin has an Appendix B,
22     we will get it to you.
23             MR. BELINFANTE:  Okay.
24   BY MR. BELINFANTE:
25        Q.   All right.  In the second to last paragraph,

1   the first sentence says, "According to the Election

2   Center website, only six current Georgia election

3   officials have completed the CERA certification

4   program."  Do you see that?

5       A.    Yes.

6       Q.    All right.  I have gone to the website that

7   is cited there at Footnote 30.  And that page opens

8   with "Professional Education Program," but I could not

9   see where you were able to get the number that six

10  Georgia election officials have done the training, or

11  any other state for that matter.  I mean, I see there's

12  a section on -- go ahead.

13      A.    My recollection is there's a -- on the

14  right-hand corner there's -- it says graduates or CERA

15  members, and you click on that, and it drops down.  But

16  when I copied the link, that would be the link that

17  would have pulled it.  And, you know, there's several

18  hundred, and it tells you what state they're from,

19  whether or not they're still active, and that's how I

20  did my count.

21      Q.    All right.  I'll have to -- because I'm

22  not seeing that.  Maybe if you could -- and forgive me

23  for being dense, I guess, but -- because I see where

24  it's CERA Graduates in the News, and there's a member

25  area that has Resources and Check PPP, but you have to

1    log in to get that.

2        A.    And I did not have to log in to access that

3    information.

4        Q.    All right.

5        A.    So I'll make a specific point to pass it on

6    to --

7        Q.    Yeah, that would be great.  That would be

8    great.  And then I received an email that is cited in

9    your report as Exhibit 31, which is to Tim Mattice at

10   the Election Center.

11       A.    It's pronounced Mattice, but --

12       Q.    Oh, Mattice.  Okay.  He says that there

13   are -- as your report reflects, there are 34 members of

14   the Election Center in Georgia and that 11 members of

15   CERA are in the Secretary of State's office.  Did you

16   in any other emails ask him for a comparative kind of

17   number?  I'm just curious where Georgia falls as

18   compared to other states.

19       A.    I did not ask him for that.

20       Q.    Do you have a general sense of where -- or

21   how many local officials in Wisconsin have completed

22   the CERA certification program?

23       A.    It's less than Georgia.  They either tended

24   to be people in my office or county clerks.  I'm not

25   sure if there were any municipal clerks that completed

1  the CERA certification.  They have some other

2  certification programs, national and state, that our

3  local people avail themselves of.  In fact, our staff

4  is taught at the University of Wisconsin Green Bay

5  through the municipal clerk professional certification

6  program.

7      Q.    Okay.

8      A.    I don't remember the number from Wisconsin.

9      Q.    All right.  Do you know -- do you recall

10 roughly how many persons in your office at the GAB had

11 CERA certification?

12     A.    I'm guessing over the time I was there up to

13 a dozen.

14          MR. BELINFANTE:  All right.  Let's go ahead

15     and just enter in the email as Exhibit 12.  And I

16     think the exhibit is technically, Beth, your

17     forwarding email to me.

18          MS. TANIS:  Okay.

19          (Whereupon, Defendants' Exhibit Number D-12

20     was marked for identification.)

21 BY MR. BELINFANTE:

22     Q.    Is there anything in -- well, never mind.  I

23 think we've covered that territory.  All right.  Let's

24 look at page 14, that's the court's number, your report

25 number page 13.

1      A.      Okay.

2      Q.      You talk about that Wisconsin has an even
3  larger number of local election officials than Georgia.
4  Roughly do you know how many poll workers are at
5  polling locations in a Wisconsin general election?

6      A.      The statute requires seven poll workers at
7  an election.  There are processes for reducing that to
8  a minimum of three.

9      Q.      Is that per -- go ahead.  I interrupted.
10  Sorry.

11      A.      I know.  I was going to say our rural
12  municipalities might be able to run a polling place
13  with three poll workers.  We also permit our poll
14  workers to work in shifts, so it's not unusual that
15  you'll have a morning shift and an afternoon shift of
16  poll workers or a mixture of people who work part of
17  the day and people who work the full day.

18      Q.      Okay.  Do you know how many polling
19  locations there are in Wisconsin in a general election?

20      A.      I always say it's under 3,000, but it's
21  probably between 2750 and 2850 depending.  It will be a
22  lot less next week I'm sure.

23      Q.      Sure.  All right.  The last I guess sentence
24  of the fourth full paragraph, including the bold one,
25  reads -- again, this is on page 13 of your report --

1    "From my 30 plus years of experience as Wisconsin's

2    chief election official, I can describe the challenges

3    presented in establishing and maintaining an effective

4    training program for a large diverse group of local

5    election officials."  Do you see that?

6        A.    I do.

7        Q.    When you say diverse group of local election

8    officials, what did you mean by diverse group in that

9    sentence?

10        A.    In Wisconsin it would cover ranges in

11    educational attainment, socioeconomic status, racial

12    distinction, age.

13        Q.    Okay.

14        A.    Gender, I suppose.

15        Q.    Sure.  And then it says in the next

16    paragraph, the second sentence is "Establishing a

17    communication protocol is the foundation for effective

18    training."  Do you see that?

19        A.    I do.

20        Q.    What did you mean by a communication

21    protocol?

22        A.    I mean that it's important to have a means

23    to ensure that the information you develop is available

24    for the election officials and the different audiences

25    that you're reaching out to.  And that can be, you

1    know, email communications, it can be a website portal,

2    or even the website.

3        Q.    Okay.  Do you know -- I mean, we've talked

4    about what Wisconsin had.  Do you know how other states

5    have had communication pro -- let me ask it this way.

6    Do you know what communication protocols in states

7    other than Georgia and Wisconsin have been?

8        A.    I have seen demonstrations at state election

9    director meetings, and there's a course devoted to

10   communications with the CERA program, which covers a

11   wide range of communications.  There's been

12   descriptions of similar setups where they've talked

13   about building communication networks.

14              And obviously it's evolved over the years

15   from the Listserv and bulletin boards, which were

16   obviously the first step, because when I started, you

17   know, we had local official mailings.  There wasn't

18   email to all of them.  But then there was the

19   development of electronic bulletin boards and Listserv,

20   so it's evolved.  And I'm sure it's continuing to

21   evolve.  I had to explain to my board members who, you

22   know, widely are on Twitter, sort of Twitter and

23   Facebook, so that we had -- continued getting our

24   message out.

25       Q.    Okay.  Do you know -- I mean, is there a

 1    state that you would look to and say they do it best?

 2        A.    I can't cite to one.  I mean, I know that

 3    Colorado does a very good job in general with

 4    administering elections.  And I couldn't tell you

 5    specifically about their communication protocols, if

 6    it's an example of how well elections are run in

 7    Colorado.

 8        Q.    All right.  Also on page 13, the last full

 9    paragraph, the last sentence reads, "There must be a

10    requirement that county election officials report back

11    to the Secretary of State that they received the OEBs,

12    reviewed the content of the OEBs, and taken steps to

13    implement court ordered requirements spelled out in the

14    OEBs, including directing poll workers and other

15    frontline election workers to carry out their duties

16    consistent with the court directives."  Do you see

17    that?

18        A.    I do.

19        Q.    Okay.  And, sir, I'm truly not trying to be

20    semantic here, but you used the word must again.  By

21    must, do you mean that there is a legal obligation to

22    do so?

23        A.    By must, I mean that you can't be assured

24    that people have gotten the message and carried out

25    their responsibilities unless you have that feedback

1   loop.

2        Q.    All right.  And what did Wisconsin do when

3   there was a court case that came out and specifically

4   to make sure that the city municipal clerks all knew

5   about the court case?

6        A.    Well, it generally came out in our UOCAVA

7   litigation that they're -- it required them to report

8   back on tracking that.  We actually kept track of the

9   status of how they were dealing with the court orders.

10  One of them had to deal with making sure that the --

11  most of the procedures were in place through our

12  statewide voter registration system.

13           But then we could track -- have them

14  specifically track and explain any shortcomings.  I

15  mean, if you missed the 47 day deadline, we needed to

16  know why you missed it.  So, you know, when we had that

17  kind of a court order, we were hands on with 1850 -- it

18  was 1854 when I was there.  It's now at least another

19  50 municipal clerks.

20       Q.    And the example you gave with UOCAVA, was

21  the feedback loop limited to UOCAVA?

22       A.    Oh, in that case it was.  I can't recall

23  that we've actually had a court order that affected the

24  election administration from that point.  I wasn't

25  there when the One Wisconsin Now order came out, which

```
 1   would have impacted that.  I can tell you as a poll
 2   worker I got information on that.  The poll worker
 3   training manual that I have for Wisconsin that I got
 4   for my training makes reference to that court order.
 5        Q.    Okay.  And do you have a sense -- or not a
 6   sense.  Do you have specific knowledge on what other
 7   states do when a court order comes down and how they
 8   communicate that out to election officials?
 9        A.    I can't say that I have a specific sense.  I
10   think the implications are pretty clear.  When a court
11   issues an order, you've got to do something to make
12   sure it gets implemented.  I mean, even Chris Harvey
13   talked about the same thing with their UOCAVA, that
14   there had to be followup on tracking compliance.  I
15   don't know what it generated, but there was a court
16   order that generated the UOCAVA compliance, and he made
17   a reference to it in one of his depositions.
18        Q.    Okay.  Are you familiar with an organization
19   known as the Association of County Commissioners of
20   Georgia?
21        A.    No.
22        Q.    How about the Georgia Municipal Association?
23        A.    No.  I mean, I can tell you I'm not
24   surprised that they exist.  We have similar --
25        Q.    Sure.
```

1      A.    -- organizations in Wisconsin, and they're a

2  national -- probably part of a national component.

3      Q.    At some point -- I'm just looking for the

4  place on the report, but at some point in the report

5  you talk about the need to track names and contact

6  information for local election officials.  How is that

7  done in Wisconsin?

8      A.    It's built into our statewide voter

9  registration system.  And there's a method for updating

10  that information, and we will -- I don't know if it's a

11  statutory requirement for county clerks, but counties

12  always issue a directory of local election officials.

13  And so we will look at the directories and compare them

14  to what we have in the statewide voter registration

15  system.

16          And we have established -- I don't want to

17  say it's a specific protocol but certainly a practice

18  of communication among our county and municipal clerks.

19  So, for example, it's not unusual for us to get notice

20  that a municipal clerk may have passed away, may have

21  quit their job, or had some -- or left for various

22  reasons, which spurs us to then follow up to make sure

23  that that's current.

24      Q.    All right.  Do you know how other states do

25  it?

1      A.    My sense is they would be doing it the same,

2  very similar way.  I don't know if they would build it

3  into their statewide voter registration system, but for

4  us we looked at our voter registration system as a

5  complete election administration tool for our election

6  officials.

7      Q.    Okay.  What information do you have on how

8  Georgia maintains a current list of elected -- or

9  election officials at the local level?

10     A.    I don't have any information.

11     Q.    If you can turn to page 14 of your report,

12 court document page 15 on Document 167.  The first full

13 paragraph reads, "In developing and implementing

14 training programs, the Secretary of State needs to

15 focus on teaching challenges due to age, background,

16 and learning styles of the local election officials."

17 Do you see that?

18     A.    Yes.

19     Q.    Is it your opinion that that is not being

20 done in Georgia right now?

21     A.    That's my sense.  Most of the materials and

22 information I see emanating from the Secretary of

23 State's office seems to be focused primarily on written

24 material.  I know there are training videos in Firefly.

25 But, again, they also tend to be here's what you have

1   to do and here's how you do it.  I didn't see much that

2   indicated there was any hands-on experiences.

3          Q.    Are there metrics out there to determine

4   whether training programs are being created in a way to

5   address different learning styles?

6          A.    I'm not sure if there are metrics.  I mean,

7   there are metrics in the sense that you can measure the

8   reading comprehension of reading material.  That's not

9   an unusual situation.  And, in fact, that was obviously

10  one of the concerns about ballot design, making sure

11  that the instructions were not written at a college

12  level for voters.

13             And there was quite a bit of involvement for

14  election officials through the Election Center's

15  training programs and NASED, which is the state

16  election directors association, where they brought in

17  individuals to talk about the learning style, including

18  some of these groups that -- and I can't remember the

19  names of them.  I've actually got a series of pamphlets

20  from them that are written and geared to comprehend

21  language.

22         Q.    Well, maybe I -- I probably asked the wrong

23  question.  Is there a particular methodology that you

24  employed to have your conclusion that the state is

25  not -- the state of Georgia is not doing enough to

1   address different learning styles?

2       A.    Well, my methodology looked at what I saw

3   that was available either described in depositions or

4   other materials and the materials themselves.

5       Q.    Right.  And so that explains the facts that

6   you observed.  And then when you were trying to apply

7   those facts to a particular -- or apply a methodology

8   to those facts to determine, make a conclusion, I'm

9   just trying to figure out what methodology or method

10  you were doing other than -- well, I'll just leave it

11  at that.  Was there a particular method you were

12  looking at to reach those conclusions?

13      A.    Well, as you said, I was trying to identify

14  the factual basis of what was there in evaluating

15  whether the materials reached across multiple channels

16  of communication, you know, visual, aural -- as in

17  a-u-r-a-l, something someone could hear -- physical.

18  Whether there were feedback mechanisms in that is part

19  of the challenge of communication.

20      Q.    All right.

21      A.    So I --

22      Q.    Go ahead.

23      A.    I think that's the description of what I was

24  doing.

25      Q.    Okay.  The next paragraph says that "The

1    Secretary of State has to evaluate what information is

2    the most essential to focus on at a given point in

3    time."  Do you see that?

4         A.    Yes.

5         Q.    Would you agree with me that making that

6    decision is pretty much a judgment call for the

7    secretary to make?

8         A.    That's true.

9         Q.    The next paragraph begins with "Georgia's

10   history of restricting access to the ballot for

11   citizens of color also presents significant challenges

12   to an effective training program."  Do you see that?

13        A.    I do.

14        Q.    Can you explain that to me, what Georgia's

15   history -- how it impacts effective training?

16        A.    Well, Georgia was one of, what, 13 states

17   that were subject to preclearance provisions based on

18   findings when the Voting Rights Act was enacted in 1965

19   about its history of discrimination against individuals

20   of color.  And that has an impact on training because

21   it subjects, I think, Georgia and other states to much

22   more scrutiny with respect to ensuring that you're

23   protecting those rights where there's been a historical

24   practice of discrimination.

25              I mean, you oftentimes have to break down

1    institutional approaches.  Just saying treat everybody

2    equal doesn't necessarily work unless you've given them

3    the framework of why that's important and where it

4    comes from.  And also to pair election officials

5    together, that's going to be one way to ensure the

6    system is going to be evaluated is are you taking

7    action to have an audit system of more disparate

8    impacts on individuals of color.

9        Q.    Well, you could have a disparate impact on

10   voters of color in any state; right?

11       A.    That's right.

12       Q.    And so I guess what I'm trying to figure out

13   is why is Georgia's history, how does that get into

14   training on say the use of provisional ballots?  Give

15   me a specific example of how Georgia's history impacts

16   training on provisional ballots.

17       A.    Well, provisional ballots are generally a

18   fail-safe mechanism for individuals who, for whatever

19   reason, aren't able to cast their ballot at a

20   particular location for a number of different

21   scenarios.  And, you know, the history of provisional

22   ballots, it was designed to protect people who might

23   have been subject to voter registration errors and

24   other reasons why they might be disenfranchised.  If

25   you've got a past history of that kind of practice, it

1    underscores the need to make sure that you're being

2    even more careful than you would be.  To me it just

3    tells me to focus on making sure that there's no

4    possibility that people can say we are treating people

5    differently than we're affording any voter the

6    opportunity to fully participate in the election.

7         Q.    Is it your opinion that Georgia poll workers

8    don't know the importance of the value of voting?

9         A.    No, that's not my opinion.

10        Q.    Is it your opinion that Georgia poll workers

11   don't recognize the importance of allowing eligible

12   voters to vote?

13        A.    No.  I think my concern was making sure that

14   that's consistently reinforced.

15        Q.    Well, I mean, if that's true in Georgia,

16   shouldn't it be consistently reinforced everywhere?

17        A.    I would hope that it's reinforced

18   everywhere, yes.

19        Q.    Okay.  And so I guess where I'm getting to

20   is I don't see any linkage between Georgia's history

21   and current training on voting in elections that's

22   unique to Georgia or any other state that was covered

23   under Section 5.  And so I guess my question is your

24   paragraph concludes with "leaving the history of

25   discrimination unspoken when presenting information

1    about election officials' duties creates the impression

2    treating all voters equally and fairly is not a

3    paramount responsibility for doing their job."  How

4    is -- if you don't believe that poll workers believe

5    that -- let me put it this way.  If you believe, which

6    I think you just said, that poll workers believe that

7    treating people fairly and equally is an important duty

8    in their job, why does training materials need to bring

9    up Georgia's history dating back decades?

10              MS. TANIS:  Object to the form.

11        A.    Well, what I'm saying in my opinion is that

12   that is not really being addressed in the training.

13   You know, what you get is here is what you have to do,

14   here's how you have to do it.  It doesn't tell you

15   we're doing this for the voter.  It doesn't tell you

16   what the background is from that.

17              It's sort of -- you know, my evaluation of

18   these materials are that, from the perspective of the

19   Secretary of State, there are no issues, despite the

20   complaints and the lawsuits that are out there, and

21   that when they're being -- that when the state election

22   operations are being challenged on that basis that it's

23   important to incorporate into the training materials,

24   look, a lot of attention is being focused on us for

25   this, here's why we do this, here's how we address it.

1          I did not see those components in the

2    training material, and I think that's important that

3    you not only come from that background, that it's not

4    singling out people in the office for when the poll

5    workers were behaving a particular way.  There's a lot

6    of attention being directed to you from the -- because

7    we're Georgia and it comes from this, and this

8    underscores the need to make sure that we are doing

9    what the law requires, both the Georgia statutes and

10   then the federal law.

11        Q.    Are you familiar with Stacey Abrams?

12        A.    Yes.  I know she was a candidate for

13   governor.

14        Q.    And -- go ahead.

15        A.    Yes, against the current governor.

16        Q.    Brian Kemp.

17        A.    Brian Kemp.

18        Q.    Yeah.

19        A.    And I believe she -- I wasn't sure what her

20   role in the House was.  They kept making reference to

21   she was a leader.  I didn't know if she was actually

22   like a majority leader or a speaker when she was in

23   the -- I believe it's the House of Representatives in

24   Georgia.

25        Q.    She was the house minority.

1    A.    And I know that she's done a lot of national
2  discussion about possibilities.
3    Q.    Including vice presidential possibilities?
4    A.    Yes.
5    Q.    And you were aware of that when you wrote
6  the report?
7    A.    I was aware of it.  It wasn't a factor in my
8  report.
9    Q.    Were you aware when you wrote your report
10 that organizations that Ms. Abrams has been affiliated
11 with conducted poll testing on the phrase voter
12 disenfranchisement?
13   A.    No.
14   Q.    Were you aware that polling conducted showed
15 that using the phrase voter disenfranchisement
16 motivated voters very strongly?
17   A.    No.
18   Q.    If you knew that, would it change your
19 opinion on some of the allegations in the complaint?
20   A.    I wasn't taking opinions on the allegations
21 in the complaint.  I mean, I'm -- my focus was on the
22 training materials and the performance of duties and
23 enforcement aspects of this.  The complaints informs me
24 about what the concerns were by the parties that hired
25 me.

1      Q.    Okay.  Wisconsin's -- are you aware that
2  Wisconsin's African American population is
3  significantly smaller than Georgia's?
4      A.    Yes.
5      Q.    I think I've seen some census data that has
6  Wisconsin's African American population at about
7  6.7 percent projected for 2019.  Does that sound right
8  to you?
9      A.    Well, that's the material that you provided
10 through Beth Tanis to me, and I looked at that.  And
11 that -- I mean, without looking at that, I would have
12 said it was in the 6 percent range, so --
13     Q.    Okay.  Honestly, I couldn't recall if I
14 included that or not, so let's go ahead and mark that
15 census data sheet as Exhibit 13.
16           (Whereupon, Defendants' Exhibit Number D-13
17      was marked for identification.)
18 BY MR. BELINFANTE:
19     Q.    Any reason to doubt the U.S. Census numbers
20 on this?
21     A.    I don't have any reason to doubt it.
22     Q.    Okay.  On your opinion that leaving out
23 information regarding Georgia's history of
24 discrimination, are there studies that you relied on to
25 form that opinion?  Are there -- I'll leave it at that.

1  Are there studies that you relied on?

2       A.    What I relied on to say that I thought it

3  was important to make sure that was included?

4       Q.    Yes.

5       A.    No.  I think that would be based more on my

6  experience over a broad range of training protocols.  I

7  mean, we certainly talked a lot about the impact of

8  discrimination nationally in the CERA certification

9  program.  It's certainly something that we are

10 sensitive to in Wisconsin since our African American

11 population and, you know, the Hispanic population tend

12 to be concentrated in a few urban areas and becomes a

13 focus in the redistricting lawsuits that have occurred

14 every year -- or every ten years.  It's always kind of

15 focused on that, so --

16      Q.    Okay.  One of the criticisms you have of the

17 State Election Board is that its members did not have

18 training before coming onto the board or upon being

19 appointed.  Do you recall that?

20      A.    I do.

21      Q.    Okay.  Does it matter to you that the

22 members of the State Election Board, at least over the

23 last decade, have been lawyers with legal training?

24      A.    No.  I mean, based on my experience, lawyers

25 with legal training don't all know -- understand

1    elections.  And my board were former judges, and they

2    were some of the best judges that served in the state,

3    both the trial and appellate level.

4              And they were coming into a very complex

5    regimen, not only of election administration, but

6    campaign finance, ethics and lobbying.  And they'd had

7    some experience with that because they all ran for

8    office.  They all had to file campaign finance reports.

9    They all were subject not only to the state ethics code

10   but the judicial ethics code.  May or may not have any

11   experience with lobbying.

12             But for them to be effective board members,

13   it was important to give them an introduction into

14   responsibilities of the board, the duties of the board,

15   the mechanisms by which the board operates, to give

16   them a comfort level with the website.  It also

17   actually helped us because, based on the questions they

18   got, we're like, Well, why do we do this?  Well, why

19   don't we -- we don't have any information on that?  So

20   to me that was essential when you're dealing with, like

21   I said, very knowledgeable, intelligent, experienced

22   individuals with legal backgrounds.

23        Q.    Sure.  But would you agree with me that a

24   general counsel for a state political party has

25   significant election law experience?

1          A.     They would have election law experience.  I
2    don't know how that makes them entirely familiar with
3    the full operations of the duties they might be taking
4    on, but certainly they're starting at a different
5    point.
6          Q.    Sure.  And that would be true too for
7    someone who served as the general counsel to the office
8    of the governor as well; right?
9          A.     They'd have a much broader range of
10   experience.  In my dealings with gubernatorial counsel,
11   they weren't necessarily election law experts, but --
12   in fact, we spent quite a bit of time working with the
13   governor's counsel over the years.  Learned from
14   experience to be proactive particularly when they were
15   calling special elections to make sure they understood
16   what the requirements are.
17         Q.    Do you know how many other states have a
18   board that's like the State Election Board?
19         A.     I don't know.  It's not unusual in the sense
20   of having a State Elections Board and a Secretary of
21   State.  I know Indiana has that, for example.  Maryland
22   and the District of Columbia and Illinois just have an
23   elections board.  I don't -- you know, these are ones
24   that I know from my own experience.  I can't remember
25   if Ohio also has a board in addition to the Secretary

1  of State.  Rhode Island I believe does.  And I know in

2  terms of running elections, I think there's 10 or 11

3  where the board is responsible for the running of

4  elections, but there are some where it stays with the

5  Secretary of State, but there's also a board there.

6          And the division of duties are -- you know,

7  you have to look at them, you know.  I mean, I had to

8  learn about what the role of the Georgia Board of

9  Elections was, you know, for the state by looking at

10  the statutes and the meetings and the minutes and

11  things.

12      Q.    Do you know if there are standard training

13  materials for persons who go on those kinds of boards?

14      A.    I don't know.  I can -- I only know what I

15  thought was important to make sure that our board

16  members knew and tried to refine that, and we would

17  usually get a new board member every year.  And I will

18  say I did not do that when it was the State Elections

19  Board.  It's a practice that I learned was beneficial.

20  And, as I stated, members of the State Elections Board

21  often came from similar backgrounds to what you

22  described for your board.  In other words, they weren't

23  former judges, although one was married to a judge.

24      Q.    One of ours was a judge, but I get the

25  point.  All right.  Let's talk about the part of your

1    report -- I've got it on page, starting on using your
2    report, number 16 to 17 which talks about the focus on
3    the voter approach.
4        A.    Yes.
5        Q.    Is the focus on the voter approach, is that
6    something that kind of is -- you've coined that phrase,
7    or is that something that I would find in national
8    literature on election training?
9        A.    I would expect that you would see that in
10   literature on election training.  I would expect you
11   would see that in some of the Election Center training
12   programs.  But, you know, whether they use the same
13   phrase or not, I think anyone who's worked in
14   elections, it's not an unknown quantity.  The bottom
15   line is you're doing this for the voter as well as for
16   the institution of the process, and you're trying to
17   make this system work.
18           I mean, it's one of the incredible
19   privileges that a handful of state and local election
20   officials get to have that direct responsibility as
21   opposed to just processing a license application, not
22   to diminish the importance of that.  But it can be very
23   inspirational to recognize you, in the words of what
24   were in some of the Georgia materials, are holding a
25   very important responsibility in your hands for someone

1    else that you want to facilitate and protect.

2         Q.    Can you identify for me states that have

3    effectively adopted the focus on the voter approach?

4         A.    I have not looked at, you know, a wealth of

5    training materials particularly in other states.  As I

6    said, from my 40 years of experience, the takeaway that

7    I come from is if you're going to be successful in

8    training your election officials at all levels that an

9    important element is that you get to the bottom line,

10   which is the voter and protecting the rights of that

11   voter to cast a ballot that they're entitled to cast.

12        Q.    Okay.  Would you agree with me, though, if a

13   state is complying with election laws, that voters'

14   rights are being protected?

15        A.    Assuming that the state's laws are

16   consistent with that.  I mean, I think nowadays they

17   are, but they weren't always.  Our laws are constantly

18   challenged on that basis.  I mean, the One Wisconsin

19   Now case was a challenge to changes in Wisconsin law

20   arguing that they were not protecting voter rights in

21   certain situations.

22        Q.    Fair.  Let me ask it this way.  If somebody

23   is complying with federal election law, then at least

24   the rights articulated in those statutes are being

25   protected.

1       A.      What, you know, my opinion is is that you
2    don't just say follow the law.  You give equal -- you
3    provide some leadership.  You give them a reason why
4    that's the case, because people don't always follow the
5    law.  And there are consequences when you don't follow
6    the law, and understanding what those consequences are
7    is important.  That's, you know, what I was
8    identifying -- what I identify in my opinion was that
9    that's an important element to ensure that you are
10   protecting those rights by providing that.  You're
11   doing this for the voter, and here's why we're doing
12   it.
13       Q.      Right.  But at the end of the day, for
14   whatever reason they're doing it -- they could be doing
15   it just because they like law and want to enforce law.
16   As long as the law is being complied with, then there's
17   not a diminution of that voter's rights articulated in
18   that law; is that correct?
19       A.      That's correct.  The idea -- the idea of the
20   training is simply to reinforce that it's done.
21       Q.      And I think I've asked this before, but you
22   would agree with me that at least kind of coming into
23   the polling place most poll workers want to comply with
24   the law.
25       A.      Yes.  But they have to know what it is and

1   understand it and know what the --

2        Q.    Sure.

3        A.    -- consequences are.

4        Q.    All right.  Let's see.  I'm on page 16 of

5   your report, page 17 of Document 167.

6             MR. BELINFANTE:  I notice we've been going

7        for about an hour and 40 minutes.  Does anybody

8        want to take a brief break?

9             MS. TANIS:  I'll leave that up to Kevin and

10       the court reporter.

11            THE WITNESS:  I'm fine at the moment.  I

12       don't know when you're going to come to another

13       breaking point, but I'm fine for now.

14            (Thereupon, an off-the-record discussion was

15       held between the parties.)

16  BY MR. BELINFANTE:

17       Q.    Under the "Focus on the Voter," it looks

18  like the third paragraph says that "This must be

19  reflected in an emphasis on making voting easy,

20  accessible, and transparent.  This requires not

21  only" -- excuse me.  "This requires a focus not only on

22  accessibility for persons with disabilities, but

23  selecting locations and setting hours that enable

24  voters to easily get to the voting location."  Do you

25  see that?

1     A.    Yes.

2     Q.    Selecting locations and setting hours, is

3  that an issue of training, or is that something else?

4     A.    Well, that's training for your county

5  officials.  My understanding is they have some

6  flexibility in the locations of their polling places,

7  the hours that advanced voting is available, and these

8  are considerations that need to be reinforced.  It was

9  a subject in the One Wisconsin Now lawsuit, and it's

10  certainly something that election officials have to

11  take into consideration.

12     Q.    What are the voting hours in Wisconsin, or

13  do they truly vary by jurisdiction?

14     A.    Well, they used to vary by jurisdiction.

15  They are now standard.  On election day they are from

16  7:00 in the morning until 8:00 at night.  In terms of

17  what we call early in-person absentee voting, which you

18  would refer to as advanced voting, that was a subject

19  in the lawsuit that we were talking about, One

20  Wisconsin Now.  But municipalities have a lot of

21  flexibility.  It used to be restricted to one location,

22  but they had almost no restriction on hours.  The

23  legislature scaled that back considerably.  And --

24     Q.    Is it -- go ahead.  I'm sorry.  I thought

25  you were done.

1      A.    I was just going to say and the lawsuit
2    addressed some of that scaling back.
3      Q.    All right.  Does your report -- I didn't see
4    it, so I'll just ask.  Does your report provide an
5    opinion on whether the selection of polling locations
6    and setting of hours in Georgia is sufficient?
7      A.    My report -- I mean, what I read in the
8    materials about both closing polling places and
9    expanding polling places and accessibility to polling
10   places informed my opinion about training but not about
11   whether or not -- what's going on with advanced voting
12   locations and polling places.  So no specific opinion.
13   It just reinforced or gave me factors to consider in
14   talking about the training.
15     Q.    Okay.  You have not read the depositions of
16   the plaintiffs' experts that you -- right?  You've just
17   read their reports?
18     A.    Just the reports, that's right.
19     Q.    Okay.  You say in the next paragraph that "A
20   voter-centric focus will also mitigate the impact of
21   discrimination in the voting process directed towards
22   persons of color."  Do you see that?
23     A.    I see that.
24     Q.    Does that sentence presume that there is
25   discrimination in the voting process directed towards

1    persons of color?

2        A.    That sentence presumes that there can be and

3    that by focusing specifically on the voter and the

4    voter rights, you act in a colorblind or color neutral

5    manner.

6        Q.    All right.  And your report does not opine

7    that there is discrimination against persons of color

8    in voting in Georgia, does it?

9        A.    My report is informed by the past history of

10   voting practices in Georgia, the concerns that have

11   been raised in media reports over the years, and the

12   concerns raised in the lawsuit, but it does not

13   specifically have an opinion as to whether or not that

14   is the case.  It's really directed at that by making

15   sure that the training programs are voter-centric,

16   transparent, that you're going to avoid and you're

17   going to protect against having those kind of

18   discriminatory impacts.

19       Q.    In the next paragraph after the one we just

20   talked about, you discuss absentee voting and

21   provisional ballots.  Is it your contention that --

22   well, strike that.  I think we've covered that area.

23   What would you say based on what you've seen is the

24   foundation for conducting elections in Georgia?

25       A.    I'm sorry.  What do you mean the foundation

1    for conducting elections?

2        Q.    I'm looking on page 17 of your report, page

3    18 of the court's document.  The second paragraph ends

4    with "This training approach would send a message to

5    everyone involved in the electoral process, from poll

6    workers to county election officials to voters to

7    candidates, that enabling full participation by all

8    voters is the foundation for conducting Georgia

9    elections."  So my question is what do you believe is

10   the foundation for conducting Georgia elections?

11       A.    You mean as opposed to serving the voter?

12       Q.    No.  I mean, I couldn't tell from that

13   paragraph if you were implying that Georgia elections

14   had a different foundation.

15       A.    No, no, I was not -- I was saying that that

16   should be the foundation of any electoral system is

17   facilitating participation by the voters, protecting

18   their rights.  And I wasn't suggesting that that

19   wouldn't be the foundation, but to ensure that people

20   who participate in the process understand that.  That's

21   what my recommendations are going toward.

22       Q.    I gotcha.  Okay.  All right.  Let's look at

23   the same page, the second full paragraph under the

24   underlined "Mandatory Uniform Training Protocol for

25   Poll Workers."  The last sentence of that paragraph

1   says, "A mandatory state-directed uniform training

2   program for poll workers is the best way to ensure the

3   citizen's right to vote is protected and eligible

4   citizens are able to cast a vote and have that vote

5   counted."  Do you see that?

