# EXHIBIT 1

# PART 2

# DEFENDANTS' EX. 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## EXPERT REPORT OF KEVIN J. KENNEDY



DEFENDANT'S EXHIBIT

PENGAD 800-631-6989

3-31-20   CG

# Expert Report of Kevin J. Kennedy

*Fair Fight Action, Inc., et al. v. Raffensperger, et al.*
U.S. District Court for the Northern District of Georgia, Atlanta Division
Civ. Act. No. 1:18-cv-05391-SCJ

## Introduction

I have been asked to opine on the basic policies, procedures and practices that the Georgia Secretary of State and the State Election Board must have in place in order to train county election superintendents, registrars and poll workers to carry out their duties; and in order to ensure that elections comply with state and federal election laws and the United States Constitution; and whether those policies, practices and procedures are in place in Georgia.

To prepare this report, I have reviewed Plaintiffs' Amended Complaint and numerous materials produced in discovery. I have also reviewed Georgia state statutes, rules and regulations pertaining to elections. In addition, I reviewed Plaintiffs' expert reports prepared by Dr. Khalilah L. Brown-Dean and Dr. Adrienne Jones. A more comprehensive description of the facts, data and materials I have examined and considered in preparing this report is set out in Appendix A.

In developing the conclusions described in this report I have drawn on my experience and expertise as an administrator, consultant and attorney actively involved in election administration at the state, local and national level since April 1, 1979. My opinions reflect on the offices of the Secretary of State and State Elections Board, not the individuals holding those positions or agency employees.

## Synopsis

There is a basic training and monitoring framework a chief state election official must have in place to ensure that local election officials know and are carrying out their responsibilities to fairly and effectively administer elections conducted in the chief state election official's jurisdiction and to protect the voting rights of state voters.

The Georgia State Election Board and the Georgia Secretary of State are required by law to train local election officials in their election administration duties and responsibilities and ensure their performance conforms to Georgia and federal law.

Although the Georgia Secretary of State has developed a large portfolio of training materials and methods for county superintendents and registrars since 2012, that portfolio is lacking key ingredients required to ensure Georgia elections are administered fairly, effectively and in a uniform manner that protects the voting rights of Georgia electors. Only a small part of that portfolio is directed to the training of poll workers.

In order to be effective, the training protocols of the Georgia Secretary of State must address significant challenges presented by the large number of local election officials, a diverse voter population along with evolving legal and technological complexity in election administration.

The Georgia Secretary of State's training does an effective job of providing county superintendents and registrars with information, guidance and support with its complex electronic election administration tools. However, electronic election administration tools are just one component of election administration.

The Georgia State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections.

The Georgia State Election Board and Secretary of State need to better track and analyze in a comprehensive, transparent manner recurring voter issues that impact individuals' voting rights.

**Professional Background**

I served as Wisconsin's Chief Election Officer for more than 33 years, including an initial 8½ months in an acting capacity before my permanent appointment on August 17, 1983, by the Wisconsin State Elections Board. In my capacity as chief state election officer, I served at the pleasure of two different executive branch state agencies run by independent citizen boards. The Wisconsin State Elections Board was an independent, bipartisan citizen board responsible for the administration and enforcement of Wisconsin election and campaign finance law from July 1, 1974, through January 8, 2008.

In January, 2007, legislation was enacted creating the Wisconsin Government Accountability Board (GAB).[i] The GAB was an independent, nonpartisan citizen board comprised of former state judges responsible for the administration and enforcement of Wisconsin election, campaign finance, ethics and lobby law from January 9, 2008, through June 29, 2016. The legislation creating the GAB combined the former State Elections Board and former State Ethics Board into a single independent state agency. After a national search, I was selected as the Director and General Counsel for the Wisconsin Government Accountability Board on November 5, 2007. I held that position until the dissolution of the GAB on June 29, 2016.[ii]

I have been actively involved in election administration as an administrator, consultant and attorney since April 1, 1979, at the state, local and national level. In addition to my service as Wisconsin's Chief Election Officer, I have served on several national task forces, committees and working groups focused on developing, implementing and administering innovations in election law.

Currently I serve on the Boards of Directors of two non-profit organizations focused on improving the administration of elections: Center for Election Innovation and Research[iii] (Vice-President and Treasurer) and U.S. Vote Foundation[iv] (Director). I also serve on the Advisory Board for the MIT Election Data Science Lab.[v]

Last year I completed service on the *Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine. That work resulted in the publication and release of a nationally acclaimed consensus report: *Securing the Vote: Protecting American Democracy*.[vi]

In addition, I have served as an election inspector (poll worker) and chief inspector-in-training for the City of Madison, Wisconsin since the beginning of 2018. A copy of my resume follows the substantive report.

In these capacities I have overseen and supervised the development, implementation and application of a wide range of election official training. I have also participated in extensive election official training at the local, state and national level.

Along with this case, I am currently serving as an expert witness in *Louis M. Bouvier, Jr. v. William Clark Porter, IV*, No. 17 CVS 3273 (N.C. Super. Ct., Guilford Cty.). During my service as Wisconsin's chief election officer I have testified on numerous occasions as a fact witness and an expert in election and campaign finance law. Most recently I was called adversely by the plaintiffs as the lead witness in litigation challenging a series of voting restrictions enacted into Wisconsin law in the 2011-12 and 2013-14 legislative sessions. *One Wisconsin Institute, Inc. v. Mark L. Thomsen*, No. 3:15-cv-00324-jdp (W.D. Wis.)

I am being compensated at the rate of $175 per hour for my work in this case.

In order to provide context for my analysis of the basic training policies, procedures, and practices that the Georgia Secretary of State and the State Election Board must have in place, I describe my experience with election official training at the state, local and national level in more detail in the following section of this report.

**Experience with Election Official Training**

In 37 years as a state election official beginning on April 1, 1979, and the three plus years since I left government service on June 29, 2016, I have had extensive experience with election official training at the state, local and national level.

Wisconsin law requires the state elections agency (initially the State Elections Board, then the Government Accountability Board and now the Wisconsin Elections Commission) to conduct regular information and training meetings at various locations in the state for county and municipal clerks and other election officials.[vii] This requirement has been in place since July 1, 1974, when the responsibility for administering elections was removed from the Office of Secretary of State and placed under the direction of an independent executive branch agency.[viii] These information and training meetings must be designed to explain the election laws and the forms and rules of the state elections agency, to promote uniform procedures and to assure that clerks and other election officials are made aware of the integrity and importance of the vote of each citizen.[ix]

In Wisconsin, the 1,850 municipal clerks are responsible for conducting elections for federal, state and local offices and referenda. This includes selecting and training poll workers; establishing, equipping and supplying polling places; registering voters; administering absentee voting by mail and in-person; and overseeing voting on Election Day.[x]

Wisconsin's 72 county clerks also play a significant role in the administration of elections. County clerks are required to publish election notices for county, state and federal elections; prepare ballots and program voting equipment for county, state and federal elections; and canvass and certify election results for county, state and federal elections.[xi]

The state elections agency is required to prepare and publish an elections manual for local election officials.[xii] The election manual is required to be written so as to be easily understood by the general public explaining the duties of election officials. An essential element of the election manual is a statutory requirement to emphasize the fact that election officials should help, not hinder, electors in exercising their voting rights. During my tenure with the Wisconsin independent election agencies I authored versions of the manual and directed the preparation of later versions as the agency staff expanded.

In my role as legal counsel and then administrative director of the Wisconsin state elections agency I was actively involved in planning, designing, developing and vetting training materials and programs for local election officials. Initially as legal counsel, and as executive director, I personally presented the bulk of the training for local election officials in administrative meetings as well as regional and statewide conferences of local election officials.

I was primarily responsible for writing the election manual and presenting it for approval by the Board. As the agency staff increased I was able to delegate the responsibility for maintaining and updating the election manual to our two agency election specialists. They were also able to assist in making in-person presentations. We also utilized the services of the University of Wisconsin Extension to conduct electronic presentations through the Extension's statewide telecommunications network.

Following the 2000 Presidential election, increased emphasis was focused on local election official and poll worker training. Wisconsin law was amended to require training and certification of the chief election inspector at each of the approximately 3,000 polling places in the state.[xiii] The requirements of the training and certification program were developed under my direction and promulgated as rules in the Wisconsin Administrative Code.[xiv]

Certification of municipal clerks was added to Wisconsin law in 2006.[xv] The requirements and content of the training and certification program were also developed under my direction and promulgated as administrative rules in the Wisconsin Administrative Code.[xvi]

At the national level, in 2003 I completed the Certified Election and Registration Administrator Program (CERA) offered by the Election Center.[xvii] During my tenure as a state election official I completed the CERA recertification process every three years through 2018. The Election Center is a 501(c)(3) organization dedicated to the training and certification of state and local

4

election officials.[xviii] I served on the Professional Education Program Committee of the Election Center for several years until 2017.

As a member of the National Academies of Sciences, Engineering and Medicine *Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology* I wrote the section on Election Administrator and Poll Worker Training for the Committee's report: *Securing the Vote: Protecting American Democracy*.[xix]

During my time as Wisconsin's chief election officer, I spent many elections observing the voting process at the polls and early voting locations throughout the state. On many occasions I escorted international observers and U.S. Elections Assistance Commission members and staff on these observations. From 2008 through 2016 I visited polling places for every scheduled election as well as numerous early voting locations in the two weeks before Election Day.

In my role as a poll worker for the City of Madison, Wisconsin I have taken pre-election online training before each of the four elections I worked since 2018. In January 2019, I completed the Chief Election Inspector certification program. This is the same program whose implementation and development I directed in 2002, following the legislative mandate for the program.

**Opinions and Analysis**

In my analysis, references to elections includes primary, general and special elections and referenda. Unless otherwise specifically indicated references to election officials includes registrars, superintendents of elections, poll managers, poll officers, absentee ballot clerks and staff of the Office of Secretary of State. References to poll workers includes poll managers, poll officers, clerks and other election officials appointed by the superintendent to work at the polling place or advance voting location.

***There is a basic training and monitoring framework a chief state election official must have in place to ensure local election officials know and are carrying out their responsibilities to fairly and effectively administer elections conducted in the chief state election official's jurisdiction and to protect the voting rights of voters.***

Laws governing the duties of a chief state election official and training requirements for local election officials vary among the states. However, state and federal law along with the evolution of election administration since the 2000 presidential election suggest that there is a threshold foundation for training and holding election officials accountable that must be in place under the direction of the chief state election official to ensure elections are administered in a fair, uniform and transparent manner.

Both Georgia and Wisconsin assign this responsibility to the chief state election official by requiring training of local election officials and the development of a certification program for local election officials. Georgia requires the Secretary of State to conduct annual training sessions with superintendents of elections and registrars. O.C.G.A. § 21-2-50(a)(11). Wisconsin requires the state election agency to conduct regular information and training meetings at various locations in the state for county and municipal clerks and other election officials. Wis. Stat

§ 5.05(7). Other states have similar provisions.

The first major infusion of federal funds to address the nationwide fallout from the 2000 presidential election included a major component for training local election officials. The Help America Vote Act of 2002 (HAVA) was enacted to provide assistance with the administration of certain federal election laws and programs and establish minimum election administration standards for states and local units of government responsible for administering those laws.[xx] HAVA put the onus for implementation of its provisions on the chief state election official. 52 U.S.C. § 21003(e).

HAVA Section 101 payments were made available to all states immediately upon passage of the Act.[xxi] These payments were designated to improve the administration of elections. One of the specified permissible uses for the payments was for training election officials, poll workers and election volunteers. *Id.* § 20901(b)(1)(d).

These payments for training underscored the importance of ensuring election officials and poll workers had the information, knowledge and skills essential to conducting fair and uniform elections. HAVA also introduced and funded technology upgrades for the administration of elections including statewide electronic voter registration systems, electronic voting equipment and requirements for voting accessibility for persons with disabilities and voters in need of language assistance. A separate pool of HAVA payments to states through the Department of Health Services to improve voting accessibility for persons with disabilities includes provisions for training election officials, poll workers and election volunteers on how to best promote access and participation of individuals with disabilities in elections. *Id.* § 21021(b)(2).

The technology upgrades mandated under HAVA along with specific provisions for training election officials and poll workers demonstrate the importance of a robust state-directed training portfolio for local election officials and poll workers to ensure they are carrying out their responsibilities to administer fair and uniform elections. Other federal laws have created similar significant changes in election administration for state and local election officials to ensure fair and uniform elections. While these laws have not provided funding or specifically authorized election official or poll worker training, the new federal requirements necessitated enhanced training for local election officials and poll workers.

The Voting Rights Act of 1965 (VRA)[xxii] and the National Voter Registration Act of 1993[xxiii] (NVRA) are the best examples of comprehensive federal provisions that require a knowledgeable workforce of election officials and poll workers to ensure that voters are provided the fair and uniform treatment required by law. These laws, along with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)[xxiv] and the Voting Accessibility for the Elderly and Handicapped Act,[xxv] provide essential protections for voters to ensure citizens have equal access and opportunity to fully participate in federal elections. A comprehensive training program for election officials and poll workers is essential to ensuring voting rights are protected.

Following the 2000 presidential election, I was among a group of state and local election officials organized by the Election Center to meet with Members of Congress and their staff as they worked on legislation that became the Help America Vote Act of 2002. One key takeaway

from these discussions that resonated with me was the idea that the proposed legislation was going to make available early money to enable state officials to adequately plan for the implementation of new federal requirements and quickly address chronic issues including election official and poll worker training. Congressional staffers viewed this as a lesson learned from experience with the haphazard implementation of the NVRA.

This idea was manifested in the HAVA Section 101 payments. The fourth item of the eight permitted uses of these payments is training election officials, poll workers and election volunteers. 52 U.S.C. § 20901(b)(1).

The latest infusion of federal funds for improving the administration of elections adds more levels of complexity for election officials and poll workers. In 2018, Congress authorized $380 million in payments to the states as part of the Consolidated Appropriations Act of 2018 to improve the administration of federal elections including to enhance technology and make cyber security improvements. Congress chose to fund the payments through HAVA Section 101. This infusion of federal funds also entails training local election officials to ensure the efficacy of the funding.

The elaborate framework of state and federal laws designed to facilitate voter participation requires a comprehensive, robust training program to ensure election officials at all levels are able to carry out their responsibilities. This cannot be done by occasional meetings supplemented by a written manual which may or may not be accessible online. The audience of election officials is too large and diverse for a limited training endeavor. The many layers of regulations is too vast to distill into a cursory presentation supported by a voluminous set of materials. The process of conveying complex requirements with a range of exceptions in legalese is too fraught with confusion to risk not properly explaining what is expected of election officials and poll workers. The increased reliance on technology in election administration requires a supportive approach to ensure election officials and poll workers are able to effectively use the electronic tools available to them.

According to the 2016 Election Administration and Voting Survey,[xxvi] Georgia had 20,062 poll workers in the 2016 presidential election. Along with the superintendents of election, registrars and their staff in 159 counties, this constitutes a large number of election officials requiring comprehensive training. They all have different informational needs and more importantly different ways of learning. Superintendents and registrars need to see the big picture of election administration as well as the detailed steps necessary to carry out their tasks. They also need to have the resources and knowledge to properly train their poll workers.

Poll workers do their work a few times a year. They need to be thoroughly trained in their Election Day responsibilities and brought up to date on changes since the last time they worked. They also need access to information to resolve critical issues that occur at the polling place, such as how to resolve a provisional ballot issue. Because poll workers tend to be elderly compared to the rest of the election official population, they will have different learning styles and will need easily accessible support to assist in making crucial Election Day decisions.

I have described a number of federal election laws that election officials need to be familiar with along with the Georgia Elections Code and State Election Board rules. The training protocol has to account for all of these requirements, regulations and rules. This is an immense amount of information that has to be accessible to election officials and poll workers.

These requirements, regulations and rules are not written in plain English. They must be presented in language that is easy for a diverse audience to understand. While poll workers are required to read, write and speak English, they will have to convey information to voters who are not as conversant.[xxvii] They may also bring their experience of English as a second language to their training. The presentation and content of training materials need to be easily understood by the target audience of election officials and poll workers.

Administering elections is driven by technology. The days of operating a polling place out of supplies contained in a shoebox are long gone. In Georgia new voting technology was introduced in 2002. That voting equipment is scheduled for replacement in 2020. Training election officials and poll workers in the use of new technology requires a hands-on approach in addition to demonstration of the equipment capabilities and making user manuals available. The information in user manuals will have to be distilled into checklists and step-by-step instructions to ensure election officials and poll workers can easily do their work and resolve problems.

There also have to be accountability mechanisms included as part of the training program if the program is to be effective. This includes a test or assessment to ensure the election officials and poll workers have learned the information presented. It also includes a method for reviewing their performance such as an audit. There must also be clear procedures for identifying and tracking errors or failure to perform required duties and holding individuals accountable.

Finally, the training protocols must be accessible to the public. Transparency enables voters and community groups the opportunity to assess the quality of the training program. Feedback from outside the narrow world of election administrators ensures critical issues are being addressed and provides for an additional level of accountability. It also engenders public confidence in the electoral process.

In sum, a statewide training protocol must be comprehensive both in scope to cover all regulatory requirements and in breadth to ensure all essential election personnel are reached. The training portfolio must be easily accessible to election officials and poll workers. The training must be presented in a variety of formats to enable election officials and poll workers the best opportunity to absorb the information. There must be accountability measures in place to assess the viability of the program and ensure participants are responsible for their performance. The full training program must be transparent and accessible to the public.

***The Georgia State Election Board and the Georgia Secretary of State are required by law to train local election officials in their election administration duties and responsibilities and ensure their performance conforms to Georgia and federal law.***

The State Election Board is required to promulgate rules and regulations to ensure uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers and

other election officials. O.C.G.A. § 21-2-31(1). The Board is also required to formulate, adopt and promulgate rules and regulations consistent with law that will be conducive to the fair, legal and orderly conduct of elections. O.C.G.A. § 21-2-31(2). Finally, the Board is required to promulgate rules and regulations to define uniform and nondiscriminatory standards on what constitutes a vote and what will be counted as a vote. O.C.G.A. § 21-2-31(7).

Upon adoption, the Board is required to file certified copies of the rules and regulations with the Secretary of State and each superintendent of elections. O.C.G.A. § 21-2-31(2). The Board is also required to publish and furnish to election officials indexed copies of current election laws, rules and regulations. O.C.G.A. § 21-2-31(3).

The State Election Board has the authority to fine registrars and superintendents of elections and their government authority employer for failure to attend training or complete the required certification. O.C.G.A. §§ 21-2-100(e), 21-2-101(d). The Board may require additional or remedial training or limit, suspend or revoke a superintendent of elections for a violation of Title 21, O.C.G.A. or any rule, regulation or order issued by the Board. O.C.G.A. § 21-2-101(e). The State Election Board is authorized to promulgate, amend or repeal rules and regulations to implement and enforce the training and certification requirements. O.C.G.A. § 21-2-101(f).

The State Election Board is required to investigate the administration of election laws and frauds and irregularities in elections. O.C.G.A. § 21-2-31(5). Among the available resolutions of these investigations is the issuance of a letter of instruction to local election officials or the imposition of a civil monetary penalty on local election officials. *See* Deposition of Chris Harvey, 117:8-120:5 (Aug. 16, 2019);  Depositions of State Elections Board Members Seth Harp, 28:9-29:2 (Oct. 16, 2019); Rebecca Sullivan, 76:22-78:8 (Oct. 15, 2019); and David Worley, 108:12-109:16 (Oct. 10, 2019).

Implicit in the requirements for the State Election Board to promulgate rules and regulations and investigate election administration, fraud and irregularities is the responsibility for the Board to ensure local election officials are apprised of their responsibilities and the consequences of failure to carry out their duties. Because the State Election Board has no staff and only meets sporadically, this responsibility appears to have devolved upon the Secretary of State, who serves as Chair of the State Election Board. O.C.G.A. § 21-2-30(d).

Since 2012 the State Election Board has met an average of slightly more than 4 times a year including just two meetings in 2017 and three in 2019.[xxviii] Board Members have indicated they have very little contact with local election officials. Depositions of State Elections Board Members Seth Harp, 36:21-37:9 (Oct. 16, 2019); Rebecca Sullivan, 24:22-27:10, 48:25-49:22 (Oct. 15, 2019); and David Worley, 109:17-110:7 (Oct. 10, 2019). Board members have also stated that they have not received any training in their duties and responsibilities. Rebecca Sullivan, 20:7–9 (Oct. 15, 2019); Seth Harp, 7:25-8:6, 23:3-9 (Oct. 16, 2019); David Worley 10:6-12 (Oct. 10, 2019).

Georgia law specifically requires the Secretary of State to conduct annual training sessions for registrars and superintendents of elections. O.C.G.A. § 21-2-50(a)(11). The Secretary of State is also required by law to carry out specific election-related tasks in coordination with local

election officials that necessitate ensuring local election officials have the direction and information essential to complying with directives from the Secretary of State. These include certifying the names of candidates in substantially the form of ballots to superintendents of elections, furnishing election forms and supplies to superintendents of elections with the appropriate instructions for their use, maintaining the official list of registered state voters and developing, programing, building and reviewing ballots on voting systems in use in the state. O.C.G.A. § 21-2-50(a)(4), (5), (14), (15).

All county and municipal election superintendents, chief registrars and absentee ballot clerks along with other specified election officials are required to complete a certification program approved by the Secretary of State within six months of appointment. The program shall not exceed 64 hours and may include instruction on the operation of voting equipment along with state and federal law and procedures related to elections. O.C.G.A. § 21-2-101(a).

The election superintendent and at least one registrar—or in counties with boards of election or combined boards of election and registration—a board member or designee of the board, are required to complete a minimum of 12 hours training annually. In municipalities, the election superintendent and at least one registrar shall complete a minimum of 12 hours training biennially. The Secretary of State selects the training. O.C.G.A. § 21-2-100(a).

In addition to this state mandated training, there are also several essential federal laws whose complex provisions necessitate training local election officials and poll workers to ensure the voting rights protected by federal law are protected in practice by state and local election officials.

These laws protecting citizen voting rights include the Voting Rights Act of 1965, the National Voter Registration Act of 1993, the Uniformed and Overseas Citizens Absentee Voting Act, the Voting Accessibility for the Elderly and Handicapped Act and the Help America Vote Act of 2002. The State Election Board and the Secretary of State cannot be confident these laws are administered in a consistent and uniform manner unless the county election officials and poll workers are effectively trained in the requirements of these critical federal laws.

***Although the Georgia Secretary of State has developed a large portfolio of training materials and methods for county superintendents and registrars since 2012, that portfolio is lacking key ingredients required to ensure Georgia elections are administered fairly, effectively and in a uniform manner that protects the voting rights of Georgia electors. Only a small part of that portfolio is directed to the training of poll workers.***

In preparation of this report I have reviewed a large amount of training materials and information provided by the defendants in discovery. For purposes of my report, I focus on *The Poll Worker Manual*, 2018 Edition and 5,148 pages of PowerPoint presentations. This part of the discussion focuses on the PowerPoint presentations, not on the poll worker manual.

Although many of the presentations are undated, the materials appear to be arranged chronologically. Most presentations seem to be connected with annual conferences of the Georgia Election Officials Association (GEOA), the Voter Registrars Association of Georgia

(VRAG) and combined meetings of the two organizations of local election officials. The first referenced conference is the May 2012 GEOA conference and the last referenced conference is the March 2018 VRAG/GEOA combined conference.[xxix] I am aware that there will be a state conference in December 2019 as well.

The Secretary of State's Elections Director, Chris Harvey, refers to these conferences as the primary opportunity to train local election officials. Deposition of Chris Harvey, August 16, 2019, 30:20-35:20. Notably, other local election officials including poll workers and poll managers do not participate in these conferences. There are no statewide meetings designed to reach poll workers and the Secretary of State does not do anything to ensure information from these conferences reach those front line election officials.

The majority of the presentations were done by staff from the Office of the Secretary of State. They were responsible for 89 of the 160 different sets of training materials.

Presentations ranged from professional development such as *The Art of Communicating* (State-Defendants 00002381) to high level discussions with historical perspective such as *Setting the Stage - How Did We Get to Where We Are Now?* (State-Defendants 00002852) along with legislative updates. The bulk of the presentations focused on detailed step-by-step procedures to carryout specific election administration tasks such as *UOCAVA Voters: Mail and Electronic Ballot Delivery* (State-Defendants 00003080). As new technology was implemented, like the new Georgia Voter Registration System, the presentations included screen shots from the technology platforms. *Overview of GVRS* (State-Defendants 00003682).

Local election officials provided the next highest number of presentations. These presentations generally focused on successful local election administration initiatives such as *Ballot On Demand* from Athens-Clarke County (State-Defendants 00003201) to best practices for required duties such as *Absentee Reconciliation* from Gwinnett County (State-Defendants 00006168).

Staff from Kennesaw State University Center for Election Systems (KSU) also provided a large number of presentations. KSU has played an integral role in Georgia election administration since the acquisition of a uniform touch screen electronic voting system in 2002. The KSU Center for Election Systems was responsible for maintaining and programming the voting equipment in a partnership with the Office of the Secretary of State and local election officials. KSU presentations ranged from detailed step by step programming procedures such as *Creating and Saving Export Files in GEMS* (State-Defendants 00002557) to high level discussion of issues faced by election officials such as *General Security Concepts and Terms* (State-Defendants 00006732).

The relationship between Kennesaw State University and the Office of Secretary of State ended in late 2017 or early 2018. Some staff from the KSU Center for Election Systems moved to the Secretary of State's office to continue to support state and local election officials.

Presentations also were provided by representatives from other government offices such as the Georgia Government Transparency and Campaign Finance Commission, *Update on Georgia Campaign Finance Law and Filing Requirements* (State-Defendants 00006677). On occasion

federal agencies also played a role in the conference presentations: *What FVAP Can Do for Georgia UOCAVA Voters* (State-Defendants 00002577) from the U.S. Department of Defense Federal Voting Assistance Program and *Election Infrastructure Security Initiative* (State-Defendants 00007452) from the U.S. Department of Homeland Security.

The training materials reference other modes of training made available to local election officials by the Secretary of State besides the conference PowerPoint presentations. The voter registration system and electronic voting equipment are supported with print and electronic manuals. There were also a series of video tutorials covering a wide range of election administration subjects available on the eLearn platform.

In 2015 eLearn was replaced with Firefly. Firefly is an electronic searchable document repository developed and maintained by the Office of Secretary of State and available to local election officials. Firefly is accessible to county superintendents and registrars through a controlled access system. References to Firefly appear in materials presented at the May 2015 GEOA conference. (State-Defendants 00004630, 00005098, and 00005118). I was not provided access to Firefly.

A small number of Georgia election officials also participate in the training opportunities provided by the Election Center. The Election Center offers special two-day workshops in February and April of each year along with a three-day Annual Conference in August. The Election Center in conjunction with faculty from Auburn University administers a nationally recognized election official certification program.

The Certified Election and Registration Administrator (CERA) core curriculum program consists of 12 day-long and half-day courses covering a range of election administration areas including Management and Leadership Concepts; Planning and Budgeting; Facilitating Voter Participation; Enfranchisement, Enhancement & Enforcement: Modern Federal Election Law and Regulation; and the History of Elections. Appendix B contains a full list of the core courses along with a description of the core competencies of the course materials. These core courses are required as part of the initial CERA certification.

According to the Election Center website only six current Georgia election officials have completed the CERA certification program.[xxx] A total of 12 Georgia election officials are included among the 1,208 CERA graduates since the first class of graduates in 1995. Election Center staff has informed me that there are presently 34 Election Center members from Georgia including 11 in the Office of the Secretary of State.[xxxi]

The Election Center provides an opportunity to bring fresh ideas and innovations to Georgia's election officials training program. Participation by all county superintendents and registrars is essential to ensure a more professional cadre of local election officials with a broader perspective on their role in ensuring fair and effective administration of Georgia elections and protection of the voting rights of Georgia citizens.

*In order to be effective, the training protocols of the Georgia Secretary of State must address*
*significant challenges presented by the large number of local election officials, a diverse voter*
*population along with evolving legal and technological complexity in election administration.*

Training local election officials in Georgia presents some unique challenges. These challenges
arise from the large number of local election officials and the differing organizational structure
of election administration among Georgia counties. Georgia's history of restricting the vote of
citizens of color also significantly impacts training approaches.

County, state and federal elections are administered at the county level in Georgia's 159
counties. Only Texas has more counties responsible for election administration.[xxxii] There are
103 Combined Boards of Elections and Voter Registration. Elections in 53 counties are
administered by a probate judge and registrar and three counties have an election supervisor and
registrar. (State-Defendants 00002408).

Wisconsin has an even larger number of local election officials. Elections are conducted at the
municipal level in the state's 1,850 towns, villages and cities. In addition, the 72 counties also
have significant election responsibilities. From my 30 plus years of experience as Wisconsin's
chief election official, I can describe the challenges presented in establishing and maintaining an
effective training program for a large, diverse group of local election officials.

The Georgia Secretary of State has a variety of training challenges based on the number of local
election officials. Establishing a communication protocol is the foundation for effective training.
Information needs to be delivered in a timely and efficient manner. The Secretary of State cannot
rely on just one channel of communication such as email or providing internet access to a central
contact point to convey important information. It is essential that the Secretary of State identify
and utilize multiple communication channels when reaching out to local election officials.

For example, as a result of litigation in 2018 and other years, the Secretary of State was required
by the courts to issue several Official Election Bulletins (OEBs) to county election officials to
ensure federal court orders were carried out. In their depositions Elections Director Chris
Harvey, Deputy Elections Director/Deputy General Counsel Kevin Rayburn and State Election
Board Member David Worley described the distribution of these OEBs.[xxxiii]

They were emailed to county election officials and posted on Firefly. However, there was no
mechanism in place to ensure the county election officials received, reviewed and implemented
the OEBs. There must be a requirement that county election officials report back to the Secretary
of State that they have received the OEBs, reviewed the content of the OEBs and taken steps to
implement the court ordered requirements spelled out in the OEBs including directing poll
workers and other front line election workers to carry out their duties consistent with the court
directives.

Tracking names and contact information of county election officials is also a challenge. There
will be constant turnover due to the expiration of terms, resignations, retirement, health issues
and in some cases death of local election officials. Not only must contact information be kept

13

current, but tracking compliance with training requirements and election-driven deadlines is a responsibility of the Secretary of State that presents logistical challenges.

In developing and implementing training programs, the Secretary of State needs to focus on teaching challenges due to age, background and learning styles of the local election officials. While these differences may not be tracked, they have to be accounted for in each presentation and the overall training curriculum.

The Secretary of State has to also evaluate what information is the most essential to focus on at a given point in time. New technology such as voting equipment often drives the content of training, but certain election administration tasks present recurring challenges. Absentee voting and provisional ballots are examples that all election officials need to be attentive to – especially given the consequences of any error.

Georgia's history of restricting access to the ballot for citizens of color also presents significant challenges to an effective training program. Georgia was one of several states identified in the Voting Rights Act of 1965 that drew special scrutiny because of past practices of election discrimination based on race. This should be addressed in a straight forward manner in training for local election officials and poll workers. Leaving this history of discrimination unspoken when presenting information about election officials' duties creates the impression treating all voters equally and fairly is not a paramount responsibility for doing their job.

Until the U.S. Supreme Court decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), all voting changes in Georgia were required to be precleared by the U.S. Department of Justice. Preclearance provided training challenges for Georgia election officials that still persist. Even without preclearance requirements any voting change made by local election officials will be scrutinized and questioned. It has to be stressed in training protocols how important it is for local election officials to ensure any voting change does not have a disparate impact on voters of color.

This description of the challenges faced by the Secretary of State in developing and implementing a comprehensive training program sets a high bar for the Secretary of State and the State Election Board to ensure local election officials and poll workers have the information and tools required to do their jobs. In a subsequent section I describe how the current training does not measure up to this mark.

***The Georgia Secretary of State's training does an effective job of providing county superintendents and registrars with information, guidance and support with its complex electronic election administration tools. However, electronic election administration tools are just one component of election administration.***

Technology has become an integral part of administering elections since the 2000 election. The Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901 *et seq.*, provided the impetus with requirements for a computerized list of registered voters maintained at the state level, accessible voting equipment for voters with disabilities, uniform voting equipment standards and requirements for tracking and accessing the status of provisional ballots. Georgia implemented a

14

single system of electronic voting in 2002 and developed a statewide voter registration system to comply with HAVA.

The partnership with Kennesaw State University's Center for Election Systems provided a central point of focus for state and local election officials for the programming and maintenance of the voting equipment. When Georgia implemented electronic poll books KSU helped ensure uniform procedures and practices were implemented statewide.

In 2015, the Secretary of State rolled out a new statewide voter registration system. The training materials demonstrate a deep dive into the nuts and bolts of the new system. The PowerPoint presentations have step by step instructions along with screen shots for guiding local election officials in the training sessions. The presentations refer to user manuals that were distributed at the sessions and available in electronic form through Firefly. (State-Defendants 00005001-00005023).

This "in the weeds" detailed level of technology training is one of the stronger aspects of the programs developed by the Office of the Secretary of State. However, electronic election administration tools are just one component of election administration. The Secretary of State needs to make all aspects of its training program comprehensive enough to ensure local election officials and poll workers are treating voters in an equal, fair and uniform manner,

***The Georgia State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections.***

The State Election Board and Secretary of State need to be more proactive in ensuring that local election officials are carrying out their election administration responsibilities to ensure all voters are able to fully participate in Georgia elections. In particular Georgia training programs should be more voter-centric with an emphasis that election officials and poll workers should help, not hinder, citizens exercising their voting rights and emphasize the integrity and importance of the vote of each citizen.

This includes training for State Election Board Members who presently receive no training about their duties or how the Georgia election system works. It is incomprehensible that citizens should be asked to serve on a Board charged with the oversight of election administration and enforcement of election laws, rules and regulations without receiving any training.

For example, in Wisconsin when a new member was appointed to the Government Accountability Board, I set up a half-day training for the new member. The training included presentations from several different staff members, along with a briefing on pending cases and a review of the agency website. We also demonstrated the use and capabilities of agency electronic platforms such as the statewide voter registration system, complaint tracking data base and election official training portal. This provided the new Board Member with a solid background before participating in Board meetings.

From my perspective, there are four crucial elements missing from the State Election Board and the Office of Secretary of State training and enforcement of state and federal election law. The first element is a focus on serving the voter from registration to voting to dealing with ballot issues. The second element is a comprehensive training program for poll officers and poll workers directed by the State Election Board and the Office of Secretary of State. The third element is a consistent regimen of accountability for election officials' performance. The final element is transparency.

<u>Focus on the Voter</u>

Complying with statutory requirements, rules and regulations appears to be the primary focus of the current training programs along with detailed instruction on working effectively with election technology. While this is important and essential to a smooth functioning election, it alone does not protect voters' rights.

Elections are the event where voters have the opportunity to shape government by choosing their elected officials. There needs to be more of a voter-centric focus to the overall training program. Facilitating voter participation is a core value of election administration. There needs to be a strong message imbued into the training that emphasizes serving the voter. This is not an element in the Secretary of State's training materials.

This must be reflected in an emphasis on making voting easy, accessible and transparent. This requires a focus not only on accessibility for persons with disabilities, but selecting locations and setting hours that enable voters to easily get to the voting location. This is essential in ensuring that advance voting and Elections Day voting are accessible to all voters.

A voter-centric focus will also mitigate the impact of discrimination in the voting process directed towards persons of color. This is important in establishing voter confidence in the Georgia electoral process. The conference training materials on the Voting Rights Act were limited to a description of the law. There was no discussion on how Voting Rights Act is voter focused to ensure all voters have an equal opportunity to participate in the electoral process.

Training scenarios that deal with resolving voter problems are a key component for a comprehensive and effective training protocol. Absentee voting and the issuance of provisional ballots commonly present the most challenges to poll workers. From my experience training local election officials, observing poll workers at the polls on Election Day and working as a poll worker, absentee voting and processing absentee ballots comprise the largest segment of election administration issues. Developing training scenarios that illustrate the problem and the options for resolution must be an integral part of the Secretary of State's training program.

For example, many of the Election Day complaints fielded by Chris Harvey and Kevin Rayburn in November 2018 dealt with individuals with questions about their registration status and voting location. This led to concerns about issuing provisional ballots. There were also numerous questions about absentee voting. A well-designed poll worker training program implemented statewide would provide scenarios dealing with the situations encountered by voters.

This would enable state and local election officials to work out resolutions to these frequently encountered problems in advance of voting. It would provide poll workers with a road map for addressing these issues. If made publicly available, it would provide an opportunity for voters and the media to see what is expected of election officials and how particular issues are resolved.

This voter-centric approach only works if the State Election Board and the Office of Secretary of State incorporate it in their training materials and require its use for poll workers as well as county election officials. This training approach would send a message to everyone involved in the electoral process, from poll workers to county election officials to voters to candidates, that enabling full participation by all voters is the foundation for conducting Georgia elections.

Mandatory Uniform Training Protocol for Poll Workers

The voter is the central focus of administering and conducting elections. The Secretary of State's training materials recognize poll workers hold in their hands "the citizen's right to cast a vote" and "ensure that eligible citizens are able to cast a vote and have that vote counted." (State-Defendants 00008025).

Georgia law vests the responsibility for training poll officers and poll workers with the county superintendents. O.C.G.A. §§ 21-2-70(8), 21-2-99(a). The responsibility for ensuring uniformity in the practices of poll officers and the fair, legal and orderly conduct of elections is vested in the State Election Board. O.C.G.A. § 21-2-31(1), (2). A mandatory state-directed uniform training program for poll workers is the best way to ensure "the citizen's right to vote" is protected and "eligible citizens are able to cast a vote and have that vote counted."

If poll workers are not complying with their statutory duties or implementing practices that hinder voters in exercising their rights, it will be the State Elections Board and Secretary of State that will ultimately have to answer for that failure.

The Office of Secretary of State has developed a 104 page manual for poll workers. *The Poll Worker Manual*, 2018 Edition. (State-Defendants 00008952-9059). It appears this manual is designed to assist superintendents in carrying out their statutory training responsibilities. There are also some related materials about qualifications of poll workers, a sample poll worker training certificate, as well as instructions and training tips directed to superintendents. (State-Defendants 00009060-9070). No State Election Board rules or Office of the Secretary of State directives require this manual be used in poll worker training although the Secretary of State encourages its use in poll worker training.

Although the manual contains helpful information, it is far from comprehensive and contains large chunks of statutory language that are difficult to understand. It also takes an inappropriately passive approach to issuing provisional ballots, which appears from my review of complaints in the 2018 general election to be a significant source of inconsistent practices. (State-Defendants 00018885 – 00036315).

The chief state election official must develop and mandate a robust training program for the election personnel that are the primary contact with voters when casting their ballots. This is

necessary to ensure uniform practices throughout Georgia and that poll workers are adequately trained in "the use of voting equipment, voting procedures, all aspects of state and federal law applicable to conducting elections, and the poll officers' or poll workers' duties in connection therewith . . . ." as required by law. [xxxiv]

It is my understanding that the Office of the Secretary of State is focused on developing and implementing a training program for election officials including poll workers for the new electronic voting system which has been piloted in a handful of counties and will be deployed statewide for the March 2020 presidential primary. It is also my understanding that a new poll worker manual has been prepared, but that manual has not yet been produced in this case.

My opinion is based on *The Poll Worker Manual*, 2018 Edition. To the extent the new poll worker manual contains the same deficiencies I identify in this report, my opinion also addresses the new manual.

My comments on *The Poll Worker Manual*, 2018 Edition, are intended to illustrate key elements that must be incorporated in order to have more robust training for poll workers that provides confidence poll workers will help, not hinder, voter participation and are mindful of the integrity and importance of the vote of each citizen. I do not believe a single manual can effectively serve as the end all of a robust training program. It is important to have a wide range of resources that are part of the training and accessible to election officials and poll workers during voting.

It is logical to organize an Election Day training program chronologically from setting up and opening the polling place; checking in voters; confirming voter identity; issuing ballots; handling absentee, challenged and provisional ballots; to wrapping up, closing the polling place and transporting ballots, results and closing documentation. However, this information has to be presented in a user-friendly manner that makes it easier for the poll workers to understand what is expected and required.

The manual opens with two pages of statutory language about poll worker qualifications, conduct and training. In fact, 23 of the 104 pages consist of statutory language. (Pages 1, 2, 5, 6, 24, 25, 29, 45-47, 51-59 and 69-71) It is essential for poll workers to have access to the law because a plain language description of legal requirements may not be comprehensive. However, if a poll worker is reading the manual to gain an understating of what is required, a recitation of statutory language will not effectively convey that information. A narrative description of each step will be easier to digest.

However, narrative information needs to be accented and augmented with visual information to illustrate key components such as signage and acceptable voter identification. Flow charts, checklists and step-by-step procedures are also important elements for conveying critical information. These tools will also facilitate comprehension of the required information.

The 104 page manual contains 17 pages of forms, 19 pages of flow charts, 11 pages of step-by-step instructions and 10 pages dedicated to troubleshooting particular issues such as problems setting up voting equipment. These are helpful tools that can convey critical information, but as presented they lack context.

18

One contextual element that is missing is a focus on the voter as the central actor in Election Day scenarios. It is important for the poll workers to be presented with the voter's perspective. This provides the "why" we are doing this that is essential to getting poll worker buy-in to the required procedures.

There are 26 pages in the manual devoted to provisional and challenged ballots. Twelve pages consist of language from the applicable statute or State Election Board rule. There is no voter-centric context to provide a perspective why these procedures are important. Interestingly, the manual seems to suggest that issuing a provisional ballot is an optional procedure. On page 20 in the flowchart, the language is if a voter "would like to be issued a provisional ballot" because for some reason they cannot vote at the polling place. On page 30, the voter "may vote a provisional ballot" if they do not have acceptable identification. On page 42, the voter "may be offered a provisional ballot" if the voter's name cannot be located on the voter list.

Provisional voting is a complex procedure with many different scenarios. The instructions in the manual are overly simplified, do not provide the full context for provisional ballots or a reference to where complete information can be found. Given the importance of provisional ballots as a mechanism for protecting voter rights, this part of the manual is woefully deficient.

The manual allocates six pages to voter identification including one page of statutory language. There are four pages of examples of acceptable identification documents. Interestingly, there is only one person of color depicted in the 12 examples of acceptable identification. Given Georgia's history of discrimination, the manual should reflect the diverse composition of the electorate.

This dissection of the primary example of poll working training developed at the state level illustrates what a state-directed poll worker training program has to contain if it is going to provide a comprehensive, user friendly training experience for the front line workers in election administration. A model state-directed training initiative for poll workers must provide participants in the electoral process with confidence that poll workers know their responsibilities, will help, not hinder, voter participation and are mindful of the integrity and importance of the vote of each citizen.

Accountability for Election Official Performance

The most robust, comprehensive training program can be a wasted effort if there is not an effective means of holding election officials accountable for properly performing their duties and helping not hindering voter participation in the electoral process. Georgia has three accountability mechanisms in place. There are statutory training and certification requirements for superintendents and registrars.[xxxv] There appears to be a monitoring program in place where investigators from the Secretary of State's Office are present at some voting locations during elections. The State Election Board has the authority to investigate irregularities and fraud in the administration of elections.[xxxvi]

These are important accountability tools, but they are not effectively utilized by the State Election Board and the Secretary of State.

Election superintendents and voter registrars are required to take a minimum of 12 hours of annual training. This requirement can be met through participation in the annual conference. The State Election Board can fine individual election officials and their government employer for failure to attend the required training. O.C.G.A. § 21-2-100(e).

Election superintendents, voter registrars and absentee ballot clerks are required to complete a certification program offered by the Secretary of State within six months of their appointment. The certification program consists of up 64 hours of online or in-person training and includes an exam. The State Election Board can fine individual election officials and their government employer for failure to complete the certification. *Id.* § 21-2-101(d).

This would be a powerful tool to ensure compliance with the minimum training requirements if it was implemented consistently, in a timely and transparent manner. I have no information on how often election officials fail to complete the certification or training. In his deposition, Chris Harvey suggests that if local election officials do not comply with the law they are subject to sanctions from the State Election Board. He refers to that process as "the stick" to ensure compliance. Deposition of Chris Harvey, 96:21-25 (Aug. 16, 2019). However, the State Election Board meets on ad hoc basis at most a few times a year.

Chris Harvey also suggested that counties regularly pay attention to complaints involving election officials before the State Elections Board. *Id.* at 196:12-25 197:1-11. He believes this has a deterrent effect and county election officials will learn from the transgressions of other county election officials. But he provided no basis for this belief and I saw no documents demonstrating that counties pay attention to complaints before the State Election Board. The counties are not informed when State Election Board minutes and transcripts are posted online. The lack of a regular schedule provides no predictability to when minutes and transcripts may be posted. In addition, there appears to be a long lag time between the date of a meeting and when minutes and transcripts are posted online. The training materials do not emphasize the consequences election officials face if they do not comply with state and federal election administration requirements.

My review of complaints considered by the State Election Board shows a large number are disposed of without any action. It also takes two to three years before a complaint is presented to the State Election Board. In cases involving local election officials failing to comply with the law where a sanction is imposed, a letter of instruction seems to be the most common penalty. If there is a more egregious case it seems that the election official has already left government service.

The Georgia State Election Board and Secretary of State need to better track and analyze in a comprehensive, transparent manner recurring voter issues that impact individuals' voting rights. There is no comprehensive, transparent monitoring system for tracking the receipt and disposition of election complaints. Most complaints appear to come to the Secretary of State

through emails or telephone contacts. Complaints filed through the Secretary of State's website generate an email for review by the Election Director or Deputy Election Director.

Chris Harvey testified in his depositions that there is no logging system for complaints. Deposition of Chris Harvey, 116:18-117:12__(Aug. 16, 2019), 267:21-268:4 (Dec. 5, 2019). There is no categorization, analysis or quantification of the complaints. Deposition of Chris Harvey, 134:14-19 (Aug. 16, 2019), 268:5-16 (Dec. 5,2019). There is no tracking of the disposition of complaints. *Id.* at 116:18-120:14, 129:7-19 (Dec. 5, 2019). There are also no written procedures for Secretary of State staff on how to handle complaints including criteria for assessing the seriousness of complaints. (Deposition of Chris Harvey, 129:7-19 (Aug. 16, 2019), 263:10-267:20__ (Dec. 5, 2019).

There are commercial software applications designed for customer service centers that could be modified to facilitate tracking complaints. If complaints are properly logged with relevant information such as the nature of the complaint and where and when it happened, the State Election Board and Secretary of State would have an effective tool for monitoring election official compliance and assessing local election official performance.

There seems to be very little information about the Election Day monitoring activities of investigators with the Office of the Secretary of State. According to Chris Harvey in his December 5, 2019 deposition, there are about 40-45 investigators from the Secretary of State's Office in the field on Election Day. If a violation is observed, it is written up as a complaint and goes through the investigation process. (Deposition of Chris Harvey, 31:12-32:11 (Dec. 5, 2019). This can lead to consideration of the matter by the State Election Board. However, given the limitations of review by the State Election Board, this accountability mechanism is not timely or readily transparent to local election officials or the public.

Election Day and advance voting monitoring is also not a comprehensive accountability mechanism. Georgia has a large number of polling places and advance voting locations. The on-site investigators cannot cover a significant number at any given election. If Georgia law permitted nonpartisan observers, the number of eyes on the voting process could be increased significantly.

In Wisconsin, the state election agency regularly reviews reports from election observers, voter advocacy groups and disability rights groups following major election events. This provides a public forum for raising the voting issues and an effective assessment tool for monitoring election official performance.

One additional tool to ensure compliance would be to require the implementation of an Election Day observation and post election audit of polling places throughout the state. Observers or monitors under the direction of the State Election Board would be present at selected polling places and prepare a report on what they saw and heard. In addition, following the election the paperwork completed by the poll workers should be reviewed to ensure it was properly completed.

While election superintendents should be doing the post election audit as a matter of practice, having a state representative observing Election Day activities and reviewing post-election paperwork provides a more objective evaluation. This activity can also be contracted out to an independent organization specializing in performance audits.

Transparency

Transparency is an essential element of a robust training program. Transparency provides individuals and organizations with a stake in the electoral process with a window into how it operates. It is important that there be more transparency for all aspects of Georgia's election official and poll worker training program. Currently that is not the case. Members of the public and the media must have access to training manuals and videos so they can assess the efficacy of the materials.

**Conclusion**

I was asked to opine on the basic policies, procedures, and practices that the Georgia Secretary of State and the State Election Board must have in place in order to train county election superintendents, registrars and poll workers to carry out their duties and in order to ensure that elections comply with state and federal election laws and the United States Constitution and whether those policies, practices, and procedures are in place in Georgia.

I started with a description of a robust top to bottom training program under the direction and responsibility of the chief state election officer that must be in place to ensure that elections comply with state and federal election laws and the United States constitution. My analysis examined the state and federal statutory requirements applicable to the State Election Board and Secretary of State.

My conclusions are that there is a large portfolio of election official training materials in place in Georgia. Their strength is the detailed training in support of the technological tools used in elections particularly the statewide voter registration system. But there is much more to administering an election than mastering technology. There has to be a focus on the people involved in elections – primarily the voters and the poll workers.

What is missing and crucial to ensuring Georgia elections comply with state and federal election laws and the United States Constitution is a robust training initiative for poll workers under the direction of the Secretary of State. There are several essential elements that need to be integrated into a state directed poll worker training program. These essential elements should also be incorporated into the current training program for county election officials.

The first element is a voter focused component to training on duties and responsibilities related to voter registration, absentee voting, issuing provisional ballots and the voting experience at advance voting locations and polling places. There needs to be an increased commitment to accountability of poll workers and county election officials. Developing a tracking mechanism for election complaints will enable the State Election Board and Secretary of State to identify

performance issues, track complaint dispositions, tailor training content and target the delivery of training to election officials who need it the most.

Finally, it is important that there is more transparency for all aspects of Georgia's election official and poll worker training. Members of the public and the media should have access to training manuals and videos so they can assess the efficacy of the materials. They should also have access to the tracking mechanism for complaints.

I believe these training, tracking, accountability and transparency enhancements will ensure that Georgia election officials and poll workers are better positioned to carry out their election administration duties in a manner that helps, not hinders, voter participation, emphasizes the integrity and importance of the vote of each citizen and complies with state and federal law.

---

[i] 2007 Wisconsin Act 1.

[ii] Effective June 30, 2016, the Government Accountability Board, an independent executive branch agency, was replaced by two separate legislatively controlled bipartisan commissions, the Wisconsin Elections Commission and the Wisconsin Ethics Commission. 2015 Wisconsin Act 118.

[iii] https://electioninnovation.org/.

[iv] https://www.usvotefoundation.org/.

[v] https://electionlab.mit.edu/.

[vi] https://www.nap.edu/catalog/25120/securing-the-vote-protecting-american-democracy.

[vii] Wis. Stat § 5.05(7).

[viii] Chapter 334, (Wisconsin) Laws of 1973.

[ix] Wis. Stat § 5.05(7).

[x] Wis. Stat § 7.15.

[xi] Wis. Stat § 7.10.

[xii] Wis. Stat § 7.08(3).

[xiii] Wis. Stat § 7.31 as created by 2001 Wisconsin Act 16, § .

[xiv] Chapter EL 11, Wis. Admin. Code.

[xv] 2005 Wisconsin Act 451, § 122, creating Wis. Stat § 7.315.

[xvi] Chapter EL 12, Wis. Admin. Code.

[xvii] https://www.electioncenter.org/certified-elections-registration-administrator.html.

[xviii] https://www.electioncenter.org/about-us.html.

[xix] The National Academies Press, National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy.*: doi: https://doi.org/10.17226/25120. Pp 107-109 (2018).

[xx] 42 U.S.C. §§ 15301-15545 (2013).

[xxi] Georgia was entitled to receive $8.6 million in HAVA § 101 payments. 69 Fed. Reg. 14002, 14260, 14247-63 (Mar. 24, 2004).

[xxii] 52 U.S.C. §§ 10301-10702.

[xxiii] 52 U.S.C. §§ 20501-20511.

[xxiv] 52 U.S.C. §§ 20301-20311.

[xxv] 52 U.S.C. §§ 20101-20107.

[xxvi] https://public.tableau.com/profile/u.s.election.assistance.commission#!/vizhome/EAVS2016DataViz-FinalVersion_1/EACDataVizTool.

[xxvii] O.C.G.A. § 21-2-92.

[xxviii] https://sos.ga.gov/index.php/elections/state_election_board.

[xxix] These inferences are supported by the chronological organization of the materials, references within the materials to outside events such as specific elections, court cases, legislative updates or the implementation of election-related technology including a new voter registration system, a new e-learning platform and most recently election security initiatives.

[xxx] https://www.electioncenter.org/certified-elections-registration-administrator.html.

xxxi Email from Tim Mattice, Election Center Executive Director (Nov. 3, 2019).

xxxii https://thefactfile.org/us-states-counties/.

xxxiii The December 6, 2019 deposition of Kevin Rayburn was presented to me in rough draft form so I am unable to include specific cites to the material discussed in this report.

xxxiv O.C.G.A. § 21-2-99(a).

xxxv O.C.G.A. §§ 21-2-100, 21-2-101.

xxxvi O.C.G.A § 21-2-31(5).

**List of Cases – Kevin J. Kennedy, Expert Witness – 2016-2019**

*Louis M. Bouvier, Jr. v. William Clark Porter, IV*, No. 17 CVS 3273 (N.C. Super. Ct., Guilford Cty.) – Deposition, Trial Not Scheduled

*One Wisconsin Institute, Inc. v. Mark L. Thomsen*, No. 3:15-cv-00324-jdp (W.D. Wis.) – Trial Testimony, Deposition

**List of Publications - - Kevin J. Kennedy – 2010-2019**

National Academies of Sciences, Engineering, and Medicine 2018. *Securing the Vote: Protecting American Democracy*. Washington, DC: The National Academies Press*
https://doi.org/10.17226/25120

Hands on or Hands Off? – Watchdog Agencies and Their Independence, *The Guardian*, Volume 38, Issue 1; Spring 2017**

*This publication was crafted and edited individual members of *the Committee on the Future of Voting:Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine working with a Committee reporter.

**The Guardian* is a publication of the Council on Governmental Ethics Laws (COGEL)

My expert report is attached.

Kevin J. Kennedy
December 16, 2019

# Kevin J. Kennedy

## Educational Background

University of Wisconsin-Madison, Law School, J.D. December 1976

University of Wisconsin-Madison, College of Letters and Science, B.A., Honors Candidate in Mathematics and Communication Arts, May 1974

## Professional Qualifications

Admitted to State Bar of Wisconsin, December 27, 1976
Admitted to practice in the Eastern and Western Districts, Wisconsin Federal District Court
Admitted to practice in the Seventh Circuit, United States Court of Appeals

## Work Experience

**Kennedy Election Law Services**
**July 2016 to present**

Provide consulting services including advice, expert testimony, lectures and speeches in the areas of election administration, campaign finance and governmental ethics.

**Director and General Counsel, Wisconsin Government Accountability Board**
**November 2007 to June 2016**

Serve as chief administrative and legal officer for state agency responsible for administering, interpreting and enforcing the campaign finance, election, ethics, lobbying and public campaign funding laws of the State of Wisconsin.  Serve as Chief Election Officer for the State of Wisconsin.

**Executive Director, Wisconsin State Elections Board, August 1983 to January 2008**

Provide agency leadership on behalf of the Board.  Responsible for all administrative duties including implementing Board policy, preparation of formal opinions, budget development, legislative activity including administrative rules, staff supervision and development.  Carry out delegated decision making authority with respect to litigation and review of decisions of local election officials.

Serve as Chief Election Officer for the State of Wisconsin.  Responsible for directing the implementation of federal mandates under Help America Vote Act of 2002 (HAVA).  Initiated

efforts that ensured full accessibility of state polling places including the use of HAVA compliant voting systems. Developed comprehensive voting system testing and security procedures to assure the transparency and integrity of the election process.

**Acting Executive Secretary, Wisconsin State Elections Board, December 1982 to July 1983**

**Legal Counsel, Wisconsin State Elections Board, April 1979 to July 1983**

**Associate, Cyrak Law Offices S.C., Madison and Waterloo, Wisconsin**

**Assistant District Attorney, Washington County, Wisconsin**

**Law Student Intern, District Attorney's Office, Sauk County, Wisconsin**

**Law Student Intern, Legal Assistance to Institutionalized Persons Program, University of Wisconsin-Madison, Law School**

**Professional Organizations**

**Massachusetts Institute of Technology Election Data Science Lab Board, 2017 to present**

**Center for Election Innovation & Research Board, 2017 to present**

**U.S. Vote Foundation Board, 2017 to present**

**The Madison Institute Board, 2017 to present**

**State Bar of Wisconsin, 1976 to present**

**Dane County Bar Association, 1977 to present**

**Member, Council on Governmental Ethics Laws (COGEL), 1986 to present**

**Member, Past President, National Association of State Election Directors (NASED), 1990 to present**

**National Academies of Sciences Engineering and Medicine**

Member, Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology February 2017 to September 2018

Produced Consensus Study Report - *Securing the Vote: Protecting American Democracy*, September 2018

**American Law Institute (ALI)**

Serve as Adviser on ALI's Principles of Election Law: Dispute Resolution Project.  February 2011 to June, 2016

**Pew Center on the States**

Voter Registration Modernization Working Group – July 2009-August 2014

Election Performance Index Working Group – July 2010- October 2013

**Council of State Governments (CSG)**

Member, Policy Advisory Board, Overseas Voting Initiative. February 2014 to June 2016

**United States Election Assistance Commission**

Wisconsin State Representative – Standards Board, 2004 – 2008.

**Election Center, 1988 to 2017**

Co-Chair of the National Task Force on Election Reform responsible for the preparation of two comprehensive reports on election reform in 2001 and 2005.  Member, Professional Education Program Committee.  Certified Elections and Registration Administrator (CERA) - Completed professional certification program (2003) and recertification program (2006, 2009, 2012, 2015, 2018) Member, Election Hall of Fame

**Federal Election Commission (FEC)**

Member of the National Advisory Panel of State and Local Election Officials.  Served on an advisory panel for the FEC Ballot Access publications.

**Contact Information**

**41 Rough Lee Court**
**Madison, WI 53705-1083**

**kennedyjkevin@yahoo.com**

**608-843-8683**

## Appendix A

Description of facts, data and materials examined and considered in preparation of report.

**Statutes, Rules and Regulations**

Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20601-21145

The Voting Rights Act of 1965 (VRA), 52 U.S.C. §§ 10301-10702

National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §§ 20501-20511

Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301-20311

Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. §§ 20101-20107

69 Fed. Reg. 14002 (Mar. 24, 2004)

Official Code of Georgia Annotated, Title 21 Elections

Georgia Administrative Code, Title 183 State Election Board,

Wisconsin Statutes; Chapter 5, Chapter 7

Wisconsin Administrative Code; Chapter EL 11, Chapter 12

Wisconsin Session Laws; 1973 (Chapter 334), 2005 (Act 451), 2007. (Act 1), 2015 (Act 118)

**Pleadings and Depositions**

Plaintiffs' Amended Complaint

Deposition of Chris Harvey, August 16, 2019

Deposition of David Worley, October 10, 2019

Deposition of Rebecca Sullivan October 15, 2019

Deposition of Seth Harp, October 16, 2019

Second Deposition of Chris Harvey, December 5, 2019

Rough Draft of Deposition of Kevin Rayburn, December 6, 2019

Report of Dr. Khalilah L. Brown-Dean, August 16, 2019

Report of Dr. Adrienne Jones, August 16, 2019

## Materials Produced in Discovery

I reviewed hundreds of documents produced by the State-Defendants. Some of the specific documents I relied on for this report include:

GEOA/VRAG Annual Conference PowerPoint, STATE-DEFENDANTS 00002381-00007500

GEOC Certification Program, STATE-DEFENDANTS 00007768-00008243

*The Poll Worker Manual*, 2018 Edition, STATE-DEFENDANTS 00008952-00009059

Miscellaneous Materials from Secretary of State Related to Poll Worker Training, STATE-DEFENDANTS 00009060-00009070

Miscellaneous 2019 Training Materials, STATE-DEFENDANTS 00008732-00008837

Email Complaints from November 2018 General Election, STATE-DEFENDANTS 00018885-00036315

## Georgia Federal Court Decisions

*Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018)

*Common Cause of Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018)

*Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324  (N.D. Ga. 2018)

## Websites

https://sos.ga.gov/
https://ga.gov
https://elections.wi.gov
https://eac.gov
https://electioninnovation.org/
https://www.usvotefoundation.org/
https://electionlab.mit.edu/
https://national academies.org
https://www.nap.edu/
https://www.electioncenter.org

https://thefactfile.org/us-states-counties/

Other Materials

*Securing the Vote:  Protecting American Democracy*, Report of *Committee on the Future of Voting:Accessible, Reliable, Verifiable Technology* for the National Academies of Sciences, Engineering and Medicine

Interview with Matt Masterson, Former Commissioner, U.S. Election Assistance Commission, November 6, 2019

Interview with Merle King, Former Director Kennesaw State university, Center for Elections Systems, November 12, 2019

Interview with Tammy Patrick, Former Federal Coordinator, Maricopa County, Arizona County Clerk, November 13, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 16th day of December 2019, I electronically

filed the foregoing **EXPERT REPORT OF KEVIN J. KENNEDY** with the

Clerk of Court using the CM/ECF system, which will automatically send

notification of such filing to Counsel of Record:

Chris Carr, Esq.
Attorney General
Dennis Dunn, Esq.
Deputy Attorney General
Russell Willard, Esq.
Senior Assistant Attorneys General
**Georgia Office of the Attorney General**
40 Capitol Square
Atlanta, GA 30334
Telephone: (404) 656-3300
Fax: (404) 657-8733
ccarr@law.ga.gov
ddunn@law.ga.gov
rwillard@law.ga.gov

Joshua Barrett Belinfante, Esq.
Brian Edward Lake, Esq.
Carey Allen Miller, Esq.
Vincent Robert Russo, Jr., Esq.
Kimberly Anderson, Esq.
**Robbins Ross Alloy Belinfante Littlefield, LLC -Atl**
500 Fourteenth Street, NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Fax: (404) 856-3250
jbelinfante@robbinsfirm.com
blake@robbinsfirm.com
cmiller@robbinsfirm.com
vrusso@robbinsfirm.com
kanderson@robbinsfirm.com

Bryan P. Tyson, Esq.
Special Assistant Attorneys General
Bryan Jacoutot, Esq.
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249
Fax: (404) 856-3250
btyson@taylorenglish.com
bjacoutot@taylorenglish.com

*/s/Leslie J. Bryan*

Leslie J. Bryan
Georgia Bar No. 091175

# DEFENDANTS' EX. 2

One Wisconsin Institute, Inc. v. Thomsen, 198 F.Supp.3d 896 (2016)

KeyCite Yellow Flag - Negative Treatment
Distinguished by Michigan State A. Philip Randolph Institute v.
Johnson, E.D.Mich., August 9, 2018

198 F.Supp.3d 896
United States District Court, W.D. Wisconsin.

ONE WISCONSIN INSTITUTE, INC., Citizen
Action of Wisconsin Education Fund, Inc., Renee
M. Gagner, Anita Johnson, Cody R. Nelson,
Jennifer S. Tasse, Scott T. Trindl, Michael R.
Wilder, Johnny M. Randle, David Walker, David
Aponte, and Cassandra M. Silas, Plaintiffs,
v.
Mark L. THOMSEN, Ann S. Jacobs, Beverly R.
Gill, Julie M. Glancey, Steve King, Don M. Mills,
Michael Haas, Mark Gottlieb, and Kristina
Boardman, all in their official capacities,
Defendants.

15-cv-324-jdp
|
Signed July 29, 2016

**Synopsis**
**Background:** Advocacy groups and individual voters
brought action challenging constitutionality of state's
voter identification law.

**Holdings:** The District Court, James D. Peterson, J., held
that:

[1] advocacy groups had standing;

[2] reduction in in-person absentee voting violated the
Fifteenth Amendment

[3] limits on in-person absentee voting violated the First
and Fourteenth Amendments;

[4] law prohibiting in-person absentee voting on Monday
before an election did not violate the First and Fourteenth
Amendments;

[5] laws requiring documentary proof of residence and
eliminating ability to use corroboration to prove residence
did not violate the First and Fourteenth Amendments;

[6] law requiring dorm lists to indicate whether students
were United States citizens violated the First and

Fourteenth Amendments; and

[7] law increasing durational residency requirement from
10 to 28 days in order to vote in Wisconsin or a given
municipality violated the First and Fourteenth
Amendments.

Ordered accordingly.

West Headnotes (39)

[1]     **Federal Civil Procedure**⟂In general; injury or
        interest
        **Federal Civil Procedure**⟂Causation;
        redressability

        The irreducible constitutional minimum of
        standing consists of three elements in that the
        plaintiff must have: (1) suffered an injury in
        fact, (2) that is fairly traceable to the challenged
        conduct of the defendant, and (3) that is likely to
        be redressed by a favorable judicial decision.

[2]     **Associations**⟂Elections and voting rights
        **Constitutional Law**⟂Particular Constitutional
        Provisions in General
        **Constitutional Law**⟂Freedom of association
        **Constitutional Law**⟂Elections
        **Election Law**⟂Parties; standing

        Advocacy groups devoted money, time, and
        other resources away from their other priorities
        in order to educate voters about Wisconsin's
        new voter laws, and therefore, groups suffered
        an injury, as required to have standing in action
        alleging that voter identification laws violated
        First, Fourteenth, Fifteenth, and Twenty-Sixth
        Amendments, as well as the Voting Rights Act.
        U.S. Const. Amend. 1, 14, 15, 26; Voting Rights
        Act of 1965, § 2 et seq., 42 U.S.C.A. § 10301 et
        seq.

        3 Cases that cite this headnote

[3]  **Constitutional Law**—Fifteenth Amendment

To succeed on a Fifteenth Amendment claim, plaintiffs must demonstrate that the legislature intentionally discriminated against voters because of their race. U.S. Const. Amend. 15.

1 Cases that cite this headnote

[4]  **Constitutional Law**—Fifteenth Amendment

Discriminatory animus does not need to be the only reason for a state's new laws, or even the primary reason, but official action will not be held unconstitutional under the Fifteenth Amendment solely because it results in a racially disproportionate impact. U.S. Const. Amend. 15.

[5]  **Constitutional Law**—Fifteenth Amendment
**Election Law**—Evidence

Determining whether invidious discriminatory purpose was a motivating factor in passage of voting restrictions demands a sensitive inquiry, in an action alleging violations of the Fifteenth Amendment, into such circumstantial and direct evidence of intent as may be available; the starting point of the analysis is whether the law has had a disparate impact, but unless there is a startling pattern, inexplicable on grounds other than race, impact alone is not determinative. and other evidence must support a finding of discrimination, which can include the historical background and context of the law and the legislative history, especially any contemporaneous statements by the decision-making body. U.S. Const. Amend. 15.

[6]  **Constitutional Law**—Fifteenth Amendment
**Election Law**—Identification of voters

Wisconsin's law requiring presentation of identification to vote was not motivated by racial animus, as would violate the Fifteenth Amendment, despite lack of qualifying ID or documentation correlating strongly with race, where law was not passed due to any procedural irregularity, law was part of series of election reforms, which were motivated by partisan interests, and there was concern for election integrity. U.S. Const. Amend. 15.

[7]  **Constitutional Law**—Fifteenth Amendment
**Election Law**—Identification of voters

Creation and implementation of identification petition process (IDPP) to permit voters to obtain an ID in order to vote, after passage of Wisconsin's voter ID law, was not motivated by racial animus, as would violate the Fifteenth Amendment, even though nearly two-thirds of those who entered the process were minorities and 85% of denials were of African-American and Latino voters; state employees went to great lengths to track down documents to prove identities in order to issue identification. U.S. Const. Amend. 15.

[8]  **Constitutional Law**—Fifteenth Amendment
**Election Law**—Voting procedures

Wisconsin's rule requiring municipalities to offer only one location for in-person absentee voting was not enacted with racial animus, as would violate the Fifteenth Amendment, where rule was passed long before state passed other voting restrictions. U.S. Const. Amend. 15.

[9]     **Constitutional Law**—Fifteenth Amendment
       **Election Law**—Voting procedures

       Wisconsin's reduction in days and hours in
       which in-person absentee voting was allowed
       was motivated in part by intent to discriminate
       against voters based on race, and therefore,
       violated the Fifteenth Amendment, where
       weekend and evening voting was important to
       and had widespread use by African-American
       and Latino voters, and intent was to curtail
       voting in large cities that had more minority
       citizens, allegedly to achieve uniformity in
       voting hours with smaller towns, but cities were
       still able to cover more hours. U.S. Const.
       Amend. 15.

[10]    **Election Law**—Voting procedures
       **Election Law**—Identification of voters

       Wisconsin's changes to voting laws, including
       imposing identification requirement and
       reducing in-person absentee voting days and
       hours, were not motivated by intentional age
       discrimination, as would violate the
       Twenty-Sixth Amendment, where younger
       voters did not lack documents needed, and
       restrictions served state interest in election
       integrity. U.S. Const. Amend. 26.

       2 Cases that cite this headnote

[11]    **Constitutional Law**—Voting rights and
       suffrage in general

       A provision restricting the right to vote is not
       unconstitutional if the legislators who passed it
       were partly motivated by partisan gain, so long
       as there were sufficient valid justifications.

       1 Cases that cite this headnote

[12]    **Constitutional Law**—Elections in general
       **Constitutional Law**—Voting rights and
       suffrage in general

       Not every voting-related law must survive strict
       scrutiny under the First and Fourteenth
       Amendments; requiring states to narrowly tailor
       their election regulations to advance only
       compelling interests would tie the hands of
       States seeking to assure that elections are
       operated equitably and efficiently. U.S. Const.
       Amend. 1, 14.

[13]    **Constitutional Law**—Elections in general

       The rigorousness of the inquiry into the
       propriety of a state election law depends upon
       the extent to which a challenged regulation
       burdens First and Fourteenth Amendment rights.
       U.S. Const. Amend. 1, 14.

[14]    **Constitutional Law**—Elections in general

       A court must undertake a three-step analysis
       under the First and Fourteenth Amendments for
       each challenged election law provision: (1) the
       court must determine the nature and severity of
       the burden that a given provision imposes; (2)
       the court must identify the state's justification
       for the provision; and (3) the court must weigh
       the burdens against the state's justifications for
       imposing them and then make the hard judgment
       that the adversary system demands. U.S. Const.
       Amend. 1, 14.

[15]    **Constitutional Law**—Voting rights and
       suffrage in general

       Under the First and Fourteenth Amendment, in
       determining the nature and severity of the

burden that a given voting restriction imposes, a court must focus on the burdens that the challenged provisions place on eligible voters who cannot comply with the new requirements. U.S. Const. Amend. 1, 14.

[16] **Constitutional Law** ⮞Voting rights and suffrage in general

Under the First and Fourteenth Amendments, in identifying a state's justification for a voting restriction, a court must consider the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. U.S. Const. Amend. 1, 14.

1 Cases that cite this headnote

[17] **Constitutional Law** ⮞Voting rights and suffrage in general

Under the First and Fourteenth Amendments, a court must weigh the burdens of a given voting restriction against the state's justification for it; when the state imposes a severe restriction on the right to vote, then the regulation must be narrowly drawn to advance a state interest of compelling importance, but when a state election law provision imposes only reasonable, nondiscriminatory restrictions, the state's important regulatory interests are generally sufficient to justify the restrictions. U.S. Const. Amend. 1, 14.

[18] **Constitutional Law** ⮞Voting rights and suffrage in general
**Election Law** ⮞Absentee Ballots

Wisconsin election laws limiting in-person

absentee voting to one location per municipality, narrowing window for such voting to 10 days, and prohibiting clerks from offering such voting on weekends were not justified by state's interests in conducting uniform, orderly elections, allowing clerks to take care of other responsibilities, saving money, and avoiding voter confusion, and therefore, violated the First and Fourteenth Amendments; prior laws did not require clerks to offer in-person absentee voting during the eliminated days and times or at multiple locations, any burden on clerks state sought to alleviate was voluntarily taken, laws did not create uniformity and still allowed clerks to set different hours, and concerns that smaller municipalities could not keep up with larger ones could be served by expanding voting in smaller municipalities. U.S. Const. Amend. 1, 14; Wis. Stat. Ann. § 6.855.

1 Cases that cite this headnote

[19] **Constitutional Law** ⮞Voting rights and suffrage in general
**Election Law** ⮞Absentee Ballots

Wisconsin law prohibiting in-person absentee voting on Monday before an election did not violate the First and Fourteenth Amendments, where prohibition allowed municipal clerks time to complete tasks for the election, which they could not do while absentee voting was going on and required them to perform tasks after hours. U.S. Const. Amend. 1, 14.

[20] **Constitutional Law** ⮞Voting rights and suffrage in general
**Election Law** ⮞Proof of identity and eligibility

Wisconsin laws requiring documentary proof of residence to register to vote and eliminating ability to use corroboration to prove residence did not violate the First and Fourteenth Amendments, where voters could register before election day and use variety of proof of residence, they could use electronic copies of

their proof, voters could request that clerk send a letter to address at which voter wanted to register, that letter could be used as proof for registration, and not accepting corroboration helped prevent fraud. U.S. Const. Amend. 1, 14; Wis. Stat. Ann. § 6.34(2).

**[21]** **Constitutional Law**—Voting rights and suffrage in general
**Election Law**—Proof of identity and eligibility

Wisconsin law requiring dorm lists, which were certified lists of students residing in university or college sponsored housing and were used for students to register to vote in conjunction with their student identifications, to indicate whether students were United States citizens, violated the First and Fourteenth Amendments; students were only voters who had to prove citizenship. U.S. Const. Amend. 1, 14.

**[22]** **Constitutional Law**—Voting rights and suffrage in general
**Election Law**—Registration Officers
**Election Law**—Proceedings for Registration

Wisconsin laws eliminating statewide special registration deputies who could register voters on statewide basis and eliminating requirement that high schools accept registrations from staff and enrolled students did not violate the First and Fourteenth Amendments, where deputies made mistakes that municipal clerks had to correct, high school registration was not used much, and burden on voters was slight. U.S. Const. Amend. 1, 14.

**[23]** **Constitutional Law**—Voting rights and suffrage in general
**Election Law**—Proceedings for Registration

Wisconsin law overriding city ordinance requiring landlords to distribute voter registration forms to new tenants did not violate First or Fourteenth Amendments, where landlords were not precluded from handing out forms, rest of registration process remained the same, and there was potential for voter confusion. U.S. Const. Amend. 1, 14.

**[24]** **Constitutional Law**—Voting rights and suffrage in general
**Election Law**—Duration of residency

Wisconsin law increasing durational residency requirement from 10 to 28 days in order to vote in Wisconsin or a given municipality violated the First and Fourteenth Amendments, where restriction placed moderate burden on transient voters or those who lacked access to transportation, voters moving from out of state were disenfranchised from local and state elections, voters who would be required to vote in former municipalities might not have documents to prove residency, and residency requirement did not address concerns of voters influencing results of opposing party's primary election since that involved already-registered voters. U.S. Const. Amend. 1, 14.

**[25]** **Constitutional Law**—Voting rights and suffrage in general
**Election Law**—Presence of officers

Wisconsin law requiring that election observers stand between three and eight feet away from table at which voters announced names or registered to vote did not violate the First or Fourteenth Amendments, where local election officials had discretion to manage position of observers to deal with privacy or intimidation concerns. U.S. Const. Amend. 1, 14; Wis. Stat. Ann. § 7.41(2).

was too late to return the ballot. U.S. Const. Amend. 1, 14.

[26] **Constitutional Law**⚬Ballots and ballot access
**Election Law**⚬Voting for entire or part of ticket by single mark or designation

Wisconsin law eliminating straight-ticket voting did not violate First or Fourteenth Amendments, where elimination of such voting decreased chance of voter over-voting that would invalidate some or all choices made, and it encouraged voters to become more informed. U.S. Const. Amend. 1, 14.

3 Cases that cite this headnote

[27] **Constitutional Law**⚬Ballots and ballot access
**Election Law**⚬Application and delivery

Wisconsin law preventing municipal clerks from faxing or e-mailing absentee ballots, except to military or overseas electors, violated the First and Fourteenth Amendments, where provision placed moderate burden on voters who were traveling, especially on students or researchers abroad, it did not eliminate chance for errors due to clerks' having to re-create ballots in paper form on election day or eliminate any invasion of privacy in seeing voters' choices since clerks were still required to fax or e-mail ballots to military voters or those permanently overseas, and privacy concerns belonged to the voters, not the state. U.S. Const. Amend. 1, 14.

[28] **Constitutional Law**⚬Ballots and ballot access
**Election Law**⚬Votes to be counted
**Election Law**⚬Absentee or mail-in ballots

Wisconsin law preventing municipal clerks from returning received absentee ballots unless ballots were damaged or had incomplete certification did not violate the First or Fourteenth Amendments, where election officials did not open absentee ballots until election day, which

[29] **Constitutional Law**⚬Voting rights and suffrage in general
**Election Law**⚬Identification of voter

Wisconsin's identification petition process (IDPP) that allowed voters to obtain free ID to vote violated the FIrst and Fourteenth Amendments, where IDPP disenfranchised otherwise qualified voters, and voters had to endure severe burdens to obtain ID over months. U.S. Const. Amend. 1, 14.

[30] **Election Law**⚬Discriminatory practices proscribed in general

The appropriate inquiry at the first step in a Voting Rights Act vote denial case is whether the challenged provision burdens minority voters more than other voters. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[31] **Election Law**⚬Registration
**Election Law**⚬Identification of voters

Wisconsin laws requiring proof of residence to register to vote, eliminating ability to corroborate residency, and eliminating statewide special registration deputies did not disparately burden African-American or Latino voters, as would violate the Voting Rights Act, where registration requirements applied to all voters, and, while minorities were more likely to lack driver licenses or state-issued identification, there were 10 other options for proving residence. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[32]    **Election Law**—Voting Prerequisites; Tests and Devices

Wisconsin law increasing durational residency requirement from 10 to 28 days in order to vote in Wisconsin or a given municipality imposed disparate burdens on African-American and Latino voters, as required to find that law violated the Voting Rights Act, where minority populations were much more transient, there was no flexibility in the requirement, and minorities were more likely to lack access to transportation or flexible work schedules to travel to vote in correct municipality. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[33]    **Election Law**—Voting procedures

Wisconsin election laws limiting in-person absentee voting to one location per municipality, narrowing window for such voting to 10 days, and prohibiting clerks from offering such voting on weekends disparately burdened African-American and Latino voters, as required to find that laws violated the Voting Rights Act, where laws guaranteed voters would have different experiences depending on where they lived, and requiring large cities, where most minorities lived, to only have one location created large crowds. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

| Cases that cite this headnote

[34]    **Election Law**—Voting procedures

Wisconsin laws eliminating straight-ticket voting and requiring that election observers stand between three and eight feet away from table at which voters announced names or registered to vote did not disparately burden

African-American or Latino voters, as would violate the Voting Rights Act, where individual election officials made decisions regarding placement of observers, rather than the state. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

3 Cases that cite this headnote

[35]    **Election Law**—Identification of voters

Wisconsin's identification petition process (IDPP) that allowed voters to obtain free ID to vote disparately burdened African-American and Latino voters, as required to find IDPP violated the Voting Rights Act, where IDPP disenfranchised otherwise qualified voters, and voters had to endure severe burdens to obtain ID over months. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[36]    **Election Law**—Discriminatory practices proscribed in general

The second step in analyzing a vote denial claim under the Voting Rights Act is to consider whether a discriminatory burden is in part caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[37]    **Election Law**—Voting procedures

Disparate burden on African-American and Latino voters of Wisconsin laws limiting in-person absentee voting to one location per municipality, narrowing window for such voting to 10 days, and prohibiting clerks from offering such voting on weekends was caused in part or

linked to historical conditions of discrimination, and therefore, violated the Voting Rights Act; disparities in housing, education and employment condensed minority groups into high-density urban areas, in-person absentee voting rules required voters in large municipalities to travel farther and contend with larger volumes of people to vote, and lower levels of educational attainment and employment decreased flexibility to spend time waiting to vote. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

⌐ Cases that cite this headnote

[38]    **Election Law** Voting Prerequisites; Tests and Devices

Disparate burden on African-American and Latino voters of Wisconsin laws increasing durational residency requirement from 10 to 28 days in order to vote in Wisconsin or a given municipality was not linked to historical conditions of discrimination, and therefore, did not violate the Voting Rights Act. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

[39]    **Election Law** Identification of voters

Disparate burden on African-American and Latino voters of Wisconsin laws creating identification petition process (IDPP) that allowed voters to obtain free ID was not linked to historical conditions of discrimination, and therefore, did not violate the Voting Rights Act; problems with getting through IDPP related to inability to provide records, which was due to conditions in voter's home state or country. Voting Rights Act of 1965 § 2, 52 U.S.C.A. § 10301(a).

**West Codenotes**

**Held Unconstitutional**

Wis. Stat. Ann. § 5.02(6m)(f), 6.02, 6.10(3), 6.15, 6.34(3)(a)(7), 6.15(1), 6.855, 6.86, 6.87(3)(d).

**Attorneys and Law Firms**

**\*902** Bobbie J. Wilson, Perkins Coie LLP, San Francisco, CA, Bruce Van Spiva, Marc Erik Elias, Aria Christine Branch, Colin Zachary Allred, Elisabeth C. Frost, Joseph Wenzinger, Perkins Coie LLP, Washington, DC, Joshua L. Kaul, Rhett Preston Martin, Charles Grant Curtis, Jr., Perkins Coie LLP, Madison, WI, for Plaintiffs.

Brian P. Keenan, Clayton P. Kawski, Jody J. Schmelzer, Sean Michael Murphy, Winn Switzer Collins, Gabe Johnson-Karp, Wisconsin Department of Justice, Madison, WI, for Defendants.

FINDINGS OF FACT & CONCLUSIONS OF LAW

JAMES D. PETERSON, District Judge

Mrs. Smith has lived in Milwaukee since 2003.¹ She was born at home, in Missouri, in 1916. In her long life she has survived two husbands, and she has left many of the typical traces of her life in public records. But, like many older African Americans born in the South, she does not have a birth certificate or other documents that would definitively prove her date and place of birth. After Wisconsin's voter ID law took effect, she needed a photo ID to vote. So she entered the ID Petition Process (IDPP) at the Wisconsin Department of Motor Vehicles (DMV) to get a Wisconsin ID. DMV employees were able to find Mrs. Smith's record in the 1930 census, but despite their sustained efforts, they could not link Mrs. Smith to a Missouri birth record, so they did not issue her a Wisconsin ID. She is unquestionably a qualified Wisconsin elector, and yet she could not vote in 2016. Because she was born in the South, barely 50 years after slavery, her story is particularly compelling. But it is not unique: Mrs. Smith is one of about 100 qualified electors who tried to but could not obtain a Wisconsin ID for the April 2016 primary.

Wisconsin's voter ID law is part of 2011 Wis. Act 23, enacted the year after Wisconsin Republicans won the

governorship and majorities in both houses of the legislature. Act 23 was the first of eight laws enacted over the next four years that transformed Wisconsin's election system. Plaintiffs in this case challenge the voter ID law, the IDPP, and more than a dozen other provisions in these new laws, none of which make voting easier for anyone. Plaintiffs contend that the new voting requirements and restrictions are driven by partisan objectives rather than by any legitimate concern for election integrity, that these laws unduly burden the right to vote, and that they discriminate against minorities, Democrats, and the young. Plaintiffs contend that the new election laws violate the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the Constitution, and § 2 of the Voting Rights Act.

This case was tried to the court in May. Over nine extended days, the court heard the testimony of 45 live witnesses, including six experts, with additional witnesses presented by deposition. The parties submitted lengthy post-trial briefs, and the court heard closing arguments on June 30. The opinion that follows is the court's verdict. It sets out in detail the facts that the \*903 court finds and the legal conclusions that the court draws from those facts. Because of the large number of claims asserted in this case, and the volume of evidence submitted, the opinion is necessarily long, and few readers will endure to the end. But I will try, in a few pages of introduction, to explain succinctly the court's essential holdings and the reasons for them.

I start with a word about my role. It is not the job of a federal judge to decide whether a state's laws are wise, and I certainly do not have free-floating authority to rewrite Wisconsin's election laws. My task here is the more limited one of pointing out where Wisconsin's election laws cross constitutional boundaries. The Constitution leaves important decisions about election administration to the states. But election laws inevitably bear on the fundamental right to vote, so constitutional principles come into play. The standards that I must apply to plaintiffs' claims require me to examine carefully the purposes behind these laws, and sometimes to draw inferences about the motives of the lawmakers who enacted them. I conclude that some of these laws cannot stand.

Wisconsin's voter ID law has been challenged as unconstitutional before, in both federal and state court. In the federal case, *Frank v. Walker*, the Seventh Circuit held that Wisconsin's voter ID law is similar, in all the ways that matter, to Indiana's voter ID law, which the United States Supreme Court upheld in *Crawford v. Marion County Election Board*. The important takeaways

from *Frank* and *Crawford* are: (1) voter ID laws protect the integrity of elections and thereby engender confidence in the electoral process; (2) the vast majority of citizens have qualifying photo IDs, or could get one with reasonable effort; and (3) even if some people would have trouble getting an ID, and even if those people tend to be minorities, voter ID laws are not facially unconstitutional. I am bound to follow *Frank* and *Crawford*, so plaintiffs' effort to get me to toss out the whole voter ID law fails.

If it were within my purview, I would reevaluate *Frank* and *Crawford*, but not because I would necessarily reach a different conclusion. A well-conceived and carefully implemented voter ID law can protect the integrity of elections without unduly impeding participation in elections. But the rationale of these cases should be reexamined. The evidence in this case casts doubt on the notion that voter ID laws foster integrity and confidence. The Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities. To put it bluntly, Wisconsin's strict version of voter ID law is a cure worse than the disease. But I must follow *Frank* and *Crawford* and reject plaintiffs' facial challenge to the law as a whole.

The most pointed problem with Wisconsin's voter ID law is that it lacks a functioning safety net for qualified electors who cannot get a voter ID with reasonable effort. The IDPP is supposed to be this safety net, but as Mrs. Smith's story illustrates, the IDPP is pretty much a disaster. It disenfranchised about 100 qualified electors—the vast majority of whom were African American or Latino—who should have been given IDs to vote in the April 2016 primary. But the problem is deeper than that: even voters who succeed in the IDPP manage to get an ID only after surmounting severe burdens. If the petitioner lacks a birth certificate and does not have one of the usual alternatives to a birth certificate, on average, it takes five communications with the DMV after the initial application to get an ID. I conclude that the IDPP is unconstitutional and \*904 needs to be reformed or replaced. Because time is short with the fall elections approaching, I will issue an injunction targeted to the constitutional deficiencies that I identify.

Judge Lynn Adelman for the U.S. District Court for the Eastern District of Wisconsin has also concluded that the IDPP is likely unconstitutional, and he has issued a preliminary injunction requiring Wisconsin to institute an affidavit procedure. This procedure would allow an elector without an ID to vote by signing an affidavit stating that he or she is a qualified elector but could not

get a photo ID. Judge Adelman's injunction provides one type of safety net. But plaintiffs have not asked me to impose that solution, and I will not. The state has already issued an emergency rule under which those who are in the IDPP will get receipts valid for voting. Although that is not a complete or permanent solution, it blunts the harshest effects of the IDPP. I will also order the state to publicize that anyone who enters the IDPP will promptly get a receipt valid for voting. To address this problem over the longer term, I will order the state to reform the IDPP to meet certain standards, leaving it to the state to determine how best to cure its constitutional problems. I take this approach because it respects the state's decision to have a strict voter ID law rather than an affidavit system. But Wisconsin may adopt a strict voter ID system *only* if that system has a well-functioning safety net, as both the Seventh Circuit and the Wisconsin Supreme Court have held.

The heart of the opinion considers whether each of the other challenged provisions unduly burdens the right to vote, in violation of the First and Fourteenth Amendments. This analysis proceeds under what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I determine the extent of the burden imposed by the challenged provision. Second, I evaluate the interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden. Certain of Wisconsin's election laws fail *Anderson–Burdick* review. For reasons explained in the opinion, I conclude that the state may not enforce:

> • most of the state-imposed limitations on the time and location for in-person absentee voting (although the state may set a uniform rule disallowing in-person absentee voting on the Monday before elections);
>
> • the requirement that "dorm lists" to be used as proof of residence include citizenship information;
>
> • the 28-day durational residency requirement;
>
> • the prohibition on distributing absentee ballots by fax or email; and
>
> • the bar on using expired but otherwise qualifying student IDs.

The purported justifications for these laws do not justify the burdens they impose.

Plaintiffs also contend that the challenged laws intentionally discriminate on the basis of race and age. This is a serious charge against Wisconsin public officials. I reject most of it, applying the framework set out by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*. But applying that same framework, I find that 2013 Wis. Act 146, restricting hours for in-person absentee voting, intentionally discriminates on the basis of race. I reach this conclusion because I am persuaded that this law was specifically targeted to curtail voting in Milwaukee without any other legitimate purpose. The legislature's immediate goal was to achieve a partisan objective, but the means of achieving that objective was to suppress the reliably Democratic vote of Milwaukee's African *905 Americans. Thus, I conclude that the limits on in-person absentee voting imposed by Act 146 fail under the Fifteenth Amendment, as well as under the *Anderson–Burdick* analysis.

In sum, Wisconsin has the authority to regulate its elections to preserve their integrity, and a voter ID requirement can be part of a well-conceived election system. But, as explained in the pages that follow, parts of Wisconsin's election regime fail to comply with the constitutional requirement that its elections remain fair and equally open to all qualified electors.

One last point: I do not intend to disrupt the August 6, 2016 election. My decision and the injunction will have no effect on that election.

## Contents

Facts ...905
A. The challenged provisions...906

B. Parties and procedural history ...907

Analysis ...908
A. Standing ...908

B. Facial challenges to Wisconsin's voter ID law ...910

1. Facial relief because of intentional discrimination...913

2. Facial relief because the IDPP has failed ...913

C. Intentional discrimination ...917

1. Race discrimination ...917

2. Age discrimination ...925

D. Partisan fencing claim ...927

E. First and Fourteenth Amendment claims for undue burdens on the right to vote ...929

   1. Limiting in-person absentee voting ...931

   2. Requiring documentary proof of residence and eliminating corroboration ...935

   3. Changing how students can use "dorm lists" to register ...937

   4. Eliminating statewide SRDs and eliminating SRDs and registration locations at high schools ...938

   5. Preempting Madison's landlord ordinance ...940

   6. Increasing the durational residency requirement ...941

   7. Establishing a zone for election observers ...944

   8. Eliminating straight-ticket voting ...945

   9. Prohibiting clerks from sending absentee ballots by fax or email ...946

   10. Limiting when clerks can return absentee ballots to voters ...948

   11. The IDPP ...948

   12. Cumulative effect ...950

F. Voting Rights Act claims ...951

   1. Disparate burdens ...952

   2. Caused by or linked to social and historical conditions ...957

G. Fourteenth Amendment claims for disparate treatment of voters ...960

Conclusion and Remedies ...963

Order ...964

FACTS

Although extensive evidence has been presented in this case, material factual disputes few and quite circumscribed. The parties sharply dispute plaintiffs' allegations that any of the challenged laws were motivated by improper purposes, particularly intentional race and age discrimination. The parties also dispute the effect of the challenged laws on voter turnout, and whether these effects are felt more heavily by minorities and other groups of voters. But much is undisputed.

The parties have stipulated to a set of background facts, most of which describe the challenged provisions and how they operate. *See* Dkt. 184. The court adopts these facts and recounts them below, along *906 with other facts about Wisconsin's election system before the challenged provisions went into effect. The court also adopts the facts found by Judge Adelman concerning the history and operation of the IDPP, which he based substantially on the evidence presented in this case. *Frank v. Walker*, 196 F.Supp.3d 893, No. 11–cv–1128, 2016 WL 3948068 (E.D.Wis. July 19, 2016). The court will incorporate the rest of its factual findings in the analysis section of this opinion.

Historically, Wisconsin has had a well-respected election system, and the state has consistently had turnout rates among the highest in the country. Presidential elections were close in Wisconsin: the 2000 and 2004 elections were decided by less than one-half of one percentage point. In 2008, however, President Obama won Wisconsin by almost 14 percentage points. Two years later, Republicans took control of both houses of the state legislature, and voters elected a Republican governor. Since then, Wisconsin has implemented a series of election reforms. These laws covered almost every aspect of voting: registration, absentee voting, photo identification, and election-day mechanics.

**A. The challenged provisions**

On May 25, 2011, Wisconsin enacted 2011 Wis. Act 23. That legislation made the following changes to Wisconsin election law:

   • It imposed a voter ID requirement.

   • It reduced the window of time during which municipalities could offer in-person absentee voting from a period of as much as 30 days that ended on the day before election day to a period of 12 days that ended on the Friday before election day.

   • It eliminated "corroboration" as a means of proving

residence for the purpose of registering to vote.[2]

• It mandated that any "dorm list" provided to a municipal clerk to be used in connection with college IDs to prove residence for the purpose of registering to vote include a certification that the students on the dorm list were United States citizens.

• It increased the in-state durational residency requirement for voting for offices other than president and vice president from 10 days to 28 days before an election and required individuals who moved within Wisconsin later than 28 days before an election to vote in their previous wards or election districts.

• It eliminated straight-ticket voting on official ballots.

• It eliminated the authority of the Government Accountability Board (GAB) to appoint special registration deputies (SRDs) who could register voters on a statewide basis.

On November 16, 2011, Wisconsin enacted 2011 Wis. Act 75, which prohibited municipal clerks from faxing or emailing absentee ballots to absentee voters other than overseas and military voters.

On April 6, 2012, Wisconsin enacted 2011 Wis. Act 227, which prohibited municipal clerks from returning an absentee ballot to an elector unless the ballot was spoiled or damaged, had an improperly completed certificate, or had no certificate.

Also on April 6, 2012, Wisconsin enacted 2011 Wis. Act 240, which eliminated the requirements that SRDs be appointed at public high schools; that, in certain circumstances, SRDs be appointed at or sent to *907 private high schools and tribal schools; and that voter-registration applications from enrolled students and members of a high school's staff be accepted at that high school.

In August 2012, the GAB directed election officials to accept electronic versions of documents that could be used to prove residence for the purpose of registering to vote.

On March 20, 2013, Senate Bill 91 was introduced in the Wisconsin State Senate. This bill would have permitted municipalities to open multiple in-person absentee voting locations (under existing law, municipalities were limited to only one location). The bill failed to pass.

On December 12, 2013, Wisconsin enacted 2013 Wis. Act 76. This legislation had the effect of overturning a city ordinance in Madison that required landlords to provide voter-registration forms to new tenants.

On March 27, 2014, Wisconsin enacted 2013 Wis. Act 146, which reduced the window during which municipalities could offer in-person absentee voting. This law eliminated the option of offering in-person absentee voting on weekends and on weekdays before 8 a.m. or after 7 p.m.

On April 2, 2014, Wisconsin enacted 2013 Wis. Act 177, which required that observation areas at polling places be placed between three and eight feet from the location where voters signed in and obtained their ballots and from the location where voters registered to vote.

Also on April 2, 2014, Wisconsin enacted 2013 Wis. Act 182, which required all voters, other than statutory overseas and military voters, to provide documentary proof of residence when registering to vote. Before the passage of this legislation, the requirement that a voter provide documentary proof of residence when registering to vote applied only to those who registered after the third Wednesday preceding (i.e., 20 days before) an election.

**B. Parties and procedural history**
The plaintiffs in this case include two organizations and several individuals. One Wisconsin Institute, Inc. is a nonprofit corporation with a mission "to advance progressive values, ideas, and policies through strategic research and sophisticated communications." Dkt. 141, ¶ 4. Citizen Action of Wisconsin Education Fund, Inc. is also a nonprofit corporation focused on pursuing social and economic justice. The individual plaintiffs are Renee Gagner, Anita Johnson, Cody Nelson, Jennifer Tasse, Scott Trindl, Michael Wilder, Johnny Randle, David Walker, David Aponte, and Cassandra Silas. They all allege that the challenged provisions injure their rights to vote, register to vote, register others to vote, or vote for Democratic candidates.

The initial defendants in this case were the members of the GAB and two of its officers. Plaintiffs have added and removed some defendants along the way, and the list now includes: Mark Thomsen, Ann Jacobs, Beverly Gill, Julie Glancey, Steve King, and Don Mills, the members of the Wisconsin Elections Commission; Michael Haas, the administrator of the Wisconsin Elections Commission; Mark Gottlieb, the secretary of the Wisconsin Department

of Transportation (DOT); and Kristina Boardman, the administrator of the DMV. Plaintiffs have sued all defendants in their official capacities.

Plaintiffs filed this suit in May 2015, alleging that the challenged provisions were unconstitutional, violated the Voting Rights Act, and resulted from intentional discrimination by the Wisconsin legislature. The court granted defendants' motion to dismiss plaintiffs' challenge to the voter ID law, as well as some of their Equal Protection challenges to other provisions. **\*908** Dkt. 66. But the court later permitted plaintiffs to partially reinstate their claims regarding the voter ID law, based on evidence that defendants produced during discovery. Dkt. 139. A few months later, the court substantially denied defendants' motion for summary judgment, Dkt. 185, and the case proceeded to trial.

## ANALYSIS

The court will structure its analysis as follows:

First, standing. The court concludes that plaintiffs have standing to challenge each of the provisions at issue, and that the corporation plaintiffs can pursue claims under the Voting Rights Act.

Second, plaintiffs' facial challenges to Wisconsin's voter ID law. This law has already been upheld after extensive litigation in the federal courts. The court concludes that invalidating the entire voter ID law would not be appropriate in this case.

Third, plaintiffs' claims of intentional discrimination. Plaintiffs have proven by a preponderance of the evidence that the legislature passed the provisions limiting the hours for in-person absentee voting at least partially with the intent to discriminate against voters on the basis of race. But the court concludes that the remaining provisions do not violate the Fifteenth Amendment. The court also concludes that none of the challenged provisions violate the Twenty-Sixth Amendment.

Fourth, plaintiffs' "partisan fencing" claims. Although plaintiffs allege a separate claim for partisan fencing, the court concludes that their constitutional claim provides an adequate framework for analyzing these allegations.

Fifth, plaintiffs' First and Fourteenth Amendment claims for unduly burdening the right to vote. The court

concludes that some, but not all, of the challenged provisions are unconstitutional because the state's justifications for them do not outweigh the burdens that they impose.

Sixth, plaintiffs' Voting Rights Act claims. The court concludes that one of the challenged provisions violates the Voting Rights Act.

Seventh, plaintiffs' Fourteenth Amendment Equal Protection claim. The court concludes that defendants have failed to articulate a rational basis for the state's decision to exclude expired student IDs as acceptable forms of voter ID.

### A. Standing

The court begins with standing. At summary judgment, the court rejected defendants' justiciability arguments, including arguments related to standing. Defendants now renew some of these arguments, contending that no plaintiff has standing to challenge the voter ID law. Defendants also contend that plaintiffs lack standing to challenge almost all of the other provisions that are at issue. For plaintiffs' Voting Rights Act claims, defendants contend that no plaintiff qualifies as an "aggrieved person" able to pursue claims under the act.

[1]"[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citation omitted), *as revised*, (May 24, 2016). Defendants contend that plaintiffs have not proven the first of these elements: a cognizable injury in fact. As the parties invoking this court's jurisdiction, plaintiffs bear the burden of establishing that they have standing. *Id.* But only one plaintiff needs to have standing to challenge a given provision because the complaint seeks only injunctive relief. **\*909** *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir.2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

Of the 10 individual plaintiffs in this case, 6 received qualifying IDs from the DMV and 4 received receipts through the IDPP. DX022; PX445. Defendants want to stop there, arguing that none of the individual plaintiffs are harmed by the voter ID law because they all currently have qualifying IDs. But there are several problems with this argument. The most obvious problem is that under the

DMV's current rules, the receipts that four of the individual plaintiffs received will expire after two automatic renewals, which means 180 days after issuance. Although these plaintiffs will be able to vote in the upcoming August and November elections, there is essentially no plan in place for them after they use their two renewals. Without a valid ID, these plaintiffs will not be able to vote. Thus, they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo*, 136 S.Ct. at 1548.

Even setting aside the plaintiffs who will lack acceptable IDs and be unable to vote after the November 2016 election, the voter ID law also injures the remaining individual plaintiffs. At summary judgment, the court concluded that having to *present* an ID at the polls was a sufficient injury for purposes of conferring Article III standing. Dkt. 185, at 10 (citing *Frank v. Walker*, 17 F.Supp.3d 837, 866 (E.D. Wis.), *rev'd*, 768 F.3d 744 (7th Cir.2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1551, 191 L.Ed.2d 638 (2015), and *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir.2009)). The court also concluded that the plaintiffs who have IDs will have to renew them or acquire other forms of identification once their current IDs expire, which would be another injury that confers standing. *Id.*

Defendants do not substantively engage these issues; they simply assert that "[t]his Court was wrong when it held that voters who have a qualifying ID have Article III standing to challenge the voter photo ID law." Dkt. 206, at 13. If defendants want to preserve the issue for appeal, then they have done so. But they have not identified reasons for the court to depart from its earlier conclusion that plaintiffs have standing to challenge the voter ID law.

As for the other provisions at issue, the corporation plaintiffs have standing to challenge these laws. "An organization may establish an injury to itself sufficient to support standing to challenge a statute or policy by showing that the statute or policy frustrates the organization's goals and necessitates the expenditure of resources in ways that would not otherwise be required." 15 James Wm. Moore et al., *Moore's Federal Practice* § 101.60[1][f] (3d ed. 2015) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)); *see also Crawford*, 472 F.3d at 951 ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."). To establish standing, an organization must point "to a 'concrete and demonstrable injury to its activities,' not 'simply a

setback to the organization's abstract social interests.' " *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990) (alterations omitted) (quoting *Havens Realty Corp.*, 455 U.S. at 379, 102 S.Ct. 1114).

[2]At trial, plaintiffs adduced evidence that One Wisconsin and Citizen Action each devoted money, staff time, and other resources away from their other priorities to educate voters about the new laws. For example, Analiese Eicher, One Wisconsin's program and development director, testified **\*910** that she researched all but one of the challenged provisions. Tr. 5p, at 145:12-17.⁵ The purpose of this research was to allow One Wisconsin to educate its supporters, its partners, and the press. *Id.* at 145:18-25. Eicher also testified that had she not been researching the legislation, she would have been working on other programs or initiatives for One Wisconsin. *Id.* at 147:4-16. Eicher would have been advocating for other voting-related changes, such as automatic voter registration, online registration, and felony reenfranchisement. *Id.* at 147:18-24. On an organizational level, One Wisconsin developed a website to help voters navigate the registration process in an effort to remediate some of the confusion surrounding the challenged provisions. *Id.* at 148:7-9, 149:3-8.

Likewise, Anita Johnson, an individual plaintiff and one of Citizen Action's community organizers, testified that her job responsibilities have "ballooned" over the last few years as the laws have changed. Tr. 1p, at 4:16-5:1. Her presentations to community groups now take longer, she has been able to register fewer people, and she has stopped working on other issues for Citizen Action to focus exclusively on voting rights. *Id.* at 5:15-16, 7:20-8:5, 11:7-25, 32:24-33:11.

Based on this evidence, the court finds that the corporation plaintiffs are not simply redirecting their resources to litigation, which would not be an injury-in-fact that would confer standing. *See N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir.2010). Instead, both corporations are devoting resources away from other tasks and toward researching, or educating voters about, the challenged provisions. These expenditures are injuries that give both corporations standing to challenge the provisions at issue in this case because the corporations are counteracting what they perceive to be unlawful practices. *Cf. Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir.2008).

Defendants' final justiciability challenge relates to the Voting Rights Act and whether any plaintiff qualifies as an "aggrieved person" for purposes of bringing suit pursuant to 52 U.S.C. § 10302. The court rejected this

challenge at summary judgment, adopting the Eastern District of Wisconsin's reasoning in *Frank* and concluding that the corporation plaintiffs could assert claims under the Voting Rights Act. Dkt. 185, at 14-15. Once again, defendants do not substantively confront this analysis. *See* Dkt. 206, at 15. In fact, the authority on which defendants rely—*Roberts v. Wamser*, 883 F.2d 617 (8th Cir.1989)—does not actually support their assertion that corporations cannot file suit under the Voting Rights Act. *Roberts* involved an unsuccessful political candidate whose alleged injury was the loss of votes that he would have received but for the challenged voting practice. 883 F.2d at 621. The Eighth Circuit held "that an unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act." *Id.* But the Eighth Circuit also noted that the candidate was not suing on behalf of others who were unable to protect their own rights, *id.* which is what the corporation plaintiffs are doing in this case. The court will adhere to its earlier conclusion that One Wisconsin and Citizen Action can pursue claims under the Voting Rights Act.

**B. Facial challenges to Wisconsin's voter ID law**
Wisconsin's voter ID law has been through the federal courts before. The *911 Seventh Circuit upheld the law in *Frank v. Walker*, 768 F.3d 744 (7th Cir.2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1551, 191 L.Ed.2d 638 (2015), relying on the Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). Thus, this court will begin its consideration of the merits by addressing plaintiffs' contention that despite the holdings in *Crawford* and *Frank*, Wisconsin's voter ID law is facially unconstitutional and violates the Voting Rights Act.

*Crawford* considered a facial challenge to Indiana's voter ID law. 553 U.S. at 185, 128 S.Ct. 1610. The critical holding in *Crawford* is that requiring a voter to show a photo ID before voting serves the important governmental interest in ensuring the integrity of elections, particularly by preventing in-person voting fraud, thereby engendering confidence in elections. *Id.* at 200–03, 128 S.Ct. 1610. *Crawford* also held that securing an Indiana photo ID, which required assembling certain vital documents and going to the DMV to apply for the ID, imposed only modest burdens that were not much greater than the effort ordinarily required to register and vote. *Id.* at 198, 128 S.Ct. 1610. *Crawford* upheld Indiana's voter ID law against a facial challenge even though the burdens of the law fell somewhat more heavily on minority voters,

and even though some individual voters might not be able to get a photo ID without surmounting more severe burdens.

In *Frank*, the Seventh Circuit considered a facial challenge to Wisconsin's voter ID law. 768 F.3d at 745. The district court had determined that there were factual distinctions between Wisconsin's law and Indiana's law: most significantly, that there were many more voters who did not have a qualifying photo ID in Wisconsin, and that those voters tended to be minorities. The Seventh Circuit expressed skepticism about the evidence of how many voters lacked ID, but concluded that, in any case, those distinctions were not material to the facial challenge. The Seventh Circuit held that Wisconsin's voter ID law was not materially different from the Indiana law at issue in *Crawford*, and that under *Crawford*, Wisconsin's voter ID law was facially constitutional. *Id.*

It is hard to deny that a state and its citizens have a truly compelling interest in maintaining election integrity. As the evidence in this case proved once again, voter fraud is rare but not non-existent. The court credits the evidence of plaintiffs' expert on the subject, Dr. Lorraine C. Minnite, who testified and filed two expert reports. PX039; PX044. But the more compelling evidence comes from Milwaukee County, the one county in the state that has tried to systematically discover and track violations of election law. The county has an assistant district attorney devoted full-time to the job, Bruce Landgraf. Based on Landgraf's testimony, and on other evidence discussed below, the court finds that impersonation fraud—the type of fraud that voter ID is designed to prevent—is extremely rare. In most elections there are a very few incidents in which impersonation fraud cannot be ruled out. But as *Crawford* and *Frank* held, despite rarity with which election fraud occurs, it is nevertheless reasonable for states to take steps to prevent it.

Any system that requires voters to get a credential will necessarily impose a burden on them. But if the burden is a modest one, and if the credential meaningfully fosters integrity, then the constitution is satisfied. Under *Crawford* and *Frank*, collecting the necessary records and making a trip to the DMV to get an ID is a modest burden in light of the state interest that it serves. Those cases probably reflected an unduly rosy view of DMV field offices, but the evidence in this case confirms, yet *912 again, that the vast majority of Wisconsin citizens already have the necessary ID. And most citizens who do not have an ID can get one with relative ease.

This court is, of course, bound to follow *Crawford* and *Frank*, which defendants contend doom plaintiffs' facial

challenge to Wisconsin's voter ID law. Defendants are correct. But *Crawford* and *Frank* deserve reappraisal. The court is skeptical that voter ID laws engender confidence in elections, which is one of the important governmental purposes that courts have used to sustain the constitutionality of those laws.

The evidence in this case showed that portions of Wisconsin's population, especially those who live in minority communities, perceive voter ID laws as a means of suppressing voters. This means that they undermine rather than enhance confidence in our electoral system. Good national research suggests that voter ID laws suppress turnout, and that they have a small, but demonstrable, disparate effect on minority groups. *See* PX072. At trial, testimony of African American community leaders confirmed that voter ID laws engender acute resentment in minority communities. *See, e.g.*, Tr. 1p, at 131:21-24. And some of the Wisconsin legislators who supported voter ID laws believed that they would have partisan effects. Their willingness to publically tout the partisan impact of those laws deepens the resentment and undermines belief in electoral fairness.

Underlying the philosophical debate is a fundamentally factual question: do voter ID laws protect the integrity of elections? According to the *Frank* court, *Crawford* definitively answered this question. 768 F.3d at 750 ("[W]hether a photo ID requirement promotes public confidence in the electoral system is a 'legislative fact'—a proposition about the state of the world, as opposed to a proposition about these litigants or about a single state."). The primary integrity-based justification offered for voter ID laws is that they prevent voter fraud. But that seems to be a dubious proposition. A voter ID requirement addresses only certain types of election malfeasance; specifically, impersonation fraud, by which one person poses as another and votes under his or her name. This happens from time to time by accident, when a voter signs the poll book on the wrong line. That produces some frustration for voters and poll workers, but it does not represent a fundamental threat to the integrity of elections because it does not happen that often and because everyone ultimately gets to vote.

The real fear is multiple voting: that a committed but unethical partisan could cast many votes for his or her candidate under different names. Yet there is utterly no evidence that this is a systematic problem, or even a common occurrence in Wisconsin or anywhere in the United States. PX039, at 2, 35. True, it is not unheard of: in one well-known case, a Milwaukee man was so committed to Governor Walker's re-election that he voted 14 times. Tr. 8a, at 184:3-24. He was charged with and

convicted of voter fraud (even without the benefits of the voter ID law). Proponents of voter ID would say that there could be other incidents of voter fraud that have gone undetected. But there is no evidence to support that hypothesis. As many have pointed out, multiple voting is not a very effective way of influencing an election, and few people would risk the penalties to do so. The bottom line is that impersonation fraud is a truly isolated phenomenon that has not posed a significant threat to the integrity of Wisconsin's elections.

The same cannot be said for Wisconsin's voter ID law, which has so far been implemented in a rigorously strict form: the only way to vote is to secure a state-approved ID. As part of Act 23, Wisconsin **\*913** enacted a statute allowing citizens to receive free IDs to vote. But it was not until the eve of trial in this case that the state started paying for the underlying documents (e.g., birth certificates) that citizens needed to submit to obtain these free IDs. Even now, citizens who lack vital records can obtain free IDs only after navigating the complicated IDPP. Wisconsin's strict implementation of its voter ID law has disenfranchised more citizens than have ever been shown to have committed impersonation fraud.

In theory, the well-designed and easy-to-use registration and voting system imagined in *Crawford* and *Frank* facilitates public confidence without eroding participation in elections. But in practice, Wisconsin's system bears little resemblance to that ideal.

So where does that leave plaintiffs' facial challenge to the voter ID law? Plaintiffs contend that two aspects of the factual record of this case distinguish it from *Crawford* and *Frank*, paving the way to a fresh facial challenge.

**1. Facial relief because of intentional discrimination**
First, plaintiffs assert that Wisconsin's voter ID law was motivated, at least in part, by racial animus. This is a serious allegation against the public officials of Wisconsin, but the court cannot easily dismiss it here. There is manifest racial disparity in the operation of the IDPP: of the 61 actual denials that the DMV had issued as of April 2016, 85 percent were to African Americans or Latinos. PX475. And government witnesses concede that 60 of these denials were issued to qualified electors entitled to vote, but who could not meet the IDPP's criteria for a state-issued ID. *See* Tr. 6, at 75:24-76:17 (DMV administrator); Tr. 8p, at 191:2-5 (investigations unit employee). The legislative history suggests that some of the provisions challenged in this case were specifically

intended to curtail voting in Milwaukee, where 40 percent of the population is African American and 17.3 percent is Latino (approximately two-thirds of the state's minority population). Both sides agree that if the court finds that the Wisconsin legislature enacted a voter ID law for the at least partially with the intent to discriminate on the basis of race, then the law is constitutionally unsound and cannot stand. The court will address this issue below, in discussing the intentional discrimination claims that plaintiffs have alleged in this case.

#### 2. Facial relief because the IDPP has failed

The second factual distinction concerns the IDPP, which plaintiffs contend imposes severe and discriminatory burdens on some qualified Wisconsin electors. The IDPP was the subject of a great deal of testimony at trial, and it has become a dominant issue in this case. Plaintiffs contend that the IDPP demonstrates Wisconsin's intentional race discrimination, is unconstitutional under the *Anderson–Burdick* framework, and violates the Voting Rights Act.[4] And because this constitutionally required safety net is not working, plaintiffs argue that the court must strike down the entire voter ID law.

The context for, and history of, Wisconsin's effort to implement the IDPP began with Act 23, passed in 2011. Besides establishing voter ID, this legislation created Wis. Stat. § 343.50(5)(a)3., which provided that a voter could get a Wisconsin ID from the DMV for free, if the voter requested it for voting. But voters who did not have their birth certificates had to get copies, which typically required paying a fee to a government agency. Thus, getting a free ID was not really free.

**\*914** Many thought that the fees that voters had to pay for copies of their vital records were tantamount to an unconstitutional poll tax. Indeed, that was the conclusion that the Wisconsin Supreme Court reached in *Milwaukee Branch of NAACP v. Walker*, which relied on *Crawford* to uphold Wisconsin's voter ID law against a facial challenge. 2014 WI 98, ¶ 7, 357 Wis.2d 469, 851 N.W.2d 262, *reconsideration dismissed,* — Wis.2d —, 856 N.W.2d 177 (2014). The state supreme court applied a savings construction to the Wisconsin Administrative Code to provide that the required vital documents were "unavailable" to a prospective voter if he or she would have to pay a fee to get them. *Id.* ¶¶ 66–71. Thus, a person who had to pay to get a birth certificate could use the DMV's special petition process in Wis. Admin. Code DOT § 102.15 (i.e., the IDPP) to ask for a free ID on the grounds that a birth certificate was unavailable. As the

Seventh Circuit recognized in *Frank*, the availability of a truly free ID provided a necessary safety net that preserved the constitutionality of Wisconsin's voter ID law. 768 F.3d at 747. But since then, effectuating the savings construction to provide free photo IDs to voters who lacked the requisite vital records has proven to be difficult for the DMV, to say the least.

For purposes of this opinion, the court does not need to retrace every detail of DOT's response to *NAACP v. Walker*; plaintiffs have set out the timeline in a chart appended to their brief. Dkt. 207, at 253-57. In summary, the DOT instituted an emergency rule on September 11, 2014 (the day before the appellate argument in *Frank*). PX456. The emergency rule changed the definition of "unavailable," following the Wisconsin Supreme Court's direction, and it reorganized the IDPP into a new subsection of Wisconsin's Administrative Code, DOT § 102.15(5m). The emergency rule also created a procedure that, in essence, required the DMV to track down the birth record of any person who requested a free voter ID, if the person did not have a copy of their birth record. The procedure was complicated because the process required interaction between various divisions of the DMV, the Wisconsin Department of Health Services, and agencies of other states. PX472. The main task of investigating and evaluating petitions fell to the DMV's Compliance and Fraud Unit (CAFU), which, as its name implies, has staff members whose normal duties are to investigate allegations of fraud.

Many people successfully navigated the IDPP. Out of 1,389 petitions for free IDs, the DVM issued IDs to 1,132 petitioners. Of the petitioners who applied, 487 had to go through "adjudication," which included a full investigation by CAFU[5] and a final decision from Jim Miller, the head of the DMV's Bureau of Field Services (a different unit from CAFU). 230 of the petitioners who went through adjudication received IDs; 257 petitioners did not. DMV records indicate that 98 of the petitioners who did not receive IDs after adjudication cancelled their petitions.[6]

**\*915** The petitioners in suspended or denied status were the ones who faced serious roadblocks in the IDPP: their birth records did not exist, or those records did not perfectly match their names or other aspects of their identities, such as Social Security records. The problems arose because the DMV evaluated IDPP petitions for voting IDs by using the same identification standards that it applied to applications for Wisconsin driver licenses and standard IDs. To acquire any one of these products from the DMV, a person must prove both their identity and their legal presence in the United States. Thus, the

DMV refused to issue IDs to IDPP petitioners until CAFU could confirm their identities with a match to a valid birth record, or to some equivalently secure alternative. Some petitioners simply could not meet the DMV's standard of proof, and so they could not obtain free IDs.

The lack of a valid birth record correlated strikingly, yet predictably, with minority status. The evidence at trial demonstrated that Puerto Rico, Cook County, Illinois, and states with a history of *de jure* segregation have systematic deficiencies in their vital records systems. Voters born in those places were commonly unable to confirm their identities under the DMV's standards. For example, many African American residents in Wisconsin were born in Cook County or in southern states. PX479. And many of the state's Latino residents were born in Puerto Rico. *Id.* As of April 2016, more than half of the petitioners who had entered the IDPP were born in Illinois, Mississippi, or a southern state that had a history of *de jure* segregation. PX478.

In June 2015, the DMV begin issuing denials to IDPP petitioners. By the time of trial in this case, the DMV had issued 61 denials, 53 of which were to minority petitioners.[7] Again, with one exception, the DMV had no reason to doubt that those who were denied a photo ID were Wisconsin residents, United States citizens, at least 18 years of age, and qualified to vote. Tr. 6, at 75:24-76:17. The sole exception was a Latina woman who mistakenly believed that she had been naturalized.

Since the state first implemented the IDPP, another related problem has prevented petitioners from successfully navigating the process. Until recently, the state had not appropriated any funds to pay for petitioners' vital records. Although no petitioner was asked to pay for any vital record, the state did not acquire any vital record for which a fee was required. The result was that some petitioners fell into limbo: the DMV did not deny their petitions, but the petitioners could not confirm their identities. These petitioners ended up in "suspend" status, with the DMV essentially waiting either for the petitioner to turn up new records, or for enough time to pass that the DMV could officially deny the petition.

On March 7, 2016, DMV officials and state legal counsel met to discuss the state's failure to pay for vital records. At some point after the meeting, the DMV received funds, and during the second week of trial in this case, the DMV made its first payment to acquire a vital record for a petitioner. Tr. 7p, at 111:2-17.

On May 10, 2016, a week before the trial in this case began, the governor approved **\*916** another emergency rule modifying the IDPP. PX452. The new rule acknowledged that emergency rulemaking was required to ensure that qualified electors could get a photo ID with reasonable effort in time for the next elections:

> This emergency rulemaking [was] also necessary to preserve the integrity of the verification process utilized by the Department in issuing an identification card while still preserving the public welfare by ensuring that qualified applicants who may not be able to obtain acceptable photographic identification for voting purposes with reasonable effort will be able to obtain photographic identification before the next scheduled elections.

PX453, at 14. The rule ameliorated some of the deficiencies of the IDPP: it established procedures and standards for evaluating petitions; it provided a means to surmount common impediments such as minor mismatches between a birth record and other aspects of a petitioner's identity; and it established "more likely than not" as the standard for evaluating evidence of identity, birthdate, and citizenship.[8] Perhaps most important, the emergency rule required the DMV to issue petitioners temporary identification card receipts that were valid for voting purposes while their petitions were pending.

Defendants contend that the latest emergency rule fixes the problems with the IDPP, and that because all petitioners still in the process have a receipt valid for voting, the dispute over the IDPP is moot. The court disagrees for two reasons.

First, the receipts issued under the emergency rule are not permanent. Those who hold them will be able to vote only so long as the receipts are renewed. But qualified electors are entitled to vote as a matter of constitutional right, not merely by the grace of the executive branch of the state government. The state has promised to renew the receipts for 180 days so that they will be good through the November 2016 election. But the state has been utterly silent on what happens after that. As things stand now, after these receipts expire, petitioners will once again find themselves in IDPP limbo. Thus, at best, the emergency

rule gives the state time to devise a new solution (but the court has not seen any evidence to suggest that the state is actually working on a solution).

Second, even under the emergency rule, petitioners will have to convince the DMV to exercise its discretion to issue them IDs. Although the emergency rule guides that discretion and specifies that the applicable standard of proof is "more likely than not," the process is still far more arduous than collecting documents and making a trip to the DMV, as envisioned in *Crawford* and *Frank*. Being investigated by CAFU, even under the newest iteration of Wisconsin's emergency rule, still makes it unnecessarily difficult to obtain an ID.

For now, suffice it to say that the court agrees that the IDPP is a wretched failure: it has disenfranchised a number of citizens who are unquestionably qualified to vote, and these disenfranchised citizens are overwhelmingly African American and Latino. The IDPP violates the constitutional rights of those who must use it, and so Wisconsin must therefore replace or substantially reform the process. But that does not mean that the voter ID law is unconstitutional in all of its applications. **\*917** Because a targeted remedy can cure the constitutional flaws of the IDPP (and thus, the entire voter ID law), facial relief is not necessary or appropriate.

*Crawford* and *Frank* effectively foreclose invalidating Wisconsin's voter ID law outright. Based on the evidence presented at trial, the court has some misgivings about whether the law actually promotes confidence and integrity. But precedent is precedent, and so the court will deny plaintiffs' request to invalidate the entire voter ID regime.

### C. Intentional discrimination

Plaintiffs assert claims under the Fifteenth and Twenty-Sixth Amendments, alleging intentional discrimination on the basis of race and on the basis of age. The legal standards for evaluating these claims are substantially identical, and most of the pertinent evidence for each claim is the same. With the exception of Wisconsin's restriction on the number of hours that municipal clerks can offer in-person absentee voting, the court concludes that plaintiffs have failed to prove their claims of intentional discrimination.

### 1. Race discrimination

[3] [4]Plaintiffs contend that the Wisconsin legislature passed many of the challenged provisions in violation of the Fifteenth Amendment. To succeed on these claims, plaintiffs must demonstrate that the legislature intentionally discriminated against voters because of their race. *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Discriminatory animus does not need to be the only reason for Wisconsin's new laws, or even the primary reason, but "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264–65, 97 S.Ct. 555. Nor do plaintiffs have to prove discriminatory intent with direct evidence of racial animus. *Rogers*, 458 U.S. at 618, 102 S.Ct. 3272.

[5]Whether a law is motivated by racial discrimination is a difficult factual determination, guided by sparse precedent. *Arlington Heights* provides the essential template: "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. 555. The starting point of the analysis is whether the law has had a disparate impact. But unless there is a startling pattern, inexplicable on grounds other than race, impact alone is not determinative. In that case, other evidence must support a finding of discrimination. This evidence can include the historical background and context of the law and the legislative history, especially any contemporaneous statements by the decision-making body. *See id.* at 266–68, 97 S.Ct. 555.

Before turning to the *Arlington Heights* analysis, the court considers defendants' evidentiary objection to one of plaintiffs' experts, historian Allan Lichtman, PhD. At trial, Dr. Lichtman testified that several of the challenged provisions were motivated by intentional race discrimination. *See* Tr. 6, at 237:5-18. Defendants contend that Dr. Lichtman's testimony invaded the province of the court by offering an opinion on an ultimate issue in the case, and that it was therefore not a proper topic for expert analysis. The court agrees. Dr. Lichtman provided some useful factual background to the legislation at issue—background that defendants did not dispute—but the court will not otherwise adopt his analysis or opinions about the specific issue of the legislature's intent in passing the challenged provisions.

**\*918** With these considerations in mind, the court turns to the merits of plaintiffs' intentional race discrimination claim. The court will analyze this claim first in the

context of Wisconsin's voter ID law, then in the context of the IDPP, and finally in the context of the other challenged provisions.

### a. The voter ID law

[6]To analyze whether Wisconsin's voter ID law violates the Fifteenth Amendment, the court begins by summarizing the disparate impact that the law has had on racial minorities. The question of how many people in Wisconsin have a driver license or a Wisconsin ID has proved to be surprisingly hard to answer. The district court in *Frank* estimated that about 300,000, about 9 percent of the state's registered voters, lacked a valid photo ID. 17 F.Supp.3d at 854. The Seventh Circuit doubted this, partly because the district court in *Crawford* estimated that only 43,000 lacked ID in Indiana, and partly because it just seems implausible that 9 percent of the adult population could get by without a photo ID. 768 F.3d at 748.

To answer this question, both sides' experts matched the statewide voter registration database to the DMV database. Both sides recognize that the databases are not readily matched, which makes errors likely. After identifying and correcting for errors, plaintiffs' expert, Kenneth Mayer, PhD, estimated that 8.4 percent of registered voters lack a Wisconsin ID. Defendants' expert, M.V. Hood III, PhD, put the estimate at only 4.54 percent. The primary difference between the two experts is that Dr. Hood had the help of a DMV programmer, Fred Eckhardt, who was able to match an additional 112,817 registered voters to valid Wisconsin IDs. Tr. 4p, at 201:17-202:1. The court finds that Eckhardt's work was reliable, and that Dr. Hood's estimate is therefore the more credible one as to the number of registered voters without ID.

Unfortunately, Dr. Hood did not break those numbers down by race. Dr. Mayer did, PX038, at 19 (Table 3), and he shows that African Americans and Latinos are more likely to lack ID. But his starting point uses the inflated 8.4 percent of voters without ID. With some of its own arithmetic to reconcile Dr. Mayer's proportions to Dr. Hood's base,[9] the court finds that approximately 4.5 percent of white voters lack ID; 5.3 percent of African American voters lack ID; and 6.0 percent of Latino voters lack ID. The court notes that these numbers say nothing about what proportions of voters lack the documentation that would allow them to get a qualifying ID if they

sought one.

Dr. Hood's evidence shows that African Americans and Latinos make up a disproportionate share of those seeking free IDs for voting. African Americans accounted for 35.6 percent of free IDs, whereas they make up only 5.6 percent of the citizen voting age population. Latinos accounted for 8.3 percent of the free IDs, against only 3.3 percent of the citizen voting age population. These numbers show very pronounced racial differences among those who seek IDs. This, in turn, strongly suggests that a greatly disproportionate share of African Americans and Latinos will have to go to the trouble of acquiring a qualifying ID to vote. But most of those who seek free IDs are probably voters who have the documents necessary to get a qualifying ID. *Frank* recognizes that this disparity could well have a corresponding disparate effect on turnout because any procedural requirement will dissuade some voters. **\*919** But under *Frank*, the burden of going to the DMV to get a free ID is not constitutionally significant because it is a modest burden no greater than the ordinary burdens involved in voting. Still, the evidence here shows that patterns of ID possession are racially disparate, and that is likely to have a racially disparate effect on turnout. And some proportion of those seeking IDs will lack the usual documentation and have to enter the IDPP. Those individuals, too, tend to be minorities: 67.9 percent of those who entered the IDPP were minorities. PX474.

The bottom line is that the evidence suggests that the vast majority of Wisconsin voters have a qualifying ID or could get one. But both ID possession and the lack of qualifying documentation correlate strongly with race.

Next, the court considers the historical background of the voter ID law. As plaintiffs showed, before 2011, Wisconsin had an exemplary election system that produced high levels of voter participation without significant irregularities. *See* PX036, at 23 (Lichtman report discussing studies from the Pew Charitable Trusts ranking Wisconsin second best in the nation in electoral performance in 2008 and fourth best in 2010). The court will not go so far as to say that Wisconsin could not have improved its elections. But there was no evidence that Wisconsin elections actually suffered from identifiable problems, despite unsubstantiated allegations of fraud in the 2004 presidential election.

Plaintiffs contend that demographic shifts in Wisconsin made the minority vote critical to the outcome of elections. For example, from 2010 to 2014, the white voting age population in Wisconsin declined by 1.3 percent, while the African American population increased

by 3.5 percent, and the Latino population increased by 8.7 percent. *Id.* at 16-17. Voting in Wisconsin is sharply polarized by race: in statewide elections over the last decade, 90 percent of African Americans and 63 percent of Latinos voted for Democratic candidates. Because Wisconsin is a closely divided swing state, marginal differences in turnout can be decisive in close elections. Plaintiffs contend that demographic and political considerations combined to give Wisconsin Republicans a motive to discriminate against minorities in voting laws.

The Wisconsin political environment changed dramatically in 2010: Republican Scott Walker was elected governor, and Republicans won control of both houses of the legislature. Although the recall elections in summer 2012 briefly shifted control of the state senate to Democrats, Republicans regained control of the chamber a few months later. The legislature and the governorship have been in Republican control since then. Plaintiffs contend that sustained one-party control over the legislature and governorship gave Republicans the opportunity to pass discriminatory election legislation.

Plaintiffs concede that there were no procedural irregularities in how Wisconsin's voter ID law, or any of the other challenged provisions, were passed. "Given unified Republican control of the legislature and governorship ... Republicans did not have to violate procedural rules to enact many of the limitations on voting" that are at issue. *Id.* at 48. Nevertheless, plaintiffs contend that the bills were rushed through the legislature, depriving the GAB of time to review them, and providing inadequate time for public input. *See* PX084. This dovetails with plaintiffs' contention that there were *substantive* irregularities with the laws, by which plaintiffs mean that the laws were not well justified or consistent. Defendants are correct that the legislature had no obligation to provide any rationale to support a validly **\*920** enacted law. But plaintiffs have a point: the challenged laws were passed by a process that allowed limited public input and little actual debate. The legislative history demonstrates that Democrats and members of the public voiced concerns about the discriminatory impact of the laws, and that those concerns largely went unrebutted. Thus, the court has little information about what actually prompted these bills and the reasons why the legislature enacted them into law. Most of them were passed with only summary statements of legislative purpose, typically invoking only generic concerns for election integrity or consistency. *See, e.g.*, PX058; PX216.

Plaintiffs would fill the gap in the official legislative record with extra-legislative comments by Republican legislators and staffers, which plaintiffs contend strongly indicate discriminatory intent. The court will not recapitulate all such statements in the record, but plaintiffs have identified a few as particularly telling. First, plaintiffs cite to a recent comment by former state senator Glenn Grothman (now a U.S. representative) that he thought that Wisconsin's voter ID law would help Republicans in the 2016 presidential election. PX068. Second, plaintiffs cite to Grothman's statements on the floor of the senate in 2014 concerning the need to limit the hours for in-person absentee voting in Milwaukee. PX022. Third, plaintiffs cite to statements by former state senator Dale Schulz and by his staffer Todd Albaugh. During a radio interview, Schultz indicated that the Republican leadership of the legislature passed the voter ID law for partisan purposes, not out of any legitimate concern for the integrity of Wisconsin elections. PX067. Albaugh testified that at the last meeting of the Republican caucus before the vote on Act 23, the Republican leadership insisted that Republicans get in line to support the bill because it was important to future Republican electoral success. *See* Tr. 1a, at 84:1-24.[16]

The parties have also stipulated to the admissibility of notes and correspondence from the files of various Republican legislators. *See* Dkt. 184, at 3-4. Among other things, this evidence includes senator Alberta Darling's expressed opinion that had it been in effect, the voter ID law would have made a difference in the November 2012 election, *id.* at 4, which like Grothman's more recent statement, shows that legislators believed that Act 23 would have a partisan impact on elections.

The court may consider these statements under *Arlington Heights*. But ample authority counsels skepticism, and the court will not simplistically assign discriminatory intent to the legislature based on the comments of individual legislators. *See Veasey v. Abbott*, 830 F.3d 216, 234, No. 14–41127, 2016 WL 3923868, at \*9 (5th Cir. July 20, 2016) ("While probative in theory, even those (after-the-fact) stray statements made by a few individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature's intent."). The comments that plaintiffs have identified paint a consistent picture that resonates with the rest of the record, particularly the lack of a verified problem with voter fraud, and the increasingly partisan divisions in support for the law. The conclusion is hard to resist: the Republican leadership believed that voter ID would **\*921** help the prospects of Republicans in future elections. (And for that matter, Democrats apparently thought that, too.)

As for other context surrounding Wisconsin's voter ID law, the court notes that Act 23 was the first in a series of

election reforms that the Republican-controlled legislature passed between 2011 and 2014. None of these laws made registration or voting easier for anyone, but they had only minimal effect on less transient, wealthier voters. For reasons explained more fully below, the stated rationales for many provisions of Act 23, and for the election laws that followed it, were meager. Accordingly, in light of the record of the case as a whole, the conclusion is nearly inescapable: the election laws passed between 2011 and 2014 were motivated in large part by the Republican majority's partisan interests.

Against this background, the court turns to the more difficult question of whether Act 23 was motivated by racial animus. For the following reasons, the court finds that it was not.

First, the legislature passed the voter ID bill in 2011, three years after the Supreme Court upheld a facial challenge to a similar voter ID law in *Crawford*. The Court had held that voter ID laws served a legitimate government interest in election integrity, and that they did not have an unduly disparate impact on racial minorities. Legislators would have been entitled to embrace the rationale that the Supreme Court endorsed, even if other legislators or members of the public contended that the law would have a disparate impact on minorities.

Second, voter ID bills have a long history in Wisconsin and in the United States, and that history does not suggest that such laws are inherently motivated by racial animus. In 2005, the Commission on Federal Election Reform, co-chaired by Jimmy Carter and James Baker III, identified a voter ID system with photo ID as one of five pillars of a reformed U.S. election system. Commission on Federal Election Reform, *Building Confidence in U.S. Elections* (September 2005), http://www.eac.gov/assets/1/AssetManager/Exhibit%20M .PDF. That same year, the Wisconsin legislature passed a photo ID bill that was ultimately vetoed by Governor Doyle, a Democrat. Although Democrats tended to oppose that bill, it garnered significant bipartisan support. This history shows that legislators and politicians with no motive to discriminate against minorities have nevertheless supported voter ID laws.

Third, even though there is scant evidence of actual voter fraud in Wisconsin, the concern for election integrity provides a valid, non-discriminatory reason for supporting a voter ID law. To be sure, there is a legitimate countervailing concern that voter ID requirements impede access to the polls. But the existence of a robust, non-discriminatory rationale in favor of voter ID makes it hard to draw the inference that support for voter ID must

be racially motivated.[11]

Plaintiffs nevertheless contend that the strict version of voter ID enacted in 2011 suggests a discriminatory motive. But by then, the potential for a voter ID requirement to have a racially disparate impact **\*922** had long been recognized. *See, e.g., id.* at 20 ("The introduction of voter ID requirements has raised concerns that they may present a barrier to voting, particularly by traditionally marginalized groups, such as the poor and minorities, some of whom lack a government issued photo ID.") Democrats, private citizens, and the GAB repeatedly raised these types of concerns to the legislature. *See, e.g.*, PX014; PX084; PX263; PX299. The legislature passed the voter ID bill anyway, and the governor signed it.

Plaintiffs contend that the legislature's apparent willful blindness to Act 23's disparate effects is strong evidence of discrimination. But the legislature did not entirely ignore these concerns. Act 23 created Wis. Stat. § 343.50(5)(a)3., which required the DMV to provide a free ID to any citizen over the age of 18 who requested one for voting. Since the introduction of the IDPP in 2014, the profound difficulty of providing traditional DMV-issued IDs to some voters has become apparent, and the state has been painfully reluctant to address these problems. But in 2011, to the legislature that passed Act 23, the free ID seemed like a reasonable response to the concerns that opponents raised. *C.f. Building Confidence in U.S. Elections*, at 20 ("Part of these concerns are addressed by assuring that government-issued photo identification is available without expense to any citizen.").

In sum, the court concludes that plaintiffs have not proven by a preponderance of the evidence that the voter ID provision of Act 23 was motivated, even in part, by racial animus. Wisconsin's voter ID law therefore does not violate the Fifteenth Amendment.

### b. The IDPP

[7]The racial imbalances among IDPP petitioners, and among the results of the process, are striking. Minorities make up only 11 percent of Wisconsin's citizen voting age population, but they make up 55 percent of the voters who have received free IDs since Act 23 was passed. DX265. As of April 2016, two-thirds of those who entered the process were minorities; African Americans alone represented 55.9 percent of IDPP petitioners.

PX474. Worse yet, African Americans and Latinos represented 85 percent (52 out of 61) of all IDPP denials. PX475.

Plaintiffs contend that these numbers present the kind of striking pattern that is inexplicable as anything but intentional discrimination. They argue that the court should find the IDPP to be unconstitutional on that basis alone, relying on decisions such as *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (allegations of extreme gerrymandering, if proven, would be tantamount to a "mathematical demonstration" of discrimination).

The court is not persuaded that statistics about the petitioners who have used the IDPP, or been denied free IDs, compel a finding of intentional race discrimination. And the reasoning is simple: the free ID procedure and the IDPP were designed to blunt the potential for disenfranchisement that might arise from Wisconsin's voter ID law. The potential for disenfranchisement, as all recognized, fell more heavily on minorities. Thus, it is no surprise that those who sought free IDs, or who entered the IDPP because they lacked vital records, were predominantly minorities. It is also no surprise that minorities foundered at high rates in a process that required documentary proof of identity, birthdate, and citizenship.

Make no mistake: the IDPP as it currently exists has failed to fulfill its constitutional purpose. But plaintiffs have not shown that it is the result of intentional race discrimination. As plaintiffs' counsel repeatedly reiterated to the DMV witnesses, plaintiffs do not allege that DMV **\*923** employees intended to discriminate against anyone. And as the court observed during trial, some CAFU employees undertook nearly heroic efforts to track down documents to prove petitioners' identities and birthdates. The court finds that DMV employees, especially CAFU employees, undertook their duties in good faith, trying as best they could under the governing regulations to get IDs into the hands of as many petitioners as possible.

Another reason why the court cannot find that the legislature intentionally discriminated on the basis of race is that the legislature did not design or implement the IDPP. The fault lies with the executive branch, which let the IDPP grind on until plaintiffs in this litigation exposed its many flaws. But plaintiffs have not shown that anyone in the executive branch knew that the IDPP was disenfranchising voters and ignored the problem. The flaws would not have been hard to find, and Wisconsin should have done better. But based on the evidence presented at trial, the court cannot find that members of

the executive branch acted with racial animus in creating or implementing the IDPP.

#### c. Other challenged provisions

The court now turns to the other provisions that plaintiffs challenge under the Fifteenth Amendment. Setting aside the provisions relating to in-person absentee voting, plaintiffs contend that the legislature enacted the following regulations, at least in part, with the intent to discriminate against African Americans and Latinos: (1) eliminating corroboration; (2) requiring documentary proof-of-residence; (3) eliminating statewide SRDs; (4) increasing the durational residency requirement; (5) changing the location for election observers; and (6) eliminating straight-ticket voting.

Plaintiffs contend that each of these changes in Wisconsin's voting laws particularly disadvantage minorities, who tend to be poorer, less educated, and more transient. But disparate impact alone is not enough to show intentional discrimination. *Arlington Heights*, 429 U.S. at 264–65, 97 S.Ct. 555. These regulations are all facially neutral, and the extra burdens that they impose would fall on anyone who is poorer, less educated, or more transient, regardless of race. As explained in other parts of this opinion, some of these regulations are not justified by significant government interests, which puts their legitimacy under *Anderson–Burdick* in doubt. But plaintiffs give the court no reason to find that any of these regulations were targeted at minority voters or that the legislature was racially motivated in passing any of them. Accordingly, the court concludes that plaintiffs have not shown by a preponderance of the evidence that any of these changes in Wisconsin's voting laws were motivated, even in part, by racial animus.

[8]As for the one-location rule, plaintiffs proved that forcing all municipalities to offer only one location for in-person absentee voting imposed greater burdens on voters in large municipalities like Milwaukee than it did on voters in smaller towns. And because Milwaukee has a predominantly minority population, the one-location rule was all but guaranteed to have a disparate impact. But this provision has been in effect since 2005, long before the legislature enacted the restrictions to the hours for in-person absentee voting. *See* Wis. Stat. § 6.855(1). Thus, the legislative history and other contextual evidence discussed above does not bear on the issue of whether the legislature passed the one-location rule with the intent to

discriminate. Indeed, plaintiffs have not offered any evidence addressing the legislature's intent in enacting this statute. The court therefore concludes that plaintiffs have **\*924** failed to prove that the one-location rule violates the Fifteenth Amendment.

[9]That leaves the provisions that reduce the days and hours in which in-person absentee voting is allowed. Plaintiffs have adduced evidence that weekend and evening voting is particularly important for socioeconomically disadvantaged voters, and that, in Wisconsin and nationwide, African American and Latino voters have made particularly good use of various forms of early voting. *See, e.g.*, PX036, at 42; PX047. Early voting in groups on Sundays—including church-supported "Souls to the Polls" efforts—is a widespread practice among African American voters, in Wisconsin and nationwide. Tr. 1p, at 134:6-135:1; PX245, at 38. But again, a disparate impact, without more, does not prove intentional discrimination.

But plaintiffs have more. Statements by legislators show that Act 146 reduced the hours allowed for in-person absentee voting specifically to curtail voting in Milwaukee, and, secondarily, in Madison. Senator Grothman made repeated statements objecting to the extended hours for in-person absentee voting in Milwaukee and Madison, indicating that hours for voting needed to be "reined in."[12] On the floor of the senate, he said, "I want to nip this in the bud before too many other cities get on board." PX022, at 5. Senate Majority Leader Scott Fitzgerald made similar comments. *Id.* at 12. As he put it, "But the question of where this is coming from and why are we doing this and why are we trying to disenfranchise people, I mean, I say it's because the people I represent in the 13th district continue to ask me, 'What is going on in Milwaukee?' " *Id.* at 16.

Defendants contend that Grothman and Fitzgerald were simply trying to achieve a measure of statewide uniformity because smaller towns were unable to afford the extended hours that Milwaukee was offering. That explanation is hard to credit. Under Act 146, the legislature still tolerates disparities in voting hours among Wisconsin municipalities. Each municipality can set its own hours for in-person absentee voting. Larger cities can still outdo smaller municipalities by having their full-time clerks hold office hours that cover the full work week, while smaller towns with part-time clerks will hold limited hours, sometimes as little as an afternoon a week. Thus, rather than achieving uniformity, the provisions governing the hours for in-person absentee voting preserved great disparities from town-to-town. The legislative record shows that Act 146 was uniformly

opposed by municipal clerks. PX216. Its only supporter of record was the Republican election activist Ardis Cerny. *Id.* And Governor Walker partially vetoed the bill as too extreme a reduction in opportunities to vote. PX058.

The acknowledged impetus for this law was the sight of long lines of Milwaukee citizens voting after hours. Yet instead of finding a way to provide more access to voters in small towns, the legislature responded by reining in voters in Milwaukee, the state's most populous city, where two-thirds of its African American citizens live. At trial, Kevin Kennedy, director of the GAB, confirmed that the purpose of reducing the hours for in-person absentee voting was to restrain voting in Milwaukee:

> Clearly in the recall election, the City of Milwaukee opened its in-person absentee **\*925** voting for Memorial Day, which was the day before the gubernatorial recall election, and that did not sit well with the Republican majority. They thought that was designed purposely ... to allow more Democratic voters, even though it could also be said it was designed to facilitate the needs of the unique voters in Milwaukee. But that was not lost on the Legislature that the largest city made that choice whereas other municipalities wouldn't make that choice.

Tr. 5a, at 109:21-110:5.

The legislature's ultimate objective was political: Republicans sought to maintain control of the state government. But the methods that the legislature chose to achieve that result involved suppressing the votes of Milwaukee's residents, who are disproportionately African American and Latino. The legislature did not act out of pure racial animus; rather, suppressing the votes of reliably Democratic minority voters in Milwaukee was a means to achieve its political objective. But that, too, constitutes race discrimination. *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir.1984) ("We think there is little point for present purposes in distinguishing discrimination based on an ultimate objective of keeping certain incumbent whites in office from discrimination borne of pure racial animus."); *see also Rogers*, 458 U.S. at 617, 102 S.Ct. 3272 ("[M]ultimember districts violate the

Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population.").

Based on the evidence that plaintiffs have presented, the court finds that Wisconsin's restrictions on the hours for in-person absentee voting have had a disparate effect on African Americans and Latinos. The court also finds that the legislature's justification for these restrictions was meager, and that the intent was to secure partisan advantage. Finally, the court finds that the legislature specifically targeted large municipalities—Milwaukee in particular—intending to curtail minority voting. Combined, these findings lead the court to further find that the legislature passed the provisions restricting the hours for in-person absentee voting motivated in part by the intent to discriminate against voters on the basis of race.

### 2. Age discrimination

[10]Plaintiffs contend that some of the challenged provisions discriminate against younger voters on the basis of age, in violation of the Twenty-Sixth Amendment. The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

The federal courts that have considered Twenty-Sixth Amendment claims recognize that there is "a dearth of guidance on what test applies to Twenty-Sixth Amendment claims." *N.C. State Conference of the NAACP v. McCrory*, 182 F.Supp.3d 320, 522–24, No. 13–cv–658, 2016 WL 1650774, at *165 (M.D.N.C. Apr. 25, 2016), *rev'd*, 831 F.3d 204, No. 16–1468, 2016 WL 4053033 (4th Cir. July 29, 2016)[1]; *see also Walgren v. Bd. of Selectmen of Amherst*, 519 F.2d 1364, 1367 (1st Cir.1975) ("[W]e are still without the assistance of any precedents guiding us in evaluating the impact of the Twenty-sixth Amendment."); **\*926** *Nashville Student Org. Comm. v. Hargett*, 155 F.Supp.3d 749, 757, No. 15–cv–210, 2015 WL 9307284, at *6 (M.D.Tenn. Dec. 21, 2015) ("As the parties note in their briefing, there is no controlling caselaw from the Sixth Circuit or the Supreme Court regarding the proper interpretation of the Twenty-Sixth Amendment or the standard to be used in deciding claims for Twenty-Sixth Amendment violations based on an alleged abridgment or denial of the right to vote.").

The text of the Twenty-Sixth Amendment is patterned on the Fifteenth Amendment, which prohibits the denial or abridgement of the right to vote on the basis of race. This suggests that *Arlington Heights* provides the appropriate framework for evaluating plaintiffs' claims of intentional age discrimination. Indeed, other courts have taken this approach when confronted with similar allegations. *See, e.g.*, *Lee v. Va. State Bd. of Elections*, 188 F.Supp.3d 577, 608–10, No. 15–cv–357, 2016 WL 2946181, at *26 (E.D.Va. May 19, 2016). Although the district court in *North Carolina State Conference of the NAACP* expressed doubt that the Twenty-Sixth Amendment was intended to operate just like the Fifteenth Amendment, the court followed an *Arlington Heights*-style analysis for the purposes of its decision. 182 F.Supp.3d at 523, 2016 WL 1650774, at *165.

*Anderson–Burdick* provides a framework through which the court could evaluate the burdens that fall on younger voters and the state's justification for those burdens. But "[i]t is difficult to believe that [the Twenty-Sixth Amendment] contributes no added protection to that already offered by the Fourteenth Amendment, particularly if a significant burden were found to have been intentionally imposed solely or with marked disproportion on the exercise of the franchise by the benefactors of that amendment." *Walgren*, 519 F.2d at 1367. Thus, for plaintiffs' age discrimination claims, the court will apply the *Arlington Heights* framework, beginning by considering whether plaintiffs have shown that the challenged provisions have had a disparate impact on younger voters. All of the challenged provisions are facially neutral, but plaintiffs have offered anecdotal evidence that some of them disproportionately affect younger voters. *See generally* Dkt. 207, at 236-41 (discussing trial evidence). As a class, younger voters are poorer and less established. They are therefore less likely to have a driver license and documentary proof of residence. They are also more transient, and thus will likely face the burden of registration more often.

But this evidence falls short of showing that young people are more likely to face burdens that they cannot overcome with reasonable effort. Young people may be more likely to lack a driver license. But that does not show that they are more likely to lack the credentials that one needs to get a Wisconsin ID. Young people may move more often, and they may be more likely to conduct their affairs online. But that does not mean that they will lack the documents needed to register, particularly because online documents can serve as proof of residence. The court does not find strong evidence of a disparate impact, which puts plaintiffs' Twenty-Sixth Amendment claim on weak

footing.

Plaintiffs have some evidence of anti-youth comments made by legislators, particularly those by Senate Majority Leader Mary Lazich. Before the vote on Act 23, Lazich told the senate Republican caucus that they should support the bill because of what it "could mean for the neighborhoods of Milwaukee and the college campuses across this state." Tr. 1a, at 84:1-24. As the court has already concluded, the Republican majority was motivated, in **\*927** part, by partisan objectives. But without more, this type of evidence did not establish discrimination on the basis of race, and it does not establish discrimination on the basis of age either.

Much of plaintiffs' evidence concerns the restrictions that the legislature placed on the use of college IDs. The rationale for these restrictions is not as weak as the rationale for the reduction in hours for in-person absentee voting. Under *Anderson–Burdick*, the court will evaluate whether these restrictions impose burdens that are warranted in light of the interests that they serve. But in the context of intentional age discrimination, the question is more limited: were these restrictions so baseless as to suggest purposeful discrimination against young voters? The court concludes that the answer is "no." The restrictions served a legitimate interest in election integrity because many college students have documentation of two residences: their school addresses, and their permanent home addresses. The legislature had a legitimate interest in ensuring that students registered in only one place. *See, e.g.*, PX229 (legislative note expressing interest in tightening up registration requirements so that out-of-state students would have to declare residency in Wisconsin to vote in the state). The court will review the state's rationales for the other challenged restrictions later in this opinion. For the purposes of plaintiffs' age discrimination claim, however, it is sufficient to say that these rationales are not so feeble as to suggest intentional discrimination.

One last point. College students may use any of the means of identification or proof of residence that are available to all citizens generally. The legislature also extended to students the *additional* ability to use their college IDs, albeit under certain restrictive conditions. As a practical matter, these restrictions meant that the standard student IDs that many University of Wisconsin campuses issue were not valid for voting. But some universities have provided workarounds in the form of special university-issued voting IDs. This seems like an unwarranted rigmarole, but the end result is that college students have more ID options than other citizens do.

The court concludes that plaintiffs have not proven by a preponderance of the evidence that the challenged provisions were motivated by intentional age discrimination.

### D. Partisan fencing claim

At the heart of this case is plaintiffs' contention that the Wisconsin legislature passed the challenged provisions with the intent to suppress Democratic votes to gain a partisan advantage in future elections. Plaintiffs contend that to accomplish this objective, the legislature identified groups of voters who would likely vote for Democrats and then passed measures to frustrate those voters' access to the ballot box. Put differently, the legislature targeted minorities, younger citizens, and citizens in urban areas like Milwaukee, not necessarily because of racial or age-based animus, but because it believed that these groups tended to vote for Democrats. Plaintiffs bundle these allegations into a "partisan fencing" claim. Dkt. 141, ¶¶ 197-99.

This is not the first time that a group of plaintiffs in a voting rights case has asserted a partisan fencing claim. *See, e.g., Lee v. Virginia State Bd. of Elections*, No. 15-cv-357 (E.D. Va. filed June 11, 2015); *Ohio Org. Collaborative v. Husted*, No. 15–cv–1802 (S.D.Ohio filed May 8, 2015). But the legal theory is still a novel one, and neither party directs the court to precedent—binding or otherwise—that definitively establishes a framework for analyzing partisan fencing claims. Plaintiffs extrapolate that **\*928** their partisan fencing claim is essentially a claim for intentional discrimination, relying on statements in various Supreme Court decisions. They therefore urge the court to consider their evidence of partisan motivation by using the *Arlington Heights* framework, which would lead the court to invalidate any election qualification that was motivated, even in part, by partisan objectives. Defendants contend that a partisan fencing claim is really just a unique species of an undue burden claim, for which the *Anderson–Burdick* framework is appropriate.

Plaintiffs derive the term "partisan fencing" from *Carrington v. Rash*, a case in which the Supreme Court invalidated a Texas constitutional provision that prevented members of the United States armed forces from voting if they moved to Texas during their service. 380 U.S. 89, 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). The Court held that " '[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Id.* at 94, 85 S.Ct. 775. But the Court decided *Carrington* well before *Anderson v.*

*Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the two namesake cases for the *Anderson–Burdick* framework that courts now apply to evaluate whether voting regulations burden First and Fourteenth Amendment rights. Moreover, *Carrington* dealt with an outright prohibition on voting—service members who moved to Texas during their military service could not vote while they were in the armed forces. *Id.* at 89, 85 S.Ct. 775. And cases applying *Carrington* tend to involve outright prohibitions on the right to vote. *See, e.g.*, *Evans v. Cornman*, 398 U.S. 419, 419–20, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (Maryland citizens who lived on a federal reservation prohibited from voting because they were not residents of Maryland); *Cipriano v. City of Houma*, 395 U.S. 701, 702, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam) ("[O]nly 'property taxpayers' [had] the right to vote in elections called to approve the issuance of revenue bonds by a municipal utility."). Here, none of the challenged provisions categorically bar any citizen of Wisconsin from voting. For these reasons, *Carrington* is not directly on point here.

Looking toward more recent cases, at least one Justice of the Supreme Court has suggested that there would be First Amendment implications for state restrictions on voting that place burdens on voters because of their political views. *See Vieth v. Jubelirer*, 541 U.S. 267, 315, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring) ("If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."). Several years later, a unanimous Court noted that this suggestion was "uncontradicted by the majority in any of our cases." *Shapiro v. McManus*, —— U.S. ——, 136 S.Ct. 450, 456, 193 L.Ed.2d 279 (2015). But these decisions involved gerrymandering, which is not at issue in this case.

The import of these cases is that analyzing a partisan fencing claim involves a balancing analysis under the First Amendment. And that is exactly what the *Anderson–Burdick* framework provides. The framework requires the court to identify the nature and severity of the burden that a given voting regulation creates and then weigh that burden against the state's justification for it. *Common Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 917 (7th Cir.2015). Thus, *Anderson–Burdick* appears to fit the bill for plaintiffs' partisan fencing claim.

**\*929** Two federal district courts that have confronted this question reached the same conclusion. In *Ohio Organizing Collaborative v. Husted*, the Southern District of Ohio concluded that *Carrington* does not "appear to create a separate equal protection cause of action to challenge a facially neutral law that was allegedly passed with the purpose of fencing out voters of a particular political affiliation." 189 F.Supp.3d 708, 766, No. 15–cv–1802, 2016 WL 3248030, at \*48 (S.D.Ohio May 24, 2016). Instead, the court relied on the *Anderson–Burdick* framework as "the proper standard under which to evaluate an equal protection challenge to laws that allegedly burden the right to vote of certain groups of voters." *Id.* Likewise, in *Lee v. Virginia State Board of Elections*, the Eastern District of Virginia acknowledged that "[t]he term 'partisan fencing' is derived from *Carrington* ... and is somewhat of an aberration." 188 F.Supp.3d at 609, 2016 WL 2946181, at \*26. The court concluded that the term "has been rarely deployed in election law litigation thereafter. It does not appear to create a separate cause of action but may be a useful analytical tool in evaluating First Amendment and Equal Protection Clause cases." *Id.* The reasoning in these decisions is persuasive, and this court will follow their guidance.

The court will not adopt plaintiffs' partisan fencing theory, but the theory is not completely without basis. This case challenges state laws governing voter qualifications and election mechanics; it is not a redistricting case. That distinction is important. The redistricting process is inherently political through and through, and a gerrymandering claim requires a court to decide how much partisan politics is too much. *See generally League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 413–23, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). By contrast, voter qualifications and election administration should not be political at all, and partisan gain can never justify a legislative enactment that burdens the right to vote. So, plaintiffs argue, a state should not be allowed to manipulate its election regime by imposing even slight burdens, if the purpose is to suppress turnout to achieve a partisan advantage.

[11]Despite the appeal of plaintiffs' theory, *Crawford* and *Frank* foreclose the argument that partisan fencing claims should be handled like claims of intentional race or age discrimination, for which *any* discriminatory legislative intent is sufficient to invalidate a law. *See Frank*, 768 F.3d at 755 (" '[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators.' " (quoting *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610)). Put differently, a provision is not

unconstitutional if the legislators who passed it were partly motivated by partisan gain, so long as there were sufficient valid justifications. The *Anderson–Burdick* framework enables federal courts to undertake this type of review.

In sum, the court rejects plaintiffs' proposal to treat their partisan fencing claim as distinct from their undue burden claims under the First and Fourteenth Amendments. As explained below, the evidence of partisan motivation that plaintiffs have adduced is pertinent to the legislature's justifications for passing the challenged provisions. The court will therefore consider this evidence as part of its *Anderson–Burdick* balancing analysis.

### E. First and Fourteenth Amendment claims for undue burdens on the right to vote

[12]Plaintiffs contend that each of the challenged provisions violates the First **\*930** and Fourteenth Amendments by impermissibly burdening the right of Wisconsin citizens to vote. "A state election law, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Common Cause Ind.*, 800 F.3d at 917 (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564). But that is not to say that every voting-related law must survive strict scrutiny. Requiring states to narrowly tailor their election regulations to advance only compelling interests "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. Federal courts must therefore apply a "more flexible standard" when reviewing challenges to a state's election laws. *Common Cause Ind.*, 800 F.3d at 917.

[13] [14]Under the flexible *Anderson–Burdick* standard, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. The court must undertake a three-step analysis for each of the challenged provisions. First, the court must determine the nature and severity of the burden that a given provision imposes. Second, the court must identify the state's justification for the provision. Third, the court must weigh the burdens against the state's justifications for imposing them "and then make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190, 128 S.Ct. 1610.

[15]For the first step in the *Anderson–Burdick* analysis, the court must focus on the burdens that the challenged provisions place on eligible voters who cannot comply with the new requirements (e.g., who lack registration documents, who need to vote during a different in-person absentee voting period or at a different location, or who prefer to vote straight-ticket). *See id.* at 198, 128 S.Ct. 1610 ("The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of SEA 483."). Just because the majority of Wisconsin voters are able to comply with the state's registration requirements, absentee voting procedures, and miscellaneous election regulations does not mean that the burdens that these laws impose are constitutionally insignificant. But just as important, the fact that a few Wisconsin voters have difficulty complying with these laws is not enough to invalidate them across the board. *Crawford*, 553 U.S. at 199–200, 128 S.Ct. 1610 ("And even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish petitioners' right to the [facial] relief they seek in this litigation.").

[16]For the second step in the *Anderson–Burdick* analysis, the court must "consider the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Common Cause Ind.*, 800 F.3d at 921 (citations and internal quotation marks omitted).

[17]For the third step in the *Anderson–Burdick* analysis, the court must weigh the burdens of a given provision against the state's justification for it. When the state imposes a "severe" restriction on the right to vote, then "the regulation must be narrowly drawn to advance a state interest of compelling importance." **\*931** *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (citations and internal quotation marks omitted). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564).

With these considerations in mind, the court turns to the specific provisions that plaintiffs challenge in this case.

### 1. Limiting in-person absentee voting

[18]In 2005, Wisconsin enacted Wis. Stat. § 6.855, which limited municipalities to one location for in-person absentee voting. At that time, the state did not limit the hours for in-person absentee voting. But as a practical matter, in-person absentee voting could not begin until municipal clerks received the ballots from the company that printed them, which was usually three to five weeks before the election. Tr. 2, at 265:5-7; Tr. 4p, at 121:3-11; Tr. 7a, at 114:9-15. Through Act 23, passed in 2011, and Act 146, passed in 2014, the legislature narrowed the window for in-person absentee voting to 10 days and prohibited municipal clerks from offering in-person absentee voting on weekends or on the Monday before an election. The legislature also limited the hours available for in-person absentee voting to between 8:00 a.m. and 7:00 p.m.

The court finds that the challenged in-person absentee voting provisions place a moderate burden on the right to vote.

Wisconsin's changes to its in-person absentee voting regime came amidst an increase in the use of absentee voting, both nationally and in Wisconsin. About 60,000 voters cast in-person absentee ballots on the Monday before the November 2008 general election. PX435, at 13. As plaintiffs' expert, Barry Burden, PhD, testified, absentee voting in Wisconsin (both by mail and in-person) increased from 10.6 percent to 15.5 percent between the 2010 and 2014 midterm elections. PX037, at 23. For presidential elections, the increase was not as significant: 21.1 percent in 2008 to 21.4 percent in 2012. *Id.* Defendants' expert, Dr. Hood, reached similar conclusions. Tr. 8a, at 32-41; DX001, at 11.

In spite of these trends, plaintiffs contend that the one-location rule and hour limit stifled in-person absentee voting in Wisconsin. Their theory is that if the legislature had not passed the challenged provisions, then in-person absentee voting would have increased even more, particularly among minorities and young voters, who tend to vote for Democrats. The court agrees with Dr. Hood that it would be nearly impossible to directly prove this theory—there is no way to redo the 2012 and 2014 elections without the in-person absentee provisions in place. Tr. 8a, at 44:3-6. Neither side had compelling statistical evidence that African Americans in Wisconsin had made disproportionate use of in-person absentee voting.

But plaintiffs had good anecdotal and circumstantial evidence that the in-person absentee laws impose burdens for certain voters by demonstrating that the changes had profound effects in larger municipalities like Madison and

Milwaukee. These cities are home to populations of voters who disproportionately lack the resources, transportation, or flexible work schedules necessary to vote in-person absentee during the decreased timeframe. PX037, at 26-27. At trial, clerks from both cities testified that the new laws forced them to drastically cut back on the amount of time that they could offer in-person absentee voting. For example, before the November 2012 elections, Madison offered in-person absentee voting until 8:00 p.m. on weekdays, and for a few hours on Saturdays and *932 Sundays. Tr. 2, at 265:16-20. Up to 1,200 voters a day would use in-person absentee voting. *Id.* at 266:1-6. As for Milwaukee, defendants' own expert summarized how the changes have similarly affected the availability of in-person absentee voting since 2008.

Table 2. In-Person Absentee Voting Characteristics, City of Milwaukee, 2008-2014

| Election | Start | Stop | Hours | Weekends Permitted | Days Available | Total Hours |
|---|---|---|---|---|---|---|
| 2008 General | 10/13 | 11/3 | 8:00 am-8: pm, M-F; 9:00 am-5:00 pm, Sat. | Yes | 17 days | 200 |
| 2010 General | 10/5 | 11/1 | 8:30 am-4:30 pm, M-F; 8:30 am-12:30 pm, Sat. | Yes | 21 days | 164 |
| → Act 23 | | | | | | |
| 2012 General | 10/22 | 11/2 | 8:30 am-7:00 pm, M-F; 9:00 am-5:00 pm, S-S | Yes | 12 days | 121 |
| → Act 146 | | | | | | |
| 2014 General | 10/20 | 10/31 | 8:00 am-7:00 pm, M-F | No | 10 days | 110 |

DX001, at 9. Voters in both municipalities took advantage of the opportunities available before the state limited in-person absentee voting, particularly weekend voting. PX206.

In Wisconsin, voters in larger cities experience disadvantages in education, income, employment, and access to transportation. PX036, at 5-15; PX037, at 26-27. Several lay witnesses testified that these pre-existing disadvantages interact with the new laws to make it more difficult for these voters to vote during the shorter period for in-person absentee voting. For example, eliminating weekend voting and reducing the number of days on which a clerk's office can accept in-person absentee ballots is problematic for a person whose job or class schedule is less flexible. Tr. 1p, at 14:13-15:8, 75:8-25, 144:19-25; Tr. 3p, at 31:2-5. Combined with the one-location rule, limiting hours leads to longer lines at clerk's offices, which in turn requires voters to be prepared to devote more time to voting. Tr. 1p, at 92:18-96:3; Tr. 2, at 266:7-16. Having only one location creates difficulties for voters who lack access to transportation.

Eliminating weekend voting also prevented groups from holding voting drives like "Souls to the Polls"—an initiative that encouraged church congregations to vote in-person absentee after church on Sunday. Tr. 1p, at

134:20-135:1; Tr. 2, at 183:14-17. But these types of collateral effects only indirectly burden voters; impediments for groups trying to get individuals to vote do not necessarily implicate the First Amendment. *Cf. Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388–96 (5th Cir.2013) ("[W]e are unpersuaded that the smorgasbord of activities comprising voter registration drives involves expressive conduct or conduct so inextricably intertwined with speech as to require First Amendment scrutiny."); *Coal. for Sensible & Humane Sols. v. Wamser*, 771 F.2d 395, 400 (8th Cir.1985) (acknowledging the claim that "refusal to appoint qualified volunteers as deputy registrars restricts the accessibility of voter registration facilities and thus indirectly constitutes an unconstitutional infringement of the right to vote," **\*933** but refusing to "agree that there is a constitutional right to greater access to voter registration facilities per se").

The challenged provisions do not categorically bar individuals from voting. The state has shrunk the window in which municipalities can offer in-person absentee voting, but it has not closed that window completely. If the shortened period is not convenient for certain voters, then they can vote using mail-in absentee voting or vote on election day. Regardless, both sides' evidence confirms that in-person absentee voting is still widely used, and its use has increased over the last several years. As noted above, plaintiffs argue that without the challenged provisions, in-person absentee voting would be increasing *more.* But their anecdotal evidence is not sufficient to prove this assertion.

Before turning to step two of the *Anderson–Burdick* analysis, the court will address defendants' preliminary argument that there is no constitutionally protected right to cast an absentee ballot. Defendants invoke *Griffin v. Roupas*, a case in which a group of working mothers challenged Illinois's refusal to let them vote absentee because they did not satisfy any of the statutory prerequisites (out of the county, physical incapacity, religious observance, etc.). 385 F.3d 1128, 1129 (7th Cir.2004). The *Griffin* court rejected the idea "that the Constitution requires all states to allow unlimited absentee voting," *id.* at 1130, which defendants implicitly contend should end the discussion. But this case is not about Wisconsin's outright refusal to allow in-person absentee voting. Rather, plaintiffs allege that the state is denying them the opportunity to exercise a right that they already have. Put differently, plaintiffs contend that by choosing to give its citizens the privilege of in-person absentee voting, the state must administer that privilege evenhandedly. *See Zessar v. Helander*, No. 05–cv–1917, 2006 WL 642646, at \*6 (N.D.Ill. Mar. 13, 2006) ("[O]nce [states] create such a regime, they must administer it in

accordance with the Constitution." (citing *Paul v. Davis*, 424 U.S. 693, 710–12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976))). The court therefore rejects defendants' argument that plaintiffs' challenge to the in-person absentee voting provisions does not implicate their constitutional rights.

Defendants advance four justifications for the challenged in-person absentee voting provisions. First, they contend that shortening the timeframe for in-person absentee voting will allow the state to conduct uniform, orderly elections. Municipal clerks can better control the process and manage staffing. Clerks can also guarantee that absentee ballots will be available once in-person absentee voting starts (ballots are delivered at different times, which means that a clerk's office might have them available four weeks before an election one year, but only two weeks before that same election in a different year).

Second, defendants contend that municipal clerks are busy during election season. With the reduced window for in-person absentee voting, clerks have more time for other tasks, such as conducting voting at residential care facilities, mailing absentee ballots, and entering voter registrations. Clerks also have non-election-related duties, and it becomes difficult to attend to them during business hours once in-person absentee voting begins. The reduced window allows them to take care of other responsibilities before turning their exclusive attention to voting.

Third, defendants contend that limiting in-person absentee voting to one location saves money. More locations mean more staff, supplies, and security. Clerks are also able to directly supervise the entire process because it is occurring in one location rather than across the municipality.

**\*934** Fourth, defendants contend that limiting in-person absentee voting to one location avoids voter confusion by creating uniformity. Their concern is that voters might accidentally believe that because they can vote in-person absentee at multiple locations, they can also vote at multiple polling locations on election day.

With one exception, these interests do not justify the moderate burdens that the challenged provisions impose. Alleviating the workload for clerks could be a sufficient reason to limit the hours for in-person absentee voting. But the laws that the challenged provisions replaced did not *require* municipal clerks to offer in-person absentee voting during the now-eliminated days and times or at multiple locations. A clerk who wanted to retain control over the process, save money by using less staff, or reduce the hours to have time to attend to other duties could have chosen to do so under the old laws. Thus, any

burdens on clerks that the state was purporting to address were voluntarily undertaken, which undermines the state's interest in alleviating those burdens.

Furthermore, the state's interest in establishing uniform times for in-person absentee voting does not make sense because clerks can currently set whatever hours and days they want for in-person absentee voting, within the parameters of the statutes. Contrary to defendants' assertion, Dkt. 206, at 65, the new laws do not actually "provide[ ] a set date when in-person absentee voting begins." Municipal clerks are still free to start in-person absentee voting at different times, so long as it is not before the window opens. Under the new law, smaller towns with part-time clerks can still conduct in-person absentee voting by appointment only or on just a few days a week, *see, e.g.,* Tr. 7a, at 166:21-177:14; PX161, while larger municipalities can offer in-person absentee voting from 8:00 a.m. to 7:00 p.m., Monday through Friday, for two weeks, *see, e.g.,* Tr. 2, at 265:2-12. Thus, the challenged provisions do not actually create any consistency in when individual clerk's offices offer in-person absentee voting.

Requiring all municipalities to have one location for in-person absentee voting may have a superficial appeal. But uniformity for uniformity's sake gets the state only so far. In 2014, the number of adults per municipality in Wisconsin ranged from 33 to 433,496. PX037, at 26. The state's one-location rule ignores the obvious logistical difference between forcing a few dozen voters to use a single location and forcing a few hundred thousand voters to use a single location. There is simply no evidence that a one-location rule prevents voter confusion, or that any confusion would be as widespread or burdensome as the types of difficulties that voters face when having only one location at which to vote in-person absentee.

Evidence at trial suggested that one of the justifications for the challenged in-person absentee provisions was to "rein in" the big cities in the state, principally for political purposes. *See generally* PX022. State legislators were concerned that smaller municipalities could not keep up with the cities that had the resources to provide 60 to 70 hours of in-person absentee voting each week. *Id.* Ensuring equal access to the franchise is certainly a valid state interest, probably even a compelling one. But stifling votes for partisan gain is not a valid interest. And Wisconsin's approach in this instance was backward: rather than *expanding* in-person absentee voting in smaller municipalities, the state *limited* in-person absentee voting in larger municipalities. By doing so, the state has imposed moderate burdens on the residents of those larger municipalities.

The court concludes that most of the challenged in-person absentee voting provisions **\*935** violate the First and Fourteenth Amendments for three reasons: the moderate burdens that they impose are not justified by the state's proffered interests; local control addresses the needs of the communities; and the purported consistency is illusory.

[19]The one exception is the state's decision to prohibit in-person absentee voting on the Monday before an election. The Wisconsin Municipal Clerks Association advocated for this provision, emphasizing that the day before an election is usually very busy. Tr. 4p, at 123:8-124:12; Tr. 7a, at 158:22-160:9. The GAB advocated for this provision as well. Tr. 5a, at 102:2-4. The state's interest in preventing clerks from incurring additional responsibilities on the day before an election, even voluntarily, is considerably more important than during the weeks leading up to the election. Clerks cannot complete some of their preparation for election day until all absentee ballots are cast, and so allowing in-person absentee voting right up through the eve of the election necessarily prevents clerks from completing those tasks until after hours. Prohibiting in-person absentee voting on the day before an election allows clerks to focus on preparing for the election, go home at a reasonable hour, and be as sharp as possible for election day, which will itself be a long day. The state's interest in prohibiting in-person absentee voting on the day before an election outweighs the moderate burdens that this measure imposes. Thus, the court concludes that this one provision does not violate the First and Fourteenth Amendments.

### 2. Requiring documentary proof of residence and eliminating corroboration

[20]Wisconsin requires voters to provide documentary proof of residence when registering to vote. Wis. Stat. § 6.34(2). Before Act 23, passed in 2011, voters could use corroboration to prove their residence. And before Act 182, passed in 2014, voters needed to provide documentary proof of residence only when registering to vote within 20 days before an election. Plaintiffs challenge both the requirement of documentary proof of residence and the elimination of corroboration. These are two aspects of an overall challenge to what Wisconsin requires from voters who want to register. Plaintiffs contend that Wisconsin's proof of residence requirement burdens Wisconsin voters, particularly young voters who live with their parents, elderly voters, economically disadvantaged voters who live with friends or relatives,

women voters whose residency documents are in their husbands' names, and minority voters who suffer from higher rates of residential instability.[14]

The court finds that the challenged registration provisions impose only slight burdens on voters.

Between 2006 and 2012, about 35,000 Wisconsin citizens used corroboration to register to vote. PX038, at 39. But plaintiffs have adduced only anecdotal evidence to support their contention that the elimination of corroboration imposes a severe burden. They have not proven that minorities, Democrats, or young voters experience any widespread or insurmountable *936 difficulties registering to vote on account of this change in the law. Indeed, plaintiffs' expert conceded that he did "not have specific data on how many people were unable to register because they were no longer permitted to use corroborating witnesses to prove residency." *Id.* The same is true of plaintiffs' evidence about voters who could not provide documentary proof of residence: although plaintiffs have identified examples of voters who were turned away at the polls, there is no evidence about how prevalent the problem is, or about how many voters cannot obtain documentary proof of residence with reasonable effort.

Voters in Wisconsin can satisfy the proof of residence requirement with a little planning. For example, rather than trying to register on election day, voters can contact their municipal clerk beforehand, when there is still time to update mailing addresses for bank statements, utility bills, or other acceptable forms of proof of residence. *See* PX490, at 5-6 (voter tried to use corroboration at the polls); PX045, at 3 (same); PX059, at 1 (183 people not able to register at polls because they did not have proof of residence). Wisconsin also allows voters to present electronic copies of their proof of residence documents (e.g., online bank statements or utility bills), which eliminates the need to wait for a document to arrive by mail.

At least some clerks have even identified a solution for voters who are simply unable to obtain the necessary documentation. Under Wis. Stat. § 6.34(3)(a)11., a person can register to vote by providing a document issued by a unit of government. Thus, if a voter provides a municipal clerk with the address at which the voter wants to register, the clerk can send the voter a letter and *that letter* then becomes a government document that the voter can use to register. *See, e.g.,* Tr. 1p, at 163-65; Tr. 2, at 301-02. This system is not much different from the one that Wisconsin used to have. When a voter registered, the clerk's office would send him or her a postcard to confirm the

registration address. If the card came back as undeliverable, then the clerk's office knew that there was a problem; if the card did not come back, then the clerk's office considered the registration verified. The current laws merely add the step that a voter must return to the clerk's office to verify receiving the document.

The lone context in which proof of residence requirements and the elimination of corroboration can be more problematic is election day registration. An unregistered voter who lacks easy access to documentary proof of residence and decides on election day that he or she will vote may be unable to register without corroboration. The specific burdens on voters who plan to register on election day are still slight. With a little advanced planning, even a voter who lacks access to standard methods for proving residence can register to vote on election day.

For many voters, registering to vote will not be a regular event: once registered, a voter can continue voting under that registration until he or she moves. And even for voters who move often, if they complete the registration process once, they will be prepared for it in the future. Wisconsin law allows voters to choose from an array of documents to prove residence, and this flexibility means that the loss of corroboration does not impose a severe burden on the right to vote. It may be inconvenient to plan ahead to register at the polls on election day, particularly without corroboration, and it may be cumbersome to update account information with a bank or utility company. But these activities are no more burdensome than those that the Supreme Court has already considered. *See Crawford,* 553 U.S. at 198, 128 S.Ct. 1610 *937 ("For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.").

Defendants justify the registration requirements as ensuring that voters actually reside in the municipalities where they register to vote. Asking for proof of residence, and not accepting corroboration, also helps prevent fraud. Defendants adduced no actual evidence of fraudulent use of corroboration though. *See, e.g.,* Tr. 7a, at 118:20-119:6 (voter attempted to pressure other voters to corroborate his residence but they all refused).

These interests justify the slight burdens that the challenged registration provisions impose. Residence is a bona fide voter qualification. Plaintiffs are correct that defendants have not adduced evidence of a genuine threat

or history of registration-related fraud. But "[l]egislatures ... should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). Pursuant to *Frank* and *Crawford*, states can anticipate and guard against fraudulent voting, and public confidence in elections is a legitimate state interest.[15] Regardless, a voter's residence in a particular municipality is a qualification for voting in that municipality. The state has an interest in making sure that only qualified voters are participating in elections, and the proof of residence requirement is directly linked to that goal.

The court concludes that the challenged registration requirements do not violate the First and Fourteenth Amendments.

### 3. Changing how students can use "dorm lists" to register

[21]Before Act 23, college and university students could register to vote use their student IDs and a "dorm list" that their institutions provided to municipal clerks.[16] The legislature has changed this provision by requiring that dorm lists also indicate whether students are U.S. citizens. This change requires colleges and universities to provide information that the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, prevents them from disclosing without consent. PX435, at 34-35.[17] Rather than obtaining consent to provide this information, most colleges and universities have stopped providing dorm lists to municipal clerks. PX436, at 10.

The court finds that the dorm list provision places only a slight burden on student voters.

**\*938** The dorm list provision is a special accommodation that allows college and university students to prove their residences with student IDs. This option is *in addition to* the standard options that all voters have. Act 23 pulls back only some of the special dispensation that the legislature gave students. The challenged provisions do not deny students the ability to register outright. Students can also register using a student ID and a fee receipt showing that they paid tuition in the last nine months. *See* Wis. Stat. § 6.34(3)(a)7.a. And of course, students can register by presenting any of the other listed documents to prove residence. Plaintiffs did not present evidence showing how often students used dorm lists before Act

23, or how many students are now unable to register without the option. Without this sort of proof, plaintiffs cannot demonstrate that any burden on student voters is more than slight.

Act 23 nevertheless burdens student voters who want to use their student IDs as proof of residence to register because it conditions their registration on proof of citizenship, which is something that no other voter must present to register. When any voter registers in Wisconsin, including a student voter, the voter must sign a statement certifying that he or she is a U.S. citizen. *See* DX101. But that is it. Voters do not need to actually *prove* that they are citizens. True, the primary burden that this provision imposes is on colleges and universities, which must provide compliant dorm lists. But if colleges and universities are unwilling to provide these lists, then for all practical purposes, Act 23 has taken away a method through which students can register to vote.

Defendants justify the provision by arguing that U.S. citizenship is a qualification for voting in Wisconsin, *see* Wis. Const. art. III, § 1, and so "it makes sense to confirm it." Dkt. 206, at 87.[18] That is a weak justification for two reasons. First, none of the state's other methods for proving residence require voters to "confirm" their U.S. citizenship beyond signing a citizenship certification on the registration form. Students sign this certification too. Defendants do not explain how this certification procedure, which apparently satisfies the state's interest in confirming citizenship for the overwhelming majority of non-students who register to vote, is insufficient in the context of student voters. Second, even if the state is particularly worried about non-citizen students voting—and at trial, the state presented no evidence of such a problem—the challenged provision does not allay that concern. Non-citizen students could easily skirt the requirement of demonstrating citizenship by using one of the other methods for proving residence.

Although the changes to using a dorm list to register impose only slight burdens, the state has not offered even a minimally rational justification for the law. The court therefore concludes that this provision violates the First and Fourteenth Amendments.

### 4. Eliminating statewide SRDs and eliminating SRDs and registration locations at high schools

[22]Plaintiffs challenge the provisions of Act 23, passed in 2011, that eliminated statewide SRDs and the provisions of Act 240, passed in 2012, that eliminated the

requirement that high schools accept registrations from staff and enrolled students.

The court finds that the challenged SRD and high school registration provisions place only slight burdens on voters.

**\*939** Most of the burdens that plaintiffs identify from these laws do not fall directly on voters. For example, plaintiffs contend that eliminating statewide SRDs hinders individuals who register voters during off-site registration drives. *See, e.g.*, Tr. 1p, at 7:20-8:25 (Citizen Action employee cannot register voters outside the municipalities in which she is an SRD), 187:15-188:6 (college student cannot be a statewide SRD); Tr. 3a, at 101:1-102:21 (organizations cannot conduct voter-registration drives). Plaintiffs also contend that without statewide SRDs, more voters will be forced to register at a municipal clerk's office or at the polls, which will cause congestion and additional work for clerks and poll workers. Tr. 2, at 327:14-20. The *Anderson–Burdick* framework does not focus on these burdens; rather, the relevant issue is the nature and severity of the burdens that fall on *voters* and on the right to vote.

The real burden for voters is the loss of potentially convenient options for registering through a statewide SRD or at a high school. But plaintiffs have not adduced evidence of how widespread or significant this problem is. No testimony or expert opinion established how many voters want to register through statewide SRDs or at high schools and are unable to do so. Nor did any testimony establish how many voters are unable to register at all without these options. The closest that plaintiffs came was an anecdote about one municipality not appointing any SRDs in 2011 and 2012, which meant that all voters had to register through the clerk's office those years. PX490, at 3. Yet that burden was principally the result of that particular clerk refusing to appoint any SRDs. Plaintiffs do not argue that all, or even many, other municipalities refuse to appoint SRDs.

Defendants justify these provisions by arguing that statewide SRDs make mistakes that municipal clerks have to spend time correcting. Tr. 4p, at 133:3-20 (continuous difficulties in municipalities across the state with untimely or incorrect registrations from SRDs); Tr. 7a, at 121:2-7 (statewide SRDs submit incomplete forms, "which complicates things and requires follow-up"), 170:6-19 (same); Tr. 8p, at 133:8-12 (GAB auditor had problems with legibility and missing information from statewide SRDs). Defendants also presented evidence that students and staff did not use high school registration locations that frequently, and that high school SRDs also

had problems submitting registrations. Tr. 4p, at 130:18-23 (problems with high school SRDs), 131:8-17 (less than 10 registrations per year from a high school), 132:3-9 (high school students like to register on election day or in the clerk's office because "it's a Facebook picture-taking time"); Tr. 7a, at 169: 11-19 (clerk has never received a registration from a high school and has not heard complaints about eliminating high schools as registration locations). Although this evidence was not conclusive for every municipality in the state, it supported defendants' assertion that voters did not use high school registration locations that much.

Plaintiffs counter these concerns by pointing out that they came only from small municipalities. Clerks from larger municipalities supported having statewide SRDs. Tr. 1p, at 88:3-8. Plaintiffs also argue that even if statewide SRDs make mistakes, these lead municipal clerks to engage with voters to correct those mistakes, and so the net result is beneficial. Plaintiffs' criticisms are not persuasive: a state certainly does not have to stand by and watch problems fester in smaller municipalities just because one or two larger municipalities do not have, or can easily overcome, those same problems. The legislature was entitled to conclude that the problems with statewide SRDs outweighed the benefits.

**\*940** Defendants also justify eliminating statewide SRDs on the grounds that it gave clerks direct control over the SRDs in their municipalities.[19] The state supervised statewide SRDs, which made it difficult for municipal clerks to revoke or train SRDs when problems occurred. Tr. 4p, at 132:10-24. The benefits of local control led the Wisconsin Municipal Clerks Association to support eliminating statewide SRDs. *Id.* Now, clerks train and supervise each SRD in their municipality, which allows them to address issues quicker and more efficiently.

The state's interests in eliminating mistakes from high school and statewide SRDs, and in giving municipal clerks the ability to directly manage the SRDs with whom they work, justify the slight burdens that the challenged provisions impose. There is nothing stopping an individual from registering to be an SRD in as many municipalities as he or she likes. And alternative registration options alleviate virtually any inconvenience to voters who would benefit from being able to register with a statewide SRD.

The court concludes that the challenged SRD and high school registration provisions do not violate the First and Fourteenth Amendments.

**5. Preempting Madison's landlord ordinance**

[23]Act 76, passed in 2013, overrode an ordinance that Madison passed in July 2012 requiring landlords to distribute voter registration forms to new tenants. Plaintiffs contend that the act burdens the right to vote by making it harder to register.

The court finds that the landlord provision imposes only a slight burden on voters.

There is some evidence that Madison's ordinance was an effective tool for reaching voters who rented their homes. *See, e.g.,* Tr. 3a, at 24:17-25:4. In the short time that Madison's ordinance was in effect, Madison registered at least 500 voters who submitted the forms that their landlords had given them. *Id.* at 168:4-9. That was right before the November 2012 presidential election.[20] Madison is also home to a large student population, with many students renting their homes.

As with other challenged provisions, plaintiffs have not adduced evidence of a significant or widespread burden. The state statute does not preclude landlords from distributing materials; it just prevents municipalities from *requiring* that they distribute materials. Even assuming that in practice the law means that no landlord will provide forms, the only real burden that voters experience is having to obtain registration forms elsewhere—the rest of the steps for registering are the same. At most, the state has denied Madison voters a convenience. Plaintiffs have not adduced evidence of voters in Madison (or anywhere in Wisconsin) who did not receive registration forms from their landlords and were unable to register to vote.

Defendants justify the law on the grounds that requiring landlords to provide voting materials creates the possibility **\*941** for voter confusion. At trial, two municipal clerks opined that landlords, who are not trained election officials, could distribute outdated materials or inaccurate information. Tr. 4p, at 136:22-137:20; Tr. 7p, at 19:10-20:7. This testimony was speculative; defendants did not introduce evidence that landlords have actually distributed the wrong information. But the potential for confusion is at least plausible, which makes the state's interest in avoiding it a reasonable one.

The state has an interest in ensuring that voters receive the correct information about where and how to register to vote. Here, the possibility that landlords will provide outdated or inaccurate information seems minimal, and defendants' justification for overriding Madison's ordinance is relatively weak. If the statute more than

minimally burdened the right to vote, then it probably would not withstand constitutional scrutiny. But defendants have put forth a rational explanation for it, and that explanation is sufficient to justify the slight burden that the law imposes.

The court concludes that the landlord provision does not violate the First and Fourteenth Amendments.

**6. Increasing the durational residency requirement**

[24]Act 23, passed in 2011, increased Wisconsin's durational residency requirement from 10 days to 28 days. This means that residents who move within Wisconsin fewer than 28 days before an election have to vote in their former municipalities. And residents who move into Wisconsin from out-of-state fewer than 28 days before an election cannot vote in Wisconsin at all (except for the offices of president and vice president, pursuant to Wis. Stat. § 6.15(1)).

The court finds that the increased durational residency requirement imposes a moderate burden on voters in Wisconsin, particularly for populations that tend to be more transient or lack access to transportation.

"Durational residence requirements completely bar from voting all residents not meeting the fixed durational standards. By denying some citizens the right to vote, such laws deprive them of a fundamental political right, preservative of all rights." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (citations, internal quotations, and alterations omitted). Plaintiffs have adduced evidence from which the court can infer that a longer residency requirement leads to increased difficulties for certain types of voters. That is an important consideration because the court must evaluate the burdens that the law imposes on voters who cannot comply with it. *See Crawford*, 553 U.S. at 198, 128 S.Ct. 1610. Here, the burden is significant. A voter who does not satisfy the durational residency requirement cannot vote unless he or she: (1) travels back to his or her former municipality; or (2) votes absentee by mail. These options reduce the burden that the law imposes, but they do not negate it entirely.

Plaintiffs seek a return to the old 10-day rule, presumably because the rule does not impermissibly burden the right to vote. Thus, their contention is really that the *increase* from 10 days to 28 days burdens the right to vote. Given the specific burdens at issue, plaintiffs' evidence of problems with the overall durational residency

requirement, *see e.g.*, Tr. 1p, at 44:19-45:6; PX055, at 2; PX059, at 1, is not particularly relevant.

Plaintiffs have not adduced direct evidence of the burdens that the change from 10 days to 28 days imposes. They have not identified how many voters would be able to comply with a 10-day rule but not with a 28-day rule. *See* Tr. 1p, at 44:9-14 (Citizen Action employee unable to identify how **\*942** many voters were affected by the increase); Tr. 2, at 292:17-25 (municipal clerk testified to an unspecified "increase"); PX490, at 18 (one voter affected by the increase).[21] Nor could plaintiffs' experts pin down how widespread the problem is. For example, Dr. Lichtman presented 2010 census data to show that only 1.6 percent of the white population had moved into the state during the previous year, compared 2.1 percent of African Americans and 2.4 percent of Latinos. PX036, at 47. For in-state moves, 12.5 percent of white residents had lived in a different house in the previous year, compared to 26.2 percent of African Americans and 19.5 percent of Latinos. *Id.* at 41. But this information covered the entire year and was not limited to eligible voters.

As with many of their other claims, plaintiffs attempted to indirectly prove the nature and severity of the burdens that the increased durational residency requirement creates. Voters who move more often have to confront residency requirements more often. Wisconsin has a significant population of African American and Latino voters, who are more likely to be transient than white voters are. PX036, at 40-41; PX037, at 27. Thus, the court can infer that the durational residency requirement will impose considerable burdens on a class of voters within the state that will have difficulty complying with the requirement.

For voters who move into Wisconsin from another state, the 28-day residency requirement disenfranchises them from state and local elections in Wisconsin (although they can vote for president and vice president). Voters who move within the state at least have the option of voting in their former municipalities. But that option is realistically available only to those who can travel. Although voting absentee by mail can alleviate some of the burden for voters who cannot travel, that option presents its own obstacles. There is considerable public distrust of voting absentee by mail, the process is cumbersome and difficult to understand for some voters, and it presents added security challenges for municipal clerks. Tr. 1p, at 76:13-77:24; Tr. 2, at 114:18-117:10; Tr. 4p, at 158:7-159:14.

On top of the burdens of actually voting in a former municipality, the durational residency requirement

presents unique registration problems as well. Voters who must register in their former municipalities may no longer have documents to prove their residence. Tr. 1p, at 79:16-22; Tr. 2, at 290:3-291:2. And even if a voter has adequate documentation, the registration form requires signing a certification that the voter has "resided at the [former] residential address for at least 28 consecutive days immediately preceding this election, with no present intent to move." DX101, at 1. Signing this certification puts voters in an uncomfortable position because the form states that "[f]alsification of information on this form is punishable under Wisconsin law as a Class I felony." *Id*; *see also* Tr. 1p, at 79:7-15; Tr. 2, at 290:3-291:2. Also, for voters who sign the form and are able to register, there may still be confusion when the municipal clerk sends a confirmation postcard to confirm the new registration at the old address and the card is returned as undeliverable. PX436, at 24.

Defendants justify the longer residency requirement as preserving election integrity, safeguarding voter confidence, and avoiding voter confusion. Specifically, the requirement serves these interests by preventing **\*943** voter "colonization," which "involve[s] voting by nonresidents, either singly or in groups. The main concern is that nonresidents will temporarily invade the State or county, falsely swear that they are residents to become eligible to vote, and, by voting, allow a candidate to win by fraud." *Dunn*, 405 U.S. at 345, 92 S.Ct. 995. Defendants also contend that the requirement prevents "party raiding," "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Rosario v. Rockefeller*, 410 U.S. 752, 760, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

Defendants' purported interests in the 28-day durational residency requirement do not justify the severe burdens that the provision imposes for several reasons. First, defendants did not introduce any evidence at trial of a genuine threat of colonization or party raiding. Nor have defendants explained how a durational residency requirement prevents party raiding, which is a problem that involves voters who are *already registered*.

Second, even if the threat of colonization motivated the state's actions, defendants failed to address the difference between a durational residency requirement in the abstract, and increasing that requirement from 10 days to 28 days. The state's interests certainly justify some sort of residency requirement. *See Marston v. Lewis*, 410 U.S. 679, 680, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (per curiam) (upholding a 50-day rule and holding that "[s]tates have valid and sufficient interests in providing

for some period of time—prior to an election—in order to prepare adequate voter records and protect its electoral processes from possible frauds"). But defendants have not explained how a 28-day rule serves these interests better than a 10-day rule does. The court is not persuaded that increasing a durational residency requirement by 18 days actually inhibits colonization, raiding, or fraud, at least not to the extent necessary to justify the burdens that the increase imposes on otherwise-qualified voters. To the contrary, the requirement appears to simply make it harder for otherwise eligible voters to vote. It is also somewhat inconsistent with allowing election day registration, which lets voters decide to vote at the last minute.

The state also advances a few practical points, which go toward avoiding voter confusion. For example, a GAB official testified that "the justification put forward to support the 28-day residency is partly that it was maybe more consistent with what some other states had." Tr. 8p, at 41:16-18. Indeed, 25 states and the District of Columbia have a durational residency requirement, and the average length is 28.8 days. DX001, at 23. In 77 percent of those states, the requirement is 30 days. *Id.* The shortest requirement is 20 days. *Id.* at 24. Consistency with other states is a superficial rationale that does not justify burdening (or completely disenfranchising) voters within the state who cannot comply with the requirement. Nor did defendants present evidence that there were such persistent problems with registration fraud (or *any* problems, for that matter) that the state needed to lengthen its durational residency requirement.

Defendants also argue that the increased requirement allows voters more time to gather documents and plan for voting. For example, a voter who moves to a new district 11 days before an election might not have enough time to obtain documentary proof of the new residence, and a voter who moves 9 days before an election might not have enough time to request an absentee ballot from his or her former municipality. Any such convenience is utterly speculative—defendants did not **\*944** identify a single voter who benefitted from the increased time in which to gather registration documents. Regardless, the rule adds considerable *inconvenience.* As one municipal clerk testified during trial, the rule is cumbersome for a person who moves 20 days before an election and is able to gather the necessary registration documents. Tr. 7a, at 140:16-142:1. Thus, defendants' convenience-based justification is not persuasive.

The court concludes that the state's change to the durational residency requirement violates the First and Fourteenth Amendments.

### 7. Establishing a zone for election observers

[25]Act 177, passed in 2014, established a statutorily prescribed zone in which election observers must stand at the polls to oversee voting on election day. The zone had to be between three and eight feet away from the table at which voters announced their names or registered to vote. Wis. Stat. § 7.41(2). This act overrode an existing GAB rule that allowed observers to be between 6 and 12 feet from the location where voters were announcing their presence and registering to vote. Part of the impetus for Act 177 was that a select group of election observers complained that officials were invoking the GAB's rule to keep them too far away to be able to hear and see events at polling places. *See* PX240; PX441, at 14-15. Plaintiffs allege that the state burdened the right to vote by moving observers closer to voters and facilitating harassment and intimidation.

The court finds that the provisions governing where election officials can position election observers imposes only a slight burden on the right to vote.

Although the executive director for Milwaukee's Election Commission confirmed that "99.5% of election observers respect the state's election observer rules," Tr. 1p, at 112:16-18, some municipalities have had problems with disruptive, harassing, and intimidating observers. These problems are prevalent in high-minority areas like Milwaukee and Racine. PX045, at 3; PX436, at 19. Besides intimidating voters, having observers close to poll workers implicates voter privacy concerns: depending on the types of documents that a voter presents for registering or as identification, an observer could be able to see financial statements, social security numbers, or other personal information. Overly zealous election observers also potentially slow down poll workers and cause delays at the polls. Plaintiffs contend that these problems would not exist, or would at least not rise to the level of constitutional violations, under the GAB's former 6-to-12-foot rule.

Despite the evidence of problems with some observers, plaintiffs have not shown that Act 177 imposes a significant burden on voters. The court does not doubt that election observers can create consternation for many voters. But Wis. Stat. § 7.41(2) gives municipal clerks and chief election inspectors discretion to create an observation area at each polling place; it does not require that they place observers closer than the GAB rule allowed. The court is not persuaded that the statute

imposes any significant burden on voters. Local election officials have the discretion, under the statute, to manage the position of observers.

In the anecdotes that plaintiffs presented at trial, problems with election observers occurred when poll workers or chief inspectors failed to exercise the authority that the state gave them to control or even remove observers. Problems also occurred when observers were closer than three feet, which was not a situation that the state even allowed, let alone imposed on *945 voters. *See, e.g.*, Tr. 1p, at 85:4-6 ("Well, to be clear, that wasn't related to the space, the space issue; that was just related to the conduct of the observer."). Also, plaintiffs' evidence of problems consisted of incidents that occurred *before* the state passed Act 177, which undermines their assertion that the new law burdens the right to vote.

Plaintiffs' challenge to Wisconsin's election observer law is essentially dissatisfaction with the choices that clerks or chief inspectors have made, or with their failure to address unruly observers. By establishing a range in which officials can place observers, the state has arguably made it possible for others to impose burdens on voters. But plaintiffs have failed to prove that election officials consistently exercise their authority under Wis. Stat. § 7.41(2) in a way that impedes or intimidates voters. At most, then, the law imposes only a slight burden on the right to vote.

Defendants offer a compelling justification for giving municipal clerks and chief election inspectors discretion to establish an observation zone. "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election– and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). Here, the state balanced the right that observers have to be present at the polls with the rights that voters have to keep their personal information private and with the flexibility that poll workers need to conduct efficient and fair elections. Rather than setting a one-size-fits-all rule, the legislature created guidelines to allow local municipalities to organize and control their polling places. Flexibility is important because not all polling places can accommodate a uniform distance. Tr. 2, at 286:17-289:22; Tr. 4p, at 139:18-140:2. And the range that the legislature selected was not unreasonable: three feet may be necessary to accommodate elderly observers or cramped polling places; eight feet allows observers to see and hear without interfering with poll workers.

To be clear, the court does not condone harassment or

intimidation by election observers, at any distance from registration or announcement tables. The state would be well served to impress upon municipal clerks and chief inspectors the importance of managing election observers. And those election officials must in turn exercise their authority to protect voters from unruly observers. As far as Act 177 is concerned, however, the state's justification for the act outweighs any burdens that it creates.

The court concludes that the challenged election observer provisions do not violate the First and Fourteenth Amendments.

### 8. Eliminating straight-ticket voting

[26]Act 23, passed in 2011, eliminated straight-ticket voting: voters must now select individual candidates on their ballots. Plaintiffs contend that this burdens the right to vote, particularly for voters with lower levels of educational attainment.

The court finds that this provision creates only a slight burden on the right to vote, even among populations with lower levels of educational attainment or who have less time to spend voting.

The burdens that plaintiffs identify include longer lines at the polls (because voters must mark an entire ballot) and increased confusion and likelihood of mistakes. But there was limited evidence about whether the elimination of straight-ticket voting caused these burdens and, if so, to what extent. Dr. Lichtman wrote in his report that "[t]he elimination of straight-ticket voting in Act 23 also has an adverse impact on waiting time since it *946 makes voting lengthier for those who would otherwise use this option." PX036, at 44. Yet Dr. Lichtman did not identify evidence to support this assertion or indicate how much delay the elimination of straight-ticket voting actually caused. As for lay witnesses, plaintiffs elicited testimony that the lack of straight-ticket voting could confuse voters. *See, e.g.*, Tr. 1p, at 82:17-83:3. But the actual evidence of confusion involved voters who remembered having the option in the past and asking about whether it still existed. PX490, at 22-23. Beyond that, straight-ticket voting was mostly a convenience, and plaintiffs did not adduce evidence that the lack of straight-ticket voting deterred anyone from voting.

Defendants' first justification for eliminating straight-ticket voting is that it was joining a national trend. As another district court recently explained, that argument does not get the state very far. *Mich. State A.*

*Philip Randolph Inst. v. Johnson*, —— F.Supp.3d ——, ——, No. 16–cv–11844, 2016 WL 3922355, at *8 (E.D.Mich. July 21, 2016) ("The fact that some other states do not allow straight party voting changes none of the facts that are before this Court. Furthermore, and more importantly, the behaviors of other states are *irrelevant* to the question of constitutionality. If the Ohio Legislature successfully instituted poll-taxes and literacy tests without challenge, it would not change the fact that poll-taxes and literacy tests are still clearly unconstitutional burdens on the right to vote." (original emphasis)).

Defendants also argue that eliminating straight-ticket voting decreases the chance of a voter selecting a straight-ticket option and then voting for candidates on the rest of the ballot. This type of over-voting would invalidate some or all of a voter's choices. Wis. Stat. § 7.50(1)(b). Defendants did not introduce evidence that these types of problems were prevalent, although they seem no more or less likely than the confusion that some voters might experience after not seeing a straight-ticket option that they are used to. Nevertheless, defendants' justification is reasonable.

Finally, defendants argue that eliminating straight-ticket voting encourages voters to become more informed about candidates or issues, and it ensures that voters do not accidentally overlook items on a ballot. Defendants did not introduce evidence of how often these problems occur, but the danger is there: in elections with referenda or non-partisan races, a voter who uses a straight-ticket option could overlook some items on a ballot. Tr. 7p, at 20:8-21:23. This justification is reasonable.

The court concludes that the straight-ticket provision does not violate the First and Fourteenth Amendments.

#### 9. Prohibiting clerks from sending absentee ballots by fax or email

[27]Act 75, passed in 2011, prevents municipal clerks from faxing or emailing absentee ballots, except to military or overseas electors. Plaintiffs contend that this provision unjustifiably burdens voters who are traveling but who do not qualify as overseas electors.

The court finds that this provision places a moderate burden on voters who are traveling, particularly if they are outside of the country or in locations with unreliable mail delivery.

Before Act 75, some municipalities sent hundreds of ballots by fax or email. Tr. 1p, at 87:8-12; Tr. 2, at 332:11-22. Now, without the option for electronic ballots, absentee voters must rely on mail service. This is particularly problematic for students or researchers who are abroad in remote areas, but it also affects domestic travelers, especially for elections in which ballots are not finalized until close to election day. Tr. 2, at 329:8-332:10; Tr. 7a, at 144:25-145:23; PX491, at 6-9. In at least some cases, *947 voters who cannot receive ballots by fax or email are simply unable to vote. Although voters are able to request their ballots by fax or email, that does them little good if the mailed ballot itself does not ever arrive, or if it arrives too late for a voter to return it in time to be counted.

Defendants justify the law by contending that faxing or emailing ballots requires significant time and energy from municipal clerks. They also contend that there is a higher chance of human error because clerks have to re-create electronically returned ballots in paper form on election day, and that this process invades the voter's privacy because those officials will see the voter's selections. And a voter who receives an electronic copy of a ballot could forward that ballot to other voters, who might incorrectly believe that they can vote with it. According to defendants' expert, Dr. Hood, these considerations supported the state's decision to do away with faxing and emailing ballots to most absentee voters. DX001, at 19. As to the specific instances in which voters have had difficulty with receiving or sending absentee ballots by mail, defendants contend that voters can overcome these difficulties with planning, and they observe that electronic methods for sending ballots may not be any more reliable than using mail.

Defendants' justifications are not persuasive. Wisconsin already requires municipal clerks to send ballots by fax or email to military voters and to voters who are permanently overseas, which undercuts most of defendants' justifications. At trial, defendants principally relied on the testimony of two municipal clerks to defend this law. *See* Tr. 4p, at 141:12-142:25; Tr. 7a, at 116:11-118:8. These clerks testified that electronic ballots can create a little more work before and on election day. Defendants did not present evidence of widespread opposition to sending ballots by fax or email. Indeed, other election officials could not see reasons for eliminating the practice, or testified that it did not create significant logistical problems. Tr. 2, at 332:23-333:4 ("It took a few minutes to compile the email."), 333:15-17; PX435, at 48. From a practical perspective, the court simply does not credit the assertion that in the year 2016, printing a paper ballot and instructions, putting them into an envelope, and physically sending the envelope

overseas is less burdensome on municipal clerks than compiling a PDF and sending an email. This is especially so because clerks are already sending ballots electronically to military and overseas electors.

Defendants also overstate their concerns about privacy, security, and errors. A voter who chooses to submit an absentee ballot electronically is voluntarily giving up some of the privacy that a mailed ballot would have. That is the voter's problem, not the state's problem: a voter who is concerned about privacy can simply avoid voting by fax or email. As for defendants' concern that voters may forward electronic copies of absentee ballots, they presented only one example of this occurring. There is no reason to think that it is a widespread problem. Even if it occurs regularly, a municipal clerk can correct the issue with an email to the voter who submitted a forwarded ballot. Finally, even crediting defendants' assertion that there is a higher *chance* for human error in re-creating an electronically received ballot in paper form, that chance is minimal because two election officials perform the task together. Defendants did not adduce evidence that mistakes ever actually happened, or that they happen with any frequency.

If the challenges of sending and receiving electronic ballots are as severe as defendants make them out to be, then the state can make the practice optional instead of mandatory.[22] But the state's justifications *948 for flatly prohibiting clerks from sending ballots by fax or email do not outweigh the moderate burdens that the challenged provision places on voters who are affected by it.

The court concludes that the provision prohibiting municipal clerks from sending absentee ballots by fax or email violates the First and Fourteenth Amendments.

### 10. Limiting when clerks can return absentee ballots to voters

[28]Act 227, passed in 2012, prevents clerks from returning a received absentee ballot to a voter unless the ballot is damaged or has an incomplete certification. Plaintiffs contend that these provisions place undue burdens on voters with lower levels of educational attainment, who tend to be African Americans and Latinos.

The court finds that the provisions governing when clerks can return absentee ballots to voters place only a slight burden on the right to vote.

After Act 227, municipal clerks cannot return absentee

ballots to voters to correct mistakes such as over-voting or improper marks. According to plaintiffs, minorities are more likely to make these kinds of mistakes because they have lower levels of educational attainment. PX036, at 9. Dr. Lichtman opined that "[t]his problem is especially acute for Wisconsin Hispanics. According to the US Census American Community Survey 2010, 3-Year Estimates, 33.2 percent of Hispanics in Wisconsin speak English 'less than very well.' " *Id.* at 48. The court does not give these opinions much value because Dr. Lichtman did not link his conclusion to the voting context. He did not identify what percentage of minority *voters* would have difficulty understanding a ballot, nor did he explain whether (and why) absentee ballots would be a type of printed document that minority voters would struggle to understand. Likewise, plaintiffs have not directed the court to any evidence demonstrating that comprehension problems with absentee ballots actually occur. *See* Dkt. 207, at 67.

Defendants' justification for this provision is straightforward and persuasive. Election officials do not open absentee ballots until election day, when they feed the ballots through counting machines. Thus, the only time that clerks would see the types of mistakes that plaintiffs identify is when they are actually preparing to feed the ballots through the machines. At that point, it is too late to return the ballot to the voter. In contrast, the errors for which clerks are now allowed to return absentee ballots are visible without opening the ballot envelope: "a spoiled or damaged absentee ballot," Wis. Stat. § 6.86(5), and "an absentee ballot with an improperly completed certificate or with no certificate," *id.* § 6.87(9).

Beyond the procedural justification, defendants argue that permitting clerks to return ballots to correct "mistakes"—as plaintiffs want—leaves clerks without any real guidance. One clerk could determine that a voter made a mistake by not voting for each office on a ballot, while a different clerk could determine that the same voter apparently did not want to vote for each office. Preventing ambiguity and confusion serves the state's interest in running efficient and orderly elections.

The court concludes that the limits on when clerks can return absentee ballots to voters do not violate the First and Fourteenth Amendments.

### 11. The IDPP

[29]Plaintiffs contend that the IDPP impermissibly burdens the right to vote. They seek to invalidate the process not

only for the petitioners who are currently trapped within it, but also for future petitioners *949 who use the IDPP to obtain a free ID for voting purposes.

The court finds that the IDPP imposes severe burdens on the right to vote.

At least 60 qualified electors—those whose petitions were denied—were disenfranchised for the 2016 spring primary in Wisconsin. There were also 36 people in "suspend" status who had not been issued IDs. There is no evidence that any of these people were not qualified electors. And as defendants' expert, Dr. Hood, acknowledged, there are "undoubtedly" people who are discouraged from even entering the process because they lack the documents or think that it is too cumbersome. Tr. 7p, at 199:11-200:8.

Even petitioners who succeed in navigating the IDPP do so only after enduring severe burdens. Becky Beck, a CAFU research agent, indicated that once a petition gets to CAFU, it typically takes five separate contacts between the investigator and the petitioner to verify the petitioner's identity, birthdate, and citizenship. Tr. 8p, at 159:12-16. CAFU's Case Activity Reports document many instances in which petitioners are repeatedly sent to family members, hospitals, or schools to hunt for additional documentation, even when there is no doubt that the person is a qualified elector. Sometimes these petitioners succeed—but only after they have engaged in months of back-and-forth with CAFU—when the DMV finally determines, in its discretion, that the petitioner has made a strong enough case to warrant issuing an ID. Even when the effort is ultimately successful, the IDPP imposes burdens that far exceed those contemplated in *Crawford* and *Frank*.

Defendants invoke the same justifications that *Crawford* and *Frank* discuss. They contend that Wisconsin's voter ID law (which includes the IDPP) deters fraud, promotes public confidence in elections, and promotes the orderly administration of elections. These interests justify a voter ID law in general, but they do not justify the severe burdens that the IDPP imposes. The Seventh Circuit has anticipated that such burdens could pose constitutional problems for Wisconsin's voter ID law; it noted in *Frank* that:

> *Milwaukee Branch of NAACP* and the regulations leave much to the discretion of the employees at the Department of Motor Vehicles who decide whether a given person has

an adequate claim for assistance or dispensing with the need for a birth certificate. Whether that discretion will be properly exercised is not part of the current record, however, and could be the subject of a separate suit if a problem can be demonstrated.

768 F.3d at 747 n. 1.

The evidence presented at trial confirms that the IDPP disenfranchises otherwise qualified voters. And even when confronted with lawsuits in two different federal courts, the state has utterly failed to devise a workable solution for getting these voters IDs. The state's most recent emergency rule allows the petitioners who are currently in the IDPP to vote in the November 2016 election. But there is no plan in place for after the petitioners' current receipts expire. Kicking the problem down the road does not alleviate the severe burdens that these petitioners must endure, nor does it prevent any future petitioners from suffering the same severe burdens. In short, many IDPP petitioners face insurmountable obstacles that serve no important interest because the government concedes that these petitioners are qualified electors. These justifications, such as they are, do not outweigh the burdens that the IDPP imposes.

The court concludes that the current version of the IDPP violates the First and Fourteenth Amendments.

**\*950 12. Cumulative effect**
Plaintiffs contend that the cumulative effect of the challenged provisions in this case imposes an undue burden on the right to vote. According to plaintiffs, even if individual provisions comport with the First and Fourteenth Amendments, the court must still consider the overall effect of Wisconsin's election system on voters, particularly on Democratic voters. To prove this aspect of their case, plaintiffs rely heavily on the "calculus of voting" theory that Dr. Burden explained in his expert report. PX037, at 4-5. Under this theory, a voter's likelihood of voting is essentially the result of a formula that reflects a cost-benefit analysis. A person will vote if his or her probability of determining the outcome of the election, multiplied by the net psychological benefit of seeing his or her preferred candidate win, is greater than the "cost" of voting (i.e., the effort needed to become

informed, and the time and resources needed to register to vote and cast a ballot? *Id.*

Plaintiffs argue that Wisconsin has imposed a series of independently minor burdens that, collectively, increase the cost of voting enough to deter voters who tend to vote for Democrats. As explained above, plaintiffs did not present compelling statistical evidence of the deterrent effects that the challenged provisions have. But the nature of the challenged provisions, none of which facilitate voting or registration, makes it reasonable to infer that there will be some such effect. And as the Seventh Circuit recognized in *Frank*, "*any* procedural step filters out some potential voters." 768 F.3d at 749 (original emphasis). But a deterrent effect alone, especially one that is not reliably quantified, does not render the cumulative effect somehow unconstitutional.

The *Anderson–Burdick* framework requires the court to evaluate "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. This requirement is difficult in the context of "cumulative effects" because the state can have different justifications for different rules, each with varying levels of persuasiveness. Plaintiffs do not propose a legal framework for evaluating a "cumulative effects" claim under *Anderson–Burdick*. But even looking broadly at the laws that they challenge in this case, the court's analysis of the individual provisions already addresses the problematic aspects of Wisconsin's election system.

Take the challenged registration provisions: the court agrees that aspects of Wisconsin's registration requirements burden the right to vote, particularly for voters who are more likely to move (which includes minority and younger voters, and thus, Democratic voters) and for voters who lack convenient access to documentary proof of residence (again, minority and younger voters, and thus, Democratic voters). But the state's interests in preempting fraud, avoiding confusion, and ensuring that only qualified voters register to vote are compelling enough to justify at least some of the burdens that the challenged provisions collectively impose. Removing the restrictions on using dorm lists and reducing the durational residency requirement will ease the burdens of Wisconsin's registration laws, at least to a degree that the state's interests can justify.

Likewise, the principal problem with Wisconsin's in-person absentee system is that it addresses inequality across municipalities by suppressing voting in larger cities rather than by enabling increased voting in smaller cities. Invalidating that approach not only addresses the

burdens on in-person absentee voting, but it also alleviates burdens in other aspects of Wisconsin's election system. A voter who is intimidated by election observers or who is **\*951** concerned about long lines at the polls because there is no straight-ticket voting, for example, may be able to vote in-person absentee and avoid those concerns altogether.

In short, although plaintiffs press a separate claim for the cumulative effects of the challenged provisions, the court concludes that they are entitled to no broader relief than the invalidation of the specific provisions that the court has identified as constitutionally infirm. A remedy directed at the diffuse cumulative effects of Wisconsin's election regime would invite, essentially, a rewrite of the state's election laws. That would be an unwarranted intervention by a federal court into an area reserved to the state legislature.

**F. Voting Rights Act claims**

Plaintiffs challenge the following provisions under § 2 of the Voting Rights Act: the reductions to in-person absentee voting; the one-location rule for in-person absentee voting; the elimination of corroboration; the requirement of documentary proof of residence; the elimination of statewide SRDs; the increased durational residency requirement; the zone for election observers; and the elimination of straight-ticket voting. Plaintiffs contend that these provisions disparately burden African Americans and Latinos.

Section 2 of the Voting Rights Act prohibits states and political subdivisions from implementing any "voting qualification or prerequisite to voting or standard, practice, or procedure ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Plaintiffs can establish a violation of § 2 by showing that, based on the totality of the circumstances, Wisconsin's election process is "not equally open to participation by members of a class of [protected] citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). Plaintiffs do not need to adduce proof of discriminatory intent to prevail on their Voting Rights Act claims. *Chisom v. Roemer*, 501 U.S. 380, 394–95, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).

Most case law applying § 2 of the Voting Rights Act

pertains to so-called "vote dilution" claims, which generally involve gerrymandering. Plaintiffs in this case bring claims over voting and registration requirements, which are "vote denial" claims for which Voting Rights Act law is less developed. In *Frank*, the Seventh Circuit endorsed a two-step inquiry for reviewing vote-denial challenges to voting qualifications under the Voting Rights Act:

First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

768 F.3d at 754–55 (citations and internal quotation marks omitted). But the Seventh Circuit also cautioned that "§ 2(a) does not condemn a voting practice just because it has a disparate effect on minorities." *Id.* at 753. "It is better to understand § 2(b) as an equal-treatment requirement (which is how it reads) than as an equal-outcome command." *Id.* at 754. The court must therefore analyze whether plaintiffs have proven that: (1) the challenged provisions impose disparate burdens on African Americans and Latinos; and (2) under the **\*952** totality of the circumstances, these burdens are linked to the state's historical conditions of discrimination.

#### 1. Disparate burdens

Two threshold issues affect how the court evaluates plaintiffs' evidence of disparate burdens. First, defendants contend that the Voting Rights Act requires plaintiffs to couch their evidence in terms of a departure from an "objective benchmark," rather than a departure from what Wisconsin's laws used to be. Dkt. 206, at 114. The Supreme Court has indicated that a different baseline is part of what distinguishes § 2 claims from § 5 claims:

In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect. In § 2 or Fifteenth

Amendment proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative: If the *status quo* "results in [an] abridgement of the right to vote" or "abridge[s] [the right to vote]" relative to what the right to vote *ought to be,* the status quo itself must be changed.

*Reno v. Bossier Par. Sch. Bd.,* 528 U.S. 320, 334, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) (original emphasis).

But *Reno* and the other cases on which defendants rely are vote *dilution* cases; this is a vote *denial* case. The few other federal courts that have considered how to evaluate burdens in vote denial cases have determined that this distinction is important. Relying on the text of the Voting Rights Act, the Southern District of Ohio recently concluded that "the relevant benchmark is inherently built into § 2 claims and is whether members of the minority have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." *Ohio Org. Collaborative*, 189 F.Supp.3d at 757, 2016 WL 3248030, at \*39; *see also Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 556 (6th Cir.2014) ("Section 2 vote denial claims inherently provide a clear, workable benchmark.... under the challenged law or practice, how do minorities fare in their ability 'to participate in the political process' *as compared to other groups of voters*?" (original emphasis) (quoting 42 U.S.C. § 1973(b), which has been transferred to 52 U.S.C. § 10301)), *vacated on other grounds*, No. 14–3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). The reasoning in these cases is persuasive, and the court rejects defendants' argument that plaintiffs must identify an objective benchmark to prevail on their Voting Rights Act claims.

[30]Part of determining whether minority voters have less opportunity to participate than other members of the electorate may involve comparing the challenged provisions with the laws that they replaced. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 241–42 (4th Cir.2014), *cert. denied*, ─── U.S. ───, 135 S.Ct. 1735, 191 L.Ed.2d 702 (2015); *Ohio Org. Collaborative*, 189 F.Supp.3d at 758, 2016 WL 3248030, at \*40 ("[A]n analysis of whether a change in law results in a decreased opportunity of minorities to vote as compared to other voters is exactly the type of analysis required by § 2 claims."). But that is not to say that a given provision would violate the Voting Rights Act just because it leaves minority voters worse off than a prior law. The appropriate inquiry at this first step is whether the challenged provision burdens **\*953** minority voters more than other voters. *See Frank*, 768 F.3d at 753.

The second threshold issue concerns the type of evidence that the parties have presented to prove (or disprove) that African Americans and Latinos have suffered disparate burdens under the challenged provisions. Experts on both sides have presented extensive statistical evidence derived from election turnout data in Wisconsin over time. Given the information available about Wisconsin's elections, turnout rates may be the best that the parties can offer. But raw turnout statistics reveal very little about the disparate burdens that a state's election system imposes. For example, defendants tout the high turnout numbers for the April 2016 election—the first statewide election in which the voter ID law and other challenged provisions were in effect—as evidence that minorities are not suffering disparate burdens under Wisconsin's election laws. Tr. 1a, at 60:8-17. But turnout in a given election depends on many factors, ranging from which offices are on the ballot to the amount of money spent on campaigning and the contentiousness of the races. The April 2016 Wisconsin involved unusually sharply contested primaries on both sides, which undoubtedly contributed to the higher-than-average turnout for an April election. Tr. 2, at 42:10-43:9. One cannot infer from the high overall turnout that Wisconsin's election laws have no impact, or that they have no differential impact on minorities.

That is not to say that turnout statistics are utterly useless. Plaintiffs' expert, Dr. Mayer, used the statewide voter database, correlated to a separate database of demographic and political information, to track several cohorts of voters across the 2010 and 2014 elections (i.e., before and after some of the challenged provisions went into effect). Both sides' experts agreed that comparing midterm elections, rather than presidential elections, made sense, because Barack Obama's presence on the ballot in 2008 and 2012 would likely skew minority turnout. And, although the usual constellation of factors affected voting in 2010 and 2014, a change in election law regime was one significant difference between those elections, and no one was aware of any other major factor likely to affect turnout. Dr. Mayer also opined that, based on survey research, in 2014 most voters believed that the voter ID law was in effect, even though it was actually still enjoined. Thus, Dr. Mayer was of the view that the 2014 election would be a good test of the impact of the laws challenged in this case.

Dr. Mayer used statistical regression analysis to isolate some of the variables that contribute to a voter's likelihood of voting. Based on this analysis, Dr. Mayer concluded that African Americans, Latinos, and those who lived in student wards, were slightly less likely to vote in the 2014 election than the average voter was.

PX043, at 14 (updated Table 8). By contrast, in the 2010 election, African Americans and those in student wards were actually *more* likely to have voted. For Latinos, the difference between 2010 and 2014 was small (though slightly in the opposite direction; they were slightly less likely to vote in 2010). Plaintiffs contend that Dr. Mayer's analysis shows that they challenged the provisions decreased likelihood that minorities will vote. These conclusions are in line with other national studies, which conclude that voter ID laws tend to suppress minority turnout at elections. *See* PX072.

Defendants' expert, Nolan McCarty, PhD, criticized Dr. Mayer's conclusions because Dr. Mayer does not account for "roll-off" in the statewide voter database. That database provides a "snapshot" in that it includes voting records only for **\*954** those voters who are registered as of the date the report of the database is generated, which in Dr. Mayer's case was September 24, 2015. Thus the September 24, 2015 database does not include the voting records of any voter who was not registered as of that date, even though that voter might have been registered for the 2010 or 2014 elections. Dr. McCarty surmises that minority voters would have been more likely to rolloff, so that Dr. Mayer's turnout rates for 2010 were too high, and thus the difference between those rates and the 2014 rates would be smaller. DX005, at 9. Dr. Mayer response is that despite the roll-off effect, his conclusions are sound, because he finds the effect even among the cohort of committed voters (because they stayed registered from 2010 to 2015 without rolling off the database). The court finds that, despite Dr. McCarty's criticism, Dr. Mayer's regression analysis supports the conclusion that the probability of an African American voting, relative to an average voter, was less in 2014 than it was in 2010. The court finds that Dr. Mayer's conclusions about those who live in student wards are not informative, because his definition of those who live in student wards does not include only students. The bottom line is that Dr. Mayer's analysis lends some support to the plaintiffs' claim that the challenged provisions tend to reduce African American voting by some modest amount. But nothing presented by either side demonstrated that the challenged laws had a striking impact on turnout overall or among any class of voters.

And even with the support of other empirical evidence, Dr. Mayer's conclusions, without more, are not enough to carry the day for plaintiffs. "It is better to understand § 2(b) as an equal-treatment requirement (which is how it reads) than as an equal-outcome command." *Frank*, 768 F.3d at 754. At the end of the day, turnout statistics report outcomes, not the burdens of the election regulations that might have influenced those outcomes. Thus, the court

must look for specific evidence demonstrating that the challenged provisions fall disparately on minorities.

### a. Registration provisions

[31]Plaintiffs challenge three registration-related provisions under the Voting Rights Act: proof of residence, elimination of corroboration, and elimination of statewide SRDs. Plaintiffs contend that these provisions impose disparate burdens on minority voters, who are more likely to move than white voters are. The court accepts plaintiffs' expert evidence that minority populations are more transient. PX036, at 47. If those populations register at the same rate that white populations do, then they would need to complete registration more often. For minority voters who do not have convenient access to proof of residence, this requirement could be disparately burdensome, as could the elimination of corroboration.

Wisconsin's registration requirements apply to all voters, regardless of race. The fact that voters must register after they move does not itself impose a disparate burden. Instead, plaintiffs must demonstrate that it is categorically more difficult for African American or Latino voters to comply with the registration requirements, and that registering more often therefore forces these populations to confront those difficulties more often. Plaintiffs have failed to make this showing.

Even acknowledging that minorities are more likely to lack driver licenses or state-issued IDs, those are only 2 of the 12 options for proving residence that Wis. Stat. § 6.34(3)(a) authorizes. Dr. Lichtman indicates that minorities are more likely to be unemployed, *id.* at 7-8, which could mean that they would lack access to paychecks. But that still leaves residential leases, utility bills, bank statements, and documents issued by any unit of government. *955 Indeed, as discussed above, municipal clerks have devised a strategy for sending letters to voters and then letting them use those letters to register. *See, e.g.*, Tr. 1p, at 163-65; Tr. 2, at 301-02. Plaintiffs therefore cannot demonstrate that the documentary proof of residence requirement burdens minorities for purposes of § 2. *Cf. Frank*, 768 F.3d at 752–53 ("[P]ersons who rely on the waiver procedure still must apply for it, which means that on average black and Latino residents must file more paperwork than white residents. Although these findings document a disparate outcome, they do not show a 'denial' of anything by Wisconsin, as § 2(a) requires.").

As for corroboration, plaintiffs' evidence of a disparate burden substantially consists of anecdotes and lay observations. *See, e.g.*, Tr. 1p, at 78:7-20 (corroboration is useful to people who are transient or in poverty); Tr. 3a, at 88:15-20 (corroboration facilitates participation by homeless or marginally housed voters). This testimony does not establish a verifiable disparate effect. And although some voters have been unable to register at the polls because corroboration is no longer an option, plaintiffs do not identify a racial slant to this problem. In fact, Dr. Lichtman expressly acknowledged that statistics about the use of corroboration by race are not available. PX036, at 40. This leaves plaintiffs unable to prove that the elimination of corroboration disparately prevents minorities from registering to vote.

In the abstract, African Americans and Latinos could have more difficulties presenting documentary proof of residence, particularly without corroboration. But plaintiffs did not actually *proven* that the challenged burdens disparately burden minorities. There is no persuasive evidence that minorities who want to register are systematically unable to comply with the requirement that they present proof of residence. The challenged provision violates the Voting Rights Act only if it gives "members of the protected class ... less opportunity than other members of the electorate to participate in the political process." *Frank*, 768 F.3d at 755 (citations and internal quotation marks omitted). Given the number of documents that voters can use to prove their residence, African American and Latino voters do not have "less opportunity" to participate in elections just because they are less likely to be able to use certain types of documents. *Cf. Ohio Org. Collaborative*, 189 F.Supp.3d at 758, 2016 WL 3248030, at *40 (prohibiting officials from sending unsolicited applications for absentee ballots does not create a burden for § 2 purposes).

Plaintiffs also argue that minority voters are more likely to register through SRDs at voter-registration drives than white voters are. But plaintiffs' only citation for this proposition is a website. *See* Dkt. 207, at 204. Plaintiffs did not introduce the website as evidence at trial, and they do not direct the court to other evidence admitted at trial that supports this contention. The court therefore concludes that plaintiffs have failed to prove that the elimination of statewide SRDs has had a disparate effect on minorities.

The court concludes that the challenged provisions requiring documentary proof of residence, eliminating corroboration, and eliminating statewide SRDs do not disparately burden African Americans or Latinos.

One Wisconsin Institute, Inc. v. Thomsen, 198 F.Supp.3d 896 (2016)

#### b. Durational residency provision

[32]In the context of plaintiffs' constitutional challenge, the court concluded that the increased durational residency requirement imposes disparate burdens on African Americans and Latinos. For substantially the same reasons, the court concludes that this provision also disparately *956 burdens minorities for purposes of the plaintiffs' Voting Rights Act claims.

Wisconsin's minority populations are much more transient than its white population is, in terms of both moving into the state and moving within the state. PX036, at 47. Unlike the methods for proving residence, there is no flexibility in the durational residency requirement: a voter either satisfies the requirement or does not satisfy it. Voters who have not been in a municipality for at least 28 days must either return to their former municipalities (if they moved within Wisconsin) or be disenfranchised. Because African Americans and Latinos are also more likely to lack access to transportation and to have less flexible work schedules, traveling to another municipality is not always feasible. On top of these burdens, voters who first have to register in their former municipalities must complete the awkward process of certifying that they have "resided at the [former] residential address for at least 28 consecutive days immediately preceding this election, with no present intent to move." DX101, at 1.

The court concludes that the durational residency provision disparately burdens African Americans and Latinos.

#### c. In-person absentee voting provisions

[33]In the context of plaintiffs' constitutional challenge, the court concluded that Wisconsin's in-person absentee voting provisions burden the right to vote, particularly for minority populations in larger municipalities. For substantially the same reasons, the court concludes that these provisions also disparately burden minorities for purposes of plaintiffs' Voting Rights Act claims.

Wisconsin's rules for in-person absentee voting all but guarantee that voters will have different experiences with in-person absentee voting depending on where they live: voters in large cities will have to crowd into one location to cast a ballot, while voters in smaller municipalities will breeze through the process. And because most of Wisconsin's African American population lives in Milwaukee, the state's largest city, the in-person absentee voting provisions necessarily produce racially disparate burdens. Moreover, plaintiffs have demonstrated that minorities actually used the extended hours for in-person absentee voting that were available to them under the old laws. PX036, at 43.

The court concludes that the in-person absentee voting provisions disparately burden African Americans and Latinos.

#### d. Election observer and straight-ticket voting provisions

[34]Plaintiffs contend that African Americans and Latinos are disparately affected by the state's rules governing where election observers can stand at polling places and by the state's elimination of straight-ticket voting.

Problems with election observers are more prevalent in high-minority areas like Milwaukee and Racine. But, as with plaintiffs' constitutional challenges to this provision, the problem for plaintiffs' Voting Rights Act claims is that municipal clerks and chief election inspectors decide where observers stand, not the state. The individual decisions that election officials make may lead to increased harassment at certain polling places. But that is not the same as saying that the state has imposed a disparate burden on minorities just by defining a range in which to position observers.

Plaintiffs rely exclusively on anecdotal evidence to prove that observers intimidate or harass African Americans and Latino voters more often than white voters. This evidence is insufficient to prove a violation of the Voting Rights Act, and most of it is not directly relevant. Plaintiffs have not presented evidence—expert or otherwise—that minorities disparately suffer *957 burdens when election observers stand close to them, or that the state's zone for election observers leads election officials to place observers closer to voters in minority-heavy municipalities. Indeed, plaintiffs' anecdotal evidence does not address the distances at which observers have caused problems, except to suggest that many observers were closer than three feet. That is not a result of Act 177—the

state prohibited election officials from allowing observers to be closer than three feet. Thus, plaintiffs cannot attribute these problems to the state for purposes of proving a disparate burden.

This leaves plaintiffs' evidence that problems are more prevalent in Milwaukee and Racine. These problems occurred under the GAB's rule, not under the statute that replaced it, which undermines plaintiffs' assertion that Act 177 disparately burdens minorities. But even inferring that problems are more common in these municipalities under the new rule, the burden that minorities experience still comes from election officials not using the authority that the state has given them to control election observers. Plaintiffs have not proven that the state has imposed a disparate burden on African Americans or Latinos by giving election officials discretion to designate zones for election observers that are appropriate for their polling locations.

As for the elimination of straight-ticket voting, the court has already found that this provision imposes only slight burdens on the right to vote. For substantially similar reasons, the court concludes that the provision does not create a disparate burden for purposes of plaintiffs' Voting Rights Act claims. Again, plaintiffs' evidence is entirely anecdotal and mainly establishes only that African Americans and Latinos would prefer to use straight-ticket voting. The elimination of straight-ticket voting applies to all voters, regardless of race. Plaintiffs have failed to prove that this provision gives minorities less opportunity to vote than other voters.

The court concludes that the challenged provisions governing election observers and straight-ticket voting do not disparately burden African Americans or Latinos.

### e. The IDPP

[135]As explained above, the IDPP imposes a discriminatory burden on racial minority groups, meaning that their members have less opportunity than others do to participate in the political process. Plaintiffs have made a more than ample showing on this element.

The court concludes that the IDPP disparately burdens African Americans and Latinos.

### 2. Caused by or linked to social and historical conditions

[136]The second step in analyzing a claim under the Voting Rights Act is to consider whether a discriminatory burden is "in part ... caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Frank*, 768 F.3d at 755. Having concluded that Wisconsin's durational residency requirement, provisions for in-person absentee voting, and IDPP disparately burden African Americans and Latinos, the court now considers whether those burdens are linked to social and historical conditions of discrimination.

Plaintiffs contend that the court should apply the so-called *Gingles* factors to analyze their Voting Rights Act claims. The Supreme Court has endorsed these factors, at least in the context of vote dilution cases. *See Thornburg v. Gingles*, 478 U.S. 30, 44–45, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). But the Seventh Circuit has found them to be "unhelpful in voter-qualification cases," *Frank*, 768 F.3d at 754, and so the **\*958** court will not organize its analysis by factor. Nevertheless, the Voting Rights Act requires courts to examine "the totality of circumstances," 52 U.S.C. § 10301(b), which essentially comprises the same inquiries that the *Gingles* factors address. Thus, plaintiffs' evidence about Wisconsin's history of discrimination and about the effects of past discrimination that minority groups suffer is relevant to their Voting Rights Act claims.

Wisconsin has a relatively scant history of state-sanctioned discrimination. When Wisconsin became a state in 1848, its constitution did not extend the right to vote to African Americans; they obtained that right after the measure was passed at a statewide election in 1849. But the effect of the election remained in doubt until 1866, when the Wisconsin Supreme Court clarified that African Americans had the right to vote. *See generally Gillespie v. Palmer*, 20 Wis. 544 (1866).

Other statewide policies (or lack thereof) have disparately affected minorities to some degree, even if they were not facially discriminatory. For example, from 1913 to 2006, only municipalities with more than 5,000 residents had to register voters. In other municipalities, voters did not have to register. According to Dr. Burden, the result of this practice was that "98% of blacks and 91% of Latinos lived in municipalities where registration was required. In contrast, only 68% of whites lived in these municipalities." PX037, at 11. Thus, until 2006, minorities in Wisconsin disproportionately faced more impediments to voting than white citizens faced.

Few municipalities outside of Milwaukee provide election-related materials in languages other than English, despite the fact that the GAB makes these forms available for clerks to use, and no other municipality provides ballots in Spanish. *Id.* Given the significant percentages of Spanish-speaking voters in municipalities across the state, *id.*; PX036, at 48, Wisconsin's failure to address the issue is significant.

Plaintiffs' other evidence of historical conditions of discrimination concerns Milwaukee. This makes sense, given that Milwaukee is home to most of the state's minority population. Along with other large cities in the state, Milwaukee is where the disparate burdens that the challenged provisions impose are most prevalent. But under the Voting Rights Act, "units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination." *Frank*, 768 F.3d at 753. Thus, defendants have argued in this case that Milwaukee's history of discrimination, which is technically not the state's own discrimination, cannot give rise to liability under the Voting Rights Act.

Drawing such a rigid distinction for purposes of plaintiffs' Voting Rights Act claims would undermine the purposes of the law. *See Chisom*, 501 U.S. at 403, 111 S.Ct. 2354 ("Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting.... [T]he Act should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." (citations, internal quotation marks, and alterations omitted)). But even assuming that the Voting Rights Act does not impose liability on the state for a municipality's discrimination—a questionable assumption—the act certainly prevents a state from enacting laws that interact with a municipality's history of discrimination to impose disparate burdens. *See Frank*, 768 F.3d at 754 ("We are not saying that, as long as blacks register and vote more frequently than whites, a state is entitled to make changes for the purpose of curtailing black voting. Far from it; that would clearly violate § 2 [of the Voting Rights Act].").

**\*959** Beginning with the in-person absentee provisions, there is evidence that the state legislature passed these laws, at least in part, to specifically address what it perceived to be a problem with larger municipalities, like Milwaukee. Legislators were concerned that these municipalities offered residents more opportunities to vote than smaller municipalities offered. For example, during a floor session in the state senate, proponents of limiting the window for in-person absentee voting specifically referred to nipping Milwaukee and Madison's practices "before too many other cities get on board."

PX022, at 6. Even if the state was not directly responsible for creating the socioeconomic disparities that exist in Milwaukee and other larger cities, the in-person absentee provisions impose burdens *because* of those disparities. For these reasons, the court concludes that evidence of discrimination in Milwaukee is relevant to the causation element of plaintiffs' Voting Rights Act claims.

During the 1960s and 1970s, Milwaukee experienced considerable white flight. Although the city's Common Council passed an open housing law, discriminatory housing practices continued to limit housing choices for African Americans, confining them to the inner city. PX037, at 12. Zoning regulations in the municipalities surrounding Milwaukee further reinforced the segregation. As a result, two-thirds of Wisconsin's African American residents now live in Milwaukee, which remains one of the most segregated cities in the country. *Id.* at 13.

Coupled with segregated housing practices, Milwaukee has also had a difficult history with discrimination in education. In 1976—more than 20 years after *Brown v. Board of Education*—a federal judge concluded that Milwaukee's schools were illegally segregated. *Amos v. Bd. of Sch. Dirs. of Milwaukee*, 408 F.Supp. 765 (E.D.Wis.), *aff'd sub nom.*, *Armstrong v. Brennan*, 539 F.2d 625 (7th Cir.1976), *vacated*, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977). The case settled after going to the Supreme Court. But the results of educational inequality have persisted. In 2015, high school graduation rates in Wisconsin were 66 percent for blacks, 78 percent for Latinos, and 93 percent for whites.[23] PX037, at 16.

Most of the rest of plaintiffs' expert evidence does not link to the disparate burdens that the in-person absentee provisions create. For example, Dr. Burden catalogs other instances of racial disparities in incarceration rates, income, and health. *Id.* at 15-18. Although this evidence is credible, it is only tangentially relevant to plaintiffs' Voting Rights Act claims. Likewise, Dr. Burden's analysis of other *Gingles* factors (i.e., racially polarized voting, race-based appeals in political campaigns, minority members elected to public office) does not bear directly on the disparate burdens that the court has found.

[37]Disparities in housing, education, and employment, have left minority groups condensed into high-density urban areas, which makes them particularly vulnerable to Wisconsin's rules for in-person absentee voting. With only one location for in-person absentee voting, voters must travel farther than they would otherwise have to travel if municipalities could establish more locations. And basic math confirms that one location in a larger

municipality will have to contend with a larger volume of voters than one location in a smaller municipality will have to confront. Lower levels of educational attainment and employment decrease the flexibility that minority *960 populations will have to spend time waiting in line to vote in-person absentee, which makes the reduced hours problematic as well. The court therefore finds that the burdens that Wisconsin's in-person absentee provisions impose are linked to historical conditions of discrimination. These provisions are invalid under the Voting Rights Act.

[38]As for durational residency, African Americans and Latinos will have to deal with this requirement more often than white voters will because they move more often. These populations are also more likely to lack access to transportation, meaning that if they do not satisfy the durational residency requirement, they will be less able to travel back to vote in their former municipalities. But plaintiffs have not persuasively explained how these burdens are linked to the historical conditions of discrimination described above. "Section 2(a) forbids discrimination by 'race or color' but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters." *Frank*, 768 F.3d at 753. The court therefore finds that the burdens that Wisconsin's durational residency requirement imposes are not linked the historical conditions of discrimination. These provisions do not violate the Voting Rights Act.

[39]Finally, based on the evidence adduced at trial, the court cannot conclude that the burdens that the IDPP imposes are linked to historical conditions of discrimination in Wisconsin. Most of the problems that petitioners have had with getting through the IDPP relate to their inability to provide vital records to the DMV or to CAFU. But those failures tend to result from historical conditions of discrimination in the petitioner's home state or country. Under *Frank*, it is not clear that the Voting Rights Act authorizes the court to hold Wisconsin accountable for these conditions. *See* 768 F.3d at 753 ("The judge did not conclude that the state of Wisconsin has discriminated in any of these respects. That's important, because units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination."). It would be up to the Seventh Circuit, not this court, to clarify the scope of the inquiry under § 2.

Plaintiffs contend that this is an excessively narrow reading of the Voting Rights Act, because it would allow Wisconsin to ignore rank discrimination by other states. They may be right, but the result appears to follow from

*Frank*. Because the IDPP is manifestly unconstitutional under the *Anderson–Burdick* framework, the court will invalidate the IDPP regardless of its status under the Voting Rights Act.

## G. Fourteenth Amendment claims for disparate treatment of voters

Plaintiffs initially challenged three of the provisions at issue under the Fourteenth Amendment, alleging that the legislature lacked a rational basis for: (1) implementing a 28-day durational residency requirement; (2) eliminating straight-ticket voting; and (3) excluding technical college, out-of-state, and other expired IDs as qualifying forms of voter ID. Dkt. 19, ¶¶ 164-69. The court dismissed the claims concerning Wisconsin's durational residency requirement and straight-ticket voting. Dkt. 66, at 5-9. At summary judgment, plaintiffs dropped their challenge to excluding technical college IDs, and the court granted summary judgment to defendants on most of the rest of plaintiffs' remaining rational basis claim. Dkt. 185, at 20-24. The court denied defendants' motion for summary judgment with regard to plaintiffs' challenge that the state lacked a rational basis for excluding expired college or university IDs from the list of qualifying forms of voter ID.

*961 In their post-trial brief, plaintiffs purport to "continue to challenge the rational basis of excluding three forms of ID: 1) out-of-state driver's licenses, 2) driving receipts issued under Wis. Stat. § 343.11, and 3) state ID card receipts." Dkt. 207, at 128. Plaintiffs are free to pursue these issues on appeal, but the court has already entered summary judgment for defendants on these aspects of plaintiffs' rational basis claims.

Plaintiffs also note that at summary judgment, the court "ruled that excluding expired college or university IDs lacked a rational basis." *Id.* at 128 n.32. That is incorrect. In denying defendants' motion, the court did not affirmatively conclude that the state lacked a rational basis for excluding expired college or university IDs. As the pertinent section of the summary judgment opinion stated: "[a]t this point, defendants have failed to identify a rational basis for the legislature's decision to exclude expired student IDs. The court will deny this aspect of defendants' motion for summary judgment." Dkt. 185, at 24. The court essentially concluded that defendants' proffered justifications for excluding expired student IDs were insufficient, and that defendants would have to do better at trial if they wanted to overcome plaintiffs' rational basis challenge.

Ultimately, plaintiffs' misreading of the summary judgment decision is immaterial because rational basis review focuses on the state's justification for its actions, rather than on plaintiffs' disagreement with those actions. "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The court will uphold the state's decision to exclude expired college or university IDs if defendants identify "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320, 113 S.Ct. 2637. Defendants did not need to produce evidence at trial to support the rationality of the state's decision, nor are they limited to the justifications that the legislature had in mind at the time that it passed the challenged provisions—any rational justification for the laws will overcome an equal protection challenge. *Id.* at 320–21, 113 S.Ct. 2637.

The state's approach to college and university IDs is somewhat inconsistent. The state purports to have given students the flexibility and convenience to choose how to verify their identities at the polls. In addition to the other forms of acceptable ID that are available to citizens generally, students have the unique option of using the IDs that they receive from their schools. But that option is not as convenient as it appears. College or university IDs are acceptable only if they expire within two years after issuance. Wis. Stat. § 5.02(6m)(f). The standard ID that the University of Wisconsin-Madison—the state's flagship university—issues does not comply with this requirement. Tr. 1p, at 173:2-174:18; Tr. 3a, at 44:13-21. Instead, UW-Madison offers a second, voting-specific ID to its students who want to use university-issued IDs to vote. Tr. 3a, at 45:15-46:19. Thus, in practice, the option to use a college or university ID does not provide much flexibility or convenience.

The state has also taken considerable pains to limit the use of college or university IDs to current students only. The three requirements in Wis. Stat. § 5.02(6m)(f) are redundant: (1) the ID card itself must be unexpired; (2) the card must have an expiration date that is no more than two years after its date of issuance; and (3) the voter must present proof of current enrollment. If each of these requirements provided some additional level of protection against former students using their IDs to *962 vote, then those requirements might be rational. But as it stands, defendants have not explained why any requirement beyond proof of current enrollment is necessary to protect against fraudulent voting with a college or university ID. Nevertheless, plaintiffs' rational basis claim challenges

only the requirement that the ID card be unexpired when a voter presents it at the polls.

Defendants argue that it is rational to require voters to present unexpired college and university IDs because voters can use these IDs only in conjunction with proof of enrollment. *See* Wis. Stat. § 5.02(6m)(f). According to defendants, the state reasonably has presumed that anyone with an expired ID is probably no longer enrolled at the issuing college or university. Thus, it makes no sense to allow a voter to use an expired college or university ID because that voter will not be able to also provide proof of enrollment. This is a circular argument. Worse, it is the exact argument that defendants presented at summary judgment. The court concluded that this argument was not persuasive for two reasons:

> First, defendants apparently make no room for the possibility that a student could be enrolled at an institution but have an expired student ID. If incoming freshmen at four-year universities receive student IDs that expire two years after issuance, then any junior or senior who fails to obtain a new student ID would have to find a different way to prove his or her identity. Second, unlike receipts for driver licenses and ID cards, expired student IDs are not later replaced with entirely different documents. Defendants therefore cannot rely on the same arguments about simplifying elections by eliminating unnecessary duplicative forms of ID.

Dkt. 185, at 24. Repetition has not made defendants' argument any more persuasive.

At a macro level, the state's concern with ensuring that only current students vote with student IDs may be rational. But Wis. Stat. § 5.02(6m)(f) adequately addresses that concern by requiring a voter to present proof of enrollment with the student ID. Adding the requirement that a voter's college or university ID be unexpired does not provide any additional protection against fraudulent voting. If anything, this measure prevents otherwise qualified voters from voting simply because they have not renewed their IDs since beginning

school. Thus, even under an exceedingly deferential rational basis review, the state has failed to justify its disparate treatment of voters with expired IDs. The court concludes that requiring unexpired college or university IDs violates the Fourteenth Amendment.

To be clear, the court is not concluding that voters have carte blanche to use expired college or university IDs at the polls; they must still comply with the other requirements of Wis. Stat. § 5.02(6m)(f). Plaintiffs have not directed their rational basis challenge to the requirement that a voter with a college or university ID also present proof of enrollment at the issuing institution. Nor have plaintiffs challenged the rational basis for permitting only IDs that expire no more than two years after issuance.[24] These requirements still apply. The only thing that will change is that the ID card that a college or university student actually presents at the polls can be expired.

### *963 CONCLUSION AND REMEDIES

The court has identified several constitutional and statutory violations, and the court will grant declaratory and injunctive relief accordingly.

For the challenged provisions relating to in-person absentee voting, Wisconsin's statutes establishing a one-location rule, Wis. Stat. § 6.855–.86, violate the First and Fourteenth Amendments and § 2 of the Voting Rights Act. Likewise, the sections of Act 146 amending Wis. Stat. §§ 6.86(1)(b) to limit the days and times for in-person absentee voting violate the Fifteenth Amendment. These provisions, along with the sections of Act 23 that limit the hours for in-person absentee voting, also violate § 2 of the Voting Rights Act and the First and Fourteenth Amendments, except with regard to preventing municipal clerks from holding hours for in-person absentee voting on the Monday before an election.

For the challenged provisions relating to registering to vote, the sections of Act 23 amending Wis. Stat. § 6.34(3)(a)7. to require dorm lists to include proof of a student's citizenship violate the First and Fourteenth Amendments. Likewise, the sections of Act 23 amending Wis. Stat. §§ 6.02, .10(3), and .15 to increase the durational residency requirement from 10 days to 28 days violate the First and Fourteenth Amendments.

For the challenged provisions relating to election procedures, the sections of Act 75 amending Wis. Stat § 6.87(3)(d) to prohibit municipal clerks from emailing or faxing absentee ballots to voters violate the First and Fourteenth Amendments.

For the challenged provisions relating to voter ID, the statutes and administrative rules that create and govern the IDPP that voters can use to obtain free IDs for purposes of voting violate the First and Fourteenth Amendments.

Plaintiffs seek a permanent injunction. Dkt. 207, at 244. They must therefore demonstrate that: (1) they have succeeded on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm that Wisconsin will suffer if the injunction is granted; and (5) the injunction will not harm the public interest. *Old Republic Ins. Co. v. Emp'rs Reinsurance Corp.*, 144 F.3d 1077, 1081 (7th Cir.1998). Based on the court's conclusion that several of the challenged provisions violate the Constitution or the Voting Rights Act, or both, the court finds that plaintiffs have made the requisite showing and injunctive relief is appropriate. With the exception of the IDPP, the court will permanently enjoin defendants from enforcing the invalid provisions.

The IDPP does not require wholesale invalidation. As described in the introduction to this opinion, another federal court has already issued a preliminary injunction against enforcing the IDPP. That injunction imposes an affidavit-based solution, essentially allowing voters to sign a form instead of presenting an ID at the polls. Plaintiffs have not asked for that type of relief here, and the court will not grant it. Nothing would prevent the state from complying with both Judge Adelman's injunction and the one that this court will impose.

This court will require that the IDPP be reformed to satisfy two criteria. First, Wisconsin cannot make it unreasonably difficult for voters to obtain a free ID. Once a petitioner has submitted materials sufficient to initiate the IDPP, the DMV must promptly issue a credential valid for voting, unless readily available information shows that the petitioner is not a qualified elector entitled to such a credential. Second, *964 the state must inform the general public that those who enter the IDPP will promptly receive a credential valid for voting, unless readily available information shows that the petitioner is not a qualified elector entitled to such a credential.

For further clarification: the credentials issued under this

One Wisconsin Institute, Inc. v. Thomsen, 198 F.Supp.3d 896 (2016)

procedure need not be valid for any purpose other than voting; the court is not ordering the state to issue Wisconsin IDs to all those who enter the IDPP. But the credentials issued are not temporary: petitioners and the public must be informed that these credentials have a term equivalent to that of a driver license or Wisconsin ID, and that they will be valid for voting until they expire or are revoked for good cause. Good cause is shown if the petitioner is not a qualified elector; the failure to provide additional information or communication to the DMV is not good cause. The receipts issued under the most recent Emergency Rule would meet these requirements, with the exception of the currently stated term of expiration.

ORDER

IT IS ORDERED that:

1. The IDPP as implemented is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

2. 2013 Wis. Act 146 is unconstitutional under the Fifteenth Amendment to the United States Constitution;

3. The restriction limiting municipalities to one location for in-person absentee voting is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

4. The state-imposed limits on the time for in-person absentee voting, with the exception of the prohibition applicable to the Monday before election day, are unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

5. The requirement that "dorm lists" to be used as proof of residence include citizenship information is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

6. The increase of the durational residency requirement from 10 days to 28 days is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

7. The prohibition on distributing absentee ballots by fax or email is unconstitutional under the First and Fourteenth Amendments to the United States

Constitution;

8. The prohibition on using expired, but otherwise qualifying, student IDs is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

9. Plaintiffs' request for a permanent injunction is GRANTED, and defendants are permanently enjoined from enforcing any of the provisions held unlawful in sections 1 through 8 of this ORDER;

10. Defendants, and their officers, agents, servants, employees, attorneys, and all those acting in active concert or participation with them, or having actual or implicit knowledge of this order, are further ORDERED to:

a. Promptly issue a credential valid as a voting ID to any person who enters the IDPP or who has a petition pending;

b. Provide that any such credential has a term of expiration equivalent to that of a Wisconsin driver license or photo ID and will not be cancelled without cause;

*965 c. Inform the general public that credentials valid for voting will be issued to persons who enter the IDPP;

d. Further reform the IDPP so that qualified electors will receive a credential valid for voting without undue burden, consistent with this opinion;

11. Provisions 10.a. through 10.d. are to be effectuated within 30 days so that they will be in place and available for voters well before the November 8, 2016, election.

12. The court retains jurisdiction to oversee compliance with the injunction;

13. The court intends this ruling to be immediately appealable; for the avoidance of doubt, the court grants permission to any party to file an interlocutory appeal if this order is not final for appeal purposes.

All Citations

198 F.Supp.3d 896

Footnotes

1       "Mrs. Smith" is not her real name, which I withhold to protect her privacy. The record of her interaction with the DMV is PX421.

2       Corroboration allows a registered voter to sign a statement verifying the residence of another person, which allows that person to register to vote.

3       Citations to trial transcripts are by day, session, page, and line. Thus, "Tr. 5p, at 145:12-17" refers to the transcript from the fifth day of trial, afternoon session, page 145, lines 12 through 17.

4       The court will analyze the IDPP under these legal theories later in this opinion.

5       Full investigation by CAFU commonly involved acquiring a CLEAR background report. These reports contained a substantial amount of deeply personal information, including any criminal records, judgments and liens, residence history, home and vehicle ownership history, and a list of possible relatives and associates. The DMV witnesses testified that the DMV never used CLEAR reports to the disadvantage of petitioners. But even assuming that CLEAR reports were acquired only to connect petitioners to vital records, the court finds that having DMV personnel acquire and review a compilation of personal information imposes a substantial burden on the right to vote.

6       The DMV's code for "customer initiated cancel" covers a wide range of results. For example, petitions received this code when the petitioner died while the petition was pending. Petitions also received this code if a petitioner simply gave up or if he or she found a birth certificate and applied for a standard state-issued ID.

7       Nine of the petitioners who received denial letters were able to track down vital records on their own and receive free IDs without using the IDPP. See Dkt. 207, at 69 (discussing examples). The DMV re-coded these denials to "customer-initiated cancellations."

8       At trial, DMV witnesses testified that the new emergency rule codified current practice. Tr. 8p, at 190:7-193:7. This testimony was not credible. The testimony of CAFU employees showed that petitioners were held to a much higher standard than "more likely than not." The court finds that IDPP petitions were decided by a standard that was at least as rigorous as "clear and convincing proof."

9       The court also assumes that the errors corrected by Eckhardt are distributed evenly across racial groups. Nothing in Eckhardt's description of the errors that he found suggested that they would correlate with race.

10      At trial, defendants disputed Albaugh's interpretation and evaluation of the meeting, and they also objected to his testimony on hearsay grounds. The court overrules the hearsay objection because Lazich's out-of-court statements were not offered for their truth. The point was not that the voter ID law would actually help Republicans in future elections. The point was that Lazich thought they would, and that was part of her motive for encouraging support for the voter ID law. Defendants offered no evidence to dispute the accuracy of Albaugh's recounting of what was said at the meeting.

11      Dr. Lichtman points out that in 2015, during consideration of a bill to require photo IDs for the Food Share program, the Wisconsin Assembly rejected an amendment that would have allowed Food Share IDs to be used for voting. PX036, at 36-37. According to Dr. Lichtman, if the legislature were sincerely interested in election integrity, it would accept Food Share IDs for voting because they are every bit as secure as Wisconsin IDs. The refusal to accept Food Share IDs is, therefore, evidence of discriminatory intent. The argument would be persuasive, if it were contemporaneous with Act 23, the voter ID law. The force of the argument is also blunted because the Food Share ID bill has not been enacted.

12      Plaintiffs have adduced evidence that might suggest personal bias on Grothman's part. PX078 (statements about Martin Luther King, Jr. Day); PX073 (about Milwaukee voters who would not be able to vote on weekends: "[A]nybody who can't vote with all these options, they've really got a problem. I really don't think they care that much about voting in the first place, right?"). The court does not ascribe Grothman's personal antagonism toward minority voters to the legislature.

13      The court has reviewed the Fourth Circuit's decision invalidating North Carolina's voter ID law on the grounds that it was motivated by an intent to discriminate on the basis of race. The decision relies on factual considerations unique to North

One Wisconsin Institute, Inc. v. Thomsen, 198 F.Supp.3d 896 (2016)

14   Plaintiffs also contend that Wisconsin's registration requirements have effectively put an end to voter registration drives. As explained above, the court's primary task under *Anderson–Burdick* is to evaluate the burden that a given provision places on *voters*. "[T]here is nothing 'inherently expressive' about receiving a person's completed application and being charged with getting that application to the proper place," *Voting for Am., Inc.*, 732 F.3d at 392 (citations omitted), which means that the First Amendment would not protect a group's mere desire to register voters. Plaintiffs' evidence regarding voter registration drives is mostly tangential to the main issues in this case.

15   *Frank* and *Crawford* dealt with the requirement of presenting ID at the polls on election day. Presenting documentary proof of residence is the functional equivalent of a photo ID for the registration side of elections.

16   A dorm list is "a certified and current list of students who reside in housing sponsored by the university, college, or technical college." Wis. Stat. § 6.34(3)(a)7.b.

17   FERPA permits colleges and universities to release only "directory information" without parental consent. This information includes "the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student." 20 U.S.C. § 1232g(a)(5)(A).

18   Defendants also argue that students have other options for proving residence. But that is not a justification for the law; as explained above, it is a reason for concluding that the law imposes only slight burdens on student voters.

19   The court notes that for this issue, the parties have switched sides on the importance of local control. Plaintiffs—for whom local control was so important in the context of in-person absentee voting—now appear to want statewide control, and defendants—for whom uniformity was so important in the context of in-person absentee voting—now argue that local control is vital.

20   The municipal clerk could not remember if it was the 2010 or 2012 election. But the ordinance went into effect in July 2012. *See* Madison, Wis., Code of Ordinances, § 32.06(5).

21   Defendants offered anecdotal evidence that not very many voters fall into the window between 10 and 28 days. *See, e.g.*, Tr. 7a, at 122:4-10, 172:22-173:6. But this evidence, too, is inconclusive.

22   Before 2011, the statute was permissive, not mandatory.

23   Although these are statewide statistics, the problem is likely just as prevalent in Milwaukee.

24   Without the requirement that a voter present an unexpired college or university ID, it seems unnecessary to regulate the ID's expiration date. But that is outside the scope of plaintiffs' challenge, and so the court will leave it to the state to determine whether this provision is still necessary.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# DEFENDANTS' EX. 3

# State of Wisconsin



**2015 Assembly Bill 388**

Date of enactment: **December 16, 2015**
Date of publication*: **December 17, 2015**

# 2015 WISCONSIN ACT 118

### (Vetoed in Part)

AN ACT *to repeal* 5.05 (1m), 5.05 (2m) (c) 3., 5.05 (2m) (c) 8., 5.05 (2m) (g), 5.05 (2s), 5.05 (5s) (f) 1., 5.05 (5s) (f) 2. a., 5.05 (5s) (f) 2. b., 5.052, 5.054, 5.09, 5.68 (3m), 13.62 (4), 15.04 (2), 15.07 (1) (a) 2., 15.07 (2) (b), 15.07 (5) (m), 15.60 (title), 15.60 (2), 15.60 (3), 15.60 (5), 15.60 (7), 15.603 (title), 15.603 (1) (title), 15.603 (2) (title), 15.607, 19.42 (3), 20.511 (intro.) and (1) (title), 20.923 (4) (f) 3j., 230.08 (2) (e) 4h., 230.08 (2) (on) and 758.19 (9); *to renumber* 5.05 (2m) (c) 2. b., 15.60 (6), 20.511 (1) (bm), 20.511 (1) (c), 20.511 (1) (d), 20.511 (1) (im), 20.511 (1) (t) and 20.511 (1) (x); *to renumber and amend* 5.02 (1s), 5.05 (2), 5.05 (5s) (f) 2. c., 5.05 (6a), 12.01, 15.06 (2), 15.60 (1), 15.60 (4), 15.60 (8), 15.603 (1), 15.603 (2), 19.47, 19.851, 20.511 (1) (a), 20.511 (1) (be), 20.511 (1) (g), 20.511 (1) (h), 20.511 (1) (i), 20.511 (1) (j), 20.511 (1) (jm) and 20.511 (1) (m); *to amend* 5.01 (4) (a), 5.05 (title), 5.05 (1) (intro.), 5.05 (1) (b), 5.05 (1) (c), 5.05 (1) (d), 5.05 (1) (e), 5.05 (1) (f), 5.05 (1e), 5.05 (2m) (a), 5.05 (2m) (c) 2. a., 5.05 (2m) (c) 4., 5.05 (2m) (c) 5. (intro.), 5.05 (2m) (c) 6. a., 5.05 (2m) (c) 12., 5.05 (2m) (c) 13., 5.05 (2m) (c) 14., 5.05 (2m) (d) 1., 5.05 (2m) (h), 5.05 (2m) (i), 5.05 (2w), 5.05 (3g), 5.05 (5e), 5.05 (5s) (intro.), 5.05 (5s) (b), 5.05 (5s) (bm), 5.05 (5s) (d), 5.05 (9), 5.05 (10), 5.05 (11), 5.055, 5.056, 5.07, 5.08, 5.40 (7), 5.58 (2), 5.58 (2m), 5.60 (1) (b), 5.62 (4) (b), 5.93, 6.26 (3), 6.275 (1) (f), 6.275 (2), 6.33 (5) (a), 6.36 (1) (b) 1. a., 6.36 (1) (bm), 6.36 (2) (a), 6.50 (2g), 6.50 (7), 6.56 (3), 6.95, 6.96, 6.97 (1), 7.03 (1) (a), 7.03 (1) (b), 7.03 (2), 7.08 (title), 7.08 (1) (a), 7.08 (4), 7.15 (1) (g), 7.41 (5), 7.52 (1) (a), 7.60 (4) (a), 7.60 (5), 7.70 (3) (b), 7.70 (3) (i), 7.70 (5) (a), 8.05 (1) (j) 3., 8.10 (5), 8.10 (6) (a), 8.15 (4) (b), 8.17 (9) (a), 8.20 (6), 8.20 (7), 8.30 (2m), 8.50 (1) (a), 8.50 (3) (a), 8.50 (3) (e), 9.01 (1) (a) 1., 9.01 (1) (a) 4., 9.01 (1) (ar) 4., 9.01 (1) (ar) 3., 9.01 (5) (a), 9.01 (5) (bm), 9.01 (5) (c), 9.01 (6) (a), 9.01 (7) (a), 9.01 (8) (a), 9.01 (8) (c), 9.01 (8) (d), 9.01 (10), 10.06 (1) (title), 11.09, 11.21 (title), 11.21 (7) (intro.), 11.30 (2) (fm), 11.60 (4), 11.61 (2), 12.13 (5) (a), 13.123 (3) (b) 2., 13.23, 13.63 (1) (a), 13.685, 14.38 (10m), 15.01 (2), 15.04 (1) (d), 15.06 (5), 15.06 (6), 15.07 (1) (cm), 15.07 (4), 16.753 (2), 16.79 (2), 16.96 (3) (b), 16.973 (6), 17.17 (1), 17.17 (4), 19.43 (4), 19.43 (5), 19.46 (1) (intro.), 19.48 (intro.), 19.48 (1), 19.48 (2), 19.48 (3), 19.48 (7), 19.48 (9), 19.55 (1), 19.55 (2) (c), 19.59 (1) (g) 8., 19.85 (1) (h), 19.851 (title), 20.505 (1) (d), 20.930, 20.9305 (2) (e) (intro.), 38.16 (3) (br) 3., 45.44 (1) (b), 49.165 (4) (a), 59.605 (3) (a) 3., 67.05 (3) (b), 67.05 (6), 73.0301 (1) (d) 13., 73.0301 (1) (e), 85.61 (1), 108.227 (1) (e) 13., 108.227 (1) (f), 117.20 (2), 117.27 (2) (b) (intro.), 121.91 (3) (c), 125.05 (1) (b) 10., 165.25 (1), 165.93 (4) (a), 198.08 (10), 200.09 (11) (am) 2., 200.09 (11) (am) 3., 227.03 (6), 227.52 (6), 230.08 (4) (a), 234.02 (3m) (c), 301.03 (20m), 343.11 (2m), 756.04 (2) (c) 1., 778.135, 978.05 (1) and 978.05 (2); and *to create* 5.05 (2m) (k), 5.05 (2q), 5.05 (3d), 5.05 (5s) (am), 5.05 (5t), 5.05 (6a) (a) 3., 5.05 (6a) (b) 2., 5.05 (6a) (b) 3., 5.05 (6a) (c) 1., 5.05 (6) (6), 5.05 (16), 5.05 (17), 11.01 (4m), 12.01 (2), 13.62 (5m), 15.06 (1) (d), 15.06 (1) (e), 15.06 (2) (b), 15.06 (3) (a) 5., 15.06 (3) (a) 6., 15.06 (10), 15.61 (title), 15.61 (1) (b) 1. to 6., 15.61 (1) (b) 2., 15.61 (1m), 15.61 (5), 15.62, 19.42 (4p), 19.42 (10) (a), 19.46 (2), 19.47 (title), 19.47 (1), (2) and (4) to (10), 19.49, 19.50, 19.55 (3), 19.55 (4), 19.552, 19.554, 19.58 (4), 20.510 (intro.) and (1) (title), 20.510 (1) (br), 20.521 (intro.)

---

* Section 991.11, WISCONSIN STATUTES: Effective date of acts. "Every act and every portion of an act enacted by the legislature over the governor's partial veto which does not expressly prescribe the time when it takes effect shall take effect on the day after its date of publication."



DEFENDANT'S EXHIBIT

3

3-31-20  CG

PENGAD 800-631-6989

and (1), 230.08 (2) (eL) and 230.08 (2) (et) of the statutes; **relating to:** reorganizing the Government Accountability Board, requiring the exercise of rule–making authority, and making appropriations.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

SECTION 1. 5.01 (4) (a) of the statutes is amended to read:

5.01 **(4)** (a)  If 2 or more candidates for the same office receive the greatest, but an equal number of votes, the winner shall be chosen by lot in the presence of the board of canvassers charged with the responsibility to determine the election, or in the case of an election for state or national office or metropolitan sewerage commissioner, if the commissioner is elected under s. 200.09 (11) (am), in the presence of the chairperson of the ~~board~~ elections commission or the chairperson's designee.

SECTION 2. 5.02 (1s) of the statutes is renumbered 5.025 and amended to read:

**5.025 Elections commission; definition.** ~~"Board~~ In chs. 5 to 10 and 12, "commission" means the ~~government accountability board~~ elections commission.

SECTION 3. 5.05 (title) of the statutes is amended to read:

**5.05** (title)  ~~Government accountability board~~ **Elections commission; powers and duties.**

SECTION 4. 5.05 (1) (intro.) of the statutes is amended to read:

5.05 **(1)** GENERAL AUTHORITY. (intro.)  The ~~government accountability board~~ elections commission shall have the responsibility for the administration of chs. 5 to ~~12,~~ 10 and 12 and other laws relating to elections and election campaigns, ~~subch. III of ch. 13, and subch. III of ch. 19,~~ other than laws relating to campaign financing. Pursuant to such responsibility, the ~~board~~ commission may:

SECTION 5. 5.05 (1) (b) of the statutes is amended to read:

5.05 **(1)** (b)  In the discharge of its duties and after providing notice to any party who is the subject of an investigation, subpoena and bring before it any person and require the production of any papers, books, or other records relevant to an investigation. Notwithstanding s. 885.01 (4), the issuance of a subpoena requires action by the ~~board~~ commission at a meeting of the ~~board~~ commission. ~~A circuit court may by order permit the inspection and copying of the accounts and the depositor's and loan records at any financial institution, as defined in s. 705.01 (3), doing business in the state to obtain evidence of any violation of ch. 11 upon showing by the board of probable cause to believe there is a violation and that such accounts and records may have a substantial relation to the violation.~~ In the discharge of its duties, the ~~board~~ commission may cause the deposition of witnesses to be taken in the manner prescribed for taking depositions in civil actions in circuit court.

SECTION 6. 5.05 (1) (c) of the statutes is amended to read:

5.05 **(1)** (c)  Bring civil actions to require a forfeiture for any violation of chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19 or a license revocation for any violation of subch. III of ch. 13 for which the offender is subject to a revocation.~~ The ~~board~~ commission may compromise and settle any civil action or potential action brought or authorized to be brought by it which, in the opinion of the ~~board~~ commission, constitutes a minor violation, a violation caused by excusable neglect, or which for other good cause shown, should not in the public interest be prosecuted under such chapter. Notwithstanding s. 778.06, a civil action or proposed civil action authorized under this paragraph may be settled for such sum as may be agreed between the parties. Any settlement made by the ~~board~~ commission shall be in such amount as to deprive the alleged violator of any benefit of his or her wrongdoing and may contain a penal component to serve as a deterrent to future violations. In settling civil actions or proposed civil actions, the ~~board~~ commission shall treat comparable situations in a comparable manner and shall assure that any settlement bears a reasonable relationship to the severity of the offense or alleged offense. Except as otherwise provided in sub. (2m) (c) 15. and 16. and ss. 5.08, and 5.081, ~~and 19.59 (8),~~ forfeiture ~~and license revocation~~ actions brought by the ~~board~~ commission shall be brought in the circuit court for the county where the defendant resides, or if the defendant is a nonresident of this state, in circuit court for the county wherein the violation is alleged to occur. For purposes of this paragraph, a person other than ~~a natural person~~ an individual resides within a county if the person's principal place of operation is located within that county. Whenever the ~~board~~ commission enters into a settlement agreement with an individual who is accused of a civil violation of chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~ or who is investigated by the ~~board~~ commission for a possible civil violation of one of those provisions, the ~~board~~ commission shall reduce the agreement to writing, together with a statement of the ~~board's~~ commission's findings and reasons for entering into the agreement and shall retain the agreement and statement in its office for inspection.

SECTION 7. 5.05 (1) (d) of the statutes is amended to read:

5.05 **(1)** (d)  Sue for injunctive relief, a writ of mandamus or prohibition, or other such legal or equitable relief as may be appropriate to enforce any law regulating the conduct of elections or election campaigns, other than laws regulating campaign financing, or ensure its proper administration. No bond is required in such actions.

Actions shall be brought in circuit court for the county where a violation occurs or may occur.

SECTION 8. 5.05 (1) (e) of the statutes is amended to read:

5.05 **(1)** (e) ~~Delegate to its legal counsel the authority to intervene in a civil action or proceeding under sub. (9), issue~~ Issue an order under s. 5.06, exempt a polling place from accessibility requirements under s. 5.25 (4) (a), exempt a municipality from the requirement to use voting machines or an electronic voting system under s. 5.40 (5m), approve an electronic data recording system for maintaining poll lists under s. 6.79, or authorize nonappointment of an individual who is nominated to serve as an election official under s. 7.30 (4) (e)~~, subject to such limitations as the board deems appropriate~~.

SECTION 9. 5.05 (1) (f) of the statutes is amended to read:

5.05 **(1)** (f) Promulgate rules under ch. 227 applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns, other than laws regulating campaign financing, or ensuring their proper administration.

SECTION 10. 5.05 (1e) of the statutes is amended to read:

5.05 **(1e)** Any action by the ~~board~~ commission, except an action relating to procedure of the commission, requires the affirmative vote of at least ~~4~~ two−thirds of the members.

SECTION 11. 5.05 (1m) of the statutes is repealed.

SECTION 12. 5.05 (2) of the statutes is renumbered 19.49 (2g) and amended to read:

19.49 **(2g)** AUDITING. In addition to the facial examination of reports and statements required under s. 11.21 (13), the ~~board~~ commission shall conduct an audit of reports and statements which are required to be filed with it to determine whether violations of ch. 11 have occurred. The ~~board~~ commission may examine records relating to matters required to be treated in such reports and statements. The ~~board~~ commission shall make official note in the file of a candidate, committee, group or individual under ch. 11 of any error or other discrepancy which the ~~board~~ commission discovers and shall inform the person submitting the report or statement.

SECTION 13. 5.05 (2m) (a) of the statutes is amended to read:

5.05 **(2m)** (a) The ~~board~~ commission shall investigate violations of laws administered by the ~~board~~ commission and may prosecute alleged civil violations of those laws, directly or through its agents under this subsection, pursuant to all statutes granting or assigning that authority or responsibility to the ~~board~~ commission. Prosecution of alleged criminal violations investigated by the ~~board~~ commission may be brought only as provided in par. (c) 11., 14., 15., and 16. and s. 978.05 (1). For purposes of this subsection, the commission may only initiate an investigation of an alleged violation of chs. 5 to 10 and 12, other than an offense described under par. (c) 12., based on a sworn complaint filed with the commission, as provided under par. (c). Neither the commission nor any member or employee of the commission, including the commission administrator, may file a sworn complaint for purposes of this subsection.

SECTION 14. 5.05 (2m) (c) 2. a. of the statutes is amended to read:

5.05 **(2m)** (c) 2. a. Any person may file a complaint with the ~~board~~ commission alleging a violation of chs. 5 to 10 or 12~~, subch. III of ch. 13, or subch. III of ch. 19~~. No later than 5 days after receiving a complaint, the commission shall notify each person who or which the complaint alleges committed such a violation. Before voting on whether to take any action regarding the complaint, other than to dismiss, the commission shall give each person receiving a notice under this subd. 2. a. an opportunity to demonstrate to the commission, in writing and within 15 days after receiving the notice, that the commission should take no action against the person on the basis of the complaint. The commission may not conduct any investigation or take any other action under this subsection solely on the basis of a complaint by an unidentified complainant.

am. If the ~~board~~ commission finds, by a preponderance of the evidence, that a complaint is frivolous, the ~~board~~ commission may order the complainant to forfeit not more than the greater of $500 or the expenses incurred by the ~~division~~ commission in investigating the complaint.

SECTION 15. 5.05 (2m) (c) 2. b. of the statutes is renumbered 19.49 (1m).

SECTION 16. 5.05 (2m) (c) 3. of the statutes is repealed.

SECTION 17. 5.05 (2m) (c) 4. of the statutes is amended to read:

5.05 **(2m)** (c) 4. If the ~~board~~ commission reviews a complaint and fails to find that there is a reasonable suspicion that a violation under subd. 2. has occurred or is occurring, the ~~board~~ commission shall dismiss the complaint. If the ~~board~~ commission believes that there is reasonable suspicion that a violation under subd. 2. has occurred or is occurring, the ~~board~~ commission may by resolution authorize the commencement of an investigation. The resolution shall specifically set forth any matter that is authorized to be investigated. To assist in the investigation, the ~~board~~ commission may elect to retain a special investigator. If the ~~board~~ commission elects to retain a special investigator, the administrator of the ~~ethics and accountability division~~ commission shall submit to the ~~board~~ commission the names of 3 qualified individuals to serve as a special investigator. The ~~board~~ commission may retain one or more of the individuals. If the ~~board~~ commission retains a special investigator to investigate a complaint against a person who is a resident of

2015 Wisconsin Act 118  — 4 —  2015 Assembly Bill 388

this state, the ~~board~~ commission shall provide to the district attorney for the county in which the person resides a copy of the complaint and shall notify the district attorney that it has retained a special investigator to investigate the complaint. For purposes of this subdivision, a person other than ~~a natural person~~ an individual resides within a county if the person's principal place of operation is located within that county. The ~~board~~ commission shall enter into a written contract with any individual who is retained as a special investigator setting forth the terms of the engagement. A special investigator who is retained by ~~the board~~ commission may request the ~~board~~ commission to issue a subpoena to a specific person or to authorize the special investigator to request ~~a~~ the circuit court of the county in which the specific person resides to issue a search warrant. The ~~board~~ commission may grant the request by approving a motion to that effect at a meeting of the ~~board~~ commission if the ~~board~~ commission finds that such action is legally appropriate.

**SECTION 18.** 5.05 (2m) (c) 5. (intro.) of the statutes is amended to read:

5.05 **(2m)** (c) 5. (intro.) Each special investigator who is retained by the ~~board~~ commission shall make periodic reports to the ~~board~~ commission, as directed by the ~~board~~ commission, but in no case may the interval for reporting exceed 30 days. If the ~~board~~ commission authorizes the commission administrator ~~of the ethics and accountability division~~ to investigate any matter without retaining a special investigator, the administrator shall make periodic reports to the ~~board~~ commission, as directed by the ~~board~~ commission, but in no case may the reporting interval exceed 30 days. During the pendency of any investigation, the ~~board~~ commission shall meet for the purpose of reviewing the progress of the investigation at least once every 90 days. The special investigator or the administrator shall report in person to the ~~board~~ commission at that meeting concerning the progress of the investigation. If, after receiving a report, the ~~board~~ commission does not vote to continue an investigation for an additional period not exceeding 90 days, the investigation is terminated at the end of the reporting interval. The ~~board~~ commission shall not expend more than ~~$10,000~~ $25,000 to finance the cost of an investigation before receiving a report on the progress of the investigation and a recommendation to commit additional resources. The ~~board~~ commission may vote to terminate an investigation at any time. If an investigation is terminated, any complaint from which the investigation arose is deemed to be dismissed by the ~~board~~ commission. Unless an investigation is terminated by the ~~board~~ commission, at the conclusion of each investigation, the administrator shall present to the ~~board~~ commission one of the following:

**SECTION 19.** 5.05 (2m) (c) 6. a. of the statutes is amended to read:

5.05 **(2m)** (c) 6. a. If the ~~board~~ commission finds that there is probable cause to believe that a violation under

subd. 2. has occurred or is occurring, the ~~board~~ commission may authorize the commission administrator ~~of the ethics and accountability division~~ to file a civil complaint against the alleged violator. In such case, the administrator may request the assistance of special counsel to prosecute any action brought by the ~~board~~ commission. If the administrator requests the assistance of special counsel with respect to any matter, the administrator shall submit to the ~~board~~ commission the names of 3 qualified individuals to serve as special counsel. The ~~board~~ commission may retain one of the individuals to act as special counsel. The staff of the ~~board~~ commission shall provide assistance to the special counsel as may be required by the counsel to carry out his or her responsibilities.

**SECTION 20.** 5.05 (2m) (c) 6. b. of the statutes is amended to read:

5.05 **(2m)** (c) 6. b. The ~~board~~ commission shall enter into a written contract with any individual who is retained as special counsel setting forth the terms of the engagement. The contract shall set forth the compensation to be paid such counsel by the state. The contract shall be executed on behalf of the state by the ~~board's legal counsel, who~~ commission and the commission shall file the contract in the office of the secretary of state. The compensation shall be charged to the appropriation under s. ~~20.505 (1) (d)~~ 20.510 (1) (br).

**SECTION 21.** 5.05 (2m) (c) 8. of the statutes is repealed.

**SECTION 22.** 5.05 (2m) (c) 12. of the statutes is amended to read:

5.05 **(2m)** (c) 12. The ~~board may~~ commission shall, by rule, prescribe categories of civil offenses which the ~~board~~ commission will agree to compromise and settle without a formal investigation upon payment of specified amounts by the alleged offender. The ~~board~~ commission may authorize the commission administrator ~~of the ethics and accountability division~~ to compromise and settle such alleged offenses in the name of the ~~board~~ commission if the alleged offenses by an offender, in the aggregate, do not involve payment of more than ~~$1,000~~ $2,500.

**SECTION 23.** 5.05 (2m) (c) 13. of the statutes is amended to read:

5.05 **(2m)** (c) 13. If a special investigator or the commission administrator ~~of the ethics and accountability division~~, in the course of an investigation authorized by the ~~board~~ commission, discovers evidence that a violation under subd. 2. that was not within the scope of the authorized investigation has occurred or is occurring, the special investigator or the administrator may present that evidence to the ~~board~~ commission. If the ~~board~~ commission finds that there is a reasonable suspicion that a violation under subd. 2. that is not within the scope of the authorized investigation has occurred or is occurring, the ~~board~~ commission may authorize the special investigator or the administrator to investigate the alleged violation or

**2015 Assembly Bill 388**    – 5 –    **2015 Wisconsin Act 118**

may elect to authorize a separate investigation of the alleged violation as provided in subd. 4.

SECTION 24. 5.05 (2m) (c) 14. of the statutes is amended to read:

5.05 **(2m)** (c) 14. If a special investigator or the commission administrator of the ethics and accountability division of the board, in the course of an investigation authorized by the board commission, discovers evidence of a potential violation of a law that is not administered by the board commission arising from or in relation to the official functions of the subject of the investigation or any matter that involves elections, ethics, or lobbying regulation, the special investigator or the administrator may present that evidence to the board commission. The board commission may thereupon refer the matter to the appropriate district attorney specified in subd. 11. or may refer the matter to the attorney general. The attorney general may then commence a civil or criminal prosecution relating to the matter.

SECTION 25. 5.05 (2m) (d) 1. of the statutes is amended to read:

5.05 **(2m)** (d) 1. No individual who serves as the legal counsel to the board or as a division commission administrator for the board may have been a lobbyist, as defined in s. 13.62 (11). No such individual may have served in a partisan state or local office.

SECTION 26. 5.05 (2m) (g) of the statutes is repealed.

SECTION 27. 5.05 (2m) (h) of the statutes is amended to read:

5.05 **(2m)** (h) If the defendant in an action for a civil violation of chs. 5 to 10 or 12, subch. III of ch. 13, or subch. III of ch. 19 is a district attorney or a circuit judge or a candidate for either such office, the action shall be brought by the board commission. If the defendant in an action for a civil violation of chs. 5 to 10 or 12, subch. III of ch. 13, or subch. III of ch. 19 is the attorney general or a candidate for that office, the board commission may appoint special counsel to bring suit on behalf of the state.

SECTION 28. 5.05 (2m) (i) of the statutes is amended to read:

5.05 **(2m)** (i) If the defendant in an action for a criminal violation of chs. 5 to 10 or 12, subch. III of ch. 13, or subch. III of ch. 19 is a district attorney or a circuit judge or a candidate for either such office, the action shall be brought by the attorney general. If the defendant in an action for a criminal violation of chs. 5 to 10 or 12, subch. III of ch. 13, or subch. III of ch. 19 is the attorney general or a candidate for that office, the board commission may appoint a special prosecutor to conduct the prosecution on behalf of the state.

SECTION 29. 5.05 (2m) (k) of the statutes is created to read:

5.05 **(2m)** (k) The commission's power to initiate civil actions under this subsection for the enforcement of chs. 5 to 10 or 12 shall be the exclusive remedy for alleged civil violations of chs. 5 to 10 or 12.

SECTION 30. 5.05 (2q) of the statutes is created to read:

5.05 **(2q)** SUPPLEMENTAL FUNDING FOR ONGOING INVESTIGATIONS. The commission may request supplemental funds to be credited to the appropriation account under s. 20.510 (1) (be) for the purpose of continuing an ongoing investigation initiated under sub. (2m). A request under this subsection shall be filed with the secretary of administration and the cochairpersons of the joint committee on finance in writing and shall contain a statement of the action requested, the purposes therefor, the statutory provision authorizing or directing the performance of the action, and information about the nature of the investigation for which the commission seeks supplemental funds, excluding the name of any individual or organization that is the subject of the investigation. If the cochairpersons of the joint committee on finance do not notify the secretary of administration that the committee has scheduled a meeting for the purpose of reviewing the request within 14 working days after the commission filed the request, the secretary shall supplement the appropriation under s. 20.510 (1) (be) from the appropriation under s. 20.505 (1) (d) in an amount not to exceed the amount the commission requested. If, within 14 working days after the commission filed the request, the cochairpersons of the joint committee on finance notify the secretary that the committee has scheduled a meeting for the purpose of reviewing the commission's request under this subsection, the secretary may supplement the appropriation under s. 20.510 (1) (be) only with the committee's approval. The committee and the secretary shall notify the commission of all their actions taken under this subsection.

SECTION 31. 5.05 (2s) of the statutes is repealed.

SECTION 32. 5.05 (2w) of the statutes is amended to read:

5.05 **(2w)** ELECTIONS DIVISION COMMISSION. The elections division commission has the responsibility for the administration of chs. 5 to 10 and 12.

SECTION 33. 5.05 (3d) of the statutes is created to read:

5.05 **(3d)** ADMINISTRATOR. The commission shall appoint an administrator in the manner provided under s. 15.61 (1) (b). The administrator shall be outside the classified service. The administrator shall appoint such other personnel as he or she requires to carry out the duties of the commission and may designate a commission employee to serve as the commission's legal counsel. The administrator shall perform such duties as the commission assigns to him or her in the administration of chs. 5 to 10 and 12.

SECTION 34. 5.05 (3g) of the statutes is amended to read:

5.05 **(3g)** CHIEF ELECTION OFFICER. The board commission administrator shall designate an employee of the board to serve as the chief election officer of this state.

**2015 Wisconsin Act 118**    – 6 –    **2015 Assembly Bill 388**

SECTION 35. 5.05 (5e) of the statutes is amended to read:

5.05 (5e) ~~BIENNIAL~~ ANNUAL REPORT. The ~~board~~ commission shall ~~include in its biennial~~ submit an annual report under s. 15.04 (1) (d) and shall include in its annual report the names and duties of all individuals employed by the ~~board~~ commission and a summary of its determinations and advisory opinions issued under sub. (6a). Except as authorized or required under sub. (5s) (f) ~~2.~~, the ~~board~~ commission shall make sufficient alterations in the summaries to prevent disclosing the identities of individuals or organizations involved in the decisions or opinions. ~~The board may also include in its biennial report any information compiled under s. 11.21 (7)~~ The commission shall identify in its report the statutory duties of the commission administrator, together with a description of the manner in which those duties are being fulfilled. Notwithstanding sub. (5s) and s. 12.13 (5), the commission shall also specify in its report the total number of investigations conducted by the commission since the last annual report and a description of the nature of each investigation. The ~~board~~ commission shall make such further reports on the matters within its jurisdiction and such recommendations for further legislation as it deems desirable.

SECTION 36. 5.05 (5s) (intro.) of the statutes is amended to read:

5.05 (5s) ACCESS TO RECORDS. (intro.) Records obtained or prepared by the ~~board~~ commission in connection with an investigation, including the full text of any complaint received by the ~~board~~ commission, are not subject to the right of inspection and copying under s. 19.35 (1), except as ~~provided in pars. (d) and (e) and except that~~ follows:

SECTION 37. 5.05 (5s) (am) of the statutes is created to read:

5.05 (5s) (am) The commission shall provide to the joint committee on finance records obtained or prepared by the commission in connection with an ongoing investigation when required under sub. (2q).

SECTION 38. 5.05 (5s) (b) of the statutes is amended to read:

5.05 (5s) (b) Investigatory records of the ~~board~~ commission may be made public in the course of a prosecution initiated under chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~.

SECTION 39. 5.05 (5s) (bm) of the statutes, as created by 2015 Wisconsin Act 2, is amended to read:

5.05 (5s) (bm) The ~~board~~ commission shall provide investigatory records to the state auditor and the employees of the legislative audit bureau to the extent necessary for the bureau to carry out its duties under s. 13.94.

SECTION 40. 5.05 (5s) (d) of the statutes is amended to read:

5.05 (5s) (d) If the ~~board~~ commission commences a civil prosecution of a person for an alleged violation of chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~ as the result of an investigation, the person who is the subject of the investigation may authorize the ~~board~~ commission to make available for inspection and copying under s. 19.35 (1) records of the investigation pertaining to that person if the records are available by law to the subject person and the ~~board~~ commission shall then make those records available.

SECTION 40d. 5.05 (5s) (f) 1. of the statutes is repealed.

SECTION 40h. 5.05 (5s) (f) 2. a. of the statutes is repealed.

SECTION 40p. 5.05 (5s) (f) 2. b. of the statutes is repealed.

SECTION 40t. 5.05 (5s) (f) 2. c. of the statutes is renumbered 5.05 (5s) (f) and amended to read:

5.05 (5s) (f) The ~~board~~ commission shall make public formal and informal advisory opinions and records obtained in connection with requests for formal or informal advisory opinions relating to matters under the jurisdiction of the ~~elections division~~ commission, including the identity of individuals requesting such opinions or organizations or governmental bodies on whose behalf they are requested.

SECTION 43. 5.05 (5t) of the statutes is created to read:

5.05 (5t) GUIDANCE FOLLOWING BINDING COURT DECISIONS. Within 2 months following the publication of a decision of a state or federal court that is binding on the commission and this state, the commission shall issue updated guidance or formal advisory opinions, commence the rule−making procedure to revise administrative rules promulgated by the commission, or request an opinion from the attorney general on the applicability of the court decision.

SECTION 44. 5.05 (6a) of the statutes is renumbered 5.05 (6a) (a) 1. and amended to read:

5.05 (6a) (a) 1. Any individual, either personally or on behalf of an organization or governmental body, may make a ~~written or electronic~~ request of the ~~board~~ commission in writing, electronically, or by telephone for ~~an~~ a formal or informal advisory opinion regarding the propriety under chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~ of any matter to which the person is or may become a party~~; and any~~. Any appointing officer, with the consent of a prospective appointee, may request of the ~~board an~~ commission a formal or informal advisory opinion regarding the propriety under chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~ of any matter to which the prospective appointee is or may become a party. The ~~board~~ commission shall review a request for an advisory opinion and may issue a formal or informal written or electronic advisory opinion to the person making the request. Except as authorized or required for opinions specified in sub. (5s) (f) ~~2.~~, the ~~board's~~ commission's deliberations and actions upon such requests shall

be in meetings not open to the public. ~~No person acting in good faith upon an advisory opinion issued by the board is subject to criminal or civil prosecution for so acting, if the material facts are as stated in the opinion request~~ A member of the commission may, by written request, require the commission to review an advisory opinion.

2. To have legal force and effect, each formal and informal advisory opinion issued by the ~~board~~ commission must be supported by specific legal authority under a statute or other law, or by specific case or common law authority. Each formal and informal advisory opinion shall include a citation to each statute or other law and each case or common law authority upon which the opinion is based, and shall specifically articulate or explain which parts of the cited authority are relevant to the ~~board's~~ commission's conclusion and why they are relevant.

(b) 1. The ~~board~~ commission may authorize ~~its legal counsel~~ the commission administrator or his or her designee to issue an informal written advisory opinion or to ~~transmit~~ an informal advisory opinion electronically on behalf of the ~~board~~ commission, subject to such limitations as the ~~board~~ commission deems appropriate. Every informal advisory opinion shall be consistent with applicable formal advisory opinions issued by the ~~board.~~ commission, statute or other law, and case law.

(a) 4. At each regular meeting of the commission, the administrator shall review informal advisory opinions requested of and issued by the administrator and that relate to recurring issues or issues of first impression for which no formal advisory opinion has been issued. The commission may determine to issue a formal advisory opinion adopting or modifying the informal advisory opinion. If the ~~board~~ commission disagrees with ~~an~~ a formal or informal advisory opinion that has been issued by or on behalf of the ~~board~~ commission, the ~~board~~ commission may withdraw the opinion ~~or,~~ issue a revised formal or informal advisory opinion ~~and no, or request an opinion from the attorney general.~~ No person acting after the date of the withdrawal or issuance of the revised advisory opinion is exempted from prosecution under this subsection if the opinion upon which the person's action is based has been withdrawn or revised in relevant degree.

(a) 5. Except as authorized or required under sub. (5s) (f) ~~2.,~~ no member or employee of the ~~board~~ commission may make public the identity of the individual requesting a formal or informal advisory opinion or of individuals or organizations mentioned in the opinion.

(c) 2. Any person ~~receiving~~ requesting a formal ~~or informal~~ advisory opinion under this ~~subsection who disagrees with the opinion~~ paragraph may request a public or private hearing before the ~~board~~ commission to discuss the opinion. The ~~board~~ commission shall grant a request for a public or private hearing under this ~~subsection. After hearing the matter, the board may reconsider~~

~~its opinion and may issue a revised opinion to the person.~~ paragraph.

(c) 3. Promptly upon issuance of each formal advisory opinion ~~that is not open to public access~~, the ~~board~~ commission shall publish ~~a summary of~~ the opinion ~~that is consistent with applicable requirements~~ together with the information specified under sub. (5s) (f) on the commission's Internet site.

**SECTION 45.** 5.05 (6a) (a) 3. of the statutes is created to read:

5.05 **(6a)** (a) 3. No person acting in good faith upon a formal or informal advisory opinion issued by the commission under this subsection is subject to criminal or civil prosecution for so acting, if the material facts are as stated in the opinion request.

**SECTION 46.** 5.05 (6a) (b) 2. of the statutes is created to read:

5.05 **(6a)** (b) 2. Any individual may request in writing, electronically, or by telephone an informal advisory opinion from the commission under this paragraph. The commission's designee shall provide a written response, a written reference to an applicable statute or law, or a written reference to a formal advisory opinion of the commission to the individual, or shall refer the request to the commission for review and the issuance of a formal advisory opinion.

**SECTION 47.** 5.05 (6a) (b) 3. of the statutes is created to read:

5.05 **(6a)** (b) 3. Any person receiving an informal advisory opinion under this paragraph may, at any time, request a formal advisory opinion from the commission on the same matter.

**SECTION 48.** 5.05 (6a) (c) 1. of the statutes is created to read:

5.05 **(6a)** (c) 1. Any individual may request in writing, electronically, or by telephone a formal advisory opinion from the commission or the review or modification of a formal advisory opinion issued by the commission under this paragraph. The individual making the request shall include all pertinent facts relevant to the matter. The commission shall review a request for a formal advisory opinion and may issue a formal advisory opinion to the individual making the request. Except as authorized or required for opinions specified in sub. (5s) (f), the commission's deliberations and actions upon such requests shall be in meetings not open to the public.

**SECTION 49.** 5.05 (6a) (c) 4. of the statutes is created to read:

5.05 **(6a)** (c) 4. If the commission declines to issue a formal advisory opinion, it may refer the matter to the attorney general or to the standing legislative oversight committees.

**SECTION 50.** 5.05 (9) of the statutes is amended to read:

5.05 **(9)** STANDING. The ~~board~~ commission has standing to commence or intervene in any civil action or pro-

**2015 Wisconsin Act 118**          – 8 –          **2015 Assembly Bill 388**

ceeding for the purpose of enforcing the laws regulating the conduct of elections or election campaigns, other than laws regulating campaign financing, or ensuring their proper administration. If the board delegates authority to its legal counsel under sub. (1) (e) to act in its stead, the legal counsel has standing to commence or intervene in such an action or proceeding.

SECTION 51. 5.05 (10) of the statutes is amended to read:

5.05 **(10)** STATE ELECTION ADMINISTRATION PLAN. With the assistance of the election administration council and approval of the joint committee on finance as provided in this subsection, the board commission shall adopt and modify as necessary a state plan that meets the requirements of P.L. 107–252 to enable participation by this state in federal financial assistance programs authorized under that law. The board commission shall adopt the plan and any modifications only after publishing a class 1 notice under ch. 985 or posting on the Internet a statement describing the proposed plan or modification and receiving public comment thereon. After approval of the proposed plan or any modification of the plan by the board commission, the board commission shall submit the proposed plan or modification to the joint committee on finance for the approval of the committee. The board commission may adopt the proposed plan or modification only if the committee approves the proposed plan or modification.

SECTION 52. 5.05 (11) of the statutes is amended to read:

5.05 **(11)** AIDS TO COUNTIES AND MUNICIPALITIES. From the appropriations under s. 20.511 20.510 (1) (t) and (x), the board commission may provide financial assistance to eligible counties and municipalities for election administration costs in accordance with the plan adopted under sub. (10). As a condition precedent to receipt of assistance under this subsection, the board commission shall enter into an agreement with the county or municipality receiving the assistance specifying the intended use of the assistance and shall ensure compliance with the terms of the agreement. Each agreement shall provide that if the federal government objects to the use of any assistance moneys provided to the county or municipality under the agreement, the county or municipality shall repay the amount of the assistance provided to the board commission.

SECTION 53. 5.05 (16) of the statutes is created to read:

5.05 **(16)** POLICIES AND PROCEDURES. (a) Annually, the commission shall adopt written policies and procedures in order to govern its internal operations and management and shall annually report such policies and procedures to the appropriate standing committees of the legislature under s. 13.172 (3).

(b) Notwithstanding par. (a), the commission may reconsider at any time any policy or procedure adopted

as provided under par. (a). If, upon reconsideration, the commission revises a previously reported policy or procedure, the commission shall report the revision to the appropriate standing committees of the legislature under s. 13.172 (3).

(c) The commission may reconsider at any time any written directives or written guidance provided to the general public or to any person subject to the provisions of chs. 5 to 10 and 12 with regard to the enforcement and administration of those provisions.

SECTION 54. 5.05 (17) of the statutes is created to read:

5.05 **(17)** PAYMENTS. The commission may accept payment by credit card, debit card, or other electronic payment mechanism for any amounts owed pursuant to the administration of chs. 5 to 10 or 12, and may charge a surcharge to the payer to recover charges associated with the acceptance of that electronic payment.

SECTION 55. 5.052 of the statutes is repealed.

SECTION 56. 5.054 of the statutes is repealed.

SECTION 57. 5.055 of the statutes is amended to read:

**5.055 Election assistance commission standards board.** The commission administrator of the elections division of the board shall, in consultation with the board commission, appoint an individual to represent this state as a member of the federal election assistance commission standards board. The administrator shall also conduct and supervise a process for the selection of an election official by county and municipal clerks and boards of election commissioners to represent local election officials of this state as a member of the federal election assistance commission standards board. The administrator shall ensure that the members of the federal election assistance commission standards board representing this state shall at no time be members of the same political party. Upon appointment or election of any new member of the federal election assistance commission standards board representing this state, the administrator shall transmit a notice of that member's appointment or election to the officer or agency designated by federal law.

SECTION 58. 5.056 of the statutes is amended to read:

**5.056 Matching program with secretary of transportation.** The commission administrator of the elections division of the board shall enter into the agreement with the secretary of transportation specified under s. 85.61 (1) to match personally identifiable information on the official registration list maintained by the board commission under s. 6.36 (1) with personally identifiable information maintained by the department of transportation.

SECTION 59. 5.07 of the statutes is amended to read:

**5.07 Action to compel compliance.** Whenever a violation of the laws regulating the conduct of elections or election campaigns, other than a violation of the laws regulating campaign financing, occurs or is proposed to occur, the attorney general or the district attorney of the

county where the violation occurs or is proposed to occur may sue for injunctive relief, a writ of mandamus or prohibition, or other such legal or equitable relief as may be appropriate to compel compliance with the law. No bond is required in such actions.

SECTION 60. 5.08 of the statutes is amended to read:

**5.08 Petition for enforcement.** In addition to or in lieu of filing a complaint, any elector may file a verified petition alleging such facts as are within his or her knowledge to indicate that an election official has failed or is failing to comply with any law regulating the conduct of elections or election campaigns, other than a law regulating campaign financing, or proposes to act in a manner inconsistent with such a law, and requesting that an action be commenced for injunctive relief, a writ of mandamus or prohibition or other such legal or equitable relief as may be appropriate to compel compliance with the law. The petition shall be filed with the district attorney for the county having jurisdiction to prosecute the alleged failure to comply under s. 978.05 (1) and (2). The district attorney may then commence the action or dismiss the petition. If the district attorney declines to act upon the petition or if the district attorney fails to act upon the petition within 15 days of the date of filing, the petitioner may file the same petition with the attorney general, who may then commence the action.

SECTION 61. 5.09 of the statutes is repealed.

SECTION 62. 5.40 (7) of the statutes is amended to read:

5.40 **(7)** Whenever a municipality adopts and purchases voting machines or an electronic voting system, or adopts and purchases a different type of voting machine or electronic voting system from the type it was previously using, the municipal clerk or executive director of the municipal board of election commissioners shall promptly notify the county clerk or executive director of the county board of election commissioners and the administrator of the elections division of the board commission in writing.

SECTION 63. 5.58 (2) of the statutes is amended to read:

5.58 **(2)** STATE SUPERINTENDENT OF PUBLIC INSTRUCTION; JUDICIARY; COUNTY EXECUTIVE; COUNTY COMPTROLLER; AND COUNTY SUPERVISORS. There shall be one separate ballot for state superintendent, judicial officers, county executive under s. 59.17, and county supervisor, except as authorized in s. 5.655. In counties having a population of 750,000 or more, the ballot shall also include the office of comptroller and in counties having a population of 500,000 or more, the ballot shall also include those offices under s. 8.11 (2) (b) and (2m). The arrangement of names of candidates for state superintendent, justice, court of appeals judge, and circuit court judge shall be determined by the board commission in the manner specified in s. 5.60 (1) (b). Arrangement of the names of candidates for county executive, county comp-

troller, and county supervisor shall be determined by the county clerk or by the executive director of the county board of election commissioners in the manner specified in s. 5.60 (1) (b).

SECTION 64. 5.58 (2m) of the statutes is amended to read:

5.58 **(2m)** METROPOLITAN SEWERAGE COMMISSION. Except as authorized in s. 5.655, there shall be a separate ballot for members of the metropolitan sewerage commission if commissioners are elected under s. 200.09 (11) (am), with candidates for different seats listed in separate columns or rows if more than one seat is contested at any election. Arrangement of the names on the ballot shall be determined by the board elections commission.

SECTION 65. 5.60 (1) (b) of the statutes is amended to read:

5.60 **(1)** (b) The board elections commission shall certify the candidates' names and designate the official ballot arrangement for candidates for state superintendent, justice, court of appeals judge, and for circuit judge and, if commissioners are elected under s. 200.09 (11) (am), the for metropolitan sewerage commission commissioners elected under s. 200.09 (11) (am). The arrangement of names of all candidates on the ballot whose nomination papers are filed with the board elections commission shall be determined by the board elections commission by the drawing of lots not later than the 2nd Tuesday in January, or the next day if the first Tuesday is a holiday. Whenever a primary is held for an office, a 2nd drawing of all candidates for that office shall be held by or under the supervision of the board elections commission not later than the 3rd day following the completion of the primary canvass to determine the arrangement of candidates on the election ballot.

SECTION 66. 5.62 (4) (b) of the statutes is amended to read:

5.62 **(4)** (b) The county board of election commissioners in counties having a population of more than 750,000 shall prepare the official primary ballot. The commissioners shall arrange the names of all candidates for each office whose nomination papers are filed at the county level, using the same method as that used by the government accountability board elections commission under s. 5.60 (1) (b).

SECTION 67. 5.68 (3m) of the statutes is repealed.

SECTION 68. 5.93 of the statutes is amended to read:

**5.93 Administration.** The board may commission shall promulgate reasonable rules for the administration of this subchapter.

SECTION 69. 6.26 (3) of the statutes is amended to read:

6.26 **(3)** The board commission shall, by rule, prescribe procedures for appointment of special registration deputies, for revocation of appointments of special registration deputies, and for training of special registration deputies by municipal clerks and boards of election com-

missioners. The procedures shall be coordinated with training programs for special registration deputies conducted by municipal clerks under s. 7.315 and shall be formulated to promote increased registration of electors consistent with the needs of municipal clerks and boards of election commissioners to efficiently administer the registration process.

**SECTION 70.** 6.275 (1) (f) of the statutes, as created by 2013 Wisconsin Act 148, is amended to read:

6.275 **(1)** (f) The total number of postcards sent by the municipal clerk or board of election commissioners under s. 6.56 (3), the total number of such postcards returned to the municipal clerk or board of election commissioners because the elector did not reside at the address given on the postcard, the total number of electors whose status was changed from eligible to ineligible on the registration list as a result of the audit under s. 6.56 (3), and the number of individuals referred to the district attorney under s. 6.56 (3). The municipal clerk or board of election commissioners shall provide the information described under this paragraph to the ~~board~~ elections commission and the county clerk or county board of election commissioners at the earliest practicable time after, but no later than 90 days after, each primary and election at which a state or national office is filled or a statewide referendum is held, including any special election. The municipal clerk or board of election commissioners shall update the information described under this paragraph on a monthly basis and shall submit, on a monthly basis, any such updated information to the ~~board~~ elections commission and the county clerk or county board of election commissioners.

**SECTION 71.** 6.275 (2) of the statutes, as affected by 2013 Wisconsin Act 148, is amended to read:

6.275 **(2)** Upon receipt of each report filed under this section, the ~~board~~ commission shall, within 7 days of receiving the report, publish the information on its Internet site. The ~~board~~ commission shall update the information published under this subsection on a monthly basis.

**SECTION 72.** 6.33 (5) (a) of the statutes is amended to read:

6.33 **(5)** (a) Except as provided in par. (b) and this paragraph, whenever a municipal clerk receives a valid registration or valid change of a name or address under an existing registration and whenever a municipal clerk changes a registration from eligible to ineligible status, the municipal clerk shall promptly enter electronically on the list maintained by the ~~board~~ commission under s. 6.36 (1) the information described under this subsection. Except as provided in par. (b) and this paragraph, the municipal clerk may update any entries that change on the date of an election other than a general election within 30 days after the date of that election, and may update any entries that change on the date of a general election within 45 days after the date of that election. The ~~legal counsel of the board~~ commission administrator may, upon

request of a municipal clerk, permit the clerk to update entries that change on the date of a general election within 60 days after that election. The municipal clerk shall provide to the ~~board~~ commission information that is confidential under s. 6.47 (2) in such manner as the ~~board~~ commission prescribes.

**SECTION 73.** 6.36 (1) (b) 1. a. of the statutes is amended to read:

6.36 **(1)** (b) 1. a. Except as provided in pars. (bm) and (bn), no person other than an employee of the ~~board~~ commission, a county clerk, a deputy county clerk, an executive director of a county board of election commissioners, a deputy designated by the executive director, a municipal clerk, a deputy municipal clerk, an executive director of a city board of election commissioners, or a deputy designated by the executive director may view the date of birth, operator's license number, or social security account number of an elector, the address of an elector to whom an identification serial number is issued under s. 6.47 (3), or any indication of an accommodation required under s. 5.25 (4) (a) to permit voting by an elector.

**SECTION 74.** 6.36 (1) (bm) of the statutes is amended to read:

6.36 **(1)** (bm) The ~~board~~ commission or any municipal clerk or board of election commissioners may transfer any information in the registration list to which access is restricted under par. (b) 1. a. to a law enforcement agency, as defined in s. 165.77 (1) (b), to be used for law enforcement purposes.

**SECTION 75.** 6.36 (2) (a) of the statutes is amended to read:

6.36 **(2)** (a) Except as provided in par. (b), each registration list prepared for use as a poll list at a polling place or for purposes of canvassing absentee ballots at an election shall contain the full name and address of each registered elector; a blank column for the entry of the serial number of the electors when they vote or the poll list number used by the municipal board of absentee ballot canvassers in canvassing absentee ballots; an indication next to the name of each elector for whom proof of residence under s. 6.34 is required; a space for entry of the type of and the name of the entity or institution that issued the identifying document submitted by the elector as proof of residence when proof of residence under s. 6.34 is required; a space for entry of the elector's signature, or if another person signed the elector's registration form for the elector by reason of the elector's physical disability, the word "exempt"; and a form of certificate bearing the certification of the commission administrator ~~of the elections division of the board~~ stating that the list is a true and complete registration list of the municipality or the ward or wards for which the list is prepared. The ~~board~~ commission shall, by rule, prescribe the space and location for entry of each elector's signature on the poll list which shall provide for entry of the signature without

changing the orientation of the poll list from the orientation used by the election officials.

SECTION 76. 6.50 (2g) of the statutes is amended to read:

6.50 (2g) The board commission may delegate to a municipal clerk or board of election commissioners of a municipality the responsibility to change the registration status of electors when required under sub. (2).

SECTION 77. 6.50 (7) of the statutes is amended to read:

6.50 (7) When an elector's registration is changed from eligible to ineligible status, the board commission, municipal clerk, or board of election commissioners shall make an entry on the registration list, giving the date of and reason for the change.

SECTION 78. 6.56 (3) of the statutes is amended to read:

6.56 (3) Upon receipt of the list under sub. (1), the municipal clerk or board of election commissioners shall make an audit of all electors registering to vote at the polling place or other registration location under s. 6.55 (2) and all electors registering by agent on election day under s. 6.86 (3) (a) 2. unless the clerk or board of election commissioners receives notice from the board elections commission under sub. (7) that the board elections commission will perform the audit. The audit shall be made by 1st class postcard. The postcard shall be marked in accordance with postal regulations to ensure that it will be returned to the clerk, board of election commissioners, or government accountability board elections commission if the elector does not reside at the address given on the postcard. If any postcard is returned undelivered, or if the clerk, board of election commissioners, or government accountability board elections commission is informed of a different address than the one specified by the elector which was apparently improper on the day of the election, the clerk, board of election commissioners, or government accountability board elections commission shall change the status of the elector from eligible to ineligible on the registration list, mail the elector a notice of the change in status, and provide the name of the elector to the district attorney for the county where the polling place is located and the government accountability board elections commission.

SECTION 79. 6.95 of the statutes is amended to read:

6.95 Voting procedure for challenged electors. Whenever the inspectors under ss. 6.92 to 6.94 receive the vote of a person offering to vote who has been challenged, the inspectors shall, before giving the elector a ballot, write on the back of the ballot the serial number of the challenged person corresponding to the number kept at the election on the poll list, or other list maintained under s. 6.79, and the notation "s. 6.95". If voting machines are used in the municipality where the person is voting, the person's vote may be received only upon an absentee ballot furnished by the municipal clerk which

shall have the corresponding serial number from the poll list or other list maintained under s. 6.79 and the notation "s. 6.95" written on the back of the ballot by the inspectors before the ballot is given to the elector. The inspectors shall indicate on the list the reason for the challenge. The inspectors shall then deposit the ballot. The challenged ballots shall be counted under s. 5.85 or 7.51. The municipal board of canvassers may decide any challenge when making its canvass under s. 7.53. If the returns are reported under s. 7.60, a challenge may be reviewed by the county board of canvassers. If the returns are reported under s. 7.70, a challenge may be reviewed by the chairperson of the board commission or the chairperson's designee. The decision of any board of canvassers or of the chairperson or chairperson's designee may be appealed under s. 9.01. The standard for disqualification specified in s. 6.325 shall be used to determine the validity of challenged ballots.

SECTION 80. 6.96 of the statutes is amended to read:

6.96 Voting procedure for electors voting pursuant to federal court order. Whenever any elector is allowed to vote at a polling place pursuant to a federal court order after the closing time provided under s. 6.78, the inspectors shall, before giving the elector a ballot, write on the back of the ballot the notation "s. 6.96". If voting machines are used in the municipality where the elector is voting, the elector's vote may be received only upon an absentee ballot furnished by the municipal clerk which shall have the notation "s. 6.96" written on the back of the ballot by the inspectors before the ballot is given to the elector. When receiving the elector's ballot, the inspectors shall provide the elector with the written voting information prescribed by the board commission under s. 7.08 (8). The inspectors shall indicate on the list the fact that the elector is voting pursuant to a federal court order. The inspectors shall then deposit the ballot. The ballot shall be counted under s. 5.85 or 7.51 unless the order is vacated. If the order is vacated after the ballot is counted, the appropriate board or boards of canvassers or the chairperson of the board commission or his or her designee shall reopen the canvass to discount any ballots that were counted pursuant to the vacated order and adjust the statements, certifications, and determinations accordingly.

SECTION 81. 6.97 (1) of the statutes is amended to read:

6.97 (1) Whenever any individual who is required to provide proof of residence under s. 6.34 in order to be permitted to vote appears to vote at a polling place and cannot provide the required proof of residence, the inspectors shall offer the opportunity for the individual to vote under this section. Whenever any individual, other than a military elector, as defined in s. 6.34 (1) (a), or an overseas elector, as defined in s. 6.34 (1) (b), or an elector who has a confidential listing under s. 6.47 (2), appears to vote at a polling place and does not present proof of

**2015 Wisconsin Act 118**    – 12 –    **2015 Assembly Bill 388**

identification under s. 6.79 (2), whenever required, the inspectors or the municipal clerk shall similarly offer the opportunity for the individual to vote under this section. If the individual wishes to vote, the inspectors shall provide the elector with an envelope marked "Ballot under s. 6.97, stats." on which the serial number of the elector is entered and shall require the individual to execute on the envelope a written affirmation stating that the individual is a qualified elector of the ward or election district where he or she offers to vote and is eligible to vote in the election. The inspectors shall, before giving the elector a ballot, write on the back of the ballot the serial number of the individual corresponding to the number kept at the election on the poll list or other list maintained under s. 6.79 and the notation "s. 6.97". If voting machines are used in the municipality where the individual is voting, the individual's vote may be received only upon an absentee ballot furnished by the municipal clerk which shall have the corresponding number from the poll list or other list maintained under s. 6.79 and the notation "s. 6.97" written on the back of the ballot by the inspectors before the ballot is given to the elector. When receiving the individual's ballot, the inspectors shall provide the individual with written voting information prescribed by the ~~board~~ commission under s. 7.08 (8). The inspectors shall indicate on the list the fact that the individual is required to provide proof of residence or proof of identification under s. 6.79 (2) but did not do so. The inspectors shall notify the individual that he or she may provide proof of residence or proof of identification to the municipal clerk or executive director of the municipal board of election commissioners. The inspectors shall also promptly notify the municipal clerk or executive director of the name, address, and serial number of the individual. The inspectors shall then place the ballot inside the envelope and place the envelope in a separate carrier envelope.

SECTION 82. 7.03 (1) (a) of the statutes is amended to read:

7.03 **(1)** (a)  Except as authorized under this paragraph, a reasonable daily compensation shall be paid to each inspector, voting machine custodian, automatic tabulating equipment technician, member of a board of canvassers, messenger, and tabulator who is employed and performing duties under chs. 5 to 12. Daily compensation shall also be provided to inspectors and inspector trainees for attendance at training programs conducted by the ~~board~~ commission and municipal clerks under ss. 7.31 and 7.315. Alternatively, such election officials and trainees may be paid by the hour at a proportionate rate for each hour actually worked. Any election official or trainee may choose to volunteer his or her services by filing with the municipal clerk of the municipality in which he or she serves a written declination to accept compensation. The volunteer status of the election official or

trainee remains effective until the official or trainee files a written revocation with the municipal clerk.

SECTION 83. 7.03 (1) (b) of the statutes is amended to read:

7.03 **(1)** (b)  Except as provided in par. (bm), any compensation owed shall be paid by the municipality in which the election is held, except that any compensation payable to a technician, messenger, tabulator, or member of the board of canvassers who is employed to perform services for the county shall be paid by the county and compensation payable to any messenger or tabulator who is employed to perform services for the state shall be paid by the ~~board~~ commission.

SECTION 84. 7.03 (2) of the statutes is amended to read:

7.03 **(2)**  The amount of compensation of election officials, when authorized or required, shall be fixed by the appropriate county board of supervisors, municipal governing body, or municipal board of election commissioners in cities over 500,000 population. The ~~board~~ commission shall fix the amount to be paid any person employed to perform duties for the state. If the ~~board~~ commission employs an individual to perform duties which are the responsibility of a county or municipality, the ~~board~~ commission shall charge the expense to the county or municipality.

SECTION 85. 7.08 (title) of the statutes is amended to read:

**7.08** (title)  ~~Government accountability board~~ **Elections commission**.

SECTION 86. 7.08 (1) (a) of the statutes is amended to read:

7.08 **(1)** (a)  Prescribe all official ballot forms necessary under chs. 5 to 10 and 12 and revise the official ballot forms to harmonize with legislation and the current official status of the political parties whenever necessary. The ~~board~~ commission shall include on each ballot form, in the space for official endorsement, markings or spaces for identifying a ballot as an overvoted ballot, a duplicate overvoted ballot, a damaged ballot, or a duplicate damaged ballot, and for writing an identifying serial number. The ~~board~~ commission shall provide one copy of each ballot form without charge to each county and municipal clerk and board of election commissioners. The ~~board~~ commission shall distribute or arrange for distribution of additional copies. The prescribed forms shall be substantially followed in all elections under chs. 5 to 10 and 12.

SECTION 87. 7.08 (4) of the statutes is amended to read:

7.08 **(4)** ELECTION LAWS. Publish the election laws. The ~~board~~ commission shall sell or distribute or arrange for the sale or distribution of copies of the election laws to county and municipal clerks and boards of election commissioners and members of the public.

**SECTION 88.** 7.15 (1) (g) of the statutes, as affected by 2013 Wisconsin Act 148, is amended to read:

7.15 **(1)** (g)  In the manner prescribed by the ~~board~~ commission, report suspected election frauds, irregularities, or violations of which the clerk has knowledge to the district attorney for the county where the suspected activity occurs and to the ~~board~~ commission. The ~~board~~ commission shall annually report the information obtained under this paragraph to the legislature under s. 13.172 (2).

**SECTION 89.** 7.41 (5) of the statutes is amended to read:

7.41 **(5)** The ~~board may~~ commission shall promulgate rules that are consistent with the requirements of sub. (2) regarding the proper conduct of individuals exercising the right under sub. (1), including the interaction of those individuals with inspectors and other election officials.

**SECTION 90.** 7.52 (1) (a) of the statutes is amended to read:

7.52 **(1)** (a)  The governing body of any municipality may provide by ordinance that, in lieu of canvassing absentee ballots at polling places under s. 6.88, the municipal board of absentee ballot canvassers designated under s. 7.53 (2m) shall, at each election held in the municipality, canvass all absentee ballots received by the municipal clerk by 8 p.m. on election day. Prior to enacting an ordinance under this subsection, the municipal clerk or board of election commissioners of the municipality shall notify the ~~board~~ elections commission in writing of the proposed enactment and shall consult with the ~~board~~ elections commission concerning administration of this section. At every election held in the municipality following enactment of an ordinance under this subsection, the board of absentee ballot canvassers shall, any time after the opening of the polls and before 10 p.m. on election day, publicly convene to count the absentee ballots for the municipality. The municipal clerk shall give at least 48 hours' notice of any meeting under this subsection. Any member of the public has the same right of access to a meeting of the municipal board of absentee ballot canvassers under this subsection that the individual would have under s. 7.41 to observe the proceedings at a polling place. The board of absentee ballot canvassers may order the removal of any individual exercising the right to observe the proceedings if the individual disrupts the meeting.

**SECTION 91.** 7.60 (4) (a) of the statutes is amended to read:

7.60 **(4)** (a)  The board of canvassers shall make separate duplicate statements showing the numbers of votes cast for the offices of president and vice president; state officials; U.S. senators and representatives in congress; state legislators; justice; court of appeals judge; circuit judges; district attorneys; and metropolitan sewerage commissioners, if the commissioners are elected under s. 200.09 (11) (am). If a municipal judge elected under s.

755.01 (4) serves a municipality that is located partially within the county and candidates for that judgeship file nomination papers in another county, the board of canvassers shall prepare a duplicate statement showing the numbers of votes cast for that judgeship in that county for transmittal to the other county. For partisan candidates, the statements shall include the political party or principle designation, if any, next to the name of each candidate. The board of canvassers shall also prepare a statement showing the results of any county, technical college district, or statewide referendum. Each statement shall state the total number of votes cast in the county for each office; the names of all persons for whom the votes were cast, as returned; the number of votes cast for each person; and the number of votes cast for and against any question submitted at a referendum. The board of canvassers shall use one copy of each duplicate statement to report to the ~~government accountability board~~ elections commission, technical college district board, or board of canvassers of any other county and shall file the other statement in the office of the county clerk or board of election commissioners.

**SECTION 92.** 7.60 (5) of the statutes is amended to read:

7.60 **(5)** REPORTING. (a)  Immediately following the canvass, the county clerk shall deliver or transmit to the ~~government accountability board~~ elections commission a certified copy of each statement of the county board of canvassers for president and vice president, state officials, senators and representatives in congress, state legislators, justice, court of appeals judge, circuit judge, district attorney, and metropolitan sewerage commissioners, if the commissioners are elected under s. 200.09 (11) (am). The statement shall record the returns for each office or referendum by ward, unless combined returns are authorized under s. 5.15 (6) (b) in which case the statement shall record the returns for each group of combined wards. Following primaries the county clerk shall enclose on forms prescribed by the ~~government accountability board~~ elections commission the names, party or principle designation, if any, and number of votes received by each candidate recorded in the same manner. The county clerk shall deliver or transmit the certified statement to the ~~government accountability board~~ elections commission no later than 9 days after each primary except the partisan primary, no later than 10 days after the partisan primary and any other election except the general election, and no later than 14 days after the general election. The board of canvassers shall deliver or transmit a certified copy of each statement for any technical college district referendum to the secretary of the technical college district board.

(b)  If the board of canvassers becomes aware of a material mistake in the canvass of an election for state or national office or a statewide or technical college district referendum prior to the close of business on the day the

**2015 Wisconsin Act 118**                 **– 14 –**                 **2015 Assembly Bill 388**

~~government accountability board~~ elections commission receives returns from the last county board of canvassers with respect to that canvass, the board of canvassers may petition the ~~government accountability board~~ elections commission to reopen and correct the canvass. The ~~government accountability board~~ elections commission shall direct the canvass to be reopened and corrected if it determines that the public interest so requires. If the ~~government accountability board~~ elections commission directs the canvass to be reopened, the board of canvassers shall reconvene and transmit a certified corrected copy of the canvass statement to the ~~government accountability board~~ elections commission or secretary of the technical college district board.

**SECTION 93.** 7.70 (3) (b) of the statutes is amended to read:

7.70 **(3)** (b) The ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee shall examine the certified statements of the county boards of canvassers. If it appears that any material mistake has been made in the computation of votes, or any county board of canvassers failed to canvass the votes or omitted votes from any ward or election district in the county, the ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee may dispatch a messenger to the county clerk with written instructions to certify the facts concerning the mistake or the reason why the votes were not canvassed. A clerk to whom such instructions are delivered shall immediately make a true and full answer, sign it, affix the county seal and deliver it to the messenger. The messenger shall deliver it with all possible dispatch to the ~~board~~ commission.

**SECTION 94.** 7.70 (3) (i) of the statutes is amended to read:

7.70 **(3)** (i) The ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee shall canvass only regular returns made by the county board of canvassers and shall not count or canvass any additional or supplemental returns or statements made by the county board or any other board or person. The ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee shall not count or canvass any statement or return which has been made by the county board of canvassers at any other time than that provided in s. 7.60. This provision does not apply to any return made subsequent to a recount under s. 9.01, when the return is accepted in lieu of any prior return from the same county for the same office; or to a statement given to the ~~commission~~ chairperson ~~of the board~~ or chairperson's designee or a messenger sent by the chairperson or designee to obtain a correction.

**SECTION 95.** 7.70 (5) (a) of the statutes is amended to read:

7.70 **(5)** (a) The ~~board~~ commission shall record in its office each certified statement and determination made by the ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee. Immediately after the expiration of

the time allowed to file a petition for recount, the ~~board~~ commission shall make and transmit to each person declared elected a certificate of election under the seal of the ~~board~~ commission. It shall also prepare similar certificates, attested by the ~~commission~~ administrator ~~of the elections division of the board~~, addressed to the U.S. house of representatives, stating the names of those persons elected as representatives to the congress from this state. In the case of U.S. senators, the ~~board~~ commission shall prepare a certificate of election for the governor's signature, and the governor shall sign and affix the great seal of the state and transmit the certificate to the president of the U.S. senate. The certificate shall be countersigned by the secretary of state. If a person elected was elected to fill a vacancy, the certificate shall so ~~state~~ indicate. When a valid petition for recount is filed, the ~~commission~~ chairperson ~~of the board~~ or the chairperson's designee may not certify a nomination, and the governor or ~~board~~ commission may not issue a certificate of election until the recount has been completed and the time allowed for filing an appeal has passed, or if appealed until the appeal is decided.

**SECTION 96.** 8.05 (1) (j) 3. of the statutes is amended to read:

8.05 (1) (j) 3. A candidate for municipal judge shall, in addition to making the filings required under subd. 2., file a statement of economic interests with the ~~board~~ ethics commission under s. 19.43 (4) no later than 4:30 p.m. on the 5th day after notification of nomination is mailed or personally delivered to the candidate, or no later than 4:30 p.m. on the next business day after the last day for filing a declaration of candidacy whenever that candidate is granted an extension of time for filing a declaration of candidacy under subd. 2.

**SECTION 97.** 8.10 (5) of the statutes is amended to read:

8.10 **(5)** Nomination papers shall be accompanied by a declaration of candidacy under s. 8.21. If a candidate has not filed a registration statement under s. 11.05 at the time he or she files nomination papers, the candidate shall file the statement with the papers. A candidate for state office or municipal judge shall also file a statement of economic interests with the ~~board~~ ethics commission under s. 19.43 (4) no later than 4:30 p.m. on the 3rd day following the last day for filing nomination papers under sub. (2) (a), or no later than 4:30 p.m. on the next business day after the last day whenever that candidate is granted an extension of time for filing nomination papers under sub. (2) (a).

**SECTION 98.** 8.10 (6) (a) of the statutes is amended to read:

8.10 **(6)** (a) For state offices or seats on a metropolitan sewerage commission, if the commissioners are elected under s. 200.09 (11) (am), in the office of the ~~board~~ elections commission.

SECTION 99. 8.15 (4) (b) of the statutes is amended to read:

8.15 **(4)** (b) Nomination papers shall be accompanied by a declaration of candidacy under s. 8.21. If a candidate for state or local office has not filed a registration statement under s. 11.05 at the time he or she files nomination papers, the candidate shall file the statement with the papers. A candidate for state office shall also file a statement of economic interests with the ~~board~~ ethics commission under s. 19.43 (4) no later than 4:30 p.m. on the 3rd day following the last day for filing nomination papers under sub. (1), or no later than 4:30 p.m. on the next business day after the last day whenever that candidate is granted an extension of time for filing nomination papers under sub. (1).

SECTION 100. 8.17 (9) (a) of the statutes is amended to read:

8.17 **(9)** (a) If a county has no committee as provided by sub. (5) (a), residents of that county may voluntarily form a committee, which, upon approval of the state committee and certification by the secretary of the state committee to the ~~board~~ commission and the county clerk or board of election commissioners, shall then become the county committee with equal standing as if it had been organized under sub. (5) (a). This standing shall remain unless and until a committee is organized under sub. (5) (a).

SECTION 101. 8.20 (6) of the statutes is amended to read:

8.20 **(6)** Nomination papers shall be accompanied by a declaration of candidacy under s. 8.21. If a candidate for state or local office has not filed a registration statement under s. 11.05 at the time he or she files nomination papers, the candidate shall file the statement with the papers. A candidate for state office shall also file a statement of economic interests with the ~~board~~ ethics commission under s. 19.43 (4) no later than 4:30 p.m. on the 3rd day following the last day for filing nomination papers under sub. (8) (a), or no later than 4:30 p.m. on the next business day after the last day whenever that candidate is granted an extension of time for filing nomination papers under sub. (8) (a).

SECTION 102. 8.20 (7) of the statutes is amended to read:

8.20 **(7)** Nomination papers shall be filed in the office of the ~~board~~ commission for all state offices and the offices of U.S. senator and representative in congress, and in the office of county clerk or board of election commissioners for all county offices.

SECTION 103. 8.30 (2m) of the statutes is amended to read:

8.30 **(2m)** The official or agency with whom nomination papers and declarations of candidacy are required to be filed shall not place a candidate's name on the ballot if the candidate's name is ineligible for ballot placement

under s. 5.05 (2m) (d) 2. ~~or 15.60 (6),~~ 15.61 (3), or 19.49 (2) (c) 2.

SECTION 104. 8.50 (1) (a) of the statutes is amended to read:

8.50 **(1)** (a) When there is to be a special election, the special election for county office shall be ordered by the county board of supervisors except as provided in s. 17.21 (5); the special election for city office shall be ordered by the common council; the special election for village office shall be ordered by the board of trustees; the special election for town office shall be ordered by the town board of supervisors; the special election for school board member in a school district organized under ch. 119 shall be ordered by the school board; the special election for municipal judge shall be ordered by the governing body of the municipality, except in 1st class cities, or if the judge is elected under s. 755.01 (4) jointly by the governing bodies of all municipalities served by the judge; and all other special elections shall be ordered by the governor. When the governor or attorney general issues the order, it shall be filed and recorded in the office of the ~~board~~ commission. When the county board of supervisors issues the order, it shall be filed and recorded in the office of the county clerk. When the county executive issues the order, it shall be filed in the office of the county board of election commissioners. When the common council issues the order, it shall be filed in the office of the city clerk. When the board of trustees issues the order, it shall be filed in the office of the village clerk. When the town board of supervisors issues the order, it shall be filed in the office of the town clerk. When the school board of a school district organized under ch. 119 issues the order, it shall be filed and recorded in the office of the city board of election commissioners. If a municipal judge is elected under s. 755.01 (4), the order shall be filed in the office of the county clerk or board of election commissioners of the county having the largest portion of the population of the jurisdiction served by the judge.

SECTION 105. 8.50 (3) (a) of the statutes is amended to read:

8.50 **(3)** (a) Nomination papers may be circulated no sooner than the day the order for the special election is filed and shall be filed not later than 5 p.m. 28 days before the day that the special primary will or would be held, if required, except when a special election is held concurrently with the spring election or general election, the deadline for filing nomination papers shall be specified in the order and the date shall be no earlier than the date provided in s. 8.10 (2) (a) or 8.15 (1), respectively, and no later than 35 days prior to the date of the spring primary or no later than June 1 preceding the partisan primary. Nomination papers may be filed in the manner specified in s. 8.10, 8.15, or 8.20. Each candidate shall file a declaration of candidacy in the manner provided in s. 8.21 no later than the latest time provided in the order for filing

nomination papers. If a candidate for state or local office has not filed a registration statement under s. 11.05 at the time he or she files nomination papers, the candidate shall file the statement with the papers. A candidate for state office shall also file a statement of economic interests with the ~~board~~ ethics commission no later than the end of the 3rd day following the last day for filing nomination papers specified in the order.

SECTION 106. 8.50 (3) (e) of the statutes is amended to read:

8.50 **(3)** (e) In a special election for a state or national office, the county clerk or board of election commissioners shall transmit the statement of the county board of canvassers to the ~~government accountability board~~ elections commission no later than 7 days after the special primary and 13 days after the special election.

SECTION 107. 9.01 (1) (a) 1. of the statutes is amended to read:

9.01 **(1)** (a) 1. Any candidate voted for at any election or any elector who voted upon any referendum question at any election may petition for a recount. The petitioner shall file a verified petition or petitions with the proper clerk or body under par. (ar) not earlier than the time of completion of the canvass following canvassing of any valid provisional and absentee ballots under ss. 6.97 (4) and 7.515 (6) and, except as provided in this subdivision, not later than 5 p.m. on the 3rd business day following the last meeting day of the municipal or county board of canvassers determining the election for that office or on that referendum question following canvassing of all valid provisional and absentee ballots or, if more than one board of canvassers makes the determination, not later than 5 p.m. on the 3rd business day following the last meeting day of the last board of canvassers which makes a determination following canvassing of all valid provisional and absentee ballots. If the commission chairperson ~~of the board~~ or chairperson's designee makes the determination for the office or the referendum question, the petitioner shall file the petition not earlier than the last meeting day of the last county board of canvassers to make a statement in the election or referendum following canvassing of all valid provisional and absentee ballots and not later than 5 p.m. on the 3rd business day following the day on which the ~~government accountability board~~ commission receives the last statement from a county board of canvassers for the election or referendum following canvassing of all valid provisional and absentee ballots.

SECTION 108. 9.01 (1) (a) 4. of the statutes is amended to read:

9.01 **(1)** (a) 4. The petition under subd. 1. may be amended to include information discovered as a result of the investigation of the board of canvassers or the commission chairperson ~~of the board,~~ or chairperson's designee, after the filing of the petition if the petitioner moves to amend the petition as soon as possible after the peti-

tioner discovers, or reasonably should have discovered, the information that is the subject of the amendment and if the petitioner was unable to include the information in the original petition.

SECTION 109. 9.01 (1) (ag) 4. of the statutes is amended to read:

9.01 **(1)** (ag) 4. The ~~board~~ commission shall deposit all moneys received by it into the account under s. ~~20.511~~ 20.510 (1) (g), and shall pay the fees required for each recount to the county clerks of the counties in which the recount is to be held. The county clerk shall deposit fees received by him or her with the county treasurer. The municipal clerk shall deposit fees received by him or her with the municipal treasurer.

SECTION 110. 9.01 (1) (ar) 3. of the statutes is amended to read:

9.01 **(1)** (ar) 3. Whenever a clerk receives a valid petition and any payment under par. (ag) 3., the clerk shall thereupon notify the proper board of canvassers. Whenever the ~~board~~ commission receives a valid petition and any payment under par. (ag) 3., the ~~board~~ commission shall promptly by certified mail or other expeditious means order the proper county boards of canvassers to commence the recount. County boards of canvassers shall convene no later than 9 a.m. on the second day after receipt of an order and may adjourn for not more than one day at a time until the recount is completed in the county, except that the ~~board~~ commission may permit extension of the time for adjournment. Returns from a recount ordered by the ~~board~~ commission shall be transmitted to the office of the ~~board~~ commission as soon as possible, but in no case later than 13 days from the date of the order of the ~~board~~ commission directing the recount. The commission chairperson ~~of the board~~ or the chairperson's designee may not make a determination in any election if a recount is pending before any county board of canvassers in that election. The commission chairperson ~~of the board~~ or the chairperson's designee need not recount actual ballots, but shall verify the returns of the county boards of canvassers in making his or her determinations.

SECTION 111. 9.01 (5) (a) of the statutes is amended to read:

9.01 **(5)** (a) The board of canvassers or the commission chairperson ~~of the board~~ or the chairperson's designee shall keep complete minutes of all proceedings before the board of canvassers or the chairperson or designee. The minutes shall include a record of objections and offers of evidence. If the board of canvassers or the commission chairperson or the chairperson's designee receives exhibits from any party, the board of canvassers or the chairperson or designee shall number and preserve the exhibits. The board of canvassers or the chairperson or chairperson's designee shall make specific findings of fact with respect to any irregularity raised in the petition or discovered during the recount. Any member of the board of canvassers or the chairper-

son or chairperson's designee may administer oaths, certify official acts, and issue subpoenas for purposes of this section. Witness fees shall be paid by the county. In the case of proceedings before the <u>commission</u> chairperson <s>of the board</s> or chairperson's designee, witness fees shall be paid by the <s>board</s> <u>commission</u>.

SECTION 112. 9.01 (5) (bm) of the statutes is amended to read:

9.01 **(5)** (bm) Upon the completion of its proceedings, a board of canvassers shall deliver to the <s>board</s> <u>commission</u> one copy of the minutes of the proceedings kept under par. (a). In addition, in the case of a recount of an election for state or national office, for each candidate whose name appears on the ballot for that office under the name of a political party, the board of canvassers shall deliver one copy of the minutes to the chief officer, if any, who is named in any registration statement filed under s. 11.05 (1) by the state committee of that political party, and in the case of a recount of an election for county office, for each candidate whose name appears on the ballot for that office under the name of a political party, the board of canvassers shall deliver one copy of the minutes to the chief officer, if any, who is named in any registration statement filed under s. 11.05 (1) by the county committee of that political party.

SECTION 113. 9.01 (5) (c) of the statutes is amended to read:

9.01 **(5)** (c) If the recount is made by a municipal or county board of canvassers and the result is required to be reported to a county board of canvassers or to the <u>commission</u> chairperson <s>of the board</s> or the chairperson's designee, the board of canvassers making the initial recount shall immediately certify the results to the county board of canvassers or to the <u>commission</u> chairperson <s>of the board</s> or designee. If a county board of canvassers receives such results, it shall then convene not later than 9 a.m. on the next business day following receipt to examine the returns and determine the results. If the <u>commission</u> chairperson <s>of the board</s> or the chairperson's designee receives such results, the chairperson or designee shall publicly examine the returns and determine the results not later than 9 a.m. on the 3rd business day following receipt, but if that day is earlier than the latest day permitted for that election under s. 7.70 (3) (a), the <u>commission</u> chairperson <s>of the board</s> or designee may examine the returns and determine the results not later than the day specified in s. 7.70 (3) (a).

SECTION 114. 9.01 (6) (a) of the statutes is amended to read:

9.01 **(6)** (a) Within 5 business days after completion of the recount determination by the board of canvassers in all counties concerned, or within 5 business days after completion of the recount determination by the <u>commission</u> chairperson <s>of the board</s> or the chairperson's designee whenever a determination is made by the chairperson or designee, any candidate, or any elector when for a ref-

erendum, aggrieved by the recount may appeal to circuit court. The appeal shall commence by serving a written notice of appeal on the other candidates and persons who filed a written notice of appearance before each board of canvassers whose decision is appealed, or in the case of a statewide recount, before the <u>commission</u> chairperson <s>of the board</s> or the chairperson's designee. The appellant shall also serve notice on the <s>board</s> <u>commission</u> if the <u>commission</u> chairperson <s>of the board</s> or the chairperson's designee is responsible for determining the election. The appellant shall serve the notice by certified mail or in person. The appellant shall file the notice with the clerk of circuit court together with an undertaking and surety in the amount approved by the court, conditioned upon the payment of all costs taxed against the appellant.

SECTION 115. 9.01 (7) (a) of the statutes is amended to read:

9.01 **(7)** (a) The court with whom an appeal is filed shall forthwith issue an order directing each affected county <s>or</s>, municipal clerk, or board<u>, and the commission,</u> to transmit immediately all ballots, papers and records affecting the appeal to the clerk of court or to impound and secure such ballots, papers and records, or both. The order shall be served upon each affected county <s>or</s>, municipal clerk, or board<u>, the commission,</u> and all other candidates and persons who filed a written notice of appearance before any board of canvassers involved in the recount.

SECTION 116. 9.01 (8) (a) of the statutes is amended to read:

9.01 **(8)** (a) Unless the court finds a ground for setting aside or modifying the determination of the board of canvassers or the <u>commission</u> chairperson <s>of the board</s> or chairperson's designee, it shall affirm the determination.

SECTION 117. 9.01 (8) (c) of the statutes is amended to read:

9.01 **(8)** (c) The court may not receive evidence not offered to the board of canvassers or the <u>commission</u> chairperson or <u>the</u> chairperson's designee except for evidence that was unavailable to a party exercising due diligence at the time of the recount or newly discovered evidence that could not with due diligence have been obtained during the recount, and except that the court may receive evidence not offered at an earlier time because a party was not represented by counsel in all or part of a recount proceeding. A party who fails to object or fails to offer evidence of a defect or irregularity during the recount waives the right to object or offer evidence before the court except in the case of evidence that was unavailable to a party exercising due diligence at the time of the recount or newly discovered evidence that could not with due diligence have been obtained during the recount or evidence received by the court due to unavailability of counsel during the recount.

SECTION 118. 9.01 (8) (d) of the statutes is amended to read:

**2015 Wisconsin Act 118**    – 18 –    **2015 Assembly Bill 388**

9.01 **(8)** (d) The court shall set aside or modify the determination of the board of canvassers or the commission chairperson ~~of the board~~ or the chairperson's designee if it finds that the board of canvassers or the chairperson's designee has erroneously interpreted a provision of law and a correct interpretation compels a particular action. If the determination depends on any fact found by the board of canvassers or the commission chairperson or the chairperson's designee, the court may not substitute its judgment for that of the board of canvassers or the chairperson or designee as to the weight of the evidence on any disputed finding of fact. The court shall set aside the determination if it finds that the determination depends on any finding of fact that is not supported by substantial evidence.

**SECTION 119.** 9.01 (10) of the statutes is amended to read:

9.01 **(10)** STANDARD FORMS AND METHODS. The ~~government accountability board~~ commission shall prescribe standard forms and procedures for the making of recounts under this section. The procedures prescribed by the ~~government accountability board~~ commission shall require the boards of canvassers in recounts involving more than one board of canvassers to consult with the ~~government accountability board~~ commission staff prior to beginning any recount in order to ensure that uniform procedures are used, to the extent practicable, in such recounts.

**SECTION 120.** 10.06 (1) (title) of the statutes is amended to read:

10.06 **(1)** (title)    ~~GOVERNMENT ACCOUNTABILITY BOARD~~ ELECTIONS COMMISSION.

**SECTION 121.** 11.01 (4m) of the statutes is created to read:

11.01 **(4m)** "Commission" means the ethics commission.

**SECTION 122.** 11.09 of the statutes is amended to read:

**11.09 Duplicate reports required in certain cases.** **(3)** Each registrant whose filing officer is the ~~board~~ commission, who or which makes disbursements in connection with elections for offices which serve or referenda which affect only one county or portion thereof, except a candidate, personal campaign committee, political party committee or other committee making disbursements in support of or in opposition to a candidate for state senator, representative to the assembly, court of appeals judge or circuit judge, shall file a duplicate original of each financial report filed with the ~~board~~ commission with the county clerk or board of election commissioners of the county in which the elections in which the registrant participates are held. Such reports shall be filed no later than the dates specified under s. 11.20 (2) and (4) for the filing of each report with the ~~board~~ commission.

**(4)** In every case where a duplicate report is filed by the ~~board~~ commission or by any person under sub. (3), the ~~board~~ commission shall transmit a certified duplicate copy of the registration statement to each county clerk or board of election commissioners with whom a duplicate report is filed.

**SECTION 123.** 11.21 (title) of the statutes is amended to read:

**11.21 (title) Duties of the** ~~government accountability board~~ ethics commission.

**SECTION 124.** 11.21 (7) (intro.) of the statutes is amended to read:

11.21 **(7)** (intro.) Include in its ~~biennial~~ annual report under s. ~~15.04 (1) (d)~~ 19.47 (5) compilations of any of the following in its discretion:

**SECTION 125.** 11.30 (2) (fm) of the statutes is amended to read:

11.30 **(2)** (fm) This subsection does not apply to communications printed on pins, buttons, pens, balloons, nail files and similar small items on which the information required by this subsection cannot be conveniently printed. The ~~board may~~ commission shall, by rule, specify small items not mentioned in this paragraph to which this subsection shall not apply.

**SECTION 126.** 11.60 (4) of the statutes is amended to read:

11.60 **(4)** Except as otherwise provided in ss. ~~5.05 (2m) (c) 15. and 16. and (h),~~ 5.08, ~~and 5.08l~~ 19.49 (2) (b) 13. and 14. and (g) and 19.554, actions under this section may be brought by the ~~board~~ commission or by the district attorney for the county where the defendant resides or, if the defendant is a nonresident, by the district attorney for the county where the violation is alleged to have occurred. For purposes of this subsection, a person other than ~~a~~ ~~natural person~~ an individual resides within a county if the person's principal place of operation is located within that county.

**SECTION 127.** 11.61 (2) of the statutes is amended to read:

11.61 **(2)** Except as otherwise provided in ss. ~~5.05 (2m) (c) 15. and 16. and (i),~~ 5.08, ~~and 5.08l~~ 19.49 (2) (b) 13. and 14. and (h), and 19.554, all prosecutions under this section shall be conducted by the district attorney for the county where the defendant resides or, if the defendant is a nonresident, by the district attorney for the county where the violation is alleged to have occurred. For purposes of this subsection, a person other than ~~a natural person~~ an individual resides within a county if the person's principal place of operation is located within that county.

**SECTION 128.** 12.01 of the statutes is renumbered 12.01 (intro.) and amended to read:

**12.01 Definitions.** (intro.) The definitions given under s. 11.01 apply to this chapter, except ~~that a "candidate"~~ as follows:

~~(1)~~ "Candidate" includes ~~candidates~~ a candidate for national office.

**SECTION 129.** 12.01 (2) of the statutes is created to read:

12.01 **(2)** "Commission" means the elections commission.

**SECTION 130.** 12.13 (5) (a) of the statutes is amended to read:

12.13 **(5)** (a) Except as specifically authorized by law and except as provided in par. (b), no investigator, prosecutor, employee of an investigator or prosecutor, or member or employee of the ~~board~~ commission may disclose information related to an investigation or prosecution under chs. 5 to 10 or 12, ~~subch. III of ch. 13, or subch. III of ch. 19~~ or any other law specified in s. 978.05 (1) or (2) or provide access to any record of the investigator, prosecutor, or the ~~board~~ commission that is not subject to access under s. 5.05 (5s) to any person other than an employee or agent of the prosecutor or investigator or a member, employee, or agent of the ~~board~~ commission prior to ~~presentation of~~ presenting the information or record in a court of law.

**SECTION 131.** 13.123 (3) (b) 2. of the statutes is amended to read:

13.123 **(3)** (b) 2. In making the determination under subd. 1., the chief clerk is bound by the determination of the chairperson of the ~~government accountability board~~ elections commission or the chairperson's designee if such determination has been issued.

**SECTION 132.** 13.23 of the statutes is amended to read:

**13.23 Election contests; notice.** Any person wishing to contest the election of any senator or member of the assembly shall, within 30 days after the decision of the board of canvassers, serve a notice in writing on the person whose election the contestant intends to contest, stating briefly that the election will be contested and the cause of such contest, and shall file a copy thereof in the office of the ~~government accountability board~~ elections commission at least 10 days before the day fixed by law for the meeting of the legislature. The ~~government accountability board~~ elections commission shall then send a copy of s. 13.24 to both contestants. If any contestant fails to so file a copy of such notice, the contestant shall not be entitled to any mileage or salary in case payment has been made therefor to the sitting member.

**SECTION 133.** 13.62 (4) of the statutes is repealed.

**SECTION 134.** 13.62 (5m) of the statutes is created to read:

13.62 **(5m)** "Commission" means the ethics commission.

**SECTION 135.** 13.63 (1) (a) of the statutes is amended to read:

13.63 **(1)** (a) An ~~application~~ applicant for a license to act as a lobbyist may ~~be obtained~~ obtain an application from and ~~filed~~ file the application with the ~~board~~ commission. Except as authorized under par. (am), an applicant shall include his or her social security number on the application. The ~~application~~ applicant shall ~~be signed~~, under the penalty for making false statements under s. 13.69 (6m), ~~by the lobbyist~~ sign the application. The applicant shall submit with the application the applicable fee under s. 13.75 (1) or (1m). Upon approval of the application ~~and payment of the applicable license fee under s. 13.75 (1) or (1m) to the board~~ by the commission, the ~~board~~ commission shall issue a license ~~which~~ to the applicant. A license issued under this paragraph entitles the licensee to practice lobbying on behalf of each registered principal ~~who or which has~~ filed for whom or which an authorization for that lobbyist, as required under s. 13.65 ~~for that lobbyist~~, has been filed and ~~paid~~ for whom or which the authorization fee under s. 13.75 (4). ~~The~~ has been paid. A license issued under this paragraph shall expire on December 31 of each even−numbered year.

**SECTION 136.** 13.685 of the statutes is amended to read:

**13.685 Duties of the ~~government accountability board~~ ethics commission. (1)** The ~~board~~ commission shall prescribe forms and instructions for preparing and filing license applications under s. 13.63 (1), registration applications under s. 13.64 and the statements required under ss. 13.68 and 13.695.

**(2)** The ~~board~~ commission shall prepare and publish a manual setting forth recommended uniform methods of accounting and reporting for use by persons who are required to provide information under s. 13.68 (4) or to file statements under s. 13.68 or 13.695.

**(3)** The ~~board~~ commission shall examine each statement filed under s. 13.68.

**(4)** The ~~board~~ commission shall, by rule, define what constitutes a "topic" for purposes of ss. 13.67 and 13.68 (1) (bn).

**(7)** Beginning with the 3rd Tuesday following the beginning of any regular or special session of the legislature and on every Tuesday thereafter for the duration of such session, the ~~board~~ commission shall, from its records, submit to the chief clerk of each house of the legislature, for distribution to the legislature under s. 13.172 (2), a report of the names of lobbyists licensed under s. 13.63 and the names of officers and employees of agencies filed under s. 13.695 who were not previously reported, the names of the principals or agencies whom they represent and the general areas of legislative and administrative action which are the object of their lobbying activity. Such reports shall be incorporated into the journal of the senate and a copy filed in the office of the chief clerk of the assembly. The ~~board~~ commission shall also notify the chief clerk of each house that a copy of each statement which is required to be filed under ss. 13.68 and 13.695 is available upon request. Such copy shall be open to public inspection but shall not be incorporated in the journal unless the chief clerk so orders.

The ~~board~~ commission shall include in its ~~biennial~~ report under s. 13.04 (1) (d), a summary of the statements it has received under ss. 13.68 and 13.695.

SECTION 137. 14.38 (10m) of the statutes is amended to read:

14.38 **(10m)** NOTIFICATION OF CONSTITUTIONAL AMENDMENT. If an amendment to the Wisconsin Constitution is approved that requires the legislature to provide for temporary succession to the powers and duties of public offices for the period of an emergency resulting from a cause other than an enemy action, within 30 days after the ~~government accountability board~~ elections commission records the approval under s. 7.70 (3) (h), notify the legislature that the amendment has been approved.

SECTION 138. 15.01 (2) of the statutes is amended to read:

15.01 **(2)** "Commission" means a 3−member governing body in charge of a department or independent agency or of a division or other subunit within a department, except for the Wisconsin waterways commission which shall consist of 5 members, the elections commission which shall consist of at least 6 members, the ethics commission which shall consist of at least 6 members, and the parole commission which shall consist of 8 members. A Wisconsin group created for participation in a continuing interstate body, or the interstate body itself, shall be known as a "commission", but is not a commission for purposes of s. 15.06. The parole commission created under s. 15.145 (1) shall be known as a "commission", but is not a commission for purposes of s. 15.06.

SECTION 139. 15.04 (1) (d) of the statutes is amended to read:

15.04 **(1)** (d) *Biennial report.* On or before October 15 of each odd−numbered year, submit to the governor and the chief clerk of each house of the legislature, for distribution to the legislature under s. 13.172 (2), a report on the performance and operations of the department or independent agency during the preceding biennium, and projecting the goals and objectives of the department or independent agency as developed for the program budget report. The secretary of administration may prescribe the format of the report and may require such other information deemed appropriate. Each department or independent agency shall provide a copy of its biennial report to legislators upon request. Any department or independent agency may issue such additional reports on its findings and recommendations as its operations require. A department or independent agency may, on or before October 15, submit an annual report prepared by it, in place of the biennial report required under this paragraph, if the submission of the annual reports is approved by the secretary of administration or is otherwise required by law.

SECTION 140. 15.06 (1) (d) of the statutes is created to read:

15.06 **(1)** (d) Members of the elections commission shall be appointed and serve terms as provided under s. 15.61.

SECTION 141. 15.06 (1) (e) of the statutes is created to read:

15.06 **(1)** (e) Members of the ethics commission shall be appointed and serve terms as provided under s. 15.62.

SECTION 142. 15.06 (2) of the statutes, as affected by 2015 Wisconsin Act 55, is renumbered 15.06 (2) (a) and amended to read:

15.06 **(2)** (a) ~~Each~~ Except as provided in par. (b), each commission may annually elect officers other than a chairperson from among its members as its work requires. Any officer may be reappointed or reelected. At the time of making new nominations to commissions, the governor shall designate a member or nominee of each commission, other than the public service commission, and except as provided in par. (b), to serve as the commission's chairperson for a 2−year term expiring on March 1 of the odd−numbered year except that the labor and industry review commission shall elect one of its members to serve as the commission's chairperson for a 2−year term expiring on March 1 of the odd−numbered year.

SECTION 143. 15.06 (2) (b) of the statutes is created to read:

15.06 **(2)** (b) 1. The chairperson of the elections commission shall be chosen from the members appointed under s. 15.61 (1) (a) 1. to 4. by affirmative vote of at least two−thirds of the commission members at the commission's first meeting every 2 years. The chairperson shall serve a 2−year term. The first chairperson shall be chosen from the commissioners affiliated with the same major political party. The major political party from which to select the first chairperson shall be determined by lot. The 2nd chairperson shall be chosen from the commissioners affiliated with the other major political party. Each subsequent chairperson shall be chosen from the commissioners affiliated with the 2 major political parties on a rotating basis.

2. The chairperson of the ethics commission shall be chosen from the members appointed under s. 15.62 (1) (a) 1. to 4. by affirmative vote of at least two−thirds of the commission members at the commission's first meeting every 2 years. The chairperson shall serve a 2−year term. The first chairperson shall be chosen from the commissioners affiliated with the same major political party. The major political party from which to select the first chairperson shall be determined by lot. The 2nd chairperson shall be chosen from the commissioners affiliated with the other major political party. Each subsequent chairperson shall be chosen from the commissioners affiliated with the 2 major political parties on a rotating basis.

SECTION 144. 15.06 (3) (a) 5. of the statutes is created to read:

15.06 **(3)** (a) 5. Members of the elections commission.

**SECTION 145.** 15.06 (3) (a) 6. of the statutes is created to read:

15.06 **(3)** (a) 6. Members of the ethics commission.

**SECTION 146.** 15.06 (5) of the statutes is amended to read:

15.06 **(5)** FREQUENCY OF MEETINGS; PLACE. Every commission shall meet on the call of the chairperson or a majority of its members. Every commission shall maintain its offices in Madison, but may meet or hold hearings at such other locations as will best serve the citizens of this state. The elections commission and the ethics commission shall meet in person at least 4 times each year and shall conduct meetings in accordance with accepted parliamentary procedure.

**SECTION 147.** 15.06 (6) of the statutes is amended to read:

15.06 **(6)** QUORUM. A majority of the membership of a commission constitutes a quorum to do business, except that vacancies shall not prevent a commission from doing business. This subsection does not apply to the parole commission, elections commission, or ethics commission.

**SECTION 148.** 15.06 (10) of the statutes is created to read:

15.06 **(10)** COMPENSATION. Members of the elections commission and members of the ethics commission shall receive for each day they were actually and necessarily engaged in performing their duties a per diem equal to the amount prescribed under s. 753.075 (3) (a) for reserve judges sitting in circuit court.

**SECTION 149.** 15.07 (1) (a) 2. of the statutes is repealed.

**SECTION 150.** 15.07 (1) (cm) of the statutes is amended to read:

15.07 **(1)** (cm) The term of one member of the government accountability board shall expire on each May 1. The terms of the 3 members of the land and water conservation board appointed under s. 15.135 (4) (b) 2. shall expire on January 1. The term of the member of the land and water conservation board appointed under s. 15.135 (4) (b) 2m. shall expire on May 1 of an even–numbered year. The terms of the appraiser members of the real estate appraisers board and the terms of the auctioneer and auction company representative members of the auctioneer board shall expire on May 1 in an even–numbered year. The terms of the members of the cemetery board shall expire on July 1 in an even–numbered year. The term of the student member of the Board of Regents of the University of Wisconsin System who is at least 24 years old shall expire on May 1 of every even–numbered year.

**SECTION 151.** 15.07 (2) (b) of the statutes is repealed.

**SECTION 152.** 15.07 (4) of the statutes is amended to read:

15.07 **(4)** QUORUM. A majority of the membership of a board constitutes a quorum to do business, and, unless a more restrictive provision is adopted by the board, a majority of a quorum may act in any matter within the jurisdiction of the board. This subsection does not apply to actions of the government accountability board or the school district boundary appeal board as provided in ss. 5.05 (1e) and s. 117.05 (2) (a).

**SECTION 153.** 15.07 (5) (m) of the statutes is repealed.

**SECTION 154.** 15.60 (title) of the statutes is repealed.

**SECTION 155.** 15.60 (1) of the statutes is renumbered 15.61 (1) (a) (intro.) and amended to read:

15.61 **(1)** (a) (intro.) There is created a government accountability board an elections commission consisting of 6 persons. Members shall serve for 6–year terms. the following members who shall serve for 5–year terms:

**SECTION 156.** 15.60 (2) of the statutes is repealed.

**SECTION 157.** 15.60 (3) of the statutes is repealed.

**SECTION 158.** 15.60 (4) of the statutes is renumbered 15.61 (2) and amended to read:

15.61 **(2)** No member of the commission may hold another office or position that is a state public office or a local public office, as defined in s. 19.42, except the office of circuit judge or court of appeals judge under s. 753.075.

**SECTION 159.** 15.60 (5) of the statutes is repealed.

**SECTION 160.** 15.60 (6) of the statutes is renumbered 15.61 (3).

**SECTION 161.** 15.60 (7) of the statutes is repealed.

**SECTION 162.** 15.60 (8) of the statutes is renumbered 15.61 (4) and amended to read:

15.61 **(4)** No member may be a lobbyist, as defined in s. 13.62 (11), or an employee of a principal, as defined in s. 13.62 (12), except that a member may serve as a circuit judge or court of appeals judge under s. 753.075.

**SECTION 163.** 15.603 (title) of the statutes is repealed.

**SECTION 164.** 15.603 (1) (title) of the statutes is repealed.

**SECTION 165.** 15.603 (1) of the statutes is renumbered 15.62 (1) (b) 1. and amended to read:

15.62 **(1)** (b) 1. There is created in the government accountability board an ethics and accountability division. The ethics and accountability division commission shall be under the direction and supervision of an administrator, who shall be appointed by a majority of the members of the board commission, with the advice and consent of the senate, to serve for a 4–year term expiring on July 1 of the odd–numbered year. Until the senate has confirmed an appointment made under this subdivision, the ethics commission shall be under the direction and supervision of an interim administrator selected by a majority of the members of the commission. If a vacancy occurs in the administrator position, the commission

shall appoint a new administrator, and submit the appointment for senate confirmation, no later than 45 days after the date of the vacancy. If the commission has not appointed a new administrator at the end of the 45−day period, the joint committee on legislative organization shall appoint an interim administrator to serve until a new administrator has been confirmed by the senate but for a term of no longer than one year. If the administrator position remains vacant at the end of the one−year period, the process for filling the vacancy described in this subdivision is repeated until the vacancy is filled.

**SECTION 166.** 15.603 (2) (title) of the statutes is repealed.

**SECTION 167.** 15.603 (2) of the statutes is renumbered 15.61 (1) (b) 1. and amended to read:

15.61 (1) (b) 1. ~~There is created in the government accountability board an elections division.~~ The elections ~~division~~ commission shall be under the direction and supervision of an administrator, who shall be appointed by a majority of the members of the ~~board~~ commission, with the advice and consent of the senate, to serve for a 4−year term expiring on July 1 of the odd−numbered year. Until the senate has confirmed an appointment made under this subdivision, the elections commission shall be under the direction and supervision of an interim administrator selected by a majority of the members of the commission. If a vacancy occurs in the administrator position, the commission shall appoint a new administrator, and submit the appointment for senate confirmation, no later than 45 days after the date of the vacancy. If the commission has not appointed a new administrator at the end of the 45−day period, the joint committee on legislative organization shall appoint an interim administrator to serve until a new administrator has been confirmed by the senate but for a term of no longer than one year. If the administrator position remains vacant at the end of the one−year period, the process for filling the vacancy described in this subdivision is repeated until the vacancy is filled.

**SECTION 168.** 15.607 of the statutes is repealed.

**SECTION 169.** 15.61 (title) of the statutes is created to read:

**15.61** (title) **Elections commission; creation.**

**SECTION 170.** 15.61 (1) (a) 1. to 6. of the statutes are created to read:

15.61 (1) (a) 1. One member appointed by the senate majority leader.

2. One member appointed by the senate minority leader.

3. One member appointed by the speaker of the assembly.

4. One member appointed by the assembly minority leader.

5. Two members who formerly served as county or municipal clerks and who are nominated by the governor, with the advice and consent of a majority of the members

of the senate confirmed. The legislative leadership of the 2 major political parties that received the largest number of votes for president shall prepare a list of not more than 3 individuals such that each major political party has prepared one list. The governor shall choose one nominee from each list.    **Vetoed In Part**

6. For each political party, other than the 2 major political parties, qualifying for a separate ballot under s. 5.62 (1) (b) or (2) whose candidate for governor received at least 10 percent of the vote in the most recent gubernatorial election, one member, nominated by the governor from a list of 3 individuals selected by the chief officer of that political party and with the advice and consent of a majority of the members of the senate confirmed.

**SECTION 170g.** 15.61 (1) (b) 2. of the statutes is created to read:

15.61 **(1)** (b) 2. The administrator may be removed by the affirmative vote of a majority of all members of the commission voting at a meeting of the commission called for that purpose.

**SECTION 170m.** 15.61 (1m) of the statutes is created to read:

15.61 **(1m)** Members appointed with the advice and consent of the senate may serve prior to senate confirmation.

**SECTION 171.** 15.61 (5) of the statutes is created to read:

15.61 **(5)** (a) 1. Except as provided in subd. 2., if a vacancy occurs for a member appointed under sub. (1) (a) 1. to 4., the individual responsible for making the appointment shall appoint a new member no later than 45 days after the date of the vacancy.

2. If the political party affiliation of the individual responsible for filling a vacancy under this paragraph is not the same as the political party affiliation of the individual who made the initial appointment, the legislative leader of the political party that made the initial appointment shall fill the vacancy.

(b) If a vacancy occurs for a member appointed under sub. (1) (a) 5. or 6., a new member shall be selected, nominated, and submitted to the senate for confirmation no later than 45 days after the date of the vacancy.

**SECTION 172.** 15.62 of the statutes is created to read:

**15.62 Ethics commission; creation. (1)** (a) There is created an ethics commission consisting of the following members who shall serve for 5−year terms:

1. One member appointed by the senate majority leader.

2. One member appointed by the senate minority leader.

3. One member appointed by the speaker of the assembly.

4. One member appointed by the assembly minority leader.

5. Two individuals who formerly served as judges for a court of record in this state, who were elected to the

positions in which they served, and who are nominated by the governor with the advice and consent of a majority of the members of the senate confirmed. The legislative leadership of the 2 major political parties that received the largest number of votes for president shall prepare a list of not more than 3 individuals such that each major political party has prepared one list. The governor shall choose one nominee from each list.

**Vetoed In Part**

6. For each political party, other than the 2 major political parties, qualifying for a separate ballot under s. 5.62 (1) (b) or (2) whose candidate for governor received at least 10 percent of the vote in the most recent gubernatorial election, one member, nominated by the governor from a list of 3 individuals selected by the chief officer of that political party and with the advice and consent of a majority of the members of the senate confirmed.

(b) 2. The administrator may be removed by the affirmative vote of a majority of all members of the commission voting at a meeting of the commission called for that purpose.

**(1m)** Members appointed with the advice and consent of the senate may serve prior to senate confirmation.

**(2)** No member of the commission may hold another office or position that is a state public office or a local public office, as defined in s. 19.42, except the office of circuit judge or court of appeals judge under s. 753.075.

**(3)** No member, while serving on the commission, may become a candidate, as defined in s. 11.0101 (1), for state office or local office, as defined in s. 5.02.

**(4)** No member may be a lobbyist, as defined in s. 13.62 (11), or an employee of a principal, as defined in s. 13.62 (12), except that a member may serve as a circuit judge or court of appeals judge under s. 753.075.

**(5)** (a) 1. Except as provided in subd. 2., if a vacancy occurs for a member appointed under sub. (1) (a) 1. to 4., the individual responsible for making the appointment shall appoint a new member no later than 45 days after the date of the vacancy.

2. If the political party affiliation of the individual responsible for filling a vacancy under this paragraph is not the same as the political party affiliation of the individual who made the initial appointment, the legislative leader of the political party that made the initial appointment shall fill the vacancy.

(b) If a vacancy occurs for a member appointed under sub. (1) (a) 5. or 6., a new member shall be selected, nominated, and submitted to the senate for confirmation no later than 45 days after the date of the vacancy.

SECTION 173. 16.753 (2) of the statutes is amended to read:

16.753 **(2)** Except as otherwise expressly provided, each agency shall provide to the ~~government accountability board~~ ethics commission for posting on the Internet a list identifying each solicitation for bids or competitive sealed proposals and each proposed order or contract of the agency for which bids or competitive sealed propos-

als will not be solicited that involves a major expenditure, together with all information required under sub. (4).

SECTION 174. 16.79 (2) of the statutes is amended to read:

16.79 **(2)** The department shall distribute in pamphlet form copies of the constitution and such laws as may be required to meet the public demand, including the election laws. The department shall distribute election manuals, forms, and supplies specified by the ~~government accountability board~~ elections commission. The laws, manuals, forms, and supplies shall be sold by the department at cost, including distribution cost as determined under s. 35.80. The ~~government accountability board~~ elections commission shall inform the department in writing as to which election manuals, forms, and supplies shall be offered for distribution under this subsection.

SECTION 175. 16.96 (3) (b) of the statutes is amended to read:

16.96 **(3)** (b) Maintain and keep current throughout the decade the maps of congressional and legislative district boundaries received from the legislative reference bureau under s. 13.92 (1) (a) 6. and provide copies thereof to the ~~government accountability board~~ elections commission.

SECTION 176. 16.973 (6) of the statutes is amended to read:

16.973 **(6)** With the advice of the ~~government accountability board~~ ethics commission, adopt and enforce standards of ethical conduct applicable to its paid consultants which are similar to the standards prescribed in subch. III of ch. 19, except that the department shall not require its paid consultants to file statements of economic interests.

SECTION 177. 17.17 (1) of the statutes is amended to read:

17.17 **(1)** SENATORS AND MEMBERS OF CONGRESS. In the office of United States senator or member of congress from this state, by the county clerk of the county wherein such officer resided at the time of election, to the ~~government accountability board~~ elections commission.

SECTION 178. 17.17 (4) of the statutes is amended to read:

17.17 **(4)** JUSTICES AND JUDGES. In the office of justice of the supreme court, court of appeals judge, or judge of a circuit court, by the director of state courts to the governor and the ~~government accountability board~~ elections commission.

SECTION 179. 19.42 (3) of the statutes is repealed.

SECTION 180. 19.42 (4p) of the statutes is created to read:

19.42 **(4p)** "Commission" means the ethics commission.

SECTION 181. 19.42 (10) (a) of the statutes is created to read:

19.42 **(10)** (a) A member or employee of the elections commission.

SECTION 182. 19.43 (4) of the statutes is amended to read:

19.43 (4) A candidate for state public office shall file with the ~~board~~ commission a statement of economic interests meeting each of the requirements of s. 19.44 (1) no later than 4:30 p.m. on the 3rd day following the last day for filing nomination papers for the office which the candidate seeks, or no later than 4:30 p.m. on the next business day after the last day whenever that candidate is granted an extension of time for filing nomination papers or a declaration of candidacy under s. 8.05 (1) (j), 8.10 (2) (a), 8.15 (1), or 8.20 (8) (a)~~,~~; no later than 4:30 p.m. on the 5th day after notification of nomination is mailed or personally delivered to the candidate by the municipal clerk in the case of a candidate who is nominated at a caucus~~,~~; or no later than 4:30 p.m. on the 3rd day after notification of nomination is mailed or personally delivered to the candidate by the appropriate official or agency in the case of a write–in candidate or candidate who is appointed to fill a vacancy in nomination under s. 8.35 (2) (a). The information contained on the statement shall be current as of December 31 of the year preceding the filing deadline. Before certifying the name of any candidate for state public office under s. 7.08 (2) (a), the ~~government accountability board~~ elections commission, municipal clerk, or board of election commissioners shall ascertain whether that candidate has complied with this subsection. If not, the ~~government accountability board~~ elections commission, municipal clerk, or board of election commissioners may not certify the candidate's name for ballot placement.

SECTION 183. 19.43 (5) of the statutes is amended to read:

19.43 (5) Each member of the investment board and each employee of the investment board who is a state public official shall complete and file with the ~~government accountability board~~ commission a quarterly report of economic transactions no later than the last day of the month following the end of each calendar quarter during any portion of which he or she was a member or employee of the investment board. Such reports of economic transactions shall be in the form prescribed by the ~~government accountability board~~ commission and shall identify the date and nature of any purchase, sale, put, call, option, lease, or creation, dissolution, or modification of any economic interest made during the quarter for which the report is filed and disclosure of which would be required by s. 19.44 if a statement of economic interests were being filed.

SECTION 184. 19.46 (1) (intro.) of the statutes is amended to read:

19.46 (1) (intro.) Except in accordance with the ~~board's~~ commission's advice under ~~s. 5.05 (6a)~~ sub. (2) and except as otherwise provided in sub. (3), no state public official may:

SECTION 185. 19.46 (2) of the statutes is created to read:

19.46 (2) (a) 1. Any individual, either personally or on behalf of an organization or governmental body, may make a request of the commission in writing, electronically, or by telephone for a formal or informal advisory opinion regarding the propriety under ch. 11, subch. III of ch. 13, or this subchapter of any matter to which the person is or may become a party. Any appointing officer, with the consent of a prospective appointee, may request of the commission a formal or informal advisory opinion regarding the propriety under ch. 11, subch. III of ch. 13, or this subchapter of any matter to which the prospective appointee is or may become a party. The commission shall review a request for an advisory opinion and may issue a formal or informal written or electronic advisory opinion to the person making the request. Except as authorized or required for opinions specified in s. 19.55 (4) (b), the commission's deliberations and actions upon such requests shall be in meetings not open to the public. A member of the commission may, by written request, require the commission to review an advisory opinion.

2. To have legal force and effect, each formal and informal advisory opinion issued by the commission must be supported by specific legal authority under a statute or other law, or by specific case or common law authority. Each formal and informal advisory opinion shall include a citation to each statute or other law and each case or common law authority upon which the opinion is based, and shall specifically articulate or explain which parts of the cited authority are relevant to the commission's conclusion and why they are relevant.

3. No person acting in good faith upon a formal or informal advisory opinion issued by the commission under this subsection is subject to criminal or civil prosecution for so acting, if the material facts are as stated in the opinion request.

4. At each regular meeting of the commission, the commission administrator shall review informal advisory opinions requested of and issued by the administrator and that relate to recurring issues or issues of first impression for which no formal advisory opinion has been issued. The commission may determine to issue a formal advisory opinion adopting or modifying the informal advisory opinion. If the commission disagrees with a formal or informal advisory opinion that has been issued by or on behalf of the commission, the commission may withdraw the opinion, issue a revised formal or informal advisory opinion, or request an opinion from the attorney general. No person acting after the date of the withdrawal or issuance of the revised advisory opinion is exempted from prosecution under this subsection if the opinion upon which the person's action is based has been withdrawn or revised in relevant degree.

5. Except as authorized or required under s. 19.55 (4) (b), no member or employee of the commission may make public the identity of the individual requesting a formal or informal advisory opinion or of individuals or organizations mentioned in the opinion.

(b) 1. The commission may authorize the commission administrator or his or her designee to issue an informal written advisory opinion or transmit an informal advisory opinion electronically on behalf of the commission, subject to such limitations as the commission deems appropriate. Every informal advisory opinion shall be consistent with applicable formal advisory opinions issued by the commission, statute or other law, and case law.

2. Any individual may request in writing, electronically, or by telephone an informal advisory opinion from the commission under this paragraph. The commission's designee shall provide a written response, a written reference to an applicable statute or law, or a written reference to a formal advisory opinion of the commission to the individual, or shall refer the request to the commission for review and the issuance of a formal advisory opinion.

3. Any person receiving an informal advisory opinion under this paragraph may, at any time, request a formal advisory opinion from the commission on the same matter.

(c) 1. Any individual may request in writing, electronically, or by telephone a formal advisory opinion from the commission or the review or modification of a formal advisory opinion issued by the commission under this paragraph. The individual making the request shall include all pertinent facts relevant to the matter. The commission shall review a request for a formal advisory opinion and may issue a formal advisory opinion to the individual making the request. Except as authorized or required for opinions specified in s. 19.55 (4) (b), the commission's deliberations and actions upon such requests shall be in meetings not open to the public.

2. Any person requesting a formal advisory opinion under this paragraph may request a public or private hearing before the commission to discuss the opinion. The commission shall grant a request for a public or private hearing under this paragraph.

3. Promptly upon issuance of each formal advisory opinion, the commission shall publish the opinion together with the information specified under s. 19.55 (4) (c) on the commission's Internet site.

4. If the commission declines to issue a formal advisory opinion, it may refer the matter to the attorney general or to the standing legislative oversight committees.

SECTION 186. 19.47 (title) of the statutes is created to read:

**19.47 (title) Operation.**

SECTION 187. 19.47 of the statutes is renumbered 19.47 (3) and amended to read:

19.47 **(3)** STATEMENTS OF ECONOMIC INTERESTS. All members and employees of the ~~board~~ commission shall file statements of economic interests with the ~~board~~ commission.

SECTION 188. 19.47 (1), (2) and (4) to (10) of the statutes are created to read:

19.47 **(1)** OFFICE. The office of the commission shall be in Madison, but the commission may, after proper public notice and in compliance with subch. V, meet or exercise any of its powers at any other place in the state.

**(2)** ADMINISTRATOR. The commission shall appoint an administrator in the manner provided under s. 15.62 (1) (b). The administrator shall be outside the classified service. The administrator shall appoint such other personnel as he or she requires to carry out the duties of the commission and may designate an employee of the commission to serve as legal counsel of the commission. The administrator shall perform such duties as the commission assigns to him or her in the administration of ch. 11, subch. III of ch. 13, and this subchapter.

**(4)** ACTION. Any action by the commission, except an action relating to procedure of the commission, requires the affirmative vote of at least two−thirds of its members.

**(5)** ANNUAL REPORT. The commission shall submit an annual report under s. 15.04 (1) (d) and shall include in its annual report the names and duties of all individuals employed by the commission and a summary of its determinations and advisory opinions issued under s. 19.46 (2). Except as authorized or required under s. 19.55 (4) (b), the commission shall make sufficient alterations in the summaries to prevent disclosing the identities of individuals or organizations involved in the decisions or opinions. The commission shall identify in its report the statutory duties of the administrator of the commission, together with a description of the manner in which those duties are being fulfilled. Notwithstanding ss. 19.50 and 19.55 (3), the commission shall also specify in its report the total number of investigations conducted by the commission since the last annual report and a description of the nature of each investigation, including whether the investigation related to campaign finance, ethics, or lobbying. The commission may also include in its annual report any information compiled under s. 11.1304 (14). The commission shall make such further reports on the matters within its jurisdiction and such recommendations for legislation as it deems appropriate.

**(6)** OPERATION. The joint committee on legislative organization shall be advisory to the commission on all matters relating to operation of the commission.

**(7)** GUIDANCE FOLLOWING BINDING COURT DECISIONS. Within 2 months following the publication of a decision of a state or federal court that is binding on the commission and this state, the commission shall issue updated guidance or formal advisory opinions, commence the

rule−making procedure to revise administrative rules promulgated by the commission, or request an opinion from the attorney general on the applicability of the court decision.

(**8**) Standing. The commission has standing to commence or intervene in any civil action or proceeding for the purpose of enforcing the laws regulating campaign finance, ethics, or lobbying or ensuring their proper administration.

(**9**) Policies and procedures. (a) Annually, the commission shall adopt written policies and procedures in order to govern its internal operations and management and shall annually report such policies and procedures to the appropriate standing committees of the legislature under s. 13.172 (3).

(b) Notwithstanding par. (a), the commission may reconsider at any time any policy or procedure adopted as provided under par. (a). If, upon reconsideration, the commission revises a previously reported policy or procedure, the commission shall report the revision to the appropriate standing committees of the legislature under s. 13.172 (3).

(c) The commission may reconsider at any time any written directives or written guidance provided to the general public or to any person subject to the provisions of ch. 11, subch. III of ch. 13, and this subchapter with regard to the enforcement and administration of those provisions.

(**10**) Employees. All employees of the commission shall be nonpartisan.

(**11**) Payments. The commission may accept payment by credit card, debit card, or other electronic payment mechanism for any amounts owed pursuant to the administration of ch. 11, subch. III of ch. 13, or this subchapter, and may charge a surcharge to the payer to recover charges associated with the acceptance of that electronic payment.

Section 189. 19.48 (intro.) of the statutes is amended to read:

**19.48 Duties of the ~~board~~ ethics commission.** (intro.) The ~~board~~ commission shall:

Section 190. 19.48 (1) of the statutes is amended to read:

19.48 (**1**) Promulgate rules necessary to carry out ~~this subchapter and~~ ch. 11, subch. III of ch. 13, and this subchapter. The ~~board~~ commission shall give prompt notice of the contents of its rules to state public officials who will be affected thereby.

Section 191. 19.48 (2) of the statutes is amended to read:

19.48 (**2**) Prescribe and make available forms for use under ~~this subchapter and~~ ch. 11, subch. III of ch. 13, and this subchapter, including the forms specified in s. 13.685 (1).

Section 192. 19.48 (3) of the statutes is amended to read:

19.48 (**3**) Accept and file any information related to the purposes of ~~this subchapter and~~ ch. 11, subch. III of ch. 13, and this subchapter which is voluntarily supplied by any person in addition to the information required by this subchapter.

Section 193. 19.48 (7) of the statutes is amended to read:

19.48 (**7**) Prepare and publish special reports and technical studies to further the purposes of ~~this subchapter and~~ ch. 11, subch. III of ch. 13, and this subchapter.

Section 194. 19.48 (9) of the statutes is amended to read:

19.48 (**9**) Administer programs to explain and interpret ~~this subchapter and~~ ch. 11, subch. III of ch. 13, and this subchapter for state public officials, and for elective state officials, candidates for state public office, legislative officials, agency officials, lobbyists, as defined in s. 13.62, local public officials, corporation counsels and attorneys for local governmental units. The programs shall provide advice regarding appropriate ethical and lobbying practices, with special emphasis on public interest lobbying. The ~~board~~ commission may delegate creation and implementation of any such program to a group representing the public interest. The ~~board~~ commission may charge a fee to participants in any such program.

Section 195. 19.49 of the statutes is created to read:

**19.49 Administration; enforcement. (1)** General authority. The commission shall have the responsibility for the administration of ch. 11, subch. III of ch. 13, and this subchapter. Pursuant to such responsibility, the commission may:

(a) In the discharge of its duties and after providing notice to any party who is the subject of an investigation, subpoena and bring before it any person and require the production of any papers, book, or other records relevant to an investigation. Notwithstanding s. 885.01 (4), the issuance of a subpoena requires action by the commission at a meeting of the commission. A circuit court may by order permit the inspection and copying of the accounts and the depositor's and loan records at any financial institution, as defined in s. 705.01 (3), doing business in the state to obtain evidence of any violation of ch. 11 upon showing by the commission of probable cause to believe there is a violation and that such accounts and records may have a substantial relation to the violation. In the discharge of its duties, the commission may cause the deposition of witnesses to be taken in the manner prescribed for taking depositions in civil actions in circuit court.

(b) Bring civil actions to require a forfeiture for any violation of ch. 11, subch. III of ch. 13, or this subchapter or for a license revocation for any violation of subch. III of ch. 13 for which the offender is subject to a revocation. The commission may compromise and settle any civil

action or potential action brought or authorized to be brought by it which, in the opinion of the commission, constitutes a minor violation, a violation caused by excusable neglect, or which for other good cause shown, should not in the public interest be prosecuted under such chapter. Notwithstanding s. 778.06, a civil action or proposed civil action authorized under this paragraph may be settled for such sum as may be agreed between the parties. Any settlement made by the commission shall be in such amount as to deprive the alleged violator of any benefit of his or her wrongdoing and may contain a penal component to serve as a deterrent to future violations. In settling civil actions or proposed civil actions, the commission shall treat comparable situations in a comparable manner and shall assure that any settlement bears a reasonable relationship to the severity of the offense or alleged offense. Except as otherwise provided in sub. (2) (b) 13. and 14. and ss. 19.554 and 19.59 (8), forfeiture and license revocation actions brought by the commission shall be brought in the circuit court for the county where the defendant resides, or if the defendant is a nonresident of this state, in circuit court for the county wherein the violation is alleged to occur. For purposes of this paragraph, a person other than an individual resides within a county if the person's principal place of operation is located within that county. Whenever the commission enters into a settlement agreement with an individual who is accused of a civil violation of ch. 11, subch. III of ch. 13, or this subchapter or who is investigated by the commission for a possible civil violation of one of those provisions, the commission shall reduce the agreement to writing, together with a statement of the commission's findings and reasons for entering into the agreement and shall retain the agreement and statement in its office for inspection.

(c) Sue for injunctive relief, a writ of mandamus or prohibition, or other such legal or equitable relief as may be appropriate to enforce any law regulating campaign financing or ensure its proper administration. No bond is required in such actions. Actions shall be brought in circuit court for the county where a violation occurs or may occur.

**(1m)** (title) COMPLAINTS.

**(2)** ENFORCEMENT. (a) The commission shall investigate violations of laws administered by the commission and may prosecute alleged civil violations of those laws, directly or through its agents under this subsection, pursuant to all statutes granting or assigning that authority or responsibility to the commission. Prosecution of alleged criminal violations investigated by the commission may be brought only as provided in par. (b) 9., 12., 13., and 14. and s. 978.05 (1). For purposes of this subsection, the commission may only initiate an investigation of an alleged violation of ch. 11, subch. III of ch. 13, and this subchapter, other than an offense described under par. (b) 10., based on a sworn complaint filed with the commis-

sion, as provided under par. (b). Neither the commission nor any member or employee of the commission, including the commission administrator, may file a sworn complaint for purposes of this subsection.

(b) 1. Any person may file a complaint with the commission alleging a violation of ch. 11, subch. III of ch. 13, or this subchapter. No later than 5 days after receiving a complaint, the commission shall notify each person who or which the complaint alleges committed such a violation. Before voting on whether to take any action regarding the complaint, other than to dismiss, the commission shall give each person receiving a notice under this subdivision an opportunity to demonstrate to the commission, in writing and within 15 days after receiving the notice, that the commission should take no action against the person on the basis of the complaint. The commission may not conduct any investigation or take any other action under this subsection solely on the basis of a complaint by an unidentified complainant.

1m. If the commission finds, by a preponderance of the evidence, that a complaint is frivolous, the commission may order the complainant to forfeit not more than the greater of $500 or the expenses incurred by the commission in investigating the complaint.

2. Any person to whom ch. 11, subch. III of ch. 13, or this subchapter may have application may request the commission to make an investigation of his or her own conduct or of allegations made by other persons as to his or her conduct. Such a request shall be made in writing and shall set forth in detail the reasons therefor.

3. If the commission reviews a complaint and fails to find that there is a reasonable suspicion that a violation under subd. 1. has occurred or is occurring, the commission shall dismiss the complaint. If the commission believes that there is reasonable suspicion that a violation under subd. 1. has occurred or is occurring, the commission may by resolution authorize the commencement of an investigation. The resolution shall specifically set forth any matter that is authorized to be investigated. To assist in the investigation, the commission may elect to retain a special investigator. If the commission elects to retain a special investigator, the administrator shall submit to the commission the names of 3 qualified individuals to serve as a special investigator. The commission may retain one or more of the individuals. If the commission retains a special investigator to investigate a complaint against a person who is a resident of this state, the commission shall provide to the district attorney for the county in which the person resides a copy of the complaint and shall notify the district attorney that it has retained a special investigator to investigate the complaint. For purposes of this subdivision, a person other than an individual resides within a county if the person's principal place of operation is located within that county. The commission shall enter into a written contract with any individual who is retained as a special investigator

setting forth the terms of the engagement. A special investigator who is retained by the commission may request the commission to issue a subpoena to a specific person or to authorize the special investigator to request the circuit court of the county in which the specific person resides to issue a search warrant. The commission may grant the request by approving a motion to that effect at a meeting of the commission if the commission finds that such action is legally appropriate.

4. Each special investigator who is retained by the commission shall make periodic reports to the commission, as directed by the commission, but in no case may the interval for reporting exceed 30 days. If the commission authorizes the administrator to investigate any matter without retaining a special investigator, the administrator shall make periodic reports to the commission, as directed by the commission, but in no case may the reporting interval exceed 30 days. During the pendency of any investigation, the commission shall meet for the purpose of reviewing the progress of the investigation at least once every 90 days. The special investigator or the administrator shall report in person to the commission at that meeting concerning the progress of the investigation. If, after receiving a report, the commission does not vote to continue an investigation for an additional period not exceeding 90 days, the investigation is terminated at the end of the reporting interval. The commission shall not expend more than $25,000 to finance the cost of an investigation before receiving a report on the progress of the investigation and a recommendation to commit additional resources. The commission may vote to terminate an investigation at any time. If an investigation is terminated, any complaint from which the investigation arose is deemed to be dismissed by the commission. Unless an investigation is terminated by the commission, at the conclusion of each investigation, the administrator shall present to the commission one of the following:

a. A recommendation to make a finding that probable cause exists to believe that one or more violations under subd. 1. have occurred or are occurring, together with a recommended course of action.

b. A recommendation for further investigation of the matter together with facts supporting that course of action.

c. A recommendation to terminate the investigation due to lack of sufficient evidence to indicate that a violation under subd. 1. has occurred or is occurring.

5. a. If the commission finds that there is probable cause to believe that a violation under subd. 1. has occurred or is occurring, the commission may authorize the administrator to file a civil complaint against the alleged violator. In such case, the administrator may request the assistance of special counsel to prosecute any action brought by the commission. If the administrator requests the assistance of special counsel with respect to any matter, the administrator shall submit to the commis-

sion the names of 3 qualified individuals to serve as special counsel. The commission may retain one of the individuals to act as special counsel. The staff of the commission shall provide assistance to the special counsel as may be required by the counsel to carry out his or her responsibilities.

b. The commission shall enter into a written contract with any individual who is retained as special counsel setting forth the terms of the engagement. The contract shall set forth the compensation to be paid such counsel by the state. The contract shall be executed on behalf of the state by the commission and the commission shall file the contract in the office of the secretary of state. The compensation shall be charged to the appropriation under s. 20.521 (1) (br).

6. No individual who is appointed or retained by the commission to serve as special counsel or as a special investigator is subject to approval under s. 20.930.

7. At the conclusion of its investigation, the commission shall, in preliminary written findings of fact and conclusions based thereon, make a determination of whether or not probable cause exists to believe that a violation under subd. 1. has occurred or is occurring. If the commission determines that no probable cause exists, it shall dismiss the complaint. Whenever the commission dismisses a complaint or a complaint is deemed to be dismissed under subd. 4., the commission shall immediately send written notice of the dismissal to the accused and to the party who made the complaint.

8. The commission shall inform the accused or his or her counsel of exculpatory evidence in its possession.

9. If the commission finds that there is probable cause to believe that a violation under subd. 1. has occurred or is occurring, the commission may, in lieu of civil prosecution of any matter by the commission, refer the matter to the district attorney for the county in which the alleged violator resides, or if the alleged violator is a nonresident, to the district attorney for the county where the matter arises, or if par. (h) applies, to the attorney general or a special prosecutor. For purposes of this subdivision, a person other than an individual resides within a county if the person's principal place of operation is located within that county.

10. The commission shall, by rule, prescribe categories of civil offenses which the commission will agree to compromise and settle without a formal investigation upon payment of specified amounts by the alleged offender. The commission may authorize the administrator to compromise and settle such alleged offenses in the name of the commission if the alleged offenses by an offender, in the aggregate, do not involve payment of more than $2,500.

11. If a special investigator or the administrator, in the course of an investigation authorized by the commission, discovers evidence that a violation under subd. 1. that was not within the scope of the authorized investiga-

tion has occurred or is occurring, the special investigator or the administrator may present that evidence to the commission. If the commission finds that there is a reasonable suspicion that a violation under subd. 1. that is not within the scope of the authorized investigation has occurred or is occurring, the commission may authorize the special investigator or the administrator to investigate the alleged violation or may elect to authorize a separate investigation of the alleged violation as provided in subd. 3.

12. If a special investigator or the administrator, in the course of an investigation authorized by the commission, discovers evidence of a potential violation of a law that is not administered by the commission arising from or in relation to the official functions of the subject of the investigation or any matter that involves campaign finance, ethics, or lobbying regulation, the special investigator or the administrator may present that evidence to the commission. The commission may thereupon refer the matter to the appropriate district attorney specified in subd. 9. or may refer the matter to the attorney general. The attorney general may then commence a civil or criminal prosecution relating to the matter.

13. Except as provided in subd. 15., if the commission refers a matter to the district attorney specified in subd. 9. for prosecution of a potential violation under subd. 1. or 12. and the district attorney informs the commission that he or she declines to prosecute any alleged civil or criminal violation related to any matter referred to the district attorney by the commission, or the district attorney fails to commence a prosecution of any civil or criminal violation related to any matter referred to the district attorney by the commission within 60 days of the date of the commission's referral, the commission may refer the matter to the district attorney for another prosecutorial unit that is contiguous to the prosecutorial unit of the district attorney to whom the matter was originally referred. If there is more than one such prosecutorial unit, the chairperson of the commission shall determine the district attorney to whom the matter shall be referred by publicly drawing lots at a meeting of the commission. The district attorney may then commence a civil or criminal prosecution relating to the matter.

14. Except as provided in subd. 15., if the commission refers a matter to a district attorney under subd. 13. for prosecution of a potential violation under subd. 1. or 12. and the district attorney informs the commission that he or she declines to prosecute any alleged civil or criminal violation related to any matter referred to the district attorney by the commission, or the district attorney fails to commence a prosecution of any civil or criminal violation related to any matter referred to the district attorney by the commission within 60 days of the date of the commission's referral, the commission may refer the matter to the attorney general. The attorney general may then

commence a civil or criminal prosecution relating to the matter.

15. The commission is not authorized to act under subd. 13. or 14. if a special prosecutor is appointed under s. 978.045 in lieu of the district attorney specified in subd. 9.

16. Whenever the commission refers a matter to special counsel or to a district attorney or to the attorney general under this subsection, the special counsel, district attorney, or attorney general shall report to the commission concerning any action taken regarding the matter. The report shall be transmitted no later than 40 days after the date of the referral. If the matter is not disposed of during that period, the special counsel, district attorney, or attorney general shall file a subsequent report at the end of each 30−day period following the filing of the initial report until final disposition of the matter.

(c) 1. No individual who serves as the administrator may have been a lobbyist, as defined in s. 13.62 (11). No such individual may have served in a partisan state or local office.

2. No employee of the commission, while so employed, may become a candidate, as defined in s. 11.0101 (1), for a state or partisan local office. No individual who is retained by the commission to serve as a special investigator or as special counsel may, while so retained, become a candidate, as defined in s. 11.0101 (1), for any state or local office. A filing officer shall decline to accept nomination papers or a declaration of candidacy from any individual who does not qualify to become a candidate under this paragraph.

(d) No individual who serves as an employee of the commission and no individual who is retained by the commission to serve as a special investigator or a special counsel may, while so employed or retained, make a contribution, as defined in s. 11.0101 (8), to a candidate for state or local office. No individual who serves as an employee of the commission and no individual who is retained by the commission to serve as a special investigator or as special counsel, for 12 months prior to becoming so employed or retained, may have made a contribution, as defined in s. 11.0101 (8), to a candidate for a partisan state or local office.

(e) Pursuant to any investigation authorized under par. (b), the commission has the power:

1. To require any person to submit in writing such reports and answers to questions relevant to the proceedings as the commission may prescribe, such submission to be made within such period and under oath or otherwise as the commission may determine.

2. To order testimony to be taken by deposition before any individual who is designated by the commission and has the power to administer oaths, and, in such instances, to compel testimony and the production of evidence in the same manner as authorized by sub. (1) (a).

3. To pay witnesses the same fees and mileage as are paid in like circumstances by the courts of this state.

4. To request and obtain from the department of revenue copies of state income or franchise tax returns and access to other appropriate information under s. 71.78 (4) regarding all persons who are the subject of such investigation.

(f) 1. Except as provided in subd. 2., no action may be taken on any complaint that is filed later than 3 years after a violation of ch. 11, subch. III of ch. 13, or this subchapter is alleged to have occurred.

2. The period of limitation under subd. 1. is tolled for a complaint alleging a violation of s. 19.45 (13) or 19.59 (1) (br) for the period during which such a complaint may not be filed under sub. (1m) or s. 19.59 (8) (cm).

(g) If the defendant in an action for a civil violation of ch. 11, subch. III of ch. 13, or this subchapter is a district attorney or a circuit judge or a candidate for either such office, the action shall be brought by the commission. If the defendant in an action for a civil violation of ch. 11, subch. III of ch. 13, or this subchapter is the attorney general or a candidate for that office, the commission may appoint special counsel to bring suit on behalf of the state.

(h) If the defendant in an action for a criminal violation of ch. 11, subch. III of ch. 13, or this subchapter is a district attorney or a circuit judge or a candidate for either such office, the action shall be brought by the attorney general. If the defendant in an action for a criminal violation of ch. 11, subch. III of ch. 13, or this subchapter is the attorney general or a candidate for that office, the commission may appoint a special prosecutor to conduct the prosecution on behalf of the state.

(i) Any special counsel or prosecutor who is appointed under par. (g) or (h) shall be independent of the attorney general and need not be a state employee at the time of his or her appointment.

(j) The commission's power to initiate civil actions under this subsection for the enforcement of ch. 11, subch. III of ch. 13, or this subchapter shall be the exclusive remedy for alleged civil violations of ch. 11, subch. III of ch. 13, or this subchapter.

(2q) SUPPLEMENTAL FUNDING FOR ONGOING INVESTIGATIONS. The commission may request supplemental funds to be credited to the appropriation account under s. 20.521 (1) (be) for the purpose of continuing an ongoing investigation initiated under sub. (2). A request under this subsection shall be filed with the secretary of administration and the cochairpersons of the joint committee on finance in writing and shall contain a statement of the action requested, the purposes therefor, the statutory provision authorizing or directing the performance of the action, and information about the nature of the investigation for which the commission seeks supplemental funds, excluding the name of any individual or organization that is the subject of the investigation. If the cochairpersons

of the joint committee on finance do not notify the secretary of administration that the committee has scheduled a meeting for the purpose of reviewing the request within 14 working days after the commission filed the request, the secretary shall supplement the appropriation under s. 20.521 (1) (be) from the appropriation under s. 20.505 (1) (d) in an amount not to exceed the amount the commission requested. If, within 14 working days after the commission filed the request, the cochairpersons of the joint committee on finance notify the secretary that the committee has scheduled a meeting for the purpose of reviewing the commission's request under this subsection, the secretary may supplement the appropriation under s. 20.521 (1) (be) only with the committee's approval. The committee and the secretary shall notify the commission of all their actions taken under this subsection.

SECTION 196. 19.50 of the statutes is created to read:

**19.50 Unauthorized release of records or information.** (1) Except as specifically authorized by law and except as provided in sub. (2), no investigator, prosecutor, employee of an investigator or prosecutor, or member or employee of the commission may disclose information related to an investigation or prosecution under ch. 11, subch. III of ch. 13, or this subchapter or any other law specified in s. 978.05 (1) or (2) or provide access to any record of the investigator, prosecutor, or the commission that is not subject to access under s. 19.55 (3) to any person other than an employee or agent of the prosecutor or investigator or a member, employee, or agent of the commission prior to presenting the information or record in a court of law.

(2) This section does not apply to any of the following communications made by an investigator, prosecutor, employee of an investigator or prosecutor, or member or employee of the commission:

(a) Communications made in the normal course of an investigation or prosecution.

(b) Communications with a local, state, or federal law enforcement or prosecutorial authority.

(c) Communications made to the attorney of an investigator, prosecutor, employee, or member of the commission or to a person or the attorney of a person who is investigated or prosecuted by the commission.

SECTION 197. 19.55 (1) of the statutes is amended to read:

19.55 (1) Except as provided in ~~sub.~~ subs. (2) ~~and s. 5.05 (5s)~~ to (4), all records under ch. 11, this subchapter, or subch. III of ch. 13 in the possession of the ~~board~~ commission are open to public inspection at all reasonable times. The ~~board~~ commission shall require an individual wishing to examine a statement of economic interests or the list of persons who inspect any statements which are in the ~~board's~~ commission's possession to provide his or her full name and address, and if the individual is representing another person, the full name and address of the person which he or she represents. Such identification

may be provided in writing or in person. The ~~board~~ commission shall record and retain for at least 3 years information obtained by it pursuant to this subsection. No individual may use a fictitious name or address or fail to identify a principal in making any request for inspection.

SECTION 198. 19.55 (2) (c) of the statutes is amended to read:

19.55 **(2)** (c)  Statements of economic interests and reports of economic transactions which are filed with the ~~government accountability board~~ commission by members or employees of the investment board, except that the ~~government accountability board~~ commission shall refer statements and reports filed by such individuals to the legislative audit bureau for its review, and except that a statement of economic interests filed by a member or employee of the investment board who is also an official required to file shall be open to public inspection.

SECTION 199. 19.55 (3) of the statutes is created to read:

19.55 **(3)**  Records obtained or prepared by the commission in connection with an investigation, including the full text of any complaint received by the commission, are not subject to the right of inspection and copying under s. 19.35 (1), except as follows:

(a)  The commission shall permit inspection of records that are distributed or discussed in the course of a meeting or hearing by the commission in open session.

(am)  The commission shall provide to the joint committee on finance records obtained or prepared by the commission in connection with an ongoing investigation when required under s. 19.49 (2q).

(b)  Investigatory records of the commission may be made public in the course of a prosecution initiated under ch. 11, subch. III of ch. 13, or this subchapter.

(bm)  The commission shall provide investigatory records to the state auditor and the employees of the legislative audit bureau to the extent necessary for the bureau to carry out its duties under s. 13.94.

(c)  The commission shall provide information from investigation and hearing records that pertains to the location of individuals and assets of individuals as requested under s. 49.22 (2m) by the department of children and families or by a county child support agency under s. 59.53 (5).

(d)  If the commission commences a civil prosecution of a person for an alleged violation of ch. 11, subch. III of ch. 13, or this subchapter as the result of an investigation, the person who is the subject of the investigation may authorize the commission to make available for inspection and copying under s. 19.35 (1) records of the investigation pertaining to that person if the records are available by law to the subject person and the commission shall then make those records available.

(e)  The following records of the commission are open to public inspection and copying under s. 19.35 (1):

1.  Any record of the action of the commission authorizing the filing of a civil complaint under s. 19.49 (2) (b) 5.

2.  Any record of the action of the commission referring a matter to a district attorney or other prosecutor for investigation or prosecution.

3.  Any record containing a finding that a complaint does not raise a reasonable suspicion that a violation of the law has occurred.

4.  Any record containing a finding, following an investigation, that no probable cause exists to believe that a violation of the law has occurred.

SECTION 200. 19.55 (4) of the statutes is created to read:

19.55 **(4)** (a)  Except as authorized or required under par. (b), records obtained in connection with a request for an advisory opinion issued under s. 19.46 (2), other than summaries of advisory opinions that do not disclose the identity of individuals requesting such opinions or organizations on whose behalf they are requested, are not subject to the right of inspection and copying under s. 19.35 (1).  Except as authorized or required under par. (b), the commission shall make sufficient alterations in the summaries to prevent disclosing the identities of individuals or organizations involved in the opinions.

(b)  The commission may make records obtained in connection with an informal advisory opinion under par. (a) public with the consent of the individual requesting the informal advisory opinion or the organization or governmental body on whose behalf it is requested.  A person who makes or purports to make public the substance of or any portion of an informal advisory opinion requested by or on behalf of the person is deemed to have waived the confidentiality of the request for an informal advisory opinion and of any records obtained or prepared by the commission in connection with the request for an informal advisory opinion.

(c)  Within 30 days after completing an investigation related to and the preparation of a formal advisory opinion on a matter under the jurisdiction of the commission, the commission shall make public the formal advisory opinion and records obtained in connection with the request for the formal advisory opinion, replacing the identity of any organization or governmental body on whose behalf the formal opinion is requested with generic, descriptive terms.  The commission shall redact information related to the identity of any natural person making the request.

SECTION 201. 19.552 of the statutes is created to read:

**19.552  Action to compel compliance.**  Whenever a violation of the laws regulating campaign financing occurs or is proposed to occur, the attorney general or the district attorney of the county where the violation occurs or is proposed to occur may sue for injunctive relief, a writ of mandamus or prohibition, or other such legal or

equitable relief as may be appropriate to compel compliance with the law. No bond is required in such actions.

SECTION 202. 19.554 of the statutes is created to read:

**19.554 Petition for enforcement.** In addition to or in lieu of filing a complaint, any elector may file a verified petition alleging such facts as are within his or her knowledge to indicate that an election official has failed or is failing to comply with any law regulating campaign financing or proposes to act in a manner inconsistent with such a law, and requesting that an action be commenced for injunctive relief, a writ of mandamus or prohibition or other such legal or equitable relief as may be appropriate to compel compliance with the law. The petition shall be filed with the district attorney for the county having jurisdiction to prosecute the alleged failure to comply under s. 978.05 (1) and (2). The district attorney may then commence the action or dismiss the petition. If the district attorney declines to act upon the petition or if the district attorney fails to act upon the petition within 15 days of the date of filing, the petitioner may file the same petition with the attorney general, who may then commence the action.

SECTION 203. 19.58 (4) of the statutes is created to read:

19.58 **(4)** A person who violates s. 19.50 may be fined not more than $10,000 or imprisoned for not more than 9 months or both.

SECTION 204. 19.59 (1) (g) 8. of the statutes is amended to read:

19.59 **(1)** (g) 8. No district board member, member of a district board member's immediate family, nor any organization with which the district board member or a member of the district board member's immediate family owns or controls at least 10% of the outstanding equity, voting rights, or outstanding indebtedness may enter into any contract or lease involving a payment or payments of more than $3,000 within a 12–month period, in whole or in part derived from district funds unless the district board member has first made written disclosure of the nature and extent of such relationship or interest to the ~~government accountability board~~ commission and to the

district. Any contract or lease entered into in violation of this subdivision may be voided by the district in an action commenced within 3 years of the date on which the ~~government accountability board~~ commission, or the district, knew or should have known that a violation of this subdivision had occurred. This subdivision does not affect the application of s. 946.13.

SECTION 205. 19.85 (1) (h) of the statutes is amended to read:

19.85 **(1)** (h) Consideration of requests for confidential written advice from the ~~government accountability board~~ elections commission under s. 5.05 (6a) or the ethics commission under s. 19.46 (2), or from any county or municipal ethics board under s. 19.59 (5).

SECTION 206. 19.851 (title) of the statutes is amended to read:

**19.851** (title) **Closed sessions by** ~~government accountability board~~ **ethics or elections commission.**

SECTION 207. 19.851 of the statutes is renumbered 19.851 (2) and amended to read:

19.851 **(2)** The ~~government accountability board~~ commission shall hold each meeting of the ~~board~~ commission for the purpose of deliberating concerning an investigation of any violation of the law under the jurisdiction of the ~~ethics and accountability division of the board~~ commission in closed session under this section.

**(1)** Prior to convening under this section or under s. 19.85 (1), the ~~government accountability board~~ ethics commission and the elections commission shall vote to convene in closed session in the manner provided in s. 19.85 (1). The ethics commission shall identify the specific reason or reasons under sub. (2) and s. 19.85 (1) (a) to (h) for convening in closed session. The elections commission shall identify the specific reason or reasons under s. 19.85 (1) (a) to (h) for convening in closed session. No business may be conducted by the ~~government accountability board~~ ethics commission or the elections commission at any closed session under this section except that which relates to the purposes of the session as authorized in this section or as authorized in s. 19.85 (1).

SECTION 208. 20.005 (3) (schedule) of the statutes: at the appropriate place, insert the following amounts for the purposes indicated:

| | | | | | 2015–16 | 2016–17 |
|---|---|---|---|---|---|---|
| **20.510 Elections commission** | | | | | | |
| (1) | ADMINISTRATION OF ELECTIONS | | | | | |
| (a) | General program operations; general purpose revenue | GPR | B | | –0– | –0– |
| (be) | Investigations | GPR | A | | –0– | –0– |
| (br) | Special counsel | GPR | A | | –0– | –0– |
| (c) | Voter identification training | GPR | A | | –0– | –0– |
| (e) | Elections administration | GPR | A | | –0– | –0– |
| (g) | Recount fees | PR | A | | –0– | –0– |
| (h) | Materials and services | PR | A | | –0– | –0– |

**2015 Assembly Bill 388**   − 33 −   **2015 Wisconsin Act 118**

| | | | | 2015−16 | 2016−17 |
|---|---|---|---|---|---|
| (jm) | Gifts and grants | PR | A | −0− | −0− |
| (m) | Federal aid | PR−F | A | −0− | −0− |
| (t) | Election administration | SEG | A | −0− | −0− |
| (x) | Federal aid; election administration fund | SEG−F | C | −0− | −0− |
| **20.521** | **Ethics commission** | | | | |
| (1) | Ethics, campaign finance and lobbying regulation | | | | |
| (a) | General program operations; general purpose revenue | GPR | A | −0− | −0− |
| (be) | Investigations | GPR | A | −0− | −0− |
| (br) | Special counsel | GPR | A | −0− | −0− |
| (g) | General program operations; program revenue | PR | A | −0− | −0− |
| (h) | Gifts and grants | PR | A | −0− | −0− |
| (i) | Materials and services | PR | A | −0− | −0− |
| (im) | Lobbying administration; program revenue | PR | A | −0− | −0− |
| (j) | Electronic filing software | PR | A | −0− | −0− |

**Section 209.** 20.505 (1) (d) of the statutes is amended to read:

20.505 **(1)** (d) *Special counsel.* A sum sufficient, subject to s. 5.05 (2q), for supplementing the appropriation under s. 20.510 (1) (be) for ongoing investigations; subject to s. 19.49 (2q). for supplementing the appropriation under s. 20.521 (1) (be) for ongoing investigations; and, subject to the procedures established in ss. 5.05 (2m) (c) and s. 14.11 (2) (c), for the compensation of special counsel appointed as provided in ss. 5.05 (2m) (c), 14.11 (2), and 321.42.

**Section 210.** 20.510 (intro.) and (1) (title) of the statutes are created to read:

**20.510 Elections commission.** (intro.) There is appropriated from the general fund, except where otherwise indicated, to the elections commission for the following programs:

**(1)** (title) Administration of elections.

**Section 211.** 20.510 (1) (br) of the statutes is created to read:

20.510 **(1)** (br) *Special counsel.* The amounts in the schedule for the compensation of special counsel appointed as provided in s. 5.05 (2m) (c) 6.

**Section 212.** 20.511 (intro.) and (1) (title) of the statutes are repealed.

**Section 213.** 20.511 (1) (a) of the statutes is renumbered 20.510 (1) (a) and amended to read:

20.510 **(1)** (a) *General program operations; general purpose revenue.* Biennially, the amounts in the schedule for general program operations of the board commission, including the printing of forms, materials, manuals, and election laws under ss. s. 7.08 (1) (b), (3), and (4) and 11.21 (3) and (14), and the training of election officials under s. 5.05 (7).

**Section 214.** 20.511 (1) (be) of the statutes is renumbered 20.510 (1) (be) and amended to read:

20.510 **(1)** (be) *Investigations.* A sum sufficient The amounts in the schedule for the purpose of financing the costs of investigations authorized by the board commission of potential violations of chs. 5 to 10 and 12, subch. III of ch. 13, and subch. III of ch. 19.

**Section 215.** 20.511 (1) (bm) of the statutes is renumbered 20.510 (1) (bm).

**Section 216.** 20.511 (1) (c) of the statutes is renumbered 20.510 (1) (c).

**Section 217.** 20.511 (1) (d) of the statutes is renumbered 20.510 (1) (d).

**Section 218.** 20.511 (1) (g) of the statutes is renumbered 20.510 (1) (g) and amended to read:

20.510 **(1)** (g) *Recount fees.* The amounts in the schedule to be apportioned to the county clerks or county board of election commissioners as prescribed in s. 9.01 (1) (ag). All moneys received on account of recount petitions filed with it, to be apportioned to the county clerks or county board of election commissioners as prescribed in s. 9.01 (1) (ag) the commission shall be credited to this appropriation account.

**Section 219.** 20.511 (1) (h) of the statutes is renumbered 20.510 (1) (h) and amended to read:

20.510 **(1)** (h) *Materials and services.* The amounts in the schedule for the costs of publishing documents, locating and copying records, and conducting programs under s. 19.48 (9) and administrative meetings and conferences, for compiling, disseminating, and making available information prepared by and filed with the board under s. 19.48 (10) commission, and for supplies, postage, and shipping. All moneys received by the board commission from collections for sales of publications, for copies of records, for supplies, for postage, for shipping and records location fees, from fees assessed under s. 19.48 (9) and (10), and for charges assessed to participants in administrative meetings and conferences, except

moneys received from requesters from sales of copies of the official registration list, shall be credited to this appropriation account.

SECTION 220. 20.511 (1) (i) of the statutes is renumbered 20.510 (1) (e) and amended to read:

20.510 (1) (e) *Elections administration; program revenue.* The amounts in the schedule for the administration of chs. 5 to 10 and 12. All moneys received from fees imposed under s. 11.055 (1) shall be credited to this appropriation account.

SECTION 221m. 20.511 (1) (im) of the statutes is renumbered 20.521 (1) (im).

SECTION 222. 20.511 (1) (j) of the statutes is renumbered 20.521 (1) (j) and amended to read:

20.521 (1) (j) *Electronic filing software.* The amounts in the schedule for providing software to be utilized for electronic filing of campaign finance reports under s. 11.1304 (6). All moneys received from registrants who purchase software to be utilized for electronic filing of campaign finance reports under s. 11.21 (16), for the purpose of providing that software s. 11.1304 (6) shall be credited to this appropriation account.

SECTION 223. 20.511 (1) (jm) of the statutes is renumbered 20.510 (1) (jm) and amended to read:

20.510 (1) (jm) *Gifts and grants.* The amounts in the schedule to carry out the purposes, not inconsistent with the law, for which gifts, grants, and bequests to the commission are made. All moneys received by the board commission from gifts, grants, and bequests to carry out the purposes, not inconsistent with the law, for which made or received shall be credited to this appropriation account.

SECTION 224. 20.511 (1) (m) of the statutes is renumbered 20.510 (1) (m) and amended to read:

20.510 (1) (m) *Federal aid.* The amounts in the schedule to be used for the administration of chs. 5 to 10 and 12. All moneys received from the federal government, as authorized by the governor under s. 16.54, that are not appropriated under par. (x), to be used for the administration of chs. 5 to 12, subch. III of ch. 13, or subch. III of ch. 19 shall be credited to this appropriation account.

SECTION 225. 20.511 (1) (t) of the statutes is renumbered 20.510 (1) (t).

SECTION 226. 20.511 (1) (x) of the statutes is renumbered 20.510 (1) (x).

SECTION 227. 20.521 (intro.) and (1) of the statutes are created to read:

**20.521 Ethics commission.** (intro.) There is appropriated to the ethics commission for the following programs:

(1) ETHICS, CAMPAIGN FINANCE AND LOBBYING REGULATION. (a) *General program operations; general purpose revenue.* The amounts in the schedule for general program operations under ch. 11, subch. III of ch. 13, and subch. III of ch. 19.

(be) *Investigations.* The amounts in the schedule for the purpose of financing the costs of investigations authorized by the commission of potential violations of ch. 11, subch. III of ch. 13, or subch. III of ch. 19.

(br) *Special counsel.* The amounts in the schedule for the compensation of special counsel appointed as provided in s. 19.49 (2) (b) 5.

(g) *General program operations; program revenue.* The amounts in the schedule for general program operations under ch. 11 and subch. III of ch. 19. All moneys received from fees imposed under s. 11.0102 (2) shall be credited to this appropriation account.

(h) *Gifts and grants.* The amounts in the schedule to carry out the purposes, not inconsistent with the law, for which gifts, grants, and bequests to the commission are made. All moneys received by the commission from gifts, grants, and bequests shall be credited to this appropriation account.

(i) *Materials and services.* The amounts in the schedule for the cost of publishing documents, locating and copying records, postage and shipping, and conducting programs under s. 19.48 (9) and of compiling, disseminating, and making available information prepared by and filed with the commission under s. 19.48 (10). All moneys received by the commission from sales of documents, and from fees collected for copies of records, for postage, shipping, and location fees, and from fees assessed under s. 19.48 (9) and (10) shall be credited to this appropriation account.

SECTION 228. 20.923 (4) (f) 3j. of the statutes is repealed.

SECTION 229. 20.930 of the statutes is amended to read:

**20.930 Attorney fees.** Except as provided in ss. 5.05 (2m) (c) 7., 19.49 (2) (b) 6., 46.27 (7g) (h), 49.496 (3) (f), and 49.682 (6), no state agency in the executive branch may employ any attorney until such employment has been approved by the governor.

SECTION 230. 20.9305 (2) (e) (intro.) of the statutes is amended to read:

20.9305 (2) (e) (intro.) The governor shall post on the Internet site maintained by the government accountability board ethics commission under s. 16.753 all of the following:

SECTION 231. 38.16 (3) (br) 3. of the statutes is amended to read:

38.16 (3) (br) 3. The referendum shall be held in accordance with chs. 5 to 12. The district board shall provide the election officials with all necessary election supplies. The form of the ballot shall correspond substantially with the standard form for referendum ballots prescribed by the government accountability board elections commission under ss. 5.64 (2) and 7.08 (1) (a). The question submitted shall be whether the limit under this subsection may be exceeded by a specified amount. The limit otherwise applicable to the district under this sub-

section is increased by the amount approved by a majority of those voting on the question.

**SECTION 232.** 45.44 (1) (b) of the statutes is amended to read:

45.44 **(1)** (b) "Licensing agency" means the department of agriculture, trade and consumer protection; the department of children and families; the department of financial institutions; the department of health services; the department of natural resources; the department of public instruction; the department of revenue; the department of safety and professional services and its examining boards and affiliated credentialing boards; the department of transportation; the department of workforce development; the board of commissioners of public lands; the ~~government accountability board~~ ethics commission; or the office of the commissioner of insurance.

**SECTION 233.** 49.165 (4) (a) of the statutes is amended to read:

49.165 **(4)** (a) The department shall certify to the ~~government accountability board~~ elections commission, on a continuous basis, a list containing the name and address of each organization that is eligible to receive grants under sub. (2).

**SECTION 234.** 59.605 (3) (a) 3. of the statutes is amended to read:

59.605 **(3)** (a) 3. The referendum shall be held in accordance with chs. 5 to 12. The governing body shall provide the election officials with all necessary election supplies. The form of the ballot shall correspond substantially with the standard form for referendum ballots prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a). If the resolution under subd. 1. specifies the operating levy rate, the question shall be submitted as follows: "Under state law, the operating levy rate for the .... (name of county), for the tax to be imposed for the year .... (year), is limited to $.... per $1,000 of equalized value. Shall the .... (name of county) be allowed to exceed this rate limit for .... (a specified number of years) (an indefinite period) by $.... per $1,000 of equalized value that results in an operating levy rate of $.... per $1,000 of equalized value?" If the resolution under subd. 1. specifies the operating levy, the question shall be submitted as follows: "Under state law, the operating levy rate for the .... (name of county), for the tax to be imposed for the year .... (year), is limited to $.... per $1,000 of equalized value. Notwithstanding the operating levy rate limit, shall the .... (name of county) be allowed to levy an amount not to exceed $.... (operating levy) for operating purposes for the year .... (year), which may increase the operating levy rate for .... (a specified number of years) (an indefinite period)? This would allow a ....% increase above the levy of $.... (preceding year operating levy) for the year .... (preceding year)."

**SECTION 235.** 67.05 (3) (b) of the statutes is amended to read:

67.05 **(3)** (b) The clerk of the jurisdiction in which the referendum is held shall prepare or arrange for the preparation of the ballots. If the jurisdiction in which the referendum is held is not a city, village, or town, and the clerk of the jurisdiction in which the referendum is held prepares the ballots, the clerk shall deliver the ballots to the municipal clerk of each city, village, or town which is wholly or partly contained within the jurisdiction in which the referendum is held. The form of the ballot shall correspond with the form prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a).

**SECTION 236.** 67.05 (6) of the statutes is amended to read:

67.05 **(6)** REFERENDUM IN OTHER CASES. Whenever an initial resolution has been adopted by the governing body of any municipality other than a county, a town, a city, a village, a technical college district, a metropolitan sewerage district created under ss. 200.01 to 200.15 or 200.21 to 200.65, a town sanitary district, a public inland lake protection and rehabilitation district, or a board of park commissioners, the clerk of such municipality shall immediately record the resolution and call a special meeting for the purpose of submitting it to the electors of the municipality for ratification or rejection. The calling and conduct of the meeting shall be governed by those statutes, so far as applicable, which govern the calling and conduct of special meetings in general. The notice of the meeting, which shall be publicly read before the balloting shall commence, and the ballot used, shall embody a copy of the resolution; the form of the ballot shall correspond with the form prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a); and the question submitted shall be whether the resolution shall be approved.

**SECTION 237.** 73.0301 (1) (d) 13. of the statutes is amended to read:

73.0301 **(1)** (d) 13. A license issued by the ~~government accountability board~~ ethics commission under s. 13.63 (1).

**SECTION 238.** 73.0301 (1) (e) of the statutes is amended to read:

73.0301 **(1)** (e) "Licensing department" means the department of administration; the department of agriculture, trade and consumer protection; the board of commissioners of public lands; the department of children and families; the ~~government accountability board~~ ethics commission; the department of financial institutions; the department of health services; the department of natural resources; the department of public instruction; the department of safety and professional services; the department of workforce development; the office of the commissioner of insurance; or the department of transportation.

**SECTION 239.** 85.61 (1) of the statutes is amended to read:

85.61 **(1)** The secretary of transportation and the administrator of the elections ~~division of the government accountability board~~ commission shall enter into an agreement to match personally identifiable information on the official registration list maintained by the ~~government accountability board~~ commission under s. 6.36 (1) with personally identifiable information in the operating record file database under ch. 343 and vehicle registration records under ch. 341 to the extent required to enable the secretary of transportation and the administrator of the elections ~~division of the government accountability board~~ commission to verify the accuracy of the information provided for the purpose of voter registration.

**SECTION 240.** 108.227 (1) (e) 13. of the statutes is amended to read:

108.227 **(1)** (e) 13. A license issued by the ~~government accountability board~~ ethics commission under s. 13.63 (1).

**SECTION 241.** 108.227 (1) (f) of the statutes is amended to read:

108.227 **(1)** (f) "Licensing department" means the department of administration; the department of agriculture, trade and consumer protection; the board of commissioners of public lands; the department of children and families; the ~~government accountability board~~ ethics commission; the department of financial institutions; the department of health services; the department of natural resources; the department of public instruction; the department of revenue; the department of safety and professional services; the office of the commissioner of insurance; or the department of transportation.

**SECTION 242.** 117.20 (2) of the statutes is amended to read:

117.20 **(2)** The clerk of each affected school district shall publish notice, as required under s. 8.55, in the territory of that school district. The procedures for school board elections under s. 120.06 (9), (11), (13), and (14) apply to a referendum held under this section. The school board and school district clerk of each affected school district shall each perform, for that school district, the functions assigned to the school board and the school district clerk, respectively, under those subsections. The form of the ballot shall correspond to the form prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a). The clerk of each affected school district shall file with the secretary of the ~~board~~ commission a certified statement prepared by the school district board of canvassers of the results of the referendum in that school district.

**SECTION 243.** 117.27 (2) (b) (intro.) of the statutes is amended to read:

117.27 **(2)** (b) (intro.) The school district clerk shall include in the notice of the spring election a statement that the election ballot will include a question on the change requested by the petition. The form of the ballot shall correspond to the form prescribed by the ~~govern-~~

~~ment accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a) and the question on the ballot shall be:

**SECTION 244.** 121.91 (3) (c) of the statutes is amended to read:

121.91 **(3)** (c) The referendum shall be held in accordance with chs. 5 to 12. The school district clerk shall provide the election officials with all necessary election supplies. The form of the ballot shall correspond substantially with the standard form for referendum ballots prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a). The question submitted shall be whether the limit under sub. (2m) may be exceeded by a specified amount. If the resolution provides that any of the excess revenue will be used for a nonrecurring purpose, the ballot in the election shall so state and shall specify the amount that will be used for a nonrecurring purpose. The limit otherwise applicable to the school district under sub. (2m) is increased by the amount approved by a majority of those voting on the question.

**SECTION 245.** 125.05 (1) (b) 10. of the statutes is amended to read:

125.05 **(1)** (b) 10. Each question submitted to the electors shall conform to the form prescribed by the ~~government accountability board~~ elections commission under ss. 5.64 (2) and 7.08 (1) (a).

**SECTION 246.** 165.25 (1) of the statutes is amended to read:

165.25 **(1)** REPRESENT STATE IN APPEALS AND ON REMAND. Except as provided in ss. 5.05 (2m) (a), 19.49 (2) (a), and 978.05 (5), appear for the state and prosecute or defend all actions and proceedings, civil or criminal, in the court of appeals and the supreme court, in which the state is interested or a party, and attend to and prosecute or defend all civil cases sent or remanded to any circuit court in which the state is a party. Nothing in this subsection deprives or relieves the attorney general or the department of justice of any authority or duty under this chapter.

**SECTION 247.** 165.93 (4) (a) of the statutes is amended to read:

165.93 **(4)** (a) The department shall certify to the ~~government accountability board~~ elections commission, on a continuous basis, a list containing the name and address of each organization that is eligible to receive grants under sub. (2).

**SECTION 248.** 198.08 (10) of the statutes is amended to read:

198.08 **(10)** ELECTION STATISTICS. The clerk of the district shall seasonably obtain, compile, and file in his or her office, for the information of the public, a statement showing the total number of votes cast for the office of governor in the last preceding general election in each subdistrict of the district. The clerk of every municipality and the ~~government accountability board~~ elections com-

mission shall furnish such information so far as obtainable from their records, duly certified, to the clerk of the district upon request therefor by the clerk of the district. If the total number of votes cast in any subdistrict for the office of governor in the last preceding election cannot, because of an intervening change of boundaries of election wards or for any reason, be ascertained from any official record the clerk of the district shall fairly estimate such number for the purposes of such statement to be filed in his or her office.

SECTION 249. 200.09 (11) (am) 2. of the statutes is amended to read:

200.09 **(11)** (am) 2. No resolution passed under subd. 1. may authorize election of commissioners sooner than 6 months after the date of passage. The metropolitan sewerage district commission shall immediately notify the ~~government accountability board~~ elections commission under s. 5.05 upon passage of a resolution under subd. 1.

SECTION 250. 200.09 (11) (am) 3. of the statutes is amended to read:

200.09 **(11)** (am) 3. If the governing bodies of each city, town, and village comprising the district pass a resolution to discontinue election of commissioners, each commissioner may hold office until a successor is appointed and qualified. The metropolitan sewerage district commission shall immediately notify the ~~government accountability board~~ elections commission under s. 5.05 upon passage of a resolution under this subdivision.

SECTION 251. 227.03 (6) of the statutes is amended to read:

227.03 **(6)** Orders of the ~~government accountability board~~ elections commission under s. 5.06 (6) are not subject to this chapter.

SECTION 252. 227.52 (6) of the statutes is amended to read:

227.52 **(6)** Decisions of the chairperson of the ~~government accountability board~~ elections commission or the chairperson's designee.

SECTION 253. 230.08 (2) (e) 4h. of the statutes is repealed.

SECTION 254. 230.08 (2) (eL) of the statutes is created to read:

230.08 **(2)** (eL) The administrator and assistant administrator of the elections commission.

SECTION 255. 230.08 (2) (et) of the statutes is created to read:

230.08 **(2)** (et) The administrator and assistant administrator of the ethics commission.

SECTION 256. 230.08 (2) (on) of the statutes is repealed.

SECTION 257. 230.08 (4) (a) of the statutes is amended to read:

230.08 **(4)** (a) The number of administrator positions specified in sub. (2) (e) includes all administrator positions specifically authorized by law to be employed out-

side the classified service in each department, board or commission and the historical society, and any other managerial position determined by an appointing authority. In this paragraph, "department" has the meaning given under s. 15.01 (5), "board" means the educational communications board, ~~government accountability board,~~ investment board, public defender board and technical college system board and "commission" means the employment relations commission and the public service commission. Notwithstanding sub. (2) (z), no division administrator position exceeding the number authorized in sub. (2) (e) may be created in the unclassified service.

SECTION 258. 234.02 (3m) (c) of the statutes is amended to read:

234.02 **(3m)** (c) The authority shall, with the advice of the ~~government accountability board~~ ethics commission, adopt and enforce ethics guidelines applicable to its paid consultants which are similar to subch. III of ch. 19, except that the authority may not require its paid consultants to file financial disclosure statements.

SECTION 259. 301.03 (20m) of the statutes is amended to read:

301.03 **(20m)** Transmit to the ~~government accountability board~~ elections commission, on a continuous basis, a list containing the name of each living person who has been convicted of a felony under the laws of this state and whose civil rights have not been restored, together with his or her residential address and the date on which the department expects his or her civil rights to be restored.

SECTION 260. 343.11 (2m) of the statutes is amended to read:

343.11 **(2m)** Within 30 days following surrender of a license under sub. (1), the department shall provide notice to the ~~government accountability board~~ elections commission of the person's name and address, the name of the jurisdiction issuing the surrendered license, and the date on which the license was surrendered.

SECTION 261. 756.04 (2) (c) 1. of the statutes is amended to read:

756.04 **(2)** (c) 1. A list of registered voters from the ~~government accountability board~~ elections commission.

SECTION 262. 758.19 (9) of the statutes is repealed.

SECTION 263. 778.135 of the statutes is amended to read:

**778.135 Campaign finance, lobbying, and ethics forfeitures; how recovered.** Notwithstanding s. 778.13, whenever any action or proposed action by the ~~government accountability board~~ elections commission under s. 5.05 (1) (c) or the ethics commission under s. 19.49 (1) (b) is settled as a result of agreement between the parties without approval of the court, the moneys accruing to the state on account of such settlement shall be paid to the ~~board~~ commission and deposited with the secretary of administration.

SECTION 264. 978.05 (1) of the statutes is amended to read:

978.05 **(1)** CRIMINAL ACTIONS. Except as otherwise provided by law, prosecute all criminal actions before any court within his or her prosecutorial unit and have sole responsibility for prosecution of all criminal actions arising from violations of chs. 5 to 12, subch. III of ch. 13, or subch. III of ch. 19 and from violations of other laws arising from or in relation to the official functions of the subject of the investigation or any matter that involves elections, ethics, or lobbying regulation under chs. 5 to 12, subch. III of ch. 13, or subch. III of ch. 19, that are alleged to be committed by a resident of his or her prosecutorial unit, or if alleged to be committed by a nonresident of this state, that are alleged to occur in his or her prosecutorial unit unless another prosecutor is substituted under s. 5.05 (2m) (i) or 19.49 (2) (h) or this chapter or by referral of the ~~government accountability board~~ elections commission under s. 5.05 (2m) (c) 15. or 16. or the ethics commission under s. 19.49 (2) (b) 13. or 14. For purposes of this subsection, a person other than ~~a natural person~~ an individual is a resident of a prosecutorial unit if the person's principal place of operation is located in that prosecutorial unit.

SECTION 265. 978.05 (2) of the statutes is amended to read:

978.05 **(2)** FORFEITURES. Except as otherwise provided by law, prosecute all state forfeiture actions, county traffic actions and actions concerning violations of county ordinances which are in conformity with state criminal laws in the courts within his or her prosecutorial unit and have joint responsibility, together with the ~~government accountability board~~ elections commission and the ethics commission, for prosecution of all forfeiture actions arising from violations of chs. 5 to 12, subch. III of ch. 13, or subch. III of ch. 19 and from violations of other laws arising from or in relation to the official functions of the subject of the investigation or any matter that involves elections, ethics, or lobbying regulation under chs. 5 to 12, subch. III of ch. 13, or subch. III of ch. 19 that are alleged to be committed by a resident of his or her prosecutorial unit, or if alleged to be committed by a nonresident of this state, that are alleged to occur within his or her prosecutorial unit unless another prosecutor is substituted under s. 5.05 (2m) (h) or 19.49 (2) (g) or this chapter or by referral of the ~~government accountability board~~ elections commission under s. 5.05 (2m) (c) 15. or 16. or the ethics commission under s. 19.49 (2) (b) 13. or 14. For purposes of this subsection, a person other than ~~a natural person~~ an individual is a resident of a prosecutorial unit if the person's principal place of operation is located in that prosecutorial unit.

SECTION 266. **Nonstatutory provisions.**

(1) AUDIT REPORT RECOMMENDATIONS. The elections commission and ethics commission, and their employees, shall, to the extent practicable within their respective responsibilities, implement the recommendations contained in the legislative audit bureau's Report 14−14 and Report 15−13 regarding the past performance of the government accountability board. The elections commission and ethics commission shall report their progress implementing those recommendations to the legislature no later than December 31, 2016.

(2) ASSETS AND LIABILITIES. On the effective date of this subsection, all assets and liabilities of the government accountability board are transferred to the elections commission and the ethics commission. The secretary of administration shall determine which assets and which liabilities are transferred to each commission.

(3) POSITIONS AND EMPLOYEES.

(a) On the effective date of this paragraph, all full−time equivalent positions of the government accountability board are transferred to the elections commission and the ethics commission. The secretary of administration shall determine which full−time equivalent positions are transferred to each commission.

(b) All incumbent employees holding positions at the government accountability board on the effective date of this paragraph, except the incumbent employee holding the position of director and general counsel, are transferred on the effective date of this paragraph to the elections commission or the ethics commission. The secretary of administration shall determine which incumbent employees are transferred to each commission.

(c) Employees transferred under paragraph (b) have all the rights and the same status under subch. V of chapter 111 of the statutes at the elections commission or the ethics commission that they enjoyed at the government accountability board immediately before the transfer. Notwithstanding section 230.28 (4) of the statutes, no employee so transferred who has attained permanent status in class is required to serve a probationary period.

(4) TANGIBLE PERSONAL PROPERTY. On the effective date of this subsection, all tangible personal property, including records, of the government accountability board is transferred to the elections commission and the ethics commission. The secretary of administration shall determine which property is transferred to each commission.

(5) CONTRACTS. All contracts entered into by the government accountability board that are in effect on the effective date of this subsection shall remain in effect and are transferred to the elections commission and the ethics commission. The secretary of administration shall determine which contracts are transferred to each commission. The elections commission and the ethics commission shall carry out all contractual obligations under each contract until the contract is modified or rescinded by that commission to the extent allowed under the contract.

(6) RULES, ORDERS, AND FORMAL OPINIONS. All rules promulgated and all formal opinions and orders issued by the government accountability board that are in effect on the effective date of this subsection are transferred to the elections commission and the ethics commission and

shall remain in effect until the commission to which they are transferred amends or repeals a rule or order or changes or withdraws a formal opinion. The secretary of administration shall determine which rules, orders, and formal opinions are transferred to each commission.

(7) PENDING MATTERS. All matters pending with the government accountability board on the effective date of this subsection are transferred to the elections commission and the ethics commission, and all materials submitted to or actions taken by the government accountability board with respect to any pending matter are considered as having been submitted to or taken by the elections commission or the ethics commission. The secretary of administration shall determine which pending matters are transferred to each commission.

(8) TRANSITIONS; INITIAL TERMS.

(a) Notwithstanding section 15.60, 2013 stats., and section 15.07 (1) (cm), 2013 stats., the terms of office of all members of the government accountability board holding office on the effective date of this paragraph shall expire on the effective date of this paragraph.

(ag) Notwithstanding section 15.60 of the statutes and notwithstanding section 15.06 (1) (d) of the statutes and section 15.61 of the statutes, as created by this act, the governor, majority leader of the senate, minority leader of the senate, speaker of the assembly, and minority leader of the assembly may appoint members to serve on the government accountability board in a nonvoting capacity effective February 1, 2016. Individuals appointed to the government accountability board under this paragraph may also be appointed to the elections commission under paragraph (b) and may serve prior to senate confirmation. Individuals appointed under this paragraph may identify and appoint an individual to serve as administrator of the elections commission in the manner provided under section 15.61 (1) (b) 1. of the statutes and the senate may confirm the appointment of that individual as provided under section 15.61 (1) (b) 1. of the statutes, but that individual may not serve as administrator until June 30, 2016.

(ar) Notwithstanding section 15.60 of the statutes and notwithstanding section 15.06 (1) (e) of the statutes and section 15.62 of the statutes, as created by this act, the governor, majority leader of the senate, minority leader of the senate, speaker of the assembly, and minority leader of the assembly may appoint members to serve on the government accountability board in a nonvoting capacity effective February 1, 2016. Individuals appointed to the government accountability board under this paragraph may also be appointed to the ethics commission under paragraph (b) and may serve prior to senate confirmation. Individuals appointed under this paragraph may identify and appoint an individual to serve as administrator of the ethics commission in the manner provided under section 15.62 (1) (b) 1. of the statutes and the senate may confirm the appointment of that individ-

ual as provided under section 15.62 (1) (b) 1. of the statutes, but that individual may not serve as administrator until June 30, 2016.

(b) On the effective date of this paragraph, all members of the elections commission and the ethics commission who are appointed and qualify for office shall take office.

(bg) The members of the elections commission shall appoint an individual to serve as administrator of the commission pursuant to section 15.61 (1) (b) of the statutes no later than 45 days after the effective date of this paragraph. If the elections commission has not made an appointment as required under this paragraph, the joint committee on legislative organization shall appoint an interim administrator of the elections commission to serve until an administrator has been confirmed by the senate but for a term of no longer than one year. If the administrator position remains vacant at the end of the one−year period, the process for filling the position described in this subsection is repeated until the position is filled.

(br) The members of the ethics commission shall appoint an individual to serve as administrator of the commission pursuant to section 15.62 (1) (b) of the statutes no later than 45 days after the effective date of this paragraph. If the ethics commission has not made an appointment as required under this paragraph, the joint committee on legislative organization shall appoint an interim administrator of the ethics commission to serve until an administrator has been confirmed by the senate but for a term of no longer than one year. If the administrator position remains vacant at the end of the one−year period, the process for filling the position described in this subsection is repeated until the position is filled.

(c) Notwithstanding section 15.06 (1) (d) of the statutes and section 15.61 of the statutes, as created by this act, one half of the members of the elections commission who are appointed as initial members of the commission shall serve for terms expiring on May 1, 2019.

(d) Notwithstanding section 15.06 (1) (e) of the statutes and section 15.62 of the statutes, as created by this act, one half of the members of the ethics commission who are appointed as initial members of the commission shall serve for terms expiring on May 1, 2019.

(em) The chairperson of the assembly committee on campaigns and elections or the senate committee on elections and local government may request that individuals employed by the government accountability board on the date of publication of this act and the individual who is serving as director and general counsel of the government accountability board on the date of publication of this act to appear before either of both committees for the purpose of providing information to the committees about the progress of transitioning from the government accountability board to the elections commission and the ethics commission.

(9m) IMPLEMENTATION PLAN. The secretary of administration shall submit an implementation plan by June 1, 2016, to the joint committee on finance for approval under section 13.10 of the statutes. In the plan the secretary shall propose expenditure authority for the elections commission and the ethics commission by appropriation and shall specify funding sources of all positions for each commission. The individual who is serving as director and general counsel of the government accountability board on the date of publication of this act shall work in concert with the secretary of administration and members appointed to the elections commission and the ethics commission to ensure a smooth transition and shall participate in formulating the implementation plan.

(10) TERMINOLOGY CHANGE. In the following, as affected by the acts of 2015, substitute "commission" for "board," sections 5.05 (2m) (c) 9., 10., 11., 15., 16., 17., and 18., (d) 2., (e), and (f) (intro.), 1., and 2., (4), (5f), (5s) (a), (c), (e) (intro.), 1., and 2., (f) 1., (7), (12), (13) (a), (b), (c), and (d) (intro.), (14), and (15), 5.06 (1), (2), (4), (5), (6), (7), (8), and (9), 5.061 (1), (2), (3), and (4), 5.25 (4), 5.35 (6) (a) 2m., 4a., 4b., and 5. and (b), 5.40 (5m), 5.51 (6) and (8), 5.58 (1b) (bm) and (cm), 5.60 (3) (ag), (5) (ar), (6) (a), and (8) (am), 5.62 (1) (a) and (b) 1., (2) (a), (3), and (4) (ar), 5.64 (1) (ag), (b), and (es) and (2) (am) and (c), 5.655 (3), 5.72 (1), (2), and (3), 5.83, 5.87 (2), 5.905 (2), (3), and (4), 5.91 (intro.), 5.95, 6.06, 6.22 (4) (d) and (6), 6.24 (3), (4) (d), (5), and (6), 6.276 (2) and (3), 6.29 (2) (am), 6.30 (4), 6.33 (1) and (5) (b), 6.36 (1) (a), (bn), (d), (e), and (f) and (6), 6.47 (1) (ag), (am) 2., and (dm), (2), and (3), 6.50 (1) (intro.), (2), and (2r) (intro.), (b), and (h), 6.55 (2) (a) 1. (intro.) and (cs) and (3) (b), 6.56 (3m), (4), and (7), 6.57, 6.79 (1m), 6.86 (2) (a), (2m) (a), and (3) (a) 1., 6.869, 6.87 (3) (d), 6.875 (5), 6.92 (1), 6.925, 7.08 (1) (b), (c), and (d), (2) (a) and (3), (3) (intro.) and (a), and (6), 7.10 (1) (a), (2), (3) (a), (4), (7), (8), (9), and (10), 7.15 (1) (e), (1m), (8), (9), (10), and (13), 7.30 (2) (c), (4) (e), and (6) (b), 7.31 (1), (2), (4), and (5), 7.315 (1) (a), (2), and (3), 7.38 (5), 7.70 (1) (a) and (b), (3) (a), (c), (d), (e), (g), and (h), and (5) (b), 8.07, 8.12 (1) (a), (b), (c), and (d), (2), and (3), 8.15 (8) (a), 8.16 (2) (b) and (7), 8.17 (12), 8.18 (2), 8.185 (2) and (3), 8.19 (1) and (3), 8.40 (3), 8.50 (1) (b) and (d), 9.01 (1) (ar) 2., 10.01 (1) and (2) (intro.), 10.02 (1), (2) (c), and (3) (intro.), 10.06 (1) (a), (c), (e), (f), (h), and (i) and (2) (a), (b), (e), (h), and (k), 11.02 (1), (2), (4), and (5), 11.05 (3) (e) and (3m), 11.055 (1), 11.06 (1) (intro.), (3) (b) (intro.), (3m) (c), (3r) (c), and (9), 11.08, 11.12 (5), 11.16 (3) and (5), 11.20 (1), 11.21 (1), (2), (12), (13), and (16), 11.22 (intro.), (1) and (4), 11.23 (6), 11.30 (3) (b), 11.38 (1) (a) 2., 11.60 (5), 11.66, 12.13 (5) (b) (intro.) and 3., 13.62 (4m), 13.621 (5), 13.63 (1) (am) and (b), 13.64 (1) (intro.), (2), (2m), and (3), 13.65, 13.67 (1) and (2), 13.68 (1) (intro.) and (c)

(intro.), (4), and (6), 13.69 (1) and (2), 13.695 (1) (intro.) and (2), 13.74 (1) and (2), 13.75 (intro.), 19.41 (2), 19.43 (1), (2), (3), (7), and (8), 19.44 (1) (intro.), 19.45 (6) and (11) (a), 19.47, 19.48 (4) (a), (b), and (c), (5), (6), and (10), 19.55 (2) (intro.), 19.56 (2) (b) 4., 19.57, 19.575, 19.579 (1), and 19.59 (6) of the statutes.

SECTION 267. **Fiscal changes.**

(1) The unencumbered revenue balance in the appropriation account under section 20.511 (1) (i), 2013 stats., immediately before the effective date of this subsection, is transferred to the appropriation account under section 20.521 (1) (g) of the statutes, as created by this act.

(2b) In the schedule under section 20.005 (3) of the statutes for the appropriations to the government accountability board under section 20.511 of the statutes, as affected by the acts of 2015, the dollar amounts are zero for the second fiscal year of the fiscal biennium in which this subsection takes effect for the purposes for which the appropriations are made.

(2c) In the schedule under section 20.005 (3) of the statutes for the appropriation to the joint committee on finance under section 20.865 (4) (a) of the statutes, as affected by the acts of 2015, the dollar amount is increased by $2,920,500 for the second fiscal year of the fiscal biennium in which this subsection takes effect for the purposes for which the appropriation is made.

(2d) In the schedule under section 20.005 (3) of the statutes for the appropriation to the joint committee on finance under section 20.865 (4) (g) of the statutes, as affected by the acts of 2015, the dollar amount is increased by $559,500 for the second fiscal year of the fiscal biennium in which this subsection takes effect for the purposes for which the appropriation is made.

(2e) In the schedule under section 20.005 (3) of the statutes for the appropriation to the joint committee on finance under section 20.865 (4) (m) of the statutes, as affected by the acts of 2015, the dollar amount is increased by $3,015,100 for the second fiscal year of the fiscal biennium in which this subsection takes effect for the purposes for which the appropriation is made.

(2f) In the schedule under section 20.005 (3) of the statutes for the appropriation to the joint committee on finance under section 20.865 (4) (u) of the statutes, as affected by the acts of 2015, the dollar amount is increased by $100 for the second fiscal year of the fiscal biennium in which this subsection takes effect for the purposes for which the appropriation is made.

SECTION 268. **Effective dates.** This act takes effect on June 30, 2016, except as follows:

(1) SECTIONS 266 (8) (ag), (ar), and (em) and (9m) and 267 (2b), (2c), (2d), (2e), and (2f) of this act take effect on the day after publication.