# EXHIBIT A



Deposition of:

**Peyton McCrary , Ph.D.**

*May 22, 2020*


In the Matter of:

**Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.**


Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
4   FAIR FIGHT ACTION, INC., et
    al.,
5
             Plaintiffs,
6                                  CIVIL ACTION FILE
           vs.
7                                  NO. 1:18-cv-05391-SCJ
    BRAD RAFFENSPERGER, in his
8   official Capacity as Secretary
    of State of Georgia, et al.,
9
             Defendants.
10
11                 DEPOSITION OF
12              PEYTON MCCRARY, PhD
13         TAKEN BY REMOTE VIDEOCONFERENCE
14               May 22, 2020
15                9:41 a.m.
16              Arlington, Virginia
17      Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
18
19
20
21
22
23
24
25

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 2

1                      INDEX TO EXHIBITS

2    EXHIBIT   DESCRIPTION                                PAGE

3    For the Defendants:

4    Exhibit 1  Notice of Deposition                       11

5    Exhibit 2  Curriculum vitae                           18

6    Exhibit 3  Expert Report of Dr. Peyton McCrary        18

7    Exhibit 4  Article:  The End of Preclearance

8               as We Knew It                              29

9    Exhibit 5  Yes, but what have they done to

10              black people lately?                       35

11   Exhibit 6  Keeping the Courts Honest:  The Role

12              of Historians as Expert Witnesses in

13              Southern Voting Rights Cases               39

14   Exhibit 7  Testimony of Dr. Peyton McCrary

15              Before the House Judiciary

16              Committee, Subcommittee on the

17              Constitution, Civil Rights, and

18              Civil Liberties                            68

19   Exhibit 8  Testimony before US Commission on

20              Civil Rights                               89

21   Exhibit 9  Excerpts from "Injustice:  Exposing

22              the Racial Agenda of the Obama

23              Justice Department"                        91

24   Exhibit 10 Brennan Center report                     128

25   Exhibit 11 Georgia Laws Act 1207                     138

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 3

1    Exhibit 12 DOJ Objection letter to 1994 change    139

2    Exhibit 13 Amendment to the no contact process    140

3    Exhibit 14 Journal of the House of             140

4               Representatives Of the State of

5               Georgia at The Regular Session

6               Commenced at Atlanta, Monday,

7               January 13, 1997 and adjourned

8               Friday, March 28, 1997           140

9    Exhibit 15 Report of The 21st Century Voting

10              Commission                       144

11   Exhibit 16 Table 4b from 2008 CPS data      154

12   Exhibit 17 Table 4b from 2012 CPS data      155

13   Exhibit 18 Table 4b from 2018 CPS data      156

14   Exhibit 19 Expert Report of John R. Alford,

15              PhD                              162

16   Exhibit 20 Why Georgia, Why? Peach State

17              Residents' Perceptions of

18              Voting-Related Improprieties

19              and Their Impact on the 2018

20              Gubernatorial Election (Hood and

21              McKee)                           171

22

23               INDEX TO EXAMINATION          PAGE

24   By Mr. Tyson                                 7

25

Peyton McCrary , Ph.D.                           May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 4

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs (via videoconference):

3              SARAH R. FINK, ESQ.

4              MATTHEW G. KAISER, ESQ.

5              KaiserDillon PLLC

6              1099 14th Street, NW

7              8th Floor West

8              Washington, DC  20005

9              sfink@kaiserdillon.com

10             mkaiser@kaiserdillon.com

11   -and-

12             LESLIE J. BRYAN, ESQ.

13             Lawrence & Bundy, LLC

14             1180 West Peachtree Street, NW

15             Suite 1650

16             Atlanta, Georgia  30309

17             leslie.bryan@lawrencebundy.com

18

19

20

21

22

23

24

25

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                            Page 5

1    APPEARANCES (Continued):

2    On behalf of the Defendants (via videoconference):

3              BRYAN TYSON, ESQ.

4              Taylor English Duma LLP

5              1600 Parkwood Circle

6              Suite 200

7              Atlanta, Georgia  30339

8              btyson@taylorenglish.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 6

1          MR. TYSON:  This will be the deposition of

2    Dr. Peyton McCrary taken by Defendant, Brad

3    Raffensperger, for purposes of discovery and all

4    purposes allowed under the Federal Rules of Civil

5    Procedure.  And given that we are conducting this

6    via Zoom, we have a stipulation first that this is

7    taking place remotely but will be treated as if it

8    was under oath and in the same room.  And is that

9    acceptable to y'all?

10          MS. FINK:  Yes.

11          THE WITNESS:  Yes.

12          MR. TYSON:  And all objections except

13    those going to form and responsiveness and privilege

14    we'll reserve until trial or first use.  Is that

15    also acceptable, Sarah?

16          MS. FINK:  Yes.

17          MR. TYSON:  All right.  If you could

18    please swear the witness.

19          THE REPORTER:  Before I swear the witness,

20    could I get a stipulation from all counsel that the

21    court reporter is allowed to give the oath remotely?

22          MS. FINK:  Yes.

23          MR. TYSON:  Yes, on behalf of defendants.

24               PEYTON MCCRARY, PhD.,

25    having been first duly sworn, was examined and

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 7

 1    testified as follows:

 2                        EXAMINATION

 3    BY MR. TYSON:

 4        Q    Good morning, Dr. McCrary.  My name is

 5    Bryan Tyson.  I represent the defendants in this

 6    case, and I look forward to talking with you today

 7    about your report in this case.  I'm assuming that

 8    you've been deposed any number of times before; is

 9    that correct?

10        A    Yes.

11        Q    And so you're familiar with our basic

12    ground rules.  Talking over each other gets a little

13    bit complicated with the virtual platform, but we'll

14    do our best to start a question, and I'll pause to

15    wait for your response; having yes and no answers as

16    opposed to uh-huh or huh-uh; we obviously, just like

17    in a normal deposition, can take breaks as needed,

18    and my only request is that we answer the last

19    question I posed prior to taking a break.  Both

20    Ms. Fink and Mr. Kaiser have been in enough

21    depositions, and Leslie too, with me to know that

22    when -- sometimes I ask a question that makes

23    absolutely no sense, and I get to the question mark,

24    and I have no idea what I'm asking, you have no idea

25    what I'm asking.  If that happens, just let me know,

Peyton McCrary , Ph.D.                              May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 8

1   and I'll work to rephrase it.  Will that work for

2   you?

3        A    Yes.

4        Q    Okay.

5             And so just to put on the record as well

6   how we're handling the depositions, the kind of

7   formal introduction of the depositions will be

8   through the exhibit share platform that the court

9   reporting service has provided, but all counsel has

10  PDF copies of what will be uploaded through that.

11  Dr. McCrary, you have received paper copies of those

12  as well.  And, Dr. McCrary, have you reviewed any of

13  the paper exhibits prior to the start of the

14  deposition today?

15       A    No.

16            MS. FINK:  Just if I can I'll just put on

17  the record that when Dr. McCrary received all the

18  exhibits, he opened them up to take out the folders.

19  There was one document that was not in a folder, so

20  he saw what that was.  He told me about that.  I

21  instructed him not to talk to me about it anymore,

22  and that was the extent of our conversation about

23  it.

24            MR. TYSON:  Got it.  Thank you for that.

25  We were trying to manage putting those together

                Veritext Legal Solutions

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 9

1    across multiple people with a skeleton staff at the
2    office, so I apologize for that, so thank you.
3            MS. FINK:  Yes.
4    BY MR. TYSON:
5        Q    Dr. McCrary, what I'm planning to do today
6    is just start out with some background information
7    about your involvement in the case, kind of what you
8    did to get ready for the deposition today.  We'll
9    talk through that, we'll move into your CV and
10   biographical background materials, and then we'll
11   move into your report in the case.
12           So if we can go ahead and start this
13   morning by you telling me what you did to get ready
14   for your deposition today.
15       A    In the immediate background let's say this
16   week I reviewed my report, I reviewed some of the
17   documents I had referenced in the report.
18       Q    Okay.  And beyond some of the documents in
19   the report and your report, did you review any other
20   documents to get ready for your deposition today?
21       A    Not that I recall.
22       Q    Okay.  And I know we'll get into this with
23   the report officially, but you're being compensated
24   at a rate of $300 an hour; is that correct?
25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 10

1       Q      Do you know approximately how much you

2    billed in this case so far?

3       A      I do not.

4       Q      Do you have an estimate of how many hours

5    you spent preparing your report?

6       A      I don't really have an estimate on the tip

7    of my tongue.  It was a lot of time.

8       Q      Have you sent a bill to the plaintiff

9    counsel at this point in the case?

10      A      Yes.

11      Q      And do you recall approximately how much

12   the bills that you sent would be?

13      A      No, because I was instructed to bill

14   monthly, and I did so.  So there were --

15      Q      Okay.

16      A      -- numerous monthly invoices.

17      Q      Got it.  And I'm assuming you've been paid

18   on those invoices as well?

19      A      I'm sorry, repeat your question.

20      Q      Certainly.  I'm assuming you've been paid

21   on those invoices as well?

22      A      Yes.

23      Q      Okay.  All right.  We are going to see how

24   this works.  I'm going to just review, Dr. McCrary,

25   document 01, which is just a Notice of Deposition.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 11

1        A    Yes.

2        Q    Okay.  Give that for the record.

3             (Defendant's Exhibit 1 was marked for

4   identification.)

5   BY MR. TYSON:

6        Q    So let's go ahead and start about the

7   lawsuit.  How did you first hear about the Fair

8   Fight Action case?

9        A    My recollection is I was contacted by

10  Sarah Fink, and she told me the basic outlines of

11  the case they had filed and asked if I would

12  consider working on it.

13       Q    And do you recall approximately when that

14  conversation would have taken place?

15       A    My recollection is that the initial

16  conversation took place in November of 2018.

17       Q    And did you begin working on your report

18  immediately at that point, or was there a gap in

19  time from the time you initially were contacted to

20  the time you began working on your report?

21       A    There were two or three months, I think,

22  before I was provided with a retainer agreement and

23  began working on the case.

24       Q    Now, did plaintiff's counsel provide you

25  with any data or documents that you used in

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 12

1    preparing your report?

2        A    Yes.

3        Q    And what were those data or documents --

4    and document?

5        A    Well, to the best of my recollection, of

6    course, I received the complaint in the case, and

7    during the last phase of the case I received copies

8    of reports of other experts retained by the

9    plaintiffs, although that was -- that was pretty

10   late in the preparation of my report.  And I had a

11   paralegal at KaiserDillon, who was assigned to serve

12   as a research assistant, who sent me various

13   documents with -- at my request with links to

14   legislative documents and other documents from the

15   Secretary of State's office, that sort of thing.

16   And that's about all I recall.

17       Q    So we have the complaint, the reports of

18   the other experts.  And then in terms of the

19   research assistant role who was assisting you, what

20   would a request look -- would you ask for specific

21   categories of documents, or what role did the

22   research assistant play, I guess, is what I'm really

23   asking versus what research you did?

24       A    Right.  I requested particular categories

25   of documents, and some of the time he was able to

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 13

1    find them, and some of the time he was not.  Much of

2    the research is research that I undertook myself.

3         Q    Now, have you read any of the -- well, I'm

4    assuming you've read the complaint in this case,

5    correct?

6         A    Yes.

7         Q    And have you read any of the other

8    pleadings filed in this case?

9         A    I don't recall seeing any of the

10   pleadings.  There were a couple of orders, such as a

11   discovery schedule order and that sort of thing that

12   were provided to me, but I don't recall looking at

13   pleadings in the case.

14        Q    Okay.  And throughout your report you also

15   reference sets of documents that were produced by

16   the Secretary of State's office to the plaintiff in

17   the litigation.  Did you receive those through the

18   kind of research assistant process you described,

19   you would ask for documents related to something and

20   were provided those, or did you receive them some

21   other way?

22        A    My recollection is that Sarah Fink

23   provided most of the documents that were received

24   through discovery.

25        Q    Okay.  And are there documents that were

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 14

1    part of the discovery documents that you reviewed

2    but did not reference in your report?

3         A    Oh, yes, there were a lot of discovery

4    documents that I received, and only -- only some of

5    them seemed relevant for the -- for the analysis

6    that I was doing.  Well, they were -- often

7    documents were relevant in the sense that they

8    provided a broader context but were not -- not

9    things that needed to be cited as evidence in the

10   report.

11        Q    So then you just personally made the

12   decision after reviewing those documents as to which

13   document to include -- reference in your report and

14   which ones not to, that was your decision?

15        A    Oh, yes.

16        Q    Did plaintiff's counsel ask you to make

17   any assumptions in the process of preparing your

18   report?

19        A    No.

20        Q    So in your own words, could you describe

21   to me what you believe the Fair Fight Action case is

22   about?

23        A    Well, let me begin with the portion of the

24   case that I referenced in my report.  There were a

25   lot of different aspects of the Georgia voter

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 15

1   verification process and other aspects of the way in

2   which the Secretary of State's office administered

3   the registration process that I did not address in

4   my report.  I have, however, seen documents relating

5   to a wide variety of the other issues that were

6   raised in the complaint by Fair Fight -- by Fair

7   Fight Action.

8          Q    Okay.  Thank you.  I appreciate that.

9               Could you describe to me globally, though,

10  your understanding of what the case as a whole is

11  about, not your specific portion?

12         A    Well, it's concern with the claim that

13  aspects of the state's administration of the

14  registration process that have a racially

15  discriminatory effect and therefore would violate

16  either Section 2 of the Voting Rights Act, or I

17  think there were constitutional claims as well.

18         Q    Okay.  Thank you.

19              In terms of some of the specific documents

20  that you reviewed, did you review preclearance

21  submissions as part of the preparation of your

22  report?

23         A    Yes, that was a category of documents I

24  requested early on.

25         Q    And did you review any e-mails from the

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 16

1    Secretary of State's office as part of the

2    preparation of your report?

3        A    There probably were some.  I don't

4    remember that there was a large volume of them.

5        Q    Do you recall when you last received

6    documents from plaintiff's counsel that had been

7    produced by the defendants that you relied on in the

8    preparation of your report?

9        A    Well, you're really asking two questions.

10       Q    Okay.  I can try it again.  Let's do it

11   this way:  When did you receive the last set of

12   documents from the plaintiff's counsel that were --

13   that were subcategory of documents produced by the

14   defense that you relied on in the preparation of

15   your report?

16       A    You're still asking two questions.  One,

17   when I received them, and the other was you were

18   restricting it to particular category, documents

19   that I relied on.  It seems to me that's two

20   different questions.

21       Q    Okay.  I'm trying to use the documents you

22   rely on and modifying the when did you receive.  I'm

23   asking only as to the subset of documents produced

24   by the defendants.  So to category one, also

25   documents that you relied on that were produced by

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 17

1    the defendants, when did you last receive those

2    categories of documents -- documents that fit in

3    those categories?

4         A    It was pretty recent, but I don't recall

5    an exact date, but it was certainly in 2020.

6         Q    Okay.  As part of the research for your

7    report, did you speak with anyone other than

8    plaintiff's counsel to -- in Georgia?

9         A    Not that I recall.

10        Q    Okay.  So you didn't talk to any voter

11   registrars or election officials as part of the

12   preparation of your report?

13        A    No.

14        Q    Let's turn next to your CV.  Ms. Fink

15   yesterday sent a revised CV from May 2020.  Do you

16   have a copy of that document?

17        A    I don't have it in front of me.

18        Q    Okay.

19             MR. TYSON:  Let's do this then.  Sarah, is

20   that something you could forward to Dr. McCrary just

21   so we're talking about all the same documents at

22   once?

23             MS. FINK:  Absolutely.  Do you have your

24   e-mail open and I can forward it to you,

25   Dr. McCrary?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 18

1            THE WITNESS:  I think I just messed up our

2      Zoom connection by trying to access it.

3            MS. FINK:  We see you fine.

4            MR. TYSON:  We can still see you fine.

5            THE WITNESS:  I see nobody.  I'm sorry.

6            MS. FINK:  Can we go off the record for a

7      minute and just try to fix this?

8            MR. TYSON:  We'll do that.

9            (Off-the-record discussion.)

10            MR. TYSON:  For purposes of clarity here,

11      we've marked as Exhibit 2 the updated CV, the

12      changes to which Dr. McCrary has made to his CV.

13            (Defendant's Exhibit 2 was marked for

14      identification.)

15            MR. TYSON:  We are going to now mark as

16      Exhibit 3 Dr. McCrary's report, which also includes

17      a prior version of his CV, and he's aware of the

18      differences there, and we can discuss those as

19      needed.

20            (Defendant's Exhibit 3 was marked for

21      identification.)

22      BY MR. TYSON:

23        Q    I don't expect the questions will involve

24      anything that's changed, Dr. McCrary.

25            So Exhibit 3 is titled Expert Report of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 19

1    Dr. Peyton McCrary.  I'm assuming you're familiar

2    with this document, correct?

3         A    Yes.

4         Q    And so at the end of this document Exhibit

5    1 is your CV that was filed with the report, and on

6    the PDF it's page 103, but it's six pages from the

7    end, Dr. McCrary, in the paper version.

8         A    I see it.

9         Q    And as we've discussed, the most recent

10   version of your CV we've marked as Exhibit 2, but

11   for convenience we're going to work off of the CV

12   attached to Exhibit 3, correct?

13        A    Yes.

14        Q    Now, kind of getting started on your

15   background, I ran across another version of your CV

16   in another case that mentioned that you were

17   originally from Danville, Virginia; is that correct?

18        A    That's correct.

19        Q    And that's funny to me because I've been

20   reading through Taylor Branch's history of the civil

21   rights movement and recognized Danville.  I had not

22   heard of Danville except there was a Student

23   Nonviolent Coordinating Council protest there in

24   1963.  Are you familiar with that incident?

25        A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 20

1       Q     And were you in Danville at that time?

2       A     I was.

3       Q     Were you involved at all in the operations

4   that were happening then?

5       A     No.

6       Q     Okay.  Do you have any familiarity with

7   the Danville city officials that were involved at

8   the time, the police chief McCain or Mayor Stinson?

9       A     I remember who they were.  That's the

10  extent of what I recall from reading the newspaper.

11      Q     Okay.  If we could begin with your

12  educational background.  If you could just maybe

13  give me a brief summary of your educational history.

14      A     I went to the public schools in Danville,

15  Virginia, where I graduated from high school in

16  1961.  I was an undergraduate at the University of

17  Virginia and received my BA in 1965.  I stayed for

18  an additional year and took a master's degree in

19  1966, and then I went to Princeton, where I

20  completed my PhD degree in 1972.

21      Q     Great.  And for your master's at UVA, what

22  was the topic of your thesis; do you recall?

23      A     Yes.  John Spencer Bassett:  The Scholar

24  as Social Critic.

25      Q     The scholar and social critic, you said?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 21

1       A     Scholar as social critic.

2       Q     Got it.

3             And was there -- do you recall any

4    references to Georgia in that thesis?

5       A     No.

6       Q     Now, for your PhD at Princeton, what was

7    the topic of your dissertation there?

8       A     Title of the dissertation was Moderation

9    in the Revolutionary World:  Abraham Lincoln and

10   Reconstruction in Louisiana.  That's an

11   approximation.  I may have gotten the subtitle

12   wrong.

13      Q     It refers to Louisiana.  I'm assuming that

14   was the primary focus of the work?

15      A     That's correct.

16      Q     Okay.  You mentioned that you are

17   currently teaching at George Washington University

18   Law School.  What does the role of professional

19   lecturer mean?

20      A     Professorial lecturer is the term that the

21   university gives to adjunct faculty members.

22            THE REPORTER:  Adjunct faculty...

23            THE WITNESS:  Adjunct faculty.

24            MR. TYSON:  Members.

25   BY MR. TYSON:

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 22

1      Q     And so what courses are you currently

2    teaching at George Washington Law School?

3      A     The only course that I've taught there is

4    a course I co-teach with a former colleague in the

5    voting section of the Department of Justice, a

6    course on the voting rights law.

7      Q     Who is that former colleague from the

8    Department of Justice?

9      A     Stephen Pershing.

10     Q     And is it correct that the topic of your

11   class on voting rights law does not involve the area

12   of election administration?

13     A     No.

14     Q     What parts of election administration are

15   addressed in your voting rights law course?

16     A     Well, first of all, we talk about cases

17   involving voter registration before 1965,

18   particularly from Smith versus Allwright, through --

19   through the cases in 1961, '65, and election

20   administration was the primary focus of those cases.

21          Additionally, we discussed election

22   administration in the context of explaining the

23   evolution of the operation of Section 5 of the Voter

24   Rights Act on the preclearance reviews by the

25   Department of Justice or in lawsuits that -- some of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 23

1    which dealt with election administration.

2              In addition, we give close attention in

3    the last part of the course to several recent cases

4    involving election administration issues in various

5    states.

6        Q    And is your teaching role as one of the

7    co-teachers in that class focused on the historical

8    components?

9        A    Well, first of all, you recall that I am

10   not an attorney, but if you hang around voting

11   rights lawyers for about 40 years you pick up a

12   little law, and so I confess that I often discuss

13   the evolution of case law, but one of the focus --

14   one focus that I try to bring to the course is to

15   explain how the fact-finding in voting rights in

16   election law cases develops the role of expert

17   witnesses in cases, the sort of empirical issues the

18   courts had to address, and how the courts have

19   addressed those issues.

20             So I wouldn't characterize that

21   necessarily as historical, but it's certainly --

22   certainly deals with social science as well as how

23   litigation is conducted.  We actually try to teach

24   law students how litigation operates.

25       Q    That sounds fascinating.  I'm assuming in

Peyton McCrary , Ph.D.                May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 24

1   the course of that as part of your course you're

2   obviously teaching about several cases from Georgia

3   in that Voting Rights Act litigation experience; is

4   that correct?

5        A    Yes.  Certainly.

6        Q    So let's take a look at your publications

7   in your CV.  We'll begin with that.  And I was

8   looking just kind of at the list, and seems to be a

9   lot about Alabama and Florida, and I was looking for

10  some Georgia-specific items, and I found three, and

11  I wanted to make sure I've got that right and

12  haven't missed something.

13            So the first one on page 3 of the CV is an

14  analysis of the -- of Georgia state senate

15  redistricting in 1962, top of page 3.  Are you with

16  me on that?

17       A    Yes.

18       Q    And that was a publication that involved,

19  obviously, looking at the state of Georgia, correct?

20       A    Yes.

21       Q    And the next item on that page, The

22  Dynamics of Minority Vote Dilution:  The case of

23  Augusta, Georgia, is a study from 1946 through 1986

24  that involved Georgia, correct?

25       A    Yes.

Page 25

1      Q    And in your report you mentioned the end

2   of preclearance as we know it where you recounted

3   facts involving Georgia legislative redistricting in

4   2001.  Do you recall that paper?

5      A    Yes.

6      Q    Okay.  Are there any other publications

7   you looked at on your CV that involve Georgia

8   elections that I've missed out of those three?

9      A    Yes, a Law Review article that is listed

10  immediately following, The End of Preclearance to

11  which you referred, Bringing Equality to Power:  How

12  the Federal Courts Transformed the Electoral

13  Structure of Southern Politics, 1960 to '90, which

14  was published in the University of Pennsylvania

15  Journal of Constitutional Law in 2003.

16     Q    Got it.

17          Okay, so we've added that one, so we're at

18  four.  Are there any other publications you have

19  published that involve Georgia?

20          MS. FINK:  Dr. McCrary, if you need time

21  to read through the list of publications to think

22  about whether they involve Georgia, you should take

23  the time to do that.

24          THE WITNESS:  That's what I was doing.

25          MS. FINK:  Good.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 26

1    BY MR. TYSON:

2        Q    Please take your time.

3        A    There is a book chapter called the Law of

4    Preclearance which was published in collection of

5    essays entitled, The Future of the Voting Rights Act

6    published by Russell Sage in 2006, which is -- which

7    is essentially an excerpt from the Law Review

8    article in which we were asked to present the

9    empirical evidence regarding objection decisions

10   that we had -- we had previously discussed in the

11   Law Review article, and that also necessarily deals

12   with some of the Georgia facts.

13       Q    Any others you can identify?  Please take

14   your time.  Don't rush.

15       A    I'm trying to recall.  I'm pretty sure

16   there were also some Georgia cases discussed in an

17   article entitled -- Law Review article again called

18   Keeping the Courts Honest:  The Role of Historians

19   as Expert Witnesses in Southern Voting Rights Cases.

20            Actually, now that I think about it,

21   there's also Georgia material in the Law Review

22   article listed immediately below that,

23   Discriminatory Intent:  The Continuing Relevance of

24   Purpose Evidence in Vote-Dilution Lawsuits published

25   in the Howard Law Journal in 1985.

Peyton McCrary , Ph.D.                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 27

1          I think there's also some discussion of

2     Georgia expert witness reports in a journal article

3     entitled, Racially Polarized Voting in the South:

4     Quantitative Evidence from the Courtroom, published

5     in Social Science History in 1990 and listed on page

6     3 of the CV.

7          And there's also, now that I think about

8     it, in a review in -- review essay that I published

9     that's listed on page 3 entitled, Race and

10    Misrepresentation:  Review of Maurice T. Cunningham,

11    Maximization, Whatever the Cost:  Race,

12    Redistricting, and the Department of Justice,

13    published online in a online journal known as H-Net

14    in 2002.  I think that's all.

15         Q    Okay.  Excellent.  Thank you for taking

16    the time for looking at that.  I appreciate that.

17              So on page 3 there before we get into some

18    of these others, I see you have a review essay,

19    Without Fear and Without Research:  Abigail

20    Thernstrom on the Voting Rights Act, from 1988.  Do

21    you see that entry?

22         A    Yes.

23         Q    And was that referring to Dr. Thernstrom's

24    book, Whose Vote Counts?

25         A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 28

1      Q    And I'm guessing from the title of your

2   review that you were critical of the book; that a

3   fair statement?

4      A    That's correct.

5      Q    Do you recall calling Dr. Thernstrom's

6   work careless in that review?

7      A    I don't remember whether I used the word

8   "careless," but I'm sure I made comments that would

9   be synonymous with it.

10     Q    Do you recall saying that Dr. Thernstrom's

11  work was, quote, crafted to serve a conservative

12  political agenda?

13     A    I don't recall those words, but it's

14  consistent with what I think Pam Karlan and I said

15  in the review.

16     Q    Do you personally oppose Dr. Thernstrom's

17  conservative political agenda?

18     A    Do I personally oppose her conservative

19  agenda?

20     Q    Yes.

21     A    Well, actually, Abby and I knew each other

22  pretty well, and we were on good terms even in the

23  last year -- years of her life.  And I didn't agree

24  with her about the -- portions of her ideology in

25  her publications, but the primary focus of that

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 29

1   review was the carelessness of her scholarship and

2   the way in which she distorted evidence to fit her

3   ideological views.  It wasn't a critique of her

4   views so much as it was a critique of her

5   scholarship.

6        Q    Thank you.

7             Let's take a look at one of the

8   Georgia-specific publications we had, The End of

9   Preclearance as We Knew It.  That is document 3 for

10  you, 03.

11       A    Okay.  We need to refer to the CV anymore

12  or should I put it back in the folder?

13       Q    We're going to be coming back to it.  The

14  report you probably want to hang on to since we're

15  going to need to come back to that as we go.  I'm

16  going to try to minimize bouncing between exhibits

17  as much as I can.

18       A    What did you tell me to refer to, which

19  exhibit?

20       Q    Document 03, which we'll mark as Exhibit

21  4.

22            (Defendant's Exhibit 4 was marked for

23  identification.)

24       A    Yes.

25  BY MR. TYSON:

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 30

1      Q    It's the article, The End of Preclearance
2   as We Knew It.
3      A    Yes, I have it.
4      Q    Is this the article that you authored
5   that's referenced on your CV in 2001?  I'm sorry.
6      A    It appears to be the article.  It's a
7   different format from the original, but it appears
8   to be a copy of the article or the article.
9      Q    Okay.  So obviously I know it's relatively
10  lengthy.  Do you recall where in the article you
11  discussed Georgia's legislative districting?
12     A    So I can look through and find all the
13  references to Georgia if that's --
14     Q    That might be -- sorry, I might be able to
15  assist you.  If you go to page 36.
16     A    I'm looking at page 36.
17     Q    So that first paragraph, maybe about fifth
18  line down that begins:  Thus, the majority in
19  Georgia versus Ashcroft, can you see that?
20     A    Yes.
21     Q    And do you personally agree or disagree
22  with the court's opinion in Georgia versus Ashcroft?
23     A    Agree or disagree is not the way I would
24  couch it.  What we said in the article and what I
25  think is that it was an opinion that would create a

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 31

1    standard for enforcing Section 5 of the Voting

2    Rights Act that would be administratively difficult

3    and confused and called for things that had

4    previously not been regarded as suitable evidence in

5    a Section 5 review, including the political party

6    controlling the legislature and the role of the

7    party control of the legislature in putting

8    African-American legislators in committee

9    chairmanships, which is not the kind of thing we had

10   ever been authorized to look at under Section 5.

11          It also instructed the Department of

12   Justice or the federal courts to consider the

13   creation of influence districts, which had never

14   been a part of a Section 5 review, and, in fact,

15   it's a concept that political scientists regard as

16   a -- a very sloppy category of districting to

17   examine with little empirical -- little empirical

18   definition, and so it seemed a particularly bad

19   idea.

20          So I was -- I was critical of -- we

21   were -- my co-authors and I were critical of the

22   decision because it seemed to create a lot of

23   confusion in the standards for administering the

24   preclearance review of voting changes.

25          There were some aspects of it that seemed

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 32

1    to have some appeal.  You know, it suggested

2    attention to things that are of interest, but it was

3    difficult for me or for anyone in the voting section

4    to figure out how the heck to administer Section 5.

5              And, of course, the case was remanded and

6    we were struggling with that, and it appeared to

7    call, among other things, for legislative roll-call

8    analysis of voting behavior in the legislature in

9    the case of a redistricting decision which meant

10   that we had have to use a totally different kind of

11   expert.  So there were a lot of administrative

12   problems with the standard that the court had

13   announced in Georgia versus Ashcroft.

14        Q    Thank you.  And that actually kind of

15   leads to what I was going to ask you about.  On the

16   next page on page 37, footnote 229 makes reference

17   to what you just described as the issue of looking

18   at the legislative influence of African-American

19   legislators.  Are you with me on that footnote?  And

20   it says:  In Georgia, as in most states, the party

21   which provided the most leadership opportunities for

22   representatives elected by minority voters was the

23   Democratic Party, and references Dr. Karlan.  Thus

24   under this new view of retrogression, evidence that

25   a plan maintained or enhanced the chances that

Peyton McCrary , Ph.D.                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 33

1    Democrats would control the state senate would

2    presumably enhance the likelihood of preclearance.

3              Do you see that language?

4         A    Yes.

5         Q    And so based on what you've described

6    earlier, your main concern with this new review that

7    the Supreme Court was requiring in Ashcroft was the

8    administerability of it from the voting section's

9    view; is that a fair statement?

10        A    And the federal courts.

11        Q    Did you have concerns about the

12   constitutionality of engaging in this kind of

13   exercise that would involve partisan line --

14   partisan engagements in preclearance analyses?

15        A    Yes, but I'm not sure exactly what you

16   mean by the question.  I mean, it seemed to me that

17   this was -- this was something that had never been a

18   part of Section 5 review, and it seems to invite a

19   kind of partisan decision-making which we had always

20   tried to avoid.

21        Q    Do you have a personal opinion on whether

22   or not the leadership opportunities for

23   representatives elected by minority voters should

24   have been part of a preclearance review?

25        A    Yes, I don't think it should be part of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 34

1   the preclearance review.

2        Q    Okay.  And those Georgia plans on the next

3   page of footnote 235 you note were later found

4   unconstitutional on the one-person, one-vote

5   principle, correct?

6        A    Where are you referring me to?

7        Q    Page 38, footnote 235.

8        A    Yes.

9        Q    And so ultimately the department didn't

10  have to answer those questions as to those Georgia

11  plans; is that fair?

12       A    That's correct.

13       Q    And then is it your understanding that

14  Georgia versus Ashcroft was overturned by statutory

15  changes in the 2006 renewal of the Voting Rights

16  Act?

17       A    I wouldn't use the term "overturned."

18  Congress doesn't overturn courts' decisions.

19       Q    So is it -- let me ask a better question

20  then.  Is it your understanding that Georgia versus

21  Ashcroft is not applicable to preclearance in light

22  of the changes made by Congress in 2006?

23       A    That's correct.

24       Q    Thank you.

25            We can put that article away for now.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 35

1    Actually, I shouldn't need to go back to that one.

2              Let's talk next about document 04, and

3    that is the document, Yes, but what have they done

4    to black people lately? from 1995.

5         A    Yes.

6         Q    I'm going to introduce -- mark that as

7    Exhibit 5.

8              (Off-the-record discussion.)

9              (Defendant's Exhibit 5 was marked for

10   identification.)

11   BY MR. TYSON:

12        Q    Do you have that in front of you now,

13   Dr. McCrary?

14        A    Yes.

15        Q    Okay, great.  Is this the article that was

16   referenced on your CV, Yes, But What Have They Done

17   to Black People Lately?  The Role of Historical

18   Evidence in the Virginia School Board Case?

19        A    Yes.

20        Q    I guess I'd like for you to turn to the

21   third physical page, page 1276, in the Chicago-Kent

22   Law Review.

23        A     In this copy there is no 1276.  I go from

24   1275 to 1277.

25        Q    Well, that's a problem.  Let me do this,

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 36

1    is it correct to say that this article is an

2    analysis of what would be referred to as the Shaw

3    line of cases before the US Supreme Court?

4         A    No.

5         Q    And how would you explain what this

6    article was about then?

7         A    This article was about the evidence in a

8    particular case which was initially styled Irby

9    versus Fitzhugh, I think, which challenged the

10   constitutionality of and I suppose the legality

11   under Section 2 of the Voting Rights Act of the

12   method of appointing elected school -- appointing

13   school boards, local school boards in the state of

14   Virginia.

15        Q    If you could turn to page 1277, since I

16   know you have that one.  First full paragraph on

17   that page begins:  This article will examine the

18   historical evidence of discriminatory intent

19   presented by the plaintiffs in the Virginia school

20   board case and the basis on which courts minimized

21   the ultimate significance of this evidence.

22             Do you see that?

23        A    Yes.

24        Q    And you indicate that no court has

25   followed this precedent in deciding subsequent

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 39 of 270
Peyton McCrary , Ph.D.                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 37

1    lawsuits.  Were you urging the adoption of the

2    precedent used in the Virginia school board case or

3    the rejection of that precedence?

4         A    I'm sorry, could you rephrase that

5    question?

6         Q    Certainly.  So you're examining the

7    historical evidence of discriminatory intent

8    presented by the plaintiffs and the basis on which

9    the court minimized the evidence.  I'm assuming in

10   general this article you're advocating against the

11   court's position in how it treated discriminatory

12   intent evidence; is that correct?

13        A    Yes.

14        Q    Okay.  And you indicate that no courts

15   have followed this precedent in deciding subsequent

16   lawsuits.  Are you aware of courts that have adopted

17   the precedents minimizing the ultimate significance

18   of intent evidence in other cases?

19        A    I have to think about that for a moment.

20   I was, of course, writing this in the middle of the

21   1990s.  I can think of cases since that time in

22   which courts have minimized the significance of

23   historical evidence, but it would take me a while to

24   go through and recall precisely which cases.

25        Q    I don't want you to engage in that kind of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 38

1    exercise.

2            Obviously you are a historian, have worked

3    in the Voting Rights Act area for a while.  Is it

4    your personal belief that historical evidence is

5    critically important to intent analyses by courts in

6    voting cases?

7        A    Well, historical evidence is a term that I

8    don't refer to with any chronological limits.  In

9    other words, when I am analyzing recent history,

10   that's still historical analysis, and that's still

11   historical evidence.  It seems to me that it depends

12   on the circumstances.

13           For example, in the Supreme Court decision

14   in Hunter versus Underwood and the earlier 11th

15   Circuit decision in that same case challenging the

16   petty crimes provision of the 1901 Alabama

17   constitution, the court was focused entirely on

18   things that happened in the period around the third

19   of the 20th century, and that was decision in which

20   then Associate Justice William Rehnquist voted with

21   his -- with the fellow members of the court in a

22   unanimous opinion based entirely on very old

23   historical evidence because it was relevant to the

24   facts at issue with the court on that case.

25           So there are occasions when going back a

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 39

1    very long time might be highly relevant, and I have

2    been involved in some of those cases myself, but I

3    also have the view that more recent historical

4    evidence can be much more probative than what

5    happened 50 or a hundred years ago.  So, you know, I

6    interpret history very broadly.

7        Q    Got it.  Thank you.

8             So we can go ahead and put that one away.

9    Let's go next to another publication document 07

10   called, Keeping the Courts Honest.

11       A    Sorry, it's 7?

12       Q    Yes, sir.

13       A    Okay.

14       Q    So we'll mark this as Exhibit Number 6.

15            (Defendant's Exhibit 6 was marked for

16   identification.)

17   BY MR. TYSON:

18       Q    And is this an article you published in

19   1989 involving the role of historians as expert

20   witnesses?

21       A    Yes.

22       Q    Okay.  And so hopefully we have all the

23   pages here.  If you could go to page 105, which is

24   the sixth physical page.

25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 40

1      Q    So about the middle of that page in the

2  paragraph that starts, "This sort of direct

3  expression."  You with me on that?

4      A    Yes.

5      Q    You note about halfway through that

6  paragraph:  Evidence of discriminatory intent is

7  most commonly found in newspapers.  Opposing counsel

8  normally objects to newspapers, particularly if less

9  than 20 years old, as hearsay evidence.

10          Do you see that statement?

11     A    Yes.

12     Q    You obviously use newspaper accounts in

13 your analysis here and in other cases; is that

14 correct to say?

15     A    Yes.

16     Q    And this is one of the tools of a

17 historian is to be able to look at newspaper

18 accounts; is that a correct statement?

19     A    Yes.  It's not restricted to historians,

20 but yes.

21     Q    Okay.  And when you're doing research

22 involving newspapers, how do you locate the

23 newspapers that you are going to consult?  Is it

24 print only?  We have so many ways of delivery now.

25 Is there a particular method that you use in your

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 41

1    research process?

2        A    Well, the access to newspapers has evolved

3    over time, as I'm sure you know.  Back in the 1980s

4    when this article was written and when I was

5    testifying in a variety of cases I had to read

6    newspapers on microfilm, and sometimes I had to

7    travel to the field to analyze them.  In fact,

8    usually that was necessary.

9            Nowadays I have access through my GW

10   University connection to an online database of

11   newspapers and newspaper articles known as NewsBank,

12   which I also was able to use during my time in the

13   Department of Justice, and so sitting at my desk I

14   can access newspapers rather than traveling to

15   Mississippi or Georgia or Montana or wherever to

16   read newspapers.

17           There is also the possibility of

18   identifying newspapers through an Internet browser

19   sometimes, and so some of the time I can locate

20   newspaper articles that way, so it just depends.

21           You also asked about a current trend in

22   journalism for online newspapers, and that is also a

23   source of access.  For example, I think it's -- I

24   may -- it may be a coalition of the newspapers in

25   Alabama which has an online publication called

Peyton McCrary , Ph.D.                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 42

1    AL.com.  It's an online version.  I think it's
2    probably the Montgomery Advertiser and Birmingham
3    News, but I'm speculating there.
4            So there are online journalism sources all
5    over the place nowadays in addition to the
6    searchable database, which includes things that were
7    originally in print.
8        Q    Thank you.  That's very helpful.
9            So what methodology do you use as a
10   historian to determine what newspaper accounts are
11   relevant when you're doing an analysis and which
12   ones are irrelevant?
13       A    Well, of course, it depends on the
14   questions you're asking.  If, for example, I'm
15   analyzing the adoption of a statute, I focus on
16   stories, reports, news reports covering the
17   operations of a state legislature at the time the
18   statute was under consideration.
19           If I'm talking about the administration of
20   elections, for example, I would often be looking at
21   newspaper coverage of things that a state agency
22   did, as in this case Secretary of State's office.
23   So it depends very much on what subject matter
24   you're investigating, but newspaper articles are
25   also useful as a what I usually refer to as a

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 43

1    pattern-searching device to find out things to

2    explore through other documents.

3            So the reason why newspapers were so

4    important in cases in the 1980s is that there's

5    virtually no legislative history record of state

6    legislatures other than the bare-bones account in

7    the journals of the legislature.  So if you really

8    want to find out what's happening in the

9    legislature, you can't go to an official document,

10   and the best available evidence was usually

11   newspaper coverage of what the legislature is doing.

12           Of course, as with any documents, a social

13   scientist, such as an historian, has to analyze each

14   piece of evidence in context and compare what you're

15   finding in one document with other documents that

16   deal with the same subject matter.

17           So it's the kind of thing where an expert

18   social scientist -- social scientist who was

19   exercising his expertise or her expertise has to be

20   careful in using newspapers just like any other

21   document.

22       Q    And so on -- later on that same page when

23   you say -- or the same paragraph when you say that

24   historians -- experts trained in the scrutiny of

25   such sources, and surely historians would rank first

Peyton McCrary , Ph.D.                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 44

1    among equals here, typically relies on such sources

2    in reaching a professional opinion, is that

3    essentially the process you're referring to you just

4    described, you have to review it and determine what

5    the relevance might be?

6         A    Yes.

7         Q    Turning to page 109, four or five pages

8    later.

9         A    Yes.

10        Q    Second full paragraph that begins:  The US

11   Department of Justice has also made extensive use of

12   historians as expert witnesses in voting rights

13   lawsuits, do you see that language?

14        A    Yes.

15        Q    Besides you, were there other historians

16   working at the Department of Justice as expert

17   witnesses in voting cases?

18        A    Well, at that time I was not working at

19   the Department of Justice.  What I'm referring to

20   there is expert witnesses retained by the

21   department.  And, for example, Morgan Kousser, an

22   historian at Caltech, was often an expert in voting

23   rights cases; Vernon Burton, who was then at the

24   University of Illinois, was another historian used

25   as an expert witness in a number of cases.  There

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 45

1   were others, some of whom might have served only one

2   or two cases, but it was rather common.

3       Q    When an historian was used in a Voting

4   Rights Act case, was -- had the determination

5   already been made that the department was going to

6   engage in litigation and the historian was brought

7   in to assist in building that case, or were

8   historians used in the analytical process prior to

9   the decision on whether to bring a case?

10      A    Historians were not involved in the prior

11  decision-making.  The department -- the court brings

12  out a lawsuit, carries out an extensive

13  investigation, and does not use consultants in that

14  period ordinarily, and certainly didn't in that

15  period, so all the historians would have been

16  retained after a case was filed.

17      Q    And so was the historian essentially

18  helping paint the context, or were the historians

19  focused on discriminatory intent, or did it vary too

20  much case by case to say there was a consistent

21  practice?

22      A    In the 1980s most of the cases where

23  historians were used were dealing with cases in the

24  South where there were judicial findings of the

25  history of discrimination effect on voting, and so

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 46

1    it was hardly necessary to have an expert historian

2    to document what the courts had already found.

3            So the ordinary practice was where the

4    department thought that there was an intent question

5    to be investigated, the department would retain an

6    historian to focus on the intent question, and that

7    was the primary role.

8            Though when cases involved states outside

9    the South where there was no body of judicial

10   findings regarding the history of discrimination,

11   such as in cases in the 1990s in Montana and in

12   South Dakota, historians were -- were retained to

13   document the history of discrimination affecting the

14   American Indians.

15           And there were probably other categories

16   of question where historians were used that I'm just

17   not recalling off the top of my head.

18       Q    Thank you.

19           Let's keep moving through the article to

20   page 115, which is page 15 of the PDF.

21       A    Yes.

22       Q    At the bottom of that page you begin to

23   discuss a case from Edgefield County, South

24   Carolina.  Do you see that section?

25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 47

1     Q     And you served as the plaintiff's expert

2    in that case on intentional discrimination; is that

3    correct?

4     A     Yes.

5     Q     And do you recall that the court

6    ultimately did not rule on the intentional

7    discrimination element of the Section 2 claim?

8     A     That's my recollection.

9     Q     And ultimately the court didn't decide

10    whether the testimony you gave or the testimony of

11    the defendant's expert, Dr. Belz, was credible,

12    correct?

13    A     Sorry, defendant's expert who?

14    Q     Dr. Belz, B-E-L-Z?

15    A     Oh, Herman Belz.

16          The court made no credibility finding

17    about either expert, as I recall.

18    Q     So on page 116, the next page over, you

19    relate the story of the defendant's expert

20    testimony.  If you want to take a minute to review

21    that, I have a couple questions about that.

22          MS. FINK:  What paragraph are you

23    referring to on page 116?

24          MR. TYSON:  Page 116, the first two

25    paragraphs there are what I want to ask about.

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 48

1              THE WITNESS:  I've read it.

2     BY MR. TYSON:

3         Q     Okay.  Thank you.

4              So when you say at the beginning of the

5     first full paragraph that had the defendants' expert

6     stopped there, his testimony would have been

7     credible, that's just referring to your assessment

8     of his testimony because the court never made a

9     credibility determination, correct?

10        A     That's correct.

11        Q     If you can turn to page 117, the last

12    paragraph on that page is what I'm interested in

13    here.  And it lists -- and why don't you take a

14    minute to read it, and then I'll ask you about it.

15        A     I've reviewed it, and I remember the

16    testimony, so go ahead and ask your question.

17        Q     Excellent.

18             So you talk about a number of things that

19    you looked at, chain gangs, the athletic teams'

20    names, playing Dixie at a football game.  In

21    preparing that kind of testimony, how did you

22    determine which community practices were relevant to

23    a question of racial intent in a voting case?

24        A     Well, recall that you elicited the

25    information earlier in this deposition that I grew

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 49

1    up in Danville, Virginia.  I was intimately familiar

2    with the southern racial etiquette of the time

3    period we're talking about, and any historian who's

4    written about the South would also be familiar with

5    that, even if that historian didn't grow up in the

6    South.  So this is -- this is what would be

7    understood by almost anyone writing about the

8    history of the South in the 1960s and 1970s.

9        Q    And in the process of looking for the

10   record of discriminatory continuing behavior by

11   county officials that you reference here, do you

12   also in your analysis search for nondiscriminatory

13   behavior, or do you limit your focus to locating

14   discriminatory behavior?

15       A    Of course you look at all the purposes.

16   For example, there might be circumstances in which

17   there is a legitimate governmental interest in

18   taking some particular action that would justify it.

19   So you have to weigh racial considerations along

20   with other nonracial considerations in anything

21   you're analyzing.

22       Q    What methodology are you using to make

23   that analysis?  Obviously you're bringing your

24   background in the southern way of life as you

25   described in Danville.  What methodology are you

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 50

1    using to determine whether there may be a legitimate

2    government purpose versus a racially discriminatory

3    purpose?

4        A    Well, it has nothing to do with growing up

5    in the South.  You were asking me specifically about

6    the racial etiquette facts that are referred to in

7    that paragraph when I made the comment about growing

8    up in Danville.

9            An historian is trained to analyze the

10   total context in which decisions are made, and that

11   includes all of the considerations that went into a

12   decision.  That's what we normally -- that's what

13   we're trained to do in our education and taught to

14   do when we're conducting research.  So even someone

15   that grew up in the North can analyze the South in

16   the 1960s and 1970s.

17       Q    Have you ever heard the name of David

18   Barton from evangelical circles in the context of

19   history?

20       A    David Barton?

21       Q    Just for context, he's someone who is not

22   a trained historian who has been accused of cherry

23   picking quotes from the Founders to reach a

24   particular conclusion about the founding of the

25   country.  I can see from your face you don't know

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 51

1  what I'm talking about.  That's totally fine.

2      A     I've never heard of David Barton that I

3  recall.

4      Q     Let me ask this question:  Apart from

5  that, what processes does a historian use to avoid

6  the mistake of just going through and cherry picking

7  out stories to support a narrative when you're

8  evaluating a historical practice or the adoption of

9  a policy?

10     A     That's a very broad and really vague

11  question, it seems to me.  You bring everything you

12  know about the way a political process operates or

13  the way in which social behavior operates in the

14  society you're examining, and you start by trying to

15  assemble all of the evidence you can about the

16  subject matter you're investigating.

17          There's no -- it's not something like a

18  statistical analysis where you can point to a

19  particular procedure that you're using to analyze

20  whether voting patterns are racially polarized or

21  whether there is a realignment or whether you have

22  social mobility in the society.  It's not -- it's a

23  much broader gauge kind of analysis.

24          But I'm always struck by the language that

25  the courts have used in beginning with White versus

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 52

1    Regester, I think, and extending down to the present

2    day when the courts talk about analyzing the

3    totality of circumstances.  That's what historians

4    do.  That's what historians do when they're writing

5    history, not when they're involved in voting rights

6    cases.

7            And it's -- the same thing is true of

8    political scientists or sociologists when they're

9    analyzing questions such as those that we're talking

10   about here.  It's not something only historians do.

11           I made a quote in -- a silly comment that

12   I made in that article or one of the articles that

13   historians are first among equals.  That was a

14   little disciplinary chest beating, I suppose, but

15   historians do it a lot more than political

16   scientists or sociologists do, but some political

17   scientists and sociologists are very good

18   historians.

19       Q    Very good.

20           If you can turn to page 118 for me.

21       A    Yes.

22       Q    At the top of that page you say:  The

23   defendants' expert, on the other hand, had testified

24   that he was not an expert on voting rights, and at

25   the end of that paragraph you say that his opinion

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 53

1    was not entitled to the weight of a professional

2    opinion within the meaning of Rule 702 of the

3    Federal Rules of Evidence.  That was your opinion,

4    not a finding the court made, correct?

5         A    That's correct, although I should add it

6    probably started with my attorney co-author and not

7    with me, but I'm familiar with Rule 702.

8         Q    Great.  And later on that same page you

9    mention a county representative who was not a

10   credible witness.  Again, this is the opinion of you

11   and your author, not something the court found,

12   correct?

13        A    That's correct.

14        Q    Let's move away from this case to page --

15   sorry, in the document away from the Edgefield case

16   to page 126?

17        A    Yes.

18        Q    All right.  So on this page you're talking

19   about the legal standard in vote-dilution cases --

20   sorry.  There we go.  Sorry.  Middle of the page

21   there:  By trying to shift the court's attention to

22   the causes, rather than the degree, of racially

23   polarized voting, the defendants' expert sought to

24   reintroduce an intent standard.

25             Do you see that?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 54

1          A     Yes.

2          Q     And so I'm assuming you're familiar with

3    the terms "vote dilution" and "vote denial."

4          A     Yes.

5          Q     And so how would you define vote dilution

6    in the context of a Section 2 case, just your -- I'm

7    not asking for your legal definition, just your

8    personal definition.

9          A     Could you repeat the question?

10         Q     Certainly.  How would you personally

11   define the term "vote dilution" when used in a

12   Section 2 case?

13         A     Well, the question -- first of all, a vote

14   dilution case is challenging a method of election,

15   such as an at-large election system or a districting

16   system that is being challenged as discriminatory in

17   effect because voting patterns are racially

18   polarized, and that means that the voting strength

19   of minority voters is diluted by the voting strength

20   of the majority group in a particular jurisdiction.

21   So that's really what the term means.

22         Q     And those vote dilution cases would be

23   primarily redistricting or at-large election

24   systems; is that fair to say?

25         A     Yes.

Peyton McCrary , Ph.D.          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 55

1       Q     And then how would you personally define a

2    vote denial case under Section 2?

3       A     Well, I usually refer to denial in

4    abridgment cases where the -- I mean, in cases

5    before 1965 there were instances in which vote

6    denial took place where it was simply impossible for

7    African-Americans in some jurisdictions to register

8    to vote because of the practices of a local

9    registrar, that's almost never the case nowadays.

10   But where the administration of elections makes it

11   more difficult for persons to vote and then the

12   burden of meeting the administrative requirements to

13   vote falls disproportionately on minority voters,

14   that would abridge their voting strength even though

15   their voting strength is not denied.

16      Q     Thank you.

17            Let's move ahead to page 128.  I'm almost

18   finished with this document here.  On page 128 we're

19   reaching the conclusion of the paper, and the first

20   full paragraph begins:  Critics charge that the

21   adversary system tempts witnesses to become

22   partisans of the cause for which they identify.

23   Some see liberals as especially guilty of serving

24   causes.  Our experience is that witnesses are less

25   likely to fall prey to partisanship than to more

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 56

1   pedestrian vices, such as sloppiness, muddled

2   thinking or lack of attention to detail, and that

3   experts serving the defendants' side in these cases

4   are more likely to fall from professional grace than

5   are plaintiffs' experts.

6           Do you see that language?

7           MS. FINK:  Just like to correct one of the

8   words.  I think you read critics charge that the

9   adversary system tempts witnesses to become

10  partisans of the causes for which they identify, but

11  it should read, the cause for which they "testify."

12          MR. TYSON:  Thank you.  I'm sorry, I meant

13  to say "testify."

14  BY MR. TYSON:

15      Q    So what do you mean by the statement that

16  those on the defendants' side of voting cases are

17  more likely to fall from professional grace than

18  plaintiffs' experts?

19      A    Remember we're referring here in this

20  paragraph to allied experience, and what I mean to

21  say is that I have a lot of experience watching

22  experts for both parties in a lawsuit, and it is

23  still true that social scientists testifying for

24  defendants are more likely to engage in sloppy

25  scholarship than -- than are plaintiffs' experts,

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 57

1    though that's by no means always true.  But that's

2    what we were saying there.

3        Q    Have you ever seen a plaintiff expert

4    engage in what you would consider partisan behavior

5    in a voting case given that background?

6        A    No, and I'm not sure I would say that I've

7    seen defendants' experts engaging in partisan

8    behavior, as we said in that paragraph.  That's

9    not -- that's not the problem.  The problem is the

10   quality of the evidence they bring to bear on the

11   issues they were asked to investigate.

12       Q    So in the next sentence there you say:  In

13   any event, the virtues that lawyers seek in expert

14   witnesses are the same as those valued by academics:

15   Knowledge of all the scholarship in their field of

16   research, hard work in the primary sources, and

17   honest, thoughtful analysis of all the evidence.  If

18   after that the testimony is not likely to help the

19   lawyer's case, the expert will not appear on the

20   stand.  The standards of the courtroom are as high

21   as those of academe.

22            Do you see that?

23       A    Yes.

24       Q    Is that statement your understanding today

25   of the standard for expert witness testimony in

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 58

1    federal court?

2        A    Which part of that long quote?

3        Q    The part at the end, standards of the

4    courtroom are as high as those of academe, is that

5    your understanding of the standard for expert

6    witness testimony in federal court?

7             MS. FINK:  Objection, calls for a legal

8    conclusion.

9        A    Yes.

10   BY MR. TYSON:

11       Q    Okay.  Is that your personal opinion of

12   what the standard for expert witness testimony would

13   be in this case?

14       A    In this particular litigation or in the

15   paragraph you just asked me about?

16       Q    Let's start with this litigation.

17       A    Well, I haven't read the expert witness

18   reports of everyone in this case, and I certainly

19   haven't given them much attention in terms of -- in

20   all -- I haven't given all of them the kind of

21   attention I would need to have given if I were going

22   to make such a judgment.  So you're asking me a

23   question about investigations I haven't made in this

24   case.

25       Q    Let me ask about you specifically.  I'm

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 61 of 270

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 59

1    sorry, yes.  Let me ask about you specifically.  Is

2    it your testimony that you believe your expert

3    report in this case is as -- the same as the

4    standard for a peer-reviewed journal article?

5         A    Yes.

6         Q    Okay.  And you're aware, I'm assuming, of

7    the distinction between testifying and nontestifying

8    experts?

9         A    Yes.

10        Q    And so when you say in this quote that if

11   after that the testimony is not likely to help the

12   lawyer's case, the expert will not appear on the

13   stand, are you aware of disclosed testifying experts

14   who did not appear on the stand because their

15   testimony wasn't likely to help the lawyer's case?

16        A    No, that's actually probably the jaundiced

17   view of my co-author, who is an attorney.  But it's

18   also a common sense proposition.  If the expert

19   reaches a conclusion that's contrary to the claims

20   made by the lawyer's client in the lawsuit, the

21   lawyer would not be inclined to put on testimony

22   that is adversarial to the interest of his client,

23   as I understand the practice.

24        Q    Let me ask you about one more quote from

25   this.  That last full paragraph:  A vote dilution

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 60

1    lawsuit is an interdisciplinary enterprise in which

2    lawyers and academics learn from each other.  These

3    cases also make available to scholars financial

4    resources rarely given for academic research.  The

5    investigation often deals with issues ignored by

6    historians in the past, and the findings presented

7    in courtroom testimony serve to enrich our

8    understanding of the complex relationship between

9    race and politics in the South.  In so doing,

10   historical research may exercise a direct influence

11   over events in the real world of the present.

12           You with me on that?

13       A    Yes.

14       Q    And so you're being paid for your work in

15   this case obviously, correct?

16       A    Yes.

17       Q    And is that payment giving you resources

18   to deal with issues ignored by historians in the

19   past?

20       A    Let me try to answer your question in this

21   way:  To travel and do research and to have time to

22   do research takes money.  Historians and political

23   scientists and sociologists and so on can get grant

24   money to finance research.

25           The first time I ever testified in a case

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 61

1    I apparently felt embarrassed to discuss my expert

2    witness fee, and Judge Virgil Pittman in the

3    Southern District of Alabama said, you shouldn't be

4    embarrassed to admit that you're being paid for your

5    services.  If you were working for free, I would

6    have to conclude that you were an advocate of a

7    cause, and so I stopped being embarrassed about the

8    fact that I'm paid a fee as an expert witness.  I'm

9    also paid to teach.  That doesn't mean that I am

10   teaching in a way that's corruptible by the fact

11   that I receive a salary for it.

12          And so the point is that these are not

13   issues which would normally be the subject of a

14   grant application.  It would be difficult in some

15   cases to find foundations that would investigate a

16   particular locality, you know, and so the only way

17   these things could be done is by involvement as an

18   expert witness in a court case.

19          But the other part of what I'm talking

20   about in that paragraph is that -- is what I've also

21   referred to in this report, and that is that the

22   fact-finding in court cases is often providing new

23   empirical evidence about subject matter of great

24   interest to other social scientists, and that means

25   that the court decision itself and the documents

Peyton McCrary , Ph.D.                      May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 62

1    that were referenced in the court's decision from

2    expert witness reports to specific documents or

3    courtroom testimony is valuable evidence for

4    historians to use, and in writing about many

5    subjects, historians, political scientists, and

6    sociologists use evidence for court cases.  That's

7    really the opinion we were addressing in that

8    paragraph.

9         Q    Okay.  What do you mean by the complex

10   relationship between race and politics in the South

11   in that sentence?

12        A    Well, race -- racial concerns have been a

13   central part of the southern experience, and I

14   wouldn't restrict it to the South.  That happens to

15   be the subject we were talking about there.  But

16   it's certainly not always true that political

17   decisions are motivated by racial concerns, and it's

18   not always true that social behavior is motivated by

19   race.

20             It's a complex relationship, and you have

21   to investigate the complexities if you want to

22   understand whether there is or isn't a racial

23   dimension to political behavior.

24        Q    Do you still believe the relationship

25   between race and politics in the South is complex?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 63

1        A     Yes.

2        Q     And this article was written at a time

3   when there were white Democrats and black Democrats

4   and white Republicans, is it fair to say there was a

5   decent breakdown there like that?

6        A     Are you talking about the 1980s now?

7        Q     Yes, the time of this article I believe

8   was the 1980s.

9        A     Yes.

10       Q     At that time there was still a sizable

11   number of white voters who identified as Democrats;

12   is that right?

13       A     Yes.  I was actually thinking about the

14   question of whether African-Americans were divided

15   between Republican and Democratic Parties as they

16   used to be in 1940s, '50s, and early '60s, and by

17   the 1980s, most African-Americans had become -- had

18   become identified with the Democratic Party and

19   voted accordingly.

20       Q     All right.  We're finished with this

21   document.  We have also been going for a little bit

22   over an hour and a half.  Dr. McCrary, do you want

23   to take a break or keep going?  I'm going to be

24   switching over to expert testimony and other things

25   now.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 64

1              MS. FINK:  Let's take a break.

2              THE WITNESS:  I definitely would.  I've

3     been drinking a lot of water.

4              (Recess 11:10-11:21 a.m.)

5     BY MR. TYSON:

6         Q    Dr. McCrary, we're going to turn next to

7     your expert testimony, and so if you could go back

8     to your CV there for me.

9         A    Okay.

10        Q    And in reviewing the list of cases, it

11    appears to me that when you were not testifying for

12    the United States, you have always testified as an

13    expert for plaintiffs against jurisdictions, either

14    county or state; is that correct?

15        A    Yes.

16        Q    In cases where you served as a testifying

17    expert, have you ever concluded that a jurisdiction

18    was not engaged in discriminatory actions of some

19    sort?

20        A    In cases in which I've testified, is that

21    your question?

22        Q    Yes.  Yes, sir, just the testifying expert

23    questions.

24        A    No, as I observed earlier, if I reached

25    the opposite conclusion the lawyer would not have

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 65

1    wanted to use me in the case, and that has happened.

2         Q    Have you ever been hired as an expert

3    witness by any conservative-leaning organization?

4         A    Conservative-leaning organizations.  Can

5    you be more specific?

6         Q    Certainly.  You're familiar with the term

7    "politically conservative," correct?

8         A    Yes, although it has varied in its

9    definition over time.

10        Q    Certainly.  What is your definition of

11   politically conservative?

12        A    You're asking about right now or 15 years

13   ago or 25 years ago?

14        Q    Right now.

15        A    That's very hard to pin down because

16   conservatives have changed their views so

17   dramatically in recent years, and it depends on

18   which particular conservatives you're talking about.

19   There are a lot of people who call themselves

20   political conservatives who are sharply critical of

21   the position taken by the Republican Party in recent

22   years, both in the Congress or state legislatures,

23   in the current President, and so forth.  So a lot of

24   people who call themselves conservative disagree

25   with other people who call themselves conservative.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 66

1      Q    So is your answer then that you can't give

2    a definition what politically conservative means

3    despite recognizing that term?

4      A    Yes.

5      Q    Let's try it this way:  Have you ever been

6    hired by a Republican Party or -- either state or

7    local or nationally?

8      A    No, but I haven't been hired by a

9    political party.

10     Q    Okay.  Have you ever been hired by -- I'm

11   sorry, didn't mean to cut you off.

12     A    No, you didn't cut me off.

13     Q    Have you ever been hired by a Republican

14   Secretary of State in an election case?

15     A    I've never been hired by a Secretary of

16   State.

17     Q    You're familiar with the term "civil

18   rights organization," correct?

19     A    Yes.

20     Q    And how would you define a civil rights

21   organization?

22     A    An organization that is created in order

23   to advance the interests of minority citizens to

24   protect their civil rights.

25     Q    And you have been hired by civil rights

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 67

1    organizations, using your definition, as an expert

2    witness, correct?

3         A    Yes.

4         Q    In the list of cases where you provided

5    expert testimony, you mentioned Shelby County versus

6    Holder.  Can you describe for me in your own words

7    what Shelby County was about?

8         A    It was a challenge to the

9    constitutionality of the preclearance requirements

10   of the Voting Rights Act focusing specifically on

11   the coverage formula found in Section 4 of the Civil

12   Rights Act -- of the Voting Rights Act.

13        Q    And you were retained as an expert witness

14   for the Department of Justice, correct?

15        A    No.  I was --

16        Q    You were an expert witness --

17             (Simultaneous speaking.)

18             THE REPORTER:  I didn't hear the answer.

19             THE WITNESS:  I was employed by --

20             MR. TYSON:  Sorry.

21             THE WITNESS:  -- the Department of

22   Justice.

23   BY MR. TYSON:

24        Q    And you testified as an expert witness on

25   behalf of the United States in that case, correct?

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 68

1     A    In the sense that I filed a written

2  declaration in the case, yes.

3     Q    And you were assisting in the defense of

4  the constitutionality of the coverage formula under

5  Section 4; is that correct?

6     A    Yes.

7     Q    Let's next go to document 10.

8     A    Okay.  Give me a moment.

9     Q    Certainly.  We'll mark this as Exhibit

10 Number 7.

11          (Defendant's Exhibit 7 was marked for

12 identification.)

13     A    Yes, I have document 10.

14 BY MR. TYSON:

15     Q    And is this testimony you provided to

16 Congress, specifically House Judiciary Subcommittee,

17 during its review of the Voting Rights Act after

18 Shelby County?

19     A    Yes.

20     Q    So I want to ask you a few questions about

21 that.  About the middle of the page there you

22 indicate:  In the view of the five conservative

23 justices in the majority, the coverage formula no

24 longer identified the parts of the country where

25 present-day racial discrimination affecting voters

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 69

1    are concentrated.

2            Is it your testimony that Shelby County

3    was a conservative decision?

4        A    You mean the position of the majority

5    opinion in the -- yes.

6        Q    And the bottom of page 1 right there in

7    the next sentence you note that Chief Justice

8    Roberts said much had changed about the South.  Do

9    you see that language?

10       A    Yes.

11       Q    As a historian, do you disagree with the

12   chief justice's statement that much has changed in

13   the South between 1965 and Shelby County?

14       A    No.

15       Q    Turning to page 2 of your testimony, the

16   first full paragraph on that page you're discussing

17   vote denial cases and vote dilution cases.  If you

18   want to take a minute to read that paragraph, I want

19   to ask about that.

20       A    I'm sorry, which paragraph?

21       Q    The paragraph that begins:  The formula --

22       A    Yes.

23       Q    The first full paragraph:  The formula

24   adopted in 1965.

25       A    Thank you.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 70

1          Yes, I've read the paragraph.

2          Q     What I want to ask you about is the

3     statement in the middle of the paragraph that says:

4     Because the coverage formula was not altered by

5     using new data to identify jurisdictions where both

6     vote denial or abridgment and vote dilution were

7     sufficiently harmful to justify a preclearance

8     requirement, it appears, the majority in Shelby

9     County chose to ignore the extensive record of

10    discriminatory voting changes.

11          Can you explain to me what you were

12    arguing in that paragraph or that sentence about the

13    record that the court reviewed and how it ignored

14    it?

15          A     The best way to answer that question will

16    take a few moments.

17          Q     Okay.

18          A     Because I go on in the testimony to

19    distinguish between the view of the majority and the

20    view of the dissenters, and to make the point that

21    the majority and the dissenters look at -- looked at

22    a -- took account of different parts of the record,

23    the dissenters focused on the evidence of continuing

24    discriminatory behavior in the jurisdictions that

25    were covered by the existing formula, and the

Peyton McCrary , Ph.D.                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 71

1    majority looked primarily at evidence that related

2    to the justification for the formula itself, and the

3    majority opinion ignores much of the record

4    assembled by the congress in 2005 and 2006 focusing

5    on evidence of voter participation, and the reason

6    for that was the fact that the formula itself is

7    based on evidence regarding political participation,

8    and so the majority opinion ignored a lot of

9    evidence that the dissenters thought was more

10   probative to the issues that were before the court.

11        Q     Thank you.

12              On page 3 after the dissenters there, you

13   say:  The decision in Shelby County removed a

14   uniquely powerful tool.

15              Is it fair to say that you believe

16   personally that preclearance should be reimposed?

17        A     Yes.

18        Q     And you personally believe that Georgia

19   should still be covered by the preclearance

20   requirements of the Voting Rights Act, correct?

21        A     Yes.

22        Q     Now, we can go far ahead in that document

23   to page 32.  Okay.  In the further full paragraph

24   that begins, "In the aftermath of Shelby County,"

25   you discuss the change to focus on barriers in the

Page 72

1   path of in-person voting.  Do you see that section

2   there?

3        A    Yes.  I apologize for the coughing.  It's

4   a chronic cough.  I'm not coming down with COVID-19.

5        Q    That's good.  I'm glad you're okay on that

6   front at least.  That's totally fine.  And we can

7   take a break at any point if you need to.

8             So you say in that paragraph that few

9   Section 2 cases have dealt with these types of

10  issues, and then you make the statement:  Courts

11  lack a body of relevant precedents to guide them.

12            Do you still agree with that today?

13       A    It is -- it is less true today because the

14  courts have resolved a way of reconciling the

15  fact-finding necessary in denial of abridgment cases

16  with the standards set down in the Supreme Court in

17  Thornburg versus Gingles, which was designed to deal

18  with voter dilution cases.

19       Q    All right.  We can put that away.  Thank

20  you.

21            Are you familiar with the term "voter

22  suppression"?

23       A    Yes.

24       Q    And how would you define the term "voter

25  suppression"?

Peyton McCrary , Ph.D.                     May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 73

1      A     Well, I generally don't use the term, but

2    what it refers to is barriers that make it more

3    difficult for citizens to vote, placing various

4    kinds of administrative burdens on their ability to

5    register and to vote.

6      Q     And do you consider voter suppression to

7    be a partisan activity?

8      A     Well, not necessarily.

9      Q     When would voter suppression not be a

10   partisan activity?

11     A     Well, either party could choose to

12   suppress voting strength.  In general, that is -- in

13   general, there is a partisan pattern to the use of

14   laws that present burdens to the registration and

15   casting of ballots.  That tends to be the work of

16   Republican Parties and state legislatures.

17     Q     Let's move next to your work history at

18   the Department of Justice.

19     A     Okay.

20     Q     And so in your CV --

21     A     Are you calling my attention to an

22   exhibit?

23     Q     I am not.  No.  No.  I was just -- I just

24   want to discuss generally.

25     A     Okay.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 74

1      Q    I believe, from your CV, that you were

2    hired at DOJ in 1990; is that correct?

3      A    Yes.

4      Q    And do you recall who hired you in 1990?

5      A    Who hired me?  There's a complex personnel

6    operation that means that the decision is not made

7    by any one individual, and that's the best answer I

8    can give you.

9      Q    And you were hired as part of the career

10   staff in the department, correct?

11     A    Yes.

12     Q    So you indicate in your CV you conducted

13   research for voting rights litigation.  Did you have

14   any role in any of the Shaw line of cases?

15     A    I had a role in those cases.  They were,

16   of course, filed by private plaintiffs, and the

17   United States was a defendant.

18          And so I wasn't doing an investigation

19   before the case was filed, I was only doing research

20   in connection with the issues posed in that

21   particular litigation after it was filed.

22          I'm sorry, maybe I made too much of the

23   word "investigation."  In the department we

24   distinguished between an investigation that takes

25   place before the filing of a case and work that is

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 75

1    done in a case after the case is filed.

2        Q    And I appreciate you making that

3    distinction.  One of my questions was -- you talked

4    about your expert witness role already.  I'm

5    assuming you had a nonexpert witness role within the

6    department from a research standpoint.  Is that --

7    is that a correct assumption on my part?

8        A    When you say in nonexpert role, often my

9    job was characterized as an in-house expert, but if

10    you mean by that I was not retained as an expert by

11    the department, that's correct.

12        Q    Well, and I guess maybe I need to

13    understand a little bit more of the inner workings

14    of the department.  You referred to the

15    investigations before case is filed and the

16    investigation after a case is filed.  Did you

17    participate in investigations before cases were

18    filed, or was your work with the department

19    exclusively investigations after a case was filed?

20        A    Are you asking now about Shaw cases in

21    particular or cases in general?

22        Q    I'm moving to all cases now just to

23    understand your role before we go back to Shaw.

24        A    I routinely was involved in investigations

25    before a case was filed to help determine whether

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 76

1    the case should be filed.

2        Q    Were you also involved in preclearance

3    review of state and local voting practices?

4        A    Sometimes.

5        Q    So were you involved in the preclearance

6    review that was part of the Georgia versus Ashcroft

7    2001 legislative district in Georgia?

8        A    No.

9        Q    Were you involved in the preclearance

10   review of the 19 -- early 1990s Georgia

11   congressional and legislative plans?

12       A    Not that I recall.

13       Q    I believe in your report you said you did

14   not participate in anything related to Georgia's

15   database matching preclearance process; is that

16   correct?

17       A    I don't know whether I testified to that

18   effect, but that's true.

19       Q    Were you involved in the preclearance

20   review --

21       A    I'm sorry, could I -- I'm not sure I -- my

22   answer was directly related to the question you

23   asked.  Can you rephrase -- can you tell me what you

24   asked so I make sure I'm consistent?

25       Q    Certainly.  I'll remove the reference to

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 77

1    your report that -- I was just explaining where I

2    got the information.

3              I'll ask it this way:  Were you involved

4    in any review of Georgia's database matching

5    processes in the 2007 to 2009 range for preclearance

6    review?

7        A    I'm glad I asked you for clarification.  I

8    thought you were asking me about the photo

9    identification requirement that Georgia first

10   adopted.  No, I was not.

11       Q    And you anticipated my next question,

12   which was:  Were you involved in the administrative

13   preclearance review of Georgia's photo

14   identification law?

15       A    No.

16       Q    Were you involved in the preclearance

17   review of Georgia's 2011 redistricting plans?

18       A    As I recall a Georgia suit in a Section 5

19   declaratory judgment action before the -- of a

20   three-judge court in the District of Columbia, and

21   I -- therefore, my work would have been in the

22   context of that litigation.

23       Q    So is that a yes, you did work on some

24   sort of preclearance review, or that you only -- is

25   your testimony that you worked on the lawsuit that

Peyton McCrary, Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                        Page 78

1    was filed concurrent with -- well, I won't

2    testify -- put words in your mouth on that.

3            Did you work on Georgia's -- preclearance

4    review of Georgia's redistricting plan either in

5    litigation or through an administrative process?

6        A    Yes.

7        Q    Did you participate in making a

8    recommendation about whether to preclear Georgia's

9    2011 redistricting plans?

10       A    No, that wasn't -- making recommendations

11   of that sort wasn't my role in lawsuits, it was only

12   my role in administrative review where I was an

13   analyst, and I would actually make recommendation,

14   which was reviewed up the chain.

15       Q    In your role as an analyst in an

16   administrative preclearance review -- so I'm

17   limiting to that subset of cases that you worked

18   on -- did you ever recommend that a Georgia voting

19   change be precleared?

20       A    I'm trying to recall everything over 26

21   years.  I did not often work on administrative

22   reviews.  They usually only asked me to do -- to

23   take a hand in an administrative review when they

24   had a serious question about the purpose of the

25   change, so they tended to ask me about cases where a

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 79

1    decision to object would be more likely than the

2    ordinary run-of-the-mill administrative review.

3         Q    Sitting here today, you can't -- I'm

4    sorry, go ahead.

5         A    Go ahead with your question.

6         Q    So sitting here today, you can't recall a

7    situation where you were part of an administrative

8    review for preclearance of a Georgia voting

9    practice, you were an analyst on that review, and

10   you recommended that the practice be precleared,

11   correct?

12        A    That's correct.

13        Q    For the same group when you were part of

14   an administrative preclearance review for a Georgia

15   voting practice, did you ever recommend that

16   preclearance be denied?

17        A    Yes.  I'm obligated not to discuss

18   particular internal decision-making in any one

19   instance, but I can answer that the answer is, yes,

20   I did sometimes participate in recommending an

21   objection.

22        Q    Were there other historians who were

23   employed by the Department of Justice when you were

24   there?

25        A    No.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                              Page 80

1        Q       Was there a historian who was employed --
2    sorry.
3        A       Let me correct.  Were you asking
4    specifically about the voting section, which is what
5    I understood you to be asking about?  You actually
6    said the department, and it's a different answer.
7        Q       Thank you for that clarification.  Yes,
8    when I'm referring to the Department of Justice in
9    this, I am limiting it to the voting section, so I
10   will be precise about that.
11       A       Because there are historians who work in
12   other parts of the Department of Justice.
13       Q       Certainly.  Certainly.
14               Did the Department of Justice's voting
15   section employ a historian before you were hired?
16       A       No.
17       Q       Do you know if the voting section hired
18   an -- a new historian after you retired?
19       A       I do not know.
20       Q       Is it correct that the Section 2 cases you
21   worked on in the voting section were all what we
22   would call vote dilution cases?
23       A       No.
24       Q       So you did work on some vote denial and
25   abridgment cases as you categorized them earlier?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 81

1        A      Yes.

2        Q      And do you recall which cases -- well, I

3   guess -- let me reask that.  Is the fact that you

4   worked on a particular case if you were not a

5   disclosed expert also something that you are bound

6   to a confidentiality agreement regarding with the

7   voting section?

8        A      No, I just can't discuss the internal

9   decision-making process.

10       Q      Okay.  So do you recall what vote denial

11  or abridgment cases you worked on during your time

12  at the voting section?

13       A      And your question specifically is about

14  Section 2 cases, right?

15       Q      Correct.

16       A      The challenge to a 2013 statute adopted by

17  North Carolina, which was challenged in United

18  States versus McCrory and challenge to -- Section 2

19  challenge to the photo identification requirement in

20  Texas.

21              In other cases which were Section 5 cases

22  brought by jurisdictions, I also worked on denial or

23  abridgment matters.

24       Q      Is it correct to say that the cases --

25  Section 2 vote denial or abridgment cases that you

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 82

1    worked on was after Shelby County was decided?

2            This isn't a memory test.  I didn't know

3    if there was a specific delineator for you or not,

4    and if there's not, that's fine.

5        A    Well, the complication is that I worked on

6    the Texas photo ID case when it was before the DC

7    court before Shelby County, and in the South

8    Carolina Section 5 case before Shelby County was

9    decided, and I worked on a Florida case before

10   Shelby County was decided, again a Section 5

11   context.  And because we were -- because the United

12   States was involved in the Texas photo ID case in

13   DC, we were not involved in the Section 2 case down

14   in Texas until after Shelby County was decided.

15       Q    Thank you for that clarification.

16            You mentioned that one of your roles was

17   identifying consultants and expert witnesses to be

18   used in cases; is that correct?

19       A    Yes.  I just remembered another context

20   that I had forgotten to mention in connection with

21   denial or abridgment cases, and that is a case

22   involving a claim in Noxubee County, Mississippi, US

23   versus Ike Brown, which was also a denial or

24   abridgment case well before Shelby County was

25   decided.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 83

1      Q      Thank you.

2      A      And I'm trying to remember whether I was

3   involved in any others, but that's enough.  That's

4   as much as I can recall.

5      Q      Thank you.

6             So you mentioned that one of your roles

7   was assisting in identifying consultants and expert

8   witnesses for the voting section to use in cases; is

9   that correct?

10     A      Yes.

11     Q      And so you hired political science

12  experts, I'm assuming?

13     A      Oh, yes.  More political scientists than

14  anyone else.  More political scientists than anyone

15  else.  Than any other discipline.

16     Q      And did you -- I'm sorry, yes.

17            And did you ever look at hiring Dr. Tom

18  Brunell during your time at the Department of

19  Justice?

20     A      I met Tom Brunell at, I think, an American

21  Political Science Association meeting where he was

22  with his dissertation advisor, Bernie Grofman, who

23  was an old friend of mine and an expert I had worked

24  with in cases.  I don't remember whether we ever

25  considered using Tom Brunell in a case or not.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 84

1     Q     So while you were employed at the voting

2  section, were you ever placed on a remedial plan as

3  a result of any workplace discipline?

4     A     I beg your pardon?

5     Q     While you were employed at the department,

6  were you ever placed on a remedial plan as a result

7  of a workplace disciplinary process?

8     A     I don't even know what a remedial plan is

9  in the Department of Justice, but I was never -- my

10  objectivity or behavior was never questioned in any

11  regard.

12     Q     While you were employed at DOJ, were you

13  ever disciplined for refusing to work on a case

14  because of the racial makeup of the alleged victims?

15     A     No.

16     Q     While you were employed at DOJ, were you

17  ever formally reprimanded by your supervisors for

18  refusing to work on a case because of the racial

19  makeup of the alleged victims?

20     A     No.

21     Q     Were you ever informally reprimanded by

22  your supervisors for refusing to work on a case

23  because of the racial makeup of the alleged victims?

24     A     No.

25     Q     I'd like to talk about two particular

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 85

1    cases that you worked on while you were at the

2    Department of Justice.  First, you mentioned a few

3    minutes ago the Noxubee County case, the Ike Brown

4    case.

5         A    Yes.

6         Q    You're familiar with that case?

7         A    Yes.

8         Q    Could you briefly describe what that case

9    involves?

10        A    Yes, it involved claims that the

11   Democratic Party leadership in that county, which

12   was, as I recall, an African-American majority

13   county and the party leadership, the executive

14   committee and so on was controlled by

15   African-Americans, and there were claims that they

16   interfered with the opportunity of the white

17   minority in the county to -- I forget whether it

18   involved registration.  It mostly involved voting as

19   I recall.  And so that was the basic factual

20   situation in the case.

21        Q    Now, did you initially refuse to work on

22   that case because of your personal opposition to the

23   department bringing it?

24        A    No.

25        Q    Were you personally opposed to that case

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 86

1    because it was being brought to protect white voters

2    from African-Americans who were being accused of

3    violating the Voting Rights Act?

4        A    No.  At that time I did have questions in

5    my mind as to whether that was consistent with the

6    mission of the civil rights division, but I -- I saw

7    a memo by a former colleague, David Marblestone,

8    which he had been tasked with years earlier where he

9    established through his research into the

10   congressional -- the record before Congress and the

11   courts that such claims were legitimate, but that's

12   the only sense in which I had questions about it.

13            I had questions also about the legal

14   argument that was being used in the case initially

15   as to whether it was appropriate to characterize the

16   behavior described as vote dilution, which it seemed

17   to me was clearly a denial or abridgment kind of

18   claim, but I did not refuse to work on the case.

19            In fact, I helped identify the appropriate

20   expert witness to use in the case, Theodore

21   Arrington, whom we had used in the past.  I worked

22   with the attorneys and with Professor Arrington in

23   the course of his investigation, I went to -- and

24   helped prepare him for his deposition as I recall,

25   and I certainly went to Jackson to help prepare him

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 87

1   at trial.

2        Q    Were your questions about the mission of

3   the voting section related to the racial makeup of

4   the alleged victims in the Noxubee County case?

5        A    Yes, I couldn't think of any other case of

6   that sort that had been brought in the -- in the

7   history of the civil rights division's

8   implementation of the Voting Rights Act since 1965,

9   and it did seem to me an unusual case, but once I

10  saw the facts in the case, I became convinced that

11  it was a meritorious case.

12       Q    And were your questions about the mission

13  because you believed the mission of the voting

14  section was to protect people of color as opposed to

15  white voters?

16       A    It was because the mission was to protect

17  the interests of minority voters, and I didn't at

18  first realize that African-Americans were in the

19  majority in that county and that whites were

20  necessarily in the minority.  That changed the

21  complexion of the case, no pun intended.

22       Q    Now, who was Christopher Coates at the

23  time of the Ike Brown case?

24       A    He was an attorney in the voting section.

25  He had -- he had not -- I think at that point he had

Peyton McCrary , Ph.D.                                                     May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 88

1    not become the deputy chief, but I may be

2    misremembering the chronology of his promotion, and

3    it was before he was section chief.

4             Chris is a person I had known since 1980.

5    I had worked on several cases for him in the 1980s

6    as an expert witness, a testifying expert.  I had,

7    in fact, recruited him to come to the voting section

8    in the 1990s when his daughter graduated from high

9    school, and he was -- he was interested in leaving

10   private practice in Milledgeville.

11            So I had worked with him regularly on

12   cases after he came to the voting section, including

13   cases in Montana, which we investigated together

14   initially.  So I've known Chris for many years.

15       Q    Are you aware that Mr. Coates testified to

16   the US Commission on Civil Rights in 2010 about the

17   Ike Brown case?

18       A    Yes.

19       Q    If you could turn to document 11 with me

20   here.

21       A    There's nothing in the folder.  I think

22   this must have been the document that was not in a

23   folder which I accidentally saw when I removed

24   the -- you want me to get that document?

25       Q    Yes, please.  It's a transcript of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 89

1    testimony to the US Commission on Civil Rights.

2        A    Yes, I've got it.

3        Q    We will mark that as Exhibit 8.

4            (Defendant's Exhibit 8 was marked for

5    identification.)

6    BY MR. TYSON:

7        Q    If you could turn to page 16 of that

8    testimony?

9        A    Okay.

10       Q    On page 16 -- hold on.  Let me get there

11   too, sorry.  Do you see the first full paragraph

12   says:  One of the social scientists who worked in

13   the voting section and whose responsibility it was

14   to do past and present research into a local

15   jurisdiction's history flatly refused to participate

16   in the investigation.

17           Do you see that statement?

18       A    Yes.

19       Q    And are you familiar with this statement

20   by Mr. Coates to the US Commission on Civil Rights?

21       A    Yes.

22       Q    And do you know the social scientist to

23   whom Mr. Coates is referring?

24       A    Yes, he was referring to me.

25       Q    And though you ultimately testified at the

Peyton McCrary , Ph.D.                     May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 90

1   trial, I believe you -- what you've explained here

2   is you did initially not participate in the case; is

3   that correct?

4        A    No, that's not correct.  I will preface my

5   answer by saying that the testimony you just read is

6   false, and I addressed this in the investigation by

7   the Inspector General's office in the Department of

8   Justice, and the inaccuracy of that is addressed in

9   the Inspector General's report.

10            My recollection, which could be wrong, is

11  that there is a footnote 28 in the Inspector

12  General's report that refers to this and points out,

13  which I had quite forgotten, that Chris Coates --

14  and I hadn't seen the document, the evaluation

15  document to which the Inspector General investigator

16  was referring, but that he had rated my performance

17  on that case outstanding.

18        Q    Going back a page to page 15 at line 18.

19        A    Okay.

20        Q    The statement:  Once the full

21  investigation into Brown's practices commenced,

22  opposition to it by career personnel in the voting

23  section was widespread.

24            Were you aware of any opposition to the

25  Brown case within the voting section?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 91

1      A    I was aware of some individuals who

2  didn't -- in the white case, including, actually,

3  the paralegal who went to Mississippi when I was

4  unavailable to go and do the newspaper research.

5      Q    So it's your testimony that you were

6  not -- I'm sorry?

7      A    I also remember a number of attorneys who

8  said this was a meritorious case, so there were a

9  lot of different views.

10     Q    And it's your testimony that you were not

11 part of resistance or opposition to the case within

12 the voting section; is that correct?

13     A    That's correct, and I so offered sworn

14 testimony twice.

15     Q    Are you familiar with the book Injustice:

16 Exposing the Racial Agenda of the Obama Justice

17 Department by J. Adams?

18     A    No.

19     Q    Let's go to document 12.  Hang on to the

20 civil rights testimony because we will come back to

21 that.  Document 12 we'll mark as Exhibit 9.

22          (Defendant's Exhibit 9 was marked for

23 identification.)

24     A    I actually do remember now seeing this

25 online when it was published.  I had forgotten about

Peyton McCrary , Ph.D.                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 92

1    it.

2    BY MR. TYSON:

3        Q    Okay.  Have you ever read this book

4    before?

5        A    No.

6        Q    I want to ask you about two sections, two

7    excerpts from it.  The first excerpt is the second

8    physical page, pages 50 and 51.  And I believe you

9    actually answered my first question.  At the bottom

10   of page 50 and top of page 51, if you can read the

11   paragraph that kind of overlaps those two.

12       A    I've read the paragraph.

13       Q    The first statement I wanted to ask you

14   about, Mr. Adams's book says:  Coates could not find

15   anyone in the section to work with him.

16            Is that your recollection of what happened

17   with this case or is Mr. Adams incorrect?

18       A    I think Mr. Adams is incorrect.

19       Q    Mr. Adams at the end of that page says

20   that Joann Sazama went to do the newspaper reviews

21   in Noxubee County.  Do you recall that?

22       A    I do.

23       Q    And Ms. Sazama was a paralegal, not a

24   historian, correct?

25       A    That's correct.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 93

1      Q    Is the local newspaper review a role you

2   undertook in every other Section 2 case in which you

3   participated directly?

4      A    In most, yes, but we also used paralegals

5   in doing research, and from time to time we would

6   engage graduate students at some university nearby

7   when we had retained an expert to do research for

8   the -- for the expert as well.

9      Q    Okay.

10     A    In other words, you don't have to have a

11  PhD in history to do newspaper research.

12     Q    So on page 51 at the top of that first

13  full paragraph when Mr. Adams says that Ms. Sazama

14  ended up having to do the job of the DOJ's in-house

15  historian, it's your testimony that that is not a

16  correct statement because other people would do that

17  job as well of local newspaper review?

18     A    I'm not sure I understand your question in

19  the context of this paragraph.

20     Q    Okay.

21     A    It is true that Joann went to Mississippi

22  to do research on the case, and I was busy at the

23  time doing -- working on other matters, as I told

24  the Inspector General's investigator, and, in

25  particular, I was using my nights and weekends to

Peyton McCrary, Ph.D.                         May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 94

1  work on the Law Review article that ended up being

2  published at the end of preclearance, and I was

3  reluctant -- and it was also not long after I had

4  emergency quadruple bypass surgery, so I was trying

5  to take it a little easy at that point.

6          But in that sense the way that Christian

7  puts it, it's like I wasn't doing my duty, but --

8  and I see that in the same paragraph, Christian goes

9  on to quote Chris Coates's false testimony before

10  the Civil Rights Commission that I flatly refused to

11  work on the Ike Brown investigation.  That's just

12  not true.

13          In fact, I remember a conversation with

14  Chris Coates in which he came asking me about

15  working on the case, and I told him I have never

16  flatly refused to work on a case.  And I said, I'm

17  tied up with other matters right now, but I

18  directly -- actually, he's probably quoting me when

19  he says that in his testimony before the Civil

20  Rights Commission, but it's just not true.

21          Actually, Christian says later on in that

22  paragraph that I did travel to Noxubee County later

23  in the case.

24      Q    So you're referring to the author as

25  Christian.  I'm assuming you know Mr. Adams

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 95

1   personally.

2        A    Yes, we worked on one case together

3   probably -- actually, two cases together, and so I

4   knew him well.  And, in fact, at that time he

5   attended the Catholic church next door to the

6   Presbyterian church that my wife and I attend, so I

7   sometimes saw him on Sunday morning.  But, yes, I

8   know him well.

9             He's also false in saying that -- well, I

10  take that back.  He says:  Coates viewed McCrary's

11  lack of cooperation was a kind of insubordination.

12  Chris never said that to me nor to anyone else, to

13  my knowledge, who may have said it to Christian, but

14  I -- I reject that charge.

15       Q    Let's turn to the next page, which is page

16  52 there, and let's look at the first full

17  paragraph.  Mr. Adams says:  But with his

18  involvement in the Ike Brown case, suddenly none of

19  that mattered anymore.  Many voting section

20  attorneys stopped talking to Coates.  He had met

21  Peyton McCrary for lunch at least once for many

22  years, but that tradition quickly ended.

23            Is that a correct statement, first that

24  you met for lunch once a week for many years?

25       A    That's true.

Case 1:18-cv-05391-SCJ   Document 404-1   Filed 06/28/20   Page 98 of 270
Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 96

1      Q    Did that end after -- I'm sorry.

2      A    Half of that claim is false.

3      Q    So the statement that the -- that

4    opportunities or the tradition of you having lunch

5    with Mr. Coates ended after the Noxubee County case

6    is false?

7      A    That's true.  I don't know how Christian

8    would have known what the pattern was since he

9    wasn't involved in going to lunch.

10     Q    Have you spoken to Mr. Coates following

11   his testimony to the US Commission on Civil Rights?

12     A    I'm sure I have because -- well, actually,

13   I should look at the date.  Yes, that was in 2010,

14   and subsequent to that I had occasion to talk with

15   Chris on several -- several times when he was

16   representing South Carolina after he retired from

17   the department in the case involving the

18   preclearance of South Carolina's photo

19   identification requirement.

20          In fact, he had borrowed a copy of my book

21   and returned it to me during the proceedings in that

22   case, and, of course, we had conversations in

23   connection with a deposition that we both attended.

24     Q    Did you ever talk to Mr. Coates about what

25   you said are his lies to the US Commission on Civil

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 97

1    Rights?

2         A    No, I didn't see any point in rubbing his

3    nose in it.  I try not to pick fights.

4         Q    So let's -- we'll come back to that

5    Exhibit 9 in just a minute.  Let's go back to

6    Exhibit 8, the testimony to the US Commission on

7    Civil Rights.

8         A    I have that as document 11.

9         Q    I'm sorry.  It's document 11 for you, and

10   Exhibit 8 to the deposition.  I'll refer to it by

11   document number.  If you can flip with me to pages

12   83 and 84.

13        A    Okay.

14        Q    I want to ask you about the last paragraph

15   on 83 going into 84.  Mr. Coates says:  And I had

16   trial attorneys that I had worked with in cases that

17   were successful and we had good relationships with.

18   And they told me, one -- the person that testified

19   told me point blank that he didn't come to the

20   voting section to sue black people, to sue

21   African-American people.

22             Do you see that statement?

23        A    I do.

24        Q    Did you ever hear comments like that from

25   the attorneys in the voting section when you were

Peyton McCrary , Ph.D.    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 98

1    there?

2        A    No.

3        Q    Do you share that view of you didn't come

4    to the voting section to sue African-American

5    individuals?

6        A    No.

7        Q    Let's go next to page 18 of the testimony.

8        A    Okay.

9        Q    In the middle paragraph of that page

10   there's a reference to Mark Kappelhoff, the chief of

11   the division's criminal section.  Do you see that?

12       A    Yes.

13       Q    And do you know Mr. Kappelhoff?

14       A    I do not.

15       Q    And at the bottom of page 18 over into

16   page 19 there's a statement that:  The primary role

17   of the civil rights division is to enforce the civil

18   rights laws enacted by Congress -- I'm sorry, I'm

19   reading the wrong section.  My apologies.

20            Are you aware of any civil rights groups

21   that complained to members of the voting section

22   about the Ike Brown case?

23       A    No.

24       Q    And on page 19 there's a statement about

25   civil rights groups where Mr. Coates says beginning

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 99

1    with "Instead" at line 6:   Instead, many of these

2    groups act, as they did in response to the Brown

3    case, not as civil rights groups but as special

4    interest lobbies for racial and ethnic minorities

5    and demand not equal treatment but enforcement of

6    the Voting Rights Act for only racial and language

7    minorities.

8              Do you see that language?

9        A    Yes.

10       Q    Do you agree with that description of

11   civil rights groups that Mr. Coates is giving?

12       A    No.

13       Q    And the Ike Brown case was ultimately a

14   successful outcome for the division, correct?

15       A    That's correct.

16       Q    Okay.  Let's move next to the New Black

17   Panthers Party case.  Are you familiar with that

18   case?

19       A    Yes.

20       Q    And what were the issues in that case?

21       A    As best I recall it involved a lawsuit

22   about two individuals who were members of an obscure

23   group called the New Black Panther Party, who were

24   apparently trying to intimidate voters at a polling

25   place in Philadelphia.  And my recollection is that

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 100

1    this was a polling place or in a precinct with a

2    substantial African-American population, whether

3    majority or just a large minority I don't recall,

4    but one of the two had a policeman's nightstick and

5    was beating -- hitting the palm of his hand with it

6    as presumably a method of intimidating people who

7    were going in to vote.

8            And as I say it involved two people in one

9    polling place, not the kind of thing that you

10   ordinarily bring a lawsuit about.  When you're on

11   election coverage, we try to deal with that

12   situation informally with people that are involved

13   in the administration of election in the

14   jurisdiction, but it's -- it's hardly the kind of

15   thing that I had ever seen a case brought, but I'm

16   generally familiar with it.

17       Q    And the victims or the alleged victims in

18   that case that the individuals were attempting to

19   intimidate -- well, say it this way:  Were the

20   individuals in that case attempting to intimidate

21   white voters?

22       A    Well, I think that was the claim that the

23   department had in the case.  I don't know that to be

24   true.

25       Q    Okay.  Now, you worked on the New Black

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 101

1    Panther case with Mr. Adams, correct?

2         A     Well, I worked on it in a limited

3    capacity.  The only thing they asked me to do was to

4    identify possible expert witnesses, and it was --

5    they were looking for someone who was basically

6    experienced in law enforcement as I recall.  And I

7    looked, but I don't think we came upon any logical

8    choices, and they more or less dropped the idea, and

9    eventually the case went away.

10        Q     If you could go back to document 12, which

11   is Exhibit 9, the last page of Mr. Adams's book.

12        A     Page 180?  I'm sorry.  Yes, 180.

13        Q     The page number in the book is 130.  It's

14   the last physical page of document 12, Exhibit 9.

15        A     Okay.  The number is hard for me to read.

16   130, okay.

17        Q     And so Mr. Adams begins at the top of that

18   page:  Similar to the Ike Brown case, DOJ lawyers

19   working on the Panther case ran into institutional

20   resistance within the DOJ from the very beginning,

21   including from the historian who had hobbled the

22   Brown case, Peyton McCrary.

23             Did you launch institutional resistance to

24   the Black Panther case?

25        A     No.  I also didn't hobble --

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 102

1       Q     Mr. Adams is --

2       A     I also didn't hobble --

3       Q     I'm sorry?

4       A     -- the Brown case.  That sentence has two

5    false statements with it.

6       Q     And the next sentence indicates that you

7    were tasked with looking for an expert to explain

8    the history of voter intimidation tactics and the

9    intimidating nature of the Panther organization.

10   That's a slightly different description of expert in

11   law enforcement that you gave.  Is this description

12   of what you were tasked to do correct?

13      A     No.

14      Q     Another two sentences later, Mr. Adams

15   says:  Mr. McCrary tried to scuttle our

16   recommendation, claiming the expert wasn't competent

17   to testify about the organization.

18            Is that a correct statement?

19      A     No, I had no -- I have no recollection I

20   had any such involvement, and I simply don't know

21   who the heck he was talking about there.  I don't

22   know what potential expert he was talking about, but

23   I didn't evaluate anybody.  I looked unsuccessfully

24   for somebody to work on the case, but it was a much

25   more limited role.

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 103

1            I don't remember Christian or Chris asking

2    me to identify someone who -- what was his -- to

3    explain the history of voter intimidation tactics

4    and the intimidating nature of the Panther

5    organization.

6            If he means the Black Panthers in the

7    1960s by reference to the Panther organization, I'm

8    absolutely confident that that issue never came up.

9    If he's talking about the New Black Panther Party, I

10   don't know anyone who would know anything about the

11   history of the New Black Panther organization, so it

12   just sounds increasingly farfetched.  Bears no

13   relationship to the memory I have of anything having

14   to do with that case that involved me.

15       Q    And at the end of that paragraph, Mr.

16   Adams says:  McCrary's obstructionism damaged the

17   case.

18            I'm assuming you disagree with that as

19   well.

20       A    Of course.

21       Q    Then at the bottom of the page, Mr. Adams

22   talks about the advent of -- last full paragraph,

23   the advent of the Obama administration.  Do you see

24   that?

25       A    You said the last full paragraph?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 104

1          Q    Last full paragraph on that page starts

2    with, "The problem extended far beyond McCrary."

3          A    Yes.

4          Q    If you want to read that paragraph, I just

5    have one question about that.

6          A    Okay.

7          Q    So was it your experience that the

8    election of President Obama made resistance to the

9    New Black Panther Party case go to the top of the

10   civil rights division, as Mr. Adams says in that

11   paragraph?

12         A    No, not to my knowledge.

13         Q    We can put that exhibit away, and I have

14   couple more questions about Mr. Coates's testimony.

15         A    Okay.

16         Q    So if you could turn first to page 21 of

17   Mr. Coates's testimony.

18         A    Okay.

19         Q    And the first full paragraph on that page

20   starting at line 5:  The election of President Obama

21   brought to positions of influence and power within

22   the civil rights division many of the very people

23   who had demonstrated hostility to the concept of

24   equal enforcement of the Voting Rights Act.

25              Do you agree with that statement?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                Page 105

1        A     No.

2        Q     Did the election of President Obama change

3    the focus of the voting section's work?

4        A     Yes, in the sense that the relative

5    indifference to bringing affirmative Section 2 cases

6    in the George W. Bush administration was replaced by

7    a return to a wish to enforce actively the Voting

8    Rights Act.

9        Q     If you can go next to page 34.

10        A     Okay.

11        Q     Line 14 of page 34 Mr. Coates testified:

12    During the Bush administration, the voting section

13    began filing cases under the list maintenance

14    provision of Section 8 to compel state and local

15    registration officials to remove ineligibles from

16    the list.

17             Were you involved in any Section 8 NVRA

18    list maintenance cases in the voting section?

19        A     I had a very limited involvement as I

20    recall.  I'm trying to remember what it would have

21    been, but it was probably more than a casual

22    involvement.  It may have been -- may have involved

23    asking about potential experts, but I wasn't

24    actively involved in any of them.  And, actually,

25    they were largely not expert-related cases, as I

Page 106

1    recall.

2         Q    And beginning on line 21 of page 34,

3    Mr. Coates said:  When Ms. Fernandes told the voting

4    section that the Obama administration was not

5    interested in the Section 8 list maintenance

6    enforcement activity, everyone in the room

7    understood exactly what she meant.

8              Were you ever present at a meeting with

9    Ms. Fernandes where this Section 8 list maintenance

10   was discussed?

11        A    Yes.  Excuse me, I've got spam coming in.

12   I'll have to cut it off.

13             Now, can you -- you were asking about the

14   meeting in which Julie Fernandes is quoted by Chris

15   Coates as saying that the Obama administration was

16   not interested in Section 8 list maintenance

17   enforcement activity.  I do remember it, though I

18   don't remember those exact words.  But I also think

19   that I know what Julie meant, which was --

20        Q    And what do you -- I'm sorry.

21        A    -- which was --

22        Q    You anticipated my question.

23        A    -- which was that this -- this was a

24   matter that, A, was not a problem, and, B, that it

25   was something that didn't -- it wasn't -- it wasn't

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 107

1    consistent with what the civil rights division had

2    always done in regard to -- in regard to enforcing

3    the Voting Rights Act.

4              And furthermore, the problem of list

5    maintenance as -- as the -- as the lawyers who were

6    bringing -- advocated bringing such cases was that

7    they looked at the census data on the voting age

8    population, and they looked at the voter

9    registration lists, and they saw that sometimes

10   there were more persons listed as registered voters

11   than there were in the voting age population of the

12   jurisdiction.

13             And that's actually an artifact of the

14   fact that there was widespread failure to purge

15   voter registration lists, particularly in the

16   Mississippi counties that Christian Adams's

17   organization and Chris Coates were involved in after

18   leaving the voting section.

19             But they were simply not meritorious

20   cases.  And, in fact, the department was

21   unsuccessful in getting the federal courts to take

22   its view of those list maintenance cases.

23       Q    Based on your experience within the

24   department, did partisan politics drive the

25   enforcement divisions of the voting section at any

Page 108

1    time when you were there?

2        A    Yes, during the George W. Bush

3    administration.

4        Q    And so you don't believe that politics

5    were driving the enforcement decisions during the

6    Obama administration at all, only during the Bush

7    administration?

8        A    That's correct.  And to underscore my

9    emphasis on the George W. Bush administration, that

10   had also been true -- not been true in any

11   administration before that.  Even in the years when

12   W. Bradford Reynolds was head of the division and

13   was perceived as hostile to voting rights, he

14   actually was engaging in a lot of active enforcement

15   of Voting Rights Act in ways that were responsible,

16   and under George H.W. Bush, that continued to be

17   true.

18          So it's -- the only time I've ever seen

19   partisan decision-making in the voting section of

20   the civil rights division was during a portion of

21   the George W. Bush administration when they were

22   literally hiring from the Republican Trial Lawyers

23   Association.  And there's ample discussion of this

24   in an Inspector General's report which faults the

25   persons who were actively running the civil rights

Peyton McCrary , Ph.D.                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 109

1    division during a portion of that time, Brad

2    Schlozman and Hans von Spakovsky.

3         Q     And do you know Mr. von Spakovsky?

4         A     Yes.

5         Q     And did you ever have any interactions

6    with Mr. von Spakovsky?

7         A     Yes.

8         Q     Did you ever refer to Mr. von Spakovsky as

9    a Nazi?

10        A     No.  He claims that I did based on

11   something he was doing, but I did not.

12        Q     While you were employed in the voting

13   section, was some information that you handled

14   confidential?

15        A     I'm sorry, what was the question?

16        Q     While you were employed with the voting

17   section, was some of the information that you had

18   in, for example, preclearance review files,

19   considered to be confidential by the department?

20        A     Oh, yes.

21        Q     And how did you determine what was

22   confidential information and what was not in the

23   department?

24        A     There were guidelines explaining exactly

25   what categories fit into confidential and not.  I

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 110

1    mean, internal deliberations of any kind and the

2    work of analysts and attorney -- well, work of

3    analysts working on a Section 5 review, the work of

4    attorneys in an investigation, all of that was

5    confidential in the sense that it was an internal

6    deliberation or an internal practice.

7         Q    While you were employed at the voting

8    section, did you ever provide confidential

9    information to a nongovernment entity that was not

10   entitled to have it?

11        A    No.

12        Q    Did you ever -- while you were at the

13   voting section, did you ever provide confidential

14   information that your superiors did not authorize

15   you to provide to an outside person or organization?

16        A    No.

17        Q    Did you ever provide information your

18   superiors didn't authorize you to provide to Gerry

19   Hebert?

20        A    No.

21        Q    Joe Rich?

22        A    No.

23        Q    Or Bill Yeomans?

24        A    No.

25        Q    Now, aside from your work at the

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 111

1    Department of Justice and your work as a professor,

2    have you had any other employment in the last 20

3    years or so?

4         A    You want to repeat your question because I

5    was mulling over, and I'm not sure I followed

6    exactly what you're asking.

7         Q    I just was asking a more general question.

8    In the last 20 years, looking at your CV, aside from

9    your work as a professor and at the Department of

10   Justice, did you have any other employment during

11   that time?

12        A    No.

13        Q    Did you work anywhere else is all I'm

14   asking.

15        A    Not during the last 20 years.  In 1999, I

16   did take leave from the government to teach at

17   Swarthmore College as the Eugene Lang Professor, but

18   that wasn't within the last 20 years.

19        Q    Thank you.

20             Let's go off the record real quick.

21        A    Okay.

22             (Recess 12:34-1:23 p.m.)

23   BY MR. TYSON:

24        Q    Hope everybody had a good lunch.

25   Dr. McCrary, we're now going to move to our -- to

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 112

1    your report itself.  So if you could get that in

2    front of you.  I believe we marked it as Exhibit 3,

3    but it's document 2 for you.

4              First of all, did you write this report

5    all yourself, or did you -- I know you had

6    assistance on the research side, but did you have

7    assistance on the writing side?

8         A    Nobody writes my reports for me, period.

9         Q    And did you send plaintiff's counsel

10   drafts of your report before it was finished?

11        A    Yes, I sent two or three partial drafts,

12   as I recall.

13        Q    And did plaintiff's counsel provide you

14   with any suggested edits that led to change -- led

15   you to change your opinions at all?

16        A    No.

17        Q    So one issue that I know we kind of talked

18   a little bit about already, but I know your report

19   as a historian is a little different than maybe a

20   statistical report or something else in terms of

21   what you relied on to formulate your opinions.  I

22   know you've talked about kind of the research

23   process that you went through and all of that.  Is

24   it correct that any document that you relied on to

25   form your opinion is cited in the footnotes of your

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 113

1    report?

2        A    It depends on what you mean by relied on.

3    I looked at a lot of things that affected my

4    selection of what I thought was relevant to discuss.

5    I've got well over a file cabinet full of documents

6    from this case, so I didn't -- even though I have

7    over 300 footnotes, I didn't cite everything that I

8    looked at that had a remote relationship to my

9    conclusions in this case.

10       Q    And I understand that and appreciate that.

11   Given that, can you describe maybe general

12   categories of documents that you reviewed in the

13   preparation of your report?

14       A    You mean that I did not cite?

15       Q    Correct, yeah, documents, I'm sorry -- let

16   me ask that again.  So given that there are some

17   documents you reviewed and relied on in preparation

18   of your report that are not cited, could you give me

19   the categories of documents that you reviewed that

20   are not referenced in the footnotes?

21       A    Sure.  I examined all of the Section 5

22   submissions that were supplied through discovery.  I

23   didn't cite very many of them, but they help me in

24   identifying the work of the Secretary of State's

25   Office, and, of course, many of them turned out not

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 114

1    to be very revealing, but it was useful to read

2    through those documents even though I didn't cite

3    them.  That would be one category.

4              I did a lot of newspaper research, and I

5    cited very few newspaper articles in the report on

6    that, so that was another category -- big category

7    of documents that I reviewed that I did not end up

8    citing.

9              There are other categories if I think

10   about it for a moment if you want me to pursue that

11   line of meditation.

12       Q    That's helpful.  Maybe what I can do is

13   narrow that a little bit.  Did you review the

14   legislation as to House Bill 316 in the 2019 session

15   of the General Assembly?

16       A    I did not.  I mean, I looked at the

17   statute in general, I looked at news coverage of its

18   adoption, but I did not make an analysis of it, and,

19   therefore, I didn't discuss it in the report.

20       Q    Are there any expert reports from other

21   cases that you reviewed that are not cited in the

22   footnotes?

23       A    I'm sure there are because I looked at a

24   lot of expert reports.  I don't remember.  If they

25   were particularly relevant, I certainly cited them.

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 115

1      Q    Okay.  So this gets me back a little bit

2   to something we talked a little bit more earlier,

3   but is there a particular method that you use, based

4   on your training and experience, to determine what

5   is relevant to review and include in your report?

6      A    Well, there's no method to determine

7   what's relevant.  It depends on the questions that

8   are under investigation.  So that's -- that's a hard

9   question to answer.

10          Remember that, as my report reveals, I

11   have a much broader gauged approach than many

12   historians in that I consider statistical evidence

13   at some length in a variety of ways, and I also

14   consider legal documents in ways that not every

15   historian does.  So having worked on voting rights

16   litigation for 40 years, I have a lot of experience

17   in evaluating what is relevant and what's not due to

18   the claims in this lawsuit.

19      Q    Ultimately you're relying on your

20   experience in this -- in this space to be able to

21   determine what is relevant and what is not; is that

22   fair?

23      A    Could you repeat that question?  I'm not

24   sure I caught every word.

25      Q    Sure.  So ultimately the kind of

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 116

1   methodology that you're using to determine what's

2   relevant for your review and preparing your report

3   is the experience that you've had in voting rights

4   cases over decades to know what is relevant and what

5   is not; is that a fair statement?

6        A    Well, that's not all.  You know, the work

7   that I did as a historian before 1980 is also

8   relevant, and -- excuse me -- it's the case that I

9   draw on my traditional historical training as well

10  as my unusual use of regression analysis and other

11  forms of statistical analysis that helps to inform

12  the work that I do, and my scholarly writing draws

13  on my experience both in a -- in my academic

14  training and my experience working on voting rights

15  matters.

16       Q    Thank you.

17            And you mentioned that your method is

18  broader than a lot of historians.  Are there other

19  historians who use the methodology that you're

20  describing to reach opinions and do historical

21  research?

22       A    Oh, yes.  One way of imparting this trend

23  is to emphasize journals, and also in my educational

24  background when I was in graduate school at

25  Princeton all graduate students took a course

Page 117

1    entitled Interdisciplinary Approaches to History,
2    and we were all encouraged to learn from other
3    disciplines, and among those that I learned the most
4    from was political science.  I had a course in
5    quantitative methods, which was unusual in graduate
6    school and history departments, especially in the
7    1960s.
8              The professor that taught me quantitative
9    methods, Theodore Rabb, was one of the co-founding
10   editors of the Journal of Interdisciplinary History
11   in which historians who do social science research
12   like me regularly publish.
13             The journal -- the organization Social
14   Science History publishes a journal called Social
15   Science History in which actually in one of my
16   publications appeared.  So there's a major school of
17   historical research that is considered
18   nontraditional that engages in social science
19   analysis of a variety of different types.
20             And some of the historians who were --
21   some of the persons who developed the technique
22   known as ecological regression analysis as a method
23   of analyzing voting behavior were historians, Allan
24   Lichtman at American University, and J. Morgan
25   Kousser of Caltech.

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 118

1      Q      Thank you.

2             Let's go ahead and start with your report.

3    I want to start with the first paragraph --

4    unnumbered paragraph there on page 1.  You say that

5    you've been asked by attorneys for the plaintiff in

6    this litigation to assist the court in assessing the

7    impact of the Voting Rights Act on Georgia's

8    historical policies and practices and the impact of

9    the removal of preclearance requirements based on

10   the Supreme Court's opinion in Shelby County versus

11   Holder.

12            So is that what you understood your

13   mission to be in preparing your report?

14     A      That's only one aspect of it.  I was

15   basically asked to focus on the racial effects of

16   Georgia's registration and voting practices.  I'm

17   not sure how I came to put this as the first thing I

18   said in the report, but I was also asked to look at

19   the question of the impact of Voting Rights Act on

20   the policies and practices of election

21   administration in Georgia that are at issue in the

22   plaintiff's claim.

23            And, of course, two of my book chapters

24   were chapters in a co-authored book called The

25   Impact of the Voting Rights Act, so that's something

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 119

1    I regularly look at in my scholarly research.

2        Q    So if we can head to paragraph 8, which is

3    on page 6 entitled Summary of Findings.

4        A    Yes.

5        Q    All right.  So you -- I believe you just

6    said that your -- you were looking at the voter

7    registration practices in the state of Georgia; is

8    that right?

9        A    Yes.

10       Q    Okay.  And the way I read your findings,

11   and you can tell me if I'm misreading this, the

12   first opinion you reach in paragraph 9 is about

13   Georgia's implementation of its voter verification

14   process under HAVA since 2006, and your opinion is

15   it has exercised a persistent discriminatory effect

16   on minority voters' opportunity to register and

17   vote.

18          Do you think that's a correct first

19   opinion that you offer in this report?

20       A    Yes.

21       Q    And then paragraph 10 on page 7 seems to

22   me to be the second opinion, which is the current

23   pattern of voter registration and voting in Georgia

24   bears a striking resemblance to the system of voter

25   registration in the Jim Crow era before 1965.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 120

1          Would you agree that that's the second

2    opinion that you're offering in this report?

3          A    That's certainly a second opinion.  I'm

4    not sure that I have a list of opinions that I

5    offer, but I would agree that that's one of the

6    opinions I express.

7          Q    Okay.  And then in paragraph 11 you

8    express an opinion that the political context within

9    which the current registration system operates also

10   resembles the politics of Georgia before the

11   adoption of the 1965 Voting Rights Act.  That kind

12   of is the third opinion you're offering in your

13   report; would you agree?

14         A    Yes, it's a third opinion I offer.

15         Q    Okay.  Are there other expert opinions --

16   I'm not trying to pin you down with this, I'm trying

17   to frame where we're going to be discussing your

18   report.  Are there other expert opinions you are

19   offering that are not covered by those three

20   categories?

21         A    There are a lot of sort of subsidiary

22   opinions that I offer about these categories, but

23   those are -- that's a good way of characterizing the

24   categories of my opinions.

25         Q    Okay.  Now, one thing that I was looking

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 121

1   for in your opinion and wasn't -- your report and

2   wasn't able to locate is an opinion that Georgia --

3   any part of Georgia's voter registration system was

4   enacted with discriminatory intent.

5            Are you opining that any portion of

6   Georgia's voter registration practices and systems

7   were adopted with a discriminatory intent?

8        A    No.

9        Q    Okay.  So given that, on the bottom of

10  paragraph 11 on page 8 you make a statement that

11  there is a powerful incentive for Republican

12  officials at the state and local levels to place

13  hurdles in the path of minority citizens seeking to

14  register and vote.  That is what has happened, you

15  say.

16           It's your testimony that is not a

17  statement that any practice currently in effect is

18  intentional -- or, I'm sorry, was enacted with

19  discriminatory intent?

20       A    That's correct.

21       Q    Now, in your report it looks like you

22  focus primarily on the voter verification process's

23  so-called exact match process.  Is that correct or

24  was it broad to the entirety of the registration

25  system in the state?

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 122

1        A     It is focused on the voter verification

2     process utilizing an exact match.  I do discuss

3     other aspects of election administration, but that

4     is the principal focus.

5        Q     And as we kind of categorize them

6     categories 2 and 3, the way I read them, relate to

7     the entirety of the voter registration system in the

8     state.  Am I reading that wrong, or are those

9     limited to the exact match process?

10       A     Well, your question assumes limits that I

11    wouldn't impose on the impact of the exact match

12    requirement because everything in the administration

13    of elections in the years after the creation of the

14    methods of implementing HAVA in Georgia essentially

15    depended on the application of an exact match and

16    voter verification process.

17            It's also true that I mentioned the

18    discretion exercised by local registrars, for

19    example, but their understanding of how to operate

20    was conditioned in part on the -- the results of the

21    exact match aspect of the voter verification

22    process.  And the core to understand about how --

23    how the voter verification process limited minority

24    opportunities to register is dependent on how the

25    exact match system operated.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 123

1        Q     So in your review did you review -- let me

2     ask this:  To reach your opinion about the

3     discriminatory effects of the voter verification

4     exact match system, you're relying in part on the

5     work of Dr. McDonald and Dr. Mayer and some other

6     political scientists, correct?

7        A     In addition, I'm relying on the analysis

8     of the Department of Justice underlying the adoption

9     of its 2009 objection to the voter verification

10    process, I'm relying in part on the assessment of

11    the HAVV system by the Social Security

12    Administration reflected in the Inspector General's

13    report in -- the Inspector General of the Social

14    Security Administration, and I'm including also the

15    analysis of the voter registration process by Gary

16    Bartlett, the election director for almost 20 years

17    in the state of North Carolina, who is a highly

18    respected election administrator.

19       Q     And as to your opinions, the first

20    category of opinions we discussed, Georgia's voter

21    verification process exercised a persistent

22    discriminatory effect, that is the only opinion

23    about a discriminatory effect in your report; is

24    that correct?

25       A     First of all, are you asking only about

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 124

1    the period of HAVA implementation?

2         Q    What I'm trying to get to -- maybe I can

3    give you some background what I'm trying to

4    understand about your opinions.

5              So categories 2 and 3 about the

6    resemblance to the Jim Crow era of the voter

7    registration system and the political context

8    resembling the politics before the Voting Rights

9    Act, I don't read those as opinions that there's a

10   discriminatory effect of a particular practice; it's

11   more like a global view.

12             My question is:  As to the specific

13   practices that Georgia utilizes for its voter

14   registration system, the only opinion you're

15   reaching about a racially discriminatory effect is

16   as to Georgia's implementation of its voter

17   verification process under HAVA since 2006, correct?

18        A    No, not correct.  My historical account of

19   the period before 1965 clearly establishes that

20   there was a discriminatory effect, not surprising

21   since the effects of the system were determined by

22   the formula -- coverage formula for the Voting

23   Rights Act in 1965 as justifying Georgia being

24   placed under the special provisions, including the

25   elimination of the literacy test and the

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 125

1    establishment of the preclearance process.  That was

2    all because of the discriminatory effects revealed

3    in the -- in the racial disparities in voter

4    registration in Georgia.

5         Q    So is it your testimony then that

6    opinion -- the second category of opinions that the

7    current pattern of voter registration in voting in

8    Georgia has a discriminatory effect in total?

9         A    I'm sorry?

10        Q    I didn't see that in your report.

11        A    I'm not understanding your question.  What

12   I said in the report is that there was a racially

13   discriminatory effect in the operation of Georgia's

14   registration system before 1965, and that there is,

15   in the period of HAVA implementation, also a

16   racially discriminatory effect.

17        Q    Got it.  Okay.  That helps clarify what I

18   was looking for.

19             So in terms of the opinions, then, the

20   only racially discriminatory effects that you are

21   opining about as far as specific practices are the

22   entirety of the registration system prior to 1965

23   and the implementation of voter verification under

24   HAVA since 2006.  Is that correctly framing that

25   now?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 126

1      A    I think that's correct.

2      Q    Okay.  You don't disagree with it?

3      A    I don't disagree with it.  It's possible I

4  expressed an opinion that I'm not calling to mind

5  about the HAVA implementation period, but -- but I

6  was certainly focused on the voter verification

7  process.

8      Q    And so then in light of that, then it's

9  correct that you are not opining that the entirety

10  of Georgia's voter registration system as it stands

11  today has a racially discriminatory effect on

12  minority voters?

13      A    Well, you weren't listening to my earlier

14  answer, I think.  What I said --

15      Q    I know you want to clarify -- I don't want

16  to interrupt you, but I know you'll clarify.  I

17  understand you believe the voter verification

18  process touches every part of the registration

19  process.

20      A    Yes.

21      Q    But then you also seem to be saying that

22  you are not opining as to the entire registration

23  process today; you're limiting your opinion to the

24  voter verification implementation since HAVA.  I

25  want to understand what your opinion actually is.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 127

1        A     Well, if you understand what you said at
2    the beginning of your statement, you understand that
3    if it necessarily affected every part of the
4    registration process, it's hard for me to cabin that
5    to saying it has no effect on the registration
6    process because I think it had much broader
7    implications for the whole registration process, and
8    so I'm puzzled by your questions.
9        Q     So maybe I can ask it this way:  If
10   Georgia completely eliminated its current voter
11   verification system, would it still be your opinion
12   that Georgia's voter registration system has a
13   racially discriminatory effect on minority voters?
14       A     Sorry, I didn't mean to interrupt.
15   Probably, probably not, but it's a hypothetical, and
16   I'm uncomfortable with hypotheticals even though I
17   teach in a law school.
18       Q     This is my chance to finally ask a
19   professor some good hypotheticals.  Here we go.
20             Let's do this, Dr. McCrary.  Let's go to
21   document number 13.  We're going to mark this --
22       A     Document 13.
23       Q     -- Brennan Center report.
24       A     Okay.
25       Q     Are you familiar with the Brennan Center

Peyton McCrary , Ph.D.                           May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 128

1    for Law and Justice?

2         A    Yes.

3         Q    Are you familiar with the --

4              MS. FINK:  Are you marking it as an

5    exhibit?

6              MR. TYSON:  Yes.  I'm sorry, I was

7    trying -- Exhibit 10.  We'll mark that Exhibit 10.

8              (Defendant's Exhibit 10 was marked for

9    identification.)

10   BY MR. TYSON:

11        Q    Dr. McCrary, are you familiar with the

12   Brennan Center's opinions related to elections?

13        A    In general, but I don't remember seeing

14   this document.

15        Q    Okay.  I want to ask you about a couple of

16   things on page 3 of the report.  That's using the

17   numbers at the bottom of the page.

18        A    I'm there.

19        Q    So you see the title that says Protect and

20   Expand Voting?

21        A    Yes.

22        Q    The first item on that list says Enact

23   Automatic Voter Registration.  You see that?

24        A    Yes.

25        Q    Do you know if Georgia has automatic voter

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 129

1   registration?

2       A    It does not.

3       Q    You'd agree that automatic voter

4   registration makes it easier for individuals to

5   vote, correct?

6       A    Yes.

7       Q    Did you look at the question of Georgia's

8   use or nonuse of automatic voter registration in

9   forming the opinions in this report?

10      A    No.

11      Q    Second item on the document there says

12  Expand Early Voting.  Does Georgia have early

13  voting?

14      A    It has -- I'm forgetting exactly how they

15  treat absentee voting, so it's not something I

16  analyzed in this report.

17      Q    So you didn't look at how Georgia

18  implements early voting at any point in preparing

19  your report, correct?

20      A    Not that I recall.

21      Q    The third section there, Modernize the

22  Voting Process, Protect Voting Rights, and Secure

23  Elections Against Foreign Interference, talks about,

24  number one, Upgrade and Secure Voting

25  Infrastructure.  Do you see that section?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 130

1      A    Yes.

2      Q    Did you at all review whether Georgia has

3   taken any steps to upgrade the security of its voter

4   registration database?

5      A    Yes.

6      Q    You did review that question?

7      A    Yes.  I don't address it in the report,

8   but I did review it.

9      Q    Okay.

10     A    Example, I read the opinions in Curling

11  versus Kemp.

12     Q    But you didn't rely on those opinions in

13  reaching the opinions in your report, correct?

14     A    I did not.

15          Could I interrupt you for just a moment?

16     Q    Yes.

17     A    Getting awfully warm.  I was wondering if

18  anyone would be offended if I took off my sport

19  coat?

20     Q    Not at all.

21     A    Be back in a moment.

22          (Brief recess.)

23  BY MR. TYSON:

24     Q    We can put the Brennan Center document

25  away and return back to your report, Dr. McCrary.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 131

1          A     Okay.

2          Q     In working towards your opinions in the

3    report, did you speak to any county voter registrars

4    in Georgia?

5          A     No.

6          Q     Did you conduct any review of the methods

7    by which Georgians are able to register to vote?

8          A     Yes.

9          Q     And what did that review involve?

10         A     Well, I looked at aspects of -- I'm sorry,

11   are you asking about how people are able to register

12   to vote?

13         Q     Correct.  If that was part of your review.

14         A     Yes.  And the fact that I may not have

15   total recall of every aspect of how absentee voting

16   is treated doesn't mean that I didn't look at it at

17   one point, and I did not see that as central to the

18   issues I was investigating, but I tried to

19   familiarize myself by looking at all the training

20   materials, the official election bulletins, I came

21   upon PowerPoint presentations, and -- what's the

22   other term -- webinars by which registrars were

23   trained, but I can't say that I have total recall of

24   everything in the training materials.

25         Q     Certainly.  Did you review Georgia's

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 132

1    online registration process?

2         A    I looked at it, yes.  I reviewed it in

3    that sense, but I didn't carefully analyze it as a

4    part of my investigation.

5         Q    Did you review Georgia's app-based

6    registration processes?

7         A    No.

8         Q    And you reached a conclusion about the

9    discriminatory effect of Georgia's voter

10   registration system, but you didn't look at

11   automatic voter registration -- the methods by which

12   Georgians can register to vote; is that correct?

13        A    No, I didn't recall every aspect of how

14   they register to vote, but I did look at it, and I

15   focused on that part that was related to the voter

16   verification process.

17        Q    Did you review materials related to how

18   many voters go through the voter verification

19   process, or did you assume that every voter goes

20   through the verification process?

21        A    The way I read the Secretary of State's

22   website and training and the laws that were adopted,

23   everyone has to go through voter verification

24   process.

25        Q    And if only a subset of voters had to go

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 133

1    through the voter verification process, would that

2    change your analysis?

3        A    If that were true it would change my

4    opinion as to that percentage for which it's not

5    true.

6        Q    Okay.  And so if only paper applications,

7    for example, went through the verification process,

8    you would then conclude that there was no

9    discriminatory effect as to nonpaper applications;

10   is that correct?

11       A    I'm not sure -- you're going to have to

12   rephrase that question.  Sounded to me like you

13   contradicted yourself.

14       Q    Certainly.  Let me do this, I will posit

15   it as a hypothetical to you.  Assume for purposes of

16   this question that not all voter registration

17   applications go through the voter verification

18   process.  Further assume that the only registration

19   applications that go through the verification

20   process are paper applications, not applications

21   received through the Department of Driver Services,

22   online voter registration, or the app.  Are you with

23   me so far?

24       A    By the DDS part of your question, are you

25   talking about the process of DDS giving voter

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 134

1    registration opportunities to individuals when they

2    apply for a driver's license, is that what you're

3    asking about?

4         Q    Yes, so I am excluding for purposes of

5    this hypothetical Department of Driver

6    Services-initiated verification process records

7    through whatever method.  If the application comes

8    from a driver services office, I want you to assume

9    for purposes of this question that those are not

10   included in the verification process.  Are we clear

11   on that?

12        A    Yes.

13        Q    Okay.  So if we assume those things in

14   this hypothetical, would your opinion then be that

15   because the voter verification process does not

16   apply to any voter registration applications except

17   those coming from paper in the hypothetical that

18   there is not a discriminatory effect except for

19   those voter registrations that come via paper

20   application?

21        A    I have trouble with hypotheticals because,

22   first of all, you're not putting any numbers on the

23   categories.  My understanding is that not very

24   many -- not a very large number of persons and not a

25   very large percentage of persons who succeed in

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 135

1    getting registered come through the motor voter

2    procedure at DDS or its equivalent in other states.

3    So if, in fact, the facts in your hypothetical are

4    true, it would -- it would be true that anything

5    that doesn't go through the voter verification

6    process I have not addressed in this report.  I just

7    don't know what the numbers are.

8         Q    I believe a minute ago you said that if

9    Georgia were to hypothetically completely eliminate

10   its voter verification process, your opinion that

11   Georgia's voter registration system has a racially

12   discriminatory effect would change.  Am I

13   characterizing your testimony correctly?

14        A    Yes, depending on what the numbers show.

15        Q    And in that scenario, I guess that's why I

16   thought my hypothetical would be easier, because if

17   there is a subset of voters to whom the verification

18   process does not apply, then it would seem logical

19   that then there could not be a racially

20   discriminatory effect as to that subgroup no matter

21   what size it is.  Do you disagree with that?

22        A    Well, this is the first time I've ever

23   thought about that hypothetical.  And so, for

24   example, I don't know enough about how the motor

25   voter process operates in Georgia in terms of how

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 136

1    successful the DDS agency is in processing voter

2    registration applications.  That's often a problem

3    in other states.  I don't know what the facts are

4    with regard to Georgia.

5            So, I mean, if, for example, it turns out

6    to be 1 percent of the registered voters in Georgia,

7    then it wouldn't be a very significant exception to

8    the voter verification process, but I just don't

9    know the facts about it.

10        Q    And in preparing your report, you didn't

11   attempt to uncover those facts.  You strictly looked

12   at the verification process, correct?

13        A    It's -- well, I didn't just look at the

14   voter verification process, but I did not examine

15   the operation of the DDS system of offering

16   registration opportunities to people.

17        Q    Okay.  Thank you.

18            Let's turn next to paragraph 17 of your

19   report on page 12.  You indicate in that statement

20   you're talking specifically about the method of

21   assessing whether persons are legally registered

22   voters from 2008 to the present, and I wondered why

23   not back earlier than 2008?  Was there a particular

24   reason why you chose 2008?

25        A    Yeah, that's the period after which

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 137

1    Georgia was -- beginning with which Georgia was
2    implementing HAVA.
3         Q    Okay.  Let's turn next to paragraph 24 of
4    your report on page 19.
5         A    Yes, I'm there.
6         Q    And first of all, you reference that
7    Secretary of State Max Cleland was encouraging local
8    boards to appoint more black deputy registrars, and
9    there was a dismissal of a case involved there.  Do
10   you know what party was -- Secretary Cleland was a
11   member of?
12        A    Yes, he was a Democrat.
13        Q    In footnote 32 also on that page you
14   indicate that when Georgia tried to cut back on the
15   availability of satellite registration in 1991, the
16   Department of Justice objected.  Was Georgia also
17   still controlled by Democrats in 1991?
18        A    Yes.
19        Q    So then in paragraph 25 you start talking
20   about an objection from 1994 to some of the aspects
21   of Georgia's changes to comply with the National
22   Voter Registration Act.  Do you see that?
23        A    Yes.
24        Q    What I'd like to do is refer you to
25   document number 14, and we'll mark this as Exhibit

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 138

1    11.

2              (Defendant's Exhibit 11 was marked for

3    identification.)

4         A    Okay.

5    BY MR. TYSON:

6         Q    And this is a printout from the Georgia

7    Laws regarding legislation, as you see here at the

8    beginning, to amend Title 21 to conform to National

9    Voter Registration Act of 1993.  Do you see that?

10        A    Yes.

11        Q    If you could turn to page 24.

12        A    Okay.

13        Q    And there you see kind of two thirds of

14   the way down the page 21-2-234, you see:  As used in

15   this code section, the term "no contact" shall mean

16   that the elector has not voted.

17             Do you see that language?

18        A    Yes.

19        Q    And did you at any part of your opinion in

20   your report review the list maintenance process

21   related to no contact?

22        A    Yes, in the period of HAVA implementation.

23        Q    Okay.  And do you know what party was in

24   the majority in Georgia in 1994 when this

25   legislation was adopted?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 139

1       A     I believe that's the Democratic Party.

2       Q     Next if you could turn with me to document

3    15, which we'll mark as Exhibit 12.

4             (Defendant's Exhibit 12 was marked for

5    identification.)

6       A     Yes, I'm there.

7    BY MR. TYSON:

8       Q     And I am assuming this is one of the

9    preclearance objection letters you've reviewed as

10   part of preparing your report?

11      A     Yes.

12      Q     And at the beginning there you see that

13   the Attorney General objected about the provisions

14   of no contacts during the three-year period at the

15   bottom last paragraph on page 1?

16      A     Yes.

17      Q     And so this objection was to the no

18   contact procedures adopted by the Democratic

19   majority in 1994; is that a fair statement?

20      A     Yes.

21      Q     In your report you next say:  In response

22   to this objection the state amended its objection

23   laws to comply with the NVRA.

24             Did you review those amended laws?

25      A     I did, but I can't recall the specific --

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 140

1   the specific law in question.

2        Q    I can help with that if you can look at

3   document number 16 before you.

4        A    Document 16 is the 1997 law.

5        Q    Correct.  And did you review on page 1 --

6   page 2, section 2, there's an amendment to the no

7   contact process.  Do you see that?

8             MS. FINK:  Can we mark this one as Exhibit

9   13?

10            MR. TYSON:  This is 13, yes.  I'm sorry,

11  Sarah.  This is 13.

12            (Defendant's Exhibit 13 was marked for

13  identification.)

14       A    Yes, I see it.

15  BY MR. TYSON:

16       Q    Okay.  So is this the law that you're

17  referring to the state amended its election laws to

18  comply with the NVRA?

19       A    Yes.

20       Q    Then let me give you one more on this

21  point, document 17, which we'll mark as Exhibit 14.

22            (Defendant's Exhibit 14 was marked for

23  identification.)

24       A    Okay.

25  BY MR. TYSON:

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 141

1      Q    This is an entry from the House Journal in

2    1997?

3      A    Yes.

4      Q    And page 5, the last page there, is the

5    vote on the 1997 legislation.  You with me on that?

6      A    This is under section 3.  Yes.

7      Q    You see that that vote was unanimous,

8    correct?

9      A    That's correct.

10     Q    Okay.  So going back to your report -- you

11   can set those '94 and '97 documents to the side.

12     A    Okay.

13     Q    Going back to your report in paragraph 26

14   on page 21 you mentioned that the Department of

15   Justice blocked 177 proposed changes to election

16   laws in Georgia.  You'd agree with me, wouldn't you,

17   that most of those objections came prior to the year

18   2000?

19     A    Yes.

20     Q    And when you say on paragraph -- the

21   bottom of 26:  The department found that each had a

22   retrogressive impact on voters of color in Georgia,

23   could the department also have found that the state

24   didn't submit sufficient evidence to determine there

25   was not a retrogressive impact on voters of color?

Peyton McCrary , Ph.D.          May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 142

1    A    That's a better way of phrasing the legal

2   burden under a Section 5 review, and I like that

3   wording better.

4            Also, I would correct that sentence in

5   that there were some objections that were

6   purpose-based and not based on retrogressive effect.

7   Small number.

8    Q    I'm assuming you have not reviewed, or

9   have you reviewed every single objection from 1965

10  to Shelby County for Georgia?

11   A    I have reviewed and analyzed and written

12  about every objection from 1965 through mid 2004 for

13  a Law Review article on the end of preclearance, but

14  I have not examined -- I actually looked at all the

15  objection letters on -- in periods since -- since

16  2004 for Georgia in connection with this report.

17   Q    But I think you agreed with me earlier,

18  though, there's not an affirmative finding of

19  retrogressive impact in every one of those, there

20  could also be a determination of the state or the

21  county had not submitted sufficient evidence of a

22  lack of retrogressive impact, correct?

23   A    Usually the objection letter phrases it as

24  you just did, and that is because that's the way --

25  that's the language of Section 5 of the Voting

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 143

1    Rights Act.

2           The burden is on the jurisdiction in a

3    Section 5 review, whereas it's on the plaintiffs in

4    a Section 2 lawsuit or some other kind of legal

5    claim, and the objection letter reflects the burden

6    that the Act imposes on jurisdictions.  So I was

7    careless in saying that each objection had a

8    retrogressive impact.  I should have phrased it more

9    carefully as you did.  The jurisdictions had not met

10   their burden.

11       Q    Thank you.

12           The next section of your report looks at

13   the adoption of DREs in Georgia.  Initially I was

14   curious in terms of if you're looking at voter

15   registration why you looked at voting machines as

16   part of that analysis.  Can you give me a little bit

17   of understanding of that, please?

18       A    Yes, I looked at that because it was

19   associated with the whole process of HAVA

20   implementation, and I thought it was useful to

21   include that discussion because it included a

22   consideration of that part of the voting system to

23   which the voter registration process led.  I suppose

24   one could argue that it was not relevant, but it

25   seemed to me part of the story.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 144

1      Q     Let's turn next to -- actually, let me ask

2  you this question first:  In footnote 37 you cite to

3  the report of the 21st Century Voting Commission

4  from December 2001.  Did you review that report as

5  part of preparing your expert report here?

6      A     Yes.

7      Q     If you could turn with me to document 18,

8  which we'll mark as Exhibit 15.

9            (Defendant's Exhibit 15 was marked for

10  identification.)

11      A     Okay.

12  BY MR. TYSON:

13      Q     Does this appear to be -- is it a copy of

14  the 21st Century Voting Commission report?

15      A     Yes.

16      Q     And if you could turn to page -- physical

17  page 20, page number 19.

18      A     Okay, I'm on page 19 of the report.

19      Q     Okay.  And there's a bullet at the top of

20  that paragraph -- I'm interested in the paragraph

21  that begins, "The data indicates that, across the

22  board."

23      A     Uh-huh.

24      Q     And the report found that the percentage

25  of undervotes on paper ballots was higher than

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 145

1   the -- in predominantly black precincts than in

2   predominantly white precincts.  Do you see that

3   conclusion?

4        A    I'm actually -- I need to review this

5   because I'm not seeing that.  First of all, it

6   begins by discussing overvotes, not undervotes.  Let

7   me read the paragraph.

8        Q    Certainly.  Please take your time.

9        A    Okay, I've read the paragraph.  You want

10   to repeat your question?

11        Q    Yes.  So you see the commission found that

12   there was an undervote gap that was greater in

13   counties that used paper ballots, and the highest

14   undervote percentages were in African-American

15   precincts using those paper ballots.  Do you see

16   that portion?

17        A    You're talking about in a separate

18   paragraph?

19        Q    Third paragraph, "The data indicates that,

20   across the board."

21        A    I was looking for reference to that in the

22   paragraph you called my attention to first.  I'm

23   sorry, I'll have to look at the --

24        Q    I apologize.

25        A    Okay, I see that now.  What was your

Peyton McCrary , Ph.D.                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 146

1    question?

2        Q    Well, first I was going to ask you if you

3    saw it.  I'm glad we're on the same page now.  Would

4    you agree, based on your analysis of the adoption of

5    the DREs in Georgia in your report, that at least

6    one basis for Secretary Cox moving toward electronic

7    voting was to rectify a disparity on the impact of

8    African-American voters when paper ballots were

9    used?

10       A    Yes, and I thought that's what I said in

11   my report relying in part on the analysis of

12   political scientist Charles Stewart, who did a very

13   careful analysis in an unpublished paper of the

14   subject matter that the commission was addressing.

15       Q    Thank you.

16            I'm assuming you would support a voting

17   system that allows -- that corrects undervotes for

18   African-American voters, and you believe that was a

19   good policy decision for Georgia to move to that

20   system; is that correct?

21       A    I would -- without even referencing the

22   race of the voters, I think it's -- a system should

23   cut if not eliminate undervotes and overvotes.

24       Q    Uh-huh.  If you could put the commission

25   report away.  If you could turn to paragraph 35 of

Page 147

```
 1   your report.

 2        A    Okay.

 3        Q    In this paragraph you talk about the

 4   efforts that staff and Diebold and Center for

 5   Election Systems went through.  Did you look at all,

 6   as part of your report, at Georgia's new voting

 7   system of ballot-marking devices or how those were

 8   implemented?

 9        A    No.

10        Q    And in paragraph 36 you indicate about

11   halfway through that paragraph, initial success

12   would not, as it turned out, be replicated in coming

13   years, as the new DREs aged and the impressive

14   training of election administrators and the staff

15   they supervised is replaced with less intensive

16   training efforts.

17             How did you determine that the training in

18   2002 was impressive?

19        A    That was the analysis of Professor Stewart

20   and also Professors Alvarez and Hall in the article

21   they co-authored that I cited.

22        Q    And are you also relying on those

23   professors for your conclusion that the impressive

24   training was replaced with less intensive training

25   effort?
```

Peyton McCrary , Ph.D.                              May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 148

1      A      There I am -- there I am going on my

2   reading of the training materials in the last 10

3   years and the analysis of those materials by Gary

4   Bartlett in his expert report in the 2016 case.

5      Q      And did you analyze all the training

6   efforts in the training materials related to DREs?

7      A      I think I read almost all of them.  I

8   can't -- I don't have any recollection of any that I

9   did not include, but I didn't cite them all.

10     Q      The next section of your report addresses

11  realignment in the Georgia party system.

12     A      Yes.

13     Q      I want to go to paragraph 39.

14     A      Okay.

15     Q      You talk about the secular realignment of

16  white voters leaving the Democratic Party and

17  switching to the Republican Party, and you mention

18  the 2002 gubernatorial election as accelerating that

19  process.  And my -- at the end of paragraph 39 what

20  I want to ask about that is as a result you say:

21  Decisions about voter registration, election

22  administration, and the machinery by which ballots

23  were cast in 2002 reflected the policy preferences

24  of the Republican Party, and you're citing to an

25  article by Dr. Bullock for that statement.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 149

1              Is it your -- are you making that

2     statement simply because Republicans were the

3     majority party, or are you saying that Republicans

4     have particular policy preferences about voter

5     registration, election administration, and the

6     machinery by which ballots are cast?

7          A    In that sentence I'm simply referring to

8     the fact that they controlled the majority in the

9     legislature and the governorship, and after 2004,

10    2006, I forget which, Secretary of State's Office.

11         Q    And in paragraph 40 you say:  In

12    white-majority Georgia, Republicans benefited from a

13    pattern of voting that was polarized along racial

14    lines.

15              And you'd agree with me that from 1965 to

16    2002, racially polarized voting was not beneficial

17    to Republicans in Georgia; is that correct?

18         A    That's correct, it benefited whatever

19    party was the dominant party in the state, and

20    before 2002 -- for much of the time before 2002 it

21    was Democratic Party or it was becoming more evenly

22    balanced.

23         Q    In paragraph 41 on the next page you're

24    talking about a study by Dr. Bullock and Dr. Gaddie

25    indicating -- about -- towards the end of that

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 150

1    paragraph you indicate that between 30 and 40

2    percent of white voters in the state supported

3    Democratic candidates in the 1990s, but only about a

4    quarter of whites voted Democratic beginning in

5    2002.

6              Have you looked at any racial polarization

7    analysis on a statewide level in Georgia after this,

8    after the Bullock and Gaddie study?

9        A    Yes.  For one thing I cite -- you're

10   asking about statewide patterns as opposed to

11   patterns for a portion of the state?

12       Q    Correct.  I know you cite the Gwinnett

13   County cases and some of those other specific ones

14   in parts of the state.

15       A    I looked at a number of studies that cite

16   exit poll data or -- exit poll data during a period

17   up through at least 2014, and I cite them in the

18   report.

19       Q    You did not review any studies that

20   conducted an ecological imprint analysis of racial

21   polarization, you only used exit poll data up to

22   that 2014 date for the state statewide?

23       A    Actually, I also looked at a second book

24   by Chuck Bullock and Keith Gaddie called, I think,

25   The Rise and Fall of the Voting Rights Act, and my

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 151

1    recollection is they also have data on racial

2    polarization after this initial book, The Triumph of

3    Voting Rights in the South in 2009.  I don't --

4        Q    The end of paragraph -- I'm sorry?

5        A    I don't think I cited the second Bullock

6    and Gaddie book, though, in the report.

7        Q    At the end of paragraph 41 you say:  Such

8    polarized voting is evidence of vote dilution, of

9    course, only in contests where minority

10   candidates -- minority-preferred candidates usually

11   lose.

12            And you'd agree with me that in the 2018

13   governor's race in Georgia, Ms. Abrams came within a

14   little bit more than 50,000 votes of winning an

15   outright majority, correct?

16       A    Yes.

17       Q    And have you conducted any racial

18   polarized voting analyses of that race in 2018 to

19   determine her level of support among white voters?

20       A    I have not.

21            Did you have a question about the sentence

22   that you called my attention to or not?

23       Q    That was the setup for my question

24   about --

25       A    Okay.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 152

1          Q     -- 2018.  Yeah.

2                So let's turn to paragraph 45.  We're

3    talking there about the 2008 election.

4          A     Yes.

5          Q     And the second paragraph -- second

6    sentence there indicates that the same percentage of

7    white voters voted for Obama in 2008 as voted for

8    Democratic nominee John Kerry in 2004.  How do you

9    determine when there's same level of support for an

10   African-American candidate and the same level of

11   support for a white candidate among white voters

12   that the polarization you see is racial and not

13   political?

14         A     Well, it's obviously political, and what

15   I'm talking about there is, as I go on in that

16   paragraph to discuss, is other aspects of the voting

17   patterns in 2008.  That sentence is not the

18   principal subject matter of the paragraph.

19         Q     I'm sorry to step back a couple, but in

20   paragraph 43 I see you discussing the level of white

21   turnout versus black turnout in various elections.

22   You see that?

23         A     Yes.

24         Q     I didn't find -- maybe I was missing it,

25   but I didn't find turnout rates by race for any

Peyton McCrary , Ph.D.                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 153

1   election after 2004 in your report with the

2   exception of -- I see you cover 2008 as far as the

3   racial breakdown, but in terms of turnout by white

4   and black voters, I didn't find any election after

5   that.  Did you leave those out on purpose?

6        A    No, I didn't -- I don't think I had any --

7   I don't think I encountered any studies that

8   discussed that subject matter, and I did not try to

9   conduct an analysis myself in the years after 2008.

10       Q    You're familiar, I'm assuming, with the

11  current --

12       A    I'm sorry, I paused.  In terms of

13  statewide patterns as opposed to local patterns.

14       Q    Certainly, yes.  And for these I'm

15  definitely focusing statewide.  I know that there's

16  specific cases later.

17            You're familiar, I'm assuming, with the

18  Current Population Survey from the Census Bureau?

19       A    Yes.

20       Q    And that's what Dr. Bullock and Dr. Gaddie

21  used in footnote 79 that you reference on the

22  estimates of registration and turnout by race

23  published by the census when they gave the turnout

24  numbers you cited; is that correct?

25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 154

1      Q    I want you to turn to document 19, which

2    we'll mark as Exhibit 16.

3          (Defendant's Exhibit 16 was marked for

4    identification.)

5    BY MR. TYSON:

6      Q    This is Table 4b from the CPS report for

7    November 2008 you can see there at the top.  I have

8    hidden the rows for states other than nationwide and

9    Georgia.  So do you see -- I'm sure you're familiar

10   with generally how these reports look.

11     A    Yes.

12     Q    Is that right?

13     A    Yes.

14     Q    And looking at the column percentage

15   voted, you'd agree with me that in terms of total

16   voted percentage for the 2008 election, black alone

17   or in combination is six points higher than whites

18   alone or in combination in Georgia.

19     A    I'm sorry, I have to line up the rows.

20   Okay, ask your question.

21     Q    You'd agree with me that the total voter

22   percentage for black alone or in combination is

23   higher in November 2008 than white alone or in

24   combination, correct?

25     A    That's correct.  You're asking me -- I

Peyton McCrary , Ph.D.                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 155

1    thought you were asking me white alone and black

2    alone.

3        Q    So I was asking you first about white

4    alone or in combination and black alone or in

5    combination.

6        A    I'm sorry, but I have to use a straight

7    line to read the table correctly here.

8            Yes, I would agree black turnout in Census

9    Bureau estimates is slightly higher than the white

10   or Hispanic alone.  Did you ask me in combination?

11       Q    Yes.  Then if you can look at those in

12   combination, and the question is the same:  Would

13   you agree that black alone or in combination is

14   higher turnout than white alone or in combination

15   for the November 2008 election?

16       A    Yes.

17       Q    Okay.  Now I'm going to ask you the same

18   questions for 2012 and 2018.  So those are document

19   20, which we'll mark as Exhibit 17.

20            (Defendant's Exhibit 17 was marked for

21   identification.)

22       A    See the same pattern in the 2012 election.

23   BY MR. TYSON:

24       Q    And so the black voter turnout is higher

25   than white voter turnout for the 2012 election in

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 156

1    Georgia, correct?

2         A    Yes, according to the Census Bureau

3    estimates.

4         Q    And then document 21, which we'll mark as

5    Exhibit 18, same question for the 2018 election.

6              (Defendant's Exhibit 18 was marked for

7    identification.)

8         A    Same pattern.

9    BY MR. TYSON:

10        Q    So in the November 2018 election

11   African-American turnout is higher than white

12   turnout as well, according to the census Current

13   Population Survey?

14        A    Yes.  Yes.

15             Could I review this portion of the report

16   to see whether I left out a major point that I've

17   addressed in other reports?

18        Q    Certainly.

19        A    I see I left out the discussion that I

20   have always tried to include in discussing

21   participation rates when referring to the Census

22   Bureau estimates.  And so since it's not in the

23   report, the only way I can explain what I was about

24   to say is if you'll indulge me to explain what's not

25   in the report.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 157

1      Q    And I'm certain you will be explaining to
2   me that it's an estimate and is self-reported, and
3   it is not actual turnout numbers.
4      A    That's right.
5      Q    Instead of doing that, let me just go to
6   two questions.  Number one, you relied on the Bureau
7   of the Census numbers in paragraph -- footnote 79;
8   is that correct?
9      A    79?
10      Q    On page 32.
11      A    No, there's no discussion of the Census
12   Bureau estimates there.
13      Q    Footnote 79:  Bullock and Gaddie cite the
14   estimates of registration and turnout by race
15   published by the Bureau of --
16      A    Footnote 79.  I thought you said
17   paragraph.  I'm sorry.
18      Q    I'm sorry.  We are getting late in the
19   afternoon.
20      A    Well, I often cite the Census Bureau
21   reports that are estimates I should say, but point
22   out that there is a problem of overreporting that
23   is -- political scientists have found to be greater
24   among African-Americans than among whites.
25            But with that caveat, they're useful, and

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 158

1    they're useful for comparisons where you're trying

2    to compare one state that does not have racial data

3    on registration with voting with a state like

4    Georgia that does have those data.  So the only way

5    you can compare the states is to use the Census

6    Bureau estimates.

7              All I'm saying is there's a qualification

8    to it, but the estimates tend to -- tend to suggest

9    a slightly higher turnout rate among

10   African-Americans than among non-Hispanic whites.

11        Q    You didn't attempt to -- I'm sorry.

12        A    They're still useful data, but they are

13   not as good as the official data that a state like

14   Georgia supplies.

15        Q    And you didn't attempt to go and locate

16   the official data from Georgia about turnout rates

17   for any elections after 2004; is that correct?

18        A    Actually, I think I did, but I may be

19   mixing up -- I may be mixing up reports.  I may be

20   thinking about another case.

21        Q    Okay.  Moving to paragraph 46 -- sorry?

22              MS. FINK:  Will you be getting to a

23   breaking point any time soon?  Like to take a

24   five-minute break.

25              THE WITNESS:  That would be useful.

Peyton McCrary , Ph.D.    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 159

1          MR. TYSON:  This is actually a great time
2     to.  Let's go off the record, and we can do a
3     five-minute break definitely.
4               (Recess 2:42-2:52 p.m.)
5     BY MR. TYSON:
6          Q    Dr. McCrary, good news, I don't have any
7     more detailed spreadsheets for you to look at, so we
8     can move next to paragraph 46 of your report.
9               And in this survey about white voters
10    favoring and reporting that they're Democrats or
11    Republicans, I believe the citation is to survey
12    data from the Pew Research Center at footnote 86 and
13    not to any sort of regression analysis.  This is
14    self-reported survey data, correct?
15         A    That's correct.  That's what Professor
16    Hutchings was relying on.  I was actually --
17         Q    Did you attempt --
18         A    I was not actually looking at the Pew
19    data.  I was looking at his analysis of the Pew
20    data.
21         Q    Got it.  And did you attempt to locate any
22    similar survey from the 2018 election?
23         A    I attempted to find expert reports
24    after -- that would address that, but I never
25    located any.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 160

1     Q    In paragraph 47 you begin to discuss a

2   local election lawsuit in Gwinnett County.  I

3   believe that was about county commission districts;

4   is that right?

5     A    My wife came in and asked me if I wanted

6   the coat back on, and I -- I took it off for a

7   reason.

8          What was your question about the -- about

9   what the governing bodies at issue were?

10    Q    The county commission I believe you said

11  involved local elections.  I believe it was county

12  commission and school board.  I realize it's not in

13  your report.

14    A    I think it was both county commission and

15  school board, but that's my recollection.  I didn't

16  say anything in the paragraph about it.

17    Q    And are you aware that the lawsuit was

18  dismissed after the Democratic candidates were

19  successful in the 2018 election?

20    A    Not with regard to the Gwinnett County

21  case.  I am familiar with that in connection with

22  the challenge to two state house districts in

23  Gwinnett and Henry Counties.

24    Q    So your testimony is you don't know if the

25  Gwinnett local election case you referenced in

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 161

1    paragraph 47 is still ongoing or not?

2        A    I simply don't recall, as I sit here, what

3    the outcome of the case was.

4        Q    So let's move to paragraph 48.  You

5    reference two state house districts, and this is --

6    this is a case that you know was dismissed after the

7    Democratic candidates were successful in the 2018

8    election, correct?

9        A    Was it the 2018 election?  Yeah, I guess

10   it was.

11       Q    Now, I want to ask you about footnotes 89

12   and 90.  You're talking about some various expert

13   reports in both those Gwinnett local election case

14   and the state house district case.  Where did you

15   obtain those declarations?

16       A    In the case of the legislative case, I was

17   an expert in that case, and I suspect I got the --

18   frankly, I don't remember where I got the Engstrom

19   report in the Gwinnett County case, whether I found

20   it -- I often search Election Law at Moritz to find

21   documents filed in election law cases, and that

22   could be where I found it.

23       Q    Did you review the report of Dr. Alford

24   that you reference in footnote 89 on page 36?

25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 162

1     Q     Let's go to document number 22, which

2   we'll mark as 19.

3            (Defendant's Exhibit 19 was marked for

4   identification.)

5     A     Okay.

6   BY MR. TYSON:

7     Q     Is this the report of Dr. Alford that you

8   reviewed in that Gwinnett County local election

9   case?

10     A     It appears to be.  Let me just check

11   something.

12            Actually, as I look in my footnote, I

13   don't think I cited to Professor Alford's report.  I

14   was quoting from the Engstrom rebuttal to that

15   report.

16     Q     Do you know then if you reviewed

17   Dr. Alford's report, or did you only rely on

18   Dr. Engstrom's report?

19     A     I have reviewed a good many expert reports

20   by Professor Alford.  I'm not sure I remember

21   reading this one.

22     Q     Okay.  There's only one -- couple

23   different sections, one particular -- two particular

24   places I want us to look together.  Page 9 in the

25   blue numbers at the top at Exhibit 19.

Peyton McCrary , Ph.D.          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 163

1        A     Okay.

2        Q     Do you see the last paragraph that begins,

3    "In the one remaining election for the 2012 District

4    5 seat"?

5        A     Yes.

6        Q     Could you just review that paragraph, and

7    then it goes over on to the next page.

8        A     Okay.  Okay.

9        Q     So you see Dr. Alford is discussing a race

10   where there was an African-American Republican

11   candidate who was overwhelmingly favored by the

12   white voters and overwhelmingly opposed by the

13   African-American and Hispanic and Asian voters; you

14   agree that's a fair characterization?

15       A     Yes.

16       Q     And on this basis Dr. Alford focused on

17   the issue of partisan polarization because the race

18   of the candidate didn't matter.  In your review in

19   terms of relevance of information, do you believe

20   the race of the candidate assists the court or has

21   any role in determining whether something is

22   partisan polarization or racial polarization?

23       A     It depends on the overall pattern.  First

24   of all, notice that this is one election contest,

25   and I'm reluctant to draw a conclusion from one

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 164

1    election contest.

2          Secondly, it is often the case that

3    African-American voters vote against a candidate who

4    is also African-American because they perceive him

5    or her as being unsympathetic to the policy

6    preferences they have.

7          I would cite, for example, Tim Scott.

8    When I worked on a case in Charleston County, South

9    Carolina, in the justice department roughly almost

10   20 years ago, now Senator Scott was a member of the

11   county council.  He was the only African-American

12   member on the county council.  We found that --

13   Professor Arrington's expert analysis found that

14   Mr. Scott received about 5 to 10 percent of the

15   African-American vote the first time he ran for the

16   county council, and his black support went down in

17   every other election.  So he fits the pattern of

18   H.K. Dido in this particular -- in this particular

19   example.

20          The issue in a voting rights case is the

21   rights of minority voters, not minority candidates.

22   So the question of who the minority voters prefer as

23   opposed to who the white voters prefer is what

24   experts and the justice department and the courts

25   look at.  That's the standard for analyzing voting

Peyton McCrary , Ph.D.                     May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 165

1   behavior.

2          So if in this case Mr. Dido was not

3   perceived as sympathetic to the policy positions of

4   African-American voters, and actually in Gwinnett

5   also Hispanic and Asian voters, then he was not the

6   preferred candidate of minority voters.

7          And that doesn't suggest that it's -- that

8   there is a causal relationship, the fact that he is

9   a partisan is the reason for that voter choice.

10  It's the -- it's the positions that the voters

11  prefer.

12         And in the case of Mr. Dido, about whom I

13  know exactly nothing, if he were like Mr. Scott --

14  Tim Scott in Charleston County, there were reasons

15  why the African-American voters, and in this case

16  Hispanic and Asian voters, voted against him.

17         So that's an example of the complications

18  and complexities in trying to analyze causality,

19  which the -- which the courts have generally avoided

20  doing except in judicial election cases in my

21  experience.  And the reason is that statistically

22  you can't separate the effects of party and race in

23  places like Gwinnett County or the state of Georgia

24  or Alabama or other southern states because of the

25  very high correlation between race and party,

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 166

1  particularly when it comes to African-American

2  voters, and the problem of multi-collinearity is a

3  problem that troubles any analysis of the causality

4  issue in connection with racially polarized voting.

5       Q    So turning to page 13 at the top in the

6  blue numbers, the bottom of that page says --

7       A    Are we still --

8       Q    We're still in Dr. Alford's -- still in

9  Dr. Alford's report.

10      A    Okay, his paragraph -- what are you

11 telling me to look for?

12      Q    On the very top there's a row of blue

13 numbers, case number document filed.

14      A    Yes.

15      Q    Go to page number 13 on that.

16      A    Okay.

17      Q    There's a section titled Summary

18 Conclusions.

19      A    Okay.  I have read Professor Alford's

20 paragraph.

21      Q    And so Professor Alford's conclusions are

22 that African-American voters vote cohesively for

23 Democrats, white voters vote cohesively for

24 Republicans.  What led you to reject Dr. Alford's

25 criticisms of Dr. Engstrom and rely on Dr. Engstrom

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 167

1    for your statement in paragraph 47 of your report?

2         A    Well, I think you've asked a compound

3    question that's confusing.  If I may separate the

4    issues out, let me start the first point.

5              I don't find John Alford's conclusion in

6    that paragraph to be a sound analysis for the reason

7    I previously indicated.  It's simply not correct to

8    say that he has demonstrated that the cause is

9    partisan rather than racial polarization.

10             Then you were asking some other things,

11   and I can't recall exactly what other aspects of the

12   question you want to ask about.

13        Q    Well, I think you've answered the second

14   part, which was on what basis did you reject

15   Dr. Alford's conclusion that -- and endorse

16   Dr. Engstrom's.  I think what I've heard you say is

17   you don't believe Dr. Alford's conclusions are

18   supportable.  Is that fair to say?

19        A    That's correct, but your -- your question

20   involves footnote 89 as I recall in my report, and

21   there you'll see that the point that Engstrom was

22   addressing didn't have anything to do with the

23   causality argument, it was his -- his criticism was

24   related to a few district elections where the small

25   number of precincts created problems for statistical

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 168

1    analysis, and it didn't resolve -- it didn't involve

2    the causality issue at all.  So I wasn't actually

3    addressing this part of Alford's report in that

4    footnote.

5        Q    Earlier on paragraph 47 you make the

6    statement:  Non-Hispanic whites consistently

7    defeated minority-preferred candidates in

8    interracial contests, at the top of page 36 of your

9    report.

10       A    Yeah, let me see what the beginning of the

11   paragraph deals with.  We talking about the Gwinnett

12   County case?

13       Q    Correct.

14       A    Okay.  What's your question?

15       Q    So that's your statement.  Wouldn't it

16   also be just as true to say Republicans consistently

17   defeated African-American-preferred candidates or

18   Democratic candidates -- sorry, let me start over

19   again.

20            Wouldn't it be consistent with the

21   statistical analysis to say Republicans consistently

22   defeated Democratic candidates in interracial or

23   interparty contests because we can't tease out party

24   and race?

25       A    The answer is yes, but that's not the

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 169

1    standard that the courts are considering in a case

2    such as this.  And, in fact, this isn't the case

3    involving political gerrymandering, which the courts

4    also don't want to go to.

5              But where the question is related to the

6    racial effect of -- of an election practice,

7    whatever it is, in here we're talking about a

8    dilution case, then the Supreme Court in Thornburg

9    versus Gingles rejected the causality defense.  I'm

10   embarrassed to say they actually relied on

11   discussion of the causality defense in a Law Review

12   article I published which they cited and quoted in

13   the text of Gingles.

14             But there are courts in cases involving

15   the election -- the method of electing judges who

16   have taken a different view of that question of the

17   causality question, which I think is -- is setting

18   up a standard of proof in a voting rights case

19   that's impossible for plaintiffs to meet because of

20   the multi-collinearity problem.

21        Q    Thank you.  We can put away Dr. Alford's

22   report now.

23             So let's move to your report, paragraph

24   49, top of page -- bottom of page 37, top of page

25   38.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 170

1      A    Okay.

2      Q    You make the statement there:  Because

3  minority voters routinely support Democratic

4  candidates, Republicans stood to benefit from making

5  registration and voting by minority citizens more

6  difficult.

7           You're not saying that Republicans

8  intentionally made it more difficult, correct?

9      A    That's correct.

10     Q    And in footnote 95 on page 38 you're

11  discussing Dr. Hood and Dr. McKee's report.  You'd

12  agree with me that Dr. Hood's report is a survey of

13  voter perception, not necessarily a survey of

14  particular election practices and their use; that

15  correct?

16     A    Let me -- let me work back to the Hood and

17  McKee.  Ask your question again.

18     Q    The Hood and McKee report you cite was a

19  survey of what voters perceived as issues, not what

20  were or were not actual issues of election

21  administration; is that correct?

22     A    I think that's correct now that I

23  understand your question.

24     Q    So you'd agree that it's a survey of voter

25  perception, not a study of particular election

Peyton McCrary , Ph.D.          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 171

1   practice?

2       A    That particular article which they

3   published is -- is not about the particular election

4   practice, yes.

5       Q    And you'd agree it's a survey of voter

6   perception?

7       A    I actually don't remember that aspect of

8   their article very well.

9       Q    Let's go to document 26.  We'll mark it as

10  Exhibit 20.

11          (Defendant's Exhibit 20 was marked for

12  identification.)

13      A    Yes, you were right.

14  BY MR. TYSON:

15      Q    The Hood and McKee article, you agree now,

16  having reviewed Exhibit 20, was a survey of voter

17  perception?

18      A    Yes.

19      Q    Okay, great.

20      A    I'm trying to see the context in which I

21  cited that.  That was actually a conclusory

22  statement they made in their article.

23      Q    Uh-huh.

24          And the conclusory statement that you're

25  referencing is the statement at the end of paragraph

Peyton McCrary , Ph.D.          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 172

1    49 of your report?

2        A    That's correct.

3        Q    Okay.  Let's skip ahead to paragraph 53 of

4    your report.  Now we're into the part of your report

5    about immigration and citizenship issues.  In

6    paragraph 53 you're discussing the state's adoption

7    of Senate Bill 529 in 2006.

8        A    Yes.

9        Q    You mentioned that two key provisions

10   required verification of citizenship for either

11   applications for employment or applications for

12   public benefits.

13           Is it unusual among states or have you

14   looked at other states to determine the rate at

15   which those states require citizenship verification

16   for either of those applications for public

17   benefits?

18       A    It's not uncommon for states to do that.

19   I was discussing the particular adoption in Georgia

20   and the things said in connection with justifying

21   it.

22       Q    In paragraph 54 you discuss that federal

23   funding -- there was a provision for state law

24   enforcement assisting in the enforcement of federal

25   immigration laws, and you mentioned federal funding.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 173

1    It's correct, isn't it, that it was federal law that

2    allowed local law enforcement to assist in enforcing

3    immigration laws, correct?

4         A    Yes, that's why there's a memorandum of

5    understanding between the federal agency and the

6    state.  In that particular sentence that's what I

7    was referring to.

8         Q    Okay.  On the top of page 43, the end of

9    paragraph 54 you say:  These new functions would

10   likely have a significant effect on the state's

11   Hispanic or perhaps Asian residents.

12            What are you using to determine what --

13   that there would likely have a significant effect on

14   Hispanic and Asian Georgians?

15        A    Well, I have to read the context in the

16   paragraph.

17            Well, I meant simply that most of the

18   persons who were noncitizens in Georgia were either

19   Hispanic or Asian, although one study suggested

20   there were also African noncitizens in significant

21   degree in certain Georgia counties along with

22   perhaps noncitizens from the Caribbean.

23        Q    In paragraph 55 you state that Governor

24   Perdue's statements when signing Senate Bill 529

25   used inflammatory language that rose to the level of

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 174

1    demagoguery.

2         A    Yes.

3         Q    How did you determine it was inflammatory

4    and rose to a level of demagoguery?

5         A    I read the sentence quoted in the next

6    sentence of that paragraph.

7         Q    Okay.  And on footnote 111 you indicate

8    that Lieutenant Governor Cagle or then State Senator

9    Cagle said the issue of dealing with the impact of

10   illegal aliens on the healthcare system is a

11   significant one for Georgia, and you're saying that

12   that was also incorrect, that there was not an issue

13   with undocumented individuals affecting healthcare

14   coverage in Georgia?

15        A    That's the conclusion I drew from the

16   study that I cite in subsequent paragraphs that, in

17   fact, the citizens don't -- noncitizens don't have

18   access to healthcare in Georgia.

19        Q    In paragraph -- sorry, in footnote 112 you

20   make a reference to the fact that individual D.A.

21   King was consulted by Senator Chip Rogers in

22   drafting Senate Bill 529, and you mentioned that

23   Senator Rogers was also a sponsor of the photo

24   identification requirements for voting.  What is the

25   connection between those two things?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 175

1      A     The photo ID requirement for voting that I

2   was referring to is the one struck down as

3   unconstitutional by Judge Harold Murphy.

4      Q     And my question was, how is Senator

5   Rogers's work in drafting Senate Bill 529 connected

6   to the fact that he was a sponsor for the photo

7   identification requirement?  Why are you making a

8   connection there?

9      A     Because it's an indication of his support

10   for placing difficulties in the path of voters as

11   consistent with -- actually, I guess it's not

12   relevant in the sense that SB 529 didn't relate to

13   voting, so I should have -- I should not have

14   mentioned that -- should not have included that

15   sentence because it's not an election bill.

16      Q     In paragraph 55 after Governor Perdue's

17   quote you make the statement:  The state's voting

18   process at the time, including a restrictive photo

19   identification requirement for in-person voting,

20   made the governor's claim of undocumented immigrants

21   voting extremely unlikely, unless local election

22   officials were routinely failing to enforce the law.

23           Do you agree that photo identification for

24   in-person voting helps avoid undocumented immigrants

25   from voting or illegal votes being cast?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 176

1      A    I agree it would do that.  I also would
2  add that there are other provisions protecting
3  against illegal aliens from voting in state law and
4  in federal law.
5      Q    Going to paragraph 56 you make a statement
6  at the end:  Hispanic groups warned that Georgia's
7  immigration crackdown would turn conservative
8  Hispanic voters away from the Republican Party.
9           If that was correct, wouldn't the
10  Republican Party be undermining its own ability to
11  win elections?
12      A    I'm not offering that as my own opinion as
13  much as I'm saying that's what the newspaper was
14  reporting -- the Associated Press story was
15  reporting, and I don't in fact -- I mean, I don't
16  know that there's evidence that there were a lot of
17  conservative Hispanic voters who voted for the
18  Republican Party.  That's just a part of the
19  discussion of the issue that newspaper coverage
20  revealed.  I'm not sure -- I'm not sure that it's
21  correct.
22      Q    Moving to paragraph 57 on page 45, you're
23  discussing a study from the Georgia Budget & Policy
24  Institute.
25      A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 177

1      Q    And are you aware if the Georgia Budget &

2    Policy Institute is considered to be a liberal

3    organization?

4      A    I have seen that somewhere, but this is a

5    detailed, documented report that I was quoting.

6      Q    So you're not concerned about any

7    particular political leanings of GBPI because the

8    report was very detailed?

9      A    Prior you were previously calling my

10   attention to a Brennan Center report.  The Brennan

11   Center is also regarded as a liberal organization in

12   general, but it often does very good work in a

13   variety of different ways.  And where there is

14   documentation for a point that is substantial, I pay

15   attention to -- whatever the political leanings of

16   the organization, I -- I'm focused on the evidence,

17   not on the political -- political leanings that are

18   attributed to an organization.

19     Q    Let's move forward to paragraph 60 which

20   addresses House Bill 87 from 2011.

21     A    Yes.

22     Q    So you state that House Bill 87 was among

23   the most controversial pieces of legislation in the

24   2011 session.  Was that based on the note from the

25   Georgia State Law Review?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 178

1      A    No, that particular statement is based on

2    all the newspaper coverage of the process by which

3    HB 87 was adopted and the demonstrations against it,

4    which were covered in the newspaper articles.

5      Q    Okay.  Was your conclusion based on the

6    newspaper coverage of House Bill 87?

7      A    Yes.  The Law Review note that I cited is

8    a detailed presentation of the legislative history

9    of HB 87 and a -- and an analysis of the content of

10   the bill.

11     Q    Moving to paragraph 61.

12     A    Okay.

13     Q    You indicate that there was a provision

14   that appeared to forbid racial profiling in HB 87,

15   correct?

16     A    Yes.

17     Q    Wouldn't that be a good thing in the bill,

18   or was it your conclusion that it was basically

19   useless based on your later statements in that

20   paragraph?

21     A    No, it would be a good thing.  And, in

22   fact, the court relied on that statement as a way of

23   addressing the question of racial profiling as I

24   recall.

25     Q    And --

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 179

1      A    My point was simply it's a very general

2    reference to constitutional protection.  It doesn't

3    specify any particular method of dealing with racial

4    profiling.

5      Q    Okay.  Would a prohibition on racial

6    profiling like in House Bill 87, would that be

7    something you would review if you were conducting a

8    review for discriminatory intent in the adoption of

9    House Bill 87, would that be relevant to that

10   component?

11     A    Yes, that would be one piece of evidence.

12          In this case I hope you're not suggesting

13   that I am arguing that a provision that appears to

14   forbid racial profiling would be evidence of

15   discriminatory intent because that is not the case.

16     Q    Oh, definitely not.  No, I was asking more

17   generally, I'm sorry.

18          Let's move to paragraph 62, and you

19   indicate that the crackdown against undocumented

20   immigrants would threaten to cause problems with

21   traditional Republican constituencies.  I guess one

22   of the things I struggled with was the immigration

23   discussion here is, is your report essentially

24   saying that the Republican majority is acting

25   irrationally when it passes immigration restrictions

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 180

1  because its key supporters oppose them, but it's

2  acting rationally when it's passing voting

3  restrictions because it serves a partisan interest?

4       A    I'm not arguing they're acting

5  irrationally.  I'm simply observing that the issue

6  of dealing with illegal immigration was more

7  important than their traditional -- than the

8  traditional Republican policies of assisting

9  business and the interest of agriculture.

10            In other words, it's a way of stressing

11  how salient the issue of illegal immigration was for

12  the Republican Party majority, and that observers

13  were pointing out the fact that business and

14  agricultural interests that benefited from illegal

15  immigration apparently were -- were often opposed to

16  the restrictions that the legislature was adopting

17  because of the economic difficulties it posed,

18  particularly to agriculture, but also for some

19  business interests where immigrant -- an immigrant

20  labor force was key.

21       Q    So let's move forward to paragraph 66,

22  Problems with Election Administration and Database

23  Matching.

24       A    Yes, I'm there.

25       Q    So first you say the subsequent compliance

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 181

1    with HAVA, the Help America Vote Act, was spotty and

2    reflected an uncertain grasp of what HAVA requires.

3    I believe we talked about things earlier.  Although

4    you teach some cases that involve election

5    administration, you don't have specialized training

6    or expertise in the administration of elections,

7    particularly as to compliance with HAVA, do you?

8        A    I don't have that as a specialty, but I

9    did research on HAVA compliance in preparing this

10   report.

11       Q    So have you ever prepared a report

12   previously involving a state's efforts at HAVA

13   compliance?

14       A    No.  What I'm relying on, of course, is

15   research on HAVA compliance in large part.

16       Q    The last sentence of paragraph 66 says:

17   This was especially true of the state's flawed

18   implementation of HAVA's requirements when states

19   use electronic database matching to create a voter

20   verification program.

21            So you agree that a voter verification

22   program is required under the Help America Vote Act,

23   correct?

24       A    Yes.

25       Q    You just disagree with how Georgia had

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 182

1    gone about implementing its voter verification

2    requirement?

3        A    If you mean I disagree -- that I'm

4    critical of how it operated and the effects of that

5    operation, yes.

6        Q    So at the top of page 55 in paragraph 67,

7    the first full sentence says:  The purpose of this

8    database matching was to identify the applicant as a

9    resident of the state and county and to confirm that

10   the person was a citizen of the United States.

11           So it's your testimony that the HAVA

12   requirements were designed to identify -- to confirm

13   citizenship as one component of the match, correct?

14       A    Of course.

15       Q    And then at the bottom of that paragraph,

16   the bottom of 67, you state that whether the

17   applicant was qualified under state law for

18   registration as a legal voter, in other words, was

19   left to the judgment of the states.

20           So you'd also agree that eligibility to

21   vote is also a question of state law, correct?

22       A    Yes, and as the sentence concludes, that's

23   why it was subject to the preclearance requirements

24   of Section 5.

25       Q    In paragraph 68 you discuss the Morales

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 183

1    case.

2         A    Yes.

3         Q    That case was a Section 5 enforcement

4    action, correct?

5         A    I think that's right.

6         Q    So a Section 5 enforcement action only

7    asks the question of whether a state had a change in

8    voting practices precleared, correct?

9         A    That's the legal issue the court's allowed

10   to address, yes.

11        Q    So a court would not be making a finding

12   related to the specific administration; the only

13   question is did you get it precleared or not, right?

14        A    As I said, that's what they had the

15   authority to address, but the court made factual

16   findings about the specific plaintiff and his

17   experiences.

18        Q    Do you know what the court ultimately

19   ordered in Morales as a remedy?

20        A    I read the case.  I don't recall, as I sit

21   here, how the case was finally resolved.

22        Q    Okay.  In paragraph 70 you state at the

23   end of that paragraph that "when DDS checks SAVE."

24   So is it your understanding the Department of Driver

25   Services is currently using the SAVE system to

Peyton McCrary , Ph.D.                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 184

1    verify citizenship of applicants for driver's

2    licenses?

3        A    I didn't investigate what DDS is currently

4    doing.  I was talking about what it was doing at

5    that time and how that relates to the state's -- the

6    Secretary of State's later claim that they had to

7    have SAVE in order to identify who was and wasn't a

8    noncitizen.  DDS was using SAVE all along, as I

9    understand the facts from the sources I cited.

10       Q    If DDS was not using SAVE all along to

11   verify citizenship, did that change your analysis or

12   your opinion in this case?

13       A    Well, it certainly would be a different

14   fact from what I reported, and my recollection is I

15   was actually looking at the law, and I'm -- I'm

16   quoting from the DDS website which cited a Georgia

17   code provision.  Are you saying that DDS was making

18   it up?

19       Q    I'm just asking if it would change your

20   analysis if DDS was not using SAVE.

21       A    It would change my analysis of that

22   particular point, yes.

23       Q    And is it your understanding that Georgia

24   currently uses SAVE at any point for verifying

25   citizenship either through SSA or through DDS?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 185

1        A    I don't recall looking at that question as

2    to how the current -- how DDS currently operates.

3        Q    If you could turn to page 59.  You

4    indicate that SSA had signed user agreements with 46

5    states to use the HAVV system.

6        A    I'm sorry, where are you referring me to?

7        Q    Top of page 59.

8        A    59.  Okay, I'm there.

9        Q    And the Social Security Administration's

10   matching process is the same for all 46 states and

11   territories that use the HAVV process; is that

12   right?

13       A    Yes.

14       Q    Do you know how many or did you look at --

15   actually, let me ask it this way:  Did you conduct

16   any analysis of what percentage of voters in the

17   voter verification process go through the HAVV

18   system from SSA?

19       A    I remember that is addressed in Michael

20   McDonald's report in the 2016 case; I just don't

21   remember what percentage that was.

22       Q    Okay.

23       A    It's a smaller percentage.  Most people go

24   through DDS verification, as I understand the facts.

25       Q    In paragraph 74 on page 60, your last

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                              Page 186

1    sentence says:  To be reliable, Georgia would have

2    to devise ways of checking and cleaning up its

3    database matching results to address these routine

4    human errors.

5              In your analysis of Georgia's voter

6    verification processes, did you look at the role of

7    registrars in reviewing the results of failures to

8    match?

9        A    Yes, in general.  That is to say, I looked

10   at the training materials that the registrars were

11   exposed to.  I took account of the declaration of a

12   recently retired voter registrar from a rural county

13   in Georgia, who said that that was -- that while she

14   did that kind of checking, she was never -- she was

15   never exposed to training that mandated that or

16   required that, and she just thought it was a good

17   practice to do.

18             But my recollection of what Gary

19   Bartlett's expert report said, and he did analyze

20   the whole process, is that there was no requirement

21   that registrars do that that the states enforce.  It

22   was obviously something that should have been done,

23   but the state -- Secretary of State's training

24   didn't really specifically require that as a part of

25   what registrars should do.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 187

1      Q    Going forward to paragraph 77, you

2    reference that:  Georgia sought preclearance of its

3    newly revised voter verification process from a

4    three-judge court in the District of Columbia as

5    well as through administrative review by the

6    Department of Justice.

7           That's allowed by the Voting Rights Act to

8    pursue both tracks, correct?

9      A    Sure.

10     Q    You indicate at the end of that paragraph

11   that then Attorney General Thurbert Baker refused to

12   file the lawsuit.  Are you aware of the prior

13   litigation between Governor Perdue and Attorney

14   General Baker regarding the scope of authority to

15   represent the state?

16     A    I am not, and I'm simply reporting that as

17   what a newspaper article reported.

18     Q    Paragraph 78 on the next page, you quote

19   the letter from the Department of Justice -- or

20   actually, I'm sorry, the federal court:  The

21   department informed the plaintiff that it did not

22   intend to object to the implementation of the

23   revised verification process.  And that's typical

24   language from the department, don't you agree, that

25   it's a failure to object, it's not an approval?

Peyton McCrary , Ph.D.                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 188

1      A     That's correct.

2      Q     And then you say in the next sentence:

3   The department agreed to preclear the process to

4   settle Georgia's lawsuit.

5            You're not saying the department was

6   forced to preclear in order to settle, correct?

7      A     No.  The point is if they didn't see a

8   basis for objection, they would settle the lawsuit.

9      Q     Paragraph 79 you reference the training

10  materials from a 2015 presentation:  For the

11  applicant who is registering to vote using their

12  driver's license number nothing changes.

13           Is it your understanding that those

14  individuals would not go through a matching process?

15     A     No, that's not --

16     Q     I'm sorry, I'm in the wrong section.  I'm

17  sorry.  We've already covered the piece I was going

18  to ask you about there.

19           So let me go to paragraph 80.  Sorry,

20  Dr. McCrary.  Are you doing good?  You need a break

21  or you doing okay?

22     A     Actually, if we can have a two-minute

23  break, that would be very helpful.

24     Q     Certainly.  Why don't we pause here and

25  take two minutes --

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 189

1        A     Thank you.

2        Q     -- and go off the record.  Thank you.

3              (Recess 3:42-3:49 p.m.)

4   BY MR. TYSON:

5        Q     Dr. McCrary, if you could move with me to

6   paragraph 80 of your report on page 65.

7        A     Yes.

8        Q     And in this paragraph you're describing

9   what is supposed to happen under the training

10  materials from the state if an individual fails a

11  verification process; is that fair to say?

12       A     Yes.

13       Q     There's a human check to determine if

14  there's transposition of numbers, problems with the

15  name, all those kinds of things, and the registrar

16  was able to correct that process, correct?

17       A     That's correct.

18       Q     Okay.  You say at the end of paragraph 80:

19  In my opinion, if preclearance had still been in

20  effect, the department would have objected to these

21  overly technical identification requirements and the

22  Secretary of State's use of a pending list.

23             What are you basing that opinion on?

24       A     Let me first review the paragraph in light

25  of that question.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 190

1          That is reference to the notification

2     letter which Gary Bartlett described as extremely

3     difficult to follow for most people and to the

4     complicated steps that had to be followed if you

5     fail -- if a -- if an applicant failed a voter

6     verification system.

7          Q    Yeah.  So this is a reference to the

8     entirety of the voter verification process?

9          A    No.

10          Q    This is your opinion the department would

11     have objected to the pending list and to this

12     particular letter that went after 40 days?

13          A    Had there been a voting change, and the

14     complication is that I'm not sure they -- the

15     information I had didn't make clear whether there

16     was a change that would have been subject to

17     preclearance before Shelby County was decided.

18          Q    You talk at the beginning of paragraph 81:

19     The central focus of the state voter verification

20     process was its use of an inflexible and

21     unsystematic exact match procedure for database

22     matching.

23          Why are you describing the process that

24     way when there was a human check as you described in

25     paragraph 80 for individuals who failed the matching

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 191

1    process?

2         A    Well, because it's not clear from the

3    evidence I have seen that that was actually done

4    systemically by the registrars.

5         Q    So it's your opinion that although the

6    state was instructing and had a process for it, the

7    registrars weren't doing their job to follow that

8    process; is that fair?

9         A    I haven't investigated whether they were

10   doing their job.  I have just observed that, based

11   on the training materials, it doesn't appear as if

12   that was particularly stressed or certainly mandated

13   by -- by the state.  But it's also -- the point I'm

14   making here is also that they were very much guided

15   by the failure of an applicant to match the voter

16   verification process through DDS or in some

17   instances through SSA, but the whole eNet system was

18   built around the failure to match.

19        Q    In paragraph 82 you discuss expert

20   database matching that used several different

21   algorithms to provide a more accurate result.

22        A    Yes.

23        Q    I'm assuming you have not done any sort of

24   technical verification of DDS's computers to

25   determine if they're able to run those different

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 194 of 270

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 192

1    algorithms, correct?

2         A    I have not.  My understanding from

3    descriptions is that they did not do it.  Whether

4    they had the capability of doing it, I'm not aware.

5         Q    Skipping ahead to paragraph 86, you

6    indicate that the DDS exact matching procedure is a

7    primitive method that is no longer an accepted

8    practice in the field, I believe quoting from

9    Dr. McDonald's report.  Do you see that statement?

10        A    That's correct.

11        Q    And you'd agree that the exact matching

12   process is still what's used by the Social Security

13   Administration, correct?

14        A    Yes, and as I pointed out the Inspector

15   General in his report said that it was a very --

16   very faulty method because of the results it

17   produced.

18        Q    Now, in these paragraphs kind of running

19   through your explanation of Dr. McDonald's report,

20   you are aware that the system Dr. McDonald analyzed

21   is no longer the law in Georgia, correct?

22        A    That's correct, he was analyzing an

23   earlier period.

24        Q    In paragraph 90, if you can skip ahead

25   there with me.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 193

1        A     Okay.

2        Q     Last sentence you report Dr. McDonald's

3   conclusion that the practice of requiring an exact

4   match has a clear discriminatory effect, and is that

5   based solely on the overrepresentation of particular

6   racial groups versus their total population from the

7   prior paragraph?

8        A     Yes.  You mean Professor McDonald's

9   conclusion, yes.

10        Q     Yes, that you're reporting.

11        A     Yes.

12        Q     In paragraph 91 you quote Dr. McDonald

13   again saying that a voter registration application

14   is effectively a literacy and writing test.  Do you

15   agree with that statement?

16        A     Well, the one caveat I would place here is

17   the term "application," as I understand it,

18   refers -- in that sentence refers to the whole

19   process, including the application form, but, more

20   particularly, the notification letter if the person

21   fails the voter verification first step, and the

22   process of using the state's website to deal with

23   how to satisfy the voter verification process.  In

24   other words, the whole application process, not just

25   the application form itself.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 194

1        Q      Paragraph 93 on page 75 --

2        A      Yes.

3        Q      -- you make a note that the process was

4    especially difficult for individuals with lower

5    educational achievement.  Are you relying solely on

6    Mr. Bartlett for that conclusion -- or that

7    statement, sorry?

8        A      Sorry, where are you?

9        Q      Paragraph 93.

10        A      You mean --

11        Q      93, the first sentence.

12        A      I am quoting him, but I also agree with

13    that.

14        Q      But you're relying on him for that

15    statement.  You haven't conducted an independent

16    analysis of the difficulty for individuals with

17    lower educational achievement?

18        A      That's correct, but recall in the next

19    sentence I'm citing the literature of political

20    scientists writing about the relationship between

21    socioeconomic characteristics, such as educational

22    achievement, and participation in the political

23    process.

24        Q      So, in other words, any government policy

25    that was difficult for individuals with lower

Page 195

1    educational achievement would, by necessity, be --

2    also have a racially discriminatory effect?

3        A    No, only if there was an observed racial

4    effect.  I mean, not all persons with lower

5    educational achievement are members of a minority

6    group after all.  Political scientists aren't just

7    referring to racial minorities when they talk about

8    the relationship between socioeconomic

9    characteristics and political participation.

10       Q    Going to page 77, the last part of

11   paragraph 94 there at the top of page 77.

12       A    Okay.

13       Q    And you're concluding in short there were

14   consistent racial disparities in the socioeconomic

15   characteristics usually affecting participation

16   rates, and the same disparities are likely to have a

17   significant impact on the ability to remedy exact

18   match failures in the state's flawed voter

19   verification program.

20            The way I read this you're saying it's

21   likely, but you can't say for certain that it would

22   have a significant impact; is that right?

23       A    That's correct, it's an inference I've

24   drawn.

25       Q    On the next page you're discussing the

Page 196

1    allegations of a lawsuit brought in 2016, and you

2    talk about the allegation of the cancellation rate

3    for African-American applicants was higher than that

4    rate for white applicants.  What I want to ask about

5    is the next sentence you say:  According to the

6    plaintiffs, the same discriminatory effect was clear

7    as well in non-matches on the question of

8    citizenship.

9           Is the use of "discriminatory effect" here

10   based solely on the fact that a cancellation rate

11   for African-Americans was higher than for white

12   voters?

13       A    We're talking now about the complaint in

14   the case, right?

15       Q    Correct.

16       A    And I'm quoting from the complaint before

17   I started talking about the experts.  Can you repeat

18   the question again now that I've clarified where we

19   are?

20       Q    Certainly, and I'll put a finer point on

21   it here too.  I understand that you're reporting

22   what the plaintiffs had claimed in this lawsuit.  My

23   question is:  The use of the word "discriminatory

24   effect" there, would you use the term

25   "discriminatory effects" to describe a process where

Page 197

1    the cancellation rate for African-Americans was
2    higher than for white applicants alone, or would you
3    have to have more information to conclude there was
4    a discriminatory effect?
5         A    So you're not asking about the next
6    sentence, which you did earlier, right?  Citizenship
7    sentence.
8         Q    What I'm zeroing in on is the "same
9    discriminatory effects," that phrase in the
10   "According to the plaintiffs" sentence on page 78.
11        A    Uh-huh.
12        Q    And your opinion in this case is that
13   there was a racially discriminatory effect of the
14   voter verification process.
15        A    Yes.
16        Q    Here we seem to be talking about a
17   discriminatory effect based solely on the
18   differential between the cancellation rate for
19   African-American applicants and white applicants.
20   So my question to you is:  Is that all you need to
21   determine there's a racially discriminatory effect
22   is a differential rate, or do you need something
23   more than that?
24        A    Well, differential rate of cancellation is
25   a very strong piece of evidence.  Of course, there

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 198

1    is a lot more evidence deduced in the expert reports

2    I'm citing, and -- but if you're asking whether the

3    rates of rejection are sufficient to show a

4    discriminatory effect, the answer is yes.

5         Q     Okay.  Going to page 80, paragraph 98.

6         A     Okay.

7         Q     We're now to another piece of legislation

8    where you say undermines the equitable

9    implementation of the settlements about the voter

10   verification process.  Do you know if anyone moved

11   to enforce the settlement agreement in that case as

12   a result of that legislation passing?

13        A     You mean other than the fact that the

14   plaintiffs filed a subsequent lawsuit in the

15   aftermath of HB 268?

16        Q     That's your understanding of the further

17   action after the settlement was the new lawsuit

18   filed in 2018?

19        A     Yes.

20        Q     Paragraph 99 on page 81 you again make a

21   statement of a law that would likely have been

22   objected to by the department.  And you, as I

23   understood it, never reviewed the files on the old

24   voter verification process, you weren't involved in

25   that administrative preclearance process, right?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 199

1         A     That's correct.

2         Q     And so what is the basis for your

3    statement that the administrative implementation of

4    House Bill -- HB 268 in 2017 would likely have been

5    objectable?  Objectionable, sorry?

6         A     My knowledge of the standards applied by

7    the government in -- in enforcing the preclearance

8    requirement when it existed is the principal basis

9    for that along with the facts regarding HB 268 and

10   the context in which it was adopted, that is,

11   immediately following the settlement agreement of

12   the 2016 lawsuit.

13        Q     Later in paragraph 99, you state:  Because

14   the state now implemented voting changes -- sorry,

15   top of page 82:  Because the state now implemented

16   voting changes with a racially discriminatory effect

17   knowing that it would have that effect, this voting

18   change would have been adopted with a racially

19   discriminatory purpose.

20              So I read this as you're saying that there

21   was discriminatory intent in the adoption of House

22   Bill 268; is that right?

23        A     That's inartfully worded.  What I meant

24   was that it would have been objectionable under the

25   intent or purpose prong of Section 5 review, that is

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 200

1    to say that the state could not have met its burden

2    of proving that it didn't have a discriminatory

3    purpose because of the strong evidence presented in

4    the 2016 lawsuit that had caused the state to settle

5    that voting case in a way that satisfied the

6    plaintiffs.

7         Q    So this isn't saying this was

8    discriminatory intent for purposes of the 15th

9    Amendment --

10        A    No.

11        Q    -- this is lack of being able to meet

12   Section 5 standard for preclearance, correct?

13        A    That's correct.  That's why I said it was

14   inartfully worded on my part.  I apologize.

15        Q    We can go forward to paragraph 104 on page

16   85.

17        A    Okay.

18        Q    You relate the story of Mr. Oren and his

19   experience sending in his application with his

20   naturalization certificate.  Do you recall what

21   county Mr. Oren -- what county registrar Mr. Oren

22   was dealing with?

23        A    I don't recall with any precision.  I have

24   a general sense -- I mean, I have -- I have a

25   recollection that I'm not comfortable relying on

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 201

1    that it was Fulton County.

2        Q    I thought it was Fulton as well.  I hadn't

3    gone back and checked.  We're both thinking the same

4    thing.

5        A    Don't take that to the bank.  I don't

6    recall with sufficient clarity.

7        Q    Certainly.  So let's go forward to

8    paragraph 108 on page 88.

9        A    Okay.

10       Q    And this is reporting the racial makeup of

11   individuals flagged as potential noncitizens from

12   Dr. McDonald's declaration.  Do you know if

13   Dr. McDonald looked at the pool of -- sorry.  Do you

14   know what basically the denominator was for

15   Dr. McDonald's conclusions here what group was he

16   looking at?  Was he looking at all applicants, all

17   voters, or was he looking at only voters who

18   submitted a paper application, do you know?  I think

19   it was to all voters.

20       A    My recollection is it was to all

21   applicants, but I would naturally prefer reviewing

22   the report to check my recollection.

23       Q    Certainly.  So let's go forward to page 91

24   and paragraph 112.

25       A    Okay.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 202

1      Q    And so you now were reporting the adoption

2    of House Bill 316, which I believe we mentioned

3    earlier.

4      A    Yes.

5      Q    And so you'd agree that the law on

6    Georgia's voter verification process has changed,

7    correct?

8      A    Yes.

9      Q    And you say at the end -- on the next page

10   at the end of paragraph 112 that whether House Bill

11   316 fully resolves the issues in the exact match

12   case remains to be seen.  And so we're -- we're at a

13   point of we're not sure if that's going to be enough

14   to satisfy the judge in that case, or what do you

15   mean in terms of resolve the issues in the exact

16   match case?

17     A    Well, as I recall HB 316 hasn't been

18   implemented in an election, has it?

19     Q    We have one coming up in a couple weeks.

20     A    You used the future test there, right?

21     Q    We had to delay -- it should have already

22   happened by now, but we had to push it out because

23   of COVID.

24     A    Yes.

25     Q    So when you say resolve the issues in the

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 203

1    exact match case, you're saying you need to see an

2    election run using the provisions of House Bill 316

3    to make that determination?

4         A    At a minimum, yeah.

5         Q    Let's forward to page 95, paragraph 117.

6         A    Okay.

7         Q    And you referenced that voters who failed

8    the verification process were to be classified as

9    active with an MIDR requirement.  You report that

10   Dr. Mayer says those individuals face additional

11   identification requirements.  Your understanding, is

12   it consistent with Dr. Mayer's that MIDR means

13   additional identification requirements or fewer

14   identification requirements under Georgia law?

15        A    Would you repeat your question?

16        Q    Sure.  It was a terribly worded question.

17             Is it your understanding that a voter who

18   is flagged active with an MIDR flag faces additional

19   identification requirements or fewer identification

20   requirements than an active status voter?

21        A    I'm still not sure I understand your

22   question.

23        Q    Okay.  Let me try -- take another run at

24   it.  You're reporting in paragraph 117 that

25   individuals who are in MIDR status because they

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 204

1   failed verification face additional identification

2   requirements, and you're relying on Dr. Mayer for

3   that statement.  You see where that is in the middle

4   of 117?

5        A    Yes, that's what he's saying, but I'm

6   still not sure I understand your question.

7        Q    My question is:  Did you do any analysis

8   of what MIDR status means?

9        A    Yes.  I don't recall with any

10  particularity, as I sit here, exactly what I found,

11  but I did look -- I did read documents that

12  explained exactly what it meant.

13       Q    And so it's your understanding that MIDR

14  status means additional identification requirements

15  for a voter, correct?

16       A    Well, it means that they have to supply --

17  they have to supply identification because it was

18  not -- it was not evident in the -- in the voter

19  verification process.  It may already have been in

20  their files, for example, or they may have -- they

21  may possess documentation showing, for example, that

22  they were naturalized, so that -- that's what I

23  believe Professor Mayer meant when he referred to

24  additional identification requirements.

25             You know, part of the problem seems to be,

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 205

1    according to, I think, Gary Bartlett's analysis and

2    some of the other documents I saw, is that

3    registrars don't always check their files to see

4    what's actually in their files because there are

5    examples of persons who were naturalized citizens

6    and showed the documentation when they first

7    applied, and the registrar hadn't -- hadn't picked

8    up on what was actually in their file, their

9    application file.

10            So, you know, the point is they have to

11   supply identification which -- even if it's in the

12   file, I think it's providing additional

13   identification.

14       Q    And when you -- Mr. Bartlett has not

15   reviewed the new process that exists under House

16   Bill 316 and the official election bulletin issued

17   pursuant to that statute, right?

18       A    That's correct.  His report was in 2016.

19       Q    Let's go to page 97.

20       A    Okay.

21       Q    Paragraph 120 -- paragraph 120 you

22   reference individuals who were in pending status for

23   reasons other than citizenship verification.  Do you

24   see that?

25       A    Yes.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 206

1      Q    Last sentence says:  Again these data

2  reveal an impact of these missing data "falls most

3  heavily on minority registrants."  See that

4  statement?

5      A    I'm not seeing it.  Where is it?

6      Q    The last sentence of paragraph 120.

7      A    Yes.

8      Q    It's not your testimony if a voter doesn't

9  sign his or her voter application that that

10  application should be put into active status, right?

11      A    I'm sorry?  Would you repeat the question?

12      Q    You say -- yes.  It's not your testimony

13  that a voter who does not sign a voter registration

14  application should have that application put into

15  active status, correct?

16      A    I don't know why that's inferred from

17  anything in paragraph 120.

18      Q    First sentence of paragraph 120 says

19  individuals that you're identifying with continuing

20  racial disparity are in that status because of

21  missing information or lack of a signature.

22      A    That's what Professor Mayer was saying,

23  yes.

24      Q    Right.  And so my question is:  You're not

25  saying that voter registration applications that

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 207

1    lack a signature should be processed with no further

2    action by the registrar, are you?

3         A    The registrar should call attention of the

4    applicant to the fact that he didn't sign -- he or

5    she didn't sign the document.

6         Q    And do you know if that's the process

7    that's used in Georgia if there's missing

8    information like that?

9         A    I don't -- I don't know that it is or

10   isn't because I haven't investigated all the actions

11   of the registrars, but I -- I think that if you

12   recall the declaration of the former registrar whose

13   name I'm blanking on at the moment that I cited

14   earlier, she said she would have checked, and she

15   would have presumably contacted the citizen who

16   applied to say you didn't sign your application

17   form.  That's just routine, good practice.

18        Q    Let's move to the conclusion section of

19   your report on page 98.

20        A    Okay.

21        Q    First of all we have, kind of again coming

22   back to our structure, paragraph 122 summarizes your

23   opinion about the persistent discriminatory effects

24   on minority voters' opportunity to register and vote

25   by Georgia's implementation of its voter

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 208

1    verification process under HAVA; that correct?

2        A    Yes.

3        Q    In that paragraph you refer to a

4    cumbersome and decentralized system of

5    decision-making of individual voter verification.

6    Did you discuss that somewhere in the report because

7    I don't remember addressing the cumbersome and

8    decentralized system of decision-making directly in

9    the report.

10       A    You were asking me questions about part of

11   what I was discussing in that sentence already in

12   this deposition.  The decentralized system is a

13   system in which the Secretary of State's office has

14   some role in the process in carrying out the voter

15   verification process of the databases, and then the

16   state relies on each local registrar or board of

17   registrars to make the final decision.  That's what

18   I meant by decentralized system.

19           The cumbersome reference is to the -- the

20   character of the exact match system, which is

21   cumbersome and inaccurate and flawed and achieves

22   more disenfranchising effect than would be

23   justified.

24           So I think we've covered that a good bit

25   in this deposition because it's covered a good bit

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 209

1    in the report.

2        Q    Okay.  Then paragraph 123 seems to go to

3    your second major area, the current pattern has its

4    analogue in the system of voter registration in the

5    Jim Crow era before 1965.  Then you make a

6    comparison to the complexity of the literacy test

7    used by Georgia between 1945 and 1965 with the

8    difficulties that minority voters face in dealing

9    with Georgia's voter verification system since 2008.

10   You're a historian.  You study history.  Do you

11   really think it is -- it's comparable to the

12   disenfranchisement of the Jim Crow law?  That's what

13   you're saying in this report, and that's a pretty

14   bold statement to me.

15       A    First of all, you're talking about

16   problems of vote denial or abridgment in both

17   instances.  It's not a question of dilution.

18            Secondly, there is an observed

19   discriminatory effect against minority citizens in

20   both periods.  The discrimination was more dramatic

21   in its -- in its numerical effects in the period

22   before 1965, but there's -- there is a

23   discriminatory effect in both patterns.

24            It's also true that there is evidence of

25   intentional discrimination in the application of the

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 210

1   literacy tests and other aspects of the registration
2   process in Georgia before 1965, and I'm not -- I'm
3   not actually concluding that there is a
4   discriminatory intent underlying the use of voter
5   verification system by Georgia in the current -- in
6   the current system, but I do see similarities.  But
7   obviously they are somewhat different as well as
8   somewhat similar.
9        Q    Then paragraph 124 covers the third area,
10   the resembling of the politics of Georgia before the
11   1965 Voting Rights Act.  I know we covered this,
12   but, again, at the very last sentence you referenced
13   a powerful incentive for Republican officials to
14   place hurdles in the path of minority citizens
15   seeking to register and vote, but there is no
16   testimony here that that is intentional in this --
17   in this report, correct?
18        A    That's correct.
19        Q    Dr. McCrary, do you have any other
20   opinions related to the issues in this case that are
21   not addressed in your report or that we have not
22   covered today in this deposition?
23        A    Not that I -- not that I can think of.
24        Q    Okay.  Sitting here today you can't think
25   of any others?

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 211

1      A     No.  I suppose I could be asked questions

2    in trial testimony that would raise another issue

3    that I didn't address in the report, and to answer

4    the question I might have to address the subject

5    matter of the question, but it's not -- it's not my

6    intention to offer an additional -- an additional

7    opinion unless there were a rebuttal report

8    criticizing my analysis, in which case I would

9    expect to be able to reply.

10     Q     Certainly.  Thank you.  And for your

11   reference, we are not planning to offer a rebuttal

12   report to your report, so we'll be in good shape

13   there.

14     A     Okay.

15     Q     Dr. McCrary, that's all the questions I

16   have.  Ms. Fink may have some questions for you, or

17   we'll see where we go from here.

18           MS. FINK:  If we can take a break.  We can

19   go off the record.  Let's take just a 10-minute

20   break.

21           MR. TYSON:  Certainly.

22           (Recess 4:26-4:30 p.m.)

23           MS. FINK:  I don't have any questions for

24   Dr. McCrary.

25           MR. TYSON:  Well, thank you for your time,

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 212

1    Dr. McCrary.   Hope you have a good weekend.

2              THE WITNESS:   Do my best.

3              (Deposition concluded at 4:30 p.m.)

4              (Signature reserved.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 213

1              The following reporter and firm
    disclosures were presented by me at this proceeding
2    for review by counsel:
3                    REPORTER DISCLOSURES
4              The following representations and
    disclosures are made in compliance with Georgia Law,
5    more specifically:
6              Article 10 (B) of the Rules and
    Regulations of the Board of Court Reporting
    (disclosure forms)
7              OCGA Section 9-11-28 (c) (disqualification
    of reporter for financial interest)
8              OCGA Sections 15-14-37 (a) and (b)
    (prohibitions against contracts except on a
9    case-by-case basis).
10   - I am a certified court reporter in the State of
    Georgia.
11   - I am a subcontractor for Veritext.
    - I have been assigned to make a complete and
12   accurate record of these proceedings.
    - I have no relationship of interest in the matter
13   on which I am about to report which would disqualify
    me from making a verbatim record or maintaining my
14   obligation of impartiality in compliance with the
    Code of Professional Ethics.
15   - I have no direct contract with any party in this
    action, and my compensation is determined solely by
16   the terms of my subcontractor agreement.
17
18                    FIRM DISCLOSURES
19   - Veritext was contacted to provide reporting
    services by the noticing or taking attorney in this
20   matter.
    - There is no agreement in place that is prohibited
21   by OCGA 15-14-37 (a) and (b).  Any case-specific
    discounts are automatically applied to all parties,
22   at such time as any party receives a discount.
    - Transcripts:  The transcript of this proceeding as
23   produced will be a true, correct, and complete
    record of the colloquies, questions, and answers as
24   submitted by the certified court reporter.
    - Exhibits:  No changes will be made to the exhibits
25   as submitted by the reporter, attorneys, or
    witnesses.

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 214

1    - Password-Protected Access:  Transcripts and

     exhibits relating to this proceeding will be

2    uploaded to a password-protected repository, to

     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 215

```
 1                    CERTIFICATE
 2   STATE OF GEORGIA:
     COUNTY OF FULTON:
 3
 4          I hereby certify that the foregoing
     transcript was taken down remotely, as stated in the
 5   caption, and the colloquies, questions and answers
     were reduced to typewriting under my direction; that
 6   the transcript is a true and correct record of the
     evidence given upon said proceeding.
 7          I further certify that I am not a relative
     or employee or attorney of any party, nor am I
 8   financially interested in the outcome of this
     action.
 9          I have no relationship of interest in this
     matter which would disqualify me from maintaining my
10   obligation of impartiality in compliance with the
     Code of Professional Ethics.
11          I have no direct contract with any party
     in this action and my compensation is based solely
12   on the terms of my subcontractor agreement.
            Nothing in the arrangements made for this
13   proceeding impacts my absolute commitment to serve
     all parties as an impartial officer of the court.
14
15          Th
16
17
18   _____
19        ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25
```

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 216

1   To:   Sarah Fink

2   Re: Signature of Deponent  Payton McCrary

3   Date Errata due back at our offices: 30 Days

4

5   Greetings:

6   This deposition has been requested for read and sign
    by the deponent.  It is the deponent's

7   responsibility to review the transcript, noting any
    changes or corrections on the attached PDF Errata.

8   The deponent may fill out the Errata electronically
    or print and fill out manually.

9

    Once the Errata is signed by the deponent and

10  notarized, please mail it to the offices of Veritext
    (below).

11

    When the signed Errata is returned to us, we will

12  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies

13  of the Errata to all ordering parties.

14  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the

15  court without the signature of the deponent.

16

17  Please send completed Errata to:

18  Veritext Production Facility

19  20 Mansell Court, Suite 300

20  Roswell, GA 30076

21  (770) 343-9696

22

23

24

25

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 217

1    ERRATA for ASSIGNMENT #4116077

2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that

3

4    ___ There are no changes noted.

5    ___ The following changes are noted:

6

     Pursuant to Rule 30(7)(e) of the Federal Rules of

7    Civil Procedure and/or OCGA 9-11-30(e), any changes
     in form or substance which you desire to make to

8    your testimony shall be entered upon the deposition
     with a statement of the reasons given for making

9    them.  To assist you in making any such corrections,
     please use the form below.  If additional pages are

10   necessary, please furnish same and attach.

11   Page No._____Line No._____Change to_____

12   _____

13   Reason for change_____

14   Page No._____Line No._____Change to_____

15   _____

16   Reason for change_____

17   Page No._____Line No._____Change to_____

18   _____

19   Reason for change_____

20   Page No._____Line No._____Change to_____

21   _____

22   Reason for change_____

23   Page No._____Line No._____Change to_____

24   _____

25   Reason for change_____

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

                                                    Page 218

1    Page No._____Line No._____Change to_____

2    _____

3    Reason for change_____

4    Page No._____Line No._____Change to_____

5    _____

6    Reason for change_____

7    Page No._____Line No._____Change to_____

8    _____

9    Reason for change_____

10   Page No._____Line No._____Change to_____

11   _____

12   Reason for change_____

13   Page No._____Line No._____Change to_____

14   _____

15   Reason for change_____

16   Page No._____Line No._____Change to_____

17   _____

18   Reason for change_____

19

                        _____

20                        DEPONENT'S SIGNATURE

21   Sworn to and subscribed before me this_____day of

     _____, 20___.

22

23   _____

     NOTARY PUBLIC

24

25   My Commission Expires:_____

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[& - 2006]**                                                      Page 1

**&**

**&**   4:13 176:23
   177:1

**0**

**01**   10:25
**03**   29:10,20
**04**   35:2
**05391**   1:7
**07**   39:9

**1**

**1**   2:4 11:3 19:5
   69:6 118:4 136:6
   139:15 140:5
**10**   2:24 68:7,13
   119:21 128:7,7,8
   148:2 164:14
   211:19 213:5
**103**   19:6
**104**   200:15
**105**   39:23
**108**   201:8
**109**   44:7
**1099**   4:6
**11**   2:4,25 88:19
   97:8,9 120:7
   121:10 138:1,2
**111**   174:7
**112**   174:19 201:24
   202:10
**115**   46:20
**116**   47:18,23,24
**117**   48:11 203:5,24
   204:4
**118**   52:20
**1180**   4:14
**11:10-11:21**   64:4
**11th**   38:14
**12**   3:1 91:19,21
   101:10,14 136:19
   139:3,4

**120**   205:21,21
   206:6,17,18
**1207**   2:25
**122**   207:22
**123**   209:2
**124**   210:9
**126**   53:16
**1275**   35:24
**1276**   35:21,23
**1277**   35:24 36:15
**128**   2:24 55:17,18
**12:34-1:23**   111:22
**13**   3:2,7 127:21,22
   140:9,10,11,12
   166:5,15
**130**   101:13,16
**13609**   215:17
**138**   2:25
**139**   3:1
**14**   3:3 105:11
   137:25 140:21,22
**140**   3:2,3,8
**144**   3:10
**14th**   4:6
**15**   3:9 46:20 65:12
   90:18 139:3 144:8
   144:9
**15-14-37**   213:8,21
**154**   3:11
**155**   3:12
**156**   3:13
**15th**   200:8
**16**   3:11 89:7,10
   140:3,4 154:2,3
**1600**   5:5
**162**   3:15
**1650**   4:15
**17**   3:12 136:18
   140:21 155:19,20
**171**   3:21

**177**   141:15
**18**   2:5,6 3:13
   90:18 98:7,15
   144:7 156:5,6
**180**   101:12,12
**19**   3:14 72:4 76:10
   98:16,24 137:4
   144:17,18 154:1
   162:2,3,25
**1901**   38:16
**1940s**   63:16
**1945**   209:7
**1946**   24:23
**1960**   25:13
**1960s**   49:8 50:16
   103:7 117:7
**1961**   20:16 22:19
**1962**   24:15
**1963**   19:24
**1965**   20:17 22:17
   55:5 69:13,24
   87:8 119:25
   120:11 124:19,23
   125:14,22 142:9
   142:12 149:15
   209:5,7,22 210:2
   210:11
**1966**   20:19
**1970s**   49:8 50:16
**1972**   20:20
**1980**   88:4 116:7
**1980s**   41:3 43:4
   45:22 63:6,8,17
   88:5
**1985**   26:25
**1986**   24:23
**1988**   27:20
**1989**   39:19
**1990**   27:5 74:2,4
**1990s**   37:21 46:11
   76:10 88:8 150:3

**1991**   137:15,17
**1993**   138:9
**1994**   3:1 137:20
   138:24 139:19
**1995**   35:4
**1997**   3:7,8 140:4
   141:2,5
**1999**   111:15
**1:18**   1:7

**2**

**2**   2:5 15:16 18:11
   18:13 19:10 36:11
   47:7 54:6,12 55:2
   69:15 72:9 80:20
   81:14,18,25 82:13
   93:2 105:5 112:3
   122:6 124:5 140:6
   140:6 143:4
**20**   3:16 40:9 111:2
   111:8,15,18
   123:16 144:17
   155:19 164:10
   171:10,11,16
   216:19 218:21
**200**   5:6
**2000**   141:18
**20005**   4:8
**2001**   25:4 30:5
   76:7 144:4
**2002**   27:14 147:18
   148:18,23 149:16
   149:20,20 150:5
**2003**   25:15
**2004**   142:12,16
   149:9 152:8 153:1
   158:17
**2005**   71:4
**2006**   26:6 34:15,22
   71:4 119:14
   124:17 125:24
   149:10 172:7

Peyton McCrary , Ph.D.                                                   May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[2007 - 85]**                                                             Page 2

**2007**   77:5
**2008**   3:11 136:22
   136:23,24 152:3,7
   152:17 153:2,9
   154:7,16,23
   155:15 209:9
**2009**   77:5 123:9
   151:3
**2010**   88:16 96:13
**2011**   77:17 78:9
   177:20,24
**2012**   3:12 155:18
   155:22,25 163:3
**2013**   81:16
**2014**   150:17,22
**2015**   188:10
**2016**   148:4 185:20
   196:1 199:12
   200:4 205:18
**2017**   199:4
**2018**   3:13,19 11:16
   151:12,18 152:1
   155:18 156:5,10
   159:22 160:19
   161:7,9 198:18
**2019**   114:14
**2020**   1:14 17:5,15
   215:15
**20th**   38:19
**21**   104:16 106:2
   138:8 141:14
   156:4
**21-2-234**   138:14
**2138**   1:17 215:19
**21st**   3:9 144:3,14
**22**   1:14 162:1
**229**   32:16
**235**   34:3,7
**24**   137:3 138:11
**25**   65:13 137:19

**26**   78:20 141:13,21
   171:9
**268**   198:15 199:4,9
   199:22
**28**   3:8 90:11
**29**   2:8
**2:42-2:52**   159:4

**3**

**3**   2:6 18:16,20,25
   19:12 24:13,15
   27:6,9,17 29:9
   71:12 112:2 122:6
   124:5 128:16
   141:6
**30**   150:1 216:3
   217:6
**300**   9:24 113:7
   216:19
**30076**   216:20
**30309**   4:16
**30339**   5:7
**316**   114:14 202:2
   202:11,17 203:2
   205:16
**32**   71:23 137:13
   157:10
**34**   105:9,11 106:2
**343-9696**   216:21
**35**   2:10 146:25
**36**   30:15,16 147:10
   161:24 168:8
**37**   32:16 144:2
   169:24
**38**   34:7 169:25
   170:10
**39**   2:13 148:13,19
**3:42-3:49**   189:3

**4**

**4**   2:7 29:21,22
   67:11 68:5

**40**   23:11 115:16
   149:11 150:1
   190:12
**41**   149:23 151:7
**4116077**   217:1
**43**   152:20 173:8
**45**   152:2 176:22
**46**   158:21 159:8
   185:4,10
**47**   160:1 161:1
   167:1 168:5
**48**   161:4
**49**   169:24 172:1
**4:26-4:30**   211:22
**4:30**   212:3
**4b**   3:11,12,13
   154:6

**5**

**5**   2:9 22:23 31:1,5
   31:10,14 32:4
   33:18 35:7,9
   77:18 81:21 82:8
   82:10 104:20
   110:3 113:21
   141:4 142:2,25
   143:3 163:4
   164:14 182:24
   183:3,6 199:25
   200:12
**50**   39:5 92:8,10
**50,000**   151:14
**50s**   63:16
**51**   92:8,10 93:12
**52**   95:16
**529**   172:7 173:24
   174:22 175:5,12
**53**   172:3,6
**54**   172:22 173:9
**55**   173:23 175:16
   182:6

**56**   176:5
**57**   176:22
**59**   185:3,7,8

**6**

**6**   2:11 39:14,15
   99:1 119:3
**60**   177:19 185:25
**60s**   63:16
**61**   178:11
**62**   179:18
**65**   22:19 189:6
**66**   180:21 181:16
**67**   182:6,16
**68**   2:18 182:25

**7**

**7**   2:14 3:24 39:11
   68:10,11 119:21
   217:6
**70**   183:22
**702**   53:2,7
**74**   185:25
**75**   194:1
**77**   187:1 195:10,11
**770**   216:21
**78**   187:18 197:10
**79**   153:21 157:7,9
   157:13,16 188:9

**8**

**8**   2:19 89:3,4 97:6
   97:10 105:14,17
   106:5,9,16 119:2
   121:10
**80**   188:19 189:6,18
   190:25 198:5
**81**   190:18 198:20
**82**   191:19 199:15
**83**   97:12,15
**84**   97:12,15
**85**   200:16

Peyton McCrary , Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[86 - administration's]**
Page 3

**86**  159:12 192:5
**87**  177:20,22 178:3
  178:6,9,14 179:6,9
**88**  201:8
**89**  2:20 161:11,24
  167:20
**8th**  4:7 215:15

**9**

**9**  2:21 91:21,22
  97:5 101:11,14
  119:12 162:24
**9-11-28**  213:7
**9-11-30**  217:7
**90**  25:13 161:12
  192:24
**91**  2:23 193:12
  201:23
**93**  194:1,9,11
**94**  141:11 195:11
**95**  170:10 203:5
**97**  141:11 205:19
**98**  198:5 207:19
**99**  198:20 199:13
**9:41**  1:15

**a**

**a.m.**  1:15 64:4
**abby**  28:21
**abigail**  27:19
**ability**  73:4 176:10
  195:17
**able**  12:25 30:14
  40:17 41:12
  115:20 121:2
  131:7,11 189:16
  191:25 200:11
  211:9
**abraham**  21:9
**abrams**  151:13
**abridge**  55:14

**abridgment**  55:4
  70:6 72:15 80:25
  81:11,23,25 82:21
  82:24 86:17
  209:16
**absentee**  129:15
  131:15
**absolute**  215:13
**absolutely**  7:23
  17:23 103:8
**academe**  57:21
  58:4
**academic**  60:4
  116:13
**academics**  57:14
  60:2
**accelerating**
  148:18
**acceptable**  6:9,15
**accepted**  192:7
**access**  18:2 41:2,9
  41:14,23 174:18
  214:1,2
**accidentally**  88:23
**account**  43:6
  70:22 124:18
  186:11
**accounts**  40:12,18
  42:10
**accurate**  191:21
  213:12
**accused**  50:22
  86:2
**achievement**
  194:5,17,22 195:1
  195:5
**achieves**  208:21
**act**  2:25 15:16
  22:24 24:3 26:5
  27:20 31:2 34:16
  36:11 38:3 45:4

67:10,12,12 68:17
  71:20 86:3 87:8
  99:2,6 104:24
  105:8 107:3
  108:15 118:7,19
  118:25 120:11
  124:9,23 137:22
  138:9 143:1,6
  150:25 181:1,22
  187:7 210:11
**acting**  179:24
  180:2,4
**action**  1:4,6 11:8
  14:21 15:7 49:18
  77:19 183:4,6
  198:17 207:2
  213:15 215:8,11
**actions**  64:18
  207:10
**active**  108:14
  203:9,18,20
  206:10,15
**actively**  105:7,24
  108:25
**activity**  73:7,10
  106:6,17
**actual**  157:3
  170:20
**adams**  91:17
  92:17,18,19 93:13
  94:25 95:17 101:1
  101:17 102:1,14
  103:16,21 104:10
**adams's**  92:14
  101:11 107:16
**add**  53:5 176:2
**added**  25:17
**addition**  23:2 42:5
  123:7
**additional**  20:18
  203:10,13,18

204:1,14,24
  205:12 211:6,6
  217:9
**additionally**  22:21
**address**  15:3
  23:18 130:7
  159:24 183:10,15
  186:3 211:3,4
**addressed**  22:15
  23:19 90:6,8
  135:6 156:17
  185:19 210:21
**addresses**  148:10
  177:20
**addressing**  62:7
  146:14 167:22
  168:3 178:23
  208:7
**adjourned**  3:7
**adjunct**  21:21,22
  21:23
**administer**  32:4
**administerability**
  33:8
**administered**  15:2
**administering**
  31:23
**administration**
  15:13 22:12,14,20
  22:22 23:1,4
  42:19 55:10
  100:13 103:23
  105:6,12 106:4,15
  108:3,6,7,9,11,21
  118:21 122:3,12
  123:12,14 148:22
  149:5 170:21
  180:22 181:5,6
  183:12 192:13
**administration's**
  185:9

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[administrative - analyst]**                                      Page 4

**administrative**
32:11 55:12 73:4
77:12 78:5,12,16
78:21,23 79:2,7,14
187:5 198:25
199:3
**administratively**
31:2
**administrator**
123:18
**administrators**
147:14
**admit** 61:4
**adopted** 37:16
69:24 77:10 81:16
121:7 132:22
138:25 139:18
178:3 199:10,18
**adopting** 180:16
**adoption** 37:1
42:15 51:8 114:18
120:11 123:8
143:13 146:4
172:6,19 179:8
199:21 202:1
**advance** 66:23
**advent** 103:22,23
**adversarial** 59:22
**adversary** 55:21
56:9
**advertiser** 42:2
**advisor** 83:22
**advocate** 61:6
**advocated** 107:6
**advocating** 37:10
**affirmative** 105:5
142:18
**african** 31:8 32:18
55:7 63:14,17
85:12,15 86:2
87:18 97:21 98:4

100:2 145:14
146:8,18 152:10
156:11 157:24
158:10 163:10,13
164:3,4,11,15
165:4,15 166:1,22
168:17 173:20
196:3,11 197:1,19
**aftermath** 71:24
198:15
**afternoon** 157:19
**age** 107:7,11
**aged** 147:13
**agency** 42:21
136:1 173:5
**agenda** 2:22 28:12
28:17,19 91:16
**ago** 39:5 65:13,13
85:3 135:8 164:10
**agree** 28:23 30:21
30:23 72:12 99:10
104:25 120:1,5,13
129:3 141:16
146:4 149:15
151:12 154:15,21
155:8,13 163:14
170:12,24 171:5
171:15 175:23
176:1 181:21
182:20 187:24
192:11 193:15
194:12 202:5
**agreed** 142:17
188:3
**agreement** 11:22
81:6 198:11
199:11 213:16,20
215:12
**agreements** 185:4
**agricultural**
180:14

**agriculture** 180:9
180:18
**ahead** 9:12 11:6
39:8 48:16 55:17
71:22 79:4,5
118:2 172:3 192:5
192:24
**al** 1:4,8
**al.com.** 42:1
**alabama** 24:9
38:16 41:25 61:3
165:24
**alford** 3:14 161:23
162:7,20 163:9,16
**alford's** 162:13,17
166:8,9,19,21,24
167:5,15,17 168:3
169:21
**algorithms** 191:21
192:1
**aliens** 174:10
176:3
**allan** 117:23
**allegation** 196:2
**allegations** 196:1
**alleged** 84:14,19
84:23 87:4 100:17
**allied** 56:20
**allowed** 6:4,21
173:2 183:9 187:7
**allows** 146:17
**allwright** 22:18
**altered** 70:4
**alvarez** 147:20
**amend** 138:8
**amended** 139:22
139:24 140:17
**amendment** 3:2
140:6 200:9
**america** 181:1,22

**american** 31:8
32:18 46:14 83:20
85:12 97:21 98:4
100:2 117:24
145:14 146:8,18
152:10 156:11
163:10,13 164:3,4
164:11,15 165:4
165:15 166:1,22
168:17 196:3
197:19
**americans** 55:7
63:14,17 85:15
86:2 87:18 157:24
158:10 196:11
197:1
**ample** 108:23
**analogue** 209:4
**analyses** 33:14
38:5 151:18
**analysis** 14:5
24:14 32:8 36:2
38:10 40:13 42:11
49:12,23 51:18,23
57:17 114:18
116:10,11 117:19
117:22 123:7,15
133:2 143:16
146:4,11,13
147:19 148:3
150:7,20 153:9
159:13,19 164:13
166:3 167:6 168:1
168:21 178:9
184:11,20,21
185:16 186:5
194:16 204:7
205:1 211:8
**analyst** 78:13,15
79:9

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 225 of 270

Peyton McCrary , Ph.D.                          May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[analysts - assist]                                              Page 5

**analysts** 110:2,3
**analytical** 45:8
**analyze** 41:7 43:13
  50:9,15 51:19
  132:3 148:5
  165:18 186:19
**analyzed** 129:16
  142:11 192:20
**analyzing** 38:9
  42:15 49:21 52:2
  52:9 117:23
  164:25 192:22
**announced** 32:13
**answer** 7:18 34:10
  60:20 66:1 67:18
  70:15 74:7 76:22
  79:19,19 80:6
  90:5 115:9 126:14
  168:25 198:4
  211:3
**answered** 92:9
  167:13
**answers** 7:15
  213:23 215:5
**anticipated** 77:11
  106:22
**anybody** 102:23
**anymore** 8:21
  29:11 95:19
**apart** 51:4
**apologies** 98:19
**apologize** 9:2 72:3
  145:24 200:14
**app** 132:5 133:22
**apparently** 61:1
  99:24 180:15
**appeal** 32:1
**appear** 57:19
  59:12,14 144:13
  191:11

**appearances** 4:1
  5:1
**appeared** 32:6
  117:16 178:14
**appears** 30:6,7
  64:11 70:8 162:10
  179:13
**applicable** 34:21
**applicant** 182:8,17
  188:11 190:5
  191:15 207:4
**applicants** 184:1
  196:3,4 197:2,19
  197:19 201:16,21
**application** 61:14
  122:15 134:7,20
  193:13,17,19,24
  193:25 200:19
  201:18 205:9
  206:9,10,14,14
  207:16 209:25
**applications** 133:6
  133:9,17,19,20,20
  134:16 136:2
  172:11,11,16
  206:25
**applied** 199:6
  205:7 207:16
  213:21
**apply** 134:2,16
  135:18
**appoint** 137:8
**appointing** 36:12
  36:12
**appreciate** 15:8
  27:16 75:2 113:10
**approach** 115:11
**approaches** 117:1
**appropriate** 86:15
  86:19

**approval** 187:25
**approximately**
  10:1,11 11:13
**approximation**
  21:11
**area** 22:11 38:3
  209:3 210:9
**argue** 143:24
**arguing** 70:12
  179:13 180:4
**argument** 86:14
  167:23
**arlington** 1:16
**arrangements**
  215:12
**arrington** 86:21
  86:22
**arrington's** 164:13
**article** 2:7 25:9
  26:8,11,17,17,22
  27:2 30:1,4,6,8,8
  30:10,24 34:25
  35:15 36:1,6,7,17
  37:10 39:18 41:4
  46:19 52:12 59:4
  63:2,7 94:1
  142:13 147:20
  148:25 169:12
  171:2,8,15,22
  187:17 213:5
**articles** 41:11,20
  42:24 52:12 114:5
  178:4
**artifact** 107:13
**ashcroft** 30:19,22
  32:13 33:7 34:14
  34:21 76:6
**asian** 163:13 165:5
  165:16 173:11,14
  173:19

**aside** 110:25 111:8
**asked** 11:11 26:8
  41:21 57:11 58:15
  76:23,24 77:7
  78:22 101:3 118:5
  118:15,18 160:5
  167:2 211:1
**asking** 7:24,25
  12:23 16:9,16,23
  42:14 50:5 54:7
  58:22 65:12 75:20
  77:8 80:3,5 94:14
  103:1 105:23
  106:13 111:6,7,14
  123:25 131:11
  134:3 150:10
  154:25 155:1,3
  167:10 179:16
  184:19 197:5
  198:2 208:10
**asks** 183:7
**aspect** 118:14
  122:21 131:15
  132:13 171:7
**aspects** 14:25 15:1
  15:13 31:25 122:3
  131:10 137:20
  152:16 167:11
  210:1
**assemble** 51:15
**assembled** 71:4
**assembly** 114:15
**assessing** 118:6
  136:21
**assessment** 48:7
  123:10
**assigned** 12:11
  213:11
**assignment** 217:1
**assist** 30:15 45:7
  118:6 173:2 217:9

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 226 of 270

Peyton McCrary , Ph.D.                                              May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[assistance - begins]                                                  Page 6

**assistance** 112:6,7
**assistant** 12:12,19
  12:22 13:18
**assisting** 12:19
  68:3 83:7 172:24
  180:8
**assists** 163:20
**associate** 38:20
**associated** 143:19
  176:14
**association** 83:21
  108:23
**assume** 132:19
  133:15,18 134:8
  134:13
**assumes** 122:10
**assuming** 7:7
  10:17,20 13:4
  19:1 21:13 23:25
  37:9 54:2 59:6
  75:5 83:12 94:25
  103:18 139:8
  142:8 146:16
  153:10,17 191:23
**assumption** 75:7
**assumptions** 14:17
**athletic** 48:19
**atlanta** 1:2 3:6
  4:16 5:7
**attach** 217:10
**attached** 19:12
  216:7
**attempt** 136:11
  158:11,15 159:17
  159:21
**attempted** 159:23
**attempting** 100:18
  100:20
**attend** 95:6
**attended** 95:5
  96:23

**attention** 23:2
  32:2 53:21 56:2
  58:19,21 73:21
  145:22 151:22
  177:10,15 207:3
**attorney** 23:10
  53:6 59:17 87:24
  110:2 139:13
  187:11,13 213:19
  215:7 216:12
**attorneys** 86:22
  91:7 95:20 97:16
  97:25 110:4 118:5
  213:25
**attributed** 177:18
**augusta** 24:23
**author** 53:6,11
  59:17 94:24
**authored** 30:4
  118:24 147:21
**authority** 183:15
  187:14
**authorize** 110:14
  110:18
**authorized** 31:10
**authors** 31:21
**automatic** 128:23
  128:25 129:3,8
  132:11
**automatically**
  213:21
**availability**
  137:15
**available** 43:10
  60:3
**avoid** 33:20 51:5
  175:24
**avoided** 165:19
**aware** 18:17 37:16
  59:6,13 88:15
  90:24 91:1 98:20

160:17 177:1
  187:12 192:4,20
**awfully** 130:17

**b**

**b** 1:17 47:14
  106:24 213:5,8,21
  215:19
**ba** 20:17
**back** 29:12,13,15
  35:1 38:25 41:3
  64:7 75:23 90:18
  91:20 95:10 97:4
  97:5 101:10 115:1
  130:21,25 136:23
  137:14 141:10,13
  152:19 160:6
  170:16 201:3
  207:22 216:3
**background** 9:6
  9:10,15 19:15
  20:12 49:24 57:5
  116:24 124:3
**bad** 31:18
**baker** 187:11,14
**balanced** 149:22
**ballot** 147:7
**ballots** 73:15
  144:25 145:13,15
  146:8 148:22
  149:6
**bank** 201:5
**bare** 43:6
**barriers** 71:25
  73:2
**bartlett** 123:16
  148:4 190:2 194:6
  205:14
**bartlett's** 186:19
  205:1
**barton** 50:18,20
  51:2

**based** 33:5 38:22
  71:7 107:23
  109:10 115:3
  118:9 132:5 142:6
  142:6 146:4
  177:24 178:1,5,19
  191:10 193:5
  196:10 197:17
  215:11
**basic** 7:11 11:10
  85:19
**basically** 101:5
  118:15 178:18
  201:14
**basing** 189:23
**basis** 36:20 37:8
  146:6 163:16
  167:14 188:8
  199:2,8 213:9
**bassett** 20:23
**bear** 57:10
**bears** 103:12
  119:24
**beating** 52:14
  100:5
**becoming** 149:21
**beg** 84:4
**began** 11:20,23
  105:13
**beginning** 48:4
  51:25 98:25
  101:20 106:2
  127:2 137:1 138:8
  139:12 150:4
  168:10 190:18
**begins** 30:18 36:17
  44:10 55:20 69:21
  71:24 101:17
  144:21 145:6
  163:2

Case 1:18-cv-05391-SCJ   Document 404-1   Filed 06/28/20   Page 227 of 270

Peyton McCrary , Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[behalf - business]
Page 7

**behalf** 4:2 5:2 6:23
67:25
**behavior** 32:8
49:10,13,14 51:13
57:4,8 62:18,23
70:24 84:10 86:16
117:23 165:1
**belief** 38:4
**believe** 14:21 59:2
62:24 63:7 71:15
71:18 74:1 76:13
90:1 92:8 108:4
112:2 119:5
126:17 135:8
139:1 146:18
159:11 160:3,10
160:11 163:19
167:17 181:3
192:8 202:2
204:23
**believed** 87:13
**belz** 47:11,14,15
**beneficial** 149:16
**benefit** 170:4
**benefited** 149:12
149:18 180:14
**benefits** 172:12,17
**bernie** 83:22
**best** 7:14 12:5
43:10 70:15 74:7
99:21 212:2
**better** 34:19 142:1
142:3
**beyond** 9:18 104:2
**big** 114:6
**bill** 10:8,13 110:23
114:14 172:7
173:24 174:22
175:5,15 177:20
177:22 178:6,10
178:17 179:6,9

199:4,22 202:2,10
203:2 205:16
**billed** 10:2
**bills** 10:12
**biographical** 9:10
**birmingham** 42:2
**bit** 7:13 63:21
75:13 112:18
114:13 115:1,2
143:16 151:14
208:24,25
**black** 2:10 35:4,17
63:3 97:20 99:16
99:23 100:25
101:24 103:6,9,11
104:9 137:8 145:1
152:21 153:4
154:16,22 155:1,4
155:8,13,24
164:16
**blank** 97:19
**blanking** 207:13
**blocked** 141:15
**blue** 162:25 166:6
166:12
**board** 35:18 36:20
37:2 144:22
145:20 160:12,15
208:16 213:6
**boards** 36:13,13
137:8
**bodies** 160:9
**body** 46:9 72:11
**bold** 209:14
**bones** 43:6
**book** 26:3 27:24
28:2 91:15 92:3
92:14 96:20
101:11,13 118:23
118:24 150:23
151:2,6

**borrowed** 96:20
**bosworth** 1:17
215:19
**bottom** 46:22 69:6
92:9 98:15 103:21
121:9 128:17
139:15 141:21
166:6 169:24
182:15,16
**bouncing** 29:16
**bound** 81:5
**brad** 1:7 6:2 109:1
**bradford** 108:12
**branch's** 19:20
**break** 7:19 63:23
64:1 72:7 158:24
159:3 188:20,23
211:18,20
**breakdown** 63:5
153:3
**breaking** 158:23
**breaks** 7:17
**brennan** 2:24
127:23,25 128:12
130:24 177:10,10
**brief** 20:13 130:22
**briefly** 85:8
**bring** 23:14 45:9
51:11 57:10
100:10
**bringing** 25:11
49:23 85:23 105:5
107:6,6
**brings** 45:11
**broad** 51:10
121:24
**broader** 14:8
51:23 115:11
116:18 127:6
**broadly** 39:6

**brought** 45:6
81:22 86:1 87:6
100:15 104:21
196:1
**brown** 82:23 85:3
87:23 88:17 90:25
94:11 95:18 98:22
99:2,13 101:18,22
102:4
**brown's** 90:21
**browser** 41:18
**brunell** 83:18,20
83:25
**bryan** 4:12 5:3 7:5
**btyson** 5:8
**budget** 176:23
177:1
**building** 45:7
**built** 191:18
**bullet** 144:19
**bulletin** 205:16
**bulletins** 131:20
**bullock** 148:25
149:24 150:8,24
151:5 153:20
157:13
**bundy** 4:13
**burden** 55:12
142:2 143:2,5,10
200:1
**burdens** 73:4,14
**bureau** 153:18
155:9 156:2,22
157:6,12,15,20
158:6
**burton** 44:23
**bush** 105:6,12
108:2,6,9,16,21
**business** 180:9,13
180:19

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 228 of 270

Peyton McCrary , Ph.D.                                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[busy - census]**                                                      Page 8

busy 93:22
bypass 94:4

**c**

c 213:7
cabin 127:4
cabinet 113:5
cagle 174:8,9
call 32:7,7 65:19
  65:24,25 80:22
  207:3
called 26:3,17 31:3
  39:10 41:25 99:23
  117:14 118:24
  121:23 145:22
  150:24 151:22
calling 28:5 73:21
  126:4 177:9
calls 58:7
caltech 44:22
  117:25
cancellation 196:2
  196:10 197:1,18
  197:24
candidate 152:10
  152:11 163:11,18
  163:20 164:3
  165:6
candidates 150:3
  151:10,10 160:18
  161:7 164:21
  168:7,17,18,22
  170:4
capability 192:4
capacity 1:8 101:3
caption 215:5
career 74:9 90:22
careful 43:20
  146:13
carefully 132:3
  143:9

careless 28:6,8
  143:7
carelessness 29:1
caribbean 173:22
carolina 46:24
  81:17 82:8 96:16
  123:17 164:9
carolina's 96:18
carries 45:12
carrying 208:14
case 7:6,7 9:7,11
  10:2,9 11:8,11,23
  12:6,7 13:4,8,13
  14:21,24 15:10
  19:16 23:13 24:22
  32:5,9 35:18 36:8
  36:20 37:2 38:15
  38:24 42:22 45:4
  45:7,9,16,20,20
  46:23 47:2 48:23
  53:14,15 54:6,12
  54:14 55:2,9 57:5
  57:19 58:13,18,24
  59:3,12,15 60:15
  60:25 61:18 65:1
  66:14 67:25 68:2
  74:19,25 75:1,1,15
  75:16,19,25 76:1
  81:4 82:6,8,9,12
  82:13,21,24 83:25
  84:13,18,22 85:3,4
  85:6,8,20,22,25
  86:14,18,20 87:4,5
  87:9,10,11,21,23
  88:17 90:2,17,25
  91:2,8,11 92:17
  93:2,22 94:15,16
  94:23 95:2,18
  96:5,17,22 98:22
  99:3,13,17,18,20
  100:15,18,20,23

101:1,9,18,19,22
101:24 102:4,24
103:14,17 104:9
113:6,9 116:8
137:9 148:4
158:20 160:21,25
161:3,6,13,14,16
161:16,17,19
162:9 164:2,8,20
165:2,12,15
166:13 168:12
169:1,2,8,18
179:12,15 183:1,3
183:20,21 184:12
185:20 196:14
197:12 198:11
200:5 202:12,14
202:16 203:1
210:20 211:8
213:9,9,21
cases 2:13 22:16
  22:19,20 23:3,16
  23:17 24:2 26:16
  26:19 36:3 37:18
  37:21,24 38:6
  39:2 40:13 41:5
  43:4 44:17,23,25
  45:2,22,23 46:8,11
  52:6 53:19 54:22
  55:4,4 56:3,16
  60:3 61:15,22
  62:6 64:10,16,20
  67:4 69:17,17
  72:9,15,18 74:14
  74:15 75:17,20,21
  75:22 78:17,25
  80:20,22,25 81:2
  81:11,14,21,21,24
  81:25 82:18,21
  83:8,24 85:1 88:5
  88:12,13 95:3

97:16 105:5,13,18
105:25 107:6,20
107:22 114:21
116:4 150:13
153:16 161:21
165:20 169:14
181:4
cast 148:23 149:6
  175:25
casting 73:15
casual 105:21
categories 12:21
  12:24 17:2,3
  46:15 109:25
  113:12,19 114:9
  120:20,22,24
  122:6 124:5
  134:23
categorize 122:5
categorized 80:25
category 15:23
  16:18,24 31:16
  114:3,6,6 123:20
  125:6
catholic 95:5
caught 115:24
causal 165:8
causality 165:18
  166:3 167:23
  168:2 169:9,11,17
cause 55:22 56:11
  61:7 167:8 179:20
caused 200:4
causes 53:22 55:24
  56:10
caveat 157:25
  193:16
ccr 1:17 215:19
census 107:7
  153:18,23 155:8
  156:2,12,21 157:7

Case 1:18-cv-05391-SCJ     Document 404-1     Filed 06/28/20     Page 229 of 270

Peyton McCrary , Ph.D.
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

May 22, 2020

[census - claim]

Page 9

157:11,20 158:5
**center** 2:24 127:23
  127:25 130:24
  147:4 159:12
  177:10,11
**center's** 128:12
**central** 62:13
  131:17 190:19
**century** 3:9 38:19
  144:3,14
**certain** 157:1
  173:21 195:21
**certainly** 10:20
  17:5 23:21,22
  24:5 37:6 45:14
  54:10 58:18 62:16
  65:6,10 68:9
  76:25 80:13,13
  86:25 114:25
  120:3 126:6
  131:25 133:14
  145:8 153:14
  156:18 184:13
  188:24 191:12
  196:20 201:7,23
  211:10,21
**certificate** 200:20
  215:1
**certified** 213:10
  213:24
**certify** 215:4,7
  217:2
**chain** 48:19 78:14
**chairmanships**
  31:9
**challenge** 67:8
  81:16,18,19
  160:22
**challenged** 36:9
  54:16 81:17

**challenging** 38:15
  54:14
**chance** 127:18
**chances** 32:25
**change** 3:1 71:25
  78:19,25 105:2
  112:14,15 133:2,3
  135:12 183:7
  184:11,19,21
  190:13,16 199:18
  217:11,13,14,16
  217:17,19,20,22
  217:23,25 218:1,3
  218:4,6,7,9,10,12
  218:13,15,16,18
**changed** 18:24
  65:16 69:8,12
  87:20 202:6
**changes** 18:12
  31:24 34:15,22
  70:10 137:21
  141:15 188:12
  199:14,16 213:24
  216:7 217:4,5,7
**chapter** 26:3
**chapters** 118:23
  118:24
**character** 208:20
**characteristics**
  194:21 195:9,15
**characterization**
  163:14
**characterize** 23:20
  86:15
**characterized**
  75:9
**characterizing**
  120:23 135:13
**charge** 55:20 56:8
  95:14

**charles** 146:12
**charleston** 164:8
  165:14
**check** 162:10
  189:13 190:24
  201:22 205:3
**checked** 201:3
  207:14
**checking** 186:2,14
**checks** 183:23
**cherry** 50:22 51:6
**chest** 52:14
**chicago** 35:21
**chief** 20:8 69:7,12
  88:1,3 98:10
**chip** 174:21
**choice** 165:9
**choices** 101:8
**choose** 73:11
**chose** 70:9 136:24
**chris** 88:4,14
  90:13 94:9,14
  95:12 96:15 103:1
  106:14 107:17
**christian** 94:6,8,21
  94:25 95:13 96:7
  103:1 107:16
**christopher** 87:22
**chronic** 72:4
**chronological** 38:8
**chronology** 88:2
**chuck** 150:24
**church** 95:5,6
**circle** 5:5
**circles** 50:18
**circuit** 38:15
**circumstances**
  38:12 49:16 52:3
**citation** 159:11
**cite** 113:7,14,23
  114:2 144:2 148:9

150:9,12,15,17
  157:13,20 164:7
  170:18 174:16
**cited** 14:9 112:25
  113:18 114:5,21
  114:25 147:21
  151:5 153:24
  162:13 169:12
  171:21 178:7
  184:9,16 207:13
**citing** 114:8
  148:24 194:19
  198:2
**citizen** 182:10
  207:15
**citizens** 66:23 73:3
  121:13 170:5
  174:17 205:5
  209:19 210:14
**citizenship** 172:5
  172:10,15 182:13
  184:1,11,25 196:8
  197:6 205:23
**city** 20:7
**civil** 1:6 2:17,18
  2:20 6:4 19:20
  66:17,20,24,25
  67:11 86:6 87:7
  88:16 89:1,20
  91:20 94:10,19
  96:11,25 97:7
  98:17,17,20,25
  99:3,11 104:10,22
  107:1 108:20,25
  217:7
**claim** 15:12 47:7
  82:22 86:18 96:2
  100:22 118:22
  143:5 175:20
  184:6

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 230 of 270

Peyton McCrary , Ph.D.                                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[claimed - conditioned]**                                          Page 10

claimed  196:22
claiming  102:16
claims  15:17 59:19
  85:10,15 86:11
  109:10 115:18
clarification  77:7
  80:7 82:15
clarified  196:18
clarify  125:17
  126:15,16
clarity  18:10
  201:6
class  22:11 23:7
classified  203:8
cleaning  186:2
clear  134:10
  190:15 191:2
  193:4 196:6
clearly  86:17
  124:19
cleland  137:7,10
client  59:20,22
close  23:2
coalition  41:24
coat  130:19 160:6
coates  87:22 88:15
  89:20,23 90:13
  92:14 94:14 95:10
  95:20 96:5,10,24
  97:15 98:25 99:11
  105:11 106:3,15
  107:17
coates's  94:9
  104:14,17
code  138:15
  184:17 213:14
  215:10
cohesively  166:22
  166:23
colleague  22:4,7
  86:7

collection  26:4
college  111:17
collinearity  166:2
  169:20
colloquies  213:23
  215:5
color  87:14 141:22
  141:25
columbia  77:20
  187:4
column  154:14
combination
  154:17,18,22,24
  155:4,5,10,12,13
  155:14
come  29:15 88:7
  91:20 97:4,19
  98:3 134:19 135:1
comes  134:7 166:1
comfortable
  200:25
coming  29:13 72:4
  106:11 134:17
  147:12 202:19
  207:21
commenced  3:6
  90:21
comment  50:7
  52:11
comments  28:8
  97:24
commission  2:19
  3:10 88:16 89:1
  89:20 94:10,20
  96:11,25 97:6
  144:3,14 145:11
  146:14,24 160:3
  160:10,12,14
  218:25
commitment
  215:13

committee  2:16
  31:8 85:14
common  45:2
  59:18
commonly  40:7
community  48:22
comparable
  209:11
compare  43:14
  158:2,5
comparison  209:6
comparisons
  158:1
compel  105:14
compensated  9:23
compensation
  213:15 215:11
competent  102:16
complained  98:21
complaint  12:6,17
  13:4 15:6 196:13
  196:16
complete  213:11
  213:23
completed  20:20
  216:17
completely  127:10
  135:9
complex  60:8 62:9
  62:20,25 74:5
complexion  87:21
complexities  62:21
  165:18
complexity  209:6
compliance
  180:25 181:7,9,13
  181:15 213:4,14
  215:10
complicated  7:13
  190:4

complication  82:5
  190:14
complications
  165:17
comply  137:21
  139:23 140:18
component  179:10
  182:13
components  23:8
compound  167:2
computers  191:24
concentrated  69:1
concept  31:15
  104:23
concern  15:12
  33:6
concerned  177:6
concerns  33:11
  62:12,17
conclude  61:6
  133:8 197:3
concluded  64:17
  212:3
concludes  182:22
concluding  195:13
  210:3
conclusion  50:24
  55:19 58:8 59:19
  64:25 132:8 145:3
  147:23 163:25
  167:5,15 174:15
  178:5,18 193:3,9
  194:6 207:18
conclusions  113:9
  166:18,21 167:17
  201:15
conclusory  171:21
  171:24
concurrent  78:1
conditioned
  122:20

Peyton McCrary , Ph.D.                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[conduct - correct]                                    Page 11

**conduct** 131:6
153:9 185:15
**conducted** 23:23
74:12 150:20
151:17 194:15
**conducting** 6:5
50:14 179:7
**confess** 23:12
**confident** 103:8
**confidential**
109:14,19,22,25
110:5,8,13
**confidentiality**
81:6
**confirm** 182:9,12
**conform** 138:8
**confused** 31:3
**confusing** 167:3
**confusion** 31:23
**congress** 34:18,22
65:22 68:16 71:4
86:10 98:18
**congressional**
76:11 86:10
**connected** 175:5
**connection** 18:2
41:10 74:20 82:20
96:23 142:16
160:21 166:4
172:20 174:25
175:8
**conservative**
28:11,17,18 65:3,4
65:7,11,24,25 66:2
68:22 69:3 176:7
176:17
**conservatives**
65:16,18,20
**consider** 11:12
31:12 57:4 73:6
115:12,14

**consideration**
42:18 143:22
**considerations**
49:19,20 50:11
**considered** 83:25
109:19 117:17
177:2
**considering** 169:1
**consistent** 28:14
45:20 76:24 86:5
107:1 168:20
175:11 195:14
203:12
**consistently** 168:6
168:16,21
**constituencies**
179:21
**constitution** 2:17
38:17
**constitutional**
15:17 25:15 179:2
**constitutionality**
33:12 36:10 67:9
68:4
**consult** 40:23
**consultants** 45:13
82:17 83:7
**consulted** 174:21
**contact** 3:2 138:15
138:21 139:18
140:7
**contacted** 11:9,19
207:15 213:19
**contacts** 139:14
**content** 178:9
**contest** 163:24
164:1
**contests** 151:9
168:8,23
**context** 14:8 22:22
43:14 45:18 50:10

50:18,21 54:6
77:22 82:11,19
93:19 120:8 124:7
171:20 173:15
199:10
**continued** 5:1
108:16
**continuing** 26:23
49:10 70:23
206:19
**contract** 213:15
215:11
**contracts** 213:8
**contradicted**
133:13
**contrary** 59:19
**control** 31:7 33:1
**controlled** 85:14
137:17 149:8
**controlling** 31:6
**controversial**
177:23
**convenience** 19:11
**conversation** 8:22
11:14,16 94:13
**conversations**
96:22
**convinced** 87:10
**cooperation** 95:11
**coordinating**
19:23
**copies** 8:10,11
12:7 216:12
**copy** 17:16 30:8
35:23 96:20
144:13
**core** 122:22
**correct** 7:9 9:24
13:5 19:2,12,17,18
21:15 22:10 24:4
24:19,24 28:4

34:5,12,23 36:1
37:12 40:14,18
47:3,12 48:9,10
53:4,5,12,13 56:7
60:15 64:14 65:7
66:18 67:2,14,25
68:5 71:20 74:2
74:10 75:7,11
76:16 79:11,12
80:3,20 81:15,24
82:18 83:9 90:3,4
91:12,13 92:24,25
93:16 95:23 99:14
99:15 101:1
102:12,18 108:8
112:24 113:15
119:18 121:20,23
123:6,24 124:17
124:18 126:1,9
129:5,19 130:13
131:13 132:12
133:10 136:12
140:5 141:8,9
142:4,22 146:20
149:17,18 150:12
151:15 153:24
154:24,25 156:1
157:8 158:17
159:14,15 161:8
167:7,19 168:13
170:8,9,15,21,22
172:2 173:1,3
176:9,21 178:15
181:23 182:13,21
183:4,8 187:8
188:1,6 189:16,16
189:17 192:1,10
192:13,21,22
194:18 195:23
196:15 199:1
200:12,13 202:7

Case 1:18-cv-05391-SCJ     Document 404-1     Filed 06/28/20     Page 232 of 270

Peyton McCrary , Ph.D.                                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[correct - cv]                                                    Page 12

204:15 205:18 206:15 208:1 210:17,18 213:23 215:6

**corrections** 216:7 217:9

**correctly** 125:24 135:13 155:7

**corrects** 146:17

**correlation** 165:25

**corruptible** 61:10

**cost** 27:11

**couch** 30:24

**cough** 72:4

**coughing** 72:3

**council** 19:23 164:11,12,16

**counsel** 4:1 6:20 8:9 10:9 11:24 14:16 16:6,12 17:8 40:7 112:9 112:13 213:2

**counties** 107:16 145:13 160:23 173:21

**country** 50:25 68:24

**counts** 27:24

**county** 46:23 49:11 53:9 64:14 67:5,7 68:18 69:2 69:13 70:9 71:13 71:24 82:1,7,8,10 82:14,22,24 85:3 85:11,13,17 87:4 87:19 92:21 94:22 96:5 118:10 131:3 142:10,21 150:13 160:2,3,10,11,14 160:20 161:19 162:8 164:8,11,12

164:16 165:14,23 168:12 182:9 186:12 190:17 200:21,21 201:1 215:2

**couple** 13:10 47:21 104:14 128:15 152:19 162:22 202:19

**course** 12:6 22:3,4 22:6,15 23:3,14 24:1,1 32:5 37:20 42:13 43:12 49:15 74:16 86:23 96:22 103:20 113:25 116:25 117:4 118:23 151:9 181:14 182:14 197:25

**courses** 22:1

**court** 1:1 6:21 8:8 32:12 33:7 36:3 36:24 37:9 38:13 38:17,21,24 45:11 47:5,9,16 48:8 53:4,11 58:1,6 61:18,22,25 62:6 70:13 71:10 72:16 77:20 82:7 118:6 163:20 169:8 178:22 183:11,15 183:18 187:4,20 213:6,10,24 215:13 216:15,19

**court's** 30:22 37:11 53:21 62:1 118:10 183:9

**courtroom** 27:4 57:20 58:4 60:7 62:3

**courts** 2:11 23:18 23:18 25:12 26:18 31:12 33:10 34:18 36:20 37:14,16,22 38:5 39:10 46:2 51:25 52:2 72:10 72:14 86:11 107:21 164:24 165:19 169:1,3,14

**cover** 153:2

**coverage** 42:21 43:11 67:11 68:4 68:23 70:4 100:11 114:17 124:22 174:14 176:19 178:2,6

**covered** 70:25 71:19 120:19 178:4 188:17 208:24,25 210:11 210:22

**covering** 42:16

**covers** 210:9

**covid** 72:4 202:23

**cox** 146:6

**cps** 3:11,12,13 154:6

**crackdown** 176:7 179:19

**crafted** 28:11

**crc** 1:17 215:19

**create** 30:25 31:22 181:19

**created** 66:22 167:25

**creation** 31:13 122:13

**credibility** 47:16 48:9

**credible** 47:11 48:7 53:10

**crimes** 38:16

**criminal** 98:11

**critic** 20:24,25 21:1

**critical** 28:2 31:20 31:21 65:20 182:4

**critically** 38:5

**criticism** 167:23

**criticisms** 166:25

**criticizing** 211:8

**critics** 55:20 56:8

**critique** 29:3,4

**crow** 119:25 124:6 209:5,12

**crr** 1:17 215:19

**cumbersome** 208:4,7,19,21

**cunningham** 27:10

**curious** 143:14

**curling** 130:10

**current** 41:21 65:23 119:22 120:9 125:7 127:10 153:11,18 156:12 185:2 209:3 210:5,6

**currently** 21:17 22:1 121:17 183:25 184:3,24 185:2

**curriculum** 2:5

**cut** 66:11,12 106:12 137:14 146:23

**cv** 1:7 9:9 17:14,15 18:11,12,17 19:5 19:10,11,15 24:7 24:13 25:7 27:6 29:11 30:5 35:16 64:8 73:20 74:1

Case 1:18-cv-05391-SCJ   Document 404-1   Filed 06/28/20   Page 233 of 270

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[cv - depended]                                                Page 13

74:12 111:8

**d**

**d.a.** 174:20
**dakota** 46:12
**damaged** 103:16
**danville** 19:17,21
  19:22 20:1,7,14
  49:1,25 50:8
**data** 3:11,12,13
  11:25 12:3 70:5
  107:7 144:21
  145:19 150:16,16
  150:21 151:1
  158:2,4,12,13,16
  159:12,14,19,20
  206:1,2
**database** 41:10
  42:6 76:15 77:4
  130:4 180:22
  181:19 182:8
  186:3 190:21
  191:20
**databases** 208:15
**date** 17:5 96:13
  150:22 216:3
**daughter** 88:8
**david** 50:17,20
  51:2 86:7
**day** 52:2 68:25
  215:15 218:21
**days** 190:12 216:3
**dc** 4:8 82:6,13
**dds** 133:24,25
  135:2 136:1,15
  183:23 184:3,8,10
  184:16,17,20,25
  185:2,24 191:16
  192:6
**dds's** 191:24
**deal** 43:16 60:18
  72:17 100:11

193:22
**dealing** 45:23
  174:9 179:3 180:6
  200:22 209:8
**deals** 23:22 26:11
  60:5 168:11
**dealt** 23:1 72:9
**decades** 116:4
**december** 144:4
**decent** 63:5
**decentralized**
  208:4,8,12,18
**decide** 47:9
**decided** 82:1,9,10
  82:14,25 190:17
**deciding** 36:25
  37:15
**decision** 14:12,14
  31:22 32:9 33:19
  38:13,15,19 45:9
  45:11 50:12 61:25
  62:1 69:3 71:13
  74:6 79:1,18 81:9
  108:19 146:19
  208:5,8,17
**decisions** 26:9
  34:18 50:10 62:17
  108:5 148:21
**declaration** 68:2
  186:11 201:12
  207:12
**declarations**
  161:15
**declaratory** 77:19
**deduced** 198:1
**defeated** 168:7,17
  168:22
**defendant** 6:2
  74:17
**defendant's** 11:3
  18:13,20 29:22

35:9 39:15 47:11
  47:13,19 68:11
  89:4 91:22 128:8
  138:2 139:4
  140:12,22 144:9
  154:3 155:20
  156:6 162:3
  171:11
**defendants** 1:9 2:3
  5:2 6:23 7:5 16:7
  16:24 17:1 48:5
  52:23 53:23 56:3
  56:16,24 57:7
**defense** 16:14 68:3
  169:9,11
**define** 54:5,11
  55:1 66:20 72:24
**definitely** 64:2
  153:15 159:3
  179:16
**definition** 31:18
  54:7,8 65:9,10
  66:2 67:1
**degree** 20:18,20
  53:22 173:21
**delay** 202:21
**deliberation** 110:6
**deliberations**
  110:1
**delineator** 82:3
**delivery** 40:24
**demagoguery**
  174:1,4
**demand** 99:5
**democrat** 137:12
**democratic** 32:23
  63:15,18 85:11
  139:1,18 148:16
  149:21 150:3,4
  152:8 160:18
  161:7 168:18,22

170:3
**democrats** 33:1
  63:3,3,11 137:17
  159:10 166:23
**demonstrated**
  104:23 167:8
**demonstrations**
  178:3
**denial** 54:3 55:2,3
  55:6 69:17 70:6
  72:15 80:24 81:10
  81:22,25 82:21,23
  86:17 209:16
**denied** 55:15
  79:16
**denominator**
  201:14
**department** 2:23
  22:5,8,25 27:12
  31:11 34:9 41:13
  44:11,16,19,21
  45:5,11 46:4,5
  67:14,21 73:18
  74:10,23 75:6,11
  75:14,18 79:23
  80:6,8,12,14 83:18
  84:5,9 85:2,23
  90:7 91:17 96:17
  100:23 107:20,24
  109:19,23 111:1,9
  123:8 133:21
  134:5 137:16
  141:14,21,23
  164:9,24 183:24
  187:6,19,21,24
  188:3,5 189:20
  190:10 198:22
**departments**
  117:6
**depended** 122:15

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 234 of 270

Peyton McCrary , Ph.D.                                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[dependent - discussion]                                    Page 14

**dependent** 122:24
**depending** 135:14
**depends** 38:11
  41:20 42:13,23
  65:17 113:2 115:7
  163:23
**deponent** 216:2,6
  216:8,9,15
**deponent's** 216:6
  218:20
**deposed** 7:8
**deposition** 1:11
  2:4 6:1 7:17 8:14
  9:8,14,20 10:25
  48:25 86:24 96:23
  97:10 208:12,25
  210:22 212:3
  216:6 217:8
**depositions** 7:21
  8:6,7
**deputy** 88:1 137:8
**describe** 14:20
  15:9 67:6 85:8
  113:11 196:25
**described** 13:18
  32:17 33:5 44:4
  49:25 86:16 190:2
  190:24
**describing** 116:20
  189:8 190:23
**description** 2:2
  99:10 102:10,11
**descriptions** 192:3
**designed** 72:17
  182:12
**desire** 217:7
**desk** 41:13
**despite** 66:3
**detail** 56:2
**detailed** 159:7
  177:5,8 178:8

**determination**
  45:4 48:9 142:20
  203:3
**determine** 42:10
  44:4 48:22 50:1
  75:25 109:21
  115:4,6,21 116:1
  141:24 147:17
  151:19 152:9
  172:14 173:12
  174:3 189:13
  191:25 197:21
**determined**
  124:21 213:15
**determining**
  163:21
**developed** 117:21
**develops** 23:16
**device** 43:1
**devices** 147:7
**devise** 186:2
**dido** 164:18 165:2
  165:12
**diebold** 147:4
**differences** 18:18
**different** 14:25
  16:20 30:7 32:10
  70:22 80:6 91:9
  102:10 112:19
  117:19 162:23
  169:16 177:13
  184:13 191:20,25
  210:7
**differential** 197:18
  197:22,24
**difficult** 31:2 32:3
  55:11 61:14 73:3
  170:6,8 190:3
  194:4,25
**difficulties** 175:10
  180:17 209:8

**difficulty** 194:16
**diluted** 54:19
**dilution** 24:22
  26:24 53:19 54:3
  54:5,11,14,22
  59:25 69:17 70:6
  72:18 80:22 86:16
  151:8 169:8
  209:17
**dimension** 62:23
**direct** 40:2 60:10
  213:15 215:11
**direction** 215:5
**directly** 76:22
  93:3 94:18 208:8
**director** 123:16
**disagree** 30:21,23
  65:24 69:11
  103:18 126:2,3
  135:21 181:25
  182:3
**disciplinary** 52:14
  84:7
**discipline** 83:15
  84:3
**disciplined** 84:13
**disciplines** 117:3
**disclosed** 59:13
  81:5
**disclosure** 213:6
**disclosures** 213:1
  213:3,4,18
**discount** 213:22
**discounts** 213:21
**discovery** 6:3
  13:11,24 14:1,3
  113:22
**discretion** 122:18
**discrimination**
  45:25 46:10,13
  47:2,7 68:25

**209:20,25**
**discriminatory**
  15:15 26:23 36:18
  37:7,11 40:6
  45:19 49:10,14
  50:2 54:16 64:18
  70:10,24 119:15
  121:4,7,19 123:3
  123:22,23 124:10
  124:15,20 125:2,8
  125:13,16,20
  126:11 127:13
  132:9 133:9
  134:18 135:12,20
  179:8,15 193:4
  195:2 196:6,9,23
  196:25 197:4,9,13
  197:17,21 198:4
  199:16,19,21
  200:2,8 207:23
  209:19,23 210:4
**discuss** 18:18
  23:12 46:23 61:1
  71:25 73:24 79:17
  81:8 113:4 114:19
  122:2 152:16
  160:1 172:22
  182:25 191:19
  208:6
**discussed** 19:9
  22:21 26:10,16
  30:11 106:10
  123:20 153:8
**discussing** 69:16
  120:17 145:6
  152:20 156:20
  163:9 170:11
  172:6,19 176:23
  195:25 208:11
**discussion** 18:9
  27:1 35:8 108:23

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 235 of 270
Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[discussion - ecological]                                          Page 15

143:21 156:19
157:11 169:11
176:19 179:23
disenfranchisem...
209:12
disenfranchising
208:22
dismissal 137:9
dismissed 160:18
161:6
disparities 125:3
195:14,16
disparity 146:7
206:20
disproportionately
55:13
disqualification
213:7
disqualify 213:13
215:9
dissenters 70:20
70:21,23 71:9,12
dissertation 21:7,8
83:22
distinction 59:7
75:3
distinguish 70:19
distinguished
74:24
distorted 29:2
district 1:1,1 61:3
76:7 77:20 161:14
163:3 167:24
187:4
districting 30:11
31:16 54:15
districts 31:13
160:3,22 161:5
divided 63:14
division 1:2 86:6
98:17 99:14

104:10,22 107:1
108:12,20 109:1
division's 87:7
98:11
divisions 107:25
dixie 48:20
document 8:19
10:25 12:4 14:13
17:16 19:2,4 29:9
29:20 35:2,3 39:9
43:9,15,21 46:2,13
53:15 55:18 63:21
68:7,13 71:22
88:19,22,24 90:14
90:15 91:19,21
97:8,9,11 101:10
101:14 112:3,24
127:21,22 128:14
129:11 130:24
137:25 139:2
140:3,4,21 144:7
154:1 155:18
156:4 162:1
166:13 171:9
207:5
documentation
177:14 204:21
205:6
documented 177:5
documents 9:17
9:18,20 11:25
12:3,13,14,14,21
12:25 13:15,19,23
13:25 14:1,4,7,12
15:4,19,23 16:6,12
16:13,18,21,23,25
17:2,2,21 43:2,12
43:15 61:25 62:2
113:5,12,15,17,19
114:2,7 115:14
141:11 161:21

204:11 205:2
doing 14:6 25:24
40:21 42:11 43:11
60:9 74:18,19
93:5,23 94:7
109:11 157:5
165:20 184:4,4
188:20,21 191:7
191:10 192:4
doj 3:1 74:2 84:12
84:16 101:18,20
doj's 93:14
dominant 149:19
door 95:5
dr 2:6,14 6:2 7:4
8:11,12,17 9:5
10:24 17:20,25
18:12,16,24 19:1,7
25:20 27:23 28:5
28:10,16 32:23
35:13 47:11,14
63:22 64:6 83:17
111:25 123:5,5
127:20 128:11
130:25 148:25
149:24,24 153:20
153:20 159:6
161:23 162:7,17
162:18 163:9,16
166:8,9,24,25,25
167:15,16,17
169:21 170:11,11
170:12 188:20
189:5 192:9,19,20
193:2,12 201:12
201:13,15 203:10
203:12 204:2
210:19 211:15,24
212:1
drafting 174:22
175:5

drafts 112:10,11
dramatic 209:20
dramatically
65:17
draw 116:9 163:25
drawn 195:24
draws 116:12
dres 143:13 146:5
147:13 148:6
drew 174:15
drinking 64:3
drive 107:24
driver 133:21
134:5,8 183:24
driver's 134:2
184:1 188:12
driving 108:5
dropped 101:8
due 115:17 216:3
duly 6:25
duma 5:4
duty 94:7
dynamics 24:22

e

e 15:25 17:24
47:14 217:6,7
earlier 33:6 38:14
48:25 64:24 80:25
86:8 115:2 126:13
136:23 142:17
168:5 181:3
192:23 197:6
202:3 207:14
early 15:24 63:16
76:10 129:12,12
129:18
easier 129:4
135:16
easy 94:5
ecological 117:22
150:20

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 236 of 270
Peyton McCrary , Ph.D.    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[economic - errata]    Page 16

economic  180:17
edgefield  46:23
  53:15
editors  117:10
edits  112:14
education  50:13
educational  20:12
  20:13 116:23
  194:5,17,21 195:1
  195:5
effect  15:15 45:25
  54:17 76:18
  119:15 121:17
  123:22,23 124:10
  124:15,20 125:8
  125:13,16 126:11
  127:5,13 132:9
  133:9 134:18
  135:12,20 142:6
  169:6 173:10,13
  189:20 193:4
  195:2,4 196:6,9,24
  197:4,13,17,21
  198:4 199:16,17
  208:22 209:19,23
effectively  193:14
effects  118:15
  123:3 124:21
  125:2,20 165:22
  182:4 196:25
  197:9 207:23
  209:21
effort  147:25
efforts  147:4,16
  148:6 181:12
either  15:16 47:17
  64:13 66:6 73:11
  78:4 172:10,16
  173:18 184:25
elected  32:22
  33:23 36:12

electing  169:15
election  3:20
  17:11 22:12,14,19
  22:21 23:1,4,16
  54:14,15,23 66:14
  100:11,13 104:8
  104:20 105:2
  118:20 122:3
  123:16,18 131:20
  140:17 141:15
  147:5,14 148:18
  148:21 149:5
  152:3 153:1,4
  154:16 155:15,22
  155:25 156:5,10
  159:22 160:2,19
  160:25 161:8,9,13
  161:20,21 162:8
  163:3,24 164:1,17
  165:20 169:6,15
  170:14,20,25
  171:3 175:15,21
  180:22 181:4
  202:18 203:2
  205:16
elections  25:8
  42:20 55:10
  122:13 128:12
  129:23 152:21
  158:17 160:11
  167:24 176:11
  181:6
elector  138:16
electoral  25:12
electronic  146:6
  181:19
electronically
  216:8
element  47:7
elicited  48:24

eligibility  182:20
eliminate  135:9
  146:23
eliminated  127:10
elimination
  124:25
embarrassed  61:1
  61:4,7 169:10
emergency  94:4
emphasis  108:9
emphasize  116:23
empirical  23:17
  26:9 31:17,17
  61:23
employ  80:15
employed  67:19
  79:23 80:1 84:1,5
  84:12,16 109:12
  109:16 110:7
employee  215:7
employment  111:2
  111:10 172:11
enact  128:22
enacted  98:18
  121:4,18
encountered  153:7
encouraged  117:2
encouraging  137:7
ended  93:14 94:1
  95:22 96:5
endorse  167:15
enet  191:17
enforce  98:17
  105:7 175:22
  186:21 198:11
enforcement  99:5
  101:6 102:11
  104:24 106:6,17
  107:25 108:5,14
  172:24,24 173:2
  183:3,6

enforcing  31:1
  107:2 173:2 199:7
engage  37:25 45:6
  56:24 57:4 93:6
engaged  64:18
engagements
  33:14
engages  117:18
engaging  33:12
  57:7 108:14
english  5:4
engstrom  161:18
  162:14 166:25,25
  167:21
engstrom's  162:18
  167:16
enhance  33:2
enhanced  32:25
enrich  60:7
entered  217:8
enterprise  60:1
entire  126:22
entirely  38:17,22
entirety  121:24
  122:7 125:22
  126:9 190:8
entitled  26:5,17
  27:3,9 53:1
  110:10 117:1
  119:3
entity  110:9
entry  27:21 141:1
equal  99:5 104:24
equality  25:11
equals  44:1 52:13
equitable  198:8
equivalent  135:2
era  119:25 124:6
  209:5
errata  216:3,7,8,9
  216:11,13,14,17

Case 1:18-cv-05391-SCJ Document 404-1 Filed 06/28/20 Page 237 of 270

Peyton McCrary , Ph.D. May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[errata - expert] Page 17

217:1
errors 186:4
especially 55:23
117:6 181:17
194:4
esq 4:3,4,12 5:3
essay 27:8,18
essays 26:5
essentially 26:7
44:3 45:17 122:14
179:23
established 86:9
establishes 124:19
establishment
125:1
estimate 10:4,6
157:2
estimates 153:22
155:9 156:3,22
157:12,14,21
158:6,8
et 1:4,8
ethics 213:14
215:10
ethnic 99:4
etiquette 49:2 50:6
eugene 111:17
evaluate 102:23
evaluating 51:8
115:17
evaluation 90:14
evangelical 50:18
evenly 149:21
event 57:13
events 60:11
eventually 101:9
everybody 111:24
evidence 14:9 26:9
26:24 27:4 29:2
31:4 32:24 35:18
36:7,18,21 37:7,9

37:12,18,23 38:4,7
38:11,23 39:4
40:6,9 43:10,14
51:15 53:3 57:10
57:17 61:23 62:3
62:6 70:23 71:1,5
71:7,9 115:12
141:24 142:21
151:8 176:16
177:16 179:11,14
191:3 197:25
198:1 200:3
209:24 215:6
evident 204:18
evolution 22:23
23:13
evolved 41:2
exact 17:5 106:18
121:23 122:2,9,11
122:15,21,25
123:4 190:21
192:6,11 193:3
195:17 202:11,15
203:1 208:20
exactly 33:15
106:7 109:24
111:6 129:14
165:13 167:11
204:10,12
examination 3:23
7:2
examine 31:17
36:17 136:14
examined 6:25
113:21 142:14
examining 37:6
51:14
example 38:13
41:23 42:14,20
44:21 49:16
109:18 122:19

130:10 133:7
135:24 136:5
164:7,19 165:17
204:20,21
examples 205:5
excellent 27:15
48:17
exception 136:7
153:2
excerpt 26:7 92:7
excerpts 2:21 92:7
excluding 134:4
exclusively 75:19
excuse 106:11
116:8
executive 85:13
exercise 33:13
38:1 60:10
exercised 119:15
122:18 123:21
exercising 43:19
exhibit 2:2,4,5,6,7
2:9,11,14,19,21,24
2:25 3:1,2,3,9,11
3:12,13,14,16 8:8
11:3 18:11,13,16
18:20,25 19:4,10
19:12 29:19,20,22
35:7,9 39:14,15
68:9,11 73:22
89:3,4 91:21,22
97:5,6,10 101:11
101:14 104:13
112:2 128:5,7,7,8
137:25 138:2
139:3,4 140:8,12
140:21,22 144:8,9
154:2,3 155:19,20
156:5,6 162:3,25
171:10,11,16

exhibits 2:1 8:13
8:18 29:16 213:24
213:24 214:1
existed 199:8
existing 70:25
exists 205:15
exit 150:16,16,21
expand 128:20
129:12
expect 18:23 211:9
experience 24:3
55:24 56:20,21
62:13 104:7
107:23 115:4,16
115:20 116:3,13
116:14 165:21
200:19
experienced 101:6
experiences
183:17
expert 2:6,12 3:14
18:25 23:16 26:19
27:2 32:11 39:19
43:17 44:12,16,20
44:22,25 46:1
47:1,11,13,17,19
48:5 52:23,24
53:23 57:3,13,19
57:25 58:5,12,17
59:2,12,18 61:1,8
61:18 62:2 63:24
64:7,13,17,22 65:2
67:1,5,13,16,24
75:4,9,10 81:5
82:17 83:7,23
86:20 88:6,6 93:7
93:8 101:4 102:7
102:10,16,22
105:25 114:20,24
120:15,18 144:5
148:4 159:23

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 238 of 270
Peyton McCrary , Ph.D.                                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[expert - finished]                                                 Page 18

161:12,17 162:19
164:13 186:19
191:19 198:1
**expertise**  43:19,19
181:6
**experts**  12:8,18
43:24 56:3,5,18,22
56:25 57:7 59:8
59:13 83:12
105:23 164:24
196:17
**expires**  218:25
**explain**  23:15 36:5
70:11 102:7 103:3
156:23,24
**explained**  90:1
204:12
**explaining**  22:22
77:1 109:24 157:1
**explanation**
192:19
**explore**  43:2
**exposed**  186:11,15
**exposing**  2:21
91:16
**express**  120:6,8
**expressed**  126:4
**expression**  40:3
**extended**  104:2
**extending**  52:1
**extensive**  44:11
45:12 70:9
**extent**  8:22 20:10
**extremely**  175:21
190:2

**f**

**face**  50:25 203:10
204:1 209:8
**faces**  203:18
**facility**  216:18

**fact**  23:15 31:14
41:7 61:8,10,22
71:6 72:15 81:3
86:19 88:7 94:13
95:4 96:20 107:14
107:20 131:14
135:3 149:8 165:8
169:2 174:17,20
175:6 176:15
178:22 180:13
184:14 196:10
198:13 207:4
**facts**  25:3 26:12
38:24 50:6 87:10
135:3 136:3,9,11
184:9 185:24
199:9
**factual**  85:19
183:15
**faculty**  21:21,22
21:23
**fail**  190:5
**failed**  190:5,25
203:7 204:1
**failing**  175:22
**fails**  189:10
193:21
**failure**  107:14
187:25 191:15,18
**failures**  186:7
195:18
**fair**  1:4 11:7 14:21
15:6,6 28:3 33:9
34:11 54:24 63:4
71:15 115:22
116:5 139:19
163:14 167:18
189:11 191:8
**fall**  55:25 56:4,17
150:25

**falls**  55:13 206:2
**false**  90:6 94:9
95:9 96:2,6 102:5
**familiar**  7:11 19:1
19:24 49:1,4 53:7
54:2 65:6 66:17
72:21 85:6 89:19
91:15 99:17
100:16 127:25
128:3,11 153:10
153:17 154:9
160:21
**familiarity**  20:6
**familiarize**  131:19
**far**  10:2 71:22
104:2 125:21
133:23 153:2
**farfetched**  103:12
**fascinating**  23:25
**faults**  108:24
**faulty**  192:16
**favored**  163:11
**favoring**  159:10
**fear**  27:19
**federal**  6:4 25:12
31:12 33:10 53:3
58:1,6 107:21
172:22,24,25
173:1,5 176:4
187:20 217:6
**fee**  61:2,8
**fellow**  38:21
**felt**  61:1
**fernandes**  106:3,9
106:14
**fewer**  203:13,19
**field**  41:7 57:15
192:8
**fifth**  30:17
**fight**  1:4 11:8
14:21 15:6,7

**fights**  97:3
**figure**  32:4
**file**  1:6 113:5
187:12 205:8,9,12
216:12
**filed**  11:11 13:8
19:5 45:16 68:1
74:16,19,21 75:1
75:15,16,18,19,25
76:1 78:1 161:21
166:13 198:14,18
216:14
**files**  109:18 198:23
204:20 205:3,4
**filing**  74:25 105:13
**fill**  216:8,8
**final**  208:17
**finally**  127:18
183:21
**finance**  60:24
**financial**  60:3
213:7
**financially**  215:8
**find**  13:1 30:12
43:1,8 61:15
92:14 152:24,25
153:4 159:23
161:20 167:5
**finding**  23:15
43:15 47:16 53:4
61:22 72:15
142:18 183:11
**findings**  45:24
46:10 60:6 119:3
119:10 183:16
**fine**  18:3,4 51:1
72:6 82:4
**finer**  196:20
**finished**  55:18
63:20 112:10

Peyton McCrary , Ph.D.                                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[fink - gaddie]**                                              Page 19

**fink** 4:3 6:10,16,22
  7:20 8:16 9:3
  11:10 13:22 17:14
  17:23 18:3,6
  25:20,25 47:22
  56:7 58:7 64:1
  128:4 140:8
  158:22 211:16,18
  211:23 216:1
**firm** 213:1,18
**first** 6:6,14,25
  11:7 22:16 23:9
  24:13 30:17 36:16
  43:25 47:24 48:5
  52:13 54:13 55:19
  60:25 69:16,23
  77:9 85:2 87:18
  89:11 92:7,9,13
  93:12 95:16,23
  104:16,19 112:4
  118:3,17 119:12
  119:18 123:19,25
  128:22 134:22
  135:22 137:6
  144:2 145:5,22
  146:2 155:3
  163:23 164:15
  167:4 180:25
  182:7 189:24
  193:21 194:11
  205:6 206:18
  207:21 209:15
**fit** 17:2 29:2
  109:25
**fits** 164:17
**fitzhugh** 36:9
**five** 44:7 68:22
  158:24 159:3
**fix** 18:7
**flag** 203:18

**flagged** 201:11
  203:18
**flatly** 89:15 94:10
  94:16
**flawed** 181:17
  195:18 208:21
**flip** 97:11
**floor** 4:7
**florida** 24:9 82:9
**focus** 21:14 22:20
  23:13,14 28:25
  42:15 46:6 49:13
  71:25 105:3
  118:15 121:22
  122:4 190:19
**focused** 23:7 38:17
  45:19 70:23 122:1
  126:6 132:15
  163:16 177:16
**focusing** 67:10
  71:4 153:15
**folder** 8:19 29:12
  88:21,23
**folders** 8:18
**follow** 190:3 191:7
**followed** 36:25
  37:15 111:5 190:4
**following** 25:10
  96:10 199:11
  213:1,4 217:5
**follows** 7:1
**football** 48:20
**footnote** 32:16,19
  34:3,7 90:11
  137:13 144:2
  153:21 157:7,13
  157:16 159:12
  161:24 162:12
  167:20 168:4
  170:10 174:7,19

**footnotes** 112:25
  113:7,20 114:22
  161:11
**forbid** 178:14
  179:14
**force** 180:20
**forced** 188:6
**foregoing** 215:4
**foreign** 129:23
**forget** 85:17
  149:10
**forgetting** 129:14
**forgotten** 82:20
  90:13 91:25
**form** 6:13 112:25
  193:19,25 207:17
  217:7,9
**formal** 8:7
**formally** 84:17
**format** 30:7
**former** 22:4,7 86:7
  207:12
**forming** 129:9
**forms** 116:11
  213:6
**formula** 67:11
  68:4,23 69:21,23
  70:4,25 71:2,6
  124:22,22
**formulate** 112:21
**forth** 65:23
**forward** 7:6 17:20
  17:24 177:19
  180:21 187:1
  200:15 201:7,23
  203:5 216:12
**found** 24:10 34:3
  40:7 46:2 53:11
  67:11 141:21,23
  144:24 145:11
  157:23 161:19,22

164:12,13 204:10
**foundations** 61:15
**founders** 50:23
**founding** 50:24
  117:9
**four** 25:18 44:7
**frame** 120:17
**framing** 125:24
**frankly** 161:18
**free** 61:5
**friday** 3:8
**friend** 83:23
**front** 17:17 35:12
  72:6 112:2
**full** 36:16 44:10
  48:5 55:20 59:25
  69:16,23 71:23
  89:11 90:20 93:13
  95:16 103:22,25
  104:1,19 113:5
  182:7
**fully** 202:11
**fulton** 201:1,2
  215:2
**functions** 173:9
**funding** 172:23,25
**funny** 19:19
**furnish** 217:10
**further** 71:23
  133:18 198:16
  207:1 215:7
**furthermore**
  107:4
**future** 26:5 202:20

**g**

**g** 4:4
**ga** 216:20
**gaddie** 149:24
  150:8,24 151:6
  153:20 157:13

Peyton McCrary , Ph.D.                                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**game** 48:20
**gangs** 48:19
**gap** 11:18 145:12
**gary** 123:15 148:3
  186:18 190:2
  205:1
**gauge** 51:23
**gauged** 115:11
**gbpi** 177:7
**general** 37:10
  73:12,13 75:21
  90:15 111:7
  113:11 114:15,17
  123:13 128:13
  139:13 177:12
  179:1 186:9
  187:11,14 192:15
  200:24
**general's** 90:7,9
  90:12 93:24
  108:24 123:12
**generally** 73:1,24
  100:16 154:10
  165:19 179:17
**george** 21:17 22:2
  105:6 108:2,9,16
  108:21
**georgia** 1:1,8 2:25
  3:5,16 4:16 5:7
  14:25 17:8 21:4
  24:2,10,14,19,23
  24:24 25:3,7,19,22
  26:12,16,21 27:2
  29:8 30:13,19,22
  32:13,20 34:2,10
  34:14,20 41:15
  71:18 76:6,7,10
  77:9,18 78:18
  79:8,14 118:21
  119:7,23 120:10
  121:2 122:14

124:13,23 125:4,8
127:10 128:25
129:12,17 130:2
131:4 135:9,25
136:4,6 137:1,1,14
137:16 138:6,24
141:16,22 142:10
142:16 143:13
146:5,19 148:11
149:12,17 150:7
151:13 154:9,18
156:1 158:4,14,16
165:23 172:19
173:18,21 174:11
174:14,18 176:23
177:1,25 181:25
184:16,23 186:1
186:13 187:2
192:21 203:14
207:7 209:7 210:2
210:5,10 213:4,10
215:2
**georgia's** 30:11
  76:14 77:4,13,17
  78:3,4,8 118:7,16
  119:13 121:3,6
  123:20 124:16
  125:13 126:10
  127:12 129:7
  131:25 132:5,9
  135:11 137:21
  147:6 176:6 186:5
  188:4 202:6
  207:25 209:9
**georgians** 131:7
  132:12 173:14
**gerry** 110:18
**gerrymandering**
  169:3
**getting** 19:14
  107:21 130:17

135:1 157:18
158:22
**gingles** 72:17
  169:9,13
**give** 6:21 11:2
  20:13 23:2 66:1
  68:8 74:8 113:18
  124:3 140:20
  143:16
**given** 6:5 57:5
  58:19,20,21 60:4
  113:11,16 121:9
  215:6 217:8
**gives** 21:21
**giving** 60:17 99:11
  133:25
**glad** 72:5 77:7
  146:3
**global** 124:11
**globally** 15:9
**go** 9:12 11:6 18:6
  29:15 30:15 35:1
  35:23 37:24 39:8
  39:9,23 43:9
  48:16 53:20 64:7
  68:7 70:18 71:22
  75:23 79:4,5 91:4
  91:19 97:5 98:7
  101:10 104:9
  105:9 111:20
  118:2 127:19,20
  132:18,23,25
  133:17,19 135:5
  148:13 152:15
  157:5 158:15
  159:2 162:1
  166:15 169:4
  171:9 185:17,23
  188:14,19 189:2
  200:15 201:7,23
  205:19 209:2

211:17,19
**goes** 94:8 132:19
  163:7
**going** 6:13 10:23
  10:24 18:15 19:11
  29:13,15,16 32:15
  35:6 38:25 40:23
  45:5 51:6 58:21
  63:21,23,23 64:6
  90:18 96:9 97:15
  100:7 111:25
  120:17 127:21
  133:11 141:10,13
  146:2 148:1
  155:17 176:5
  187:1 188:17
  195:10 198:5
  202:13
**good** 7:4 25:25
  28:22 52:17,19
  72:5 97:17 111:24
  120:23 127:19
  146:19 158:13
  159:6 162:19
  177:12 178:17,21
  186:16 188:20
  207:17 208:24,25
  211:12 212:1
**gotten** 21:11
**governing** 160:9
**government** 50:2
  111:16 194:24
  199:7
**governmental**
  49:17
**governor** 173:23
  174:8 175:16
  187:13
**governor's** 151:13
  175:20

Case 1:18-cv-05391-SCJ   Document 404-1   Filed 06/28/20   Page 241 of 270

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[governorship - history]                                    Page 21

**governorship**
149:9
**grace** 56:4,17
**graduate** 93:6
116:24,25 117:5
**graduated** 20:15
88:8
**grant** 60:23 61:14
**grasp** 181:2
**great** 20:21 35:15
53:8 61:23 159:1
171:19
**greater** 145:12
157:23
**greetings** 216:5
**grew** 48:25 50:15
**grofman** 83:22
**ground** 7:12
**group** 54:20 79:13
99:23 195:6
201:15
**groups** 98:20,25
99:2,3,11 176:6
193:6
**grow** 49:5
**growing** 50:4,7
**gubernatorial**
3:20 148:18
**guess** 12:22 35:20
75:12 81:3 135:15
161:9 175:11
179:21
**guessing** 28:1
**guide** 72:11
**guided** 191:14
**guidelines** 109:24
**guilty** 55:23
**gw** 41:9
**gwinnett** 150:12
160:2,20,23,25
161:13,19 162:8

165:4,23 168:11

**h**

**h** 27:13
**h.k.** 164:18
**h.w.** 108:16
**half** 63:22 96:2
**halfway** 40:5
147:11
**hall** 147:20
**hand** 52:23 78:23
100:5
**handled** 109:13
**handling** 8:6
**hang** 23:10 29:14
91:19
**hans** 109:2
**happen** 189:9
**happened** 38:18
39:5 65:1 92:16
121:14 202:22
**happening** 20:4
43:8
**happens** 7:25
62:14
**hard** 57:16 65:15
101:15 115:8
127:4
**harmful** 70:7
**harold** 175:3
**hava** 119:14
122:14 124:1,17
125:15,24 126:5
126:24 137:2
138:22 143:19
181:1,2,7,9,12,15
182:11 208:1
**hava's** 181:18
**havv** 123:11 185:5
185:11,17
**hb** 178:3,9,14
198:15 199:4,9

202:17
**head** 46:17 108:12
119:2
**healthcare** 174:10
174:13,18
**hear** 11:7 67:18
97:24
**heard** 19:22 50:17
51:2 167:16
**hearsay** 40:9
**heavily** 206:3
**hebert** 110:19
**heck** 32:4 102:21
**help** 57:18 59:11
59:15 75:25 86:25
113:23 140:2
181:1,22
**helped** 86:19,24
**helpful** 42:8
114:12 188:23
**helping** 45:18
**helps** 116:11
125:17 175:24
**henry** 160:23
**herman** 47:15
**hidden** 154:8
**high** 20:15 57:20
58:4 88:8 165:25
**higher** 144:25
154:17,23 155:9
155:14,24 156:11
158:9 196:3,11
197:2
**highest** 145:13
**highly** 39:1 123:17
**hired** 65:2 66:6,8
66:10,13,15,25
74:2,4,5,9 80:15
80:17 83:11
**hiring** 83:17
108:22

**hispanic** 155:10
158:10 163:13
165:5,16 168:6
173:11,14,19
176:6,8,17
**historian** 38:2
40:17 42:10 43:13
44:22,24 45:3,6,17
46:1,6 49:3,5 50:9
50:22 51:5 69:11
80:1,15,18 92:24
93:15 101:21
112:19 115:15
116:7 209:10
**historians** 2:12
26:18 39:19 40:19
43:24,25 44:12,15
45:8,10,15,18,23
46:12,16 52:3,4,10
52:13,15,18 60:6
60:18,22 62:4,5
79:22 80:11
115:12 116:18,19
117:11,20,23
**historical** 23:7,21
35:17 36:18 37:7
37:23 38:4,7,10,11
38:23 39:3 51:8
60:10 116:9,20
117:17 118:8
124:18
**history** 19:20
20:13 27:5 38:9
39:6 43:5 45:25
46:10,13 49:8
50:19 52:5 73:17
87:7 89:15 93:11
102:8 103:3,11
117:1,6,10,14,15
178:8 209:10

Peyton McCrary , Ph.D.                                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

hitting 100:5
hobble 101:25
  102:2
hobbled 101:21
hold 89:10
holder 67:6
  118:11
honest 2:11 26:18
  39:10 57:17
hood 3:20 170:11
  170:16,18 171:15
hood's 170:12
hope 111:24
  179:12 212:1
hopefully 39:22
hostile 108:13
hostility 104:23
hour 9:24 63:22
hours 10:4
house 2:15 3:3
  68:16 75:9 93:14
  114:14 141:1
  160:22 161:5,14
  177:20,22 178:6
  179:6,9 199:4,21
  202:2,10 203:2
  205:15
howard 26:25
huh 7:16,16
  144:23 146:24
  171:23 197:11
human 186:4
  189:13 190:24
hundred 39:5
hunter 38:14
hurdles 121:13
  210:14
hutchings 159:16
hypothetical
  127:15 133:15
  134:5,14,17 135:3

135:16,23
hypothetically
  135:9
hypotheticals
  127:16,19 134:21

i

idea 7:24,24 31:19
  101:8
identification 11:4
  18:14,21 29:23
  35:10 39:16 68:12
  77:9,14 81:19
  89:5 91:23 96:19
  128:9 138:3 139:5
  140:13,23 144:10
  154:4 155:21
  156:7 162:4
  171:12 174:24
  175:7,19,23
  189:21 203:11,13
  203:14,19,19
  204:1,14,17,24
  205:11,13
identified 63:11
  63:18 68:24
identify 26:13
  55:22 56:10 70:5
  86:19 101:4 103:2
  182:8,12 184:7
identifying 41:18
  82:17 83:7 113:24
  206:19
ideological 29:3
ideology 28:24
ignore 70:9
ignored 60:5,18
  70:13 71:8
ignores 71:3
ike 82:23 85:3
  87:23 88:17 94:11
  95:18 98:22 99:13

101:18
illegal 174:10
  175:25 176:3
  180:6,11,14
illinois 44:24
immediate 9:15
immediately 11:18
  25:10 26:22
  199:11
immigrant 180:19
  180:19
immigrants
  175:20,24 179:20
immigration
  172:5,25 173:3
  176:7 179:22,25
  180:6,11,15
impact 3:19 118:7
  118:8,19,25
  122:11 141:22,25
  142:19,22 143:8
  146:7 174:9
  195:17,22 206:2
impacts 215:13
impartial 215:13
impartiality
  213:14 215:10
imparting 116:22
implementation
  87:8 119:13 124:1
  124:16 125:15,23
  126:5,24 138:22
  143:20 181:18
  187:22 198:9
  199:3 207:25
implemented
  147:8 199:14,15
  202:18
implementing
  122:14 137:2
  182:1

implements
  129:18
implications 127:7
important 38:5
  43:4 180:7
impose 122:11
imposes 143:6
impossible 55:6
  169:19
impressive 147:13
  147:18,23
imprint 150:20
improprieties 3:18
inaccuracy 90:8
inaccurate 208:21
inartfully 199:23
  200:14
incentive 121:11
  210:13
incident 19:24
inclined 59:21
include 14:13
  115:5 143:21
  148:9 156:20
included 134:10
  143:21 175:14
includes 18:16
  42:6 50:11
including 31:5
  88:12 91:2 101:21
  123:14 124:24
  175:18 193:19
incorrect 92:17,18
  174:12
increasingly
  103:12
independent
  194:15
index 2:1 3:23
indians 46:14

**indicate** 36:24
37:14 68:22 74:12
136:19 137:14
147:10 150:1
174:7 178:13
179:19 185:4
187:10 192:6
**indicated** 167:7
**indicates** 102:6
144:21 145:19
152:6
**indicating** 149:25
**indication** 175:9
**indifference** 105:5
**individual** 74:7
174:20 189:10
208:5
**individuals** 91:1
98:5 99:22 100:18
100:20 129:4
134:1 174:13
188:14 190:25
194:4,16,25
201:11 203:10,25
205:22 206:19
**indulge** 156:24
**ineligibles** 105:15
**inference** 195:23
**inferred** 206:16
**inflammatory**
173:25 174:3
**inflexible** 190:20
**influence** 31:13
32:18 60:10
104:21
**inform** 116:11
**informally** 84:21
100:12
**information** 9:6
48:25 77:2 109:13
109:17,22 110:9

110:14,17 163:19
190:15 197:3
206:21 207:8
**informed** 187:21
**infrastructure**
129:25
**initial** 11:15
147:11 151:2
**initially** 11:19
36:8 85:21 86:14
88:14 90:2 143:13
**initiated** 134:6
**injustice** 2:21
91:15
**inner** 75:13
**inspector** 90:7,9
90:11,15 93:24
108:24 123:12,13
192:14
**instance** 79:19
**instances** 55:5
191:17 209:17
**institute** 176:24
177:2
**institutional**
101:19,23
**instructed** 8:21
10:13 31:11
**instructing** 191:6
**insubordination**
95:11
**intend** 187:22
**intended** 87:21
**intensive** 147:15
147:24
**intent** 26:23 36:18
37:7,12,18 38:5
40:6 45:19 46:4,6
48:23 53:24 121:4
121:7,19 179:8,15
199:21,25 200:8

210:4
**intention** 211:6
**intentional** 47:2,6
121:18 209:25
210:16
**intentionally**
170:8
**interactions** 109:5
**interdisciplinary**
60:1 117:1,10
**interest** 32:2 49:17
59:22 61:24 99:4
180:3,9 213:7,12
215:9
**interested** 48:12
88:9 106:5,16
144:20 215:8
**interests** 66:23
87:17 180:14,19
**interfered** 85:16
**interference**
129:23
**internal** 79:18
81:8 110:1,5,6
**internet** 41:18
**interparty** 168:23
**interpret** 39:6
**interracial** 168:8
168:22
**interrupt** 126:16
127:14 130:15
**intimately** 49:1
**intimidate** 99:24
100:19,20
**intimidating** 100:6
102:9 103:4
**intimidation** 102:8
103:3
**introduce** 35:6
**introduction** 8:7

**investigate** 57:11
61:15 62:21 184:3
**investigated** 46:5
88:13 191:9
207:10
**investigating**
42:24 51:16
131:18
**investigation**
45:13 60:5 74:18
74:23,24 75:16
86:23 89:16 90:6
90:21 94:11 110:4
115:8 132:4
**investigations**
58:23 75:15,17,19
75:24
**investigator** 90:15
93:24
**invite** 33:18
**invoices** 10:16,18
10:21
**involve** 18:23
22:11 25:7,19,22
33:13 131:9 168:1
181:4
**involved** 20:3,7
24:18,24 39:2
45:10 46:8 52:5
75:24 76:2,5,9,19
77:3,12,16 82:12
82:13 83:3 85:10
85:18,18 96:9
99:21 100:8,12
103:14 105:17,22
105:24 107:17
137:9 160:11
198:24
**involvement** 9:7
61:17 95:18
102:20 105:19,22

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 244 of 270

Peyton McCrary , Ph.D.                                    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[involves - labor]                                           Page 24

**involves** 85:9
  167:20
**involving** 22:17
  23:4 25:3 39:19
  40:22 82:22 96:17
  169:3,14 181:12
**irby** 36:8
**irrationally**
  179:25 180:5
**irrelevant** 42:12
**issue** 32:17 38:24
  103:8 112:17
  118:21 160:9
  163:17 164:20
  166:4 168:2 174:9
  174:12 176:19
  180:5,11 183:9
  211:2
**issued** 205:16
**issues** 15:5 23:4,17
  23:19 57:11 60:5
  60:18 61:13 71:10
  72:10 74:20 99:20
  131:18 167:4
  170:19,20 172:5
  202:11,15,25
  210:20
**item** 24:21 128:22
  129:11
**items** 24:10

**j**

**j** 4:12 91:17
  117:24
**jackson** 86:25
**january** 3:7
**jaundiced** 59:16
**jim** 119:25 124:6
  209:5,12
**joann** 92:20 93:21
**job** 75:9 93:14,17
  191:7,10

**joe** 110:21
**john** 3:14 20:23
  152:8 167:5
**journal** 3:3 25:15
  26:25 27:2,13
  59:4 117:10,13,14
  141:1
**journalism** 41:22
  42:4
**journals** 43:7
  116:23
**judge** 61:2 77:20
  175:3 187:4
  202:14
**judges** 169:15
**judgment** 58:22
  77:19 182:19
**judicial** 45:24 46:9
  165:20
**judiciary** 2:15
  68:16
**julie** 106:14,19
**june** 215:15
**jurisdiction** 54:20
  64:17 100:14
  107:12 143:2
**jurisdiction's**
  89:15
**jurisdictions** 55:7
  64:13 70:5,24
  81:22 143:6,9
**justice** 2:23 22:5,8
  22:25 27:12 31:12
  38:20 41:13 44:11
  44:16,19 67:14,22
  69:7 73:18 79:23
  80:8,12 83:19
  84:9 85:2 90:8
  91:16 111:1,10
  123:8 128:1
  137:16 141:15

  164:9,24 187:6,19
**justice's** 69:12
  80:14
**justices** 68:23
**justification** 71:2
**justified** 208:23
**justify** 49:18 70:7
**justifying** 124:23
  172:20

**k**

**kaiser** 4:4 7:20
**kaiserdillon** 4:5
  12:11
**kaiserdillon.com**
  4:9,10
**kappelhoff** 98:10
  98:13
**karlan** 28:14
  32:23
**keep** 46:19 63:23
**keeping** 2:11
  26:18 39:10
**keith** 150:24
**kemp** 130:11
**kent** 35:21
**kerry** 152:8
**key** 172:9 180:1
  180:20
**kind** 8:6 9:7 13:18
  19:14 24:8 31:9
  32:10,14 33:12,19
  37:25 43:17 48:21
  51:23 58:20 86:17
  92:11 95:11 100:9
  100:14 110:1
  112:17,22 115:25
  120:11 122:5
  138:13 143:4
  186:14 192:18
  207:21

**kinds** 73:4 189:15
**king** 174:21
**knew** 2:8 28:21
  29:9 30:2 95:4
**know** 7:21,25 9:22
  10:1 25:2 30:9
  32:1 36:16 39:5
  41:3 50:25 51:12
  61:16 76:17 80:17
  80:19 82:2 84:8
  89:22 94:25 95:8
  96:7 98:13 100:23
  102:20,22 103:10
  103:10 106:19
  109:3 112:5,17,18
  112:22 116:4,6
  126:15,16 128:25
  135:7,24 136:3,9
  137:10 138:23
  150:12 153:15
  160:24 161:6
  162:16 165:13
  176:16 183:18
  185:14 198:10
  201:12,14,18
  204:25 205:10
  206:16 207:6,9
  210:11
**knowing** 199:17
**knowledge** 57:15
  95:13 104:12
  199:6
**known** 27:13
  41:11 88:4,14
  96:8 117:22
**kousser** 44:21
  117:25

**l**

**l** 47:14
**labor** 180:20

Peyton McCrary , Ph.D. May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**lack** 56:2 72:11
95:11 142:22
200:11 206:21
207:1
**lang** 111:17
**language** 33:3
44:13 51:24 56:6
69:9 99:6,8
138:17 142:25
173:25 187:24
**large** 16:4 54:15
54:23 100:3
134:24,25 181:15
**largely** 105:25
**late** 12:10 157:18
**lately** 2:10 35:4,17
**launch** 101:23
**law** 21:18 22:2,6
22:11,15 23:12,13
23:16,24 25:9,15
26:3,7,11,17,21,25
35:22 77:14 94:1
101:6 102:11
127:17 128:1
140:1,4,16 142:13
161:20,21 169:11
172:23 173:1,2
175:22 176:3,4
177:25 178:7
182:17,21 184:15
192:21 198:21
202:5 203:14
209:12 213:4
**lawrence** 4:13
**lawrencebundy....**
4:17
**laws** 2:25 73:14
98:18 132:22
138:7 139:23,24
140:17 141:16
172:25 173:3

**lawsuit** 11:7 45:12
56:22 59:20 60:1
77:25 99:21
100:10 115:18
143:4 160:2,17
187:12 188:4,8
196:1,22 198:14
198:17 199:12
200:4
**lawsuits** 22:25
26:24 37:1,16
44:13 78:11
**lawyer** 59:21
64:25
**lawyer's** 57:19
59:12,15,20
**lawyers** 23:11
57:13 60:2 101:18
107:5 108:22
**leadership** 32:21
33:22 85:11,13
**leads** 32:15
**leaning** 65:3,4
**leanings** 177:7,15
177:17
**learn** 60:2 117:2
**learned** 117:3
**leave** 111:16 153:5
**leaving** 88:9
107:18 148:16
**lecturer** 21:19,20
**led** 112:14,14
143:23 166:24
**left** 156:16,19
182:19
**legal** 53:19 54:7
58:7 86:13 115:14
142:1 143:4
182:18 183:9
**legality** 36:10

**legally** 136:21
**legislation** 114:14
138:7,25 141:5
177:23 198:7,12
**legislative** 12:14
25:3 30:11 32:7
32:18 43:5 76:7
76:11 161:16
178:8
**legislators** 31:8
32:19
**legislature** 31:6,7
32:8 42:17 43:7,9
43:11 149:9
180:16
**legislatures** 43:6
65:22 73:16
**legitimate** 49:17
50:1 86:11
**length** 115:13
**lengthy** 30:10
**leslie** 4:12 7:21
**leslie.bryan** 4:17
**letter** 3:1 142:23
143:5 187:19
190:2,12 193:20
**letters** 139:9
142:15
**level** 150:7 151:19
152:9,10,20
173:25 174:4
**levels** 121:12
**liberal** 177:2,11
**liberals** 55:23
**liberties** 2:18
**license** 134:2
188:12
**licenses** 184:2
**lichtman** 117:24
**lies** 96:25

**lieutenant** 174:8
**life** 28:23 49:24
**light** 34:21 126:8
189:24
**likelihood** 33:2
**limit** 49:13
**limited** 101:2
102:25 105:19
122:9,23
**limiting** 78:17
80:9 126:23
**limits** 38:8 122:10
**lincoln** 21:9
**line** 30:18 33:13
36:3 74:14 90:18
99:1 104:20
105:11 106:2
114:11 154:19
155:7 217:11,14
217:17,20,23
218:1,4,7,10,13,16
**lines** 149:14
**links** 12:13
**list** 24:8 25:21
64:10 67:4 105:13
105:16,18 106:5,9
106:16 107:4,22
120:4 128:22
138:20 189:22
190:11
**listed** 25:9 26:22
27:5,9 107:10
**listening** 126:13
**lists** 48:13 107:9
107:15
**literacy** 124:25
193:14 209:6
210:1
**literally** 108:22
**literature** 194:19

Peyton McCrary , Ph.D.    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**litigation** 13:17 23:23,24 24:3 45:6 58:14,16 74:13,21 77:22 78:5 115:16 118:6 187:13
**little** 7:12 23:12 31:17,17 52:14 63:21 75:13 94:5 112:18,19 114:13 115:1,2 143:16 151:14
**llc** 4:13
**llp** 5:4
**lobbies** 99:4
**local** 36:13 55:8 66:7 76:3 89:14 93:1,17 105:14 121:12 122:18 137:7 153:13 160:2,11,25 161:13 162:8 173:2 175:21 208:16
**locality** 61:16
**locate** 40:22 41:19 121:2 158:15 159:21
**located** 159:25
**locating** 49:13
**logical** 101:7 135:18
**long** 39:1 58:2 94:3
**longer** 68:24 192:7 192:21
**look** 7:6 12:20 24:6 29:7 30:12 31:10 40:17 49:15 70:21 83:17 95:16 96:13 118:18

119:1 129:7,17 131:16 132:10,14 136:13 140:2 145:23 147:5 154:10 155:11 159:7 162:12,24 164:25 166:11 185:14 186:6 204:11
**looked** 25:7 48:19 70:21 71:1 101:7 102:23 107:7,8 113:3,8 114:16,17 114:23 131:10 132:2 136:11 142:14 143:15,18 150:6,15,23 172:14 186:9 201:13
**looking** 13:12 24:8 24:9,19 27:16 30:16 32:17 42:20 49:9 101:5 102:7 111:8 119:6 120:25 125:18 131:19 143:14 145:21 154:14 159:18,19 184:15 185:1 201:16,16 201:17
**looks** 121:21 143:12
**lose** 151:11
**lot** 10:7 14:3,25 24:9 31:22 32:11 52:15 56:21 64:3 65:19,23 71:8 91:9 108:14 113:3 114:4,24 115:16 116:18 120:21 176:16 198:1

**louisiana** 21:10,13
**lower** 194:4,17,25 195:4
**lunch** 95:21,24 96:4,9 111:24

**m**

**machinery** 148:22 149:6
**machines** 143:15
**mail** 17:24 216:10
**mails** 15:25
**main** 33:6
**maintained** 32:25
**maintaining** 213:13 215:9
**maintenance** 105:13,18 106:5,9 106:16 107:5,22 138:20
**major** 117:16 156:16 209:3
**majority** 30:18 54:20 68:23 69:4 70:8,19,21 71:1,3 71:8 85:12 87:19 100:3 138:24 139:19 149:3,8,12 151:15 179:24 180:12
**makeup** 84:14,19 84:23 87:3 201:10
**making** 33:19 45:11 75:2 78:7 78:10 79:18 81:9 108:19 149:1 170:4 175:7 183:11 184:17 191:14 208:5,8 213:13 217:8,9
**manage** 8:25

**mandated** 186:15 191:12
**mansell** 216:19
**manually** 216:8
**marblestone** 86:7
**march** 3:8
**mark** 7:23 18:15 29:20 35:6 39:14 68:9 89:3 91:21 98:10 127:21 128:7 137:25 139:3 140:8,21 144:8 154:2 155:19 156:4 162:2 171:9
**marked** 11:3 18:11,13,20 19:10 29:22 35:9 39:15 68:11 89:4 91:22 112:2 128:8 138:2 139:4 140:12,22 144:9 154:3 155:20 156:6 162:3 171:11
**marking** 128:4 147:7
**master's** 20:18,21
**match** 121:23 122:2,9,11,15,21 122:25 123:4 182:13 186:8 190:21 191:15,18 193:4 195:18 202:11,16 203:1 208:20
**matches** 196:7
**matching** 76:15 77:4 180:23 181:19 182:8 185:10 186:3 188:14 190:22,25

Peyton McCrary , Ph.D.　　　　May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[matching - missing]　　　　　　　　　　　　　　　Page 27

191:20 192:6,11
**material** 26:21
**materials** 9:10
　131:20,24 132:17
　148:2,3,6 186:10
　188:10 189:10
　191:11
**matter** 42:23
　43:16 51:16 61:23
　106:24 135:20
　146:14 152:18
　153:8 163:18
　211:5 213:12,20
　215:9
**mattered** 95:19
**matters** 81:23
　93:23 94:17
　116:15
**matthew** 4:4
**maurice** 27:10
**max** 137:7
**maximization**
　27:11
**mayer** 123:5
　203:10 204:2,23
　206:22
**mayer's** 203:12
**mayor** 20:8
**mccain** 20:8
**mccrary** 1:12 2:6
　2:14 6:2,24 7:4
　8:11,12,17 9:5
　10:24 17:20,25
　18:12,24 19:1,7
　25:20 35:13 63:22
　64:6 95:21 101:22
　102:15 104:2
　111:25 127:20
　128:11 130:25
　159:6 188:20
　189:5 210:19

211:15,24 212:1
　216:2
**mccrary's** 18:16
　95:10 103:16
**mccrory** 81:18
**mcdonald** 123:5
　192:20 193:12
　201:13
**mcdonald's**
　185:20 192:9,19
　193:2,8 201:12,15
**mckee** 3:21 170:17
　170:18 171:15
**mckee's** 170:11
**mean** 21:19 33:16
　33:16 55:4 56:15
　56:20 61:9 62:9
　66:11 69:4 75:10
　110:1 113:2,14
　114:16 127:14
　131:16 136:5
　138:15 176:15
　182:3 193:8
　194:10 195:4
　198:13 200:24
　202:15
**meaning** 53:2
**means** 54:18,21
　57:1 61:24 66:2
　74:6 103:6 203:12
　204:8,14,16
**meant** 32:9 56:12
　106:7,19 173:17
　199:23 204:12,23
　208:18
**meditation** 114:11
**meet** 169:19
　200:11
**meeting** 55:12
　83:21 106:8,14

**member** 137:11
　164:10,12
**members** 21:21,24
　38:21 98:21 99:22
　195:5
**memo** 86:7
**memorandum**
　173:4
**memory** 82:2
　103:13
**mention** 53:9
　82:20 148:17
**mentioned** 19:16
　21:16 25:1 67:5
　82:16 83:6 85:2
　116:17 122:17
　141:14 172:9,25
　174:22 175:14
　202:2
**meritorious** 87:11
　91:8 107:19
**messed** 18:1
**met** 83:20 95:20
　95:24 143:9 200:1
**method** 36:12
　40:25 54:14 100:6
　115:3,6 116:17
　117:22 134:7
　136:20 169:15
　179:3 192:7,16
**methodology** 42:9
　49:22,25 116:1,19
**methods** 117:5,9
　122:14 131:6
　132:11
**michael** 185:19
**microfilm** 41:6
**mid** 142:12
**middle** 37:20 40:1
　53:20 68:21 70:3
　98:9 204:3

**midr** 203:9,12,18
　203:25 204:8,13
**mill** 79:2
**milledgeville**
　88:10
**mind** 86:5 126:4
**mine** 83:23
**minimize** 29:16
**minimized** 36:20
　37:9,22
**minimizing** 37:17
**minimum** 203:4
**minorities** 99:4,7
　195:7
**minority** 24:22
　32:22 33:23 54:19
　55:13 66:23 85:17
　87:17,20 100:3
　119:16 121:13
　122:23 126:12
　127:13 151:9,10
　164:21,21,22
　165:6 168:7 170:3
　170:5 195:5 206:3
　207:24 209:8,19
　210:14
**minute** 18:7 47:20
　48:14 69:18 97:5
　135:8 158:24
　159:3 188:22
　211:19
**minutes** 85:3
　188:25
**misreading** 119:11
**misremembering**
　88:2
**misrepresentation**
　27:10
**missed** 24:12 25:8
**missing** 152:24
　206:2,21 207:7

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 248 of 270

Peyton McCrary , Ph.D.    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[mission - number]    Page 28

**mission** 86:6 87:2
87:12,13,16
118:13
**mississippi** 41:15
82:22 91:3 93:21
107:16
**mistake** 51:6
**mixing** 158:19,19
**mkaiser** 4:10
**mobility** 51:22
**moderation** 21:8
**modernize** 129:21
**modifying** 16:22
**moment** 37:19
68:8 114:10
130:15,21 207:13
**moments** 70:16
**monday** 3:6
**money** 60:22,24
**montana** 41:15
46:11 88:13
**montgomery** 42:2
**monthly** 10:14,16
**months** 11:21
**morales** 182:25
183:19
**morgan** 44:21
117:24
**moritz** 161:20
**morning** 7:4 9:13
95:7
**motivated** 62:17
62:18
**motor** 135:1,24
**mouth** 78:2
**move** 9:9,11 53:14
55:17 73:17 99:16
111:25 146:19
159:8 161:4
169:23 177:19
179:18 180:21

189:5 207:18
**moved** 198:10
**movement** 19:21
**moving** 46:19
75:22 146:6
158:21 176:22
178:11
**muddled** 56:1
**mulling** 111:5
**multi** 166:2
169:20
**multiple** 9:1
**murphy** 175:3

## n

**name** 7:4 50:17
189:15 207:13
**names** 48:20
**narrative** 51:7
**narrow** 114:13
**national** 137:21
138:8
**nationally** 66:7
**nationwide** 154:8
**naturalization**
200:20
**naturalized**
204:22 205:5
**naturally** 201:21
**nature** 102:9
103:4
**nazi** 109:9
**nearby** 93:6
**necessarily** 23:21
26:11 73:8 87:20
127:3 170:13
**necessary** 41:8
46:1 72:15 217:10
**necessity** 195:1
**need** 25:20 29:11
29:15 35:1 58:21
72:7 75:12 145:4

188:20 197:20,22
203:1
**needed** 7:17 14:9
18:19
**net** 27:13
**never** 31:13 33:17
48:8 51:2 55:9
66:15 84:9,10
94:15 95:12 103:8
159:24 186:14,15
198:23
**new** 32:24 33:6
61:22 70:5 80:18
99:16,23 100:25
103:9,11 104:9
147:6,13 173:9
198:17 205:15
**newly** 187:3
**news** 42:3,16
114:17 159:6
**newsbank** 41:11
**newspaper** 20:10
40:12,17 41:11,20
42:10,21,24 43:11
91:4 92:20 93:1
93:11,17 114:4,5
176:13,19 178:2,4
178:6 187:17
**newspapers** 40:7,8
40:22,23 41:2,6,11
41:14,16,18,22,24
43:3,20
**nights** 93:25
**nightstick** 100:4
**nominee** 152:8
**non** 158:10 168:6
196:7
**noncitizen** 184:8
**noncitizens** 173:18
173:20,22 174:17
201:11

**nondiscriminatory**
49:12
**nonexpert** 75:5,8
**nongovernment**
110:9
**nonpaper** 133:9
**nonracial** 49:20
**nontestifying** 59:7
**nontraditional**
117:18
**nonuse** 129:8
**nonviolent** 19:23
**normal** 7:17
**normally** 40:8
50:12 61:13
**north** 50:15 81:17
123:17
**northern** 1:1
**nose** 97:3
**notarized** 216:10
**notary** 218:23
**note** 34:3 40:5
69:7 177:24 178:7
194:3
**noted** 217:4,5
**notice** 2:4 10:25
163:24
**noticing** 213:19
**notification** 190:1
193:20
**noting** 216:7
**november** 11:16
154:7,23 155:15
156:10
**nowadays** 41:9
42:5 55:9
**noxubee** 82:22
85:3 87:4 92:21
94:22 96:5
**number** 7:8 39:14
44:25 48:18 63:11

**[number - opining]**                                                      Page 29

68:10 91:7 97:11
101:13,15 127:21
129:24 134:24
137:25 140:3
142:7 144:17
150:15 157:6
162:1 166:13,15
167:25 188:12
**numbers** 128:17
134:22 135:7,14
153:24 157:3,7
162:25 166:6,13
189:14
**numerical** 209:21
**numerous** 10:16
**nvra** 105:17
139:23 140:18
**nw** 4:6,14

**o**

**oath** 6:8,21
**obama** 2:22 91:16
103:23 104:8,20
105:2 106:4,15
108:6 152:7
**object** 79:1 187:22
187:25
**objectable** 199:5
**objected** 137:16
139:13 189:20
190:11 198:22
**objection** 3:1 26:9
58:7 79:21 123:9
137:20 139:9,17
139:22,22 142:9
142:12,15,23
143:5,7 188:8
**objectionable**
199:5,24
**objections** 6:12
141:17 142:5

**objectivity** 84:10
**objects** 40:8
**obligated** 79:17
**obligation** 213:14
215:10
**obscure** 99:22
**observed** 64:24
191:10 195:3
209:18
**observers** 180:12
**observing** 180:5
**obstructionism**
103:16
**obtain** 161:15
**obviously** 7:16
24:2,19 30:9 38:2
40:12 49:23 60:15
152:14 186:22
210:7
**occasion** 96:14
**occasions** 38:25
**ocga** 213:7,8,21
217:7
**offended** 130:18
**offer** 119:19 120:5
120:14,22 211:6
211:11
**offered** 91:13
**offering** 120:2,12
120:19 136:15
176:12
**office** 9:2 12:15
13:16 15:2 16:1
42:22 90:7 113:25
134:8 149:10
208:13
**officer** 215:13
**offices** 216:3,10
**official** 1:8 43:9
131:20 158:13,16
205:16

**officially** 9:23
**officials** 17:11
20:7 49:11 105:15
121:12 175:22
210:13
**oh** 14:3,15 47:15
83:13 109:20
116:22 179:16
**okay** 8:4 9:18,22
10:15,23 11:2
13:14,25 15:8,18
16:10,21 17:6,10
17:18 20:6,11
21:16 25:6,17
27:15 29:11 30:9
34:2 35:15 37:14
39:13,22 40:21
48:3 58:11 59:6
62:9 64:9 66:10
68:8 70:17 71:23
72:5 73:19,25
81:10 89:9 90:19
92:3 93:9,20
97:13 98:8 99:16
100:25 101:15,16
104:6,15,18
105:10 111:21
115:1 119:10
120:7,15,25 121:9
125:17 126:2
127:24 128:15
130:9 131:1 133:6
134:13 136:17
137:3 138:4,12,23
140:16,24 141:10
141:12 144:11,18
144:19 145:9,25
147:2 148:14
151:25 154:20
155:17 158:21
162:5,22 163:1,8,8

166:10,16,19
168:14 170:1
171:19 172:3
173:8 174:7 178:5
178:12 179:5
183:22 185:8,22
188:21 189:18
193:1 195:12
198:5,6 200:17
201:9,25 203:6,23
205:20 207:20
209:2 210:24
211:14
**old** 38:22 40:9
83:23 198:23
**once** 17:22 87:9
90:20 95:21,24
216:9
**ones** 14:14 42:12
150:13
**ongoing** 161:1
**online** 27:13,13
41:10,22,25 42:1,4
91:25 132:1
133:22
**open** 17:24
**opened** 8:18
**operate** 122:19
**operated** 122:25
182:4
**operates** 23:24
51:12,13 120:9
135:25 185:2
**operation** 22:23
74:6 125:13
136:15 182:5
**operations** 20:3
42:17
**opining** 121:5
125:21 126:9,22

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 250 of 270

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[opinion - paragraph]**                                    Page 30

**opinion** 30:22,25
  33:21 38:22 44:2
  52:25 53:2,3,10
  58:11 62:7 69:5
  71:3,8 112:25
  118:10 119:12,14
  119:19,22 120:2,3
  120:8,12,14 121:1
  121:2 123:2,22
  124:14 125:6
  126:4,23,25
  127:11 133:4
  134:14 135:10
  138:19 176:12
  184:12 189:19,23
  190:10 191:5
  197:12 207:23
  211:7
**opinions** 112:15
  112:21 116:20
  120:4,6,15,18,22
  120:24 123:19,20
  124:4,9 125:6,19
  128:12 129:9
  130:10,12,13
  131:2 210:20
**opportunities**
  32:21 33:22 96:4
  122:24 134:1
  136:16
**opportunity** 85:16
  119:16 207:24
**oppose** 28:16,18
  180:1
**opposed** 7:16
  85:25 87:14
  150:10 153:13
  163:12 164:23
  180:15
**opposing** 40:7

**opposite** 64:25
**opposition** 85:22
  90:22,24 91:11
**order** 13:11 66:22
  184:7 188:6
**ordered** 183:19
**ordering** 214:2
  216:13
**orders** 13:10
**ordinarily** 45:14
  100:10
**ordinary** 46:3
  79:2
**oren** 200:18,21,21
**organization** 65:3
  66:18,21,22 102:9
  102:17 103:5,7,11
  107:17 110:15
  117:13 177:3,11
  177:16,18
**organizations** 65:4
  67:1
**original** 30:7
  216:12,14
**originally** 19:17
  42:7
**outcome** 99:14
  161:3 215:8
**outlines** 11:10
**outright** 151:15
**outside** 46:8
  110:15
**outstanding** 90:17
**overall** 163:23
**overlaps** 92:11
**overly** 189:21
**overreporting**
  157:22
**overrepresentation**
  193:5

**overturn** 34:18
**overturned** 34:14
  34:17
**overvotes** 145:6
  146:23
**overwhelmingly**
  163:11,12

**p**

**p.m.** 111:22 159:4
  189:3 211:22
  212:3
**page** 2:2 3:23 19:6
  24:13,15,21 27:5,9
  27:17 30:15,16
  32:16,16 34:3,7
  35:21,21 36:15,17
  39:23,24 40:1
  43:22 44:7 46:20
  46:20,22 47:18,18
  47:23,24 48:11,12
  52:20,22 53:8,14
  53:16,18,20 55:17
  55:18 68:21 69:6
  69:15,16 71:12,23
  89:7,10 90:18,18
  92:8,10,10,19
  93:12 95:15,15
  98:7,9,15,16,24
  101:11,12,13,14
  101:18 103:21
  104:1,16,19 105:9
  105:11 106:2
  118:4 119:3,21
  121:10 128:16,17
  136:19 137:4,13
  138:11,14 139:15
  140:5,6 141:4,4,14
  144:16,17,17,18
  146:3 149:23
  157:10 161:24
  162:24 163:7

166:5,6,15 168:8
  169:24,24,24
  170:10 173:8
  176:22 182:6
  185:3,7,25 187:18
  189:6 194:1
  195:10,11,25
  197:10 198:5,20
  199:15 200:15
  201:8,23 202:9
  203:5 205:19
  207:19 217:11,14
  217:17,20,23
  218:1,4,7,10,13,16
**pages** 19:6 39:23
  44:7 92:8 97:11
  217:9
**paid** 10:17,20
  60:14 61:4,8,9
**paint** 45:18
**palm** 100:5
**pam** 28:14
**panther** 99:23
  101:1,19,24 102:9
  103:4,7,9,11 104:9
**panthers** 99:17
  103:6
**paper** 8:11,13 19:7
  25:4 55:19 133:6
  133:20 134:17,19
  144:25 145:13,15
  146:8,13 201:18
**paragraph** 30:17
  36:16 40:2,6
  43:23 44:10 47:22
  48:5,12 50:7
  52:25 55:20 56:20
  57:8 58:15 59:25
  61:20 62:8 69:16
  69:18,20,21,23
  70:1,3,12 71:23

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 251 of 270

Peyton McCrary , Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[paragraph - people]                                    Page 31

72:8 89:11 92:11
92:12 93:13,19
94:8,22 95:17
97:14 98:9 103:15
103:22,25 104:1,4
104:11,19 118:3,4
119:2,12,21 120:7
121:10 136:18
137:3,19 139:15
141:13,20 144:20
144:20 145:7,9,18
145:19,22 146:25
147:3,10,11
148:13,19 149:11
149:23 150:1
151:4,7 152:2,5,16
152:18,20 157:7
157:17 158:21
159:8 160:1,16
161:1,4 163:2,6
166:10,20 167:1,6
168:5,11 169:23
171:25 172:3,6,22
173:9,16,23 174:6
174:19 175:16
176:5,22 177:19
178:11,20 179:18
180:21 181:16
182:6,15,25
183:22,23 185:25
187:1,10,18 188:9
188:19 189:6,8,18
189:24 190:18,25
191:19 192:5,24
193:7,12 194:1,9
195:11 198:5,20
199:13 200:15
201:8,24 202:10
203:5,24 205:21
205:21 206:6,17
206:18 207:22

208:3 209:2 210:9
**paragraphs**   47:25
174:16 192:18
**paralegal**   12:11
91:3 92:23
**paralegals**   93:4
**pardon**   84:4
**parkwood**   5:5
**part**   14:1 15:21
16:1 17:6,11 23:3
24:1 31:14 33:18
33:24,25 58:2,3
61:19 62:13 74:9
75:7 76:6 79:7,13
91:11 121:3
122:20 123:4,10
126:18 127:3
131:13 132:4,15
133:24 138:19
139:10 143:16,22
143:25 144:5
146:11 147:6
167:14 168:3
172:4 176:18
181:15 186:24
195:10 200:14
204:25 208:10
**partial**   112:11
**participate**   75:17
76:14 78:7 79:20
89:15 90:2
**participated**   93:3
**participation**   71:5
71:7 156:21
194:22 195:9,15
**particular**   12:24
16:18 36:8 40:25
49:18 50:24 51:19
54:20 58:14 61:16
65:18 74:21 75:21
79:18 81:4 84:25

93:25 115:3
124:10 136:23
149:4 162:23,23
164:18,18 170:14
170:25 171:2,3
172:19 173:6
177:7 178:1 179:3
184:22 190:12
193:5
**particularity**
204:10
**particularly**   22:18
31:18 40:8 107:15
114:25 166:1
180:18 181:7
191:12 193:20
**parties**   56:22
63:15 73:16
213:21 214:2
215:13 216:13
**partisan**   33:13,14
33:19 57:4,7 73:7
73:10,13 107:24
108:19 163:17,22
165:9 167:9 180:3
**partisans**   55:22
56:10
**partisanship**
55:25
**parts**   22:14 68:24
70:22 80:12
150:14
**party**   31:5,7 32:20
32:23 63:18 65:21
66:6,9 73:11
85:11,13 99:17,23
103:9 104:9
137:10 138:23
139:1 148:11,16
148:17,24 149:3
149:19,19,21

165:22,25 168:23
176:8,10,18
180:12 213:15,22
215:7,11
**passes**   179:25
**passing**   180:2
198:12
**password**   214:1,2
**path**   72:1 121:13
175:10 210:14
**pattern**   43:1 73:13
96:8 119:23 125:7
149:13 155:22
156:8 163:23
164:17 209:3
**patterns**   51:20
54:17 150:10,11
152:17 153:13,13
209:23
**pause**   7:14 188:24
**paused**   153:12
**pay**   177:14
**payment**   60:17
**payton**   216:2
**pdf**   8:10 19:6
46:20 216:7
**peach**   3:16
**peachtree**   4:14
**pedestrian**   56:1
**peer**   59:4
**pending**   189:22
190:11 205:22
**pennsylvania**
25:14
**people**   2:10 9:1
35:4,17 65:19,24
65:25 87:14 93:16
97:20,21 100:6,8
100:12 104:22
131:11 136:16
185:23 190:3

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[perceive - political]                                              Page 32

perceive 164:4
perceived 108:13
  165:3 170:19
percent 136:6
  150:2 164:14
percentage 133:4
  134:25 144:24
  152:6 154:14,16
  154:22 185:16,21
  185:23
percentages
  145:14
perception 170:13
  170:25 171:6,17
perceptions 3:17
perdue 187:13
perdue's 173:24
  175:16
performance
  90:16
period 38:18
  45:14,15 49:3
  112:8 124:1,19
  125:15 126:5
  136:25 138:22
  139:14 150:16
  192:23 209:21
periods 142:15
  209:20
pershing 22:9
persistent 119:15
  123:21 207:23
person 34:4 72:1
  88:4 97:18 110:15
  175:19,24 182:10
  193:20
personal 33:21
  38:4 54:8 58:11
  85:22
personally 14:11
  28:16,18 30:21

54:10 55:1 71:16
  71:18 85:25 95:1
personnel 74:5
  90:22
persons 55:11
  107:10 108:25
  117:21 134:24,25
  136:21 173:18
  195:4 205:5
petty 38:16
pew 159:12,18,19
peyton 1:12 2:6,14
  6:2,24 19:1 95:21
  101:22
phase 12:7
phd 1:12 3:15 6:24
  20:20 21:6 93:11
philadelphia
  99:25
photo 77:8,13
  81:19 82:6,12
  96:18 174:23
  175:1,6,18,23
phrase 197:9
phrased 143:8
phrases 142:23
phrasing 142:1
physical 35:21
  39:24 92:8 101:14
  144:16
pick 23:11 97:3
picked 205:7
picking 50:23 51:6
piece 43:14 179:11
  188:17 197:25
  198:7
pieces 177:23
pin 65:15 120:16
pittman 61:2
place 6:7 11:14,16
  42:5 55:6 74:25

99:25 100:1,9
  121:12 193:16
  210:14 213:20
placed 84:2,6
  124:24
places 162:24
  165:23
placing 73:3
  175:10
plaintiff 10:8
  13:16 57:3 118:5
  183:16 187:21
plaintiff's 11:24
  14:16 16:6,12
  17:8 47:1 112:9
  112:13 118:22
plaintiffs 1:5 4:2
  12:9 36:19 37:8
  56:5,18,25 64:13
  74:16 143:3
  169:19 196:6,22
  197:10 198:14
  200:6
plan 32:25 78:4
  84:2,6,8
planning 9:5
  211:11
plans 34:2,11
  76:11 77:17 78:9
platform 7:13 8:8
play 12:22
playing 48:20
pleadings 13:8,10
  13:13
please 6:18 26:2
  26:13 88:25
  143:17 145:8
  216:10,17 217:9
  217:10
pllc 4:5

point 10:9 11:18
  51:18 61:12 70:20
  72:7 87:25 94:5
  97:2,19 129:18
  131:17 140:21
  156:16 157:21
  158:23 167:4,21
  177:14 179:1
  184:22,24 188:7
  191:13 196:20
  202:13 205:10
pointed 192:14
pointing 180:13
points 90:12
  154:17
polarization 150:6
  150:21 151:2
  152:12 163:17,22
  163:22 167:9
polarized 27:3
  51:20 53:23 54:18
  149:13,16 151:8
  151:18 166:4
police 20:8
policeman's 100:4
policies 118:8,20
  180:8
policy 51:9 146:19
  148:23 149:4
  164:5 165:3
  176:23 177:2
  194:24
political 28:12,17
  31:5,15 51:12
  52:8,15,16 60:22
  62:5,16,23 65:20
  66:9 71:7 83:11
  83:13,14,21 117:4
  120:8 123:6 124:7
  146:12 152:13,14
  157:23 169:3

Peyton McCrary , Ph.D.                                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

177:7,15,17,17
194:19,22 195:6,9
**politically** 65:7,11
66:2
**politics** 25:13 60:9
62:10,25 107:24
108:4 120:10
124:8 210:10
**poll** 150:16,16,21
**polling** 99:24
100:1,9
**pool** 201:13
**population** 100:2
107:8,11 153:18
156:13 193:6
**portion** 14:23
15:11 108:20
109:1 121:5
145:16 150:11
156:15
**portions** 28:24
**posed** 7:19 74:20
180:17
**posit** 133:14
**position** 37:11
65:21 69:4
**positions** 104:21
165:3,10
**possess** 204:21
**possibility** 41:17
**possible** 101:4
126:3
**potential** 102:22
105:23 201:11
**power** 25:11
104:21
**powerful** 71:14
121:11 210:13
**powerpoint**
131:21

**practice** 45:21
46:3 51:8 59:23
79:9,10,15 88:10
110:6 121:17
124:10 169:6
171:1,4 186:17
192:8 193:3
207:17
**practices** 48:22
55:8 76:3 90:21
118:8,16,20 119:7
121:6 124:13
125:21 170:14
183:8
**precedence** 37:3
**precedent** 36:25
37:2,15
**precedents** 37:17
72:11
**precinct** 100:1
**precincts** 145:1,2
145:15 167:25
**precise** 80:10
**precisely** 37:24
**precision** 200:23
**preclear** 78:8
188:3,6
**preclearance** 2:7
15:20 22:24 25:2
25:10 26:4 29:9
30:1 31:24 33:2
33:14,24 34:1,21
67:9 70:7 71:16
71:19 76:2,5,9,15
76:19 77:5,13,16
77:24 78:3,16
79:8,14,16 94:2
96:18 109:18
118:9 125:1 139:9
142:13 182:23
187:2 189:19

190:17 198:25
199:7 200:12
**precleared** 78:19
79:10 183:8,13
**predominantly**
145:1,2
**preface** 90:4
**prefer** 164:22,23
165:11 201:21
**preferences**
148:23 149:4
164:6
**preferred** 151:10
165:6 168:7,17
**preparation** 12:10
15:21 16:2,8,14
17:12 113:13,17
**prepare** 86:24,25
**prepared** 181:11
**preparing** 10:5
12:1 14:17 48:21
116:2 118:13
129:18 136:10
139:10 144:5
181:9
**presbyterian** 95:6
**present** 26:8 52:1
60:11 68:25 73:14
89:14 106:8
136:22
**presentation**
178:8 188:10
**presentations**
131:21
**presented** 36:19
37:8 60:6 200:3
213:1
**president** 65:23
104:8,20 105:2
**press** 176:14

**presumably** 33:2
100:6 207:15
**pretty** 12:9 17:4
26:15 28:22
209:13
**previously** 26:10
31:4 167:7 177:9
181:12
**prey** 55:25
**primarily** 54:23
71:1 121:22
**primary** 21:14
22:20 28:25 46:7
57:16 98:16
**primitive** 192:7
**princeton** 20:19
21:6 116:25
**principal** 122:4
152:18 199:8
**principle** 34:5
**print** 40:24 42:7
216:8
**printout** 138:6
**prior** 7:19 8:13
18:17 45:8,10
125:22 141:17
177:9 187:12
193:7
**private** 74:16
88:10
**privilege** 6:13
**probably** 16:3
29:14 42:2 46:15
53:6 59:16 94:18
95:3 105:21
127:15,15
**probative** 39:4
71:10
**problem** 35:25
57:9,9 104:2
106:24 107:4

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

136:2 157:22
166:2,3 169:20
204:25
**problems** 32:12
167:25 179:20
180:22 189:14
209:16
**procedure** 6:5
51:19 135:2
190:21 192:6
217:7
**procedures** 139:18
**proceeding** 213:1
213:22 214:1
215:6,13
**proceedings** 96:21
213:12
**process** 3:2 13:18
14:17 15:1,3,14
41:1 44:3 45:8
49:9 51:12 76:15
78:5 81:9 84:7
112:23 119:14
121:23 122:2,9,16
122:22,23 123:10
123:15,21 124:17
125:1 126:7,18,19
126:23 127:4,6,7
129:22 132:1,16
132:19,20,24
133:1,7,18,20,25
134:6,10,15 135:6
135:10,18,25
136:8,12,14
138:20 140:7
143:19,23 148:19
175:18 178:2
185:10,11,17
186:20 187:3,23
188:3,14 189:11
189:16 190:8,20

190:23 191:1,6,8
191:16 192:12
193:19,22,23,24
194:3,23 196:25
197:14 198:10,24
198:25 202:6
203:8 204:19
205:15 207:6
208:1,14,15 210:2
**process's** 121:22
**processed** 207:1
**processes** 51:5
77:5 132:6 186:6
**processing** 136:1
**produced** 13:15
16:7,13,23,25
192:17 213:23
**production** 216:18
**professional** 21:18
44:2 53:1 56:4,17
213:14 215:10
**professor** 86:22
111:1,9,17 117:8
127:19 147:19
159:15 162:13,20
164:13 166:19,21
193:8 204:23
206:22
**professorial** 21:20
**professors** 147:20
147:23
**profiling** 178:14
178:23 179:4,6,14
**program** 181:20
181:22 195:19
**prohibited** 213:20
**prohibition** 179:5
**prohibitions** 213:8
**promotion** 88:2
**prong** 199:25

**proof** 169:18
**proposed** 141:15
**proposition** 59:18
**protect** 66:24 86:1
87:14,16 128:19
129:22
**protected** 214:1,2
**protecting** 176:2
**protection** 179:2
**protest** 19:23
**provide** 11:24
110:8,13,15,17,18
112:13 191:21
213:19
**provided** 8:9
11:22 13:12,20,23
14:8 32:21 67:4
68:15
**providing** 61:22
205:12
**proving** 200:2
**provision** 38:16
105:14 172:23
178:13 179:13
184:17
**provisions** 124:24
139:13 172:9
176:2 203:2
**public** 20:14
172:12,16 218:23
**publication** 24:18
39:9 41:25
**publications** 24:6
25:6,18,21 28:25
29:8 117:16
**publish** 117:12
**published** 25:14
25:19 26:4,6,24
27:4,8,13 39:18
91:25 94:2 153:23
157:15 169:12

171:3
**publishes** 117:14
**pun** 87:21
**purge** 107:14
**purpose** 26:24
50:2,3 78:24
142:6 153:5 182:7
199:19,25 200:3
**purposes** 6:3,4
18:10 49:15
133:15 134:4,9
200:8
**pursuant** 205:17
217:6
**pursue** 114:10
187:8
**push** 202:22
**put** 8:5,16 29:12
34:25 39:8 59:21
72:19 78:2 104:13
118:17 130:24
146:24 169:21
196:20 206:10,14
**puts** 94:7
**putting** 8:25 31:7
134:22
**puzzled** 127:8

## q

**quadruple** 94:4
**qualification**
158:7
**qualified** 182:17
**quality** 57:10
**quantitative** 27:4
117:5,8
**quarter** 150:4
**question** 7:14,19
7:22,23 10:19
33:16 34:19 37:5
46:4,6,16 48:16,23
51:4,11 54:9,13

Peyton McCrary , Ph.D.                                                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

58:23 60:20 63:14
64:21 70:15 76:22
77:11 78:24 79:5
81:13 92:9 93:18
104:5 106:22
109:15 111:4,7
115:9,23 118:19
122:10 124:12
125:11 129:7
130:6 133:12,16
133:24 134:9
140:1 144:2
145:10 146:1
151:21,23 154:20
155:12 156:5
160:8 164:22
167:3,12,19
168:14 169:5,16
169:17 170:17,23
175:4 178:23
182:21 183:7,13
185:1 189:25
196:7,18,23
197:20 203:15,16
203:22 204:6,7
206:11,24 209:17
211:4,5
**questioned** 84:10
**questions** 16:9,16
16:20 18:23 34:10
42:14 47:21 52:9
64:23 68:20 75:3
86:4,12,13 87:2,12
104:14 115:7
127:8 155:18
157:6 208:10
211:1,15,16,23
213:23 215:5
**quick** 111:20
**quickly** 95:22

**quite** 90:13
**quote** 28:11 52:11
58:2 59:10,24
94:9 175:17
187:18 193:12
**quoted** 106:14
169:12 174:5
**quotes** 50:23
**quoting** 94:18
162:14 177:5
184:16 192:8
194:12 196:16

## r

**r** 3:14 4:3
**rabb** 117:9
**race** 27:9,11 60:9
62:10,12,19,25
146:22 151:13,18
152:25 153:22
157:14 163:9,17
163:20 165:22,25
168:24
**racial** 2:22 48:23
49:2,19 50:6
62:12,17,22 68:25
84:14,18,23 87:3
91:16 99:4,6
118:15 125:3
149:13 150:6,20
151:1,17 152:12
153:3 158:2
163:22 167:9
169:6 178:14,23
179:3,5,14 193:6
195:3,7,14 201:10
206:20
**racially** 15:14 27:3
50:2 51:20 53:22
54:17 124:15
125:12,16,20
126:11 127:13

135:11,19 149:16
166:4 195:2
197:13,21 199:16
199:18
**raffensperger** 1:7
6:3
**raise** 211:2
**raised** 15:6
**ran** 19:15 101:19
164:15
**range** 77:5
**rank** 43:25
**rarely** 60:4
**rate** 9:24 158:9
172:14 196:2,4,10
197:1,18,22,24
**rated** 90:16
**rates** 152:25
156:21 158:16
195:16 198:3
**rationally** 180:2
**reach** 50:23
116:20 119:12
123:2
**reached** 64:24
132:8
**reaches** 59:19
**reaching** 44:2
55:19 124:15
130:13
**read** 13:3,4,7
25:21 41:5,16
48:1,14 56:8,11
58:17 69:18 70:1
90:5 92:3,10,12
101:15 104:4
114:1 119:10
122:6 124:9
130:10 132:21
145:7,9 148:7
155:7 166:19

173:15 174:5
183:20 195:20
199:20 204:11
216:6 217:2
**reading** 19:20
20:10 98:19 122:8
148:2 162:21
**ready** 9:8,13,20
**real** 60:11 111:20
**realignment** 51:21
148:11,15
**realize** 87:18
160:12
**really** 10:6 12:22
16:9 43:7 51:10
54:21 62:7 186:24
209:11
**reask** 81:3
**reason** 43:3 71:5
136:24 160:7
165:9,21 167:6
217:13,16,19,22
217:25 218:3,6,9
218:12,15,18
**reasons** 165:14
205:23 217:8
**rebuttal** 162:14
211:7,11
**recall** 9:21 10:11
11:13 12:16 13:9
13:12 16:5 17:4,9
20:10,22 21:3
23:9 25:4 26:15
28:5,10,13 30:10
37:24 47:5,17
48:24 51:3 74:4
76:12 77:18 78:20
79:6 81:2,10 83:4
85:12,19 86:24
92:21 99:21 100:3
101:6 105:20

Case 1:18-cv-05391-SCJ    Document 404-1    Filed 06/28/20    Page 256 of 270
Peyton McCrary , Ph.D.                           May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[recall - regulations]                                              Page 36

106:1 112:12
129:20 131:15,23
132:13 139:25
161:2 167:11,20
178:24 183:20
185:1 194:18
200:20,23 201:6
202:17 204:9
207:12
**recalling** 46:17
**receive** 13:17,20
16:11,22 17:1
61:11
**received** 8:11,17
12:6,7 13:23 14:4
16:5,17 20:17
133:21 164:14
**receives** 213:22
**recess** 64:4 111:22
130:22 159:4
189:3 211:22
**recognized** 19:21
**recognizing** 66:3
**recollection** 11:9
11:15 12:5 13:22
47:8 90:10 92:16
99:25 102:19
148:8 151:1
160:15 184:14
186:18 200:25
201:20,22
**recommend** 78:18
79:15
**recommendation**
78:8,13 102:16
**recommendations**
78:10
**recommended**
79:10
**recommending**
79:20

**reconciling** 72:14
**reconstruction**
21:10
**record** 8:5,17 11:2
18:6,9 35:8 43:5
49:10 70:9,13,22
71:3 86:10 111:20
159:2 189:2
211:19 213:12,13
213:23 215:6
**records** 134:6
**recounted** 25:2
**recruited** 88:7
**rectify** 146:7
**redistricting** 24:15
25:3 27:12 32:9
54:23 77:17 78:4
78:9
**reduced** 215:5
**refer** 29:11,18
38:8 42:25 55:3
97:10 109:8
137:24 208:3
**reference** 13:15
14:2,13 32:16
49:11 76:25 98:10
103:7 137:6
145:21 153:21
161:5,24 174:20
179:2 187:2 188:9
190:1,7 205:22
208:19 211:11
**referenced** 9:17
14:24 30:5 35:16
62:1 113:20
160:25 203:7
210:12
**references** 21:4
30:13 32:23
**referencing**
146:21 171:25

**referred** 25:11
36:2 50:6 61:21
75:14 204:23
**referring** 27:23
34:6 44:3,19
47:23 48:7 56:19
80:8 89:23,24
90:16 94:24
140:17 149:7
156:21 173:7
175:2 185:6 195:7
**refers** 21:13 73:2
90:12 193:18,18
**reflected** 123:12
148:23 181:2
**reflects** 143:5
**refuse** 85:21 86:18
**refused** 89:15
94:10,16 187:11
**refusing** 84:13,18
84:22
**regard** 31:15
84:11 107:2,2
136:4 160:20
**regarded** 31:4
177:11
**regarding** 26:9
46:10 71:7 81:6
138:7 187:14
199:9
**regester** 52:1
**register** 55:7 73:5
119:16 121:14
122:24 131:7,11
132:12,14 207:24
210:15
**registered** 107:10
135:1 136:6,21
**registering** 188:11
**registrants** 206:3

**registrar** 55:9
186:12 189:15
200:21 205:7
207:2,3,12 208:16
**registrars** 17:11
122:18 131:3,22
137:8 186:7,10,21
186:25 191:4,7
205:3 207:11
208:17
**registration** 15:3
15:14 22:17 73:14
85:18 105:15
107:9,15 118:16
119:7,23,25 120:9
121:3,6,24 122:7
123:15 124:7,14
125:4,7,14,22
126:10,18,22
127:4,5,7,12
128:23 129:1,4,8
130:4 132:1,6,10
132:11 133:16,18
133:22 134:1,16
135:11 136:2,16
137:15,22 138:9
143:15,23 148:21
149:5 153:22
157:14 158:3
170:5 182:18
193:13 206:13,25
209:4 210:1
**registrations**
134:19
**regression** 116:10
117:22 159:13
**regular** 3:5
**regularly** 88:11
117:12 119:1
**regulations** 213:6

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[rehnquist - repository]                                          Page 37

rehnquist  38:20
reimposed  71:16
reintroduce  53:24
reject  95:14
  166:24 167:14
rejected  169:9
rejection  37:3
  198:3
relate  47:19 122:6
  175:12 200:18
related  3:18 13:19
  71:1 76:14,22
  87:3 105:25
  128:12 132:15,17
  138:21 148:6
  167:24 169:5
  183:12 210:20
relates  184:5
relating  15:4
  214:1
relationship  60:8
  62:10,20,24
  103:13 113:8
  165:8 194:20
  195:8 213:12
  215:9
relationships
  97:17
relative  105:4
  215:7
relatively  30:9
relevance  26:23
  44:5 163:19
relevant  14:5,7
  38:23 39:1 42:11
  48:22 72:11 113:4
  114:25 115:5,7,17
  115:21 116:2,4,8
  143:24 175:12
  179:9

reliable  186:1
relied  16:7,14,19
  16:25 112:21,24
  113:2,17 157:6
  169:10 178:22
relies  44:1 208:16
reluctant  94:3
  163:25
rely  16:22 130:12
  162:17 166:25
relying  115:19
  123:4,7,10 146:11
  147:22 159:16
  181:14 194:5,14
  200:25 204:2
remaining  163:3
remains  202:12
remanded  32:5
remedial  84:2,6,8
remedy  183:19
  195:17
remember  16:4
  20:9 28:7 48:15
  56:19 83:2,24
  91:7,24 94:13
  103:1 105:20
  106:17,18 114:24
  115:10 128:13
  161:18 162:20
  171:7 185:19,21
  208:7
remembered
  82:19
remote  1:13 113:8
remotely  6:7,21
  215:4
removal  118:9
remove  76:25
  105:15
removed  71:13
  88:23

renewal  34:15
repeat  10:19 54:9
  111:4 115:23
  145:10 196:17
  203:15 206:11
rephrase  8:1 37:4
  76:23 133:12
replaced  105:6
  147:15,24
replicated  147:12
reply  211:9
report  2:6,24 3:9
  3:14 7:7 9:11,16
  9:17,19,19,23 10:5
  11:17,20 12:1,10
  13:14 14:2,10,13
  14:18,24 15:4,22
  16:2,8,15 17:7,12
  18:16,25 19:5
  25:1 29:14 59:3
  61:21 76:13 77:1
  90:9,12 108:24
  112:1,4,10,18,20
  113:1,13,18 114:5
  114:19 115:5,10
  116:2 118:2,13,18
  119:19 120:2,13
  120:18 121:1,21
  123:13,23 125:10
  125:12 127:23
  128:16 129:9,16
  129:19 130:7,13
  130:25 131:3
  135:6 136:10,19
  137:4 138:20
  139:10,21 141:10
  141:13 142:16
  143:12 144:3,4,5
  144:14,18,24
  146:5,11,25 147:1
  147:6 148:4,10

150:18 151:6
  153:1 154:6
  156:15,23,25
  159:8 160:13
  161:19,23 162:7
  162:13,15,17,18
  166:9 167:1,20
  168:3,9 169:22,23
  170:11,12,18
  172:1,4,4 177:5,8
  177:10 179:23
  181:10,11 185:20
  186:19 189:6
  192:9,15,19 193:2
  201:22 203:9
  205:18 207:19
  208:6,9 209:1,13
  210:17,21 211:3,7
  211:12,12 213:13
reported  157:2
  159:14 184:14
  187:17
reporter  6:19,21
  21:22 67:18 213:1
  213:3,7,10,24,25
reporting  8:9
  159:10 176:14,15
  187:16 193:10
  196:21 201:10
  202:1 203:24
  213:6,19
reports  12:8,17
  27:2 42:16,16
  58:18 62:2 112:8
  114:20,24 154:10
  156:17 157:21
  158:19 159:23
  161:13 162:19
  198:1
repository  214:2

Peyton McCrary , Ph.D.                                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[represent - revised]**                                          Page 38

**represent** 7:5
187:15
**representations**
213:4
**representative**
53:9
**representatives**
3:4 32:22 33:23
**representing**
96:16
**reprimanded**
84:17,21
**republican** 63:15
65:21 66:6,13
73:16 108:22
121:11 148:17,24
163:10 176:8,10
176:18 179:21,24
180:8,12 210:13
**republicans** 63:4
149:2,3,12,17
159:11 166:24
168:16,21 170:4,7
**request** 7:18 12:13
12:20
**requested** 12:24
15:24 216:6
**require** 172:15
186:24
**required** 172:10
181:22 186:16
**requirement** 70:8
77:9 81:19 96:19
122:12 175:1,7,19
182:2 186:20
199:8 203:9
**requirements**
55:12 67:9 71:20
118:9 174:24
181:18 182:12,23
189:21 203:11,13

203:14,19,20
204:2,14,24
**requires** 181:2
**requiring** 33:7
193:3
**research** 12:12,19
12:22,23 13:2,2,18
17:6 27:19 40:21
41:1 50:14 57:16
60:4,10,21,22,24
74:13,19 75:6
86:9 89:14 91:4
93:5,7,11,22 112:6
112:22 114:4
116:21 117:11,17
119:1 159:12
181:9,15
**resemblance**
119:24 124:6
**resembles** 120:10
**resembling** 124:8
210:10
**reserve** 6:14
**reserved** 212:4
**resident** 182:9
**residents** 173:11
**residents'** 3:17
**resistance** 91:11
101:20,23 104:8
**resolve** 168:1
202:15,25
**resolved** 72:14
183:21
**resolves** 202:11
**resources** 60:4,17
**respected** 123:18
**response** 7:15 99:2
139:21
**responsibility**
89:13 216:7

**responsible**
108:15
**responsiveness**
6:13
**restrict** 62:14
**restricted** 40:19
**restricting** 16:18
**restrictions**
179:25 180:3,16
**restrictive** 175:18
**result** 84:3,6
148:20 191:21
198:12
**results** 122:20
186:3,7 192:16
**retain** 46:5
**retained** 12:8
44:20 45:16 46:12
67:13 75:10 93:7
**retainer** 11:22
**retired** 80:18
96:16 186:12
**retrogression**
32:24
**retrogressive**
141:22,25 142:6
142:19,22 143:8
**return** 105:7
130:25
**returned** 96:21
216:11,14
**reveal** 206:2
**revealed** 125:2
176:20
**revealing** 114:1
**reveals** 115:10
**review** 9:19 10:24
15:20,25 25:9
26:7,11,17,21 27:8
27:8,10,18 28:2,6
28:15 29:1 31:5

31:14,24 33:6,18
33:24 34:1 35:22
44:4 47:20 68:17
76:3,6,10,20 77:4
77:6,13,17,24 78:4
78:12,16,23 79:2,8
79:9,14 93:1,17
94:1 109:18 110:3
114:13 115:5
116:2 123:1,1
130:2,6,8 131:6,9
131:13,25 132:5
132:17 138:20
139:24 140:5
142:2,13 143:3
144:4 145:4
150:19 156:15
161:23 163:6,18
169:11 177:25
178:7 179:7,8
187:5 189:24
199:25 213:2
216:7
**reviewed** 8:12
9:16,16 14:1
15:20 48:15 59:4
70:13 78:14
113:12,17,19
114:7,21 132:2
139:9 142:8,9,11
162:8,16,19
171:16 198:23
205:15
**reviewing** 14:12
64:10 186:7
201:21
**reviews** 22:24
78:22 92:20
**revised** 17:15
187:3,23

Veritext Legal Solutions

Peyton McCrary , Ph.D.    May 22, 2020

Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**revolutionary**
21:9
**reynolds**  108:12
**rich**  110:21
**right**  6:17 10:23
12:24 24:11 53:18
63:12,20 65:12,14
69:6 72:19 81:14
94:17 119:5,8
154:12 157:4
160:4 171:13
183:5,13 185:12
195:22 196:14
197:6 198:25
199:22 202:20
205:17 206:10,24
**rights**  2:13,17,20
15:16 19:21 22:6
22:11,15,24 23:11
23:15 24:3 26:5
26:19 27:20 31:2
34:15 36:11 38:3
44:12,23 45:4
52:5,24 66:18,20
66:24,25 67:10,12
67:12 68:17 71:20
74:13 86:3,6 87:7
87:8 88:16 89:1
89:20 91:20 94:10
94:20 96:11 97:1
97:7 98:17,18,20
98:25 99:3,6,11
104:10,22,24
105:8 107:1,3
108:13,15,20,25
115:15 116:3,14
118:7,19,25
120:11 124:8,23
129:22 143:1
150:25 151:3
164:20,21 169:18

187:7 210:11
**rise**  150:25
**roberts**  69:8
**robyn**  1:17 215:19
**rogers**  174:21,23
**rogers's**  175:5
**role**  2:11 12:19,21
21:18 23:6,16
26:18 31:6 35:17
39:19 46:7 74:14
74:15 75:4,5,8,23
78:11,12,15 93:1
98:16 102:25
163:21 186:6
208:14
**roles**  82:16 83:6
**roll**  32:7
**room**  6:8 106:6
**rose**  173:25 174:4
**roswell**  216:20
**roughly**  164:9
**routine**  186:3
207:17
**routinely**  75:24
170:3 175:22
**row**  166:12
**rows**  154:8,19
**rpr**  1:17 215:19
**rubbing**  97:2
**rule**  47:6 53:2,7
217:6
**rules**  6:4 7:12 53:3
213:5 217:6
**run**  79:2 191:25
203:2,23
**running**  108:25
192:18
**rural**  186:12
**rush**  26:14
**russell**  26:6

**s**

**sage**  26:6
**salary**  61:11
**salient**  180:11
**sarah**  4:3 6:15
11:10 13:22 17:19
140:11 216:1
**satellite**  137:15
**satisfied**  200:5
**satisfy**  193:23
202:14
**save**  183:23,25
184:7,8,10,20,24
**saw**  8:20 86:6
87:10 88:23 95:7
107:9 146:3 205:2
**saying**  28:10 57:2
90:5 95:9 106:15
126:21 127:5
143:7 149:3 158:7
170:7 174:11
176:13 179:24
184:17 188:5
193:13 195:20
199:20 200:7
203:1 204:5
206:22,25 209:13
**says**  32:20 70:3
89:12 92:14,19
93:13 94:19,21
95:10,17 97:15
98:25 102:15
103:16 104:10
128:19,22 129:11
166:6 181:16
182:7 186:1
203:10 206:1,18
**sazama**  92:20,23
93:13
**sb**  175:12

**scenario**  135:15
**schedule**  13:11
**schlozman**  109:2
**scholar**  20:23,25
21:1
**scholarly**  116:12
119:1
**scholars**  60:3
**scholarship**  29:1,5
56:25 57:15
**school**  20:15 21:18
22:2 35:18 36:12
36:13,13,19 37:2
88:9 116:24 117:6
117:16 127:17
160:12,15
**schools**  20:14
**science**  23:22 27:5
83:11,21 117:4,11
117:14,15,18
**scientist**  43:13,18
43:18 89:22
146:12
**scientists**  31:15
52:8,16,17 56:23
60:23 61:24 62:5
83:13,14 89:12
123:6 157:23
194:20 195:6
**scj**  1:7
**scope**  187:14
**scott**  164:7,10,14
165:13,14
**scrutiny**  43:24
**scuttle**  102:15
**seal**  216:12
**search**  49:12
161:20
**searchable**  42:6
**searching**  43:1

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[seat - side]**                                                    Page 40

seat  163:4
second  44:10 92:7
  119:22 120:1,3
  125:6 129:11
  150:23 151:5
  152:5,5 167:13
  209:3
secondly  164:2
  209:18
secretary  1:8
  12:15 13:16 15:2
  16:1 42:22 66:14
  66:15 113:24
  132:21 137:7,10
  146:6 149:10
  184:6 186:23
  189:22 208:13
section  15:16 22:5
  22:23 31:1,5,10,14
  32:3,4 33:18
  36:11 46:24 47:7
  54:6,12 55:2
  67:11 68:5 72:1,9
  77:18 80:4,9,15,17
  80:20,21 81:7,12
  81:14,18,21,25
  82:8,10,13 83:8
  84:2 87:3,14,24
  88:3,7,12 89:13
  90:23,25 91:12
  92:15 93:2 95:19
  97:20,25 98:4,11
  98:19,21 105:5,12
  105:14,17,18
  106:4,5,9,16
  107:18,25 108:19
  109:13,17 110:3,8
  110:13 113:21
  129:21,25 138:15
  140:6 141:6 142:2
  142:25 143:3,4,12

148:10 166:17
  182:24 183:3,6
  188:16 199:25
  200:12 207:18
  213:7
section's  33:8
  105:3
sections  92:6
  162:23 213:8
secular  148:15
secure  129:22,24
security  123:11,14
  130:3 185:9
  192:12
see  10:23 18:3,4,5
  19:8 27:18,21
  30:19 33:3 36:22
  40:10 44:13 46:24
  50:25 53:25 55:23
  56:6 57:22 69:9
  72:1 89:11,17
  94:8 97:2,22
  98:11 99:8 103:23
  125:10 128:19,23
  129:25 131:17
  137:22 138:7,9,13
  138:14,17 139:12
  140:7,14 141:7
  145:2,11,15,25
  152:12,20,22
  153:2 154:7,9
  155:22 156:16,19
  163:2,9 167:21
  168:10 171:20
  188:7 192:9 203:1
  204:3 205:3,24
  206:3 210:6
  211:17
seeing  13:9 91:24
  128:13 145:5
  206:5

seek  57:13
seeking  121:13
  210:15
seen  15:4 57:3,7
  90:14 100:15
  108:18 177:4
  191:3 202:12
selection  113:4
self  157:2 159:14
senate  24:14 33:1
  172:7 173:24
  174:22 175:5
senator  164:10
  174:8,21,23 175:4
send  112:9 216:12
  216:17
sending  200:19
sense  7:23 14:7
  59:18 68:1 86:12
  94:6 105:4 110:5
  132:3 175:12
  200:24
sent  10:8,12 12:12
  17:15 112:11
sentence  57:12
  62:11 69:7 70:12
  102:4,6 142:4
  149:7 151:21
  152:6,17 173:6
  174:5,6 175:15
  181:16 182:7,22
  186:1 188:2 193:2
  193:18 194:11,19
  196:5 197:6,7,10
  206:1,6,18 208:11
  210:12
sentences  102:14
separate  145:17
  165:22 167:3
serious  78:24

serve  12:11 28:11
  60:7 215:13
served  45:1 47:1
  64:16
serves  180:3
service  8:9
services  61:5
  133:21 134:6,8
  183:25 213:19
serving  55:23 56:3
session  3:5 114:14
  177:24
set  16:11 72:16
  141:11
sets  13:15
setting  169:17
settle  188:4,6,8
  200:4
settlement  198:11
  198:17 199:11
settlements  198:9
setup  151:23
sfink  4:9
shape  211:12
share  8:8 98:3
sharply  65:20
shaw  36:2 74:14
  75:20,23
shelby  67:5,7
  68:18 69:2,13
  70:8 71:13,24
  82:1,7,8,10,14,24
  118:10 142:10
  190:17
shift  53:21
short  195:13
show  135:14 198:3
showed  205:6
showing  204:21
side  56:3,16 112:6
  112:7 141:11

Peyton McCrary , Ph.D.                                          May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[sign - standard]**                                          Page 41

sign   206:9,13
207:4,5,16 216:6
signature   206:21
207:1 212:4
215:17 216:2,15
218:20
signed   185:4 216:9
216:11,14
significance   36:21
37:17,22
significant   136:7
173:10,13,20
174:11 195:17,22
signing   173:24
silly   52:11
similar   101:18
159:22 210:8
similarities   210:6
simply   55:6
102:20 107:19
149:2,7 161:2
167:7 173:17
179:1 180:5
187:16
simultaneous
67:17
single   142:9
sir   39:12 64:22
sit   161:2 183:20
204:10
sitting   41:13 79:3
79:6 210:24
situation   79:7
85:20 100:12
six   19:6 154:17
sixth   39:24
sizable   63:10
size   135:21
skeleton   9:1
skip   172:3 192:24

skipping   192:5
slightly   102:10
155:9 158:9
sloppiness   56:1
sloppy   31:16
56:24
small   142:7
167:24
smaller   185:23
smith   22:18
social   20:24,25
21:1 23:22 27:5
43:12,18,18 51:13
51:22 56:23 61:24
62:18 89:12,22
117:11,13,14,18
123:11,13 185:9
192:12
society   51:14,22
socioeconomic
194:21 195:8,14
sociologists   52:8
52:16,17 60:23
62:6
solely   193:5 194:5
196:10 197:17
213:15 215:11
somebody   102:24
somewhat   210:7,8
soon   158:23
sorry   10:19 18:5
30:5,14 37:4
39:11 47:13 53:15
53:20,20 56:12
59:1 66:11 67:20
69:20 74:22 76:21
79:4 80:2 83:16
89:11 91:6 96:1
97:9 98:18 101:12
102:3 106:20
109:15 113:15

121:18 125:9
127:14 128:6
131:10 140:10
145:23 151:4
152:19 153:12
154:19 155:6
157:17,18 158:11
158:21 168:18
174:19 179:17
185:6 187:20
188:16,17,19
194:7,8 199:5,14
201:13 206:11
sort   12:15 13:11
23:17 40:2 64:19
77:24 78:11 87:6
120:21 159:13
191:23
sought   53:23
187:2
sound   167:6
sounded   133:12
sounds   23:25
103:12
source   41:23
sources   42:4 43:25
44:1 57:16 184:9
south   27:3 45:24
46:9,12,23 49:4,6
49:8 50:5,15 60:9
62:10,14,25 69:8
69:13 82:7 96:16
96:18 151:3 164:8
southern   2:13
25:13 26:19 49:2
49:24 61:3 62:13
165:24
space   115:20
spakovsky   109:2,3
109:6,8

spam   106:11
speak   17:7 131:3
speaking   67:17
special   99:3
124:24
specialized   181:5
specialty   181:8
specific   12:20
15:11,19 24:10
29:8 62:2 65:5
82:3 124:12
125:21 139:25
140:1 150:13
153:16 183:12,16
213:21
specifically   50:5
58:25 59:1 67:10
68:16 80:4 81:13
136:20 186:24
213:5
specify   179:3
speculating   42:3
spencer   20:23
spent   10:5
spoken   96:10
sponsor   174:23
175:6
sport   130:18
spotty   181:1
spreadsheets
159:7
ssa   184:25 185:4
185:18 191:17
staff   9:1 74:10
147:4,14
stand   57:20 59:13
59:14
standard   31:1
32:12 53:19,24
57:25 58:5,12
59:4 164:25 169:1

Peyton McCrary , Ph.D.                                        May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[standard - substance]                                        Page 42

169:18 200:12
**standards** 31:23
57:20 58:3 72:16
199:6
**standpoint** 75:6
**stands** 126:10
**start** 7:14 8:13 9:6
9:12 11:6 51:14
58:16 118:2,3
137:19 167:4
168:18
**started** 19:14 53:6
196:17
**starting** 104:20
**starts** 40:2 104:1
**state** 1:8 3:4,16
24:14,19 33:1
36:13 42:17,21
43:5 64:14 65:22
66:6,14,16 73:16
76:3 105:14 119:7
121:12,25 122:8
123:17 137:7
139:22 140:17
141:23 142:20
149:19 150:2,11
150:14,22 158:2,3
158:13 160:22
161:5,14 165:23
172:23 173:6,23
174:8 176:3
177:22,25 182:9
182:16,17,21
183:7,22 186:23
187:15 189:10
190:19 191:6,13
199:13,14,15
200:1,4 208:16
213:10 215:2
**state's** 12:15 13:16
15:2,13 16:1

42:22 113:24
132:21 149:10
172:6 173:10
175:17 181:12,17
184:5,6 186:23
189:22 193:22
195:18 208:13
**stated** 215:4
**statement** 28:3
33:9 40:10,18
56:15 57:24 69:12
70:3 72:10 89:17
89:19 90:20 92:13
93:16 95:23 96:3
97:22 98:16,24
102:18 104:25
116:5 121:10,17
127:2 136:19
139:19 148:25
149:2 167:1 168:6
168:15 170:2
171:22,24,25
175:17 176:5
178:1,22 192:9
193:15 194:7,15
198:21 199:3
204:3 206:4
209:14 217:8
**statements** 102:5
173:24 178:19
**states** 1:1 23:5
32:20 46:8 64:12
67:25 74:17 81:18
82:12 135:2 136:3
154:8 158:5
165:24 172:13,14
172:15,18 181:18
182:10,19 185:5
185:10 186:21
**statewide** 150:7,10
150:22 153:13,15

**statistical** 51:18
112:20 115:12
116:11 167:25
168:21
**statistically**
165:21
**status** 203:20,25
204:8,14 205:22
206:10,15,20
**statute** 42:15,18
81:16 114:17
205:17
**statutory** 34:14
**stayed** 20:17
**step** 152:19 193:21
**stephen** 22:9
**steps** 130:3 190:4
**stewart** 146:12
147:19
**stinson** 20:8
**stipulation** 6:6,20
**stood** 170:4
**stopped** 48:6 61:7
95:20
**stories** 42:16 51:7
**story** 47:19 143:25
176:14 200:18
**straight** 155:6
**street** 4:6,14
**strength** 54:18,19
55:14,15 73:12
**stressed** 191:12
**stressing** 180:10
**strictly** 136:11
**striking** 119:24
**strong** 197:25
200:3
**struck** 51:24 175:2
**structure** 25:13
207:22

**struggled** 179:22
**struggling** 32:6
**student** 19:22
**students** 23:24
93:6 116:25
**studies** 150:15,19
153:7
**study** 24:23
149:24 150:8
170:25 173:19
174:16 176:23
209:10
**styled** 36:8
**subcategory** 16:13
**subcommittee**
2:16 68:16
**subcontractor**
213:11,16 215:12
**subgroup** 135:20
**subject** 42:23
43:16 51:16 61:13
61:23 62:15
146:14 152:18
153:8 182:23
190:16 211:4
**subjects** 62:5
**submissions** 15:21
113:22
**submit** 141:24
**submitted** 142:21
201:18 213:24,25
**subscribed** 218:21
**subsequent** 36:25
37:15 96:14
174:16 180:25
198:14
**subset** 16:23 78:17
132:25 135:17
**subsidiary** 120:21
**substance** 217:7

Case 1:18-cv-05391-SCJ     Document 404-1     Filed 06/28/20     Page 263 of 270

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[substantial - teams]                                           Page 43

**substantial** 100:2
  177:14
**subtitle** 21:11
**succeed** 134:25
**success** 147:11
**successful** 97:17
  99:14 136:1
  160:19 161:7
**suddenly** 95:18
**sue** 97:20,20 98:4
**sufficient** 141:24
  142:21 198:3
  201:6
**sufficiently** 70:7
**suggest** 158:8
  165:7
**suggested** 32:1
  112:14 173:19
**suggesting** 179:12
**suit** 77:18
**suitable** 31:4
**suite** 4:15 5:6
  216:19
**summarizes**
  207:22
**summary** 20:13
  119:3 166:17
**sunday** 95:7
**superiors** 110:14
  110:18
**supervised** 147:15
**supervisors** 84:17
  84:22
**supplied** 113:22
**supplies** 158:14
**supply** 204:16,17
  205:11
**support** 51:7
  146:16 151:19
  152:9,11 164:16
  170:3 175:9

**supportable**
  167:18
**supported** 150:2
**supporters** 180:1
**suppose** 36:10
  52:14 143:23
  211:1
**supposed** 189:9
**suppress** 73:12
**suppression** 72:22
  72:25 73:6,9
**supreme** 33:7 36:3
  38:13 72:16
  118:10 169:8
**sure** 24:11 26:15
  28:8 33:15 41:3
  57:6 76:21,24
  93:18 96:12 111:5
  113:21 114:23
  115:24,25 118:17
  120:4 133:11
  154:9 162:20
  176:20,20 187:9
  190:14 202:13
  203:16,21 204:6
**surely** 43:25
**surgery** 94:4
**surprising** 124:20
**survey** 153:18
  156:13 159:9,11
  159:14,22 170:12
  170:13,19,24
  171:5,16
**suspect** 161:17
**swarthmore**
  111:17
**swear** 6:18,19
**switching** 63:24
  148:17
**sworn** 6:25 91:13
  218:21

**sympathetic** 165:3
**synonymous** 28:9
**system** 54:15,16
  55:21 56:9 119:24
  120:9 121:3,25
  122:7,25 123:4,11
  124:7,14,21
  125:14,22 126:10
  127:11,12 132:10
  135:11 136:15
  143:22 146:17,20
  146:22 147:7
  148:11 174:10
  183:25 185:5,18
  190:6 191:17
  192:20 208:4,8,12
  208:13,18,20
  209:4,9 210:5,6
**systemically** 191:4
**systems** 54:24
  121:6 147:5

                t

**t** 27:10
**table** 3:11,12,13
  154:6 155:7
**tactics** 102:8 103:3
**take** 7:17 8:18
  24:6 25:22 26:2
  26:13 29:7 37:23
  47:20 48:13 63:23
  64:1 69:18 70:16
  72:7 78:23 94:5
  95:10 107:21
  111:16 145:8
  158:23 188:25
  201:5 203:23
  211:18,19
**taken** 1:13 6:2
  11:14 65:21 130:3
  169:16 215:4

**takes** 60:22 74:24
**talk** 8:21 9:9 17:10
  22:16 35:2 48:18
  52:2 84:25 96:14
  96:24 147:3
  148:15 190:18
  195:7 196:2
**talked** 75:3 112:17
  112:22 115:2
  181:3
**talking** 7:6,12
  17:21 42:19 49:3
  51:1 52:9 53:18
  61:19 62:15 63:6
  65:18 95:20
  102:21,22 103:9
  133:25 136:20
  137:19 145:17
  149:24 152:3,15
  161:12 168:11
  169:7 184:4
  196:13,17 197:16
  209:15
**talks** 103:22
  129:23
**tasked** 86:8 102:7
  102:12
**taught** 22:3 50:13
  117:8
**taylor** 5:4 19:20
**taylorenglish.com**
  5:8
**teach** 22:4 23:23
  61:9 111:16
  127:17 181:4
**teachers** 23:7
**teaching** 21:17
  22:2 23:6 24:2
  61:10
**teams** 48:19

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[tease - today]                                                Page 44

tease 168:23
technical 189:21
  191:24
technique 117:21
tell 29:18 76:23
  119:11
telling 9:13 166:11
tempts 55:21 56:9
tend 158:8,8
tended 78:25
tends 73:15
term 21:20 34:17
  38:7 54:11,21
  65:6 66:3,17
  72:21,24 73:1
  131:22 138:15
  193:17 196:24
terms 12:18 15:19
  28:22 54:3 58:19
  112:20 125:19
  135:25 143:14
  153:3,12 154:15
  163:19 202:15
  213:16 215:12
terribly 203:16
territories 185:11
test 82:2 124:25
  193:14 202:20
  209:6
testified 7:1 52:23
  60:25 64:12,20
  67:24 76:17 88:15
  89:25 97:18
  105:11
testify 56:11,13
  78:2 102:17
testifying 41:5
  56:23 59:7,13
  64:11,16,22 88:6
testimony 2:14,19
  47:10,10,20 48:6,8

48:16,21 57:18,25
58:6,12 59:2,11,15
59:21 60:7 62:3
63:24 64:7 67:5
68:15 69:2,15
70:18 77:25 89:1
89:8 90:5 91:5,10
91:14,20 93:15
94:9,19 96:11
97:6 98:7 104:14
104:17 121:16
125:5 135:13
160:24 182:11
206:8,12 210:16
211:2 217:2,8
tests 210:1
texas 81:20 82:6
  82:12,14
text 169:13
thank 8:24 9:2
  15:8,18 27:15
  29:6 32:14 34:24
  39:7 42:8 46:18
  48:3 55:16 56:12
  69:25 71:11 72:19
  80:7 82:15 83:1,5
  111:19 116:16
  118:1 136:17
  143:11 146:15
  169:21 189:1,2
  211:10,25
theodore 86:20
  117:9
thernstrom 27:20
thernstrom's
  27:23 28:5,10,16
thesis 20:22 21:4
thing 12:15 13:11
  31:9 43:17 52:7
  100:9,15 101:3
  118:17 120:25

150:9 178:17,21
201:4
things 14:9 31:3
  32:2,7 38:18 42:6
  42:21 43:1 48:18
  61:17 63:24 113:3
  128:16 134:13
  167:10 172:20
  174:25 179:22
  181:3 189:15
think 11:21 15:17
  18:1 25:21 26:20
  27:1,7,14 28:14
  30:25 33:25 36:9
  37:19,21 41:23
  42:1 52:1 56:8
  83:20 87:5,25
  88:21 92:18
  100:22 101:7
  106:18 114:9
  119:18 126:1,14
  127:6 142:17
  146:22 148:7
  150:24 151:5
  153:6,7 158:18
  160:14 162:13
  167:2,13,16
  169:17 170:22
  183:5 201:18
  205:1,12 207:11
  208:24 209:11
  210:23,24
thinking 56:2
  63:13 158:20
  201:3
third 35:21 38:18
  120:12,14 129:21
  145:19 210:9
thirds 138:13
thornburg 72:17
  169:8

thought 46:4 71:9
  77:8 113:4 135:16
  135:23 143:20
  146:10 155:1
  157:16 186:16
  201:2
thoughtful 57:17
threaten 179:20
three 11:21 24:10
  25:8 77:20 112:11
  120:19 139:14
  187:4
thurbert 187:11
tied 94:17
tim 164:7 165:14
time 10:7 11:19,19
  11:20 12:25 13:1
  20:1,8 25:20,23
  26:2,14 27:16
  37:21 39:1 41:3
  41:12,19 42:17
  44:18 49:2 60:21
  60:25 63:2,7,10
  65:9 81:11 83:18
  86:4 87:23 93:5,5
  93:23 95:4 108:1
  108:18 109:1
  111:11 135:22
  145:8 149:20
  158:23 159:1
  164:15 175:18
  184:5 211:25
  213:22 216:14
times 7:8 96:15
tip 10:6
title 21:8 28:1
  128:19 138:8
titled 18:25 166:17
today 7:6 8:14 9:5
  9:8,14,20 57:24
  72:12,13 79:3,6

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[today - unconstitutional]**                                    Page 45

126:11,23 210:22
210:24
**told** 8:20 11:10
93:23 94:15 97:18
97:19 106:3
**tom** 83:17,20,25
**tongue** 10:7
**tool** 71:14
**tools** 40:16
**top** 24:15 46:17
52:22 92:10 93:12
101:17 104:9
144:19 154:7
162:25 166:5,12
168:8 169:24,24
173:8 182:6 185:7
195:11 199:15
**topic** 20:22 21:7
22:10
**total** 50:10 125:8
131:15,23 154:15
154:21 193:6
**totality** 52:3
**totally** 32:10 51:1
72:6
**touches** 126:18
**tracks** 187:8
**tradition** 95:22
96:4
**traditional** 116:9
179:21 180:7,8
**trained** 43:24 50:9
50:13,22 131:23
**training** 115:4
116:9,14 131:19
131:24 132:22
147:14,16,17,24
147:24 148:2,5,6
181:5 186:10,15
186:23 188:9
189:9 191:11

**transcript** 88:25
213:22 215:4,6
216:7,12,14 217:2
**transcripts** 213:22
214:1
**transformed**
25:12
**transposition**
189:14
**travel** 41:7 60:21
94:22
**traveling** 41:14
**treat** 129:15
**treated** 6:7 37:11
131:16
**treatment** 99:5
**trend** 41:21
116:22
**trial** 6:14 87:1
90:1 97:16 108:22
211:2
**tried** 33:20 102:15
131:18 137:14
156:20
**triumph** 151:2
**trouble** 134:21
**troubles** 166:3
**true** 52:7 56:23
57:1 62:16,18
72:13 76:18 93:21
94:12,20 95:25
96:7 100:24
108:10,10,17
122:17 133:3,5
135:4,4 168:16
181:17 209:24
213:23 215:6
**try** 16:10 18:7
23:14,23 29:16
60:20 66:5 97:3
100:11 153:8

203:23
**trying** 8:25 16:21
18:2 26:15 51:14
53:21 78:20 83:2
94:4 99:24 105:20
120:16,16 124:2,3
128:7 158:1
165:18 171:20
**turn** 17:14 35:20
36:15 48:11 52:20
64:6 88:19 89:7
95:15 104:16
136:18 137:3
138:11 139:2
144:1,7,16 146:25
152:2 154:1 176:7
185:3
**turned** 113:25
147:12
**turning** 44:7 69:15
166:5
**turnout** 152:21,21
152:25 153:3,22
153:23 155:8,14
155:24,25 156:11
156:12 157:3,14
158:9,16
**turns** 136:5
**twice** 91:14
**two** 11:21 16:9,16
16:19 45:2 47:24
84:25 92:6,6,11
95:3 99:22 100:4
100:8 102:4,14
112:11 118:23
138:13 157:6
160:22 161:5
162:23 172:9
174:25 188:22,25
**types** 72:9 117:19

**typewriting** 215:5
**typical** 187:23
**typically** 44:1
**tyson** 3:24 5:3 6:1
6:12,17,23 7:3,5
8:24 9:4 11:5
17:19 18:4,8,10,15
18:22 21:24,25
26:1 29:25 35:11
39:17 47:24 48:2
56:12,14 58:10
64:5 67:20,23
68:14 89:6 92:2
111:23 128:6,10
130:23 138:5
139:7 140:10,15
140:25 144:12
154:5 155:23
156:9 159:1,5
162:6 171:14
189:4 211:21,25

**u**

**uh** 7:16,16 144:23
146:24 171:23
197:11
**ultimate** 36:21
37:17
**ultimately** 34:9
47:6,9 89:25
99:13 115:19,25
183:18
**unanimous** 38:22
141:7
**unavailable** 91:4
**uncertain** 181:2
**uncomfortable**
127:16
**uncommon** 172:18
**unconstitutional**
34:4 175:3

Peyton McCrary , Ph.D.                                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

[uncover - violating]                                                       Page 46

uncover  136:11
undergraduate
  20:16
underlying  123:8
  210:4
undermines  198:8
undermining
  176:10
underscore  108:8
undersigned  217:2
understand  59:23
  62:22 75:13,23
  93:18 113:10
  122:22 124:4
  126:17,25 127:1,2
  170:23 184:9
  185:24 193:17
  196:21 203:21
  204:6
understanding
  15:10 34:13,20
  57:24 58:5 60:8
  122:19 125:11
  134:23 143:17
  173:5 183:24
  184:23 188:13
  192:2 198:16
  203:11,17 204:13
understood  49:7
  80:5 106:7 118:12
  198:23
undertook  13:2
  93:2
undervote  145:12
  145:14
undervotes  144:25
  145:6 146:17,23
underwood  38:14
undocumented
  174:13 175:20,24
  179:19

uniquely  71:14
united  1:1 64:12
  67:25 74:17 81:17
  82:11 182:10
university  20:16
  21:17,21 25:14
  41:10 44:24 93:6
  117:24
unnumbered
  118:4
unpublished
  146:13
unsuccessful
  107:21
unsuccessfully
  102:23
unsympathetic
  164:5
unsystematic
  190:21
unusual  87:9
  116:10 117:5
  172:13
updated  18:11
upgrade  129:24
  130:3
uploaded  8:10
  214:2
urging  37:1
use  6:14 16:21
  32:10 34:17 40:12
  40:25 41:12 42:9
  44:11 45:13 51:5
  62:4,6 65:1 73:1
  73:13 83:8 86:20
  115:3 116:10,19
  129:8 155:6 158:5
  170:14 181:19
  185:5,11 189:22
  190:20 196:9,23
  196:24 210:4

217:9
useful  42:25 114:1
  143:20 157:25
  158:1,12,25
useless  178:19
user  185:4
uses  184:24
usually  41:8 42:25
  43:10 55:3 78:22
  142:23 151:10
  195:15
utilizes  124:13
utilizing  122:2
uva  20:21

                v

vague  51:10
valuable  62:3
valued  57:14
varied  65:8
variety  15:5 41:5
  115:13 117:19
  177:13
various  12:12 23:4
  73:3 152:21
  161:12
vary  45:19
verbatim  213:13
verification  15:1
  119:13 121:22
  122:1,16,21,23
  123:3,9,21 124:17
  125:23 126:6,17
  126:24 127:11
  132:16,18,20,23
  133:1,7,17,19
  134:6,10,15 135:5
  135:10,17 136:8
  136:12,14 172:10
  172:15 181:20,21
  182:1 185:17,24
  186:6 187:3,23

189:11 190:6,8,19
  191:16,24 193:21
  193:23 195:19
  197:14 198:10,24
  202:6 203:8 204:1
  204:19 205:23
  208:1,5,15 209:9
  210:5
verify  184:1,11
verifying  184:24
veritext  213:11,19
  216:10,18
vernon  44:23
version  18:17 19:7
  19:10,15 42:1
versus  12:23 22:18
  30:19,22 32:13
  34:14,20 36:9
  38:14 50:2 51:25
  67:5 72:17 76:6
  81:18 82:23
  118:10 130:11
  152:21 169:9
  193:6
vices  56:1
victims  84:14,19
  84:23 87:4 100:17
  100:17
videoconference
  1:13 4:2 5:2
view  32:24 33:9
  39:3 59:17 68:22
  70:19,20 98:3
  107:22 124:11
  169:16
viewed  95:10
views  29:3,4 65:16
  91:9
violate  15:15
violating  86:3

Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**virgil** 61:2
**virginia** 1:16
  19:17 20:15,17
  35:18 36:14,19
  37:2 49:1
**virtual** 7:13
**virtually** 43:5
**virtues** 57:13
**vitae** 2:5
**volume** 16:4
**von** 109:2,3,6,8
**vote** 24:22 26:24
  27:24 34:4 53:19
  54:3,3,5,11,13,22
  55:2,5,8,11,13
  59:25 69:17,17
  70:6,6 73:3,5
  80:22,24 81:10,25
  86:16 100:7
  119:17 121:14
  129:5 131:7,12
  132:12,14 141:5,7
  151:8 164:3,15
  166:22,23 181:1
  181:22 182:21
  188:11 207:24
  209:16 210:15
**voted** 38:20 63:19
  138:16 150:4
  152:7,7 154:15,16
  165:16 176:17
**voter** 14:25 17:10
  22:17,23 71:5
  72:18,21,24 73:6,9
  102:8 103:3 107:8
  107:15 119:6,13
  119:23,24 121:3,6
  121:22 122:1,7,16
  122:21,23 123:3,9
  123:15,20 124:6
  124:13,16 125:3,7

125:23 126:6,10
126:17,24 127:10
127:12 128:23,25
129:3,8 130:3
131:3 132:9,11,15
132:18,19,23
133:1,16,17,22,25
134:15,16,19
135:1,5,10,11,25
136:1,8,14 137:22
138:9 143:14,23
148:21 149:4
154:21 155:24,25
165:9 170:13,24
171:5,16 181:19
181:21 182:1,18
185:17 186:5,12
187:3 190:5,8,19
191:15 193:13,21
193:23 195:18
197:14 198:9,24
202:6 203:17,20
204:15,18 206:8,9
206:13,13,25
207:25 208:5,14
209:4,9 210:4
**voters** 32:22 33:23
  54:19 55:13 63:11
  68:25 86:1 87:15
  87:17 99:24
  100:21 107:10
  119:16 126:12
  127:13 132:18,25
  135:17 136:6,22
  141:22,25 146:8
  146:18,22 148:16
  150:2 151:19
  152:7,11 153:4
  159:9 163:12,13
  164:3,21,22,23
  165:4,5,6,10,15,16

166:2,22,23 170:3
170:19 175:10
176:8,17 185:16
196:12 201:17,17
201:19 203:7
207:24 209:8
**votes** 151:14
  175:25
**voting** 2:13 3:9,18
  15:16 22:5,6,11,15
  23:10,15 24:3
  26:5,19 27:3,20
  31:1,24 32:3,8
  33:8 34:15 36:11
  38:3,6 44:12,17,22
  45:3,25 48:23
  51:20 52:5,24
  53:23 54:17,18,19
  55:14,15 56:16
  57:5 67:10,12
  68:17 70:10 71:20
  72:1 73:12 74:13
  76:3 78:18 79:8
  79:15 80:4,9,14,17
  80:21 81:7,12
  83:8 84:1 85:18
  86:3 87:3,8,13,24
  88:7,12 89:13
  90:22,25 91:12
  95:19 97:20,25
  98:4,21 99:6
  104:24 105:3,7,12
  105:18 106:3
  107:3,7,11,18,25
  108:13,15,19
  109:12,16 110:7
  110:13 115:15
  116:3,14 117:23
  118:7,16,19,25
  119:23 120:11
  124:8,22 125:7

128:20 129:12,13
129:15,18,22,22
129:24 131:15
142:25 143:15,22
144:3,14 146:7,16
147:6 149:13,16
150:25 151:3,8,18
152:16 158:3
164:20,25 166:4
169:18 170:5
174:24 175:1,13
175:17,19,21,24
175:25 176:3
180:2 183:8 187:7
190:13 199:14,16
199:17 200:5
210:11
**vs** 1:6

**w**

**w** 105:6 108:2,9,12
  108:21
**wait** 7:15
**want** 29:14 37:25
  43:8 47:20,25
  62:21 63:22 68:20
  69:18,18 70:2
  73:24 88:24 92:6
  97:14 104:4 111:4
  114:10 118:3
  126:15,15,25
  128:15 134:8
  145:9 148:13,20
  154:1 161:11
  162:24 167:12
  169:4 196:4
**wanted** 24:11 65:1
  92:13 160:5
**warm** 130:17
**warned** 176:6
**washington** 4:8
  21:17 22:2

Peyton McCrary , Ph.D.                                      May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

**[watching - zoom]**                                              Page 48

watching 56:21
water 64:3
way 13:21 15:1
  16:11 29:2 30:23
  41:20 49:24 51:12
  51:13 60:21 61:10
  61:16 66:5 70:15
  72:14 77:3 94:6
  100:19 116:22
  119:10 120:23
  122:6 127:9
  132:21 138:14
  142:1,24 156:23
  158:4 178:22
  180:10 185:15
  190:24 195:20
  200:5
ways 40:24 108:15
  115:13,14 177:13
  186:2
we've 18:11 19:9
  19:10 25:17
  188:17 208:24
webinars 131:22
website 132:22
  184:16 193:22
week 9:16 95:24
weekend 212:1
weekends 93:25
weeks 202:19
weigh 49:19
weight 53:1
went 20:14,19
  50:11 86:23,25
  91:3 92:20 93:21
  101:9 112:23
  133:7 147:5
  164:16 190:12
west 4:7,14
white 51:25 63:3,4
  63:11 85:16 86:1

87:15 91:2 100:21
  145:2 148:16
  149:12 150:2
  151:19 152:7,11
  152:11,20 153:3
  154:23 155:1,3,9
  155:14,25 156:11
  159:9 163:12
  164:23 166:23
  196:4,11 197:2,19
whites 87:19 150:4
  154:17 157:24
  158:10 168:6
wide 15:5
widespread 90:23
  107:14
wife 95:6 160:5
william 38:20
win 176:11
winning 151:14
wish 105:7
witness 6:11,18,19
  18:1,5 21:23
  25:24 27:2 44:25
  48:1 53:10 57:25
  58:6,12,17 61:2,8
  61:18 62:2 64:2
  65:3 67:2,13,16,19
  67:21,24 75:4,5
  86:20 88:6 158:25
  212:2
witnesses 2:12
  23:17 26:19 39:20
  44:12,17,20 55:21
  55:24 56:9 57:14
  82:17 83:8 101:4
  213:25
wondered 136:22
wondering 130:17
word 28:7 74:23
  115:24 196:23

worded 199:23
  200:14 203:16
wording 142:3
words 14:20 28:13
  38:9 56:8 67:6
  78:2 93:10 106:18
  180:10 182:18
  193:24 194:24
work 8:1,1 19:11
  21:14 28:6,11
  57:16 60:14 73:15
  73:17 74:25 75:18
  77:21,23 78:3,21
  80:11,24 84:13,18
  84:22 85:21 86:18
  92:15 94:1,11,16
  102:24 105:3
  110:2,2,3,25 111:1
  111:9,13 113:24
  116:6,12 123:5
  170:16 175:5
  177:12
worked 38:2 77:25
  78:17 80:21 81:4
  81:11,22 82:1,5,9
  83:23 85:1 86:21
  88:5,11 89:12
  95:2 97:16 100:25
  101:2 115:15
  164:8
working 11:12,17
  11:20,23 44:16,18
  61:5 93:23 94:15
  101:19 110:3
  116:14 131:2
workings 75:13
workplace 84:3,7
works 10:24
world 21:9 60:11
write 112:4

writes 112:8
writing 37:20 49:7
  52:4 62:4 112:7
  116:12 193:14
  194:20
written 41:4 49:4
  63:2 68:1 142:11
wrong 21:12 90:10
  98:19 122:8
  188:16

**y**

y'all 6:9
yeah 113:15
  136:25 152:1
  161:9 168:10
  190:7 203:4
year 20:18 28:23
  139:14 141:17
years 23:11 28:23
  39:5 40:9 65:12
  65:13,17,22 78:21
  86:8 88:14 95:22
  95:24 108:11
  111:3,8,15,18
  115:16 122:13
  123:16 147:13
  148:3 153:9
  164:10
yeomans 110:23
yesterday 17:15

**z**

z 47:14
zeroing 197:8
zoom 6:6 18:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.