IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*,<br><br>    Plaintiffs,<br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia; *et al.*,<br><br>    Defendants. | Civil Action File<br><br>No. 1:18-cv-05391-SCJ |

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DANIEL A. SMITH and SUPPORTING BRIEF

Defendants Secretary Raffensperger, the State Election Board, and the State Election Board Members Rebecca Sullivan, David Worley, and Anh Le (collectively "Defendants"), pursuant to Federal Rule of Evidence 702, hereby submit this Motion and incorporated Brief to exclude the testimony of Daniel A. Smith, Ph.D. ("Dr. Smith") both at trial and in consideration of Defendants' Motions for Summary Judgment. *See Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1313 (11th Cir. 2014) (only admissible evidence can be considered in analyzing motion for summary judgment).

## I. Introduction.

Dr. Smith is one of Plaintiffs' expert witnesses regarding the alleged deficiencies of Georgia's training and oversight of local officials in election administration and execution. (Doc. 168, ¶ 8); (Doc. 41 at ¶¶ 57, 65, 131–157). In his report, Dr. Smith analyzed publicly available information related to ballots cast in the 2018 election cycle and, on the basis of that examination, concluded that apparent discrepancies in the data he examined were the result of the Defendant's failure to train and oversee local election officials. (Doc. 168, ¶¶ 7–8). Dr. Smith also opines that, "registered voters in Georgia who are black are disproportionately more likely to cast an absentee [ballot] that is rejected by local election officials than white registered voters." (Doc. 168, ¶ 9).

Dr. Smith's testimony should be excluded because it is neither relevant nor reliable. His conclusions do not adequately consider Georgia election law, its training procedures, and are otherwise lacking in Georgia-specific knowledge. Additionally, serious methodological flaws exist as a result of Dr. Smith's admitted gaps in knowledge that render his opinions at best speculative and, in any event, too unreliable to be admissible. Dr. Smith's analysis is fraught with false assumptions at every stage. This Circuit has long guarded against admitting such proposed expert opinion acknowledging

that the weighty deference given to experts may overwhelm the factfinder with undue influence. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

## II. Facts.

The report filed by Dr. Smith "relies solely on the official election administration records maintained and disseminated by Georgia's Elections Division of the Secretary of State's Office and the State Election Board and [Dr. Smith's] extensive experience with state election systems." (Doc. 168, ¶ 10). Utilizing this data and his experience as a state elections analyst, Dr. Smith notes that he encountered "numerous" and "unexpected" "data processing issues." (Doc. 168, ¶ 16). Dr. Smith claims that "glaring" irregularities he uncovered in his research on Georgia's 2018 publicly available election data "can mean that an individual voter – or number of voters – will not have their votes countered and can potentially alter election results." (Doc. 168, ¶ 16). But when asked about this striking statement, Dr. Smith conceded that it is "pretty rare that would happen at a statewide

contest." Deposition of Daniel Smith[1] ("Smith Dep."), 62:9–10. Dr. Smith also acknowledged that were such an outcome to occur, many states, including Georgia, provide for election-contest litigation to protect against situations where voting irregularities might have altered the outcome of an election. *Id.* at 63:3–21.

The fundamental misstep Dr. Smith makes throughout his report, as confirmed in his deposition on numerous occasions, is that—when confronted with gaps in the data or the shortcomings of his own experiential knowledge base—he inserts his "best guess," Smith Dep., 68:3–6, or what he deems a "logical" inference, (Doc. 168, ¶ 22). The trouble is that these guesses and inferences corrupt the data he analyzed, by inserting his own bias and opinion into the figures themselves.

As explained below, Dr. Smith allowed his conclusion to guide his analysis of data rather than the data to guide him to an accurate conclusion. Dr. Smith's conclusions are little more than a "best guess" based on incomplete and often-inaccurate assumptions about available data. Several examples will serve to illustrate these problems, which permeate the entirety of Dr. Smith's report.

---

[1] The transcript of Dr. Smith's deposition is attached as Ex. A.

In Paragraph 8 of Dr. Smith's report, he plainly summarizes his findings stating, "to a reasonable degree of professional certainty, that there are clear administrative and record keeping problems with Georgia's voter lists and voter history files." (Doc. 168, ¶ 8). Dr. Smith continues:

> Based on my experience, these record keeping problems provide evidence that the Secretary of State and the State Election Board has failed to adequately oversee, train, and advise county officials on the proper handling of voter registration applications, the recording of voter histories, and the recording of absentee ballot and Provisional ballot transactions.

