# EXHIBIT A



Deposition of:

# Daniel Smith , Ph.D.

*January 28, 2020*

In the Matter of:

# Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF FLORIDA
2                     ATLANTA DIVISION
3                    Civil Action File
                     CASE NO.:  1:18-cv-05391-SCJ
4

5    FAIR FIGHT ACTION, INC., et al,
6              Plaintiffs,
7    vs.
8    BRAD RAFFENSPERGER, in his official
     Capacity as Secretary of State
9    Georgia; et al,
10             Defendants.
11

     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
12
13                  D E P O S I T I O N
14                         OF
15                DANIEL A. SMITH, Ph.D.
             taken on behalf of the Defendants
16
17       DATE:      Tuesday, January 28, 2020
18       TIME:      9:35 a.m. - 2:48 p.m.
19       PLACE:     Veritext c/o Scribe Associates, Inc.
                    Court Reporters
20                  201 Southeast Second Avenue
                    Suite 207
21                  Gainesville, Florida  32601
22       REPORTER:  Debora M. Holloway
                    Stenographic Reporter
23
24
25

Daniel Smith , Ph.D.                         January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 2

1    APPEARANCES:

2      KAISER DILLON, PLLC
       1099 14th Street, N.W.
3      8th Floor West
       Washington, DC  20005
4      (202) 640-2849
       BY:  Matt Kaiser, Esquire,
5           mkaiser@kaiserdillon.com
       BY:  Norman G. Anderson, Esquire,
6           nanderson@kaiserdillon.com
                   Counsel for the Plaintiffs
7

       TAYLOR, ENGLISH, DUMA, LLP
8      1600 Parkwood Circle
       Suite 200
9      Atlanta, Georgia  30339
       (678) 336-7249
10     BY:  Bryan P. Tyson, Esquire,
            btyson@taylorenglish.com,
11                 Counsel for the Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 3

1                            I N D E X

2

3     WITNESS:                                   PAGE

4     DANIEL A. SMITH, Ph.D.

5     Direct Examination Mr. Tyson                  4

6     Reporter's Certificates                     157

7

8                    DEFENDANT'S EXHIBITS

      EXHIBIT

9     NUMBER                                     PAGE

10

      EXHIBIT 1 Notice to Take Expert Deposition      5

11    EXHIBIT 2 Expert Report of Daniel A. Smith, Ph.D.    6

      EXHIBIT 3 Election Smith Website Printout        21

12    EXHIBIT 4 The Ballot Initiative Strategy Center    26
                Website Printout

13    EXHIBIT 5 Common Cause Voting and Elections Page    27

      EXHIBIT 6 DNC Services Corp. et al v. Lee, et al    37

14              Expert Report

      EXHIBIT 7 British Journal of Political Science    146

15              Article

16

17

18

19

20    REPORTER'S KEY TO PUNCTUATION:

21         -- At end of question or answer references
              interruption.

22
           ... References a trail-off by the speaker.

23            No testimony omitted.

24         "Uh-huh"  References an affirmative sound.

25         "Huh-uh"  References a negative sound.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 4

 1      THEREUPON:

 2                      DANIEL A. SMITH, Ph.D.

 3      having been first duly sworn, testified as follows:

 4                      DIRECT EXAMINATION

 5              MR. TYSON:  All right.  This will be the

 6          deposition of Professor Daniel A. Smith, taken by

 7          Defendant Brad Raffensperger, as Secretary of

 8          State of Georgia, for the purpose of discovery

 9          and all purposes allowed under the Federal Rules

10          of Civil Procedure.

11              Reserve all objections except form and

12          privilege and responsiveness until trial or first

13          use?

14              MR. KAISER:  Yep.

15      BY MR. TYSON:

16          Q.   Okay.  And Professor Smith, I assume you have

17      been deposed before?

18          A.   Yes, I have.

19          Q.   So you know the ground rules:  Try not to talk

20      over each other, affirmative yes or no on the record,

21      take breaks whenever you need to, all that kind of

22      thing.

23              One thing, unfortunately when you're deposed

24      by me, is I will sometimes get to a question mark and

25      you have no idea what I'm asking, I have no idea what

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 5

1    I'm asking.  If that happens, let me know, I'll try to

2    figure it out.

3            And obviously, we met a few minutes ago, but I

4    am Bryan Tyson, I represent the state and just try to

5    dig in on the report in Fair Fight Action.

6            So I'll start out by just asking what you did

7    to get ready for your deposition today?

8       A.   I read over my report yesterday, and I met

9    with counsel for a couple of hours yesterday afternoon.

10      Q.   All right.  How did you come to get involved

11   in this lawsuit?

12      A.   I was approached by the Fair Fight Action

13   plaintiffs sometime about a year ago.  I had done some

14   brief work for the Stacey Abrams campaign immediately

15   following the 2018 election.

16      Q.   The work that you did for the Abrams campaign,

17   was that in the context of litigation, or was that for

18   some other purpose, do you recall?

19      A.   I think I was retained for the purpose of

20   possible litigation, yes.

21           (Thereupon, Defendant's Exhibit 1 was marked

22   for identification.)

23      Q.   Well, let's start out, I have marked as

24   Exhibit 1 the notice for the deposition.

25           I'm sure you have seen that before; is that

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 6

1     correct?

2          A.    Correct.

3               (Thereupon, Defendant's Exhibit 2 was marked

4     for identification.)

5          Q.    And Exhibit 2 we marked, and is this your

6     expert report in this case?

7          A.    Yes, it appears that it is.

8          Q.    And what I would like to do is just if we turn

9     to your CV, at the end of that, that might make our

10    journey through your educational background history a

11    little bit easier.

12         A.    Correct.

13         Q.    Have there been any additions to your CV since

14    this was filed in 2019?

15         A.    I would imagine so.  It looks like it's dated

16    the 23rd of November, and things have changed at the

17    margins, so to speak, yes.  So I'm sure there are a

18    couple of things that have changed.

19         Q.    Okay.  Well, let's start with your education

20    history starting out with your master's at the

21    University of Wisconsin-Madison.  So it indicates you

22    received that degree in 1989, correct?

23         A.    Correct.

24         Q.    And what was your thesis from that degree?

25         A.    My thesis was not a thesis because I was not

Daniel Smith , Ph.D.                       January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 7

1    in a terminal master's program.  So I just had

2    comprehensive exam and a paper that I had to defend.

3         Q.   And do you recall the topic of the paper you

4    had to defend?

5         A.   Oh, it had something to do with organized

6    labor and voter participation I am sure.  Honestly, it's

7    been a long time since -- 30 years since I did that.

8              But something along that line, defending a

9    paper I had to write for a class.

10        Q.   Did you do -- while you were at the University

11   of Wisconsin, was Professor Ken Mayer there at any

12   point?  Did you study under him?

13        A.   Ken came on the faculty around that time of my

14   master's.  I don't know if he came in 1988, '89, '90.  I

15   never took a class with him, yeah.

16             But I did know him.  He was on the faculty and

17   he was young.

18        Q.   So for your doctorate, also in the same -- I'm

19   assuming it was a continuation of the same program?

20        A.   That's correct.

21        Q.   And so what was your thesis in terms of your

22   PhD?

23        A.   My PhD looked at the coordination among state

24   actors, organized labor, and employers looking at

25   reconciling issues of unemployment compensation and

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 8

 1    disability and trying to retain those costs by

 2    coordinating efforts to overcome collective action

 3    issues.

 4            I looked at several different states, case

 5    studies, and looking over time at the development of

 6    what were known as labor management councils.

 7        Q.   And during your time at the University of

 8    Wisconsin for your master's and your PhD, I'm assuming

 9    you didn't have any specialized study related to Georgia

10    or Georgia voting processes; is that correct?

11        A.   I'm sure I looked at all 50 states because I

12    was focusing on state politics, and I'm relatively

13    certain that Georgia did not have a labor management

14    council in the 1980s.

15        Q.   And when you say you were studying state

16    politics, at this time you were focused on organized

17    labor, not so much on the kind of administration of

18    elections?

19        A.   I was focused broadly on state politics.  I'm

20    probably one of the few scholars of my generation who

21    actually wrote a dissertation on state politics and took

22    all facets of state politics seriously.

23            State politics, at the time, was seen as a

24    backwater, why would anyone be studying state politics

25    when all the fascination was in Washington, D.C.  And

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 9

1      many scholars in my generation were dissuaded by faculty

2      advisors to focus on the 50 states.

3              I am someone who doesn't always listen to

4      authority and wanted to follow my passions, so I focused

5      on 50 states, not only labor management but electoral

6      politics.

7              I wrote papers on looking at different levels

8      of turnout and whether it was related to unionization,

9      for instance.

10             But there was certainly a labor aspect to my

11     early research interests in Wisconsin.

12     Q.    I found something similar, people like you

13     shouldn't study election law, and that turned out to

14     work out okay.

15             I know you said earlier as to Dr. Mayer, it's

16     great you didn't take any classes or study under him for

17     your PhD, correct?

18     A.    I never took classes from him.  He was not

19     under my committee.

20     Q.    It looks like after you completed the time

21     there, going to your academic employment history, was

22     your first assistant professorship at West Virginia

23     University, am I reading that correctly?

24     A.    Yes.  And I think I got that job largely

25     because I was interested in organized labor and had done

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 10

1        a case study in West Virginia.

2              Q.    And for the various titles, assistant

3        professor, associate professor, and kind of the various

4        ones you've held, can you give me a brief overview of

5        what each of those titles involved and how you tier that

6        as a professor?

7              A.    Sure.  I had a visiting position at WVU.  I

8        left after one of a two-year post because I took a

9        tenured track job at the University of Denver.  I

10       started that in 1994.  I ended up getting tenure.  I

11       went up in 1999, got tenure in 2000.  I held that

12       position until I resigned in 2003.

13             During that period of time there was some

14       transition because my wife is also an academic and we

15       were trying to get two positions at the same university.

16       That explains why I was at Denver.

17             I had a fellowship in 2000, 2001, a Fulbright

18       fellowship to teach and do research at the University of

19       Ghana.

20             The following year I was a visitor at the

21       University of Florida part time to see whether or not

22       Florida would be a place where we both wanted to be.

23             I had to come back and pay off my sabbatical

24       year, which was that year, at the University of Denver,

25       and University of Florida thought that it was wise to

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 11

1       hire me in order to keep my wife, and so I came here in

2       2003 on a tenure track.  I'm sorry, on a tenured

3       position.  So I came in tenured at the University of

4       Florida.

5                 I went up for a full professorship in 2009 and

6       became a full professor.  And I have been department

7       chair, as a position appointed by the dean in 2017, so

8       I'm finishing up my third year as chair.

9            Q.   You mentioned your wife is also a professor at

10      the University of Florida.  What does she teach?

11           A.   She is a professor of anthropology and is the

12      director of African studies.

13           Q.   And how large is the political science

14      department at the University of Florida?

15           A.   In terms of faculty?  Students?

16           Q.   Let's do faculty first, then students.

17           A.   We have now close to 40 faculty, that is full

18      time as well as a handful of full-time lecturers.  So

19      full time I mean tenured, tenured track.  And probably

20      an additional five full-time lecturers, and we are darn

21      close to 40.

22                We have over a thousand majors.  We are the

23      third largest major in College of Liberal Arts and

24      Sciences behind psychology and biology.

25           Q.   That's impressive.

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 12

1        A.    And we also have a large graduate student, PhD

2    students as well as MA.  I don't have the numbers off

3    the top of my head, but combined it is probably close to

4    100 students matriculating in the MA and PhD programs.

5        Q.    So let me walk back briefly.  University of

6    Denver, when you were at the University of Denver, were

7    you teaching classes on elections and voting while you

8    were there or were you focused primarily on organized

9    labor?

10       A.    Oh, no.  My research interests and, therefore,

11   teaching interests tend to flow with where I'm going.

12   I'm very much a product of my environment.  I was that

13   way when I was in grad school in Wisconsin focusing on

14   organized labor.  I continued at West Virginia.

15            When I went to Denver, one of the first

16   questions I got as a faculty member on a tenured track

17   position from the press was asking me about a ballot

18   measure that had passed in 1992.  And this is the fall

19   of 1994.

20            I really didn't know that much about direct

21   democracy.  I grew up in Pennsylvania, went to school in

22   Wisconsin.  Neither of those states had the initiative

23   process.

24            And as a student of state politics, I

25   certainly knew about the initiative and referendum, but

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 13

1    as a scholar hadn't thought about it.  So that actually

2    started a whole very fruitful 15 years of working on

3    questions of direct democracy.

4              So at that moment I started more focusing

5    directly on campaigns and elections and certainly taught

6    classes on parties and interest groups and elections and

7    direct democracy and state politics, which has a good

8    chunk on looking at state elections and voting

9    processes.

10        Q.   And so then when you got to Florida, I'm

11   assuming that was the right time to be focused on

12   election administration in the state of Florida.  Is

13   that where your interest followed when you got here?

14        A.   Yeah.  Ironically, I was out of the country in

15   the 2000 election.  But when I came in 2001 to UF and

16   then permanently in 2003, it's a state that has direct

17   democracy, but much more fascinating to me were the

18   various changes to election administration and voting

19   that was going on in this battleground state.

20        Q.   Florida somehow seems to have stayed a

21   battleground state for a very long time.  I'm sure

22   there's some political dynamic you can describe, but

23   it's interesting to me.

24             So you're currently, obviously, teaching at

25   the University of Florida.  And the next page of your

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 14

1    CV, you have some of the courses that you're teaching

2    there.

3              What is just kind of a general overview for

4    each of these courses?  We can start with Intro to

5    American Politics.  Just kind of an overview of the

6    types of subjects you're teaching within each of those

7    courses.

8         A.   Well, I haven't taught Intro to American

9    Politics in close to 20 years.  There are other faculty

10   who are much more interested in teaching that class.  In

11   the big -- and that's a big general soups-to-nuts class

12   on American politics.  I taught that regularly at the

13   University of Denver.

14             The large class that I teach at the

15   undergraduate level is the state and local government

16   class, and I teach a graduate seminar that's really

17   state politics.  State politics, I'm happy to be

18   teaching that grad seminar this semester on state

19   politics.  But that's by virtue of fewer faculty,

20   focusing on state politics.  And that course being a

21   required course for a lot of other majors.  Journalism,

22   they want to have their students taking a state and

23   local politics or government class.  I teach that class.

24   I have not taught that class in the last several years

25   because of my chair duties, and I have a reduction in

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 15

1      teaching.

2              But of the courses that are listed here, the

3      undergraduate level, that's the course that I teach

4      most.  It's structured very similar to an American

5      politics class in that we look at various institutions,

6      political participation, state and local politics of

7      direct democracy, look at campaigns and elections,

8      political parties, interest groups, state legislature,

9      governor, the courts, budgeting, and then various public

10     policies from education, welfare, healthcare.

11         Q.   Do you cover the topic of kind of election

12     administration in this class, or would there be a

13     different class where that fits?

14         A.   Oh, no, election administration is certainly

15     in the state and local government class and in my

16     graduate seminar.

17         Q.   And for the graduate seminar, what are some of

18     the topics that are covered there, is it the same topics

19     but at a deeper level?

20         A.   That's generally the way I would characterize

21     it, yes.  I had my class meeting yesterday morning.  We

22     had a book by Melanie Springer that looks at state

23     election laws and reforms from 1920 to 2000.

24              She has cross-sectional time series data where

25     she is looking at various restrictions placed on voting

Daniel Smith , Ph.D.                         January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 16

1    across the states and the adoption or the removal of

2    those, from literacy tests and property requirements and

3    the like, to more recent -- more recent in terms of that

4    80-year period, a reform such as no-excuse absentee

5    ballot, differentiation on registration from, you know,

6    several months, as it used to be, or residency

7    requirements to a 30-day or 29-day or election day,

8    same-day registration, early in-person voting and the

9    like.

10          So that was the first reading.  It was a book

11   that we discussed.  And looked at the effects of those

12   over time.  We read a piece by Barry Burden that was

13   also looking more recently at the adoption of some of

14   these election reforms and whether they lead to greater

15   turnout.

16          We read no-excuse absentee ballots and kind of

17   case studies in California or Colorado and the effect

18   they have on people turning out to vote or the

19   likelihood of filling out a full ballot.

20          So last -- this week, happened to be yesterday

21   morning, was all election administration.  That's the

22   only way.  Next week it's all election administration.

23   And it happens to be focused on Florida and the changes

24   in Florida and the scholarly takes on that.  The

25   following week it's going to be other forms of election

Daniel Smith , Ph.D.                                  January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                      Page 17

1    administration.

2           As I told the students, you're going to get a

3    lot of this because that's what I'm interested in,

4    that's what I'm writing on, and yes, we will cover all

5    the other institutions, but my enthusiasm may not be as

6    strong.  But they know that.

7       Q.   And you focused, you mentioned, on Florida

8    voting administration.  Have you ever taught a class on

9    election administration for Georgia law specifically?

10      A.    No.  But the textbook that I'm a coauthor of,

11   which was a leading textbook for quite some time,

12   certainly covers the 50 states and looks at variations

13   across the states in terms of various restrictions as

14   well as more expansive.

15          So, you know, Georgia adopted, for instance,

16   online voter registration.  They were out there among

17   the forefront.  So looking at that.  But Georgia also

18   adopted in the mid 2000's a restricted voter ID.  So my

19   coauthors and I for that textbook put together an index

20   on looking at the expansion or retraction.

21          And so in that sense, my students are almost

22   all from in state, and both graduate students as well as

23   undergraduate, they're interested in Florida, but it's

24   important, from my perspective, to make sure they're

25   exposed to what's going on in other states to understand

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 18

1    why does Alabama not have the ability to vote an

2    absentee ballot unless you swear that you're going to be

3    outside of the county in order to request an absentee

4    ballot, that they have no early in-person voting.

5          Thinking for my grad students how you might

6    leverage those differences to understand whether or not

7    institutions matter with respect to turnout.  You can

8    use a parallel line between the Georgia and Florida or

9    the Alabama and the Florida line to look at comparisons

10   on how effective might these institutions be in terms of

11   turnout.

12         So that's what I want to give my students, a

13   wide array of readings so that they can think as

14   political scientists, both at the undergraduate level

15   and graduate level, how institutions may shape political

16   behavior.

17         Q.   So is it fair to say then a decent amount of

18   the work is kind of looking state by state and

19   comparing, you know, more restrictive, less restrictive,

20   what is the impact on turnout, on campaigns, on all

21   those kinds of things, is that a fair?

22         A.   I mean, it sounds like you were in my seminar

23   yesterday morning because we had this large discussion

24   with my seven students about whether or not, as a social

25   scientist, and you're trying to really explain things,

Daniel Smith , Ph.D.                         January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 19

1     do you want to look at a single state and change over

2     time or variation across sub-state units such as

3     counties, or do you want to look at cross states over

4     time cross-sectionally.  There are advantages and

5     disadvantages of both of those.

6              If you're looking across time, across states,

7     you, as a social scientist, have a limited ability to be

8     able to get precise measurements, is early voting the

9     same in Florida as in Georgia as in Texas as in Arizona.

10             If not, and yet you know that they all have

11    early voting, you are going to be limiting, by thinking

12    about this as coding as they either have it or they

13    don't have it, and that gets even more difficult if

14    you're looking over time at micro-level changes.

15             If you're looking at a single state, you can

16    look at changes or time and hold constant a lot of other

17    factors.  So there are tradeoffs in terms of how much

18    you can generalize from a single-state case study.

19    There are limitations when you're looking

20    cross-sectionally or over time at a national data set in

21    terms of how precise your measurements are and whether

22    or not you're really picking up what you want to know.

23             I want my students to be sensitive to that as

24    I am as a scholar.

25             Q.   You mentioned early voting as an example of

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 20

1      that.  I guess it's not necessarily for a state-by-state

2      comparison, a binary yes or no.  Because it may be two

3      states that have early voting, but one has 21 days, one

4      has seven days, one includes weekends, one doesn't.

5                  THE COURT REPORTER:  Can you slow down,

6            please.

7                  MR. TYSON:  I'm sorry.

8      BY MR. TYSON:

9            Q.   So you need more depth in a state-by-state

10     comparison; is that correct?

11           A.   Again, I think there are tradeoffs, and as

12     someone who's toiled in both of these kind of realms of

13     looking cross-sectionally over time but also in depth in

14     case studies, as I said, there's value both ways.

15           Q.   Now, you mentioned in your CV as well that

16     you're president of Election Smith and have been since

17     2006, correct?

18           A.   Right.

19           Q.   And did that -- did you start Election Smith

20     around the same time, or, I guess, soon after you

21     started teaching at the University of Florida?

22           A.   Yes.  I mean, it's coincidental with respect

23     to that.  It had more to do with accounting purposes.

24     Election Smith is an S corp.  I report all that income

25     on my 1040.  And I wanted to be able to more precisely

Page 21

1    differentiate my work on the outside activities as

2    opposed to work as a political scientist at the

3    University of Florida.

4              (Thereupon, Defendant's Exhibit 3 was marked

5    for identification.)

6         Q.    Okay.  I'm going to hand you what I have

7    marked as Exhibit 3.  Is this a printout of the Election

8    Smith website?  Does it appear to be that?

9         A.    It does appear to be that.  I have no idea

10   what the date of that is or when it may have been

11   looking like this.  I don't refer to my web page very

12   often.

13        Q.    So you mention that Election Smith, in that

14   first sentence, works with clients to provide empirical

15   analysis, research reports, and expert witnesses,

16   declarations and affidavits.

17             Is that a fair summary of what you do through

18   Election Smith, or are there other things that Election

19   Smith does as well?

20        A.    Well, yes, I think it's a fair summary.  I

21   certainly blog occasionally.  I Tweet occasionally.

22   Those are both under the banner of Election Smith.  But

23   that basically summarizes the empirical analysis,

24   research reports, expert witnesses, declarations and

25   affidavits, yes.

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 22

1        Q.   When you do work through Election Smith for

2    the clients you reference here that are nongovernmental

3    clients, would you generally categorize those clients as

4    more progressive and left-leaning organizations or

5    conservative and right-leaning organizations?

6        A.   I don't know how I would characterize them.

7    I'm looking at organizations that I think are interested

8    in promoting small D democratic processes and fair

9    elections participation.  So I don't really like those

10   terms per~se.

11       Q.   Have you worked for candidates through

12   Election Smith?

13       A.   I have not worked on any political candidate

14   campaign.  I have not been hired by any political

15   campaign that involves a candidate.

16            The only time that I can think in recent

17   memory was a lawsuit that was filed by Corrine Brown

18   that had to do with preservation of early voting

19   locations in Duval County.  And at the time of the

20   representation by the attorney I worked for, that was

21   not known to me.

22       Q.   Now, you mentioned that you also post on

23   Twitter your Election Smith account; is that correct?

24       A.   I want to go back one more that -- I would

25   have to go through my CV on all the things that I have

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 23

1        listed that I have worked for.

2                The only other one that I'm coming up with

3        that, again, was looking at a possible candidate was a

4        mayoral race in South Florida.  Sawiki is the name of

5        the ...

6                        THE COURT REPORTER:  Say it again.

7                        THE WITNESS:  I will find it for you.

8                Again, I would have to go look line by line to

9                tell you if there was a specific candidate

10               involved but it -- here it is.  S-A-W-I-K-I.  I

11               provided a written affidavit, and I was deposed

12               in that Cape Coral mayoral election from 2014.

13               I have no idea, actually, of whether or not

14               they have partisan mayoral elections in Cape

15               Coral.  I have never been to Cape Coral.

16               I was contacted by an attorney who represents

17               the Democratic Florida Party.  So I can make an

18               assumption that that was a candidate who was a

19               partisan.  But that's speculative.  I honestly

20               don't know whether she's a Republican, Democrat

21               or no party affiliate, whether or not they have

22               partisan elections.

23       BY MR. TYSON:

24           Q.   Okay, thank you.  In looking through your past

25       Tweets, I ran across the term, "The fraudulent fraud

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 24

1      squad."  Can you tell me about what that means?

2           A.   I think that's a term that Rick Hasen coined.

3      Rick Hasen, H-A-S-E-N, is a professor of law in

4      California.  And yes, I think he has used that term to

5      characterize certain individuals who like to bandy about

6      the idea that there is massive election fraud.  And so

7      Rick has called them Fraudulent Fraud Squad.

8           Q.   That their allegations of voter fraud are

9      fraudulent?

10          A.   Correct.

11          Q.   And you have a penned Tweet at the top of your

12     Twitter page about a victory.  You said, "A great

13     victory in the Eleventh Circuit over the Fraudulent

14     Fraud Squad in an ACRU case."  Do you recall that?

15          A.   Yeah, I'm not sure if that's still penned.  It

16     could be.  It's either that or trying to raise money for

17     our election sciences group at the University of

18     Florida.

19               But that penned Tweet was -- as an expert you

20     kind of forget about cases, and when you see something

21     where your eyebrows go up, I was actually very surprised

22     to have such a decisive victory at the Eleventh Circuit

23     on this case that was brought by Christian Adams and the

24     ACRU in Broward County.

25               And I was hired, not by Brenda Snipes, the

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 25

1    Democratic Supervisor of Elections, I was hired by a

2    group that came in to defend the integrity of the

3    election system broadly and specifically with respect to

4    Broward County.  So I was a defendant intervenor expert.

5          Q.   Out of the theme of some of your Tweets

6    focuses on the term "voter purges."  Are you familiar

7    with the term "voter purge"?

8          A.   Yes.

9          Q.   How would you define voter purge?

10         A.   Well, that's a complicated question.  Voter

11   purging is a regular process of list maintenance, and

12   should be.

13              And I'm very, you know, adamant that we should

14   have clean voter rolls and there should be a process in

15   which people who are no longer in the jurisdiction as a

16   registered voter, people who have passed away, people

17   who have violated a state constitutional rule such as

18   committing a felony, in those contexts, in those

19   jurisdictions, should be removed from the roll through

20   due process.

21              And so purging of voter rolls, list

22   maintenance, whatever euphemism you want to call it,

23   should be going on.  So I have no kind of face objection

24   to list maintenance.

25         Q.   For list maintenance that is done based on no

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 26

1      contact where there's a voter who has not had contact

2      with election officials, has not returned a postage

3      card, is that the type of list maintenance that you

4      would oppose?

5                MR. KAISER:  Objection.  Scope.  It's beyond

6           the scope of his case.

7                THE WITNESS:  Yes, it's definitely beyond the

8           scope of this because I didn't look at those

9           questions.  You can look at my various work on

10          that as a scholar or as an expert in other cases.

11     BY MR. TYSON:

12          Q.   Okay.  Now, you have a few other affiliations.

13     You mention that you were a board member of the Ballot

14     Initiative Strategy Center; is that correct?

15          A.   At the time of this CV, correct.

16               (Thereupon, Defendant's Exhibit 4 was marked

17     for identification.)

18          Q.   I'm going to hand you what I have marked as

19     Exhibit 4.  Sorry, that's mine.

20               And this is a printout of the website from the

21     Ballot Initiative Strategy Center that describes it as,

22     let's see the first sentence there, "the only

23     progressive organization that works across these various

24     efforts."

25               Would you consider the Ballot Initiative

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 27

1    Strategy Center to be a progressive organization?

2         A.   Yes.  I was on their board from 1999 till my

3    resignation in early December.  So I served 20 years on

4    that board and stepped away since I felt that my

5    services were no longer really beneficial to them.

6    They -- they have done just fine and 20 years is a long

7    time to be on a board.

8              But I would agree with that comment.

9         Q.   Are you on any boards of any organizations

10   that would identify themselves as conservative

11   organizations?

12        A.   I have been on the academic advisors of the

13   institute and referendum institute and University of

14   California at USC, University of Southern California.

15             And I certainly characterize John Matsusaka

16   who runs that as conservative, yeah.

17        Q.   And you also mention you're on the board of

18   Common Cause Florida, correct?

19        A.   That is correct.

20        Q.   And are you still on that board?

21        A.   I am.

22             (Thereupon, Defendant's Exhibit 5 was marked

23   for identification.)

24        Q.   I'll hand you what we have marked as Exhibit

25   5, which is the voting and elections page from Common

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 28

1      Cause Florida.

2              Are you familiar with the voting and election

3      missions of Common Cause Florida?

4          A.   I can't say that I have looked at this web

5      page ever.

6          Q.   Okay.  Well, then we can set that one aside.

7      Easy enough.

8              All right.  So I have to ask, I noticed on

9      your CV one of the topics was consulting work you did

10     for Last Week with John Oliver on voting.

11         A.   I enjoy watching Last Week with John Oliver.

12     I worked in the public defender space prior to coming

13     back into private practice here, and he did a special on

14     public defenders as well in Georgia.

15         Q.   I'm assuming it was for the voting segment

16     that he did?

17         A.   It was.  I want to say it was the voting

18     segment that launched that season.

19         Q.   What kind of advising did you do for

20     Mr. Oliver's show?

21         A.   Completely pro bono.  Multiple phone calls

22     where they were just mining me for various cases that

23     they would look into, and I'm sure from your experience

24     looking at how your former fellow public defenders were

25     portrayed, you're probably happy that you were not among

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 29

1      them that made it on camera.

2              So they didn't send the producer down, they

3      didn't send a camera crew, and I was grateful that I

4      could stay in the background and provide them with some

5      direction.  But not be skewered.

6          Q.   I completely understand.  Were there

7      particular topics that you recall they were asking you

8      about or was it just all very scattershot?

9          A.   It was scattershot.  It was all over the

10     place.  I think I did look at that segment when it came

11     out because I was obviously interested, and, you know,

12     they take some of the things you're interested in and

13     not others.

14             But I honestly don't remember the details.  I

15     think it was more like what I do with the reporters who

16     call me all the time about what are some of the

17     interesting things that are going on, or can you comment

18     on this specific issue.  It was more -- I think they

19     tried -- I think they have some integrity in that they

20     tried to not just have humor but show kind of the ins

21     and outs of the workings, in this case, the election

22     system.

23         Q.   And in your consulting work listed on your CV,

24     I see a number of times you have worked on behalf of the

25     ACLU; is that correct?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 30

1           A.    That is correct.

2           Q.    And generally speaking, did ACLU contact you

3      or did you reach out to them for this kind of work?  The

4      kind of work I'm referring to would be in the Outside

5      Activities consulting section of your CV.

6           A.    I, generally speaking, and almost I think

7      without exception, do not reach out to groups.  They

8      contact me.

9           Q.    And specifically there was a reference to some

10     work around redistricting efforts in the state of

11     Georgia.

12               Do you recall that work?

13          A.    Yes.

14          Q.    And on page -- it's page 39, using the blue

15     numbers at the top there, page 8 of your CV.

16          A.    Yes.

17          Q.    And you provided an analysis.  It says, of

18     proposed redistricting changes to the Georgia House?

19          A.    Correct.

20               MR. KAISER:  What page are you on?

21               MR. TYSON:  Page 39.

22               MR. KAISER:  How far down?

23               MR. TYSON:  Right here (indicating).

24               MR. KAISER:  Great.  Thank you.

25               THE WITNESS:  Yes.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                          Page 31

1      BY MR. TYSON:

2          Q.    And do you recall whether those were adopted?

3      I know it says proposed here, do you recall whether the

4      changes that you analyzed were eventually adopted?

5          A.    That, I do not know.

6          Q.    So why don't we go ahead and do this.  Are you

7      good break-wise?

8          A.    I'm fine.

9          Q.    Okay.  Let's go to the substance of your

10     report because this will lead into a couple of other

11     questions about the cases as we go through your

12     background and qualifications here.

13              We have marked your report as Exhibit 2.  And

14     did you write this report yourself, did you have

15     assistance in drafting it?

16         A.    No, I wrote it myself.

17         Q.    Are there drafts of the report that were sent

18     to plaintiff's counsel before it was finished?

19         A.    That's possible.  That is possible.

20         Q.    Do you recall if the plaintiff's counsel

21     provided you with suggested edits to drafts of the

22     report?

23         A.    I would -- if I recall correctly, yes.  That's

24     general practice of giving me suggestions.

25         Q.    All right.  Let's just walk though here.  So

Daniel Smith , Ph.D.                                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                              Page 32

1      in paragraph 2 on that page, page 2 of the report, you

2      reference that you've written extensively on electoral

3      processes in the American states, including in Georgia.

4              And I know we discussed earlier kind of some

5      of the overview of things.  Do you have specific

6      writings that you have done on the state of Georgia or

7      were those always included in larger treatment of state

8      laws generally?

9          A.    The latter.  It would be relative to a

10     cross-sectional study of various types of reforms,

11     whether it's restrictive voter ID, whether it's online

12     voter registration, Georgia would be highlighted and

13     profiled in both of those accounts.

14             In terms of peer reviewed articles with

15     respect to my textbook and the four editions, dozens

16     upon dozens of examples of Georgia, either in the

17     context of the 50 states or specifically on what they

18     have done.

19             So yes, Georgia is the subject of many of

20     those comparisons.

21         Q.    And then in paragraph 3 on the next page, you

22     mentioned your being the lead author in "Direct

23     Democracy Scholars."  I'm assuming this is when you were

24     focused on direct democracy and ballot initiatives kind

25     of prior to your current focus?

Daniel Smith , Ph.D.                     January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 33

1          A.   Well, direct democracy scholarship that I have

2     been engaged with for 30 years almost, it's kind of like

3     annuity.  So if I am -- it's there.  And it keeps paying

4     dividends in this case.  I wasn't really writing a lot

5     on direct democracy around 2010.  I was already shifting

6     my focus into Florida and elections.

7               But I was approached by some counsel to work

8     with other counsel to work with experts on putting

9     together an amicus brief on direct democracy.  So I

10    jumped at that opportunity, pro bono as it was, and that

11    direct democracy scholar's brief was actually held up

12    during oral argument, which was kind of fun.

13         Q.   That's awesome.  And I don't recall in Doe vs.

14    Reed, do you recall what the major issue was?  I should

15    have looked that up.

16         A.   Sure.

17         Q.   I'm now curious.

18         A.   It was fascinating.  It was fascinating.  I

19    think it was a seven-two or eight-one decision.  I knew

20    we were going to win when Antonin Scalia talked about

21    how you have to be tough in democracy.

22              The case revolved around whether or not

23    signatures being gathered to overturn a law that gave

24    rights to gay and lesbians in the state of Washington,

25    this was a popular referendum to overturn that law,

Daniel Smith , Ph.D.                     January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 34

1    whether or not the signatures collected could be kept

2    private or whether they were subject to the same public

3    scrutiny that any record in the state of Washington was.

4    Signing petitions are public record.

5         And so I had done actual work in the state of

6    Washington on ballot measures and was familiar with it.

7    I'm a very strong advocate of public records, so it was

8    a fun brief to write on supporting the state's effort to

9    keep those signatures open to the public scrutiny when

10   the petition gatherers wanted to keep them private.  And

11   we won with a rare bipartisan nomination of the Supreme

12   Court justice coming together.

13        Q.   And in paragraph 4 you mentioned that you have

14   served as an expert for the State of Florida and the

15   State of California defending their election laws.  I'm

16   assuming it's correct you have never defended the State

17   of Georgia in a case, correct?

18        A.   I'm waiting for the call.  Happy to do it.

19        Q.   Then there's a couple of cases you list here

20   that you were involved in.  I just want to ask about

21   those.  The first is the American Civil Rights Union vs.

22   Snipes.  And this is the case you referenced earlier

23   where the Eleventh Circuit agreed with the approach you

24   took about the NVRA; is that right?

25        A.   I don't know if I would limit it just to the

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 35

1    NVRA, but they upheld the federal judge's opinion that

2    relied heavily on my expert work in that case.

3        Q.    And is this the case where you reference

4    defending serving as an expert for the State of Florida?

5    Is it this case or is there a different case?

6        A.    No.    That's not the case that I'm referring

7    to.    I was a defendant intervenor even though it was on

8    behalf of a county supervisor of election who is a state

9    constitutional officer, that's not the case I was

10    referring to.

11        Q.    Which case were you referring to as serving as

12    an expert for the State of Florida?

13        A.    I will have to go and look at my CV, sadly,

14    because I don't remember the specific name.    But it was

15    working for the Secretary of State of Florida.    And it

16    was the case Worley, W-O-R-L-E-Y, it's on the top of

17    page 40 of the Document 168, Worley v. Detzner.    So I

18    worked with the secretary of state's office and state

19    attorney general defending Secretary of State Ken

20    Detzner.

21        Q.    The issues in that case, it appears from the

22    CV, were about, I guess, campaign finance and direct

23    democracy type issues with ballot committees; is that

24    correct?

25        A.    Yeah.    It dealt with defending the reporting

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 36

1      requirements for committees set up to run or oppose

2      ballot measures, yes.

3           Q.   At the bottom of page 3 of your report you

4      reference Judicial Watch and Others vs. Logan.  Is that

5      the case where you served as an expert for the State of

6      California?

7           A.   That is correct.

8           Q.   And that was also a case under the NVRA,

9      correct?

10          A.   I think it was generally that.  Unfortunately,

11     as an expert we often don't know what the legal

12     questions are.  We're asked to do kind of an empirical

13     study, and I don't really delve into the legal question

14     or the statute that may be at question.  That's

15     generally not what I'm asked to do as an expert.

16          Q.   And your work in that case was focused on

17     voter list maintenance for no contact; is that correct?

18          A.   Yes, that is correct.  Or I don't know if it

19     was no contact, it was more looking at general list

20     maintenance and whether or not there appeared to be list

21     maintenance going on.

22          Q.   I believe I'm on Number 6.

23          A.   I think so, yes.

24          Q.   Okay.  The next case marked on your CV after

25     the ACRU case is DNC Services Corporation vs. Lee.  Do

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 37

1    you recall that case?

2          A.    No.   There are several that are very similar,

3    so I would have to look at the details.

4                (Thereupon, Defendant's Exhibit 6 was marked

5    for identification.)

6          Q.    Well, I have handed you what's been marked as

7    Exhibit 6, which is, appears to be an expert report also

8    titled DNC Services vs. Lee.  Does that refresh your

9    recollection as to that case?

10         A.    There has been a flurry of legal activity in

11   Florida, as you're well aware of, so I would have to

12   look at this.

13               Yes, it looks like it's on the vote-by-mail

14   ballots and trying to understand in 2019.

15               MR. KAISER:  Do you want to take a minute and

16          read it?

17               THE WITNESS:  Yeah, I'll take a look at it.

18          It might help me in narrowing down which of these

19          cases I was asked to work on.

20               MR. TYSON:  Certainly.  And take your time.

21          I'll direct you to a few specific questions I

22          have after you have had a chance to review it.

23               THE WITNESS:  Yes, I am remembering this

24          analysis.

25

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                        Page 38

 1     BY MR. TYSON:

 2          Q.    So if you could turn with me then to page 7,

 3     paragraph 13.

 4          A.    Yes.

 5          Q.    We have a summary of opinions offered.  And in

 6     the first sentence, can you read that first sentence to

 7     me, please.

 8          A.    Sure.  "In my opinion, counties' recordkeeping

 9     of VBM ballots cast by Florida voters is rife with

10     inconsistencies and errors."

11          Q.    And in this report were you conducting an

12     analysis of an absentee file compared to a voter file

13     similar to the analysis you performed in this case?

