## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, *et al.*,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, in his
official Capacity as Secretary of
State of Georgia, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action File

No. 1:18-cv-05391-SCJ

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. MICHAEL C. HERRON AND BRIEF IN SUPPORT

Pursuant to Federal Rule of Evidence 702, Defendants Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia (the "Secretary"), and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le, also sued in their individual capacities (collectively, the "Defendants"), submit this Motion to Exclude the Testimony of Dr. Michael C. Herron at trial and for this Court's consideration of Defendants' Motions for Summary Judgment. See Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (citation omitted) (only admissible evidence can be considered on a motion for summary judgment).

# I.    Introduction and Facts

Plaintiffs engaged Dr. Herron, a professor at Dartmouth College, to "assess the extent to which polling place adjustments were made in Georgia between the 2014 and 2018 General Elections," and whether those adjustments were racially neutral.  Doc. [241 at 7].[1]  Based on his review of various election-related data and third-party reports about polling place changes in Georgia (Doc. [241 at 15, 22, 24-26]; (Herron Dep. Ex. 8[2])), Dr. Herron concludes (1) that the impact of polling location changes in Georgia was not "racially neutral;" and (2) that polling place location changes negatively impact voter turnout.  Doc. [241 at 6].

Dr. Herron's testimony fails two essential aspects of the Rule 702 analysis.  First, it is irrelevant.  Georgia counties make decisions about adding, closing, or moving polling locations.  O.C.G.A. § 21-2-265.  Thus, whatever impact may befall Georgia voters as a result of increasing or decreasing polling locations, the State has not caused it, and it is irrelevant to a lawsuit about State actors.  Dr. Herron's testimony is equally irrelevant because he does not opine on the reasons or motives behind local

---

[1] Though Plaintiffs initially claimed that Dr. Herron would opine on the so-called "use it or lose it" statute, he does not do so.  Doc. [80 at 3]; (Herron Dep. 15: 14-18).

[2] Dr. Herron's deposition transcript is attached hereto as <u>Exhibit 1</u>.

governments' decisions to move polling locations.  (Herron Dep. 25:4-11; 27:18-22).

Second, Dr. Herron's methodology is deeply flawed.  He wrongly focuses on Statewide data; misapplies 2016 election data; understates the role of early voting; and he speculates as to the value of early voting.  Doc. [277 at 5; Doc. 294].  Additionally, under Federal Rule of Evidence 403, his testimony will likely confuse the jury, because, *inter alia*, it does not address any factors but race, and Dr. Herron does not quantify his analysis as statistically significant.  For any of these reasons, Dr. Herron's testimony is inadmissible.

A.    Dr. Herron's Conclusions

Dr. Herron's report makes several findings regarding polling location changes between 2014 and 2018:[3]

(1)    During that time period, 459 of 2,516 Georgia polling places closed, which affected over a million registered voters. Doc. [241 at 5].

---

[3] Dr. Herron began with 2014 to determine the impact of the United States Supreme Court's decision in Shelby County, Alabama. v. Holder, 570 U.S. 529 (2013).

(2)    The polling location changes were not "racially neutral;" meaning they impacted, in terms of percentages, African-American voters more than white voters.  Doc. [241 at 5].

(3)    New polling locations can depress voter turnout.  Doc. [241 at 6].

Dr. Herron's supplemental report does not change these conclusions. Doc. [294 at 63-64].

B.    Dr. Herron's Methodology

To reach his conclusions, Dr. Herron conducted several analyses, or "counting exercises."  (Herron Dep. 36:8).  Each considered whether a polling location "closed" between 2014 and 2018, which means the location was used for voting in 2014 but not in 2018.  Doc. [241 at 7].  Dr. Herron's report also considered "reprecincting," which occurred when a voter was assigned to one polling location in 2014 and a different one by 2018 (for whatever reason). Doc. [241 at 11]; (Herron Dep. 79:17 – 80:16).  Thus, voters were included in Dr. Herron's analyses if their polling location relocated, closed, was consolidated, or if the County opened a new polling location in addition to existing ones.  (Herron Dep. 152:17-24).  Dr. Herron attempted to exclude from his analysis those Georgians who moved residences sometime between 2014 and 2018.  (Herron Dep. 143:13-144:4); Doc. [241 at 60].  Using this

data, he found that, of those Georgians who maintained the same residence between 2014 and 2018, 18% were assigned new polling locations. Doc. [241 at 60].

