## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al*,<br><br>*Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:18-cv-05391-SCJ |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON JURISDICTION

## INTRODUCTION

At the outset of this case, Plaintiffs had a minimal burden to invoke this Court's jurisdiction. But now that discovery is complete, Plaintiffs must face the facts—there is no foundation on which to rest this Court's jurisdiction because Plaintiffs cannot support the allegations in their Amended Complaint, Doc. No. [41].

The evidence shows that Plaintiffs lack standing because they (1) are not diverting resources, (2) are serving their organizational mission, (3) cannot identify what activities they diverted resources *from*, and (4) challenge practices that are not traceable to or redressable by Defendants. Further, Plaintiffs' claims about technology, voter-list security, and notice

and cure opportunities for absentee ballots are now moot. Plaintiffs' HAVA

claims are foreclosed because there is no private right of action. Finally,

Plaintiffs seek judicial intervention in areas barred by the political-question

doctrine. Because Plaintiffs cannot support their jurisdictional claims with

evidence, this Court should grant judgment in favor of Defendants.

## ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is appropriate when there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56. The moving party bears the initial burden, but need not

disprove the opposing party's claims. Instead, the moving party may point

out the absence of evidence to support the non-moving party's case. Celotex

Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); Marion v. DeKalb

County, Ga., 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims,

the non-moving party must do "more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The non-

moving party "must come forward with significant, probative evidence

demonstrating the existence of a triable issue of fact." Irby v. Bittick, 44 F.3d

949, 953 (11th Cir. 1995) quoting Chanel, Inc. v. Italian Activewear, Inc., 931

F.2d 1472, 1477 (11th Cir. 1991).

## I.   The undisputed facts demonstrate Plaintiffs have no injury.

Federal courts may decide only active "cases" and "controversies."  U.S. Const. art. III, § 2. To establish standing to present a case or controversy, a litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." Jacobson v. Fla Sec'y, 957 F.3d 1193, 1201 (11th Cir. 2020) citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); U.S. v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" Jacobson, 957 F.3d at 1201 (quoting Lujan, 504 U.S. at 561). The plaintiffs in this litigation have established none of those elements with admissible evidence.

There are no individual voters in this case—only six organizations. The organizations do not allege associational standing, as this Court previously noted. Doc. No. [68], p. 13; Summers v. Earth Island Inst., 555 U.S. 488, 494, 129 S. Ct. 1142 (2009). Rather, each organization alleges that it has suffered its own injuries from Georgia's election practices. Doc. No. [41] at ¶¶ 13, 18, 23, 26, 30, 35; see also Doc. No. [68], pp. 15-16.

Organizational plaintiffs making such claims must prove that counteracting the defendant's allegedly illegal acts required diversion of

either financial resources or its personnel's time and energy. Arcia v. Sec'y of Fla., 772 F.3d 1335, 1341 (11th Cir. 2014); Common Cause of Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009). At this stage of the case, Plaintiffs must sustain their burden of proof with trial-worthy evidence, Lujan, 504 U.S. at 561, which must show an injury—in this case diversion of resources—as of the time that the plaintiffs filed their complaint. A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., 925 F.3d 1205, 1212 (11th Cir. 2019); Arcia, 772 F.3d at 1340; Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003).

Further, each plaintiff must be more than just a "concerned bystander" who is interested in a problem—the plaintiff must show that the injury is distinct to that plaintiff. Gardner v. Mutz, No. 19-10461, 2020 U.S. App. LEXIS 19329, at *22-23 (11th Cir. June 22, 2020) (no injury when only generalized interest in preserving history). Other circuit courts and another district court within this circuit have recognized the particularity requirement as mandating that an organization demonstrate that "the asserted illegal acts are in conflict with the organization's mission." People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium, 189 F. Supp. 3d 1327, 1337-38 (S.D. Fla. 2016) (citing Arcia, 772 F.3d at 1342) (finding standing where PETA protests against captivity of a whale and

efforts to secure its release "impaired its mission of protecting animals from abuse through legislative and educational efforts"); see also Nat'l Treasury Emps. Union v. U.S., 101 F.3d 1423, 1430 (D.C. Cir. 1996) (if the conduct "does not directly conflict with the organization's mission," the claimed injury is likely shared by many citizens and thus insufficient).

Finally, while a conflict with the mission of the organization is necessary to confer standing, it is not sufficient. Id. at 1429 ("Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization."). Plaintiffs cannot claim injury simply by diverting resources to new initiatives. They must identify what activities they must "divert resources away from in order to spend additional resources" combatting the practices at issue. Jacobson, 957 F.3d at 1206 (emphasis in original). Furthermore, they must demonstrate a concrete injury such as perceptible impairment of organizational activities or daily operations, Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919-21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended," Cigar Ass'n of Am. v. U.S., 323 F.R.D. 54, 63 (D.C. Dist. 2017). Accord, Ga. Republican Party v. SEC, 888 F.3d 1198, 1203 (11th Cir. 2018) (no evidence that plaintiff was forced to divert resources, "let alone

that such diversion impairs the Party."); <u>Ga. Latino Alliance for Human Rights v. Deal</u>, 691 F.3d 1250, 1260 (11th Cir. 2012) (challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").

