EXHIBIT 1

## In the Matter Of:

## FAIR FIGHT ACTION vs BRAD RAFFENSPERGER

1:18-cv-05391-SCJ

## SEAN P. TRENDE

*April 16, 2020*



800.211.DEPO (3376)
EsquireSolutions.com

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF GEORGIA |
| 2 | ATLANTA DIVISION |

```
 3   FAIR FIGHT ACTION, INC.;         )
     CARE IN ACTION, INC.;           )
 4   EBENEZER BAPTIST CHURCH OF       )
     ATLANTA, GEORGIA, INC.;         )
 5   BACONTON MISSIONARY BAPTIST      )
     CHURCH, INC.;                    )
 6   VIRGINIA-HIGHLAND CHURCH,        )
     INC.; and THE SIXTH             )
 7   EPISCOPAL DISTRICT, INC.,        )
                                      )
 8          Plaintiffs,               )
                                      )
 9      v.                            ) CIVIL ACTION FILE
                                      ) NO. 1:18-cv-05391-SCJ
10   BRAD RAFFENSPERGER, in his       )
     Official capacity as Secretary   )
11   of State of the State of         )
     Georgia and as Chair of the      )
12   State Election Board of Georgia;)
     REBECCA N. SULLIVAN,             )
13   DAVID J. WORLEY, and SETH HARP,  )
     in their official capacities     )
14   as members of the STATE ELECTION)
     BOARD; and STATE ELECTION BOARD,)
15                                    )
            Defendants.               )
16
                 REMOTE DEPOSITION OF
17                   SEAN P. TRENDE

18                   10:09 a.m.
                  April 16, 2020
19
               1146 Elderberry Loop
20                Delaware, Ohio

21      Penny McPherson Walker, CCR-B-914, RPR

22

23

24

25
```



```
 1                    APPEARANCES OF COUNSEL

 2
      On behalf of the Plaintiffs:
 3
           LAWRENCE & BUNDY LLC
 4         LESLIE J. BRYAN, ESQ. (Via videoconferencing)
           1180 West Peachtree Street
 5         Suite 1650
           Atlanta, Georgia 30309
 6         404/400-3350
           leslie.bryan@lawrencebundy.com
 7
           DUBOSE MILLER LLC
 8         VON A. DuBOSE, ESQ. (Via videoconferencing)
           75 14th Street, Northeast
 9         Suite 2110
           Atlanta, Georgia 30309
10         404/720-8111
           dubose@dubosemiller.com
11
      On behalf of the Defendants:
12
           TAYLOR ENGLISH DUMA LLP
13         BRYAN P. TYSON, ESQ. (Via videoconferencing)
           LOREE ANNE PARADISE, ESQ. (Via videoconferencing)
14         1600 Parkwood Circle
           Suite 200
15         Atlanta, Georgia 30339
           678/336-7249
16         btyson@taylorenglish.com
           lparadise@taylorenglish.com
17

18

19

20

21

22

23

24

25
```



```
 1               INDEX TO EXAMINATIONS

 2            Examination                        Page

 3   Examination by Mr. DuBose                    4

 4                      -  -  -

 5               INDEX TO EXHIBITS

 6   Plaintiffs'
       Exhibit            Description            Page
 7

 8   Exhibit 1   Plaintiffs' Notice of Videotaped
                 Deposition of Sean Trende and
 9               Notice to Produce                6

10   Exhibit 2   Expert Report of Sean P. Trende  48

11   Exhibit 3   Response of Plaintiffs' Expert
                 Stephen C. Graves to Expert
12               Report of Defendants' Expert
                 Sean P. Trende                   54
13

14

         (Plaintiffs' Exhibits 1, 2 and 3 have been
15   attached to the original transcript.)

16

17

18

19

20

21

22

23

24

25
```



| | | |
|---|---|---|
| 1 | Remote Deposition of Sean P. Trende | |
| 2 | April 16, 2020 | |
| 3 | | |
| 4 | (Reporter disclosure made pursuant to Article | |
| 5 | 10.B. of the Rules and Regulations of the Board of | |
| 6 | Court Reporting of the Judicial Council of Georgia.) | |
| 7 | (Reporter reads statement regarding remote | |
| 8 | swearing of the witness.) | |
| 9 | SEAN P. TRENDE, having been first duly | |
| 10 | sworn, was examined and testified as follows: | |
| 11 | EXAMINATION | |
| 12 | BY MR. DUBOSE: | 10:09:18 |
| 13 | Q.    Good morning, Mr. Trende.  My name is Von | 10:09:18 |
| 14 | DuBose.  I represent the plaintiffs in this case. | 10:09:24 |
| 15 | MR. DUBOSE:  This will be the deposition | 10:09:25 |
| 16 | of Sean Trende, taken for all permissible | 10:09:26 |
| 17 | purposes under the Federal Rules. | 10:09:30 |
| 18 | Q.    (By Mr. DuBose) Would you state your whole | 10:09:32 |
| 19 | name and spell it for the court reporter, please. | 10:09:34 |
| 20 | A.    It's Sean Patrick Trende, S-E-A-N, | 10:09:35 |
| 21 | P-A-T-R-I-C-K, T-R-E-N-D-E. | 10:09:41 |
| 22 | Q.    Mr. Trende, have you been deposed before? | 10:09:46 |
| 23 | A.    Yes. | 10:09:48 |
| 24 | Q.    So you know how this goes; you understand | 10:09:49 |
| 25 | you are under oath as if you were in court. | 10:09:53 |



| | | |
|---|---|---|
| 1 | A.    Yes. | 10:09:56 |
| 2 | Q.    I'll try to be clear and fair in asking my | 10:09:56 |
| 3 | questions.  If you don't understand or if you don't | 10:10:00 |
| 4 | hear me, please ask me to repeat; I don't mind.  If | 10:10:02 |
| 5 | you answer a question, I will assume you understood | 10:10:06 |
| 6 | the question.  Is that fair? | 10:10:08 |
| 7 | A.    Yes. | 10:10:10 |
| 8 | Q.    Are you on any medications that would | 10:10:11 |
| 9 | impair your ability to testify accurately here today? | 10:10:13 |
| 10 | A.    No. | 10:10:17 |
| 11 | Q.    We can take a break whenever you like. | 10:10:17 |
| 12 | The only thing I ask is if I have a question on the | 10:10:22 |
| 13 | table that you answer that question before taking the | 10:10:25 |
| 14 | break.  Is that fair? | 10:10:28 |
| 15 | A.    Yes. | 10:10:28 |
| 16 | Q.    Mr. Trende, are you represented by counsel | 10:10:29 |
| 17 | here today? | 10:10:31 |
| 18 | A.    You know, the rule on expert attorney | 10:10:32 |
| 19 | privilege came in after I left the practice of law. | 10:10:40 |
| 20 | So I don't think I have an attorney-client | 10:10:44 |
| 21 | relationship with someone, but I would imagine the | 10:10:47 |
| 22 | State of Georgia under this new privilege has some | 10:10:50 |
| 23 | relationship with me. | 10:10:53 |
| 24 | Q.    So I take that as a no. | 10:10:54 |
| 25 | A.    You should take that as I don't really | 10:10:58 |



| | | |
|---|---|---|
| 1 | know how this new expert attorney privilege thing | 10:11:01 |
| 2 | works.  I'm not in an attorney-client relationship | 10:11:04 |
| 3 | with anyone, to my knowledge. | 10:11:07 |
| 4 | Q.    We can sort that out. | 10:11:09 |
| 5 | MR. DUBOSE:  Bryan, we're reserving all | 10:11:12 |
| 6 | objections except for privilege and form? | 10:11:15 |
| 7 | MR. TYSON:  Yes, that's acceptable. | 10:11:17 |
| 8 | Thanks. | 10:11:19 |
| 9 | MR. DUBOSE:  I just want to attach the | 10:11:23 |
| 10 | Notice of Deposition as the first exhibit. | 10:11:25 |
| 11 | Penny, do you have that? | 10:11:29 |
| 12 | (Discussion ensued off the record.) | 10:11:43 |
| 13 | (Plaintiffs' Exhibit 1 was marked for | 10:11:43 |
| 14 | identification.) | 10:11:43 |
| 15 | MR. DUBOSE:  Let's attach that as | 10:11:44 |
| 16 | Exhibit 1. | 10:11:45 |
| 17 | Q.    (By Mr. DuBose) Mr. Trende, Exhibit 1 to | 10:11:47 |
| 18 | your deposition will be the Notice of Deposition. | 10:11:48 |
| 19 | I'm not going to ask you any questions about that; | 10:11:49 |
| 20 | just for the sake of a complete record, we're | 10:11:52 |
| 21 | attaching that as an exhibit to your deposition. | 10:11:54 |
| 22 | So, Mr. Trende, you were asked to bring -- | 10:12:02 |
| 23 | are you -- one more question. | 10:12:09 |
| 24 | Actually, never mind.  Mr. Trende, we | 10:12:12 |
| 25 | received from Mr. Tyson yesterday a couple of | 10:12:31 |



1    documents.  One was an invoice that you forwarded to        10:12:35

2    the State for your work and I think one more thing.         10:12:37

3    I don't recall it.                                          10:12:57

4              MR. DUBOSE:  Bryan, what was the other            10:12:57

5         thing you sent yesterday, the invoice and what         10:12:58

6         else?                                                  10:13:02

7              MR. TYSON:  I believe it was a cover              10:13:03

8         e-mail where Mr. Trende sent the invoice and           10:13:05

9         then the invoice itself.  So those were the two        10:13:07

10        documents related to request number 1 in the          10:13:12

11        notice on his billing.                                 10:13:16

12        Q.    (By Mr. DuBose)  So we have the invoice          10:13:16

13   and a cover e-mail.  Mr. Trende, do you have any            10:13:17

14   additional documents that may be responsive to our         10:13:20

15   requests as you sit here this morning?                      10:13:24

16        A.    No.                                              10:13:26

17        Q.    Mr. Trende, when were you first contacted       10:13:27

18   about serving as an expert in this case?                   10:13:34

19        A.    I don't know.                                    10:13:37

20        Q.    Can you give me a year?                         10:13:38

21        A.    Probably 2019.                                   10:13:40

22        Q.    Can you give me a season in that year?          10:13:44

23   Winter?  Fall?  Spring?                                     10:13:49

24        A.    Probably fall.                                   10:13:54

25        Q.    Can you give me a month?                        10:13:56



| | | | |
|---|---|---|---|
| 1 | A. | No. | 10:13:58 |
| 2 | Q. | Who contacted you? | 10:13:58 |
| 3 | A. | I believe Mr. Tyson. | 10:14:01 |
| 4 | Q. | Was that e-mail or phone? | 10:14:05 |
| 5 | A. | I don't know. | 10:14:11 |
| 6 | Q. | You can't recall? | 10:14:12 |
| 7 | A. | Can't recall. | 10:14:14 |
| 8 | Q. | Did you know Mr. Tyson before you were | 10:14:15 |

9 contacted by him about serving as an expert in this    10:14:22

10 case?                                                  10:14:26

11       A.    Not that I can remember.                  10:14:26

12       Q.    Do you have any notes or anything to that  10:14:28

13 effect regarding the initial communications with      10:14:41

14 Mr. Tyson when you were contacted about serving as an  10:14:44

15 expert in this case?                                   10:14:49

16       A.    Certainly not.                             10:14:50

17       Q.    So when you are contacted about an         10:14:52

18 engagement, what is your typical practice?  Do you     10:15:01

19 not take notes at all, or do you just kind of keep it  10:15:05

20 all in your head?                                      10:15:09

21       A.    I usually try to keep it all in my head.   10:15:10

22 As a former attorney, I try not to create those sorts  10:15:14

23 of documents.                                          10:15:17

24       Q.    So it's intentional that you don't create  10:15:18

25 documents when you're contacted?                       10:15:21



1    A.    It seems to work not creating them, and      10:15:23

2    there's no downside to not creating them.  So...    10:15:26

3         Q.    What's the upside to not creating them?   10:15:29

4         A.    You don't create a paper record as an     10:15:31

5    attorney, just as I imagine -- just as I imagine you  10:15:34

6    would hope your experts don't do that.               10:15:36

7         Q.    But you're not serving as an attorney in  10:15:39

8    this case, are you?                                  10:15:41

9         A.    No, but I know how being an expert works, 10:15:42

10   and I know how things work on the attorney side of   10:15:46

11   things.                                              10:15:49

12        Q.    So you don't create them because you know 10:15:49

13   you may get a request that you produce those         10:15:51

14   documents at some point in time, right?              10:15:54

15        A.    That's certainly it.                      10:15:56

16        Q.    And throughout your service as an expert  10:15:57

17   in this case, have you followed that practice of     10:16:01

18   creating as little paper as possible?                10:16:05

19        A.    Yes.                                      10:16:09

20        Q.    Outside of the invoice that you sent over, 10:16:14

21   do you have any documents that relate to the         10:16:20

22   compensation for the work that you've done in this   10:16:24

23   case?                                                10:16:25

24        A.    No.                                       10:16:26

25        Q.    I notice that the invoice did not have    10:16:28



1  detail.  Do you have any notes that record the detail        10:16:31
2  of the work you've performed on behalf of the State         10:16:35
3  in this case?                                                10:16:39
4       A.    No.                                               10:16:39
5       Q.    So how do you keep record of the time you         10:16:40
6  spent on the case?  Is that handwritten, or is that         10:16:44
7  in your head too?                                            10:16:49
8       A.    Mostly in my head.                                10:16:50
9       Q.    So do you record at the end of, what,             10:16:52
10 every week or month or day the amount of time you           10:16:56
11 spent on a case?                                             10:17:00
12      A.    A lot of it I can just remember from the          10:17:01
13 time that I spent, what days I spent on it.  I know          10:17:04
14 what my normal workday is, and I can create it that         10:17:06
15 way.  I have no written documents.                           10:17:11
16      Q.    So you were first contacted in the fall           10:17:13
17 of 2019 about serving as an expert in this case,            10:17:16
18 right?                                                       10:17:19
19      A.    I believe so.                                     10:17:19
20      Q.    And the invoice that you generated I              10:17:19
21 believe is dated for what month of this year?               10:17:23
22      A.    I don't have it in front of me.                   10:17:29
23      Q.    Well, but between the time that you were          10:17:31
24 retained and the time you generated that invoice,          10:17:34
25 your testimony is that there is not one single piece       10:17:39



| | |
|---|---|
| 1 | of paper that details the amount of time you spent | 10:17:42 |
| 2 | working on this case and the particular services | 10:17:46 |
| 3 | provided for each entry of work; there's not one | 10:17:49 |
| 4 | single piece of paper? | 10:17:57 |
| 5 |     A.    Yes. | 10:17:58 |
| 6 |     Q.    That's correct?  I'm correct in what I'm | 10:18:00 |
| 7 | saying? | 10:18:02 |
| 8 |     A.    Yes. | 10:18:03 |
| 9 |     Q.    That's a pretty good memory.  Did anyone | 10:18:04 |
| 10 | execute an engagement letter for the services that | 10:18:17 |
| 11 | you provided in this case? | 10:18:20 |
| 12 |     A.    I don't believe so. | 10:18:24 |
| 13 |     Q.    Have you been retained personally, or was | 10:18:25 |
| 14 | RealPolitics -- or RealClearPolitics retained? | 10:18:31 |
| 15 |     A.    RealClearPolitics is not involved. | 10:18:33 |
| 16 |     Q.    So do you have a company that you work | 10:18:37 |
| 17 | through that is your own when you provide expert | 10:18:42 |
| 18 | witness services? | 10:18:45 |
| 19 |     A.    No. | 10:18:46 |
| 20 |     Q.    So you work through your personal, | 10:18:48 |
| 21 | individual profile; is that correct? | 10:18:55 |
| 22 |     A.    Yes. | 10:19:02 |
| 23 |     Q.    So you don't have a corporate entity | 10:19:07 |
| 24 | through which you work to provide expert services? | 10:19:12 |
| 25 |     A.    I don't have any corporate entity, period. | 10:19:15 |



| | | |
|---|---|---|
| 1 | Q.    So is there an engagement letter between | 10:19:19 |
| 2 | the defendants and you individually? | 10:19:24 |
| 3 | A.    Not to my recollection.  If there was, | 10:19:27 |
| 4 | Mr. or -- Mr. Tyson would have it. | 10:19:31 |
| 5 | Q.    So the services you are providing are | 10:19:35 |
| 6 | pretty much pursuant to an oral agreement? | 10:19:40 |
| 7 | A.    I think that's right. | 10:19:43 |
| 8 | MR. TYSON:  Von, before we get too much | 10:19:47 |
| 9 | farther, I believe we do have an engagement | 10:19:51 |
| 10 | letter that outlines a lot more than just | 10:19:52 |
| 11 | compensation.  So I can provide a redacted | 10:19:55 |
| 12 | version of that if you think that's responsive. | 10:20:00 |
| 13 | MR. DUBOSE:  Sure.  You need time to | 10:20:01 |
| 14 | redact it; is that what you're saying? | 10:20:02 |
| 15 | MR. TYSON:  Yes, so I can take a look. | 10:20:04 |
| 16 | MR. DUBOSE:  If you could do that while | 10:20:09 |
| 17 | we're together here today and send it over and | 10:20:11 |
| 18 | if I have anything additional on it, I'll circle | 10:20:13 |
| 19 | around to it so we'll keep moving. | 10:20:20 |
| 20 | MR. TYSON:  Sounds good.  I'll look into | 10:20:23 |
| 21 | that. | 10:20:26 |
| 22 | MR. DUBOSE:  All right.  Thanks. | 10:20:26 |
| 23 | Q.    (By Mr. DuBose)  So, Mr. Trende, did you | 10:20:26 |
| 24 | just forget that there was an engagement letter in | 10:20:28 |
| 25 | this case? | 10:20:30 |



| | | |
|---|---|---|
| 1 | A.    I do a lot of expert work.  Sometimes | 10:20:30 |
| 2 | there's engagement letters; sometimes there aren't. | 10:20:34 |
| 3 | I don't remember there being one here. | 10:20:37 |
| 4 | Q.    What is your hourly rate for the services | 10:20:39 |
| 5 | you provided in this case? | 10:20:44 |
| 6 | A.    I believe it's 300 an hour.  That's my | 10:20:45 |
| 7 | standard rate. | 10:20:51 |
| 8 | Q.    When did you begin work on this case? | 10:20:52 |
| 9 | A.    I don't know. | 10:20:56 |
| 10 | Q.    Was it shortly after you got the call from | 10:20:58 |
| 11 | Mr. Tyson? | 10:21:02 |
| 12 | A.    I seem to remember you-all were stalled | 10:21:03 |
| 13 | out, and there was some sort of discovery battle or | 10:21:06 |
| 14 | something.  I don't think I started right away. | 10:21:10 |
| 15 | Q.    Have you been paid yet? | 10:21:12 |
| 16 | A.    Yes. | 10:21:15 |
| 17 | Q.    Paid in full? | 10:21:16 |
| 18 | A.    Yes. | 10:21:18 |
| 19 | Q.    Do you have any documents, including | 10:21:19 |
| 20 | communications with counsel for defendants, that | 10:21:33 |
| 21 | identify facts or data that the defense counsel | 10:21:37 |
| 22 | provided and that you considered in forming the | 10:21:40 |
| 23 | opinions you are expressing in this case? | 10:21:43 |
| 24 | A.    I believe Dr. Graves included his data | 10:21:45 |
| 25 | helpfully in his report, so I didn't need to obtain | 10:21:51 |



| | | |
|---|---|---|
| 1 | anything other than the reports in this case. | 10:21:56 |
| 2 | Q.    So notwithstanding what you needed to | 10:21:59 |
| 3 | obtain, my question was:  Were you provided with any | 10:22:09 |
| 4 | documents by defense counsel? | 10:22:12 |
| 5 | A.    No.  That's my answer; I don't think | 10:22:15 |
| 6 | there's anything to obtain other than what Dr. Graves | 10:22:18 |
| 7 | reported.  So other than the expert reports that were | 10:22:22 |
| 8 | provided to me by counsel, I don't think there was | 10:22:25 |
| 9 | anything else. | 10:22:27 |
| 10 | Q.    Do you have any documents, including | 10:22:28 |
| 11 | communications with counsel for defendants, that | 10:22:35 |
| 12 | identify assumptions that the defendants' attorney | 10:22:38 |
| 13 | provided that the expert relied on in forming | 10:22:42 |
| 14 | opinions?  So do you have anything as to identifying | 10:22:45 |
| 15 | the assumptions that defense counsel made with | 10:22:48 |
| 16 | respect to the subject matter of your expert report? | 10:22:52 |
| 17 | A.    I don't believe so. | 10:22:55 |
| 18 | Q.    What did you do to prepare for this | 10:22:57 |
| 19 | deposition? | 10:23:00 |
| 20 | A.    I had a conversation with counsel and | 10:23:00 |
| 21 | looked over the exhibits that were provided by | 10:23:02 |
| 22 | plaintiffs' counsel. | 10:23:06 |
| 23 | Q.    You say counsel; you mean Mr. Tyson? | 10:23:08 |
| 24 | A.    Yes. | 10:23:10 |
| 25 | Q.    And have you reviewed Dr. Graves' | 10:23:11 |



