**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FAIR FIGHT ACTION, INC., *et al.*,

    Plaintiffs,


    v.

BRAD RAFFENSPERGER, *et al.*,

    Defendants.

Civil Action No.
1:18-CV-5391-SCJ

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF
PROFESSOR THOMAS BRUNELL</u>**

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** .................................................................. ii

**PRELIMINARY STATEMENT** ........................................................1

**THE EXPERT OPINIONS** ..............................................................4

**LEGAL STANDARD** .......................................................................8

**ARGUMENT** ....................................................................................9

   **I.**   **Professor Brunell lacks relevant qualifications and experience.** ............9

   **II.**   **Professor Brunell improperly weighs the evidence like a factfinder, not an expert.** ..............................................................12

   **III.**   **Professor Brunell's unhelpful assertions are not based on independent analysis.** ..............................................................16

      A.   Professor Brunell conducts no independent analysis. ...........................17

      B.   Professor Brunell relies on unattributed hearsay. ................................19

**CONCLUSION** ...............................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*,
    248 F.R.D. 298 (N.D. Ga. 2008), *aff'd*, 555 F.3d 1331 (11th Cir. 2009) ..........14

*Arista Records LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009) ...............................................................19

*Common Cause v. Lewis*,
    No. 18-cvs-014001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019) ...........4

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
    No. 14-cv-24277, 2016 WL 7507848 (S.D. Fla. Aug. 1, 2016).........................17

*Cordoves v. Miami-Dade Cty.*,
    104 F. Supp. 3d 1350 (S.D. Fla. 2015)..............................................................14

*Conroy v. Vilsack*,
    707 F.3d 1163, 1168 (10th Cir. 2013) ...............................................................10

*Encompass Indemnity Co. v. Ascend Techs., Inc.*,
    No. 1:13-cv-02668, 2015 WL 10582168 (N.D. Ga. Sept. 29, 2015) ................12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................8

*Gaylor v. Ga. Dep't of Nat. Res.*,
    No. 2:11-cv-288-RWS, 2014 WL 4545810 (N.D. Ga. Sept. 12, 2014) ............12

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................................................19

*Hughes v. Kia Motors Corp.*,
    766 F.3d 1317 (11th Cir. 2014) ..............................................................8, 9, 16

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010)..............................................................12

*Jones Creek Inv'rs, LLC v. Columbia Cty.*,
   No. CV 111-174, 2013 WL 12141348 (S.D. Ga. Dec. 23, 2013) ..................... 19

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010) ............................................................. 8

*Knight v. Miami-Dade Cty.*,
   856 F.3d 795 (11th Cir. 2017) ............................................................. 20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................ 18

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ....................................................... 18, 19

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ........................................................... 18

*Noe v. Metro. Gen. Ins. Co.*,
   No. 1:11-cv-02026-SCJ, 2012 WL 7760143 (N.D. Ga. Dec. 10, 2012)............ 14

*Ohio A. Philip Randolph Inst. v. Householder*,
   373 F. Supp. 3d 978 (S.D. Ohio), *vacated on other grounds sub nom.*
   *Householder v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 101 (2019) ............... 4

*Trilink Saw Chain, LLC v. Blount, Inc.*,
   583 F. Supp. 2d 1293 (N.D. Ga. 2008)........................................... 9, 11

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
   746 F.3d 1008 (11th Cir. 2014) ............................................................. 9

**OTHER AUTHORITIES**

Federal Rule of Evidence 702 ................................................................. 8

Federal Rule of Evidence 705 ............................................................... 15

Pursuant to *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), Federal Rule of Evidence 702, Local Rule of the Northern District of Georgia 26.2(C), and this Court's Second Amended Scheduling Order (ECF No. 228), Plaintiffs Fair Fight Action, Inc., Care in Action, Inc., Ebenezer Baptist Church of Atlanta, Georgia, Inc., Baconton Missionary Baptist Church, Inc., Virginia-Highland Church, Inc., and The Sixth Episcopal District, Inc. (collectively, the "Plaintiffs") have moved this Court to exclude the reports, ECF Nos. 211, 276, and 292, and expert testimony of Professor Thomas Brunell, and hereby submit their memorandum in support thereof.

