# EXHIBIT 1

**In the Matter Of:**

FAIR FIGHT ACTION vs RAFFENSPERGER

1:18-cv-05391-SCJ

# THOMAS BRUNELL, PH.D.

*May 21, 2020*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   FAIR FIGHT ACTION, INC; CARE
     IN ACTION, INC; EBENEZER
 4   BAPTIST CHURCH OF ATLANTA,
     GEORGIA, INC.; BACONTON
 5   MISSIONARY BAPTIST CHURCH,
     INC; VIRGINIA-HIGHLAND CHURCH,
 6   INC.; and THE SIXTH EPISCOPAL
     DISTRICT, INC.,
 7
          Plaintiffs,              Civ. Act. No.
 8                                 1:18-cv-05391-SCJ
               V.
 9
     BRAD RAFFENSPERGER, in his
10   official capacity as Secretary
     of State of the State of Georgia
11   and as Chair of the State
     Election Board of Georgia;
12   REBECCA N. SULLIVAN, DAVID J.
     WORLEY, and SETH HARP, in their
13   official capacities as members
     of the STATE ELECTION BOARD; and
14   STATE ELECTION BOARD,

15        Defendants.

16

17   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
18                 REPORTER'S CERTIFICATION
                     ORAL DEPOSITION OF
19                  THOMAS BRUNELL, Ph.D.
                       MAY 21, 2020
20                   (Reported Remotely)
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
21

22

23

24        ORAL DEPOSITION OF THOMAS BRUNELL, Ph.D.,

25   produced as a witness at the instance of the Plaintiffs,
```



1  and duly sworn, was taken in the above-styled and

2  -numbered cause on the 21st of May, 2020, from 9:07

3  a.m., before Brandy Cooper, CSR in and for the State of

4  Texas, reported by machine shorthand, at the residence

5  of witness, located in Richardson, Texas, pursuant to

6  the First Emergency Order Regarding the COVID-19 State

7  of Disaster, and the provisions stated on the record or

8  attached hereto.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        MATTHEW G. KAISER (Via Video Conference)
          NORMAN G. ANDERSON (Via Video Conference)
 4        Kaiser Dillon, PLLC
          1099 Fourteenth Street, NV
 5        Eighth Floor West
          Washington, DC  20005
 6        (202) 640-2850
          mkaiser@kaiserdillon.com
 7
          LESLIE BRYAN (Via Video Conference)
 8        Lawrence & Bundy, LLC
          1180 West Peachtree Street, Suite 1650
 9        Atlanta, Georgia  30309
          (404) 400-3350
10        leslie.bryan@lawrencebundy.com

11
     FOR THE DEFENDANTS:
12
          BRYAN P. TYSON (Via Video Conference)
13        Taylor, English, Duma, LLP
          1600 Parkwood Circle, Suite 200
14        Atlanta, Georgia  30339
          (678) 336-7249
15        btyson@taylorenglish.com

16   ALSO PRESENT:

17        PATRICK MURPHY - Videographer

18

19

20

21

22

23

24

25
```



THOMAS BRUNELL, PH.D.                          May 21, 2020
FAIR FIGHT ACTION vs RAFFENSPERGER                        4

1                    I N D E X

2   Appearances   . . . . . . . . . . . . . . . Page    3

3   Exhibit Index   . . . . . . . . . . . . . . Page    5

4   Stipulations    . . . . . . . . . . . . . . Page    7

5   Examination by Mr. Kaiser   . . . . . . . . Page    8

6   Examination by Mr. Tyson   . . . . . . . . . Page  206

7   Further Examination by Mr. Kaiser   . . . . . Page  208

8   Signature and Corrections   . . . . . . . . Page  212

9   Reporter's Certificate    . . . . . . . . . Page  213

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              E X H I B I T   L I S T

 2                                                      Page
       No.   Description
 3

 4     1    Notice of Deposition for Dr. Brunell          11

 5     2    Expert Report of Dr. Brunell filed 2-3-20     16

 6     3    First Supplemental Expert Report of

 7          Dr. Brunell filed 3-24-20                     41

 8     4    Second Supplemental Expert Report of

 9          Dr. Brunell filed 4-3-20                      59

10     5    Expert Report of Daniel Smith filed 12-16-19  60

11     6    Expert Report of Michael McDonald filed

12          2-18-20                                       110

13     7    Supplemental Expert Report of Michael

14          McDonald filed 4-8-20                         110

15     8    Expert Report of Michael Herron filed

16          2-18-20                                       163

17     9    Supplemental Expert Report of Michael Herron

18          filed 4-9-20                                  164

19

20

21

22

23

24

25
```



```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the

 3    record and recording.  Today is Thursday, May 21st,

 4    2020, and the time is 9:07 a.m. Central Time.  This

 5    begins the videoconference deposition of Dr. Thomas

 6    Brunell taken in the matter of Fair Fight Action, Inc.,

 7    et al. versus Brad Raffensperger, et al., Case No.

 8    1-18-CV05391SCJ, pending in U.S. District Court for the

 9    Northern District of Georgia, Atlanta Division.

10              My name is Patrick Murphy.  I am your

11    remote videographer today.  Our court reporter today is

12    Brandy Cooper, and we both represent Esquire Deposition

13    Solutions.

14              And as a reminder, if you mute your audio

15    after make your introduction if you won't be speaking

16    for any duration.

17              Will those all present please introduce

18    themselves for the record and whom you represent, and

19    the court reporter will then swear in the witness.

20              MR. KAISER:  Sure.  This is Matt Kaiser

21    for the plaintiffs.

22              MR. ANDERSON:  Norm Anderson, Kaiser

23    Dillon, on behalf of the plaintiffs.

24              MS. BRYAN:  Leslie Bryan, Lawrence &

25    Bundy, on behalf of the plaintiffs.
```



1          MR. TYSON:  Bryan Tyson of Taylor,

2   English, on behalf of the defendants.

3          THE VIDEOGRAPHER:  The court reporter will

4   now swear in the witness.

5          THE REPORTER:  Sorry.

6          This is the oral deposition of Dr. Thomas

7   Brunell, and it is being conducted remotely in

8   accordance with the First Emergency Order Regarding the

9   COVID-19 State of Disaster, Paragraphs 2.b and c.  The

10  witness is located at his residence located in

11  Richardson, Texas, 75080.

12         My name is Brandy Cooper, CSR No. 7211.  I

13  am administering the oath remotely and reporting the

14  deposition remotely by stenographic means from my

15  residence in the State of Texas.  My business address is

16  1700 Pacific Avenue, Suite 1000, Dallas, Texas.  The

17  witness has been identified to me through attestation of

18  counsel.

19         Would counsel please state their

20  appearances and locations for the record along with any

21  stipulations and agreements.

22         MR. KAISER:  Bryan, I take it -- I realize

23  the law in this is relatively clear, but everybody

24  agrees under oath same as if we were all in the same

25  room?



1            MR. TYSON:  Yeah, that's correct, we -- we

2  agree.

3            MR. KAISER:  Yeah.  And all stipulations

4  we've had in place for the rest of this case.

5            MR. TYSON:  Certainly.  Happy to do that

6  as well.

7                  THOMAS BRUNELL, Ph.D.,

8  having been first duly sworn, testified as follows:

9                     EXAMINATION

10 BY MR. KAISER:

11     Q.  Good morning, Dr. Brunell.

12     A.  Good morning, Mr. Kaiser.  How are you?

13     Q.  Good.  How are you?

14     A.  Same.  Same.

15     Q.  Good.

16          Dr. Brunell or Professor Brunell?

17     A.  Professor is fine.  Tom's fine.  But Professor

18 or Doctor, I think.

19     Q.  Okay.  I'll -- I'll try to do that.  If I -- if

20 I mess up, it's not intended as a slight.

21     A.  I won't be offended.

22     Q.  You've had your deposition taken before, right?

23     A.  I have.

24     Q.  Yeah.  How many times?

25     A.  Twelve, fifteen, maybe somewhere in there.



1    Q.   Sure.  So you -- you probably know the ground

2    rules.  Let me go over these briefly anyway.  First of

3    all, if I ask you a question, I'm going to assume that

4    you understand the question if you answer.  So if you

5    don't understand a question, please let me know.

6    A.   Yes.

7    Q.   Second, and I think we both did this

8    incorrectly in that last exchange, if I ask you a

9    question, you've got to verbalize the answer with a

10   "yes" or "no."

11   A.   Of course.

12   Q.   Okay.  Nodding your head, even though you and I

13   can both see each other, doesn't do anything to the

14   record.

15         Similarly, we both need to work on not

16   talking over each other.  So I will -- when I'm asking

17   you a question, I will wait until you're done answering

18   before I start talking.  I would ask, when I'm asking a

19   question, that you also wait until I'm done before you

20   start answering.  Is that okay?

21   A.   That sounds reasonable.

22   Q.   Okay.  Great.

23         And you know, I realize it's what, it's

24   9:00 a.m. in Texas?

25   A.   Correct.



1   Q.   I assume you haven't had any drugs or alcohol

2   this morning that would impair your ability to testify?

3   A.   Just a little coffee.

4   Q.   Great.

5        And are you taking any medication that

6   affects your ability to testify, cognitive ability in

7   any way?

8   A.   I am not.

9   Q.   Great.  Okay.

10       So because we're doing this remotely, just

11  to make sure the record's clear, is there anybody there

12  with you?

13  A.   At the moment, no, just my dog, although my son

14  will be coming in at some point, probably after lunch.

15  But at the moment, it's just me and the dog.

16  Q.   Okay.  And I would ask, when your son comes in,

17  if you can sort of let us know that.

18  A.   You'll know because the dogs are going to bark,

19  but yeah, I will -- if for some reason he doesn't bark,

20  I will let you know.

21  Q.   Great.

22       And similarly, in order to try to make

23  this as close to as if we're in the same room as

24  possible, I realize sometimes on Zoom calls or remote

25  calls, sometimes people look at other -- they shift away



 1  from the screen that's live, the Zoom screen.  If you do

 2  that, can you let us know?

 3      A.   Sure.  So --

 4      Q.   Does that make sense?

 5      A.   Yeah, it does.  And I do have my -- my -- right

 6  here is my -- I'm on my laptop and my desktop is right

 7  here, and that's where I'm going to read anything that

 8  you want me to read.  So I will be looking this way

 9  whenever I'm reading anything.  So I don't think you

10  want me to tell you every time I do that.  But if you do

11  want me to tell you every time, I will.

12      Q.   I think that -- I think that makes sense.

13           Let's do it this way:  If you're looking

14  at something other than the video call or the documents

15  we're talking about, let us know; is that fair?

16      A.   Yes.

17      Q.   Okay.  Great.

18           So let me turn to, I guess, Document J

19  that was just e-mailed to you.  And let's mark that as

20  Exhibit 1.

21           (Exhibit No. 1 was marked.)

22           MR. KAISER:  Court reporter, is that okay?

23  You've got that?

24           THE REPORTER:  Yes, that will be something

25  that will have to be done after the depo with me.  Thank

1  you.

2              MR. KAISER:  Let me make a note.

3      Q.  (BY MR. KAISER)  You've got that in front of

4  you?

5      A.  I do.

6      Q.  Great.

7              And do you recognize this document?

8      A.  I do.

9      Q.  Okay.  You'll notice on the second page it says

10 "Notice to Produce"?

11     A.  Yes.

12     Q.  And I understand that you're -- that -- that

13 Bryan just sent us a couple of documents.

14              Do you know what he sent us?

15     A.  Yes, I do.

16     Q.  What did he send?

17     A.  He sent the three invoices that I've submitted

18 to him for my work in this case.

19     Q.  And I take it that responds to No. 1?

20     A.  Correct.

21     Q.  Okay.  Do you know if he sent us any documents

22 that respond to Numbers 2 or 3 on that list?

23     A.  He did not.

24     Q.  Do you know if there are any documents that

25 respond to Numbers 2 or 3?



1    A.   There is not -- not to my knowledge, there are

2  not.

3    Q.   Okay.  Okay.  Great.

4             So let me ask you this:  How did you

5  prepare for the deposition this morning?

6    A.   I looked over the reports that were produced

7  that you sent me, the -- you know, my responses and then

8  the various reports by Professor Smith and Herron and

9  McDonald, and Bryan and I had a conversation yesterday

10  on the phone talking about what would happen today.

11    Q.   Did you look at anything else other than those

12  reports?

13    A.   This morning I was looking at like the news

14  for -- about precinct closures and stuff like that

15  related to COVID.  So that's kind of one thing I was

16  doing this morning that isn't related to the documents,

17  but I think that's it.

18    Q.   Sure.  Sure.

19             But did you do that in preparation for

20  this deposition, or just because everybody's so worried

21  about COVID?

22    A.   Maybe both, I suppose.  I mean I think we might

23  talk about precinct closures today a little bit.  It's a

24  topic that, you know, the news might be relevant to our

25  conversation today, maybe, perhaps.  And maybe it may

THOMAS BRUNELL, PH.D.                                        May 21, 2020
FAIR FIGHT ACTION vs RAFFENSPERGER                                    14

1   not be.

2        Q.   Okay.  Fair enough.

3             So let's make sure we've got a -- we're on

4   the same page about the documents you looked at.  There

5   were reports, just to go through this quickly.  You

6   looked at the original Dan Smith report from

7   December 16th of last year; is that right?

8        A.   Yes.

9        Q.   Okay.  Then -- then you had an expert report

10  from February 3rd responding to Dan Smith's report?

11       A.   Yes.

12       Q.   And then there was an expert from Professor

13  McDonald on February 18th?

14       A.   Yes.

15       Q.   An expert report from Professor Aaron on

16  February 18th?

17       A.   Correct.

18       Q.   Okay.  Then Dan Smith had a supplemental report

19  on March 4th?

20       A.   Yes.

21       Q.   Great.

22             Then you responded to that supplemental

23  report on April 3rd?

24       A.   Correct.

25       Q.   Then we've got a supplemental report on



1  April 8th from McDonald, correct?

2       A.   Right.

3       Q.   And an April 9th supplemental report from

4  Professor Herron?

5       A.   Right.

6       Q.   And I believe the one I've missed is your

7  response to Professors Herron and McDonald on

8  March 20th; is that --

9       A.   Yes, that's correct.

10      Q.   That's the universe of documents you've looked

11 at to prepare besides the news reports on COVID and

12 recent closures?

13      A.   Yes, I believe so.

14      Q.   Great.

15           You said you reviewed them.  What's that

16 mean?

17      A.   I mean I read them, I reminded myself -- you

18 know, it's been a while.  Some of these it's been

19 several months so I had to remind myself what -- what

20 was going on, what was -- what were -- what were the

21 reports about, what were my objections to what various

22 of my colleagues did.  So, but that's really all, just

23 sort of rereading those and reminding myself what's

24 going on.

25      Q.   Okay.  And you and Mr. Tyson talked yesterday?



1      A.    We did.

2      Q.    For about how long did you talk?

3      A.    I think it was about 90 minutes.

4      Q.    Okay.  Great.

5            Let me turn now to what we'll mark as

6   Exhibit 2, and this is going to be your first report

7   from February 3rd, 2020.

8            (Exhibit No. 2 was marked.)

9      Q.    (BY MR. KAISER)  Do you have that?

10     A.    Yes, I do.

11     Q.    So this document is your -- the first report

12  that was filed from you in this case, right?

13     A.    It is.

14     Q.    And it's got your CV on it; is that right?

15     A.    It does.

16     Q.    So can you turn with me to, I guess, Page 16 --

17  if you look at the numbering on the -- you see the

18  numbering at the top of the document?

19     A.    Yes.

20     Q.    Where it's in blue for me.  Is it in blue for

21  you?

22     A.    No, it's not.

23     Q.    Okay.  Well, there's numbering at the very top

24  of the document.  There's the case number, then document

25  number.  We're talking about the same thing?



1      A.   Oh.   I thought you were talking about -- I'm

2   looking for the page number.   I'm on Page 16.

3      Q.   Yeah.   No, can you see my screen, what I'm

4   holding up?

5      A.   Yeah, now I know what you're talking about, the

6   blue header at the top of the page.

7      Q.   Exactly.   Exactly.

8      A.   Yes.

9      Q.   Excellent.   Thanks.

10           Okay.   So Page 16 in the blue header

11   numbers.

12      A.   Yes, I'm on it.

13      Q.   Okay.   What's that document?

14      A.   This is my -- this is my CV.

15      Q.   Excellent.

16           Is your CV up-to-date?   Sorry.

17           Is this version of your CV the current

18   one?  Let me ask you that.

19      A.   I believe it is.   I believe it is, yes.

20      Q.   Okay.   And what's your -- I know different

21   people have different practices with updating their CVs

22   to make sure it's up-to-date.   What do you -- what do

23   you normally do to make sure your CV is up-to-date?

24      A.   Well, I keep a running list of things that

25   should go on my CV -- well, I keep a running list at



1  work of things that I'm going to put in my annual

2  report.  And then at the end of the year when my annual

3  report is due, I also usually update my CV at that

4  point.

5      Q.   Okay.  So just to sort of be efficient, can you

6  give me a brief overview of your educational background?

7      A.   Sure.  I went to the University of California

8  Irvine where I got a bachelor's degree, master's degree,

9  and a Ph.D., all in political science.

10      Q.   What was your Ph.D. thesis?

11      A.   It was on elections to the United States

12  Senate.

13      Q.   What part of those elections?

14      A.   Well, the title was "Short-term versus

15  long-term forces" and so I was looking at things like

16  the impact of realignment.  You know, we have this

17  concept of a realignment where the -- the majority of

18  voters in the country identify with one party and then

19  identify with another party.  So I was looking at the

20  impact of realignments which go all the way back to --

21  to the 1800s on elections to the senate.

22           I had a chapter in there about partisan

23  bias in the senate, various sources of partisan bias in

24  the senate.  I can't remember what all the chapters

25  were.  It's been a long -- very long time now.  But



1  that's basically it.

2      Q.   Yeah, that -- that -- great.  Thank you.

3           Can you give me kind of the same sort of

4  thumbnail background of your employment history?

5      A.   Sure.  After I finished my Ph.D., I got a

6  congressional fellowship from the American Political

7  Science Association so I spent a year working on Capitol

8  Hill.  And then after that, I got my first academic job

9  at SUNY Binghamton in New York, where I think I was

10 there about four years.  And then I switched to -- I

11 took a job at Northern Arizona University in Flagstaff,

12 Arizona, where I think I was there for two years.  And

13 then for the past 15 years, I've been at the University

14 of Texas at Dallas.

15     Q.   Over the last few years, let's say four years,

16 what classes have you taught?

17     A.   I teach classes from -- you know, all the way

18 from the freshman class on introduction to the United

19 States government, and other undergraduate classes I

20 teach include campaigns and elections.  I don't think

21 I've taught political parties and interest groups

22 recently, but -- not in the last four year, but I've

23 taught that in the past.

24           U.S. Congress, I have a -- a -- my

25 boutique class is on race and redistricting at the



1  undergraduate level.  Every year I teach a required

2  course for all political sciences majors called

3  "American Political Institutions."

4            And then at the graduate level, I teach

5  classes on the U.S. Congress.  I teach a class on

6  election law.  I teach a class on -- a seminar on --

7  kind of an introductory seminar on American politics.

8  And I think that's about it.

9       Q.   Okay.  And I guess this is obvious, but I don't

10 know that it was said.  You're a professor in the

11 political science department; is that fair?

12      A.   Yes.

13      Q.   And aside from teaching and research, do you

14 have any other responsibilities at the -- at the

15 university?

16      A.   I do.

17      Q.   What are they?

18      A.   At the moment, I'm the program head, which is

19 the same thing as a department chair, for both the

20 political science program and the public policy

21 political economy program.

22      Q.   Anything else?

23      A.   No, that's really it.  That's a lot, but that's

24 more -- more than I want to do, so...

25      Q.   Condolences.



1    A.    Yeah.

2    Q.    Let's talk a little bit about your -- your

3  academic research.  So from -- from looking at your CV,

4  it looks like you have written about redistricting a

5  decent amount; is that fair?

6    A.    That's correct.

7    Q.    Okay.  And you've written some papers on issues

8  in the government of the United Kingdom or politics in

9  the United Kingdom?

10    A.    Yes.

11    Q.    And I thought I saw something about EU

12  government issues?

13    A.    Yeah, in the European Court of Justice, in

14  particular.

15    Q.    Right.  Thank you.

16            Have you written any -- any articles on

17  election administration?

18    A.    I believe -- yes, I believe I have.  The 2015

19  piece with Shaun Bowler, Todd Donovan and Paul Gronke on

20  election administration and the perception of fair

21  elections.

22    Q.    Great.

23            That was the one in Electoral Studies?

24    A.    That's right.

25    Q.    It's listed on Page 2 of your CV?



1      A.    It is.

2      Q.    Great.  So let's -- we'll come back to that one

3  in a second.

4            Have you written any other articles on

5  election administration?

6      A.    Let me look.

7      Q.    Sure.

8      A.    That might be the only one that deals directly

9  with election administration.  I mean I'm interested in

10  elections in general, but most of my work is about

11  voters and the outcomes of elections and that sort of

12  stuff.  So in terms of published research, you know,

13  there's things that are related to election

14  administration, but I think that one is the one that's

15  most clearly directly about the administration of

16  elections.

17      Q.    And from the conference presentation section of

18  your CV, it looks like you guys -- it looks like you and

19  the other authors also did some conference presentations

20  that were the same as that paper or the same topic as

21  that paper?

22      A.    Probably, yes.

23      Q.    Okay.  Who was the lead author on that?

24      A.    Shaun Bowler is.

25      Q.    Okay.  And just so I'm clear, there are a



 1  number of coauthors, right?

 2      A.    There are.

 3      Q.    How -- how does one interpret the work -- what

 4  work each coauthor did in -- in an academic piece?

 5      A.    It's very difficult to do.  We just listed our

 6  names alphabetically in that particular article.

 7      Q.    Okay.  So how well do you remember that

 8  article?

 9      A.    I remember -- I remember a little bit.  But if

10  you're going to ask me specific questions, I'm going to

11  have to -- I'm going to have to look at it again.

12      Q.    That is completely fair.  Let me ask you this

13  question, sorry -- and I'm happy to show it to you if

14  you need the article to answer it.  I don't -- it's not

15  a memory contest.  I want to make sure we get this

16  right.

17      A.    Okay.

18      Q.    So it -- really do let me know if you need to

19  see the article.  In the article -- well, let me do it

20  this way.

21            What's the main sort of thrust of the

22  article, as you remember it?

23      A.    You're going to have to show me the article.

24            MR. KAISER:  Norm, do you mind e-mailing

25  the article to Bryan so Bryan could e-mail the article



 1  to Professor Brunell?  Bryan, is that all right?

 2              MR. TYSON:  Yes, that's totally fine.  In

 3  fact, let me send Dr. Brunell's e-mail address to you,

 4  Norm.  We can do it all at once, if that works.

 5              MR. KAISER:  That's probably more

 6  efficient.

 7              MR. ANDERSON:  That's fine.

 8              MR. TYSON:  Okay.  I just sent an e-mail

 9  to both of you.  So that should come to you, Norm, you

10  can just reply on that and it will send to all.

11      Q.   (BY MR. KAISER)  Do you have your article,

12  Professor?

13      A.   Not yet.  It hasn't come through yet.

14              MR. ANDERSON:  I just sent it so you

15  should receive that in a moment.

16      A.   Here it is.

17      Q.   (BY MR. KAISER)  Okay.  Let me ask you just to

18  sort of focus your attention a little bit.  What -- what

19  I understand this article to be is a study about really

20  sort of the perceptions people have of fair elections in

21  states that run better or worse elections.  So it looks

22  to me, although again, like, look at the article to

23  see -- for my purposes, this is what I care about.

24              It looks to me like what you did is you

25  looked at the election performance index as a measure of



1  whether a state is running an election well.  And then

2  you looked at perceptions within each state about

3  whether their election process is fair or not.

4              So what I'm hoping you can do is look and

5  let me know at a relatively gross level if that

6  describes the point of this article.

7      A.   All right.  Let me look at it really quickly,

8  just to remind myself.

9              You're -- I think that your

10 characterization is reasonably good.

11     Q.   Thanks.

12             So as I look at this, it looks like when

13 you did the first part of that, trying to figure out if

14 the state runs an election well, you -- you took the

15 sort of data and conclusions from the election

16 performance index, which I -- I guess is run by the Pew

17 Center for the states, as -- as the beginning and end of

18 that analysis.  You did not do an independent analysis

19 of state performance beyond that in the conducting of

20 elections?  But tell me if that's wrong.

21     A.   I believe that that is correct.

22     Q.   Okay.  And -- and where I'm looking at for

23 that, if you look -- you know, in -- in my copy, it's --

24 which I believe is the copy you've got, so it's Page 3.

25     A.   (Moves head up and down.)



1    Q.    You've got "Measuring Performance of Elections

2  and Election Laws" as a subheading?

3    A.    I see that.

4    Q.    Okay.  And it looks like in the second

5  paragraph of that section, that's where you describe

6  what the -- you know, sort of the basis for your

7  assessment of whether an election is well run or poorly

8  run?

9    A.    Correct.

10    Q.    And it's not the case that this is an in-depth

11  treatment of whether elections are run well enough, you

12  take the Pew Center's work as the starting point and

13  ending point of that analysis.  Is that a fair

14  characterization?

15    A.    We use the Pew -- Pew trying to measure how

16  well the different states run their elections and we did

17  use their data.  We looked at it.  We -- I -- I do know

18  that we looked at it to see if we thought that this

19  was -- made a reasonably good metric from our

20  perspective of what's going on.  And we decided that it

21  did so we did use it as a measure of election

22  administration performance.

23    Q.    Sure.  But you then didn't get in -- at least

24  in the paper that was published, do an independent

25  assessment of election performance beyond what Pew did?



1    A.   I don't recall to the extent we tried or didn't

2 try to individually assess it.  You know, this -- this

3 is a few years old now, so I don't -- I don't really

4 recall everything we did.  A lot of stuff happens behind

5 the scenes when you write a paper.  Lots of stuff gets

6 put in, lots gets left out, so I'm not entirely sure

7 whether we did or did not.

8    Q.   But in terms of what's in the paper itself,

9 there's not an additional independent analysis about

10 different states are doing aside from what the Pew

11 Center has, what the Pew Center did?

12    A.   I mean I would really have to read the whole

13 thing to see if we added any additional variables that I

14 could disagree with you about your characterization on.

15 So, you know, I want to agree without having read the

16 whole thing in -- in toto.  But we did use the Pew

17 Center's metrics after looking at it and examining it.

18 And like -- like political scientists often do, we like

19 it when other people measure stuff for us too.

20         But, you know, whether or not -- I

21 don't -- I'm not just going to blanket agree with your

22 characterization that we did nothing else.

23    Q.   Okay.  Okay.  Fair enough.

24         You have testified as an expert before,

25 right?



 1      A.    Yes.

 2      Q.    And if we go to your CV.  So do you have your

 3  CV back in front of you?

 4      A.    I do.

 5            MR. TYSON:  I believe you're looking for

 6  Page 31, Matt?

 7            MR. KAISER:  You're good to me.

 8      A.    It is 31.

 9      Q.    (BY MR. KAISER)  Okay.  So in your expert

10  testimony, first of all, the topics you're qualified on

11  as an expert are what, racial block voting analysis,

12  voting rights acts, partisan gerrymandering,

13  representational fairness and traditional redistricting

14  principles; is that a fair characterization of what

15  you're typically qualified for as an expert?

16      A.    Those are some of them, for sure.  But I've

17  testified about the census in the past.  I did work in a

18  Florida case about election administration.  So there

19  are -- there are other things, but in general, I would

20  say I'm usually called to testify about redistricting

21  and voting rights acts and related stuff.

22      Q.    Okay.  In the Florida case where you testified

23  about election administration, which one was that?

24      A.    I don't know if that's made it on the list yet.

25  That's the one that Dan Smith also worked on.  And the



1  name escapes me at the moment.  But I think -- I think I

2  cited my report -- or his report in the case in my first

3  report.  Let me look.

4      Q.  It's the one -- I think we'll -- we'll talk

5  about that study in a little bit.  But is that DNC

6  Services Corporation, et al. versus Lee, et al.?

7      A.  I don't remember for sure.  That sounds kind of

8  familiar, but I don't want to --

9      Q.  Sure.

10     A.  Yeah.

11     Q.  The report you submitted, what year did you

12  send it in?

13     A.  I believe it was just last year.

14     Q.  And what was the basis -- what was the -- what

15  was your testimony in your expert report in that one?

16     A.  The case was about --

17     Q.  Yeah, sorry.

18         You submitted a report, right?

19     A.  I did submit a report.

20     Q.  Did you testify?

21     A.  No.  The case was -- well, my understanding is

22  the case was dismissed at some point so it never got to

23  a position in which the experts testified.  I don't even

24  know if I was ever deposed.  I don't recall.  But I know

25  that I never testified in court.



1    Q.   Okay.  And is that on your CV?

2    A.   It doesn't -- I don't -- I don't see it, so I

3  don't think that it is.

4    Q.   Okay.  I guess a note to update for later?

5    A.   Right.

6    Q.   All right.  And what was your testimony in --

7  what was your opinion in that expert report that you

8  filed in that case?

9    A.   Well, the case broadly was about signature

10 mismatch and ballots being thrown out for signature

11 mismatch.  So Professor Smith wrote a report and I wrote

12 a rebuttal report, you know, basically the same way that

13 I did for this case, you know, talking about the

14 shortcomings of his analysis, what he -- what he left

15 out, those sorts of things.

16   Q.   Okay.  And that -- that was signature mismatch

17 in vote by mail; is that right?

18   A.   I believe that that's correct.

19   Q.   And your -- your report was, I guess, limited

20 to responding to his report; is that fair?

21   A.   I mean, just going by memory, I feel like

22 that's what it was limited to, but -- but I can't be

23 sure.

24   Q.   Okay.  And that's the only time you've

25 testified or offered an expert opinion about an issue of



1  election administration; is that fair?

2      A.   I don't -- I don't really know if that's -- I

3  don't know if I would agree with that either.

4      Q.   What other -- other times have you offered an

5  expert opinion about election administration -- well,

6  let me back up.

7           When I say "election administration,"

8  what's that mean to you?

9      A.   Things having to do with the process of voting,

10  counting votes, collecting votes, that sort of thing.

11      Q.   Okay.  Fair enough.  Right.

12           So when did you offer another opinion

13  about election administration?

14      A.   I mean it could have come up in any of these

15  things.  I'm not saying that it did, but I can't swear

16  to you that I've never testified about election

17  administration in the past.  You know, sometimes these

18  things come up, you know, as a -- as an aside in a

19  redistricting case or something like that.  It might

20  have -- might have come up in a -- in a previous case.

21           The South Dakota case was about -- if I

22  remember right, was about election administration.  I

23  think it was about the location of -- the polling

24  locations, so I think that's directly related to

25  election administration.  And like I said, the other



1  ones, it -- you know, it may have come up in other -- in

2  other of these cases as well.

3      Q.   And what was your -- what was the issue in the

4  South Dakota case?

5      A.   The state was being sued because -- let me see,

6  I don't know if they wanted -- I think they were being

7  sued -- the plaintiffs wanted more polling locations, if

8  memory serves correctly.  Or maybe longer hours.  I

9  don't -- I don't remember exactly, but it was -- I think

10  it was about the location and hours in which polling

11  locations were open in general.

12      Q.   Okay.  And do you remember what your opinion

13  was in that case?

14      A.   Again, I was a rebuttal witness so I -- social

15  scientist, I can't -- don't remember his name, wrote a

16  report.  And the only thing I really remember was he

17  kind of did -- he went out on the streets to conduct

18  interviews, like a -- he did a sample survey where he

19  just kind of went out onto the streets in, you know, one

20  of the big cities in South Dakota, and then he called

21  that a -- a survey.

22           So I was just testifying to the court that

23  this isn't standard political science procedure for --

24  for gathering a random sample.

25      Q.   And your -- so it sounds like your opinion was



1   about survey -- the -- the flaws in, you know, sort of

2   random guy on the street asking questions to people as

3   they walk by as a survey measure; is that fair?

4       A.   That was part of it.  I don't -- I don't

5   remember everything else.  It's been -- I don't have a

6   date on that one, but it's been a long enough time that

7   I -- I barely remember anything about the case at this

8   point.

9       Q.   Okay.  Let me ask you this:  In your report, on

10  the very first page, away from your CV, in the middle of

11  it, you write, My -- I have published a book and dozens

12  of journal articles on redistricting, elections,

13  political parties, Congress and representation?

14      A.   Correct.

15      Q.   And, you know, aside from what we've talked

16  about, have you written anything else on election

17  administration?

18      A.   Not that I -- I can think of, off the top of my

19  head.

20      Q.   Okay.  Have you written anything on, you know,

21  voting records and what voting records should be

22  maintained by states or how those should be reconciled

23  with one another?

24      A.   I haven't published anything on that specific

25  topic.



1     Q.    Okay.  Have you testified or offered an expert

2  opinion on that topic?

3     A.    The Florida case, does the Florida case --

4     Q.    Okay.

5     A.    -- count for that one?

6     Q.    Aside from the Florida case.

7     A.    Maybe the South Dakota case.  There might have

8  been another case about early voting, but I can't --

9  have vague recollections of.  So -- so I think there

10  might be a couple cases where I've testified about these

11  sorts of things.

12     Q.    So what I'm asking about here is not election

13  administration generally, but the maintenance of voting

14  records and reconciling different voting records,

15  different categories of voting records in the same way

16  that Dan Smith did and your -- your response to.

17     A.    Okay.

18     Q.    So I guess -- I hear you on the Florida case.

19            On the South Dakota, I thought that had to

20  do with polling place locations and the validity of the

21  survey?

22     A.    I think -- yeah, it may not have had -- but

23  again, I'm -- without looking at what I said, I can't

24  say for sure.  But in general, your -- your -- what I

25  told you in your -- you know, how you've characterized



1  it back to me is -- is correct.

2      Q.  Okay.  And the early voting case that you were

3  talking about a second ago, that similarly would not be

4  about sort of voting -- sorry, voting records and

5  reconciling voting records; is that fair?

6      A.  I don't recall if my report had anything to do

7  with that, but in general, it was about, you know, the

8  extent to which early voting affects turnout as a --

9  that's kind of the broad theme, as I remember it.

10     Q.  Okay.  And let's talk about your prior

11 experience with voter list maintenance.  So, you know,

12 removing voters from the rolls.  Have you written

13 academic pieces about that?

14     A.  On that very specific topic, I don't believe

15 that I have.

16     Q.  Okay.  Have you testified as an expert witness

17 about that?

18     A.  In the Florida case does -- I think the Florida

19 case, yes.

20     Q.  That was the signature match -- match case?

21     A.  Yeah, but voter -- I mean doesn't that fit in

22 your -- in your characterization?

23     Q.  So my -- my question was about voter list

24 maintenance, so removing voters from the rolls for

25 either change of national -- change of address issues



1  or, you know, people that became felonies or died or --

2  or didn't have contact with the election system.

3              Now, the Florida case, it sounds like, was

4  a vote by mail case.  Does that have to do, in your

5  understanding, of removing voters from their rolls?  I

6  thought that was the signature match issues.

7       A.   Yes, I mean I don't know.  I guess you're being

8  very, very, very specific.  Right.  So if you want to

9  drill down, right, that far, I suppose then it doesn't

10  classify -- I mean if you don't want it to classify, I'm

11  happy for you to characterize it in an extremely

12  specific way.  And then yes, I will agree with you that

13  the Florida case is not exactly the same as that.

14       Q.   Okay.  It's not a voter maintenance -- voter

15  list maintenance case?

16       A.   Yeah, it -- I mean, you know, there are -- I

17  did look at voter lists and we analyzed all that sort of

18  stuff, and so -- but, you know, if you want, you know,

19  in your very, very specific characterization, it's

20  different in some ways than -- than your

21  characterization.

22       Q.   Okay.  And now let's talk about the racial

23  impact of polling place changes.

24       A.   Okay.

25       Q.   What have you written about the -- the impact



1  of -- upon voters of different racial groups of polling

2  place changes?

3      A.   I've written a lot of stuff on the Voting

4  Rights Act, and so I don't know if there's anything -- I

5  can't recall off the top of my head if there's something

6  specific about, I mean, this very, very specific topic.

7  But there could be.  I don't -- I can't recall off the

8  top of my head.

9      Q.   Okay.  And for expert testimony, have you done

10  any -- have you offered expert opinions on the racial

11  impact of polling place changes?

12     A.   I mean I think the South Dakota case was

13  related to that and it may have come up in other cases,

14  but I don't -- I don't recall specifically.

15     Q.   Let me ask you, I guess, about your experience

16  with programming, programming languages.

17     A.   Okay.

18     Q.   Computer -- sorry.

19          Political scientists sometimes use

20  programming languages to analyze data; is that accurate?

21     A.   Correct.

22     Q.   What programming languages do you use?

23     A.   I do most of my analysis using a program called

24  Stata.

25     Q.   Okay.



1      A.    But I'm familiar with R as well.  Those are the
2  two -- those are the two main ones that I use.
3      Q.    And you -- so I guess you're able to read and
4  write in R, is that the --
5      A.    I'm sorry, you'll have to repeat it because I
6  cut you off accidentally.
7      Q.    Sure.  I think Zoom is, you know, new for all
8  of us.
9            Is it fair to say you're able to read and
10  write in R?
11     A.    Yeah, I think that I have basic understanding
12  of R, although that's not my program of choice.  I
13  prefer Stata.  I'm much more familiar with Stata.  So
14  there's some things in R that -- you know, R -- R is
15  very, very, very -- what's the word I want to use?  You
16  can do lots of stuff with R.  Okay.  So there are people
17  doing, you know, incredibly complex programing in R
18  and -- and that I won't understand.  But I have used R
19  in the past, although it's not my preferred package of
20  choice.
21     Q.    Okay.  Did you use R in analyzing Professor
22  Smith's data?
23     A.    No.
24     Q.    And actually, do you -- you know, I -- do you
25  know what programming language Professor Smith used?



1      A.    He used -- I think he used R for all of it.

2      Q.    Do you know what programming language Professor

3  McDonald used?

4      A.    I don't think he said anything.  I don't

5  think -- I don't recall getting his data or his files,

6  so I'm not sure.

7      Q.    Okay.  Do you know if you used R or Stata to

8  analyze his data?

9      A.    I don't remember whether I got the actual

10  survey data from him or not.  I don't recall.

11     Q.    So I guess you -- would you remember if you

12  analyzed it?

13     A.    No, I just said I -- I don't recall if I did or

14  not.  I don't know if I just used the data that was in

15  his report or if I got -- because I know I got Dan's

16  data, Dan Smith's data.  I don't know if -- if Professor

17  McDonald's data was provided to me or not and whether I

18  looked at it or not.

19     Q.    Okay.  And Professor Herron, did you -- do you

20  know if you looked at Professor Herron's data in Stata

21  or R?

22     A.    I don't recall.  I don't think that I did.  I

23  think I just responded to his analysis and I'm not sure

24  that I looked at his data specifically --

25     Q.    Okay.



1      A.    -- the underlying data.

2      Q.    When did you first learn about this case?

3      A.    Mr. Tyson contacted me a long -- what seems

4   like ages ago.  I think it was late last summer, August

5   maybe.

6      Q.    And when were you hired by -- hired as an

7   expert?

8      A.    I think it was around that time, August or

9   September of 2019.

10     Q.    Have you read the complaint in this case?

11     A.    Yes, I believe that I have, yes.

12     Q.    What's your understanding of what the case is

13  about?

14     A.    The case is about a lot of stuff.  There's a --

15  there's a lot going on, right.  But -- but in general,

16  you know, I think that it's various actions by both the

17  State of Georgia and the counties may have,

18  intentionally or unintentionally, been motivated or have

19  racial implications, disparate racial impact or may have

20  been motivated by race as well.

21     Q.    You prepared, I guess, expert reports in this

22  case responding to three different experts.  So with Dan

23  Smith, what materials did you look at to prepare your

24  reports in response to his report -- reports?

25     A.    I looked at his report.  I got his data and



1  then I think for that -- it's in that, my response -- my

2  initial response to Dan Smith's report where I analyzed

3  EAC data as well.

4      Q.   What about the other reports, the other Dan

5  Smith -- the report you did responding to Dan Smith, do

6  you remember what you looked at in that?

7      A.   I don't know if I went back and had to relook

8  at his data or not.  I don't think there was anything

9  additional that I looked at.  But I don't recall exactly

10  what I looked at beyond his response to my response.

11     Q.   Okay.  What about for Professor McDonald, do

12  you know what you looked at when you prepared your

13  response to him?

14     A.   I may have looked at his underlying survey

15  data.  I may not have.  And let me see, let me look at

16  it really quickly.

17     Q.   I'm sorry, what are you looking at?

18     A.   I'm looking at my response to Herron and

19  McDonald, Exhibit B.

20     Q.   At this point, just for ease, why don't we mark

21  that as Exhibit 3.

22              (Exhibit No. 3 was marked.)

23     Q.   (BY MR. KAISER)  And that's -- when we -- when

24  we talk about your response, just to make sure we're

25  talking about the same thing, when you look at the top



1  of that, is it ECF No. -- Document No. 276 from

2  March 20th?

3      A.   Yes.

4      Q.   Great.

5      A.   I did look at information regarding sample

6  sizes for other surveys.

7      Q.   What information?

8      A.   I was looking for -- I was looking for

9  information -- obviously, I objected to the size of the

10 sample survey, so I was looking -- the first thing I

11 looked at was let's see what the American National

12 Election Study sample size is.  And this is -- Professor

13 McDonald mischaracterizes this enhanced response to me

14 saying, I only looked at one study -- one survey.

15           But, you know, they -- like I said in my

16 report, they run surveys every two years since 1952.

17 And I looked at the sample sizes of all of those

18 surveys.  And so this is to give the court an idea that

19 his sample size might be too small to rely on.

20     Q.   And just so you know, we'll spend -- we'll

21 spend some time talking about that in a bit.  Right now

22 I'm mainly just trying to get a sense of what you looked

23 at for each report.

24     A.   Sure.

25     Q.   Is there anything else you looked at for that



1  document responding to Professors McDonald and Herron?

2  You've got the report up and it's both documents, may as

3  well talk about both experts.

4      A.   Sure.

5              THE REPORTER:  Mr. Kaiser, you're talking

6  really fast, sometimes I'm not able to understand what

7  you said.  So if you wouldn't mind slowing down,

8  particularly when you read for me, that would be so

9  helpful.

10             MR. KAISER:  I'll work on that.  Thank you

11  very much.  I appreciate it.

12             THE REPORTER:  Thank you.

13             MR. KAISER:  Please ding me if I don't do

14  that.

15             THE REPORTER:  Thank you.  I'll throw you

16  my red card.

17             MR. KAISER:  Thank you.  You should have a

18  yellow card as well.

19             THE REPORTER:  I should.

20      A.   For Professor Herron, I did look at his two

21  articles that he cites about being assigned new polling

22  places and the odds of turning out.  That might be -- as

23  far as I can remember -- off the top of my head,

24  that's -- that's what I remember.  That's all I

25  remember.



1    Q.   (BY MR. KAISER)  Aside from counsel, aside from

2  Mr. Tyson and others, you know, at his firm or the other

3  firm representing to defendants here, who did you talk

4  to about forming the opinions in your report, if anyone?

5    A.   There were two phone calls with officials from

6  the Secretary of State's office, the election people

7  that administer these lists that we're talking about.

8  I -- I don't -- I couldn't tell you what their names

9  were, but there were two separate phone calls with

10  several people on the phone.

11    Q.   Do you remember when those were?

12    A.   I don't.  I really I -- I could not tell you

13  the date.

14    Q.   Do you remember -- thank you.

15         Do you remember the role of the people you

16  talked to at the Secretary of State's office?

17    A.   Like I said, they had -- these were people that

18  were informed about, you know, NCOA procedures, about no

19  contact, these sorts of things, so they knew a lot about

20  the lists, how people get moved off and on, right, how

21  people move from active to inactive and then how the --

22  how the -- how those procedures work.

23    Q.   Okay.  Did they talk -- did you talk to them

24  about anything else?

25    A.   I'm going to cough.  Excuse me.



1              Well, I know that we talked about -- you

2    know, that's where I -- that's where I got the

3    understanding about the specifics that Professor Smith

4    made in his first report about his assumption that, you

5    know, electronic meant that's the way the voters vote.

6    And I was told by the Secretary of State's office, no,

7    that's -- that's not what that means.  That's the way

8    that voters -- the ballot is delivered to the voters.

9         Q.   Okay.  Did you talk about anything else with

10   him?

11        A.   I -- we may have, but in general, those are --

12   those are the main points that I recall.

13        Q.   Do you know if you -- well, did you talk to any

14   of the other defense experts in this case?

15        A.   No, I did not.

16        Q.   So you drafted these three reports.  Can you

17   describe to me the process of drafting the reports?

18        A.   (No response.)  I have no --

19        Q.   You have a silly grin.  I assume you pulled up

20   a word processor and, you know, pressed A when you

21   wanted an A to appear.

22        A.   Right.

23        Q.   Did you do a first draft or did counsel do a

24   first draft?

25        A.   Counsel didn't.  I -- I wrote it.  I -- I wrote



1  all these reports.

2      Q.   Okay.  And did you send drafts to counsel for

3  their review?

4      A.   Yes.

5      Q.   And did you change your opinions in light of

6  those conversations?

7      A.   No, I don't -- I don't think that I did.

8      Q.   You're a paid expert in this case?

9      A.   Yes.

10     Q.   What's your hourly rate for your work in this

11 case?

12     A.   $750.

13     Q.   And I assume I'll get this when I go through

14 the invoices that were just e-mailed, but how many hours

15 have you spent working on this case so far?

16     A.   I think it's been around -- I think we're over

17 100 at this point.

18     Q.   And how much have you been paid aside from what

19 you've billed in the case?

20     A.   I'm not sure I understand your question.  How

21 much have I got paid in addition to what I've billed?

22 Or how much have --

23     Q.   Well, I assume when you send the invoice,

24 you're not paid immediately.  So I'm just wondering how

25 much have you paid total, just as of yesterday's phone



1  call?

2      A.   Right.  Interestingly, I had not up until

3  this -- I think early this morning, I hadn't been paid a

4  dime.  But I now have been paid for my first invoice, as

5  of this morning.

6      Q.   Excellent.

7           And how much was that?

8      A.   I believe it was $43,000, somewhere in that

9  neighborhood.

10      Q.   Okay.  So now let's go back to your CV.  We're

11  on Page 31 and we talked about your redistricting and

12  litigation experience.  And I think we talked about one

13  case, the Florida case that doesn't appear on your CV?

14      A.   Correct.

15      Q.   To the best of your knowledge, are there any

16  other cases where you've been an expert where you

17  haven't -- where they haven't been on your CV?

18      A.   Hang on one second.  I -- I scrolled up.

19      Q.   Sure.  Page 31 using the blue numbers.

20      A.   Yes.

21      Q.   Are they blue for you?

22      A.   They are blue for me.

23           I think that -- there are -- there are

24  some additional cases that aren't listed.  The Ohio

25  early voting case isn't on there.



1    Q.    Do you remember the case name?

2    A.    I -- I don't, I'm afraid.

3    Q.    Do you remember when it was?

4    A.    Two, three years ago, something like that.  I

5  actually thought that I put this on my CV.  I thought

6  that I updated my cases.  I don't -- I don't know why

7  they're not on there.  Because there's a couple other

8  redistricting cases too; one in -- one in Ohio and --

9  and one in North Carolina.  And again, I'm afraid I

10  don't remember the names of the cases.

11    Q.    So let me ask this kind of overview question,

12  and if we need to go through each place where you

13  expert -- where you offered testimony, we can do it, but

14  I -- we'll see.

15           When you've been hired in -- to give

16  expert testimony in a case, have you ever been hired as

17  an expert for a progressive leaning organization or a

18  liberal leaning organization?

19    A.    I don't recall any off the top of my head, no.

20    Q.    Have you ever been hired by the Democratic

21  Party?

22    A.    Well, I have been hired -- I'm sorry, you got

23  cut off.  Would you --

24    Q.    I'm sorry, I was talking over you.

25           Either state or national?



```
 1      A.    There -- the Alabama case -- one of the Alabama
 2   cases, I worked for the congressional delegation, which
 3   was a bipartisan delegation.
 4      Q.    Sure.  So right now I'm just asking about
 5   party, and I'll come back to delegations, things like
 6   that.  But just the party itself, the Democratic Party,
 7   either the national or state Democratic Party, have you
 8   ever been hired by the national or state Democratic
 9   Party?
10      A.    I don't believe so, no.
11      Q.    Okay.  Have you ever been hired by a government
12   entity that is controlled by members of the Democratic
13   Party?
14      A.    Well, you're going to -- that's a -- what do
15   you mean by that?
16      Q.    Sure.
17            Have you ever been hired by a Secretary of
18   State who's a Democrat?
19      A.    Not that I recall.
20      Q.    Or I guess I should say, when I say even hired
21   by the Democratic Party or Secretary -- what I mean is
22   hired by lawyers for the Secretary of State or the
23   Democratic Party.
24      A.    Sure.
25      Q.    I take it that doesn't change your answer?
```



1      A.   That does not change my answer.

2      Q.   So in the redistricting work that you've done,

3  have you been hired by a group of democratic

4  legislatures?

5      A.   I have worked for legislatures in which there

6  are democrats in them.

7      Q.   Sure.  And so, you know, going back to the

8  question about government entity control.  Have you been

9  hired by a legislature where the majority party is the

10 Democratic Party?

11     A.   I -- not that I recall.

12     Q.   But you have been hired by legislatures when

13 the majority party is the Republican Party; is that

14 right?

15     A.   Yes.

16     Q.   Have you been required by Republican

17 Secretaries of State?

18     A.   I believe so, yes.

19     Q.   Back in this case you are, right?

20     A.   I believe that's correct.

21     Q.   Have you ever been hired by the Republican

22 Party or a Republican state party?

23     A.   I don't know if I've ever been hired by lawyers

24 representing the party directly.  Often times it's like

25 a -- it's a -- it's an elected official.  Sometimes it's



1  been an -- an interest group.  But I don't know if I've

2  ever been hired -- I may have been, but I don't recall

3  having been hired by -- Hey, we're going to be working

4  for the Republican Party of Ohio or Michigan or

5  whatever.  But it's possible.

6        Q.   Okay.  Have you ever been hired by a, you know,

7  sort of strictly nonpartisan group?

8        A.   I mean strictly nonpartisan, I mean I don't

9  know what -- I don't know -- you're going to have to

10  give me a list of the -- of which groups classify as

11  being strictly nonpartisan because every -- it's going

12  to be a short list.

13        Q.   That may be true, and a sad commentary.

14             Have you been hired by any organizations

15  that are arguably nonpartisan, and then we can talk

16  about whether they were nonpartisan?

17        A.   That's a good follow-up question.

18        Q.   Thank you.

19        A.   I think it's possible.  You know, I have been

20  hired sometimes -- like the Kentucky finance case, I

21  worked for -- I just work for lawyer.  I don't know what

22  his -- what his deal was.  You know, I don't know his

23  partisanship or anything like that, and so he was

24  just -- he was just a guy suing the state over the

25  campaign finance limits in the state.  And was he a



1  Democrat, Republican?  I didn't ask, he didn't tell, and

2  so I don't know if that qualifies or not.

3      Q.   What was your -- what was the issue there?

4      A.   He -- the case -- he was suing the state

5  because the -- he was arguing that the donation limits

6  and other limitations, state limitations were a

7  violation of the federal constitution.

8      Q.   Have you ever offered an opinion that something

9  the state or county does with respect to elections

10  violates the Voting Rights Act?

11      A.   I -- I don't recall off the top of my head, but

12  it's certainly possible with all the redistricting

13  stuff.

14      Q.   Have you offered an opinion -- this is if you

15  recall -- about whether a practice or procedure of a

16  state with respect to the conduct of election laws

17  violates any other provision of federal law?

18      A.   I don't recall off the top of my head, but

19  again, certainly -- certainly possible.

20      Q.   Okay.  And I guess with your first answer on

21  the voting rights acts, you know, with the redistricting

22  work that you were doing, what's kind of the nature of

23  that?

24      A.   Well, there's -- there used to be -- in

25  general, there was Section 2 violations, which is about,



1  you know, has the state drawn enough majority/minority

2  districts.  And then prior to the -- the case that --

3  the recent case that sort of dismantled Section 4, there

4  were Section 5 violations with the Voting Rights Act as

5  well, which had to do with, you know, what did -- has

6  the state made any changes to their -- to their election

7  administration.  And there's a whole process they have

8  to go through if they fall under Section 5 about getting

9  these precleared.

10      Q.   Right.  I guess my -- my question was about --

11  thank you for that.  My question was about the work that

12  you did.

13          Tell me if this -- if this is fair.  Is

14  the work that you were doing sitting with folks who

15  would draw a proposed map for districts and then consult

16  with them about whether the map was appropriate?  Or

17  good and broadly -- broadly defined?

18      A.   I don't -- I don't know.  I don't really know

19  what you mean there.

20      Q.   Okay.  I mean were you helping people,

21  legislatures, legislate -- legislators, legislatures,

22  government officials draw maps for redistricting?

23      A.   I think sort of, but I don't -- I don't draw

24  maps, right, but I have been hired prior to a map being

25  drawn and asked to do things that then they would take



 1  into account.

 2     Q.   Great.  Yes.  Thank you.  Very helpful.

 3     A.   Okay.

 4     Q.   Your answers are better than my questions on

 5  this.

 6     A.   I'm trying.

 7     Q.   We're all trying.

 8          When you've done that work, I take it --

 9  is one of the things that happens, people say, Here's a

10  possible map and you say, That would be a problematic

11  map?

12     A.   I don't know if I've ever done that in

13  particular.  I think I -- I have done stuff on

14  particular districts, perhaps, on majority/minority

15  districts and -- and those sorts of things.  But I don't

16  think I've ever been hired to like give an opinion, a

17  sort of quasi-legal opinion on, you know, Is this map

18  going to pass muster or not.

19     Q.   Let me ask you, your CV says that you attended

20  a 2016 Republic National Convention?

21     A.   Does it really say that?

22     Q.   Yeah, it's on Page 23.

23     A.   Well, that's true.  I didn't -- I don't know

24  why I put it on my CV, but that is absolutely true.

25     Q.   It's probably true whether or not it's on your



1  CV.

2      A.   Yes, that's -- that's right.

3      Q.   What did you do with the Republican National

4  Convention?

5      A.   I was just a -- a -- I was just there as a -- a

6  spectator.  I was going to say "witness," but that's --

7  that's the wrong word.  I was there merely as a

8  spectator.  I had friends that had extra tickets and I

9  had never been to a convention before, and so this was

10 my chance to go to one and so I took it.

11     Q.   And have you -- did you write anything about

12 it?  Was it -- was it an academic project?

13     A.   It was -- it had the potential -- everything

14 has the potential to be an academic project.  I don't

15 think I ever wrote anything about it.

16     Q.   Okay.  You were under consideration to be the

17 census director for the Census Bureau under the Trump

18 administration; is that right?

19     A.   The -- the media has reported that.

20     Q.   Is that not true?

21     A.   Well, the White House never confirmed it, so I

22 don't know.  It depends on who you're asking.

23     Q.   I guess if I were asking you, let's say --

24     A.   Right.

25     Q.   -- were there talks about you coming to be the



1  census director?

2      A.    There were talks.

3      Q.    Okay.  You didn't wind up in the job, right?

4      A.    That's correct.

5      Q.    Did you talk to people about going to be the

6  census director?

7      A.    What do you mean?

8      Q.    Well, I'm not sure -- did you talk to people in

9  the Trump administration about going to be the census

10  director?

11      A.    I did.

12      Q.    Okay.  And were those people who had the

13  ability to put you in the position of census director?

14      A.    As far as I know, yes.

15      Q.    Okay.  And there was -- I think you said a

16  second ago there were media reports about you being

17  talked about for that job?

18      A.    Correct.

19      Q.    And some of those reports were negative; is

20  that fair to say?

21      A.    Yes, I think that is fair to say.

22      Q.    What's your understanding of that criticism?

23      A.    That's a loaded question there.  I think it was

24  a lack of understanding about me as a person and as a

25  scholar, that's how I would characterize it.



1    Q.   It was reported that you are a registered
2  Republican.  Did you see that?
3    A.   I did see that, and that's incorrect.
4    Q.   What is your -- what's your party registration?
5    A.   In Texas, we don't register by parties so I
6  don't have one.
7    Q.   Have you ever been to a Democratic National
8  Convention?
9    A.   No, but I would -- I would go in a heartbeat.
10   Q.   And I guess -- forgive me, I've not been to a
11 convention.  I guess you've got to get tickets?
12   A.   Yes.  They're hard to come by.
13   Q.   They don't just let anybody come in off the
14 street?
15   A.   That's correct.
16   Q.   And you came to go to the Republican convention
17 because you had a friend who had tickets?
18   A.   Correct.
19   Q.   One of the things that I should have done at
20 the very beginning of this deposition that I didn't do,
21 and I apologize for that, is talk about breaks.  You
22 know, and I'm sure, because I know you've been deposed
23 before, you kind of know the ground rules.  If you need
24 a break at any point, let me know.  Happy to give you a
25 break or take a break, just don't do it while a question



 1  is pending.  Is that okay?

 2      A.   Yes.

 3      Q.   We've been going for, I think, an hour and 15

 4  minutes.  I don't know how you're doing.  Now would be a

 5  natural break point for me, but if you --

 6      A.   Okay.

 7      Q.   -- want to --

 8      A.   Yeah, I could keep -- I -- I leave it up to

 9  you.  I'm happy to plug along or I'm happy to do a -- to

10  take the dog outside real quick.

11              MR. KAISER:  Yeah, why don't we --

12              THE WITNESS:  And come back in five

13  minutes.

14              MR. KAISER:  Why don't we go off the

15  record.  And is five minutes good?  I don't know how

16  long your dog needs.

17              THE WITNESS:  He doesn't need long.  Five

18  minutes is fine.

19              MR. KAISER:  Okay.  Great.  So Come back

20  in five minutes.

21              THE WITNESS:  Okay.

22              THE VIDEOGRAPHER:  Okay.  We're going off

23  the record at 10:19 a.m. Central Time.  And recording is

24  paused.  We're off the record.

25              (Break was taken.)



1              THE VIDEOGRAPHER:  All right.  We are back

2   on the record at 10:26 a.m. Central.  Please proceed.

3       Q.   (BY MR. KAISER)  So we talked a little earlier,

4   you wrote three reports in this case, right?

5       A.   Right.

6       Q.   Just to make sure I know, we've marked as an

7   exhibit the first two, just as a housekeeping matter.

8   The third exhibit let's now mark as Exhibit 4.  It's --

9   this document you should have it's an April 3rd

10  supplemental report, No. 2 of yours.

11              (Exhibit No. 4 was marked.)

12      Q.   (BY MR. KAISER)  You've got that?

13      A.   I do.

14      Q.   We'll come back to that in a little bit.

15              So let's talk about your criticisms of Dan

16  Smith.  So in the first instance, what is Dan Smith's

17  reputation as a scholar?

18      A.   Dan is -- he's a good scholar, good political

19  scientist.  I like Dan.

20      Q.   Who -- and with all of the -- do you like meet

21  guys at conferences?  Are you a part of the team, sort

22  of the political science community?

23      A.   Yep.

24      Q.   Okay.  So let's talk about what you're

25  responding to in Professor Smith's report.  In here,



1  let's go to -- I think it's Document C that you've got.

2  And let's mark this as, I guess, Exhibit 5.

3            (Exhibit No. 5 was marked.)

4      Q.  (BY MR. KAISER)  And so, just so we're talking

5  about the same thing, this is -- if you look at the blue

6  on the top, it's Document 168?

7      A.  Yes.  That -- that's Dan's original report,

8  yes.

9      Q.  So let's go to Paragraph 8 of that on Page 5.

10           Are you with me?

11     A.  I am there.

12     Q.  Okay.  So this section is the "Summary of

13  Opinions Offered" section, right?

14     A.  That's what it says.

15     Q.  And, you know, look at it, tell me if you agree

16  or disagree.  But, you know, in Paragraph 8 he's talking

17  about his first opinion and in Paragraph 9 he's talking

18  about his second opinion.

19     A.  Okay.

20     Q.  Is that fair?

21     A.  Yes.

22     Q.  And Paragraph 8 is about problems he has

23  identified in the -- his opinion there is about problems

24  he has identified in certain voter files maintained by

25  the Secretary of State's office in Georgia; is that

1  right?

2      A.   I think that's right.

3      Q.   And then the second opinion is about the

4  processing of absentee ballots for black voters relative

5  to the -- how they were processed for white voters; is

6  that fair?

7      A.   That looks like what it says.

8      Q.   Great.

9           So your report then in response -- and

10 tell me if this is not your understanding -- it responds

11 to both of those opinions and then it adds a third

12 opinion about some EAC data?

13     A.   I -- I mean if you want to classify it that

14 way, I don't think that that's -- that seems reasonable

15 enough.

16     Q.   Okay.  I'm just trying -- you know, for

17 organizational purposes, as we talk about it, if we

18 classify it that way, do we miss anything?

19     A.   You might.  I don't -- I don't know.

20     Q.   Okay.

21     A.   I don't.  Yeah.

22     Q.   Great.  Well, let's talk about the first issue.

23          So when we're with Professor Smith's

24 report, let's go to Paragraph 11 of the report.  This is

25 Page 7.  You got it?



1    A.    Yes.

2    Q.    In Paragraph 11, Professor Smith describes

3  Georgia's system -- describes Georgia as maintaining a

4  single uniform top-down centralized voter list; is that

5  right?  That's what --

6    A.    That's what he says.

7    Q.    Do you disagree with that?

8    A.    I don't believe that I do, no.

9    Q.    And he describes the top-down system, which

10 says that it's when the state has a single platform that

11 collects and stores all voter registration information

12 from jurisdictions.

13         Do you disagree with that?

14   A.    That's what he says.

15   Q.    Sorry.  Do you disagree that that's what a

16 top-down system is?

17   A.    I -- I -- I mean I don't know.  I don't define

18 or -- or undefine what a top-down system is.  I don't --

19 I don't know if it matters to me.

20   Q.    But you agree with the prior sentence that

21 Georgia has a top-down system, right?

22   A.    That's my understanding, yes.

23   Q.    What do you think a top-down system is?

24   A.    Where the state manages the list.

25   Q.    In a single platform?



 1      A.   Well, I don't know.  Like what is -- what do

 2   you mean by single platform?

 3      Q.   What would you think single platform would

 4   mean?

 5      A.   I don't -- I don't know.  I really don't know

 6   what that means.  What is a single platform?

 7      Q.   Okay.  How about in a single place?

 8      A.   I mean, I don't -- I don't know where they keep

 9   the data or, you know, is it in the cloud, is that in a

10   single place?  I -- I'm not trying to be -- I don't want

11   to -- I want to get through this, just like you do.  So

12   I feel like I'm answering in a way that -- that I'm

13   trying to be really, really argumentative and I'm not.

14           But like I don't -- I don't know what

15   this -- I don't know what a single platform means and --

16   but -- but it is centralized, right?  That is my

17   understanding of it.  And so if Dan says that it -- that

18   it's a single platform, I'm happy to believe that.

19      Q.   Okay.  Let's go to the last sentence of that

20   paragraph.

21      A.   Okay.

22      Q.   Professor Smith says, In a well-functioning

23   top-down system, state election officials oversee voter

24   list information of every legally registered voter in

25   the state, each of whom has a unique identifier.



1           Do you agree with that sentence?

2      A.   I don't know if I agree with his definition of

3  what well functioning is or not.  That -- that isn't

4  something that I've -- I've considered and so I don't

5  know if those are the -- the only criteria that I would

6  include in well functioning or if I would include those

7  at all or not.  But, you know, if that -- that's Dan's

8  opinion and I'm -- I'm fine with that.

9      Q.   You don't dispute that characterization, I

10 guess?

11     A.   I do not.  But I don't agree with it.  I don't

12 necessarily agree with it.

13     Q.   Okay.  Right.  But you're not challenging it?

14     A.   I'm not.

15     Q.   You're not offering an opinion that that's

16 wrong?

17     A.   I'm not.

18     Q.   Okay.  So before we go to the -- the sort of

19 meat of the opinion in your disagreements, let's go to

20 the next page -- I'm sorry, page after that, it's

21 Paragraph 16.

22     A.   Okay.  I'm there.

23     Q.   So Professor Smith, in the middle of that

24 paragraph, writes, For my academic research.  Do you see

25 where I'm going to start reading there?



1    A.    (No response.)

2    Q.    Middle of the sentence, there's a semicolon

3  that sort of breaks the sentence, so starting right

4  after the semicolon.

5    A.    Okay.  I'm going to find it here -- I do see it

6  now, yeah.

7    Q.    For my academic research, I routinely conducted

8  verified with data processing across the states.  I have

9  published more than a dozen peer-reviewed articles over

10  the past decade that utilize publicly available voter

11  files.  In doing so, I have processed hundreds of

12  millions of voter registration records across several

13  states.

14         Do you see that?

15    A.    I do.

16    Q.    Do you have any reason to believe that that's

17  false?

18    A.    I don't.

19    Q.    In your academic work, have you processed

20  hundreds of millions of voter registration records?

21    A.    I have looked at voter registration records, I

22  couldn't tell you the total number, though.

23    Q.    Okay.  Have you published articles that use

24  vote registration files?

25    A.    I don't know off the top of my head if any of



1  my published research has, but it's not -- it's not sort

2  of a central thing in my -- in my research, I will -- I

3  will say that.

4      Q.   And I guess you're -- tell me if this is right,

5  not trying to argue, but your -- your testimony is you

6  just don't remember right now articles that you've

7  published that have required you to process voter files;

8  is that --

9      A.   Correct.

10     Q.   All right.  So on your report, on Page 2 of it,

11 you write that, In order to better understand Professor

12 Smith's arguments, I downloaded the three data sets he

13 used in his report and tried to replicate what he did.

14          Do you see that?

15     A.   I do.

16     Q.   It's right at the bottom of the page?

17     A.   Yes.

18     Q.   I should have said that part about where it was

19 on the page before reading it.  If I do that again,

20 please stop me.

21     A.   Okay.

22     Q.   And then a couple pages later on Page 4, you

23 write in the -- that first full paragraph at the top, I

24 replicated most of what Professor Smith did with respect

25 to the three files from the Georgia Secretary of State's



1  office, correct?

2      A.   Correct.

3      Q.   What I'd like to do is get an understanding of

4  what it is you actually did to replicate Professor

5  Smith's work.  So can you walk me through that?

6      A.   Yeah, the -- I had to basically clean and merge

7  the data sets to -- and then I was kind of going through

8  and trying to make sure -- and I think I was looking at

9  his R code at the same time, trying to see what he did,

10  and I was trying to follow the same exact path that he

11  took to -- to then create his tables in his -- in his

12  report.

13     Q.   Okay.  So just to break that down for me, you

14  said you clean -- I guess like cleaned and merged the

15  data sets?

16     A.   Yeah.  I think there was -- I think there were

17  some duplicate records in one of them, and so you have

18  to get rid of the duplicates in order to merge with one

19  of the other files.

20     Q.   And -- and the process you used to do that,

21  using R, right?

22     A.   No.  I worked in Stata.

23     Q.   You worked in Stata to do that.  Okay.

24          Do you know what programming language

25  Professor Smith worked in?



1      A.    I think he used R for all this, but I don't --

2   he may have used something else, I don't know.

3      Q.    You said you looked at his R code?

4      A.    Yes, I did.

5      Q.    So when you -- when you clean and merge data

6   sets, you know, can you explain exactly what that means?

7      A.    Yeah.  So, you know, like I said, one of the

8   data sets had -- I don't remember which one, had

9   duplicates.  And so when you're merging two data sets

10  together, right, you want to have a one-to-one merge to

11  the extent that's possible, and so you get rid of

12  duplicates in one of the files.  And then once you're

13  satisfied this is going to merge nicely, then you

14  just -- then you merge the two data sets together.

15     Q.    Okay.

16     A.    Based upon, right -- in this case, the -- the

17  voter ID, the unique identifier.

18     Q.    Okay.  So when you say you merge based on the

19  voter ID unique identifier, tell me if this is an

20  accurate way to describe that.  You take File A, which

21  has a bunch of entries, and each entry has a unique

22  identifier; is that right?

23     A.    It might, yes.

24     Q.    Okay.  And then -- well, let's do it with

25  specific files.  So you -- you merged the -- the voter



1  history file with the absentee ballot file; is that

2  right?

3      A.   I don't remember exactly, but that sounds

4  right, yeah.

5      Q.   Can you tell me what files you merged so we can

6  use the ones you actually worked with?

7      A.   Let me look.

8      Q.   Sure.

9      A.   I did the voter registration file, and then the

10  absentee ballot file, that was the first step.  Those

11  are the two that I merged.

12      Q.   Did you merge the voter history file?

13      A.   I don't recall if I did or not.  I feel like I

14  merged all three of them together, but I don't -- I

15  don't see it in the code right here.

16      Q.   Oh, I'm sorry, we -- we made a deal early on.

17  Don't you remember, Professor Brunell, that if you were

18  looking at something that we -- we weren't talking about

19  it, you would tell us what it was?

20      A.   That's -- I'm sorry.  That's right.  Well, I

21  should have been specific.  But yes, I'm looking at

22  my -- the code that I used in this case to merge the --

23  the files together.

24      Q.   Okay.  Please let us know if you're going to

25  look at something other than the documents and exhibits



 1  we give you.

 2      A.   I apologize.  And I really should have looked

 3  at my report, that would have been much easier, but I

 4  didn't.

 5      Q.   Yeah, how about you looked at your report?  I

 6  think that might --

 7      A.   I think that would be easier.

 8      Q.   You know, if you start at the bottom of Page 2,

 9  if I were to choose a place on the report to start.  It

10  describes your process there.  And -- and please don't,

11  if you -- let me know if you want to look at your code

12  again.

13           So it looks like -- tell me if this is

14  wrong, starting at the bottom of Page 2, it looks like

15  you downloaded the voter history file?

16      A.   That was the first step, yeah.

17      Q.   What's the voter history file?

18      A.   That's a file listing the -- the -- each of the

19  individual voters and some indication of when they had

20  voted.  I don't remember what -- and it has other stuff

21  in it as well, but that's the voter history file.

22      Q.   What -- what time frame does the voter history

23  file cover?

24      A.   I don't recall off the top of my head how far

25  it goes back.



THOMAS BRUNELL, PH.D.                          May 21, 2020
FAIR FIGHT ACTION vs RAFFENSPERGER                      71

1      Q.    Is it a voter history file for one election or

2   for all elections?

3      A.    I don't remember.  I don't recall.

4      Q.    Do you know if you knew at the time?

5      A.    I'm sure I knew at the time.  I understood what

6   was in the data sets.

7      Q.    Okay.  And you downloaded a different version

8   of the voter history file than Professor Smith used?

9      A.    That's correct.

10     Q.    Why did you use a different version?

11     A.    It was a more updated version than the one that

12  he used.  So that -- I think in my discussions with the

13  Secretary of State's office, you know, they were

14  explaining to me the different versions that were used,

15  and they said this one might have more updated -- there

16  might have been voters added to these files.  The

17  records would be updated since the one that Professor

18  Smith used.

19     Q.    You had access to the one Professor Smith used,

20  right?

21     A.    I believe it was sent to me, yes.

22     Q.    And you didn't use that one?

23     A.    I did not.

24     Q.    Did you even do a preliminary analysis on that

25  one?



1    A.   I don't know -- I mean the differences were

2  small, and this was a better one so I don't recall if

3  I -- if I did or not.  But this was a slightly better

4  version that differed in -- in -- for a couple dozen

5  cases than the one that Professor Smith used.

6    Q.   Okay.  And you downloaded this voter history

7  file December 19th, 2019; is that right?  Bottom of

8  Page 2.

9    A.   Yes.

10    Q.   And the one Professor Smith downloaded was

11  about a month earlier; is that right?

12    A.   Okay.

13    Q.   Why would there be different information added

14  to the voter history file for the 2018 election more

15  than a year after the election?

16    A.   My understanding from the Secretary of State's

17  office is that, you know, these things get updated

18  manually.  And like I said, the -- the two files

19  differed for just -- there's 104 more people in the

20  version that I used, out of a total of 4 million, so

21  we're talking about very trivial differences here.  But

22  my understanding is that the Secretary of State's office

23  continues to update or correct errors in the voter data

24  file as time goes on.

25    Q.   Yeah.  But I guess my -- my question is, why



1  would a -- a year after the election they still be

2  detecting errors and finding new voters who voted in the

3  election?

4      A.   That would be a question for the Secretary of

5  State's office, I think.

6      Q.   Is that a question you asked the Secretary of

7  State's office?

8      A.   I don't recall.  We may have had a discussion

9  about how this works, but sometimes the bureaucracy

10 works slowly.  And again, these are -- there isn't very

11 many of them, right, 104 out of 4 million, we're talking

12 about a very small number.  And so, you know, I think

13 that if the Secretary of State's office failed to update

14 things when they find new information, that would be

15 more disconcerting to me than them updating a data set.

16     Q.   But you would -- well, would you --

17     A.   They could ignore new data and just say, Oh,

18 we're not putting this in, right, we're not going to

19 release a new data set.  And I think that would be far

20 worse.

21     Q.   Should they have found the data closer to the

22 election, the data they needed to update?

23     A.   Well, I don't -- I don't know where the

24 information came from, so --

25     Q.   Well, did --



 1      A.   I can't make a -- you know, a should they have,

 2   right.  I'm not going to make a normative judgment

 3   about, you know, what the Secretary of State's office is

 4   doing because I have no idea, neither does Dan Smith,

 5   about the specifics of where these data -- where these

 6   updated data came from.

 7      Q.   Well, one of the -- one of the positions -- one

 8   of the ballot -- one of the offices on the ballot in the

 9   2018 election was the governorship; is that your

10   understanding?

11      A.   Yes.

12      Q.   Do you know when the person who was elected

13   through that 2018 election took office?

14      A.   I would assume shortly thereafter, maybe in

15   early 2019.

16      Q.   Right.  So it would have been before December

17   of 2019, right?

18      A.   Almost certainly, yes.

19      Q.   And -- and would you agree with me that it

20   would be good to have the accurate election information

21   in before the person who is determined to be a winner

22   from the election takes office?

23      A.   As a general rule, I totally agree with that.

24   But, you know, in -- you know, in terms of this

25   particular case, I know that the winner won by far more



1  than 104 votes.  And so, you know, I don't want -- I'm

2  not trying to be flippant and say these small

3  discrepancies don't matter, because I want every vote to

4  be counted.  I want them to be counted immediately and

5  accurately, because I think that's the way elections

6  should be run.  But people, regular people like you and

7  I run these bureaucracies so there's bound to be

8  mistakes.

9      Q.   Okay.  But I guess it's -- so going back to the

10  question I asked a minute ago, just to make sure I'm

11  clear on this.  You don't know why more than a year

12  after the election more data was being added to the

13  voter history file?

14      A.   I -- I don't.  No, I don't.  They -- somehow

15  the Secretary of State's office got more information and

16  they did the right thing by updating the data set.

17      Q.   Right.  And -- and -- okay.  Did you compare

18  the -- what -- I know you did some comparisons.  What

19  was the nature -- sorry.

20           How much of a comparison did you do with

21  the files you downloaded versus the one that Dan Smith

22  downloaded?  And by file, I'm talking the voter history

23  file, the ones we just talked about.

24      A.   Right.  I don't recall.  I don't know if I

25  merged the two and -- and -- and I mean I must have done



1  something because I do -- I mention that there's 104

2  more people in this version than the one that Professor

3  Smith used, so...

4      Q.   Do you know if you got that information from

5  the Secretary of State's office?  Or did you do it

6  through your own work with the data?

7      A.   My rec- -- I don't recall specifically, but I

8  think that that's from my analysis, not something that

9  was handed to me.

10     Q.   And your analysis was criticizing Dan Smith, is

11 that a fair characterization?

12     A.   I mean, I was -- I do criticize Professor

13 Smith.

14     Q.   Right.  And -- and I guess what I'm -- what

15 I'm -- when you are looking at someone else's work to

16 criticize it, why would you use different data than they

17 used?

18     A.   Well, the data aren't really different, right?

19 The -- the data set that I have is the -- is the same as

20 Dan's with a very small number of additional records.

21 And so this would have been a way for me to replicate

22 and update what Professor Smith had done.  So -- but

23 generally, right, you want to use -- you want to use

24 data sets that are the same, right.  You want to

25 replicate what they've done.  And that is what I did,



1  right.  We're talking about very, very trivial

2  differences between these two files.

3      Q.   Okay.  So Professor Smith notes that there's a

4  difference between the number of entries in the voter

5  history file and the data on the Secretary of State's

6  web page by the number of people who voted.  Do you

7  remember that?

8      A.   I do.

9      Q.   And you describe that expectation as overly

10  optimistic.  Do you remember that?  I can point you

11  where in your report, if you want.

12      A.   That sounds familiar.  I don't see it, but that

13  sounds familiar.

14      Q.   Sure.  It's in the middle of Page 3.  There's

15  kind of a paragraph in the middle --

16      A.   Oh, yes.  Yeah, I do see it.

17      Q.   How often have you looked at whether a state's

18  voter history file has a number of observation that

19  matches the reported vote totals on election results web

20  page?

21      A.   This may have been the first time.  I don't

22  know.  I don't recall doing this before.  Every state

23  does it differently, so, you know, what -- I don't think

24  that there's anything, you know, specific about doing

25  this exercise that is -- that's critical.



1      Q.   Sure.  But my question was, just to make sure
2  we're communicating, have you done this for any state,
3  not just whether you've done this for Georgia before?
4      A.   Right.  I don't think so.  But again, you know,
5  this -- you know, just the -- I mean I think the short
6  answer is I don't -- I don't recall doing it in any
7  other state.
8      Q.   Okay.  All right.  So on Page 4 of this, you
9  move on and you work with the absentee file, right?
10     A.   I believe so, yes.
11     Q.   And on that, you write criticizing Professor
12 Smith that the absentee file -- this is on Page 4 of
13 your report, I'm in the middle of the page.  The
14 absentee file contains records for everyone who
15 requested an absentee ballot, not just those that voted
16 by absentee ballot.
17          Do you see that in the middle of Page 4?
18     A.   I do.
19     Q.   What was your basis for that assertion?
20     A.   That, I think that was in my conversation with
21 the -- the folks at the Secretary of State's office.
22     Q.   All right.  Let's -- let's go to the bottom of
23 that page.
24     A.   Okay.
25     Q.   So one of the things Professor Smith did --



1  tell me if this is consistent with your understanding --

2  he took the voter history file and he, I guess, cleaned

3  that up and merged that with the absentee file, and then

4  he merged that with the -- the voter file?

5       A.   I believe that's right, yes.

6       Q.   And what's the -- well, I should go back.

7             What's your understanding what the

8  absentee file is?

9       A.   That's the list of all voters who requested an

10  absentee ballot.

11       Q.   What information is in that file?

12       A.   I don't recall everything, but I know that

13  there was -- you know, there's the unique identifier.  I

14  think there's information about, you know, how they made

15  the request, whether it was electronic or -- or in

16  person or -- or there -- there was other fields as well.

17  And the date, if there's a date when they made the

18  request, and I believe there's some other fields as

19  well.  I don't recall off the top of my head all the --

20  all the variables in there.

21       Q.   Okay.  And I think we talked about earlier, the

22  unique identifier in the absentee ballot file is the way

23  you, I guess, marry entries in the absentee ballot file

24  with the voter history file for a particular voter; is

25  that right?



1    A.    That's correct.

2    Q.    And that unique identifier should be in every

3  database that has voter information in it at the

4  Secretary of State's office?

5    A.    I don't want to make a blanket statement like

6  that, but, you know, if there's information about

7  specific voters and you want to be able to identify them

8  easily, then including that variable would probably be a

9  good idea.

10   Q.    All right.  But that unique identifier is also

11  in the voter file?

12   A.    I believe it is, yeah.

13   Q.    What's the voter file?

14   A.    The voter file is the list of all -- all

15  registered voters in the state.

16   Q.    Right.  Okay.

17       So at the bottom of Page 4 of your report,

18  you note that Professor Smith requested the daily voter

19  file from the Georgia Secretary of State's office for

20  October 15th, 2018.  Do you see that?

21   A.    I do.

22   Q.    And then you criticize Professor Smith for

23  choosing that date, saying that the reason for choosing

24  this particular date is neither clear nor sound when

25  conducting data compilation?



1      A.    Correct.

2      Q.    What date do you think should have been chosen?

3      A.    I mean I think that picking something, you

4  know, given that there -- there are changes thereafter,

5  something a little bit later probably would have been a

6  better idea.

7      Q.    So Professor Smith writes in his report that --

8  this is on Page 20, Paragraph 36, if you want to look at

9  it with me.

10     A.    Is this -- which document is this?  What's the

11  letter?

12     Q.    It's his -- it's his report from December 16th

13  of 2019.  Am I giving you the information you need to

14  find it?

15     A.    Did you say it's Document B?

16     Q.    C, C as in cat, yes.

17     A.    I'm on C.  Which page?

18     Q.    20.

19     A.    Okay.

20     Q.    Paragraph 36.

21     A.    Page -- okay.  I'm on Page 20.

22     Q.    Great.  Paragraph 36 at the bottom.

23     A.    Okay.

24     Q.    Here he's talking about the voter file,

25  right --



 1      A.    Yes, he is.

 2      Q.    -- he downloaded, right?  So we're talking

 3  about the same thing we were just talking about from

 4  your report?

 5      A.    It is.

 6      Q.    Okay.  He says, The -- the data of this

 7  snapshot of the voter file is important as it was

 8  created well after the state's 30-day voter registration

 9  closing deadline prior to the 2018 general election on

10  November 6th, right?

11      A.    I see that.

12      Q.    What I'm wondering is, why is that not clear or

13  sound?

14      A.    Because the data continue -- I mean since we

15  know that the office continued to update, right, and

16  correct errors over the course of time, then it's

17  possible that some of the mismatches that he finds in

18  his analysis are due to recordkeeping errors that were

19  later corrected.  And so -- I mean I think generally,

20  you know, using a more updated data set is probably the

21  better idea, right, particularly if we -- if we know

22  that errors have been corrected over time.

23      Q.    Did you download a file, a voter list from

24  later that you think should have been the one used?

25      A.    Is that -- is this the one -- is the voter list



1  the one I used from a year later?

2      Q.   No.  That was the voter history file.

3      A.   Oh, the voter history file.  I'm sorry,

4  these -- keeping these separate in my head is difficult

5  to do.

6              So I -- I think the other two files I used

7  the same ones that he did.

8      Q.   Right.  So your criticism is that he -- he

9  shouldn't have used the one from October 15th, right?

10     A.   I criticized him for that, yes.

11     Q.   And here we're talking about the voter file,

12  just to be clear, right?

13     A.   I believe so, yes.

14     Q.   If you want to take a minute just to make sure

15  we're on the same page, do.  Are you okay?  I can't tell

16  what you're looking at.

17     A.   I'm looking at my report.  The voter list file,

18  is that the same as the voter file?

19     Q.   I mean I don't know.  I'm not the expert.

20     A.   Right.  Yeah, I -- now I have similar number in

21  the absentee ballot file, so I don't know if the voter

22  list file is the same -- and Dan had particular names

23  for the files which I don't -- I don't recall.

24     Q.   Okay.  Well, so the one you're criticizing him

25  for -- for at the bottom of Page 4 up to the top of



 1  Page 5 --

 2      A.   Yes.

 3      Q.   -- that's the daily voter file, right?

 4      A.   I think so.  I call it the voter list file.

 5      Q.   Well, so if you look at the first -- the bottom

 6  of Page 4, that first sentence of that paragraph --

 7      A.   Yes.

 8      Q.   -- Professor Smith requested the daily voter

 9  file?

10      A.   Yes.  Oh, yes.

11      Q.   I'm just -- okay.  Great.  And that's the same

12  thing as the voter list file at the top of the next

13  page, right?

14      A.   I think so.

15      Q.   You -- when you say you think so, sometimes

16  people mean that to say yes and sometimes people mean it

17  to say I'm not quite sure, but probably.

18      A.   Yeah, no, I think that it is.  I mean I -- I

19  should have been more careful to call it one thing and

20  one thing only.  But yeah, I call -- in the very next

21  sentence, I'm talking about the same file, so I think I

22  called the daily voter file and the voter list file,

23  those refer to the same file.

24      Q.   Okay.  And you say that Professor Smith should

25  not have used October 15th as the date to download the



1  file, he should have been used some other date, right?

2      A.   I criticized him for that, yes.

3      Q.   Did you download the file from the date that

4  you think he should have used?

5      A.   I don't think I did.

6      Q.   Okay.  So you then did not compare whatever was

7  in that file with the file that he used, right?

8      A.   I don't believe that I did.

9      Q.   So you don't actually know whether there were

10 any differences between the voter file that he

11 downloaded and, you know, whatever the perfect voter

12 file to download would have been, right?

13     A.   I don't recall comparing them.

14     Q.   Right.  So you don't know if there were any

15 differences?

16     A.   Which means, yes, I don't know if there were

17 any differences or not.

18     Q.   And you had said that the -- that the voter

19 file is updated, you know, sort of -- it gets updated

20 closer to the election, even after the voter

21 registration file, right?

22     A.   I believe that's true.

23     Q.   What was the -- what's the basis for that

24 belief?

25     A.   I think that's from the Secretary of State's



 1  office.

 2      Q.    Yeah.

 3            On Page 5, that first full paragraph,

 4  Another major flaw.

 5      A.    Yes.

 6      Q.    You write, Another major flaw in Professor

 7  Smith's report is he used valid style code as methods in

 8  which the voter cast the ballots, i.e., mailed or

 9  electronic.  However, these fields indicate the method

10  by which the ballot was delivered to the voter, not how

11  the ballot was cast, right?

12      A.    Correct.

13      Q.    Where did you get that information?

14      A.    That was from the Secretary of State's office.

15      Q.    Your phone call with them?

16      A.    Correct.

17      Q.    Who arranged that phone call?

18      A.    Mr. Tyson.

19      Q.    Okay.  You didn't just call up like the main

20  number and say, Hey, I've got some questions about your

21  records?

22      A.    No, I don't think I ever did that.

23      Q.    Defense counsel arranged for you to have a call

24  with their client to get the information, is that your

25  understanding?



1    A.    Yes.

2    Q.    On Page 3 of your report, you talk about the

3  final vote tally.  This is in the middle of that page,

4  that paragraph that starts with, Next Professor Smith?

5    A.    Yes.

6    Q.    Right in the middle of that, it says, First it

7  is unclear how the final tally on the web page accounts

8  for provisional and supplemental ballots cast.

9              Do you see that?

10   A.    I do.

11   Q.    Did you ask the Secretary of State about that?

12   A.    I believe we did have a conversation about it.

13   Q.    Did you learn the answer?

14   A.    I think that the -- that -- I don't remember

15  specifically, right, what they said, but, you know, I

16  think that it -- it included -- it did include

17  provisional -- well, I don't -- I can't say for sure

18  whether it did or -- whether it included provisional or

19  supplemental ballots or not.  I don't recall

20  specifically.

21   Q.    I guess when you write, It's unclear how the

22  final tally on the web page accounts for these ballots,

23  presumably that means at that point you don't know?

24   A.    That's correct.  I think I'm pretty clear.

25   Q.    Right.  Because if you knew, it would be clear



1  and then you would say it?

2      A.    That's right.  Correct.  That's correct.

3      Q.    Right.  So, and I think you said that you asked

4  the Secretary of State's office about this?

5      A.    I -- I recall having a conversation about the

6  web page numbers.

7      Q.    Okay.  And the -- the Secretary of State's

8  office didn't know?

9      A.    I -- no, I'm not saying that.  I don't recall

10 what the specifics were about it, but I think that -- I

11 don't know if we talked specifically about provisional

12 and supplemental ballots, but I was asking them about

13 these discrepancies, but I don't recall that they had an

14 answer for why there were -- were discrepancies between

15 the two, but there was a small number of discrepancies

16 between these two -- between the date -- the official

17 data set -- I mean the numbers on the web page and then

18 these data sets that -- that we were using.

19             I mean I think, you know, they were -- you

20 know, they were saying how it could be this and could be

21 that, but I don't recall the specifics.

22     Q.    Okay.  All right.  Let's talk about that

23 Florida opinion.  Do you remember the Florida opinion we

24 talked about after Professor Smith's?

25     A.    Yes.



1    Q.   Now, you, I guess on the top of Page 4 of your
2  report, note that in unrelated litigation -- are you at
3  the top of Page 4?  Just let me ask that.
4    A.   I am.
5    Q.   In unrelated litigation, Professor Smith
6  writes -- and here you're quoting from his report,
7  County's recordkeeping of VBM, vote by mail, ballots
8  cast by Florida voters is rife with inconsistencies and
9  errors.  Right?  And that's the language?
10    A.   That's what it says.
11    Q.   And I take it that's your -- that's one of your
12  criticisms of Professor Smith, right?
13    A.   Here in Georgia, yes.
14    Q.   Right.  And tell me if I've got your argument
15  right.  If I don't, please correct me.  But Professor
16  Smith says basically, Look, I have done this analysis on
17  a bunch of states and Georgia's records, because of the
18  problems I've identified, are an outlier, they're worse
19  than other states.  And --
20    A.   If you --
21    Q.   I'm sorry.  Go ahead.
22    A.   No, no.  You weren't finished.  I'm sorry.
23    Q.   Yeah, thanks.
24          And the -- he says, I've done this based
25  on a bunch of states.  And one of the states he talks



 1  about is Florida, right?

 2      A.    That's right.  He -- he -- without providing

 3  any details or evidence, he argues that Georgia is worse

 4  based upon his years of experience.  And then he only

 5  mentions two states specifically, again, without

 6  providing any evidence for the court about how Georgia

 7  is worse than these other ones.  And one of those if

 8  Florida, which I thought was ironic considering he just

 9  had been criticizing Florida for their poor

10  recordkeeping months -- months prior.

11      Q.    The point of your using this report, referring

12  to this report is that earlier Professor Smith had

13  talked about poor recordkeeping in Florida counties and

14  now he's saying Florida recordkeeping is good, is that

15  basically your argument?

16      A.    As far as --

17      Q.    I'm trying to make sure we're talking about the

18  same thing.

19      A.    Yeah, we are talking about the same thing.  He

20  holds that -- again, for this case in Georgia, he only

21  mentions -- he doesn't -- he makes an argument without

22  any support whatsoever.  He just says I've done this a

23  hundred -- hundreds of millions of cases and Georgia is

24  really bad, and you're going to have to rely on that and

25  nothing else for -- for that conclusion.  And then



1  later, he says -- you know, he mentions Florida and

2  North Carolina as exemplars for good recordkeeping.  And

3  again, I happen to have personal knowledge that he

4  thought only months earlier that Florida was bad at

5  recordkeeping elections.  So I thought that that was of

6  interest.

7      Q.    Great.  So the -- the DNC services case where

8  that report comes from, you were an expert in that case

9  as well, right?

10     A.    Correct.

11     Q.    And your report responded to his report, right?

12     A.    Yes.

13     Q.    And the issue in that case was vote by mail and

14  signature mismatch?

15     A.    I believe that was the -- the main thing, yes.

16     Q.    What do you know about how Florida maintains

17  its voter lists?

18     A.    I -- I don't -- I don't know about how Florida

19  maintains its voter lists.

20     Q.    So we talked earlier about how Georgia is a

21  top-down system, right?

22     A.    We did.

23     Q.    And you remember that what that means is that

24  basically all of the information on Florida voters is

25  kept at the -- Florida, sorry.  The -- my mistake.



1          The Georgia records on voters are kept in

2    the Georgia Secretary of State's office, right?

3       A.   Correct.

4       Q.   They're centralized into state and that's the

5    top and then it goes down to the counties, right?

6       A.   Yes.

7       Q.   Do you know whether Florida is a top-down

8    system?

9       A.   I don't recall off the top of my head, no.

10      Q.   And if -- Professor Smith is talking about the

11   records maintained by the counties in Florida, right?

12      A.   I don't recall.

13      Q.   Okay.  So if you go to Page 4 of your report,

14   where you're quoting Professor Smith, he writes -- you

15   write -- Professor Smith writes --

16      A.   Right.

17      Q.   -- Counties recordkeeping of VBM ballots passed

18   in Florida is rife with inconsistencies and errors,

19   right?

20      A.   Correct.

21      Q.   And he's talking about the county's

22   recordkeeping, right?

23      A.   For that specific -- for that specific

24   instance, yes.

25      Q.   The language you quote from the report is about



 1  the county's, right?

 2      A.    It is.

 3      Q.    And it's not about the state's?

 4      A.    I don't know if he criticizes the state

 5  elsewhere in that report or not, but for that particular

 6  sentence it's about -- it's clearly about the counties.

 7      Q.    And you don't know what the interaction of the

 8  county recordkeeping and state recordkeeping in Florida

 9  is?

10      A.    Not -- not off the top of my head.

11      Q.    You don't know whether that recordkeeping

12  information -- bless you.

13            You don't know whether that's done in a

14  way that's the same as Georgia?

15      A.    I don't.

16      Q.    Okay.  Let's go to Professor Smith's other

17  opinion, the second one --

18      A.    Okay.

19      Q.    -- the absentee ballots.  So Professor Smith

20  offers an opinion that absentee ballots were rejected

21  for black voters at higher rates than they were rejected

22  for white voters, right?  Is that basically the opinion?

23      A.    Yes.

24      Q.    And so in response, you write -- and here we're

25  obvious Page 2 of your report --



1        A.    Okay.

2        Q.    -- In terms of racial differences among

3   absentee rejection rates, there are indeed some small

4   differences among all the different racial and ethnic

5   groups.  The underlying cause of those differences,

6   however, is unclear?

7        A.    Correct.

8        Q.    Is that a fair sort of characterization of kind

9   of like the bottom line of your opinion on this?

10       A.    I mean I think that that -- I mean it --

11  it's -- it's part of my opinion, yes.

12       Q.    Sure.  So it -- it looks like your point here

13  is the differences are small and Professor Smith doesn't

14  tell us what causes the differences?

15       A.    Those are both true.

16       Q.    And -- and those are both your -- your

17  criticisms?

18       A.    Correct.

19       Q.    Does Professor Smith in -- in any of his

20  reports, does he purport to talk about the cause of

21  those differences?

22       A.    No, he does not.

23       Q.    Have you read his deposition transcript?

24       A.    I have not.

25       Q.    Do you know whether he offered a cause at his



 1  deposition?

 2      A.    I don't know whether he did or not.

 3      Q.    And you have a couple of, you know -- so aside

 4  from the cause part of this, right, where it looked

 5  like -- although tell me if you think this is wrong.  It

 6  looks like you and Professor Smith, like you're just

 7  kind of not joined in the issue?  He's not offering an

 8  opinion and you're pointing out he's not offering an

 9  opinion (inaudible) --

10      A.    That's correct.

11            MR. KAISER:  Madam court reporter, am I

12  talking too fast again?

13            THE REPORTER:  (Moves head up and down.)

14            MR. KAISER:  I'm very sorry.  Thank you.

15  I heard myself do it, and then -- okay.

16      Q.    (BY MR. KAISER)  All right.  So on that -- that

17  first part about the differences, you criticize how

18  Professor Smith gets to the conclusion that there were

19  differences as well in your report, right?

20      A.    I do.

21      Q.    And here we're on Page 6?

22      A.    Okay.

23      Q.    You see the "Reasons for Rejected Ballots" --

24  "Ballots" heading?

25      A.    I do.



1    Q.   So you look -- look in that paragraph, the last

2  two sentences of that first paragraph underneath it, he

3  only looked at those ballots that were delivered to

4  voters by mail, results for all absentee ballots could

5  be different?

6    A.   Yes.

7    Q.   And -- and he refers to Professor Smith?

8    A.   Correct.

9    Q.   Did -- did you do an analysis for all absentee

10  ballot -- ballots rather than just those that were

11  delivered to voters by mail?

12    A.   No, I don't -- I don't recall.  I don't think I

13  did, but I don't recall specifically.

14    Q.   If you did, would you have put that in your

15  report?

16    A.   I may have.

17    Q.   Okay.  If -- if there were -- if there were a

18  big difference when you would add those other ballots

19  in, would you have -- that strikes me as the kind of

20  thing you would have mentioned in your report, that --

21    A.   I think that's a fair assumption.

22    Q.   Okay.  Do you know who receives absentee

23  ballots other than through the mail?

24    A.   Well, the people receive it electronically.

25    Q.   Well, yeah.  Yeah, who -- who receives absentee



1  ballots in Georgia electronically?

2      A.   My understanding is electronic absentee ballots

3  are mainly, although not exclusively, members of the

4  military.

5      Q.   Sure.  Overseas folks?

6      A.   I believe that's right.

7      Q.   Do you know how many voters that is in Georgia?

8      A.   I don't recall the number.  I don't know the

9  number off the top of my head, no.

10     Q.   Okay.  Do you have a sense of the percentage?

11 Do you know the percentage?

12     A.   I would guess it's quite a bit smaller than

13 people getting absentee ballots by mail.

14     Q.   Okay.  And you say that the results for all of

15 the absentee ballots, including those ballots for the --

16 the military folks, those results could be different,

17 right?

18     A.   Correct.

19     Q.   You don't say that they are different, right?

20     A.   That's correct.

21     Q.   So you indicate on that page on -- on -- toward

22 the bottom of Page 6 that the absentee ballot file has

23 reasons why ballots are rejected, right?  You list four

24 of them.  Do you see that?

25     A.   I do.



1    Q.   Do you remember that, that part of your report,
2  just to make sure?
3    A.   I do.
4    Q.   Do you know as you -- you know, in your work
5  working with the absentee ballot file, do you remember
6  how many different possible answers there are for why a
7  ballot is rejected?
8    A.   I think, if I remember right, this was like an
9  open field where a county worker would kind of type
10  something in.  And so there were -- there were -- I
11  think that's correct.  And so there wasn't -- sometimes
12  they use kind of standard codes and other times there
13  would be codes that were related to the standard codes
14  but different slightly.
15    Q.   Right.  So I think you identify on the -- I
16  know you identify on the next page some of the reasons
17  are failed to sign in with an elector.  And I guess that
18  as a reason appears just once in the absentee ballot
19  file?
20    A.   Correct.
21    Q.   And there are what, 3200 and change rejected
22  absentee ballots in that file?
23    A.   That's right.
24    Q.   So it -- is it fair to say that there's not a
25  lot of standardization across county officials about



1  what they should be entering in that reason field?

2       A.   I don't know if that's fair.  Like I said, I

3  think that it seems like they were probably instructed

4  what they should put in there, but -- but maybe they

5  just -- maybe all the county officials didn't adhere to

6  their instructions the way they ought to.  Because like

7  I said, there was -- there were slight variations on

8  each other, right.  So maybe they were supposed to

9  write, you know, no oath and somebody might just write

10 oath, right, instead of putting no oath.  So there was

11 variation across the fields, but you could tell what

12 they were getting at.

13      Q.   You glitched for a second there for me.  I'm

14 sorry, but you -- I think what you said is you could

15 tell what they were getting at?

16      A.   Usually you could tell, yes.

17      Q.   And you say that you -- it's the county

18 officials who enters the codes?

19      A.   I think they're -- well, I don't know if

20 they're county officials.  They're election workers.  I

21 don't know if they're working for counties or localities

22 or what.  But they're -- these are codes from -- from

23 local officials.

24      Q.   What's the basis for your belief that they're

25 codes from local officials?



 1      A.    I think we've talked -- I talked about this

 2  with the Secretary of State's office, I believe.

 3      Q.    So you asked the Secretary of State's office

 4  how does this information get in here?

 5      A.    That's correct.

 6      Q.    And that's what they told you?

 7      A.    Yes.

 8      Q.    Do you know if there are any qualify control

 9  mechanisms that make sure the ballots are reviewed in a

10  timely way?

11      A.    I don't.  I don't know.

12      Q.    Were any quality control mechanisms that --

13  that make sure that the codes are uniform for why a

14  ballot is rejected?

15      A.    I don't know if there is or not.

16      Q.    So on Page 8 of your report, you say that race

17  information in the Georgia voter file contains a -- a

18  field for unknown?

19      A.    Correct.

20      Q.    And that that's a little bit more than

21  10 percent of the total voters?

22      A.    Around 10 percent, yes.

23      Q.    Sure.  Oh, my goodness, you're light.

24      A.    It's slightly under 10 percent, it looks like.

25      Q.    9.22?



1    A.    Yes.

2    Q.    And you sort of posit in that paragraph in the

3  middle, If one race is more likely to refuse to answer

4  this question than the other races, then using the

5  available data to draw conclusions based on race is made

6  more difficult.  Perhaps white voters are less likely to

7  answer the race question than other voters.

8    A.    (Moves head up and down.)

9    Q.    Are you aware of any data or studies that say

10  that a person of a particular race is less likely to

11  reveal race information on a voter application?

12    A.    No.

13    Q.    And this information comes from voter

14  applications, right?  Voter --

15    A.    That's right, self-reported.

16    Q.    Are you aware of any information or any studies

17  or anything that says that white voters in particular

18  are less willing to share their race?

19    A.    No.  And it could be any race, white was just

20  an example.  If -- if all -- if there's a majority of

21  the -- if -- not even a majority.  If -- if Asian voters

22  or African-American voters or Hispanic voters, or any

23  voters of any of these categories are more likely to put

24  unknown than the other racial or ethnic categories,

25  then -- right, then we're going to have -- the analysis



1  is going to be biased based on this.  And we don't -- we

2  don't -- I -- I don't know, right -- and I think that's

3  the problem, I don't think that Professor Smith knows

4  either whether there are more -- if any one of these

5  racial or ethnic groups is over or under represented in

6  the data, which is why I pointed it out.

7       Q.   Okay.  So you -- you talked -- your sort of

8  next opinion that you offer is about comparing Georgia

9  to other states with respect to absentee ballot

10 rejection rates, right?

11      A.   I'm -- yes, on Page 10.

12      Q.   Yes.  Thank you.  Exactly.

13           And you -- you say that, It maybe useful

14 to situate Georgia's absentee ballot rejection rate

15 against the other states in the country to get a better

16 idea if Georgia's rejection rate is too high or too low,

17 right?

18      A.   Right.

19      Q.   Does Professor Smith offer an opinion about

20 whether Georgia's absentee ballot rate is high or low?

21      A.   Um...

22      Q.   Ballot rejection rate?

23      A.   Yeah, right.  Right, right, rejection rate.  I

24 mean I think that's the -- that's the implication,

25 right, that it's -- that -- well, I'm trying to think if



1  he does or not.  But I think when he -- when he refers

2  to -- no, that was about recordkeeping.

3          I don't know if he specifically says that

4  or not.  But I think that this is a useful exercise,

5  right, to see -- instead of just looking at Georgia in

6  isolation, right, and saying, Oh, my gosh, there's all

7  these errors, I think it's useful to compare it to other

8  states to say, you know, so we don't know the -- is a

9  1 percent rejection rate really high or really low?  If

10  we don't look at any other states, we don't know, right?

11          Maybe every other state rejects no

12  ballots, well, then 1 percent is high.  But if every

13  other state rejects 10 percent of the absentee ballots,

14  well, then 1 percent is really low.  So I think this is

15  a useful -- this is useful information for the court.

16     Q.   Georgia, it looks like -- my understanding of

17  your conclusion of the section, and -- and it might be

18  easier to do this by looking at that chart on Page 11.

19     A.   Okay.

20     Q.   Well, actually, before I have get there, let

21  me -- let me back up.

22          So this is based on Election Assistance

23  Commission data, right?

24     A.   That's right.

25     Q.   So they -- they do -- how -- how does one



1  pronounce the study they do, the survey they do, EAVS?

2      A.    Oh.   I mean, I think EAVS is fine, or maybe

3  E.A.D.S. (sic).   You know, we can -- we could say it or

4  spell it out, either way.

5      Q.    I'm -- I'm -- I just want to know what the cool

6  kids in the political science world do.

7      A.    I would say E.A.D.S.

8      Q.    Isn't it V?   E.A.V.S.?

9      A.    Oh, E.A.V.S., yes, yes, yeah.   Sorry.

10     Q.    Right.   It's voting and --

11     A.    Yes.   Election Administration and Voting

12  Survey.   Yeah, EAVS is kind of a weird word, so I would

13  say E.A.V.S.

14     Q.    The E.A.V.S. survey, what is that?

15     A.    They do a -- a survey, the EAC surveys all

16  the -- the election administration in every state asking

17  them for specific data on all -- all kinds of variables,

18  not just absentee ballot variables, but about all kind

19  of election -- various aspects of election

20  administration.

21     Q.    And it -- it's a survey they -- where they, I

22  guess like, request information from local officials?

23     A.    Yes, local and state officials.

24     Q.    So they -- thank you, or state officials.

25          They -- do they go out and download the



 1  data and do their own analysis?  Or do they just rely on

 2  self-reporting from elections officials?

 3      A.   My understanding is it's all self-reporting.  I

 4  don't know if they double-check anything or not.

 5      Q.   And what you did here is you took the, I guess,

 6  raw data from the EAVS data set from the 2018 election

 7  survey and you looked at the number of absentee ballots

 8  that were counted and the number that were rejected; is

 9  that right?

10      A.   That's correct.

11      Q.   And then you figured out a percentage?

12      A.   Correct.

13      Q.   And what you found is that Georgia's on the

14  high end, but not, I guess, really bad; is that a fair

15  way of characterizing it?

16      A.   I don't know if we --

17              MR. TYSON:  I'll object to form on that

18  one, but you can answer.

19      A.   I don't know if I -- did I said something

20  specific?  I said -- I said it's in the upper part of

21  the middle section.  I think that's a reasonable -- I

22  think we would all agree that that's a reasonable

23  description of the figure on -- of where Georgia lies on

24  the figure on Figure 1.

25      Q.   (BY MR. KAISER)  Right.  So we're looking at



1   Page 11 of Figure 1?

2        A.    Right.

3        Q.    Okay.    And I guess as I count, there are, what,

4   11 states plus the District of Columbia that have higher

5   rejection rates than Georgia?

6        A.    I count 11 too.

7        Q.    Okay.    Great.

8               And this doesn't tell us anything about

9   the differences in reinjection rates by rates, right?

10       A.    This does not, no.

11       Q.    And in fact, the EAVS, the E.A.V.S. -- it's

12  hard -- well, the E.A.V.S. doesn't ask for rejection

13  where it's based on race?

14       A.    My recollection is they don't, but I -- I

15  wouldn't swear to that.

16       Q.    I guess I -- I'm just wondering why does it

17  matter if there are ten states that are -- have a worse

18  record on rejecting absentee ballots than Georgia?

19       A.    Again, I think it is a useful exercise to see,

20  right, instead of looking at Georgia in isolation, you

21  know.  And this is kind of standard operating procedure

22  in political science, this is why we have comparative

23  politics, right?  Because if we look at one country and

24  say, Oh, my gosh, Finland is doing X, right, is that

25  abnormal?  Well, we only know if it's abnormal if we



1  compare Finland to other countries.

2              And in the same way, I think this is a

3  useful exercise to see how does Georgia compare to other

4  states, right, in terms of its overall rejection rate of

5  absentee ballots.  Is it high, low, in the middle, etc.?

6       Q.   Okay.  All right.  So we've spent a fair amount

7  of time talking about Professor Smith and your

8  criticisms of Professor Smith.  Do you have any opinions

9  about Professor Smith's work that either aren't

10 contained in your expert reports or we haven't talked

11 about today?  Do you have any extra opinions?

12      A.   I don't -- I don't -- I mean is there anything

13 that I plan on testifying in trial that's not in my

14 report, is that a better specific question?

15      Q.   Yeah, I don't know that I want to -- who knows

16 what's going to happen in the trial.  I want -- I'm

17 trying to figure out is there -- is there something that

18 you didn't put in the report that we haven't talked

19 about today that is an opinion that you've got -- an

20 expert opinion that you've got about Professor Smith's

21 work?

22      A.   I mean, I don't -- I don't have any surprises

23 in my pocket that, you know, as -- as I sit here today,

24 to spring upon you about -- about Professor Smith.  I

25 mean I did criticize him in the other supplemental --



1  one of the other reports.  So I don't -- I don't want to

2  limit -- overly limit myself in what I'm going to say in

3  trial.  But I will tell you that there's nothing -- I

4  don't -- I don't have -- there's no October surprise in

5  my back pocket.

6       Q.   Okay.  And -- and the stuff in the other -- the

7  opinions you've got in your -- your other supplemental

8  report, just as to Dan Smith, just as to Professor Smith

9  at this point, those opinions, although tell me if you

10  think I'm wrong, relate to the opinions in the criticism

11  that we've had -- that we've already talked about here;

12  is that fair?

13       A.   I think that that's fair, yes.

14       Q.   And so I take it your answer when I ask if you

15  have any extra opinions, any opinions that aren't in the

16  reports and that we haven't talked about today is as you

17  sit here right now, no; is that right?

18       A.   I think that that's fair, yes.

19       Q.   Great.  Then let's talk about Professor

20  McDonald.

21       A.   Okay.

22       Q.   So --

23       A.   Is now a -- is now a good time to take a break?

24  Or --

25       Q.   Absolutely.  We're going to shuffle paper



1  anyway.  Do it.

2      A.   Okay.

3      Q.   How much time do you -- either you need or your

4  dog need?

5      A.   What -- whatever -- whatever you guys want to

6  do is fine by me.

7          MR. KAISER:  Okay.  Why don't we take --

8  is ten minutes okay, Bryan?

9          MR. TYSON:  That's fine with me, yeah.

10         MR. KAISER:  Okay.  Agree.

11         MS. BRYAN:  Matt, I'm going to use the

12 opportunity to slide off.

13         MR. KAISER:  Okay.

14         MS. BRYAN:  Enjoy the rest of your day.

15         MR. KAISER:  Thank you.

16         Great.  Can we go off the record?

17         THE VIDEOGRAPHER:  Okay.  If there's no

18 objection, we'll go off the record at 11:33 a.m. Central

19 Time.  Okay, we're off the record.

20             (Ms. Bryan exits the deposition.)

21             (Break was taken.)

22         THE VIDEOGRAPHER:  And we are back on the

23 record at 11:47 a.m. Central Time.  Please proceed.

24         MR. KAISER:  Thank you.

25     Q.   (BY MR. KAISER)  Okay.  So now let's talk about



1  Professor McDonald's reports and your criticism about

2  that.  Does that make sense?

3      A.   Yes.

4      Q.   So here we're going to be talking about your

5  report, which was filed on March 24th, 2020.  That has

6  already been marked as Exhibit 3.  We're also going to

7  be talking about Professor McDonald's report, which was

8  filed February 18th, 2020.  Do you have that?

9      A.   I have my report open.  Let me just get -- I

10  can't find McDonald.  So let me reopen it here.

11      Q.   Document D, if that helps in what we sent you.

12      A.   That does help and I do have it.

13      Q.   Okay.  Great.

14            So that hasn't been marked, let's mark

15  that Exhibit 6.

16            (Exhibit No. 6 was marked.)

17      Q.   (BY MR. KAISER)  And then we also have a

18  supplemental excerpt report from Professor McDonald from

19  April 8th of this year.  That has also not been marked.

20  Do you have that one open?

21      A.   I do.

22      Q.   Let's mark that one Exhibit 7.

23            (Exhibit No. 7 was marked.)

24      Q.   (BY MR. KAISER)  So Professor McDonald, on

25  Page 17 of his report -- do you mind going there with



 1  me?

 2      A.    Okay.

 3      Q.    Actually, before we get there, let me ask

 4  you -- we talked with Dan Smith that, you know, you guys

 5  are in the same kind of community of political

 6  scientists.  Is Professor McDonald in that community?

 7      A.    Yes.

 8      Q.    What's your opinion of his work as a scholar or

 9  his reputation as a scholar?

10      A.    Mike -- Michael is -- I've known Michael for

11  many years and he's -- I like him as a scholar and as a

12  person.

13      Q.    And is -- there are two Michael McDonalds in

14  the political science community, right?

15      A.    There are indeed.

16      Q.    The other one is a reference on your CV, right?

17      A.    Well, both of them are on my -- well, yes.  So

18  both of them are on my CV.  I coauthored a paper with

19  Michael McDonald in this case many years ago.  And then

20  the other Michael McDonald, I believe, has a reference

21  on my CV as well.

22      Q.    Fair.  Okay.  So Page 17, thanks.

23      A.    I'm there.

24      Q.    Here -- here what I'm trying to do is really

25  sort of frame and organize our conversation.  So my



1  understanding is that Professor McDonald really offers

2  two opinions.  And he summarizes those here on -- on

3  Page 17.  And the first one is in that first paragraph.

4  He says in that first sentence, It's my opinion that the

5  Georgia Secretary of State's office canceled the

6  registrations of conservatively estimated 59,866

7  no-contact registrants who continue to ride -- reside at

8  their current voter registration address.

9            Do you see that?

10      A.   That's on Page 18.

11      Q.   No.  I'm sorry, I'm looking at the page number

12  at the bottom of the page, not the one at the top.  Yes,

13  that's right.  It's Page 18 on the blue page number at

14  the top.

15      A.   Yes, I'm now there.  Okay.

16      Q.   Do you -- do you sort of agree with me that

17  that's one of his opinions?

18      A.   Yes.

19      Q.   And as I read your report, you don't offer an

20  opinion that that conclusion is wrong; is that correct?

21      A.   I don't recall -- I don't think that I do,

22  though.  I don't -- I don't think I take dispute with

23  the total number, specifically in my report.

24      Q.   Right.  So you -- you have not offered an

25  opinion here that that opinion of his that I just read



1  is incorrect?

2      A.    I believe that that is true.

3      Q.    And then his second opinion, when you look at

4  that -- that second paragraph on Page 18, using the blue

5  page numbers, is that the Georgia Secretary of State's

6  NCOA matching procedures may identify too many

7  registrants as having filed an NCOA form with the

8  U.S. Post Office.  And he notes that two data vendors

9  cannot find NCOA matches for nearly 14,732 registrants

10  whom the Secretary of State's office canceled based on

11  an alleged NCOA match.

12            Do you sort of understand that to be one

13  of his opinions as well?

14      A.    Yes, although, he -- I think his supplemental,

15  he kind of goes into that again with more specificity.

16      Q.    Sure.  Yeah, yeah.  And regardless of whether

17  he's talking about it in his original report or his

18  supplemental, I think that's kind of his bottom line

19  opinion on that point.  Is that your understanding?

20      A.    That is.

21      Q.    And as I read your report, it -- it doesn't

22  look like your opinion is that you -- is that that's

23  wrong?

24      A.    I don't -- I don't think that -- I don't think

25  that I specifically talk about that -- whether the



1  14,000 number is right or wrong.

2           THE REPORTER:  Matt, I didn't hear the end

3  of your question.  I heard the opinion that that's

4  wrong, and I saw about six more words come out of your

5  mouth.

6      Q.   (BY MR. KAISER)  You don't offer an opinion

7  that that's wrong, right?

8      A.   I believe that that is correct, I don't dispute

9  the 14,000 number.

10     Q.   So Professor McDonald's report and your

11 response to it are -- are about Georgia's process of

12 cancelling voter registrations every other year; is that

13 right?

14     A.   That's part of it, sure.

15     Q.   What else is in it?

16     A.   Well, there's stuff about race as well, I

17 believe.

18     Q.   Oh, oh, in your report, yeah, excellent.  Thank

19 you.  Thank you.

20           So let's, I guess, go to Professor

21 McDonald's report on Page 10, using the blue numbers.

22 It's that table.  You see the table?

23     A.   I do.

24     Q.   And as I look at this, tell me if this is your

25 understanding, on the very right-hand side of the table,



1  it lists the total voters in the voter file on

2  November 15th and their -- and it breaks down their

3  percentage by rates with the total votes; is that right?

4      A.   Correct.

5      Q.   And the voter file, it's just the list of all

6  the registered voters, right?

7      A.   Correct.

8      Q.   And then he has in the -- I guess in the

9  leftmost column, he's got that sort of breakdown of

10  races and ethnic identities that are in the voter file;

11  is that right?

12     A.   Yes.

13     Q.   Then he has three -- three separate columns to

14  the right of that breakdown of races, NCOA, No Contact

15  and Returned Mail, right?

16     A.   Correct.

17     Q.   And each one of those categories, the voter's

18  put on what he's calling the first list to be removed

19  from the rolls of registered voters in the State of

20  Georgia; is that right?

21     A.   I believe that's correct.

22     Q.   So you had testified earlier that you talked to

23  the Secretary of State's office about their process of

24  generating the list that this report is based on, right?

25     A.   Yes, we talked about these processes.



1    Q.   So I guess what I'm -- what I'm hoping you can

2    do is explain each of these and how the voter winds up

3    on these lists.  And that's not a question yet.  Why

4    don't we start with the NCOA list.

5              What does NCOA stand for?

6    A.   National change of address.

7    Q.   Okay.  And what's the national change of

8    address?  What's that list?

9    A.   When you move, you can notify the post office

10   that you're moving so that your mail can be forwarded to

11   your new address.  So it's people that have filed those

12   forms.

13   Q.   And -- and what's your understanding of how the

14   Georgia Secretary of State's office uses the NCOA list?

15   A.   I mean, I don't know all the specifics, but I

16   know that they get these data -- I believe they get

17   these data from -- from the post -- from the post office

18   or the federal government and then they can flag voters

19   who have moved in Georgia to -- to see if they have --

20   are still at that address or not or if they should be

21   moved from active to inactive status.

22   Q.   And do you -- you talked to the Georgia

23   Secretary of State's office about how this list is

24   generated based on the NCOA information; is that right?

25   A.   In -- in broad generalities, not -- we didn't



1  get into the weeds on it.

2      Q.   Okay.  And so in broad generalities, I think

3  what you just said is that the idea is somebody files a

4  change of address form, that tells the post office

5  they've got a new address and the Secretary of State's

6  office gets and puts them on this list; is that fair?

7      A.   Sure.

8      Q.   The no contact category that is cited in the

9  second column, how is that list generated?

10     A.   That list is for people that have had no

11 contact with the state in various forms, but mainly

12 due -- but mainly with regard to elections for some

13 period of time, at which time -- and I know that the

14 period of time has changed.  Again, I don't have -- the

15 Secretary of State's office could tell you

16 specifically --

17             THE WITNESS:  Oops.  Sorry.  My -- my son

18 is here, I believe, according to my dog.  Let me mute

19 for -- can I mute, so you don't have to listen to it?

20             MR. KAISER:  (Moves head up and down.)

21             THE WITNESS:  All right.

22             MR. KAISER:  Would you like -- would you

23 like to go off the record for a minute?  Okay.

24             THE WITNESS:  All right.  My -- my son is

25 here in the house with me and I think my dog has figured



1  that out and we should be good to continue.

2      Q.   (BY MR. KAISER)  I think it's probably highly

3  likely, but -- unlikely, but if your son tries to tell

4  you anything about your testimony, will you let us know?

5      A.   I will.

6      Q.   Okay.  So we were talking about the no contact

7  list.  And I'm sorry, I -- I kind of lost my train of

8  thought with the interruption.  But your -- you were

9  explaining your understanding of how the no contact list

10  works.  And I think what you said is you understand it

11  in broad brush strokes?

12      A.   Correct.

13      Q.   That -- and you understand that things have

14  changed a little bit, but that the basic idea is if a

15  voter doesn't have contact with, I guess, the Secretary

16  of State's office or the election system?

17      A.   Or through -- through the DMV is my

18  understanding as well.

19      Q.   Okay.  Then they are placed -- the voter is

20  placed on this list and they are -- do you know how much

21  time elapses before they are -- are placed on this list

22  and removed from the rolls?

23      A.   Well, I think it happens and there's multiple

24  steps.  So after some period of time in which there's no

25  contact at all between -- they don't vote, they don't



1 renew their registration, they don't call their local

2 office, they don't -- they don't renew their

3 registration, voter registration, right.  Again, there's

4 several different ways that constitute contact with the

5 voter.

6            After some period of time of no contact,

7 then they're placed -- they're moved from active to

8 inactive, at which time they can still vote, right.  And

9 then after some other period of time on the inactive

10 list, then they're removed from the voter rolls.

11     Q.   Do you know what those periods of time are?

12     A.   Not -- not specifically.  I think -- I mean I

13 think that for the latter -- I think -- I mean if you

14 want me to guess, right, I can guess.  But I don't -- I

15 don't have it all committed to memory.  And of course,

16 the people from the Secretary of State's know this far

17 better than I do, but I mean I think I remember bits and

18 pieces of it.  And if you want me to -- to -- to recite

19 those, I'm happy to.

20     Q.   Okay.  I -- I didn't need to know (inaudible)

21 okay.

22            And the kinds of contact that a voter

23 needs to have to avoid being on the no contact list, you

24 had said voting, renewing their registration, talking

25 to, I think it was a county elections office.  Anything



 1  else?

 2      A.   Well, I believe they also are sent

 3  self-addressed -- they're sent something to their

 4  mailing address telling them that -- that we haven't had

 5  any contact with you and if you send this letter back,

 6  you know, we'll -- that will constitute contact and

 7  you'll be -- you'll remain on the voter rolls.  I

 8  believe that's another one.  And there may be more I

 9  don't -- I don't recall.

10      Q.   Sure.

11           And then the return mail category, on the

12  middle column, do you know how that's generated or what

13  that is?

14      A.   Yeah, that's when -- I believe it's on mail

15  from Election Administration, not -- not any piece of

16  state mail, but I could be wrong about that -- is sent

17  to the voter and is delivered.  And then it's returned

18  to the state, to the sender as undeliverable, which

19  would mean that presumably the person is no longer at

20  that address.

21      Q.   And with Professor McDonald's report -- and --

22  and I know we talked about this earlier, my memory of

23  your testimony is that you don't know if you got this

24  underlying data or not?

25      A.   Yeah, I don't -- I don't recall if I got the --

 1  the survey data.  I don't recall if I got the survey
 2  data.
 3      Q.   Sure.  But leaving aside the survey data, but
 4  underlying data -- do you mind if I ask what you're
 5  looking at?
 6      A.   I'm just looking at Michael McDonald's report.
 7      Q.   Yeah.  I didn't know if your son was -- needed
 8  the printer.
 9      A.   Oh, yeah, no.  He is standing there, but it
10  looks like he's got things under control.
11              THE WITNESS:  Are you going to be able to
12  print?
13      A.   Okay.  I think he's got it, so...
14      Q.   (BY MR. KAISER)  Okay.  Great.
15              So Professor McDonald did an analysis of
16  the herds checklist, right?
17      A.   Correct.
18      Q.   Did you get the data that he used to do that
19  analysis?  Survey is a separate category of data, right?
20  So just talking about the purge list data, did you get
21  that data?
22      A.   I don't recall.  Usually I get all of the data.
23  So if I had to guess, I would say I was provided the
24  data, but I don't recall specifically whether I was
25  given Professor McDonald's data for -- for either one of



 1  those two categories.

 2      Q.    Okay.  Do you remember if you analyzed that

 3  data?

 4      A.    As I sit here today, I don't believe that I --

 5  that I did.  I don't think that I did.  I think I just

 6  went off of what he reported in this report.

 7      Q.    Okay.  And you -- well, let's move to your

 8  report, the one you filed on March 24th.  And let's go

 9  to the second page of that.

10      A.    Okay.

11      Q.    You'll see that the paragraph in the middle

12  starts with "Based on"?

13      A.    I do.

14      Q.    You write, Based on Professor McDonald's

15  analysis, the administration of voter list maintenance

16  in Georgia does not have a disparate impact on black

17  voters in the state.  Similarly, there's no basis for

18  concluding that the State of Georgia acts in a racially

19  discriminatory manner with respect to these processes;

20  is that right?

21      A.    That's what it says.

22      Q.    And is that your opinion?

23      A.    Yes.

24      Q.    Can you explain how you reached that opinion?

25      A.    Sure.  We can go back to Professor McDonald's



1  report, still on Page -- on Page 10, looking at the --

2  the table that we just spoke about recently.  And if you

3  look at -- if you compare the -- the racial and ethnic

4  categories on the -- on the -- the different

5  subcategories to the -- the final column, the voter file

6  count, we can get an idea of are any racial or ethnic

7  groups more likely to be on one of these lists that move

8  you from active to inactive relative to the overall

9  percentage of racial categories in the voter list file,

10 right.

11             And the difference is -- there's not --

12 there's not really any meaningful differences between

13 the various categories and the final -- the voter count

14 file.

15     Q.   Okay.  Did -- did Professor McDonald offer an

16 opinion that there was a -- a disparate impact based on

17 this?

18     A.   I don't think that he did, but he has -- I mean

19 there's a reason why the table -- I mean if you are

20 willing to remove these tables from his report, I'm

21 willing to remove my criticisms of them.  They're in the

22 report and I assume that they're -- they're in there for

23 a reason, and I'm responding to them.

24     Q.   And -- and again, really your -- your sort

25 of -- your analysis to come up with your opinion about



1  this disparate impact is really a matter of just reading

2  Table 1 on Page 10, right?

3      A.   Yes.

4      Q.   And you didn't do any statistical analysis on

5  your own of this data, right?

6      A.   Neither did -- yeah, just like Professor

7  McDonald didn't.

8      Q.   Did you do any analysis of any other Georgia

9  list maintenance data, right?  So they removed voters

10  from the rolls in 2017 and in other years, did you get

11  that data and do an analysis of that?

12     A.   No.  I was responding to what Professor

13  McDonald did.

14     Q.   Sure.  Sure.

15          And I guess what I'm -- what I'm wondering

16  is, you know, as I look at your report and what you're

17  telling me, it looks like your -- the basis for your

18  conclusion is that you looked at this number for white

19  not of Hispanic origin voters on the far right-hand

20  column, 52.9 percent, right?  And then you went over and

21  looked at it for -- looked at the percentage for white

22  not of Hispanic origin for the grand total of people who

23  are on the purged list and noticed that 54.9 percent is

24  higher than 52.9 percent; is that right?

25     A.   And you could look at the various subcategories

1  as well, like NCOA, for instance, if that's the one that

2  Professor McDonald is most interested in or no contact

3  or whatever.

4      Q.   So I guess what I'm -- what I'm wondering is,

5  you know, the -- the percentages are here on the table,

6  right?

7      A.   Yes.

8      Q.   And -- and you didn't do any analysis of how

9  they got on the table, right?

10     A.   Just like Professor McDonald didn't do any

11 analysis how they got on the table.

12     Q.   And your opinion is -- you know, the basis of

13 your opinion, I guess, is what I'm wondering about.  Why

14 does a political scientist have value to add in just

15 looking at what the percentages are?

16     A.   I don't know what -- I don't know what your --

17 what your underlying opinion of what political

18 scientists do is, but Professor McDonald provided

19 nothing more than this table in his report and he

20 made -- he's making the case, even though he doesn't put

21 it in his conclusions, he does have a section where he

22 talks about race where he's talking about -- where he's

23 implying that -- that blacks -- I'll read it directly.

24     Q.   What page are you on?

25     A.   I am on Page 7 of his report -- 7 and 8.



1  Sorry.

2            So in the final category, he talks about

3  the fact that blacks not of Hispanic origin have a

4  higher percentage of appearance on the inactive reason

5  for no contact --

6     Q.   Where are you?

7     A.   Oh, wait.  So this is -- this is the first full

8  paragraph on Page 7, right.  So he's interpreting just

9  like I did, I did exactly what Professor McDonald did,

10 and we're both political scientists.  So if there's no

11 added value here, that would apply to both of us

12 equally, which is -- which is fine, if that's your --

13 that's your opinion of us as a discipline.

14            But I was just doing to same thing, there

15 aren't really big differences between the -- the

16 distribution of racial and ethnic categories in the

17 voter list compared to the race of registrants on the

18 various purge lists, on the -- on the various reasons

19 for the purge list.

20    Q.   So let me ask you this -- and for what it's

21 worth, I have a lot of respect for political scientists.

22 I -- I guess I'm trying to figure out what the analysis

23 is that is being offered is.  And as I read the summary

24 of Professor McDonald's opinions at the end -- but

25 please tell me if this is wrong -- he is not offering an



1  opinion that there is a disparate impact based on race

2  from placement on the purge lists.  His report doesn't

3  reach that conclusion one way or another?

4      A.   I believe that's correct, but he does talk

5  about race.  And it's my understanding that's an

6  important part of the case, which is why I address it.

7      Q.   Okay.  And the way you address it is -- is

8  really just by looking at the percentage numbers on

9  Table 1 on Page 10?

10     A.   I do the exact same thing that Professor

11 McDonald does.

12     Q.   Okay.  Except you reach -- it appears to me you

13 reach an expert opinion about that and, you know, I

14 thought we both agreed that he doesn't?

15     A.   I don't -- I mean he doesn't put it in his

16 conclusion and I'm just rebutting the -- I'm talking

17 about things that are important to the case from my

18 perspective.  And I think that there's implications for

19 that whether or not he says it or not.  And if he

20 doesn't, then he and I agree that there isn't a

21 disparate impact.  And so that also is -- is a perfectly

22 fine outcome.

23     Q.   Okay.  So let's -- let's talk about the survey.

24     A.   Okay.

25     Q.   So here let's go to your report on Page 2,



1  where you note that the number of survey responses is --
2  is low?

3      A.    Yes.

4      Q.    And I -- I believe you say -- see this is in
5  that survey paragraph, starting four lines from the
6  bottom of the page?

7      A.    (Moves head up and down.)

8      Q.    A sample size of just 142 people is well below
9  the sample size that we usually see for political
10 science surveys published peer-reviewed journal
11 articles.

12           I take it there's probably an "and" that
13 should be between published and peer-reviewed articles?

14     A.    Yes --

15     Q.    Okay.

16     A.    -- that is correct.

17     Q.    So let's talk about sample sizes and surveys.
18 One way social scientists, like political scientists,
19 account for uncertainty generated by a small sample size
20 is by calculating margin of errors and weight, correct?

21     A.    That's correct.

22     Q.    Relatively standard practice?

23     A.    Yes.

24     Q.    And Professor McDonald, in this case,
25 calculated a margin of error; is that right?



1    A.    He did.

2    Q.    And let's look at that.  That's on -- in his

3  report on Page 16.  I have his report upside down, so

4  give me a second.

5          You see where he kind of lists the margin

6  of error?

7    A.    It's on Page 17, if we're going to stick with

8  the blue numbers.

9    Q.    Oh, thank you.  I'm really sorry.  Yeah,

10 thanks.

11         Okay.  You see where he calculated the

12 margin of error?

13   A.    Yes.

14   Q.    Did he do the math wrong?

15   A.    No, I don't think that he did.

16   Q.    He -- so he calculated -- he calculated the

17 margin of error correctly?

18   A.    I believe that he did, yes.

19   Q.    And his calculation, once you account for the

20 margin of error, is that there's a range of what,

21 79 percent and 91 percent; is that right, at the very

22 end?

23   A.    Oh, yeah.  Yes, that's correct.

24   Q.    Okay.  So what does that mean?

25   A.    That means that he -- so the margin of error



1  gives you kind of boundaries, right, in which -- so you

2  have the -- the sampling mean which is 85 percent,

3  that's what he found, for the number of people that

4  were -- that -- people on the list for reasons of no

5  contact who still -- who haven't moved, right, is -- he

6  got 85 percent.

7            And then given his sample size, right, we

8  know with 95 percent confidence that the true -- right,

9  the real answer is somewhere between plus or minus 6 of

10 the number that he got, right.  So that's why it says

11 he's 95 percent confident that the true value is

12 somewhere between 79 percent and 91 percent.

13      Q.    And that 79 percent to 91 percent, that is the

14 percentage of people who are on the purge list for no

15 contact who have not actually been moved, is that --

16      A.    That's his estimate, yes.

17      Q.    And your criticism of that is that the sample

18 size is too small -- or I'm not even sure you say it's

19 too small.  You say it's smaller than you normally see?

20      A.    That's correct, yes.  Yeah, I don't think -- I

21 think if he wanted to get something like this published

22 with only 142 respondents, he might run into -- to

23 objections at the -- at the peer-review level.

24      Q.    Okay.  And -- and you cite to the national

25 election study?



1    A.    Right.

2    Q.    I think you say it's the most well-known survey

3    regarding Americans and their attitudes about politics

4    and elections?

5    A.    That's correct.

6    Q.    I mean the characterization is correct --

7    incorrect, you said?

8    A.    That's -- yes, they're both correct.

9    Q.    And you note that the survey -- the total

10   number of respondents that range from 1,132 to 5,852,

11   right?

12   A.    That's right.  It's between 1952 and I think

13   2016.  So Professor McDonald said something about how I

14   reference only one survey, and that's incorrect.  I'm

15   referencing the American National Election Study, but

16   it's -- they do a survey every two years since 1952, so

17   it's lots and lots of surveys.

18   Q.    Right.  So the numbers you just gave us, the

19   1952 through 2018 or '19, whatever you said, those are

20   units, right?

21   A.    Right.

22   Q.    And that lets you reach conclusions about the

23   American voting public as a whole; is that right?

24   A.    Yes.

25   Q.    How big is that pool of people?  How many



1   American voters are there?

2       A.    Hundred -- I mean certainly it's -- it's

3   definitely over 100 million.  Probably somewhere between

4   100 and 200 million people, I would guess.

5       Q.    Sure.  It's big?

6       A.    It is.  It's a lot of people.

7       Q.    And this survey that Professor McDonald did,

8   right, it's -- it's only talking about voters who are

9   put on the no contact list in 2019, right?

10      A.    Right.

11      Q.    And that's 97,000 voters and change?

12      A.    Correct.

13      Q.    So I guess with a smaller population to survey,

14  why wouldn't it be appropriate to have a smaller sample

15  size?

16      A.    Because the math works out the same regardless

17  of what the total population is.  So you still want more

18  respondents, right, so that we can be more confident

19  about our estimates regardless of whether the

20  population, right, the underlying people that we're

21  interested in is 97,000 people or 97 million people.

22  Which is kind of counterintuitive, but it's true.

23      Q.    Okay.  And -- and I guess we -- you say --

24  well, let's go to this.  Professor McDonald filed a

25  response to your report, right?



1    A.    Correct.

2    Q.    And that's -- we've previously marked that as

3  Exhibit 7.  Do you have that up in front of you?  That's

4  the one from April 8th?

5    A.    I do now.

6    Q.    Okay.  Fair.

7          And he addresses this criticism in that

8  report, right?

9    A.    He does.

10    Q.    So I think that's on Page 2, right?

11    A.    Page 3.

12    Q.    You're right.  You're so right.  Thank you for

13  that.  I'm -- yeah.  Thanks.

14          Right.  So this is the paragraph in

15  reality?

16    A.    Yes.

17    Q.    You know, his view is academics publish small

18  sample size surveys frequently.  In the context of

19  political science surveys, small sample survey sizes are

20  often encountered by researchers studying the behavior

21  of subgroups in the overall population.

22          That's his opinion -- or that's what he

23  says in his report, right?

24    A.    Yes.

25    Q.    You disagree with that?



1    A.   No.   We -- this happens all the time, but that

2  doesn't mean that we -- we can just throw away, right,

3  the -- our -- our basis for believing, you know, what we

4  need in order to conduct appropriate survey sample

5  sizes.   So I mean I would be surprised if -- if

6  Latino -- if Professor McDonald and Latino Decisions did

7  not want more respondents -- more respondents are always

8  better.   You know what I'm saying?

9            They cost more money, right, so at some

10  point you have to stop getting respondents, but I would

11  guess that they were -- they were -- well, I would think

12  that they would have been disappointed with only 142,

13  that they wished they would have had more -- we always

14  wish we would have had more, right.   And so -- and he

15  only cites one -- one -- I think this is telling that he

16  only cites one piece of published research with 132

17  observations in it, right.   And again, it's like a

18  sub-sub-sub-sample, it's Latino foreign-born citizens

19  from the American National Election Study.

20            But, for instance, you know, in the 1950s,

21  there was -- we had this -- we had the American National

22  Election Study, which had at the time roughly a thousand

23  to 1200 respondents.   And there were some really famous

24  articles analyzing how responsive congressional

25  representatives were.   Okay.



1            And the problem with this is that in order
2    to do this analysis, right, now we're talking about
3    congressional district level rather than the nationwide
4    level.  And so for -- for congressional districts, there
5    were only a couple dozen observations for each
6    congressional district.  So this published research was
7    soundly criticized because if we can't rely on this,
8    right, because this survey was designed to tap at what's
9    going at the nationwide level, and even though we have
10   the data, you know, coded down to the congressional
11   district level, that doesn't mean we can just use it,
12   right, because we don't have sufficient samples at that
13   level of geography.  Okay.
14            And so I think that, you know, I -- I -- I
15   continue on the stand on my -- my argument that sample
16   sizes this small would -- you know, some of them might
17   get through, but in general, people -- peer reviewers
18   are going to be -- going to look at -- are going to
19   frown at samples that small for a survey.
20       Q.   Right.  Let me just make sure I understand your
21   opinion.  Everybody can agree probably that more is
22   always better?
23       A.   Yes.
24       Q.   At least with respect to survey responses?
25       A.   Yes.



1    Q.   And I suspect -- strike that.

2         With this, I guess your opinion is not

3    just that more would have been better.  Your opinion, as

4    I take it, is that 142 respondents is such that this

5    wouldn't get published in an academic paper --

6    A.   I believe that -- I believe that they would

7    have a hard time.  I mean the peer review process all

8    depends on the peers that you draw, right, in order to

9    review it.  And we're not all the same, we're all

10   different people.  But if -- if somebody -- if I was

11   reviewing a paper and they had a sample size of 142

12   people, I would certainly bring it up as this -- you

13   know, this is problematic.

14   Q.   And the -- the journal article that he cites in

15   the next sentence, the one after the one we read, you

16   don't think that should have been published?

17   A.   I'm not saying that, but that is -- okay.  So

18   I'm looking at it now.  So it...

19   Q.   That was 139 respondents?

20   A.   Right.  I didn't actually look -- I haven't

21   looked at that particular article.  And I'm not -- let

22   me -- I'm going to click on the link in Professor

23   McDonald's report to bring up the article.

24   Q.   Let us not click on the link at this point.

25   A.   Okay.  I'm going to close -- I'll close the



1  link.

2      Q.    Thank you.  I appreciate that.

3      A.    All right.

4      Q.    Expert in -- in something.

5            Okay.  I guess I'm trying to figure out

6  what your opinion is with respect to that article based

7  just on survey size?

8      A.    Yeah, I don't know what were they -- it depends

9  on that they were doing, right, with the survey data,

10  right.  If he just -- he went and found an article that

11  at some point references 139 Latino foreign --

12  foreign-born citizens in one of their statistical

13  models.  Like I don't -- I don't -- I didn't look at

14  what else was going on, right.  So is that --

15            Right, because that -- because they use

16  the AMES data, okay.  That's what he says right before

17  the 139, which is a much larger sample.  But now he's

18  talking about, right, they're interested in -- in a

19  subsample of the population.  So that -- just like the

20  example I gave, that can be problematic, right.

21            So, for instance, the American National

22  Election Study has done oversamples of minority voters

23  in some cases, right.  Because if we have a 1200 person

24  survey, and we're interested in Hispanic voters, there

25  might only be, out of those 1200 respondents, say 100



1  Latino respondents.  So that doesn't give us the

2  purchase, right, doesn't give us the leverage that we

3  really need in order to study Latinos.  And so they --

4  they've done oversamples of -- of voters.

5              And also, they had a similar election

6  study where they needed an analysis was kind of at the

7  same time both the nationwide, but then also, they

8  oversampled certain states so that we could make

9  references or inferences, I'm sorry, about voters from

10 specific states by -- by oversampling voters in states,

11 right.  So you want your sample size to be sufficiently

12 large, right, to do this.

13             And -- and I -- again, I think 140, that

14 would raise eyebrows at the peer-review level.

15             THE REPORTER:  Would you slow down for me,

16 sir?  Thank you.

17             THE WITNESS:  I will.

18             THE REPORTER:  Thank you.

19             MR. KAISER:  I'm glad it's you not me.

20     Q.  (BY MR. KAISER)  Let's talk about the -- the

21 age differences in this, because you also fault

22 Professor McDonald based on the size of the age levels,

23 right?

24     A.  Correct.

25     Q.  And you write that some of the statements



1  weren't -- well, it is a question.  Are 14 respondents

2  out of 10,124 representative of all people in the no

3  contact list who are between 18 to 29 years old, is

4  that --

5      A.   That's correct.

6      Q.   Okay.  Does Professor McDonald, does he draw

7  any conclusions about the subgroups by age specifically

8  in his report?

9      A.   No, but that doesn't matter, right.

10     Q.   Why?

11     A.   It's still the case that he only has 14

12 respondents, right, in that age group to stand for

13 10,000 people.  So I think understanding that, like,

14 Hey, this -- like any survey, we're taking a sample,

15 right.  And even though he doesn't specifically address

16 just the 18 to 29-year-old subgroup, that doesn't mean

17 that that subgroup isn't there.  It's still there.  And

18 it contributes to the -- his overall conclusions.

19             So the fact of the matter is, if he only

20 has 14 respondents in his survey that fit that age group

21 and they're representing -- their opinions of those 14

22 people are representing the opinions of the 10,000.  So

23 I think a judge understanding that might say, you know,

24 I need to be cautious about -- about accepting the

25 results of this survey because the samples are --



 1  particularly when you look at subgroups are very small.

 2  The -- elderly people are oversampled.  Younger people

 3  are undersampled.  And that's important.  It's important

 4  to know.

 5       Q.    Why does the way not accountable?

 6       A.    Because you still only have 14.  You can't

 7  magically -- right, so imagine you only had one person,

 8  right, in one of these subgroups, which he almost has,

 9  right, because some of these subgroups we're talking

10  about barely double digit people.  You know, if we -- we

11  could surely just magically weight them, right, and then

12  say, Okay, young people are underrepresented in our

13  sample so we need to overweight our respondents, right.

14            You've got to remember that you're --

15  you're basing that on just a handful of people, right.

16  So -- and the whole idea of a random sample is you need

17  to get a reasonably size sampled in order to make

18  inferences.  So if we just had one person, one Asian

19  person, right, in Georgia that responded to this, sure,

20  we can weight that response really, really heavily,

21  right, to stand for all the Asian people that are really

22  on this list.  But that's the problem, right, we don't

23  have a good sample for this subsample in the overall

24  scheme of things.  Okay.

25            So the weighting is appropriate, but



1  understanding that's not a magic -- right, there's no

2  magic here.  Right.  It -- it was perfectly appropriate

3  for him to weight them, and I say that in my report.

4  And I think he misinterprets what I say in his response

5  to me, but he should have weighted them like he did, but

6  that doesn't fix all the problems, right.  If you're

7  undersampling strata in this survey, that doesn't --

8  that's still a problem, right, because you're weighting

9  their responses to stand for a whole bunch of people.

10 Right.

11            And imagine we got the -- the 14 young

12 people, you know, maybe they were totally different,

13 right, than the 10,124 people in the total population

14 for that strata.  Right.  That's the risk with smaller

15 sample size, right, is that that's what's going to

16 happen.

17      Q.   Sure.  But there is -- I take it what you're

18 saying is that there's risk of error when the sample

19 sizes are small, right?

20      A.   Sure.  Absolutely.

21      Q.   Are there hard rules for when a sample size is

22 too small?

23      A.   There's not -- no.  But there's kind of ranges,

24 right.  So I think that for most surveys -- most surveys

25 are kind of at or near a thousandish, right, but there's



1  no -- there's no hard and fast rule.

2      Q.   Right.  So -- so this is sort of your opinion

3  about what the range of acceptable responses is?

4      A.   And I think it's shared within -- within the

5  discipline largely.

6      Q.   Let me ask you about the -- you know, one --

7  one other response he's got based on the national

8  election survey.

9      A.   Okay.

10     Q.   This is Page 4 of his response.  Are you there?

11     A.   Almost.  Okay.  Page 4 of his supplemental?

12     Q.   Yes.

13     A.   I am there.

14     Q.   The blue numbers.

15     A.   Yeah.

16     Q.   Middle paragraph, the last two sentences of

17  that in the link provided by Dr. Brunell --

18     A.   Yes.

19     Q.   -- what he's saying in this part is that the

20  2016 American National Election Study has a sample of

21  only 18 respondents who are born between 1911 and 1926.

22  And yet that a bunch of people, it seems like almost

23  everybody who does work on elections, including you,

24  relies on the American national election study.

25     A.   And that's -- this was -- this is silly.



 1      Q.    Okay.  Why is it silly?

 2      A.    I mean so yes, we all rely on the American

 3   National Election Study.  And is it -- is it surprising,

 4   right, that the number of respondents in this survey for

 5   people that are 90 -- 80 to 90 years old is only 18,

 6   right?  That's not surprising at all.  And, you know,

 7   so, but what he needed to find to make this interesting

 8   was that I had published an article based just on those

 9   18 respondents, then, right, we could have a

10   conversation.

11            But, you know, I could say, well, geez --

12   you know, if I were him, I could say, you know, the

13   number of, you know, left-handed -- you know, you

14   could -- you could pick some crazy small subset and say,

15   Oh, my gosh, there's only one person in this

16   sub-sub-sub-sample, that's meaningless, right, until I'm

17   trying to do something with that sub-sub-sub-sample.

18   Right.

19            I do, I publish with the American National

20   Election Study all the time, but I've never run an

21   analysis, right, on the 2016 sample for people born

22   between 1911 and 1926.  So this example is -- is

23   completely meaningless.  Also, it -- it even supports

24   what I'm arguing, right.  He wouldn't use that small of

25   a sample, right, that small of a subsample.  And he



 1  didn't with his other two groups that were only in the

 2  teens, right.  How come he --

 3              If 139 is fine for him, then how come 17

 4  wasn't good enough or 14 wasn't good enough?  Right.  He

 5  didn't run analysis on those two groups, and I assume

 6  was because the sample size was too small, right.  Those

 7  are really too small.

 8              So I think this just -- this helps my

 9  point more than anything else.

10    Q.   So this is a subgroup within the American

11  National Election Study, right?

12    A.   That's right.

13    Q.   Of variable people?

14    A.   Correct.

15    Q.   And they only have 18 respondents who are

16  representing the whole American voter voting public,

17  right?

18    A.   For their age group.

19    Q.   Yeah, thank you.  Sorry.  Of course, yes --

20    A.   Yes.

21    Q.   -- for that age group.

22              And you had said -- here's where I'm

23  having trouble.  You had said a minute ago about

24  Professor McDonald that he's only got 14 respondents for

25  this group of like, you know, 90-some-thousand people



1  for their age group and that's too small because we

2  don't know that that's representative of all of the

3  people of that age?

4      A.   Right.

5      Q.   Here we've only got 18 people who are in this

6  age group who are representing all of the American

7  voting public generally --

8      A.   In that age group.

9      Q.   Sure.  But it strikes me that we have the same

10  problem -- I don't understand why we don't have the same

11  problem with the American National Election Study

12  because 18 is, on your reasoning, too small to get a

13  truly representative sample of people in that age group?

14      A.   Well, their -- the over --

15           THE REPORTER:  Slow down.

16           MR. KAISER:  I didn't understand that hand

17  gesture, I'm sorry.

18           THE REPORTER:  I was just telling him to

19  slow down.

20           MR. KAISER:  Thank you.

21      A.   So the American National Election Study total

22  sample size is -- in 2016.  I don't know what it is, but

23  I think it was several thousand, right, so that's the

24  difference there, right.  If we -- like I said, for any

25  subgroup, we can -- we can drill down and that becomes



1  problematic.  So there is an analog to what you just

2  said that I'm arguing.  So I agree with you that

3  there -- that there's an analog here, there's an

4  analogy.  But the total sample size of the American

5  National Election Study is appropriately large, right,

6  and despite the fact that their -- for some -- for some

7  certain subgroups, there might be -- total sample size

8  might be relatively small as we drill down.

9      Q.   (BY MR. KAISER)  Well, then tell me if I'm

10 wrong.  My understanding was you had two arguments.  So

11 Argument 1, total sample size is too small.  Argument 2,

12 the number of folks within subgroups, the size of the

13 samples within subgroups is too small.  And those --

14     A.   Some are --

15     Q.   -- those are two separate problems with

16 Professor McDonald's survey.  It sounds like what you're

17 saying is that if the sample size is big enough, like in

18 the American National Election Study survey, then it's

19 okay that a subgroup has really small numbers as long as

20 you're not doing something specific with that subgroup?

21          MR. TYSON:  (Inaudible.)

22     A.   Not exactly.  Right.  So there are two

23 interrelated problems, right.  And the first being that

24 the total sample size is small, okay.  And then his --

25 when Latino Decisions did the survey, right, they



1  either -- so why are older people oversampled in this

2  survey?  I don't know for sure, but it might be that

3  they're more likely to be at home when they're called

4  than younger people are.  It might be that there are

5  more people that fit this group, which -- I'm trying to

6  remember which group specific.  I believe it's the no

7  contact list, right, there might be more people in -- in

8  that group that are older.

9          But regardless of why the -- the survey

10 oversamples older people, it did.  Okay.  And so when

11 you oversample one group, that means necessarily you're

12 going to be undersampling other groups, okay.  So my

13 point is that I think it's important to understand this

14 is that, A, the sample size is small and, B, when we

15 look at specific subgroups, there are only a handful of

16 people representing that group.  Okay.

17          So in that last part, what I said, right,

18 I think the example he uses is similar, there's only 18

19 elderly Americans in the 2016 ANES, which isn't a huge

20 number of people to stand for all of the elderly voting

21 American public.

22     Q.   Right.  Here's what I'm hearing you say -- tell

23 me if this is wrong -- if Professor McDonald had a

24 bigger sample size -- or strike that -- yeah, had a --

25 had a bigger number of respondents to the survey, then



1  the problem with the sample size being skewed would not

2  be present in the same way that the reason only having

3  18 respondents in this older American population is not

4  a problem for the American National Election Study

5  because the sample size for the American National

6  Election Study is so large.  Is that what you're saying?

7      A.    I -- I don't think so.  I think -- I think

8  you're close.

9      Q.    Thank you.

10     A.    Yeah.  I think you're close.

11           So if Latino Decisions and -- had more

12 respondents, right, they may also, right, have gotten a

13 bigger sample of younger voters as that sample size

14 increased.  They may not have, right, but the -- and,

15 again, right, that you could do this -- so here's --

16 here's what I think you want me to say, okay?  I'm going

17 to give you what you want.  Right.

18           So on the survey, right, you can pick,

19 right, you can -- you can drill down to a really small

20 subgroup and then say, Oh, there's only a couple people

21 here representing all of them and that's a problem.  And

22 I think that that's true.  Right.  But the key is, is

23 what's the subgroup and how far do you have to drill

24 down, right.  If you're -- if -- and so I think that 18

25 to 29-year-olds on the Georgia purge list from no



1  contact, right, is different than voters in the whole --

2  in all of America born, you know, before 1926 or

3  whatever.  Right.

4              And the problem would correct itself if

5  the sample size were bigger -- well, it might correct

6  itself, right.  He still -- he still might oversample

7  elderly Americans.  But as the sample size increases, so

8  would presumably, the number of 18 to 29-year-olds that

9  Latino Decisions would reach and, therefore, right,

10  that's -- that would -- that would be good, right?

11              But you could always -- if there were

12  other variables you could continue to point out, but in

13  smaller and smaller subgroups and say, Well, in this

14  particular subgroup there's only a handful of people.

15  Okay.  So I think that the subgroups are reasonably

16  general -- general in my criticism, right.

17              And again, this is just for the court to

18  understand.  Look, right, here -- here's what's going on

19  in the survey and the court can choose to accept it or

20  not.  Right.  But there's only 14 people called between

21  the ages of 18 and 29, right.  And that's up to you,

22  Judge, right, whether you think that's sufficient or

23  not.  And you know, is 143 or however many people, is

24  that enough?

25              So I'm just saying that the -- the overall



1  sample size is small and at the -- at the very basic

2  general levels, right, some of these subsamples are very

3  small.

4     Q.    Right.  I appreciate that.  I'm not exactly

5  sure that's what I wanted you to say.  But I appreciate

6  that.

7              I'm trying to understand why the American

8  National Election Study is a good thing to rely on when

9  it has only 18 -- in your view, is a good thing to rely

10 on when it has only 18 respondents from an age category

11 when Professor McDonald's survey is a bad thing to rely

12 on in your view because it has only 14 respondents from

13 a particular age category.  And the I think the answer

14 is that the sample size is too small, which is your

15 first criticism and I think I understand that.  But I --

16 it strikes me that the answer to explain the -- the

17 tension I'm having trouble with, isn't just a sample

18 size issue, you're saying it's something else.

19             Is it that, you know, there are a bunch --

20 there aren't that many really old people and so we think

21 that 18 is a better number relative to the small set of

22 really, really old people as an absolute number?  I

23 guess I -- I'm sorry, I'm still not -- I'm not

24 understanding why 18 is big enough for the ANES, but too

25 small for Professor McDonald.



1    A.    All right.  Let me try it a different way.  I

2  think it's telling that Professor McDonald didn't pick

3  the 18 to 29-year-old group in the American National

4  Election Study to use to criticize my criticism.  Right.

5  He picked a very, very small group, right, of elderly

6  Americans who are -- all who, one, right, are less

7  numerous than people in younger categories, as we all

8  know, and also probably less likely to take a survey.

9  Right.

10             When I'm 90, I know for sure when somebody

11  comes to ask me a survey about anything, I'm going to

12  tell them to get out of my yard.  Right.  So that's the

13  problem with -- with the example.  Right.  I mean I -- I

14  gave you what you wanted in the sense that I said that

15  yes, this is a small number -- 18 is a small number and

16  I wish that were higher, but the ANES is much bigger

17  overall, right, and I think that the subgroup that he

18  picked is smaller relative to the total population and

19  the subgroup that I'm criticizing him for in his sample,

20  so there are differences between the two.

21    Q.    Although is the -- is the size relative to

22  the -- what's the right comparison?  Is it the number of

23  people in that demographic group relative to the

24  population as a whole or the number of people in that

25  demographic group relative to the size of the population



1  you're trying to sample?  Did I ask that well enough?

2      A.   Yes.  It's -- it's the latter.  Right.  It's

3  what -- what's the analysts interest in it.

4      Q.   Right.  And so, you know, whether the ANES --

5  is that how one refers to it?

6      A.   Yes.  We don't say -- I won't even say ANES is

7  a word, but we always say ANES.

8      Q.   Right.  Is the ANES then, in your view, only

9  useful if the number of people in that age category is,

10  I guess, proportionate to the 18 respondents in this

11  same -- let me back up.  This is a horrible question.

12  Strike all that.

13           Your point is that there aren't that many

14  really old people and that really old people won't do --

15  won't answer surveys because they've got better things

16  to do like telling people to get off their lawn?

17      A.   Uh-huh.

18      Q.   The number of people in the 18 to 29

19  demographic who are on the no contact list, right, it's

20  not the 18 to 29-year-old people in the population as a

21  whole that matters, it's the number of 18 to 19 -- 18 to

22  29-year-old people on the no contact list, right?

23      A.   If that's what the analyst is interested in,

24  which I thinks that is.

25      Q.   Right.  Do we -- do you -- I mean, it strikes



1  me you're making a claim right now that the ANES -- I

2  assume you're making a claim that the ANES is okay

3  despite the 18 respondents in that category, right?

4     A.   Yes.  Again, I think that we can always pick

5  subgroups, right, and then concern -- then make

6  ourselves concerned that maybe this sub-sub-sub-group

7  isn't well -- doesn't have a big enough subsample,

8  right, to represent it overall.  Okay.

9           So do I wish there were more people,

10  respondents in that age group in the ANES, sure I do.

11  Right.  More is always better.  And so -- so that's

12  where I'm saying I'm trying to give you what you want.

13  The 18 number, I do wish the ANES was bigger, but I

14  think that he's picked a sub-sub-sub-group where the --

15  it's necessarily going to be a smaller number, right.

16           Imagine if we picked left-handed

17  libertarians, right, living in -- on the southern Oregon

18  coast, right, that were born in February, right.  Oh,

19  there's only one of them, right?  Yeah, so there --

20  there is only one op them.  But the subgroup is so

21  specific, right, that that doesn't matter.  So -- so --

22  but like I said, that age group, right, isn't that --

23  isn't as specific as my example, but it's more specific

24  and it's going to be necessarily be smaller than the 18

25  to 29-year-olds, I think.



1    Q.    Do you know how many American voters fall into

2  the age category that we're talking about in the ANES?

3  Were there any --

4    A.    I don't.

5    Q.    You don't?

6    A.    I don't -- I don't -- I don't know off the top

7  of my head how many people are -- in 1911, that's

8  like -- so this is like -- these people are 74 -- these

9  people are between 94 and 109, I think, by my rough

10  math.  That's the subgroup that he picked, right.

11    Q.    They're really old?

12    A.    Very, very old.  How many people -- Americans

13  are over the age of 94, I have no idea off the top of my

14  head, but it's a much smaller age group than any other

15  age group unless you're older than 115, right.

16    Q.    It's small.

17    A.    Thank you.

18    Q.    There aren't that many variable people, yes.

19  But I guess your -- in -- in order to assess the --

20  whether the 18 number is a problem, why don't you have

21  to know the number of Americans who fall in that age

22  group?

23    A.    Because sampling is sampling, right.  I mean

24  like I said, it doesn't matter for -- just like it

25  doesn't matter whether you're interested in the whole



1  nation or just Georgians on the no contact list, right,

2  are -- are calculations for the -- are power

3  calculations for the sample size you need in order to

4  make certain -- you know, how big your margin of error,

5  the math is always the same.  Okay.

6          And so -- and I don't need to know

7  specifically because I -- I have knowledge -- general

8  knowledge like anybody else, right, that there aren't

9  that many people in America between -- that vote or the

10 America National Election Study is actually interested

11 in nonvoters too so strike the voter part.  People

12 between the ages of whatever I've said, I mean

13 incredibly old people.  Again, I think if he wanted to

14 be serious, he should have told me what's the number of

15 people in the 18 to 29-year-olds in 2016.  Maybe I'll

16 look that up between now and the trial.

17    Q.  Okay.  We can move on.

18    A.  Okay.

19    Q.  Give me a second.  Thank you.

20          Professor McDonald looks at some specifics

21 from two NCOA database circuits, right, the target smart

22 and L2?

23    A.  Yes.

24          Are we on his first report or second

25 report?



1    Q.   We were on the second report, going back to the

2  first report.

3    A.   Okay.  So we're on his first report.

4    Q.   Yes.

5    A.   Okay.  Yes, he uses two vendors.

6    Q.   And I think we might have talked about this

7  earlier.  Those searches found what, the 8 -- 59,866

8  people on the no contact list who did not submit NCOA

9  forms, right?  That is on Page 13, I believe.  Actually,

10  that is on Page 14, but my notes are based not on the

11  blue numbers.

12    A.   I was on the supplemental report, we're on his

13  original.  Okay.  Page 14 of his original report.

14    Q.   We're in that right above survey of purged list

15  reference, the paragraph right above that.

16    A.   Yes, sir.

17    Q.   And your report, as I understand it, doesn't --

18  you don't disagree with that conclusion?

19    A.   I don't think I write about that in my report.

20    Q.   Not saying you agree, you just -- your opinion

21  is not that that's wrong?

22    A.   Right.  Correct.

23    Q.   And you did not dispute Professor McDonald's

24  conclusion that at least those 59,000 people and change

25  who were purged for no contact haven't moved their -- or



 1  they haven't moved their address?

 2      A.   Well, I don't -- I don't know, but I -- I think

 3  I -- I do address this slightly in that, you know, in my

 4  report I talk about no contact and NCOA are two totally

 5  separate, completely independent processes.

 6      Q.   Yeah.

 7      A.   And so making the comparisons between the two

 8  groups, I don't know.

 9      Q.   That is exactly right, you do.  Thank you for

10  the awesome transition.

11      A.   Okay.

12      Q.   So you say no contact does not mean someone

13  necessarily moved, right?

14      A.   That's correct.

15      Q.   It is possible to have no contact and to not

16  have moved, right?

17      A.   Of course.

18      Q.   And you wrote in your report that you weren't

19  surprised to find that many people who were moved to

20  inactive status due to no contact could be found at the

21  same address, right?

22      A.   Correct.

23      Q.   That didn't surprise you?

24      A.   I mean there's going to be people that stop

25  voting, there's going to be people that don't have the



1    time to vote for a couple successive elections or

2    whatever.  So the fact that some of them still live in

3    the same address, I don't think is a surprise.

4         Q.   So for a minute, let's assume that you got to

5    design this (inaudible) from scratch?

6         A.   You cut out.  Say that again, I'm sorry.

7         Q.   Let's assume for a minute that you had the

8    power to design a list maintenance process from scratch,

9    right?

10        A.   Okay.  Okay.

11        Q.   Your goal, your only goal is to make sure that

12   people who have, in fact, moved are taken off the list.

13        A.   That's my goal?

14        Q.   That's your only goal --

15        A.   Okay.

16        Q.   -- people who have moved only.

17        A.   Okay.

18        Q.   And then it looks like that using the no

19   contact list would not be a terribly effective way of

20   reaching that goal; is that right?

21        A.   I think that -- that national change of address

22   more directly addresses it, but the no contact list

23   would also catch some as well.  But it was going to

24   catch a lot of other people that haven't moved.

25        Q.   Right.  So if your goal is to get rid of all --



 1  all and only the people who moved, the NCOA would be a

 2  more effective way to do that?

 3      A.    That -- that seems -- that seems right to me.

 4      Q.    And you know, this -- everybody's real worried

 5  about -- let me strike that.

 6              So your opinions with respect to Professor

 7  McDonald, is it the case that the only opinions you've

 8  got about his work in this case are the ones that are

 9  contained in your report and that we've talked about

10  here today?

11      A.    Yes, as I sit here today, yes.

12      Q.    Great.  There's no other October surprise

13  opinion concerning Professor McDonald?

14      A.    No, sir, not right now.

15              MR. KAISER:  Okay.  I am going to move on

16  to talk about Professor Herron now.  I didn't know if

17  you -- if anybody wants a break, if anybody wants a

18  break (inaudible) --

19              THE REPORTER:  (Indicating.)

20              THE WITNESS:  Brandy wants one.  I'm

21  good -- I'm good to take a break.

22              MR. KAISER:  All right.  Why don't we go

23  off the record.

24              THE VIDEOGRAPHER:  Okay.  We are going off

25  the record at 12:59 p.m. Central.  We're off.



```
 1                 (Break was taken.)
 2                 THE VIDEOGRAPHER:  We are back on the
 3    record at 1:14 p.m. Central Time.  Please proceed.
 4         Q.   (BY MR. KAISER)  Professor Brunell, so before
 5    we talk about Professor Herron, I just want to go back
 6    on the sample size question and talk to you a little bit
 7    more on -- I think this will be pretty quick.
 8                 The sample size for the ANES, right, is a
 9    few thousand.  And its sampling a population of between
10    what, I think you said 100 million to 200 million; is
11    that right?
12         A.   Yes.
13         Q.   The sample size for Professor McDonald's survey
14    was 142 and he was sampling a population of 90,000ish;
15    is that right?
16         A.   Correct.
17         Q.   I think I asked you if the sample size needs to
18    be bigger or smaller, depending on the size of the
19    population you're sampling.  Do you remember that?
20         A.   I do.
21         Q.   I believe your answer was no; is that right?
22         A.   Correct, because the math is the same.
23         Q.   Although, surely, at some point, that has to
24    hit -- there's got to be a bound on that, is that -- I
25    mean if you -- I mean, a 100 organizations and you have
```



1  a sample size of 92, you would have more confidence than

2  if you were sampling 100,000 people and you've got a

3  sample size of 92, right?

4      A.   Well, I would just get the other eight and say,

5  Hey, I've talked to everybody.

6      Q.   Well, some people don't want to talk to you.

7  But anyway.  Everyone wants to talk to you, of course.

8  But assuming that, isn't it true that if you've got a

9  population of 100 and you're able to sample 92, you will

10 have more confidence in that survey than if you've got a

11 population of 10,000 and you're able to survey 92?

12     A.   It's not really a survey, you know what I mean?

13 Like you're -- you're talking to everybody except the

14 people that you can't find -- you know what I mean?  So

15 I get what you're saying, but the math, right, our

16 margins of error are the exactly same if that our total

17 population is 100,000 or 100 million.

18     Q.   Right.  So it's your opinion there is -- for

19 survey purposes, there's no relationship between the

20 size of the sample you need and the size of the

21 population you're sampling?

22     A.   I'm not going to make a blanket statement like

23 that, but if you -- if your -- if your population is

24 only 50 people, then a survey makes less and less,

25 right, because we do serve them because talking to 100



1  million people --

2            THE REPORTER:  You both are breaking out

3  on me quite a bit.  Is that happening to anyone else?

4  So on the record, if -- and I'm okay with that if you

5  are.

6            MR. KAISER:  Why don't -- why don't we see

7  how it -- whether it keeps happening.

8            THE REPORTER:  Okay.

9       Q.   (BY MR. KAISER)  Professor, I'm sorry, you

10  were -- do you want me to ask you a question?  Or do you

11  want to go back to talking?

12       A.   I -- I -- I can sort of repeat what I just

13  said.

14       Q.   Okay.  I think I might be able to summarize it

15  in a way that's productive for everybody.

16       A.   Okay.

17       Q.   There are some cases where you're trying to

18  figure out something about a very small population

19  where, if you're asking a subset of them, it's not

20  really a survey in the way that statisticians or

21  political scientists or social scientists probably think

22  of surveys.  But when you're talking about surveys, your

23  view is -- surveys in the way that statisticians do,

24  your view is that the sample size that you need does not

25  bear any relationship to the size of the population that



 1  you're sampling?

 2      A.    That is not my view.  That is the view.  That's

 3  the math.  Right.  The -- the margins of error -- the

 4  relationship between the margins of error and size of

 5  the sample do not vary based upon what your total

 6  population is.

 7      Q.    Okay.  I think I've got a clear answer.  Thank

 8  you very much.  With that, let's move to Professor

 9  Herron.

10      A.    Okay.

11      Q.    So Professor Herron filed a report in this case

12  on February 18th, 2020.  Let me mark that as Exhibit 8.

13            (Exhibit No. 8 was marked.)

14      Q.    (BY MR. KAISER)  Do you have that in front of

15  you?

16      A.    I do.

17      Q.    And then you filed your response to the same

18  report that you responded to Professor McDonald in,

19  right?

20      A.    Correct.

21      Q.    And then Professor Herron filed a supplement on

22  April 9th, right?

23      A.    I have all three of those files open.

24      Q.    Great.  And let me mark the supplemental as, I

25  guess, Exhibit 9.



1          (Exhibit No. 9 was marked.)

2     Q.   (BY MR. KAISER)  Okay.  Professor Herron, what

3  is your opinion of him as a scholar?

4     A.   The same as the other two.  I'm -- I'm not

5  going to -- I don't bad talk any of my colleagues in the

6  discipline, ever -- well, at least, not on the record.

7  And I don't think Michael and I have ever met in person.

8  If we have, it was a long time ago.  I know Dan and

9  Michael personally and I wouldn't -- Michael and I don't

10  know each other personally, but I certainly -- we

11  certainly know each other professionally and he -- he's

12  an excellent scholar.

13     Q.   And, you know, the part of your report that

14  responds to his report, I guess same question I've asked

15  with the last two experts, what did you do to prepare

16  your response?

17     A.   I read his report.  And I don't recall if I

18  was -- I assume I was given the data, but I don't recall

19  if I was or not.  I don't think that I opened -- I -- I

20  don't know if I ever opened or certainly I don't recall

21  doing any meaningful analysis on his original data.  I

22  think I was responding to his summaries and his main

23  points in his report.

24     Q.   So is it fair to say that you are -- you didn't

25  do original -- and you didn't do analysis of the data



1  that he talks about you responding to the things he

2  wrote in his report; is that fair?

3      A.   I think that's fair.  I didn't try to replicate

4  what he did like I did with Professor Smith.

5      Q.   Thank you.

6              And you don't -- as I understand your

7  opinion, you don't dispute the accuracy of the data he

8  relied on or the -- the accuracy of his analysis of that

9  data; is that right?

10     A.   That wasn't part of my portfolio to criticize.

11     Q.   Sure.  Sure.  No.  Fair enough.  Fair enough.

12             You're not saying it's accurate, you're

13 not saying it's not accurate --

14     A.   Right.

15     Q.   -- you're just not saying it's not accurate?

16     A.   I wasn't asked to respond to the accuracies or

17 inaccuracies.

18     Q.   Okay.  Let me go to your report to Page 4.

19             Let me know when you're there.  Are you

20 there?

21     A.   I am.

22     Q.   So at the bottom, you write, Before getting to

23 the specifics, it's important to note that decisions

24 regarding whether to move, open or close a polling place

25 is made at the county level.  Just moving over to the



1  following page.  The State of Georgia is not responsible

2  for these decisions.

3            Is that -- did I read that right?

4      A.   You did.

5      Q.   Is that your opinion?

6      A.   That's my understanding.

7      Q.   Okay.  Who -- where did you get that

8  understanding?

9      A.   I think in discussions with counsel and with

10 the Secretary of State's office.

11     Q.   Did you do any independent research to verify

12 that?

13     A.   I know I'd -- I read some articles at some

14 point about, you know, closures in specific counties.

15 And so I did at some level, yes.

16     Q.   Okay.  Do -- do you know what those articles

17 were?

18     A.   I don't recall off the top of my head.  I feel

19 like there was one about Gwinnett County closures, if I

20 remember correctly.  But these were newspaper articles

21 and there was nothing in there to led me to believe that

22 this wasn't a county-based decision.

23     Q.   Sure.  So let me just kind of explore the level

24 of your knowledge about that a little.  And with these

25 questions, of course with any question, if you don't



 1  know, just tell me you don't know.

 2              You know, if a county official decided to

 3  close all of the polling places, all of the places where

 4  people vote the day before the election, could a state

 5  official in Georgia -- state elections official in

 6  Georgia do anything to prevent that?

 7      A.   I don't --

 8              MR. TYSON:  Objection, form.  That calls

 9  for a legal conclusion.

10              THE WITNESS:  Oh, sorry.

11      Q.   (BY MR. KAISER)  What's your understanding of

12  whether a state elections official in Georgia could

13  prevent a county official from closing a polling

14  location the day before an election?

15      A.   Yeah, I don't -- I don't know the specifics in

16  the -- the Georgia constitution or in the statutes about

17  how the -- what remedies are available to the state at

18  that particular time, but I imagine something would

19  happen.

20      Q.   And, you know, in a similar vein, if a -- if a

21  county decided let's -- let's close all of the polling

22  places where the voters are -- majority -- where

23  majority of the voters are one race or another, would a

24  state have any ability to -- what's your understanding

25  of whether the state would have any ability to prevent

1  that?

2      A.    Same answer as the last one, I don't -- I

3  certainly know that they may get in trouble at the

4  federal level with the Voting Rights Act or something

5  like that.  And at the state level, I'm not entirely

6  sure.

7      Q.    Okay.  You don't know one way or another

8  whether the Secretary of State can stop that?

9      A.    I don't -- I don't know what legal authority

10  they have to do that.

11      Q.    Okay.  And have you -- as a part of your work

12  preparing your report and preparing for this deposition,

13  have you looked at any of the training materials put

14  together by the Secretary of State's office?

15      A.    I did not.

16      Q.    Do you have an understanding of whether the

17  State of Georgia is -- state elections officials in

18  Georgia are informed when a county -- or when a polling

19  place is going to be changed?

20      A.    I -- I assume they're informed, but I don't

21  know that to be a fact.

22      Q.    Now, when you say the State of Georgia in that

23  language I just read, what entity are you referring to

24  specifically?

25      A.    I would include the executive -- I'm going to



 1  include the whole -- the executive and legislative

 2  branch, in particular, when I'm talking about that.

 3      Q.   Okay.  Would you include the State Board of

 4  Elections?

 5      A.   Yeah -- yes, I would include the -- the

 6  bureaucracy, which I assume is part of the -- the

 7  executive branch.

 8      Q.   Okay.  So you write sort of after that language

 9  that I just read, Thus -- we're at the top of Page 5 of

10  your report, Thus from the start, Professor Herron's

11  report does not add any value to considerations related

12  to the policies of the State of Georgia.

13          State of Georgia is italicized, I take it,

14  for emphasis?

15      A.   Correct.

16      Q.   What do you mean, it doesn't add value?

17      A.   Well, the -- if these decisions are made at the

18  county level and the counties -- it's my understanding

19  that the state is the defendant in this case and not the

20  counties.  And so writing a report for something that

21  the counties do that the state doesn't do is orthogonal,

22  right, doesn't have any impact on what this particular

23  lawsuit is about.

24      Q.   And that depends on an assumption about the

25  state's ability to interact with a polling place closure



1   or relocation decisions, right?

2       A.   It's about -- I am assuming that these

3   decisions are made, polling locations, opening

4   locations, closures, is made at the county level.

5       Q.   Right.  And if that assumption is wrong, then

6   the conclusion that it doesn't add value is also wrong;

7   is that right?

8       A.   If it -- if the state is making all of these

9   decisions, then this is -- then this does add value to

10  this case.

11      Q.   Or if the state is making some of the decisions

12  or has a role in the decisions, then it may or may not

13  add value?

14      A.   If it -- I'll give you may or may not.

15      Q.   I mean it's a -- you -- you've set out a

16  conditional, right?  If the State of Georgia has no

17  control, then a report about something the State of

18  Georgia has no control about adds no value to assume it

19  against the State of Georgia; that's your position?

20      A.   Yes.

21      Q.   And, you know, if the antecedent is false, we

22  don't know anything about the truth of the consequence;

23  is that right?

24      A.   Or what -- that's true, right.  If the -- if

25  the state is making all of these decisions, then this



1  would be relevant to the case.

2      Q.   Sure.  Cool.

3            All right.  So you -- you fault Professor

4  Herron on Page 5 of your report.  I'm going to this --

5  the paragraph right under "Research on turnout and

6  reprecincting," you fault him for relying on only two

7  published studies for the proposition that when a voter

8  is reassigned to a new polling location, the likelihood

9  of voting decreases?

10     A.   It was only -- it was two articles about --

11 they were very specific in the scope of their research.

12 One was about managing county -- one -- one county in

13 Florida and the other one is about a single county,

14 Los Angeles County in California.  So there's only two

15 and they're very, very specific studies, not -- there's

16 not -- not even statewide, these are only countywide

17 studies.

18     Q.   And then in his rebuttal report, Professor

19 Herron points to a third involving, I believe, voters in

20 Atlanta.  Did you see that?

21     A.   I did.

22     Q.   In your -- why don't we do this.  What's the

23 point you're making by saying there were only two or

24 three studies?

25     A.   That there isn't that -- the extent -- or the



1  existing research, at least the ones that Professor
2  Herron cited, right, there are limitations to these,
3  right, and the court should understand it.  That's it,
4  right.  So if the court decides that, Hey, two cases
5  encompassing Manatee County, Florida and Los Angeles
6  County, California are enough for me, then that's fine.
7  But the judge should know that there are -- that these
8  are limit -- very limited studies.  These aren't
9  nationwide studies, right.  These aren't even statewide
10  studies and they're -- and there isn't that many
11  studies, right.
12          The number of articles written about voter
13  turnout number in the tens of thousands, all right -- or
14  I don't even know how many there is, right.  We've
15  killed a lot of trees writing about voter turnout.  So
16  this is a -- this is a small section of political
17  science, right, which is -- that's not Professor
18  Herron's fault at all, right.  He might be citing
19  everything that's ever been published out there, and
20  that's fine.  But these are limited studies.
21          So that's -- that's the point I'm trying
22  to make, right.  And it's up to the judge, you know, is
23  this enough or is this not enough.
24     Q.   Are you aware of any studies that say that
25  moving a polling place increases turnout?



1     A.    Not off the top of my head, no.

2     Q.    Are you aware of any studies that say that

3  moving a polling place has no effect at all in turnout?

4     A.    Not that I'm aware of, but polling places do

5  have to be moved.  All right.  That's the fact -- the

6  reality is polling places have to be moved.

7     Q.    Okay.  And -- and, you know, Dr. Herron does a

8  lot of data analysis in his work.  He does data analysis

9  in his report.  Does that analysis depend on the studies

10 that he cited being accurate or not?

11    A.    No.

12    Q.    So on Page 7 of your response, you write in

13 that last paragraph, If we restrict our analyses

14 strictly to proportions, Professor Herron's analyses are

15 inconclusive.  There are some metrics in which the

16 population of black voters is slightly higher than white

17 voters, although the reverse is true as well.

18          You see?  Do you see that?

19    A.    Yes, that's what it says.

20    Q.    What metrics are you talking about that show

21 that the reverse is true?

22    A.    I wish I would have cited them because now I'm

23 going to have to dig.

24          Okay.  So there's one -- the first example

25 that I can find -- I'm just scrolling through this



1  report quickly to try to look for instances of this.

2  But if you look on -- well, they match this time, both

3  the blue number and the real number are both 50, 5-0,

4  Table 2, right, at the cutoff for 95, there are -- the

5  black closure rate is lower than the white closure rate.

6      Q.    And what does that table -- what's that table

7  say?  What's that table show?

8      A.    He's looking at racially homogenous block

9  groups, all right, so he --

10     Q.    What's a racially homogenous block group?

11     A.    It's a block groups that is almost -- is

12  comprised almost entirely of one race or another --

13     Q.    And so --

14     A.    Of one race.  Sorry.

15     Q.    Right.  And so on the left-hand column of

16  Table 2 on Page 50, he's got numbers that go down from

17  100 to 95?

18     A.    Correct.

19     Q.    What are those numbers?

20     A.    That's the cutoff that he uses.  So the

21  percent -- that's the percent of homogenated, right.  So

22  95 means that 95 percent of the block group was either

23  black or white or -- so two separate groups, right?

24  95 percent black and then 95 percent white.

25     Q.    And this is a -- an allocation by polling



1  place; is that right?

2      A.    Well, it's an analysis of the rates of polling

3  place closures, but the geographic unit of analysis are

4  block groups.

5      Q.    Right.  Thank you.

6            And what's a block group?

7      A.    A block group, that's a census term about a

8  group of blocks.  Right.  Like an actual block in a

9  tract of homes, right.  So there's a -- it's a -- it's a

10  census unit of geography.

11     Q.    Right.  And on this chart, when it says the

12  cutoff is -- for the ones where the cutoff is 100,

13  right, and there are 47,600 blacks in that second

14  column --

15     A.    Yes.

16     Q.    -- what is that?  Is that 47,600 people?

17  Blocks?  Polling places?

18     A.    That's people, right.  So they found a certain

19  number -- we don't know how many block groups there are,

20  but that's the number of voters in a -- in block groups

21  that are 100 percent African-American.

22     Q.    Right.  And then the closure rates in the --

23  sort of skipping over two columns -- well, let me back

24  up.

25            I take it where it says "whites" and then



1  there are -- you know, in that next column, it's the

2  same thing except just for white people instead of black

3  people?

4      A.   That's right.

5      Q.   And then you go to the next column, Black

6  closure rate, what's black closure rate?

7      A.   That's the percent of -- hang on.

8      Q.   Are you reading his report?

9      A.   Yes.  So the -- wait, hang on.

10          Okay.  So I can't find it right now in his

11  report, but the closure rate, I assume, was the

12  percentage of voters in that group that had their

13  polling place moved or closed.  But it could also be the

14  percentage of polling places that were closed.  And I'm

15  trying to -- because it says "Polling place closure

16  rates."  So I don't know if that's a percentage.  And he

17  doesn't say -- I can't see it in his narrative whether

18  that means that the percent of polling places closed or

19  that's the percent of voters that were affected by

20  polling place closure, but I would -- I would think it's

21  one of those two things.

22      Q.   Okay.  Fair enough.  But I guess at this point,

23  looking at this table, you're not sure exactly which of

24  the two it is right now?

25      A.   I can't -- I don't see which one -- I don't see



1  an explanation in his narrative which one it is at this

2  very moment in time.  And logically, I think it could be

3  either one of those two.

4      Q.   Sure.

5           And sort of going back to the -- the

6  larger point we were at a second ago, you said that, you

7  know, some of the metrics are -- you know, support a

8  conclusion that the proportion of -- white voters who

9  are subject to a polling place closure or relocation is

10 higher than black voters, that's the line I find support

11 for from your report?

12     A.   Correct.

13     Q.   (Inaudible) right now, right?

14     A.   No, we are through with this table.  We don't

15 know specifically because he doesn't -- I can't find it

16 right now in there whether it's the percentage of voters

17 we had or the passenger of polling places, both of them

18 get at roughly the same idea.  But I do know what the

19 table means, but I don't -- I can't find specifically

20 which it is, so I don't want to make a mistake and say

21 it's one and not the other.

22     Q.   Fair enough.

23          Are there other metrics in the report?

24 Actually, before -- before you do that, let me ask you

25 another question.  Because, you know, Professor Herron



1   responded to your report, right?

2       A.   He did.

3       Q.   And you've seen that?

4       A.   I have.

5       Q.   And so he writes -- I'm looking at his report

6   now on Page 23, Paragraph 50.

7       A.   Okay.

8       Q.   Of this criticism of yours, he writes, Given

9   the seriousness of this charge, I would have expected

10  Dr. Brunell -- Brunell -- I'm sorry -- to have carefully

11  gone through my results and to have explained in detail

12  why some results show that white registered voters were

13  disproportionately affected by polling place closures

14  and other results the opposite.

15          I'm not exactly sure what the "other

16  results the opposite," what the syntax on that is, but I

17  think we get to point of that sentence.

18          Dr. Brunell did not do this, which

19  undermines his charge that my results are inclusive.

20          Do you see that?

21      A.   I did.

22      Q.   So I guess, what do you think of that criticism

23  of your report?

24      A.   I think it's precious.  So one of my criticisms

25  of all these reports is that there is no causality here



1  about -- none of them are making arguments about a

2  racial causality, you know, why -- why are they

3  seeing -- so they're pointing out, Hey, there's these

4  racial differences, and none of them bother to look for

5  causality.  And then Herron criticizes me for not

6  finding causality, right.  Well, that's my criticism,

7  right.

8            He's on the plaintiff's side so he's

9  supposed to do that, right.  And then I can respond to

10 that.  But the fact that he doesn't look for causality

11 and then he criticizes me for not looking for causality,

12 I thought it was interesting, right, and misplaced.

13     Q.   Well, why do you think he's saying you should

14 look at causality?

15     A.   Well, he says -- he -- it's to show why -- to

16 explain in some detail why some results show that white

17 registered voters were disproportionately affected by

18 polling places.

19     Q.   Oh, I see.  Okay.  If we read it so it's not

20 asking for a cause for why voters of one race or another

21 were affected by the polling place location, but rather

22 a justification or a reason for your -- or an

23 explanation for your view that some metrics support that

24 white voters were disproportionately affected by polling

25 place locations, right?  Do you understand what I mean



1  by reading it that way?

2      A.   Not really.  I mean I think that his analysis

3  shows that sometimes black voters are affected more, and

4  his analysis showed that sometimes white voters are

5  affected more.  I pointed that out, right, that these

6  are -- these are inconsistent with one another and,

7  therefore, makes conclusions about how these actions

8  affected racial subgroups less convincing.  And I

9  don't -- I see no problem with that whatsoever.

10     Q.   Okay.  I guess, let me ask you this.  So you

11 write, There are some metrics in which the proportion of

12 black voters is slightly higher than white voters, the

13 reverse is true as well, right?

14     A.   Right.

15     Q.   Then you write, The reverse is true as well.  I

16 take it what you mean -- tell me if I'm wrong -- is

17 there are some metrics in which the proportion of white

18 voters is slightly higher than black voters?

19     A.   Correct.

20     Q.   You don't, in your report, on Page 7, tell us

21 which metrics, right?

22     A.   I didn't.

23     Q.   And right now, you've given us the one line

24 from Table 2 on Page 50.  What else have you got?

25     A.   I -- I'll continue going through the tables.  I



1  wish I would have listed them all for you.  Okay.

2      Q.    I do too.

3      A.    But --

4      Q.    Because to -- to sort of cut to the chase,

5  Professor, the way I read Paragraph 50 of the rebuttal

6  report is faulting you not for failing to come up with a

7  cause, but for failing to come up with an explanation.

8      A.    How are those different?  I'm sorry.

9      Q.    Well, I mean let's -- it doesn't -- it probably

10  doesn't matter for these purposes.  Let's move on.

11  Let's figure out what you've got that supports your

12  proposition that there are some metrics in which the

13  proportion of white voters is higher than black voters.

14      A.    Okay.

15      Q.    We'll go to Table 2.

16      A.    Okay.  Some of these tables later on, this

17  isn't exactly what I had in mind, I don't think.  But

18  the -- you know, the effects of -- so I'm on like Page

19  73, 74, Tables 12 and 13, looks like -- I'm sorry?

20      Q.    I interrupted you.  Go ahead.

21      A.    Oh.  Looks like white voters are more affected

22  by polling place changes than African-American voters

23  are.  Maybe I was thinking about that as well.  But

24  those -- that's the only other example I could find in

25  going over his tables on the fly.



1    Q.   Those tables that you're looking at towards the

2    end, those are the ones that show when there's a polling

3    place moved, white voters then turn out -- they face a

4    higher drop in turnout percentages on election day,

5    right?

6    A.   Hang on.

7    Q.   Which table are you looking at?

8    A.   Table 13 and 12.  Yes, so like Table 12.

9    Q.   Right.  So those tables don't tell us anything

10   about the closure or relocation of polling places,

11   right?  Those are turnout tables?

12   A.   Those are turnout tables.

13   Q.   The -- the -- so Professor Herron, in addition

14   to responding the way you felt was precious, also

15   responds to your statement in Paragraph 49 of his

16   report.  If you'll go with me to Page 22, Paragraph 49.

17   A.   Okay.

18   Q.   And here, he says, With respect to the matter

19   of whether black registered voters were

20   disproportionately affected by polling place closures

21   compared to white registered voters, the

22   proportions-based results in Table 3, 5, 7 and 9 all

23   point in the same direction.

24            You see that?

25   A.   I do.



1     Q.   Have you gone through the process of looking at
2  each of these tables and confirming that they point in
3  the same direction?
4     A.   I have not.
5     Q.   Okay.  Well, let's -- let's do it together.
6     A.   Okay.
7     Q.   Page 53.
8     A.   Yes.
9     Q.   So you see Table 3?
10    A.   I'm almost there.
11    Q.   Let me know when you're there.
12    A.   I'm there.
13    Q.   Okay.  So in this table, it's polling place
14 closure -- closure rates by race, right?
15    A.   Correct.
16    Q.   And it shows in that kind of center column
17 where it says "Registered Voters," the total number of
18 white voters who had their polling place -- sorry, the
19 total number of registered voters by race in the state,
20 right; is that how you read that?
21    A.   Yes.
22    Q.   And then the next column closed is the total
23 number of voters by race who had the polling place
24 closed?
25    A.   Correct.



1    Q.   By that, you mean closed or moved, right?

2    A.   Yes.

3    Q.   And then percent closed is the last column,

4  right?

5    A.   Yes.

6    Q.   And that shows the percentage of the people who

7  had their polling place closed or moved of the total

8  number of voters of that race in the State of Georgia,

9  right?

10    A.   Correct.

11    Q.   And it says there that white voters had their

12  polling place closed -- sorry, 16.68 percent of white

13  voters had their polling place closed and 16.8 percent

14  of black voters has their -- had their polling place

15  closed, right?

16    A.   Correct.

17    Q.   Closed means closed or relocated, right?

18    A.   Correct.

19    Q.   16.8 is higher than 16.68?

20    A.   Slightly.

21    Q.   Right.  And then the next one is April 5 on

22  Page 55.  So those are closure rates in black majority

23  polling places?

24    A.   Let me just go back, I'm sorry, to Table 3, so

25  I think it's important to note the other -- so like the



 1  unknown, right, that these are the people that don't

 2  self-report race is the highest.  Then I kind of renew

 3  my -- my criticism that, you know, these are largely one

 4  race or another, then that would -- if we actually knew

 5  the race of these people, then that might change all of

 6  our conclusions based upon where they are to actually be

 7  allocated.

 8      Q.  Sure.  If all of the unknowns are white, then

 9  the -- the difference would change, right?

10      A.  Correct.

11      Q.  And if all of the unknowns were black, then the

12  difference would change some more?

13      A.  And they don't all have to be one race, they

14  just have to be --

15      Q.  A majority of them, sure.

16              And we don't know one way or another what

17  the unknowns are?

18      A.  Correct.

19      Q.  Or if they're distributed evenly or if

20  they're -- we just don't know?

21      A.  Nobody knows, as far as I know.

22      Q.  Right.

23              Okay.  So Table 5, Page 55.

24      A.  Okay.

25      Q.  It says the closure rates in black majority



1  polling places, right?

2      A.   Yes.

3      Q.   So what this is looking at is when you've

4  got -- it's an analysis by polling place, right?

5      A.   Yes.

6      Q.   And so there are, according to this, 542 black

7  majority polling places, right?

8      A.   Yes.

9      Q.   And 1,974 not black majority polling places?

10     A.   Correct.

11     Q.   And the closure rate for black majority polling

12  places is 20.3?

13     A.   Yes.

14     Q.   And non-black majority polling place is 17.68,

15  right?

16     A.   Yes.

17     Q.   And 20.3 is higher than 17.68?

18     A.   It is indeed.

19     Q.   Let's go to Table 7 on Page 56.

20          Are you there?

21     A.   I am.

22     Q.   So this is closure rates by black super

23  majority polling places, right?

24     A.   Wait, this -- did you say Table 7?

25     Q.   I'm sorry.  You're right.  I did.  And then I



 1  turned to Table 6.

 2      A.   Okay.

 3      Q.   You know what, we just found a labeling mistake

 4  in Professor Herron's report.

 5      A.   Okay.

 6      Q.   I think this is supposed to be -- in his

 7  supplemental report, I think he meant to say Table 6

 8  instead of Table 7.

 9      A.   We all make mistakes.

10      Q.   All right.  So this is closure rates in black

11  super majority polling places, right?

12      A.   Yes.

13      Q.   And this differs from the last table we looked

14  at in that this is not black majority polling places,

15  this is black majority super polling places, right?

16      A.   Correct.

17      Q.   And here, Professor Herron uses 60 percent as

18  the cutoff for blacks super majority district, right?

19      A.   That's what he says.

20      Q.   And 20.73 of the black majority -- super

21  majority polling places were closed, right?

22      A.   Yes.

23      Q.   And 13.76 of the not black majority -- not

24  black super majority polling places were closed, right?

25      A.   Correct.  Correct.



1    Q.   And 20.73 is higher than 17.76?

2    A.   Every day.

3    Q.   Every day.

4             Last one, Page 61.  This is the -- are you

5    there?

6    A.   Yes.

7    Q.   So this is the distribution of rates and new

8    polling place status among all of the voters who didn't

9    move in 2014 and 2018.  Does that make sense?  Is that

10   your understanding?

11   A.   Okay.  That's what it appears to say.

12   Q.   Cool.

13            And we see that the difference between new

14   place versus not new place for white voters is .89,

15   right?

16   A.   That's right.

17   Q.   And the number of black voters, it's -.62; is

18   that right?

19   A.   That is correct.

20   Q.   Professor Herron's conclusion is that all of

21   these tables point in the same direction towards his

22   conclusion that black voters were disproportionately in

23   polling places that moved or closed relative to white

24   voters, right?

25   A.   That's his position, yes.



1    Q.   And do you dispute that these tables do support

2  that proposition?

3    A.   No.  I mean the -- there were differences and

4  it supports the proposition that blacks, as percentages,

5  were slightly more affected by it.  But that's the main

6  point I make in my report is that we can't -- you know,

7  looking at a percentage is good, but if we looked at the

8  wrong number of voters, I think that adds, you know,

9  nuance to what's really going on.  Right.

10           So if this is, you know, a strategy to

11  decrease the number of black voters, it's not -- it's

12  not a very good one because you're affecting far more

13  white voters than black voters in raw numbers, right, in

14  elections.  Percentages are interesting, right.  And I

15  appreciated him explaining percentages to me in his

16  supplemental report.  But if we only look at

17  percentages, right, my point is, Hey, we could look at

18  the wrong numbers as well.

19           And so if -- again, if this is a strategy

20  to dilute black voters in a discriminatory -- in a

21  discriminatory way and to -- which I assume also means

22  at the -- to the benefit of white voters, this isn't a

23  way to go about it.

24    Q.   So I appreciate that.  We'll talk about that in

25  a minute.  I guess what I'm --



1      A.    Okay.

2      Q.    -- trying to figure out is this language you

3  had about the reverse being true.  Each of the tables we

4  have looked at supports the proposition -- leaving aside

5  causation, bracket causation, each of these supports the

6  position that black voters were disproportionately

7  affected by a precinct relocation or closure relative to

8  white voters, right?

9      A.    Those -- the tables that we just looked at do.

10     Q.    Right.  You had identified one table where

11  there was one line that suggested that for a certain

12  distribution of census blocks, there were -- there was a

13  different change.  It showed a different trend.

14            Why is that chart or that calculation --

15  if you want to go back to it, we can -- more persuasive

16  than these charts that we've gone through?

17     A.    I don't think I said it was more persuasive.  I

18  just said that it's evidence, right -- I was trying to

19  be -- I was trying to summarize what I thought his

20  evidence showed, which was sometimes there are small

21  differences and indeed black -- for most of his results,

22  blacks are affected at a higher rate than white in terms

23  of percentages, but not in terms of raw voters by any

24  stretch of the imagination.

25            But there was some evidence in going



1  through the table right now, we only found one, but

2  there is one -- at least one that showed that whites

3  were affected in terms of proportion at a higher rate

4  than blacks were.  And so that was -- that's the point,

5  right, but my statement which is still true.

6       Q.    But that one table we looked at, right --

7       A.    Yes.

8       Q.    -- that talks about a very narrow kind of

9  census block, right, and polling place changes that

10  affected that narrow kind of census block, right?

11       A.    Yes.

12       Q.    The tables we just looked at are tables that

13  show effects on voters, right?

14       A.    Yes.

15       Q.    And the question is less whether voting blocks

16  have had their voting rights infringed on because

17  they -- they don't actually have voting rights, right?

18  They're just blocks.  But more whether voters have been

19  disproportionately affected based on rates or -- meaning

20  when you look at rates.  I'm trying to say it in a

21  correlation way, not a cause way.

22            So when you -- when you look at the tables

23  in Professor Herron's report that look at voters and not

24  voting blocks, we -- we just walked through that all of

25  them support the conclusion that there's been a



1  disproportionate effects on black voters and none of

2  them support the conclusion that there's been a

3  disproportionate effect on white voters?

4      A.   I mean there are voters in the other table that

5  you don't like, right?

6      Q.   It's not that I don't like them.

7      A.   I mean the ones that we're talking about,

8  right, that -- that's my point, right.  My point is very

9  simple, right, and I -- you know, you can try to walk me

10  down a road of 20 conditions to get me to agree to

11  something, but he's not always talking about all voters,

12  right.  I mean like in Table 9, it's only about

13  nonmoving voters so we're talking about a subset of the

14  population.

15          And so my point is very simple that, you

16  know, that some -- and maybe it's only one.  Right, we

17  can only one now.  And if it's only one, I'm happy to

18  say there's only one bit of evidence that shows whites

19  were disproportionately affected than blacks were.

20  Right.  But that's my only point, right, and that it

21  wasn't always in the same direction, right.  And that

22  oftentimes the differences were very, very small.  And

23  that's still true.  All of that is still true.

24      Q.   But the one you have pointed to, Table 2, is

25  not -- as I understand what you've said, not a table



1  about voters, it's a table about block groups?

2      A.    And voters live in block groups.

3      Q.    Sure.  But we've seen a whole bunch of tables

4  that compile the data based on voters?

5      A.    Right.

6      Q.    Looking at it all on voters -- and I guess I

7  could see how you can get from a block group to a voter,

8  doing some -- you know, winging it, estimating.  But why

9  would you look at that on block groups instead of the

10  ones on voters?

11      A.    I didn't -- I didn't make the table.  Professor

12  Herron made the table, not me.  And so I'm going off of

13  the evidence that he has provided to the court, right.

14           And so I appreciate you trying to parse

15  this down in such a way that -- that one table that I

16  pick doesn't fit with the others, but you know, I'm

17  just -- I'm not going to agree with it.  There are

18  voters that we're talking about, right.  And most of his

19  evidence -- you know, I'm happy to -- I'm not -- I'm not

20  here to -- to -- to pull the wool over anybody's eyes.

21  Most of the evidence points in the direction that

22  Professor Herron argues, right.

23           But there are -- there's at least one

24  that's inconsistent with his conclusion.  And there may

25  be more that I just haven't found right now.  And so



 1  that's all I'm saying, right, it's very, very simple,

 2  and very straightforward.

 3      Q.  And -- and just so the record's clear -- and I

 4  hear what you're saying.  We're fine.

 5          Just so the record's clear, the one table

 6  you're looking at that supports the reverse inference

 7  that you say applies in your report deals with block --

 8  block groups, not voters, right?

 9      A.  It deals with voters as well.  We're -- we're

10  not interested necessarily in block groups because --

11  we're interested in block groups only because people

12  live in them.

13      Q.  Sure.  Fair enough.

14          But the data -- the data in the table is

15  about block groups and then you can get to voters

16  because, you're right, voters live in block groups,

17  right?

18      A.  Right.

19      Q.  Excellent.  We can move on.

20          Absolute numbers, you had wanted to talk

21  about this a second ago.  Now let's talk about it.

22          On Page 6 -- I guess, as I understand your

23  opinion -- wait, let me back up because I think I

24  learned something --

25      A.  Can -- can I -- can I just have one minute?  We



 1  can go off the record if we want to, but I only need one

 2  minute to go talk to my son?

 3      Q.   Oh, yeah, of course.  Absolutely.

 4              THE WITNESS:  Give me just one minute and

 5  we'll be right back.

 6              THE VIDEOGRAPHER:  Okay.  We're going off

 7  the record, if there's no objection, at 2:08 p.m.

 8  Central Time.

 9              (Break was taken.)

10              THE VIDEOGRAPHER:  And we are back on the

11  record at 2:14 p.m. Central Time.  Please proceed.

12      Q.   (BY MR. KAISER)  Okay.  Professor Brunell,

13  let's look at your report on Page 6.  Let me know when

14  you're there.

15      A.   I'm there.

16      Q.   So the first -- that first paragraph at the top

17  that -- I think it starts on the prior page, the last

18  sentence of that I think is the one you wanted to talk

19  about a minute ago, which is, While black voters are

20  affected at a slightly higher percentage than white

21  voters, there are more white voters affected by

22  repre- -- reprecincting decisions made at the county

23  level.  Is that --

24      A.   Correct.

25      Q.   You were saying earlier that you believe that



1  is evidence that this is not -- that there's no -- let

2  me back up.

3            Professor Herron has a lot of data about

4  correlations, right, about disproportionate effects,

5  right?

6      A.   Yes.

7      Q.   And mere correlations cannot establish on their

8  own causation in any cases, right?

9      A.   Correct.

10     Q.   And what I understood you to be saying a minute

11 ago is that when you had a causation question, you

12 believe that the raw numbers of voters affected

13 undermine a conclusion based on causation or -- and the

14 ENS (phonetic) increase in precinct changes?

15     A.   I don't know if causation is necessarily

16 involved with my objection or not.  I'm simply pointing

17 out that when we switch from percentages to raw numbers,

18 since whites make up a larger percentage of the state

19 than African-Americans do, that more -- when we're

20 looking at sheer numbers, there are more white voters

21 affected by reprecincting than there are black voters.

22     Q.   Sure.  But black voters, according to the

23 tables we're looking at, are disproportionately affected

24 by precinct closures or relocations relative to white

25 voters, right?



1      A.    Absolutely.

2      Q.    Okay.  And I guess that's what disproportionate

3  means, it means in proportion to the voters of other

4  groups?

5      A.    That's correct.  I mean but it doesn't mean we

6  can't look at the raw numbers as well and think

7  logically, what does this -- what does this entail,

8  right, for -- if -- you know, just in the same way if we

9  say 10 percent of Americans are -- you know, using his

10  example, are sick with COVID and 10 percent of people

11  that live in Luxembourg are getting sick at the same

12  rate, that were both -- Luxembourgers and Americans are

13  getting sick at the same rate, but there are far more

14  Americans sick than they are Luxembourgers because there

15  are more people in America.

16           That's -- again, this is -- this is simple

17  stuff.  This isn't -- there's nothing tricky going on

18  here.

19      Q.    Right.  So -- so focussing on the raw -- on the

20  total numbers doesn't undermine the conclusion about the

21  proportionate numbers?

22      A.    I mean I think it does.  Like, if you're like

23  I'm only going to look at proportions, then it does.

24  But my point is you also need to look at raw numbers

25  because, again, if we're trying to dilute the voter --



1  the votes of one race which will benefit the voters of

2  another race, then it should both be disproportionate,

3  but also shouldn't it affect more voters, right?

4          Because ultimately we're going to count

5  the votes.

6          And so it's not a very good strategy,

7  right, to slightly affect, right -- if there's some

8  grand scheme going on, it's not a very good one because

9  they're only slightly affecting black voters more and

10  they're affecting far more white voters in sheer

11  numbers.  So then when we go to election day, what's

12  going to -- you know, what's the impact that's going to

13  have?

14     Q.   Does that assume that there is one entity

15  coordinating where all of the polling place changes or

16  closures are?

17     A.   No, I don't think so.

18     Q.   But in the grand scheme, you know, normally you

19  sort of think there's a grand schemer, right, that's in

20  the head of schemers.  You know, so I guess I think your

21  argument is that the raw numbers undermine the existence

22  of a grand scheme.  But I -- I wonder if that's limited

23  to an explanation of the correlation that requires a

24  grand schemer?

25     A.   That question, I have no idea what it means.



1  So I think that question was too smart for me.  I'm not

2  entirely sure what -- we've really gone down -- you

3  know, we're in a corner here and I don't -- I don't know

4  how to get out.

5              My point is simple, right.  It's not about

6  the hypothetical grand schemer, whether there's one

7  original mover or not, right.  It -- it's just -- it's

8  simply, Look, all right, if there is -- if there's

9  something going on here diluting the votes of one race,

10 right, it should probably consistently, right, and --

11 and -- and the difference should be presumably really,

12 really large, not minute.

13             And so I think all of these -- and -- and

14 the raw numbers should also probably make sense that

15 there's far more black voters affected by these things

16 than there are white voters, and that's not true.

17 Right.  So I think all of these things combined, right,

18 sheds doubt on whether there's -- you know, whether

19 there's racial discriminatory practices going on here.

20     Q.    And that doesn't -- that doesn't bear on

21 whether there are racially disproportionately effects?

22 It doesn't undermine the conclusion that there are

23 racially disproportionately effects, right?

24     A.    In some of his analyses, there are indeed

25 racially disproportionate effects that affect blacks at



1  high rates than whites.

2      Q.   Right.  And the total number of affected voters

3  by race does not undermine that proportional finding?

4      A.   It does not, right, because they're two

5  separate things.

6      Q.   All right.  So let's turn to something you

7  wanted to talk about a minute ago that I didn't take you

8  up on, but we can talk about now, which is turnout.  So

9  you write that -- where are we?  We're on Page 6 of your

10  report.

11     A.   Okey-doke.

12     Q.   The very bottom, Professor Herron's analysis --

13  analysis.  You see that?

14     A.   I do.

15     Q.   Professor Herron's analysis for election day

16  turnout for the 2018 election indicates white voters

17  experienced nearly twice as much drop-off in terms of

18  percentages relative to black voters.  You see that?

19     A.   I do.

20     Q.   And -- and what you're talking about there is,

21  I take it, Table 12 on Page 73, but tell me if I'm

22  wrong.

23     A.   I'm almost from.

24     Q.   Sure.  Take your time.

25     A.   I think that's probably true, yes.



1      Q.   It's probably true that this is the table
2  you're talking about when you make -- write that
3  sentence?
4      A.   I think so.
5      Q.   And this is the table that deals just with
6  election day turnout, turnout only on election day,
7  right?
8      A.   That's correct.
9      Q.   Not the overall turnout for the election?
10     A.   Correct.
11     Q.   And what this shows is that turnout is down for
12 pretty much every group when a polling place moves or is
13 closed, right?
14     A.   That's right.
15     Q.   Do you remember the two studies we were talking
16 about at the very beginning of our conversation about
17 Professor Herron's report?
18     A.   I do.
19     Q.   And those two studies found that when you move
20 or close polling places, turnout goes down, right?
21     A.   I believe they -- they did.  I can't remember
22 the magnitudes, but I believe both of them did, yes.
23     Q.   And so these findings are consistent with those
24 studies, right?
25     A.   I would say that they are.  I mean as far as I



1  remember, yes.

2      Q.   Sure.

3           Okay.  And -- and if you look at Table 11

4  on Page 71.

5      A.   Okay.

6      Q.   This is 2018 turnout by race among people who

7  voted in 2014?

8      A.   That's what it looks like.

9      Q.   Okay.  And you see that -- so what this looks

10  at is turnout for the whole election, not just on

11  election day, right?

12      A.   I'm looking in his -- he doesn't say

13  specifically whether it does or not.

14      Q.   You're right to pause.  You're right to pause.

15  I got the wrong table.

16      A.   Oh, okay.

17      Q.   Sorry.  Long day for all of us.  I'm supposed

18  to be on Page 69, Table 10.

19      A.   Okay.  All right.  I'm there.

20      Q.   Yes.  This is the turnout for the whole

21  election by race, right?

22      A.   It's only nonmovers who are registered in both

23  2014 and 2018.

24      Q.   Right.  People who didn't move, but had a

25  polling place move?



1    A.    Well, I think it includes people that also did
2  not have a polling place move.
3    Q.    Yes, you're right, the new place versus not new
4  place?
5    A.    Correct.
6    Q.    People who didn't move their address, their
7  house stayed in the same thing.  And then for the non
8  new place, there wasn't a move in polling place and for
9  the new place there wasn't a polling place, right?
10    A.    I believe that's correct.
11    Q.    And what this shows in the last column for the
12  whole election day voting, not just -- for the whole
13  election voting, not just on day of election voting,
14  that there was a drop-off in turnout for both white
15  people and -- white voters and black voters, right?
16    A.    And every other group too.
17    Q.    And the drop-off for black voters was larger
18  than the one for white voters, right?
19    A.    Yes, indeed, it is.
20    Q.    All right.  So we've -- I've asked you this
21  question with the last two experts.  Aside from what's
22  in your report and what we've talked about today, do you
23  have any other opinions about Professor Herron that are
24  relevant to this case?
25    A.    Not as I sit here today, I do not.



 1    Q.    Okay.  Great.  Let me just ask you two other
 2  brief things and then we'll probably wrap up.
 3              You had talked about conversations you'd
 4  had with folks in the Secretary of State's office?
 5    A.    Yes.
 6    Q.    And I think you said there were two
 7  conversations?
 8    A.    That's my recollection.
 9    Q.    Those were by phone?
10    A.    Correct.
11    Q.    Do you know how many people were on the line
12  when you talked to them?
13    A.    Well, the short answer is no.  But both of them
14  had multiple people in the Secretary of State's office,
15  but the number was like between two and four, I would
16  say, for both of them, if I -- if my memory serves me
17  correctly.
18    Q.    Was it the same people in both calls?
19    A.    I could not tell you.
20    Q.    Men?  Women?
21    A.    There were -- I definitely remember there being
22  men.  And I feel like there may have been a woman on one
23  of them.  But I'm just -- I'm just digging in my memory
24  banks.  So there may or may not have been a woman on one
25  or both of the calls.



1     Q.   Okay.  And we talked about a number of things

2  you talked about with him, the voter lists, McDonald --

3  Professor McDonald's report and the voter list

4  maintenance that they do and the mechanics of that.  We

5  talked about the way data is maintained.

6            Are there any other things that you talked

7  to them that we haven't talked about today?

8     A.   No, I don't think so.  I think we've covered

9  pretty much everything that we talked about.  That's the

10  best of my recollection.

11     Q.   Okay.  And how long were those conversations?

12     A.   They weren't -- neither one was super long.  I

13  want to say 15, 20 minutes, maybe 30, but none of them

14  were like, you know, four hours long or anything like

15  that.  I think both of them were a half-hourish or maybe

16  less.

17            MR. KAISER:  Okay.  Why don't we go off

18  the record for a second and take a quick break and

19  probably wrap up; is that all right?

20            MR. TYSON:  Sure.

21            THE VIDEOGRAPHER:  Okay.  If there's no

22  objection, we will go off the record now at 2:29 p.m.

23  Central Time.  Okay.  We're off the record.

24            (Break was taken.)

25            THE VIDEOGRAPHER:  We are back on the



 1  record at 2:29 p.m.  Go ahead.

 2      Q.   (BY MR. KAISER)  One last question, Professor,

 3  and then unless Bryan has questions, you're free to go

 4  on about your day.

 5            What -- ballpark, what percentage of your

 6  income would you say comes from expert testimony work?

 7      A.   It varies widely from year to year.

 8      Q.   Ballpark, when you add it up over the last four

 9  years?

10      A.   The last four years.  Oh, my gosh.  This has

11  been a strange cycle in that there was lots of

12  redistricting at the end of the decade, so this was --

13  the last four years have been pretty good.  I mean

14  normally sometimes I won't get any work at all after,

15  you know, years ending in 4 or 5, but there was more

16  this time.  So I would say this decade, in the last four

17  years, I would say it was maybe 20 percent of my total

18  income, something like that.

19            MR. KAISER:  Those are all the questions

20  I've got.  Bryan, do you have any questions?

21            MR. TYSON:  I have a couple of brief ones.

22  Shouldn't take that long.

23                      EXAMINATION

24  BY MR. TYSON:

25      Q.   Dr. Brunell, I just wanted to ask you a couple



1  of questions.

2          Do you recall Mr. Kaiser asking you a

3  hypothetical about designing a list maintenance process

4  that involved capturing people who moved.  Do you recall

5  those questions?

6     A.   I do.

7     Q.   And if you had a process that relied only on

8  the national change of address, would you capture every

9  person that moved, or would you possibly miss some

10 people who moved from that?

11    A.   You would only capture people necessarily who

12 submit the nation -- the change of address form, so

13 anybody who moves that doesn't submit the form would not

14 be included.

15    Q.   So a process that only used national change of

16 address and not some sort of no contact process has a

17 distinct possibility of missing people who move that

18 don't file an NCOA?

19    A.   For sure.

20    Q.   You were also asked about Table 10 in

21 Dr. Herron's report for the entirety of the 2018 general

22 election turnout.  Are precincts -- polling locations

23 and precincts open throughout the early voting period,

24 or are they only open on election day?

25    A.   I think they're only open on election day.



1    Q.   And last question, the Florida CNC (phonetic)

2    Services case that you discussed earlier in response to

3    Professor McDonald's report, that was a case that

4    involved absentee ballot recordkeeping, I believe.  You

5    had questions from Mr. Kaiser about that.

6               Do you recall that?

7    A.   I do.

8    Q.   And the information in that case was entered by

9    county election officials, is that -- is that my recall

10   in your testimony correctly?

11   A.   I believe that's correct.

12   Q.   And in Georgia, is absentee ballot information

13   entered into a database by county election officials?

14   A.   I mean county or local election officials,

15   something sub-state, yes.

16   Q.   All right.

17   A.   I don't know exactly who they're working for.

18   Q.   I apologize.  I said last question, this is my

19   last one.

20               In your work in the past with large

21   databases, have you had the opportunity to work with

22   voter registration databases on a regular basis?

23   A.   Yes, I have, mainly -- so, for instance, like

24   on a -- in a Section 2 case or even in a Section 5

25   Voting Rights Act case, we're likely to do racially



1  polarized voting analysis.  And some states like Georgia

2  and Florida, I believe, if my memory serves correctly,

3  collect registration data on race /and so in those

4  states, rather than using -- relying on census data to

5  tag race by voting calculation district, which is the

6  lowest level we can do it, we would use voting records

7  from those states rather than census data.

8              MR. TYSON:  All right.  Thank you.  I

9  don't have anything else.

10             MR. KAISER:  Two follow-ups off of that.

11             FURTHER EXAMINATION

12 BY MR. KAISER:

13    Q.   When you're doing that -- the work you just

14 described, working with voter registration databases,

15 to -- I take it that's to figure out the distribution of

16 voters by race within a jurisdiction?

17    A.   Correct.

18    Q.   Do you need to marry voter activity files or

19 absentee ballot files with that database in order to do

20 that work?

21    A.   No, I don't think we -- no, it's not necessary

22 for voting -- for polarization analysis, it's not.

23    Q.   Great.

24             And you talked about picking up people who

25 moved who did not fill out a change of address form and



1  making -- you know, and what you need to do to find

2  those folks to take them off of the list.

3           Do you have any reason to think that -- or

4  have you seen studies that show that not being in touch

5  with elections officials will pick up the people who are

6  unlikely to file a change of address form?  Have you

7  seen any research on that?

8      A.   I haven't seen any research.  I mean it makes

9  sense, it makes logical sense that would be one --

10 another indicator, but I haven't seen any research that

11 shows that.

12          MR. KAISER:  Okay.  That's all I've got.

13 Thank you very much for your time.

14          MR. TYSON:  Nothing else from me.  Thank

15 you.

16          THE VIDEOGRAPHER:  Okay.  Thank you,

17 everyone.  This concludes today's deposition.

18          Just one quick thing before we go off the

19 record here, if you could please let us know your

20 transcript and video orders, and if you are ordering

21 video, do you want it synchronized with the transcripts?

22          MR. KAISER:  We are and we would.

23          THE VIDEOGRAPHER:  Thank you.

24          MR. TYSON:  And we'll do E transcripts for

25 us.



```
 1              THE VIDEOGRAPHER:  Video as well.

 2              MR. TYSON:  No video for us right now.

 3              THE REPORTER:  Mr. Tyson, do you want a

 4  rush for you due in three days also, three business day

 5  rush?

 6              MR. KAISER:  I'm sorry, I just didn't hear

 7  what you said.

 8              THE REPORTER:  I asked Mr. Tyson if he

 9  wants an expedited copy of the transcript as well for

10  Tuesday.

11              MR. TYSON:  No.  We don't need an

12  expedited copy, no thank you.

13              THE REPORTER:  Do you want a rough draft?

14              MR. TYSON:  No, thank you.

15              THE VIDEOGRAPHER:  If there's nothing

16  else, we will go off the record at 2:37 p.m. Central.

17              Okay.  We're off the record.  Thank you,

18  everyone.

19                    (End of Proceedings.)

20

21

22

23

24

25
```



THOMAS BRUNELL, PH.D.                                    May 21, 2020
FAIR FIGHT ACTION vs RAFFENSPERGER                              212

```
 1                    CORRECTIONS AND SIGNATURE

 2    WITNESS:  Thomas Brunell, Ph.D.        DATE:  5-21-2020

 3    PAGE/LINE      CORRECTION        REASON FOR CHANGE

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14         I, THOMAS BRUNELL, Ph.D., have read the foregoing
      deposition and hereby affix my signature that same is
15    true and correct except as noted herein.

16

17                              _____
                                THOMAS BRUNELL, Ph.D.
18                              CASE NO. 1:18-cv-05391-SCJ

19    STATE OF TEXAS )
           Subscribed and sworn to before me by the said
20    witness, THOMAS BRUNELL, Ph.D., on this the _____ day of
      _____,  2020.
21

22                              _____
                                NOTARY PUBLIC IN AND FOR
23                              THE STATE OF TEXAS

24    My Commission Expires:  _____

25
```



```
 1  STATE OF TEXAS )
 2      I, Brandy Cooper, a Certified Shorthand Reporter
 3  duly commissioned and qualified in and for the State of
 4  Texas, do hereby certify that there came before me on
 5  the 21st day of May, A.D., 2020, at  9:07 a.m  at
 6  residence of witness, located in Richardson, State of
 7  Texas, the following named person, to wit:  THOMAS
 8  BRUNELL, Ph.D., who was by me duly cautioned and sworn
 9  to testify the truth, the whole truth and nothing but
10  the truth, of knowledge touching and concerning the
11  matters in controversy in this cause; and that he was
12  thereupon carefully examined upon his oath, and his
13  examination was reduced to writing under my supervision;
14  that the deposition is a true record of the testimony
15  given by the witness.
16      I further certify that pursuant to FRCP Rule
17  30(e)(1) that the signature of the deponent:
18      __X___ was requested by the deponent or a party
19  before the completion of the deposition, and that
20  signature is to be before any notary public and returned
21  within 30 days from date of receipt of the transcript;
22      _____ was not requested by the deponent or a party
23  before the completion of the deposition.
24      I further certify that I am neither attorney or
25  counsel for, nor related to or employed by any of the
```



 1  parties to the action in which this deposition is taken,

 2  and further that I am not a relative or employee of any

 3  attorney or counsel employed by the parties hereto, or

 4  financially interested in the action.

 5       CERTIFIED TO BY ME on this 26th day of May, 2020.

 6

 7

 8                    _____
                      BRANDY COOPER, CSR
                      Certification Expires 12-31-2020
 9                    Firm Registration No. 286
                      1700 Pacific Avenue, Suite 1000
10                    Dallas, Texas  75201
                      (214) 257-1436
11

12

13  

14

15

16  Taxable cost of original charged to Plaintiffs:
    $_____
17  Attorney:  Mr. Kaiser

18

19

20

21

22

23

24

25

**Exhibits**

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT1
  5:4
  11:20,21

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT2
  5:5 16:6,
  8

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT3
  5:6
  41:21,22
  110:6

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT4
  5:8 59:8,
  11

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT5
  5:10
  60:2,3

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT6

  5:11
  110:15,16

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT7
  5:13
  110:22,23
  133:3

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT8
  5:15
  163:12,13

5562518 Tho
mas.
Brunell,
 Ph.D..
EXHIBIT9
  5:17
  163:25
  164:1

_____

  **$**

_____

**$43,000**
  47:8
**$750**
  46:12

_____

  **-**

_____

**-.62**
  188:17

**-numbered**
  2:2

_____

  **1**

_____

**1**
  5:4
  11:20,21
  12:19
  103:9,12,
  14 105:24
  106:1
  124:2
  127:9
  146:11

**1,132**
  131:10

**1,974**
  186:9

**1-18-
CV05391SCJ**
  6:8

**10**
  100:21,
  22,24
  102:11
  103:13
  114:21
  123:1
  124:2
  127:9
  197:9,10
  202:18
  207:20

**10,000**
  139:13,22
  161:11

**10,124**
  139:2
  141:13

**100**
  46:17
  132:3,4
  137:25
  160:10,25

  161:9,17,
  25 174:17
  175:12,21

**100,000**
  161:2,17

**1000**
  7:16

**104**
  72:19
  73:11
  75:1 76:1

**109**
  154:9

**10:19**
  58:23

**10:26**
  59:2

**11**
  5:4 61:24
  62:2
  103:18
  106:1,4,6
  202:3

**110**
  5:12,14

**115**
  154:15

**11:33**
  109:18

**11:47**
  109:23

**12**
  181:19
  182:8
  200:21

**12-16-19**
  5:10

**1200**
  134:23
  137:23,25

**12:59**
  159:25

**13**
  156:9
  181:19
  182:8

**13.76**
  187:23

**132**
  134:16

**139**
  136:19
  137:11,17
  144:3

**14**
  139:1,11,
  20,21
  140:6
  141:11
  144:4,24
  149:20
  150:12
  156:10,13

**14,000**
  114:1,9

**14,732**
  113:9

**140**
  138:13

**142**
  128:8
  130:22
  134:12
  136:4,11
  160:14

**143**
  149:23

**15**
  19:13
  58:3
  205:13



**15th**
  80:20
  83:9
  84:25
  115:2

**16**
  5:5 16:16
  17:2,10
  64:21
  129:3

**16.68**
  184:12,19

**16.8**
  184:13,19

**163**
  5:16

**164**
  5:18

**1650**
  3:8

**168**
  60:6

**16th**
  14:7
  81:12

**17**
  110:25
  111:22
  112:3
  129:7
  144:3

**17.68**
  186:14,17

**17.76**
  188:1

**1700**
  7:16

**18**
  112:10,13
  113:4
  139:3,16

142:21
143:5,9
144:15
145:5,12
147:18
148:3,24
149:8,21
150:9,10,
21,24
151:3,15
152:10,
18,20,21
153:3,13,
24 154:20
155:15

**1800s**
  18:21

**18th**
  14:13,16
  110:8
  163:12

**19**
  131:19
  152:21

**1911**
  142:21
  143:22
  154:7

**1926**
  142:21
  143:22
  149:2

**1950s**
  134:20

**1952**
  42:16
  131:12,
  16,19

**19th**
  72:7

**1:14**
  160:3

───────────
      **2**
───────────

**2**
  5:5
  12:22,25
  16:6,8
  21:25
  52:25
  59:10
  66:10
  70:8,14
  72:8
  93:25
  127:25
  133:10
  146:11
  174:4,16
  180:24
  181:15
  192:24
  208:24

**2-18-20**
  5:12,16

**2-3-20**
  5:5

**2.b**
  7:9

**20**
  81:8,18,
  21 192:10
  205:13
  206:17

**20.3**
  186:12,17

**20.73**
  187:20
  188:1

**200**
  3:13
  132:4
  160:10

**20005**
  3:5

**2014**
  188:9
  202:7,23

**2015**
  21:18

**2016**
  54:20
  131:13
  142:20
  143:21
  145:22
  147:19
  155:15

**2017**
  124:10

**2018**
  72:14
  74:9,13
  80:20
  82:9
  105:6
  131:19
  188:9
  200:16
  202:6,23
  207:21

**2019**
  40:9 72:7
  74:15,17
  81:13
  132:9

**202 640-
2850**
  3:6

**2020**
  2:2 6:4
  16:7
  110:5,8
  163:12

**206**
  4:6

**208**
  4:7

**20th**
  15:8 42:2

**212**
  4:8

**213**
  4:9

**21st**
  2:2 6:3

**22**
  182:16

**23**
  54:22
  178:6

**24th**
  110:5
  122:8

**276**
  42:1

**29**
  139:3
  149:21
  152:18

**29-year-old**
  139:16
  151:3
  152:20,22

**29-year-
olds**
  148:25
  149:8
  153:25
  155:15

**2:08**
  195:7

**2:14**
  195:11

**2:29**
  205:22



206:1

**2:37**
211:16

——————————
            **3**
——————————

3
4:2 5:6
12:22,25
25:24
41:21,22
77:14
87:2
110:6
133:11
182:22
183:9
184:24

**3-24-20**
5:7

30
205:13

**30-day**
82:8

30309
3:9

30339
3:14

31
28:6,8
47:11,19

3200
98:21

36
81:8,20,
22

**3rd**
14:10,23
16:7 59:9

——————————
            **4**
——————————

4
5:8 53:3
59:8,11
66:22
72:20
73:11
78:8,12,
17 80:17
83:25
84:6
89:1,3
92:13
142:10,11
165:18
206:15

**4-3-20**
5:9

**4-8-20**
5:14

**4-9-20**
5:18

404 400-
3350
3:9

41
5:7

47,600
175:13,16

49
182:15,16

4th
14:19

——————————
            **5**
——————————

5
4:3 5:10
53:4,8
60:2,3,9

84:1 86:3
169:9
171:4
182:22
184:21
185:23
206:15
208:24

5,852
131:10

5-0
174:3

50
161:24
174:3,16
178:6
180:24
181:5

52.9
124:20,24

53
183:7

54.9
124:23

542
186:6

55
184:22
185:23

56
186:19

59
5:9

59,000
156:24

59,866
112:6
156:7

——————————
            **6**
——————————

6
5:11
95:21
97:22
110:15,16
130:9
187:1,7
194:22
195:13
200:9

60
5:10
187:17

61
188:4

678 336-
7249
3:14

69
202:18

6th
82:10

——————————
            **7**
——————————

7
4:4 5:13
61:25
110:22,23
125:25
126:8
133:3
173:12
180:20
182:22
186:19,24
187:8

71
202:4

7211
7:12

73
181:19
200:21

74
154:8
181:19

75080
7:11

79
129:21
130:12,13

——————————
            **8**
——————————

8
4:5 5:15
60:9,16,
22 100:16
125:25
156:7
163:12,13

80
143:5

85
130:2,6

89
188:14

8th
15:1
110:19
133:4

——————————
            **9**
——————————

9
5:17
60:17
163:25
164:1



182:22
192:12

**9.22**
100:25

**90**
16:3
143:5
151:10

**90,000ish**
160:14

**90-some-
thousand**
144:25

**91**
129:21
130:12,13

**92**
161:1,3,
9,11

**94**
154:9,13

**95**
130:8,11
174:4,17,
22,24

**97**
132:21

**97,000**
132:11,21

**9:00**
9:24

**9:07**
2:2 6:4

**9th**
15:3
163:22

───────
**A**
───────

**a.m.**

2:3 6:4
9:24
58:23
59:2
109:18,23

**Aaron**
14:15

**ability**
10:2,6
56:13
167:24,25
169:25

**abnormal**
106:25

**above-
styled**
2:1

**absentee**
61:4
69:1,10
78:9,12,
14,15,16
79:3,8,
10,22,23
83:21
93:19,20
94:3
96:4,9,
22,25
97:2,13,
15,22
98:5,18,
22 102:9,
14,20
103:13
104:18
105:7
106:18
107:5
208:4,12
209:19

**absolute**
150:22
194:20

**absolutely**
54:24
108:25
141:20
195:3
197:1

**academic**
19:8 21:3
23:4
35:13
55:12,14
64:24
65:7,19
136:5

**academics**
133:17

**accept**
149:19

**acceptable**
142:3

**accepting**
139:24

**access**
71:19

**accidentall
y**
38:6

**accordance**
7:8

**account**
54:1
128:19
129:19

**accountable**
140:5

**accounts**
87:7,22

**accuracies**
165:16

**accuracy**
165:7,8

**accurate**
37:20
68:20
74:20
165:12,
13,15
173:10

**accurately**
75:5

**Act**
37:4
52:10
53:4
168:4
208:25

**Action**
6:6

**actions**
40:16
180:7

**active**
44:21
116:21
119:7
123:8

**activity**
209:18

**acts**
28:12,21
52:21
122:18

**actual**
39:9
175:8

**add**
96:18
125:14
169:11,16
170:6,9,
13 206:8

**added**
27:13

71:16
72:13
75:12
126:11

**addition**
46:21
182:13

**additional**
27:9,13
41:9
47:24
76:20

**address**
7:15 24:3
35:25
112:8
116:6,8,
11,20
117:4,5
120:4,20
127:6,7
139:15
157:1,3,
21 158:3,
21 203:6
207:8,12,
16 209:25
210:6

**addresses**
133:7
158:22

**adds**
61:11
170:18
189:8

**adhere**
99:5

**administer**
44:7

**administeri
ng**
7:13



**administration**
21:17,20
22:5,9,
14,15
26:22
28:18,23
31:1,5,7,
13,17,22,
25 33:17
34:13
53:7
55:18
56:9
104:11,
16,20
120:15
122:15

**affect**
198:3,7
199:25

**affected**
176:19
178:13
179:17,
21,24
180:3,5,8
181:21
182:20
189:5
190:7,22
191:3,10,
19 192:19
195:20,21
196:12,
21,23
199:15
200:2

**affecting**
189:12
198:9,10

**affects**
10:6 35:8

**afraid**

48:2,9

**African-american**
101:22
175:21
181:22

**African-americans**
196:19

**age**
138:21,22
139:7,12,
20
144:18,21
145:1,3,
6,8,13
150:10,13
152:9
153:10,22
154:2,13,
14,15,21

**ages**
40:4
149:21
155:12

**agree**
8:2
27:15,21
31:3
36:12
60:15
62:20
64:1,2,
11,12
74:19,23
105:22
109:10
112:16
127:20
135:21
146:2
156:20
192:10
193:17

**agreed**
127:14

**agreements**
7:21

**agrees**
7:24

**ahead**
89:21
181:20
206:1

**Alabama**
49:1

**alcohol**
10:1

**alleged**
113:11

**allocated**
185:7

**allocation**
174:25

**alphabetically**
23:6

**America**
149:2
155:9,10
197:15

**American**
19:6
20:3,7
42:11
131:15,23
132:1
134:19,21
137:21
142:20,24
143:2,19
144:10,16
145:6,11,
21 146:4,
18 147:21
148:3,4,5

150:7
151:3
154:1

**Americans**
131:3
147:19
149:7
151:6
154:12,21
197:9,12,
14

**AMES**
137:16

**amount**
21:5
107:6

**analog**
146:1,3

**analogy**
146:4

**analyses**
173:13,14
199:24

**analysis**
25:18
26:13
27:9
28:11
30:14
37:23
39:23
71:24
76:8,10
82:18
89:16
96:9
101:25
105:1
121:15,19
122:15
123:25
124:4,8,
11 125:8,
11 126:22

135:2
138:6
143:21
144:5
164:21,25
165:8
173:8,9
175:2,3
180:2,4
186:4
200:12,
13,15
209:1,22

**analyst**
152:23

**analysts**
152:3

**analyze**
37:20
39:8

**analyzed**
36:17
39:12
41:2
122:2

**analyzing**
38:21
134:24

**Anderson**
3:3 6:22
24:7,14

**ANES**
147:19
150:24
151:16
152:4,6,
7,8
153:1,2,
10,13
154:2
160:8

**Angeles**
171:14



172:5

**annual**
18:1,2

**answering**
9:17,20
63:12

**answers**
54:4 98:6

**antecedent**
170:21

**anybody's**
193:20

**apologize**
57:21
70:2
208:18

**appearance**
126:4

**appearances**
4:2 7:20

**appears**
98:18
127:12
188:11

**application**
101:11

**applications**
101:14

**applies**
194:7

**apply**
126:11

**appreciated**
189:15

**appropriately**
146:5

**April**
14:23

15:1,3
59:9
110:19
133:4
163:22
184:21

**arguably**
51:15

**argue**
66:5

**argues**
90:3
193:22

**arguing**
52:5
143:24
146:2

**argument**
89:14
90:15,21
135:15
146:11
198:21

**argumentative**
63:13

**arguments**
66:12
146:10
179:1

**Arizona**
19:11,12

**arranged**
86:17,23

**article**
23:6,8,
14,19,22,
23,25
24:11,19,
22 25:6
136:14,
21,23

137:6,10
143:8

**articles**
21:16
22:4
33:12
43:21
65:9,23
66:6
128:11,13
134:24
166:13,
16,20
171:10
172:12

**Asian**
101:21
140:18,21

**aspects**
104:19

**assertion**
78:19

**assess**
27:2
154:19

**assessment**
26:7,25

**assigned**
43:21

**Assistance**
103:22

**Association**
19:7

**assume**
9:3 10:1
45:19
46:13,23
74:14
123:22
144:5
153:2
158:4,7

164:18
168:20
169:6
170:18
176:11
189:21
198:14

**assuming**
161:8
170:2

**assumption**
45:4
96:21
169:24
170:5

**Atlanta**
3:9,14
6:9
171:20

**attached**
2:8

**attended**
54:19

**attention**
24:18

**attestation**
7:17

**attitudes**
131:3

**audio**
6:14

**August**
40:4,8

**author**
22:23

**authority**
168:9

**authors**
22:19

**Avenue**

7:16

**avoid**
119:23

**aware**
101:9,16
172:24
173:2,4

**awesome**
157:10

———————

**B**

**bachelor's**
18:8

**back**
18:20
22:2 28:3
31:6 35:1
41:7
47:10
49:5
50:7,19
58:12,19
59:1,14
70:25
75:9 79:6
103:21
108:5
109:22
120:5
122:25
152:11
156:1
160:2,5
162:11
175:23
177:5
184:24
190:15
194:23
195:5,10
196:2
205:25



**background**
18:6 19:4

**bad**
90:24
91:4
105:14
150:11
164:5

**ballot**
45:8
69:1,10
74:8
78:15,16
79:10,22,
23 83:21
86:10,11
96:10
97:22
98:5,7,18
100:14
102:9,14,
20,22
104:18
208:4,12
209:19

**ballots**
30:10
61:4 86:8
87:8,19,
22 88:12
89:7
92:17
93:19,20
95:23,24
96:3,4,
10,18,23
97:1,2,
13,15,23
98:22
100:9
103:12,13
105:7
106:18
107:5

**ballpark**
206:5,8

**banks**
204:24

**barely**
33:7
140:10

**bark**
10:18,19

**based**
68:16,18
89:24
90:4
101:5
102:1
103:22
106:13
113:10
115:24
116:24
122:12,14
123:16
127:1
137:6
138:22
142:7
143:8
156:10
163:5
185:6
191:19
193:4
196:13

**basic**
38:11
118:14
150:1

**basically**
19:1
30:12
67:6
89:16
90:15
91:24

93:22

**basing**
140:15

**basis**
26:6
29:14
78:19
85:23
99:24
122:17
124:17
125:12
134:3
208:22

**bear**
162:25
199:20

**beginning**
25:17
57:20
201:16

**begins**
6:5

**behalf**
6:23,25
7:2

**behavior**
133:20

**belief**
85:24
99:24

**believing**
134:3

**benefit**
189:22
198:1

**bias**
18:23

**biased**
102:1

**big**

32:20
96:18
126:15
131:25
132:5
146:17
150:24
153:7
155:4

**bigger**
147:24,25
148:13
149:5
151:16
153:13
160:18

**billed**
46:19,21

**Binghamton**
19:9

**bipartisan**
49:3

**bit**
13:23
21:2 23:9
24:18
29:5
42:21
59:14
81:5
97:12
100:20
118:14
160:6
162:3
192:18

**bits**
119:17

**black**
61:4
93:21
122:16
173:16
174:5,23,

24 176:2,
5,6
177:10
180:3,12,
18 181:13
182:19
184:14,22
185:11,25
186:6,9,
11,22
187:10,
14,15,20,
23,24
188:17,22
189:11,
13,20
190:6,21
192:1
195:19
196:21,22
198:9
199:15
200:18
203:15,17

**blacks**
125:23
126:3
175:13
187:18
189:4
190:22
191:4
192:19
199:25

**blanket**
27:21
80:5
161:22

**bless**
93:12

**block**
28:11
174:8,10,
11,22
175:4,6,



7,8,19,20
191:9,10
193:1,2,
7,9
194:7,8,
10,11,15,
16

**blocks**
175:8,17
190:12
191:15,
18,24

**blue**
16:20
17:6,10
47:19,21,
22 60:5
112:13
113:4
114:21
129:8
142:14
156:11
174:3

**Board**
169:3

**book**
33:11

**born**
142:21
143:21
149:2
153:18

**bother**
179:4

**bottom**
66:16
70:8,14
72:7
78:22
80:17
81:22
83:25
84:5 94:9

97:22
112:12
113:18
128:6
165:22
200:12

**bound**
75:7
160:24

**boundaries**
130:1

**boutique**
19:25

**Bowler**
21:19
22:24

**bracket**
190:5

**Brad**
6:7

**branch**
169:2,7

**Brandy**
2:3 6:12
7:12
159:20

**break**
57:24,25
58:5,25
67:13
108:23
109:21
159:17,
18,21
160:1
195:9
205:18,24

**breakdown**
115:9,14

**breaking**
162:2

**breaks**
57:21
65:3
115:2

**briefly**
9:2

**bring**
136:12,23

**broad**
35:9
116:25
117:2
118:11

**broadly**
30:9
53:17

**Brunell**
1:24 5:4,
5,7,9 6:6
7:7 8:7,
11,16
24:1
69:17
142:17
160:4
178:10,18
195:12
206:25

**Brunell's**
24:3

**brush**
118:11

**Bryan**
3:7,12
6:24 7:1,
22 12:13
13:9
23:25
24:1
109:8,11,
14,20
206:3,20

btyson@
taylorengli
sh.com
3:15

**bunch**
68:21
89:17,25
141:9
142:22
150:19
193:3

**Bundy**
3:8 6:25

**Bureau**
55:17

**bureaucraci
es**
75:7

**bureaucracy**
73:9
169:6

**business**
7:15
211:4

————————

C

————————

**calculated**
128:25
129:11,16

**calculating**
128:20

**calculation**
129:19
190:14
209:5

**calculation
s**
155:2,3

**California**
18:7

171:14
172:6

**call**
11:14
47:1
84:4,19,
20 86:15,
17,19,23
119:1

**called**
20:2
28:20
32:20
37:23
84:22
147:3
149:20

**calling**
115:18

**calls**
10:24,25
44:5,9
167:8
204:18,25

**campaign**
51:25

**campaigns**
19:20

**canceled**
112:5
113:10

**cancelling**
114:12

**Capitol**
19:7

**capture**
207:8,11

**capturing**
207:4

**card**
43:16,18



**care**
  24:23

**careful**
  84:19

**carefully**
  178:10

**Carolina**
  48:9  91:2

**case**
  6:7  8:4
  12:18
  16:12,24
  26:10
  28:18,22
  29:2,16,
  21,22
  30:8,9,13
  31:19,20,
  21  32:4,
  13  33:7
  34:3,6,7,
  8,18
  35:2,18,
  19,20
  36:3,4,
  13,15
  37:12
  40:2,10,
  12,14,22
  45:14
  46:8,11,
  15,19
  47:13,25
  48:1,16
  49:1
  50:19
  51:20
  52:4
  53:2,3
  59:4
  68:16
  69:22
  74:25
  90:20
  91:7,8,13

**case** (cont.)
  111:19
  125:20
  127:6,17
  128:24
  139:11
  159:7,8
  163:11
  169:19
  170:10
  171:1
  203:24
  208:2,3,
  8,24,25

**cases**
  32:2
  34:10
  37:13
  47:16,24
  48:6,8,10
  49:2  72:5
  90:23
  137:23
  162:17
  172:4
  196:8

**cast**
  86:8,11
  87:8  89:8

**cat**
  81:16

**catch**
  158:23,24

**categories**
  34:15
  101:23,24
  115:17
  122:1
  123:4,9,
  13  126:16
  151:7

**category**
  117:8
  120:11
  121:19

  126:2
  150:10,13
  152:9
  153:3
  154:2

**causality**
  178:25
  179:2,5,
  6,10,11,
  14

**causation**
  190:5
  196:8,11,
  13,15

**cautious**
  139:24

**census**
  28:17
  55:17
  56:1,6,9,
  13  175:7,
  10  190:12
  191:9,10
  209:4,7

**center**
  25:17
  27:11
  183:16

**Center's**
  26:12
  27:17

**central**
  6:4  58:23
  59:2  66:2
  109:18,23
  159:25
  160:3
  195:8,11
  205:23
  211:16

**centralized**
  62:4
  63:16

  92:4

**Certificate**
  4:9

**chair**
  20:19

**challenging**
  64:13

**chance**
  55:10

**change**
  35:25
  46:5
  49:25
  50:1
  98:21
  116:6,7
  117:4
  132:11
  156:24
  158:21
  185:5,9,
  12  190:13
  207:8,12,
  15  209:25
  210:6

**changed**
  117:14
  118:14
  168:19

**chapter**
  18:22

**chapters**
  18:24

**characteriz
ation**
  25:10
  26:14
  27:14,22
  28:14
  35:22
  36:19,21
  64:9
  76:11

  94:8
  131:6

**characteriz
e**
  36:11
  56:25

**characteriz
ed**
  34:25

**characteriz
ing**
  105:15

**charge**
  178:9,19

**chart**
  103:18
  175:11
  190:14

**charts**
  190:16

**chase**
  181:4

**checklist**
  121:16

**choice**
  38:12,20

**choose**
  70:9
  149:19

**choosing**
  80:23

**chosen**
  81:2

**Circle**
  3:13

**circuits**
  155:21

**cite**
  130:24



cited
  87:24,25
  163:7
  194:3,5
click
  136:22,24
client
  86:24
close
  10:23
  136:25
  148:8,10
  165:24
  167:3,21
  201:20
closed
  176:13,
  14,18
  183:22,24
  184:1,3,
  7,12,13,
  15,17
  187:21,24
  188:23
  201:13
closer
  73:21
  85:20
closing
  82:9
  167:13
closure
  169:25
  174:5
  175:22
  176:6,11,
  15,20
  177:9
  182:10
  183:14
  184:22
  185:25
  186:11,22
  187:10
  190:7

cited
  29:2
  117:8
  172:2
  173:10,22
cites
  43:21
  134:15,16
  136:14
cities
  32:20
citing
  172:18
citizens
  134:18
  137:12
claim
  153:1,2
class
  19:18,25
  20:5,6
classes
  19:16,17,
  19 20:5
classify
  36:10
  51:10
  61:13,18
clean
  67:6,14
  68:5
cleaned
  67:14
  79:2
clear
  7:23
  10:11
  22:25
  75:11
  80:24
  82:12
  83:12

closures
  13:14,23
  15:12
  166:14,19
  170:4
  175:3
  178:13
  182:20
  196:24
  198:16
cloud
  63:9
CNC
  208:1
coast
  153:18
coauthor
  23:4
coauthored
  111:18
coauthors
  23:1
code
  67:9 68:3
  69:15,22
  70:11
  86:7
coded
  135:10
codes
  98:12,13
  99:18,22,
  25 100:13
coffee
  10:3
cognitive
  10:6
colleagues
  15:22
  164:5
collect

  209:3
collecting
  31:10
collects
  62:11
Columbia
  106:4
column
  115:9
  117:9
  120:12
  123:5
  124:20
  174:15
  175:14
  176:1,5
  183:16,22
  184:3
  203:11
columns
  115:13
  175:23
combined
  199:17
commentary
  51:13
Commission
  103:23
committed
  119:15
communicati
ng
  78:2
community
  59:22
  111:5,6,
  14
comparative
  106:22
compare
  75:17

85:6
  103:7
  107:1,3
  123:3
compared
  126:17
  182:21
comparing
  85:13
  102:8
comparison
  75:20
  151:22
comparisons
  75:18
  157:7
compilation
  80:25
compile
  193:4
complaint
  40:10
completely
  23:12
  143:23
  157:5
complex
  38:17
comprised
  174:12
Computer
  37:18
concept
  18:17
concern
  153:5
concerned
  153:6
concludes
  210:17



concluding
   122:18

conclusion
   90:25
   95:18
   103:17
   112:20
   124:18
   127:3,16
   156:18,24
   167:9
   170:6
   177:8
   188:20,22
   191:25
   192:2
   193:24
   196:13
   197:20
   199:22

conclusions
   25:15
   101:5
   125:21
   131:22
   139:7,18
   180:7
   185:6

conditional
   170:16

conditions
   192:10

Condolences
   20:25

conduct
   32:17
   52:16
   134:4

conducted
   7:7 65:7

conducting
   25:19
   80:25

conference
   3:3,7,12
   22:17,19

conferences
   59:21

confidence
   130:8
   161:1,10

confident
   130:11
   132:18

confirmed
   55:21

confirming
   183:2

Congress
   19:24
   20:5
   33:13

congressional
   19:6 49:2
   134:24
   135:3,4,
   6,10

consequence
   170:22

conservatively
   112:6

consideration
   55:16

considerations
   169:11

considered
   64:4

consistent
   79:1
   201:23

consistently
   199:10

constitute
   119:4
   120:6

constitution
   52:7
   167:16

consult
   53:15

contact
   36:2
   44:19
   115:14
   117:8,11
   118:6,9,
   15,25
   119:4,6,
   22,23
   120:5,6
   125:2
   126:5
   130:5,15
   132:9
   139:3
   147:7
   149:1
   152:19,22
   155:1
   156:8,25
   157:4,12,
   15,20
   158:19,22
   207:16

contacted
   40:3

contained
   107:10
   159:9

contest
   23:15

context
   133:18

continue
   82:14
   112:7
   118:1
   135:15
   149:12
   180:25

continued
   82:15

continues
   72:23

contributes
   139:18

control
   50:8
   100:8,12
   121:10
   170:17,18

controlled
   49:12

convention
   54:20
   55:4,9
   57:8,11,
   16

conversation
   13:9,25
   78:20
   87:12
   88:5
   111:25
   143:10
   201:16

conversations
   46:6
   204:3,7
   205:11

convincing

180:8

cool
   104:5
   171:2
   188:12

Cooper
   2:3 6:12
   7:12

coordinating
   198:15

copy
   25:23,24
   211:9,12

corner
   199:3

Corporation
   29:6

correct
   8:1 9:25
   12:20
   14:17,24
   15:1,9
   21:6
   25:21
   26:9
   30:18
   33:14
   35:1
   37:21
   47:14
   50:20
   56:4,18
   57:15,18
   66:9
   67:1,2
   71:9
   72:23
   80:1 81:1
   82:16
   86:12,16
   87:24
   88:2
   89:15



91:10
92:3,20
94:7,18
95:10
96:8
97:18,20
98:11,20
100:5,19
105:10,12
112:20
114:8
115:4,7,
16,21
118:12
121:17
127:4
128:16,
20,21
129:23
130:20
131:5,6,8
132:12
133:1
138:24
139:5
144:14
149:4,5
156:22
157:14,22
160:16,22
163:20
169:15
174:18
177:12
180:19
183:15,25
184:10,
16,18
185:10,18
186:10
187:16,25
188:19
195:24
196:9
197:5
201:8,10
203:5,10

204:10
208:11
209:17

**corrected**
82:19,22

**Corrections**
4:8

**correctly**
32:8
129:17
166:20
204:17
208:10
209:2

**correlation**
191:21
198:23

**correlations**
196:4,7

**cost**
134:9

**cough**
44:25

**counsel**
7:18,19
44:1
45:23,25
46:2
86:23
166:9

**count**
34:5
106:3,6
123:6,13
198:4

**counted**
75:4
105:8

**counterintuitive**
132:22

**counties**
40:17
90:13
92:5,11,
17 93:6
99:21
166:14
169:18,
20,21

**counting**
31:10

**countries**
107:1

**country**
18:18
102:15
106:23

**county**
52:9 93:8
98:9,25
99:5,17,
20 119:25
165:25
166:19
167:2,13,
21 168:18
169:18
170:4
171:12,
13,14
172:5,6
195:22
208:9,13,
14

**county's**
89:7
92:21
93:1

**county-based**
166:22

**countywide**
171:16

**couple**
12:13
34:10
48:7
66:22
72:4 95:3
135:5
148:20
158:1
206:21,25

**court**
6:8,11,19
7:3 11:22
21:13
29:25
32:22
42:18
90:6
95:11
103:15
149:17,19
172:3,4
193:13

**cover**
70:23

**covered**
205:8

**COVID**
13:15,21
15:11
197:10

**COVID-19**
2:6 7:9

**crazy**
143:14

**create**
67:11

**created**
82:8

**criteria**
64:5

**critical**

77:25

**criticism**
56:22
83:8
108:10
110:1
130:17
133:7
149:16
150:15
151:4
178:8,22
179:6
185:3

**criticisms**
59:15
89:12
94:17
107:8
123:21
178:24

**criticize**
76:12,16
80:22
95:17
107:25
151:4
165:10

**criticized**
83:10
85:2
135:7

**criticizes**
93:4
179:5,11

**criticizing**
76:10
78:11
83:24
90:9
151:19

**CSR**
2:3 7:12



current
  17:17
  112:8

cut
  38:6
  48:23
  158:6
  181:4

cutoff
  174:4,20
  175:12
  187:18

CV
  16:14
  17:14,16,
  17,23,25
  18:3
  21:3,25
  22:18
  28:2,3
  30:1
  33:10
  47:10,13,
  17 48:5
  54:19,24
  55:1
  111:16,
  18,21

CVS
  17:21

cycle
  206:11

———————

          D

———————

daily
  80:18
  84:3,8,22

Dakota
  31:21
  32:4,20
  34:7,19
  37:12

Dallas
  7:16
  19:14

Dan
  14:6,10,
  18 28:25
  34:16
  39:16
  40:22
  41:2,4,5
  59:15,16,
  18,19
  63:17
  74:4
  75:21
  76:10
  83:22
  108:8
  111:4
  164:8

Dan's
  39:15
  60:7 64:7
  76:20

Daniel
  5:10

data
  25:15
  26:17
  37:20
  38:22
  39:5,8,
  10,14,16,
  17,20,24
  40:1,25
  41:3,8,15
  61:12
  63:9 65:8
  66:12
  67:7,15
  68:5,8,9,
  14 71:6
  72:23
  73:15,17,
  19,21,22

74:5,6
  75:12,16
  76:6,16,
  18,19,24
  77:5
  80:25
  82:6,14,
  20 88:17,
  18 101:5,
  9 102:6
  103:23
  104:17
  105:1,6
  113:8
  116:16,17
  120:24
  121:1,2,
  3,4,18,
  19,20,21,
  22,24,25
  122:3
  124:5,9,
  11 135:10
  137:9,16
  164:18,
  21,25
  165:7,9
  173:8
  193:4
  194:14
  196:3
  205:5
  209:3,4,7

database
  80:3
  155:21
  208:13
  209:19

databases
  208:21,22
  209:14

date
  33:6
  44:13
  79:17

80:23,24
  81:2
  84:25
  85:1,3
  88:16

day
  109:14
  167:4,14
  182:4
  188:2,3
  198:11
  200:15
  201:6
  202:11,17
  203:12,13
  206:4
  207:24,25
  211:4

days
  211:4

DC
  3:5

deadline
  82:9

deal
  51:22
  69:16

deals
  22:8
  194:7,9
  201:5

decade
  65:10
  206:12,16

December
  14:7 72:7
  74:16
  81:12

decent
  21:5

decided
  26:20

167:2,21

decides
  172:4

decision
  166:22

decisions
  134:6
  146:25
  148:11
  149:9
  165:23
  166:2
  169:17
  170:1,3,
  9,11,12,
  25 195:22

decrease
  189:11

decreases
  171:9

defendant
  169:19

defendants
  3:11 7:2
  44:3

defense
  45:14
  86:23

define
  62:17

defined
  53:17

definition
  64:2

degree
  18:8

delegation
  49:2,3

delegations
  49:5



delivered
  45:8
  86:10
  96:3,11
  120:17

Democrat
  49:18
  52:1

democratic
  48:20
  49:6,7,8,
  12,21,23
  50:3,10
  57:7

democrats
  50:6

demographic
  151:23,25
  152:19

department
  20:11,19

depend
  173:9

depending
  160:18

depends
  55:22
  136:8
  137:8
  169:24

depo
  11:25

deposed
  29:24
  57:22

deposition
  1:24 5:4
  6:5,12
  7:6,14
  8:22
  13:5,20
  57:20

94:23
95:1
109:20
168:12
210:17

describe
  26:5
  45:17
  68:20
  77:9

describes
  25:6
  62:2,3,9
  70:10

description
  5:2
  105:23

design
  158:5,8

designed
  135:8

designing
  207:3

desktop
  11:6

detail
  178:11
  179:16

details
  90:3

detecting
  73:2

determined
  74:21

died
  36:1

differed
  72:4,19

difference
  77:4

96:18
123:11
145:24
185:9,12
188:13
199:11

differences
  72:1,21
  77:2
  85:10,15,
  17 94:2,
  4,5,13,
  14,21
  95:17,19
  106:9
  123:12
  126:15
  138:21
  151:20
  179:4
  189:3
  190:21
  192:22

differently
  77:23

differs
  187:13

difficult
  23:5 83:4
  101:6

dig
  173:23

digging
  204:23

digit
  140:10

Dillon
  3:4 6:23

dilute
  189:20
  197:25

diluting

199:9

dime
  47:4

ding
  43:13

direction
  182:23
  183:3
  188:21
  192:21
  193:21

directly
  22:8,15
  31:24
  50:24
  125:23
  158:22

director
  55:17
  56:1,6,
  10,13

disagree
  27:14
  60:16
  62:7,13,
  15 133:25
  156:18

disagreemen
ts
  64:19

disappointe
d
  134:12

Disaster
  2:7 7:9

discipline
  126:13
  142:5
  164:6

disconcerti
ng
  73:15

discrepanci
es
  75:3
  88:13,14,
  15

discriminat
ory
  122:19
  189:20,21
  199:19

discussed
  208:2

discussion
  73:8

discussions
  71:12
  166:9

dismantled
  53:3

dismissed
  29:22

disparate
  40:19
  122:16
  123:16
  124:1
  127:1,21

disproporti
onate
  192:1,3
  196:4
  197:2
  198:2
  199:25

disproporti
onately
  178:13
  179:17,24
  182:20
  188:22
  190:6
  191:19
  192:19



196:23
199:21,23

**dispute**
64:9
112:22
114:8
156:23
165:7
189:1

**distinct**
207:17

**distributed**
185:19

**distributio
n**
126:16
188:7
190:12
209:15

**district**
6:8,9
106:4
135:3,6,
11 187:18
209:5

**districts**
53:2,15
54:14,15
135:4

**Division**
6:9

**DMV**
118:17

**DNC**
29:5 91:7

**Doctor**
8:18

**document**
11:18
12:7
16:11,18,
24 17:13

42:1 43:1
59:9
60:1,6
81:10,15
110:11

**documents**
11:14
12:13,21,
24 13:16
14:4
15:10
43:2
69:25

**dog**
10:13,15
58:10,16
109:4
117:18,25

**dogs**
10:18

**donation**
52:5

**Donovan**
21:19

**double**
140:10

**double-
check**
105:4

**doubt**
199:18

**download**
82:23
84:25
85:3,12
104:25

**downloaded**
66:12
70:15
71:7
72:6,10
75:21,22

82:2
85:11

**dozen**
65:9 72:4
135:5

**dozens**
33:11

**draft**
45:23,24
211:13

**drafted**
45:16

**drafting**
45:17

**drafts**
46:2

**draw**
53:15,22,
23 101:5
136:8
139:6

**drawn**
53:1,25

**drill**
36:9
145:25
146:8
148:19,23

**drop**
182:4

**drop-off**
200:17
203:14,17

**drugs**
10:1

**due**
18:3
82:18
117:12
157:20
211:4

**duly**
2:1 8:8

**Duma**
3:13

**duplicate**
67:17

**duplicates**
67:18
68:9,12

**duration**
6:16

———————

**E**

———————

**e-mail**
23:25
24:3,8

**e-mailed**
11:19
46:14

**e-mailing**
23:24

**E.A.D.S.**
104:3,7

**E.A.V.S.**
104:8,9,
13,14
106:11,12

**EAC**
41:3
61:12
104:15

**earlier**
59:3
72:11
79:21
90:12
91:4,20
115:22
120:22
156:7

195:25
208:2

**early**
34:8
35:2,8
47:3,25
69:16
74:15
207:23

**ease**
41:20

**easier**
70:3,7
103:18

**easily**
80:8

**EAVS**
104:1,2,
12 105:6
106:11

**ECF**
42:1

**economy**
20:21

**educational**
18:6

**effect**
173:3
192:3

**effective**
158:19
159:2

**effects**
181:18
191:13
192:1
196:4
199:21,
23,25

**efficient**
18:5 24:6



**Eighth**
  3:5

**elapses**
  118:21

**elderly**
  140:2
  147:19,20
  149:7
  151:5

**elected**
  50:25
  74:12

**election**
  20:6
  21:17,20
  22:5,9,13
  24:25
  25:1,3,
  14,15
  26:2,7,
  21,25
  28:18,23
  31:1,5,7,
  13,16,22,
  25 33:16
  34:12
  36:2
  42:12
  44:6
  52:16
  53:6
  63:23
  71:1
  72:14,15
  73:1,3,22
  74:9,13,
  20,22
  75:12
  77:19
  82:9
  85:20
  99:20
  103:22
  104:11,
  16,19

  105:6
  118:16
  120:15
  130:25
  131:15
  134:19,22
  137:22
  138:5
  142:8,20,
  24 143:3,
  20 144:11
  145:11,21
  146:5,18
  148:4,6
  150:8
  151:4
  155:10
  167:4,14
  182:4
  198:11
  200:15,16
  201:6,9
  202:10,
  11,21
  203:12,13
  207:22,
  24,25
  208:9,13,
  14

**elections**
  18:11,13,
  21 19:20
  21:21
  22:10,11,
  16 24:20,
  21 25:20
  26:1,11,
  16 33:12
  52:9 71:2
  75:5 91:5
  105:2
  117:12
  119:25
  131:4
  142:23
  158:1

  167:5,12
  168:17
  169:4
  189:14
  210:5

**elector**
  98:17

**Electoral**
  21:23

**electronic**
  45:5
  79:15
  86:9 97:2

**electronica
lly**
  96:24
  97:1

**else's**
  76:15

**Emergency**
  2:6 7:8

**emphasis**
  169:14

**employment**
  19:4

**encompassin
g**
  172:5

**encountered**
  133:20

**end**
  18:2
  25:17
  105:14
  114:2
  126:24
  129:22
  182:2
  206:12
  211:19

**ending**

  26:13
  206:15

**English**
  3:13 7:2

**enhanced**
  42:13

**Enjoy**
  109:14

**ENS**
  196:14

**entail**
  197:7

**entered**
  208:8,13

**entering**
  99:1

**enters**
  99:18

**entirety**
  207:21

**entity**
  49:12
  50:8
  168:23
  198:14

**entries**
  68:21
  77:4
  79:23

**entry**
  68:21

**equally**
  126:12

**error**
  128:25
  129:6,12,
  17,20,25
  141:18
  155:4
  161:16

  163:3,4

**errors**
  72:23
  73:2
  82:16,18,
  22 89:9
  92:18
  103:7
  128:20

**escapes**
  29:1

**Esquire**
  6:12

**establish**
  196:7

**estimate**
  130:16

**estimated**
  112:6

**estimates**
  132:19

**estimating**
  193:8

**et al**
  6:7 29:6

**ethnic**
  94:4
  101:24
  102:5
  115:10
  123:3,6
  126:16

**EU**
  21:11

**European**
  21:13

**evenly**
  185:19

**everybody's**
  13:20



159:4

**evidence**
90:3,6
190:18,
20,25
192:18
193:13,
19,21
196:1

**exact**
67:10
127:10

**Examination**
4:5,6,7
8:9
206:23
209:11

**examining**
27:17

**excellent**
17:9,15
47:6
114:18
164:12
194:19

**excerpt**
110:18

**exchange**
9:8

**exclusively**
97:3

**Excuse**
44:25

**executive**
168:25
169:1,7

**exemplars**
91:2

**exercise**
77:25
103:4

106:19
107:3

**exhibit**
4:3
11:20,21
16:6,8
41:19,21,
22 59:7,
8,11
60:2,3
110:6,15,
16,22,23
133:3
163:12,
13,25
164:1

**exhibits**
69:25

**existence**
198:21

**existing**
172:1

**exits**
109:20

**expectation**
77:9

**expected**
178:9

**expedited**
211:9,12

**experience**
35:11
37:15
47:12
90:4

**experienced**
200:17

**expert**
5:5,6,8,
10,11,13,
15,17
14:9,12,

15 27:24
28:9,11,
15 29:15
30:7,25
31:5 34:1
35:16
37:9,10
40:7,21
46:8
47:16
48:13,16,
17 83:19
91:8
107:10,20
127:13
137:4
206:6

**experts**
29:23
40:22
43:3
45:14
164:15
203:21

**explain**
68:6
116:2
122:24
150:16
179:16

**explained**
178:11

**explaining**
71:14
118:9
189:15

**explanation**
177:1
179:23
181:7
198:23

**explore**
166:23

**extent**
27:1 35:8
68:11
171:25

**extra**
55:8
107:11
108:15

**extremely**
36:11

**eyebrows**
138:14

**eyes**
193:20

_____

            **F**

_____

**face**
182:3

**fact**
24:3
106:11
126:3
139:19
146:6
158:2,12
168:21
173:5
179:10

**failed**
73:13
98:17

**failing**
181:6,7

**fair**
6:6 11:15
14:2
20:11
21:5,20
23:12
24:20
25:3

26:13
27:23
28:14
30:20
31:1,11
33:3 35:5
38:9
53:13
56:20,21
60:20
61:6
76:11
94:8
96:21
98:24
99:2
105:14
107:6
108:12,
13,18
111:22
117:6
133:6
164:24
165:2,3,
11 176:22
177:22
194:13

**fairness**
28:13

**fall**
53:8
154:1,21

**false**
65:17
170:21

**familiar**
29:8
38:1,13
77:12,13

**famous**
134:23

**fast**
43:6



95:12
142:1

**fault**
138:21
171:3,6
172:18

**faulting**
181:6

**February**
14:10,13,
16 16:7
110:8
153:18
163:12

**federal**
52:7,17
116:18
168:4

**feel**
30:21
63:12
69:13
166:18
204:22

**fellowship**
19:6

**felonies**
36:1

**felt**
182:14

**field**
98:9 99:1
100:18

**fields**
79:16,18
86:9
99:11

**fifteen**
8:25

**Fight**
6:6

**figure**
25:13
105:23,24
106:1
107:17
126:22
137:5
162:18
181:11
190:2
209:15

**figured**
105:11
117:25

**file**
68:20
69:1,9,
10,12
70:15,17,
18,21,23
71:1,8
72:7,14,
24 75:13,
22,23
77:5,18
78:9,12,
14 79:2,
3,4,8,11,
22,23,24
80:11,13,
14,19
81:24
82:7,23
83:2,3,
11,17,18,
21,22
84:3,4,9,
12,21,22,
23 85:1,
3,7,10,
12,19,21
97:22
98:5,19,
22 100:17
115:1,5,
10 123:5,

9,14
207:18
210:6

**filed**
5:5,7,9,
10,11,14,
15,18
16:12
30:8
110:5,8
113:7
116:11
122:8
132:24
163:11,
17,21

**files**
39:5
60:24
65:11,24
66:7,25
67:19
68:12,25
69:5,23
71:16
72:18
75:21
77:2
83:6,23
117:3
163:23
209:18,19

**fill**
209:25

**final**
87:3,7,22
123:5,13
126:2

**finance**
51:20,25

**find**
65:5
73:14
81:14

110:10
113:9
143:7
157:19
161:14
173:25
176:10
177:10,
15,19
181:24
210:1

**finding**
73:2
179:6
200:3

**findings**
201:23

**finds**
82:17

**fine**
8:17
24:2,7
58:18
64:8
104:2
109:6,9
126:12
127:22
144:3
172:6,20
194:4

**finished**
19:5
89:22

**Finland**
106:24
107:1

**firm**
44:2,3

**fit**
35:21
139:20
147:5

193:16

**fix**
141:6

**flag**
116:18

**Flagstaff**
19:11

**flaw**
86:4,6

**flaws**
33:1

**flippant**
75:2

**Floor**
3:5

**Florida**
28:18,22
34:3,6,18
35:18
36:3,13
47:13
88:23
89:8
90:1,8,9,
13,14
91:1,4,
16,18,24,
25 92:7,
11,18
93:8
171:13
172:5
208:1
209:2

**fly**
181:25

**focus**
24:18

**focussing**
197:19

**folks**



53:14
78:21
97:5,16
146:12
204:4
210:2

**follow**
67:10

**follow-up**
51:17

**follow-ups**
209:10

**forces**
18:15

**foreign**
137:11

**foreign-
born**
134:18
137:12

**forgive**
57:10

**form**
105:17
113:7
117:4
167:8
207:12,13
209:25
210:6

**forming**
44:4

**forms**
116:12
117:11
156:9

**forwarded**
116:10

**found**
73:21
105:13

130:3
137:10
156:7
157:20
175:18
187:3
191:1
193:25
201:19

**Fourteenth**
3:4

**frame**
70:22
111:25

**free**
206:3

**frequently**
133:18

**freshman**
19:18

**friend**
57:17

**friends**
55:8

**front**
12:3 28:3
133:3
163:14

**frown**
135:19

**full**
66:23
86:3
126:7

**functioning**
64:3,6

————————

G

————————

**gathering**
32:24

**gave**
131:18
137:20
151:14

**geez**
143:11

**general**
22:10
28:19
32:11
34:24
35:7
40:15
45:11
52:25
74:23
82:9
135:17
149:16
150:2
155:7
207:21

**generalitie
s**
116:25
117:2

**generally**
34:13
76:23
82:19
145:7

**generated**
116:24
117:9
120:12
128:19

**generating**
115:24

**geographic**
175:3

**geography**
135:13
175:10

**Georgia**
3:9,14
6:9 40:17
60:25
62:3,21
66:25
78:3
80:19
89:13
90:3,6,
20,23
91:20
92:1,2
93:14
97:1,7
100:17
102:8
103:5,16
105:23
106:5,18,
20 107:3
112:5
113:5
115:20
116:14,
19,22
122:16,18
124:8
140:19
148:25
166:1
167:5,6,
12,16
168:17,
18,22
169:12,13
170:16,
18,19
184:8
208:12
209:1

**Georgia's**
62:3
89:17
102:14,
16,20

105:13
114:11

**Georgians**
155:1

**gerrymander
ing**
28:12

**gesture**
145:17

**get all**
121:22

**give**
18:6 19:3
42:18
48:15
51:10
54:16
57:24
70:1
129:4
138:1,2
148:17
153:12
155:19
170:14
195:4

**giving**
81:13

**glad**
138:19

**glitched**
99:13

**goal**
158:11,
13,14,20,
25

**good**
8:11,12,
13,15
25:10
26:19
28:7



51:17
53:17
58:15
59:18
74:20
80:9
90:14
91:2
108:23
118:1
140:23
144:4
149:10
150:8,9
159:21
189:7,12
198:6,8
206:13

**goodness**
100:23

**gosh**
103:6
106:24
143:15
206:10

**government**
19:19
21:8,12
49:11
50:8
53:22
116:18

**governorship**
74:9

**graduate**
20:4

**grand**
124:22
198:8,18,
19,22,24
199:6

**great**
9:22

10:4,9,21
11:17
12:6  13:3
14:21
15:14
16:4  19:2
21:22
22:2  42:4
54:2
58:19
61:8,22
81:22
84:11
91:7
106:7
108:19
109:16
110:13
121:14
159:12
163:24
204:1
209:23

**grin**
45:19

**Gronke**
21:19

**gross**
25:5

**ground**
9:1  57:23

**group**
50:3
51:1,7
139:12,20
144:18,
21,25
145:1,6,
8,13
147:5,6,
8,11,16
151:3,5,
23,25
153:10,22

154:14,
15,22
174:10,22
175:6,7,8
176:12
193:7
201:12
203:16

**groups**
19:21
37:1
51:10
94:5
102:5
123:7
144:1,5
147:12
157:8
174:9,11,
23  175:4,
19,20
193:1,2,9
194:8,10,
11,15,16
197:4

**guess**
11:18
16:16
20:9
25:16
30:4,19
34:18
36:7
37:15
38:3
39:11
40:21
49:20
52:20
53:10
55:23
57:10,11
60:2
64:10
66:4
67:14

72:25
75:9
76:14
79:2,23
87:21
89:1
97:12
98:17
104:22
105:5,14
106:3,16
114:20
115:8
116:1
118:15
119:14
121:23
124:15
125:4,13
126:22
132:4,13,
23  134:11
136:2
137:5
150:23
152:10
154:19
163:25
164:14
176:22
178:22
180:10
189:25
193:6
194:22
197:2
198:20

**guy**
33:2
51:24

**guys**
22:18
59:21
109:5
111:4

**Gwinnett**
166:19

_____

**H**

_____

**half-
hourish**
205:15

**hand**
145:16

**handed**
76:9

**handful**
140:15
147:15
149:14

**hang**
47:18
176:7,9
182:6

**happen**
13:10
91:3
107:16
141:16
167:19

**happening**
162:3,7

**happy**
8:5  23:13
36:11
57:24
58:9
63:18
119:19
192:17
193:19

**hard**
57:12
106:12
136:7
141:21



142:1

**head**
9:12
20:18
25:25
33:19
37:5,8
43:23
48:19
52:11,18
65:25
70:24
79:19
83:4 92:9
93:10
95:13
97:9
101:8
117:20
128:7
154:7,14
166:18
173:1
198:20

**header**
17:6,10

**heading**
95:24

**hear**
34:18
114:2
194:4
211:6

**heard**
95:15
114:3

**hearing**
147:22

**heartbeat**
57:9

**heavily**
140:20

**helpful**
43:9 54:2

**helping**
53:20

**helps**
110:11
144:8

**herds**
121:16

**hereto**
2:8

**Herron**
5:15,17
13:8
15:4,7
39:19
41:18
43:1,20
159:16
160:5
163:9,11,
21 164:2
171:4,19
172:2
173:7
177:25
179:5
182:13
187:17
193:12,22
196:3
203:23

**Herron's**
39:20
169:10
172:18
173:14
187:4
188:20
191:23
200:12,15
201:17
207:21

**Hey**
51:3
86:20
139:14
161:5
172:4
179:3
189:17

**high**
102:16,20
103:9,12
105:14
107:5
200:1

**higher**
93:21
106:4
124:24
126:4
151:16
173:16
177:10
180:12,18
181:13
182:4
184:19
186:17
188:1
190:22
191:3
195:20

**highest**
185:2

**highly**
118:2

**Hill**
19:8

**hired**
40:6
48:15,16,
20,22
49:8,11,
17,20,22
50:3,9,

12,21,23
51:2,3,6,
14,20
53:24
54:16

**Hispanic**
101:22
124:19,22
126:3
137:24

**history**
19:4
69:1,12
70:15,17,
21,22
71:1,8
72:6,14
75:13,22
77:5,18
79:2,24
83:2,3

**hit**
160:24

**holding**
17:4

**holds**
90:20

**home**
147:3

**homes**
175:9

**homogenated**
174:21

**homogenous**
174:8,10

**hoping**
25:4
116:1

**horrible**
152:11

**hour**

58:3

**hourly**
46:10

**hours**
32:8,10
46:14
205:14

**house**
55:21
117:25
203:7

**housekeepin
g**
59:7

**huge**
147:19

**hundred**
90:23
132:2

**hundreds**
65:11,20
90:23

**hypothetica
l**
199:6
207:3

———————

I

**i.e.**
86:8

**ID**
68:17,19

**idea**
42:18
74:4 80:9
81:6
82:21
102:16
117:3
118:14



123:6
140:16
154:13
177:18
198:25

**identified**
7:17
60:23,24
89:18
190:10

**identifier**
63:25
68:17,19,
22 79:13,
22 80:2,
10

**identify**
18:18,19
80:7
98:15,16
113:6

**identities**
115:10

**ignore**
73:17

**imagination**
190:24

**imagine**
140:7
141:11
153:16
167:18

**immediately**
46:24
75:4

**impact**
18:16,20
36:23,25
37:11
40:19
122:16
123:16
124:1

127:1,21
169:22
198:12

**impair**
10:2

**implication**
102:24

**implication
s**
40:19
127:18

**implying**
125:23

**important**
82:7
127:6,17
140:3
147:13
165:23
184:25

**in-depth**
26:10

**inaccuracie
s**
165:17

**inactive**
44:21
116:21
119:8,9
123:8
126:4
157:20

**inaudible**
95:9
119:20
146:21
158:5
159:18
177:13

**include**
19:20
64:6

87:16
168:25
169:1,3,5

**included**
87:16,18
207:14

**includes**
203:1

**including**
80:8
97:15
142:23

**inclusive**
178:19

**income**
206:6,18

**inconclusiv
e**
173:15

**inconsisten
cies**
89:8
92:18

**inconsisten
t**
180:6
193:24

**incorrect**
57:3
113:1
131:7,14

**incorrectly**
9:8

**increase**
196:14

**increased**
148:14

**increases**
149:7
172:25

**incredibly**
38:17
155:13

**independent**
25:18
26:24
27:9
157:5
166:11

**index**
4:3 24:25
25:16

**Indicating**
159:19

**indication**
70:19

**indicator**
210:10

**individual**
70:19

**individuall
y**
27:2

**inference**
194:6

**inferences**
138:9
140:18

**information**
42:5,7,9
62:11
63:24
72:13
73:14,24
74:20
75:15
76:4
79:11,14
80:3,6
81:13
86:13,24
91:24

93:12
100:4,17
101:11,
13,16
103:15
104:22
116:24
208:8,12

**informed**
44:18
168:18,20

**infringed**
191:16

**initial**
41:2

**instance**
1:25
59:16
92:24
125:1
134:20
137:21
208:23

**instances**
174:1

**Institution
s**
20:3

**instructed**
99:3

**instruction
s**
99:6

**intended**
8:20

**intentional
ly**
40:18

**interact**
169:25

**interaction**



93:7

**interest**
  19:21
  51:1 91:6
  152:3

**interested**
  22:9
  125:2
  132:21
  137:18,24
  152:23
  154:25
  155:10
  194:10,11

**interesting**
  143:7
  179:12
  189:14

**Interestingly**
  47:2

**interpret**
  23:3

**interpreting**
  126:8

**interrelated**
  146:23

**interrupted**
  181:20

**interruption**
  118:8

**interviews**
  32:18

**introduce**
  6:17

**introduction**
  6:15

19:18

**introductory**
  20:7

**invoice**
  46:23
  47:4

**invoices**
  12:17
  46:14

**involved**
  196:16
  207:4
  208:4

**involving**
  171:19

**ironic**
  90:8

**Irvine**
  18:8

**isolation**
  103:6
  106:20

**issue**
  30:25
  32:3 52:3
  61:22
  91:13
  95:7
  150:18

**issues**
  21:7,12
  35:25
  36:6

**italicized**
  169:13

―――――――――

**J**

**job**
  19:8,11

56:3,17

**joined**
  95:7

**journal**
  33:12
  128:10
  136:14

**judge**
  139:23
  149:22
  172:7,22

**judgment**
  74:2

**jurisdiction**
  209:16

**jurisdictions**
  62:12

**Justice**
  21:13

**justification**
  179:22

―――――――――

**K**

**Kaiser**
  3:3,4
  4:5,7
  6:20,22
  7:22 8:3,
  10,12
  11:22
  12:2,3
  16:9
  23:24
  24:5,11,
  17 28:7,9
  41:23
  43:5,10,
  13,17

44:1
58:11,14,
19 59:3,
12 60:4
95:11,14,
16 105:25
109:7,10,
13,15,24,
25
110:17,24
114:6
117:20,22
118:2
121:14
138:19,20
145:16,20
146:9
159:15,22
160:4
162:6,9
163:14
164:2
167:11
195:12
205:17
206:2,19
207:2
208:5
209:10,12
210:12,22
211:6

**keeping**
  83:4

**Kentucky**
  51:20

**key**
  148:22

**kids**
  104:6

**killed**
  172:15

**kind**
  13:15
  19:3 20:7

29:7
32:17,19
35:9
48:11
52:22
57:23
67:7
77:15
94:8 95:7
96:19
98:9,12
104:12,18
106:21
111:5
113:15,18
118:7
129:5
130:1
132:22
138:6
141:23,25
166:23
183:16
185:2
191:8,10

**kinds**
  104:17
  119:22

**Kingdom**
  21:8,9

**knew**
  44:19
  71:4,5
  87:25
  185:4

**knowledge**
  13:1
  47:15
  91:3
  155:7,8
  166:24



L

L2
 155:22

labeling
 187:3

lack
 56:24

language
 38:25
 39:2
 67:24
 89:9
 92:25
 168:23
 169:8
 190:2

languages
 37:16,20,
 22

laptop
 11:6

large
 138:12
 146:5
 148:6
 199:12
 208:20

largely
 142:5
 185:3

larger
 137:17
 177:6
 196:18
 203:17

late
 40:4

Latino
 134:6,18
 137:11

138:1
146:25
148:11
149:9

Latinos
 138:3

law
 7:23  20:6
 52:17

lawn
 152:16

Lawrence
 3:8  6:24

laws
 26:2
 52:16

lawsuit
 169:23

lawyer
 51:21

lawyers
 49:22
 50:23

lead
 22:23

leaning
 48:17,18

learn
 40:2
 87:13

learned
 194:24

leave
 58:8

leaving
 121:3
 190:4

led
 166:21

Lee
 29:6

left
 27:6
 30:14

left-hand
 174:15

left-handed
 143:13
 153:16

leftmost
 115:9

legal
 167:9
 168:9

legally
 63:24

legislate
 53:21

legislative
 169:1

legislators
 53:21

legislature
 50:9

legislatures
 50:4,5,12
 53:21

Leslie
 3:7  6:24

leslie.
bryan@
lawrencebun
dy.com
 3:10

lets
 131:22

letter
 81:11

120:5

level
 20:1,4
 25:5
 130:23
 135:3,4,
 9,11,13
 138:14
 165:25
 166:15,23
 168:4,5
 169:18
 170:4
 195:23
 209:6

levels
 138:22
 150:2

leverage
 138:2

liberal
 48:18

libertarian
s
 153:17

lies
 105:23

light
 46:5
 100:23

likelihood
 171:8

limit
 108:2
 172:8

limitations
 52:6
 172:2

limited
 30:19,22
 172:8,20
 198:22

limits
 51:25
 52:5

lines
 128:5

link
 136:22,24
 137:1
 142:17

list
 12:22
 17:24,25
 28:24
 35:11,23
 36:15
 51:10,12
 62:4,24
 63:24
 79:9
 80:14
 82:23,25
 83:17,22
 84:4,12,
 22  97:23
 115:5,18,
 24  116:4,
 8,14,23
 117:6,9,
 10  118:7,
 9,20,21
 119:10,23
 121:20
 122:15
 123:9
 124:9,23
 126:17,19
 130:4,14
 132:9
 139:3
 140:22
 147:7
 148:25
 152:19,22
 155:1
 156:8,14



158:8,12,
19,22
205:3
207:3
210:2

listed
21:25
23:5
47:24
181:1

listen
117:19

listing
70:18

lists
36:17
44:7,20
91:17,19
115:1
116:3
123:7
126:18
127:2
129:5
205:2

litigation
47:12
89:2,5

live
11:1
158:2
193:2
194:12,16
197:11

living
153:17

LLC
3:8

LLP
3:13

loaded
56:23

local
99:23,25
104:22,23
119:1
208:14

localities
99:21

located
2:5  7:10

location
31:23
32:10
167:14
171:8
179:21

locations
7:20
31:24
32:7,11
34:20
170:3,4
179:25
207:22

logical
210:9

logically
177:2
197:7

long
16:2
18:25
33:6  40:3
58:16,17
146:19
164:8
202:17
205:11,
12,14
206:22

long-term
18:15

longer
32:8

120:19

looked
13:6
14:4,6
15:10
24:25
25:2
26:17,18
39:18,20,
24  40:25
41:6,9,
10,12,14
42:11,14,
17,22,25
65:21
68:3
70:2,5
77:17
95:4  96:3
105:7
124:18,21
136:21
168:13
187:13
189:7
190:4,9
191:6,12

Los
171:14
172:5

lost
118:7

lot
20:23
27:4  37:3
40:14,15
44:19
98:25
126:21
132:6
158:24
172:15
173:8
196:3

lots
27:5,6
38:16
131:17
206:11

low
102:16,20
103:9,14
107:5
128:2

lower
174:5

lowest
209:6

lunch
10:14

Luxembourg
197:11

Luxembourge
rs
197:12,14

─────────

M

─────────

machine
2:4

Madam
95:11

made
26:19
28:24
45:4  53:6
69:16
79:14,17
101:5
125:20
165:25
169:17
170:3,4
193:12
195:22

magic
141:1,2

magically
140:7,11

magnitudes
201:22

mail
30:17
36:4  89:7
91:13
96:4,11,
23  97:13
115:15
116:10
120:11,
14,16

mailed
86:8

mailing
120:4

main
23:21
38:2
45:12
86:19
91:15
164:22
189:5

maintained
33:22
60:24
92:11
205:5

maintaining
62:3

maintains
91:16,19

maintenance
34:13
35:11,24
36:14,15
122:15



124:9
158:8
205:4
207:3

**major**
86:4,6

**majority**
18:17
50:9,13
101:20,21
167:22,23
184:22
185:15,25
186:7,9,
11,14,23
187:11,
14,15,18,
20,21,23,
24

**majority/
minority**
53:1
54:14

**majors**
20:2

**make**
6:15
10:11,22
11:4 12:2
14:3
17:22,23
23:15
41:24
59:6 67:8
74:1,2
75:10
78:1 80:5
83:14
90:17
98:2
100:9,13
110:2
135:20
138:8

140:17
143:7
153:5
155:4
158:11
161:22
172:22
177:20
187:9
188:9
189:6
193:11
196:18
199:14
201:2

**makes**
11:12
90:21
161:24
180:7
210:8,9

**making**
125:20
153:1,2
157:7
170:8,11,
25 171:23
179:1
210:1

**manages**
62:24

**managing**
171:12

**Manatee**
172:5

**manner**
122:19

**manually**
72:18

**map**
53:15,16,
24 54:10,
11,17

**maps**
53:22,24

**March**
14:19
15:8 42:2
110:5
122:8

**margin**
128:20,25
129:5,12,
17,20,25
155:4

**margins**
161:16
163:3,4

**mark**
11:19
16:5
41:20
59:8 60:2
110:14,22
163:12,24

**marked**
11:21
16:8
41:22
59:6,11
60:3
110:6,14,
16,19,23
133:2
163:13
164:1

**marry**
79:23
209:18

**master's**
18:8

**match**
35:20
36:6
113:11
174:2

**matches**
77:19
113:9

**matching**
113:6

**materials**
40:23
168:13

**math**
129:14
132:16
154:10
155:5
160:22
161:15
163:3

**Matt**
6:20 28:6
109:11
114:2

**matter**
6:6 59:7
75:3
106:17
124:1
139:9,19
153:21
154:24,25
181:10
182:18

**matters**
62:19
152:21

**MATTHEW**
3:3

**Mcdonald**
5:11,14
13:9
14:13
15:1,7
39:3
41:11,19
42:13

43:1
108:20
110:10,
18,24
111:6,19,
20 112:1
121:15
123:15
124:7,13
125:2,10,
18 126:9
127:11
128:24
131:13
132:7,24
134:6
138:22
139:6
144:24
147:23
150:25
151:2
155:20
159:7,13
163:18
205:2

**Mcdonald's**
39:17
110:1,7
114:10,21
120:21
121:6,25
122:14,25
126:24
136:23
146:16
150:11
156:23
160:13
205:3
208:3

**Mcdonalds**
111:13

**meaning**
191:19



meaningful
    123:12
    164:21

meaningless
    143:16,23

means
    7:14  45:7
    63:6,15
    68:6
    85:16
    87:23
    91:23
    129:25
    147:11
    174:22
    176:18
    177:19
    184:17
    189:21
    197:3
    198:25

meant
    45:5
    187:7

measure
    24:25
    26:15,21
    27:19
    33:3

Measuring
    26:1

meat
    64:19

mechanics
    205:4

mechanisms
    100:9,12

media
    55:19
    56:16

medication
    10:5

meet
    59:20

members
    49:12
    97:3

memory
    23:15
    30:21
    32:8
    119:15
    120:22
    204:16,23
    209:2

men
    204:20,22

mention
    76:1

mentioned
    96:20

mentions
    90:5,21
    91:1

mere
    196:7

merge
    67:6,18
    68:5,10,
    13,14,18
    69:12,22

merged
    67:14
    68:25
    69:5,11,
    14  75:25
    79:3,4

merging
    68:9

mess
    8:20

met
    164:7

method
    86:9

methods
    86:7

metric
    26:19

metrics
    27:17
    173:15,20
    177:7,23
    179:23
    180:11,
    17,21
    181:12

Michael
    5:11,13,
    15,17
    111:10,
    13,19,20
    121:6
    164:7,9

Michigan
    51:4

middle
    33:10
    64:23
    65:2
    77:14,15
    78:13,17
    87:3,6
    101:3
    105:21
    107:5
    120:12
    122:11
    142:16

Mike
    111:10

military
    97:4,16

million
    72:20
    73:11

132:3,4,
    21 160:10
    161:17
    162:1

millions
    65:12,20
    90:23

mind
    23:24
    43:7
    110:25
    121:4
    181:17

minority
    137:22

minus
    130:9

minute
    75:10
    83:14
    117:23
    144:23
    158:4,7
    189:25
    194:25
    195:2,4,
    19 196:10
    199:12
    200:7

minutes
    16:3
    58:4,13,
    15,18,20
    109:8
    205:13

mischaracte
rizes
    42:13

misinterpre
ts
    141:4

mismatch
    30:10,11,

16  91:14

mismatches
    82:17

misplaced
    179:12

missed
    15:6

missing
    207:17

mistake
    91:25
    177:20
    187:3

mistakes
    75:8
    187:9

mkaiser@
kaiserdillo
n.com
    3:6

models
    137:13

moment
    10:13,15
    20:18
    24:15
    29:1
    177:2

money
    134:9

month
    72:11

months
    15:19
    90:10
    91:4

morning
    8:11,12
    10:2
    13:5,13,
    16  47:3,5



THOMAS BRUNELL, PH.D.
FAIR FIGHT ACTION vs RAFFENSPERGER

motivated
  40:18,20

mouth
  114:5

move
  44:21
  78:9
  116:9
  122:7
  123:7
  155:17
  159:15
  163:8
  165:24
  181:10
  188:9
  194:19
  201:19
  202:24,25
  203:2,6,8
  207:17

moved
  44:20
  116:19,21
  119:7
  130:5,15
  156:25
  157:1,13,
  16,19
  158:12,
  16,24
  159:1
  173:5,6
  176:13
  182:3
  184:1,7
  188:23
  207:4,9,
  10 209:25

mover
  199:7

moves
  25:25
  95:13

101:8
117:20
128:7
201:12
207:13

moving
  116:10
  165:25
  172:25
  173:3

multiple
  118:23
  204:14

Murphy
  3:17 6:10

muster
  54:18

mute
  6:14
  117:18,19

——————

N

——————

names
  23:6 44:8
  48:10
  83:22

narrative
  176:17
  177:1

narrow
  191:8,10

nation
  155:1
  207:12

national
  35:25
  42:11
  48:25
  49:7,8
  54:20
  55:3 57:7

116:6,7
130:24
131:15
134:19,21
137:21
142:7,20,
24 143:3,
19 144:11
145:11,21
146:5,18
148:4,5
150:8
151:3
155:10
158:21
207:8,15

nationwide
  135:3,9
  138:7
  172:9

natural
  58:5

nature
  52:22
  75:19

NCOA
  44:18
  113:6,7,
  9,11
  115:14
  116:4,5,
  14,24
  125:1
  155:21
  156:8
  157:4
  159:1
  207:18

necessarily
  64:12
  147:11
  153:15,24
  157:13
  194:10

196:15
207:11

needed
  73:22
  121:7
  138:6
  143:7

negative
  56:19

neighborhoo
d
  47:9

news
  13:13,24
  15:11

newspaper
  166:20

nicely
  68:13

no-contact
  112:7

Nodding
  9:12

non-black
  186:14

nonmovers
  202:22

nonmoving
  192:13

nonpartisan
  51:7,8,
  11,15,16

nonvoters
  155:11

Norm
  6:22
  23:24
  24:4,9

NORMAN
  3:3

normative
  74:2

North
  48:9 91:2

Northern
  6:9 19:11

note
  12:2 30:4
  80:18
  89:2
  128:1
  131:9
  165:23
  184:25

notes
  77:3
  113:8
  156:10

notice
  5:4 12:9,
  10

noticed
  124:23

notify
  116:9

November
  82:10
  115:2

nuance
  189:9

number
  16:24,25
  17:2 23:1
  65:22
  73:12
  76:20
  77:4,6,18
  83:20
  86:20
  88:15
  97:8,9
  105:7,8



112:11,
13,23
114:1,9
124:18
128:1
130:3,10
131:10
143:4,13
146:12
147:20,25
149:8
150:21,22
151:15,
22,24
152:9,18,
21
153:13,15
154:20,21
155:14
172:12,13
174:3
175:19,20
183:17,
19,23
184:8
188:17
189:8,11
200:2
204:15
205:1

**numbering**
16:17,18,
23

**numbers**
12:22,25
17:11
47:19
88:6,17
113:5
114:21
127:8
129:8
131:18
142:14
146:19
156:11

174:16,19
189:13,18
194:20
196:12,
17,20
197:6,20,
21,24
198:11,21
199:14

**numerous**
151:7

**NV**
3:4

_____

O

_____

**oath**
7:13,24
99:9,10

**object**
105:17

**objected**
42:9

**objection**
109:18
167:8
195:7
196:16
205:22

**objections**
15:21
130:23

**observation**
77:18

**observation
s**
134:17
135:5

**obvious**
20:9
93:25

**October**
80:20
83:9
84:25
108:4
159:12

**odds**
43:22

**offended**
8:21

**offer**
31:12
102:8,19
112:19
114:6
123:15

**offered**
30:25
31:4 34:1
37:10
48:13
52:8,14
60:13
94:25
112:24
126:23

**offering**
64:15
95:7,8
126:25

**offers**
93:20
112:1

**office**
44:6,16
45:6
60:25
67:1
71:13
72:17,22
73:5,7,13
74:3,13,
22 75:15
76:5

78:21
80:4,19
82:15
86:1,14
88:4,8
92:2
100:2,3
112:5
113:8,10
115:23
116:9,14,
17,23
117:4,6,
15 118:16
119:2,25
166:10
168:14
204:4,14

**offices**
74:8

**official**
50:25
88:16
167:2,5,
12,13

**officials**
44:5
53:22
63:23
98:25
99:5,18,
20,23,25
104:22,
23,24
105:2
168:17
208:9,13,
14 210:5

**oftentimes**
192:22

**Ohio**
47:24
48:8 51:4

**Okey-doke**

200:11

**older**
147:1,8,
10 148:3
154:15

**one-to-one**
68:10

**Oops**
117:17

**op**
153:20

**open**
32:11
98:9
110:9,20
163:23
165:24
207:23,
24,25

**opened**
164:19,20

**opening**
170:3

**operating**
106:21

**opinion**
30:7,25
31:5,12
32:12,25
34:2
52:8,14
54:16,17
60:17,18,
23 61:3,
12 64:8,
15,19
88:23
93:17,20,
22 94:9,
11 95:8,9
102:8,19
107:19,20
111:8

112:4,20,          1:24 7:6        orthogonal          195:7,11           142:16
25 113:3,                            169:21             205:22             156:15
19,22              order                               206:1              171:5
114:3,6             2:6 7:8         outcome             211:16             173:13
122:22,24           10:22            127:22                                178:6
123:16,25           66:11                              Pacific            181:5
125:12,             67:18          outcomes             7:16              182:15,16
13,17               134:4            22:11                                195:16
126:13              135:1                              package
127:1,13            136:8          outlier              38:19             Paragraphs
133:22              138:3            89:18                                 7:9
135:21              140:17                             pages
136:2,3             154:19         overly               66:22             Parkwood
137:6               155:3            77:9                                  3:13
142:2               209:19          108:2              paid
156:20                                                  46:8,18,          parse
159:13             ordering        oversample           21,24,25          193:14
161:18              210:20          147:11              47:3,4
164:3                               149:6                                part
165:7              orders                              paper               18:13
166:5               210:20         oversampled          22:20,21          25:13
194:23                              138:8               26:24             33:4
                   Oregon           140:2               27:5,8            59:21
opinions            153:17          147:1               108:25           66:18
 37:10                                                  111:18           94:11
 44:4 46:5         organizatio     oversamples          136:5,11         95:4,17
 60:13             n                137:22                                98:1
 61:11              48:17,18        138:4              papers             105:20
 107:8,11                           147:10              21:7              114:14
 108:7,9,          organizatio                                           127:6
 10,15             nal             oversamplin         paragraph         142:19
 112:2,17           61:17          g                    26:5             147:17
 113:13                             138:10              60:9,16,         155:11
 126:24            organizatio                          17,22            164:13
 139:21,22         ns              Overseas             61:24            165:10
 159:6,7            51:14            97:5               62:2             168:11
 203:23             160:25                              63:20            169:6
                                   oversee              64:21,24
opportunity        organize         63:23              66:23            parties
 109:12             111:25                              77:15             19:21
 208:21                            overview             81:8,20,         33:13
                   origin           18:6               22 84:6          57:5
opposite            124:19,22       48:11               86:3 87:4
 178:14,16          126:3                               96:1,2           partisan
                                   overweight           101:2            18:22,23
optimistic         original         140:13             112:3            28:12
 77:10              14:6 60:7                           113:4
                    113:17         _____         122:11          partisanshi
oral                156:13                              126:8           p
                    164:21,25           P              128:5            51:23
                    199:7          _____         133:14

                                   p.m.
                                    159:25
                                    160:3



**party**
18:18,19
48:21
49:5,6,7,
9,13,21,
23 50:9,
10,13,22,
24 51:4
57:4

**pass**
54:18

**passed**
92:17

**passenger**
177:17

**past**
19:13,23
28:17
31:17
38:19
65:10
208:20

**path**
67:10

**Patrick**
3:17 6:10

**Paul**
21:19

**pause**
202:14

**paused**
58:24

**Peachtree**
3:8

**peer**
135:17
136:7

**peer-review**
130:23
138:14

**peer-reviewed**
65:9
128:10,13

**peers**
136:8

**pending**
6:8 58:1

**people**
10:25
17:21
24:20
27:19
33:2 36:1
38:16
44:6,10,
15,17,20,
21 53:20
54:9
56:5,8,12
72:19
75:6 76:2
77:6
84:16
96:24
97:13
116:11
117:10
119:16
124:22
128:8
130:3,4,
14 131:25
132:4,6,
20,21
135:17
136:10,12
139:2,13,
22 140:2,
10,12,15,
21 141:9,
12,13
142:22
143:5,21
144:13,25

145:3,5,
13 147:1,
4,5,7,10,
16,20
148:20
149:14,
20,23
150:20,22
151:7,23,
24 152:9,
14,16,18,
20,22
153:9
154:7,8,
9,12,18
155:9,11,
13,15
156:8,24
157:19,
24,25
158:12,
16,24
159:1
161:2,6,
14,24
162:1
167:4
175:16,18
176:2,3
184:6
185:1,5
194:11
197:10,15
202:6,24
203:1,6,
15
204:11,
14,18
207:4,10,
11,17
209:24
210:5

**percent**
100:21,
22,24
103:9,12,

13,14
124:20,
23,24
129:21
130:2,6,
8,11,12,
13
174:21,
22,24
175:21
176:7,18,
19 184:3,
12,13
187:17
197:9,10
206:17

**percentage**
97:10,11
105:11
115:3
123:9
124:21
126:4
127:8
130:14
176:12,
14,16
177:16
184:6
189:7
195:20
196:18
206:5

**percentages**
125:5,15
182:4
189:4,14,
15,17
190:23
196:17
200:18

**perception**
21:20

**perceptions**
24:20

25:2

**perfect**
85:11

**perfectly**
127:21
141:2

**performance**
24:25
25:16,19
26:1,22,
25

**period**
117:13,14
118:24
119:6,9
207:23

**periods**
119:11

**person**
56:24
74:12,21
79:16
101:10
111:12
120:19
137:23
140:7,18,
19 143:15
164:7
207:9

**personal**
91:3

**personally**
164:9,10

**perspective**
26:20
127:18

**persuasive**
190:15,17

**Pew**
25:16
26:12,15,



25 27:10,
11,16

**Ph.d.**
1:24 8:7
18:9,10
19:5

**phone**
13:10
44:5,9,10
46:25
86:15,17
204:9

**phonetic**
196:14
208:1

**pick**
143:14
148:18
151:2
153:4
193:16
210:5

**picked**
151:5,18
153:14,16
154:10

**picking**
81:3
209:24

**piece**
21:19
23:4
120:15
134:16

**pieces**
35:13
119:18

**place**
8:4 34:20
36:23
37:2,11
48:12
63:7,10

70:9
165:24
168:19
169:25
172:25
173:3
175:1,3
176:13,
15,20
177:9
178:13
179:21,25
181:22
182:3,20
183:13,
18,23
184:7,12,
13,14
186:4,14
188:8,14
191:9
198:15
201:12
202:25
203:2,3,
4,8,9

**placement**
127:2

**places**
43:22
167:3,22
173:4,6
175:17
176:14,18
177:17
179:18
182:10
184:23
186:1,7,
9,12,23
187:11,
14,15,21,
24 188:23
201:20

**PLAINTIFF**

3:2

**plaintiff's**
179:8

**plaintiffs**
1:25
6:21,23,
25 32:7

**plan**
107:13

**platform**
62:10,25
63:2,3,6,
15,18

**PLLC**
3:4

**plug**
58:9

**pocket**
107:23
108:5

**point**
10:14
18:4 25:6
26:12,13
29:22
33:8
41:20
46:17
57:24
58:5
77:10
87:23
90:11
94:12
108:9
113:19
134:10
136:24
137:11
144:9
147:13
149:12
152:13

160:23
166:14
171:23
172:21
176:22
177:6
178:17
182:23
183:2
188:21
189:6,17
191:4
192:8,15,
20 197:24
199:5

**pointed**
102:6
180:5
192:24

**pointing**
95:8
179:3
196:16

**points**
45:12
164:23
171:19
193:21

**polarizatio
n**
209:22

**polarized**
209:1

**policies**
169:12

**policy**
20:20

**political**
18:9
19:6,21
20:2,3,
11,20,21
27:18

32:23
33:13
37:19
59:18,22
104:6
106:22
111:5,14
125:14,17
126:10,21
128:9,18
133:19
162:21
172:16

**politics**
20:7 21:8
106:23
131:3

**polling**
31:23
32:7,10
34:20
36:23
37:1,11
43:21
165:24
167:3,13,
21 168:18
169:25
170:3
171:8
172:25
173:3,4,6
174:25
175:2,17
176:13,
14,15,18,
20 177:9,
17 178:13
179:18,
21,24
181:22
182:2,10,
20
183:13,
18,23
184:7,12,



13,14,23
186:1,4,
7,9,11,
14,23
187:11,
14,15,21,
24 188:8,
23 191:9
198:15
201:12,20
202:25
203:2,8,9
207:22

pool
131:25

poor
90:9,13

poorly
26:7

population
132:13,
17,20
133:21
137:19
141:13
148:3
151:18,
24,25
152:20
160:9,14,
19 161:9,
11,17,21,
23
162:18,25
163:6
173:16
192:14

portfolio
165:10

posit
101:2

position
29:23
56:13

170:19
188:25
190:6

positions
74:7

possibility
207:17

possibly
207:9

post
113:8
116:9,17
117:4

potential
55:13,14

power
155:2
158:8

practice
52:15
128:22

practices
17:21
199:19

precinct
13:14,23
190:7
196:14,24

precincts
207:22,23

precious
178:24
182:14

precleared
53:9

prefer
38:13

preferred
38:19

preliminary

71:24

preparation
13:19

prepare
13:5
15:11
40:23
164:15

prepared
40:21
41:12

preparing
168:12

present
3:16 6:17
148:2

presentation
22:17

presentations
22:19

pressed
45:20

pretty
87:24
160:7
201:12
205:9
206:13

prevent
167:6,13,
25

previous
31:20

previously
133:2

principles
28:14

print

121:12

printer
121:8

prior
35:10
53:2,24
62:20
82:9
90:10
195:17

problem
102:3
135:1
140:22
141:8
145:10,11
148:1,4,
21 149:4
151:13
154:20
180:9

problematic
54:10
136:13
137:20
146:1

problems
60:22,23
89:18
141:6
146:15,23

procedure
32:23
52:15
106:21

procedures
44:18,22
113:6

proceed
59:2
109:23
160:3
195:11

Proceedings
211:19

process
25:3 31:9
45:17
53:7 66:7
67:20
70:10
114:11
115:23
136:7
158:8
183:1
207:3,7,
15,16

processed
61:5
65:11,19

processes
115:25
122:19
157:5

processing
61:4 65:8

processor
45:20

Produce
12:10

produced
1:25 13:6

productive
162:15

professionally
164:11

professor
8:16,17
13:8
14:12,15
15:4
20:10
24:1,12



30:11
38:21,25
39:2,16,
19,20
41:11
42:12
43:20
45:3
59:25
61:23
62:2
63:22
64:23
66:11,24
67:4,25
69:17
71:8,17,
19 72:5,
10 76:2,
12,22
77:3
78:11,25
80:18,22
81:7
84:8,24
86:6 87:4
88:24
89:5,12,
15 90:12
92:10,14,
15 93:16,
19 94:13,
19 95:6,
18 96:7
102:3,19
107:7,8,
9,20,24
108:8,19
110:1,7,
18,24
111:6
112:1
114:10,20
120:21
121:15,25
122:14,25
123:15

124:6,12
125:2,10,
18 126:9,
24 127:10
128:24
131:13
132:7,24
134:6
136:22
138:22
139:6
144:24
146:16
147:23
150:11,25
151:2
155:20
156:23
159:6,13,
16 160:4,
5,13
162:9
163:8,11,
18,21
164:2
165:4
169:10
171:3,18
172:1,17
173:14
177:25
181:5
182:13
187:4,17
188:20
191:23
193:11,22
195:12
196:3
200:12,15
201:17
203:23
205:3
206:2
208:3

**Professors**

15:7 43:1

**program**
20:18,20,
21 37:23
38:12

**programing**
38:17

**programming**
37:16,20,
22 38:25
39:2
67:24

**progressive**
48:17

**project**
55:12,14

**pronounce**
104:1

**proportion**
177:8
180:11,17
181:13
191:3
197:3

**proportiona
l**
200:3

**proportiona
te**
152:10
197:21

**proportions**
173:14
197:23

**proportions
-based**
182:22

**proposed**
53:15

**proposition**
171:7

181:12
189:2,4
190:4

**provided**
39:17
121:23
125:18
142:17
193:13

**providing**
90:2,6

**provision**
52:17

**provisional**
87:8,17,
18 88:11

**provisions**
2:7

**public**
20:20
131:23
144:16
145:7
147:21

**publicly**
65:10

**publish**
133:17
143:19

**published**
22:12
26:24
33:11,24
65:9,23
66:1,7
128:10,13
130:21
134:16
135:6
136:5,16
143:8
171:7
172:19

**pull**
193:20

**pulled**
45:19

**purchase**
138:2

**purge**
121:20
126:18,19
127:2
130:14
148:25

**purged**
124:23
156:14,25

**purport**
94:20

**purposes**
24:23
61:17
161:19
181:10

**pursuant**
2:5

**put**
18:1 27:6
48:5
54:24
56:13
96:14
99:4
101:23
107:18
115:18
125:20
127:15
132:9
168:13

**puts**
117:6

**putting**
73:18



99:10

_____

Q
_____

qualified
  28:10,15

qualifies
  52:2

qualify
  100:8

quality
  100:12

quasi-legal
  54:17

question
  9:3,4,5,
  9,17,19
  23:13
  35:23
  46:20
  48:11
  50:8
  51:17
  53:10,11
  56:23
  57:25
  72:25
  73:4,6
  75:10
  78:1
  101:4,7
  107:14
  114:3
  116:3
  139:1
  152:11
  160:6
  162:10
  164:14
  166:25
  177:25
  191:15
  196:11
  198:25

199:1
203:21
206:2
208:1,18

questions
  23:10
  33:2 54:4
  86:20
  166:25
  206:3,19,
  20 207:1,
  5 208:5

quick
  58:10
  160:7
  205:18
  210:18

quickly
  14:5 25:7
  41:16
  174:1

quote
  92:25

quoting
  89:6
  92:14

_____

R
_____

race
  19:25
  40:20
  100:16
  101:3,5,
  7,10,11,
  18,19
  106:13
  114:16
  125:22
  126:17
  127:1,5
  167:23
  174:12,14
  179:20

183:14,
19,23
184:8
185:2,4,
5,13
198:1,2
199:9
200:3
202:6,21
209:3,5,
16

races
  101:4
  115:10,14

racial
  28:11
  36:22
  37:1,10
  40:19
  94:2,4
  101:24
  102:5
  123:3,6,9
  126:16
  179:2,4
  180:8
  199:19

racially
  122:18
  174:8,10
  199:21,
  23,25
  208:25

Raffensperg
er
  6:7

raise
  138:14

random
  32:24
  33:2
  140:16

range
  129:20

131:10
142:3

ranges
  141:23

rate
  46:10
  102:14,
  16,20,22,
  23 103:9
  107:4
  174:5
  176:6,11
  186:11
  190:22
  191:3
  197:12,13

rates
  93:21
  94:3
  102:10
  106:5,9
  115:3
  175:2,22
  176:16
  183:14
  184:22
  185:25
  186:22
  187:10
  188:7
  191:19,20
  200:1

raw
  105:6
  189:13
  190:23
  196:12,17
  197:6,19,
  24 198:21
  199:14

reach
  127:3,12,
  13 131:22
  149:9

reached
  122:24

reaching
  158:20

read
  11:7,8
  15:17
  27:12,15
  38:3,9
  40:10
  43:8
  94:23
  112:19,25
  113:21
  125:23
  126:23
  136:15
  164:17
  166:3,13
  168:23
  169:9
  179:19
  181:5
  183:20

reading
  11:9
  64:25
  66:19
  124:1
  176:8
  180:1

real
  58:10
  130:9
  159:4
  174:3

realignment
  18:16,17

realignment
s
  18:20

reality
  133:15
  173:6



**realize**
  7:22 9:23
  10:24

**reason**
  10:19
  65:16
  80:23
  98:18
  99:1
  123:19,23
  126:4
  148:2
  179:22
  210:3

**reasonable**
  9:1
  61:14
  105:21,22

**reasoning**
  145:12

**reasons**
  95:23
  97:23
  98:16
  126:18
  130:4

**reassigned**
  171:8

**rebuttal**
  30:12
  32:14
  171:18
  181:5

**rebutting**
  127:16

**rec-**
  76:7

**recall**
  27:1,4
  29:24
  35:6
  37:5,7,14
  39:5,10,

  13,22
  41:9
  45:12
  48:19
  49:19
  50:11
  51:2
  52:11,15,
  18 69:13
  70:24
  71:3 72:2
  73:8
  75:24
  76:7
  77:22
  78:6
  79:12,19
  83:23
  85:13
  87:19
  88:5,9,
  13,21
  92:9,12
  96:12,13
  97:8
  112:21
  120:9,25
  121:1,22,
  24
  164:17,
  18,20
  166:18
  207:2,4
  208:6,9

**receive**
  24:15
  96:24

**receives**
  96:22,25

**recent**
  15:12
  53:3

**recently**
  19:22
  123:2

**recite**
  119:18

**recognize**
  12:7

**recollectio
n**
  106:14
  204:8
  205:10

**recollectio
ns**
  34:9

**reconciled**
  33:22

**reconciling**
  34:14
  35:5

**record**
  2:7 6:3,
  18 7:20
  9:14
  58:15,23,
  24 59:2
  106:18
  109:16,
  18,19,23
  117:23
  159:23,25
  160:3
  162:4
  164:6
  195:1,7,
  11
  205:18,
  22,23
  206:1
  210:19
  211:16,17

**record's**
  10:11
  194:3,5

**recording**
  6:3 58:23

**recordkeepi
ng**
  82:18
  89:7
  90:10,13,
  14 91:2,5
  92:17,22
  93:8,11
  103:2
  208:4

**records**
  33:21
  34:14,15
  35:4,5
  65:12,20,
  21 67:17
  71:17
  76:20
  78:14
  86:21
  89:17
  92:1,11
  209:6

**red**
  43:16

**redistricti
ng**
  19:25
  21:4
  28:13,20
  31:19
  33:12
  47:11
  48:8 50:2
  52:12,21
  53:22
  206:12

**refer**
  84:23

**reference**
  111:16,20
  131:14
  156:15

**references**

  137:11
  138:9

**referencing**
  131:15

**referring**
  90:11
  168:23

**refers**
  96:7
  103:1
  152:5

**refuse**
  101:3

**regard**
  117:12

**register**
  57:5

**registered**
  57:1
  63:24
  80:15
  115:6,19
  178:12
  179:17
  182:19,21
  183:17,19
  202:22

**registrants**
  112:7
  113:7,9
  126:17

**registratio
n**
  57:4
  62:11
  65:12,20,
  21,24
  69:9 82:8
  85:21
  112:8
  119:1,3,
  24 208:22
  209:3,14



registratio
ns
    112:6
    114:12

regular
    75:6
    208:22

reinjection
    106:9

rejected
    93:20,21
    95:23
    97:23
    98:7,21
    100:14
    105:8

rejecting
    106:18

rejection
    94:3
    102:10,
    14,16,22,
    23 103:9
    106:5,12
    107:4

rejects
    103:11,13

relate
    108:10

related
    13:15,16
    22:13
    28:21
    31:24
    37:13
    98:13
    169:11

relationshi
p
    161:19
    162:25
    163:4

relative
    61:4
    123:8
    150:21
    151:18,
    21,23,25
    188:23
    190:7
    196:24
    200:18

release
    73:19

relevant
    13:24
    171:1
    203:24

relied
    165:8
    207:7

relies
    142:24

relocated
    184:17

relocation
    170:1
    177:9
    182:10
    190:7

relocations
    196:24

relook
    41:7

rely
    42:19
    90:24
    105:1
    135:7
    143:2
    150:8,9,
    11

relying
    171:6

209:4

remain
    120:7

remedies
    167:17

remember
    18:24
    23:7,9,22
    29:7
    31:22
    32:9,12,
    15,16
    33:5,7
    35:9
    39:9,11
    41:6
    43:23,24,
    25 44:11,
    14,15
    48:1,3,10
    66:6 68:8
    69:3,17
    70:20
    71:3
    77:7,10
    87:14
    88:23
    91:23
    98:1,5,8
    119:17
    122:2
    140:14
    147:6
    160:19
    166:20
    201:15,21
    202:1
    204:21

remind
    15:19
    25:8

reminded
    15:17

reminder

6:14

reminding
    15:23

remote
    6:11
    10:24

remotely
    7:7,13,14
    10:10

remove
    123:20,21

removed
    115:18
    118:22
    119:10
    124:9

removing
    35:12,24
    36:5

renew
    119:1,2
    185:2

renewing
    119:24

reopen
    110:10

repeat
    38:5
    162:12

replicate
    66:13
    67:4
    76:21,25
    165:3

replicated
    66:24

reply
    24:10

report
    5:5,6,8,

10,11,13,
15,17
14:6,9,
10,15,18,
23,25
15:3
16:6,11
18:2,3
29:2,3,
11,15,18,
19 30:7,
11,12,19,
20 32:16
33:9 35:6
39:15
40:24,25
41:2,5
42:16,23
43:2 44:4
45:4
59:10,25
60:7
61:9,24
66:10,13
67:12
70:3,5,9
77:11
78:13
80:17
81:7,12
82:4
83:17
86:7 87:2
89:2,6
90:11,12
91:8,11
92:13,25
93:5,25
95:19
96:15,20
98:1
100:16
107:14,18
108:8
110:5,7,
9,18,25
112:19,23



113:17,21
114:10,
18,21
115:24
120:21
121:6
122:6,8
123:1,20,
22 124:16
125:19,25
127:2,25
129:3
132:25
133:8,23
136:23
139:8
141:3
155:24,25
156:1,2,
3,12,13,
17,19
157:4,18
159:9
163:11,18
164:13,
14,17,23
165:2,18
168:12
169:10,
11,20
170:17
171:4,18
173:9
174:1
176:8,11
177:11,23
178:1,5,
23 180:20
181:6
182:16
187:4,7
189:6,16
191:23
194:7
195:13
200:10
201:17

203:22
205:3
207:21
208:3

**reported**
2:4 55:19
57:1
77:19
122:6

**reporter**
6:11,19
7:3,5
11:22,24
43:5,12,
15,19
95:11,13
114:2
138:15,18
145:15,18
159:19
162:2,8
211:3,8,
13

**Reporter's**
4:9

**reporting**
7:13

**reports**
13:6,8,12
14:5
15:11,21
40:21,24
41:4
45:16,17
46:1
56:16,19
59:4
94:20
107:10
108:1,16
110:1
178:25

**repre-**
195:22

**reprecincti
ng**
171:6
195:22
196:21

**represent**
6:12,18
153:8

**representat
ion**
33:13

**representat
ional**
28:13

**representat
ive**
139:2
145:2,13

**representat
ives**
134:25

**represented**
102:5

**representin
g**
44:3
50:24
139:21,22
144:16
145:6
147:16
148:21

**Republic**
54:20

**Republican**
50:13,16,
21,22
51:4 52:1
55:3
57:2,16

**reputation**
59:17

111:9

**request**
79:15,18
104:22

**requested**
78:15
79:9
80:18
84:8

**required**
20:1
50:16
66:7

**requires**
198:23

**rereading**
15:23

**research**
20:13
21:3
22:12
64:24
65:7
66:1,2
134:16
135:6
166:11
171:5,11
172:1
210:7,8,
10

**researchers**
133:20

**reside**
112:7

**residence**
2:4 7:10,
15

**respect**
52:9,16
66:24
102:9

122:19
126:21
135:24
137:6
159:6
182:18

**respond**
12:22,25
165:16
179:9

**responded**
14:22
39:23
91:11
140:19
163:18
178:1

**respondents**
130:22
131:10
132:18
134:7,10,
23 136:4,
19 137:25
138:1
139:1,12,
20 140:13
142:21
143:4,9
144:15,24
147:25
148:3,12
150:10,12
152:10
153:3,10

**responding**
14:10
30:20
40:22
41:5 43:1
59:25
123:23
124:12
164:22
165:1



182:14

**responds**
12:19
61:10
164:14
182:15

**response**
15:7
34:16
40:24
41:1,2,
10,13,18,
24 42:13
45:18
61:9 65:1
93:24
114:11
132:25
140:20
141:4
142:7,10
163:17
164:16
173:12
208:2

**responses**
13:7
128:1
135:24
141:9
142:3

**responsibil
ities**
20:14

**responsible**
166:1

**responsive**
134:24

**rest**
8:4
109:14

**restrict**
173:13

**results**
77:19
96:4
97:14,16
139:25
178:11,
12,14,16,
19 179:16
182:22
190:21

**return**
120:11

**returned**
115:15
120:17

**reveal**
101:11

**reverse**
173:17,21
180:13,15
190:3
194:6

**review**
46:3
136:7,9

**reviewed**
15:15
100:9

**reviewers**
135:17

**reviewing**
136:11

**Richardson**
2:5 7:11

**rid**
67:18
68:11
158:25

**ride**
112:7

**rife**

89:8
92:18

**right-hand**
114:25
124:19

**rights**
28:12,21
37:4
52:10,21
53:4
168:4
191:16,17
208:25

**risk**
141:14,18

**road**
192:10

**role**
44:15
170:12

**rolls**
35:12,24
36:5
115:19
118:22
119:10
120:7
124:10

**room**
7:25
10:23

**rough**
154:9
211:13

**roughly**
134:22
177:18

**routinely**
65:7

**rule**
74:23
142:1

**rules**
9:2 57:23
141:21

**run**
24:21
25:16
26:7,8,
11,16
42:16
75:6,7
130:22
143:20
144:5

**running**
17:24,25
25:1

**runs**
25:14

**rush**
211:4,5

_____

S
_____

**sad**
51:13

**sample**
32:18,24
42:5,10,
12,17,19
128:8,9,
17,19
130:7,17
132:14
133:18,19
134:4
135:15
136:11
137:17
138:11
139:14
140:13,
16,23
141:15,
18,21

142:20
143:21,25
144:6
145:13,22
146:4,7,
11,17,24
147:14,24
148:1,5,
13 149:5,
7 150:1,
14,17
151:19
152:1
155:3
160:6,8,
13,17
161:1,3,
9,20
162:24
163:5

**sampled**
140:17

**samples**
135:12,19
139:25
146:13

**sampling**
130:2
154:23
160:9,14,
19 161:2,
21 163:1

**satisfied**
68:13

**scenes**
27:5

**scheme**
140:24
198:8,18,
22

**schemer**
198:19,24
199:6



schemers
  198:20

scholar
  56:25
  59:17,18
  111:8,9,
  11 164:3,
  12

science
  18:9 19:7
  20:11,20
  32:23
  59:22
  104:6
  106:22
  111:14
  128:10
  133:19
  172:17

sciences
  20:2

scientist
  32:15
  59:19
  125:14

scientists
  27:18
  37:19
  111:6
  125:18
  126:10,21
  128:18
  162:21

scope
  171:11

scratch
  158:5,8

screen
  11:1 17:3

scrolled
  47:18

scrolling

173:25

searches
  156:7

Secretaries
  50:17

Secretary
  44:6,16
  45:6
  49:17,21,
  22 60:25
  66:25
  71:13
  72:16,22
  73:4,6,13
  74:3
  75:15
  76:5 77:5
  78:21
  80:4,19
  85:25
  86:14
  87:11
  88:4,7
  92:2
  100:2,3
  112:5
  113:5,10
  115:23
  116:14,23
  117:5,15
  118:15
  119:16
  166:10
  168:8,14
  204:4,14

section
  22:17
  26:5
  52:25
  53:3,4,8
  60:12,13
  103:17
  105:21
  125:21
  172:16

208:24

self-
addressed
  120:3

self-report
  185:2

self-
reported
  101:15

self-
reporting
  105:2,3

semicolon
  65:2,4

seminar
  20:6,7

senate
  18:12,21,
  23,24

send
  12:16
  24:3,10
  29:12
  46:2,23
  120:5

sender
  120:18

sense
  11:4,12
  42:22
  97:10
  110:2
  151:14
  188:9
  199:14
  210:9

sentence
  62:20
  63:19
  64:1
  65:2,3
  84:6,21

93:6
  112:4
  136:15
  178:17
  195:18
  201:3

sentences
  96:2
  142:16

separate
  44:9 83:4
  115:13
  121:19
  146:15
  157:5
  174:23
  200:5

September
  40:9

seriousness
  178:9

serve
  161:25

serves
  32:8
  204:16
  209:2

services
  29:6 91:7
  208:2

set
  73:15,19
  75:16
  76:19
  82:20
  88:17
  105:6
  150:21
  170:15

sets
  66:12
  67:7,15
  68:6,8,9,

14 71:6
  76:24
  88:18

share
  101:18

shared
  142:4

Shaun
  21:19
  22:24

sheds
  199:18

sheer
  196:20
  198:10

shift
  10:25

short
  51:12
  78:5
  204:13

Short-term
  18:14

shortcoming
s
  30:14

shorthand
  2:4

shortly
  74:14

show
  23:13,23
  173:20
  174:7
  178:12
  179:15,16
  182:2
  191:13
  210:4

showed
  180:4



190:13,20
191:2

**shows**
180:3
183:16
184:6
192:18
201:11
203:11
210:11

**shuffle**
108:25

**sic**
104:3

**sick**
197:10,
11,13,14

**side**
114:25
179:8

**sign**
98:17

**signature**
4:8 30:9,
10,16
35:20
36:6
91:14

**silly**
45:19
142:25
143:1

**similar**
83:20
138:5
147:18
167:20

**similarly**
9:15
10:22
35:3
122:17

**simple**
192:9,15
194:1
197:16
199:5

**simply**
196:16
199:8

**single**
62:4,10,
25 63:2,
3,6,7,10,
15,18
171:13

**sir**
138:16
156:16
159:14

**sit**
107:23
108:17
122:4
159:11
203:25

**sitting**
53:14

**situate**
102:14

**size**
42:9,12,
19 128:8,
9,19
130:7,18
132:15
133:18
136:11
137:7
138:11,22
140:17
141:15,21
144:6
145:22
146:4,7,
11,12,17,

24
147:14,24
148:1,5,
13 149:5,
7 150:1,
14,18
151:21,25
155:3
160:6,8,
13,17,18
161:1,3,
20
162:24,25
163:4

**sizes**
42:6,17
128:17
133:19
134:5
135:16
141:19

**skewed**
148:1

**skipping**
175:23

**slide**
109:12

**slight**
8:20 99:7

**slightly**
72:3
98:14
100:24
157:3
173:16
180:12,18
184:20
189:5
195:20
198:7,9

**slow**
138:15
145:15,19

**slowing**
43:7

**slowly**
73:10

**small**
42:19
72:2
73:12
75:2
76:20
88:15
94:3,13
128:19
130:18,19
133:17,19
135:16,19
140:1
141:19,22
143:14,
24,25
144:6,7
145:1,12
146:8,11,
13,19,24
147:14
148:19
150:1,3,
14,21,25
151:5,15
154:16
162:18
172:16
190:20
192:22

**smaller**
97:12
130:19
132:13,14
141:14
149:13
151:18
153:15,24
154:14
160:18

**smart**
155:21
199:1

**Smith**
5:10 13:8
14:6,18
28:25
30:11
34:16
38:25
40:23
41:5 45:3
59:16
62:2
63:22
64:23
66:24
67:25
71:8,18,
19 72:5,
10 74:4
75:21
76:3,10,
13,22
77:3
78:12,25
80:18,22
81:7
84:8,24
87:4
89:5,12,
16 90:12
92:10,14,
15 93:19
94:13,19
95:6,18
96:7
102:3,19
107:7,8,
24 108:8
111:4
165:4

**Smith's**
14:10
38:22
39:16



41:2
59:16,25
61:23
66:12
67:5 86:7
88:24
93:16
107:9,20

snapshot
82:7

social
32:14
128:18
162:21

Solutions
6:13

son
10:13,16
117:17,24
118:3
121:7
195:2

sort
10:17
15:23
18:5 19:3
22:11
23:21
24:18,20
25:15
26:6
31:10
33:1 35:4
36:17
51:7
53:3,23
54:17
59:21
64:18
65:3 66:1
85:19
94:8
101:2
102:7

111:25
112:16
113:12
115:9
123:24
142:2
162:12
169:8
175:23
177:5
181:4
198:19
207:16

sorts
30:15
34:11
44:19
54:15

sound
80:24
82:13

soundly
135:7

sounds
9:21 29:7
32:25
36:3 69:3
77:12,13
146:16

sources
18:23

South
31:21
32:4,20
34:7,19
37:12

southern
153:17

speaking
6:15

specific
23:10
33:24

35:14
36:8,12,
19 37:6
68:25
69:21
77:24
80:7
92:23
104:17
105:20
107:14
138:10
146:20
147:6,15
153:21,23
166:14
171:11,15

specifically
37:14
39:24
76:7
87:15,20
88:11
90:5
96:13
103:3
112:23
113:25
117:16
119:12
121:24
139:7,15
155:7
168:24
177:15,19
202:13

specificity
113:15

specifics
45:3 74:5
88:10,21
116:15
155:20
165:23

167:15

spectator
55:6,8

spell
104:4

spend
42:20,21

spent
19:7
46:15
107:6

spoke
123:2

spring
107:24

stand
116:5
135:15
139:12
140:21
141:9
147:20

standard
32:23
98:12,13
106:21
128:22

standardization
98:25

standing
121:9

start
9:18,20
64:25
70:8,9
116:4
169:10

starting
26:12
65:3

70:14
128:5

starts
87:4
122:12
195:17

Stata
37:24
38:13
39:7,20
67:22,23

state
2:3,6
7:9,15,19
25:1,2,
14,19
32:5
40:17
48:25
49:7,8,
18,22
50:17,22
51:24,25
52:4,6,9,
16 53:1,6
62:10,24
63:23,25
77:22
78:2,7
80:15
87:11
92:4
93:4,8
103:11,13
104:16,
23,24
115:19
117:11
120:16,18
122:17,18
166:1
167:4,5,
12,17,24,
25 168:5,
8,17,22



169:3,12,
13,19,21
170:8,11,
16,17,19,
25 183:19
184:8
196:18

state's
44:6,16
45:6
60:25
66:25
71:13
72:16,22
73:5,7,13
74:3
75:15
76:5
77:5,17
78:21
80:4,19
82:8
85:25
86:14
88:4,7
92:2 93:3
100:2,3
112:5
113:5,10
115:23
116:14,23
117:5,15
118:16
119:16
166:10
168:14
169:25
204:4,14

stated
2:7

statement
80:5
161:22
182:15
191:5

statements
138:25

states
18:11
19:19
24:21
25:17
26:16
27:10
33:22
65:8,13
89:17,19,
25 90:5
102:9,15
103:8,10
106:4,17
107:4
138:8,10
209:1,4,7

statewide
171:16
172:9

statistical
124:4
137:12

statisticia
ns
162:20,23

status
116:21
157:20
188:8

statutes
167:16

stayed
203:7

stenographic
c
7:14

step
69:10
70:16

steps
118:24

stick
129:7

stipulation
s
4:4 7:21
8:3

stop
66:20
134:10
157:24
168:8

stores
62:11

straightfor
ward
194:2

strange
206:11

strata
141:7,14

strategy
189:10,19
198:6

street
3:4,8
33:2
57:14

streets
32:17,19

stretch
190:24

strictly
51:7,8,11
173:14

strike
136:1
147:24
152:12
155:11

159:5

strikes
96:19
145:9
150:16
152:25

strokes
118:11

studies
21:23
101:9,16
171:7,15,
17,24
172:8,9,
10,11,20,
24 173:2,
9 201:15,
19,24
210:4

study
24:19
29:5
42:12,14
104:1
130:25
131:15
134:19,22
137:22
138:3,6
142:20,24
143:3,20
144:11
145:11,21
146:5,18
148:4,6
150:8
151:4
155:10

studying
133:20

stuff
13:14
22:12
27:4,5,19

28:21
36:18
37:3
38:16
40:14
52:13
54:13
70:20
108:6
114:16
197:17

style
86:7

sub-state
208:15

sub-sub-
sub-group
153:6,14

sub-sub-
sub-sample
134:18
143:16,17

subcategori
es
123:5
124:25

subgroup
139:16,17
144:10
145:25
146:19,20
148:20,23
149:14
151:17,19
153:20
154:10

subgroups
133:21
139:7
140:1,8,9
146:7,12,
13 147:15
149:13,15
153:5



180:8

**subheading**
26:2

**subject**
177:9

**submit**
29:19
156:8
207:12,13

**submitted**
12:17
29:11,18

**subsample**
137:19
140:23
143:25
153:7

**subsamples**
150:2

**subset**
143:14
162:19
192:13

**successive**
158:1

**sued**
32:5,7

**sufficient**
135:12
149:22

**sufficientl
y**
138:11

**suggested**
190:11

**suing**
51:24
52:4

**Suite**
3:8,13

7:16

**summaries**
164:22

**summarize**
162:14
190:19

**summarizes**
112:2

**summary**
60:12
126:23

**summer**
40:4

**SUNY**
19:9

**super**
186:22
187:11,
15,18,20,
24 205:12

**supplement**
163:21

**supplementa
l**
5:6,8,13,
17 14:18,
22,25
15:3
59:10
87:8,19
88:12
107:25
108:7
110:18
113:14,18
142:11
156:12
163:24
187:7
189:16

**support**
90:22

177:7,10
179:23
189:1
191:25
192:2

**supports**
143:23
181:11
189:4
190:4,5
194:6

**suppose**
13:22
36:9

**supposed**
99:8
179:9
187:6
202:17

**surely**
140:11
160:23

**surprise**
108:4
157:23
158:3
159:12

**surprised**
134:5
157:19

**surprises**
107:22

**surprising**
143:3,6

**survey**
32:18,21
33:1,3
34:21
39:10
41:14
42:10,14
104:1,12,
14,15,21

105:7
121:1,3,
19 127:23
128:1,5
131:2,9,
14,16
132:7,13
133:19
134:4
135:8,19,
24 137:7,
9,24
139:14,
20,25
141:7
142:8
143:4
146:16,
18,25
147:2,9,
25 148:18
149:19
150:11
151:8,11
156:14
160:13
161:10,
11,12,19,
24 162:20

**surveys**
42:6,16,
18 104:15
128:10,17
131:17
133:18,19
141:24
152:15
162:22,23

**suspect**
136:1

**swear**
6:19 7:4
31:15
106:15

**switch**
196:17

**switched**
19:10

**sworn**
2:1 8:8

**synchronize
d**
210:21

**syntax**
178:16

**system**
36:2
62:3,9,
16,18,21,
23 63:23
91:21
92:8
118:16

——————

**T**

**table**
114:22,25
123:2,19
124:2
125:5,9,
11,19
127:9
174:4,6,
7,16
176:23
177:14,19
180:24
181:15
182:7,8,
22 183:9,
13 184:24
185:23
186:19,24
187:1,7,
8,13
190:10
191:1,6



192:4,12,
24,25
193:1,11,
12,15
194:5,14
200:21
201:1,5
202:3,15,
18 207:20

**tables**
67:11
123:20
180:25
181:16,
19,25
182:1,9,
11,12
183:2
188:21
189:1
190:3,9
191:12,22
193:3
196:23

**tag**
209:5

**takes**
74:22

**taking**
10:5
139:14

**talk**
13:23
16:2 21:2
29:4
35:10
36:22
41:24
43:3
44:3,23
45:9,13
51:15
56:5,8
57:21

59:15,24
61:17,22
87:2
88:22
94:20
108:19
109:25
113:25
127:4,23
128:17
138:20
157:4
159:16
160:5,6
161:6,7
164:5
189:24
194:20,21
195:2,18
200:7,8

**talked**
15:25
33:15
44:16
45:1
47:11,12
56:17
59:3
75:23
79:21
88:11,24
90:13
91:20
100:1
102:7
107:10,18
108:11,16
111:4
115:22,25
116:22
120:22
156:6
159:9
161:5
203:22
204:3,12

205:1,2,
5,6,7,9
209:24

**talking**
9:16,18
11:15
13:10
16:25
17:1,5
30:13
35:3
41:25
42:21
43:5 44:7
48:24
60:4,16,
17 69:18
72:21
73:11
75:22
77:1
81:24
82:2,3
83:11
84:21
90:17,19
92:10,21
95:12
107:7
110:4,7
113:17
118:6
119:24
121:20
125:22
127:16
132:8
135:2
137:18
140:9
154:2
161:13,25
162:11,22
169:2
173:20
192:7,11,

13 193:18
200:20
201:2,15

**talks**
55:25
56:2
89:25
125:22
126:2
165:1
191:8

**tally**
87:3,7,22

**tap**
135:8

**target**
155:21

**taught**
19:16,21,
23

**Taylor**
3:13 7:1

**teach**
19:17,20
20:1,4,5,
6

**teaching**
20:13

**team**
59:21

**teens**
144:2

**telling**
120:4
124:17
134:15
145:18
151:2
152:16

**tells**
117:4

**ten**
106:17
109:8

**tens**
172:13

**tension**
150:17

**term**
175:7

**terms**
22:12
27:8
74:24
94:2
107:4
190:22,23
191:3
200:17

**terribly**
158:19

**testified**
8:8 27:24
28:17,22
29:23,25
30:25
31:16
34:1,10
35:16
115:22

**testify**
10:2,6
28:20
29:20

**testifying**
32:22
107:13

**testimony**
28:10
29:15
30:6 37:9
48:13,16
66:5
118:4



120:23
206:6
208:10

**Texas**
2:4,5
7:11,15,
16 9:24
19:14
57:5

**theme**
35:9

**thesis**
18:10

**thing**
13:15
16:25
20:19
27:13,16
31:10
32:16
41:25
42:10
60:5 66:2
75:16
82:3
84:12,19,
20 90:18,
19 91:15
96:20
126:14
127:10
150:8,9,
11 176:2
203:7
210:18

**things**
17:24
18:1,15
22:13
28:19
30:15
31:9,15,
18 34:11
38:14

44:19
49:5
53:25
54:9,15
57:19
72:17
73:14
78:25
118:13
121:10
127:17
140:24
152:15
165:1
176:21
199:15,17
200:5
204:2
205:1,6

**thinking**
181:23

**thinks**
152:24

**Thomas**
1:24 6:5
7:6 8:7

**thought**
17:1
21:11
26:18
34:19
36:6 48:5
90:8
91:4,5
118:8
127:14
179:12
190:19

**thousand**
134:22
145:23
160:9

**thousandish**
141:25

**thousands**
172:13

**throw**
43:15
134:2

**thrown**
30:10

**thrust**
23:21

**thumbnail**
19:4

**Thursday**
6:3

**tickets**
55:8
57:11,17

**time**
6:4
11:10,11
18:25
30:24
33:6 40:8
42:21
58:23
67:9
70:22
71:4,5
72:24
77:21
82:16,22
107:7
108:23
109:3,19,
23
117:13,14
118:21,24
119:6,8,
9,11
134:1,22
136:7
138:7
143:20
158:1
160:3

164:8
167:18
174:2
177:2
195:8,11
200:24
205:23
206:16
210:13

**timely**
100:10

**times**
8:24 31:4
50:24
98:12

**title**
18:14

**today**
6:3,11
13:10,23,
25
107:11,
19,23
108:16
122:4
159:10,11
203:22,25
205:7

**today's**
210:17

**Todd**
21:19

**told**
34:25
45:6
100:6
155:14

**Tom's**
8:17

**top**
16:18,23
17:6
33:18

37:5,8
41:25
43:23
48:19
52:11,18
60:6
65:25
66:23
70:24
79:19
83:25
84:12
89:1,3
92:5,9
93:10
97:9
112:12,14
154:6,13
166:18
169:9
173:1
195:16

**top-down**
62:4,9,
16,18,21,
23 63:23
91:21
92:7

**topic**
13:24
22:20
33:25
34:2
35:14
37:6

**topics**
28:10

**total**
46:25
65:22
72:20
100:21
112:23
115:1,3
124:22



131:9
132:17
141:13
145:21
146:4,7,
11,24
151:18
161:16
163:5
183:17,
19,22
184:7
197:20
200:2
206:17

**totally**
24:2
74:23
141:12
157:4

**totals**
77:19

**toto**
27:16

**touch**
210:4

**tract**
175:9

**traditional**
28:13

**train**
118:7

**training**
168:13

**transcript**
94:23
210:20
211:9

**transcripts**
210:21,24

**transition**
157:10

**treatment**
26:11

**trees**
172:15

**trend**
190:13

**trial**
107:13,16
108:3
155:16

**tricky**
197:17

**trivial**
72:21
77:1

**trouble**
144:23
150:17
168:3

**true**
51:13
54:23,24,
25 55:20
85:22
94:15
113:2
130:8,11
132:22
148:22
161:8
170:24
173:17,21
180:13,15
190:3
191:5
192:23
199:16
200:25
201:1

**Trump**
55:17
56:9

**truth**
170:22

**Tuesday**
211:10

**turn**
11:18
16:5,16
182:3
200:6

**turned**
187:1

**turning**
43:22

**turnout**
35:8
171:5
172:13,
15,25
173:3
182:4,11,
12 200:8,
16 201:6,
9,11,20
202:6,10,
20 203:14
207:22

**Twelve**
8:25

**type**
98:9

**typically**
28:15

**Tyson**
3:12 4:6
7:1 8:1,5
15:25
24:2,8
28:5 40:3
44:2
86:18
105:17
109:9
146:21

167:8
205:20
206:21,24
209:8
210:14,24
211:2,3,
8,11,14

_____

**U**

**U.S.**
6:8 19:24
20:5
113:8

**Uh-huh**
152:17

**ultimately**
198:4

**uncertainty**
128:19

**unclear**
87:7,21
94:6

**undefine**
62:18

**undeliverab
le**
120:18

**undergradua
te**
19:19
20:1

**underlying**
40:1
41:14
94:5
120:24
121:4
125:17
132:20

**undermine**
196:13

197:20
198:21
199:22
200:3

**undermines**
178:19

**underneath**
96:2

**underrepres
ented**
140:12

**undersample
d**
140:3

**undersampli
ng**
141:7
147:12

**understand**
9:4,5
12:12
24:19
38:18
43:6
46:20
66:11
113:12
118:10,13
135:20
145:10,16
147:13
149:18
150:7,15
156:17
165:6
172:3
179:25
192:25
194:22

**understandi
ng**
29:21
36:5
38:11



40:12
45:3
56:22,24
61:10
62:22
63:17
67:3
72:16,22
74:10
79:1,7
86:25
97:2
103:16
105:3
112:1
113:19
114:25
116:13
118:9,18
127:5
139:13,23
141:1
146:10
150:24
166:6,8
167:11,24
168:16
169:18
188:10

**understood**
71:5
196:10

**uniform**
62:4
100:13

**unintention**
**ally**
40:18

**unique**
63:25
68:17,19,
21 79:13,
22 80:2,
10

**unit**
175:3,10

**United**
18:11
19:18
21:8,9

**units**
131:20

**universe**
15:10

**university**
18:7
19:11,13
20:15

**unknown**
100:18
101:24
185:1

**unknowns**
185:8,11,
17

**unrelated**
89:2,5

**up-to-date**
17:16,22,
23

**update**
18:3 30:4
72:23
73:13,22
76:22
82:15

**updated**
48:6
71:11,15,
17 72:17
74:6
82:20
85:19

**updating**
17:21
73:15

75:16

**upper**
105:20

**upside**
129:3

**utilize**
65:10

_____

**V**
_____

**vague**
34:9

**valid**
86:7

**validity**
34:20

**variable**
80:8
144:13
154:18

**variables**
27:13
79:20
104:17,18
149:12

**variation**
99:11

**variations**
99:7

**varies**
206:7

**vary**
163:5

**VBM**
89:7
92:17

**vein**
167:20

**vendors**
113:8

156:5

**verbalize**
9:9

**verified**
65:8

**verify**
166:11

**version**
17:17
71:7,10,
11 72:4,
20 76:2

**versions**
71:14

**versus**
6:7 18:14
29:6
75:21
188:14
203:3

**video**
3:3,7,12
11:14
210:20,21
211:1,2

**videoconfer**
**ence**
6:5

**view**
133:17
150:9,12
152:8
162:23,24
163:2
179:23

**violates**
52:10,17

**violation**
52:7

**violations**
52:25

53:4

**vote**
30:17
36:4 45:5
65:24
75:3
77:19
87:3 89:7
91:13
118:25
119:8
155:9
158:1
167:4

**voted**
70:20
73:2 77:6
78:15
202:7

**voter**
35:11,21,
23 36:14,
17 60:24
62:4,11
63:23,24
65:10,12,
20,21
66:7
68:17,19,
25 69:9,
12 70:15,
17,21,22
71:1,8
72:6,14,
23 75:13,
22 77:4,
18 79:2,
4,24
80:3,11,
13,14,18
81:24
82:7,8,
23,25
83:2,3,
11,17,18,



21 84:3,
4,8,12,22
85:10,11,
18,20
86:8,10
91:17,19
100:17
101:11,
13,14
112:8
114:12
115:1,5,
10 116:2
118:15,19
119:3,5,
10,22
120:7,17
122:15
123:5,9,
13 126:17
144:16
155:11
171:7
172:12,15
193:7
197:25
205:2,3
208:22
209:14,18

**voter's**
115:17

**voters**
18:18
22:11
35:12,24
36:5 37:1
45:5,8
61:4,5
70:19
71:16
73:2 79:9
80:7,15
89:8
91:24
92:1
93:21,22

96:4,11
97:7
100:21
101:6,7,
17,21,22,
23 115:1,
6,19
116:18
122:17
124:9,19
132:1,8,
11
137:22,24
138:4,9,
10 148:13
149:1
154:1
167:22,23
171:19
173:16,17
175:20
176:12,19
177:8,10,
16 178:12
179:17,
20,24
180:3,4,
12,18
181:13,
21,22
182:3,19,
21
183:17,
18,19,23
184:8,11,
13,14
188:8,14,
17,22,24
189:8,11,
13,20,22
190:6,8,
23
191:13,
18,23
192:1,3,
4,11,13
193:1,2,

4,6,10,18
194:8,9,
15,16
195:19,21
196:12,
20,21,22,
25 197:3
198:1,3,
9,10
199:15,16
200:2,16,
18
203:15,
17,18
209:16

**votes**
31:10
75:1
115:3
198:1,5
199:9

**voting**
28:11,12,
21 31:9
33:21
34:8,13,
14,15
35:2,4,5,
8 37:3
47:25
52:10,21
53:4
104:10,11
119:24
131:23
144:16
145:7
147:20
157:25
168:4
171:9
191:15,
16,17,24
203:12,13
207:23
208:25

209:1,5,
6,22

———————

**W**

———————

**wait**
9:17,19
126:7
176:9
186:24
194:23

**walk**
33:3 67:5
192:9

**walked**
191:24

**wanted**
32:6,7
45:21
130:21
150:5
151:14
155:13
194:20
195:18
200:7
206:25

**Washington**
3:5

**ways**
36:20
119:4

**web**
77:6,19
87:7,22
88:6,17

**weeds**
117:1

**weight**
128:20
140:11,20
141:3

**weighted**
141:5

**weighting**
140:25
141:8

**weird**
104:12

**well-
functioning**
63:22

**well-known**
131:2

**West**
3:5,8

**whatsoever**
90:22
180:9

**white**
55:21
61:5
93:22
101:6,17,
19
124:18,21
173:16
174:5,23,
24 176:2
177:8
178:12
179:16,24
180:4,12,
17
181:13,21
182:3,21
183:18
184:11,12
185:8
188:14,23
189:13,22
190:8,22
192:3
195:20,21
196:20,24
198:10

199:16
200:16
203:14,
15,18

**whites**
175:25
191:2
192:18
196:18
200:1

**widely**
206:7

**wind**
56:3

**winds**
116:2

**winging**
193:8

**winner**
74:21,25

**wished**
134:13

**woman**
204:22,24

**Women**
204:20

**won**
74:25

**wondering**
46:24
82:12
106:16
124:15
125:4,13

**wool**
193:20

**word**
38:15
45:20
55:7
104:12

152:7

**words**
114:4

**work**
9:15
12:18
18:1
22:10
23:3,4
26:12
28:17
43:10
44:22
46:10
50:2
51:21
52:22
53:11,14
54:8
65:19
67:5
76:6,15
78:9 98:4
107:9,21
111:8
142:23
159:8
168:11
173:8
206:6,14
208:20,21
209:13,20

**worked**
28:25
49:2 50:5
51:21
67:22,23,
25 69:6

**worker**
98:9

**workers**
99:20

**working**
19:7

46:15
51:3 98:5
99:21
208:17
209:14

**works**
24:4
73:9,10
118:10
132:16

**world**
104:6

**worried**
13:20
159:4

**worse**
24:21
73:20
89:18
90:3,7
106:17

**worth**
126:21

**wrap**
204:2
205:19

**write**
27:5
33:11
38:4,10
55:11
66:11,23
78:11
86:6
87:21
92:15
93:24
99:9
122:14
138:25
156:19
165:22
169:8
173:12

180:11,15
200:9
201:2

**writes**
64:24
81:7 89:6
92:14,15
178:5,8

**writing**
169:20
172:15

**written**
21:4,7,16
22:4
33:16,20
35:12
36:25
37:3
172:12

**wrong**
25:20
55:7
64:16
70:14
95:5
108:10
112:20
113:23
114:1,4,7
120:16
126:25
129:14
146:10
147:23
156:21
170:5,6
180:16
189:8,18
200:22
202:15

**wrote**
30:11
32:15
45:25

55:15
59:4
157:18
165:2

_____

**Y**
_____

**yard**
151:12

**year**
14:7 18:2
19:7,22
20:1
29:11,13
72:15
73:1
75:11
83:1
110:19
114:12
206:7

**years**
19:10,12,
13,15
27:3
42:16
48:4 90:4
111:11,19
124:10
131:16
139:3
143:5
206:9,10,
13,15,17

**yellow**
43:18

**yesterday**
13:9
15:25

**yesterday's**
46:25

**York**
19:9



**young**
   140:12
   141:11

**younger**
   140:2
   147:4
   148:13
   151:7

—————————

**Z**

—————————

**Zoom**
   10:24
   11:1  38:7

