# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    Plaintiffs,

    v.

BRAD RAFFENSPERGER, *et al.*,

    Defendants.

Civil Action No.
1:18-CV-5391-SCJ

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO EXCLUDE
## THE EXPERT TESTIMONY OF DR. JANET R. THORNTON

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ................................................................... 1

LEGAL STANDARD ................................................................................. 3

ARGUMENT .............................................................................................. 4

I.   Dr. Thornton's qualifications are insufficient to support the opinions she offers ............................................................................................................ 5

II.  Dr. Thornton's testimony is grounded in impermissible legal conclusions. 7

III. Dr. Thornton's methodologies are unreliable ............................................. 13

   A.  Dr. Thornton's conclusions are based on her own assertions and ipse dixit, not valid methods of statistical analysis. ........................................ 13

   B.  Where Dr. Thornton does apply an "analysis," she uses unreliable statistical methods. ........................................................................................... 18

IV.  Dr. Thornton offers misleading opinions which cannot help the trier of fact. ........................................................................................................... 22

V.   Other courts have limited Dr. Thornton's opinions ................................... 24

CONCLUSION ........................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) .......................................................................4, 7

*Architects Collective v. Pucciano & English, Inc.*,
    247 F. Supp. 3d 1322 (N.D. Ga. 2017) ...............................................................8

*Barber v. United Airlines, Inc.*,
    17 Fed. Appx. 433 (7th Cir. 2001) .....................................................................20

*Commodores Entm't Corp. v. McClary*,
    879 F.3d 1114 (11th Cir. 2018) ...........................................................................8

*Common Cause v. Lewis*,
    No. 18-cvs-014001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019) ..........24

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*,
    402 F.3d 1092 (11th Cir. 2005) .........................................................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................4, 13

*Democratic Nat'l Comm. v. Reagan*,
    329 F. Supp. 3d 824 (D. Ariz. 2018), *rev'd on other grounds sub nom.*
    *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) ....................24

*Dukes v. Georgia*,
    428 F. Supp. 2d 1298 (N.D. Ga.), *aff'd sub nom. Dukes v. State of Ga.*, 212 F.
    App'x 916 (11th Cir. 2006) ...............................................................................14

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................... 13-14

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).........................................22

*Hughes v. Kia Motors Corp.*,
    766 F.3d 1317 (11th Cir. 2014) ..........................................................................3

*In re Chevron U.S.A., Inc.*,
    109 F. 3d 1016 (5th Cir. 1997) ..........................................................................19

*In re Trasylol Prod. Liab. Litig.-MDL-1928*,
    No. 08-MD-1928, 2013 WL 1192300 (S.D. Fla. Mar. 22, 2013) ......................19

*Leathers v. State Farm Mut. Auto. Ins. Co.*,
    No. 1:12-cv-00198-SCJ, 2012 WL 13014634 (N.D. Ga. Dec. 3, 2012).............8

*Little v. Ford Motor Co.*,
    No. 1:16-cv-00931-ELR, 2017 WL 6994586 (N.D. Ga. Dec. 21, 2017)...........11

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ........................................................................13

*Montgomery v. Aetna Cas. & Sur. Co.*,
    898 F.2d 1537 (11th Cir. 1990) ..........................................................................8

*Ohio A. Philip Randolph Inst. v. Householder*,
    373 F. Supp. 3d 978 (S.D. Ohio), *vacated on other grounds*, 140 S. Ct. 101 (2019)................................................................................................................24

*Olsen v. Shell Oil Co.*,
    708 F.2d 976 (5th Cir. 1983) ............................................................................16

*Otogenetics, Corp. v. Omega Bio-Tek*,
    No. 1:15-cv-02697 (N.D. Ga. Aug. 7, 2017).....................................................22

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ..........................................................................5

*United States v. Everglades Coll., Inc.*,
    No. 12-60185-CIV, 2014 WL 11531790 (S.D. Fla. May 27, 2014) ...................9

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) .......................................................................18

*United States v. Norris*,
   No. 1:05-cr-479-JTC/AJB, 2007 WL 9655845 (N.D. Ga. May 8, 2007), *report and recommendation adopted by* 2007 WL 9657880 (N.D. Ga. Oct. 3, 2007). 22

*United States v. Oliveros*,
   275 F.3d 1299 (11th Cir. 2001) .........................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................................12, 13

## OTHER AUTHORITIES

Fed. R. Evid. 702 .................................................................................passim

Fed. R. Evid. 702 advisory committee's note to 2000 amendment.........................14

