# EXHIBIT 1

**In the Matter Of:**

FAIR FIGHT ACTION vs BRAD RAFFENSPERGER

1:18-cv-05391-SCJ

---

# JANET THORNTON PH.D

*May 22, 2020*

---



800.211.DEPO (3376)
EsquireSolutions.com

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3    FAIR FIGHT ACTION, INC.; CARE IN
     ACTION, INC.; EBENEZER BAPTIST
4    CHURCH OF ATLANTA, GEORGIA, INC.;
     BACONTON MISSIONARY BAPTIST
5    CHURCH, INC.; VIRGINIA-HIGHLAND
     CHURCH, INC.; and THE SIXTH
6    EPISCOPAL DISTRICT, INC.,

7         Plaintiffs,                    CIVIL ACTION NO.:
                                         1:18-cv-05391-SCJ
8    vs.

9    BRAD RAFFENSPERGER, in his
     official capacity as Secretary
10   of State of the State of
     Georgia and as Chair of the
11   State Election Board of Georgia;
     REBECCA N. SULLIVAN, DAVID J.
12   WORLEY, and SETH HARP, in their
     official capacities as members
13   of the STATE ELECTION BOARD;
     and STATE ELECTION BOARD,

14
          Defendants.
15   _____/

16

17          VIDEOTAPED VIDEOCONFERENCE DEPOSITION
                  OF JANET THORNTON, Ph.D.
18      Appearing Remotely Via Videoconference from
          Leon County, Tallahassee, Florida 32308
19
              Taken By Counsel for Plaintiffs
20                   (Pages 1-93)

21
                  Friday, May 22, 2020
22             10:03 a.m. - 2:11 p.m.

23
                     HELD REMOTELY
24               VIA VIDEOCONFERENCE

25



```
 1   Stenographically Reported By:
     Jennifer Figueroa, RPR, CLR, FPR
 2   Notary Public, State of Florida at Large
     Appearing Remotely from Hillsborough County, Florida
 3   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
 4   Esquire Job No. J5562519

 5

 6
     APPEARANCES:
 7
          ELIZABETH EDMONDSON, ESQUIRE
 8        TASSITY JOHNSON, ESQUIRE
          Jenner & Block LLP
 9        919 3rd Avenue
          New York, New York 20022
10        212.891.1600
          eedmondson@jenner.com
11        tjohnson@jenner.com

12        - AND -

13        LESLIE J. BRYAN, ESQUIRE
          Lawrence & Bundy LLC
14        1180 West Peachtree Street
          Suite 1650
15        Atlanta, Georgia 30309
          404.400.3350
16        leslie.bryan@lawrencebundy.com

17             On Behalf of the Plaintiffs

18

19        JOSHUA BARRETT BELINFANTE, ESQUIRE
          Robbins Ross Alloy Belinfante Littlefield, LLC
20        500 Fourteenth Street N.W.
          Atlanta, Georgia 30318
21        678.701.9381
          jbelinfante@robbinsfirm.com
22
               On Behalf of the Defendants
23

24   ALSO PRESENT:

25        GEORGE ELLIS, VIDEOGRAPHER
```



```
 1                          I N D E X

 2                                                        PAGE

 3   Direct Examination by Ms. Edmondson                     6

 4   Errata Sheets                                        87-91

 5   Certificate of Reporter                                92

 6   Certificate of Oath                                    93

 7

 8

 9

10

11                          EXHIBITS

12   NO.                  DESCRIPTION                      PAGE

13   Exhibit 1     Rebuttal Report of Janet R.
                   Thornton, Ph.D., re: instant
14                 case; dated 3/24/2020                     9

15   Exhibit 2     Second Rebuttal Report of
                   Janet R. Thornton, Ph.D.,
16                 re: instant case; dated
                   4/30/2020                               26
17
     Exhibit 3     Expert Report of Michael C. Herron
18                 re: instant case; dated 2/18/2020       31

19   Exhibit 4     Supplemental Expert Report of
                   Michael C. Herron re: instant
20                 case; dated 4/8/2020                    80

21

22

23

24

25
```



 1          Videoconference deposition taken before

 2   Jennifer Figueroa, Registered Professional Reporter and

 3   Notary Public in and for the State of Florida at Large,

 4   in the above cause.

 5                  *    *    *    *    *

 6          THE VIDEOGRAPHER:  I will now start the

 7      recording.  We are now on the record.  The time is

 8      now 10:03 a.m. Eastern Standard Time on May 22nd,

 9      2020.  This begins the videoconference deposition

10      of Dr. Janet Thornton taken in the matter of Fair

11      Fight Action, Incorporated, et al., versus Brad

12      Raffensperger, et al., filed in the United States

13      District Court for the Northern Division [sic] of

14      Georgia, Atlanta Division, case number which is

15      1:18-cv-05391-SCJ.

16          My name is George Ellis.  I'm your remote

17      videographer today.  The court reporter is Jennifer

18      Figueroa.  We are representing Esquire Deposition

19      Solutions.  As a courtesy will everyone who is not

20      speaking please mute your audio and please remember

21      to unmute your audio when you are ready to speak.

22          Counsel, will you please state your name and

23      who you represent, after which the court reporter

24      will swear in the witness.

25          MS. EDMONDSON:  Elizabeth Edmondson of



```
 1   Jenner & Block for plaintiffs.

 2        MS. JOHNSON:  Tassity Johnson of

 3   Jenner & Block for plaintiffs.

 4        MS. BRYAN:  This is Leslie Bryan,

 5   Lawrence & Bundy for plaintiffs.

 6        MR. BELINFANTE:  This is Josh Belinfante of

 7   the Robbins firm for defendants.

 8        THE COURT REPORTER:  Okay.  The attorneys

 9   participating in this deposition acknowledge that

10   I, the court reporter, am not present with the

11   witness and that I will be reporting the

12   proceedings and administering the oath remotely.

13   This arrangement is pursuant to the Florida Supreme

14   Court Administrative Order No. AOSC20-23.  The

15   parties and their counsel consent to this

16   arrangement and waive any objection to this manner

17   of reporting.

18        Please indicate your agreement by stating your

19   name and your agreement on the record, starting

20   with plaintiffs' counsel.

21        MS. EDMONDSON:  Elizabeth Edmondson.  I agree.

22        MS. JOHNSON:  Tassity Johnson.  I agree.

23        MR. BRYAN:  Leslie Bryan.  I agree.

24        MR. BELINFANTE:  Josh Belinfante.  I agree.

25        THE COURT REPORTER:  Okay.  Dr. Thornton,
```



 1          could you please raise your right hand for me?

 2              Do you swear or affirm that the testimony

 3          you're about to give will be the truth, the whole

 4          truth, and nothing but the truth?

 5              THE WITNESS:  Yes.

 6              THE COURT REPORTER:  And I just want to make

 7          sure you are currently located at Tallahassee,

 8          Florida, with a ZIP code of 32308?

 9              THE WITNESS:  Yes.

10              THE COURT REPORTER:  Thank you.

11              Ms. Edmondson, you may proceed.

12     THEREUPON,

13                      JANET THORNTON, Ph.D.,

14     having been first duly sworn or affirmed, was examined

15     and testified as follows:

16                      DIRECT EXAMINATION

17     BY MS. EDMONDSON:

18          Q.   Good morning, Dr. Thornton.

19          A.   Good morning.

20          Q.   Dr. Thornton, you've been deposed before.

21     Correct?

22          A.   Yes.

23          Q.   Approximately how many times?

24          A.   I don't know.

25          Q.   Have you ever done this over video before?



1    A.   No.

2    Q.   So that is a first.  So while I'm sure you're

3  familiar with the procedures for being deposed, I'm

4  going to focus on a few that may be particularly

5  relevant today.  Of course the court reporter can only

6  take down verbal answers and the court reporter can only

7  hear one person at a time.  So we'll need to make sure

8  not to talk over each other.  Understood?

9    A.   Yes.

10    Q.   And that's going to be especially challenging

11  since we're doing this in this very bizarre remote

12  setup.

13         Of course your attorney, Mr. Belinfante, may

14  object to one of my questions.  So please give him a

15  chance to interpose an objection before responding;

16  unless he instructs you not to answer, however, please

17  go ahead and answer the question afterwards.

18  Understood?

19    A.   Yes.

20    Q.   If you'd like to take a break at any moment,

21  please just let me know and we can go ahead and take a

22  break as long as a question is not pending, and we'll

23  plan to take a break about every hour or so.  Okay?

24    A.   Okay.

25    Q.   And if there's any question I ask that is



 1  confusing or vague or you just don't understand, please

 2  let me know, and I will try to clarify; but if you don't

 3  say anything, I will assume you understand the question.

 4          With that, Dr. Thornton, is there any reason

 5  you may not be able to testify truthfully and accurately

 6  today?

 7      A.   I don't believe so.

 8      Q.   How did you prepare for your deposition

 9  today?

10      A.   I reviewed my reports.

11      Q.   Only your reports or any other documents?

12      A.   I reviewed Dr. Herron's reports in parts -- in

13  part.

14      Q.   And did you meet with attorneys for defendants

15  to prepare for this deposition?

16      A.   I did not meet with them.  I had a brief -- I

17  had a phone call.

18      Q.   I should have realized nobody's meeting with

19  anybody at this point.

20          Okay.  I'm going to ask you a few questions

21  about your educational and professional background.  I'm

22  not going to go into your educational background in any

23  detail, but if you'd like to have your CV in front of

24  you, which I think may be what you're doing right now,

25  we can go ahead and mark your report, your rebuttal

 1  report, as Exhibit 1, and your CV is at Appendix A.
 2           (Exhibit 1 will be marked for identification
 3       and attached to the transcript once received by the
 4       reporter.)
 5  BY MS. EDMONDSON:
 6       Q.   I take it you prepared this report, this
 7  Exhibit 1?
 8       A.   Yes.
 9       Q.   Who assisted you in preparing it, if anyone?
10       A.   Dr. Carrie Amidon, and an analyst, Michael
11  Testa, both of whom worked under my direction.
12       Q.   And you're currently a managing director at
13  Berkeley Research Group.  Correct?
14       A.   Yes.
15       Q.   And are the two people you mentioned,
16  Dr. Amidon and Mr. Testa, also at Berkeley Research
17  Group?
18       A.   Yes.
19       Q.   At a high level can you tell us what is the
20  focus of your work at BRG?
21       A.   I manage projects.  I compare statistical
22  analyses and manage a group of people who work under my
23  direction in preparing various analyses on numerous
24  different projects.
25       Q.   And would it be fair to say a focus of your



1   work at BRG is labor and employment issues?

2        A.   That is one of them, yes.

3        Q.   And was that also the case at ERS Group where

4   you were employed previously?

5        A.   Yes.

6        Q.   And can you tell us what the other primary

7   focus is of your work in terms of subject matter or

8   industry are besides labor and employment?

9        A.   I worked on a number of matters involving

10  credit and lending, and I have prepared various analyses

11  involving questions involving voting rights.  There may

12  be some other areas, but those would be some of the

13  primary areas.

14       Q.   And your resume states that as far as labor

15  and employment goes you have prepared economic and

16  statistical analyses involving employment discrimination

17  claims.  Can you elaborate a little bit on what those

18  statistical analyses might entail?

19       A.   Sure.  So I'm asked to, for example, conduct

20  analyses that look at questions of equal pay regarding

21  gender, and race and ethnicity among other demographic

22  groups; both in terms of questions that are raised in

23  terms of compensation, discrimination where it's

24  litigation, as well as I'm retained by companies to --

25  and other entities to analyze their compensation



1    decisions to determine if there are disparities among

2    various groups so they can then investigate.

3            In addition I've been asked to examine -- you

4    know, more recently I've been asked to analyze

5    termination and reduction in force and furloughs for

6    organizations given the current economic climate.  And

7    additionally both in terms of proactively as well as in

8    terms of involving litigation or other inquiries,

9    questions on claims of hiring, promotion, as well as

10   termination decisions.  So I'm looking at decisions and

11   constructing analyses to determine whether or not

12   there's disparate impact with respect to a particular

13   group after controlling all those factors.

14       Q.   So setting aside your consulting work for

15   companies and focusing only on the work that's been in a

16   litigation context, have you ever provided an analysis

17   of the type you've described for a plaintiff bringing an

18   employment discrimination claim?

19       A.   Yes.

20       Q.   On approximately how many occasions,

21   ballpark?

22       A.   I don't know.

23       Q.   Do you think it would be more than 5?

24       A.   There's probably a good chance of that.

25       Q.   More than 20?



1        A.    Probably not.

2        Q.    And have you provided an analysis of this type

3    for a defendant defending against an employment

4    discrimination claim?

5        A.    I've been retained by defendants in these

6    sorts of claims, yes.

7        Q.    And on how many -- approximately how many

8    occasions?

9        A.    I don't know.

10       Q.    Again, do you think it's more than 5?

11       A.    Probably, yes.

12       Q.    But less than 20?

13       A.    I don't know because sometimes one is retained

14   but it doesn't involve testimony.

15       Q.    Understood.  I'm asking about times where it's

16   in the context of a litigation even if it doesn't

17   ultimately result in testimony.

18       A.    I don't know.  Going back through my career, I

19   don't know how many times I've been retained.

20       Q.    Okay.

21       A.    By either party, for that matter.

22       Q.    Okay.  Now I'd like to turn to the work you've

23   done on voting-rights issues, which is another category

24   you mentioned.  In terms of the time you spend, about

25   how much of your work at BRG is focused on voting-rights



 1  issues in one way or another?

 2       A.   I don't know.  There are months where I'm not

 3  working on voting-rights matters and other months where

 4  it's a larger percentage.  It varies month to month.

 5       Q.   Would you say that it's a smaller percentage

 6  of your work than the employment-discrimination

 7  issues?

 8       A.   It would depend on the period of time.  Since

 9  coming to BRG there have been times when it's been a

10  larger portion, you know, over 50 percent; and other

11  times not.  This is a difficult question to answer.

12       Q.   Sure.  I understand.

13            And then the other category you mentioned was

14  analyses dealing with credit and lending.  Would you say

15  that that is more or less than the time you spend on

16  voting-rights issues?

17       A.   Currently less.

18       Q.   Okay.  And your resume mentions that you have

19  previously provided expert testimony on voting-rights

20  issues.  Have you published any papers on voting-rights

21  issues?

22       A.   No.

23       Q.   Have you given any academic presentations on

24  voting-rights issues?

25       A.   I don't believe so.



1        Q.   Have you served as a paid or unpaid consultant

2    outside of a litigation context on any voting-rights

3    issues in any capacity?

4        A.   No.

5        Q.   Have you ever given any training or other more

6    practical instruction on voting-rights issues?

7        A.   No.

8        Q.   And your resume references that your previous

9    testimony on voting-rights issues included analysis of

10   voter ID match rates and voting patterns among

11   demographic groups.  Are there other voting-rights

12   issues that you have provided testimony on?

13            THE WITNESS:  I believe my video is freezing

14       up.

15            MS. EDMONDSON:  It looks that way to me too.

16       Should we go off the record for a moment?

17            THE WITNESS:  I don't know what I'm supposed

18       to do.

19            THE COURT REPORTER:  Would you like to go off

20       the record, Counsel?

21            THE VIDEOGRAPHER:  Off the record.  The time

22       is 10:18.

23            (Recess from 10:18 a.m. to 10:33 a.m.)

24            THE VIDEOGRAPHER:  We are back on the record.

25       The time is 10:33.



1  BY MS. EDMONDSON:

2      Q.   Dr. Thornton, you can set aside the CV part of

3  your report for now because now I'd like to switch to

4  asking you about your findings.

5           In Paragraph 17 of your report you stated that

6  you were asked -- I'll let you turn to that page.  You

7  stated that you were asked by counsel for the State to

8  review the report of plaintiffs' expert, Dr. Herron, to

9  determine if his assertions regarding the closures and

10  movement of polling places adversely impacted

11  African-American voters.  That statement appears to be

12  missing a word.  Is it fair to say that you were asked

13  to determine if his assertions were accurate?

14      A.   I believe so.

15      Q.   And did counsel for the State ask you to do

16  any -- to opine on any other topics?

17      A.   No.  They asked me to review his report

18  calculation.

19      Q.   In Paragraph 18 you also talk about your

20  understanding of certain of the allegations in the

21  complaint in this matter.  Did you undertake in your

22  report to analyze the accuracy of these allegations in

23  the complaint referenced in Paragraph 18?

24      A.   Only to the extent that I was -- to some

25  extent -- the allegation that I describe in Paragraph 18



 1  is to some extent addressed in my review of Dr. Herron's

 2  report.

 3      Q.   And as part of your work in this matter did

 4  you review the entirety of the complaint?

 5      A.   I likely did back when I received it.

 6      Q.   In Paragraph 19 you provide a summary of key

 7  findings, I think there are 10 of them.  Were there any

 8  other findings, less key, I suppose, that you made as a

 9  result of your review of Dr. Herron's report?

10      A.   As I recall what I described here is -- are

11  the key findings.  There could be more in-depth or

12  subfindings within these, but these were the -- but they

13  would perhaps fall in through these.

14           THE COURT REPORTER:  Doctor, could you please

15      speak up a little bit?  I'm having a hard time

16      hearing you.

17           THE WITNESS:  Sure.

18           THE COURT REPORTER:  Thank you.

19           THE WITNESS:  Sure.  I apologize.  I'm moving

20      my phone.

21           THE COURT REPORTER:  Thank you.

22  BY MS. EDMONDSON:

23      Q.   And is it fair to say to the extent you have

24  subfindings those are also included in either your

25  original report or your supplemental report?



1        A.   I think so.  You know, when I looked at the

2   data, when I look at the results, the underlying

3   information, there are pieces that I may not have

4   described but they would fall under the category.  So I

5   may -- I could have perhaps elaborated more; but in

6   general they're there, but I could perhaps have

7   described in more detail.

8        Q.   And were there any analyses that you undertook

9   that did not lead to any findings?  So separate analyses

10  from those described in your report?

11       A.   No, other than reviewing -- you know,

12  reviewing the underlying information that fed into these

13  calculations.  So there could have been something more

14  county-specific that I would have looked at, but would

15  not change my findings.  They would perhaps elaborate on

16  them.

17       Q.   But there are no extra tables or graphs or

18  anything else you created but did not end up using in

19  your report.  Is that correct?

20       A.   Not that I recall.

21       Q.   Okay.  If you would turn to Appendix B of your

22  report which is on Page 29 of the PDF in my version, so

23  at the very, very end, this is your list of materials

24  relied upon.  Did you rely on any other materials, such

25  as data or studies, other than those listed here?



1      A.    I don't believe so.   The only question I

2   cannot recall is Dr. Herron relied on numerous data

3   sets, and I cannot recall if he produced those data sets

4   or once we received his report and we saw that there

5   were data sets that he did not provide, we may have

6   requested those; but otherwise, there would not have

7   been anything additional.   They would have been

8   presumably the same databases that he used because we,

9   of course, ran his programs to see if we could match up

10   his table.

11      Q.    And following up on that if you turn back to

12   Paragraph 20 of the body of your report, and I'll let

13   you turn back, you state that you "relied upon the

14   programming logic that Dr. Herron produced on March 4th,

15   2020.   His code was modified in order to generate his

16   summary results by county as reported below."

17          Can you just describe for us in a little more

18   detail what you did with the code, how you modified it

19   in order to provide the results on a county-level basis?

20      A.    Sure.   So we're obviously running the code on

21   our computers rather than Dr. Herron's computer or his

22   analyst, so we would have needed to modify his logic to

23   run the code on our database.   Additionally, when we ran

24   his code, as I recall, there were a few fields that he

25   had truncated.   So we would have, you know, modified the

 1  code to, you know, read in the data properly.  There

 2  were also a few files that he did not produce.  It ended

 3  up that those files were not necessary to generate the

 4  table.

 5          So once we were able to run his code -- for

 6  example, for Table 3, we would have run his code and

 7  just verified we matched his percentages.  And then once

 8  we did that then we would have modified the code to

 9  include a -- where we're aggregating by county rather

10  than running it across county as he did.  So that would

11  have been in his -- our code, that's what we would have

12  done.

