IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, INC., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia; *et al.*,<br><br>    Defendants. | Civil Action File<br><br>No. 1:18-cv-05391-SCJ |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR
<u>SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' CLAIMS</u>**

**Table of Contents**

INTRODUCTION ....................................................................................1

STANDARD OF REVIEW ......................................................................5

STATEMENT OF THE CASE ................................................................5

  I.   The wholesale lack of evidence regarding intentional discrimination. .. 6

  II.  The Secretary's training efforts. ............................................... 8

    A.  The Secretary's training program. ......................................8

     i.   Training on administration of absentee ballots. ............................... 11

     ii.  Training on administration of provisional ballots. ........................... 12

    B.  Lines at polling places. ....................................... 14

  III. Polling place changes..................................................... 16

  IV. Georgia's list-maintenance efforts. ....................................... 18

  V.  Georgia's HAVA-match program. ......................................... 19

ARGUMENT AND CITATION TO AUTHORITY ......................................... 21

  I.   Plaintiffs' fundamental right to vote claims fail (Count I). ................... 21

    A.  Alleged lack of resources for polling places. ........................................ 22

    B.  Alleged failure to train. ....................................... 23

     i.   Claims regarding poll worker training.................................... 26

     ii.  Claims regarding superintendents' training.................................... 30

    C.  Plaintiffs' claims regarding list maintenance. ..................................... 32

  II.  Plaintiffs' claim that facially neutral laws violate the Fifteenth Amendment fails since they show neither disparate impact nor discriminatory purpose (Count II). .................... 33

  III. Plaintiffs' Equal Protection claims also fail (Count III). ...................... 34

  IV. Plaintiffs' Procedural Due Process claim is unsupported (Count IV)................................................................. 36

V.   Plaintiffs' claims under Section 2 of the Voting Rights Act
     are void of factual and legal support (Count V). ................................... 39

     A.  Step 1: Discriminatory impact. ............................................. 42

     B.  Step 2: Totality of the circumstances.................................... 46

VI.  Plaintiffs seek an impermissible "obey the law"
     injunction.................................................................................. 48

CONCLUSION................................................................................ 49

## INTRODUCTION

This is an important case.  The State, the Secretary of State ("Secretary"), the State Election Board ("SEB"), and its members take elections and election administration seriously.  They each recognize the critical importance of the franchise and the need for Georgians to have confidence in their electoral process.  In pursuit of this purpose, and since Plaintiffs filed this lawsuit, the General Assembly overhauled Georgia's election laws with House Bills 316 and 392 ("HB 316" and "HB 392").  The Secretary has procured completely new voting equipment and distributed it to counties faster than anyone thought possible; he restored 22,000 voters to the active list from the canceled list as soon as it became apparent they were placed there incorrectly, Doc. No. [188] at 2–3; and he recently undertook the herculean and costly effort of mailing every active Georgia voter an absentee ballot request form.  In short, the elected branches of state government have been working to enact real and meaningful election reform.

For Plaintiffs, this is an important case too.  They filed this lawsuit in the immediate wake of the 2018 general election.  For Plaintiff Fair Fight Action, this litigation is a realization of its founding purpose, having been reborn and announced by former State House Minority Leader Stacey Abrams in the same speech in which she "acknowledge[d]" her defeat in the

2018 gubernatorial election.[1]  Days later, Fair Fight Action announced the lawsuit it was created to file, proclaiming they would "prove in court, how the constitutional rights of Georgians were trampled in the 2018 general election," and reveal the efforts of Governor Kemp as the "secretary of suppression."[2]

The Complaint, Doc. No. [1], and Amended Complaint, Doc. No. [41], did not disappoint Ms. Abrams's supporters.  They contain stark allegations of what Plaintiffs contend are coordinated and intentionally racist acts that purportedly disenfranchised hundreds of thousands of voters.  <u>See generally</u>, <u>id</u>.  Meanwhile, some of the Plaintiffs continued to attack[3] Georgia's elected officials as part of what appears to be a larger political strategy to advance Ms. Abrams's Vice Presidential candidacy,[4]  Reverend Warnock's U.S. Senate

---

[1] Jim Galloway, <u>Stacey Abrams: 'I will not concede because the erosion of our democracy is not right'</u>, Atlanta Journal-Constitution, Nov. 16, 2018, https://www.ajc.com/blog/politics/stacey-abrams-will-not-concede-because-the-erosion-our-democracy-not-right/JQqttbuF09NYkMQbIYx9BM/.

[2] Richard Faussett, <u>Large-Scale Reforms' of Georgia Elections Sought in Federal Lawsuit</u>, N.Y. Times, Nov. 27, 2018, available at https://www.nytimes.com/2018/11/27/us/georgia-elections-federal-lawsuit.html.

[3] Fair Fight Action, <u>NEW TV AD: Georgia's chief elections officer is passing the buck on his responsibilities</u>, Facebook (Jun. 16, 2020), https://www.facebook.com/FairFightAction/posts/1991726570957844.

[4] Edward-Isaac Dovere, <u>Stacey Abrams's Remarkable Campaign for Vice President</u>, The Atlantic, (Apr. 24, 2020) available at

bid, or that of their allies.[5]  This public persuasion and advocacy campaign

may well continue through the November elections.  As a matter of political

strategy, it appears effective.  Documents produced by Fair Fight Action show

that they first poll-tested the phrase "voter suppression" in 2014 and that

this highly-charged but ambiguous phrase was very motivational for its

target audience, which led Fair Fight to use that phrase along with more

conventional political messaging phrases like "educational opportunities for

children."[6]  Defendants' Statement of Material Facts ("SMF") at ¶ 6.

The problem for the Plaintiffs, however, is that their political argument

is not a legal one.  Courts of law are not courts of public opinion.  Here,

---

https://www.theatlantic.com/politics/archive/2020/04/stacey-abrams-biden-vice-president/610441/.

[5] Care in Action's leadership also has political aspirations: State Senator Nikema Williams is its National Deputy Executive Director and Chair of the Democratic Party of Georgia. Maya T. Prabhu, <u>Meet Nikema Williams, the newly elected leader of Georgia's Democrats</u>, Atlanta Journal Constitution (Jan. 28, 2019), https://www.ajc.com/news/state--regional-govt--politics/meet-nikema-williams-the-newly-elected-leader-georgia-democrats/aO7iTKsTyelrt9jrNRJ7qK/.

[6] Many of Plaintiffs' experts shied away from using that term because it "carries more baggage than utility," and has "become a partisan term."  SMF at ¶ 70. Dr. McCrary doesn't use the term but said it "tends to be the work of Republican Parties and state legislatures."  SMF at ¶ 74. Dr. Jones, on the other hand, believes the federal government is engaging in voter suppression. SMF ¶ 74, n. 13.

evidence matters.  Cognizable claims are required.  And, any requested relief must be manageable.  Plaintiffs offer this Court none of the above.  Instead, Count I of the Amended Complaint alleges violations of voters' rights under First and Fourteenth Amendments, but virtually all of the activity Plaintiffs complain of is decided and administered by counties, not State actors.  Doc. No. [41], ¶¶ 158-168.  Counts II, III, and V allege State actors intentionally burdened voters of color's right to vote, but—in stark contrast to their public statements—none of Plaintiffs' representatives could say, under oath, that the State intentionally discriminated against anyone.  Doc. No. [41], ¶¶ 169-200.  Count IV claims voters were deprived due process through voter list maintenance, but this Court has already held that re-registering to vote is not an unconstitutional burden.  Doc. No. [188] at 27.  Count V alleges violations of Section 2 of the VRA, but here too Plaintiffs have not shown an underlying burden on voting or that the State causes any such burden. Finally, Count VI alleges a violation of HAVA but overlooks that only the federal government may bring a HAVA claim against the State.[7]

---

[7] Unlike other federal voting laws, HAVA creates no private cause of action. Bellitto v. Snipes, 935 F.3d 1192, 1199 (11th Cir. 2019).  While briefly addressed here, Plaintiffs' HAVA claims are addressed more fully in Defendants' Motion for Summary Judgment on jurisdictional issues.

