## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action File<br><br>    No. 1:18-cv-05391-SCJ |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants Brad Raffensperger, in his official capacity as Secretary of State (the "Secretary"), the State Election Board (the "SEB"), and State Election Board Members Rebecca Sullivan, David Worley, and Anh Le, also in their official capacities (collectively, the "Defendants"), by through counsel, offer the following undisputed material facts:

## I.    The Plaintiffs in this lawsuit.

1.    Plaintiff Fair Fight Action ("Fair Fight Action") is a non-profit corporation organized under the laws of Georgia. 2018 Fair Fight Certificate of Amendment – Name Change, Ex. No. (42).

2.      Former candidate for governor of Georgia Stacey Abrams is the founder of Fair Fight Action and its Chief Executive Officer is Lauren Groh-Wargo, who served as Ms. Abrams's campaign manager for her 2018 Georgia gubernatorial campaign. Fair Fight Action 30(b)(6) Dep., Ex. No. (13) at 126:9-15; L. Groh-Wargo Dep., Ex. No. (17) at 25:23-25.

3.      Plaintiff Fair Fight Action previously operated under the name Voting Access Institute ("VAI"); its name was changed to Fair Fight Action on November 21, 2018. Ex. No. (13) at 79:3-7; Ex. No. (17) at 29:20-25; Ex. No. (42).

4.      The purpose of Fair Fight Action was not altered following the name change from VAI to Fair Fight Action. Ex. No. (13) at 79:21-25.

5.      While operating as VAI, Fair Fight Action conducted a poll to test the phrase "voter suppression" in motivating its target voters.  Ex. No. (17) at 205:5-206:5; Exhibit 27.

6.      The phrase "voter suppression" was found to be as motivational as "educational opportunities for children, healthcare, hospital closures and Medicaid expansion, and economic opportunities for adults of all ages." Ex. No. (17) at Exhibit 30. As a result, VAI planned to use "voter suppression" as a theme for targeted messaging.  Id.

7.    Because the purpose of a political organization is to get its voters out to vote, Fair Fight Action is incentivized to continue employing the motivational phrase in targeted messaging.  Ex. No. (13) at 35:5-36:1; 179:10-16; Ex. No. (17) at 29:9-15.

8.    In discovery, Plaintiffs provided declarations from 308 individuals[1] who testified they either experienced or observed some form of voting issue in 42 Georgia counties. Chart of Declarants, Ex. No. (133) (summary chart of Plaintiffs' declarants by county and whether he or she purports to offer testimony regarding a personal voting experience, offered for statistical analysis purposes).

9.    The majority of these declarants come from four (4) counties: Fulton County (79); DeKalb County (57); Gwinnett County (38) and Cobb County (34). Id.

10.    Nineteen (19) counties—Bartow County, Bibb County, Bleckley County, Butts County, Carroll County, Early County, Fayette County, Grady County, Lee County, Liberty County, Meriwether County, Newton County,

---

[1] Plaintiffs initially submitted 313 declarations. Doc. No. [360] at 2. Two declarants have since passed. Id. at 2, n.2. Plaintiffs communicated to Defense counsel they would not rely on five declarations. Doc. No. [361] at 7; see also Doc. No. [361-3]. Thus, 308 declarants remain. Four of those, Plaintiffs stated they also agree to withdraw. Doc. No. [360] at 2, n.3.

Paulding County, Stephens County, Thomas County, Walton County, Ware County, Webster County, and Wheeler County—were each represented by a single declarant. Id.

11.    In 2016, Georgia's five most heavily African-American counties, by percentage of population, were Hancock County (71.8%); Clayton County (70.9%); Dougherty County (70.1%); Calhoun County (61.6%); and Randolph County (61.4%), according to the Georgia Governor's Office of Planning and Budget. (Report publicly available at https://opb.georgia.gov/document/publication/county-population-race-2016/download)

12.    In compiling the declarations used in this lawsuit, Plaintiffs worked with the Democratic Party of Georgia, (Aug. 21, 2019 Email: L. Conrad to S. Ghazal, Re: Speaking to Hannah Spero, Ex. No. (43) at PLTFS-FFA-003949), and the Abrams for Governor Campaign, (Feb. 26, 2019 Email: S. Laurand to V. Abhiraman, Re: Your Voter Statement - signature needed, Ex. No. (44) at PLTFS-FFA-004887; June 4, 2019 Email: P. Nathan to Info, Re: Invite Only: Democracy Warrior Organizing Day Summit, Ex. No. (45) at PLTFS-FFA-005904; Nov. 26, 2018 Email: L. Bryan to N. Larson, RE: Draft Statement – Larson, Ex. No. (46) at PLTFS-FFA-007708; Nov. 13, 2018 Email: K. Dermody to L. Bryan, RE: Poll Watcher Issues – Fulton County,

Ex. No. (47) at PLTFS-FFA-009331; Apr. 12, 2019 Email: M. Marks to J.

DeLapp, M. Oliphant, Re: Looking for DeKalb Election night download, Ex.

No. (48) at PLTFS-FFA-00333).

13.    Shortly after the November 2018 general election, Plaintiffs'

attorneys began to reach out to potential declarants and indicated they were

doing so on behalf of the Abrams for Governor Campaign. See, e.g., Nov. 11,

2019 Email: B. Burruezo to L. Bryan, RE: Poll watcher, Ex. No. (49) at

PLTFS-FFA-010427.

14.    Drafts of declarations prepared by Plaintiffs' counsel indicate

that this litigation was to be brought by Stacey Abrams and the Abrams

Campaign. See, e.g., Draft Affidavit of K. Dermody, Ex. No. (50) at PLTFS-

FFA-10373-80.

15.    Plaintiffs provided declarants with template declarations

containing checklists of potential issues from which to choose. See, e.g.,

Declaration of P. Davis, Ex. No. (51) at PLTFS000648-49; Declaration of F.

Dixon, Ex. No. (52) at PLTFS000483; Declaration of L. George, Ex. No. (53) at

PLTFS000214-15.

16.    As part of its campaign to collect declarations in support of this

lawsuit, Plaintiff Fair Fight Action sent emails to various community leaders

on behalf of "Leader Stacey Abrams" asking for them to connect Fair Fight

Action with "3-5 individuals who experienced any issue with voting or who have a story to share about voting." May 16, 2019 Email: L. Conrad to L. Conrad, Next steps: conversation with Leader Abrams 5/15, Ex. No. (54) at PLTFS-FFA-004137.

17.     To collect additional declarations during the March 2020 presidential primary, Fair Fight Action trained volunteers to act as "Declaration Takers," individuals stationed outside polling locations who would speak to voters and offer to document their experiences, and "Declaration Chasers," who would bring hard copies of declarations drafted by Fair Fight Action to voters to be signed and collected. Feb. 2, 24 Email: L. Conrad to K. Vu, Volunteering to document voters' experiences in March, Ex. No. (55) at PLTFS-FFA-006187.

18.     Fair Fight Action told potential declarants that they wanted to "listen to" and "uplift" their stories. May 14, 2019 Email: H. Wollensack to L. Walker, Re: Event Description, Ex. No. (56) at PLTFS-FFA-005283.

19.     When drafting declarations on behalf of declarants, Fair Fight Action would revise them to be "as effective as possible." Sept. 28, 2019 Email: FFA Story to R. K. Hawkins, Re: Change of Address on Voter Registration, Ex. No. (57) at PLTFS-FFA-004815.

20.    Fair Fight Action informed declarants during the drafting process that they wanted the declarations to "narrate as deeply personal, compelling stories." May 9, 2019 Email: V. Abhiraman to W. McGinniss, Re: McGinniss Voting Documents, Ex. No. (58) at PLTFS-FFA-003579.

21.    Some of the declarant testimony submitted by Plaintiffs in this lawsuit are unrelated to, and do not support, the claims alleged in this case, such as that of Courtney Mitchell, who complained of a power outage occurring at an early voting polling location she attempted to visit in Fulton County (Declaration of C. Mitchell, Ex. No. (59) at PLTFS000671-73), or that of Hattie M. Allen, who stated that after her absentee ballot was rejected for improper verification, she was offered a complementary ride to the polls and voted in person without issue (Declaration of H. Allen, Ex. No. (60) at PLTFS000632), or that of Kristen Morris, who complained of how long it took the postal service to deliver her ballot (K. Morris Dep., Ex. No. (28) at 29:6-18).

22.    Some declarants submitted declarations that simply confirmed their voting experience proceeded properly, such as Mona Chase, who stated in her declaration that she requested an absentee ballot, decided not to use it,

and thus submitted a provisional ballot when she later voted in person.[2] Declaration of M. Chase, Ex. No. (61) at PLTFS000261.

23.    Some of the declarations submitted by Plaintiffs in this lawsuit relate only to issues allegedly experienced with voting machines that are no longer used in this State. <u>See</u>, <u>e.g.</u>, Declaration of T. Adams, Ex. No. (62) at PLTFS000355; Declaration of T. Alridge, Ex. No. (63) at PLTFS000478; Declaration of C. Massiah, Ex. No. (64) at PLTFS000817; Declaration of J. McGhin, Ex. No. (65) at PLTFS000895-97.

