# EXHIBIT 19

**In the Matter Of:**

Fair Fight vs Raffensperger

---

**Chris Harvey - Confidential**

*December 05, 2019*

---



3200 COBB GALLERIA PARKWAY
SUITE 265
ATLANTA, GA 30339

Fair Fight vs Raffensperger          Chris Harvey - Confidential                    12/05/2019

```
 1        A.   Well, I, the way I read it, it says
 2   they're accountable for investigating election
 3   fraud, and they enforce --
 4        Q.   I see.
 5        A.   -- state election laws.
 6        Q.   Okay.
 7        A.   And I --
 8        Q.   And --
 9        A.   Go ahead.
10        Q.   And the "enforcing state election laws"
11   refers to all the State's election laws, doesn't
12   it?
13        A.   I think all the state election laws, of
14   course, have to be followed.  In terms of enforcing
15   them, there are situations where the Secretary of
16   State's office doesn't have a role in the
17   enforcement.
18             We may provide guidance or illumination
19   about what the law is if a county were to call us,
20   but we don't necessarily enforce the law.
21        Q.   What situations are those where you think
22   that the Secretary of State's office doesn't have a
23   role in the enforcement of the election laws?
24        A.   Well, for example, if a candidate were to
25   call me, which happens, after an election, and it's
```



1   generally not the winning candidate, but they would

2   call me and they say, you know, I think I got a raw

3   deal, I think, you know, this person -- they had a

4   sign for this person, you know, they shouldn't have

5   been allowed to work at the polls or whatever

6   the -- and I would tell them, look, the law allows

7   you to contest the election, here's how you do it,

8   you go to 21-2-524, and there's a procedure if you

9   want to contest the election, I can't do anything

10  about the fact that you think you got a raw deal in

11  the election.

12          If somebody calls and says they're upset

13  because they weren't hired as a poll worker and

14  they want to take it up with the, you know, the

15  Secretary of State for -- because the county

16  election director in X county didn't hire them as a

17  poll worker or fired them as a poll worker, I tell

18  them the same thing, look, we don't have any

19  authority to determine employment decisions for

20  poll workers.

21          Those are just two very basic scenarios

22  where, you know, the election law is there, or

23  isn't there, and I point somebody to it and say,

24  you've got to go to a Superior Court judge if you

25  want something done about this.

1      Q.    All right.  Well, let's take a different

2    situation where the scenario is that somebody comes

3    to you with an issue that suggests a violation --

4      A.    Uh-huh.

5      Q.    -- of the state election --

6      A.    Okay.

7      Q.    -- laws.  What is the Secretary of State's

8    responsibility, if any, to enforce those state

9    election laws?

10      A.    Well --

11            MR. BELINFANTE:  Object to the form.

12            You can answer.

13            THE WITNESS:  It depends a lot on

14      what the violation is.  If it's something

15      that a -- let me think about -- can you

16      give me an example of a complaint that

17      you --

18    BY MS. TANIS:

19      Q.    Sure.  You get a complaint from a voter

20    where the voter says, I timely requested an

21    absentee ballot and I never received one.

22      A.    Okay.  In that case, we would general --

23    depending on the circumstances, if it's -- if they

24    were to call us with that, say, four days before

25    the election, the first thing we would do would be

 1   to contact the county and see if we could figure

 2   out what, if anything, happened.

 3          Maybe something got lost in the mail.

 4   Maybe something is stuck on somebody's desk.  Maybe

 5   they can take some action to get this person what

 6   they're entitled to.

 7          If it's after the election, we would

 8   generally send it to our investigative division,

 9   who would investigate to determine whether or not

10   the County acted properly within the law, if they

11   met their legal requirements to make sure that they

12   properly processed and handled absentee ballot

13   applications and absentee ballots.

14          And then we would take whatever the result

15   of that investigation was to the State Election

16   Board, and the State Election Board would make a

17   determination as to whether or not there was a

18   violation and what the proper sanctions would be.

