# EXHIBIT 22

# In The Matter Of:

*Fair Fight Action v.*
*Raffensperger*

---

*Kevin Kennedy*
*March 31, 2020*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



**REGENCY-BRENTANO, INC.**
*Certified Court Reporters*

Min-U-Script® with Word Index

1  went back and looked at the depositions of Chris

2  Harvey.  There were three different depositions that he

3  provided in this case.  Since my report, I've looked at

4  expert witness depositions that were taken after my

5  report, notably the depositions of Ken Mayer, Dan

6  Smith, Michael McDonald.  There were two other

7  professors, one from I think Dartmouth.

8      Q.    Was that Dr. Herron?

9      A.    Yes, yes, Dr. Herron.

10     Q.    Okay.

11     A.    And looked at a large number of training

12  materials that were produced since my report and

13  complaints from the 2017 and 2018 elections.  Obviously

14  met with counsel just to go over my report and their

15  expectations of what they thought might be asked today.

16     Q.    Sure.  Okay.  And in looking at the

17  additional training materials, do you know if you

18  looked at the 2020 poll worker manual as it's called?

19     A.    No.  In fact, I made a specific request

20  about that and was advised that it had not been

21  produced.

22     Q.    Okay.  Do you know about when you made that

23  request?

24     A.    Within the last two weeks.

25     Q.    Okay.

1       A.    I looked at the statutes that were

2   available, which would have been after the law was

3   passed.  In my preparation there were a lot of

4   questions in the depositions about changes that House

5   Bill 316 made.  I did not look at the legislation

6   itself.  But, you know, there were materials that were

7   presented that summarized House Bill 316 that were part

8   of the materials presented to the county election

9   official conferences, so in that sense I had somewhat

10  of a familiarity with the changes.

11      Q.    All right.  Are you offering an opinion on

12  whether any state officials have acted with intentional

13  discrimination towards voters of color?

14      A.    Again, I looked at allegations concerning

15  that, materials related to that, but I'm not offering

16  an opinion specifically on that, no.

17      Q.    All right.  Okay.  Let's talk briefly about

18  your time with the Government Accountability Board in

19  Wisconsin and its predecessor organization.  Who

20  appointed you as the director of the GAB?

21      A.    The Government Accountability Board itself

22  appointed me.  They are six former judges who were

23  appointed by the governor from a list that was

24  recommended to the governor by state court of appeals

25  judges based on applications they reviewed, and then

1  obligation, to directly train poll workers?

2       A.    I think the obligation is implicit within

3  the responsibilities of the Secretary of State.  It's

4  not an -- you're correct, it's not an express one

5  because it runs down through the counties in terms of

6  the training.

7       Q.    All right.  So with that in mind, let's look

8  at Code Section 21-2-70, we'll mark as Exhibit 6.

9            (Whereupon, Defendants' Exhibit Number D-6

10       was marked for identification.)

11       A.    Okay.

12  BY MR. BELINFANTE:

13       Q.    And isn't it true that this code section

14  addresses the powers of superintendents, election

15  superintendents in cities and counties?

16       A.    The powers and duties, yes.

17       Q.    All right.  And one of those duties in

18  paragraph 8 is to instruct poll officers and others in

19  their duties.  Do you see that?

20       A.    Yes, I do.

21       Q.    Okay.  So is it your opinion that Georgia

22  law imposes a duty on city and county election

23  superintendents to train poll officers?

24       A.    Yes.

25       Q.    And indeed one of the obligations imposed on

1      Q.    Right.  But it doesn't -- I mean, you also

2  describe in that same section we're looking at that

3  there's a threshold in foundation.  Help me -- how does

4  one identify what that threshold --

5      A.    How does one identify what that threshold

6  is?  You look at the requirements in the state code of

7  what needs to be done to carry out an election.  You

8  look at the federal framework that surrounds that, the

9  National Voter Registration Act, the Voting Rights Act,

10 the Help America Vote Act, the UOCAVA, the

11 Accessibility Act for the Elderly and Handicapped.

12 That gives you the foundation of what needs to get done

13 and establishes your threshold of what the

14 responsibilities are going to be.  And --

15     Q.    But -- go ahead.

16     A.    Well, I think I've made my point.

17     Q.    Is there a single document or gold standard

18 promulgated by an organization that sets forth, you

19 know, what -- if I'm looking to get the gold standard

20 in training and I'm looking to follow -- define what

21 that threshold in foundation is, is there a singular

22 document I can go to or a standard, or is there not?

