# EXHIBIT 24

**In The Matter Of:**

*Fair Fight Action v.*
*Raffensperger*

*Kenneth Mayer, Ph.D.*
*February 26, 2020*

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

**Min-U-Script® with Word Index**

```
 1         analysis.do.  Did -- other -- is that file -- do you
 2         have any analysis in that file other than simply
 3         combining spreadsheets?
 4    A.   That code does something different.  That code takes
 5         the -- the result of the appending -- of the append
 6         file, so I now have a statewide voter file, and then
 7         that -- that file or that code processes the file
 8         to -- to produce the data that I then analyze to
 9         generate the data for the tables in the report.
10    Q.   Okay.  And the tables in the report, those are the
11         tables that are in the pending analysis January 2020
12         Excel file here?
13    A.   That Excel file was what I used to actually format
14         the tables, so that -- that Excel file takes the
15         output of the -- of the STATA file and it just is a
16         matter of convenience because Excel has some
17         formatting features that allows you to generate
18         tables that are -- that are more readable and that
19         STATA doesn't do very well.
20    Q.   Okay.  Now, Section 4 of your report on page 5
21         estimating -- titled Estimating the Quantity of
22         Interest, you state that the key empirical quantity
23         of interest is the number of otherwise eligible
24         people incorrectly placed in MIDR status because
25         their registration information did not exactly match
```

```
 1        with information in state driver's license files
 2        maintained by DDS or national social security files,
 3        the verification process, or because they were
 4        flagged as non-citizens.
 5             Do you still maintain that that is the key
 6        empirical quantity of interest?
 7   A.   That's the basic one that you would then use to
 8        generate some of the other estimates looking at the
 9        demographics of registrants in that status.
10   Q.   Now, your -- your report does not -- actually --
11        Well, you do not actually determine the key
12        empirical quantity of interest, correct?
13   A.   Well, as I -- as I note that that is unobservable.
14   Q.   And -- and why is that?
15   A.   Because as I note in the report, what I see or what
16        we observe is the -- the number of people who are in
17        that status.  What is not observable is whether
18        someone is in that status and shouldn't be because
19        they actually were in the DDS files or they are
20        citizens, but because of errors or the nature of the
21        match process, they are kicked out as -- as failing
22        verification or non-citizens when they actually
23        shouldn't have.
24   Q.   So there's -- You're not opining on any number of
25        individuals that were incorrectly placed into MIDR
```

1              or pending status?
2     A.       Well, I am absolutely certain that the number is
3              greater than zero, but I -- it is not possible to
4              point to a specific number and say this is the exact
5              quantity, this is the exact number of people who
6              were incorrectly placed in this status.
7     Q.       So your report lists a number of different statuses
8              but doesn't show that anyone was wrongfully placed
9              in those statuses, although you believe there's at
10             least one person?
11    A.       Well, it's not a matter of belief, it's a matter of
12             certainty.  But there is nothing in the data that
13             specifically indicates that this person was
14             incorrectly placed in -- in status.  You would have
15             to infer that from the nature of the process and
16             looking at people who were originally -- or at some
17             point were in pending status but then were
18             ultimately moved to the active file.  And I have
19             data on that, and that's -- that's -- that's a
20             quantity that you can use to draw a more general
21             inference.
22    Q.       And that's the same for -- for non -- for the
23             non-citizens, right?  You state that you can't
24             observe the number of pending registrants who are
25             incorrectly flagged as non-citizens, though you are

| | | |
|---|---|---|
| 1 | | certain that the number is -- is non-zero? |
| 2 | A. | That's correct. |
| 3 | Q. | Now, what's -- what is the -- what is the value |
| 4 | | of -- of this inference for purposes of your -- your |
| 5 | | report if we don't know that anybody was actually |
| 6 | | incorrectly flagged? |
| 7 | A. | Well, that's -- that's the foundation of inference |
| 8 | | is that you examine the data that you can observe, |
| 9 | | and you use that to reach an informed view of what |
| 10 | | you cannot directly observe.  And that's used |
| 11 | | universally in social science.  Any time somebody |
| 12 | | makes a forecast, that's an inference.  Any time |
| 13 | | someone is making a population estimate by using a |
| 14 | | sample, any survey is a kind of inference, and so |
| 15 | | it's not this sort of obscure mystic process where I |
| 16 | | am trying to define what I can't observe.  It's the |
| 17 | | basic element of social science reasoning that you |
| 18 | | are interested in something that you cannot directly |
| 19 | | observe and so you examine the data that you -- that |
| 20 | | you can observe and draw inferences based on that of |
| 21 | | what the underlying characteristics or the |
| 22 | | underlying values are. |
| 23 | Q. | And so your inference is based on the voter |
| 24 | | registration file, the pending registrant file, and |
| 25 | | the county registration files that you combined? |

```
 1  Q.  But if that number -- if the number of registrants
 2      after HB 316 was -- number of African-American
 3      registrants after 316 constitutes 40 percent of the
 4      total active registrants in that period, then
 5      there -- the number of individuals in pending status
 6      is not disproportionate to the reg -- to the
 7      registration numbers?
 8  A.  I think that would be right.
 9  Q.  Okay.  And that would be the same across any group,
10      right?  If -- if your percentage of individuals in
11      pending status -- so let's take whites.  White
12      non -- not of Hispanic origin.  14.68 percent of the
13      individuals in pending status are -- are white,
14      correct?
15  A.  That's correct.
16  Q.  And if the number of individuals, the percentage of
17      registrants from 316, enactment of 316, to whenever
18      these numbers were pulled, was greater than 14.68,
19      there would be a disproportionate number of
20      registrants being flagged or being placed in pending
21      status who are white?
22  A.  So if we looked at a specific period?
23  Q.  Same exact thing that we just went over.
24  A.  I think that's correct.
25  Q.  Okay.  Is there a reason why you didn't look at the
```

