# EXHIBIT 25



Deposition of:
# Peyton McCrary , Ph.D.

*May 22, 2020*

In the Matter of:

# Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 1:18-cv-05391-SCJ    Document 451-25    Filed 06/29/20    Page 3 of 17
Peyton McCrary , Ph.D.    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 72

1   path of in-person voting.  Do you see that section
2   there?
3       A   Yes.  I apologize for the coughing.  It's
4   a chronic cough.  I'm not coming down with COVID-19.
5       Q   That's good.  I'm glad you're okay on that
6   front at least.  That's totally fine.  And we can
7   take a break at any point if you need to.
8           So you say in that paragraph that few
9   Section 2 cases have dealt with these types of
10  issues, and then you make the statement:  Courts
11  lack a body of relevant precedents to guide them.
12          Do you still agree with that today?
13      A   It is -- it is less true today because the
14  courts have resolved a way of reconciling the
15  fact-finding necessary in denial of abridgment cases
16  with the standards set down in the Supreme Court in
17  Thornburg versus Gingles, which was designed to deal
18  with voter dilution cases.
19      Q   All right.  We can put that away.  Thank
20  you.
21          Are you familiar with the term "voter
22  suppression"?
23      A   Yes.
24      Q   And how would you define the term "voter
25  suppression"?

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 4 of 17
Peyton McCrary, Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 73

1      A   Well, I generally don't use the term, but
2  what it refers to is barriers that make it more
3  difficult for citizens to vote, placing various
4  kinds of administrative burdens on their ability to
5  register and to vote.
6      Q   And do you consider voter suppression to
7  be a partisan activity?
8      A   Well, not necessarily.
9      Q   When would voter suppression not be a
10 partisan activity?
11     A   Well, either party could choose to
12 suppress voting strength.  In general, that is -- in
13 general, there is a partisan pattern to the use of
14 laws that present burdens to the registration and
15 casting of ballots.  That tends to be the work of
16 Republican Parties and state legislatures.
17     Q   Let's move next to your work history at
18 the Department of Justice.
19     A   Okay.
20     Q   And so in your CV --
21     A   Are you calling my attention to an
22 exhibit?
23     Q   I am not.  No.  No.  I was just -- I just
24 want to discuss generally.
25     A   Okay.

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 5 of 17
Peyton McCrary , Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 114

1  to be very revealing, but it was useful to read
2  through those documents even though I didn't cite
3  them.  That would be one category.
4         I did a lot of newspaper research, and I
5  cited very few newspaper articles in the report on
6  that, so that was another category -- big category
7  of documents that I reviewed that I did not end up
8  citing.
9         There are other categories if I think
10 about it for a moment if you want me to pursue that
11 line of meditation.
12     Q   That's helpful.  Maybe what I can do is
13 narrow that a little bit.  Did you review the
14 legislation as to House Bill 316 in the 2019 session
15 of the General Assembly?
16     A   I did not.  I mean, I looked at the
17 statute in general, I looked at news coverage of its
18 adoption, but I did not make an analysis of it, and,
19 therefore, I didn't discuss it in the report.
20     Q   Are there any expert reports from other
21 cases that you reviewed that are not cited in the
22 footnotes?
23     A   I'm sure there are because I looked at a
24 lot of expert reports.  I don't remember.  If they
25 were particularly relevant, I certainly cited them.

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 6 of 17
Peyton McCrary , Ph.D.                                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 120

1           Would you agree that that's the second
2    opinion that you're offering in this report?
3        A    That's certainly a second opinion.  I'm
4    not sure that I have a list of opinions that I
5    offer, but I would agree that that's one of the
6    opinions I express.
7        Q    Okay.  And then in paragraph 11 you
8    express an opinion that the political context within
9    which the current registration system operates also
10   resembles the politics of Georgia before the
11   adoption of the 1965 Voting Rights Act.  That kind
12   of is the third opinion you're offering in your
13   report; would you agree?
14       A    Yes, it's a third opinion I offer.
15       Q    Okay.  Are there other expert opinions --
16   I'm not trying to pin you down with this, I'm trying
17   to frame where we're going to be discussing your
18   report.  Are there other expert opinions you are
19   offering that are not covered by those three
20   categories?
21       A    There are a lot of sort of subsidiary
22   opinions that I offer about these categories, but
23   those are -- that's a good way of characterizing the
24   categories of my opinions.
25       Q    Okay.  Now, one thing that I was looking

