# EXHIBIT 123

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Ngan Kim Vu. I am over eighteen years of age and competent to testify to the matters contained herein.

2. I am a resident of Fulton County in Georgia and my residence address is ▮▮▮▮▮▮▮▮▮▮▮▮▮, Atlanta, GA, 30324.

3. It is important to me to make sure my community participates in elections and, in 2018, I actively volunteered to get people to the polls. My experience as a poll monitor on Election Day in Gwinnett County made me rethink everything I had done; turning out my community was not enough—voting itself was an obstacle course that I now am committed to fixing.

4. On Election Day, I volunteered at the Lucky Shoals polling location in Gwinnett County with the Asian American Advance Justice - Atlanta. I was there to monitor the polls and translate for Vietnamese voters. I was joined by a colleague who spoke Korean and another who spoke Spanish. I wanted to see how voters were treated at the polls. I had no idea how bad the voter experience would be.

5. Over the course of the day, poll workers' lack of training and resistance to adapting their practices caused significant issues for voters.

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

6. I was stationed outside of the polling location, beyond the perimeter legally required to talk with voters. As soon as the polls opened at 7am, I began noticing voters leaving the polling station without voting.

7. By 10am, we had counted over 50 people who had come to Lucky Shoals only to find out it was not their polling location. Many people had been voting here their whole lives and had never received notice that their polling location had changed. Others said that their polling location had been changed so many times that they didn't know where to go. A few told me they thought they could go to any location. Some voters told me that third party sites gave them they wrong address. One couple told me that they updated their address at the same time and only his change of address had been processed. His wife had to vote provisionally. Another family, who all lived at the same address, were each assigned to different polling locations.

8. Concerned by the number of people who were not at the correct location, we began asking arriving voters if they knew they were in the correct location. Some voters told us that they were confident that they were in the correct location, but others told us that they had not checked. For those who were not sure, we looked them up in The Secretary of State's My Voter Page (MVP) and informed them of the correct location.

9. Over the course of the day, I tallied over 100 voters who we found were in the wrong location. Most of these voters were assigned to a polling location

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

PLTFS001061

only a few minutes down the street, and they thanked us and headed to the correct location. Some voters, though, especially those who found out they were supposed to be at a polling location that was far away, decided to vote provisionally. A few voters left without sharing their plans. I'll never know how many voters actually ended up casting their ballots after leaving Lucky Shoals.

10. Around 11:00am, I saw a man approach who appeared to be Vietnamese and greeted him in Vietnamese. He didn't really acknowledge us and walked inside. But, later, he came back outside, holding a sample ballot. In Vietnamese, he asked me whether the sample ballot could be turned in to the poll workers as his vote. I explained to him that he needed to cast his vote on a computer and asked if he knew how to use the computer. He said he did not. I asked if he would like help using the computer, and he said he would.

11. From my training with Asian Americans Advancing Justice, I knew that all voters were entitled to translators if needed.

12. I took off my poll monitor credential and walked into the polling location with the voter, as a regular citizen. I was stopped by the poll worker immediately after entering. I told her that the voter needed help translating. The poll worker told me that I could not be inside, and I countered that I was assisting a voter who needed help with translation. She asked me to go outside and wait while she confirmed whether I could assist the voter. I

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391 pending in the United States District Court for the Northern District of Georgia

PLTFS001062

relayed this to the voter, and told him I didn't know if I would be allowed back in.

13. I went back outside and waited. The line was two hours long at that point, and the delay caused by the phone calls seemed trivial in comparison. But what if the line had been quicker? I felt bad for the voter who had to wait while the poll workers determined whether he could exercise his rights.

14. After the poll worker had made a call, someone called me back inside and asked what I needed. Confused, I told her that I was trying to assist a voter who did not speak English. I told this poll worker that I had not approached the man but rather that he had approached me. The poll worker said that they did not need a translator, because they already had a "bilingual speaker." I asked what language this "bilingual speaker" spoke, and she said, "Spanish; we're good." I replied that there are languages other than Spanish and that the voter needed some to help him who speaks Vietnamese. I was appalled.

15. The poll worker appeared to have an epiphany and asked me to go back outside while she made another call.

16. After a little while, the poll worker came outside and asked me to come inside again. She said they needed to witness the voter tell them, in English, that he needed a translator. This was obviously hard for him, as his English proficiency was limited. The poll workers had me ask the voter, in English, "do you know how to use a computer?" We had been speaking in Vietnamese

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

PLTFS001063

this whole time, so this felt strange. He did not really answer. I asked, "Do you need my help?" and he said, "Yes."

17. The voter was now approaching the front of the line. I wanted to be able to accompany him as he approached and completed the process in which poll workers check your identification. The line resembled a maze—it was confusing to walk through—I had observed the poll workers speaking with voters without much patience, talking quickly and exactly. If you do not speak perfect English or are a first-time voter, this attitude is hostile and unwelcoming. I could imagine the voter would be overwhelmed by the experience and was afraid he might not vote again.

18. I asked the poll worker if I could accompany the voter in line, and she replied that I could only translate for him at the computer when he cast his ballot. This seemed like an unnecessarily strict interpretation of the rules. I had originally said he needed help with the computer, and they refused to let me translate for him at any part of the voting process aside from this final step. I went back outside to wait.

19. Eventually, the poll workers called me back in and I found the voter wandering around the room. He was standing between the second station and the computer, and he did not appear to be in the right place. Speaking in English, a poll worker questioned him, and told him he was in the wrong location. We moved to another part of the gym, attempting our best to follow

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

the directions. In Vietnamese, he told me that they had told him to follow a red line on the floor, and there we were, standing above the red line. We had followed their directions! Though the voter knew some English, the poll workers' treatment made me feel like he was less competent than he is.

