**EXHIBIT 1**

# In The Matter Of:

*Fair Fight Action v.*
*Raffensperger*

---

*Kenneth Mayer, Ph.D.*
*February 26, 2020*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



## REGENCY-BRENTANO, INC.
### Certified Court Reporters

Min-U-Script® with Word Index

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3   _____

 4   FAIR FIGHT ACTION, INC., et al.,

 5          Plaintiffs,

 6       vs.                    Case No. 1:18-CV-5391-SCJ

 7   BRAD RAFFENSPERGER, et al.,

 8          Defendants.

 9   _____

10

11

12

13                   DEPOSITION OF

14                 Kenneth R. Mayer

15                 Madison, Wisconsin
                   February 26, 2020
16                9:27 a.m. to 2:51 p.m.

17

18          Laura L. Kolnik, RPR/RMR/CRR

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4              MILLER & CHEVALIER, by

 5              Mr. Andrew D. Herman

 6              900 16th Street NW

 7              Washington, D.C. 20006

 8              aherman@milchev.com

 9

10

11    FOR THE DEFENDANTS:

12              ROBBINS ROSS ALLOY BELINFANTE

13              LITTLEFIELD, LLC, by

14              Mr. Vincent R. Russo

15              500 14h Street, NW

16              Atlanta, Georgia  30318

17              vrusso@robbinsfirm.com

18

19

20

21

22

23

24

25
```

3

```
 1                        I N D E X

 2   Kenneth R. Mayer                              PAGE

 3         By Mr. Russo                               4

 4


 5                      E X H I B I T S

 6   Exhibit 1    Plaintiffs' Initial Expert Disclosures
 7   Exhibit 2    Expert Report of Kenneth R. Mayer
     Exhibit 3    List of documents
 8   Exhibit 4    Georgia Code 21-2-220.1
     Exhibit 5    Georgia Code 21-2-417
 9   Exhibit 6    SSA Quick Response Evaluation
     Exhibit 7    Spreadsheets
10   Exhibit 8    Georgia Code 21-2-216

11

12

13

14

15

16

17
     (Original transcript supplied to Attorney Russo.)
18
     (Original exhibits attached to original transcript with
19   scanned copies provided to counsel.)

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

```
1                    P R O C E E D I N G S
2              KENNETH R. MAYER, called as a witness herein,
3         after having been first duly sworn, was examined and
4         testified as follows:
5                         EXAMINATION
6    BY MR. RUSSO:
7    Q.   Dr. Mayer --
8              MR. RUSSO:  Oh, this is the deposition of
9         Dr. Kenneth Mayer taken by Defendant Secretary of
10        State Brad Raffensperger for the purpose of
11        discovery purposes allowed under the Rules of --
12        Federal Rules of Civil Procedure.  All objections to
13        those -- except those going to privilege and the
14        form of the question and responsiveness of the
15        answer are reserved until trial or first use of
16        deposition.  Is that good with you, Andrew?
17             MR. HERMAN:  That's fine.
18             MR. RUSSO:  Okay.
19             MR. RUSSO:  And for the -- I guess everyone can
20        identify themselves for the record, of course.
21        Vincent Russo for the defendants.
22             MR. HERMAN:  Andrew Herman for the plaintiffs.
23   BY MR. RUSSO:
24   Q.   Now, Mr. -- or excuse me, Dr. Mayer, you've been
25        deposed before, correct?
```

1  A.   That's correct.

2  Q.   And just -- so you're familiar obviously with the

3       general ground rules, but I'll try not to speak over

4       you, and please do the same when I'm asking a

5       question.

6            If at any time you need to take a break, of

7       course let me know.  It sounds like I may be the one

8       with my back issues that needs to take a break more

9       often than you.

10            Please try to avoid the, you know, uh-huhs and

11       hu-huhs for the answers and just affirmative and

12       negative answers would be best, yes or no.  If any

13       of my questions are confusing, it's likely my fault

14       and just ask me to rephrase it, and I'll be happy to

15       do that.

16            So Dr. Mayer, what all did you do to prepare

17       for the deposition today?

18  A.   I reviewed my report.  I reviewed some of the

19       materials that I used as sources for my report.

20  Q.   And were those materials that you used as sources,

21       are those the sources that are referenced in your

22       report?

23  A.   Mostly.  There were a few more recent things that I

24       didn't refer to my report.

25  Q.   And would -- Are any of the sources materials that

```
 1          would change any opinions in your report?
 2   A.     No.
 3   Q.     And do you -- what were those -- or what are those
 4          sources?
 5   A.     Primarily an updated version of the registrar
 6          certification course that -- I don't know precisely
 7          what the title is, but there's one -- it's an
 8          updated version of the -- of the presentation or the
 9          training that I cited in my report.
10   Q.     Okay.  So that was -- that was a document that was
11          produced by the defendants in this case?
12   A.     That's correct.
13   Q.     Okay.  And for your work in this matter, you're
14          being compensated at $350 an hour?
15   A.     That's correct.
16   Q.     And have you submitted any invoices to the
17          plaintiffs for your work in this case?
18   A.     I have.
19   Q.     And have you been paid for -- on it -- paid on any
20          of those invoices?
21   A.     Some of them.
22   Q.     And do you know how much you have been paid so far?
23   A.     Not off the top of my head, no.
24   Q.     Has it been over $10,000?
25   A.     No.
```

1    Q.    Now, you agreed to provide an opinion for the

2          plaintiffs in this case, correct?

3    A.    I agreed to provide an answer to the empirical

4          question, so I offered some conclusions.

5    Q.    By agreeing to prepare that opinion, you did expect

6          to get paid for your work, right?

7    A.    That's correct.

8    Q.    And if you declined the engagement, of course you

9          wouldn't be paid, correct?

10   A.    That's correct.

11   Q.    Most of your services as an expert witness have come

12         within the last ten years or so would you say?

13   A.    Yes.

14   Q.    Is that -- Have you seen an uptick in redistricting

15         and voting rights litigation over the past ten

16         years?

17   A.    In terms of my work?  Yes.

18   Q.    So this is -- that's -- that's provided you with

19         more opportunities of course to serve as an expert

20         witness?

21   A.    That's correct.

22              (Exhibit No. 1 marked for identification.)

23   Q.    Dr. Mayer, I'm showing you what's been marked as

24         Plaintiffs' Exhibit 1.  These are plaintiffs'

25         initial disclosures.  Have you seen this before?

1    A.    I have not.

2    Q.    If you flip to -- turn to page 4 of the document,

3          you'll see it states at item 6 or number 6 is

4          Dr. Kenneth Mayer.  It states that you're expected

5          to testify on the impact of the exact match policy.

6               Is this your understanding that you would be

7          testifying on the impact of the exact match policy?

8    A.    In part.

9    Q.    Okay.  And what do you mean by -- by that?

10   A.    My report goes into some related areas that are --

11         go specifically beyond the exact match, but some of

12         the -- the consequences of the -- of the

13         verification process and the -- the processes, the

14         administrative processing, processes of handling

15         voters or registrants who failed the verification

16         process.

17   Q.    And you say that -- related areas, so can you expand

18         upon that?

19   A.    Well, I would have to look at my report to

20         completely pin down all of the things, but the

21         conclusions that I offered were related or began

22         with the verification process, which was based on

23         exact match at its core.  So the -- the conclusions

24         that are offered were -- were related to the exact

25         match process but were not entirely specifically

```
 1        about the precise exact match process.
 2   Q.   Okay.  And when you refer and the reference here
 3        to -- in Plaintiffs' Initial Expert Disclosures to
 4        quote/unquote exact match policy, just to ensure
 5        we're talking about the same thing, are you
 6        referring to Georgia's statutes on voter
 7        verification for voter registration purposes and the
 8        Help America Vote Act match process?
 9   A.   Not precisely.  I was referring to the process that
10        was described by the officials in the Secretary of
11        State's office about how they had implemented the
12        registration, the registration and verification
13        process for registration, which my understanding
14        from their testimony was based on the -- the rules
15        that they had issued or the policies they had
16        issued, which were not specifically required by the
17        statute.
18   Q.   Okay.  And did you -- did you read the statute, I
19        believe it's official credit Georgia annotated
20        21-2-220.1?
21   A.   I read the statute and the changes that were made
22        through HB 316.  I don't know if I could cite the
23        specific section of the code.
24   Q.   And when you refer to other policies for
25        implementing, what -- what policies are you
```

```
 1          referring to?
 2    A.    Well, again it's based on the -- the descriptions
 3          offered by officials in the Secretary of State's
 4          office where they described that it was -- it was
 5          their internal policies for the specific
 6          requirements of the verification process, how they
 7          handled registrants who had failed verification, and
 8          the -- the internal processes they had to conduct
 9          the verification process and -- and deal with the
10          outcomes of that process.
11    Q.    Okay.  So are you -- are these internal policies,
12          did -- are these training materials that you're
13          referring to?  Are they actual, you know, policies
14          and procedure documents?
15    A.    Well, again working from the testimony of the -- of
16          the officials, there aren't a lot of written policy
17          documents that they -- that they talked about.  So
18          it was based on their description, it was based on
19          the training materials that I reviewed, and it was
20          based on the data in the voter file at the state and
21          county level.
22    Q.    Okay.  So you're referring to depositions in this
23          case when you talk about their testimony on the
24          internal policies?
25    A.    That's correct.
```

1    Q.    Now, you said it's their policies for conducting the

2          voter verification?

3    A.    Their description of that process.

4    Q.    The Secretary of State's office of course doesn't

5          handle voter registration, right?

6    A.    Well, they are involved in that in setting the

7          practices and training the actual process.  My

8          understanding is it's conducted by county registrars

9          based on guidance and support they receive from the

10         Secretary of State's office.

11   Q.    So other than depositions, voter registration data,

12         and training materials, did you conduct any other

13         research on Georgia's policies?

14   A.    There were some materials in the academic literature

15         that I reviewed on Georgia.

16   Q.    And were those academic materials on Georgia in

17         regard to Georgia's exact match policy?

18   A.    Some of them were about the voter verification

19         process.  There were articles on voter ID, but if I

20         relied on it as part of forming my opinion, it's

21         cited in my report.

22   Q.    So any academic literature that you relied on

23         regarding Georgia's voter verification process would

24         be in that -- the sources that you relied on?

25   A.    That's correct.

```
1    Q.   And now when you refer to voter ID, you're -- you're
2         not referring to Georgia's voter verification
3         process, right?
4    A.   No.  On voter ID it is -- it's about the specific
5         Georgia voter ID statute or practices, policies.
6    Q.   Uh-huh.  And we call that photo ID in Georgia, but
7         you're talking about showing a photo ID when you go
8         to vote, right?
9    A.   That's correct.
10   Q.   Okay.  So these are individuals who are already
11        active registrants?
12   A.   That's generally correct, but as I noted in my
13        report, there are -- there are some possible
14        ambiguities.
15   Q.   Okay.  And who were you first contacted in
16        connection with this case?
17   A.   Can you repeat the question?
18   Q.   When were you first contacted in connection with
19        this case?
20   A.   I don't remember precisely.  I think it was in
21        the -- in the summer of 2019.
22   Q.   Do you recall who contacted you?
23   A.   I believe it was Mr. Herman.
24   Q.   And did he call you?
25   A.   Yes.
```

 1    Q.    And did you discuss this -- this engagement at that
 2          time?
 3    A.    I believe so.
 4    Q.    And prior to that contact, did you have any
 5          familiarity with Georgia's voter verification
 6          process?
 7    A.    In general I was familiar with it but had not
 8          drilled down specifically into the details.
 9    Q.    So did he contact you after HB 316 had been enacted?
10    A.    Yes.
11    Q.    And did you have any -- you said you had some
12          understanding of the legal issues.  What about the
13          facts, the facts in this case?
14    A.    At the time that I was contacted, no.
15    Q.    And did he indicate his -- his role in this case?
16    A.    By role, what do you mean?
17    Q.    Whom he represents.
18    A.    I believe so.
19    Q.    Okay.  And what -- what all -- What did he say to
20          you during that initial contact?
21    A.    Well, I -- I don't remember every detail of it.  I
22          believe we talked or he described the -- the nature
23          of the action and what I would -- the questions they
24          would want me to analyze and whether I'd be able and
25          available to do the work.

```
 1   Q.   You've never testified on this -- this issue before,
 2        correct?
 3   A.   On the issue of voter verification?
 4   Q.   Correct.
 5   A.   I have done work on registration and ID and
 6        citizenship which is related to verification
 7        processes.
 8   Q.   And what -- was it in connection with litigation?
 9   A.   Yes.
10   Q.   What -- what case was that?
11   A.   One was a state case in Wisconsin, the Milwaukee
12        chapter of the NAACP versus Walker.  One was a
13        voting rights case in Wisconsin which was -- I
14        believe it was One Wisconsin versus -- I don't
15        remember the -- the name of the defendant.  It was
16        the -- the person at the Government Accountability
17        Board.  So in both of those cases I was engaged and
18        actually looked at the file linking and matching
19        processes in order to develop estimates of the
20        number of registrants who possessed a driver's
21        license or state ID in Wisconsin.
22   Q.   And the issue in those two cases involved
23        Wisconsin's photo ID law, right?
24   A.   That's correct.
25   Q.   They -- they didn't involve HAVA verification?  And
```

```
 1          HAVA is Help America Vote Act.
 2   A.    No.
 3   Q.    And did they -- did Wisconsin -- or excuse me.  Did
 4          any issues in the case involve a matching process
 5          for voter registration purposes?
 6   A.    No.
 7   Q.    So you were looking at data sets to determine
 8          whether individuals had a driver's license for
 9          purposes of the photo ID law in Wisconsin, the
10          challenge to that law?
11   A.    That's correct.
12   Q.    Have you had any other cases involving citizenship
13          verification for voter registration?
14   A.    No.
15   Q.    What about any -- any cases regarding HAVA
16          verification?  And I'm talking about the HAVA
17          verification, the HAVA match process.
18   A.    No.
19   Q.    What did you -- what did you -- what did you say
20          when Mr. Herman contacted you on your -- on your
21          phone call I'm referring to?
22   A.    Well, again it's been six or eight months, but I
23          said I was available to -- to do the work.
24   Q.    Did you tell him you'd never provided expert
25          services for a case involving voter registration?
```

```
 1   A.   Well, I'm not sure that's -- that's true, but I
 2        don't recall telling him that.
 3   Q.   And which -- which case -- you said you're not sure
 4        that's true.  What do you mean you're not sure
 5        that's true?
 6   A.   Well, I've done work on examining statewide voter
 7        files and have done academic work looking at
 8        compliance with HAVA reporting requirements.
 9   Q.   Do you -- do you have an understanding -- or how was
10        Mr. Herman referred to you?  Do you have an
11        understanding of that?
12   A.   I don't know.
13   Q.   Do you have any prior relationship working with the
14        attorneys for the plaintiffs in this case?
15   A.   No.
16   Q.   Now, on that phone call did you discuss the
17        financial terms of your arrangement?
18   A.   I imagine I told him what my -- what my hourly rate
19        was.
20   Q.   Now, you said you've submitted a few invoices.  Do
21        you know how much time you've spent so far preparing
22        your opinions in this case?
23   A.   Not off the top of my head, no.
24   Q.   Do you know how much time you've spent preparing for
25        this deposition today?
```

```
1    A.   Well, depending on what you count as preparation,
2         I'd probably say somewhere in the neighborhood of
3         five to seven hours.
4    Q.   And when -- when Mr. Herman contacted you, what did
5         he say he want -- that the plaintiffs wanted you to
6         examine?
7    A.   My recollection is that they wanted me to look at
8         the -- the results of the verification process and
9         how the -- the state was handling voters who failed
10        the verification process.
11   Q.   And did he mention HB 316 at that time?
12   A.   At that time I don't believe so.
13   Q.   So it was a pretty new law, right?
14   A.   I believe it was enacted in March of 2019 and went
15        into effect -- actually may not have been actually
16        in effect when -- when we talked.  So -- but he did
17        not mention it.
18   Q.   Had he mentioned that -- mentioned to you on that
19        call that the law had not been in effect, would that
20        have changed your response to his request for you to
21        be able to provide an opinion on the verification
22        process?
23   A.   I'm sorry, can you -- can you say that again?
24   Q.   Had the -- Had you known at that time whether HB 316
25        was in effect, would you have -- would that have
```

1           changed your ability to agree to provide an opinion
2           at that time?
3    A.     No.
4    Q.     Did -- Plaintiffs' counsel has provided you with
5           data in this case?
6    A.     That's correct.
7    Q.     And what -- what data has been provided to you?
8    A.     Received data in several batches.  There was a --
9           some data that I received I believe in September
10          that included data through July of 2019 on the --
11          what was presented to me as pending lists of voters
12          in pending status.  I received another batch of
13          files in December of 2019 which included versions of
14          the statewide voter file.  And then in January of
15          2020 I received another batch of data which included
16          county-level registration files, which included both
17          voter status and whether a voter was in MIDR or
18          missing ID required status at the county level.
19   Q.     And in terms of the versions of the statewide voter
20          file, what versions are you referring to?
21   A.     In that sense by version I mean the date at which
22          the file was generated.
23   Q.     And do you recall what dates for those files you
24          had?
25   A.     So I believe -- I think there was one in September

1   of 2019.  I'm not sure I received the statewide

2   voter file at that point.  I did receive two

3   statewide voter files, I believe one was dated

4   December 27th and one was dated December 30th.  And

5   then the third batch was in addition to the

6   statewide voter file, the 159 county level files in

7   January.  I don't recall what the precise date.  I

8   think it was in the first or second week of January.

9  Q.  And you mentioned December 27th and December 30th.

10      That's 2019?

11 A.  Correct.

12 Q.  Okay.  So the oldest file would be -- that you

13      received, voter registration file would have been

14      September 2019?

15 A.  Well, that was the first date.  The files were

16      frequently dated earlier.  There were some files

17      from 2018, some files from earlier in 2019.

18 Q.  Okay.  So those were snap -- And I'm just trying to

19      understand what universe of information you were

20      looking at here.  So those were snapshots of the

21      voter registration database from 2018.  Is that what

22      you're saying?

23 A.  I'm not sure if it was the full voter registration

24      database in 2018, but all of the data sources I

25      listed in my report.

```
 1   Q.   Did they provide you with any information or any
 2        data on the -- the -- the rates of voter
 3        registration by demographics?
 4   A.   Can you define what you mean by rates of voter
 5        registration?
 6   Q.   Sure.  So increases, increases or the rates at which
 7        different, you know, groups of folks are
 8        registering.
 9   A.   So the -- the percentage of different populations
10        that registered.  I don't believe I examined that.
11   Q.   What about any data related to whether individuals
12        voted -- or registered by mail or some other way?
13   A.   I did not examine that data.
14   Q.   Did plaintiffs' counsel ask you to make any
15        assumptions in forming your opinion?
16   A.   No.
17   Q.   And have you read the amended complaint in this
18        case?
19   A.   I'm not sure.  I don't know what date the amended
20        complaint was filed.
21   Q.   Have you read any of the complaints in this case?
22   A.   Yes.
23   Q.   Do you recall -- Well, in your own words can you
24        tell me what the --
25   A.   I recall reading the complaint probably in the late
```

```
 1        summer or early fall.
 2   Q.   Okay.  And you've of course read some depositions in
 3        this -- in this case, right?
 4   A.   That's correct.
 5   Q.   And you read the deposition of Chris Harvey?
 6   A.   I believe he gave two so I've read both of them.
 7   Q.   Okay.  And Ron Germany?
 8   A.   Yes.
 9   Q.   And he's the general counsel for the Secretary of
10        State's office, right?
11   A.   That's my understanding.
12   Q.   And you also referenced the deposition of Kevin
13        Rayburn?
14   A.   That's correct
15   Q.   Did you read any other depositions in this case?
16   A.   No.
17   Q.   What about briefs.  Have you read any of the briefs
18        filed in this case?
19   A.   No.
20   Q.   Do you know, you know, what this case is about?
21   A.   In general.
22   Q.   What -- what do you -- What's your general
23        understanding?
24   A.   My understanding is challenging a number of
25        practices related to registration and voting
```

```
 1            practices in the state.
 2   Q.   Now, as part of your -- your research, did you
 3        contact anyone other than plaintiffs' counsel?
 4   A.   No.
 5   Q.   So you did not -- Did you speak with anybody in
 6        Georgia about this case?
 7   A.   No.
 8   Q.   What about did you speak with anyone in Georgia
 9        about the voter verification process?
10   A.   No.
11   Q.   Did you speak with anyone in Georgia about any of
12        the issues discussed in your report?
13   A.   No.
14   Q.   Did you speak with any -- anyone at all about --
15        other than plaintiffs' counsel about the contents of
16        your opinion?
17   A.   No.
18            (Exhibit No. 2 marked for identification.)
19   Q.   Handing you what's been marked as Mayer Exhibit 2.
20            MR. HERMAN:   Thank you.
21   Q.   I've handed you what's been marked as Mayer Exhibit
22        2, and that's your expert report?
23   A.   That's correct.
24   Q.   You can flip through it if you need to.  Now, your
25        CV is attached an an addendum, Addendum A?
```

 1   A.   That's correct.

 2   Q.   Is this -- is this CV still accurate?

 3   A.   I believe this is the most recent one that I have --

 4        that I have done.

 5   Q.   Does this -- I'll let you finish looking through it.

 6   A.   Okay.  Yeah, this is the most recent version.

 7   Q.   And does it -- It reflects all of your recent

 8        activities?

 9   A.   Yes.

10   Q.   So you don't have any additions to make to your CV?

11   A.   No.

12   Q.   Dr. Mayer, do you have any qualifications that

13        are -- excuse me, any credentials that would qualify

14        you to serve as an expert in this case that are not

15        reflected in your CV?

16   A.   That are not reflected in my CV?  Some of the work

17        that I have done is -- is -- is not entirely

18        reflected on this because some of the activity with

19        the Government Accountability Board was through

20        grants that were actually other people were the

21        principal and primary -- or principal investigators

22        so I don't list those grants on my CV.  But in terms

23        of the publications and work, this is -- this has

24        the work that I have done on election administration

25        and registration that qualifies me as an expert

```
 1          witness.
 2   Q.     And the reports, the grants that you're referring
 3          to, is that -- you're referring to the 2008 report
 4          for GAB?
 5   A.     That's correct.  There was a large grant that had
 6          come from the Government Accountability Board and
 7          the Election Assistance Commission that I was not a
 8          PI on the applicant, but the work that -- a number
 9          of pieces of work was done through that process.
10   Q.     And that -- that grant was looking at how ** VAC
11          money was being spent?
12   A.     The -- the nature of the project was there was a
13          group of four of us at the university, three
14          political scientists and one person at the public
15          policy school, to help the Government Accountability
16          Board evaluate their compliance with HAVA, Help
17          America Vote Act reporting, compliance and the
18          election administration issues generally.
19   Q.     Okay.  And are you -- are you currently teaching any
20          courses at the university?
21   A.     Yes.
22   Q.     And what -- what courses are you teaching?
23   A.     If you -- do you mean this semester or the last --
24   Q.     Sure, we'll just go with this.
25   A.     So this semester I'm teaching an upper division
```

1      course on the American presidency, and I'm also

2      teaching a senior seminar on electoral integrity.

3  Q.  What's the course on American presidency -- what's

4      the agenda for that course for the semester?

5  A.  It's a pretty typical course on the -- the history

6      of the presidency, the evolution of presidential

7      power, presidential elections, presidential

8      administrative structures and different policy

9      areas.

10 Q.  Have any students complained about that -- that

11     course?

12 A.  This semester, no.

13 Q.  Last semester or ever?

14 A.  There have been -- there was a complaint last

15     semester that was ultimately -- I guess it was not

16     formally made to the university, but the complaint

17     was eventually withdrawn about what the -- what the

18     issue was purported to be.

19 Q.  Where -- where was -- You say the complaint was not

20     formally made to the university.  Where was it made?

21 A.  It was made on Fox News.

22 Q.  So there was actually -- there was no real -- there

23     was not a legal complaint or a, you know, compliance

24     complaint against you, it was just a PR complaint;

25     is that what you're saying?

```
1    A.   There was no formal complaint lodged with the
2         university.
3    Q.   What about classes.  Have you ever taught any
4         classes on election administration?
5    A.   Yes.
6    Q.   And which -- which classes have you taught on
7         election administration?
8    A.   It's a seminar that I have taught several times.  I
9         think the last time I taught it was in the fall of
10        2017.
11   Q.   And what -- you recall -- you said it was a seminar.
12        What was the name of the seminar, if you recall?
13   A.   I believe it was just called Election
14        Administration.
15   Q.   And do you recall what -- what topics were taught in
16        that class about election administration?
17   A.   It was the full range of topics, ranged from voting
18        rights, electoral practices, registration,
19        redistricting, voting technologies.  I used a -- a
20        law -- I used a case book on election
21        administration.  One of the -- There were a couple
22        of major case books, and I used one of them.
23   Q.   This was also at the University of Wisconsin?
24   A.   That's correct.
25   Q.   Was the focus on Wisconsin law and federal law?
```

```
 1   A.   Mostly on federal and state administrative
 2        practices.  It wasn't focused on Wisconsin.
 3   Q.   Your CV cites 14 cases, is that correct, that you've
 4        been an expert witness on?
 5   A.   That's correct.
 6   Q.   The Andrew Goodman Foundation v. Bostelmann.  Is
 7        that the most recent case?
 8   A.   That's correct.
 9   Q.   Have you ever not been qualified as an expert in any
10        case in which you've been offered to give an
11        opinion?
12   A.   No.
13   Q.   Have you ever been qualified over -- over an
14        objection?
15   A.   Yes.
16   Q.   And do you recall which case that was?
17   A.   I believe it was the Milwaukee NAACP versus walker,
18        which was the 2012 voter ID case in Wisconsin
19        Circuit Court.
20   Q.   Now, the Andrew Goodman Foundation, what are the --
21        what are the claims in that case?
22   A.   That case is about the voter ID practices that apply
23        specifically to college and university students in
24        Wisconsin.
25   Q.   And so that's again just the requirement to show a
```

**Regency-Brentano, Inc.**

1          certain type of photo ID when a student goes to
2          vote?
3   A.    That's correct.
4   Q.    Plaintiffs' counsel in the case is Marc Elias
5          Perkins Coie?
6   A.    I don't know who the counsel of record is.  That's
7          not who I've been communicating with.
8   Q.    Who have you been communicating with?
9   A.    An attorney named Amanda Callais.
10  Q.    And you've -- you've worked with Amanda Callais in
11         other cases, right?
12  A.    No, this is the first time I've been an expert
13         witness on a case where I communicated with her.
14  Q.    Okay.  And you served as -- You were retained by
15         Perkins Coie in the case in Georgia, right?
16  A.    That's correct.
17  Q.    And that's the Dwight --
18  A.    Dwight versus Raffensperger.
19  Q.    And that's a redistricting case, right?
20  A.    That's correct.
21  Q.    That's the only case in Georgia that you've had
22         previously, right?
23  A.    Yes.
24  Q.    And the Dwight case, that case you said was
25         restricting.  It did not, though, involve any voter

```
 1           registration challenges, right?
 2    A.     My work did not.
 3    Q.     Okay.  Priorities U.S.A. versus Missouri.  That's
 4           a -- another photo ID case?
 5    A.     That's correct.
 6    Q.     And then you have it appears what, three -- three
 7           cases in Texas involving independent school
 8           districts; is that right?
 9    A.     That's correct.
10    Q.     And those -- Are the claims in those cases limited
11           to challenges to the at-large elections for school
12           boards?
13    A.     That's correct.
14    Q.     Those -- those cases do not involve voter
15           registration, right?
16    A.     No.
17    Q.     Whitford v. Gill, is that -- is that case still
18           ongoing?
19    A.     No.
20    Q.     What happened after it was remanded?
21    A.     I believe the sequence was after the Supreme Court
22           in Rucho versus Common Cause declared partisan
23           gerrymandering a non-judiciable issue, that the case
24           was withdrawn.  I don't know exactly what the --
25           what the procedure would be, but I believe the case
```

```
 1            was resolved.
 2    Q.    And you were retained to give an opinion on the
 3            efficiency gap; is that right?
 4    A.    In part.  My role, my opinion in that case was in
 5            addition to examining the efficiency gap, drawing a
 6            demonstration plan, demonstration assembly
 7            redistricting plan with a more neutral efficiency
 8            gap metric.
 9    Q.    And the plaintiffs in that case, they identify
10            themselves as supporters of public policies espoused
11            by the Democratic party and of Democratic party
12            candidates.  Is that your understanding?
13    A.    I'm not -- I -- I don't know if that language came
14            from the complaint, but I am aware that the
15            plaintiffs were largely Democrats.
16    Q.    And that case went up to the U.S. Supreme Court,
17            right?
18    A.    That's correct.
19    Q.    And what -- what did -- What is your understanding
20            of the Supreme Court's holding in that case?
21    A.    My understanding of the holding in that case is that
22            they -- they remanded it on issues of standing; that
23            the plaintiffs had not demonstrated the necessary
24            standing to actually file or to be a party to that
25            case.
```

```
1   Q.   Did the Supreme Court make any findings on the
2        metrics and the efficiency gap measure that was
3        presented by the plaintiffs?
4   A.   Not in the majority opinion, not -- not that I
5        recall.
6   Q.   Do you recall whether the Supreme Court made any --
7        any finding related to your -- your opinion?
8   A.   I -- I think there was a mention in the dissent, but
9        I'm -- there was -- I don't believe there was any
10       specific discussion of my work in the majority
11       opinion.
12  Q.   So you don't think you were mentioned in the
13       majority opinion.  Have you read the majority
14       opinion?
15  A.   Yes.
16  Q.   And Professor Simon Jackman also opined on the
17       efficiency gap measure in that case?
18  A.   That's correct.
19  Q.   And ultimately that decision was vacated there,
20       right?
21  A.   I believe that's right.
22  Q.   Now, what -- let's go to page --
23  A.   Can I refill my water?
24           MR. HERMAN:  Off the record for a second.
25           MR. RUSSO:  Yes, we can go off the record.
```

**Regency-Brentano, Inc.**

```
1              (Discussion held off the record.)
2              MR. RUSSO:  We'll go back on the record.
3    BY MR. RUSSO:
4    Q.   Flip to page -- page 2 of the report.  And when I
5         give you a page number, I'm going to refer to the --
6         the page at the bottom of your report, not the
7         filing page.
8    A.   Understood.
9    Q.   Now, you -- you state that -- Let's see, you
10        reference your work in election administration.
11        What did -- What do you mean by election
12        administration there?
13   A.   In this context election administration refers to
14        the full range of practices involved in conducting
15        elections, everything from the registration process
16        through maintaining voter rolls through conducting
17        the election, processes for absentee ballots and
18        actually the voter experience at the -- polls
19        through the counting of ballots and recounts.
20   Q.   And you mentioned earlier that you have published on
21        topics involving the Help America Vote Act.  Have
22        any of those publications also involved the match --
23        the match process in the voter verification --
24        excuse me, in HAVA?  And you mentioned a 2008 report
25        with that.
```

1    A.    It's been awhile since I looked at it, but I think

2          the -- the evaluation report discussed the HAVA

3          processes, but I don't believe that discussed the --

4          the verification process in Wisconsin.

5    Q.    Which -- which paper -- Which papers did involve

6          HAVA verification, if you recall?

7    A.    So I'm not sure that any of the articles were

8          specifically about the verification process, but I

9          recall that that was part of a number of different

10         articles.  And my recollection is that the -- the

11         HAVA processes informed that analysis, but I

12         don't -- I don't -- I have not published a specific

13         article on the HAVA verification process.

14   Q.    And do you recall which of the -- which ones would?

15         I don't know which page you're on, but --

16   A.    Well, I'm looking at pages 4 and 5.  There were a

17         lot of these that were written over the last ten or

18         12 years, so I, sitting here, I can't point to a

19         specific one.

20   Q.    And well, putting aside whether you pointed to a

21         specific one, how -- how would your work on those

22         publications you have referenced, although you

23         mentioned they're not specific to the HAVA

24         verification process, how -- how have they provided

25         you with the expertise to offer an opinion on the

```
 1        precise issues in this case regarding the
 2        quote/unquote exact match?
 3   A.   These administrative practices -- I mean it's not
 4        magic.  There is a well-established academic
 5        literature on the matching process that is used in
 6        voting.  I've done it myself in several cases I
 7        served as an expert witness on.  I'm familiar with
 8        the -- the practices that are used and alternatives
 9        through ERIC, the Electronic Registration
10        Information Center.  So I do have specific knowledge
11        that pertains to that specific issue.
12   Q.   Okay.  Now, turning to -- well, more generally I
13        suppose in your report.  Were any portions of the
14        report prepared by anyone other than you?
15   A.   No.
16   Q.   Did you use any -- any research assistants?
17   A.   No.
18   Q.   Did -- did any -- did anyone other than you
19        conduct -- outside -- other than the sources you've
20        cited in here, research that you relied on in
21        drafting this report?
22   A.   Only to the extent that I relied on the academic
23        literature that I cited.
24   Q.   And what information did you review before arriving
25        at your opinion in this report?
```

1  A.   The -- the data and sources that I relied on are
2       listed on --
3  Q.   Page 2?
4  A.   -- page 1 --
5  Q.   Page 1, I'm sorry.
6  A.   -- of my expert report under the Scope of
7       Assignment.
8  Q.   So other than the seven items listed here on page 1,
9       you did not review any of these -- any other
10      materials before arriving at your opinion?
11 A.   Other than looking at some of the training materials
12      that were provided, which I actually don't see on
13      this list, but no, there were -- there were no other
14      data sources that I examined before arriving at my
15      conclusions.
16 Q.   Flipping to, let's see -- let's stay on page 1 under
17      scope of assignment.  It states, I've been asked by
18      plaintiffs' counsel to offer opinions about the
19      voter registration and voter verification processes
20      in Georgia.
21          Outside of what you have in this -- what's in
22      this report, do you have any additional opinions
23      about the voter registration and voter verification
24      processes in Georgia?
25 A.   Outside the scope of this report?

```
1   Q.   Yeah, outside of what is in your report.
2   A.   In terms of this case or -- no.
3   Q.   Have you -- have you been asked to provide any
4        additional -- any additional opinions for this case?
5   A.   No.
6   Q.   Do you intend to provide any additional opinions in
7        this case?
8   A.   I don't know.
9   Q.   And you say you don't know.  But there have been no
10       discussions about providing additional opinions?
11  A.   No.
12  Q.   Do you intend to perform any additional expert
13       services in this case?
14  A.   In terms of testifying or -- I don't know what that
15       expert services, what that would encompass.
16  Q.   Will you provide non-testifying expert services
17       also?
18  A.   I have not been asked to do any of that.
19  Q.   Are the -- are the opinions in your report, are
20       those your complete opinion?
21  A.   So I'm not sure I understand the question.
22  Q.   Do you -- is this -- Is your report an exhaustive
23       report on your opinion on expert -- excuse me, on
24       exact match?
25  A.   Sitting here today, yes.
```

```
 1              (Exhibit No. 3 marked for identification.)
 2   Q.   I hand you what's been marked as Mayer 3.  This is
 3        a -- a printout of all the documents that were
 4        provided by plaintiffs' counsel as either your
 5        sources that you relied on or the analysis that you
 6        created.  And I'm more interested in regards to the
 7        analysis piece.  But are there any -- are there any
 8        files outside of the ones on this list that you
 9        developed for your opinion?
10   A.   The -- the program code, the dot DO files, that's
11        code that uses the state-level voter files or
12        county-level voter files to generate -- to generate
13        statewide files.  Those were enormous, somewhere
14        between 8 and 15 gigabytes.  And so this code allows
15        you to generate those files, which are essentially
16        processing the voter files to extract data or
17        combining the voter files to allow you to look at --
18        to actually link the different -- different files.
19              So the -- it doesn't include the underlying
20        data that was provided to me, and it doesn't include
21        the files that I produced using this code simply
22        because they were -- they were too large, and
23        someone who was familiar with this data would be
24        able to use that to generate them.
25   Q.   So you -- so I understand, you had received -- were
```

```
 1         they Excel spreadsheets?
 2    A.   They were either Excel spreadsheets or -- or text
 3         files.
 4    Q.   And -- and the -- let's just take the first one,
 5         county file append dot DO.  That is the -- tell me
 6         what would be in that file.
 7    A.   I received 159 spreadsheets, one from each county in
 8         the state, that included all the registrants.  I
 9         think it was as of January 14th or 15th, but it was
10         in January, which included the voter status, and it
11         included whether the voter was a -- was in missing
12         ID required or MIDR status.  And in order to analyze
13         that, I needed to take those 159 spreadsheets and
14         combine them into a single file.  And that's what
15         this code does.  It generates a single statewide
16         file from all 159 county files.
17    Q.   And did you do any -- any checks to make sure there
18         were no -- that the data converted over into this --
19         this file correctly?
20    A.   Yes, I did.
21    Q.   Did you find any issues that -- with the -- with the
22         conversion that made you have to do it again or
23         cause -- called into question whether they've been
24         combined accurately?
25    A.   Yes, I did.  Or yes, there were.
```

```
 1   Q.   And what -- what were those issues?
 2   A.   The issue -- it's a technical issue that involves
 3        how STATA-- that's a S-T-A-T-A -- reads in files,
 4        that most of the counties had voters in pending
 5        status and so there was a field of the voter status,
 6        and as you read the data in, if there was one value
 7        of that that said pending, it was recorded as a txt
 8        because it was all characters and so STATA read it
 9        as a txt file.
10             There were some counties, particularly some
11        smaller counties with only a few thousand
12        registrants, that didn't have any pending voters.
13        And rather than reading it -- reading those files in
14        with that field as just a blank, STATA read them as
15        a missing value or number, which was a different
16        format.  And so that created an error that I, when I
17        realized that it was happening, I included some code
18        that converted the fields before I appended them,
19        which eliminated that error.
20   Q.   And did you confirm that when you -- you said you
21        created some coding to eliminate that error, that
22        the fields were then populated accurately?
23   A.   That's correct.
24   Q.   Did you conduct any -- well, you have -- I'll go
25        down.  There's one file called MIDR pending
```

1       analysis.do.  Did -- other -- is that file -- do you

2       have any analysis in that file other than simply

3       combining spreadsheets?

