# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-CV-05391-SCJ

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL MCDONALD

# **Table of Contents**

INTRODUCTION ...................................................................................1

   **I.** **Dr. McDonald's Reports** ..........................................................3

      A.   Dr. McDonald's First Report ...........................................4

      B.   Dr. McDonald's Second Report ........................................9

**LEGAL STANDARD** ........................................................................11

**ARGUMENT** ......................................................................................12

   **I.** **Dr. McDonald is indisputably well qualified to testify.** ............12

  **II.** **Dr. McDonald employs reliable methodologies to support his conclusions about the Purge List.** ................................................................13

 **III.** **Dr. McDonald's opinions will assist the trier of fact.** ...............22

**CONCLUSION** ..................................................................................24

# Table of Authorities

**Page(s)**

**Cases**

*In re Abilify Products Liability Litigation*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018) ............................................................21

*Adams v. Lab. Corp. of Am.*,
760 F.3d 1322 (11th Cir. 2014) ........................................................................12

*Benisek v. Lamone*,
348 F. Supp. 3d 493 (D. Md. 2018), *vacated and remanded sub
nom. Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ...................................12

*Benton v. Deli Mgmt., Inc.*,
396 F. Supp. 3d 1261 (N.D. Ga. 2019)..............................................................15

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ..........................................................................11

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) ............................................................................12

*Coshap, LLC v. Ark Corp. Member Ltd.*,
No. 1:16-CV-0904-SCJ, 2017 WL 9287017 (N.D. Ga. Dec. 12,
2017) .................................................................................................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..............................................................................2, 11, 14

*Erebia v. Allstate Prop. & Cas. Ins. Co.*,
No. 1:15-CV-312-MHC, 2016 WL 4435089 (N.D. Ga. July 18,
2016) .................................................................................................................16

*Fish v. Kobach*,
309 F. Supp. 3d 1048 (D. Kan. 2018), *aff'd sub nom. Fish v.
Schwab*, 957 F.3d 1105 (10th Cir. 2020)...........................................................12

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
   347 F. Supp. 3d 1251 (N.D. Ga. 2018)............................................................12

*Holderbaum v. Carnival Corp.*,
   No. 13-24216-CIV-LENARD/GOODMAN, 2015 WL 12781271
   (S.D. Fla. Aug. 19, 2015)..............................................................................20

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) ....................................................................13

*Sec. & Exch. Comm'n v. Avent*,
   No. 1:16-CV-2459-SCJ, 2018 WL 8996270 (N.D. Ga. Mar. 15,
   2018) .............................................................................................................13

*United States v. Brown*,
   415 F.3d 1257 (11th Cir. 2005) ....................................................................22

**Statutes**

O.C.G.A. § 21-2-233....................................................................................14

O.C.G.A. § 21-2-235............................................................................4, 5, 18

**Rules**

Federal Rule of Evidence 702.................................................................11, 13

Federal Rule of Evidence 703........................................................................16

**INTRODUCTION**

Dr. Michael P. McDonald, a nationally recognized authority on elections and election administration, analyzed the reliability of a list that Defendants compiled consisting of over 300,000 Georgia voter registrants whom the Georgia Secretary of State (SOS)'s office purged or cancelled from the Georgia voter registration database (the "Purge List"). After a painstakingly careful analysis in which he used two of the most respected voter data vendors to help determine if registrants on the list had, in fact, moved, Dr. McDonald concluded that there are, conservatively, tens of thousands of voters on the Purge List who still reside at their registration address. Dr. McDonald's analysis provides detailed and irrefutable support for Plaintiffs' claims that Defendants' voter list maintenance is arbitrarily and unnecessarily cancelling thousands of Georgia voters' registrations. (*See* Am. Compl. ¶¶ 69-81, ECF No. 41.) Defendants' expert, Dr. Brunell, agreed unequivocally with Dr. McDonald's conclusion, noting that "[t]here is no surprise that many people who were moved to inactive status due to No contact could be found at the same address." (Suppl. Report #1 of Thomas L. Brunell, Ph.D. 4, ECF No. 276.)

