# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (MERITS)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION .....................................................................1

BACKGROUND .......................................................................4

    A.   Defendants Suppress Voting at Every Stage of the Electoral Process. ........4

        1.  Exact Match ..............................................................4

        2.  Mismanagement of Voter Registration Database...................6

        3.  The Voter Purge...........................................................7

        4.  Absentee Ballots .........................................................8

        5.  Precinct and Polling Place Changes .....................................9

        6.  Provisional Ballots.....................................................10

        7.  Hours-Long Waits to Vote ..............................................10

    B.   Defendants Abdicate Their Responsibility for Georgia's Electoral System. ..................................................................11

STANDARD OF REVIEW ...........................................................15

ARGUMENT .........................................................................15

I.    Factual Disputes Preclude Summary Judgment on Plaintiffs' Fundamental Right to Vote Claim. ...........................................15

    A.   Disputed Issues of Fact Preclude Summary Judgment on Each of Defendants' Voter Suppression Practices.................................19

        1.  Exact Match .............................................................19

        2.  Mismanagement of Voter Registration Database..................22

i

3.  The Voter Purge.....................................................................22

4.  Absentee Ballots .................................................................26

5.  Precinct and Polling Place Changes ...................................30

6.  Provisional Ballots..............................................................31

7.  Hours-Long Waits to Vote ..................................................34

B.  The Eleventh Amendment Does Not Bar Plaintiffs' Claim. .....................35

II.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Claim That the Voter Purge Violates Procedural Due Process Requirements. ..........36

III.  Factual Disputes Preclude Summary Judgment on Plaintiffs' Claim That Defendants Violated Section 2 of the VRA...............................................40

A.  Genuine Issues of Fact Exist Regarding Disparate Impact. ......................42

1.  Polling Place Changes .........................................................42

2.  Absentee Ballot Rejections..................................................43

3.  Exact Match ........................................................................44

B.  Historical Conditions ..................................................................45

IV.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Equal Protection and Fifteenth Amendment Claims..................................................48

V.    Defendants Deny Voters Equal Protection on the Basis of Their Residence.......................................................................................53

VI.   Plaintiffs Do Not Seek an "Obey the Law" Injunction. ...................................59

CONCLUSION .........................................................................................60

# TABLE OF AUTHORITIES

## CASES

*Airtran Airlines, Inc. v. Plain Dealer Publishing Co.*, 314 F. Supp. 2d 1266 (N.D. Ga. 2002) ...........................................................................15

*Alberti v. Sheriff of Harris County*, 937 F.2d 984 (5th Cir. 1991) .........................36

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ..................................................16, 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................15

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) .....................................................49

*Burdick v. Takushi*, 504 U.S. 428 (1992)...............................................................16

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) .............................48

*Bush v. Gore*, 531 U.S. 98 (2000).....................................................................53, 58

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................15

*Chisom v. Roemer*, 501 U.S. 380 (1991) ...............................................................41

*Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) ...........................................................................................................60

*Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285 (S.D.N.Y. 2020) ...........................................................................................................38

*Connick v. Thompson*, 563 U.S. 51 (2011)............................................................19

*Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018) ................................53, 54

*Curling v. Raffensperger*, 397 F. Supp. 3d 1334 (N.D. Ga. 2019)...................32, 60

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (11th Cir. 2019)................................................................. 15, 16, 18, 24, 25, 27

*Democratic National Committee v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) ...........................................................................................................46, 48

*Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) ....................................................................12

*Dollar v. Haralson County*, 704 F.2d 1540 (11th Cir. 1983) ...................17

*Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir. 1983)...................49

*Elston v. Talladega County Board of Education*, 997 F.2d 1394 (11th Cir. 1993)...........................................................................................49

*Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366 (9th Cir. 2016) ..............................................................................................41

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020) ....................................25

*Georgia Coalition for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) ...........................................................20, 22, 45

*Grayden v. Rhodes*, 345 F.3d 1225 (11th Cir. 2003)...............................36

*Greater Birmingham Ministries v. Secretary of State for Alabama*, No. 18-10151, __ F.3d __, 2020 WL 4185801 (11th Cir. July 21, 2020)................46

*Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011)............................. 11-12

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966).........................37

*Hughey v. JMS Development Corp.*, 78 F.3d 1523 (11th Cir. 1996) ....................60

*I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014)................................48, 49

*J.R. v. Hansen*, 736 F.3d 959 (11th Cir. 2013) ..................................37, 38

*Jacobson v. Florida Secretary of State*, 957 F.3d 1193 (11th Cir. 2020) ..............................................................................................36

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............................................................................................26

*Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795 (11th Cir. 2017) ..............................................................................................34

*League of Women Voters of North Carolina v. North Carolina*, 769
F.3d 224 (4th Cir. 2014) ................................................................41, 46

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir.
2008) ...........................................................................................57, 58

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) .............................................41

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018)................ 36, 37-38, 40, 60

*Miccosukee Tribe of Indians of Florida v. United States*, 722 F. Supp.
2d 1293 (S.D. Fla. 2010), *aff'd*, 716 F.3d 535 (11th Cir. 2013).........................49

*Monnell v. Department of Social Services of City of New York*, 436
U.S. 658 (1978)..................................................................................17

*Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612
(6th Cir. 2016)...................................................................................53

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) ......................................40

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) ....................41, 46

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) ................36

*S & M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198 (11th Cir.
2019) ...............................................................................................35

*Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018) ......................................38

*SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012)...........................................60

*SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016) .....................................59

*Shelby County v. Holder*, 570 U.S. 529 (2013) ........................................9

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .........................................1, 40

*Southard v. State Farm Fire & Casualty Co.*, No. 4:11-CV-243, 2013
WL 209224 (S.D. Ga. Jan. 17, 2013) ...................................................43

*St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815 (11th Cir. 1999)..................................................................44

*Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987)........................19

*Teagan v. City of McDonough*, 949 F.3d 670 (11th Cir. 2020)..............................36

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .........................................................40, 46

*United States v. City of Yonkers*, 96 F.3d 600 (2d Cir. 1996) ................................36

*United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir. 1984) ......................................................................................46, 47, 48

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)........................................41, 46, 48

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ...........................................................48, 50, 53

*Weaver v. Tillman*, No. CIV.A. 05-0449-WS-B, 2006 WL 1889565 (S.D. Ala. July 10, 2006), *aff'd sub nom. Weaver v. Mobile County*, 228 F. App'x 883 (11th Cir. 2007) ........................................36

*Wright v. Sumter County Board of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018) ........................................................46

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. XIV, § 1 ...................................................................17

U.S. Const. amend. XV, § 1 ....................................................................17

42 U.S.C. § 1983 .....................................................................................17

52 U.S.C. § 10301(a) ..............................................................17, 40, 45

52 U.S.C. § 20507(a)(4)..........................................................................25

Ga. Comp. R. & Regs. § 183-1-12-.18 ..................................................33

Ga. Comp. R. & Regs. § 183-1-12-.18(3).................................................33

Ga. Comp. R. & Regs. § 183-1-12-.18(13)................................................39

Ga. Comp. R. & Regs. § 183-1-14-.11 ....................................................8

Ga. Comp. R. & Regs. § 183-1-14-.13 ...................................................39

O.C.G.A. § 21-2-31.............................................................................11, 13

O.C.G.A. § 21-2-31(1).........................................................................14, 54

O.C.G.A. § 21-2-31(5).............................................................................12

O.C.G.A. § 21-2-32.................................................................................13

O.C.G.A. § 21-2-33.1..........................................................................13, 14

O.C.G.A. § 21-2-50......................................................................11, 12, 54

O.C.G.A. § 21-2-50.2..............................................................................11

O.C.G.A. § 21-2-210..............................................................................11

O.C.G.A. § 21-2-233..........................................................................23, 37

O.C.G.A. § 21-2-234..........................................................................23, 37

O.C.G.A. § 21-2-234(a)(2) ......................................................................23

O.C.G.A. § 21-2-234(c) ...........................................................................23

O.C.G.A. § 21-2-234(c)(1) .......................................................................25

O.C.G.A. § 21-2-235................................................................................37

O.C.G.A. § 21-2-235(a) ...........................................................................37

O.C.G.A. § 21-2-235(b) ...........................................................................23

O.C.G.A. § 21-2-388(2) ...........................................................................29

O.C.G.A. § 21-2-418.........................................................................38, 39

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ................................................................................................15

Opinion Attorney General No. 2005-3, 2005 WL 897337 (Apr. 15, 2005) ............................................................................................................12

## INTRODUCTION

In 1966, the Supreme Court concluded the "blight of racial discrimination in voting" had "infected the electoral process in parts of our country." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). Today, almost fifty-five years later, that blight still infects Georgia. Due to Defendants' maladministration, systemic and severe problems marred Georgia's November 2018 midterm election. Scores of citizens, disproportionately people of color, were disenfranchised. These problems only worsened in the June 2020 primary. Absent injunctive relief, Defendants will again break the core promise of American democracy in future elections.

In moving for summary judgment, Defendants repeatedly claim there is no burden on the right to vote and, if any burden exists, they are not responsible for it. The record conclusively establishes to the contrary on both points, although at this stage all Plaintiffs need demonstrate is a genuine issue of disputed material fact. Plaintiffs more than meet that requirement as to each of their claims.

*First*, Defendants ignore key evidence of the substantial burdens on the right to vote at every stage of the election process that are caused by their actions. To give but a few examples: The Exact Match process creates hurdles for voters flagged through a process Defendants concede has "ridiculous" error rates of "20 or 30 percent." For those who succeed in registering, hundreds of thousands are

later removed from the voter rolls, often without their knowledge, by a purge process that cancels voters who have not moved (over 70,000 in 2019 alone). Those who try to obtain absentee ballots—a process Defendants concede they fail to monitor despite their obligation to do so—often never receive a ballot at all or receive it too late to vote. The polling locations of over 650,000 voters who have not moved have been changed since 2014 and 459 polling places have been closed since 2014, closures Defendants encouraged. At the polls, voters wait hours due to insufficient ballots and polling stations and poorly trained poll workers, all of which Defendants are fully aware of and decline to remedy. And, due to Defendants' deficient training, many voters who are eligible for a provisional ballot are denied that option. Defendants attempt to disclaim responsibility for some of these constitutional defects in Georgia' election system, but to no avail: both the facts and the law establish that Defendants are the officials responsible.

*Second*, Defendants seek summary judgment on Plaintiffs' procedural due process claim, asserting the risks posed by Georgia's program of purging registered voters are minimal. Given the hundreds of purged voters who came to the polls in 2018 and swore in writing that they met all eligibility criteria, at the very least a factual dispute exists on this issue.

