**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**FAIR FIGHT ACTION, INC.,** *et al.,*

   **Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER,** *et al.,*

   **Defendants.**

**CIVIL ACTION FILE
NO. 1:18-CV-5391-SCJ**

## ORDER

This matter is before the Court on Defendants' Motion to Exclude the Testimony of Dr. Stephen C. Graves ("Dr. Graves") pursuant to Federal Rule of Evidence 702 (Doc. No. [400]) [1] and Plaintiffs' Motion to Exclude the Expert Testimony of Sean P. Trende ("Mr. Trende") (Doc. No. [443]). Mr. Trende was retained as a rebuttal witness to Dr. Graves—thus, the Court considers both motions here.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

## I.   BACKGROUND

### A.   Dr. Graves' Report

Dr. Stephen Graves is an academic and the Abraham J. Siegel Professor of Management at the Massachusetts Institute of Technology ("MIT"). Doc. No. [166], p. 52. He specializes in operations management and applied operations research. Id. Plaintiffs state that Dr. Graves has "four decades of experience teaching and researching operations management and applied operations, and nearly two decades providing advice on the effective administration of polling places." Doc. No. [472], p. 5. Plaintiffs seek to use his testimony to support their claim that polling place wait times disproportionately impact voters of color. See Doc. [80] at 2; Doc. [166] at 3.

Dr. Graves used election-day data from Fulton County, which was collected as part of a nationwide study conducted by the Bipartisan Policy Center ("BPC") and researchers MIT, "with an intent to estimate wait times at the polls during the 2018 midterms." Doc. No. [166], p. 3. The BPC/MIT report compiled data from 3,119 individual polling places across the country to measure wait times at the polls during the 2018 midterm elections. Id. at 26. It concluded that

2

Black and Hispanic voters wait longer to vote on average than white voters. Id. at 15.

Plaintiffs retained Dr. Graves to "ensure that nothing unique about Georgia causes it to deviate from the larger national trend of Black voters spending more time in lines," as "the BPC/MIT Report used a large, national dataset to obtain its results." Doc. No. [472], p. 7. Thus, "Plaintiffs obtained from Fulton County the same underlying data the County had provided to BPC/MIT and then provided that data to Dr. Graves." Id. Dr. Graves concluded that the general findings in the BPC/MIT report were accurate as they related to Fulton County. Doc. No. [166], p. 3. In summary, he concluded that, "[a]s shown in the BPC report, Fulton County, Georgia had the longest wait times of the 3,119 polling places surveyed nationwide." Id.

### 1.   *Defendants' Arguments*

Defendants argue that Dr. Graves' report is not admissible under Federal Rule of Evidence 702 for two reasons. Doc. No. [400], p. 5. First, they argue, Dr. Graves' report is not relevant to the issues before this Court because it focuses on one county, whereas Plaintiffs claims are about Georgia elections generally and state policymakers specifically. Id. Thus, his conclusions do not speak to state

action. Id. at 5, 7. They also argue that his report is not relevant to Plaintiffs' racial discrimination claims because "he does not assert that there is a statistically significant relationship between precinct wait times and the percentage of the associated electorate that is African American." Id. at 6.

Second, Defendants argue Dr. Graves' report is not reliable because the sample size he analyzed is insufficient to come to any significant conclusion. Id. This is because the report relies on data from only one election (2018), only 18% polling sites in Fulton County, and only about 7.2% of the ballots cast in Fulton County. Id. at 8. "Whatever the wait times in these handful of precincts in a single county during a single election, they are irrelevant to wait times for the State as a whole." Id.

### 2. *Plaintiffs' Response*

Plaintiffs argue that Dr. Graves' report is both relevant and reliable. While Defendants argue that Dr. Graves' report is irrelevant because it lacks a connection to any action taken by the State Defendants, Plaintiffs maintain that "Dr. Graves need not, as a condition to admissibility, single-handedly prove Plaintiffs' case . . . . His opinions are a piece—but not the whole—of Plaintiffs' evidence." Doc. No. [472], p. 10. Because the length of polling place lines lines

4

and their impact on Black voters is in dispute, they argue, Dr. Graves' testimony is relevant and helpful. Id. at 11.

