IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **FAIR FIGHT ACTION, INC., et al.,**  Plaintiffs,  v.  **BRAD RAFFENSPERGER, et al.,**  Defendants. | **CIVIL ACTION FILE NO.**  **1:18-CV-5391-SCJ** |

### ORDER

This matter appears before the Court on Defendants' Motion to Exclude Testimony of Dr. Michael McDonald ("Dr. McDonald"). Doc. No. [402].[1] On September 22, 2020, the Court held oral argument on all pending motions to exclude expert testimony. It took those motions under advisement, and now issues the following Order.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

**I. BACKGROUND**

Dr. McDonald is an Associate Professor of Political Science at the University of Florida. Doc. No. [240], p. 2. He is "widely regarded as a leading expert on United States elections." Id. He has published peer-reviewed articles on the reliability of voter registration files and has testified or submitted expert reports in numerous election-related cases. Id. Dr. McDonald is one of Plaintiffs' designated experts in the case *sub judice*. He is "expected to testify about the Secretary of State's purge or cancellation of registered voters in Georgia, the bases for such action, and the identity and status of those registered voters affected by such action." Doc. No. [193], p. 2.[2] As stated by Plaintiffs, he offers his opinions

---

[2] The Court recognizes that the parties continue to dispute whether the word "purge" or "cancel" is correct in describing the voter list maintenance process at issue in this litigation. In the preliminary injunction context, the Court recognized Defendants' evidence and argument that use of the word "purge" (as well as the word "remove") is not correct. Doc. No. [188], p. 1, n.1. However, in their response briefing for the pending motion to exclude, Plaintiffs argue that Defendants' preferred term (i.e., "voter-list maintenance") "fails to describe or reflect the impact of the cancellation on the voter's registration or the voter's right to vote." Doc. No. [476], p. 8, n.1. Plaintiffs also indicate that "purge list" is a "commonly used term" in relevant literature and their expert, Dr. McDonald, indicates that the term "purge" is "shorthand." Doc. No. [402-1], McDonald Dep. 28:25. There is merit in each of the parties' arguments. For purposes of this Order, the Court alters its prior ruling in the preliminary injunction context and will attempt to use all of the contested terms, i.e., "purge," "canceled," "removal," and "voter list maintenance" to refer to the statutory process at issue in which an "elector shall be removed from the inactive list of electors." O.C.G.A. § 21-2-235(b).

2

of the reliability of a list of "over 300,000 Georgia voter registrants whom the Georgia Secretary of State (SOS)'s office purged or cancelled from the Georgia voter registration database." Doc. No. [473], p. 5.

### A. Removal from the Inactive List of Electors

The process for a voter to be "removed from the inactive list of electors" is statutorily provided for in O.C.G.A. § 21-2-235(b) which states in relevant part:

> (b) An elector placed on the inactive list of electors shall remain on such list until the day after the second November general election held after the elector is placed on the inactive list of electors. If the elector makes no contact, as defined in Code Section 21-2-234, during that period, **the elector shall be removed from the inactive list of electors**. Not less than 30 nor more than 60 days prior to the date on which the elector is to be removed from the inactive list of electors, the board of registrars shall mail a notice to the address on the elector's registration record. (emphasis added).

### B. Dr. McDonald's Reports

Dr. McDonald has prepared two reports for this case and provided testimony in the context of a 2019 preliminary injunction hearing. Doc. Nos. [84]. [240], and [293].

As correctly stated by Defendants, Dr. McDonald's methodology involved employing the service of two data vendors to match the voter maintenance list

3

against the US Postal Services' national change of address (NCOA) files. Doc. No. [402], p. 7; see also Doc. No. [240], p. 12. Dr. McDonald described the vendors as "the most well-established national voter registration list vendors, L2 and TargetSmart." Doc. No. [240], p. 12.

In his first report, Dr. McDonald concluded "[i]f the list vendors' NCOA match is accurate, it my opinion that the Georgia Secretary of State's Office cancelled the registrations of, conservatively estimated 59,866 No Contact registrants who continue to reside at their current voter registration address." Doc. No. [240], p. 18. He also concluded that "the Georgia Secretary of State's NCOA matching procedures may identify too many registrants as having filed an NCOA form with the Office" and that "[t]wo data vendors cannot find NCOA matches for nearly 14,732 registrants whom the Georgia Secretary of State's Office canceled based upon an alleged NCOA match." Id.

