# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC; CARE IN ACTION, INC; EBENEZER BAPTIST CHURCH OF ATLANTA, GEORGIA, INC.; BACONTON MISSIONARY BAPTIST CHURCH, INC; VIRGINIA-HIGHLAND CHURCH, INC.; and THE SIXTH EPISCOPAL DISTRICT, INC.,
    *Plaintiffs,*

    v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia and as Chair of the State Election Board of Georgia; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as members of the STATE ELECTION BOARD; and STATE ELECTION BOARD,

    *Defendants.*

Civ. Act. No. 1:18-cv-05391-SCJ

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

PARTIES, JURISDICTION, AND VENUE ...................................... 2

FACTUAL ALLEGATIONS ...................................................... 19

   I.  Defendants Are Responsible for Georgia's Election System. .................. 25

  II.  Defendants Disenfranchise Voters. ........................................ 31

      A.  "Use It or Lose It" Statute: The Secretary of State Purges Georgians From the Rolls of Registered Voters. ................................ 31

      B.  "Exact Match" Policy: The Secretary of State Prevents Georgians From Registering to Vote. ................................................ 37

      C.  Defendants Use Election Technology That Is Vulnerable to Hacking and Manipulation. .................................................. 43

      D.  Defendants Promote Moving and Closing Precincts and Polling Places. ................................................................... 44

      E.  The Secretary of State Maintains Inaccurate Voter Registration Rolls. .................................................................... 45

      F.  The Secretary of State Does Not Provide Adequate Resources to Polling Places. ......................................................... 50

      G.  Defendants Inadequately Oversee and Train Elections Officials on Provisional Ballots. .................................................... 54

      H.  Defendants Inadequately Oversee Absentee Ballots and Inadequately Train and Advise Elections Officials about Them. ......... 58

CLAIMS FOR RELIEF ......................................................... 65

Count I .................................................................................................... 65

Violation of the Fundamental Right to Vote ........................................... 66

Count II ................................................................................................. 69

Violation of the Ban on Racial Discrimination in Voting ........................ 69

Count III ................................................................................................ 73

Violation of Equal Protection .................................................................. 73

Count IV ................................................................................................ 78

Violation of Procedural Due Process ....................................................... 78

Count V ................................................................................................. 81

Violation of Section 2 of the Voting Rights Act of 1965 ......................... 81

PRAYER FOR RELIEF ...................................................................................... 88

## INTRODUCTION[1]

1.      Without the right to vote, all other democratic rights are illusory. Fair elections ensure the consent of the governed; they are the moral foundation of the compact between the government and its citizens.

2.      In the 2018 General Election (the "2018 Election"), Georgia's elections officials broke that compact. The Secretary of State, the State Election Board, and its members ("Defendants") enforced unconstitutional and otherwise unlawful legislation, created and enforced unconstitutional and otherwise unlawful policies, and engaged in gross mismanagement that resulted in an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote. This Second Amended Complaint describes the serious

---

[1] Pursuant to this Court's November 17, 2020 Order granting leave to amend, ECF No. 570, Plaintiffs hereby amend their Amended Complaint to eliminate all claims and counts under which they are no longer proceeding and to update the State Election Board defendants named individually. Plaintiffs have corrected typographical errors and, so as not to reallege statements that are now outdated due to changes in Georgia law or Plaintiffs' understanding of the facts, Plaintiffs have also deleted or made limited modifications to certain allegations in this Second Amended Complaint.

and unconstitutional flaws in Georgia's elections process—flaws that persist today.

3.      The resulting elections process violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

4.      The responsibility for ensuring access to the ballot is a bipartisan responsibility–and one that, if ignored, will harm our democracy. Without judicial relief, the violations detailed in this Second Amended Complaint will continue and taint the outcome of future elections in Georgia.

## PARTIES, JURISDICTION, AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States of America.

6.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a) and 42 U.S.C. §§ 1983, 1988(a) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

7.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because defendant Brad Raffensperger is a resident of this district.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

10.     Plaintiff Fair Fight Action, Inc. ("Fair Fight Action"), formerly known as Voter Access Institute, is an Internal Revenue Code § 501(c)(4) nonprofit entity organized under the laws of Georgia. Fair Fight Action's core mission is to secure the voting rights of Georgians. The unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Second Amended Complaint thwart Fair Fight Action's mission and will continue to do so in the future.

11.     When it was known as Voter Access Institute, the organization conducted a large vote-by-mail program; provided voters with information about upcoming elections (e.g., how and where to vote, polling place hours and

3

locations, ballot information, and voter registration deadlines); and engaged in a get-out-the-vote program during early voting and on Election Day. Fair Fight Action also engages with and advocates for Georgians on other issues, including health care.

12.    Fair Fight Action's past voter-related efforts were focused on getting-out-the-vote activities and providing voters with general information about upcoming elections and voter registration. Those efforts were not focused on educating voters about how to overcome the voter suppression efforts described in this Second Amended Complaint and did not entail efforts to reform the election system. While Fair Fight Action plans to continue its past work, Fair Fight Action will also implement new education programs and engage in election reform efforts that are focused specifically on counteracting problems voters encountered in the 2018 Election as a result of the unconstitutional and otherwise unlawful legislation, policies, and actions alleged in this Second Amended Complaint. Fair Fight Action's new activities are in direct response to the voter suppression that occurred in connection with the 2018 Election.

13.     Engaging in these new activities to counteract the voting impediments alleged in this Second Amended Complaint will require Fair Fight Action to expend additional resources diverted from its other programs, such as getting-out-the vote drives and providing voters with general information on upcoming elections. This diversion of resources is necessitated by and directly traceable to Defendants' misconduct described in this Second Amended Complaint. If, however, the relief requested in this Second Amended Complaint is granted, that relief will redress Fair Fight Action's injuries.

14.     Plaintiff Care in Action, Inc.("Care in Action") is an Internal Revenue Code § 501(c)(4) nonprofit entity organized under the laws of Delaware. Care in Action is dedicated to fighting for dignity and fairness for the millions of domestic workers in the United States. Care in Action works on a number of issues, including immigration, sexual harassment, and human trafficking. Its activities have included organizing and training domestic workers, as well as direct service work (e.g., providing food to a refugee camp).

15.     To further its mission of securing fairness and dignity for domestic workers, Care in Action encourages domestic workers to vote so that they have a

voice in the issues that affect them. During the campaign for the 2018 Election,

Care in Action provided voters with basic information about the election,

including the date of Election Day. Care in Action also conducted significant

advocacy and outreach activities to ensure that domestic workers and others

could be well-informed when casting their ballots. Care in Action registered with

the Georgia Government Transparency and Campaign Finance Commission as an

independent committee due to the portion of its activities that consisted of

independent expenditures in support of several statewide and legislative

candidates in the 2018 Election.

16.     The unlawful legislation, policies, and misconduct alleged in this

Second Amended Complaint with respect to the 2018 Election thwarted Care in

Action's mission by burdening domestic workers' right to vote.

17.     Care in Action dedicated significant resources to counteracting the

voter suppression that occurred during the 2018 Election. For example, Care in

Action contacted voters who cast provisional ballots to ensure that they took the

steps required to cause the State to count their ballots. Multiple national Care in

Action staff—who lived outside of Georgia but had been in the State to help with

6

election efforts—stayed in Georgia for weeks after the election. These were not people who regularly worked on voting rights issues. They included Care in Action's Digital Director, as well as a person who regularly worked on immigration. The usual work these Care in Action employees were supposed to be doing during this time went undone.

18.    As a result of Care in Action's experience with Georgia's 2018 Election—during which domestic workers were disenfranchised—the organization has now shifted its budget priorities and added more staff to address voting rights. Care in Action will provide education and assistance to voters so that Defendants' wrongdoing does not prevent those voters from voting and having their votes counted. To carry out these efforts, the organization has diverted, and will continue to divert, resources from its efforts with respect to other core issues, including a federal domestic workers bill of rights, immigration, sexual harassment, and human trafficking, and has sacrificed non-voting rights work it had hoped to do in the future.

19.    Because the unlawful legislation, policies, and misconduct alleged in this Second Amended Complaint are ongoing and will continue unless this Court

grants the relief Plaintiffs are requesting, Care in Action will have to continue diverting resources in the future to counteract that voter suppression in upcoming Georgia elections.

20.    Care in Action's above-described diversion of resources is necessitated by and directly traceable to Defendants' enforcement of unconstitutional legislation and policies and to Defendants' other misconduct alleged in this Second Amended Complaint, and Care in Action's injuries will be redressed by the relief requested herein.

21.    Plaintiff Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer"), is an Internal Revenue Code § 501(c)(3) nonprofit entity organized under the laws of Georgia. Ebenezer is a 6,000-member church that has long-served Atlanta's African American community and has been at the forefront of the civil rights movement. Its purpose is to be a global ministry dedicated to individual growth and social transformation through living in the message and carrying out the mission of Jesus Christ. The church believes that the test of a congregation's spiritual health and the relevance of its ministry is their effect on the community.

22.    Voting rights are at the core of Ebenezer's work for social transformation; without a voice, people cannot speak. Ebenezer has been engaged in the fight for voting rights since at least 1935, when its then head pastor, Martin Luther King, Sr., led a voting rights campaign in Atlanta, Georgia. Since 1935, Ebenezer's pastors, leadership, and congregation have been active in efforts to educate and empower its congregants and community. In alignment with its mission of social transformation, Ebenezer regularly sponsors voter registration drives and activities, partners with community organizations to raise awareness regarding voting, provides information and education to the community about voting, and provides community members with rides to voting locations. The unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Second Amended Complaint thwart Ebenezer's mission and will continue to do so in the future, unless redressed.

23.    In addition to the more generalized voter awareness and registration efforts described in the preceding paragraph, Ebenezer has undertaken work to counteract voter suppression. Prior to the 2018 Election cycle, Ebenezer urged people to vote early so that they would have time to try to remedy any

impediments to voting caused by voter suppression tactics. In connection with the
2018 Election, however, the church's concerns about voter suppression and the
integrity of the elections system were heightened due to the extent of the voter
suppression tactics being employed to prevent people from voting at their polling
places and due to the publicity about the lack of security surrounding the DRE
system and its failure to produce an auditable and verifiable paper trail. To
counteract these problems—problems alleged in this Second Amended
Complaint— Ebenezer engaged in an extensive vote-by-mail campaign. This new
campaign required significant time and effort: all of the Ebenezer ministers on
staff were involved in some aspect of it, as was the church's administrative staff.
Church space and volunteers were also dedicated to this campaign. To expend the
resources necessary to carry out this campaign, Ebenezer had to divert resources,
including personnel and time, from its other ministries and activities. As long as
the wrongful conduct alleged in this Second Amended Complaint continues in
future election cycles, Ebenezer will continue to divert resources to counteracting
it. In fact, Ebenezer expects to undertake additional activities in future election
cycles to counteract the wrongdoing alleged in the Second Amended Complaint.

