**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**FAIR FIGHT ACTION, INC.,** *et al.,*

  **Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER,** *et al.,*

  **Defendants.**

**CIVIL ACTION FILE
NO. 1:18-CV-5391-SCJ**

**ORDER**

This matter is before the Court on Defendants' Secretary Raffensperger, the State Election Board ("SEB"), and SEB Members Rebecca Sullivan, David Worley, and Anh Le (collectively "Defendants") Motion and to Exclude the testimony of Peyton McCrary ("Dr. McCrary") pursuant to Federal Rule of Evidence 702 (Doc. No. [404]).

## I.    BACKGROUND

Defendants do not dispute Dr. McCrary's qualifications as an expert witness, and thus the Court will not recite his extensive resume here. See Doc. No. [404], p. 4 ("Defendants do not dispute his expertise as a historian . . . .").

1

However, it will highlight some of his background which is most relevant to Defendants' reliability and relevance arguments.

Dr. McCrary is a "historian by training"[1] and taught history at the university level from 1969 until 1990. Doc. No. [339], p. 2. During the 1980s, while teaching at the University of South Alabama, he served as an expert witness in numerous voting rights cases in the South. Id. From 1990 until his retirement in 2016, he worked for the Voting Section, Civil Rights Division, of the Department of Justice ("DOJ").[2] Id. his responsibilities in the DOJ Civil Rights Division included "the planning, direction, coordination, and performance of historical research and empirical analysis for voting rights litigation, including the identification of appropriate expert witnesses to appear for the government at trial." Id. at 2–3. He worked with experts in analyzing: (1) the adoption and maintenance of election laws; (2) the statistical analysis of

---

[1] Dr. McCrary received B.A. and M.A. degrees from the University of Virginia in 1965 and 1966, respectively, and obtained his Ph.D. in History from Princeton University in 1972. Doc. No. [339], p. 3. His primary training was in the history of the United States, with a specialization in the history of the South during the 19th and 20th centuries. Id.

[2] During the academic year 1998–1999, however, he took leave from the DOJ to teach political science as the Eugene Lang Professor at Swarthmore College. Doc. No. [339], p. 2.

racially polarized voting; (3) the use of database matching techniques in the construction of statewide voter registration databases; and (4) other issues relating to the conduct of elections. Id. at 3.

Since 1981, Dr. McCrary has testified in court in seventeen voting rights cases; in four of those cases and ten additional cases he also presented sworn written testimony as an expert. Id. at 3. Over the last thirty-six years he has also published "numerous studies in scholarly journals and books dealing with the history of minority voting rights, as well as with the implementation of the Voting Rights Act." Id. His published work has focused on "the history of discriminatory election laws in the South, evidence concerning discriminatory intent or racially polarized voting presented in the context of voting rights litigation, and the impact of the Voting Rights Act in the South." Id. at 4. Some of this published work focuses specifically on Georgia. See id. at 5 (listing works).

A.    Dr. McCrary's Report

Dr. McCrary was retained to assess "the impact of the Voting Rights Act on Georgia's historical voting policies and practices and the impact of the removal of preclearance requirements" after Shelby County v. Holder, 570 U.S. 529 (2013). Plaintiffs offer Dr. McCrary's report and testimony in support of

3

their Section 2 claims; specifically that Georgia's voter verification process (referred to in this litigation as "Exact Match") has a disparate impact on Black and recently naturalized citizens. See Doc. No. [41] (Am. Compl.), pp. 38–40, ¶¶ 89, 91.

Much of Dr. McCrary's report provides historical context. As he summarizes:

> I document the history of voter registration from 1945 through 2018, explaining in some detail how the registration process worked—and how it evolved over time. I present evidence of racial and ethnic disparities in the state's registration list and the degree to which that disparity changed as the registration process evolved. I also explain how federal law and public policy—including the Voting Rights Act and the Help America Vote Act (HAVA) (and the enforcement of both in the federal courts)—have affected Georgia's voter registration system. Finally, I place the changes in the state's voter registration system in the context of Georgia's party system as it, too, evolved over time.

Id. at 6. Dr. McCrary explains why, in his opinion, the current pattern of voter registration and voting in Georgia bears a "striking resemblance to the system of voter registration in the Jim Crow era before 1965." Id. at 7.

Specifically, in Dr. McCrary's opinion, "Georgia's implementation of its voter verification process under HAVA since 2006 has exercised a persistent

discriminatory effect on minority voters' opportunity to register and vote." Id.

He opines that "[t]he state's insistence on using a simple—and

methodologically obsolete—exact match requirement forms a very substantial

obstacle to fair and equal registration for minority citizens." Id. at 7. Dr.

