IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FAIR FIGHT ACTION, INC., et al.,

    **Plaintiffs,**

**v.**

                                **CIVIL ACTION FILE NO.**

                                **1:18-CV-5391-SCJ**

BRAD RAFFENSPERGER, et al.,

    **Defendants.**

## ORDER

This matter appears before the Court on Defendants' Motion for Summary on Jurisdiction. Doc. No. [441].

## I.    BACKGROUND[1]

Plaintiffs Fair Fight Action, Inc. ("Fair Fight"), Care in Action, Inc. ("Care in Action"), Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer"), Baconton Missionary Baptist Church, Inc. ("BMBC"), Virginia-Highland Church, Inc. ("Virginia-Highland"), and The Sixth Episcopal District, Inc. (the "Sixth District") (collectively, "Plaintiffs") first filed this lawsuit on November 27, 2018.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Doc. No. [1]. Since then, Plaintiffs have twice amended their Complaint (Doc. Nos. [41]; [582]), and the Court dismissed several of Plaintiffs' original claims. Doc. No. [68]. Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief brings certain claims against Defendants Brad Raffensperger (in his official capacity as Secretary of State of the State of Georgia and as Chair of the State Election Board of Georgia), Members of the State Election Board in their official capacities (Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le), and the State Election Board (collectively, the "Defendants"). Doc. No. [582].

In their Second Amended Complaint, Plaintiffs allege that in the 2018 General Election, Defendants "enforced unconstitutional and otherwise unlawful legislation, created and enforced unconstitutional and otherwise unlawful policies, and engaged in gross mismanagement that resulted in an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote." Id. ¶ 2. Plaintiffs assert that Defendants' actions violated the First,

Fourteenth, and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Id. ¶ 3.[2]

On June 10, 2020, upon Defendants' request, the Court informed the Parties that they would be allowed to file two separate summary judgment motions for purposes of addressing jurisdictional and substantive issues. Doc. No. [379]. On June 29, 2020, Defendants filed their Motion for Summary Judgment on Jurisdiction (Doc. No. [441]), arguing that Plaintiffs lack organizational and associational standing, are unable to show that their alleged harms are traceable to or redressable by Defendants, and assert other claims that are moot, barred, or otherwise foreclosed by law (see Doc. No. [441-1], pp. 1–2). Plaintiffs have

---

[2] Specifically, Plaintiffs' five causes of action are as follows: (1) violation of the fundamental right to vote (First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count I); (2) violation of the ban on racial discrimination in voting (Fifteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count II); (3) violation of Equal Protection (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count III); (4) violation of Procedural Due Process (Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983) (Count IV); (5) violation of Section 2 of the Voting Rights Act of 1965 (Count V). Doc. No. [582], ¶¶ 150–222. Despite the recent amendment of the Complaint, the Court is of the opinion that its prior Eleventh Amendment immunity ruling as to the State Election Board (as a state agency) controls. Doc. No. [68], pp. 43–52, 85. Accordingly, only Count V (which pertains to Section 2 of the Voting Rights Act of 1965) remains pending against the State Election Board. The immunity ruling does not apply to the official capacity causes of actions asserted against the individual members of the State Election Board.

3

responded in opposition (Doc. No. [489]), and Defendants replied (Doc. No. [533]).[3] The Court held a hearing on the pending motion on January 12, 2021. Doc. No. [602]. After consideration of the arguments and the Parties' presentations of material facts,[4] this matter is now ripe for review.

## II.   LEGAL STANDARD[5]

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[3] Additional supplemental filings are at Doc. Nos. [546], [553], [564], [566], [594].

[4] Plaintiffs and Defendants have both filed various iterations and updates of statements of material facts, as well as responses and objections thereto. See, e.g., Doc. Nos. [451]; [458]; [491]; [492], [506]; [532]; [534]; [550]; [604]; [610]. In this Order, the Court draws primarily from the uncontested material facts in Defendants' (Doc. No. [451]) and Plaintiffs' (Doc. No. [604]) latest statements of material facts. The Court recognizes that Defendants have filed a global objection to Plaintiffs' Corrected Statement of Additional Material Facts (Doc. Nos. [534], [610]). The Court has deemed it proper to resolve the jurisdictional aspects of the case first. The Court will resolve the global objection prior to a ruling on the merits aspect of the case. To the extent that any party has filed specific objections to the facts cited in this Order, the Court has overruled said objection by the inclusion of said fact in this Order (or otherwise specified the purpose for which the Court considered the fact).

[5] The standard below pertains only to summary judgment. Additional legal standards pertaining to specific standing doctrines will be discussed further below in the analysis section.

A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325 (internal quotations omitted).

In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). "In doing so, the district court may not weigh the evidence or find facts. Nor may the court make credibility determinations of its own." Ga. State Conf. of NAACP v.

5

Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015) (internal quotations and citations omitted). Further, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924–25 (11th Cir. 2018) (holding that "conclusory allegations without specific supporting facts have no probative value").

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Celotex Corp., 477 U.S. at 324 (requiring the nonmoving party to "go beyond the pleadings" to establish that there is a "genuine issue for trial"). All reasonable doubts should be resolved in the favor of the nonmovant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." Id. (citations omitted).

6

III.   **ANALYSIS**

The Court's analysis is divided into three parts: standing, mootness, and political question doctrine.

A.   <u>**Standing**</u>

"Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" <u>CAMP Legal Def. Fund, Inc. v. City of Atlanta</u>, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. Art. III § 2; <u>see also Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559–60 (1992). Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 408 (2013). Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing. <u>Focus on the Fam. v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities); <u>Johnson v. Bd. of Regents of Univ. of Ga.</u>, 263

7

11 F.3d 1234, 1267 (11th Cir. 2001); <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>,

408 F.3d 1349, 1352 n.3 (11th Cir. 2005).

> To establish standing, a plaintiff must show three things:

>> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Lujan</u>, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted).

"The party invoking federal jurisdiction bears the burden of establishing

standing—and, at the summary judgment stage, such a party can no longer rest

on . . . mere allegations, but must set forth by affidavit or other evidence specific

facts." <u>Clapper</u>, 568 U.S. at 411–12 (internal quotations and citations omitted); <u>see</u>

<u>also</u> <u>Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater</u>, 777 F.2d

598, 607 n.24 (11th Cir. 1985) (noting that standing "is a legal determination based

on the facts established by the record").

8

The Court will now consider the three requisites that the organizational plaintiffs must establish: injury in fact, causal connection, and redressability.

### 1.   *Injury in Fact*

An organization may have standing under a "diversion-of-resources" theory when it must divert financial resources or its personnel's time to counteract a defendant's unlawful acts, thereby impairing the organization's ability to engage in its typical projects. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); Common Cause/Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding that an organization had standing because it "would divert resources from its regular activities to educate and assist voters in complying with" a challenged statute); Common Cause Ind. v. Lawson, 937 F.3d 944, 952–53 (7th Cir. 2019) (listing cases finding organizational standing for voter-advocacy groups that diverted resources to counteract unlawful election activity).[6] The

---

[6] An organization that diverts its resources voluntarily can still have standing if the "drain on [the] organization's resources arises from the organization's need to counteract the defendants' assertedly illegal practices [because] that drain is simply another manifestation of the injury to the organization's noneconomic goals." Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008) (internal quotations and citation omitted).

diversion of resources constitutes an Article III injury in fact. See Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1165 n.14 (11th Cir. 2008).

In the Eleventh Circuit, a litigant can establish organizational standing to challenge election laws by showing it has or anticipates having to divert time, personnel, or other resources from its usual projects to assist voters whose ability to vote is affected by state action. See Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1341 (11th Cir. 2014); Browning, 522 F.3d at 1165–66 (finding organizational standing when a plaintiff diverted resources from election-day education and monitoring to educating volunteers and voters on compliance with a new election law). Even when an organization diverts its resources to achieve its typical goal in a different or amplified manner, the organization may still gain standing. See Browning, 522 F.3d at 1166 (finding organizational standing when a plaintiff anticipated that it would "expend many more hours than it otherwise would have" on specific election-related activity). To create a concrete injury, the diversion must cause a perceptible impairment of organizational activities. Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1249 (11th Cir. 2020). And to show the concrete injury, the organization must identify the specific activities from which it diverted or is diverting resources. Id. at 1250.

10

Plaintiffs assert that they have established organizational standing under a diversion-of-resources theory. Doc. No. [489], pp. 6–19.[7] Each Plaintiff is an organization involved in civic engagement and that undertakes work in voting rights. See Doc. No. [582], ¶¶ 10–35. In their Motion for Summary Judgment on Jurisdiction, Defendants argue that Plaintiffs have failed to establish organizational standing because "they (1) are not diverting resources, (2) are serving their organizational mission, [and] (3) cannot identify what activities they diverted resources from." Doc. No. [441-1], p. 1. They argue that several Plaintiffs are unable to identify from what activity or fund they divert resources because they were unable to "quantify" the diversion. E.g., id. at 9, 15 (stating that certain Plaintiffs were unable to quantify exactly how much personnel time was diverted or how diverting personnel time impacted their other activities). In sum, Defendants argue that Plaintiffs failed to summon "trial-worthy evidence

_____

[7] Although Plaintiffs argued during the hearing that "associational standing has been part of this case all along" (Doc. No. [607], p. 50), Plaintiffs assert it for the first time in their response to Defendants' Motion for Summary Judgment on Jurisdiction. Doc. No. [489], pp. 19–20. Defendants argue that Plaintiffs' delay in bringing this argument results in a waiver of their right to assert it. Doc. No. [533], pp. 9–10. Because the Court finds that Plaintiffs have established organizational standing, the Court will forgo analysis as to associational standing.

showing" that they diverted resources in a manner that would confer standing. Id. at 6.