6       A.    I do.

7       Q.    So if the state were to adopt your opinion

8   here, it would prohibit counties from creating their

9   own training programs, wouldn't it?

10      A.    Not necessarily.  I think you set a bottom

11  line with your mandatory program.  And I think there's

12  a recognition that training is not a static thing, that

13  new information is important, new techniques are

14  important.  But it should be the Secretary of State's

15  office or the chief election officer's office that is

16  leading that to make sure that the essentials are being

17  taken care of on that and that leaving it just to local

18  officials to make up on their own is not going to

19  ensure that things are done in a uniform manner, that

20  all voters have the same opportunities because their

21  poll workers have gotten the same basic information.

22          But I don't think it restricts counties from

23  adapting that program.  Certainly how our materials are

24  presented in Wisconsin and I would think in other

25  places is not going to be exactly the same, but you

1    want to make sure that the fundamentals are there.  I

2    mean, we adopted a rule that for training poll workers

3    that laid out the kind of things that had to be

4    covered, but we didn't say in order to cover it you

5    need to get these elements done or that you had to do

6    it in a particular way.

7             So I don't think that this hamstrings the

8    counties or puts them at risk if they are enhancing the

9    program.  I think it's if they're ignoring the program

10   or if they don't have that direction that the whole --

11   all of the -- you know, the chief election officer and

12   the voters are the ones that become at risk.

13       Q.    That's ultimately a policy decision, isn't

14   it, in terms of who provides the training, counties or

15   state?

16       A.    It's a policy decision as to who does it,

17   but the impact of the failures are going to rest, you

18   know, on the chief election officer if those failures

19   impact voters' rights, as well as they're going to fall

20   on the voters and the people who failed to comply.  But

21   that's why the responsibility I think ends up resting

22   with the chief election officer.

23       Q.    Is it your opinion, though, that counties

24   cannot effectively train poll workers and their own

25   officials in a way that avoids depriving persons of

1  their rights to vote?

2        A.    I think they're capable of doing that, yes.

3  I think they probably do it in many cases.  But if you

4  want to ensure that it's being done, I think you need

5  to have some mandatory elements to the program that

6  ensure uniformity.

7        Q.    So really what we're -- I'm sorry.  I

8  thought you were done.  Go ahead.

9        A.    I was just going to say, you know, the

10  quotes come from the statute.  You know, the citizen's

11  right to vote is protected, citizens are able to cast a

12  vote and have that vote counted, those are standards

13  that are set in Georgia law.

14        Q.    Agreed.  But it's also in Georgia law that

15  counties train the poll workers, and so my question is

16  do you think that Georgia law creates an impossibility

17  where counties are responsible for training poll

18  workers and that there's still to be uniformity across

19  the state?

20        A.    No, I don't think that --

21              MS. TANIS:  Object to the form.

22        A.    All right.  As I said, I don't think those

23  are incompatible.

24  BY MR. BELINFANTE:

25        Q.    And when you came to the conclusion that a

1    state mandated -- or, excuse me, a mandatory

2    state-directed uniform training program is the best

3    way, are there case studies you relied on for that?

4         A.    No, there were not case studies.  It's,

5    again, based on my experience that if there is not

6    leadership at the state level, you're not going to get

7    uniformity, you're not going to get compliance.  You're

8    going to have instances of people being deprived of

9    their right to participate in the process.

10        Q.    Looking further down the page, you say in

11   the last full paragraph, "Although the manual contains

12   helpful information, it is far from comprehensive and

13   contains large chunks of statutory language that are

14   difficult to understand.  It also takes an

15   inappropriately passive approach to issuing provisional

16   ballots, which appears from my review of complaints in

17   the 2018 general election to be a significant source of

18   inconsistent practices."  What did you mean by passive

19   approach to issuing provisional ballots?

20        A.    Further on in my report there are examples

21   of the language that's in that manual that suggests

22   that you may do something, you might do this, if the

23   voter asks you may do it.  That to me when I read that,

24   I'm like wait a minute.  Provisional ballots, you need

25   to be much more specific about when and how you do

1    this, not, oh -- that was my conclusion from looking at

2    those materials.  There's an awful lot of permissive

3    language in there, and it's cited later on in the

4    report.

5          Q.    Are there states that you would have Georgia

6    look to that does a better job of training in a more --

7    or, excuse me, in a less passive approach?

8          A.    Well, that's a language choice in this case.

9    I mean, I think from my experience with the provisional

10   ballot training we do, we are very clear what the

11   conditions are that you can do it, what the conditions

12   are that you can't do it.  Provisional voting varies

13   across states.  There are different rules to that, and

14   it can be very confusing.

15                I mean, I mention in my report a couple of

16   times that from my experience provisional voting and

17   absentee voting seem to be the biggest challenges for

18   local election officials, whether they're at the

19   administrative level, municipal or county, or at the

20   polling place level.  And that's why they require

21   focus.

22                It appears here -- I'm looking at what was

23   the state election training for poll workers, and one

24   of its failings to me was that the language choices are

25   very passive about the issuance of provisional ballots.

1    The whole manual has challenges because it's not very

2    comprehensive.  It doesn't flow easily.  It's

3    interruptive of the statutory language.  It has a

4    number of good elements, but it's not a very well

5    organized or complete training document.

6        Q.    Okay.  In your experience, are most poll

7    workers pretty reliable voters in the sense that they

8    vote frequently?

9        A.    I honestly don't know.  It makes sense to me

10   that poll workers probably do vote frequently.  I know

11   that in Wisconsin we've had to address concerns -- this

12   was before absentee voting became more prevalent --

13   that poll workers who were assigned to a location other

14   than where they could cast their ballots had the

15   opportunity to vote by absentee.  So I think my sense

16   is if you're working at a polling place, you're

17   probably going to be a fairly active voter, at least on

18   the days that you're voting -- that you're working.

19       Q.    Okay.  You write on page 20 at the top, top

20   of the page number 19 of your report, that "It is

21   important for poll workers to be presented with a

22   voter's perspective."  And so my question is what

23   exactly would that look like even in training

24   materials?

25       A.    Well, in a TTX training scenario, what we

1    call a tabletop exercise, poll workers would be

2    presented with a situation such as a voter comes in to

3    a polling place, and you describe their confusion or

4    you describe what their issue is.  Then you ask the

5    poll worker how would you handle this or what should

6    you do in this situation.  But by putting it into a

7    scenario where you're describing the voter situation,

8    you've given them that perspective on that, and that's

9    what they're going to actually encounter on election

10   day.

11        Q.   And is it your opinion that by failing --

12   presuming that that's not done, is it your opinion that

13   not doing so causes constitutional violations in an

14   election?

15        A.   It's my opinion that by putting these kind

16   of scenarios in you are going to reduce or eliminate

17   the possibility that poll workers don't know how to

18   handle the situation where someone's vote wouldn't be

19   counted that should have been counted.

20        Q.   And the same is true -- is it your opinion

21   that by telling poll workers that people's votes count

22   and people's votes matter that they're less likely to

23   engage in conduct that violates someone's

24   constitutional or statutory rights?

25        A.   Yes.

 1      Q.    Page 19 of your report, the I guess third
 2   paragraph, it starts with the sentence "Provisional
 3   voting is a complex procedure with many different
 4   scenarios."  Do you see that?
 5      A.    Yes.
 6      Q.    And the decision on whether to use a
 7   provisional ballot is one that requires human
 8   interaction in just about every state; isn't that
 9   right?
10      A.    Yes.
11      Q.    And so there's always the possibility of
12   human error when dealing with provisional ballots; is
13   that fair?
14      A.    That's right, which is why you want to be
15   very focused in your training on that and very clear.
16      Q.    What did you mean then in the next sentence
17   where you say that the manual on provisional ballots is
18   overly simplified?
19      A.    My reading of the manual was that it did not
20   provide a robust picture of the opportunities for
21   provisional voting.  I don't think that a poll worker
22   coming from that gets the full impression of how to
23   deal with issuing, recording provisional ballots.
24      Q.    Have you heard the phrase in Georgia "when
25   in doubt, hand it out"?

1        A.    Yes, I have.

2        Q.    Is it your opinion that the default rule in

3   Georgia is to hand out a paper -- or, excuse me, a

4   provisional ballot?

5        A.    That seems to be what Chris Harvey says

6   should be the case.

7        Q.    And do you have reason to believe that it is

8   not the case?

9        A.    I'm looking at, you know, the complaints

10  that came in.  It seemed like there were a large number

11  of instances where people didn't get a provisional

12  ballot.  I'm not sure whether or not they were entitled

13  to it, but it certainly generated concerns that they

14  were willing to reach out to the Secretary of State's

15  office and say, "I don't know why I didn't get a

16  provisional ballot," or other people were deserving and

17  someone was not getting offered that opportunity.

18       Q.    In your experience, have you seen similar

19  complaints in other states?

20       A.    I've read media accounts that suggest that,

21  yes.  I've dealt with election observers who come from

22  other states to Wisconsin who put a strong emphasis on

23  that and often have to remind them.  In our training

24  with poll workers, we talk about the fact that they

25  need to look at our resources when it comes to how you

1   process a provisional ballot because you can't -- as I

2   said, the requirements and the provisions are different

3   in different states.

4        Q.   Okay.  Have you ever gone and observed an

5   election in another state?

6        A.   I'm reasonably sure I have.  I'm just trying

7   to think of the actual experiences of that.  I have

8   observed elections in South Korea.  For some reason I

9   can't -- I want to say yes, but I just can't give you

10  an example.

11       Q.   Okay.  That's fair.  And let me ask you

12  another question on this overly simplified.  And I'm

13  not -- I'm truly not trying to be argumentative, and

14  forgive me for asking a similar question frequently,

15  but is there a model kind of training?  I mean -- and

16  I'm thinking almost like the equivalent of a, you know,

17  model penal code that we learned in law school or the

18  UCC or something that somebody could turn to for

19  guidance on best practices as it relates to training on

20  provisional ballots.

21       A.   I'm not aware that there is.  I mean, I know

22  that in the gatherings with the National Association of

23  State Election Directors people would provide examples

24  of how they train on provisional ballots.  I know that

25  there's a course on provisional voting -- I'm not sure

 1    if it's specifically provisional voting but where
 2    provisional voting is a key element at the Election
 3    Center.  Again, I think a lot of times what you're
 4    looking at with provisional ballots or any other
 5    election-day practice is how can you provide that
 6    information to poll workers and election administrators
 7    and voters in a method that is going to ensure that
 8    provisional ballots are issued appropriately.
 9        Q.    I'm looking at page -- same page, sorry,
10    page 19 at the bottom of the page, page 20 at the top.
11    When you talk about the voter identification documents,
12    you write -- and this is the fourth full paragraph,
13    "Interestingly, there is only one person of color
14    depicted in the 12 examples of acceptable
15    identification."  Do you see that?
16        A.    Yes.
17        Q.    How does that really impact training?
18        A.    It provides the poll workers with an
19    exposure to the voters that are going to come into the
20    polling place.  I know that when we developed our voter
21    identification training program, we were very focused
22    on making sure that the depictions of acceptable forms
23    of identification showed a diverse group of individuals
24    by age, gender, and race.
25        Q.    But, I mean, is it then the opinion -- or

1    the conclusion to draw from that that Georgia poll

2    workers don't know what people of different races look

3    like?

4         A.    No.   I'm just saying that -- what I'm saying

5    is that it goes to reinforcing to the poll workers

6    you're dealing with a diverse population.   It's not a

7    judgment on what they think.   It's a question of how

8    can you make your training materials more effective and

9    create an atmosphere that doesn't suggest that only

10   certain people are entitled to vote or only certain

11   people are going to show up to vote.

12        Q.    So it's your opinion that by not including a

13   more diverse group that the state is implying that

14   people of color are not going to show up to vote or

15   shouldn't be able to show up to vote?

16        A.    That's not my opinion, but I think you can

17   draw an inference about the sensitivity to the training

18   program, to the training protocols when you look at how

19   materials are presented.

20        Q.    Do you believe that Georgia State election

21   officials are communicating to local officials that

22   persons of color are not coming to the polls?

23        A.    I don't think that's the case, no.

24        Q.    Do you think that state election officials

25   are communicating implicitly or explicitly to

1    poll workers that persons of color should not be able

2    to vote?

3         A.    That they are?  No.

4         Q.    Same page, next paragraph, the last sentence

5    says, "A model state-directed training initiative for

6    poll workers must provide participants in the electoral

7    process with confidence that poll workers know their

8    responsibilities, will help not hinder voter

9    participation, and are mindful of the integrity and

10   importance of the vote of each citizen."  Was there a

11   particular model that you had in mind when writing

12   that?

13        A.    No.  I think -- I mean, obviously the

14   language I'm drawing from is from my experience.

15   That's what animates the training programs that I was

16   responsible for overseeing.  I think the use of the

17   term model is -- I think this is a way of communicating

18   this is an essential element when someone is evaluating

19   their training program that they can see that this is a

20   focus because it's going to -- I think it moves the

21   training to ensuring that voters' rights are protected.

22        Q.    All right.  Are your criticisms of the poll

23   worker manual all contained in this report?

24        A.    I don't think I was quite as harsh in the

25   report as I just was earlier.

1     Q.    I guess let me ask it this way.  Go ahead.
2     A.    I was just going to say I think I was more
3  blunt in my assessment of the quality of that manual.
4  When you asked me the question, I made some comments
5  about its deficiencies and its disorganization.
6          MS. TANIS:  Josh, I also want to point out
7       that Kevin said in the report that he was basing
8       it on the 2018 poll workers manual because he
9       didn't have the other manuals available to him at
10      that point.  I'm kind of assuming your question is
11      geared to the 2018 manual but wanted to clarify
12      that.
13         MR. BELINFANTE:  Yeah, my questions are all
14      geared to the report, which does indicate that
15      it's based on the 2018 manual.
16  BY MR. BELINFANTE:
17     Q.    All right.  Actually, my next stuff we've
18  already covered.  On page 21 of the court's pagination,
19  page 20 of your report, the third paragraph from the
20  bottom begins with Chris Harvey.  There's a sentence
21  about two-thirds of the way down that says, and it's
22  talking about the State Election Board, "In addition,
23  there appears to be a long lag time between the date of
24  a meeting and when the minutes and transcripts are
25  posted online."  What is the significance of that lag

1    time?  How does that impact the training of election

2    officials in Georgia?

3        A.    Chris Harvey said repeatedly in his

4    deposition that county election officials in particular

5    pay attention to what's going on at the State Elections

6    Board so that they learn from this, that they don't

7    make mistakes.  And if there is a lag time between when

8    the meeting is and when the results of that meeting

9    show up, it's pretty hard -- you know, that just the

10    lapse of time period, the disconnect from any kind of

11    learning process to the extent that that exists.

12        Q.    Were the meetings of the GAB transcribed?

13        A.    Well, they were videotaped, almost all of

14    them were.

15        Q.    Okay.  And then the video was put online?

16        A.    The video was put online.  So in one sense

17    the board's actions were -- I mean, you know, we got a

18    lot of press coverage at our meetings, so the key

19    issues we're going to get coverage.  We might end up

20    issuing a press release depending on the nature of a

21    decision that came out related to election

22    administration, but we linked to Wisconsin Eye video on

23    our website.

24            Minutes obviously didn't get approved until

25    the next meeting.  But, again, our meetings were fairly

1   regular.  We had meetings laid out over a two-year

2   period.  One of the things we would do in the summer of

3   an odd-numbered year was present to the board here's a

4   set of proposed meeting schedules so that they would

5   have it on their calendar.  Obviously there were times

6   when we had to have special meetings or adjust a

7   meeting time if something came up, but our calendar was

8   pretty well set for two years on that end.  You know,

9   the election cycle pretty much dictated when we were

10  going to have it so we would be responsive to election

11  issues.

12       Q.    All right.  You talk about an example -- and

13  I probably should but don't know which one it's

14  referring to.  It's in the next paragraph at the last

15  line.  "If there is a more egregious case, it seems

16  that the election official has already left government

17  service."  Do you recall which case that was or cases?

18       A.    I don't remember the specifics of the cases.

19  You know, when I'm reading these materials, I'm just

20  trying to -- I wasn't taking detailed notes about, you

21  know, which county, what the name of the official was.

22  I was trying to get a sense of how were these handled,

23  what are we learning from this.  And it struck me that

24  if you had a county official who really wasn't doing

25  the job and had been identified as such in the report,

1   they were no longer there by the time the board took

2   action.

3       Q.    And --

4       A.    But I can't --

5       Q.    Okay.

6       A.    -- name one, but I remember there were a

7   handful of them, two, three, four.

8       Q.    And do you recall if that -- I mean, if the

9   county official was no longer in office as a

10  consequence of what you describe as egregious conduct?

11      A.    My sense was that's why they were no longer

12  there.  I think the county was being proactive in

13  getting rid of them.  I mean, the county, as I

14  understand it, still had some consequences.  They may

15  have -- they may have been fined.  They certainly were

16  given negative publicity.  I don't know if they did a

17  letter of instruction, you know, a direct letter of

18  instruction to an oversight body about don't hire

19  someone like this again, but --

20      Q.    And so, I mean, in some ways isn't that

21  evidence that the process is working, that if there's a

22  truly egregious violation the county is taking care of

23  it itself?

24      A.    In most cases it tells you that the process

25  is working.  I mean, I think what I was describing were

1    situations that seemed to be repeating themselves over

2    and over, whether it's the quality of the voter

3    registration data, which was reinforced by a couple of

4    other experts as I mentioned, whether it's the problems

5    that were being associated.

6              But, I mean, a lot of times the problems

7    that began that were egregious might not have been

8    specific to -- may have more to do with did they make

9    their absentee ballots available in a timely manner,

10    did they accurately report the numbers from the

11    election or even timely report the numbers from the

12    election, were they available when they were supposed

13    to be to issue ballots.  Both seemed to me to be bigger

14    performance issues that an administrator needs to be

15    aware of.  Again, I don't know those are the cases, but

16    I'm --

17        Q.    Okay.  Going to the next page, you talk

18    about intake of complaints.  That's on -- it starts on

19    page 20 of your report and holds over onto 21, page 21

20    and 22 of the court document.  Is there a kind of gold

21    standard for how states are to intake complaints about

22    elections?

23        A.    Well, I can point to our practice that every

24    complaint was logged in and assigned a number.  And

25    that has been my experience with a lot of other law

1  enforcement agencies in terms of dealing with those

2  complaints that -- so that we could track the

3  disposition of them.  We had a database available.  I

4  think you get different levels of complaints if there

5  was any distinction -- or at least a clear distinction

6  between them.

7        I mean, Chris Harvey says in his complaint

8  that his staff knew to give him the complaint.  The

9  staff of the commission -- or the Secretary of State's

10 office directed complaints to him, and later on I guess

11 Kevin Rayburn was involved as well.  I think his role

12 was as deputy director as well as having the legal

13 responsibility, from what I read.  His later deposition

14 talks about sharing the handling of complaints with

15 Mr. Rayburn.

16       But the gold standard I think is how do you

17 know how many complaints you've got, how do you keep

18 track of what's going on, what are they about, how were

19 they disposed.

20    Q.    Did you understand Mr. Harvey to say that at

21 any given time Georgia is not aware of how many

22 complaints have been received in the office?

23    A.    He never gave any indication that he had a

24 sense of how many complaints were received.  There was

25 no reference to any kind of tracking mechanism or

1    follow-up other than, you know, the referrals that went

2    out to investigators or what the standards were for

3    making those referrals.

4         Q.    Well, if the standard is that all of them go

5    to the investigators, wouldn't that be a standard?

6         A.    It would be, but I'm pretty sure that they

7    don't given a lot of the complaints, as he pointed out

8    and as I observed, wouldn't be things you'd

9    investigate.  I mean, whether Secretary Kemp should

10   have been in charge of elections while he was running

11   for governor was not a complaint that they were going

12   to, you know, respond to that, or whether that

13   Challenger Abrams should have continued her

14   post-election activities.  There were a lot of

15   complaints in those areas that clearly -- I'm making an

16   assumption here -- didn't get referred to the

17   investigators to follow up because they were not

18   actionable under the elections code.

19        Q.    Sure.  Okay.  I think you answered that.

20   Well, what I guess would be your opinion that they

21   should do with complaints that come in like that that

22   are not actionable under the election code?  And I'll

23   give you one just as a clear and easy one.  Let's say

24   somebody does a campaign finance violation and files it

25   with the Secretary of State's office as opposed to in

1  Georgia we have our -- it's called something else, but

2  everyone refers to it as the State Ethics Commission,

3  it's old name, so there's literally just no

4  jurisdiction at the Secretary of State's office.  What

5  is your -- go ahead.

6      A.    I was just going to make an aside that I

7  remember the old name and some of the people who worked

8  there at different times from my campaign finance days

9  and their participation in the council and ethics laws.

10 But that's not responsive to your question.  To your

11 question --

12     Q.    Yeah, go ahead.  Yeah, go ahead.

13     A.    I mean, to your question, I mean, I think

14 there's a couple of different ways of taking care of

15 that.  But I mean -- and I think it's important in

16 doing this in any setting where you're dealing with

17 complaints is, you know, categorizing the ones that

18 aren't actionable.  I mean, how much detail you need to

19 put into them is different.

20         But, you know, if you don't have the

21 jurisdiction as to campaign finance, that's all you

22 have to put in.  You probably don't have to assign a

23 number to it.  You don't have to worry about followup

24 tracking, other than maybe saying the person was

25 referred to the appropriate agency on that or -- I

```
 1    mean, again, I can tell you we got a whole series of
 2    complaints that we categorized because they were
 3    generated by like an internet-generated complaint.
 4    People would be getting an email, you know, complain to
 5    the Government Accountable Board about somebody's
 6    ballot access issue here.  You know, they tended to be
 7    about presidential issues, but they tended to be about
 8    whether or not we should put someone on the ballot,
 9    even though they clearly didn't qualify or whatever.
10    But, I mean, I think you're familiar with how those
11    things pop up.
12              I mean, I can think of an instance where it
13    may not have been about that but where we had like
14    three or four boxes of these complaints.  And, you
15    know, we made a record how many did we get from the
16    fact that we didn't even bother to respond to them
17    because we couldn't justify the effort.  And it was
18    clearly, you know, a targeted mailing that was being
19    generated through, you know, some internet driven
20    protocol.
21        Q.    And I guess my question is did that specific
22    criticism, the fact that some complaints may or may not
23    be logged, speak to training?
24        A.    It does because what I -- you know, we
25    talked about complaints are a metric, and I think in my
```

1    report I talk about how complaints help you focus on,

2    you know, the failures of your training, the failures

3    in your performance that you want to rectify.  I mean,

4    it's an important metric, and so you want to make sure

5    that you can document that.

6            I think you want to treat it just like the

7    training to the extent that the law permits.  You want

8    to be able to say nobody -- we're not having these

9    issues.  I mean, I anticipated you asking me a number

10   of questions about comparisons between Wisconsin and

11   Georgia, and my response has been those issues did not

12   surface in Wisconsin.  We had others.

13           But the reason why you -- I mean, from what

14   I gleaned from looking at the depositions and the

15   minutes and the complaints were that there wasn't a

16   clear tracking mechanism on the complaints or

17   categorization method or any kind of action that

18   converted that into training, whereas from my

19   experience when we had some complaints, not only did we

20   take action and incorporate it in our training, we let

21   the general public know that that's what we were doing.

22           And I think that's one of the reasons why

23   from my experience Wisconsin had a high confidence

24   rating by participants in the process, whether it's the

25   candidate or the voters.  We had a UW Madison survey

1    where they looked at that through a couple of

2    elections, and that was important in Wisconsin during

3    some of the more tumultuous periods of time that we

4    had.

5          Q.    When were those surveys conducted?

6          A.    They were conducted like 2012, 2016.  I

7    think Ken Mayer actually refers to one of them in his

8    deposition.  He was part of the UW -- by UW I mean

9    University of Wisconsin -- Madison political science

10   team that we had and that we brought in for the

11   conducting of those surveys.

12         Q.    So was that before the issue with the

13   supreme court justice election?

14         A.    It was probably after.

15         Q.    After?  Okay.  Have you had candidates

16   running for office in Wisconsin who have made a

17   campaign issue out of election administration and

18   attacking another candidate for election

19   administration?

20         A.    Not to the extent that I've seen in other

21   places because the chief election officer is -- you

22   know, was me, and my accountability was not at the

23   ballot box.  It was in the hands of a citizen board so

24   that I was auditioning for my job every day as opposed

25   to just on election day.  And so, I mean, I'm aware

1   that in other states that's not an unusual practice.

2   But, you know, we would have candidates for secretary

3   of state who wanted to take back election

4   administration from the citizen board.  And that would

5   be the last one.  They generally couldn't articulate

6   that there was a problem with that.  None of them won

7   election.  Our current Secretary of State, who was

8   Secretary -- has been Secretary of State since just

9   after the election board was created, never had any

10  responsibility with elections, but he would be the one

11  to challenge on that.

12      Q.    All right.  One of the things you talk about

13  on page 21 of your report, page 22 of the court's, is

14  post-election audit of polling places throughout the

15  state.

16      A.    Yes.

17      Q.    What kind of audit --

18      A.    Okay.  I'm sorry.  I spoke ahead of you.

19      Q.    I think we're headed to the same place.

20  What kind of audits were being conducted?

21      A.    What I'm saying is an accountability tool,

22  an assessment tool, a performance audit.  In election

23  administration, there are performance audits of any

24  number of aspects of administration, you know, looking

25  at how do you process complaints.  But there's also

1    post-election audits of election results because, you

2    know, it's a whole different area and it's something

3    that we talked about in the National Academy of

4    Sciences report.  And it's often talked about as an

5    accountability tool for the validity of election

6    results.

7              Here I'm talking about the performance

8    audits, and other states have done this.  Washington

9    State is a good example of this.  I wanted Wisconsin to

10   do it, but I was looking -- I tried to convince the

11   legislature to adopt that as a policy.  But basically

12   it would involve going in after the election to review

13   the paperwork, review complaints, evaluate how good of

14   a job was done in administering elections in different

15   categories.  And in this case I'm talking about how did

16   you run an election on election day, although you could

17   also focus on advanced voting as well.

18        Q.    What was the -- while you were there, what

19   was the budget of the GAB?

20        A.    You know, I'm not quite sure.  I would be

21   speculating on it.  I mean, I can tell you to put it in

22   the perspective that until the Help America Vote Act

23   and prior to 2000, my peak number of employees for

24   elections and campaign finance was 14, including

25   myself.  More likely it was closer to 11 individuals.

1    And that's going to be one of your big driving aspects

2    of this.  You know, the current election commission,

3    the last count that I saw, and it's based on looking at

4    contact information in my poll worker manual, was 25

5    individuals.  And that's not too different from --

6    maybe down a little bit from when I was there for the

7    election division.

8              But because we had two different divisions,

9    our legal staff and administrative staff were really

10   supporting both divisions, which included the campaign

11   finance, ethics, and lobbying functions as well,

12   although that division itself had I think six or seven

13   employees out of the full complement of 40-plus

14   employees.

15        Q.    All right.

16        A.    I'd like to point out --

17        Q.    Go ahead.

18        A.    I'd like to point out that it's 3:45, so

19   we've been going at this for two and a half hours.

20        Q.    Yeah.  I was just about to say if y'all give

21   me about ten minutes, I can probably wrap this up.

22        A.    Well, even if you want ten minutes, can I

23   get two minutes before you do that?

24        Q.    Sure.

25        A.    I would be more comfortable answering the

1  questions in the next ten minutes if we take a

2  two-minute break.

3      Q.    No, no, no.  I'm saying let's take a break.

4  I need to go through some stuff, and it'll take me

5  about ten minutes.

6      A.    Okay.

7      Q.    And what I'm saying is I might be done.

8      A.    Okay.  All right.

9      Q.    So if you want to take a ten-minute break,

10 that would be great.

11     A.    All right.  So we'll get back together at

12 five minutes to 5:00 your time?

13     Q.    Sure.

14     A.    Okay.

15         MS. TANIS:  Okay.

16         (Whereupon, there was a brief recess.)

17 BY MR. BELINFANTE:

18     Q.    Mr. Kennedy, you said that you had expected

19 me to ask some other questions about your experience in

20 Wisconsin and the issues you dealt with.  What would

21 you say were the top three issues you were dealing with

22 while the general counsel at the GAB as it relates to

23 elections?

24     A.    Well, it's hard to say because things were

25 dynamic.  Clearly the biggest challenge had to do with

1    the administration of recall elections for state

2    senators and the governor and lieutenant governor that

3    occurred in 2011 and 2012.  Administratively there was

4    the implementation of the photo ID law that began in

5    2011, along with the myriad of changes that occurred

6    between the elections laws that were the subject of the

7    lawsuit in One Wisconsin Now would probably be the --

8    you know, combine those two as far as challenges go,

9    and obviously they had a big impact.

10             You know, when you talk about that

11   implementation, there's a big education and training

12   component that goes in with that, as there was with the

13   recall, and then going back to the continued

14   implementation and compliance with the HAVA

15   requirements that had started in 2003 and continued

16   until the time I left.

17        Q.    And how did those issues come to your

18   attention?

19        A.    Well, as chief election officer, they were

20   clearly the responsibility of my agency to handle them.

21   I mean, these were -- the recall was -- you know, I

22   mean, it spawned a whole series of complaints to

23   investigate, and it forced us to mobilize our staffing

24   to deal with eventually checking recall petitions that

25   would have close to a million names of them.  But, I

1    mean, that was generated just by the political climate

2    that existed in Wisconsin and the current statutory

3    framework that said that you could hold elected

4    officials accountable through the recall process.

5              The legislative changes that I was

6    responsible for, obviously that came from the direction

7    of the legislature signing those changes into law by

8    the governor that carried with it their own

9    implementation requirements.  And the Help America Vote

10   Act was an act of Congress that I think it still

11   continues in the sense that, you know, people working

12   at the elections commission are responding to federal

13   mandates with respect to -- and with respect to

14   election security and now addressing a pandemic health

15   issue.

16             MR. BELINFANTE:  Understood.  All right,

17        Mr. Kennedy.  Beth, do you have any questions

18        you're going to ask?

19             MS. TANIS:  Not that I know of.

20             MR. BELINFANTE:  Okay.  What I'm going to do

21        right now is suspend your deposition.  The only

22        reason I'm doing that is if there is a follow-up

23        report that takes into account additional

24        evidence, I want to be able to ask you about at

25        least that new evidence and any new conclusions

1    you've reached.  So I think procedurally the

2    proper thing to do is to suspend your deposition,

3    and at this point I don't have any further

4    questions.

5          MS. TANIS:  Okay.  And, Josh, I'm a little

6    bit confused.  Are you talking about because of

7    the documents that were produced after his report?

8          MR. BELINFANTE:  Yes, yes.

9          MS. TANIS:  Okay.  Well, the judge has

10   already said that this deposition you could ask

11   about that kind of stuff, so I'm not sure why it's

12   just being suspended.

13         MR. BELINFANTE:  Because he hasn't read it.

14   And so my point is if he reads it and then issues

15   a new report or new opinion on it, then I want to

16   be able to ask him about that.

17         MS. TANIS:  Okay.  I'm sorry.  I'm still

18   confused.  What are you talking about that he

19   still hasn't read?

20         MR. BELINFANTE:  The 2020 poll manual, poll

21   worker manual.