*Id.* But when pressed in his deposition to elucidate how he arrived at that conclusion, Dr. Smith conceded, "much of this, is unobservable." Smith Dep. 43:13–16. "I'm looking at records after the fact and imputing some type of linkage." *Id.* at 43:17. And while Dr. Smith states several times that he's "letting the data speak for themselves," *id.* at 43:18, much of his conclusion is based not on what the data says, but on what Dr. Smith's assumes or infers from what he perceives are gaps in the data. A simple inquiry into these perceived gaps in the data would have provided Dr. Smith with much-needed context, and might have resulted in his ability to provide a reliable expert opinion. But Dr. Smith failed to make such an inquiry. Smith Dep. 44:16–22. Not only did Dr. Smith decline to approach Georgia state officials regarding the gaps in the data he was analyzing, he declined to even review Georgia's

5

training materials prior to opining on Georgia's training practices. Smith Dep. 48:15–49:8.

One discrepancy of particular significance to Dr. Smith is noted in Paragraph 18 of his Report, where he finds that there 39,601 voter records in the Absentee File that "have no code in the ballot status field." According to Dr. Smith, "that's one of those discrepancies that I have been trying to wrap my head around because ostensively [sic] it should be tracked... I don't know the interworkings [sic] of how it's done, I can only assume that they should reconcile with one another." Smith Dep. 66:19–67:3. But this assumption, like many others made by Dr. Smith throughout his Report, is incorrect. A brief exchange during Dr. Smith's deposition illustrates the point.

> Q. Okay. So let's work through paragraph 19 then. We were talking about these records that have no ballot status code. And so we have no ballot status code but we do have a ballot style; is that correct, fair to say?
>
> A. Some of them, I guess, do, yes...
>
> Q. And you indicate the mailed ballot style indicates that these voters mailed their absentee ballot to a local election official. Do you see that statement?
>
> A. I do.
>
> Q. And why do you think that's the case?

> A. Again, since there is no codebook that I have seen publically [sic] available that indicates it is, my best guess to mailed is mailed.
>
> Q. And so you're assuming what that particular field means, correct?
>
> A. As mailed, correct.
>
> Q. If that field referred to the method by which the registrar delivered the absentee ballot to the voter [as opposed to the way in which the voter returned it], would that change your analysis in that paragraph?
>
> A. I don't know if it would change my analysis. It might change the interpretation of that analysis, but the data are still the data.

Smith Dep. 67:23–68:16. To put Dr. Smith's final response in the above exchange differently, the explanation offered by Counsel for the Defendants would not change Dr. Smith's raw figures, but it might change *his interpretation* of the raw figures. Thus, it might change the conclusion he reaches from those figures. Dr. Smith admits as much, saying while he would not agree with the underlying assumption that the ballot style category refers to delivery of the ballot *to the voter,* if such were the case then he conceded that the discrepancy of 39,601 votes discussed in Paragraph 18, in fact, "wouldn't be terribly unusual." Smith. Dep. 70:10–16.

This is an important concession, because Dr. Smith readily admits to making numerous "assumptions" such as this throughout his Report where

he felt there were "discrepancies" in the data. Indeed, the faulty underlying assumption led to a chain of ultimately illogical inferences made by Dr. Smith, whose report concluded that these apparent discrepancies can "**likely** be chalked up to poor administrative record keeping by local election officials, revealing problems **that likely** stem from errors in how data is recorded or maintained by local elections officials, or by different counties using different standards or processes to collect and maintain elections data." (Doc. 168, ¶ 18) (emphasis added).

And from these "likely" scenarios that Dr. Smith rattled off with no actual evidence other than a faulty underlying assumption, he took the further step in concluding that the "errors" were "**likely** the result of poor guidelines or training by the Elections Division of the Secretary of State's Office and the State Election Board." *Id.* (emphasis added). But when confronted with the reality that his underlying assumption had a much more reasonable explanation, Dr. Smith's conclusion became far less menacing: instead of 39,601 records representing clear evidence of a "failure to train," they transmuted into something that "wouldn't be terribly unusual." Smith Dep. 70:16. This aptly illustrates how Dr. Smith's faulty assumptions undermine his methodology and the entirety of his report.

Dr. Smith responded to hypotheticals involving assumptions he made that further undermine his conclusions regarding so-called "discrepancies" related to approximately 3,000 absentee votes that did not show up due to the Absentee File "locking" on election day (Smith Dep. 71:6–75:15), relating to duplicate data in the Secretary of State's voter file (Smith Dep. 76:2–79:15), and relating to the ability of voters with "Cancelled" absentee ballots to vote in person on election day (Smith Dep. 101:20–103:6). Each of these reasonable alternative explanations were met with little opposition from Dr. Smith, and his errors fatally undermine the thesis of the entire Report.

Ultimately, when confronted by Counsel for Defendants with accurate explanations for perceived gaps in the data, instead of utilizing his faulty underlying assumptions, Dr. Smith backed away from the bold conclusions in his report.