14          A.    Yeah, I think it's analogous.

15          Q.    And it appears from your statement in

16     paragraph 13 that you found a lot of inconsistencies and

17     errors, is that fair to say?

18          A.    That is true.

19          Q.    On the next physical page, you continue to

20     summarize, page 8 in paragraph 13, you continue to

21     summarize the issues you identified.  And it appears

22     that there was a lot of difficulty trying to match up

23     the absentee file and the voter file; is that correct?

24          A.    That is -- that appears to be true, yes.

25          Q.    If you could go to page 10 and paragraph 18.

                      Veritext Legal Solutions

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 39

1     You mentioned that there were duplicate, triplicate and

2     even quadruple entries in the vote-by-mail records; is

3     that correct?

4          A.    That is correct.

5          Q.    In your experience, is it unusual to see

6     duplicate or multiple entries in absentee files?

7          A.    Looking specifically at Florida?  It varies.

8     Some county supervisors do a much better job of

9     maintaining a single record for a single individual as

10    opposed to duplicating that individual's record and

11    entering it multiple times.

12         Q.    Beyond the State of Florida and the State of

13    Georgia, have you reviewed absentee files for other

14    states?

15         A.    Yes.

16         Q.    And what states would those be?

17         A.    I have looked at absentee files probably most

18    closely in Ohio.  I have also looked at them in North

19    Carolina.  There may be other states that I'm not

20    remembering right now, but I have looked at,

21    specifically, absentee files.

22         Q.    And for the absentee files for the State of

23    Ohio, do you recall whether they were duplicate,

24    triplicate, multiple entries for voters in that file?

25         A.    It's been a while.  Probably, six, seven

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 40

1    years.  I don't recall specifically when linking the

2    county level records to the statewide file.

3        Q.   And for North Carolina, do you recall whether

4    there were multiple entries for the voters in the

5    absentee file?

6        A.   North Carolina happens to be probably the

7    cleanest of all the states that I have looked at in

8    terms of their voter files.  So I can't recall off the

9    top of my head, but I would be surprised if -- I would

10   have remembered had I had issues there.  I'm not

11   remembering having issues specifically in North

12   Carolina.

13       Q.   If you could turn to page 15 of Exhibit 6.  In

14   paragraph 30 you reference an alarming number of

15   anomalies in the daily vote-by-mail ballot data.  Do you

16   see that paragraph?

17       A.   Yes.

18       Q.   And it appears from the language in paragraph

19   30 that you found discrepancies again between the

20   absentee vote-by-mail status file and the vote history

21   in the statewide voter file, correct?

22       A.   Yes, it appears so.

23       Q.   Onto the next page in paragraph 31, one of

24   those anomalies was duplicative vote-by-mail activity

25   observations; is that right?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 41

1          A.    Can you point directly --

2          Q.    Yeah, paragraph 31, the first sentence.

3          A.    Gotcha.  Yes.

4          Q.    Did you determine what the cause of the

5     duplicative entries in the Florida vote-by-mail was or

6     were?

7          A.    I am sure that I reached out to some

8     supervisors of elections to get their sense of what's

9     going on, and partly it was failure to follow -- you

10    know, a staff member not following correctly the rules

11    laid out.  That seemed to be the biggest issue of here's

12    the directive and rather than having one record per

13    voter, they were adding an additional record.

14         Q.    And do you recall, were they adding an

15    additional record when there was another contact by the

16    voter or what would have triggered that?

17         A.    That is generally the case.  The only other

18    case that I recall was if a voter moved their voter

19    registration in and it got pulled in with respect to the

20    vote-by-mail record, which is a separate file.

21         Q.    On the next physical page, paragraph 32, you

22    reference different coding, and one of them is a voter's

23    standing request.  What is -- what does a voter's

24    standing request refer to?

25         A.    So in Florida, state law has changed on this

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 42

1    several times.  Voters may request to be on a

2    vote-by-mail list, meaning a standing request that for

3    two election cycles they will automatically be mailed

4    their absentee ballot as opposed to having to request

5    one.

6         Q.    Thank you.  I'll set that one aside.

7               Getting back to your report in this case, in

8    paragraph 5 on page 4 you reference that you're being

9    paid $400 an hour for your work plus expenses?

10        A.    Correct.

11        Q.    Is that the highest hourly rate you have

12   charged for past expert work?

13        A.    That's what I have been charging the last

14   year.  2018, 2019 I moved into that category.  And I

15   realized that I'm still underpaying myself.

16        Q.    It's always a challenge to make sure you

17   adjust your hourly rates.

18        A.    Exactly.

19        Q.    So in paragraph 6 you discuss the topics that

20   counsel for plaintiff asked you to provide consultation

21   about.  And the way I read it, and you can tell me if

22   I'm wrong on this, they were just kind of just two

23   discreet areas, one was analyzing Georgia's voter

24   registration data, and the second area was how Georgia

25   handles absentee and provisional ballots in the 2018

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 43

1    election; is that correct?

2         A.    I think that's a fair characterization.

3         Q.    And you were not asked to provide a report on

4    any other topics, correct?

5         A.    That's correct.

6         Q.    So let's move to paragraph 8.  Your first

7    sentence you summarize your opinion that there are clear

8    administrative and recordkeeping problems with Georgia's

9    voter list and voter history.  And then you, in the next

10   sentence, conclude that that recordkeeping problem is

11   the result of a failure to oversee, train and advise

12   county officials.

13          Can you tell me how you drew that connection

14   to that particular cause versus other causes?

15         A.    Sure.  I mean, obviously some of this, much of

16   this, is unobservable.  I'm looking at records after the

17   fact and am imputing some type of linkage.  But from my

18   analysis of the data, looking at it objectively and

19   letting the data speak for themselves, unlike some of

20   the cases in Florida or other states where there seems

21   to be some synchronizing problems between a county and

22   the state or specific cases with incidences within a

23   county, the heterogeneity, the inconsistencies across

24   the 159 counties in Georgia appear to me to raise

25   attention to the state centralized officials who are

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 44

1    supposed to be assuring there's a uniformity rather than

2    some idiosyncratic specific case going on in one of

3    those jurisdictions.

4        Q.    In preparing your report, did the plaintiff's

5    counsel ask you to assume anything was true, any facts

6    were true?

7        A.    No, I can't think of anywhere that was

8    portrayed to me.

9        Q.    Have you reviewed the complaint or other

10   briefs filed in this case?

11       A.    I am sure that when I was initially hired, I

12   looked at those materials.

13       Q.    So you're aware that one of the claims

14   plaintiffs make is a failure to train claim, correct?

15       A.    Yes, I am aware of that.

16       Q.    And your opinions that you're reaching in this

17   report, specifically in paragraph 8 that we're

18   discussing, are based on the data files and your

19   analysis of that data not based on any interviews with

20   officials or in further investigation beyond the data;

21   is that correct?

22       A.    That is correct.

23       Q.    In that sentence, in paragraph 8, about

24   failure to oversee, train and advise, you reference

25   several areas, voter registration applications, voter

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 45

1    histories, absenteeism and ballot transactions, how --

2    and we may get into this as we go through the report.

3    But specifically where is the tie-in for voter

4    registration applications in those areas, reaching the

5    conclusion?

6        A.   Sure.  As you know, one of the three major

7    files I look at is the voter file.  And there are

8    inconsistencies with respect to voter registration

9    dates.  And I know that by looking at those data, and I

10   can tell that there are issues.  There's missing data

11   with respect to race codes or other information that

12   should be part of the file.  So that usually happens

13   through the registration process.  That's how the voter

14   file, as I call it, is populated, is through individual

15   voter registration records.

16       Q.   In paragraph 9, your second opinion, you say

17   that voters in Georgia who are black are

18   disproportionately more likely to cast an absentee

19   ballot, I'm assuming, that is rejected by local election

20   officials.  Do you see that part?

21       A.   Yes.  And there should be a "ballot" after

22   absentee ballot.  It should be absentee mail ballot,

23   specifically.

24       Q.   Thank you.  And again, we'll look at some of

25   the specifics here in a minute.  But you looked at this

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 46

1      on a global scale, you didn't look at the racial -- I'm

2      sorry, let me take that back -- the political makeup of

3      a county of who is administering an election; is that

4      correct?

5            A.   That is correct.

6            Q.   In paragraph 10 you reference the role of the

7      secretary of state's office and the state election

8      board.  Do you recall what state election board

9      materials you reviewed to prepare this report, if any?

10           A.   I don't think I reviewed any for this report.

11     It's tied to my general knowledge and my work on some

12     scholarship that is in process on Georgia that's from

13     two or three years ago where I was looking at that.  And

14     quite honestly, the relationship between the secretary

15     of state office and the state election board is one that

16     I wish I knew more about.

17                It's somewhat confusing for an outsider.  We

18     don't have a state election board in Florida, and many

19     other states don't.  But it's from, you know, some

20     research that I was doing not tied at all to this

21     litigation around the 2016 election.

22           Q.   Okay.  And what is -- what was the scholarship

23     and research you were doing around the 2016 election

24     where you acquired this knowledge?

25           A.   Yeah, I worked on a paper with an honor

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 47

1      student who was looking into the pending list, I think

2      it was called in Georgia, on voter registration, and so

3      that's where I started digging in to help advise him on

4      his honors thesis, and from that honors thesis, I worked

5      with a colleague and a graduate student on a paper that

6      has kind of been languishing.

7           Q.   And that paper was focused on the pending list

8      in Georgia?

9           A.   Correct.

10          Q.   You also say about halfway through paragraph

11     10 that the secretary of state and the state election

12     board provide training to county registrars and

13     superintendents.  Do you see that reference?

14          A.   Yes.

15          Q.   Is that statement also based on this 2016

16     research you were doing or based on the statutory

17     language?

18          A.   Yeah, I'm looking at the statutory codes, and

19     I know that I had another undergraduate student at that

20     time dig up the actual language from the Georgia state

21     code to figure out what actually the process was of the

22     election administration as background for that paper.

23          Q.   Is it typical in most states that a secretary

24     of state or some statewide entity provides training to

25     registrars and superintendents?

Daniel Smith , Ph.D.                              January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 48

1          A.    Again, I don't have extensive knowledge across

2      all the states, but for the states that I have looked

3      at, certainly Florida, Secretary of State's office works

4      very closely with the Florida Supervisors of Elections

5      Association, and they have webinars, and I have

6      certainly sat in on webinars, and I have look at the

7      PDFs of the PowerPoints of the training, I've looked at

8      the training manuals.

9               I have seen similar types of things in North

10     Carolina with their state board of elections and other

11     states where other scholars have written extensively

12     about that relationship between a statewide office and

13     the local election officials.  So Colorado, New Mexico,

14     California all come to mind.

15         Q.    Just so we're clear, for Georgia you have not

16     reviewed any training materials the secretary of state

17     or election board would provide regarding any of the

18     topics in your report, correct?

19         A.    Again, if I did, it was tied to that

20     scholarship and advising my honor student and working on

21     this paper with my coauthors to make sure that we

22     understood the dynamics between the state office and the

23     local offices.

24         Q.    And so in reaching the conclusions you reached

25     about training, those conclusions are not based on a

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 49

1      review of training materials but only on the data that

2      you reviewed, correct?

3           A.    Again, for this case, I focused on the

4      administrative data from the secretary of state's

5      office.

6           Q.    And no training materials?

7           A.    I did not review training materials in this

8      case.

9           Q.    So let's go to the first section, Roman

10     Numeral III at the top of page 7.

11               I wanted to ask first, in the title you say

12     that the data problems and logical inconsistencies that

13     most likely reflect a substantial deficiency in the

14     training is this statement indicating that you believe

15     there could be other causes besides deficiencies in

16     training?

17          A.    Oh, I wouldn't rule out other possibilities.

18          Q.    So it's entirely possible then that the data

19     problems and inconsistencies you discovered are caused

20     by something other than a deficiency in training,

21     correct?

22          A.    The fact that it is widespread and across the

23     159 counties leads me to believe that it's not

24     idiosyncratic or some rogue county or local elections

25     official, that there's something more systematic going

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 50

1      on of the failure to have more uniform codes.

2            Q.    But that could be something other than a

3      deficiency in training, correct?

4            A.    I haven't come up with any other options, but

5      I wouldn't rule them out.  I would certainly consider

6      them.

7            Q.    Okay.  So sitting here today, you can't think

8      of another cause but you're not ruling out the fact that

9      there could be something other than a deficiency in

10     training that causes the data problems here, is that

11     fair to say?

12           A.    I'm an empiricist.  If you bring me other data

13     and possibilities, I will look critically at them from

14     an objective standpoint as I can to see if there are any

15     relationships.

16           Q.    So let's talk about some of those data pieces

17     in paragraph 11.  You reference single uniform top-down

18     centralized voter list.  Are you familiar with the

19     software E-Net that's used for voter registration

20     databases?

21           A.    Yeah, ElectioNet or E-Net, I'm generally

22     familiar with that system, or FVRS in Florida or others.

23     Every state is slightly different.  They're called a

24     little different.  But yes, as a pole worker, I am

25     familiar with Florida's system more directly.

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 51

1      Q.    And you reference the last sentence in

2   paragraph 11 in a well-functioning top-down system.

3   What would you define as a well-functioning top-down

4   system?

5      A.    I think it basically can be summed up by

6   having good coordination and technological interface

7   between the statewide system and the local offices.

8           And, you know, I can point many examples in

9   which things could be cleaned up quite a bit in Georgia,

10  just from digging into the data where it's clear that

11  there's way too much discretion in the 159 counties in

12  terms of how they're coding things that makes it not

13  that well-functioning.

14          I mean, in some ways if you're having a

15  centralized system, you need to have set formats in

16  order to be able to compare them across the different

17  jurisdictions.  And that is a good system, one that

18  creates parameters in which the subsidiaries all can

19  follow and logically maintain their lists in uploading

20  them to a centralized system.

21     Q.    Based on the report we looked at earlier for

22  DNC Services Corporation, would you define Florida's

23  system as having good coordination between the statewide

24  and local offices?

25     A.    Yes and no.  I mean, yes, with respect to

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 52

1    their general immediacy of list maintenance where it's

2    in realtime, supervisors who get a photo registration

3    and is moved from one county to another, it's immediate

4    in terms of interacting to the state as well as to other

5    jurisdiction that is being pulled in or pulled out.

6            No with respect to the maintenance of the

7    absentee ballot files.  Although, because of the

8    litigation, it's getting better.

9            And that's one of the things that I take some

10   pride of, is being an expert in multiple cases in which

11   we have seen an improvement in Florida in terms of,

12   especially absentee ballots, they can be cured and the

13   process of curing that.

14           Is it perfect, if it were, I wouldn't have

15   been asked to write a report in April of 2019

16   documenting some of the problems that persist,

17   especially with respect to the vote-by-mail

18   recordkeeping.

19       Q.   And you mentioned that you had knowledge

20   particularly of Florida's system.  You don't know how

21   Georgia handles county-to-county voter registration

22   moves, do you?

23       A.   I can't speak with authority on that, no.

24       Q.   In paragraph 12 you started your analysis, you

25   said, with the October 10, 2018 voter list.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 53

1          A.    That is a scrivener's error.  It's actually

2     October 15 throughout.  I think that's the only place

3     where I made a mistake.  I must have had 10/15/2018.

4                MR. KAISER:  That's it?

5                THE WITNESS:  That's the vote history.

6                MR. KAISER:  Sorry.  Sorry.

7                THE WITNESS:  October's list, it's definitely

8          October 15th because when I read through this

9          yesterday, I said, oh, that doesn't make sense.

10         It's October 15th throughout for the voter file.

11         So I would like to amend that on page 7,

12         paragraph 12 to reflect that it's a scrivener's

13         error.  It's October 15th.

14    BY MR. TYSON:

15         Q.    Certainly.  And just so we have all the kind

16    of data pieces in one place, we have October 15th for

17    the voter file, the complete voter registration

18    database.  The voter history file is for the 2018

19    election, I'm assuming updated through October 2019?

20         A.    You know, it's interesting because I'm sure

21    that I pulled that file immediately after the election

22    when it was publicized in 2018 when I was hired for this

23    and started to do the analysis this fall.  The date on

24    it was October 17th.

25                But I'm a data hound.  I collect publicly

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 54

1    available data all the time, and I am sure that I got

2    the snapshot of the Georgia voter history file sometime

3    probably December of 2018.

4         Q.    And then we have the statewide absentee file

5    as well updated, I'm assuming, through January 2019,

6    same --

7         A.    The same question mark is that I'm sure I

8    grabbed that when it was available soon after the 2018

9    election when I started doing this analysis in October

10   of last fall when I grabbed it to get the clean, it had

11   January 2nd.  So I grabbed them at the same time.  Why

12   one was updated with the date of October 17th, the other

13   still of January 2nd, I can't answer that.

14        Q.    Do you know if the State of Georgia stops

15   updating any of these three files or locks them at any

16   particular point?

17        A.    I do not know the answer to that.

18        Q.    All right.  So let's turn to page 8.  And in

19   paragraph 13 you have the various -- basically, I guess,

20   we can kind of clarify all the data points so we can

21   track this through.

22             So the voter history file basically contains,

23   and please correct me, I want to make sure I'm phrasing

24   this correctly, a voter's identifying marks or voter

25   registration vote number, maybe some other data points,

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 55

1    but specifically did they vote in the 2018 general

2    election and then the method by which they voted, either

3    on election day or prior to election day, is that fair

4    to say, or am I missing some categories?

5        A.   It is limited to those who cast a ballot, yes.

6    And it differentiates whether you cast the ballot on

7    election day or as that file calls it an absentee

8    ballot.

9        Q.   And you reference in paragraph 15 that the

10   number of individuals who are recorded as having credit

11   for voting who the file says voted is within 604 of the

12   state's official results, is that a fair summary of

13   paragraph 15?

14       A.   Yeah, when I was reading through this

15   yesterday, I was looking at that number and thinking,

16   wow, that's really remarkably close when you're talking

17   about almost 4 million.  And then I realized that

18   actually it's a lot more than that, it just happens to

19   even out in the wash.

20            So if I can just give an example here, there

21   are five of us in this room.  If you say that there are

22   zero in this room and I say there are ten of us in this

23   room, it actually evens out on average that there are

24   five of us, and yet we could be pretty far off in terms

25   of our accounting.

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 56

1          And in fact, when I think back on this, when I

2     looked across these two, there's a tremendous amount of

3     variation where, at the county level, which is the

4     lowest jurisdiction that I can use, some counties had

5     hundreds more in the vote history of having cast a

6     ballot and others had hundreds more in the actual

7     official vote cast than they had in the vote history.

8     It just happens that they balanced out.  Even though --

9     I think it's been a while since I did the analysis, I

10    think there were over 5,000 discrepancies when you look

11    at the county level.  It just overall averages out to

12    604.

13          So I probably should have put that into the

14    report, for whatever reason I didn't, but I was being

15    generous with respect to somehow the overall tally

16    matching up ostensibly to the vote history yes and no

17    categories, so.

18    Q.   So in terms of that specifically, you, in your

19    analysis, found variations between the official vote

20    count and the number of individuals who were giving

21    credit for voting on a county-by-county basis but didn't

22    include that in the report?

23    A.   For whatever reason I -- there's a lot I could

24    have put into this report and didn't.  And that's one of

25    those things when I was reading through it and thinking

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 57

1    about the variation that I found in the counties, that's
2    something that if I could amend my report and add that
3    in, I probably would.
4              Because I think it's pretty telling that --
5    it's not like every county was off by -- so let's say
6    you have 159 counties, was off by three in one
7    direction.  That would equal to close to 600, right.
8    Three and a half, whatever.  That's not what's going on.
9              You have some counties where it was off by
10   hundreds in one direction or hundreds in the other
11   direction.  It just evens out in the aggregate.
12             So again, I think I put in the end of this
13   report that if I have a chance to amend it, I would be
14   happy to add that factoid in there.
15             But in the end it all evens out in the wash
16   with respect to the 604, which is pretty close overall.
17   But again, I think I was using that to set up the fact
18   that there is a lot more disparities when you start
19   digging into it.
20        Q.   Based on your experience in teaching election
21   administration, do you expect the state's official voter
22   history file and the official results to match perfectly
23   at the end of an election?
24        A.   I am a cynic and a sceptic.  No, I don't think
25   they will always align perfectly.  Should they, of

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 58

1    course they should.  As a pole worker, I would hope they
2    would.  But they don't always.
3         Q.   Do you know, based on your experience in these
4    areas, if states err on the side of giving somebody
5    credit for voting and you would rather do that instead
6    of not give them credit for voting and lead to an
7    overcount that way?
8         A.   I mean, again, normatively, I think that's
9    what ought to be done.  The fact of the matter is when I
10   disaggregate, that wasn't the case, even though it
11   appears to be with the 604.  I can tell you at the
12   county-by-county levels, there are counties that's in
13   the opposite direction where their vote total does not
14   match up in the opposite direction with their certified
15   election results of votes cast.
16        Q.   In paragraph 16 you begin talking about kind
17   of the process that you went through.  And step one, it
18   sounds like, was taking the credit for voting -- or I'm
19   sorry, the voter history file and basically looking for
20   matches between registration numbers in the absentee
21   file, is that correct, step one?
22        A.   Correct.  That should be an easy merge using
23   unique voter ID number.
24        Q.   And what you discovered in that process was
25   that there were duplicates in the absentee file; is that

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 59

 1     correct?

 2          A.    Yes.

 3          Q.    And that was consistent with what you found in

 4     Florida's vote-by-mail records as well, correct?

 5          A.    Yes.  In certain county's, that's definitely

 6     the case, yes.

 7          Q.    And you describe these as unexpected, that you

 8     rarely have inconsistencies like this.  But you had just

 9     found this doing a similar analysis a few months before,

10     correct?

11          A.    Yeah.  And I guess I was really surprised in

12     Georgia, because unlike Florida, it's the secretary of

13     state's office and state election board that's providing

14     a single file of the absentee.

15               In Florida, for whatever reason, the

16     supervisors maintain their absentee ballot files, and as

17     a result, there's an expectation that it's not going to

18     be uniform across the 67 counties.

19               And even despite the litigation and the

20     efforts to do a better job with recordkeeping, I have

21     found that that is not always the case when looking at

22     the curing of absentee ballots.

23               Florida does have a state-wide absentee ballot

24     record as well, again, built up by the counties as

25     opposed to a statewide system like Georgia has.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 60

1           So I have to say I was surprised, thinking

2      that this is the same state agency that is showing me on

3      their vote history file a yes for those people who voted

4      absentee, and in the statewide file that's coming with

5      respect to the absentee file, having lots of

6      discrepancies in terms of multiple entries.

7           Q.   Do you know how Georgia's single file is

8      created, where the data entry points are to that?

9           A.   No, I don't know specifically.  I can assume

10     that the data points are coming from the 159 counties

11     since that's where the interface is with people with

12     vote-by-mail.

13          Q.   And so in that sense, wouldn't it be similar

14     to Florida's model then if counties are doing the input?

15          A.   Again, in Florida the counties are maintaining

16     separate files.  That's not my understanding on how it's

17     been done in Georgia.

18          Q.   You mentioned in paragraph 16, a little bit

19     more than halfway, that you have processed hundreds of

20     millions of voter registration records across several

21     states, and then we mentioned Florida, Georgia, North

22     Carolina, Ohio.  Are there other states where you have

23     processed voter registration records that you're

24     referencing there in the several states?

25          A.   Well, California gets you very close to the

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 61

1      hundred million, with 30 million or whatever registered

2      voters.  And you do that couple of times when you're

3      comparing files.  I have done that in Alabama for

4      litigation purposes.  I have looked at voter files in

5      Mississippi with a former student who is working at

6      Mississippi State University.  I have looked at voter

7      files in Pennsylvania and Maryland and New York.

8                Again, it's hundreds of millions across some

9      of these large states, and multiples of hundreds of

10     millions when I look at the multiple files over time in

11     North Carolina and Florida alone.

12         Q.   And in that experience is it what you observe

13     that states keep these records differently, each state

14     will have a little bit different way of keeping these

15     kinds of absentee records or voter history records?

16         A.   Yes.  There is certainly variation across the

17     states in terms of how they do list maintenance and

18     voter files generally.

19         Q.   Then in the last sentence of paragraph 16, you

20     make a pretty bold statement that minor irregularities

21     and inconsistencies can mean that voters won't have

22     their votes counted or alter election results.  Do you

23     find minor irregularities and inconsistencies in voter

24     files when you look at them for other states?

25         A.   I think as a general statement that's true,

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 62

1    yes.

2         Q.   General statement that there are minor --

3         A.   There are minor irregularities and

4    inconsistencies, yes.

5         Q.   How would, taking minor irregularities and

6    inconsistencies for a moment, how would that potentially

7    alter election results if there was an inconsistency in

8    a voter file?

9         A.   It's pretty rare that would happen at a

10   statewide contest.  But certainly we have many local

11   elections, state, house, county, city in which those

12   minor irregularities could actually affect an election.

13   We saw that in Virginia with respect to list maintenance

14   and people being assigned the wrong precinct and

15   actually having the contest end up tied.  And that

16   administrative error very well jeopardized one of the

17   candidates from winning or losing; one of the candidates

18   from winning, the other candidate from winning.

19             So I'm not suggesting that every election is

20   going to have 537 votes between them, like in the 2000

21   presidential election in Florida in which the 604 is

22   larger.  But we have many elections in any election

23   cycle that are very close, and the counting of ballots

24   and making sure that ballots that have been cast and

25   that are valid count and are reconciled between the

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 63

1      individual level and the total count for that office I

2      think is an important one.

3          Q.    In your experience of other states, do states

4      have mechanisms to correct results when that happens,

5      such as, for example, an election contest or some other

6      way of handling -- is there some state remedial measure

7      if there was an alteration of an election result?

8          A.    Yes.  Generally there are automatic recalls.

9      Recounts, sorry.  Automatic recounts triggered when

10     elections are close.  And then you would, hopefully, try

11     to reconcile any discrepancies.

12         Q.    And do most states also have some sort of

13     contest procedure where if you still can't reconcile,

14     you can contest the results of the election?

15         A.    I can't say with certainty about every state's

16     election code and whether that's the case.  I just don't

17     have that knowledge.

18         Q.    Do you know if Georgia has an election contest

19     procedure for resolving elections like that?

20         A.    Judging by the litigation that followed the

21     2018 election, I'm assuming yes.

22         Q.    Going to paragraph 17, we begin to discuss the

23     observations of what you found in the absentee file.

24     And you indicate that there are 67,000-ish more records

25     in the absentee file than records of absentee votes in

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 64

1    the voter history file.  Do you see that portion in

2    paragraph 17?

3         A.   Yes.

4         Q.   You say at the end of that paragraph, "There's

5    no clear explanation why a discrepancy of that size

6    exists."

7              We just referenced, I believe in the Florida

8    database, that there were people, for example, recording

9    every interaction with the voter.  Did you check to see

10   if that could be an explanation for the discrepancy in

11   Georgia's absentee file?

12        A.   I think, since you've read my report, that's

13   exactly what I attempt to do, is try to reconcile that.

14        Q.   And so is, fair to say, that 18 and 19, I

15   guess really on through the next few, are the attempts

16   to reconcile that information?

17        A.   Yes, I think that's a fair statement.

18        Q.   All right.  So I want to start with the kind

19   of analytical process and come back to some of the

20   conclusions you reach in paragraph 18.

21             First of all, actually in paragraph 18, you

22   mention the 2,114,409 records that have a code of

23   accepted.  Are you with me at the end of 18 there?

24        A.   Yes.

25        Q.   I know we're going to get to this number

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 65

1    later, but the number of accepted is within 3,000 or so

2    of the number in the voter history file in paragraph 13;

3    is that correct?  I know we'll get to that number later

4    on here.

5         A.   Yeah, I think you've characterized that

6    correctly, and it seems to me that number should be

7    identical ultimately.

8         Q.   And you reference that there are 39,601

9    records that have no code in the ballot status field.

10        A.   Correct.

11        Q.   Do you know what the ballot status field

12   tracks?

13        A.   I would have to go back and look at the codes

14   specifically.  I think I talk about the ballot status

15   field and other context of the report.

16        Q.   And as we get into this section, we have the

17   ballot status field and the ballot style field that are

18   two separate fields; is that correct?

19        A.   Correct.  I mean, the ballot status, generally

20   from looking at the raw data, have an A or a C or an R

21   or an S code.  Unfortunately, I tried my best to find a

22   key that provides this information, and unlike in other

23   states where you can download a PDF or text file that

24   has all the coding, I failed to find that information.

25   So I am doing my best in terms of interpreting what some

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 66

1    of these codes are.

2              My understanding is the A, C, R, S stand for

3    accepted, canceled, rejected and spoiled.

4         Q.   Is it your understanding that the absentee

5    file contains all requests for absentee ballots or all

6    returned absentee ballots?

7         A.   It should have all requests, as well as,

8    obviously, returns.  One should not be returning an

9    absentee ballot if it wasn't requested.

10        Q.   And so in the ballot status, are you aware how

11   the state tracks or how a county tracks when an absentee

12   ballot is requested but not returned?

13        A.   I think there's obviously some discrepancies

14   in terms of how the counties are doing that.  And I'm

15   sure we'll turn to that when we look at, you know, Table

16   1, I believe it is.

17             When we look at those that have no ballot

18   status code and yet were cast as accepted absentee

19   ballot in the vote history, so that's one of those

20   discrepancies that I have been trying to wrap my head

21   around because ostensively it should be tracked.  There

22   should be a code there, if in one file it's saying that

23   the ballot was an absentee ballot and was actually

24   accepted.

25             So your question was a good question and one

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 67

1    that I don't know the interworkings of how it's done, I

2    can only assume that they should reconcile with one

3    another.

4        Q.    In your experience, there are voters who

5    request absentee ballots and don't return them, correct?

6        A.    Certainly.

7        Q.    And none of the A, C, R or S fields would

8    include someone who did not return a ballot; is that

9    correct?

10       A.    Again, I don't know if that's correct.  When I

11   look at the data, and especially when I have individuals

12   who are listed multiple times and have multiple codes,

13   perhaps an A and a C, whereas it should have been

14   changed to the most recent, what you just stipulated,

15   I'm not sure I can agree with that.

16       Q.    Okay.  So let's work through paragraph 19

17   then.  We were talking about these records that have no

18   ballot status code.  And so we have no ballot status

19   code but we do have a ballot style; is that correct,

20   fair to say?

21       A.    Some of them, I guess, do, yes.  Many of them

22   do.  But some don't have a style, correct.

23       Q.    And you indicate the mailed ballot style

24   indicates that these voters mailed their absentee ballot

25   to a local election official.  Do you see that

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 68

1    statement?

2          A.    I do.

3          Q.    And why do you think that's the case?

4          A.    Again, since there is no codebook that I have

5    seen publically available that indicates it is, my best

6    guess to interpret mailed as mailed.

7          Q.    And so you're assuming what that particular

8    field means, correct?

9          A.    As mailed, correct.

10         Q.    If that field referred to the method by which

11   the registrar delivered the absentee ballot to the

12   voter, would that change your analysis in that

13   paragraph?

14         A.    I don't know if it would change my analysis.

15   It might change the interpretation of that analysis, but

16   the data are still the data.

17         Q.    You also say later, the sentence immediately

18   after the mailed ballot style, "The absentee file does

19   not report any disposition of the mailed absentee ballot

20   voters returned to their local election officials."  Do

21   you see that sentence?

22         A.    Yes.

23         Q.    And so if the mailed ballot style referred to

24   the delivery method of the ballot to the voter, would it

25   then make sense to not have a disposition if the ballot

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 69

1    was never received back?

2         A.   If that's correct as you put it, then I think

3    that logic makes sense.

4         Q.   The next sentence you say that an electronic

5    ballot style code refers to a voter who casts a ballot

6    prior to election day on an electronic voting machine.

7    Do you see that sentence?

8         A.   Correct.

9         Q.   And again, you're assuming that's what

10   electronic means in this scenario?

11        A.   Again, I'm making some assumptions since there

12   was no available key.  It could refer to other things,

13   certainly.

14        Q.   And are you aware of the coding in the

15   absentee file for absentee in-person voting?

16        A.   I would have the same caveats of what you are

17   suggesting, that it, rather than in terms of returning,

18   it could be providing, correct.

19        Q.   And are you aware of electronic ballot

20   delivery to what we refer to UOCAVA voters, U-O-C-A-V-A?

21        A.   Sure.  And certainly it could mean that's how

22   the ballots are provided or returned.

23        Q.   And so if we assume for a moment that ballot

24   style refers to method of delivery to the voter, and no

25   ballot status code means the voter didn't return it,

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 70

1      there's no recording of that, would this 39,000 voter

2      group be anomalous or would that be fairly typical for

3      an election?

4          A.    Can you just rephrase how you -- you know, the

5      predicate of that question.

6          Q.    Yeah.  So I want you to assume for purposes of

7      this question that the ballot status code refers to what

8      happens when a ballot is returned, that the ballot style

9      field refers to method of delivery to the voter.

10               If that's what those fields referred to, would

11     having 39,601 voters who received an absentee ballot but

12     didn't return it be an unusual occurrence in an

13     election?

14         A.    I don't -- again, I'm not sure I agree with

15     all your predicate to this.  But no, I think that

16     wouldn't be terribly unusual if that was the case.

17         Q.    In the next paragraph, paragraph 20, we then

18     start talking about the recordkeeping of the accepted

19     code field.

20               And you note on the top of page 12 that the

21     absentee file with accepted ballot status has 3,048

22     fewer records than the voter history file, correct?

23         A.    Yes.

24         Q.    And if the state stopped allowing updates --

25     let me stop this.  Start over gone.

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 71

1          Do you know -- I think you have already
2     testified that you don't know specifically what the data
3     entry process is to create the absentee file; is that
4     right?
5          A.   That is correct.
6          Q.   So you also don't know if there's a point at
7     which that absentee file becomes locked and can't be
8     further edited, right?
9          A.   That's right, I don't know that.
10         Q.   If there -- if the absentee file, I want you
11    to assume for purposes of this question, the absentee
12    file locks on election day, would it then be unusual to
13    have more records in voter history than in the absentee
14    file, or would that be more typical if you could no
15    longer update that file?
16         A.   I mean, logically that's making sense.  I
17    can't say that's how it's done.
18         Q.   In paragraph 21, you then reference the voter
19    history file containing more than 3,000 absentee votes
20    cast before election day and point out this discrepancy
21    and reach the conclusion that this appears to be a
22    statewide election administrative problem.  Do you see
23    that section?
24         A.   Yes.
25         Q.   But as we just discussed, if I want to ask you

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 72

1    to assume this, the file stops updating at a particular

2    point, it wouldn't be a statewide administrative

3    problem, it would just be a data entry issue, correct?

4         A.    I'm not sure those are mutually exclusive.

5         Q.    In your experience, voters are still given

6    credit for voting after election day as absentee ballots

7    are processed; is that right?

8         A.    Again, I don't know what context you're

9    referring to.  That's not always the case.

10        Q.    For UOCAVA voters, they can be counted, their

11   votes can be counted if received after election day?

12        A.    Absolutely.

13        Q.    So if we're in a scenario where the absentee

14   file would not be updated but registrars are still

15   processing UOCAVA voters, you would expect to find more

16   individuals with vote history credit for voting than the

17   absentee file, correct?

18        A.    If those absentee ballots are verified as

19   valid, yes.  If not, one would assume they wouldn't go

20   into the vote history as a Y for the absentee.

21        Q.    And are you aware that in Georgia we had a

22   large amount of litigation surrounding absentee ballots

23   following the November election?

24        A.    I guess I'm generally aware of that, yeah.

25        Q.    And are you aware if federal judges ordered

Daniel Smith , Ph.D.                           January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 73

1    the counting of additional absentee ballots after

2    election day that had been previously rejected?

3         A.   I guess I'm generally aware of that, yes.

4         Q.   And so if the absentee file could not be

5    updated and those orders were coming out, you would

6    expect again to find a discrepancy between the voter

7    history and the absentee file, correct?

8         A.   If that logic is true, then yes, we should see

9    a lot more in the vote history than the 600, if your

10   logic is correct.  If it is thousands of more coming in

11   after the vote-by-mail is locked, we should see the vote

12   history increasing considerably after that point.

13        Q.   I'm referring specifically to the 3,048

14   records, that the discrepancy between the absentee

15   file -- the absentee file could not be further updated,

16   but yet the voter history file was continuing to be

17   updated as votes were counted, you would expect a few

18   thousand, at least, discrepancy, right?

19        A.   That's one way of thinking about it.

20   Assuming, again, these ballots are coming in that are

21   legally allowed to come in after the cutoff date that

22   are valid, yes.

23        Q.   And so then your conclusion that the

24   discrepancy is likely the result of local officials not

25   properly recording who voted a ballot, if the file is

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 74

1    locked, there is an alternative explanation that is not

2    a failure of local officials, correct?

3         A.   Again, if there's a statewide uniform policy

4    on that, then we can't blame the local officials for

5    that.  It does obviously prevent us from looking to see

6    whether or not the statuses change to reconcile the

7    history with the absentee ballot file.

8         Q.   And so your statement at the last sentence of

9    paragraph 21, that this discrepancy leads you to

10   question the accuracy of the official election results,

11   if we had this technological limitation, you would no

12   longer question official election results, correct?

13        A.   No, I don't think I would say that.  Again,

14   when I'm referring to the official election results,

15   that's 604 votes in one of the early paragraphs, again,

16   that is an aggregation across the 159 counties.

17             When we're seeing wide ranges of vote history

18   compared to the actual vote tally in those counties,

19   your explanation doesn't resolve that quandary.

20        Q.   Just to be clear, I'm not talking about the

21   604 of the official versus the voter history, I'm

22   talking specifically about this 3,048 differential

23   between the vote history and absentee file.

24             You would not question the accuracy of the

25   results based on that 3,048 voters if the absentee file

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 75

1       locked, correct?

2           A.   Again, if it was that simple, I would have

3       less difficulty agreeing with that statement.  But I

4       think it's more complicated than that.  That's one

5       possibility.

6           Q.   I understand we can set aside the differential

7       of the vote history and the official voter results.  I

8       want to make sure we're working through each to the

9       specific objections and concerns you have raised about

10      the recordkeeping.

11              So specifically as to the 3,048, that's not

12      going to be an unusual occurrence, assuming that the

13      absentee file locks at a particular point?

14          A.   Again, that could help to explain some of the

15      discrepancies, I will grant you that.

16              MR. KAISER:  When you get to a natural point,

17          a break would be nice.

18              MR. TYSON:  Sure.

19              MR. KAISER:  I don't want to break up your --

20              MR. TYSON:  I'm good.  We can actually stop

21          right now if you want to.

22              (A brief recess taken.)

23              MR. TYSON:  All right.  We'll go back on the

24          record.

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 76

1    BY MR. TYSON:

2         Q.   So Dr. Smith, we were talking about -- let's

3    see.  We were in paragraph 22.  I wanted to ask you

4    further questions there.

5              On the top of page 13 in paragraph 22, you

6    reference that the ballot status code of accepted in the

7    absentee file is supposed to indicate that a voter cast

8    an accepted absentee ballot prior to election day.