1.    Census Blocks

Dr. Herron's first analysis compared 2010 Georgia census block groups that were racially homogenous, meaning that they were 100% to 95% white or African-American.[4]  Doc. [241 at 49-51]; (Herron Dep. 103:1-13; Ex. 9).  Of Georgia's 5,533 census block groups, 69 (1.2%) met such criteria.  (Herron Dep. 103:1-13; Ex. 9).  Dr. Herron acknowledged that "most Georgians [who are] registered voters[] do not live in racially homogeneous census block groups," (Herron Dep. at 102:16-19), which he concedes represents a "disadvantage" to the approach.  Doc. [241 at 37].

Dr. Herron's analysis revealed minimal polling-location-change differences between African-American and white areas.  In the 100% racially homogeneous areas (representing 135,730 Georgians), African-American majority areas had polling closures at a higher rate than white majority

---

[4] The United States Census defines a "block group" as "statistical divisions of census tracts, that are generally defined to contain between 600 and 3,000 people, and are used to present data and control block numbering." *Glossary*, UNITED STATES CENSUS, https://www.census.gov/glossary/ #term_BlockGroupBG.

areas by only 2.76%.  Doc. [241 at 50].  But, in areas that are 95% racially homogenous, white majority areas experienced more polling location closures by 0.55%.  (Id.). The average difference between polling place closure rates in mostly African-American census blocks and mostly white census blocks (where the homogeneity ranges from 100 to 95%) was 1.275%.  (Id.).

### 2.     Voter Files

Dr. Herron's second analysis focuses on the 2014, 2016, and 2018 voter files, which are documents maintained by the Secretary that identify every "registered voter[] in the [S]tate with accompanying demographic information."  Doc. [241 at 16, 40].  Dr. Herron used this information to determine the number of voters, by race, who were registered in 2014 and 2018.  (Id. at 52).  Dr. Herron then analyzed this data in the context of polling place closures between 2014 and 2018.  (Id. at 53).[5]

From this data, Dr. Herron conducted several analyses to reach various findings.  First, he examined polling closures by race and concluded that African-American voters experienced polling location closures at a rate of

---

[5] Dr. Herron did not initially determine whether the polling closure occurred before the 2016 or 2018 General Elections.  Doc. [277 at 11].  As discussed below, this omission matters.

16.8% compared to 16.68% for white voters, a difference of 0.12%.  Doc. [241 at 53].

Second, he considered polling places where most of the registered voters are African-American.  Doc. [241 at 53-55]. Using this metric—and looking at closures only—he concludes that the Statewide closure rate for majority African-American precincts is 20.3% versus 17.68% in precincts where African-Americans are not the majority, a difference of 2.62%.  (Id.). Dr. Herron said this evidence, standing alone, would not lead him to conclude that there is a disproportionate effect relating to polling closures on African-American voters in Georgia.  (Herron Dep. 130:15-23).

Third, when considering the years 2014-2018, Dr. Herron found that of Georgia voters who (1) did not move; and (2) did not receive new polling places in Georgia (approximately 82% of registered voters), about 59% were white and 28% were African-American.  (Herron Dep. 144:13-145:21); Doc. [241 at 61].  This roughly corresponds to the racial percentages of Georgia voters in 2018: 53.86% were white, and 29.86% were African-American.  Doc. [241 at 23].