Plaintiffs' alleged injuries fall into three categories: one admits it did not divert anything, two claim diversion of only personnel time, and three claim they diverted both financial resources and personnel time. But none of the plaintiffs have trial-worthy evidence showing that they diverted "resources from general voting initiatives or other missions of the organization to programs designed to address the impact of the specific conduct of the Defendants." Doc. No. [68], p. 16. Without that evidence, they cannot invoke this Court's jurisdiction.

### A.    *The Sixth Episcopal District, Inc.*

The Sixth Episcopal District, Inc. ("Sixth District") provides the easiest standing analysis—its 30(b)(6) designee testified that the Sixth District did not divert financial resources as a result of the practices challenged in this litigation. Statement of Material Facts, attached as Ex. A ("SMF") at ¶ 1. He initially testified that the church diverted volunteer time, but then explained that the church actually did nothing different from its usual practices. <u>Id</u>. at ¶ 2. In sum, the Sixth District diverted no resources as a result of any contested election practices. <u>Id</u>. at ¶ 3.

With no definable injury, the Sixth District has no standing in this litigation. The church has admirable goals and sincerely held concerns, but those are not sufficient for standing. "[A]bstract social interest[s]" cannot establish a concrete injury in fact. Arcia, 772 F.3d at 1342; Gardner, 2020 U.S. App. LEXIS 19329, at *23.

B.    *Virginia-Highland Church, Inc.*

Virginia-Highland Church, Inc. claims no financial diversion. SMF at ¶ 4. Its pastor, Rev. Matthew Laney, testified that all of its diverted resources are the time of its volunteers. Id. at ¶ 5. Since 2014, the church's mission includes voter education and registration, id. at ¶ 5, and one of its existing ministries concentrates on voter education and registration and voting advocacy, id. at ¶ 7. In this litigation, Rev. Laney identified only the "use it or lose it" statute, the exact match requirements, closing or moving polling sites, and the lack of provisional ballots at polling locations as areas of concern. Id. at ¶ 8. He did not identify which of those concerns the church's voter education activities address, but it seems apparent that only the first three could be a part of such education efforts.

Church members and volunteers regularly register people to vote, and urge members of the congregation to vote. Id. at ¶ 9. Approximately eight to ten members of the church volunteer to register voters after Sunday

meetings. Id. at ¶ 10. Church members and volunteers also educate and register potential voters during an annual neighborhood festival. Id. at ¶ 11. The diversion of resources that the church experiences consists of less time from church volunteers. Id. at ¶ 12. Each volunteer has to spend more time explaining voting requirements to each person as they are registering to vote, id. at ¶ 13, with the net effect of contacting fewer voters, id. at ¶ 14, and less time spent in other ministries of the congregation, id.

Rev. Laney, however, was not able to quantify how much time church volunteers diverted specifically to the practices alleged in the Amended Complaint that concern the church. Id. at ¶ 15. He could identify only two members whose voting rights work caused them to step back from another church ministry. Id. at ¶ 16. Significantly, for those two members, Rev. Laney did not quantify how much time those volunteers spent on explaining what he called the "use it or lose it" statute, "exact match" requirement, or polling-location issues as opposed to other voting rules. Id. at ¶ 17. He also did not describe any perceptible impairment in the church's usual activities. Id. at ¶ 18; see also Ga. Republican Party, 888 F.3d at 1203; Food & Water Watch, Inc., 808 F.3d at 919-021. Without evidence of a quantifiable impairment, Virginia-Highland does not have standing to contest the practices about which it complains. Id.

C.     *Baconton Missionary Baptist Church, Inc.*

Baconton Missionary Baptist Church, Inc. ("Baconton") also claims no diversion of money. SMF at ¶ 19. Its pastor, Dr. Hermon Scott, testified that the church diverted resources of its staff and members in response to the "use it or lose it" statute. Id. at ¶ 20. Although the church worked to remain nonpartisan, much of its interest in voting issues stemmed from its interest in seeing Stacey Abrams elected as Governor of Georgia. Id. at ¶ 21. One of the reasons Baconton started a new program in 2018 focusing on voter education and registration was its enthusiasm for Ms. Abrams' candidacy. Id. at ¶ 22. Voting issues are part of the church's mission, id. at ¶ 23, but Dr. Scott testified that time spent on voting issues could not be spent on other parts of the church's mission, id. at ¶ 24. According to Dr. Scott, he spent an unquantified amount of time talking about the "use it or lose it" statute in his sermons and Bible-study classes. Id. at ¶ 25. Volunteer church members also spent time helping voters check their voting status instead of "some evangelistical stuff perhaps." Id. at ¶ 26. Dr. Scott also participated in "Faith Prayer Rallies" in area churches. Id. at ¶ 27. Only two of the rallies were a Baconton church function. Id.

Dr. Scott was unable to quantify how much time was diverted to the "use it or lose it" statute. Id. at ¶ 28. In his sermons and at the Faith Prayer

Rallies, he spoke about a variety of voting issues. Id. at ¶ 29. He estimated that he spent "about five minutes or less" on the "use it or lose it" statute in each Sunday sermon. Id. at ¶ 30. He testified that he could have spent those five minutes talking about other topics that were also related to the church's mission. Id. at ¶ 31. He also admitted that he has talked about voting in sermons for the past 20 years, but that he spends more time talking about registration, education, and participation "when there is a candidate that is a bigger ticket." Id. at ¶ 32. He did not describe any perceptible impairment in the church's usual activities. Id. at ¶ 33; see also Ga. Republican Party, 888 F.3d at 1203; Food & Water Watch, Inc., 808 F.3d at 919-021. Five minutes of his time serving the mission of the church and unknown time from church members cannot establish standing for Baconton.