1   deposition?                                        10:23:20

2        A.    No.                                     10:23:20

3        Q.    So I want to talk to you a little bit   10:23:21

4   about your qualifications now.  You've offered     10:23:29

5   opinions in (inaudible), right?                    10:23:29

6        A.    Correct.                                10:23:29

7             THE REPORTER:  I'm sorry.  Mr. DuBose, I'm  10:23:29

8        sorry, I did not hear all that question.      10:23:29

9        Q.    (By Mr. DuBose) Okay.  Mr. Trende, you've  10:23:42

10  offered opinions in other voting cases, correct?   10:23:43

11       A.    That's correct.                         10:23:46

12            MR. DUBOSE:  Am I fading out when I move  10:23:48

13       away from my device, Penny?                   10:23:48

14            THE REPORTER:  A little bit, yes.         10:23:48

15            MR. DUBOSE:  I'll make sure I stay close.  10:23:48

16            THE REPORTER:  Thank you.                 10:23:57

17       Q.    (By Mr. DuBose) One of those cases was   10:23:57

18  Common Cause versus Rucho --                       10:23:59

19       A.    Rucho.                                  10:23:59

20       Q.    -- Rucho in the Middle District of North  10:24:02

21  Carolina, right?                                   10:24:07

22       A.    Correct.                                10:24:08

23       Q.    And your report in that case was dated  10:24:09

24  approximately April of 2017, so maybe about three  10:24:13

25  years ago?                                         10:24:17



| | |
|---|---|
| 1 | A.    I don't have it in front of me, but I'll | 10:24:18 |
| 2 | accept your stipulation. | 10:24:22 |
| 3 | Q.    And at the time you generated that expert | 10:24:23 |
| 4 | report, you had an undergrad degree, a law degree, | 10:24:27 |
| 5 | and a master's in political science; is that right? | 10:24:35 |
| 6 | A.    That's right. | 10:24:39 |
| 7 | Q.    And, at the time, you were a doctoral | 10:24:39 |
| 8 | student at The Ohio State University; is that right? | 10:24:43 |
| 9 | A.    Thank you for getting the title right. | 10:24:49 |
| 10 | Yes. | 10:24:53 |
| 11 | Q.    Well, I went to law school in Cleveland, | 10:24:54 |
| 12 | so even though I'm a Michigan fan, I've heard The | 10:24:54 |
| 13 | Ohio State University enough times to at least give | 10:24:58 |
| 14 | the institution it's proper name. | 10:24:59 |
| 15 | A.    We appreciate that. | 10:25:03 |
| 16 | Q.    All right.  And since the 2017 expert | 10:25:07 |
| 17 | report, is it correct you've completed a second | 10:25:11 |
| 18 | master's degree? | 10:25:14 |
| 19 | A.    That's correct. | 10:25:16 |
| 20 | Q.    In applied statistics? | 10:25:17 |
| 21 | A.    Correct. | 10:25:20 |
| 22 | Q.    In your second master's degree did you | 10:25:20 |
| 23 | conduct any original research? | 10:25:26 |
| 24 | A.    No. | 10:25:32 |
| 25 | Q.    Let's turn to your doctoral work.  The CV | 10:25:33 |



| | | |
|---|---|---|
| 1 | you provided us in this case said you expect your | 10:25:47 |
| 2 | Ph.D. this year. | 10:25:51 |
| 3 | A.    Yeah, it should be updated to next year. | 10:25:52 |
| 4 | Q.    Next year? | 10:25:55 |
| 5 | A.    Yes. | 10:25:56 |
| 6 | Q.    Have you finished all of your course work? | 10:25:58 |
| 7 | A.    Yes. | 10:26:02 |
| 8 | Q.    Have you defended your thesis yet? | 10:26:05 |
| 9 | A.    No.  That is usually done shortly before | 10:26:10 |
| 10 | you graduate. | 10:26:14 |
| 11 | Q.    So what would -- | 10:26:15 |
| 12 | A.    By thesis -- | 10:26:15 |
| 13 | Q.    Go ahead.  I'm sorry. | 10:26:19 |
| 14 | A.    By thesis I assume you mean the | 10:26:20 |
| 15 | dissertation. | 10:26:23 |
| 16 | Q.    Sure.  That's what I mean.  So you said | 10:26:24 |
| 17 | that the expected date of completion should be | 10:26:33 |
| 18 | updated to next year.  Is there a reason for the | 10:26:36 |
| 19 | delay? | 10:26:38 |
| 20 | A.    One of my committee members committed | 10:26:39 |
| 21 | suicide late last year, so I've had to reconfigure | 10:26:44 |
| 22 | some things. | 10:26:48 |
| 23 | Q.    Okay.  I'm sorry to hear that. | 10:26:49 |
| 24 | A.    Yes. | 10:26:53 |
| 25 | Q.    Do you have some teaching responsibilities | 10:26:53 |



| | | |
|---|---|---|
| 1 | in connection with your Ph.D. program? | 10:27:07 |
| 2 | A.    Yes. | 10:27:10 |
| 3 | Q.    Are you currently still in the semester | 10:27:10 |
| 4 | for school? | 10:27:14 |
| 5 | A.    Yeah.  I mean, we're teaching remotely, | 10:27:17 |
| 6 | but we're still on the semester. | 10:27:22 |
| 7 | Q.    And what are you teaching right now? | 10:27:26 |
| 8 | A.    Voting and -- I can't remember the exact | 10:27:30 |
| 9 | title, but it's voting participation and turnout. | 10:27:35 |
| 10 | Q.    Anything else? | 10:27:38 |
| 11 | A.    No. | 10:27:41 |
| 12 | Q.    And this is at Ohio State? | 10:27:42 |
| 13 | A.    Yes. | 10:27:53 |
| 14 | Q.    I'm assuming you have a syllabus for that | 10:27:54 |
| 15 | class. | 10:28:03 |
| 16 | A.    Yes. | 10:28:04 |
| 17 | Q.    Is it available online? | 10:28:04 |
| 18 | A.    I don't believe so. | 10:28:05 |
| 19 | Q.    What classes have you taught in the past? | 10:28:15 |
| 20 | A.    I taught Intro to American Politics for | 10:28:22 |
| 21 | three semesters at Ohio State, and then my sophomore | 10:28:27 |
| 22 | year -- or sophomore year -- second year, spring | 10:28:33 |
| 23 | semester, sorry about that, I was asked by Ohio | 10:28:37 |
| 24 | Wesleyan University to teach Media in American | 10:28:41 |
| 25 | Government. | 10:28:46 |



1    Q.    Anything else?                                10:28:47

2    A.    No.                                           10:28:50

3    Q.    Any syllabus available for those other two   10:28:50

4    classes online anywhere?                           10:29:00

5    A.    I don't know if they have been put up        10:29:03

6    online or not.  Usually the department does that.  10:29:08

7    Q.    What's the topic of your dissertation?       10:29:11

8    A.    It's a three-papers dissertation.            10:29:14

9    Q.    Okay.                                         10:29:17

10   A.    One of them is Supreme Court voting          10:29:18

11   patterns in the early 1900s; one of them is ballot 10:29:21

12   order effect, and one of them is spatio-temporal   10:29:25

13   modeling of the Southern realignment.              10:29:31

14   Q.    Any of the three finished yet, the           10:29:36

15   dissertation papers?                               10:29:42

16   A.    No.                                           10:29:43

17   Q.    At any time in your career have you          10:29:43

18   designed and executed a study yourself from start to 10:29:49

19   finish?                                            10:29:52

20   A.    I think I know what you mean by study, but   10:29:57

21   as broadly as you worded it, I would have to say yes, 10:30:04

22   with some of my RealClearPolitics stuff.  I'm      10:30:09

23   assuming you mean an academic study.               10:30:12

24   Q.    Yes, and let's do it this way.  You can      10:30:14

25   certainly say anything or reference anything you've 10:30:17



| | |
|---|---|
| 1 | done through RealClear. Let's take it outside of | 10:30:20 |
| 2 | RealClear. Have you designed and executed a study | 10:30:24 |
| 3 | outside of anything you've done with | 10:30:28 |
| 4 | RealClearPolitics? | 10:30:30 |
| 5 | A. Well, again, you know, I've written a | 10:30:31 |
| 6 | book. I've written several book chapters, but if you | 10:30:33 |
| 7 | want to narrow it down to peer-reviewed published | 10:30:38 |
| 8 | literature, the answer is no, which I think is what | 10:30:40 |
| 9 | you're getting at. | 10:30:43 |
| 10 | Q. Okay. So let's just kind of work through | 10:30:43 |
| 11 | this a little bit to kind of parse it. RealClear or | 10:31:00 |
| 12 | not, have you ever developed a hypothesis for a | 10:31:05 |
| 13 | study? | 10:31:07 |
| 14 | A. Yes. | 10:31:08 |
| 15 | Q. What was that study? | 10:31:19 |
| 16 | A. I mean, every paper or every study you | 10:31:21 |
| 17 | have, every paper you write for a course has a | 10:31:25 |
| 18 | hypothesis in it, and developing hypotheses is one of | 10:31:29 |
| 19 | the core things in statistical course work. | 10:31:34 |
| 20 | Q. And so you're referencing studies that | 10:31:37 |
| 21 | you've done as it relates to your academic career, | 10:31:41 |
| 22 | not necessarily something that you've done | 10:31:47 |
| 23 | professionally outside of your academic career; is | 10:31:48 |
| 24 | that right? | 10:31:54 |
| 25 | A. I said everything, just about everything | 10:31:54 |



| | | |
|---|---|---|
| 1 | you do involves the formulation of a hypothesis that | 10:31:57 |
| 2 | you're interested in pressing. | 10:32:02 |
| 3 | Q.    So you're referencing exercises in your | 10:32:08 |
| 4 | studies as you progress toward the degrees that you | 10:32:11 |
| 5 | have, right?  I'm talking about more so in a | 10:32:14 |
| 6 | professional academic setting where you have reached | 10:32:21 |
| 7 | wherever it is you're going, and then you start to | 10:32:23 |
| 8 | generate and you ended it up as peer-reviewed content | 10:32:27 |
| 9 | that you -- say, for instance, if you're on tenure | 10:32:35 |
| 10 | track at an academic institution, those are the kind | 10:32:39 |
| 11 | of things that you are going to be doing. | 10:32:42 |
| 12 | So what I'm trying to do is determine | 10:32:44 |
| 13 | whether outside of your academic travels where you | 10:32:46 |
| 14 | are seeking your degrees, master's degrees, your | 10:32:50 |
| 15 | Ph.D. program, have you been a part of or have you | 10:32:52 |
| 16 | participated in any study where you have designed and | 10:32:58 |
| 17 | executed a study from start to finish. | 10:33:03 |
| 18 | A.    Haven't authored any peer-reviewed | 10:33:06 |
| 19 | literature, so that would include developing a | 10:33:09 |
| 20 | hypothesis for peer-reviewed literature. | 10:33:12 |
| 21 | Q.    During your testimony in North Carolina, | 10:33:18 |
| 22 | the Common Cause case, you testified that you would | 10:33:23 |
| 23 | not call yourself a political scientist; is that | 10:33:26 |
| 24 | right? | 10:33:30 |
| 25 | A.    I will accept your stipulation on that. | 10:33:30 |



1    Q.    Do you recall that?                          10:33:33

2    A.    No.                                          10:33:34

3    Q.    And you still do not consider yourself a     10:33:35

4    political scientist, correct?                      10:33:54

5    A.    I wouldn't call myself a political           10:33:55

6    scientist.                                         10:34:00

7    Q.    Why not?                                     10:34:00

8    A.    Because I'm not a political science          10:34:01

9    professor.                                         10:34:04

10   Q.    Is that the only reason?                     10:34:06

11   A.    As I sit here, that's the only reason.       10:34:09

12   Q.    Well, if you think of something else after   10:34:19

13   the fact, let Mr. Tyson know so he can get that    10:34:22

14   information on over to us.  Okay?                   10:34:25

15   A.    Gotcha.                                      10:34:27

16   Q.    I'm going to butcher this, but you do        10:34:29

17   consider yourself a psephologist; is that right?   10:34:32

18   A.    Yeah, that's a word that seems to give a     10:34:37

19   lot of otherwise intelligent people unwarranted    10:34:40

20   confusion.  So I don't really use it anymore, but, 10:34:44

21   yes, a psephologist is somebody who studies        10:34:48

22   elections.                                         10:34:52

23   Q.    Did I pronounce it correctly?                10:34:52

24   A.    You did.                                     10:34:54

25   Q.    So I was kind of grinding on the             10:34:56



1    pronunciation.  You are a psephologist in your own          10:35:00
2    estimation, right?                                          10:35:05
3        A.    I study elections, and a psephologist is          10:35:05
4    somebody who studies elections, so yes.                     10:35:09
5        Q.    There's no academic degree in psephology,         10:35:12
6    is there, to your knowledge?                                10:35:15
7        A.    No.  There's no academic degree in                10:35:17
8    redistricting either, but you can be a redistricter.        10:35:21
9    It doesn't make the word any less real.                     10:35:24
10       Q.    Sure.  And I'm not challenging whether            10:35:26
11   it's real or not; just trying to understand.  So            10:35:29
12   there's no academic curriculum one would follow in          10:35:34
13   order to become a psephologist; is that right?              10:35:41
14       A.    Ohio State doesn't offer any sort of             10:35:43
15   accreditation or whatever in elections or minors or         10:35:51
16   anything like that.  I can't speak to other programs.       10:35:56
17       Q.    Are there any professional organizations          10:36:00
18   that psephologists typically belong to or associate         10:36:05
19   with?                                                        10:36:09
20       A.    I mean, if you're a Ph.D. who studies             10:36:10
21   elections, you would be probably a member of APSA or        10:36:15
22   some of the other professional organizations.               10:36:20
23       Q.    What does APSA stand for?                          10:36:22
24       A.    American Political Science Association.            10:36:24
25       Q.    Are you a member?                                  10:36:27



1    A.    I have been.  I can't remember if I am          10:36:28

2    right now or not.                                     10:36:30

3    Q.    Any other professional organizations for        10:36:33

4    psephologists?                                        10:36:37

5    A.    Well, there's associations for political       10:36:37

6    scientists that if you are someone who studies        10:36:40

7    elections you would be a member of.  They aren't      10:36:43

8    specifically for people who study elections.          10:36:48

9    Q.    Any other professional organizations that       10:36:51

10   you're a member of where one of the primary          10:36:55

11   characteristics is that the member study elections?   10:36:59

12   A.    No.  Not that I can think of.                    10:37:03

13   Q.    There's no agreed-upon methodology by           10:37:06

14   which psephologists make their predictions, right?    10:37:18

15   A.    Yeah.  There's a variety of approaches.         10:37:21

16   Q.    You've mentioned that you don't belong to       10:37:31

17   the APSA.  How about the Association of Political      10:37:41

18   Theory?                                               10:37:44

19   A.    I didn't say I didn't belong to APSA.  I        10:37:45

20   said I couldn't remember if I still do.               10:37:49

21   Q.    Okay.                                            10:37:51

22   A.    I don't belong to the Association of            10:37:52

23   Political Theorists.                                  10:37:55

24   Q.    Do you do a fair amount of public               10:38:06

25   speaking?                                             10:38:14



1         A.    Not right now but I have, yes.                10:38:14

2         Q.    In the last two years have you been fairly    10:38:21

3    active?                                                  10:38:24

4         A.    It's been -- it's slowed down considerably    10:38:24

5    in the age of Trump, but I do speeches.                  10:38:29

6         Q.    Why has it slowed down in the age of          10:38:33

7    Trump?                                                   10:38:36

8         A.    We think that politics has become so nasty    10:38:36

9    and polarized that event planners are reluctant to      10:38:44

10   put political speakers on the agenda.                   10:38:49

11        Q.    Who has been reluctant to put political      10:38:52

12   speakers on the agenda?                                 10:38:57

13        A.    Event planners.                              10:38:58

14        Q.    Would you consider yourself a political      10:38:59

15   speaker?                                                10:39:03

16        A.    I do political speaking.                     10:39:03

17        Q.    When you say "we believe," are you talking   10:39:05

18   about RealClearPolitics?                                10:39:15

19        A.    No.  Some other political speakers that      10:39:17

20   I've talked to as well have noticed a downturn.         10:39:19

21   Obviously, with the shutdowns, there's nothing going    10:39:29

22   on.                                                     10:39:31

23        Q.    Sure.  So would you agree with the           10:39:32

24   sentiment that the political climate has gotten so --   10:39:54

25   what was the word you used, nasty?                      10:39:58



1    A.    Yes.                                          10:40:01

2    Q.    Would you agree with that sentiment?         10:40:01

3    A.    I think the political climate right now is   10:40:04

4  pretty nasty.                                         10:40:07

5    Q.    Unnecessarily so?                             10:40:08

6    A.    I think some of it is deserved.              10:40:10

7    Q.    Like what?                                    10:40:15

8    A.    I don't think too much of the current        10:40:17

9  president.  I understand why people are horrified.   10:40:19

10    Q.    Turning to your report in other cases in    10:40:25

11  which you've testified, I think we covered -- what  10:40:44

12  was the North Carolina case? -- Common Cause versus 10:40:48

13  Rucho.  You also did work in Dixon versus Rucho; is 10:40:54

14  that right?                                          10:40:59

15    A.    That's right.                                10:40:59

16    Q.    Seems to be about a 2011 case.  Does that   10:41:00

17  sound right timewise?                                10:41:05

18    A.    I think it was two thousand -- about,        10:41:07

19  yeah.                                                10:41:16

20    Q.    You indicated in that report that you also  10:41:16

21  submitted a report in the Covington case.  Do you   10:41:18

22  recall that?                                         10:41:20

23    A.    I wouldn't -- I don't think I would have    10:41:21

24  said that in the Dixon v. Rucho report, but I did   10:41:23

25  file an expert report in the Covington case.        10:41:27



| | | |
|---|---|---|
| 1 | Q.    And both of those cases, Dixon and | 10:41:30 |
| 2 | Covington, involved challenges to maps for the North | 10:41:34 |
| 3 | Carolina state legislative bodies; is that right? | 10:41:38 |
| 4 | A.    Yes.  They were identical cases.  Well, | 10:41:41 |
| 5 | functionally identical cases I should say. | 10:41:47 |
| 6 | Q.    And you testified for the State defending | 10:41:50 |
| 7 | the maps as drawn, correct? | 10:41:53 |
| 8 | A.    I testified for the State.  My opinion was | 10:41:55 |
| 9 | that the maps would tend to elect Republicans.  I | 10:42:02 |
| 10 | don't know if that's really defending the maps as | 10:42:08 |
| 11 | drawn. | 10:42:11 |
| 12 | Q.    Have you ever testified for a plaintiff in | 10:42:11 |
| 13 | a case? | 10:42:17 |
| 14 | A.    No.  I've never been asked. | 10:42:18 |
| 15 | Q.    In the Covington case, was there a trial? | 10:42:26 |
| 16 | A.    Yes. | 10:42:28 |
| 17 | Q.    Did you testify at trial? | 10:42:29 |
| 18 | A.    No. | 10:42:32 |
| 19 | Q.    Why not; do you know? | 10:42:32 |
| 20 | A.    My understanding is that since the | 10:42:37 |
| 21 | Covington case and Dixon case were functionally the | 10:42:42 |
| 22 | same, there was an agreement between the parties to | 10:42:47 |
| 23 | bring in the record from the Dixon case.  And when | 10:42:50 |
| 24 | the record from the Dixon case got brought in and | 10:42:53 |
| 25 | admitted, my report from Dixon got brought in and | 10:42:56 |



| | | |
|---|---|---|
| 1 | admitted. | 10:43:00 |
| 2 | And so, since my testimony was already | 10:43:01 |
| 3 | admitted into evidence or my written testimony was | 10:43:03 |
| 4 | already admitted into evidence, they figured they | 10:43:07 |
| 5 | could argue from that. | 10:43:11 |
| 6 | Q.    Did you testify in the Dixon case? | 10:43:11 |
| 7 | A.    No. | 10:43:14 |
| 8 | Q.    And did the Dixon case, to your knowledge, | 10:43:15 |
| 9 | go to trial? | 10:43:23 |
| 10 | A.    I believe it did 'cause it went up to -- I | 10:43:23 |
| 11 | don't know if there was a trial or just an | 10:43:28 |
| 12 | evidentiary hearing, but it went up to the Supreme | 10:43:30 |
| 13 | Court of North Carolina, so there was something. | 10:43:34 |
| 14 | Q.    In the Dixon or Covington cases, were | 10:43:37 |
| 15 | there any motions to exclude or limit your opinions? | 10:43:42 |
| 16 | A.    I didn't even get deposed in Dixon, so I | 10:43:45 |
| 17 | would imagine there wasn't any motion in limine | 10:43:51 |
| 18 | there.  I believe there was in Covington, but I'm not | 10:43:55 |
| 19 | sure. | 10:43:57 |
| 20 | Q.    In Covington do you know what the result | 10:43:58 |
| 21 | of the motion to exclude or limit was? | 10:44:05 |
| 22 | A.    Because my report got brought in as | 10:44:12 |
| 23 | evidence, I don't know if the Court ended up ruling | 10:44:20 |
| 24 | on it, but it might have.  I don't know. | 10:44:23 |
| 25 | Q.    It might have what? | 10:44:26 |



| | |
|---|---|
| 1 | A.    The Court might have ruled on the motion. | 10:44:28 |
| 2 | I don't think it did because they brought in my | 10:44:31 |
| 3 | report from Rucho -- not Rucho -- from Dixon as | 10:44:33 |
| 4 | evidence.  So I don't think the Court ended up | 10:44:37 |
| 5 | ruling. | 10:44:40 |
| 6 | Q.    Is it fair that most of your work as an | 10:44:41 |
| 7 | expert has been in redistricting cases? | 10:44:45 |
| 8 | A.    Hum.  It's certainly been a fair amount. | 10:44:54 |
| 9 | I don't know if it's been a majority. | 10:45:01 |
| 10 | Q.    So how does your work in redistricting | 10:45:05 |
| 11 | cases translate to a case like this where the issue | 10:45:10 |
| 12 | on which you are offering an opinion is simply | 10:45:15 |
| 13 | whether the lines to vote were longer in the majority | 10:45:18 |
| 14 | or minority districts than -- I'm sorry -- longer in | 10:45:22 |
| 15 | majority-minority districts than they were in | 10:45:27 |
| 16 | majority-majority districts? | 10:45:31 |
| 17 | MR. TYSON:  I'll object to form. | 10:45:34 |
| 18 | Q.    (By Mr. DuBose)  You understand the | 10:45:35 |
| 19 | question, right? | 10:45:36 |
| 20 | A.    I think I understand the question.  I just | 10:45:37 |
| 21 | don't know if I know the answer. | 10:45:40 |
| 22 | Q.    Need a second? | 10:45:53 |
| 23 | A.    No.  That's something that depends on how | 10:45:56 |
| 24 | the lawyers are going to argue it.  I mean, I think | 10:46:01 |
| 25 | to the extent that I've been admitted, I suppose if I | 10:46:04 |