## PRELIMINARY STATEMENT

Three of Plaintiffs' experts—political scientists Drs. Daniel Smith, Michael McDonald, and Michael Herron—provided lengthy and detailed expert reports explaining how Georgia's election system is poorly administered and how aspects of Georgia's election system disproportionately disenfranchise voters of color. In response, Defendants offered testimony from Professor Thomas Brunell that purports to qualify as expert testimony. His opinions fall far short of the necessary standard. Professor Brunell's opinions should be excluded because they (1) have little connection to his subject matter expertise; (2) attempt to usurp the Court's

role; and (3) are methodologically unsound because they are laden with conclusory assertions unsupported by independent analysis.

First, Professor Brunell lacks the relevant experience or expertise to offer his opinions. Professor Brunell is an expert on redistricting analysis, which is neither the subject of any of his reports, nor an issue in the instant litigation. Plantiffs' expert Dr. Smith provided expert testimony based on his analysis of Georgia's voter files, informed by the dozens of times he has done the same analysis in the past with other states' files. Professor Brunell attempted to duplicate and respond to Dr. Smith's analysis but admitted that it was "the first time" he had performed such work. Brunell Dep. 77:21 (attached as Exhibit 1). Similarly, Dr. McDonald performed a survey of voters who were purged because they had not voted or had other contact with the Georgia elections system. Professor Brunell criticized this survey, but there is no evidence he has ever conducted a survey, ever offered expert testimony on survey construction before, ever written about survey construction, or taught survey methods other than in an introductory class. *See id*. at 19:15-20:8; ECF No. 211 at 16-32.

Second, rather than aid the factfinder, Professor Brunell seeks to take the factfinder's place. His opinions on the sufficiency and relevance of Plaintiffs' evidence invade the province of the Court. Professor Brunell concludes that "there

2

is no evidence" to support some of Plaintiffs' expert testimony and assesses whether Plaintiffs' evidence is "relevant to the case." ECF No. 211 at 2; Brunell Dep. 170:24-171:1. These are questions for the Court, not Professor Brunell.

Third, no independent analysis—or any analysis—informs Professor Brunell's opinions. Before offering his cursory rebuttals, Professor Brunell declined to analyze the underlying data of two of Plaintiffs' experts. In fact, Professor Brunell was unsure if that data had even been provided to him. Brunell Dep. 39:2-24. Professor Brunell agreed his approach was really just a matter of reading the McDonald Report, *id*. at 123:24-124:3, and, of Dr. Herron, he said, "I think I just responded to his analysis," *id*. at 39:19-24.

Despite responding to three lengthy and detailed reports covering election administration data, issues with Georgia's purging of voters from its rolls, and polling place closures and their impact, the combined length of Professor Brunell's three reports is approximately twenty pages. In Professor Brunell's case, brevity is not the result of succinct and trenchant analysis informed by relevant expertise, but instead merely underlines that his opinions are not supported by the type of rigorous analysis necessary to assist the Court.

For each of these reasons, the Court should decline to admit Professor Brunell's opinions.[1]

## THE EXPERT OPINIONS

Drs. Smith, McDonald, and Herron offered a number of opinions in a series of reports.[2] Professor Brunell responded to these expert opinions in three separate reports.[3] An understanding of the underlying opinions informs why Professor Brunell's testimony does not satisfy the demands of *Daubert* and the Federal Rules of Evidence.

<u>Dr. Smith</u>

Dr. Smith offered two opinions.

---

[1] Other courts have found Professor Brunell's opinions of limited value. *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1058 n.621 (S.D. Ohio) (noting that Professor Brunell's report and testimony "suffer[] from a scarcity of explanation"), *vacated on other grounds sub nom. Householder v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 101 (2019); *Common Cause v. Lewis*, No. 18-cvs-014001, 2019 WL 4569584, at *90 (N.C. Super. Ct. Sept. 3, 2019) (noting that Professor Brunell's rebuttal opinions "reflect a failure to understand the work of Plaintiffs' experts").