Pursuant to *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), Federal Rule of Evidence 702, Local Rule of the Northern District of Georgia 26.2(C), and this Court's Second Amended Scheduling Order (ECF No. 228), Plaintiffs Fair Fight Action, Inc., Care in Action, Inc., Ebenezer Baptist Church of Atlanta, Georgia, Inc., Baconton Missionary Baptist Church, Inc., Virginia-Highland Church, Inc., and The Sixth Episcopal District, Inc. (collectively, the "Plaintiffs") have moved this Court to exclude the reports, ECF Nos. 277 and 250, and expert testimony of Dr. Janet R. Thornton and hereby submit their memorandum in support thereof.

## PRELIMINARY STATEMENT

Plaintiffs' expert Dr. Michael C. Herron, through multiple, detailed statistical analyses, assessed polling place closures and changes in Georgia between 2014 and 2018 and how these actions affected racial groups. *See* ECF No. 241 ¶ 7 ("Herron Report"); ECF No. 294 ¶ 1 ("Herron Second Report"). Supporting Plaintiffs' claim that Defendants' actions deprived Georgia citizens of color of their fundamental right to vote, Dr. Herron found that polling place closures and changes disproportionately affected Black registered voters as compared to white registered voters. Herron Report ¶ 18; Herron Second Report ¶ 154.

1

To rebut Dr. Herron's opinions, Defendants proffered the expert testimony of Dr. Janet R. Thornton, a statistician whose expert opinions are not only ungrounded in statistical analysis, but also fall short of what is required for expert testimony. Dr. Thornton's opinions and testimony should therefore be excluded.

Dr. Thornton is not qualified to provide the opinions offered in her testimony. Dr. Thornton's fields of expertise include statistical analysis, computer analysis of large databases, and applied econometrics. *See* ECF No. 277 ¶ 2 ("Thornton Report" or "ECF No. 277"). But Dr. Thornton's testimony provides little statistical analysis to challenge Dr. Herron's arguments. In other election law cases where Dr. Thornton has offered testimony, courts have afforded little or no weight to her opinions.

Instead of challenging Dr. Herron's statistical methodology or analysis, Dr. Thornton's rebuttal is grounded in her interpretation of O.C.G.A. § 21-2-265. She contends the statute places decisionmaking authority with Georgia's counties for determining polling place locations, and not the Secretary of State. *See* Thornton Report ¶¶ 19, 21-22; ECF No. 350 ¶¶ 2, 5, 5 n.4 ("Thornton Second Report" or

"ECF No. 350").[1] As a result, she refuses to credit Dr. Herron's statewide analysis and questions the utility of *any* statewide analysis. Thornton Dep. 23:6-23:24.[2]

Using her interpretation of the statute, Dr. Thornton impermissibly offers a legal conclusion on an ultimate issue in the case—the identity of the entities with responsibility for election administration decisionmaking in Georgia. The "analyses" Dr. Thornton does conduct, albeit sparingly, are either based on her own speculation and unsupported assertions without any methodology or scientific reasoning, or otherwise employ methods that cannot be validated. Accordingly, Dr. Thornton's expert opinion should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 authorizes the admission of the testimony of an expert qualified by knowledge, skill, experience, training or education, but only if: (1) the expert's specialized knowledge will help the trier of fact; *and* (2) the testimony is based on sufficient facts or data and is produced by reliable principles and methods, which the expert then reliably applied to the case. Fed. R. Evid. 702(a)-(d). The trial judge serves as the "gatekeeper," ensuring that "speculative, unreliable expert testimony" is not admitted. *Hughes v. Kia Motors Corp.*, 766

---

[1] Dr. Thornton's first report omits paragraph 25. *See* Thornton Report at 9-10. Her second report omits paragraph 17. *See* Thornton Second Report at 9.
[2] The transcript of Dr. Thornton's deposition is attached as Exhibit 1.

F.3d 1317, 1328-29 (11th Cir. 2014) (discussing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and quoting *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1291 (11th Cir.2005)). The court's gatekeeping function is critical because an expert's testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (citation omitted).

To determine the admissibility of expert testimony, courts apply a three-part inquiry. *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1309 (11th Cir. 1999). First, the expert must be qualified to testify on the matter addressed. *Id.* Second, the expert's conclusions must be supported by reliable methodologies. *Id.* Third, the expert's scientific, technical, or specialized knowledge must assist the trier of fact. *Id.* The burden of satisfying all three parts of this inquiry rests with the party offering the expert. *Id.* at 1306.