13      Q.   Do you recall now which fields were

14  truncated?

15      A.   As I recall it would have been in his SQL

16  code, and my recollection is they were code towards the

17  end of the code.  I don't remember offhand.  It's been a

18  while.

19      Q.   Sure.  Did the truncation of those fields

20  affect the conclusions he drew from the data?

21      A.   No.  As I recall they -- in terms of the

22  tables that we regenerated, it did not.  As I recall

23  what we were focusing on is whether we could match up

24  the percentages that he calculated.  I do recall in a

25  few instances there were a few number differences, small



 1   numbers, because we're talking about three -- let's say
 2   if we have 3 million registered voters, it could be off
 3   by a few, and that could have been due to the
 4   truncation.
 5          As I recall in his report he describes how
 6   there were 18 individuals with races that didn't make
 7   sense to him, and so he would have excluded them.  When
 8   we frequencied the data, it looked fine; but the key
 9   here is where the percentage is, did they match.  So
10   that was my focus.
11          So were there anomalies?  Yes.  Did it impact
12   the percentages?  No.
13      Q.   And so in -- after you modified the code you
14   were able to duplicate the percentages that Dr. Herron
15   had calculated.  Is that fair?
16      A.   That is correct.
17      Q.   Okay.  And did you personally modify the code
18   and reproduce the results that Dr. Herron had generated
19   or was that someone working under you?
20      A.   It was not me.  It was someone who worked
21   under my direction.
22      Q.   But you felt comfortable with the process they
23   used and embraced their results, I take it?
24      A.   I looked at the code before -- I looked at the
25   code and the percentages and the numbers, and then



 1  similarly when he modified it by county, again, making
 2  sure that an aggregate count matched.
 3      Q.   We can turn to Section II of your report which
 4  is still on Page 6.  Excuse me.  I have a table that is
 5  too small for what I am trying to put on it.
 6           Dr. Thornton, one of your critiques of
 7  Dr. Herron's report is that under Georgia Law Georgia
 8  counties and municipalities have the responsibility to
 9  determine the polling place within each district and to
10  make the changes of the polling places.  Is that
11  correct?
12      A.   Yes.  My critique is that he provided --
13  prepared -- relied upon aggregated outcome.
14      Q.    "Aggregated" meaning aggregated across
15  counties.  Is that accurate?
16      A.   Yes.
17      Q.   And how did you come to the understanding that
18  Georgia counties and municipalities have the
19  responsibilities to determine the polling places within
20  each precinct?  What are you relying upon for that?
21      A.   When I reviewed his report, based on my
22  understanding in general, I thought it was odd the way
23  he aggregated.  And I asked counsel if there was a
24  statute delineating how polling places are determined,
25  and I requested it.



1      Q.    And counsel provided that statute to you?

2      A.    Yes.

3      Q.    And that's the statute referenced in the

4   report, 21-2-265.  Correct?

5      A.    Yes.  It's referenced in the materials relied

6   upon, uh-huh.

7      Q.    You aren't a lawyer.  Correct?

8      A.    No.

9      Q.    You've read the statute though?

10     A.    Yes.

11     Q.    Have you read to see if there are judicial

12   opinions interpreting the statute?

13     A.    No.

14     Q.    And so you're not aware of, for example,

15   whether under Georgia law or federal or constitutional

16   election law there might be exceptions to the statute.

17   Correct?

18          MR. BELINFANTE:  Object to the form.

19          You can answer.

20     A.    I don't know one way or another.

21   BY MS. EDMONDSON:

22     Q.    So you don't have an expert opinion --

23   correct? -- that county officials have unfettered

24   authority to make decisions about polling place

25   locations.  Correct?



1          MR. BELINFANTE:  Object to the form.

2      A.   I am -- based on -- based on my analysis in

3  terms of my understanding of the statute and the

4  variation by county in these outcomes.

5  BY MS. EDMONDSON:

6      Q.   So, Dr. Thornton, is it your opinion that

7  given this statute there could be no meaningful analysis

8  of racial discrepancies and polling place closures at

9  the state level?

10     A.   My -- based on my review, it's my opinion that

11 a county-by-county analysis is more useful, more

12 instructive than an overall aggregated outcome; and

13 regardless of a statute, you see tremendous variation

14 from one county to another.

15     Q.   So to be clear, even if -- setting the statute

16 aside, you review a statewide analysis here as not

17 useful because of the variation between counties.  Is

18 that correct?

19     A.   I think it's a combination.  One, you have a

20 statute; and two, looking at the data and looking at the

21 variation, there is a substantial variation from county

22 to county.  So in statistics when you aggregate outcomes

23 where you have a lot of variation, you can have a

24 misleading outcome and that's what we have here.

25     Q.   In statistics are there tools where you have a



1   great deal of variation in the data to reduce the

2   possibility of a misleading outcome?

3        A.   There are ways that you can account for the

4   variation, if that's your question, and that's what I

5   talk about in my report or write about in my report, and

6   in terms of accounting for the variation by county.

7        Q.   So it's not the case that you have to just

8   throw up your hands and say that there's no useful

9   analysis that could be done at the statewide level?

10       A.   Well, I think in a sense you can look at it by

11  county and then provide statistics that describe the

12  outcomes by county, which is what I've done.  So does

13  that give you a statewide look but adjusted for county?

14  Yes, it does.  Are there other statistical techniques in

15  terms of inferential statistics, which we don't have

16  here.  Dr. Herron hasn't produced inferential

17  statistics.  He's provided descriptive statistics.  And

18  so as a consequence in reviewing those descriptive

19  statistics what I have done is looked at it by county

20  and then prepared summary statistics that adjust for the

21  county.

22       Q.   To be clear, though, you haven't reproduced

23  Dr. Herron's analysis -- each of Dr. Herron's analysis

24  at the state -- at the county-level for each county.

25  Correct?  You've looked at a few counties here and there



1    on an anecdotal basis?

2         A.    Actually, that's not correct.  So, for

3    example, at Table 3 and at Table 4 I looked at it county

4    by county, and then I summarized what those findings

5    showed.

6         Q.    Can you point me to the page of your report

7    that you're referring to for Table 3 and Table 4?

8         A.    On Page 13.

9         Q.    I see.  You're referring to Dr. Herron's

10   Table 3, not your own Table 3.  Is that correct?

11        A.    That's correct.

12        Q.    I see.  So you've summarized what the overall

13   count of counties is that fall in one category versus

14   another, but you haven't provided a table listing all of

15   the counties and the results of each county.  Is that

16   fair?

17        A.    That -- I did not reproduce that, but it is

18   in -- when one runs the --

19             THE COURT REPORTER:  I'm sorry, but it is

20        in -- I'm sorry, Doctor.  "But it is in" -- what

21        did you say?  "One one"?

22        A.    What I said is that I did not provide that

23   table as an attachment to the report.  When one runs

24   Dr. Herron's code by county we produce an Excel file,

25   just like he does, with those county-by-county results



 1  and it's from those that we then summarize in Paragraph
 2  3.
 3  BY MS. EDMONDSON:
 4      Q.   While we're on the topic of county-level
 5  decision-making I wanted to look at a paragraph in your
 6  rebuttal report for a moment, if you have that handy.
 7          MS. EDMONDSON:  So let's mark that as Exhibit
 8      2 for the record.
 9          (Exhibit 2 will be marked for identification
10      and attached to the transcript once received by the
11      reporter.)
12  BY MS. EDMONDSON:
13      Q.   For the formalities here, Exhibit 2 is a
14  report that you prepared.  Correct?
15      A.   Yes.
16      Q.   With the assistance of others at BRG who are
17  working under your supervision.  Correct?
18      A.   That's correct.
19      Q.   Okay.  If you look at Paragraph 6 and 7,
20  excuse me, at the beginning of Paragraph 7 you state
21  that "Dr. Herron ignores the racial and partisan makeup
22  of each of the county boards of elections involved in
23  the decisions to move or close polling places."
24          Can you elaborate on the relevance in your
25  view of the partisan makeup of county boards of



 1  elections to your analysis?

 2       A.   Well, in Dr. Herron's report he provides us

 3  monolithic statistics across counties.  He doesn't

 4  adjust for the decision-making of the boards of

 5  elections that then result in closures of polling

 6  places, changes in polling places, increasing in polling

 7  places, and it's those individuals who are making the

 8  decisions.  So Dr. Herron is looking at it as a

 9  monolithic statistic without making any kind of an

10  adjustment for those decisions that obviously results in

11  the outcomes that he is analyzing.

12            So there's no -- essentially what I'm saying

13  is there's no control for county.

14       Q.   And looking just at a specific county, if

15  we're just looking at one county, how would the partisan

16  makeup of a county board of elections affect your

17  analysis of that county's decision-making?  What would

18  you do to adjust -- how would you use that information

19  of the partisan makeup to adjust the results or adjust

20  your analysis?

21       A.   But my statement here is a description of a

22  few examples when I looked at a number of the websites

23  to see that -- what was happening; and my point is that,

24  again, Dr. Herron is looking at it as a monolithic

25  statistic without making an adjustment.  So my point is



1  in this description is you have each county making these

2  decisions and in a vacuum of just aggregating it all up

3  you're ignoring those decisions.

4          So my point is that the decision-makers may be

5  basically a equal percentage of the different parties.

6  So again in that light it comes back to what were the

7  reasons for a closure increasing the polling placing or

8  making no changes to the polling places.  And so those

9  are the decision-makers.

10      Q.   And so is it your view that if a county

11  commission is bipartisan then it's impossible that there

12  is a racially disparate impact in the closing of polling

13  places?

14      A.   No, that's not what I'm saying.  I'm saying

15  that these are the decision-makers and so one needs to

16  look at what were the reasons for a closure or a move or

17  an increase in the number of polling places, and these

18  are the decision-makers.

19          So you could have an outcome with equal

20  representation and you may or may not have -- and here I

21  want to be clear, disparate impact is not being

22  measured.  There are no statistical tests, no

23  inferences, but you could have a difference in a

24  proportion.

25          And so in that instance the question is, well,



1    why?  Why is there a difference?  Is it because there

2    needed to be more polling places in particular areas

3    because of population increases?  Was there a decrease

4    in the population?  What are the reasons?  A site that

5    no longer existed?  I described some of them in my

6    report and without learning that information one would

7    not know if you have a difference in the percentage, if

8    it is -- race is what Dr. Herron measures or is it

9    something else?

10        Q.   And is it fair, then, that your focus was

11   looking at the reason, whether -- excuse me.  Withdrawn.

12   Let me restart the question.

13        Is it fair then that your focus was in

14   considering whether race was explicitly a reason why

15   counties chose to close particular polling places?

16        MR. BELINFANTE:  Object to form.

17        A.   What -- what I am looking at is that

18   Dr. Herron provided statistics generally that are across

19   county, a monolithic set of statistics, and the only

20   factor that he's measuring is race.  And what I am

21   looking at is, is there potential for there being

22   factors that could be correlated with race and it is

23   both factors and then not race as he's measured it.  So

24   when I say he hasn't adjusted, he hasn't adjusted for

25   any factors.  He has just looked at generally statewide



 1  statistics and looked at race.

 2          MS. EDMONDSON:  So let's go off the record for

 3      a moment.

 4          MR. BELINFANTE:  Okay.

 5          THE VIDEOGRAPHER:  Off the record.  The time

 6      is 11:03.

 7          (Recess from 11:03 a.m. to 11:11 a.m.)

 8          THE VIDEOGRAPHER:  We are back on the record.

 9      The time is 11:11.

10  BY MS. EDMONDSON:

11      Q.  Dr. Herron [sic], if you could turn to Section

12  II of your report, Paragraphs 21 and 22; and I'm going

13  to look in particular at Paragraph 22, but feel free to

14  take a moment to read those over to yourself.  I know

15  it's been a while since you wrote them.

16          So in Paragraph 22 you state that "While

17  Dr. Herron depicts variation from county to county, he

18  does not provide by county the equivalent of his overall

19  state statistics that form the basis of his

20  conclusions."  And then at the end of the paragraph you

21  say, "As a consequence, Dr. Herron has mis-leadingly

22  masked these county differences through his use of

23  state-wide statistics."

24          And one of the examples you give of

25  information that was misleadingly masked was that



1  between 2014 and 2018, 36 percent of the counties did

2  not close polling places.  And I think you may have

3  anticipated where I am going.  Are you getting

4  Dr. Herron's report?

5       A.   Well, actually, I thought you were asking me

6  about Exhibit 2 so I'm catching up with you.  I

7  apologize.

8       Q.   Oh, I'm sorry.  Take a moment then, please.

9  I'm sorry.  I'm back on Exhibit 1.  Take your time.  So

10  I was asking about Paragraphs 21 and 22 in Exhibit 1.

11       A.   Okay.

12       Q.   So to recap, one of the county differences

13  that you say was "mis-leadingly masked" by Dr. Herron's

14  analysis is that between 2014 and 2018 36 percent of the

15  counties did not close polling places.  Do you see that

16  in Paragraph 22?

17       A.   Yes.

18            MS. EDMONDSON:  Okay.  So now if we can mark

19       Dr. Herron's report as Exhibit 3, Dr. Herron's

20       first report.

21            (Exhibit 3 will be marked for identification

22       and attached to the transcript once received by the

23       reporter.)

24  BY MS. EDMONDSON:

25       Q.   Dr. Horton, I'll ask you to confirm that this




1   is the report from Dr. Herron that you reviewed?

2       A.   Yes.

3       Q.   Okay.  If you could turn to Paragraph 115 of

4   his report.  Are you there?

5       A.   I did -- I am.

6       Q.   And if you'll see there, Dr. Herron notes that

7   58 counties in the state did not close any polling

8   places between the 2014 and 2018 election.  Is it fair

9   to say that those 58 counties are the 36 percent of the

10  159 counties that you referenced in your report?

11      A.   Yes.

12      Q.   And so looking at this paragraph Dr. Herron

13  did not -- actually included that information in his

14  report.  Correct?

15      A.   Yes, he did; but the point of Paragraph 22 is

16  that when you look in detail at those overall statistics

17  you have, they're influenced by these counties that did

18  not close -- or did not make any changes.

19      Q.   But it is correct that Dr. Herron included in

20  his report the fact that 58 counties did not have any

21  changes -- excuse me, did not close any polling places

22  between 2014 and 2018.  Correct?

23      A.   He makes that point.  My Paragraph 22, the

24  first sentence says, "While Dr. Herron depicts variation

25  by county by county, he does not provide by county the



1  equivalent of his overall state statistics that form the

2  basis of his conclusions."  In other words, he doesn't

3  take the equivalent of the statewide and prepare them by

4  county.  So certainly he included the number without a

5  closure, but he does not provide, for example, Table 3

6  by county.  That's what I'm describing.

7       Q.   But he does include data by county for the

8  percentage of polling places closed; for example, if you

9  look at Figure 2 of his report, which is on the next

10  page.

11       A.   Again, what I am talking about here in

12  Paragraph 2 is that the overall state statistics that he

13  relies upon are looking at racial composition, racial

14  differences; and what I am describing here is he doesn't

15  provide those same statistics that are the focus of the

16  report and he asserts are the focus of his report county

17  by county.

18       Q.   But it's certainly possible to see from his

19  report that -- and not something he hid or masked or any

20  way -- that there's a great deal of variation between

21  counties and how many polling places they closed.

22  That's clear from his report.  Correct?

23       A.   He provides the polling places closed by

24  county, yes; but the purpose as I understand of his

25  report is to examine racial composition, that's the



1  focus.  And those same comparisons that he makes --

2  they're not "analyses," they're "comparisons" that he

3  makes -- that form his conclusions he does not provide

4  by county, and it's that overall aggregate outcome masks

5  the individual variation by county.  That's what I'm

6  describing.

7          And in my report I clearly state what he

8  provided by county, but he doesn't provide the same

9  statistics that he -- or comparisons that he provides by

10  race, and it's by failing to do that he's masking -- the

11  overall statistics mask what the individual counties

12  look like.

13     Q.  Going back to something you said there, I want

14  to make sure that we're using the same terminology.  I

15  think you mentioned something that you said it's not an

16  analysis, it's a comparison, and I may have been using

17  "analysis" as a layperson.  Does "analysis" have a

18  specific meaning to you that's different from its

19  ordinary meaning in normal conversation?

20          MR. BELINFANTE:  Object to form.

21     A.  When I use the word "analysis" I am generally

22  referring to statistical analyses from which you can

23  draw inferences.  These are -- what Dr. Herron generates

24  are descriptive statistics or descriptive comparisons,

25  they're not analyses.  You cannot draw statistical



1  inferences from Dr. Herron's comparisons.

2  BY MS. EDMONDSON:

3      Q.   Can you elaborate on why not for a moment?

4      A.   He did not provide a statistical test.

5      Q.   Okay.  I will try not to use the word

6  "analysis" then; but if I do, you can assume I mean it

7  in the general sense of analyzing something rather than

8  a statistical analysis in particular or at least clarify

9  what I mean by the question.  Okay?

10      A.   Okay.

11      Q.   If we go on to Paragraph 23 of your report,

12  your first report, Exhibit 1, you state that "Because

13  Dr. Herron does not examine the reasons for polling

14  place closures he has," quote, "'inflated' his

15  statistics regarding closure rates."  So I want to speak

16  for a moment about what you mean by "closure rates,"

17  what you understand a closure to be here.  And elsewhere

18  in your report you put closure in quotation marks, so I

19  want to understand what counts as a closure.

20          I take it that you're not arguing that places

21  like Meadowview Elementary that you highlighted in your

22  report were actually open and used for voting in the

23  2018 election.  Correct?

24      A.   That's correct, it was not one of the -- it

25  was not a polling place and it wasn't in existence then.



1    Q.    Okay.  So the reason it's a -- something might
2   be a "closure," in quotation marks, is not because you
3   have some suspicion that it didn't actually close or
4   become unavailable.  Is that correct?
5    A.    That's correct.  The reason for my use of the
6   word "closure" is I measured closure as Dr. Herron did.
7   He called that a "closure."  And as a consequence I put
8   it in quotes because to your point, it wasn't in
9   existence; and if a place isn't in existence to call it
10  a "closure," you know, it's really not a closure, it's
11  just not available.  And so because Dr. Herron called
12  these "closures," I used the quotation marks to
13  distinguish.
14   Q.    So if you had been undertaking this analysis
15  yourself in the first instance, what do you think would
16  be appropriate to categorize as a closure?  What would
17  count as sort of a true closure for the purposes of this
18  analysis?
19   A.    Well, as I recall there are 459, quote,
20  "closures" as Dr. Herron has measured; and for those I
21  would want to know for each the reason.  And as I stated
22  in my second report it would take more than a Google
23  search.  And so what I would want to know is, is it a
24  closure because it just doesn't exist?  Is it a closure
25  because it -- the site no longer wanted to serve as a

1    polling place?  I would want to know is it a closure
2    because the building exists but it can no longer
3    function?  For example, it may have deteriorated, it
4    isn't safe.  I would want to know for each what is the
5    reason.
6          And then from those determine -- for each of
7    those reasons is there -- is there a higher proportion,
8    for example, Caucasian or higher proportion African
9    American registered voters at each of those sites?  In
10   other words, what are the reasons for each and then what
11   is the racial makeup of those registered voters.  And
12   without knowing each of those reasons, I don't -- I
13   don't know the reasons, that's what I would want to know
14   so that you could then filter out what would have --
15   what is the -- to the extent there is a difference by
16   race, is it because of a particular reason or not.
17        Q.   So is it fair to say that the categories you
18   listed -- that a polling place might not exist; that it
19   might exist but no longer want to serve as a polling
20   place; or is dilapidated or unable to function as a
21   polling place -- that for your purposes those would be
22   irrelevant to the analysis of whether there was a
23   disparate racial -- I don't want to use the term
24   "disparate impact" because you alluded to it having a
25   specific meaning, but is that irrelevant to the decision

 1   of whether -- actually, I'm sorry.  Let me withdraw that

 2   whole question because I got myself a little tied up in

 3   knots there.