For these unsupported causes of action, Plaintiffs seek nothing short of a federal takeover of the State's administration of elections.  What the Court is to do once it oversees the electoral process, however, remains unclear.  At the hearing on the Motion to Dismiss in April 2019, Plaintiffs claimed more discovery was needed to "crystalize" their requested relief, and intimated that discovery would show "how the relief would need to be phrased."  Doc. No. [64], Tr. 76:13–14.  More than a year later—after obtaining millions of pages of documents produced by Defendants, proffering expert testimony of eleven individuals, conducting repeated depositions of the Secretary of State's Office and even Governor Kemp—Georgia finds itself facing another election and Plaintiffs are no closer to "crystalizing" the relief they believe they are entitled to.  Due to any of these deficiencies, summary judgment is warranted.  Plaintiffs can then focus their political advocacy on the elected branches of State government.

## STANDARD OF REVIEW

Summary judgment is warranted when there are no "genuine dispute[s] as to any material fact" and the defendant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Defendants (as movants) bear the burden of making this showing, satisfied by demonstrating there "is an absence of evidence" to support an element of Plaintiffs' claims.  Celotex

5

Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Evidence and "factual inferences [are viewed] in the light most favorable" to Plaintiffs (as non-movants). Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir.1996).  Once Defendants satisfy this initial requirement, the burden shifts to the Plaintiffs to show the existence of a dispute of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## STATEMENT OF THE CASE

Defendants incorporate by reference their Statement of Undisputed Material Facts, which is filed with this Motion.

## I.    The wholesale lack of evidence regarding intentional discrimination.

To the extent Plaintiffs sought to show statewide and "[t]ime-tested voter suppression tactics," they failed.  Doc. No. [41], ¶ 44.  From the start, Plaintiffs celebrated the fact that they had "hundreds" of declarants hailing from every corner of the state, willing to testify about purported voter suppression.  Discovery revealed a different story.  Plaintiffs have provided 308 hand-picked declarations, many of which were obtained well after Plaintiffs' Complaint was filed. SMF at ¶ 8.  Declarations were produced from individuals residing in only 42 of Georgia's 159 counties.  The vast majority of Plaintiffs' declarants, 67.5%, are concentrated in four Metro-Atlanta counties

that produced 34.6% of the votes in the 2018 gubernatorial election:  Fulton

(79 or 26%); DeKalb (57 declarants or 19%); Gwinnett (38 or 12%), and Cobb

County (34 or 11%).  Id. at ¶ 9.  The declarations, therefore, provide an

insufficient basis to reach conclusions about statewide and systemic

discrimination.

Very few declarants even *insinuated* that they or others faced

intentional discrimination when attempting to vote.  Of the handful of

declarants who even mentioned race, none offered reliable testimony that

State Defendants intentionally discriminated against minority groups.  See,

e.g., SMF at ¶¶ 42, 57-62.

The declarants' testimony is consistent with the sworn testimony of the

Plaintiffs themselves.  Despite their public allegations of intentional racial

discrimination, none could say under oath that the Defendants intentionally

discriminated against voters of color.  See SMF at ¶¶ 39-40, 43-56.  Finally,

only one of Plaintiffs' experts even *considered* intentional discrimination.[8]

SMF at ¶ 74, n.13.  But she provided no evidence to support her conclusion

aside from her misunderstanding of state and federal law.  Id.

---

[8] Defendants have filed motions to exclude each of Plaintiffs' proffered
experts.

7

In contrast, the Secretary of State's Office did not equivocate: there is nothing "[it] do[es] that encourages or allows or suggests any discrimination in voting." SMF at ¶ 75. This is not surprising, and Plaintiffs have known it all along.

## II.   The Secretary's training efforts.

Plaintiffs assert that Defendants disenfranchised voters by failing to train county superintendents and poll workers on election law, absentee and provisional ballot administration, Election Day supplies and polling locations. Doc. [41], ¶ 164. However, the SEB is under no obligation to train anyone, which means it cannot be liable for alleged failures to train or to supervise, and the evidence does not support Plaintiffs' claims against the Secretary.

### A.   The Secretary's training program.

In carrying out his statutory obligations to train election superintendents and registrars, O.C.G.A. § 21-2-50(a)(11), the Secretary conducts annual training courses in conjunction with the Georgia Association of Voter Registration and Election Officials (GAVREO).[9] SMF at ¶ 76. These

---

[9] The Georgia Association of Election Officials and the Voter Registrars Association of Georgia were previously two separate entities that consolidated to form GAVREO. SMF at ¶ 76, n.14.

training sessions help the superintendents and registrars become certified and maintain their certification as required by law.  Id. at ¶ 77.

Additionally, the Secretary's office frequently disseminates various updates and provides monthly webinars ("3T's") for superintendents and registrars.  SMF at ¶ 78.  To facilitate the prompt and efficient distribution of these materials, the Secretary utilizes "Firefly," a central repository for training materials and election information, (id. at ¶ 79), and each county is assigned a liaison who acts as a central point of contact between a county and the Secretary's Office.  Id. at ¶ 80.  Elections Director Chris Harvey testified that he would often follow-up those communications by telephone, himself. Id. at ¶ 90.

Plaintiffs put forth no evidence of an election superintendent who claims that their training was insufficient or caused constitutional violations. Instead, their claim relies entirely on the inadmissible report of Kevin Kennedy, Wisconsin's former elections administrator.  Mr. Kennedy acknowledges that the Secretary "has developed a large portfolio of training materials and methods for county superintendents and registrars."  SMF at ¶ 93.  He offers two criticisms.  First, Kennedy opines that there is a perceived lack of communication protocol to ensure that local officials receive and review training information.  Doc. No. [167] at 14.  Mr. Kennedy did not,

however, review the index of Firefly files produced by the Defendants or any of the materials it references.  Id. at 13; SMF at ¶ 94.  He also cites to no national standard or comparator that would show constitutional inadequacy by the State's communication efforts.  Doc. No. [167] at 20; SMF at ¶¶ 97-98.

Kennedy's second criticism is that the State should train poll workers with an accountable, transparent, and "voter-centric" approach.  Doc. No. [167] at 20; SMF at ¶¶ 96, 102-105.  However, Wisconsin law differs significantly from Georgia law in that it requires the Wisconsin Elections Commission to "prescribe the training" provided to poll workers.[10]  Wis. Stat. Ann. § 7.315.  Georgia law, on the other hand, provides that only election superintendents train poll workers, and that the superintendent provide that training.  O.C.G.A. § 21-2-99.  On accountability, Mr. Kennedy acknowledged that Georgia poll workers are subject to a system of accountability.  SMF at ¶ 99.  Indeed, while Mr. Kennedy complains that in more egregious cases the election official typically leaves office before the complaint is heard, Doc. No. [167], pp. 19-20, he agrees that such results tell "you that the process is working."  SMF at ¶ 99.

_____

[10] Wisconsin law refers to "inspectors" and "chief inspectors," which appear to be akin to poll workers and poll managers in Georgia, respectively.  Cf. Wis. Stat. Ann. §§ 7.37 (inspector duties), 7.36 (chief inspector's duties).

Also contrary to Mr. Kennedy's report, the Secretary's poll worker materials are undisputedly transparent.  A simple Google search for "poll worker Georgia" returns the Secretary's Poll Worker Training Resource webpage, which was first disseminated by Secretary Kemp in 2015 and continuously updated since.[11]  SMF at ¶ 100.  The website also contains tips for local officials to effectively train poll workers and a host of videos covering many of the specific situations he opines about.  SMF at ¶ 88.

Finally, Mr. Kennedy's "voter-centric" critique is largely undefined but suggests that poll workers should be informed about the importance of voting.  Mr. Kennedy expressly did not opine that Georgia's training approach was rooted in anything other than enabling participation for all voters.  SMF at ¶ 102.

i.   *Training on administration of absentee ballots.*

Evidence is also lacking to suggest that Georgia's training of superintendents and registrars on absentee ballots is constitutionally deficient.  Doc. [41], ¶164.  While some of Plaintiffs' declarants generally allege the poll workers were improperly trained, none of the Declarants had

---

[11] Poll Worker Training Resources, Office of the Secretary of State, https://georgiapollworkers.sos.ga.gov/Pages/default.aspx (last visited Jun. 22, 2020).

received that training themselves.  Their statements are thus inadmissible

speculation of persons who lack direct knowledge, or the required foundation

to draw such conclusions.  See Fed. R. Evid. 602, Fed. R. Civ. P. 56(c)(4).[12]

Mr. Kennedy's testimony does not bridge the gap left by the declarants

either.  His criticism of Georgia's absentee ballot training is that more could

be done.  Doc. No. [167] at 16; SMF at ¶ 183.  He does not opine that county

officials were incorrectly or improperly trained, nor does he cite examples

where specific training was so inadequate as to cause constitutional harm.

ii.   *Training on administration of provisional ballots.*

Plaintiffs next complain that Defendants provide an insufficient

number of provisional ballots to polling places and, through unconstitutional

training, discourage or prevent the use of provisional ballots.  Both

contentions are unsupported by the undisputed facts in this case.