24.    Numerous declarants admitted that whatever issue they may have experienced was resolved and that they have since been able to vote without issue. <u>See</u>, <u>e.g.</u>, (J. Thomas Dep., Ex. No. (37) at 25:14-19); Robyn Roberts (R. Roberts Dep., Ex. No. (31) at 36:13-37:2 (on behalf of her daughter)); Sue Murphy (S. Murphy Dep., Ex. No. (29) 24:22-25:3; 37:2-5); Thyrsa Gravely (T. Gravely Dep., Ex. No. (15) at 64:6-10); Phoebe Einzig-Roth (P. Einzig Roth Dep., Ex. No. (12) at 29:2-7).

---

[2] This process followed Georgia law as it existed in 2018. Following the passage of HB 316, a voter who had not yet returned his or her ballot and decided to vote in person could do so without using a provisional ballot by signing an affidavit and having the absentee ballot cancelled. <u>See</u> O.C.G.A. § 21-2-388; <u>see also</u> HB 316, Act 24, lines 974–990.

25. Some declarants were unaware their declarations were being used in this lawsuit before being contacted to sit for a deposition. See, e.g., E. Walden Dep., Ex. No. (40) at 22:10-13; J. Bartley Dep., Ex. No. (4) at 28:6-12; D. Brown Dep., Ex. No. (6) at 21:7-10.

26. Fair Fight Action's political and policy interests are not limited to voting; for example, Fair Fight coordinated with, and offered behind-the-scenes support to, Planned Parenthood, NARAL Pro-Choice Georgia, the ACLU of Georgia and other groups with "the ultimate goal to kill" the 2019-20 HB 481 Living Infants Fairness and Equality (LIFE) Act. March 19, 2019 Email: H. Holley to S. Fox, A. Rosato, Aimee, L. Simmons, HB 481 Press Conference, Ex. No. (66) at PLTFS-FFA-005428.

27. Fair Fight Action sent draft form letters purporting to oppose 2019-20 HB 481 to individuals encouraging them to "fight Brian Kemp's anti-abortion bill." March 19, 2019 Email: H. Holley to BCC [Numerous], REQUEST: Local Elected Officials Sign Onto Letter Opposing HB 481, Ex. No. (67) at PLTFS-FFA-005431-33.

28. Fair Fight Action and its affiliated groups also disseminate various political advertisements regarding election administration. See, e.g., Fair Fight Action, NEW TV AD: Georgia's chief elections officer is passing the

buck on his responsibilities, Facebook (Jun. 16, 2020), available at

https://www.facebook.com/FairFightAction/posts/1991726570957844.

## II.  The intervening legislative and administrative actions taken since this lawsuit was filed.

29.    After this lawsuit was filed, the General Assembly enacted an

overhaul of Georgia's election laws with the enactment of House Bill 316

("HB 316") on or about April 2, 2019 and House Bill 392 ("HB 392") on or

about July 1, 2019.  HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019),

available at http://www.legis.ga.gov/Legislation/en-US/display/20192020

/HB/316 (Signed by the Governor as Act 24); HB 392, 155th Gen. Assemb.,

Reg. Sess. (Ga. 2019), available at http://www.legis.ga.gov/Legislation/en-

US/display/20192020/HB/392 (Signed by the Governor as Act 75).

30.    The passage of these laws constituted a "monumental" change to

Georgia election law. Secretary of State Aug. 16, 2019 30(b)(6) Dep., Ex. No.

(32) at 182:23-24.

31.    As mandated by HB 316, the Secretary procured new voting

equipment called ballot-marking devices (BMDs), which have been fully

distributed and are currently in use in all counties in Georgia. C. Harvey

June 29, 2020 Declaration, Ex. No. (131) at ¶ 3.

32.     These BMDs replaced the Direct-Recording Electronic Voting Machines (DREs) that were previously used in Georgia, including during the November 2018 general elections. Id.

33.     As of December 30, 2019, DREs have been decertified by the Secretary of State and can no longer be used in Georgia elections. C. Harvey Dep., Ex. No. (19) at 365:20–367:7; C. Harvey June 29, 2020 Declaration, Ex. No. (131) at ¶ 3, Ex. A.

34.     HB 392 "requires the Secretary of State to promulgate a regulation establishing industry-based security standards and to annually certify that Georgia is substantially complying with its own security regulations." O.C.G.A. § 45-13-20(14.1).

35.     On or about August 13, 2019, the Secretary promulgated the regulation required by HB 392, (see Ga. Comp. R. & Regs. 590-8-3-.01), and on or about December 31, 2019 certified the State's compliance with it. C. Harvey June 29, 2020 Declaration, Ex. No. (131) at ¶ 4, Ex. B.

36.     The Secretary has also joined the Electronic Registration Information Center ("ERIC"), a non-profit organization that assists states with keeping accurate voter registration rolls. May 22, 2019 Email: S. Hamlin to [Numerous], Georgia's Membership and Public Announcement, Ex. No. (68) at STATE-DEFENDANTS-00202598; see also Secretary

Raffensperger Announces Major Partnership to Enhance Voter Registration

Systems, Georgia Secretary of State, available at

https://sos.ga.gov/index.php/general

/secretary_raffensperger_announces_major_partnership_to_enhance_voter

_registration_systems (last visited Jun. 27, 2020).

37.    The Georgia General Assembly considered legislation offered by

the Secretary this year which addressed lines at polling places. As

introduced, that legislation would require local officials monitor wait times at

polling locations for precincts with more than 2,000 electors and require that

precinct to be reduced in size if voters experienced a wait time in excess of

one hour. See Senate Bill 463, version LC 28 9567 (2020), available at

http://www.legis.ga.gov/Legislation/20192020/191511.pdf.

38.    Fair Fight Action opposed the provision of this legislation

intended to remedy wait times longer than one hour at large precincts. See

Mark Niesse, Bill to add Georgia precincts faces unexpected opponent: voting

groups, Atlanta-Journal Constitution (Mar. 25, 2020),

https://www.ajc.com/news/state--regional-govt--politics/bill-add-georgia-

precincts-faces-unexpected-opponent-voting-groups

/CqngPZCnA9mSNBqQcRYyxO/.

### III.    There is no evidence of intentional discrimination by the State Defendants.

39.    The Founder of Fair Fight Action, Stacey Abrams, admitted that she could not point to any evidence of an intentionally discriminatory act by the Secretary of State to disenfranchise Georgia voters. Abrams Dep., Ex. No. (1) at 58:20-59:3.

40.    Fair Fight Action's CEO, Lauren Groh-Wargo, testified on behalf of Fair Fight Action that intentional discrimination by the State of Georgia was implied by its legislatures' adoption of O.C.G.A. 21-2-220.1, the so-called "exact match" law, which she believed had previously been rejected for pre-clearance by the United State Department of Justice. Ex. No. (13) at 191:9-25).

41.    As Plaintiffs' expert Dr. McCrary testified, the HAVA-match process Georgia first implemented was pre-cleared pursuant to a settlement agreement, (Ex. No. (25) at 187:1-188:8),[3] and the Secretary of State's representative testified that the intent of the law was to verify voter accuracy. Ex. No. (19) at 186:17-19.

---

[3] Code Section 21-2-220.1, Georgia's existing HAVA-match process, was first adopted in 2017, after pre-clearance ended following <u>Shelby Cty., Ala. v. Holder</u>, 570 U.S. 529 (2013).

42.    The only two individuals identified by Plaintiffs as having been affected by the so-called "exact match" law, Ms. Ngoc Anh Thi Tran and Dr. Carlos Del Rio, did not claim that they were intentionally discriminated against. Declaration of N. Tran, Ex. No. (69) at PLTFS-001119-22; Declaration of C. del Rio, Ex. No. (70) at PLTFS000363-64.[4]

43.    Ms. Groh-Wargo could not identify a specific instance when former Secretary of State Brian Kemp intentionally discriminated against Georgia minority voters. Ex. No. (17) at 82:7-16.

44.    When asked, Ms. Groh-Wargo also could not identify an example of how the State Election Board members have intentionally discriminated against minority groups. Id. at 82:2-6.

45.    Ms. Groh-Wargo testified that she had no knowledge of a Georgia voter being told they could not vote due to their race (Id. at 118:14-18), and when testifying on behalf of Fair Fight Action, she, like Ms. Abrams, pointed

---

[4] Plaintiffs produced a signed declaration from Mrs. Tran that is not in English.  Defendants understand that Mrs. Tran's first language is Vietnamese and assume that her declaration is in Vietnamese.  Plaintiffs also produced an unsigned declaration bearing Mrs. Tran's name that is written in English.  Defendants refer here to the English-language document.  In doing so, they do not admit that the document is authentic, admissible, or an accurate translation of Mrs. Tran's signed declaration.  Defendants also refer to the declaration and deposition testimony of Cam Ashling, a volunteer who met Mrs. Tran while canvassing and described Mrs. Tran's experience from her perspective. Declaration of C. Ashling, Ex. No. (71) at PLTFS000946-47.

only to State Defendants' alleged inaction as implying intentional discrimination. Ex. No. (13) at 189:8-12.

46.     Ms. Groh-Wargo identified various alleged voting-related problems in Georgia while testifying on behalf of Fair Fight Action, such as alleged inaccurate voter rolls and a lack of provisional ballots at the polls, but was unable to provide evidence that these issues occurred as a result of intentional discrimination by Defendants. Id. at 192:1-12.

47.     Care in Action's representative admitted that he could not testify to Defendants' intent at all, stating: "I've never spoken to Brian Kemp, so I'm not sure that I can determine what his intention is." Care in Action 30(b)(6) Dep., Ex. No. (8) at 141:3-7.