19       Q.   You talked before about how the state

20   election code assigns certain tasks to the counties

21   and assigns certain tasks at -- to the state -- at

22   the state level --

23       A.   Uh-huh.

24       Q.   -- to the Secretary of State's office;

25   correct?  Is that a fair --

 1  differently, even though counties -- you know, this

 2  county says we're not going to do that because we

 3  don't have that many absentee ballots, it doesn't

 4  take us very long.

 5          Whereas, if Fulton County or Cobb County

 6  or DeKalb County didn't take advantage of that

 7  system, it would take them hours and hours and

 8  hours longer to get results.  Those are different

 9  practices that are based on the specific needs of

10  the county and their resources.

11      Q.   Right.  And the -- and that practice,

12  though, that you're talking about doesn't really

13  affect the voter one way or the other, right, the

14  voter has already come in and cast a ballot?

15      A.   Right.  And so I would -- as I think I

16  said, the actual voting practice, there's really

17  not much room for creativity.  There's really not

18  much variation.  And that's that uniformity that

19  I'm talking about where you do provide that

20  protection.

21      Q.   During early voting or on Election Day,

22  does the Secretary of State have personnel, you

23  know, on the ground checking whether polling places

24  are following the election laws?

25      A.   We do.



```
 1    the second page of that exhibit.  There's an E-mail

 2    from Jansen Head?

 3        A.   Okay.

 4        Q.   And she said -- she said -- and you got

 5    this E-mail; correct?

 6        A.   If I'm in the list, I'm sure I did, yes.

 7        Q.   And it says:

 8             "Dear board members, attached is

 9         the Official Election Bulletin that

10         Chris Harvey distributed to the county

11         election officials today..."

12             It says -- and then it goes on to say:

13             "The same has also been posted to

14         Firefly and on the Secretary of State

15         Web site as a press release."

16             Was it common for O.E.B.s to be issued as

17    press releases?

18        A.   I don't think so, no.

19        Q.   Okay.  Why was this particular O.E.B.

20    issued as a press release?

21        A.   I don't know.

22        Q.   Okay.  Did you talk to Mr. Worley or

23    communicate with him otherwise about his E-mail

24    after he sent it?

25        A.   He called me -- I believe the answer is
```

```
 1   no.  He called me that evening and was unhappy, as

 2   we discussed.  And I believe, looking at the

 3   timing, the E-mail was sent at 7:18, so I believe

 4   the E-mail was sent after he had called me.

 5        Q.   Okay.

 6        A.   Now, whether we ever spoke about it again,

 7   I don't know.  I don't recall anything, but.  I

 8   think that kind of ended this topic --

 9        Q.   Okay.

10        A.   -- as far as he and I were concerned.

11             (Whereupon, a discussion ensued

12       off the record.)

13                        (Whereupon, Plaintiff's

14                         Exhibit 14 was previously

15                         marked for identification.)

16   BY MS. TANIS:

17        Q.   I'm handing you what we've marked

18   previously as Exhibit 14.  And this is an E-mail

19   that Mr. Worley sent on November 13th, 2018;

20   correct?

21        A.   Yes, ma'am.

22        Q.   You received this E-mail?

23        A.   I'm sure I did.

24        Q.   And in this E-mail, Mr. Worley reports

25   that U.S. District Court Judge May issued an order
```