23     A.    I don't think that there is -- I mean, I

24 have not -- I mean, this is why I was talking with

25 various people I know who are involved in this to see

1      A.      I think the consequences of the shortcomings

2   of the program lead to voters losing their opportunity

3   to participate in the elections.  And that comes

4   through in the complaints that people have, and I think

5   it certainly flows from the fact that not enough

6   information and not enough focus is given to how do we

7   treat provisional ballots and absentee ballots and how

8   do I properly manage my responsibilities -- by my, I

9   mean the county official -- with respect to the Georgia

10  voter registration system.

11          The outcomes that surprised me are any

12  complaints I got about I can't find that information,

13  about I just registered at the Department of Driver

14  Services, or whatever the DDS acronym is for, and now

15  the information --

16      Q.      Hu?

17      A.      -- doesn't show up on the website or I've

18  been registered, now I'm told I'm not there anymore,

19  what happened.  There's an awful lot of those

20  complaints consistently throughout the process.  And I

21  look at the expert reports that point out the failings

22  in that area, and that directly impacts people's

23  constitutionally protected right to vote.

24      Q.      Anything other than voter registration

25  errors that you believe training has led to an

1    focused on the Secretary of State.  But, you know, it's

2    clear that what was being conveyed down the line wasn't

3    effective given the large number of complaints that

4    were coming out of the election.

5         Q.    But I guess my question is a little bit more

6    specific than that, which is do you have an opinion

7    on -- or does your report have an opinion on county

8    training manuals for poll workers?

9         A.    It does not have a specific opinion on that,

10   no.

11        Q.    Okay.  And your criticisms that you just

12   spoke of regarding the complaint, you're presuming the

13   facts in the complaint are true.  Is that fair?

14        A.    That's fair.

15        Q.    All right.

16        A.    I think there's a reasonable basis for that

17   given the number of the same types of issues recurring

18   in these complaints.

19        Q.    Well, let's talk about that for a minute.

20   How much -- do you have an opinion or does your report

21   have an opinion on how many errors of a similar kind

22   need to happen in order for something to be systemic?

23   I didn't see your report address that, and that's my

24   question is whether your report does.

25        A.    My report doesn't quantify it.  It talks

1   about that as a measure for, you know, like the canary

2   in the coal mine.  It tells you there's an issue and

3   spurs you to respond to that issue.

4       Q.    Sure.  But you had extensive experience with

5   poll workers, certainly at least -- and, in fact, you

6   are one in Wisconsin; right?

7       A.    That's right.

8       Q.    And in your experience are poll workers

9   trying to do the right thing by voters?

10      A.    In my experience, they generally are.

11  There's occasionally a rogue poll worker that you sort

12  of wonder given their personalities what's driving

13  them.  My dad was a poll worker, and the guy who was

14  the chief inspector used to drive me nuts when I'd stop

15  by to visit that polling place.

16      Q.    But those folks -- I'm sorry.  Go ahead.

17      A.    No.  I was just giving an example that, yes,

18  they are trying to do that.  But we know that mistakes

19  are made, and you want to minimize those and certainly

20  mitigate the impact of those mistakes.

21      Q.    Sure.  And do you have any reason to believe

22  that at least as it relates to that standard, and by

23  that I mean trying to assist the voter and coming at it

24  from a position of goodwill, that the majority of poll

25  workers in Georgia are different from those in

1    would be more effective for them than just reading

2    materials cold?

3         A.    Yeah.  I talked about the fact that you need

4    to -- any training has to have several different

5    channels because you're going to have a diverse

6    audience, and the different channels reaffirm points

7    that you've made.  I mean, that's the idea of a

8    PowerPoint is to give you a visual illustration.  I

9    think we've all been at conferences where someone just

10   reads a PowerPoint.