1        numbers from post 316?
2   A.   No.  I was interested in the -- the total numbers of
3        people in the -- in the status.
4   Q.   And you'll agree though then that your conclusion,
5        if we do look at the -- the number of registrants
6        from that period, your conclusion that no matter how
7        the data are aggregated, the verification process
8        disproportionately affects minority registrants,
9        that would be incorrect?
10  A.   I don't think that would be incorrect.
11  Q.   Why?
12  A.   I think the marginals might change, but just
13       eyeballing it, there's no reason to think that the
14       overall conclusion of minority voters being
15       disproportionately affected would change.
16  Q.   Well, if -- and that's disproportionate, which in
17       your conclusion you're referring to disproportionate
18       to white voters, right?
19  A.   Disproportionate to their makeup in the voting
20       population.
21  Q.   And if -- again, if the number of voters who
22       registered after 316, that -- the number of let's
23       say white voters is greater than 14.68, then -- then
24       you'd conclude that the white voters are being put
25       in pending status at a disproportionate rate, right?

|   |    |   |
|---|----|---|
| 1 |    | percentage of white registrants in pending status, |
| 2 |    | or any minority.  Pick any group.  I think it |
| 3 |    | applies across the board, the analysis.  So if it |
| 4 |    | did, though, would you -- would you agree that your |
| 5 |    | opinion is -- is incorrect? |
| 6 | A. | Well, if the results were -- showed that -- |
| 7 | Q. | Well, if the numbers were -- percentages were |
| 8 |    | equal -- let's just take every group except for the |
| 9 |    | white group, white non-Hispanics.  I think that was |
| 10|    | the only one that in your analysis went the other |
| 11|    | direction.  If -- if the number or percentage of |
| 12|    | active registrants for this period, say for Asian -- |
| 13|    | Asian or Pacific Islanders is greater than 16.83 |
| 14|    | percent, then that would not -- the number of Asian |
| 15|    | Pacific Islanders in pending status as of January |
| 16|    | 2020 would not be disproportionate? |
| 17| A. | If that's what the data showed, but I don't think |
| 18|    | that's what the data would show. |
| 19| Q. | But if it did, you would agree? |
| 20| A. | Well, my conclusions are based on the data. |
| 21| Q. | Well, you didn't look at this data, right? |
| 22| A. | I didn't look at that particular data. |
| 23| Q. | Now, you did look at -- at individuals in non -- |
| 24|    | that are -- or registrants that are in pending |
| 25|    | status due to non-citizenship, right?  And table 5 |

1       of your report, page 22, and table 6, now these two
2       reports you're looking -- excuse me, tables --
3       you're -- you're looking at percentages of
4       individuals who are in pending status as
5       non-citizen, and you're taking their -- by race, and
6       then in table 6 you are looking at just the
7       percentage of individuals who are voting age
8       naturalized citizens living in Georgia according to
9       the 2014-2018 five-year American Community survey,
10      right?
11             And if I'm -- if I'm following this correctly,
12      the -- let's take Hispanics in table 6.  20.9
13      percent of the voting age naturalized citizens
14      living in Georgia are Hispanic, and you say that in
15      table 5 there's 20.9 percent in pending status as
16      flagged, so you wouldn't say there's a
17      disproportionate effect there?
18  A.  Well, I'm not arguing for -- Again we're comparing
19      two different numbers.  The point of table 6 is to
20      demonstrate that there are, in fact, hundreds of
21      thousands of naturalized foreign-born citizens
22      living in Georgia.
23  Q.  Uh-huh.
24  A.  And combined with the known inaccuracies of relying
25      on driver's license data to verify citizenship

1    because it's rarely updated or frequently not
2    updated, this shows that among the people who are
3    registered who are flagged as non-citizens, I mean I
4    am certain that there are actual citizens on that --
5    in -- on that list of people.  I don't know how
6    many, but I can express certainty that the number is
7    greater than zero.
8         So that means that some of these individuals
9    are actually citizens, and because of a flaw in the
10   underlying verification process, they are flagged as
11   non-citizens and will have to go through a separate
12   process.
13        And the point of table 6 is not to say that
14   those numbers of -- you know, the percentage --
15  Q. Okay.
16  A. -- of naturalized foreign-born African-American --
17  Q. Right.
18  A. -- people in Georgia should be the same as that
19   number.
20  Q. I understand that.
21  A. It's just that there are --
22  Q. It's a little different.  It's not the same analysis
23   that we were just looking at regarding the total?
24  A. That's correct.
25  Q. Now, you said that there are the flaws in the

```
 1              method of relying on driver's license data.
 2    Q.        Looking at the -- the conclusions in your report,
 3              have any of those conclusions changed?
 4    A.        No.
 5    Q.        And your -- your analysis -- You didn't conduct any
 6              causal analysis for your report, right?
 7    A.        Causal in terms of?
 8    Q.        Well, why an individual may be -- yeah, the cause
 9              and effect, why an individual may be in MIDR status.
10              You looked -- Your report is based on inferences
11              solely?
12    A.        That's generally true.
13    Q.        I mean you state in your -- in your report --
14    A.        Right, so I don't have information about any
15              particular individuals.
16    Q.        So your report is -- is based on limited
17              information?
18    A.        It's -- There was information that I did not have
19              access to.
20    Q.        And are the opinions that we've discussed today,
21              yours -- are those opinions in this deposition and
22              in your report your complete opinion in this case?
23    A.        I would say yes.  I mean this is -- these are the
24              conclusions I reached based on the data that I have
25              had, that I have access to.
```