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 7 of 17
Peyton McCrary , Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 121

1   for in your opinion and wasn't -- your report and
2   wasn't able to locate is an opinion that Georgia --
3   any part of Georgia's voter registration system was
4   enacted with discriminatory intent.
5           Are you opining that any portion of
6   Georgia's voter registration practices and systems
7   were adopted with a discriminatory intent?
8       A   No.
9       Q   Okay.  So given that, on the bottom of
10  paragraph 11 on page 8 you make a statement that
11  there is a powerful incentive for Republican
12  officials at the state and local levels to place
13  hurdles in the path of minority citizens seeking to
14  register and vote.  That is what has happened, you
15  say.
16          It's your testimony that is not a
17  statement that any practice currently in effect is
18  intentional -- or, I'm sorry, was enacted with
19  discriminatory intent?
20      A   That's correct.
21      Q   Now, in your report it looks like you
22  focus primarily on the voter verification process's
23  so-called exact match process.  Is that correct or
24  was it broad to the entirety of the registration
25  system in the state?

Case 1:18-cv-05391-SCJ  Document 451-25  Filed 06/29/20  Page 8 of 17
Peyton McCrary, Ph.D.                    May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 123

1  Q   So in your review did you review -- let me
2  ask this:  To reach your opinion about the
3  discriminatory effects of the voter verification
4  exact match system, you're relying in part on the
5  work of Dr. McDonald and Dr. Mayer and some other
6  political scientists, correct?
7  A   In addition, I'm relying on the analysis
8  of the Department of Justice underlying the adoption
9  of its 2009 objection to the voter verification
10 process, I'm relying in part on the assessment of
11 the HAVV system by the Social Security
12 Administration reflected in the Inspector General's
13 report in -- the Inspector General of the Social
14 Security Administration, and I'm including also the
15 analysis of the voter registration process by Gary
16 Bartlett, the election director for almost 20 years
17 in the state of North Carolina, who is a highly
18 respected election administrator.
19 Q   And as to your opinions, the first
20 category of opinions we discussed, Georgia's voter
21 verification process exercised a persistent
22 discriminatory effect, that is the only opinion
23 about a discriminatory effect in your report; is
24 that correct?
25 A   First of all, are you asking only about

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 9 of 17
Peyton McCrary, Ph.D.                                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 125

1  establishment of the preclearance process.  That was
2  all because of the discriminatory effects revealed
3  in the -- in the racial disparities in voter
4  registration in Georgia.
5      Q   So is it your testimony then that
6  opinion -- the second category of opinions that the
7  current pattern of voter registration in voting in
8  Georgia has a discriminatory effect in total?
9      A   I'm sorry?
10     Q   I didn't see that in your report.
11     A   I'm not understanding your question.  What
12  I said in the report is that there was a racially
13  discriminatory effect in the operation of Georgia's
14  registration system before 1965, and that there is,
15  in the period of HAVA implementation, also a
16  racially discriminatory effect.
17     Q   Got it.  Okay.  That helps clarify what I
18  was looking for.
19         So in terms of the opinions, then, the
20  only racially discriminatory effects that you are
21  opining about as far as specific practices are the
22  entirety of the registration system prior to 1965
23  and the implementation of voter verification under
24  HAVA since 2006.  Is that correctly framing that
25  now?

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 10 of 17
Peyton McCrary, Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 126

1   A   I think that's correct.
2   Q   Okay. You don't disagree with it?
3   A   I don't disagree with it. It's possible I
4   expressed an opinion that I'm not calling to mind
5   about the HAVA implementation period, but -- but I
6   was certainly focused on the voter verification
7   process.
8   Q   And so then in light of that, then it's
9   correct that you are not opining that the entirety
10  of Georgia's voter registration system as it stands
11  today has a racially discriminatory effect on
12  minority voters?
13  A   Well, you weren't listening to my earlier
14  answer, I think. What I said --
15  Q   I know you want to clarify -- I don't want
16  to interrupt you, but I know you'll clarify. I
17  understand you believe the voter verification
18  process touches every part of the registration
19  process.
20  A   Yes.
21  Q   But then you also seem to be saying that
22  you are not opining as to the entire registration
23  process today; you're limiting your opinion to the
24  voter verification implementation since HAVA. I
25  want to understand what your opinion actually is.