20. I felt like the poll workers were taking out their frustration on the voter. If they had let me translate for him earlier as I had requested, I would have been able to help him.

21. When we finally got to the computer, he voter did not know how to use the machine. I was very glad that I was able to help him with this part; he would not have been able to cast his ballot without my help.

22. I had to fill out a form afterwards to indicate that I had assisted the voter as a translator, but none of the options listed applied to me; they included, a spouse, family, and someone else from the county. I didn't want this man's vote to be thrown out because I filled out the form incorrectly. I asked the poll worker what to select. They told me to just "pick one." I was worried that they would later review my form and disqualify the man's vote.

23. After this process was complete, I went back outside to monitor. Two hours later, the poll worker came out and told me that they needed someone to help translate. I was excited to help someone else! It appeared that, now, because the poll workers were familiar with me, they were eager for me to help.

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391 pending in the United States District Court for the Northern District of Georgia

24. I started talking to the voter, but quickly realized that he didn't speak Vietnamese. We are both Asian, but we don't speak the same language! I was just as equipped as the poll workers to help this voter because I could only communicate with him in English. However, because I was patient and able to slow down, I was able to help him more than I think they could have.

25. A few other volunteers and I stayed most of the day. By 3pm, we had counted 80 voters who were at the incorrect location. Many people assured us that they were sure they were at the correct location but admitted that hadn't checked the registration in a long time.  We ended up having extensive conversations with voters in our attempt to convince them to quickly check their polling place before getting in a two-hour line.

26. At some point later in the afternoon, I was helping a husband and wife. She was interested in checking her registration, but he was impatient. He became angry at us for asking them questions. After the wife provided her information and another volunteer looked her up in MVP, we realized that they were at the wrong location. We explained her options to wife, and she went to get her husband and so they could drive to the correct location. He came back out, angry. He asked why we had been taking their information. I clarified that we had only been entering their information in MVP. I further explained that they were not at the correct location and I was trying to save them two hours.

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

PLTFS001066

27. Right after they left, the poll manager came out and told us that we had to leave. She told me that she had received multiple complaints that we had been taking down voters' information. I told her that we were having people enter their information on the MVP site on their own phones. She explained that, from her perspective, every person with whom we talked left the location. I explained that this was correct because all these people were at the wrong location! I told her that she wasn't seeing what we were seeing: people were grateful for our help.

28. I asked her a few questions about provisional ballots, admitting that it was my first time as a poll monitor. She told me that all provisional ballots count, discounting my concerns and writing them off as a factor of my inexperience.

29. Another man, who was a more experienced poll monitor, came over. He asked if people had been given "precinct passes," the card that allows people who are in the wrong location to skip the line when they go to their correct location. She had never head of precinct passes and went inside to call the Board of Elections. By that point it was 4pm—hundreds of people had left without a precinct pass!

30. I called my AAAJ volunteer coordinator and explained what happened. She told me to go to Rockbridge Elementary School, a nearby polling location. She offered to come and deal with this obstinate poll manager.

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

31. When I arrived at Rockbridge, I found a voter who needed Vietnamese translation. I removed my poll monitor credentials again and went inside to help her. After assisting the voter, I was given the form to fill out and, once again, none of the options applied. The poll worker told me to lie and check the first option, which claimed I was not a poll monitor and was a resident of the county, which made me uncomfortable.

32. I left, exhausted and frustrated by the poll workers' resistance to helping voters and general lack of training.

33. Later, I thought it was a great idea to volunteer at the run-off. I was assigned to Lucky Shoals again. When I got there, I saw the same polling manager. This time, it was cold or rainy, and they let us go inside right away. The poll manager came up to me excitedly. I was confused, because she had been so difficult on Election Day.

34. She asked me, "Do you like what I've done?" I didn't know what she was referring to and looked around. I noticed that a few voters were walking away from the polls having not voted, but this time they carried sticky notes where she had written down the address of their correct locations. She said that we had helped them reevaluate their processes.

35. We got to talking and she explained that she has to answer to people above her and is not able to change things on the fly. She said that they were

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391
pending in the United States District Court for the Northern District of Georgia

PLTFS001068

resistant to our help on Election Day because they did not want it to appear as though they were not doing their jobs.

36. The entire experience was very disheartening and made me question the work I had done convincing people that their vote mattered. I had believed that all I needed to do was get people to show up at the polls, but then I realized that they would only be met with new challenges. Maybe the most important thing is not just getting people to the polls but having good people there to help. Chick-fil-a might have problematic business practices, but their customer service is great. Why can't our elections officials be as good?

37. I am committed to making sure my community's needs are met. I am working on multi-lingual Census PSA videos and I have offered to assist Fair Fight with any Vietnamese translation needs they may have.

38. I give this Declaration freely, without coercion, and without any expectation of compensation or other reward.

39. I understand that in giving this Declaration, that I am not represented by a lawyer. Nor has any lawyer asked me to be their client or to serve in anyway as anything other than a witness in this litigation.

40. I declare under penalty of perjury that the foregoing is true and correct.

Further affiant sayeth not, this the 2 day of October , 2019.

_____
Signature

Confidential pursuant to Protective Order entered in Fair Fight Action Inc. v. Raffensperger Case No. 18-5391 pending in the United States District Court for the Northern District of Georgia