4    A.  That code does something different.  That code takes

5       the -- the result of the appending -- of the append

6       file, so I now have a statewide voter file, and then

7       that -- that file or that code processes the file

8       to -- to produce the data that I then analyze to

9       generate the data for the tables in the report.

10   Q.  Okay.  And the tables in the report, those are the

11      tables that are in the pending analysis January 2020

12      Excel file here?

13   A.  That Excel file was what I used to actually format

14      the tables, so that -- that Excel file takes the

15      output of the -- of the STATA file and it just is a

16      matter of convenience because Excel has some

17      formatting features that allows you to generate

18      tables that are -- that are more readable and that

19      STATA doesn't do very well.

20   Q.  Okay.  Now, Section 4 of your report on page 5

21      estimating -- titled Estimating the Quantity of

22      Interest, you state that the key empirical quantity

23      of interest is the number of otherwise eligible

24      people incorrectly placed in MIDR status because

25      their registration information did not exactly match

1     with information in state driver's license files

2     maintained by DDS or national social security files,

3     the verification process, or because they were

4     flagged as non-citizens.

5          Do you still maintain that that is the key

6     empirical quantity of interest?

7  A. That's the basic one that you would then use to

8     generate some of the other estimates looking at the

9     demographics of registrants in that status.

10 Q. Now, your -- your report does not -- actually --

11    Well, you do not actually determine the key

12    empirical quantity of interest, correct?

13 A. Well, as I -- as I note that that is unobservable.

14 Q. And -- and why is that?

15 A. Because as I note in the report, what I see or what

16    we observe is the -- the number of people who are in

17    that status.  What is not observable is whether

18    someone is in that status and shouldn't be because

19    they actually were in the DDS files or they are

20    citizens, but because of errors or the nature of the

21    match process, they are kicked out as -- as failing

22    verification or non-citizens when they actually

23    shouldn't have.

24 Q. So there's -- You're not opining on any number of

25    individuals that were incorrectly placed into MIDR

```
1           or pending status?
2    A.     Well, I am absolutely certain that the number is
3           greater than zero, but I -- it is not possible to
4           point to a specific number and say this is the exact
5           quantity, this is the exact number of people who
6           were incorrectly placed in this status.
7    Q.     So your report lists a number of different statuses
8           but doesn't show that anyone was wrongfully placed
9           in those statuses, although you believe there's at
10          least one person?
11   A.     Well, it's not a matter of belief, it's a matter of
12          certainty.  But there is nothing in the data that
13          specifically indicates that this person was
14          incorrectly placed in -- in status.  You would have
15          to infer that from the nature of the process and
16          looking at people who were originally -- or at some
17          point were in pending status but then were
18          ultimately moved to the active file.  And I have
19          data on that, and that's -- that's -- that's a
20          quantity that you can use to draw a more general
21          inference.
22   Q.     And that's the same for -- for non -- for the
23          non-citizens, right?  You state that you can't
24          observe the number of pending registrants who are
25          incorrectly flagged as non-citizens, though you are
```

1           certain that the number is -- is non-zero?
2    A.     That's correct.
3    Q.     Now, what's -- what is the -- what is the value
4           of -- of this inference for purposes of your -- your
5           report if we don't know that anybody was actually
6           incorrectly flagged?
7    A.     Well, that's -- that's the foundation of inference
8           is that you examine the data that you can observe,
9           and you use that to reach an informed view of what
10          you cannot directly observe.  And that's used
11          universally in social science.  Any time somebody
12          makes a forecast, that's an inference.  Any time
13          someone is making a population estimate by using a
14          sample, any survey is a kind of inference, and so
15          it's not this sort of obscure mystic process where I
16          am trying to define what I can't observe.  It's the
17          basic element of social science reasoning that you
18          are interested in something that you cannot directly
19          observe and so you examine the data that you -- that
20          you can observe and draw inferences based on that of
21          what the underlying characteristics or the
22          underlying values are.
23   Q.     And so your inference is based on the voter
24          registration file, the pending registrant file, and
25          the county registration files that you combined?

1    A.    In part.  That's not the -- that's not the -- the

2          only data or the only things that I relied on in

3          drawing that inference.

4    Q.    What additional -- what additional data then did you

5          rely on?

6    A.    Well, it was my knowledge of how the matching

7          process works, the -- the literature on matching,

8          what is known about the use of driver's license

9          files to verify citizenship.  So again we're looking

10         at what we -- what we know and applying that to this

11         data to generate an estimate or an inference about

12         what the -- what the underlying values are.

13   Q.    And you said it's also based on you said the

14         driver's license -- your understanding of the

15         driver's license files.  Have you done any research

16         on Georgia's driver's license files?

17   A.    That's based on -- so no, but that's based on the

18         descriptions of how the verification process worked

19         by Mr. Rayburn, Mr. Harvey, and Mr. Germany.

20   Q.    And you mentioned the SSA file also and you drawing

21         inferences from that.  What -- what do you know

22         about the SSA file that states have access to for

23         the HAVA verification?

24   A.    Again I'm working with the description that the

25         officials in the Secretary of State office, the

```
1        descriptions that they gave from working with the
2        Inspector General report that the Social Security
3        Administration produced in 2009, I believe, and
4        there is data in the -- in at least some of the
5        pending files about what the -- the responses that
6        the Social Security Administration gave to the
7        specific records that were submitted to them.
8             And you can also track through the Election
9        Assistance Commission, I believe it's the EAC that
10       produces data on the -- the specific numbers of
11       registration records that are submitted to the
12       Social Security Administration that are -- that are
13       verified, what the response rates are, and what
14       percentage of the records that are submitted to them
15       are actually verified.
16   Q.  And the reports that you've mentioned and the
17       testimony, none -- none of those reports and none of
18       the testimony indicate what information is available
19       through SSA, right?  They state what information is
20       put on the request that goes to SSA, but they don't
21       state what information SSA holds, correct?
22   A.  Well, we know what information goes to the
23       administration, and we know what the Social Security
24       Administration responds, so the -- I don't have
25       access to the Social Security Administration files
```

```
 1          or to the driver's license files.
 2    Q.    All right.  And you mentioned in different areas of
 3          your report checking citizenship through SS --
 4          through the SSA portion of the match, right?
 5    A.    That's correct.
 6    Q.    And is it your understanding that SSA maintains
 7          citizenship information in that -- in the database
 8          that the states -- the HAVA verification matches
 9          against?
10    A.    So is there citizenship data in the Social Security
11          Administration files?
12    Q.    That's a little broader than my -- my question.  My
13          question is is there citizenship information that
14          states get access to from SSA in the HAVA
15          verification?
16    A.    Yes.
17    Q.    And you're -- you're positive about that?
18    A.    That's the reason the Social Security Administration
19          provides the citizenship check.
20    Q.    And so is it your understanding that the Social
21          Security Administration provides the citizenship
22          check for HAVA?
23    A.    I don't know if that's specifically for HAVA, but
24          I -- from my recollection of what the data that's
25          actually in the secretary's -- in the voter file,
```

```
 1            that there is citizen information that is obtained
 2            from the Social Security Administration.
 3    Q.      So your understanding is based on the -- the file
 4            that you received in this case?
 5    A.      It's the -- the files that I received in this case,
 6            the -- the descriptions of the officials, and my
 7            more general knowledge of the -- of the voter
 8            registration and verification processes.
 9    Q.      You state that there's a lack of clarity in the
10            verification process.  What do you mean by -- what
11            did you mean by that?  And I'm looking at Section 5
12            of your report.
13                  MR. HERMAN:  Page 7.
14                  MR. RUSSO:  Page 7.  Correct.
15                  THE WITNESS:  The Help America Vote Act
16            requires states to conduct a verification process by
17            comparing the information that a registrant provides
18            to either the driver's license or state ID files,
19            which is the Department of Transportation, or in the
20            case of Georgia the Department of Driver Services,
21            and/or the Social Security Administration to confirm
22            identities and citizenship.  The precise nature of
23            how states go through that process varies.  States
24            have wide discretion in deciding what information
25            they are going to submit, what counts as a match or
```

1     non-match to Department of Driver Services or

2     Department of Transportation, or what they will

3     accept as -- as confirmation of an individual's

4     identity and citizenship.

5          In Georgia, again based on the descriptions of

6     high-ranking officials in the Secretary of State's

7     Elections Division, they didn't appear to understand

8     how it actually worked, what counted as a match,

9     what fields were submitted, what was required to

10    match, and the descriptions that they gave were

11    inconsistent or they said they really didn't know

12    how the verification process worked.

13  BY MR. RUSSO:

14  Q.   Now, I think are you referring to the testimony of I

15       believe Mr. Germany where he mentioned first letter

16       of a first name matching or not matching?

17  A.   That's one of the -- of the issues.

18  Q.   What -- what other -- you mentioned that they don't

19       know the data.  Where -- where was that?

20  A.   Well, as I believe it's footnote -- footnote 7

21       through 11.  In Mr. Harvey's deposition he was asked

22       whether a mismatched space character, so again exact

23       match means a character-for-character match between

24       two fields in different databases.  So it is

25       possible that a -- a misplaced space in a name or

1    that there's a space in one record or one file and

2    that field doesn't have a space in the other file,

3    whether that would trigger a non-match.  Mr. Harvey

4    said it would.  Mr. Rayburn said he didn't know.

5         Another question is whether a hyphen in one

6    data set and not another would trigger a non-match.

7    Mr. Germany didn't know.  The director of elections

8    said that matching is done on last name, first name,

9    date of birth, and last four of social, presumably

10   social security number.  The general counsel said

11   that the match is only done on the first initial of

12   the last name.  And that even though that was the

13   policy of the Secretary of State's office, there

14   were some counties that were incorrectly using the

15   entire first name to match.

16        So there's inconsistency in how the people who

17   are making and enforcing policy described the

18   matching process and evidence that the counties were

19   not doing the matching process in the manner that

20   the Secretary of State said they should be doing the

21   matching process.  And that's -- I look at that and

22   that's information or that's evidence that the

23   people who are in charge of making and enforcing

24   policy didn't really understand how the process

25   actually worked.

```
 1   Q.   Now, is it your -- you're not -- It's not your
 2        opinion that the process actually changes based on
 3        what one official says versus another?  I mean it's
 4        a computer -- it's a matching process run by DDS,
 5        right?
 6   A.   That's my understanding.  It's certainly possible
 7        that the administrative practices -- in fact,
 8        there's evidence that the administrative practices
 9        that are used in state and counties actually do
10        vary, but the fact that these officials didn't
11        really know how the process works is material
12        because these are the officials who are ultimately
13        responsible for either making, implementing, or
14        enforcing the policy.  I mean they couldn't describe
15        it with 100 percent certainty or couldn't describe
16        the elements.
17   Q.   Well, the -- the elements, they all -- you're saying
18        that none of them -- that none of them could
19        describe the actual policy or they just didn't
20        understand the technical piece?
21   A.   There were elements of both because I recall -- I
22        didn't cite this in my -- my report, but I believe
23        it was Mr. Harvey's deposition where he said
24        there -- in a number of these areas there were no
25        written policies.  It's just sort of practices that
```

1    were used.  So -- and the technical process actually

2    matters because the Division of Elections or the

3    Secretary of State's office or the counties submit

4    the -- submit the information to DDS.  They get an

5    answer back, and it's actually up to -- it's within

6    the discretion of states to decide how they

7    interpret that information.

8         So it strikes me as important for the -- the

9    people who are running elections to understand the

10   technical details of that process.

11 Q.  And do you know if the Secretary of State's office

12   has any other employees that handle the technical

13   piece of the process?  You referred to the general

14   counsel of the entire agency, Ryan Germany, so not

15   just the elections division, but another attorney in

16   the office, Kevin Rayburn, and then the rest of the

17   entire elections division.  And so those are three

18   employees who -- you're right, they are in

19   high-level positions.  They are not the computer --

20   the computer folks within the office.

21        Are you aware of whether any of the technical

22   employees that handle the computer side and

23   interface with DDS, whether they don't know the

24   process?

25 A.  I don't know.

```
 1   Q.   Now, you state that -- that any non-match in any
 2        field such as a hyphen would create -- would create
 3        a non-match or create an additional burden on the
 4        voter.  What do you mean by additional burden on the
 5        voter?
 6   A.   So the way that the process operates, and this is
 7        working from the descriptions and the actual
 8        training materials that are provided to county
 9        registrars, that a person who match -- a person who
10        registers and who is verified, meaning that their
11        information matches, they're sent their precinct
12        card, their registration is complete, they show up,
13        comply with the other elements of what they need to
14        do to vote; they vote.
15             Someone who fails verification either because
16        their name or birth date doesn't match exactly or
17        they get a value returned indicating that DDS or
18        social security agency thinks they're non-citizens,
19        that triggers a separate administrative process that
20        they get a letter saying that you need to provide
21        additional information.  If you are a -- if you --
22        verification process results in you being a
23        non-citizen or a return value of non-citizen, you
24        have to appear or provide citizenship documents,
25        which there is a separate administrative step.
```

```
 1              It turns out that the letter that county
 2         officials send to voters who fail the verification
 3         process appears to have incorrect information about
 4         what they need to do or what they would have to do
 5         at the -- at the polling place when they show up on
 6         election day.
 7              And so it -- it triggers a set of actions that
 8         a registrant has to take.  Now, if this is someone
 9         who failed the verification process because of a
10         mismatch or a false non-citizenship flag, meaning
11         that the error existed in the underlying data or
12         there was an error made by registration officials,
13         the burden is on the voter or registrant to correct
14         that.  That's the basis for the -- the conclusion at
15         the top of page 11.
16    Q.   And if -- if the voter -- and we'll use the scenario
17         where an individual has to present ID when they go
18         to vote, right, because of a non-match, and would
19         you agree it's an individual that has a non-match
20         and doesn't provide ID also at the time of
21         registration under the statute?
22    A.   So can you say that again?
23    Q.   So the statute -- an individual who's a non-match,
24         if they provide their ID with their voter
25         registration, they would not have an additional step
```

```
1            at the -- at the poll, an additional burden, as you
2            put it, correct?
3    A.     Based on the descriptions of the officials, that a
4            registrant who provides a photo ID at the time they
5            register, that would override a non-match, and they
6            would not show up, and they would just be an active
7            voter.  They wouldn't show up in MIDR status.
8    Q.     Is it -- I mean you -- you're not -- you're not
9            saying that an individual who just doesn't match is
10           also not an active voter, right?
11   A.     They are an active voter -- well, they -- assuming
12           that the information was entered completely by
13           registration officials, if the -- the only reason
14           that they were in MIDR status was that there was a
15           non-match, they would still be -- they would be
16           recorded as an active voter on the rolls.
17   Q.     And you say assuming that the election official
18           enters the information completely.  What do you
19           mean?
20   A.     So my understanding is that someone, for example,
21           who registers online, that they can't complete the
22           registration process unless they have entered
23           complete information, although they could still
24           trigger a non-match if they made a mistake entering
25           their name.
```

1           The -- For a voter who registers in person or
2      voter who registers by mail, there's a paper form
3      that they fill out, and someone in the county
4      registrar takes that information and manually enters
5      it into the electronic voter registration system.
6      So there are a variety of ways that people interact
7      with the -- with the registration system.
8           And if someone registers in person or provides
9      a copy of their ID or their driver's license number
10     matches, that would override a non-match in a name
11     or date of birth field, and they would just be
12     placed on the voter rolls as active with no -- no
13     notation that they had to provide ID to complete the
14     process.
15  Q.  So -- and backing up I guess to my question about
16     election officials not entering information
17     completely.  That -- If information wasn't entered
18     completely, if there's a typo, that would be a -- a
19     non-match?  That would not be a place them in a
20     pending status, though, correct?
21  A.  My understanding if it was just a typo in a name, in
22     a name field, that that would not result in someone
23     being placed in pending status, although if it was
24     an error in an address, that could trigger pending
25     status because the -- the address doesn't show up as

1       a -- as a residence.

2   Q.  Okay.  So if there was missing information, in other

3       words, so if there was not -- if there was -- if

4       there was an address -- well, and I'm not so sure

5       that would put someone in pending status, but if

6       there was entire fields that were missing required

7       of information, that would -- that would put someone

8       in a pending status is your understanding?

9   A.  That's my understanding.

10  Q.  Versus if the voter -- so if the voter didn't

11      complete their name, that may put them in a pending

12      status versus the voter has, you know, handwriting

13      is not legible and the election official puts it in,

14      has a typo, that would not put someone in a pending

15      status in and of itself?

16  A.  If it was in a name field, would not put them in

17      pending status.  If it were, there are a number of

18      records that have missing addresses or address

19      verification -- I'd have  -- so there are records

20      where there is an address but it is -- that people

21      are pending because the address is not verified

22      or -- but a typo in a name or birth date or social

23      security number triggering a non-match would not

24      result in a voter being placed in pending status.

25  Q.  So if a voter puts in an address that doesn't exist,

1            in other words, that -- there may be an address that

2            is put in the field, in a spreadsheet, but the

3            individual's actually in pending status because

4            there's -- there's no such address that exists?

5     A.     That's my understanding.

6     Q.     You would not -- you would not know where to -- what

7            districts to put the individual in, right, that's

8            correct?

9     Q.     You wouldn't know where the person goes to vote?

10           You couldn't assign them to a precinct, correct?

11    A.     That's correct.

12               MR. HERMAN:  Can we take a break?

13               MR. RUSSO:  Sure.

14               MR. HERMAN:  Of course.

15               MR. RUSSO:  Go right ahead.

16           (Break taken.)

17               MR. RUSSO:  Back on.

18    BY MR. RUSSO:

19    Q.     Before the break, Dr. Mayer, you mentioned that you

20           were talking about SSA and citizenship information

21           that's provided.  If SSA didn't provide citizenship

22           information to the states, would that alter your

23           opinion any?

24    A.     No.

25    Q.     I want to show you what's been previously marked as

1        Exhibit 116 Germany.  And I only have one copy.
2             MR. HERMAN:  That's fine.  I've memorized that.
3        Do you want -- Oh, so it's been marked.
4             MR. RUSSO:  It's been marked before.
5   BY MR. RUSSO:
6   Q.   Is this the three -- the webinar that you were
7        referring to, the webinar materials?  And I believe
8        it's a compilation actually of multiple webinars.  I
9        don't -- I don't think there was a cite to the Bates
10       numbers in your report.
11            MR. HERMAN:  Here.  Look at page 20, although
12       there's a different date on there.
13  BY MR. RUSSO:
14  Q.   That's the -- that is the -- the report.  I mean
15       that is a -- I'm not trying to confuse you guys
16       here.  The -- the Germany Exhibit 116, that is a
17       compilation of all of the webinars.  So if you flip
18       to about Bates page defendant 0008885 or so, you'll
19       see the cover page, I believe.  Should be right
20       around there, maybe is one off.  The page I'm going
21       to go to ultimately is 8899.  But there's not the --
22  A.   Okay.  So 8854 is felon process change.
23  Q.   8884.
24  A.   8884.
25  Q.   I'm just doing some math here based on the page that

```
 1          I'm going to ultimately go to, but the page number
 2          of the -- are you on 884?
 3     A.   So 8884, which is page 31.
 4     Q.   85.  I'm sorry.  Flip one more.  I'm sorry, and it
 5          might even be 86.  There you go.
 6     A.   Oh, all right.  So this --
 7               MR. HERMAN:  Yeah.
 8               THE WITNESS:  Got it.
 9     Q.   And so that's the report here you're referring to?
10     A.   Yes, the -- the date and title match.
11     Q.   Okay.  And if you flip -- if you will flip to 8899,
12          this is -- it states Special Topics of the Month,
13          Verification Changes Due to HB 316.  And we're going
14          to look at 8899 through 88 -- 8912 if you want to
15          flip through it real quick and see if that's what
16          you had reviewed.
17     A.   Okay.
18     Q.   Okay.  Now, this is what you reviewed --
19     A.   Yes.
20     Q.   -- on the MIDR --
21     A.   Yes, in terms of that -- that paragraph, that's
22          correct.
23     Q.   Okay.  Now, I want to flip to -- there's some
24          scenarios listed on 8901, scenarios -- it says
25          Scenarios for Verification Process.  And for the
```

1      next three pages there's six scenarios presented,

2      and I just want to go through these to see if

3      you're -- if it's your opinion that what's being

4      presented here is inaccurate.

5           So scenario 1 is application presented with

6      IDs.  All identifiers pass verification.  ID

7      provided.  Citizenship verified by process.  Voters

8      move to active status with ID provided as yes.  And

9      it says not MIDR.

10          Do you -- do you disagree with any part of

11     that -- that hypothetical?

12  A.  So I'm not -- on what basis would I disagree with

13     that?

14  Q.  That's what I'm asking.  I'm trying to --

15  A.  So the way that -- I mean that is consistent with

16     the -- with my understanding of the -- of the

17     verification process and the MIDR status process.

18  Q.  And number 2 is application presented without ID.

19     All identifiers pass verification process.  ID not

20     provided.  Citizenship is verified by process.

21     Voter is moved to active status with ID provided as

22     yes.  Not MIDR.

23          So do you -- do you agree or disagree that

24     under this scenario where an individual's

25     information is -- is matched, although an ID is not

```
1         provided, that the individual's not in MIDR status?
2   A.    So again, I don't mean to quibble unnecessarily, but
3         I would have no basis for disagreeing that this is
4         how the process occurs, and there's -- the data
5         that -- that I have examined is consistent with
6         this.
7   Q.    If you'll flip the page to 8902, number -- the third
8         scenario is application presented with ID.  One or
9         more identifiers do not pass verification process.
10        ID provided.  Citizenship is verified by process.
11        Voter is moved to active status with ID provided as
12        yes.  Not MIDR.  Go ahead.
13  A.    That's consistent with the descriptions.  That's
14        consistent with my understanding of the verification
15        process.
16  Q.    Okay.  Number 4 is application presented without ID.
17        One or more identifiers pass verification process.
18        ID not provided.  Citizenship is verified by
19        process.  Voter is moved to active status with MIDR
20        status.
21            Is this consistent with your -- your
22        understanding of the process?
23  A.    Yes.
24  Q.    Okay.  And so in number -- in this scenario the
25        individual would have to show ID when he or she goes
```

1          to vote, correct?

2    A.   So we're talking about number 4?

3    Q.   Uh-huh.

4    A.   So my understanding and my review of the materials

5         suggests that there is an ambiguity here, which is

6         what ID the MIDR status registrant would have to

7         produce at the polling place in order to -- in order

8         to vote.

9    Q.   And what do you mean by -- Can you elaborate on what

10        the ambiguity is here?

11   A.   The ambiguity stems from a couple of things.  One is

12        that, as I note in the report, I saw at least three

13        different descriptions of what a MIDR registrant

14        would have to do in order to vote, depending on who

15        was describing it.

16             There's also inconsistencies in some other more

17        recent training materials about how voters or how a

18        registrant would resolve this at a polling place.

19        And also on page 19 when it gives an example of a

20        MIDR letter, it actually leaves open a -- a question

21        about whether a voter in MIDR status has to show

22        photo ID at all in order to vote.

23             So my -- my conclusion from this is that this

24        is actually a confusing administrative process that

25        could lead a voter to be unsure of what they

```
1            actually need to do to move their registration
2            status into -- to non-MIDR status so they can
3            actually cast a ballot.
4   Q.   And you refer to this letter on page 19, and you
5            said there's some confusion possibly about what ID
6            could be shown.  Is this -- Are you referring to the
7            HAVA, the HAVA process for first-time -- the
8            requirement of Help America Vote Act for first-time
9            voters who register by mail and do not provide an ID
10           with their registration?
11  A.   That's part of it.  It's also possible that a voter
12           may register in person without showing a voter --
13           without showing an ID.  And as I read this letter,
14           this letter would apply to a voter who voted by mail
15           or registered by mail without providing an ID.  And
16           there is a provision under HAVA and under Georgia
17           law that someone who registered by mail without
18           providing ID actually should be able to vote without
19           showing a photo ID if they present one of the forms
20           of HAVA-compliant ID on the right side, one of those
21           four different forms of -- of ID.
22               But if this is the -- if I registered in
23           person, and I get this letter, it's confusing
24           because this refers to someone who registered for
25           the first time in Georgia who mails in a voter
```

1          registration form, and I would not -- if that's not

2          how I presented at the registration office, that --

3          that would be confusing.

4               So this -- this letter doesn't actually address

5          Scenario 4 if someone registers in person rather

6          than submitting a mail application.

7    Q.    And you referred to someone who registers in person.

8          What would be a -- What is your understanding of

9          when a -- someone would register in person under

10         Georgia law?

11   A.    My understanding someone who appears at a -- at a

12         registration -- at the county clerk's office or at

13         the officials who were -- who actually -- someone

14         who appears at the office to register in person.

15   Q.    Okay.  And when someone does that, they turn in, do

16         you know how they go about submitting an

17         application?  Is it similar to DDS when you're on a

18         computer, or is it similar to online registration

19         when you're doing it electronically, or -- or do you

20         turn in a mail application?

21   A.    That I don't know specifically.

22   Q.    So if an individual went to -- under your scenario

23         to register in person by going to the registrar's

24         office and turns in a mail application, does that

25         change your opinion any?

```
 1   A.   Well, I'm not -- I don't recall from actually
 2        looking at the registration application whether it
 3        distinguishes between if I hand -- if I fill it out
 4        by hand and I turn it over to someone at a clerk's
 5        office, whether that's counted as a registration by
 6        mail.  I don't know specifically how that is
 7        recorded by registration method.
 8   Q.   Uh-huh.  So -- But back to my question is if it is
 9        recorded as -- or treated the same as any other
10        paper application, would -- would that change your
11        understanding of this process?
12   A.   No, because I -- I still maintain that that would be
13        confusing for a registrant who gets a letter saying
14        they registered by mail when they didn't register by
15        mail, which would imply that I put it in an envelope
16        and I stick it in a mailbox.
17   Q.   Uh-huh.  And again, it's -- your -- your analysis
18        was based on your understanding that in-person
19        registrations are more than simply registering at
20        DDS?
21   A.   Well, DDS would be through Motor Voter when someone
22        obtains a driver's license or ID and they -- but I
23        regarded this as someone who goes to a clerk's
24        office and registers in person that way.
25   Q.   Okay.  And again you didn't -- you didn't do any
```

| | |
|---|---|
| 1 | research to determine whether that paper, whether an |
| 2 | application that is submitted at a registrar's |
| 3 | office is a different application from one that is |
| 4 | submitted to a voter registration organization to |
| 5 | turn in or one that's mailed in? |
| 6 A. | Well, it should be the same application, whether |
| 7 | it's recorded as -- |
| 8 Q. | Okay. |
| 9 A. | -- mail or in person.  No, I did not do research |
| 10 | specifically on that question. |
| 11 Q. | Okay.  And you did just mention the Motor Voter law |
| 12 | and registering at DDS.  Do you know if individuals |
| 13 | who register at DDS, how they're processed through |
| 14 | the verification process? |
| 15 A. | I don't know specifically.  I imagine it would be |
| 16 | the same process. |
| 17 Q. | So somebody who -- so somebody who registers at DDS |
| 18 | would -- Is it your opinion that someone who |
| 19 | registers at DDS could ever come up as a non-match? |
| 20 A. | I think it would be likely because they would |
| 21 | register with their driver's license or ID number |
| 22 | which would override a non-match.  So unless that |
| 23 | number was somehow erroneously entered, that should |
| 24 | not result in an MIDR status for someone who |
| 25 | registers through the Motor Voter process. |

1  Q.   So if -- if we assume that anybody who registered

2       through DDS is never going to be flagged for, or I

3       don't think they'd ever come up as a non-match or as

4       a non-citizen, right?  Because citizenship would be

5       checked when you register to vote at DDS also,

6       right?

7  A.   Well, there are cases of Department of

8       Transportation where a clerk asks someone if they

9       want to register someone to vote even though they

10      don't want to or they're not a citizen.  But

11      presumably if someone registers through Motor Voter,

12      there should be no difference between their voter

13      registration data and the DDS data because they're

14      both entered at the same time through the same

15      process.  So I would think it would have to be some

16      type of administrative failure if that process

17      resulted in someone being in MIDR pending status.

18 Q.   So the universe of applicants that we're ultimately

19      looking at for purposes of the verification process

20      are individuals who do not -- who register somewhere

21      other than DDS, right?

22 A.   That's my understanding.  I mean we can observe how

23      many people are in MIDR status.

24 Q.   What do you mean by that?

25 A.   Well, we can look at the voter file, and we have a

```
 1        table that count the number of people who are in
 2        MIDR status, and I think it's somewhere in the
 3        neighborhood of 60,000 people.
 4   Q.   And -- but you don't -- you don't know if those
 5        individuals registered at DDS or if they submitted a
 6        paper application, right?
 7   A.   There's no data in the files about what method
 8        someone used to register.
 9   Q.   That's all I was trying to ask.  Okay.  So going
10        back to scenario -- Scenario 4, the individual under
11        Scenario 4 would not be pending due to citizenship.
12        Would you agree?
13   A.   If their citizenship was verified, they would not be
14        pending for citizenship.
15   Q.   And so they aren't, but this individual would be an
16        active -- in active status with MIDR status.  And
17        you mentioned the ID that the person would have to
18        show at the -- at the poll, right?  Is the ID other
19        than a first-time registrant who registers by mail
20        and does not provide an ID?  So other than somebody
21        who falls under HAVA, do you know if the -- the ID
22        that would have to be presented when the individual
23        goes to vote is any different than what a voter
24        would have to present under Georgia's photo ID law?
25   A.   It shouldn't because the only other situations would
```

```
 1           be someone who had previously registered in Georgia
 2           and for some reason their registration was either
 3           cancelled through inactivity or they had moved to
 4           another state, established residency, and then moved
 5           back and reregistered.  And my understanding, in
 6           that circumstance they would not qualify under HAVA
 7           because they were not a first-time registrant.
 8                So it would have to be people who were
 9           registering in Georgia and who had not previously
10           been registered.
11  Q.   So it seems like though somebody who's a first-time
12           registrant who registers by mail and does not
13           provide ID actually has more options to -- more
14           types of ID that the person can provide at the
15           polling place than someone else?
16  A.   Well, that's what this letter suggests, although
17           there's other training materials that say that
18           that's not true, that what someone needs to do would
19           be to show a HAVA ID to complete the registration
20           process and then show a photo ID as required
21           under -- under Georgia's photo ID law.
22  Q.   And what -- what -- what training material?  Is that
23           cited in your paper?
24  A.   That's a more recent version of the Georgia
25           registration course.
```

1    Q.   Okay.  And do you know --

2    A.   It's not cited in my report.

3    Q.   And do you have a date or anything about that

4         document that we can help you find it?

5    A.   Not off the top of my head, in part because the

6         registration course, they actually don't have dates

7         on them.

8    Q.   Is there Bates -- is there a Bates number on it?

9    A.   I -- I don't know, but I can -- actually I think

10        there's a Bates number.

11   Q.   How did you know it was a more recent registration

12        material if it doesn't have dates on it?

13   A.   Because it referred to -- it referred to recent --

14        more recent events than the previous course.

15             MR. HERMAN:  Can we go off the record for one

16        second?

17             MR. RUSSO:  Uh-huh.

18             (Discussion held off the record.)

19             THE WITNESS:  Back on the record?  So this

20        is -- so that's the Bates number there, that 00?

21             MR. HERMAN:  Yeah.  Yep.

22             THE WITNESS:  So the number is 00105899, and

23        then there's a document number which is 136884.

24   BY MR. RUSSO:

25   Q.   Okay.  And so that's the document -- that document

```
1          you've recently reviewed and you're stating a local
2          registrar --
3     A.   So this is -- it's called the -- it's the general
4          registration online -- or it's training materials
5          that are provided for registration officials or
6          county clerks, and then at the end it tells them how
7          to take the certification test.  And it provides --
8          it gives information about the -- the full range of
9          registration and voting.  And again there's a
10         version that I referred to in the report, but again
11         as far as I could see it didn't have a date on it so
12         you had to sort of triangulate to identify the
13         sequence.
14    Q.   Let me just show you real quickly the --
15              MR. RUSSO:  We can mark them for ease.
16              (Exhibits Nos. 4 and 5 marked for
17         identification.)
18    BY MR. RUSSO:
19    Q.   Mayer Exhibit 4 and that --
20    A.   Are we done with this?
21    Q.   Keep that out.  Here, I have --
22    A.   Oh, we have two different documents.
23    Q.   That's right.  These are just the statutes.  Are
24         these the Georgia statutes that you -- did you
25         review these statutes in preparing your opinion?
```

1   A.   In general, yes.

2   Q.   What do you mean in general?

3   A.   So I don't -- I don't think I cite them in the

4        report, but I did review them.

5   Q.   Okay.  That's all I'm asking is you actually

6        reviewed the law when coming up with -- these laws,

7        you reviewed them?  I don't know if they're cited

8        either, but I'm just asking if you reviewed it?

9   A.   Yes, I did.

10  Q.   Okay.  And 21-2-220.1, this is voter registration

11       documentation requirements.  Do you -- This is the

12       state's voter verification statute, right?

13  A.   This looks like the language in HB 316.

14  Q.   And if you turn to subsection (c), it states, "Proof

15       of the applicant's identity as set forth in

16       subsection (b) of this code section shall be the

17       forms of identification listed in subsection (c) of

18       Code Section 21-2-417."

19            Do you see that?

20  A.   Yes.

21  Q.   Okay.  And so the forms of ID under the statute,

22       would you agree, are those that are allowed under

23       subsection (c) of 21-2-417?

24  A.   That's what it says.

25  Q.   And subsection (c), did you -- did you get a chance

```
 1           to read -- read this in your preparation?
 2   A.      Yes.
 3   Q.      Now, this -- this subsection indicates that -- it
 4           says an elector who registered to vote by mail but
 5           did not comply with subsection (c) of Code Section
 6           21-2-220, and who votes for the first time in the
 7           state, shall present to the poll workers either one
 8           of the forms of identification listed in subsection
 9           (a) of this code section, or copy of a current
10           utility bill, bank statement, government check,
11           paycheck or other government document that shows the
12           name of the -- the name and address of the elector.
13                The -- a current utility bill, bank statement,
14           government check, paycheck, or other government
15           document, that tracks what's in HAVA, right?
16   A.      I believe so.
17   Q.      And that would be a -- and HAVA only applies to
18           first-time registrants by mail, right?
19   A.      That's my understanding.
20   Q.      Okay.  So -- so an individual who doesn't -- an
21           individual who doesn't provide ID under the
22           verification process could provide one of those,
23           correct?
24   A.      That's correct.
25   Q.      And an individual -- and then it refers to
```

1      subsection (a), says, you know, that -- who votes

2      for the first time in this state shall present to

3      the poll workers either one of the forms of

4      identification listed in subsection (a).  So that's

5      the other option.  Subsection (a), this is Georgia's

6      photo ID law, right?

7  A.  Correct.

8  Q.  And that lists the various forms of ID that can --

9      can be shown, right?

10 A.  That's correct.

11 Q.  Okay.  So I guess I want to go back to earlier you

12     said that there was an individual who is put in MIDR

13     status.  So in Scenario 4 here, that individual has

14     an additional burden.  And I'm still just not

15     understanding what you mean by there's an additional

16     burden.

17 A.  So one of the ways to think about that is it's an

18     extra administrative step that a registrant is

19     required to navigate.  And a burden can be something

20     specific that they have to do.  It could also be an

21     informational burden that they have to understand

22     and process additional information.  And this letter

23     that voters receive, it's actually kind of

24     confusing.

25 Q.  Well, I'm just talking about statute.  The letter --

1      We'll put the letter to the side.  I understand that

2      you think that it's confusing regarding what is a

3      mail registration.  But I want to focus on the

4      additional administrative burden because from

5      looking at these two statutes, I'm not able to see

6      what this additional step is because it's a step

7      that would be performed regardless.  Right?

8  A.   But that's true, but again, the -- there is an

9      additional step that now as a -- as a registrant,

10     you have -- there are -- there are now two separate

11     processes that stream into one, which is, you know,

12     according to the Secretary of State officials, a

13     voter will see no difference.  They show up, they

14     show their ID to vote, and they are -- actually

15     at -- the -- the way that I believe both Chris

16     Harvey and Kevin Rayburn describe it is that the

17     only interaction would be when a voter presents

18     their ID under Georgia's photo ID law, they would be

19     allowed to vote.