Defendants' motion is exceedingly narrow with little support. Defendants do not dispute Dr. McDonald's expert qualifications. They do not challenge the phone

survey he conducted or any of its methodology. Nor do they critique his reliance on the National Change of Address (NCOA) database maintained by the U.S. Postal Service to assess whether individuals on Defendants' list have actually changed their address. Indeed, Defendants' *Daubert* attack does nothing to tarnish Dr. McDonald's core conclusion—that over 50,000 voters were purged in 2019 for "no contact" despite confirmation that they had never filed NCOA forms.

Instead, Defendants argue only that Dr. McDonald cannot testify with sufficient certainty as to the steps that Defendants *themselves* took to create the Purge List, and that he cannot vouch for the accuracy of the work done by the vendors he used. These attacks go to the weight, not the admissibility, of Dr. McDonald's opinions. But in any event, neither argument has merit.

To begin, the opacity of Defendants' own procedures in assembling the Purge List is not a flaw in Dr. McDonald's analysis; it is itself evidence of one of the very heavy burdens Defendants impose on voters' rights. Defendants delayed providing any information to Plaintiffs about their Purge List procedures. When Defendants finally provided some limited information, Dr. McDonald updated his report to reflect it. In any event, Dr. McDonald's analysis does not depend on Defendants' procedures; it is an independent assessment of whether the Purge List accurately identifies voters who have moved. Defendants argue Dr. McDonald

cannot be certain that his well-qualified and experienced vendors performed this work accurately, but Defendants offer no direct criticisms—or even hints of inaccuracies—to substantiate this critique.

Finally, Defendants argue there is too much risk of Dr. McDonald's testimony confusing the jury. But this argument is likely moot because Plaintiffs have submitted an Unopposed Motion to Strike their Jury Demand (ECF No. 465.) As the Court has found, the Court is well-equipped to assess Dr. McDonald's analysis. (Ex. 1 (Mot. Prelim. Inj. Hr'g Tr. 21:10-14, Dec. 19, 2019).)

Because Dr. McDonald is unquestionably qualified, his methodology is sound, and his opinions would assist the Court in resolving Plaintiffs' claims, Defendants' motion to exclude should be denied.

## I.   DR. MCDONALD'S REPORTS

Dr. McDonald set forth his opinions in his first report, (Expert Report of Dr. Michael McDonald, Feb. 17, 2020, ECF No. 240); and a supplemental report— responding to criticisms from Defendants' expert Professor Thomas L. Brunell, and supplementing his opinions based on Defendants' belated production of documents related to the voter verification processes, (Suppl. Report of Dr. Michael McDonald, April 7, 2020, ECF No. 293).

A. <u>Dr. McDonald's First Report</u>

In Dr. McDonald's report, he opined on the reliability of the Purge List.[1]

The Purge List—a file entitled "2019 List Maintenance" downloaded from the

SOS's Elections Division webpage and described on that webpage as "[t]he list of

registrations subject to cancellation"—originally contained 313,243 registrants

scheduled for removal. (ECF No. 240 at 2-3.) As the direct result of Dr.

McDonald's analysis in support of Plaintiffs' motion for preliminary injunction,

the SOS subsequently acknowledged that Defendants had erroneously included

22,896 registrants (7.3% of the original list) whose last contact occurred between

---

[1] In his report, Dr. McDonald utilizes the phrase "Purge List" because voter "purging" is a commonly used term in the relevant literature for voters whose registration is cancelled and who can no longer vote. Contrary to Defendants' misleading protestations, (Def. Mot. to Exclude Dr. Michael McDonald and Supp. Br 16, ECF No. 402), and consistent with their testimony, this term, like that used by state law, the term "cancelled" is entirely accurate in that the purged or cancelled voter is no longer simply "inactive" in Defendants' registration database, but must re-register in order to vote, *see* O.C.G.A. § 21-2-235(b) ("If the elector makes no contact [during the two-general-elections period], the elector shall be removed from the inactive list of electors."). (*See* Ex. 2 (STATE-DEFENDANTS-00234459 at 00234460 (letter from SOS to U.S. Department of Justice explaining that, "Although electors can still vote while in an inactive status, they are no longer able to vote in cancelled status")); Ex. 3 (Germany Dep. 51:3-20 (cancelled registrants must re-register)).) By contrast, the term Defendants adopt in their motion for the Purge List—the "voter-list maintenance file," (ECF No. 402 at 5, n.4)—fails to describe or reflect the impact of the cancellation on the voter's registration or her right to vote.