*Third*, Defendants seek summary judgment on Plaintiffs' claim under Section 2 of the Voting Rights Act (VRA) by ignoring critical evidence showing Georgia's election system disproportionately disadvantages voters of color. As just two examples, the overall rejection rate for absentee ballots cast by Black voters in the 2018 Election was 1.5 times higher, and voters of color were six to ten times more likely to be flagged for inadequate identification in the Exact Match process. The record shows at a minimum a dispute as to whether Defendants' practices and policies have led to these disparities.

*Fourth*, Defendants seek summary judgment on Plaintiffs' intentional discrimination claims under the Fourteenth and Fifteenth Amendments, but, undisputedly, Defendants have been on notice for roughly a *decade* that their policies have a disparate impact on people of color. In 2014, then-Secretary of State (SOS) Brian Kemp warned that Democrats were "registering all these minority voters that are out there and others that are sitting on the sidelines, if they can do that they can win this November." Order 13, ECF No. 154. Defendants have chosen not to train county election officials on their VRA obligations, instead encouraging the closure and consolidation of polling places. Defendants' claim that no evidence exists of intentional discrimination blinks at reality.

*Fifth*, Defendants urge summary judgment on Plaintiffs' claim that they violated the Equal Protection Clause by treating voters differently based on residence. To give but one example from a record replete with non-uniformity across the state, the Exact Match process is applied vastly differently depending on location: voters are flagged for missing identification in Fulton County at a rate 135 times higher than the rate in Treutlen County.

*Last*, Plaintiffs do not seek a prohibited "obey the law" injunction. This Court can grant the specific and tailored injunctive relief Plaintiffs request.

Defendants' motion for summary judgment on the merits of Plaintiffs' claims should be denied.

## BACKGROUND

### A.  Defendants Suppress Voting at Every Stage of the Electoral Process.

#### 1.  Exact Match

The SOS's Exact Match policy and process erroneously flag people eligible to vote as "non-matches"; these flags make voting more difficult, and the burden falls disproportionately on voters of color. When a person submits a paper voter registration application, a county official inputs the applicant's information into the SOS's database. Under Exact Match, the registrant's first name, last name, date of birth, driver's license number, and social security number in the SOS database are

compared to records from the Georgia Department of Driver Services (DDS) or Social Security Administration (SSA). Defs.' Statement of Material Facts (Merits) ¶¶ 140-41, ECF No. 451 ("Merits SMF"). Trivial errors like missing hyphens and minor misspellings place tens of thousands in a second-class registration status (once called "Pending" status, and now "Active-Missing ID Required" (MIDR)), exposing them to delays and confusion when trying to vote. Pls.' Statement of Additional Material Facts ¶¶ 387-429, 434-38, 451-63, 491-92, 525-90, 610 ("SAMF"). Exact Match disparately impacts voters of color, as the SOS knew for a decade. *See infra* at 44, 50. In the run-up to the 2018 election, this process flagged nearly 50,000 records—70% for Black applicants. SAMF ¶¶ 608, 610, 614.

The SOS's citizenship matching protocol is likewise deeply flawed. For applicants who do not submit proof of citizenship when they apply to register (or for whom that proof is not recorded), the SOS uses DDS data to verify citizenship. Merits SMF ¶¶ 139-40, 142. A non-match bars registration unless applicants provide proof of citizenship within twenty-six months. SAMF ¶¶ 435-36, 495. The fundamental problem with this process—left unchanged by HB 316, *id.* ¶ 435, and acknowledged by the SOS, *id.* ¶¶ 441-42, 448-50—is that DDS erroneously flags naturalized citizens as non-matches for citizenship, *see id.* ¶¶ 439-50. The impact of the citizenship matching protocol—including, at times, disenfranchisement—

severely burdens voters of color, who comprise the majority of naturalized citizens. *Id.* ¶¶ 430-33, 439, 490, 495-524, 607.

## 2. Mismanagement of Voter Registration Database

SOS records reveal the SOS's registration system erroneously removes or marks as ineligible many eligible voters. *Id.* ¶¶ 728-29. And for registered voters, the system frequently lists incorrect addresses that lead to disenfranchisement. *Id.* ¶¶ 636-45, 735. The result of these inaccuracies is predictable: in past elections, many properly registered voters arrived at their polling stations only to be informed they were not registered. *Id.* ¶¶ 703-05, 741. Some eligible voters were told erroneously they were felons and therefore could not cast ballots. *Id.* ¶¶ 729, 742. Others, because of inaccurate address data, were told they had to vote at different polling locations. *Id.* ¶¶ 743, 1015-16. Local election officials informed voters they were not registered at their current addresses even though the voters had given the SOS change-of-address documentation and, in some cases, had voted previously at that very polling place. *Id.* ¶ 744. Some voters were told to vote at polling locations different from those where people who lived at the same address had voted. *Id.* ¶ 745. These errors meant eligible voters could not cast ballots at all or had no choice but to cast provisional ballots. *Id.* ¶¶ 746-47, 921-28. Far from being a localized issue, these myriad problems result from Defendants' unjustified

failure to manage the voter registration database. Yet, the SOS has no plans to improve the registration database's accuracy. *Id.* ¶ 750.

### 3. The Voter Purge

In odd-numbered years, the SOS cancels the registrations of hundreds of thousands of Georgia voters through its "NGE" process.[1] *Id.* ¶¶ 624-34. Defendants deregister these voters on the assumption they moved.[2] *Id.* ¶¶ 712-13. The evidence proves that assumption false. The majority of voters purged for "No Contact"— at least 59,866 in 2019—had not moved. The SOS purged at least 14,732 additional voters on the premise they filed National Change of Address (NCOA) forms when they had not. *Id.* ¶ 672. This results in widespread and unjustified disenfranchisement. In the 2018 election alone, Georgia documented

---

[1] Defendants reject the term "voter purge" because cancelled voters' information remains in a database visible to SOS employees. Defs.' Br. Supp. Summ. J. (Merits) 18 n.17, ECF No. 450-1 ("Defs.' Br."). But whether *SOS* employees can see cancelled voters' information is irrelevant. Voters in "cancelled" status cannot vote (and must re-register) precisely because their names have been "purged" from the rolls. SAMF ¶¶ 630-31.

[2] Defendants' attorneys have started to suggest that the purge of voters for "No Contact" is not to eliminate voters who have moved. That argument is made-for-litigation. The SOS's website describes the cancellation process, including "No Contact," as "removing [voters] from the voter rolls due to a change in address." SAMF ¶ 712. In 2017, SOS Kemp explained to the U.S. Department of Justice that "No Contact" and the two other means to identify registrants for cancellation are for "voter registrations where the elector has changed residency." *Id.*

*hundreds* of ballots rejected because they were cast by voters who did not realize they had been purged. *Id.* ¶¶ 703-05.

### 4. Absentee Ballots

Over 200,000 Georgia voters cast absentee-by-mail ballots in the 2012, 2016, and 2018 elections. *Id.* ¶ 752. In the June 2020 primary, given the COVID-19 pandemic, that number expanded to at least 1.1 million. *Id.* In every election, the absentee ballot process has failed large numbers of voters.

Absentee ballots often do not reach voters for weeks, if at all. *Id.* ¶¶ 753-54, 760-85, 789-93. Even though counties are required to send an absentee ballot within three business days of receiving the application, *see* Ga. Comp. R. & Regs. § 183-1-14-.11, Defendants do not enforce the law. When a voter attempts to return the ballot, they are often told the ballot never reached officials or arrived too late to be counted. SAMF ¶¶ 786-87, 794-99. Voters who never receive their absentee ballots often cannot vote in person at all, whether due to ill-health, being out of state, or some other impediment.

Defendants have known of these and other problems for years, but exercise no meaningful oversight over the timely and accurate processing of applications or ballots. *Id.* ¶¶ 753-74, 788, 823-67. Defendants have not ensured that voters can reliably track ballot status, and have taken only minimal steps to ensure voters who

never received their absentee ballots or received them too late can cancel those ballots and vote in person. *Id.* ¶¶ 800-23, 868-95. These problems only worsened in the June 2020 primary. *Id.* ¶¶ 789-98, 820, 893-95.

### 5. Precinct and Polling Place Changes

After *Shelby County v. Holder*, 570 U.S. 529 (2013), struck down the VRA's "preclearance" requirement, Georgia counties began closing and relocating polling places at record pace: between the 2014 and 2018 general elections, 459 polling places closed, and the polling places of approximately 650,000 people—18% of voters—changed. SAMF ¶¶ 993-97. These changes depressed turnout among Georgia voters generally, and especially among Black voters, whose polling places closed or relocated at a higher rate than white voters. *Id.* ¶¶ 1022-28, 1037-43. These changes were also concentrated in select parts of the State. *Id.* ¶¶ 1030-36.

Polling place changes made voting more difficult. Some counties failed to notify voters of the changes prior to Election Day; consequently, voters went to, and were turned away from, polling places where they had voted for years. *Id.* ¶¶ 1012-21, 1023-24, 1026, 1029. If not offered provisional ballots, these voters were forced to choose between trying to make it to their new polling places—in some cases miles farther from their homes—in time to vote, or not voting at all. *Id.* ¶¶ 1025, 1027.

The SOS actively promoted these changes. *Id.* ¶¶ 998-1002. In post-*Shelby County* training, the SOS advised counties to begin consolidating polling places "now." *Id.* ¶ 1000. The SOS's training did not even *mention* counties' continuing obligations to ensure polling place changes did not disparately affect voters of color. *Id.* ¶¶ 376-78, 1051-56, 1157-58. Defendants knew that numerous counties eliminated over half of their polling places, leaving only one or two remaining, and did nothing. *Id.* ¶¶ 1003-06, 1009-11.

### 6. Provisional Ballots

Defendants recognize "if you don't offer someone a provisional ballot, they don't get a chance" to vote. *Id.* ¶¶ 901-08. Nonetheless, many voters are denied provisional ballots; others are told they cannot vote without being informed of the provisional option or are discouraged outright from provisional voting. *Id.* ¶¶ 909-36. Some polling places run out of provisional ballots altogether. *Id.* ¶¶ 945-56. Even voters who manage to cast provisional ballots are not informed adequately of whether they need to take additional action to ensure their ballots are counted. *Id.* ¶¶ 940-44, 969-70.

### 7. Hours-Long Waits to Vote

Although voter turnout for the 2018 election hit historic highs, turnout in Georgia had been steadily on the rise since 1998. *Id.* ¶¶ 1057-60. The SOS thus

knew turnout would be high in 2018; the SOS also knew, from voter complaints in prior high-turnout elections, that broken or malfunctioning voting machines, and inadequate supplies and poll worker training, would lead to long waits, and to some voters leaving without voting. *Id.* ¶¶ 1061, 1063-67. And as Defendants know, *they* are responsible for ensuring county election practices are uniform and fair, and that county personnel fulfill their legal obligations. *Id.* ¶¶ 221-61.