Plaintiffs also argue that Dr. Graves' report is reliable. Id. at 12–18. "Dr. Graves' task was to analyze whether there is any reason to doubt that studies relying on large national data sets, such as the BPC/MIT Report, apply with equal force in Georgia." Id. at 12. To do this,

> Dr. Graves independently verified the Fulton County data, confirmed the BPC/MIT Report's findings are accurately stated for Fulton County, and found the Fulton County dataset to be consistent with the BPC/MIT Report's conclusion that average voter wait time grows as the percentage of Black voters in a precinct increases.

Id. at 8. Dr. Graves is qualified to conduct this analysis, they argue, as he "has forty-three years of experience analyzing operation management problems, such as how to minimize lines in service operations." Id.

Nor does the sample size render his report unreliable, Plaintiffs argue. Because Dr. Graves' task was to assess whether the Georgia data used in the BPC/MIT Report was consistent with its overall conclusions, Dr. Graves was

looked only the Georgia data used in the BPC/MIT Report.[2] Id. at 13. Regardless, they maintain, "[d]ata from sixty-eight polling sites, representing 59,000 voters, is not a 'small' sample." Id. Defendants' sample size arguments "misunderstand basic statistics," Plaintiffs argue, as "Dr. Graves made no claim about the statistical significance of the relationship between the Fulton County data set and the population as a whole . . . ." Id. at 15–16. Thus, he did not need to account for the sample size, as that is only necessary in calculating inferential statistics. Id. at 16.

Plaintiffs maintain Dr. Graves did not need to calculate the statistical significance of the relationship between the Fulton County dataset and the population as a whole because "ample empirical literature, such as the BPC/MIT Report, already shows a relationship between the percentage of Black voters at a precinct and average wait times." Id. "The purpose of Dr. Graves' analysis was to run a regression analysis on the Fulton County data to test whether what is true for the entire population of voters—that Black voters experience longer wait

---

[2]      "Nor did the size of the sample Dr. Graves analyzed even need to be large to be sound. Dr. Graves' opinion is that the Fulton County data set shows the same trend as does the national data set used in the BPC/MIT Report. The regression analysis he includes in his report demonstrates the accuracy of that assertion." Doc. No. [472], p. 14.

times at the polls — was likewise true for the available data from Fulton County."

Id.

### B.   **Mr. Trende's Report**

Defendants offer Mr. Trende as a rebuttal expert to Dr. Graves. Mr. Trende received a B.A. in in history and political science from Yale University, a J.D. from Duke University, a M.A. in political science from Duke University, and master's in applied statistics from The Ohio State University. Doc. No. [195], ¶¶ 6–9. He is currently a doctoral candidate in political science at The Ohio State University. Id. at 10. He assumed a fulltime position with the Washington, D.C.-based company RealClearPolitics in March of 2010. Id. ¶ 11. His title is Senior Elections Analyst. Mr. Trende "analyzed the only data presented by Plaintiffs about the length of time voters waited in line in Georgia," and concluded that "there was insufficient evidence to conclude that 'an increased African-American share of registered voters was associated with greater wait times.'" Doc. No. [195], ¶ 43.

### 1.   *Plaintiffs' Arguments*

First, Plaintiffs argue that Mr. Trende is not a qualified expert and should not be permitted to opine as a rebuttal expert on Dr. Graves' study design and conclusions. Doc. No. [443-1], p. 7. Plaintiffs note that Mr. Trende does not yet

7

have his Ph.D. and is not a professor. Id. Rather, Mr. Trende "is a former lawyer, now a political commentator for a right-leaning media company." Id. Plaintiffs assert that Mr. Trende is not qualified because has "never generated or reviewed academic research," "has never been asked to peer review the work of others," and "has never had a peer-reviewed publication or even developed a hypothesis for peer review." Id. at 13. Plaintiffs recognize that one need not be a professor or Ph.D. to qualify as an expert witness. However, Plaintiffs argue that because Mr. Trende "has never designed a research question suitable for peer review and academic publication and has no experience reviewing the research design of others and assessing their methodology," he is not qualified to comment on Dr. Graves' methodology or conclusions.[3] Id. at 20.

### 2.   Defendants' Response

Defendants argue that "Mr. Trende is well-qualified, his expert methods are generally accepted in his field, and his analysis is highly relevant to the case at bar both in a general sense and for the purpose of rebutting the testimony of

---

[3]     Plaintiffs note that they "are not arguing that an expert witness must always have a Ph.D., hold a tenure-track professorship, or have a certain number of peer-reviewed studies," however, "here, where Mr. Trende is offered to rebut the research methodology of a prominent professor, Mr. Trende should be experienced in peer reviewing such methodology." Doc. No. [443-1], p. 20.