### C. Defendants' Arguments

Defendants state that they are not challenging Dr. McDonald's expertise in the field of election administration. Doc. No. [402], p. 11. "Defendants challenge the reliability of Dr. McDonald's methodology and his reliance on the work performed by the two voter list vendors he utilized in his analysis." Id.

4

Defendants assert that Dr. McDonald himself "calls into question the reliability or accuracy of the data his own vendors generated" by using the language "[i]f the list vendors' NCOA match is accurate" in his report. Doc. No. [514], p. 2. Defendants state that they "are not challenging the accuracy or validity of the application of Dr. McDonald's methodology. Rather, Defendants are contesting the foundation of his methodology, which is dependent on the NCOA match lists prepared by two vendors." Id. p. 4.

Defendants also assert that Dr. McDonald's testimony would prejudice the jury. Doc. No. [402], p. 15.

### D. Plaintiffs' Response

In their response brief, Plaintiffs assert that Dr. McDonald employs reliable methodologies to support his conclusions and his opinions will assist the trier of fact. Doc. No. [473].

## II. LEGAL STANDARD

### A. The Gatekeeping Function of Trial Courts

Trial courts serve an important gatekeeping role regarding the admissibility of expert testimony. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) ("The objective . . . is to ensure the reliability and relevancy of expert testimony."). Thus, the trial court must examine "the foundations of expert opinions to ensure they meet the standards for admissibility." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis omitted) (citing McCorvey, 298 F.3d at 1257).[3] However, the Eleventh Circuit has held that this standard is "relaxed" when no jury is involved:

> Th[e] barriers [of Rule 702] are even more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about dumping a

---

[3] It is within the district court's discretion whether to hold a Daubert hearing to help decide issues concerning an expert's adequacy to testify. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005) ("Daubert hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses.") (citation omitted). The Court held oral argument on all pending motions to exclude expert testimony on September 22, 2020.

> barrage of questionable scientific evidence on a jury. There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.

United States v. Brown, 415 F.3d 1257, 1268–69 (11th Cir. 2005) (internal quotations and citations omitted).

## B. Federal Rule of Evidence 702

Federal Rule of Evidence 702 allows a qualified expert to give opinion testimony when it is necessary to help the trier of fact understand the issues, the opinion is based on sufficient facts or data, it was produced using reliable principles and methods, and those principles and methods were reliably applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs a "rigorous" three-part inquiry to determine if these admissibility criteria are met. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

7

Id. Thus, the admissibility of an expert's opinion turns on three things: qualifications, reliability, and helpfulness. "The burden of establishing qualification[s], reliability, and helpfulness rests on the proponent of the expert opinion." Frazier, 387 F.3d at 1260; Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (stating that the proponent has the burden to show reliability by a preponderance of the evidence).

### 1. *Qualifications*

An expert may be "qualified" in many ways. Frazier, 387 F.3d at 1260. Federal Rule of Evidence 702 makes clear that expertise can arise from "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The trial court must ensure that an individual's experience provides an appropriate foundation for asserting the opinions in question. Frazier, 387 F.3d at 1262. Determining that a witness is qualified to form an opinion, however, is a separate and distinct inquiry from whether that opinion has a reliable basis. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). In other words, a witness can be qualified yet offer unreliable testimony. Id. at 1342.

### *2. Reliability*

The reliability inquiry focuses solely on the principles and methodology underlying the expert's opinion, *not* the expert's conclusions. Daubert, 509 U.S. at 595. Thus, the question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable. Allison, 184 F.3d at 1312. Generally, if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis. Daubert, 509 U.S. at 592–93.

In Daubert, the Supreme Court discussed four factors that the trial court might consider in its reliability inquiry: (1) whether the methodology has been (or can be) tested, (2) whether the methodology has been subject to peer review, (3) whether the methodology has a high rate of error, and (4) whether or not the methodology is widely accepted within the scientific community. Id. at 593–94. This list, however, is not comprehensive. Id. at 593 ("Many factors will bear on the inquiry, and [there is no] definitive checklist or test."). The trial court is not limited to the Daubert factors and may consider other questions in light of the specific facts of the case at hand. Kumho, 526 U.S. at 152 ("[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular

9

case is a matter that the law grants the trial judge broad latitude to determine.") (emphasis omitted); see also Allison, 184 F.3d at 1312 (noting that the factors listed in Daubert were not exhaustive). Trial courts have considered other factors such as whether an expert relied on "anecdotal evidence (as in case reports), temporal proximity, [or] improper extrapolations (as in animal studies)." Allison, 184 F.3d at 1312.