To carry out these activities, Ebenezer will be required to divert resources from its other church activities.

24.    Ebenezer's past and future diversion of resources to counteract the wrongdoing alleged in the Second Amended Complaint has been, and will in the future be, necessitated by and directly traceable to Defendants' misconduct. If, however, the relief requested in this Second Amended Complaint is granted, that relief will redress Ebenezer's injuries.

25.    Plaintiff Baconton Missionary Baptist Church, Inc. ("BMBC") is a Christian church, established and existing as a nonprofit religious corporation under the laws of the State of Georgia. BMBC is dedicated to building a biblically-based community of loving relationships where members love, follow, and model Jesus on a daily basis. BMBC considers voting an integral part of its community building mission. Thus, during past election cycles, including during the 2018 Election, BMBC's civic activities have included various voter engagement activities, including voter registration drives, voter education efforts, and weekly prayer meetings for Georgia candidates running for office.

11

26.    The unconstitutional legislation, policies, and conduct alleged in this Second Amended Complaint frustrated BMBC's community-building mission and will continue to do so in the future. Leading up to the 2018 Election, BMBC's head pastor learned of the purges of registered voters from Georgia's voter registration rolls pursuant to the "use it or lose it" statute described in this Second Amended Complaint. In response to learning of those purges, BMBC diverted time of its church volunteers and church resources to assist church and community members determine whether they had been purged from the voter rolls. In future election cycles, BMBC will continue to dedicate resources to counteract the conduct alleged in this Second Amended Complaint. In the absence of Defendants' misconduct, BMBC, a religious organization with limited resources, would be able to use those resources on other church activities.

27.    BMBC's above-described diversion of resources was, and will continue to be, necessitated by and directly traceable to Defendants' enforcement of unconstitutional legislation and policies, and to Defendants' other misconduct alleged in this Second Amended Complaint, and BMBC's injuries will be redressed by the relief requested herein.

28.     Plaintiff Virginia-Highland Church, Inc. ("Virginia-Highland") is an Internal Revenue Code § 501(c)(3) nonprofit corporation and Atlanta church that was established in 1923. The church's mission is to "do justice, love mercy, and walk humbly." Since its inception, Virginia-Highland has focused on inclusivity and has championed social justice for marginalized members of society. Virginia-Highland views voting rights as being at the heart of inclusivity and social justice issues. In the past, Virginia-Highland has encouraged people to vote. Its efforts have included voter registration for the congregation and wider church community, training congregants to help others register to vote, voter engagement efforts, generally, and assisting with Election Day transport. Those previous efforts were not focused on educating voters about how to overcome the voter suppression described in this Second Amended Complaint.

29.     The racial dynamics and disparities that were evident during the 2018 Election cycle are contrary to Virginia-Highland's mission and spurred the church to action. For future elections, and in direct response to the voter suppression the church saw in the 2018 Election, Virginia-Highland will create programs specifically geared towards educating voters on how to overcome the

13

obstacles, alleged in this Second Amended Complaint, to voter registration and to having votes counted.

30.     For Virginia-Highland to provide those programs, Virginia-Highland will have to divert to them church resources that otherwise would have been dedicated to other church ministries and activities. This diversion of resources will be necessitated by and directly traceable to Defendants' misconduct described in this Second Amended Complaint. If the relief requested in this Second Amended Complaint is granted, that relief will redress Virginia-Highland's injuries.

31.     Plaintiff The Sixth Episcopal District, Inc. (d/b/a the "Sixth Episcopal District of the African Methodist Episcopal Church" or the "Sixth District A.M.E.") is a collective group of twelve church districts representing 534 Georgia African Methodist Episcopal ("A.M.E.") churches. It is incorporated pursuant to the laws of the State of Georgia and is an Internal Revenue Code § 501(c)(3) nonprofit entity. Sixth District A.M.E. principles are in keeping with the A.M.E. Church motto, "God Our Father, Christ Our Redeemer, Man Our Brother," and place a high value on social service. As such, Sixth District

A.M.E.'s mission priorities are "church growth, Christian education, handling money God's way, and social justice."

32.    Voting rights are of great current and historical importance to Sixth District A.M.E.'s social justice mission. Sixth District A.M.E. churches grew, in large part, through missionary efforts to newly-freed slaves in Georgia during the post-Civil War Reconstruction era. Many Sixth District A.M.E. member-churches played an important role during the Civil Rights movement, with church buildings hosting mass meetings for Civil Rights leaders. Sixth District A.M.E. leadership has addressed election priorities within its largely African American churches and communities as part of its social justice initiative, encouraging voter registration at all congregations, and providing funding for transportation to the polls on Election Day. The voter suppression tactics alleged in the Second Amended Complaint frustrated Sixth District A.M.E.'s mission of working for social justice.

33.    In connection with the 2018 Election, Sixth District A.M.E. leadership undertook district-wide voter education and empowerment efforts. Bishop Reginald Jackson traveled to most of the twelve Georgia districts asking

15

church elders to encourage congregants to vote early and by mail and emphasizing the importance of voting and understanding candidates' positions on the issues. Also in connection with the 2018 Election, Sixth District A.M.E. leadership urged church leadership to speak to their congregations about the many sacrifices made to secure the vote for African Americans and to encourage congregants to educate themselves on 2018 Election matters and to vote. To further effect its mission in connection with the 2018 Election, Sixth District A.M.E. also registered voters within its member churches and local communities, assisted with voter registration record verification, encouraged congregants to vote (and to encourage others to do the same), and coordinated efforts to deliver voters to the polls on Election Day.

34.    These previous efforts were issue-driven to encourage voting. They were not focused on educating voters about how to overcome the voter suppression described in this Second Amended Complaint. While Sixth District A.M.E. plans to continue its past "Souls to the Polls" work, the voter suppression tactics that it saw in the 2018 Election have led it believe that it needs to spend additional resources specifically to counteract voter suppression. In the future, and among other things, the Sixth District A.M.E. will not only emphasize the

16

importance of voting by mail but will also follow-up with congregants to ensure that they were able to vote and that their ballots have actually been counted.

35.     For Sixth District A.M.E. to undertake the additional efforts to verify that its congregants have voted and that their ballots were counted, the District will have to divert resources that otherwise would have been dedicated to ministries and programs, including those for food banks and homeless shelters, across 534 Georgia churches. This diversion of resources will be necessitated by and directly traceable to Defendants' misconduct described in this Second Amended Complaint. If the relief requested in this Second Amended Complaint is granted, that relief will redress Sixth District A.M.E.'s injuries.

36.     Brad Raffensperger is Georgia's Secretary of State and is named solely in his official capacity. The Secretary of State is the constitutional officer serving as Georgia's chief official who oversees and administers elections. O.C.G.A. § 21-2-50. The Secretary of State is also the chairperson of the State Election Board. O.C.G.A. § 21-2-30(d). As the chief elections officer designated under the Help America Vote Act of 2002 ("HAVA"), the Secretary of State is

17

also responsible for coordinating the obligations of the state under HAVA.

O.C.G.A. § 21-2-50.2.

37.    Defendant State Election Board of Georgia is responsible for, inter

alia, (1) promulgating rules and regulations to "obtain uniformity" in the

practices and proceedings of elections officials, "as well as the legality and

purity in all . . . elections"; (2) formulating, adopting, and promulgating rules

and regulations "conducive to the fair, legal, and orderly conduct of primaries

and elections"; (3) promulgating rules and regulations to "define uniform and

nondiscriminatory standards concerning what constitutes a vote and what will be

counted as a vote"; and (4) investigating frauds and irregularities in elections.

*See* O.C.G.A. § 21-2-231.

38.    Defendants Rebecca N. Sullivan, David J. Worley, Matthew

Mashburn, and Anh Le are members of the State Election Board of Georgia and

are named solely in their official capacity. As members of the State Election

Board, their responsibilities include: (1) promulgating rules and regulations to

"obtain uniformity" in the practices and proceedings of elections officials, "as

well as the legality and purity in all . . . elections"; (2) formulating, adopting, and

18

promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and elections"; (3) promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote"; and (4) investigating frauds and irregularities in elections. *See* O.C.G.A. § 21-2-31.

## FACTUAL ALLEGATIONS

39.    Georgia has a history of neglecting its election's infrastructure and suppressing votes—particularly those of people of color.

40.    Many long-standing barriers to voting were halted by the Voting Rights Act of 1965 ("the Voting Rights Act" or "the Act"), 52 U.S.C. §§ 10101-10702. But, after *Shelby County v. Holder*, 570 U.S. 529 (2013), removed the Act's preclearance requirement for voting changes,[2] Georgia began again to erect discriminatory voting barriers reminiscent of the Jim Crow era.

---

[2] Before the Supreme Court's decision in *Shelby County*, Georgia needed "preclearance" from the United States Department of Justice to implement changes in its elections, such as the location of a polling place, to prevent the state from implementing policies that discriminate against voters of color. *Shelby County* struck down that preclearance requirement.

41.    The U.S. Commission on Civil Rights, a bipartisan, independent agency, found that, among the states previously subject to preclearance under the Voting Rights Act, Georgia was the only state that had implemented voting restrictions in every category the Commission examined: strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

42.    The Secretary of State is Georgia's chief official who oversees and administers elections; the Secretary also serves as Georgia's chief architect of these voting barriers.[3]

43.    The 2018 election cycle drew historic voter registration and turnout, particularly among voters of color. Almost four million people voted, including hundreds of thousands of voters of color for the first time. This voter turnout was more than that for any previous midterm election in Georgia history—and would

---

[3] Brian Kemp, Georgia's new Governor, served as Secretary of State from early 2010 (shortly before the preclearance requirements under the Voting Rights Act were eliminated) until two days after the November 6, 2018, gubernatorial election that he administered and oversaw.

have been even greater but for the unconstitutional and otherwise unlawful legislation, policies, and misconduct alleged in this Second Amended Complaint. The rise in turnout cannot be allowed to mask a more troubling trend of voter suppression.

44.     Decades-long neglect of the Georgia elections infrastructure left the voting system virtually guaranteed to fail. Time-tested voter suppression tactics further burdened the right to vote: voters faced an unconstitutional statute whose arbitrary enforcement purged thousands of voters from the voter registration rolls; an "exact match" policy that prevented voters from registering to vote; the systematic disregard for established rules and requirements, including those for absentee and provisional ballots; the failure to provide polling places with resources adequate to enable a fair voting process; and other policies and practices that stymied Georgians trying to exercise their right to vote. In isolation, each example is troubling because it represents a voter who could not fully participate in this democracy. Combined, they represent the disenfranchisement of Georgia voters in general, and targeted communities of color or low-income neighborhoods in particular.