McCrary concludes:

> [Georgia's] cumbersome and decentralized system of decision-making about individual voter verifications—granting ultimate authority over voter registration decisions to local registrars who had little legal education or training—compounded the difficulty of correcting errors produced by the voter verification process. As we have seen, it continues to have a racially and ethnically discriminatory effect . . . .

Doc. No. [339], p. 98, ¶ 122.

### B.    Defendants' Arguments

Defendants do not dispute Dr. McCrary's expertise as a historian but

argue that "Dr. McCrary's opinion on Georgia's history is neither reliable nor

relevant to the issues in this litigation." Doc. No. [404], p. 4.

Defendants argue that Dr. McCrary's report is not reliable because his

expertise is in historic intent behind election laws, not in statistical analysis of

the effects of election laws. Id. at 6. Thus, they argue, his opinions about the

effects of Georgia's current election laws are not reliable. Id. They also argue

that Dr. McCrary's report is not reliable because it relies on the research of two other witnesses in this case. Defendants assert Dr. McCrary's opinion is not scientific analysis, but simply "an approval of the opinions of other experts" and a biased "repetition of the Plaintiff's legal arguments about what policy choice Defendants should have made in administering elections." Id. at 9.

Defendants also argue that Dr. McCrary's report is not relevant. First, they argue, "the vast majority of Dr. McCrary's opinion describes his views about the discriminatory effect of election practices that Georgia no longer uses," and is thus not relevant to the issues in this case. Id. at 8. Defendants argue that he "simply compares past practices to current ones with no causal connection." Id.

### C. **Plaintiffs' Response**

Plaintiffs argue that the Court should admit Dr. McCrary's testimony for three reasons. First, as Defendants acknowledge, Dr. McCrary is a qualified expert historian and meets the first prong of Daubert. Plaintiffs argue his expertise is a proper foundation for the analysis he conducts in his report. Doc. No. [476], pp. 10–11. Second, Dr. McCrary's opinions are reliable because he "uses the methodology of social science to evaluate discriminatory effects of voting practices, a methodology he has employed throughout his career." Id.

6

at 10; 12–14. Third, Dr. McCrary's opinions are "highly probative" of the factors in Thornburg v. Gingles, 478 U.S. 30, 44-45 (1986), and thus, to demonstrating disparate impact for Plaintiffs' Section 2 VRA vote-denial claims, 52 U.S.C. § 10301. Id. at 10; 20–22.

## II.    LEGAL STANDARD

### A.    The Gatekeeping Function of Trial Courts

Trial courts serve an important gatekeeping role regarding the admissibility of expert testimony. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) ("The objective . . . is to ensure the reliability and relevancy of expert testimony."). Thus, the trial court must examine "the foundations of expert opinions to ensure they meet the standards for admissibility." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis omitted) (citing McCorvey, 298 F.3d at 1257). [3]

---

[3]    It is within the district court's discretion whether to hold a Daubert hearing to help decide issues concerning an expert's adequacy to testify. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005) ("Daubert hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses.") (citation omitted). The Court held oral argument on all pending motions to exclude expert testimony on September 22, 2020.

However, the Eleventh Circuit has held that this standard is "relaxed" when

no jury is involved:

> Th[e] barriers [of Rule 702] are even more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about dumping a barrage of questionable scientific evidence on a jury. There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.

United States v. Brown, 415 F.3d 1257, 1268–69 (11th Cir. 2005) (internal

quotations and citations omitted).

### B.      Federal Rule of Evidence 702

Federal Rule of Evidence 702 allows a qualified expert to give opinion

testimony when it is necessary to help the trier of fact understand the issues,

the opinion is based on sufficient facts or data, it was produced using reliable

principles and methods, and those principles and methods were reliably

applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs

a "rigorous" three-part inquiry to determine if these admissibility criteria are

met. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562

(11th Cir. 1998). Expert testimony is admissible when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

> conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> Thus, the admissibility of an expert's opinion turns on three things: qualifications, reliability, and helpfulness. "The burden of establishing qualification[s], reliability, and helpfulness rests on the proponent of the expert opinion." <u>Frazier</u>, 387 F.3d at 1260; <u>see also</u> <u>Allison</u>, 184 F.3d at 1312 (stating that the proponent has the burden to show reliability by a preponderance of the evidence).

### 1.   *Qualifications*

An expert may be "qualified" in many ways. <u>Frazier</u>, 387 F.3d at 1260. Federal Rule of Evidence 702 makes clear that expertise can arise from "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The trial court must ensure that an individual's experience provides an appropriate foundation for asserting the opinions in question. <u>Frazier</u>, 387 F.3d at 1262. Determining that a witness is qualified to form an opinion, however, is a separate and distinct inquiry from whether that opinion has a reliable basis. <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341

(11th Cir. 2003). In other words, a witness can be qualified yet offer unreliable testimony. Id. at 1342.