Plaintiffs counter that they do not need to quantify their diversions of resources to show that they have in fact diverted resources and thereby suffered a concrete injury. Doc. No. [489], p. 8.[8] Plaintiffs also argue that they do not have to undertake new activities that conflict with their organizational missions. Id. Instead, Plaintiffs contend that they need only show—and have shown—that they had or will have to divert resources because Defendants' unlawful conduct would hinder Plaintiffs' abilities to carry out their missions. Id.

As an initial matter, the Court agrees with Plaintiffs that they do not need to quantify their diversions of resources to show that such diversions occurred. Plaintiffs must make only a minimal showing of a concrete injury to meet the modest diversion-of-resources requirement. While quantifying the diversion of resources certainly would help the Court identify a concrete injury, it is but one

---

[8] For support, Plaintiffs cite People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium, 189 F. Supp. 3d 1327, 1340 (S.D. Fla. 2016), aff'd 879 F.3d 1142 (11th Cir. 2018), which states that "[t]he showing of an actual, concrete injury is a modest requirement for Article III standing, which does not require quantification."

way to show the injury. Testimony identifying the diversion—even if that testimony does not *quantify* the diversion—suffices.

Furthermore, the Court agrees that Plaintiffs do not have to undertake new missions that conflict with their existing missions to show a diversion of resources. As the law currently stands, Plaintiffs simply need to show that Defendants' actions caused Plaintiffs to divert resources, even if that manifests as a diversion from one activity geared towards achieving the organization's mission to a different activity geared towards that mission.[9] Similarly, while Defendants are correct that mere interest in an issue is not sufficiently concrete to support standing (see Doc. No. [533], p. 2), the law currently confers standing to an organization that diverts its resources to counteract a defendant's unlawful

---

[9] To be clear, the question is not necessarily whether the litigant is unable to continue pursuing its core mission but instead whether it suffered a perceptible impairment in its pursuit of that mission by having to divert resources to counteract the defendant's acts. The litigant may both continue to pursue its core mission and gain organizational standing if it has been forced to divert resources from one means of achieving the mission to another means of doing so. In other words, for organizations with broad missions such as "voting rights," the analysis may often turn on whether the organization had to divert resources in a way that forced it to alter *how* it achieved its mission, not *whether* it was pursuing its usual or a new mission. Otherwise, organizations with broad missions would never have standing to challenge laws that affect their area of work. Of course, a diversion of resources from an unrelated activity or mission may also suffice.

acts. The fact that the organization has a preexisting interest in the subject at issue does not change the diversion-of-resources analysis, and under current jurisprudence an organization can show more than mere interest if it shows that it suffered an injury by diverting resources.[10]

The Court now analyzes organizational standing as to each Plaintiff.

### i.   Fair Fight Action, Inc.

Fair Fight is a 501(c)(4) nonprofit organization whose "core mission is to secure the voting rights of Georgians." Doc. No. [582], ¶ 10. Fair Fight alleges that its past voter-related efforts have included conducting a vote-by-mail program, educating voters about upcoming elections, and engaging in a "get-out-the-vote" program. Id. ¶ 11. Plaintiffs assert that these efforts were focused solely on educating and encouraging voters about elections and voter registration, but they were not focused on "educating voters about how to overcome the voter

---

[10] During summary judgment oral argument, Defendants also noted perceived tension in the organizational standing jurisprudence, questioning why an organization could have standing to sue a state in an election case when individuals have had their election lawsuits dismissed due to lack of a particularized injury. See Doc. No. [607], pp. 14–18. The cases cited by Defendants are factually distinguishable. Regardless, the law currently gives standing to organizations that divert resources to counteract a defendant's unlawful acts. Without further guidance from the Eleventh Circuit, standing jurisprudence for individuals does not change the Court's analysis here.

14

suppression" about which Plaintiffs complain. Id. ¶ 12. Fair Fight intends to continue its past work but must implement new programs and engage in new efforts to counteract Defendants' acts. See id. Fair Fight alleges that these new activities will require it "to expend additional resources diverted from its other programs," and that this "diversion of resources is necessitated by and directly traceable to Defendants' misconduct." Id. ¶ 13.

Defendants contend that Fair Fight did not divert resources but instead merely "continued its organizational mission of making voting more accessible" and fighting voter suppression, even if Fair Fight claimed during this litigation that its mission is only "to do voter engagement work." See Doc. No. [441-1], pp. 16–18. Thus, Defendants argue, Fair Fight "can show only a frustration of its objectives" that is insufficient to confer organizational standing. Id. at 18. Also, Defendants argue that Fair Fight was unable to quantify its diversions of funds. Id. And to the extent staff would not be working to counteract Defendants' acts, they would be working on matters for a separate organization, so there is no diversion of personnel time that impairs Fair Fight's activities. Id. at 20. In sum, Defendants argue that Fair Fight was formed specifically to litigate this matter, and as a result it cannot show a diversion of resources. See id. at 19–20.

Plaintiffs respond that Fair Fight has shown that it diverted resources from its typical voter engagement activities to voter protection activities. Doc. No. [489], p. 16. They argue that Fair Fight has provided evidence that its work to counteract Defendants' acts has "come[] at a cost" to its core work and limited Fair Fight's typical efforts in voter education and engagement. Id. at 16–18. And while Fair Fight was formed to undertake election work, it has still shown a "diversion of resources because it has responded to Defendants' acts by undertaking voter suppression work, which has impaired its voter education and engagement work." Id.

The Court finds that Fair Fight has provided sufficient evidence to show a diversion of resources. Fair Fight has shown through deposition testimony that Defendants' actions perceptibly impaired its ability to carry out its usual voter education efforts. See Doc. No. [604-2], ¶¶ 113, 137. Fair Fight has also sufficiently shown that it has diverted and anticipates needing to divert resources from its general voter education efforts to address alleged voter suppression. See id. ¶¶ 99, 101–102, 106–112. Further, Fair Fight has provided specific examples of activities from which it was diverting personnel time and other resources. See,

16

e.g., id. ¶¶ 132–134, 136–137, 139–141.[11] Even though Fair Fight was able to maintain its core mission (see Doc. No. [604-2], ¶ 96), it still has shown that it diverted personnel time and other resources from its typical activities to counteract Defendants' acts. Because Fair Fight could have allocated those resources to their typical activities, the diversion necessarily results in a perceptible impairment of their ability to pursue their typical activities.[12] Therefore, Fair Fight has shown a diversion of resources sufficient to show an injury in fact.

### ii.   Care in Action, Inc.

Care in Action is a 501(c)(4) organization that undertakes work to support domestic workers, which includes engaging in voter encouragement and

---

[11]  Fair Fight also shows that it diverted personnel time by having phone-banking volunteers ask Georgia residents about voter registration status, in addition to engaging in their typical voter education talking points. Doc. No. [604-2], ¶¶ 113, 120. Even in situations like these where an organization adds to its usual activities instead of fully replacing them, a diversion of resources can still result. For example, Fair Fight may not have *replaced* its usual phone-banking talking points by including questions concerning voter registration, but the additional time spent covering the latter logically reduces the breadth of Fair Fight's potential outreach, thereby creating a perceptible impairment of Fair Fight's ability to carry out its usual tasks.

[12]  After all, the diversion-of-resources standard does not require the diversion to preclude the organization from undertaking its typical activities—the diversion need only perceptibly impair the organization's ability to do so.

education. Doc. No. [582], ¶¶ 14–15. Care in Action alleges that Defendants' actions have thwarted its "mission by burdening domestic workers' right to vote." Id. ¶ 16. It also alleges that it "dedicated significant resources to counteracting" Defendants' acts. Id. ¶ 17. For example, Care in Action states that it undertook efforts to contact voters who cast provisional ballots and reallocated personnel to help with voting rights issues in Georgia. Id. Moreover, Care in Action alleges that Defendants' actions have caused it to "shift[] its budget priorities and add[] more staff to address voting rights," and that Care in Action will continue to divert resources from its traditional programs to counteract Defendants' alleged acts. See id. ¶¶ 18–20.

While Care in Action claims that it diverted both financial resources and personnel time, Defendants argue that counting provisional ballots falls squarely within Care in Action's stated mission of encouraging domestic workers to vote, is not "contrary to its mission," and is not in response to Defendants' alleged acts. Doc. No. [441-1], pp. 12–13. To the extent Care in Action identified expenditures, Defendants argue it was unable to specify how those expenses "were unique to its post-election counting of provisional ballots" or otherwise was different from its usual election-related activities. See id. at 13–14. Defendants also contend that

Care in Action failed to identify from what activities it allegedly diverted funds and in fact expended resources only in furtherance of its stated mission. See id. at 14–15. Similarly, Defendants argue that Care in Action has failed to show that it diverted personnel time in response to Defendants' acts because the organization had already trained domestic workers in election-related matters, did not undertake activities that substantially differed from its typical voting-related work, and did not identify whether its usual activities were impaired. Id. at 15. And Defendants contend that even when Care in Action was able to identify a staffer who was diverted from other work to counteract Defendants' acts, it was unable to quantify how the diversion of the staff member impaired its usual activities. Id. In sum, Defendants argue that Care in Action did not divert resources but instead "merely continued its pre-election campaign activities." Id. at 16.

Plaintiffs respond that Care in Action has shown that it extended its anticipated election work in Georgia in response to Defendants' acts, which is sufficient for diversion-of-resources standing. Doc. No. [489], p. 14. Specifically, Plaintiffs argue that Care in Action has provided evidence that it diverted resources from its usual projects to undertake unexpected post-election work in

response to Defendants' acts to ensure provisional ballots were counted. Id. at 14–15. For example, Care in Action has shown that a staff member who stayed in Georgia to assist with post-election efforts was unable to perform tasks in the staffer's regular, full-time job in immigration work. Id. at 14. Plaintiffs also argue that, even though Care in Action need not quantify its diversions, it did so by describing the usual activity a staffer was not undertaking and providing documentation of its relevant expenses. Id. at 15. Finally, Plaintiffs reject Defendants' argument that Care in Action need have undertaken activities contrary to its mission to gain organizational standing. Id. at 15–16.