22         MS. TANIS:  Oh, okay.

23         MR. BELINFANTE:  And the new training stuff

24   he's already talked about.  It really comes down

25   to the 2020 poll manual.

```
1              (Whereupon, a discussion was held off the
2         record.)
3              MR. BELINFANTE:  Sorry about that.
4              MS. TANIS:  Okay.  I'm not necessarily
5         agreeing with you, but I do understand what you're
6         referring to.  Thanks.
7              MR. BELINFANTE:  Okay.  All right.  Well,
8         Mr. Kennedy, let me say again thank you for your
9         flexibility.  Thank you to the court reporter for
10        doing this on the phone as well and for everyone
11        else for being flexible and working with us on the
12        documents as well.  So that's all I've got.
13             MS. TANIS:  All right.  I don't have any
14        questions.  Thank you.
15             (Deposition concluded at 4:02 p.m. CDT)
16                        -   -   -
17
18
19
20
21
22
23
24
25
```

```
 1              E R R A T A   S H E E T

 2

 3          Pursuant to Rule 30(e) of the Federal Rules of
        Civil Procedure and/or O.C.G.A. 9-11-30(e), any changes
 4      in form or substance which you desire to make to your
        deposition testimony shall be entered upon the
 5      deposition with a statement of the reasons given for
        making them.
 6
            To assist you in making any such corrections,
 7      please use the form below.  If supplemental or
        additional pages are necessary, please furnish same and
 8      attach them to this errata sheet.

 9
                             - - -
10

11          I, the undersigned, KEVIN KENNEDY, hereby
        certify under penalty of perjury that I have read the
12      foregoing deposition and that said transcript is true
        and accurate, with the exception of the following
13      changes noted below, if any:

14

15      Page_____/Line_____/Should Read:_____

16      _____

17      Reason:_____

18

19      Page_____/Line_____/Should Read:_____

20      _____

21      Reason:_____

22

23      Page_____/Line_____/Should Read:_____

24      _____

25      Reason:_____
```

**Regency-Brentano, Inc.**

198

```
1   Page_____/Line_____/Should Read:_____

2   _____

3   Reason:_____

4

5   Page_____/Line_____/Should Read:_____

6   _____

7   Reason:_____

8

9   Page_____/Line_____/Should Read:_____

10  _____

11  Reason:_____

12

13  Page_____/Line_____/Should Read:_____

14  _____

15  Reason:_____

16

17  Page_____/Line_____/Should Read:_____

18  _____

19  Reason:_____

20

21

22  Executed on:

23

24  _____        _____

25  DATE                          KEVIN KENNEDY
```

**Regency-Brentano, Inc.**

```
1                   C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    PAULDING COUNTY:

5

6              I hereby certify that the foregoing

7         transcript was taken down, as stated in the

8         caption, and the questions and answers thereto

9         were reduced to the written page under my

10        direction and that the foregoing pages 1

11        through 198 represent a true and correct

12        transcript of the evidence given.

13              I further certify that I am not of kin

14        or counsel to the parties in the case, am not

15        in the regular employ of counsel for any of

16        said parties, nor am I anywise interested in

17        the result of said case.  The witness did

18        reserve the right to read and sign the

19        transcript.

20              This, the 16th day of April 2020.

21

22

23

24        _____

25        CYNTHIA B. GATEWOOD, CCR-B-1400
```

**Regency-Brentano, Inc.**

1                              DISCLOSURE

2    STATE OF GEORGIA:
     COUNTY OF PAULDING:
3
                        Deposition of KEVIN KENNEDY
4
             Pursuant to Article 10.B of the Rules and
5    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia, I make the following
6    disclosure:

7            I am a Georgia Certified Court Reporter.  I am
     here as a representative of Regency-Brentano, Inc.
8

9            I am not disqualified for a relationship of
     interest under the provisions of O.C.G.A. §9-11-28©.
10

11           Regency-Brentano, Inc., was contacted by the
     offices of Robbins Ross Alloy Belinfante Littlefield to
12   provide court reporting services for this deposition.

13
             Regency-Brentano, Inc., will not be taking this
14   deposition under any contract that is prohibited by
     O.C.G.A. §15-14-37 (a) and (b).
15

16           Regency-Brentano, Inc., has no exclusive
     contract to provide reporting services with any party
17   to the case, any counsel in the case, or any reporter
     or reporting agency from whom a referral might have
18   been made to cover this deposition.

19
             Regency-Brentano, Inc., will charge its usual
20   and customary rates to all parties in the case, and a
     financial discount will not be given to any party to
21   this litigation.

22

23                    *Cynthia Gatewood*

24   _____
                     CYNTHIA B. GATEWOOD, CCR-B-1400
25                   Date:  April 16, 2020

**Regency-Brentano, Inc.**

Fair Fight Action v.
Raffensperger

Kevin Kennedy
March 31, 2020

**$**

**$400 (1)**
34:2

**[**

**[sic] (1)**
38:14

**A**

**a11 (3)**
60:6,7,12
**a8 (1)**
67:2
**able (20)**
9:19;41:22;65:7,24;
68:10;112:24;120:8,
10;129:6;132:16;
133:9;136:12;147:19;
165:4;167:11;176:15;
177:1;187:8;194:24;
195:16
**above (1)**
121:17
**Abrams (3)**
150:11;151:10;
184:13
**absentee (14)**
23:14;34:8;89:15;
99:7;100:2;107:25;
108:7;126:22;161:17;
163:20;169:17;
170:12,15;182:9
**absolutely (3)**
5:11;21:3;22:23
**academics (1)**
79:2
**Academies (2)**
78:20;79:1
**Academy (2)**
97:25;190:3
**acceptable (2)**
175:14,22
**acceptance (1)**
33:21
**access (17)**
10:16;40:17;49:1,5,
24;50:3,13,16,19,24;
51:3,16;89:18;
120:11;134:2;146:10;
186:6
**accessed (2)**
41:21;49:23
**Accessibility (4)**
84:11;103:1;
160:22;162:9
**accessible (4)**
33:8;50:22;113:2;
160:20
**accomplish (1)**

**88:22**
**according (2)**
124:15;133:1
**account (2)**
102:15;194:23
**Accountability (24)**
16:2;19;21:15;
27:18,21;30:1;41:17;
48:6;51:20;54:9,25;
71:16;75:3,19;90:7;
98:11;110:7,9,11,21;
111:2;188:22;189:21;
190:5
**accountable (10)**
33:16;69:22;70:25;
71:8;72:18;80:23;
81:13;82:22;186:5;
194:4
**accounts (1)**
173:20
**accumulation (1)**
86:14
**accuracy (2)**
104:25;122:9
**accurate (4)**
23:23;29:13;77:20;
126:7
**accurately (2)**
11:9;182:10
**achieve (1)**
71:14
**acknowledged (3)**
22:15;23:4;101:13
**acronym (1)**
99:14
**across (14)**
13:8;14:23;34:24;
52:17;56:9;73:4;82:3;
85:11;86:18;87:16;
129:21;145:15;
167:18;169:13
**act (46)**
28:16,19;29:9;
31:24;32:10;33:3,13,
22,25;34:3,8;38:18;
42:13;52:4,10;54:6,8;
62:19,20;63:1,2,22;
70:16,18,19,24,25;
82:17;83:1,10,22;
84:9,9,10,11;102:8,
14,25,25;103:2,12;
146:18;163:4;190:22;
194:10,10
**acted (3)**
27:12;93:17;94:17
**action (9)**
16:3;21:12,18;
35:13;40:10;147:7;
181:2;187:17,20
**actionable (3)**
184:18,22;185:18
**actions (9)**
30:18;41:19;43:8,

**17;58:23;61:20,24;**
**63:12;179:17**
**active (7)**
15:23,23;16:22;
17:4;39:16;133:19;
170:17
**actively (2)**
16:5;72:23
**activities (2)**
73:11;184:14
**activity (4)**
48:9,9;104:13;
117:14
**actor (1)**
65:2
**acts (4)**
21:25;62:2;64:4;
102:24
**actual (4)**
16:23;86:2;110:20;
174:7
**actually (24)**
15:24;24:19;31:20;
39:9;44:8;45:21;
48:12;52:6,22;63:18;
65:20;91:12;105:16;
110:20;120:20;126:5;
140:8,23;144:19;
150:21;154:17;171:9;
178:17;188:7
**adapt (1)**
93:8
**adapting (1)**
165:23
**addition (6)**
39:21;54:6;57:14;
108:8;155:25;178:22
**additional (6)**
7:17;11:5,7;13:18;
22:5;194:23
**address (7)**
93:2,7;127:23;
144:5;145:1;149:25;
170:11
**addressed (2)**
149:12;162:2
**addresses (2)**
60:6;66:14
**addressing (1)**
194:14
**adequate (1)**
67:16
**adequately (1)**
61:23
**adjust (1)**
180:6
**administer (2)**
33:15;73:24
**administered (6)**
42:5;46:12;81:1;
89:2;110:13;120:25
**administering (8)**
11:19;36:20;62:23;

**71:2;73:5,10;139:4;**
**190:14**
**administration (39)**
9:22;13:20;17:24;
18:2,16,21;21:21;
24:11;25:5,16;26:10;
30:17;33:2;36:11;
38:16;40:7;55:2;
56:18;71:7;72:24;
74:4;80:21;81:6;
93:11;106:16;119:7;
123:2,13;125:5;
140:24;143:5;154:5;
179:22;188:17,19;
189:4,23,24;193:1
**Administrative (5)**
37:11;55:19;
125:14;169:19;191:9
**Administratively (1)**
193:3
**administrator (12)**
21:17;31:7,9,14,15;
32:14;72:22,25;73:3;
90:21;97:22;182:14
**administrators (3)**
73:6;131:17;175:6
**admitted (3)**
15:8,10,12
**adopt (2)**
165:7;190:11
**adopted (3)**
32:2;158:3;166:2
**advanced (6)**
63:20;86:12;161:7,
18;162:11;190:17
**adversely (1)**
24:7
**advice (1)**
18:20
**advise (2)**
18:15;20:15
**advised (1)**
7:20
**advisory (3)**
18:7;54:2,18
**afar (1)**
93:24
**affected (1)**
140:23
**affiliated (1)**
151:10
**affirmative (3)**
76:4;112:12;131:16
**affording (1)**
148:5
**African (1)**
152:2,6;153:10
**afternoon (2)**
119:13;136:15
**Again (40)**
4:19;5:1;6:1;8:19,
24;14:24;16:22;
25:19;26:16;27:14;

**28:8;30:14;31:17;**
**40:8;42:8,18;43:5;**
**45:6,16;47:25;53:7;**
**61:16;74:19;78:8;**
**95:17;101:6,24;**
**111:22;113:9;120:4;**
**136:25;139:20;**
**143:25;168:5;175:3;**
**179:25;181:19;**
**182:15;186:1;196:8**
**against (11)**
11:18;19:9;21:14,
14;34:18;40:10;
45:14;146:19;150:15;
163:7,17
**age (4)**
95:8;137:12;
143:15;175:24
**agencies (3)**
30:10;48:2,5;183:1
**agencies' (1)**
48:14
**agency (3)**
30:12,14,16,22;
32:5;42:22;48:21,22;
49:17;75:2;76:9;
185:25;193:20
**agenda (3)**
56:22;119:14;120:5
**agendas (1)**
100:15
**agent (1)**
72:12
**aggrieved (1)**
19:8
**ago (2)**
5:24;12:11
**agree (24)**
23:17;37:13;38:22;
57:22;60:2,11;64:20;
65:18;67:14;70:5;
77:14;83:8;100:18,
20;109:8,19;110:2;
115:22;117:24;
129:10;146:5;154:23;
158:12;159:22
**agreeable (4)**
4:9,11;5:8;6:15
**Agreed (1)**
167:14
**agreeing (1)**
196:5
**agreement (1)**
4:7
**ahead (39)**
4:12;10:7,21;13:25;
14:1;20:6,13;28:25;
29:6,15;32:8;36:23;
37:1;52:12;59:15,18;
67:8;74:13;84:15;
92:25;98:13,15;
108:17;118:23;
128:16;133:12;

135:14;136:9;145:22;
150:14;152:14;
161:24;167:8;178:1;
185:5,12,12;189:18;
191:17
**allegations (5)**
26:7,16;27:14;
151:19,20
**alleged (2)**
34:23;42:6
**allowed (4)**
4:4;40:9;50:13;
92:8
**allowing (1)**
148:11
**almost (5)**
5:23;119:6;161:22;
174:16;179:13
**along (6)**
17:18;80:20;81:5;
96:7;125:10;193:5
**although (10)**
31:25;41:4;57:1;
65:12;112:14;119:18;
156:23;168:11;
190:16;191:12
**always (10)**
56:21;57:3;72:5;
89:4;136:20;142:12;
153:14;158:17;159:4;
172:11
**amended (4)**
6:2;11:13;38:19;
70:18
**America (18)**
31:24;33:2,12,22,
24;34:3;62:19;63:1,
22;82:17;83:1,9,22;
84:10;102:8;103:12;
190:22;194:9
**American (5)**
95:2,2;152:2,6;
153:10
**amicus (1)**
16:4
**among (2)**
92:1;142:18
**amount (1)**
8:15
**analysis (4)**
10:5;63:21,24;
106:9
**and/or (2)**
65:8;77:17
**animates (1)**
177:15
**annexations (1)**
36:3
**Annotated (1)**
59:13
**annual (6)**
18:9;47:23;57:3,12,
14;118:18

**answered (3)**
18:18;101:17;
184:19
**anticipated (2)**
120:20;187:9
**anymore (2)**
41:23;99:18
**appeals (1)**
27:24
**appears (6)**
23:22;37:14;49:6;
168:16;169:22;
178:23
**appellate (1)**
154:3
**Appendix (14)**
10:25;11:1,8,22;
12:5;59:1;114:10;
121:12;131:21,22,23;
132:18,21,21
**application (2)**
35:7;157:21
**applications (1)**
27:25
**applied (1)**
54:13
**apply (3)**
116:2;145:6,7
**appoint (4)**
39:12,15;75:20;
76:1
**appointed (10)**
27:20,22,23;30:24;
43:14;44:2;72:6;
75:23,25;153:19
**appointees (1)**
30:23
**appointment (2)**
28:3;48:3
**appoints (2)**
31:14,15
**approach (7)**
157:3,5;158:3;
164:4;168:15,19;
169:7
**approaches (1)**
147:1
**appropriate (3)**
38:12;90:10;185:25
**appropriately (1)**
175:8
**approved (1)**
179:24
**apt (1)**
41:5
**archives (1)**
120:17
**area (8)**
34:13;89:9,10;
99:22;101:10;133:25;
163:22;190:2
**areas (5)**
35:24;79:9;96:22;

153:12;184:15
**arguing (1)**
158:20
**argumentative (1)**
174:13
**arising (2)**
34:7;102:23
**Arizona (1)**
12:25
**around (7)**
22:8;44:9;52:14;
56:7;119:12,12;
129:15
**article (3)**
14:11;78:19,22
**articles (1)**
106:14
**articulate (1)**
189:5
**articulated (2)**
158:24;159:17
**articulating (1)**
103:25
**aside (2)**
50:25;185:6
**aspects (5)**
88:10;89:23;
151:23;189:24;191:1
**assembly (2)**
28:2,20
**asserting (1)**
46:25
**assess (1)**
104:25
**assessing (1)**
13:7
**assessment (5)**
89:20;110:12;
111:5;178:3;189:22
**assign (1)**
185:22
**assigned (2)**
170:13;182:24
**assignment (1)**
65:5
**assigns (1)**
70:8
**assist (2)**
34:3;128:23
**Assistance (2)**
14:3,7
**assistant (1)**
16:25
**assisted (1)**
78:23
**assisting (1)**
45:6
**associated (1)**
182:5
**Association (14)**
56:23;57:3,6;73:15;
98:3;105:18;112:2,
10,13;122:23;141:19,

22;144:16;174:22
**assume (1)**
60:19
**Assuming (2)**
158:15;178:10
**assumption (1)**
184:16
**assumptions (1)**
10:5
**assured (1)**
139:23
**atmosphere (1)**
176:9
**attacking (1)**
188:18
**attainment (1)**
137:11
**attend (3)**
116:25;117:5,10
**attendance (1)**
112:18
**attended (6)**
67:22;112:1,4;
122:20,22;129:9
**attention (7)**
45:1;83:7;94:11;
149:24;150:6;179:5;
193:18
**attorney (4)**
15:6;17:1;45:19;
72:23
**attorneys (1)**
16:2
**attributed (1)**
23:9
**Auburn (1)**
105:16
**audience (2)**
129:23;130:6
**audiences (1)**
137:24
**audio (1)**
129:23
**audit (4)**
147:7;189:14,17,22
**auditioning (1)**
188:24
**audits (4)**
189:20,23;190:1,8
**aural (1)**
145:16
**a-u-r-a-l (1)**
145:17
**auspices (2)**
34:3;39:9
**authored (1)**
79:12
**authorities (1)**
97:13
**authority (7)**
38:2;39:21;42:21;
48:23;73:24;76:10;
116:2

**authorize (1)**
91:16
**authorized (1)**
65:8
**authorizes (1)**
60:25
**autonomy (1)**
36:8
**avail (1)**
135:3
**available (21)**
10:3;13:7;27:2;
37:4;39:13;41:23;
51:7;52:23;106:19;
112:23;113:13;126:2,
3;130:16;137:23;
145:3;161:7;178:9;
182:9,12;183:3
**average (2)**
40:22;120:2
**avoid (1)**
163:16
**avoids (1)**
166:25
**awakening (1)**
82:3
**aware (14)**
39:20;59:11;
130:25;131:3;132:20;
151:5,7,9,14;152:1;
174:21;182:15;
183:21;188:25
**awareness (1)**
81:11
**away (2)**
129:11;142:20
**awful (3)**
48:1;99:19;169:2

**B**

**back (19)**
7:1;31:20;57:25;
58:4;59:17;68:14;
75:9;78:9,14;94:11;
107:3;139:10;140:8;
149:9;161:23;162:2;
189:3;192:11;193:13
**background (4)**
28:10;143:15;
149:16;150:3
**backgrounds (2)**
154:22;156:21
**ballot (22)**
40:17;80:6;89:15,
16;90:25;95:3;108:7,
12;109:22;144:10;
146:10;147:19;
158:11;169:10;172:7;
173:4,12,16;174:1;
186:6,8;188:23
**ballots (27)**
33:10;35:12;51:4;

99:7,7;100:3;126:22,
22;147:14,16,17,22;
163:21;168:16,19,24;
169:25;170:14;
172:12,17,23;174:20,
24;175:4,8;182:9,13
**bar (1)**
15:13
**bargaining (1)**
43:21
**based (25)**
27:25;48:23;63:20;
80:18;85:16,17,17,18;
88:11;90:8,13;
105:12,13,14;107:21;
114:15;119:13;
146:17;153:5,24;
154:17;163:23;168:5;
178:15;191:3
**basic (8)**
9:14;33:12;36:1;
45:22;51:6;68:24;
96:8;165:21
**basically (19)**
9:13;13:1,12;14:9,
17;17:15,19,25;33:7;
35:20;36:5;40:6;
44:22;45:8;75:21;
95:19;96:16;114:18;
190:11
**basing (1)**
178:7
**basis (9)**
61:25;85:23;
107:20,21;118:18;
127:16;145:14;
149:22;158:18
**Bay (1)**
135:4
**Bear (1)**
121:12
**became (3)**
14:8;95:6;170:12
**Becker (1)**
12:14
**become (1)**
166:12
**becomes (1)**
153:12
**began (3)**
8:21;182:7;193:4
**beginning (4)**
9:12;11:5;15:3;
25:20
**begins (4)**
22:14;38:6;146:9;
178:20
**behalf (1)**
45:10
**behaving (1)**
150:5
**BELINFANTE (61)**
4:1,12,18,20;5:3,11,

12;8:2,7,10;10:17;
20:12;24:22;25:1;
29:4;37:6;57:19;58:2,
6,11;59:22;66:12;
67:11;76:21;80:8,12;
88:2;90:17;107:2,6,
10;108:21;113:4,8,15,
17;115:14;116:16;
131:24;132:8,12,16,
23,24;135:14,21;
152:18;160:6,16;
167:24;178:13,16;
192:17;194:16,20;
195:8,13,20,23;196:3,
7
**below (2)**
37:17;120:22
**beneficial (1)**
156:19
**beneficiaries (1)**
88:21
**best (10)**
55:6;87:5;91:13;
95:2;101:1;139:1;
154:2;165:2;168:2;
174:19
**bet (1)**
55:6
**Beth (6)**
4:10;5:3;131:24;
135:16;152:10;
194:17
**better (5)**
94:14,23;96:1;
129:24;169:6
**biannual (5)**
48:8,14,15,24;
55:11
**big (9)**
23:1;71:6;82:18;
98:4;102:10,16;
191:1;193:9,11
**bigger (2)**
93:4;182:13
**biggest (4)**
102:12;104:18;
169:17;192:25
**Bill (5)**
26:23;27:5,7;52:9;
58:24
**billed (1)**
8:16
**binding (2)**
51:25;52:16
**binds (1)**
70:24
**Bipartisan (1)**
13:13
**bit (10)**
6:5;8:13;34:15;
121:12;127:5;130:14;
144:13;155:12;191:6;
195:6

**block (5)**
22:19;23:7,11,21,
24
**blunt (1)**
178:3
**Board (89)**
9:15;11:20;12:12;
16:2,19;18:4,7;21:15;
27:18,21;28:1;29:20,
21,23;32:2,2;36:8;
39:10,11,16;46:1,18,
23;47:11,21;48:6,7;
51:20,21;54:9,13,25;
62:6;69:1;72:8,12,15;
75:2,3,20;77:8;86:1;
87:12;90:7,8;93:10;
95:5;100:7,15;
113:21;115:24;116:2,
6,21,24;117:4;
119:21;120:24;
124:16;138:21;
153:17,18,22;154:1,
12,14,14,15;155:18,
18,20,23,25;156:3,5,
8,15,17,19,20,22;
178:22;179:6;180:3;
181:1;186:5;188:23;
189:4,9
**boards (6)**
29:12;56:3;82:25;
138:15,19;156:13
**boards' (1)**
64:8
**board's (2)**
49:11;179:17
**bodies (1)**
75:25
**body (1)**
181:18
**bold (2)**
121:17;136:24
**books (1)**
92:7
**both (11)**
10:23;45:11;77:17,
18;97:3;123:12;
150:9;154:3;162:8;
182:13;191:10
**bother (1)**
186:16
**bottom (20)**
10:22;11:2;15:4;
32:18,20;44:20;
80:15,16;101:16;
107:13;113:19;
120:23;121:10;
132:10,15;157:14;
158:9;165:10;175:10;
178:20
**boundaries (1)**
36:4
**Bouvier (2)**
6:1;18:25

**box (1)**
188:23
**boxes (1)**
186:14
**Brad (1)**
4:3
**branch (3)**
30:12,16,22
**break (16)**
6:10,11,14;55:16;
57:22;60:24;92:6;
106:24;108:3,7;
119:16;146:25;160:8;
192:2,3,9
**breaking (1)**
160:13
**breakout (1)**
34:4
**breaks (1)**
37:5
**Brian (2)**
150:16,17
**brief (3)**
16:4;160:8;192:16
**briefly (1)**
27:17
**bring (4)**
38:25;39:4;40:10;
149:8
**bringing (1)**
39:25
**broad (4)**
42:21;76:10;
112:15;153:6
**broadcast (1)**
120:9
**broaden (2)**
87:18,23
**broader (2)**
13:10;155:9
**broadly (1)**
112:6
**broke (1)**
29:10
**broken (2)**
79:9;109:25
**brought (13)**
19:12;21:12,18;
34:18;39:10,14;
42:17;73:14;79:1;
103:19;119:19;
144:16;188:10
**Brown-Dean's (1)**
114:10
**budget (3)**
48:15,24;190:19
**build (2)**
101:5;143:2
**building (1)**
138:13
**built (2)**
111:15;142:8
**bulk (1)**

8:23
**bulletin (2)**
138:15,19
**business (1)**
106:8

## C

**cabinet (1)**
30:13
**calendar (3)**
48:12;180:5,7
**call (13)**
31:7;37:10;43:1,1;
44:5;57:25;75:15;
96:5;107:3;115:7;
146:6;161:17;171:1
**called (9)**
7:18;24:7;47:10;
51:25;52:23;71:4;
79:18;116:4;185:1
**calling (1)**
155:15
**came (23)**
33:22;47:25;52:6,
16;58:23;90:11;
91:19;94:7;100:4;
102:12;105:3;123:19;
124:10;126:19;140:3,
6,25;156:21;167:25;
173:10;179:21;180:7;
194:6
**campaign (31)**
16:15,17;17:18;
29:10,13,17,20,23;
30:1,6,17;38:15,21;
42:11,18;48:21;
49:11;52:6;54:20,24;
55:4;83:5;119:2;
154:6,8;184:24;
185:8,21;188:17;
190:24;191:10
**campaigns (5)**
38:14;39:1,6;46:20;
64:17
**can (76)**
6:13,14;9:24;10:14,
18;11:13;16:10;
20:18;21:10;25:18;
28:23;36:1;38:10;
39:7,17;42:13,16,25;
49:10,13;50:17,19;
51:12,12;64:4;68:21;
69:17,22;72:72:1;76:15;
83:23;84:22;87:20,
25;101:1;104:8,10,18,
20,22,25,25;106:10;
107:16;108:4,10;
110:11;111:1;116:24;
126:1;137:2,25;
138:1;141:1,23;
143:11;144:7;146:14;
148:4;156:14;157:22;

Fair Fight Action v.
Raffensperger

Kevin Kennedy
March 31, 2020

158:2;163:2;169:11,
14;175:5;176:8,16;
177:19;182:23;186:1,
12;187:5;190:21;
191:21,22
**canary (1)**
128:1
**cancel (1)**
97:9
**canceled (1)**
50:19
**candidate (4)**
44:12;150:12;
187:25;188:18
**candidates (3)**
164:7;188:15;189:2
**canvass (1)**
44:3
**Canvassers (5)**
46:18;47:11,21;
87:12;93:10
**canvassing (1)**
44:21
**capable (1)**
167:2
**capacity (2)**
5:21;75:22
**capitol (1)**
93:25
**card (1)**
102:19
**care (4)**
101:12;165:17;
181:22;185:14
**careful (1)**
148:2
**Carolina (6)**
5:25;17:17;19:2,8,
10,25
**carried (6)**
11:19;33:17;63:18;
71:19;139:24;194:8
**carry (12)**
39:17;44:19;69:3,
14,18,22,24;84:7;
85:5,13;86:2;139:15
**carrying (4)**
9:19;61:13;73:20;
81:25
**Carter-Baker (1)**
82:10
**case (46)**
4:21;5:21,22,24,25;
6:1;7:3;12:18;16:8,
13;17:16,17;18:23;
19:2,5,13,17,22;20:2,
24;21:11;24:2,10,15;
33:13;39:17;42:16;
53:5;63:16;108:11;
115:5;140:3,5,22;
158:19;159:4;163:14;
168:3,4;169:8;173:6,
8;176:23;180:15,17;

190:15
**cases (30)**
5:15,17,19,20;17:2;
25:9,11,14;34:21;
35:14,14;40:16,22;
41:5,8;53:23;58:20,
20,20,25;70:23;
71:11;94:21;117:3;
118:11;167:3;180:17,
18;181:24;182:15
**cast (8)**
43:16;95:3;147:19;
158:11,11;165:4;
167:11;170:14
**catch (1)**
132:5
**catchall (1)**
43:4
**categories (1)**
190:15
**categorization (1)**
187:17
**categorized (1)**
186:2
**categorizing (1)**
185:17
**cause (2)**
45:20;118:15
**caused (2)**
43:12;118:16
**causes (1)**
171:13
**CDT (1)**
196:15
**census (3)**
152:5,15,19
**Center (20)**
12:14;13:13;18:5;
73:17;87:17,23;
97:21;105:15;106:1,
3;112:17;125:8;
131:6,7,8;133:2;
134:10,14;157:11;
175:3
**Center's (1)**
144:14
**CERA (10)**
125:9;133:3,14,24;
134:15,22;135:1,11;
138:10;153:8
**C-E-R-A (1)**
125:9
**certain (5)**
35:22;54:12;
158:21;176:10,10
**certainly (26)**
26:7,16;39:19;
53:15;63:15;64:18;
65:4;71:5;73:6,12;
86:20;87:16;95:11;
99:5;114:18;125:8;
128:5,19;142:17;
153:7,9;155:4;

161:10;165:23;
173:13;181:15
**certification (8)**
97:23;133:3;
134:22;135:1,2,5,11;
153:8
**certifications (1)**
125:10
**certified (1)**
97:22
**certify (3)**
46:18;47:11;65:16
**certifying (1)**
87:12
**cetera (1)**
23:5
**chafed (1)**
30:11
**chair (1)**
62:6
**challenge (4)**
145:19;158:19;
189:11;192:25
**challenged (6)**
20:1;22:11,24;23:3;
149:22;158:18
**Challenger (1)**
184:13
**challenges (7)**
73:7;137:2;143:15;
146:11;169:17;170:1;
193:8
**challenging (1)**
21:18
**chance (1)**
111:13
**Chandler (1)**
9:9
**change (9)**
38:19;47:25;71:6;
81:21;95:15;118:5,9,
16;151:18
**changed (4)**
71:10;82:19;96:15;
104:5
**changes (15)**
21:21;22:5;26:24;
27:4,10;46:23;52:7;
82:16;90:1;103:19;
114:25;158:19;193:5;
194:5,7
**channels (3)**
130:5,6;145:15
**Chapter (5)**
37:4;42:15;59:25;
60:1;115:7
**characterization (3)**
23:17,19;24:6
**characterize (2)**
35:4;95:22
**characterized (1)**
35:2
**charge (9)**

29:22;37:23;49:17;
71:1;72:4;75:16;76:9,
23;184:10
**chart (2)**
109:1,10
**charts (1)**
109:5
**Check (1)**
133:25
**checked (1)**
92:9
**check-in (1)**
91:14
**Checking (3)**
92:3,10;193:24
**checklist (2)**
108:9,24
**checklists (2)**
107:15;108:6
**chief (45)**
5:18;32:4,25;33:13;
50:20;62:5,15,17;
63:9,11,16;64:14,17;
65:5;70:1,2,3,7,10,12,
20;71:8,22;72:11;
75:17;80:24;83:10;
85:2,16,25;86:3,22;
88:25;89:1;96:5,11;
101:9;128:14;137:2;
165:15;166:11,18,22;
188:21;193:19
**choice (1)**
169:8
**choices (1)**
169:24
**choose (1)**
31:2
**Chris (11)**
7:1;11:6;100:8;
123:14,15;124:11;
141:12;173:5;178:20;
179:3;183:7
**chunks (1)**
168:13
**circuit (1)**
5:25
**citation (1)**
114:4
**citations (1)**
114:22
**cite (7)**
26:21;83:16,21;
97:12;106:10;115:4;
139:2
**cited (5)**
94:7;115:6;133:7;
134:8;169:3
**cities (6)**
34:25;35:21;36:3,
19;44:25;66:15
**citizen (3)**
177:10;188:23;
189:4

**citizens (9)**
22:16;34:8;70:17;
75:23;81:16,17;
146:11;165:4;167:11
**citizen's (2)**
165:3;167:10
**citizenship (2)**
95:1,8
**City (14)**
18:11;35:19;36:13,
15;46:11,12,16;
66:22;67:1;76:13;
77:6,7;91:2;140:4
**Civil (4)**
4:5;19:25;42:6,23
**claimed (1)**
102:15
**claiming (2)**
19:9;44:13
**claims (2)**
11:17,18
**clarified (1)**
100:6
**clarify (2)**
31:25;178:11
**classes (5)**
105:15;112:18,20;
125:12;131:8
**cleaner (1)**
6:10
**clear (15)**
12:15;18:19;71:14;
74:15;89:13;98:23;
121:21;126:4;127:2;
141:10;169:10;
172:15;183:5;184:23;
187:16
**clearly (9)**
30:19;45:22;46:21;
77:24;184:15;186:9,
18;192:25;193:20
**clerk (24)**
36:9,11,13,13;
39:12;43:8;44:4,13,
18,21;45:10,14;46:3,
11,14;47:1;76:1,23;
77:2,5,6;87:11;135:5;
142:20
**clerks (25)**
31:1,2;35:10,12;
37:20;47:20;53:7,10,
11,13;56:20,23;57:7,
12;60:20;75:6,19;
77:3,12;134:24,25;
140:4,19;142:11,18
**clerks' (1)**
35:3
**Clerk's (2)**
52:23;53:2
**click (1)**
133:15
**client (2)**
15:23;16:21