> Q. So in paragraph 34, you then say at this point, in your opinion, there are serious election administration data processing problems in Georgia. And that's really only true if your assumptions about the data are correct, that the absentee file is constantly updated there shouldn't be duplicates, several of the assumptions we have talked about, because, as we have discussed, there might be other explanations for most of the tens of thousands of alleged problems you identified, correct?
>
> A. I'm not going to sit here and say there can't be other explanations…

> Q. In the second part of paragraph 34, you again reiterate that the problems likely stem from the failure to adequately oversee, train and advise. I want to, for purposes of this question, assume that ballot status code is a returned ballot, assume the ballot style is the method delivery of the voter, assume that the absentee file locks at a certain point. In that scenario, it's entirely possible that county election officials are doing exactly what they're supposed to be doing, correct?
>
> A. Again, given those conditions, which I don't necessarily agree with all of them, that is a possibility.

Smith Dep. 107:17–109:8.

### III. Legal analysis.

Dr. Smith testimony does not meet the requirements for expert testimony in this circuit because it is neither reliable nor relevant.

#### A. *The* Daubert *standard.*

As this Circuit has long noted, a proper *Daubert* analysis consists of three elements.

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999).

Trial courts have a critical responsibility under Rule 702 to ensure that expert testimony at trial is reliable. *Daubert v. Merrell Dow Pharms., Inc.,*

509 U.S. 579 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), Fed. R. Evid. 702. A federal trial court must review "the *foundations* of expert opinions to ensure they meet the standards for admissibility." *Frazier*, 387 F.3d at 1260 (emphasis in original). The proponent of the testimony has the burden of showing that the expert's opinion meets those standards. *McCorvey v Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

On the issue of qualification, Defendants do not dispute Dr. Smith's expertise in the area of state elections generally. That determination, however, is not the end of this Court's inquiry, particularly given the admittedly speculative content of Dr. Smith's Report. The expert's opinion also must be reliable. *City of Tuscaloosa v. Harcros Chem., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998). Even a qualified expert witness can offer unreliable testimony. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1342 (11th Cir. 2003).

The *Daubert* reliability inquiry considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Daubert*, 509 U.S. at 593-94.

Furthermore, expert testimony "does not operate in a vacuum," and it must also meet "stringent standards" of relevance set forth in Federal Rules of Evidence 401, 402, and 403. *Allison*, 184 F.3d at 1309-10. This relevance analysis requires that the expert opinion "logically advances a material aspect of the proposing party's case." *Id.* at 1312, *quoting Daubert,* 43 F.3d at 1314 (on remand). "[T]he judge in weighing possible prejudice against probative force under Rule 403… exercises more control over experts than lay witnesses." *Frazier,* 387 F.3d at 1263. Dr. Smith's testimony does not meet these standards in any respect.

### B. Reliability.

As earlier noted, an otherwise qualified individual "may be considered an expert but still offer unreliable testimony." *Quiet Tech.,* 326 F.3d at 1342. For purposes of Dr. Smith's testimony, which relies primarily, if not exclusively, on his experience, the inquiry is fairly straightforward:

> [I]f the witness is relying solely or primarily on experience, then the witness must explain <u>how</u> that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

*Fraizer,* 387 F. 3d at 1261, *quoting,* Fed. R. Evid. 702 advisory committee's note (2000 amends.). Dr. Smith's report and subsequent deposition, however, reveal no such explanation.

Dr. Smith instead relies on what he deems "logical" inferences, "likely" scenarios, and "best guess" suppositions. But none of these gap-filling practices represent accepted or peer-reviewed analysis, and each utilization of the practice is tinged with either a clear bias toward a preconceived conclusion, or else an ostensible scientific inquiry that lacks any legitimate search for truth. As a result, Dr. Smith's report is the antithesis of what is expected under a *Daubert* standard. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593. Dr. Smith, however, does not meet this methodological standard in the case at bar. Instead, he appears to prefer the Court just take his word for it. But, "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier,* 387 F. 3d at 1261.

Courts, especially trial courts, are called upon to take up the necessary task of eschewing undisciplined scientific extrapolations in the absence of the

13

due rigor a true scientific inquiry demands. When faced with an exacting inquiry as to the methodology of Dr. Smith's analysis, his Report falls flat.

### C. Relevance.

"The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact." *Frazier,* 367 F. 3d at 1262. This is also known as the "relevance" inquiry. Perhaps the most troubling aspect of admitting Dr. Smith's testimony is the prejudicial effect it would have on potential jurors, particularly in light of the grand assumptions he makes throughout his analysis. "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury…" *Id.* at 1263; see also *Hull v. Merck & Co., Inc.,* 758 F. 2d 1474, 1477 ("[T]he assumptions made by [the proposed expert witness] rendered his seemingly firm opinion quite speculative, and the danger of irrelevance is clear. Such potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702.").