9    Again, that's an assumption you're making, correct?

10        A.   Yeah.  I mean, lacking a key, it's obviously

11   possible for UOCAVA voters, for instance, to have an

12   absentee ballot that comes in after election day.  So

13   that should be corrected to state that possibility

14   exists.

15        Q.   And so the second part of paragraph 22, you

16   then begin an effort to understand this discrepancy

17   basically.

18             In step one, it looks like, is to eliminate

19   duplicate records in the absentee file.  Is that a fair

20   summary of paragraph 23?

21        A.   Yeah, I think just going back to our

22   conversation about the absentee file, the previous

23   conversation we were just having about the ballot style

24   field and the ballot status field, this is looking

25   purely at the absentee ballot file.  I think it's

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 77

1       important to clarify.

2              It started by looking on its own at that file

3       and trying to understand the ballots that go out, come

4       in, including possibly the ones that go out that don't

5       come in.

6              But taking that file for what it is and to

7       lead into then paragraph 23, the next logical step, it

8       seemed to me, was to change the vote history with the

9       absentee ballot file.  And that's where we just left

10      off.

11      Q.   Okay.  So I'm assuming when you're trying to

12      join two databases, if one database has multiple entries

13      of the field that only exists one time in the voter

14      history file, you have to eliminate duplicates to do

15      that analysis?

16      A.   You don't have to.  There are other ways to

17      work around it.  But my understanding is that

18      individuals in the absentee file should have one

19      disposition, one row of data.

20             There are possibilities of appending that data

21      for those cases that are duplicates, but that's not what

22      I chose to do.  I chose to try to figure out how best to

23      join a single unique identifier.  And obviously there

24      are decisions that have to be made when you have

25      multiple identifiers.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 78

1      Q.   You referred to in the beginning of paragraph

2   23, a problem with duplicate registrations in the file.

3           If the Georgia absentee file was meant to

4   record every interaction a voter has, would you still

5   categorize that as a problem to have duplicate entries?

6      A.   I suppose you could look at it in different

7   ways.  From my perspective, trying to take data that has

8   evolved over time, one would want to have a single file

9   that updates as opposed to another entry.

10     Q.   And so in the sentence that begins "Processing

11   the data", you discovered there was this number of

12   duplicates, and then this next sentence in paragraph 23

13   says, "This should not happen."

14           But it shouldn't happen if the absentee file

15   is only supposed to only record the disposition of an

16   absentee ballot; is that correct?

17     A.   Yes, that's correct.

18     Q.   But it should happen if it's meant to record

19   every interaction with a voter; is that also correct?

20     A.   If that -- if what you state is clear, then it

21   seems to me that 37,000 is surely way under because

22   every interaction there are multiple records that an

23   individual will have with respect to points of contact.

24           So again, I have to assume that this is --

25   there are some discrepancies here.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 79

1        Q.    If the absentee file is meant to have a record

2     for every application for an absentee ballot, then you

3     would expect to see duplicate entries, correct?

4        A.    I'm trying to think logically why that would

5     be.  Are you suggesting if I request multiple times for

6     an absentee ballot as a voter?

7        Q.    Or if I have a standing request and submit an

8     application anyway on top of that.  There are possible

9     reasons if you're tracking each application why a

10    duplicate would exist, you would agree with me, wouldn't

11    you, if that's what you were trying to track?

12       A.    That is a possibility as opposed to keeping a

13    single record and updating that or providing another

14    field for a multiple entry.  Yes, that's a different way

15    of maintaining a database, I would agree with you.

16       Q.    And then you designed a method to ensure that

17    if you had multiple entries, so if I submitted a ballot

18    or an application, my original one was spoiled or

19    canceled, I submitted another application and it was

20    accepted, you would privilege the acceptance and

21    privilege the last contact date in order to determine

22    from, I guess you say, conservative method which vote --

23    which absentee ballots were ultimately accepted; is that

24    correct?

25       A.    Again, I am being very conservative, very

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 80

1    generous with respect to counting valid votes.

2            Again, I'm not an expert on all the details of

3    the Georgia election code, but it seems to me that if

4    you vote an absentee ballot that is rejected, you don't

5    get a second go at it, that you don't get a chance to

6    change your vote that you somehow got last minute

7    information.  And then even if you have accepted it, do

8    you have another chance; if I accepted a ballot, I don't

9    get another ballot to vote again.

10           Now, we talked a little bit about the legal

11   ramifications after the election with respect to a

12   rejected ballot.  But it seems to me that I, in my

13   effort, try to be very conservative and say I'll take

14   all the single records that are accepted.  If I find

15   duplicates that have a rejected or accepted, I'm going

16   to give you the benefit of the doubt and give you the

17   accepted partly because of the possibility of

18   litigation.  Again, be very conservative.

19           Again, if you have duplicate records, one that

20   is canceled, one that is accepted, I'm going to give you

21   the benefit of the doubt.  Maybe there's an

22   administrative error of why it was canceled.  You voted

23   an accepted ballot.

24           So that's my parsing effort that is understood

25   to be very conservative to deal with these duplicate

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 81

1    records.

2              Again, I don't have firsthand knowledge about

3    every specific one of these 30 some thousand duplicates,

4    but I'm trying to reconcile them giving the benefit of

5    the doubt to a ballot that has been accepted.

6         Q.   And all of these efforts that you're

7    describing in paragraphs 23 and 24 were seeking to

8    explain the difference in the 3,048 records between the

9    absentee file and the voter history file; is that

10   correct?

11             And I'm referencing the end of paragraph 24

12   for that statement.  If that's not correct, let me know.

13        A.   No, I don't think that's what I was trying to

14   reconcile.  The effort in 23 and 24 paragraphs is trying

15   to parse the absentee so that I can link a unique code

16   from the absentee to the history.  It's irrespective of

17   whatever number that might be.

18        Q.   Okay.  So in paragraph 24 then, about midway

19   through the sentence that begins, "My parsing still does

20   not resolve the discrepancy between the total number in

21   the absentee file and the total in the voter history

22   file."

23             So was this not an effort to resolve that

24   3,000 discrepancy or was it a step towards a further

25   analysis?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 82

1          A.    Yeah, the parsing was not necessarily done to

2     reconcile.  If it reconciled, great.  But it didn't

3     resolve that.  The intent was not necessarily to resolve

4     it.  The intent was merely to find if someone has on a

5     vote history a Y code for absentee, that they have some

6     record, that I have made a logical conservative effort

7     to find of multiple records, one that privileges a vote

8     cast, that is the effort here.  If it resolves that

9     discrepancy, great.  But that was not the intent to

10    resolve it, it was -- the intent of 23 and 24, those

11    paragraphs, the parsing, is to be able to at least join

12    the two files.

13          Q.    And joining the two files was necessary to

14    your further examination when we get into the hybrid

15    file; is that correct?

16          A.    Correct.  Correct.

17          Q.    And so at the end of 24, when you say, "It is

18    simply unknowable whether those more than 3,000 votes

19    were in addition to or less than the votes reported as

20    cast", that's referring to what we talked about in 20

21    and 21, correct?

22          A.    Yes, I think that's correct.

23          Q.    And if, as we discussed, the file locks at any

24    particular point, it would be knowable why there is a

25    discrepancy, right?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 83

1      A.    Correct.  And that's again why my strategy of

2     joining is very generous to the state and to its

3     juration of voter files because I'm being overly

4     inclusive.  I'm not conditioning on the absentee file

5     vote history.  And I'm also not conditioning the vote

6     history on the absentee.  Vice versa, I want to make

7     sure I had those two ways.

8            I'm basically saying if you're in one, if

9     you're in the other, I'm bringing you together, and

10    that's because I don't know which one is privilege.  The

11    absentee file, which may or may not lock, to me, that's

12    immaterial because I'm taking it for what it is and I'm

13    taking the vote history whether or not it locks, whether

14    or not it updates, I'm taking the data that I have and

15    the process of joining if you're in one, if you're in

16    the other, if you're in both, they're all included in

17    this hybrid file that I then created.

18     Q.    Let's talk next about paragraph 25.  You note

19    that there are additional problems with the statewide

20    absentee file.  And you point to the roughly 37,000

21    individuals who had no information in the ballot status

22    field.  Are you with me on that?

23     A.    Yes.

24     Q.    And you indicate because they are in the

25    absentee file, they clearly interfaced with a local

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 84

1    election official.  And than you make the statement,

2    "Many of them likely attempted to cast an absentee

3    ballot."  What is the part of the sentence after the

4    semicolon based on?

5          A.   Right.  So of these folks who are

6    unclassified, it appears that over 34,000 were mailed a

7    ballot, had a mailed ballot or electronic ballot or

8    voted in person.  It's really the others that I have no

9    idea what's going on with the ones who are not appearing

10   in the absentee file with a valid status code.

11          I mean, if what you portrayed previously, that

12   these are things being mailed out, I'm really not

13   understanding why they're in there.  But again, there's

14   some discrepancies that I'm just trying to wrap my head

15   around.

16          Q.   Given your history and awareness of campaign

17   efforts, it would be information of interest to a

18   campaign if a supporter had requested an absentee

19   ballot, correct?

20          A.   Yes, that's generally true.

21          Q.   And the campaign would want to follow up with

22   that voter to make sure that they return that ballot, is

23   that generally true?

24          A.   Yes, that's also true.

25          Q.   So kind of to our discussion earlier, if

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 85

1    ballot status -- I'm sorry -- if ballot style is a

2    method of delivery and ballot status tells what happens

3    when a ballot is returned, that would be information

4    useful to political campaigns; is that correct?

5         A.   Yes, that's a fair statement.

6         Q.   And if those are what those fields refer to,

7    then would you still categorize the individuals with no

8    information in the ballot status field as a problem with

9    the statewide absentee file?

10        A.   Again, I'm using that term because I do find

11   it poor design with respect to tracking an individual's

12   interface with the local election officials.

13        Q.   Does Florida make public information about

14   absentee ballot requests?

15        A.   Yes.

16        Q.   Is that included in the VBM files kept by

17   counties?

18        A.   That's actually a statewide file that's

19   available to campaigns and parties and others.

20        Q.   So Florida makes the same information

21   available as Georgia but in a different type of file; is

22   that correct?

23        A.   It's updated daily.

24        Q.   And so if Georgia chose to make both the

25   application and the disposition in the same file, you

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 86

1    don't like that as a method of administration, but it's

2    not --

3        A.   No, no, no.  I'm sorry, that's not what I was

4    referring to.  It's -- it should be the same row of

5    information that is updating that information, not

6    arbitrarily it seems adding, in some cases, an

7    individual with respect to those interfaces.

8            So if you're doing daily tracking, when a

9    ballot goes out, there's a date for that.  When the

10   ballot is received or when a person comes in with a

11   ballot, there's a date for that.  And if there's other

12   interfacing, say another ballot goes out because an

13   individual contacts the local office that they didn't

14   receive their absentee ballot, there should be a field

15   and date for that in that same row for an individual.

16   Seems to be a logical way of handling this.

17       Q.   So your preferred method is it's all on one

18   line, but would you still categorize it as a problem if

19   Georgia did it differently than that?

20       A.   Again, there are different ways of doing this,

21   I will concede that.  The fact that there seems to be

22   still great discrepancies, as we will get to, I hope, in

23   terms of some of these categories for people who have no

24   style and yet cast a ballot, that, to me, is logically

25   problematic.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                              Page 87

1              If you have no ballot status code, no ballot

2      style and yet have been recorded as voting a ballot that

3      that should be tracking, that, to me, is a problem.  So

4      that's why I'm using that language.

5          Q.   And to be clear, that problem you identified

6      there refers to the 612 individuals who have no ballot

7      status code and no ballot style, correct?

8          A.   I think it's more general than just that.  I

9      think it's -- I would not limit it just to those 612

10     records.

11         Q.   I'm going to apologize.  I must be missing

12     something then.

13             So when you say the problems with the file, I

14     understand if someone doesn't have a ballot status code

15     as a ballot style and you would say, okay, we don't know

16     how they received a ballot, we don't know what happened,

17     but where are the other problems you're identifying, if

18     assuming that Georgia's method is as we are assuming for

19     this line of questioning?

20         A.   Again, I think there's a problem in terms of

21     them trying to, as I have done, link the absentee with

22     the vote history with the voter file, they should be

23     commensurate with one another.  And if you're finding

24     people who have a vote history of absentee who are not

25     in that vote-by-mail file, absentee file, locked or

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 88

1    unlocked, if you have people who have voted an absentee

2    ballot and then in the vote history appear to have voted

3    on election day, that's a problem.

4            If you have people who have appeared in the

5    vote-by-mail absentee file who then don't appear in the

6    voter file, even though it's at the time of the book

7    closing, as we call it here in Florida, that's a

8    problem.  There are numerous ones.  So I don't want to

9    limit it just to this relatively smaller number of 612

10   of no ballot status code or no ballot style whatsoever.

11   It's a broader issue in terms of being able to reconcile

12   these different files.

13           Again, from my perspective, it's all about

14   making sure votes count and trying to make sure that

15   there's some uniformity across the state.

16       Q.   And I just wanted to make sure we're all on

17   the same page.  I was referring to, in paragraph 25, the

18   additional problems with the absentee file.  Just in

19   that paragraph alone, from our discussion here, it

20   sounds like if we assume for purposes of the question

21   that the Georgia system as we have described, the

22   interaction with the applications, the valid status

23   field is returned, ballot style is method of delivery to

24   the voter, from that group in paragraph 25, the only

25   group of that listing about which you would have a

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 89

```
1     concern in that hypothetical is the 612, setting aside

2     the larger problems?  I understand there are other

3     issues you have with the database.

4          A.   Again, I would just politely like to push back

5     a little and say that would be true if we saw these

6     individuals where there's no record with respect to the

7     ballot status, who then appear in the voter history file

8     or who then don't appear in the voter file at book

9     closing, to me those are broader than the narrower

10    interpretation that you're giving.

11         And so I just -- this paragraph is focusing on

12    those individuals, but it's not just the ones who have

13    no ballot status or ballot style, it's possible, and I

14    think I document in here, that you can have individuals

15    where there was no record of their ballot status who end

16    up casting an absentee ballot or who are not in the

17    voter file.  And that logically should not be the case.

18         At book closing it should be there.  You

19    should be able to tie that information with all the

20    information we have about individuals who are registered

21    to the absentee, if they interface there, and certainly

22    with the vote history.

23         Q.   And I understand that and appreciate that.

24    And what I'm really trying to dig into is the opinion

25    that you're offering in this case is that there are
```

Daniel Smith , Ph.D.                       January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 90

1    massive recordkeeping problems with Georgia's voter

2    files, and that's based on this failure to train.  We'll

3    get to the absentee questions later.

4          What I'm trying to get to is there are other

5    possible explanations for large sections.  What we

6    covered so far, I know we have the reconciliation with

7    the voter file coming up next, but in terms of the

8    absentee file, there are alternate explanations for why

9    those discrepancies exist, whether you think it's a good

10   practice or not, is that fair to say?

11        A.   I will grant you that characterization.  It's

12   not one that I happen to agree with, my analysis of the

13   data, but that's a possibility.

14        Q.   And so in paragraph 26, we're going to start

15   working our way towards our hybrid file.  And so let me

16   just kind of make sure I've got the sequencing right in

17   my own mind.  We had an absentee file.  We removed

18   duplicates from that, privileging records that would

19   indicate your vote was counted.

20        A.   Just to clarity that.  Yes, but also putting

21   people back in who may have had two rejections or two

22   cancellations or any combinations of those.  I have

23   reasserted them back but as a single value.

24        Q.   Got it.

25        A.   So it's not discarding all, it's putting these

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 91

1    votes back in, especially concentrating on the rejection

2    and accepted.

3         Q.   And then we have taken that, I guess, deduped,

4    would be the right term, absentee file, and joined that

5    or connected that to the voter history file, looking to

6    see theoretically everybody in the absentee file should

7    have a Y in the absentee file, or accepted -- let me

8    start that again.

9              Theoretically everyone in the absentee file

10   with an accepted ballot should also have a Y in the

11   absentee ballot column of the voter history file?

12        A.   Given the considerations that you've

13   stipulated earlier, that it might be locked and there

14   might be other individuals, I'll grant that possible

15   caveat.

16        Q.   Okay.  And so then we took then that combined

17   absentee and voter history file and connected it to the

18   entire voter registration database; is that correct?

19        A.   Yes, that would be the next step.  So the

20   hybrid file is standing alone, taking the vote history

21   and the absentee, deduping, reinserting people with a

22   code, conservatively assigned, and then tying that file

23   to the October 15th voter file, again, not privileging

24   the voter file and not privileging the hybrid file, but

25   allowing them both to combine with unique combinations

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 92

1    but also ones that are found in the voter file that

2    includes people who didn't vote at all, as well as

3    people in the vote history and absentee hybrid file that

4    could possibly have cast a ballot that aren't in that

5    October 15th file.

6              So again, very conservative in terms of

7    allowing it all to flow together in one large database

8    that for whatever reason actually has more people than

9    that October 15th snapshot of the voter file.

10        Q.    And so in paragraph 28, we have arrived at

11    that point, and you have 38,902 more records of -- let

12    me see if I'm saying this right -- basically records of

13    vote cast from the absentee file and/or the voter

14    history that do not tie to a voter registration record;

15    is that correct?

16        A.    I think you included the word "cast" but it's

17    not necessarily cast.  You could have records from the

18    absentee file that were not technically cast.  They may

19    have been canceled.

20        Q.    So a voter may have a canceled or rejected

21    record but their record still appears in the voter

22    registration database; is that correct?

23        A.    It may or may not.  So again, privileging that

24    data from both the hybrid file as well as the voter

25    file, it is conceivable to have people in the absentee

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 93

1      vote history hybrid file that are not in the voter file

2      that have some characteristic that may not be a vote

3      cast.

4            Q.    Now, you're -- the voter file you used was

5      dated October 15, 2018, correct?

6            A.    Correct.

7            Q.    And you indicate that that was after the book

8      closing for the November 2018 election; is that right?

9            A.    If my math is correct, that would be the case.

10           Q.    And actually, I think I'm getting ahead of

11     myself here, because the hybrid file, we have not yet

12     matched that to the voter registration database; is that

13     correct?

14           A.    You were just walking me through the

15     possibility of doing so.

16           Q.    Okay.

17           A.    So I think we are there in terms of that

18     joining of the hybrid to the voter file that allows data

19     from both datasets to exist in the unified one.

20           Q.    Got it.  So let's turn to Table 1 in paragraph

21     29.  And then we referenced that earlier.  Let's walk

22     through what the hybrid file is going to contain here.

23           A.    So at this point you're correct, you jumped

24     ahead a little.

25           Q.    I'm going back.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 94

1          A.    Back in time just looking at the hybrid file

2     that has not been linked as I have described to the

3     voter file, correct.  We're on the same page.

4          Q.    Sorry about that.  I was getting ahead of

5     myself.

6                So the fields across the top of table one

7     are -- can you describe what each of those fields means

8     for table one?

9          A.    Sure.  I think the easiest way is to do

10    exactly as you have suggested here.  So if we look at

11    the Y and the N -- or the N and the Y and not in file

12    and total, this was coming from the voter history file

13    from January of 2019, I think it was.

14               And so really we're only looking at the first

15    two columns and why.  And we're looking at just the

16    unique individuals of 1.8 million, no; and 2.1 million,

17    yes, at the bottom of those columns.  Those are the

18    categories in the vote history file in the field of

19    absentee that we're going to find.  The vote history

20    file only has votes that were cast in the election, not

21    votes not cast.

22         Q.    And so the Columns N and Y are going to take

23    us back to paragraph 13, which has our totals for people

24    who voted on election day and people who voted via

25    absentee ballot, correct?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 95

1          A.    Yes.  And I hope those numbers match.

2          Q.    They appear to be the same to me.

3          A.    That's good.

4          Q.    So then we get to the -- so then the question

5     is, why are we arriving at the 3988807 number, is that

6     the question we're looking for?

7          A.    No.  I think in terms of thinking about this,

8     remember, this is the hybrid file, so I am allowing both

9     datasets to be privileged.  I'm not saying that one

10    should be privileged over the other and I should

11    condition one with the other.  I'm joining these files,

12    and, again, after deduplicating the absent ballot file,

13    I'm joining on unique numbers.

14            There are unique numbers of voter ID that come

15    across both, but then there are obviously ones that are

16    in the vote history that are not in the absentee.  Most

17    obviously those are people who voted on election day and

18    didn't vote on advanced ballot.  But there are also

19    people in the absentee file because I'm privileging that

20    one as well who are not in the vote history file.

21            And so that's why that number is inflated

22    because they don't perfectly align, and I'm allowing

23    those that are in one file, as well as those that are in

24    the other file, as well as those that are in both file

25    to become one large file.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 96

1      Q.   And that assumption -- and the assumption you

2    are making that underlies the analysis in Table 1 is

3    that people who appear in the absentee file with no

4    ballot status code likely cast a ballot, or attempted to

5    cast a ballot in the election; is that correct?

6      A.   I missed -- I'm sorry, I missed a little of

7    that.

8      Q.   Yes, I'm sorry.  I'm trying to make sure I got

9    it all, so I apologize.

10         The assumption you're making for Table 1 is

11   that every individual in the deduplicated, absentee file

12   who does not have a ballot status code should have --

13   should be showing up in the voter history, basically,

14   that they attempted to vote in some way?

15     A.   No, no, that's not the logic.  The logic is

16   actually not any expectation of either of these.

17         The logic I was doing is merely saying let's

18   take these two files, whether or not the absentee file

19   stops getting updated or not, doesn't really matter, I

20   want to privilege all the information that's in there.

21   All the individuals after I have deduplicated them

22   through that logic we have gone through, I want to take

23   it as an official record of people who interfaced with

24   local election officials and whether or not they were

25   mailed a ballot, electronically, or cast a ballot in

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 97

1    person or by mail, I'm taking all the information there

2    and I'm taking all the information in the voter history

3    file, and I just want to join those two together.

4            And one would think that, you know, if you

5    have an accepted ballot in the absentee file, that

6    individual should certainly show up in the vote history.

7    If your supposition is correct, the opposite might not

8    be true if the absentee ballot file stops.  But

9    certainly if a local official has said this absentee

10   ballot counts and we have recorded it as such as

11   accepted in the vote-by-mail, that should show up in the

12   vote history file, and all the other combinations,

13   right.

14           And so that's what I'm trying -- there's no

15   specific, you know, focus on the no ballot status code

16   or not file, I'm just interested in how well do these

17   two things join and whether there are some logical

18   consistencies and inconsistencies, and certainly there

19   are a lot of logical consistencies.

20           So you can look down the column of N and say

21   the vote history file has 1,833,052 of total noes,

22   meaning these individuals did not vote in advance of the

23   election, they voted on election day.

24           And you know what, it's interesting, there are

25   1,822,064 who do not show up in the absentee file.  That

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 98

1      makes a lot of sense.

2              But there are people who do show up, right.

3      And some of them might make sense, right.  Some of them

4      make sense.  If you have no ballot status code, maybe

5      there was no interaction with the local office with

6      respect to an absentee ballot, even though you're in

7      that file and you voted on election day successfully

8      because that's what the vote history suggested, you

9      voted a valid ballot.

10              Where it becomes a little more -- where the

11      questions arise, why are there 24 people who voted an

12      absentee ballot as recorded in the absentee ballot file

13      as an accepted ballot who also voted on election day.

14      That, to me, and I kind of describe in the following

15      paragraphs, are the things I'm just trying to look at.

16      There seemed to be discrepancies.

17              If you have 684 people who voted an absentee

18      ballot that was deemed to be rejected, well, those

19      individuals appear to have also voted successfully on

20      election day.  Maybe there's a logical reason for that.

21      I don't know all the details of the 684 individuals, nor

22      do I think there is any way for me from the

23      administrative record at the level I have looked at to

24      be able to determine that.  Certainly it could be those

25      13 individuals who had an absentee ballot that was

Daniel Smith , Ph.D.                            January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 99

1    spoiled.  Maybe there was some reason why they were

2    allowed to vote on election day.  That's what I'm trying

3    to do.

4            And you can do the same thing going down the

5    other file.  And that's what I think the elegance of

6    this table -- I do think it's an elegant table because

7    it's privileging not one over the other, but bringing

8    them both together.

9            If you simply go down the Y column, again, the

10   total in the vote history is 2,117,457 total individuals

11   that have a Y, meaning they voted in advance of the

12   election.

13           Now, to me, that's great that 2,114,283 are

14   also in the absentee ballot file.  But there are others

15   who have other codes in that file that don't make sense

16   or who are actually not in the file.

17           Again, maybe the 2,169 are people who, as you

18   suggest, had their ballot accepted after the election

19   day.  But presumedly they had to request a ballot either

20   by mail or electronically if you're correct in that,

21   they should be in the file.  They shouldn't not be in

22   the absentee ballot file.

23           So those are things for me just trying to wrap

24   my head around, you know, how do you vote a successful

25   absentee ballot if in the file you're recorded as

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 100

1    rejected.

2            Again, I -- privileged, if it happens to be a

3    duplicate, but one that was accepted.  But this is

4    clearly someone who either has a rejected ballot or

5    multiple rejected ballots.  They appear to have cast a

6    ballot in the ballot history.

7            And again, 757 with no ballot status code who

8    somehow miraculously voted a valid ballot before the

9    election.

10           Those are the things that this table are

11   really trying to reconcile.  And we should have a lot of

12   blanks, zeros in here if it was really clean.  But we

13   don't.

14           Again, you can go down that one in the

15   not-in-file.  This is, again, the not-in-file column are

16   38,298 people who do not show up in the voter history

17   file dated January after the election.  And yet of those

18   there were six -- I'm sorry, there were 102 people who

19   had a ballot accepted, actually had an absentee ballot

20   accepted because that's coming from the absentee ballot

21   file, right.

22           Again, that, to me, needs some explanation.

23   Perhaps it makes sense, but again, I don't know why they

24   wouldn't be in the voter history file.

25           This is the one that kind of raises some

Daniel Smith , Ph.D.                            January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 101

1    questions about whether your vote actually counts and

2    whether the vote history is privileged, as you might

3    suggest, that here are people who -- the local county

4    election officials, said your absentee ballot counts and

5    yet they don't show up in the vote history.  Again,

6    there could be a logical reason for that.

7             So anyway, that's what the design of this

8    table is to do, is to not privilege one over the other,

9    to take them all and try to combine them in a way that

10   allows us to look at how we can possibly reconcile these

11   data.

12       Q.   And thank you for that.  That helps me

13   immensely.  I appreciate it.  And just to briefly --

14       A.   Sure.

15       Q.   -- clarify a couple of points.  So if we look

16   first at the end column, the difference between our

17   not-in-file and our total is 11,000 and change let's

18   say.

19       A.   Yes.

20       Q.   And as you pointed out, people have either --

21   if we assume, for purposes of this, that the absentee

22   file, no valid status code, meant you did not return an

23   absentee ballot, canceled means your ballot was

24   canceled, rejected means it was rejected, all those

25   individuals would still be eligible to vote on election

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 102

1    day, and that would account for the vast majority of the

2    difference between the row not-in-file and the row

3    total, correct?

4         A.    That would be one interpretation.  That's

5    plausible.  The one that's obviously not is the

6    accepted.  I don't see how that's reconcilable.

7         Q.    The 24 individuals?

8         A.    Yeah.  With your logic.  But I would not

9    concede all that.  I mean, I would have to look at this.

10   And, you know, the other way to think about it is,

11   everyone who has a canceled absentee ballot was able to

12   vote on election day.  So if you look across the row of

13   canceled, for instance, the 4,171 who apparently had

14   their absentee ballot canceled were allowed to vote on

15   election day, but there are still over 900 who had their

16   absentee ballot canceled who didn't show up in the voter

17   history file.

18          So again, to me, what you stipulate is a

19   possibility, but it doesn't help to explain one out of

20   five voters who didn't have that same opportunity to

21   vote on election day because their absentee ballot was

22   being canceled.

23          So again, I don't have the detail on each of

24   these 5,000 individuals who had their absentee ballot

25   canceled.  Apparently some of them had the opportunity

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 103

1     to vote on election day and had their vote tallied in

2     the vote history, but there are one in five -- I'm

3     sorry, yeah, one in five who didn't.

4          Q.   That could be that the voter just chose not to

5     vote on election day, correct?

6          A.   I don't have any information on that.

7          Q.   What I'm really trying to get to is if we are

8     looking at Column N, for example, you're alleging

9     there's these massive recordkeeping problems, there's

10    thousands of records that are in the wrong place that

11    are not there.  It sounds like from at least Column N,

12    we're talking 24 out of 1.8 million that don't really

13    make sense, given the record, is that fair to say?

14         A.   Again, we can focus on the most egregious.

15    There are others that are also egregious that may not be

16    most egregious in terms of trying to reconcile all of

17    these.  I wouldn't limit it to that.  I would highlight,

18    you know, a lot of these other cells as being somewhat

19    problematic.

20         Q.   In Column N you would?

21         A.   Again, in Column N, I would want to look at

22    the rejected absentee ballots and who among those got

23    the chance to vote on election day, and similarly look

24    across the row that that 684 is a fraction, it's one out

25    of ten, one out of 11, out of all the rejected ballots.

Daniel Smith , Ph.D.                              January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 104

1    So for me, as someone who doesn't know the particulars,

2    is not looking at individuals, is not looking at sworn

3    affidavits of individuals, it's looking at that universe

4    of data that I have available to me, I think it's fair

5    to say that not everyone who had an absentee ballot that

6    was rejected was able to vote on election day.

7          So again, that's all I can read from the

8    birdseye view of the data, is that, you know, why is

9    it -- again, 29 people, not a lot of people had their

10   absentee ballot spoiled.

11         But, you know, 40 percent of them were able to

12   vote on election day.  And four of them had their

13   absentee ballot count even though in the code it says

14   it's spoiled.

15         Again, we're not talking a lot, but as you

16   know, there are elections that are won or lost with that

17   number of votes.  I think you have probably been

18   involved in cases running elections like that.

19   Q.    And so for the Y column, same question.  I

20   mean, we talked about the 3,000 differential, the

21   not-in-file.  If we were in a scenario as we discussed

22   earlier where the absentee file locked, we would expect

23   to find people with a Y vote history who weren't in the

24   file, correct?

25   A.    Again, if that is how it operates, sure.

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 105

1    There are logical reasons why that might occur, that you

2    have a tally in the vote history that counts, and yet

3    you don't have a valid status code or something, that

4    you're not in the file.  However, I'll come back to that

5    2,169 who are not in the absentee ballot file.  Whether

6    it locks or not, from what you have presented to me, it

7    locks after the election.

8              I don't know of any state in which they allow

9    people to make a request for an absentee ballot, have

10   that ballot delivered, and have that ballot returned,

11   UOCAVA or otherwise, that can do so after election day.

12             Again, I don't know all of Georgia's

13   particulars, but I have a hard time believing that

14   Georgia allows any voter, UOCAVA or otherwise, to have

15   that leeway.

16             Again, I'm a strong supporter of UOCAVA.  I

17   have written critically of places that are not

18   apparently enforcing UOCAVA in getting the ballots out

19   in time.  I have -- you know, want everything possible

20   to make sure that those overseas voters have every

21   opportunity.

22             But that you're not in the file, if these are

23   UOCAVA, I'm not saying they're UOCAVA, if it is locked

24   or not, one would assume that there would be some record

25   of transmittal prior to that locking, that you have over

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 106

1    2,000 votes cast in the vote history prior to election,

2    and they're not at all in that file raises some

3    eyebrows.

4         Q.   And then for our not-in-file group, that

5    column, the no valid status code number of 30,826,

6    again, if that's referring to voters who did not return

7    a ballot, it's not surprising they wouldn't be in the

8    voter history, correct?

9         A.   Again, I don't really dispute that.  They're

10   really not much of a concern to me, correct.

11             Of concern in that column are the 102 who have

12   an absentee ballot, that the absentee file and the local

13   recorders, supervisors of elections, local officials

14   said count, they're accepted, and yet we don't find

15   those individuals in the January of vote history file.

16        Q.   So understanding you have other concerns on

17   this table beyond what I'm about to say, but your

18   biggest concerns on this table are the 24 individuals

19   accepted with an N category and the 102 accepted but not

20   in file?

21        A.   No, I wouldn't characterize that.

22        Q.   You wouldn't.  Okay.  Let's -- we have covered

23   most of my questions for 31, so let's move to paragraph

24   32, the top of page 19.

25             You indicate there's 205 records in the voter

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 107

1    history file that show a successfully cast absentee

2    ballot but the absentee file shows rejected.  Do you see

3    that?

4            A.    Uh-huh.

5            Q.    And we discussed earlier this type of record

6    would be consistent with a court ordering registrars to

7    count additional absentee ballots that were previously

8    rejected after an election, correct?

9            A.    That's a possibility, if indeed the absentee

10   records from the file aren't updated and there is

11   something overturned, that is a plausible explanation, I

12   will grant you that, yep.

13           Q.    And then paragraph 33, I think we have already

14   covered that, the questions about 24 cast and accepted

15   absentee ballots but then the election -- I apologize.

16   Hold on a second.

17              So in paragraph 34, you then say at this

18   point, in your opinion, there are serious election

19   administration data processing problems in Georgia.  And

20   that's really only true if your assumptions about the

21   data are correct, that the absentee file is constantly

22   updated there shouldn't be duplicates, several of the

23   assumptions we have talked about, because, as we have

24   discussed, there might be other explanations for most of

25   the tens of thousands of alleged problems you

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 108

1     identified, correct?

2          A.   I'm not going to sit here and say there can't

3     be other explanations.  I have the raw data, the data of

4     record, the administrative records that are kept by the

5     secretary of state and the state elections board.

6               I am, as objectively as I possibly can, taking

7     the data and letting the data speak for themselves.  And

8     that I find it troubling that you can't reconcile things

9     that should be fairly straightforward, again, I would

10    call that a problem.  That there might be other

11    explanations, you've posed a couple of them, court

12    orders that change a ballot from being invalid to valid,

13    an absentee ballot file that gets locked, some

14    understanding of the ballot style.

15              Again, I don't think any of those undermine my

16    concern that there are a lot of discrepancies.  It's not

17    isolated, it's across the state.  And it's surprising to

18    me because these are statewide files, not ones that I

19    have to build up from a public records request from 159

20    different jurisdictions.

21         Q.   In the second part of paragraph 34, you again

22    reiterate that the problems likely stem from the failure

23    to adequately oversee, train and advise.

24              I want to, for purposes of this question,

25    assume that ballot status code is a returned ballot,

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 109

```
 1     assume the ballot style is the method delivery of the

 2     voter, assume that the absentee file locks at a certain

 3     point.  In that scenario, it's entirely possible that

 4     county election officials are doing exactly what they're

 5     supposed to be doing, correct?

 6         A.   Again, given those conditions, which I don't

 7     necessarily agree with all of them, that is a

 8     possibility.  Although, I certainly don't think it

 9     explains these discrepancies that I have identified,

10     that the -- there's clearly differences across the 159

11     counties where there doesn't appear to be uniformity in

12     the instructions and directions, directives,

13     instructions and directives and training.

14         Q.   And what is that statement based on?  So you

15     don't know what the directives and the training was, so

16     how are you reaching a conclusion that there is not

17     uniformity in the instructions and directives?

18         A.   That is true.  And if there is uniformity,

19     that's an even greater problem, it seems to me, because

20     of the discrepancies across these jurisdictions.  I

21     assume we're going to turn to some of that with respect

22     to rejection rates of mailed-in absentee ballots, for

23     instance.

24         Q.   What you're referring to as discrepancies are

25     your interpretation or assumptions about the data that
```

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 110

1    you're looking at, correct?

2         A.   Yeah.  I mean, it's limited to those three

3    statewide voter files.  And again, my hope coming into

4    it is looking to see some cleanness of those files of

5    logically linking to one another.  And the fact of the

6    matter is that there are a lot of problems.

7              And again, I'm -- I wasn't looking for

8    problems, I was looking really just to do the second

9    part of the analysis.  And this report where I was asked

10   to look at the voter file and issues with, you know,

11   vote history, uncovered quite a bit of discrepancies

12   that, again, I don't have all the explanation, but I do

13   have the official data of record.

14        Q.   And at the very least you feel like this is

15   something that merits further investigation?

16        A.   You know, at the very least, you know, I would

17   like to see systematic efforts to clean up, regardless

18   of this litigation.  I mean, as a scholar, it makes my

19   life a lot easier to have clean data that I can work

20   with.  And I do an awful lot of work with administrative

21   data, so I would much rather be able to answer questions

22   that I'm interested in than worrying about how to

23   reconcile data from a state.

24        Q.   On the top of page 20, the last part of

25   paragraph 34, you make the statement that in your

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 111

1     experience, local election officials follow the

2     instructions and directives of state election officials.

3     But in Florida with the vote-by-mail file you found that

4     wasn't the case, correct?

5           A.    No.  Actually, no, that's not the case in

6     Florida.  The case in Florida is that there weren't very

7     good directions and directives or instructions.  And I

8     think that's one of the issues of trying to deal with

9     Florida's vote-by-mail, is making sure that there is

10    some uniform standards with respect to how absentee

11    ballots are treated.

12          Again, Florida's different than Georgia, than

13    other states.  In Florida, there was litigation prior to

14    the 2016 election, which I was involved in as well, that

15    allowed for absentee ballots that came in before

16    election day to be cured if they were missing a

17    signature.

18          The county supervisors implemented that after

19    the litigation, after the secretary of state says you

20    have to do this, they did it differentially.

21          Prior to the 2018 election, there was

22    litigation that I was again involved in that said, all

23    right, if an absentee ballot comes in before the

24    deadline without a signature, certainly those that come

25    in with a signature that's mismatched should have an

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 112

1    opportunity to be cured.  Secretary of state issued a

2    directive, the counties implemented, they did it

3    differentially.

4            So the report you have in front of you, I'm

5    sure, is part of the response of trying to figure out

6    those discrepancies of both missing and mismatched

7    signatures all in an effort, hopefully, to have a more

8    standardized uniform process so that my ballot, if I'm

9    casting it in Alachua County and it has a problem with

10   the signature, I'm going to be treated the same as if

11   I'm in Pinellas County or Levy County or Miami-Dade

12   County.  That's, from my perspective as a scholar and as

13   a citizen who is interested in voting rights, that's

14   what I'm interested in, is to have uniform standards

15   treating us equally across jurisdictions.

16       Q.   If you could grab Exhibit 6 and turn to page

17   16 for me just real quick.

18            In paragraph 31, do you see the sentence that

19   begins, "Despite the division of elections' clear

20   directive", and it goes on to explain that there are a

21   lot of different codes and things that are entered.  Do

22   you see that?

23       A.   Yep.  Yes.

24       Q.   And so your testimony in this case was there

25   was a clear directive from the state that was not being

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 113

1      followed by local officials, correct?

2          A.   There's a lot of discrepancy in terms of how

3      they interpreted that directive that came out right

4      before the election.

5          Q.   So is that a yes?

6              MR. KAISER:  You mean in this case, or I'm

7          sorry?