### 3.    Voter Turnout and Precinct Changes

Dr. Herron then attempts to connect the data on polling location closures to voter turnout.  Doc. [241 at 68-74].  He concludes that, of those

voters who voted in 2014, fewer voted in 2018 if there was a new voting location.  (Id. at 72).  The percentage difference was generally slight: African-American voters with new polling locations experienced a small decrease in voter turnout (0.88%), and the effect on similarly situated white voters was more negligible (0.26%); the difference between white and African-American voters was a mere 0.62%.  (Id.).  Dr. Herron also considered in-person voting on Election Day in 2014 and 2018.  (Id. at 74).  Using those years, he found lower Election Day turnout for voters who had not moved but were subject to a precinct change.  (Id.)  African American voters turned out less on Election Day than white voters by 2.5 points.  (Id.)  The calculation did not, however, include early voters.

    4.    <u>Dr. Herron's Supplemental Report and New Theories.</u>

Dr. Herron's supplemental report—produced after his deposition and well into the COVID-19 pandemic—articulates two new theories that were nowhere to be found in his original report.  First, he opines that early cast ballots are not "equal" to those cast on Election Day, in that early voters have access to less information than Election Day voters.[6]  Doc. [294 at 50-55].

---

[6] This line of testimony was not included in any of Plaintiffs' initial or supplemental disclosures regarding expert testimony.  Should Dr. Herron's testimony survive this Motion, Defendants reserve the right to move,

Second, after Defendants' expert, Dr. Janet Thornton[7], pointed out how omitting 2016 election data rendered Dr. Herron's analysis incomplete at best (Doc. [277 at 11-12]), Dr. Herron attempted to resuscitate his analysis by considering 2016 election data in his supplemental report.   Doc. [294].  The 2016 analysis remained incomplete (Doc [350 at 7]), as Dr. Herron selected only those methods of analysis that supported his earlier conclusions, namely that, in 2016, the impact of polling location changes in 2016 was greater on African-American voters (1%) than white voters (0.62%) by 0.38% percentage points.  Doc. [294 at 39-41].

C.    <u>Matters Not Considered By Dr. Herron.</u>

While Dr. Herron analyzed polling closures and new polling places, he offers no opinion on *who*—between County and State officials—are responsible for moving, closing, consolidating, and/or creating new polling locations.  (Herron Dep. 25 at 4-19); Doc. [294 at 26].  Nor does Dr. Herron opine on *why* any government entity changed a polling location.  Doc. [294 at 9]; (Herron Dep. 27:18-22).  He also takes no position on whether State or

---

pursuant to other Rules of Evidence, to exclude his testimony regarding the value of early votes.

[7] Dr. Thornton's deposition transcript is attached hereto as <u>Exhibit 2</u>.

County officials knew of any alleged impacts of changing polling locations.

(Id. at 28:12-29:20).[8]

## II.    Argument and Citation to Authority

Dr. Herron's testimony should be excluded because it is irrelevant, his

methodology is unreliable, and his testimony is not helpful.  In this case,

Plaintiffs allege that Defendants engaged in "specific misconduct in

overseeing the training of County officials [who] fail[ed] to have enough

precincts."  Doc. [41 at ¶¶ 176, 190, 214; see also ¶¶ 108-109].  Plaintiffs then

allege that this conduct violates Section 2 of the Voting Rights Act, the Equal

Protection Clause of the Fourteenth Amendment, and the Fifteenth

Amendment to the United States Constitution.  (Id.).  Each claim requires a

showing of intentional conduct by Defendants.  In other words, Plaintiffs

---

[8] For that matter, Dr. Herron cites only two studies as having examined the role of relocating polling locations on voter turnout: Brian Amos, Daniel A. Smith, and Casey Ste. Claire, *Reprecincting and Voter Behavior*, Pol. Behav., 39(1): 133-56 (2016); Henry E. Brady, John E. McNulty, *Turning Out to Vote: The Costs of Finding and Getting to the Polling Place*, 105 Am. Pol. Sci. Rev. 1, 115-34 (2011).  Doc. [241 at 11]; (Herron Dep. Exs. 3 and 4). The first examined one County election in Florida, and the second studied Los Angeles County voters during the 2003 gubernatorial recount vote in California.  (Id.).  Both cite another article that considered Atlanta's 2001 mayoral election, M. Hapsel and H.G. Knotts, *Location, location, location: Precinct placement and the costs of voting*, 67 J. of Pol., 560-73 (2005).  In that study, the research indicated that increasing voting polling stations (and the resulting new polling locations) resulted in an increase in voter turnout.  (Id.).