D.   *Ebenezer Baptist Church of Atlanta, Georgia, Inc.*

Since 1935, when Martin Luther King Sr. led a voting-rights campaign in Atlanta, Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer") has been spending resources on voter registration, education, and mobilization, with its current engagement level beginning after Hurricane Katrina. SMF at ¶ 34. Protecting voting rights and "challenging unjust policies that create unnecessary barriers to voting" are key parts of

- 10 -

Ebenezer's mission, especially because those efforts are also part of the tradition of the black church. Id. at ¶ 35.

All of Ebenezer's efforts related to voting are paid for from the social-justice budget, and its budget does not specify the type of voting-related activity within that line item. Id. at ¶¶ 36-37. Despite claiming it had to divert monetary resources, Ebenezer had no documentation that it spent any funds differently in 2018 from prior-year elections. Id. at ¶ 38.

In the 2018 election, Ebenezer continued its prior efforts to register voters, engage in a vote-by-mail campaign,[1] and educate members about voting. Id. at ¶ 39. The only activity added was an emphasis on "verification," to confirm that members were registered to vote. Id. at ¶ 42.

Ultimately, the only diversions Ebenezer could identify as part of its activity in "verification" were (1) volunteers who spent more time in voting work than they typically would have, (2) the addition of a hotline at the church,[2] like what the church previously added in response to Hurricane

---

[1] While there was testimony that the vote-by-mail effort started in 2018, it was actually just "increased" in its focus from earlier vote-by-mail efforts in 2014 and 2016. Id. at ¶ 40. The church plans to continue the vote-by-mail efforts in the future. Id. at ¶ 41.
[2] The hotline did not maintain records of voters' questions, but instead sent the voters who needed assistance to other organizations. Id. at ¶ 44.

Katrina, and (3) church space for the hotline. Id. at ¶ 43.[3] The diversions
were in response to "voter purges" and "cross-matching" within the voter-
registration system, along with possibly polling stations being moved. Id. at ¶
47.

None of Ebenezer's "verification" activities impaired its regular
activities, id. at ¶ 48-49, but were in pursuit of the church's longstanding
mission to assist voters. Ga. Republican Party, 888 F.3d at 1203; Food &
Water Watch, Inc., 808 F.3d at 919-021. Ebenezer did not identify what its
volunteers would have done otherwise or how it would have used the church
space if it had not hosted the hotline. SMF at ¶¶ 48-49; Jacobson, 957 F.3d at
1206. Ebenezer has not shown it diverted any resources sufficient to invoke
this Court's jurisdiction.

E.    Care in Action, Inc.

Like Ebenezer, Care in Action, Inc. ("Care in Action"), claims to have
needed to divert both financial resources, and time resources of its personnel.
SMF at ¶ 50. The entirety of the "diversion" in 2018 was related only to its

---

[3] Several other activities of the church in the voting arena were actually the
work of the New Georgia Project, which designed an app for voters that was
unveiled in a service at the church, handled the absentee-ballot applications
for the church, designed the church's vote-by-mail program, and participated
in an email encouraging everyone in the church to vote early or vote by mail.
Id. at ¶ 45. Ms. Abrams founded the New Georgia Project and Ms. Groh-
Wargo served as its director for a period of time. Id. at ¶ 46.

efforts in counting provisional ballots after the 2018 election. Id. at ¶ 51. It anticipates similar diversions in future elections. Id. at ¶ 52.

Counting provisional ballots does not conflict with Care in Action's mission. That mission is to "support nannies, housekeepers, caregivers for the elderly and other domestic workers in order to advance the rights and socioeconomic well-being of domestic workers." Id. at ¶ 53. That mission also includes encouraging domestic workers to vote. Id. at ¶ 54. Beginning with the 2018 election, Care in Action organized get-out-the-vote activities. Id. at ¶ 55. Its post-election activities were not contrary to its mission or in response to any allegedly illegal activity, and thus cannot establish standing.

Care in Action claims that it had to keep staff in Georgia longer than it had anticipated in order to count provisional ballots. Id. at ¶ 56. It identified some travel expenses, although it was unable to testify to specific details about the staff travel or expenses. Id. at ¶ 57. Care in Action also failed to identify how many of those expenditures, such as airplane tickets, were unique to its post-election counting of provisional ballots. Id. at ¶ 58. Care in Action also identified $76,257.22 that it spent on a text messaging service, but it could not identify how much of that amount was due to post-election provisional ballot activities versus its election-related activities. Id. at ¶ 59. Care in Action spent $107,500.00 in ads that it testified were unique to its

post-election provisional ballot activities, although its designee was unable to describe the content of the ads or provide copies. Id. at ¶ 60.

Care in Action refused to identify the amount of its entire budget, id. at ¶ 61, making it impossible to determine whether the expenditures significantly impaired its daily operations. Ga. Republican Party, 888 F.3d at 1203. More important, Care in Action never identified where else it would have been spending those funds, i.e., from what activities it diverted its funds. Jacobson, 957 F.3d at 1206.