| 1 | were putting on my lawyer hat, to the extent that | 10:46:07 |
| 2 | I've been admitted as an expert in other cases, it's | 10:46:10 |
| 3 | informative -- in other election-related cases, it's | 10:46:13 |
| 4 | informative of whether I should be admitted here, but | 10:46:16 |
| 5 | that's getting down into the weeds. | 10:46:19 |
| 6 | Q. No. You can leave your lawyer hat in the | 10:46:21 |
| 7 | closet. Let's go with the expert hat. So how does | 10:46:24 |
| 8 | your work in redistricting cases translate to what | 10:46:24 |
| 9 | you're doing in this case? | 10:46:28 |
| 10 | A. Well, I think -- | 10:46:30 |
| 11 | Q. Is it completely unrelated, or are we | 10:46:33 |
| 12 | drawing from a different pool of talents here? | 10:46:36 |
| 13 | MR. TYSON: Objection. | 10:46:36 |
| 14 | Q. (By Mr. DuBose) Or does it build on the | 10:46:38 |
| 15 | work that you've done in the past on the | 10:46:40 |
| 16 | redistricting cases in some way? If so, if that's | 10:46:46 |
| 17 | your sentiment, if that's what you believe, | 10:46:48 |
| 18 | explain -- | 10:46:50 |
| 19 | A. I would say that to the extent that Dr. -- | 10:46:50 |
| 20 | I would say to the extent that Dr. Mayer's work in | 10:46:53 |
| 21 | redistricting cases is relevant to his work here, | 10:46:54 |
| 22 | mine is. To the extent it isn't, mine isn't. | 10:46:59 |
| 23 | Q. Dr. Mayer? | 10:47:03 |
| 24 | A. Yes. | 10:47:05 |
| 25 | Q. Can you explain that? | 10:47:05 |



| | | |
|---|---|---|
| 1 | A.    He's done work in redistricting cases too. | 10:47:07 |
| 2 | If his work in redistricting cases is utterly | 10:47:11 |
| 3 | irrelevant to his work in this case, then, I suppose | 10:47:16 |
| 4 | mine is too.  I don't know if that's true.  I think | 10:47:18 |
| 5 | there are general approaches, statistical approaches, | 10:47:21 |
| 6 | that get brought in.  I think there are -- I think | 10:47:26 |
| 7 | you look at things under the general umbrella of | 10:47:30 |
| 8 | American politics which is the actual kind of | 10:47:34 |
| 9 | political science subcategory, and even elections, | 10:47:36 |
| 10 | and it's a relevant consideration.  But at the end of | 10:47:42 |
| 11 | the day, this is a legal question.  So I don't know | 10:47:47 |
| 12 | exactly how I can answer it. | 10:47:51 |
| 13 | Q.    What's a legal question? | 10:47:54 |
| 14 | A.    The question of relevance. | 10:47:56 |
| 15 | Q.    Well, I'm not using relevance, and if I | 10:48:02 |
| 16 | did, I didn't intend to use relevance in my question. | 10:48:06 |
| 17 | I wanted to ask you about your work in redistricting; | 10:48:10 |
| 18 | how does that relate to or translate to what you're | 10:48:14 |
| 19 | doing in this case. | 10:48:19 |
| 20 | So I'm not asking for a legal opinion. | 10:48:20 |
| 21 | I'm not asking for that.  If I did, Bryan certainly | 10:48:23 |
| 22 | would have objected.  So I'm not asking for a legal | 10:48:27 |
| 23 | opinion.  I'm just asking you to explain how your | 10:48:30 |
| 24 | past experience in redistricting cases translates to | 10:48:34 |
| 25 | what you're doing in this case. | 10:48:38 |



| | | |
|---|---|---|
| 1 | A.    Mr. Tyson did object, but I think I've | 10:48:40 |
| 2 | answered your question.  There's a broader approach | 10:48:46 |
| 3 | to statistics that if we're going to avoid the word | 10:48:49 |
| 4 | relevant, we will say relates to all of American | 10:48:57 |
| 5 | politics and then the subspecialty of elections which | 10:49:01 |
| 6 | is what it falls under.  And I think to the extent | 10:49:05 |
| 7 | that Dr. Mayer's work in redistricting cases is | 10:49:10 |
| 8 | relevant here, mine probably is too. | 10:49:14 |
| 9 | Q.    Now, refresh my recollection on the Rucho | 10:49:25 |
| 10 | case.  You said you do not recall testifying in | 10:49:29 |
| 11 | trial? | 10:49:33 |
| 12 | A.    The Dixon -- | 10:49:33 |
| 13 | Q.    Common Cause.  Common Cause, I'm sorry, | 10:49:34 |
| 14 | versus Rucho. | 10:49:37 |
| 15 | A.    Common Cause versus Rucho, that's the -- | 10:49:38 |
| 16 | that's the gerrymandering case? | 10:49:43 |
| 17 | Q.    Okay. | 10:49:46 |
| 18 | A.    I'm asking you.  There's a lot of cases -- | 10:49:47 |
| 19 | Q.    It should have been running in or about | 10:49:50 |
| 20 | October of 2017. | 10:49:54 |
| 21 | A.    I did testify at trial in that case. | 10:49:55 |
| 22 | Q.    Three-judge panel; is that what you | 10:50:00 |
| 23 | recall? | 10:50:02 |
| 24 | A.    Yes. | 10:50:02 |
| 25 | Q.    So before your testimony in that case, you | 10:50:03 |



1    had finished your master's in applied statistics,          10:50:07
2    right?                                                     10:50:11
3         A.    No.                                             10:50:11
4         Q.    No?                                             10:50:11
5         A.    No.  I wasn't in the program yet.               10:50:12
6         Q.    When you say "the program," the applied         10:50:15
7    statistics program?                                        10:50:18
8         A.    If I recall correctly, and I may not, but       10:50:19
9    if I recall correctly, at that point I had done some       10:50:23
10   of the course work and was hoping to get into the          10:50:26
11   program but was not yet in the program.                    10:50:29
12        Q.    You mentioned Dr. Mayer a few minutes ago.      10:50:38
13   Have you reviewed the report that he generated in          10:50:44
14   this case?                                                 10:50:48
15        A.    I think I read it once.                         10:50:49
16        Q.    Outside of the report that you read, were       10:51:03
17   you familiar with Dr. Mayer and his background             10:51:09
18   generally?                                                 10:51:12
19        A.    I know he's a political scientist at            10:51:12
20   Wisconsin.  I think he teaches election classes.  I        10:51:16
21   read his paper on early voting with Burden and Canon.      10:51:20
22   Most of my interaction has been in the Wisconsin           10:51:29
23   redistricting case though.                                 10:51:32
24        Q.    So in Common Cause versus Rucho, you were       10:51:38
25   proffered as an expert in U.S. elections including         10:51:42



| | | |
|---|---|---|
| 1 | congressional elections, analysis of electoral | 10:51:49 |
| 2 | history, and redistricting.  Does that sound about | 10:51:49 |
| 3 | right? | 10:51:52 |
| 4 |     A.    You know, that was three years ago.  So, | 10:51:53 |
| 5 | again, it's one of those, I'll accept your | 10:51:56 |
| 6 | stipulation.  I'm assuming you've read the | 10:51:58 |
| 7 | transcripts recently. | 10:52:01 |
| 8 |     Q.    And that was a redistricting case, right? | 10:52:02 |
| 9 |     A.    That was a political gerrymandering case, | 10:52:06 |
| 10 | yep. | 10:52:10 |
| 11 |     Q.    Let me ask you about your work in NAACP | 10:52:13 |
| 12 | versus McCrory.  Do you remember that case? | 10:52:19 |
| 13 |     A.    Yes. | 10:52:21 |
| 14 |     Q.    Do you recall offering the opinion that | 10:52:22 |
| 15 | voting reforms contained in HB589 placed the state | 10:52:23 |
| 16 | within the mainstream of American voting laws; do you | 10:52:29 |
| 17 | recall that? | 10:52:32 |
| 18 |     A.    Yes. | 10:52:32 |
| 19 |     Q.    Would you consider what you offered as | 10:52:32 |
| 20 | that opinion to be a legal opinion? | 10:52:35 |
| 21 |     A.    I haven't given much thought to that. | 10:52:40 |
| 22 |         MR. TYSON:  Object to form. | 10:52:41 |
| 23 |     Q.    (By Mr. DuBose)  Want to take a second and | 10:52:45 |
| 24 | think about it? | 10:52:47 |
| 25 |     A.    No.  I don't even know how to answer that | 10:52:47 |



1    question.  I mean, it's expert opinion.            10:52:50

2         Q.    Not a legal opinion?                    10:52:54

3         A.    It involved analysis of statutes, so it  10:52:57

4    was an opinion about law, but I don't know if it's a  10:53:02

5    legal opinion.  I mean, I think a legal opinion is an  10:53:05

6    opinion about law in the same way that a red herring  10:53:10

7    is a scarlet fish.  So...                          10:53:13

8         Q.    Did the opposing attorneys attempt to   10:53:16

9    exclude or limit your expert report or opinion in   10:53:26

10   that case?                                         10:53:29

11        A.    Yes.                                     10:53:30

12        Q.    What was the result of that challenge?  10:53:31

13        A.    I don't think it was granted to any     10:53:34

14   extent, and it was denied with respect to opinion 1,  10:53:42

15   is my recollection, but that was, again, four years  10:53:47

16   ago -- or six years ago now.                       10:53:49

17        Q.    Was it granted as to any other opinion?  10:53:52

18        A.    I don't believe it was.                 10:53:58

19        Q.    When you practiced law did you ever handle  10:54:02

20   a case that involved either voting rights or        10:54:07

21   redistricting?                                     10:54:12

22        A.    No.                                      10:54:12

23        Q.    So your opinion in the NAACP versus     10:54:13

24   McCrory wasn't based on any legal experience that  10:54:24

25   you've had, right?                                 10:54:28



1    A.    Oh, I won't agree with that.  I mean, my      10:54:29

2    legal experience is how I learned to read and      10:54:33

3    interpret a statute, but I've never handled a voting  10:54:35

4    rights case.                                         10:54:39

5    Q.    And to be clear, then, you concede then       10:54:40

6    that the opinion you provided in the NAACP versus   10:54:44

7    McCrory involved you reading and interpreting       10:54:50

8    statutes?                                            10:54:52

9    A.    Yes.                                           10:54:53

10   Q.    In NAACP versus McCrory did the Court         10:55:17

11   prevent you from testifying about your opinion as to  10:55:23

12   North Carolina law being consistent with other laws?  10:55:27

13   A.    I don't remember the Court preventing me      10:55:30

14   from testifying on anything, but I'm assuming you've  10:55:33

15   read the transcripts more recently than I have.     10:55:35

16   Q.    Notwithstanding you providing                 10:55:41

17   interpretations of law in NAACP versus McCrory, you  10:55:52

18   do understand that interpretation of law is typically  10:55:58

19   the province of the judge and Court, right?         10:56:00

20        MR. TYSON:  I'll object to form.               10:56:04

21        THE WITNESS:  Legal conclusions are            10:56:08

22     typically the province of the Court I'm sure.     10:56:10

23   Q.    (By Mr. DuBose)  So in this case do you       10:56:17

24   intend to tell Judge Jones what the law is and how  10:56:18

25   that should govern his decisions?                   10:56:22



1          MR. TYSON:  I'll object to form.                    10:56:26

2          THE WITNESS:  Yeah, I don't know what               10:56:27

3     Mr. Tyson's legal strategy is or what he would           10:56:30

4     plan for me at trial if I were to testify, but I         10:56:34

5     don't think anything to that effect is in my             10:56:37

6     report.                                                  10:56:39

7     Q.    (By Mr. DuBose)  Did anyone assist you in          10:56:44

8     drafting the report in this case?                        10:56:48

9     A.    No.                                                10:56:49

10    Q.    Your report.                                       10:56:50

11    A.    No.  No one assisted me.                           10:56:53

12    Q.    Did you generate any drafts or versions            10:56:55

13    prior to the final version?                              10:56:59

14    A.    I actually can't remember if there were            10:57:07

15    any edits on this one.                                   10:57:17

16    Q.    Did you draft it on your personal                  10:57:19

17    computer?                                                10:57:22

18    A.    Yes.                                               10:57:22

19    Q.    Do you recall sharing any drafts with              10:57:24

20    anyone?                                                  10:57:30

21    A.    If there was a draft, it would have gone           10:57:31

22    to Mr. Tyson and no one else.                            10:57:39

23    Q.    Do you recall receiving edits on that              10:57:41

24    draft?                                                   10:57:44

25    A.    Like I said, I can't remember if there             10:57:44



| | | |
|---|---|---|
| 1 | were edits on this draft, on any draft or not, or if | 10:57:47 |
| 2 | we just went ahead and submitted it. | 10:57:51 |
| 3 | Q.    Does this opinion that you provided in | 10:57:54 |
| 4 | this case contain all of your opinions as to any | 10:57:56 |
| 5 | matter related to this lawsuit? | 10:58:00 |
| 6 | A.    Like formal opinions? | 10:58:06 |
| 7 | Q.    Formal and informal. | 10:58:09 |
| 8 | A.    I mean, I don't think you can go through a | 10:58:10 |
| 9 | case without developing informal opinions, but as to | 10:58:22 |
| 10 | anything I would testify to at trial, I imagine it's | 10:58:28 |
| 11 | contained in here. | 10:58:31 |
| 12 | Q.    That's what I want to know. | 10:58:32 |
| 13 | A.    Yeah, any -- like I said, I can't pin | 10:58:35 |
| 14 | Mr. Tyson down, and I have no idea what his legal | 10:58:39 |
| 15 | strategy is or what my -- what any direct at trial | 10:58:43 |
| 16 | would look like, but certainly when I write an expert | 10:58:47 |
| 17 | report, the idea is to get anything that I would | 10:58:51 |
| 18 | testify to out on paper. | 10:58:53 |
| 19 | Q.    And your report contains the substance of | 10:58:56 |
| 20 | the facts you relied on to form your opinions; is | 10:59:01 |
| 21 | that correct? | 10:59:04 |
| 22 | A.    I think I took the facts from Dr. Graves' | 10:59:04 |
| 23 | report. | 10:59:10 |
| 24 | Q.    All right. | 10:59:14 |
| 25 | A.    He helpfully in Appendix II provided the | 10:59:15 |



| | | |
|---|---|---|
| 1 | dataset. | 10:59:21 |
| 2 | Q.    Does your opinion rely on any documents or | 10:59:22 |
| 3 | facts that are not cited in the report? | 10:59:25 |
| 4 | A.    I always hate that question because, of | 10:59:34 |
| 5 | course, especially with respect to statistical | 10:59:37 |
| 6 | things, there's things you learn along the way that | 10:59:40 |
| 7 | you wouldn't include in a report, but as far as facts | 10:59:42 |
| 8 | on the ground as far as specific citations, I believe | 10:59:48 |
| 9 | they are all in the report. | 10:59:53 |
| 10 | Q.    Were you asked to provide any opinion that | 10:59:54 |
| 11 | is not reflected in your report? | 11:00:03 |
| 12 | MR. TYSON:  And I'll object on, just | 11:00:13 |
| 13 | briefly, Mr. Trende did provide some | 11:00:16 |
| 14 | nontestifying expert services for us at one | 11:00:19 |
| 15 | point, so if we could caveat it to the issues on | 11:00:21 |
| 16 | which his report's there, I think that would be | 11:00:24 |
| 17 | some -- obviously, that wouldn't be disclosable. | 11:00:27 |
| 18 | MR. DUBOSE:  In this case? | 11:00:30 |
| 19 | MR. TYSON:  In this case, yes.  He was a | 11:00:32 |
| 20 | consulting expert prior to being retained as a | 11:00:33 |
| 21 | trial expert, and so I want to make sure we're | 11:00:36 |
| 22 | limiting it to the retention on these particular | 11:00:39 |
| 23 | issues. | 11:00:42 |
| 24 | MR. DUBOSE:  Was he disclosed in both | 11:00:47 |
| 25 | capacities as a consulting and testifying | 11:00:51 |



| | | |
|---|---|---|
| 1 | expert? | 11:00:53 |
| 2 | MR. TYSON:  Well, no, we're not going to | 11:00:53 |
| 3 | disclose consulting expert -- we disclosed him | 11:00:55 |
| 4 | as a testifying expert at the time we disclosed | 11:00:55 |
| 5 | him, whenever that was in the docket. | 11:00:57 |
| 6 | MR. DUBOSE:  Okay.  And are those -- were | 11:01:00 |
| 7 | those pursuant to separate engagement letters | 11:01:05 |
| 8 | or... | 11:01:08 |
| 9 | MR. TYSON:  I don't recall.  I can look, | 11:01:09 |
| 10 | but it was a period of time where he was | 11:01:10 |
| 11 | retained prior to being disclosed on the docket | 11:01:13 |
| 12 | and provided some nontestifying services for us. | 11:01:15 |
| 13 | I just want to make sure we're limiting to the | 11:01:18 |
| 14 | time he was disclosed going forward. | 11:01:21 |
| 15 | MR. DUBOSE:  Yeah, we don't have to go too | 11:01:23 |
| 16 | far out.  Don't worry about it. | 11:01:25 |
| 17 | Q.   (By Mr. DuBose) So as it relates to your | 11:01:28 |
| 18 | services for things that you may testify about in | 11:01:29 |
| 19 | this case, were you asked to provide any opinion that | 11:01:33 |
| 20 | is not reflected in your report? | 11:01:38 |
| 21 | MR. DUBOSE:  How is that, Bryan? | 11:01:40 |
| 22 | MR. TYSON:  That works for me. | 11:01:42 |
| 23 | THE WITNESS:  I don't believe so. | 11:01:44 |
| 24 | Q.   (By Mr. DuBose)  Again, as to your duties | 11:01:47 |
| 25 | as a testifying expert, were you asked to provide any | 11:01:50 |



| | |
|---|---|
| 1 | opinion that you declined to provide? | 11:01:54 |
| 2 | A.    So this isn't me -- this is me protecting | 11:02:01 |
| 3 | myself and not me playing hide the ball.  I don't | 11:02:14 |
| 4 | remember any -- we can call it maybe a big picture. | 11:02:19 |
| 5 | Like in the past I've refused to do photographic | 11:02:22 |
| 6 | identification cases.  Like I would consider that a | 11:02:26 |
| 7 | big picture opinion that I would decline. | 11:02:28 |
| 8 | I don't remember anything like that. | 11:02:30 |
| 9 | There may have been smaller issues where I said no, | 11:02:32 |
| 10 | like the data don't support that or whatever, but I | 11:02:35 |
| 11 | can't think of anything to that nature. | 11:02:40 |
| 12 | Q.    You said there may have been smaller | 11:02:42 |
| 13 | issues in this case? | 11:02:45 |
| 14 | A.    You always have conversations with people | 11:02:46 |
| 15 | who don't have statistical backgrounds, and they | 11:02:49 |
| 16 | might ask you about something, and you say no.  Like | 11:02:52 |
| 17 | I said, I'm honestly not playing hide the ball here. | 11:02:59 |
| 18 | I can't think of anything of that nature in this | 11:03:03 |
| 19 | case, but I also wouldn't remember it.  I would | 11:03:05 |
| 20 | remember something on the order of I don't like to | 11:03:08 |
| 21 | testify in photo I.D. cases. | 11:03:10 |
| 22 | Q.    Were you asked to take any opinions out of | 11:03:13 |
| 23 | this report before finalizing it? | 11:03:18 |
| 24 | A.    I don't think so. | 11:03:20 |
| 25 | Q.    Were you asked not to opine on any subject | 11:03:23 |



1    matter related to this litigation?                    11:03:26

2        A.    Can you repeat that?                         11:03:28

3        Q.    Sure.  Were you asked not to opine on any    11:03:31

4    subject matter related to this litigation?            11:03:33

5        A.    No.                                          11:03:38

6        Q.    Were you asked to change any opinion in      11:03:39

7    any way that you declined to do?                       11:03:41

8        A.    It's kind of the same answer.  There might   11:03:43

9    have been little things where I said no, we can't      11:03:50

10   word it that way.  I don't remember anything like      11:03:55

11   that and certainly not a major headline opinion.       11:03:59

12       Q.    Let's talk about RealClearPolitics.com.      11:04:03

13   You've been employed by RealClearPolitics since 2009?  11:04:09

14       A.    That's right.                                11:04:15

15       Q.    And you're still currently employed by       11:04:15

16   them?                                                  11:04:17

17       A.    That's right.                                11:04:18

18       Q.    And are they an exclusively online           11:04:18

19   publication?                                           11:04:24

20       A.    Yeah, I think that's fair.                   11:04:24

21       Q.    And it's a Web site that gathers together    11:04:36

22   and publishes political stories and content; is that   11:04:38

23   correct?                                               11:04:43

24       A.    The company does produce a Web site, yes.    11:04:43

25       Q.    Sometimes described as a one-stop shop for   11:04:51



| 1 | political readers? | 11:04:55 |
| 2 | A. I think that tag line has been used, yeah. | 11:04:58 |
| 3 | Q. And you publish content on the site? | 11:05:01 |
| 4 | A. Yes. | 11:05:09 |
| 5 | Q. How would you characterize the content | 11:05:09 |
| 6 | that you publish on the site? | 11:05:13 |
| 7 | A. It is generally political analysis, | 11:05:15 |
| 8 | specifically related to elections usually. | 11:05:19 |
| 9 | Q. And are you still a senior elections | 11:05:24 |
| 10 | analyst with RealClearPolitics? | 11:05:29 |
| 11 | A. Yes. | 11:05:32 |
| 12 | Q. As a senior elections analyst, you rate | 11:05:33 |
| 13 | the competitiveness of various races around the | 11:05:36 |
| 14 | country; is that correct? | 11:05:39 |
| 15 | A. Yes. | 11:05:41 |
| 16 | Q. Look at various polls in doing that? | 11:05:41 |
| 17 | A. Yes. | 11:05:44 |
| 18 | Q. Do you evaluate those polls statistically? | 11:05:44 |
| 19 | A. Yes. | 11:05:49 |
| 20 | Q. Do you conduct Meta-Analysis of those | 11:05:51 |
| 21 | polls? | 11:05:55 |
| 22 | A. Meta-Analysis is one of those terms of | 11:05:56 |
| 23 | art, and it's an area of statistics that I actually | 11:06:05 |
| 24 | don't know a whole lot about. We average polls, | 11:06:09 |
| 25 | which I suppose you could consider a Meta-Analysis. | 11:06:12 |