[2] ECF No. 168 ("Smith Report"); ECF No. 240 ("McDonald Report"); ECF No. 241 ("Herron Report"); ECF No. 259 ("Smith Rebuttal"); ECF No. 294 ("Herron Rebuttal").

[3] ECF No. 211 (responding to ECF No. 168); ECF No. 276 (responding to ECF Nos. 240, 241); ECF No. 292 (responding to ECF No. 259).

First, Dr. Smith analyzed three of the Secretary of State's files that contain information about voter behavior in the 2018 General Election. Those files are: (1) the voter history file, which describes how each individual voter interacted with the elections system in Georgia in 2018; (2) the voter file, which is a list of all registered voters in Georgia; and (3) the absentee ballot file, which is a record of each voter in Georgia who requested an absentee ballot and how those requests and absentee ballots were handled. ECF No. 168 ¶¶ 7-10. As part of his academic research, Dr. Smith routinely analyzes files of these kinds in states across the country. *Id.* ¶¶ 16, 51. Dr. Smith opined that Georgia's voter files are plagued by "serious irregularities and inconsistencies." *Id.* ¶ 16.

Dr. Smith's second opinion was that Georgia's Black voters' absentee ballots were rejected at a disproportionately higher rate than white voters' absentee ballots. ECF No. 168 ¶ 9. Dr. Smith did not offer an opinion as to *why* Black voters' absentee ballots were disproportionately rejected—a fact he freely admitted in his deposition. Smith Dep. 134:6-14 (excerpts are attached as Exhibit 2).

<u>Professor Brunell's Criticism of Dr. Smith</u>

Professor Brunell opines in response to Dr. Smith that: (a) Dr. Smith made an incorrect assumption about one of the fields in the data files he analyzed; (b) the conclusions Dr. Smith reached are not interesting to Professor Brunell such that

5

they "hardly seem worth writing home about (or writing an expert report)," ECF
No. 292 at 3; and (c) while Dr. Smith is right that Black voters' absentee ballots
are rejected at disproportionately higher rates than white voters, Dr. Smith does not
offer an explanation for why that is.

Dr. McDonald

Dr. McDonald's report addressed Georgia's process for removing voters
from the rolls of registered voters under the National Change of Address matching
process and through Georgia's "no contact" process. Dr. McDonald designed and
executed a survey of those voters who were removed from the rolls of registered
voters through Georgia's "no contact" process, which found that many of these
purged voters were still living at the same address as their voter registration. ECF
No. 240 at 17.

Professor Brunell's Response to Dr. McDonald

Professor Brunell did not conduct an independent analysis of the data on
which Dr. McDonald relied nor does he dispute the data Dr. McDonald analyzed or
the conclusions Dr. McDonald reached. Instead, Professor Brunell noted that on
one chart prepared by Dr. McDonald, white voters appeared to be purged in higher
numbers than voters of color for one category of purged voters. ECF. No. 276 at
1-2. Professor Brunell also suggested the survey that Dr. McDonald conducted had

a lower sample size than political scientists "usually see for political science surveys published [sic] peer-reviewed journal articles," ECF No. 276 at 2, though he acknowledged that Dr. McDonald correctly calculated the margin of error, Brunell Dep. 129:11-18.

Dr. Herron's Report

Dr. Herron analyzed the effect of polling place closures or changes on voter turnout and analyzed the likelihood that a Black voter would have his or her polling location changed from the 2014 to 2018 general elections. He included thirteen tables in his report showing the effect of polling location changes on voters broken down by race. He concluded that disproportionately more Black voters were affected by polling location changes and that voters who had their polling location changed were less likely to vote. ECF No. 241 ¶¶ 180-82.

Professor Brunell's Response to Dr. Herron

Professor Brunell performed no independent analysis of the data on which Dr. Herron relied. He merely offered three points in response: (1) his understanding was that polling place decisions are made by counties and not the state of Georgia, so he believed Dr. Herron's analysis was not relevant to a claim against the state of Georgia; (2) he was not convinced by Dr. Herron's charts that the disproportionate effect of polling place closures was significant; and (3)

7

overall, a larger number of white voters were affected by polling place changes, even if there was a disproportionate effect of polling place closures on Black voters when looking at the percentages of voters affected.