## ARGUMENT

Defendants have not met their burden of showing Dr. Thornton's testimony is admissible. Dr. Thornton is not qualified to offer many of her opinions, as they are not based on statistical analysis and do not require her technical expertise. Instead, she invades the Court's province by offering legal conclusions in support of her overarching critique that Dr. Herron does not account for county-based decisionmaking. The few analyses she does provide are flawed as they either use

unreliable statistical methods or are based on her own assertions. Further, she offers opinions that misrepresent the underlying facts on which they rely, which will mislead, rather than assist, the trier of fact.

## I.     Dr. Thornton's qualifications are insufficient to support the opinions she offers.

To offer an opinion, an expert must be qualified. That is, the expert must have either the requisite "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. An expert with some qualifications may still be disqualified if he or she lacks sufficient experience in the relevant field. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (affirming decision that witness with degree in plant pathology was not qualified to testify as an expert in controlled substances because he had worked only with the relevant substance on isolated projects and lacked the requisite license). Dr. Thornton's background is in statistical analysis and economics.[3] She holds a Ph.D. in economics and her "fields of special interest" include "computer analysis of large databases, applied econometrics and statistical analysis." Thornton Report ¶ 2; ECF No. 277 at 21 ("Thornton CV"). Yet, her rebuttal to Dr. Herron's statistical analyses involves

---

[3] Dr. Thornton's only potentially relevant background experience is her undergraduate degree in economics and political science, obtained almost forty years ago. Her academic and professional work since then has focused on statistics and economics, not political science. ECF No. 277 at 22 (Thornton CV).

almost no quantitative methods. Rather, she bases many of her critiques on unsubstantiated theories of election administration and voting patterns, not statistical testing.

For example, Dr. Thornton critiques Dr. Herron's analysis of voter turnout in the 2018 General Election as "incomplete and misleading," arguing that rather than examining turnout rates based on polling place changes between 2014 and 2018, Dr. Herron should have examined the effect of polling place changes between 2014 and 2016, and then 2016 and 2018. Thornton Report ¶¶ 27, 28. According to Dr. Thornton, this distinction is important because "it is likely that voters whose polling place changed prior to the 2016 election and who then voted in 2016 would have known of their polling place at least two years prior to the 2018 election." *Id*. ¶ 27. Dr. Thornton's report assumes changes in polling places affect voter turnout only because voters may not know where to vote on Election Day, and conversely, that voter turnout would not be affected if voters did know where to vote.[4] Dr. Thornton relied on no statistical analysis for this conclusion; instead, she offered an opinion based on her understanding of voter behavior. At

---

[4] In response, Dr. Herron analyzed the effects on turnout of polling place changes between 2014 and 2016 and 2016 and 2018, finding the results were qualitatively the same as the results in his original analysis. Herron Second Report ¶¶ 78-107. Polling place changes in each of these time periods were associated with a decrease in turnout, with a greater effect on Black voters than white voters. *Id.* ¶ 106.

her deposition, she altered that opinion, admitting polling place changes could affect voter turnout (either up or down) for a variety of other reasons besides voters' ignorance of their polling places. Thornton Dep. 46:16-21.

Though Dr. Thornton bases many of her opinions on theories of voter behavior and election administration, Dr. Thornton is not qualified to testify on those issues. She has no advanced degree in political science; she has published no papers nor made academic presentations on issues related to voter behavior or election administration; and she has never worked on voting rights topics as a consultant outside the litigation context. Thornton Dep. 13:18-14:7; ECF No. 277 at 21-25 (Thornton CV). The only "voting rights" experience on Dr. Thornton's CV are cases for which she was retained as an expert in statistical analysis and economics. *See* ECF No. 277 at 22.

Thus, the Court should reject Dr. Thornton as an expert because her opinions on the administration of elections in Georgia do not rely on any specialized knowledge in statistics.