 4          My question is basically, if you remove those

 5   categories of polling places that are unavailable for

 6   one reason or another, would it be your intent only to

 7   look at the remaining polling places that were closed as

 8   a result of an entirely voluntary decision on the part

 9   of the county officials that those would be the only

10   relevant polling places to look at?

11      A.   I would want to know if there -- if it is

12   correlated with the racial makeup in terms of the

13   reason.  In terms of all the reasons, based on the list

14   that you've given, those are perhaps some of the reasons

15   that are basically out of the control of the county

16   board of elections.  There may be others that I don't --

17   am not aware of or haven't thought of, but if one wants

18   to know the decisioning, then I would want to

19   distinguish between those that are basically out of the

20   control of the county in terms of the closure -- I

21   should say, quote, "closure."

22      Q.   So if you were doing this in the first

23   instance, if I understand correctly, that you would look

24   at each category of reason for closure as best as you

25   could figure it out, and then look at the racial impact



```
 1    for each of those categories or the racial makeup for
 2    each of those categories.  Is that fair?
 3         A.   Yes, and I'd want to do it by county because
 4    the racial makeup of each county is different.
 5         Q.   If you were going to do that analysis how
 6    would you undertake to see whether a particular county's
 7    stated reason for closure might be pretextual?  For
 8    example, would you have any concern that a county might
 9    take a position that a polling place was dilapidated
10    even though it could perhaps still serve as a polling
11    place?
12              MR. BELINFANTE:  Object to the form.
13         A.   I don't -- I would want to just first look to
14    see what the statistics showed to see if what the racial
15    differences are by county within each of those
16    categories.
17    BY MS. EDMONDSON:
18         Q.   So when you say that Dr. Herron's statistics
19    regarding quote/unquote "closure rates" are inflated, is
20    it fair to say that you're not disagreeing with his
21    calculation of closure rates given the definition of
22    closure that he's using?  You agree with that given his
23    definition of closure?
24         A.   Based on his definition of closure that
25    includes sites that no longer existed or could no longer
```



1   serve for various reasons, he's calculated 459; but in
2   terms of what one would think of as a "closure," meaning
3   you have a site and the decision is made "we're no
4   longer going to use it," and there isn't a reason that
5   I, for example, described amongst those, then it would
6   be -- the 459 would be inflated, and therefore the rate
7   would be inflated.
8       Q.   So is it fair to say you don't disagree that
9   there are 459 closures under his definition of
10  "closure."  Correct?
11      A.   As best I -- as best I recall.
12      Q.   But your contention instead is that he's using
13  the wrong definition of "closure" for any kind of legal
14  relevance here.  Is that fair?
15      A.   Well, I'm not an attorney, but in terms of
16  from a usefulness of a statistic -- and here we're
17  looking at -- or what he is looking at is an overall
18  statistic -- to the extent that he is including sites
19  that were closed that are outside of the control of the
20  county board of elections, then I don't know how useful
21  those statistics are.
22      Q.   How useful they are to determine what?
23      A.   How useful they are to determine, based on his
24  overall statistics or on a county bilevel, whether or
25  not there is a difference in -- by race as he's



 1  | calculated it.
 2  |      Q.   I think a minute ago you posited that there
 3  | might be correlations on the basis of race for some of
 4  | the other categories why a polling place might be
 5  | closed; for example, that it might not exist.  Is that
 6  | fair?
 7  |      A.   I think I would describe it differently.
 8  |      Q.   That's fine.
 9  |      A.   What I said is that what we don't know is if
10  | the -- if the reasons for closures, if there's variation
11  | by race in the reasons, we don't know.  To the extent
12  | that there is a different by race and the reasons within
13  | a county, then the question then becomes if you
14  | controlled for those reasons would you then have a race
15  | effect.
16  |           So in Dr. Herron's analyses -- and I'm using
17  | your word "analysis" -- in his comparisons he's looking
18  | at all 459 closures and asking the question, "Is there a
19  | difference?"  He's not filtering out, "Is it race?" as
20  | he's measured it, or "Is it something correlated with
21  | race?" and we don't know that.  And he's making the
22  | assumption in a second report as he recalled -- if I
23  | recall, he's assuming that it's uniform by race, but he
24  | hasn't tested that.  And so as a researcher one would
25  | want to know in terms of the distributions that he's



 1  calculated is it race or is it something correlated with

 2  race.

 3      Q.   So in looking at the -- you give three

 4  examples of polling places that existed in 2014 but were

 5  torn down or otherwise unavailable to serve as polling

 6  sites; that's at 24 to 2016 of your report.  Sorry, 24

 7  to 26, pardon me.

 8          How did you locate these three examples that

 9  you've included in your report?

10      A.   Well, I make clear that -- or if -- this isn't

11  a scientific sample.  I wanted to illustrate his

12  definition of "closure," what, you know, it included.

13  So I focused on Fulton and DeKalb County.  You have -- I

14  believe as I recall those were the counties with the

15  most closures.

16          So I just asked an analyst to go and look at

17  Google in the maps and just see if there were places in

18  a county that were polling places that were closed where

19  you could clearly see that they were demolished.  I

20  said, "Just look to see if you can find a couple of them

21  to illustrate the point."  It was by no means to be a

22  survey or a statistical sampling.  Given the small

23  numbers of polling places within a county, closures, to

24  do a scientific sample in all likelihood you'd actually

25  have to sample all 459.  If you wanted to have a

1  scientific study or sampling, as Dr. Herron alludes to,

2  you need to do a stratified sample and the numbers are

3  just so small you'd have to find out the reason for each

4  of the 459.

5            So to answer your question, I focused on those

6  two counties because I knew there would be quite a few,

7  I knew the numbers, and just asked the researcher to see

8  if they could find a few to illustrate the point.

9      Q.    And because it was an illustration you didn't

10  ask the researcher, I take it, to also include examples

11  where the researcher couldn't locate any alternative

12  reason why the polling place became unavailable.

13  Correct?

14     A.    There's no way to find that out through Google

15  search, maybe Google Maps.  All we could do is look to

16  see, "Is this a place?  Is it there?  Is it open?"

17     Q.    Okay.

18     A.    You can't find through Google Maps each of the

19  reasons.

20     Q.    Just circling back for a moment, in your focus

21  on the decision-making of the counties, is it fair to

22  say that by -- that your focus is whether the decision

23  to close a polling place could have been motivated by

24  racial animus on the part of the county officials

25  charged with making the decisions?



1        A.   Well, Dr. Herron's comparisons are examining

2   race across the state and in those statistics he's

3   including closures that are outside of the control of

4   the county boards of election.  So a more appropriate

5   analysis is to determine after controlling for the

6   factors -- you know, determining what the factors are

7   for each, and then determining is there a race effect as

8   he has measured it by county.

9        MS. EDMONDSON:  Can I ask the court reporter

10        to read back that response, please?

11        THE COURT REPORTER:  Yes, ma'am.

12        "Answer:  Well, Dr. Herron's comparisons are

13        examining race across the state and in those

14        statistics he's including closures that are outside

15        of the control of the county boards of election.

16        So a more appropriate analysis is to determine

17        after controlling for the factors -- you know,

18        determining what the factors are for each, and then

19        determining is there a race effect as he has

20        measured it by county."

21   BY MS. EDMONDSON:

22        Q.   Okay.  If you could go to Section III of your

23   report.  We're looking at Paragraph 27.  I'm looking at

24   the third sentence, you see there, "Given that voter

25   participation for the 2016 presidential election was



1  higher than the 2018 mid-term election, it is likely

2  that voters whose polling place changed prior to the

3  2016 election and who then voted in 2016 would have

4  known of their new polling place at least two years

5  prior to the 2018 election."

6          So I take it from that sentence that you're of

7  the view that one reason why changes in polling places

8  might affect voter turnout is that voters might not know

9  of their new polling place before the election.

10 Correct?

11     A.   It's a possibility, yes.

12     Q.   Are there any other reasons why closing of

13 polling places might affect further turnout?

14     A.   I don't know all the reasons for voter

15 turnout.  Could you ask me the question again?

16     Q.   Sure.  Is there any reason why closing a

17 polling place -- sorry.  Withdrawn.

18          You mentioned one reason why closing a polling

19 place might affect voter turnout, which is that voters

20 might not know where to go on election day.  What I am

21 asking is whether you can think of any other reasons why

22 closing a polling place might affect voter turnout?

23     A.   Well, you could close a polling place or

24 move -- and then move it, which would be included among

25 Dr. Herron's reasons, and make it in a more convenient



1   place for registered voters and it could then perhaps

2   increase.  So, you know, again, there are reasons that

3   could increase or decrease voter turnout from a closure.

4        Q.   And conversely, if you were to close a polling

5   place and the new polling place was farther away, that

6   might decrease the likelihood that a particular voter

7   might show up to vote on election day.  Is that fair?

8        A.   May or may not.

9        Q.   Or if -- I'm sorry.  Go ahead.

10       A.   It could be further away, but in terms of

11   getting there, you know, ease of transportation, all of

12   those reasons that, you know, Dr. Herron didn't analyze,

13   I didn't look at it, there's a whole set of reasons that

14   could influence the location.  It could be better

15   parking, for example, could influence it.

16       Q.   So it's fair to say that there are a whole set

17   of reasons, other than not knowing where your new

18   polling place is, that could affect voter turnout from

19   closing a polling place; either increasing it as you're

20   mentioning or decreasing it.  Correct?

21       A.   That's correct.

22       Q.   And you acknowledge that 30 percent of

23   counties did have a reduction in the total number of

24   polling places from 2014 to 2018.  Correct?  I'm taking

25   that statistic from Paragraph 22 of your report, if I've



 1  understood it correctly.

 2       A.   Yes, I believe 30 percent had a reduction.

 3       Q.   Several of those counties in the 30 percent of

 4  counties closed more than one polling place.  Correct?

 5       A.   I believe so.

 6       Q.   Okay.  So would you agree that it stands to

 7  reason that at least in those counties that had a

 8  reduction in the total number of polling places that

 9  closures of polling places meant that some people had to

10  travel farther to those?

11       A.   I don't know.

12       Q.   You think that's possible that they could have

13  reduced the total number of polling places in a county

14  and no one had to travel farther to vote?

15       A.   There's likely to be some portion, but I don't

16  know specifics.

17       Q.   You don't know what portion, but there's

18  likely to be some portion?

19       A.   I have no way of knowing one way or another.

20       Q.   You didn't undertake that analysis?

21       A.   No.  I was responding to Dr. Herron's report.

22       Q.   Okay.

23       A.   Or I should say I was reviewing Dr. Herron's

24  report.

25       Q.   If we look at Paragraph 29 of your report, as



1    I read it this paragraph includes a critique that

2    Dr. Herron's analysis of voters who had their polling

3    places closed is flawed because he didn't in this

4    analysis of closures remove voters who moved, and as a

5    consequence their polling place would have potentially

6    changed regardless of the closure.

7          Is that fair that that's the critique you're

8    setting forth here?

9    A.   Yes.  Here he's including as I recall the

10   registered voters who moved.

11   Q.   And in your view that's particularly

12   problematic because according to census data a higher

13   percentage of African Americans moved versus Caucasians

14   moved.  Is that accurate?

15   A.   Well, regardless of the racial composition, if

16   you're -- if you moved, then there is a higher

17   probability of a change in your polling place.  So to

18   look at the impact of closures as Dr. Herron has done,

19   he would have included individuals who may or may not

20   have been impacted by that closure.

21   Q.   It wouldn't be that 100 percent of registered

22   voters who moved who would be affected.  Right?  Because

23   some people might have moved within the same precinct.

24   Correct?

25   A.   Certainly.



1      Q.   And those people who moved within the same
2  precinct would be affected by a precinct closure, taking
3  his definition of "closure"?
4      A.   That's correct.
5      Q.   And I take it you don't have any statistics
6  and perhaps there aren't any available on what
7  percentage of Georgians who moved or African-American
8  Georgians who moved within a precinct?
9      A.   I do not know that.
10     Q.   Dr. Thornton, is it your position that when a
11 polling place closes within a precinct that closure has
12 no effect on voters moving into that precinct?
13          MR. BELINFANTE:  I'm sorry.  Could you repeat
14     the question?
15          MS. EDMONDSON:  I'm going to ask the court
16     reporter to read it back because I'm not sure I
17     can.
18          MR. BELINFANTE:  Okay.  Thanks.
19          THE COURT REPORTER:  Yes, sir.
20          "Dr. Thornton, is it your position that when a
21     polling place closes within a precinct that closure
22     has no effect on voters moving into that precinct?"
23          MR. BELINFANTE:  Object to form.
24          You can answer.
25     A.   It -- I want to make sure I understand the



 1  question.  Are you asking me if a precinct closed -- or,

 2  pardon me, a polling place has closed and so there is a

 3  new polling place, and then someone moves into that area

 4  so then his or her polling place is the new polling

 5  place, would the closure have an influence?  Is that the

 6  question?

 7  BY MS. EDMONDSON:

 8      Q.   Yes.

 9      A.   Well, if I wasn't aware of the prior polling

10  place and I moved into a new -- I've moved in and so

11  I'm -- now I'm aware of my new polling place, I don't

12  know what the impact of the closed polling place would

13  be on the individual.  I -- I don't know.

14      Q.   But if the -- looking at the total number of

15  polling places as we did just a moment ago, if the new

16  polling place was less convenient than the old polling

17  place had been, that might mean that the person moving

18  into this precinct might be less likely to vote than if

19  the polling place had never been closed.  Is that

20  fair?

21      A.   It's a possibility, keeping in mind that the

22  individual may not have been aware of the prior polling

23  place so if he or she chose to vote, then they would be

24  aware, based on your example, of the new polling place.

25  An individual may choose to vote for all hosts of



 1   reasons.

 2        Q.   So this critique -- I want to understand the

 3   scope of this critique about including movers in the

 4   analysis of closures.  Dr. Herron performed three

 5   different methodologies of comparing or addressing

 6   polling place closures by race.  Correct?  He looked at

 7   racially homogenous black groups from the census, he

 8   looked at voter file comparisons, and then he looked at

 9   black majority precincts.  That's a fair description of

10   his three different methodologies broadly stated?

11        A.   I need to have his report in front of me to

12   answer that.

13        Q.   Sure.  Please feel free to look.  I will tell

14   you I believe it is at -- if you look at Paragraph 107.

15        A.   Okay.

16        Q.   So looking at Paragraph 107 is it accurate

17   that Dr. Herron purported at least to look at the issue

18   of polling place closures in Georgia by race in three

19   different ways: looking at census block groups;

20   comparison of various voter files; and then, three,

21   analysis of majority black polling places in Georgia?

22        A.   Yes, as described in Paragraph 107.

23        Q.   Okay.  And your criticism about the inclusion

24   of registered voters who moved I want to understand

25   which of Dr. Herron's assessments that criticism applies



 1  to?  Does it apply to all three assessments or does it
 2  apply only to the comparison of the voter files?
 3      A.   It has -- it is mainly my criticism is in
 4  relation to Table 3 because the question becomes if one
 5  was to have removed those individuals, how would it have
 6  changed the distribution.
 7      Q.   And you did an analysis of that for how it
 8  would change Table 3.  Correct?
 9      A.   No, I did not.  What I said is that it
10  would -- it would -- the -- providing the Bureau of
11  Census data is to show that that distribution of movers
12  is different by race; and consequently, you would expect
13  the distribution that Dr. Herron produced at Table 3
14  would also change.
15      Q.   But you concluded that that difference in the
16  rate of movement would more than offset the difference
17  that he reported in Table 3.  Correct?
18      A.   You would expect it to perhaps do that.
19      Q.   So you're not sure that it would offset that
20  difference, but you would expect that it would offset
21  that difference?
22      A.   What I'm saying is that it more than offsets;
23  and based on his other charts, one can see that when he
24  removed nonmovers the distribution does change.  It
25  becomes less African American.



1      Q.   All I'm trying to ask right now is, did you do

2   the analysis to know that it off -- that the rate of

3   moving offsets the difference -- the .12 difference he

4   found; or are you saying that given the numbers, you

5   would expect, perhaps strongly, that it would offset

6   that difference?

7      A.   What I'm saying is that I haven't tested it;

8   but based on the Bureau of Census data we know that

9   African Americans move at a higher rate, and therefore

10  there is the potential that it would offset the

11  difference.  And from his other charts you can see that

12  the percentage of African Americans when you remove

13  nonmovers does go down.  I should say "when you remove

14  the movers."  I apologize.

15     Q.   Understood.  No problem.

16          MS. EDMONDSON:  We've been going about another

17      hour.  Should we not take another quick break?

18          THE WITNESS:  Yes.  May I ask a question?

19          MS. EDMONDSON:  Sure.  Although perhaps we

20      should go off the record first if it's a logistical

21      question.

22          THE VIDEOGRAPHER:  Going off the record.  The

23      time is 11:59.

24          (Recess from 11:59 a.m. to 12:07 p.m.)

25          THE VIDEOGRAPHER:  Okay.  We are back on the



1        record.  The time is 12:07.

2    BY MS. EDMONDSON:

3        Q.   Hello, again.  If we can turn to Paragraph 30

4    of your report.  Paragraph 30 includes the statement

5    that "Among the 101 counties with at least one closure,

6    54 (or 53.5%) have a higher proportion of Caucasian

7    registered voters with a closure compared to the closure

8    of African-American registered voters."

9            My first question is just a clarification.  I

10   take it you mean compared to the proportion of African

11   American registered voters with a closure.  Is that

12   fair?

13       A.   Yes.  So to be clear, for each county with a

14   closure, counting the percentage of among African

15   Americans of their proportion with a closure as measured

16   by Dr. Herron as compared to among Caucasian the

17   proportion of Caucasian registered voters with a closure

18   as identified by Dr. Herron.

19       Q.   Understood.  I just wanted to clarify that it

20   wasn't compared to the proportion of African American

21   registered voters in the county more generally, that it

22   also relates to the closures.

23            What data does this analysis in Paragraph 30

24   use?

25       A.   It's the data -- it's the data -- same data



1   relied upon by Dr. Herron in his preparation of Table 3.

2   So it's essentially taking Table 3 of Dr. Herron's --

3   the code from his Table 3 and running it by county.

4        Q.   And so Table 3 is the comparison Dr. Herron

5   does on the basis of comparing the 2014 voter file by

6   race group to the 2018 voter file by race group.

7   Correct?

8        A.   Table 3 is looking at polling place closure

9   rates by race.

10       Q.   But based on a comparison of the 2014 and 2018

11  voter file.  Correct?

12       A.   Yes.

13       Q.   So for this analysis why did you focus on the

14  101 counties with at least one closure as opposed to the

15  total number of counties?

16       A.   Well, because for the remaining you would have

17  had a zero percent closure rate for both African

18  Americans and Caucasians, so there's no comparison.

19       Q.   Just because the two rates are the same?

20       A.   Yeah, there's no information to glean.

21       Q.   Did you look to see whether the rates of

22  closures were the same for any other counties; whether

23  there happened to be, for example, a 5 percent closure

24  rate for African Americans and a 5 percent closure rate

25  for Caucasians and exclude those counties from the



1  analysis too?

2      A.   No, because in here we're looking at closures;

3  and so if the rate of closure is the same, meaning there

4  are no closure decisions, there's nothing to compare.

5  On the other hand, there is variation from county to

6  county and we're looking then at where decisions were

7  made to close -- using Dr. Herron's measure of

8  "closure" -- when you had a decision, what is the

9  closure rate by race.

10     Q.   Did you analyze at all the racial composition

11 or racial demographics of the 58 counties that had no

12 closures?

13     A.   No.  I know that there was variations.

14     Q.   So you did analyze the racial demographics of

15 those 58 counties at least enough to know that there was

16 some variation in their racial demographics?

17     A.   When I looked at the output that we generate

18 for Table 3 by county, you can see that there's

19 variation.

20     Q.   So I may be misunderstanding you.  I'm asking

21 you generally -- not with respect to closures -- just

22 what the racial demographics are of the 58 counties that

23 did not have any closures for everyone in that county?