Notwithstanding the law's clear commitment of those responsibilities to

local officials, the record reflects that State officials do not discourage the use

or offering of provisional ballots.  Though Mr. Kennedy only reviewed the

first, the 2018 and 2020 Poll Worker Manuals contain twenty-six pages of

---

[12] Defendants reserve all rights to contest the admissibility of any statements
contained in the declarations submitted by Plaintiffs.

source material detailing the use of provisional ballots.  SMF at ¶ 192.

Beyond this, the Secretary's public webpage instructs: "please, do not

discourage a person eligible to cast a provisional ballot from casting it,

ALWAYS OFFER A PROVISIONAL BALLOT! A good rule to remember is:

when in doubt, give it out." Id. at ¶ 193.

   Plaintiffs have offered no evidence to suggest the Secretary trains local

officials to do otherwise.  Mr. Kennedy, questions why some voters "didn't get

a provisional ballot," but he acknowledges that he is "not sure" whether they

were entitled to one. SMF at ¶ 205.  The few declarations that do address the

issue are equally inconclusive.  Ms. Gwendolyn Lee, a DeKalb County poll

worker in 2018 criticizes DeKalb County (not the State) for what she deems

insufficient training.  Id. at ¶ 198.  Ms. Alvilynn Callaway voted in Clayton

County, even though she resides in Macon County.  Id. at ¶ 199.  She is

frustrated because a poll worker *offered her a provisional ballot* instead of

telling her to return home to Macon County to vote.  Id. at ¶ 200.  Similarly,

Mr. Jeffrey Marion submitted a declaration largely concerning his long wait

due to a lack of voter access cards at his Gwinnett County precinct.  Id. at

¶ 201.  Mr. Marion did not want to vote by paper ballot, despite being offered

one.  Id. at ¶ 202.  This evidence does not show constitutionally infirm

training, or that such training caused widespread constitutional violations.

13

B.   <u>Lines at polling places.</u>

Plaintiffs make numerous allegations about long lines but their evidence effectively confirms what Defendants have said all along: long lines are not a systemic problem in typical elections and are not caused by constitutionally deficient training.  None of Plaintiffs' evidence discusses what training could help prevent long lines.  For the declarants, only about 63 (of 308) discuss long lines at polling locations.  SMF at ¶ 223.[13]  These declarants represent only 10 of Georgia's 159 Counties, with over 75% (49 out of 63) concentrated in the four Metro-Atlanta counties of Fulton, Cobb, Gwinnett, and DeKalb.  <u>Id.</u> at ¶ 225.[14]  Similarly, of the approximately 2,300 polling locations across Georgia, (<u>id.</u> at ¶ 227), Plaintiffs have generated declarations from only a handful of locations with more than two complaints: Pitman Park Recreational Center in Fulton County (6); Rothwell Baptist Church in Chatham County (3); Annistown Elementary School in Gwinnett County (3); and Central United Methodist Church in Fulton County (3).  <u>Id.</u> at ¶ 226.  In total, Plaintiffs' declarants identified only about 49 polling

---

[13]   Of these 63, 47 declarants were voters and 16 were "poll watchers" or other observers working on behalf of the Democratic Party of Georgia or other political groups.  SMF at ¶ 224.

[14]  The other counties with such declarants are: Clayton, Chatham, Cherokee, Dougherty, Henry, Houston, and Pickens. Clayton, Houston, and Pickens Counties had one declarant each.  SMF ¶ at 225.

14

places where they purportedly witnessed "long lines." Id.  And of that group,

only five individuals arguably allege that long lines directly prevented them

from voting.[15] Id. at 228.

Plaintiffs rely on the testimony of Dr. Stephen C. Graves to show what

their declarations do not: the effect of long lines on minority populations.

SMF at ¶ 212.  But Dr. Graves relies on another study (to which he did not

contribute) and its examination of approximately 68 of 373 precincts in

Fulton County (18%) during the 2018 election.  Id. at ¶¶ 212, 214.  From this

extremely limited study, Dr. Graves concludes that the average wait time at

African American majority[16] sites was only 1.6 minutes (96 seconds) longer

than it was for non-African American majority sites.  Id. at ¶ 218.  Dr. Graves

---

[15]  Two of these declarants refused or failed to appear for depositions by
Defendants.  SMF at ¶ 228.  Their testimony is, at best, unverified and
unreliable.  Given the number of declarants (and the insufficiency of
Plaintiffs' evidence to support their claims regardless) Defendants have so far
not moved to sanction any declarant under Rule 45(e) for failure to appear or
otherwise sought to exclude their testimony at trial. Defendants reserve the
right to move this Court to exclude entirely the testimony of these two
declarants—and all others who failed to appear for duly subpoenaed or
noticed depositions, as well as those Plaintiffs failed to produce—prior to
trial. See, e.g., Compton v. Rent-A-Ctr., Inc., No. CIV-07-972-D, 2008 WL
2553309, at *2 (W.D. Okla. June 17, 2008) (fact witness who did not appear
for deposition "will not be permitted to testify at trial unless Defendant first
has an opportunity to depose him.").
[16]  Dr. Graves defines "Black Majority sites" as precincts in which the
"percent of Black registered voters was more . . . than 50%." SMF at ¶ 218.

made no finding regarding "a statistically significant relationship between the percentage of African American share and the wait time at the polls;" nor did he conclude that the 68 polling locations in the study were representative of Fulton County generally.  Id. at ¶¶ 219-20.  This is not nearly enough evidence to show of systemic "voter suppression" through long lines.

## III.   Polling place changes.

Plaintiffs further contend Defendants "promote" polling place closures. Doc. No. [41] at ¶ 42.  Once again, Plaintiffs ignore that the General Assembly provided local governments and local election superintendents with the exclusive authority to open, close, or otherwise relocate polling locations. O.C.G.A. § 21-2-265(a); SMF at ¶ 240.  The only involvement of the Secretary is to receive *notice* of a polling-location change.  O.C.G.A. § 21-2-265(c); SMF at ¶ 244.  Plaintiffs have provided no evidence addressing training about polling-location changes.

The evidence in the record does, however, show that Defendants do nothing to actively encourage their closure, and they certainly engage in no activity to close polling places in minority-majority areas (intentionally or otherwise).  The Secretary's interaction with local officials is limited to reiterating the demands of Georgia law regarding notice and timing. See, e.g., SMF at ¶ 244.  Indeed, the Office of the Secretary of State acknowledges the

16

decision is the counties' to make, but the Secretary often cautions against the closing of polling locations, encourages counties to carefully consider any such decision and "take into consideration the convenience of the voters and the public interest." Id. at ¶ 246.

The Secretary's efforts are supported by Plaintiffs' own declarants. Many acknowledged it is their county that closed the polling location, not the State. See, e.g., SMF at ¶ 241. Some were aware of legitimate reasons for the closures. See, e.g., id. at ¶ 242. Others were simply mistaken about their polling location. Id. at ¶ 243. Some contained only inadmissible speculation and concessions that everyone could vote despite polling location changes. Id. at ¶4.

Finding no support from their fact witnesses, Plaintiffs offer the expert testimony of Dr. Michael C. Herron who opines that "[t]he adjustments made to Georgia's polling places between 2014 and 2018 were not racially neutral." SMF at ¶ 233. Dr. Herron takes no position, however, as to: (1) who is responsible for closing polling places; (2) why polling locations were changed; (3) whether State or County officials had knowledge of the alleged impacts of changing polling locations; or (4) State Defendants' intent. Id. at ¶¶ 234-36. His research also shows that any differences between African American

voters and voters of color are minimal, and in some cases, white voters bore more of the proportional brunt of polling location changes.  Id. at ¶ 237.

## IV.   Georgia's list-maintenance efforts.

State and Federal law require the Secretary ensure that voter rolls contain only eligible Georgia voters.  To these ends, the Secretary places registered voters on one of three lists: active status, inactive status, cancelled status.[17]  Active and inactive status voters can vote without re-registering, and those in cancelled status only need to register again.  SMF at ¶¶ 113, 121.