48.     The representative from Virginia Highland Church, when asked if he believed Defendants intended to discriminate against voters based on race, said "[I]t's impossible for me to know what anyone's intentions are." Virginia Highland Church 30(b)(6) Dep., Ex. No. (39) at 138:10-16.

49.     When the representative from Ebenezer Baptist Church was asked whether the church had any "evidence of a designed intent behind the current Georgia elections system," he responded only that the church "apparently felt that there was enough evidence to vote unanimously to sue

the state of Georgia," but offered no evidence to support this belief. Ebenezer Baptist Church 30(b)(6) Dep., Ex. No. (11) at 89:21-90:15.

50.    When asked, the Sixth Episcopal District AME representative could not point to any intentional act of the State Defendants. Sixth Episcopal District AME 30(b)(6) Dep., Ex. No. (34) at 130:10-17; 138:19-139:8; 143:13-17.

51.    The representative from Sixth Episcopal District AME stated that he did not know whether or not the Secretary of State's office intentionally intended to impact the results of the 2018 General Election. Ex. No. (34) at 78:5-9.

52.    The Sixth Episcopal District AME said of then-Secretary Brian Kemp's actions regarding the 2018 General Elections: "I don't think he did anything intentionally." Ex. No. (34) at 117:11-12.

53.    Similarly, the representative from Sixth Episcopal District AME asserted that the State Election Board did a "lousy job of handling elections," but did not assert that it intentionally stopped Georgia electors from voting. Ex. No. (34) at 117:14-21.

54.    The representative on behalf of Baconton Missionary Baptist Church ("Baconton") admitted that it did not possess firsthand knowledge of any of the allegations contained in the Amended Complaint and that its

understanding of the issues was based on media reports and discussions with counsel. Baconton 30(b)(6) Dep., Ex. No. (3) at 87:7-19.

55.    Baconton's representative admitted that it could not confirm whether the media reports it relied upon were truthful or accurate. Ex. No. (3) at 88:10-15.

56.    When asked, Baconton's representative could not testify as to any instance of any policy or action challenged in this lawsuit disproportionately affecting voters or color or minority voters. Ex. No. (3) at 156:6-22.

57.    Plaintiffs' declarant witness Hank Bromley, a poll watcher during the 2018 elections, claimed that while he witnessed several African-American individuals being told that they were not on the voter rolls, he did not contend that such was caused by discriminatory intent. Declaration of H. Bromley, Ex. No. (72) at PLTFS000423-46.

58.    Mr. Bromley admitted that he did not speak to the individuals that were turned away, and that he could not testify as to the reason they were turned away or whether they were properly registered at that polling location. H. Bromley Dep., Ex. No. (5) at 41:7-23.

59.    Poll watcher Diana Cofield claimed that she observed poll workers providing several African-American voters with provisional ballots, but did not state that such was the result of intentional discrimination—she

did not know if the individuals were registered to vote or at the right precinct. D. Cofield Dep., Ex. No. (9) at 32:20-33:1.

60.     Poll watcher Carolyn Stephens noted that several black voters encountered registration problems at the polls, but she did not state that the County or State officials caused such issues, much less that they did so purposefully. Declaration of C. Stephens, Ex. No. (73) at PLTFS000047-48.

61.     Carol Sealey, another of Plaintiffs' declarants, stated in her declaration that Clay County, which is predominately African-American, had all polling locations closed except one, but she did not blame State Defendants for such closures; instead, she blamed County officials: "Voting in Clay County had always been confusing, and then the county just shut down all the polling locations except the one." Declaration of C. Sealey, Ex. No. (74) at PLTFS000881-82.

62.     Margaret Tyson, who opined in her declaration that insufficient notice was given to voters when a polling location was relocated due to the prior location being used as a FEMA disaster recovery center following Hurricane Michael (Declaration of M. Tyson, Ex. No. (75) at PLTFS000677-78), suggested the problem stemmed from a mistake by county personnel rather than intentional conduct. M. Tyson Dep., Ex. No. (38) at 16:22-24.

63.    Dr. Herron,[5] who opined on polling place adjustments in Georgia, did not weigh in on whether Georgia officials knew of the purported effects on voters of moving polling locations.  M. Herron Dep., Ex. No. (20) at 28:12-29:20.

64.    Dr. Stephen Graves,[6] who opined on polling place wait times, stated that he could not testify about the intent of Georgia State or County policymakers. S. Graves Dep., Ex. No. (16) at 20:15-24.

65.    Dr. Minnite,[7] who opined on voter fraud in Georgia, did not allege that Georgia legislators intentionally passed discriminatory laws. L. Minnite Dep., Ex. No. (27) at 51:13-16.

66.    Regarding voting machines, Plaintiffs' proffered expert Dr. Halderman[8] admitted he did not review or allege any intentional conduct. A. Halderman Dep., Ex. No. (18) at 15:7-15.

---

[5] Defendants have moved to exclude, in its entirety, the testimony of Dr. Herron. See Doc. No. [406].

[6] Defendants have moved to exclude, in its entirety, the testimony of Dr. Graves. See Doc. No. [400].

[7] Defendants have moved to exclude, in its entirety, the testimony of Dr. Minnite. See Doc. No. [392].

[8] Defendants have moved to exclude, in its entirety, the testimony of Dr. Halderman. See Doc. No. [401].

67.    Dr. Halderman agreed the voting system was not intentionally designed to be vulnerable to hacking. Ex. No. (18) at 192:15-20.

68.    Dr. Halderman admitted that he never looked at any racial data to determine if there was any disparate impact regarding the State's voting machines. Ex. No. (18) at 13:25-15:15.

69.    Mr. Kennedy,[9] who opined regarding training, did not offer any opinion as to the alleged discriminatory intent of Defendants. K. Kennedy Dep., Ex. No. (22) at 27:11-16.

70.    Dr. Daniel Smith[10] said he was "absolutely not" saying that election officials were engaged in intentional discrimination against African-American voters in rejecting absentee ballots. D. Smith Dep., Ex. No. (35) at 139:2-7. He also did not opine that Defendants had engaged in "voter" suppression, stating that the term "carries more baggage than utility" and "has become a partisan term." Ex. No. (35) at 154:17-24; 155:19-156:13.

---

[9] Defendants have moved to exclude, in its entirety, the testimony of Mr. Kennedy. See Doc. No. [403].

[10] Defendants have moved to exclude, in its entirety, the testimony of Dr. Smith. See Doc. No. [405].

71.    Dr. McDonald[11] admitted that he did not "have any knowledge of the intent of the Secretary of State's office behind their list maintenance procedures." M. McDonald Dep., Ex. No. (26) at 18:11-15.

72.    Dr. McDonald took no position on any racial relation to the particular voting practices he evaluated. Ex. No. (26) at 38:17-38:23; 40:4-12.

73.    Dr. Peyton McCrary,[12] another of Plaintiffs' experts who opined about the history of Georgia's voter-registration practices and systems, specifically did not offer any opinion about whether any part of the current voting system was adopted or enacted with discriminatory intent. P. McCrary Dep., Ex. No. (25) at 120:25-121:20; 209:2-210:18.

74.    Dr. McCrary did not opine on the intent behind any Georgia election practice.  Ex. No. (25) at 121:05-121:08; 121:16-121:04; 170:02-09; 199:13-200:10; 210:09-210:18. He did opine, without evidence, that voter suppression "tends to be the work of Republican Parties and state legislatures. Ex. No. (25) at 72:21-73:16.[13]

---

[11] Defendants have moved to exclude, in its entirety, the testimony of Dr. McDonald. See Doc. No. [402].

[12] Defendants have moved to exclude, in its entirety, the testimony of Dr. McCrary. See Doc. No. [404].

[13] Plaintiffs' proffered expert Dr. Adrienne Jones opined, also without evidence, that the federal government is engaging in voter suppression. Ex.

75.     The representative of the Secretary of State's office, Chris Harvey, testified unequivocally that there is nothing "[it] do[es] that encourages or allows or suggests any discrimination in voting." Secretary of State Jan. 6, 2020 30(b)(6) Dep., Ex. No. (33) at 140:6-8.

## IV.     Training of superintendents and registrars.

76.     In carrying out the statutory obligations imposed upon the Office of the Secretary of State, the Secretary conducts annual training courses in conjunction with the Georgia Association of Voter Registration and Election Officials (GAVREO).[14]  Ex. No. (33) at 35:18-23; see also GAVREO Presentations, Ex. No. (90) at STATE-DEFENDANTS-00002381–00007528.

77.     Superintendents and registrars must also become certified by completing a certification program approved by the Secretary of State and maintain certification by completing a minimum of 12 hours' training annually. Ex. No. (32) at 98:22-99:10; Ex. No. (33) at 35:18-21; Georgia

No. (21) at 64:7-11. She also alleged that Georgia engaged in intentional voter disenfranchisement in 2018, without evidence, based on largely the same theories of Plaintiffs' Complaint. Id. at 48:7-10; 48:15-22.

[14] The Georgia Association of Election Officials and the Voter Registrars Association of Georgia were previously two separate entities that consolidated to form GAVREO. Ex. No. (32) at 35:16-18.

Election Official and Registrar Certification Courses, Ex. No. (90) at STATE-DEFENDANTS-00007768–00008731.