Fair Fight vs Raffensperger          Chris Harvey - Confidential                    12/05/2019

```
1    you and I pronounce her name, her last name
2    differently.  So pronounce --
3        A.    Frechette?
4        Q.    No, no, no.  Jordan?
5        A.    Fuchs.
6        Q.    Fuchs.
7        A.    Fuchs.
8        Q.    So she pronounces it Fuchs?
9        A.    Yeah, Fuchs.
10       Q.    All right.  So --
11       A.    Okay.
12       Q.    -- let me try to phrase a question that's
13   more --
14       A.    Okay.
15       Q.    -- limited and comprehensible, and that's
16   whether you've discussed with Secretary
17   Raffensperger or Jordan Fuchs what the Secretary of
18   State's responsibilities are with respect to
19   training.
20       A.    We have.
21       Q.    Okay.  And what have those conversations
22   been?
23       A.    It has been that it's our -- it's the
24   Secretary of State's responsibility to train the
25   counties, which is usually the county election
```

```
 1   director or board.  And then it is the counties'
 2   responsibility to train their poll workers and
 3   their staff.  So it's a "train the trainer"
 4   scenario.
 5             And that's the same understanding that was
 6   the place with Secretary Kemp.
 7        Q.   And is it your impression that Secretary
 8   Raffensperger and Ms. Fuchs agree with that?
 9        A.   Yes.
10        Q.   The Secretary of State's office provides
11   training for county superintendents and registrars;
12   correct?
13        A.   Yes.
14        Q.   And that's the training that they take to
15   get certified?
16        A.   Yes.
17        Q.   The Secretary of State provides a series
18   of courses in connection with that; correct?
19        A.   Yes.
20        Q.   Okay.
21                       (Whereupon, Plaintiff's
22                        Exhibit 50 was marked for
23                        identification.)
24   BY MS. TANIS:
25        Q.   I'm handing you what I've marked as
```

```
 1   counties'.

 2       Q.   All right.  But you provide, for example,

 3   poll workers manual and you --

 4       A.   Some videos.

 5       Q.   -- and videos, et cetera?

 6       A.   Yes.

 7       Q.   And you're aware that the counties can use

 8   those materials directly; correct?

 9       A.   Yes, ma'am.

10       Q.   And in fact, the Secretary of State's

11   office has repeatedly encouraged the counties to

12   use the training materials the Secretary of State's

13   office has prepared; right?

14       A.   Yes.

15       Q.   But the Secretary of State's office

16   doesn't require the counties to use the poll worker

17   training materials that the Secretary of State has

18   prepared; is that correct?

19       A.   I believe that's correct.

20       Q.   Why doesn't the Secretary of State's

21   office require that?

22       A.   Well, because it's the responsibility of

23   the counties to train their poll workers.  So we

24   make it available.  And frankly, I think most of

25   the counties do use the materials.
```



```
 1              I'm not aware of any county that doesn't
 2   use -- and again, I can't speak for all 159
 3   counties, but I don't believe I've ever had a
 4   conversation or a discussion with somebody where
 5   they said, we refuse to use your materials.
 6       Q.   Well, I'm not -- I mean, having a
 7   conversation that says I refuse to use your
 8   materials is a little bit different from you
 9   knowing what materials the counties are using;
10   correct?
11       A.   Yes.
12       Q.   Okay.  And in fact, I think you testified
13   before, you don't know what the counties are using,
14   you're not required to look at those materials, you
15   don't look at those materials; right?
16       A.   Right.
17       Q.   But let me go back to the question, do
18   you -- of why doesn't the Secretary of State
19   require its training materials to be used in the
20   training of poll workers?
21       A.   I just, I don't think it's -- I don't know
22   that it would be helpful.  I'm not sure that we
23   have the authority to require specific materials
24   outside of what is required.
25       Q.   Do you know -- you know the state election
```



1      Q.    Okay?

2            Did you ever talk to or otherwise

3      communicate with Secretary Kemp about what the

4      intent behind the "exact match" policy was?

5      A.    I don't believe so.

6      Q.    Have you ever communicated with anybody

7      else in the Secretary of State's office about what

8      the intent of the "exact match" policy was?

9      A.    I know we discussed the exact match a

10     couple times, I think, due to pending litigation.

11     And so we were talking about -- I spoke with Ryan

12     Germany and Kevin Rayburn in our office about the

13     process and about amending the process through

14     legislation, I think in 2018, where we changed and

15     we extended the time frame and we made some

16     changes.