11        Q.    Yeah.  Those are the ones where the coffee

12   sells out quickly.  I've been to plenty.  Page 13 of

13   the court's document, number 167, page 12 of yours,

14   there's a discussion a little bit about Firefly.  At

15   the time that you completed your report, were you given

16   any documents that showed the files that are available

17   on Firefly?

18        A.    I don't recall any documents.  There was

19   some descriptions in the depositions.  I don't recall

20   seeing a document that listed everything that was

21   there, but --

22        Q.    Okay.  Have you since seen a document like

23   that?

24        A.    No.

25        Q.    All right.  Are you aware that other states

```
1    and groups have come to Georgia to study Firefly
2    because they find it to be effective?
3        A.    I'm not aware of that.
4        Q.    All right.  Also on page 13 of the court's
5    number, page 12 of your report, there's a discussion of
6    the Election Center, which you've talked about some
7    thus far.  Is the Election Center -- poll workers
8    typically don't go take classes at the Election Center;
9    is that correct?
10       A.    Very few do, right.
11       Q.    Okay.  It's more for supervisors and other
12   trainers; is that fair?
13       A.    Yeah, generally -- I mean, you'll have a
14   mixture of state and local officials, more local
15   officials than state.
16       Q.    Uh-huh (affirmative).
17       A.    And by local I mean the administrators, not
18   the election day officials.
19       Q.    Okay.  Let me ask you on that page 12 of
20   your report, page 13 of the court's page numbers,
21   there's a reference to Appendix B in your report, and I
22   did not -- I didn't see where I got a copy of Appendix
23   B.  Mine ends with Appendix A, page 3.
24            MR. BELINFANTE:  Beth, do you know if that
25       was -- if maybe I printed the wrong copy or if it
```

1      A.    What, you know, my opinion is is that you

2  don't just say follow the law.  You give equal -- you

3  provide some leadership.  You give them a reason why

4  that's the case, because people don't always follow the

5  law.  And there are consequences when you don't follow

6  the law, and understanding what those consequences are

7  is important.  That's, you know, what I was

8  identifying -- what I identify in my opinion was that

9  that's an important element to ensure that you are

10 protecting those rights by providing that.  You're

11 doing this for the voter, and here's why we're doing

12 it.

13      Q.    Right.  But at the end of the day, for

14 whatever reason they're doing it -- they could be doing

15 it just because they like law and want to enforce law.

16 As long as the law is being complied with, then there's

17 not a diminution of that voter's rights articulated in

18 that law; is that correct?

19      A.    That's correct.  The idea -- the idea of the

20 training is simply to reinforce that it's done.

21      Q.    And I think I've asked this before, but you

22 would agree with me that at least kind of coming into

23 the polling place most poll workers want to comply with

24 the law.

25      A.    Yes.  But they have to know what it is and

1   persons of color?

2        A.     That sentence presumes that there can be and

3   that by focusing specifically on the voter and the

4   voter rights, you act in a colorblind or color neutral

5   manner.

6        Q.     All right.  And your report does not opine

7   that there is discrimination against persons of color

8   in voting in Georgia, does it?

9        A.     My report is informed by the past history of

10  voting practices in Georgia, the concerns that have

11  been raised in media reports over the years, and the

12  concerns raised in the lawsuit, but it does not

13  specifically have an opinion as to whether or not that

14  is the case.  It's really directed at that by making

15  sure that the training programs are voter-centric,

16  transparent, that you're going to avoid and you're

17  going to protect against having those kind of

18  discriminatory impacts.

19       Q.     In the next paragraph after the one we just

20  talked about, you discuss absentee voting and

21  provisional ballots.  Is it your contention that --

22  well, strike that.  I think we've covered that area.

23  What would you say based on what you've seen is the

24  foundation for conducting elections in Georgia?

25       A.     I'm sorry.  What do you mean the foundation

1   for conducting elections?

2        Q.    I'm looking on page 17 of your report, page

3   18 of the court's document.  The second paragraph ends

4   with "This training approach would send a message to

5   everyone involved in the electoral process, from poll

6   workers to county election officials to voters to

7   candidates, that enabling full participation by all

8   voters is the foundation for conducting Georgia

9   elections."  So my question is what do you believe is

10  the foundation for conducting Georgia elections?