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 11 of 17
Peyton McCrary , Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 170

1    A    Okay.
2    Q    You make the statement there:  Because
3    minority voters routinely support Democratic
4    candidates, Republicans stood to benefit from making
5    registration and voting by minority citizens more
6    difficult.
7         You're not saying that Republicans
8    intentionally made it more difficult, correct?
9    A    That's correct.
10   Q    And in footnote 95 on page 38 you're
11   discussing Dr. Hood and Dr. McKee's report.  You'd
12   agree with me that Dr. Hood's report is a survey of
13   voter perception, not necessarily a survey of
14   particular election practices and their use; that
15   correct?
16   A    Let me -- let me work back to the Hood and
17   McKee.  Ask your question again.
18   Q    The Hood and McKee report you cite was a
19   survey of what voters perceived as issues, not what
20   were or were not actual issues of election
21   administration; is that correct?
22   A    I think that's correct now that I
23   understand your question.
24   Q    So you'd agree that it's a survey of voter
25   perception, not a study of particular election

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 12 of 17
Peyton McCrary, Ph.D.                                   May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 187

1    Q    Going forward to paragraph 77, you
2    reference that: Georgia sought preclearance of its
3    newly revised voter verification process from a
4    three-judge court in the District of Columbia as
5    well as through administrative review by the
6    Department of Justice.
7         That's allowed by the Voting Rights Act to
8    pursue both tracks, correct?
9    A    Sure.
10   Q    You indicate at the end of that paragraph
11   that then Attorney General Thurbert Baker refused to
12   file the lawsuit. Are you aware of the prior
13   litigation between Governor Perdue and Attorney
14   General Baker regarding the scope of authority to
15   represent the state?
16   A    I am not, and I'm simply reporting that as
17   what a newspaper article reported.
18   Q    Paragraph 78 on the next page, you quote
19   the letter from the Department of Justice -- or
20   actually, I'm sorry, the federal court: The
21   department informed the plaintiff that it did not
22   intend to object to the implementation of the
23   revised verification process. And that's typical
24   language from the department, don't you agree, that
25   it's a failure to object, it's not an approval?

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 13 of 17
Peyton McCrary, Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 188

1     A     That's correct.
2     Q     And then you say in the next sentence:
3  The department agreed to preclear the process to
4  settle Georgia's lawsuit.
5           You're not saying the department was
6  forced to preclear in order to settle, correct?
7     A     No.  The point is if they didn't see a
8  basis for objection, they would settle the lawsuit.
9     Q     Paragraph 79 you reference the training
10 materials from a 2015 presentation:  For the
11 applicant who is registering to vote using their
12 driver's license number nothing changes.
13          Is it your understanding that those
14 individuals would not go through a matching process?
15    A     No, that's not --
16    Q     I'm sorry, I'm in the wrong section.  I'm
17 sorry.  We've already covered the piece I was going
18 to ask you about there.
19          So let me go to paragraph 80.  Sorry,
20 Dr. McCrary.  Are you doing good?  You need a break
21 or you doing okay?
22    A     Actually, if we can have a two-minute
23 break, that would be very helpful.
24    Q     Certainly.  Why don't we pause here and
25 take two minutes --

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 14 of 17
Peyton McCrary , Ph.D.   May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 199

1    A    That's correct.

2    Q    And so what is the basis for your
3    statement that the administrative implementation of
4    House Bill -- HB 268 in 2017 would likely have been
5    objectable?  Objectionable, sorry?

6    A    My knowledge of the standards applied by
7    the government in -- in enforcing the preclearance
8    requirement when it existed is the principal basis
9    for that along with the facts regarding HB 268 and
10   the context in which it was adopted, that is,
11   immediately following the settlement agreement of
12   the 2016 lawsuit.