20          Whoever is at the polling place would make a

21     notation that they have provided ID and that they're

22     no longer in MIDR status.

23  Q.   So the voter would never even know then that they

24     have this what you call administrative step, an

25     additional administrative step even though it's the

1     same one when those two paths that you just
2     mentioned converge, it's the same step?
3  A.  But it's not the same step because a voter who is in
4     MIDR will get this letter or a letter like this, and
5     now this suggests that the -- there is a possible
6     earlier step where the voter has to complete the
7     registration process in some way, which is actually
8     what the training materials say.
9          And again the notion of a burden doesn't
10    necessarily mean a physical burden.  I have to
11    travel some place or I have to perform an additional
12    act.  That -- a burden could be informational that
13    now a voter has to navigate these separate
14    processes, and a voter could easily look at this and
15    think Georgia has a photo ID law and why do I -- why
16    do I just need to show up with a bank statement?
17         And so there's a -- there's an informational
18    burden.  And then there's -- there is extensive
19    literature on administrative burdens, some of which
20    I've actually done, that say that voters can be --
21    voters find these complicated letters and procedures
22    and that it's confusing.
23 Q.  So it's the -- your administrative burden is tied to
24    the letter?  You're not -- you're not -- you're not
25    opining that the actual process of going to vote

1        is -- and what is provided at the polling place is

2        an additional burden?

3   A.   It certainly could be because there's reason to

4        think that the way in which the MIDR processes are

5        carried out at the polling place, that that's not

6        going to be uniform across the state.  And it's also

7        possible that poll workers could be confused about

8        what they need to do.

9             So it is -- as far as I am aware -- actually I

10       know that there hasn't been a statewide election

11       that has been held.  There have been a couple of

12       special elections, but it is -- I think it's likely

13       that there is going to be confusion at the polling

14       place on the part of both voters and poll workers

15       about how this process actually works.

16  Q.   And this process, do you know -- do you know if the

17       process for Georgia's photo ID and the HAVA

18       first-time voter, has that changed?  Did that change

19       under HB 316?

20  A.   No.

21  Q.   So that process is actually still the same?

22  A.   I believe so.

23  Q.   And -- and did you look at -- Did you do any

24       research on elections that have occurred since HB

25       316?  There have been elections, right?

1   A.   There have been two or a couple of local special

2        elections.

3   Q.   What about municipal elections?  Do you know if this

4        applies to municipal elections also?

5   A.   This should apply to any election held in the state.

6   Q.   And you're aware that 2019 is a year that some

7        municipalities hold elections in Georgia, right?

8   A.   Yes.

9   Q.   But not all of them.  So did you find any -- did you

10       find any -- any evidence of confusion at the polls

11       on this -- this particular issue regarding what ID

12       could be acceptable that -- from the 2019 elections?

13  A.   I did not conduct an investigation of that.

14  Q.   Okay.  So you just assume that there's going to --

15       there could be confusion, and as a result that would

16       be an additional -- that would be an administrative

17       burden at the polling place on a voter?

18  A.   I would -- I would call it an inference rather than

19       an assumption, but yes.

20  Q.   Well, and what data are you basing this inference on

21       that there would be -- there's going to be confusion

22       if you never looked at it?

23  A.   Based on my experience studying election

24       administration, based on the confusion among

25       election officials, based on information in the

```
 1          training materials that -- that from what I can
 2          observe, even the people who are responsible for
 3          carrying out this law are not entirely clear on how
 4          it's going to work.
 5   Q.     And the -- the confusion and the training materials,
 6          that's again -- you're referring to this document
 7          that state defendants -- labeled state defendants'
 8          00105899 that you just mentioned, that's --
 9   A.     Well, but it's also -- it's also this.  It's also
10          the material that I cite in my report.
11   Q.     And expand upon that for me because I don't think
12          there is any confusion on which IDs were acceptable
13          in your -- in your report.
14   A.     But it's not simply a question of which IDs are
15          acceptable.  It's a question of how voters are going
16          to experience this process and the information and
17          instructions they receive.  It's not -- it's not
18          completely clear.
19   Q.     So a voter who may not know whether there's any
20          additional step because there isn't one may feel an
21          administrative burden?  That's another -- that's
22          another burden that you're referring to?  I'm just
23          trying to make sure I understand all the
24          administrative burdens that you're -- you're opining
25          on here.
```

```
1    A.    So again the -- the key here in this particular
2          example is that there's an informational burden,
3          that a voter who --
4    Q.    You don't disagree that any of those forms of ID,
5          though, are acceptable, right?
6    A.    No.
7    Q.    Okay.
8    A.    But we know -- I know from work that I've done that
9          voters are frequently confused about voter ID laws
10         because they are administratively complex.
11   Q.    And now you're not opining on Georgia's photo ID law
12         in this case, right?
13   A.    That's correct.
14   Q.    And you're aware that Georgia's photo ID law has
15         been held up in -- by the 11th Circuit Court of
16         Appeals?
17   A.    I am.
18   Q.    So really, again the -- you're administrative burden
19         and their confusion, the voter registration process,
20         although the individual is already in active status,
21         so there's just some confusion that you are
22         contending may occur tied to photo ID but as a
23         result the MIDR process?
24   A.    Not exactly.  So I'm not making an argument that
25         the -- that the issue here is the Georgia's photo ID
```

1       law.  That's -- that's a separate question.  My

2       position or my conclusion is that this -- the MIDR

3       process that places someone in active status is

4       different than someone who's just placed in active

5       status because now a voter gets this letter and is

6       instructed that they have to do some things in order

7       to vote that a -- a voter who's just in active

8       status would not experience.

9   Q.  What about a voter who is in active status who's a

10      first-time -- any first-time voter?  They would

11      be -- What IDs would they be able to show?

12  A.  I believe that the -- Well, my understanding is that

13      the only registrants who would get this letter would

14      be those who are in MIDR status.  So if I registered

15      and I -- to take the scenario -- I don't know

16      exactly which scenario it was, but I show up, I

17      register without providing an ID, but all of my

18      information matches, I think that's Scenario 3.

19  Q.  No, I believe it's maybe 2.

20  A.  Okay.  Two.  So I'm a registrant in Scenario 2.  All

21      of my information matches.  I get my precinct card.

22  Q.  You get a precinct card regardless if you're in

23      active status?

24  A.  That's correct.

25  Q.  Everybody's getting a precinct card --

1    A.    Who --

2    Q.    -- who's in active status?

3    A.    Who's in active status.  But again my understanding

4          is that this letter only goes out to voters who are

5          in MIDR status.

6    Q.    So again an individual under Scenario 2 who doesn't

7          provide the ID but all identifiers pass, they're

8          active status, and they're non-MIDR, that individual

9          goes to vote, the ID that -- that individual still

10         has to comply with photo ID, right?

11   A.    That's correct, because they've already -- their

12         identity under HAVA has already been taken care of.

13   Q.    Which is one form of ID, any of those under 417 that

14         a voter in MIDR status can provide, right?

15   A.    That's correct.

16   Q.    Okay.  But that individual could not show the bank

17         statement, the utility bill, the -- is that -- is

18         that what you're telling me?  Or that person could

19         still do it because they are -- because HAVA still

20         applies to that individual, right?  They might not

21         be in MIDR status, but they would still be able to

22         provide --

23   A.    So that's correct, but under the statute that --

24         under (b) of the 220.1, it's someone who doesn't

25         verify, in the event that their name, driver's

1       license, social security number or date of birth

2       does not match information, then the applicant shall

3       nevertheless be registered to vote and shall be

4       required to produce proof of his or her identity.

5            And proof of the applicant's identity is set

6       forth in Section (b) of this code shall be forms of

7       identification -- So as I read this and look at this

8       letter, that someone who failed the verification

9       process would get this letter and be able to confirm

10      their identity through a HAVA document.

11  Q.  And -- and somebody who is not in MIDR status but

12      registered to vote by mail for the first time and

13      did not provide an ID, they could also still use the

14      same HAVA documents, right, under 417?

15  A.  So again the -- the voter ID statute refers to

16      voters who registered by mail -- by mail but did not

17      comply with Section (c), so they haven't provided

18      identification.  So as I read this, someone who's

19      identity has been verified through the verification

20      process actually simply skipped that first part and

21      vote by showing a photo ID.

22  Q.  They -- they could use a photo ID or -- or a bank

23      statement; isn't that right?

24  A.  I don't know.

25  Q.  Okay.  But that's what HAVA would -- HAVA would

1           provide, right?

2    A.    Yes.  But HAVA applies to a particular circumstance

3          of verifying identity through the registration

4          process.  So states can add their own requirements

5          on top of that like photo ID.

6    Q.    Sure.  I mean HAVA is -- HAVA -- and I'm simply

7          referring to the provision of HAVA that says where

8          an individual's a first-time registrant by mail who

9          does not provide ID with the registration is

10         required to show one of several forms of ID provided

11         under HAVA, bank statement -- they're not photo IDs,

12         they're just what HAVA deems to be IDs, or what a

13         state may also allow, which in Georgia of course

14         it's the photo IDs listed in 417(a).  You would

15         agree with that, right?

16   A.    That's correct.

17   Q.    Okay.  I mean I'm basically saying here that the

18         individual who's in MIDR status who is -- who's -- I

19         mean, excuse me, who is not in MIDR status, an

20         individual who did not provide ID, first-time

21         registrants, they fall under HAVA, they're not in

22         MIDR status if everything matched, right?

23   A.    That's correct.

24   Q.    But for purposes of HAVA, they -- and 417, they

25         could -- that person would still be able to show --

1        they still have to present ID under HAVA, it would

2        be a bank statement or a utility bill or what

3        else -- anything else the state allows them to

4        provide, which are the forms of photo ID under (a).

5        And so that individual falls in the same bucket.

6   A.   Well the --

7   Q.   The only difference that you're telling me is they

8        don't get a letter.  And so we're getting down to

9        the scenario which it's a letter is what you're

10       saying is the -- the letter is the burden?

11  A.   Well, it's an informational burden because the --

12       the process has -- the process is different.

13  Q.   But it's not a -- it's an informational burden.  It

14       is not a burden on you can't show -- or you have to

15       show additional forms of ID that you would otherwise

16       not have to show, right?

17  A.   That's correct.

18  Q.   Okay.

19            MR. RUSSO:  I'm about to move into another

20       topic on the data.

21            THE WITNESS:  This would be a good time to take

22       a lunch.

23            MR. HERMAN:  Okay.

24            THE WITNESS:  Is that okay?

25            MR. RUSSO:  I figure we'll be chatting about

```
 1            the data for a little while and then I'll be pretty
 2            close to done.
 3                    (Lunch break taken.)
 4                    MR. RUSSO:  Back on the record.
 5     BY MR. RUSSO:
 6     Q.     Dr. Mayer, we discussed briefly I believe earlier in
 7            the day on page 13 of your report you refer to a
 8            paper by Hood and Bullock from 2008, and your report
 9            states license and ID possession rates among
10            minority populations are lower than for non-Hispanic
11            whites, both generally and in Georgia.  And you cite
12            to Hood and Bullock paper.
13                    Did you -- did you conduct any follow-up
14            research on that paper to see if those -- if the
15            rates of the license and ID possession rates among
16            minority populations have -- has changed any in
17            Georgia?
18     A.     Not in Georgia, but generally data from 2012 through
19            2016 suggested a general pattern of lower ID
20            possession rates among minority populations.
21     Q.     And is the -- the general connection there and the
22            voting context that photo ID is going to cause lower
23            voter turnout or registration by minorities?
24     A.     The evidence is that it does reduce turnout.  The
25            evidence of registration is -- is not quite as clear
```

1        about what the effects are.

2    Q.  And I guess Georgia must be somewhat of an anomaly

3        with our voter -- voter turnout rates having gone up

4        so high over the last decade since photo ID among

5        minority voters.  I don't know if you've looked at

6        that or not.

7    A.  I'm sorry, say that again.

8    Q.  Turnout amongst minority voters has increased

9        significantly in Georgia since implementation of

10       photo ID.

11   A.  So the -- most studies of aggregate turnout find

12       that that doesn't happen, but the -- the issue with

13       voter ID is not only turnout generally but whether

14       an otherwise qualified individual has their access

15       to the voting booth impeded through voter ID laws.

16       And the evidence there I think is quite clear that

17       it does.

18   Q.  But again, you don't -- I mean as to Georgia, I

19       realize we're not here to discuss photo ID.  You

20       haven't looked at that in Georgia?

21   A.  So I'm not offering an opinion about the effect of

22       voter ID on turnout in this report.

23   Q.  You go on to mention the Social Security

24       Administrator's OIG report from 2009.  I assume you

25       reviewed that report prior to writing your -- your

```
 1        report?
 2   A.   I did.
 3   Q.   And in that report it states that Georgia's -- the
 4        percentage of non-matches through SSA for Georgia at
 5        that time was 14 percent?
 6   A.   I don't know if that specific citation refers to
 7        Georgia.  I did look at data from the Social
 8        Security Administration that found over half of the
 9        records sent by the state to the social security
10        agency for matching, over half of them failed to --
11        failed to match.  And also if you look at the -- the
12        data that was actually submitted through, for
13        example, the pending files, that a very small
14        percentage actually was returned as this person
15        matched and we can verify their identity.  The
16        majority were either no match was found or there
17        were invalid input data.
18   Q.   Invalid input data would be somebody's four digits
19        didn't -- didn't match, or would it be they didn't
20        have -- so the state submitted it or DDS submitted
21        it because I believe that's actually DDS that does
22        that through HAVA and their contract with SSA,
23        the -- a field was left blank that's required?
24   A.   Or something -- the problem was with the data
25        submitted, not that the data did not match.
```

```
 1   Q.   All right?
 2   A.   Because if they were able to bring the data in and
 3        run whatever matching algorithm they use, it would
 4        show up as no match found, not invalid input data.
 5   Q.   And you state in here in your paper that the
 6        nine-digit security number would be a better
 7        identifier to use than the four digit, right?
 8   A.   Well, the nine-digit social security number is
 9        unique for each individual, and so if you have that,
10        there would be no question that you were dealing
11        with the same person.  And I note that the
12        combination of the last four digits, if you account
13        for combinations that the Social Security
14        Administration doesn't allow, you can call it 10,000
15        times 365.  There are only a few million
16        combinations so that's far less than the number of
17        people that are in the social security database.  So
18        that combination is not unique to an individual.
19   Q.   So again the State of Georgia allows individuals
20        provide a nine-digit, it's voluntary, though, but
21        federal law of course prohibits them from requiring
22        the nine-digit as I'm sure you already know that?
23   A.   That's correct.
24   Q.   Are you familiar with the Schwier v Cox case?
25   A.   No.
```

```
 1   Q.   Which is the case out of Georgia that -- in which it
 2        was overseen under the privacy act for collecting
 3        the nine-digit social security number that enforced
 4        Georgia -- HAVA, there's an exemption for HAVA,
 5        right, for states to collect the nine-digit social
 6        security number.  Are you aware of that?
 7   A.   Not all of the -- the details.
 8   Q.   I'll mark this as --
 9            (Exhibit No. 6 marked for identification.)
10   Q.   Exhibit 6, that's the social security report that
11        you are referring to?  And I apologize the staple is
12        on the wrong side.
13   A.   So this is the report.
14   Q.   Uh-huh.  And if you flip to Appendix C of the
15        report, it is the fourth or fifth last page, this --
16        it's Appendix C, Verification Request for Top Ten
17        States; shows Georgia actually had nearly 1.95
18        million transactions and 14 percent of those
19        transactions were non -- non-matches.
20            And then in your report you then refer to a
21        file that you just pulled, the HAV running list
22        spreadsheet, and you indicate that it shows since
23        2011 half -- over half of the records, 53.4 percent
24        sent by the state to SSA end up as a non-match.
25            Do you -- do you know -- did you have -- Have
```

```
 1        you ever looked into why that change?
 2   A.   Why that changed from 14 percent to 53 percent?
 3   Q.   Uh-huh.
 4   A.   I don't.  I have not.
 5   Q.   On page 15 of your report, it appears -- I guess you
 6        did look at some -- some names, and you said you
 7        came up with mismatches from the State of Georgia
 8        from the data that you reviewed in this case?
 9   A.   That's correct.
10   Q.   And tell me -- tell me how you -- it looks like you
11        combined a couple files here, pending 2018 file and
12        a pending 2014 to 2019, and you pulled -- you merged
13        the files, pulled out some individuals, and you came
14        up with 19 individuals non -- with non-matching
15        names?
16   A.   So what I did in that case is that there were two
17        pending files.  One I believe was everyone who was
18        in pending status in February of 2018.  And then
19        there was a second file that included everyone who
20        was in pending status between I believe it was
21        January 2014 and July 2019.  All of those records in
22        both files had Georgia a voter registration number,
23        which is a -- I think it's an eight-digit number
24        that actually should be unique for the individuals.
25             Because I had a unique identifier, it was a
```

1        simple matter to merge the files.  And so I had all

2        of the data for each individual in both files.  And

3        it showed that even in this case that there were

4        people -- that this was the same data should have

5        been entered in a similar or the same process, that

6        there were still names that didn't match, either

7        first name or last name, either because of a one

8        character difference in -- in spelling, an

9        apostrophe in one file and no apostrophe in another

10       or typographical errors.

11            And so this was just demonstrating that even

12       for the same individuals, that we know they're the

13       same individuals, that exact matching on names can

14       produce false non-matches.

15  Q.   Now, this -- the registration number for those

16       individuals, they had the same registration number,

17       right?  So they were in both files with the same

18       registration number?

19  A.   That's correct.

20  Q.   So it wasn't -- for example, you have someone named

21       Malaya, M-A-L-A-Y-A and Melaya, M-E-L-A-Y-A.  Is

22       that -- there -- but there's only one person, right?

23  A.   That's correct.  I looked at the records, and it was

24       usually the same last name, same address and so it

25       was -- and even if it wasn't, the -- the voter

```
 1         registration number should be unique.
 2    Q.   And did -- did you -- We don't know I guess whether
 3         that pending file that you looked at, whether there
 4         was an error somewhere within that file that caused
 5         the person's name to be spelled one way in one file
 6         and one way in the other?
 7    A.   So if it was a -- an error in the production of the
 8         file?  It could have been, but that -- that wouldn't
 9         matter if you were using exact matching because it
10         would still be a character-by-character match on the
11         field even if the -- the error was related to the
12         process of -- sort of the internal processes of
13         generating that file.
14    Q.   Okay.  So these were just two pending list files,
15         and there's an error -- do we know if the person
16         tried to register twice and that was that their name
17         was on both files for that reason?  I'm just -- It
18         doesn't make sense to me why there would be -- so
19         there's a 2018 pending list and a large be pending
20         list, right?  And I guess they were merged -- some
21         data was pulled at some point, and someone's name --
22         that person doesn't show up twice in the same list?
23    A.   As a rule that's correct.  So these are the same
24         individuals.
25    Q.   I get that part.  I'm just trying to understand how
```

1        this data is -- it seems like if it's -- you're

2        pulling the data from a pending list, unless

3        somebody tried to register twice.

4    A.  Or someone may have reregistered.

5    Q.  Yeah.  It doesn't -- that's right.

6    A.  Or updated their information.

7    Q.  Did it indicate in the file -- And I apologize.  I

8        didn't mean to cut you off.

9    A.  No, I was finished.

10   Q.  Did it indicate the reason for the non -- I guess it

11       was a person pending.  Well, why was the person

12       pending status?  Did you look at that?

13   A.  I did not look at the reason they were in pending.

14       I was interested in looking at the relationship

15       between exact matching and what happened for

16       individuals who were in the same type of data set

17       produced by the same agencies at different times.

18   Q.  Do you know when those data sets were -- were

19       actually pulled?

20   A.  I believe they were pulled at the point that the

21       file -- the files were generated in February 2018

22       and July 2019.

23   Q.  And are there any reasons that -- other reasons that

24       may exist as to why someone is being pulled from

25       presumably the same population, the same data set at

1       different times, why their name could have been

2       spelled differently?

3              So in other words, you pull somebody, you pull

4       his data set in late 2019 or mid 2019, and this

5       person has been -- was on it since whenever, I guess

6       2018; is that right?  And then if you had pulled

7       that same list in 2018 -- more of a technical issue

8       I guess with how the data sets were pulled?

9   A.  Well, the -- the purpose of this exercise was to

10      sort of explore the -- the consequences of exact

11      character-for-character matching techniques.  So I

12      am not certain why the errors existed.  I don't know

13      why a name was spelled this way in one data set and

14      a different way in a different data set.

15             But for these purposes that doesn't matter.

16      The important thing is that there was a difference,

17      that an exact matching technique would not -- would

18      falsely not connect -- not link these records and

19      would not consider them the same person if you were

20      matching on name fields.

21  Q.  Okay.  So I understand.  So you're just trying --

22      You're trying to point out that an exact match of

23      these characters -- now, we don't know if maybe this

24      person tried to register twice, right, and one time

25      spelled the name M-A-L-A-Y-A or maybe spelled it

1          M-E-L-A-Y-A once and was sloppy with their

2          handwriting and it picked up as M-A-L another time.

3          I mean if they were registering twice, I guess that

4          would make sense if they submitted two registrations

5          why, but you're saying you didn't review the file

6          for that purpose?

7    A.    So there was no indication --

8    Q.    No.

9    A.    -- of why the errors occurred.

10   Q.    Gotcha.

11              (Exhibit No. 7 marked for identification.)

12   Q.    Handing you what's been marked as Exhibit Mayer 7.

13         This is the -- a printout of the pending -- you see

14         the name of the file at the bottom of the page,

15         Pending Analysis January 2020.xlsx file.  Does this

16         look like your spreadsheet?

17   A.    Yes, it does.

18   Q.    And I can tell you that's -- that's what it --

19         that's what it is.  And it's each of the sheets that

20         were in that file.  Now, on the first page you have

21         table 1 at the bottom, shows the number of active

22         registrants as of December 2019, and then the

23         column -- at the top are columns that fall under

24         pending less age January 2020, pending less age

25         January 2020 including pending verification.  The --

1            and those are -- those are the numbers that you

2            pulled from the 2020 data set that you compiled from

3            the counties?

4    A.     The top tables, yes.

5    Q.     Now, you -- you mention in your report that the

6            differences in the, you know, the aggregation, the

7            county files for the 2020 data sets produced nearly

8            identical data that is not material.  That is not

9            material?

10   A.     That is correct.

11   Q.     And I'm looking -- looking at it, it looks -- it

12           appears that in column B at row 10, that the number

13           of black, not of Hispanic origin, voters as of

14           January 2020, you have 2,065,722 active voters; is

15           that right?

16   A.     I believe that's right.

17   Q.     And if you look at column G on under -- it's

18           actually got a different number.  Do you know why

19           there's a difference in those numbers?

20   A.     So the -- the column G includes a separate category

21           of pending verifications, and there weren't that --

22   Q.     I thought H is the pending verification column.

23   A.     So there were -- so that number is -- is different

24           by a hundred and -- 115.  The -- the total is the

25           same.  So there -- there are a few people in that

```
 1         category.  You can see the other numbers are
 2         different as well probably because there were --
 3         there may have been people in more than one
 4         category.  But again those -- those differences are
 5         not -- are not significant.  We're talking about 100
 6         people out of -- out of 2 million.
 7    Q.   But you were working off the same files?  That's --
 8    A.   That's correct.  These were -- these were the same
 9         files.
10    Q.   So I realize that it's not a large number between --
11         the difference -- I was trying to get an
12         understanding as to maybe why there was a difference
13         there.  And in addition to the other -- the other
14         categories if you are pulling it all from the same
15         data set.
16    A.   These were pulled from the same data set, so this
17         was a function of the data that was actually in the
18         file.
19    Q.   And when you put -- placed it into this -- this
20         pending analysis spreadsheet, I mean was there
21         some -- would there have been an issue with how it
22         was copied over?  Is that why it was different?
23    A.   No, it shouldn't.  What this means is that there
24         were -- so if you look at the --
25    Q.   Seems like the total should still be the same no
```

1         matter what.

2    A.   And they are.  If you look at the -- the total

3         number of people.  So what this indicates is that

4         there were a small number of people in some

5         categories that were -- that have had different

6         reasons for being pending.  And there were a small

7         number of people, looks like about 200 people who

8         were in the file for the reasons of pending

9         verification.  And I -- I can't remember exactly why

10        I considered that informative.

11   Q.   And I'm just looking at columns B and G.  I realize

12        that some -- that H and -- columns H and C are going

13        to be a little bit different because you're adding

14        pending verification, so you're --

15   A.   So what this means if you add up B and C and G and

16        H, those numbers are the same.  So there are some

17        people who moved from --

18   Q.   Right.  I got that.  I got that.  I was wondering

19        why B and G would be different.  It's the same for

20        row 4, American Indians have the same number --

21        anyway, it's -- it's fine.  I get that they're

22        different, and it sounds like you're not quite --

23        quite sure why there would be, you know, looking at

24        row 7, for example, 7B, 165,014 active Asian or

25        Pacific Islander voters under that demographic, and

```
 1         then row 7G which shows 164,979 active registrants
 2         as -- that are Asian or Pacific Islander.  And it's
 3         a --
 4    A.   So given that we're talking about 200 people, these
 5         might be registrants whose information has not yet
 6         been submitted or has been submitted but they don't
 7         have an answer back.
 8    Q.   Oh.
 9    A.   So that could be it.
10    Q.   And I do think that individuals in pending
11         verification status, that is probably true.  That is
12         what pending verification means.
13              Now, looking at the totals in table 1 in the
14         bottom left-hand corner, there's row 33B.  There's I
15         guess the end of December or sometime in December
16         there's 2,011,116 African-American active
17         registrants in Georgia.  And then, you know, back to
18         row 10, column B, as of January gone up about
19         55,000; is that right?
20    A.   That's correct.
21    Q.   So the number of registrants between December and
22         January, that increased for African-American voters
23         presumably about 55,000, right?
24    A.   That's correct.
25    Q.   And then for white voters, which is row 22B and row
```

1      32B, there was in December 2019 about 3,594,048
2      active registrants who are white, non-Hispanic.  And
3      then January looking at -- of 2020 looking at row
4      22, column B, there is about 3,619,336 white
5      non-Hispanic active voters in Georgia.  So about 20
6      -- what is that, about 25,000?
7  A.  That looks about right.
8  Q.  So the -- the rate of registration between December
9      of 2019 and January of 2020 of African-American
10     voters versus white voters, they're -- it's about a
11     little more than two-to-one rate; is that right?
12 A.  Well, I would be very careful about drawing a
13     conclusion from what amounts to probably three weeks
14     of registration data in an off year.  So it is true
15     that there were more African Americans who were on
16     the active rolls in January than there were in
17     December, but I don't regard those differences as
18     informative.
19 Q.  Well, you're saying over that three-week period, I
20     mean are you saying that maybe there was -- it could
21     be even higher number for the rest of January?
22 A.  The number of people who registered, if you looked
23     at it now, would almost certainly be higher than in
24     this for most if not all of these groups.
25 Q.  Of course because all these people are registering

```
 1        to vote.  I'm talking about the rate of

 2        registration.

 3   A.   Calculated how?

 4   Q.   Well, just looking at the totals from your report.

 5   A.   So the number of new registrants divided by the

 6        total number of registrants?

 7   Q.   The -- I guess you could, yeah, you could calculate

 8        that rate that way.

 9   A.   So by that standard the rate of African-American

10        registration was higher than it was for non-Hispanic

11        whites.

12   Q.   Right.  And looking at your table, table 4, I

13        believe, you calculated -- you calculated the rate

14        of like -- I guess the likelihood of MIDR status

15        statewide in table 4, but basically it's the rate at

16        which registrants are in MIDR status.  That's what

17        you're -- you appear to be doing, and that rate --

18        How did you come up with that rate?

19   A.   That was the number of registrants in MIDR status

20        for each demographic group divided by the total

21        number of registrants.

22   Q.   And you -- you didn't look at the number of

23        applications coming in over that certain time frame,

24        though, in coming up with this -- this rate?  I mean

25        it's just applied to the whole population?
```

1    A.    Each sub group.  That's correct.

2    Q.    Uh-huh.  Now, would your -- would your opinion

3          change if the rate at which African-American voters,

4          for example, were registering as, you know, over two

5          times as many for a given period as whites, you

6          would expect them to have more potential -- have

7          more people potentially in MIDR status, right?

8    A.    Not necessarily.

9    Q.    And why is that?

10   A.    Because here we are looking at the -- the percentage

11         of people who are in a category as a percentage of

12         the whole, and you would have to start with the --

13         you would have to make the assumption that there's

14         some difference between types of registrants or the

15         likelihood that someone was going to be in MIDR

16         status based on when they registered.  But if we

17         look at the entire period over which voters were --

18         were or should have been placed in active status and

19         MIDR, we're not just looking at a three-week period.

20         We're actually looking at almost a year because

21         the -- the point at which the -- the change was

22         supposed to have taken place was in April 2019.

23              So this -- the rate or the likelihood that a

24         registrants is in MIDR status is actually looking at

25         a much longer time period rather than just a

1    difference between December 27th or December 30th

2    and the middle of January.  So this encompasses much

3    more data.

4         So even if it were true that people who

5    registered in January for some reason, African

6    Americans, were more likely to trigger an MIDR

7    match, that would be -- that would not explain the

8    magnitude of this difference, which is we're talking

9    about a factor of ten.

10  Q.   But your -- you're looking at it, though, for all

11       time?  I mean you didn't apply the -- the number of

12       individuals in pending or MIDR status from April of

13       2019 to -- to, you know, the day that you did the --

14       you did the report or that the numbers were from?  I

15       mean you looked at -- so would it be more accurate

16       then -- I get that December/January may be a shorter

17       time frame.  You mentioned that you were looking at

18       pending voters from the end of April through

19       January, but you didn't -- you didn't look at the

20       number of registrants during that -- that period as

21       a total.  So if --

22  A.   So --

23  Q.   So if African Americans are still registering at --

24       let's assume that they registered at a, you know,

25       two to one to white non-Hispanic registrants from

```
 1          the beginning of that pending list, wouldn't that be
 2          the appropriate comparison?
 3    A.    You could do that.  I don't think there's any reason
 4          to think that the numbers would be that different
 5          because if I'm -- if I have a certain probability of
 6          triggering an MIDR match, that the absolute number
 7          of people who register won't effect that percentage.
 8          It will affect the number of people, but this is --
 9          this is not based -- this is not a function of the
10          number of people who register.  There are more
11          people who registered that I wouldn't expect that to
12          change this dramatically because I'm dividing the
13          number of people in a sub category by the number of
14          people in the population.
15                So if you have more people registering and the
16          underlying probabilities of triggering MIDR are the
17          same, that you wouldn't expect any different result
18          in this table.
19    Q.    So if -- if -- and looking at your spreadsheet, you
20          have -- and I guess we could just use your -- we'll
21          use pending verification for now.  I believe
22          that's -- you have about, what, 39.4 percent for
23          black non-Hispanic voters in pending status; is that
24          right?
25    A.    So that -- that reflects that about 39. -- actually
```

```
1          39.4 percent of the registrants in pending status --
2    Q.    Right.
3    A.    -- are African-American.
4    Q.    Uh-huh.  And then, you know, you take that number,
5          and you're comparing it to the demographics of the
6          entire -- of all active registrants in Georgia,
7          right?
8    A.    Well, no, we're actually -- you're comparing apples
9          and oranges here because the spreadsheet is talking
10         about voters in pending status.  Table 4 is talking
11         about --
12   Q.    Oh.
13   A.    -- people in MIDR status.
14   Q.    Sorry.  I was not referring to table 4.  I was just
15         referring to what you did in your report.  You
16         compared that number 39.4 as, you know, the number
17         of individuals who are black non-Hispanic in pending
18         status, right?  So of the total number of voters in
19         pending status as of January 2020, 39.4 percent of
20         those voters are individuals who are
21         African-American, right?
22   A.    That's correct.
23   Q.    And you concluded that since the number of
24         percentage of active registrants in Georgia of
25         African Americans and as of December 2019 was 29.6
```

1          percent, then there's a disproportionate number of

2          registrants being placed in pending status who are

3          African-American, correct?

4    A.   That's correct.

5    Q.   However, and what I'm asking, what we were just

6          discussing is if -- if the number of registrants

7          from the beginning of when this pending list is --

8          was created, which is I guess April of 2019 through

9          January 2020, if African Americans were registering

10         at a rate of say 60 -- 60 percent of the total

11         number of individuals who registered from that time

12         period, then it wouldn't be disproportionate,

13         correct?

14   A.   So if there were more African Americans who

15         registered, and they were more likely to be in

16         pending status --

17   Q.   Well, I'm not saying more likely or not.  I mean

18         we're just comparing the percentages, you know.  I

19         think it's more apples to apples at this point

20         versus what the his -- you know, there are obviously

21         folks who are in that 29.6 percent of active

22         registrants who registered long before any of these

23         policies were put in place.

24   A.   So it is possible that the number of people in

25         pending -- pending status would be a function of the

1       number of people who register.  But in terms of

2       the -- the burden, that doesn't matter because you

3       still have people who are in pending status and so

4       the -- the -- the percentage of people in that

5       category would be a function of the number of people

6       who registered and the likelihood that they are in

7       pending status.

8           But you still have the -- I think if you

9       calculated that in a different time period, you

10      would still find that minority registrants are

11      disproportionately in pending status in a magnitude

12      that wouldn't be explained by the differences in

13      registration rates or the numbers of people in each

14      group who registered.

15  Q.  Well, if during that time, this time period we're

16      discussing, so if we're if talking about April 2nd

17      of 2019 through this -- the date on this -- you

18      know, this file, sometime in January, we're going to

19      assume it's the end of January for our purposes of

20      discussion, if there were 60 percent of the

21      registrants from that time period that were

22      African-American or 50 percent or anything above

23      39.4 percent, there wouldn't be a dis -- you'd agree

24      there wouldn't be a disproportionate number of

25      African Americans in pending status, right?

1   A.   Well, in one sense perhaps, but the -- the number of

2        people in pending status is not simply a function of

3        who registered between December 27th and January

4        15th.  This pending list actually goes way back.

5        For people who were in pending status in February

6        2018, unless they have resolved whatever issue

7        placed them in pending status, they are still going

8        to be in pending status in January of 2020.

9             So you're looking at essentially a three-week

10       period and trying to draw an inference about these

11       numbers of people in pending status when the number

12       of people in pending status is a function of

13       practices that go much farther back than between

14       January and December.

15  Q.   Right.  But after -- after HB 316, the number of

16       individuals in pending status changed significantly

17       because individuals who didn't have a match were

18       not nec -- were not -- they were automatically in

19       active status, correct?  You couldn't look back to

20       people in pending status -- to all pending status

21       voters from the time that this policy was actually

22       started, which I think was probably, you know,

23       sometime maybe in 2009 or '8 or '10, you wouldn't --

24       you couldn't look at that entire universe of

25       applicants because HB 316 wiped most of -- a lot of

1      those folks would never be in pending status under

2      HB 316?

3  A.  I'd have to check.  I'm not sure how evenly it was

4      applied retroactively, but I would have to check.

5  Q.  You would agree, though, if you could be -- if an

6      applicant would go into pending status prior to HB

7      316 due to having a name not match -- I'm just going

8      to use this hypothetical, of course, but for a name

9      not matching, and the person prior to 316 would go

10     into pending status, after 316 the person goes into

11     active status, right?

12 A.  If they register after 316.

13 Q.  So -- Right.  So you wouldn't -- it wouldn't -- you

14     couldn't look at all the entire history of pending

15     status voters because there's a -- after 316 there's

16     a number of those individuals that may not ever

17     be -- they would never be in pending status.

18     They're automatically in active status post 316.  So

19     that's why I'm using that as the time for viewing

20     this rate.

21 A.  So I would have to check.  I don't think there's any

22     reason to expect these numbers to be dramatically

23     different if you limited the -- the population of

24     people in pending status after April 2nd, but I

25     can't sit here and tell you what that number is.

1   Q.   But if that number -- if the number of registrants

2        after HB 316 was -- number of African-American

3        registrants after 316 constitutes 40 percent of the

4        total active registrants in that period, then

5        there -- the number of individuals in pending status

6        is not disproportionate to the reg -- to the

7        registration numbers?

8   A.   I think that would be right.

9   Q.   Okay.  And that would be the same across any group,

10       right?  If -- if your percentage of individuals in

11       pending status -- so let's take whites.  White

12       non -- not of Hispanic origin.  14.68 percent of the

13       individuals in pending status are -- are white,

14       correct?

15  A.   That's correct.

16  Q.   And if the number of individuals, the percentage of

17       registrants from 316, enactment of 316, to whenever

18       these numbers were pulled, was greater than 14.68,

19       there would be a disproportionate number of

20       registrants being flagged or being placed in pending

21       status who are white?

22  A.   So if we looked at a specific period?

23  Q.   Same exact thing that we just went over.

24  A.   I think that's correct.

25  Q.   Okay.  Is there a reason why you didn't look at the

1        numbers from post 316?

2   A.   No.  I was interested in the -- the total numbers of

3        people in the -- in the status.