January 1 and November 6, 2012, leaving a list of approximately 290,000 that Dr. McDonald analyzed. (*Id*. at 5; Ex. 1 at 7:8–8:2, 59:18–25.)

In odd-numbered years, the SOS cancels the registration of those voters on the Purge List pursuant to state law. *See* O.C.G.A. § 21-2-235(b). It is undisputed that these purged voters do not receive any notification after they have been purged, (*see* Ex. 1 at 77:25–78:19 (reflecting testimony of Mr. Harvey that voter must periodically check voter registration to determine whether it has been cancelled)); that they are unable to reregister to vote within thirty days of an election; and that, if such voters show up to the polls on Election Day, they are unable to vote.

Defendants placed registrants on the Purge List for three reasons in 2019, each of which Defendants have acknowledged is designed to identify voters who have moved from their registration addresses, (*see* Ex. 3 (Germany Dep. 52:17–23); Ex. 4 (Rayburn Dep. 169:2–4))[2]:

---

[2] (*See* Ex. 2 (STATE-DEFENDANTS-00234459 ("Regarding voter registrations where the elector has changed residency, Georgia employs three main list maintenance processes; returned mail, National Change of Address ('NCOA'), and 'no contact.'")). *See also Georgia Secretary of State's Office Cleans Voter File by 4 percent as Required by Law*, *2019 List Maintenance*, sos.ga.gov, https://sos.ga.gov/index.php/elections/2019_list_maintenance (last visited July 14, 2020) (describing the 2019 list maintenance process as "removing [people] from the voter rolls due to a change in address").

(1) 97,577 registrants were listed under "No Contact," indicating an apparent lack of contact with Georgia election officials—through voting, updating their registration, or other correspondence—since 2012;

(2) 108,256 registrants were listed under "National Change of Address (NCOA),", purportedly because a matching record in the U.S. Postal Service's NCOA database showed a change of address form had been filed; and

(3) 84,301 registrants were listed under "Returned Mail," indicating that mail addressed to the registrant was returned to election officials by the Post Office as undeliverable,

(ECF No. 240 at 4, 6).

In his report, Dr. McDonald concluded that the SOS cancelled the registrations of at least 59,866 No Contact registrants who continue to reside at their registration address. (*Id.* at 17.) He also concluded that the SOS's NCOA matching procedures, used to identify the NCOA group on the Purge List, erroneously identified at least 14,732 registrants who did not file a NCOA. (*Id.*)

Dr. McDonald reached these conclusions after a careful and conservative analysis, relying on two of the most reputable data vendors in the country and his prodigious experience in both election administration and survey design. First, Dr. McDonald engaged with Latino Decisions,[3] a nationally recognized polling and

---

[3] *See About Us*, Latino Decisions, https://latinodecisions.com/about/ (last visited July 19, 2020).

survey firm. Dr. McDonald and Latino Decisions engaged L2 and TargetSmart, two of the most well-established national voter list vendors in the country. (*Id.* at 11.)[4] To add an extra assurance of reliability, L2 and TargetSmart each conducted their own matches of the Purge List with the U.S. Postal Service's NCOA database, which each vendor regularly uses. This robust matching process via two vendors found no NCOA forms had been filed by 13.6% of the NCOA registrants (14,732 people), 61.4% of the No Contact registrants (59,866 people), and 30.9% of the Returned Mail registrants (26,063 people). (*Id.*; *see also* Ex. 5 (McDonald Dep. 41:19– 42:2 (describing the vendor matching process)).) As Dr. McDonald explained, these are conservative estimates of registrants improperly included on the Purge List because they do *not* include those who filed NCOA notices *after* the period in which Georgia law provides that they could have been properly added to the Purge List. (ECF No. 240 at 11.)[5]

---

[4] *Why Us?*, L2 POLITICAL, https://l2political.com/why-us/ (last visited July 19, 2020) (describing 50-plus year history of L2); *Services*, TargetSmart, https://targetsmart.com/services/ (last visited July 19, 2020).

[5] For example, registrants who filed NCOA notices in 2019 are not eligible under the law to be placed on the 2019 Purge List.  Dr. McDonald's analysis through L2 and TargetSmart counted those filers as a match, however, and excluded them from his numbers of registrants who had not filed an NCOA form.