Nevertheless, the SOS did not ensure polling places had adequate working voting machines, supplies, or poll worker training. *Id.* ¶¶ 322-72, 1062, 1068-82, 1120-22. As a result, in 2018, Georgians waited as long as four-and-a-half hours to vote at polling places with too few working voting machines, poll workers whose poor training left voters waiting, and no offer of emergency paper ballots when voting machines were not working. *Id.* ¶¶ 1083-1103, 1118-30. During the June 2020 primary election, these waits were almost twice as long as in 2018. *Id.* ¶ 1127. Unable to wait hours to vote, many Georgians left the polls without voting at all. *Id.* ¶¶ 1104-17, 1128.

## B.  Defendants Abdicate Their Responsibility for Georgia's Electoral System.

Both the SOS and State Election Board (SEB) have the duty to ensure elections are administered uniformly and in accordance with state and federal law. *Id.* ¶¶ 221-46; *see* O.C.G.A. §§ 21-2-31, 21-2-50, 21-2-50.2, 21-2-210; *Grizzle v.*

*Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (recognizing Defendants have "both the power and the duty to ensure" local actors' compliance with election laws); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1338 n.2 (N.D. Ga. 2018) (Jones, J.); Ga. Op. Att'y Gen. No. 2005-3, 2005 WL 897337, at *3, *7 (Apr. 15, 2005) (recognizing the SOS "is *the* state official with the power, duty, and authority to manage the state's electoral system" and the SEB has the "statutory purpose of assuring 'uniformity . . . and legality and purity in all primaries and elections'" (quoting O.C.G.A. § 21-2-31)); Order 60-63, ECF No. 68 (similar conclusion at the motion-to-dismiss stage).

The law, Defendants' own descriptions of their powers, and Defendants' actions show they have all the tools they need to administer an election system that complies with the United States Constitution and the VRA. For the SOS, those tools include promulgating rules; issuing directives; investigating counties' practices and initiating SEB enforcement proceedings; proposing and drafting regulations for the SEB to promulgate; requiring counties to certify their compliance with election laws; training the counties; requiring county election personnel to take particular training the SOS prescribes; requiring counties to prove the adequacy of any training the county does; and responding to voter complaints. SAMF ¶¶ 256-61, 269, 302-26; O.C.G.A. §§ 21-2-31(5), 21-2-50. For

the SEB, those tools include promulgating rules and regulations; investigating counties' practices; presiding over administrative enforcement actions; issuing letters of instruction; imposing fines; referring matters to state or federal prosecutors; and engaging in litigation. SAMF ¶¶ 238-40, 250-54; O.C.G.A. §§ 21-2-31, 21-2-32, 21-2-33.1.

The SOS admits "[p]roper training of everyone involved in the elections process" is a necessary component of its own duty to ensure elections are administered lawfully and uniformly. SAMF ¶¶ 303-05. It also knows inadequate training causes deprivations of the right to vote. *Id.* ¶¶ 305, 345-54. Yet, the SOS has neither established nor enforced any training standards for county personnel. *Id.* ¶¶ 328-44. The SOS and SEB are aware county-administered training is often insufficient, but the SEB has promulgated no regulations pertaining to training and the SOS deems poll worker training "adequate" as long as counties simply claim they have provided training. *Id.* And, while county election superintendents and registrars must be certified by the SOS as having received training, the SOS does not enforce even that requirement. *Id.* ¶¶ 307-16. As to the rest of the State's training materials, Defendants do not know whether county personnel have seen or understood them. *Id.* ¶¶ 317-21, 337-44.

Rather than train county personnel to prevent discrimination and

13

disenfranchisement as required by federal law, the SOS's training materials either omit reference to or do not explain the requirements of the VRA. *Id.* ¶¶ 373-86. The SOS's Elections Director, who is in charge of training the counties, does not even understand the VRA's requirements himself. *Id.* ¶¶ 379-83.

The SOS received hundreds of complaints regarding the 2016 and 2018 elections. *Id.* ¶¶ 286-90. Although the SOS identifies voter complaints as a primary source of information about counties' compliance with election laws, the SOS has no formal policies or procedures for responding to voter complaints. *Id.* ¶¶ 277-88. The SOS does not log complaints and performs no analysis to identify prevalent problems. *Id.* ¶¶ 282-85. The SOS does nothing to hold counties accountable for those problems except sending a few cases to the SEB. *Id.* ¶¶ 262-76, 291-301.

The SEB, in turn, is essentially defunct. It has no staff. *Id.* ¶ 255. Its members are not briefed on their responsibilities. *Id.* ¶ 241. It convenes sporadically every several months, hears cases years after the damage to voters has occurred, and "resolves" cases by telling offenders to "refrain from further violations" or referring the matter elsewhere. *Id.* ¶¶ 252, 271-76. Above all, it has abdicated its legal obligation to promulgate and enforce rules that "obtain uniformity" and "legality" regarding the practices Plaintiffs challenge. *Id.* ¶¶ 238, 242, 330, 464-70, 617-23, 634, 976-83; *see* O.C.G.A. §§ 21-2-31(1), 21-2-33.1.

## STANDARD OF REVIEW

Summary judgment is proper only where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the opposing party must go beyond the pleadings and present evidence establishing there is a genuine issue of material fact. *AirTran Airlines, Inc. v. Plain Dealer Publ'g Co.*, 314 F. Supp. 2d 1266 (N.D. Ga. 2002). At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

### I.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Fundamental Right to Vote Claim.

Defendants' voter-suppression practices violate the First and Fourteenth Amendments' "prohibition against undue burdens on the right to vote." *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). Under the governing test (known as the *Anderson-Burdick* standard), this Court

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see* Defs.' Br. 21 (agreeing the *Anderson-Burdick* standard is the applicable test).[3] Even where a practice "imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify the burden." *Lee*, 915 F.3d at 1318-19.

Defendants argue summary judgment should be granted on Plaintiffs' fundamental right to vote claim for two overlapping reasons. *First*, Defendants argue there exists no genuine issue of material fact as to the burden on voters resulting from the practices Plaintiffs identify. Defs.' Br. 23-24, 32. Defendants are wrong. As demonstrated below, at a minimum genuine issues of material fact precluding summary judgment exist as to each practice.

---

[3] *Anderson-Burdick* applies regardless of whether burdens are imposed through the defendants' actions or inaction. *See, e.g.*, *Lee*, 915 F.3d at 1315, 1319-20 (applying *Anderson-Burdick* where the Florida Secretary of State did not supply training or uniform standards to county election personnel who were required to perform signature-matching on absentee ballots); *contra* Defs.' Br. 22.

16

*Second*, for a subset of these practices, Defendants argue even if a burden exists, Defendants cannot be held responsible for any failure to train and supervise county personnel adequately. Defs.' Br. 23-32.[4] Defendants are wrong. Under § 1983, liability attaches regardless of whether Defendants themselves carried out the unconstitutional practice. 42 U.S.C. § 1983 (providing for liability where the defendant "subjects, *or causes to be subjected*, any . . . person" to the deprivation of constitutional rights (emphasis added)); *see also Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). As discussed practice-by-practice below, at a minimum genuine issues of material fact exist as to Defendants' causal role.[5]

---

[4] This argument applies to Plaintiffs' claims regarding absentee ballots, provisional ballots, polling place changes, and long lines. *See* Defs.' Br. 23-34.

[5] In its Order on Defendants' motion to dismiss, this Court instructed the parties to address *Dollar v. Haralson County*, 704 F.2d 1540 (11th Cir. 1983). Order 71-72 n.25, ECF No. 68. In *Dollar*, the Eleventh Circuit held a municipality could not be held liable under 42 U.S.C. § 1983 for harms resulting from a failure to build a bridge because the plaintiff "cited no authority from Georgia or elsewhere that imposed" such a duty. 704 F.2d at 1544. Here, by contrast, Plaintiffs have cited a constellation of state-law duties—as well as factual evidence regarding those duties—confirming Defendants' obligation to ensure elections in Georgia comply with the U.S. Constitution and the VRA. *See supra* at 11-14. Moreover, *Dollar* appears limited to circumstances where plaintiffs seek to transform common-law negligence claims into constitutional violations. 704 F.2d at 1544. *Dollar*'s duty analysis has never been applied in any voting-rights case, perhaps because the U.S. Constitution and the VRA expressly impose duties on "State" actors—i.e., Defendants—to refrain from the particular voting-rights deprivations Plaintiffs allege. U.S. Const. amends. XIV § 1, XV § 1; 52 U.S.C. § 10301(a).

Moreover, Defendants cannot escape liability by claiming Plaintiffs fail to show "deliberate indifference." Defs.' Br. 24-25. Defendants concede the Eleventh Circuit has *never* applied a deliberate-indifference standard "in the context of elections." *Id*. at 25. That is an understatement: just last year, the Eleventh Circuit applied *Anderson-Burdick* to a claim brought against the Florida Secretary of State—whose only involvement in the challenged practice concerned training and oversight—*without* requiring deliberate-indifference. *See Lee*, 915 F.3d at 1319-20, 1322. Defendants do not discuss *Lee*, and the out-of-circuit cases they cite are simply not governing law.

In any event, Plaintiffs' evidence at a minimum creates a genuine issue of material fact as to Defendants' deliberate indifference.[6] For example, the SOS is the recipient of the voter complaints submitted from across the state, in which voters have made the SOS aware of burdens regarding each challenged practice. SAMF ¶¶ 277-78, 286-87, 508-11, 527, 530-33, 569-75, 579-81, 589, 695, 767-68, 783-85, 787, 804, 808-14, 823-27, 856, 868-84, 910-18, 926-32, 938, 943-44, 947-50, 988-91. Despite receiving those complaints, and then often blaming the

---

[6] Training need not "diverge from a known 'accepted standard'" to be actionable if a deliberate-indifference requirement applies, and neither of Defendants' case citations indicate otherwise. Defs.' Br. 25, 30.

burdens on county-level training, neither the SOS nor the SEB has chosen to set training standards or require counties to demonstrate the adequacy of their training. *Id.* ¶¶ 328-40, 345-46.[7] *See also supra* at 13-14; *infra* at 27-35. Thus, even if deliberate indifference were required, which it is not, there exists a genuine issue of material fact regarding whether Defendants "disregarded a known or obvious consequence of [their] action[s]": creating undue burdens on the right to vote. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted).

### A. Disputed Issues of Fact Preclude Summary Judgment on Each of Defendants' Voter Suppression Practices.

#### 1. Exact Match

Defendants sensibly identify no state interest in the multiple flaws that exist in the SOS's Exact Match process. *See* Defs.' Br. 21-32.[8] The SOS's own employees admit that voters can be flagged for non-material, "hypertechnical" reasons, and that flags can result from typing errors. SAMF ¶¶ 457, 471-76; *see*

---

[7] Defendants' suggestion that they are immune from liability because poll workers are not their employees, Defs.' Br. 26, is foreclosed by precedent. *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc).