Dr. Graves." Doc. No. [485], p. 2. First, they argue Mr. Trende is qualified because his "academic credentials and practical experience are more than sufficient to allow him to testify in this case." Id. Though he is not a tenured professor, Defendants note that "he teaches college courses in his areas of proffered expertise," id., and that Daubert "does not require that the proffered expert has been subjected to some kind of peer-review process." Id. at 7 (citing Allison, 184 F.3d at 1312). Defendants also argue that Plaintiffs' criticisms of Mr. Trende's work at RealClearPolitics are nothing more than "unfounded attacks on the company itself" and do not go to the sufficiency of his qualifications. Id. at 2.

Second, Defendants argue, Mr. Trende used "one of the most widely used tests in all of statistics" in compiling his report. Id. "No one can reasonably dispute," they argue, "that the t-test or the non-parametric tests that Mr. Trende proposes, in either their 'one-tailed' or 'two-tailed' form, run afoul of any of the four Daubert reliability factors, because they are well-established tests." Id. at 11. Plaintiffs' argument, Defendants contend, is essentially that "a one-tailed test would be better than a two-tailed test." Id. at 12. However, they maintain "the two-tailed test proffered by Mr. Trende is perfectly acceptable," and any question

of which test is more accurate would be one for the finder of fact, not a Daubert

order. Id.

## II.    LEGAL STANDARD

### A.    The Gatekeeping Function of Trial Courts

Trial courts serve an important gatekeeping role regarding the

admissibility of expert testimony. See Daubert v. Merrell Dow Pharm., Inc., 509

U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific

testimony or evidence admitted is not only relevant, but reliable."); see also

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) ("The objective . . .

is to ensure the reliability and relevancy of expert testimony."). Thus, the trial

court must examine "the foundations of expert opinions to ensure they meet the

standards for admissibility." United States v. Frazier, 387 F.3d 1244, 1260 (11th

Cir. 2004) (emphasis omitted) (citing McCorvey, 298 F.3d at 1257).[4] However, the

_____

[4]     It is within the district court's discretion whether to hold a Daubert hearing to
help decide issues concerning an expert's adequacy to testify. See Cook ex rel. Estate of
Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005) ("Daubert
hearings are not required, but may be helpful in complicated cases involving multiple
expert witnesses.") (citation omitted). The Court held oral argument on all pending
motions to exclude expert testimony on September 22, 2020.

Eleventh Circuit has held that this standard is "relaxed" when no jury is involved:

> Th[e] barriers [of Rule 702] are even more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about dumping a barrage of questionable scientific evidence on a jury. There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.

United States v. Brown, 415 F.3d 1257, 1268–69 (11th Cir. 2005) (internal quotations and citations omitted).

### B.   Federal Rule of Evidence 702

Federal Rule of Evidence 702 allows a qualified expert to give opinion testimony when it is necessary to help the trier of fact understand the issues, the opinion is based on sufficient facts or data, it was produced using reliable principles and methods, and those principles and methods were reliably applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs a "rigorous" three-part inquiry to determine if these admissibility criteria are met. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the

11

> methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the
> sort of inquiry mandated in <u>Daubert</u>; and (3) the
> testimony assists the trier of fact, through the
> application of scientific, technical, or specialized
> expertise, to understand the evidence or to determine a
> fact in issue.

<u>Id.</u> Thus, the admissibility of an expert's opinion turns on three things: qualifications, reliability, and helpfulness. "The burden of establishing qualification[s], reliability, and helpfulness rests on the proponent of the expert opinion." <u>Frazier</u>, 387 F.3d at 1260; <u>see also</u> <u>Allison</u>, 184 F.3d at 1312 (stating that the proponent has the burden to show reliability by a preponderance of the evidence).

### 1.   *Qualifications*

An expert may be "qualified" in many ways. <u>Frazier</u>, 387 F.3d at 1260. Federal Rule of Evidence 702 makes clear that expertise can arise from "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The trial court must ensure that an individual's experience provides an appropriate foundation for asserting the opinions in question. <u>Frazier</u>, 387 F.3d at 1262. Determining that a witness is qualified to form an opinion, however, is a separate and distinct inquiry from whether that opinion has a reliable basis. <u>Quiet Tech.</u>

12

DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). In other words, a witness can be qualified yet offer unreliable testimony. Id. at 1342.