Moreover, there is an important distinction between scrutinizing the reliability of an expert opinion's underlying methodology (or principles) and scrutinizing the expert's application of that methodology. Quiet Tech., 326 F.3d at 1343. Challenging the underlying methodology in general is an admissibility issue; challenging the expert's application of that methodology is an accuracy issue. Id. at 1344, 1344 n.11, 1345. Issues of accuracy are best resolved through cross-examination and the adversarial process. Id. at 1345; see also Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

### 3. *Helpfulness/Relevance*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person such that it

is helpful to the trier of fact. Frazier, 387 F.3d at 1262. The testimony must also have a "valid scientific connection to the disputed facts in the case." Daubert, 509 U.S. at 591. The expert may be qualified and the basis for the opinion may be reliable, but if the opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. See id. ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted).

## III. ANALYSIS

Defendants do not argue that Dr. McDonald is unqualified to testify as an expert in the area of election administration. Doc. No. [402], p. 2. Thus, the Court addresses the grounds of their motion in three sections: reliability/methodology, prejudice, and helpfulness. Id.

### A. Reliability/Methodology

As stated above, Defendants assert that Dr. McDonald's methodology is based on speculation and is fatally flawed under Daubert. Doc. No. [402], p. 12. According to Defendants, "[t]he problem with Dr. McDonald's conclusion is that he himself calls into question the reliability or accuracy of the data his own vendors generated." Doc. No. [514], p. 2. Defendants state that "Dr. McDonald's

11

reliance on unproven data is the very 'unscientific speculation' Daubert warns against." Id. at p. 2. Defendants further state that "Dr. McDonald himself conditions the very foundation of his opinions on data he is unable to confirm." Id. at p. 3. Defendants also state that "Dr. McDonald's conclusions that the State matching procedure 'may' identify too many registrants or 'may be too aggressive' are not valid scientific conclusions, but rather, mere conjecture." Doc. No. [514], p. 5. Defendants cite the case of: Owens v. Stifel, Nicolaus & Co., No. 7:12-CV-144 HL, 2014 WL 948527, at *4 (M.D. Ga. Mar. 11, 2014) in support of their argument. In Owens, the district court stated: "[w]ith respect to expert opinions, the law is clear that an opinion that is speculative or conjectural does not satisfy Rule 702. Thus, 'proffered expert testimony should be excluded if it is speculative or conjectural.'" (citations omitted).

After review, the Court declines to uphold Defendants' arguments as it has been held that "an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility. 'Our system relies on cross-examination to alert the [trier of fact] to the difference between good data and speculation.'" Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796, 809 (7th

Cir. 2013) (citations omitted).[4] Further, "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." Williams v. Illinois, 567 U.S. 50, 57 (2012); see also Companhia Energetica Potiguar v. Caterpillar Inc., No. 14-CV-24277, 2016 WL 11547499, at *12–13 (S.D. Fla. June 13, 2016), *report and recommendation adopted*, No. 14-24277-CIV, 2016 WL 7497339 (S.D. Fla. Sept. 20, 2016) ("The mere fact that he did not independently confirm that certain events described in documents actually occurred is not a sufficient ground to justify an order excluding his expert testimony.").

### B. Prejudice

The following authority controls Defendants' prejudice argument:[5]

> excluding relevant evidence on the basis of "unfair prejudice" [in a bench trial] is a useless procedure. Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw

---

[4] It has also been held that "[t]he district court usurps the role of the [trier of fact], and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." Manpower, 732 F.3d at 806.

[5] The Court recognizes that Defendants' motion was filed prior to Plaintiffs' filing of their motion to strike jury demand. Doc. No. [465].


> from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision.

Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir. 1981).[6]

### C. Helpfulness

Defendants assert that Dr. McDonald's "conclusions are simply too speculative to be helpful to the trier of fact and fail under the third requirement of Daubert." Doc. No. [514], p. 8. After review, the Court finds that Plaintiffs' proffer of evidence concerning Dr. McDonald's testimony meets the above-stated helpfulness standard.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude Testimony of Dr. Michael McDonald (Doc. No. [402]) is **DENIED**.

**IT IS SO ORDERED** this 2nd day of December, 2020.

s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

14