21

45.     In 1997, Georgia enacted legislation (the "use it or lose it" statute) requiring Georgia citizens to be purged from the voter registration rolls based in large measure on whether they decided to vote in certain time frames. O.C.G.A. § 21-2-234. In 2017 alone, the Secretary of State used this unconstitutional statute to purge the voter rolls of nearly ten percent of Georgia's registered voters.

46.     Many Georgians worked tirelessly to register new voters. In response to these voter registration efforts, then-Secretary of State Kemp adopted an extreme interpretation of the statute requiring a "match" between the information on a voter registration form and other government records, implementing a policy requiring the match to be exact. Under the "exact match" policy, inconsequential typographical mismatches were used to deny Georgians their right to vote. These mismatches were often caused by technical limitations on government computer systems or typographical errors by government employees. Before a federal court halted the practice, the "exact match" policy suspended tens of thousands of new voter registrations.

47.     Georgia elections officials deployed a known strategy of voter suppression: closing and relocating polling places. Over the years leading up to

the 2018 Election, elections officials closed or moved approximately 305 polling places, many in neighborhoods with numerous voters of color. Fewer polling places meant that the remaining locations strained to accommodate an influx of voters. Yet elections officials failed to supply sufficient, functioning voting machines (both DRE and Express Polls), and enough provisional ballots. Depriving polling places of basic tools needed for voting meant that voters who arrived at polling places anxious and excited to express their patriotism through the basic, fundamental act of voting were met with hours-long lines. Some lines were four hours long. Georgians who could not wait—because of disability, health, or work or family obligations— effectively lost the right to vote.

48.     Voters who managed to reach their polling places and endure the wait to reach a poll worker then faced an increased chance that they would not be found on the voter rolls. A voter who is registered to vote at a precinct but cannot be confirmed by a poll worker can vote by provisional ballot. Yet the provisional ballot process failed.

49.     Georgia law requires elections officials to provide a provisional ballot to any voter whose registration cannot be confirmed, but many poll

workers either did not understand the requirement or simply refused to comply. In other locations, particularly high-turnout precincts for voters of color, precincts ran out of provisional ballots. Without access to provisional ballots, many voters lost their right to vote entirely.

50.    Absentee ballots fared no better.[4] Thousands of Georgians who cast absentee ballots—one way to avoid long lines and other voting place problems—experienced significant impediments. Some voters who applied for an absentee ballot never received one; some received a ballot too late to ensure that it would be counted; and some had their applications or ballots illegally rejected. Elections officials also misinformed voters about whether absentee ballots had been accepted, preventing potential absentee voters from curing purported deficiencies in their ballots.

51.    Further, Defendants knowingly left Georgia's voting infrastructure vulnerable to hacking. Georgia maintains one of the least secure elections

---

[4] Georgia law describes in-person voters at early voting locations as absentee voters. Because this description is different from how the terms are commonly used, this Second Amended Complaint uses "absentee voting" to describe traditional mail-in absentee voting only.

systems in the country. Despite being aware of these well-publicized vulnerabilities for years, the Secretary of State and State Election Board rejected and rebuffed attempts, including by the federal Department of Homeland Security, to improve the data security of the Georgia database of voters.

52.     These problems in Georgia's voting system are pervasive, severe, chronic, and persistent. Their foreseeable, cumulative effect is to disenfranchise Georgia voters or severely burden their right to vote, with voters of color being particularly targeted and affected. Georgia voters will continue to be disenfranchised or have their voting rights severely burdened unless this Court grants the relief requested in this Second Amended Complaint.

**I.     Defendants Are Responsible for Georgia's Election System.**

53.     Georgia's election system is administered at the state-level and directed by the Secretary of State and the State Election Board. The Secretary of State is the chief elections officer in Georgia. O.C.G.A. § 21-2-50. The State Election Board is responsible for ensuring uniform election processes across the state. O.C.G.A. § 21-2-31. The Secretary of State chairs the State Election Board, which has four additional members. O.C.G.A. § 21-2-30(a).

54.    The Secretary of State and the State Election Board are responsible for the election system as a whole, a responsibility that includes promoting and supporting accurate, fair, open, and secure elections; implementing election laws, regulations, and policies that are consistent with Georgia law and the constitutional rights of the voters of Georgia; and ensuring consistency across counties to guard the rights of Georgians.

55.    The "Elections" page of the Secretary of State's website describes the Secretary's broad authority over elections: "The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, municipal, state, county, and federal elections. . . . They are also accountable for investigating election fraud and enforcing state election laws."[5]

56.    The Secretary of State is responsible for maintaining the official list of registered voters, O.C.G.A. § 21-2-50(a)(14), and is the designated state official for ensuring compliance with the Help America Vote Act of 2002, 52 U.S.C. §§ 20901 *et seq. See* O.C.G.A. § 20-2-50.2.

---

[5] Ga. Sec'y of State, Elections, http://sos.ga.gov/index.php/elections (last visited Dec. 1, 2020).

26

57.     The Secretary of State is also responsible for preparing ballots,

election forms, and other materials to distribute across the state, and for training

county elections officials, including registrars and superintendents. O.C.G.A. §

21-2-50(a)(5), (11).

58.     Voting machines are "supplied by the Secretary of State or purchased

by the counties with the authorization of the Secretary of State." Ga. Comp. R. &

Regs 183-1-12-.01, .02, .07.

59.     The Secretary of State is also responsible for tabulating the

consolidated election returns from Georgia's counties, for directing county

election superintendents to conduct vote recounts, and for certifying the vote total

for federal and state offices, among other offices. *See* O.C.G.A. §§ 21-2-50(b), -

495, -499; Ga. Comp. R. & Regs. 590-1-1-.01, .02. This District recently

explained that the Secretary has robust supervision of the counties when

certifying elections: "[t]he certification process required of the Secretary of State

under Georgia law, on its face, is more than a mere rubber stamp. It requires that

Secretary of State to engage in the same tabulation, computation, and canvassing

process undertaken by the counties as set forth in O.C.G.A. § 21-2-493 prior to

27

final certification. And in the event errors are discovered, the Secretary of State shall notify and direct the counties to engage in a redo." *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1291 (N.D. Ga. 2018).

60.     The Secretary of State takes an active role in how counties conduct elections. For example, before the 2018 Election, Randolph County hired a consultant to help it determine whether polling locations should be changed. That consultant recommended closing seven of the nine polling locations in the majority African American county before the election. The Secretary of State's Office acknowledged that it recommended the consultant to Randolph County. The Secretary of State had also recommended what the consultant should do: In a presentation to Randolph County residents, the consultant, Mike Malone, displayed a slide that said, "[c]onsolidation has come highly recommended by the Secretary of State. . . ."

61.     The State Election Board, whose Chair is the Secretary of State, is responsible for "promulgating rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars,

poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

62.　The State Election Board is responsible for distributing "indexed copies of all primary and election laws and pertinent rules and regulations then in force." O.C.G.A. § 21-2-31(3).

63.　The State Election Board must also "formulate and conduct a voter education program concerning voting procedures for voting by absentee ballot and at the polls with particular emphasis on the proper types of identification required for voting." O.C.G.A. § 21-2-31(9).

64.　The State Election Board has broad authority to act "as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(10). And, recently, the Fulton County Director of Registration and Elections, Mr. Richard Barron, testified "The State Election Board has the -- the ultimate authority over the boards, the -- the Fulton County Board of Registration and Elections."[6]

---

[6] Transcript of Record at 35:14-16, Coal. for Good Governance v. Crittenden, No. 2018-CV-313418 (Ga. Sup. Ct. Jan. 18, 2019).

29

65. Thus, while Georgia counties have responsibility for some aspects of Georgia elections, the Secretary of State and the State Election Board have broad authority to oversee, manage, and train the counties on their duties. And, if the counties fail in their responsibilities, the Secretary of State and the State Election Board can impose penalties. *See* O.C.G.A. § 21-2-31(5).

66. Indeed, a presentation by then-Secretary Kemp in 2011 details the duties of the Secretary of State and of the State Election Board. He explained the Secretary of State is "empowered with numerous" duties and responsibilities, including "[g]enerally facilitating the operation of the State's election system by helping to train and coordinate with the various local elections officials." "As such," the Secretary of State wrote, "local elections officials look to the Secretary of State for guidance and coordination on elections questions." As for the State Election Board, the Secretary of State described it as "[c]reat[ing] and enforc[ing] rules regarding elections" and "[t]ak[ing] action to ensure fair, legal, and orderly conduct of primaries and elections."

67.    Thus, Defendants directly administer and supervise Georgia's elections processes and are ultimately responsible for overseeing the entire system.

## II.    Defendants Disenfranchise Voters.

68.    The unconstitutional and otherwise unlawful legislation, policies, and other misconduct alleged in this Second Amended Complaint disenfranchise voters and thwart new voter registrations, with the impact disproportionately affecting low-income voters and voters of color. If not enjoined, Defendants will continue to disenfranchise Georgia voters and suppress their voting rights in the future.

### A.    "Use It or Lose It" Statute: The Secretary of State Purges Georgians From the Rolls of Registered Voters.

69.    Georgia's Secretary of State is responsible for maintaining the state's voter registration list. Georgia law requires the Secretary of State to ascertain regularly whether Georgia voters have moved, died, been convicted of a felony, or been declared mentally incompetent. *See* O.C.G.A. § § 21-2-231, -232.

70.    The statute mandates that the Secretary of State coordinate with other state agencies and the U.S. Postal Service to obtain information the

31

Secretary of State uses to indicate whose names should be removed from the

voter registration rolls or whose voter registration information should be updated.

*See* O.C.G.A. § 21-2-231, -233. On information and belief, the Secretary of State

subscribes to a private service that provides all change of address notifications

filed with the U.S. Postal Service.

71. Under Georgia's "use it or lose it" statute, the Secretary of State

must also remove voters' names from the registration list based primarily on

whether those voters voted recently. Voters who opted not to vote or otherwise

did not contact elections officials within a certain period of time (before 2019,

within the past three years, and now, within the past five years)—for example, by

updating their addresses—are sent a single postcard notifying them that they may

lose their right to vote. O.C.G.A. § 21-2-234 (2018); O.C.G.A. § 21-2-234

(2019). The postcard asks voters to confirm their current address. If a voter fails

to return the postcard, the voter's status on the registration list is changed to

"inactive." If the voter does not vote in the next two general elections, he or she

will be purged from the rolls of registered voters.

72.     Then-Secretary Kemp purged hundreds of thousands of voter registrations under the "use it or lose it" statute. Many of those purged voters had not moved, had not died, and had not been convicted of a felony. The registration information for these voters remained accurate; the Secretary of State simply deemed them no longer eligible to vote because those voters chose not to vote in certain elections and failed, one time, to return a postcard. As a result of the "use it or lose it" statute and the Secretary of State's purges, Georgia's voter rolls have become less accurate.