### 2. *Reliability*

The reliability inquiry focuses solely on the principles and methodology underlying the expert's opinion, *not* the expert's conclusions. Daubert, 509 U.S. at 595. Thus, the question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable. Allison, 184 F.3d at 1312. Generally, if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis. Daubert, 509 U.S. at 592–93.

In Daubert, the Supreme Court discussed four factors that the trial court might consider in its reliability inquiry: (1) whether the methodology has been (or can be) tested, (2) whether the methodology has been subject to peer review, (3) whether the methodology has a high rate of error, and (4) whether or not the methodology is widely accepted within the scientific community. Id. at 593–94. This list, however, is not comprehensive. Id. at 593 ("Many factors will bear on the inquiry, and [there is no] definitive checklist or test."). The trial court is not limited to the Daubert factors and may consider other questions in light of the specific facts of the case at hand. Kumho, 526 U.S. at 152 ("[W]hether

10

Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.") (emphasis omitted); see also Allison, 184 F.3d at 1312 (noting that the factors listed in Daubert were not exhaustive). Trial courts have considered other factors such as whether an expert relied on "anecdotal evidence (as in case reports), temporal proximity, [or] improper extrapolations (as in animal studies)." Allison, 184 F.3d at 1312.

Moreover, there is an important distinction between scrutinizing the reliability of an expert opinion's underlying methodology (or principles) and scrutinizing the expert's application of that methodology. Quiet Tech., 326 F.3d at 1343. Challenging the underlying methodology in general is an admissibility issue; challenging the expert's application of that methodology is an accuracy issue. Id. at 1344, 1344 n.11, 1345. Issues of accuracy are best resolved through cross-examination and the adversarial process. Id. at 1345; see also Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

### 3. *Helpfulness/Relevance*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person such that

it is helpful to the trier of fact. Frazier, 387 F.3d at 1262. The testimony must also have a "valid scientific connection to the disputed facts in the case." Daubert, 509 U.S. at 591. The expert may be qualified and the basis for the opinion may be reliable, but if the opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. See id. ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted).

### III.   ANALYSIS

#### A.   Dr. McCrary's Report is Relevant

First, the Court rejects Defendant's relevance arguments. Defendants argue that Dr. McCrary's report is irrelevant because the "vast majority of Dr. McCrary's opinion describes his views about the discriminatory effect of election practices that Georgia no longer uses." Doc. No. [404], p. 8. They also argue that, even if historical analysis were relevant, it would be relevant only to claims of intentional discrimination, not discriminatory effect. The Court disagrees.

First, as this Court noted in its Order denying the motion to exclude Dr. Jones' testimony, "historical analysis is helpful to the trier of fact because it

12

provides a relevant, historical backdrop to the facts of this case." Doc. No. [577], p. 15. This is especially true in complex voting rights cases such as this one.

Second, the Court finds no authority to support Defendants' argument that history is irrelevant to claims of discriminatory effect. To the contrary, in Gingles, the United States Supreme Court stated that "the essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and *historical conditions* to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47 (emphasis added). Determining whether, based on the totality of circumstances, a state or political subdivision violated Section Two "requires a 'searching practical evaluation of the past and present reality.'" Rios-Andino v. Orange Cty., 51 F. Supp. 3d 1215, 1219 (M.D. Fla. 2014) (quoting Gingles 478 U.S. at 45). In a vote denial claim such as Plaintiffs', Plaintiffs must show the challenged "standard, practice, or procedure" imposes a discriminatory burden on members of a protected class, leaving them with "less opportunity . . . to participate in the political process." NE Ohio Coal. for the Homeless v. Husted, 837 F.3d 612, 626-27 (6th Cir. 2016). As Defendants note in their summary judgment briefing, that burden must be caused by or linked to "social

13

and *historical* conditions" that produce current discrimination. Doc. No. [450-1], p. 44 (emphasis added) (quoting id.).

For these reasons, the Court holds Dr. McCrary's report is relevant to Plaintiffs' Section 2 claim. Defendants' argument that the  history he recounts bears an insufficient temporal relation to any challenged practice in this case goes to the weight this Court should ultimately assign to his analysis—not its admissibility.

## B.    Dr. McCrary's Report is Based on Reliable Methodology

Defendants argue Dr. McCrary's report is unreliable because it is "merely a repetition of the testimony of other witnesses about an issue in which Dr. McCrary has conducted no original analysis." Doc. No. [404], p. 7. The Court disagrees. Dr. McCrary states: "when I cite evidence presented by other scholars, I only rely on work based on methodology I am qualified to evaluate from my training and experience." Doc. No. [339], p. 9, ¶ 13. And as Plaintiffs note, Dr. McCrary's report is based on far more than just a few other expert reports:

> Dr. McCrary analyzes the opinions of other expert witness and draws conclusions based on not only those opinions, but also based on "scholarly studies by historians, political scientists, and other social scientists"; "statutes or constitutional provisions";

14

> "official legislative history documents and newspaper coverage"; "other documents produced in litigation, such as deposition transcripts, stipulations of fact between the parties, or settlement agreements"; "government records"; "records of Department of Justice enforcement of the preclearance requirements of Section 5 of the Voting Rights Act"; and documents defendants produced during discovery.