The Court finds that Care in Action has shown a diversion of resources. Care in Action has provided deposition testimony that Defendants' acts caused it to divert financial resources and personnel time from its usual work—including planned immigration and lobbying projects—to assist with post-election work in Georgia that it had not anticipated undertaking. See Doc. No. [604-2], ¶¶ 56, 58, 61–74, 81–87.[13] Care in Action further showed that it has

_____

[13] For example, Care in Action stated that one staff member forwent a planned work trip to Mexico to help open an immigration refugee camp so the staff member could remain in Georgia to undertake election work. See Doc. No. [604-2], ¶ 83.

20

continued to divert resources to counteract Defendants' acts and expects to continue doing so. See id. ¶¶ 77–78. The organization has shown an injury in fact.

### iii.   Ebenezer Baptist Church of Atlanta, Georgia, Inc.

Ebenezer is a 501(c)(3) organization and church with a 6,000-member congregation and that "has long-served Atlanta's African American community and has been at the forefront of the civil rights movement." Doc. No. [582], ¶ 21. Among other work in "global ministry dedicated to individual growth and social transformation," Ebenezer has long engaged in voting rights efforts. Id. ¶¶ 21–22. For example, "Ebenezer regularly sponsors voter registration drives and activities, partners with community organizations to raise awareness regarding voting, provides information and education to the community about voting, and provides community members with rides to voting locations." Id. ¶ 22. Ebenezer alleges that Defendants have thwarted its voting-related mission and have forced it to divert resources from its typical activity to conducting "an extensive vote-by-mail campaign." See id. ¶¶ 22–23. Ebenezer had to reallocate church volunteers, staff, and space to undertake the campaign, and it had to divert its resources, "including personnel and time," from its other ministries and activities.

21

Id. ¶ 22. The church anticipates having to continue diverting resources from its other church activities to counteract Defendants' actions. Id. ¶¶ 22–24.

Defendants argue that Ebenezer has long undertaken voting rights work, funding that work through a social-justice budget "that does not specify the type of voting-related activity within that line item." Doc. No. [441-1], pp. 10–11. Defendants contend that Ebenezer cannot support its claim that it diverted monetary resources because the church had no documentation that it spent money differently to counteract Defendants' acts. Id. at 10–11. And in any event, Defendants argue, Ebenezer's efforts in 2018 were mere continuations of their already existing efforts to register, encourage, and educate voters. See id. at 10. Defendants acknowledge that Ebenezer identified diversions in the form of reallocating volunteer time and establishing a voter hotline, but Defendants argue that these activities were in pursuit of Ebenezer's existing mission to assist voters and did not impair its regular activities. See id. at 11–12.

In response, Plaintiffs argue that in 2018 Ebenezer had intended to commit resources to voting encouragement efforts but was forced to counter Defendants' alleged suppression tactics instead. Doc. No. [489], p. 9. Plaintiffs provide evidence that Ebenezer established a phone bank, created materials to counteract

22

Defendants' acts, and refocused its educational efforts and materials. See id. at 9 n.2. Plaintiffs also show that Ebenezer diverted these resources from church programming, allocation of church space, and election-related activities that Ebenezer typically undertook. Id. at 9–10. Thus, Plaintiffs argue Ebenezer has provided evidence that it diverted resources to counteract Defendants' acts. See id. at 10.

The Court finds that Ebenezer has sufficiently shown a diversion of resources. Ebenezer provided deposition testimony that the church had undertaken or planned to undertake certain voting rights activities—such as voter registration, education, and mobilization—but had to divert resources, volunteers, and staff from those and other church activities to refocus efforts on voter verification, educating voters about alleged voter suppression in Georgia, and teaching voters how properly to vote by mail. See Doc. No. [604-2], ¶¶ 6, 8–10, 12, 18–23, 25–27, 34–36, 38–47. These new activities included establishing a voter verification hotline in which volunteers who normally undertook other church or voting-related activities assisted callers ensure they were properly registered to vote. See id. ¶¶ 9–10, 22–23, 25–27. While these new activities arguably fall within Ebenezer's broad, preexisting mission to support voting

rights, they are materially different means of achieving that goal. And even though Ebenezer did not provide financial documentation, the church has provided sufficient evidence to show that it diverted resources from its typical activities in order to pursue these new means. Thus, the Court finds that Ebenezer has shown that it diverted resources to counteract Defendants' acts and has thereby suffered an injury in fact.

### iv.   Baconton Missionary Baptist Church, Inc.

BMBC is a "nonprofit religious organization" that "considers voting an integral part of its community building mission." Doc. No. [582], ¶ 25. During past election cycles, BMBC has undertaken voting activities such as voter engagement, education, and registration drives, as well as weekly prayer meetings for candidates. Id. BMBC alleges that Defendants' actions have frustrated and will continue to frustrate its mission. Id. ¶ 26. Specifically, BMBC claims that Defendants' voter "purges" have caused BMBC to divert the "time of its church volunteers and church resources to assist church and community members" to determine whether they could vote. Id. BMBC alleges that it will continue to divert resources from its usual church activities to counteract Defendants' actions. Id. ¶¶ 26–27.

Defendants argue that BMBC failed to show a diversion of resources. Doc. No. [441-1], pp. 9–10. They contend that while BMBC alleged that voting issues are part of the church's mission and that time spent on voting issues could not be spent on other parts of the church's mission, BMBC failed to *quantify* how much time spent allegedly counteracting Defendants' actions was diverted from other activities or impaired the church's normal activities. See id. For example, BMBC's diversion allegedly includes a pastor's time discussing Defendants' actions in sermons and Bible-study classes and volunteers spending time helping voters check their voter status instead of engaging in other church activity. Id. at 9. But, according to Defendants, BMBC could not sufficiently quantify the time or resources diverted. Id. at 10. And to the extent the pastor estimated his time spent discussing Defendants' actions, it was minimal and not different enough from prior election-related speech to constitute a perceptible impairment of the church's activities. Id.

Plaintiffs respond that although BMBC has long undertaken election-related activities, it has shown that it had to divert resources to counter Defendants' acts. Doc. No. [489], pp. 11–12. For example, BMBC has shown that

25

its pastor and volunteers spent time discussing or facilitating voter verification when they could have discussed or assisted with other church matters. Id. at 12.

Through deposition testimony, BMBC showed that while it previously had engaged in voting-rights activities, its pastor and the church shifted their focus to ensuring that congregants and their communities were checking their voter registration status by, among other things, devoting time during worship and church meetings to discuss the matter, and also printing related materials that the church otherwise would not have printed. Doc. No. [604-2], ¶¶ 146–156. BMBC has asserted that this focus diverted from time and other resources typically spent addressing issues such as feeding the hungry and engaging in other community outreach. See id. ¶¶ 164–166. BMBC also diverted volunteer time from these typical activities to assist with voter verification. See id. ¶¶ 157–159. While these diversions of resources arguably are minimal, they are enough to satisfy the modest requirements for organizational standing.

### v.    <u>Virginia-Highland Church, Inc.</u>

Virginia-Highland is a 501(c)(3) organization and Atlanta church that "has focused on inclusivity and has championed social justice for marginalized members of society." Doc. No. [582], ¶ 28. Championing voting rights is central

to Virginia-Highland's cause, and the church has encouraged voters by undertaking voter registration and engagement efforts and assisting with Election Day transportation. See id. In response to Defendants' actions, however, Virginia-Highland will divert its resources from these and other church activities to voter education efforts that it has not undertaken in the past. Id. ¶¶ 28–30.

Defendants argue Virginia-Highland has failed to establish organizational standing because it "claims no financial diversion" and has not actually diverted volunteer time from its usual activities. See Doc. No. [441-1], pp. 7–8. Because the church's mission already "includes voter education and registration," Defendants argue, Virginia-Highland cannot have diverted resources from its usual activities if the church's alleged response to Defendants' actions was to undertake its usual activities. See id. Moreover, Defendants argue that Virginia-Highland was unable to describe a perceptible impairment to its usual activities or quantify how much time its volunteers diverted to counteract Defendants' actions. Id. at 8. As a result, Defendants argue that Virginia-Highland has failed to establish organizational standing. Id.

Plaintiffs counter that while Virginia-Highland previously engaged in election-related activities, Defendants' acts required the church to reallocate

27

more volunteer time to addressing voter suppression. Doc. No. [489], pp. 10–11. They further argue that even if Virginia-Highland did not "quantify" its diversion, the church has provided sufficient testimonial evidence to show that it has diverted personnel time from church and election-related activities to counteract Defendants' acts. Id. at 11.

The Court finds that Virginia-Highland has provided enough evidence to show a diversion of resources. Virginia-Highland has provided deposition testimony that while it has worked on voter education and registration since 2014, the church diverted volunteer and personnel time from those activities to addressing voter roll irregularities, absentee ballot issues, polling place closures, and other voting issues that the church believe Defendants caused. See Doc. No. [604-2], ¶¶ 169, 171–174, 183–188. For example, Virginia-Highland volunteers have spent more time with voters explaining new issues that voters have had to navigate, allegedly because of Defendants' actions. Id. ¶¶ 172–173. These new points of focus have diverted volunteer time from other church activities and even from the church's typical voting rights efforts because they require volunteers to spend less time addressing their typical voting-rights discussion points, which effectively reduces the number of voters that volunteers can help.

28

Id. ¶¶ 173–174, 183–188. This deposition testimony suffices to show a diversion of resources from typical activities that Virginia-Highland identified to activities meant to counteract Defendants' acts. Thus, Virginia-Highland has shown an injury in fact.