Fair Fight Action v.
Raffensperger

Kevin Kennedy
March 31, 2020

clients (3)
  15:20;16:24;17:14
Cliff (1)
  123:10
climate (1)
  194:1
close (1)
  193:25
closed (3)
  119:3,5,12
closely (1)
  73:4
closer (1)
  190:25
closing (1)
  162:8
coal (1)
  128:2
co-chair (1)
  82:13
co-chaired (1)
  73:18
Code (36)
  37:14;41:25;50:16;
  58:14;59:5,13,19;
  60:3;64:2;66:8,13;
  67:7,15,20,24;68:2,
  12;70:4,6,6;75:10;
  76:25;77:11;83:21;
  84:6;115:10,10;
  116:9,25;117:10,11;
  154:9,10;174:17;
  184:18,22
coffee (1)
  130:11
coined (1)
  157:6
cold (1)
  130:2
colleague (4)
  13:2;14:5;17:19,19
colleagues (4)
  49:20;73:3,13;
  85:18
collective (1)
  43:21
college (1)
  144:11
colleges (1)
  98:20
color (13)
  27:13;146:11,20;
  147:8,10;162:22;
  163:1,4,7;175:13;
  176:14,22;177:1
Colorado (2)
  139:3,7
colorblind (1)
  163:4
Columbia (3)
  17:18,21;155:22
combine (1)
  193:8

comfort (1)
  154:16
comfortable (2)
  21:1;191:25
coming (11)
  40:11;82:16;100:7;
  105:25;127:4;128:23;
  153:18;154:4;159:22;
  172:22;176:22
command (2)
  63:14;69:25
comment (2)
  18:10;19:15
commented (1)
  79:13
comments (3)
  79:14;118:13;178:4
commission (28)
  13:4;14:4,7;30:4,5;
  31:3,4,5,15;36:25;
  37:19,24;38:1,10;
  41:11,15;42:4,5,9,16;
  55:4,5;75:4;82:10;
  183:9;185:2;191:2;
  194:12
commissioner (2)
  14:3,9
commissioners (4)
  30:24;48:3;77:8;
  141:19
commissions (1)
  30:3,21;82:9
committed (1)
  45:21
Committee (2)
  79:17,21
committees (3)
  73:18;82:14;106:5
common (1)
  110:14
communicate (5)
  52:18,25;53:10;
  116:5;141:8
communicating (3)
  176:21,25;177:17
communication (10)
  53:6;137:17,20;
  138:5,6,13;139:5;
  142:18;145:16,19
communications (3)
  138:1,10,11
community (1)
  93:18
comparative (1)
  134:16
compare (3)
  97:19,20;142:13
compared (2)
  96:3;134:18
compares (1)
  95:19
comparison (3)
  95:23;96:19;97:15

comparisons (1)
  187:10
compensated (1)
  74:5
compiling (1)
  13:14
complain (1)
  186:4
complaining (1)
  100:13
complaint (17)
  6:2;11:13,17;16:23;
  33:11;40:7;44:12;
  93:3;127:12,13;
  151:19,21;182:24;
  183:7,8;184:11;186:3
complaints (54)
  7:13;11:8;19:8;
  26:18;87:6,7;96:25;
  97:7;99:4,14,20;
  100:4,5,7,9,10;102:4,
  5,7;104:13,15;122:7;
  126:19;127:3,18;
  149:20;151:23;
  168:16;173:9,19;
  182:18,21;183:2,4,10,
  14,17,22,24;184:7,15,
  21;185:17;186:2,14,
  22,25;187:1,15,16,19;
  189:25;190:13;
  193:22
complaint's (1)
  104:14
complement (1)
  191:13
complete (3)
  89:14;143:5;170:5
completed (7)
  67:22;104:21;
  108:12;130:15;133:3;
  134:21,25
complex (2)
  154:4;172:3
compliance (9)
  9:21;43:5;70:25;
  121:22,24;141:14,16;
  168:7;193:14
complied (2)
  33:6;159:16
comply (7)
  35:3;40:18;62:25;
  72:18;91:6;159:23;
  166:20
complying (3)
  39:23;158:13,23
component (2)
  142:2;193:12
components (1)
  150:1
comprehend (1)
  144:20
comprehension (1)
  144:8

comprehensive (4)
  96:9;101:19;
  168:12;170:2
computer (1)
  79:20
conceivable (1)
  71:21
concentrated (1)
  153:12
concept (2)
  70:20;71:5
concern (1)
  148:13
concerned (1)
  126:21
concerning (3)
  26:8;17;27:14
concerns (8)
  95:7;126:18;
  144:10;151:24;
  163:10,12;170:11;
  173:13
concluded (2)
  118:14;196:15
concludes (1)
  148:24
conclusion (9)
  44:16,18;101:25;
  114:7;144:24;145:8;
  167:25;169:1;176:1
conclusions (4)
  114:14;115:2;
  145:12;194:25
conditions (2)
  169:11,11
conduct (15)
  38:2,13,25;39:5;
  40:12,13;44:10;53:8;
  60:12;67:2;75:4;94:9;
  110:21;171:23;
  181:10
conducted (16)
  44:4,11,14;50:11;
  62:8;67:3,4;86:24;
  100:17;104:16;119:3;
  151:11,14;188:5,6;
  189:20
conducting (7)
  64:12;87:19;
  163:24;164:1,8,10;
  188:11
conference (5)
  44:5;57:3,7;129:12,
  25
conferences (15)
  14:23;18:8;27:9;
  37:11;55:19;57:14;
  105:23;112:5,17;
  122:16;124:20,23;
  129:9,9;130:9
confidence (4)
  13:15;101:12;
  177:7;187:23

confident (1)
  120:25
confirm (1)
  14:11
confirmation (1)
  31:16
confirmed (4)
  23:12;28:1,2,4
conform (2)
  40:13;63:6
conformed (1)
  53:8
confuse (1)
  6:19
confused (2)
  195:6,18
confusing (2)
  6:18;169:14
confusion (2)
  126:23;171:3
Congress (4)
  82:6;83:1;103:11;
  194:10
congressional (1)
  85:20
consent (2)
  34:20;35:15
consequence (1)
  181:10
consequences (7)
  69:23;88:19;99:1;
  159:5,6;160:3;181:14
consider (2)
  124:7;162:13
considerably (1)
  161:23
consideration (3)
  39:20;41:2;161:11
considerations (1)
  161:8
considered (1)
  11:10
consistent (4)
  23:25;121:1;
  139:16;158:16
consistently (3)
  99:20;148:14,16
consisting (1)
  73:18
consists (1)
  85:23
constable (1)
  36:9
constant (1)
  34:14
constantly (2)
  126:21;158:17
Constitution (1)
  98:25
constitutional (2)
  171:13,24
constitutionally (1)
  99:23

**construe (1)**
5:9
**consult (1)**
18:15
**consultant (2)**
72:23;74:2
**consultation (1)**
18:20
**consultations (1)**
90:8
**consulted (1)**
74:3
**contact (4)**
14:10;41:9;142:5;
191:4
**contacted (2)**
8:20;9:7
**contacts (1)**
52:21
**contained (2)**
55:12;177:23
**contains (2)**
168:11,13
**content (4)**
68:4,5,7;139:12
**contention (1)**
163:21
**contents (1)**
119:14
**contested (1)**
90:2
**context (2)**
88:15;129:14
**continued (7)**
18:11;54:24;123:7;
138:23;184:13;
193:13,15
**continues (1)**
194:11
**continuing (5)**
17:24;18:1;33:15,
23;138:20
**contractors (1)**
17:20
**contributed (1)**
79:15
**control (3)**
30:16;46:25;48:1
**convenor (1)**
14:22
**conversation (4)**
13:22;123:15,17,23
**conversations (7)**
8:21;12:6;14:9;
123:3,12;125:11,13
**converted (2)**
41:17;187:18
**convey (1)**
107:23
**conveyed (1)**
127:2
**convince (1)**
190:10

**copied (2)**
42:14;133:16
**copy (7)**
5:23;10:13;20:18;
28:22,23;131:22,25
**corner (5)**
52:22,23;53:2;
133:14
**corrected (2)**
93:16,20
**correspond (1)**
48:14
**council (1)**
185:9
**counsel (23)**
4:8,8,23;7:14;9:5,
25;10:2,4;12:4,22;
16:1;28:12;32:1,3,5,
11;90:21;123:10;
154:24;155:7,10,13;
192:22
**count (4)**
56:19;133:20;
171:21;191:3
**counted (6)**
108:13;126:22;
165:5;167:12;171:19,
19
**counties (16)**
65:15;66:5,15;
71:11,13;90:23;
97:10;124:8;142:11;
165:8,22;166:8,14,23;
167:15,17
**country (7)**
13:20;14:23;44:9;
82:3;85:11;86:18;
87:16
**county (81)**
9:17;27:8;35:24;
36:1;37:19;43:8;44:3,
4,4,11,25;45:15;
46:10,14,16,18,19,21,
23,25;47:1,2,2,3,6,10,
12,20,21;50:12;53:10,
14;56:20;62:10,10;
63:19;66:22;67:1;
69:2;75:6;87:8,9,11,
12;91:1;93:10,12;
94:10,12;97:5;99:9;
101:14;104:15,17;
116:8;121:1;124:13,
18,24;125:6,18,24;
126:3,14,18;127:7;
134:24;139:10;
141:19;142:11,18;
161:4;164:6;169:19;
179:4;180:21,24;
181:9,12,13,22
**county's (3)**
46:17;125:19;126:5
**countywide (1)**
47:4

**couple (6)**
12:11;43:15;
169:15;182:3;185:14;
188:1
**course (4)**
45:11;124:14;
138:9;174:25
**court (45)**
5:25;6:7;16:6;19:2;
22:9;24:20;25:10,20,
22;27:24;28:9;32:17;
39:15;43:14,25;52:1,
16;53:3,23;58:22;
68:22;70:23;71:4;
74:22;78:15;86:6;
94:3;95:14;107:12;
139:13,16;140:3,5,9,
17,23;141:4,7,10,15;
143:12;160:10;
182:20;188:13;196:9
**courts (2)**
58:21;95:11
**court's (14)**
10:20;80:14;
103:15;110:5;113:20;
120:21;130:13;131:4,
20;132:9;135:24;
164:3;178:18;189:13
**cover (4)**
35:13;119:24;
137:10;166:4
**coverage (2)**
179:18,19
**covered (10)**
52:24;101:15;
120:19;121:20;
129:16;135:23;
148:22;163:22;166:4;
178:18
**covers (2)**
75:13;138:10
**coverup (1)**
46:1
**create (1)**
176:9
**created (10)**
29:24,25;30:4,14;
42:20,20;52:9;54:7;
144:4;189:9
**creates (3)**
64:18;149:1;167:16
**creating (1)**
165:8
**creation (3)**
29:21;54:8,16
**credentials (2)**
15:11;113:3
**crime (1)**
45:21
**criminal (3)**
43:2;45:17;46:1
**critical (1)**
121:3

**criticism (2)**
125:19;186:22
**criticisms (3)**
127:11;153:16;
177:22
**criticizing (1)**
45:12
**CROSS-EXAMINATION (1)**
4:17
**curious (1)**
134:17
**current (13)**
4:6;14:12;17:7;
41:10;49:11;133:2;
142:23;143:8;148:21;
150:15;189:7;191:2;
194:2
**currently (3)**
13:2;17:7;54:2
**cutting (1)**
85:8
**CV (5)**
15:2;17:13;32:16,
18;74:18
**cycle (3)**
48:12,20;180:9
**cycles (1)**
124:14

**D**

**D-1 (1)**
10:11
**D-10 (1)**
115:12
**D-11 (1)**
116:14
**D-12 (1)**
135:19
**D-13 (1)**
152:16
**D-2 (1)**
20:10
**D-3 (1)**
29:2
**D-4 (1)**
37:2
**D-5 (1)**
59:20
**D-6 (1)**
66:9
**D-7 (1)**
67:9
**D-8 (1)**
76:18
**D-9 (1)**
108:19
**dad (1)**
128:13
**Dan (2)**
7:5;97:3
**Dartmouth (1)**
7:7

**DAs (1)**
43:3
**dash (3)**
36:24;59:5,17
**data (9)**
9:23,24;18:7;
104:15;105:1;122:9;
152:5,15;182:3
**database (1)**
183:3
**date (3)**
65:16;103:19;
178:23
**dating (1)**
149:9
**David (1)**
12:14
**day (17)**
33:17;76:2;82:23;
86:2;91:22;103:18;
108:13;131:18;
136:17,17;140:15;
159:13;161:15;
171:10;188:24,25;
190:16
**day-long (1)**
56:15
**days (4)**
45:13;79:22;
170:18;185:8
**day-to-day (2)**
73:10,20
**DC (1)**
72:14
**DDS (1)**
99:14
**deadline (1)**
140:15
**deal (4)**
64:10;140:10;
172:23;193:24
**dealing (10)**
13:19;34:3;53:7;
140:9;154:20;172:12;
176:6;183:1;185:16;
192:21
**dealings (1)**
155:10
**dealt (5)**
33:7;40:16;119:4;
173:21;192:20
**debacle (1)**
102:9
**decade (1)**
153:23
**decades (1)**
149:9
**December (2)**
8:24;48:18
**decent (1)**
106:21
**decided (1)**
58:20

**decision (10)**
20:5,23;30:8;52:16;
53:3;146:6;166:13,
16;172:6;179:21
**decisions (4)**
40:17;52:1;58:23;
94:19
**decree (2)**
34:20;35:15
**dedicated (2)**
118:20;120:2
**deem (2)**
34:10;40:3
**deemed (1)**
90:10
**defamation (1)**
19:12
**default (1)**
173:2
**defendant (4)**
4:2;5:19;20:1;24:6
**defendants (3)**
4:20;19:14;21:17
**Defendants' (13)**
10:11;20:10;29:2;
37:2;59:20;66:9;67:9;
76:18;108:19;115:12;
116:14;135:19;
152:16
**deficiencies (1)**
178:5
**define (4)**
70:7;77:5;78:2;
84:20
**defined (3)**
25:4;77:2,19
**definitely (4)**
9:3;75:14;104:17;
120:5
**definition (2)**
65:4;78:5
**definitions (1)**
77:4
**degrees (1)**
35:22
**deliver (1)**
116:6
**Democratic (1)**
30:25
**demonstrations (1)**
138:8
**dense (1)**
133:23
**Department (5)**
14:4;34:16,17,23;
99:13
**depended (1)**
54:19
**Depending (5)**
53:2;92:5;120:5;
136:21;179:20
**depends (1)**
89:7

**depicted (1)**
175:14
**depictions (1)**
175:22
**deposed (5)**
5:13,15,20,22,24
**deposition (21)**
4:1,5,24;5:8,21;
6:24;12:7;114:11,11,
12;118:3,5;124:15,
17;179:4;183:13;
188:8;194:21;195:2,
10;196:15
**depositions (14)**
7:1,2,4,5;11:6;27:4;
118:8;124:11;126:7;
130:19;141:17;145:3;
162:15;187:14
**deprivation (1)**
94:21
**deprived (1)**
168:8
**depriving (1)**
166:25
**deputies (1)**
75:18
**deputized (1)**
75:18
**deputy (2)**
113:23;183:12
**derives (1)**
48:23
**describe (6)**
84:2;121:20;137:2;
171:3,4;181:10
**described (4)**
11:5;69:20;145:3;
156:22
**describes (1)**
22:9
**describing (4)**
64:21,23;171:7;
181:25
**description (5)**
53:23;88:19;
109:14;112:15;
145:23
**descriptions (2)**
130:19;138:12
**descriptive (2)**
88:6;114:18
**deserving (1)**
173:16
**design (3)**
80:6;89:19;144:10
**designate (3)**
62:4;70:12;71:21
**designated (3)**
62:16;72:16;120:22
**designation (7)**
20:1;80:14,17;
103:16;110:5,6;
113:20

**designations (1)**
72:1
**designed (4)**
111:11;122:14;
124:12;147:22
**despite (1)**
149:19
**detail (1)**
185:18
**detailed (6)**
54:11;87:9;88:9,12;
98:9;180:20
**determine (6)**
87:1;97:16;103:23;
104:6;144:3;145:8
**determining (1)**
104:6
**develop (1)**
137:23
**developed (4)**
47:10;106:2,5;
175:20
**developing (3)**
49:24;50:2;143:13
**development (2)**
82:16;138:19
**devoted (2)**
119:6;138:9
**dialing (1)**
58:3
**dictated (1)**
180:9
**difference (4)**
35:18;49:16;90:12;
129:11
**differences (2)**
92:12,15
**different (49)**
7:2;8:21;21:13;
29:12;48:11,22;50:9;
52:19;53:12;54:14;
56:6;61:9;65:19;
71:23;72:2;76:1;
79:10;82:14;90:13;
91:4,7,10;96:4;105:2,
10;111:11;121:23;
128:25;130:4,6;
137:24;144:5;145:1;
147:20;155:4;164:14;
169:13;172:3;174:2,
3;176:2;183:4;185:8,
14,19;190:2,14;191:5,
8
**differently (5)**
83:3;85:1;89:24;
91:1;148:5
**difficult (2)**
20:17;168:14
**digest (1)**
110:1
**diminish (1)**
157:22
**diminution (1)**

**designations (1)** 159:17
**direct (8)**
30:22;42:20;50:13;
53:6;62:21;69:25;
157:20;181:17
**directed (6)**
126:25;150:6;
162:21,25;163:14;
183:10
**directing (4)**
31:22;32:21;46:23;
139:14
**direction (6)**
11:20;80:24;129:4,
20;166:10;194:6
**directive (2)**
37:24;69:9
**directives (2)**
116:3;139:16
**directly (12)**
43:25;48:4;51:6;
52:25;61:2,6,18;
62:10;66:1;74:3;
99:22;104:23
**director (10)**
23:12;27:20;28:12;
31:6,21;32:3;77:7;
123:4;138:9;183:12
**directories (1)**
142:13
**Directors (8)**
73:16,19;98:4;
105:19;112:11,14;
144:16;174:23
**directory (1)**
142:12
**disabilities (1)**
160:22
**disagreement (1)**
35:6
**disclose (1)**
45:24
**disclosing (1)**
45:13
**disconnect (2)**
57:24;179:10
**discovery (2)**
4:4;10:3
**discretion (1)**
96:6
**discrimination (10)**
23:2;27:13;146:19,
24;148:25;152:24;
153:8;162:21,25;
163:7
**discriminatory (1)**
163:18
**discuss (1)**
163:20
**discussing (2)**
60:3;125:5
**discussion (11)**
12:14,17;80:10;

**disenfranchised (1)**
147:24
**disenfranchisement (2)**
151:12,15
**dismiss (1)**
113:12
**disorganization (1)**
178:5
**disparate (2)**
147:7,9
**disposed (1)**
183:19
**disposition (1)**
183:3
**dispute (1)**
90:6
**dissolution (1)**
28:13
**dissolve (1)**
29:7
**dissolved (1)**
28:16;30:3
**distilled (1)**
107:15
**distinction (4)**
92:22;137:12;
183:5,5
**distributed (1)**
33:23
**district (6)**
17:1,17,20;20:8;
45:19;155:22
**diverse (5)**
85:6,10;130:5;
137:4,7,8;175:23;
176:6,13
**divided (1)**
36:7
**division (7)**
21:16;29:25;30:1;
119:2;156:6;191:7,12
**divisions (4)**
29:24;72:8;191:8,
10
**document (28)**
10:8;11:1,23;13:14;
15:3;25:19,22;28:8;
31:18;32:17,17;
68:17;74:7,22;78:15;
84:17,22;107:12;
130:13,20,22;143:12,
12;160:5;164:3;
170:5;182:20;187:5
**documentation (1)**
47:15
**documented (2)**
45:8;104:22
**documents (14)**
9:25;10:15;11:9,13;
41:18;50:24;55:11,

**Fair Fight Action v.**
**Raffensperger**

**Kevin Kennedy**
**March 31, 2020**

13;89:22;130:16;18;
175:11;195:7;196:12
**Doe (1)**
16:9
**DOJ (1)**
35:4
**done (43)**
8:23;12:2;13:17;
17:15;39:9;49:9;68:9;
76:13;84:7,12;86:19;
88:23;90:18;91:1;
95:19,20,20;96:1,1;
103:3;104:9;105:12;
111:24,25;113:8,9,10;
118:2;125:22;133:10;
142:7;143:20;151:1;
159:20;161:25;
165:19;166:5;167:4,
8;171:12;190:8,14;
192:7
**double (1)**
110:12
**doubt (3)**
152:19,21;172:25
**down (24)**
37:5;41:15;52:17;
60:24;62:9;64:13;
66:5;79:9;86:1,12;
92:7;108:3;109:15,
21,25;120:22;127:2;
133:15;141:7;146:25;
168:10;178:21;191:6;
195:24
**download (1)**
49:12
**downloaded (1)**
51:7
**dozen (1)**
135:13
**Dr (3)**
7:8,9;114:10
**drafts (1)**
79:12
**draw (4)**
13:18;97:20;176:1,
17
**drawing (3)**
96:19;102:1;177:14
**drawn (2)**
72:21;105:17
**drew (1)**
106:20
**drive (1)**
128:14
**driven (2)**
117:13;186:19
**Driver (1)**
99:13
**driving (2)**
128:12;191:1
**dropped (1)**
32:14
**drops (1)**

133:15
**drove (2)**
94:3,4
**Drs (1)**
11:7
**due (1)**
143:15
**duly (1)**
4:15
**duplicative (1)**
125:1
**during (12)**
39:6;42:7;47:22;
49:25;54:18;56:10;
57:25;78:10;81:10;
110:15;111:17;188:2
**duties (21)**
60:1;63:17;66:16,
17,19;69:4,14;72:9;
73:20;77:12,13;85:4;
86:2;87:11;104:1;
139:15;149:1;151:22;
154:14;155:3;156:6
**duty (7)**
63:3;66:22;67:15;
68:5;116:1;117:16;
149:7
**dynamic (1)**
192:25
**dynamics (1)**
52:14

**E**

**earlier (3)**
100:6;122:21;
177:25
**early (2)**
8:23;161:17
**easier (1)**
10:19
**easily (4)**
51:7;107:17;
160:24;170:2
**East (1)**
72:14
**Eastern (2)**
58:4;107:3
**easy (4)**
109:25;110:1;
160:19;184:23
**education (3)**
37:17;133:8;193:11
**educational (1)**
137:11
**Edward (1)**
77:11
**effective (14)**
4:9;39:25;40:4,14;
110:8;127:3;130:1;
131:2;137:3,17;
146:12,15;154:12;
176:8

**effectively (7)**
26:3;38:9;44:19;
81:22;121:2;158:3;
166:24
**effectiveness (1)**
64:10
**efficacy (3)**
19:15;121:19;
126:14
**effort (2)**
8:14;186:17
**efforts (1)**
34:10
**egregious (4)**
180:15;181:10,22;
182:7
**eight (4)**
21:24;41:5;118:19;
119:9
**either (5)**
16:19;50:11;
104:23;134:23;145:3
**Elderly (2)**
84:11;103:1
**elect (1)**
36:9
**elected (6)**
47:1,4;72:6;85:19;
143:8;194:3
**electing (1)**
36:8
**election (311)**
5:18;9:17;12:15;
13:5,20;14:3,6,22;
17:8,14,24;18:2,4,5,7,
8,15,19,21;19:8,12;
21:21;24:10;25:4,16;
27:8;29:11;30:17;
32:25;33:13,25;
36:18;38:10,14;39:1,
5,14,22;40:10;42:24,
24;43:6,13;44:2,8,21,
24;45:5;46:7;47:13,
19;48:12;49:11;50:8,
16,19;52:18,21;53:1;
54:21;55:2,5,24;
56:18;58:14;60:23;
62:5,9,15,18,24;63:9,
11,16;64:14,18;65:5;
66:14,22;67:15;68:2,
12;69:1,2,16;70:2,4,6,
6,7,10,13,20;71:7,8,
22;72:11,23;73:16,19,
24;75:7,12;76:2;77:7,
8,13,23;78:3,3,6,11;
79:2,23;80:5,20,21,
23,25;81:5,6,7,12,14,
23,25;82:7,21;83:10,
24;84:7;85:3,11,16,
24;86:1,2,3,22;87:12,
13,17,18,22,23;88:25,
25;89:1,6;90:3,9;
91:22;93:5,11,13,18;

94:3,8,12;95:10;96:5,
11;97:21,22;98:4,21;
100:7,22,23;101:8,9,
10,20;102:9,13,17;
103:18;105:15,17,18,
22;106:12,15;107:16,
23;108:13;110:16;
111:7;112:5,10,14,16,
17,19;113:21,24;
115:24,24;116:21,24;
117:4,23;119:5,7;
120:24;121:2;122:17;
123:4,12,18;124:14;
125:5,6,8;127:4;
131:6,7,8,18;133:1,2,
10;134:10,14;136:3,5,
7,19;137:2,5,7,24;
138:8;139:10,15;
140:24;141:8;142:6,
12;143:5,5,9,16;
144:14,14,16;147:4;
148:6;149:1,21;
153:17,22;154:5,25;
155:1,11,18;157:8,10,
11,19;158:8,13,23;
161:10,15;164:6;
165:15;166:11,18,22;
168:17;169:18,23;
171:9,14;173:21;
174:5,23;175:2,6;
176:20,24;178:22;
179:1,4,21;180:9,10,
16;182:11,12;184:22;
188:13,17,18,21,25;
189:3,7,9,22;190:1,5,
12,16,16;191:2,7;
193:19;194:14
**election-day (1)**
175:5
**elections (122)**
7:13;9:15,22;11:19,
20;14:19;16:15;
21:16;29:12,17,20,21,
22,23,25;30:4;31:3,5;
36:12,15,20,25;38:3,
13;39:1,5,10,16;40:8;
41:1,11,15;42:17;
46:20;47:12;48:7,21;
51:21;52:17;53:12;
54:15,18;55:25;56:1;
60:14;61:14;62:5,8,
23;64:8;67:3;71:2;
72:4,25;73:5,10,17,
21;74:4;75:2,2,4;
76:7,9,24;80:25;
81:17;82:12;83:3,6;
86:24;89:2;90:7;
93:21;94:5,10,16,19;
95:5;99:3;100:15;
104:16;106:4;118:21,
25,25;119:24;120:3;
122:22;123:1,8;
139:4,6;148:21;

154:1;155:15,20,23;
156:2,4,9,18,20;
157:14;163:24;164:1,
9,10,13;174:8;179:5;
182:22;184:10,18;
188:2;189:10;190:14,
24;192:23;193:1,6;
194:12
**electoral (3)**
164:5,16;177:6
**Electronic (2)**
106:3;138:19
**element (4)**
158:9;159:9;175:2;
177:18
**elements (5)**
87:24;104:6;166:5;
167:5;170:4
**eligibility (1)**
89:21
**eligible (2)**
148:11;165:3
**eliminate (1)**
171:16
**else (7)**
12:3;53:9;91:1;
158:1;161:3;185:1;
196:11
**email (9)**
52:20;53:1;132:18;
134:8;135:15,17;
138:1,18;186:4
**emails (1)**
134:16
**emanating (1)**
143:22
**embraced (1)**
86:18
**emphasis (3)**
102:8;160:19;
173:22
**employed (2)**
17:8;144:24
**employee (1)**
14:6
**employees (5)**
43:22;75:24;
190:23;191:13,14
**empowered (1)**
117:21
**empowers (2)**
60:12;77:17
**enable (1)**
160:23
**enabling (1)**
164:7
**enacted (2)**
21:19;146:18
**encompasses (1)**
77:24
**encounter (1)**
171:9
**encountered (1)**

**Regency-Brentano, Inc.**

126:23
**encourage (1)**
    53:15
**encouraged (1)**
    91:15
**end (7)**
    9:13;22:10;95:15;
    123:7;159:13;179:19;
    180:8
**ended (2)**
    17:22;119:11
**ends (4)**
    22:7;131:23;164:3;
    166:21
**enforce (4)**
    38:13,25;39:5;
    159:15
**enforcement (5)**
    26:18;42:1;83:5;
    151:23;183:1
**enforcing (1)**
    70:23
**engage (2)**
    42:9;171:23
**Engineering (1)**
    78:20
**England (1)**
    71:13
**enhanced (1)**
    73:12
**enhancing (1)**
    166:8
**enough (6)**
    39:12;56:15;83:23;
    99:5,6;144:25
**ensure (31)**
    9:19,20;35:12;
    38:15;39:11,22;
    47:18;61:22;62:7;
    63:4;69:16;80:25;
    81:15;82:21;89:2;
    95:16;96:10;107:16;
    110:15;113:22;
    122:16;129:6;137:23;
    147:5;159:9;164:19;
    165:2,19;167:4,6;
    175:7
**ensuring (5)**
    94:14;101:21;
    102:22;146:22;
    177:21
**entail (1)**
    32:23
**enter (2)**
    10:7;135:15
**entered (1)**
    34:21
**entering (1)**
    45:7
**entire (1)**
    79:18
**entirely (3)**
    29:14;37:16;155:2

**entirety (1)**
    74:17
**entities (2)**
    17:14;36:19
**entitled (5)**
    49:22;129:7;
    158:11;173:12;
    176:10
**entity (1)**
    120:10
**equal (2)**
    147:2;159:2
**equally (2)**
    149:2,7
**equipment (7)**
    33:8,8;98:21;
    102:11;107:24;
    110:25;123:9
**equitable (1)**
    38:12
**equivalent (1)**
    174:16
**error (3)**
    45:9;46:20;172:12
**errors (10)**
    45:11;94:19;99:25;
    100:22,25;104:4;
    124:11;126:10;
    127:21;147:23
**essential (8)**
    87:19,24;101:21;
    102:22;125:23;146:2;
    154:20;177:18
**essentially (2)**
    42:14;43:21
**essentials (1)**
    165:16
**establish (1)**
    62:7
**established (4)**
    36:6;44:20;57:16;
    142:16
**establishes (2)**
    84:13;86:15
**establishing (7)**
    33:9,10,11;85:23;
    98:7;137:3,16
**et (1)**
    23:5
**ethics (20)**
    29:17,18,19,25;
    30:1,5,6,18;31:4;
    42:15,19;54:13,14;
    119:2;154:6,9,10;
    185:2,9;191:11
**evaluate (3)**
    111:14;146:1;
    190:13
**evaluated (1)**
    147:6
**evaluating (3)**
    110:22;145:14;
    177:18

**evaluation (1)**
    149:17
**even (26)**
    30:21;33:23;46:8;
    51:18;53:11;63:1;
    72:2;78:17;88:11;
    90:24;98:19;100:18,
    20;102:7;109:10;
    110:22;117:22;136:2;
    138:2;141:12;148:2;
    170:23;182:11;186:9,
    16;191:22
**even-numbered (5)**
    22:8;48:16,18;
    55:24;56:1
**events (1)**
    125:12
**eventually (1)**
    193:24
**everybody (6)**
    55:17;57:22;58:8;
    86:19;107:8;147:1
**everyone (3)**
    164:5;185:2;196:10
**everywhere (2)**
    148:16,18
**evidence (4)**
    65:19;181:21;
    194:24,25
**evolution (2)**
    80:20;81:5
**evolve (1)**
    138:21
**evolved (2)**
    138:14,20
**evolving (1)**
    93:10
**exact (5)**
    8:15;26:15,20;
    83:16,20
**exactly (6)**
    8:19;15:25;121:18,
    18;165:25;170:23
**examined (1)**
    4:15
**example (28)**
    32:9;47:6;50:15;
    51:3;76:3;82:11;
    88:13;89:23;91:14;
    92:19;93:9;94:11,23;
    108:6,24;109:5,11;
    124:10;125:21;
    128:17;139:6;140:20;
    142:19;147:15;
    155:21;174:10;
    180:12;190:9
**examples (8)**
    79:15;111:1,12;
    124:18;126:17;
    168:20;174:23;
    175:14
**except (2)**
    5:5;88:9

**exceptions (1)**
    48:19
**excuse (14)**
    36:24;55:4;59:5;
    64:7;65:10;81:5;89:1;
    100:4;114:9;118:24;
    160:21;168:1;169:7;
    173:3
**executive (6)**
    30:12,16,22;31:6,
    21;47:3
**exercise (2)**
    59:24;171:1
**exhibit (36)**
    10:7,8,11;20:6,10;
    29:1,2;37:1,2;59:19,
    20;66:8,9;67:8,9;
    68:15;72:21;74:8,16,
    18;76:17,18;107:11;
    108:18,19;114:9;
    115:11,12;116:12,14;
    134:9;135:15,16,19;
    152:15,16
**exist (1)**
    141:24
**existed (1)**
    194:2
**existence (1)**
    30:11
**exists (3)**
    87:17,23;179:11
**expanded (1)**
    49:19
**expanding (2)**
    50:4;162:9
**expect (4)**
    23:23;100:25;
    157:9,10
**expectations (2)**
    7:15;47:20
**expected (2)**
    56:11;192:18
**experience (50)**
    13:19;62:22,22;
    72:22,25;73:5,9,19;
    81:9;82:24;83:4;85:2,
    14,16;90:20;92:14;
    96:7,20,22;102:3;
    105:12,13;106:20;
    107:22;111:23;125:4;
    128:4,8,10;137:1;
    153:6,24;154:7,11,25;
    155:1,10,14,24;158:6;
    168:5;169:9,16;
    170:6;173:18;177:14;
    182:25;187:19,23;
    192:19
**experienced (4)**
    53:24;101:14;
    102:7;154:21
**experiences (2)**
    144:2;174:7
**expert (20)**

6:1;7:4;9:7;11:6;
    17:16;19:25;24:3,10,
    14,16,19,20,21;25:3,
    9;59:1;85:13;95:25;
    97:1;99:21
**expertise (3)**
    25:7,10;72:22
**experts (3)**
    155:11;162:16;
    182:4
**explain (3)**
    138:21;140:14;
    146:14
**explains (1)**
    145:5
**explanation (1)**
    87:10
**explicit (3)**
    64:23,25;77:21
**explicitly (1)**
    176:25
**exposed (1)**
    97:24
**exposure (2)**
    87:24;175:19
**exposures (1)**
    87:18
**express (5)**
    63:14;65:25;66:4;
    83:9;103:12
**expressed (1)**
    77:16
**expressly (3)**
    63:8;65:8;103:2,6;
    115:23,25
**extensive (1)**
    128:4
**extent (5)**
    12:20;54:12;
    129:23;179:11;187:7;
    188:20
**extra (1)**
    46:4
**extraordinary (1)**
    35:13
**Eye (3)**
    120:9,11;179:22

**F**

**face (1)**
    82:8
**Facebook (1)**
    138:23
**faced (1)**
    73:7
**facilitate (2)**
    129:5;158:1
**facilitating (1)**
    164:17
**facing (1)**
    44:2
**fact (24)**