The numerous times Dr. Smith freely admits to using a "best guess" or a "logical assumption" where no data was readily available shows that speculation runs rampant throughout his analysis. This speculation, coupled with the fact that he has a remarkable degree of inexperience with the state

14

of Georgia's training and oversight practices, effectively removes his opinion from that of expert analysis. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier,* 387 F. 3d at 1262–1263.

### D.  Dr. Smith's opinion that registered voters who are black are disproportionately likely to cast rejected absentee ballots should be excluded.

Though much of Dr. Smith's Report focuses on whether state election officials adequately train and oversee local elections officials, he devotes some time to a second opinion: "[T]hat registered voters in Geogia who are black are disproportionately more likely to cast an absentee [ballot] that is rejected by local election officials than white registered voters." (Doc. 168, ¶ 9). For the same reasons this Court should deny admission of Dr. Smith's training opinion, it should also deny his disproportionate-effect analysis.

As an initial matter, Dr. Smith does not put forth any novel information in his opinion other than to draw out publicly available data points.

> Q. And of that subset of absentee votes, you found a white voter rejection rate 2.3% percent and black voter rejection rate of 3.7%?
>
> A. Yes, that's correct.

15

> Q. And you note that the rejection rate for black voter is nearly 65 percent higher than the rejection rate for white voters, correct?
>
> A. Yes.
>
> Q. And unless I missed somewhere, you're not really opining about why that is, you're just pointing out that it is; is that correct?
>
> A. Again, I think that's correct. I'm letting the data speak for themselves.

Smith Dep. 134:2–14. When subsequently asked whether he conducted any sort of analysis on the rejection-rate data, Dr. Smith demurred. "I'm really kind of opposed to that type of analysis because this is actually the administrative data of record." Smith Dep. 134:19–21. Dr. Smith also noted that he did not conduct any kind of regression analysis, (Smith Dep. 135:7–9), nor did he look for any explanation for his opinion such as whether the rejected ballots were first time voters (Smith Dep. 135:12–15), experienced voters (*id.*), or whether there was a campaign to turnout African-American voters via absentee ballot that might result in increased rejection rates (Smith Dep. 135:17–136:2). In effect, all Dr. Smith accomplished with his second opinion is providing a unique visualization of the raw data in charts and graphs provided in the report. But this does not rise to the level needed

16

for admissibility of expert testimony and all the weight that accords Dr. Smith's opinion in the eyes of the fact finder.

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F. 3d at 1262. See also, *Unites States v. Ruoco,* 765 F. 2d 983, 995 (11th Cir. 1985) (holding that expert testimony must offer something "beyond the understanding and experience of the average citizen.") Dr. Smith's opinion on this point is particularly ill-suited to the trappings of expert opinion because it does not add anything beyond what competent counsel might be able to argue at closing argument. *See, e.g.*, *Frazier,* 387 F. 3d at 1252. Put differently, Dr. Smith's opinion on the matter will not assist the finder of fact, and it is far more likely to inspire undue deference by jurors to his conclusions if he were admitted as an expert. Accordingly, the Court should not admit his testimony on this second issue.

## IV. Conclusion.

The *Daubert* standard exists so that qualified, methodologically rigorous expert opinions may be presented to laypersons to assist them on technically difficult issues. It does not exist so that a false veneer of esoteric expertise can unduly influence the fact finder into siding with a

17

particular party. For the foregoing reasons, Dr. Smith's Report and Testimony represent the latter instance, and should not be admitted.

Respectfully submitted this 28th day of June, 2020.

    Christopher M. Carr
    Attorney General
    GA Bar No. 112505
    Brian K. Webb
    Deputy Attorney General
    GA Bar No. 743580
    Russell D. Willard
    Senior Assistant Attorney General
    GA Bar No. 760280
    **State Law Department**
    40 Capitol Square, S.W.
    Atlanta, Georgia 30334

    Josh Belinfante
    Georgia Bar No. 047399
    jbelinfante@robbinsfirm.com
    Vincent Russo
    Georgia Bar No. 242628
    vrusso@robbinsfirm.com
    Carey Miller
    Georgia Bar No. 976240
    cmiller@robbinsfirm.com
    Brian Lake
    Georgia Bar No. 575966
    blake@robbinsfirm.com
    Alexander Denton
    Georgia Bar No. 660632
    adenton@robbinsfirm.com
    Melanie Johnson
    Georgia Bar No. 466756
    mjohnson@robbinsfirm.com
    **Robbin Ross Alloy Belinfante Littlefield LLC**
    500 14th Street NW

Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:(404) 856-3250

*/s/Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Attorneys for Defendants*

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing MOTION TO EXCLUDE TESTIMONY OF DANIEL A. SMITH and SUPPORTING BRIEF was prepared double-spaced in 13-point Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

*/s/ Bryan P. Tyson*
Bryan P. Tyson