8              THE WITNESS:  In the Florida case?

9      BY MR. TYSON:

10         Q.   Yes.

11         A.   I would have to go back and reread all of

12     this.  But I can say that notwithstanding that directive

13     of the secretary of state, that each file should contain

14     vote-by-mail requests, but one per record as italicized

15     that there were still issues with respect to individuals

16     who had multiple vote-by-mail codes.

17         Q.   So at least in this Florida case that we're

18     referencing in Exhibit 6, local election officials did

19     not follow a clear directive from the state, correct?

20         A.   I would say it was limited.  I mean, we're

21     talking 56,000, which seems a lot.  But we had 3.6

22     million absentee ballots almost, I think, that was

23     isolated to certain counties.  I'm sure in my report I

24     go in and look at those differences.

25             Am I going to sit here and say that local

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 114

1    officials don't have discretion in following directives,

2    no, of course not.  There is discretion.  But that part

3    of it has to do with what kind of directions you're

4    getting, what kind of timing and training you have.

5            If I put on my political science hat and say

6    that the best way of administering elections is through

7    last-minute litigation that changes rules and

8    procedures, it's probably not the best way of doing it.

9            That said, I have been involved in a lot of

10   these cases.  I'm happy with the results of a lot of

11   them in trying to make things better, and hopefully over

12   time that will become better.  That's very different

13   than having codes that are on the books that are

14   supposed to be trained and followed by local officials

15   in conjunction with the state standards that are not the

16   result of an 11th hour lawsuit coming down that requires

17   a directive and not an awful lot of time to create

18   uniform standards.

19           I want to say, too, that directive gave some

20   leeway of how the counties in Florida were doing it.

21   Clearly, however, some did not follow the idea of having

22   a single record for every individual and their

23   interaction.

24      Q.   And so we can say, at least in some cases,

25   local election officials do not follow the clear

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 115

1      instructions and directives of state officials, correct?

2          A.    Again, I can't say with any particular

3      knowledge in Georgia.  It's hard for me to even say that

4      in Florida because I'm -- my unit of analysis is the

5      individual level, but I'm looking at it from 30,000

6      feet.  And so to say that local officials don't have

7      discretion, would violate every bone in my body with

8      respect to a political scientist.

9              Yes, local administrators have discretion, but

10     it's a dance that both the authority, the principal and

11     the agent play with respect to thinking about the

12     administration of whatever policy, so.

13         Q.    And recognizing that fact, and I completely

14     understand where you're coming from having been through

15     local officials navigating a lot of this, at the very

16     end of paragraph 34, you indicate that the data problems

17     are indicative of systemic failings at the level of the

18     secretary of state.

19             But you really don't know what the directives

20     have been, you're relying only on a data analysis and

21     assumptions to reach that conclusion, right?

22         A.    Again, I have dug around in the Georgia state

23     code as part of my academic research.  I have a paper

24     that I have coauthored.  I have supervised an honors

25     thesis that won best honors thesis for the department.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 116

1    That student has done very well, and, you know, working

2    on academic paper where I have gone in and looked at,

3    you know, the code for state of Georgia.

4              So I know what's on the books.  I know it's

5    supposed to be there.  I can only assume that the

6    authorities, either the state elections board or the

7    secretary of state, is promulgating and disseminating

8    any changes to the code to make sure that the 159 local

9    officials and their boards, if they have them, are

10   carrying out the directives.

11             I mean, states have uniform codes for a

12   reason, and, I mean, the Bush v. Gore decision, limited

13   as it is, highlighted the problems when you don't have

14   uniform codes.

15             So yeah, do I have the specific knowledge, no.

16   But I can assume that the state is following the

17   directives of the state legislature, of court orders,

18   and are disseminating information.  That we have a lot

19   of problems in Georgia, I don't think we can attribute

20   it solely to discretion of local officials.  It also has

21   to do with are they being trained and informed of how

22   the procedures are supposed to be carried out.

23        Q.   And it also could be a question of design,

24   correct, that the system may be designed and still

25   function in a way different than how you assumed that

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 117

1    could also inform what you're seeing, correct?

2         A.   Again, I'm not going to rule out other

3    possibilities.  I can only look at the data that I have,

4    and my report is really limited to those three large

5    data files.

6              MR. TYSON:  Go off the record for a second.

7              (Discussion off the record.)

8    BY MR. TYSON:

9         Q.   All right.  Dr. Smith, welcome back.

10        A.   Thank you.

11        Q.   We'll pick back up at paragraph 35.  And now

12   we're going to get to the point where I accidentally

13   skipped ahead to earlier where we are now, taking a

14   hybrid file and looking at the comparison to the actual

15   statewide vote file.

16        A.   Correct.

17        Q.   So first of all, let's talk about on paragraph

18   36, and this is where I started and got myself off

19   track, that there's a 30-day registration closing

20   deadline in Georgia.  Are you familiar with that?

21        A.   Yes.

22        Q.   So your theory in getting the November 15th

23   file was that it would have anybody who had registered

24   to vote by October the 6th, is that fair to say?

25        A.   Yes, that's -- that's the logic.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 118

1        Q.    And in your experience, do election registrars

2   continue to enter new voter registrations after the

3   cutoff date for an election -- I'm sorry, registration

4   deadline for an election?

5        A.    Generally speaking, no.  Especially with

6   states with -- as generous for the state of a 30-day

7   window to get registration done.  There are certainly

8   exceptions to that.

9        Q.    And in looking at this particular file, did

10   you look to see or check for any supplemental county

11   lists?  Are you familiar with that terminology?

12        A.    No, I'm not familiar with that terminology.

13        Q.    In Florida, if someone shows up to vote, has

14   registered at the very last minute, is there some sort

15   of mechanism to account for that person's registration

16   if it's not yet reflected in a statewide database?

17        A.    Sure.  We have a provisional vote opportunity

18   for anyone who doesn't show up in the roles in a

19   particular jurisdiction.

20        Q.    Got it.  So in paragraph 36 you said the voter

21   registration list should include every voter who was

22   eligible to cast a ballot on November 6th.  But that's,

23   again, an assumption.  You're not sure of that, you're

24   just assuming it should?

25        A.    Again, that's how it should function.  That's

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 119

1    why states say they need 30 days in order to make sure

2    they can process everyone before an election.  That's

3    been the argument, that some states have said they can't

4    have election day registration because they need time to

5    vet applications.

6              So again, an October 15th voter file is well

7    after that 30-day isn't going to capture everyone, there

8    are always exceptions.

9         Q.   And did you do any checks to look at how many

10   people had registered to vote at particular deadlines

11   for the State of Georgia close to the final registration

12   date?

13        A.   No.  For this analysis, I didn't do any.

14        Q.   Would it surprise you if there were additional

15   registered voters entered into the database after

16   October 15th who were eligible to vote in the November

17   6th election?

18        A.   I would not be surprised.

19        Q.   And so in paragraph 37, when you joined the

20   hybrid file and the voter file, the idea there was kind

21   of, I guess, our next step in our analysis, to see how

22   closely those files match, is that fair to say?  Am I

23   describing that --

24        A.   Sure.  I'm looking for exact matches using the

25   voter identification unique number.  But again, I am

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 120

1    allowing the data to speak for themselves not

2    privileging any of those three files, the two that have

3    been combined in the hybrid and the voter file, and so

4    in coding parlance, it's an out or join, where I'm

5    allowing all the data to be merged together in one

6    master file.

7         Q.   And at the end of paragraph 37 where you say

8    every person in the voter file should appear in the

9    hybrid file and vice versa, that's based on the

10   assumption that the voter file contained every eligible

11   voter for November 6th?

12        A.   And vice versa.

13        Q.   So then we start with the analysis of what was

14   in -- what you found there.  And first of all, you found

15   records in the hybrid file that do not, you said, have a

16   race or ethnicity code in the voter file?

17        A.   Uh-huh.

18        Q.   And how did you -- what did that tell you then

19   if they didn't have a race or ethnicity code?

20        A.   Well, since one of my charges was to look at

21   race and looking at patterns of voting, one of the

22   things I initially did was look to see, now that I have

23   joined the voter file with this other file, simple cross

24   tabulations of an individual's race and their

25   disposition with respect to that hybrid file.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 121

1      Q.    And so that's just some information that was

2   not included, but you say in paragraph 39 that the lack

3   of a race ethnicity code meant that they were not in the

4   statewide voter file.  How did you make that

5   determination?

6      A.    So in that snapshot, apparently they did not

7   have any information about race in the voter file.

8      Q.    And so is the 6,864 records in paragraph 38

9   the same 6,864 records that are in paragraph 39 or is

10  that a different group?

11     A.    That should be the same individuals, yes.

12     Q.    So paragraphs 38 and 39 are the same group of

13  individuals?

14     A.    Right.  So 38, where I say there are 6,840 --

15  864 unique records in the hybrid file but have no race

16  ethnicity in the voter file, what I am doing is

17  narrowing it down to those who are in the absentee file,

18  correct.

19     Q.    So if someone was in the absentee file, or

20  hybrid file I should say, and does not have a race

21  ethnicity code, is it correct to say there was to

22  corresponding record in the voter file because that

23  information would have populated from the voter file?

24     A.    I think that's correct, if I'm following you.

25     Q.    And then in paragraph 40 you have an

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 122

1        additional group of individuals who are in the statewide

2        voter file as having voted but do not have a race

3        ethnicity code.  Am I tracking that correctly?

4              A.    Correct.

5              Q.    Okay.  And so like the absentee file, these

6        are individuals who show up as having credit for voting

7        in the voter history file but don't have a corresponding

8        record in the voting file itself; is that right?

9              A.    From the October 15th snapshot, correct.

10             Q.    And so if the state was continuing to or if --

11       I'm sorry.  If county registrars were continuing to

12       process voter applications that came in on October 6th,

13       or somewhere close to there, this would be the result

14       you would expect, right, that an October 15th voter file

15       would not have all the records for people who ultimately

16       voted; is that right?

17             A.    Again, I was really trying to be generous of

18       using an October 15th snapshot as opposed to one that

19       was actually, at the time of book closing 30 days before

20       the election, that there might be slippage and certain

21       registrars, voters who are registering becoming at a

22       later point, again, that's certainly a possibility.

23             Q.    And did you do any further analysis of

24       another, for example, later voter file to determine if

25       these individuals registered to vote close to the

Daniel Smith , Ph.D.                     January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 123

1    deadline?

2         A.    No, I did not.

3         Q.    And so it's -- again, it's a possibility, I

4    think you've already said, that those people,

5    registrations were processed after October 15th but they

6    were still eligible to vote in the election?

7         A.    That is certainly possible, yes.

8         Q.    And as to paragraph 41, you identified some

9    individuals who were recorded as voting absentee in the

10   voter history file but also recorded as having cast an

11   early in-person ballot.  Do you see that?

12        A.    Yes.

13        Q.    And you're relying on the code of in-person

14   from the ballot style field to reach that conclusion,

15   correct?

16        A.    Correct.  From the absentee file.

17        Q.    And if the ballot style field, as we discussed

18   earlier, refers to the method of delivery to the voter,

19   then that would be -- this really wouldn't be an issue

20   at all because it would be talking about two different

21   things; is that right?

22        A.    So it could be, if you presented, as you've

23   already done, that could be a possibility, yes.  That --

24   I just want to make sure that you're presenting what

25   I've written here.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 124

1        Q.    Sure.

2        A.    The way I am thinking you are.

3        Q.    Please check that I am.  I want to make sure

4    I'm getting it right.

5        A.    Yeah, I think what you're talking about there

6    is not really the point of this paragraph.  The point of

7    this paragraph is more looking at these individuals

8    regardless of how they were classified as in-person, who

9    have a yes in the voter history file were not in the

10   2000 -- October of 2018 -- October 15, 2018 file.

11   That's the point that I'm driving home here.

12           I think it's really immaterial with respect to

13   the ballot style field.

14       Q.    Okay, got it.  Thank you.

15           So for paragraph 41, then the same analysis

16   would apply; if there were still registrations being

17   entered, then it's possible that these are individuals

18   who were eligible but weren't captured in the October

19   15th file?

20       A.    That is the point of this paragraph, correct.

21       Q.    Now, the group of people in paragraph 42, can

22   you help me understand who those 226,805 individuals

23   are?

24       A.    Sure.  As I have written here, they have a

25   mail ballot, according to the absentee voter file, and

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 125

1    I'm looking at them with respect to whether or not they

2    had an accepted or rejected also from the absentee voter

3    file.  And I am comparing those individuals with the

4    vote history file.

5              And again, there are 6,194 that are not in the

6    vote history file.  That could make sense with respect

7    to absentee ballots that are rejected that shouldn't be

8    recorded in the vote history file because that's

9    recording valid ballots, but there are some anomalies

10   still.

11        Q.   And so referring back to Table 1, not to get

12   myself lost in the thicket of Table 1, again, I

13   apologize.

14        A.   That's all right.

15        Q.   But there's a reference to 6,449 rejected

16   ballots that were not in the voter history file; is that

17   correct?

18        A.   Uh-huh.

19        Q.   And that's -- basically that could be this

20   same group of individuals or some significant overlap

21   with the reference in paragraph 42?

22        A.   I think that's correct, yes.

23        Q.   Okay.  And then at the end of paragraph 42,

24   there are 882 individuals in the absentee file with the

25   code rejected who are coded as having voted.  And I

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 126

1    think we have discussed that could be voting in person

2    or having an absentee ballot counted by a court order as

3    a possible explanation for that, correct?

4         A.    Sure.  That's a possible explanation.

5         Q.    Going over to paragraph 43, you also look at

6    the status of provisional ballots.  And you reference a

7    number of 8,646 valid provisional ballots.  Is that the

8    individuals who voted a provisional ballot that was

9    counted?  Is that what that number is referring to?

10        A.    That's my understanding.

11        Q.    And you reference at the end of that that the

12   state should take additional steps to keep records of

13   why more than 22,000 provisional ballots that were cast

14   were either accepted or rejected.

15             Are you aware of changes in Georgia law in

16   2019 regarding recordkeeping for provisional ballots?

17        A.    I am generally familiar just in terms of

18   keeping up on state elections across the country, but

19   not particularly.

20        Q.    Okay.  So not particularly.  So you're not

21   aware of the specifics of recordkeeping requirements

22   that are now under Georgia law for provisional ballots?

23        A.    Correct.  I can't say that I'm knowledgeable

24   about specific changes to Georgia law.  That Georgia is

25   considering a variety of laws, I'm knowledgable about

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 127

1    that.

2         Q.    And when you reference provisional ballots in

3    Florida and North Carolina and your study of those in

4    the past, it's a general practice that you wouldn't give

5    credit for voting for someone who voted a provisional

6    ballot that was not counted.  Is that a general

7    practice?

8         A.    Correct.  Provisional ballots that count are

9    recorded as having a valid code.

10             In Florida, for instance, a provisional ballot

11    that counts has a separate code, although those laws

12    have changed as well.

13             But, you know, generally speaking, it is

14    something that the state keeps a record of, as well as

15    local jurisdictions keep a record of.

16         Q.    And you are also not aware whether the state

17    of Georgia, even before the change in the law,

18    maintained additional records of provisional ballots

19    because you looked only at these three databases,

20    correct?

21         A.    That is correct.

22         Q.    That moves us into Roman Numeral V, breakdown

23    of rejected absentee ballots.  So the universe we're

24    talking about here is the individuals who mailed an

25    absentee ballot back and had that ballot accepted or

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 128

1    rejected, not any other categories; is that correct?

2        A.    That is the universe.

3        Q.    And do you know who makes the decision about

4    whether an absentee ballot will be accepted or rejected?

5        A.    No.  I know there's some variation in Georgia

6    in terms of a local elections official, or some of them,

7    my understanding is they have boards that consider.

8            My knowledge is more looking at other states

9    where I have done more academic research on that

10   particular question of accepting or rejecting ballots

11   that come in via mail as opposed to on election day in

12   person.

13       Q.    And do you know whether the racial category of

14   a voter is available to any official making a decision

15   about whether to accept or reject an absentee ballot

16   when they're making that decision?

17       A.    That's a really interesting question, because

18   I have written on absentee ballot rejection rates, and

19   that's the first thing that supervisors, or canvassing

20   boards in Florida, relate to me, we don't know a

21   person's race.

22            And I assume that's the same in Georgia.

23   You're looking at a signature, you're looking at a

24   registration, you're trying to make a determination of

25   whether or not that information, as well as anything

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 129

1    else on the affidavit that might be required, is

2    correct.

3              There's a large body of literature on implicit

4    bias.  I can tell you, living in the South for nearly 20

5    years, if you found a Daniel Smith on my birthdate or

6    around that time who lived east of Waldo Road in

7    Gainesville, there's a high probability that that person

8    is going to be African-American.  If they're living west

9    of Martin Luther King Street, Avenue, there's a good

10   chance the person is going to be white because of the

11   patterns of racial segregation.

12             So I'm not saying that local election

13   officials know the race of an individual.  It's not part

14   of the data they're looking at.  Name and address, which

15   is on the envelope, can be good indicators.

16             Again, I'm not impugning or implying that that

17   is going on with respect to a determination, but

18   patterns of racial segregation, I think we can stipulate

19   exist in my state, in my county, and in your state and a

20   variety -- varying counties in Georgia.  So I'll leave

21   it at that.

22        Q.   You would agree with me that there are some

23   types of absentee ballot rejections whether it's no

24   discretion to the local official, correct?

25        A.   Especially in Georgia, sure.  Yes.

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 130

1     Q.    So if an absentee ballot comes in after

2    election day and it's not UOCAVA eligible or some court

3    order extending it, that ballot's rejected, right?

4     A.    Again, I am not going to completely concede

5    that there's not a local discretion that would be in

6    violation of the law but might make exceptions.  That

7    could very well be there.

8     Q.    So a local official would have to ignore a

9    directive of state law to accept an absentee ballot that

10    came in after the deadline, correct?

11     A.    I will put it very plainly, that discretion

12    can work in either direction.  It can work to

13    enfranchise or it can work to disenfranchise.

14    Exceptions can be made.

15          Classic example of that was in Florida with

16    Hurricane Michael coming through the Panhandle where one

17    of the supervisors of elections made a decision to allow

18    absentee ballots from domestic voters to be either faxed

19    or e-mailed; clearly in violation of state law, clearly

20    in violation of the state election director, secretary

21    of state, but also clearly defendable from the

22    perspective that people's lives were destroyed, people

23    were displaced.

24          And what I'm saying is, there's discretion in

25    both ways.  It's is a good example of discretion.  I

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                    Page 131

1      can't say I agree with it, but I can understand why a

2      supervisor may make accommodations that not every voter

3      has the opportunity to exercise.  Just as it could be on

4      the flip side with respect to the discretion to look

5      more critically at a signature or a ballot that is

6      coming in.

7                So I will leave it at that, not making

8      judgments one way or the other.  It exists.  Is it wide

9      spread, I would hope not.  It's really difficult to

10     show.

11         Q.   And when you looked at rejection rates here,

12     you didn't look at the reason for the rejection, you

13     just looked at whether a ballot was accepted or

14     rejected, right?

15         A.   I did look into the code.  The code for --

16     there is a code in the absentee voter file, if I recall

17     correctly.  It's been well over a month since I looked

18     at it.

19               There is a code for reason of rejection.  And

20     I want to say that there were hundreds of reasons for

21     rejection that appeared to have quite a bit of local

22     discretion in terms of why an absentee ballot was

23     rejected.

24               For me, I have seen similar issues in other

25     states.  It's very difficult for me to come up with a

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 132

1    coding scheme to actually do something with hundreds of

2    different decisions by a local official or officials,

3    designating a ballot as being rejected and coming up

4    with a scheme that I can actually do something with.

5              Two hundred different codes, or whatever it

6    was, where many of them have one or two and others have

7    hundreds, is really in the eye of the beholder how you

8    would categorize something like that.

9              Does a signature not match, is that the same

10   as a mismatched signature, is that the same as a

11   signature by a different elector, you tell me.  It's

12   difficult to come up with some type of -- so I decided

13   intentionally, when I saw there is not a uniform

14   standard across the counties, not to plow any further

15   into that field.

16        Q.   Okay.  Would you agree that the reason for the

17   rejection could inform your analysis in terms of you're

18   saying, okay, there's a higher rejection rate with

19   African-American voters in larger percentage counties,

20   if 90 percent of those rejections were because the

21   ballot came in on November 15th, that's one thing, if 90

22   percent of the rejections were because of a signature

23   mismatch, that might mean something else.  Don't you

24   agree that has at least some relevance to what these

25   data mean?

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 133

1        A.    I think that's a good point.  Again, I have to

2    put that in consideration what I have learned today,

3    that there might be a cutoff in terms of when those

4    things could be changed.

5              Again, October 15th seems to be pretty late

6    for a ballot to come in if it's been locked in with the

7    disposition at an earlier time.

8              But again, from a social science perspective

9    as a practitioner, I would love to have five different

10   categories for why a ballot is deemed unacceptable and

11   should be rejected, not hundreds of categories where it

12   seems like there's an awful lot of leeway in terms of

13   how to categorize.

14       Q.    And in paragraph 45, start kind of walking

15   through the analysis that you performed here.  And you

16   relied on the mail code and the ballot style field; is

17   that correct?

18       A.    Uh-huh.  Yes.

19       Q.    If the ballot style field, as we have

20   discussed multiple times today, refers to the method of

21   delivery to the voter, this is not going to capture all

22   absentee ballots that were voted in November 2018,

23   correct?

24       A.    Oh, no, it certainly will not, correct.  It

25   focuses narrowly on those with the mail code and ballot

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 134

1    style.

2         Q.    And of that subset of absentee votes, you

3    found a white voter rejection rate of 2.3 percent and a

4    black voter rejection rate of 3.7 percent?

5         A.    Yes, that's correct.

6         Q.    And you note that the rejection rate for black

7    voters is nearly 65 percent higher than the rejection

8    rate for white voters, correct?

9         A.    Yes.

10        Q.    And unless I missed somewhere, you're not

11   really opining about why that is, you're just pointing

12   out that it is; is that correct?

13        A.    Again, I think that's correct.  I'm letting

14   the data speak for themselves.

15        Q.    And did you conduct any sort of analysis to

16   determine whether these results could be equally

17   explained by chance, any sort of progression or any

18   analysis on that front?

19        A.    I'm really kind of opposed to that type of

20   analysis because this is actually the administrative

21   data of record.

22             And so I have stayed away in this table and

23   from doing that type of analysis because I can, on the

24   face of it, say that not only is 3,162 greater than

25   2,468, I can also say that of those who cast mail-in

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 135

1    ballots, with the mail-in ballot style, who were black,

2    have 3.72 percent rejected as opposed to the same

3    category for whites, at 2.26.

4            And I can say with certainty that it's 60 some

5    odd percent greater, and I can say with certainty it's

6    about one and a half percent greater.

7            There's no need for progression.  This is not

8    a sample.  This is the raw data from, presumably, the

9    official results coming from the State of Georgia.

10       Q.   Again, obviously, a variety of factors that

11   can influence an acceptance and rejection.

12           Did you look at all whether any of these

13   voters rejections, were they first time voters, were

14   they experienced voters, did you conduct any analysis on

15   those other factors?

16       A.   No, I did not.

17       Q.   And if there was a particular campaign that

18   had a heavy absentee ballot focus on African-American

19   voters, for example, and got a disproportionately high

20   number of first time African-American voters voting

21   absentee, you would expect to see higher rejection rate,

22   wouldn't you?

23       A.   Again, it depends.  There is certainly

24   evidence out there suggesting younger voters may be more

25   predisposed to have a rejected absentee ballot than

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 136

1    those more veteran.  But no, I did not conduct that type

2    of analysis.

3         Q.   And in Table 2 it looks like the rejection

4    rate for Hispanic and Asian voters was higher than the

5    rejection rate for white or black voters; is that right?

6         A.   Yes, according to the data that I have.

7         Q.   And the other category refers to other racial

8    categories, or does that include the unknown racial

9    category?

10        A.   I think the unknown is the NA, yeah.  So other

11   is an official category in the voter file, if I recall

12   correctly.  Or it's all those that are not -- all those

13   that have a race that are not white, black, Hispanic,

14   Asian.  In fact, Georgia differentiates between race and

15   ethnicity, so I'm sure that I conditioned on all that.

16   These would be the residuals with the race.  The NA are

17   the ones that have no information.

18        Q.   So in paragraph 47, you then seek to visualize

19   this and looked at the percentage of absentee ballots

20   cast by black voters and the percentage of absentee

21   ballots cast by black voters that were rejected,

22   correct?

23        A.   Correct.

24        Q.   And you see, obviously, on Figure 1 it's a

25   wide distribution, a lot of dots in a lot of different

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 137

1     places.  Why did you conclude that there was a positive

2     relationship between the percentage of absentee ballots

3     cast in the county by black voters and the rejection

4     rate of absentee ballots cast by black voters in a

5     county?

6         A.    Right.  I mean, very simply, as I ran a

7     bivariate regression that regressed on the percent

8     rejected of these absentee ballots cast by blacks

9     against the percent of absentee ballots of all ballots

10    cast by blacks, and I see a positive relationship here.

11         I ran a regression because I wanted to weigh

12    it by the number of total, I think it was, ballots cast.

13    I'm sorry, absentee ballots mailed.

14         Obviously, Georgia has counties that have lots

15    of voters and those that have very few voters.  So you

16    see an upward slope here.  And it merely reflects that

17    in jurisdictions where African-Americans have a more

18    dense with respect to casting, of those who are casting

19    absentee ballots being black, the relationship goes up.

20         There are different ways you could visualize

21    this.  Clearly there's a lot of heterogeneity going on.

22    I actually find it more interesting looking at the

23    counties that are kind of highlighted in the middle that

24    are about 50 percent of the absentee ballots cast are by

25    blacks out of all the ballots cast.  There are quite a

Case 1:18-cv-05391-SCJ     Document 405-1     Filed 06/28/20     Page 140 of 205

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 138

1      few that have very high rates of absentee ballots cast

2      by blacks that are rejected, you know.

3              So to take an example, Glynn County, where 40

4      percent of all the absentee ballots cast were by blacks

5      and yet blacks had one in ten absentee ballots rejected

6      that they had cast.  So that's how I would interpret

7      this relationship.

8          Q.   If you had a particularly large county that

9      was rejecting all absentee ballots at a higher rate and

10     was also heavily more African-American, would that skew

11     the rejection rate statewide?

12         A.   That's why I kind of did it this way, as well

13     as had the regression weighted by a measure of

14     population.  Which is precisely what I do.  So that

15     takes that into consideration.

16         Q.   Is this an analysis that would benefit from

17     additional variables being considered?  You mention that

18     young voters, first time voters, the reason for the

19     rejection, wouldn't additional variables tell us more

20     than just a bivariate regression?

21         A.   Well, certainly one could add in other

22     information into that.  You could add in how long an

23     individual has been registered, whether they voted an

24     absentee ballot in the past, whether they're a first

25     time voter.  Sure, you could throw in other individual

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 139

1    level variables and model this differently.

2         Q.   Now, based on what you found in the rejection

3    rate in Figure 1, you're not saying that local election

4    officials are engaged in intentional racial

5    discrimination against African-American voters, are you?

6         A.   No, absolutely not.  Again, I'm not imputing

7    or impugning motive here.

8              What this plot does, which, I mean, I could

9    have easily just provided a table, but tables with 159

10   cases get unwieldy, I could have easily done that so you

11   could compare black and white percentage of absentee

12   ballot cast, and black and white rejection rates of

13   those absentee ballots cast.

14             County name, 159, and four columns of data,

15   it's really difficult to visualize from that the pattern

16   that I think is quite clear from this figure as well as

17   the Figure 2, and that is there is a lot of

18   heterogeneity; meaning there's a lot of counties that

19   those have very few blacks who voted an absentee ballot,

20   such as Pickens, that have a very high rejection rate.

21             You have others that I don't have labeled that

22   have less than 10 percent that didn't have many absentee

23   ballots cast by blacks rejected, you know, less than 3

24   percent, less than the statewide average, right.

25             So there's a lot going on there with respect

Daniel Smith , Ph.D.                              January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 140

1      to rejection rates of absentee ballots cast by blacks

2      that this plot is trying to represent.  The regression

3      relation line merely suggests that the relationship is

4      positive in that bivariate sense.

5          Q.   When you say a relationship is positive in a

6      bivariate sense, is that just basically saying these two

7      variables are somehow related but we're not sure how?

8          A.   Sure.  They're correlated in this fashion.

9      It's not -- it's not excluding all other possible

10     factors, as we have already discussed.

11         Q.   And have you seen situations in past modeling

12     of datasets where a bivariate regression would show a

13     relationship and multivariate would not?

14         A.   Yeah, sure.  Again, I've got working papers on

15     absentee ballot rejection rates from Florida, for

16     instance, in which it has a bivariate relationship that

17     is positive, and I have thrown every possible control

18     variable known to mankind because I've got two some

19     million observations; their age, their past vote

20     history, their gender, whether they have a hyphenated

21     last name, whether they have an apostrophe in their

22     name, as well as what we would call county fixed

23     effects, what the party is of the supervisor in Florida,

24     what the support was for the republican candidate in the

25     county and the racial relationship still holds.  It

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 141

1    still holds.

2              So this is a very simple bivariate

3    relationship that I have plotted here.  I'm not saying

4    that throwing everything in the kitchen sink into a

5    model won't have this same relationship hold.  I didn't

6    do it.

7         Q.    Okay.  And in paragraph 48 you reference about

8    40 percent of all mailed absentee ballots cast in

9    Gwinnett, nearly 8 percent were rejected, the ones cast

10   by black voters.

11             Are you aware of Gwinnett County being in the

12   news for its rejection rate of absentee ballots

13   generally?

14        A.    Yes.

15        Q.    And again, you're not saying that that

16   rejection was racially motivated, correct?

17        A.    From what I read in the papers, there were

18   other issues with ballot design or absentee ballot

19   envelope design.

20        Q.    Going to Figure 2, I guess this is not quite

21   the inverse of the prior dataset, but could you just

22   walk me through it a little bit how Figure 2 differs

23   from Figure 1?

24        A.    You're absolutely right, it is quite not the

25   inverse, and that's because these are looking at the

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 142

1    percent of white and black and yet there are other

2    racial ethnic categories of individuals who either cast

3    an absentee ballot or had them rejected.

4              So the reason they're not mirror images of

5    each other is because we still have about 15 percent of

6    registered voters who cast absentee ballots, as I have

7    conditioned here, who are not either white or black.

8              But effectively, it is very similar because

9    we're dealing with 85 percent of black and white out of

10   100 percent of all absentee ballots cast.

11       Q.    So ultimately, the kind of data limitations

12   are the same here, we're looking at a bivariate

13   progression, we're looking at not considering rejection

14   reason, other potential causes for rejection of ballot,

15   correct?

16       A.    That's correct.

17       Q.    Moving to your conclusion, I want to kind of

18   take this apart piece by piece.

19              So first you say in paragraph 50 that your

20   analysis uncovers serious election administration

21   recordkeeping problems with Georgia's voter list and

22   individual voter records.  And those serious problems

23   you've identified or if all of your assumptions hold

24   true about the nature of the data, is that fair to say?

25       A.    I don't know if all the assumptions have to

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 143

1      hold true at all.  I mean, I have made some assumptions

2      since I didn't have a key for some of the voter file

3      information, but I would certainly say that many of the

4      conclusions I have come to, suggest that there are

5      serious election administration and recordkeeping

6      problems.

7           Q.   And you've also said that there are disparate

8      effects on registered voters who are black, particularly

9      when it comes to mailed absentee ballots.  And the

10     disparate effects you are referring to are just the

11     differential and the rejection rate between white and

12     black voters; is that correct?

13          A.   That's what I limited my report to focus on,

14     yes.

15          Q.   So then you state next that there is ample

16     evidence that the secretary of state and the state

17     election board has not adequately overseen, trained or

18     advised county officials.  And again, that conclusion is

19     based solely on this database analysis, not on any

20     analysis of training or any direction from the state,

21     correct?

22          A.   Right.  It's based on my analysis of those

23     three datasets in Section 1 and in Section 2.  The first

24     empirical section looking at the voter file and the

25     merging of them, the second looking at the absentee

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 144

1      ballot rejection rates where there's just so much

2      variation going on here that clearly it seems there's

3      some disconnect between how these local officials should

4      be carrying out their list maintenance and absentee

5      files and vote history files and the -- as well as

6      looking at the rejection rates of vote-by-mail ballots.

7          Q.    You mentioned in that sentence as well the

8      recording of provisional ballot transactions, there's a

9      disconnect, lack of training there.

10              The only reference that I found was paragraph

11     43 about the provisional ballots.  Is there another part

12     of your report that supports your conclusions about

13     provisional ballot transactions that I have missed?

14         A.    No, that's the section where I focused on

15     that.

16         Q.    And the last sentence of paragraph 50, you say

17     that black registered voters are more negatively

18     affected than white registered voters in the state.

19     When you say "negatively affected", you're not saying by

20     what, you're just saying there's some difference, is

21     that fair to say?

22         A.    Yes.  Again, it appears that black voters, for

23     whatever the reason is, the data suggests that they are

24     differentially affected, yeah.

25         Q.    And I'm assuming you would want to do further

Daniel Smith , Ph.D.                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 145

1    analysis to figure out the why behind that, or you would

2    need to do further analysis to figure out the why behind

3    it?

4         A.   Getting to the why is very difficult in my

5    scholarly research as well as any expert work.  Yeah.  I

6    prefer to let the data speak and draw the conclusions

7    from those patterns.

8         Q.   And the conclusion you have drawn here is just

9    that there is some negative effect, and we don't

10   necessarily know what's going on there, fair to say?

11        A.   I think -- I think that's fair to say.

12        Q.   In paragraph 51, you mention that Georgia's

13   voter list and recording of voter histories fall far

14   short of other state election officials.  And you have

15   listed Florida and North Carolina.

16             Are you taking into account other states in

17   that statement as well?

18        A.   Yes.  I didn't list others by name, but again,

19   I have a long history of looking at voter files in other

20   states.  And I think I have to put Georgia in that

21   broader perspective, thinking that they have a statewide

22   system.  My initial assumption is that it should be

23   immune from some of the problems that I identified.

24        Q.   And have you found that Florida and North

25   Carolina are immune from some of the problems you found

Daniel Smith , Ph.D.                     January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 146

1      in this report?

2           A.   They're certainly not immune.  And I think

3      they have taken many corrective efforts over the years.

4      Partly through litigation.

5                But I would say that no state administration

6      is immune from problems.

7           Q.   In your experience have you ever seen a

8      perfect election?

9           A.   No, I have never seen a perfect election.  And

10     I mean that from an administrative standpoint as opposed

11     to an outcome standpoint.

12          Q.   Yes, I was referring to the administration

13     standpoint, not the outcome.

14               (Thereupon, Defendant's Exhibit 7 was marked

15     for identification.)

16               I'm going to hand you what we have marked

17     Exhibit 7.

18               MR. KAISER:  Thanks.

19               MR. ANDERSON:  Thank you.

20     BY MR. TYSON:

21          Q.   Is this an article that you worked on with

22     Daniel Biggers?

23          A.   Yes.

24          Q.   And can you explain to me briefly what Exhibit

25     7 involved, if you remember?

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 147

```
1         A.    I don't know if I can do it briefly.  It's a

2    very complicated article, and it's one that is pretty

3    brilliant.  And that's why it got published in the top

4    journal because it's very careful in terms of trying to

5    analyze the effects of what happened in Florida in 2012,

6    which was an effort orchestrated from the secretary of

7    state's office to purge voters.

8              We have talked about purging voters before,

9    and again, I have no problem purging voters if it's done

10   through the legal standards, federal as well as state

11   law that conform with due process and all the

12   conditionalities.

13             What Florida did in 2012 was have an outside

14   vendor come up with a list of 182,000 people who they

15   suspected of being non citizens.

16             MR. KAISER:  Can we go off the record for a

17        second?

18             MR. TYSON:  Sure.

19             (Discussion off the record.)

20             THE WITNESS:  So that was in 2012.  There was

21        a lot of pushback to the secretary of state with

22        that list.  I could go into detail about how I

23        became aware of that list, which was not in a

24        litigation perspective at all, but because I was

25        looking at the people in Alachua County and
```

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 148

1       people were asking me, as someone who worked in

2       this area, I did get involved in the litigation

3       with this case.  This is the Arcia case,

4       A-R-C-I-A.  In 2012 when I was asked to be an

5       expert for some of the plaintiffs that challenged

6       the ultimate list of 2,625 individuals who the

7       state claimed were not citizens.

8           This paper looks at a portion of that group,

9       1600 people, if I recall correctly, who were

10      identified as non citizens in Miami-Dade, and it

11      simply asked the question that is not a simple

12      question, are people who are targeted by a state

13      authority for being ineligible to participate

14      more or less likely to turn out to vote once

15      those rights have been restored.

16          That's what happened in this case, was the

17      preliminary injunction, or I can't remember

18      exactly what order it was in 2012, the clerks --

19      the supervisor of elections identified these

20      individuals and then proceeded to not take anyone

21      off the rolls with a few exceptions of those

22      2,625.

23          It's one thing to say, hey, did these people

24      show up to vote, and the other thing is what do

25      we compare it to.  This is really an exercise in

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 149

1          trying to use, again, social science to take a

2          look at individuals who are very similar to those

3          individuals who are targeted and compare rates of

4          turnout of whether or not being targeted had a

5          negative effect on your likelihood of turning

6          out, or, in fact, did people get ticked off, did

7          they react and participate in even greater force

8          than we might expect them to compared to their

9          doppelganger, their twin.

10   BY MR. TYSON:

11          Q.   If you could turn to page 20 for me.

12          A.   Sure.

13          Q.   In the conclusion section.

14          A.   I'm glad my readership just went up a couple

15   for this paper.

16              MR. KAISER:  It doubles.

17              THE WITNESS:  It's exciting.  It may have

18          doubled.

19              MR. TYSON:  I found it very interesting,

20          actually.

21   BY MR. TYSON:

22          Q.   The second paragraph there, you propose that

23   future work needs to be done to examine the scale and

24   scope of response to policies perceived to target the

25   voting rights of specific communities.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 150

1           Do you -- have you or do you know of anyone

2    who has done work in that space since this paper was

3    published?

4           A.    So this paper came out very recently, 2018.

5    There's a lot of work going on among scholars looking at

6    this exact question, if not the exact policy decision,

7    to purge people from the rolls because of citizenship or

8    non citizenship.  That's going on, obviously.  We've got

9    a lot of litigation going on in that.

10           The other major area is with respect to voter

11   ID laws and whether or not people can cast a ballot if

12   they don't have the proper form of ID.

13           There have been a lot of studies that are

14   trying to actually measure the effects of those

15   administrative decisions with, frankly, mixed results.

16           Some suggest that things like strict voter ID,

17   or proof of citizenship when you're registering to vote

18   can have a depressive effect on an individual's

19   likelihood to turn out to vote, assuming that an

20   individual was able to get some form of ID or whether an

21   individual got on the rolls after a citizenship

22   requirement.