must show "who" made decisions on polling location changes and "why."

Dr. Herron's analysis addresses neither of these questions.

> A.    Standard for Admitting Expert Testimony

"Under Rule 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579 (1993), district courts must act as 'gatekeepers' which admit

expert testimony only if it is both reliable and relevant." Rink v. Cheminova,

Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).  Pursuant to Rule 702, the Court:

> can admit relevant expert testimony only if it finds
> that: (1) the expert is qualified to testify about the
> matters he intends to address; (2) the methodology
> used by the expert to reach his conclusions is
> sufficiently reliable; and (3) the expert's testimony will
> assist the trier of fact, through the application of
> scientific, technical, or specialized expertise, to
> understand the evidence or determine a fact in issue.

Fed. R. Evid. 702.  Sumner v. Biomet, Inc., No. 7:08-CV-98, 2010 WL

4736320, at *3 (M.D. Ga. Nov. 16, 2010) (citing McCorvey v. Baxter

Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)).  These requirements

apply to opinion testimony by both scientific and non-scientific expert

witnesses. Bowers v. Norfolk So. Corp., 537 F. Supp. 2d 1343, 1350 (M.D. Ga.

2007).

The primary purpose of the Court's gatekeeping function is to ensure

that an expert "'employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field.'" Am. Gen.
Life & Acc. Ins. Co. v. Ward, 530 F. Supp. 2d 1306, 1312 (N.D. Ga. 2008)
(quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)).  The
Plaintiffs bear the burden of satisfying each of these elements by a
preponderance of the evidence.  Rink, 400 F.3d at 1292.

Even if an expert's testimony survives the Rule 702 analysis, it will be
excluded if it poses a threat of "unfair prejudice, confusing the issues,
misleading the jury, undue delay, wasting time, or needlessly presenting
cumulative evidence." Fed. R. Evid. 403; see also United States v. Frazier,
387 F.3d 1244, 1263 (11th Cir. 2004) (noting that, in applying Rule 403, the
trial judge "exercises more control over experts than over lay witnesses . . .
[and] must take care to weigh the value of [expert testimony] against its
potential to lead or confuse") (citations and internal quotations omitted).

B.    Dr. Herron's Opinion Testimony is Irrelevant

Expert testimony must be relevant.  Fed. R. Evid. 702; Rink, 400 F.3d
at 1291.  The relevance prong requires the party offering the testimony to
show that the proffered testimony "logically advances a material aspect of the
proposing party's case."  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312
(11th Cir. 1999).  Dr. Herron's testimony fails to satisfy this standard.

1.     Dr. Herron's Testimony Ignores Who Closes Polling Locations.

Dr. Herron does not address the first question of "who" changes polling locations.  Georgia statutory law does: the "superintendent of a [c]ounty or the governing authority of a municipality shall select and fix the polling place within each precinct."  O.C.G.A. § 21-2-265(a).  Dr. Herron's original report acknowledged this: "[c]ounties in Georgia engaged in reprecincting between the 2014 General Election and the 2018 General Election."  Doc. [241 at 10-11] (emphasis added).  He later backtracked and stated that his "report doesn't engage the matter of what governmental bodies chose to close any particular polling places."  (Herron Dep. 25:17-19).  Whether the counties or the State make the decisions regarding polling location closures is apparently "outside the scope of [Dr. Herron's] report" and "expertise."  Doc. [294 at 9, 10].