In fact, Care in Action did not spend the funds on its provisional ballot program in response to any allegedly illegal conduct by Defendants, but in furtherance of its stated mission of helping Stacey Abrams get elected. The organization endorsed Ms. Abrams and its get-out-the-vote activities included handing out literature supporting her. Id. at ¶¶ 62-64. Its texting campaign supported Ms. Abrams. Id. at ¶ 65. In its Campaign Contribution Disclosure Report, it identified the texting service cost and ad buys as contributions to Ms. Abrams' campaign. Id. at ¶ 66. Care in Action's post-election activities, then, were not a diversion from its usual activities, but part and parcel of those activities. "An organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized

partisan preference' that federal courts are 'not responsible for vindicating.'"
Jacobson, 957 F.3d at 1206 (citations omitted).

Care in Action's claim of having to divert its personnel time fares no
better. The organization trains domestic workers in election-related
activities. SMF at ¶ 67. It claims that it had to do additional training for
post-election activities, but never identified which of its usual activities
suffered as a result. Id. at ¶ 68. Its post-election efforts did not diminish its
regular training or its regular get-out-the-vote activities. Id. at ¶ 69. Its
representative was unable to identify any differences between its pre-election
and post-election texting activities. Id. at ¶ 70. Care in Action was able to
identify only one staffer who was diverted from other work to the Georgia
post-election activity. Id. at ¶ 71. Even then, the organization did not
quantify how the diversion of that one staff member impacted those other
activities. Id. at ¶ 72.

Like its financial expenditures, Care in Action's post-election activities
were just an extension of its support for the Abrams for Governor campaign.
The 2018 election in Georgia was the first time that the organization had
conducted get-out-the-vote activities in support of a candidate, id. at ¶ 73,
making it difficult to ascertain on this record what its "usual" activities were.
Care in Action coordinated its post-election ballot activities with other

organizations supporting the Abrams for Governor campaign and its activities supported that campaign. <u>Id</u>. at ¶¶ 74-75. It did not divert resources—it merely continued its pre-election campaign activities. Those activities cannot give it standing in this case.

F.   *Fair Fight Action, Inc.*

Fair Fight Action, Inc. ("Fair Fight Action") was originally founded in 2014 as the Voter Access Institute (VAI), to advocate for "voter enfranchisement" and "state laws that make voting more accessible." SMF at ¶ 76. In 2014, VAI worked to turn out low-propensity voters of color, using messages that included "fighting voter suppression" because it found those messages "motivational" for voters. <u>Id</u>. at ¶ 77. VAI did not participate in elections after 2014 and became inactive in late 2016 or early 2017—remaining inactive for the remainder of 2017 and most of 2018. <u>Id</u>. at ¶ 78. VAI sprang to life again on November 17, 2018—the day after Ms. Abrams suspended her campaign—adopting the new name "Fair Fight Action" on November 21, 2018 and then filing this lawsuit on November 27, 2018. <u>Id</u>. at ¶ 79.

Fair Fight Action continued its organizational mission of making voting more accessible, explaining to donors that its "first step was to file a federal lawsuit to ask the courts to enact broad, bold, sweeping election reform in the

state of Georgia" and announcing plans for further action on progressive issues in the future.[4] Id. at ¶ 80. Its website explains that Fair Fight Action's mission is to "promote fair elections in Georgia and around the country," noting that it "has mounted significant programs to combat voter suppression in Georgia and nationally." Id. at ¶ 82. In Ms. Groh-Wargo's personal-capacity deposition in September 2019, she explained that the mission of the organization is "to engage and educate voters and fight voter suppression broadly in the state, and particularly in communities of color . . ." Id. at ¶ 83 (emphasis added).[5]

The day before Fair Fight Action became active again in November 2018, a political action committee ("PAC") named Fair Fight, Inc. (the "PAC") incorporated using the same address as VAI. Id. at ¶ 85. While all individuals are employees of Fair Fight Action, the PAC reimburses Fair Fight Action for time staff spent on non-political projects. Id. at ¶ 86

In Fair Fight Action's 30(b)(6) deposition, its representative suddenly explained that its mission was actually not to fight voter suppression:

---

[4] This approach is consistent with Fair Fight Action's efforts to have "Election reform litigation run like a campaign." Id. at ¶ 81.
[5] Ms. Abrams discussed the purpose of Fair Fight Action in her new book, explaining she founded "Fair Fight Action to focus on voting rights and voter suppression in Georgia." Id. at ¶ 84.

> Q: And I think we've covered this, but it's not correct to say that Fair Fight Action was founded to "combat voter suppression in Georgia." Correct?

> A: That is correct. The organization was founded in 2014 to do voter engagement work.

Id. at ¶ 87. Now it was the *PAC* that focused on voter suppression, unlike the mission of Fair Fight Action. Id. at ¶ 88. Ms. Groh-Wargo apparently no longer agreed with her earlier testimony that the purpose of Fair Fight Action was fighting voter suppression. Compare id. at ¶ 83.

Because Fair Fight Action is serving its organizational mission by filing this lawsuit, it can show only a frustration of its objectives—the kind of "abstract concern that does not impart standing." Nat'l Treasury Emps. Union, 101 F.3d at 1429; Gardner, 2020 U.S. App. LEXIS 19329, at *23.