1   But, like I said, again, I'm not trying to hide the    11:06:15

2   ball.  It's just you're getting into a term of art     11:06:19

3   that I don't know about.                               11:06:23

4        Q.    Does anyone at RealClearPolitics perform    11:06:27

5   that analysis?                                         11:06:33

6        A.    Again, if you consider a poll average a     11:06:35

7   Meta-Analysis then yes, but if not, then no.           11:06:37

8        Q.    Is your work with RealClearPolitics         11:06:44

9   primarily an analysis of races for federal offices,    11:06:47

10  or do you analyze any state races too?                 11:06:50

11       A.    Primarily federal offices.                  11:06:54

12       Q.    Are there some state races peppered in      11:06:58

13  there as well?                                         11:07:05

14       A.    Yes.                                         11:07:06

15       Q.    If you had to put a percentage on it, what  11:07:09

16  percentage would you say is federal, and what          11:07:13

17  percentage would you say is state?                     11:07:15

18       A.    Maybe 70 percent federal, 75 percent        11:07:22

19  federal.                                               11:07:26

20       Q.    Did you conduct any published analysis of   11:07:26

21  the 2018 gubernatorial race in Georgia?                11:07:33

22       A.    I don't remember.                           11:07:37

23       Q.    Have you ever done any consulting for       11:07:44

24  campaigns?                                             11:07:47

25       A.    No.                                         11:07:50



| | | |
|---|---|---|
| 1 | Q.    Have you ever been asked to do any | 11:07:52 |
| 2 | consulting for campaigns? | 11:07:55 |
| 3 | A.    I don't think so.  A pollster asked me to | 11:07:57 |
| 4 | do a workup of a Senate race in a state -- I can't | 11:08:11 |
| 5 | remember which state -- I think it was in 2014, and I | 11:08:16 |
| 6 | declined. | 11:08:19 |
| 7 | Q.    Why did you decline? | 11:08:24 |
| 8 | A.    Because if we're going to cover elections, | 11:08:27 |
| 9 | it would be a conflict to be actively consulting for | 11:08:33 |
| 10 | a specific campaign.  And, above that, they offered | 11:08:40 |
| 11 | me $500 which didn't seem worth it. | 11:08:44 |
| 12 | Q.    Okay.  And, I'm sorry, I can't remember | 11:08:48 |
| 13 | what you answered to this question about whether you | 11:08:58 |
| 14 | published analysis of the 2018 gubernatorial race in | 11:09:04 |
| 15 | Georgia. | 11:09:08 |
| 16 | A.    I don't remember it, but I can't remember | 11:09:09 |
| 17 | half of what I wrote for 2018; probably more than | 11:09:11 |
| 18 | half. | 11:09:15 |
| 19 | Q.    Did you conduct any unpublished analysis | 11:09:16 |
| 20 | of the 2018 gubernatorial race in Georgia? | 11:09:24 |
| 21 | A.    Not that I can think of.  I mean, | 11:09:30 |
| 22 | actually, if we're talking -- when you say | 11:09:45 |
| 23 | unpublished, I'm assuming run like a thoroughly, like | 11:09:48 |
| 24 | an article-length summary.  You know, we were rating | 11:09:54 |
| 25 | the competitiveness of the gubernatorial races.  So I | 11:09:58 |



1  certainly would have looked at the governor's race in      11:10:02

2  2018 through that lens, but I don't think there were        11:10:05

3  any article and write-ups.                                  11:10:11

4       Q.    Yeah.  I'm asking as to any content              11:10:15

5  whatsoever where you --                                     11:10:16

6       A.    Not --                                           11:10:17

7       Q.    What's that?                                     11:10:18

8       A.    Yeah, so if it's any content whatsoever,         11:10:19

9  you know, we rated the competitiveness of the 2018          11:10:22

10 Georgia gubernatorial race, and I would have been           11:10:25

11 involved in that.  So to that effect, yeah, I did           11:10:29

12 analyze the Georgia governor's race.                        11:10:36

13      Q.    When you say you rated the                       11:10:39

14 competitiveness, can you describe what the content of       11:10:40

15 that rating would consist of?                               11:10:43

16      A.    So for statewide races we usually have           11:10:45

17 robust polling, and we mostly rely on our poll              11:10:49

18 averages for those.  But for races that are kind of         11:10:54

19 at the periphery, you know, our cutoff for a toss-up        11:10:58

20 is usually about 5 points.  So if there's a race            11:11:03

21 that's 4.9, we would dive in a little deeper than           11:11:07

22 that.                                                       11:11:12

23           And, of course, we're always having              11:11:12

24 conversations about these races, the competitive           11:11:15

25 races and what we think it's going to turn out but         11:11:17



1   nothing that would have been committed to writing.      11:11:20

2        Q.    Would there have been any characterization   11:11:23

3   by you anywhere on the candidates for the Georgia       11:11:31

4   2018 gubernatorial race?                                11:11:38

5        A.    Beyond the race ratings?  I don't think      11:11:42

6   so.  I think there's a time series of how races were    11:11:47

7   rated somewhere on the Web site, but I don't know.  I   11:11:51

8   may be involved in the race ratings.  I am in no way    11:11:57

9   involved in the archiving of our site's data, and the   11:12:01

10  archiving is a mess.                                    11:12:06

11       Q.    The content you create and publish on        11:12:08

12  RealClearPolitics is not peer reviewed, is it?          11:12:15

13       A.    That's correct.                              11:12:18

14       Q.    Is it reviewed by an editor or copy editor   11:12:18

15  before it's published?                                  11:12:23

16       A.    Both.                                        11:12:24

17       Q.    The founder and CEO of RealClearPolitics     11:12:25

18  is John McIntyre?                                       11:12:41

19       A.    He's the cofounder, yeah.                    11:12:43

20       Q.    Cofounder.  Do you have a close             11:12:45

21  relationship with him, Mr. McIntyre?                    11:12:49

22       A.    Yes.                                         11:12:51

23       Q.    You've been described as Mr. McIntyre's      11:12:52

24  right-hand man on occasion?                             11:12:55

25       A.    Yes.                                         11:12:57



| | | |
|---|---|---|
| 1 | Q.    And do you still enjoy a close | 11:12:57 |
| 2 | relationship with Mr. McIntyre today? | 11:13:00 |
| 3 | A.    Fairly close, yes. | 11:13:02 |
| 4 | Q.    In Paragraph 11 of your report, it details | 11:13:04 |
| 5 | how RealClearPolitics is, quote, cited by the most | 11:13:09 |
| 6 | influential voices in politics, and it lists the New | 11:13:13 |
| 7 | York Times, Fox News, the Almanac of American | 11:13:16 |
| 8 | Politics, and the Wall Street Journal; is that right? | 11:13:22 |
| 9 | A.    Just a second.  Let me pull up my report. | 11:13:25 |
| 10 | MR. TYSON:  Do we want to go ahead and | 11:13:33 |
| 11 | mark the report as an exhibit? | 11:13:36 |
| 12 | MR. DUBOSE:  Sure, let's go ahead.  So | 11:13:39 |
| 13 | I'll mark at this time the expert report of Sean | 11:13:41 |
| 14 | P. Trende. | 11:13:45 |
| 15 | (Plaintiffs' Exhibit 2 was marked for | 11:13:45 |
| 16 | identification.) | 11:13:47 |
| 17 | THE WITNESS:  Oh, yeah, that's in | 11:13:47 |
| 18 | Paragraph 11. | 11:13:49 |
| 19 | Q.    (By Mr. DuBose)  So as your expert report | 11:13:50 |
| 20 | lays out, the RealClearPolitics Website is cited by | 11:13:56 |
| 21 | news outlets from all sides of the political | 11:14:04 |
| 22 | spectrum, both conservative and liberal; is that kind | 11:14:06 |
| 23 | of what you're saying there? | 11:14:08 |
| 24 | A.    Yes. | 11:14:14 |
| 25 | Q.    You also note in Paragraph 20 that you've | 11:14:15 |



| | | |
|---|---|---|
| 1 | appeared on Fox News and MSNBC? | 11:14:19 |
| 2 | A.    Yes. | 11:14:22 |
| 3 | Q.    Isn't it true, Mr. Trende, that | 11:14:23 |
| 4 | RealClearPolitics has secretly run a Facebook page | 11:14:27 |
| 5 | called Conservative Country in the past? | 11:14:32 |
| 6 | A.    No, that's not true. | 11:14:35 |
| 7 | Q.    That's not true? | 11:14:36 |
| 8 | A.    To my understanding, at least, that is not | 11:14:37 |
| 9 | true. | 11:14:39 |
| 10 | Q.    And what do you base that understanding | 11:14:40 |
| 11 | on? | 11:14:41 |
| 12 | A.    Conversations with Mr. McIntyre. | 11:14:42 |
| 13 | Q.    And at some point were the denials of | 11:14:45 |
| 14 | being involved with Conservative Country published in | 11:14:51 |
| 15 | any way? | 11:14:57 |
| 16 | A.    No.  Not to my knowledge. | 11:14:57 |
| 17 | Q.    So those were just private denials between | 11:14:59 |
| 18 | you and Mr. McIntyre as to RealClearPolitics' | 11:15:03 |
| 19 | involvement with the Facebook page Conservative | 11:15:07 |
| 20 | Country, right? | 11:15:11 |
| 21 | A.    Yes. | 11:15:11 |
| 22 | Q.    You do know what the Facebook page | 11:15:12 |
| 23 | Conservative Country is, right? | 11:15:18 |
| 24 | A.    I've heard of it now. | 11:15:18 |
| 25 | Q.    But you've heard of it before today as | 11:15:20 |



1   well, correct?                                                11:15:22

2        A.    I heard of it for the first time the day          11:15:23

3   that Daily Beast story dropped.                              11:15:25

4        Q.    So you're familiar with the story that            11:15:28

5   kind of characterizes the content of the Facebook            11:15:30

6   page Conservative Country where it contains far right        11:15:33

7   memes and Islamophobic smears?                               11:15:39

8              MR. TYSON:   Object.                               11:15:45

9        Q.    (By Mr. DuBose)   You're aware of that?            11:15:46

10             MR. TYSON:   Object to form.                       11:15:48

11             THE WITNESS:   I read the Daily Beast              11:15:49

12        story, yeah.                                            11:15:51

13       Q.    (By Mr. DuBose)   Correct.   And that story        11:15:51

14   talks about, for instance, on September 26th -- I'm         11:15:53

15   sorry, September 16th, and it's unclear what year,          11:15:55

16   but that page posted a picture of someone holding two       11:15:57

17   automatic weapons pointing at a closed door with the        11:16:02

18   caption reading:   Just Sitting Here Waiting on Beto;       11:16:06

19   have you heard of that meeting?                             11:16:11

20       A.    Yes.                                               11:16:12

21       Q.    And you understand that to be a reference         11:16:13

22   to former Democratic presidential candidate Beto           11:16:16

23   O'Rourke?                                                   11:16:16

24       A.    Yes.                                               11:16:24

25             MR. TYSON:   And I'll object based on              11:16:24



| | | |
|---|---|---|
| 1 | relevance.  I'm not really sure where we're | 11:16:24 |
| 2 | going.  He said he doesn't have any involvement | 11:16:24 |
| 3 | in the page and doesn't have any responsibility | 11:16:24 |
| 4 | for it.  I mean, we're asking if he's seen | 11:16:28 |
| 5 | things.  I just don't understand where that | 11:16:29 |
| 6 | fits. | 11:16:29 |
| 7 | MR. DUBOSE:  Well, obviously his company | 11:16:34 |
| 8 | does. | 11:16:34 |
| 9 | MR. TYSON:  He said his company has not -- | 11:16:36 |
| 10 | MR. DUBOSE:  His company does and in his | 11:16:39 |
| 11 | expert report he goes to great lengths too to | 11:16:41 |
| 12 | lay out that he is involved on both sides of the | 11:16:44 |
| 13 | political spectrum.  But what's very clear from | 11:16:47 |
| 14 | his Facebook page is that his company is | 11:16:50 |
| 15 | involved in a far right, you know, outfit, and | 11:16:53 |
| 16 | some of the content there is -- I think cuts | 11:16:58 |
| 17 | directly against what's being laid out in his | 11:17:03 |
| 18 | expert report. | 11:17:07 |
| 19 | So if it's all right with you, I'll go | 11:17:07 |
| 20 | ahead and explore a little bit more, and then | 11:17:09 |
| 21 | we'll move on, but I want to make sure that we | 11:17:12 |
| 22 | touch this to the extent the expert report seems | 11:17:15 |
| 23 | to paint a different picture. | 11:17:19 |
| 24 | MR. TYSON:  That's fine.  Just so the | 11:17:20 |
| 25 | record is clear, I believe he testified his | 11:17:23 |



| | | |
|---|---|---|
| 1 | company -- | 11:17:23 |
| 2 | MR. DUBOSE:  You can make your record. | 11:17:23 |
| 3 | MR. TYSON:  I'm sorry? | 11:17:23 |
| 4 | MR. DUBOSE:  You can make your record.  Go | 11:17:25 |
| 5 | ahead, Bryan. | 11:17:25 |
| 6 | MR. TYSON:  Yeah, I just wanted to make | 11:17:28 |
| 7 | the record clear that I believe he testified his | 11:17:29 |
| 8 | company is not involved in that Facebook page | 11:17:31 |
| 9 | unless I misheard that. | 11:17:34 |
| 10 | MR. DUBOSE:  Yeah, he testified to that, | 11:17:36 |
| 11 | but he also testified that there has been no | 11:17:43 |
| 12 | public denial of involvement. | 11:17:47 |
| 13 | Q.    (By Mr. DuBose) So that Website, | 11:17:48 |
| 14 | Conservative Country, on Facebook, the Facebook page, | 11:17:53 |
| 15 | also posted a meme stating that Pete Buttigieg and | 11:17:55 |
| 16 | Bernie Sanders should team up on the same ticket and | 11:17:59 |
| 17 | call it, quote, Butt-Bern 2020.  Have you seen that | 11:18:02 |
| 18 | meme? | 11:18:08 |
| 19 | A.    No. | 11:18:08 |
| 20 | Q.    But you would, nevertheless, agree that | 11:18:08 |
| 21 | that is a homophobic post directed at Mr. Buttigieg; | 11:18:11 |
| 22 | would you agree with that? | 11:18:17 |
| 23 | MR. TYSON:  I'll object to form. | 11:18:18 |
| 24 | THE WITNESS:  It certainly would seem that | 11:18:20 |
| 25 | way. | 11:18:22 |



| | |
|---|---|
| 1 | Q.    (By Mr. DuBose) Are you aware of the meme | 11:18:22 |
| 2 | that the Facebook page Conservative Country posted | 11:18:23 |
| 3 | with a picture of Hillary Clinton in a jail where the | 11:18:27 |
| 4 | caption read, quote:  "Listen, Obama, you better | 11:18:30 |
| 5 | pardon me.  I'll expose your ties to Islam if you | 11:18:34 |
| 6 | don't"?  That seems to be pretty partisan, right? | 11:18:38 |
| 7 |         MR. TYSON:  I'll object to form. | 11:18:44 |
| 8 |         THE WITNESS:  That's certainly nasty. | 11:18:45 |
| 9 | Q.    (By Mr. DuBose)  That's kind of the nasty | 11:18:47 |
| 10 | politics that you testified about earlier, right? | 11:18:49 |
| 11 | A.    Oh, I think that goes beyond what I was | 11:18:52 |
| 12 | talking about earlier. | 11:18:58 |
| 13 | Q.    Agreed.  Are you aware of the post on | 11:19:00 |
| 14 | Conservative Country, and this is the last one, in | 11:19:07 |
| 15 | September of 2015 that showed a Muslim man kneeling | 11:19:08 |
| 16 | on a prayer mat, and the caption read, quote:  "Here | 11:19:12 |
| 17 | is my new invention.  I call it the Mohammed 3000, a | 11:19:15 |
| 18 | land mine that looks like a prayer mat." | 11:19:20 |
| 19 |         And then it goes on to say:  "Prophets" -- | 11:19:23 |
| 20 | spelled with a P-H -- "are going through the roof." | 11:19:26 |
| 21 | A.    Yes. | 11:19:32 |
| 22 | Q.    You're aware of that meme? | 11:19:33 |
| 23 | A.    I read it in the Daily Beast article. | 11:19:35 |
| 24 | Q.    And you would agree that is a horribly | 11:19:38 |
| 25 | offensive post, right? | 11:19:40 |



| 1 | A.    Oh, yes. | 11:19:42 |
| 2 | Q.    Let's talk about your opinion as it | 11:19:46 |
| 3 | relates to Dr. Graves' work in this case.  Is the | 11:19:49 |
| 4 | primary thrust of your opinion that it is not | 11:20:04 |
| 5 | possible to argue that the relationship between race | 11:20:07 |
| 6 | and wait times is statistically significant; would | 11:20:10 |
| 7 | that be correct? | 11:20:14 |
| 8 | MR. TYSON:  I'll object to form. | 11:20:16 |
| 9 | THE WITNESS:  I think I would say no, that | 11:20:18 |
| 10 | the opinion is that the data don't suggest an | 11:20:29 |
| 11 | association between race and wait times. | 11:20:32 |
| 12 | Q.    (By Mr. DuBose)  And you reached that | 11:20:34 |
| 13 | conclusion based on your statistical analysis of the | 11:20:38 |
| 14 | data that was provided in Dr. Graves' report, right? | 11:20:41 |
| 15 | A.    Correct. | 11:20:45 |
| 16 | MR. DUBOSE:  I want to tender the response | 11:20:55 |
| 17 | of plaintiffs' expert Stephen C. Graves to the | 11:20:58 |
| 18 | expert report of Defendants' expert Sean P. | 11:21:02 |
| 19 | Trende. | 11:21:08 |
| 20 | (Plaintiffs' Exhibit 3 was marked for | 11:21:08 |
| 21 | identification.) | 11:21:21 |
| 22 | THE WITNESS:  Von, since we don't have a | 11:21:21 |
| 23 | question -- and I'm sorry for using your first | 11:21:26 |
| 24 | name.  I've completely forgotten your last name. | 11:21:26 |
| 25 | MR. DUBOSE:  You can call me Von.  It's | 11:21:28 |



| | | |
|---|---|---|
| 1 | not a problem. | 11:21:31 |
| 2 | THE WITNESS:  Well, I, you know... | 11:21:32 |
| 3 | MR. DUBOSE:  We're fine.  Go ahead. | 11:21:33 |
| 4 | THE WITNESS:  If we're not going to go --I | 11:21:35 |
| 5 | know we're getting to the response.  I don't | 11:21:36 |
| 6 | know how much longer you have planned with this, | 11:21:37 |
| 7 | but I could use a restroom break if we're going | 11:21:40 |
| 8 | to be going for a long time. | 11:21:43 |
| 9 | MR. DUBOSE:  Sure.  I mean, yeah, if you | 11:21:46 |
| 10 | want to take a restroom break.  Yeah, it's going | 11:21:47 |
| 11 | to take a little time.  I'm sure we'll probably | 11:21:50 |
| 12 | have some back and forth, so sure. | 11:21:53 |
| 13 | THE WITNESS:  Can we go off the record for | 11:21:55 |
| 14 | ten minutes? | 11:21:57 |
| 15 | MR. DUBOSE:  Fine with me. | 11:22:01 |
| 16 | THE WITNESS:  Thank you. | 11:22:03 |
| 17 | (Recess from 11:22 a.m. to 11:31 a.m.) | 11:22:09 |
| 18 | Q.    (By Mr. DuBose)  So we ended kind of | 11:33:14 |
| 19 | talking about the Conservative Country Facebook page. | 11:33:26 |
| 20 | Mr. Trende, have you ever published anything on that | 11:33:30 |
| 21 | Facebook page? | 11:33:33 |
| 22 | A.    No. | 11:33:34 |
| 23 | Q.    Are you currently a Gerald Ford scholar at | 11:33:35 |
| 24 | the American Enterprise Institute? | 11:33:46 |
| 25 | A.    Yes. | 11:33:47 |



| | | |
|---|---|---|
| 1 | Q.    And how long have you been in that | 11:33:49 |
| 2 | capacity as a scholar? | 11:33:57 |
| 3 | A.    I believe it was early 2018. | 11:34:06 |
| 4 | Q.    Is that something you have to apply for? | 11:34:09 |
| 5 | A.    No. | 11:34:11 |
| 6 | Q.    How does the selection process go? | 11:34:13 |
| 7 | A.    I was asked by Ryan Streeter if I would be | 11:34:16 |
| 8 | interested in being a visiting scholar at the | 11:34:24 |
| 9 | American Enterprise Institute, and I said yes. | 11:34:28 |
| 10 | Q.    Who is Ryan Streeter? | 11:34:30 |
| 11 | A.    He is an administrator at the American | 11:34:33 |
| 12 | Enterprise Institute. | 11:34:36 |
| 13 | Q.    And what's the general purpose of the | 11:34:37 |
| 14 | American Enterprise Institute? | 11:34:39 |
| 15 | A.    They are a think tank.  I'm sure they have | 11:34:41 |
| 16 | a mission statement online that I'm sure you'd | 11:34:52 |
| 17 | appreciate I would not want to misstate in the | 11:34:57 |
| 18 | deposition. | 11:34:59 |
| 19 | Q.    Sure.  Would you say they trend | 11:34:59 |
| 20 | conservative or liberal? | 11:35:04 |
| 21 | A.    So we're kind of in this new ideological | 11:35:09 |
| 22 | ecosystem that's hard -- you know, five years ago I | 11:35:14 |
| 23 | would have answered without skipping a beat that they | 11:35:17 |
| 24 | were conservative.  Today I would say they are kind | 11:35:20 |
| 25 | of in the nonTrump conservative ecosphere, although, | 11:35:23 |