## LEGAL STANDARD

To be admissible as expert testimony under Federal Rule of Evidence 702, testimony must be proffered by a witness who is qualified by relevant knowledge, skill, experience, training or education; whose specialized knowledge will help the trier of fact; and whose testimony is based on sufficient facts or data and produced by reliable principles and methods, reliably applied by the witness to the case. Fed. R. Evid. 702. As expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it," the trial judge must police "speculative, unreliable expert testimony." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (citation omitted); *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328-29 (11th Cir. 2014) (citation omitted).

To guard against the admission of improper expert testimony, courts apply a three-part test. First, experts must be qualified to testify on the matters they intend to address; second, their conclusions must rest on reliable methodologies; and third, the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335

(11th Cir. 2010). The party offering the expert testimony bears the burden of showing the testimony meets all three requirements. *Hughes*, 766 F.3d at 1329. Professor Brunell's proffered expert opinions fail to meet these three standards.

## ARGUMENT

### I.    Professor Brunell lacks relevant qualifications and experience.

Defendants fail to make the required showing that Professor Brunell is "qualified by background, training, and expertise to testify competently regarding the matters he intends to address." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1027 (11th Cir. 2014). Professor Brunell's arguable expertise lies only in the field of redistricting, which is not the subject matter of either this litigation or his proffered testimony. Courts "exclude[] expert testimony that might implicate the expert's field or discipline if the expert has no specific experience or background with the topic in dispute and has not satisfied the court that he has obtained expertise in regard to the topic in preparation for litigation." *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). Professor Brunell is not qualified to offer opinions in election administration and recordkeeping, Georgia voter list maintenance, or the impact of polling place closures on voters.

Possessing expertise within a broad area of academic study such as political science is not sufficient to qualify an expert to testify regarding all topics in that discipline. Courts regularly exclude expert opinions where, as here, an expert lacks particular expertise regarding the topic of litigation. For example, in *Conroy v. Vilsack*, the United States Court of Appeals for the Tenth Circuit held that expert testimony was properly excluded where the expert's experience fell in the same general area (human resource management and organizational behavior) but did not extend to the issue in the litigation (the application of sex stereotyping to disparate treatment claims). 707 F.3d 1163, 1168 (10th Cir. 2013).

Similarly here, Professor Brunell's opinions regarding Dr. Smith's report should be excluded because Professor Brunell is not qualified to testify as an expert on election administration and recordkeeping. Professor Brunell could not name any publications he wrote involving analysis of voter registration files and admitted this type of work was not "central" to his research. Brunell Dep. 66:2. Similarly, Professor Brunell has not published any articles on election administration and voter database management.[4] *Id*. at 33:15-25. Nor has Professor

---

[4] Although Professor Brunell was named as one of four coauthors in a publication addressing election administration, the article did not reflect any independent analysis on the subject. Instead, the article borrowed data from another study, as Professor Brunell himself acknowledged. *Id*. at 21:16-25:21.

Brunell used voter registration files in his academic work. *Id*. at 65:23-66:3. In fact, the analysis of Georgia's voter history files Professor Brunell performed for this litigation—an attempt to explain supposed flaws in Dr. Smith's comparison of voter files to election data on the website of the Georgia Secretary of State's office—"may have been the first time" he conducted such an analysis. *Id*. at 77:21; *see also id*. at 77:22 ("I don't recall doing this before."); *id*. at 78:1-7. As the Northern District of Georgia has previously held, however, experience gained in preparation for testifying in litigation does not provide "expertise." *Trilink Saw Chain*, 583 F. Supp. at 1305-06.

Similarly, Professor Brunell opines that the survey Dr. McDonald conducted was neither sufficient nor reliable because the sample size was too small. ECF No. 276 at 2-3. Yet Professor Brunell has no expertise in survey design or implementation. He does not teach survey design, Brunell Dep. 19:15-20:8, and counsel is unaware of any evidence that Professor Brunell has ever conducted or designed a survey or offered an opinion on survey design in any court, ECF No. 211 at 16-32. In short, Professor Brunell offers opinions about the adequacy of Dr. McDonald's survey but lacks survey expertise.