## II.    Dr. Thornton's testimony is grounded in impermissible legal conclusions.

An expert opinion is admissible under *Daubert* and Federal Rule 702 only if it "assists the trier of fact." *Allison*, 184 F.3d at 1310 (discussing *Daubert* standard). The law is clear that an expert witness may not offer testimony

regarding legal conclusions because, by doing so, the expert "invade[s] the court's exclusive prerogative." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). "A witness [] may not testify to the legal implications of conduct; the court must be the . . . only source of law." *Montgomery v. Aetna Cas. & Sur. Co*., 898 F.2d 1537, 1541 (11th Cir. 1990); *see United States v. Oliveros*, 275 F.3d 1299, 1306-07 (11th Cir. 2001) ("Domestic law is properly considered and determined by the court . . . [and] not to be presented through testimony and argued to the [factfinder] as a question of fact."). Courts in this circuit have repeatedly refused to permit experts to provide legal opinions on the ultimate issues in the case. *See, e.g.*, *Montgomery*, 898 F.2d at 1541 (holding that district court abused its discretion in allowing expert to testify that insurer had duty to hire tax counsel because "an expert may not . . . merely tell [the factfinder] what result to reach"); *Architects Collective v. Pucciano & English, Inc*., 247 F. Supp. 3d 1322, 1335-36 (N.D. Ga. 2017) (excluding opinions encompassing the ultimate legal issue of similarity of architectural plans).

The general principle that expert witnesses may not offer legal conclusions applies to interpretations of statutes. "Witnesses are prohibited from interpreting a statute because the Court determines the meaning of the law, and the [factfinder] determines whether a party properly complied with the law." *Leathers v. State*

8

*Farm Mut. Auto. Ins. Co*., No. 1:12-cv-00198-SCJ, 2012 WL 13014634, at *4

(N.D. Ga. Dec. 3, 2012) (Jones, J.) (excluding expert's testimony as improper legal

conclusion); *see also United States v. Everglades Coll., Inc.*, No. 12-60185-CIV,

2014 WL 11531790, at *5 (S.D. Fla. May 27, 2014) (excluding expert's

interpretation of the False Claims Act ("FCA") because "questions of law as to the

FCA's elements and requirements are within the Court's purview").

     Dr. Thornton has plainly violated these principles by couching her

interpretation of a Georgia elections statute, O.C.G.A. § 21-2-265, as expert

opinion. She repeatedly offered her legal opinion on this statute as the basis for her

underlying critique of Dr. Herron's work—namely, that Dr. Herron improperly

uses a statewide analysis in analyzing poll closures rather than a county-by-county

analysis. *See* Thornton Report ¶¶ 19, 21-22; Thornton Second Report ¶¶ 2, 5, 5 n.4;

Thornton Dep. 21:17-23:24. As the Court is aware, the question of which actors

are responsible for Georgia's election system is a crucial legal issue in this

litigation, as is the interpretation of O.C.G.A. § 21-2-265 and other relevant

election administration statutes. *See, e.g*., Order on Defs.' Renewed Mot. Dismiss,

ECF No. 68 at 57-64. Thus, Dr. Thornton is not only positing legal conclusions;

she is proffering an opinion on an important ultimate legal issue and using that

opinion as the basis for her rebuttal of Plaintiffs' expert.

Dr. Herron, Chair of the Program in Quantitative Social Science at Dartmouth College, conducted multiple analyses using three methodologies to assess the racial impacts of polling place closures, each of which showed Black registered voters in Georgia were disproportionately affected by polling place closures as compared to white registered voters. Herron Report ¶¶ 20, 107; s*ee id.* ¶¶ 124-142 (analyzing racially homogenous census block groups, the Georgia voter file, and Black majority polling places). As Dr. Herron's report sought to determine the racial impacts of polling place changes in Georgia, he provided statewide results for those analyses while also focusing, at the outset of his report, on variations among counties. *Id.* ¶¶ 7, 111-121.

Because of the significant statistical analyses in Dr. Herron's report, Dr. Thornton's mandate was to determine the accuracy of Dr. Herron's analyses of polling place closures. Thornton Report ¶ 17; Thornton Dep. 15:2-14. Instead of deploying her own expertise in statistics, however, Dr. Thornton critiqued the statewide analyses conducted in Dr. Herron's report based largely on her interpretation of a Georgia statute provided to her by defense counsel. Thornton Dep. 22:1-2. Specifically, Dr. Thornton believes that *no* useful analysis can be conducted at a statewide level. *See* Thornton Second Report ¶ 5 n.4 (explaining that Dr. Herron's "programming code/logic is not the issue," but rather "what he

10

instructed the programming code to do is the issue, in particular instructing the

programming code to produce statewide statistics"); Thornton Dep. 23:6-24:14.