24     A.   Well, the information from -- that you

25 generate from Table 3 that we produced you can see if



 1  there's diversity amongst the 159 counties and included

 2  in those are the 58.

 3      Q.   Okay.  So from that information you looked

 4  enough at that to know, for example, that the 58

 5  counties were not -- that had no closures were not the

 6  58 most African-American counties in the state, for

 7  example.  There was diversity among them?

 8      A.   There's diversity.

 9      Q.   Okay.  But you don't recall what the -- you

10  didn't create a table or otherwise undertake a

11  systematic review of the demographics of those

12  counties?

13      A.   No.  I just saw that there was diversity, but

14  the focus is where the county for which there was a

15  decision made to close a polling place as defined by

16  Dr. Herron.

17      Q.   And this annual -- this review or comparison

18  that you did in Paragraph 30, this is essentially

19  counting counties.  Correct?  It doesn't take into

20  account the degree to which a particular county might

21  have more Caucasian registered voters with a closure

22  compared to African American registered voters with a

23  closure?

24      A.   No, it's counting -- it's showing that -- it's

25  showing that those overall statistics when you bring it



1    down to a county-by-county comparison where you have

2    closures, you have about the same proportion of county

3    having a -- in about half the counties it's a higher

4    proportion Caucasian and another little less than half

5    you have African American -- higher closure rates among

6    African Americans.

7         Q.   But if a particular county had -- let's take

8    an example where one county had -- County A had 1

9    percent more Caucasians than African Americans affected

10   by closures, and County B had 20 percent more Caucasians

11   than African Americans affected by closures.  Each of

12   these would just show up in this analysis as the same --

13   right? -- as a county that had more Caucasian than

14   African Americans affected by closures.  Is that fair?

15        A.   It's counting which ones are higher and which

16   one's lower.

17        Q.   But not taking into account the degree of

18   difference?

19        A.   No, it -- it's counting.

20        Q.   Then you reference the fact that if Bibb

21   County is removed from Dr. Herron's analysis, the

22   polling place for closure rate for black and white

23   voters flips.

24             How did you come to choose to remove Bibb

25   County from the test data?



1        A.    So when I was looking at the individual lines

2   for each county I noticed that, you know, four counties

3   comprised about 30 percent of the population of African

4   American and registered voters.  So I wanted to look at

5   a county proofing that was smaller than that proofing.

6   And when I looked at Bibb's, it's the next county down

7   that list with the highest -- higher numbers of

8   closures.

9        So the more populous counties, like Fulton,

10  DeKalb, Cobb, Gwinnett -- I believe I'm forgetting one,

11  I apologize, but in the Atlanta area -- they comprise

12  about a third of the registered voters, and they have

13  varying degrees of closures.  And so relative to those

14  counties Bibb is a smaller county and it had a higher

15  number of closures relative to some of those counties in

16  that Atlanta area.

17        So I was curious.  This is a county that had

18  more closures, what would happen if you removed it?  So

19  when I say it's smaller, it's smaller relative to those

20  that have -- are, you know, far more populous, and it

21  had -- Bibb had a higher closure rate, relatively

22  speaking.  So I wanted to take a look to see what's the

23  influence.

24        In statistics we have something called

25  "Simpson's paradox."  So here Dr. Herron has one



1   aggregated outcome, and you can have an aggregated

2   outcome mask the individual variation.

3           And so what I'm illustrating here is how you

4   can have a lot of variation county by county and that's

5   why it's important to look at it county by county; and

6   to illustrate if you remove this one county that is

7   relative to this larger counties, has a -- it's smaller

8   but has a relatively higher number of closures, what

9   would the influence be?

10      Q.   And so in choosing Bibb County one of the

11  reasons you chose Bibb County was that it did have a

12  relatively high closure rate.  Is that fair?

13      A.   It had numerically more of the closures.

14      Q.   Did you -- do you know how Bibb County

15  compares to other counties in Georgia in terms of its --

16  the percentage of its population that is African

17  American?

18      A.   As I recall -- I don't remember specifically,

19  but I recall it being perhaps -- perhaps more African

20  American relative to some counties.

21      Q.   After you had done the analysis with Bibb

22  County did you do a similar analysis removing any other

23  counties from the analysis; or did you do a review of

24  removing any other counties from the calculations?

25      A.   No.  I described my -- my logic of why I chose



1  Bibb and -- relative to those other counties, and it was

2  to illustrate how having an aggregate outcome as

3  Dr. Herron had used can result in a misleading outcome

4  because county by county there is a lot of variation.

5      Q.   There's also a lot of variation in Georgia

6  about racial demographics by county.  Correct?

7      A.   Sure, and that's one reason why you'd want to

8  look at it county by county.

9      Q.   Elaborate on that, please.

10     A.   Well, again, Dr. Herron has this aggregated

11 outcome and you do not know based on what he's depicted

12 in his chart -- for example, on Table 3 -- is it

13 influenced by one county?  Is it influenced by all the

14 counties?  In other words, do you have the outcome that

15 he shows which is -- I apologize, I have to go back to

16 his --

17     Q.   No problem.

18     A.   -- he calculates at Table 3 a .12

19 percentage-point difference.  If you looked at it by

20 county, would you come to that same conclusion or a

21 similar conclusion if you looked at it county by county;

22 or is it that there's a particular county or group of

23 counties that are influencing that outcome?  And that's

24 why it's relevant to look at it county by county.

25     Q.   Okay.  Let's do one more thing before lunch,



 1   if that works.  Let's move on to ... one moment, please.

 2          MS. EDMONDSON:  Actually, I think if we can

 3       break now it will be a little bit more efficient,

 4       if that suits everybody?  Is that okay?

 5          THE VIDEOGRAPHER:  We're going off the record.

 6       The time is 12:24.

 7          (Recess from 12:24 p.m. to 1:02 p.m.)

 8          (Ms. Bryan is no longer present.)

 9          THE VIDEOGRAPHER:  We are back on the record.

10       The time is 1:02.

11   BY MS. EDMONDSON:

12       Q.   Good afternoon, Dr. Thornton.

13       A.   Good afternoon.

14       Q.   Dr. Thornton, now I want to move on to

15   Paragraphs 31 and 32 of your report.  And these

16   paragraphs address Tables 4 through 6 of Dr. Herron's

17   report.  And I just want to confirm tables -- this --

18   these two paragraphs represent a critique of

19   Dr. Herron's analysis of how polling place closures

20   affected African Americans if you focus on the issue of

21   how majority black polling places were affected.  Is

22   that your understanding as well?

23       A.   Yes.  It's an aggregate analysis based on his

24   measurement of -- his definition of African-American

25   polling places.



1      Q.   Okay.  And is it fair to say here that the

2   analysis you performed or the review you did is similar

3   to the review we just talked about before lunch, that

4   you removed those polling places -- excuse me, those

5   counties that had no closures and then counted how many

6   of the remaining counties had more -- counted the

7   closure rate in the remaining counties?

8      A.   It's looking at a subset of the 101 because I

9   did not want to include instances in which you did not

10  have at least one majority African-American polling

11  place using his threshold.

12     Q.   Okay.  And is it fair to say that the same

13  reasons you gave a moment ago about why it's fair to

14  leave out the counties with no closures would also apply

15  to this analysis?

16     A.   Well, I did not want to mislead by including

17  counties without a majority African-American polling

18  place because if you -- if I included those then the

19  Caucasian closure rate would have been higher than the

20  53.5 percent that I calculated here.

21     Q.   Okay.  I understand that, I think.  Is it fair

22  to say, then, that your -- the only criticism in your

23  report of Tables 4 through 6 in Dr. Herron's report is

24  that it's inappropriate to aggregate the data across

25  counties and that it's more appropriate to look at it on



 1   a county-by-county basis?

 2        A.   My criticism is that he does not -- that he

 3   masks the variation and he calculates the higher closure

 4   rate based on his threshold that includes groups that

 5   for which there were not any decisions made and

 6   includes -- and so in this instance you're not -- he did

 7   not adjust for the county variation.

 8        Q.   And that's a criticism you're making I

 9   understand in Paragraphs 31 and 32.  My question is, I

10   don't believe that there are any other criticisms of

11   Tables 4 through 6 in your report?  And if you disagree

12   with that, I'd like you to tell me.

13        A.   Well, I believe that there's an overarching

14   point that I make regarding closures that we -- you

15   asked me about earlier today; and that is, Dr. Herron is

16   including closures that are out of the control of the

17   county boards of elections.  So to the extent that those

18   closures are correlated in some way with race, then his

19   outcomes and his conclusions could be different.

20        Q.   But if we accept for the moment Dr. Herron's

21   definition of "closures" for the purposes of discussion,

22   you don't have any quarrel with Dr. Herron's

23   calculations in Tables 4 through 6.  Is that fair?

24        A.   If you're asking me if arithmetically he has

25   distribute -- calculated in terms of the 459, then



1   arithmetically I do not know of an error.  In terms of

2   his methodology, that's what I'm critiquing overall.

3        Q.   And you have essentially two critiques of the

4   methodology.  One is the definition of "closure," and

5   one is that you don't think it's appropriate to

6   aggregate across county lines.

7             Are there any other critiques of the

8   methodology that you would offer?

9        A.   Well, as I alluded to earlier today and in my

10  report, my first report, is he's not only provided

11  statistics or a few statistics here that are

12  cross-county, but he also has gone from 2004 to 2008 and

13  he doesn't distinguish 2016.  And that is an arc -- a

14  point that I've made in general because his entire

15  report is 2014 to 2018.

16       Q.   And does that criticism apply to Tables 4

17  through 6 as well as -- I understand that it applies to

18  Table 3.  Does it also apply to Tables 4 through 6?

19       A.   Certainly.

20       Q.   And why is that since Tables 4 through 6 focus

21  on the overall racial makeup of polling places rather

22  than a particular -- looking at a particular voter?

23       A.   Well, as I understand what Dr. Herron is

24  attempting to measure is he wants to know if there

25  are -- he is measuring whether there is a difference by



1   race in closure.  And the -- as I understand the issue,

2   it's particularly in relation to what happened in 2018.

3   So as a consequence he's mixing activity that happened

4   between the 2014 midterm and the general election and

5   presidential election in 2016 with the presidential

6   election in 2016 and the 2018 midterm.

7          So the question is, is the pattern that he

8   calculates looking across that four-year time period, is

9   it the same pattern from 2014 to 2016 or 2016 to 2018?

10  And throughout his initial report he did not look at

11  that question because the question is, is there

12  consistency in his statistics in that time period or is

13  there a shift, is there a difference?

14     Q.   And in your view what is the proper unit of

15  time to look at this under?  Should we look at the

16  differences between a midterm and a presidential

17  election like every two years, every one year, every

18  month?  How consistent -- what is the unit across which

19  it must be consistent to be useful?

20     A.   Well, the question here is if -- he's combined

21  different activities and different decisions, and so as

22  a consequence -- and what he's done is he's masked the

23  difference between 2014 and 2016, and 2016 and 2018.

24  Why he does -- did that, I don't know.

25     Q.   But what do you think is the proper way to do



1  it?  What would answer the question?

2      A.   Well, I think it's important to take a look to

3  see if there is a difference.  So the proper thing to do

4  is to not make an assumption of grouping it altogether.

5  It's important to see where you have these events --

6  2014, 2016, 2018 -- what changed.

7      Q.   So stepping back for a moment, so we've talked

8  about Table 3 of Dr. Herron's report and Tables 4

9  through 6.  Other than your overarching criticisms of

10  Dr. Herron's total approach, I don't believe that you've

11  offered any criticisms of his analysis of the census

12  block -- of looking at the issue of race through

13  racially homogenous census blocks.  But if that's

14  incorrect, please let me know.  That would be his Table

15  2.

16      A.   At Paragraph 26 I discuss that Dr. Herron

17  himself testified that "most registered voters in

18  Georgia 'do not live in racially homogeneous census'"

19  group blocks -- "'census block groups,'" pardon me.  So

20  as a consequence it raises into question the value of

21  his analysis because he's looking at a very small

22  proportion based on what he testified and one can see

23  that there's quite a range.

24          So at 95 percent racially homogeneous you have

25  a -- pardon me -- so at 95 percent you have a different



1  conclusion than you do at 99 percent or 100.  So it --

2  as expected you're going to have a difference as you

3  go -- become more and more, you know, at 100 percent

4  African American or 100 percent Caucasian.

5         So to his point you're looking at a relatively

6  small proportion of the population of registered voters

7  for me to these categories based on his own testimony;

8  and as I point out, this analysis includes among the

9  closures those polling places that are closed outside of

10  the control of the boards of elections.

11     Q.  Did you undertake your own analysis of how

12  many voters in Georgia live in racially homogeneous

13  census block groups?

14     A.  No, I did not.

15     Q.  Did you add up the numbers in Table 2 to see

16  the total number of voters according to Dr. Herron's

17  data that live in racially homogeneous block groups?

18     A.  I did not.  I replicated his table.

19     Q.  So you have no quarrel with the individual

20  rows of data in his table as far as an arithmetic

21  matter?  I understand you might have criticisms of the

22  methodology that led him to identify those as relevant.

23     A.  If you're asking me if his code did what it

24  was asked to do and it arithmetically matches the

25  output, then it matches.



1      Q.   So I'm not going to ask you to do the math or

2    the input right here, but looking at the numbers now

3    would it surprise you if I represented to you that

4    according to these numbers it's approximately 2.5

5    million people in - voters in Georgia who live in

6    racially homogeneous census block groups?

7      A.    I would disagree with that calculation because

8    the individual in -- in, for example, cut off 2 --

9    pardon me, cut off the -- those at 100 are included in

10   the 99, 98, 97, 96, and 95 categories.  Those in 99 are

11   included in 98, 97, and 96 and 95 cutoff, so on and so

12   forth.  So 96 is included in the 95, so that would be

13   incorrect.

14     Q.   I see.

15          Okay.  So if we move on to Section IV of your

16   report, if you look at paragraph thirty -- it's

17   essentially Paragraphs 33 through 35, but I'm going to

18   focus on Paragraph 35 and the table.

19          So if you look at Paragraph 35, like the

20   earlier discussions we talked about, in this analysis

21   you removed the 31 counties who had no changes to their

22   polling places between 2014 and 2018.  And I take it

23   that your reasoning for that choice is the same or

24   similar as what you offered about the 58 counties that

25   had no polling place closures earlier in the report,



1  that those counties without any changes to their polling

2  places are not relevant to this inquiry.  Is that fair?

3       A.   That is correct.  There's no decision made --

4  there were no decisions made by the board -- county

5  board of elections that influenced the placement of

6  polling places.

7       Q.   Okay.  But here in Table 1 you're doing

8  something a little different than you did when

9  discussing the polling place closures because you're not

10 just counting the number of counties that have more --

11 higher percentage of African-American closures versus

12 Caucasian closures.  You're actually recalculating the

13 percents across the counties.  Correct?

14      A.   Yes.  I'm looking at the -- Dr. Herron's Table

15 9 and removing from his Table 9 the 31 counties.

16      Q.   And so here can you explain why it's

17 appropriate when you're recalculating Table 9 to remove

18 the 31 counties that did not have any changes to their

19 polling places?

20      A.   Well, the 31 counties, regardless of their

21 racial composition, there's no decisioning, nothing was

22 changed.  No new polling places.  No closures.  No moved

23 polling places.  So there's no decision because then

24 races -- Dr. Herron is looking at a distribution, it has

25 no -- no -- there's not contributing from those



1   counties.

2        So here I'm looking at those counties where a

3   decision was made regarding a new polling place, a

4   change in polling place, a closure altogether without a

5   replacement and looking at that question because these

6   are the decisions, these are the counties for which

7   decisions were made.

8        Q.   But if you look at the column in your table

9   you have the breakdown of voters who did not have a new

10  polling place by Caucasian, African American, et cetera.

11  But there are voters who lacked a new polling place in

12  the 31 counties that you omitted.  Correct?

13       A.   Can you say that again?  I could not hear

14  that.

15       Q.   Sure.  So there's a column in your Table 1

16  that refers to the racial distribution of those voters

17  who did not have a new polling place.  That's the "Not

18  New Place" column in your Table 1.  Correct?

19       A.   Yes.

20       Q.   But there are registered voters in the 31

21  counties -- in fact, all the registered voters in the 31

22  counties -- who did not have a change to their voting

23  place who aren't included in this table.  Correct?

24       A.    And they're not included because those

25  counties did not have any in the "New Place."  They're



1   only in the "Not New Place."  No decisioning was being

2   made.  So by including them it inflates the "Not New"

3   percentages.

4        Q.   And since removing the 31 counties increases

5   the relative percentage of white voters with changes

6   versus black voters, we can assume as a matter of math

7   that the 31 counties with no changes are

8   disproportionally white compared to the rest of Georgia.

9   Correct?

10       A.   Slightly.

11       Q.   But definitely disproportionately white, even

12   if "slightly"?

13       A.   By a -- if I recall -- hold on.  By about 1

14   percentage point.

15       Q.   But enough to make the difference that you

16   think is important to change Table 9 into your Table 1.

17   Correct?

18       A.   Well, first I think it's important to

19   recognize that the percentage difference in the

20   distributions changed -- changes were less than a

21   percentage.  And so what it shows is, is that when you

22   remove those 31 for which there were no decisions made,

23   that it narrows the difference between Caucasian and

24   African American registered voters and it advantages

25   using -- in the way in which Dr. Herron writes among



1    those African Americans had a smaller difference in

2    having a new place.

3        Q.   As an aside, you referred to counties in which

4    no decisions were made.  But a decision not to close a

5    polling place or not to change a polling place could

6    count as a decision.  Right?

7        A.   Perhaps, but then the question is, did it --

8    was even, you know -- there -- from my perspective from

9    an analysis for those counties there was -- there were

10   no changes, so in those counties the racial composition

11   isn't -- if the county boards of election were making a

12   decision based on race hypothetically, in those counties

13   there were no decisions made.  And so from my -- from my

14   review of the data what this shows is again Dr. Herron

15   makes the conclusion aggregating across the counties,

16   yet there are these 31 for which there were no changes.

17       Q.   But you don't know, for example, that in the

18   31 counties where no changes were made the boards didn't

19   consider closing or indeed opening additional polling

20   places.  Right?

21       A.   I don't know one way or another.  From my

22   standpoint from looking at the data, they made no

23   changes.

24       Q.   But that doesn't necessarily tell you that

25   they weren't faced with or didn't make any decisions



1    about whether to make a change?

2        A.    I don't know one way or another, but they did

3    not make a -- they did not make a change.

4        Q.    Okay.  If we look at section -- excuse me,

5    Paragraphs 36 and 37, you critique Dr. Herron for

6    failing to consider the influence of the shift toward

7    absentee and early voting in Paragraph 36.  In your

8    Table 2 you're only comparing the absentee and early

9    voting from 2014 to 2018.  Correct?

10       A.    Yes, to be -- because that's the period that

11   Dr. Herron focused on in his report.

12       Q.    And you didn't look to see if that rate of

13   change was different between 2014 and 2016, and 2016 and

14   2018.  Correct?

15       A.    I don't know if I looked at 2016, I may have,

16   or at least looked to see how easily I could pull the

17   data from EABS.  However, my focus was to respond to

18   Dr. Herron's comparison of 2014 to 2018.

19       Q.    And you focused on the shift to early voting

20   because of a hypothesis that the need and perhaps the

21   supply of polling places may have been lessened and that

22   might have been part of what was driving the closures of

23   polling places in 2018.  Is that fair?

24       A.    What I am showing is that from an economist

25   standpoint of supply and demand, the usage of early



 1    voting and no-excuse absentee ballots may influence

 2    decision makers.

 3         Q.    But here we're focused on the decisions to

 4    close polling places at some point before 2018.  So

 5    isn't it true that any drop or any drop in in-person

 6    voting between 2016 and 2018 could not have been a basis

 7    for election officials to close polling places in

 8    anticipation of the 2018 election?

 9              MR. BELINFANTE:  Object to form.

10         A.    Well, what -- what we know is that there is --

11    has been a trend in the use of absentee -- no-excuse

12    absentee ballots and in the usage of early voting.