This Court has seen Plaintiffs' evidence on list maintenance before.  In December, Plaintiffs moved for a temporary restraining order and preliminary injunction to halt the Secretary's execution of his list-maintenance obligations, Doc. No. [164], which the Court denied.  Doc. No. [188].  At that time, Plaintiffs identified eight voters who, they said, improperly would be moved from inactive to cancelled status under the State's execution of the list-maintenance policy.[18]  SMF at ¶ 127.  Of those

---

[17] As the Court explained in its order on Plaintiffs' Preliminary Injunction Motion, this is not a "purge" in any form of the word either—voters are not deleted or removed from the registration system.  Doc. No. [188]; see also SMF at ¶ 120.

[18]  Plaintiffs did not call any of these eight people to testify at the preliminary-injunction hearing. Nothing in the evidentiary record indicates

eight, four actually were in active status and not subject to being moved to cancelled status.  Id. at ¶ 128.  The remaining four properly were moved to cancelled status in accordance with state law, and one of those four subsequently was moved to inactive status at the Secretary's direction.  Id. at ¶ 129.

Plaintiffs' expert, Dr. McDonald, did not offer much to support Plaintiffs' claims either.  He found that on the list of voters to be moved to cancelled status, white voters were *overrepresented* and African-American voters were *underrepresented* when compared to their presence on voter file as a whole.  SMF at ¶ 123.  As a percentage of their total in the entire voter file, a smaller proportion of African-American voters were also on the inactive list for reason of "no contact," versus their proportion of the voter file.  Id. at ¶ 124.

## V.   Georgia's HAVA-Match program.

Georgia's voter-verification law crosschecks a voters' identifying information with information on file with the Georgia Department of Driver Services ("DDS") or United States Social Security Administration ("SSA"), as required by 52 U.S.C. § 21083(a)(5).  See O.C.G.A. § 21-2-220.1(b).  If there is

---

whether these eight people have any relationship with any of the Plaintiffs or Plaintiffs' alleged voting-related outreach work.

no match, the voter is registered as "Missing ID Required" or "MIDR." Voters classified as MIDR are placed on the rolls as an active voter and can vote with proper identification. See O.C.G.A. § 21-2-220.1(b). Separately, an applicant may be placed in "pending" status if information on file indicates that he or she is not a United States citizen. See O.C.G.A. § 21-2-216(g).

Plaintiffs wrongly allege that this "policy prevented 53,000 Georgians from having their registrations accepted" shortly before the 2018 election. Doc. No. [41] ¶¶ 86-87. The evidence shows something different. Of the 308 declarants Plaintiffs identified in this case, it appears that two described voting experiences that touched on the voter-verification law. One voted within ten minutes of arriving at the polling station. SMF at ¶ 156. The other voted the same day. Id. at ¶ 164. Both voted before HB 316's changes to the HAVA-match process.

Plaintiffs are forced to rely on two experts to show a constitutional injury. One, Dr. Kenneth Mayer, a political science professor in Wisconsin, identified a racial disparity arising from the State's policies, but he was not able to identify any cause of the disparity, as he could not determine "whether someone *is in that status and shouldn't be* . . . ." SMF at ¶ 169 (emphasis added). And, Dr. Mayer only made comparisons to the entire voter file in finding a disparity, not the number of registrants in any particular

20

time period (such as the universe of registrants after the adoption of HB 316).

Id. at ¶ 170.[19]

## ARGUMENT AND CITATION TO AUTHORITY

### I.  Plaintiffs' fundamental right to vote claims fail (Count I).

Plaintiffs assert that various acts and omissions of Defendants impose

an unconstitutional burden on Georgian's right to vote.  Doc. No. [41] ¶¶ 158-

168.  This claim requires Plaintiffs to first identify a burden.  Crawford v.

Marion Cty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring in

judgment).  Then, as this Court has previously noted, the analysis shifts to

considering the "character and magnitude" of the asserted injury against the

interests of the State.  Doc. No. [188] at 21 (citing Anderson v. Celebrezze,

460 U.S. 780, 789 (1983)).  "If a State's election law imposes only 'reasonable,

nondiscriminatory restrictions' upon the First and Fourteenth Amendment

rights of voters, 'the State's important regulatory interests are generally

sufficient to justify' the restrictions.  Burdick, 504 U.S. at 434 (citing

Anderson, 460 U.S. at 788)."  Id.  The burden of proof and persuasion remains

---

[19]  Dr. McCrary relied in part on Dr. Mayer's analysis in reaching his
conclusions on the voter-verification process.  SMF at ¶ 172.  But Dr.
McCrary never reviewed or considered H.B. 316 and its effect on Georgia's
matching process.  Id.

on Plaintiffs at all times.  <u>Common Cause/Georgia v. Billups</u>, 554 F.3d 1340,

1353 (11th Cir. 2009).

As an initial matter, the nature of Plaintiffs' claims make it difficult to

apply traditional <u>Anderson-Burdick</u> (Count I) and Fifteenth Amendment

(Count II) precedent.  Most cases arising under these theories involve a

challenge to a particular statute, regulation, or official policy; Plaintiffs

largely challenge alleged *non-action*.  <u>See, e.g.</u>, <u>Crawford</u>, 553 U.S. at 181

(applying <u>Anderson-Burdick</u> analysis to photo identification requirement);

<u>Baker v. Carr</u>, 369 U.S. 186, 208 (1962) (applying Fifteenth Amendment state

apportionment statute).  This leaves Plaintiffs, for the most part, in search of

a court order to "do more," which is not obtainable relief in federal court.

<u>See</u> <u>Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections</u>,

1:20-CV-00912-SDG, 2020 WL 1031897, at *7 (N.D. Ga. Mar. 3, 2020).

A.     <u>Alleged lack of resources for polling places.</u>

Plaintiffs failed to set forth evidence to support their claim that

Defendants caused a systemic, unconstitutional burden by failing to provide

polling locations with sufficient "tools for voting," including equipment,

provisional ballots, and paper ballots. Doc. No. [41], ¶¶ 163, 164, 176, 189-90.

But neither the Secretary nor the SEB Members have a legal obligation to

equip county election offices with provisional ballots or paper ballots.

22

O.C.G.A. § 21-2-238 (superintendent responsible for printing ballots); Ga. Comp. R. & Regs. 183-1-12-.18(3) (superintendent to provide polling places with "adequate supply" of provisional ballots). Moreover, SEB rules require counties to be prepared to timely resupply polling places with provisional ballots while voting is occurring. Ga. Comp. R. & Regs. 183-1-12-.18(3).

Regardless, Plaintiffs claim that the 2018 election included an insufficient number of old voting machines in polling locations is moot, and there is no evidence of a systemic failure by the BMDs. Doc. No. [41] at ¶¶ 121-22. In addition, HB 316 requires there to be at least one voting machine per every 250 voters. O.C.G.A. § 21-2-367(b). The Amended Complaint contains no allegations to challenge this statute, nor have Plaintiffs provided any evidence of its inadequacy. There is also no evidence of a county official's request for resources going unheeded. Thus, there is no policy on supplies that burdens Plaintiffs' rights, no evidence of a burden, and no evidence of Defendants causing any harm.

B.   Alleged failure to train.

Plaintiffs bring what appears to be the first failure to train case involving elections in the Eleventh Circuit. The claims are divided into two types. The first alleges failures to train *poll workers* on election laws generally, Doc. No. [41] ¶¶ 163, 175, 189, absentee ballots, id., ¶¶ 164, 176,

23

190, and provisional ballots, id., ¶ 164.  The other allegations involve failure to train *superintendents* on issues that they decide directly, including: methods to reduce lines at polling locations, id., ¶¶ 164, 176, 190; having a sufficient number of paper ballots, id., ¶¶ 164, 170, 190; and having sufficient precincts.  Id. ¶¶ 176, 190.

As a threshold matter, Plaintiffs have failed to show an underlying unconstitutional burden on voting, which is a prerequisite for a failure to train or supervise claim fails.  Knight v. Miami-Dade Cty., 856 F.3d 795, 821 (11th Cir. 2017).  Beyond this, there is also insufficient evidence on the other elements of the claim.  The Supreme Court has described failure to train claims as the "most tenuous" of civil rights causes of action.  Connick v. Thompson, 563 U.S. 51, 61 (2011).  To overcome summary judgment, Plaintiffs must show: (1) a constitutional injury, (2) caused by the Secretary's acts, (3) which constitute deliberate indifference to the need to train superintendents or poll workers.  City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (citation omitted).  *Respondeat superior* theory does not apply.  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

Liability attaches "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice," id., and deliberate indifference "is a stringent standard of fault, requiring proof that a [governmental] actor disregarded a known or

24

obvious consequence of his action.'"  Connick, 563 U.S. at 61 (citing Bd. of

Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997)).  To be known or

obvious, policymakers must be on notice of "obvious, flagrant, rampant" and

ongoing constitutional violations that existing training does not represent.