78. The Secretary's office disseminates "Election Updates," "Election Nuggets," and monthly webinars ("3T's") to provide additional guidance to superintendents and registrars in the form of webinars and bulletins. Ex. No. (32) at 30:20-31:13; see also 3T's Through 2018, Ex. No. (90) at STATE-DEFENDANTS-00000001–00002029; Election Nuggets Through 2018, Ex. No. (90) at STATE-DEFENDANTS-00002030–00002068; Election Updates Through 2018, Ex. No. (90) at STATE-DEFENDANTS-00002069–00002380; GEOA-VRAG Presentations, Ex. No. (90) at STATE-DEFENDANTS-00002381-00007528; Certification Courses, Ex. No. (90) at STATE-DEFENDANTS-00007768-00008731; 3T's From 2019, Ex. No. (90) at STATE-DEFENDANTS-00008732–00008951.

79. To facilitate the prompt and efficient distribution of these materials, the Secretary utilizes "Firefly," a central repository for training materials and election information. K. Rayburn Dep., Ex. No. (30) at 103:9-104:2).

80. Each county is assigned a liaison within the Secretary's Office, who distributes materials directly to their assigned counties and is a central

point of contact between a county and the Secretary's Office. Ex. No. (19) at 60:9–11.

81.    Firefly is maintained by the Secretary of State's office and is accessible to authorized users of the counties through an ID and password system. Ex. No. (32) at 31:9-21.

82.    The Secretary of State is responsible for training the head election officials of a county, usually an election director or board, and those county elections officials are responsible for training poll workers and their staff. Ex. No. (19) at 121:23-122:4.

83.    Ms. Abrams, on the other hand, stated that the Secretary of State "is the person who is responsible under the Constitution of Georgia for the oversight and management of the entire elections system." Ex. No. (1) at 32:7–18; 40:7–19. Ms. Abrams believes that obligation under the Georgia Constitution also applies to the State Election Board. Id. at 40:20–41:3

84.    Counties are responsible for hiring and firing poll workers and staff. Ex. No. (19) at 35:21-36:25.

85.    While it is the counties who provide poll worker training (Ex. No. (32) at 178:9-9; Ex. No. (22) at 66:21-24), the Secretary of State does prepare materials county officials may (but are not required) to use in training their poll workers. (Ex. No. (32) at 30:3-19).

86.     These materials include, but are not limited to, videos, webinars, power points and other documents. Ex. No. (32) at 30:20-31:6.

87.     All poll worker and other training materials are available on Firefly and officials are encouraged to sign up for webinars addressing poll worker training. Ex. No. (32) at 179:4-13.

88.     Additionally, the Secretary publishes a public-facing webpage containing a poll worker manual, various election day tips, and videos regarding certain common issues. See Poll Worker Training Resources, Office of the Secretary of State Brad Raffensperger, available at https://georgiapollworkers.sos.ga.gov/Pages/default.aspx (last visited Jun. 28, 2020).

89.     The Secretary of State's office encourages counties to use the poll worker training materials prepared by the Secretary of State's office and is unaware of any counties that do not use them. Ex. No. (19) at 135:10-136:5.

90.     Communications from the Secretary of State's office are made through both Firefly and email to superintendents and registrars, monthly webinars are posted to Firefly, and often county liaisons and Director Harvey himself would follow-up those communications by telephone. Ex. No. (32) at 55:11-23; Ex. No. (33) at 27:3-29:5.

91.     Within the past three years, the Elections Director of the Secretary of State's office, Chris Harvey, has personally responded to inquiries on specific issues from the top county election officials, either registrars or election directors, for a majority of counties throughout the State. Ex. No. (32) at 180:19-181:20.

92.     The training and advice provided by Secretary of State officials on poll worker training is dictated by the Georgia Code and State Election Board rules. Ex. No. (32) at 178:15-180:3.

93.     Plaintiffs' proffered expert regarding the sufficiency of training produced by the Secretary, Kevin Kennedy, acknowledged that the Secretary "has developed a large portfolio of training materials and methods for county superintendents and registrars." Doc. No. [167] at 11.

94.     Defendants produced to Plaintiffs an index of all documents hosted on Firefly, (Ex. No. (90) at STATE-DEFENDANTS-00084463), and all messages—or "Buzz" posts—therein, (Ex. No. (90) at STATE-DEFENDANTS-00084462).

95.     The documents posted to Firefly include training documents, webinars, and updates dating back to at least 2014, (Ex. No. (32) at 45:6-46:5), but Mr. Kennedy was not provided access to Firefly nor did he review

the index of files posted to Firefly produced by Defendants, (Ex. No. (22) at
130:11-24).

96.    Mr. Kennedy opined on what he believes are components of a
good election worker training program and that Georgia's training materials
"lack[] key ingredients" in areas he finds important. Doc. No. [167] at 10.

97.    Mr. Kennedy's opinion is informed by his experience as a state
election official in Wisconsin, Doc. No. [167] at 3, and he admitted that his
opinions regarding Georgia's training procedures are not based on a
comparison to any national or accepted standard for training. See, e.g.,
Ex. No. (22) at 174:11-21; 84:17-23.

98.    Mr. Kennedy's proposal for a "mandatory state-directed uniform
training program for poll workers" is not based on any determinable standard
or case study. Ex. No. (22) at 168:4-9.

99.    Mr. Kennedy acknowledges that poll workers are subject to
sanction by the State Election Board, (Doc. No. [167] at 19–20), and that in
instances where an election official leaves government service before the
complaint is heard, "it tells you that the process is working." Ex. No. (22) at
181:24-25.

100.    Mr. Kennedy did not review the Secretary's publicly available
Poll Worker Training Resource webpage, first disseminated by Secretary

Kemp in 2015, and continuously updated since. Press Release, Secretary of State Brian P. Kemp Announces New Poll Worker Training Website, Oct. 20, 2015, Ex. No. (76) at STATE-DEFENDANTS-00124523. Nor did Mr. Kennedy review the 2020 Poll Worker Manual. Ex. No. (22) at 7:16–21; 2020 Poll Worker Manual, Ex. No. (90) at STATE-DEFENDANTS-00867638–867744.

101.    Mr. Kennedy testified that he had no opinion on materials prepared by counties for their poll workers. Ex. No. (22) at 127:5-10.

102.    Mr. Kennedy admitted that he was not opining that Georgia's training approach was rooted in anything other than enabling participation for all voters. Ex. No. (22) at 164:2-21.

103.    Mr. Kennedy agreed that so long as poll workers are following the law, a voter's rights are protected. Ex. No. (22) at 159:13–20.

104.    Mr. Kennedy does not offer any opinion as to how many errors make a problem systemic. Ex. No. (22) at 127:19-128:3

105.    Mr. Kennedy likewise does not provide any evidence that the training materials from the Secretary of State have a racial impact of any kind, other than that because the pictures of acceptable identification in the 2018 Poll Worker Manual included only one picture of an African-American resident, the Manual does not reinforce that poll workers are dealing with a diverse population. Ex. No. (22) at 163:6-18; 175:9-177:3; see also 2018 Poll

Worker Training Manual, Ex. No. (90) at STATE-DEFENDANTS-00008952-009070.

## V.    Georgia's list maintenance activities pursuant to O.C.G.A. § 21-2-234.

106.    The State has an interest in the maintenance of reliable voter lists. Doc. No. [188] at 28–29.

107.    Accurate voter rolls are necessary for the State to assess where and to what degree to deploy equipment and personnel on election day. Doc. No. [188] at 29.

108.    The State and the Secretary have an interest in enforcing Georgia election laws as written. Doc. No. [188] at 29.

109.    Georgia's voter list maintenance scheme reduces voter confusion and improves election day operations. Doc. No. [188] at 29.

110.    Georgia's voter list maintenance process by which inactive voters are moved to cancelled status was significantly altered by the passage of HB 316. See supra, ¶ 29, HB 316, lines 253-280.

111.    Prior to the passage of HB 316, if a voter had no contact with the elections or voter registration system for three calendar years,[15] they would

---

[15] Following the passage of HB 316, the "no contact" period before a voter is moved to inactive status has been extended to five calendar years. See O.C.G.A. § 21-2-234; see also HB 316, Act 24, lines 264 and 267.

be sent a confirmation notice by their respective county to confirm whether the voter wished to remain on the voting rolls. Ex. No. (32) at 200:22-201:4.

112.   If the voter returned the confirmation notice, he or she would remain in active status; if he or she did not, he or she would be moved to inactive status. Ex. No. (32) at 201:5-10.

113.   Voters in inactive status may still vote and doing so will move them out of inactive status and to active status. Ex. No. (32) at 201:11-18.

114.   Any voter activity with the Department of Driver Services updates the State's voter registration lists and results in an inactive voter becoming active unless the voter specifically opts out. Doc. No. [183], Tr. 44:6–9.

115.   A voter will move from inactive to active upon request for an absentee ballot. Id. at 44:14–15.

116.   Once a voter is in inactive status after following expiration of the five-year "no contact" period, if he or she remains inactive for another two federal election cycles, his or her voter registration would be changed to cancelled status. Ex. No. (32) at 201:19-23.

117.   This process in Georgia is also known as NGE (no general election). Ex. No. (30) at 143:12-17.

118.   Georgia's NGE, as laid out in the National Voter Registration Act, is the process of moving inactive voters to cancelled status, "after providing them notice and waiting for two federal elections where they have not voted." Id.

119.   At present, following the passage of HB 316, cancellations of voter registrations occur only in odd-numbered years and notices must be sent to potentially affected voters between 30 and 60 days before a voter's registration is cancelled. Ex. No. (32) at 140:12-15: 206:23-2017:15.