17           I don't know that we ever talked beyond

18     the idea of the goal of "match" was to verify voter

19     accuracy.

20     Q.    Okay.  Now, if a voter registration

21     application isn't complete when it's submitted, is

22     the registrar supposed to or required to obtain the

23     omitted information before sending that

24     registration application or before inputting the

25     information into E-net where it goes into the whole

1      A.   I'm not aware of any.

2      Q.   And when you testified a minute ago about

3   discussions about the desirability of having plenty

4   of polling places and concerns about closing of

5   polling places that might cause problems, have

6   those discussions at least included a discussion

7   about the potential impact of those changes on

8   voters of color?

9      A.   I don't know that it's been specifically

10   addressed "voters of color."  I think it generally

11   has to do more with accessibility and geography,

12   especially if you're talking about rural counties

13   that don't have mass transit and things like that.

14   In some cases those will be voters of color, in

15   some cases they won't.

16         Most of the conversations that I recall

17   have been focused around the impact it would have

18   on people in that county, regardless of race.

19      Q.   Okay.  When have those conversations or

20   discussions occurred?

21      A.   You know, the issue was -- it sort of came

22   to a head last -- in the late summer, I think, of

23   2018 in Randolph County when Randolph County was

24   going to close some polling places.  I sent them a

25   strong letter urging them to reconsider that



 1   option, which they eventually did and didn't close

 2   the polling places.

 3          And it's come up as we've been discussing,

 4   you know, the huge turn-out in 2018, which was

 5   fantastic, but realizing that voter participation,

 6   registrations through the roof, participations

 7   through the roof, the counties need to be ready for

 8   a lot of voters.  And you need a lot of real

 9   estate.  You need devices.  You need places.  You

10   need all that stuff.

11          So we've actively been encouraging

12   counties to strongly consider expanding polling

13   places and have cautioned them, frankly, when it's

14   been brought to my attention, cautioned them and

15   have -- asked them to take a second look if they

16   were considering closing or consolidating polling

17   places.

18      Q.   And how has the Secretary of State's

19   office gone about encouraging counties to expand

20   the number of polling places?

21      A.   A lot of it has had to do with discussions

22   around the new voting equipment and some of the

23   changes that that's going to necessitate.  And so

24   in conference call -- I have a weekly conference

25   call with the whole state.  It's actually divided



1            But I can't answer why they did this in
2    this document.
3        Q.   All right.  You've been consulted several
4    times by voters or election officials about
5    potential polling place closures; correct?
6        A.   Yes.
7        Q.   And your response has typically been it's
8    a -- this is a county decision and the Secretary of
9    State's office doesn't have authority to intervene?
10       A.   I do tell them ultimately it's their call.
11   But what I tell them is that I would hope that they
12   would be very, first of all, be very skeptical,
13   that they need to be very data driven, they need to
14   do their homework and find out the statistics, the
15   X's and O's, how many people are -- how many people
16   vote during advance voting, how many people vote on
17   Election Day, all that data, and then make a case,
18   have public -- I say make it as public as -- I
19   encourage them to make it as public as possible,
20   get people involved early, don't drop it on people
21   at the last minute, and to realize that, one, you
22   know, it's going to be viewed very, very critically
23   in today's climate, that they're going to get a lot
24   of questions about it, and that, you know, given
25   the what we're going to with the new voting system,

 1    there's probably going to be a need -- and the

 2    turn-out, there's going to be a need for more

 3    polling places.  So.

 4          But I do say that it's their call.  And I

 5    believe that it's their call.  But I, frankly, try

 6    to throw up as many speed bumps as possible so that

 7    if, at the very least, if they make that

 8    determination, because I do believe they ultimately

 9    know, you know, what their situation is better than

10    I do anyway, that they are well-prepared with data

11    that's going to support any decision they make.

12        Q.   And on what basis do you say that the

13    Secretary of State's office doesn't have the

14    authority to intervene in these decisions?