11       A.    You mean as opposed to serving the voter?

12       Q.    No.  I mean, I couldn't tell from that

13  paragraph if you were implying that Georgia elections

14  had a different foundation.

15       A.    No, no, I was not -- I was saying that that

16  should be the foundation of any electoral system is

17  facilitating participation by the voters, protecting

18  their rights.  And I wasn't suggesting that that

19  wouldn't be the foundation, but to ensure that people

20  who participate in the process understand that.  That's

21  what my recommendations are going toward.

22       Q.    I gotcha.  Okay.  All right.  Let's look at

23  the same page, the second full paragraph under the

24  underlined "Mandatory Uniform Training Protocol for

25  Poll Workers."  The last sentence of that paragraph

1    state mandated -- or, excuse me, a mandatory

2    state-directed uniform training program is the best

3    way, are there case studies you relied on for that?

4        A.    No, there were not case studies.  It's,

5    again, based on my experience that if there is not

6    leadership at the state level, you're not going to get

7    uniformity, you're not going to get compliance.  You're

8    going to have instances of people being deprived of

9    their right to participate in the process.

10       Q.    Looking further down the page, you say in

11   the last full paragraph, "Although the manual contains

12   helpful information, it is far from comprehensive and

13   contains large chunks of statutory language that are

14   difficult to understand.  It also takes an

15   inappropriately passive approach to issuing provisional

16   ballots, which appears from my review of complaints in

17   the 2018 general election to be a significant source of

18   inconsistent practices."  What did you mean by passive

19   approach to issuing provisional ballots?

20       A.    Further on in my report there are examples

21   of the language that's in that manual that suggests

22   that you may do something, you might do this, if the

23   voter asks you may do it.  That to me when I read that,

24   I'm like wait a minute.  Provisional ballots, you need

25   to be much more specific about when and how you do

1       A.    Yes, I have.

2       Q.    Is it your opinion that the default rule in

3   Georgia is to hand out a paper -- or, excuse me, a

4   provisional ballot?

5       A.    That seems to be what Chris Harvey says

6   should be the case.

7       Q.    And do you have reason to believe that it is

8   not the case?

9       A.    I'm looking at, you know, the complaints

10  that came in.  It seemed like there were a large number

11  of instances where people didn't get a provisional

12  ballot.  I'm not sure whether or not they were entitled

13  to it, but it certainly generated concerns that they

14  were willing to reach out to the Secretary of State's

15  office and say, "I don't know why I didn't get a

16  provisional ballot," or other people were deserving and

17  someone was not getting offered that opportunity.

18      Q.    In your experience, have you seen similar

19  complaints in other states?

20      A.    I've read media accounts that suggest that,

21  yes.  I've dealt with election observers who come from

22  other states to Wisconsin who put a strong emphasis on

23  that and often have to remind them.  In our training

24  with poll workers, we talk about the fact that they

25  need to look at our resources when it comes to how you

1  process a provisional ballot because you can't -- as I

2  said, the requirements and the provisions are different

3  in different states.

4       Q.    Okay.  Have you ever gone and observed an

5  election in another state?

6       A.    I'm reasonably sure I have.  I'm just trying

7  to think of the actual experiences of that.  I have

8  observed elections in South Korea.  For some reason I

9  can't -- I want to say yes, but I just can't give you

10  an example.

11       Q.    Okay.  That's fair.  And let me ask you

12  another question on this overly simplified.  And I'm

13  not -- I'm truly not trying to be argumentative, and

14  forgive me for asking a similar question frequently,

15  but is there a model kind of training?  I mean -- and

16  I'm thinking almost like the equivalent of a, you know,

17  model penal code that we learned in law school or the

18  UCC or something that somebody could turn to for

19  guidance on best practices as it relates to training on

20  provisional ballots.