13   Q    Later in paragraph 99, you state:  Because
14   the state now implemented voting changes -- sorry,
15   top of page 82:  Because the state now implemented
16   voting changes with a racially discriminatory effect
17   knowing that it would have that effect, this voting
18   change would have been adopted with a racially
19   discriminatory purpose.

20        So I read this as you're saying that there
21   was discriminatory intent in the adoption of House
22   Bill 268; is that right?

23   A    That's inartfully worded.  What I meant
24   was that it would have been objectionable under the
25   intent or purpose prong of Section 5 review, that is

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 15 of 17
Peyton McCrary, Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 200

1  to say that the state could not have met its burden
2  of proving that it didn't have a discriminatory
3  purpose because of the strong evidence presented in
4  the 2016 lawsuit that had caused the state to settle
5  that voting case in a way that satisfied the
6  plaintiffs.
7      Q    So this isn't saying this was
8  discriminatory intent for purposes of the 15th
9  Amendment --
10     A    No.
11     Q    -- this is lack of being able to meet
12 Section 5 standard for preclearance, correct?
13     A    That's correct.  That's why I said it was
14 inartfully worded on my part.  I apologize.
15     Q    We can go forward to paragraph 104 on page
16 85.
17     A    Okay.
18     Q    You relate the story of Mr. Oren and his
19 experience sending in his application with his
20 naturalization certificate.  Do you recall what
21 county Mr. Oren -- what county registrar Mr. Oren
22 was dealing with?
23     A    I don't recall with any precision.  I have
24 a general sense -- I mean, I have -- I have a
25 recollection that I'm not comfortable relying on

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 16 of 17
Peyton McCrary, Ph.D.                                May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 209

1  in the report.
2       Q   Okay.  Then paragraph 123 seems to go to
3  your second major area, the current pattern has its
4  analogue in the system of voter registration in the
5  Jim Crow era before 1965.  Then you make a
6  comparison to the complexity of the literacy test
7  used by Georgia between 1945 and 1965 with the
8  difficulties that minority voters face in dealing
9  with Georgia's voter verification system since 2008.
10 You're a historian.  You study history.  Do you
11 really think it is -- it's comparable to the
12 disenfranchisement of the Jim Crow law?  That's what
13 you're saying in this report, and that's a pretty
14 bold statement to me.
15      A   First of all, you're talking about
16 problems of vote denial or abridgment in both
17 instances.  It's not a question of dilution.
18          Secondly, there is an observed
19 discriminatory effect against minority citizens in
20 both periods.  The discrimination was more dramatic
21 in its -- in its numerical effects in the period
22 before 1965, but there's -- there is a
23 discriminatory effect in both patterns.
24          It's also true that there is evidence of
25 intentional discrimination in the application of the

Case 1:18-cv-05391-SCJ   Document 451-25   Filed 06/29/20   Page 17 of 17
Peyton McCrary, Ph.D.
May 22, 2020
Fair Fight Action, Inc., Et Al. v. Raffensperger, Brad, Et Al.

Page 210

1   literacy tests and other aspects of the registration
2   process in Georgia before 1965, and I'm not -- I'm
3   not actually concluding that there is a
4   discriminatory intent underlying the use of voter
5   verification system by Georgia in the current -- in
6   the current system, but I do see similarities.  But
7   obviously they are somewhat different as well as
8   somewhat similar.
9       Q   Then paragraph 124 covers the third area,
10  the resembling of the politics of Georgia before the
11  1965 Voting Rights Act.  I know we covered this,
12  but, again, at the very last sentence you referenced
13  a powerful incentive for Republican officials to
14  place hurdles in the path of minority citizens
15  seeking to register and vote, but there is no
16  testimony here that that is intentional in this --
17  in this report, correct?
18      A   That's correct.
19      Q   Dr. McCrary, do you have any other
20  opinions related to the issues in this case that are
21  not addressed in your report or that we have not
22  covered today in this deposition?
23      A   Not that I -- not that I can think of.
24      Q   Okay.  Sitting here today you can't think
25  of any others?