4   Q.   And you'll agree though then that your conclusion,

5        if we do look at the -- the number of registrants

6        from that period, your conclusion that no matter how

7        the data are aggregated, the verification process

8        disproportionately affects minority registrants,

9        that would be incorrect?

10  A.   I don't think that would be incorrect.

11  Q.   Why?

12  A.   I think the marginals might change, but just

13       eyeballing it, there's no reason to think that the

14       overall conclusion of minority voters being

15       disproportionately affected would change.

16  Q.   Well, if -- and that's disproportionate, which in

17       your conclusion you're referring to disproportionate

18       to white voters, right?

19  A.   Disproportionate to their makeup in the voting

20       population.

21  Q.   And if -- again, if the number of voters who

22       registered after 316, that -- the number of let's

23       say white voters is greater than 14.68, then -- then

24       you'd conclude that the white voters are being put

25       in pending status at a disproportionate rate, right?

1   A.   That would be direct.

2   Q.   And if the number of black voters who register

3        during that same period is 40 percent of the total

4        voters, then you would say that the number of voters

5        placed in pending status who are black is not

6        disproportionate?

7   A.   Well, so as I'm thinking about this, that could be

8        true, but it depends on when someone was placed in

9        pending status.  If we were looking at only the

10       people who registered between say April 1st and

11       January of 2020, then the number of people -- number

12       of African Americans in pending status would be

13       different from this because you're sort of assuming

14       that everybody in pending status registered after

15       this date, after April 2nd.  And I don't know that

16       that's true.  So there are -- there are several

17       moving parts.  But if you looked at a -- a

18       particular registration period and looked at the

19       people who registered and the number of people who

20       are in each group and the number of people in each

21       group who were placed in pending status, that would

22       tell you how many people -- and calculated the

23       percentages, you could reach a conclusion about

24       effects on registrants who registered in that

25       period.

```
 1   Q.   Okay.  And -- and if some -- you know, you say if
 2        you looked farther back, I suppose because there's
 3        some individuals who may have been in pending status
 4        prior to 316, after 316 they didn't come out of
 5        pending status because they were still, say they
 6        were still missing information, right, or for any
 7        reason that somebody would go into to be in pending
 8        status currently, they wouldn't have changed their
 9        status.  You're saying, you know, maybe you need to
10        look back farther.  It actually wouldn't -- wouldn't
11        that skew the numbers even more such that this --
12        that there may be even fewer -- there may be even
13        more white non-Hispanic voters that are in pending
14        status in proportion to the total number of
15        registrants and vice versa for again
16        African-American voters where maybe there was 50
17        percent actually of the active registrants during
18        whatever period you were going to go back to, you'd
19        go back to so the number could be even greater,
20        right?
21   A.   It's possible, but there are two moving pieces here.
22        One is the number of people who register and the
23        other is the number of people who are in pending
24        status among new registrants so I would have to go
25        examine the data to see if that was happening.
```

1              But again I -- it might affect the -- some of

2         the marginal percentages, but there's no reason to

3         think that the effect on minority registrants in the

4         aggregate would be significantly different.

5    Q.   So you though applied it to the entire -- compared

6         it to the entire percentage of African -- you would

7         agree with me though that that is less accurate than

8         looking at the number -- the voters for the

9         applicable, the narrower applicable time frame,

10        right?

11   A.   So that --

12   Q.   It inflates the results -- it inflates the -- the

13        results?

14   A.   I don't know that it inflates the results.  It could

15        change the results, but I -- again, it might affect

16        the percentages for African Americans, but given the

17        total number of people who likely registered between

18        these two periods, I don't think there's any chance

19        that the results wouldn't show that minority

20        registrants are disproportionately affected.  I

21        don't think that the percentage of white registrants

22        in pending status would go from 14 percent to 50

23        percent.

24   Q.   I'm not saying the percentage of white registrants,

25        I'm saying -- yes, I guess that would be right, the

```
 1            percentage of white registrants in pending status,
 2            or any minority.  Pick any group.  I think it
 3            applies across the board, the analysis.  So if it
 4            did, though, would you -- would you agree that your
 5            opinion is -- is incorrect?
 6    A.      Well, if the results were -- showed that --
 7    Q.      Well, if the numbers were -- percentages were
 8            equal -- let's just take every group except for the
 9            white group, white non-Hispanics.  I think that was
10            the only one that in your analysis went the other
11            direction.  If -- if the number or percentage of
12            active registrants for this period, say for Asian --
13            Asian or Pacific Islanders is greater than 16.83
14            percent, then that would not -- the number of Asian
15            Pacific Islanders in pending status as of January
16            2020 would not be disproportionate?
17    A.      If that's what the data showed, but I don't think
18            that's what the data would show.
19    Q.      But if it did, you would agree?
20    A.      Well, my conclusions are based on the data.
21    Q.      Well, you didn't look at this data, right?
22    A.      I didn't look at that particular data.
23    Q.      Now, you did look at -- at individuals in non --
24            that are -- or registrants that are in pending
25            status due to non-citizenship, right?  And table 5
```

1    of your report, page 22, and table 6, now these two
2    reports you're looking -- excuse me, tables --
3    you're -- you're looking at percentages of
4    individuals who are in pending status as
5    non-citizen, and you're taking their -- by race, and
6    then in table 6 you are looking at just the
7    percentage of individuals who are voting age
8    naturalized citizens living in Georgia according to
9    the 2014-2018 five-year American Community survey,
10   right?
11           And if I'm -- if I'm following this correctly,
12   the -- let's take Hispanics in table 6.  20.9
13   percent of the voting age naturalized citizens
14   living in Georgia are Hispanic, and you say that in
15   table 5 there's 20.9 percent in pending status as
16   flagged, so you wouldn't say there's a
17   disproportionate effect there?
18 A.  Well, I'm not arguing for -- Again we're comparing
19   two different numbers.  The point of table 6 is to
20   demonstrate that there are, in fact, hundreds of
21   thousands of naturalized foreign-born citizens
22   living in Georgia.
23 Q.  Uh-huh.
24 A.  And combined with the known inaccuracies of relying
25   on driver's license data to verify citizenship

1     because it's rarely updated or frequently not

2     updated, this shows that among the people who are

3     registered who are flagged as non-citizens, I mean I

4     am certain that there are actual citizens on that --

5     in -- on that list of people.  I don't know how

6     many, but I can express certainty that the number is

7     greater than zero.

8          So that means that some of these individuals

9     are actually citizens, and because of a flaw in the

10    underlying verification process, they are flagged as

11    non-citizens and will have to go through a separate

12    process.

13         And the point of table 6 is not to say that

14    those numbers of -- you know, the percentage --

15 Q.  Okay.

16 A.  -- of naturalized foreign-born African-American --

17 Q.  Right.

18 A.  -- people in Georgia should be the same as that

19    number.

20 Q.  I understand that.

21 A.  It's just that there are --

22 Q.  It's a little different.  It's not the same analysis

23    that we were just looking at regarding the total?

24 A.  That's correct.

25 Q.  Now, you said that there are the flaws in the

1          registration process as it applies to verifying
2          citizenship.  You're aware of course that it's --
3          citizenship is compared to the information in DDS's
4          database, right?
5     A.   That's correct.
6     Q.   And it's your position that that information may be
7          outdated, right?
8     A.   That's correct.
9     Q.   Now, what is your understanding of how that
10         information gets -- gets updated?  So an individual
11         who's a non-citizen but able to have a license, and
12         it ends up thus there in the DDS database, and when
13         that person would then change over to be in the DDS
14         database as a citizen.
15    A.   My understanding is it would require affirmative --
16         an affirmative step by the registrant to change
17         their status at DDS.  It doesn't automatically
18         update when someone naturalizes.
19    Q.   So right.  So USCIS doesn't provide naturalization
20         information automatically to the states to say these
21         people have been naturalized, update your driver's
22         license database?
23    A.   That's my understanding.
24    Q.   So it's all self-reporting.  So if somebody's
25         flagged as a non-citizen and in pending status, but

```
 1          they are -- but that person is a citizen, it would
 2          be because that person hasn't updated their
 3          information in DDS's database?
 4     A.   That's my understanding.
 5     Q.   And is it your understanding that -- Do you know if
 6          SSA provides naturalization information to states
 7          whenever they run the HAVA match?
 8     A.   My understanding is that information that is --
 9          there is voter information provided to the social
10          security administration for the purposes of
11          citizenship match because if I register using my
12          social security number and don't have a driver's
13          license number, I mean there's really nothing to --
14          nothing to match, and --
15     Q.   What do you mean?
16     A.   -- if all I did was report my name and birth date,
17          that's unlikely to produce a match in DDS because
18          there are just too many possible combinations.
19     Q.   But non-citizens can still have a social security
20          number, right?
21     A.   That's correct.
22     Q.   So you could have somebody who matches -- You could
23          have somebody who could be in SSA's database with
24          the first name, last name, date of birth, last four
25          digits and be a non-citizen, right?
```

1   A.   That's correct.

2   Q.   And you don't know whether SSA would then say okay,

3        we have a match, but this person is actually a

4        non-citizen, a non-citizen?

5   A.   I believe it does because there is a code in the --

6        in the files that reports the results of the Social

7        Security Administration verification process.

8   Q.   And I believe it's in one of these reports also, but

9        just for -- I guess it's easier -- Okay.

10           So if we go to -- I don't remember what number

11       we marked as the SSA report.

12  A.   It's six.

13  Q.   Exhibit 6, page 2.  There's a -- a chart here, table

14       1, HAVV responses, and it states -- and see midway

15       through the charts says types of match verification

16       responses:  single match alive, single match

17       deceased, multiple match alive, multiple match

18       deceased, multiple match mixed.

19           Now, do you know if -- if these are -- this is

20       the accurate match verification responses that --

21  A.   So my recollection is that there was a separate code

22       that the Social Security Administration provides

23       that they do their own citizenship test.  I would

24       have to go back and look at the -- look at the data.

25       But in the pending files there are separate fields

```
 1           for DDS citizenship and social security
 2           verification.  And I -- I recall that there -- that
 3           there is a separate verification code for social
 4           security citizenship verification.
 5    Q.     Now, if we go to the -- the training materials
 6           exhibit, that Ryan Germany 116, I believe, that --
 7           that we discussed earlier.  If you flip to page
 8           Bates 8832.  Okay.  This document, it's -- it says
 9           dashboard verification responses to review.  DDS
10           will provide a quote/unquote Y or quote/unquote N
11           value for each field that is reviewed.  SSA provides
12           a single response code.  All of the possible
13           responses are listed in the table below.  No match
14           found -- and I -- and no match found is a Z.; Y
15           response is single match deceased; X is single match
16           alive; W multiple matches, at least one alive and at
17           least one deceased; V, multiple matches all alive; T
18           multiple match all deceased; S invalid input data,
19           and 9 system error, unable to process at this time.
20                And so it's your -- you believe that -- you
21           contend that there's actually another response code
22           that SSA would provide on citizenship?
23    A.     So I would have to go back, and I could be
24           misremembering, but my recollection is that in the
25           files there's a separate field for citizenship based
```

1      on Social Security Administration responses.  But I
2      would have to look specifically at the files to
3      confirm that.
4   Q.  And so if -- if there is no confirmation by SSA, you
5      would agree that this statement in your report
6      that -- regarding SSA citizenship verification is
7      incorrect, right?
8   A.  If they don't do it, then I have misremembered that.
9   Q.  Now, back to your pending analysis spreadsheet.  If
10     entries that -- I guess really the fourth group --
11     or excuse me, the third data set down beginning at
12     row L -- excuse me, column L.  You have MIDR under
13     M, and then beginning at column R you have ID
14     required January 20.  So the MIDR section, and I
15     don't -- I don't know what -- how else to describe
16     it quite honestly, but beginning at column L, from L
17     to P, what is that data set?
18  A.  So that -- from L to P, that is a table of the --
19     whether a registrant is in MIDR status.  So that's
20     everyone in the -- in the voter files.
21  Q.  Okay.  And then S or R to U?
22  A.  So R to U is looking at the voters in MI -- so there
23     is the -- January 2014 to July 2019 is a list of
24     everyone who was in pending status, and that
25     includes voters who were in MIDR status because at

```
 1            that point they were pending.
 2    Q.    Say that again, I'm sorry.
 3    A.    So in July 2019 everyone who was in MIDR status --
 4    Q.    Uh-huh.
 5    A.    -- was pending.  They were not on the active rolls.
 6    Q.    So after 316 had been enacted but prior to anybody
 7          whose prior -- prior pending status due to a name --
 8          a name mismatch, for example --
 9    A.    Correct, and the reason is --
10    Q.    -- possibly, they hadn't run that --
11    A.    The software had not -- yeah, the software had not
12          been updated until -- this apparently was generated
13          before that change was made to the system.  So not
14          everybody in pending status was MIDR, but everybody
15          who was MIDR was in pending status.
16                 I compared -- I took all the registrants who
17          were in MIDR in that pending file and then looked in
18          the January 2020 file to see whether that voter was
19          still in MIDR status, so -- using the voter
20          registration, the unique voter registration number.
21          And it -- so the way to interpret that table is if
22          you look at column U, there were 1,999 registrants
23          who were in the July 2019 pending file who were also
24          in the 2020 voter file.  So we know --
25    Q.    Which column are you looking at again?
```

```
 1    A.    I'm looking at column U, row 7.

 2    Q.    Okay.  The S column, the one thousand -- no.

 3    A.    1,999.

 4    Q.    Okay.

 5    A.    So that's everybody in the July pending file in MIDR

 6          status, so that -- who was in the --

 7    Q.    Okay.  I understand.

 8    A.    -- the January 20th.

 9    Q.    And if it's a no -- go ahead.

10    A.    So if -- and column S, if --

11    Q.    I gotcha.

12    A.    If they -- yes for in column R is whether they were

13          in pending status in July 2019.

14    Q.    Okay.

15    A.    Column S and T, row 2 was whether they were in

16          pending status or whether they were in MIDR status

17          in January 2020.  So if we look at the cell S7 --

18    Q.    Uh-huh.

19    A.    -- those 479 people --

20    Q.    Very good.

21    A.    -- were in MIDR status in July but were not in MIDR

22          status in January, so they had taken whatever steps

23          they needed to to -- to cure or to correct that MIDR

24          status.  And so it means about 24 percent of the

25          people who were on MIDR status were able to get that
```

```
 1        resolved presumably by providing the necessary ID or
 2        correcting the information that resulted them --
 3        resulted in them being placed in MIDR status.
 4   Q.   Okay.  And this is -- on page 24 of your report,
 5        you -- this is -- that is the analysis you were
 6        discussing at the top of page 24, right?  Say of the
 7        3,672 MIDR pending registrants in July 2019, only
 8        429, 13 percent, had provided identification to
 9        registrars and were restored to active non-MIDR
10        status by 2020.  Is that --
11   A.   So I think there's a typo there.  I think it should
12        be 479 in the report.
13   Q.   Uh-huh.
14   A.   But that doesn't dramatically change.  That raises
15        it from 13 to --
16   Q.   Sure.
17   A.   -- 14 percent.
18   Q.   And the 3,672 MIDR, so that is -- I'm trying to see
19        what number that correlates to in your --
20   A.   Well, that includes people who were not -- who were
21        in the January file but -- or I'm sorry, were in the
22        July file but didn't show up in the January file so
23        they had been --
24   Q.   The total?
25   A.   -- removed, were no longer in the file.
```

```
 1   Q.   Okay.  And the no column, so I guess that's R -- S4?
 2   A.   Yes.
 3   Q.   And T4?  What is -- what is S4 and what's that --
 4   A.   S4 would be someone who was not in MIDR status in
 5        July and not in MIDR status in January.  So it's
 6        people who were --
 7   Q.   Never in MIDR?
 8   A.   -- never in MIDR status but they were in the pending
 9        file.
10   Q.   Okay.  So -- Gotcha.  So somebody who is -- had been
11        flagged for being a non-citizen, for example, or
12        missing information.  Any pending status?
13   A.   That's correct.
14   Q.   All right.  And of that you state in your report
15        only 429 or 479 voters had been -- had provided
16        identification to registrars and were restored to
17        active non-MIDR by January 2020.  You would -- you
18        would agree that it's most likely an individual
19        who's in MIDR status, they're going to -- they're
20        always in active status -- well, not always.  I
21        don't want to say that.  An individual who's active
22        MIDR, it's likely that they're going to move from
23        that MIDR status when they go to -- when they go to
24        vote, right?
25   A.   It's possible.
```

1   Q.   And that's kind of what the statute contemplates

2        because it's tied to showing your ID, the photo ID

3        requirement, which is what you show when you go to

4        vote?

5   A.   That's the claim.

6   Q.   Somebody I suppose could come off -- could go to the

7        registrar and show that ID, although they're not

8        going to vote, because there's no -- they might do

9        that whenever, it's not an election that's going on,

10       and clear that MIDR status up, right?

11  A.   That's possible.

12  Q.   But it's most likely people are going to do it when

13       they go to vote?

14  A.   That's -- that's the claim.

15  Q.   And so -- so this 429 number, I mean are you -- are

16       you saying here that that is -- that number is only

17       13 percent because of -- for some -- some reason

18       other than there weren't elections for those -- for

19       these other individuals last year?

20  A.   So it -- that -- the percentage of people who were

21       able to resolve it, it does not distinguish between

22       people who resolved it by going to the -- a clerk's

23       office or providing the ID and those who did it at

24       the polls.  We'll have to see what happens in March

25       after the statewide primary to see whether that

1        changes.

2   Q.   You mean the May statewide primary?

3   A.   May statewide prime.

4   Q.   And you didn't look to see whether any of those

5        individuals who had come off -- or back -- Scratch

6        that.

7             You didn't look at whether the entire

8        population, that 3,672, what number those folks

9        actually had elections last year that they could

10       have voted in?

11  A.   I don't know.  I did not have access to a 2019 voter

12       history file.

13  Q.   And but conceivably you could have looked -- you

14       could look then and see whether these individuals

15       had elections.  It may not even be in their voter

16       file whether they had an election to go vote in and

17       just didn't and stayed in MIDR status or not, right?

18  A.   So if I had a -- a comprehensive set of voter

19       history files, because I think in Georgia they

20       produce them election by election.

21  Q.   But I don't think they show if somebody didn't vote.

22       It'll only show if you did vote.

23  A.   Well, if you registered and didn't vote -- I mean if

24       you were in the voter file at a point and were not

25       in the voter history file, the conclusion is that

```
 1        you didn't vote.
 2   Q.   Okay.  I understand what voter -- I was referring to
 3        an individual's voter history file, not a
 4        compiled -- we would call it voter history file in
 5        Georgia; you know, my personal history.  So my voter
 6        history file is -- would show what elections I voted
 7        in?
 8   A.   Okay.  I mean --
 9   Q.   Does that make sense?
10   A.   Yes.
11   Q.   So semantics, but I understand what you're saying.
12   A.   The ones that are provided.
13   Q.   In one election.
14   A.   You have to request them election by election.
15   Q.   I understand what you're saying.
16   A.   I'm going to grab some more water.
17   Q.   Going back to your pending analysis spreadsheet --
18        and what -- I'm sorry, what did we mark that as?
19        What exhibit?
20   A.   Seven.
21   Q.   Going back to Exhibit 7, the -- the number in column
22        N for MIDR, now that's -- that's really just
23        everybody in pending status, right?
24   A.   No.  That's -- that is taken from the January voter
25        file.  So this includes people who are in pending or
```

1          active status as MIDR.

2   Q.    Okay.  As of January?

3   A.    So it is possible for someone in pending status to

4          be MIDR, but most of them are not.

5   Q.    And it looks like -- yeah, we'll go row -- so row N,

6          I guess -- excuse me, row 13, column N, there's --

7          there are 3,432 registrants.  Well, some may be

8          active.  We don't know because if they're pending,

9          they wouldn't be in active status, but some

10         proportion of that number is all -- is active, and

11         there may be some people in pending, right?

12  A.    I think most of them are in active status.

13  Q.    Okay.  And of course we know that as a result of HB

14         316 an MIDR could still be in active status.  Only

15         someone in pending status for a limited reason, you

16         know, limited reasons would not be in active status?

17  A.    That's correct.

18  Q.    Okay.  So the 3,432 people, so that is the number of

19         Hispanic registrants in MIDR status total as of

20         January 2020?

21  A.    That's correct.

22  Q.    Okay.  And so -- and that's, what, 5.67 percent of

23         the total regis -- total individuals in MIDR status,

24         right?

25  A.    That's correct.

1   Q.   Okay.  And we discussed -- discussed a little bit
2        earlier about MIDR and, you know, you said someone
3        who goes and registers at DDS would most like -- you
4        know, I don't want to say would never because you
5        had a few scenarios where maybe there was a data
6        input issue, you said, but it's highly unlikely that
7        anybody who registers at DDS is ever going to be in
8        MIDR status, right?
9   A.   I think that's probably true.
10  Q.   So these individuals had to have registered some
11       other -- they submitted an application for
12       registration some other way.  Do you know if an
13       individual who vote -- excuse me, who registers
14       using Georgia's online voter registration system,
15       whether that individual would ever be MIDR?
16  A.   I think it could happen if there were an error that
17       were -- that was made.  I don't know the voter
18       file -- or the voter registration file does not
19       include any -- that I saw includes any data about
20       the mode or how someone registered.
21  Q.   And what kind of -- you said if some kind of error
22       was made.  What kind of error do you mean?
23  A.   I would think that a -- a typographical error in a
24       field, I'm not sure if it corrects it immediately,
25       or when someone enters their driver's license or ID

1        number.

2   Q.   Because you have to have a driver's license or ID to

3        register online, right?

4   A.   I believe that's true.

5   Q.   So you would never have anybody registering online

6        being in MIDR status due to name mismatch because

7        they would always have to have a driver's license or

8        ID match, otherwise they'd never get found?

9   A.   I think that's probably right.  I did not go through

10       the online registration process because I'm not a

11       resident of Georgia, and I didn't want to start down

12       that road so --

13  Q.   Well, and I'm just trying to understand if there's

14       some -- you know, if -- so we're looking at the

15       numbers of individuals here who are in MIDR, and it

16       seems relevant to know what methods of registration

17       are being used by these individuals, and if the

18       method of registration is for one reason or another

19       having a role in the numbers.

20  A.   That could be --

21  Q.   I mean it could be part of the cause, right?

22  A.   That could be informative.  It doesn't answer every

23       question because there might be particular reasons

24       why someone was not able to register online:  they

25       didn't have a computer, they don't have the

1          ability --
2    Q.   And I'm not talking about just online.  I'm just
3          saying why people are in MIDR status.  If it's
4          relevant to know that say every single person who's
5          in MIDR status is someone who submitted an
6          application by paper, that would probably -- that
7          would be relevant to your -- your analysis, right?
8    A.   That's correct.
9    Q.   And I mean you would agree that paperless
10         registration is more accurate than paper -- using
11         paper forms, paper registration applications, right?
12   A.   I would say that's true.
13   Q.   And there are studies that I've seen --
14   A.   That's correct.
15   Q.   -- that find that.
16             So but you did not look at the -- the mode of
17         registration in this?
18   A.   I did not have access to that data.
19   Q.   And if -- if certain -- in fact, have you -- so have
20         you ever looked at census data on voter
21         registration?
22   A.   Yes.
23   Q.   And census data for -- regarding voter registration
24         does include information about the estimates I
25         suppose about the mode of registration for different

```
 1        demographics, right?
 2   A.   So that's not quite true.  There is a -- a survey
 3        that is done by the census bureau called the current
 4        population survey, and they usually -- they do a
 5        survey, it's called the November voting and
 6        registration supplement, so there is -- there is
 7        survey data about the mode of registration that you
 8        could --
 9   Q.   It wouldn't be exact, but it's just -- I'm just
10        asking if you --
11   A.   No, I have not looked at that.
12   Q.   And if certain -- so let's say if -- and you have --
13        what's that row -- row 10L is the black not of
14        Hispanic origin, right?  Yeah, African-American
15        registrants, 41,946 individuals as of January who
16        are in pending -- or not pending, excuse me, who are
17        in MIDR.  Now, if -- if African-American registrants
18        were more likely to or did register, you know, maybe
19        through organizations, for example, it would be more
20        likely that you'd have some greater percentage of
21        those -- those registrants in MIDR status simply
22        because of the numbers, right?
23   A.   It's possible, but that by itself doesn't eliminate
24        the question of whether there is a particular
25        disproportionate effect because if some groups use a
```

1         mode of registration that is more likely to trigger

2         MIDR status, you still have a -- you still have a

3         consequential effect.

4    Q.   Right.  And I guess again I'm just look -- I'm

5         thinking about it or looking at it in terms of the

6         total.  If there was -- the numbers would match --

7         you would expect the numbers to still be higher one

8         way or the other.  There may be other reasons.

9         There could be -- I'm not -- you know, there could

10        still be typographical areas in putting it into the

11        system, for example, right?

12   A.   It's possible.

13   Q.   But if the numbers are greater, then it's more

14        likely you're going to have more -- a greater

15        percentage from a -- and I'm not -- I'm not saying

16        just voter registration groups.  For any reason,

17        right?  If some group is more ** precedent in a mail

18        registration, that could inflate the numbers there

19        without it actually being a flaw in the system?

20   A.   So I would agree with the first part of the

21        question, not necessarily with the second because it

22        is possible that the way that the registration

23        system is structured leads to different groups using

24        different modes.  And if a -- if African-Americans

25        for any one of a number of reasons use a form of

```
 1        registration that is more likely to produce an
 2        erroneous MIDR, I would conclude that that's still a
 3        consequential effect.
 4   Q.   Now, remind me, you testified earlier about the --
 5        the rates of having driver's licenses amongst the
 6        different -- different populations?
 7   A.   Correct.
 8   Q.   You said you hadn't looked at Georgia, though, to
 9        determine whether there was a significantly greater
10        rate of African-American voters versus any other --
11        or any group, the rates of any -- any group for
12        their -- I'm butchering this question.  I'm sorry --
13            The rate of having a license or ID issued by
14        DDS, you did not look at -- at that.  You looked at
15        the Bullock report from -- Hood and Bullock paper
16        from '08, I believe, but nothing else?
17   A.   I have not looked at --
18   Q.   Okay.
19   A.   -- recent data on driver's license or ID possession
20        rates in Georgia.
21   Q.   Because even a group that's, you know, somebody --
22        any individual that's filling out a paper form, I
23        believe HAVA requires if an individual has a
24        driver's license or social security number, they
25        have to use one of those on the application?
```

1    A.    That's what the application says.

2    Q.    And you would agree that online voter registration

3          where you have to use an ID number or driver's

4          license number would -- would be more accurate than

5          submitting applications to begin with?

6    A.    That's correct.

7    Q.    Now, on -- on page 25 of your report --

8                MR. RUSSO:  Andrew, you're still doing okay,

9          time for you?

10               MR. HERMAN:  Fine.

11               THE WITNESS:  Can I take a quick break?

12               MR. RUSSO:  Go right ahead.

13               (Discussion held off the record.)

14   BY MR. RUSSO:

15   Q.    On page 25 of your report you refer to data errors,

16         and it's a section -- Section 9, data errors and

17         potential non-uniform administration.  You've given

18         some examples of anomalies that are -- that you

19         noticed in the voter registration system or that you

20         noticed in the files that you reviewed.  Excuse me.

21               Did you conduct any kind of research or review

22         to determine if maybe records were entered -- these

23         weren't really errors and records were just entered

24         a certain way for a certain reason that way?

25   A.    So I've worked with a lot of voter databases and a

```
 1          lot of large databases, and my experience is that
 2          they all contain some errors.  And it is possible
 3          that some of them, some of these values are default
 4          values, that when a state moved to -- to a statewide
 5          system and imported records, that there might be an
 6          error introduced there.  But we know that these are
 7          errors.  We know that there is no one -- no
 8          registered voter in Georgia who is 119 years old or
 9          that someone cannot have a birth date or birth year
10          after their registration date.
11               And so in a very real sense it doesn't matter
12          why these errors occurred, whether it was a input
13          error or it was an issue in producing the files in a
14          certain way.  I think it's likely -- again this is
15          based on my experience in working with files like
16          this that it is a combination of entry error and
17          default values.
18     Q.   And is it possible that it's -- that a -- someone
19          who has a birth date in -- you're looking at
20          individuals who are registered voters who had a
21          birth date of 18 -- earlier than 1901, for example?
22     A.   So in the file there -- it's actually not a birth
23          date.  It's a birth year.
24     Q.   Right.
25     A.   In part because the files have -- they have privacy
```

1          protections that -- that I'm quite sure that the

2          date of birth exists.

3    Q.   That's fine.  I was just reading.  You used birth

4          date in your report.

5    A.   Birth year.

6    Q.   You meant birth year.  So and you were looking at I

7          think you had 1,857 records have a birth date, you

8          meant birth year of 1901 or earlier, including 17

9          with a birth date in 1800.  Those individuals, they

10          weren't individuals in -- were they in pending

11          status?

12   A.   I did not look.

13   Q.   Presumably not.  Okay.  Well, but did you look to

14          see if they were in active status?  You were looking

15          at the voter registration file, right?

16   A.   That was the December 30, 30th, 2019 voter file.

17   Q.   And is it possible that -- Now, you said you've

18          worked with a lot of different voting systems,

19          the --

20   A.   Voter files.

21   Q.   -- databases?

22   A.   Correct.

23   Q.   And voter files, are you referring to a file or like

24          a -- the actual type of software that a state may

25          use, whatever -- I don't know what Wisconsin uses,

| | | |
|---|---|---|
| 1 | | but certain software to input information into the |
| 2 | | system? |
| 3 | A. | So I was working with files that were produced -- |
| 4 | Q. | Okay. |
| 5 | A. | -- and provided to me, not with the -- not with -- |
| 6 | | in this case not with the ENet system. |
| 7 | Q. | And so -- that's -- so ENet is what's used |
| 8 | | currently.  Is it possible that, you know, you |
| 9 | | mentioned a conversion could be an error, possible |
| 10 | | that a -- someone actually intended to put -- a |
| 11 | | registrar intended to put someone's date as 1800 |
| 12 | | just as a flag because maybe software doesn't allow |
| 13 | | a -- wouldn't allow a registration application to be |
| 14 | | processed without a date of birth or year of birth? |
| 15 | | So an 1800 date may just be an identifier that well, |
| 16 | | we didn't get this person's year of birth, but we've |
| 17 | | got to put something in to put in the system so use |
| 18 | | a number that is clearly not, you know, going to be |
| 19 | | a -- a real year of birth? |
| 20 | A. | It's possible. |
| 21 | Q. | And I'm not saying ENet -- and I don't believe ENet |
| 22 | | does that currently, but my understanding is that |
| 23 | | old systems maybe had those issues? |
| 24 | A. | Although I would say that most databases that I've |
| 25 | | used, a missing value would be something different. |

```
 1        Instead of 1800 it would be 9999 or something that
 2        clearly is not a -- is not a date.  So but again
 3        it's possible that those were entered intentionally.
 4   Q.   And we don't know when -- and we don't even know
 5        when those -- You didn't look at the dates of
 6        registration for those individuals so we don't know
 7        how far back, you know, this -- this birth date of,
 8        you know, you mentioned 17 people with a birth date
 9        in 1800, you didn't look to see if that -- those 17
10        people registered within the last six months or a
11        year or might be somebody who registered whatever
12        decade ago?
13   A.   I did not.
14   Q.   Now, you mentioned that you drew an inference from
15        the data that administration's not uniform across
16        the state.  Again this -- this is on page 26 of your
17        report.  Your -- This goes back to the document that
18        you mentioned earlier that you reviewed after you
19        read this report?
20   A.   That's in part, but it's also based on the -- the
21        underlying voter file, the data in the file.
22   Q.   And but did you -- Well, what data in the file did
23        you view that would indicate that there's
24        non-uniform administration?
25   A.   That would be --
```

1   Q.   Are you referring to depositions again?

2   A.   No, the specific would be -- would be figures 1 and

3        2 that looks at the percentage of registrants in

4        MIDR status by county and in pending status by

5        county as a function of the underlying demographics

6        of the -- of the county.

7   Q.   Now you -- you -- figure 1 you have -- let's see,

8        you're on page 29, I suppose?

9   A.   Correct.

10  Q.   Okay.  The five counties that you refer to here as

11       having 69.5 percent of the total registrants in MIDR

12       status is Fulton, DeKalb, Clayton, Gwinnett and

13       Chatham counties, right?

14  A.   I would have to check the specific counties.  Oh, in

15       footnote 33.  That's correct.

16  Q.   Now, those are -- Fulton County is the county with

17       the highest number of voter registrations, correct?

18  A.   That's correct.

19  Q.   And Gwinnett is the second, and DeKalb is -- has the

20       third highest voter registration in the state, and

21       Chatham is the fifth, and Clayton's the sixth.  And

22       the number based on my calculation of registered

23       voters in those five counties is two point --

24       2,218,159.  So does that sound about -- you must

25       have calculated a number.

1    A.   I did, but sitting here I can't remember those

2         numbers off the top of my head.

3    Q.   Okay.  And did you look at what counties -- the

4         numbers that some of the smaller counties had for

5         voter registration totals?

6    A.   I did.  So in this chart the size of each circle is

7         proportional to the population -- the number of

8         registered voters in the county.  So the smaller the

9         circle, the fewer people there are.

10   Q.   And obviously you would -- you would agree with me

11        that where the larger urban centers of the state

12        are, you're likely to have more voter registrations,

13        right?  They have higher populations?

14   A.   Higher populations would be associated with more

15        voter registration.

16   Q.   Okay.  That's true.  And in Georgia there are,

17        what -- City of Atlanta, of course, is the largest

18        city?

19   A.   Correct.

20   Q.   Which is -- and you -- are you -- you know that it's

21        Fulton County, DeKalb County, Clayton County and

22        Gwinnett are all part of the greater Atlanta area,

23        right?

24   A.   Right.

25   Q.   And Chatham County is where Savannah is located,

1           right?

2    A.     Now we're getting into the details of geography.  I

3           think that's right, but I'm not completely sure.

4    Q.     And did you -- did you look at -- well, we know they

5           have a greater percentage of voters -- the number of

6           voter registration applications those counties are

7           receiving?

8    A.     I -- So I did not look at the number of applications

9           over a particular period of time.

10   Q.     If they were -- they were receiving more

11          applications, it could be for any -- any number of

12          reasons, there could be a big mayor's race or some

13          other reason why or simply just because maybe voter

14          registration efforts are in one county or one city

15          versus another, would you agree that if there are

16          more applications coming in, and again we're talking

17          about MIDR status, so paper applications, the -- the

18          number of voters in MIDR status may not be a --

19          support an inference that election administration

20          laws are being applied differently?

21   A.     That's not necessarily true because you do see

22          variation that is a function of things other than

23          population.  So it's not the case that every large

24          county has a high rate of MIDR, nor is it true that

25          there are no small counties that have small rates of

1     MIDR.

2          So as I noted in the report, that if you had

3     uniform application, which also applies to the

4     methods and implementation, you would expect the

5     rates of key variables to be either uncorrelated or

6     they would vary in ways that weren't systematic.

7          So the fact that the percentage of voters --

8     and again the percentage is a function of something

9     more than just the absolute numbers.  The fact --

10    what these chart show is that the -- the rate of

11    voters who were placed in either pending or MIDR

12    status is pretty strongly associated with the -- the

13    racial demographics of a -- of a county, that the

14    higher percentage of non-Hispanic whites a county is

15    in population, the less likely you are to have a

16    significant number of voters in either MIDR or

17    pending status.

18         And we know from the literature on election

19    administration that there really is no doubt that

20    election laws, election practices, election

21    administration is affected by the race of voters,

22    that there is discriminatory implementation that is

23    biased against minority voters.  So these charts are

24    consistent with that, that it's a function of

25    implementation, it's a function of the -- of the

1       rules, it's a function of the error rates in

2       which -- of the different methods that voters use to

3       engage with the process.

4             So and we also know from the testimony of

5       election officials that I believe it was Mr. Rayburn

6       who said that the match only occurs on the first

7       letter of the first name, but there were still

8       counties that were doing matching on the full name.

9             So what that suggests, what that indicates is

10      that there is variation in how counties and

11      localities implement the what are supposed to be

12      uniform statewide practices.

13  Q.   And so -- and again this is for -- we're really kind

14      of focusing on your inference from the data that

15      there's non-uniform administration of this -- of

16      these laws.  And we've already discussed other

17      reasons that may be factors into why more

18      individuals are placed -- more mail-in applications

19      get submitted in one area versus another.  Your --

20      your -- are you -- Are you testifying that a

21      registrar in Atlanta, the city of Atlanta is

22      inputting application information into the system at

23      a higher error rate than someone in Polk County or

24      some other -- some other county?

25  A.   It's possible.  It's possible that the -- again we

1      know from the testimony of Harvey Rayburn and

2      Germany that the counties have discretion in how

3      they audit their results and whether or not they

4      correct information, and they are not required.

5      It's described as a best practice.

6           So again we can be quite sure that the

7      administrative practices are -- they differ between

8      counties.  It can be a function of size.  It can be

9      a function of a number of different things, but we

10     know that administration will vary.

11  Q.  Well, is it your testimony that there are that

12     many -- you said that some counties will audit

13     their, so to speak, the inputs if somebody comes

14     back as a non-match on first name, for example, and

15     DL doesn't match, right?  If the DL matches, then

16     that takes the person out anyway, right?