Dr. McDonald then coordinated a phone survey, conducted by Latino Decisions, using phone numbers of the Purge List registrants. (*Id.* at 14.) Latino Decisions successfully completed 204 phone interviews, though 25 of those were for individuals whom the SOS later restored to active status. Of the remaining 178, 142 were with No Contact registrants. Because the largest number of completed surveys came from the No Contact registrants, Dr. McDonald focused his analysis on the results of the 142 No Contact registrants. Among those respondents, 122 of the 142 (85.3%) reported to the interviewer that they still lived at the address where they had been registered to vote. (*Id.* at 16.) Based on this sample size, Dr. McDonald calculated the margin of error of this survey as +/- 5.9%. (*Id.*) Dr. McDonald noted that this result "overwhelmingly verified" his conclusion that the SOS cancelled the registrations of over 50,000 No Contact registrants who still resided at their registered address. (*Id.* at 17.)

Notably, Dr. McDonald's core conclusion—that the "Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact registrants who continue to reside at their current voter registration address"—did not rest on the 85.3% found in his survey, which would have fully supported a finding that 83,233 registrants in the No Contact group had been improperly

8

cancelled.[6] Instead, he used the lower, more conservative figure of 59,866, derived from the undisputed fact that 61.4% of the 97,577 No Contact registrants (i.e., 59,866) did not have an NCOA database match. Far from being unreliable, therefore, Dr. McDonald's analysis reflected his *understatement* of the voters improperly placed on the Purge List.

Defendants' expert Professor Brunell did not object at all to Dr. McDonald's methodology, analysis, or conclusions concerning the NCOA matching process. Brunell expressly agreed that the SOS is cancelling many registrants who reside at their current registration address, stating that "[t]here is no surprise that many people who were moved to inactive status due to No contact could be found at the same address." (ECF No. 276 at 4.)

B. Dr. McDonald's Second Report

Dr. McDonald prepared a supplemental report in which he responded to Professor Brunell, and addressed newly produced, relevant evidence. (ECF No.

---

[6] Based on the phone survey, Dr. McDonald found that the "overwhelming majority [of No Contact registrants] live at their current address," and after calculating the margin of error of +/- 5.9%, Dr. McDonald stated that he had "95% confidence that the percentage of persons on the Purge List for the reason of No Contact who have not actually moved lies somewhere between 79% and 91%." (ECF No. 240 at 16.)  To provide a more conservative estimate, however, Dr. McDonald relied upon the lower number reached from the (over-inclusive) NCOA matching process, and found that the phone survey provided further support for that conclusion.

293.) Of relevance here, Dr. McDonald supplemented his NCOA matching

analysis with a document produced by Defendants just over a week prior to the due

date for Dr. McDonald's first report, a memorandum entitled "NCOA List

Maintenance Process." (Ex. 6 (STATE-DEFENDANTS-00287546); ECF No. 293

at 5–6, Ex. A.)[7] Based on the data vendors' matching which showed that only

86.4% of the "NCOA" registrants on the Purge List had in fact filed NCOA forms,

Dr. McDonald had very conservatively opined that Georgia "may" be purging

voters who had not actually moved, but stated that he did "not have sufficient

information to determine the reasons for this discrepancy." (ECF No. 240 at 3.) For

the first time in this case, the NCOA List Maintenance Process memorandum

confirmed some of the most disturbing parameters of the SOS's NCOA matching

process.

Dr. McDonald concluded that this new document "strengthens [his] opinion

that Georgia's NCOA process may incorrectly identify people who have not

moved" by offering possible reasons for these errors, including that the SOS's

NCOA vendor relies on mailing addresses, instead of residential addresses, for a

match; does not incorporate first names into family matches and does not require

---

[7] Plaintiffs served the set of requests for production that sought this document on
July 15, 2019, nearly six months before it was produced. (*See* Pls.' Certificate of
Service Disc. Materials, ECF No. 82.)

entire address fields to match, which leads to the purging of registrants who still live in the same housing complex and share only a last name with a registrant who has moved; and counts business address moves as residential moves. (ECF No. 293 at 6–8.)