[8] Defendants do not argue that Exact Match is justified by an interest in preventing voter fraud. Defs.' Br. 19-32. Regardless, Plaintiffs have proffered substantial evidence that voter fraud in Georgia is insignificant, SAMF ¶¶ 591-99, 719, and that Exact Match heavily burdens *eligible* voters.

*also id.* ¶¶ 451-56, 458-63. SOS General Counsel Ryan Germany acknowledges the error rates for voters whose information is matched against SSA records[9] are "20 or 30 percent . . . [which] seems pretty ridiculous." *Id.* ¶ 420. The SOS *could* require counties to correct records that fail verification because of obvious data entry errors, but does not do so. *Id.* ¶¶ 464-82. Nonetheless, Defendants argue summary judgment should be granted because flagged voters "can vote with proper identification," which, they imply, is only a minimal burden on the right to vote. Defs.' Br. 19-21.[10] The record demonstrates, at least, a genuine issue of material fact on this question.

Active-MIDR flag: Defendants concede "[t]he process for an affected applicant to cure the verification issue and vote both before and after HB 316 is largely the same." Merits SMF ¶ 148. Prior to HB 316, the SOS claimed "every single pending voter" would be able to vote in the November 2018 election by

---

[9] Voters who register with a Social Security number but no driver's license number have their records matched against SSA records. SAMF ¶ 419.

[10] Defendants' also say Plaintiffs "have no declarants who were precluded from voting due to the HAVA-match policy." Defs.' Br. 45. Not only have Plaintiffs identified voters disenfranchised by Exact Match, SAMF ¶¶ 516-24, 557, but an unconstitutional burden on the franchise can exist without an individual being wholly deprived of the ability to successfully cast a ballot. *See Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1263 (N.D. Ga. 2018).

presenting a photo ID, SAMF ¶¶ 551-52, but this was untrue. Voters often did not receive notice of their pending status, were unable to decipher the requirements for resolving verification issues, and contacted county offices in vain. *Id.* ¶¶ 525-27, 529-33. County officials were unsure which verification documents could be used to move voters to active status, and one voter had to submit a provisional ballot despite having completed *four* registration forms. *Id.* ¶¶ 483-89, 493-94, 559. Even the SOS's lead liaison for local officials expressed confusion about the requirements. *Id.* ¶¶ 483-88. Predictably enough, verification caused pending voters delay and difficulty on Election Day. *Id.* ¶¶ 555-57, 559. Given Defendants' concession that the processes pre- and post- HB 316 are the same, there is at least a genuine dispute as to whether voters in MIDR status will likewise be burdened. A mere 13% of voters in MIDR status as of July 2019 were able to move to regular active status by January 2020. *Id.* ¶ 534. And although the SOS acknowledges poll workers may turn away voters for immaterial ID mismatches, the SOS's 2020 poll worker manuals contain no instruction not to do so. *Id.* ¶¶ 536-47, 558, 569.

Citizenship flag: The citizenship match erroneously flags citizens as non-citizens. *Id* ¶¶ 439-50. And, once flagged, *U.S. citizen* voters are subject to a documentary proof of citizenship requirement and the possible cancellation of their registrations after twenty-six months. *Id.* ¶ 495. Likewise, voters may not receive

prompt notice that they were placed in pending status, may receive confusing or inconsistent information about what is required to cure their status, and may experience months-long processing delays. *Id.* ¶¶ 500-11. The difficulties they face in trying to cure their pending status can lead to disenfranchisement. *See Ga. Coal. for People's Agenda*, 347 F. Supp. 3d at 1269; SAMF ¶¶ 516-24.

### 2. Mismanagement of Voter Registration Database

Defendants do not even address Plaintiffs' claims regarding their failure to maintain an accurate voter registration database.[11] Therefore, Defendants have not carried their burden to show that, as a matter of law, they are entitled to summary judgment on these claims.

### 3. The Voter Purge

Defendants argue they are entitled to summary judgment because: (1) the burden on the right to vote arising from the voter purge is not severe, and (2) the burden is outweighed by three state interests. Defs.' Br. 32. At a minimum, a genuine issue of material fact exists as to each point.

<u>Burden on the right to vote:</u> Understanding the burden caused by the purge

---

[11] As explained in Part II of Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. (Jurisdiction), Defendants' minimal steps to address voter roll security and to incorporate information from other states do nothing to address the problems many voters face with inaccuracies in the voter rolls.

requires a brief description of the purge process itself. Every two years, the SOS deregisters hundreds of thousands of voters on the premise that they have "changed residency." SAMF ¶¶ 624, 712. This process proceeds in two phases. *First*, the SOS changes voters' registration status from "active" to "inactive" for voters the SOS identifies as having: (i) filed a National Change of Address (NCOA) form; (ii) election mail returned as undeliverable; or (iii) had "No Contact" with election officials for five years. *Id.* ¶¶ 624-25; O.C.G.A. §§ 21-2-233, 21-2-234. *Second*, the SOS deregisters all "inactive" voters it identifies as having "No Contact" for a period spanning two general elections. O.C.G.A. § 21-2-235(b). Voters are supposed to receive notices instructing them to confirm their address before they are moved to "inactive" status and "cancelled" status. O.C.G.A. §§ 21-2-234(a)(2), (c), 21-2-235(b). Once voters are "cancelled," they cannot vote unless they reregister at least one month prior to an election. SAMF ¶¶ 630-32.

Defendants argue Plaintiffs "have not provided evidence of a constitutional burden." Defs.' Br. 32. They are wrong. For one, *both* parties' experts agree the SOS's use of "No Contact" as a proxy for voters who have moved is grossly inaccurate. SAMF ¶¶ 708-10. Moreover, even accepting its proxies, the SOS purges voters based on a wide variety of inaccurate data: for example, it flags voters as having submitted an NCOA form for a change of residential address

when they have not, and it flags as "No Contact" voters who *have* had contact. *Id.* ¶¶ 635-82. Crucially, even though voters are supposed to be notified before they are purged, they are generally not notified. *Id.* ¶¶ 683-705. They are also not notified after they have been purged. *Id.* ¶ 699. The predictable result is erroneous disenfranchisement. Indeed, hundreds of votes cast in the 2018 election were not counted solely because voters' registrations were erroneously purged. *Id.* ¶¶ 703-704.[12]

At the preliminary injunction stage, with none of this evidence before it and under a higher legal standard, the Court observed "returning a prepaid, preaddressed confirmation notice and/or reregistering to vote[]" is unlikely to pose a severe burden. Order 27, ECF No. 188. The summary judgment record now shows the burden is disenfranchisement. *See Lee*, 915 F.3d at 1321 ("[E]ven one disenfranchised voter . . . is too many."). The Eleventh Circuit has recognized voting restrictions impose a "serious burden" when voters "might not learn that their vote would not be counted until it [i]s too late to do anything about it." *Id.* at

---

[12] The hundreds of purged voters identified in the state's provisional-ballot-rejection records represent just a small slice of those erroneously disenfranchised: these records exclude voters from 137 of Georgia's 159 counties; voters who decided not to submit provisional ballots knowing they would not count; and voters who did not attempt to vote because they somehow found out they were purged after it was too late to reregister. SAMF ¶¶ 704-06.

1321, 1325-26. That is the case here: Defendants' purge process leaves voters without a "safety valve" or "backup option for them to cast votes" when they appear at the polls not knowing they were purged. *Fish v. Schwab*, 957 F.3d 1105, 1129 (10th Cir. 2020) (finding a "substantial burden" even where voters were contacted three times about their status before an election).

Lack of a state interest: Defendants claim any burden is "outweighed" by three state interests: "(1) maintaining a reliable list of electors; (2) applying the law as written; and (3) eliminating voter confusion and improving Election Day operations." Defs.' Br. 32. These are legitimate interests in the abstract, Order 28-29, ECF No. 188, but are not served—much less justified—by a process that disenfranchises so many eligible voters. *Anderson*, 460 U.S. at 789, 806.

*First*, Defendants' interest in maintaining a "reliable list of electors" justifies—as the NVRA *they* rely upon makes clear, Letter from Josh Belinfante 4, ECF No. 185—"remov[ing] the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant," 52 U.S.C. § 20507(a)(4); *see also* O.C.G.A. § 21-2-234(c)(1). This interest is not served by purging registrants Defendants know, or can readily ascertain, have not

moved.[13] SAMF ¶¶ 703-22.

*Second*, Defendants' interest in "applying the law as written" is a non-starter. Defendants have no interest in applying an unconstitutional law. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Otherwise, no state law or policy could ever be struck down as unconstitutional.

*Third*, Defendants' interest in "eliminating voter confusion and improving Election Day operations" weighs strongly in *Plaintiffs'* favor. Defendants' voter purge causes confusion by ensnaring voters in the process based on incorrect information and changing voters' status without their knowledge. SAMF ¶¶ 635-711. Likewise, the purge worsens Election Day operations: purged voters are told they are not on the rolls, slow down lines and occupy poll worker time, and then face the cumbersome provisional ballot process, all for naught. *Id.* ¶¶ 695-97, 704.

### 4. Absentee Ballots

Defendants do not dispute Georgia voters face severe obstacles to voting absentee. But they argue for summary judgment because: (1) there is no evidence of "widespread or systemic constitutional violations regarding poll workers'

---

[13] Defendants' access to the Electronic Registration Information Center's information about voter movement makes their continued purge of voters on the basis of "No Contact" even less justifiable. *See* Defs.' Statement of Material Facts (Jurisdiction) ¶¶ 112-13, ECF No. 441-2; SAMF ¶ 720.

application" of election laws governing absentee ballots, Defs.' Br. 29; and (2) they train county officials adequately, *id.* at 11-12. Genuinely disputed issues of fact exist as to both. *See Lee*, 915 F.3d at 1319 (noting a state may not "subject[] vote-by-mail electors . . . to the risk of disenfranchisement").

<u>Widespread and systematic violations:</u> Voters regularly face prohibitive delays in receiving absentee ballots in time to return them by 7 PM on Election Day, SAMF ¶¶ 753-59—sometimes never receiving an absentee ballot at all or receiving the ballot after Election Day. *Id.* ¶¶ 760-68, 781-84, 790-94. Even when voters do timely receive ballots, they face substantial mailing delays preventing ballots from reaching local elections offices in time. *Id.* ¶¶ 786-87. And when voters attempt to vote in person, having never received their ballots or unsure if their completed absentee ballots were ever received by the counties, they are informed they cannot vote, must vote provisionally, or must travel to a centralized office first to formally cancel their ballot. *Id.* ¶¶ 868-95.