### 2.    Reliability

The reliability inquiry focuses solely on the principles and methodology underlying the expert's opinion, *not* the expert's conclusions. Daubert, 509 U.S. at 595. Thus, the question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable. Allison, 184 F.3d at 1312. Generally, if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis. Daubert, 509 U.S. at 592–93.

In Daubert, the Supreme Court discussed four factors that the trial court might consider in its reliability inquiry: (1) whether the methodology has been (or can be) tested, (2) whether the methodology has been subject to peer review, (3) whether the methodology has a high rate of error, and (4) whether or not the methodology is widely accepted within the scientific community. Id. at 593–94. This list, however, is not comprehensive. Id. at 593 ("Many factors will bear on the inquiry, and [there is no] definitive checklist or test."). The trial court is not limited to the Daubert factors and may consider other questions in light of the

13

specific facts of the case at hand. <u>Kumho</u>, 526 U.S. at 152 ("[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.") (emphasis omitted); <u>see</u> <u>also</u> <u>Allison</u>, 184 F.3d at 1312 (noting that the factors listed in <u>Daubert</u> were not exhaustive). Trial courts have considered other factors such as whether an expert relied on "anecdotal evidence (as in case reports), temporal proximity, [or] improper extrapolations (as in animal studies)." <u>Allison</u>, 184 F.3d at 1312.

Moreover, there is an important distinction between scrutinizing the reliability of an expert opinion's underlying methodology (or principles) and scrutinizing the expert's application of that methodology. <u>Quiet Tech.</u>, 326 F.3d at 1343.  Challenging the underlying methodology in general is an admissibility issue; challenging the expert's application of that methodology is an accuracy issue. <u>Id.</u> at 1344, 1344 n.11, 1345. Issues of accuracy are best resolved through cross-examination and the adversarial process. <u>Id.</u> at 1345; <u>see</u> <u>also</u> <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

14

### 3. *Helpfulness/Relevance*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person such that it is helpful to the trier of fact. Frazier, 387 F.3d at 1262. The testimony must also have a "valid scientific connection to the disputed facts in the case." Daubert, 509 U.S. at 591. The expert may be qualified and the basis for the opinion may be reliable, but if the opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. See id. ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted).

## III. <u>ANALYSIS</u>

The Court will first address Defendants' motion to exclude Dr. Graves' testimony and will then discuss Plaintiffs' motion to exclude Mr. Trende's rebuttal testimony.

### A. <u>Defendants' Motion to Exclude Dr. Graves' Testimony</u>

### 1. *Qualifications*

Defendants do not argue that Dr. Graves is unqualified to offer the proffered expert testimony. See Doc. No. [400], pp. 5–6. They do imply, however,

15

that his expertise is misplaced. See id. at 2 ("Dr. Graves has never taught a course on elections or elections management, and the only elections-related publication to his name was his contribution to a group report regarding the 2000 presidential election."). Because it is Plaintiffs burden to establish their expert is qualified, the Court will address Dr. Graves' qualifications. See Frazier, 387 F.3d at 1260 (noting the proponent of expert testimony bears the burden of satisfying the three Daubert factors).

Dr. Graves is the Abraham J. Siegel Professor of Management at MIT Sloan School of Management and has forty-three years of experience in operations management and applied operations research. Doc. No. [166], p. 52. A focus of his work is how to improve the efficiency and function of complex operations, including elections. He has been an active member and participant in the Caltech/MIT Voting Technology Project since its inception immediately after the 2000 election. Doc. No. [472-1], ¶ 5. His main contributions to this project have been "modeling a polling place as a queuing system, and then using queuing theory to improve the operations of polling places." Id. As part of that work, he designed and implemented a software tool to aid in the design and planning of polling places. Id.

16

Dr. Graves was retained to analyze whether the Fulton County wait time data from the BPC/MIT study was accurate in isolation, given that the study itself was a nationwide study. Doc. No. [166], p. 3. Given his experience in data analysis, modeling, and applied operations research relating to polling place wait times, the Court finds that Dr. Graves is qualified to offer this analysis.