73.     Many Georgia voters learned they had been purged from the voter rolls only when they showed up to vote. For example, on Election Day in 2018, a poll watcher at the Iglesia Bautista Nueva Jerusalén polling location in Gwinnett County observed many people being told they were not on the voter rolls. The poll watcher saw at least five voters who had previously voted at the polling location and had not moved residences, but who were no longer on the voter rolls.

33

74.    Georgia does not provide same-day registration for voters. Thus, voters who learn they are purged from the rolls only when they show up to vote on Election Day are denied their right to vote.

75.    Purging voters from the voter rolls because of voter inactivity penalizes infrequent voters, who are disproportionately young, poor, and people of color, and voters who make a conscious choice not to vote in every election.

76.    For example, in the 2008 and 2012 Elections, when President Obama headed the Democratic ticket, voter turnout among African American women was eighty percent and seventy-seven percent, respectively. For African American men, the turnout numbers for those elections were seventy percent and sixty-six percent, respectively. But in 2014, with the governorship and a U.S. Senate seat at stake, African American voters signaled their lack of enthusiasm for the candidates by not voting, causing African American voter turnout to plummet. In fact, in only one Georgia county did turnout for African American women exceed sixty percent and in only fourteen other counties did that turnout exceed fifty percent.

That same pattern persisted in 2016. In 2018, however, African American voter turnout surged[7], as many voters chose to engage in the political process again.

77.     The "use it or lose it" statute, as well as its enforcement by Defendants, unlawfully disenfranchises voters or severely burdens their right to vote by penalizing voters based on their voting choices, providing voters inadequate notice, and failing to ameliorate the purges by offering same-day registration.

78.     Further exacerbating these harms, the "use it or lose it" statute is subject to manipulation, and has in fact been manipulated, for political benefit. For example, then-Secretary Kemp waited until before his own elections to remove hundreds of thousands of voters under the statute. In 2014, when he was running for reelection, then-Secretary Kemp purged over 250,000 people under the "use it or lose it" statute. In 2017, when he was running for governor in the upcoming 2018 Election, then-Secretary Kemp purged over 665,000 people under the "use it or lose it" statute. In a single night in July 2017, he struck over

---

[7] See Ga. Sec'y of State, Elections, sos.ga.gov/index.php/elections/voter_ registration_statistics (last visited February 4, 2019).

500,000 people from the voter rolls—approximately eight percent of Georgia's registered voters. The *Atlanta Journal-Constitution* called it the "largest mass disenfranchisement in U.S. history."[8] By contrast, in years when he was not running for office (2013, 2015, and 2016), then-Secretary Kemp removed fewer than 100 people cumulatively under the "use it or lose it" statute.

79.     Defendants have no compelling or substantial governmental interest for this irregular and arbitrary removal of voters from Georgia's registration rolls; nor does the "use it or lose it" statute, which results in less accurate voting rolls, serve any compelling or substantial governmental interest in maintaining the rolls.

80.     Secretary of State Raffensperger has publicly stated that he will continue removing voter registrations under the "use it or lose it" statute.

81.     The "use it or lose it" statute—and the selective, arbitrary purges of voters that occur, and will continue to occur, under it—violate Georgia voters'

---

[8] Alan Judd, *Georgia's Strict Laws Lead to Large Purge of Voters*, Atlanta J.-Const. (Oct. 27, 2018), https://www.myajc.com/news/state--regional-govt--politics/voter-purge-begs-question-what-the-matter-with-georgia/YAFvuk3Bu95kJIMaDiDFqJ.

rights under the First and Fourteenth Amendments. The "use it or lose it" statute

penalizes voters for voicing their dissatisfaction with candidates by opting not to

vote. It also disenfranchised thousands of Georgia voters in the 2018 Election and

will continue to disenfranchise voters in the future.

> **B.     "Exact Match" Policy: The Secretary of State Prevents Georgians From Registering to Vote.**

82.     Many Georgians submitted new voter registration forms shortly

before the 2018 Election. Yet many of those registrations were rejected under an

aggressive and extreme interpretation of Georgia's statute requiring voter

registration information to match information in certain government files.

83.     Georgia law requires the state's voter registration information to

match the information in the state's Department of Driver Services ("DDS") files

if the voter uses his or her driver's license as proof of identity. O.C.G.A. § 21-2-

220.1.[9] As of 2018, if a voter's application information did not match those files,

the Secretary of State held the application in "pending" status. An applicant

---

[9] If the voter uses a Social Security card, then the information must match the records in the Social Security Administration. On information and belief, the vast majority of people use a driver's license instead of a Social Security card.

whose registration was pending needed to resolve the mismatch; if the applicant

failed to do so, the Secretary of State would reject the application. *Ga. Coal. for*

*People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1255–57 (N.D. Ga. 2018)

(addressing the "exact match" policy and registration processing).

84.     The Secretary of State interprets and applies the statutory "match"

requirement in ways that unfairly and disproportionately prevent voters of color

from voting.

85.     Specifically, the Secretary of State applies the statutory "match"

language in an unreasonably literal way—requiring an "exact" match of all

information no matter how insignificant that information is. As of 2018, under the

Secretary's onerous "exact match" policy, voter registrations were rejected if the

mismatch consisted of insignificant typographical errors or other inconsequential

differences. For example, if the punctuation in voters' last names on their voter

registration forms did not match their DDS files, those voters' applications were

rejected—even if the problem originated entirely with the DDS system and not

with the voter.

86.    Shortly before the 2018 Election, the Secretary's "exact match" policy prevented 53,000 Georgians from having their registrations accepted.

87.    The experience of Dr. Carlos del Rio, the chair of the Department of Global Health Studies at the Rollins School of Public Health at Emory University, illustrates this problem with the "exact match" policy. Dr. del Rio had correctly written his last name as "del Rio" on his voter registration form; but because the DDS system does not recognize spaces in last names, DDS incorrectly lists his last name as "delRio" in its system and on his driver's license.[10] Dr. del Rio explained to elections officials that their actions were illegal; and only after being forced to navigate a lengthy process was he finally allowed to vote. Dr. del Rio reflected, "While I was ultimately able to cast my vote, it was a frustrating experience and I can only imagine the powerlessness that others less fortunate than I may have felt as they attempted to exercise a fundamental American right."

_____

[10] Citizens of Latino descent are disproportionately likely to have two surnames or a surname beginning with the preposition "de" or "del," making them more likely to print their name with a space. *See* Lotus D. Cirilo, *Naming Conventions of Spanish-Speaking Cultures*, http://lrc.salemstate.edu/hispanics/other/Naming_Conventions_of_Spanish-Speaking_Cultures.htm (last visited Nov. 19, 2018).

39

88.     Dr. del Rio is right—other Georgians were powerless to vote when they arrived at the polls due to the "exact match" policy. One poll worker reported seeing at least six voters who were told they were not on voter rolls because their names had hyphens, apostrophes, or spellings unfamiliar to poll workers.

89.     The "exact match" policy disproportionately disenfranchises recently naturalized U.S. citizens because the Secretary of State places new citizens' voter registration forms in pending status if those voters have not informed DDS of the change to their citizenship. But whether a person is a citizen is irrelevant to whether he or she can have a driver's license. In effect, the Secretary of State has denied new citizens the right to vote because they do not update DDS with information it neither asks for nor needs.

90.     This disenfranchisement of recently naturalized citizens disproportionately affects people of color, too, both because many new citizens are people of color [11] and because recently naturalized citizens may be more

---

[11] In 2016, 49 percent of new citizens in the United States were born in countries in South America and Mexico, Asia, and the Caribbean. *See* Jie Zong, *et al*., Migration Policy Institute, *Frequently Requested Statistics on Immigrants and Immigration in the United States*, (Feb. 8, 2018),

40

likely to have state employees enter their names incorrectly if those names are less familiar to those employees. As of 2018, of the Georgians whose applications were pending for a citizenship mismatch, about a quarter were Asian American, although only 2.1 percent of Georgia's registered voter pool is Asian American; and 17 percent were of Latino descent, although only 2.8 percent of Georgia's registered voter pool is of Latino descent. *Ga. Coal.*, 347 F. Supp. 3d at 1263. These percentages contrast with those for white voters; only 13.7 percent of Georgians whose applications were pending for a citizenship mismatch were white, even though more than half of Georgia's registered voter pool is white. *Id.* Because of this disparate impact on minority voters, a federal judge concluded that new citizens whose voter registrations were placed in pending status had demonstrated a substantial likelihood the State violated their constitutional rights. *Id.*

91.     Beyond the harm to recent citizens, the "exact match" policy has a disparate impact on black voters. Of the voter registrations pending because of

---

https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Naturalization.

41

the policy before the 2018 Election, approximately 70 percent were for black voters, even though only approximately a third of Georgia's population is black.

92.     The impact of the "use it or lose it" statute and "exact match" policy can be seen in the record-breaking number of provisional ballots cast in the 2018 Election: over 21,000. This number is higher than the number of provisional ballots cast in the 2016 presidential election even though overall turnout in 2018 was slightly lower than in 2016. This Court recently noted that "[c]omparing the 2018 election and the last non-presidential election in 2014, there has been a statistically significant increase in the proportion of voters required to vote on provisional ballots relative to the total vote." *Common Cause Ga.*, 347 F. Supp. 3d at 1293.

93.     The Secretary of State's adoption and application of the "exact match" policy—as well as his other impediments to voter registration alleged herein— disenfranchised, and will continue to disenfranchise, thousands of Georgia voters, thereby violating their constitutional and other legal rights.

**C.     Defendants Use Election Technology That Is Vulnerable to Hacking and Manipulation.**

94.    Georgia's elections system, including its voter registration data, lacks adequate data security. This insecurity presents a risk of hacking and tampering that could cause voters to be removed from voter rolls. Georgia's voter registration data already has been breached twice. Defendants have had notice of these problems but have done little to fix them.

95.    The threat of hacking is not hypothetical. Georgia's voter rolls were breached in 2015, when 6 million voters had their personal information taken from the State, and in 2017 when as many as 7.5 million voter records were compromised. Special Counsel Robert Mueller indicted Russian military officers for, among other things, exploring vulnerabilities in Georgia counties' elections systems in an effort to identify cybersecurity flaws.

96.    The experience of many Georgia voters suggests significant problems with the State's voter registration data—whether because of a security breach or Defendants' failure to maintain adequately this essential database. Many voters were told when they tried to vote that the voter registration rolls

contained information different from the information the voters had supplied when registering to vote.

97.     Defendants even rejected federal funds and assistance for election and voting security from the United States Department of Homeland Security.

98.     By leaving Georgia's registration database vulnerable to tampering, Defendants place voters at risk of having their voter registrations removed or changed.