Doc. No. [476], pp. 16–17 (citing Doc. Nos. [339], ¶¶ 13–15; [413] (McCrary Dep.) 11:24–15:24). During his deposition, when asked if he relied only on other expert reports, Dr. McCrary stated:

> In addition, I'm relying on the analysis of the Department of Justice underlying the adoption of its 2009 objection to the voter verification process, I'm relying in part on the assessment of the HAVV system by the Social Security Administration reflected in the Inspector General's report . . . and I'm including also the analysis of the voter registration process by Gary Bartlett, the election director for almost 20 years in the state of North Carolina, who is a highly respected election administrator.

McCrary Dep., 123:7–18.

Dr. McCrary also explained his methodology, including his newspaper research process, see id. at 40:12–43:21, how he determines whether "there may be a legitimate government purpose versus a racially discriminatory purpose," id. at 49:22–50:16, his interdisciplinary approach, id. at 116:22–117:25), and

15

statistical analyses, id. at 115:10–18. Courts have found that gathering and analyzing multiple sources to reach conclusions about historical facts is an accepted historical methodology for expert witnesses. See United States v. Kantengwa, 781 F.3d 545, 562 (1st Cir. 2015). To the extent Dr. McCrary considers other expert reports, historians may reasonably rely on a combination of primary and secondary sources while maintaining sound methodology. See Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama, No. 2:16-CV-731-WKW, 2020 WL 579385, at *3–4 (M.D. Ala. Feb. 5, 2020); United States v. Paracha, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *20–21 (S.D.N.Y. Jan. 3, 2006).

Defendants also argue that Dr. McCrary's report is unreliable because he is a historical expert in discriminatory intent behind statutes, not discriminatory effect. Doc. No. [404], p. 6. This argument is similarly unavailing.

First, Dr. McCrary's experience does include analysis of discriminatory effect. In Alabama State Conference of NAACP v. Alabama, No. 2:16-CV-731-WKW, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020) Dr. McCrary testified about discriminatory effects including, inter alia, the history of official discrimination in Alabama, racially polarized voting over the years in Alabama, and the continuing effects of past discrimination in Alabama. Doc. No. [476-1]

16

(McCrary Decl.) ¶¶ 13–34, 35–43, 54–58. And, more recently, in Chestnut v. Merrill, No. 2:18-cv-907-KON (N.D. Ala. Mar. 8, 2019) he testified to the "persistent, ongoing effects of Alabama's long history of discrimination." Id. ¶¶ 11–45, 46–60. Plaintiffs also cite a number of Dr. McCrary's published works in which he discusses discriminatory effect. See Doc. No. [476], p. 14, n.1.

Second, Defendants' view of the reliability requirement is too narrow. They essentially argue that an unquestionably qualified historical expert on discriminatory intent is somehow incapable of using the foundational tools of his expertise to analyze discriminatory effects. This is a misapplication of the Daubert reliability standard. Generally, if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis. Daubert, 509 U.S. at 592–93. Here, Dr. McCrary "employed the standard methodology used by historians and political scientists in my fields of expertise when investigating the intent underlying the adoption or maintenance of election laws, and the effects of these laws on the political process." Doc. No. [339], p. 9. As he notes,

> When analyzing political decision-making, historians and political scientists examine the political, institutional, and social context within which a

17

decision is made. When examining how the political system operates, we consider quantitative evidence regarding voter behavior, the conduct of registration and voting by state or local officials, and the behavior of legislative bodies. In both types of investigations, we examine relevant scholarly studies, newspaper articles concerning events, reports of state or federal governments, and relevant court decisions as well.

Id. n. 5. The Court finds this methodology to be generally accepted and reliable. Defendants can raise arguments about the accuracy of Dr. McCrary's conclusions on cross-examination.[4] See Quiet Tech., 326 F.3d at 1344–45.

## IV.   CONCLUSION

For the forgoing reasons, Defendants' Motion to Exclude the Testimony of Peyton McCrary ("Dr. McCrary") pursuant to Federal Rule of Evidence 702 (Doc. No. [404]) is **DENIED**.

**IT IS SO ORDERED** this __4th__ day of December, 2020.

s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[4] So, too, can Defendants question Dr. McCrary about his perceived bias, see Doc. No. [404], p. 9—but this Court rejects the notion that any policy preference Dr. McCrary may personally have renders his testimony inadmissible.