### vi.    The Sixth Episcopal District, Inc.

The Sixth District is a 501(c)(3) entity and group of twelve church districts representing hundreds of Georgia African Methodist Episcopal churches. Doc. No. [582], ¶ 31. The Sixth District has long made voting rights part of its social justice mission by encouraging voter registration at its congregations and facilitating election day transportation to the polls. Id. ¶ 32. The Sixth District claims that Defendants' actions have frustrated its mission. Id. During the 2018 election season, Sixth District leadership traveled to congregations and urged church elders to encourage congregants to vote and educate themselves on the 2018 election. Id. ¶ 33. The Sixth District also encouraged voters, assisted with voter registration and verification, and coordinated efforts to transport voters to the polls. Id. According to the Sixth District, Defendants' actions forced it to divert resources from its typical voting-related efforts to educating voters about overcoming voter suppression and otherwise counteracting the same. See id. ¶ 34.

The Sixth District states that it will continue this diversion of resources that otherwise would have gone to its typical "ministries and programs" by communicating with congregants to ensure that they have voted and that their ballots have been counted. Id. ¶¶ 34–35.

Defendants argue that the Sixth District does not have organizational standing because its 30(b)(6) designee testified that (1) the Sixth District did not divert financial resources to counteract Defendants' actions and (2) the Sixth District diverted personnel time but in a manner that did not differ from its usual practices. Doc. No. [441-1], p. 6.

Plaintiffs counter that the Sixth District has shown that it has already diverted resources and will later have to divert resources to counteract Defendants' acts. Doc. No. [489], p. 13. Although the Sixth District's social justice mission includes voting-related work, Plaintiffs argue, the Sixth District will have to divert resources to new election-related activities to remotivate voters and ensure votes are counted. Id. at 13–14.[14]

_____

[14] Counsel for Plaintiffs also asserted during the summary judgment hearing that the Sixth District's 30(b)(6) designee misspoke when he said that the Sixth District had done nothing different from its usual practices, asserting that the designee fully discussed the diversion of resources on redirect in the deposition. See Doc. No. [607], pp. 48–50.

30

The Court finds that the Sixth District has shown a diversion of resources. The Sixth District provided deposition testimony that it will have to divert resources from its typical voting-related activities to projects to ensure that its congregants are continuing to vote in the face of voter registration concerns caused by Defendants' actions. See Doc. No. [604-2], ¶¶ 195, 197–203, 205. While the Sixth District's mission has encompassed voting rights, its new focus on efforts to ensure that votes are counted has diverted time typically spent on the Sixth District's voter registration activities. See id. ¶ 203. That diversion constitutes a perceptible impairment to the Sixth District's mission. The Sixth District has thus shown a diversion of resources sufficient to show an injury in fact.

### 2.    *Causal Connection and Redressability*

Next, the Court addresses the second and third requirements for Article III standing: causal connection and redressability. As stated above, for Plaintiffs to establish standing "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. [Also], it must be likely, as opposed to merely

31

speculative, that the injury will be redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted).

In this section of the Order, the Court draws guidance from the Eleventh Circuit's recent decision in <u>Jacobson v. Florida Secretary of State</u>, 974 F.3d 1236 (2020). In <u>Jacobson</u>, the Eleventh Circuit considered a constitutional challenge to the order in which the names of candidates appeared on the Florida election ballot. <u>Id.</u> at 1263. The Eleventh Circuit also concluded that the asserted injury was not redressable by judgment against the Florida Secretary of State "because she [did] not enforce the challenged law. Instead, the [county] [s]upervisors. . . officials independent of the Secretary—[were] responsible for placing candidates on the ballot in the order the law prescribe[d]." <u>Id.</u> The Court's conclusion rested on the reality that the county election supervisors were independent officials under Florida law who were not subject to the secretary's control. <u>Id.</u> at 1253.

In the briefing and oral argument for the case *sub judice*, Plaintiffs made several attempts to distinguish <u>Jacobson</u> or otherwise assert its inapplicability. After review, the Court deems it proper to apply <u>Jacobson</u> to this case and align with other recent cases that have applied <u>Jacobson</u> to election-related litigation. <u>See, e.g.</u>, <u>Georgia Republican Party, Inc. v. Sec'y of State for Ga.</u>, No. 20-14741-

32

RR, 2020 WL 7488181, at *1 (11th Cir. Dec. 21, 2020) (applying Jacobson to conclude that the plaintiffs failed to demonstrate that any alleged injury was traceable to and redressable by the Georgia Secretary of State where Georgia law gave authority to conduct the absentee ballot signature-verification process to local county supervisors); Anderson v. Raffensperger, No. 1:20-CV-03263, 2020 WL 6048048, at *23 (N.D. Ga. Oct. 13, 2020) ("[G]eneral powers [of the Georgia Secretary of State] are insufficient to establish traceability. . . . The [c]ourt rejects [p]laintiffs' contention that the alleged injuries of which they complain are traceable to the Secretary of State simply because the Georgia Code refers to him as the 'state's chief election official.' Likewise, the [c]ourt rejects the notion the alleged injuries are traceable to the State Election Board simply because of its duty to ensure uniformity in the administration of election laws."). (citations omitted).[15]

The Court is unable to uphold Plaintiffs' arguments to the contrary.[16]

_____

[15] The Court recognizes that its prior pre-Jacobson joinder ruling on Defendants' motion to dismiss for failure to join the counties as necessary parties is inconsistent with the above-stated ruling concerning standing. See Doc. No. [68], pp. 53–68). However, for purposes of the standing analysis, the Court will adhere to the guidance provided in Jacobson.

[16] In addition, Plaintiffs' "counterexamples"/demonstrative exhibits concerning the

With the <u>Jacobson</u> principles in mind, the Court now addresses each of Plaintiffs' main claims in turn.

      i.      **Plaintiffs Have Standing to Pursue Claims Related to Georgia's "Use It or Lose It" Process and Georgia's Exact Match Policy**

Plaintiffs have standing to pursue their claims related to Georgia's list maintenance process (also referred to in this litigation as "Use It Or Lose It," or the "no contact provision") and Exact Match (also referred to as "HAVA Match," relating to the federal Help America Vote Act of 2002) because those claims are directly traceable to and redressable by Defendants. Defendants do not argue that there is a jurisdictional issue with the claims related to list maintenance and

_____

scope of Defendants' authority, i.e., a Consent Order entered between the State Election Board and the Fulton County Board of Registration and Elections and statements made in briefing before the United States Supreme Court, do not change the Court's opinion because under Georgia's statutory scheme, the State Election Board must eventually resort to judicial process if the counties fail to perform their election duties. <u>See</u> O.C.G.A. § 21-2-33.1(c) ("The Attorney General of this state shall, upon complaint by the State Election Board, bring an action in the superior court in the name of the State Election Board for a temporary restraining order or other injunctive relief or for civil penalties assessed against any violator of any provision of this chapter or any rule or regulation duly issued by the State Election Board."). In <u>Jacobson</u>, the Eleventh Circuit concluded that having to resort to judicial process underscores the secretary's "lack of authority over" the county election supervisors and "their actions to implement the ballot statute may not be imputed to the [s]ecretary for purposes of establishing traceability." <u>Jacobson</u>, 974 F.3d at 1253–54.

34

matching. See Doc. Nos. [441-1], p. 24; [607], Tr. 25:3–8, 28:10–19. Indeed, this Court has already addressed claims related to list maintenance in this and other lawsuits against the Secretary. See Doc. No. [164] (denying Plaintiffs' TRO related to list maintenance); Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-04869-SCJ, 2020 WL 7394457 (N.D. Ga. Dec. 16, 2020) (same). It was never argued that claims related to list maintenance and matching were not traceable to or redressable by the Secretary.

State law explicitly assigns responsibility for the voter verification and matching processes to the Secretary. See O.C.G.A. § 21-2-50(a)(14) (requiring the Secretary to "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter"); O.C.G.A. § 21-2-50.2(a) ("The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002."); O.C.G.A. § 21-2-216(g)(7) (stating the Secretary "shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration,

including whether the applicant has provided satisfactory evidence of United States citizenship"). These statutes provide a far more direct link than the general election oversight authority which was insufficient to confer standing in Jacobson. See 974 F.3d at 1254 (holding the Florida the Secretary of State's position as "the chief election officer of the state" with "general supervision and administration of the election laws" did not make the order in which candidates appear on the ballot traceable to her). Thus, these claims do not present jurisdictional issues.

### ii. Plaintiffs Lack Standing to Pursue Claims Related to the Moving and Closing of Precincts and Polling Places

In their Second Amended Complaint, Plaintiffs allege that Defendants "deployed a known strategy of voter suppression" in promoting the closure and relocation of polling places. Doc. No. [582], pp. 25–26, ¶ 47. Under Georgia law, the county election superintendent has authority for determining the location of polling places and the "division, redivision, alteration, formation, or consolidation of precincts." See O.C.G.A. §§ 21-2-70(4), -261(a), -262(c), -263, -265(a). Counties sometimes request the Secretary of State to assist in consolidating precincts. Doc. No. [604-2], pp. 322–24, ¶¶ 1001–1002. However, Plaintiffs allege that the Secretary of State did not merely provide help when

asked but in 2015, he actively encouraged counties to consolidate and relocate polling places through direct training on the subject. See Doc. Nos. [582], pp. 47–48 ¶ 101; [604-2], pp. 321–322, ¶¶ 998–999.[17]

Defendants contend that their ability to stop counties from closing and relocating polling places is limited to offering guidance. Doc. No. [604-2], p. 326 ¶ 1006. Plaintiffs, however, assert that, through their enforcement powers and duty to maintain uniformity, Defendants have the ultimate responsibility for the precinct and polling place changes. See Doc. No. [607], Tr. 40:4–8, 57:4–8, 61:19–21, 62:1–23; see id. at 57:11–24. Defendants' alleged failure to fulfill this responsibility is that on which Plaintiffs base, in part, their causes of actions in Counts I, II, III, and V of their Second Amended Complaint. See Doc. No. [582], pp. 69–86, ¶¶ 156, 168, 182, 206.