7:19;24:3;25:7;
29:16;30:10;32:24;
40:9;45:12;64:6,11,
13;96:2;99:5;102:8;
115:3;117:9;128:5;
130:3;135:3;144:9;
155:12;173:24;
186:16,22
**factor (1)**
151:7
**factors (1)**
162:13
**facts (4)**
127:13;145:5,7,8
**factual (1)**
145:14
**fail (1)**
117:9
**failed (1)**
166:20
**failing (2)**
117:5;171:11
**failings (2)**
99:21;169:24
**fail-safe (1)**
147:18
**failure (8)**
45:24;62:25;69:22,
23;72:18;81:22;
101:4;102:13
**failures (7)**
35:3;86:11;102:10;
166:17,18;187:2,2
**fair (16)**
23:19;24:5;58:17;
71:25;81:1;89:2;
95:18;119:15,23;
126:12;127:13,14;
131:12;158:22;
172:13;174:11
**fairly (9)**
52:5;57:8,10;88:5;
96:13;149:2,7;
170:17;179:25
**fairness (1)**
64:9
**fall (2)**
22:6;166:19
**falls (3)**
60:22;96:17;134:17
**familiar (6)**
14:20;98:6;141:18;
150:11;155:2;186:10
**familiarity (1)**
27:10
**far (7)**
37:23;76:6;85:12;
90:3;131:7;168:12;
193:8
**faster (1)**
120:20
**faulted (1)**
97:4

**Federal (28)**
4:5;9:21;15:11;
19:10;31:23;33:21;
34:6;35:11;46:19,20;
47:12;58:22;62:14,
18;65:6;69:15;70:14;
71:15,23;80:19;81:4;
84:8;97:13;121:3;
122:1;150:10;158:23;
194:12
**feedback (9)**
85:19;110:15;
111:1,16,18;125:25;
139:25;140:21;
145:18
**feet (1)**
86:8
**felony (1)**
17:2
**few (4)**
48:19;103:17;
131:10;153:12
**figure (3)**
87:3;145:9;147:12
**figurehead (1)**
86:22
**file (4)**
16:4;47:23;48:7;
154:8
**filed (5)**
15:24;16:23;19:9;
26:19;44:12
**files (2)**
130:16;184:24
**filing (4)**
25:20;40:4;74:22;
118:9
**filtered (1)**
102:5
**final (1)**
79:8
**finance (26)**
16:15,17;17:18;
29:10,13,17,20,23;
30:2,6,18;42:11,18;
48:21;52:7;54:20,24;
83:5;119:2;154:6,8;
184:24;185:8,21;
190:24;191:11
**financing (2)**
38:15,21
**find (12)**
22:13;41:7,22,23;
68:13;91:5;99:12;
112:24;117:3;131:2;
132:4;157:7
**findings (1)**
146:18
**fine (9)**
37:7;43:1;45:14,16;
58:2;107:4;116:24;
160:11,13
**fined (2)**

117:5;181:15
**fire (1)**
86:8
**Firefly (5)**
50:1;130:14,17;
131:1;143:24
**first (23)**
4:15;5:7;9:7;22:1,
3;24:7;29:8;32:24;
40:11;44:2;68:16,18,
21,22;70:15;74:25;
76:22;94:24;113:10;
122:13;133:1;138:16;
143:12
**fiscal (1)**
48:13
**five (2)**
79:22;192:12
**five- (1)**
57:21
**flavor (1)**
100:11
**flexibility (3)**
161:6,21;196:9
**flexible (1)**
196:11
**floor (1)**
6:13
**Florida (5)**
79:11;82:4;102:12,
19;105:24
**flow (7)**
69:24,25;97:10;
109:1,5,10;170:2
**flows (1)**
99:5
**flying (1)**
44:9
**focus (18)**
83:5;93:6;99:6;
143:15;146:2;148:3;
151:21;153:13;157:2,
5;158:3;160:17,21;
162:20;169:21;
177:20;187:1;190:17
**focused (11)**
39:2;79:5,6;106:17;
127:1;129:4;143:23;
149:24;153:15;
172:15;175:21
**focusing (1)**
163:3
**folks (2)**
57:19;128:16
**follow (7)**
84:20;108:11;
142:22;159:2,4,5;
184:17
**followed (2)**
49:20;93:3
**Following (7)**
28:3;44:20;51:25;
60:2;93:20;94:6;

102:9
**follows (1)**
4:16
**followup (3)**
46:5;141:14;185:23
**follow-up (2)**
184:1;194:22
**footnote (2)**
83:20;133:7
**forbidden (1)**
93:1
**forced (1)**
193:23
**foresight (1)**
9:5
**forfeiture (1)**
43:1
**forgive (3)**
25:12;124:25;
133:22;174:14
**form (4)**
5:6;149:10;152:25;
167:21
**formal (1)**
54:9
**formalized (1)**
82:19
**format (2)**
6:5;56:7
**formed (3)**
13:4;91:19;118:6
**former (11)**
13:23;14:2,6;17:19;
27:22;31:1,1,4;49:20;
154:1;156:23
**forms (3)**
56:6;89:14;175:22
**forth (1)**
84:18
**forwarding (1)**
135:17
**found (5)**
32:15;44:6;94:10;
95:14;113:15
**Foundation (16)**
18:6;80:22;81:7;
84:3,12,21;86:16;
96:9;137:17;163:24,
25;164:8,10,14,16,19
**four (4)**
30:22;55:25;181:7;
186:14
**fourth (4)**
120:23;121:9;
136:24;175:12
**four-year (1)**
21:25
**framework (3)**
84:8;147:3;194:3
**frequently (7)**
39:4;40:15;54:17;
118:17;170:8,10;
174:14

**Friday (1)**
4:25
**front (9)**
10:10,13;16:5;21:5,
9;22:21;92:4;100:15;
106:18
**frontline (2)**
122:17;139:15
**full (14)**
79:17;101:18;
122:13;136:17,24;
139:8;143:12;155:3;
164:7,23;168:11;
172:22;175:12;
191:13
**fully (1)**
148:6
**functions (4)**
29:8,10,11;191:11
**fundamentals (1)**
166:1
**funding (2)**
17:21;83:15
**funds (2)**
33:21,23
**further (6)**
109:15;168:10,20;
195:3
**Future (2)**
79:17;94:15

## G

**GAB (38)**
16:16,20;17:4;
23:12;27:20;28:12,
13,16;29:9,10,16,22,
24;30:3;31:12,21;
34:5;38:24;39:4;
40:21;42:8,19;47:22;
49:7;50:23;52:16,18;
54:16,17;78:11;
90:22;95:21;118:18;
119:9;135:10;179:12;
190:19;192:22
**gather (1)**
37:19
**gathered (1)**
79:23
**gathering (2)**
79:25;85:14
**gatherings (1)**
174:22
**gave (11)**
13:10;40:12;44:4;
47:17;53:22;93:9;
94:22;105:4;140:20;
162:13;183:23
**geared (3)**
144:20;178:11,14
**Gender (2)**
137:14;175:24
**general (18)**

6:3;13:5;16:1;
28:12;32:3;43:4;56:8;
64:15;82:2;134:20;
136:5,19;139:3;
154:24;155:7;168:17;
187:21;192:22
**generally (12)**
23:24;34:12;57:10;
71:1;75:9;95:11;
119:11;128:10;
131:13;140:6;147:17;
189:5
**generate (5)**
41:3,5;65:3
**generated (7)**
43:9;141:15,16;
173:13;186:3,19;
194:1
**Georgia (107)**
9:22;11:19;12:13;
15:16;26:22;42:25;
50:1;58:13,19,20,21;
59:4,13,18;61:17,19;
62:4;64:2,24;65:7,9,
11,24;66:21;68:2,12,
25;69:10;70:4,6;88:3,
7;95:19;96:4,17,19,
23;97:4,14,20;98:6,
16,24;99:9;102:6;
106:18,18;108:14,23;
112:2,5,17,19;113:4;
114:4,14,20;115:10;
122:22;123:1,2,13;
125:6;128:25;131:1;
133:2,10;134:14,17,
23;136:3;138:7;
141:20,22;143:8,20;
144:25;146:16,21;
148:7,10,15,22;150:7,
9,24;156:8;157:24;
162:6;163:8,10,24;
164:8,10,13;167:13,
14,16;169:5;172:24;
173:3;176:1,20;
179:2;183:21;185:1;
187:11
**Georgia's (11)**
96:14;97:16;124:8;
146:9,14;147:13,15;
148:20;149:9;152:3,
23
**Germany (1)**
124:1
**gets (5)**
83:7;86:19;88:9;
141:12;172:22
**Gilbert (2)**
79:11,13
**given (16)**
4:6;6:4;36:8;54:22;
65:23;99:6;127:3,17;
128:12;130:15;146:2;
147:2;171:8;181:16;

183:21;184:7
**gives (3)**
84:12;111:10;
129:16
**giving (3)**
26:4;110:17;128:17
**gleaned (1)**
187:14
**goal (2)**
88:21;101:10
**goals (1)**
71:15
**goes (5)**
25:21;37:23;42:7;
176:5;193:12
**gold (5)**
84:17,19;100:21;
182:20;183:16
**good (18)**
13:17;14:24;47:17;
55:15;56:15;61:15;
96:14;100:11;104:9;
108:6;125:21;126:17,
20;132:17;139:3;
170:4;190:9,13
**goodwill (1)**
128:24
**googled (1)**
113:4
**gotcha (2)**
32:13;164:22
**governing (3)**
29:12,13;75:25
**Government (22)**
16:1;19;18:20;
21:15;27:18,21;
35:23;36:10;41:16;
48:5;51:20;54:8,25;
57:18;69:17;75:3,19;
81:19;82:20;90:7;
180:16;186:5
**governmental (2)**
35:21;75:22
**governments (2)**
18:15;77:18
**governor (19)**
27:23,24;30:24;
31:2;43:15,18,20;
72:7,11;94:6;118:3;
124:3;150:13,15;
155:8;184:11;193:2,
2;194:8
**governor's (2)**
30:13;155:13
**graduates (2)**
133:14,24
**granted (1)**
59:24
**Great (8)**
4:19;6:17,23;25:2;
67:14;134:7,8;192:10
**Green (1)**
135:4

**greeter (1)**
91:18
**grew (1)**
71:15
**grid (2)**
35:25;36:6
**ground (2)**
62:12;121:21
**group (7)**
85:6,10;137:4,7,8;
175:23;176:13
**groups (4)**
21:13;90:8;131:1;
144:18
**gubernatorial (2)**
19:12;155:10
**guess (24)**
23:1;24:5;46:11;
50:23;73:22;87:4;
97:12;101:18;102:20;
112:15;116:3;121:11;
127:5;129:3;133:23;
136:23;147:12;
148:19,23;172:1;
178:1;183:10;184:20;
186:21
**guessing (2)**
8:13;135:12
**Guidance (2)**
51:25;174:19
**guided (1)**
50:10
**guidelines (1)**
64:11
**guy (1)**
128:13
**Gwinnett (2)**
124:12;126:5

# H

**half (8)**
28:1,2;57:20;79:25;
80:9;119:22,25;
191:19
**half-day (3)**
56:16;57:4,4
**hamstrings (1)**
166:7
**hand (2)**
172:25;173:3
**handful (6)**
35:9,14;72:10,12;
157:19;181:7
**Handicapped (2)**
84:11;103:2
**handle (5)**
95:7,14;171:5,18;
193:20
**handled (3)**
53:23;89:17;180:22
**handling (2)**
107:24;183:14

**hands (3)**
140:17;157:25;
188:23
**hands-on (2)**
111:20;144:2
**Hang (3)**
31:19;78:3;116:10
**happen (9)**
26:22;40:15;89:14;
91:11;95:17;101:6;
117:15;118:2;127:22
**happened (7)**
45:18;46:8;81:21;
91:12;95:13;99:19;
125:15
**happens (2)**
112:15;117:12
**hard (3)**
6:7;179:9;192:24
**harsh (1)**
177:24
**Harvey (14)**
7:2;11:6;100:8;
123:14,15,17;124:11;
126:6;141:12;173:5;
178:20;179:3;183:7,
20
**HAVA (13)**
31:24;32:22,25;
63:21;70:11,11,12;
71:5;83:14,17;94:24;
103:1;193:14
**head (1)**
78:1
**headed (1)**
189:19
**heading (2)**
25:21;37:10
**headings (1)**
22:18
**headnotes (1)**
20:24
**heads (1)**
46:8
**health (2)**
4:7;194:14
**hear (4)**
51:12,12,15;145:17
**heard (1)**
172:24
**hearing (1)**
129:24
**held (9)**
14:23;28:11;69:22;
72:17;73:23;80:11;
90:16;160:15;196:1
**Help (23)**
31:23;33:2,12,22,
24;34:3;41:22;62:19;
63:1,22;82:17;83:1,9,
22;84:3,10;98:18;
102:8;103:11;177:8;
187:1;190:22;194:9

**helped (2)**
78:19;154:17
**helpful (1)**
168:12
**here's (8)**
88:12;143:25;
144:1;149:14,25,25;
159:11;180:3
**Herron (3)**
7:8,9;11:7
**high (1)**
187:23
**hinder (1)**
177:8
**hire (1)**
181:18
**hired (3)**
32:3;95:3;151:24
**Hispanic (1)**
153:11
**historical (3)**
41:16,19;146:23
**historically (1)**
55:10
**history (13)**
14:18;146:10,15,
19;147:13,15,21,25;
148:20,24;149:9;
152:23;163:9
**hold (4)**
56:8,11;70:1;194:3
**holding (6)**
44:5;70:24;71:7;
80:23;86:8;157:24
**holds (3)**
63:11;70:2;182:19
**home (1)**
44:10
**Homeland (1)**
14:5
**Honestly (2)**
152:13;170:9
**hook (1)**
50:25
**hope (1)**
148:17
**Hopefully (1)**
93:8
**hour (4)**
14:15;57:20;
119:22;160:7
**hours (14)**
8:15;22:16;23:13;
56:22;119:8,22,25;
160:23;161:2,7,12,22;
162:6;191:19
**House (7)**
26:23;27:4,7;58:24;
150:20,23,25
**How's (1)**
8:8
**Hu (1)**
99:16

huh-uh (1)
  6:9
human (5)
  100:23;117:13,13;
  172:7,12
hundred (3)
  43:15;94:1;133:18
hundreds (1)
  100:12
hypothetical (1)
  92:16

## I

ID (7)
  22:4;92:9,12,23,24,
  24;193:4
idea (9)
  55:16;76:5,9;92:19;
  93:15;108:6;130:7;
  159:19,19
identification (20)
  10:12;20:11;29:3;
  37:3;45:17;59:21;
  66:10;67:10;76:19;
  89:17;92:5;108:20;
  115:13;116:15;
  135:20;152:17;
  175:11,15,21,23
identified (16)
  10:24;12:4;13:11;
  18:14,24;26:25;41:8;
  47:7;59:1;91:23;
  93:15;102:3,24;
  121:23;122:5;180:25
identifies (1)
  77:12
identify (12)
  19:14;65:7,24;
  68:10;84:4,5;92:4;
  93:11;102:1;145:13;
  158:2;159:8
identifying (1)
  159:8
IEEE (1)
  87:14
ignoring (1)
  166:9
III (1)
  33:7
Illinois (2)
  72:14;155:22
illustration (1)
  130:8
immediately (2)
  93:4;94:12
impact (12)
  53:21;54:15;
  128:20;146:20;147:9;
  153:7;162:20;166:17,
  19;175:17;179:1;
  193:9
impacted (1)

141:1
impacting (1)
  52:17
impacts (5)
  99:22;146:15;
  147:8,15;163:18
impetus (2)
  22:15;23:4
implement (4)
  83:22;98:5;111:18;
  139:13
implementation (8)
  31:23;32:21;33:2;
  34:25;193:4,11,14;
  194:9
implemented (4)
  87:25;100:19,21;
  141:12
implementing (5)
  33:14;34:6,10;
  36:20;143:13
implicate (1)
  37:22
implications (1)
  141:10
implicit (4)
  64:23;65:4;66:2;
  77:23
implicitly (1)
  176:25
implied (1)
  116:4
implying (2)
  164:13;176:13
importance (4)
  148:8,11;157:22;
  177:10
important (19)
  88:20;137:22;
  147:3;149:7,23;
  150:2;153:3;154:13;
  156:15;157:25;158:9;
  159:7,9;165:13,14;
  170:21;185:15;187:4;
  188:2
imposed (4)
  60:1;65:24;66:25;
  82:17
imposes (4)
  63:8;66:22;67:15;
  83:10
impossibility (1)
  167:16
impression (2)
  149:1;172:22
improve (1)
  82:12
inappropriately (1)
  168:15
inaudible (1)
  53:17
incidents (1)
  90:23

include (5)
  5:10;60:1;75:14;
  77:6;78:12
included (10)
  22:4;75:11;109:13;
  110:7;111:12;118:24;
  132:1;152:14;153:3;
  191:10
includes (2)
  75:17,21
including (18)
  9:17;11:5;21:16;
  45:11;48:5;64:15;
  70:19;74:18;77:2;
  79:3;83:24;94:6;
  136:24;139:14;
  144:17;151:3;176:12;
  190:24
incompatible (1)
  167:23
inconsistent (1)
  168:18
incorporate (3)
  126:1;149:23;
  187:20
incorporated (5)
  35:22;36:4;70:21;
  79:14;111:2
incorporating (1)
  98:19
incorrectly (2)
  52:9;103:9
incredible (1)
  157:18
incumbent (3)
  43:14;44:1,6
indeed (1)
  66:25
independent (6)
  17:20;30:12,13;
  33:11;48:2;115:1
index (1)
  106:4
Indiana (1)
  155:21
indicate (2)
  114:9;178:14
indicated (2)
  82:13;144:2
indication (2)
  105:4;183:23
indicators (2)
  122:3,6
individual (6)
  21:14;35:3,20,23;
  62:4;72:17
individually (1)
  68:18
individuals (16)
  12:10;19:7,14;
  39:13;75:20;78:23;
  79:24;81:18;144:17;
  146:19;147:8,18;

154:22;175:23;
190:25;191:5
industry (2)
  105:7,8
inference (1)
  176:17
information (51)
  11:4;13:9;14:10,12;
  26:8;37:19;38:2;41:8,
  10,18;49:22;51:6,17;
  53:2;62:12;63:5;75:5;
  79:23;80:1;91:24;
  93:6;95:16;97:24;
  99:6,12,15;106:3;
  107:14;110:18,18;
  116:5;122:16;124:7;
  126:1;134:3;137:23;
  141:2;142:6,10;
  143:7,10,22;146:1;
  148:25;152:23;
  154:19;165:13,21;
  168:12;175:6;191:4
informed (7)
  26:9;73:12,19;
  95:25;114:19;162:10;
  163:9
informs (3)
  85:6;96:16;151:23
initial (3)
  28:1,3;79:12
initially (1)
  75:2
initiative (1)
  177:5
injunctive (2)
  38:7,10
Innovation (2)
  12:15;18:6
innovations (1)
  73:8
in-person (4)
  23:13;50:18,21;
  161:17
insertion (1)
  38:20
inside (1)
  108:8
insight (1)
  106:6
inspector (3)
  50:20;75:17;128:14
inspectors (1)
  75:15
inspirational (1)
  157:23
instance (1)
  186:12
instances (2)
  168:8;173:11
Institute (3)
  20:5;24:14;57:12
institution (1)
  157:16

institutional (2)
  86:10;147:1
instruct (1)
  66:18
instruction (4)
  108:25;116:3;
  181:17,18
instructions (8)
  89:13;107:15;
  108:9,10;109:10,12,
  16;144:11
intake (2)
  182:18,21
integrity (1)
  177:9
intelligent (1)
  154:21
intentional (4)
  23:2;27:12;45:9,23
interacting (1)
  90:4
interaction (2)
  98:1;172:8
interactions (1)
  73:12
interactive (1)
  50:10
Interestingly (1)
  175:13
internet (1)
  186:19
internet-generated (1)
  186:3
interpretation (1)
  35:7
interpreted (1)
  78:11
interrupted (1)
  136:9
interruptive (1)
  170:3
interviews (1)
  11:24
into (31)
  10:7;15:1;22:5;
  36:7;37:5;52:6;71:4;
  79:9,15;81:10;97:15;
  98:12;103:13;107:15;
  108:3;109:25;111:15;
  142:8;143:3;147:13;
  149:23;154:4,13;
  159:22;161:11;171:6;
  175:19;185:19;
  187:18;194:7,23
introduces (1)
  23:11
introduction (2)
  114:20;154:13
investigate (4)
  42:4;43:8;184:9;
  193:23
investigating (2)
  42:9,17

**investigation (3)**
40:12;44:14,17
**investigations (2)**
100:16;119:4
**investigative (1)**
42:21
**investigators (3)**
184:2,5,17
**involve (4)**
16:14;25:12,15;
190:12
**involved (14)**
16:5,9,10;50:9;
64:16;72:23;73:3;
84:25;93:17;98:6;
106:13;124:16;164:5;
183:11
**involvement (4)**
17:24;18:2;78:22;
144:13
**involving (2)**
25:4;96:22
**Island (1)**
156:1
**issuance (1)**
169:25
**issue (18)**
40:13;43:11;47:5;
52:24;54:17;90:24;
102:16;116:3;128:2,
3;142:12;161:3;
171:4;182:13;186:6;
188:12,17;194:15
**issued (7)**
15:15;41:12;45:14,
16;46:22;54:22;175:8
**issues (23)**
43:7,24;92:11;93:4,
20;94:2;100:4;
102:12;122:4;125:14;
127:17;141:11;
149:19;179:19;
180:11;182:14;186:7;
187:9,11;192:20,21;
193:17;195:14
**issuing (5)**
119:4;168:15,19;
172:23;179:20
**items (1)**
110:11

**J**

**January (1)**
48:17
**job (13)**
13:17;46:17;96:11;
104:9;129:5;139:3;
142:21;149:3,8;
169:6;180:25;188:24;
190:14
**jobs (1)**
105:5

**John (2)**
9:9;16:9
**Johnson (1)**
4:22
**joined (1)**
4:21
**Josh (6)**
4:20;8:1;24:18;
113:1;178:6;195:5
**Journal (1)**
106:13
**Juan (1)**
79:11
**judge (3)**
156:23,24;195:9
**judges (3)**
27:22,25;31:4;
154:1,2;156:23
**judgment (2)**
146:6;176:7
**judicial (3)**
28:5;56:3;154:10
**July (2)**
48:15,16
**June (1)**
28:13
**jurisdiction (6)**
36:15;88:1;161:13,
14;185:4,21
**jurisdictions (1)**
36:21
**Justice (5)**
34:16,18;43:14;
44:1;188:13
**justify (1)**
186:17

**K**

**Kathy (1)**
123:4
**keep (2)**
58:7;183:17
**keeping (1)**
111:3
**Kemp (5)**
118:3;124:3;
150:16,17;184:9
**Ken (3)**
7:5;97:3;188:7
**Kennedy (16)**
4:2,14,19;5:13;
8:11;10:9;17:8,14;
18:19;23:12;51:11;
80:13;108:22;192:18;
194:17;196:8
**Kennesaw (2)**
14:18;98:7
**kept (3)**
39:20;140:8;150:20
**Kevin (8)**
4:2,14;23:12;
123:24;132:21;160:9;

178:7;183:11
**Kevin's (1)**
132:3
**key (4)**
72:16;101:5;175:2;
179:18
**kind (22)**
46:3;51:1;106:8;
127:21;134:16;
140:17;147:25;
153:14;157:6;159:22;
163:17;166:3;171:15;
174:15;178:10;
179:10;182:20;
183:25;187:17;
189:17,20;195:11
**kinds (1)**
156:13
**King (3)**
14:10,14;122:25
**knew (7)**
45:12;93:19;94:16;
140:4;151:18;156:16;
183:8
**knowledge (3)**
20:3;35:15;141:6
**knowledgeable (2)**
13:5;154:21
**known (4)**
14:20;26:23;48:7;
141:19
**Korea (1)**
174:8
**kudos (1)**
9:5

**L**

**Lab (1)**
18:7
**lack (1)**
82:1
**lag (3)**
178:23,25;179:7
**laid (2)**
166:3;180:1
**lakes (1)**
36:2
**landmarks (1)**
36:2
**landscape (1)**
13:6
**language (16)**
38:20;53:20;76:6;
77:17;83:9;87:10;
108:2;110:1;144:21;
168:13,21;169:3,8,24;
170:3;177:14
**lapse (1)**
179:10
**large (14)**
7:11;10:1;45:4;
56:11;57:8,10;75:13;

88:5;97:8;100:9;
127:3;137:4;168:13;
173:10
**largely (2)**
49:6;101:17
**larger (1)**
136:3
**last (39)**
4:25;5:21,23;6:17;
7:24;15:18,22;16:3;
17:22;23:10;28:11;
67:4;68:3;74:8,13,25;
80:18;87:20;101:18,
18,19;103:16,20;
107:13;120:23;
121:14;122:13;
125:16;132:25;
136:23;139:8,9;
153:23;164:25;
168:11;177:4;180:14;
189:5;191:3
**late (1)**
8:20
**later (6)**
94:5;107:8;116:1;
169:3;183:10,13
**law (64)**
15:16;17:8;19:10;
22:4,15;23:5;26:10,
22;27:2;35:7,8;38:13;
39:23;40:13,18;
41:20;42:5,11;44:14;
49:21;52:7;53:8;
55:10;62:18;63:6;
66:22;70:14;75:1;
80:20;81:4;93:1;
95:24;96:2;106:12;
108:8;114:3,14,20;
115:2;122:1,1;150:9,
10;154:25;155:1,11;
158:19,23;159:2,5,6,
15,15,16,18,24;
167:13,14,16;174:17;
182:25;187:7;193:4;
194:7
**laws (21)**
9:21;21:19,21,22,
23;38:14,21;42:6,24;
65:6;69:15;71:19;
81:10;120:25;121:4,
24;158:13,15,17;
185:9;193:6
**lawsuit (17)**
11:15;12:3,7;15:24;
39:5,11,14,25;40:4;
90:3,11;94:23;161:9,
19;162:1;163:12;
193:7
**lawsuits (5)**
34:17;38:25;85:4;
149:20;153:13
**lawyer (1)**
95:4

**lawyers (1)**
153:23,24
**lay (1)**
9:12
**lead (4)**
32:5;86:21;99:2;
101:9
**leader (3)**
86:23;150:21,22
**leadership (4)**
53:13;129:4;159:3;
168:6
**leading (1)**
165:16
**League (1)**
57:11
**learn (3)**
129:24;156:8;179:6
**learned (12)**
46:6;56:13;85:18;
96:7;97:21;105:14,
17;119:21;126:16;
155:13;156:19;
174:17
**learners (1)**
129:23
**learning (6)**
143:16;144:5,17;
145:1;179:11;180:23
**least (23)**
6:2,4;34:21;38:1;
51:5;57:4;70:11;
71:21;76:7;78:11;
109:9;112:23;120:1;
128:5,22;132:17;
140:18;153:22;
158:23;159:22;
170:17;183:5;194:25
**leave (3)**
145:10;152:25;
160:9
**leaving (4)**
17:3;148:24;
152:22;165:17
**led (2)**
43:18;99:25
**left (4)**
123:6;142:21;
180:16;193:16
**legal (17)**
16:3;32:1,11;38:12;
63:8;69:20,21;90:1,
21;91:6;114:7;
139:21;153:23,25;
154:22;183:12;191:9
**legally (2)**
61:5,18,20;62:1;
64:3;86:8;129:7
**legis (1)**
30:9
**legislation (3)**
26:23;27:5;71:15
**legislative (3)**

22:7;48:1;194:5
**legislature (18)**
21:19;28:17;29:7;
30:8,11,14,15,19,23,
25;43:20;47:24;48:4;
72:7;90:10;161:23;
190:11;194:7
**less (5)**
54:11;134:23;
136:22;169:7;171:22
**lesson (1)**
46:6
**letter (2)**
181:17,17
**letters (1)**
116:3
**level (21)**
62:9,10;63:19,19;
71:24;72:24;76:11,
13;83:6;85:20,21;
87:9;89:5;101:14;
143:9;144:12;154:3,
16;168:6;169:19,20
**levels (4)**
57:18;69:17;158:8;
183:4
**liability (1)**
95:12
**library (1)**
55:10
**license (1)**
157:21
**lied (1)**
80:16
**lieutenant (2)**
72:11;193:2
**lifted (2)**
35:16;42:14
**liked (1)**
92:2
**likely (2)**
171:22;190:25
**limit (1)**
73:9
**limitation (1)**
53:9
**limited (3)**
40:8;73:1;140:21
**line (7)**
44:20;58:7;127:2;
157:15;158:9;165:11;
180:15
**lines (3)**
22:16;23:5;91:19
**link (5)**
28:23;113:5,12;
133:16,16
**linkage (1)**
148:20
**linked (1)**
179:22
**links (1)**
65:14

**list (5)**
27:23;31:1,1,3;
143:8
**listed (2)**
11:24;130:20
**lists (1)**
30:25
**Listserv (2)**
138:15,19
**literally (1)**
185:3
**literature (2)**
157:8,10
**litigation (10)**
9:8;15:20,23,24;
16:22;17:5;25:4;
34:15;53:5;140:7
**little (13)**
6:5;23:1,2;35:14;
54:11;73:22;102:20;
107:8;121:11;127:5;
130:14;191:6;195:5
**lived (1)**
96:14
**lobbying (11)**
29:18,18;30:2,6,18;
42:11,19;119:3;
154:6,11;191:11
**local (37)**
9:16;39:22;40:10,
17;41:1,2;42:24;43:3;
47:18;52:25;56:2;
72:24;73:19;75:25;
81:25;82:20;90:9;
98:21;101:14;107:22;
131:14,14,17;134:21;
135:3;136:3;137:4,7;
138:17;142:6,12;
143:9,16;157:19;
165:17;169:18;
176:21
**locals (2)**
63:13;86:6
**location (8)**
63:20;86:13;89:12,
19;147:20;160:24;
161:21;170:13
**locations (9)**
75:5;96:6;136:5,19;
160:23;161:2,6;
162:5,12
**log (2)**
134:1,2
**logged (2)**
182:24;186:23
**long (9)**
14:13,21;22:15;
23:5;119:8,20;
120:18;159:16;
178:23
**longer (3)**
181:1,9,11
**long-time (2)**

13:1;14:5
**look (39)**
10:16;19:13;20:19;
26:23;27:5;30:9,20;
41:25;42:13;66:7;
76:16;83:3;84:6,8;
87:6;95:1;97:18;
99:21;100:13;104:19,
20,22,25;106:12;
109:1;113:18;116:9;
126:19;135:24;139:1;
142:13;149:24;156:7;
164:22;169:6;170:23;
173:25;176:2,18
**looked (27)**
7:1,3,11,18;13:16;
26:7,16;27:1,14;
43:13;44:1;96:25;
97:2,7,23,25;98:16,
19;114:16;115:3,6;
124:22;143:4;145:2;
152:10;158:4;188:1
**looking (52)**
7:16;8:14,22;11:22;
13:9;22:17;26:18;
31:17;32:10,15;37:7;
49:15;50:6;54:1;
59:10;68:16;78:16,
17;79:20;80:13;84:2,
19,20;86:16;97:12,
16;100:11;102:18;
106:1,16;109:10;
117:18;121:22;122:3;
126:16,24;129:17;
142:3;145:12;152:11;
156:9;164:2;168:10;
169:1,22;173:9;
175:4,9;187:14;
189:24;190:10;191:3
**looks (8)**
52:3;104:1,2,3;
108:22;109:16;
114:24;160:17
**loop (2)**
140:1,21
**lose (2)**
26:6;44:3
**losing (3)**
43:15;44:12;99:2
**lost (1)**
51:9
**lot (37)**
8:14;13:15;16:13;
17:22,22;27:3;41:18,
19;44:11;48:1;56:3;
70:3;71:6;72:2;73:20;
80:2;88:18;94:11;
95:24;96:21;98:12;
99:19;105:21;111:9;
136:22;149:24;150:5;
151:1;153:7;161:20;
169:2;175:3;179:18;
182:6,25;184:7,14

**Lowndes (6)**
124:18,24;125:18,
19,23;126:18
**lunch (5)**
106:24;119:16,19,
19,22

## M

**machine (1)**
76:2
**machines (1)**
51:1
**Madison (6)**
16:25;18:11;56:12;
105:24;187:25;188:9
**mailing (1)**
186:18
**mailings (1)**
138:17
**main (1)**
16:11
**maintaining (1)**
137:3
**maintains (1)**
143:8
**majority (2)**
128:24;150:22
**makes (5)**
6:7;52:13;141:4;
155:2;170:9
**making (14)**
33:6;53:14;114:7;
140:10;144:10;146:5;
148:3,13;150:20;
160:19;163:14;
175:22;184:3,15
**manage (2)**
60:22;99:8
**managers (1)**
61:12
**mandamus (1)**
38:11
**mandated (2)**
19:20;168:1
**mandates (6)**
31:23;32:22;34:7;
61:1;77:18;194:13
**mandatory (6)**
33:6;164:24;165:1,
11;167:5;168:1
**manifested (2)**
96:25;97:1
**manner (8)**
81:2;82:19;89:3,11;
121:1;163:5;165:19;
182:9
**manual (23)**
7:18;108:1,15,23;
109:9,14;112:23;
126:8;141:3;168:11,
21;170:1;172:17,19;
177:23;178:3,8,11,15;