23           There are other studies that have found that,

24   in fact, like we're finding here, people can respond

25   either individually or because of a focus on that issue

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 151

1    and overcome those institutional effects.

2            I think the jury is certainly out.  We don't

3    have a definitive scholarship on this.  There are all

4    kind of interesting studies.  I review quite a few of

5    them because of articles like this that I've published.

6    And there are four people citing this, and because I'm a

7    known expert in this area, I get articles to review all

8    the time.

9            I think that's probably why my coauthor and I

10   wrote in a way saying that we need to have more studies

11   like this.

12           I -- again, I'm an empiricist.  More studies

13   are better, more research designs are better.

14           One of the things I really like about this

15   paper is that we're using administrative data.  It would

16   be very difficult to get through an institutional review

17   board, which all scholarship has to go through when

18   you're dealing with human subjects, to randomly assign

19   people in Georgia to question their citizenship or to

20   take away their ID, to see whether or not either of

21   those two things with that randomly treated population

22   compared to a control group, whether they're actually

23   more likely to get really aggravated and more likely to

24   turn out to vote, or more likely to go and find an

25   alternative form of ID than the group that wasn't.

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 152

1          I'm being a little facetious here, obviously.

2     You're not going to get that through an IRB approval.

3          The states do this.  We have seen across the

4     country, states have interpreted election codes and

5     federal law differently with respect to purging voters

6     periodically or if they haven't voted.

7          The Husted case out of Ohio, or what's going

8     on with states with restrictive voter ID, like we have

9     seen in Georgia and other states, I happen to not do a

10    lot of experimental work as a scholar, I happen to rely

11    on administrative data.  As a result, the reason why

12    this paper is so lengthy and why the appendix is even

13    longer is because there are a lot of things that you

14    want to go through, since it's not a natural experiment

15    and these people weren't randomly assigned, to be able

16    to see whether those patterns hold with placebo tests

17    and other things.

18         So again, I think this is a fascinating --

19    this is what gets me up in the morning, is writing

20    papers like this and thinking about whether or not the

21    litigation actually mattered with respect to people

22    turning out to vote.

23         I'm sorry that's a lengthy answer, but I --

24    again, I think this kind of research is fascinating, you

25    know.  Does the litigation matter.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 153

1          Q.    And when you say "does the litigation matter",
2     can you explain to me a little bit about what you mean
3     by that?
4               MR. KAISER:  Objection.  Scope.
5               Not to -- do your thing.
6               THE WITNESS:  Again, I have no idea.  Would I
7               have been surprised that -- I guess this is even
8               contrary to -- the assumption going in was that
9               these people who are being challenged are not
10              going to vote, that they are going to be
11              quiescent, concerned, and silenced by having
12              their citizenship challenged as opposed to
13              reactive and energized by that.  I mean,
14              that's -- I had no idea going into this.
15                  And so to dust off some litigation that was in
16              2012 and treat it scholarly was something that's
17              personally just very interesting to me to do.
18              And I'm doing that with quite a bit of other
19              projects.
20                  There's -- again, I'm interested in this as a
21              political scientist.  These are interesting
22              research questions to me.  And that I might find
23              a depressive effect in a different situation
24              where voter ID is required and depressing turnout
25              among certain populations that are less likely to

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 154

1           have it who aren't able to overcome or don't have

2           the assistance to have remedies, I don't think

3           there's any intrinsic bias one way or the other.

4           I'm just an empiricist that is interested in

5           looking at these relationships.

6      BY MR. TYSON:

7           Q.   I believe you mentioned earlier that you read

8      the complaint in this case or are generally familiar

9      with the allegations in the case.

10          A.   I have no idea how many complaints or amended

11     complaints or whatever.  I'm sure I read one complaint

12     at some point long ago.  I have no idea when this

13     litigation even started.  It may be a year old as far as

14     I know, so it may have been a year ago that I read

15     through that complaint.  But yes, I am familiar with the

16     complaint.

17          Q.   And in the political science field, are you

18     familiar with the term "vote suppression" or "voter

19     suppression"?

20          A.   Yes.

21          Q.   And how would you define that term?

22          A.   It's a term that I generally try to stay away

23     from.  It's one that, from my perspective, carries more

24     baggage than its utility.

25               I'm interested in how rules and institutions

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 155

1    affect behavior.  That's what has driven me since I was

2    working on organized labor and these labor management

3    groups in Wisconsin and other states to direct democracy

4    campaigns and whether or not they actually led people to

5    turn out to vote because they were interested in ballot

6    issues as opposed to Republicans for Democrats.  It's

7    the same thing that animates my research now, looking at

8    institutional variation changes and how it affects

9    different populations from turning out to vote.

10           Voter suppression, to me, if I've used it,

11   it's something that I don't see a lot of utility in

12   because it kind of gets to intent.  When I do use it,

13   it's more with respect to expressive comments made where

14   it's clearly designed to reduce the likelihood of

15   certain populations to vote.

16           And so I hope that I have been, in my own

17   academic research, circumspect with respect to that

18   term.

19      Q.   Do you consider vote suppression as a term, a

20   partisan term in the political science world?

21      A.   I think it's become a partisan term, just like

22   voter fraud has become a partisan term.  Again, I don't

23   find either of those terribly useful as a political

24   scientist.  Again, that I've used those terms, hopefully

25   they're in the context of other political actors who are

Daniel Smith , Ph.D.                          January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 156

1        using them.

2                But again, has it become a partisan term, I

3        think there's a lot of evidence to suggest it has.  Just

4        like people who cry there's a lot of voter fraud.  Two,

5        3 million fraudulent votes cast seems to become a

6        partisan term.

7                And from my perspective, again, as a scholar

8        and a scholar first who has a long record and one that

9        I'm very proud of, those terms don't do a lot for me as

10       an academic.  That I might have a Tweet out there "The

11       fraudulent fraud squad", it's a Tweet.

12               My reputation, I hope, is more than my Twitter

13       profile.

14               MR. TYSON:  I think we can all hope for that.

15               We can go off the record.

16               (Discussion off the record.)

17               MR. TYSON:  All right.  Dr. Smith, thank you

18           for your time today.  I don't have any further

19           questions for you.

20               MR. KAISER:  We've got no questions.

21               (Discussion off the record.)

22               THE COURT REPORTER:  And are you ordering?

23               MR. TYSON:  Electronic, yes.

24               THE COURT REPORTER:  PDF?

25               MR. TYSON:  Yes.

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 157

1              THE COURT REPORTER:  And do you need a copy?

2              MR. KAISER:  Yes.

3              THE COURT REPORTER:  PDF?

4              MR. KAISER:  Yes.

5              (Thereupon, the right to read and sign the

6      deposition was explained to the witness and the witness

7      requested to review the transcript.)

8              (Whereupon, the deposition was concluded at

9      2:48 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 158

1

2

3

CERTIFICATE OF OATH

4

5

6     STATE OF FLORIDA     )

      COUNTY OF ALACHUA     )

7

8           I, the undersigned authority, certify that

9     DANIEL A. SMITH, Ph.D. personally appeared before me and

10    was duly sworn.

11          WITNESS my hand and official seal this 5th day

12    of February, 2020.

13

14

                        Debora M. Holloway

15                      Court Reporter, Notary Public

16

17

18

19

20

21

22

23

24

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 159

1

2

3                          CERTIFICATE

4

5     STATE OF FLORIDA     )

      COUNTY OF ALACHUA    )

6

7              I, Debora M. Holloway, Court Reporter, certify

8     that I was authorized to and did stenographically report

9     the deposition of DANIEL A. SMITH, Ph.D.; that a review

10    of the transcript was requested; and that the transcript

11    is a true and complete record of my stenographic notes.

12             I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17             DATED this 6th day of February, 2020.

18

19

20                         Debora M. Holloway

                           Court Reporter

21

22

23

24

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

Page 160

1    Matt Kaiser

2

3                          February 11, 2020

4

5         1/28/2020, Daniel Smith , Ph.D. (#3848281)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   litsup-ga@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                      Page 161

 1    Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

 2    Daniel Smith , Ph.D. (#3848281)

 3                    E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Daniel Smith , Ph.D.                              Date

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

                                                Page 162

1     Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

2     Daniel Smith , Ph.D. (#3848281)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Daniel Smith , Ph.D., do hereby declare that I

5     have read the foregoing transcript, I have made any

6     corrections, additions, or changes I deemed necessary as

7     noted above to be appended hereto, and that the same is

8     a true, correct and complete transcript of the testimony

9     given by me.

10

11    _____     _____

12    Daniel Smith , Ph.D.                           Date

13    *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[05391 - 30]**                                                      Page 1

| | | | |
|---|---|---|---|
| **0** | 74:16 108:19 | **2.1** 94:16 | **21** 3:11 20:3 71:18 |

**0**

**05391** 1:3

**1**

**1** 3:10 5:21,24
66:16 93:20 96:2
96:10 125:11,12
136:24 139:3
141:23 143:23
**1,822,064** 97:25
**1,833,052** 97:21
**1.8** 94:16 103:12
**1/28/2020** 160:5
**10** 38:25 46:6
47:11 52:25
139:22
**10/15/2018** 53:3
**100** 12:4 142:10
**102** 100:18 106:11
106:19
**1040** 20:25
**1099** 2:2
**11** 50:17 51:2
103:25 160:3
**11,000** 101:17
**11th** 114:16
**12** 52:24 53:12
70:20
**13** 38:3,16,20
54:19 65:2 76:5
94:23 98:25
**1319** 158:14
159:19
**146** 3:14
**14th** 2:2
**15** 13:2 40:13 53:2
55:9,13 93:5
124:10 142:5
**157** 3:6
**159** 43:24 49:23
51:11 57:6 60:10

74:16 108:19
109:10 116:8
139:9,14
**15th** 53:8,10,13,16
91:23 92:5,9
117:22 119:6,16
122:9,14,18 123:5
124:19 132:21
133:5
**16** 58:16 60:18
61:19 112:17
**1600** 2:8 148:9
**168** 35:17
**17** 63:22 64:2
**17th** 53:24 54:12
**18** 38:25 64:14,20
64:21,23
**182,000** 147:14
**19** 64:14 67:16
106:24
**1920** 15:23
**1980s** 8:14
**1988** 7:14
**1989** 6:22
**1992** 12:18
**1994** 10:10 12:19
**1999** 10:11 27:2
**1:18** 1:3

**2**

**2** 3:11 6:3,5 31:13
32:1,1 136:3
139:17 141:20,22
143:23
**2,000** 106:1
**2,114,283** 99:13
**2,114,409** 64:22
**2,117,457** 99:10
**2,169** 99:17 105:5
**2,468** 134:25
**2,625** 148:6,22

**2.1** 94:16
**2.26.** 135:3
**2.3** 134:3
**20** 14:9 27:3,6
70:17 82:20
110:24 129:4
149:11 162:15
**200** 2:8
**2000** 10:11,17
13:15 15:23 62:20
124:10
**2000's** 17:18
**20005** 2:3
**2001** 10:17 13:15
**2003** 10:12 11:2
13:16
**2006** 20:17
**2009** 11:5
**201** 1:20
**2010** 33:5
**2012** 147:5,13,20
148:4,18 153:16
**2014** 23:12
**2016** 46:21,23
47:15 111:14
**2017** 11:7
**2018** 5:15 42:14,25
52:25 53:18,22
54:3,8 55:1 63:21
93:5,8 111:21
124:10,10 133:22
150:4
**2019** 6:14 37:14
42:14 52:15 53:19
54:5 94:13 126:16
**202** 2:4
**2020** 1:17 158:12
159:17 160:3
**205** 106:25
**207** 1:20

**21** 3:11 20:3 71:18
74:9 82:21
**22** 76:3,5,15
**22,000** 126:13
**226,805** 124:22
**23** 76:20 77:7 78:2
78:12 81:7,14
82:10
**23rd** 6:16
**24** 81:7,11,14,18
82:10,17 98:11
102:7 103:12
106:18 107:14
**25** 83:18 88:17,24
**26** 3:12 90:14
**27** 3:13
**28** 1:17 92:10
**29** 16:7 93:21
104:9
**2:48** 1:18 157:9
**2nd** 54:11,13

**3**

**3** 3:11 21:4,7
32:21 36:3 139:23
156:5
**3,000** 65:1 71:19
81:24 82:18
104:20
**3,048** 70:21 73:13
74:22,25 75:11
81:8
**3,162** 134:24
**3.6** 113:21
**3.7** 134:4
**3.72** 135:2
**30** 7:7 16:7 33:2
40:14,19 61:1
81:3 117:19 118:6
119:1,7 122:19
160:17

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[30,000 - absentee]**                                    Page 2

**30,000**  115:5
**30,826**  106:5
**30339**  2:9
**31**  40:23 41:2
  106:23 112:18
**32**  41:21 106:24
**32601**  1:21
**33**  107:13
**336-7249**  2:9
**34**  107:17 108:21
  110:25 115:16
**34,000**  84:6
**35**  117:11
**36**  117:18 118:20
**37**  3:13 119:19
  120:7
**37,000**  78:21 83:20
**38**  121:8,12,14
**38,298**  100:16
**38,902**  92:11
**3848281**  160:5
  161:2 162:2
**39**  30:14,21 121:2
  121:9,12
**39,000**  70:1
**39,601**  65:8 70:11
**3988807**  95:5

**4**

**4**  3:5,12 26:16,19
  34:13 42:8 55:17
**4,171**  102:13
**40**  11:17,21 35:17
  104:11 121:25
  138:3 141:8
**400**  42:9
**41**  123:8 124:15
**42**  124:21 125:21
  125:23
**43**  126:5 144:11
**45**  133:14

**47**  136:18
**48**  141:7

**5**

**5**  3:10,13 27:22,25
  42:8
**5,000**  56:10 102:24
**50**  8:11 9:2,5
  17:12 32:17
  137:24 142:19
  144:16
**51**  145:12
**537**  62:20
**56,000**  113:21
**5th**  158:11

**6**

**6**  3:11,13 36:22
  37:4,7 40:13
  42:19 112:16
  113:18
**6,194**  125:5
**6,449**  125:15
**6,840**  121:14
**6,864**  121:8,9
**60**  135:4
**600**  57:7 73:9
**604**  55:11 56:12
  57:16 58:11 62:21
  74:15,21
**612**  87:6,9 88:9
  89:1
**640-2849**  2:4
**65**  134:7
**67**  59:18
**67,000**  63:24
**678**  2:9
**684**  98:17,21
  103:24
**6th**  117:24 118:22
  119:17 120:11
  122:12 159:17

**7**

**7**  3:14 38:2 49:10
  53:11 146:14,17
  146:25
**757**  100:7

**8**

**8**  30:15 38:20 43:6
  44:17,23 54:18
  141:9
**8,646**  126:7
**80**  16:4
**85**  142:9
**864**  121:15
**882**  125:24
**89**  7:14
**8th**  2:3

**9**

**9**  45:16
**90**  7:14 132:20,21
**900**  102:15
**9:35**  1:18

**a**

**a.m.**  1:18
**ability**  18:1 19:7
**able**  19:8 20:25
  51:16 82:11 88:11
  89:19 98:24
  102:11 104:6,11
  110:21 150:20
  152:15 154:1
**abrams**  5:14,16
**absent**  95:12
**absentee**  16:4,16
  18:2,3 38:12,23
  39:6,13,17,21,22
  40:5,20 42:4,25
  45:18,22,22 52:7
  52:12 54:4 55:7
  58:20,25 59:14,16
  59:22,23 60:4,5

**61**:15 63:23,25,25
**64**:11 66:4,5,6,9
**66**:11,18,23 67:5
**67**:24 68:11,18,19
**69**:15,15 70:11,21
**71**:3,7,10,11,13,19
**72**:6,13,17,18,20
**72**:22 73:1,4,7,14
**73**:15 74:7,23,25
**75**:13 76:7,8,12,19
**76**:22,25 77:9,18
**78**:3,14,16 79:1,2
**79**:6,23 80:4 81:9
**81**:15,16,21 82:5
**83**:4,6,11,20,25
**84**:2,10,18 85:9,14
**86**:14 87:21,24,25
**88**:1,5,18 89:16,21
**90**:3,8,17 91:4,6,7
**91**:9,11,17,21 92:3
**92**:13,18,25 94:19
**94**:25 95:16,19
**96**:3,11,18 97:5,8
**97**:9,25 98:6,12,12
**98**:17,25 99:14,22
**99**:25 100:19,20
**101**:4,21,23
**102**:11,14,16,21
**102**:24 103:22
**104**:5,10,13,22
**105**:5,9 106:12,12
**107**:1,2,7,9,15,21
**108**:13 109:2,22
**111**:10,15,23
**113**:22 121:17,19
**122**:5 123:9,16
**124**:25 125:2,7,24
**126**:2 127:23,25
**128**:4,15,18
**129**:23 130:1,9,18
**131**:16,22 133:22

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[absentee - allotted]                                           Page 3

134:2 135:18,21
135:25 136:19,20
137:2,4,8,9,13,19
137:24 138:1,4,5,9
138:24 139:11,13
139:19,22 140:1
140:15 141:8,12
141:18 142:3,6,10
143:9,25 144:4
**absenteeism** 45:1
**absolutely** 72:12
139:6 141:24
**academic** 9:21
10:14 27:12
115:23 116:2
128:9 155:17
156:10
**accept** 128:15
130:9
**acceptance** 79:20
135:11
**accepted** 64:23
65:1 66:3,18,24
70:18,21 76:6,8
79:20,23 80:7,8,14
80:15,17,20,23
81:5 91:2,7,10
97:5,11 98:13
99:18 100:3,19,20
102:6 106:14,19
106:19 107:14
125:2 126:14
127:25 128:4
131:13
**accepting** 128:10
**accidentally**
117:12
**accommodations**
131:2
**account** 22:23
102:1 118:15

145:16
**accounting** 20:23
55:25
**accounts** 32:13
**accuracy** 74:10,24
160:9
**acknowledgement**
162:3
**acknowledgment**
160:12
**aclu** 29:25 30:2
**acquired** 46:24
**acru** 24:14,24
36:25
**action** 1:3,5 5:5,12
8:2 159:15,16
161:1 162:1
**activities** 21:1
30:5
**activity** 37:10
40:24
**actors** 7:24 155:25
**actual** 34:5 47:20
56:6 74:18 117:14
**adamant** 25:13
**adams** 24:23
**add** 57:2,14
138:21,22
**adding** 41:13,14
86:6
**addition** 82:19
**additional** 11:20
41:13,15 73:1
83:19 88:18 107:7
119:14 122:1
126:12 127:18
138:17,19
**additions** 6:13
162:6
**address** 129:14

**adequately** 108:23
143:17
**adjust** 42:17
**administering**
46:3 114:6
**administration**
8:17 13:12,18
15:12,14 16:21,22
17:1,8,9 47:22
57:21 86:1 107:19
115:12 142:20
143:5 146:5,12
**administrative**
43:8 49:4 62:16
71:22 72:2 80:22
98:23 108:4
110:20 134:20
146:10 150:15
151:15 152:11
**administrators**
115:9
**adopted** 17:15,18
31:2,4
**adoption** 16:1,13
**advance** 97:22
99:11
**advanced** 95:18
**advantages** 19:4
**advise** 43:11 44:24
47:3 108:23
**advised** 143:18
**advising** 28:19
48:20
**advisors** 9:2 27:12
**advocate** 34:7
**affect** 62:12 155:1
**affidavit** 23:11
129:1
**affidavits** 21:16,25
104:3

**affiliate** 23:21
**affiliations** 26:12
**affirmative** 3:24
4:20
**african** 11:12
129:8 132:19
135:18,20 137:17
138:10 139:5
**afternoon** 5:9
**age** 140:19
**agency** 60:2
**agent** 115:11
**aggravated** 151:23
**aggregate** 57:11
**aggregation** 74:16
**ago** 5:3,13 46:13
154:12,14
**agree** 27:8 67:15
70:14 79:10,15
90:12 109:7
129:22 131:1
132:16,24
**agreed** 34:23
**agreeing** 75:3
**ahead** 31:6 93:10
93:24 94:4 117:13
**al** 1:5,9 3:13,13
161:1,1 162:1,1
**alabama** 18:1,9
61:3
**alachua** 112:9
147:25 158:6
159:5
**alarming** 40:14
**align** 57:25 95:22
**allegations** 24:8
154:9
**alleged** 107:25
**alleging** 103:8
**allotted** 160:20

Veritext Legal Solutions

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[allow - assumption]                                              Page 4

**allow** 105:8 130:17
**allowed** 4:9 73:21 99:2 102:14 111:15
**allowing** 70:24 91:25 92:7 95:8 95:22 120:1,5
**allows** 93:18 101:10 105:14
**alter** 61:22 62:7
**alteration** 63:7
**alternate** 90:8
**alternative** 74:1 151:25
**amend** 53:11 57:2 57:13
**amended** 154:10
**american** 14:5,8 14:12 15:4 32:3 34:21 129:8 132:19 135:18,20 138:10 139:5
**americans** 137:17
**amicus** 33:9
**amount** 18:17 56:2 72:22
**ample** 143:15
**analogous** 38:14
**analysis** 21:15,23 30:17 37:24 38:12 38:13 43:18 44:19 52:24 53:23 54:9 56:9,19 59:9 68:12,14,15 77:15 81:25 90:12 96:2 110:9 115:4,20 119:13,21 120:13 122:23 124:15 132:17 133:15 134:15,18,20,23

135:14 136:2 138:16 142:20 143:19,20,22 145:1,2
**analytical** 64:19
**analyze** 147:5
**analyzed** 31:4
**analyzing** 42:23
**anderson** 2:5 146:19
**animates** 155:7
**annuity** 33:3
**anomalies** 40:15 40:24 125:9
**anomalous** 70:2
**answer** 3:21 54:13 54:17 110:21 152:23
**anthropology** 11:11
**antonin** 33:20
**anybody** 117:23
**anyway** 79:8 101:7
**apart** 142:18
**apologize** 87:11 96:9 107:15 125:13
**apostrophe** 140:21
**apparently** 102:13 102:25 105:18 121:6
**appear** 21:8,9 43:24 88:2,5 89:7 89:8 95:2 96:3 98:19 100:5 109:11 120:8
**appearances** 2:1
**appeared** 36:20 88:4 131:21 158:9

**appearing** 84:9
**appears** 6:7 35:21 37:7 38:15,21,24 40:18,22 58:11 71:21 84:6 92:21 144:22
**appended** 162:7
**appending** 77:20
**appendix** 152:12
**applicable** 160:8
**application** 79:2,8 79:9,18,19 85:25
**applications** 44:25 45:4 88:22 119:5 122:12
**apply** 124:16
**appointed** 11:7
**appreciate** 89:23 101:13
**approach** 34:23
**approached** 5:12 33:7
**approval** 152:2
**april** 52:15
**arbitrarily** 86:6
**arcia** 148:3
**area** 42:24 148:2 150:10 151:7
**areas** 42:23 44:25 45:4 58:4
**argument** 33:12 119:3
**arizona** 19:9
**array** 18:13
**arrived** 92:10
**arriving** 95:5
**article** 3:15 146:21 147:2
**articles** 32:14 151:5,7

**arts** 11:23
**asian** 136:4,14
**aside** 28:6 42:6 75:6 89:1
**asked** 36:12,15 37:19 42:20 43:3 52:15 110:9 148:4 148:11
**asking** 4:25 5:1,6 12:17 29:7 148:1
**aspect** 9:10
**assign** 151:18
**assigned** 62:14 91:22 152:15
**assistance** 31:15 154:2
**assistant** 9:22 10:2
**associate** 10:3
**associates** 1:19
**association** 48:5
**assume** 4:16 44:5 60:9 67:2 69:23 70:6 71:11 72:1 72:19 78:24 88:20 101:21 105:24 108:25 109:1,2,21 116:5,16 128:22
**assumed** 116:25
**assuming** 7:19 8:8 13:11 28:15 32:23 34:16 45:19 53:19 54:5 63:21 68:7 69:9 73:20 75:12 77:11 87:18,18 118:24 144:25 150:19
**assumption** 23:18 76:9 96:1,1,10 118:23 120:10 145:22 153:8

Daniel Smith , Ph.D.                                     January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[assumptions - behalf]**                                                    Page 5

**assumptions** 69:11
  107:20,23 109:25
  115:21 142:23,25
  143:1
**assuring** 44:1
**atlanta** 1:2 2:9
**attached** 160:11
**attempt** 64:13
**attempted** 84:2
  96:4,14
**attempts** 64:15
**attention** 43:25
**attorney** 22:20
  23:16 35:19
  159:13 160:13
**attorneys** 159:15
**attribute** 116:19
**author** 32:22
**authorities** 116:6
**authority** 9:4
  52:23 115:10
  148:13 158:8
**authorized** 159:8
**automatic** 63:8,9
**automatically**
  42:3
**available** 54:1,8
  68:5 69:12 85:19
  85:21 104:4
  128:14 160:6
**avenue** 1:20 129:9
**average** 55:23
  139:24
**averages** 56:11
**aware** 37:11 44:13
  44:15 66:10 69:14
  69:19 72:21,24,25
  73:3 126:15,21
  127:16 141:11
  147:23

**awareness** 84:16
**awesome** 33:13
**awful** 110:20
  114:17 133:12

**b**

**back** 10:23 12:5
  22:24 28:13 42:7
  46:2 56:1 64:19
  65:13 69:1 75:23
  76:21 89:4 90:21
  90:23 91:1 93:25
  94:1,23 105:4
  113:11 117:9,11
  125:11 127:25
**background** 6:10
  29:4 31:12 47:22
**backwater** 8:24
**baggage** 154:24
**balanced** 56:8
**ballot** 3:12 12:17
  16:5,19 18:2,4
  26:13,21,25 32:24
  34:6 35:23 36:2
  40:15 42:4 45:1
  45:19,21,22,22
  52:7 55:5,6,8 56:6
  59:16,23 65:9,11
  65:14,17,17,19
  66:9,10,12,17,19
  66:23,23 67:8,18
  67:18,19,23,24
  68:11,18,19,23,24
  68:25 69:5,5,19,23
  69:25 70:7,8,8,11
  70:21 73:25 74:7
  76:6,8,12,23,24,25
  77:9 78:16 79:2,6
  79:17 80:4,8,9,12
  80:23 81:5 83:21
  84:3,7,7,7,19,22
  85:1,1,2,3,8,14

86:9,10,11,12,14
86:24 87:1,1,2,6,7
87:14,15,16 88:2
88:10,10,23 89:7
89:13,13,15,16
91:10,11 92:4
94:25 95:12,18
96:4,4,5,12,25,25
97:5,8,10,15 98:4
98:6,9,12,12,13,18
98:25 99:14,18,19
99:22,25 100:4,6,6
100:7,8,19,19,20
101:4,23,23
102:11,14,16,21
102:24 104:5,10
104:13 105:5,9,10
105:10 106:7,12
107:2 108:12,13
108:14,25,25
109:1 111:23
112:8 118:22
123:11,14,17
124:13,25 126:2,8
127:6,10,25,25
128:4,15,18
129:23 130:1,9
131:5,13,22 132:3
132:21 133:6,10
133:16,19,25
135:1,18,25
138:24 139:12,19
140:15 141:18,18
142:3,14 144:1,8
144:13 150:11
155:5
**ballot's** 130:3
**ballots** 16:16
  37:14 38:9 42:25
  52:12 59:22 62:23
  62:24 66:5,6 67:5

69:22 72:6,18,22
73:1,20 77:3
79:23 100:5
103:22,25 105:18
107:7,15 109:22
111:11,15 113:22
125:7,9,16 126:6,7
126:13,16,22
127:2,8,18,23
128:10 130:18
133:22 135:1
136:19,21 137:2,4
137:8,9,9,12,13,19
137:24,25 138:1,4
138:5,9 139:13,23
140:1 141:8,12
142:6,10 143:9
144:6,11
**bandy** 24:5
**banner** 21:22
**barry** 16:12
**based** 25:25 44:18
  44:19 47:15,16
  48:25 51:21 57:20
  58:3 74:25 84:4
  90:2 109:14 120:9
  139:2 143:19,22
**basically** 21:23
  51:5 54:19,22
  58:19 76:17 83:8
  92:12 96:13
  125:19 140:6
**basis** 56:21
**battleground**
  13:19,21
**becoming** 122:21
**beginning** 78:1
**begins** 78:10 81:19
  112:19
**behalf** 1:15 29:24
  35:8

Veritext Legal Solutions

Daniel Smith , Ph.D. January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[behavior - case] Page 6

behavior 18:16 155:1
beholder 132:7
believe 36:22 49:14,23 64:7 66:16 154:7
believing 105:13
beneficial 27:5
benefit 80:16,21 81:4 138:16
best 65:21,25 68:5 77:22 114:6,8 115:25
better 39:8 52:8 59:20 114:11,12 151:13,13
beyond 26:5,7 39:12 44:20 106:17
bias 129:4 154:3
big 14:11,11
biggers 146:22
biggest 41:11 106:18
binary 20:2
biology 11:24
bipartisan 34:11
birdseye 104:8
birthdate 129:5
bit 6:11 51:9 60:18 61:14 80:10 110:11 131:21 141:22 153:2,18
bivariate 137:7 138:20 140:4,6,12 140:16 141:2 142:12
black 45:17 134:4 134:6 135:1 136:5 136:13,20,21 137:3,4,19 139:11

139:12 141:10 142:1,7,9 143:8,12 144:17,22
blacks 137:8,10,25 138:2,4,5 139:19 139:23 140:1
blame 74:4
blanks 100:12
blog 21:21
blue 30:14
board 26:13 27:2 27:4,7,17,20 46:8 46:8,15,18 47:12 48:10,17 59:13 108:5 116:6 143:17 151:17
boards 27:9 116:9 128:7,20
body 115:7 129:3
bold 61:20
bone 115:7
bono 28:21 33:10
book 15:22 16:10 88:6 89:8,18 93:7 122:19
books 114:13 116:4
bottom 36:3 94:17
brad 1:8 4:7 161:1 162:1
break 31:7 75:17 75:19
breakdown 127:22
breaks 4:21
brenda 24:25
brief 5:14 10:4 33:9,11 34:8 75:22
briefly 12:5 101:13 146:24

147:1
briefs 44:10
brilliant 147:3
bring 50:12
bringing 83:9 99:7
british 3:14
broader 88:11 89:9 145:21
broadly 8:19 25:3
brought 24:23
broward 24:24 25:4
brown 22:17
bryan 2:10 5:4
btyson 2:10
budgeting 15:9
build 108:19
built 59:24
burden 16:12
bush 116:12

**c**

c 1:19 65:20 66:2 67:7,13 69:20 148:4
california 16:17 24:4 27:14,14 34:15 36:6 48:14 60:25
call 25:22 29:16 34:18 45:14 88:7 108:10 140:22
called 24:7 47:2 50:23
calls 28:21 55:7
camera 29:1,3
campaign 5:14,16 22:14,15 35:22 84:16,18,21 135:17
campaigns 13:5 15:7 18:20 85:4

85:19 155:4
canceled 66:3 79:19 80:20,22 92:19,20 101:23 101:24 102:11,13 102:14,16,22,25
cancellations 90:22
candidate 22:13 22:15 23:3,9,18 62:18 140:24
candidates 22:11 62:17,17
canvassing 128:19
capacity 1:8
cape 23:12,14,15
capture 119:7 133:21
captured 124:18
card 26:3
careful 147:4
carolina 39:19 40:3,6,12 48:10 60:22 61:11 127:3 145:15,25
carried 116:22
carries 154:23
carrying 116:10 144:4
case 1:3 6:6 8:4 10:1 16:17 19:18 20:14 24:14,23 26:6 29:21 33:4 33:22 34:17,22 35:2,3,5,6,9,11 35:16,21 36:5,8,16 36:24,25 37:1,9 38:13 41:17,18 42:7 44:2,10 49:3 49:8 58:10 59:6 59:21 63:16 68:3

Daniel Smith , Ph.D. January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[case - clear] Page 7

70:16 72:9 89:17
89:25 93:9 111:4
111:5,6 112:24
113:6,8,17 148:3,3
148:16 152:7
154:8,9
**cases** 24:20 26:10
28:22 31:11 34:19
37:19 43:20,22
52:10 77:21 86:6
104:18 114:10,24
139:10
**cast** 38:9 45:18
55:5,6 56:5,7
58:15 62:24 66:18
71:20 76:7 82:8
82:20 84:2 86:24
92:4,13,16,17,18
93:3 94:20,21
96:4,5,25 100:5
106:1 107:1,14
118:22 123:10
126:13 134:25
136:20,21 137:3,4
137:8,10,12,24,25
138:1,4,6 139:12
139:13,23 140:1
141:8,9 142:2,6,10
150:11 156:5
**casting** 89:16
112:9 137:18,18
**casts** 69:5
**categories** 55:4
56:17 86:23 94:18
128:1 133:10,11
136:8 142:2
**categorize** 22:3
78:5 85:7 86:18
132:8 133:13
**category** 42:14
106:19 128:13

135:3 136:7,9,11
**cause** 3:13 27:18
28:1,3 41:4 43:14
50:8
**caused** 49:19
**causes** 43:14 49:15
50:10 142:14
**caveat** 91:15
**caveats** 69:16
**cells** 103:18
**center** 3:12 26:14
26:21 27:1
**centralized** 43:25
50:18 51:15,20
**certain** 8:13 24:5
59:5 109:2 113:23
122:20 153:25
155:15
**certainly** 9:10
12:25 13:5 15:14
17:12 21:21 27:15
37:20 48:3,6 50:5
53:15 61:16 62:10
67:6 69:13,21
89:21 97:6,9,18
98:24 109:8
111:24 118:7
122:22 123:7
133:24 135:23
138:21 143:3
146:2 151:2
**certainty** 63:15
135:4,5
**certificate** 158:4
159:3
**certificates** 3:6
**certified** 58:14
**certify** 158:8
159:7,12
**chair** 11:7,8 14:25

**challenge** 42:16
**challenged** 148:5
153:9,12
**chance** 37:22
57:13 80:5,8
103:23 129:10
134:17
**change** 19:1 68:12
68:14,15 74:6
77:8 80:6 101:17
108:12 127:17
161:4,7,10,13,16
161:19
**changed** 6:16,18
41:25 67:14
127:12 133:4
**changes** 13:18
16:23 19:14,16
30:18 31:4 114:7
116:8 126:15,24
155:8 160:10
162:6
**characteristic**
93:2
**characterization**
43:2 90:11
**characterize** 15:20
22:6 24:5 27:15
106:21
**characterized**
65:5
**charged** 42:12
**charges** 120:20
**charging** 42:13
**check** 64:9 118:10
124:3
**checks** 119:9
**chose** 77:22,22
85:24 103:4
**christian** 24:23

**chunk** 13:8
**circle** 2:8
**circuit** 24:13,22
34:23
**circumspect**
155:17
**citing** 151:6
**citizen** 112:13
**citizens** 147:15
148:7,10
**citizenship** 150:7
150:8,17,21
151:19 153:12
**city** 62:11
**civil** 1:3 4:10
34:21
**claim** 44:14
**claimed** 148:7
**claims** 44:13
**clarify** 54:20 77:1
101:15
**clarity** 90:20
**class** 7:9,15 14:10
14:11,14,16,23,23
14:24 15:5,12,13
15:15,21 17:8
**classes** 9:16,18
12:7 13:6
**classic** 130:15
**classified** 124:8
**clean** 25:14 54:10
100:12 110:17,19
**cleaned** 51:9
**cleanest** 40:7
**cleanness** 110:4
**clear** 43:7 48:15
51:10 64:5 74:20
78:20 87:5 112:19
112:25 113:19
114:25 139:16

Daniel Smith , Ph.D.                                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[clearly - conditioning]                                                    Page 8

**clearly** 83:25
100:4 109:10
114:21 130:19,19
130:21 137:21
144:2 155:14
**clerks** 148:18
**clients** 21:14 22:2
22:3,3
**close** 11:17,21
12:3 14:9 55:16
57:7,16 60:25
62:23 63:10
119:11 122:13,25
**closely** 39:18 48:4
119:22
**closing** 88:7 89:9
89:18 93:8 117:19
122:19
**coauthor** 17:10
151:9
**coauthored**
115:24
**coauthors** 17:19
48:21
**code** 47:21 63:16
64:22 65:9,21
66:18,22 67:18,19
69:5,25 70:7,19
76:6 80:3 81:15
82:5 84:10 87:1,7
87:14 88:10 91:22
96:4,12 97:15
98:4 100:7 101:22
104:13 105:3
106:5 108:25
115:23 116:3,8
120:16,19 121:3
121:21 122:3
123:13 125:25
127:9,11 131:15
131:15,16,19

133:16,25
**codebook** 68:4
**coded** 125:25
**codes** 45:11 47:18
50:1 65:13 66:1
67:12 99:15
112:21 113:16
114:13 116:11,14
132:5 152:4
**coding** 19:12
41:22 51:12 65:24
69:14 120:4 132:1
**coincidental** 20:22
**coined** 24:2
**colleague** 47:5
**collect** 53:25
**collected** 34:1
**collective** 8:2
**college** 11:23
**colorado** 16:17
48:13
**column** 91:11
97:20 99:9 100:15
101:16 103:8,11
103:20,21 104:19
106:5,11
**columns** 94:15,17
94:22 139:14
**combinations**
90:22 91:25 97:12
**combine** 91:25
101:9
**combined** 12:3
91:16 120:3
**come** 5:10 10:23
48:14 50:4 64:19
73:21 77:3,5
95:14 105:4
111:24 128:11
131:25 132:12
133:6 143:4

147:14
**comes** 76:12 86:10
111:23 130:1
143:9
**coming** 23:2 28:12
34:12 60:4,10
73:5,10,20 90:7
94:12 100:20
110:3 114:16
115:14 130:16
131:6 132:3 135:9
**commensurate**
87:23
**comment** 27:8
29:17
**comments** 155:13
**committee** 9:19
**committees** 35:23
36:1
**committing** 25:18
**common** 3:13
27:18,25 28:3
**communities**
149:25
**compare** 51:16
139:11 148:25
149:3
**compared** 38:12
74:18 149:8
151:22
**comparing** 18:19
61:3 125:3
**comparison** 20:2
20:10 117:14
**comparisons** 18:9
32:20
**compensation**
7:25
**complaint** 44:9
154:8,11,15,16

**complaints** 154:10
154:11
**complete** 53:17
159:11 162:8
**completed** 9:20
160:17
**completely** 28:21
29:6 115:13 130:4
**complicated** 25:10
75:4 147:2
**comprehensive**
7:2
**concede** 86:21
102:9 130:4
**conceivable** 92:25
**concentrating**
91:1
**concern** 89:1
106:10,11 108:16
**concerned** 153:11
**concerns** 75:9
106:16,18
**conclude** 43:10
137:1
**concluded** 157:8
**conclusion** 45:5
71:21 73:23
109:16 115:21
123:14 142:17
143:18 145:8
149:13
**conclusions** 48:24
48:25 64:20 143:4
144:12 145:6
**condition** 95:11
**conditionalities**
147:12
**conditioned**
136:15 142:7
**conditioning** 83:4
83:5