This renders Dr. Herron's testimony irrelevant.  Because the State neither makes nor can prevent polling location decisions, there is no reason to entertain testimony on the independent acts of Georgia's counties in a lawsuit against the State.[9]  See Doc. [276 at 5].

_____

[9]  Plaintiffs have never provided any basis for their claim that there is a duty imposed on Defendants to train about polling locations.

### 2.    Dr. Herron's Testimony Does Not Explain Why Polling Locations Moved.

Dr. Herron also takes no position on "why" County officials moved polling locations, (Herron Dep. 27:18-28:11), nor does he opine on whether Georgia officials knew of the purported effects of moving polling locations. (Herron Dep. 28:12-29:20).  Thus, Dr. Herron's testimony cannot be used to establish any liability under an intentional or deliberate indifference standard.  See Lane v. Philbin, 835 F.3d 1302, 1308 (11th Cir. 2016).[10]

Put simply, Dr. Herron excluded from his analysis the very type of evidence that is actually relevant to Plaintiffs' claims.  Consequently, the testimony has no "connection to the disputed facts," *Allison*, 184 F.3d at 1312.  His testimony should be excluded.

### 3.    Dr. Herron Fails To Quantify His Analysis.

Dr. Herron proved unable to state whether his statistical findings are material and could not even effectively define key terms in his report.  (See generally Herron Dep.).  His testimony, therefore, is also irrelevant because there is no competent evidence to explain whether his findings are statistically significant.  Specifically, Dr. Herron's central thesis addresses

---

[10] Defendants maintain that Plaintiffs' claims require a showing of actual intent and not simply deliberate indifference, and Defendants intend to raise that issue in a summary judgment motion.

"racial neutrality," but he struggled to define the term.  During his deposition, he indicated that <u>any difference</u> in an election practice's effect between racial groups would not be racially neutral.  (Herron Dep. 30:5-9).  A few moments later, he acknowledged that "from a statistical analytical perspective," something could impact African-Americans and whites differently but still be racially neutral.  (<u>Id</u>. at 31:6:16).  Ultimately, Dr. Herron could not effectively identify at which point an impact went from being racially neutral to not.  (<u>Id</u>. at 31:21-37:12).  While he opined that the polling location changes had a "disproportionate effect" on African-American voters, Dr. Herron also failed to offer a definition of the term; he said, "ultimately[,] that's a question in front of the Court."  (Herron Dep. 35:9-34:17).

There is also no indication that Dr. Herron's findings on the small distinctions between African-American and white voters' experiences are statistically significant.  Indeed, the lack of any testimony on the subject is particularly problematic here, because the differences in impact on African-American and white voters are very small:

| Analysis | Difference Between African-American and White Voters[11] |
|---|---|
| Polling Closures By Census Block Groups | 1.275% higher for African-Americans than whites |
| Polling Location Closures by Voter's Race | 0.12% higher for African-Americans than whites |
| Majority African-American Polling Locations versus Majority White Polling Locations | 2.62% higher for African-Americans than whites |
| Voter Turnout for Voters with Polling Location Changes | 0.62% higher for African-Americans than whites |
| Election Day Turnout | 2.5 points higher turnout for African-Americans than whites |

Courts have excluded evidence when there is no indication of statistical significance.  In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Products Liab. Litig., 174 F. Supp. 3d 911, 926 (D.S.C. 2016).  Federal district courts should be "especially vigilant in scrutinizing the basis, reasoning, and statistical significance of studies."  Brock v. Merrell Dow Pharm., Inc., 884 F.2d 166, 167 (5th Cir. 1989) (evaluating medical and epidemiologic proof.) For similar reasons, this Court should exclude Dr. Herron's testimony.  There is simply no competent evidence that the minimal differences he found

---

[11] As discussed below, Dr. Thornton demonstrated that these numbers ignore differences reflected by the 2016 election.

between African-American and white voters' experiences are statistically significant and thus relevant.