But even if it was not just serving its mission, Fair Fight Action identified only three areas of diversion of resources: (1) the creation of the Democracy Warriors program, (2) the creation of the Fair Fight U program, and (3) staff time that it diverted to other projects. SMF at ¶ 89. None of these three alleged diversions had occurred prior to the filing of the complaint and Fair Fight Action could not provide any specific dollar amounts for diversion of funds. Id. at ¶ 90. Fair Fight Action also testified that it would

plan to engage in broader get-out-the-vote activities if the issues in this lawsuit were resolved. Id. at ¶ 91.

Because Fair Fight Action sprang to life specifically to file this lawsuit, it cannot identify what it was diverting resources from at the outset of this litigation—because it had no other activities. Jacobson, 957 F.3d at 1206; A&M Gerber Chiropractic LLC, 925 F.3d at 1212; Arcia, 772 F.3d at 1340; Nat'l Treasury Employees Union, 101 F.3d at 1429. Democracy Warriors and Fair Fight U are not diversions because they serve multiple purposes that advance the organization's mission—they are not a diversion from other activities. While these two groups work on "voter suppression" issues, they also work on the progressive issues the organization supports more broadly. SMF at ¶ 92. Fair Fight U also does political work that is paid for by the PAC. Id. at ¶ 93. Further, prior to filing this lawsuit, Fair Fight Action had not engaged in "voter education activities" since 2014, meaning that it cannot be diverting funds from those activities to counter the laws it challenges in this litigation because it had no active programs. Id. at ¶ 94.

Regarding the staff time that could be devoted to other projects, Ms. Groh-Wargo admitted that staff, including in the Democracy Warriors and Fair Fight U programs, work extensively on efforts related to this lawsuit. Id.

at ¶ 95. Litigation expenses cannot be used to impart standing on an organization. <u>Nat'l Taxpayers Union</u>, 68 F.3d at 1434.

For staff time not spent on litigation, if not for this lawsuit, staff at Fair Fight Action currently working on litigation support would spend all their time doing political work paid for by the PAC. SMF at ¶ 96. In other words, the different use of staff does not impair <u>Fair Fight Action's</u> activities—it affects the activities of its associated, non-plaintiff PAC. As a result, different use of staff time cannot form the basis for a diversion from activities of Fair Fight Action for purposes of standing because it is not concrete and particularized. <u>Jacobson</u>, 957 F.3d at 1206; <u>Gardner</u>, 2020 U.S. App. LEXIS 19329, at *21-25. Because its mission has not been impaired nor its activities impeded, Fair Fight Action has no evidence supporting any injury sufficient to confer standing in this case.

## II.   Plaintiffs lack standing to challenge practices that are not traceable to or redressable by Defendants.

As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" <u>Jacobson</u>, 957 F.3d at 1207 quoting <u>Lujan</u>, 504 U.S. at 560. Further, "it must be the effect of the court's

judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." <u>Lewis v. Governor of Ala.</u>, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotations omitted).

The undisputed evidence demonstrates that a significant portion of the harm Plaintiffs attribute to the Defendants and the accompanying remedies they seek are outside the realm of Defendants' direct control. Indeed, to achieve much of the redress they seek in their Amended Complaint, Doc. No. [41], pp. 90–92, ¶ 11(a-h),(j),(k)), Plaintiffs admit it would require action taken by non-party counties: <u>id</u>. at ¶ 11(a) ("Ensure <u>that counties</u>" process voter-registration requests), 11(d) ("Ensure <u>that counties</u> . . . process absentee ballot requests"), 11(e) ("Ensure <u>each county</u> . . . deploys . . . . voting machines," "signage," and "all other materials or tools necessary for voting"), 11(f) ("Ensure <u>each precinct and county</u>" has sufficient polling stations), 11(h) ("Ensure <u>each county</u>" recruits poll workers), 11(j) (Ensure <u>each county</u> has adequate materials") (emphasis added). The evidence in this case conclusively demonstrates that these subject areas are the responsibility of counties, not Defendants. SMF at ¶¶ 97-104. The only enforcement mechanism available, similar to the county supervisors in <u>Jacobson</u>, 957 F.3d

at 1207-08, is through an investigation and possible sanctions by the State Election Board—not by direct control over the county officials.[6] SMF at ¶ 105.

Plaintiffs effectively ask this Court to rewrite large swaths of Georgia's Election Code to unilaterally redistribute power and control vested in the counties to the Defendants. But this Court's authority is limited. "[F]ederal courts have no authority to erase a duly enacted law from the statute books." Jacobson, 957 F. 3d at 1209, quoting Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 936 (2018). And even a "favorable declaratory judgment… cannot make [] an unconstitutional statute disappear." Steffel v. Thompson, 415 U.S. 452, 469 (1974). Thus, while this Court may "enjoin executive officials from taking steps to enforce a statute," Mitchell, supra at 936, it may "exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit," Jacobson, 957 F. 3d at 1209. Thus, even if Plaintiffs obtain an order from this Court granting all the relief they seek, that order cannot enjoin "absent nonparties." Id. at 1208.

---

[6] Unlike Georgia law, the Florida law considered in Jacobson empowered its Secretary of State to redress the alleged harm required the Florida Secretary to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws" and to "[p]rovide written direction and opinions to the supervisors of elections," Fla. Stat. § 97.012, and the Eleventh Circuit found even that insufficient to establish traceability or redressability.