| | |
|---|---|
| 1 | they do have liberal scholars on staff. | 11:35:30 |
| 2 | Q.    In your capacity as a Gerald Ford scholar, | 11:35:36 |
| 3 | what do you do? | 11:35:40 |
| 4 | A.    I analyze elections. | 11:35:43 |
| 5 | Q.    And in any way does your role with the | 11:35:44 |
| 6 | American Enterprise Institute relate to what you do | 11:35:48 |
| 7 | at RealClearPolitics? | 11:35:54 |
| 8 | A.    I mean, I don't think I would have been -- | 11:35:56 |
| 9 | I don't think I would have been approached but for | 11:36:02 |
| 10 | the profile I've raised with my work, you know, RCP | 11:36:05 |
| 11 | and otherwise, but I don't run anything that I write | 11:36:11 |
| 12 | or do for them past the RealClearPolitics people. | 11:36:15 |
| 13 | It provides an outlet for longer think | 11:36:21 |
| 14 | pieces.  We wouldn't publish 5,000-word reports or | 11:36:25 |
| 15 | 8,000-word reports at RealClearPolitics.  So I guess | 11:36:30 |
| 16 | there's a relationship that way. | 11:36:33 |
| 17 | Q.    Let's get back to the rebuttal report that | 11:36:39 |
| 18 | Dr. Graves generated after reviewing your expert | 11:36:47 |
| 19 | report.  Have you reviewed that rebuttal report? | 11:36:50 |
| 20 | A.    Yes. | 11:36:56 |
| 21 | Q.    Have you had a chance to review | 11:36:56 |
| 22 | Dr. Graves' deposition transcript in this case? | 11:37:07 |
| 23 | A.    No. | 11:37:08 |
| 24 | Q.    You understand that Dr. Graves in | 11:37:09 |
| 25 | generating his expert opinion in this case was | 11:37:21 |



| | |
|---|---|
| 1 | analyzing a study that had already been published; is | 11:37:24 |
| 2 | that right? | 11:37:28 |
| 3 | A.   That's my understanding. | 11:37:28 |
| 4 | Q.   And you understand that study to be the | 11:37:29 |
| 5 | BPC/MIT report; is that correct? | 11:37:33 |
| 6 | A.   Yeah. | 11:37:35 |
| 7 | Q.   And you understand that Dr. Graves, in | 11:37:37 |
| 8 | generating his expert report, was essentially | 11:37:40 |
| 9 | replicating the results of that report, correct? | 11:37:43 |
| 10 | A.   I'm not sure exactly what Dr. Graves was | 11:37:46 |
| 11 | trying to do.  It struck me as a kind of weird expert | 11:37:49 |
| 12 | report.  So if you say that's what he was trying to | 11:37:55 |
| 13 | do, I don't have any reason to doubt you. | 11:38:00 |
| 14 | Q.   Do you have any quarrel with the results | 11:38:07 |
| 15 | of the BPC/MIT report? | 11:38:12 |
| 16 | A.   I don't have an opinion one way or the | 11:38:16 |
| 17 | other on it. | 11:38:19 |
| 18 | Q.   Okay.  You understand that Dr. Graves | 11:38:19 |
| 19 | disagrees with your analysis regarding whether there | 11:38:24 |
| 20 | is a positive relationship between wait time and the | 11:38:27 |
| 21 | percentage of African-American voters at a polling | 11:38:32 |
| 22 | station; do you understand that? | 11:38:37 |
| 23 | A.   I don't know if he ever comes out in his | 11:38:38 |
| 24 | report and says -- makes the claim that there is a | 11:38:41 |
| 25 | positive relationship in Georgia, but... | 11:38:46 |



1        Q.    My question was as to your understanding        11:38:52

2    that Dr. Graves disagrees with the way you structured      11:38:56

3    your analysis on the question of whether there's a         11:38:59

4    positive relationship between wait time and the           11:39:03

5    percentage -- and the percent of African-American         11:39:06

6    voters at a polling station, polling location.            11:39:10

7             MR. TYSON:   I'll object to form.                 11:39:13

8             THE WITNESS:   Yeah, I think I answered          11:39:14

9        that.   I mean, he raises an objection to an          11:39:15

10       analysis in conclusion --                             11:39:22

11       Q.    (By Mr. DuBose)   Correct.                       11:39:22

12       A.    -- but I don't know if he actually goes          11:39:23

13   the next step and says this data demonstrates a           11:39:26

14   relationship, especially since his first argument is      11:39:31

15   that he wasn't trying, as I understood it, he wasn't      11:39:35

16   trying to demonstrate such a relationship; he was         11:39:40

17   just trying to tie this in somehow to the BPC report.     11:39:42

18       Q.    And you said two things there.   What I         11:39:46

19   want to focus on is the first part of what you just       11:39:49

20   relayed, which is, his disagreement with your             11:39:53

21   analysis.   Notwithstanding what his ultimate opinion     11:39:55

22   and/or conclusion was, I want to focus your attention     11:39:59

23   on his disagreement with the analysis, the method        11:40:02

24   that you use to address this question.   All right?      11:40:06

25            So let's start there as a premise, and I        11:40:12



1    think we can drill down on this and get some            11:40:16

2    clarification with my next question.  So in              11:40:19

3    particular, are you aware that the primary issue          11:40:23

4    Dr. Graves takes with your analysis is that you used     11:40:26

5    a two-sided test when he believes a one-sided test       11:40:29

6    should have been used?                                   11:40:34

7              MR. TYSON:  Object to form.                    11:40:37

8              THE WITNESS:  Yeah, he thinks -- I would       11:40:38

9         call it a one-tailed and a two-tailed test but      11:40:42

10        yeah.                                                11:40:45

11        Q.    (By Mr. DuBose)  One tail and two tail        11:40:45

12   but -- so we're talking about the same thing?           11:40:47

13        A.    I think so, yeah.                             11:40:50

14        Q.    So how would you describe the difference     11:40:51

15   between a one-tailed and two-tailed test in general?    11:40:53

16        A.    So the two-tailed test is probably easier    11:40:58

17   to explain, and from there you can go on to the         11:41:01

18   one-tailed test.  The two-tailed test, you can          11:41:04

19   think -- and we'll use the t-test since that has an     11:41:09

20   actual distribution we can talk about.                  11:41:15

21              So the two-tailed test, you can imagine a    11:41:18

22   bell curve which is the T distribution, and the         11:41:23

23   two-tailed test asks yourself -- asks:  Given the       11:41:30

24   null hypothesis is true, no relationship between        11:41:38

25   the -- no relationship between -- I'm just going to     11:41:43



1   shortcut it and say wait times and African-American        11:41:48

2   share, what's the probability you would see this           11:41:53

3   result.  And it looks at the probability of a test         11:41:57

4   statistic falling in the tails on either side of the       11:42:01

5   bell curve.                                                 11:42:06

6           The one-tailed test you can think of it as         11:42:06

7   ignores the 2.5 percent chance of it ending up in          11:42:09

8   either -- we'll call it the top or the right side of       11:42:17

9   the distribution and then takes that 2.5 percent and       11:42:20

10  expands the left side of the distribution.                 11:42:26

11          And you can do that either way.  There's a         11:42:27

12  two-tailed -- there's a one-tailed upper test and a        11:42:30

13  one-tailed lower test, but in lay terms it involves        11:42:32

14  taking the 2.5 percent off of one tail and expanding       11:42:35

15  the size of the other tail by 2.5 percent.                 11:42:41

16      Q.    So take that concept as you've just             11:42:45

17  explained it and apply it to the subject matter of         11:42:48

18  the expert opinions we're dealing with here, both          11:42:51

19  yours and Mr. Graves'.                                      11:42:55

20      A.    So is it Mr. Graves or Dr. Graves?              11:42:57

21      Q.    I'm sorry.  Dr. Graves.  You're right.          11:43:01

22      A.    No, no, no.  I just don't want to demote        11:43:03

23  him.                                                        11:43:06

24      Q.    Yeah, that's my fault.                          11:43:06

25      A.    You can do that.                                11:43:08



1      Q.    No, not intended.                              11:43:09

2      A.    So Dr. Graves, what Dr. Graves explains I      11:43:13

3   think summarizes it fairly that the two-tailed test     11:43:19

4   would ask the probability of African-American wait      11:43:23

5   times being greater than or less than -- I can't        11:43:27

6   remember if it's white or nonHispanic white wait        11:43:32

7   times.                                                  11:43:35

8          The one-tailed test you would look at the        11:43:35

9   probability, depending on which side of the             11:43:37

10  distribution you're looking at, which tail you're       11:43:39

11  looking at, the probability of seeing this sort of      11:43:41

12  data that African-American wait times are greater or    11:43:46

13  African-American wait times are less than.              11:43:51

14          So it's the difference between looking at       11:43:56

15  them both at the same time, you know, whites greater    11:43:58

16  than African-Americans or whites less than              11:44:02

17  African-Americans, versus breaking them up into two     11:44:04

18  separate analyses would be the one-tailed.              11:44:11

19     Q.    So --                                          11:44:11

20     A.    And, just to be clear, I'm shortcutting a      11:44:14

21  lot in kind of a lay explanation.                       11:44:18

22     Q.    Sure.  Yeah, let's continue to just work       11:44:19

23  through this.  So what you're saying is Dr. Graves      11:44:21

24  disagrees with the way you establish your analysis to   11:44:24

25  the extent your alternative hypothesis allowed for an   11:44:27



| | |
|---|---|
| 1 | increase or decrease in wait time as the share of | 11:44:31 |
| 2 | black registered voters increased; is that correct? | 11:44:35 |
| 3 | MR. TYSON:  Object to form. | 11:44:39 |
| 4 | THE WITNESS:  Yeah, I think that's right. | 11:44:40 |
| 5 | He proposes the one-tailed test statistics, the | 11:44:43 |
| 6 | null hypothesis being the wait time is greater | 11:44:50 |
| 7 | than -- or is less than or equal to zero versus | 11:44:53 |
| 8 | the alternative that it's greater than zero. | 11:44:55 |
| 9 | Q.    (By Mr. DuBose)  Right.  And under | 11:45:00 |
| 10 | Dr. Graves' analysis, that one-tailed alternative | 11:45:01 |
| 11 | hypothesis only allowed for a positive relationship | 11:45:03 |
| 12 | as wait time increased as the share of black | 11:45:06 |
| 13 | registered voters increased; is that correct? | 11:45:09 |
| 14 | A.    It would only find a significant result | 11:45:17 |
| 15 | as -- if the relationship were positive. | 11:45:28 |
| 16 | Q.    Right.  So it's a one-tailed test. | 11:45:32 |
| 17 | A.    Yeah. | 11:45:33 |
| 18 | Q.    Correct.  And you also understand that | 11:45:34 |
| 19 | Dr. Graves formulated his analysis that way based on | 11:45:40 |
| 20 | anecdotal evidence from past elections that | 11:45:45 |
| 21 | African-American voters have longer wait times than | 11:45:50 |
| 22 | other voters; you understand that as well? | 11:45:54 |
| 23 | MR. TYSON:  Object to form. | 11:45:56 |
| 24 | THE WITNESS:  That's what I read on | 11:45:57 |
| 25 | page 2. | 11:46:00 |



| | | |
|---|---|---|
| 1 | Q. (By Mr. DuBose) Correct. That's where I | 11:46:01 |
| 2 | am exactly, on page 2. So for your use of the | 11:46:02 |
| 3 | two-tailed test as it relates to the alternative | 11:46:08 |
| 4 | hypothesis, what anecdotal evidence did you rely on | 11:46:11 |
| 5 | to include that second side of your alternative | 11:46:17 |
| 6 | hypothesis? | 11:46:20 |
| 7 | A. I did the two-tailed test because that's | 11:46:23 |
| 8 | typically the test that you use. It's the default | 11:46:26 |
| 9 | that almost every regression analysis and | 11:46:28 |
| 10 | T-distribution uses. And so, you know, it's kind of | 11:46:32 |
| 11 | the baseline unless you have good reason to do a | 11:46:38 |
| 12 | one-tailed test. | 11:46:41 |
| 13 | Q. Right. But here Dr. Graves cites | 11:46:43 |
| 14 | anecdotal evidence as the rationale for him to do | 11:46:47 |
| 15 | some one-tailed tests. Do you have any anecdotal | 11:46:50 |
| 16 | test as to why you -- and I'm not talking about just | 11:46:54 |
| 17 | what's usually done. Do you have any anecdotal | 11:46:57 |
| 18 | evidence that drove your decision to perform a | 11:47:01 |
| 19 | two-tailed test as opposed to one-tailed? | 11:47:03 |
| 20 | A. No. I used the two-tailed test because | 11:47:06 |
| 21 | that's usually what you use unless you have a very | 11:47:09 |
| 22 | good reason to do a one-tailed test. | 11:47:12 |
| 23 | Q. Can you explain to me why if -- do you | 11:47:14 |
| 24 | believe that Dr. Graves' use of the one-tailed test | 11:47:18 |
| 25 | in this instance is improper? | 11:47:21 |



| | | |
|---|---|---|
| 1 | A.    Improper? | 11:47:25 |
| 2 | Q.    Yes or -- | 11:47:31 |
| 3 | A.    No.  I know what improper means.  I wasn't | 11:47:34 |
| 4 | trying to be disagreeable there. | 11:47:39 |
| 5 | Q.    Sure. | 11:47:42 |
| 6 | A.    Most of these things, when you get down to | 11:47:46 |
| 7 | study design, involve judgment calls.  I don't know | 11:47:48 |
| 8 | that I would utilize a one-tailed test on the basis | 11:47:55 |
| 9 | of anecdotal evidence since, to my understanding, the | 11:48:01 |
| 10 | two-tailed test is generally favored, but at the end | 11:48:05 |
| 11 | of the day, we're answering -- our one-tailed versus | 11:48:08 |
| 12 | two-tailed test answers different questions. | 11:48:12 |
| 13 | I'm answering the question of whether the | 11:48:15 |
| 14 | data support a difference in African-American wait | 11:48:17 |
| 15 | times.  He's answering the question what is the | 11:48:21 |
| 16 | support for difference if you exclude interest in | 11:48:25 |
| 17 | whether white wait times are longer. | 11:48:30 |
| 18 | Q.    Right.  And my question I guess put a | 11:48:33 |
| 19 | different way then is:  Are you aware of any | 11:48:35 |
| 20 | anecdotal evidence where the wait time increased as | 11:48:37 |
| 21 | the share of white voters increased? | 11:48:45 |
| 22 | A.    I haven't -- no, I'm not. | 11:48:50 |
| 23 | Q.    And can you explain to me why, if you do | 11:48:53 |
| 24 | believe that this is the case, if you believe the | 11:49:00 |
| 25 | methodology that Dr. Graves has employed here is | 11:49:02 |



1   incorrect, can you lay out the rationale for that          11:49:06

2   position?                                                  11:49:10

3        A.    Well, the methodology to which I was            11:49:10

4   objecting was his initial report where he had no           11:49:13

5   significance tests.  I believe my previous testimony       11:49:16

6   is that you can use a one-tailed test; it just             11:49:19

7   answers a different question.  And you have to, you        11:49:24

8   know, since the two-tailed test is generally the one       11:49:28

9   that's employed, I think, you know, there is a burden      11:49:30

10  of justifying one-tailed test.                             11:49:33

11       Q.    So you believe that there was a burden          11:49:37

12  upon Dr. Graves to justify the one-tailed test as he       11:49:42

13  did in this case, right?                                   11:49:46

14       A.    Yeah, I probably shouldn't have used the        11:49:47

15  word burden since that comes with legal baggage, but       11:49:50

16  I think you get my drift.                                  11:49:55

17       Q.    Yeah, legal baggage aside, we won't use it      11:49:57

18  in that context.  All right?  I get what you're            11:50:01

19  saying.  So are you saying that Dr. Graves failed to       11:50:02

20  carry the burden to establish why the one-sided test       11:50:06

21  was appropriate here?                                      11:50:11

22       A.    No.  I don't think I'm even -- I don't          11:50:11

23  know that I'm even saying that.  I think I would           11:50:17

24  question using just anecdotal evidence, and I think        11:50:20

25  there's some circularity involved relying on the BPC       11:50:23



| | |
|---|---|
| 1 | study to justify your test that is trying to validate | 11:50:28 |
| 2 | the BPC study, but at the end of the day, my report | 11:50:34 |
| 3 | was filed objecting to a report that had no | 11:50:38 |
| 4 | significance tests in it, and that's where my opinion | 11:50:42 |
| 5 | lies. | 11:50:45 |
| 6 | Q.    And this, where you land on this, you say | 11:50:46 |
| 7 | there's no significance, is that based on, using this | 11:50:52 |
| 8 | one-tailed test, Dr. Graves' observation that there's | 11:50:57 |
| 9 | a probability of .16 of observed sample results and | 11:51:00 |
| 10 | that not reaching the, quote-unquote, gold standard | 11:51:05 |
| 11 | of 5 percent? | 11:51:10 |
| 12 | A.    I mean, yeah, I don't know -- maybe | 11:51:11 |
| 13 | there's examples in the peer-reviewed literature | 11:51:14 |
| 14 | where people have accepted a finding with a p-value | 11:51:18 |
| 15 | of 0.16 or I think in one instance 0.31 or whatever, | 11:51:21 |
| 16 | but I can't think of them off the top of my head. | 11:51:29 |
| 17 | Q.    Do you recall seeing in Dr. Graves' | 11:51:33 |
| 18 | rebuttal report, page 3, that -- and do you have it | 11:51:37 |
| 19 | in front of you, his rebuttal report? | 11:51:44 |
| 20 | A.    Yes, I printed these out. | 11:51:46 |
| 21 | Q.    Okay, great.  If you'll go to page 3 and | 11:51:48 |
| 22 | it's the fourth paragraph there, it starts with: | 11:51:50 |
| 23 | "Thus we find that there is a probability..." | 11:51:58 |
| 24 | A.    Okay, I'm going to have to ask when we do | 11:52:01 |
| 25 | page references, can we make it to the actual page | 11:52:06 |



| | | |
|---|---|---|
| 1 | number in the report rather than the typewritten | 11:52:09 |
| 2 | number at the top?  Just so we're on the same page | 11:52:13 |
| 3 | literally. | 11:52:18 |
| 4 | Q.    Sure.  I got you.  I'm on the bottom of | 11:52:18 |
| 5 | the page, not the page of the document at the top. | 11:52:22 |
| 6 | So I'm at page 3 at the bottom of the piece of paper. | 11:52:27 |
| 7 | A.    Yeah.  I gotcha. | 11:52:31 |
| 8 | Q.    Are you with me on the paragraph? | 11:52:36 |
| 9 | A.    Yes, I see that. | 11:52:38 |
| 10 | Q.    So here Dr. Graves -- and I may, you know, | 11:52:40 |
| 11 | I'm not a statistician, just a regular old lawyer, so | 11:52:46 |
| 12 | I may stumble through this a little bit but help me | 11:52:51 |
| 13 | out.  It says: "We find that there's a probability of | 11:52:55 |
| 14 | 0.16 of observing sample results," right? | 11:52:58 |
| 15 | A.    Yes. | 11:53:00 |
| 16 | Q.    And he goes on to state that that's not | 11:53:01 |
| 17 | necessarily the gold standard of 5 percent being | 11:53:03 |
| 18 | necessary to reject the null hypothesis.  Do you see | 11:53:07 |
| 19 | where I am there? | 11:53:14 |
| 20 | A.    Yes. | 11:53:14 |
| 21 | Q.    But he says:  "But it does imply that we | 11:53:15 |
| 22 | have an 84 percent confidence level that the true | 11:53:18 |
| 23 | value of the slope coefficient is positive." | 11:53:22 |
| 24 | Did I read that correctly? | 11:53:24 |
| 25 | A.    You did read that correctly. | 11:53:25 |