Professor Brunell possesses no more expertise in list maintenance systems or the racial impact of polling place changes than he does in election administration

or survey construction. Professor Brunell has never published an article on voter list maintenance. Brunell Dep. 35:10-15. Professor Brunell likewise has never been qualified by a federal court to testify regarding these subjects. *Id*. at 28:9-21. During his deposition, Professor Brunell was unable to recall ever writing about the racial impact of polling place closures. *Id*. at 36:25-37:8.

## II.    Professor Brunell improperly weighs the evidence like a factfinder, not an expert.

Weighing the evidence in a case and applying the governing law is the role of the trier of fact—in this case, the Court. Professor Brunell repeatedly offers opinions on the sufficiency and relevance of Plaintiffs' evidence, invading the province of the Court. Those opinions should be excluded.

Professor Brunell offers numerous opinions that are nothing more than inadmissible legal conclusions purporting to be expert opinions. *Encompass Indem. Co. v. Ascend Techs., Inc.*, No. 1:13-cv-02668-SCJ, 2015 WL 10582168, *14 (N.D. Ga. Sept. 29, 2015) (Jones, J.) (excluding expert opinion because expert "may not testify on the sufficiency of the evidence"); *Gaylor v. Ga. Dep't of Nat. Res.*, No. 2:11-cv-288-RWS, 2014 WL 4545810, at *7 (N.D. Ga. Sept. 12, 2014) (concluding that expert may not "testify as to whether the legal standard has been satisfied" (citation omitted)); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) ("[The expert] does not analyze the facts; she . . .

12

regurgitates them and reaches conclusory opinions that are purportedly based on these facts. These facts should be presented to the jury directly; [the expert] assumes the role of Plaintiffs' advocate in her presentation of the facts and invades the province of the jury.").

For example, although Professor Brunell does not dispute Dr. Smith's opinion that Black voters' absentee ballots are rejected at a higher rate than other voters, *see* ECF No. 168 ¶¶ 9, 44-49, he notes that "there is no evidence that any of the rejected absentee ballots, regardless of race or ethnicity, were rejected wrongly," ECF No. 211 at 2. Examination of the motivation for rejection of absentee ballots is simply not a part of Dr. Smith's opinion, and Dr. Smith said as much when deposed. Smith Dep. 134:6-14. Professor Brunell is not offering expert opinion; he is attempting to make a legal argument about the limits of Dr. Smith's opinion. Similarly, Professor Brunell remarks that Dr. Smith "provides no evidence" that election clerks were aware of a voter's race or ethnicity, which is true enough—Dr. Smith does not opine on that topic. ECF No. 211 at 2. But, again, such a statement is not an expert opinion; it is an explanation of what Dr. Smith says and does not say. Professor Brunell is not offering expert analysis; he is just reading. Conclusions about the sufficiency and relevance of the evidence are beyond the province of expert opinion and should be excluded.

13

Professor Brunell also challenges the admissibility of Dr. Smith's conclusions. ECF No. 168 ¶ 16. Professor Brunell dismisses Dr. Smith's opinion (which was based on Dr. Smith's extensive experience with voter files from different states) as merely saying, "Trust me, I have a lot of experience." ECF No. 211 at 6. There are two problems with his position. First, in questioning Dr. Smith's experience, Professor Brunell improperly usurps the Court's role as the gatekeeper of expert testimony. *See Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) (excluding rebuttal expert testimony "that reads less like an expert's opinion and more like a lawyer's *Daubert* motion to exclude [the other expert's] testimony"). Second, if weighing in on the legal question of the permissibility of Dr. Smith's opinion were Professor Brunell's job, he has done it incorrectly. That is, the law is clear that experts may offer opinions on the basis of their experience. *See, e.g.*, *Noe v. Metro. Gen. Ins. Co.*, No. 1:11-cv-02026-SCJ, 2012 WL 7760143, at *3 (N.D. Ga. Dec. 10, 2012) (Jones, J.) (rejecting argument that expert's methodology was flawed for not "specifically highlight[ing] which outside sources validate his opinion" and admitting expert's testimony as reliable based on the expert's experience); *see also Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 248 F.R.D. 298, 303 (N.D. Ga. 2008) ("The Court's reliability inquiry may, for example, focus upon personal knowledge or experience." (citing

14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))), *aff'd*, 555 F.3d 1331

(11th Cir. 2009). Dr. Smith specifically details that he "routinely conduct[s] this

very type of data processing across the states" for his academic research; that he

has published "more than a dozen peer-reviewed articles over the past decade that

utilize publicly available voter files"; and that he has "processed hundreds of

millions of voter registration records across several states." ECF No. 168 ¶ 16.