According to Dr. Thornton, "[u]nder Georgia Statute § 21-2-265, it is the

responsibility of the county or municipality to determine the polling place within

each precinct." Thornton Report ¶ 21. She acknowledges, however, she is not a

lawyer; she admits she reviewed no judicial opinions interpreting the statute; and

she admits she was unaware whether exceptions to the statute existed. Thornton

Dep. 21:17-22:20. Dr. Thornton nevertheless engages in further statutory

interpretation, arguing that any statewide analysis "is contrary to the statute that

dictates that it is the county and not the state that makes decisions regarding the

closure and placement of polling places." Thornton Report ¶ 21.[5]

Dr. Thornton repeatedly relies on this statute, including after Dr. Herron

responded to her statute-based critique by explaining that her suggested analysis is

outside the scope of his report.[6] Herron Second Report ¶¶ 52-55. Dr. Thornton's

---

[5] Dr. Thornton's "Materials Relied Upon" disclosure does not include any
documents produced in this case, suggesting that she likely has no knowledge of
the case documents demonstrating the Secretary of State's role in polling place
closures. ECF No. 277 at 29; ECF No. 350 at 20.

[6] Dr. Herron's report does not discuss the precise identities of government officials
and institutions that influence polling place closures. Rather, it examines how
closures, regardless of the reason for the closure, affect different racial groups.
Thus, Dr. Thornton's legal opinion is also an improper rebuttal opinion. *See Little
v. Ford Motor Co.*, No. 1:16-cv-00931-ELR, 2017 WL 6994586, at *8 (N.D. Ga.

second rebuttal report begins by arguing again that Dr. Herron "ignor[es] the individual decision-making of each county to determine the location of its polling place(s) as dictated by Georgia Statute § 21-2-265." Thornton Second Report ¶ 3; *see also id.* ¶ 5 ("It is the sole responsibility of the county Boards of Elections, not the Secretary of State or the federal government, to determine polling place locations."). When asked at her deposition whether, separate and apart from the statute, she would find Dr. Herron's statewide analysis unhelpful as a matter of statistics, she was unable to say and again referenced O.C.G.A. § 21-2-265 as the basis for her opinion. Thornton Dep. 23:15-24.

Another instance of Dr. Thornton's impermissible legal opining is her misguided reliance on the United States Supreme Court decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Thornton Second Report ¶ 5 n.7. To demonstrate why Dr. Herron erred in not examining county-level decisionmaking, Dr. Thornton, a statistician with no legal training, opined that the Supreme Court ruled the class plaintiffs were not subject to the same discriminatory policies because "store managers (analogous to county Boards of Elections) at Wal-Mart could make their own pay and promotion decisions (analogous to decisions

Dec. 21, 2017) (excluding expert's testimony as an improper rebuttal opinion because "rebuttal testimony must contradict or respond to specific contentions made by the other party's experts").

regarding moving/closing polling places)." *Id.*

For the reasons discussed above, Dr. Thornton's uninformed and inadmissible legal analyses are impermissible as expert testimony and thus, Dr. Thornton's testimony should be excluded.

## III.  Dr. Thornton's methodologies are unreliable.

Dr. Thornton's flawed methodology also requires her testimony to be excluded, as expert testimony must be supported by "good grounds and appropriate validation." *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1237 (11th Cir. 2005). Dr. Thornton's testimony has neither. The rebuttals she offers are either rooted in her own unsupported conclusions or employ unreliable statistical methods. As the methodologies she applies are either unknown or unreliable, the Court should exclude Dr. Thornton's opinions.

### A.  Dr. Thornton's conclusions are based on her own assertions and ipse dixit, not valid methods of statistical analysis.

"[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Experts may not substitute their own assertions for scientific proof to support the opinions they provide. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522

13

U.S. 136, 146 (1997). When presented with insufficient evidence for a conclusion, the court should exclude the opinion if "there is simply too great an analytical gap between the data and the opinion proffered." *See id.* "The trial court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note to 2000 amendment (quotation marks omitted). Further, the court may admit "only 'scientific knowledge,' and not speculation or subjective belief." *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1309 (N.D. Ga.) (citations omitted), *aff'd sub nom. Dukes v. State of Ga.*, 212 F. App'x 916 (11th Cir. 2006).

Dr. Thornton repeatedly violates these principles, offering opinions not based on her expertise in statistics, but rather consisting of "conclusory statements devoid of factual or analytical support," which are "simply not enough." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005).