13    BY MS. EDMONDSON:

14         Q.    And for the decision-makers who are making

15    decisions about polling place locations for 2018, they

16    would have needed to rely on data from 2014 to 2016 or

17    indeed 2012 to 2014 rather than data right before --

18    from the 2018 election?

19              MR. BELINFANTE:  Object to form.

20         A.    I don't know what -- I don't know what

21    information they would or would not have relied upon.

22    What this does show is that there is movement; and what

23    I am familiar with in reading literature and looking at

24    statistics, there has been an upward increasing usage of

25    absentee ballots and usage of early voting.



 1   BY MS. EDMONDSON:

 2        Q.    And for these statistics you're looking on a

 3   statewide aggregated basis.  Correct?

 4        A.    Yes, in response to Dr. Herron.

 5        Q.    Did you look to see if there were geographic

 6   differences in the shift or trend toward early and

 7   absentee voting among different counties in Georgia?

 8        A.    No, this is just to say -- this isn't looking

 9   at racial composition.  It's looking at an overall

10   trend.  When one looks at Dr. Herron's statistics on

11   election day polling places, he does not show a

12   difference by race that's adverse to African Americans.

13   And so I wanted to look to see what is the usage.

14        Q.    But you didn't look specifically to see if the

15   counties that closed polling places were counties that

16   experienced a trend in the shift toward early and

17   absentee voting.  Is that correct?

18        A.    That is correct.

19        Q.    So we can move on to Section V.  In the end of

20   Paragraph 37 you state that voters "who voted early

21   and/or submitted absentee ballots would not be impacted

22   by a change in polling place because early voting places

23   and submitting an absentee ballot have no relationship

24   to the election day polling places of voter.  Not clear

25   why Dr. Herron close to include these distributions by



1   race and ethnicity in his report as they are

2   misleading."

3           So I take it it's your position that a closed

4   or moved polling place could have no effect on a voter's

5   decision to vote early or absentee?

6       A.   What I am stating is for the statistic that

7   Dr. Herron is calculating regarding the racial

8   composition or distribution between those who moved and

9   did not move, in terms of those statistics what is

10  relevant are those election day ballots where they're

11  actually going to those polling places.

12      Q.   So my question was just a smaller question,

13  which is, is it your position that the fact that a

14  voter's polling place has been closed or moved would

15  have no effect on a voter's decision to vote early or

16  absentee?

17      A.   I don't know the rationale for why someone

18  votes with an absentee ballot or decides to vote early.

19  What I am saying is that in terms of the relevance of

20  the polling places they are on election day.

21      Q.   So it doesn't seem possible to you that if a

22  voter learned that his or her polling place had been

23  closed that that voter might choose to vote early or

24  absentee rather than vote on election day?

25      A.   I suppose it's possible.  From Dr. Herron's



 1 | information and from the data available one cannot
 2 | ascertain that.
 3 |     Q.   But is it at least possible the shift of some
 4 | groups to earlier absentee voting in 28 might be the
 5 | effect of the closure of polling places rather than the
 6 | cause of the closure of polling places?
 7 |     A.   I don't know one way or another.  Individuals
 8 | can choose to vote early or by absentee for his or her
 9 | own personal reasons.
10 |     Q.   So if we look then at your second report --
11 |         MS. EDMONDSON:  Actually, I think if we can
12 |     take a short break now that would just let me
13 |     streamline things.  I don't have very much more to
14 |     go, so I think it will help me streamline things,
15 |     if that's all right?
16 |         THE VIDEOGRAPHER:  Okay.  Off the record.  The
17 |     time is 1:40.
18 |         (Recess from 1:40 p.m. to 1:51 p.m.)
19 |         THE VIDEOGRAPHER:  We are back on the record.
20 |     The time is 1:51.
21 | BY MS. EDMONDSON:
22 |     Q.   Dr. Herron -- Dr. Herron -- Dr. Thornton,
23 | before we broke we were discussing the effect on
24 | election day voting of changes in polling place
25 | locations.



1          Your conclusion in your report was that

2    African Americans were the, quote, "least

3    'disenfranchised'" of any other racial ethnic category

4    because they had the least change in election-day

5    turnout by change in polling place.  Correct?

6         A.   I should have been clearer to say "among those

7    with a known race."

8              THE COURT REPORTER:  I'm sorry, "a known"

9         what?

10        A.   "Among those with a known race in his table,"

11   in Dr. Herron's Table 12.

12   BY MS. EDMONDSON:

13        Q.   In his supplemental report Dr. Herron offered

14   a few reasons why absentee or early voting might not be

15   seen as as good a substitute for election-day voting,

16   and I don't believe you offered any reaction or critique

17   of those reasons, but I wanted to give you an

18   opportunity to do so if you have any.

19        A.   I apologize.  Could you ask me the question

20   again?

21        Q.   Sure.  In his supplemental report --

22             MS. EDMONDSON:  We can mark that as an

23        exhibit.  I don't believe we have yet, actually.

24             We can call that Exhibit 3, I believe?

25             THE COURT REPORTER:  4.



1          MS. EDMONDSON:  4.  Apologies.

2          (Exhibit 4 will be marked for identification

3       and attached to the transcript once received by the

4       reporter.)

5  BY MS. EDMONDSON:

6       Q.   In paragraphs approximately 120 to 125

7  Dr. Herron identifies some -- takes the position that

8  not all forms of voting are equal.  So I was offering

9  you an opportunity -- I don't believe you offered any

10  critique of that position in your supplemental report,

11  but I wondered if you agreed with that proposition or if

12  you had a critique of it?

13       A.   I don't have an opinion one way or another.

14  My understanding is that there is now -- I read an

15  article in which Ms. Abrams was questioned by the AP and

16  she thought that absentee voting is going to be the law

17  of the land, and that she viewed it as the safest and

18  most accessible form of voting.

19          So there seems to be perhaps a disagreement on

20  the usage and the pros and cons of absentee voting in

21  Dr. Herron's opinion versus Ms. Abrams'.

22       Q.   Do you recall when you read this article by

23  Ms. Abrams or quoting Ms. Abrams?

24       A.   It would have been after I filed my report.

25  But there's been a lot of discussion about the usage of



1  absentee voting, and I did not address it in my report

2  as there's been -- there's pros and cons.

3       Q.   Was it after your supplemental report or after

4  your initial report?

5       A.   I believe that it would have been after my --

6  after both reports.

7       Q.   And do you recall what publication you read

8  this in?

9       A.   It was an Associated Press question and

10  answer.

11      Q.   So if it was after your second report is it

12  fair to say it was after the COVID-19 pandemic was fully

13  on the horizon?

14      A.   Both of my reports were submitted after it was

15  fully on the horizon.

16      Q.   Okay.  So do you recall whether Ms. Abrams

17  comments about the safety of absentee voting were made

18  in the context of public health concerns concerning

19  in-person voting?

20      A.   I believe as I recall the article there was

21  certainly that, but she also -- as I recall she viewed

22  it as I think, quote, "the safest and most accessible

23  way to vote."  And so she was looking at it not only

24  from the standpoint of safety but also accessibility.

25      Q.   Do you still have that article handy?  Not



 1  necessarily right now, but to provide to your counsel

 2  for production.

 3       A.   If I can find it on the Internet.

 4       Q.   Okay.  Well, after this deposition we'd

 5  appreciate it if we could do that so we can mark it as

 6  an exhibit after the fact, if possible.

 7            If you can turn to your second report.  If you

 8  look at Paragraph 23 you note that "In addition to the

 9  general trend of increased alternative voting, in 2018,

10  African-American voters in particular used early voting

11  polling places at a higher rate."

12            And I take it from the citation that is

13  nationwide and not necessarily in Georgia, your citation

14  there?

15       A.   Yes.

16       Q.   But the data in your table backs up that that

17  is also true in Georgia for in-person early voting.  Is

18  that accurate?

19       A.   What I have available for in-person early

20  voting in Georgia is the overall usage.  Table 3 allows

21  us -- one to look at the in-person early voting by race

22  and ethnicity.

23       Q.   So I think perhaps can you explain then what

24  the numbers in Table 3 represent here?  For example, the

25  16.2 for white alone, what does that -- what does that



1  number mean?

2      A.   So among those who voted in the 2018 election,

3  16.2 percent of Caucasians voted early in person.

4      Q.   Okay.  And 24 percent of Caucasians voted by

5  mail.  Is that accurate?

6      A.   That's correct.

7      Q.   So, Dr. Thornton, if you look at these

8  numbers, while it is true that African Americans had a

9  higher percentage of early voting versus other racial

10 and ethnic groups, isn't it true that they had the

11 lowest percentage of voting by mail of any of the ethnic

12 groups listed here?

13     A.   They do; and in the context of Georgia, within

14 Georgia no-excuse absentee mail-in ballots are a

15 relatively small proportion of the overall ballots cast.

16     Q.   And this data that you're looking at in

17 Table 3 shows that African Americans have the lowest

18 percentage of alternative voting taking in-person and

19 mail together of any ethnic group that's included.

20 Correct?

21     A.   That may be correct but as I testified, in

22 mail is a relatively small proportion of the ballots

23 cast in Georgia.  They're mostly as an early ballot,

24 alternative ballots, it's in-person early voting in

25 which you have a higher proportion of African Americans



1   in that category.

2       Q.   Dr. Thornton, we've spent most of our time

3   today focusing on what I would say is the primary

4   critique you offer of Dr. Herron's analysis, which is

5   his decision to look at things on a statewide basis

6   rather than to look at the individual decisions made by

7   county officials.  Would you agree that that's

8   essentially the central critique of your report?

9       A.   It's one of the central critiques.

10      Q.   And you've agreed that you did not provide a

11  county-by-county break down of the reasons why polling

12  places were closed or unavailable.  Correct?

13      A.   No, neither -- Dr. Herron did not.  I raised

14  it as an issue, and he did not do such in his response

15  report.

16      Q.   And you've identified a lot of reasons why

17  that would be very difficult to do.  Correct?  It would

18  require a lot more than a Google search to do.

19  Correct?

20      A.   It would take more than a Google search.

21      Q.   And is it fair to say that it would be close

22  to impossible to have a comprehensive account of why

23  polling places were closed in each county?

24          MR. BELINFANTE:  Object to the form.

25      A.   I don't know one way or another, but in order



1   to assess the statistics -- in order to frame the

2   statistics that Dr. Herron has calculated, one would

3   need to know what those reasons were.

4   BY MS. EDMONDSON:

5       Q.   And your reason for thinking that's important

6   is that, as you've cited, the counties have -- you cited

7   a statute to show that the counties are the

8   decision-makers when it comes to shutting down polling

9   places.  Correct?

10      A.   Counties make the decision regarding

11  polling -- the location and number of polling places;

12  and based on the information -- for example, in

13  Table 3 -- when you look at it county by county there is

14  great variation.

15      Q.   But, Dr. Thornton, it's correct, is it not,

16  that elections in Georgia for governor, for senator, and

17  various others, what matters is not the decisions county

18  by county but the overall aggregate percentages by

19  registered voter in the state of Georgia.  Correct?

20          MR. BELINFANTE:  Object to the form.

21      A.   If you're asking me in terms of who is elected

22  for a statewide or a election that is the total ballots

23  that count, yes.  To the extent that it is alleged that

24  changes in polling places influence those outcomes, then

25  one would want to know which counties actually could



 1  potentially impact those numbers.  So you have included

 2  in those numbers statewide ballots cast, counties for

 3  which there were no changes or no closures.

 4          MS. EDMONDSON:  Can we go off the record for a

 5      moment?

 6          MR. BELINFANTE:  Okay.

 7          MS. EDMONDSON:  Um --

 8          THE VIDEOGRAPHER:  Just a moment, please.

 9          MS. EDMONDSON:  I'm sorry.

10          THE VIDEOGRAPHER:  Off the record.  The time

11      is 2:07.

12          (Recess from 2:07 p.m. to 2:10 p.m.)

13          THE VIDEOGRAPHER:  We are back on the record.

14      The time is 2:10.

15          MS. EDMONDSON:  Dr. Thornton, thank you very

16      much for appearing today remotely by video, and I

17      have nothing further for you.

18          THE COURT REPORTER:  Any cross, Counsel?

19          MR. BELINFANTE:  I have no questions.

20      Thank you.

21          THE VIDEOGRAPHER:  Okay.  This is the

22      videographer.  We ask that all participants please

23      stay connected briefly to provide your transcript

24      and video orders, after which I'll close the

25      record.



 1        THE COURT REPORTER:  Ms. Edmondson, you're

 2   ordering the original, and you need it on a 3-day

 3   expedited basis.  Is that correct?

 4        MS. EDMONDSON:  If that is what you've already

 5   been told, that sounds fine.  I would have to

 6   check, but I can check and confirm if that's not

 7   the case.

 8        THE COURT REPORTER:  Did you need a --

 9        THE VIDEOGRAPHER:  And the video -- oh, sorry.

10   Go ahead.

11        THE COURT REPORTER:  Did you need a copy of

12   the transcript --

13        MS. EDMONDSON:  Me?

14        THE COURT REPORTER:  -- defense counsel?

15   Sorry.

16        MR. BELINFANTE:  Yes, please, we would like a

17   copy of the transcript.

18        THE COURT REPORTER:  And is your witness going

19   to read or waive?

20        MR. BELINFANTE:  She'll read, please.

21        THE VIDEOGRAPHER:  Ms. Edmondson, would you

22   like a copy of the video also?

23        MS. EDMONDSON:  Let me get back to you about

24   that.  I'm not the decision-maker on that question.

25        THE VIDEOGRAPHER:  Okay.  So because it's an



 1  expedite when I turn this in I'm going to -- let me

 2  go off the record.

 3       We are now going off the record on May 22nd,

 4  2020, at 2:11 p.m.  This concludes the

 5  videoconference deposition of Dr. Janet Thornton.

 6       (The reading and signing of this

 7  videoconference deposition is not waived, and the

 8  taking of this videoconference deposition concluded

 9  at 2:11 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1           VIDEOCONFERENCE DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No. J5562519

 4   Case Caption:  Fair Fight Action, et al., v.
                    Raffensperger, et al.
 5

 6           DECLARATION UNDER PENALTY OF PERJURY

 7       I declare under penalty of perjury that I have read

 8   the entire transcript of my Videoconference Deposition

 9   taken in the captioned matter or the same has been read

10   to me, and the same is true and accurate, save and

11   except for changes and/or corrections, if any, as

12   indicated by me on the VIDEOCONFERENCE DEPOSITION ERRATA

13   SHEET hereof, with the understanding that I offer these

14   changes as if still under oath.

15

16       Signed on the _____ day of _____, 20____.

17

18

19

20                    _____

21                    JANET THORNTON, Ph.D.

22

23

24

25
```



```
1              VIDEOCONFERENCE DEPOSITION ERRATA SHEET
                   ESQUIRE JOB NO. J5562519
2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24  SIGNATURE:_____DATE:_____
                JANET THORNTON, Ph.D.
25
```



JANET THORNTON PH.D                                    May 22, 2020
FAIR FIGHT ACTION vs BRAD RAFFENSPERGER                         91

```
                   VIDEOCONFERENCE DEPOSITION ERRATA SHEET
                          ESQUIRE JOB NO. J5562519

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
                 JANET THORNTON, Ph.D.
```



1                       CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6              I, Jennifer Figueroa, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the foregoing videoconference

9    deposition, Pages 1 through 88; and that the transcript

10   is a true record of the testimony given by the witness.

11

12             I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18             Dated this 28th day of May, 2020.

19

20

21

22   _____
                                      Jennifer Figueroa, RPR
23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

```
1                   CERTIFICATE OF OATH

2

3   STATE OF FLORIDA

4   COUNTY OF HILLSBOROUGH

5

6           I, Jennifer Figueroa, Registered Professional

7   Reporter, Notary Public, State of Florida, certify that

8   JANET THORNTON, Ph.D., appeared remotely via

9   videoconference before me on the 22nd day of May, 2020,

10  and was duly sworn.

11

12          WITNESS my hand and official seal this 28th

13  day of May, 2020.

14

15  Identification:

16  Personally known ___ or produced identification X.

17  Type of identification produced:

18  Florida driver's license.

19

20

21

22  _____

23  Jennifer Figueroa, RPR
    Notary Public, State of Florida
    Commission No.: GG 071120
24  Commission Expires: 03/02/2021