Brown, 906 F.2d at 671.  Further, to be constitutionally deficient, the

challenged training must knowingly diverge from a known "accepted

standard." See Owaki v. City of Miami, 491 F. Supp.2d 1140, 1162 (S.D. Fla.

2007); see also Eberhardinger v. City of York, 341 F. Supp. 3d 420, 430 (M.D.

Pa. 2018), aff'd 782 F. App'x 180 (3d Cir. 2019).

　　　While the Eleventh Circuit has not applied failure to train and failure

to supervise theories in the context of elections, other courts have applied

Harris's and Connick's test such claims.  See, e.g., Minnesota Majority v.

Mansky, 708 F.3d 1051, 1060 (8th Cir. 2013); Acosta v. Democratic City

Comm., CV 17-1462, 2018 WL 4178522, at *11 (E.D. Pa. Aug. 30, 2018), aff'd

767 Fed. Appx. 392 (3d Cir. 2019); Hunter v. Hamilton Cty. Bd. of Elections,

850 F. Supp. 2d 795, 844-46 (S.D. Ohio 2012).  Defendants have found no

other analytical framework that has been applied in these circumstances.[20]

---

[20]  Failure to supervise and failure to train theories are similar, and courts
have blended the two causes of action.  Kerr v. City of W. Palm Beach, 875
F.2d 1546, 1555 (11th Cir. 1989).  The Eleventh Circuit described a failure to
supervise claim as one that alleges that the (1) "supervisor personally

i.   *Claims regarding poll worker training.*

Plaintiffs' allegations about training poll workers never make it out of the starting gate, because Defendants are not responsible for training poll workers—superintendents are.  <u>Compare</u> O.C.G.A. §§ 21-2-50(11) (duties of the Secretary of State) <u>with</u> 21-2-99(a) (superintendents' duties to train poll workers).  Cases have held government officials responsible for the acts of their employees.  <u>See</u>, <u>e.g.</u>, <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978).  Defendants have not, however, found any case where a government official is liable for the acts of third parties that he or she does not employ, appoint, or directly train.[21]

This is for good reason. The law does not impose constitutional liability for governments because they do not *exceed* their statutory obligations.  <u>Cf.</u> <u>Gwinnett Cty. NAACP</u>, 2020 WL 1031897, at *6-7.  Duty is a critical element to any constitutional tort, and it is also necessary to show that the

---

participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation;" and (2) the deprivations are "widespread … obvious, flagrant, rampant and of continued duration."  <u>Brown</u>, 906 F.2d at 671.

[21] This Court's Order on Defendants' Motion to Dismiss addressed this point by citing <u>Luckey v. Harris</u>, 860 F.2d 1012, 1015-16 (11th Cir. 1988).  Doc. No. [68] at 72.  <u>Luckey</u>, however, addresses an exception to the <u>Ex Parte Young</u> doctrine not the elements of a failure to train or supervise claim.  860 F.2d at 1013, 1016.

Defendants (and not third parties) caused Plaintiffs' alleged harm.[22]  To hold

otherwise would impose a new-found training responsibility upon state

election officials when no statute has.

Plaintiffs' theory runs headfirst into another problem: the Eleventh

Amendment, a jurisdictional defense that precludes states from being sued in

federal court on the "basis of state law."  Doc. No. [188] at 12-13 n.11 (citing

Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984)).  This

Court already denied Plaintiffs' Motion for Preliminary Injunction on these

grounds, and the same reasoning applies to Defendants' Motion for Summary

Judgment.  As before, the Secretary reads Georgia law one way, specifically

as imposing on superintendents the duty to train poll workers.  Plaintiffs

read the law differently and seek to impose federal liability based on their

contrary interpretation.  Thus, once again, "the gravamen of the Plaintiffs'

pending motion appears to be that the Secretary of State (and therefore the

---

[22] In the Order on the Motion to Dismiss, this Court instructed the parties to
address the Eleventh Circuit's decision in Dollar v. Haralson County, 704
F.2d 1540, 1543 (11th Cir. 1983).  Doc. No. [68] 71-72 n.25.  Dollar correctly
recognizes that 42 U.S.C. § 1983 "is not self-executing, in that the statute
itself creates no substantive rights."  704 F.2d at 1543.  Thus, the focus of
liability is whether a duty "exists between the parties that the community
will impose a legal obligation upon one for the benefit of the other."  Id.  State
law "inform[s but does] not control[]" the issue.  Id. at 1544.  As discussed,
State law does not support Plaintiffs' legal theories.

State of Georgia) has improperly interpreted and failed to adhere to Georgia's" election laws, which means any interpretation by this Court will violate the Eleventh Amendment."  Doc. No. [188] at 16.

Even if this Court looks beyond the jurisdictional implications of Plaintiffs' legal theory, a Georgia court would likely agree with the Secretary's interpretation.  First, the statutory text describing the Secretary as the "Chief Election Official," O.C.G.A. § 21-2-50(b), imposes no duties other than ensuring compliance with HAVA.  O.C.G.A. § 21-2-50.2.  Second, in Georgia, the more specific statute typically controls.  See Bellsouth Telecommunications, LLC v. Cobb Cty., 305 Ga. 144, 147, 824 S.E.2d 233, 239 (2019).  The only (and therefore, most specific) statute addressing the training of poll workers mentions only superintendents.  O.C.G.A. § 21-2-99(a).  Third, had the General Assembly wanted the Secretary to train poll workers, it would have expressly said so.[23]  See Deutsche Bank Nat. Tr. Co. v. JP Morgan Chase Bank, N.A., 307 Ga. App. 307, 311, 704 S.E.2d 823, 828 (2010).  Finally, Georgia courts recognize divisions of power between county

---

[23] Even Democratic legislators recognize the centrality of county election administration:  in the wake of the 2020 primary, the Fulton County delegation in the Georgia General Assembly introduced HB 1202, which seeks to abolish and reconstitute the Fulton County Board of Elections.  See http://www.legis.ga.gov/Legislation/20192020/193609.pdf

and state officeholders, which belies Plaintiffs' unitary executive argument.

Compare Lindey v. Guhl, 237 Ga. 567, 570, 229 S.E.2d 354, 358 (1976)

(describing counties' "broad discretion" to exercise power) with Piedmont

Cotton Mills v. Ga. Ry. & Elec. Co., 131 Ga. 129, 62 S.E.2d 52, 60 (1908)

(addressing Secretary's limited authority to grant charters).  Combined with

the Jacobson decision discussed in Defendants' other motion for summary

judgment, the weight of precedent is against Plaintiffs' attempt to expand the

Secretary's authority (and liability) by implication.[24]  Jacobson v. Florida

Sec'y of State, 957 F.3d 1193, 1207-1212 (11th Cir. 2020).

Beyond these legal flaws with Plaintiffs' claims, inadequate factual

showings foreclose relief.  Plaintiffs can point to no evidence of widespread or

systemic constitutional violations regarding poll workers' application of any

specific election laws, including those governing absentee and provisional

ballots specifically.  Supra, pp. 12-13; SMF at ¶¶ 82-105, 183, 189-206.  Thus,

there is no injury and, consequently, no Anderson-Burdick claim.

---

[24]  Plaintiffs may also rely on Grizzle for the idea that the Secretary is responsible for every aspect of a Georgia election.  But Grizzle's holding arose in the context of whether the Secretary was a proper party to the suit. Grizzle v. Kemp, 634 F.3d 1314, 1318–19. The Eleventh Circuit has since decided Jacobson, which concerns *traceability* to State officials for the actions of local elections officials. 957 F.3d at 1207-12.  It is also important to note that no Georgia court has adopted Grizzle's reasoning.

Even if an injury were shown, there is no evidence of deliberate indifference by Defendants.  Nothing provides a basis to decide Defendants were on notice of "obvious, flagrant, rampant" constitutional violations by Georgia's poll workers.  Brown, 906 F.2d at 671.  Nothing demonstrates a conscious choice by Defendants to continue a "'policy of inaction' in light of [such] notice."  Connick, 563 U.S. at 51 (citing Harris, 489 U.S. at 395).  To the contrary, the evidence now before this Court shows, robust, significant, and annually updated training efforts.