120.   Voters removed from Georgia's inactive list and placed in cancelled status are not "purged" from the voter registration database, as they remain in the State's voter database.  Ex. No. (26) at 25:9-27:5; Ex. No. (32) at 208:1-4; 216:2-4.

121.   Any voter moved to cancelled status, after being sent notice and failing to respond, can reregister to vote, and will be placed back in active status. Ex. No. (32) at 201:19-23.

122.   Voters can re-register on-line, by mail, or by renewing their driver's license. Doc. No. [183], Tr. 47:1-48:4 (C. Harvey testimony).

123.   Dr. McDonald found that on the list of voters to be moved to cancelled status, white voters were overrepresented (by two percentage points) and Black voters were underrepresented (by 2.9 percentage points)

when compared to their presence on voter file as a whole, indicating that white voters were disproportionately more likely to be on the list of those moving to cancelled status. Doc. No. [240] at 10; Ex. No. (26) at 36:22-37:20.

124. On the inactive list for reason of "no contact," Black voters were underrepresented compared to their presence on the voter file as a whole. Doc. No. [240] at 10; Ex. No. (26) at 38:11-38:23.

125. McDonald offered no opinion on intent regarding Georgia's list maintenance, made no conclusions regarding racial demographic characteristics of "purge list," and offered no opinion on significance of demographic percentages. Ex. No. (26) at 18:11-18:15; 38:17-38:23; 40:4-12. He offered no opinion as to whether any changes to voters' statuses were legally improper. Ex. No. (26) at 16:17-22.

126. Dr. McDonald's investigation did not address whether individuals received confirmation notices sent pursuant to O.C.G.A. §§ 21-2-234 and -235. Ex. No. (26) at 75:8-12.

127. Plaintiffs previously identified eight voters who, they said, improperly would be moved from inactive to cancelled status under the State's execution of the list-maintenance policy. Doc. No. [188] at 25-26.

128.   Of those eight, four were in active status and not subject to being moved to the cancelled list. Id. at 26; Doc. No. [183], Tr. 50:4-53:8, Exs. D-2 – D-5 (C. Harvey testimony and Enet voter records).

129.   The remaining four properly were moved to cancelled status in accordance with state law, and one of those four subsequently was moved to inactive status at the Secretary's direction.  Doc. No. [188] at 26; Doc. No. [183], Tr. 53:14-58:15, Exs. D-6 – D-9 (C. Harvey testimony and Enet voter records).

130.   None of these four voters were precluded from returning the two confirmation notices, which are prepaid and addressed. Doc. No. [188] at 26.

131.   None of these four were precluded from re-registering to vote. Doc. No. [188] at 27.

132.   Re-registering after being moved to cancelled status for "no contact" is no different from registering to vote in the first instance. Doc. No. [183], Tr. 47:23-48:2 (C. Harvey testimony).

133.   A voter can re-register to vote by going online to use the Online Voter Registration system, renewing one's driver's license or identification card with the Department of Driver Services or "with pen and pencil".  Doc. No. [183], Tr. 48:2-4 (C. Harvey testimony).

134.  Of these four voters, three have reregistered and one remains in inactive status. One of the voters, Clifford Thomas, voted in the June primary.  C. Harvey June 29, 2020 Declaration, Ex. No. (131) at ¶¶ 5-6, Exs. C and D.

## VI.   Georgia's application of the Help America Vote Act pursuant to O.C.G.A. § 21-2-220.1.

135.  Georgia's voter verification process, by which the county election officials confirm the identities of voters whose information does not match that which is on file with the Georgia Department of Driver Services ("DDS"), was altered by the passage of HB 316. See generally supra, ¶ 29, HB 316.

136.  Plaintiffs are aware and have acknowledged that counties, not the Secretary of State, handle voter registrations. Ex. No. (43) at PLTFS-FFA-003949.

137.  Since the 2016 implementation of automatic voter registration, when a voter updates information at DDS, their voter registration information is automatically updated based upon the information in the DDS database if the individual does not specifically opt out. Ex. No. (30) at 138:23-24.

138.  The DDS registration information automatically goes into the State's voter registration system each night, is divided up according to county

as per the address from DDS, and shows up on county registrars' dashboards for processing.  Ex. No. (30) at 139:2-7.

139.   If a person registers to vote with a paper application at a local board of election office, the information is put into eNet (the state's voter registration system).  Ex. No. (30) at 156:6-17.

140.   There is an overnight electronic process whereby the following fields from paper applications are checked against DDS' database: first name, last name, date of birth, driver's license number, and social security number. Id.

141.   The information is compared to the federal Social Security Administration ("SSA") records for verification if the verification process cannot complete using DDS records. Ex. No. (32) at 233:21-234:4.

142.   The system also compares the registrants' citizenship status as it was presented to DDS.  Ex. No. (30) at 156:18-21.

143.   Prior to the passage of HB 316, if an applicant's information did not match that which was on file with either DDS or the SSA, his or her registration would be placed in "pending" status. Ex. No. (32) at 234:16-234:2.

144.   A voter who had been placed in "pending" status could provide a photo ID at the polls, or anytime beforehand, to cure the verification issue and vote normally. Ex. No. (32) at 234:16-234:2.

145.   Now, following the passage of HB 316, an applicant who registers using a paper application, and whose information cannot be verified, is nevertheless considered an active voter and issued a precinct card. Ex. No. (32) at 235:3-5.

146.   The applicant is placed in Missing Identification Required ("MIDR") status, which means he or she will have to provide valid photo ID to complete his or her registration but is nevertheless considered an active voter. Ex. No. (32) at 235:5-7.

147.   If an applicant registers by paper application and includes a photo ID with the registration, the verification process with DDS and the SSA will not affect his or her registration. Ex. No. (32) at 234:3-6.

148.   The process for an affected applicant to cure the verification issue and vote both before and after HB 316 is largely the same; he or she may provide a valid photo ID at the polling location (or beforehand) and vote normally. Ex. No. (32) at 236:9-237:21.

149.   A photo ID is required to vote in-person in Georgia. Ex. No. (32) at 237:1-5.

150.   Voters are not removed from the voter rolls pursuant to Georgia's voter-verification law. Ex. No. (32) at 233:12-19.

151.    Prior to the passage of HB 316, if an applicant whose information could not be verified did not cure his or her registration and remained in "pending" status for 26 months, his or her registration would be rejected. Ex. No. (32) at 237:25-238:5.

152.    Following the passage of HB 316, because an applicant is labelled an active voter regardless of the verification process, this no longer occurs; an affected voter will remain in MIDR status until either the registration issue is cured or the voter is placed in inactive status for some other reason. Ex. No. (32) at 238:6-9.

153.    During the 2018 general election, Dr. Carlos del Rio, a declarant witness identified by Plaintiffs as being affected by Georgia's voter-verification law, presented his voter form and driver's license to the poll worker and was told he was not registered to vote. C. del Rio Dep., Ex. No. (10) at 33:18-34:1.

154.    Dr. del Rio told the poll worker he was, in fact, registered and showed her his registration on his phone.  Id. at 34:2-7.

155.    The poll worker noticed a discrepancy in the spelling of his last name on his license and in the voter-registration database, consulted her supervisor, and then told Dr. del Rio that he was allowed to vote, which he did.  Id. at 34:8-35:1.

156.   In total, Dr. del Rio's entire experience lasted between eight and ten minutes. Id. at 44:24-45:17.

157.   Ngoc Anh Thi Tran, the only other declarant identified by Plaintiffs as having a voting experience involving Georgia's voter-verification law, discovered prior to the November 2018 election that she was registered to vote but her registration was not in active status.[16]  Ex. No. (69) at PLTFS-001119.

158.   The Secretary's My Voter Page directed Mrs. Tran to call her county election office, which Cam Ashling, who met Mrs. Tran while canvassing for an Asian American political action committee, did on Mrs. Tran's behalf.  Ex. No. (69) at PLTFS-001119; Ashling Dep., Ex. No. (2) at 24:23-25:6; 33:4-11.

159.   Cam Ashling is the Chair/Treasurer of the Georgia Advancing Progress Political Action Committee (GAP PAC), which advocates against Georgia's new BMD voting machine technology. April 11, 2019 Email: C.

---

[16] The evidence is unclear as to the precise status of Mrs. Tran's registration—e.g., whether it was pending status or inactive status—at the time.  It seems Mrs. Tran previously had been registered to vote but never actually voted in Georgia until the November 2018 election.  Ex. No. (69) at PLTFS-001119; see also Ex. No. (2) at 33:4-15 (describing the indicated status of Mrs. Tran's voter registration as "like not active or non-active or pending or something, but it wasn't active").)

Ashling to C. Ashling, Georgia's Voting Machine 'Reform' Is a Threat to Free

and Fair Elections, Ex. No. (77) at PLTFS-FFA-005913.

160.   Ms. Ashling told Mrs. Tran that the county required verification

of Mrs. Tran's citizenship to update her registration status.  Ex. No. (69) at

PLTFS-001119.

161.   Mrs. Tran's husband located Mrs. Tran's naturalization papers,

and Ms. Ashling drove Mrs. Tran to the county election office.  Ex. No. (69) at

PLTFS-001119; Ex. No. (2) at 34:15-35:9.

162.   There, a staff member at the county election office told Mrs. Tran

that the spacing in her name on her naturalization document did not exactly

match what appeared in the voter-registration database, and that her gender

was listed as male instead of female.  Ex. No. (69) at PLTFS-001119; Ex. No.

(2) at 47:17-48:2, 50:17-51:12.