15        A.   Well, because the law specifically gives

16    to -- authority to the county election

17    superintendent.

18        Q.   If the Secretary of State's office saw

19    that there would be a disparate impact on voters of

20    color with polling place closures and an actual or

21    potential violation of the Voting Rights Act, do

22    you think the Secretary of State's would have --

23    State's office would have no authority to intervene

24    on that?

25              MR. BELINFANTE:  Object to the form.



1    Q.    When was the first time -- I mean, when
2  you say you've been -- you generally encourage
3  counties to keep polling places open or to add
4  polling places, when did you first start doing
5  that?
6    A.    It was probably, frankly, around the time
7  of the Randolph County --
8    Q.    Okay.
9    A.    -- issue.  I mean, it's always been our
10  position that it's ultimately the County's call,
11  but.  And then seeing, again, seeing the turn-out
12  and realizing what -- you know, the turn-out
13  increases that are -- you know, we expected it to
14  increase this year over last year, they're just
15  going to need more space.
16    Q.    Now, with respect to the Randolph County
17  situation in the summer of 2018, Secretary Kemp
18  came out with a public statement saying that the
19  Secretary of State's office had strongly urged
20  local election officials to abandon their effort to
21  close polling places; correct?
22    A.    That sounds familiar.
23    Q.    So there was certainly as many impediments
24  to the Secretary of State's office strongly urging
25  a county not to close polling places; right?



```
 1   situation?

 2        A.   I think he was -- I'm not sure if I'd use

 3   the word "upset."  I think he was concerned that it

 4   seemed to be very fast, not well-planned perhaps,

 5   and that it was not well-timed.

 6        Q.   When you say it wasn't well-timed, what do

 7   you mean?

 8        A.   Well, it's, you know, getting into the

 9   election season, you know, which starts earlier and

10   earlier every year, like other seasons tend to.

11        Q.   But it was within the statutory --

12        A.   It was.

13        Q.   -- within the --

14        A.   Yes.

15        Q.   -- acceptable statutory time frame;

16   correct?

17        A.   It was.

18        Q.   So --

19        A.   And it was also ultimately their decision

20   to make, as we pointed out in the letter.

21        Q.   Did Secretary Kemp ask you to send a

22   letter to Mr. Peavy?

23        A.   I believe so.

24        Q.   Did you write this letter or did somebody

25   else in the Secretary of State's office write it?
```



```
 1       And to the extent there has been, then I
 2       would instruct you not to answer.
 3            THE WITNESS:  I'm trying to think.  I
 4       don't recall a lot of specific
 5       conversations.
 6            I know, for example, and this
 7       doesn't -- isn't affected by what
 8       Mr. Belinfante said, the -- I remember
 9       them asking about the provisional ballots.
10       Because the complaint says that the state
11       provides provisional ballots to the
12       counties, and that's not correct.
13            And so I think they asked about that,
14       and I clarified that we don't provide
15       provisional ballots to the county.  So it
16       may have been things like that.
17   BY MS. TANIS:
18       Q.   Are those the only questions that you've
19   gotten from Secretary Raffensperger or Jordan Fuchs
20   about the allegations in the complaint?
21            MR. BELINFANTE:  Again, I would
22       object to the extent that, if the
23       questions arise in a meeting where counsel
24       is present, then I would instruct him not
25       to answer that.
```

```
 1    line for significantly longer periods of time than
 2    people who don't?
 3        A.    I --
 4             MR. BELINFANTE:  Object to the form.
 5             THE WITNESS:  No, I don't think they
 6        should.
 7    BY MS. TANIS:
 8        Q.    That's not treating people in different
 9    counties uniformly, is it?
10        A.    That's correct.  I think in my
11    recollection, in several of the cases there were
12    mistakes that were made by local election
13    officials.
14             I know in Fulton County that there was a
15    park where they just mistakenly sent too few voting
16    machines.  And the election director acknowledged
17    he, I think he read a spreadsheet wrong and he put
18    the wrong number to be delivered.
19             And Gwinnett County had an issue with some
20    power cords that were left or not packed in with
21    the stuff, and that resulted in long lines.  But I
22    agree with your point that you shouldn't be
23    penalized by long lines regardless of where you
24    live.
25        Q.    Other than what you've already testified
```

```
 1              (Whereupon, the document was
 2        reviewed by the witness.)
 3              THE WITNESS:  Okay.  Yes, I'm up
 4        there.  I'm with you.
 5   BY MS. TANIS:
 6        Q.   Okay.  And in neither of these situations,
 7   if those facts are accurate, in neither of those
 8   situations were voters treated the way that they
 9   should be treated; correct?
10              MR. BELINFANTE:  Object to form.
11              THE WITNESS:  Yeah, I'm -- in the