21       A.    I'm not aware that there is.  I mean, I know

22  that in the gatherings with the National Association of

23  State Election Directors people would provide examples

24  of how they train on provisional ballots.  I know that

25  there's a course on provisional voting -- I'm not sure

1   if it's specifically provisional voting but where

2   provisional voting is a key element at the Election

3   Center.  Again, I think a lot of times what you're

4   looking at with provisional ballots or any other

5   election-day practice is how can you provide that

6   information to poll workers and election administrators

7   and voters in a method that is going to ensure that

8   provisional ballots are issued appropriately.

9       Q.    I'm looking at page -- same page, sorry,

10  page 19 at the bottom of the page, page 20 at the top.

11  When you talk about the voter identification documents,

12  you write -- and this is the fourth full paragraph,

13  "Interestingly, there is only one person of color

14  depicted in the 12 examples of acceptable

15  identification."  Do you see that?

16      A.    Yes.

17      Q.    How does that really impact training?

18      A.    It provides the poll workers with an

19  exposure to the voters that are going to come into the

20  polling place.  I know that when we developed our voter

21  identification training program, we were very focused

22  on making sure that the depictions of acceptable forms

23  of identification showed a diverse group of individuals

24  by age, gender, and race.

25      Q.    But, I mean, is it then the opinion -- or

1   the conclusion to draw from that that Georgia poll

2   workers don't know what people of different races look

3   like?

4       A.    No.   I'm just saying that -- what I'm saying

5   is that it goes to reinforcing to the poll workers

6   you're dealing with a diverse population.   It's not a

7   judgment on what they think.   It's a question of how

8   can you make your training materials more effective and

9   create an atmosphere that doesn't suggest that only

10  certain people are entitled to vote or only certain

11  people are going to show up to vote.

12      Q.    So it's your opinion that by not including a

13  more diverse group that the state is implying that

14  people of color are not going to show up to vote or

15  shouldn't be able to show up to vote?

16      A.    That's not my opinion, but I think you can

17  draw an inference about the sensitivity to the training

18  program, to the training protocols when you look at how

19  materials are presented.

20      Q.    Do you believe that Georgia State election

21  officials are communicating to local officials that

22  persons of color are not coming to the polls?

23      A.    I don't think that's the case, no.

24      Q.    Do you think that state election officials

25  are communicating implicitly or explicitly to

1  poll workers that persons of color should not be able

2  to vote?

3      A.    That they are?  No.

4      Q.    Same page, next paragraph, the last sentence

5  says, "A model state-directed training initiative for

6  poll workers must provide participants in the electoral

7  process with confidence that poll workers know their

8  responsibilities, will help not hinder voter

9  participation, and are mindful of the integrity and

10  importance of the vote of each citizen."  Was there a

11  particular model that you had in mind when writing

12  that?

13      A.    No.  I think -- I mean, obviously the

14  language I'm drawing from is from my experience.

15  That's what animates the training programs that I was

16  responsible for overseeing.  I think the use of the

17  term model is -- I think this is a way of communicating

18  this is an essential element when someone is evaluating

19  their training program that they can see that this is a

20  focus because it's going to -- I think it moves the

21  training to ensuring that voters' rights are protected.

22      Q.    All right.  Are your criticisms of the poll

23  worker manual all contained in this report?

24      A.    I don't think I was quite as harsh in the

25  report as I just was earlier.

 1  they were no longer there by the time the board took
 2  action.
 3      Q.    And --
 4      A.    But I can't --
 5      Q.    Okay.
 6      A.    -- name one, but I remember there were a
 7  handful of them, two, three, four.
 8      Q.    And do you recall if that -- I mean, if the
 9  county official was no longer in office as a
10  consequence of what you describe as egregious conduct?
11      A.    My sense was that's why they were no longer
12  there.  I think the county was being proactive in
13  getting rid of them.  I mean, the county, as I
14  understand it, still had some consequences.  They may
15  have -- they may have been fined.  They certainly were
16  given negative publicity.  I don't know if they did a
17  letter of instruction, you know, a direct letter of
18  instruction to an oversight body about don't hire
19  someone like this again, but --
20      Q.    And so, I mean, in some ways isn't that
21  evidence that the process is working, that if there's a
22  truly egregious violation the county is taking care of
23  it itself?
24      A.    In most cases it tells you that the process
25  is working.  I mean, I think what I was describing were