17  A.  That's what the testimony is, yes.

18  Q.  And what's what the lawsuits indicate, too, right?

19  A.  That's what the materials and --

20  Q.  So you're not contesting that.  But if somebody's

21     first name is -- maybe there's a misspelling so a

22     voter registration application comes in, registrar

23     in Fulton County is inputting, and the individual's

24     name is Vincent and it gets spelled, you know,

25     V-I-N-E-E-N-T instead of V-I-N-C-E-N-T, some

1      counties may go back and say, oh, that looks like an

2      input error; let's check and make sure, versus

3      others?

4  A.  That's --

5  Q.  And that -- go ahead.

6  A.  Okay.  That's -- that's certainly --

7  Q.  Right.

8  A.  -- one type of variation.

9  Q.  And but you're not -- you're not saying that that

10     one type of variation is going to create this

11     disproportionate number of voters in MIDR, being put

12     in MIDR status for say any of these five counties

13     versus another county?

14 A.  I don't have information about the specific

15     practices in a county, and we're looking -- I'm

16     looking at outcomes here.

17 Q.  Uh-huh.  And again so I mean this is for your

18     inference.  You did not have any evidence of one

19     county doing -- having a different election

20     administration than another -- than another?

21 A.  Well, other than --

22 Q.  You have the --

23 A.  Other than the evidence that there are different

24     practices, I did not have evidence about the

25     specifics and how one county, a particular county

1           differed from another county.

2    Q.    So you don't know, and again back to this double

3           checking the spelling of a name issue, you know,

4           whether these five counties are the only five

5           counties in the state at that don't double check

6           someone's -- I mean you don't know which counties

7           do -- do what -- you just understand that maybe some

8           counties have a few different variations in how they

9           administer this -- this MIDR piece?

10   A.    Again the first part of that is true, that I don't

11          have information about the specifics.  The second

12          part, you know, I am quite confident that there are

13          differences, but again I don't have information

14          about this county does it this way, Fulton County

15          does it that way, DeKalb County does it a different

16          way.

17   Q.    Okay.  Now, you go on to say that there's another

18          possible reason for variation is that training

19          materials provided to county election officials

20          include some basic errors.  This is on page 27.  And

21          on 28 you -- well, you say, for example, last

22          paragraph on 27, for example, the Georgia

23          Registration Official Certification Registrar Course

24          No. 4, which is intended to, quotes, server -- serve

25          as the foundation to build on your legal and

1    procedural expertise of the process of voter

2    registration, sets out the qualifications of an

3    elector in Georgia.

4         And then on page 28, at the top it says the --

5    to register to vote in the State of Georgia, an

6    elector must be, and it sets out three bullet points

7    of qualifications.

8         Then you go on to say this information is

9    incorrect as, quote, a citizen of Georgia is not a

10   meaningful term.  What do you mean a citizen of

11   Georgia is not a meaningful term?

12 A.  What that means is that -- citizenship is based on

13   sovereignty.  So far as I'm aware there's no such

14   thing as a citizen of Georgia.  There are residents

15   of Georgia and citizens of the United States.  So I

16   just found it very odd that the official training

17   materials would contain something like this which --

18   I mean I'm not a citizen of Wisconsin.  I'm a

19   resident of Wisconsin.  I'm a citizen of the United

20   States.

21        I also note that that information on the slide

22   is different than the information of -- provided by

23   the Georgia Secretary of State voter registration

24   page.

25 Q.  Now, have you ever done any research on -- you said

```
 1        you know for sure that you're not a citizen of
 2        Wisconsin.  You're just a citizen of the United
 3        States.  Have you ever looked to see if there's such
 4        a concept of citizen of a state?
 5   A.   There is in the 14th Amendment, but it's not a
 6        concept that in my experience has any meaning for
 7        election administration --
 8   Q.   I see.
 9   A.   -- because the key is residency and citizenship of
10        the United States.  Those are the key quantities or
11        the key factors.
12   Q.   So, yeah, you're right, the Constitution does
13        indicate that an individual who's a resident and
14        citizen, citizen of the United States and of the
15        state in which he or she resides, right?
16   A.   It's true.  I would be astounded if the person who
17        wrote this had the 14th Amendment in mind when he or
18        she wrote this slide.
19   Q.   All right.  Have you ever looked at Georgia's
20        Constitution regarding citizenship of individuals in
21        Georgia?
22   A.   No.
23   Q.   So you don't know whether Georgia's Constitution
24        contemplates, you know, that an individual could be
25        a citizen of Georgia and of the United States?
```

Regency-Brentano, Inc.

1    A.    It's possible, but -- I suppose it's possible, but

2          then I find it quite curious that it's -- the only

3          time I've ever seen this is in the -- in this

4          training material and not in the -- the registration

5          site where you actually engage with the registration

6          process.

7                (Exhibit No. 8 marked for identification.)

8    Q.    I'm going hand you what is Exhibit -- marked as

9          Exhibit 8.  Now, this is Section 21-2-216 of the

10         Georgia law, Georgia election code, and its titled

11         Elector's Qualifications.  Did you read this -- this

12         statute?

13   A.    I did not.

14   Q.    And you'll see Section A right up front says no

15         person shall vote in any primary or election held in

16         the state unless such person shall be, one,

17         registered as an elector in the manner prescribed by

18         law; two, a citizen of this state and of the United

19         States.

20                Do you see that?

21   A.    I do.

22   Q.    And that's exactly the same language that's -- that

23         you're referencing here in your report from -- from

24         the training materials.

25   A.    Well, then my question would be where does the

1       definition of a citizen of the state -- and, you
2       know, even if this is copied and pasted from that,
3       it's still incomplete as it doesn't -- I mean is it
4       possible for someone to be a citizen of Wisconsin
5       and a resident of Georgia?  I guess I don't -- in
6       terms of election administration, I see residents --
7       citizenship has been demonstrated to a board of
8       registrars.
9  Q.   Well, you said -- you wrote in your report that this
10      was a basic -- that this was an error when, in fact,
11      this phrase is taken directly out of the code, the
12      law in Georgia, and -- and did no research on
13      whether individual -- Georgia's Constitution may
14      state who a citizen of Georgia is or some other
15      section of the law.
16          So you'd agree with me, though, that that is
17      not an error?
18 A.   It looks to me that it's -- as I'm reading this
19      section of the statute, that citizenship and
20      residents are defined, are used synonymously and,
21      you know, even at this point is incorrect.  And I
22      have never seen it in any other context except here.
23      The information is still incomplete.
24 Q.   Well, but you -- Would you agree with me that
25      quoting the law in a training material would not

1              suggest an inconsistent administration of the law in

2              and of itself?

3    A.    Not in this particular instance.

4    Q.    Okay.  Now, you then go on to -- to look at, what,

5              Walton -- is it Walton County, and you mention voter

6              data also suggests inconsistent administration.  You

7              point out to -- to the January 2020 voter file 22

8              registrants in pending status because of a pending

9              hearing.  And then you refer to Statute 21-2-229

10             that allows an individual to be challenged -- a

11             registrant's eligibility to be challenged.  But you

12             infer that since Walton County has -- that there are

13             21 of these 22 pending hearing statuses, that that

14             in and of itself is a -- you infer that there's some

15             inconsistent administration, right?

16   A.    Well, the term that I used is suggestive.

17   Q.    Suggestive.  And did you do any kind of research

18             into anything that may be happening in Walton County

19             that would indicate a reason why maybe registrants

20             were being challenged?

21   A.    I did.  I did do some searching.  I was not able to

22             find anything that gave me information about why

23             this might be happening.

24   Q.    And what -- what did you -- what did you search?

25   A.    I looked at news sources within the county;

```
 1            wasn't -- wasn't a terribly detailed search, but I
 2            was interested in whether something might be going
 3            on that could explain why it happened in this one
 4            relatively small municipality and county but not
 5            anyplace else.
 6     Q.     You would agree that there may be some -- some
 7            reason why in one county, or particularly, you know,
 8            within -- in a single municipality within a county
 9            there may be an uptick due to -- and challenges to a
10            voter's -- are I shouldn't say voter's, excuse me,
11            to a registrant's eligibility?
12     A.     It's possible.
13     Q.     Of course as you -- you probably know, you know,
14            there's different municipal related issues such as
15            becoming a -- when an area wants to become a city,
16            for example, right?  And I don't know if you've
17            ever -- I'm sure you're familiar with some of this.
18     A.     Annexations occur in Wisconsin.
19     Q.     Uh-huh.  And a lot of times it may be that the
20            number, percentage of voters to annex -- to be
21            annexed or to leave a particular city and want to
22            create their own city may be based on the -- the
23            total number of registrants at the time of the
24            referendum.  I don't know if you ever -- Have you
25            ever looked at any of these issue?
```

1   A.   Not in Georgia.

2   Q.   Okay.  And so that might be one issue.  But there

3        could be any.  You didn't look -- Did you call

4        the -- the registrar?

5   A.   I did not.

6   Q.   Okay.  What about the superintendent?

7   A.   No, I didn't talk to anybody in Walton county.

8   Q.   Now, you state -- apologies.  One second.

9            Going back to footnote 25, and you -- you state

10       that -- in your report that use of driver's license

11       files screens citizenship as well as produces

12       false -- or false non-citizenship flags with error

13       rates that approach near 100 percent.  You also cite

14       to this report out of -- out of Florida.

15           And of course you know a lot of folks in

16       Georgia would take great offense to being -- being

17       compared to the State of Florida, but Florida has

18       different voter registration laws and policies,

19       right?

20  A.   That's correct.

21  Q.   Than Georgia.  And you didn't conduct any analysis

22       to see whether this report on the State of Florida

23       and their -- the number of registrants that were

24       falsely identified as non-citizens, whether Georgia

25       has -- Georgia's policy is different or the same as

1          that policy, right?

2   A.    Well, the method in Florida was the same in Georgia,

3          which is looking at the voter registration files,

4          matching or linking that file into the driver's

5          license file and flagging people who were not

6          citizens.  And that was the basis of the official

7          claim in the Secretary of State's office.

8                And it's also happened in Texas, it's happened

9          in a number of places where there is a claim that

10         there were non-citizens who were registered to vote

11         based on driver's license files.  And these reports

12         turn out to be wildly exaggerated because of this

13         known issue with driver's license files, that the

14         citizenship information is not automatically updated

15         when someone naturalizes.

16               So there may be different underlying

17         registration requirements, but the -- the reliance

18         on driver's license data to verify citizenship is --

19         is the same.

20  Q.    And it's self-reporting in those states also?

21  A.    My understanding is that it's self-reporting in

22         Florida and Texas.

23  Q.    So your -- your opinion is based on reports from

24         other states?

25  A.    Well, it's based on what is understood about the

1          method of relying on driver's license data.
2     Q.   Looking at the -- the conclusions in your report,
3          have any of those conclusions changed?
4     A.   No.
5     Q.   And your -- your analysis -- You didn't conduct any
6          causal analysis for your report, right?
7     A.   Causal in terms of?
8     Q.   Well, why an individual may be -- yeah, the cause
9          and effect, why an individual may be in MIDR status.
10         You looked -- Your report is based on inferences
11         solely?
12    A.   That's generally true.
13    Q.   I mean you state in your -- in your report --
14    A.   Right, so I don't have information about any
15         particular individuals.
16    Q.   So your report is -- is based on limited
17         information?
18    A.   It's -- There was information that I did not have
19         access to.
20    Q.   And are the opinions that we've discussed today,
21         yours -- are those opinions in this deposition and
22         in your report your complete opinion in this case?
23    A.   I would say yes.  I mean this is -- these are the
24         conclusions I reached based on the data that I have
25         had, that I have access to.

1   Q.   And if those conclusions or those opinions change,

2        of course, I assume you'll submit a supplemental

3        report, right?

4   A.   I would expect that.

5   Q.   Okay.

6             MR. RUSSO:  I have no further questions.

7             MR. HERMAN:  Okay.  Let just chat for a second.

8             (Discussion held off the record.)

9             MR. HERMAN:  Back on the record.  We don't have

10       any -- anything we want to add right now.

11            MR. RUSSO:  Okay.  Dr. Mayer, I appreciate your

12       time today.

13            THE WITNESS:  Thank you.

14            MR. RUSSO:  And thanks.  Thanks for your time

15       here.  We conclude the deposition.

16            (Deposition ended at 2:51 p.m.)

17

18

19

20

21

22

23

24

25

FAIR FIGHT ACTION vs BRAD RAFFENSPERGER
February 26, 2020                                         161

```
1    STATE OF WISCONSIN     }

2                           }  SS:

3    COUNTY OF WALWORTH      }

4
          I, LAURA L. KOLNIK, Registered Professional
5    Reporter and Notary Public in and for the State of
     Wisconsin, do hereby certify that the foregoing
6    deposition was taken before me.

7         That the appearances were as noted initially.

8         That said witness, before testifying, was first
     duly sworn by me to testify the truth, the whole truth
9    and nothing but the truth relative to said cause.

10        I further certify that I am neither counsel for,
     related to, nor employed by any of the parties to the
11   action in which this proceeding was taken; and, further,
     that I am not a relative or employee of any attorney or
12   counsel employed by the parties hereto, nor financially
     interested, or otherwise, in the outcome of this action.

13
          That the foregoing proceedings are true and correct
14   as reflected by my original machine shorthand notes taken
15   at said time and place.

16        Dated this 4th day of March 2020

17

18                          LAURA L. KOLNIK, RPR/RMR/CRR
                            Notary Public
                            State of Wisconsin
19                          My commission expires
                            February 23, 2022
20

21

22

23

24

25
```

**$**

**$10,000 (1)**
6:24
**$350 (1)**
6:14

**\***

**\*\* (2)**
24:10;136:17

**A**

**ability (2)**
18:1;134:1
**able (15)**
13:24;17:21;37:24;
63:18;75:5;81:11;
82:21;83:9;84:25;
89:2;119:11;125:25;
128:21;133:24;
155:21
**above (1)**
108:22
**absentee (1)**
32:17
**absolute (2)**
105:6;146:9
**absolutely (1)**
42:2
**academic (6)**
11:14,16,22;16:7;
34:4,22
**accept (1)**
48:3
**acceptable (4)**
78:12;79:12,15;
80:5
**access (8)**
44:22;45:25;46:14;
87:14;129:11;134:18;
159:19,25
**according (2)**
75:12;117:8
**account (1)**
89:12
**Accountability (4)**
14:16;23:19;24:6,
15
**accurate (6)**
23:2;104:15;115:7;
121:20;134:10;138:4
**accurately (2)**
38:24;39:22
**across (4)**
77:6;111:9;116:3;
142:15
**Act (8)**
9:8;15:1;24:17;
32:21;47:15;63:8;
76:12;90:2

**ACTION (4)**
1:4;13:23;0:,11
**actions (1)**
53:7
**active (53)**
12:11;42:18;54:6,
10,11,16;55:12;60:8,
21;61:11,19;68:16,
16;80:20;81:3,4,7,9,
23;82:2,3,8;96:21;
97:14;99:24;100:1,
16;101:2,5,16;
103:18;106:6,24;
107:21;109:19;
110:11,18;111:4;
114:17;116:12;124:5;
126:9;127:17,20,21;
131:1,8,9,10,12,14,
16;140:14
**activities (1)**
23:8
**activity (1)**
23:18
**actual (7)**
10:13;11:7;50:19;
52:7;76:25;118:4;
140:24
**actually (69)**
14:18;17:15,15;
23:20;25:22;30:24;
32:18;35:12;37:18;
40:13;41:10,11,19,22;
43:5;45:15;46:25;
48:8;49:25;50:2,9;
51:1,5;57:3;58:8;
62:20,24;63:1,3,18;
64:4,13;65:1;69:13;
70:6,9;72:5;74:23;
75:14;76:7,20;77:9,
15,21;83:20;88:12,14,
21;90:17;91:24;
94:19;97:18;98:17;
103:20,24;105:25;
106:8;109:4,21;
114:10,17;118:9;
121:3;122:21;129:9;
136:19;139:22;
141:10;153:5
**add (3)**
84:4;99:15;160:10
**addendum (2)**
22:25,25
**adding (1)**
99:13
**addition (3)**
19:5;30:5;98:13
**additional (25)**
35:22;36:4,4,6,10,
12;44:4,4;52:3,4,21;
53:25;54:1;74:14,15,
22;75:4,6,9,25;76:11;
77:2;78:16;79:20;
85:15

**additions (1)**
23:10
**address (12)**
55:24,25;56:4,18,
20,21,25;57:1,4;64:4;
73:12;92:24
**addresses (1)**
56:18
**administer (1)**
150:9
**administration (41)**
23:24;24:18;26:4,7,
14,16,21;32:10,12,13;
45:3,6,12,23,24,25;
46:11,18,21;47:2,21;
78:24;88:8;89:14;
120:10;121:7,22;
123:1;138:17;142:24;
145:19;146:19,21;
147:15;148:10;
149:20;152:7;154:6;
155:1,6,15
**administration's (1)**
142:15
**administrative (21)**
8:14;25:8;27:1;
34:3;50:7,8;52:19,25;
62:24;67:16;74:18;
75:4,24,25;76:19,23;
78:16;79:21,24;
80:18;148:7
**administratively (1)**
80:10
**Administrator's (1)**
87:24
**affect (3)**
105:8;115:1,15
**affected (3)**
112:15;115:20;
146:21
**affects (1)**
112:8
**affirmative (3)**
5:11;119:15,16
**African (10)**
101:15;104:5,23;
106:25;107:9,14;
108:25;113:12;115:6,
16
**African-American (15)**
100:16,22;101:9;
102:9;103:3;106:3,
21;107:3;108:22;
111:2;114:16;118:16;
135:14,17;137:10
**African-Americans (1)**
136:24
**again (49)**
10:2,15;15:22;
17:23;27:25;38:22;
44:9,24;48:5,22;
53:22;61:2;65:17,25;
71:9,10;75:8;76:9;

**79:6;80:1,18;82:3,6;
83:15;87:7,18;89:19;
98:4;112:21;114:15;
115:1,15;117:18;
124:2,25;136:4;
139:14;142:2,16;
143:1;145:16;146:8;
147:13,25;148:6;
149:17;150:2,10,13**
**against (3)**
25:24;46:9;146:23
**age (4)**
96:24,24;117:7,13
**agencies (1)**
94:17
**agency (3)**
51:14;52:18;88:10
**agenda (1)**
25:4
**aggregate (2)**
87:11;115:4
**aggregated (1)**
112:7
**aggregation (1)**
97:6
**ago (1)**
142:12
**agree (22)**
18:1;53:19;60:23;
68:12;72:22;84:15;
108:23;110:5;112:4;
115:7;116:4,19;
123:5;127:18;134:9;
136:20;138:2;144:10;
145:15;154:16,24;
156:6
**agreed (2)**
7:1,3
**agreeing (1)**
7:5
**ahead (5)**
57:15;61:12;125:9;
138:12;149:5
**aherman@milchevcom (1)**
2:8
**al (2)**
1:4,7
**algorithm (1)**
89:3
**alive (5)**
121:16,17;122:16,
16,17
**allow (5)**
37:17;84:13;89:14;
141:12,13
**allowed (3)**
4:11;72:22;75:19
**allows (5)**
37:14;40:17;85:3;
89:19;155:10
**ALLOY (1)**
2:12
**almost (2)**

**101:23;103:20**
**alter (1)**
57:22
**alternatives (1)**
34:8
**although (10)**
33:22;42:9;54:23;
55:23;58:11;60:25;
69:16;80:20;128:7;
141:24
**always (3)**
127:20,20;133:7
**Amanda (2)**
28:9;10
**ambiguities (1)**
12:14
**ambiguity (3)**
62:5,10,11
**amended (2)**
20:17,19
**Amendment (2)**
152:5,17
**America (4)**
9:8;15:1;24:17;
32:21;47:15;63:8
**American (4)**
25:1,3;99:20;117:9
**Americans (9)**
101:15;104:6,23;
106:25;107:9,14;
108:25;113:12;
115:16
**among (7)**
78:24;86:9,15,20;
87:4;114:24;118:2
**amongst (2)**
87:8;137:5
**amounts (1)**
101:13
**analysis (18)**
33:11;37:5,7;40:2,
11;65:17;96:15;
98:20;116:3,10;
118:22;123:9;126:5;
130:17;134:7;157:21;
159:5,6
**analysisdo (1)**
40:1
**analyze (3)**
13:24;38:12;40:8
**and/or (1)**
47:21
**Andrew (6)**
2:5;4:16,22;27:6,
20;138:8
**annex (1)**
156:20
**Annexations (1)**
156:18
**annexed (1)**
156:21
**annotated (1)**
9:19

**anomalies (1)**
138:18
**anomaly (1)**
87:2
**anyplace (1)**
156:5
**apologies (1)**
157:8
**apologize (2)**
90:11;94:7
**apostrophe (2)**
92:9,9
**apparently (1)**
124:12
**Appeals (1)**
80:16
**appear (3)**
48:7;52:24;102:17
**appearances (1)**
0:7
**appears (6)**
29:6;53:3;64:11,14;
91:5;97:12
**append (2)**
38:5;40:5
**appended (1)**
39:18
**appending (1)**
40:5
**Appendix (2)**
90:14,16
**apples (3)**
106:8;107:19,19
**applicable (2)**
115:9,9
**applicant (3)**
24:8;83:2;110:6
**applicants (2)**
67:18;109:25
**applicant's (2)**
72:15;83:5
**application (22)**
60:5,18;61:8,16;
64:6,17,20,24;65:2,
10;66:2,3,6;68:6;
132:11;134:6;137:25;
138:1;141:13;146:3;
147:22;148:22
**applications (9)**
102:23;134:11;
138:5;145:6,8,11,16,
17;147:18
**applied (4)**
102:25;110:4;
115:5;145:20
**applies (7)**
73:17;78:4;82:20;
84:2;116:3;119:1;
146:3
**apply (4)**
27:22;63:14;78:5;
104:11
**applying (1)**

44:10
**appreciate (1)**
160:11
**approach (1)**
157:13
**appropriate (1)**
105:2
**April (8)**
103:22;104:12,18;
107:8;108:16;110:24;
113:10,15
**area (3)**
144:22;147:19;
156:15
**areas (6)**
8:10,17;25:9;46:2;
50:24;136:10
**arguing (1)**
117:18
**argument (1)**
80:24
**around (1)**
58:20
**arrangement (1)**
16:17
**arriving (3)**
34:24;35:10,14
**article (1)**
33:13
**articles (3)**
11:19;33:7,10
**Asian (5)**
99:24;100:2;
116:12,13,14
**aside (1)**
33:20
**assembly (1)**
30:6
**assign (1)**
57:10
**Assignment (2)**
35:7,17
**Assistance (2)**
24:7;45:9
**assistants (1)**
34:16
**associated (2)**
144:14;146:12
**assume (6)**
67:1;78:14;87:24;
104:24;108:19;160:2
**assuming (3)**
54:11,17;113:13
**assumption (2)**
78:19;103:13
**assumptions (1)**
20:15
**astounded (1)**
152:16
**ATLANTA (6)**
1:2;2:16;144:17,22;
147:21,21
**at-large (1)**

29:11
**attached (2)**
3:;22:25
**Attorney (4)**
3:;28:9;51:15;0:
**attorneys (1)**
16:14
**audit (2)**
148:3,12
**automatically (5)**
109:18;110:18;
119:17,20;158:14
**available (3)**
13:25;15:23;45:18
**avoid (1)**
5:10
**aware (8)**
30:14;51:21;77:9;
78:6;80:14;90:6;
119:2;151:13
**awhile (1)**
33:1

## B

**back (32)**
5:8;32:2;51:5;
57:17;65:8;68:10;
69:5;70:19;74:11;
86:4;100:7,17;109:4,
13,19;114:2,10,18,19;
121:24;122:23;123:9;
129:5;130:17,21;
142:7,17;148:14;
149:1;150:2;157:9;
160:9
**backing (1)**
55:15
**ballot (1)**
63:3
**ballots (2)**
32:17,19
**bank (7)**
73:10,13;76:16;
82:16;83:22;84:11;
85:2
**based (36)**
8:22;9:14;10:2,18,
18,20;11:9;43:20,23;
44:13,17,17;47:3;
48:5;50:2;54:3;58:25;
65:18;78:23,24,25;
103:16;105:9;116:20;
122:25;139:15;
142:20;143:22;
151:12;156:22;
158:11,23,25;159:10,
16,24
**basic (4)**
41:7;43:17;150:20;
154:10
**basically (2)**
84:17;102:15

**basing (1)**
78:20
**basis (4)**
53:14;60:12;61:3;
158:6
**batch (3)**
18:12,15;19:5
**batches (1)**
18:8
**Bates (7)**
58:9,18;70:8,8,10,
20;122:8
**become (1)**
156:15
**becoming (1)**
156:15
**began (1)**
8:21
**begin (1)**
138:5
**beginning (5)**
105:1;107:7;
123:11,13,16
**belief (1)**
42:11
**BELINFANTE (1)**
2:12
**below (1)**
122:13
**best (2)**
5:12;148:5
**better (1)**
89:6
**beyond (1)**
8:11
**biased (1)**
146:23
**big (1)**
145:12
**bill (4)**
73:10,13;82:17;
85:2
**birth (26)**
49:9;52:16;55:11;
56:22;83:1;120:16,
24;139:9,9,19,21,22,
23;140:2,3,5,6,7,8,9;
141:14,14,16,19;
142:7,8
**bit (2)**
99:13;132:1
**black (6)**
97:13;105:23;
106:17;113:2,5;
135:13
**blank (2)**
39:14;88:23
**Board (6)**
14:17;23:19;24:6,
16;116:3;154:7
**boards (1)**
29:12
**book (1)**

26:20
**books (1)**
26:22
**booth (1)**
87:15
**Bostelmann (1)**
27:6
**both (12)**
14:17;18:16;21:6;
50:21;67:14;75:15;
77:14;86:11;91:22;
92:2,17;93:17
**bottom (4)**
32:6;96:14,21;
100:14
**BRAD (2)**
1:7;4:10
**break (7)**
5:6,8;57:12,16,19;
86:3;138:11
**briefly (1)**
86:6
**briefs (2)**
21:17,17
**bring (1)**
89:2
**broader (1)**
46:12
**bucket (1)**
85:5
**build (1)**
150:25
**bullet (1)**
151:6
**Bullock (4)**
86:8,12;137:15,15
**burden (25)**
52:3,4;53:13;54:1;
74:14,16,19,21;75:4;
76:9,10,12,18,23;
77:2;78:17;79:21,22;
80:2,18;85:10,11,13,
14;108:2
**burdens (2)**
76:19;79:24
**bureau (1)**
135:3
**butchering (1)**
137:12

## C

**calculate (1)**
102:7
**Calculated (6)**
102:3,13,13;108:9;
113:22;143:25
**calculation (1)**
143:22
**call (10)**
12:6,24;15:21;
16:16;17:19;75:24;
78:18;89:14;130:4;

**157:3**
**Callais (2)**
28:9,10
**called (7)**
4:2;26:13;38:23;
39:25;71:3;135:3,5
**came (3)**
30:13;91:7,13
**can (43)**
4:19;8:17;12:17;
17:23,23;20:4,23;
22:24;31:23,25;
42:20;43:8,20;45:8;
53:22;57:12;62:9;
63:2;67:22,25;69:14;
70:4,9,15;71:15;74:8,
9,19;76:20;79:1;
82:14;84:4;88:15;
89:14;92:13;96:18;
98:1;118:6;120:19;
138:11;148:6,8,8
**cancelled (1)**
69:3
**candidates (1)**
30:12
**card (4)**
52:12;81:21,22,25
**care (1)**
82:12
**careful (1)**
101:12
**carried (1)**
77:5
**carrying (1)**
79:3
**Case (69)**
1:6;6:11,17;7:2;
10:23;12:16,19;
13:13,15;14:10,11,13;
15:4,25;16:3,14,22;
18:5;20:18,21;21:3,
15,18,20,22;6;23:14;
26:20,22;27:7,10,16,
18,21,22;28:4,13,15,
19,21,24,24;29:4,17,
23,25;30:4,9,16,20,
21,25;31:17;34:1;
36:2,4,7,13;47:4,5,20;
80:12;89:24;90:1;
91:8,16;92:3;141:6;
145:23;159:22
**cases (11)**
14:17,22;15:12,15;
27:3;28:11;29:7,10,
14;34:6;67:7
**cast (1)**
63:3
**categories (2)**
98:14;99:5
**category (6)**
97:20;98:1,4;
103:11;105:13;108:5
**causal (2)**

**159:6,7**
**Cause (6)**
29:22;38:23;86:22;
133:21;159:8;0:9
**caused (1)**
93:4
**cell (1)**
125:17
**census (3)**
134:20,23;135:3
**Center (1)**
34:10
**centers (1)**
144:11
**certain (13)**
28:1;42:2;43:1;
95:12;102:23;105:5;
118:4;134:19;135:12;
138:24,24;139:14;
141:1
**certainly (4)**
50:6;77:3;101:23;
149:6
**certainty (3)**
42:12;50:15;118:6
**certification (3)**
6:6;71:7;150:23
**certify (2)**
0:,10
**challenge (1)**
15:10
**challenged (3)**
155:10,11,20
**challenges (3)**
29:1,11;156:9
**challenging (1)**
21:24
**chance (2)**
72:25;115:18
**change (17)**
6:1;58:22;64:25;
65:10;77:18;91:1;
103:3,21;105:12;
112:12,15;115:15;
119:13,16;124:13;
126:14;160:1
**changed (8)**
17:20;18:1;77:18;
86:16;91:2;109:16;
114:8;159:3
**changes (4)**
9:21;50:2;59:13;
129:1
**chapter (1)**
14:12
**character (2)**
48:22;92:8
**character-by-character (1)**
93:10
**character-for-character (2)**
48:23;95:11
**characteristics (1)**
43:21

**characters (2)**
39:8;95:23
**charge (1)**
49:23
**chart (3)**
121:13;144:6;
146:10
**charts (2)**
121:15;146:23
**chat (1)**
160:7
**Chatham (3)**
143:13,21;144:25
**chatting (1)**
85:25
**check (10)**
46:19,22;73:10,14;
110:3,4,21;143:14;
149:2;150:5
**checked (1)**
67:5
**checking (2)**
46:3;150:3
**checks (1)**
38:17
**CHEVALIER (1)**
2:4
**Chris (2)**
21:5;75:15
**circle (2)**
144:6,9
**Circuit (2)**
27:19;80:15
**circumstance (2)**
69:6;84:2
**citation (1)**
88:6
**cite (7)**
9:22;50:22;58:9;
72:3;79:10;86:11;
157:13
**cited (7)**
6:9;11:21;34:20,23;
69:23;70:2;72:7
**cites (1)**
27:3
**citizen (19)**
47:1;67:10;119:14;
120:1;151:9,10,14,18,
19;152:1,2,4,14,14,
25;153:18;154:1,4,14
**citizens (8)**
41:20;117:8,13,21;
118:4,9;151:15;158:6
**citizenship (40)**
14:6;15:12;44:9;
46:3,7,10,13,19,21;
47:22;48:4;52:24;
57:20,21;60:7,20;
61:10,18;67:4;68:11,
13,14;117:25;119:2,
3;120:11;121:23;
122:1,4,22,25;123:6;

**151:12;152:9,20;**
154:7,19;157:11;
158:14,18
**City (7)**
144:17,18;145:14;
147:21;156:15,21,22
**Civil (1)**
4:12
**claim (4)**
128:5,14;158:7,9
**claims (2)**
27:21;29:10
**clarity (1)**
47:9
**class (1)**
26:16
**classes (3)**
26:3,4,6
**Clayton (2)**
143:12;144:21
**Clayton's (1)**
143:21
**clear (5)**
79:3,18;86:25;
87:16;128:10
**clearly (2)**
141:18;142:2
**clerk (1)**
67:8
**clerks (1)**
71:6
**clerk's (4)**
64:12;65:4,23;
128:22
**close (1)**
86:2
**Code (25)**
3:,8,10;9:23;37:10,
11,14,21;38:15;
39:17;40:4,4,7;72:16,
18;73:5,9;83:6;121:5,
21;122:3,12,21;
153:10;154:11
**coding (1)**
39:21
**Coie (2)**
28:5,15
**collect (1)**
90:5
**collecting (1)**
90:2
**college (1)**
27:23
**column (20)**
96:23;97:12,17,20,
22;100:18;101:4;
123:12,13,16;124:22,
25;125:1,2,10,12,15;
127:1;130:21;131:6
**columns (3)**
96:23;99:11,12
**combination (3)**
89:12,18;139:16

**combinations (3)**
89:13,16;120:18
**combine (1)**
38:14
**combined (4)**
38:24;43:25;91:11;
117:24
**combining (2)**
37:17;40:3
**coming (4)**
72:6;102:23,24;
145:16
**Commission (3)**
24:7;45:9;0:19
**Common (1)**
29:22
**communicated (1)**
28:13
**communicating (2)**
28:7,8
**Community (1)**
117:9
**compared (5)**
106:16;115:5;
119:3;124:16;157:17
**comparing (5)**
47:17;106:5,8;
107:18;117:18
**comparison (1)**
105:2
**compensated (1)**
6:14
**compilation (2)**
58:8,17
**compiled (2)**
97:2;130:4
**complained (1)**
25:10
**complaint (11)**
20:17,20,25;25:14,
16,19,23,24,24;26:1;
30:14
**complaints (1)**
20:21
**complete (9)**
36:20;52:12;54:21,
23;55:13;56:11;
69:19;76:6;159:22
**completely (5)**
8:20;54:12,18;
55:17,18;79:18;145:3
**complex (1)**
80:10
**compliance (4)**
16:8;24:16,17;
25:23
**complicated (1)**
76:21
**comply (4)**
52:13;73:5;82:10;
83:17
**comprehensive (1)**
129:18

**computer (6)**
50:4;51:19,20,22;
64:18;133:25
**conceivably (1)**
129:13
**concept (2)**
152:4,6
**conclude (3)**
112:24;137:2;
160:15
**concluded (1)**
106:23
**conclusion (10)**
53:14;62:23;81:2;
101:13;112:4,6,14,17;
113:23;129:25
**conclusions (9)**
7:4;8:21,23;35:15;
116:20;159:2,3,24;
160:1
**conduct (10)**
10:8;11:12;34:19;
39:24;47:16;78:13;
86:13;138:21;157:21;
159:5
**conducted (1)**
11:8
**conducting (3)**
11:1;32:14,16
**confident (1)**
150:12
**confirm (4)**
39:20;47:21;83:9;
123:3
**confirmation (2)**
48:3;123:4
**confuse (1)**
58:15
**confused (2)**
77:7;80:9
**confusing (8)**
5:13;62:24;63:23;
64:3;65:13;74:24;
75:2;76:22
**confusion (10)**
63:5;77:13;78:10,
15,21,24;79:5,12;
80:19,21
**connect (1)**
95:18
**connection (4)**
12:16,18;14:8;
86:21
**consequences (2)**
8:12;95:10
**consequential (2)**
136:3;137:3
**consider (1)**
95:19
**considered (1)**
99:10
**consistent (6)**
60:15;61:5,13,14,

21;146:24
**constitutes (1)**
111:3
**Constitution (4)**
152:12,20,23;
154:13
**contact (4)**
13:4,9,20;22:3
**contacted (6)**
12:15,18,22;13:14;
15:20;17:4
**contain (2)**
139:2;151:17
**contemplates (2)**
128:1;152:24
**contend (1)**
122:21
**contending (1)**
80:22
**contents (1)**
22:15
**contesting (1)**
148:20
**context (3)**
32:13;86:22;154:22
**contract (1)**
88:22
**convenience (1)**
40:16
**converge (1)**
76:2
**conversion (2)**
38:22;141:9
**converted (2)**
38:18;39:18
**copied (1)**
98:22;154:2
**copies (1)**
3:19
**copy (3)**
55:9;58:1;73:9
**core (1)**
8:23
**corner (1)**
100:14
**correcting (1)**
126:2
**correctly (2)**
38:19;117:11
**corrects (1)**
132:24
**correlates (1)**
126:19
**counsel (14)**
3:19;18:4;20:14;
21:9;22:3,15;28:4,6;
35:18;37:4;49:10;
51:14;0:10,12
**count (2)**
17:1;68:1
**counted (2)**
48:8;65:5
**counties (27)**

39:4,10,11;49:14,
18;50:9;51:3;97:3;
143:10,13,14,23;
144:3,4;145:6,25;
147:8,10;148:2,8,12;
149:1,12;150:4,5,6,8
**counting (1)**
32:19
**counts (1)**
47:25
**county (50)**
10:21;11:8;18:18;
19:6;38:5,7,16;43:25;
52:8;53:1;55:3;64:12;
71:6;97:7;143:4,5,6,
16,16;144:8,21,21,21,
25;145:14,24;146:13,
14;147:23,24;148:23;
149:13,15,19,25,25;
150:1,14,14,15,19;
155:5,12,18,25;156:4,
7,8;157:7;0:3
**county-level (2)**
18:16;37:12
**couple (5)**
26:21;62:11;77:11;
78:1;91:11
**course (27)**
4:20;5:7;6:6;7:8,
19;11:4;21:2;25:1,3,
4,5,11;57:14;69:25;
70:6,14;84:13;89:21;
101:25;110:8;119:2;
131:13;144:17;
150:23;156:13;
157:15;160:2
**courses (2)**
24:20,22
**COURT (7)**
1:1;27:19;29:21;
30:16;31:1,6;80:15
**Court's (1)**
30:20
**cover (1)**
58:19
**Cox (1)**
89:24
**create (5)**
52:2,2,3;149:10;
156:22
**created (4)**
37:6;39:16,21;
107:8
**credentials (1)**
23:13
**credit (1)**
9:19
**cure (1)**
125:23
**curious (1)**
153:2
**current (3)**
73:9,13;135:3

currently (4)
24:19;114:8;141:8,
22
**cut (1)**
94:8
**CV (7)**
22:25;23:2,10,15,
16,22;27:3