## LEGAL STANDARD

Federal Rule of Evidence 702 directs the admission of testimony of an expert qualified by knowledge, skill, experience, training or education, where: (1) the expert's specialized knowledge will help the trier of fact; and (2) the testimony is based on sufficient facts or data and is produced by reliable principles and methods, which the expert then reliably applied to the case. Fed. R. Evid. 702. The Court serves as the "gatekeeper" to ensure that "speculative, unreliable expert testimony" is not admitted. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *accord City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

To determine such admissibility, courts apply a three-part test. First, experts must be qualified to testify on the matters they intend to address; second, their conclusions must rest on reliable methodologies; and third, the testimony must assist the trier of fact through the application of scientific, technical, or specialized

expertise. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1328 (11th Cir. 2014). Dr.

McDonald's testimony satisfies all three of these benchmarks.

## ARGUMENT

### I.   Dr. McDonald is indisputably well qualified to testify.

Dr. McDonald, a professor of political science at the University of Florida, is

a leading expert on United States elections. (ECF No. 240 at 1.) He has published

extensively on elections and election administration, including peer-reviewed

articles on the specific topics of the reliability of voter registration files and on

matching algorithms as applied to voter registration files. (*Id.* at 1, Ex. A.) He has

consulted on election work with the federal and state governments, and has

received numerous research grants and honors for his work. (*Id.*) He also has

extensive experience in conducting and supervising surveys. (*Id.* at 1-2.) Courts

across the country, including in this District, have allowed him to testify as an

expert in election law cases, and specifically on voter registration.[8]

---

[8] *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251,
1263 (N.D. Ga. 2018) (relying upon Dr. McDonald's declaration related to
citizenship voter verification process); *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1067
(D. Kan. 2018), *aff'd sub nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)
(relying on Dr. McDonald's analysis of a list of voters whose registration was
cancelled or suspended, and listing his qualifications as "a leading scholar on
American elections, voter registration, and factors affecting voter behavior and
turnout"); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 957 n.2 (7th Cir. 2019)
(citing Dr. McDonald's work as an expert); *Benisek v. Lamone*, 348 F. Supp. 3d

Understandably, Defendants "do not contest Dr. McDonald's expertise in the area of election administration generally or his qualifications to testify in this matter" on the reliability of the Purge List. (ECF No. 402 at 2.) Dr. McDonald is thus is undisputedly "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

## II.   Dr. McDonald employs reliable methodologies to support his conclusions about the Purge List.

To raise an "admissibility issue" with Dr. McDonald's methodology, Defendants must "challeng[e] the underlying methodology in general," as opposed to "challenging the expert's application of that methodology," which is an "accuracy issue" that speaks only to the weight assigned to the expert's opinion. *Sec. & Exch. Comm'n v. Avent*, No. 1:16-CV-2459-SCJ, 2018 WL 8996270, at *3 (N.D. Ga. Mar. 15, 2018) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). Yet Defendants' challenge to Dr. McDonald's methodology is perfunctory.

Dr. McDonald's analysis of the Purge List was careful, conservative, and narrowly confined to determining the extent to which the list included registrants

---

493, 528 (D. Md. 2018) (relying on Dr. McDonald's expert report in finding partisan political gerrymander harming Republican voters), *vacated and remanded sub nom. Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

who still reside at their registration address. In the first instance, he based his

conclusions upon his analysis of the matching data derived from not one, but two,

nationally recognized data vendors from the NCOA database. He then further

confirmed his conclusions by directing a phone survey of the type he has directed

for decades. In sum, the "principles, theories, and methodologies behind [Dr.

McDonald's] opinion are scientifically valid and can be applied to the facts at issue

in the case," and thus "ha[ve] a reliable basis." *Coshap, LLC v. Ark Corp. Member

Ltd.*, No. 1:16-CV-0904-SCJ, 2017 WL 9287017, at *2 (N.D. Ga. Dec. 12, 2017)

(citing *Daubert*, 509 U.S. at 592-93).

Not surprisingly, Defendants do not challenge his reliance on the NCOA

database matched by the vendors as a means to assess whether registrants on the

Purge List have actually moved, nor do they offer any specific reasons to doubt the

numbers of registrants Dr. McDonald opined were included on the Purge List

despite not having moved. (ECF No. 240 at 12.) Defendants' expert, Dr. Brunell,

testified that he did not dispute the numbers of registrants calculated by Dr.