Although these problems have plagued Georgia elections for years, the June 2020 primary demonstrated how far they are from being solved. Counties delayed processing ballot requests, with no SOS oversight or intervention. *Id.* ¶¶ 790-93. The SOS centralized the process of mailing absentee ballots, but the out-of-state vendors it enlisted and supervised sent ballots late. *Id.* ¶ 793. Voters who attempted

to use county drop boxes found that their ballots disappeared or were logged as received late. *Id.* ¶¶ 794-98. Adding to voters' woes, the SOS website gave them inaccurate information about absentee ballot applications and ballot status. *Id.* ¶¶ 805, 820-21. Voters attempted to vote in person in droves given the problems described above—only to be denied the ability to vote in light of their absentee ballot requests. *Id.* ¶¶ 893-95.

Defendants' responsibility and inadequate training: Although Defendants are responsible for the uniform treatment of Georgia voters and for overseeing counties to ensure that constitutional rights are respected, Defendants have left unaddressed obstacles at every stage of the process.

The SOS can easily review information within eNet to make sure ballots are sent promptly after applications are received; indeed, the SOS performs these sorts of "spot checks" to address whether counties have mailed absentee ballots *too early*, as well as to make sure that absentee ballots sent to overseas and military voters comply with federal deadlines. *Id.* ¶¶ 769-80. Defendants nevertheless do not dispute they take no meaningful steps to ensure election officials—or, in the case of the June 2020 primary, the third-party contractor *the SOS selected* to mail absentee ballots—process applications and mail ballots in a timely fashion. *Id.* ¶¶ 772-74.

28

Moreover, Defendants turn a blind eye to pervasive mailing delays voters face when receiving and returning their absentee ballots. *Id.* ¶¶ 781-88. Even with the massive increase in absentee voting due to the COVID-19 pandemic, Defendants still have not ensured voters can bypass the postal service and return absentee ballots in drop boxes. *Id.* ¶ 794. Compounding these problems, the SOS's My Voter Page portal provides inaccurate information about absentee ballot status. *Id.* ¶¶ 806-22.

Defendants also have long been aware that in-person voters are often denied the ability to vote if they are listed as having requested an absentee ballot. Even though state law clarifies a voter does not need to have the physical ballot to cancel it at a polling place and vote in person, *see* O.C.G.A. § 21-2-388(2), Defendants have taken no meaningful steps to ensure poll workers comply with this requirement, SAMF ¶¶ 362-63, 886-95. Indeed, the SOS poll worker manual in effect during the June 2020 primary *deleted* instructions about how poll workers should handle in-person voters who had previously requested absentee ballots, and voters continue to face obstacles to cancelling their ballots. *Id.* ¶¶ 363, 887-95.

Defendants' persistent inaction results in a system where voters are told they can vote absentee for any reason but then manifestly cannot.

### 5.  Precinct and Polling Place Changes

In the aftermath of *Shelby County*, Defendants advised counties to begin closing polling places "now." *Id.* ¶ 1000. Counties willingly obliged: over a four-year period, and with Defendants' encouragement, counties closed over 450 polling places and moved over 650,000 voters' polling places. *See supra* at 9. Genuine issues of material fact exist on Defendants' arguments for why these changes did not burden the right to vote.

*First*, Defendants claim Plaintiffs offer no evidence that polling place changes prevented anyone from voting. Defs.' Br. 31. That claim is contradicted by data showing that voters who did not move but received a new polling place between 2014 and 2018 turned out in lower numbers in 2016 and 2018 than voters whose polling place did not close or change. SAMF ¶¶ 1022-28.

*Second*, Defendants claim Plaintiffs offer no evidence that "Georgia counties moved polling locations for improper reasons." Defs.' Br. 31. But Plaintiffs need only show that polling place changes burdened the franchise. Defendants must, but do not, show a compelling state interest justifying this burden. *See supra* at 16.

*Third*, Defendants claim Plaintiffs offer no evidence of deficiencies in Defendants' training on polling place changes, or the training's harm. Defs.' Br. 31. To the contrary, Plaintiffs have shown Defendants' failure to train counties on

30

their continuing obligation to comply with the VRA *and* inadequate supervision of polling place changes harmed voters. SAMF ¶¶ 376-78, 998-1002, 1051-56, 1157-58. Despite knowing that some counties planned to close nearly all of their polling places, Defendants intervened to stop a closure only once, after negative press. *Id.* ¶¶ 1003-11. As a result, turnout among voters who experienced these closures and relocations—and Black voters especially, who were disproportionately affected—was depressed. *Id.* ¶¶ 1022-28, 1037-43.

### 6. Provisional Ballots

Defendants argue the Court should grant summary judgment because: (1) there exist no "widespread or systemic constitutional violations" regarding provisional ballots, Defs.' Br. 29; and (2) in any event Defendants have trained county election officials adequately, *id.* at 12-13, 23-27. At a minimum, genuine issues of material fact exist on both issues.

<u>Widespread and systemic constitutional violations:</u> Voters have been routinely denied provisional ballots, discouraged from provisional voting, or not made aware that voting provisionally was an option. SAMF ¶¶ 909-36, 971-75.[14]

---

[14] The Court should take judicial notice of the evidence submitted in other cases establishing that voters who believed they were properly registered—including voters who had recently voted or knew that they had timely registered—have been

Even when provisional ballots are a theoretical option, ballot shortages make voting provisionally impossible. *Id*. ¶¶ 945-56. Voters who cast a provisional ballot are not instructed on how to "cure" their ballots or verify their ballots are counted. *Id*. ¶¶ 940-44. The evidence of disenfranchisement is clear: many voters are not able to vote at all; others have their provisional ballots improperly rejected.

<u>Defendants' responsibility and improper training:</u> Defendants try to eschew responsibility in two ways. *First*, they claim they are not responsible for training of poll workers or printing provisional ballots. Defs.' Br. 26-27. This argument fails for the reasons discussed above. *See supra* at 11-14, 17-19.

*Second*, Defendants claim to the extent they are responsible, they fulfill that responsibility by "not discourag[ing] the use or offering of provisional ballots," and advising counties "when in doubt, give it out." Defs.' Br. 12-13 (citation omitted). The record refutes this assertion. Voters for years have complained to the SOS that poll workers failed to provide provisional ballots, and SOS investigations have routinely found these complaints justified. SAMF ¶¶ 910-13, 915-17, 926-31. Defendants, however, have offered inconsistent, incoherent guidance on whether

---

"refused provisional ballots or sometimes only provided provisional ballots after returning to the polls to insist on this," while others were not offered provisional ballots. *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1386-89, 1392 (N.D. Ga. 2019) (citing *Common Cause v. Kemp* litigation (No. 16-cv-452-TCB)).

poll workers are required to offer provisional ballots. *Id*. ¶¶ 933-35, 976-83.

Indeed, despite concluding federal law requires provisional ballots be given to

voters who request them, Defendants took no steps to standardize counties' actions

or prevent problems with distribution and processing of provisional ballots in the

2018 election and beyond. *Id*. ¶¶ 929-39, 957-68.[15]

Even after Defendants amended SEB rules, ostensibly to instruct poll

workers to offer provisional ballots proactively in certain circumstances and to

require issuance of provisional ballots in others, *see* Ga. Comp. R. & Regs. § 183-

1-12-.18, the latest SOS 2020 Poll Worker Manual (in place during the June 2020

primary) quotes the *prior* version of the relevant SEB rule, which did not impose

these obligations. SAMF ¶¶ 361, 933-35. Voters continue to be turned away or

discouraged from voting provisionally. *Id*. ¶ 936. As the SOS Elections Director

admitted, the SOS "can do better" in training poll workers in the distribution of

provisional ballots. *Id*. ¶ 920.

---

[15] Notwithstanding substantial evidence regarding shortages of provisional ballots, Defendants have not provided standards for how many provisional ballots are "adequate." SAMF ¶¶ 945-54. The new SEB rules *still* do not provide any guidance. *See* Ga. Comp. R. & Regs. § 183-1-12-.18(3); Defs.' Br. 22-23. The June 2020 Primary showed that, even under the new regulation, polling places ran out of provisional ballots or envelopes. SAMF ¶¶ 955-56.

### 7. Hours-Long Waits to Vote

Repeating a now-familiar refrain, Defendants argue there is no evidence of widespread long lines at polling locations burdening the right to vote and, even if the lines exist, they are not indicative of Defendants' systemic failures. Defs.' Br. 31. Again, the record and applicable case law preclude summary judgment.

*First*, at minimum, genuinely disputed issues of material fact exist on the burden caused by long lines. The SOS knew turnout would be high in the 2018 election, but Defendants did nothing to prevent hours-long wait times. SAMF ¶¶ 322-72, 1061-67, 1071-82. Some voters waited *four-and-a-half hours* to vote, and those voters who could not wait that long left without voting at all. *Id.* ¶¶ 1083-117. Voters experienced even longer wait times during the June 2020 primary, and in some cases, were eventually unable to vote. *Id.* ¶¶ 1127-28.

*Second*, Defendants' only basis for disavowing responsibility for these wait times is *Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795 (11th Cir. 2017). Defs.' Br. 31. But unlike the *Kerr* defendants, Defendants had notice that long wait times prevented Georgians from voting in the past. SAMF ¶¶ 1065-67; *contra Kerr*, 856 F.3d at 820. Unlike the *Kerr* plaintiffs, Plaintiffs have pointed to specific deficiencies in Defendants' poll worker training and supervision, *contra Kerr*, 856 F.3d at 820: Rather than try to prevent hours-long waits, exacerbated by problems

with the voting machines Defendants require counties to use, Defendants' poll worker manual simply assumes that long lines are inevitable. SAMF ¶¶ 1074-76. And the manual offers almost no instruction on providing emergency paper ballots when voting machines malfunction, a deficiency confirmed by the fact that many poll workers did not provide these ballots. *Id.* ¶¶ 1122, 1125.

### B.   The Eleventh Amendment Does Not Bar Plaintiffs' Claim.

Defendants argue, erroneously, that the Eleventh Amendment bars Plaintiffs' fundamental right to vote claim as it relates to violations involving poll workers. Defs.' Br. 27-28. The Eleventh Amendment applies when the obligation allegedly violated by a state official "comes from state law" and the measure of relief "is determined by state law." *S & M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1205 (11th Cir. 2019). But Plaintiffs argue Defendants have violated the *federal* Constitution, *not* state law, and the measure of relief sought is that which the federal Constitution requires.