## 2. _Relevance_

Plaintiffs claim that "unreasonably long lines" at busy polling places have prevented Georgians from exercising their right to vote. See, e.g., Doc. No. [40] (Amended Complaint), p. 52, ¶¶ 124–26. Again, because the BPC/MIT study on polling place wait times was a national study, Plaintiffs retained Dr. Graves to ensure that the data relating to Fulton County specifically was accurate. The Court finds that his testimony regarding wait times in Fulton County is relevant to Plaintiffs' claims that long lines have prevented or discouraged some Georgians from voting.

With approximately 1,063,937 residents, Fulton County is Georgia's largest. United States Census Bureau, County Population Totals: 2010-2019, Georgia (July 1, 2019) available at https://www2.census.gov/programs-surveys/popest/tables/2010-2019/counties/totals/co-est2019-annres-13.xlsx.

Dr. Graves analyzed data submitted by sixty-eight Fulton County polling sites, which represent 135 precincts. Doc. No. [163], p. 3. Over 59,000 voters voted at these polling sites on election day in 2018. Id. The Court finds that Dr. Graves' report need not speak to polling place wait times statewide to be relevant to Plaintiffs' claims. Plaintiffs state that Dr. Graves' "opinions are a piece—but not the whole" of their evidence on this point. Doc. No. [472], p. 10. Nor does the number of polling places represented in the data render the report irrelevant. Defendants' argument that the data is not sufficiently representative of Fulton County as a whole or the state of Georgia more generally is one for cross-examination.

### 3.    *Reliability*

Defendants argue that Dr. Graves' conclusions are unreliable for two reasons: (1) the sample size he analyzed is insufficient to come to any significant conclusion; and (2) Mr. Trende conducted tests on Dr. Graves' data and did not come to the same conclusions as Dr. Graves, "suggesting that such conclusions are unreliable." Doc. No. [400], p. 6. The Court will address these arguments in turn.

18

First, for similar reasons as those discussed <u>supra</u>, the Court finds that the sample size does not render Dr. Graves' conclusions unreliable. As Plaintiffs note, the purpose of a large sample size is to more accurately extrapolate findings to a larger population. <u>See</u> David M. Lane et al., Introduction to Statistics 24 (2003), http://onlinestatbook.com/Online_Statistics_Education.pdf ("Only a large sample size makes it likely that our sample is close to representative of the population. For this reason, inferential statistics take into account the sample size when generalizing results from samples to populations.") But Dr. Graves' report never attempts to generalize the data from Fulton County to make conclusions or inferences about larger, unsampled populations (say, the whole state of Georgia). [5]  The sample size has no bearing on whether the data from Fulton County in the BPC/MIT Report are accurate.

Relatedly, it is true that Dr. Graves made no factual finding that a statistically significant relationship exists between polling places' percentage of Black voters and their wait times. <u>See</u> Doc. No. [400-1] (Graves Dep. Tr.) 43:24–

---

[5]      In fact, Dr. Graves' report sought to do the inverse: "The purpose of Dr. Graves' analysis was to run a regression analysis on the Fulton County data to test whether what is true for the entire population of voters—that Black voters experience longer wait times at the polls—was likewise true for the available data from Fulton County." Doc. No. [472], p. 16.

44:5. But that is not what he was retained to do. Dr. Graves was retained to use his expertise to determine whether the "general findings in the BPC/MIT report, for the case of Fulton County in Georgia are accurately stated." Doc. No. [166], p. 3. The Court agrees that "Dr. Graves had no reason to calculate statistical significance because he never asserted the Fulton County data set, *on its own*, could demonstrate a statistically significant relationship between Black voter participation and wait times." Doc. No. [472], p. 16 (emphasis added).

Further, Defendants' argument that Mr. Trende's conclusions prove that Dr. Graves' conclusions are unreliable puts the cart before the horse. The Court discusses the admissibility of Mr. Trende's report and conclusions infra. Regardless, that opposing experts came to different conclusions is neither uncommon nor a valid reason for the Court to decide, at the Daubert stage, that one of the expert's opinions is inadmissible. See, e.g., Monroe Cty. Emp. Ret. Sys. v. S. Co., No. 1:17-cv-00241-WMR, 2019 WL 2482399, at *6 (N.D. Ga. June 12, 2019) (recognizing experts may disagree on which index to use and the choice of one over the other does not result in exclusion of the expert); Anderson v. Hunte Delivery Sys., Inc., No. 2:11-cv-355-TEM, 2012 WL 1392918, at *6 (M.D. Ala. Apr. 23, 2012) ("[T]he Defendants [sic] primary argument is that they disagree with