99.     The unnecessary and reckless security vulnerabilities alleged in this Second Amended Complaint place a severe burden on the right to vote.

100.    Defendants failed to adequately secure the election system, making it vulnerable to cyber-breaches or hacking that could undermine electors' confidence in the outcome.

**D.      Defendants Promote Moving and Closing Precincts and Polling Places.**

101.    The Secretary of State encourages precinct consolidation and polling place closures. In 2015, then-Secretary Kemp issued a memorandum to local elections boards outlining why polling place closures might be appropriate and emphasizing that *Shelby County v. Holder*, 570 U.S. 529 (2013), removed the

Voting Rights Act requirement that elections officials submit precinct or polling place changes to the U.S. Department of Justice for preclearance.[12]

102.   Since preclearance requirements were lifted, Georgia has consolidated and moved precincts and closed polling places in areas with high proportions of voters of color. In just a few short years leading up to the 2018 Election, elections officials closed or moved more than 300 precincts. As a result, approximately one-third of Georgia's counties now have fewer polling places than they had in 2012. Most of those counties have poverty rates higher than the state average and almost half have populations that are over 25 percent black.

103.   In addition, precinct and polling place changes and closures left voters without enough places to vote on Election Day in 2018, disproportionately affecting low-income voters and voters of color. These polling place closures unduly burdened Georgians' right to vote.

**E.   The Secretary of State Maintains Inaccurate Voter Registration Rolls.**

---

[12] Ga. Sec'y of State Elections Div., Manual on Precinct Closures (Feb. 2015), https://drive.google.com/file/d/1xFw-DbVRcdFustzb_SJHziFrONtkpXL3/view

104.   Georgia's voter registration rolls, which are maintained by the Secretary of State, are inaccurate, often foreclosing voters from exercising their right to vote. Many Georgians who register to vote arrive at the polls and are told they are not on the list of registered voters. One poll worker in the 2018 Election explained to a poll watcher that voters should never expect to be on the rolls if they registered near or on the deadline. "This," the poll worker said, "is Georgia."

105.   Issues with voter registration rolls affect voters across multiple counties in Georgia and include: (i) family members who lived in the same house and used the same address when they registered to vote being told they would have to vote in different locations; (ii) Georgians who had registered to vote being told that their names were not on the rolls; (iii) Georgians who had voted at the same polling place for years being told their polling place had moved or that they were no longer registered to vote; and (iv) Georgians who registered under the Motor Voter Act not being on the rolls.

> *(ii)*     Family Members With the Same Address Are Told to Vote at Different Polling Places.

106.   Several voters and poll watchers have described family members who live in the same house being directed to vote in different polling places. For

example, a disabled veteran who relies on a service dog confirmed, weeks before Election Day in 2018, that she and her husband were registered to vote. On Election Day, she, accompanied by her service dog, husband, and eight-year-old son, went to vote at Mill Creek Middle School. Her husband was allowed to vote there. Although she had registered to vote using the same address as her husband, she was told that she could not vote at that polling place because her address on the voter rolls differed from the address she provided when she registered to vote. Her address as shown on the voter rolls was an address she had never had. Without her input or action, her registration data had changed.

107.    A poll watcher at the Liberty Elementary School in Cherokee County was troubled by what happened when married couples arrived to vote. He repeatedly saw instances when both spouses had changed their addresses through DDS to reflect their current Cherokee County addresses. Even though the address on their drivers' licenses were correct, at least three couples learned that only one spouse's address had been correctly updated on the voter rolls, while the other spouse's address still showed as the couple's former address. The poll workers

47

directed the spouse with the unchanged address to go to the voting location for the unchanged address.

108.   A poll worker who staffed the Express Poll machine in the Coralwood Precinct in DeKalb County said a couple arrived together and displayed identification showing they resided at the same address. But the voter registration rolls stated that they were registered to vote in two different precincts. Because the voter registration rolls showed the couple as having different voting precincts from each other, the poll worker has concerns about the integrity of the voting records and whether they had been tampered with.

> *(iii)*   Georgians Who Registered to Vote Shortly Before the Deadline Are Not on the Voter Rolls.

109.   Many Georgians register to vote before the registration deadline but learn on Election Day that they are not on the rolls of registered voters. Even worse, poll workers do not offer many of these voters provisional ballots.

110.   For example, Tyra Bates is a Gwinnett County resident who registered to vote online in early October 2018. She received a reference number and even took a screenshot of the confirmation page after she completed the registration process. When she arrived at her polling place, however, an elections

official told her she was not registered. She was not allowed to cast a provisional ballot.

> ### *(iv)* Voter Registration Roll Information for Voters Who Had Voted at the Same Polling Place for Years is Inaccurate.

111.   Elections officials told many voters during the 2018 Election they were at the wrong polling place even though they had voted at that polling place for years and had not moved. Some of those voters were directed to vote at another location. Others were given provisional ballots. Of those voters given provisional ballots, many were not given the instructions required under Georgia law about how to cure any deficiencies in their voter registrations and how to learn whether their votes were counted.

112.   For example, Jim Peterson, an attorney who lives in DeKalb County, went to his polling place at Mary Lin Elementary School on Election Day in 2018. Mr. Peterson's registration information showed that his precinct was in Fulton County's Morningside neighborhood even though he had not lived in Morningside since 1993. Poll workers gave him a provisional ballot, which he cast. Although the poll workers were required under Georgia law to provide him "written information" about how "to ascertain if his . . . ballot was counted and, if

such ballot was not counted, the reason why such ballot was not counted,"

O.C.G.A. § 21-2-418(f), he was not given that information. Instead, a poll worker

assured him his vote would be counted. The poll worker was not correct. Georgia

law does not allow voters to vote in a county other than where they are registered.

*(v)*    Georgians Who Registered to Vote Pursuant to the
Motor Voter Act Are Not on the Voter Rolls.

113.    Under the Motor Voter Act, Georgia must provide its voters with the

opportunity to register to vote at the same time they apply for a driver's license.

52 U.S.C. § 20504. But Georgians who registered to vote under the Motor Voter

Act discovered on Election Day that they were not on the voter rolls. Voters and

poll watchers reported this occurring in many counties, including Athens-Clarke,

Carroll, Cobb, DeKalb, Fulton, and Gwinnett.

**F.     The Secretary of State Does Not Provide Adequate Resources to
Polling Places.**

114.    The Secretary of State fails to provide enough voting machines to

counties, provides voting machines that do not work, and fails to advise counties

on sufficient numbers of ballots, provisional ballots, and other supplies to meet

turnout expectations. These problems were acute in the 2018 Election despite the

anticipated high turnout.

50

115.   Despite express warnings from the Democratic Party of Georgia about anticipated turnout, counties did not print enough ballots and some polling places ran out of provisional ballots. Other polling places lacked enough voting machines to accommodate the expected demand. As CNN reported, thousands of voters waited at polling places with only three voting machines.[13] As a result, voters faced unreasonably long lines–as long as four hours in some places. Many voters came to vote, saw the long lines, and left without voting.

116.   For example, one polling place in Snellville, Gwinnett County, had no power cords for the voting machines at the start of Election Day in 2018, requiring its machines to operate on battery power. The batteries died in under an hour.

117.   Pittman Recreational Center, a polling place in Atlanta, started Election Day in 2018 with only three operational voting machines. While more machines were provided during the day, those newly-installed machines lacked the equipment necessary to operate them. Wait times ranged from two to four

---

[13] Van Jones, *Don't Let Brian Kemp Steal Georgia's Gubernatorial Election*, CNN (Nov. 9, 2018), https://www.cnn.com/2018/11/09/opinions/dont-let-brian-kemp-steal-georgias-gubernatorial-election-van-jones/index.html.

hours, causing people to leave without voting. One voter went to Pittman three times but could not vote because of the hours-long wait. In addition, Pittman closed for 30 minutes at 7:00 p.m., violating a court order to stay open until 9:00 p.m. While Pittman was closed, many voters left without voting.

118.   Similarly, at a Gwinnett County polling place, the voting machines malfunctioned shortly after the polls opened. These malfunctioning machines created long lines that prompted voters to leave without voting.

119.   A number of busy polling places lacked an adequate number of the machines to verify a voter's registration or had machines that malfunctioned. This lack of equipment contributed to the inability of Georgians to exercise their right to vote because the check-in bottlenecks led to unreasonably long lines.

120.   The problems with voting machines were compounded when polling places did not have enough provisional ballots. Provisional ballots are used when an elections official cannot determine whether a voter is eligible to vote.

121.   Because of the problems with inoperable machines, the inaccurate voter registration list, the "exact match" policy and "use it or lose it" statute and its enforcement, provisional ballots were in high demand and many polling places

52

ran out of them. Once a polling place runs out of provisional ballots, voters at

that polling place, who would otherwise cast a provisional ballot, lose the right to

vote.

122.   The Secretary of State knew that the "use it or lose it" purge and the

"exact match" policy would increase the need for provisional ballots. The

Democratic Party had warned the Secretary of State that voter turnout would be

high, a warning reinforced by the high voter turnout during early voting. Despite

knowing that counties needed to have a large number of provisional ballots,

Defendants did nothing leading up to the 2018 Election to let the counties know

they would need more provisional ballots or to supply the counties with an

adequate number of these ballots.

123.   Many of the voters who had to wait in long lines to vote in the 2018

Election were voters of color. On information and belief, polling locations in

areas with large numbers of voters of color had disproportionately fewer

resources, such as adequate numbers of voting machines or ballots, creating the

hours-long waits that deterred many Georgians from voting. Moreover, the

increased need for provisional ballots came, in part, from the "exact match"

policy and "use it or lose it" statute, which disproportionately affected voters of color.

124.    Defendants have a duty to oversee the election, train county officials to staff polling places adequately, and issue guidance to the counties to protect every Georgians' right to vote. Defendants have a duty to prevent Georgians' right to vote from being unduly burdened. Defendants have not fulfilled these duties.

**G.    Defendants Inadequately Oversee and Train Elections Officials on Provisional Ballots.**

125.    The State Election Board, chaired by the Secretary of State, is responsible for enforcing uniform rules for election administration. O.C.G.A. § 21-2-31(1). The Secretary of State is also responsible for training county elections officials, including registrars and superintendents, on the law governing state elections. O.C.G.A. § 21-2-50(a)(11).

126.    Defendants did not and do not satisfy these obligations, as demonstrated in the 2018 Election; throughout the State, elections officials misunderstand their duties and ignore the law.