The Court finds that Plaintiffs lack standing to pursue their claims related to the moving and closing of precincts and polling places because those claims

---

[17] In 2015, after the Supreme Court's decision in Shelby Cnty. v. Holder, 570 U.S. 529 (2013) removed the preclearance requirement for polling place changes, the Secretary of State issued a training document that advised counties to start "consolidating and changing polling places '[n]ow.'" Doc. Nos. [582], pp. 47–48 ¶ 101; [604-2], p. 322, ¶ 1000. Between the 2014 and 2018 General Elections, "counties changed the polling places of around 18 percent of voters who remained at the same registered address for all four years—over 650,000 people." Doc. No. [604-2], p. 321, ¶¶ 996–997.

are neither traceable to nor redressable by Defendants. State law explicitly assigns responsibility for determining and changing precincts and polling places to the county superintendents. See O.C.G.A. §§ 21-2-70(4), -261(a), -262(c)–(d), -265(a)–(b), -265(e). It requires that any changes to precincts or polling places satisfy certain requirements. See id. §§ 21-2-261.1, -263, -265(c)–(d). It also identifies who is tasked with providing county superintendents the information they need to make such decisions. See id. §§ 21-2-262(a)–(a.1), -263. Defendants' authority to prescribe rules and provide guidance to the county superintendents does not make this issue traceable to Defendants because their power to prescribe rules and issue directives does not give Defendants the authority to make the complained-of changes. See Jacobson, 974 F.3d at 1257. "If rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it." Id.

For example, Plaintiffs complain that consolidation of precincts—which the Secretary of State actively promoted—resulted in precincts too small to accommodate its voters. Doc. No. [582], pp. 25–26, ¶ 47. They allege that counties based their decisions on whether to change precincts and polling places based off

38

of the Secretary of State's guidance. Id. at 31, 47–48, ¶¶ 60, 101; Doc. No. [604-2], pp. 321–24, ¶¶ 998, 1000, 1002. But county superintendents are the ones who have the statutory duty to ensure precincts are large enough to accommodate their voters. See O.C.G.A. § 21-2-263 ("If at the previous general election a precinct contained more than 2,000 electors and if all those electors desiring to vote had not completed voting one hour following the closing of the polls, *the superintendent* shall either reduce the size of said precinct so that it shall contain not more than 2,000 electors . . . or provide additional voting equipment or poll workers or both before the next general election." (emphasis added)); O.C.G.A. § 21-2-265(c) ("In primaries, *the superintendent* . . . shall select a polling place which will provide adequate space for all parties conducting their primaries therein." (emphasis added)).

Plaintiffs argue that where these changes burden individuals' right to vote or otherwise violate election law, Defendants are responsible for making counties comply. Doc. No. [607], Tr. 62:10–23. However, in the absence of any evidence that Defendants control the moving and closing of precincts and polling places, Plaintiffs "cannot rely on the Secretary's general election authority to establish traceability." Jacobson, 974 F.3d at 1254.

Any relief requiring Defendants to mandate where county superintendents place polling places and how they change precincts may force superintendents to violate their statutory duties. <u>See</u> O.C.G.A. § 21-2-265(b) ("[I]f a petition is presented to the superintendent . . . on or before the day set for [a] hearing . . . for change of a polling place, signed by 20 percent of the electors of the precinct objecting to the proposed change, such change shall not be ordered."). Relief against Defendants would not eliminate county superintendents' ultimate statutory authority and responsibility regarding precincts and polling places under Georgia law, for "federal courts have no authority to erase a duly enacted law from the statute books." <u>Jacobson</u>, 974 F.3d at 1255 (quoting Jonathan F. Mitchell, <u>The Writ-of-Erasure Fallacy</u>, 104 Va. L. Rev. 933, 936 (2018)) (internal quotation marks omitted); <u>see also</u> <u>Steffel v. Thompson</u>, 415 U.S. 452, 469 (1974) ("Of course, a favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (internal quotation marks omitted)). And an injunction ordering Defendants to promulgate rules and regulations that override or take that statutory authority and responsibility away from the county superintendents would raise "serious federalism concerns." <u>Jacobson</u>, 974 F.3d at 1257.

40

To the extent that such relief would be limited to requiring Defendants to provide or refrain from giving counties specific guidance regarding precinct and polling place changes, the Eleventh Circuit has rejected such "notice" theory of redressability. Id. at 1254. "Any persuasive effect a judicial order might have upon the [county superintendents], as absent nonparties who are not under the Secretary's control, cannot suffice to establish redressability." Id.; see also id. at 1254–55 ("Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power.").

"Even if we consider the persuasive effect of the judgment on the nonparty [superintendents], the [plaintiffs] have not established that redress is likely 'as a practical matter.'" Id. at 1255 (quoting Utah v. Evans, 536 U.S. 452, 461 (2002)). While Defendants may offer guidance and training to counties on how and when to change precincts and polling places, county superintendents are free to ignore their advice. Certainly, some may be likely to follow Defendants' advice when given, but Plaintiffs have not shown that relief against Defendants will "significantly increase the likelihood" that the superintendents will "follow a

41

federal decree that does not bind them." Id. (quoting Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019)).

For the reasons above, the Court finds that county superintendents—not Defendants—are statutorily responsible and thus accountable for the closing and relocation of polling places and precincts. Thus, the effects stemming from those actions are traceable not to Defendants but to the county superintendents. And for the same reasons, these claims are not redressable by Defendants. As a result, the Court finds that Plaintiffs lack standing to pursue their claims related to the moving and closing of precincts and polling places.

### iii. Plaintiffs Have Standing on Their Claim that the Secretary of State Maintains Inaccurate Voter Registration Rolls

Plaintiffs have standing to pursue their claims related to the maintenance of inaccurate voter registration rolls because those claims are directly traceable to and redressable by Defendants.

State law explicitly assigns responsibility for maintenance of the official list of registered voters to the Secretary. See O.C.G.A. § 21-2-50(a)(14) (requiring the Secretary to "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter"); O.C.G.A. § 21-2-50.2(a)

42

(indicating that the Secretary of State shall be responsible for coordinating the obligations of the state under HAVA); see also 52 U.S.C. § 21083(a)(1), (4) (setting forth each state's duties under HAVA; stating that each state "shall implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State"; and stating that "[t]he State election system shall include provisions to ensure that voter registration records in the State are accurate and updated regularly . . . ."). Like the Exact Match and "Use it or Lose It" statutory schemes, the above-stated statutes provide a direct link to the Secretary and establish that the Secretary plays a role in maintenance of accurate voter registration rolls.

The Court recognizes Defendants' argument that, in practice, updates to the voter registration rolls are made at the county (not state) level—and that there is a Jacobson problem. Doc. No. [607], Tr. 31:14–17; 78:9–12. However, after review, the Court does not agree that there is a Jacobson problem because, as indicated above, "the law itself contemplate[s] [a] role for" the Secretary—i.e., maintaining accurate registration rolls under HAVA. Jacobson, 974 F.3d at 1254.

The Secretary maintains and controls the registration rolls and in accordance with the principles of Jacobson, Plaintiffs can rely on the above-stated express statutory authority to establish traceability and redressability of their asserted injuries for the Secretary's challenged conduct.

Accordingly, Plaintiffs meet Article III's traceability and redressability requirements as to their voter list inaccuracy claim.

### iv.   Plaintiffs Lack Standing to Pursue Their Claims Related to Resources at Polling Places

The Court finds that Plaintiffs lack standing to pursue their claims related to resources at polling places because those claims are not traceable to Defendants. State law explicitly assigns responsibility for ensuring there is an adequate number of supplies to the election superintendents. See O.C.G.A. §§ 21-2-70(4)–(5), -290, -384(a)(1), -400(a); see also Ga. Comp. R. & Regs. 183-1-12-.01, -.11(c), -.18(3). The law sets the minimum number of resources per elector that the superintendent must acquire. See O.C.G.A. §§ 21-2-290, -323(b), -367(b). Local election officials are also tasked with keeping an inventory of election equipment, number of ballots used, and who and how many voted. See O.C.G.A. §§ 21-2-294, -390, -411, -419(e), -432, -433(b), -440(a), -453, -456; Ga. Comp. R. & Regs. 183-1-12-.06(4)–(7). Thus, election superintendents are not without information that

44

will help them determine what supplies and how many they need to acquire for upcoming elections.

As indicated above, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Jacobson, 974 F.3d at 1253 (11th Cir. 2020) (quoting Lujan, 504 U.S. at 560). It is true that the Secretary of State provides certain equipment and supplies. See O.C.G.A. §§ 21-2-50(a)(5), -300(a)(1), -300(a), -384(b); Ga. Comp. R. & Regs. 183-1-12-.01. But the county is ultimately responsible for purchasing them and in what amounts. See O.C.G.A. § 21-2-70(5) (requiring the superintendent to purchase all supplies and election equipment "except voting machines"); see also O.C.G.A. §§ 21-2-320, -333, -366, -374(c), -378, -389; Ga. Comp. R. & Regs. 183-1-12-.01; cf. O.C.G.A. § 21-2-327(f) ("In every primary or election, the superintendent shall furnish, *at the expense of the municipality*, all . . . supplies which are required under this chapter and which are not furnished by the Secretary of State. . . . In a municipal primary, ballot labels and other materials necessary for the preparation of the voting machines shall be furnished free of charge to the municipal superintendent by the political party conducting such

45

primary.") (emphasis added). Further, the superintendent must furnish any other necessary supplies that the state does not provide. See O.C.G.A. §§ 21-2-327(f), -328(c), -330(c), -375(c), -389. A county may also acquire additional equipment and supplies if it so desires. See O.C.G.A. § 21-2-300(a)(3).