191:4;195:20,21,25
**manuals (5)**
51:17;107:14;
124:12;127:8;178:9
**many (24)**
17:13;40:19,22;
65:17;75:24;91:16;
111:6,9,16,18,20;
118:20;127:21;
134:21;135:10;136:4,
18;155:17;167:3;
172:3;183:17,21,24;
186:15
**March (1)**
22:8
**mark (13)**
20:6;28:25;29:6;
37:1,1;59:18;66:8;
67:8;76:16;108:17;
115:10;116:12;
152:14
**marked (13)**
10:12;20:11;29:3;
37:3;59:21;66:10;
67:10;76:19;108:20;
115:13;116:15;
135:20;152:17
**married (1)**
156:23
**Maryland (2)**
72:14;155:21
**Masterson (1)**
13:21
**match (2)**
26:15,20
**matching (2)**
19:13,16
**material (6)**
51:23;95:13;
143:24;144:8;150:2;
152:9
**materials (42)**
7:12,17;8:14,22;
10:2;11:8,23;13:18;
26:17;27:6,8,15;
49:12,23;50:8;51:18;
53:4;106:19;107:22;
126:5,14,17;129:12;
130:2;143:21;145:4,
4,15;149:8,18,23;
151:22;156:13;
157:24;158:5;162:8;
165:23;169:2;170:24;
176:8,19;180:19
**Matt (3)**
13:21,23;14:2
**matter (4)**
17:18;133:11;
153:21;171:22
**matters (1)**
110:20
**Mattice (3)**
134:9,11,12

**may (34)**
6:17;19:23;22:3,6;
29:5;36:3;38:12;42:5;
49:9;56:4;65:1;69:24,
25;76:25;78:1;86:9,
12;89:18;92:6;95:9;
124:17,21;142:20,20;
154:10,10;168:22,23;
181:14,15;182:8;
186:13,22,22
**Maybe (9)**
8:7;39:1;105:25;
124:15;131:25;
133:22;144:22;
185:24;191:6
**Mayer (5)**
7:5;11:7;97:3;
118:13;188:7
**McDonald (2)**
7:6;11:7
**Meagan (2)**
31:11;33:18
**mean (127)**
8:25;9:1;15:24;
17:4;18:3;24:18;25:8;
32:22;44:19;49:24;
50:3;52:20;54:22;
55:9;57:9,15;58:16,
20;61:7,16;69:11,13;
71:10;75:22;76:5;
77:19;79:24;81:8,9;
83:4;84:1,23,24;87:2,
14,16;89:8,23;90:24;
92:18;93:25;94:23;
96:2,7,13;98:6,18;
99:9;100:3;103:10;
106:14;110:9;113:9;
114:3,6,16;115:3,7;
119:4;126:12,24;
128:23;129:24;130:7;
131:13,17;132:16;
133:11;137:8,20,22;
138:3,25;139:2,21,23;
140:15;141:12,23;
144:6;146:25;148:15;
151:21;152:11;153:7,
24;156:7;157:18;
158:16,18;162:7;
163:25;164:11,12;
166:2;168:18;169:9,
15;172:16;174:15,21;
175:25;177:13;
179:17;181:8,13,20,
25;182:6;183:7;
184:9;185:13,13,15,
18;186:1,10,12;187:3,
9,13;188:8,25;
190:21;193:21,22;
194:1
**meaning (2)**
16:22;28:12
**means (4)**
61:21;62:8;100:11;

**137:22**
**meant (4)**
33:5,20;82:16;
114:13
**measure (5)**
87:3,5;104:12;
128:1;144:7
**measures (3)**
96:17;104:18;105:2
**measuring (1)**
121:19
**mechanism (6)**
110:22;111:19;
116:5;147:18;183:25;
187:16
**mechanisms (6)**
98:11;110:7,9,11;
145:18;154:15
**media (3)**
102:18;163:11;
173:20
**mediation (1)**
19:20
**Medicine (1)**
78:21
**meet (3)**
35:11;56:20;118:18
**meeting (14)**
56:16;57:8,10,15;
112:1;120:6;122:23;
125:12;178:24;179:8,
8,25;180:4,7
**meetings (33)**
18:9;37:11;38:3;
51:20;55:19,22;56:8,
9,11,16,17,22,24;
75:5;79:22;112:9,16;
118:20,25;119:9,17,
24;120:8,11;122:14;
123:22;138:9;156:10;
179:12,18,25;180:1,6
**Melanie (1)**
4:22
**member (6)**
13:3;15:12;124:16;
125:7;133:24;156:17
**members (17)**
28:3;30:22;57:5,6;
82:25;86:1;119:21;
123:18;133:15;
134:13,14;138:21;
153:17,22;154:12;
156:16,20
**mention (1)**
169:15
**mentioned (5)**
67:20;81:20;109:5;
118:12;182:4
**Merle (3)**
14:10,13,20
**message (4)**
107:7;138:24;
139:24;164:4

**met (2)**
7:14;56:23
**method (5)**
142:9;145:9,11;
175:7;187:17
**methodology (4)**
144:23;145:2,7,9
**methods (2)**
110:12;121:25
**metric (2)**
186:25;187:4
**metrics (9)**
87:1;104:8,10;
105:10;122:3,6;
144:3,6,7
**Michael (1)**
7:6
**Michigan (2)**
71:12;82:5
**middle (1)**
94:3
**might (20)**
7:15;13:7;35:2;
49:17;78:5;87:15;
89:24;110:24;119:5,
12;120:10;129:14;
136:12;147:22,24;
155:3;168:22;179:19;
182:7;192:7
**mile (1)**
35:25
**million (3)**
34:2;43:16;193:25
**Milwaukee (3)**
22:16;23:14;41:4;
56:13;77:7,9
**mind (3)**
66:7;135:22;177:11
**mindful (1)**
177:9
**mine (5)**
17:19,19;58:7;
128:2;131:23
**minimize (1)**
128:19
**minimum (1)**
136:8
**minority (1)**
150:25
**minute (5)**
18:23;51:9;59:17;
127:19;168:24
**minutes (12)**
100:14;156:10;
160:7;178:24;179:24;
187:15;191:21,22,23;
192:1,5,12
**mirrored (1)**
108:10
**misdemeanor (1)**
17:2
**miss (1)**
129:14

**missed (4)**
45:8;49:4;140:15,
16
**missing (1)**
88:18
**mistake (3)**
45:23;46:14;93:13
**mistakes (5)**
93:12,14;101:7;
128:18,20;179:7
**MIT (2)**
79:20;106:5
**mitigate (2)**
128:20;162:20
**MIT's (1)**
18:7
**mixed (1)**
121:12
**mixture (2)**
131:14;136:16
**mobilize (1)**
193:23
**model (5)**
174:15,17;177:5,
11,17
**modified (1)**
81:10
**module (2)**
47:10,18
**moment (1)**
160:11
**monetary (1)**
43:2
**money (1)**
83:23
**months (2)**
5:24;12:11
**more (49)**
8:16;13:9;19:10;
30:16;39:24;40:4,14,
25;41:1,4;46:25;48:1,
19;53:8;55:14,23;
56:25;68:3,10;73:20,
23;81:13;87:9;88:22;
89:22;91:8,10;92:19;
102:20;104:11;127:5;
130:1;131:11,14;
146:22;147:7;148:2;
153:5;168:25;169:6;
170:12;176:8,13;
178:2;180:15;182:8;
188:3;190:25;191:25
**morning (2)**
136:15;161:16
**most (26)**
5:20;35:23;37:22;
42:17;43:5;46:7;
48:13,23;50:11;51:6;
54:20,23;56:15;
67:25;71:11;89:9,10;
100:19;110:14;
129:17;140:11;
143:21;146:2;159:23;

**170:6;181:24**
**mostly (3)**
33:25;40:16;86:20
**motion (1)**
113:11
**motivated (1)**
151:16
**MOVE (1)**
70:19
**moved (1)**
5:1
**moves (1)**
177:20
**moving (1)**
120:20
**much (13)**
8:12;16:10;40:14;
50:7;56:25;127:20;
144:1;146:6,21;
155:9;168:25;180:9;
185:18
**multiple (2)**
19:15;145:15
**municipal (22)**
35:10;37:20;50:12;
53:10,12;56:23;57:7;
75:6,18;76:23;77:2,5,
12,18;134:25;135:5;
140:4,19;141:22;
142:18,20;169:19
**Municipalities (6)**
57:11;71:13;91:17;
92:1;136:12;161:20
**municipality (5)**
39:14;44:22;45:3,8;
76:25
**must (11)**
69:1,11,12;80:24;
103:3;139:9,20,21,23;
160:18;177:6
**mute (1)**
58:7
**myriad (1)**
193:5
**myself (3)**
21:16;79:3;190:25

**N**

**name (7)**
4:20;16:12;65:13;
180:21;181:6;185:3,7
**named (1)**
21:17
**names (4)**
125:9;142:5;
144:19;193:25
**narrow (1)**
40:20
**NASED (5)**
112:16,16;123:5,
18;144:15
**National (24)**

Fair Fight Action v.
Raffensperger

Kevin Kennedy
March 31, 2020

62:19;70:15;72:24;
73:15,18;78:20,25;
79:24;84:9;97:25;
98:3;102:14,18,25;
105:18;112:10,13;
135:2;142:2,2;151:1;
157:7;174:22;190:3
**nationally (1)**
153:8
**natural (1)**
36:2
**nature (3)**
53:3;117:13;179:20
**necessarily (6)**
71:3;88:12;147:2;
155:11;165:10;196:4
**necessary (3)**
10:15;93:9;101:3
**necessity (2)**
81:12;98:8
**need (23)**
6:8,10;71:16;78:18;
86:23;89:1,17;96:1;
98:12;103:18;127:22;
130:3;142:5;148:1;
149:8;150:8;161:8;
166:5;167:4;168:24;
173:25;185:18;192:4
**needed (5)**
39:12,21;56:13;
91:21;140:15
**needs (6)**
84:7,12;87:2;116:4;
143:14;182:14
**Neenah (1)**
95:5
**negative (1)**
181:16
**negligence (2)**
45:10,22
**negotiation (1)**
19:20
**networks (1)**
138:13
**neutral (1)**
163:4
**new (16)**
6:5;11:1;22:4;30:3,
21;43:17;53:21;
71:12;156:17;165:13,
13;194:25,25;195:15,
15,23
**news (2)**
102:18;133:24
**next (18)**
20:4;50:19;86:7;
95:2;116:9;136:22;
137:15;145:25;146:9;
162:19;163:19;
172:16;177:4;178:17;
179:25;180:14;
182:17;192:1
**night (3)**

43:13;45:5;161:16
**nine (2)**
5:24;21:24
**nobody (1)**
187:8
**None (1)**
189:6
**normally (1)**
105:6
**North (6)**
5:24;17:16;19:2,7,
10,24
**northern (1)**
56:14
**notably (2)**
7:5;62:18
**note (1)**
123:17
**noted (1)**
124:10
**notes (2)**
68:16;180:20
**notice (3)**
11:12;142:19;160:6
**noticed (1)**
44:22
**notify (1)**
67:21
**November (1)**
8:23
**nowadays (1)**
158:16
**number (72)**
5:19;6:25;7:11;
8:20;10:9,11,20,21,
22;11:1,17;16:24;
19:7;20:10;21:13,20;
29:2;35:14;37:2;
52:19;56:6;58:13,22;
59:20;62:3,14;65:13;
66:9;67:9;70:18;
75:13;76:18;79:1;
82:1;87:15;97:8;
100:9,13;101:13;
104:10;105:3;107:12;
108:19;110:10;
111:22;115:12;
116:14;122:7;123:3;
127:3,17;130:13;
131:5;132:9;133:9;
134:17;135:8,19,24,
25;136:3;147:20;
152:16;157:2;170:4,
20;173:10;182:24;
185:23;187:9;189:24;
190:23
**numbered (2)**
68:18;121:5
**numbers (5)**
74:16;131:20;
152:19;182:10,11
**numerous (2)**
129:8,9

**nuts (1)**
128:14
**NVRA (5)**
63:1,7,11;81:23;
94:25

# O

**oath (1)**
109:11
**Object (2)**
149:10;167:21
**objections (1)**
5:5
**obligated (2)**
61:6,18
**obligation (8)**
63:8;65:25;66:1,2;
69:20,21;83:10;
139:21
**obligations (1)**
66:25
**observation (1)**
88:7
**observations (2)**
104:22;122:8
**observe (1)**
90:5
**observed (4)**
145:6;174:4,8;
184:8
**observer (2)**
90:3,8
**observers (5)**
89:23;90:13;
104:23;122:8;173:21
**observing (2)**
61:11;94:15
**obvious (1)**
25:13
**Obviously (21)**
7:13;12:23;16:2;
25:7;33:17;36:1;
41:17;44:8;46:23;
53:17;75:24;96:13;
129:14;138:14,16;
144:9;177:13;179:24;
180:5;193:9;194:6
**occasion (1)**
39:8
**occasionally (1)**
128:11
**occur (5)**
19:23;57:2;72:9;
86:12;125:13
**occurred (7)**
46:10;56:25;81:24;
86:15;153:13;193:3,5
**occurs (1)**
47:13
**October (2)**
8:21;56:4
**odd-numbered (8)**

40:25;41:3;48:15,
17;55:23;56:2,5;
180:3
**OEBs (3)**
139:11,12,14
**off (4)**
51:7;78:1;80:9;
196:1
**offered (1)**
173:17
**offering (3)**
25:25;27:11,15
**offhand (1)**
54:6
**office (30)**
9:16;14:8;15:1;
44:13;62:13;64:14;
70:9;76:8;93:13;
95:12;98:10;102:6,7;
123:11;134:15,24;
135:10;143:23;150:4;
154:8;155:7;165:15,
15;173:15;181:9;
183:10,22;184:25;
185:4;188:16
**officer (36)**
5:18;33:13;41:10;
60:23;62:5,15,18,24;
63:9,11,16;64:14,18;
65:5;70:2,4,7,11,13,
20;71:9,22;72:11;
81:12;85:16;86:1,3,
22;96:5,11;101:9;
166:11,18,22;188:21;
193:19
**officers (9)**
21:16;57:8;66:18,
23;67:17;68:1,12;
83:11;113:24
**officer's (1)**
165:15
**offices (6)**
41:1,2,4;56:2,3;
72:3
**official (15)**
27:9;33:1;40:11;
47:1;72:6;80:25;
85:24;99:9;122:23;
137:2;138:17;180:16,
21,24;181:9
**officials (91)**
9:17,17;27:12;
39:22;40:17;42:25;
46:7;47:4,19;50:8,12,
13;52:18,21;53:1;
69:16;75:7,12;77:13,
23;78:3,4,6,11;79:2,
23,24;80:23;81:14,
25;82:7,21;83:15,24;
85:3,11;89:1;90:9;
93:13;94:6,14;96:5;
97:5;98:21;101:11,
20;105:18;107:16,23;

110:16;112:5,18,19;
113:25;115:24;121:2;
122:17;126:3;131:14,
15,18;133:3,10;
134:21;136:3;137:5,
8,24;139:10;141:8;
142:6,12;143:6,9,16;
144:14;147:4;157:20;
158:8;161:5,10;
164:6;165:18;166:25;
169:18;176:21,21,24;
179:2,4;184:2;194:4
**officials' (4)**
87:18,23;111:7;
149:1
**off-the-record (3)**
80:10;90:15;160:14
**often (16)**
41:3;42:7;51:8,12,
18,19;53:13;54:19;
55:21,23;56:24,25;
100:24;156:21;
173:23;190:4
**oftentimes (1)**
146:25
**Ohio (2)**
14:7;155:25
**Old (3)**
109:18;185:3,7
**once (2)**
19:11;93:15
**One (120)**
5:22;6:6;7:7;8:3;
11:12;12:12;20:4,5,6,
22,22;21:2,17;22:3;
24:14;29:12,12;30:4,
25;31:19,21;34:21;
36:14;38:6,9;39:8,17;
41:14,42:16;43:24;
44:24;48:19;50:5;
51:14;55:14,17;
56:10,12,12,21;62:3;
64:12;66:4,17,25;
68:13,18,23;71:21;
75:19;77:12;78:18;
79:8;80:5,15,16;
82:18;84:4,5;87:2,5;
89:23;90:1,2;91:1,2,
17;92:17;98:4;
102:12;104:12,12,18;
105:1,24,25;109:6;
110:14;115:19;
116:17;122:22;
124:10,19,23,24;
128:6;129:3;136:24;
139:2;140:10,25;
141:17;144:10;
146:16;147:5;153:16;
156:23,24;157:18;
158:18;161:9,19,21;
163:19;169:23;172:7;
175:13;179:16;180:2,
13;181:6;184:23,23,

187:22;188:7;189:5,
10,12;191:1;193:7
**ones (5)**
58:25;130:11;
155:23;166:12;
185:17
**online (10)**
50:20,22;111:10,
15;112:23,24;132:17;
178:25;179:15,16
**only (25)**
6:12,12;12:6;28:4;
29:16;37:14;38:19;
39:7;67:19;88:10;
106:2,7;124:23;
133:2;150:3;154:5,9;
156:14;160:21,21;
175:13;176:9,10;
187:19;194:21
**onto (2)**
153:18;182:19
**open (4)**
41:11,20;58:7;
119:6
**opened (1)**
108:7
**opens (1)**
133:7
**operates (2)**
48:23;154:15
**operational (2)**
48:9,20
**operations (4)**
30:19;61:10;
149:22;155:3
**opine (2)**
9:13;58:16;68:19,
24;163:6
**opining (1)**
26:4
**opinion (65)**
9:11;15:15;20:7;
26:4,12,14,19;27:11,
16;29:7;30:7,15;54:3,
10;60:25;61:5,17,25;
63:7;64:5,22;66:21;
67:24;85:22;88:3;
94:18;95:25;96:16,
18;98:23;107:20,21;
126:13,24;127:6,7,9,
20,21;143:19;148:7,9,
10;149:11;151:19;
152:22,25;159:1,8;
162:5,10,12;163:13;
165:7;166:23;171:11,
12,15,20;173:2;
175:25;176:12,16;
184:20;195:15
**opinions (14)**
25:25;26:9;41:12;
54:11,14,18,20,22,24;
55:1;118:6,10;119:4;
151:20

**opportunities (2)**
165:20;172:20
**opportunity (6)**
47:17;95:6;99:2;
148:6;170:15;173:17
**opposed (8)**
6:9;45:21;48:13;
62:13;157:21;164:11;
184:25;188:24
**option (1)**
51:14
**order (15)**
5:23;46:22;69:2,14;
71:14;83:22;127:22;
140:17,23,25;141:4,7,
11,16;166:4
**ordered (2)**
46:3;139:13
**orders (3)**
40:13;41:12;140:9
**organization (6)**
13:3;16:21;27:19;
32:4;84:18;141:18
**organizations (8)**
12:12;18:5,13;
57:17;73:14;82:14;
142:1;151:10
**organized (2)**
91:21;170:5
**organizing (1)**
53:14
**original (5)**
21:18;70:17;
105:25;132:6,9
**originally (5)**
4:24;8:20;21:14;
29:19;92:22
**others (5)**
66:18;96:8;106:10;
110:17;187:12
**ought (1)**
89:11
**ours (2)**
54:15;156:24
**out (79)**
9:12,19;11:20;
12:16;16:11;20:17;
29:10;34:7;39:17;
43:16;44:19;45:11;
58:23;61:13;63:18;
64:11;69:4,14,18,22,
24;71:15,19;73:21;
81:25;84:7;85:5,9,13;
86:2;87:3;91:5;93:5;
94:7;96:21;99:21;
102:12,23;104:13;
105:3;106:16;119:18,
21,22;123:19;124:10,
24;126:19;127:4;
130:12;132:5;137:25;
138:24;139:13,15,24;
140:3,6,25;141:8;
144:3;145:9;147:12;

149:20;150:4;152:22;
166:3;172:25;173:3,
14;178:6;179:21;
180:1;184:2,7;
188:17;191:13,16,18
**outcomes (1)**
99:11
**outside (1)**
40:9
**over (29)**
5:18;6:6;7:14;
13:19;21:25;25:21;
29:9;33:17;35:5;
42:14;47:14;48:2,9;
56:7;85:14;96:15;
123:13;124:13;
125:15;135:12;
138:14;153:6,22;
155:13;163:11;180:1;
182:1,2,19
**overall (2)**
126:24,25
**overlap (1)**
57:5
**overlapped (1)**
123:18
**overly (2)**
172:18;174:12
**Overseas (2)**
34:7;70:17
**overseeing (2)**
40:17;177:16
**oversight (1)**
181:18
**own (10)**
17:8;36:10,11;
41:18;105:12;155:24;
165:9,18;166:24;
194:8

---

## P

**package (1)**
34:1
**packed (1)**
44:10
**page (112)**
10:20,20,21,22,25;
11:1,22,22;12:5;15:3;
22:10;25:2,20,20,22,
22;28:9,9;32:17,18;
68:15,17,17;72:20,20;
74:7,9,9,19,21,22,23,
25;78:14,15,15;80:13,
14,14,15,16,16,17;
101:15,16,16,16;
103:15,16;107:11,12,
12,13;108:22;109:16,
21;110:5,6;113:19,
19;120:20,21,22,22;
121:5,13;122:11,11;
130:12,13;131:4,5,19,
20,20,23;132:6,6,8,9,

11,12;133:7;135:24,
25;136:25;139:8;
143:11,12;157:1;
160:4,5;164:2,2,23;
168:10;170:19,20;
172:1;175:9,9,10,10,
10;177:4;178:18,19;
182:17,19,19;189:13,
13
**pages (5)**
21:7;31:18;60:8;
109:7;114:21
**paginated (1)**
15:4
**pagination (1)**
178:18
**paid (1)**
45:1
**painfully (1)**
25:13
**pair (1)**
147:4
**pamphlets (1)**
144:19
**pandemic (1)**
194:14
**paper (5)**
78:19,22;79:4;
105:21;173:3
**papers (2)**
18:10;105:22
**paperwork (4)**
104:21;121:11;
122:8;190:13
**paragraph (50)**
22:14;28:10;38:20;
42:3;48:25;49:2;60:6;
66:18;67:2;68:17,18;
74:9,13,25;75:10;
76:22,22;77:10,11;
80:18;101:18,19;
103:16;107:13;
120:23;121:9;122:13;
132:10,15,25;136:24;
137:16;139:9;143:13;
145:25;146:9;148:24;
160:18;162:19;
163:19;164:3,13,23,
25;168:11;172:2;
175:12;177:4;178:19;
180:14
**parallel (1)**
77:9
**paramount (1)**
149:3
**part (32)**
15:3;16:15;27:7;
30:12;35:25;45:23;
49:19;51:19;52:9;
56:14;57:16;58:12;
60:21;70:14;79:4;
81:21;82:24;87:17,
22;88:22;109:1;

110:7,13,21,23;
111:21;118:25;
136:16;142:2;145:18;
156:25;188:8
**participants (3)**
9:18;177:6;187:24
**participate (7)**
18:8;57:13;81:17;
99:3;148:6;164:20;
168:9
**participated (1)**
105:23
**participation (5)**
129:6;164:7,17;
177:9;185:9
**participatory (1)**
125:24
**particular (13)**
41:13;70:9;104:13,
16,17;144:23;145:7,
11;147:20;150:5;
166:6;177:11;179:4
**particularly (3)**
98:20;155:14;158:5
**parties (5)**
80:11;90:9,16;
151:24;160:15
**partisan (1)**
28:6
**party (2)**
40:9;154:24
**pass (1)**
134:5
**passed (7)**
21:23,25;26:23;
27:3;33:5;34:1;
142:20
**passive (4)**
168:15,18;169:7,25
**past (4)**
13:19;82:25;
147:25;163:9
**Patrick (2)**
12:25;13:1
**pauses (1)**
120:18
**pay (1)**
179:5
**PDF (2)**
20:18;37:4
**peak (1)**
190:23
**penal (1)**
174:17
**penalties (2)**
42:23;116:2
**penalty (1)**
43:2
**pending (2)**
19:18,19
**people (63)**
14:20;39:12;44:8;
47:11;49:22;50:13;

51:21;53:7;56:12;
61:13;62:11,12,23;
63:4;65:17;75:13,18;
76:1;81:12;84:25;
86:1,8;91:5,7,19;92:2,
10,23;94:1;99:4;
101:7;102:15,18;
103:8;111:23;125:9;
126:20;129:17,24;
134:24;135:3;136:16,
17;139:24;147:22;
148:4,4;149:7;150:4;
159:4;164:19;166:20;
168:8;173:11,16;
174:23;176:2,10,11,
14;185:7;186:4;
194:11
**people's (3)**
99:22;171:21,22
**per (3)**
4:25;105:8;136:9
**perceived (1)**
45:25
**percent (2)**
152:7,12
**perception (1)**
82:3
**perfect (3)**
54:1;100:19;101:8
**perform (2)**
59:25;104:24
**performance (10)**
63:17;106:4;
110:19;111:14;
151:22;182:14;187:3;
189:22,23;190:7
**performs (1)**
110:23
**period (10)**
19:20;21:25;41:3,
13;48:10;56:10;
57:25;125:16;179:10;
180:2
**periods (2)**
119:20;188:3
**permissive (1)**
169:2
**permit (2)**
81:17;136:13
**permits (1)**
187:7
**person (17)**
51:3;61:9;70:2;
71:1,22,23;72:4,5,16;
75:16;89:8;92:9;95:2;
100:12;106:7;175:13;
185:24
**personalities (1)**
128:12
**persons (10)**
12:4;135:10;
156:13;160:22;
162:22;163:1,7;

166:25;176:22;177:1
**person's (2)**
64:17;91:19
**perspective (5)**
13:10;149:18;
170:22;171:8;190:22
**petitioner (1)**
16:12
**petitions (1)**
193:24
**Pew (1)**
106:1
**Philadelphia (1)**
105:24
**phone (4)**
4:21;57:25;68:16;
196:10
**photo (4)**
92:23,24,24;193:4
**phrase (9)**
60:16;69:5;70:3,10;
151:11,15;157:6,13;
172:24
**physical (2)**
110:24;145:17
**picture (1)**
172:20
**piece (2)**
49:5;54:3
**PIO (1)**
55:4
**place (45)**
9:15;40:21;43:18;
50:1,7;52:6;55:22;
63:19;69:2,11,16;
80:24;81:10,13;
86:10,12,17;88:4;
89:9,10,18,24,25;
91:25;92:6,13,17;
94:15;96:23;98:12;
102:16;104:3,16;
105:3;126:23;128:15;
136:12;140:11;142:4;
159:23;169:20;
170:16;171:3;175:20;
189:19
**places (12)**
13:9;71:12;90:13;
97:11;161:6;162:8,9,
10,12;165:25;188:21;
189:14
**plaintiffs (6)**
4:23;11:16;21:14;
24:6;26:5,14
**plaintiffs' (7)**
9:4,25;10:2,4;
11:13;12:4;162:16
**plan (2)**
57:23;58:3
**platform (1)**
111:15
**platforms (1)**
50:9

**played (2)**
56:7;72:13
**plays (1)**
33:19
**plenty (1)**
130:12
**plus (1)**
137:1
**pm (1)**
196:15
**point (32)**
44:8;56:10;59:16;
61:15;74:6;78:1,18;
79:8;84:16;87:4;
98:16,17;99:21;
105:20;106:14,22;
132:19;134:5;140:24;
142:3,4;146:2;155:5;
156:25;160:13;178:6,
10;182:23;191:16,18;
195:3,14
**pointed (3)**
45:11;96:21;184:7
**pointing (1)**
132:5
**points (3)**
109:3;129:21;130:6
**policies (4)**
9:14;37:20;68:25;
69:15
**Policy (6)**
13:13;26:14,20;
166:13,16;190:11
**political (8)**
52:14;64:16;79:19;
90:9;94:2;154:24;
188:9;194:1
**politically (2)**
43:19;47:5
**poll (130)**
7:18;9:17;18:12;
50:15;60:16,17,21;
61:1,3,6,8,8,10,11,12,
16,18,20,23;62:2;
63:10;64:4;65:9,10,
15;66:1,18,23;67:17,
17;68:1,1,11,12;69:3;
71:3;75:14,24;76:12;
77:19,22,24;78:12;
83:11,24;90:4,4,
91:17;92:4,6;93:12;
94:13,25;95:4;98:9;
101:20;103:17;104:2;
105:4;107:16;108:15,
23;110:17;112:23;
113:4,24;117:24;
121:2;122:14;124:9,
12,20,21;125:20;
126:8,14;127:8;
128:5,8,11,13,24;
131:7;136:4,6,13,13,
16;139:14;141:1,2;
148:7,10;149:4,6;

150:4;151:11;159:23;
164:5,25;165:2,21;
166:2,24;167:15,17;
169:23;170:6,10,13,
21;171:1,5,17,21;
172:21;173:24;175:6,
18;176:1,5;177:1,6,7,
22;178:8;191:4;
195:20,20,25
**polling (35)**
63:18;75:16;86:12;
89:9,10,18,23,25;
90:13;91:25;92:6,13,
17;97:11;102:16;
104:16;105:3;126:23;
128:15;136:5,12,18;
151:14;159:23;161:6;
162:5,8,9,9,12;
169:20;170:16;171:3;
175:20;189:14
**polls (3)**
61:11;91:22;176:22
**pop (1)**
186:11
**population (5)**
152:2,6;153:11,11;
176:6
**portal (1)**
138:1
**Porter (1)**
18:25
**portfolio (3)**
49:19;50:7;88:6
**portion (3)**
25:24;109:9;119:24
**portions (2)**
62:4;64:2
**Portland (1)**
106:1
**position (7)**
28:11,11;31:8;
32:11,12;46:12;
128:24
**positions (3)**
28:5;73:23;118:11
**possibilities (2)**
151:2,3
**possibility (3)**
148:4;171:17;
172:11
**possible (3)**
101:3;112:6;123:21
**post (1)**
53:1
**posted (2)**
44:23;178:25
**post-election (3)**
184:14;189:14;
190:1
**posting (1)**
45:1
**power (3)**
35:22;40:12;95:10

**PowerPoint (6)**
124:19;125:25;
129:13,16;130:8,10
**PowerPoints (1)**
124:22
**powers (6)**
40:5;42:21;59:24;
60:3;66:14,16
**PPP (1)**
133:25
**practical (3)**
41:16;89:22;109:6
**practice (12)**
15:19;16:22,25;
26:11;86:18;142:17;
146:24;147:25;
156:19;175:5;182:23;
189:1
**practices (11)**
9:14;11:18;68:25;
69:16;91:3;106:19;
113:22;125:14;
163:10;168:18;
174:19
**preclearance (1)**
146:17
**predates (1)**
71:5
**predecessor (2)**
16:20;27:19
**preparation (3)**
27:3;125:3,4
**prepare (2)**
6:24;26:19
**preparing (3)**
8:12;79:8;125:1
**present (5)**
56:12;60:17;
129:12,25;180:3
**presentation (3)**
56:15;125:18;
129:18
**presentations (2)**
17:23;57:4
**presented (9)**
27:7,8;124:19;
129:8;137:3;165:24;
170:21;171:2;176:19
**presenting (1)**
148:25
**presents (1)**
146:11
**preserved (1)**
41:20
**president (3)**
73:16;123:5,5
**presidential (5)**
41:4;80:21;81:6;
151:3;186:7
**president's (1)**
13:4
**press (4)**
44:5;52:24;179:18,

20
**presume (3)**
   5:4;119:16;162:24
**presumes (1)**
   163:2
**presuming (2)**
   127:12;171:12
**pretty (13)**
   44:14;46:24;50:7;
   88:6;100:11;114:17;
   141:10;146:6;170:7;
   179:9;180:8,9;184:6
**prevalent (1)**
   170:12
**previously (1)**
   122:6
**primarily (8)**
   25:6;40:8;42:10;
   56:2,17;64:7;126:25;
   143:23
**print (1)**
   21:7
**printed (3)**
   20:16;59:10;131:25
**printout (1)**
   115:7
**Prior (8)**
   48:5;54:10,15;57:1,
   2;83:4;125:3;190:23
**private (4)**
   15:19;16:21,25;
   75:23
**privilege (2)**
   5:6,9
**privileges (1)**
   157:19
**pro (1)**
   138:5
**proactive (3)**
   46:24;155:14;
   181:12
**probable (1)**
   45:20
**Probably (31)**
   5:20;8:16;16:3;
   21:24;35:10;39:24;
   41:9,21,22;43:6;
   55:15;78:17;89:22;
   91:13;93:4;94:23;
   100:5;104:11;110:14;
   120:17;136:21;142:2;
   144:22;167:3;170:10,
   17;180:13;185:22;
   188:14;191:21;193:7
**problem (4)**
   47:7;87:8;89:11;
   189:6
**problems (7)**
   73:8;81:24;93:12;
   94:10;107:17;182:4,6
**procedurally (1)**
   195:1
**Procedure (3)**