Daniel Smith , Ph.D.                                      January 28, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[conditions - counts]**                                            Page 9

conditions   109:6
conduct   134:15
  135:14 136:1
conducting   38:11
conform   147:11
confusing   46:17
conjunction
  114:15
connected   91:5,17
  159:15
connection   43:13
conservative   22:5
  27:10,16 79:22,25
  80:13,18,25 82:6
  92:6
conservatively
  91:22
consider   26:25
  50:5 128:7 155:19
considerably
  73:12
consideration
  133:2 138:15
considerations
  91:12
considered   138:17
considering
  126:25 142:13
consistencies
  97:18,19
consistent   59:3
  107:6
constant   19:16
constantly   107:21
constitutional
  25:17 35:9
consultation   42:20
consulting   28:9
  29:23 30:5
contact   26:1,1
  30:2,8 36:17,19

41:15 78:23 79:21
contacted   23:16
contacts   86:13
contain   93:22
  113:13
contained   120:10
containing   71:19
contains   54:22
  66:5
contest   62:10,15
  63:5,13,14,18
context   5:17 32:17
  65:15 72:8 155:25
contexts   25:18
continuation   7:19
continue   38:19,20
  118:2
continued   12:14
continuing   73:16
  122:10,11
contrary   153:8
control   140:17
  151:22
conversation
  76:22,23
coordinating   8:2
coordination   7:23
  51:6,23
copies   160:14
copy   157:1
coral   23:12,15,15
corp   3:13 20:24
corporation   36:25
  51:22
correct   6:1,2,12
  6:22,23 7:20 8:10
  9:17 20:10,17
  22:23 24:10 26:14
  26:15 27:18,19
  29:25 30:1,19
  34:16,17 35:24

36:7,9,17,18 38:23
  39:3,4 40:21
  42:10 43:1,4,5
  44:14,21,22 46:4,5
  47:9 48:18 49:2
  49:21 50:3 54:23
  58:21,22 59:1,4,10
  63:4 65:3,10,18,19
  67:5,9,10,19,22
  68:8,9 69:2,8,18
  70:22 71:5 72:3
  72:17 73:7,10
  74:2,12 75:1 76:9
  78:16,17,19 79:3
  79:24 81:10,12
  82:15,16,16,21,22
  83:1 84:19 85:4
  85:22 87:7 91:18
  92:15,22 93:5,6,9
  93:13,23 94:3,25
  96:5 97:7 99:20
  102:3 103:5
  104:24 106:8,10
  107:8,21 108:1
  109:5 110:1 111:4
  113:1,19 115:1
  116:24 117:1,16
  121:18,21,24
  122:4,9 123:15,16
  124:20 125:17,22
  126:3,23 127:8,20
  127:21 128:1
  129:2,24 130:10
  133:17,23,24
  134:5,8,12,13
  136:22,23 141:16
  142:15,16 143:12
  143:21 162:8
corrected   76:13
corrections   162:6

corrective   146:3
correctly   9:23
  31:23 41:10 54:24
  65:6 122:3 131:17
  136:12 148:9
correlated   140:8
corresponding
  121:22 122:7
corrine   22:17
costs   8:1
council   8:14
councils   8:6
counsel   2:6,11 5:9
  31:18,20 33:7,8
  42:20 44:5 159:13
  159:15 160:14
count   56:20 62:25
  63:1 88:14 104:13
  106:14 107:7
  127:8
counted   61:22
  72:10,11 73:17
  90:19 126:2,9
  127:6
counties   19:3 38:8
  43:24 49:23 51:11
  56:4 57:1,6,9
  58:12 59:18,24
  60:10,14,15 66:14
  74:16,18 85:17
  109:11 112:2
  113:23 114:20
  129:20 132:14,19
  137:14,23 139:18
counting   62:23
  73:1 80:1
country   13:14
  126:18 152:4
counts   97:10
  101:1,4 105:2
  127:11

Daniel Smith , Ph.D.    January 28, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[county - decisions]    Page 10

**county** 18:3 22:19 24:24 25:4 35:8 39:8 40:2 43:12 43:21,23 46:3 47:12 49:24 52:3 52:21,21 56:3,11 56:21,21 57:5 58:12,12 62:11 66:11 101:3 109:4 111:18 112:9,11 112:11,12 118:10 122:11 129:19 137:3,5 138:3,8 139:14 140:22,25 141:11 143:18 147:25 158:6 159:5
**county's** 59:5
**couple** 5:9 6:18 31:10 34:19 61:2 101:15 108:11 149:14
**course** 14:20,21 15:3 58:1 114:2
**courses** 14:1,4,7 15:2
**court** 1:1,19 20:5 23:6 34:12 107:6 108:11 116:17 126:2 130:2 156:22,24 157:1,3 158:15 159:7,20
**courts** 15:9
**cover** 15:11 17:4
**covered** 15:18 90:6 106:22 107:14
**covers** 17:12
**create** 71:3 114:17
**created** 60:8 83:17

**creates** 51:18
**credit** 55:10 56:21 58:5,6,18 72:6,16 122:6 127:5
**crew** 29:3
**critically** 50:13 105:17 131:5
**cross** 15:24 19:3,4 19:20 20:13 32:10 120:23
**cry** 156:4
**cured** 52:12 111:16 112:1
**curing** 52:13 59:22
**curious** 33:17
**current** 32:25
**currently** 13:24
**cutoff** 73:21 118:3 133:3
**cv** 1:3 6:9,13 14:1 20:15 22:25 26:15 28:9 29:23 30:5 30:15 35:13,22 36:24
**cycle** 62:23
**cycles** 42:3
**cynic** 57:24

**d**

**d** 1:13 3:1 22:8
**d.c.** 8:25
**dade** 112:11 148:10
**daily** 40:15 85:23 86:8
**dance** 115:10
**daniel** 1:15 3:4,11 4:2,6 129:5 146:22 158:9 159:9 160:5 161:2 161:24 162:2,4,12

**darn** 11:20
**data** 15:24 19:20 40:15 42:24 43:18 43:19 44:18,19,20 45:9,10 49:1,4,12 49:18 50:10,12,16 51:10 53:16,25 54:1,20,25 60:8,10 65:20 67:11 68:16 68:16 71:2 72:3 77:19,20 78:7,11 83:14 90:13 92:24 93:18 101:11 104:4,8 107:19,21 108:3,3,7,7 109:25 110:13,19,21,23 115:16,20 117:3,5 120:1,5 129:14 132:25 134:14,21 135:8 136:6 139:14 142:11,24 144:23 145:6 151:15 152:11
**database** 53:18 64:8 77:12 79:15 89:3 91:18 92:7 92:22 93:12 118:16 119:15 143:19
**databases** 50:20 77:12 127:19
**dataset** 141:21
**datasets** 93:19 95:9 140:12 143:23
**date** 1:17 21:10 53:23 54:12 73:21 79:21 86:9,11,15 118:3 119:12 161:24 162:12

**dated** 6:15 93:5 100:17 159:17
**dates** 45:9
**day** 16:7,7,7,8 55:3,3,7 69:6 71:12,20 72:6,11 73:2 76:8,12 88:3 94:24 95:17 97:23 98:7,13,20 99:2,19 102:1,12,15,21 103:1,5,23 104:6 104:12 105:11 111:16 117:19 118:6 119:4,7 128:11 130:2 158:11 159:17 162:15
**days** 20:3,4 119:1 122:19 160:17
**dc** 2:3
**deadline** 111:24 117:20 118:4 123:1 130:10
**deadlines** 119:10
**deal** 80:25 111:8
**dealing** 142:9 151:18
**dealt** 35:25
**dean** 11:7
**debora** 1:22 158:14 159:7,20
**december** 27:3 54:3
**decent** 18:17
**decided** 132:12
**decision** 33:19 116:12 128:3,14 128:16 130:17 150:6
**decisions** 77:24 132:2 150:15

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[decisive - directives]                                              Page 11

decisive 24:22
declarations 21:16
  21:24
declare 162:4
deduped 91:3
deduping 91:21
deduplicated
  96:11,21
deduplicating
  95:12
deemed 98:18
  133:10 162:6
deeper 15:19
defend 7:2,4 25:2
defendable 130:21
defendant 4:7
  25:4 35:7
defendant's 3:8
  5:21 6:3 21:4
  26:16 27:22 37:4
  146:14
defendants 1:10
  1:15 2:11
defended 34:16
defender 28:12
defenders 28:14
  28:24
defending 7:8
  34:15 35:4,19,25
deficiencies 49:15
deficiency 49:13
  49:20 50:3,9
define 25:9 51:3
  51:22 154:21
definitely 26:7
  53:7 59:5
definitive 151:3
degree 6:22,24
delivered 68:11
  105:10

delivery 68:24
  69:20,24 70:9
  85:2 88:23 109:1
  123:18 133:21
delve 36:13
democracy 12:21
  13:3,7,17 15:7
  32:23,24 33:1,5,9
  33:11,21 35:23
  155:3
democrat 23:20
democratic 22:8
  23:17 25:1
democrats 155:6
dense 137:18
denver 10:9,16,24
  12:6,6,15 14:13
department 11:6
  11:14 115:25
depends 135:23
deponent 160:13
  162:3
deposed 4:17,23
  23:11
deposing 160:13
deposition 3:10
  4:6 5:7,24 157:6,8
  159:9
depressing 153:24
depressive 150:18
  153:23
depth 20:9,13
describe 13:22
  59:7 94:7 98:14
described 88:21
  94:2
describes 26:21
describing 81:7
  119:23
design 85:11 101:7
  116:23 141:18,19

designating 132:3
designed 79:16
  116:24 155:14
designs 151:13
despite 59:19
  112:19
destroyed 130:22
detail 102:23
  147:22
details 29:14 37:3
  80:2 98:21
determination
  121:5 128:24
  129:17
determine 41:4
  79:21 98:24
  122:24 134:16
detzner 35:17,20
development 8:5
difference 81:8
  101:16 102:2
  144:20
differences 18:6
  109:10 113:24
different 8:4 9:7
  15:13 35:5 41:22
  50:23,24 51:16
  61:14 78:6 79:14
  85:21 86:20 88:12
  108:20 111:12
  112:21 114:12
  116:25 121:10
  123:20 132:2,5,11
  133:9 136:25
  137:20 153:23
  155:9
differential 74:22
  75:6 104:20
  143:11
differentially
  111:20 112:3

144:24
differentiate 21:1
differentiates 55:6
  136:14
differentiation
  16:5
differently 61:13
  86:19 139:1 152:5
differs 141:22
difficult 19:13
  131:9,25 132:12
  139:15 145:4
  151:16
difficulty 38:22
  75:3
dig 5:5 47:20
  89:24
digging 47:3 51:10
  57:19
dillon 2:2
direct 3:5 4:4
  12:20 13:3,7,16
  15:7 32:22,24
  33:1,5,9,11 35:22
  37:21 155:3
direction 29:5
  57:7,10,11 58:13
  58:14 130:12
  143:20
directions 109:12
  111:7 114:3
directive 41:12
  112:2,20,25 113:3
  113:12,19 114:17
  114:19 130:9
directives 109:12
  109:13,15,17
  111:2,7 114:1
  115:1,19 116:10
  116:17

Daniel Smith , Ph.D.                                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[directly - efforts]                                              Page 12

| | | | e |
|---|---|---|---|

**directly** 13:5 41:1
50:25
**director** 11:12
130:20
**disability** 8:1
**disadvantages**
19:5
**disaggregate**
58:10
**discarding** 90:25
**disconnect** 144:3,9
**discovered** 49:19
58:24 78:11
**discovery** 4:8
**discreet** 42:23
**discrepancies**
40:19 56:10 60:6
63:11 66:13,20
75:15 78:25 84:14
86:22 90:9 98:16
108:16 109:9,20
109:24 110:11
112:6
**discrepancy** 64:5
64:10 71:20 73:6
73:14,18,24 74:9
76:16 81:20,24
82:9,25 113:2
**discretion** 51:11
114:1,2 115:7,9
116:20 129:24
130:5,11,24,25
131:4,22
**discrimination**
139:5
**discuss** 42:19
63:22
**discussed** 16:11
32:4 71:25 82:23
104:21 107:5,24
123:17 126:1

**discussing** 44:18
**discussion** 18:23
84:25 88:19 117:7
147:19 156:16,21
**disenfranchise**
130:13
**disparate** 143:7,10
**disparities** 57:18
**displaced** 130:23
**disposition** 68:19
68:25 77:19 78:15
85:25 120:25
133:7
**disproportionately**
45:18 135:19
**dispute** 106:9
**disseminating**
116:7,18
**dissertation** 8:21
**dissuaded** 9:1
**distribution**
136:25
**district** 1:1,1
**dividends** 33:4
**division** 1:2
112:19
**dnc** 3:13 36:25
37:8 51:22
**doctorate** 7:18
**document** 35:17
89:14
**documenting**
52:16
**doe** 33:13
**doing** 46:20,23
47:16 54:9 59:9
60:14 65:25 66:14
86:8,20 93:15
96:17 109:4,5
114:8,20 121:16

133:20 140:10
**domestic** 130:18
**doppelganger**
149:9
**dots** 136:25
**doubled** 149:18
**doubles** 149:16
**doubt** 80:16,21
81:5
**download** 65:23
**dozens** 32:15,16
**dr** 9:15 76:2 117:9
156:17
**drafting** 31:15
**drafts** 31:17,21
**draw** 145:6
**drawn** 145:8
**drew** 43:13
**driven** 155:1
**driving** 124:11
**due** 25:20 147:11
**dug** 115:22
**duly** 4:3 158:10
**duma** 2:7
**duplicate** 39:1,6
39:23 76:19 78:2
78:5 79:3,10
80:19,25 100:3
**duplicates** 58:25
77:14,21 78:12
80:15 81:3 90:18
107:22
**duplicating** 39:10
**duplicative** 40:24
41:5
**dust** 153:15
**duties** 14:25
**duval** 22:19
**dynamic** 13:22
**dynamics** 48:22

134:23 153:18

**e**

**e** 1:13 3:1 24:3
35:16 50:19,21
130:19 161:3,3,3
**earlier** 9:15 32:4
34:22 51:21 84:25
91:13 93:21
104:22 107:5
117:13 123:18
133:7 154:7
**early** 9:11 16:8
18:4 19:8,11,25
20:3 22:18 27:3
74:15 123:11
**easier** 6:11 110:19
**easiest** 94:9
**easily** 139:9,10
**east** 129:6
**easy** 28:7 58:22
**edited** 71:8
**editions** 32:15
**edits** 31:21
**education** 6:19
15:10
**educational** 6:10
**effect** 16:17 145:9
149:5 150:18
153:23
**effective** 18:10
**effectively** 142:8
**effects** 16:11
140:23 143:8,10
147:5 150:14
151:1
**effort** 34:8 76:16
80:13,24 81:14,23
82:6,8 112:7
147:6
**efforts** 8:2 26:24
30:10 59:20 81:6
84:17 110:17

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[efforts - example]                                                    Page 13

146:3
egregious   103:14
  103:15,16
eight   33:19
either   19:12 24:16
  32:16 55:2 96:16
  99:19 100:4
  101:20 116:6
  126:14 130:12,18
  142:2,7 150:25
  151:20 155:23
election   3:11 5:15
  9:13 13:12,15,18
  15:11,14,23 16:7
  16:14,21,22,25
  17:9 20:16,19,24
  21:7,13,18,18,22
  22:1,12,23 23:12
  24:6,17 25:3 26:2
  28:2 29:21 34:15
  35:8 42:3 43:1
  45:19 46:3,7,8,15
  46:18,21,23 47:11
  47:22 48:13,17
  53:19,21 54:9
  55:2,3,3,7 57:20
  57:23 58:15 59:13
  61:22 62:7,12,19
  62:21,22 63:5,7,14
  63:16,18,21 67:25
  68:20 69:6 70:3
  70:13 71:12,20,22
  72:6,11,23 73:2
  74:10,12,14 76:8
  76:12 80:3,11
  84:1 85:12 88:3
  93:8 94:20,24
  95:17 96:5,24
  97:23,23 98:7,13
  98:20 99:2,12,18
  100:9,17 101:4,25

102:12,15,21
103:1,5,23 104:6
104:12 105:7,11
106:1 107:8,15,18
109:4 111:1,2,14
111:16,21 113:4
113:18 114:25
118:1,3,4 119:2,4
119:17 122:20
123:6 128:11
129:12 130:2,20
139:3 142:20
143:5,17 145:14
146:8,9 152:4
electionet   50:21
elections   3:13 8:18
  12:7 13:5,6,8 15:7
  22:9 23:14,22
  25:1 27:25 33:6
  41:8 48:4,10
  49:24 62:11,22
  63:10,19 104:16
  104:18 106:13
  108:5 112:19
  114:6 116:6
  126:18 128:6
  130:17 148:19
elector   132:11
electoral   9:5 32:2
electronic   69:4,6
  69:10,19 84:7
  156:23
electronically
  96:25 99:20
elegance   99:5
elegant   99:6
eleventh   24:13,22
  34:23
eligible   101:25
  118:22 119:16
  120:10 123:6

124:18 130:2
eliminate   76:18
  77:14
empirical   21:14
  21:23 36:12
  143:24
empiricist   50:12
  151:12 154:4
employee   159:13
  159:14
employers   7:24
employment   9:21
ended   10:10
energized   153:13
enforcing   105:18
enfranchise
  130:13
engaged   33:2
  139:4
english   2:7
enjoy   28:11
ensure   79:16
enter   118:2
entered   112:21
  119:15 124:17
entering   39:11
enthusiasm   17:5
entire   91:18
entirely   49:18
  109:3
entity   47:24
entries   39:2,6,24
  40:4 41:5 60:6
  77:12 78:5 79:3
  79:17
entry   60:8 71:3
  72:3 78:9 79:14
envelope   129:15
  141:19
environment
  12:12

equal   57:7
equally   112:15
  134:16
err   58:4
errata   160:11,13
  160:17
error   53:1,13
  62:16 80:22
errors   38:10,17
especially   52:12
  52:17 67:11 91:1
  118:5 129:25
esquire   2:4,5,10
et   1:5,9 3:13,13
  161:1,1 162:1,1
ethnic   142:2
ethnicity   120:16
  120:19 121:3,16
  121:21 122:3
  136:15
euphemism   25:22
evens   55:23 57:11
  57:15
eventually   31:4
everybody   91:6
evidence   135:24
  143:16 156:3
evolved   78:8
exact   119:24 150:6
  150:6
exactly   42:18
  64:13 94:10 109:4
  148:18
exam   7:2
examination   3:5
  4:4 82:14
examine   149:23
example   19:25
  55:20 63:5 64:8
  103:8 122:24
  130:15,25 135:19

Daniel Smith , Ph.D.                                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[example - file]**                                                                Page 14

138:3
**examples** 32:16
  51:8
**exception** 30:7
**exceptions** 118:8
  119:8 130:6,14
  148:21
**exciting** 149:17
**excluding** 140:9
**exclusive** 72:4
**excuse** 16:4,16
**exercise** 131:3
  148:25
**exhibit** 3:8,10,11
  3:11,12,13,13,14
  5:21,24 6:3,5 21:4
  21:7 26:16,19
  27:22,24 31:13
  37:4,7 40:13
  112:16 113:18
  146:14,17,24
**exhibits** 3:8
**exist** 79:10 90:9
  93:19 129:19
**exists** 64:6 76:14
  77:13 131:8
**expansion** 17:20
**expansive** 17:14
**expect** 57:21 72:15
  73:6,17 79:3
  104:22 122:14
  135:21 149:8
**expectation** 59:17
  96:16
**expenses** 42:9
**experience** 28:23
  39:5 57:20 58:3
  61:12 63:3 67:4
  72:5 111:1 118:1
  146:7

**experienced**
  135:14
**experiment**
  152:14
**experimental**
  152:10
**expert** 3:10,11,14
  6:6 21:15,24
  24:19 25:4 26:10
  34:14 35:2,4,12
  36:5,11,15 37:7
  42:12 52:10 80:2
  145:5 148:5 151:7
**experts** 33:8
**explain** 18:25
  75:14 81:8 102:19
  112:20 146:24
  153:2
**explained** 134:17
  157:6
**explains** 10:16
  109:9
**explanation** 64:5
  64:10 74:1,19
  100:22 107:11
  110:12 126:3,4
**explanations** 90:5
  90:8 107:24 108:3
  108:11
**exposed** 17:25
**expressive** 155:13
**extending** 130:3
**extensive** 48:1
**extensively** 32:2
  48:11
**eye** 132:7
**eyebrows** 24:21
  106:3

**f**

**face** 25:23 134:24
**facetious** 152:1
**facets** 8:22
**fact** 43:17 49:22
  50:8 56:1 57:17
  58:9 86:21 110:5
  115:13 136:14
  149:6 150:24
**factoid** 57:14
**factors** 19:17
  135:10,15 140:10
**facts** 44:5
**faculty** 7:13,16 9:1
  11:15,16,17 12:16
  14:9,19
**failed** 65:24
**failings** 115:17
**fails** 160:19
**failure** 41:9 43:11
  44:14,24 50:1
  74:2 90:2 108:22
**fair** 1:5 5:5,12
  18:17,21 21:17,20
  22:8 38:17 43:2
  50:11 55:3,12
  64:14,17 67:20
  76:19 85:5 90:10
  103:13 104:4
  117:24 119:22
  142:24 144:21
  145:10,11 161:1
  162:1
**fairly** 70:2 108:9
**fall** 12:18 53:23
  54:10 145:13
**familiar** 25:6 28:2
  34:6 50:18,22,25
  117:20 118:11,12
  126:17 154:8,15
  154:18

**far** 30:22 55:24
  90:6 145:13
  154:13
**fascinating** 13:17
  33:18,18 152:18
  152:24
**fascination** 8:25
**fashion** 140:8
**faxed** 130:18
**february** 158:12
  159:17 160:3
**federal** 4:9 35:1
  72:25 147:10
  152:5
**feel** 110:14
**feet** 115:6
**fellow** 28:24
**fellowship** 10:17
  10:18
**felony** 25:18
**felt** 27:4
**fewer** 14:19 70:22
**field** 65:9,11,15,17
  65:17 68:8,10
  70:9,19 76:24,24
  77:13 79:14 83:22
  85:8 86:14 88:23
  94:18 123:14,17
  124:13 132:15
  133:16,19 154:17
**fields** 65:18 67:7
  70:10 85:6 94:6,7
**fight** 1:5 5:5,12
  161:1 162:1
**figure** 5:2 47:21
  77:22 112:5
  136:24 139:3,16
  139:17 141:20,22
  141:23 145:1,2
**file** 1:3 38:12,12
  38:23,23 39:24

Daniel Smith , Ph.D.                        January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[file - forefront]**                                          Page 15

40:2,5,20,21 41:20
45:7,12,14 53:10
53:17,18,21 54:2,4
54:22 55:7,11
57:22 58:19,21,25
59:14 60:3,4,5,7
62:8 63:23,25
64:1,11 65:2,23
66:5,22 68:18
69:15 70:21,22
71:3,7,10,12,14,15
71:19 72:1,14,17
73:4,7,15,15,16,25
74:7,23,25 75:13
76:7,19,22,25 77:2
77:6,9,14,18 78:2
78:3,8,14 79:1
81:9,9,21,22 82:15
82:23 83:4,11,17
83:20,25 84:10
85:9,18,21,25
87:13,22,25,25
88:5,6,18 89:7,8
89:17 90:7,8,15,17
91:4,5,6,7,9,11,17
91:20,22,23,24,24
92:1,3,5,9,13,18
92:24,25 93:1,1,4
93:11,18,22 94:1,3
94:11,12,18,20
95:8,12,19,20,23
95:24,24,25 96:3
96:11,18 97:3,5,8
97:12,16,21,25
98:7,12 99:5,14,15
99:16,21,22,25
100:15,15,17,21
100:24 101:17,22
102:2,17 104:21
104:22,24 105:4,5
105:22 106:2,4,12

106:15,20 107:1,2
107:10,21 108:13
109:2 110:10
111:3 113:13
117:14,15,23
118:9 119:6,20,20
120:3,6,8,9,10,15
120:16,23,23,25
121:4,7,15,16,17
121:19,20,22,23
122:2,5,7,8,14,24
123:10,16 124:9
124:10,19,25
125:3,4,6,8,16,24
131:16 136:11
143:2,24
**filed**  6:14 22:17
44:10
**files**  39:6,13,17,21
39:22 40:8 44:18
45:7 52:7 54:15
59:16 60:16 61:3
61:4,7,10,18,24
82:12,13 83:3
85:16 88:12 90:2
95:11 96:18
108:18 110:3,4
117:5 119:22
120:2 144:5,5
145:19
**filling**  16:19
**final**  119:11
**finance**  35:22
**financially**  159:16
**find**  23:7 61:23
65:21,24 72:15
73:6 80:14 82:4,7
85:10 94:19
104:23 106:14
108:8 137:22
151:24 153:22

155:23
**finding**  87:23
150:24
**fine**  27:6 31:8
**finished**  31:18
**finishing**  11:8
**first**  4:3,12 9:22
11:16 12:15 16:10
21:14 26:22 34:21
38:6,6 41:2 43:6
49:9,11 64:21
94:14 101:16
117:17 120:14
128:19 135:13,20
138:18,24 142:19
143:23 156:8
**firsthand**  81:2
**fits**  15:13
**five**  11:20 55:21
55:24 102:20
103:2,3 133:9
**fixed**  140:22
**flip**  131:4
**floor**  2:3
**florida**  1:1,21
10:21,22,25 11:4
11:10,14 13:10,12
13:20,25 16:23,24
17:7,23 18:8,9
19:9 20:21 21:3
23:4,17 24:18
27:18 28:1,3 33:6
34:14 35:4,12,15
37:11 38:9 39:7
39:12 41:5,25
43:20 46:18 48:3
48:4 50:22 52:11
59:12,15,23 60:15
60:21 61:11 62:21
64:7 85:13,20
88:7 111:3,6,6,13

113:8,17 114:20
115:4 118:13
127:3,10 128:20
130:15 140:15,23
145:15,24 147:5
147:13 158:6
159:5
**florida's**  50:25
51:22 52:20 59:4
60:14 111:9,12
**flow**  12:11 92:7
**flurry**  37:10
**focus**  9:2 32:25
33:6 97:15 103:14
135:18 143:13
150:25
**focused**  8:16,19
9:4 12:8 13:11
16:23 17:7 32:24
36:16 47:7 49:3
144:14
**focuses**  25:6
133:25
**focusing**  8:12
12:13 13:4 14:20
89:11
**folks**  84:5
**follow**  9:4 41:9
51:19 84:21 111:1
113:19 114:21,25
**followed**  13:13
63:20 113:1
114:14
**following**  5:15
10:20 16:25 41:10
72:23 98:14 114:1
116:16 121:24
**follows**  4:3
**force**  149:7
**forefront**  17:17

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**foregoing** 162:5
**forget** 24:20
**form** 4:11 150:12
  150:20 151:25
**formats** 51:15
**former** 28:24 61:5
**forms** 16:25
**found** 9:12 38:16
  40:19 56:19 57:1
  59:3,9,21 63:23
  92:1 111:3 120:14
  120:14 129:5
  134:3 139:2
  144:10 145:24,25
  149:19 150:23
**four** 32:15 104:12
  139:14 151:6
**fraction** 103:24
**frankly** 150:15
**fraud** 23:25 24:6,7
  24:8,14 155:22
  156:4,11
**fraudulent** 23:25
  24:7,9,13 156:5,11
**front** 112:4 134:18
**fruitful** 13:2
**fulbright** 10:17
**full** 11:5,6,17,18
  11:19,20 16:19
**fun** 33:12 34:8
**function** 116:25
  118:25
**functioning** 51:2,3
  51:13
**further** 44:20 71:8
  73:15 76:4 81:24
  82:14 110:15
  122:23 132:14
  144:25 145:2
  156:18 159:12

**future** 149:23
**fvrs** 50:22

**g**

**g** 2:5
**ga** 160:15
**gainesville** 1:21
  129:7
**gathered** 33:23
**gatherers** 34:10
**gay** 33:24
**gender** 140:20
**general** 14:3,11
  31:24 35:19 36:19
  46:11 52:1 55:1
  61:25 62:2 87:8
  127:4,6
**generalize** 19:18
**generally** 15:20
  22:3 30:2,6 32:8
  36:10,15 41:17
  50:21 61:18 63:8
  65:19 72:24 73:3
  84:20,23 118:5
  126:17 127:13
  141:13 154:8,22
**generation** 8:20
  9:1
**generous** 56:15
  80:1 83:2 118:6
  122:17
**georgia** 1:9 2:9 4:8
  8:9,10,13 17:9,15
  17:17 18:8 19:9
  28:14 30:11,18
  32:3,6,12,16,19
  34:17 39:13 42:24
  43:24 45:17 46:12
  47:2,8,20 48:15
  51:9 52:21 54:2
  54:14 59:12,25
  60:17,21 63:18

72:21 78:3 80:3
  85:21,24 86:19
  88:21 105:14
  107:19 111:12
  115:3,22 116:3,19
  117:20 119:11
  126:15,22,24,24
  127:17 128:5,22
  129:20,25 135:9
  136:14 137:14
  145:20 151:19
  152:9
**georgia's** 42:23
  43:8 60:7 64:11
  87:18 90:1 105:12
  142:21 145:12
**getting** 10:10 42:7
  52:8 93:10 94:4
  96:19 105:18
  114:4 117:22
  124:4 145:4
**ghana** 10:19
**give** 10:4 18:12
  55:20 58:6 80:16
  80:16,20 127:4
**given** 72:5 84:16
  91:12 103:13
  109:6 162:9
**giving** 31:24 56:20
  58:4 81:4 89:10
**glad** 149:14
**global** 46:1
**glynn** 138:3
**go** 22:24,25 23:8
  24:21 31:6,9,11
  35:13 38:25 45:2
  49:9 65:13 72:19
  75:23 77:3,4 80:5
  99:9 100:14
  113:11,24 117:6
  147:16,22 151:17

151:24 152:14
  156:15
**goes** 86:9,12
  112:20 137:19
**going** 9:21 12:11
  13:19 16:25 17:2
  17:25 18:2 19:11
  21:6 25:23 26:18
  29:17 33:20 36:21
  41:9 44:2 49:25
  57:8 59:17 62:20
  63:22 64:25 75:12
  76:21 80:15,20
  84:9 87:11 90:14
  93:22,25 94:19,22
  99:4 108:2 109:21
  112:10 113:25
  117:2,12 119:7
  126:5 129:8,10,17
  130:4 133:21
  137:21 139:25
  141:20 144:2
  145:10 146:16
  150:5,8,9 152:2,7
  153:8,10,10,14
**good** 13:7 31:7
  51:6,17,23 66:25
  75:20 90:9 95:3
  111:7 129:9,15
  130:25 133:1
**gore** 116:12
**gotcha** 41:3
**government** 14:15
  14:23 15:15
**governor** 15:9
**grab** 112:16
**grabbed** 54:8,10
  54:11
**grad** 12:13 14:18
  18:5

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[graduate - hybrid]**                                                    Page 17

**graduate** 12:1
  14:16 15:16,17
  17:22 18:15 47:5
**grant** 75:15 90:11
  91:14 107:12
**grateful** 29:3
**great** 9:16 24:12
  30:24 82:2,9
  86:22 99:13
**greater** 16:14
  109:19 134:24
  135:5,6 149:7
**grew** 12:21
**ground** 4:19
**group** 24:17 25:2
  70:2 88:24,25
  106:4 121:10,12
  122:1 124:21
  125:20 148:8
  151:22,25
**groups** 13:6 15:8
  30:7 155:3
**guess** 20:1,20
  35:22 54:19 59:11
  64:15 67:21 68:6
  72:24 73:3 79:22
  91:3 119:21
  141:20 153:7
**gwinnett** 141:9,11

**h**

**h** 24:3 161:3
**half** 57:8 135:6
**halfway** 47:10
  60:19
**hand** 21:6 26:18
  27:24 146:16
  158:11
**handed** 37:6
**handful** 11:18
**handles** 42:25
  52:21

**handling** 63:6
  86:16
**happen** 62:9 78:13
  78:14,18 90:12
  152:9,10
**happened** 16:20
  87:16 147:5
  148:16
**happens** 5:1 16:23
  40:6 45:12 55:18
  56:8 63:4 70:8
  85:2 100:2
**happy** 14:17 28:25
  34:18 57:14
  114:10
**hard** 105:13 115:3
**hasen** 24:2,3
**hat** 114:5
**head** 12:3 40:9
  66:20 84:14 99:24
**healthcare** 15:10
**heavily** 35:2
  138:10
**heavy** 135:18
**held** 10:4,11 33:11
**help** 37:18 47:3
  75:14 102:19
  124:22
**helps** 101:12
**hereto** 162:7
**heterogeneity**
  43:23 137:21
  139:18
**hey** 148:23
**high** 129:7 135:19
  138:1 139:20
**higher** 132:18
  134:7 135:21
  136:4 138:9
**highest** 42:11

**highlight** 103:17
**highlighted** 32:12
  116:13 137:23
**hire** 11:1
**hired** 22:14 24:25
  25:1 44:11 53:22
**hispanic** 136:4,13
**histories** 45:1
  145:13
**history** 6:10,20
  9:21 40:20 43:9
  53:5,18 54:2,22
  56:5,7,16 57:22
  58:19 60:3 61:15
  64:1 65:2 66:19
  70:22 71:13,19
  72:16,20 73:7,9,12
  73:16 74:7,17,21
  74:23 75:7 77:8
  77:14 81:9,16,21
  82:5 83:5,6,13
  84:16 87:22,24
  88:2 89:7,22 91:5
  91:11,17,20 92:3
  92:14 93:1 94:12
  94:18,19 95:16,20
  96:13 97:2,6,12,21
  98:8 99:10 100:6
  100:16,24 101:2,5
  102:17 103:2
  104:23 105:2
  106:1,8,15 107:1
  110:11 122:7
  123:10 124:9
  125:4,6,8,16
  140:20 144:5
  145:19
**hold** 19:16 107:16
  141:5 142:23
  143:1 152:16

**holds** 140:25
  141:1
**holloway** 1:22
  158:14 159:7,20
**home** 124:11
**honestly** 7:6 23:19
  29:14 46:14
**honor** 46:25 48:20
**honors** 47:4,4
  115:24,25
**hope** 58:1 86:22
  95:1 110:3 131:9
  155:16 156:12,14
**hopefully** 63:10
  112:7 114:11
  155:24
**hound** 53:25
**hour** 42:9 114:16
**hourly** 42:11,17
**hours** 5:9
**house** 30:18 62:11
**huh** 3:24,25 107:4
  120:17 125:18
  133:18
**human** 151:18
**humor** 29:20
**hundred** 61:1
  132:5
**hundreds** 56:5,6
  57:10,10 60:19
  61:8,9 131:20
  132:1,7 133:11
**hurricane** 130:16
**husted** 152:7
**hybrid** 82:14
  83:17 90:15 91:20
  91:24 92:3,24
  93:1,11,18,22 94:1
  95:8 117:14
  119:20 120:3,9,15
  120:25 121:15,20

Case 1:18-cv-05391-SCJ    Document 405-1    Filed 06/28/20    Page 182 of 205

Daniel Smith , Ph.D.                                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[hyphenated - interested]**                                Page 18

**hyphenated**
  140:20
**hypothetical**  89:1

**i**

**idea**  4:25,25 21:9
  23:13 24:6 84:9
  114:21 119:20
  153:6,14 154:10
  154:12
**identical**  65:7
**identification**  5:22
  6:4 21:5 26:17
  27:23 37:5 119:25
  146:15
**identified**  38:21
  87:5 108:1 109:9
  123:8 142:23
  145:23 148:10,19
**identifier**  77:23
**identifiers**  77:25
**identify**  27:10
**identifying**  54:24
  87:17
**idiosyncratic**  44:2
  49:24
**ignore**  130:8
**iii**  49:10
**images**  142:4
**imagine**  6:15
**immaterial**  83:12
  124:12
**immediacy**  52:1
**immediate**  52:3
**immediately**  5:14
  53:21 68:17
**immensely**  101:13
**immune**  145:23,25
  146:2,6
**impact**  18:20
**implemented**
  111:18 112:2

**implicit**  129:3
**implying**  129:16
**important**  17:24
  63:2 77:1
**impressive**  11:25
**improvement**
  52:11
**impugning**  129:16
  139:7
**imputing**  43:17
  139:6
**incidences**  43:22
**include**  56:22 67:8
  118:21 136:8
**included**  32:7
  83:16 85:16 92:16
  121:2
**includes**  20:4 92:2
**including**  32:3
  77:4
**inclusive**  83:4
**income**  20:24
**inconsistencies**
  38:10,16 43:23
  45:8 49:12,19
  59:8 61:21,23
  62:4,6 97:18
**inconsistency**  62:7
**increasing**  73:12
**index**  17:19
**indicate**  63:24
  67:23 76:7 83:24
  90:19 93:7 106:25
  115:16
**indicates**  6:21
  67:24 68:5
**indicating**  30:23
  49:14
**indicative**  115:17
**indicators**  129:15

**individual**  39:9
  45:14 63:1 78:23
  86:7,13,15 96:11
  97:6 114:22 115:5
  129:13 138:23,25
  142:22 150:20,21
**individual's**  39:10
  85:11 120:24
  150:18
**individually**
  150:25
**individuals**  24:5
  55:10 56:20 67:11
  72:16 77:18 83:21
  85:7 87:6 89:6,12
  89:14,20 91:14
  94:16 96:21 97:22
  98:19,21,25 99:10
  101:25 102:7,24
  104:2,3 106:15,18
  113:15 121:11,13
  122:1,6,25 123:9
  124:7,17,22 125:3
  125:20,24 126:8
  127:24 142:2
  148:6,20 149:2,3
**ineligible**  148:13
**inflated**  95:21
**influence**  135:11
**inform**  117:1
  132:17
**information**  45:11
  64:16 65:22,24
  80:7 83:21 84:17
  85:3,8,13,20 86:5
  86:5 89:19,20
  96:20 97:1,2
  103:6 116:18
  121:1,7,23 128:25
  136:17 138:22
  143:3

**informed**  116:21
**initial**  145:22
**initially**  44:11
  120:22
**initiative**  3:12
  12:22,25 26:14,21
  26:25
**initiatives**  32:24
**injunction**  148:17
**input**  60:14
**ins**  29:20
**instance**  9:9 17:15
  76:11 102:13
  109:23 127:10
  140:16
**institute**  27:13,13
**institutional**  151:1
  151:16 155:8
**institutions**  15:5
  17:5 18:7,10,15
  154:25
**instructions**
  109:12,13,17
  111:2,7 115:1
**integrity**  25:2
  29:19
**intent**  82:3,4,9,10
  155:12
**intentional**  139:4
**intentionally**
  132:13
**interacting**  52:4
**interaction**  64:9
  78:4,19,22 88:22
  98:5 114:23
**interest**  13:6,13
  15:8 84:17
**interested**  9:25
  14:10 17:3,23
  22:7 29:11,12
  97:16 110:22

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[interested - know]                                              Page 19