C.    Dr. Herron's Methods are Unreliable

Dr. Herron's testimony is also based on an unreliable methodology. The Court should exclude expert testimony unless "the methodology used by the expert to reach his conclusions is sufficiently reliable" and if "[t]he testimony is the product of reliable principles or methods." Fed. R. Evid. 702; Rink, 400 F.3d at 1291 (11th Cir. 2005); Sumner v. Biomet, Inc., No. 7:08-CV-98, 2010 WL 4736320, at *3. The "reliability" analysis considers "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." Allison, 184 F.3d at 1312. Dr. Herron's methodology is erroneous and thus unreliable.

1.    Dr. Herron Wrongly Focuses on Statewide Data.

Dr. Herron erroneously relies upon Statewide statistics instead of a County-by-County analysis. See Doc. [277 at 6-11]; Doc. [350 3-5]. First, looking at Statewide statistics implies that the State is responsible for decisions about where to locate polling locations but, as shown, only counties

-17-

possess that authority.[12]  Doc. [277 at 6-7]; O.C.G.A. § 21-2-265.  And, as

Dr. Herron acknowledges, there is "nonuniformity across the [S]tate" in

terms of polling location changes.  (Herron Dep. 119:17-120:1); Doc. [241 at

46].

Second, even if a Statewide analysis were reliable (or relevant),

Dr. Herron's methodology ignores what is occurring in Georgia writ large.

Specifically, and contrary to the picture Plaintiffs paint of a Statewide effort

to disenfranchise, between 2014 and 2018, "70% of the [c]ounties did not have

a reduction in the number of polling places … [and] 36% of the [c]ounties did

not close polling places."  Doc. [277 at 7] (emphasis added).  Thus, Dr.

Herron's analysis improperly "masked these [C]ounty differences" and adopts

an unreliable methodology.  (Id.).

A few examples demonstrate the point:  Dr. Herron finds that, based on

polling place closures between 2014 and 2018, Stephens and Rabun Counties'

had the fewest number of polling locations per registered voter (using 2014

registered voter data). Doc. [241 at 42-43]; (Herron Dep. at 113:3-22).

Dr. Herron ignores, however, that Rabun and Stephens Counties are 94.9%

and 85% white, respectively.  (Herron Dep. Ex. 11).  On the other hand,

---

[12] This is also why the testimony is irrelevant.

Fulton County—with a 44.5% African-American population in 2019[13]—added 22 new polling locations between 2014 and 2018 (a 6% increase). (Herron Dep. Ex. 8 at 61). DeKalb County, which in 2019 was 54.9% African-American[14], also added three polling locations, a 2% increase overall. (Id.). To the extent fewer polling places negatively impact voters, Dr. Herron ignores that counties with the most polling location closures impacted white voters more, and counties with polling location increases benefitted African-American voters more.

Finally, Dr. Herron cherry-picks the type of data he analyzes in a way that obfuscates their meaning. He claims that examining impacts on the total number of voters is wrong, and the jury should compare impacts on percentages of white voters versus percentages of African-American voters. Doc. [294 at 13-17]. Yet, when it comes to analyzing Georgia Counties, he takes the opposite approach. Specifically, Dr. Herron examined gross numbers and considered all Georgia Counties' polling location changes. When the 31 Counties that did not change polling places between 2014 and

---

[13] Fulton County, Georgia, UNITED STATES CENSUS, https://www.census.gov/quickfacts/fultoncountygeorgia.

[14] DeKalb County, Georgia, UNITED STATES CENSUS, https://www.census.gov/quickfacts/fact/table/dekalbcountygeorgia.fultoncountygeorgia/PST045219.