Even if the Defendants could cobble together the authority to carry out a Plaintiffs-designed order from this Court, Plaintiffs' failure to sue the entities that can remedy their alleged harms could lead to "arbitrary and disparate treatment to voters in its different counties." Bush v. Gore, 531 U.S. 98, 107, 121 S. Ct. 525 (2000). Some counties would defer to Defendants' directions, while others would simply continue to follow the law as it exists.[7] Jacobson, 957 F. 3d at 1209; see also Friedman v. Snipes, 345 F. Supp. 2d 1356, 1381 (S.D. Fla. 2004).

A federal court cannot apply declaratory relief or an injunction to those "who are not parties to this action." Jacobson, 957 F. 3d at 1208. And even if this Court attempted to extend its ruling to counties not presently before it, they are in no way "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]." Lewis, 944 F. 3d at 1302 (internal quotation marks omitted). This limitation preventing the judiciary from binding non-parties to its orders is rooted in separation of powers and the limited authority of Article III courts.

---

[7] An earlier case that predates Jacobson and the en banc decision in Lewis, Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011), was decided only under a proper-party analysis and did not consider standing, making it a "drive-by jurisdictional ruling[]" that either has no precedential effect or is limited to the proper-party context. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91, 118 S. Ct. 1003, 1011 (1998).

"Redressability requires that the court be able to afford relief <u>through the exercise of its power</u>, not through the persuasive or even awe-inspiring effect of the opinion <u>explaining</u> the exercise of its power." <u>Id</u>. at 1305, quoting <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 825, 112 S. Ct. 2767 (1992) (Scalia, J. concurring in part and concurring in the judgment) (emphasis in original). "Any persuasive effect a judicial order might have upon the [non-party counties] . . . cannot suffice to establish redressability." <u>Jacobson</u>, 957 F. 3d at 1208. Moreover, if a plaintiff sues the wrong defendant, an order enjoining a non-party "cannot suddenly make the plaintiff's injury redressable." <u>Id</u>. at 1209.

The "failure to join the [county officials] is an independent reason that [Plaintiffs] lack standing," <u>id</u>. at 1207, and this Court should grant judgment as a matter of law to Defendants on Plaintiffs' claims related to voter registration, absentee ballots, provisional ballots, polling places, resources for precincts, and poll workers. None of those claims can either be traced to Defendants or redressed by them.

## III. Plaintiffs' claims about technology, voter-list security, and absentee ballots are moot.

Mootness is part of the "powerful limitation[]" that Article III imposes on the federal judiciary: "if a suit is moot, it cannot present an Article III case

or controversy and the federal courts lack subject matter jurisdiction to entertain it." Coral Springs Street Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004). When a government does not intend to return to a prior legislative scheme, plaintiffs must present affirmative evidence that their claims remain viable. U.S. v. Georgia, 778 F.3d 1202, 1205 (11th Cir. 2015); Nat'l Advert. Co. v. City of Miami, 402 F.3d 1329, 1334 (11th Cir. 2005). The undisputed facts demonstrate that Defendants have no intent to return to several voting practices that Plaintiffs challenge.

A.     *Plaintiffs' claims regarding Georgia's use of DREs are moot.*

In this Court's Order on Defendants' Motion to Dismiss, it noted that "upon statewide implementation of the new voting machines, Plaintiffs' claims based on the current DRE voting machines could be subject to becoming moot." Doc. No. [68], p. 36 n.7. As Defendants earlier notified this Court, the Secretary of State decertified the entire DRE system on December 30, 2019. Doc. No. [266-1]. That was at the end of a process to purchase and deploy entirely new ballot-marking devices ("BMDs") that were certified on August 9, 2019, SMF at ¶ 107, and used throughout the state for the June 9 election as required by O.C.G.A. § 21-2-300(a)(2). Plaintiffs' expert Dr. Halderman agreed that the new system was implemented and completely replaced the DRE system. Doc. No. [239], p. 4; SMF at ¶ 108.

As a result of this change of systems and because Plaintiffs are only entitled to prospective injunctive relief, Plaintiffs' request for an order "[p]ermanently enjoining Defendants from using the insecure and unreliable DRE voting machines that lack a paper trail, and replace DRE voting machines with paper ballots and optical scanners" is now moot, as are all of Plaintiffs' claims pertaining to Georgia's use of DREs. Doc. No. [41], p. 87; ¶¶ 94-107, 163(e), 175(f), 189(f), and 213(f). As this Court recognized already, Plaintiffs do not challenge the new BMD system. Doc. No. [271], p. 9 n.4. Now that the implementation of the BMDs is complete, Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims pertaining to DREs. Doc. No. [68], p. 36 n.7.

B.    *Plaintiffs' claims relating to voter-list security are moot.*

In recognizing the impact of HB 392 on Plaintiffs' claims on voter-list security, this Court earlier noted that establishing a regulation setting security protocols would moot Plaintiffs' claims about voter-list security. Doc. No. [68], p. 37. This Court found those claims were not moot "until such regulation is established." Id.

On August 13, 2019, the regulation required by HB 392, Georgia's "Standards for Security of Voter Registration System," became effective and describes the industry standards that "eliminates the alleged harms" of

Plaintiffs' claims about the voter list. Ga. Comp. R. & Regs. r. 590-8-3-.01. The regulation sets forth 27 industry standards covering numerous aspects of data security, including hardware, software, malware, firewalls, secure protocols for vendors, intrusion detection, data back-up procedures and training along with requirements for regular cyber-security assessments and annual certifications of compliance. SMF at ¶¶ 109-110. The Secretary certified compliance on December 31, 2019. Id. at ¶ 111. Because the regulation has now been finalized and certification is complete, Plaintiffs' claims pertaining to data security, Doc. No. [41], p. 89-91; ¶¶ 94-101, 163(c), 175(c), 189(c), 213(c), 237-238, are moot.