1    Q.    So that may not be the gold standard as to          11:53:26

2    a confidence level that is typically expected, but I       11:53:31

3    would say that's at least a silver or bronze;              11:53:34

4    wouldn't you agree?                                        11:53:37

5        A.    No.                                              11:53:37

6            MR. TYSON:   I'll object to the form.             11:53:38

7        Q.    (By Mr. DuBose)   84 percent?                   11:53:42

8        A.    A p-value of 0.16.                              11:53:43

9        Q.    Right.                                          11:53:49

10       A.    That's not a -- go ahead.                       11:53:49

11       Q.    But here in the last sentence he says he        11:53:50

12   has an 84 percent confidence level.  Is your              11:53:53

13   testimony that this 84 percent confidence level           11:53:56

14   should just be completely disregarded?                    11:54:00

15       A.    Yeah, I think -- I mean, to put on my           11:54:02

16   legal hat, it's Daubertable because it's not up to        11:54:05

17   the standard of the profession.                           11:54:08

18       Q.    Right.  So the standard --                      11:54:10

19       A.    And I think you need to understand, when        11:54:12

20   he says confidence level, he's not saying we're           11:54:15

21   84 percent -- he's not saying we're 84 percent            11:54:20

22   confident the slope is positive.  You can't say that,     11:54:21

23   and I don't think he would say that.  He's talking        11:54:25

24   about confidence in the process.                          11:54:29

25       Q.    Right.                                          11:54:31



| | |
|---|---|
| 1 | A.    What you do with a p-value and the only | 11:54:32 |
| 2 | thing you can do with a p-value is what he says in | 11:54:34 |
| 3 | the first sentence that if the null hypothesis of no | 11:54:37 |
| 4 | difference were true, how probable would the results | 11:54:42 |
| 5 | we see -- how probable are the results we see. | 11:54:46 |
| 6 | And what this p-value of 0.16 means is | 11:54:49 |
| 7 | that if there's no hypothesis as we run elections | 11:54:53 |
| 8 | over and over again, we would see results like this | 11:54:58 |
| 9 | about one time out of six, which is less than the | 11:55:02 |
| 10 | probability of having three kids who are all boys | 11:55:07 |
| 11 | which I can attest to you happens and it's not | 11:55:13 |
| 12 | unusual. | 11:55:15 |
| 13 | So we would not have a reason to reject | 11:55:15 |
| 14 | the null hypothesis.  And, like I said, I cannot | 11:55:18 |
| 15 | think of any political science literature that | 11:55:21 |
| 16 | accepts a p-value of 0.16 to reject the null | 11:55:24 |
| 17 | hypothesis. | 11:55:29 |
| 18 | Q.    And you feel like this is Daubertable, is | 11:55:29 |
| 19 | what you said. | 11:55:33 |
| 20 | A.    Yes. | 11:55:33 |
| 21 | Q.    Any other reason for your confidence level | 11:55:35 |
| 22 | as to rejection of Dr. Graves' opinion here, both on | 11:55:41 |
| 23 | your statistics hat and your legal hat? | 11:55:48 |
| 24 | A.    I haven't really thought of it any further | 11:55:51 |
| 25 | on the legal hat, but on the statistics hat, I mean, | 11:55:55 |



| | | |
|---|---|---|
| 1 | I guess there's two prongs of the statistics hat, | 11:55:58 |
| 2 | just as long as we're building a record. | 11:56:02 |
| 3 | The first prong is that -- I guess it's | 11:56:05 |
| 4 | more the political science hat that I'm -- it may | 11:56:08 |
| 5 | exist, but I'm not aware of null hypotheses being | 11:56:11 |
| 6 | rejected with p-value of 0.16 is not what would be | 11:56:17 |
| 7 | considered reasonable scientific certainty within the | 11:56:22 |
| 8 | discipline. | 11:56:25 |
| 9 | The second objection is you have to be | 11:56:26 |
| 10 | very -- he worded that last sentence in a very | 11:56:28 |
| 11 | specific way, and you cannot take it to mean an | 11:56:32 |
| 12 | 84 percent chance that the slope is positive. | 11:56:37 |
| 13 | Q.    Okay.  Anything else? | 11:56:40 |
| 14 | A.    As I sit here, that's it. | 11:56:44 |
| 15 | Q.    So we've kind of touched on a couple of | 11:56:46 |
| 16 | discrete parts of this rebuttal report.  As you -- | 11:56:51 |
| 17 | and you just reviewed this report prior to us getting | 11:56:57 |
| 18 | together today, right? | 11:57:02 |
| 19 | A.    Yes. | 11:57:03 |
| 20 | Q.    Are there any other pieces of this report | 11:57:04 |
| 21 | that you I guess take issue with? | 11:57:06 |
| 22 | MR. TYSON:  Object to form. | 11:57:11 |
| 23 | THE WITNESS:  I mean, we can walk through | 11:57:13 |
| 24 | it, and there might be little things.  Certainly | 11:57:15 |
| 25 | to the extent that this analysis is repeated for | 11:57:18 |



| 1 | the other various proposed tests, I would object | 11:57:22 |
| 2 | to them on the same -- in the same way. | 11:57:26 |
| 3 | Q.    (By Mr. DuBose)  Okay.  Anything else? | 11:57:35 |
| 4 | A.    As I sit here, you know, no.  My only | 11:57:39 |
| 5 | opinion in the first report was that the data don't | 11:57:53 |
| 6 | support the conclusion that at least seemed to be | 11:57:57 |
| 7 | suggested, and nothing in this report changes my mind | 11:58:04 |
| 8 | about that. | 11:58:07 |
| 9 | Q.    Anything else you want to add to the | 11:58:08 |
| 10 | record about taking issue with the rebuttal report | 11:58:12 |
| 11 | that we have not covered? | 11:58:18 |
| 12 | MR. TYSON:  Object to form. | 11:58:23 |
| 13 | THE WITNESS:  Yeah, again, if you have | 11:58:24 |
| 14 | specific issues, I'll answer any questions you | 11:58:28 |
| 15 | have, but my main objection at least is to this | 11:58:30 |
| 16 | paragraph that we've been discussing on page 3. | 11:58:35 |
| 17 | At the bottom of numbered page 4 we can | 11:58:39 |
| 18 | see kind of a similar analysis repeated, and I | 11:58:42 |
| 19 | would object to those analyses for the same | 11:58:47 |
| 20 | reason. | 11:58:50 |
| 21 | Q.    (By Mr. DuBose)  Okay.  A couple follow-up | 11:58:50 |
| 22 | questions from some things we touched on earlier. | 11:58:55 |
| 23 | Are you an active member of any bar? | 11:58:58 |
| 24 | A.    I believe I'm an active member of D.C. and | 11:58:59 |
| 25 | an inactive member of Texas; I pay dues in both | 11:59:09 |



| | | |
|---|---|---|
| 1 | those. | 11:59:15 |
| 2 | Q. Have you taken any other bars? | 11:59:16 |
| 3 | A. I took Virginia. | 11:59:18 |
| 4 | Q. Are you inactive there? | 11:59:21 |
| 5 | A. I don't believe I'm even on the rolls | 11:59:23 |
| 6 | anymore. | 11:59:26 |
| 7 | Q. Did you pass the Virginia bar? | 11:59:27 |
| 8 | A. Oh, yeah. Yeah. | 11:59:29 |
| 9 | Q. You just let your membership go? | 11:59:31 |
| 10 | A. They're expensive to keep up. | 11:59:34 |
| 11 | Q. Did you take any other bar exams? | 11:59:38 |
| 12 | A. Well, just to be precise, I only took | 11:59:40 |
| 13 | Texas and Virginia, and then I waived into D.C. | 11:59:46 |
| 14 | Q. Okay. | 11:59:50 |
| 15 | A. And I passed (inaudible.) | 11:59:55 |
| 16 | Q. I'm sorry. What did you say? | 11:59:56 |
| 17 | A. And I passed both the first time. | 11:59:58 |
| 18 | Q. Okay. Turning back to your earlier | 12:00:00 |
| 19 | response about working as a consulting expert and a | 12:00:04 |
| 20 | testifying expert in this case, can you tell me when | 12:00:07 |
| 21 | you began working as a consulting expert? | 12:00:10 |
| 22 | A. Honestly, no. | 12:00:15 |
| 23 | Q. Did you submit a separate bill for the | 12:00:17 |
| 24 | work you did as a consulting expert? | 12:00:21 |
| 25 | A. No. You have all my bills. | 12:00:23 |



```
 1         Q.    So it's one bill for consulting and trial     12:00:26
 2    work or testifying work?                                 12:00:30
 3         A.    Yes.                                           12:00:31
 4         Q.    Can you tell me how much you were paid for     12:00:33
 5    or how much you billed as a consulting expert?           12:00:40
 6         A.    No.                                            12:00:43
 7         Q.    What was the scope of your work during         12:00:43
 8    your time as a consulting expert?                         12:00:49
 9              MR. TYSON:   And I would object on the          12:00:54
10         basis that we don't have to disclose -- he was a    12:00:56
11         consulting expert; we don't have to disclose        12:00:58
12         what work he was doing while he was a consulting    12:01:00
13         expert for us.                                       12:01:04
14         Q.    (By Mr. DuBose)  Outside of what you were      12:01:04
15    provided with respect to facts and data for your         12:01:06
16    testifying expert role, were you supplied any other      12:01:10
17    facts and data for your consulting expert opinions?      12:01:13
18              MR. TYSON:   And, again, I'll just object,     12:01:18
19         I don't think that's discoverable.  He was         12:01:20
20         retained as a consulting expert for us so I        12:01:20
21         don't know on what basis you'd have access to      12:01:20
22         what we provided to him or what analysis he did    12:01:27
23         for us in a nontestifying capacity.                12:01:27
24         Q.    (By Mr. DuBose)  Was there a connection       12:01:33
25    between the consulting expert and testifying expert      12:01:35
```



| | | |
|---|---|---|
| 1 | work? | 12:01:38 |
| 2 | MR. TYSON:  And, again, same objection. | 12:01:41 |
| 3 | MR. DUBOSE:  Okay.  We may be done.  Give | 12:01:51 |
| 4 | me a minute and I'll come back.  All right? | 12:01:54 |
| 5 | THE WITNESS:  All right. | 12:02:01 |
| 6 | (Recess from 12:02 p.m. to 12:04 p.m.) | 12:02:07 |
| 7 | Q.    (By Mr. DuBose)  Mr. Trende, you there? | 12:04:48 |
| 8 | A.    I am. | 12:04:50 |
| 9 | MR. DUBOSE:  Just one little housekeeping | 12:04:53 |
| 10 | thing.  Bryan, you objected on the questions | 12:04:55 |
| 11 | with respect to his role as a consulting expert. | 12:04:59 |
| 12 | Just to be clear, were you instructing him not | 12:05:03 |
| 13 | to answer those questions? | 12:05:06 |
| 14 | MR. TYSON:  Yes, I was because that's not | 12:05:10 |
| 15 | discoverable information under the Federal | 12:05:12 |
| 16 | Rules, yes. | 12:05:14 |
| 17 | Q.    (By Mr. DuBose)  And, Mr. Trende, you're | 12:05:15 |
| 18 | going to follow Mr. Tyson's direction; is that | 12:05:16 |
| 19 | correct? | 12:05:19 |
| 20 | A.    Yes. | 12:05:19 |
| 21 | MR. DUBOSE:  That's all I've got. | 12:05:22 |
| 22 | MR. TYSON:  I don't have anything to add, | 12:05:24 |
| 23 | so that will be it for the day.  Thank you. | 12:05:24 |
| 24 | THE REPORTER:  Gentlemen, don't leave me | 12:05:24 |
| 25 | yet.  Okay? | 12:05:24 |



| | | |
|---|---|---|
| 1 | (Discussion ensued off the record.) | 12:05:49 |
| 2 | MR. TYSON:  Mr. Trende, do you want to | 12:05:49 |
| 3 | read and sign? | 12:05:51 |
| 4 | THE WITNESS:  Honestly, am I able to just | 12:06:02 |
| 5 | read it and send you an image of my signature, | 12:06:10 |
| 6 | or do I need to get it, like, notarized? | 12:06:14 |
| 7 | MS. BRYAN:  Bryan, what we agreed to in | 12:06:25 |
| 8 | the declarant depositions is just to let the | 12:06:27 |
| 9 | witness handwrite on the errata sheet:  "I | 12:06:31 |
| 10 | hereby declare under penalty of perjury pursuant | 12:06:34 |
| 11 | to 28 U.S.C. 17 46 that the foregoing is true | 12:06:38 |
| 12 | and correct" so that they don't need to get a | 12:06:40 |
| 13 | notary. | 12:06:43 |
| 14 | MR. TYSON:  That's fine with me if we want | 12:06:44 |
| 15 | to use that process here as well. | 12:06:46 |
| 16 | THE WITNESS:  I never really find much, | 12:06:51 |
| 17 | but I'll read and sign. | 12:06:52 |
| 18 | MS. BRYAN:  I think we had asked for a | 12:07:25 |
| 19 | draft but no rush delivery. | 12:07:28 |
| 20 | MR. TYSON:  We just would need electronic | 12:07:32 |
| 21 | only and no rough draft for us. | 12:07:35 |
| 22 | (Whereupon, the deposition was concluded | 12:08:01 |
| 23 | at 12:08 p.m.) | |
| 24 | (Pursuant to Rule 30(e) of the Federal | |
| 25 | Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), | |



1    signature of the witness has been reserved.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6         I hereby certify that the foregoing

7    transcript was taken down, as stated in the

8    caption, and the questions and answers thereto

9    were reduced to typewriting under my direction;

10   that the foregoing pages 1 through 77 represent

11   a true, complete, and correct transcript of the

12   evidence given upon said hearing, and I further

13   certify that I am not of kin or counsel to the

14   parties in the case; am not in the regular

15   employ of counsel for any of said parties; nor

16   am I in anywise interested in the result of said

17   case.

18        This, the 21st day of April 2020.

19

20

21             PENNY MCPHERSON WALKER, CCR-B-914

22

23

24

25



1

2                    COURT REPORTER DISCLOSURE

3

4        Pursuant to Article 10.B. of the Rules and
    Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia which states: "Each court
    reporter shall tender a disclosure form at the time
6    of the taking of the deposition stating the
    arrangements made for the reporting services of the
7    certified court reporter, by the certified court
    reporter, the court reporter's employer, or the
8    referral source for the deposition, with any party to
    the litigation, counsel to the parties or other
9    entity.  Such form shall be attached to the
    deposition transcript," I make the following
10   disclosure:

11       I am a Georgia Certified Court Reporter.  I am
    here as a representative of Esquire Deposition
12   Solutions.  Esquire Deposition Solutions was
    contacted to provide court reporting services for the
13   deposition.  Esquire Deposition Solutions will not be
    taking this deposition under any contract that is
14   prohibited by O.C.G.A. 9-11-28 (c).

15       Esquire Deposition Solutions has no
    contract/agreement to provide reporting services with
16   any party to the case, any counsel in the case, or
    any reporter or reporting agency from whom a referral
17   might have been made to cover this deposition.
    Esquire Deposition Solutions will charge its usual
18   and customary rates to all parties in the case, and a
    financial discount will not be given to any party to
19   this litigation.

20

21                 PENNY MCPHERSON WALKER, CCR-B-914

22

23

24

25



1                    DEPOSITION ERRATA SHEET

2

3     Our Assignment No. 5481621

4     Case Caption: Fair Fight Action, et al vs. Brad

5     Raffensperger, et al

6

7             DECLARATION UNDER PENALTY OF PERJURY

8

9         I declare under penalty of perjury that I have

10    read the entire transcript of my deposition taken in

11    the above-captioned matter or the same has been read

12    to me and the same is true and accurate, save and

13    except for changes and/or corrections, if any, as

14    indicated by me on the DEPOSITION ERRATA SHEET

15    hereof, with the understanding that I offer these

16    changes as if still under oath.  Signed on the _____

17    day of _____, 20___.

18

19    _____

20    SEAN P. TRENDE

21

22

23

24

25



SEAN P. TRENDE                                         April 16, 2020
FAIR FIGHT ACTION vs BRAD RAFFENSPERGER                         81

1          DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25            SEAN P. TRENDE



```
 1 │   DEPOSITION ERRATA SHEET
 2 │  Page No._____Line No._____Change to:_____
 3 │  _____
 4 │  Reason for change:_____
 5 │  Page No._____Line No._____Change to:_____
 6 │  _____
 7 │  Reason for change:_____
 8 │  Page No._____Line No._____Change to:_____
 9 │  _____
10 │  Reason for change:_____
11 │  Page No._____Line No._____Change to:_____
12 │  _____
13 │  Reason for change:_____
14 │  Page No._____Line No._____Change to:_____
15 │  _____
16 │  Reason for change:_____
17 │  Page No._____Line No._____Change to:_____
18 │  _____
19 │  Reason for change:_____
20 │  Page No._____Line No._____Change to:_____
21 │  _____
22 │  Reason for change:_____
23 │
24 │  SIGNATURE:_____DATE:_____
25 │          SEAN P. TRENDE
```



1              My name is Penny McPherson Walker.  I am a

2      Georgia certified shorthand reporter.  This

3      deposition is being held via videoconferencing

4      equipment.  The witness and the reporter are not in

5      the same room.  The witness will be sworn in remotely

6      pursuant to agreement of all parties.  The parties

7      stipulate that the testimony is being given as if the

8      witness was sworn in person.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibits

5481621 Sea
n.P.Tende.
EXHIBIT2
  3:10
  48:15

$

$500
  45:11

-

--I
  55:4

0

0.16
  67:15
  68:14
  69:8
  70:6,16
  71:6

0.31
  67:15

1

1
  6:13,16,
  17 7:10
  35:14

11
  48:4,18

11:22
  55:17

11:31
  55:17

12:02
  75:6

12:04
  75:6

16
  67:9

16th
  50:15

17
  76:11

1900s
  19:11

2

2
  48:15
  63:25
  64:2

2.5
  61:7,9,
  14,15

20
  48:25

2009
  42:13

2011
  26:16

2014
  45:5

2015
  53:15

2017
  15:24
  16:16
  32:20

2018
  44:21

45:14,17,
20 46:2,9
47:4 56:3

2019
  7:21
  10:17

2020
  52:17

26th
  50:14

28
  76:11

3

3
  54:20
  67:18,21
  68:6
  72:16

300
  13:6

3000
  53:17

4

4
  72:17

4.9
  46:21

46
  76:11

5

5
  46:20
  67:11
  68:17

5,000-word
  57:14

7

70
  44:18

75
  44:18

8

8,000-word
  57:15

84
  68:22
  69:7,12,
  13,21
  71:12

A

a.m.
  55:17

ability
  5:9

academic
  19:23
  20:21,23
  21:6,10,
  13 23:5,
  7,12

accept
  16:2
  21:25
  34:5

acceptable
  6:7

accepted
  67:14

accepts
  70:16

access
  74:21

accreditati
on
  23:15

accurately
  5:9

active
  25:3
  72:23,24

actively
  45:9

actual
  31:8
  60:20
  67:25

add
  72:9
  75:22

additional
  7:14
  12:18

address
  59:24

administrat
or
  56:11

admitted
  27:25
  28:1,3,4
  29:5
  30:2,4

African-
american
  58:21
  59:5 61:1
  62:4,12,
  13 63:21
  65:14



African-
americans
  62:16,17

age
  25:5,6

agenda
  25:10,12

agree
  25:23
  26:2 36:1
  52:20,22
  53:24
  69:4

agreed
  53:13
  76:7

agreed-upon
  24:13

agreement
  12:6
  27:22

ahead
  17:13
  38:2
  48:10,12
  51:20
  52:5 55:3
  69:10

allowed
  62:25
  63:11

Almanac
  48:7

alternative
  62:25
  63:8,10
  64:3,5

American
  18:20,24
  23:24
  31:8 32:4
  34:16

48:7
55:24
56:9,11,
14 57:6

amount
  10:10
  11:1
  24:24
  29:8

analyses
  62:18
  72:19

analysis
  34:1 35:3
  43:7
  44:5,9,20
  45:14,19
  54:13
  58:19
  59:3,10,
  21,23
  60:4
  62:24
  63:10,19
  64:9
  71:25
  72:18
  74:22

analyst
  43:10,12

analyze
  44:10
  46:12
  57:4

analyzing
  58:1

and/or
  59:22

anecdotal
  63:20
  64:4,14,
  15,17
  65:9,20

66:24

answering
  65:11,13,
  15

answers
  65:12
  66:7

anymore
  22:20
  73:6

appeared
  49:1

Appendix
  38:25

applied
  16:20
  33:1,6

apply
  56:4
  61:17

approach
  32:2

approached
  57:9

approaches
  24:15
  31:5

approximate
ly
  15:24

April
  15:24

APSA
  23:21,23
  24:17,19

archiving
  47:9,10

area
  43:23

argue
  28:5
  29:24
  54:5

argument
  59:14

art
  43:23
  44:2

article
  46:3
  53:23

article-
length
  45:24

asks
  60:23

assist
  37:7

assisted
  37:11

associate
  23:18

association
  23:24
  24:17,22
  54:11

association
s
  24:5

assume
  5:5 17:14

assuming
  18:14
  19:23
  34:6
  36:14
  45:23

assumptions
  14:12,15

attach
  6:9,15

attaching
  6:21

attempt
  35:8

attention
  59:22

attest
  70:11

attorney
  5:18 6:1
  8:22 9:5,
  7,10
  14:12

attorney-
client
  5:20 6:2

attorneys
  35:8

authored
  21:18

automatic
  50:17

average
  43:24
  44:6

averages
  46:18

avoid
  32:3

aware
  50:9
  53:1,13,
  22 60:3
  65:19
  71:5

_____

B

_____

back



55:12
57:17
73:18
75:4

**background**
33:17

**backgrounds**
41:15

**baggage**
66:15,17

**ball**
41:3,17
44:2

**ballot**
19:11

**bar**
72:23
73:7,11

**bars**
73:2

**base**
49:10

**based**
35:24
50:25
54:13
63:19
67:7

**baseline**
64:11

**basis**
65:8
74:10,21

**battle**
13:13

**Beast**
50:3,11
53:23

**beat**
56:23

**began**
73:21

**begin**
13:8

**behalf**
10:2

**believes**
60:5

**bell**
60:22
61:5

**belong**
23:18
24:16,19,
22

**Bernie**
52:16

**Beto**
50:18,22

**big**
41:4,7

**bill**
73:23
74:1

**billed**
74:5

**billing**
7:11

**bills**
73:25

**bit**
15:3,14
20:11
51:20
68:12

**black**
63:2,12

**bodies**
27:3

**book**
20:6

**bottom**
68:4,6
72:17

**boys**
70:10

**BPC**
59:17
66:25
67:2

**BPC/MIT**
58:5,15

**break**
5:11,14
55:7,10

**breaking**
62:17

**briefly**
39:13

**bring**
6:22
27:23

**broader**
32:2

**broadly**
19:21

**bronze**
69:3

**brought**
27:24,25
28:22
29:2 31:6

**Bryan**
6:5 7:4
31:21
40:21
52:5
75:10
76:7,18

**build**
30:14

**building**
71:2

**burden**
33:21
66:9,11,
15,20

**butcher**
22:16

**Butt-bern**
52:17

**Buttigieg**
52:15,21

_____

C

_____

**call**
13:10
21:23
22:5 41:4
52:17
53:17
54:25
60:9 61:8

**called**
49:5

**calls**
65:7

**campaign**
45:10

**campaigns**
44:24
45:2

**candidate**
50:22

**candidates**
47:3

**Canon**
33:21

**capacities**
39:25

**capacity**
56:2 57:2
74:23

**caption**
50:18
53:4,16

**career**
19:17
20:21,23

**Carolina**
15:21
21:21
26:12
27:3
28:13
36:12

**carry**
66:20

**case**
4:14 7:18
8:10,15
9:8,17,23
10:3,6,
11,17
11:2,11
12:25
13:5,8,23
14:1
15:23
17:1
21:22
26:12,16,
21,25
27:13,15,
21,23,24
28:6,8
29:11
30:9
31:3,19,
25 32:10,
16,21,25
33:14,23