Professor Brunell testified that he had no reason to doubt Dr. Smith's experience.

Brunell Dep. 65:7-18.[5]

Professor Brunell also offers an opinion regarding the sufficiency of the

evidence presented in Dr. Herron's report about the disproportionate impact of

polling place closures on Black voters. Professor Brunell merely asserts, based on

his interpretation of a single table in Dr. Herron's report, that the evidence "is not

sufficient, in my opinion, to support a conclusion that counties are engaged in

systematic, racially discriminatory fashion [sic] in terms of decisions they make

---

[5] Nor was Dr. Smith required to disclose the underlying data used in his prior experience researching election administration in other states. Under Federal Rule of Evidence 705, an expert may state an opinion without first testifying to the underlying facts or data. Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data.").

with respect to where polling places ought to be." ECF No. 276 at 6. But Professor

Herron's opinion analyzed the racial *impact* of polling place changes; he offered

no opinion regarding whether counties were engaged in any "systematic, racially

discriminatory" action. *Id.* Professor Brunell's sweeping legal conclusion was

based solely on a single table in Dr. Herron's report. Brunell Dep. 193:23-24.[6]

Because Professor Brunell offers legal conclusions that improperly attempt

to weigh the evidence and determine the qualifications of Plaintiffs' experts, his

opinions should be excluded.

## III.    Professor Brunell's unhelpful assertions are not based on independent analysis.

Where an identifiable methodology is lacking, expert opinion can and should

be excluded. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014)

(holding district court did not err by excluding opinion where expert's leap from

data to opinion was too great). There are therefore two independent reasons for

excluding Professor Brunell's opinions. First, he conducts no independent analysis

of Dr. McDonald's or Dr. Herron's data; he merely offers a reading of the impact

of that data—a task that should be performed by the factfinder. Second, his

---

[6] Professor Brunell also impermissibly opined on the relevance of Dr. Herron's testimony, noting that Dr. Herron's analysis of polling place closures "would be relevant to the case" only if closures are dictated at the state level. Brunell Dep. 170:24-171:1.

opinions improperly rely on factual assertions from unidentified sources. His opinions are a thinly veiled effort to launder unattributed and inadmissible hearsay so that those statements can come before the Court without being examined.

### A. Professor Brunell conducts no independent analysis.

Testimony that merely relays observations rather than performing true expert analysis should be excluded. *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-cv-24277, 2016 WL 7507848, at *8 (S.D. Fla. Aug. 1, 2016) (citing *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. at 1347)).

Professor Brunell failed to review or analyze Dr. McDonald's underlying data. Professor Brunell testified, "I don't remember whether I got the actual survey data from [Dr. McDonald] or not." Brunell Dep. 39:9-10. When asked if he analyzed Dr. McDonald's data, Professor Brunell testified, "I don't think that I did." *Id*. at 122:5. As for the basis of his rebuttal opinion to Dr. McDonald, Professor Brunell said, "I think I just went off what he reported in this report." *Id*. at 122:5-6. Instead of conducting any form of statistical analysis, Professor Brunell's methodology was "really just a matter of reading Table 1 on Page 10" in Dr. McDonald's report and providing observations that any lay reader could make. *Id*. at 123:24-124:3.

The same is true of Professor Brunell's opinions responding to Dr. Herron's work. Professor Brunell testified he was unsure if he even received Dr. Herron's data. *Id.* at 39:22. He explained his approach as simply responding to Dr. Herron's report, without reviewing the underlying data. Brunell Dep. 39:22-24. A read-it-and-respond methodology does not rise to the "level of intellectual rigor" that characterizes expert political science testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005).