First, Dr. Thornton claims Dr. Herron's closure rate statistics are "inflated" because Dr. Herron included all polling place closures in his analysis. Thornton Report ¶ 23. Dr. Thornton posits that Dr. Herron should have included only those poll closures that resulted from the decisions of the county board of elections. *Id.*; Thornton Second Report ¶ 10. But she could offer no support for her contention that the *reason* for a poll closure, rather than the fact of closure itself, is necessary to

14

analyze the impact of closed polling places on racial groups. Thornton Dep. 39:18-40:21. Simply put, Dr. Thornton is conflating the issue of *racial animus* with disparate racial impact. This is confirmed by her contention that, had Dr. Herron examined the reasons for the poll closures, he "could determine whether [other factors], and not race, explain his findings." Thornton Second Report ¶ 10; *see also* Thornton Dep. 41:2-42:2; 43:20-44:8. But Dr. Herron's analysis need not grapple with racial animus to be relevant given that, among other reasons, Plaintiffs have brought disparate impact claims under the Voting Rights Act. *See* ECF No. 41 ¶¶ 209-218. Regardless, Dr. Thornton's critique is undermined by her own concession at her deposition that polling place closures could result in racially disparate outcomes even if the decisions were not motivated by race. *See* Thornton Dep. 28:10-14; 38:4-39:16.

Second, and relatedly, Dr. Thornton opines that the racial and political demographics of Georgia county election boards are relevant and should have been included in Dr. Herron's analysis. Thornton Second Report ¶ 7 ("Dr. Herron ignores the racial and partisan make-up of each of the county Boards of Elections involved in the decisions to move or close polling places."). Dr. Thornton did not offer any reasoned explanation for why the race and political affiliations of government officials were relevant to Dr. Herron's stated subject: to determine the

15

extent of any racial disparities in polling place closures. Thornton Dep. 26:19-30:1 (explaining that the demographics of the county election board are necessary to understand the reasons for closures).

Third, Dr. Thornton offers nothing beyond her own speculative conclusions to support her "methodology" of eliminating thirty-one counties from Dr. Herron's analysis of polling place changes for voters who did not move. Thornton Report ¶¶ 35. In calculating the changes in polling places for registered voters who did not move between 2014 and 2018, Dr. Herron found that Black "non-movers" were more likely than white "non-movers" to receive a new polling place. Herron Report ¶¶ 144-155. In critiquing this analysis, Dr. Thornton notes that "among the 159 counties, 31 did not have any changes to their polling places between 2014 and 2018," and using Dr. Herron's data, recalculates the percentages of closures by simply eliminating those thirty-one counties. Thornton Report ¶ 35; Thornton Dep. 70:7-14. Dr. Thornton explained she excluded those counties because "[n]o decisioning [sic] was being made" about polling place changes by the election officials in those counties. Thornton Dep. 72:1-2. Dr. Thornton's conclusion is pure speculation, however; she disregards the principle that "no decision is a decision," *see, e.g.*, *Olsen v. Shell Oil Co.*, 708 F.2d 976, 985 (5th Cir. 1983). In addition, when confronted in her deposition, she conceded she did not know if

county officials in those thirty-one counties may in fact have made a decision—a decision to keep polling places open. Thornton Dep. 73:3-74:3.

Fourth, Dr. Thornton offers an inadmissible critique of Dr. Herron's analysis of voter turnout in the 2018 general election disaggregated by race. Dr. Herron's analysis of polling place changes and voter turnout in the 2018 general election comprehensively accounts for absentee and early voters, as well as voters who voted in person on Election Day. *See* Herron Report ¶¶ 167-175. Dr. Thornton deems Dr. Herron's inclusion of early and absentee voters "misleading" because "[t]hese voters would not be impacted by a change in polling place because early voting places and submitting an absentee ballot have no relationship to the election day polling place of a voter." Thornton Report ¶ 37. Again, Dr. Thornton provides no basis for her conclusion that early and absentee voters are not affected by changes in polling places. Nor does she have any experience in the area. *See supra* Section I. Moreover, Dr. Thornton admitted in her deposition that it "is possible" a voter may choose to vote early or absentee due to the closure of a polling place and thus polling place closures could well impact absentee and early voters. Thornton Dep. 77:3-74:3.

17

As Dr. Thornton offers no statistical grounding—only speculation, conjecture, and subjective beliefs—to support her testimony, the Court should decline to admit her opinions.

### B. Where Dr. Thornton does apply an "analysis," she uses unreliable statistical methods.

To admit testimony, the "[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.*, good grounds, based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 590) (alterations in original). The few statistical analyses Dr. Thornton does offer are neither supported on "good grounds," *id.,* such that they are not "the product of reliable principles and methods," Fed. R. Evid. 702 (c). Therefore, these analyses and accompanying opinions should not be admitted.