25
```



──────────────
   Exhibits

5562519 Tho
rnton.
Janet.
Exhibit1
    3:13 9:1,
    2,7 31:9,
    10 35:12

5562519 Tho
rnton.
Janet.
Exhibit2
    3:15
    26:7,8,9,
    13 31:6

5562519 Tho
rnton.
Janet.
Exhibit3
    3:17
    31:19,21
    79:24

5562519 Tho
rnton.
Janet.
Exhibit4
    3:19 80:2

──────────────
       1

1
    9:1,2,7
    31:9,10
    35:12
    58:8 70:7
    71:15,18
    72:13,16

10
    16:7

100
    48:21

68:1,3,4
69:9

101
    54:5
    55:14
    63:8

107
    51:14,16,
    22

10:03
    4:8

10:18
    14:22,23

10:33
    14:23,25

115
    32:3

11:03
    30:6,7

11:11
    30:7,9

11:59
    53:23,24

12
    53:3
    61:18
    79:11

120
    80:6

125
    80:6

12:07
    53:24
    54:1

12:24
    62:6,7

13
    25:8

159
    32:10

57:1

16.2
    82:25
    83:3

17
    15:5

18
    15:19,23,
    25 20:6

19
    16:6

1:02
    62:7,10

1:18-cv-
05391-scj
    4:15

1:40
    78:17,18

1:51
    78:18,20

──────────────
       2

2
    26:8,9,13
    31:6
    33:9,12
    67:15
    68:15
    69:8 74:8

2.5
    69:4

20
    11:25
    12:12
    18:12
    58:10

2004
    65:12

2008

65:12

2012
    75:17

2014
    31:1,14
    32:8,22
    42:4
    46:24
    55:5,10
    65:15
    66:4,9,23
    67:6
    69:22
    74:9,13,
    18 75:16,
    17

2016
    42:6
    44:25
    45:3
    65:13
    66:5,6,9,
    23 67:6
    74:13,15
    75:6,16

2018
    31:1,14
    32:8,22
    35:23
    45:1,5
    46:24
    55:6,10
    65:15
    66:2,6,9,
    23 67:6
    69:22
    74:9,14,
    18,23
    75:4,6,8,
    15,18
    82:9 83:2

2020
    4:9 18:15
    88:4

21
    30:12
    31:10

21-2-265
    22:4

22
    30:12,13,
    16 31:10,
    16 32:15,
    23 46:25

22nd
    4:8 88:3

23
    35:11
    82:8

24
    42:6 83:4

26
    42:7
    67:16

27
    44:23

28
    78:4

29
    17:22
    47:25

2:07
    86:11,12

2:10
    86:12,14

2:11
    88:4,9

──────────────
       3

3
    19:6 20:2
    25:3,7,10
    26:2



31:19,21
33:5
52:4,8,
13,17
55:1,2,3,
4,8
56:18,25
61:12,18
65:18
67:8
79:24
82:20,24
83:17
85:13

**3-day**
87:2

**30**
46:22
47:2,3
54:3,4,23
57:18
59:3

**31**
62:15
64:9
69:21
70:15,18,
20 71:12,
20,21
72:4,7,22
73:16,18

**32**
62:15
64:9

**32308**
6:8

**33**
69:17

**35**
69:17,18,
19

**36**
31:1,14

**32:**
74:5,7

**37**
74:5
76:20

────────

**4**

**4**
25:3,7
62:16
63:23
64:11,23
65:16,18,
20 67:8
79:25
80:1,2

**459**
36:19
40:1,6,9
41:18
42:25
43:4
64:25

**4th**
18:14

────────

**5**

**5**
11:23
12:10
55:23,24

**50**
13:10

**53.5**
63:20

**53.5%**
54:6

**54**
54:6

**58**
32:7,9,20
56:11,15,
22 57:2,
4,6 69:24

────────

**6**

**6**
21:4
26:19
62:16
63:23
64:11,23
65:17,18,
20 67:9

────────

**7**

**7**
26:19,20

────────

**9**

**9**
70:15,17
72:16

**95**
67:24,25
69:10,11,
12

**96**
69:10,11,
12

**97**
69:10,11

**98**
69:10,11

**99**
68:1
69:10

────────

**A**

**a.m.**
4:8 14:23
30:7
53:24

**Abrams**
80:15,23
81:16

**Abrams'**
80:21

**absentee**
74:7,8
75:1,11,
12,25
76:7,17,
21,23
77:5,16,
18,24
78:4,8
79:14
80:16,20
81:1,17
83:14

**academic**
13:23

**accept**
64:20

**accessibili
ty**
81:24

**accessible**
80:18
81:22

**account**
24:3
57:20
58:17
84:22

**accounting**
24:6

**accuracy**
15:22

**accurate**
15:13
21:15
48:14
51:16
82:18
83:5

**accurately**
8:5

**acknowledge**
5:9 46:22

**Action**
4:11

**activities**
66:21

**activity**
66:3

**add**
68:15

**addition**
11:3 82:8

**additional**
18:7
73:19

**additionall
y**
11:7
18:23

**address**
62:16
81:1

**addressed**
16:1

**addressing**
51:5

**adjust**
24:20
27:4,18,



19 64:7

**adjusted**
24:13
29:24

**adjustment**
27:10,25

**administeri
ng**
5:12

**Administrat
ive**
5:14

**advantages**
72:24

**adverse**
76:12

**adversely**
15:10

**affect**
19:20
27:16
45:8,13,
19,22
46:18

**affected**
48:22
49:2
58:9,11,
14 62:20,
21

**affirm**
6:2

**affirmed**
6:14

**African**
37:8
48:13
52:25
53:9,12
54:10,14,
20 55:17,

24 57:22
58:5,6,9,
11,14
59:3
60:16,19
62:20
68:4
71:10
72:24
73:1
76:12
79:2
83:8,17,
25

**African-
american**
15:11
49:7 54:8
57:6
62:24
63:10,17
70:11
82:10

**afternoon**
62:12,13

**aggregate**
21:2
23:22
34:4 61:2
62:23
63:24
65:6
85:18

**aggregated**
21:13,14,
23 23:12
60:1
61:10
76:3

**aggregating**
19:9 28:2
73:15

**agree**
5:21,22,

23,24
39:22
47:6 84:7

**agreed**
80:11
84:10

**agreement**
5:18,19

**ahead**
7:17,21
8:25 46:9
87:10

**allegation**
15:25

**allegations**
15:20,22

**alleged**
85:23

**alluded**
37:24
65:9

**alludes**
43:1

**alternative**
43:11
82:9
83:18,24

**altogether**
67:4 71:4

**American**
37:9
52:25
54:11,20
57:22
58:5 59:4
60:17,20
68:4
71:10
72:24

**Americans**
48:13

53:9,12
54:15
55:18,24
58:6,9,
11,14
62:20
73:1
76:12
79:2
83:8,17,
25

**Amidon**
9:10,16

**analyses**
9:22,23
10:10,16,
18,20
11:11
13:14
17:8,9
34:2,22,
25 41:16

**analysis**
11:16
12:2 14:9
23:2,7,
11,16
24:9,23
27:1,17,
20 31:14
34:16,17,
21 35:6,8
36:14,18
37:22
39:5
41:17
44:5,16
47:20
48:2,4
51:4,21
52:7 53:2
54:23
55:13
56:1
58:12,21

60:21,22,
23 62:19,
23 63:2,
15 67:11,
21 68:8,
11 69:20
73:9 84:4

**analyst**
9:10
18:22
42:16

**analyze**
10:25
11:4
15:22
46:12
56:10,14

**analyzing**
27:11
35:7

**and/or**
76:21

**anecdotal**
25:1

**animus**
43:24

**annual**
57:17

**anomalies**
20:11

**answers**
7:6

**anticipated**
31:3

**anticipatio
n**
75:8

**AOSC20-23**
5:14

**AP**
80:15



**Apologies**
  80:1

**apologize**
  16:19
  31:7
  53:14
  59:11
  61:15
  79:19

**appearing**
  86:16

**appears**
  15:11

**Appendix**
  9:1 17:21

**applies**
  51:25
  65:17

**apply**
  52:1,2
  63:14
  65:16,18

**approach**
  67:10

**approximately**
  6:23
  11:20
  12:7 69:4
  80:6

**arc**
  65:13

**area**
  50:3
  59:11,16

**areas**
  10:12,13
  29:2

**arguing**
  35:20

**arithmetic**

  68:20

**arithmetically**
  64:24
  65:1
  68:24

**arrangement**
  5:13,16

**article**
  80:15,22
  81:20,25

**ascertain**
  78:2

**assertions**
  15:9,13

**asserts**
  33:16

**assess**
  85:1

**assessments**
  51:25
  52:1

**assistance**
  26:16

**assisted**
  9:9

**assume**
  8:3 35:6
  72:6

**assuming**
  41:23

**assumption**
  41:22
  67:4

**Atlanta**
  4:14
  59:11,16

**attached**
  9:3 26:10
  31:22

  80:3

**attachment**
  25:23

**attempting**
  65:24

**attorney**
  7:13
  40:15

**attorneys**
  5:8 8:14

**audio**
  4:20,21

**authority**
  22:24

**aware**
  22:14
  38:17
  50:9,11,
  22,24

———————

**B**

———————

**back**
  12:18
  14:24
  16:5
  18:11,13
  28:6 30:8
  31:9
  34:13
  43:20
  44:10
  49:16
  53:25
  61:15
  62:9 67:7
  78:19
  86:13
  87:23

**background**
  8:21,22

**backs**
  82:16

**ballot**
  76:23
  77:18
  83:23

**ballots**
  75:1,12,
  25 76:21
  77:10
  83:14,15,
  22,24
  85:22
  86:2

**ballpark**
  11:21

**based**
  21:21
  23:2,10
  38:13
  39:24
  40:23
  50:24
  52:23
  53:8
  55:10
  61:11
  62:23
  64:4
  67:22
  68:7
  73:12
  85:12

**basically**
  28:5
  38:4,15,
  19

**basis**
  18:19
  25:1
  30:19
  33:2 41:3
  55:5 64:1
  75:6 76:3

  84:5 87:3

**beginning**
  26:20

**begins**
  4:9

**Belinfante**
  5:6,24
  7:13
  22:18
  23:1
  29:16
  30:4
  34:20
  39:12
  49:13,18,
  23 75:9,
  19 84:24
  85:20
  86:6,19
  87:16,20

**Berkeley**
  9:13,16

**Bibb**
  58:20,24
  59:14,21
  60:10,11,
  14,21
  61:1

**Bibb's**
  59:6

**bilevel**
  40:24

**bipartisan**
  28:11

**bit**
  10:17
  16:15
  62:3

**bizarre**
  7:11

**black**
  51:7,9,21



58:22
62:21
72:6

**block**
5:1,3
51:19
67:12,19
68:13,17
69:6

**blocks**
67:13,19

**board**
27:16
38:16
40:20
70:4,5

**boards**
26:22,25
27:4
44:4,15
64:17
68:10
73:11,18

**body**
18:12

**Brad**
4:11

**break**
7:20,22,
23 53:17
62:3
78:12
84:11

**breakdown**
71:9

**BRG**
9:20 10:1
12:25
13:9
26:16

**briefly**
86:23

**bring**
57:25

**bringing**
11:17

**broadly**
51:10

**broke**
78:23

**Bryan**
5:4,23
62:8

**building**
37:2

**Bundy**
5:5

**Bureau**
52:10
53:8

———————

**C**

**calculated**
19:24
20:15
40:1 41:1
42:1
63:20
64:25
85:2

**calculates**
61:18
64:3 66:8

**calculating**
77:7

**calculation**
15:18
39:21
69:7

**calculations**
17:13

60:24
64:23

**call**
8:17 36:9
79:24

**called**
36:7,11
59:24

**capacity**
14:3

**career**
12:18

**Carrie**
9:10

**case**
4:14 10:3
24:7 87:7

**cast**
83:15,23
86:2

**catching**
31:6

**categories**
37:17
38:5
39:1,2,16
41:4 68:7
69:10

**categorize**
36:16

**category**
12:23
13:13
17:4
25:13
38:24
79:3 84:1

**Caucasian**
37:8
54:6,16,
17 57:21

58:4,13
63:19
68:4
70:12
71:10
72:23

**Caucasians**
48:13
55:18,25
58:9,10
83:3,4

**census**
48:12
51:7,19
52:11
53:8
67:11,13,
19 68:13
69:6

**census'**
67:18

**central**
84:8,9

**cetera**
71:10

**challenging**
7:10

**chance**
7:15
11:24

**change**
17:15
48:17
52:8,14,
24 71:4,
22 72:16
73:5
74:1,3,13
76:22
79:4,5

**changed**
45:2 48:6
52:6 67:6

70:22
72:20

**charged**
43:25

**chart**
61:12

**charts**
52:23
53:11

**check**
87:6

**choice**
69:23

**choose**
50:25
58:24
77:23
78:8

**choosing**
60:10

**chose**
29:15
50:23
60:11,25

**circling**
43:20

**citation**
82:12,13

**cited**
85:6

**claim**
11:18
12:4

**claims**
10:17
11:9 12:6

**clarification**
54:9

**clarify**



8:2 35:8
54:19

clear
23:15
24:22
28:21
33:22
42:10
54:13
76:24

clearer
79:6

climate
11:6

close
26:23
29:15
31:2,15
32:7,18,
21 36:3
43:23
45:23
46:4 56:7
57:15
73:4
75:4,7
76:25
84:21
86:24

closed
33:8,21,
23 38:7
40:19
41:5
42:18
47:4 48:3
50:1,2,
12,19
68:9
76:15
77:3,14,
23 84:12,
23

closes

49:11,21

closing
28:12
45:12,16,
18,22
46:19
73:19

closure
28:7,16
33:5
35:15,16,
17,18,19
36:2,6,7,
10,16,17,
24 37:1
38:20,21,
24 39:7,
19,21,22,
23,24
40:2,10,
13 42:12
46:3
48:6,20
49:2,3,
11,21
50:5
54:5,7,
11,14,15,
17 55:8,
14,17,23,
24 56:3,
4,8,9
57:21,23
58:5,22
59:21
60:12
63:7,19
64:3 65:4
66:1 71:4
78:5,6

closures
15:9 23:8
27:5
35:14
36:12,20

40:9
41:10,18
42:15,23
44:3,14
47:9
48:4,18
51:4,6,18
54:22
55:22
56:2,12,
21,23
57:5
58:2,10,
11,14
59:8,13,
15,18
60:8,13
62:19
63:5,14
64:14,16,
18,21
68:9
69:25
70:9,11,
12,22
74:22
86:3

Cobb
59:10

code
6:8
18:15,18,
20,23,24
19:1,5,6,
8,11,16,
17 20:13,
17,24,25
25:24
55:3
68:23

column
71:8,15,
18

combination
23:19

combined
66:20

comfortable
20:22

comments
81:17

commission
28:11

companies
10:24
11:15

compare
9:21 56:4

compared
54:7,10,
16,20
57:22
72:8

compares
60:15

comparing
51:5 55:5
74:8

comparison
34:16
51:20
52:2
55:4,10,
18 57:17
58:1
74:18

comparisons
34:1,2,9,
24 35:1
41:17
44:1,12
51:8

compensation
10:23,25

complaint

15:21,23
16:4

composition
33:13,25
48:15
56:10
70:21
73:10
76:9 77:8

comprehensive
84:22

comprise
59:11

comprised
59:3

computer
18:21

computers
18:21

concern
39:8

concerns
81:18

concluded
52:15
88:8

concludes
88:4

conclusion
61:20,21
68:1
73:15
79:1

conclusions
19:20
30:20
33:2 34:3
64:19

conduct
10:19



confirm
 31:25
 62:17
 87:6

confusing
 8:1

connected
 86:23

cons
 80:20
 81:2

consent
 5:15

consequence
 24:18
 30:21
 36:7 48:5
 66:3,22
 67:20

consistency
 66:12

consistent
 66:18,19

constitutional
 22:15

constructing
 11:11

consultant
 14:1

consulting
 11:14

contention
 40:12

context
 11:16
 12:16
 14:2
 81:18
 83:13

contributing
 70:25

control
 27:13
 38:15,20
 40:19
 44:3,15
 64:16
 68:10

controlled
 41:14

controlling
 11:13
 44:5,17

convenient
 45:25
 50:16

conversation
 34:19

conversely
 46:4

copy
 87:11,17,
 22

correct
 6:21 9:13
 17:19
 20:16
 21:11
 22:4,7,
 17,23,25
 23:18
 24:25
 25:2,10,
 11 26:14,
 17,18
 32:14,19,
 22 33:22
 35:23,24
 36:4,5
 40:10

43:13
 45:10
 46:20,21,
 24 47:4
 48:24
 49:4 51:6
 52:8,17
 55:7,11
 57:19
 61:6
 70:3,13
 71:12,18,
 23 72:9,
 17 74:9,
 14 76:3,
 17,18
 79:5
 83:6,20,
 21 84:12,
 17,19
 85:9,15,
 19 87:3

correctly
 38:23
 47:1

correlated
 29:22
 38:12
 41:20
 42:1
 64:18

correlations
 41:3

counsel
 4:22
 5:15,20
 14:20
 15:7,15
 21:23
 22:1 82:1
 86:18
 87:14

count

21:2
 25:13
 36:17
 73:6
 85:23

counted
 63:5,6

counties
 21:8,15,
 18 23:17
 24:25
 25:13,15
 27:3
 29:15
 31:1,15
 32:7,9,
 10,17,20
 33:21
 34:11
 42:14
 43:6,21
 46:23
 47:3,4,7
 54:5
 55:14,15,
 22,25
 56:11,15,
 22 57:1,
 5,6,12,19
 58:3
 59:2,9,
 14,15
 60:7,15,
 20,23,24
 61:1,14,
 23 63:5,
 6,7,14,
 17,25
 69:21,24
 70:1,10,
 13,15,18,
 20 71:1,
 2,6,12,
 21,22,25
 72:4,7
 73:3,9,

10,12,15,
 18 76:7,
 15 85:6,
 7,10,25
 86:2

counting
 54:14
 57:19,24
 58:15,19
 70:10

counts
 35:19

county
 18:16
 19:9,10
 21:1
 22:23
 23:4,14,
 21,22
 24:6,11,
 12,13,19,
 21,24
 25:3,4,
 15,24
 26:22,25
 27:13,14,
 15,16
 28:1,10
 29:19
 30:17,18,
 22 31:12
 32:25
 33:4,6,7,
 16,17,24
 34:4,5,8
 38:9,15,
 20 39:3,
 4,8,15
 40:20,24
 41:13
 42:13,18,
 23 43:24
 44:4,8,
 15,20
 47:13



54:13,21
55:3
56:5,6,
18,23
57:14,20
58:2,7,8,
10,13,21,
25 59:2,
5,6,14,17
60:4,5,6,
10,11,14,
22 61:4,
6,8,13,
20,21,22,
24 64:7,
17 65:6
70:4
73:11
84:7,23
85:13,17,
18

**county's**
27:17
39:6

**county-by-county**
23:11
25:25
58:1 64:1
84:11

**county-level**
18:19
24:24
26:4

**county-specific**
17:14

**couple**
42:20

**court**
4:13,17,
23 5:8,
10,14,25

6:6,10
7:5,6
14:19
16:14,18,
21 25:19
44:9,11
49:15,19
79:8,25
86:18
87:1,8,
11,14,18

**courtesy**
4:19

**COVID-19**
81:12

**create**
57:10

**created**
17:18

**credit**
10:10
13:14

**criticism**
51:23,25
52:3
63:22
64:2,8
65:16

**criticisms**
64:10
67:9,11
68:21

**critique**
21:12
48:1,7
51:2,3
62:18
74:5
79:16
80:10,12
84:4,8

**critiques**
21:6

65:3,7
84:9

**critiquing**
65:2

**cross**
86:18

**cross-county**
65:12

**curious**
59:17

**current**
11:6

**cut**
69:8,9

**cutoff**
69:11

**CV**
8:23 9:1
15:2

_____

D

_____

**data**
17:2,25
18:2,3,5
19:1,20
20:8
23:20
24:1 33:7
48:12
52:11
53:8
54:23,25
58:25
63:24
68:17,20
73:14,22
74:17
75:16,17
78:1
82:16

83:16

**database**
18:23

**databases**
18:8

**day**
45:20
46:7
76:11,24
77:10,20,
24 78:24

**deal**
24:1
33:20

**dealing**
13:14

**decides**
77:18

**decision**
37:25
38:8 40:3
43:22
56:8
57:15
70:3,23
71:3
73:4,6,12
75:2
77:5,15
84:5
85:10

**decision-maker**
87:24

**decision-makers**
28:4,9,
15,18
75:14
85:8

**decision-making**

26:5
27:4,17
43:21

**decisioning**
38:18
70:21
72:1

**decisions**
11:1,10
22:24
26:23
27:8,10
28:2,3
43:25
56:4,6
64:5
66:21
70:4
71:6,7
72:22
73:4,13,
25 75:3,
15 84:6
85:17

**decrease**
29:3
46:3,6

**decreasing**
46:20

**defendant**
12:3

**defendants**
5:7 8:14
12:5

**defending**
12:3

**defense**
87:14

**defined**
57:15

**definition**
39:21,23,



24 40:9,
13 42:12
49:3
62:24
64:21
65:4

degree
57:20
58:17

degrees
59:13

Dekalb
42:13
59:10

delineating
21:24

demand
74:25

demographic
10:21
14:11

demographics
56:11,14,
16,22
57:11
61:6

demolished
42:19

depend
13:8

depicted
61:11

depicts
30:17
32:24

deposed
6:20 7:3