That training is criticized only by Mr. Kennedy, who basically opined that the State could "do more" or "do better" by adopting Wisconsin's approach to election training.  SMF at ¶ 96-105.  Regardless, liability does not attach because a government entity could do "better or more."  Harris, 489 U.S. at 391; see also Connick, 563 U.S. at 67.  Moreover, Kennedy's inability to articulate a national or otherwise "accepted standard" is fatal to Plaintiffs' claim.  See, e.g., Owaki, 491 F. Supp.2d at 1162; Eberhardinger, 341 F. Supp. 3d at 430.

ii.   *Claims regarding superintendents' training.*

Plaintiffs claim that the Secretary has been deliberately indifferent to the need to train superintendents on: training poll workers, lines at polling locations, sufficient paper ballots, and sufficient precincts. Doc. No. [41] at ¶

139. Again, the SEB has no obligation to train superintendents, though the Secretary does.  <u>Compare</u> O.C.G.A. §§ 21-2-50(a)(11) (imposing obligation on the Secretary) <u>with</u> 21-2-31 (describing duties of SEB).  But there is no evidence that suggests widespread problems with sufficient resources, or that the Defendants' training materials are deliberately indifferent to any alleged issues.

On claims about long lines, Plaintiffs' evidentiary failures are numerous.  SMF at ¶¶ 207-232.  No evidence shows that lines themselves are "widespread" and indicative of systemic failures to train or supervise.  <u>Kerr v. Miami-Dade Cty.</u>, 856 F.3d 795, 820 (11th Cir. 2017).  Nor have Plaintiffs provided evidence that Defendants' training caused lines, or that Defendants knew insufficient training caused long lines and "continued [to] adhere to constitutionally deficient training." <u>Connick</u>, 563 U.S. at 62. Indeed, neither Kennedy nor Graves address causation, and <i>res ipsa</i> is not a valid theory for constitutional violations.  SMF at ¶¶ 69, 221; <u>Brown</u>, 906 F.2d at 671.

The same is true for Plaintiffs' claims about polling locations.  There is no evidence that a polling-location change prevented anyone from voting or that Georgia counties moved polling locations for improper reasons.  SMF at ¶¶ 233-42.  Plaintiffs also failed to provide any evidence on the Secretary's training about polling closures, or that the training caused any harm.  <u>Id.</u>

¶¶ 245-46, 250.  There is just Dr. Herron's report, and he takes no position on what State officials knew or who is responsible for changing polling locations. <u>Id.</u> at ¶ 239.

      C.    <u>Plaintiffs' claims regarding list maintenance.</u>

Summary judgment is also appropriate on Plaintiffs' list maintenance claims, Doc. No. [41], ¶ 163, because Plaintiffs have not provided evidence of a constitutional burden.  <u>See</u>, <u>infra</u>, pp. 36-39.  Alternatively, as this Court has previously held, any burden on Plaintiffs' right is minimal and outweighed by three important state interests: (1) maintaining a reliable list of electors; (2) applying the law as written; and (3) eliminating voter confusion and improving Election Day operations.  Doc. No. [188] at 27-29. The evidence has not changed since December, and there has been no intervening change in law that allows Plaintiffs to escape summary judgment.[25]

---

[25]  The Court accurately noted that the State's method of voter-list maintenance, both before and after H.B. 316, was contemplated by the federal NVRA and upheld as compliant with federal law in <u>Husted v. A. Philip Randolph Inst.</u>, 138 S. Ct. 1833, 1842 (2018).

II.    **Plaintiffs' claim that facially neutral laws violate the Fifteenth Amendment fails since they show neither disparate impact nor discriminatory purpose (Count II).**

The Fifteenth Amendment prevents states from enacting election laws that discriminate on the basis of color.  See City of Mobile, Ala. v. Bolden, 446 U.S. 55, 61 (1980).  Plaintiffs' challenge to facially neutral laws and policies requires evidence of (1) a disparate racial impact caused by State policies; and (2) a "racially discriminatory purpose chargeable to the state." Lucas v. Townsend, 967 F.2d 549, 551 (11th Cir. 1992).  As discussed more fully in Section V, Plaintiffs have not provided evidence of *any* alleged disparate racial impact on anything but absentee ballot rejection rates, polling closures, and HAVA-match.  Of the remaining claims, Plaintiffs have not shown evidence that Defendants knew of the disparities and chose to ignore them.[26] There is no evidentiary basis on which to conclude that there is any racially discriminatory purpose chargeable to the State. Id.

Defendants suspect Plaintiffs may rely on their mischaracterization of two statements made by Governor Kemp at campaign events in 2014 and 2018.  See Doc. Nos. [131-2], [154] at 12-14.  What those comments show is political respect for Plaintiffs' efforts in registering new voters (in light of

---

[26] In the case of polling location changes, Plaintiffs have not shown that Defendants caused any harm.

Georgia's easy voter registration)—Governor Kemp was simply imploring his political party to do the same. Reliance on such statements as a legal matter is problematic, to say the least, using campaign speech to prove government motive raises serious First Amendment concerns and requires engaging in disfavored "judicial psychoanalysis." Washington v. Trump, 858 F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski dissenting) (citation omitted). See also Trump v. Hawaii, 138 S.Ct. 2392, 2418-20 (2018).

In any event, Plaintiffs possess nearly 2 million pages of documents reflecting *official* action of the Office of the Secretary of State. *None* of those documents suggest the significance Plaintiffs attribute to the Governor's statements, nor do they show any action consistent with Plaintiffs' misinterpretation of those statements.

## III.   Plaintiffs' Equal Protection claims also fail (Count III).

Plaintiffs raise two types of Equal Protection claims. The first challenges the same procedures as Counts I and II, and alleges that these procedures treated voters of color differently from white voters. Doc. No. [41], ¶¶ 189-90. The second Equal Protection claim is that Georgia's election laws have "different standards for administering elections or for counting ballots in different counties," which arbitrarily discriminate against voters generally. Id., ¶¶ 194-98.

Regarding Plaintiffs' Equal Protection claims grounded in racial impact, those claims challenge facially neutral laws.  Accordingly, Plaintiffs must show more than a disproportionate effect on voters of color; they must also show evidence of discriminatory intent.  Rogers v. Lodge, 458 U.S. 613, 618 (1982); see also Democratic Exec. Comm. v. Lee, 915 F.3d 1312, 1319, n.9 (11th Cir. 2019) (distinguishing traditional equal protection claims which require discriminatory animus from Anderson-Burdick claims).  Intent can be shown if the policy or action is "unexplainable on grounds other than race." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  As discussed, few of Plaintiffs' challenged acts have *any* disparate impact on voters of color.  But, Plaintiffs Equal Protection claims fail regardless because there is no evidence of discriminatory animus.

Plaintiffs' claims regarding uniformity also fail, for three reasons. First, they have offered no concrete allegation of varying practices between counties, much less any concrete *evidence* that varying practices amount to valuing the vote of one over another.  Second, they have articulated no injury that flows from the alleged differing practices in Georgia counties, particularly since the enactment of HB 316.  Third, Plaintiffs have not shown erroneously different applications of law, nor have they shown that Defendants caused differing policies to apply across the State.  Thus,

Plaintiffs' claim must be dismissed since they have not even cleared the most basic hurdle of constitutional torts—alleging an injury.

## IV. Plaintiffs' Procedural Due Process claim is unsupported (Count IV).

Plaintiffs also allege that Georgia's list-maintenance process violates procedural due process by not providing adequate pre- and post-deprivation process.  Doc. No. [41] ¶¶ 202-08.  To succeed on this claim, Plaintiffs must show: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003) (citation omitted). The analysis can begin and end with the text of the statute and not rely on "'hypothetical' or 'imaginary' cases." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008).

Under Georgia law, before a voter is placed into canceled status, two different clocks must *both* run.  The first moves a voter from the active list to the inactive list if a voter (1) has had no contact with the election superintendent in the preceding five calendar years, and (2) then does not return a confirmation notice.  O.C.G.A. § 21-2-234(a); see also SMF at ¶ 111. The second clock begins when a voter is moved from the inactive to cancelled status upon (1) having no further contact with election officials for an

36

additional two federal election cycles, and (2) not returning a second confirmation letter.  O.C.G.A. § 21-2-235(a), (b); see also SMF at ¶¶ 116-18.