163.   After Mrs. Tran presented her naturalization document, the

county election official updated Mrs. Tran's registration status, and

Mrs. Tran was able to complete the early voting process.  Ex. No. (69) at

PLTFS-001119-20.

164.   Mrs. Tran's declaration states that the combined process of

verifying her registration status and voting took "the entire day."  Ex. No.

(69) at PLTFS-001120.

165. Ms. Ashling testified that it took less time than that, stating that her interaction with Mrs. Tran began around 11:00 am and lasted between three and four hours. Ex. No. (2) at 35:14-36:8.

166. Both Ms. Tran and Dr. Del Rio successfully cast ballots in the November 2018 elections. Ex. No. (69) at PLTFS-001119-22; Ex. (70) at PLTFS000363-64; see also Ex. No. (10) at 34:8-35:1.

167. Both were able to correct the apparent mismatches by showing one piece of additional documentation prior to voting.  Ex. No. (70) at PLTFS000365; Ex. No. (69) at PLTFS-001120.

168. Dr. Mayer,[17] Plaintiffs' proffered expert regarding voter-verification, identified particular processes that he said "produce higher verification failure rates and noncitizenship flags for minority registrants compared to non-Hispanic White registrants." Doc. No. [238] at 5.

169. Dr. Mayer was not, however, able to say if this disparity was the result of people improperly failing verification, because he could not determine "whether someone is in that status and shouldn't be . . . ." K. Mayer Dep., Ex. No. (24) at 40:20-43:2.

---

[17] Defendants have moved the Court to exclude, in its entirety, the testimony of Dr. Mayer. See Doc. No. [394].

170.    Dr. Mayer only made comparisons to the entire voter file to find a disparity, not the number of registrants in any particular time period (such as the universe of registrants after the adoption of HB 316). Ex. No. (24) at 111:1-112:20; 116:7-118:24.

171.    Dr. Mayer could not opine on the cause as to why an individual may be in a particular status because he did not "have information on any particular individuals." Ex. No. (24) at 159:5-159:15.

172.    Dr. McCrary relied in part on Dr. Mayer's analysis in reaching his conclusions on the voter-verification process. Ex. No. (25) at 123:1-18. But Dr. McCrary never reviewed or considered HB 316 and its effect on Georgia's matching process. Ex. No. (25) at 114:12-19.

## VII.    Application of Georgia's no-excuse absentee-by-mail law and process.

173.    The absentee ballot process is handled at the county level, not by the Secretary of State. GEOC County Course #8 – Absentee Ballot Procedures, Ex. No. (78) at STATE-DEFENDANTS-00008134-38; Ex. No. (19) at 37:19-38:18.

174.    County election officials mail absentee ballots to voters. GEOC County Course #8 – Absentee Ballot Procedures, Ex. No. (79) at STATE-DEFENDANTS-00008136-38.

175.    Voted absentee ballots are received and processed by county election officials, which includes validating the signature and other identifying information on the voted ballot. GEOC County Course #8 – Absentee Ballot Procedures, Ex. No. (80) at STATE-DEFENDANTS-00008139.

176.    Some of Plaintiffs' declarants indicated that they experienced difficulty in either obtaining (see, e.g., Declaration of N. Broderick, Ex. No. (81) at PLTFS000611; Declaration of J. Allen, Ex. No. (82) at PLTFS-001130-31) or submitting (see, e.g., Declaration of M. Fumo, Ex. No. (83) at PLTFS000563; Declaration of S. Thaxton, Ex. No. (84) at PLTFS000630) their absentee ballots, but none attributed their experiences to Defendants' conduct.

177.    In some instances, the declarations contained incorrect information as to the issue alleged. For example, Nicolas Winbush stated in his declaration that he never received his absentee ballot. Declaration of N. Winbush, Ex. No. (85) at PLTFS000418-19. Mr. Winbush walked back this assertion in his deposition, testifying that he did in fact receive his absentee ballot, he just did not vote it. N. Winbush Dep., Ex. No. (41) at 23:9-21.

178.    In other instances, absentee ballot issues were a result of declarants' own mistakes. Natalya Kelly's absentee ballot was rejected for

insufficient oath information, and she admits her own error in not filling in her date of birth on her absentee ballot. Declaration of N. Kelly, Ex. No. (86) at PLTFS000804-05.

179.   Dinesh Chandra's absentee ballot was likewise rejected due to her failure to include her date of birth. Declaration of D. Chandra, Ex. No. (87) at PLTFS000077-78.

180.   Date of birth is no longer a required field on the absentee ballot oath form. See O.C.G.A. § 21-2-384; see also supra, ¶ 29, HB 316, Act 24, lines 772–775.

181.   Many declarants are aware that their respective counties mail, receive, and process absentee ballots and do not allege conduct on the part of Defendants. For example, Natalya Kelly called her local elections office when she did not receive her absentee ballot and again when she wanted to confirm it was received and counted (Ex. No. (86) at PLTFS000804-05); Dinesh Chandra returned her voted absentee ballot in person to her county elections office and then went back upon learning they rejected it (Ex. No. (87) at PLTFS000077-78); and Maya Cross contacted her county elections board when she did not receive her absentee ballot, and then again to question whether it was received (Declaration of M. Cross, Ex. No. (88) at PLTFS000638-39).

182.   No superintendent provided a declaration to Plaintiffs, nor did any registrar; thus, no declarant offers statements based on their personal knowledge regarding training provided by the Secretary to such officials.

183.   Plaintiffs' proffered expert, Kevin Kennedy, opined that training "shortcomings" occur when insufficient attention is given to absentee ballots, (Ex. No. (22) at 99:1-7), but does not offer an opinion that counties were incorrectly or improperly training on the timely provision and proper acceptance of ballots.

184.   Mr. Kennedy concedes that if elections workers follow the law, voters' rights are protected. Ex. No. (22) at 159:13–20.

185.   Mr. Kennedy does not have an opinion on whether there is discrimination against persons of color in voting in Georgia, (Ex. No. (22) at 163:6-14), nor does he offer an opinion as to any discriminatory intent on the part of Defendants (Ex. No. (22) at 27:11-16).

186.   Another of Plaintiffs' proffered experts, Dr. Smith, calculates a rejection rate of 2.35% for white voters' absentee ballots in the 2018 election, with a rejection rate of 3.74% for Black voters.[18] Doc. No. [259] at 17-18.

---

[18] Dr. Smith's report only covers "roughly 100 counties with more than zero rejected" absentee ballots, (Doc. No. [259] at 22), and does not address how the changes to absentee-ballot laws as a result of HB 316 could affect his analysis.

187.   Dr. Smith does not offer an opinion on why absentee ballot rejection rates are higher for black voters than for white voters. Ex. No. (35) at 134:2-14.

188.   Dr. Smith agreed that the difference in the rejection rate could have been caused by any number of non-racial factors, including age, voting experience, or several other categories besides race. Ex. No. (35) at 134:2-136:6; 139:2-140:4; 141:7-141:19.

## VIII.  Use of provisional ballots.

189.   The administration of provisional ballots is handled by county officials, not the Secretary of State. Ex. No. (19) at 278:6-16, 317:6-318:7.

190.   Counties print their own provisional ballots. Ex. No. (33) at 10:13-21; 111:5-20. The Secretary's Office does not provide them. Ex. No. (33) at 10:20-21.

191.   Counties also determine whether to accept or reject provisional ballots. GEOC County Course #8 – Absentee Ballot Procedures, Ex. No. (89) at STATE-DEFENDANTS-00008147.

192.   The 2018 Poll Worker Manual contains roughly twenty-six pages of source material detailing the use of provisional ballots, (2018 Poll Worker Training Manual, Ex. No. (90) at STATE-DEFENDANTS-00009004–29), as

does the 2020 Poll Worker Manual (Ex. No. (91) at STATE-DEFENDANTS-00867688-713).

193.   The Secretary's public-facing poll worker webpage provides further instruction on provisional ballots: "please, do not discourage a person eligible to cast a provisional ballot from casting it, ALWAYS OFFER A PROVISIONAL BALLOT! A good rule to remember is: when in doubt, give it out." Poll Worker Training Resources, *Provisional Ballots*, Office of the Secretary of State, at 8:40, https://player.vimeo.com/video/391053063?autoplay=1&title (last visited Jun. 22, 2020) (emphasis in original); see also Script for Video Number 16 – Provisional Ballots, Ex. No. (92) at STATE-DEFENDANTS-00887999.

194.   Mr. Harvey testified that the Secretary's Office did not receive many complaints concerning insufficient numbers of provisional ballots during the 2018 general election. Ex. No. (32) at 131:18-132:21.

195.   Some of Plaintiffs' declarants indicated they experienced difficulty in either obtaining (see, e.g., Declaration of D. Powers, Ex. No. (93) at PLTFS000073; Declaration of F. Freeman, Ex. No. (94) at PLTFS000999) or submitting (see, e.g., Declaration of M. Bell, Ex. No. (95) at PLTFS000436; Declaration of A. Burleson, Ex. No. (96) at PLTFS000765-76) their provisional ballots.

196.   Some declarants who were upset they were required to vote using a provisional ballot had to do so because of their own error or conduct. For example, Ikechukwu Eziefula stated he was "forced" to vote using a provisional ballot, but this is because he requested, received, and then lost his absentee ballot. Declaration of I. Eziefula, Ex. No. (97) at PLTFS000461-62. Mona Chase had to vote using a provisional ballot because she had previously requested and received an absentee ballot but then attempted to vote in person without it. Ex. No. (61) at PLTFS000261. Still others knowingly went to the wrong polling location, necessitating their vote be cast by provisional ballot. Declaration of C. Hall, Ex. No. (98) at PLTFS000041-42; Declaration of S. Awad, Ex. No. (99) at PLTFS000318-19.