12        first case, yes, clearly, Mr. Martin.
13        With the second case, I'm trying to figure
14        out.  So she...
15              (Whereupon, the document was
16        reviewed by the witness.)
17              THE WITNESS:  My advice to counties
18        is they should not tell people a
19        provisional ballot will or will not count.
20        Because the poll worker doesn't know
21        whether or not it will count.
22              It could be that the -- her -- like
23        in the case I mentioned before, this woman
24        may have been accidentally transferred to
25        a different county, and when they
```

```
 1        researched it they may have found out that
 2        it would count.
 3            So I tell -- I direct county election
 4        officials not to have, I don't think it's
 5        a good idea to have poll workers
 6        preordaining the acceptance or rejection
 7        of a provisional ballot.
 8   BY MS. TANIS:
 9        Q.   Okay.
10        A.   But I -- but yes, I think that that's not
11   the way it should have been handled.
12        Q.   All right.  So what happened in response
13   to this information?
14            Or let me state that differently.  What
15   did you do in response to getting this information,
16   which does provide the contact information and the
17   names of the voters?
18        A.   I believe I spoke with Ms. McGowan.  I'm
19   not 100 percent positive.  But I spoke with a woman
20   in this similar circumstance who voted a
21   provisional ballot or went somewhere and voted a
22   provisional ballot and then found out that, based
23   on what she heard from me, she should have stayed
24   where she was and voted there instead of going back
25   to where they told her to go.  I can't swear that
```

```
 1   assume you don't recall what you told her?
 2        A.   Assuming I had the conversation, because
 3   I'm sure I would have called her back on a request
 4   from Ms. Fuchs, it would have been essentially what
 5   I've said here about Cross-Check.
 6             But I honestly don't -- it could have been
 7   that Ms. Johnston forwarded me to a legislator or
 8   somebody else, so I really don't know.  I just
 9   don't recall having that conversation.
10        Q.   Okay.  And when you said it would have
11   essentially been what I've said about Cross-Check,
12   what has that been?
13        A.   Is that we didn't take action based on
14   information that was in Cross-Check.
15        Q.   And did you tell Ms. Fuchs that as well?
16        A.   I've told her that before.  I don't know
17   if I told her that in conjunction with this phone
18   call, although that would have been a good
19   opportunity.
20        Q.   All right.  I'm going to switch topics
21   here.  Do you know how many B.M.D. machines have
22   been bought or will be bought?
23        A.   I think it's about 33,000.
24        Q.   Okay.  And do you know how many check-in
25   machines have been bought or will be bought?
```



```
 1        A.    I don't have that number.  I know we have

 2    that number.  I'm just not -- I don't have that in

 3    my memory.

 4        Q.    And do you know whether these machines,

 5    both kinds of machines, will be distributed

 6    according to population numbers?

 7        A.    That's one of the calculations.

 8        Q.    And what are the other calculations?

 9        A.    Number of polling places.  And as much as

10    possible, similar distribution to what counties

11    already have.  Our goal is -- our basic goal is to

12    not have any county decrease in ability to conduct

13    voting.

14            Now, one of the features of the B.M.D.s

15    that's different from the D.R.E.s is that they can

16    be used in advance voting and on Election Day.  So

17    previously, once you use a D.R.E. in advance

18    voting, even if there are no votes cast on it, it

19    was done.  You couldn't use it on Election Day.

20            Now if a county deploys 40 B.M.D.s, they

21    could practically deploy all their B.M.D.s for

22    advance voting and then turn around and use all

23    those same B.M.D.s on Election Day.  So you almost

24    get twice the utility out of a B.M.D. for advance

25    and Election Day.
```

```
 1              So the general calculation that was done
 2    by other folks in our office was to try to match,
 3    and certainly not decrease any ability for counties
 4    to conduct elections, reflect changes, increases
 5    where number of voters had gone up, possibly
 6    reflect decreases in population, and -- and I think
 7    that's basically it.
 8        Q.   Okay.
 9             MS. TANIS:  If you'll let us take a
10        quick break, I may be --
11             MR. BELINFANTE:  Sure.
12             MS. TANIS:  -- done here.
13             THE VIDEOGRAPHER:  Going off the
14        record at 6:14.
15             (Whereupon, a discussion ensued
16         off the record.)
17             (Whereupon, there was a brief
18         recess.)
19             THE VIDEOGRAPHER:  We're back on the
20        record at 6:21.
21             MS. TANIS:  Mr. Harvey, I don't have
22        any questions for you right now.
23             I will just state for the record, we
24        still don't have a lot of documents,
25        including voter complaints.  So I reserve
```