# D

**dashboard (1)**
122:9
**data (102)**
10:20;11:11;15:7;
18:5,7,8,9,10,15;
19:24;20:2,11,13;
35:1,14;37:16,20,23;
38:18;39:6;40:8,9;
42:12,19;43:8,19;
44:2,4,11;45:4,10;
46:10,24;48:19;49:6;
53:11;61:4;67:13,13;
68:7;78:20;85:20;
86:1,18;88:7,12,17,
18,24,25;89:2,4;91:8;
92:2,4;93:21;94:1,2,
16,18,25;95:4,8,13,
14;97:2,7,8;98:15,16,
17;101:14;104:3;
112:7;114:25;116:17,
18,20,21,22;117:25;
121:24;122:18;
123:11,17;132:5,19;
134:18,20,23;135:7;
137:19;138:15,16;
142:15,21,22;147:14;
155:6;158:18;159:1,
24
**database (10)**
19:21,24;46:7;
89:17;119:4,12,14,22;
120:3,23
**databases (5)**
48:24;138:25;
139:1;140:21;141:24
**date (32)**
18:21;19:7,15;
20:19;49:9;52:16;
55:11;56:22;58:12;
59:10;70:3;71:11;
83:1;108:17;113:15;
120:16,24;139:9,10,
19,21,23;140:2,4,7,9;
141:11,14,15;142:2,7,
8
**dated (4)**
19:3,4,16;0:16
**dates (4)**
18:23;70:6,12;
142:5
**day (4)**
53:6;86:7;104:13;

0:16
**DC (1)**
2:7
**DDS (29)**
41:2,19;50:4;51:4,
23;52:17;64:17;
65:20,21;66:12,13,17,
19;67:2,5,13,21;68:5;
88:20,21;119:12,13,
17;120:17;122:1,9;
132:3,7;137:14
**DDS's (2)**
119:3;120:3
**deal (1)**
10:9
**dealing (1)**
89:10
**decade (2)**
87:4;142:12
**deceased (5)**
121:17,18;122:15,
17,18
**December (18)**
18:13;19:4,4,9,9;
96:22;100:15,15,21;
101:1,8,17;104:1,1;
106:25;109:3,14;
140:16
**December/January (1)**
104:16
**decide (1)**
51:6
**deciding (1)**
47:24
**decision (1)**
31:19
**declared (1)**
29:22
**declined (1)**
7:8
**deems (1)**
84:12
**default (2)**
139:3,17
**Defendant (3)**
4:9;14:15;58:18
**Defendants (5)**
1:8;2:11;4:21;6:11;
79:7
**defendants' (1)**
79:7
**define (2)**
20:4;43:16
**defined (1)**
154:20
**definition (1)**
154:1
**DeKalb (4)**
143:12,19;144:21;
150:15
**Democratic (2)**
30:11,11
**Democrats (1)**

30:15
**demographic (2)**
99:25;102:20
**demographics (6)**
20:3;41:9;106:5;
135:1;143:5;146:13
**demonstrate (1)**
117:20
**demonstrated (2)**
30:23;154:7
**demonstrating (1)**
92:11
**demonstration (2)**
30:6,6
**Department (5)**
47:19,20;48:1,2;
67:7
**depending (2)**
17:1;62:14
**depends (1)**
113:8
**deposed (1)**
4:25
**DEPOSITION (13)**
1:13;4:8,16;5:17;
16:25;21:5,12;48:21;
50:23;159:21;160:15,
16;0:6
**depositions (5)**
10:22;11:11;21:2,
15;143:1
**describe (5)**
50:14,15,19;75:16;
123:15
**described (5)**
9:10;10:4;13:22;
49:17;148:5
**describing (1)**
62:15
**description (3)**
10:18;11:3;44:24
**descriptions (10)**
10:2;44:18;45:1;
47:6;48:5,10;52:7;
54:3;61:13;62:13
**detail (1)**
13:21
**detailed (1)**
156:1
**details (4)**
13:8;51:10;90:7;
145:2
**determine (5)**
15:7;41:11;66:1;
137:9;138:22
**develop (1)**
14:19
**developed (1)**
37:9
**differ (1)**
148:7
**differed (1)**
150:1

**difference (11)**
67:12;75:13;85:7;
92:8;95:16;97:19;
98:11,12;103:14;
104:1,8
**differences (5)**
97:6;98:4;101:17;
108:12;150:13
**different (57)**
20:7,9;25:8;33:9;
37:18,18;39:15;40:4;
42:7;46:2;48:24;
58:12;62:13;63:21;
66:3;68:23;71:22;
81:4;85:12;94:17;
95:1,14,14;97:18,23;
98:2,22;99:5,13,19,
22;105:4,17;108:9;
110:23;113:13;115:4;
117:19;118:22;
134:25;136:23,24;
137:6,6;140:18;
141:25;147:2;148:9;
149:19,23;150:8,15;
151:22;156:14;
157:18,25;158:16
**differently (2)**
95:2;145:20
**digit (1)**
89:7
**digits (3)**
88:18;89:12;120:25
**direct (1)**
113:1
**direction (1)**
116:11
**directly (3)**
43:10,18;154:11
**director (1)**
49:7
**dis (1)**
108:23
**disagree (4)**
60:10,12,23;80:4
**disagreeing (1)**
61:3
**Disclosures (3)**
3:;7:25;9:3
**discovery (1)**
4:11
**discretion (3)**
47:24;51:6;148:2
**discriminatory (1)**
146:22
**discuss (3)**
13:1;16:16;87:19
**discussed (9)**
22:12;33:2,3;86:6;
122:7;132:1,1;
147:16;159:20
**discussing (3)**
107:6;108:16;126:6
**discussion (6)**

31:10;32:1;70:18;
108:20;138:13;160:8
**discussions (1)**
36:10
**disproportionate (14)**
107:1,12;108:24;
111:6,19;112:16,17,
19,25;113:6;116:16;
117:17;135:25;
149:11
**disproportionately (4)**
108:11;112:8,15;
115:20
**dissent (1)**
31:8
**distinguish (1)**
128:21
**distinguishes (1)**
65:3
**DISTRICT (2)**
1:,1
**districts (2)**
29:8;57:7
**divided (2)**
102:5,20
**dividing (1)**
105:12
**DIVISION (6)**
1:2;24:25;48:7;
51:2,15,17
**DL (2)**
148:15,15
**document (12)**
6:10;8:2;70:4,23,
25,25;73:11,15;79:6;
83:10;122:8;142:17
**documentation (1)**
72:11
**documents (7)**
3:;10:14,17;37:3;
52:24;71:22;83:14
**done (17)**
14:5;16:6,7;23:4,
17,24;24:9;34:6;
44:15;49:8,11;71:20;
76:20;80:8;86:2;
135:3;151:25
**dot (2)**
37:10;38:5
**double (2)**
150:2,5
**doubt (1)**
146:19
**down (6)**
8:20;13:8;39:25;
85:8;123:11;133:11
**Dr (10)**
4:7,9,24;5:16;7:23;
8:4;23:12;57:19;86:6;
160:11
**drafting (1)**
34:21
**dramatically (3)**

105:12;110:22;
126:14
**draw (3)**
42:20;43:20;109:10
**drawing (4)**
30:5;44:3,20;
101:12
**drew (1)**
142:14
**drilled (1)**
13:8
**Driver (2)**
47:20;48:1
**driver's (29)**
14:20;15:8;41:1;
44:8,14,15,16;46:1;
47:18;55:9;65:22;
66:21;82:25;117:25;
119:21;120:12;
132:25;133:2,7;
137:5,19,24;138:3;
157:10;158:4,11,13,
18;159:1
**Due (7)**
59:13;68:11;110:7;
116:25;124:7;133:6;
156:9
**duly (2)**
4:3;0:
**during (5)**
13:20;104:20;
108:15;113:3;114:17
**Dwight (3)**
28:17,18,24

**E**

**EAC (1)**
45:9
**earlier (12)**
19:16,17;32:20;
74:11;76:6;86:6;
122:7;132:2;137:4;
139:21;140:8;142:18
**early (1)**
21:1
**ease (1)**
71:15
**easier (1)**
121:9
**easily (1)**
76:14
**effect (12)**
17:15,16,19,25;
87:21;105:7;115:3;
117:17;135:25;136:3;
137:3;159:9
**effects (2)**
87:1;113:24
**efficiency (5)**
30:3,5,7;31:2,17
**efforts (1)**
145:14

105:12;110:22;
126:14
**eight (1)**
15:22
**eight-digit (1)**
91:23
**either (15)**
37:4;38:2;47:18;
50:13;52:15;69:2;
72:8;73:7;74:3;88:16;
92:6,7;146:5,11,16
**elaborate (1)**
62:9
**election (40)**
23:24;24:7,18;26:4,
7,13,16,20;32:10,11,
13,17;45:8;53:6;
54:17;55:16;56:13;
77:10;78:5,23,25;
128:9;129:16,20,20;
130:13,14,14;145:19;
146:18,20,20,20;
147:5;149:19;150:19;
152:7;153:10,15;
154:6
**elections (21)**
25:7;29:11;32:15;
48:7;49:7;51:2,9,15,
17;77:12,24,25;78:2,
3,4,7,12;128:18;
129:9,15;130:6
**elector (5)**
73:4,12;151:3,6;
153:17
**electoral (2)**
25:2;26:18
**Elector's (1)**
153:11
**Electronic (2)**
34:9;55:5
**electronically (1)**
64:19
**element (1)**
43:17
**elements (4)**
50:16,17,21;52:13
**Elias (1)**
28:4
**eligibility (2)**
155:11;156:11
**eligible (1)**
40:23
**eliminate (2)**
39:21;135:23
**eliminated (1)**
39:19
**else (6)**
69:15;85:3,3;
123:15;137:16;156:5
**empirical (4)**
7:3;40:22;41:6,12
**employed (2)**
0:,12
**employee (1)**
0:

**employees (3)**
51:12,18,22

**enacted (3)**
13:9;17:14;124:6

**enactment (1)**
111:17

**encompass (1)**
36:15

**encompasses (1)**
104:2

**end (5)**
71:6;90:24;100:15;
104:18;108:19

**ended (1)**
160:16

**ends (1)**
119:12

**ENet (4)**
141:6,7,21,21

**enforced (1)**
90:3

**enforcing (3)**
49:17,23;50:14

**engage (2)**
147:3;153:5

**engaged (1)**
14:17

**engagement (2)**
7:8;13:1

**enormous (1)**
37:13

**ensure (1)**
9:4

**entered (9)**
54:12,22;55:17;
66:23;67:14;92:5;
138:22,23;142:3

**entering (2)**
54:24;55:16

**enters (3)**
54:18;55:4;132:25

**entire (11)**
49:15;51:14,17;
56:6;103:17;106:6;
109:24;110:14;115:5,
6;129:7

**entirely (3)**
8:25;23:17;79:3

**entries (1)**
123:10

**entry (1)**
139:16

**envelope (1)**
65:15

**equal (1)**
116:8

**ERIC (1)**
34:9

**erroneous (1)**
137:2

**erroneously (1)**
66:23

**error (25)**

39:16,19,21;53:11,
12;55:24;93:4,7,11,
15;12:19;132:16,21,
22,23;139:6,13,16;
141:9;147:1,23;
149:2;154:10,17;
157:12

**errors (11)**
41:20;92:10;95:12;
96:9;138:15,16,23;
139:2,7,12;150:20

**espoused (1)**
30:10

**essentially (2)**
37:15;109:9

**established (1)**
69:4

**estimate (2)**
43:13;44:11

**estimates (3)**
14:19;41:8;134:24

**estimating (1)**
40:21,21

**et (2)**
1:4,7

**evaluate (1)**
24:16

**Evaluation (2)**
3:9;33:2

**even (21)**
49:12;59:5;67:9;
75:23,25;79:2;92:3,
11,25;93:11;101:21;
104:4;114:11,12,12,
19;129:15;137:21;
142:4;154:2,21

**evenly (1)**
110:3

**event (1)**
82:25

**events (1)**
70:14

**eventually (1)**
25:17

**everybody (5)**
113:14;124:14,14;
125:5;130:23

**Everybody's (1)**
81:25

**everyone (6)**
4:19;91:17,19;
123:20,24;124:3

**evidence (10)**
49:18,22;50:8;
78:10;86:24,25;
87:16;149:18,23,24

**evolution (1)**
25:6

**exact (21)**
8:5,7,11,23,24;9:1,
4;11:17;34:2;36:24;
42:4,5;48:22;92:13;
93:9;94:15;95:10,17,

22;111:23;135:9

**exactly (7)**
29:24;40:25;52:16;
80:24;81:16;99:9;
153:22

**exaggerated (1)**
158:12

**EXAMINATION (1)**
4:5

**examine (5)**
17:6;20:13;43:8,19;
114:25

**examined (4)**
4:3;20:10;35:14;
61:5

**examining (2)**
16:6;30:5

**example (16)**
54:20;62:19;80:2;
88:13;92:20;99:24;
103:4;124:8;127:11;
135:19;136:11;
139:21;148:14;
150:21,22;156:16

**examples (1)**
138:18

**Excel (6)**
38:1,2;40:12,13,14,
16

**except (3)**
4:13;116:8;154:22

**excuse (14)**
4:24;15:3;23:13;
32:24;36:23;84:19;
117:2;123:11,12;
131:6;132:13;135:16;
138:20;156:10

**exemption (1)**
90:4

**exercise (1)**
95:9

**exhaustive (1)**
36:22

**Exhibit (28)**
3:,,,7,8,9,10;7:22,
24;22:18,19,21;37:1;
58:1,16;71:19;90:9,
10;96:11,12;121:13;
122:6;130:19,21;
153:7,8,9

**exhibits (2)**
3:;71:16

**exist (2)**
56:25;94:24

**existed (2)**
53:11;95:12

**exists (2)**
57:4;140:2

**expand (2)**
8:17;79:11

**expect (8)**
7:5;103:6;105:11,
17;110:22;136:7;

146:4;160:4

**expected (1)**
8:4

**experience (7)**
32:18;78:23;79:16;
81:8;139:1,15;152:6

**Expert (18)**
3:,7;7:11,19;9:3;
15:24;22:22;23:14,
25;27:4,9;28:12;34:7;
35:6;36:12,15,16,23

**expertise (2)**
33:25;151:1

**expires (1)**
0:19

**explain (2)**
104:7;156:3

**explained (1)**
108:12

**explore (1)**
95:10

**express (1)**
118:6

**extensive (1)**
76:18

**extent (1)**
34:22

**extra (1)**
74:18

**extract (1)**
37:16

**eyeballing (1)**
112:13

**F**

**fact (7)**
50:7,10;117:20;
134:19;146:7,9;
154:10

**factor (1)**
104:9

**factors (2)**
147:17;152:11

**facts (2)**
13:13,13

**fail (1)**
53:2

**failed (7)**
8:15;10:7;17:9;
53:9;83:8;88:10,11

**failing (1)**
41:21

**fails (1)**
52:15

**failure (1)**
67:16

**FAIR (1)**
1:4

**fall (4)**
21:1;26:9;84:21;
96:23

**falls (2)**

68:21;85:5

**false (4)**
53:10;92:14;
157:12,12

**falsely (2)**
95:18;157:24

**familiar (6)**
5:2;13:7;34:7;
37:23;89:24;156:17

**familiarity (1)**
13:5

**far (7)**
6:22;16:21;71:11;
77:9;89:16;142:7;
151:13

**farther (1)**
109:13;114:2,10

**fault (1)**
5:13

**features (1)**
40:17

**February (5)**
1:;91:18;94:21;
109:5;0:

**Federal (4)**
4:12;26:25;27:1;
89:21

**feel (1)**
79:20

**felon (1)**
58:22

**few (7)**
5:23;16:20;39:11;
89:15;97:25;132:5;
150:8

**fewer (2)**
114:12;144:9

**field (13)**
39:5,14;49:2;52:2;
55:11,22;56:16;57:2;
88:23;93:11;122:11,
25;132:24

**fields (7)**
39:18,22;48:9,24;
56:6;95:20;121:25

**fifth (2)**
90:15;143:21

**FIGHT (1)**
1:4

**figure (2)**
85:25;143:7

**figures (1)**
143:2

**file (85)**
10:20;14:18;18:14,
20,22;19:2,6,12,13;
30:24;38:5,6,14,16,
19;39:9,25;40:1,2,6,6,
7,7,12,13,14,15;
42:18;43:24,24;
44:20,22;46:25;47:3;
49:1,2;67:25;90:21;
91:11,19;92:9;93:3,4,

5,8,13;94:7,21;96:5,
14,15,20;98:18;99:8;
108:18;124:17,18,23,
24;125:5;126:21,22,
22,25;127:9;129:12,
16,24,25;130:3,4,6,
25;132:18,18;139:22;
140:15,16,23;142:21,
21,22;155:7;158:4,5
**filed (2)**
20:20;21:18
**files (68)**
16:7;18:13,16,23;
19:3,6,15,16,17;37:8,
10,11,12,13,15,16,17,
18,21;38:3,16;39:3,
13;41:1,2,19;43:25;
44:9,15,16;45:5,25;
46:1,11;47:5,18;68:7;
88:13;91:11,13,17,22;
92:1,2,17;93:14,17;
94:21;97:7;98:7,9;
121:6,25;122:25;
123:2,20;129:19;
138:20;139:13,15,25;
140:20,23;141:3;
157:11;158:3,11,13
**filing (1)**
32:7
**fill (2)**
55:3;65:3
**filling (1)**
137:22
**financial (1)**
16:17
**financially (1)**
0:12
**find (10)**
38:21;70:4;76:21;
78:9,10;87:11;
108:10;134:15;153:2;
155:22
**finding (1)**
31:7
**findings (1)**
31:1
**fine (5)**
4:17;58:2;99:21;
138:10;140:3
**finish (1)**
23:5
**finished (1)**
94:9
**first (28)**
4:3,15;12:15,18;
19:8,15;28:12;38:4;
48:15,16;49:8,11,15;
63:25;73:6;74:2;
83:12,20;92:7;96:20;
120:24;136:20;147:6,
7;148:14,21;150:10;
0:8
**first-time (11)**

63:7,8;68:19;69:7,
11;73:18;77:18;
81:10,10;84:8,20
**five (6)**
17:3;143:10,23;
149:12;150:4,4
**five-year (1)**
117:9
**flag (1)**
53:10;141:12
**flagged (10)**
41:4;42:25;43:6;
67:2;111:20;117:16;
118:3,10;119:25;
127:11
**flagging (1)**
158:5
**flags (1)**
157:12
**flaw (2)**
118:9;136:19
**flaws (1)**
118:25
**flip (12)**
8:2;22:24;32:4;
58:17;59:4,11,11,15,
23;61:7;90:14;122:7
**Flipping (1)**
35:16
**Florida (6)**
157:14,17,17,22;
158:2,22
**focus (2)**
26:25;75:3
**focused (1)**
27:2
**focusing (1)**
147:14
**folks (6)**
20:7;51:20;107:21;
110:1;129:8;157:15
**following (1)**
117:11
**follows (1)**
4:4
**follow-up (1)**
86:13
**footnote (4)**
48:20,20;143:15;
157:9
**forecast (1)**
43:12
**foregoing (2)**
0:,14
**foreign-born (2)**
117:21;118:16
**form (6)**
4:14;55:2;64:1;
82:13;136:25;137:22
**formal (1)**
26:1
**formally (2)**
25:16,20

**format (2)**
39:16;40:13
**formatting (1)**
40:17
**forming (2)**
11:20;20:15
**forms (13)**
63:19,21;72:17,21;
73:8;74:3,8;80:4;
83:6;84:10;85:4,15;
134:11
**forth (2)**
72:15;83:6
**found (7)**
88:8,16;89:4;
122:14,14;133:8;
151:16
**Foundation (4)**
27:6,20;43:7;
150:25
**four (7)**
24:13;49:9;63:21;
88:18;89:7,12;120:24
**fourth (2)**
90:15;123:10
**Fox (1)**
25:21
**frame (3)**
102:23;104:17;
115:9
**frequently (3)**
19:16;80:9;118:1
**front (1)**
153:14
**full (5)**
19:23;26:17;32:14;
71:8;147:8
**Fulton (5)**
143:12,16;144:21;
148:23;150:14
**function (14)**
98:17;105:9;
107:25;108:5;109:2,
12;143:5;145:22;
146:8,24,25;147:1;
148:8,9
**further (3)**
160:6;0:10,11

## G

**GAB (1)**
24:4
**gap (5)**
30:3,5,8;31:2,17
**gave (5)**
21:6;45:1,6;48:10;
155:22
**general (15)**
5:3;13:7;21:9,21,
22;42:20;45:2;47:7;
49:10;51:13;71:3;
72:1,2;86:19,21

**generally (7)**
12:12;24:18;34:12;
86:11,18;87:13;
159:12
**generate (8)**
37:12,12,15,24;
40:9,17;41:8;44:11
**generated (3)**
18:22;94:21;124:12
**generates (1)**
38:15
**generating (1)**
93:13
**geography (1)**
145:2
**GEORGIA (79)**
1:,2:16;3:,8,10;
9:19;11:15,16;12:5,6;
22:6,8,11;28:15,21;
35:20,24;47:20;48:5;
63:16,25;64:10;69:1,
9,24;71:24;76:15;
78:7;84:13;86:11,17,
18;87:2,9,18,20;88:4,
7;89:19;90:1,4,17;
91:7,22;100:17;
101:5;106:6,24;
117:8,14,22;118:18;
129:19;130:5;133:11;
137:8,20;139:8;
144:16;150:22;151:3,
5,9,11,14,15,23;
152:21,25;153:10,10;
154:5,12,14;157:1,16,
21,24;158:2
**Georgia's (21)**
9:6;11:13,17,23;
12:2;13:5;44:16;
68:24;69:21;74:5;
75:18;77:17;80:11,
14,25;88:3;132:14;
152:19,23;154:13;
157:25
**Germany (9)**
21:7;44:19;48:15;
49:7;51:14;58:1,16;
122:6;148:2
**gerrymandering (1)**
29:23
**gets (5)**
65:13;81:5;119:10,
10;148:24
**gigabytes (1)**
37:14
**Gill (1)**
29:17
**given (4)**
100:4;103:5;
115:16;138:17
**gives (2)**
62:19;71:8
**goes (14)**
8:10;28:1;45:20,22;

57:9;61:25;65:23;
68:23;82:4,9;109:4;
110:10;132:3;142:17
**good (3)**
4:16;85:21;125:20
**Goodman (2)**
27:6,20
**Gotcha (3)**
96:10;125:11;
127:10
**Government (8)**
14:16;23:19;24:6,
15;73:10,11,14,14
**grab (1)**
130:16
**grant (2)**
24:5,10
**grants (3)**
23:20,22;24:2
**great (1)**
157:16
**greater (12)**
42:3;111:18;
112:23;114:19;
116:13;118:7;135:20;
136:13,14;137:9;
144:22;145:5
**ground (1)**
5:3
**group (15)**
24:13;102:20;
103:1;108:14;111:9;
113:20,21;116:2,8,9;
123:10;136:17;
137:11,11,21
**groups (5)**
20:7;101:24;
135:25;136:16,23
**guess (24)**
4:19;25:15;55:15;
74:11;87:2;91:5;93:2,
20;94:10;95:5,8;96:3;
100:15;102:7,14;
105:20;107:8;115:25;
121:9;123:10;127:1;
131:6;136:4;154:5
**guidance (1)**
11:9
**guys (1)**
58:15
**Gwinnett (3)**
143:12,19;144:22

## H

**half (4)**
88:8,10;90:23,23
**hand (4)**
37:2;65:3,4;153:8
**handed (1)**
22:21
**Handing (2)**
22:19;96:12

**handle (3)**
11:5;51:12,22
**handled (1)**
10:7
**handling (2)**
8:14;17:9
**handwriting (2)**
56:12;96:2
**happen (2)**
87:12;132:16
**happened (5)**
29:20;94:15;156:3;
158:8,8
**happening (4)**
39:17;114:25;
155:18,23
**happens (1)**
128:24
**happy (1)**
5:14
**Harvey (5)**
21:5;44:19;49:3;
75:16;148:1
**Harvey's (2)**
48:21;50:23
**HAV (1)**
90:21
**HAVA (47)**
14:25;15:1,15,16,
17;16:8;24:16;32:24;
33:2,6,11,13,23;
44:23;46:8,14,22,23;
63:7,7,16;68:21;69:6,
19;73:15,17;77:17;
82:12,19;83:10,14,25,
25;84:2,6,6,7,11,12,
21,24;85:1;88:22;
90:4,4;120:7;137:23
**HAVA-compliant (1)**
63:20
**HAVV (1)**
121:14
**HB (14)**
9:22;13:9;17:11,24;
59:13;72:13;77:19,
24;109:15,25;110:2,
6;111:2;131:13
**head (4)**
6:23;16:23;70:5;
144:2
**hearing (2)**
155:9,13
**held (8)**
32:1;70:18;77:11;
78:5;80:15;138:13;
153:15;160:8
**Help (8)**
9:8;15:1;24:15,16;
32:21;47:15;63:8;
70:4
**hereby (1)**
0:
**herein (1)**

4:2
**hereto (1)**
0:12
**Herman (22)**
2:5;4:17,22,22;
12:23;15:20;16:10;
17:4;22:20;31:24;
47:13;57:12,14;58:2,
11;59:7;70:15,21;
85:23;138:10;160:7,9
**high (2)**
87:4;145:24
**higher (8)**
101:21,23;102:10;
136:7;144:13,14;
146:14;147:23
**highest (2)**
143:17,20
**high-level (1)**
51:19
**highly (1)**
132:6
**high-ranking (1)**
48:6
**Hispanic (5)**
97:13;111:12;
117:14;131:19;
135:14
**Hispanics (1)**
117:12
**history (9)**
25:5;110:14;
129:12,19,25;130:3,4,
5,6
**hold (1)**
78:7
**holding (2)**
30:20,21
**holds (1)**
45:21
**honestly (1)**
123:16
**Hood (3)**
86:8,12;137:15
**hour (1)**
6:14
**hourly (1)**
16:18
**hours (1)**
17:3
**hu-huhs (1)**
5:11
**hundred (1)**
97:24
**hundreds (1)**
117:20
**hyphen (2)**
49:5;52:2
**hypothetical (2)**
60:11;110:8

**I**

**ID (112)**
11:19;12:1,4,5,6,7;
14:5,21,23;15:9;
18:18;27:18,22;28:1;
29:4;38:12;47:18;
53:17,20,24;54:4;
55:9,13;60:6,8,18,19,
21,25;61:8,10,11,16,
18,25;62:6,22;63:5,9,
13,15,18,19,20,21;
65:22;66:21;68:17,
18,20,21,24;69:13,14,
19,20,21;72:21;
73:21;74:6,8;75:14,
18,18,21;76:15;
77:17;78:11;80:4,9,
11,14,22,25;81:17;
82:7,9,10,13;83:13,
15,21,22;84:5,9,10,
20;85:1,4,15;86:9,15,
19,22;87:4,10,13,15,
19,22;123:13;126:1;
128:2,2,7,23;132:25;
133:2,8;137:13,19;
138:3
**identical (1)**
97:8
**identification (14)**
7:22;22:18;37:1;
71:17;72:17;73:8;
74:4;83:7,18;90:9;
96:11;126:8;127:16;
153:7
**identified (1)**
157:24
**identifier (3)**
89:7;91:25;141:15
**identifiers (5)**
60:6,19;61:9,17;
82:7
**identify (3)**
4:20;30:9;71:12
**identities (1)**
47:22
**identity (9)**
48:4;72:15;82:12;
83:4,5,10,19;84:3;
88:15
**IDs (7)**
60:6;79:12,14;
81:11;84:11,12,14
**imagine (2)**
16:18;66:15
**immediately (1)**
132:24
**impact (2)**
8:5,7
**impeded (1)**
87:15
**implement (1)**
147:11
**implementation (4)**
87:9;146:4,22,25

**implemented (1)**
9:11
**implementing (2)**
9:25;50:13
**imply (1)**
65:15
**important (2)**
51:8;95:16
**imported (1)**
139:5
**inaccuracies (1)**
117:24
**inaccurate (1)**
60:4
**inactivity (1)**
69:3
**INC (1)**
1:4
**include (5)**
37:19,20;132:19;
134:24;150:20
**included (9)**
18:10,13,15,16;
38:8,10,11;39:17;
91:19
**includes (5)**
97:20;123:25;
126:20;130:25;
132:19
**including (2)**
96:25;140:8
**incomplete (2)**
154:3,23
**inconsistencies (1)**
62:16
**inconsistency (1)**
49:16
**inconsistent (4)**
48:11;155:1,6,15
**incorrect (7)**
53:3;112:9,10;
116:5;123:7;151:9;
154:21
**incorrectly (7)**
40:24;41:25;42:6,
14,25;43:6;49:14
**increased (2)**
87:8;100:22
**increases (2)**
20:6,6
**independent (1)**
29:7
**Indians (1)**
99:20
**indicate (9)**
13:15;45:18;90:22;
94:7,10;142:23;
148:18;152:13;
155:19
**indicates (4)**
42:13;73:3;99:3;
147:9
**indicating (1)**

52:17
**indication (1)**
96:7
**individual (41)**
53:17,19,23;54:9;
57:7;61:25;64:22;
68:10,15,22;73:20,21,
25;74:12,13;80:20;
82:6,8,9,16,20;84:18,
20;85:5;87:14;89:9,
18;92:2;119:10;
127:18,21;132:13,15;
137:22,23;152:13,24;
154:13;155:10;159:8,
9
**individuals (48)**
12:10;15:8;20:11;
41:25;66:12;67:20;
68:5;89:19;91:13,14,
24;92:12,13,16;
93:24;94:16;100:10;
104:12;106:17,20;
107:11;109:16,17;
110:16;111:5,10,13,
16;114:3;116:23;
117:4,7;118:8;
128:19;129:5,14;
131:23;132:10;
133:15,17;135:15;
139:20;140:9,10;
142:6;147:18;152:20;
159:15
**individual's (7)**
48:3;57:3;60:24;
61:1;84:8;130:3;
148:23
**infer (3)**
42:15;155:12,14
**inference (15)**
42:21;43:4,7,12,14,
23;44:3,11;78:18,20;
109:10;142:14;
145:19;147:14;
149:18
**inferences (3)**
43:20;44:21;159:10
**inflate (1)**
136:18
**inflates (3)**
115:12,12,14
**information (68)**
19:19;20:1;34:10,
24;40:25;41:1;45:18,
19,21,22;46:7,13;
47:1,17,24;49:22;
51:4,7;52:11,21;53:3;
54:12,18,23;55:4,16,
17;56:2,7;57:20,22;
60:25;71:8;74:22;
78:25;79:16;81:18,
21;83:2;94:6;100:5;
114:6;119:3,6,10,20;
120:3,6,8,9;126:2;

Fair Fight Action v.
Raffensperger

Kenneth Mayer, Ph.D.
February 26, 2020

127:12;134:24;141:1;
147:22;148:4;149:14;
150:11,13;151:8,21,
22;154:23;155:22;
158:14;159:14,17,18
**informational (6)**
74:21;76:12,17;
80:2;85:11,13
**informative (3)**
99:10;101:18;
133:22
**informed (2)**
33:11;43:9
**Initial (5)**
3:;7:25;9:3;13:20;
49:11
**initially (1)**
0:7
**in-person (1)**
65:18
**input (8)**
88:17,18;89:4;
122:18;132:6;139:12;
141:1;149:2
**inputs (1)**
148:13
**inputting (2)**
147:22;148:23
**Inspector (1)**
45:2
**instance (1)**
155:3
**Instead (2)**
142:1;148:25
**instructed (1)**
81:6
**instructions (1)**
79:17
**integrity (1)**
25:2
**intend (2)**
36:6,12
**intended (3)**
141:10,11;150:24
**intentionally (1)**
142:3
**interact (1)**
55:6
**interaction (1)**
75:17
**Interest (4)**
40:22,23;41:6,12
**interested (6)**
37:6;43:18;94:14;
112:2;156:2;0:
**interface (1)**
51:23
**internal (5)**
10:5,8,11,24;93:12
**interpret (2)**
51:7;124:21
**into (24)**
8:10;13:8;17:15;

38:14,18,23;41:25;
55:5;63:2;75:11;
85:19;91:1;98:19;
110:6,10,10;114:7;
136:10;141:1;145:2;
147:17,22;155:18;
158:4
**introduced (1)**
139:6
**invalid (4)**
88:17,18;89:4;
122:18
**investigation (1)**
78:13
**investigators (1)**
23:21
**invoices (3)**
6:16,20;16:20
**involve (5)**
14:25;15:4;28:25;
29:14;33:5
**involved (4)**
11:6;14:22;32:14,
22
**involves (1)**
39:2
**involving (4)**
15:12,25;29:7;
32:21
**Islander (2)**
99:25;100:2
**Islanders (2)**
116:13,15
**issue (20)**
14:1,3,22;25:18;
29:23;34:11;39:2,2;
78:11;80:25;87:12;
95:7;98:21;109:6;
132:6;139:13;150:3;
156:25;157:2;158:13
**issued (3)**
9:15,16;137:13
**issues (12)**
5:8;13:12;15:4;
22:12;24:18;30:22;
34:1;38:21;39:1;
48:17;141:23;156:14
**item (1)**
8:3
**items (1)**
35:8

## J

**Jackman (1)**
31:16
**January (44)**
18:14;19:7,8;38:9,
10;40:11;91:21;
96:15,24,25;97:14;
100:18,22;101:3,9,16,
21;104:2,5,19;
106:19;107:9;108:18,

19;109:3,8,14;
113:11;116:15;
123:14,23;124:18;
125:8,17,22;126:21,
22;127:5,17;130:24;
131:2,20;135:15;
155:7
**July (12)**
18:10;91:21;94:22;
123:23;124:3,23;
125:5,13,21;126:7,22;
127:5

## K

**Keep (1)**
71:21
**Kenneth (6)**
1:14;3:2,7;4:2,9;8:4
**Kevin (3)**
21:12;51:16;75:16
**key (8)**
40:22;41:5,11;80:1;
146:5;152:9,10,11
**kicked (1)**
41:21
**kind (9)**
43:14;74:23;128:1;
132:21,21,22;138:21;
147:13;155:17
**knowledge (3)**
34:10;44:6;47:7
**known (4)**
17:24;44:8;117:24;
158:13
**Kolnik (1)**
1:18;0:,

## L

**labeled (1)**
79:7
**lack (1)**
47:9
**language (3)**
30:13;72:13;153:22
**large (6)**
24:5;37:22;93:19;
98:10;139:1;145:23
**largely (1)**
30:15
**larger (1)**
144:11
**largest (1)**
144:17
**last (20)**
7:12;24:23;25:13,
14;26:9;33:17;49:8,9,
12;87:4;89:12;90:15;
92:7,24;120:24,24;
128:19;129:9;142:10;
150:21
**late (2)**

20:25;95:4
**Laura (3)**
1:18;0:,
**law (28)**
14:23;15:9,10;
17:13,19;26:20,25,25;
63:17;64:10;66:11;
68:24;69:21;72:6;
74:6;75:18;76:15;
79:3;80:11,14;81:1;
89:21;153:10,18;
154:12,15,25;155:1
**laws (7)**
72:6;80:9;87:15;
145:20;146:20;
147:16;157:18
**lawsuits (1)**
148:18
**lead (1)**
62:25
**leads (1)**
136:23
**least (5)**
42:10;45:4;62:12;
122:16,17
**leave (1)**
156:21
**leaves (1)**
62:20
**left (1)**
88:23
**left-hand (1)**
100:14
**legal (3)**
13:12;25:23;150:25
**legible (1)**
56:13
**less (5)**
89:16;96:24,24;
115:7;146:15
**letter (26)**
48:15;52:20;53:1;
62:20;63:4,13,14,23;
64:4;65:13;69:16;
74:22,25;75:1;76:4,4,
24;81:5,13;82:4;83:8,
9;85:8,9,10;147:7
**letters (1)**
76:21
**level (3)**
10:21;18:18;19:6
**license (32)**
14:21;15:8;41:1;
44:8,14,15,16;46:1;
47:18;55:9;65:22;
66:21;83:1;86:9,15;
117:25;119:11,22;
120:13;132:25;133:2,
7;137:13,19,24;
138:4;157:10;158:5,
11,13,18;159:1
**licenses (1)**
137:5

**likelihood (4)**
102:14;103:15,23;
108:6
**likely (18)**
5:13;66:20;77:12;
104:6;107:15,17;
115:17;127:18,22;
128:12;135:18,20;
136:1,14;137:1;
139:14;144:12;
146:15
**limited (5)**
29:10;110:23;
131:15,16;159:16
**link (2)**
37:18;95:18
**linking (2)**
14:18;158:4
**List (16)**
3:;23:22;35:13;
37:8;90:21;93:14,19,
20,22;94:2;95:7;
105:1;107:7;109:4;
118:5;123:23
**listed (9)**
19:25;35:2,8;59:24;
72:17;73:8;74:4;
84:14;122:13
**lists (3)**
18:11;42:7;74:8
**literature (7)**
11:14,22;34:5,23;
44:7;76:19;146:18
**litigation (2)**
7:15;14:8
**little (6)**
46:12;86:1;99:13;
101:11;118:22;132:1
**LITTLEFIELD (1)**
2:13
**living (3)**
117:8,14,22
**LLC (1)**
2:13
**local (2)**
71:1;78:1
**localities (1)**
147:11
**located (1)**
144:25
**lodged (1)**
26:1
**long (1)**
107:22
**longer (3)**
75:22;103:25;
126:25
**look (51)**
8:19;17:7;37:17;
49:21;58:11;59:14;
67:25;76:14;77:23;
83:7;88:7,11;91:6;
94:12,13;96:16;

Regency-Brentano, Inc.