McDonald as not having moved. (Ex. 7 (Brunell Dep. 113:3–114:9).) Perhaps

Defendants do not challenge the NCOA matching conducted by these vendors

because it is essentially the same methodology that Georgia law provides the SOS

may use for this process. O.C.G.A. § 21-2-233 (SOS may use a "licensee" to

perform matching against U.S. Post Office's NCOA database). And Defendants do not challenge Dr. McDonald's phone survey methodology. In short, Defendants offer no critique of the two central methodologies that Dr. McDonald applies.

Instead, Defendants implausibly argue that Dr. McDonald's opinions "amount to nothing more than his 'subjective belief or unsupported speculation'" because he could not personally confirm: (1) the accuracy of the two data vendors' NCOA matching process, (ECF No. 402 at 12); or (2) the processes used by Defendant SOS in creating the Purge List, (*id.* at 13-14). Both of these points address the weight of Dr. McDonald's opinions, and do not impugn his methodology. *See Benton v. Deli Mgmt., Inc.*, 396 F. Supp. 3d 1261, 1282 (N.D. Ga. 2019) (holding that it was for the "jury [to] determine how the uncertainty about [the expert's] data inputs affect the weight of [the expert's] testimony" (citation omitted)). But these critiques are also entirely baseless.

With respect to the data vendors, Defendants' challenge rests almost entirely on one phrase in Dr. McDonald's report by which he prefaced his conclusion that Defendants cancelled at least 59,866 No Contact registrants who continue to live at their registration address as follows: "If the list vendors' NCOA match is accurate . . . ." (ECF No. 402 at 12.) Far from suggesting that the list vendors' NCOA matching is unreliable or speculative, Dr. McDonald's language reflects the

15

caution and care with which he renders every conclusion—indeed, every word, of his reports. Defendants do not and cannot object to the data vendors' matching itself for good reason. TargetSmart and L2 are highly regarded voter registration list vendors that regularly conduct this type of analysis, and are relied upon by experts in the field. (*See* ECF No. 240 at 11; Ex. 5 (McDonald Dep. 41:19– 42:2, 51:7–12).) "Experts routinely rely on the work of others," moreover, including "facts or data received from employees or outside consultants." *Erebia v. Allstate Prop. & Cas. Ins. Co.*, No. 1:15-CV-312-MHC, 2016 WL 4435089, at *6 (N.D. Ga. July 18, 2016) (citations omitted). Of course, experts may rely "on facts or data in the case that the expert has been made aware of . . . if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.[9]

---

[9] The evidence in this case proves painfully the irony of Defendants questioning reliance on a nationally recognized data vendor. From Defendants' internal documents and invoices, it appears that the Secretary of State relies for its entire NCOA matching process to assemble the State's Purge List on the work of a one-person "business" called Total Data Technologies, Inc., located at a residential home in Omaha, Nebraska. (*See* ECF No. 293 at 6 (noting that the same person is president, secretary, treasurer, and director of Total Data Technologies, Inc.); Ex. 8 (STATE-DEFENDANTS-00287072 (listing the address of Total Data Technologies, Inc. as 11802 Washington Plaza, Omaha, NE)); Ex. 9 (Zillow print-out for the same address showing residential home).)

Further, Dr. McDonald chose to have TargetSmart and L2 independently match the registrants on the Purge List to ensure that any registrant who had filed a NCOA form with the Post Office would be captured (via one or the other vendor's database) and not improperly counted by McDonald as having remained at his or her address. Dr. McDonald expressly employed this redundancy to avoid any possibility of over-stating the number of registrants whom Defendants erroneously placed on the Purge List. (ECF No. 240 at 11; Ex. 5 (McDonald Dep. 46:13-22 (explaining the purpose of this redundancy)).)

Similarly, while Defendants repeat Dr. McDonald's phrase "If the list vendors' NCOA match is accurate" as if it were a substantive critique of the vendors' methodology, they decline to provide the Court with Dr. McDonald's lengthy explanations of the two vendors' matching processes, (*see* Ex. 5 (McDonald Dep. 41:14–42:25)), or his own explanation that he used that phrase "to be as conservative as I possibly can. . . . so that I give the Secretary of State's office as much benefit of the doubt as I possibly can about what it is that my NCOA match is telling us about what the Secretary of State's office did," (*id*. at 79:15 – 80:11).