Of course state law—along with Defendants' own acknowledgements of their authority and Defendants' actions—is instructive in demonstrating Defendants' responsibility for the federal constitutional violations Plaintiffs identify. But courts routinely examine state statutes in § 1983 cases to determine whether a defendant bears responsibility for acts that are illegal under federal law

without finding any Eleventh Amendment concerns. *See Teagan v. City of McDonough*, 949 F.3d 670, 675 (11th Cir. 2020); *Weaver v. Tillman*, No. CIV.A. 05-0449-WS-B, 2006 WL 1889565, at *10 (S.D. Ala. July 10, 2006), *aff'd sub nom. Weaver v. Mobile Cnty.*, 228 F. App'x 883 (11th Cir. 2007); *United States v. City of Yonkers*, 96 F.3d 600, 618 (2d Cir. 1996); *see also Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1207-12 (11th Cir. 2020).

If Defendants' interpretation of the Eleventh Amendment were correct, any state defendant could stymie a federal court's power to enjoin federal constitutional violations simply by raising a dispute as to their responsibility for the violation under state law. The law is sensibly to the contrary.[16]

## II.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Claim That the Voter Purge Violates Procedural Due Process Requirements.

A § 1983 procedural due process claim consists of three elements: "(1) a deprivation of a constitutionally protected liberty interest; (2) a state action; and (3) constitutionally inadequate process." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1337 (N.D. Ga. 2018) (citing *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).

---

[16] Defendants are of course not immune from federal constitutional liability simply because their conduct *also* violates state law. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984); *Alberti v. Sheriff of Harris Cnty.*, 937 F.2d 984, 995 (5th Cir. 1991).

With good reason, Defendants do not appear to contest the first two elements: Purged voters are deprived of their constitutionally protected interest in voting, *see, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966), and the voter purge is directly implemented by the SOS, *see* O.C.G.A. §§ 21-2-233 to -235; SAMF ¶¶ 624, 630.[17] As to the third element—"constitutionally inadequate process"—courts consider three factors together: (1) the private interest affected; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the burdens that additional or substitute procedural requirements would entail. *J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2013). Defendants wrongly argue Plaintiffs have insufficient evidence to put this element in dispute. Defs.' Br. 37-39.

*First*, Defendants correctly concede the private-interest factor weighs in Plaintiffs' favor, *id.* at 37: the purge "implicates the individual's fundamental right to vote and is therefore entitled to substantial weight." *Martin*, 341 F. Supp. 3d at

---

[17] Defendants are wrong to assert that no burden arises from being moved to "inactive" status. Defs.' Br. 37. "Inactive" voters are not sent precinct cards notifying them of where to vote; they were not sent absentee ballot applications in the June 2020 primary; and they are not counted in supply requirements that end up leading to severe shortages of ballots. SAMF ¶¶ 789, 1014; O.C.G.A. § 21-2-235(a).

1338; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018).

*Second*, Defendants assert the "risk of erroneous deprivation is minimal," Defs.' Br. 38, but this is hotly disputed. For one, the purge erroneously cancels eligible voters—more than 70,000 voters in 2019 alone. SAMF ¶¶ 672, 703-11. Indeed, the majority of purged voters who were designated inactive for "No Contact" had *not* in fact moved, *id.* ¶ 708, and Defendants' implementation of the "NCOA" and "returned mail" proxies for movement has been riddled with error. *Id.* ¶¶ 636-82; *see also Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 295 (S.D.N.Y. 2020). This problem is compounded by Defendants' failure to notify voters that they need to confirm their addresses or re-register. SAMF ¶¶ 683-705. The cumulative result is that hundreds, if not thousands, of purged voters show up to vote without knowing they were purged. *Id.* ¶¶ 703-05; O.C.G.A. § 21-2-418.[18]

*Third*, Defendants' argument as to the "Government's interest" is completely misdirected. *J.R.*, 736 F.3d at 966. Defendants tether their entire argument to their interest in avoiding same-day voter registration, Defs.' Br. 38-39, ignoring that available forms of relief other than same-day voter registration easily put this factor in dispute. *See* Am. Compl. 74-75, 89, ECF No. 41. Two examples

---

[18] Defendants appear to concede that additional procedural safeguards would have value. *See* Defs.' Br. 37-39.

of procedural protections prove this point:

Notice via phone or email where available. Defendants recognize that using the telephone numbers and email addresses they already have to provide more meaningful forms of notice would not be unduly burdensome. Even the SOS Elections Director has recommended this action, expressly taking into account its estimated "cost." SAMF ¶ 701. Moreover, Defendants have already required notification of voters by email and phone in other contexts. Ga. Comp. R. & Regs. § 183-1-12-.18(13) (provisional ballots); *id*. § 183-1-14-.13 (absentee ballots).

Count provisional ballots submitted by purged voters who have not moved. The current provisional-ballot procedures already impose the same government burdens as would be necessary to count these ballots. When a purged voter casts a provisional ballot, he or she must "complete an official voter registration form," which includes the voter's address; provide identification; and swear an oath that he or she meets all criteria for voting (including residency). O.C.G.A. § 21-2-418. Officials must then investigate the voter's registration status. SAMF ¶¶ 902-07. Purged voters "are not deleted or removed from the registration system," Defs.' Br. 18 n.17, so officials already have all the information they need to verify that an eligible voter was erroneously purged and fix the problem by counting the vote.

Ultimately, the government's interests are in removing ineligible voters from

the rolls and facilitating registration for eligible ones. SAMF ¶ 721. Additional

procedural protections serve those interests. *See Martin*, 341 F. Supp. 3d at 1340.

### III.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Claim That Defendants Violated Section 2 of the VRA.

Defendants argue "undisputed" facts demonstrate that Georgia's election

administration does not violate Section 2 of the VRA. Defs.' Br. 40. The factual

record does not sustain that conclusion.

The VRA was passed to remedy decades of systematic discrimination

against Black voters throughout parts of the United States, including Georgia.

*Katzenbach*, 383 U.S. at 310. Section 2 of the VRA provides no "standard,

practice, or procedure shall be imposed or applied by any State . . . in a manner

which results in a denial or abridgement of the right of any citizen of the United

States to vote on account of race or color." 52 U.S.C. § 10301(a). In determining

whether a Section 2 vote denial claim has been proven, "a court must assess the

impact of the contested structure or practice on minority electoral opportunities 'on

the basis of [the] objective factors'" set forth in *Thornburg v. Gingles*. 478 U.S. 30,

44 (1986) (citation omitted). A showing of discriminatory effect, not intent, is

alone sufficient to prove a violation of Section 2. *Id.* at 35; *Nipper v. Smith*, 39

F.3d 1494, 1514 (11th Cir. 1994) ("[C]ertain practices and procedures that result in

the denial or abridgment of the right to vote are forbidden even though the absence

of proof of discriminatory intent . . . protects them from constitutional challenge."
(quoting *Chisom v. Roemer*, 501 U.S. 380, 383-84 (1991))).

The circuits that have addressed the vote denial standard have coalesced
around a two-part test[19]: (1) whether the challenged measure "impose[s] a
discriminatory burden on members of a protected class" that gives them "less
opportunity" to vote; and (2) whether that burden is "in part . . . caused by or
linked to social and historical conditions that have or currently produce
discrimination against members of the protected class." *Veasey v. Abbott*, 830 F.3d
216, 244 (5th Cir. 2016); *accord Ohio Democratic Party v. Husted*, 834 F.3d 620,
636-37 (6th Cir. 2016); *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366,
378-79 (9th Cir. 2016); *League of Women Voters of N.C. v. North Carolina*, 769
F.3d 224, 240 (4th Cir. 2014). On both prongs, genuinely disputed issues of
material fact exist.

---

[19] The Seventh Circuit's Section 2 vote denial standard is not substantively
different. *See Luft v. Evers*, 963 F.3d 665, 672-73 (7th Cir. 2020). The existence of
a circuit split on the standard, *see* Defs.' Br. 41—if any—is thus immaterial.

## A. Genuine Issues of Fact Exist Regarding Disparate Impact.

### 1. Polling Place Changes[20]

Defendants argue that there is no disparate racial impact, at all, from the closures of nearly five hundred polling places,[21] and relocation of polling places for over 650,000 voters, in just four years. Defs.' Br. 45. The evidence is to the contrary: Black voters' polling places changed at higher rates than those of white voters, and Black voters who had their polling places change voted less than voters whose polling places stayed the same. SAMF ¶¶ 1037-42. Rather than address this evidence, Defendants cherry-pick the one data point they believe shows a disparate impact on white voters. Defs.' Br. 43. In doing so, they miss the larger picture: *Overall* 2018 turnout—*i.e.*, in-person Election Day voting, as well as early and absentee voting—for white voters whose polling places changed was higher than turnout for Black voters. SAMF ¶ 1042. A reasonable factfinder could infer that in 2016 and 2018, white voters with new polling places simply chose to vote absentee

---

[20] Plaintiffs do not premise their Section 2 claim on wait times, *contra* Defs.' Br. 45-46, but *Defendants* have linked the number of polling places in a county to the hours-long lines Georgia voters face. As Chris Harvey testified, "encouraging [counties] to expand polling places and add polling places is directly responsive to trying to keep lines down." SAMF ¶ 1066 n.9.

[21] The number of closed polling places is nearly a fifth of the 2,300 polling places Georgia currently has.

or early more frequently than they did in 2014. A factfinder, however, could not draw the same inference about Black voters whose polling places changed, because they voted less across the board.

In any event, the parties have submitted dueling expert opinions on what the polling place data shows. *See* Defs.' Br. 43 & n.34. This conflicting evidence forecloses summary judgment. *See Southard v. State Farm Fire & Cas. Co.*, No. 4:11-CV-243, 2013 WL 209224, at *14 (S.D. Ga. Jan. 17, 2013).

### 2. Absentee Ballot Rejections

Defendants acknowledge "evidence showing at least *some* racial disparities" in Georgia's absentee ballot rejection rate. Defs.' Br. 43. And with good reason: the overall rejection rate for Black voters was over 150% of the rejection rate for white voters in the 2018 general election, Merits SMF ¶ 186, and among counties that rejected any absentee ballots in the 2018 general election, *70%* rejected absentee ballots cast by Black voters at a higher rate than those cast by white voters, SAMF ¶ 900. Defendants nonetheless claim their actions had nothing to do with these widespread disparities, and that "age, voting experience, or several other categories besides race" could have caused the disparity. Defs.' Br. 44-45. They also insinuate that HB 316 could have affected this analysis. *Id.* at 44 n.25. But Defendants' disagreement about how to interpret this evidence of disparity—a

disagreement supported only by speculation—underscores the existence of a disputed issue of material fact here. *See St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

### 3. Exact Match

Defendants do not dispute the evidence that Exact Match disparately affects voters of color. Defs.' Br. 45. Again, with good reason: Asian and Pacific Islander registrants make up only 2.4% of active Georgia registrants, but comprise 23.2% of applicants flagged as non-citizens. SAMF ¶ 607. Latinx registrants make up a mere 3.3% of all active registrants, but 20.9% of applicants flagged as non-citizens. *Id*. Non-Latinx white applicants, meanwhile, are dramatically underrepresented among those flagged for non-citizenship. *Id.* Applicants of color are also six to ten times more likely to be in MIDR status. *Id*. ¶ 606. Black registrants comprise 30% of active registrants, but 69% of applicants in MIDR status. *Id*. ¶ 607.[22]

---

[22] Of the 2014-2019 non-citizen flags, 99% resulted from a non-match with DDS data. SAMF ¶ 496. Given SOS employees' admissions that Exact Match can erroneously flag citizens as non-citizens, *id*. ¶¶ 440-42, 448; the fact that voters of color are more likely to be flagged as non-citizens than white voters, *id*. ¶¶ 600-05, 607; and Georgia's sizeable population of voting-age people of color who are naturalized citizens, *id*. ¶ 439, a reasonable factfinder should conclude that Exact Match disproportionately flags *citizen* voters of color as non-citizens.