the Plaintiff's experts' opinions but fail to attack the methodology of the experts sufficiently to cause the Court to exclude them as expert witnesses."); Rollins v. State Farm Fire & Cas. Co., No. 4:10-cv-40-HLM, 2011 WL 13234741, at *7 (N.D. Ga. Feb. 2, 2011) (refusing to exclude an expert because other experts may disagree with his assessment). In fact, even Defendants' counsel characterized Mr. Trende's report as demonstrating an "alternative hypotheses." See Graves Dep. Tr. 52:14 –15; 53:2. That an alternative hypothesis may exist to explain the data does not render Dr. Graves' regression analysis methodology unreliable. Such arguments are well-suited for cross-examination. Quiet Tech., 326 F.3d at 1345 (citing Daubert, 509 U.S. at 596) (noting that flaws that allegedly "impugn the *accuracy* of results is precisely the role of cross-examination") (emphasis added)).

**B.    Plaintiffs' Motion to Exclude Mr. Trende's Rebuttal Testimony**

The Eleventh Circuit has explained that "[t]he purpose of rebuttal evidence is 'to explain, repel, counteract, or disprove the evidence of the adverse party,' and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge." United States v. Gold, 743 F.2d 800, 818 (11th Cir. 1984) (quoting United States v. Delk, 586 F.2d 513, 516 (5th Cir. 1978)).

### 1.   *Qualifications*

Plaintiffs argue that Mr. Trende is not qualified to opine on Dr. Graves' report, methodology, or conclusions. The Court agrees.

Of course, a proffered expert need not have a Ph.D. to be qualified. However, a witness offered as a rebuttal expert must be sufficiently qualified to opine on the opposing witness' report and conclusions. Mr. Trende has no experience in Dr. Graves' area of expertise (operations management and applied operations research); nor does he have experience in analyzing polling place operations. In fact, Mr. Trende has never authored or generated hypotheses for *any* academic research. Doc. No. [443-2] (Trende Dep.), 22:05–09; 23:21–24. He has never authored a peer-reviewed study or article and has never been asked to peer review the work of others. Id. 22:18–24. He is not even a political scientist, by his own admission. Id. 24:05–06.

Perhaps Mr. Trende would be qualified to testify on matters within his area of study—generally, "political history, United States voting laws, redistricting, and the study of campaigns and elections." Doc. No. [195], p. 1, ¶ 2. But the question before the Court is whether he is qualified to testify as a rebuttal witness on the data analysis relating to polling place wait times in Fulton County.

22

Because Mr. Trende has no experience in Dr. Graves' area of expertise, and no experience reviewing the research design of others and assessing their methodology more generally, the Court finds his expertise is not an "appropriate foundation for asserting the opinions in question." <u>Frazier</u>, 387 F.3d at 1262. Thus, he is not qualified to testify as an expert rebuttal witness to Dr. Graves.

## 2. *Relevance and Reliability*

Generally, "if testimony for one party was relevant, testimony for the other party on the same issue would be relevant and, *if* otherwise admissible, should not be excluded." <u>United States v. Frazier</u>, 387 F.3d 1244, 1270 (11th Cir. 2004) (emphasis added) (citing <u>United States v. Gaskell</u>, 985 F.2d 1056, 1063 (11th Cir. 1993)). However, because the Court has determined that Mr. Trende is not qualified to testify as a rebuttal expert to Dr. Graves, his testimony is not "otherwise admissible." The Court need not address the reliability of the methods utilized in his report.

## IV.   <u>CONCLUSION</u>

For the forgoing reasons, Defendants' Motion to Exclude the Testimony of Dr. Stephen C. Graves ("Dr. Graves") pursuant to Federal Rule of Evidence 702 (Doc. No. [400]) is **DENIED**. Defendants' arguments regarding the accuracy of

Dr. Graves's report and the weight this Court should assign to it are left for cross-examination and trial. Plaintiffs' Motion to Exclude the Expert Testimony of Sean P. Trende ("Mr. Trende") (Doc. No. [443]) is **GRANTED**.

      **IT IS SO ORDERED** this   16th  day of November, 2020.

                      s/Steve C. Jones
                      **HONORABLE STEVE C. JONES**
                      **UNITED STATES DISTRICT JUDGE**