127.   At a Gwinnett County precinct, for example, voters were properly given provisional ballot forms after a voting machine malfunctioned, but voters were misinformed about how those ballots would be handled. Those ballots should have been counted as regular ballots. *See* O.C.G.A. § 21-2-418(h) (stating that "in the event that the voting machines or DRE units at a polling place malfunction and cannot be used to cast ballots . . . provisional ballots may be used by the electors at the polling place to cast their ballots. In such event, the ballots cast by electors whose names appear on the electors list for such polling place *shall not be considered provisional ballots*[]") (emphasis added). Instead of treating those ballots like regular ballots, elections officials added a cover page to the ballots that incorrectly told voters that the county election office would treat those ballots as provisional and decide later whether they would be counted. County officials later admitted that at least 50 people left the polling place without voting because they believed elections officials were requiring them to vote by provisional ballot.

128.   Elections officials also give the wrong instructions to voters who show up at the wrong polling place. A poll worker must offer a provisional ballot

to any voter who appears at the wrong polling place but who is registered to vote in that county. That way, voters need not go elsewhere to vote. Yet at some polling locations, poll workers did not provide those voters with provisional ballots and instead told them they had to go to another polling place if they wanted to vote. At least one unfortunate voter was sent from one polling place to another, and then to a third. Even when voters knew to ask for a provisional ballot, they sometimes were not given one.[14]

129.    Elections officials fail to offer provisional ballots to people in this situation, too. For example, when Kia Marlene Carter tried to vote at Shiloh Education Center in Henry County, she was told by the poll worker who scanned her identification card that the information on file for her showed that she was not a United States citizen. Ms. Carter was born in Virginia, had voted in Georgia during the past 18 years, and never before had her citizenship questioned when

---

[14] As this District explained in another case: "[T]here was evidence that voters were sometimes refused provisional ballots or if provided provisional ballots, sometimes had to return to the polls to insist on this." *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1294 (N.D. Ga. 2018).

she voted. In the 2018 Election, however, county officials did not allow Ms.

Carter to vote and did not offer her a provisional ballot.

130.    Moreover, some precincts follow rules that conflict with the law.

According to the poll watcher at Rothschild Middle School in Muscogee County,

the poll manager explained that provisional ballots were allowed only for people

arriving at the polls near closing time. The poll workers at that location would not

distribute provisional ballots in the morning because the poll manager thought it

was not late enough in the day. The Secretary's statutorily-mandated training

program failed voters at this polling place and many voters were denied their

right to cast a provisional ballot.

131.    These inconsistent and arbitrary local rules on provisional ballots

that differ from county to county violate Georgians' right to the equal opportunity

to vote.

132.    Defendants know that many Georgia voters cast provisional ballots

and that the "use it or lose it" statute, the "exact match" policy, and the other

elections systems problems identified in this Second Amended Complaint will

cause many more voters to cast provisional ballots. Nonetheless, Defendants fail

to train county elections officials adequately on the use of provisional ballots, despite knowing that this training is necessary. Defendants' failure to train county elections officials adequately has imposed, and will continue to impose, a severe burden on the right to vote and reflects the Defendants' deliberate indifference and willful blindness to the constitutional rights of Georgians.

**H.    Defendants Inadequately Oversee Absentee Ballots and Inadequately Train and Advise Elections Officials about Them.**

133.    Defendants also fail to oversee, train, and advise counties about the proper handling of absentee ballots. Georgia law permits voters to vote by absentee ballot without needing a reason to do so. Georgia law requires county elections officials who receive a request for an absentee ballot to determine whether the voter who requested the ballot is eligible to vote and, if he or she is, immediately mail the voter a ballot. *See* O.C.G.A. § 21-2-381. The voter can either return the completed absentee ballot by mail or by hand-delivery, or cancel the absentee ballot and vote in person during early voting or on Election Day.

134.    At least 283,839 voters tried to vote by absentee ballot in the 2018 Election. Many ran into hurdles that prevented them from voting absentee, or from voting at all.

135.    Elections officials fail to mail absentee ballots to voters in a timely manner, violating Georgia law. For example, despite receiving timely absentee ballot requests, Dougherty County was still mailing ballots on October 29, 2018, just days before the election.[15] Because of this delay, many Dougherty County residents—67 percent of whom are black—could not vote absentee. Moreover, thousands of absentee ballots were mailed out three weeks or more after absentee ballot requests were received by county elections officials.

136.    In 2018, elections officials also rejected absentee ballots for improper reasons. It is illegal for an elections official to reject an absentee ballot because of a minor error or omission that is not material to whether a voter can vote. *See* 52 U.S.C. § 10101(a)(2)(B). Because counties must verify voter eligibility before sending an absentee ballot, errors on the absentee ballots themselves are immaterial as the county can still determine the identity of the

---

[15] Dougherty County admitted during a proceeding in the United States District Court for the Middle District of Georgia that it had mailed ballots as late as Monday or Tuesday the week before election day, and evidence presented at that hearing showed both that mail routing in Dougherty County is unusually slow due to the closure of a distribution facility and that at least one outgoing ballot had not been postmarked until the day before election day. *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212 (M.D. Ga. Nov. 8, 2018).

voter. Yet in the 2018 Election, elections officials rejected absentee ballots for irrelevant mistakes.

137.   For example, absentee ballots requested Georgia voters' birthdates. On some absentee ballots, the line that asked for that information just said "Date," without specifying that the date being requested was the voter's birthdate. Because of this lack of specificity, many voters reasonably wrote the date they completed the ballot instead of their birthdate. Their ballots were rejected.

138.   Under intense criticism for allowing counties to reject these ballots, the Secretary of State took the unusual step, after the election, of issuing an Election Bulletin stating that elections officials would not violate state law if they accepted absentee ballots with immaterial discrepancies. The Election Bulletin, however, did not explain that this is not discretionary; elections officials are legally required to accept such ballots. And although the Election Bulletin quotes a Georgia Attorney General opinion, the Bulletin does not quote the Attorney General's conclusion that rejecting such ballots would violate federal law.

60

139.    Two judges from the United States District Court for the Northern

District of Georgia remedied some of these problems, requiring first Gwinnett,

and then other counties, to accept absentee ballots missing voters' birth years.

*Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1311 (N.D. Ga. 2018); *Democratic*

*Party of Ga. v. Crittenden*, 347 F. Supp. 3d 1324, 1340–41 (N.D. Ga. 2018). The

granted relief, however, did not address voters disenfranchised if their absentee

ballots contained other minor errors immaterial to verifying their identity.

140.    Exacerbating the effect of these errors, some counties fail to promptly

notify many Georgians that their absentee ballots have been rejected. Georgia law

requires elections officials to "promptly notify the elector" if the elector's absentee

ballot is rejected. O.C.G.A. § 21-2-386(a)(1)(C). Because absentee ballots are

submitted before Election Day, this prompt—and legally required—notification

gives the voter whose ballot was rejected time to fix the error. The Secretary of

State maintains a website that, in theory, tells voters whether their absentee ballot

has been rejected and indicates which errors need to be fixed. But this system fails,

too. Some voters who learned from the website before the 2018 Election that their

61

absentee ballots had been received and "approved" (i.e., that their absentee votes would count) learned later that their ballots did not count after all.

141.   Some voters who hand-deliver their absentee ballots are also given false information about whether their votes will be counted. One seventy-two-year-old voter, for example, hand-delivered his absentee ballot and an elections official told him there was nothing else he needed to do to ensure his vote would count. But after the 2018 Election, he learned that his absentee ballot was not counted because it was missing his birth year.

142.   Elections officials also fail to permit voters to cancel absentee ballots and vote in person. Georgia law is clear: voters who have requested an absentee ballot can cancel that ballot and vote in person either by surrendering the absentee ballot or by requesting in writing that the envelope containing the absentee ballot be marked "cancelled." O.C.G.A. § 21-2-388. Yet many voters encountered poll workers who would not allow them to cancel their absentee ballots and vote in person. Even voters who had applied for but never received absentee ballots were told they could not cancel their absentee ballots.

62

143.    These problems with absentee ballots have a disproportionate impact on voters of color. In Gwinnett County, where over 60 percent of residents are Latino, African American, or Asian American, elections officials rejected approximately eight and a half percent of all absentee ballots received by October 15, 2018. This rejection rate was more than three times the statewide average.

144.    In Chatham County, a county with a higher African American population than the state average, some completed ballots mailed by voters were returned to those voters as undeliverable, even though the ballots were mailed in an envelope supplied by the county and containing a pre-printed delivery address. These validly-cast ballots were not counted, and the voters could not resend the ballots in time to be counted.

145.    The United States District Court for the Middle District of Georgia remedied some of these problems. The Court found that Dougherty County violated voters' constitutional rights by failing to mail absentee ballots on time and ordered that some ballots received by voters and mailed back by Election Day be counted. *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212-WLS, Consent Order and Court Order at 3 (M.D. Ga. Nov. 9, 2018), ECF No. 5. But the

relief provided only applied to the 2018 Election, leaving future voters vulnerable

to the same misconduct. In addition, the Court could not grant relief to voters

who never received their absentee ballots at all, or received them so close to

Election Day that the voters reasonably concluded it would be futile to mail them

back. Voters who requested an absentee ballot because they could not get to the

polls (e.g., voters who were elderly, disabled, or out of state on Election Day)

were simply denied a vote.

146.   The inconsistent and arbitrary local rules on absentee ballots that

differ from county to county violate Georgians' right to the equal opportunity to

vote.

147.   Defendants know that many voters cast absentee ballots. Defendants

also knew that the 2018 Election would have particularly high turnout.

Nonetheless, Defendants failed to train county elections officials adequately on

the use of absentee ballots, despite knowing that this training was necessary.

Defendants' failure to train county elections officials adequately imposes, and

will continue to impose, a severe burden on the right to vote and reflects the

64

Defendants' deliberate indifference and willful blindness to the constitutional rights of Georgians.

148.   The serious and pervasive problems in Georgia's elections system are not an accident. Defendants know that voter disenfranchisement is likely from their conduct, and further know that the effect of any voter suppression is likely to fall disproportionately on Georgia's racial and ethnic minorities. Defendants' intent and motivation are to create this anticipated and foreseeable racially discriminatory effect through their policies, actions, and inaction.

149.   As shown in the 2018 Election, Georgia citizens try to exercise their constitutional rights but are denied the ability to elect their leaders because of an unconstitutional elections process. The problems plaguing Georgia's elections process are chronic, systemic, and pervasive. Defendants' failed policies and limited-to-no oversight disenfranchises or severely burdens untold numbers of voters. Absent judicial intervention, future elections in Georgia will be no different.

## CLAIMS FOR RELIEF

### Count I

65

**Violation of the Fundamental Right to Vote (First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)**

150.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

151.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . . without due process of law." This due process principle protects the fundamental right to vote. If a state imposes a severe burden on the right to vote, that burden must be narrowly drawn to advance a state interest of compelling importance. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

152.   The First Amendment prohibits a state from interfering with "the freedom of speech" or the right "to petition the Government for a redress of grievances." Freedom of speech includes the right to send political messages by voting as well as by not voting.

153.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is liable at law and in equity.

154.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that does not severely burden the right to vote.