Plaintiffs complain that "[d]uring the November and December 2018 elections, polling places faced shortages of paper ballots, causing delays or preventing voting entirely during periods of machine malfunction." Doc. No. [604-2], p. 362 ¶ 1121. However, under Georgia law, "[w]hen the use of voting machines has been authorized . . ., the use of paper ballots therein shall be discontinued." O.C.G.A. § 21-2-323(a). "If . . . the use of voting machines is not possible or practicable, the superintendent *may* arrange to have the voting . . . conducted by paper ballots." O.C.G.A. § 21-2-334 (emphasis added); accord O.C.G.A. §§ 21-2-281, -418(h); see also O.C.G.A. § 21-2-379. Thus, the number of paper ballots, if any, at polling places that used voting machines was within the discretion of the election superintendent.

Plaintiffs argue that where these inadequacies burden individuals' right to vote or otherwise violate election law, Defendants are responsible for making counties comply. Doc. No. [607], Tr. 62:10–23. They assert that because

46

Defendants recently promulgated rules that require superintendents to have "an adequate supply of provisional ballots," shortage of provisional ballots at polling places is traceable to them. See Doc. No. [604-2], pp. 307–08 ¶¶ 953–956. But again, "[i]f rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it." Jacobson, 974 F.3d at 1257. Yet Plaintiffs contend that subsequent shortages of provisional ballots during elections following this rule change are due to Defendants' failure to put procedures in place to ensure counties comply with the directive. See Doc. No. [604-2], pp. 307–08, ¶¶ 953–956. However, in accordance with Jacobson, Plaintiffs "cannot rely on the Secretary's general election authority to establish traceability." Jacobson, 974 F.3d at 1254.

Plaintiffs also argue that voting machines that malfunction or lack the necessary equipment to operate are traceable to the Secretary because he provides the voting machines to the counties. See Doc. No. [604-2], pp. 346–47, ¶ 1082. But, under Georgia law, once voting equipment is delivered to the superintendents, local election officials are responsible for their custody, maintenance, and testing. See O.C.G.A. §§ 21-2-70(5), -327(a)–(c), -331(a), -374(b), -377(a), -450, -457; Ga. Comp. R. & Regs. 183-1-12-.04(8), -.08, -.14. They are also

47

responsible for ensuring, shortly before polls open, that each piece of equipment is properly programmed and ready for use in its designated precinct. See O.C.G.A. §§ 21-2-327(a), -328(a), -374(a), -375(a), -401(a), -480(e), -482; Ga. Comp. R. & Regs. 183-1-12-.07. While the Secretary must evaluate and approve the *type* of equipment that may be used while local election officials must evaluate *each item* of equipment to ensure it functions properly. Compare O.C.G.A. § 21-2-300(a)(4) ("[T]he Secretary of State is authorized to conduct *pilot programs* to test and evaluate. . . .") (emphasis added) with O.C.G.A. § 21-2-327(a) ("The superintendent of each municipality shall . . . examine *each* machine before it is sent out to a polling place . . . .") (emphasis added).

Further, *prior* to receiving the equipment from the state, counties must "provide polling places that are adequate for the *operation* of such equipment including, if necessary, the placement within the polling places of a sufficient number of electrical outlets and telephone lines." O.C.G.A. § 21-2-300(b) (emphasis added). They must also "provide or contract for adequate *technical support* for the installation, set up, and operation of such voting equipment." O.C.G.A. § 21-2-300(c) (emphasis added).

48

In sum, the Court finds that there is no genuine dispute of material fact that county superintendents—not Defendants—are statutorily responsible and thus accountable for the inadequate resources at polling places. Because under the applicable statutory scheme, the superintendents' duties regarding resources at polling places are subject to the Secretary's control only to the extent that the *type* of resources must comply with that which the Secretary has approved and Plaintiffs have not identified a problem with the type, the effects stemming from the inadequacy of resources are not traceable to Defendants. Thus, their claim is not redressable by Defendants either. As a result, the Court finds that Plaintiffs lack standing to pursue their claims related to inadequate resources at polling places.

### v.   <u>Plaintiffs Have Standing to Pursue Their Claims Related to Training on Provisional Ballots and Absentee Ballots</u>

State law requires that the Secretary "conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." O.C.G.A. § 21-2-50(a)(11). County election superintendents and registrars are required to be certified by the Secretary. Doc. No. [507-1], p. 954, Tr. 175:8–176:5. The Secretary's office provides

training materials and requires that each superintendent and registrar take a quiz based on those materials to become certified. Id. Tr. 31:24–32:3. To facilitate the "prompt and efficient" distribution of these materials, the Secretary utilizes "Firefly," a digital repository for training materials and election information. Doc. No. [451-30], Tr. 103:9–104:2. Superintendents and registrars must also maintain their certification by completing a minimum of 12 hours' training annually. Doc. No. [451], p. 22, ¶ 77.[18]

Plaintiffs' Second Amended Complaint alleges that Defendants "did not and do not satisfy" their training obligations, "as demonstrated in the 2018 Election; throughout the State, elections officials misunderstand their duties and ignore the law." Doc. No. [582], p. 57, ¶ 126. They argue the Secretary uses training materials that "do not cover everything [county election superintendents and registrars] need to know." Doc. No. [604-2], pp. 110, 313.[19] Most specifically,

---

[18] The Court will address facts relevant to the substance of the training and its alleged inadequacy in its summary judgment order on the merits.

[19] This was included in the Plaintiffs' Corrected Statement of Additional Material Facts, but the Court agrees with Defendants' objection, see Doc. No. 532, p. 180, ¶ 313, and considers this only as an argument, not a fact.

the Second Amended Complaint alleges that training on provisional and absentee ballots is insufficient. Doc. No. [582], pp. 57–68.

Plaintiffs state that, due to inadequate or inaccurate training, county elections officials gave incorrect information on how provisional ballots would be handled; gave incorrect instructions to voters who showed up at the wrong polling place and failed to offer them a provisional ballot; and applied inconsistent and incorrect rules when handling provisional ballots. Id. at 58–61, ¶¶ 127–131. Plaintiffs also argue that "Defendants fail to oversee, train, and advise counties about the proper handling of absentee ballots," which resulted in failure to timely mail absentee ballots to voters; improper rejection of some absentee ballots; failure to timely notify some voters that their absentee ballots had been rejected, preventing a timely remedy; and refusal to allow some voters to cancel absentee ballots in-person, which the law explicitly permits. Id. at 61–65, ¶¶ 133–142; O.C.G.A. § 21-2-388.

The Supreme Court first recognized 42 U.S.C. § 1983 liability for failure to train in City of Canton v. Harris, 489 U.S. 378 (1989). The Court held that, while the municipality could not be liable just because "one of its employees happened to apply [a city] policy in an unconstitutional manner," an entity can be liable,

under limited circumstances, if the employee's misconduct is traceable to inadequate training by the entity. Id. at 387.[20] Respondeat superior does not apply. Id. To prevail on a failure-to-train theory, a plaintiff must show the employee was inadequately trained and that the failure to train caused a constitutional wrong. Id. To be "inadequate" for purposes of § 1983 liability, the training must "amount[] to deliberate indifference to the rights of persons with whom the [employees] come into contact." Id. at 389. This Order addresses only whether Plaintiffs' failure-to-train claims are traceable to and redressable by Defendants.

The central matter of disagreement between the Parties is the degree to which the Secretary is responsible for training local elections officials other than superintendents and registrars. Defendants concede that they are statutorily responsible for training of superintendents and registrars. Indeed, at the summary judgment hearing, Defendants' counsel agreed that a failure-to-train claim regarding the training of superintendents and registrars would not present a jurisdictional issue. Doc. No. [607], Tr. 30:20–31:1. Plaintiffs argue, however,

---

[20] Though the City of Canton analysis applied specifically to municipal liability, the Court finds the same analysis applies where the defendant is a state entity.

that if the Secretary does not adequately train the superintendents, the superintendents do not have the knowledge base to be able to train their personnel, including poll workers. Doc. No. [604-2], p. 110, ¶ 312.[21] Thus, they maintain, issues with training, including lower-level county officials and poll workers, are still traceable to and redressable by the Secretary.

The Court agrees that Plaintiffs have standing to pursue their claims regarding the training of superintendents and registrars given the Secretary's direct statutory responsibilities. O.C.G.A. § 21-2-50(a)(11).[22] Whether failures by lower-level county officials and poll workers are attributable to inadequate training of their supervisors is a question of fact. The Court concludes that Plaintiffs have shown a genuine issue of material fact on the traceability issue such that they survive jurisdictional summary judgment.

In the Rule 30(b)(6) deposition conducted on August 16, 2019, Secretary of State representative and Elections Director Chris Harvey stated:

---

[21] This was included in the Plaintiffs' Corrected Statement of Additional Material Facts, but the Court agrees with Defendants' objection, see Doc. No. 532, p. 180, ¶ 312, and considers this only as an argument, not a fact.

[22] The Court will address the substantive sufficiency of those claims in its summary judgment order on the merits.

> We make all of the training materials available on
> Firefly. We encourage people to sign up for the training
> webinars. It really is sort of a Train The Trainer scenario
> where we're giving them the information to them, for
> them to take back and customize for their offices.

Doc. No. [507-1], p. 958, Tr. 179:8–13. Thus, if the superintendents' training is

insufficient or inaccurate, they lack the knowledge base to be able to train their

personnel, including poll workers. Id. at 760, Tr. 178:4–10 ("Q: If the

superintendents and the registrars aren't well-trained in election laws and

practices, they don't really have the knowledge base to be able to train their

people; correct? A: Right . . . . If they're going to provide the training, they have

to understand it."). Thus, the Court finds that claims related to superintendent

and registrar training are directly traceable to and redressable by Defendants.