   4:5;19:25;172:3
**procedures (9)**
   9:14;26:10;37:21;
   44:21;62:7;68:25;
   69:15;89:16;140:11
**proceeded (1)**
   22:5
**proceeding (2)**
   4:6;16:9
**proceedings (1)**
   113:23
**process (30)**
   9:18;19:13,16;25:8,
   14;33:11;54:10;
   91:14;92:11,15;
   93:11;95:14;97:23;
   99:20;104:5;111:21;
   157:16;162:21,25;
   164:5,20;168:9;
   174:1;177:7;179:11;
   181:21,24;187:24;
   189:25;194:4
**processes (3)**
   104:4;107:25;136:7
**processing (1)**
   157:21
**produced (5)**
   7:12,21;8:1,3;195:7
**product (1)**
   5:10
**professional (5)**
   28:10;57:17;73:13;
   133:8;135:5
**Professor (4)**
   79:10,13;118:12,12
**professors (2)**
   7:7;105:16
**program (30)**
   17:21;81:13;85:24;
   87:25;88:4;94:15;
   96:9,23;99:2;101:20;
   110:8,8;133:4,8;
   134:22;135:6;137:4;
   138:10;146:12;153:9;
   165:2,11,23;166:9,9;
   167:5;168:2;175:21;
   176:18;177:19
**programs (10)**
   97:19;98:2;135:2;
   143:14;144:4,15;
   157:12;163:15;165:9;
   177:15
**prohibit (1)**
   165:8
**prohibition (1)**
   38:11
**projected (1)**
   152:7
**promise (1)**
   6:18
**prompted (1)**
   58:24
**promulgate (1)**

   113:21
**promulgated (1)**
   84:18
**pronounced (1)**
   134:11
**pronouncing (1)**
   18:24
**proof (2)**
   65:12;95:1
**proper (5)**
   33:20,21;38:15;
   111:3;195:2
**properly (4)**
   99:8;102:13;
   104:21;108:12
**proposed (2)**
   10:15;180:4
**prosecute (1)**
   42:6
**prosecution (1)**
   45:20
**protect (4)**
   96:24;147:22;
   158:1;163:17
**protected (9)**
   49:24;99:23;
   101:22;102:22;
   158:14,25;165:3;
   167:11;177:21
**protecting (6)**
   81:15;146:23;
   158:10,20;159:10;
   164:17
**protective (1)**
   50:3
**protesting (1)**
   94:1
**protocol (5)**
   137:17,21;142:17;
   164:24;186:20
**protocols (8)**
   12:16;97:5;106:3;
   112:22;138:6;139:5;
   153:6;176:18
**provide (10)**
   9:10;67:16;68:7;
   106:6;159:3;162:4;
   172:20;174:23;175:5;
   177:6
**provided (13)**
   7:3;9:24;10:1;
   17:15;26:11;28:24;
   34:2;40:7;83:23;
   98:24;112:14;119:1;
   152:9
**provides (6)**
   83:14,21;88:15;
   166:14;175:18
**providing (6)**
   9:7;26:13;65:20;
   103:24;111:1;159:10
**provision (6)**
   37:17;52:3;55:19;

   67:5;70:15;109:11
**provisional (38)**
   33:10;51:4;89:15;
   90:25;92:17;99:7;
   100:3;109:22;126:22;
   147:14,16,17,21;
   163:21;168:15,19,24;
   169:9,12,16,25;172:2,
   7,12,17,21,23;173:4,
   11,16;174:1,20,24,25;
   175:1,2,4,8
**provisions (16)**
   22:12,25;23:3;
   26:22;33:24;39:24;
   43:4;57:15;62:14,17,
   20;70:19;72:19;
   86:10;146:17;174:2
**public (9)**
   4:7;17:21;41:10;
   43:22;49:21;93:19;
   94:16;119:1;187:21
**publication (1)**
   106:15
**publicity (1)**
   181:16
**publicly (1)**
   52:22
**published (2)**
   55:9;106:11
**pull (7)**
   10:14;20:22;21:2;
   28:23;36:23;77:25;
   78:8
**pulled (2)**
   20:16;133:17
**pulling (1)**
   28:23
**punch (1)**
   102:18
**purpose (2)**
   23:13;83:15
**purposes (8)**
   4:3,4;11:10;39:15;
   41:16;70:12;77:7;
   106:17
**pursuant (1)**
   40:23
**purview (1)**
   41:6
**pushback (1)**
   86:6
**put (28)**
   8:13,15;13:14;
   43:18;47:15;48:1;
   62:15;63:3;69:6,7;
   79:22;81:10;82:9,11,
   15;83:2;90:6,14;
   98:12;102:8;149:5;
   173:22;179:15,16;
   185:19,22;186:8;
   190:21
**puts (3)**
   95:11;106:23;166:8

**putting (7)**
   50:24;79:11;80:1;
   171:6,15

## Q

**qualifications (1)**
   95:7
**qualified (5)**
   24:13,16,19,21;
   25:3
**qualify (1)**
   186:9
**qualifying (1)**
   25:9
**qualitative (1)**
   104:11
**quality (2)**
   13:15;97:6;104:14,
   20;122:8;178:3;182:2
**quantify (1)**
   127:25
**quantitative (3)**
   104:12,12,18
**quantity (1)**
   157:14
**quickly (4)**
   56:13;108:4;
   119:21;130:12
**quit (1)**
   142:21
**quite (9)**
   8:13;14:19,21;
   34:15;102:17;144:13;
   155:12;177:24;
   190:20
**quote (11)**
   22:19,20,21;23:7,
   11,21,22,25;44:6;
   67:3,16
**quotes (2)**
   75:9;167:10

## R

**race (2)**
   43:25;175:24
**races (1)**
   176:2
**racial (1)**
   137:11
**Racine (2)**
   94:10,12
**Raffensperger (2)**
   4:3;124:5
**raft (1)**
   106:15
**raise (1)**
   106:25
**raised (4)**
   81:11;126:18;
   163:11,12
**ran (2)**

83:5;154:7
**range (11)**
  76:10;82:9;83:24;
  93:18;97:23;104:24;
  110:10;138:11;
  152:12;153:6;155:9
**ranges (1)**
  137:10
**rather (4)**
  44:20;54:21;
  120:14;129:25
**rating (1)**
  187:24
**Rayburn (3)**
  123:24;183:11,15
**reach (5)**
  114:14;122:14,17;
  145:12;173:14
**reached (2)**
  145:15;195:1
**reaching (2)**
  62:9;137:25
**reaction (1)**
  81:22
**read (23)**
  11:13;17:13;20:17;
  58:19,22;68:21;
  105:20,21;114:10,12;
  115:4,19;116:17;
  118:3,9;162:7,15,17;
  168:23;173:20;
  183:13;195:13,19
**reading (9)**
  52:8;114:21;
  129:13,25;130:1;
  144:8,8;172:19;
  180:19
**reads (11)**
  59:23;75:1;80:19;
  101:19;107:14;
  120:24;130:10;
  136:25;139:9;143:13;
  195:14
**reaffirm (1)**
  130:6
**reaffirmed (1)**
  118:11
**real (3)**
  9:5,5;29:5
**realize (3)**
  40:19;105:7;118:1
**really (20)**
  13:17;42:20,23;
  43:24;53:21;71:15;
  81:23;82:8;88:15;
  106:17;108:3;124:23;
  129:19;149:12;
  163:14;167:7;175:17;
  180:24;191:9;195:24
**reason (18)**
  81:16;87:17,22;
  92:18;117:8,14;
  128:21;129:2,5;

147:19;152:19,21;
  159:3,14;173:7;
  174:8;187:13;194:22
**reasonable (1)**
  127:16
**reasonably (2)**
  108:5;174:6
**reasons (3)**
  142:22;147:24;
  187:22
**recall (38)**
  5:16;8:19;9:8;
  13:11,22;14:14;16:8;
  23:23;40:22;42:16;
  63:14;69:9;93:20;
  94:4,5,8;114:11,17;
  117:7;123:16;125:5,
  7,10,15,25;130:18,19;
  135:9;140:22;152:13;
  153:19;180:17;181:8;
  193:11,13,21,24;194:4
**receive (3)**
  65:12;87:6,7
**received (4)**
  134:8;139:11;
  183:22,24
**receiving (2)**
  65:19;112:6
**recent (3)**
  5:20;52:5;113:7
**recently (1)**
  33:23
**recess (3)**
  58:10;107:9;192:16
**recognition (6)**
  12:11;35:9;48:20;
  82:7;90:12;165:12
**recognize (4)**
  83:2;125:8;148:11;
  157:23
**recognized (3)**
  25:10;32:5;91:13
**recognizes (1)**
  32:24
**recognizing (1)**
  85:15
**recollection (2)**
  123:24;133:13
**recommendations (3)**
  51:23;82:12;164:21
**recommended (1)**
  27:24
**record (10)**
  4:23;6:10;10:23;
  20:7;32:11;74:18;
  80:9;111:3;186:15;
  196:2
**recording (1)**
  172:23
**records (5)**
  41:11,20;49:1,5,21
**recount (4)**
  43:9,12;44:10,11

**rectified (1)**
  124:13
**rectify (1)**
  187:3
**recurring (1)**
  127:17
**redistricting (1)**
  153:13
**reduce (1)**
  171:16
**reduced (1)**
  36:2
**reducing (2)**
  23:13;136:7
**redundant (1)**
  101:2
**refer (6)**
  10:20,20;16:20;
  26:14;78:18;161:18
**reference (9)**
  82:22;114:19;
  116:23;131:21;132:4;
  141:4,17;150:20;
  183:25
**referenced (1)**
  83:18
**references (3)**
  95:24;116:20;
  126:10
**referendum (1)**
  43:17
**referral (1)**
  45:19
**referrals (2)**
  184:1,3
**referred (3)**
  26:5;55:12;126:6;
  184:16;185:25
**referring (5)**
  20:7;74:10;100:6;
  180:14;196:6
**refers (3)**
  61:12;185:2;188:7
**refine (1)**
  156:16
**reflect (3)**
  11:9;25:24;114:25
**reflected (3)**
  30:10;54:12;160:19
**reflects (1)**
  134:13
**regarding (5)**
  9:21;74:3;124:8;
  127:12;152:23
**regards (1)**
  67:25
**regimen (1)**
  154:5
**regional (2)**
  56:8,24
**register (2)**
  91:21;102:13
**registered (4)**

97:8;99:13,18;
  102:15
**registrar (3)**
  116:24;117:5,9
**registrars (6)**
  60:13;69:3;112:2;
  113:23,24;117:25
**registration (23)**
  33:9;37:22;62:19;
  70:16;75:17;76:24;
  84:9;91:23;97:7,9,22;
  99:10,24;102:14,25;
  106:3;140:12;142:9,
  14;143:3,4;147:23;
  182:3
**regular (3)**
  38:2;75:4;180:1
**regularly (1)**
  49:23
**regulated (1)**
  30:17
**regulating (2)**
  38:13,21
**regulation (2)**
  29:18,19
**regulations (2)**
  105:9;113:22
**reinforce (1)**
  159:20
**reinforced (6)**
  148:14,16,17;
  161:8;162:13;182:3
**reinforcing (1)**
  176:5
**related (11)**
  18:5;26:10,17;
  27:15;54:21,21;55:2;
  56:17;77:9;104:14;
  179:21
**relates (3)**
  128:22;174:19;
  192:22
**relating (1)**
  38:14
**relationship (2)**
  71:10;82:20
**relationships (1)**
  57:16
**relatively (1)**
  98:23
**release (2)**
  52:24;179:20
**released (1)**
  20:23
**reliable (1)**
  170:7
**relied (4)**
  152:24;153:1,2;
  168:3
**relief (3)**
  38:7,11,12
**remained (1)**
  52:3

**remember (14)**
  5:17;14:16;22:20,
  20;39:18;93:24;
  113:10;115:5;135:8;
  144:18;155:24;
  180:18;181:6;185:7
**remind (1)**
  173:23
**removed (1)**
  76:7
**render (1)**
  64:3
**rendered (1)**
  94:19
**repeat (1)**
  87:20
**repeated (1)**
  124:14
**repeatedly (1)**
  179:3
**repeating (1)**
  182:1
**rephrase (1)**
  6:21
**replaced (1)**
  32:14
**report (125)**
  6:25;7:3,5,12,14;
  8:12,18;9:13;10:8,25;
  11:10;25:18,19,21,25;
  26:21,25;28:9;31:18;
  48:13,13,14,18;58:12;
  59:1;68:14;72:21;
  74:9,10,16,17,21;
  78:14,15,18;79:5,9,
  16,18,21;80:4,14,17,
  17;82:15;83:18;
  88:15;95:18;101:17;
  103:15;107:11;110:5;
  113:19;114:12,13,15,
  17;115:2;118:2,6,9,
  10,16;120:21;121:6,
  7;122:12;125:1,3,4;
  126:13;127:7,20,23,
  24,25;130:15;131:5,
  20,21;132:3,7,9,13;
  134:9,13;135:24;
  136:25;139:10;140:7;
  142:4,4;143:11;
  151:6,8,9;157:1,2;
  160:5;162:3,4,7;
  163:6,9;164:2;
  168:20;169:4,15;
  170:20;172:1;177:23,
  25;178:7,14,19;
  180:25;182:10,11,19;
  187:1;189:13;190:4;
  194:23;195:7,15
**reported (4)**
  44:23;45:7;46:16;
  47:14
**reporter (6)**
  6:8;68:22;85:8;

87:20;160:10;196:9
**reporting (3)**
 45:2;48:4,8
**reports (12)**
 11:6;47:23;48:8;
 55:11;97:1;99:21;
 100:17;119:1;154:8;
 162:17,18;163:11
**represent (1)**
 4:20
**representatives (3)**
 56:25;85:20;150:23
**represented (6)**
 15:19,22;16:21;
 17:1,4;57:17
**Republican (1)**
 31:1
**request (5)**
 4:25;6:12;7:19,23;
 41:11
**require (5)**
 92:16;111:16;
 115:25;116:6;169:20
**required (14)**
 41:19;47:23;48:7;
 50:17;65:8;91:15,25;
 110:15;113:21;114:2;
 116:25;117:6,10;
 140:7
**requirement (8)**
 53:17,21;92:23;
 103:13;114:3;117:22;
 139:10;142:11
**requirements (21)**
 33:7,12;35:11;
 36:11;39:22;48:4;
 54:13;64:6,9,25;84:6;
 91:6;96:14,15;108:8;
 121:3;139:13;155:16;
 174:2;193:15;194:9
**requires (13)**
 32:25;34:13;37:18;
 65:13;70:11;75:1;
 98:8;115:23;136:6;
 150:9;160:20,21;
 172:7
**Research (5)**
 12:15;18:6,9;
 105:22,23
**reserve (1)**
 5:5
**residence (1)**
 95:8
**resolve (2)**
 19:21;107:17
**resolved (2)**
 19:22;35:8
**resources (6)**
 13:7,11;63:5;
 101:12;133:25;
 173:25
**respect (9)**
 16:4;54:14;97:6;

99:9;100:16;104:4;
 146:22;194:13,13
**respond (5)**
 81:23;101:3;128:3;
 184:12;186:16
**responded (2)**
 82:6;87:9
**responding (1)**
 194:12
**response (1)**
 187:11
**responsibilities (20)**
 9:20;30:2,5;33:16;
 42:15;44:19;65:2;
 66:3;69:18;70:1;76:2;
 82:1,18;84:14;85:4,
 15;99:8;139:25;
 154:14;177:8
**responsibility (27)**
 33:18;53:12;61:24;
 63:3,15;64:19,21,22;
 68:8;69:13,19,23,24;
 70:8;71:18;77:24;
 82:8;91:20;95:15;
 103:19;149:3;157:20,
 25;166:21;183:13;
 189:10;193:20
**responsible (21)**
 29:16;31:22;32:21;
 33:1,14,20;34:6;
 36:12;61:20;62:1,18;
 63:12,12;64:3;71:24;
 72:16;79:11;156:3;
 167:17;177:16;194:6
**responsive (2)**
 180:10;185:10
**responsiveness (1)**
 5:7
**rest (3)**
 16:13;95:10;166:17
**resting (1)**
 166:21
**restrain (1)**
 23:14
**restricted (1)**
 161:21
**restricting (1)**
 146:10
**restriction (2)**
 64:15;161:22
**restricts (1)**
 165:22
**result (6)**
 17:23;46:10;47:4;
 52:4,6;100:1
**results (16)**
 44:7,21,23,24;45:2,
 7;46:16,17,19;47:11,
 14;87:13;111:5;
 179:8;190:1,6
**retained (1)**
 18:19
**review (8)**

17:21;18:10;20:17;
 47:15;96:14;168:16;
 190:12,13
**reviewed (4)**
 6:25;27:25;58:12;
 139:12
**reviewing (1)**
 110:19
**reviews (1)**
 50:10
**revised (1)**
 53:4
**Rhode (1)**
 156:1
**rid (1)**
 181:13
**right (173)**
 6:23;9:4,6,23;15:2;
 17:7,9,10;18:1,13,24;
 19:4;20:4,21;21:9;
 22:9;23:10,21;26:13;
 27:11,17;28:5,8,18;
 31:9,17,18;32:15;
 34:19,20,21;36:17,21;
 37:25;38:4,5;39:2;
 41:7,24;42:3;44:5;
 46:12;48:25;49:8;
 51:2,5;53:25;54:5;
 55:8,14;58:19;59:18,
 23;60:4,5,18;63:24;
 64:1;65:18,22;66:7,
 17;67:6,23;70:13;
 71:20;73:1,25;74:1;
 78:25;84:1;86:12,19,
 20;90:20;91:25;
 94:22;95:18;98:22;
 99:23;100:8;101:24;
 107:1,1,6;108:14,18;
 109:2,15,23;110:4,25;
 111:6;112:4,21;
 113:18;114:3,4,7;
 115:1,9,22;116:13,18,
 19;117:3,20,25;118:8,
 15;119:23,23;120:7;
 121:15,17,17;122:5,
 11,25;124:7,25;
 126:4;127:15;128:6,
 7,9;130:25;131:4,10;
 132:15,25;133:6,21;
 134:4;135:9,14,23;
 136:23;139:8;140:2;
 142:24;143:20;145:5,
 20;147:10,11;152:7;
 155:8;156:25;159:13;
 160:4;162:3,16,18;
 163:6;164:22;165:3;
 167:11,22;168:9;
 172:9,14;177:22;
 178:17;180:12;
 189:12;191:15;192:8,
 11;194:16,21;196:7,
 13
**right-hand (1)**

133:14
**rights (26)**
 11:17;21:13;43:21;
 63:2;70:24,25;81:15;
 84:9;101:21;102:22,
 23,25;146:18,23;
 158:10,14,20,24;
 159:10,17;163:4;
 164:18;166:19;167:1;
 171:24;177:21
**rigorous (6)**
 81:13;85:23;87:1,2;
 88:4;101:2
**rise (1)**
 94:22
**risk (2)**
 166:8,12
**rivers (1)**
 36:2
**road (1)**
 64:13
**robust (1)**
 172:20
**Rogers (1)**
 123:4
**rogue (1)**
 128:11
**role (16)**
 14:18,25;33:18;
 34:5;53:13;60:22;
 64:17;72:13;73:11,
 13;75:22;101:9;
 123:7;150:20;156:8;
 183:11
**room (1)**
 4:22
**roughly (6)**
 8:11;36:7;40:19;
 111:7;135:10;136:4
**rule (4)**
 56:8;115:5;166:2;
 173:2
**Rules (6)**
 4:5;6:3;62:7;
 113:21;116:7;169:13
**run (8)**
 36:15;39:13,16;
 100:23;106:4;136:12;
 139:6;190:16
**running (6)**
 36:12;81:19;156:2,
 3;184:10;188:16
**runs (2)**
 61:9;66:5
**rural (3)**
 35:24;89:9;136:11
**Ryan (1)**
 124:1

**S**

**Sam (1)**
 49:3

**same (29)**
 4:21;25:2;41:25;
 63:21,24;67:1;69:20;
 82:4;83:6;84:2;88:24;
 89:10,11;112:20;
 121:25;122:2,3;
 127:17;141:13;143:1;
 157:12;164:23;
 165:20,21,25;171:20;
 175:9;177:4;189:19
**satisfy (1)**
 103:24
**saw (12)**
 32:4;38:20;70:15;
 71:3;82:2,16;102:10;
 125:21;126:6,10;
 145:2;191:3
**saying (10)**
 24:20;147:1;
 149:11;164:15;176:4,
 4;185:24;189:21;
 192:3,7
**scaled (1)**
 161:23
**scaling (1)**
 162:2
**scenario (2)**
 170:25;171:7
**scenarios (3)**
 147:21;171:16;
 172:4
**schedule (2)**
 48:11;55:25
**scheduled (1)**
 4:24
**schedules (1)**
 180:4
**Schmitz (1)**
 16:12
**scholarship (1)**
 105:9
**school (2)**
 56:3;174:17
**Science (3)**
 18:8;105:22;188:9
**Sciences (4)**
 78:20;79:1;97:25;
 190:4
**scientists (2)**
 79:19,20
**scope (1)**
 50:4
**screenshots (1)**
 88:11
**scrolling (1)**
 22:17
**scrutiny (2)**
 44:12;146:22
**se (1)**
 105:8
**sea (1)**
 81:21
**sealed (1)**

16:13
**second (17)**
21:4;22:13;28:10;
31:19;60:8;80:9,18,
19;87:4;91:9;92:9;
101:18;116:10;
132:25;137:16;164:3,
23
**Secretary (71)**
4:2;9:16;11:21;
12:13;14:8,19;15:1;
59:24,25;60:3,12;
61:1,5,17,19,21,22;
62:1,6,16;63:9,17;
64:3,11,16;65:4,9,11,
14,25;66:3;67:19,21;
69:1,11;72:3,5,15;
76:8;97:4;98:10;
102:6;116:7;117:17,
21;120:24;122:15;
123:11;124:5;126:2;
127:1;134:15;139:11;
143:14,22;146:1,7;
149:19;155:20,25;
156:5;165:14;173:14;
183:9;184:9,25;
185:4;189:2,7,8,8
**Section (41)**
11:18;22:11;36:24;
37:13,15,18,18,21,25;
38:5,19;40:6;41:25;
42:14,18,20;43:7;
48:25;51:24;59:5;
60:3;66:8,13;67:7,15,
20,24;75:10;76:25;
77:11;83:14,17;84:2;
115:10,10;116:9;
117:1,10,11;133:12;
148:23
**sections (5)**
37:5;79:10,16;80:3,
3
**Securing (1)**
78:21
**Security (4)**
14:5;33:25;79:24;
194:14
**seeing (3)**
97:13;130:20;
133:22
**seem (2)**
100:3;169:17
**seemed (6)**
45:5;118:13;
125:24;173:10;182:1,
13
**seems (4)**
88:6;143:23;173:5;
180:15
**select (1)**
117:17
**selecting (2)**
160:23;161:2

**selection (3)**
76:12;81:18;162:5
**sells (1)**
130:12
**semantic (1)**
139:20
**semicolon (1)**
68:22
**senate (3)**
28:3,4;31:16
**senators (1)**
193:2
**send (2)**
56:24;164:4
**sense (27)**
13:8;27:9;30:15;
45:5;52:13;57:5;
71:16;91:8,10;
129:16;132:17;
134:20;141:5,6,9;
143:1,21;144:7;
155:19;170:7,9,15;
179:16;180:22;
181:11;183:24;
194:11
**sensitive (2)**
47:5;153:10
**sensitivity (1)**
176:17
**sentence (23)**
23:11;28:11;75:1;
80:19;87:21;88:24;
101:19;107:13;
120:23;121:16;
122:13;133:1;136:23;
137:9,16;139:9;
162:24;163:2;164:25;
172:2,16;177:4;
178:20
**separate (5)**
21:24;31:3;77:8;
110:13;120:10
**separately (2)**
15:4;124:12
**September (1)**
8:20
**series (9)**
21:19;26:2;82:11;
94:4;109:22;122:12;
144:19;186:1;193:22
**serve (1)**
91:18
**served (4)**
73:16;82:13;154:2;
155:7
**service (1)**
180:17
**services (5)**
9:7;17:9,14;18:19;
99:14
**serving (1)**
164:11
**session (7)**

21:20;22:7;50:18;
111:17;119:3,5,6
**sessions (3)**
60:13;111:25;
119:12
**set (9)**
12:16;55:25;86:23;
110:24;114:18;
165:10;167:13;180:4,
8
**sets (1)**
84:18
**setting (5)**
64:10;160:23;
161:2;162:6;185:16
**setups (1)**
138:12
**seven (2)**
136:6;191:12
**several (6)**
15:11;26:22;78:23;
125:16;130:4;133:17
**shaking (1)**
46:8
**shall (3)**
42:4;59:24,25
**share (3)**
16:11;46:7;85:15
**sharing (1)**
183:14
**sheet (1)**
152:15
**shift (2)**
136:15,15
**shifts (1)**
136:14
**shoes (1)**
71:18
**short (2)**
55:16;96:17
**shortcomings (3)**
99:1;101:13;140:14
**show (8)**
89:12;92:5,13;
99:17;176:11,14,15;
179:9
**showed (5)**
102:16;126:1;
130:16;151:14;
175:23
**showing (1)**
81:24
**shown (1)**
124:17
**shuffled (1)**
121:11
**side (1)**
16:16
**sight (2)**
22:15;23:5
**signed (1)**
16:5
**significance (1)**

178:25
**significant (7)**
45:9;46:5;58:13;
129:10;146:11;
154:25;168:17
**significantly (1)**
152:3
**sign-in (2)**
89:16;113:2
**signing (1)**
194:7
**similar (10)**
49:6,25;122:21;
127:21;138:12;
141:24;143:2;156:21;
173:18;174:14
**Similarly (1)**
117:16
**simple (1)**
73:23
**simplified (2)**
172:18;174:12
**simply (3)**
70:8;108:1;159:20
**single (2)**
65:7;84:17
**singling (1)**
150:4
**singular (1)**
84:21
**sit (2)**
12:12;18:4
**site (2)**
49:12;120:14
**sitting (2)**
86:7;92:9
**situation (6)**
4:7;144:9;171:2,6,
7,18
**situations (2)**
158:21;182:1
**six (4)**
27:22;133:2,9;
191:12
**size (1)**
92:6
**slight (1)**
96:2
**slightly (2)**
91:7,10
**small (1)**
35:14
**smaller (1)**
152:3
**Smith (4)**
7:6;11:7;97:3;
118:12
**socioeconomic (1)**
137:11
**Software (1)**
123:9
**sole (2)**
91:20;114:19

**somebody (7)**
50:24;71:20;92:16;
132:18;158:22;
174:18;184:24
**somebody's (1)**
186:5
**someone (16)**
39:15;45:6;61:10;
65:20;85:1;95:1;
110:22;129:11;130:9;
145:17;155:7;157:25;
173:17;177:18;
181:19;186:8
**someone's (4)**
89:21;94:22;
171:18,23
**sometime (1)**
123:19
**sometimes (6)**
10:21;16:20;72:6,7,
7;92:8
**somewhat (1)**
27:9
**somewhere (1)**
8:7
**sorry (32)**
8:5;15:12;22:17;
40:2,3;49:2;53:19;
59:16;61:15;68:15,
16;74:14;78:3;85:8,
10;93:21;98:13;
114:13;116:12;
118:24;120:18;121:7;
125:2;128:16;136:10;
161:24;163:25;167:7;
175:9;189:18;195:17;
196:3
**sort (8)**
13:14;43:17;
111:10;114:20;
128:11;129:4;138:22;
149:17
**sound (2)**
6:18;152:7
**source (1)**
168:17
**South (1)**
174:8
**space (1)**
86:24
**spans (1)**
109:6
**spawned (1)**
193:22
**speak (2)**
125:2;186:23
**speaker (1)**
150:22
**speaking (1)**
83:16
**speaks (1)**
68:11
**special (3)**

**Fair Fight Action v.**
**Raffensperger**

**Kevin Kennedy**
**March 31, 2020**

75:17;155:15;180:6
**specific (29)**
　7:19;37:23;39:8;
　48:3;67:25;68:3,5,11;
　69:9;85:7,12;86:11;
　94:13;101:24;102:21;
　105:21;125:11,19;
　127:6,9;134:5;141:6,
　9;142:17;147:15;
　162:12;168:25;182:8;
　186:21
**specifically (23)**
　27:16;37:9;42:16;
　43:3;55:17;62:15;
　65:1;68:15;77:1;
　83:14;97:4,18;
　103:23;106:14;
　109:11;115:6;125:15;
　139:5;140:3,14;
　163:3,13;175:1
**specifics (1)**
　180:18
**specify (1)**
　116:1
**speculating (2)**
　120:4;190:21
**spelled (1)**
　139:13
**spent (4)**
　8:12;34:15;79:25;
　155:12
**spoke (2)**
　127:12;189:18
**spoken (1)**
　123:1
**spring (2)**
　22:7;56:1
**spurs (2)**
　128:3;142:22
**square (1)**
　35:25
**squares (1)**
　36:7
**Stacey (1)**
　150:11
**staff (10)**
　32:4;47:21;50:12;
　83:1;123:10;135:3;
　183:8,9;191:9,9
**staffing (1)**
　193:23
**standard (13)**
　48:22;84:17,19,22;
　100:21;105:8;128:22;
　156:12;161:15;
　182:21;183:16;184:4,
　5
**standards (4)**
　33:9;87:15;167:12;
　184:2
**standing (1)**
　71:17
**Stanford (1)**

79:19
**star (1)**
　107:7
**start (4)**
　10:24;29:9;91:9;
　119:12
**started (6)**
　8:17;50:6;94:24;
　119:11;138:16;
　193:15
**starting (4)**
　22:10;98:16;155:4;
　157:1
**starts (5)**
　11:1;16:11;68:19;
　172:2;182:18
**State (179)**
　4:3;9:15,21,22;
　11:20,21;12:13;
　14:19;16:6,18;17:2,3;
　18:15,20;19:2;21:22;
　27:12,24;29:19,21,22;
　32:25;33:3,6,15;35:5,
　11;39:10;46:19,20;
　47:8,12;48:5,6,22;
　51:21;52:17;55:10;
　56:10,14;57:9,18;
　59:25;60:4;61:1,5,17,
　19,22;62:1,5,6,16,24;
　63:17,19;64:3,8,12,
　16;65:9,11,14,25;
　66:3;67:19;69:1,1,11,
　14;71:21,24;72:5,15,
　24;73:4,16,24;75:1,2,
　6;76:8;77:18;80:19,
　25;81:4,14;82:20;
　84:6;85:7,12,20;89:1;
　90:6;95:5;96:12;97:4;
　98:3,7,24;100:7,15,
　18,20;101:11;103:23;
　104:1,8;105:18;
　108:8;112:10,13;
　113:21;115:23;116:7,
　20,23;117:4,17;
　120:24,25;121:24;
　122:1,15;126:2;
　127:1;131:14,15;
　133:11,18;135:2;
　138:8;139:1,11;
　143:14;144:15,24,25;
　146:1;147:10;148:22;
　149:19,21;153:17,22;
　154:2,9,24;155:18,20,
　21;156:1,5,9,18,20;
　157:19;158:13;165:7;
　166:15;167:19;168:1,
　6;169:23;172:8;
　174:5,23;176:13,20,
　24;178:22;179:5;
　185:2;189:3,7,8,15;
　190:9;193:1
**stated (1)**
　156:20

state-directed (3)
　165:1;168:2;177:5
**statement (3)**
　23:24;77:20;121:17
**States (54)**
　13:8,10;15:8,10;
　33:24;34:2;62:24;
　63:9;70:12,24;71:6,8,
　11,13,14,17;72:3,10,
　12,13;73:18;74:3;
　81:22;82:2;85:17;
　95:23;97:15,19;98:1,
　25;106:2;111:6,11,16,
　20;130:25;134:18;
　138:4,6;141:7;
　142:24;146:16,21;
　155:17;158:2,5;
　169:5,13;173:19,22;
　174:3;182:21;189:1;
　190:8
**states' (2)**
　71:8;72:3
**State's (18)**
　9:16;14:8,18;15:1;
　22:4;61:21;71:2;
　98:10;102:6;123:11;
　134:15;143:23;
　158:15;165:14;
　173:14;183:9;184:25;
　185:4
**statewide (14)**
　33:9;36:18;43:9;
　46:9;89:5;93:8;97:6;
　122:14;140:12;142:8,
　14;143:3
**static (1)**
　165:12
**station (1)**
　75:16
**status (4)**
　19:17;119:1;
　137:11;140:9
**statute (29)**
　26:6,25,25;32:1;
　36:24,25;40:6,23;
　42:10;55:15;60:17,
　25;62:4;64:23;65:8,
　24;67:25;68:3,11;
　76:16;77:9;78:2;
　91:16;101:25;103:13;
　115:23;121:22;136:6;
　167:10
**statutes (26)**
　27:1;58:13,16;
　61:12;62:17;64:10,
　13,24;71:23;96:12;
　97:13,14,14;102:1,2,
　23,24;103:2,5;
　106:18;115:4,19;
　116:6;150:9;156:10;
　158:24
**statutory (12)**
　32:11;67:4;69:25;