112:13,14 153:20
154:4,25 155:5
159:16
**interesting** 13:23
29:17 53:20 97:24
128:17 137:22
149:19 151:4
153:17,21
**interests** 9:11
12:10,11
**interface** 51:6
60:11 85:12 89:21
**interfaced** 83:25
96:23
**interfaces** 86:7
**interfacing** 86:12
**interpret** 68:6
138:6
**interpretation**
68:15 89:10 102:4
109:25
**interpreted** 113:3
152:4
**interpreting** 65:25
**interruption** 3:21
**intervenor** 25:4
35:7
**interviews** 44:19
**interworkings**
67:1
**intrinsic** 154:3
**intro** 14:4,8
**invalid** 108:12
**inverse** 141:21,25
**investigation**
44:20 110:15
**involved** 5:10 10:5
23:10 34:20
104:18 111:14,22
114:9 146:25
148:2

**involves** 22:15
**irb** 152:2
**ironically** 13:14
**irregularities**
61:20,23 62:3,5,12
**irrespective** 81:16
**ish** 63:24
**isolated** 108:17
113:23
**issue** 29:18 33:14
41:11 72:3 88:11
123:19 150:25
**issued** 112:1
**issues** 7:25 8:3
35:21,23 38:21
40:10,11 45:10
89:3 110:10 111:8
113:15 131:24
141:18 155:6
**italicized** 113:14

**j**

**january** 1:17 54:5
54:11,13 94:13
100:17 106:15
**jeopardized** 62:16
**job** 9:24 10:9 39:8
59:20
**john** 27:15 28:10
28:11
**join** 77:12,23
82:11 97:3,17
120:4
**joined** 91:4 119:19
120:23
**joining** 82:13 83:2
83:15 93:18 95:11
95:13
**journal** 3:14 147:4
**journalism** 14:21
**journey** 6:10

**judge's** 35:1
**judges** 72:25
**judging** 63:20
**judgments** 131:8
**judicial** 36:4
**jumped** 33:10
93:23
**juration** 83:3
**jurisdiction** 25:15
52:5 56:4 118:19
**jurisdictions**
25:19 44:3 51:17
108:20 109:20
112:15 127:15
137:17
**jury** 151:2
**justice** 34:12

**k**

**k** 23:10
**kaiser** 2:2,4 4:14
26:5 30:20,22,24
37:15 53:4,6
75:16,19 113:6
146:18 147:16
149:16 153:4
156:20 157:2,4
160:1
**kaiserdillon.com**
2:5,6
**keep** 11:1 34:9,10
61:13 126:12
127:15
**keeping** 61:14
79:12 126:18
**keeps** 33:3 127:14
**ken** 7:11,13 35:19
**kept** 34:1 85:16
108:4
**key** 3:20 65:22
69:12 76:10 143:2

**kind** 4:21 8:17
10:3 14:3,5 15:11
16:16 18:18 20:12
24:20 25:23 28:19
29:20 30:3,4 32:4
32:24 33:2,12
36:12 42:22 47:6
53:15 54:20 58:16
64:18 84:25 90:16
98:14 100:25
114:3,4 119:20
133:14 134:19
137:23 138:12
142:11,17 151:4
152:24 155:12
**kinds** 18:21 61:15
**king** 129:9
**kitchen** 141:4
**knew** 12:25 33:19
46:16
**know** 4:19 5:1
7:14,16 9:15
12:20 16:5 17:6
17:15 18:19 19:10
19:22 22:6 23:20
25:13 29:11 31:3
31:5 32:4 34:25
36:11,18 41:10
45:6,9 46:19
47:19 51:8 52:20
53:20 54:14,17
58:3 60:7,9 63:18
64:25 65:3,11
66:15 67:1,10
68:14 70:4 71:1,2
71:6,9 72:8 81:12
83:10 87:15,16
90:6 97:4,15,24
98:21 99:24
100:23 102:10
103:18 104:1,8,11

Daniel Smith , Ph.D.                                      January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[know - locations]                                                    Page 20

104:16 105:8,12
105:19 109:15
110:10,16,16
115:19 116:1,3,4,4
127:13 128:3,5,13
128:20 129:13
138:2 139:23
142:25 145:10
147:1 150:1
152:25 154:14
**knowable** 82:24
**knowledgable**
126:25
**knowledge** 46:11
46:24 48:1 52:19
63:17 81:2 115:3
116:15 128:8
**knowledgeable**
126:23
**known** 8:6 22:21
140:18 151:7

**l**

**l** 35:16
**labeled** 139:21
**labor** 7:6,24 8:6
8:13,17 9:5,10,25
12:9,14 155:2,2
**lack** 121:2 144:9
**lacking** 76:10
**laid** 41:11
**language** 40:18
47:17,20 87:4
**languishing** 47:6
**large** 11:13 12:1
14:14 18:23 61:9
72:22 90:5 92:7
95:25 117:4 129:3
138:8
**largely** 9:24
**larger** 32:7 62:22
89:2 132:19

**largest** 11:23
**late** 133:5
**launched** 28:18
**law** 9:13 17:9 24:3
33:23,25 41:25
126:15,22,24
127:17 130:6,9,19
147:11 152:5
**laws** 15:23 32:8
34:15 126:25
127:11 150:11
**lawsuit** 5:11 22:17
114:16
**lead** 16:14 31:10
32:22 58:6 77:7
**leading** 17:11
**leads** 49:23 74:9
**leaning** 22:4,5
**learned** 133:2
**leave** 129:20 131:7
**lecturers** 11:18,20
**led** 155:4
**lee** 3:13 36:25 37:8
**leeway** 105:15
114:20 133:12
**left** 10:8 22:4 77:9
**legal** 36:11,13
37:10 80:10
147:10 160:23
**legally** 73:21
**legislature** 15:8
116:17
**lengthy** 152:12,23
**lesbians** 33:24
**letting** 43:19 108:7
134:13
**level** 14:15 15:3,19
18:14,15 19:14
40:2 56:3,11 63:1
98:23 115:5,17
139:1

**levels** 9:7 58:12
**leverage** 18:6
**levy** 112:11
**liberal** 11:23
**life** 110:19
**likelihood** 16:19
149:5 150:19
155:14
**limit** 34:25 87:9
88:9 103:17
**limitation** 74:11
**limitations** 19:19
142:11
**limited** 19:7 55:5
110:2 113:20
116:12 117:4
143:13
**limiting** 19:11
**line** 7:8 18:8,9
23:8,8 86:18
87:19 140:3 161:4
161:7,10,13,16,19
**link** 81:15 87:21
**linkage** 43:17
**linked** 94:2
**linking** 40:1 110:5
**list** 25:11,21,24,25
26:3 34:19 36:17
36:19,20 42:2
43:9 47:1,7 50:18
52:1,25 53:7
61:17 62:13
118:21 142:21
144:4 145:13,18
147:14,22,23
148:6
**listed** 15:2 23:1
29:23 67:12
145:15
**listen** 9:3

**listing** 88:25
**lists** 51:19 118:11
**literacy** 16:2
**literature** 129:3
**litigation** 5:17,20
46:21 52:8 59:19
61:4 63:20 72:22
80:18 110:18
111:13,19,22
114:7 146:4
147:24 148:2
150:9 152:21,25
153:1,15 154:13
**litsup** 160:15
**little** 6:11 50:24
60:18 61:14 80:10
89:5 93:24 96:6
98:10 141:22
152:1 153:2
**lived** 129:6
**lives** 130:22
**living** 129:4,8
**llp** 2:7
**local** 14:15,23 15:6
15:15 45:19 48:13
48:23 49:24 51:7
51:24 62:10 67:25
68:20 73:24 74:2
74:4 83:25 85:12
86:13 96:24 97:9
98:5 101:3 106:12
106:13 111:1
113:1,18,25
114:14,25 115:6,9
115:15 116:8,20
127:15 128:6
129:12,24 130:5,8
131:21 132:2
139:3 144:3
**locations** 22:19

Daniel Smith , Ph.D.                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[lock - maryland]**                                                Page 21

| | | | |
|---|---|---|---|
| lock  83:11 | 117:3 118:10 | losing  62:17 | 96:25 109:22 |
| locked  71:7 73:11 | 119:9 120:20,22 | lost  104:16 125:12 | 127:24 130:19 |
| 74:1 75:1 87:25 | 126:5 131:4,12,15 | lot  14:21 17:3 | 137:13 141:8 |
| 91:13 104:22 | 135:12 149:2 | 19:16 33:4 38:16 | 143:9 |
| 105:23 108:13 | looked  7:23 8:4,11 | 38:22 55:18 56:23 | maintain  51:19 |
| 133:6 | 16:11 28:4 33:15 | 57:18 73:9 97:19 | 59:16 |
| locking  105:25 | 39:17,18,20 40:7 | 98:1 100:11 | maintained |
| locks  54:15 71:12 | 44:12 45:25 48:2 | 103:18 104:9,15 | 127:18 |
| 75:13 82:23 83:13 | 48:7 51:21 56:2 | 108:16 110:6,19 | maintaining  39:9 |
| 105:6,7 109:2 | 61:4,6 98:23 | 110:20 112:21 | 60:15 79:15 |
| logan  36:4 | 116:2 127:19 | 113:2,21 114:9,10 | maintenance |
| logic  69:3 73:8,10 | 131:11,13,17 | 114:17 115:15 | 25:11,22,24,25 |
| 96:15,15,17,22 | 136:19 | 116:18 133:12 | 26:3 36:17,20,21 |
| 102:8 117:25 | looking  7:24 8:5 | 136:25,25 137:21 | 52:1,6 61:17 |
| logical  49:12 77:7 | 9:7 13:8 15:25 | 139:17,18,25 | 62:13 144:4 |
| 82:6 86:16 97:17 | 16:13 17:17,20 | 147:21 150:5,9,13 | major  11:23 33:14 |
| 97:19 98:20 101:6 | 18:18 19:6,14,15 | 152:10,13 155:11 | 45:6 150:10 |
| 105:1 | 19:19 20:13 21:11 | 156:3,4,9 | majority  102:1 |
| logically  51:19 | 22:7 23:3,24 | lots  60:5 137:14 | majors  11:22 |
| 71:16 79:4 86:24 | 28:24 36:19 39:7 | love  133:9 | 14:21 |
| 89:17 110:5 | 43:16,18 45:9 | lowest  56:4 | makeup  46:2 |
| long  7:7 13:21 | 46:13 47:1,18 | luther  129:9 | making  62:24 |
| 27:6 138:22 | 55:15 58:19 59:21 | | 69:11 71:16 76:9 |
| 145:19 154:12 | 65:20 74:5 76:24 | **m** | 88:14 96:2,10 |
| 156:8 | 77:2 91:5 94:1,14 | m  1:22 158:14 | 111:9 128:14,16 |
| longer  25:15 27:5 | 94:15 95:6 103:8 | 159:7,20 | 131:7 |
| 71:15 74:12 | 104:2,2,3 110:1,4 | ma  12:2,4 | management  8:6 |
| 152:13 | 110:7,8 115:5 | machine  69:6 | 8:13 9:5 155:2 |
| look  15:5,7 18:9 | 117:14 118:9 | madison  6:21 | mankind  140:18 |
| 19:1,3,16 23:8 | 119:24 120:21 | mail  37:13 39:2 | manuals  48:8 |
| 26:8,9 28:23 | 124:7 125:1 128:8 | 40:15,20,24 41:5 | margins  6:17 |
| 29:10 35:13 37:3 | 128:23,23 129:14 | 41:20 42:2 45:22 | mark  4:24 54:7 |
| 37:12,17 45:7,24 | 137:22 141:25 | 52:17 59:4 60:12 | marked  5:21,23 |
| 46:1 48:6 50:13 | 142:12,13 143:24 | 73:11 87:25 88:5 | 6:3,5 21:4,7 26:16 |
| 56:10 61:10,24 | 143:25 144:6 | 97:1,11 99:20 | 26:18 27:22,24 |
| 65:13 66:15,17 | 145:19 147:25 | 111:3,9 113:14,16 | 31:13 36:24 37:4 |
| 67:11 78:6 94:10 | 150:5 154:5 155:7 | 124:25 128:11 | 37:6 146:14,16 |
| 97:20 98:15 | looks  6:15 9:20 | 133:16,25 134:25 | marks  54:24 |
| 101:10,15 102:9 | 15:22 17:12 37:13 | 135:1 144:6 | martin  129:9 |
| 102:12 103:21,23 | 76:18 136:3 148:8 | mailed  42:3 67:23 | maryland  61:7 |
| 110:10 113:24 | | 67:24 68:6,6,9,18 | |
| | | 68:19,23 84:6,7,12 | |

Daniel Smith , Ph.D.    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[massive - nanderson]**    Page 22

**massive** 24:6 90:1
  103:9
**master** 120:6
**master's** 6:20 7:1
  7:14 8:8
**match** 38:22 57:22
  58:14 95:1 119:22
  132:9
**matched** 93:12
**matches** 58:20
  119:24
**matching** 56:16
**materials** 44:12
  46:9 48:16 49:1,6
  49:7
**math** 93:9
**matriculating**
  12:4
**matsusaka** 27:15
**matt** 2:4 160:1
**matter** 18:7 58:9
  96:19 110:6
  152:25 153:1
**mattered** 152:21
**mayer** 7:11 9:15
**mayoral** 23:4,12
  23:14
**mean** 11:19 18:22
  20:22 43:15 51:14
  51:25 58:8 61:21
  65:19 69:21 71:16
  76:10 84:11 102:9
  104:20 110:2,18
  113:6,20 116:11
  116:12 132:23,25
  137:6 139:8 143:1
  146:10 153:2,13
**meaning** 42:2
  97:22 99:11
  139:18

**means** 24:1 68:8
  69:10,25 94:7
  101:23,24
**meant** 78:3,18
  79:1 101:22 121:3
**measure** 12:18
  63:6 138:13
  150:14
**measurements**
  19:8,21
**measures** 34:6
  36:2
**mechanism**
  118:15
**mechanisms** 63:4
**meeting** 15:21
**melanie** 15:22
**member** 12:16
  26:13 41:10
**memory** 22:17
**mention** 21:13
  26:13 27:17 64:22
  138:17 145:12
**mentioned** 11:9
  17:7 19:25 20:15
  22:22 32:22 34:13
  39:1 52:19 60:18
  60:21 144:7 154:7
**merely** 82:4 96:17
  137:16 140:3
**merge** 58:22
**merged** 120:5
**merging** 143:25
**merits** 110:15
**met** 5:3,8
**method** 55:2 68:10
  68:24 69:24 70:9
  79:16,22 85:2
  86:1,17 87:18
  88:23 109:1
  123:18 133:20

**mexico** 48:13
**miami** 112:11
  148:10
**michael** 130:16
**micro** 19:14
**mid** 17:18
**middle** 137:23
**midway** 81:18
**million** 55:17 61:1
  61:1 94:16,16
  103:12 113:22
  140:19 156:5
**millions** 60:20
  61:8,10
**mind** 48:14 90:17
**mine** 26:19
**mining** 28:22
**minor** 61:20,23
  62:2,3,5,12
**minute** 37:15
  45:25 80:6 114:7
  118:14
**minutes** 5:3
**miraculously**
  100:8
**mirror** 142:4
**mismatch** 132:23
**mismatched**
  111:25 112:6
  132:10
**missed** 96:6,6
  134:10 144:13
**missing** 45:10 55:4
  87:11 111:16
  112:6
**missions** 28:3
**mississippi** 61:5,6
**mistake** 53:3
**mixed** 150:15
**mkaiser** 2:5

**model** 60:14 139:1
  141:5
**modeling** 140:11
**moment** 13:4 62:6
  69:23
**money** 24:16
**month** 131:17
**months** 16:6 59:9
**morning** 15:21
  16:21 18:23
  152:19
**motivated** 141:16
**motive** 139:7
**move** 43:6 106:23
**moved** 41:18
  42:14 52:3
**moves** 52:22
  127:22
**moving** 142:17
**multiple** 28:21
  39:6,11,24 40:4
  52:10 60:6 61:10
  67:12,12 77:12,25
  78:22 79:5,14,17
  82:7 100:5 113:16
  133:20
**multiples** 61:9
**multivariate**
  140:13
**mutually** 72:4

**n**

**n** 1:13 3:1 24:3
  94:11,11,22 97:20
  103:8,11,20,21
  106:19
**n.w.** 2:2
**name** 23:4 35:14
  129:14 139:14
  140:21,22 145:18
**nanderson** 2:6

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[narrower - okay]                                                    Page 23

narrower  89:9
narrowing  37:18
  121:17
narrowly  133:25
national  19:20
natural  75:16
  152:14
nature  142:24
navigating  115:15
nearly  129:4 134:7
  141:9
necessarily  20:1
  82:1,3 92:17
  109:7 145:10
necessary  82:13
  162:6
need  4:21 20:9
  51:15 119:1,4
  135:7 145:2
  151:10 157:1
needs  100:22
  149:23
negative  3:25
  145:9 149:5
negatively  144:17
  144:19
neither  12:22
net  50:19,21
never  7:15 9:18
  23:15 34:16 69:1
  146:9
new  48:13 61:7
  118:2
news  141:12
nice  75:17
noes  97:21
nomination  34:11
non  147:15 148:10
  150:8
nongovernmental
  22:2

norman  2:5
normatively  58:8
north  39:18 40:3,6
  40:11 48:9 60:21
  61:11 127:3
  145:15,24
northern  1:1
notary  158:15
  162:13,19
note  70:20 83:18
  134:6 160:10
noted  162:7
notes  159:11
notice  13:10 5:24
noticed  28:8
notwithstanding
  113:12
november  6:16
  72:23 93:8 117:22
  118:22 119:16
  120:11 132:21
  133:22
number  3:9 29:24
  36:22 40:14 54:25
  55:10,15 56:20
  58:23 64:25 65:1
  65:2,3,6 78:11
  81:17,20 88:9
  95:5,21 104:17
  106:5 119:25
  126:7,9 135:20
  137:12
numbers  12:2
  30:15 58:20 95:1
  95:13,14
numeral  49:10
  127:22
numerous  88:8
nuts  14:11
nvra  34:24 35:1
  36:8

o

o  1:13,13,19 35:16
  69:20
oath  158:4
objection  25:23
  26:5 153:4
objections  4:11
  75:9
objective  50:14
objectively  43:18
  108:6
observations
  40:25 63:23
  140:19
observe  61:12
obviously  5:3
  13:24 29:11 43:15
  66:8,13 74:5
  76:10 77:23 95:15
  95:17 102:5
  135:10 136:24
  137:14 150:8
  152:1
occasionally  21:21
  21:21
occur  105:1
occurrence  70:12
  75:12
october  52:25 53:2
  53:8,10,13,16,19
  53:24 54:9,12
  91:23 92:5,9 93:5
  117:24 119:6,16
  122:9,12,14,18
  123:5 124:10,10
  124:18 133:5
october's  53:7
odd  135:5
offered  38:5
offering  89:25

office  35:18 46:7
  46:15 48:3,12,22
  49:5 59:13 63:1
  86:13 98:5 147:7
officer  35:9
offices  48:23 51:7
  51:24
official  1:8 49:25
  55:12 56:7,19
  57:21,22 67:25
  74:10,12,14,21
  75:7 84:1 96:23
  97:9 110:13 128:6
  128:14 129:24
  130:8 132:2 135:9
  136:11 158:11
officials  26:2
  43:12,25 44:20
  45:20 48:13 68:20
  73:24 74:2,4
  85:12 96:24 101:4
  106:13 109:4
  111:1,2 113:1,18
  114:1,14,25 115:1
  115:6,15 116:9,20
  129:13 132:2
  139:4 143:18
  144:3 145:14
oh  7:5 12:10 15:14
  49:17 53:9 133:24
ohio  39:18,23
  60:22 152:7
okay  4:16 6:19
  9:14 21:6 23:24
  26:12 28:6 31:9
  36:24 46:22 50:7
  67:16 77:11 81:18
  87:15 91:16 93:16
  106:22 122:5
  124:14 125:23
  126:20 132:16,18

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[okay - particularly]                                                    Page 24

141:7
old  154:13
oliver  28:10,11
oliver's  28:20
omitted  3:23
once  148:14
ones  10:4 77:4
  84:9 88:8 89:12
  92:1 95:15 108:18
  136:17 141:9
online  17:16 32:11
open  34:9
operates  104:25
opining  134:11
opinion  35:1 38:8
  43:7 45:16 89:24
  107:18
opinions  38:5
  44:16
opportunity  33:10
  102:20,25 105:21
  112:1 118:17
  131:3
oppose  26:4 36:1
opposed  21:2
  39:10 42:4 59:25
  78:9 79:12 122:18
  128:11 134:19
  135:2 146:10
  153:12 155:6
opposite  58:13,14
  97:7
options  50:4
oral  33:12
orchestrated
  147:6
order  11:1 18:3
  51:16 79:21 119:1
  126:2 130:3
  148:18

ordered  72:25
ordering  107:6
  156:22
orders  73:5
  108:12 116:17
organization
  26:23 27:1
organizations  22:4
  22:5,7 27:9,11
organized  7:5,24
  8:16 9:25 12:8,14
  155:2
original  79:18
ostensibly  56:16
ostensively  66:21
ought  58:9
outcome  146:11
  146:13
outs  29:21
outside  18:3 21:1
  30:4 147:13
outsider  46:17
overall  56:11,15
  57:16
overcome  8:2
  151:1 154:1
overcount  58:7
overlap  125:20
overly  83:3
overseas  105:20
oversee  43:11
  44:24 108:23
overseen  143:17
overturn  33:23,25
overturned  107:11
overview  10:4
  14:3,5 32:5

p

p  1:13 2:10
p.m.  1:18 157:9

page  3:3,9,13
  13:25 21:11 24:12
  27:25 28:5 30:14
  30:14,15,20,21
  32:1,1,21 35:17
  36:3 38:2,19,20,25
  40:13,23 41:21
  42:8 49:10 53:11
  54:18 70:20 76:5
  88:17 94:3 106:24
  110:24 112:16
  149:11 161:4,7,10
  161:13,16,19
paid  42:9
panhandle  130:16
paper  7:2,3,9
  46:25 47:5,7,22
  48:21 115:23
  116:2 148:8
  149:15 150:2,4
  151:15 152:12
papers  9:7 140:14
  141:17 152:20
paragraph  32:1
  32:21 34:13 38:3
  38:16,20,25 40:14
  40:16,18,23 41:2
  41:21 42:8,19
  43:6 44:17,23
  45:16 46:6 47:10
  50:17 51:2 52:24
  53:12 54:19 55:9
  55:13 58:16 60:18
  61:19 63:22 64:2
  64:4,20,21 65:2
  67:16 68:13 70:17
  70:17 71:18 74:9
  76:3,5,15,20 77:7
  78:1,12 81:11,18
  83:18 88:17,19,24
  89:11 90:14 92:10

93:20 94:23
  106:23 107:13,17
  108:21 110:25
  112:18 115:16
  117:11,17 118:20
  119:19 120:7
  121:2,8,9,25 123:8
  124:6,7,15,20,21
  125:21,23 126:5
  133:14 136:18
  141:7 142:19
  144:10,16 145:12
  149:22
paragraphs  74:15
  81:7,14 82:11
  98:15 121:12
parallel  18:8
parameters  51:18
parkwood  2:8
parlance  120:4
parse  81:15
parsing  80:24
  81:19 82:1,11
part  10:21 45:12
  45:20 76:15 84:3
  108:21 110:9,24
  112:5 114:2
  115:23 129:13
  144:11
participate  148:13
  149:7
participation  7:6
  15:6 22:9
particular  29:7
  43:14 54:16 68:7
  72:1 75:13 82:24
  115:2 118:9,19
  119:10 128:10
  135:17
particularly  52:20
  126:19,20 138:8

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[particularly - politics]**                                    Page 25

143:8
**particulars** 104:1
  105:13
**parties** 13:6 15:8
  85:19 159:13,14
**partisan** 23:14,19
  23:22 155:20,21
  155:22 156:2,6
**partly** 41:9 80:17
  146:4
**party** 23:17,21
  140:23
**passed** 12:18
  25:16
**passions** 9:4
**pattern** 139:15
**patterns** 120:21
  129:11,18 145:7
  152:16
**pay** 10:23
**paying** 33:3
**pdf** 65:23 156:24
  157:3
**pdfs** 48:7
**peer** 32:14
**pending** 47:1,7
**penned** 24:11,15
  24:19
**pennsylvania**
  12:21 61:7
**people** 9:12 16:18
  25:15,16,16 60:3
  60:11 62:14 64:8
  86:23 87:24 88:1
  88:4 90:21 91:21
  92:2,3,8,25 94:23
  94:24 95:17,19
  96:3,23 98:2,11,17
  99:17 100:16,18
  101:3,20 104:9,9
  104:23 105:9

119:10 122:15
123:4 124:21
130:22 147:14,25
148:1,9,12,23
149:6 150:7,11,24
151:6,19 152:15
152:21 153:9
155:4 156:4
**people's** 130:22
**perceived** 149:24
**percent** 104:11
  132:20,22 134:3,4
  134:7 135:2,5,6
  137:7,9,24 138:4
  139:22,24 141:8,9
  142:1,5,9,10
**percentage** 132:19
  136:19,20 137:2
  139:11
**perfect** 52:14
  146:8,9
**perfectly** 57:22,25
  95:22
**performed** 38:13
  133:15
**period** 10:13 16:4
**periodically** 152:6
**permanently**
  13:16
**persist** 52:16
**person** 16:8 18:4
  69:15 84:8 86:10
  97:1 120:8 123:11
  123:13 124:8
  126:1 128:12
  129:7,10
**person's** 118:15
  128:21
**personally** 153:17
  158:9

**perspective** 17:24
  78:7 88:13 112:12
  130:22 133:8
  145:21 147:24
  154:23 156:7
**petition** 34:10
**petitions** 34:4
**ph.d.** 1:15 3:4,11
  4:2 158:9 159:9
  160:5 161:2,24
  162:2,4,12
**phd** 7:22,23 8:8
  9:17 12:1,4
**phone** 28:21
**photo** 52:2
**phrasing** 54:23
**physical** 38:19
  41:21
**pick** 117:11
**pickens** 139:20
**picking** 19:22
**piece** 16:12 142:18
  142:18
**pieces** 50:16 53:16
**pinellas** 112:11
**place** 1:19 10:22
  29:10 53:2,16
  103:10
**placebo** 152:16
**placed** 15:25
**places** 105:17
  137:1
**plainly** 130:11
**plaintiff** 42:20
**plaintiff's** 31:18
  31:20 44:4
**plaintiffs** 1:6 2:6
  5:13 44:14 148:5
**plausible** 102:5
  107:11

**play** 115:11
**please** 20:6 38:7
  54:23 124:3
**pllc** 2:2
**plot** 139:8 140:2
**plotted** 141:3
**plow** 132:14
**plus** 42:9
**point** 7:12 41:1
  51:8 54:16 71:6
  71:20 72:2 73:12
  75:13,16 82:24
  83:20 92:11 93:23
  107:18 109:3
  117:12 122:22
  124:6,6,11,20
  133:1 154:12
**pointed** 101:20
**pointing** 134:11
**points** 54:20,25
  60:8,10 78:23
  101:15
**pole** 50:24 58:1
**policies** 15:10
  149:24
**policy** 74:3 115:12
  150:6
**politely** 89:4
**political** 3:14
  11:13 13:22 15:6
  15:8 18:14,15
  21:2 22:13,14
  46:2 85:4 114:5
  115:8 153:21
  154:17 155:20,23
  155:25
**politics** 8:12,16,19
  8:21,22,23,24 9:6
  12:24 13:7 14:5,9
  14:12,17,17,19,20
  14:23 15:5,6

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[poor - proposed]                                            Page 26

poor 85:11
popular 33:25
populated 45:14
  121:23
population 138:14
  151:21
populations
  153:25 155:9,15
portion 64:1 148:8
portrayed 28:25
  44:8 84:11
posed 108:11
position 10:7,12
  11:3,7 12:17
positions 10:15
positive 137:1,10
  140:4,5,17
possibilities 49:17
  50:13 77:20 117:3
possibility 75:5
  76:13 79:12 80:17
  90:13 93:15
  102:19 107:9
  109:8 122:22
  123:3,23
possible 5:20 23:3
  31:19,19 49:18
  76:11 79:8 89:13
  90:5 91:14 105:19
  109:3 123:7
  124:17 126:3,4
  140:9,17
possibly 77:4 92:4
  101:10 108:6
post 10:8 22:22
postage 26:2
potential 142:14
potentially 62:6
powerpoints 48:7
practice 28:13
  31:24 90:10 127:4

127:7
practitioner 133:9
precinct 62:14
precise 19:8,21
precisely 20:25
  138:14
predicate 70:5,15
predisposed
  135:25
prefer 145:6
preferred 86:17
preliminary
  148:17
prepare 46:9
preparing 44:4
presented 105:6
  123:22
presenting 123:24
preservation
  22:18
president 20:16
presidential 62:21
press 12:17
presumably 135:8
presumedly 99:19
pretty 55:24 57:4
  57:16 61:20 62:9
  133:5 147:2
prevent 74:5
previous 76:22
previously 73:2
  84:11 107:7
pride 52:10
primarily 12:8
principal 115:10
printout 3:11,12
  21:7 26:20
prior 28:12 32:25
  55:3 69:6 76:8
  105:25 106:1
  111:13,21 141:21

private 28:13 34:2
  34:10
privilege 4:12
  79:20,21 83:10
  96:20 101:8
privileged 95:9,10
  100:2 101:2
privileges 82:7
privileging 90:18
  91:23,24 92:23
  95:19 99:7 120:2
pro 28:21 33:10
probability 129:7
probably 8:20
  11:19 12:3 28:25
  39:17,25 40:6
  54:3 56:13 57:3
  104:17 114:8
  151:9
problem 43:10
  71:22 72:3 78:2,5
  85:8 86:18 87:3,5
  87:20 88:3,8
  108:10 109:19
  112:9 147:9
problematic 86:25
  103:19
problems 43:8,21
  49:12,19 50:10
  52:16 83:19 87:13
  87:17 88:18 89:2
  90:1 103:9 107:19
  107:25 108:22
  110:6,8 115:16
  116:13,19 142:21
  142:22 143:6
  145:23,25 146:6
procedure 4:10
  63:13,19
procedures 114:8
  116:22

proceeded 148:20
process 12:23
  25:11,14,20 45:13
  46:12 47:21 52:13
  58:17,24 64:19
  71:3 83:15 112:8
  119:2 122:12
  147:11
processed 60:19
  60:23 72:7 123:5
processes 8:10
  13:9 22:8 32:3
processing 72:15
  78:10 107:19
producer 29:2
product 12:12
professor 4:6,16
  7:11 10:3,3,6 11:6
  11:9,11 24:3
professorship 9:22
  11:5
profile 156:13
profiled 32:13
program 7:1,19
programs 12:4
progression
  134:17 135:7
  142:13
progressive 22:4
  26:23 27:1
projects 153:19
promoting 22:8
promulgating
  116:7
proof 150:17
proper 150:12
properly 73:25
property 16:2
propose 149:22
proposed 30:18
  31:3

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[proud - realtime]**                                                    Page 27

proud   156:9
provide   21:14
  29:4 42:20 43:3
  47:12 48:17
provided   23:11
  30:17 31:21 69:22
  139:9
provides   47:24
  65:22
providing   59:13
  69:18 79:13
provisional   42:25
  118:17 126:6,7,8
  126:13,16,22
  127:2,5,8,10,18
  144:8,11,13
psychology   11:24
public   15:9 28:12
  28:14,24 34:2,4,7
  34:9 85:13 108:19
  158:15 162:19
publically   68:5
publicized   53:22
publicly   53:25
published   147:3
  150:3 151:5
pulled   41:19 52:5
  52:5 53:21
punctuation   3:20
purely   76:25
purge   25:7,9 147:7
  150:7
purges   25:6
purging   25:11,21
  147:8,9 152:5
purpose   4:8 5:18
  5:19
purposes   4:9
  20:23 61:4 70:6
  71:11 88:20
  101:21 108:24

push   89:4
pushback   147:21
put   17:19 56:13,24
  57:12 69:2 114:5
  130:11 133:2
  145:20
putting   33:8 90:20
  90:25

**q**

quadruple   39:2
qualifications
  31:12
quandary   74:19
question   3:21 4:24
  25:10 36:13,14
  54:7 66:25,25
  70:5,7 71:11
  74:10,12,24 88:20
  95:4,6 104:19
  108:24 116:23
  128:10,17 148:11
  148:12 150:6
  151:19
questioning   87:19
questions   12:16
  13:3 26:9 31:11
  36:12 37:21 76:4
  90:3 98:11 101:1
  106:23 107:14
  110:21 153:22
  156:19,20
quick   112:17
quiescent   153:11
quite   17:11 46:14
  51:9 110:11
  131:21 137:25
  139:16 141:20,24
  151:4 153:18

**r**

r   35:16 65:20 66:2
  67:7 148:4 161:3
  161:3
race   23:4 45:11
  120:16,19,21,24
  121:3,7,15,20
  122:2 128:21
  129:13 136:13,14
  136:16
racial   46:1 128:13
  129:11,18 136:7,8
  139:4 140:25
  142:2
racially   141:16
raffensperger   1:8
  4:7 161:1 162:1
raise   24:16 43:24
raised   75:9
raises   100:25
  106:2
ramifications
  80:11
ran   23:25 137:6,11
randomly   151:18
  151:21 152:15
ranges   74:17
rare   34:11 62:9
rarely   59:8
rate   42:11 132:18
  134:3,4,6,8 135:21
  136:4,5 137:4
  138:9,11 139:3,20
  141:12 143:11
rates   42:17 109:22
  128:18 131:11
  138:1 139:12
  140:1,15 144:1,6
  149:3
raw   65:20 108:3
  135:8

reach   30:3,7 64:20
  71:21 115:21
  123:14
reached   41:7
  48:24
reaching   44:16
  45:4 48:24 109:16
react   149:7
reactive   153:13
read   5:8 16:12,16
  37:16 38:6 42:21
  53:8 64:12 104:7
  141:17 154:7,11
  154:14 157:5
  160:9 162:5
readership   149:14
reading   9:23
  16:10 55:14 56:25
readings   18:13
ready   5:7
real   112:17
realized   42:15
  55:17
really   12:20 14:16
  18:25 19:22 22:9
  27:5 33:4 36:13
  55:16 59:11 64:15
  84:8,12 89:24
  94:14 96:19
  100:11,12 103:7
  103:12 106:9,10
  107:20 110:8
  115:19 117:4
  122:17 123:19
  124:6,12 128:17
  131:9 132:7
  134:11,19 139:15
  148:25 151:14,23
realms   20:12
realtime   52:2

Daniel Smith , Ph.D.    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**reason** 56:14,23
59:15 92:8 98:20
99:1 101:6 116:12
131:12,19 132:16
138:18 142:4,14
144:23 152:11
160:11 161:6,9,12
161:15,18,21
**reasons** 79:9 105:1
131:20
**reasserted** 90:23
**recall** 5:18 7:3
24:14 29:7 30:12
31:2,3,20,23 33:13
33:14 37:1 39:23
40:1,3,8 41:14,18
46:8 131:16
136:11 148:9
**recalls** 63:8
**receipt** 160:18
**receive** 86:14
**received** 6:22 69:1
70:11 72:11 86:10
87:16
**recess** 75:22
**recognizing**
115:13
**recollection** 37:9
**reconcilable** 102:6
**reconcile** 63:11,13
64:13,16 67:2
74:6 81:4,14 82:2
88:11 100:11
101:10 103:16
108:8 110:23
**reconciled** 62:25
82:2
**reconciliation**
90:6
**reconciling** 7:25

**record** 4:20 34:3,4
39:9,10 41:12,13
41:15,20 59:24
75:24 78:4,15,18
79:1,13 82:6 89:6
89:15 92:14,21,21
96:23 98:23
103:13 105:24
107:5 108:4
110:13 113:14
114:22 117:6,7
121:22 122:8
127:14,15 134:21
147:16,19 156:8
156:15,16,21
159:11
**recorded** 55:10
87:2 97:10 98:12
99:25 123:9,10
125:8 127:9
**recorders** 106:13
**recording** 64:8
70:1 73:25 125:9
144:8 145:13
**recordkeeping**
38:8 43:8,10
52:18 59:20 70:18
75:10 90:1 103:9
126:16,21 142:21
143:5
**records** 34:7 39:2
40:2 43:16 45:15
59:4 60:20,23
61:13,15,15 63:24
63:25 64:22 65:9
67:17 70:22 71:13
73:14 76:19 78:22
80:14,19 81:1,8
82:7 87:10 90:18
92:11,12,17
103:10 106:25

107:10 108:4,19
120:15 121:8,9,15
122:15 126:12
127:18 142:22
**recounts** 63:9,9
**redistricting** 30:10
30:18
**reduce** 155:14
**reduction** 14:25
**reed** 33:14
**refer** 21:11 41:24
69:12,20 85:6
**reference** 22:2
30:9 32:2 35:3
36:4 40:14 41:22
42:8 44:24 46:6
47:13 50:17 51:1
55:9 65:8 71:18
76:6 125:15,21
126:6,11 127:2
141:7 144:10
**referenced** 34:22
64:7 93:21 160:6
**references** 3:21,22
3:24,25
**referencing** 60:24
81:11 113:18
**referendum** 12:25
27:13 33:25
**referred** 68:10,23
70:10 78:1
**referring** 30:4
35:6,10,11 72:9
73:13 74:14 82:20
86:4 88:17 106:6
109:24 125:11
126:9 143:10
146:12
**refers** 69:5,24 70:7
70:9 87:6 123:18
133:20 136:7

**reflect** 49:13 53:12
**reflected** 118:16
**reflects** 137:16
**reform** 16:4
**reforms** 15:23
16:14 32:10
**refresh** 37:8
**regarding** 48:17
126:16
**regardless** 110:17
124:8
**registered** 25:16
61:1 89:20 117:23
118:14 119:10,15
122:25 138:23
142:6 143:8
144:17,18
**registering** 122:21
150:17
**registrar** 68:11
**registrars** 47:12
47:25 72:14 107:6
118:1 122:11,21
**registration** 16:5,8
17:16 32:12 41:19
42:24 44:25 45:4
45:8,13,15 47:2
50:19 52:2,21
53:17 54:25 58:20
60:20,23 91:18
92:14,22 93:12
117:19 118:3,7,15
118:21 119:4,11
128:24
**registrations** 78:2
118:2 123:5
124:16
**regressed** 137:7
**regression** 137:7
137:11 138:13,20
140:2,12

Daniel Smith , Ph.D.                                              January 28, 2020

Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[regular - result]                                                       Page 29

**regular** 25:11
**regularly** 14:12
**reinserting** 91:21
**reiterate** 108:22
**reject** 128:15
**rejected** 45:19
66:3 73:2 80:4,12
80:15 92:20 98:18
100:1,4,5 101:24
101:24 103:22,25
104:6 107:2,8
125:2,7,15,25
126:14 127:23
128:1,4 130:3
131:14,23 132:3
133:11 135:2,25
136:21 137:8
138:2,5 139:23
141:9 142:3
**rejecting** 128:10
138:9
**rejection** 91:1
109:22 128:18
131:11,12,19,21
132:17,18 134:3,4
134:6,7 135:11,21
136:3,5 137:3
138:11,19 139:2
139:12,20 140:1
140:15 141:12,16
142:13,14 143:11
144:1,6
**rejections** 90:21
129:23 132:20,22
135:13
**relate** 128:20
**related** 8:9 9:8
140:7
**relation** 140:3
**relationship** 46:14
48:12 137:2,10,19