2018 are excluded from Dr. Herron's analyses, the "conclusions change." Doc.
[277 at 15]. Specifically, a higher <u>percentage</u> of white voters experienced a
polling place change than did African-American voters between 2014 and
2018. (<u>Id</u>.). In fact, when viewed this way, most African-American voters did
not have a new polling location, whereas the majority of white voters did.
(<u>Id</u>.). Dr. Herron's selective use of comparative data and the fact that his
methodology is inconsistent with his findings means his testimony and report
are unreliable.

Collectively and individually, these errors matter. Not only did the
State not engage in the decisions to move or close polling locations, different
Counties handled the decisions differently, and Dr. Herron's analysis offers
no reliable or meaningful basis to reach a factual finding on State decisions.

2.    <u>Dr. Herron's Use of 2016 Data Is Misleading and
Unreliable.</u>

As noted above, Dr. Herron's original report does not consider 2016
election results or voting practices at all. Doc. [241 at 22]. This created
shortcomings. For example, a voter could have voted at one polling location
in 2014 and a new one in 2016. That voter may have decided not to vote in
2018, despite having the same polling location as 2016. Nevertheless,
Dr. Herron's study would count that voter as evidence of a negative impact

associated with the polling location closure, despite that the 2016 vote
demonstrates the voter overcame any effect of the poll change between 2014
and 2018.  (Herron Dep. 85:20-86:13); Doc. [277 at 11].  Dr. Herron concedes
that his original report does not account for this behavior.  Doc. [277 at 11];
(Herron Dep. at 84:23-86:13).

Dr. Herron attempted to correct this error in his supplemental report.
Doc. [294 at 33-47].  There, however, he selectively used 2016 election data to
support his preexisting conclusions.  Specifically, Dr. Herron refused to apply
all of the analyses in his original report to the 2016 election.  (Id.).  When
Dr. Thornton did, she concluded that the polling location "closure rate is
lower among African-American compared to Caucasian voters [between 2016
and 2018].  Therefore, the African-American closure rate is not consistently
higher over the period, contrary to Dr. Herron's finding when he combined
the two distinct periods."  Doc. [350 at 8] (emphasis added)).  Further, when
comparing the 2014 to 2016 General Elections, white voters experienced
polling location closures than African-American voters.  Doc. [350 at 14-15].
The same is true when comparing the 2016 to 2018 election.  (Id.).  Thus,
contrary to Dr. Herron's report, polling location changes impacted white
voters at least as much as African-American voters.   Doc. [350 at 17-18].
This shows that Dr. Herron's methodology used to determine whether polling

location changes impact one race over another is, at best, inconclusive, and at worst, manipulated.

### 3.    Dr. Herron Understates the Impact of Early Voting.

Polling location changes necessarily impact only those persons who decide to vote in person.  More and more Georgians are choosing, however, to vote by mail or during in-person early voting.  Doc. [350 at 12-13].  Indeed, Georgians who chose to vote in person on Election Day declined over 16% between 2014 and 2018, even though the overall voter turnout was higher in 2018.  Doc. [350 at 13]; (Herron Dep., Exs. 5, 7).  African-Americans "used early voting polling places at a higher rate" after 2014.  Doc. [350 at 13].

Despite these facts, Dr. Herron's methodology does not account for the rise in early voting.[15]  Instead, Dr. Herron claims that voters who experienced a poll location change were simply "less likely to vote on Election Day," but he does not consider those who had already submitted an absentee ballot or

---

[15] Tellingly, the only time Dr. Herron ventures into describing the intent of anyone is in his unsupported hypothetical that voters may choose to vote absentee because of polling place closures.  Doc. [294 at 50-51].  This highlights the unreliability of his methodology.  There is no methodology involved other than Dr. Herron's personal and speculative conclusions.  (Id.).  It is also suspect that Dr. Herron specifically avoided ascribing intent to Georgia policymakers but did so when it would support his own conclusion.  Finally, his hypothesis is "contrary to the pattern of early voting nationwide."  Doc. [350 at 10-13].

voted early.  Doc. [241 at 74-75].  Indeed, when Election Day results are accounted for, the impact of polling location changes is greater on white voters (as a percentage) than African-American voters.  Doc. [277 at 16-17]. This undermines Dr. Herron's thesis completely, and his decision to exclude early voters renders his methodology unsound.