Further, in mid-2019, the Secretary of State announced that Georgia became the 26th state to join the Electronic Registration Information Center ("ERIC"). SMF at ¶ 112. ERIC is "a non-profit organization with the sole mission of assisting states to improve the accuracy of America's voter rolls and increase access to voter registration for all eligible citizens." Id. at ¶ 113. In the earlier ruling on the motion to dismiss, this Court noted that, while the Secretary of State was authorized to "become a member of a nongovernmental entity whose purpose is to share and exchange information in order to improve the accuracy and efficiency of voter registration systems," he was not required to do so. Doc. No. [68], p. 38.

Now that the State of Georgia has joined the entity authorized by HB 316, Plaintiffs' remaining claims about inaccurate voter rolls are moot and Defendants are entitled to judgment as a matter of law. Doc. No. [68], p. 38.

### C. *Plaintiffs' claims regarding notice and cure provisions for absentee ballots are moot.*

In ruling on the motion to dismiss, this Court also noted that not all of Plaintiffs' claims concerning absentee ballots are mooted by the passage of HB 316 into law. But two of the significant claims about absentee ballots are mooted by amendments to O.C.G.A. § 21-2-384 and an SEB Rule.

First, Plaintiffs claims about voter birthdates resulting in rejection of absentee ballots are moot because the date of birth is no longer required and thus ballots cannot be rejected for that reason. Doc. No. [41], ¶ 144; O.C.G.A. § 21-2-384(c)(1). Second, Plaintiffs' claims about prompt notification to voters when their absentee ballots are rejected has been resolved by an SEB Rule. Doc. No. [41], p. 91; ¶ 147. Under Ga. Comp. R. & Regs. r. 183-1-14-.13, which became effective on May 21, 2020, registrars must notify voters of a rejected absentee ballot no later than three business days after rejecting the ballot. Plaintiffs' claims involving those prior practices are moot.

**IV.    This Court lacks jurisdiction to hear Plaintiffs' HAVA claims because there is no private right of action.**

Count VI of Plaintiffs' Amended Complaint seeks injunctive and declaratory relief under the Help America Vote Act ("HAVA"), 52 U.S.C. § 21081 et seq.; Doc. No. [41], ¶ 240. This Court should dismiss all of Plaintiffs' HAVA claims because Congress did not create a private right of action.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Alexander v. Sandoval, 532 U.S. 275, 286, 121 S. Ct. 1511 (2001). In 2019, relying on the text of HAVA, the Eleventh Circuit made clear that HAVA creates no such right: "HAVA creates no private cause of action. Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure. 52 U.S.C. §§ 21111, 21112." Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019); Am. Civil Rights Union v. Phila. City Comm'rs, 872 F.3d 175, 181 (3d Cir. 2017) (same); see also Brunner v. Ohio Republican Party, 555 U.S. 5, 6, 129 S. Ct. 5 (2008) (vacating TRO when political party was not likely to succeed on question of whether Congress authorized a private litigant to enforce HAVA); but see Sandusky Cty. Democratic Party v. Blackwell, 387 F.3d 565, 572 (6th Cir. 2004) (finding no private right of action in HAVA, but also some "rights-

creating language of HAVA" sufficient for § 1983 claim); Colón-Marrero v. Vélez, 813 F.3d 1, 20 (1st Cir. 2016) (some provisions enforceable).

"Where Congress has not created a private right of action, courts may not do so, 'no matter how desirable that might be as a policy matter, or how compatible with the statute.'" Bellitto, 935 F.3d at 1202 quoting Alexander, 532 U.S. at 287. Because Plaintiffs brought Count VI of their Amended Complaint solely under HAVA and there is no private right of action under controlling precedent, this Court should dismiss it as a matter of law.

## V. This Court lacks jurisdiction to under the political-question doctrine.

"[F]ederal courts will not intervene to . . . supervise the administrative details of a local election." Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986). The judicial system is not a conduit for a particular group to force election officials to adopt its preferred method of administering elections preferred by a particular group. GALEO v. Gwinnett Cty. Bd. of Registrations & Elections, No. 1:20-cv-1587-WMR, 2020 U.S. Dist. LEXIS 86998, at *3 (N.D. Ga. May 8, 2020).

While courts have authority to "say what the law is," there are some questions that are "in their nature[,] political" and beyond the scope of Article III. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 177 (1803). The political-

question doctrine emerges out of the Article III case-or-controversy requirement and is rooted in the separation of powers. Made in the USA Found. v. United States, 242 F.3d 1300, 1312 (11th Cir. 2001). Cases that require the court to decide a political question[8] must be dismissed for lack of jurisdiction. McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1358 (11th Cir. 2007).