34:8,9,12
35:10,20
36:4,23
37:8
38:4,9
39:18,19
40:19
41:13,19
54:3
57:22,25
65:24
66:13
73:20

cases
  15:10,17
  26:10
  27:1,4,5
  28:14
  29:7,11
  30:2,3,8,
  16,21
  31:1,2,24
  32:7,18
  41:6,21

caveat
  39:15

CEO
  47:17

certainty
  71:7

challenge
  35:12

challenges
  27:2

challenging
  23:10

chance
  57:21
  61:7
  71:12

change
  42:6

chapters
  20:6

characteris
tics
  24:11

characteriz
ation
  47:2

characteriz
e
  43:5

characteriz
es
  50:5

circle
  12:18

circularity
  66:25

citations
  39:8

cited
  39:3
  48:5,20

cites
  64:13

claim
  58:24

clarificati
on
  60:2

class
  18:15

classes
  18:19
  19:4
  33:20

clear
  5:2  36:5
  51:13,25
  52:7

62:20
75:12

Cleveland
  16:11

climate
  25:24
  26:3

Clinton
  53:3

close
  15:15
  47:20
  48:1,3

closed
  50:17

closet
  30:7

coefficient
  68:23

cofounder
  47:19,20

committed
  17:20
  47:1

committee
  17:20

Common
  15:18
  21:22
  26:12
  32:13,15
  33:24

communicati
ons
  8:13
  13:20
  14:11

company
  11:16
  42:24
  51:7,9,

10,14
52:1,8

compensatio
n
  9:22
  12:11

competitive
  46:24

competitive
ness
  43:13
  45:25
  46:9,14

complete
  6:20

completed
  16:17

completely
  30:11
  54:24
  69:14

completion
  17:17

computer
  37:17

concede
  36:5

concept
  61:16

conclusion
  54:13
  59:10,22
  72:6

conclusions
  36:21

conduct
  16:23
  43:20
  44:20
  45:19

confidence
  68:22
  69:2,12,
  13,20,24
  70:21

confident
  69:22

conflict
  45:9

confusion
  22:20

congressional
  34:1

connection
  18:1
  74:24

conservativ
e
  48:22
  49:5,14,
  19,23
  50:6
  52:14
  53:2,14
  55:19
  56:20,24,
  25

considerabl
y
  25:4

considerati
on
  31:10

considered
  13:22
  71:7

consist
  46:15

consistent
  36:12



consulting
  39:20,25
  40:3
  44:23
  45:2,9
  73:19,21,
  24 74:1,
  5,8,11,
  12,17,20,
  25 75:16

contacted
  7:17 8:2,
  9,14,17,
  25 10:16

contained
  34:15
  38:11

content
  21:8
  42:22
  43:3,5
  46:4,8,14
  47:11
  50:5
  51:16

context
  66:18

continue
  62:22

conversatio
n
  14:20

conversatio
ns
  41:14
  46:24
  49:12

copy
  47:14

core
  20:19

corporate

11:23,25

correct
  11:6,21
  15:6,10,
  11,22
  16:17,19,
  21 22:4
  27:7
  38:21
  42:23
  43:14
  47:13
  50:1,13
  54:7,15
  58:5,9
  59:11
  63:2,13,
  18 64:1
  75:19
  76:12

correctly
  22:23
  33:8,9
  68:24,25

counsel
  5:16
  13:20,21
  14:4,8,
  11,15,20,
  22,23

country
  43:14
  49:5,14,
  20,23
  50:6
  52:14
  53:2,14
  55:19

couple
  6:25
  71:15
  72:21

court
  4:19,25

19:10
28:13,23
29:1,4
36:10,13,
19,22

cover
  7:7,13
  45:8

covered
  26:11
  72:11

Covington
  26:21,25
  27:2,15,
  21 28:14,
  18,20

create
  8:22,24
  9:4,12
  10:14
  47:11

creating
  9:1,2,3,
  18

current
  26:8

curriculum
  23:12

curve
  60:22
  61:5

cutoff
  46:19

cuts
  51:16

CV
  16:25

_____

    D

_____

D.C.

72:24
73:13

Daily
  50:3,11
  53:23

data
  13:21,24
  41:10
  47:9
  54:10,14
  59:13
  62:12
  65:14
  72:5
  74:15,17

dataset
  39:1

date
  17:17

dated
  10:21
  15:23

Daubertable
  69:16
  70:18

day
  10:10
  31:11
  50:2
  65:11
  67:2
  75:23

days
  10:13

dealing
  61:18

decision
  64:18

decisions
  36:25

declarant

76:8

declare
  76:10

decline
  41:7 45:7

declined
  41:1 42:7
  45:6

decrease
  63:1

deeper
  46:21

default
  64:8

defendants
  12:2
  13:20
  14:11

defendants'
  14:12
  54:18

defended
  17:8

defending
  27:6,10

defense
  13:21
  14:4,15

degree
  16:4,18,
  22 23:5,7

degrees
  21:4,14

delay
  17:19

delivery
  76:19

Democratic
  50:22



demonstrate
59:16

demonstrates
59:13

demote
61:22

denial
52:12

denials
49:13,17

denied
35:14

department
19:6

depending
62:9

depends
29:23

deposed
4:22
28:16

deposition
4:15
6:10,18,
21 14:19
15:1
56:18
57:22

depositions
76:8

describe
46:14
60:14

deserved
26:6

design
65:7

designed
19:18

20:2
21:16

detail
10:1

details
11:1 48:4

determine
21:12

developed
20:12

developing
20:18
21:19
38:9

device
15:13

difference
60:14
62:14
65:14,16
70:4

direct
38:15

directed
52:21

direction
75:18

directly
51:17

disagreeable
65:4

disagreement
59:20,23

disagrees
58:19
59:2
62:24

discipline

71:8

disclosable
39:17

disclose
40:3
74:10,11

disclosed
39:24
40:3,4,
11,14

discoverable
74:19
75:15

discovery
13:13

discrete
71:16

discussing
72:16

discussion
6:12 76:1

disregarded
69:14

dissertation
17:15
19:7,8,15

distribution
60:20,22
61:9,10
62:10

District
15:20

districts
29:14,15,
16

dive
46:21

Dixon
26:13,24
27:1,21,
23,24,25
28:6,8,
14,16
29:3
32:12

docket
40:5,11

doctoral
16:7,25

document
68:5

documents
7:1,10,14
8:23,25
9:14,21
10:15
13:19
14:4,10
39:2

door
50:17

doubt
58:13

downside
9:2

downturn
25:20

draft
37:16,21,
24 38:1
76:19,21

drafting
37:8

drafts
37:12,19

drawing
30:12

drawn

27:7,11

drift
66:16

drill
60:1

dropped
50:3

drove
64:18

Dubose
4:12,14,
15,18
6:5,9,15,
17 7:4,12
12:13,16,
22,23
15:7,9,
12,15,17
29:18
30:14
34:23
36:23
37:7
39:18,24
40:6,15,
17,21,24
48:12,19
50:9,13
51:7,10
52:2,4,
10,13
53:1,9
54:12,16,
25 55:3,
9,15,18
59:11
60:11
63:9 64:1
69:7
72:3,21
74:14,24
75:3,7,9,
17,21

dues



72:25

**duties**
40:24

---

E

---

**e-mail**
7:8,13
8:4

**earlier**
53:10,12
72:22
73:18

**early**
19:11
33:21
56:3

**easier**
60:16

**ecosphere**
56:25

**ecosystem**
56:22

**editor**
47:14

**edits**
37:15,23
38:1

**effect**
8:13
19:12
37:5
46:11

**elect**
27:9

**election**
33:20

**election-
related**
30:3

**elections**
22:22
23:3,4,
15,21
24:7,8,11
31:9 32:5
33:25
34:1
43:8,9,12
45:8 57:4
63:20
70:7

**electoral**
34:1

**electronic**
76:20

**employed**
42:13,15
65:25
66:9

**end**
10:9
31:10
65:10
67:2

**ended**
21:8
28:23
29:4
55:18

**ending**
61:7

**engagement**
8:18
11:10
12:1,9,24
13:2 40:7

**enjoy**
48:1

**ensued**
6:12 76:1

**Enterprise**

55:24
56:9,12,
14 57:6

**entity**
11:23,25

**entry**
11:3

**equal**
63:7

**errata**
76:9

**essentially**
58:8

**establish**
62:24
66:20

**estimation**
23:2

**evaluate**
43:18

**event**
25:9,13

**evidence**
28:3,4,23
29:4
63:20
64:4,14,
18 65:9,
20 66:24

**evidentiary**
28:12

**exact**
18:8

**EXAMINATION**
4:11

**examples**
67:13

**exams**
73:11

**exclude**
28:15,21
35:9
65:16

**exclusively**
42:18

**execute**
11:10

**executed**
19:18
20:2
21:17

**exercises**
21:3

**exhibit**
6:10,13,
16,17,21
48:11,15
54:20

**exhibits**
14:21

**exist**
71:5

**expanding**
61:14

**expands**
61:10

**expect**
17:1

**expected**
17:17
69:2

**expensive**
73:10

**experience**
31:24
35:24
36:2

**expert**
5:18 6:1

7:18 8:9,
15 9:9,16
10:17
11:17,24
13:1
14:7,13,
16 16:3,
16 26:25
29:7
30:2,7
33:25
35:1,9
38:16
39:14,20,
21 40:1,
3,4,25
48:13,19
51:11,18,
22 54:17,
18 57:18,
25 58:8,
11 61:18
73:19,20,
21,24
74:5,8,
11,13,16,
17,20,25
75:11

**experts**
9:6

**explain**
30:18,25
31:23
60:17
64:23
65:23

**explained**
61:17

**explains**
62:2

**explanation**
62:21

**explore**
51:20



SEAN P. TRENDE
FAIR FIGHT ACTION vs BRAD RAFFENSPERGER

April 16, 2020
Index: expose..gold

expose
 53:5

expressing
 13:23

extent
 29:25
 30:1,19,
 20,22
 32:6
 35:14
 51:22
 62:25
 71:25

_____

      F
_____

Facebook
 49:4,19,
 22 50:5
 51:14
 52:8,14
 53:2
 55:19,21

fact
 22:13

facts
 13:21
 38:20,22
 39:3,7
 74:15,17

fading
 15:12

failed
 66:19

fair
 5:2,6,14
 24:24
 29:6,8
 42:20

fairly
 25:2 48:3
 62:3

fall
 7:23,24
 10:16

falling
 61:4

falls
 32:6

familiar
 33:17
 50:4

fan
 16:12

farther
 12:9

fault
 61:24

favored
 65:10

federal
 4:17
 44:9,11,
 16,18,19
 75:15

feel
 70:18

figured
 28:4

file
 26:25

filed
 67:3

final
 37:13

finalizing
 41:23

find
 63:14
 67:23
 68:13
 76:16

finding
 67:14

fine
 51:24
 55:3,15
 76:14

finish
 19:19
 21:17

finished
 17:6
 19:14
 33:1

fish
 35:7

fits
 51:6

focus
 59:19,22

follow
 23:12
 75:18

follow-up
 72:21

Ford
 55:23
 57:2

foregoing
 76:11

forget
 12:24

forgotten
 54:24

form
 6:6 29:17
 34:22
 36:20
 37:1
 38:20
 50:10
 52:23

53:7 54:8
 59:7 60:7
 63:3,23
 69:6
 71:22
 72:12

formal
 38:6,7

forming
 13:22
 14:13

formulated
 63:19

formulation
 21:1

forward
 40:14

forwarded
 7:1

founder
 47:17

fourth
 67:22

Fox
 48:7 49:1

front
 10:22
 16:1
 67:19

full
 13:17

functionall
y
 27:5,21

_____

      G
_____

gathers
 42:21

general

31:5,7
 56:13
 60:15

generally
 33:18
 43:7
 65:10
 66:8

generate
 21:8
 37:12

generated
 10:20,24
 16:3
 33:13
 57:18

generating
 57:25
 58:8

Gentlemen
 75:24

Georgia
 5:22
 44:21
 45:15,20
 46:10,12
 47:3
 58:25

Gerald
 55:23
 57:2

gerrymander
ing
 32:16
 34:9

give
 7:20,22,
 25 16:13
 22:18
 75:3

gold
 67:10



68:17
69:1

good
4:13 11:9
12:20
64:11,22

gotcha
22:15
68:7

govern
36:25

Government
18:25

governor's
46:1,12

graduate
17:10

granted
35:13,17

Graves
13:24
14:6
54:17
57:18,24
58:7,10,
18 59:2
60:4
61:20,21
62:2,23
63:19
64:13
65:25
66:12,19
68:10

Graves'
14:25
38:22
54:3,14
57:22
61:19
63:10
64:24
67:8,17

70:22

great
51:11
67:21

greater
62:5,12,
15 63:6,8

grinding
22:25

ground
39:8

gubernatori
al
44:21
45:14,20,
25 46:10
47:4

guess
57:15
65:18
71:1,3,21

H

half
45:17,18

handle
35:19

handled
36:3

handwrite
76:9

handwritten
10:6

hard
56:22

hat
30:1,6,7
69:16
70:23,25

71:1,4

hate
39:4

HB589
34:15

head
8:20,21
10:7,8
67:16

headline
42:11

hear
5:4 15:8
17:23

heard
16:12
49:24,25
50:2,19

hearing
28:12

helpfully
13:25
38:25

herring
35:6

hide
41:3,17
44:1

Hillary
53:3

history
34:2

holding
50:16

homophobic
52:21

honestly
41:17
73:22
76:4

hope
9:6

hoping
33:10

horribly
53:24

horrified
26:9

hour
13:6

hourly
13:4

housekeepin
g
75:9

hypotheses
20:18
71:5

hypothesis
20:12,18
21:1,20
60:24
62:25
63:6,11
64:4,6
68:18
70:3,7,
14,17

I

I.D.
41:21

idea
38:14,17

identical
27:4,5

identificat
ion
6:14 41:6
48:16

54:21

identify
13:21
14:12

identifying
14:14

ideological
56:21

ignores
61:7

II
38:25

image
76:5

imagine
5:21 9:5
28:17
38:10
60:21

impair
5:9

imply
68:21

improper
64:25
65:1,3

inactive
72:25
73:4

inaudible
15:5
73:15

include
21:19
39:7 64:5

included
13:24

including
13:19
14:10



33:25

**incorrect**
66:1

**increase**
63:1

**increased**
63:2,12,
13 65:20,
21

**individual**
11:21

**individually**
12:2

**influential**
48:6

**informal**
38:7,9

**information**
22:14
75:15

**informative**
30:3,4

**initial**
8:13 66:4

**instance**
21:9
50:14
64:25
67:15

**Institute**
55:24
56:9,12,
14 57:6

**institution**
16:14
21:10

**instructing**
75:12

**intelligent**

22:19

**intend**
31:16
36:24

**intended**
62:1

**intentional**
8:24

**interaction**
33:22

**interest**
65:16

**interested**
21:2 56:8

**interpret**
36:3

**interpretation**
36:18

**interpretations**
36:17

**interpreting**
36:7

**Intro**
18:20

**invention**
53:17

**invoice**
7:1,5,8,
9,12
9:20,25
10:20,24

**involve**
65:7

**involved**
11:15
27:2
35:3,20

36:7
46:11
47:8,9
49:14
51:12,15
52:8
66:25

**involvement**
49:19
51:2
52:12

**involves**
21:1
61:13

**irrelevant**
31:3

**Islam**
53:5

**Islamophobic**
50:7

**issue**
29:11
60:3
71:21
72:10

**issues**
39:15,23
41:9,13
72:14

———————

**J**

**jail**
53:3

**John**
47:18

**Jones**
36:24

**Journal**
48:8

**judge**
36:19,24

**judgment**
65:7

**justify**
66:12
67:1

**justifying**
66:10

———————

**K**

**kids**
70:10

**kind**
8:19
20:10,11
21:10
22:25
31:8 42:8
46:18
48:22
50:5 53:9
55:18
56:21,24
58:11
62:21
64:10
71:15
72:18

**kneeling**
53:15

**knowledge**
6:3 23:6
28:8
49:16

———————

**L**

**laid**
51:17

**land**
53:18
67:6

**late**
17:21

**law**
5:19
16:4,11
35:4,6,19
36:12,17,
18,24

**laws**
34:16
36:12

**lawsuit**
38:5

**lawyer**
30:1,6
68:11

**lawyers**
29:24

**lay**
51:12
61:13
62:21
66:1

**lays**
48:20

**learn**
39:6

**learned**
36:2

**leave**
30:6
75:24

**left**
5:19
61:10

**legal**
31:11,13,
20,22



34:20
35:2,5,24
36:2,21
37:3
38:14
66:15,17
69:16
70:23,25

legislative
27:3

lengths
51:11

lens
46:2

letter
11:10
12:1,10,
24

letters
13:2 40:7

level
68:22
69:2,12,
13,20
70:21

liberal
48:22
56:20
57:1

lies
67:5

limine
28:17

limit
28:15,21
35:9

limiting
39:22
40:13

lines
29:13

Listen
53:4

lists
48:6

literally
68:3

literature
20:8
21:19,20
67:13
70:15

litigation
42:1,4

location
59:6

long
55:8 56:1
71:2

longer
29:13,14
55:6
57:13
63:21
65:17

looked
14:21
46:1

lot
10:12
12:10
13:1
22:19
32:18
43:24
62:21

lower
61:13

─────────

M

─────────

made

14:15

main
72:15

mainstream
34:16

major
42:11

majority
29:9,13

majority-
majority
29:16

majority-
minority
29:15

make
15:15
23:9
24:14
39:21
40:13
51:21
52:2,4,6
67:25

makes
58:24

man
47:24
53:15

maps
27:2,7,9,
10

mark
48:11,13

marked
6:13
48:15
54:20

master's
16:5,18,
22 21:14

33:1

mat
53:16,18

matter
14:16
38:5
42:1,4
61:17

Mayer
30:23
33:12,17

Mayer's
30:20
32:7

Mccrory
34:12
35:24
36:7,10,
17

Mcintyre
47:18,21
48:2
49:12,18

Mcintyre's
47:23

means
65:3 70:6

Media
18:24

medications
5:8

meeting
50:19

member
23:21,25
24:7,10,
11 72:23,
24,25

members
17:20

membership
73:9

meme
52:15,18
53:1,22

memes
50:7

memory
11:9

mentioned
24:16
33:12

mess
47:10

Meta-
analysis
43:20,22,
25 44:7

method
59:23

methodology
24:13
65:25
66:3

Michigan
16:12

Middle
15:20

mind
5:4 6:24
72:7

mine
30:22
31:4 32:8
53:18

minority
29:14

minors
23:15

minute



SEAN P. TRENDE                                          April 16, 2020
FAIR FIGHT ACTION vs BRAD RAFFENSPERGER          Index: minutes..opinion

75:4

**minutes**
33:12
55:14

**misheard**
52:9

**mission**
56:16

**misstate**
56:17

**modeling**
19:13

**Mohammed**
53:17

**month**
7:25
10:10,21

**morning**
4:13 7:15

**motion**
28:17,21
29:1

**motions**
28:15

**move**
15:12
51:21

**moving**
12:19

**MSNBC**
49:1

**Muslim**
53:15

_____

**N**
_____

**NAACP**
34:11
35:23
36:6,10,

17

**narrow**
20:7

**nasty**
25:8,25
26:4
53:8,9

**nature**
41:11,18

**necessarily**
20:22
68:17

**needed**
14:2

**news**
48:7,21
49:1

**nonhispanic**
62:6

**nontestifyi
ng**
39:14
40:12
74:23

**nontrump**
56:25

**normal**
10:14

**North**
15:20
21:21
26:12
27:2
28:13
36:12

**notarized**
76:6

**notary**
76:13

**note**

**notes**
8:12,19
10:1

**notice**
6:10,18
7:11 9:25

**noticed**
25:20

**notwithstan
ding**
14:2
36:16
59:21

**null**
60:24
63:6
68:18
70:3,14,
16 71:5

**number**
7:10
68:1,2

**numbered**
72:17

_____

**O**
_____

**O'ROURKE**
50:23

**oath**
4:25

**Obama**
53:4

**object**
29:17
32:1
34:22
36:20
37:1
39:12

**48:25**

**notes**
50:8,10,
25 52:23
53:7 54:8
59:7 60:7
63:3,23
69:6
71:22
72:1,12,
19 74:9,
18

**objected**
31:22
75:10

**objecting**
66:4 67:3

**objection**
30:13
59:9 71:9
72:15
75:2

**objections**
6:6

**observation**
67:8

**observed**
67:9

**observing**
68:14

**obtain**
13:25
14:3,6

**occasion**
47:24

**October**
32:20

**offensive**
53:25

**offer**
23:14

**offered**
15:4,10

**34:19
45:10**

**offering**
29:12
34:14

**offices**
44:9,11

**Ohio**
16:8,13
18:12,21,
23 23:14

**one-sided**
60:5
66:20

**one-stop**
42:25

**one-tailed**
60:9,15,
18 61:6,
12,13
62:8,18
63:5,10,
16 64:12,
15,19,22,
24 65:8,
11 66:6,
10,12
67:8

**online**
18:17
19:4,6
42:18
56:16

**opine**
41:25
42:3

**opinion**
27:8
29:12
31:20,23
34:14,20
35:1,2,4,
5,6,9,14,



17,23
36:6,11
38:3
39:2,10
40:19
41:1,7
42:6,11
54:2,4,10
57:25
58:16
59:21
67:4
70:22
72:5