Instead of independent analysis, many of Professor Brunell's opinions consist of offhand assertions or guesswork, without any underlying factual or analytical basis. Expert testimony is inadmissible "when the only connection between the conclusion and the existing data is the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004). For example:

- In an attempt to portray Dr. Smith's underlying data as unreliable, Professor Brunell speculates, "[I]t is *likely* that [the Georgia voter list file] gets updated very close to the actual election date as registrars process registration forms that were submitted prior to the deadline." ECF No. 211 at 5 (emphasis added). In his deposition, Professor Brunell testified that Defendants told him another version "might have [sic] more updated—there might have been voters added to these files." Brunell Dep. 71:10-18.

- In an attempt to undermine Dr. Smith's data, Professor Brunell points to 9.82% of Georgia voters whose race is "Unknown" and speculates that this data is skewed towards white voters: "*Perhaps* white voters are less

18

likely to answer the race question than other groups." ECF No. 211 at 8 (emphasis added). Professor Brunell testified that he was not aware of any data or studies that support his statement, however. Brunell Dep. 101:16-19.

If these statements are informed by any analysis, methods, or experience, Professor Brunell did not reveal them in his reports or during his deposition. *See McClain*, 401 F.3d at 1237 ("The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it."); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

B. Professor Brunell relies on unattributed hearsay.

Many of Professor Brunell's opinions amount to little more than repetitions of out-of-court statements made to him by Defendants or Defendants' counsel. But "[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009); *accord Jones Creek Inv'rs, LLC v. Columbia Cty.*, No. CV 111-174, 2013 WL 12141348, at *16 (S.D. Ga. Dec. 23, 2013) (excluding expert testimony because it was based on hearsay

without any independent investigation or analysis by the expert).[7] Professor

Brunell opined that "it is important to note that decisions regarding whether to

move, open, or close a polling place is [sic] made at the county level. The state of

Georgia is not responsible for these decisions." ECF No. 276 at 4-5. Professor

Brunell explained that this legal opinion was based on "discussions with counsel

and with the Secretary of State's office," Brunell Dep. 166:9-10, and "read[ing]

some [newspaper] articles at some point," *id*. at 166:13-22.

Professor Brunell's opinions regarding the Secretary of State's data codes

were also based solely on conversations with the Secretary of State's office. *Id*. at

45:2-7 ("[T]hat's where I got the understanding about the specifics that Professor

Smith made in his first report about his assumption that, you know, electronic

meant that's the way the voters vote. And I was told by the Secretary of State's

office, no, that's—that's not what that means."); *see also id*. at 99:17-100:7

(testifying that local offices enter the codes because such was what representatives

---

[7] Of course, "an expert may rely on hearsay evidence as part of the foundation for his opinion so long as the hearsay evidence is the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *Knight v. Miami-Dade Cty*., 856 F.3d 795, 809 (11th Cir. 2017) (citations omitted).

from the Secretary of State's office had told him). Defendants' attempt to launder hearsay through Professor Brunell is improper.

Accordingly, the Court should exclude the opinions offered by Professor Brunell.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motion to exclude Professor Brunell's rebuttal reports (ECF Nos. 211, 276, and 292) and testimony and for such further relief as this Court may deem just and proper.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSOR THOMAS BRUNELL** has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

This 29th day of June, 2019.    Respectfully submitted,

/s/ Allegra J. Lawrence
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998

22

Fax: (240) 786-4501
Thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson St, Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac* vice)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW

23

Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillion.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali Bracey (Admitted *pro hac vice*)
Ishan Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

24

Jeremy M. Creelan (Admitted *pro hac vice*)
New York Bar No. 2831535
Elizabeth Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice)*
Paul M. Smith (Admitted *pro hac vice)*
**CAMPAIGN LEGAL CENTER**
1101 14 St. NW Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in
Action, Inc.; Ebenezer Baptist Church of Atlanta,
Georgia, Inc.; Baconton Missionary Baptist
Church, Inc.; Virginia-Highland Church, Inc.; and
The Sixth Episcopal District, Inc.*