Dr. Thornton fails to explain the methodology used for her county analysis. She notes when she calculated "summary results by county," Thornton Report ¶ 20, and polling place closure rates by period and on Election Day, Thornton Second Report ¶ 4, she "relied upon" and "modified" Dr. Herron's code. She does not explain how she modified Dr. Herron's data to reach her results. When asked in deposition how she modified the code, she vaguely replied that she "aggregate[ed] by county rather than running it across county." Thornton Dep. 19:9-10; *see id*. 55:2-3 ("So it's essentially taking Table 3 of Dr. Herron's—the

18

code from his Table 3 and running it by county."). Without further information about the alterations made to Dr. Herron's data, Dr. Thornton's "methodology" leaves both the Court and the parties uncertain of its soundness.

Further, Dr. Thornton improperly undertook "analyses" based on selective evidence. *See In re Trasylol Prod. Liab. Litig.-MDL-1928*, No. 08-MD-1928, 2013 WL 1192300, at *14 (S.D. Fla. Mar. 22, 2013) (concluding a court is not "bound to accept an expert's opinion based on incomplete and selective evidence"). First, Dr. Thornton's county analysis omitted key data. She used Dr. Herron's data, but only looked at the 101 counties that had at least one polling place closure, removing those precincts with no closures. Thornton Report ¶ 30. In describing the reasoning behind this methodology, she explained she removed counties with no closures because there could be no comparison of closure rates for Black and white voters using those counties because the rates would be the same (zero). Thornton Dep. 55:13-20. But she did not exclude counties where the rates of closures were the same for Black and white voters, which, by the same logic, would also result in no comparison. *Id*. at 55:21-56:9.[7] Sound reasoning does not support this significant omission of fifty-eight counties. *See In re Chevron U.S.A., Inc.*, 109 F. 3d 1016,

---

[7] Dr. Thornton neglected to analyze racial demographics of the excluded fifty-eight counties with no closures. Thornton Dep. 56:10-56:13.

1019-20 (5th Cir. 1997) (evaluating bellwether trial design in light of statistical principles and stating, "the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained"); *Barber v. United Airlines, Inc.*, 17 Fed. App'x 433, 437 (7th Cir. 2001) (affirming district court's exclusion of expert who accepted only data that suited his theory and "cherry-picked" supporting facts).

Second, purportedly to demonstrate the "substantial variation" in the rate of polling place closures among counties, Dr. Thornton performed an analysis with Bibb County data removed and found that when Bibb County was excluded, Dr. Herron's conclusions about polling place closure rates for Black and white voters were reversed. Thornton Report ¶ 30. Dr. Thornton offered no principled reason to remove Bibb County from the analysis, however. Dr. Thornton describes Bibb County as "one small county" and "relatively small." *Id*. In fact, Bibb County is the thirteenth largest county in Georgia (out of 159) as measured by the number of registered voters in 2014. Herron Second Report ¶ 141. In her deposition, she retreated from her report's description of Bibb County as "one small county." She testified, "[s]o when I say it's smaller, it's smaller relative to those that have—are, you know, far more populous." Thornton Dep. 59:18-59:20. Dr. Thornton also admitted at her deposition she did not select Bibb County at random—she chose it

because it was a county with a relatively high closure rate, and she also "recall[ed] it being perhaps—perhaps more African American relative to some counties." *Id.* at 59:1-60:21. Moreover, Dr. Thornton did no similar analysis by removing other counties from Dr. Herron's calculations. *Id.* 60:21-61:4. At her deposition, she backed down from this analysis, explaining that her removal of Bibb County merely was to "illustrate" the county variation. *Id.* at 60:2-9; 61:1-2. Yet, as discussed further below *infra* Section IV, Dr. Herron did not mask county differences; county variation and any alleged significance of Bibb County can be seen in Figures 2 and 3 of his first report. Herron Report at 45, 46.

Third, Dr. Thornton provided three examples of "polling places that existed in 2014 but were torn down or closed and, thus, not available to serve as polling sites." Thornton Report ¶¶ 24-26. At her deposition, she explained she searched in Google Maps for closed polling places within the counties with the most closures and "where you could clearly see that they were demolished." Thornton Dep. 42:16-19. In her deposition, Dr. Thornton admitted that "this isn't a scientific sample" and instead was intended "to illustrate the point." *Id.* at 42:10-12, 19-21.