deposition
4:1,9,18
5:9 8:8,

15 82:4
88:5,7,8

describe
15:25
18:17
24:11
41:7

describes
20:5

describing
33:6,14
34:6

description
27:21
28:1 51:9

descriptive
24:17,18
34:24

detail
8:23 17:7
18:18
32:16

deteriorated
37:3

determine
11:1,11
15:9,13
21:9,19
37:6
40:22,23
44:5,16

determined
21:24

determining
44:6,7,
18,19

difference
28:23
29:1,7
37:15
40:25

41:19
52:15,16,
20,21
53:3,6,11
58:18
61:19
65:25
66:13,23
67:3 68:2
72:15,19,
23 73:1
76:12

differences
19:25
30:22
31:12
33:14
39:15
66:16
76:6

differently
41:7

difficult
13:11
84:17

dilapidated
37:20
39:9

DIRECT
6:16

direction
9:11,23
20:21

director
9:12

disagree
40:8
64:11
69:7

disagreeing
39:20

disagreement
80:19

discrepancies
23:8

discrimination
10:16,23
11:18
12:4

discuss
67:16

discussing
70:9
78:23

discussion
64:21
80:25

discussions
69:20

disenfranchised'
79:3

disparate
11:12
28:12,21
37:23,24

disparities
11:1

disproportionally
72:8

disproportionately
72:11

distinguish
36:13
38:19
65:13

distribute

64:25

distribution
52:6,11,
13,24
70:24
71:16
77:8

distributions
41:25
72:20
76:25

district
4:13 21:9

diversity
57:1,7,8,
13

Division
4:13,14

Doctor
16:14
25:20

documents
8:11

draw
34:23,25

drew
19:20

driving
74:22

drop
75:5

due
20:3

duly
6:14

duplicate
20:14



**E**

**EABS**
74:17

**earlier**
64:15
65:9
69:20,25
78:4

**early**
74:7,8,
19,25
75:12,25
76:6,16,
20,22
77:5,15,
18,23
78:8
79:14
82:10,17,
19,21
83:3,9,
23,24

**ease**
46:11

**easily**
74:16

**Eastern**
4:8

**economic**
10:15
11:6

**economist**
74:24

**Edmondson**
4:25 5:21
6:11,17
9:5 14:15
15:1
16:22
22:21
23:5

26:3,7,12
30:2,10
31:18,24
35:2
39:17
44:9,21
49:15
50:7
53:16,19
54:2
62:2,11
75:13
76:1
78:11,21
79:12,22
80:1,5
85:4
86:4,7,9,
15 87:1,
4,13,21,
23

**educational**
8:21,22

**effect**
41:15
44:7,19
49:12,22
77:4,15
78:5,23

**efficient**
62:3

**elaborate**
10:17
17:15
26:24
35:3 61:9

**elaborated**
17:5

**elected**
85:21

**election**
22:16
32:8
35:23

44:4,15,
25 45:1,
3,5,9,20
46:7
66:4,5,6,
17 73:11
75:7,8,18
76:11,24
77:10,20,
24 78:24
83:2
85:22

**election-
day**
79:4,15

**elections**
26:22
27:1,5,16
38:16
40:20
64:17
68:10
70:5
85:16

**Elementary**
35:21

**Elizabeth**
4:25 5:21

**Ellis**
4:16

**embraced**
20:23

**employed**
10:4

**employment**
10:1,8,
15,16
11:18
12:3

**employment-
discriminat
ion**
13:6

**end**
17:18,23
19:17
30:20
76:19

**ended**
19:2

**entail**
10:18

**entire**
65:14

**entirety**
16:4

**entities**
10:25

**equal**
10:20
28:5,19
80:8

**equivalent**
30:18
33:1,3

**error**
65:1

**ERS**
10:3

**Esquire**
4:18

**essentially**
27:12
55:2
57:18
65:3
69:17
84:8

**et al**
4:11,12

**ethnic**
79:3
83:10,11,
19

**ethnicity**
10:21
77:1
82:22

**events**
67:5

**EXAMINATION**
6:16

**examine**
11:3
33:25
35:13

**examined**
6:14

**examining**
44:1,13

**examples**
27:22
30:24
42:4,8
43:10

**Excel**
25:24

**exceptions**
22:16

**exclude**
55:25

**excluded**
20:7

**excuse**
21:4
26:20
29:11
32:21
63:4 74:4

**exhibit**
9:1,2,7
26:7,9,13
31:6,9,
10,19,21
35:12



79:23,24
80:2 82:6

**exist**
36:24
37:18,19
41:5

**existed**
29:5
39:25
42:4

**existence**
35:25
36:9

**exists**
37:2

**expect**
52:12,18,
20 53:5

**expected**
68:2

**expedite**
88:1

**expedited**
87:3

**experienced**
76:16

**expert**
13:19
15:8
22:22

**explain**
70:16
82:23

**explicitly**
29:14

**extent**
15:24,25
16:1,23
37:15
40:18
41:11

64:17
85:23

**extra**
17:17

─────────

**F**
─────────

**faced**
73:25

**fact**
32:20
58:20
71:21
77:13
82:6

**factor**
29:20

**factors**
11:13
29:22,23,
25 44:6,
17,18

**failing**
34:10
74:6

**fair**
4:10 9:25
15:12
16:23
20:15
25:16
29:10,13
32:8
37:17
39:2,20
40:8,14
41:6
43:21
46:7,16
48:7
50:20
51:9
54:12

58:14
60:12
63:1,12,
13,21
64:23
70:2
74:23
81:12
84:21

**fall**
16:13
17:4
25:13

**familiar**
7:3 75:23

**farther**
46:5
47:10,14

**fed**
17:12

**federal**
22:15

**feel**
30:13
51:13

**felt**
20:22

**fields**
18:24
19:13,19

**Fight**
4:11

**Figueroa**
4:2,18

**figure**
33:9
38:25

**file**
25:24
51:8
55:5,6,11

**filed**
4:12
80:24

**files**
19:2,3
51:20
52:2

**filter**
37:14

**filtering**
41:19

**find**
42:20
43:3,8,
14,18
82:3

**findings**
15:4
16:7,8,11
17:9,15
25:4

**fine**
20:8 41:8
87:5

**firm**
5:7

**flawed**
48:3

**flips**
58:23

**Florida**
4:3 5:13
6:8

**focus**
7:4 9:20,
25 10:7
20:10
29:10,13
33:15,16
34:1
43:20,22
55:13

57:14
62:20
65:20
69:18
74:17

**focused**
12:25
42:13
43:5
74:11,19
75:3

**focusing**
11:15
19:23
84:3

**force**
11:5

**forgetting**
59:10

**form**
22:18
23:1
29:16
30:19
33:1
34:3,20
39:12
49:23
75:9,19
80:18
84:24
85:20

**formalities**
26:13

**forms**
80:8

**found**
53:4

**four-year**
66:8

**frame**
85:1



**free**
30:13
51:13

**freezing**
14:13

**frequencied**
20:8

**front**
8:23
51:11

**fully**
81:12,15

**Fulton**
42:13
59:9

**function**
37:3,20

**furloughs**
11:5

―――――――

**G**

―――――――

**gave**
63:13

**gender**
10:21

**general**
17:6
21:22
35:7
65:14
66:4 82:9

**generally**
29:18,25
34:21
54:21
56:21

**generate**
18:15
19:3
56:17,25

**generated**
20:18

**generates**
34:23

**geographic**
76:5

**George**
4:16

**Georgia**
4:14
21:7,18
22:15
51:18,21
60:15
61:5
67:18
68:12
69:5 72:8
76:7
82:13,17,
20 83:13,
14,23
85:16,19

**Georgians**
49:7,8

**give**
6:3 7:14
24:13
30:24
42:3
79:17

**glean**
55:20

**good**
6:18,19
11:24
62:12,13
79:15

**Google**
36:22
42:17
43:14,15,
18 84:18,

20

**governor**
85:16

**graphs**
17:17

**great**
24:1
33:20
85:14

**group**
9:13,17,
22 10:3
11:13
55:6
61:22
67:19
83:19

**grouping**
67:4

**groups**
10:22
11:2
14:11
51:7,19
64:4
68:13,17
69:6 78:4
83:10,12

**groups,'**
67:19

**Gwinnett**
59:10

―――――――

**H**

―――――――

**half**
58:3,4

**hand**
6:1 56:5

**hands**
24:8

**handy**
26:6
81:25

**happen**
59:18

**happened**
55:23
66:2,3

**happening**
27:23

**hard**
16:15

**health**
81:18

**hear**
7:7 71:13

**hearing**
16:16

**Herron**
15:8
18:2,14
20:14,18
24:16
26:21
27:8,24
29:8,18
30:11,17,
21 32:1,
6,12,19,
24 34:23
35:13
36:6,11,
20 43:1
46:12
48:18
51:4,17
52:13
54:16,18
55:1,4
57:16
59:25
61:3,10
64:15

65:23
67:16
70:24
72:25
73:14
74:5,11
76:4,25
77:7
78:22
79:13
80:7
84:13
85:2

**Herron's**
8:12
16:1,9
18:21
21:7
24:23
25:9,24
27:2
31:4,13,
19 35:1
39:18
41:16
44:1,12
45:25
47:21,23
48:2
51:25
55:2 56:7
58:21
62:16,19
63:23
64:20,22
67:8,10
68:16
70:14
74:18
76:10
77:25
79:11
80:21
84:4

**hid**
33:19



    9:19
    60:12
higher
    37:7,8
    45:1
    48:12,16
    53:9 54:6
    58:3,5,15
    59:7,14,
    21 60:8
    63:19
    64:3
    70:11
    82:11
    83:9,25
highest
    59:7
highlighted
    35:21
hiring
    11:9
hold
    72:13
homogeneous
    67:18,24
    68:12,17
    69:6
homogenous
    51:7
    67:13
horizon
    81:13,15
Horton
    31:25
hosts
    50:25
hour
    7:23
    53:17
hypothesis

    74:20
hypothetica
lly
    73:12

———————

    I

———————

ID
    14:10
identificat
ion
    9:2 26:9
    31:21
    80:2
identified
    54:18
    84:16
identifies
    80:7
identify
    68:22
ignores
    26:21
ignoring
    28:3
II
    21:3
    30:12
III
    44:22
illustrate
    42:11,21
    43:8 60:6
    61:2
illustratin
g
    60:3
illustratio
n
    43:9

impact
    11:12
    20:11
    28:12,21
    37:24
    38:25
    48:18
    50:12
    86:1
impacted
    15:10
    48:20
    76:21
important
    60:5
    67:2,5
    72:16,18
    85:5
impossible
    28:11
    84:22
in-depth
    16:11
in-person
    75:5
    81:19
    82:17,19,
    21 83:18,
    24
inappropria
te
    63:24
include
    19:9 33:7
    43:10
    63:9
    76:25
included
    14:9
    16:24
    32:13,19
    33:4
    42:9,12

    45:24
    48:19
    57:1
    63:18
    69:9,11,
    12 71:23,
    24 83:19
    86:1
includes
    39:25
    48:1 54:4
    64:4,6
    68:8
including
    40:18
    44:3,14
    48:9 51:3
    63:16
    64:16
    72:2
inclusion
    51:23
Incorporate
d
    4:11
incorrect
    67:14
    69:13
increase
    28:17
    46:2,3
increased
    82:9
increases
    29:3 72:4
increasing
    27:6 28:7
    46:19
    75:24
individual
    34:5,11
    50:13,22,

    25 59:1
    60:2
    68:19
    69:8 84:6
individuals
    20:6 27:7
    48:19
    52:5 78:7
industry
    10:8
inferences
    28:23
    34:23
    35:1
inferential
    24:15,16
inflated
    39:19
    40:6,7
inflated'
    35:14
inflates
    72:2
influence
    46:14,15
    50:5
    59:23
    60:9 74:6
    75:1
    85:24
influenced
    32:17
    61:13
    70:5
influencing
    61:23
information
    17:3,12
    27:18
    29:6
    30:25
    32:13



55:20
56:24
57:3
75:21
78:1
85:12

initial
66:10
81:4

input
69:2

inquiries
11:8

inquiry
70:2

instance
28:25
36:15
38:23
64:6

instances
19:25
63:9

instruction
14:6

instructive
23:12

instructs
7:16

intent
38:6

Internet
82:3

interpose
7:15

interpreting
22:12

investigate
11:2

involve
12:14

involved
26:22

involving
10:9,11,
16  11:8

irrelevant
37:22,25

issue
51:17
62:20
66:1
67:12
84:14

issues
10:1
12:23
13:1,7,
16,20,21,
24  14:3,
6,9,12

IV
69:15

_____

J

Janet
4:10  6:13
88:5

Jenner
5:1,3

Jennifer
4:2,17

Johnson
5:2,22

Josh
5:6,24

judicial
22:11

_____

K

keeping
50:21

key
16:6,8,11
20:8

kind
27:9
40:13

knew
43:6,7

knots
38:3

knowing
37:12
46:17
47:19

_____

L

labor
10:1,8,14

lacked
71:11

land
80:17

Large
4:3

larger
13:4,10
60:7

law
21:7
22:15,16
80:16

Lawrence
5:5

lawyer

22:7

layperson
34:17

lead
17:9

learned
77:22

learning
29:6

leave
63:14

led
68:22

legal
40:13

lending
10:10
13:14

Leslie
5:4,23

lessened
74:21

level
9:19  23:9
24:9

light
28:6

likelihood
42:24
46:6

lines
59:1  65:6

list
17:23
38:13
59:7

listed
17:25
37:18
83:12

listing
25:14

literature
75:23

litigation
10:24
11:8,16
12:16
14:2

live
67:18
68:12,17
69:5

locate
42:8
43:11

located
6:7

location
46:14
85:11

locations
22:25
75:15
78:25

logic
18:14,22
60:25

logistical
53:20

long
7:22

longer
29:5
36:25
37:2,19
39:25
40:4  62:8

looked
17:1,14
20:8,24



24:19,25
25:3
27:22
29:25
30:1
51:6,8
56:17
57:3 59:6
61:19,21
74:15,16

lot
23:23
60:4
61:4,5
80:25
84:16,18

lower
58:16

lowest
83:11,17

lunch
61:25
63:3

─────────────

M
─────────────

made
16:8 40:3
56:7
57:15
64:5
65:14
70:3,4
71:3,7
72:2,22
73:4,13,
18,22
81:17
84:6

mail
83:5,11,
19,22

mail-in

83:14

majority
51:9,21
62:21
63:10,17

make
6:6 7:7
20:6
21:10
22:24
32:18
34:14
42:10
45:25
49:25
64:14
67:4
72:15
73:25
74:1,3
85:10

makers
75:2

makes
32:23
34:1,3
73:15

makeup
26:21,25
27:16,19
37:11
38:12
39:1,4
65:21

making
21:1
27:7,9,25
28:1,8
41:21
43:25
64:8
73:11
75:14

manage
9:21,22

managing
9:12

manner
5:16

maps
42:17
43:15,18

March
18:14

mark
8:25 26:7
31:18
79:22
82:5

marked
9:2 26:9
31:21
80:2

marks
35:18
36:2,12

mask
34:11
60:2

masked
30:22,25
31:13
33:19
66:22

masking
34:10

masks
34:4 64:3

match
14:10
18:9
19:23
20:9

matched

19:7 21:2

matches
68:24,25

materials
17:23,24
22:5

math
69:1 72:6

matter
4:10 10:7
12:21
15:21
16:3
68:21
72:6

matters
10:9 13:3
85:17

Meadowview
35:21

meaning
21:14
34:18,19
37:25
40:2 56:3

meaningful
23:7

means
42:21

meant
47:9

measure
56:7
65:24

measured
28:22
29:23
36:6,20
41:20
44:8,20
54:15

measurement
62:24

measures
29:8

measuring
29:20
65:25

meet
8:14,16

meeting
8:18

mentioned
9:15
12:24
13:13
34:15
45:18

mentioning
46:20

mentions
13:18

methodologies
51:5,10

methodology
65:2,4,8
68:22

Michael
9:10

mid-term
45:1

midterm
66:4,6,16

million
20:2 69:5

mind
50:21

minute
41:2



mis-
leadingly
  30:21
  31:13
mislead
  63:16
misleading
  23:24
  24:2 61:3
  77:2
misleadingl
y
  30:25
missing
  15:12
misundersta
nding
  56:20
mixing
  66:3
modified
  18:15,18,
  25 19:8
  20:13
  21:1
modify
  18:22
  20:17
moment
  7:20
  14:16
  26:6
  30:3,14
  31:8
  35:3,16
  43:20
  50:15
  62:1
  63:13
  64:20
  67:7
  86:5,8

monolithic
  27:3,9,24
  29:19
month
  13:4
  66:18
months
  13:2,3
morning
  6:18,19
motivated
  43:23
move
  26:23
  28:16
  45:24
  53:9
  62:1,14
  69:15
  76:19
  77:9
moved
  48:4,10,
  13,14,16,
  22,23
  49:1,7,8
  50:10
  51:24
  70:22
  77:4,8,14
movement
  15:10
  52:16
  75:22
movers
  51:3
  52:11
  53:14
moves
  50:3
moving
  16:19

49:12,22
  50:17
  53:3
municipalit
ies
  21:8,18
mute
  4:20

——————————

        N

narrows
  72:23
nationwide
  82:13
necessarily
  73:24
  82:1,13
needed
  18:22
  29:2
  75:16
no-excuse
  75:1,11
  83:14
nobody's
  8:18
nonmovers
  52:24
  53:13
normal
  34:19
Northern
  4:13
Notary
  4:3
note
  82:8
notes
  32:6

noticed
  59:2
number
  4:14 10:9
  19:25
  27:22
  28:17
  33:4
  46:23
  47:8,13
  50:14
  55:15
  59:15
  60:8
  68:16
  70:10
  83:1
  85:11
numbers
  20:1,25
  42:23
  43:2,7
  53:4 59:7
  68:15
  69:2,4
  82:24
  83:8
  86:1,2
numerically
  60:13
numerous
  9:23 18:2

——————————

        O

oath
  5:12
object
  7:14
  22:18
  23:1
  29:16
  34:20
  39:12

49:23
  75:9,19
  84:24
  85:20
objection
  5:16 7:15
occasions
  11:20
  12:8
odd
  21:22
offer
  65:8 84:4
offered
  67:11
  69:24
  79:13,16
  80:9
offering
  80:8
offhand
  19:17
officials
  22:23
  38:9
  43:24
  75:7 84:7
offset
  52:16,19,
  20 53:5,
  10
offsets
  52:22
  53:3
omitted
  71:12
one's
  58:16
open
  35:22
  43:16



opening
  73:19

opine
  15:16

opinion
  22:22
  23:6,10
  80:13,21

opinions
  22:12

opportunity
  79:18
  80:9

opposed
  55:14

order
  5:14
  18:15,19
  84:25
  85:1

ordering
  87:2

orders
  86:24

ordinary
  34:19

organizatio
ns
  11:6

original
  16:25
  87:2

outcome
  21:13
  23:12,24
  24:2
  28:19
  34:4
  60:1,2
  61:2,3,
  11,14,23

outcomes
  23:4,22
  24:12
  27:11
  64:19
  85:24

output
  56:17
  68:25

overarching
  64:13
  67:9

————————

P

————————

p.m.
  53:24
  62:7
  78:18
  86:12
  88:4,9

paid
  14:1

pandemic
  81:12

papers
  13:20

paradox
  59:25

paragraph
  15:5,19,
  23,25
  16:6
  18:12
  26:1,5,
  19,20
  30:13,16,
  20 31:16
  32:3,12,
  15,23
  33:12
  35:11
  44:23

46:25
47:25
48:1
51:14,16,
22 54:3,
4,23
57:18
67:16
69:16,18,
19 74:7
76:20
82:8

paragraphs
  30:12
  31:10
  62:15,16,
  18 64:9
  69:17
  74:5 80:6

pardon
  42:7 50:2
  67:19,25
  69:9

parking
  46:15

part
  8:13 15:2
  16:3 38:8
  43:24
  74:22

participant
s
  86:22

participati
ng
  5:9

participati
on
  44:25

parties
  5:15 28:5

partisan
  26:21,25

27:15,19

parts
  8:12

party
  12:21

pattern
  66:7,9

patterns
  14:10

pay
  10:20

PDF
  17:22

pending
  7:22

people
  9:15,22
  47:9
  48:23
  49:1 69:5

percent
  13:10
  31:1,14
  32:9
  46:22
  47:2,3
  48:21
  55:17,23,
  24 58:9,
  10 59:3
  63:20
  67:24,25
  68:1,3,4
  83:3,4

percentage
  13:4,5
  20:9 28:5
  29:7 33:8
  48:13
  49:7
  53:12
  54:14

60:16
70:11
72:5,14,
19,21
83:9,11,
18

percentage-
point
  61:19

percentages