Voters in inactive status have been deprived of nothing: they can vote and sign petitions, and these acts will move them to active status.  O.C.G.A. §§ 21-2-235(d) and (a); see also SMF at ¶¶ 112-15.  Plaintiffs' claims, therefore, logically address only voters in cancelled status.  Those voters have adequate process before and after being placed in cancelled status.  In addition, Plaintiffs' proposed solution—same day voter registration—would be too significant a burden.[27]  Doc. No. [41] ¶ 77.

When deciding the adequacy of due process, courts consider three factors: (1) the private interest affected; (2) the risk of erroneous deprivation, along with the value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens of the additional or substitute procedural requirement.  Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  Plaintiffs cannot overcome summary judgment on the second and third elements.

---

[27] In contrast, when Ohio eliminated same-day registration, the Sixth Circuit found it was only a minimal burden on the right to vote. Ohio Democratic Party v. Husted, 834 F.3d 620, 630 (6th Cir. 2016).

First, the risk of erroneous deprivation is minimal.  The time in which the "two clocks" run covers at least ten years: five preceding "calendar years" before the odd-numbered year in which the change is made (the sixth year), followed by two general election cycles.[28]  During that time, voters receive two mailed notices informing them of their rights and asking only that the mail be returned (with postage already paid), and renewing drivers' licenses affords another opportunity to use Georgia's automatic voter registration scheme.  O.C.G.A. § 40-5-32(a)(1) ("driver's license shall expire on the licensee's birthday in the eighth year following the issuance of such license").  Likely for this reason, Plaintiffs have shown few, if any, instances of erroneous deprivation.  Hypothetical or rare cases are insufficient to establish liability.  Mathews, 424 U.S. at 344.  Plaintiffs' proffered expert, Dr. McDonald, provides no help to Plaintiffs in this regard either.  He offered no opinion as to whether the change in status of any voters on the list was legally improper.  SMF at ¶ 125.  This alone is fatal to Plaintiffs' claims.

Second, as this Court has already held, Defendants have important interests in maintaining reliable and accurate lists of electors.  See Doc. No.

---

[28] Since list-maintenance activity occurs in an odd-numbered year, the two general election cycles cover three years: the following year (first general election), the next odd-numbered year, and the second general election.

185 at 4; see also SMF at ¶¶ 106-09.  Plaintiffs' proposed same-day voter registration would be a wholesale change to Georgia election laws that only 21 states have adopted.[29]  Requiring Georgia counties to permit same-day registration would also be burdensome.  In addition to running an election on Election Day, state and county officials would be required to accept and process voter registration applications, including verifying information of registrants, and the voter could still be ineligible to cast a ballot at the particular polling place.  The increased potential for voter fraud is also a problem with Plaintiffs' proposal, as the limitations on real time knowledge increases the possibility that someone could register and vote in one county and then do the same in an adjacent county before the first vote is recorded. For any of these reasons, this Court should grant summary judgment on Plaintiffs' procedural due process claim.

## V.    Plaintiffs' claims under Section 2 of the Voting Rights Act are void of factual and legal support (Count V).

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or

---

[29] National Council of State Legislatures, <u>Same Day Voter Registration</u> (June 28, 2019), available at https://www.ncsl.org/research/elections-and-campaigns/same-day-registration.aspx

abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). The undisputed facts demonstrate that Georgia's administration of its elections do *not* result in the denial or abridgement of the right to vote of any citizen in violation of Section 2.

"The essence of a Section 2 claim is that *a certain electoral law, practice, or structure* interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47 (1986) (emphasis added). Section 2 claims are either based on (1) vote dilution, which challenges district boundaries; or (2) vote denial, which challenges specific election practices. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 239 (4th Cir. 2014); Veasey v. Abbott, 830 F.3d 216, 244 (5th Cir. 2016); Ohio Democratic Party v. Husted, 834 F.3d 620, 636-37 (6th Cir. 2016). Plaintiffs raise a vote-denial claim.[30]

While the parameters of vote-dilution claims are clear, no such clarity exists for the proper standard for vote-denial claims. Veasey, 830 F.3d at 244.

---

[30]   Plaintiffs explained in July 2019 that they were not challenging any district boundaries in this litigation. Doc. No. [84] at 30:17-19. Despite asking for data specifically for a Section 2 analysis at that same July status conference, Doc. No. [84] at 18:5-20:4, none of Plaintiffs' experts used this data to conduct any racial-polarization analysis for this case.

The Supreme Court has not yet addressed the proper standard for a vote-denial claim under Section 2, and the circuits are split.[31]  There is consensus, however, that a two-pronged analysis applies.  Plaintiffs must show the challenged "standard, practice, or procedure" imposes a discriminatory burden on members of a protected class, leaving them with "less opportunity … to participate in the political process." NE Ohio Coal. for the Homeless v. Husted, 837 F.3d 612, 626-27 (6th Cir. 2016).  That burden must be caused by or linked to "social and historical conditions" that produce current discrimination.  Id.; see also Democratic Nat'l Comm. v. Hobbs, 948 F.3d 989, 1012 (9th Cir. 2020); Veasey, 830 F.3d at 243-245; League of Women Voters, 769 F.3d at 240.

The Eleventh Circuit has not directly addressed whether it will adopt the same two-part test, but it has historically emphasized the importance of causality and a showing that any injury is "due to the interaction of racial bias" and the challenged voting system.[32]  Osburn v. Cox, 369 F.3d 1283,

---

[31]  The Supreme Court may consider the issue in Arizona Republican Party v. Democratic National Committee, (U.S. Supreme Court Docket No. 19-1258), available at https://www.supremecourt.gov/docket/docketfiles/html/public/19-1258.html

[32]  The circuits also disagree on what degree of statistical disparities establish a Section 2 claim.  The Fourth, Sixth, and Seventh Circuits hold that a small statistical disparity is not enough—a plaintiff must also show that the challenged practice or procedure *causes* the deprivation of an equal

1289 (11th Cir. 2004); see also Johnson v. Governor of Fla., 405 F.3d 1214,

1228 (11th Cir. 2005) ("Section 2 does not prohibit all voting restrictions that

may have a racially disproportionate effect").  The weight of applicable

authority, therefore, requires Plaintiffs to establish both causation and

disparate impact.[33]

A.    Step 1: Discriminatory Impact

Plaintiffs' Section 2 claims challenge the same policies as Count I.  Doc.

No. [41], ¶¶ 213–214.  After identifying the challenged practice or procedure,

the inquiry focuses on whether Plaintiffs have provided sufficient evidence to

show "an adverse disparate impact on protected class members' opportunity

to participate in the political process."  Husted, 834 F.3d at 637.

---

opportunity to vote. Lee v. Va. State Board of Elections, 843 F.3d 592 600
(4th Cir. 2016); Frank v. Walker, 768 F.3d 744, 745, 753 (7th Cir. 2014); Ohio
Democratic Party, 834 F.3d at 637-638. The Fifth and Ninth Circuits do not
require causality for the first prong.  Veasey, 830 F.3d at 250, 256; Hobbs,
948 F.3d at 1016.

[33]  Finding that a Section 2 violation exists based on statistical disparities
alone (without causation) also raises significant questions about the
constitutionality of Section 2.  Legislation authorized by the Fourteenth
Amendment must have "a congruence and proportionality between the injury
to be prevented or remedied and the means adopted to that end."  City of
Boerne v. Flores, 521 U.S. 507, 520 (1997).  Section 2 loses that congruence
and proportionality if it is stretched to encompass statistical disparities
alone.  See Farrakhan v. Washington, 359 F.3d 1116, 1123 (9th Cir. 2004)
(Kosinski, J., dissenting).

Plaintiffs' experts on voting technology and training never reviewed racial data or reached conclusions about race.  SMF at ¶¶ 68, 105.  Nor is there any evidence of racial disparities in provisional ballots.  On voter-list maintenance, as a percentage of their share of the voter list, white voters were *more likely* to be moved to cancelled status than African-American voters.  Id. at ¶ 123.  As a percentage of their total registered voters, African-American voters were also on the inactive list for reason of "no contact" *less* than others.  Id. at ¶ 124.  On polling locations, Plaintiffs' expert found that, for Election-Day voting in the 2018 general election, where voters actually had to go to a particular polling location (versus an early-voting site), white voters were *more* affected by precinct changes than Black voters. Id. at ¶ 237.[34]  The lack of *any* disparate effect ends the Section 2 analysis for those challenged election practices.