197.   Many declarants are aware that their respective counties provide and process provisional ballots. For example, when Felicia Freeman was upset with her voting experience and not being offered a provisional ballot, she contacted the Cherokee County Board of Elections. Ex. No. (94) at PLTFS000999. Similarly, Courtnie Fore followed up with the Cobb County Board of Elections to determine if her provisional vote was counted. Declaration of C. Fore, Ex. No. (100) at PLTFS000068.

198.   The declaration of Ms. Gwendolyn Lee, a poll worker in Dekalb County for the 2018 elections, does not address any conduct or directions

given by the State Defendants, but rather consists of complaints against her polling manager, that she did not get paid by Dekalb County, and that she was not trained by Dekalb County. Declaration of G. Lee, Ex. No. (101) at PLTFS000665-68.

199.   Ms. Alvilynn Callaway submitted a declaration regarding her provisional ballot—cast out-of-county in Clayton County rather than Macon County where she is registered. Declaration of A. Callaway, Ex. No. (102) at PLTFS000564-65.

200.   Ms. Callaway testified that she would have preferred if Clayton County poll workers had told her that her out-of-county provisional ballot would not count, rather than offering one with no comment as to its effect, since she "had enough time to go to Macon County . . . [and she] would have went home and voted." A. Callaway Dep., Ex. No. (7) at 43:20–24.

201.   Mr. Jeffrey Marion submitted a declaration largely concerning his long wait due to a lack of voter access cards at his precinct in Gwinnett County. Declaration of J. Marion, Ex. No. (103) at PLTFS000669.

202.   Mr. Marion's wait was exacerbated by his refusal to use a provisional ballot, offered by the poll workers, because he did not trust provisional ballots and preferred to vote on a DRE. J. Marion Dep., Ex. No. (23) at 23:23-24:3; 31:1-32:11.

203.   Mr. Kennedy opines that training "shortcomings" occur when provisional ballots are not given enough focus. Ex. No. (22) at 99:1-7.

204.   His criticism of Georgia's provisional ballot training is limited to opining that, based only on his experience in Wisconsin, more could be done. Doc. No. [167] at 16; Ex. No. (22) at 99:1-7.

205.   Mr. Kennedy based his provisional ballot training opinion on a perceived "large number of instances where people didn't get a provisional ballot" even where he was "not sure whether or not [the voters] were entitled to it." Ex. No. (22) at 173:7-13.

206.   It is unknown what effect Mr. Kennedy's contention that the Poll Worker Manual should not refer to when a voter "may" be offered a provisional ballot, (Doc. No. [167] at 20), would have on circumstances such as Mr. Marion's and Ms. Callaway's, supra, ¶¶ 199-202.

## IX.   Polling place closure or consolidation, provision of equipment, and lines at polling places.

A.   Long wait times at polling places are rare and equipment is provided by local officials.

207.   When they occur, lines form at polling locations due to factors generally within counties' control, such as the number of polling places, the training and operations of poll workers, and the allocation of resources to polling locations. Ex. No. (33) at 128:21-129:5.

208.   The Secretary of State's office was notified that a Fulton County polling location experienced long lines in the 2018 General Election when an election director inadvertently read a spreadsheet wrong and ordered the wrong number of voting machines for that location. Ex. No. (19) at 292:14-18.

209.   A Gwinnett County polling place had issues with long lines when it inadvertently misplaced power cords that the location needed to operate. Ex. No. (19) at 292:19-21.

210.   Georgia counties have access to the "election store" to equip polling stations and they have the superior knowledge about what their particular needs are for a given election.  Ex. No. (32) at 170:1-171:10; 172:11-173:1.

211.   The Secretary of State's office reminds counties through emails, the Firefly system, OEBs, and other means to obtain supplies for upcoming elections, but such decisions are ultimately within the counties' control. Ex. No. (32) at 174:15-175:7.

212.   Dr. Graves, Plaintiffs' proffered expert regarding lines at polling places, submitted a three-page report (Doc. No. [166]), that relies almost exclusively on the data and findings of a different report (to which Dr. Graves did not contribute) by the Bipartisan Policy Center entitled The 2018 Voting

Experience: Polling Place Lines and published in November of 2019 (the "BPC Report"). Id. at 9

213.   In his report, Dr. Graves opines on the wait times during the 2018 general election in Fulton County – one of Georgia's 159 counties (or 0.62% of the counties) during one election. Doc. No. [166] at 1.

214.   Dr. Graves only analyzed the wait times in 68 of the 373 (18%) polling sites in Fulton County. Id. at 1; Ex. No. (16) at 25:1-26:25.

215.   Dr. Graves's [elections] analysis considered only 59,000 of the 425,139 ballots cast in Fulton County (or 7.2%). November 6, 2018 General and Special Election, CLARITY ELECTIONS, https://results.enr.clarityelections.com/GA/Fulton/91700/Web02.221448/#/turnout.

216.   Dr. Graves made no attempt to apply these numbers statewide and, in fact, testified that he was not even "trying to make a conclusion about Fulton County in general." Ex. No. (16) at 24:17-18.

217.   Dr. Graves, analyzing a handful of precincts in Fulton County in 2018, concluded that in that election and pursuant to that limited sample of precincts, voters in majority-Black precincts waited in line 1.6 minutes more than in majority white precincts.  Doc. No. [166] at 5-6.

218.   Specifically, Dr. Graves' report found that the average wait time for Black-majority polling places was 18.8 minutes and the wait time at non-Black-majority sites was 17.2 minutes, a difference of 96 seconds. Doc. No. [166] at 5-6. Both these average times are below the 30-minute recommendation the BPC Report indicated was set by the Presidential Commission on Election Administration. Doc. No. [166] at 13.

219.   Dr. Graves further testified that he never made any finding of any statistically significant relationship between the African-American percentage of voters assigned to a precinct and the wait time at the polls. Ex. No. (16) at 43:24-44:5.

220.   Dr. Graves also did not analyze whether the 68 polling locations he studied accurately reflect the racial demographics of Fulton County voters even though any conclusion based on racial differences should be based on a sample set that reflect the county's demographics at large. Ex. No. (16) at 28:20-29:11; 29:18-22; 43:24-44:5; Doc. No. [208] at 2.

221.   Dr. Graves agreed that he did not make "any causal statements" in his report about line length or the impact of a line on voters. Ex. No. (16) at 20:15-24; 40:13-18.

222.   Dr. Graves offers no opinion as to whether the state or county is responsible for polling locations or the intent of policymakers in either category.  Ex. No. (16) at 20:19-21:11.

223.   Beyond the analysis of Dr. Graves, 63 of Plaintiffs' 308 declarant witnesses mention in their declarations that they experienced or observed long lines at polling locations during certain elections held in the State.  Ex. No. (133).[19]

224.   Of these 63, 47 declarants were voters and 16 were not, and those in the latter group of individuals were largely volunteering on behalf of the Democratic Party of Georgia or other political action groups.  Id.

225.   These declarants represent 10 of Georgia's 159 Counties (about 6.2%): Fulton, Cobb, Gwinnett, DeKalb, Clayton, Chatham, Cherokee, Dougherty, Henry, and Houston.  77% (49 out of 63) of the declarants are from

_____

[19] The declarants who mention lines in their declarations are as follows: S. Antione; S. Awad; A. Baier; N. Barnridge; H. Barnridge; L. Bell; M. Borrero; A. Brown; C. Carter; M. Church; C. Corona; S. Cramer; P. Davis; K. Feenie; T. Fletcher; F. Freeman; S. Gaggero; T. Gilliam; S. Goff; A. Gordon; B. Gravely; A. Greenberg; C. Hall; S. Hartley; M. Hayes; B. Herbert; B. Honor; T. Jackson-Campbell; V. Lambert; K. Lewis; B. Liscord; M. Lockwood; J. Maciejewski; M. Manning; J. Marion; D. Marshall; D. Mathis; S. Murray; C. Muzio; P. Nathan; D. Oatis; A. Oki; K. O'Malley; A. Poventud; D. Powers; M. Price; K. Reeves; B. Resler; L. Schnellinger; S. Southall; V. Stancescu; P. Terkhova; E. Underwood-Jackson; S. Urquhart; D. Van Zajac; C. Vanzant; K. "Kavi" Vu Ngan; T. Warren; C. Williams; M. Wolfe; G. Wooten; J. Young; S. Zeigler.

four Metro-Atlanta Counties: Fulton, Cobb, Gwinnett, and DeKalb. Three

Counties—Clayton, Houston, and Dougherty—had only one declarant apiece.

Id.

226.   Within the 10 Counties represented, several declarants

complained of the same few polling locations regarding long lines.

Specifically, 6 declarants complained of experiencing long lines at Pitman

Park Recreational Center in Fulton County (Declaration of A. Brown, Ex. No.

(104) at PLTFS000021; Declaration of B. Herbert, Ex. No. (105) at

PLTFS001127; Declaration of A. Poventud, Ex. No. (106) at PLTFS000009-

10; Declaration of E. Underwood-Jackson, Ex. No. (107) at PLTFS000714-15;

Ex. No. (51) at PLTFS000648; Declaration of B. Honor, Ex. No. (108) at

PLTFS001016); 3 declarants cited Rothwell Baptist Church in Chatham

County (Declaration of N. Barnridge, Ex. No. (109) at PLTFS000265;

Declaration of H. Barnridge, Ex. No (110) at PLTFS000182; Declaration of P.