# The Office of Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

2 Martin Luther King Jr. Drive
802 West Tower
Atlanta, Georgia 30334

*Chris Harvey*
ELECTIONS DIRECTOR

August 23, 2018

**Via Electronic Mail**

Mr. J. Scott Peavy
Randolph County Board of Elections and Registration
93 Front Street
Cuthbert, Georgia 39840
jscottpeavy@live.com

Re:    Polling Place Closures

Dear Chairman Peavy,

This morning, you called me regarding the ongoing situation in Randolph County. Given the sheer volume of unsubstantiated claims made by your office and its consultant, Mike Malone, I am sending you this letter to make our position clear.

We do not support the proposed consolidation. With one day before the Board's vote on Mr. Malone's consolidation proposal, it is troubling that you are contacting our office.

You spoke with me this morning about firing Mr. Malone. Contracting his services was completely up to you, your fellow board member, and your county commission. You know that, and Mr. Malone knew that. Clearly, Mr. Malone did not provide sound advice with this proposal. I did not recommend it, I do not endorse it, and I think you should abandon it. How your board reconciles employment contracts with individuals and how different governmental entities within Randolph County address these matters are solely the business of Randolph County.

You mentioned opening temporary polling places which are ADA-compliant. As I told you this morning, Georgia law puts decisions about local polling places squarely on your shoulders. The law reads the same for you as it does for every other county in the state. You should work with your county attorney, local elected officials, and voters to determine how best to serve the interest of local voters. I have no authority to allow or restrict anything that is specified in law or rules; however, I do strongly encourage you to find a timely and reasonable solution to any issues that might adversely impact voters in Randolph County.

In closing, I want to reiterate my opposition to the consolidation plan before you. I also want to underscore my frustration with the inaccurate statements about our office's role throughout this entire process.

STATE-DEFENDANTS-00081262

Document Number 30809

**EXHIBIT- 62**

12/5/2019

You have created a national media spectacle by seeking to make major changes right before an election and failing to act in a decisive manner that is responsive to the demands of voters in Randolph County.

Please follow the law, do the right thing, and work incredibly fast to right the ship in Randolph County.

Sincerely,

Chris Harvey
Elections Director

cc: Tommy Coleman, Esq., Randolph County
tcoleman@perrywalters.com

STATE-DEFENDANTS-00081263

Document Number 30809