97:17;98:24;99:2;
102:22;103:17;
104:19;109:19,24;
110:14;111:25;112:5;
114:10;116:21,22,23;
121:24,24;123:2;
124:22;125:17;129:4,
7,14;134:16;136:4;
137:14;140:12,13;
142:5,9;144:3;145:4,
8;155:4;157:3
**looked (26)**
14:18;33:1;78:22;
87:5,20;91:1;92:23;
93:3;101:22;104:15;
111:22;113:17,18;
114:2;124:17;129:13;
134:20;135:11;137:8,
14,17;152:3,19;
155:25;156:25;
159:10
**looking (50)**
15:7;16:7;19:20;
23:5;24:10;33:16;
35:11;41:8;42:16;
44:9;47:11;65:2;
67:19;75:5;94:14;
97:11,11;99:11,23;
100:13;101:3,3;
102:4,12;103:10,19,
20,24;104:10,17;
105:19;109:9;113:9;
115:8;117:2,3,6;
118:23;123:22;
124:25;125:1;133:14;
136:5;139:19;140:6,
14;149:15,16;158:3;
159:2
**looks (9)**
72:13;91:10;97:11;
99:7;101:7;131:5;
143:3;149:1;154:18
**lot (8)**
10:16;33:17;
109:25;138:25;139:1;
140:18;156:19;
157:15
**lower (3)**
86:10,19,22
**lunch (2)**
85:22;86:3

## M

**machine (1)**
0:
**Madison (1)**
1:15
**magic (1)**
34:4
**magnitude (2)**
104:8;108:11
**mail (23)**

20:12;55:2;63:9,14,
15,17;64:6,20,24;
65:6,14,15;66:9;
68:19;69:12;73:4,18;
75:3;83:12,16,16;
84:8;136:17
**mailbox (1)**
65:16
**mailed (1)**
66:5
**mail-in (1)**
147:18
**mails (1)**
63:25
**maintain (2)**
41:5;65:12
**maintained (1)**
41:2
**maintaining (1)**
32:16
**maintains (1)**
46:6
**major (1)**
26:22
**majority (5)**
31:4,10,13,13;
88:16
**makes (1)**
43:12
**makeup (1)**
112:19
**making (5)**
43:13;49:17,23;
50:13;80:24
**M-A-L (1)**
96:2
**Malaya (1)**
92:21
**M-A-L-A-Y-A (2)**
92:21;95:25
**manner (2)**
49:19;153:17
**manually (1)**
55:4
**many (6)**
67:23;103:5;
113:22;118:6;120:18;
148:12
**Marc (1)**
28:4
**March (2)**
17:14;128:24
**marginal (1)**
115:2
**marginals (1)**
112:12
**mark (3)**
71:15;90:8;130:18
**marked (17)**
7:22,23;22:18,19,
21;37:1,2;57:25;58:3,
4;71:16;90:9;96:11,
12;121:11;153:7,8

**match (62)**
8:5,7,11,23,25;9:1,
4,8;11:17;15:17;
32:22,23;34:2;36:24;
40:25;41:21;46:4;
47:25;48:8,10,23,23;
49:11,15;52:9,16;
54:9;59:10;83:2;
88:11,16,19,25;89:4;
92:6;93:10;95:22;
104:7;105:6;109:17;
110:7;120:7,11,14,17;
121:3,15,16,16,17,17,
18,20;122:13,14,15,
15,18;133:8;136:6;
147:6;148:15
**matched (3)**
60:25;84:22;88:15
**matches (9)**
46:8;52:11;55:10;
81:18,21;120:22;
122:16,17;148:15
**matching (23)**
14:18;15:4;34:5;
44:6,7;48:16,16;49:8,
18,19,21;50:4;88:10;
89:3;92:13;93:9;
94:15;95:11,17,20;
110:9;147:8;158:4
**material (8)**
50:11;69:22;70:12;
79:10;97:8,9;153:4;
154:25
**materials (24)**
5:19,20,25;10:12,
19;11:12,14,16;35:10,
11;52:8;58:7;62:4,17;
69:17;71:4;76:8;79:1,
5;122:5;148:19;
150:19;151:17;
153:24
**math (1)**
58:25
**matter (11)**
6:13;40:16;42:11,
11;92:1;93:9;95:15;
99:1;108:2;112:6;
139:11
**matters (1)**
51:2
**may (38)**
5:7;17:15;56:11;
57:1;63:12;79:19,20;
80:22;84:13;94:4,24;
98:3;104:16;110:16;
114:3,12,12;119:6;
129:2,3,15;131:7,11;
136:8;140:24;141:15;
145:18;147:17;149:1;
154:13;155:18;156:6,
9,19,22;158:16;159:8,
9
**maybe (18)**

58:20;81:19;95:23,
25;98:12;101:20;
109:23;114:9,16;
132:5;135:18;138:22;
141:12,23;145:13;
148:21;150:7;155:19
**Mayer (19)**
1:14;3:2,7;4:2,7,9,
24;5:16;7:23;8:4;
22:19,21,23;12:37:2;
57:19;71:19;86:6;
96:12;160:11
**mayor's (1)**
145:12
**mean (53)**
8:9;13:16;16:4;
18:21;20:4;24:23;
32:11;34:3;47:10,11;
50:3,14;52:4;54:8,19;
58:14;60:15;61:2;
62:9;67:22,24;72:2;
74:15;76:10;84:6,17,
19;87:18;94:8;96:3;
98:20;101:20;102:24;
104:11,15;107:17;
118:3;120:13,15;
128:15;129:2,23;
130:8;132:22;133:21;
134:9;149:17;150:6;
151:10,18;154:3;
159:13,23
**meaning (3)**
52:10;53:10;152:6
**meaningful (2)**
151:10,11
**means (7)**
48:23;98:23;99:15;
100:12;118:8;125:24;
151:12
**meant (2)**
140:6,8
**measure (2)**
31:2,17
**Melaya (1)**
92:21
**M-E-L-A-Y-A (2)**
92:21;96:1
**memorized (1)**
58:2
**mention (7)**
17:11,17;31:8;
66:11;87:23;97:5;
155:5
**mentioned (21)**
17:18,18,19;9:;
31:12;32:20,24;
33:23;44:20;45:16;
46:2;48:15,18;57:19;
68:17;76:2;79:8;
104:17;141:9;142:8,
14,18
**merge (1)**
92:1

**merged (2)**
91:12;93:20
**method (5)**
65:7;68:7;133:18;
158:2;159:1
**methods (3)**
133:16;146:4;147:2
**metric (1)**
30:8
**metrics (1)**
31:2
**MI (1)**
123:22
**mid (1)**
95:4
**middle (1)**
104:2
**MIDR (105)**
18:17;38:12;39:25;
40:24;41:25;54:7,14;
59:20;60:9,17,22;
61:1,12,19;62:6,13,
20,21;66:24;67:17,
23;68:2,16;74:12;
75:22;76:4;77:4;
80:23;81:2,14;82:5,
14,21;83:11;84:18,19,
22;102:14,16,19;
103:7,15,19,24;104:6,
12;105:6,16;106:13;
123:12,14,19,25;
124:3,14,15,17,19;
125:5,16,21,21,23,25;
126:3,7,18;127:4,5,7,
8,19,22,23;128:10;
129:17;130:22;131:1,
4,14,19,23;132:2,8,
15;133:6,15;134:3,5;
135:17,21;136:2;
137:2;143:4,11;
145:17,18,24;146:1,
11,16;149:11,12;
150:9;159:9
**midway (1)**
121:14
**might (13)**
59:5;82:20;100:5;
112:12;115:1,15;
128:8;133:23;139:5;
142:11;155:23;156:2;
157:2
**MILLER (1)**
2:4
**million (3)**
89:15;90:18;98:6
**Milwaukee (2)**
14:11;27:17
**mind (1)**
152:17
**minorities (1)**
86:23
**minority (12)**
86:10,16,20;87:5,8;

108:10;112:8,14;
115:3,19;116:2;
146:23
**mismatch (3)**
53:10;124:8;133:6
**mismatched (1)**
48:22
**mismatches (1)**
91:7
**misplaced (1)**
48:25
**misremembered (1)**
123:8
**misremembering (1)**
122:24
**missing (9)**
18:18;38:11;39:15;
56:2,6,18;114:6;
127:12;141:25
**Missouri (1)**
29:3
**misspelling (1)**
148:21
**mistake (1)**
54:24
**mixed (1)**
121:18
**mode (5)**
132:20;134:16,25;
135:7;136:1
**modes (1)**
136:24
**money (1)**
24:11
**Month (1)**
59:12
**months (2)**
15:22;142:10
**more (53)**
5:8,23;7:19;30:7;
34:12;37:6;40:18;
42:20;47:7;59:4;61:9,
17;62:16;65:19;
69:13,13,24;70:11,14;
95:7;98:3;101:11,15;
103:6,7;104:3,6,15;
105:10,15;107:14,15,
17,19;114:11,13;
130:16;134:10;
135:18,19;136:1,13,
14,17;137:1;138:4;
144:12,14;145:10,16;
146:9;147:17,18
**Most (14)**
7:11;23:3,6;27:7;
39:4;87:11;101:24;
109:25;127:18;
128:12;131:4,12;
132:3;141:24
**Mostly (2)**
5:23;27:1
**Motor (4)**
65:21;66:11,25;

67:11
**move (4)**
60:8;63:1;85:19;
127:22
**moved (8)**
42:18;60:21;61:11,
19;69:3,4;99:17;
139:4
**moving (2)**
113:17;114:21
**much (6)**
6:22;16:21,24;
103:25;104:2;109:13
**multiple (7)**
58:8;121:17,17,18;
122:16,17,18
**municipal (3)**
78:3,4;156:14
**municipalities (1)**
78:7
**municipality (2)**
156:4,8
**must (3)**
87:2;143:24;151:6
**myself (1)**
34:6
**mystic (1)**
43:15

## N

**NAACP (2)**
14:12;27:17
**name (44)**
14:15;26:12;48:16,
25;49:8,8,12,15;
52:16;54:25;55:10,
21,22;56:11,16,22;
73:12,12;82:25;92:7,
7,24;93:5,16,21;95:1,
13,20,25;96:14;110:7,
8;120:16,24,24;124:7,
8;133:6;147:7,8;
148:14,21,24;150:3
**named (2)**
28:9;92:20
**names (4)**
91:6,15;92:6,13
**narrower (1)**
115:9
**national (1)**
41:2
**naturalization (2)**
119:19;120:6
**naturalized (5)**
117:8,13,21;
118:16;119:21
**naturalizes (2)**
119:18;158:15
**nature (5)**
13:22;24:12;41:20;
42:15;47:22
**navigate (2)**

74:19;76:13
**near (1)**
157:13
**nearly (2)**
90:17;97:7
**nec (1)**
109:18
**necessarily (4)**
76:10;103:8;
136:21;145:21
**necessary (2)**
30:23;126:1
**need (9)**
5:6;22:24;52:13,20;
53:4;63:1;76:16;77:8;
114:9
**needed (2)**
38:13;125:23
**needs (2)**
5:8;69:18
**negative (1)**
5:12
**neighborhood (2)**
17:2;68:3
**neither (1)**
0:10
**neutral (1)**
30:7
**nevertheless (1)**
83:3
**new (3)**
17:13;102:5;114:24
**News (2)**
25:21;155:25
**next (1)**
60:1
**nine-digit (6)**
89:6,8,20,22;90:3,5
**non (6)**
42:22;90:19;91:14;
94:10;111:12;116:23
**non-citizen (10)**
52:23,23;67:4;
117:5;119:11,25;
120:25;121:4,4;
127:11
**non-citizens (10)**
41:4,22;42:23,25;
52:18;118:3,11;
120:19;157:24;
158:10
**non-citizenship (3)**
53:10;116:25;
157:12
**none (5)**
45:17,17,17;50:18,
18
**non-Hispanic (9)**
86:10;101:2,5;
102:10;104:25;
105:23;106:17;
114:13;146:14
**non-Hispanics (1)**

116:9
**non-judiciable (1)**
29:23
**non-match (19)**
48:1;49:3,6;52:1,3;
53:18,19,23;54:5,15,
24;55:10,19;56:23;
66:19,22;67:3;90:24;
148:14
**non-matches (3)**
88:4;90:19;92:14
**non-matching (1)**
91:14
**non-MIDR (4)**
63:2;82:8;126:9;
127:17
**non-testifying (1)**
36:16
**non-uniform (3)**
138:17;142:24;
147:15
**non-zero (1)**
43:1
**nor (3)**
145:24;0:,12
**NORTHERN (1)**
1:
**Nos (2)**
71:16
**Notary (2)**
0:5,18
**notation (2)**
55:13;75:21
**note (5)**
41:13,15;62:12;
89:11;151:21
**noted (3)**
12:12;146:2;0:7
**notes (1)**
0:
**noticed (2)**
138:19,20
**notion (1)**
76:9
**November (1)**
135:5
**number (146)**
8:3;14:20;21:24;
24:8;32:5;33:9;39:15;
40:23;41:16,24;42:2,
4,5,7,24;43:1;49:10;
50:24;55:9;56:17,23;
59:1;60:18;61:7,16,
24;62:2;66:21,23;
68:1;70:8,10,20,22,
23;83:1;89:6,8,16;
90:3,6;91:22,23;
92:15,16,18;93:1;
96:21;97:12,18,23;
98:10;99:3,4,7,20;
100:21;101:21,22;
102:5,6,19,21,22;
104:11,20;105:6,8,10,

13,13;106:4,16,16,18,
23;107:1,6,11,24;
108:1,5,24;109:1,11,
15;110:16,25;111:1,1,
2,5,16,19;112:5,21,
22;113:2,4,11,11,19,
20;114:14,19,22,23;
115:8,17;116:11,14;
118:6,19;120:12,13,
20;121:10;124:20;
126:19;128:15,16;
129:8;130:21;131:10,
18;133:1;136:25;
137:24;138:3,4;
141:18;143:17,22,25;
144:7;145:5,8,11,18;
146:16;148:9;149:11;
156:20,23;157:23;
158:9
**numbers (29)**
45:10;58:10;97:1,
19;98:1;99:16;
104:14;105:4;108:13;
109:11;110:22;111:7,
18;112:1,2;114:11;
116:7;117:19;118:14;
133:15,19;135:22;
136:6,7,13,18;144:2,
4;146:9
**NW (1)**
2:6,15

## O

**objection (1)**
27:14
**objections (1)**
4:12
**obscure (1)**
43:15
**observable (1)**
41:17
**observe (9)**
41:16;42:24;43:8,
10,16,19,20;67:22;
79:2
**obtained (1)**
47:1
**obtains (1)**
65:22
**obviously (3)**
5:2;107:20;144:10
**occur (2)**
80:22;156:18
**occurred (3)**
77:24;96:9;139:12
**occurs (2)**
61:4;147:6
**odd (1)**
151:16
**off (7)**
6:23;16:23;31:24,
25;32:1;58:20;70:5,

Fair Fight Action v.
Raffensperger

Kenneth Mayer, Ph.D.
February 26, 2020

15,18;94:8;98:7;
101:14;128:6;129:5;
138:13;144:2;160:8
**offense (1)**
157:16
**offer (2)**
33:25;35:18
**offered (5)**
7:4;8:21,24;10:3;
27:10
**offering (1)**
87:21
**office (20)**
9:11;10:4;11:4,10;
21:10;44:25;49:13;
51:3,11,16,20;64:2,
12,14,24;65:5,24;
66:3;128:23;158:7
**official (7)**
9:19;50:3;54:17;
56:13;150:23;151:16;
158:6
**officials (17)**
9:10;10:3,16;44:25;
47:6;48:6;50:10,12;
53:2,12;54:3,13;
55:16;64:13;71:5;
75:12;78:25;147:5;
150:19
**often (1)**
5:9
**OIG (1)**
87:24
**old (2)**
139:8;141:23
**oldest (1)**
19:12
**once (1)**
96:1
**one (81)**
5:7;6:7;14:11,12,
14;18:25;19:3,4;23:3;
24:14;26:21,22;
33:19,21;38:4,7;39:6,
25;41:7;42:10;48:17;
49:1,1,5;50:3;58:1,
20;59:4;61:8,17;
62:11;63:19,20;66:3,
5;70:15;73:7,22;74:3,
17;75:11;76:1;79:20;
82:13;84:10;91:17;
92:7,9,22;93:5,5,6;
95:13,24;98:3;
104:25;109:1;114:22;
116:10;121:8;122:16,
17;125:2;130:13;
133:18;136:7,25;
137:25;139:7;145:14,
14;147:19;149:8,10,
18,25;153:16;156:3,
7;157:2,8
**ones (3)**
33:14;37:8;130:12

**ongoing (1)**
29:18
**online (10)**
54:21;64:18;71:4;
132:14;133:3,5,10,24;
134:2;138:2
**only (27)**
28:21;34:22;39:11;
44:2,2;49:11;54:13;
58:1;68:25;73:17;
75:17;81:13;82:4;
85:7;87:13;89:15;
92:22;113:9;116:10;
126:7;127:15;128:16;
129:22;131:14;147:6;
150:4;153:2
**open (1)**
62:20
**operates (1)**
52:6
**opined (1)**
31:16
**opining (4)**
41:24;76:25;79:24;
80:11
**opinion (32)**
7:1,5;11:20;17:21;
18:1;20:15;22:16;
27:11;30:2,4;31:4,7,
11,13,14;33:25;
34:25;35:10;36:20,
23;37:9;50:2;57:23;
60:3;64:25;66:18;
71:25;87:21;103:2;
116:5;158:23;159:22
**opinions (11)**
6:1;16:22;35:18,22;
36:4,6,10,19;159:20,
21;160:1
**opportunities (1)**
7:19
**option (1)**
74:5
**options (1)**
69:13
**oranges (1)**
106:9
**order (7)**
14:19;38:12;62:7,7,
14,22;81:6
**organization (1)**
66:4
**organizations (1)**
135:19
**origin (3)**
97:13;111:12;
135:14
**Original (4)**
3:,,;0:
**originally (1)**
42:16
**others (1)**
149:3

**otherwise (5)**
40:23;85:15;87:14;
133:8;0:
**out (23)**
41:21;53:1;55:3;
65:3;71:21;77:5;79:3;
82:4;90:1;91:13;
95:22;98:6,6;114:4;
137:22;148:16;151:2,
6;154:11;155:7;
157:14,14;158:12
**outcome (1)**
0:
**outcomes (2)**
10:10;149:16
**outdated (1)**
119:7
**output (1)**
40:15
**outside (5)**
34:19;35:21,25;
36:1;37:8
**over (20)**
5:3;6:24;7:15;
27:13,13;33:17;
38:18;65:4;87:4;88:8,
10;90:23;98:22;
101:19;102:23;103:4,
17;111:23;119:13;
145:9
**overall (1)**
112:14
**override (1)**
54:5;55:10;66:22
**overseen (1)**
90:2
**own (4)**
20:23;84:4;121:23;
156:22

## P

**Pacific (4)**
99:25;100:2;
116:13,15
**PAGE (45)**
3:2;8:2;31:22;32:4,
4,5,6,7;33:15;35:3,4,
5,8,16;40:20;47:13,
14;53:15;58:11,18,19,
20,25;59:1,3;61:7;
62:19;63:4;86:7;
90:15;91:5;96:14,20;
117:1;121:13;122:7;
126:4,6;138:7,15;
142:16;143:8;150:20;
151:4,24
**pages (2)**
33:16;60:1
**paid (5)**
6:19,19,22;7:6,9
**paper (17)**
33:5;55:2;65:10;

66:1;68:6;69:23;86:8,
12,14;89:5;134:6,10,
11,11;137:15,22;
145:17
**paperless (1)**
134:9
**papers (1)**
33:5
**paragraph (2)**
59:21;150:22
**part (19)**
8:8;11:20;22:2;
30:4;33:9;44:1;60:10;
63:11;70:5;77:14;
83:20;93:25;133:21;
136:20;139:25;
142:20;144:22;
150:10,12
**particular (12)**
78:11;80:1;84:2;
113:18;116:22;
133:23;135:24;145:9;
149:25;155:3;156:21;
159:15
**particularly (2)**
39:10;156:7
**parties (2)**
0:,12
**partisan (1)**
29:22
**parts (1)**
113:17
**party (3)**
30:11,11,24
**pass (5)**
60:6,19;61:9,17;
82:7
**past (1)**
7:15
**pasted (1)**
154:2
**paths (1)**
76:1
**pattern (1)**
86:19
**paycheck (2)**
73:11,14
**pending (141)**
18:11,12;39:4,7,12,
25;40:11;42:1,17,24;
43:24;45:5;55:20,23,
24;56:5,8,11,14,17,
21,24;57:3;67:17;
68:11,14;88:13;
91:11,12,17,18,20;
93:3,14,19,19;94:2,
11,12,13;96:13,15,24,
24,25;97:21,22;
98:20;99:6,8,14;
100:10,12;104:12,18;
105:1,21,23;106:1,10,
17,19;107:2,7,16,25,
25;108:3,7,11,25;

109:2,4,5,7,8,11,12,
16,20,20;110:1,6,10,
14,17,24;111:5,11,13,
20;112:25;113:5,9,12,
14,21;114:3,5,7,13,
23;115:22;116:1,15,
24;117:4,15;119:25;
121:25;123:9,24;
124:1,5,7,14,15,17,
23;125:5,13,16;
126:7;127:8,12;
130:17,23,25;131:3,8,
11,15;135:16,16;
140:10;143:4;146:11,
17;155:8,8,13
**people (80)**
23:20;40:24;41:16;
42:5,16;49:16,23;
51:9;55:6;56:20;
67:23;68:1,3;69:8;
79:2;89:17;92:4;
97:25;98:3,6;99:3,4,7,
7,17;100:4;101:22,
25;103:7,11;104:4;
105:7,8,10,11,13,14,
15;106:13;107:24;
108:1,3,4,5,13;109:2,
5,11,12,20;110:24;
112:3;113:10,11,19,
19,20,22;114:22,23;
115:17;118:2,5,18;
119:21;125:19,25;
126:20;127:6;128:12,
20,22;130:25;131:11,
18;134:3;142:8,10;
144:9;158:5
**percent (31)**
50:15;88:5;90:18,
23;91:2,2;105:22;
106:1,19;107:1,10,21;
108:20,22,23;111:3,
12;113:3;114:17;
115:22,23;116:14;
117:13,15;125:24;
126:8,17;128:17;
131:22;143:11;
157:13
**percentage (27)**
20:9;45:14;88:4,14;
103:10,11;105:7;
106:24;108:4;111:10,
16;115:6,21,24;116:1,
11;117:7;118:14;
128:20;135:20;
136:15;143:3;145:5;
146:7,8,14;156:20
**percentages (6)**
107:18;113:23;
115:2,16;116:7;117:3
**perform (2)**
36:12;76:11
**performed (1)**
75:7

Regency-Brentano, Inc.

**perhaps (1)**
109:1
**period (20)**
101:19;103:5,17,
19,25;104:20;107:12;
108:9,15,21;109:10;
111:4,22;112:6;
113:3,18,25;114:18;
116:12;145:9
**periods (1)**
115:18
**Perkins (2)**
28:5,15
**person (43)**
14:16;24:14;42:10,
13;52:9,9;55:1,8;
57:9;63:12,23;64:5,7,
9,14,23;65:24;66:9;
68:17;69:14;82:18;
84:25;88:14;89:11;
92:22;93:15,22;
94:11,11;95:5,19,24;
110:9,10;119:13;
120:1,2;121:3;134:4;
148:16;152:16;
153:15,16
**personal (1)**
130:5
**person's (2)**
93:5;141:16
**pertains (1)**
34:11
**phone (2)**
15:21;16:16
**photo (32)**
12:6,7;14:23;15:9;
28:1;29:4;54:4;62:22;
63:19;68:24;69:20,
21;74:6;75:18;76:15;
77:17;80:11,14,22,25;
82:10;83:21,22;84:5,
11,14;85:4;86:22;
87:4,10,19;128:2
**phrase (1)**
154:11
**physical (1)**
76:10
**PI (1)**
24:8
**Pick (1)**
116:2
**picked (1)**
96:2
**piece (4)**
37:7;50:20;51:13;
150:9
**pieces (2)**
24:9;114:21
**pin (1)**
8:20
**place (14)**
53:5;55:19;62:7,18;
69:15;75:20;76:11;

77:1,5,14;78:17;
103:22;107:23;0:15
**placed (20)**
40:24;41:25;42:6,8,
14;55:12,23;56:24;
81:4;98:19;103:18;
107:2;109:7;111:20;
113:5,8,21;126:3;
146:11;147:18
**places (2)**
81:3;158:9
**Plaintiffs (11)**
1:5;2:3;4:22;6:17;
7:2;16:14;17:5;30:9,
15,23;31:3
**Plaintiffs' (11)**
3:;7:24,24;9:3;
18:4;20:14;22:3,15;
28:4;35:18;37:4
**plan (2)**
30:6,7
**please (2)**
5:4,10
**pm (2)**
1:16;160:16
**point (16)**
19:2;33:18;42:4,17;
93:21;94:20;95:22;
103:21;107:19;
117:19;118:13;124:1;
129:24;143:23;
154:21;155:7
**pointed (1)**
33:20
**points (1)**
151:6
**policies (14)**
9:15,24,25;10:5,11,
13,24;11:1,13;12:5;
30:10;50:25;107:23;
157:18
**policy (15)**
8:5,7;9:4;10:16;
11:17;24:15;25:8;
49:13,17,24;50:14,19;
109:21;157:25;158:1
**political (1)**
24:14
**Polk (1)**
147:23
**poll (6)**
54:1;68:18;73:7;
74:3;77:7,14
**polling (9)**
53:5;62:7,18;69:15;
75:20;77:1,5,13;
78:17
**polls (3)**
32:18;78:10;128:24
**populated (1)**
39:22
**population (11)**
43:13;94:25;

102:25;105:14;
110:23;112:20;129:8;
135:4;144:7;145:23;
146:15
**populations (7)**
20:9;86:10,16,20;
137:6;144:13,14
**portion (1)**
46:4
**portions (1)**
34:13
**position (2)**
81:2;119:6
**positions (1)**
51:19
**positive (1)**
46:17
**possessed (1)**
14:20
**possession (4)**
86:9,15,20;137:19
**possible (31)**
12:13;42:3;48:25;
50:6;63:11;76:5;77:7;
107:24;114:21;
120:18;122:12;
127:25;128:11;131:3;
135:23;136:12,22;
139:2,18;140:17;
141:8,9,20;142:3;
147:25,25;150:18;
153:1,1;154:4;156:12
**possibly (2)**
63:5;124:10
**post (2)**
110:18;112:1
**potential (2)**
103:6;138:17
**potentially (1)**
103:7
**power (1)**
25:7
**PR (1)**
25:24
**practice (1)**
148:5
**practices (19)**
11:7;12:5;21:25;
22:1;26:18;27:2,22;
32:14;34:3,8;50:7,8,
25;109:13;146:20;
147:12;148:7;149:15,
24
**precedent (1)**
136:17
**precinct (5)**
52:11;57:10;81:21,
22,25
**precise (4)**
9:1;19:7;34:1;
47:22
**precisely (3)**
6:6;9:9;12:20

**preparation (2)**
17:1;73:1
**prepare (2)**
5:16;7:5
**prepared (1)**
34:14
**preparing (3)**
16:21,24;71:25
**prescribed (1)**
153:17
**present (6)**
53:17;63:19;68:24;
73:7;74:2;85:1
**presentation (1)**
6:8
**presented (10)**
18:11;31:3;60:1,4,
5,18;61:8,16;64:2;
68:22
**presents (1)**
75:17
**presidency (3)**
25:1,3,6
**presidential (3)**
25:6,7,7
**presumably (6)**
49:9;67:11;94:25;
100:23;126:1;140:13
**pretty (4)**
17:13;25:5;86:1;
146:12
**previous (1)**
70:14
**previously (4)**
28:22;57:25;69:1,9
**Primarily (1)**
6:5
**primary (4)**
23:21;128:25;
129:2;153:15
**prime (1)**
129:3
**principal (2)**
23:21,21
**printout (2)**
37:3;96:13
**prior (9)**
13:4;16:13;87:25;
110:6,9;114:4;124:6,
7,7
**Priorities (1)**
29:3
**privacy (2)**
90:2;139:25
**privilege (1)**
4:13
**probabilities (1)**
105:16
**probability (1)**
105:5
**probably (10)**
17:2;20:25;98:2;
100:11;101:13;

109:22;132:9;133:9;
134:6;156:13
**problem (1)**
88:24
**procedural (1)**
151:1
**Procedure (3)**
4:12;10:14;29:25
**procedures (1)**
76:21
**proceeding (1)**
0:11
**proceedings (1)**
0:14
**process (112)**
8:13,16,22,25;9:1,8,
9,13;10:6,9,10;11:3,7,
19,23;12:3;13:6;15:4,
17;17:8,10,22;22:9;
24:9;32:15,23;33:4,8,
13,24;34:5;41:3,21;
42:15;43:15;44:7,18;
47:10,16,23;48:12;
49:18,19,21,24;50:2,
4,11;51:1,10,13,24;
52:6,19,22;53:3,9;
54:22;55:14;58:22;
59:25;60:7,17,17,19,
20;61:4,9,10,15,17,
19,22;62:24;63:7;
65:11;66:14,16,25;
67:15,16,19;69:20;
73:22;74:22;76:7,25;
77:15,16,17,21;79:16;
80:19,23;81:3;83:9,
20;84:4;85:12,12;
92:5;93:12;112:7;
118:10,12;119:1;
121:7;122:19;133:10;
147:3;151:1;153:6
**processed (1)**
66:13;141:14
**processes (16)**
8:13,14;10:8;14:7,
19;32:17;33:3,11;
35:19,24;40:7;47:8;
75:11;76:14;77:4;
93:12
**processing (2)**
8:14;37:16
**produce (7)**
40:8;62:7;83:4;
92:14;120:17;129:20;
137:1
**produced (6)**
6:11;37:21;45:3;
94:17;97:7;141:3
**produces (2)**
45:10;157:11
**producing (1)**
139:13
**production (1)**
93:7

**Professional (1)**
0:
**Professor (1)**
31:16
**program (1)**
37:10
**prohibits (1)**
89:21
**project (1)**
24:12
**Proof (3)**
72:14;83:4,5
**proportion (2)**
114:14;131:10
**proportional (1)**
144:7
**protections (1)**
140:1
**provide (32)**
7:1,3;17:21;18:1;
20:1;36:3,6,16;52:20,
24;53:20,24;55:13;
57:21;63:9;68:20;
69:13,14;73:21,22;
82:7,14,22;83:13;
84:1,9,20;85:4;89:20;
119:19;122:10,22
**provided (31)**
3:19;7:18;15:24;
18:4,7;33:24;35:12;
37:4,20;52:8;57:21;
60:7,8,20,21;61:1,10,
11,18;71:5;75:21;
77:1;83:17;84:10;
120:9;126:8;127:15;
130:12;141:5;150:19;
151:22
**provides (9)**
46:19,21;47:17;
54:4;55:8;71:7;120:6;
121:22;122:11
**providing (6)**
36:10;63:15,18;
81:17;126:1;128:23
**provision (2)**
63:16;84:7
**public (4)**
24:14;30:10;0:5,18
**publications (3)**
23:23;32:22;33:22
**published (2)**
32:20;33:12
**pull (2)**
95:3,3
**pulled (12)**
90:21;91:12,13;
93:21;94:19,20,24;
95:6,8;97:2;98:16;
111:18
**pulling (2)**
94:2;98:14
**purported (1)**
25:18

**purpose (3)**
4:10;95:9;96:6
**purposes (10)**
4:11;9:7;15:5,9;
43:4;67:19;84:24;
95:15;108:19;120:10
**put (20)**
45:20;54:2;56:5,7,
11,14,16;57:2,7;
65:15;74:12;75:1;
98:19;107:23;112:24;
141:10,11,17,17;
149:11
**puts (2)**
56:13,25
**putting (2)**
33:20;136:10

## Q

**qualifications (4)**
23:12;151:2,7;
153:11
**qualified (3)**
27:9,13;87:14
**qualifies (1)**
23:25
**qualify (2)**
23:13;69:6
**quantities (1)**
152:10
**Quantity (6)**
40:21,22;41:6,12;
42:5,20
**quibble (1)**
61:2
**Quick (3)**
3:9;59:15;138:11
**quickly (1)**
71:14
**quite (10)**
86:25;87:16;99:22,
23;123:16;135:2;
140:1;148:6;150:12;
153:2
**quote (1)**
151:9
**quote/unquote (4)**
9:4;34:2;122:10,10
**quotes (1)**
150:24
**quoting (1)**
154:25

## R

**race (3)**
117:5;145:12;
146:21
**racial (1)**
146:13
**RAFFENSPERGER (3)**
1:7;4:10;28:18

**raises (1)**
126:14
**range (3)**
26:17;32:14;71:8
**ranged (1)**
26:17
**rarely (1)**
118:1
**rate (21)**
16:18;101:8,11;
102:1,8,9,13,15,17,18,
24;103:3,23;107:10;
110:20;112:25;
137:10,13;145:24;
146:10;147:23
**rates (17)**
20:2,4,6;45:13;
86:9,15,15,20;87:3;
108:13;137:5,11,20;
145:25;146:5;147:1;
157:13
**rather (4)**
39:13;64:5;78:18;
103:25
**Rayburn (7)**
21:13;44:19;49:4;
51:16;75:16;147:5;
148:1
**reach (2)**
43:9;113:23
**reached (1)**
159:24
**read (20)**
9:18,21;20:17,21;
21:2,5,6,15,17;31:13;
39:6,8,14;63:13;73:1,
1;83:7,18;142:19;
153:11
**readable (1)**
40:18
**reading (5)**
20:25;39:13,13;
140:3;154:18
**reads (1)**
39:3
**real (5)**
25:22;59:15;71:14;
139:11;141:19
**realize (3)**
87:19;98:10;99:11
**realized (1)**
39:17
**really (10)**
48:11;49:24;50:11;
80:18;120:13;123:10;
130:22;138:23;
146:19;147:13
**reason (24)**
46:18;54:13;69:2;
77:3;93:17;94:10,13;
104:5;105:3;110:22;
111:25;112:13;114:7;
115:2;124:9;128:17;

131:15;133:18;
136:16;138:24;
145:13;150:18;
155:19;156:7
**reasoning (1)**
43:17
**reasons (10)**
94:23,23;99:6,8;
131:16;133:23;136:8,
25;145:12;147:17
**recall (18)**
12:22;16:2;18:23;
19:7;20:23,25;26:11,
12,15;27:16;31:5,6;
33:6,9,14;50:21;65:1;
122:2
**receive (4)**
11:9;19:2;74:23;
79:17
**Received (10)**
18:8,9,12,15;19:1,
13;37:25;38:7;47:4,5
**receiving (2)**
145:7,10
**recent (11)**
5:23;23:3,6,7;27:7;
62:17;69:24;70:11,
13,14;137:19
**recently (1)**
71:1
**recollection (5)**
17:7;33:10;46:24;
121:21;122:24
**record (14)**
4:20;28:6;31:24,25;
32:1,2;49:1;70:15,18,
19;86:4;138:13;
160:8,9
**recorded (5)**
39:7;54:16;65:7,9;
66:7
**records (14)**
45:7,11,14;56:18,
19;88:9;90:23;91:21;
92:23;95:18;138:22,
23;139:5;140:7
**recounts (1)**
32:19
**redistricting (4)**
7:14;26:19;28:19;
30:7
**reduce (1)**
86:24
**refer (11)**
5:24;9:2,24;12:1;
32:5;63:4;86:7;90:20;
138:15;143:10;155:9
**reference (2)**
9:2;32:10
**referenced (3)**
5:21;21:12;33:22
**referencing (1)**
153:23