Finally, Defendants obscure several other ways in which Dr. McDonald understated the number of registrants whom Defendants erroneously purged. For

17

example, under Georgia law no registrant who filed a NCOA form after October 2016 should have been on the Purge List. O.C.G.A. § 21-2-235(b). But because the data vendors' NCOA databases included evidence of NCOA forms filed any time between at least 2012 and 2020, Dr. McDonald did not add the many voters who filed such forms after October 2016 to the 13,000 registrants who were erroneously purged. (Ex. 5 (McDonald Dep. 44:2–19).) Similarly, Dr. McDonald declined to rest his core conclusion—that the "Secretary of State's Office cancelled the registrations of, conservatively estimated, 59,866 No Contact registrants who continue to reside at their current voter registration address"—on the 85.3% found in his survey, which would have fully supported a finding that 83,233 registrants in the No Contact group had been improperly cancelled. Instead, he used the lower, more conservative figure of 59,866, derived from the fact that 61.4% of the 97,577 No Contact registrants (i.e., 59,866) did not have an NCOA database match. Far from being "subjective belief or unsupported speculation," (ECF No. 402 at 12), Dr. McDonald's thoughtful use of the data vendors reflects his *understatement* of the voters improperly included on the Purge List.

With respect to the SOS's NCOA matching procedures, Defendants' attack amounts to repeated, bolded references to Dr. McDonald's cautious language in his report: namely, that the "Secretary of State's NCOA matching procedures ***may***

identify too many registrants as having filed an NCOA form." (ECF No. 402 at 12-13.) But this objection is not only irrelevant to McDonald's core conclusions, but further highlights the SOS's opaque and error-ridden internal NCOA matching processes rather than any deficiency in McDonald's analysis.

It is irrelevant for two reasons.  First, the SOS's NCOA matching procedures meaningfully affects only those registrants in the NCOA group on the Purge List, and not those in the No Contact group. Accordingly, even if it held any water, this attack would have no bearing on the reliability of Dr. McDonald's conclusion that over 59,000 registrants in the No Contact group were placed on the Purge List despite still living at their registration addresses.

In any event, however, Dr. McDonald's conclusion that over 13,000 voters (14%) in the NCOA group on the Purge list never, in fact, filed a NCOA form does not depend at all on *why* or *how* the SOS's internal NCOA matching processes led to that disturbing outcome. Rather, that conclusion rests on the fact—which Defendants nowhere dispute—that the matching process completed by two data vendors found that those voters did not show up at all in the NCOA database. Defendants never produced to Plaintiffs the voter-level data the SOS gave its list vendor to perform such NCOA matching, or the voter-level data returned to the SOS by that list vendor. Yet while such data would have confirmed the precise

reasons why Defendants erroneously identified registrants on the Purge List for

having filed NCOA forms, those data were unnecessary for Dr. McDonald and his

data vendors to conclude that such registrants had not filed such forms. For this

reason, Defendants' unjustified failure to produce the most basic documentation

concerning the SOS's NCOA matching processes has no bearing on the reliability

of Dr. McDonald's conclusion.

Defendants' attack on this point speaks only to the SOS's poor

documentation of his office's NCOA matching process and to Defendants' dilatory

disclosure of the meager documentation that appears to exist. Defendants quote Dr.

McDonald's testimony at the December 2019 preliminary injunction hearing to

suggest that his opinions are "speculative"; but that testimony—irrelevant to the

admissibility of his trial testimony anyway—occurred long before Defendants

produced *any* meaningful information about the SOS's NCOA matching

procedures. In fact, the only document Defendants produced that describes their

NCOA matching processes was extracted from a large batch of documents just a

week before Dr. McDonald disclosed his first report for trial, despite repeated

requests from Plaintiffs. *See Holderbaum v. Carnival Corp.*, No. 13-24216-CIV-

LENARD/GOODMAN, 2015 WL 12781271, at *10 (S.D. Fla. Aug. 19, 2015)

(concluding where documents were not yet available that "it is hardly the expert's

fault" that they were not considered, and "the absence of this information goes to the *weight*" of the testimony). Once Defendants produced the memorandum entitled "NCOA List Maintenance Process," Dr. McDonald found that it further supported his original conclusions. (ECF No. 293 at 5-6.)[10]

Plaintiffs' claims in this case target, among other things, Defendants' lack of transparency and their arbitrariness in compiling their Purge List, causing many voters to be improperly cancelled and remain unaware that they were cancelled until Election Day. (ECF No. 41 ¶¶ 69-81.) That Dr. McDonald explained that he, like much of the public, is "at a loss" as to how and why Defendants are improperly cancelling registrants pursuant to an error-prone NCOA matching process, (ECF No. 402 at 13), does not support Defendants' motion.[11]

---

[10] Defendants cite *In re Abilify Products Liability Litigation*, 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018), for the proposition that "an expert cannot merely aggregate various categories of otherwise unreliable evidence to form a reliable theory." (ECF No. 402 at 15.) But this principle does not help Defendants because they do not demonstrate why any category of Dr. McDonald's evidence is unreliable.