Defendants instead argue for summary judgment because Plaintiffs' expert did not address the cause of this disparate impact. Defs.' Br. 45. Plaintiffs, however, need only show Exact Match disparately affected voters of color, and Defendants concede Plaintiffs have done so. Defendants also wrongly argue that none of Plaintiffs' declarants were "precluded from voting," *id.*, by Exact Match, *see* SAMF ¶¶ 516-24, 557. Besides, the VRA protects against the "denial *or abridgement*" of the right to vote, 52 U.S.C. § 10301(a) (emphasis added). Defendants ask the Court to "overlook the hurdles" Exact Match disproportionately forces voters of color to jump, simply because some voters are able to do so. *Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1263.

## B.  Historical Conditions

Defendants concede Georgia has "a long and sad history of racist policies in a number of areas including voting," Defs.' Br. 47 n.38, but claim Plaintiffs have not presented evidence connecting the challenged practices to that history. Again, disputed issues of material fact preclude summary judgment.

Georgia's history of disenfranchising voters of color dates back to the state's first constitution in 1777. SAMF ¶ 1131. That history runs through the 20th and 21st centuries, when Georgia legislators were some of the strongest opponents to the VRA; the State routinely refused to submit its voting laws for preclearance;

and, before *Shelby County*, the Department of Justice blocked 177 of Georgia's

proposed changes to election laws, finding that "each had a retrogressive impact on

voters of color in Georgia." *Id.* ¶¶ 1133-37.

That history resurfaces in Georgia's modern elections, in ways that satisfy

all *Gingles* "Senate factors" relevant to this case.[23] *See Gingles*, 478 U.S. at 45. For

Senate factor one, the evidence of Georgia's "history of official discrimination,"

*id.* at 36-37, in voting is extensive. SAMF ¶¶ 1131-37. For Senate factors two and

eight,[24] voting in Georgia elections is highly racially polarized, with nearly all

---

[23] The "Senate factors" are outlined in *Gingles*. 478 U.S. at 45 (citing S. Rep. No. 97-417, at 28-29 (1982)). Courts have recognized that some Senate factors are more relevant to vote denial claims than others. *See, e.g.*, *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012-14 (9th Cir. 2020); *Veasey*, 830 F.3d at 246-47; *Ohio Democratic Party*, 834 F.3d at 638; *League of Women Voters of N.C.*, 769 F.3d at 240. A recent decision from an Eleventh Circuit panel, *Greater Birmingham Ministries v. Secretary of State*, suggested the Senate factors might not be relevant to the vote denial claim before it, but did so in dicta. No. 18-10151, __ F.3d __, 2020 WL 4185801, at *24 (11th Cir. July 21, 2020). And though the panel acknowledged Section 2 requires an assessment of the "totality of the circumstances," and that the Senate factors can assist in that assessment, it did not explain how courts should otherwise make this assessment for vote denial claims. *Id.* at *21, *23. Nor did it distinguish, or acknowledge, the other circuit court decisions that have applied the Senate factors to vote denial claims.

[24] The Eleventh Circuit has observed that the "best evidence of [political responsiveness is] racially polarized voting patterns." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1573 (11th Cir. 1984).

Black voters voting for Democratic politicians in federal and state elections, and nearly all white voters voting for Republican politicians. *Id.* ¶¶ 1138-40. For Senate factor five, Black Georgians have worse health, employment, and education outcomes than white Georgians.[25] *Id.* ¶¶ 1141-46. For Senate factor six, politicians in Georgia have run overtly anti-Black and anti-immigrant campaigns as recently as this year, and have passed explicitly anti-immigrant legislation. *Id*. ¶¶ 1147-56. And for Senate factor nine, Defendants do not offer *any* rationale for disproportionately closing and moving Black voters' polling places, disproportionately rejecting Black voters' absentee ballots, or disproportionately flagging voters of color in Exact Match. *See supra* at 19, 30, 43.

Unable to deny the myriad ways in which Georgia elections, past and present, have been tainted by the State's racism, Defendants instead argue that Plaintiffs have not adduced evidence linking the State's racist history to the challenged practices. Defs.' Br. 46-48. Defendants are first wrong on the law: Given the holistic nature of Section 2's "totality of the circumstances" standard,

---

[25] The Eleventh Circuit has recognized that "socioeconomic disadvantages" arising from past discrimination can be "important evidence of . . . discriminatory results," because they "can reduce participation and influence in political affairs." *Marengo Cnty. Comm'n*, 731 F.2d at 1567; *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018).

and the wide-ranging nature of the Senate factors' analysis, courts do not confine their review under Section 2 to only the specific challenged practice's history. *See, e.g.*, *Hobbs*, 948 F.3d at 1026; *Veasey*, 830 F.3d at 257-58; *Marengo Cnty. Comm'n*, 731 F.2d at 1567-68. Defendants are also wrong on the facts: Plaintiffs have proffered expert testimony on Georgia's history of deliberately locating and closing polling places to deny Black people the franchise, disenfranchising Black voters by letting ballots go "unrecognized," and erecting barriers to registration, akin to Exact Match, for voters of color. SAMF ¶¶ 615-16, 1157-62.

## IV. Factual Disputes Preclude Summary Judgment on Plaintiffs' Equal Protection and Fifteenth Amendment Claims.

To prove Defendants' violations of the Fourteenth and Fifteenth Amendments, Plaintiffs must show discriminatory purpose and effect. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999). Plaintiffs need not prove Defendants acted *solely* to discriminate, but rather only that discriminatory purpose was "*a motivating factor*" for Defendants' actions. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (emphasis added). The discriminatory purpose analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. A "clear pattern" of disparate impact is itself sufficient to satisfy the purpose requirement. *I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014).

"[F]oreseeability" or "knowledge of discriminatory impact" and "the availability of less discriminatory alternatives" are also appropriate factors to evaluate discriminatory purpose. *Miccosukee Tribe of Indians of Fla. v. United States*, 722 F. Supp. 2d 1293, 1299 (S.D. Fla. 2010).

To withstand summary judgment, Plaintiffs need provide "very little" evidence of discriminatory purpose; "any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder.'" *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015). When evaluating a group of challenged practices, the court may consider evidence of discriminatory intent collectively. *See Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1408 n.15 (11th Cir. 1993); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1186 (11th Cir. 1983).

Defendants concede Plaintiffs have provided evidence of disparate impact regarding absentee ballot rejection rates, polling closures, and Exact Match. Defs.' Br. 33; *see supra* at 42-45. This stark evidence, alone, establishes at least a disputed issue of material fact as to discriminatory purpose. *See I.L.*, 739 F.3d at 1278. But Defendants claim "Plaintiffs have not shown evidence that the Defendants knew of the disparities and chose to ignore them." Defs.' Br. 33. Defendants do not state the correct standard, which looks to all available

49

"circumstantial and direct evidence of intent." *Arlington Heights*, 429 U.S. at 265-66. In any event, Defendants' assertion is false.

The SOS has been on notice of Exact Match's disproportionate effects for roughly a decade. In 2009, the Department of Justice informed the SOS that Exact Match "[did] not produce accurate and reliable information" and "[t]he impact of these errors falls disproportionately on minority voters." SAMF ¶¶ 407-08.[26] Voting rights groups and journalists continued to raise the alarm in the lead-up to the 2018 election. *Id*. ¶¶ 609, 613. The SOS's own analysis showed 69.96% of applicants with records pending for Exact Match in 2018 (unrelated to citizenship) were African American, and SOS employees have conceded the SOS was aware the applications failing verification reflected "a largely African American population." *Id*. ¶¶ 610, 612. When confronted by journalists, the SOS blamed those voters' use of handwritten applications. *Id*. ¶ 611. Now, heading into the 2020 election, the SOS continues to ignore that voters who fail the verification process experience undue burdens. The SOS refuses to implement basic changes that would reduce the severe effects of its flawed policy. *See supra* at 20. The

---

[26] The Department later agreed to preclear the process, but only on the basis of the SOS's claims that there would be daily monitoring of the voter verification process and prompt notice to applicants who could not be verified. SAMF ¶¶ 409-11.

record thus reflects both the disparate impact of Exact Match on voters of color *and* that the SOS, with full knowledge of that disparate impact, has willfully refused to resolve the problem.

Governor Brian Kemp, while the sitting SOS, confirmed the motivation to discriminate against voters of color that is behind Exact Match. At a July 2014 event, Kemp warned Democrats were being too successful in registering voters of color, stating: "[Y]ou know the Democrats are working hard, and all these stories about them, you know, registering all these minority voters that are out there and others that are sitting on the sidelines, if they can do that they can win this November. But we've got to do the exact same thing." Order 12-14, ECF No. 154. Defendants' attempt to spin this comment as "show[ing] political respect" for Plaintiffs' voter registration efforts, Defs.' Br. 33-34, does nothing but show a disputed issue of material fact.

Plaintiffs have also supplied evidence of discriminatory purpose concerning absentee ballot rejections. In 2018, Kemp expressed "concern" his opponent's "base" would successfully "use[] and exercise[] their right to vote" through absentee voting. Order 13, ECF No. 154. While Kemp was careful not to reference race expressly, his statement shows he had an incentive to discourage absentee voting among voters of color because he knew high absentee voting rates among

his Black opponent's base posed a political threat. This comment, combined with the evidence of disparate impact in absentee ballot rejection rates, SAMF ¶¶ 898-900, Kemp's earlier statement, and the SOS's other discriminatory decisions in the same time period, is more than sufficient to preclude summary judgment.