155.   Voters in Georgia have a liberty interest in their fundamental right to vote. Defendants acted to deprive voters of this right through the following misconduct and severe burdens on the right: (a) failing to furnish counties and precincts with sufficient tools for voting; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; and (d) removing and preventing voter registrations under the "use it or lose it" statute and "exact match" policy. The foreseeable, cumulative effects of these actions have been to disenfranchise Georgia voters or severely burden their right to vote. Unless this Court grants the relief requested by Plaintiffs in this Second Amended Complaint, Georgia voters will continue to be disenfranchised or their voting rights severely burdened.

156.   Defendants further disenfranchised Georgia voters and deprived them of their right to vote through the following specific misconduct in training and

67

overseeing county elections officials, imposing severe burdens on the right to vote: (a) failing to provide absentee ballots requested by voters; (b) delivering requested absentee ballots to voters after the deadline for casting the ballots had passed; (c) providing requested absentee ballots that were undeliverable to the appropriate recipient; (d) refusing to accept delivery of absentee ballots; (e) refusing to provide provisional ballots; (f) discouraging and preventing the use of provisional ballots; (g) providing an insufficient number of provisional ballots to precincts; (h) creating conditions that produced unreasonably and avoidably long waits to vote at polling places; (i) providing an insufficient number of voting machines to polling places; and (j) failing to provide an adequate number of paper ballots to polling places. The foreseeable, cumulative effects of these actions have been to disenfranchise Georgia voters or severely burden their right to vote. Unless this Court grants the relief requested by Plaintiffs in this Second Amended Complaint, Georgia voters will continue to be disenfranchised and their voting rights severely burdened.

157.   Due to Defendants' misconduct, voters in Georgia have suffered and will continue to suffer irreparable harm—including disenfranchisement and severe burdens on the right to vote in any and all elections and disenfranchisement.

158.   Defendants did not narrowly draw the laws and policies at issue and have no compelling or substantial interest to justify the severe burdens on fundamental voting rights imposed by their misconduct.

159.   Unless enjoined from doing so, Defendants will continue to violate Georgians' First and Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

160.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count II

### Violation of the Ban on Racial Discrimination in Voting (Fifteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

161.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

162.   Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

69

163.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

164.    Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that does not discriminate against any Georgians based on race or color.

165.    The Fifteenth Amendment "bans racial discrimination in voting by both state and nation." *Terry v. Adams*, 345 U.S. 461, 467 (1953). The Fifteenth Amendment is "obviously applicable" to the rights of people of color "not to be discriminated against as voters in elections to determine public governmental policies . . . ." *Id.*

166.    Voters who are members of racial minority groups have a right under the Fifteenth Amendment to participate in elections on an equal basis with voters who are not members of racial minority groups.

167.    Acting under color of state law, Defendants deprived Georgians of the right to vote—as secured by the Fifteenth Amendment—by administering an

election plagued with irregularities that disproportionately affected voters of color.

Defendants acted to deprive voters of this right through the following misconduct

that fell disproportionately on voters of color: (a) failing to furnish counties and

precincts with sufficient tools for voting; (b) failing to train adequately county

elections officials on laws governing elections; (c) failing to maintain an accurate

and secure voter registration list; (d) removing and preventing voter registrations

under the "exact match" policy; and (e) purging voters from voter registration

rolls under the "use it or lose it" statute. This misconduct will continue to

disenfranchise Georgia voters or burden their right to vote unless enjoined and

abated.

168.   Defendants further acted to deprive voters of color of their

fundamental right to vote through the following specific misconduct in

overseeing and training of county elections officials, which fell

disproportionately on voters of color: (a) failing to have enough precincts, voting

machines, and provisional ballots for the assigned voters to be able to vote; (b)

failing to timely send absentee ballots; (c) failing to count the absentee ballots

cast in accordance with law; (d) causing registered, eligible voters to vote

71

provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls. This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

169.   The severe burdens Defendants imposed on racial minority voters' fundamental right to vote are not outweighed or justified by, or necessary to promote, a compelling state interest that cannot be accomplished by other less restrictive means.

170.   Defendants' misconduct irreparably harmed voters of color in Georgia by imposing severe burdens on their right to vote, sometimes resulting in complete disenfranchisement.

171.   In acting as they did, Defendants intended, at least in part, to suppress the number of votes cast by persons of color. State action intended, at least in part, to discriminate on the basis of race in the voting context violates the Fifteenth Amendment.

172.   Unless enjoined from doing so, Defendants will continue to violate Georgians' Fifteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

173.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count III

### Violation of Equal Protection (Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

174.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

175.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

176.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

177.   Defendants must protect the integrity of elections in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and

overseeing elections entities in a manner that provides equal protection to all

Georgians.

178.   Under the Equal Protection Clause of the Fourteenth Amendment,

citizens have "a constitutionally protected right to participate in elections on an

equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S.

330, 336 (1972). Thus, "state actions in election processes must not result in

'arbitrary and disparate treatment'" of voters. *Hunter v. Hamilton Cty. Bd. of

Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98,

104–05 (2000)).

179.   Voters who are members of racial minority groups have a

constitutionally protected right under the Equal Protection Clause of the

Fourteenth Amendment to participate in elections on an equal basis with voters

who are not members of racial minority groups.

180.   Before and during the 2018 Election, Defendants treated voters who

are members of racial minority groups differently from similarly situated voters

who are not members of racial minority groups.

181.   Acting under color of state law, Defendants deprived Georgians of the right to vote on an equal basis, as secured by the Equal Protection Clause, by administering an election plagued with irregularities that disproportionately affected voters of color. Defendants acted to deprive voters of this right through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish counties and precincts with sufficient tools for voting; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; and (e) purging voters from voter registration rolls under the "use it or lose it" statute. This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

182.   Defendants further acted to deprive voters of color of their fundamental right to vote through the following specific misconduct in overseeing and training of county elections officials, which fell disproportionately on voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to be able to vote; (b)

failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls. This misconduct will continue to disenfranchise Georgia voters or burden their right to vote unless enjoined and abated.

183.   The differential treatment of voters who are members of racial minority groups compared to the treatment of similarly-situated voters who are not members of racial minority groups imposed severe burdens on the fundamental right to vote of the former group.

184.   The severe burdens Defendants imposed on racial minority voters' fundamental right to vote is not outweighed or justified by, or necessary to promote, a compelling state interest that cannot be accomplished by other less restrictive means.

185.   Defendants' misconduct irreparably harmed voters of color in Georgia by imposing severe burdens on their right to vote, sometimes resulting in complete disenfranchisement. In acting as they did, Defendants intended, at least

in part, to suppress the number of votes cast by persons of color. State action intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth Amendment.

186.   Georgia's voting system also violates Equal Protection because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside.

187.   Having different standards for administering elections or for counting ballots in different counties violates the Equal Protection Clause. As the Supreme Court has recognized, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Bush*, 531 U.S. at 107 (internal quotation marks omitted). Defendants facilitated and permitted different elections systems in different counties in Georgia, and will continue to do so.

188.   Abdicating their responsibilities under state law, Defendants have allowed the voting processes in the 159 counties in Georgia to devolve into an arbitrary and inconsistent web of actual laws, erroneous interpretations of laws,

and local rules that are often unannounced until applied to a voter. These inconsistent, non-uniform rules subject voters to unequal voting strength.

189.   Defendants also knowingly permit wide variations among jurisdictions in the allocation of resources, such as ballots and voting machines, and in the training of election personnel.

190.   The cumulative effect of these geographic variations is that the likelihood of being disenfranchised was and is substantially—and arbitrarily— determined by the county in which a voter lives.

191.   Unless enjoined from doing so, Defendants will continue to violate Georgians' Fourteenth Amendment rights and inflict injuries for which voters have no adequate remedy at law.

192.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these unconstitutional violations of Georgians' fundamental right to vote.

## Count IV

### Violation of Procedural Due Process (Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983)

193.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

194.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of . . . liberty . . . without due process of law." This due process principle protects the fundamental right to vote.

195.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives any other person of his or her constitutional rights is also liable at law and in equity.

196.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that complies with the constitutional requirements of procedural due process.

197.   The Secretary of State, acting under color of state law, is administering an election process that Plaintiffs estimate deprives hundreds of thousands of voters in Georgia of their liberty interest in voting by purging their already existing voter registrations under the State's "use it or lose it" statute without constitutionally adequate pre- and post-deprivation process. Georgia's "use it or lose it" statute, and its enforcement by the Secretary of State, fails to

provide sufficient and meaningful notice of actions and decisions affecting voters'

registration status and its effect on casting and counting of ballots and fails to

provide adequate or timely process for Georgia citizens to challenge such actions

and decisions. These failures create an unreasonably high risk that Georgians will

be erroneously denied the right to vote. The "use it or lose it" statute has

frustrated, and will continue to frustrate, Plaintiffs' efforts to ensure that

registered voters are able to vote and have their votes counted, and thereby

violates voters' right to procedural Due Process under the Fourteenth

Amendment to the U.S. Constitution.

198.    As a result, voters in Georgia have suffered and will continue to

suffer irreparable harm—including disenfranchisement.

199.    Unless enjoined from doing so, the Secretary of State will continue

to enforce the "use it or lose it" statute and will continue to violate Georgians'

Fourteenth Amendment rights and inflict injuries for which voters have no

adequate remedy at law.

200.    Plaintiffs are entitled to injunctive and declaratory relief to remedy

these unconstitutional violations of Georgians' fundamental right to vote.

## Count V

## Violation of Section 2 of the Voting Rights Act of 1965

201.   Plaintiffs hereby incorporate by reference paragraphs 1 through 157.

202.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established, inter alia, if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by" citizens in a protected class in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

203.   Defendants must protect the integrity of elections held in Georgia, *see* O.C.G.A. §§ 21-2-31, 21-2-50, including by enforcing all laws and policies and overseeing elections entities in a manner that complies with the Voting Rights Act.

204.   The totality of the circumstances alleged herein establishes that the Defendants' administration of the election denied voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote, in violation of Section 2 of the Voting

81

Rights Act, 52 U.S.C. § 10301. This deprivation of the right to vote based on status as a member of a racial minority group has caused and will continue to cause irreparable harm—including disenfranchisement.

205.   Defendants violated Section 2 of the Voting Rights Act through the following misconduct that fell disproportionately on voters of color: (a) failing to furnish sufficient tools for voting to counties and precincts; (b) failing to train adequately county elections officials on laws governing elections; (c) failing to maintain an accurate and secure voter registration list; (d) removing and preventing voter registrations under the "exact match" policy; and (e) purging voters from voter registration rolls under the "use it or lose it" statute.