Plaintiffs have shown a genuine issue of material fact as to whether their training

claims related to lower level county officials and poll workers are traceable to

and redressable by Defendants.[23] Should they survive, to prevail on these claims,

Plaintiffs' evidence at trial will need to show that *Defendants'* inadequate training

---

[23] The Court will address the substance of the failure-to-train claims, including whether
they meet the deliberate indifference standard in its second summary judgment order.

of superintendents and registrars caused the constitutional deprivations complained of.[24]

### B.   Mootness

Satisfied that Plaintiffs have standing to bring this action (as to most of their claims), the Court now turns to the question of mootness.

### 1.   *Legal Standard*

As indicated above, "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477 (1990).[25] "[T]he doctrine of mootness derives directly from the case-or-controversy limitation because 'an action that is moot cannot be characterized as an active case or controversy." <u>De La Teja v. United States</u>, 321 F.3d 1357, 1361–62 (11th Cir. 2003) (citations omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Powell v. McCormack</u>, 395 U.S. 486, 496–97

---

[24] Plaintiffs' remaining claims regarding election technology will be discussed *infra* in the mootness section of this Order.

[25] "The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, § 2, underpins both [the] standing and . . . mootness jurisprudence, but the two inquiries differ in respects critical to the proper resolution of this case, so [the Court] address[es] them separately." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (2000).

(1969) (citation omitted). More specifically, "[i]f events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to afford the plaintiff . . . meaningful relief, then the case becomes moot and must be dismissed." De La Teja, 321 F.3d at 1362.

One "event" that may moot a claim is when the governmental defendant ceases the behavior on which a claim is based, through the repeal or amendment of a challenged statute, rule, or policy. Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004). The Supreme Court and the Eleventh Circuit "have repeatedly indicated that 'the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur.'" Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, 868 F.3d 1248, 1256 (11th Cir. 2017) (citations omitted). It also appears that the Eleventh Circuit has established an exception to the general rule that the burden of proving mootness falls on the party asserting it. Id. "As a result, 'once the repeal of an ordinance has caused [the Court's] jurisdiction to be questioned, [the plaintiff] bears the burden of presenting affirmative evidence that its challenge is no longer moot.'" Id. "'The key inquiry' is whether the plaintiff has shown a 'reasonable expectation'—or . . .

56

a 'substantial likelihood'—that the government defendant 'will reverse course and reenact' the repealed rule." <u>Keohane v. Fla. Dep't of Corr. Sec'y</u>, 952 F.3d 1257, 1268 (11th Cir. 2020) (citations omitted).

Three broad factors provide guidance to courts in conducting this inquiry: (1) whether the government's change in conduct resulted from substantial deliberation or is merely an attempt to manipulate jurisdiction; (2) whether the government's decision to terminate the challenged conduct was unambiguous; and (3) whether the government has consistently maintained its commitment to the new policy or legislative scheme. <u>Flanigan's Enters., Inc. of Ga.</u>, 868 F.3d at 1257. The Eleventh Circuit has also stated:

> When considering a full legislative repeal of a challenged law—or an amendment to remove portions thereof—these factors should not be viewed as exclusive nor should any single factor be viewed as dispositive. Rather, the entirety of the relevant circumstances should be considered and a mootness finding should follow when the totality of those circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation.

<u>Id.</u>

57

### 2.   *Analysis*

With above-stated legal framework in mind, the Court will now address the mootness categories presented in Defendants' summary judgment motion: technology, voter list security/accuracy, and absentee ballots.

### i.   <u>Technology</u>

A review of the record shows that Plaintiffs' initial complaints included technology claims concerning the direct-recording electronic ("DRE") voting machines in use by the State of Georgia in 2018. <u>See</u> Doc. Nos. [1], p. 1; [41], p. 12. However, as indicated above, with the Court's leave, post-filing of summary judgment, Plaintiffs filed a Second Amended Complaint in which they removed their claims concerning Georgia's voting technology/machines (Doc. No. [582]), and at oral argument Plaintiffs' Counsel confirmed that Plaintiffs "are no longer pressing a claim around the voting machines." Doc. No. [607], Tr. 68:13–14.[26] As Plaintiffs' Second Amended Complaint supersedes the allegations in the prior complaints, the Court concludes that any issues regarding voting

---

[26] The Court recognizes that Plaintiffs' Counsel expressed an intent to use the voter machine evidence at trial to support other non-abandoned claims. Doc. No. [607], Tr. 68:13–18. At this time, the Court makes no ruling as to the trial admissibility of such evidence.

technology/machines no longer remain for adjudication in the context of the pending litigation. See Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1243 (11th Cir. 2007) ("As a general matter, '[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.'") (citations omitted).

### ii.    Voter List Security and Accuracy

In their Second Amended Complaint, Plaintiffs allege that Georgia's voter registration database lacks data security and is vulnerable to cyber-breaches or hacking that could undermine electors' confidence in the outcome. Doc. No. [582], ¶¶ 94, 100. Plaintiffs further allege that "[b]y leaving Georgia's registration database vulnerable to tampering, Defendants place voters at risk of having their voter registrations removed or changed." Id. ¶ 98. In subsequent paragraphs of their Complaint, Plaintiffs allege that the Secretary of State maintains inaccurate voter registration rolls. Id. ¶¶ 104–113.

In their Motion for Summary Judgment, Defendants assert that Plaintiffs' claims about the voter registration system were mooted upon the General

Assembly's adoption of HB 392 and promulgation of the requisite regulation. Doc. Nos. [441-1], pp. 26–27; <u>see also</u> [607], Tr. 31:24–25.

HB 392, is codified at O.C.G.A. § 45-13-20(14.1) and provides in relevant part that the Secretary shall have the duty "[t]o promulgate a regulation that establishes security protocols for voter registration information maintained and developed by the Secretary of State . . . ." Doc. No. [492], pp. 25–26. The requisite regulation was promulgated on August 13, 2019 and is published at Ga. Comp. R. & Regs. 590-8-3-.01. Doc. No. [492], ¶ 35.

Defendants further assert that Plaintiffs' remaining claims concerning "inaccurate" voter rolls are moot based on the State having joined the Electronic Registration Information Center ("ERIC"), a non-profit organization with the sole mission of assisting states to improve the accuracy of America's voter roll, as authorized by HB 316. Doc. Nos. [441-1], pp. 27–28; [491], ¶ 113.

In opposition, Plaintiffs argue that "Defendants have, at most, suggested they have taken additional measures to protect their voter rolls from external hacking or intervention and can now share voter registration information with out-of-state government entities through" ERIC. Doc. No. [489], p. 24. Plaintiffs assert that "[t]hese measures do nothing to address voter roll inaccuracies caused

60

by problems internal to Defendants' voter registration database, which persistently cancels voters erroneously, marks eligible voters as ineligible, and lists voters as registered in incorrect precincts or even incorrect counties." Id. In support of their argument, Plaintiffs rely upon paragraphs 723–751 of their Statement of Additional Facts. Id. (citing Pl. SAMF, Doc. No. [532], ¶¶ 723-751).

In their reply, Defendants raise a number of objections to Plaintiffs' additional facts. See generally Doc. No. [532]. However, Defendants do admit that two key facts may be considered for purposes of summary judgment: (1) the Secretary received complaints in the 2018 election about people trying to vote and being told that they were not registered and (2) the Secretary received complaints about people trying to vote and being told that the voter rolls did not reflect their address changes. Doc. No. [532], ¶¶ 748–749. The Court concludes that these two facts alone establish a genuine dispute of material fact as to the accuracy of the voter rolls.

As to the remainder of the mootness arguments, the Court finds that Plaintiffs have not presented any affirmative evidence that their claims concerning voter list security are not moot due to the enactment of HB 316 and HB 392. In addition, the totality of the circumstances persuades this Court that

there is no reasonable expectation that the State of Georgia will reenact the challenged legislation or otherwise return to pre-HB 316 and pre-HB 392 law.

In summary, the Court concludes that Plaintiffs' voter list security claims are moot and Plaintiffs' voter list inaccuracy claims are not moot. See Powell, 395 U.S. at 497 ("Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy.").

### iii.  **Absentee Ballots**

Defendants assert that two of Plaintiffs' claims about absentee ballots are mooted by recent amendments to O.C.G.A. § 21-2-384 and State Election Board Rules. Doc. No. [441-1], p. 28.[27] More specifically, Defendants assert that "Plaintiffs [sic] claims about voter birthdates resulting in rejection of absentee ballots are moot because the [voter's] date of birth is no longer required and thus ballots cannot be rejected for that reason." Id. Defendants also assert "that Plaintiffs' claims about prompt notification to voters when their absentee ballots

---

[27]  At the January 12, 2021 hearing, Defendants presented Demonstrative Exhibit 4 which included a chart that detailed the pre- and post-HB 316 changes to O.C.G.A. § 21-2-384. The current version of the statute now "omits residential address and birth year from the absentee voter's oath." Defs. Dem. Ex. 4.

are rejected has been resolved by" a State Election Board Rule, Ga. Comp. R. & Regs. R. 183-1-14-.13.[28] Id.

In opposition, Plaintiffs argue that "[a] streamlined oath envelope and faster absentee ballot rejection notifications do not address in any way Defendants' failures to distribute absentee ballots in a timely fashion, to provide accurate information about the status of voters' ballots, or to resolve problems voters experience when attempting to cancel their absentee ballots at the polls." Doc. No. [489], p. 25.[29]

To the extent that Plaintiffs' opposition arguments concern the failure to train aspect of their case, the Court agrees that these training claims are not moot, as there has been no change in the law concerning said claims. However, Plaintiffs have not presented any affirmative evidence [30] that their claims

---

[28] Said Rule provides in relevant part that registrars must notify voters of a rejected absentee ballot no later than three business days after rejecting the ballot. Ga. Comp. R. & Regs. R. 183-1-14-.13; see also Doc. No. [491], ¶ 114.