77:16;87:10;108:2;
　110:1;142:11;168:13;
　170:3;171:24;194:2
**stayed (1)**
　123:10
**stays (1)**
　156:4
**step (2)**
　47:13;138:16
**step-by-step (5)**
　107:15;108:24;
　109:9,12,16
**steps (3)**
　108:11;109:4;
　139:12
**still (15)**
　19:18,19;36:20;
　44:10;68:6;71:23;
　78:17;83:3;100:22;
　133:19;167:18;
　181:14;194:10;
　195:17,19
**stimulus (1)**
　34:1
**stood (1)**
　124:23
**stop (1)**
　128:14
**stopping (1)**
　106:21
**stored (1)**
　55:10
**strategies (1)**
　106:9
**strike (1)**
　163:22
**stripped (1)**
　43:21
**strong (2)**
　9:5;173:22
**strongly (1)**
　151:16
**struck (1)**
　180:23
**structure (4)**
　30:10,20;85:25;
　89:25
**structures (1)**
　72:2
**studies (4)**
　152:24;153:1;
　168:3,4
**study (1)**
　131:1
**stuff (7)**
　39:1;51:1;120:19;
　178:17;192:4;195:11,
　23
**style (1)**
　144:17
**styles (3)**
　143:16;144:5;145:1
**sub (2)**

37:21,21
**subject (7)**
　31:16;146:17;
　147:23;154:9;161:9,
　18;193:6
**subjects (1)**
　146:21
**submitted (2)**
　30:25;118:2
**subparagraph (4)**
　38:1;116:21;
　117:18,22
**subsection (2)**
　37:10;59:23
**substance (1)**
　92:15
**substantive (3)**
　25:19;90:24;92:20
**successful (4)**
　34:11,12,14;158:7
**sue (2)**
　38:6,10
**sued (4)**
　35:5;62:25;86:4;
　95:4
**sufficient (3)**
　97:17;108:5;162:6
**sufficiently (1)**
　103:24
**suggest (4)**
　80:22;81:8;173:20;
　176:9
**suggested (1)**
　107:1
**suggesting (1)**
　164:18
**suggests (2)**
　81:7;168:21
**summarized (1)**
　27:7
**summary (2)**
　48:8;55:12
**summer (4)**
　17:22;19:23;
　105:25;180:2
**superintendent (5)**
　67:21;68:6;116:24;
　117:4,9
**superintendents (12)**
　60:14,20;66:14,15,
　23;67:1,16;69:3;
　113:23;117:24,25;
　125:6
**supervision (1)**
　76:24
**supervisors (1)**
　131:11
**Supp (1)**
　20:8
**support (1)**
　98:21
**supporting (1)**
　191:10

**suppose (1)**
137:14
**supposed (4)**
19:21;88:8;103:8;
182:12
**supreme (5)**
16:6;43:14,25;94:3;
188:13
**Sure (81)**
5:11;7:16;8:16;
12:11,17,24;14:17,24;
15:12,25;20:25;21:6;
22:14,19;26:3;33:6;
37:1,16;39:13;47:9;
53:14;58:2;60:9;
71:18;73:22;74:21;
76:11;80:6;86:21;
91:23,24;93:16,19;
94:16;100:10;101:5;
107:2;108:11,12;
110:25;119:15;
120:15;128:4,21;
134:25;136:22,23;
137:15;138:20;140:4,
10;141:12,25;142:22;
144:6,10;148:1,3,13;
150:8,19;153:3;
154:23;155:6,15;
156:15;160:2;163:15;
165:16;166:1;173:12;
174:6,25;175:22;
184:6,19;187:4;
190:20;191:24;
192:13;195:11
**surface (1)**
187:12
**surprised (3)**
99:11;117:12;
141:24
**surrounded (1)**
94:1
**surrounds (1)**
84:8
**survey (1)**
187:25
**surveys (2)**
188:5,11
**suspend (2)**
194:21;195:2
**suspended (1)**
195:12
**swear (1)**
4:13
**swimming (1)**
6:5
**switched (1)**
44:7
**sworn (2)**
4:8,15
**synopsis (2)**
25:21,24
**synthesized (1)**
85:1

**system (17)**
33:10,10;97:7;98:8,
10;99:10;100:22,23;
140:12;142:9,15;
143:3,4;147:6,7;
157:17;164:16
**systemic (1)**
127:22
**Systems (1)**
123:9

**T**

**tables (1)**
114:21
**tablet (1)**
10:14
**tabletop (1)**
171:1
**takeaway (1)**
158:6
**talk (25)**
6:6;12:24;14:13;
18:23;22:22;27:17;
42:7;65:2;78:19;
88:25;110:4;111:23;
123:8;127:19;136:2;
142:5;144:17;156:25;
173:24;175:11;
180:12;182:17;187:1;
189:12;193:10
**talked (27)**
12:3,22;13:6;43:3;
55:18;87:8;88:24;
90:2,22;100:2;102:4,
5;112:21;117:13;
122:7;125:2;130:3;
131:6;138:3,12;
141:13;153:7;163:20;
186:25;190:3,4;
195:24
**talking (16)**
11:24;84:24;89:7;
91:5;93:21;94:4;
105:7;117:23;126:8;
161:19;162:14;
178:22;190:7,15;
195:6,18
**talks (4)**
17:23;127:25;
157:2;183:14
**Tammy (2)**
12:24;13:1
**TANIS (32)**
4:11;5:9;8:1,5,9;
24:18;25:3;58:5,9;
107:5;113:1,6,13,16;
132:2,11,14,20;
135:18;149:10;
152:10;160:9;167:21;
178:6;192:15;194:19;
195:5,9,17,22;196:4,
13

**targeted (1)**
186:18
**task (1)**
110:23
**tasks (1)**
110:21
**Tatum (1)**
123:10
**taught (3)**
81:9;105:16;135:4
**taxation (1)**
36:10
**teaching (1)**
143:15
**team (1)**
188:10
**technical (2)**
88:10;98:20
**technically (3)**
30:21;45:25;135:16
**technicians (1)**
76:3
**techniques (1)**
165:13
**technology (2)**
14:22;50:25
**telephone (2)**
4:6;53:6
**telling (2)**
96:5;171:21
**tells (5)**
68:5;128:2;133:18;
148:3;181:24
**ten (8)**
41:5;118:19;119:9;
153:14;191:21,22;
192:1,5
**tend (2)**
143:25;153:11
**tended (8)**
25:10;40:14;54:20,
23;56:16;134:23;
186:6,7
**ten-minute (1)**
57:21;192:9
**tension (2)**
47:2,3
**tenure (5)**
39:6;42:8;54:18;
95:21;123:18
**term (8)**
61:7,11;70:7,22;
71:4;78:2;112:6;
177:17
**terms (21)**
10:5;45:23;46:24;
61:12;65:19;66:5;
68:7;71:7;76:10;
83:17;89:8,18;96:4;
98:20;111:14;119:8;
121:18;156:2;161:16;
166:14;183:1
**territory (2)**

**test (2)**
110:12;111:7
**testified (2)**
4:16;25:6
**testifying (1)**
24:10
**testimony (6)**
17:16;22:10;23:18,
20,25;94:7
**testing (1)**
151:11
**texts (1)**
96:3
**Thanks (4)**
58:7,9;107:8;196:6
**therefore (1)**
63:7
**Thereupon (5)**
58:10;80:10;90:15;
107:9;160:14
**thinking (2)**
39:7;174:16
**Third (6)**
107:13;132:10,14;
160:18;172:1;178:19
**Thomsen (1)**
20:5
**thorough (3)**
44:14;101:2;103:24
**thoroughly (2)**
103:18,22
**thoroughness (1)**
104:7
**though (8)**
30:21;53:11;65:18;
83:18;114:7;158:12;
166:23;186:9
**thought (7)**
7:15;51:14;96:13;
153:2;156:15;161:24;
167:8
**thousand (2)**
56:12;94:1
**three (16)**
7:2;11:23;35:20;
36:19;55:1;56:20,21;
79:2;105:2;119:25;
125:12;136:8,13;
181:7;186:14;192:21
**threshold (9)**
80:22;81:7;84:3,4,
5,13,21;85:22;86:16
**thresholds (1)**
96:10
**throughout (5)**
26:21;47:8;82:23;
99:20;189:14
**thus (1)**
131:7
**tie (1)**
63:15
**Tim (1)**

**times (13)**
6:25;56:20;70:18;
92:22;103:17;109:22;
118:19;119:10;
169:16;175:3;180:5;
182:6;185:8
**timing (1)**
35:11
**title (4)**
31:7;32:1,2;33:7
**titled (1)**
78:21
**today (10)**
5:1;6:18;7:15;12:7;
15:19;31:6,10,11;
113:8,9
**today's (1)**
6:24
**together (17)**
13:14;47:16;69:6,7;
73:14;79:12,22;80:1;
82:10,11,15;83:2;
90:6;96:6;123:22;
147:5;192:11
**told (2)**
95:13;99:18
**tone (1)**
86:23
**took (3)**
56:6;79:14;181:1
**tool (4)**
143:5;189:21,22;
190:5
**tools (4)**
40:4;62:11;63:5;
101:11
**top (10)**
10:9;78:1;101:15;
110:5;120:21;122:11;
170:19,19;175:10;
192:21
**topics (3)**
14:16;80:4;98:4
**totals (1)**
45:5
**touch (1)**
30:18
**touches (1)**
85:24
**toward (2)**
126:25;164:21
**towards (3)**
27:13;162:21,25
**town (14)**
35:19;36:4,8,8,11,
15,19;39:11,16;57:6,
8;76:13;77:5;95:4
**towns (3)**
34:25;35:22;36:6;
57:2,7,9;77:1,3

**134:9**
**timely (2)**
182:9,11

**track (6)**
140:8,13,14;142:5;
183:2,18
**tracking (5)**
140:8;141:14;
183:25;185:24;
187:16
**traffic (1)**
17:2
**train (20)**
61:1,6,18;62:12;
63:10;65:9;66:1,23;
69:2;77:19,22;83:11,
15,23;95:6;115:24;
124:8;166:24;167:15;
174:24
**trained (8)**
61:23;63:13;65:12,
16,20;69:17;103:18;
121:3
**trainers (1)**
131:12
**training (214)**
7:11,17;9:16;11:8;
13:7,10;26:9,18;
37:14,23;38:3;46:4,6,
9;47:8,10;49:12,23;
50:5,8,9,11,17,18,21,
24;51:4,17,23;53:4;
55:22;56:4;60:7,12,
13,20,21;61:21;
62:10;64:12;65:1,1,3,
15,21;66:6;67:2,16,
21;68:1,8,11;71:24;
75:5;76:11;77:13;
80:5,23;81:13;84:20;
86:25;87:19,24;88:4,
15,16;91:13;94:13,
15;95:13;96:3,9,22,
23;97:5,16,18,24;
98:1,5,9,18,24;99:25;
100:21,24;101:1,20;
102:9;103:3,4,7,9,13,
23;104:3,7;105:21;
107:22;110:8,13,14,
15,20,23;111:2,4,5,8,
10,17,19,21,21,25;
112:7,14,22;113:5;
116:25;117:5,10,17,
21,23;121:19,22,23,
25;122:1;124:20,21;
125:20,23;126:5,14,
20,24,25;127:8;
129:11;130:4;133:10;
137:4,18;141:3,4;
143:14,24;144:4,15;
146:12,15,20;147:14,
16;148:21;149:8,12,
23;150:2;151:22;
153:6,18,23,25;
156:12;157:8,10,11;
158:5,8;159:20;
161:3,4;162:10,14;

163:15;164:4,24;
165:1,9,12;166:2,14;
167:17;168:2;169:6,
10,23;170:5,23,25;
172:15;173:23;
174:15,19;175:17,21;
176:8,17,18;177:5,15,
19,21;179:1;186:23;
187:2,7,18,20;193:11;
195:23
**transcribed (1)**
179:12
**transcript (1)**
23:22
**transcripts (1)**
178:24
**transitioned (1)**
15:1
**transmitting (1)**
110:19
**transparent (4)**
81:1;89:3;160:20;
163:16
**treasurer (1)**
36:9
**treasurers (1)**
57:13
**treat (5)**
4:9;90:12;99:7;
147:1;187:6
**treated (3)**
89:11,24;90:25
**treating (3)**
148:4;149:2,7
**treatment (2)**
89:21;100:2
**trial (7)**
5:7;19:23;23:12,22;
24:8;25:11;154:3
**tried (4)**
10:19;56:10;
156:16;190:10
**true (9)**
34:23;66:13;73:2;
127:13;129:22;146:8;
148:15;155:6;171:20
**truly (4)**
139:19;161:13;
174:13;181:22
**try (7)**
6:20;40:20;91:20;
93:6;98:22;101:1;
103:12
**trying (24)**
6:19;13:2;14:17;
19:21;50:5;61:8;
86:20;91:4;126:15;
128:9,18,23;129:21;
132:4;139:19;145:6,
9,13;147:12;157:16;
174:6,13;180:20,22
**TTX (1)**
170:25

**tumultuous (1)**
188:3
**turbulent (1)**
43:19;93:22
**turn (12)**
15:2;25:18;59:4;
67:7;68:14;74:7;
105:9;108:22;115:9;
116:11;143:11;
174:18
**turnout (1)**
45:4
**Twitter (2)**
138:22,22
**two (38)**
5:20;7:6,24;18:4;
21:12,15;29:11,24;
30:3,20,23;45:13;
47:4;48:2;55:1;56:11;
57:4;60:8;67:4;79:10,
16;80:7;82:14,14;
92:4,10;95:23;96:3;
109:7;119:22,25;
124:14;180:8;181:7;
191:8,19,23;193:8
**two-minute (1)**
192:2
**two-thirds (1)**
178:21
**two-year (2)**
48:9;180:1
**tying (1)**
65:14
**type (2)**
17:13;89:16
**types (3)**
122:3;125:12;
127:17
**typically (3)**
119:8,25;131:8

**U**

**UCC (1)**
174:18
**ultimately (3)**
33:1;96:24;166:13
**unaware (1)**
8:6
**unchanged (1)**
52:4
**unclear (1)**
6:19
**unconstitutional (2)**
94:20;100:1
**under (43)**
4:4;11:20,23;22:11,
24;28:10;29:19,21;
30:11;31:23;33:24;
34:2;37:21;39:9,20;
40:11;41:6,12,20;
42:15,18;43:6;45:18;
49:21;54:15,24;

58:13;62:17,20,25;
65:6;69:14;80:24;
85:24;93:1;95:20;
102:14;136:20;
148:23;160:17;
164:23;184:18,22
**underlined (1)**
164:24
**underlying (1)**
43:11
**underscore (1)**
118:13
**underscores (2)**
148:1;150:8
**understood (5)**
14:18;16:14;21:8;
155:15;194:16
**uniform (11)**
53:15;81:1;89:3,4;
98:8;108:9;121:1;
164:24;165:1,19;
168:2
**Uniformed (2)**
34:7;70:17
**uniformity (8)**
34:24;64:9;71:16;
82:1;113:22;167:6,
18;168:7
**uniformly (4)**
62:8;67:3,3;89:17
**unique (1)**
148:22
**unit (4)**
35:23;36:10;
109:17,18
**United (2)**
13:8;98:25
**units (3)**
35:21;36:14;45:2
**universe (1)**
11:9
**University (2)**
135:4;188:9
**unknown (1)**
157:14
**unless (3)**
121:1;139:25;147:2
**unofficial (1)**
44:24
**unquestionably (1)**
100:21
**unspoken (1)**
148:25
**unusual (7)**
86:5;125:11;
136:14;142:19;144:9;
155:19;189:1
**UOCAVA (15)**
34:8,11;35:1;53:5;
62:21;63:1,24;84:10;
90:23;103:1;140:6,
20,21;141:13,16
**up (44)**

10:14;20:16,22;
21:2;28:23,23;41:2;
44:10;49:20;50:25;
55:25;59:17;77:25;
78:9;89:12;90:11;
93:3;96:17;98:9;
99:17;100:4;102:5,
16;103:19;105:9,25;
106:8;110:24;124:17;
135:12;142:22;149:9;
160:9;165:18;166:21;
176:11,14,15;179:9,
19;180:7;184:17;
186:11;191:21
**updated (1)**
114:25
**updating (1)**
142:9
**upon (2)**
85:17;153:18
**urban (2)**
89:10;153:12
**use (18)**
5:8;10:23;26:5;
33:21;41:18;43:7;
50:8;104:8,11;
107:24;108:4,10;
110:11;112:5;147:14;
157:12;172:6;177:16
**used (12)**
19:14;42:10;55:9;
61:7;70:3,23;83:16;
109:23;128:14;
139:20;161:14,21
**user (1)**
107:14
**using (3)**
103:15;151:15;
157:1
**usually (8)**
14:22;22:7;41:6;
50:20;53:7;81:16;
86:9;156:17
**UW (3)**
187:25;188:8,8

**V**

**valid (1)**
92:12
**validity (1)**
190:5
**value (1)**
148:8
**variance (4)**
89:5,8,20;90:24
**variances (2)**
94:18;96:2
**varied (2)**
92:1;119:13
**varies (1)**
169:12
**various (19)**

26:8;51:17;53:23;
57:17;61:13;62:17;
65:6;69:14;71:22;
72:8;75:5;76:1;79:9;
84:25;96:6;98:11;
109:3;124:22;142:21
**vary (5)**
54:23;89:18;120:5;
161:13,14
**vendor (1)**
123:10
**version (2)**
20:18;59:10
**versus (5)**
18:25;20:5;91:2;
122:1;129:12
**vetted (2)**
79:10,18
**via (1)**
53:1
**vice (2)**
123:4;151:3
**video (3)**
179:15,16,22
**videos (3)**
50:10;51:18;143:24
**videotape (1)**
129:17
**videotaped (2)**
120:9;179:13
**viewed (1)**
43:25
**vigilance (1)**
34:14
**village (7)**
35:19;36:3,13,14,
19;76:13;77:6
**villages (4)**
34:25;35:21;77:1,3
**violated (2)**
19:10;44:13
**violates (2)**
98:25;171:23
**violating (1)**
42:24
**violation (6)**
45:17;103:4,7,10;
181:22;184:24
**violations (4)**
42:4,6,9;171:13
**visit (1)**
128:15
**visual (2)**
130:8;145:16
**void (1)**
95:9
**volume (1)**
10:1
**Vote (44)**
18:6;31:24;33:3,12,
22,25;34:3;45:5;47:7;
62:20;63:1,22;78:21;
82:17;83:1,10,22;

84:10;94:22;97:9,10;
99:23;102:8;103:12;
148:12;165:3,4,4;
167:1,11,12,12;170:8,
10,15;171:18;176:10,
11,14,15;177:2,10;
190:22;194:9
**voter (47)**
22:4;33:9;37:17;
41:17;62:19;70:16;
84:9;90:5;97:6;99:10,
24;102:14,25;104:14;
108:10;112:2;128:23;
140:12;142:8,14;
143:3,4;147:23;
148:5;149:15;151:11,
15;157:3,5,15;158:3,
10,11,20;159:11;
160:17;163:3,4;
164:11;168:23;
170:17;171:2,7;
175:11,20;177:8;
182:2
**voter-centric (2)**
162:20;163:15
**voters (28)**
19:15;27:13;91:15,
20;92:10;96:24;99:2;
102:14;105:3;110:16;
128:9;129:6;144:12;
147:10;148:12;149:2;
151:16;160:24;164:6,
8,17;165:20;166:12,
20;170:7;175:7,19;
187:25
**voters' (3)**
158:13;166:19;
177:21
**voter's (3)**
95:7;159:17;170:22
**votes (5)**
43:16,16;44:6;
171:21,22
**voting (61)**
11:17;19:10;21:13;
22:16;23:14,14;33:8,
8;34:8;61:9;63:2,20;
70:17,24,25;76:2;
79:17;81:15;84:9;
86:13;98:8,20;100:3;
101:21;102:11,19,22,
24;103:1;107:24,25;
109:17,18;110:25;
123:9;146:18;148:8,
21;160:19,24;161:7,
12,17,18;162:11,21,
25;163:8,10,20;
169:12,16,17;170:12,
18;172:3,21;174:25;
175:1,2;190:17
**vulnerabilities (1)**
85:3

## W

**wait (1)**
168:24
**waive (1)**
117:21
**Washington (2)**
72:14;190:8
**watcher (3)**
61:9,10,12
**watchers (8)**
60:16,17,21;61:1,3,
6,8;65:9
**watching (1)**
110:24
**waters (1)**
6:6
**watershed (1)**
81:24
**Waukesha (6)**
44:4,11,25;47:2,6;
87:8
**way (24)**
10:16,23;24:13;
43:11;49:15;55:24;
98:9,23;107:7;118:5;
138:5;143:2;144:4;
147:5;149:5;150:5;
158:22;165:2;166:6,
25;168:3;177:17;
178:1,21
**ways (6)**
50:25;52:19;87:5;
104:24;181:20;
185:14
**wealth (1)**
158:4
**website (12)**
17:11;41:17;51:7;
52:22;99:17;120:12;
133:2,6;138:1,2;
154:16;179:23
**websites (1)**
97:14
**week (1)**
136:22
**weeks (1)**
7:24
**week's (1)**
50:19
**welcome (1)**
5:2
**weren't (3)**
155:11;156:22;
158:17
**West (1)**
20:24
**Western (1)**
20:8
**Westlaw (2)**
59:12,14
**West's (1)**

59:13
**what's (12)**
50:7;86:14;87:18;
88:21;89:13;90:5;
96:8;104:2;128:12;
162:11;179:5;183:18
**whereas (2)**
48:16;187:18
**Whereupon (15)**
10:11;20:10;29:2;
37:2;59:20;66:9;67:9;
76:18;108:19;115:12;
116:14;135:19;
152:16;192:16;196:1
**whole (13)**
44:22;45:7;79:21;
81:16;82:9,11;83:24;
93:18;166:10;170:1;
186:1;190:2;193:22
**who's (4)**
33:1;106:7;111:4;
157:13
**wide (4)**
97:23;104:24;
105:7;138:11
**widely (1)**
138:22
**wife (1)**
12:8
**willing (1)**
173:14
**Wisconsin (104)**
5:22;15:9,11,13;
16:1,6;20:5,8;21:22;
24:14;25:11,15,15;
27:19;28:6,19;32:10;
33:15;34:11,18;
35:19;36:5,24;39:10;
40:23;41:10,14;
42:24;43:19;49:11,
21;54:8;56:20,23;
57:2,11;71:12;73:1,
11,25;75:1,4,10,15;
76:16;77:16,19,22;
78:2;83:4;90:2,21;
91:22;92:3;93:22;
95:20,24;96:4,19,20;
97:13,19;101:14;
105:1;111:13;118:18;
120:9,11;128:6;
129:1;134:21;135:4,
8;136:2,5,19;137:10;
138:4,7;140:2,25;
141:3;142:1,7;
153:10;158:18,19;
161:9,12,20;165:24;
170:11;173:22;
179:22;187:10,12,23;
188:2,9,16;190:9;
192:20;193:7;194:2
**Wisconsin's (10)**
5:18;34:24;41:20;
55:24;73:21;96:15;

137:1;152:1,2,6
**Within (14)**
7:24;35:25;36:4,15;
46:19;47:5;60:22;
66:2;72:2;81:14;
85:25;86:24;87:25;
96:6
**without (6)**
40:11;72:15;103:3,
6,9;152:11
**witness (19)**
4:8,13;6:1;7:4;
17:16;24:2,3,3,7,14,
20,21,23,25;57:23;
58:3;85:14;107:4;
160:11
**Wolfe (1)**
31:11
**Wolfe's (1)**
33:18
**won (1)**
189:6
**wonder (1)**
128:12
**wondering (1)**
52:5
**word (3)**
23:24,24;60:16;
70:10;103:22;139:20
**words (11)**
11:14;19:6;20:13;
21:10;67:4;69:5;
88:16;91:18;121:24;
156:22;157:23
**work (21)**
5:10;8:23;12:13;
17:8,22;18:11;31:12;
61:13;63:4;72:8;
94:13;98:11;103:11,
17;106:1;107:17;
136:14,16,17;147:2;
157:17
**worked (9)**
13:13;14:7,21;
17:17;73:4;103:20;
123:8;157:13;185:7
**worker (21)**
7:18;18:12;50:15;
90:4,4;104:2;108:15,
23;112:23;113:5;
124:12;126:8;128:11,
13;141:2,2;171:5;
172:21;177:23;191:4;
195:21
**workers (90)**
9:18;61:16,18,20,
23;62:2;63:10,19,19,
20;64:4;65:10,15;
66:1;67:17;68:1,12;
69:3;71:3;75:14,24;
76:12;77:20,22,24;
78:12;83:11,25;
91:18;92:4;93:12;

94:13,25;95:4;98:9;
101:21;103:17;105:5;
107:16;110:17;
117:24;121:2;122:15;
124:9,20;125:20;
126:14;127:8;128:5,
8,25;131:7;136:4,6,
13,14,16;139:14,15;
148:7,10;149:4,6;
150:5;159:23;164:6,
25;165:2,21;166:2,
24;167:15,18;169:23;
170:7,10,13,21;171:1,
17,21;173:24;175:6,
18;176:2,5;177:1,6,7;
178:8
**working (20)**
8:17;16:3;17:20;
32:2;50:6;62:23;73:6;
82:25,25;101:11;
105:22;106:5;107:22;
155:12;170:16,18;
181:21,25;194:11;
196:11
**works (3)**
13:3;14:4;107:5
**Worley (1)**
124:16
**Worley's (1)**
126:7
**worry (1)**
185:23
**wrap (1)**
191:21
**writ (1)**
38:11
**write (6)**
28:9;72:21;78:19;
80:4;170:19;175:12
**writing (2)**
16:5;177:11
**written (6)**
10:13;69:9;74:16;
143:23;144:11,20
**wrong (6)**
49:15;52:8;89:12;
106:24;131:25;
144:22
**wrote (3)**
14:11;151:5,9

**Y**

**y'all (4)**
57:21;107:2;
113:11;191:20
**year (22)**
22:8;40:16,22;
48:13,13,15,16,17,18;
54:22;56:1,21;79:25;
94:5,6;103:17;
118:19;119:10;
123:19;153:14;

156:17;180:3
**years (22)**
5:18;13:19;40:25;
41:3,4;55:23,24;56:2,
5,7;85:14;96:16;
106:20;123:13;
125:16;137:1;138:14;
153:14;155:13;158:6;
163:11;180:8
**Yep (2)**
33:4;43:23

**Z**

**zeros (1)**
45:2

**1**

**1 (13)**
10:8;11:1;25:20;
32:18;54:8;68:15,17;
72:20,21;74:8,18;
76:23;107:12
**1:00 (1)**
119:13
**1:15 (1)**
106:22
**10 (5)**
115:11;120:22;
121:7,13;156:2
**101 (1)**
83:14
**10th (1)**
8:8
**11 (7)**
116:12;120:21;
121:5;122:12;134:14;
156:2;190:25
**1-1/2 (1)**
43:16
**11:45 (2)**
57:24;58:4
**118 (9)**
28:19;29:9;32:10;
38:18;42:13;48:1;
52:4,10;54:6
**119 (1)**
21:7
**12 (9)**
37:18;122:11;
130:13;131:5,19;
132:11,12;135:15;
175:14
**1200 (1)**
57:9
**13 (13)**
108:23;109:1;
130:12;131:4,20;
132:6,8,10;135:25;
136:25;139:8;146:16;
152:15
**13th (1)**

8:3
**14 (5)**
37:18;109:1;
135:24;143:11;
190:24
**15 (3)**
37:21;109:16;
143:12
**159 (1)**
124:8
**15th (1)**
8:3
**16 (3)**
37:21;157:2;160:4
**167 (15)**
10:9;11:1,23;15:3;
25:19;28:8;31:18;
32:17;68:17;74:7,22;
107:12;130:13;
143:12;160:5
**17 (3)**
157:2;160:5;164:2
**18 (1)**
164:3
**1850 (2)**
35:9;140:17
**1854 (2)**
35:10;140:18
**19 (4)**
42:15;170:20;
172:1;175:10
**1965 (1)**
146:18
**1974 (1)**
76:8
**198 (1)**
20:7
**1983 (1)**
11:18
**1993 (2)**
70:16;81:23
**1e (1)**
77:11
**1st (2)**
48:15,17

**2**

**2 (10)**
20:6;25:20,22;28:9;
32:18;59:5,16;68:15,
17;72:20
**2:00 (1)**
119:13
**2:05 (1)**
107:3
**20 (7)**
19:11;54:25;56:9;
170:19;175:10;
178:19;182:19
**2000 (12)**
57:1;71:7;80:21;
81:21,23;83:4;86:15;

98:5;102:9,13,17;
190:23
**2000's (1)**
81:6
**2001 (1)**
82:15
**2002 (3)**
31:24;33:5;98:7
**2003 (1)**
193:15
**2005 (1)**
82:15
**2006 (3)**
73:17;123:7,7
**2007 (4)**
30:14;40:21;42:8;
54:7
**2011 (6)**
22:3;43:7,20;93:23;
193:3,5
**2011-2012 (1)**
21:20
**2012 (4)**
13:5;93:21;188:6;
193:3
**2013 (1)**
22:6
**2013-2014 (1)**
21:20
**2014 (2)**
22:7;93:23
**2015 (6)**
16:7;28:19;38:19;
43:20;123:19,21
**2016 (8)**
19:11;20:9;28:13;
40:21;42:8;123:21;
125:17;188:6
**2017 (4)**
7:13;8:22,25;106:1
**2018 (8)**
7:13;108:14,23;
112:23;168:17;178:8,
11,15
**2019 (8)**
8:25;9:1,3,6;26:23;
33:23;113:14;152:7
**2020 (5)**
7:18;113:13,15;
195:20,25
**20th (1)**
8:8
**21 (5)**
115:8;178:18;
182:19,19;189:13
**21-2-100 (3)**
116:10,11;117:11
**21-2-31 (3)**
115:10,16,17
**21-2-311 (1)**
114:5
**21-2-50 (3)**
59:5,8,19

**21-2-70 (1)**
66:8
**21-2-99 (2)**
67:8,24
**22 (2)**
182:20;189:13
**24 (2)**
45:2,2
**25 (1)**
191:4
**25th (1)**
22:3
**2750 (1)**
136:21
**28 (3)**
15:3;31:18;32:17
**2850 (1)**
136:21
**29 (1)**
32:17
**29th (1)**
28:13
**2m (2)**
42:3,14

**3**

**3 (8)**
11:22;12:5;25:22;
28:9;29:1;74:9,22;
131:23
**3,000 (1)**
136:20
**3:45 (1)**
191:18
**30 (3)**
5:18;133:7;137:1
**30th (1)**
48:16
**31 (2)**
10:25;134:9
**316 (5)**
26:24;27:5,7;58:24;
114:25
**31st (1)**
48:18
**33 (1)**
11:22
**34 (1)**
134:13
**35 (1)**
10:25
**37 (1)**
72:3
**3d (1)**
20:8

**4**

**4 (5)**
37:1;74:7,23;78:15;
80:14
**4:02 (1)**

196:15
**40 (6)**
    13:19;56:9;85:14;
    106:20;158:6;160:7
**40-plus (1)**
    191:13
**47 (1)**
    140:15

**5**

**5 (10)**
    36:24;37:4;49:2,4;
    59:19;78:15;80:13,
    14,16;148:23
**5.01 (2)**
    77:5;78:2
**5.05 (7)**
    36:25;37:7,15,25;
    38:19;48:25;75:10
**5.051d (1)**
    38:5
**5.052m (2)**
    41:25;45:18
**5.055s (1)**
    49:3
**5.055t (1)**
    51:25
**5.056a (1)**
    54:2
**5.057 (2)**
    55:18;77:17
**5.06 (5)**
    40:6,11,24;41:12;
    43:6
**5:00 (2)**
    119:12;192:12
**50 (3)**
    59:17;114:21;
    140:19
**5s (3)**
    48:25;49:3,4
**5t (1)**
    52:9

**6**

**6 (9)**
    35:25,25;36:7,7;
    54:10;66:8;80:17;
    101:16;152:12
**6.7 (1)**
    152:7
**61 (1)**
    109:21
**62 (1)**
    109:21
**6a (2)**
    54:7,11

**7**

**7 (7)**

37:10,14;38:1;67:8;
    75:10;101:15;103:16
**7,500 (1)**
    44:6
**7.15 (5)**
    76:16,20;77:9,11,
    17
**7:00 (1)**
    161:16
**70 (1)**
    116:11

**8**

**8 (6)**
    66:18;76:17;
    103:15;107:12;110:6;
    113:19
**8:00 (1)**
    161:16
**896 (1)**
    20:8

**9**

**9 (4)**
    107:12;108:18;
    110:5;113:19
**9:30 (1)**
    119:11
**924 (1)**
    22:10