138:7 140:3,5,13
140:16,25 141:3,5
**relationships**
50:15 154:5
**relative** 32:9
159:12,14
**relatively** 8:12
88:9
**relevance** 132:24
**relied** 35:2 133:16
**rely** 152:10
**relying** 115:20
123:13
**remarkably** 55:16
**remedial** 63:6
**remedies** 154:2
**remember** 29:14
35:14 95:8 146:25
148:17
**remembered**
40:10
**remembering**
37:23 39:20 40:11
**removal** 16:1
**removed** 25:19
90:17
**rephrase** 70:4
**report** 3:11,14 5:5
5:8 6:6 20:24
31:10,13,14,17,22
32:1 36:3 37:7
38:11 42:7 43:3
44:4,17 45:2 46:9
46:10 48:18 51:21
52:15 56:14,22,24
57:2,13 64:12
65:15 68:19 110:9
112:4 113:23
117:4 143:13
144:12 146:1
159:8

**reported** 82:19
**reporter** 1:22,22
20:5 23:6 156:22
156:24 157:1,3
158:15 159:7,20
**reporter's** 3:6,20
**reporters** 1:19
29:15
**reporting** 35:25
**reports** 21:15,24
**represent** 5:4
140:2
**representation**
22:20
**represents** 23:16
**republican** 23:20
140:24
**republicans** 155:6
**reputation** 156:12
**request** 18:3 41:23
41:24 42:1,2,4
67:5 79:5,7 99:19
105:9 108:19
**requested** 66:9,12
84:18 157:7
159:10
**requests** 66:5,7
85:14 113:14
**required** 14:21
129:1 153:24
162:13
**requirement**
150:22
**requirements** 16:2
16:7 36:1 126:21
**requires** 114:16
**reread** 113:11
**research** 9:11
10:18 12:10 21:15
21:24 46:20,23
47:16 115:23

128:9 145:5
151:13 152:24
153:22 155:7,17
**reserve** 4:11
**residency** 16:6
**residuals** 136:16
**resignation** 27:3
**resigned** 10:12
**resolve** 74:19
81:20,23 82:3,3,10
**resolves** 82:8
**resolving** 63:19
**respect** 18:7 20:22
25:3 32:15 41:19
45:8,11 51:25
52:6,17 56:15
57:16 60:5 62:13
78:23 80:1,11
85:11 86:7 89:6
98:6 109:21
111:10 113:15
115:8,11 120:25
124:12 125:1,6
129:17 131:4
137:18 139:25
150:10 152:5,21
155:13,17
**respond** 150:24
**response** 112:5
149:24
**responsiveness**
4:12
**restored** 148:15
**restricted** 17:18
**restrictions** 15:25
17:13
**restrictive** 18:19
18:19 32:11 152:8
**result** 43:11 59:17
63:7 73:24 114:16
122:13 152:11

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[results - see]                                                    Page 30

**results** 55:12
57:22 58:15 61:22
62:7 63:4,14
74:10,12,14,25
75:7 114:10
134:16 135:9
150:15
**retain** 8:1
**retained** 5:19
**retraction** 17:20
**return** 67:5,8
69:25 70:12 84:22
101:22 106:6
160:13,17
**returned** 26:2
66:6,12 68:20
69:22 70:8 85:3
88:23 105:10
108:25
**returning** 66:8
69:17
**returns** 66:8
**review** 37:22 49:1
49:7 151:4,7,16
157:7 159:9 160:7
**reviewed** 32:14
39:13 44:9 46:9
46:10 48:16 49:2
**revolved** 33:22
**rick** 24:2,3,7
**rife** 38:9
**right** 4:5 5:10
13:11 20:18 22:5
28:8 30:23 31:25
34:24 39:20 40:25
54:18 57:7 64:18
71:4,8,9 72:7
73:18 75:21,23
82:25 84:5 90:16
91:4 92:12 93:8
97:13 98:2,3

100:21 111:23
113:3 115:21
117:9 121:14
122:8,14,16
123:21 124:4
125:14 130:3
131:14 136:5
137:6 139:24
141:24 143:22
156:17 157:5
**rights** 33:24 34:21
112:13 148:15
149:25
**road** 129:6
**rogue** 49:24
**role** 46:6
**roles** 118:18
**roll** 25:19
**rolls** 25:14,21
148:21 150:7,21
**roman** 49:9
127:22
**room** 55:21,22,23
**roughly** 83:20
**row** 77:19 86:4,15
102:2,2,12 103:24
**rule** 25:17 49:17
50:5 117:2
**rules** 4:9,19 41:10
114:7 154:25
**ruling** 50:8
**run** 36:1
**running** 104:18
**runs** 27:16

**s**

**s** 1:13 20:24 23:10
24:3 65:21 66:2
67:7 161:3
**sabbatical** 10:23
**sadly** 35:13

**sample** 135:8
**sat** 48:6
**saw** 62:13 89:5
132:13
**sawiki** 23:4
**saying** 66:22 83:8
92:12 95:9 96:17
105:23 129:12
130:24 132:18
139:3 140:6 141:3
141:15 144:19,20
151:10
**says** 30:17 31:3
55:11 78:13
104:13 111:19
**scale** 46:1 149:23
**scalia** 33:20
**scattershot** 29:8,9
**scenario** 69:10
72:13 104:21
109:3
**sceptic** 57:24
**scheme** 132:1,4
**scholar** 13:1 19:24
26:10 110:18
112:12 152:10
156:7,8
**scholar's** 33:11
**scholarly** 16:24
145:5 153:16
**scholars** 8:20 9:1
32:23 48:11 150:5
**scholarship** 33:1
46:12,22 48:20
151:3,17
**school** 12:13,21
**science** 3:14 11:13
114:5 133:8 149:1
154:17 155:20
**sciences** 11:24
24:17

**scientist** 18:25
19:7 21:2 115:8
153:21 155:24
**scientists** 18:14
**scj** 1:3
**scope** 26:5,6,8
149:24 153:4
**scribe** 1:19
**scrivener's** 53:1
53:12
**scrutiny** 34:3,9
**se** 22:10
**seal** 158:11
**season** 28:18
**second** 1:20 42:24
45:16 76:15 80:5
107:16 108:21
110:8 117:6
143:25 147:17
149:22
**secretary** 1:8 4:7
35:15,18,19 46:7
46:14 47:11,23
48:3,16 49:4
59:12 108:5
111:19 112:1
113:13 115:18
116:7 130:20
143:16 147:6,21
**section** 30:5 49:9
65:16 71:23
143:23,23,24
144:14 149:13
**sectional** 15:24
32:10
**sectionally** 19:4,20
20:13
**sections** 90:5
**see** 10:21 24:20
26:22 29:24 39:5
40:16 45:20 47:13

Daniel Smith , Ph.D.                                January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[see - southeast]                                                    Page 31

50:14 64:1,9
67:25 68:21 69:7
71:22 73:8,11
74:5 76:3 79:3
91:6 92:12 102:6
107:2 110:4,17
112:18,22 118:10
119:21 120:22
123:11 135:21
136:24 137:10,16
151:20 152:16
155:11
**seeing** 74:17 117:1
**seek** 136:18
**seeking** 81:7
**seen** 5:25 8:23
48:9 52:11 68:5
131:24 140:11
146:7,9 152:3,9
**segment** 28:15,18
29:10
**segregation**
129:11,18
**semester** 14:18
**semicolon** 84:4
**seminar** 14:16,18
15:16,17 18:22
**send** 29:2,3
**sense** 17:21 41:8
53:9 60:13 68:25
69:3 71:16 98:1,3
98:4 99:15 100:23
103:13 125:6
140:4,6
**sensitive** 19:23
**sent** 31:17 160:14
**sentence** 21:14
26:22 38:6,6 41:2
43:7,10 44:23
51:1 61:19 68:17
68:21 69:4,7 74:8

78:10,12 81:19
84:3 112:18 144:7
144:16
**separate** 41:20
60:16 65:18
127:11
**sequencing** 90:16
**series** 15:24
**serious** 107:18
142:20,22 143:5
**seriously** 8:22
**served** 27:3 34:14
36:5
**services** 3:13 27:5
36:25 37:8 51:22
**serving** 35:4,11
**set** 19:20 28:6 36:1
42:6 51:15 57:17
75:6
**setting** 89:1
**seven** 18:24 20:4
33:19 39:25
**shape** 18:15
**sheet** 160:11
**shifting** 33:5
**short** 145:14
**show** 28:20 29:20
97:6,11,25 98:2
100:16 101:5
102:16 107:1
118:18 122:6
131:10 140:12
148:24
**showing** 60:2
96:13
**shows** 107:2
118:13
**side** 58:4 131:4
**sign** 157:5 160:12
**signature** 111:17
111:24,25 112:10

128:23 131:5
132:9,10,11,22
158:14 159:19
**signatures** 33:23
34:1,9 112:7
**signed** 160:20
**significant** 125:20
**signing** 34:4
**silenced** 153:11
**similar** 9:12 15:4
37:2 38:13 48:9
59:9 60:13 131:24
142:8 149:2
**similarly** 103:23
**simple** 75:2
120:23 141:2
148:11
**simply** 82:18 99:9
137:6 148:11
**single** 19:1,15,18
39:9,9 50:17
59:14 60:7 77:23
78:8 79:13 80:14
90:23 114:22
**sink** 141:4
**sit** 108:2 113:25
**sitting** 50:7
**situation** 153:23
**situations** 140:11
**six** 39:25 100:18
**size** 64:5
**skew** 138:10
**skewered** 29:5
**skipped** 117:13
**slightly** 50:23
**slippage** 122:20
**slope** 137:16
**slow** 20:5
**small** 22:8
**smaller** 88:9

**smith** 1:15 3:4,11
3:11 4:2,6,16
20:16,19,24 21:8
21:13,18,19,22
22:1,12,23 76:2
117:9 129:5
156:17 158:9
159:9 160:5 161:2
161:24 162:2,4,12
**snapshot** 54:2
92:9 121:6 122:9
122:18
**snipes** 24:25 34:22
**social** 18:24 19:7
133:8 149:1
**software** 50:19
**solely** 116:20
143:19
**solutions** 160:23
**somebody** 58:4
**somewhat** 46:17
103:18
**soon** 20:20 54:8
**sorry** 11:2 20:7
26:19 46:2 53:6,6
58:19 63:9 85:1
86:3 94:4 96:6,8
100:18 103:3
113:7 118:3
122:11 137:13
152:23
**sort** 63:12 118:14
134:15,17
**sound** 3:24,25
**sounds** 18:22
58:18 88:20
103:11
**soups** 14:11
**south** 23:4 129:4
**southeast** 1:20

Daniel Smith , Ph.D.                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[southern - stop]**                                                    Page 32

**southern** 27:14
**space** 28:12 150:2
**speak** 6:17 43:19
   52:23 108:7 120:1
   134:14 145:6
**speaker** 3:22
**speaking** 30:2,6
   118:5 127:13
**special** 28:13
**specialized** 8:9
**specific** 23:9 29:18
   32:5 35:14 37:21
   43:22 44:2 75:9
   81:3 97:15 116:15
   126:24 149:25
**specifically** 17:9
   25:3 30:9 32:17
   39:7,21 40:1,11
   44:17 45:3,23
   55:1 56:18 60:9
   65:14 71:2 73:13
   74:22 75:11
**specifics** 45:25
   126:21
**speculative** 23:19
**spoiled** 66:3 79:18
   99:1 104:10,14
**spread** 131:9
**springer** 15:22
**squad** 24:1,7,14
   156:11
**stacey** 5:14
**staff** 41:10
**stand** 66:2
**standard** 132:14
**standardized**
   112:8
**standards** 111:10
   112:14 114:15,18
   147:10

**standing** 41:23,24
   42:2 79:7 91:20
**standpoint** 50:14
   146:10,11,13
**start** 5:6,23 6:19
   14:4 20:19 57:18
   64:18 70:18,25
   90:14 91:8 120:13
   133:14
**started** 10:10 13:2
   13:4 20:21 47:3
   52:24 53:23 54:9
   77:2 117:18
   154:13
**starting** 6:20
**state** 1:8 4:8 5:4
   7:23 8:12,15,19,21
   8:22,23,24 12:24
   13:7,8,12,16,19,21
   14:15,17,17,18,20
   14:22 15:6,8,15,22
   17:22 18:18,18
   19:1,2,15,18 20:1
   20:1,9,9 25:17
   30:10 32:6,7
   33:24 34:3,5,14,15
   34:16 35:4,8,12,15
   35:18,19 36:5
   39:12,12,22 41:25
   43:22,25 46:7,8,15
   46:15,18 47:11,11
   47:20,24 48:10,16
   48:22 50:23 52:4
   54:14 59:13,23
   60:2 61:6,13
   62:11 63:6 66:11
   70:24 76:13 78:20
   83:2 88:15 105:8
   108:5,5,17 110:23
   111:2,19 112:1,25
   113:13,19 114:15

   115:1,18,22 116:3
   116:6,7,16,17
   118:6 119:11
   122:10 126:12,18
   127:14,16 129:19
   129:19 130:9,19
   130:20,21 135:9
   143:15,16,16,20
   144:18 145:14
   146:5 147:10,21
   148:7,12 158:6
   159:5
**state's** 34:8 35:18
   46:7 48:3 49:4
   55:12 57:21 59:13
   63:15 147:7
**statement** 38:15
   47:15 49:14 61:20
   61:25 62:2 64:17
   68:1 74:8 75:3
   81:12 84:1 85:5
   109:14 110:25
   145:17
**states** 1:1 8:4,11
   9:2,5 12:22 16:1
   17:12,13,25 19:3,6
   20:3 32:3,17
   39:14,16,19 40:7
   43:20 46:19 47:23
   48:2,2,11 58:4
   60:21,22,24 61:9
   61:13,17,24 63:3,3
   63:12 65:23
   111:13 116:11
   118:6 119:1,3
   128:8 131:25
   145:16,20 152:3,4
   152:8,9 155:3
**statewide** 40:2,21
   47:24 48:12 51:7
   51:23 54:4 59:25

   60:4 62:10 71:22
   72:2 74:3 83:19
   85:9,18 108:18
   110:3 117:15
   118:16 121:4
   122:1 138:11
   139:24 145:21
**status** 40:20 65:9
   65:11,14,17,19
   66:10,18 67:18,18
   69:25 70:7,21
   76:6,24 83:21
   84:10 85:1,2,8
   87:1,7,14 88:10,22
   89:7,13,15 96:4,12
   97:15 98:4 100:7
   101:22 105:3
   106:5 108:25
   126:6
**statuses** 74:6
**statute** 36:14
**statutory** 47:16,18
**stay** 29:4 154:22
**stayed** 13:20
   134:22
**stem** 108:22
**stenographic** 1:22
   159:11
**stenographically**
   159:8
**step** 58:17,21
   76:18 77:7 81:24
   91:19 119:21
**stepped** 27:4
**steps** 126:12
**stipulate** 102:18
   129:18
**stipulated** 67:14
   91:13
**stop** 70:25 75:20

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[stopped - take]**                                                    Page 33

stopped   70:24
stops   54:14 72:1
  96:19 97:8
straightforward
  108:9
strategy   3:12
  26:14,21 27:1
  83:1
street   2:2 129:9
strict   150:16
strong   17:6 34:7
  105:16
structured   15:4
student   12:1,24
  47:1,5,19 48:20
  61:5 116:1
students   11:15,16
  12:2,4 14:22 17:2
  17:21,22 18:5,12
  18:24 19:23
studies   8:5 11:12
  16:17 20:14
  150:13,23 151:4
  151:10,12
study   7:12 8:9
  9:13,16 10:1
  19:18 32:10 36:13
  127:3
studying   8:15,24
style   65:17 67:19
  67:22,23 68:18,23
  69:5,24 70:8
  76:23 85:1 86:24
  87:2,7,15 88:10,23
  89:13 108:14
  109:1 123:14,17
  124:13 133:16,19
  134:1 135:1
sub   19:2
subject   32:19 34:2

subjects   14:6
  151:18
submit   79:7
submitted   79:17
  79:19
subscribed   162:14
subset   134:2
subsidiaries   51:18
substance   31:9
substantial   49:13
successful   99:24
successfully   98:7
  98:19 107:1
suggest   99:18
  101:3 143:4
  150:16 156:3
suggested   31:21
  94:10 98:8
suggesting   62:19
  69:17 79:5 135:24
suggestions   31:24
suggests   140:3
  144:23
suite   1:20 2:8
summarize   38:20
  38:21 43:7
summarizes   21:23
summary   21:17
  21:20 38:5 55:12
  76:20
summed   51:5
superintendents
  47:13,25
supervised   115:24
supervisor   25:1
  35:8 131:2 140:23
  148:19
supervisors   39:8
  41:8 48:4 52:2
  59:16 106:13
  111:18 128:19

130:17
supplemental
  118:10
support   140:24
supporter   84:18
  105:16
supporting   34:8
supports   144:12
suppose   78:6
supposed   44:1
  76:7 78:15 109:5
  114:14 116:5,22
supposition   97:7
suppression
  154:18,19 155:10
  155:19
supreme   34:11
sure   5:25 6:17 7:6
  8:11 10:7 13:21
  17:24 24:15 28:23
  33:16 38:8 41:7
  42:16 43:15 44:11
  45:6 48:21 53:20
  54:1,7,23 62:24
  66:15 67:15 69:21
  70:14 72:4 75:8
  75:18 83:7 84:22
  88:14,14,16 90:16
  94:9 96:8 101:14
  104:25 105:20
  111:9 112:5
  113:23 116:8
  118:17,23 119:1
  119:24 123:24
  124:1,3,24 126:4
  129:25 136:15
  138:25 140:7,8,14
  147:18 149:12
  154:11
surely   78:21

surprise   119:14
surprised   24:21
  40:9 59:11 60:1
  119:18 153:7
surprising   106:7
  108:17
surrounding
  72:22
suspected   147:15
swear   18:2
sworn   4:3 104:2
  158:10 162:14
synchronizing
  43:21
system   25:3 29:22
  50:22,25 51:2,4,7
  51:15,17,20,23
  52:20 59:25 88:21
  116:24 145:22
systematic   49:25
  110:17
systemic   115:17

**t**

t   1:13 161:3,3
table   66:15 93:20
  94:6,8 96:2,10
  99:6,6 100:10
  101:8 106:17,18
  125:11,12 134:22
  136:3 139:9
tables   139:9
tabulations   120:24
take   3:10 4:21
  9:16 29:12 37:15
  37:17,20 46:2
  52:9 78:7 80:13
  94:22 96:18,22
  101:9 126:12
  138:3 142:18
  148:20 149:1
  151:20

Daniel Smith , Ph.D.                                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[taken - three]**                                                        Page 34

taken  1:15 4:6
  75:22 91:3 146:3
takes  16:24 138:15
talk  4:19 50:16
  65:14 83:18
  117:17
talked  33:20 80:10
  82:20 104:20
  107:23 147:8
talking  55:16
  58:16 67:17 70:18
  74:20,22 76:2
  103:12 104:15
  113:21 123:20
  124:5 127:24
tallied  103:1
tally  56:15 74:18
  105:2
target  149:24
targeted  148:12
  149:3,4
taught  13:5 14:8
  14:12,24 17:8
taylor  2:7
taylorenglish.com
  2:10
teach  10:18 11:10
  14:14,16,23 15:3
teaching  12:7,11
  13:24 14:1,6,10,18
  15:1 20:21 57:20
technically  92:18
technological  51:6
  74:11
tell  23:9 24:1
  42:21 43:13 45:10
  58:11 120:18
  129:4 132:11
  138:19
telling  57:4

tells  85:2
ten  55:22 103:25
  138:5
tend  12:11
tens  107:25
tenure  10:10,11
  11:2
tenured  10:9 11:2
  11:3,19,19 12:16
term  23:25 24:2,4
  25:6,7 85:10 91:4
  154:18,21,22
  155:18,19,20,21
  155:22 156:2,6
terminal  7:1
terminology
  118:11,12
terms  7:21 11:15
  16:3 17:13 18:10
  19:17,21 22:10
  32:14 40:8 51:12
  52:4,11 55:24
  56:18 60:6 61:17
  65:25 66:14 69:17
  86:23 87:20 88:11
  90:7 92:6 93:17
  95:7 103:16 113:2
  126:17 128:6
  131:22 132:17
  133:3,12 147:4
  155:24 156:9
terribly  70:16
  155:23
testified  4:3 71:2
testimony  3:23
  112:24 160:9,18
  162:8
tests  16:2 152:16
texas  19:9
text  65:23

textbook  17:10,11
  17:19 32:15
thank  23:24 30:24
  42:6 45:24 101:12
  117:10 124:14
  146:19 156:17
thanks  146:18
theme  25:5
theoretically  91:6
  91:9
theory  117:22
thesis  6:24,25,25
  7:21 47:4,4
  115:25,25
thicket  125:12
thing  4:22,23 99:4
  128:19 132:21
  148:23,24 153:5
  155:7
things  6:16,18
  18:21,25 21:18
  22:25 29:12,17
  32:5 48:9 51:9,12
  52:9 56:25 69:12
  84:12 97:17 98:15
  99:23 100:10
  108:8 112:21
  114:11 120:22
  123:21 133:4
  150:16 151:14,21
  152:13,17
think  5:19 9:24
  18:13 20:11 21:20
  22:7,16 24:2,4
  29:10,15,18,19
  30:6 33:19 36:10
  36:23 38:14 43:2
  44:7 46:10 47:1
  50:7 51:5 53:2
  56:1,9,10 57:4,12
  57:17,24 58:8

61:25 63:2 64:12
  64:17 65:5,14
  66:13 68:3 69:2
  70:15 71:1 74:13
  75:4 76:21,25
  79:4 81:13 82:22
  87:8,9,20 89:14
  90:9 92:16 93:10
  93:17 94:9,13
  95:7 97:4 98:22
  99:5,6 102:10
  104:4,17 107:13
  108:15 109:8
  111:8 113:22
  116:19 121:24
  123:4 124:5,12
  125:22 126:1
  129:18 133:1
  134:13 136:10
  137:12 139:16
  145:11,11,20
  146:2 151:2,9
  152:18,24 154:2
  155:21 156:3,14
thinking  18:5
  19:11 55:15 56:25
  60:1 73:19 95:7
  115:11 124:2
  145:21 152:20
third  11:8,23
thought  10:25
  13:1
thousand  11:22
  73:18 81:3
thousands  73:10
  103:10 107:25
three  45:6 46:13
  54:15 57:6,8
  110:2 117:4 120:2
  127:19 143:23

Daniel Smith , Ph.D.    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[throw - tyson]**    Page 35

throw  138:25
throwing  141:4
thrown  140:17
ticked  149:6
tie  45:3 89:19
  92:14
tied  46:11,20
  48:19 62:15
tier  10:5
till  27:2
time  1:18 7:7,13
  8:5,7,16,23 9:20
  10:13,21 11:18,18
  11:19,20 13:11,21
  15:24 16:12 17:11
  19:2,4,6,14,16,20
  20:13,20 22:16,19
  26:15 27:7 29:16
  37:20 47:20 54:1
  54:11 61:10 77:13
  78:8 88:6 94:1
  105:13,19 114:12
  114:17 119:4
  122:19 129:6
  133:7 135:13,20
  138:18,25 151:8
  156:18 160:19
timeframe  160:8
times  29:24 39:11
  42:1 61:2 67:12
  79:5 133:20
timing  114:4
title  49:11
titled  37:8
titles  10:2,5
today  5:7 50:7
  133:2,20 156:18
toiled  20:12
told  17:2
top  12:3 24:11
  30:15 35:16 40:9

49:10 50:17 51:2
51:3 70:20 76:5
79:8 94:6 106:24
110:24 147:3
topic  7:3 15:11
topics  15:18,18
  28:9 29:7 42:19
  43:4 48:18
total  58:13 63:1
  81:20,21 94:12
  97:21 99:10,10
  101:17 102:3
  137:12
totals  94:23
tough  33:21
track  10:9 11:2,19
  12:16 54:21 79:11
  117:19
tracked  66:21
tracking  79:9
  85:11 86:8 87:3
  122:3
tracks  65:12 66:11
  66:11
tradeoffs  19:17
  20:11
trail  3:22
train  43:11 44:14
  44:24 90:2 108:23
trained  114:14
  116:21 143:17
training  47:12,24
  48:7,8,16,25 49:1
  49:6,7,14,16,20
  50:3,10 109:13,15
  114:4 143:20
  144:9
transactions  45:1
  144:8,13
transcript  157:7
  159:10,10 160:6

160:20 162:5,8
transition  10:14
transmittal  105:25
treat  153:16
treated  111:11
  112:10 151:21
treating  112:15
treatment  32:7
tremendous  56:2
trial  4:12
tried  29:19,20
  65:21
triggered  41:16
  63:9
triplicate  39:1,24
troubling  108:8
true  38:18,24 44:5
  44:6 61:25 73:8
  84:20,23,24 89:5
  97:8 107:20
  109:18 142:24
  143:1 159:11
  162:8
try  4:19 5:1,4
  63:10 64:13 77:22
  80:13 101:9
  154:22
trying  8:1 10:15
  18:25 24:16 37:14
  38:22 66:20 77:3
  77:11 78:7 79:4
  79:11 81:4,13,14
  84:14 87:21 88:14
  89:24 90:4 96:8
  97:14 98:15 99:2
  99:23 100:11
  103:7,16 111:8
  112:5 114:11
  122:17 128:24
  140:2 147:4 149:1
  150:14

tuesday  1:17
turn  6:8 38:2
  40:13 54:18 66:15
  93:20 109:21
  112:16 148:14
  149:11 150:19
  151:24 155:5
turned  9:13
turning  16:18
  149:5 152:22
  155:9
turnout  9:8 16:15
  18:7,11,20 149:4
  153:24
tweet  21:21 24:11
  24:19 156:10,11
tweets  23:25 25:5
twin  149:9
twitter  22:23
  24:12 156:12
two  10:8,15 20:2
  33:19 42:3,22
  46:13 56:2 65:18
  77:12 82:12,13
  83:7 90:21,21
  94:15 96:18 97:3
  97:17 120:2
  123:20 132:5,6
  140:6,18 151:21
  156:4
tying  91:22
type  26:3 35:23
  43:17 85:21 107:5
  132:12 134:19,23
  136:1
types  14:6 32:10
  48:9 129:23
typical  47:23 70:2
  71:14
tyson  2:10 3:5 4:5
  4:15 5:4 20:7,8

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

23:23 26:11 30:21
30:23 31:1 37:20
38:1 53:14 75:18
75:20,23 76:1
113:9 117:6,8
146:20 147:18
149:10,19,21
154:6 156:14,17
156:23,25

**u**

**u** 69:20
**uf** 13:15
**uh** 3:24,25 107:4
120:17 125:18
133:18
**ultimate** 148:6
**ultimately** 65:7
79:23 122:15
142:11
**unacceptable**
133:10
**unclassified** 84:6
**uncovered** 110:11
**uncovers** 142:20
**undergraduate**
14:15 15:3 17:23
18:14 47:19
**underlies** 96:2
**undermine** 108:15
**underpaying**
42:15
**undersigned** 158:8
**understand** 17:25
18:6 29:6 37:14
75:6 76:16 77:3
87:14 89:2,23
115:14 124:22
131:1
**understanding**
60:16 66:2,4
77:17 84:13

106:16 108:14
126:10 128:7
**understood** 48:22
80:24
**unemployment**
7:25
**unexpected** 59:7
**unfortunately**
4:23 36:10 65:21
**unified** 93:19
**uniform** 50:1,17
59:18 74:3 111:10
112:8,14 114:18
116:11,14 132:13
**uniformity** 44:1
88:15 109:11,17
109:18
**union** 34:21
**unionization** 9:8
**unique** 58:23
77:23 81:15 91:25
94:16 95:13,14
119:25 121:15
**unit** 115:4
**united** 1:1
**units** 19:2
**universe** 104:3
127:23 128:2
**university** 6:21
7:10 8:7 9:23 10:9
10:15,18,21,24,25
11:3,10,14 12:5,6
13:25 14:13 20:21
21:3 24:17 27:13
27:14 61:6
**unknowable** 82:18
**unknown** 136:8,10
**unlocked** 88:1
**unobservable**
43:16

**unusual** 39:5
70:12,16 71:12
75:12
**unwieldy** 139:10
**uocava** 69:20
72:10,15 76:11
105:11,14,16,18
105:23,23 130:2
**update** 71:15
**updated** 53:19
54:5,12 72:14
73:5,15,17 85:23
96:19 107:10,22
**updates** 70:24
78:9 83:14
**updating** 54:15
72:1 79:13 86:5
**upheld** 35:1
**uploading** 51:19
**upward** 137:16
**usc** 27:14
**use** 4:13 18:8 56:4
149:1 155:12
**useful** 85:4 155:23
**usually** 45:12
**utility** 154:24
155:11

**v**

**v** 3:13 35:17 69:20
116:12 127:22
161:1 162:1
**valid** 62:25 72:19
73:22 80:1 84:10
88:22 98:9 100:8
101:22 105:3
106:5 108:12
125:9 126:7 127:9
**value** 20:14 90:23
**variable** 140:18
**variables** 138:17
138:19 139:1

140:7
**variation** 19:2
56:3 57:1 61:16
128:5 144:2 155:8
**variations** 17:12
56:19
**varies** 39:7
**variety** 126:25
129:20 135:10
**various** 10:2,3
13:18 15:5,9,25
17:13 26:9,23
28:22 32:10 54:19
**varying** 129:20
**vast** 102:1
**vbm** 38:9 85:16
**vendor** 147:14
**verified** 72:18
**verify** 160:9
**veritext** 1:19
160:14,23
**veritext.com**
160:15
**versa** 83:6 120:9
120:12
**versus** 43:14 74:21
**vet** 119:5
**veteran** 136:1
**vice** 83:6 120:9,12
**victory** 24:12,13
24:22
**view** 104:8
**violate** 115:7
**violated** 25:17
**violation** 130:6,19
130:20
**virginia** 9:22 10:1
12:14 62:13
**virtue** 14:19
**visiting** 10:7

Case 1:18-cv-05391-SCJ    Document 405-1    Filed 06/28/20    Page 201 of 205

Daniel Smith , Ph.D.                                    January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

[visitor - wash]                                                  Page 37

**visitor** 10:20
**visualize** 136:18
  137:20 139:15
**vote** 16:18 18:1
  37:13 39:2 40:15
  40:20,20,24 41:5
  41:20 42:2 52:17
  53:5 54:25 55:1
  56:5,7,7,16,19
  58:13 59:4 60:3
  60:12 66:19 72:16
  72:20 73:9,11,11
  74:17,18,23 75:7
  77:8 79:22 80:4,6
  80:9 82:5,7 83:5,5
  83:13 87:22,24,25
  88:2,5 89:22
  90:19 91:20 92:2
  92:3,13 93:1,2
  94:18,19 95:16,18
  95:20 96:14 97:6
  97:11,12,21,22
  98:8 99:2,10,24
  101:1,2,5,25
  102:12,14,21
  103:1,1,2,5,23
  104:6,12,23 105:2
  106:1,15 110:11
  111:3,9 113:14,16
  117:15,24 118:13
  118:17 119:10,16
  122:25 123:6
  125:4,6,8 140:19
  144:5,6 148:14,24
  150:17,19 151:24
  152:22 153:10
  154:18 155:5,9,15
  155:19
**voted** 55:2,11 60:3
  73:25 80:22 84:8
  88:1,2 94:24,24

95:17 97:23 98:7
  98:9,11,13,17,19
  99:11 100:8 122:2
  122:16 125:25
  126:8 127:5
  133:22 138:23
  139:19 152:6
**voter** 7:6 17:16,18
  24:8 25:6,7,9,10
  25:14,16,21 26:1
  32:11,12 36:17
  38:12,23 40:8,21
  41:13,16,18,18
  42:23 43:9,9
  44:25,25 45:3,7,8
  45:13,15 47:2
  50:18,19 52:21,25
  53:10,17,17,18
  54:2,22,24 57:21
  58:19,23 60:20,23
  61:4,6,15,18,23
  62:8 64:1,9 65:2
  68:12,24 69:5,24
  69:25 70:1,9,22
  71:13,18 73:6,16
  74:21 75:7 76:7
  77:13 78:4,19
  79:6 81:9,21 83:3
  84:22 87:22 88:6
  88:24 89:7,8,17
  90:1,7 91:5,11,17
  91:18,23,24 92:1,9
  92:13,14,20,21,24
  93:1,4,12,18 94:3
  94:12 95:14 96:13
  97:2 100:16,24
  102:16 103:4
  105:14 106:8,25
  109:2 110:3,10
  118:2,20,21 119:6
  119:20,25 120:3,8

120:10,11,16,23
  121:4,7,16,22,23
  122:2,7,12,14,24
  123:10,18 124:9
  124:25 125:2,16
  128:14 131:2,16
  133:21 134:3,4
  136:11 138:25
  142:21,22 143:2
  143:24 145:13,13
  145:19 150:10,16
  152:8 153:24
  154:18 155:10,22
  156:4
**voter's** 41:22,23
  54:24
**voters** 38:9 39:24
  40:4 42:1 45:17
  61:2,21 67:4,24
  68:20 69:20 70:11
  72:5,10,15 74:25
  76:11 102:20
  105:20 106:6
  119:15 122:21
  130:18 132:19
  134:7,8 135:13,13
  135:14,19,20,24
  136:4,5,20,21
  137:3,4,15,15
  138:18,18 139:5
  141:10 142:6
  143:8,12 144:17
  144:18,22 147:7,8
  147:9 152:5
**votes** 58:15 61:22
  62:20 63:25 71:19
  72:11 73:17 74:15
  80:1 82:18,19
  88:14 91:1 94:20
  94:21 104:17
  106:1 134:2 156:5

**voting** 3:13 8:10
  12:7 13:8,18
  15:25 16:8 17:8
  18:4 19:8,11,25
  20:3 22:18 27:25
  28:2,10,15,17
  55:11 56:21 58:5
  58:6,18 69:6,15
  72:6,16 87:2
  112:13 120:21
  122:6,8 123:9
  126:1 127:5
  135:20 149:25
**vs** 1:7 33:13 34:21
  36:4,25 37:8

**w**

**w** 23:10 35:16
**waiting** 34:18
**waldo** 129:6
**walk** 12:5 31:25
  93:21 141:22
**walking** 93:14
  133:14
**want** 14:22 18:12
  19:1,3,22,23 22:24
  25:22 28:17 34:20
  37:15 54:23 64:18
  70:6 71:10,25
  75:8,19,21 78:8
  83:6 84:21 88:8
  96:20,22 97:3
  103:21 105:19
  108:24 114:19
  123:24 124:3
  131:20 142:17
  144:25 152:14
**wanted** 9:4 10:22
  20:25 34:10 49:11
  76:3 88:16 137:11
**wash** 55:19 57:15

Daniel Smith , Ph.D.                           January 28, 2020
Fair Fight Action, Inc., Et Al. Vs. Raffensperger, Brad, Et Al.

**[washington - zeros]**                                      Page 38

**washington** 2:3
  8:25 33:24 34:3,6
**watch** 36:4
**watching** 28:11
**way** 12:13 15:20
  16:22 42:21 51:11
  58:7 61:14 63:6
  73:19 78:21 79:14
  86:16 90:15 94:9
  96:14 98:22 101:9
  102:10 114:6,8
  116:25 124:2
  131:8 138:12
  151:10 154:3
**ways** 20:14 51:14
  77:16 78:7 83:7
  86:20 130:25
  137:20
**we've** 150:8
  156:20
**web** 21:11 28:4
**webinars** 48:5,6
**website** 3:11,12
  21:8 26:20
**week** 16:20,22,25
  28:10,11
**weekends** 20:4
**weigh** 137:11
**weighted** 138:13
**welcome** 117:9
**welfare** 15:10
**went** 10:11 11:5
  12:15,21 58:17
  149:14
**west** 2:3 9:22 10:1
  12:14 129:8
**whatsoever** 88:10
**white** 129:10
  134:3,8 136:5,13
  139:11,12 142:1,7
  142:9 143:11

144:18
**whites** 135:3
**wide** 18:13 59:23
  74:17 131:8
  136:25
**widespread** 49:22
**wife** 10:14 11:1,9
**win** 33:20
**window** 118:7
**winning** 62:17,18
  62:18
**wisconsin** 6:21
  7:11 8:8 9:11
  12:13,22 155:3
**wise** 10:25 31:7
**wish** 46:16
**witness** 3:3 23:7
  26:7 30:25 37:17
  37:23 53:5,7
  113:8 147:20
  149:17 153:6
  157:6,6 158:11
  160:8,10,12,19
**witnesses** 21:15,24
**won** 34:11 104:16
  115:25
**word** 92:16
**work** 5:14,16 9:14
  18:18 21:1,2 22:1
  26:9 28:9 29:23
  30:3,4,10,12 33:7
  33:8 34:5 35:2
  36:16 37:19 42:9
  42:12 46:11 67:16
  77:17 110:19,20
  130:12,12,13
  145:5 149:23
  150:2,5 152:10
**worked** 22:11,13
  22:20 23:1 28:12
  29:24 35:18 46:25

47:4 146:21 148:1
**worker** 50:24 58:1
**working** 13:2
  35:15 48:20 61:5
  75:8 90:15 116:1
  140:14 155:2
**workings** 29:21
**works** 21:14 26:23
  48:3
**world** 155:20
**worley** 35:16,17
**worrying** 110:22
**wow** 55:16
**wrap** 66:20 84:14
  99:23
**write** 7:9 31:14
  34:8 52:15
**writing** 17:4 33:4
  152:19
**writings** 32:6
**written** 23:11 32:2
  48:11 105:17
  123:25 124:24
  128:18
**wrong** 42:22 62:14
  103:10
**wrote** 8:21 9:7
  31:16 151:10
**wvu** 10:7

**x**

**x** 3:1

**y**

**y** 35:16 72:20 82:5
  91:7,10 94:11,11
  94:22 99:9,11
  104:19,23
**yeah** 7:15 13:14
  24:15 27:16 35:25
  37:17 38:14 41:2
  46:25 47:18 50:21

55:14 59:11 65:5
  70:6 72:24 76:10
  76:21 82:1 102:8
  103:3 110:2
  116:15 124:5
  136:10 140:14
  144:24 145:5
**year** 5:13 10:8,20
  10:24,24 11:8
  16:4 42:14 154:13
  154:14
**years** 7:7 13:2
  14:9,24 27:3,6
  33:2 40:1 46:13
  129:5 146:3
**yep** 4:14 107:12
  112:23
**yesterday** 5:8,9
  15:21 16:20 18:23
  53:9 55:15
**york** 61:7
**young** 7:17 138:18
**younger** 135:24

**z**

**zero** 55:22
**zeros** 100:12

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.