4.    Dr. Herron's Testimony on the Value of Absentee Voting is Inadmissible.

Faced with the fact that the rise of early voting explains declines in in-person voting between 2014 and 2018, Dr. Herron contrived a new theory from thin air.  Though well outside the initial disclosures and original report, Dr. Herron's supplemental report claims that absentee voting somehow burdens Georgians' right to vote.  Doc. [294 at 55].  As pointed out in Dr. Thornton's deposition, this puts him at odds with Plaintiff Fair Fight Action itself.[16]  (Thornton Dep. at 80:13-21).  Moreover, Dr. Herron's testimony—that voters who wait to vote on Election Day will have more knowledge than those who vote early—does not require expert testimony and should be excluded on this ground alone.  See United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985).  Third, Dr. Herron cites no authority for this

---

[16] Fair Fight Action has produced videos that encourage Georgians to vote absentee.  See Fair Fight Action, FACEBOOK, https://www.facebook. com/watch/?v=284957592541831.

proposition, nor has his conclusion been peer reviewed.  It is simply an inadmissible attempt to revive his incomplete analysis in order to reach a particular conclusion.

D.    Dr. Herron's Testimony Will Confuse the Jury

Even if Dr. Herron's Testimony survives Rule 702, which it will not, it will confuse the jury under Rule 403 for same reasons that it is irrelevant and unreliable.  As an example, if Dr. Herron cannot quantify his own findings, how do the Plaintiffs expect a jury to do so?  Further, Plaintiffs' Counts II, III, and V require a showing of intentional, race-based conduct. Dr. Herron did not test whether decisions of County officials were racially motivated.  Doc. [294 at 26-28].  In fact, he ignored that Counties may change new polling locations for numerous reasons that have nothing to do with race, including: (1) the decision of private companies, such as nursing homes, to no longer host a polling location Doc. [277 at 7]; (2) that the polling place could be located in a building that is physically closed or torn down (id. at 7-11); or (3) that Counties like Fulton County may increase the number of polling locations.  (Herron Dep., Ex. 8 at 61).  These types of reasons are discoverable.  Doc [277 at 8].

If deemed admissible, such testimony would likely confuse the jury by implying State responsibility for the acts of local governments.  Similarly, a

jury could simply presume that the State had authority to stop local acts where Georgia law provides no basis for these conclusions. So viewed, at best, Herron's testimony "nibbles around the edges of the key questions," and at worst, it indirectly or impliedly seeks to substitute correlation with causation. Walker v. Blitz USA, Inc., 663 F. Supp. 2d 1344, 1361 (N.D. Ga. 2009). A "regression result, no matter how statistically significant, cannot prove causality" from a statistical perspective. (Id. n.11 (citing A.H. Studenmund and Henry J. Cassidy, *Using Econometrics: A Practical Guide*, 5 (Little, Brown & Co.) (1987))). For these reasons, Dr. Thornton found it "surprising" that Dr. Herron did not adjust for factors other than race. Doc. [360 at 6]. Put simply, Dr. Herron's analysis is only about County governments, and this is a case about State actors. The introduction of evidence of the effects of actions by third parties not before the Court would be at best confusing and irrelevant, and at worst a deliberate attempt by Plaintiffs to impugn responsibility for County acts onto Defendants, which is improper.

## III. Conclusion

The Court should exclude Dr. Herron's testimony because it is not relevant to this case, it is unreliable, and it will confuse the jury.

Respectfully submitted this 28th day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle

Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF

DR. MICHAEL C. HERRON AND BRIEF IN SUPPORT was prepared

double-spaced in 13-point Century Schoolbook font, approved by the Court in

Local Rule 5.1(C).


*/s/ Josh Belinfante*
Josh Belinfante