There are six factors, any one of which can render a case nonjusticiable under the political-question doctrine. McMahon, 502 F.3d at 1357-58 quoting Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691 (1962). Plaintiffs' Amended Complaint seeks sweeping relief, requesting this Court govern details of elections including—among other topics—the process of voter registration and Georgia's voter registration list, what information poll workers must obtain from voters, how absentee ballots are processed, how many voting machines are assigned to each precinct, how many paper ballots are required

---

[8] While the political nature of this case is obvious, especially with Ms. Abrams describing starting Fair Fight Action as a way she "could continue to do the work that has fueled me since I was a teenager," *Our Time is Now* 245, and with Ms. Groh-Wargo explaining that, once the "full citizenry can vote . . . Democrats win," NPR, *Stacey Abrams Spearheads 'Fair Fight,' A Campaign Against Voter Suppression*, https://www.npr.org/2020/02/21/806103885/stacey-abrams-spearheads-fair-fight-a-campaign-against-voter-suppression (Feb. 21, 2020), the political-question doctrine focuses on the distinctions between the roles of respective branches of government.

for each precinct, what signs must be displayed in polling places, how officials conduct poll worker recruitment, how election officials are trained, and the creation of auditing processes.[9] Doc. No. [41], pp. 87-90. Those requests implicate at least two of the six indicia of a nonjusticiable political question.

First, the Elections Clause commits the administration of elections to other government departments—Congress and state legislatures—not courts. Baker, 369 U.S. at 217; U.S. CONST. Art. I, §4, cl. 1. "Plaintiffs ask this Court to assume the roles of state and federal legislatures, urging us to exercise the discretion that has been explicitly reserved to those political bodies." Agre v. Wolf, 284 F. Supp. 3d 591, 596 (E.D. Pa. 2018) (three-judge court) (emphasis in original).

The Elections Clause and the history of its adoption demonstrates that "the Framers did not envision such a primary role for the courts." Agre, 284 F. Supp. 3d at 599. The "manner" of conducting elections includes "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the

---

[9] The broad scope of Plaintiffs' relief also raises Eleventh-Amendment questions, which can be implicated when a plaintiff seeks an order "directing the precise way in which Georgia should conduct voting." *Curling v. Sec. of State of Ga.*, 761 Fed. Appx. 927, 934 (11th Cir. 2019).

numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." Smiley v. Holm, 285 U.S. 355, 366, 52 S. Ct. 397, 399 (1932). These are reserved expressly to the state legislatures—not the courts. Courts should focus on enforcement of the First and Fourteenth Amendments, which are "generally unobtrusive to States in promulgating election regulations." Agre, 284 F. Supp. 3d at 599.

Plaintiffs' claims present nonjusticiable political questions because they require this Court to replace Georgia's Election Code with this Court's judgment about the administration of elections, despite the "textually demonstrable constitutional commitment of the issue" to state legislatures and to Congress. Baker, 369 U.S. at 217; Agre, 284 F. Supp. 3d at 620.

Second, there are no "judicially discoverable and manageable standards" that this Court can apply to Plaintiffs' claims. McMahon, 502 F.3d at 1357-58. Plaintiffs' claims require this Court to effectively become an election administrator and micromanage tasks that have been delegated by the General Assembly to state and local election officials.

Much like cases alleging partisan gerrymandering, where courts were called upon to decide the definition of "fairness" and then "[h]ow much is too much," Rucho v. Common Cause, 139 S. Ct. 2484, 2500-01 (2019), Plaintiffs

ask this Court to take on the task of election administration by "enforcing uniform standards and processes" that cover a variety of areas. Doc. No. [41], p. 90]. See also Jacobson, 957 F.3d at 1218 (William Pryor, J., concurring) (applying Rucho to ballot-order challenge when "[t]here are no discernable and manageable standards 'to answer the determinative question'"). The judiciary is ill-equipped to handle these questions that involve the "complex, subtle, and professional decisions" required to conduct elections. Gilligan v. Morgan, 413 U.S. 1, 10, 93 S. Ct. 2440, 2446 (1973) (applied to military training). Ultimately, Plaintiffs' Complaint "poses basic questions that are political, not legal." Rucho, 139 S. Ct. at 2489; Jacobson, 957 F.3d at 1215-16.

"[N]o justiciable 'controversy' exists when parties seek adjudication of a political question . . . ." Massachusetts v. EPA, 549 U.S. 497, 516, 127 S. Ct. 1438, 1452 (2007). As another judge in this District did in another case also asking that Court to "micromanage the State's election process," this Court should dismiss Plaintiffs' Amended Complaint as a nonjusticiable political question. Coalition for Good Governance v. Raffensperger, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at *9 (N.D. Ga. May 14, 2020); see also Tex. Democratic Party v. Abbott, No. 20-50407, 2020 U.S. App. LEXIS 17564, at *12 (5th Cir. June 4, 2020) (noting the Coalition case "challenged the wisdom" of Georgia's policy choices).

## CONCLUSION

Despite grand pronouncements in the Amended Complaint, the process of discovery demonstrated that the evidence to support this Court's jurisdiction does not exist. Without that evidence, Defendants are entitled to judgment as a matter of law.

Respectfully submitted this 29th day of June, 2020.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Brian K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
40 Capitol Square, S.W.
Atlanta, Georgia 30334

**ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD LLC**

Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey A. Miller

Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
500 14th Street NW
Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250


**TAYLOR ENGLISH DUMA LLP**

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678.336.7249

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing DEFENDANTS' BRIEF IN

SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON

JURISDICTION was prepared double-spaced in 13-point Century Schoolbook

pursuant to Local Rule 5.1(C).

/s/ Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411