**opinions**
13:23
14:14
15:5,10
28:15
38:4,6,9,
20 41:22
61:18
74:17

**opposed**
64:19

**opposing**
35:8

**oral**
12:6

**order**
19:12
23:13
41:20

**organizatio
ns**
23:17,22
24:3,9

**original**
16:23

**outfit**
51:15

**outlet**
57:13

**outlets**
48:21

**outlines**
12:10

────────────
      **P**
────────────

**P-A-T-R-I-
C-K**
4:21

**P-H**
53:20

**p-value**
67:14
69:8
70:1,2,6,
16 71:6

**p.m.**
75:6

**paid**
13:15,17
74:4

**paint**
51:23

**panel**
32:22

**paper**
9:4,18
11:1,4
20:16,17
33:21
38:18
68:6

**papers**
19:15

**paragraph**
48:4,18,
25 67:22
68:8
72:16

**pardon**
53:5

**parse**
20:11

**part**
21:15
59:19

**participate
d**
21:16

**participati
on**
18:9

**parties**
27:22

**partisan**
53:6

**parts**
71:16

**pass**
73:7

**passed**
73:15,17

**past**
18:19
30:15
31:24
41:5 49:5
57:12
63:20

**Patrick**
4:20

**patterns**
19:11

**pay**
72:25

**peer**
47:12

**peer-
reviewed**

20:7
21:8,18,
20 67:13

**penalty**
76:10

**Penny**
6:11
15:13

**people**
22:19
24:8 26:9
41:14
57:12
67:14

**peppered**
44:12

**percent**
44:18
59:5
61:7,9,
14,15
67:11
68:17,22
69:7,12,
13,21
71:12

**percentage**
44:15,16,
17 58:21
59:5

**perform**
44:4
64:18

**performed**
10:2

**period**
11:25
40:10

**periphery**
46:19

**perjury**
76:10

**permissible**
4:16

**personal**
11:20
37:16

**personally**
11:13

**Pete**
52:15

**Ph.d.**
17:2 18:1
21:15
23:20

**phone**
8:4

**photo**
41:21

**photographi
c**
41:5

**picture**
41:4,7
50:16
51:23
53:3

**piece**
10:25
11:4 68:6

**pieces**
57:14
71:20

**pin**
38:13

**plaintiff**
27:12

**plaintiffs**
4:14

**plaintiffs'**
6:13
14:22



48:15
54:17,20

plan
  37:4

planned
  55:6

planners
  25:9,13

playing
  41:3,17

point
  9:14 33:9
  39:15
  49:13

pointing
  50:17

points
  46:20

polarized
  25:9

political
  16:5
  21:23
  22:4,5,8
  23:24
  24:5,17,
  23 25:10,
  11,14,16,
  19,24
  26:3 31:9
  33:19
  34:9
  42:22
  43:1,7
  48:21
  51:13
  70:15
  71:4

politics
  18:20
  25:8 31:8
  32:5

48:6,8
53:10

poll
  44:6
  46:17

polling
  46:17
  58:21
  59:6

polls
  43:16,18,
  21,24

pollster
  45:3

pool
  30:12

position
  66:2

positive
  58:20,25
  59:4
  63:11,15
  68:23
  69:22
  71:12

post
  52:21
  53:13,25

posted
  50:16
  52:15
  53:2

practice
  5:19 8:18
  9:17

practiced
  35:19

prayer
  53:16,18

precise
  73:12

predictions
  24:14

premise
  59:25

prepare
  14:18

president
  26:9

presidential
  50:22

pressing
  21:2

pretty
  11:9 12:6
  26:4 53:6

prevent
  36:11

preventing
  36:13

previous
  66:5

primarily
  44:9,11

primary
  24:10
  54:4 60:3

printed
  67:20

prior
  37:13
  39:20
  40:11
  71:17

private
  49:17

privilege
  5:19,22
  6:1,6

probability
  61:2,3
  62:4,9,11
  67:9,23
  68:13
  70:10

probable
  70:4,5

problem
  55:1

process
  56:6
  69:24
  76:15

produce
  9:13
  42:24

profession
  69:17

professional
  21:6
  23:17,22
  24:3,9

professionally
  20:23

professor
  22:9

proffered
  33:25

profile
  11:21
  57:10

program
  18:1
  21:15
  33:5,6,7,
  11

programs
  23:16

progress
  21:4

prong
  71:3

prongs
  71:1

pronounce
  22:23

pronunciation
  23:1

proper
  16:14

Prophets
  53:19

proposed
  72:1

proposes
  63:5

protecting
  41:2

provide
  11:17,24
  12:11
  39:10,13
  40:19,25
  41:1

provided
  11:3,11
  13:5,22
  14:3,8,
  13,21
  17:1 36:6
  38:3,25
  40:12
  54:14
  74:15,22

providing
  12:5
  36:16

province



36:19,22

**psephologist**
22:17,21
23:1,3,13

**psephologists**
23:18
24:4,14

**psephology**
23:5

**public**
24:24
52:12

**publication**
42:19

**publish**
43:3,6
47:11
57:14

**published**
20:7
44:20
45:14
47:15
49:14
55:20
58:1

**publishes**
42:22

**pull**
48:9

**purpose**
56:13

**purposes**
4:17

**pursuant**
12:6 40:7
76:10

**put**
19:5

25:10,11
44:15
65:18
69:15

**putting**
30:1

———————

**Q**

**qualifications**
15:4

**quarrel**
58:14

**question**
5:5,6,12,
13 6:23
14:3 15:8
29:19,20
31:11,13,
14,16
32:2 35:1
39:4
45:13
54:23
59:1,3,24
60:2
65:13,15,
18 66:7,
24

**questions**
5:3 6:19
65:12
72:14,22
75:10,13

**quote**
48:5
52:17
53:4,16

**quote-
unquote**
67:10

———————

**R**

**race**
44:21
45:4,14,
20 46:1,
10,12,20
47:4,5,8
54:5,11

**races**
43:13
44:9,10,
12 45:25
46:16,18,
24,25
47:6

**raised**
57:10

**raises**
59:9

**rate**
13:4,7
43:12

**rated**
46:9,13
47:7

**rating**
45:24
46:15

**ratings**
47:5,8

**rationale**
64:14
66:1

**RCP**
57:10

**reached**
21:6
54:12

**reaching**

67:10

**read**
33:15,16,
21 34:6
36:2,15
50:11
53:4,16,
23 63:24
68:24,25
76:3,5,17

**readers**
43:1

**reading**
36:7
50:18

**real**
23:9,11

**Realclear**
20:1,2,11

**Realclearpo
litics**
11:14,15
19:22
20:4
25:18
42:13
43:10
44:4,8
47:12,17
48:5,20
49:4
57:7,12,
15

**Realclearpo
litics'**
49:18

**Realclearpo
litics.com.**
42:12

**realignment**
19:13

**Realpolitic
s**
11:14

**reason**
17:18
22:10,11
58:13
64:11,22
70:13,21
72:20

**reasonable**
71:7

**rebuttal**
57:17,19
67:18,19
71:16
72:10

**recall**
7:3 8:6,7
22:1
26:22
32:10,23
33:8,9
34:14,17
37:19,23
40:9
67:17

**received**
6:25

**receiving**
37:23

**recently**
34:7
36:15

**recess**
55:17
75:6

**recollectio
n**
12:3 32:9
35:15

**reconfigure**



17:21

record
  6:12,20
  9:4 10:1,
  5,9
  27:23,24
  51:25
  52:2,4,7
  55:13
  71:2
  72:10
  76:1

red
  35:6

redact
  12:14

redacted
  12:11

redistricte
r
  23:8

redistricti
ng
  23:8
  29:7,10
  30:8,16,
  21 31:1,
  2,17,24
  32:7
  33:23
  34:2,8
  35:21

reference
  19:25
  50:21

references
  67:25

referencing
  20:20
  21:3

reflected
  39:11

40:20

reforms
  34:15

refresh
  32:9

refused
  41:5

registered
  63:2,13

regression
  64:9

regular
  68:11

reject
  68:18
  70:13,16

rejected
  71:6

rejection
  70:22

relate
  9:21
  31:18
  57:6

related
  7:10 38:5
  42:1,4
  43:8

relates
  20:21
  32:4
  40:17
  54:3 64:3

relationshi
p
  5:21,23
  6:2 47:21
  48:2 54:5
  57:16
  58:20,25
  59:4,14,

16 60:24,
25 63:11,
15

relayed
  59:20

relevance
  31:14,15,
  16 51:1

relevant
  30:21
  31:10
  32:4,8

relied
  14:13
  38:20

reluctant
  25:9,11

rely
  39:2
  46:17
  64:4

relying
  66:25

remember
  8:11
  10:12
  13:3,12
  18:8
  24:1,20
  34:12
  36:13
  37:14,25
  41:4,8,
  19,20
  42:10
  44:22
  45:5,12,
  16 62:6

remotely
  18:5

repeat
  5:4 42:2

repeated
  71:25
  72:18

replicating
  58:9

report
  13:25
  14:16
  15:23
  16:4,17
  26:10,20,
  21,24,25
  27:25
  28:22
  29:3
  33:13,16
  35:9
  37:6,8,10
  38:17,19,
  23 39:3,
  7,9,11
  40:20
  41:23
  48:4,9,
  11,13,19
  51:11,18,
  22 54:14,
  18 57:17,
  19 58:5,
  8,9,12,
  15,24
  59:17
  66:4
  67:2,3,
  18,19
  68:1
  71:16,17,
  20 72:5,
  7,10

report's
  39:16

reported
  14:7

reporter

4:19
  15:7,14,
  16 75:24

reports
  14:1,7
  57:14,15

represent
  4:14

represented
  5:16

Republicans
  27:9

request
  7:10 9:13

requests
  7:15

research
  16:23

reserving
  6:5

respect
  14:16
  35:14
  39:5
  74:15
  75:11

response
  54:16
  55:5
  73:19

responsibil
ities
  17:25

responsibil
ity
  51:3

responsive
  7:14
  12:12

restroom



55:7,10

**result**
28:20
35:12
61:3
63:14

**results**
58:9,14
67:9
68:14
70:4,5,8

**retained**
10:24
11:13,14
39:20
40:11
74:20

**retention**
39:22

**review**
57:21

**reviewed**
14:25
33:13
47:12,14
57:19
71:17

**reviewing**
57:18

**right-hand**
47:24

**rights**
35:20
36:4

**robust**
46:17

**role**
57:5
74:16
75:11

**rolls**

73:5

**roof**
53:20

**rough**
76:21

**Rucho**
15:18,19,
20 26:13,
24 29:3
32:9,14,
15 33:24

**rule**
5:18

**ruled**
29:1

**Rules**
4:17
75:16

**ruling**
28:23
29:5

**run**
45:23
49:4
57:11
70:7

**running**
32:19

**rush**
76:19

**Ryan**
56:7,10

──────────

S

──────────

**S-E-A-N**
4:20

**sake**
6:20

**sample**

67:9
68:14

**Sanders**
52:16

**scarlet**
35:7

**scholar**
55:23
56:2,8
57:2

**scholars**
57:1

**school**
16:11
18:4

**science**
16:5 22:8
23:24
31:9
70:15
71:4

**scientific**
71:7

**scientist**
21:23
22:4,6
33:19

**scientists**
24:6

**scope**
74:7

**Sean**
4:16,20
48:13
54:18

**season**
7:22

**secretly**
49:4

**seeking**

21:14

**selection**
56:6

**semester**
18:3,6,23

**semesters**
18:21

**Senate**
45:4

**send**
12:17
76:5

**senior**
43:9,12

**sentence**
69:11
70:3
71:10

**sentiment**
25:24
26:2
30:17

**separate**
40:7
62:18
73:23

**September**
50:14,15
53:15

**series**
47:6

**service**
9:16

**services**
11:2,10,
18,24
12:5 13:4
39:14
40:12,18

**serving**

7:18 8:9,
14 9:7
10:17

**setting**
21:6

**share**
61:2
63:1,12
65:21

**sharing**
37:19

**sheet**
76:9

**shop**
42:25

**shortcut**
61:1

**shortcuttin
g**
62:20

**shortly**
13:10
17:9

**showed**
53:15

**shutdowns**
25:21

**side**
9:10
61:4,8,10
62:9 64:5

**sides**
48:21
51:12

**sign**
76:3,17

**signature**
76:5

**significanc
e**



66:5                50:7              speeches          17 45:4,5         Stephen
67:4,7                                25:5              68:16             54:17
                    sophomore
significant         18:21,22          spell             statement         stipulation
54:6                                  4:19              56:16             16:2
63:14               sort                                                  21:25
                    6:4 13:13         spelled           statewide         34:6
silver              23:14             53:20             46:16
69:3                62:11                                                 stories
                                      spent             stating           42:22
similar             sorts             10:6,11,          52:15
72:18               8:22              13 11:1                             story
                                                        station           50:3,4,
simply              sound             spring            58:22             12,13
29:12               26:17             7:23              59:6
                    34:2             18:22                                strategy
single                                                  statistic         37:3
10:25               Sounds            staff             61:4              38:15
11:4                12:20             57:1
                                                        statistical       Street
sit                 Southern          stalled           20:19             48:8
7:15                19:13             13:12             31:5 39:5
22:11                                                   41:15             Streeter
71:14               spatio-           stand             54:13             56:7,10
72:4                temporal          23:23
                    19:12                               statistical       struck
site                                  standard          ly                58:11
42:21,24            speak             13:7              43:18
43:3,6              23:16             67:10             54:6               structured
47:7                                  68:17                               59:2
                    speaker           69:1,17,          statisticia
site's              25:15             18                n                 student
47:9                                                    68:11             16:8
                    speakers          start
Sitting             25:10,12,         19:18            statistics         studies
50:18               19                21:7,17           16:20             20:20
                                      59:25             32:3              21:4
size                speaking                            33:1,7            22:21
61:15               24:25             started           43:23             23:4,20
                    25:16             13:14             63:5              24:6
skipping                                                70:23,25
56:23               specific          starts            71:1              study
                    39:8              67:22                               19:18,20,
slope               45:10                               statute           23 20:2,
68:23               71:11             state             36:3              13,15,16
69:22               72:14             4:18 5:22                           21:16,17
71:12                                 7:2 10:2          statutes          23:3
                    specificall       16:8,13           35:3 36:8         24:8,11
slowed              y                 18:12,21                            58:1,4
25:4,6              24:8 43:8         23:14             stay               65:7
                                      27:3,6,8          15:15             67:1,2
smaller             spectrum          34:15
41:9,12             48:22             44:10,12,         step              stuff
                    51:13                               59:13
smears

19:22

stumble
68:12

subcategory
31:9

subject
14:16
41:25
42:4
61:17

submit
73:23

submitted
26:21
38:2

subspecialty
32:5

substance
38:19

suggest
54:10

suggested
72:7

suicide
17:21

summarizes
62:3

summary
45:24

supplied
74:16

support
41:10
65:14,16
72:6

suppose
29:25
31:3
43:25

Supreme
19:10
28:12

syllabus
18:14
19:3

———————————

———————————
T

T-
DISTRIBUTIO
N
64:10

T-R-E-N-D-E
4:21

t-test
60:19

table
5:13

tag
43:2

tail
60:11
61:14,15
62:10

tails
61:4

takes
60:4 61:9

taking
5:13
61:14
72:10

talents
30:12

talk
15:3
42:12
54:2
60:20

talked
25:20

talking
21:5
25:17
45:22
53:12
55:19
60:12
64:16
69:23

talks
50:14

tank
56:15

taught
18:19,20

teach
18:24

teaches
33:20

teaching
17:25
18:5,7

team
52:16

ten
55:14

tend
27:9

tender
54:16

tenure
21:9

term
44:2

terms
43:22
61:13

test

60:5,9,
15,16,18,
21,23
61:3,6,
12,13
62:3,8
63:5,16
64:3,7,8,
12,16,19,
20,22,24
65:8,10,
12 66:6,
8,10,12,
20 67:1,8

testified
21:22
26:11
27:6,8,12
51:25
52:7,10,
11 53:10

testify
5:9 27:17
28:6
32:21
37:4
38:10,18
40:18
41:21

testifying
32:10
36:11,14
39:25
40:4,25
73:20
74:2,16,
25

testimony
10:25
21:21
28:2,3
32:25
66:5
69:13

tests
64:15
66:5 67:4
72:1

Texas
72:25
73:13

Theorists
24:23

Theory
24:18

thesis
17:8,12,
14

thing
5:12 6:1
7:2,5
60:12
70:2
75:10

things
9:10,11
17:22
20:19
21:11
31:7 39:6
40:18
42:9 51:5
59:18
65:6
71:24
72:22

thinks
60:8

thought
34:21
70:24

thousand
26:18

Three-judge
32:22



three-
papers
  19:8

thrust
  54:4

ticket
  52:16

tie
  59:17

ties
  53:5

time
  9:14
  10:5,10,
  13,23,24
  11:1
  12:13
  16:3,7
  19:17
  40:4,10,
  14 47:6
  48:13
  50:2
  55:8,11
  58:20
  59:4
  62:15
  63:1,6,12
  65:20
  70:9
  73:17
  74:8

times
  16:13
  48:7
  54:6,11
  61:1
  62:5,7,
  12,13
  63:21
  65:15,17

timewise
  26:17

title
  16:9 18:9

today
  5:9,17
  12:17
  48:2
  49:25
  56:24
  71:18

top
  61:8
  67:16
  68:2,5

topic
  19:7

toss-up
  46:19

touch
  51:22

touched
  71:15
  72:22

track
  21:10

transcript
  57:22

transcripts
  34:7
  36:15

translate
  29:11
  30:8
  31:18

translates
  31:24

travels
  21:13

trend
  56:19

Trende

4:13,16,
20,22
5:16
6:17,22,
24 7:8,
13,17
12:23
15:9
39:13
48:14
49:3
54:19
55:20
75:7,17
76:2

trial
  27:15,17
  28:9,11
  32:11,21
  37:4
  38:10,15
  39:21
  74:1

true
  31:4
  49:3,6,7,
  9 60:24
  68:22
  70:4
  76:11

Trump
  25:5,7

turn
  16:25
  46:25

Turning
  26:10
  73:18

turnout
  18:9

two-sided
  60:5

two-tailed

60:9,15,
16,18,21,
23 61:12
62:3
64:3,7,
19,20
65:10,12
66:8

typewritten
  68:1

typical
  8:18

typically
  23:18
  36:18,22
  64:8 69:2

Tyson
  6:7,25
  7:7 8:3,
  8,14
  12:4,8,
  15,20
  13:11
  14:23
  22:13
  29:17
  30:13
  32:1
  34:22
  36:20
  37:1,22
  38:14
  39:12,19
  40:2,9,22
  48:10
  50:8,10,
  25 51:9,
  24 52:3,
  6,23 53:7
  54:8 59:7
  60:7
  63:3,23
  69:6
  71:22
  72:12

74:9,18
75:2,14,
22 76:2,
14,20

Tyson's
  37:3
  75:18

_____

U
_____

U.S.
  33:25

U.S.C.
  76:11

ultimate
  59:21

umbrella
  31:7

unclear
  50:15

undergrad
  16:4

understand
  4:24 5:3
  23:11
  26:9
  29:18,20
  36:18
  50:21
  51:5
  57:24
  58:4,7,
  18,22
  63:18,22
  69:19

understandi
ng
  27:20
  49:8,10
  58:3 59:1
  65:9



understood
  5:5 59:15

University
  16:8,13
  18:24

Unnecessari
ly
  26:5

unpublished
  45:19,23

unrelated
  30:11

unusual
  70:12

unwarranted
  22:19

updated
  17:3,18

upper
  61:12

upside
  9:3

utilize
  65:8

utterly
  31:2

——————————

          V

validate
  67:1

variety
  24:15

version
  12:12
  37:13

versions
  37:12

versus

15:18
26:12,13
32:14,15
33:24
34:12
35:23
36:6,10,
17 62:17
63:7
65:11

Virginia
  73:3,7,13

visiting
  56:8

voices
  48:6

Von
  4:13 12:8
  54:22,25

vote
  29:13

voters
  58:21
  59:6
  63:2,13,
  21,22
  65:21

voting
  15:10
  18:8,9
  19:10
  33:21
  34:15,16
  35:20
  36:3

——————————

          W

wait
  54:6,11
  58:20
  59:4 61:1
  62:4,6,

12,13
63:1,6,
12,21
65:14,17,
20

Waiting
  50:18

waived
  73:13

walk
  71:23

Wall
  48:8

wanted
  31:17
  52:6

weapons
  50:17

Web
  42:21,24
  47:7

Website
  48:20
  52:13

weeds
  30:5

week
  10:10

weird
  58:11

Wesleyan
  18:24

whatsoever
  46:5,8

white
  62:6
  65:17,21

whites
  62:15,16

Winter
  7:23

Wisconsin
  33:20,22

word
  22:18
  23:9
  25:25
  32:3
  42:10
  66:15

worded
  19:21
  71:10

work
  7:2 9:1,
  10,22
  10:2
  11:3,16,
  20,24
  13:1,8
  16:25
  17:6
  20:10,19
  26:13
  29:6,10
  30:8,15,
  20,21
  31:1,2,3,
  17 32:7
  33:10
  34:11
  44:8 54:3
  57:10
  62:22
  73:24
  74:2,7,12
  75:1

workday
  10:14

working
  11:2
  73:19,21

works
  6:2 9:9
  40:22

workup
  45:4

worry
  40:16

worth
  45:11

write
  20:17
  38:16
  57:11

write-ups
  46:3

writing
  47:1

written
  10:15
  20:5,6
  28:3

wrote
  45:17

——————————

          Y

year
  7:20,22
  10:21
  17:2,3,4,
  18,21
  18:22
  50:15

years
  15:25
  25:2 34:4
  35:15,16
  56:22

yesterday
  6:25 7:5



**York**
   48:7

**you-all**
   13:12