This Court has rejected "illustrations" as improper expert opinions, however. "Expert reports are not meant to be merely 'illustrative.' Such reports must contain a *complete* statement of *all* opinions the witness will express and the basis and

reasons for them." *Otogenetics, Corp. v. Omega Biosciences*, No. 1:15-cv-02697, ECF No. 146 at 11 (N.D. Ga. Aug. 7, 2017) (Jones, J.) (emphasis in original) (citing Fed. R. Civ. P. 26(a)(2)(B)(I)). Accordingly, the Bibb County and Google Maps "illustrations" do not suffice for *Daubert* purposes.

Thus, this Court should decline to admit Dr. Thornton's opinions because they use unreliable statistical methods.

## IV.    Dr. Thornton offers misleading opinions which cannot help the trier of fact.

Dr. Thornton's reports offer opinions that are misleading and misrepresent their underlying facts. These opinions should not be admitted as this testimony will impede the factfinder's credibility determinations. *See United States v. Norris*, No. 1:05-cr-479-JTC/AJB, 2007 WL 9655845, at *17 (N.D. Ga. May 8, 2007) (finding expert "testimony concerning group behavior would confuse, not assist, a [factfinder] and usurp the [factfinder]'s role in making credibility determinations"), *report and recommendation adopted by* 2007 WL 9657880 (N.D. Ga. Oct. 3, 2007); *see also Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1288 (N.D. Ga. 2002) (testimony "is not and would not be admissible" if it is "premised on an erroneous understanding of the evidence"), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).

Dr. Thornton accuses Dr. Herron of "mis-leadingly mask[ing] . . . county differences through his use of state-wide statistics." Thornton Report ¶ 22. She provides the following statistic as an example of data he "mis-leadingly masked": "between 2014 and 2018, 36% of the counties did *not* close polling places." *Id.* In actuality, Dr. Herron explicitly acknowledged county differences in three distinct ways, including by providing this very statistic. *See* Herron Report ¶ 115 (noting that "58 counties [or 36 percent] in the state did not close any polling places between the 2014 and 2018 General Elections"); *id*. at 45 (Figure 2); *id*. at 46 (Figure 3). When confronted at her deposition, Dr. Thornton acknowledged Dr. Herron had included the statistic she accused him of masking. Thornton Dep. 32:6-23.

Dr. Thornton also misrepresents data to support her claim that increased alternative voting in Georgia reduced the demand for Election Day polling places in 2018 and, therefore, "Dr. Herron has falsely minimized the importance of in-person early voting." Thornton Second Report ¶ 23. To support this claim, Dr. Thornton provides U.S. Bureau of Census data showing that nationally, "African-American voters in particular used early voting polling places at a higher rate." *Id*. Yet, she ignores that this Census data actually shows Black voters participate in alternative voting—in-person voting and mail voting combined—at the *lowest*

23

rates of all ethnic and racial groups. *Id.* at 13 (Table 3). She omits the Census data showing that Black voters participate in voting by mail at the lowest rate of all groups listed. *Id.* Dr. Thornton admitted to both of these facts in deposition, though her expert report does not mention either. Thornton Dep. 83:7-84:1.

These opinions should be excluded as unhelpful and inadmissible.

**V.     Other courts have limited Dr. Thornton's opinions.**

Other courts have discredited Dr. Thornton's methodology and testimony in election law cases, giving her opinions limited weight. *See, e.g.*, *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1055 (S.D. Ohio) (noting Dr. Thornton is an "expert in statistics generally, not in political science or redistricting" and holding that "several of Dr. Thornton's other critiques miss the mark and are not credible"), *vacated on other grounds sub nom. Householder v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 101 (2019); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 838 (D. Ariz. 2018) (finding Dr. Thornton's opinion "simplistic and not credible"), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020); *Common Cause v. Lewis*, No. 18-cvs-014001, 2019 WL 4569584, at *80 (N.C. Super. Ct. Sept. 3, 2019) ("But Dr. Thornton's testimony was not persuasive, her analysis is unreliable, and her opinions are given little weight.").

24

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to exclude Dr. Thornton's expert reports, ECF Nos. 277 and 250, and her testimony.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. JANET R. THORNTON** has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

This 29th day of June, 2019.       Respectfully submitted,

/s/ Allegra J. Lawrence
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

25

suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson St, Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac* vice)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillion.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali Bracey (Admitted *pro hac vice*)
Ishan Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
New York Bar No. 2831535
Elizabeth Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice)*
Paul M. Smith (Admitted *pro hac vice)*
**CAMPAIGN LEGAL CENTER**
1101 14 St. NW Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org

28

jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*