  19:7,24
  20:12,14,
  25 72:3
  85:18

percents
  70:13

performed
  51:4 63:2

period
  13:8
  66:8,12
  74:10

person
  7:7 50:17
  83:3

personal
  78:9

personally
  20:17

perspective
  73:8

Ph.d.
  6:13

phone
  8:17
  16:20

pieces
  17:3

place
  21:9
  22:24



23:8
35:14,25
36:9
37:1,18,
20,21
39:9,11
41:4
43:12,16,
23 45:2,
4,9,17,
19,22,23
46:1,5,
18,19
47:4
48:5,17
49:11,21
50:2,3,4,
5,10,11,
12,16,17,
19,23,24
51:6,18
55:8
57:15
58:22
62:19
63:11,18
69:25
70:9
71:3,4,
10,11,17,
18,23,25
72:1
73:2,5
75:15
76:22
77:4,14,
22 78:24
79:5

placement
70:5

places
15:10
21:10,19,
24 26:23
27:6,7
28:8,13,

17 29:2,
15 31:2,
15 32:8,
21 33:8,
21,23
35:20
38:5,7,10
42:4,17,
18,23
45:7,13
46:24
47:8,9,13
48:3
50:15
51:21
62:21,25
63:4
65:21
68:9
69:22
70:2,6,
19,22,23
73:20
74:21,23
75:4,7
76:11,15,
22,24
77:11,20
78:5,6
82:11
84:12,23
85:9,11,
24

placing
28:7

plaintiff
11:17

plaintiffs
5:1,3,5

plaintiffs'
5:20 15:8

plan
7:23

point

8:19 25:6
27:23,25
28:4
32:15,23
36:8
42:21
43:8
64:14
65:14
68:5,8
72:14
75:4

polling
15:10
21:9,10,
19,24
22:24
23:8
26:23
27:5,6
28:7,8,
12,17
29:2,15
31:2,15
32:7,21
33:8,21,
23 35:13,
25 37:1,
18,19,21
38:5,7,10
39:9,10
41:4
42:4,5,
18,23
43:12,23
45:2,4,7,
9,13,17,
18,22,23
46:4,5,
18,19,24
47:4,8,9,
13 48:2,
5,17
49:11,21
50:2,3,4,
9,11,12,

15,16,19,
22,24
51:6,18,
21 55:8
57:15
58:22
62:19,21,
25 63:4,
10,17
65:21
68:9
69:22,25
70:1,6,9,
19,22,23
71:3,4,
10,11,17
73:5,19
74:21,23
75:4,7,15
76:11,15,
22,24
77:4,11,
14,20,22
78:5,6,24
79:5
82:11
84:11,23
85:8,11,
24

population
29:3,4
59:3
60:16
68:6

populous
59:9,20

portion
13:10
47:15,17,
18

posited
41:2

position
39:9

49:10,20
77:3,13
80:7,10

possibility
24:2
45:11
50:21

potential
29:21
53:10

potentially
48:5 86:1

practical
14:6

precinct
21:20
48:23
49:2,8,
11,12,21,
22 50:1,
18

precincts
51:9

preparation
55:1

prepare
8:8,15
33:3

prepared
9:6
10:10,15
21:13
24:20
26:14

preparing
9:9,23

present
5:10 62:8

presentatio
ns
13:23



presidentia
l
    44:25
    66:5,16
Press
    81:9
pretextual
    39:7
previous
    14:8
previously
    10:4
    13:19
primary
    10:6,13
    84:3
prior
    45:2,5
    50:9,22
proactively
    11:7
probability
    48:17
problem
    53:15
    61:17
problematic
    48:12
procedures
    7:3
proceed
    6:11
proceedings
    5:12
process
    20:22
produce
    19:2
    25:24

produced
    18:3,14
    24:16
    52:13
    56:25
production
    82:2
professiona
l
    4:2 8:21
programming
    18:14
programs
    18:9
projects
    9:21,24
promotion
    11:9
proofing
    59:5
proper
    66:14,25
    67:3
properly
    19:1
proportion
    28:24
    37:7,8
    54:6,10,
    15,17,20
    58:2,4
    67:22
    68:6
    83:15,22,
    25
proposition
    80:11
pros
    80:20
    81:2

provide

16:6
    18:5,19
    24:11
    25:22
    30:18
    32:25
    33:5,15
    34:3,8
    35:4 82:1
    84:10
    86:23
provided
    11:16
    12:2
    13:19
    14:12
    21:12
    22:1
    24:17
    25:14
    29:18
    34:8
    65:10
providing
    52:10
public
    4:3 81:18
publication
    81:7
published
    13:20
pull
    74:16
purported
    51:17
purpose
    33:24
purposes
    36:17
    37:21
    64:21
pursuant

5:13
put
    21:5
    35:18
    36:7

—————————

Q

—————————

quarrel
    64:22
    68:19
question
    7:17,22,
    25 8:3
    13:11
    18:1 24:4
    28:25
    29:12
    35:9
    38:2,4
    41:13,18
    43:5
    45:15
    49:14
    50:1,6
    52:4
    53:18,21
    54:9 64:9
    66:7,11,
    20 67:1,
    20 71:5
    73:7
    77:12
    79:19
    81:9
    87:24
questioned
    80:15
questions
    7:14 8:20
    10:11,20,
    22 11:9
    86:19

quick
    53:17
quotation
    35:18
    36:2,12
quote
    35:14
    36:19
    38:21
    79:2
    81:22
quote/
unquote
    39:19
quotes
    36:8
quoting
    80:23

—————————

R

—————————

race
    10:21
    29:8,14,
    20,22,23
    30:1
    34:10
    37:16
    40:25
    41:3,11,
    12,14,19,
    21,23
    42:1,2
    44:2,7,
    13,19
    51:6,18
    52:12
    55:6,9
    56:9
    64:18
    66:1
    67:12
    73:12
    76:12



77:1
79:7,10
82:21

**races**
20:6
70:24

**racial**
23:8
26:21
33:13,25
37:11,23
38:12,25
39:1,4,14
43:24
48:15
56:10,11,
14,16,22
61:6
65:21
70:21
71:16
73:10
76:9 77:7
79:3 83:9

**racially**
28:12
51:7
67:13,18,
24 68:12,
17 69:6

**Raffensperg er**
4:12

**raise**
6:1

**raised**
10:22
84:13

**raises**
67:20

**ran**
18:9,23

**range**
67:23

**rate**
40:6
52:16
53:2,9
55:17,24
56:3,9
58:22
59:21
60:12
63:7,19
64:4
74:12
82:11

**rates**
14:10
35:15,16
39:19,21
55:9,19,
21 58:5

**rationale**
77:17

**reaction**
79:16

**read**
19:1
22:9,11
30:14
44:10
48:1
49:16
80:14,22
81:7
87:19,20

**reading**
75:23
88:6

**ready**
4:21

**realized**
8:18

**reason**
8:4
29:11,14
36:1,5,21
37:5,16
38:6,13,
24 39:7
40:4
43:3,12
45:7,16,
18 47:7
61:7 85:5

**reasoning**
69:23

**reasons**
28:7,16
29:4
35:13
37:7,10,
12,13
38:13,14
40:1
41:10,11,
12,14
43:19
45:12,14,
21,25
46:2,12,
13,17
51:1
60:11
63:13
78:9
79:14,17
84:11,16
85:3

**rebuttal**
8:25 26:6

**recalculati ng**
70:12,17

**recall**
16:10
17:20

18:2,3,24
19:13,15,
21,22,24
20:5
36:19
40:11
41:23
42:14
48:9 57:9
60:18,19
72:13
80:22
81:7,16,
20,21

**recalled**
41:22

**recap**
31:12

**received**
9:3 16:5
18:4
26:10
31:22
80:3

**recently**
11:4

**recess**
14:23
30:7
53:24
62:7
78:18
86:12

**recognize**
72:19

**recollectio n**
19:16

**record**
4:7 5:19
14:16,20,
21,24
26:8

30:2,5,8
53:20,22
54:1
62:5,9
78:16,19
86:4,10,
13,25
88:2,3

**recording**
4:7

**reduce**
24:1

**reduced**
47:13

**reduction**
11:5
46:23
47:2,8

**reference**
58:20

**referenced**
15:23
22:3,5
32:10

**references**
14:8

**referred**
73:3

**referring**
25:7,9
34:22

**refers**
71:16

**regenerated**
19:22

**registered**
4:2 20:2
37:9,11
46:1
48:10,21
51:24



54:7,8,
11,17,21
57:21,22
59:4,12
67:17
68:6
71:20,21
72:24
85:19

**relates**
54:22

**relation**
52:4 66:2

**relationshi**
**p**
76:23

**relative**
59:13,15,
19 60:7,
20 61:1
72:5

**relevance**
26:24
40:14
77:19

**relevant**
7:5 38:10
61:24
68:22
70:2
77:10

**relied**
17:24
18:2,13
21:13
22:5 55:1
75:21

**relies**
33:13

**rely**
17:24
75:16

**relying**
21:20

**remaining**
38:7
55:16
63:6,7

**remember**
4:20
19:17
60:18

**remote**
4:16 7:11

**remotely**
5:12
86:16

**remove**
38:4 48:4
53:12,13
58:24
60:6
70:17
72:22

**removed**
52:5,24
58:21
59:18
63:4
69:21

**removing**
60:22,24
70:15
72:4

**repeat**
49:13

**replacement**
71:5

**replicated**
68:18

**report**
8:25 9:1,
6 15:3,5,
8,17,22

16:2,9,25
17:10,19,
22 18:4,
12 20:5
21:3,7,21
22:4 24:5
25:6,23
26:6,14
27:2 29:6
30:12
31:4,19,
20 32:1,
4,10,14,
20 33:9,
16,19,22,
25 34:7
35:11,12,
18,22
36:22
41:22
42:6,9
44:23
46:25
47:21,24,
25 51:11
54:4
62:15,17
63:23
64:11
65:10,15
66:10
67:8
69:16,25
74:11
77:1
78:10
79:1,13,
21 80:10,
24 81:1,
3,4,11
82:7
84:8,15

**reported**
18:16
52:17

**reporter**
4:2,17,23
5:8,10,25
6:6,10
7:5,6 9:4
14:19
16:14,18,
21 25:19
26:11
31:23
44:9,11
49:16,19
79:8,25
80:4
86:18
87:1,8,
11,14,18

**reporting**
5:11,17

**reports**
8:10,11,
12 81:6,
14

**represent**
4:23
62:18
82:24

**representat**
**ion**
28:20

**represented**
69:3

**representin**
**g**
4:18

**reproduce**
20:18
25:17

**reproduced**
24:22

**requested**
18:6
21:25

**require**
84:18

**Research**
9:13,16

**researcher**
41:24
43:7,10,
11

**respect**
11:12
56:21

**respond**
74:17

**responding**
7:15
47:21

**response**
44:10
76:4
84:14

**responsibil**
**ities**
21:19

**responsibil**
**ity**
21:8

**rest**
72:8

**restart**
29:12

**result**
12:17
16:9 27:5
38:8 61:3

**results**
17:2
18:16,19
20:18,23
25:15,25
27:10,19

**resume**



10:14
13:18
14:8

retained
  10:24
  12:5,13,
  19

review
  15:8,17
  16:1,4,9
  23:10,16
  57:11,17
  60:23
  63:2,3
  73:14

reviewed
  8:10,12
  21:21
  32:1

reviewing
  17:11,12
  24:18
  47:23

rights
  10:11

Robbins
  5:7

rows
  68:20

run
  18:23
  19:5,6

running
  18:20
  19:10
  55:3

runs
  25:18,23

——————————

S

safe

37:4

safest
  80:17
  81:22

safety
  81:17,24

sample
  42:11,24,
  25 43:2

sampling
  42:22
  43:1

scientific
  42:11,24
  43:1

scope
  51:3

search
  36:23
  43:15
  84:18,20

section
  21:3
  30:11
  44:22
  69:15
  74:4
  76:19

senator
  85:16

sense
  20:7
  24:10
  35:7

sentence
  32:24
  44:24
  45:6

separate
  17:9

serve

36:25
37:19
39:10
40:1 42:5

served
  14:1

set
  15:2
  29:19
  46:13,16

sets
  18:3,5

setting
  11:14
  23:15
  48:8

setup
  7:12

She'll
  87:20

shift
  66:13
  74:6,19
  76:6,16
  78:3

short
  78:12

show
  46:7
  52:11
  58:12
  75:22
  76:11
  85:7

showed
  25:5
  39:14

showing
  57:24,25
  74:24

shows

61:15
72:21
73:14
83:17

shutting
  85:8

sic
  4:13
  30:11

signing
  88:6

similar
  60:22
  61:21
  63:2
  69:24

similarly
  21:1

Simpson's
  59:25

sir
  49:19

site
  29:4
  36:25
  40:3

sites
  37:9
  39:25
  40:18
  42:6

slightly
  72:10,12

small
  19:25
  21:5
  42:22
  43:3
  67:21
  68:6
  83:15,22

smaller
  13:5
  59:5,14,
  19 60:7
  73:1
  77:12

Solutions
  4:19

sort
  36:17

sorts
  12:6

sounds
  87:5

speak
  4:21
  16:15
  35:15

speaking
  4:20
  59:22

specific
  27:14
  34:18
  37:25

specifically
  60:18
  76:14

specifics
  47:16

spend
  12:24
  13:15

spent
  84:2

SQL
  19:15

Standard
  4:8



standpoint
  73:22
  74:25
  81:24
stands
  47:6
start
  4:6
starting
  5:19
state
  4:3,22
  15:7,15
  18:13
  23:9
  24:24
  26:20
  30:16,19
  32:7
  33:1,12
  34:7
  35:12
  44:2,13
  57:6
  76:20
  85:19
state-wide
  30:23
stated
  15:5,7
  36:21
  39:7
  51:10
statement
  15:11
  27:21
  54:4
states
  4:12
  10:14
statewide
  23:16
  24:9,13

29:25
33:3 76:3
84:5
85:22
86:2
stating
  5:18 77:6
statistic
  27:9,25
  40:16,18
  46:25
  77:6
statistical
  9:21
  10:16,18
  24:14
  28:22
  34:22,25
  35:4,8
  42:22
statistics
  23:22,25
  24:11,15,
  17,19,20
  27:3
  29:18,19
  30:1,19,
  23 32:16
  33:1,12,
  15 34:9,
  11,24
  35:15
  39:14,18
  40:21,24
  44:2,14
  49:5
  57:25
  59:24
  65:11
  66:12
  75:24
  76:2,10
  77:9
  85:1,2

statute
  21:24
  22:1,3,9,
  12,16
  23:3,7,
  13,15,20
  85:7
stay
  86:23
stepping
  67:7
stratified
  43:2
streamline
  78:13,14
strongly
  53:5
studies
  17:25
study
  43:1
subfindings
  16:12,24
subject
  10:7
submitted
  76:21
  81:14
submitting
  76:23
subset
  63:8
substantial
  23:21
substitute
  79:15
suits
  62:4
summarize
  26:1

summarized
  25:4,12
summary
  16:6
  18:16
  24:20
supervision
  26:17
supplementa
l
  16:25
  79:13,21
  80:10
  81:3
supply
  74:21,25
suppose
  16:8
  77:25
supposed
  14:17
Supreme
  5:13
surprise
  69:3
survey
  42:22
suspicion
  36:3
swear
  4:24 6:2
switch
  15:3
sworn
  6:14
systematic
  57:11

——————————

      T

table
  18:10
  19:4,6
  21:4
  25:3,7,
  10,14,23
  33:5
  52:4,8,
  13,17
  55:1,2,3,
  4,8
  56:18,25
  57:10
  61:12,18
  65:18
  67:8,14
  68:15,18,
  20 69:18
  70:7,14,
  15,17
  71:8,15,
  18,23
  72:16
  74:8
  79:10,11
  82:16,20,
  24 83:17
  85:13
tables
  17:17
  19:22
  62:16,17
  63:23
  64:11,23
  65:16,18,
  20 67:8
takes
  80:7
taking
  46:24
  49:2 55:2
  58:17



83:18
88:8

talk
7:8 15:19
24:5

talked
63:3 67:7
69:20

talking
20:1
33:11

Tallahassee
6:7

Tassity
5:2,22

techniques
24:14

term
37:23

termination
11:5,10

terminology
34:14

terms
10:7,22,
23 11:7,8
12:24
19:21
23:3
24:6,15
38:12,13,
20 40:2,
15 41:25
46:10
60:15
64:25
65:1
77:9,19
85:21

test
35:4
58:25

Testa
9:11,16

tested
41:24
53:7

testified
6:15
67:17,22
83:21

testify
8:5

testimony
6:2
12:14,17
13:19
14:9,12
68:7

tests
28:22

thing
61:25
67:3

things
78:13,14
84:5

thinking
85:5

thirty
69:16

Thornton
4:10 5:25
6:13,18,
20 8:4
15:2 21:6
23:6
49:10,20
62:12,14
78:22
83:7 84:2
85:15
86:15
88:5

thought
21:22
31:5
38:17
80:16

threshold
63:11
64:4

throw
24:8

tied
38:2

time
4:7,8 7:7
12:24
13:8,15
14:21,25
16:15
30:5,9
31:9
53:23
54:1
62:6,10
66:8,12,
15 78:17,
20 84:2
86:10,14

times
6:23
12:15,19
13:9,11

today
4:17 7:5
8:6,9
64:15
65:9 84:3
86:16

told
87:5

tools
23:25

topic
26:4

topics
15:16

torn
42:5

total
46:23
47:8,13
50:14
55:15
67:10
68:16
85:22

training
14:5

transcript
9:3 26:10
31:22
80:3
86:23
87:12,17

transportat
ion
46:11

travel
47:10,14

tremendous
23:13

trend
75:11
76:6,10,
16 82:9

true
36:17
75:5
82:17
83:8,10

truncated
18:25
19:14

truncation
19:19
20:4

truth
6:3,4

truthfully
8:5

turn
12:22
15:6
17:21
18:11,13
21:3
30:11
32:3 54:3
82:7 88:1

turnout
45:8,13,
15,19,22
46:3,18
79:5

type
11:17
12:2

─────────

U

uh-huh
22:6

ultimately
12:17

unable
37:20

unavailable
36:4 38:5
42:5
43:12
84:12

underlying
17:2,12

understand
8:1,3
13:12
33:24
35:17,19



38:23
49:25
51:2,24
63:21
64:9
65:17,23
66:1
68:21

understandi
ng
15:20
21:17,22
23:3
62:22
80:14

understood
7:8,18
12:15
47:1
53:15
54:19

undertake
15:21
39:6
47:20
57:10
68:11

undertaking
36:14

undertook
17:8

unfettered
22:23

uniform
41:23

unit
66:14,18

United
4:12

unmute
4:21

unpaid
14:1

upward
75:24

usage
74:25
75:12,24,
25 76:13
80:20,25
82:20

usefulness
40:16

—————————

V

—————————

vacuum
28:2

vague
8:1

variation
23:4,13,
17,21,23
24:1,4,6
30:17
32:24
33:20
34:5
41:10
56:5,16,
19 60:2,4
61:4,5
64:3,7
85:14

variations
56:13

varies
13:4

varying
59:13

verbal
7:6

verified
19:7

version
17:22

versus
4:11
25:13
48:13
70:11
72:6
80:21
83:9

video
6:25
14:13
86:16,24
87:9,22

videoconfer
ence
4:1,9
88:5,7,8

view
26:25
28:10
45:7
48:11
66:14

viewed
80:17
81:21

voluntary
38:8

vote
46:7
47:14
50:18,23,
25 77:5,
15,18,23,
24 78:8
81:23

voted
45:3
76:20

83:2,3,4

voter
14:10
44:24
45:8,14,
19,22
46:3,6,18
51:8,20
52:2
55:5,6,11
65:22
76:24
77:22,23
85:19

voter's
77:4,14,
15

voters
15:11
20:2
37:9,11
45:2,8,19
46:1
48:2,4,
10,22
49:12,22
51:24
54:7,8,
11,17,21
57:21,22
58:23
59:4,12
67:17
68:6,12,
16 69:5
71:9,11,
16,20,21
72:5,6,24
76:20
82:10

votes
77:18

voting
10:11

14:10
35:22
71:22
74:7,9,19
75:1,6,
12,25
76:7,17,
22 78:4,
24 79:14,
15 80:8,
16,18,20
81:1,17,
19 82:9,
10,17,20,
21 83:9,
11,18,24

voting-
rights
12:23,25
13:3,16,
19,20,24
14:2,6,9,
11

—————————

W

—————————

waive
5:16
87:19

waived
88:7

wanted
26:5
36:25
42:11,25
54:19
59:4,22
76:13
79:17

ways
24:3
51:19

websites
27:22



**white**
  58:22
  72:5,8,11
  82:25

**withdraw**
  38:1

**Withdrawn**
  29:11
  45:17

**wondered**
  80:11

**word**
  15:12
  34:21
  35:5 36:6
  41:17

**words**
  33:2
  37:10
  61:14

**work**
  9:20,22
  10:1,7
  11:14,15
  12:22,25
  13:6 16:3

**worked**
  9:11 10:9
  20:20

**working**
  13:3
  20:19
  26:17

**works**
  62:1

**write**
  24:5

**writes**
  72:25

**wrong**
  40:13

**wrote**
  30:15

---

**Y**

**year**
  66:17

**years**
  45:4
  66:17

---

**Z**

**ZIP**
  6:8