Plaintiffs have put forward evidence showing at least *some* racial disparities for only three challenged practices: (1) the rejection rate for absentee ballots, (2) the voters captured by HAVA-match process, and (3) line

---

[34]  Despite Plaintiffs' expert not showing the same information for election-day voting in his supplemental report, Defendants' expert used the same data and demonstrated the same pattern of a greater effect on white voters in both the 2016 and 2018 elections for voters who vote on election day. SMF at ¶ 238.

length at some Fulton County precincts in the 2018 General Election.

Plaintiffs fail, however, to show that any act or omission of Defendants

"causally contributes" to the alleged discrimination.[35]  Husted, 834 F.3d at

638.

ABSENTEE BALLOT REJECTION RATES. Despite their claims of

widespread and systemic failures, Plaintiffs' claim is supported by only the

inadmissible testimony of Dr. Smith, who calculates a rejection rate of 2.35%

for white voters' absentee ballots in the 2018 election and a rejection rate of

3.74% for Black voters in the same election. SMF at ¶ 186.[36]  But Dr. Smith

agreed that the difference in the rejection rate could have been caused by any

---

[35]  Plaintiffs have no such causal evidence, even if the practices with no racial disparity reach this stage of the analysis, primarily because every one of Plaintiffs' experts scrupulously avoided any causal analysis for any racial disparities.  SMF at ¶ 71 (intent); ¶ 72 (racial demographics of "purge list"); ¶ 72 (significance of demographic percentages); ¶ 236 (report takes no position on why a polling place could be closed), ¶¶ 235-36 (no opinion on intent or whether any state or local officials knew of any alleged disparate impact on any racial group), ¶ 239 (no analysis of how far polling locations moved), ¶ 239 (no engagement with the rationale of changes to precincts and no opinion as to why polling places changed); ¶ 66 (did not review or allege any intentional conduct); ¶ 67 (system was not intentionally designed to be vulnerable to hacking); ¶ 69 (not offering opinion on intent); ¶ 104 (no opinion on how many errors make a problem systemic); ¶ 105 (only racial impact is not reinforcing that poll workers are dealing with a diverse population).
[36]  Dr. Smith's report only covers "roughly 100 counties with more than zero rejected" absentee ballots in 2018, Doc. No. [259], ¶ 27, and does not address how the changes to absentee-ballot laws as a result of H.B. 316 could affect his analysis.

number of non-racial factors, including age, voting experience, or several

other categories besides race. SMF at ¶ 188. Plaintiffs did not fill this gap

with evidence of any particular practice related to absentee ballots

(identifying the elector, absentee-ballot timelines, etc.) which caused the

racial disparity in the rejection rate.

HAVA-MATCH POLICY. As shown, Plaintiffs have no declarants who were

precluded from voting due to the HAVA-match policy. Supra, pp. 20-21. And

Dr. Mayer's report does not save Plaintiffs' claims because he could not offer

any conclusion on causation.  SMF at ¶ 169.

LENGTH OF LINES AT POLLING PLACES. As shown, Plaintiffs have scant

competent factual evidence about lines. Supra, pp. 14-16.  The only evidence

on racial effect of lines is limited to a small subset of Fulton County precincts

in 2018, and a difference of 96 seconds in wait times.  SMF at ¶ 218. Dr.

Graves did not analyze causation or conclude his findings are statistically

significant.  Id. at ¶ 221.

Legally, it is doubtful that lines can even form the basis of a Section 2

violation, because they are not a "standard, practice, or procedure" of voting.

Lee v. Va. State Bd. of Elections, 155 F. Supp. 3d 572, 583 (E.D. Va. 2015)

partially modified after reconsideration on other grounds by Lee v. Va. State

Bd. of Elections, Civil Action No. 3:15CV357-HEH, 2016 U.S. Dist. LEXIS

185846, at *5 (E.D. Va. Feb. 2, 2016).  But even if it could, because Plaintiffs'

cannot show any statistical disparity *caused* by a practice that diminishes

"the *opportunity* of the protected class to participate in the electoral process,"

their Section 2 claim fails at the first hurdle it must cross. Lee, 843 F.3d at

601

     B.    Step 2: Totality of the Circumstances

Only if this Court determines that Plaintiffs have somehow shown a

disparate effect *caused* by these practices, must it then consider the totality

of the circumstances—looking to the interaction of the challenged practice

with historical conditions using the "Senate Factors" discussed in Gingles.

Husted, 834 F.3d at 638. Because Plaintiffs have not shown any disparate

impact in the opportunity to vote that is caused by the challenged practices

(e.g., long lines, absentee ballots, etc.), this Court cannot then review the

social and historical conditions under this second prong. Id.

Even if this Court reviews the social and historical conditions,

Plaintiffs have presented no evidence on the interaction of the law and

specific social considerations that have produced the discrimination.[37] Dr.

---

[37] This lack of evidence especially concerning when almost all of the evidence presented by Plaintiffs is far from "current" history. Shelby Cty. v. Holder, 570 U.S. 529, 556 (2013). In the light of Shelby County, relying exclusively on

Adrienne Jones and Dr. Peyton McCrary offered challenged expert testimony on the issue, but it too falls short. Dr. Jones focused almost exclusively on events before 1990 and provided only a handful of incidents in the last 30 years.[38]  SMF at ¶ 241, n.20.  Setting aside Dr. Jones's misstated facts, she does not provide any connection between the cited incidents and challenged voting practices other than her own statement saying it is so.  Id.

Dr. McCrary attempts to connect historical practices, such as immigration legislation in the 2000s, to Georgia's voter registration system, Doc. No. [339], pp. 38-54, but ultimately opines only on the HAVA matching process in Georgia since 2006. SMF at ¶ 253. Dr. McCrary also relied on the expert report of Dr. Mayer to reach his conclusions, Doc. No. [339], pp. 92-98, which as noted above, did not contain any causal analysis.  In any event, Dr. McCrary was clear: he was not opining that the HAVA-match process was adopted for racially suspect reasons. SMF at ¶ 73.

Even though this Court should not reach the second step in the vote-denial analysis, Plaintiffs have provided no evidence that any particular

---

decades-old history to invalidate voting practices would very likely not be a congruent and proportional use of Section 2. City of Boerne, 521 U.S. at 520.
[38]  Defendants do not contest that prior to the 1990s, Georgia had a long and sad history of racist policies in a number of areas including voting. A fact of which this Court can take judicial notice.

election practice interacts with the "social and historical conditions that have produced discrimination" to deny or abridge the right to vote. <u>Husted</u>, 834 F.3d at 638. Defendants are entitled to judgment as a matter of law on Plaintiffs' Section 2 claim.

## VI.   Plaintiffs seek an impermissible "obey the law" injunction.

Nearly two years after the 2018 General Election, and after nearly nine months of discovery, Plaintiffs still cannot articulate the relief they seek from this Court. The only remedial effect of the order they seek is a mandatory injunction requiring the State and non-party counties to operate elections in a manner "consistent with Georgia and federal law" or which permits "efficient, just, and fair elections."  Doc. No. [41], Prayer for Relief, ¶¶ 11(a), (d), (j), (l), 12.  This type of relief is routinely rejected by the Eleventh Circuit.

This Court previously denied Defendants' Motion to Dismiss on this basis, noting that it was "premature" to dismiss Plaintiffs' claims.  Doc. No. [68] at 52.  Discovery has now closed, and Plaintiffs have offered no further insight into the relief they seek.  Put another way, there is little "crystallization" of their relief yet to be had.  Plaintiffs still seek an injunction which does no "more than tell a defendant to 'obey the law' and 'merely cross-reference the relevant statutes and regulations." <u>S.E.C. v. Morgan Keegan & Co., Inc.</u>, No. 1:09-cv-1965-WSD, 2013 WL 10944536, at *57 (N.D. Ga. Feb.

15, 2013) (quoting <u>S.E.C. v. Goble</u>, 682 F.3d 934, 948-952 (11th Cir. 2012)).

This Court should not entertain Plaintiffs' request to find their remedy for

them, much less finding the constitutional infirmity their evidence cannot

establish.

## **<u>CONCLUSION</u>**

For all of these reasons, Defendants request this Court grant

Defendants' Motion for Summary Judgment.

Respectfully submitted, this 29th day of June 2020.

<u>*/s/ Josh Belinfante*</u>
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbins Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW

Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY

JUDGMENT ON THE MERITS OF PLAINTIFFS' CLAIMS was prepared

double-spaced in 13-point Century Schoolbook font, approved by the Court in

Local Rule 5.1(C).

*/s/ Josh Belinfante*
Josh Belinfante