Terekhova, Ex. No. (111) at PLTFS0000991); 3 declarants cited Annistown

Elementary School (Gwinnett) (Declaration of K. Lewis, Ex. No. (112) at

PLTFS000925; Ex. No (103) at PLTFS000669; Declaration of J. Young, Ex.

No. (113) at PLTFS000196); and Central United Methodist Church (Fulton)

(Declaration of M. Church, Ex. No. (114) at PLTFS000241; Declaration of C.

Carter, Ex. No. (115) at PLTFS000581), IGL Bautista Nueva Jerusalen

(Gwinnett) (Declaration of M. Manning, Ex. No. (116) at PLTFS000254;

Declaration of A. Oki, Ex. No. (117) at PLTFS000005), and Argyle

Elementary School (Cobb), (Declaration of S. Goff, Ex. No. (118) at

PLTFS000391; Declaration of S. Southall, Ex. No. (134) at PLTFS00333),

were each referenced by 2 declarants apiece. In total, Plaintiffs' declarants

identified only about 49 individual polling places that they claim exhibited

"long lines."

227.   There are approximately 2,300 polling places across the state.  C.

Harvey June 29, 2020 Declaration, Ex. No. (131) at ¶ 7.

228.   Of the 5 declarants who allege that long lines prevented them

from voting, two refused or failed to appear for depositions by Defendants.

Ex. No. (111) at PLTFS0000991; P. Terekova Dep., Ex. No. (36) at 4;

Declaration of A. Gordon, Ex. No. (119) at PLTFS000030; A. Gordon Dep., Ex.

No. (14) at 4:11-16.

229.   Most declarants did not speculate as to the cause of the lines they

observed or experienced (See, e.g., Declaration of T. Fletcher, Ex. No. (120) at

PLTFS001080-81); those that did generally cited either insufficient number

of machines or other equipment or technical issues or machine malfunctions.

Declaration of A. Baier, Ex. No. (121) at PLTFS000692; Declaration of S.

Gaggero, Ex. No. (122) at PLTFS000330-32; Ex. No. (112) at PLTFS000925-27; Ex. No. (107) at PLTFS000714-15.

230.   Ngan Kim Vu stated in her declaration that the delay was the result of "over 100 people" attempting to vote at the wrong location in Fulton County. Declaration of N. Kim Vu, Ex. No. (123) at PLTFS001060.

231.   Sam Awad, another of Plaintiffs declarants, admitted in his declaration that he knew he was attempting to vote at the wrong polling location in Cobb County. Ex. No. (99) at PLTFS000318-19.

232.   Jeffrey Marion complained of long lines in Gwinnett County, but his wait was exacerbated by his refusal to use the provisional ballot offered by the poll workers, preferring instead to vote on the machines.  Ex. No. (23) at 23:23-24:3; 31:1-32:11.

B.    Counties' decisions to close or consolidate polling places.

233.   Dr. Michael C. Herron testified that "[t]he adjustments made to Georgia's polling places between 2014 and 2018 were not racially neutral" Doc. No. [241] at 5.

234.   Dr. Herron takes no position, however, as to who is responsible for closing polling places. Doc. No. [294] at 26; Ex. No. (20) at 25:12-19.

235.   Dr. Herron also takes no position on any matter of intent on the part of the State of Georgia or the Secretary.  Ex. No. (20) at 27:18-22.

236.   Dr. Herron does not opine on the reasons or motives behind decisions to move polling locations, (Ex. No. (20) at 25:4-11), or whether State or County officials had knowledge of the alleged impacts of changing polling locations. (Ex. No. (20) at 28:12-29:20).

237.   Dr. Herron found that, for Election-Day voting in the 2018 general election where voters actually had to go to a particular polling location (versus an early-voting site), white voters were more affected by precinct changes than African-American voters. Doc. Nos. [241] at 72-74 and [294] at 33-34.

238.   Defendants' expert used the same data as Dr. Herron and demonstrated the same pattern of a greater effect on white voters in both the 2016 and 2018 elections for voters who vote on election day. Doc. No. [350] at 14-16.

239.   Dr. Herron provided no analysis of how far polling locations moved, (Ex. No. (20) at 50:5-10), nor did he engage with the rationale of changes to precincts and offered no opinion as to why polling places changed (Ex. No. (20) at 79:17-80:16).

240.   The selection and number of polling places is a decision within the sole authority and discretion of the Counties. Ex. No. (19) at 227:12-17; 234:9-10; 238:19-20; Ex. No. (33) at 122:1-3.

241.    Plaintiffs' proffered historical expert,[20] Dr. Adrienne Jones,[21] acknowledges the role of the counties as the decisionmaker for closing polling locations (A. Jones Dep., Ex. No. (21) at 110:8-11), as did declarants Annette Cox (Declaration of A. Cox, Ex. No. (124) at PLTFS000879) and Carol Sealy (Ex. No. (74) at PLTFS000881).

242.    At least two of Plaintiffs' declarants acknowledged that closures occurred because of legitimate reasons. See, e.g., Ex. No. (51) at PLTFS000648 (indicating polling location was closed for renovations); Declaration of B. Gravely, Ex. No. (125) at PLTFS000429 (indicating polling location was closed due to construction). Others speculated about issues while conceding that everyone could vote despite the changes. Declaration of C. Schexnyder, Ex. No. (132) at PLTFS-001123.

243.    Plaintiffs' declarant Lottie Moore stated that the polling place near her closed and that her new polling location was an hour's drive away, (Declaration of L. Moore, Ex. No. (126) at PLTFS000916), but in fact her

---

[20] Dr. Jones's report mentioned only four events occurring within the last 30 years. Doc. [92] at 1-10, 13-27. Other than her own belief, Dr. Jones could not explain how the historical events she does discuss relate to this lawsuit. Ex. No. (21) at 109:16-21.

[21] Defendants have moved the Court to exclude, in its entirety, the testimony of Dr. Jones. See Doc. No. [386].

home is located about nine miles from her polling location in Fort Gaines,

Georgia. See Google Maps, directions from [Address], Morris, Georgia to 159

Wilson Street, Fort Gaines, Georgia, Ex. No. (130).

244.   The Secretary's interaction with local officials providing notice to

the Secretary of State is limited to reiterating the demands of Georgia law

regarding notice and timing. See, e.g., Jan. 3, 2018 Email: A. Pitts to S.

Payne, RE: Question- Notification of Change of Polling Place, Ex. No. (127) at

GA00784681; August 21, 2017 Email: C. Harvey to S. Hicks, RE: Relocating a

Voting Precinct Timeline, Ex. No. (128) at GA00785126.

245.   While the selection, opening, or closure of a polling place is

ultimately within counties' authority, the Secretary of State has advised

counties to be skeptical of closures as there will be an increased need for

polling places. Ex. No. (19) at 226:7-227:17.

246.   The Office of the Secretary of State often cautions against the

closing of polling locations and encourages counties to carefully consider any

such decision, (Ex. No. (19) at Dep. 217:21-218:17), and encourages counties

to "take into consideration the convenience of the voters and the public

interest" while acknowledging the decision is the counties' to make.  See

February 2015 Precinct and Polling Place Training Document, Ex. No. (129)

at GA00785702.

247.   Some counties, such as Paulding County, Forsyth County, and Chatham County, have taken the Secretary of State's advice on this issue and have opened, or plan to open, additional polling locations for future elections. Ex. No. (33) at 24:5-21.

248.   In 2018, when Randolph County indicated it planned to close several polling locations, the Secretary of State's office urged them to reconsider. Ex. No. (19) at 217:22-218:1; Exhibit 62.

249.   Randolph County ultimately did reconsider and did not close the polling locations they had planned on. Ex. No. (19) at 218:1-2.

250.   Fair Fight Action admitted in its 30(b)(6) deposition that it did not have knowledge of the Secretary encouraging the closure of polling locations. Ex. No. (13) at 199:25-200:4.

251.   Dr. Jones discusses polling place closure in only one context in her report, regarding Randolph County's proposal that was ultimately abandoned. See Doc. No. [92] at 11.

252.   Dr. Jones acknowledged local Boards of Elections decide whether to close precincts. Ex. No. (21) at 110:8-11.

253.   Aside from reviewing issues prior to 1965, Dr. McCrary only opined about the voter-verification matching process matching process in Georgia since 2006. Ex. No. (25) at 125:19-126:7.

Respectfully submitted this 29th day of June, 2020.

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202

lparadise@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249


Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

**DEFENDANTS' STATEMENT OF MATERIAL FACTS TO WHICH**

**THERE IS NO GENUINE ISSUE TO BE TRIED** was prepared double-

spaced in 13-point Century Schoolbook font, approved by the Court in Local

Rule 5.1(C).


*/s/ Josh Belinfante*
Josh Belinfante

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the within and foregoing

**DEFENDANTS' STATEMENT OF MATERIAL FACTS TO WHICH**

**THERE IS NO GENUINE ISSUE TO BE TRIED** with the Clerk of Court

using the CM/ECF electronic filing system which will automatically send

counsel of record e-mail notification of such filing.

This 29th day of June, 2020.


*/s/ Josh Belinfante*
Josh Belinfante