**referendum (1)**
156:24
**referred (6)**
16:10;51:13;64:7;
70:13,13;71:10
**referring (24)**
9:6,9;10:1,13,22;
12:2;15:21;18:20;
24:2,3;48:14;58:7;
59:9;63:6;79:6,22;
84:7;90:11;106:14,
15;112:17;130:2;
140:23;143:1
**refers (5)**
32:13;63:24;73:25;
83:15;88:6
**refill (1)**
31:23
**reflected (4)**
23:15,16,18;0:
**reflects (2)**
23:7;105:25
**reg (1)**
111:6
**regard (2)**
11:17;101:17
**regarded (1)**
65:23
**regarding (9)**
11:23;15:15;34:1;
75:2;78:11;118:23;
123:6;134:23;152:20
**regardless (2)**
75:7;81:22
**regards (1)**
37:6
**regis (1)**
131:23
**register (28)**
54:5;63:9,12;64:9,
14,23;65:14;66:13,
21;67:5,9,20;68:8;
81:17;93:16;94:3;
95:24;105:7,10;
108:1;110:12;113:2;
114:22;120:11;133:3,
24;135:18;151:5
**registered (46)**
20:10,12;63:15,17,
22,24;65:14;67:1;
68:5;69:1,10;73:4;
81:14;83:3,12,16;
101:22;103:16;104:5,
24;105:11;107:11,15,
22;108:6,14;109:3;
112:22;113:10,14,19,
24;115:17;118:3;
129:23;132:10,20;
139:8,20;142:10,11;
143:22;144:8;153:17;
158:10;0:
**registering (11)**
20:8;65:19;66:12;

70:17,24;71:15,18;
85:19,25;86:4,5;
138:8,12,14;160:6,11,
14
**Ryan (2)**
51:14;122:6

## S

**S4 (3)**
127:1,3,4
**S7 (1)**
125:17
**same (50)**
5:4;9:5;42:22;65:9;
66:6,16;67:14,14;
76:1,2,3;77:21;83:14;
85:5;89:11;92:4,5,12,
13,16,17,24,24;93:22,
23;94:16,17,25,25;
95:7,19;97:25;98:7,8,
14,16,25;99:16,19,20;
105:17;111:9,23;
113:3;118:18,22;
153:22;157:25;158:2,
19
**sample (1)**
43:14
**Savannah (1)**
144:25
**saw (2)**
62:12;132:19
**saying (22)**
19:22;25:25;50:17;
52:20;54:9;65:13;
84:17;85:10;96:5;
101:19,20;107:17;
114:9;115:24,25;
128:16;130:11,15;
134:3;136:15;141:21;
149:9
**scanned (1)**
3:19
**scenario (17)**
53:16;60:5,24;61:8,
24;64:5,22;68:10,10,
11;74:13;81:15,16,18,
20;82:6;85:9
**scenarios (5)**
59:24,24,25;60:1;
132:5
**school (3)**
24:15;29:7,11
**Schwier (1)**
89:24
**science (2)**
43:11,17
**scientists (1)**
24:14
**Scope (3)**
35:6,17,25
**Scratch (1)**
129:5

**screens (1)**
157:11
**search (2)**
155:24;156:1
**searching (1)**
155:21
**second (9)**
19:8;31:24;70:16;
91:19;136:21;143:19;
150:11;157:8;160:7
**Secretary (15)**
4:9;9:10;10:3;11:4,
10;21:9;44:25;48:6;
49:13,20;51:3,11;
75:12;151:23;158:7
**secretary's (1)**
46:25
**section (16)**
9:23;40:20;47:11;
72:16,18;73:5,9;83:6,
17;123:14;138:16,16;
153:9,14;154:15,19
**security (34)**
41:2;45:2,6,12,23,
25;46:10,18,21;47:2,
21;49:10;52:18;
56:23;83:1;87:23;
88:8,9;89:6,8,13,17;
90:3,6,10;120:10,12,
19;121:7,22;122:1,4;
123:1;137:24
**seems (4)**
69:11;94:1;98:25;
133:16
**self-reporting (3)**
119:24;158:20,21
**semantics (1)**
130:11
**semester (6)**
24:23,25;25:4,12,
13,15
**seminar (4)**
25:2;26:8,11,12
**send (1)**
53:2
**senior (1)**
25:2
**sense (6)**
18:21;93:18;96:4;
109:1;130:9;139:11
**sent (3)**
52:11;88:9;90:24
**separate (11)**
52:19,25;75:10;
76:13;81:1;97:20;
118:11;121:21,25;
122:3,25
**September (3)**
18:9,25;19:14
**sequence (2)**
29:21;71:13
**serve (3)**
7:19;23:14;150:24

**served (2)**
28:14;34:7
**server (1)**
150:24
**services (7)**
7:11;15:25;36:13,
15,16;47:20;48:1
**set (15)**
49:6;53:7;72:15;
83:5;94:16,25;95:4,
13,14;97:2;98:15,16;
123:11,17;129:18
**sets (6)**
15:7;94:18;95:8;
97:7;151:2,6
**setting (1)**
11:6
**seven (3)**
17:3;35:8;130:20
**several (5)**
18:8;26:8;34:6;
84:10;113:16
**shall (8)**
72:16;73:7;74:2;
83:2,3,6;153:15,16
**sheets (1)**
96:19
**shorter (1)**
104:16
**shorthand (1)**
0:
**show (36)**
27:25;42:8;52:12;
53:5;54:6,7;55:25;
57:25;61:25;62:21;
68:18;69:19,20;
71:14;75:13,14;
76:16;81:11,16;
82:16;84:10,25;
85:14,15,16;89:4;
93:22;115:19;116:18;
126:22;128:3,7;
129:21,22;130:6;
146:10
**showed (3)**
92:3;116:6,17
**showing (7)**
7:23;12:7;63:12,13,
19;83:21;128:2
**shown (2)**
63:6;74:9
**shows (6)**
73:11;90:17,22;
96:21;100:1;118:2
**side (4)**
51:22;63:20;75:1;
90:12
**significant (2)**
98:5;146:16
**significantly (4)**
87:9;109:16;115:4;
137:9
**similar (3)**

**Simon (1)**
31:16
**simple (1)**
92:1
**simply (9)**
37:21;40:2;65:19;
79:14;83:20;84:6;
109:2;135:21;145:13
**single (9)**
38:14,15;121:16,
16;122:12,15,15;
134:4;156:8
**sit (5)**
110:25
**site (1)**
153:5
**sitting (3)**
33:18;36:25;144:1
**situations (1)**
68:25
**six (4)**
15:22;60:1;121:12;
142:10
**sixth (1)**
143:21
**size (2)**
144:6;148:8
**skew (1)**
114:11
**skipped (1)**
83:20
**slide (2)**
151:21;152:18
**sloppy (1)**
96:1
**small (6)**
88:13;99:4,6;
145:25,25;156:4
**smaller (3)**
39:11;144:4,8
**snap (1)**
19:18
**snapshots (1)**
19:20
**social (36)**
41:2;43:11,17;45:2,
6,12,23,25;46:10,18,
20;47:2,21;49:9,10;
52:18;56:22;83:1;
87:23;88:7,9;89:8,13,
17;90:3,5,10;120:9,
12,19;121:6,22;122:1,
3;123:1;137:24
**software (5)**
124:11,11;140:24;
141:1,12
**solely (1)**
159:11
**somebody (17)**
43:11;66:17,17;
68:20;69:11;83:11;
94:3;95:3;114:7;

120:22,23;127:10;
128:6;129:21;137:21;
142:11;148:13
**somebody's (3)**
88:18;119:24;
148:20
**somehow (1)**
66:23
**someone (58)**
37:23;41:18;43:13;
52:15;53:8;54:20;
55:3,8,22;56:5,7,14;
63:17,24;64:5,7,9,11,
13,15;65:4,21,23;
66:18,24;67:8,9,11,
17;68:8;69:1,15,18;
81:3,4;82:24;83:8,18;
92:20;94:4,24;
103:15;113:8;119:18;
127:4;131:3,15;
132:2,20,25;133:24;
134:5;139:9,18;
141:10;147:23;154:4;
158:15
**someone's (3)**
93:21;141:11;150:6
**sometime (3)**
100:15;108:18;
109:23
**somewhat (1)**
87:2
**somewhere (5)**
17:2;37:13;67:20;
68:2;93:4
**sorry (10)**
17:23;35:5;59:4,4;
87:7;106:14;124:2;
126:21;130:18;
137:12
**sort (6)**
43:15;50:25;71:12;
93:12;95:10;113:13
**sound (1)**
143:24
**sounds (2)**
5:7;99:22
**sources (12)**
5:19,20,21,25;6:4;
11:24;19:24;34:19;
35:1,14;37:5;155:25
**sovereignty (1)**
151:13
**space (4)**
48:22,25;49:1,2
**speak (6)**
5:3;22:5,8,11,14;
148:13
**Special (3)**
59:12;77:12;78:1
**specific (19)**
9:23;10:5;12:4;
31:10;33:12,19,21,23;
34:10,11;42:4;45:7,

10;74:20;88:6;
111:22;143:2,14;
149:14
**specifically (13)**
8:11,25;9:16;13:8;
27:23;33:8;42:13;
46:23;64:21;65:6;
66:10,15;123:2
**specifics (2)**
149:25;150:11
**spelled (6)**
93:5;95:2,13,25,25;
148:24
**spelling (2)**
92:8;150:3
**spent (3)**
16:21,24;24:11
**spreadsheet (8)**
57:2;90:22;96:16;
98:20;105:19;106:9;
123:9;130:17
**Spreadsheets (6)**
3::38:1,2,7,13;40:3
**SS (2)**
46:3;0:2
**SSA (21)**
3:9;44:20,22;45:19,
20,21;46:4,6,14;
57:20,21;88:4,22;
90:24;120:6;121:2,
11;122:11,22;123:4,6
**SSA's (1)**
120:23
**standard (1)**
102:9
**standing (2)**
30:22,24
**staple (1)**
90:11
**start (2)**
103:12;133:11
**started (1)**
109:22
**STATA (4)**
39:8,14;40:15,19
**STATA- (1)**
39:3
**S-T-A-T-A (1)**
39:3
**State (59)**
4:10;10:20;14:11,
21;17:9;22:1;27:1;
32:9;38:8;40:22;41:1;
42:23;44:25;45:19,
21;47:9,18;49:20;
50:9;52:1;69:4;73:7;
74:2;75:12;77:6;78:5;
79:7,7;84:13;85:3;
88:9,20;89:5,19;
90:24;91:7;127:14;
139:4;140:24;142:16;
143:20;144:11;150:5;
151:5,23;152:4,15;

153:16,18;154:1,14;
157:8,9,17,22;159:13;
0:,1,5
**state-level (1)**
37:11
**statement (8)**
73:10,13;76:16;
82:17;83:23;84:11;
85:2;123:5
**STATES (31)**
1:1;8:3,4;35:17;
44:22;46:8,14;47:16,
23,23;51:6;57:22;
59:12;72:14;84:4;
86:9;88:3;90:5,17;
119:20;120:6;121:14;
151:15,20;152:3,10,
14,25;153:19;158:20,
24
**State's (11)**
9:11;10:3;11:4,10;
21:10;48:6;49:13;
51:3,11;72:12;158:7
**statewide (16)**
16:6;18:14,19;19:1,
3,6;37:13;38:15;40:6;
77:10;102:15;128:25;
129:2,3;139:4;147:12
**stating (1)**
71:1
**status (186)**
18:12,17,18;38:10,
12;39:5,5;40:24;41:9,
17,18;42:1,6,14,17;
54:7,14;55:20,23,25;
56:5,8,12,15,17,24;
57:3;60:8,17,21;61:1,
11,19,20;62:6,21;
63:2,2;66:24;67:17,
23;68:2,16,16;74:13;
75:22;80:20;81:3,5,8,
9,14,23;82:2,3,5,8,14,
22;91:18,20;94:12;
100:11;102:14,16,19;
103:7,16,18,24;
104:12;105:23;106:1,
10,13,18,19;107:2,16,
25;108:3,7,11,25;
109:2,5,7,8,11,12,16,
19,20,20;110:1,6,10,
11,15,17,18,24;111:5,
11,13,21;112:3,25;
113:5,9,12,14,21;
114:3,5,8,9,14,24;
115:22;116:1,15,25;
117:4,15;119:17,25;
123:19,24,25;124:3,7,
14,15,19;125:6,13,16,
16,21,22,24,25;126:3,
10;127:4,5,8,12,19,
20,23;128:10;129:17;
130:23;131:1,3,9,12,

14,15,16,19,23;132:8;
133:6;134:3,5;
135:21;136:2;140:11,
14;143:4,4,12;145:17,
18;146:12,17;149:12;
155:8;159:9
**statuses (3)**
42:7,9;155:13
**statute (15)**
9:17,18,21;12:5;
53:21,23;72:12,21;
74:25;82:23;83:15;
128:1;153:12;154:19;
155:9
**statutes (5)**
9:6;71:23,24,25;
75:5
**stay (1)**
35:16
**stayed (1)**
129:17
**stems (1)**
62:11
**step (13)**
52:25;53:25;74:18;
75:6,6,9,24,25;76:2,3,
6;79:20;119:16
**steps (1)**
125:22
**stick (1)**
65:16
**still (37)**
23:2;29:17;41:5;
54:15,23;65:12;
74:14;77:21;82:9,19,
19,21;83:13;84:25;
85:1;92:6;93:10;
98:25;104:23;108:3,
8,10;109:7;114:5,6;
120:19;124:19;
131:14;136:2,2,7,10;
137:2;138:8;147:7;
154:3,23
**stream (1)**
75:11
**Street (2)**
2:6,15
**strikes (1)**
51:8
**strongly (1)**
146:12
**structured (1)**
136:23
**structures (1)**
25:8
**student (1)**
28:1
**students (2)**
25:10;27:23
**studies (2)**
87:11;134:13
**studying (1)**
78:23

**sub (2)**
103:1;105:13
**submit (4)**
47:25;51:3,4;160:2
**submitted (19)**
6:16;16:20;45:7,11,
14;48:9;66:2,4;68:5;
88:12,20,20,25;96:4;
100:6,6;132:11;
134:5;147:19
**submitting (3)**
64:6,16;138:5
**subsection (11)**
72:14,16,17,23,25;
73:3,5,8;74:1,4,5
**suggest (1)**
155:1
**suggested (1)**
86:19
**suggestive (2)**
155:16,17
**suggests (5)**
62:5;69:16;76:5;
147:9;155:6
**summer (2)**
12:21;21:1
**superintendent (1)**
157:6
**supplement (1)**
135:6
**supplemental (1)**
160:2
**supplied (1)**
3:
**support (2)**
11:9;145:19
**supporters (1)**
30:10
**suppose (6)**
34:13;114:2;128:6;
134:25;143:8;153:1
**supposed (2)**
103:22;147:11
**Supreme (5)**
29:21;30:16,20;
31:1,6
**sure (26)**
16:1,3,4;19:1,23;
20:6,19;24:24;33:7;
36:21;38:17;56:4;
57:13;79:23;84:6;
89:22;99:23;110:3;
126:16;132:24;140:1;
145:3;148:6;149:2;
152:1;156:17
**survey (6)**
43:14;117:9;135:2,
4,5,7
**sworn (2)**
4:3;0:
**synonymously (1)**
154:20
**system (14)**

55:5,7;122:19;
124:13;132:14;
136:11,19,23;138:19;
139:5;141:2,6,17;
147:22
**systematic (1)**
146:6
**systems (2)**
140:18;141:23

## T

**T4 (1)**
127:3
**table (20)**
68:1;96:21;100:13;
102:12,12,15;105:18;
106:10,14;116:25;
117:1,6,12,15,19;
118:13;121:13;
122:13;123:18;
124:21
**tables (7)**
40:9,10,11,14,18;
97:4;117:2
**talk (2)**
10:23;157:7
**talked (3)**
10:17;13:22;17:16
**talking (15)**
9:5;12:7;15:16;
57:20;62:2;74:25;
98:5;100:4;102:1;
104:8;106:9,10;
108:16;134:2;145:16
**taught (5)**
26:3,6,8,9,15
**teaching (4)**
24:19,22,25;25:2
**technical (7)**
39:2;50:20;51:1,10,
12,21;95:7
**technique (1)**
95:17
**techniques (1)**
95:11
**technologies (1)**
26:19
**telling (3)**
16:2;82:18;85:7
**tells (1)**
71:6
**ten (5)**
7:12,15;33:17;
90:16;104:9
**term (3)**
151:10,11;155:16
**terms (11)**
7:17;16:17;18:19;
23:22;36:2,14;59:21;
108:1;136:5;154:6;
159:7
**terribly (1)**

156:1

**test (2)**
71:7;121:23

**testified (3)**
4:4;14:1;137:4

**testify (2)**
8:5;0:

**testifying (4)**
8:7;36:14;147:20;
0:8

**testimony (10)**
9:14;10:15,23;
45:17,18;48:14;
147:4;148:1,11,17

**Texas (3)**
29:7;158:8,22

**thanks (2)**
160:14,14

**thinking (2)**
113:7;136:5

**third (4)**
19:5;61:7;123:11;
143:20

**though (18)**
28:25;42:25;49:12;
55:20;67:9;69:11;
75:25;80:5;89:20;
102:24;104:10;110:5;
112:4;115:5,7;116:4;
137:8;154:16

**thought (1)**
97:22

**thousand (2)**
39:11;125:2

**thousands (1)**
117:21

**three (9)**
24:13;29:6,6;51:17;
58:6;60:1;62:12;
101:13;151:6

**three-week (3)**
101:19;103:19;
109:9

**thus (1)**
119:12

**tied (3)**
76:23;80:22;128:2

**times (6)**
26:8;89:15;94:17;
95:1;103:5;156:19

**title (2)**
6:7;59:10

**titled (2)**
40:21;153:10

**today (5)**
5:17;16:25;36:25;
159:20;160:12

**told (1)**
16:18

**took (1)**
124:16

**top (11)**
6:23;16:23;53:15;

70:5;84:5;90:16;
96:23;97:4;126:6;
144:2;151:4

**topic (1)**
85:20

**topics (4)**
26:15,17;32:21;
59:12

**total (21)**
97:24;98:25;99:2;
102:6,20;104:21;
106:18;107:10;111:4;
112:2;113:3;114:14;
115:17;118:23;
126:24;131:19,23,23;
136:6;143:11;156:23

**totals (3)**
100:13;102:4;144:5

**track (1)**
45:8

**tracks (1)**
73:15

**training (20)**
6:9;10:12,19;11:7,
12;35:11;52:8;62:17;
69:17,22;71:4;76:8;
79:1,5;122:5;150:18;
151:16;153:4,24;
154:25

**transactions (2)**
90:18,19

**transcript (2)**
3:,

**Transportation (3)**
47:19;48:2;67:8

**travel (1)**
76:11

**treated (1)**
65:9

**trial (1)**
4:15

**triangulate (1)**
71:12

**tried (3)**
93:16;94:3;95:24

**trigger (6)**
49:3,6;54:24;55:24;
104:6;136:1

**triggering (3)**
56:23;105:6,16

**triggers (2)**
52:19;53:7

**true (21)**
16:1,4,5;69:18;
75:8;100:11;101:14;
104:4;113:8,16;
132:9;133:4;134:12;
135:2;144:16;145:21,
24;150:10;152:16;
159:12;0:14

**truth (3)**
0:,,9

**try (2)**

5:3,10

**trying (13)**
19:18;43:16;58:15;
60:14;68:9;79:23;
93:25;95:21,22;
98:11;109:10;126:18;
133:13

**turn (7)**
8:2;64:15,20;65:4;
66:5;72:14;158:12

**turning (1)**
34:12

**turnout (7)**
86:23,24;87:3,8,11,
13,22

**turns (2)**
53:1;64:24

**twice (5)**
93:16,22;94:3;
95:24;96:3

**two (21)**
14:22;19:2;21:6;
48:24;71:22;75:5,10;
76:1;78:1;81:20;
91:16;93:14;96:4;
103:4;104:25;114:21;
115:18;117:1,19;
143:23;153:18

**two-to-one (1)**
101:11

**txt (2)**
39:7,9

**type (6)**
28:1;67:16;94:16;
140:24;149:8,10

**types (3)**
69:14;103:14;
121:15

**typical (1)**
25:5

**typo (5)**
55:18,21;56:14,22;
126:11

**typographical (3)**
92:10;132:23;
136:10

## U

**uh-huhs (1)**
5:10

**ultimately (7)**
25:15;31:19;42:18;
50:12;58:21;59:1;
67:18

**unable (1)**
122:19

**uncorrelated (1)**
146:5

**under (36)**
4:11;35:6,16;53:21;
60:24;63:16,16;64:9,
22;68:10,21,24;69:6,

21,21;72:21,22;
73:21;75:18;77:19;
82:6,12,13,23,24;
83:14;84:11,21;85:1,
4;90:2;96:23;97:17;
99:25;110:1;123:12

**underlying (10)**
37:19;43:21,22;
44:12;53:11;105:16;
118:10;142:21;143:5;
158:16

**Understood (2)**
32:8;158:25

**uniform (4)**
77:6;142:15;146:3;
147:12

**unique (6)**
89:9,18;91:24,25;
93:1;124:20

**UNITED (8)**
1:1;151:15,19;
152:2,10,14,25;
153:18

**universally (1)**
43:11

**universe (3)**
19:19;67:18;109:24

**university (7)**
24:13,20;25:16,20;
26:2,23;27:23

**unless (5)**
54:22;66:22;94:2;
109:6;153:16

**unlikely (2)**
120:17;132:6

**unnecessarily (1)**
61:2

**unobservable (1)**
41:13

**unsure (1)**
62:25

**up (30)**
30:16;51:5;52:12;
53:5;54:6,7;55:15,25;
66:19;67:3;72:6;
75:13;76:16;80:15;
81:16;87:3;89:4;
90:24;91:7,14;93:22;
96:2;99:15;100:18;
102:18,24;119:12;
126:22;128:10;
153:14

**update (2)**
119:18,21

**updated (9)**
6:5,8;94:6;118:1,2;
119:10;120:2;124:12;
158:14

**upon (2)**
8:18;79:11

**upper (1)**
24:25

**uptick (2)**

7:14;156:9

**urban (1)**
144:11

**USA (1)**
29:3

**USCIS (1)**
119:19

**use (23)**
4:15;34:16;37:24;
41:7;42:20;43:9;44:8;
53:16;83:13,22;89:3,
7;105:20,21;110:8;
135:25;136:25;
137:25;138:3;140:25;
141:17;147:2;157:10

**used (18)**
5:19,20;26:19,20,
22;34:5,8;40:13;
43:10;50:9;51:1;68:8;
133:17;140:3;141:7,
25;154:20;155:16

**uses (2)**
37:11;140:25

**using (4)**
37:21;43:13;49:14;
93:9;110:19;120:11;
124:19;132:14;
134:10;136:23

**usually (2)**
92:24;135:4

**utility (4)**
73:10,13;82:17;
85:2

## V

**VAC (1)**
24:10

**vacated (1)**
31:19

**value (7)**
39:6,15;43:3;52:17,
23;122:11;141:25

**values (5)**
43:22;44:12;139:3,
4,17

**variables (1)**
146:5

**variation (5)**
145:22;147:10;
149:8,10;150:18

**variations (1)**
150:8

**varies (1)**
47:23

**variety (1)**
55:6

**various (1)**
74:8

**vary (3)**
50:10;146:6;148:10

**verification (78)**
8:13,15,22;9:7,12;

Fair Fight Action v.
Raffensperger

Kenneth Mayer, Ph.D.
February 26, 2020

10:6,7,9;11:2,18,23;
12:2;13:5;14:3,6,25;
15:13,16,17;17:8,10,
21;22:9;32:23;33:4,6,
8,13,24;35:19,23;
41:3,22;44:18,23;
46:8,15;47:8,10,16;
48:12;52:15,22;53:2,
9;56:19;59:13,25;
60:6,17,19;61:9,14,
17;66:14;67:19;
72:12;73:22;83:8,19;
90:16;96:25;97:22;
99:9,14;100:11,12;
105:21;112:7;118:10;
121:7,15,20;122:2,3,
4,9;123:6
**verifications (1)**
97:21
**verified (10)**
45:13,15;52:10;
56:21;60:7,20;61:10,
18;68:13;83:19
**verify (5)**
44:9;82:25;88:15;
117:25;158:18
**verifying (2)**
84:3;119:1
**versa (1)**
114:15
**version (6)**
6:5,8;18:21;23:6;
69:24;71:10
**versions (3)**
18:13,19,20
**versus (16)**
14:12,14;27:17;
28:18;29:3,22;50:3;
56:10,12;101:10;
107:20;137:10;
145:15;147:19;149:2,
13
**vice (1)**
114:15
**view (2)**
43:9;142:23
**viewing (1)**
110:19
**Vincent (3)**
2:14;4:21;148:24
**V-I-N-C-E-N-T (1)**
148:25
**V-I-N-E-E-N-T (1)**
148:25
**voluntary (1)**
89:20
**Vote (43)**
9:8;12:8;15:1;
24:17;28:2;32:21;
47:15;52:14,14;
53:18;57:9;62:1,8,14,
22;63:8,18;67:5,9;
68:23;73:4;75:14,19;

76:25;81:7;82:9;83:3,
12,21;102:1;127:24;
128:4,8,13;129:16,21,
22,23;130:1;132:13;
151:5;153:15;158:10
**voted (4)**
20:12;63:14;
129:10;130:6
**voter (163)**
9:6,7;10:20;11:2,5,
11,18,19,23;12:1,2,4,
5;13:5;14:3;15:5,13,
25;16:6;18:14,17,17,
19;19:2,3,6,13,23,23;
20:2,4;22:9;27:18,22;
28:25;29:14;32:16,
18,23;35:19,19,23,23;
37:11,12,16,17;38:10,
11;39:5;40:6;43:23;
46:25;47:7;52:4,5;
53:13,16,24;54:7,10,
11,16;55:1,2,5,12;
56:10,10,12,24,25;
60:21;61:11,19;
62:21,25;63:11,12,14,
25;65:21;66:4,11,25;
67:11,12,25;68:23;
72:10,12;75:13,17,23;
76:3,6,13,14;77:18;
78:17;79:19;80:3,9,
19;81:5,7,9,10;82:14;
83:15;86:23;87:3,3,
13,15,22;91:22;
92:25;120:9;123:20;
124:18,19,20,24;
129:11,15,18,24,25;
130:2,3,4,5,24;
132:14,17,18;134:20,
23;136:16;138:2,19,
25;139:8;140:15,16,
20,23;142:21;143:17,
20;144:5,12,15;145:6,
13;148:22;151:1,23;
155:5,7;157:18;158:3
**voters (64)**
8:15;17:9;18:11;
39:4,12;53:2;60:7;
62:17;63:9;74:23;
76:20,21;77:14;
79:15;80:9;82:4;
83:16;87:5,8;97:13,
14;99:25;100:22,25;
101:5,10,10;103:3,17;
104:18;105:23;
106:10,18,20;109:21;
110:15;112:14,18,21,
23,24;113:2,4,4;
114:13,16;115:8;
123:22,25;127:15;
137:10;139:20;
143:23;144:8;145:5,
18;146:7,11,16,21,23;
147:2;149:11;156:20

**voter's (2)**
156:10,10
**votes (2)**
73:6;74:1
**voting (14)**
7:15;14:13;21:25;
26:17,19;34:6;71:9;
86:22;87:15;112:19;
117:7,13;135:5;
140:18
vrusso@robbinsfirmcom (1)
2:17
**vs (1)**
1:6

## W

**Walker (2)**
14:12;27:17
**Walton (5)**
155:5,5,12,18;
157:7
**WALWORTH (1)**
0:3
**wants (1)**
156:15
**Washington (1)**
2:7
**water (2)**
31:23;130:16
**way (23)**
20:12;52:6;60:15;
65:24;75:15;76:7;
77:4;93:5,6;95:13,14;
102:8;109:4;124:21;
132:12;136:8,22;
138:24,24;139:14;
150:14,15,16
**ways (3)**
55:6;74:17;146:6
**webinar (2)**
58:6,7
**webinars (2)**
58:8,17
**week (1)**
19:8
**weeks (1)**
101:13
**well-established (1)**
34:4
**weren't (5)**
97:21;128:18;
138:23;140:10;146:6
**what's (7)**
7:23;21:22;22:19,
21;25:3,3;35:21;37:2;
43:3;57:25;60:3;
73:15;96:12;127:3;
135:13;141:7;148:18
**whenever (4)**
95:5;111:17;120:7;
128:9
**white (17)**

100:25;101:2,4,10;
104:25;111:11,13,21;
112:18,23,24;114:13;
115:21,24;116:1,9,9
**whites (5)**
86:11;102:11;
103:5;111:11;146:14
**Whitford (1)**
29:17
**whole (3)**
102:25;103:12;0:
**who's (15)**
53:23;69:11;81:4,7,
9;82:2,3;83:18;84:18,
18;119:11;127:19,21;
134:4;152:13
**whose (2)**
100:5;124:7
**wide (1)**
47:24
**wildly (1)**
158:12
**wiped (1)**
109:25
**Wisconsin (22)**
1:15;14:11,13,14,
21;15:3,9;26:23,25;
27:2,18,24;33:4;
140:25;151:18,19;
152:2;154:4;156:18;
0:,,1
**Wisconsin's (1)**
14:23
**withdrawn (2)**
25:17;29:24
**within (8)**
7:12;51:5,20;93:4;
142:10;155:25;156:8,
8
**without (10)**
60:18;61:16;63:12,
13,15,17,18;81:17;
136:19;141:14
**witness (16)**
4:2;7:11,20;24:1;
27:4;28:13;34:7;
47:15;59:8;70:19,22;
85:21,24;138:11;
160:13;0:8
**wondering (1)**
99:18
**words (4)**
20:23;56:3;57:1;
95:3
**work (20)**
6:13,17;7:6,17;
13:25;14:5;15:23;
16:6,7;23:16,23,24;
24:8,9;29:2;31:10;
32:10;33:21;79:4;
80:8
**worked (7)**
28:10;44:18;48:8,

12;49:25;138:25;
140:18
**workers (4)**
73:7;74:3;77:7,14
**working (8)**
10:15;16:13;44:24;
45:1;52:7;98:7;
139:15;141:3
**works (3)**
44:7;50:11;77:15
**writing (1)**
87:25
**written (3)**
10:16;33:17;50:25
**wrong (1)**
90:12
**wrongfully (1)**
42:8
**wrote (3)**
152:17,18;154:9

## Y

**year (14)**
78:6;101:14;
103:20;128:19;129:9;
139:9,23;140:5,6,8;
141:14,16,19;142:11
**years (4)**
7:12,16;33:18;
139:8
**Yep (1)**
70:21

## Z

**zero (2)**
42:3;118:7

## 0

**00 (1)**
70:20
**0008885 (1)**
58:18
**00105899 (2)**
70:22;79:8
**08 (1)**
137:16

## 1

**1 (13)**
3:;7:22,24;35:4,5,8,
16;60:5;96:21;
100:13;121:14;143:2,
7
**1,857 (1)**
140:7
**1,999 (2)**
124:22;125:3
**1.95 (1)**
90:17

**1:18-CV-5391-SCJ (1)**
1:6
**10 (3)**
97:12;100:18;
109:23
**10,000 (1)**
89:14
**100 (3)**
50:15;98:5;157:13
**10L (1)**
135:13
**11 (2)**
48:21;53:15
**115 (1)**
97:24
**116 (3)**
58:1,16;122:6
**119 (1)**
139:8
**11th (1)**
80:15
**12 (1)**
33:18
**13 (5)**
86:7;126:8,15;
128:17;131:6
**136884 (1)**
70:23
**14 (6)**
27:3;88:5;90:18;
91:2;115:22;126:17
**14.68 (3)**
111:12,18;112:23
**14h (1)**
2:15
**14th (3)**
38:9;152:5,17
**15 (2)**
37:14;91:5
**159 (4)**
19:6;38:7,13,16
**15th (2)**
38:9;109:4
**16.83 (1)**
116:13
**164,979 (1)**
100:1
**165,014 (1)**
99:24
**16th (1)**
2:6
**17 (3)**
140:8;142:8,9
**18 (1)**
139:21
**1800 (5)**
140:9;141:11,15;
142:1,9
**19 (3)**
62:19;63:4;91:14
**1901 (2)**
139:21;140:8
**1st (1)**

113:10

**2**

**2 (14)**
3:7;22:18,19,22;
32:4;35:3;60:18;
81:19,20;82:6;98:6;
121:13;125:15;143:3
**2,011,116 (1)**
100:16
**2,065,722 (1)**
97:14
**2,218,159 (1)**
143:24
**2:51 (2)**
1:16;160:16
**20 (3)**
58:11;101:5;123:14
**20.9 (2)**
117:12,15
**200 (2)**
99:7;100:4
**20006 (1)**
2:7
**2008 (3)**
24:3;32:24;86:8
**2009 (3)**
45:3;87:24;109:23
**2011 (1)**
90:23
**2012 (2)**
27:18;86:18
**2014 (3)**
91:12,21;123:23
**2014-2018 (1)**
117:9
**2016 (1)**
86:19
**2017 (1)**
26:10
**2018 (10)**
19:17,21,24;91:11,
18;93:19;94:21;95:6,
7;109:6
**2019 (30)**
12:21;17:14;18:10,
13;19:1,10,14,17;
78:6;12;91:12,21;
94:22;95:4,4;96:22;
101:1,9;103:22;
104:13;106:25;107:8;
108:17;123:23;124:3,
23;125:13;126:7;
129:11;140:16
**2020 (22)**
1:;18:15;40:11;
96:24,25;97:2,7,14;
101:3,9;106:19;
107:9;109:8;113:11;
116:16;124:18,24;
125:17;126:10;
127:17;131:20;155:7

**2020xlsx (1)**
96:15
**2022 (1)**
0:
**20th (1)**
125:8
**21 (1)**
155:13
**21-2-216 (2)**
3:10;153:9
**21-2-220 (1)**
73:6
**21-2-220.1 (3)**
3:8;9:20;72:10
**21-2-229 (1)**
155:9
**21-2-417 (3)**
3:;72:18,23
**22 (4)**
101:4;117:1;155:7,
13
**220.1 (1)**
82:24
**22B (1)**
100:25
**23 (1)**
0:
**24 (3)**
125:24;126:4,6
**25 (3)**
138:7,15;157:9
**25,000 (1)**
101:6
**26 (2)**
1:;142:16
**27 (2)**
150:20,22
**27th (4)**
19:4,9;104:1;109:3
**28 (2)**
150:21;151:4
**29 (1)**
143:8
**29.6 (2)**
106:25;107:21
**2nd (3)**
108:16;110:24;
113:15

**3**

**3 (4)**
3:;37:1,2;81:18
**3,432 (2)**
131:7,18
**3,594,048 (1)**
101:1
**3,619,336 (1)**
101:4
**3,672 (3)**
126:7,18;129:8
**30 (1)**
140:16

**2020xlsx (1)** ... see above (column 3 continued)

**30318 (1)**
2:16
**30th (4)**
19:4,9;104:1;
140:16
**31 (1)**
59:3
**316 (27)**
9:22;13:9;17:11,24;
59:13;72:13;77:19,
25;109:15,25;110:2,7,
9,10,12,15,18;111:2,
3,17,17;112:1,22;
114:4,4;124:6;131:14
**32B (1)**
101:1
**33 (1)**
143:15
**33B (1)**
100:14
**365 (1)**
89:15
**39 (1)**
105:25
**39.4 (5)**
105:22;106:1,16,
19;108:23

**4**

**4 (19)**
3:3,8;8:2;33:16;
40:20;61:16;62:2;
64:5;68:10,11;71:16,
19;74:13;99:20;
102:12,15;106:10,14;
150:24
**40 (2)**
111:3;113:3
**41,946 (1)**
135:15
**417 (3)**
82:13;83:14;84:24
**417a (1)**
84:14
**429 (3)**
126:8;127:15;
128:15
**479 (3)**
125:19;126:12;
127:15

**5**

**5 (7)**
3:;33:16;40:20;
47:11;71:16;116:25;
117:15
**5.67 (1)**
131:22
**50 (3)**
108:22;114:16;
115:22

**500 (1)**
2:15
**53 (1)**
91:2
**53.4 (1)**
90:23
**55,000 (2)**
100:19,23

**6**

**6 (11)**
3:9;8:3,3;90:9,10;
117:1,6,12,19;118:13;
121:13
**60 (3)**
107:10,10;108:20
**60,000 (1)**
68:3
**69.5 (1)**
143:11

**7**

**7 (9)**
3:;47:13,14;48:20;
96:11,12;99:24;
125:1;130:21
**7B (1)**
99:24
**7G (1)**
100:1

**8**

**8 (5)**
3:10;37:14;109:23;
153:7,9
**85 (1)**
59:4
**86 (1)**
59:5
**88 (1)**
59:14
**8832 (1)**
122:8
**884 (1)**
59:2
**8854 (1)**
58:22
**8884 (3)**
58:23,24;59:3
**8899 (3)**
58:21;59:11,14
**8901 (1)**
59:24
**8902 (1)**
61:7
**8912 (1)**
59:14

**9**

**9 (2)**
122:19;138:16
**9:27 (1)**
1:16
**900 (1)**
2:6
**9999 (1)**
142:1