[11] Defendants also fault Dr. McDonald for not identifying the particular voters who were placed improperly on the Purge List. The identity of the particular voters is irrelevant to Dr. McDonald's conclusion, but in any event he did provide that voter-specific identifying information to Defendants in spreadsheets attached to his report.

### III.   Dr. McDonald's opinions will assist the trier of fact.

Defendants argue that certain aspects of Dr. McDonald's testimony will be confusing to the jury. (ECF No. 402 at 15-16.) But this case may not be tried to a jury as Plaintiffs have submitted an Unopposed Motion to Strike their Jury Demand. (ECF No. 465).

When previously considering Dr. McDonald's testimony during the preliminary injunction hearing in this case, the Court could "separate what's different between fact and what [Dr. McDonald] can say expert-wise." (*Id.* (quoting preliminary injunction hearing transcript).) Nothing Defendants raise in their present motion has changed the Court's obvious ability to do so, and "where the judge is serving as fact finder," courts "are not concerned about 'dumping a barrage of questionable scientific evidence on a jury.'" *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (citation omitted).

Defendants have identified nothing questionable, confusing, or misleading in Dr. McDonald's testimony. Defendants point to Dr. McDonald's use of the phrase "Purge List" to describe voters having their registration cancelled. But this is not confusing or misleading, as Dr. McDonald defines the term in his report, (ECF No. 240 at 2), and this Court has previously addressed the distinction between voters

having their registration cancelled and being technically removed from the State's records in any event, (*see* Order 1 n.1, ECF No. 188).

Defendants further argue that Georgia law may permit the SOS to remove No Contact registrants even if they have not moved, and that Dr. McDonald's analysis conflates the two. (ECF No. 402 at 16.) But it is Defendants' argument that is misleading, not Dr. McDonald's testimony. Dr. McDonald is not analyzing Georgia law; he is only assessing the extent to which No Contact registrants still reside at their previously registered address. (Pls.' Apr. 3, 2020, Status Update 2-3, ECF No. 290.) In any event, Defendants' argument contradicts their own clear statements that the sole purpose of cancellation of registrations for "No Contact"—just as for "NCOA" and "Returned Mail"—is to remove registrants who have moved from their registration address. The SOS's website itself describes cancellation, including "No Contact," as "removing [voters] from the voter rolls due to a change in address."[12] In 2017, SOS Kemp explained that "No Contact" and the two other means to identify registrants for cancellation are for "voter registrations where the elector has changed residency." (Ex. 2 at -00234459.)[13]

---

[12] *Georgia Secretary of State's Office Cleans Voter File by 4 percent as Required by Law*, *supra* note 2.

[13] In his deposition, Mr. Rayburn also explained in the context of discussing the notices mailed to No Contact and other registrants before they are cancelled, "[I]t's

Any confusion on this Georgia law thus results from Defendants, not Dr. McDonald.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion to exclude Dr. McDonald's reports and testimony.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.), which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

Respectfully submitted, this, 27th day of July, 2020.

/s/ Allegra J. Lawrence
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650

---

going to this person's address who we believe is likely no longer there, that's why they're in this process." (Ex. 4 (Rayburn Dep. 169:2-4); *see also* Ex. 3 (Germany Dep. 52:17-23 (explaining that SOS uses "no contact and national change of address and returned mail" to determine whether registrants have moved)).)

Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

25

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson St, Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillon.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

26

Kali Bracey (Admitted *pro hac vice*)
Ishan Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
jershow@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice*)
Paul M. Smith (Admitted *pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL MCDONALD** using the Court's ECF System, which will send copies to all counsel of record.

This, the 27th day of July, 2020.

/s/ Allegra J. Lawrence
Allegra J. Lawrence