Discriminatory purpose can also be inferred from the SOS's promotion of polling places closures and relocations, and the SEB's failure to ensure the uniformity of these changes or their compliance with the VRA—actions which disproportionately burdened Black voters. The SOS's training was silent on counties' obligation under the VRA to ensure that Black voters would not bear the brunt of any changes to polling places. *Id*. ¶¶ 376-78, 1051-56, 1157-58. And despite Defendants' awareness that Black voters could be disparately harmed by these changes, *id*. ¶¶ 1044-48, the SOS did not stop Randolph County's planned reduction of polling places from nine—including seven polling places in majority-Black areas—to two, until after the plan became public and attracted negative media and public outcry. *Id*. ¶¶ 1007-08. Across the state, moreover, Defendants rarely did anything to prevent counties from closing and relocating polling places, even though these changes largely burdened Black voters. *Id*. ¶¶ 376-78, 998-1002, 1047-56, 1157-58. That Defendants have continued Georgia's historical pattern of using the location of polling places to disenfranchise Black voters further confirms

their discriminatory intent. *Id.* ¶¶ 1159-60; *see Arlington Heights*, 429 U.S. at 267.

## V.   Defendants Deny Voters Equal Protection on the Basis of Their Residence.

The Equal Protection Clause is violated when the "lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016). While some variance in election procedures between localities is constitutionally permissible, "arbitrary and disparate treatment" of voters in different parts of the jurisdiction is not. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Thus standards are unlawful if they produce "arbitrary and disparate treatment . . . valu[ing] one person's vote over that of another" depending on location. *Id.*

Following the 2000 presidential election and the *Bush* decision, election procedures were revised nationwide to include an increased emphasis on training. SAMF ¶ 246. These reforms established a "threshold foundation for training and holding election officials accountable that must be in place under the direction of the chief state election official to ensure elections are administered in a fair, uniform, and transparent manner." *Id.* (quoting Expert Report of K. Kennedy 5, ECF No. 167). This Court's decision in *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1325 (N.D. Ga. 2018), demonstrates the importance of *Bush*. In *Curling*, voters alleged Georgia's use of its direct recording electronic (DRE) voting systems—

required across Georgia, but in virtually no other states—burdened voters' Fourteenth Amendment rights. Applying *Bush*, this Court concluded the plaintiffs had "presented sufficient evidence so far that their votes cast by DRE may be altered, diluted, or effectively not counted on the same terms as someone using another voting method." *Id.* at 1324-25.

The SOS concedes that, as the State's chief election official, he has a "mandate" to obtain uniformity in county practices and procedures related to elections. SAMF ¶ 243; *see also* O.C.G.A. § 21-2-50; *Curling*, 397 F. Supp. 3d at 1345. Likewise, the SEB is directed by statute to "promulgate rules and regulations so as to obtain uniformity" in election practices and procedures. O.C.G.A. § 21-2-31(1). But Defendants have categorically failed in their duty to provide standards, training, and supervision to local election personnel that result in uniformity. Defendants' lack of guidance predictably leads to significant variation across the state that inevitably burdens Georgians' right to vote based on where they live. Indeed, Plaintiffs have produced evidence of non-uniformity at *every stage* of the voting process. Citing nothing, Defendants claim they are entitled to summary judgment on this claim. Defs.' Br. 35-36. They are wrong.

*First*, Plaintiffs' evidence shows Exact Match is applied differently across Georgia, creating a system where voters in some counties encounter significantly

higher barriers to registration than voters elsewhere. For instance, in the January 2020 voter file, nearly all of the voter registrants in "pending hearing" status are concentrated in Walton County. SAMF ¶ 621. Moreover, over two-thirds of registrants in MIDR status are located in just five counties that contain less than one-third of all registrants; the highest rate of voters in MIDR status (Fulton County, 3.22%), is *135 times* larger than the lowest rate (Treutlen County, 0.024%). *Id*. ¶ 622. Because of the lack of uniformity in counties' verification procedures, Georgians' ability to register is unevenly burdened depending on where they live.

Plaintiffs' evidence also shows that Georgians who successfully register are still at risk of being unable to vote based on geographical location. Between 2014 and 2018, 101 counties closed at least one polling place, while 58 counties closed none. *Id.* ¶ 1031. Among counties that closed polling locations, closure rates differed dramatically, with 18 counties closing at least half their polling places and 4 closing all their polling places. *Id*. ¶¶ 1032-33.[27]

---

[27] Thirty-one counties had no non-moving voters with relocated polling places. SAMF ¶ 1034. In sixteen counties, at least 50% of non-moving voters had their polling places change, while four counties relocated polling places for 100% of non-moving voters. *Id*. ¶ 1035. The remaining 112 counties relocated polling places for less than 50% of non-moving voters. *Id*. ¶ 1036.

Georgians in different counties also encounter different practices with respect to provisional ballots, yet Defendants do nothing. Depending on the county, poll workers have varying levels of training and engage in dramatically different approaches as to whether and when to offer provisional ballots. *Id*. ¶¶ 924, 984-87, 992. The SOS's own investigations and ensuing SEB enforcement actions demonstrate this. A 2016 investigation into Hancock County revealed that a poll worker had received *no instruction* on completing a provisional ballot. *Id*. ¶ 985. Other investigations revealed poll workers turning away voters without providing provisional ballots. *Id*. ¶¶ 911-13, 927-31.

In 2017, SEB members lamented the prevalence of improper provisional ballot practices by county election officials but took no action to rectify them. In 2018, SEB members repeated those laments, but the SEB did not issue any corrective rule or other guidance to the counties until 2020. *Id*. ¶¶ 929-36, 963-67. Even the SEB's corrective rule, however, does not address the root cause of the issues Defendants identified in 2017—ineffective and inconsistent training of poll workers and a lack of supervision by the SOS over the counties' provisional ballot processes. Further, the SOS's 2020 poll worker manual ignored the corrective rule and quoted the prior, obsolete rule. SAMF ¶¶ 361, 935.

Absentee ballot practices also vary widely, resulting in significantly different absentee ballot rejection rates depending on the county. *Id.* ¶¶ 896-97. County election officials are not informed when their absentee rejection rates are outliers, leading some counties to impose harsher standards than others. *Id.* ¶ 897.

Plaintiffs' evidence of lack of uniformity is similar to that which the United States Court of Appeals for the Sixth Circuit found could support a claim for violation of the Equal Protection Clause of the Fourteenth Amendment. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). Plaintiffs there argued that "Ohio's voting system arbitrarily denies its citizens the right to vote or burdens the exercise of that right based on where they live— 'county to county, city to city, and precinct to precinct'"—because of "non-uniform standards, processes, and rules," which included the state's failure to provide consistent instructions on and access to provisional voting, leading to disproportionately high rejection rates, and failure to give poll workers in some jurisdictions sufficient training, which produced downstream voting delays and ballot disqualifications. *Id.* at 466, 476. The Sixth Circuit concluded that "[i]f true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where

they live in violation of the Equal Protection Clause." *Id*. at 478. This Court should do the same.

Defendants also argue injury cannot be shown "since the enactment of HB 316," Defs.' Br. 35, essentially repeating the mootness argument from their jurisdictional summary judgment motion. Plaintiffs' response is the same: HB 316 provides no uniform standard for closing or moving polling places, no standard for which voter complaints are referred for investigation, and no uniform standard for training. Defendants claim Plaintiffs have not shown "Defendants caused differing policies to apply across the State." Defs.' Br. 35. This is also wrong. Defendants have an affirmative obligation to obtain uniformity in counties' election practices that they have not fulfilled. Instead, Defendants "ratified … uneven treatment." *Bush*, 513 U.S. 107. The SOS actively promoted the closure and relocation of polling locations, failed to ensure counties used uniform training to achieve uniform practices, and failed to monitor the counties' practices. SAMF ¶¶ 296-301, 331-40, 998-1002.

Plaintiffs' evidence creates genuine issues of material fact regarding their Equal Protection claims and summary judgment should be denied.

## VI.   Plaintiffs Do Not Seek an "Obey the Law" Injunction.

Defendants argue Plaintiffs seek a prohibited "obey the law" injunction,

Defs.' Br. 48-49—an argument directly at odds with their argument that Plaintiffs

ask this Court to rewrite Georgia's election laws and micromanage its elections.

The Court can remedy Defendants' unconstitutional conduct through an injunction

that is "specific and narrow enough that the parties would be afforded sufficient

warning to conform their conduct." *SEC. v. Graham*, 823 F.3d 1357, 1362 n.2

(11th Cir. 2016); *see* Order 53-53, ECF No. 68. In addition to enjoining

Defendants to provide uniform training to counties and poll-workers, illustrative

examples for each specific voter suppression practice include:

- Enjoining the SOS from enforcing the Exact Match protocol;
- Enjoining the SOS to ensure eNet accurately reflects voters' addresses;
- Enjoining the SOS from implementing unconstitutional voter purges for reason of "No Contact" and requiring Defendants to undertake additional procedural safeguards, including contacting voters by phone and email, and counting provisional ballots submitted by purged voters who did not change residency;
- Enjoining Defendants to ensure the prompt processing of absentee ballot requests and the provision of accurate information on absentee ballot status;
- Enjoining the SEB to require a minimum number of polling places per resident;
- Enjoining Defendants to expand and enforce minimum standards for the number of provisional ballots at each polling place; and
- Enjoining Defendants to address the hours-long waits voters face in Georgia elections, including by ensuring adequate poll worker training regarding election machines and sufficient election supplies including emergency ballots.

Remedies like those above stand in stark contrast to those rejected by courts

as merely commanding a defendant to "obey the law." *See, e.g.*, *SEC v. Goble*, 682 F.3d 934, 949-52 (11th Cir. 2012) ("[R]estrictions merely cross-reference[d] the relevant statutes and regulations."); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531-32 (11th Cir. 1996) (upholding injunction requiring defendant not to discharge storm water "if such discharge would be in violation of the Clean Water Act"). Instead, they are on par with the concrete election-administration remedies courts in this district have ordered. *See, e.g.*, *Curling*, 397 F. Supp. 3d at 1410-11 (voter list security and accuracy); *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1300-01 (N.D. Ga. 2018) (provisional ballot rejections); *Martin*, 341 F. Supp. 3d at 1341-42 (absentee ballot rejections).

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

This 29th day of July, 2020.   Respectfully submitted,

/s/ Allegra J. Lawrence
Allegra J. Lawrence (GA Bar No. 439797)

Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: (202) 479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275

61

beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson Street
Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac* vice)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillion.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali N. Bracey (Admitted *pro hac vice*)
Ishan K. Bhabha (Admitted *pro hac vice*)

**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 Fourteenth Street N.E.
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice*)
Paul M. Smith (Admitted *pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 Fourteenth Street NW
Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

63

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 29, 2020, I filed the within and foregoing

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (MERITS)** with

the Clerk of Court using the CM/ECF electronic filing system which will

automatically send counsel of record e-mail notification of such filing.

This the 29th day of July, 2020.

*/s/* Allegra J. Lawrence
Allegra J. Lawrence