206.   Defendants further violated Section 2 of the Voting Rights Act through the following specific misconduct in oversight and training of county elections officials, which disproportionately affected voters of color: (a) failing to have enough precincts, voting machines, and provisional ballots for the assigned voters to vote; (b) failing to timely send absentee ballots; (c) failing to count the absentee ballots cast in accordance with law; (d) causing registered, eligible

voters to vote provisionally because of long poll lines; and (e) implementing the "exact match" policy for determining whether voters are registered at the polls.

207.   Historical, socioeconomic, and other electoral conditions in Georgia combined with Defendants' misconduct to prevent Georgians of color from having an equal opportunity to register and vote. *See Thornburg v. Gingles*, 478 U.S. 30 (1986).

208.   Georgia has a long history of official discrimination that excludes people of color—and particularly African Americans—from participating in democratic processes.

209.   Georgia's history of state-sanctioned race discrimination is so familiar that courts have taken judicial notice of it. *See, e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("[T]he history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."). As the Southern District of Georgia explained in *Brooks*, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.

83

Racism and race discrimination were apparent and conspicuous realities, the

norm rather than the exception." *Id.*

210.   Indeed, Georgia received more than 170 preclearance objection letters

from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

211.   In 2015, the Electoral Integrity Project[16] ranked Georgia as the

eighth worst state in the nation for electoral integrity.

212.   Further, voting in Georgia elections is racially polarized on the state,

county, and local levels. *See, e.g.*, *Georgia State Conference of NAACP v. Fayette*

*Cty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part,*

*vacated in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

213.   Georgia's people of color bear the effects of discrimination in areas

such as education, employment, and health that hinder their ability to participate

effectively in the political process. The Georgia Department of Community

Health reports that people of color have worse health status and more chronic

---

[16] The Electoral Integrity Project is an independent academic project based at
Harvard University and the University of Sydney. Its focus is on evaluating the
integrity of elections around the world. *See*
https://www.electoralintegrityproject.com (last visited Nov. 26, 2018).

health conditions than whites. In 2016, the infant mortality rate for African

Americans in Georgia was more than double than that of whites. The Economic

Policy Institute reported the 2018 unemployment rate in Georgia for African

Americans was 2.6 times higher than that for whites. And for the 2015–2016

school year in Georgia, the gap between high school graduation rates for African

American and white students was 7 percentage points. Further, in Atlanta, Cobb,

DeKalb, and Gwinnett school districts, in the 2012–2013 school year, the

graduation rate for white males was 20 percentage points higher than for African

American males.

214.   Georgia has a history of voting practices that enhance the

opportunity for discrimination against voters of color. For example, Georgia has

an election requirement that the winner receive a majority of all votes cast. This

prevents a candidate who wins a plurality of votes cast from being elected and

forces a runoff between the top two candidates. By increasing the percentage of

votes needed to win an election, this requirement lessens the prospects for a

candidate of color. Another example is Georgia's use of large election districts,

including county-wide election districts. Using large election districts increases

the chances that white voters will be in the majority, thereby enhancing the prospects of white candidates; subdivided districts result in the election of more candidates of color.

215.   Georgia also has a history of political campaigns with both overt and subtle racial appeals.

216.   For example, in January 2017, a Gwinnett County Commissioner called the late Representative John Lewis—who has been described as "one of the most courageous persons the Civil Rights Movement ever produced"—a "racist pig" and suggested his re-election was "all illegitimate" because his district is "drawn to keep him in power."[17]

217.   During the gubernatorial campaign leading up to the 2018 Election, gubernatorial candidate and then-Secretary of State Brian Kemp posed in a photo with a man who wore a shirt that stated, "Allah is not God" and was known for

---

[17] Tyler Estep, *Gwinnett commissioner calls John Lewis 'a racist pig,' faces backlash*, Atlanta J.-Const. (Jan. 16, 2017), https://www.ajc.com/news/gwinnett-commissioner-calls-john-lewis-racist-pig-faces-backlash/K2uAUZFikv57szlncpZilO/.

ranting about killing Black Lives Matter protesters.[18] Kemp had one arm around this man and gave a thumbs-up gesture with the other.

218.   During Leader Abrams' campaign for governor, a robo-call producer who pretended to be Oprah Winfrey called Georgian voters and spewed racist comments about Leader Abrams. Those comments included, "This is the magical Negro Oprah Winfrey asking you to make my fellow Negress Stacey Abrams the governor of Georgia;" labeling Leader Abrams "a poor man's Aunt Jemima;" and "Years ago, the Jews who own the American media saw something in me—the ability to trick dumb white women into thinking I was like them. I see that same potential in Stacey Abrams."[19]

219.   Members of minority groups in Georgia have been elected to public office at vastly disparate rates than majority groups. Between 1908 and 1962, not

---

[18] Greg Bluestein, *Critics blast Kemp for posing for photo with anti-Muslim extremist*, Atlanta J.-Const. (Oct. 26, 2018), https://www.ajc.com/blog/politics/critics-blast-kemp-for-posing-for-photo-with-anti-muslim-activist/PMFHRugCobgSHKsN9hxmJP/.

[19] Emily Birnbaum, *Stacey Abrams, Oprah targeted by racist robocall funded by white supremacist group*, The Hill (Nov. 3, 2018), https://thehill.com/homenews/campaign/414703-abrams-targeted-by-racist-robocall-in-georgia.

a single person of African descent served in the Georgia General Assembly. Currently, every statewide elected official in Georgia is white, and non-white Georgians are underrepresented in the Georgia House of Representatives, Senate, and in the congressional delegation.

220.   These historical, socioeconomic, and other electoral conditions in Georgia combined with Defendants' ongoing misconduct prevented voters of color, and particularly African American voters, from having an equal opportunity to register and vote. Defendants' unlawful actions thus imposed a substantial, unwarranted, and disproportionate burden on account of race or color in violation of Section 2 of the Voting Rights Act.

221.   Unless enjoined from doing so, Defendants will continue to violate Section 2 of the Voting Rights Act and inflict injuries for which voters have no adequate remedy at law.

222.   Plaintiffs are entitled to injunctive and declaratory relief to remedy these violations of Section 2 of the Voting Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

1.    Declaring that Georgia's current elections process violates Georgians' fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution;

2.    Declaring that Georgia's current elections process violates the ban on racial discrimination in voting under the Fifteenth Amendment to the U.S. Constitution;

3.    Declaring that Georgia's current elections process violates Georgians' right to Equal Protection under the Fourteenth Amendment to the U.S. Constitution;

4.    Declaring that Georgia's "use it or lose it" statute violates Georgians' procedural Due Process rights under the Fourteenth Amendment to the U.S. Constitution;

5.    Declaring that Georgia's current elections process violates § 2 of the Voting Rights Act, 52 U.S.C. § 10301;

89

6.      Declaring that this Court will retain jurisdiction pursuant to § 3(c)

of the Voting Rights Act, 52 U.S.C. § 10302(c), for such period as it

may deem appropriate. During such period, no voting qualification,

prerequisite to voting, or standard, practice, or procedure with

respect to voting different from that in force or effect at the time the

proceeding was commenced shall be enforced unless and until this

Court finds that such qualification, prerequisite, standard, practice,

or procedure does not have the purpose and will not have the effect

of denying or abridging the right to vote on account of race or color;

7.      Permanently enjoining Defendant Secretary of State from using the

"use it or lose it" statute described above and to reinstate all

Georgia voters who were removed from the voter registration list

based on this unconstitutional policy, unless the person is ineligible

to vote for a different, constitutional reason based on Georgia law;

8.      Permanently enjoining Defendant Secretary of State from using the

"exact match" policy described above and to register all Georgia

voters whose registrations were not completed based on this
unconstitutional policy;

9.    Permanently enjoining Defendants to oversee adequately elections
by enforcing uniform standards and processes that:

    a.    Ensure that counties accurately, timely, and securely
process all voter registration requests consistent with
Georgia and federal law governing voter registration;

    b.    Ensure a functioning, accurate, and secure voter registration
website where people can check their registration status,
precinct, and ballot status;

    c.    Document each person whom elections officials or poll
workers determine will not be given a ballot, the reason for
the determination, and the person who made the
determination;

    d.    Ensure that counties accurately and timely process all
absentee ballot requests consistent with Georgia and federal
law governing absentee ballots;

91

e.    Ensure each county has and deploys to each polling place for any election day an adequate and reasonable number of functioning and secure voting machines; an adequate and reasonable number of paper ballots and provisional ballots; an adequate and reasonable amount of signage, including signage explaining voters' rights; and all other materials or tools necessary for voting;

f.    Ensure each precinct and county has enough ballot-casting stations to service adequately the number of voters assigned to the precinct, such that no voter will wait longer than 30 minutes to vote;

g.    Ensure all registered voters in a precinct can vote without unreasonable delay or hardship during any election;

h.    Ensure each county timely recruits and hires an adequate number of elections officials and poll workers before each election to ensure proper staffing on any election day;

92

i.   Provide for the timely and systematic training, based on comprehensive statewide curriculum, of elections officials and poll workers before every election;

j.   Ensure each county has adequate materials, training, and support for all elections officials and poll workers to fairly and reasonably administer elections in accordance with Georgia and federal law;

k.   Ensure timely, adequate, and meaningful processes before Georgians are deprived of the right to vote, and timely, adequate, and meaningful processes for Georgians to remedy erroneous deprivations of the right to vote, including for voter registration, voter eligibility, and provisional ballot casting;

l.   Establish and maintain requirements and processes for periodic reports from county boards of elections and audits of county boards of elections' activities to ensure that the foregoing standards, processes, and requirements are

93

adhered to and that each county has adequate procedures, policies, and staff in place to ensure efficient, just, and fair elections; and

m.  Provide such periodic reports and audits to be made public at or about the same time that they are received by the Defendants, including at regular intervals during any election day, to allow voters and the public access to information about voting problems with sufficient time to seek redress about those problems in court;

10.  Permanently enjoining Defendants to ensure each county conducts efficient, just, and fair elections;

11.  Awarding Plaintiffs their reasonable attorneys' fees and costs in bringing this action; and

12.  Providing such other and further relief as the Court may deem just and proper.

Respectfully submitted, this, the 3rd day of December, 2020.

94

By: */s/Allegra J.  Lawrence*

Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandleriff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson St, Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Scott S. Bernstein (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
sbernstein@kaiserdillon.com
nanderson@kaiserdillion.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali Bracey (Admitted *pro hac vice*)
Ishan Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E., Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Johnathan Diaz (Admitted *pro hac vice*)
Paul M. Smith (Admitted *pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 3rd day of December, 2020, I

electronically filed the foregoing SECOND AMENDED COMPLAINT FOR

DECLARATORY AND INJUNCTIVE RELIEF with the Clerk of Court using

the CM/ECF system, which will automatically send notification of such filing to

all Counsel of Record:

/s/Allegra J. Lawrence
Allegra J. Lawrence
Georgia Bar No. 439797

1