[29] At oral argument, Defendants noted that Plaintiffs' remaining arguments seem to be claiming that Defendants are not following state law, which is barred by the Eleventh Amendment. Doc. No. [607], Tr. 32:2–8. The Court defers ruling on Defendants' Eleventh Amendment arguments. Said arguments will be addressed in the context of the Court's future ruling on the merits motion for summary judgment.

[30] Without more, Plaintiffs' evidence (at Ex. 67, Doc. No. [507-5], p. 42) that the City of Parrott, Georgia received two boxes of election supplies in 2019 with absentee ballots

concerning voters' dates of birth on absentee ballots and notification of absentee ballot rejections are not moot due to the change in Georgia law.[31] In addition, the totality of the circumstances persuades this Court that there is no reasonable expectation that the State of Georgia will reenact the challenged legislation or otherwise return to its old law. Accordingly, the Court concludes that Plaintiffs' claims concerning absentee ballots (dates of birth and rejection notification) are moot.[32]

**C.   <u>Political Question Doctrine</u>**

Defendants argue that this Court lacks jurisdiction under the political question doctrine. Doc. No. [441-1], p. 30. They argue that Plaintiffs' claims are nonjusticiable "because they require this Court to replace Georgia's Election Code with this Court's judgment about the administration of elections . . . ." <u>Id.</u>

_____

still bearing the date of birth line does not create a genuine dispute of material fact as to mootness based on change in the law. As correctly noted by Defendants, it is only one instance involving a city (Doc. No. [532], p. 594) and the above-stated <u>Flanigan</u> factors look to consistency of the State's conduct/commitment to the new law.

[31]  Said claims are found in the Second Amended Complaint (Doc. No. [582]) at ¶¶ 137, 140, 141.

[32]  Plaintiffs have amended their Complaint to remove their HAVA cause of action. Doc. No. [582]. Accordingly, it is unnecessary for the Court to address the HAVA grounds asserted in Defendants' motion.

They argue this matter would require the Court to address issues "reserved expressly to the state legislatures—not the Courts." Id. at 33. The Court disagrees and finds the case law cited by Defendants is distinguishable because none of it implicates *individuals'* right to vote or alleges that a state's election law or policy has racially discriminatory effects.

### 1.    Legal Standard

Federal courts will generally refuse to hear a case if they find it presents a "political question." In this context, a political question is generally one that either is best left to the political branches of government or that lacks judicially manageable standards. As the Supreme Court explained in Rucho v. Common Cause, ___ U.S. ___, 139 S. Ct. 2484 (2019):

> Chief Justice Marshall famously wrote that it is "the province and duty of the judicial department to say what the law is." Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. In such a case the claim is said to present a "political question" and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction. Among the political question cases the Court has identified are those that lack judicially discoverable and manageable standards for resolving [them].

65

Id. at 2494 (internal quotations and citations omitted). The political question doctrine acts as a jurisdictional bar. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1365 (11th Cir. 2007).

In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court outlined a list of factors to be used in determining whether a dispute raises a non-justiciable political question. Under Baker, any one of the following removes an issue beyond the scope of justiciability:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Aktepe v. United States, 105 F.3d 1400, 1402–03 (11th Cir. 1997) (quoting Baker, 369 U.S. at 217).

66

2.    *Analysis*

Defendants are correct that generally, matters related to the administration of elections are reserved to state legislatures. However, state legislatures do not have unreviewable discretion to pass election laws which violate federal statutes or constitutional rights. The Court agrees that it is not the place of federal courts to decide complex and subtle questions of election administration. See Doc. No. [441-1], p. 34. However, federal courts are equipped and empowered to address claims that individuals' voting rights are being burdened.

Defendants rely heavily on the recent decision in Jacobson to support their argument that the political question doctrine bars this Court's consideration of this matter. As noted above, that case involved a challenge to Florida's ballot order law, which provides that candidates of the party that won the last gubernatorial election shall appear first for each office on the ballot. Id. at 1241. The Eleventh Circuit found the plaintiffs' complaint presented a non-justiciable political question because it boiled down to a complaint about unfair partisan advantage. Id. at 1242. "No judicially discernable and manageable standards exist to determine what constitutes a 'fair' allocation of the top ballot position,

and picking among the competing visions of fairness 'poses basic questions that are political, not legal.'" Id. (quoting Rucho, 139 S. Ct. at 2500).

Central to Jacobson's political question doctrine holding, however, was the fact that the plaintiffs' complaint did "not allege *any* burden on individual voting rights." Id. at 1261 (emphasis in original). The case at bar is immediately distinguishable. At bottom, Plaintiffs' Complaint is about individual voting rights and whether Georgia's election laws and policies unduly burden individuals' right to vote. Clearly, and as the Jacobson court noted, there are judicially manageable standards for evaluating such complaints—the Anderson-Burdick framework exists for precisely this purpose. See id. at 1262 ("If the statute burdened voting or associational rights even slightly, we could apply legal standards to determine whether the burden was unconstitutional. Under Anderson and Burdick, we would weigh the burden imposed by the law against the state interests justifying that burden."). Indeed, this case is far more comparable to the cases cited by the Jacobson court as ones that did *not* present nonjusticiable political questions: claims that a statute does not make it more difficult for individuals to vote, or to choose the candidate of their choice; claims that a law limits a political party's or candidate's access to the ballot, which

68

would interfere with voters' ability to vote for and support that party or candidate; claims that a law burdens the associational rights of political parties by interfering with their ability to freely associate with voters and candidates of their choosing; and claims that a law creates the risk that some votes will go uncounted or be improperly counted. Id. at 1261–62 (collecting cases).

Defendants also cite partisan gerrymandering cases to support their argument. See Doc. No. [441-1], p. 33. Partisan gerrymandering cases are nonjusticiable because they implicate "group political interests, not individual legal rights." Gill v. Whitford, __ U.S. ___, 138 S. Ct. 1916, 1933 (2018). However, this case is more akin to racial gerrymandering cases that claim a burden on individual voting rights and are clearly justiciable. Fundamentally, the one-person, one-vote doctrine implicated in racial gerrymandering cases "requires that each representative must be accountable to (approximately) the same number of constituents." Rucho, 139 S. Ct. at 2501. Thus, racial gerrymandering cases implicate individual rights and are susceptible to judicially manageable standards. Id. In contrast, partisan gerrymandering cases are "about group political interests, not individual legal rights," and thus implicate questions of fairness which courts are not equipped or empowered to answer. Gill, 138 S. Ct.

at 1933. Plaintiffs' claims here implicate individual rights and are thus susceptible to judicially manageable standards.

The Court also rejects Defendants' argument that this case is nonjusticiable because the voting rights groups in this case may represent voters who are more likely to support Democratic candidates. See Doc. No. [441-1], p. 31. All voting rights cases implicate politics—but that does not automatically make them nonjusticiable political questions. See Baker, 369 U.S. at 209 ("[T]he mere fact that [a] suit seeks protection of a political right does not mean it presents a political question."). Otherwise, every time a case is brought to vindicate individual voting rights, any showing that the plaintiffs were more likely to support candidates of a certain party would render their claims nonjusticiable.[33]

### 3. *Elections Clause*

Finally, the Court finds the Elections Clause does not bar its consideration of Plaintiffs' claims. The Elections Clause "assigns to state legislatures the power to prescribe the 'Times, Places and Manner of holding Elections" for Members of

---

[33] This argument is especially troubling given that voting rights cases are frequently brought by groups that seek to enfranchise minority voters. If this Court were to accept Defendants' argument here, such groups would be barred from bringing suit if they or their members tend to prefer candidates of a certain party. Political question doctrine does not go so far.

Congress, while giving Congress the power to "make or alter" any such regulations." Rucho, 139 S. Ct. at 2495. In Rucho, the Supreme Court rejected an argument that the Elections Clause barred it from considering gerrymandering cases. Id. ("Appellants suggest that, through the Elections Clause, the Framers set aside electoral issues such as the one before us as questions that only Congress can resolve. We do not agree.") (internal citation omitted)). Defendants have cited no cases that hold the Elections Clause prohibits federal courts from considering cases where individual voting rights and federal constitutional rights are implicated.

## IV.   CONCLUSION

Defendants' Motion for Summary Judgment on Jurisdiction (Doc. No. [441]) is **GRANTED IN PART AND DENIED IN PART.** The motion is granted in part for lack of standing as to Plaintiffs' polling place claims and for mootness as to Plaintiffs' voter list security claim and absentee ballot claims (based on dating and notification issues).[34] The motion is denied as to the remaining

---

[34]  Ordinarily, the Court prefers to link its conclusions to causes of action, as delineated in the Complaint; however, due to the nature of this case, it is impractical to follow this preferred practice. To this regard, the Court's analysis and conclusion address claims, more so than causes of action.

71

asserted grounds concerning standing, mootness, and the political-question doctrine. The Court also recognizes that certain claims have been abandoned through Plaintiffs' filing of a Second Amended Complaint. Thus, for purposes of perfecting the record, the Court provides the following full list of allegations/claims that are no longer in this case: Help America Vote Act; Voting Machines; Voter List Security; Use of Election Technology that is Vulnerable to Hacking and Manipulation; Absentee Ballots (dating and notification issues); Promotion of Moving and Closing Precincts and Polling Places; and Failure to Provide Adequate Resources to Polling Places.[35]

**IT IS SO ORDERED** this ___16th___ day of February, 2021.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[35] A ruling on the outstanding merits motion for summary judgment (Doc. No. [450]), motions to exclude expert testimony (Doc. Nos. [406], [448]), and renewed objection to Plaintiffs' Corrected Statement of Additional Material Facts (Doc. No. [610]) will follow by separate orders.