# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, *et al.*,     ) | |
|     ) | |
|     Plaintiffs,     ) | |
|     ) | Civil Action File |
| v.     ) | |
|     ) | No. 1:18-cv-05391-SCJ |
| BRAD RAFFENSPERGER, in his     ) | |
| official Capacity as Secretary of     ) | |
| State of Georgia, *et al.*,     ) | |
|     ) | |
|     Defendants.     ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

After Defendants moved for summary judgment on the entirety of Plaintiffs' claims under Section 2 of the Voting Rights Act, Doc. No. [450], this Court stayed its consideration of the issue in the light of the Supreme Court's then-pending decision in Brnovich, et al. v. Democratic National Committee, et al., ___ U.S. ___, 141 S. Ct. 2321 (2021).  Doc. No. [617] at 95.

The Supreme Court has now issued its decision in Brnovich, and it forecloses all of Plaintiffs' Section 2 theories.  The Brnovich majority made clear that "equal openness [to voting] remains the touchstone" of a Section 2 claim, and Plaintiffs have not presented evidence that the election system in Georgia is not equally open to participation by individuals of all races.  This

requires judgment as a matter of law for Defendants on Count V of Plaintiffs' Second Amended Complaint.[1]  Doc. No. [582] at ¶ 204.

## ARGUMENT AND CITATION TO AUTHORITY

The <u>Brnovich</u> Court declined to announce a new "test to govern all VRA § 2 claims involving rules, like those at issue here, that specify the time, place, or manner for casting ballots." 141 S. Ct. at 2336.  Instead, the Court began with the text of § 2 and identified "certain guideposts," <u>id.</u>, that courts must apply when considering a § 2 challenge to "generally applicable time, place, or manner voting rules." <u>Id.</u> at 2333.  <u>Brnovich</u> requires Plaintiffs to identify a "qualification or prerequisite to voting or standard, practice, or procedure" that is actionable.  141 S. Ct. at 2336-37 (citing 52 U.S.C. § 10301).  In other words, Plaintiffs must identify a specific policy or set of policies and not rely on amorphous claims about "mosaics" of disenfranchisement.  <u>Id</u>.  Only after the challenged rule is identified does the Court proceed to consideration of the totality of the circumstances under § 2(b) to determine "equal openness." <u>Id.</u>

Here, only a few of those policies and procedures remain.  Plaintiffs' Second Amended Complaint challenged a myriad of voting practices and

---

[1] Even though <u>Brnovich</u> had not been decided when Plaintiffs filed their various Complaints, it "must be given full retroactive effect." <u>Harper v. Va. Dep't of Tax'n</u>, 509 U.S. 86, 96 (1993).

procedures, and this Court decided that several of Plaintiffs claims "are no longer in this case," including those about (1) polling place locations and closures; (2) the Help America Vote Act; (3) voting machines; (4) voter list security; (5) voting technology as being susceptible to hacking; (6) absentee ballot dating and notification issues; and (7) the provision of adequate resources to polling places. Doc. No. [612] at 72. Consequently, what remains are Plaintiffs' challenges to training about in-person absentee ballot cancellations, the HAVA Match program, and the accuracy of Georgia's voter lists.[2] Doc. No. [617] at 94-95. Thus, the dispositive question now before the Court is whether these remaining policies violate Section 2 of the Voting Rights Act. When Brnovich's guideposts are applied, it is evident that they do not, and that Plaintiffs failed to meet their burden on summary judgment imposed by Federal Rule of Civil Procedure 56. See Doc. No. [617] at 12-15.

---

[2] In its summary judgment order, the Court dismissed on the merits Plaintiffs' constitutional claims regarding voter list maintenance (Count I); training and ballot rejection uniformity regarding provisional ballots (Counts I and III); and accuracy of the voter registration list apart from HAVA Match (Counts II and III). While the Court deferred addressing these issues under Section 2 at that time, the reasoning behind their dismissal in the other counts applies equally here. Accordingly, to the extent that such claims still exist, they should be dismissed for the reasons previously stated in Defendants' motions for summary judgment as well as those stated herein.

1.   __Brnovich's Guideposts__.

Brnovich involved a vote-denial Section 2 challenge to two aspects of Arizona law: (1) an anti-ballot-harvesting provision that limited who could return absentee ballots for voters; and (2) a requirement that voters who vote on Election Day do so from their assigned precinct.  141 S. Ct. at 2334.  The Court's analysis began with the statutory text and led to the holding that the "key requirement [of a Section 2 vote denial claim] is that the political process leading to the nomination and election (here, the process of voting) must be equally open to minority and non-minority groups alike."  141 S. Ct. at 2337. For purposes of Section 2, "equally open" looks to equal opportunity to participate, but the "equal openness remains the touchstone."  Id. at 2338. Equal openness under Section 2 is determined in light of the totality of the circumstances, as Section 2(b) requires. Id.  The Brnovich Court declined to "compile an exhaustive list," but did identify "several important circumstances" which should be considered. Id.

First, courts must consider the "size of the burden imposed by a challenged voting rule." Brnovich, 141 S. Ct. at 2338.  Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort." Id.

Second, the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration." Brnovich, 141 S. Ct. at 2338. The analysis must take into account the Court's "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." Id. at 2339.

Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." Brnovich, 141 S. Ct. at 2339. This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may result in some predicable disparities … but the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." Id. For this reason, a "meaningful comparison is essential." Id.

In Brnovich, that meaningful comparison focused on racial disparities in "absolute terms." 141 S. Ct. at 2344-45. It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." Id. Contrary to the dissent's analysis, the Brnovich majority did not highlight the difference between 0.5% (white voters) and 1% (voters of color). Id. Instead,

the majority looked to the numbers in the aggregate and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[3] Id.

Importantly, the <u>Brnovich</u> majority disagreed with the dissenters on this weight of a finding of disparate impact: "The dissent … would rewrite the text of § 2 and make it turn almost entirely on just one circumstance—disparate impact.  This is a radical project." Id. at 2342.  Thus, disparate impact is a factor, but it is not dispositive.

<u>Fourth</u>, the <u>Brnovich</u> Court instructed federal courts to "consider the opportunities provided by a State's <u>entire</u> system of voting when assessing the burden imposed by a challenged provision." Id. at 2339 (emphasis added).  In other words, "where a State provides multiple ways to vote," any burden imposed by one of those available methods "cannot be evaluated without also taking into account the other available means." Id. at 2339.

---

[3] The Court also opined on how the "use of statistics [can be] highly misleading." <u>Brnovich</u>, 141 S. Ct. at 2345.  For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." Id. (quoting <u>Frank v. Walker</u>, 768 F.3d 744, 752, n. 3 (7th Cir.  2014)) (internal quotation marks omitted).

Fifth, "the strength of a state's interests served by a challenged voting rule" must also be taken into account. Id.  Here, the Brnovich majority reaffirmed that the prevention of fraud is a "strong and entirely legitimate state interest."  141 S. Ct. at 2340.  And, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." Id. at 2348.

The Supreme Court also addressed what does not constitute proper analysis under a Section 2 vote denial claim.  For example, the "disparate impact model employed in Title VII and Fair Housing Act cases [is not] useful" when considering Section 2. Id. at 2340.  Adopting such a standard would lead to impermissible federal micromanaging of State elections. Id.  The Court also rejected the "cat's paw" theory of liability when looking to questions of intentional discrimination.  Id. at 2349-50.  That theory is typically used in employment contests where a plaintiff "seeks to hold the plaintiff's employer liable for the 'animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'"  Id. at 2350 (quoting Staub v. Proctor Hosp., 562 U.S. 411, 415 (2011)).  Thus, in Section 2 cases, that one policymaker may have acted with improper intent does not mean others did; indeed "it is insulting to suggest that they are mere dupes or tools." Id.

### 2.   **Plaintiffs' Remaining Claims Fail After Brnovich.**

Plaintiffs have put forward no evidence demonstrating a material question of fact on whether the remaining challenged practices preclude "equal openness."[4] Brnovich, 141 S. Ct. at 2338.  As an initial matter, like Arizona law, Georgia law "generally makes it quite easy for residents to vote."  Id. at 2333 (describing Arizona law).  Both states allow for vote by mail well before the election.  Id. at 2334; O.C.G.A. § 21-2-381.  Early and absentee voting is permitted without an excuse.  Id.; O.C.G.A. § 21-2-385(d).  Georgians and Arizonans are permitted to vote early in person in the county of their residence. Id.; O.C.G.A. § 21-2-385(d). And Georgians are automatically registered to vote (or their registration information is automatically updated) when they are issued or renew their drivers' licenses. SMF at ¶ 137.[5]  This matters.

---

[4] This Court dismissed, on jurisdictional grounds, Plaintiffs' claims challenging the moving or closing of polling places, voting machines, voter list security, use of election technology that is vulnerable to hacking, absentee ballot rejections based on dating and notification issues, and the provision of resources to polling places.  Doc. No. [612].  Consequently, no such challenges remain in the context of Plaintiffs' Section 2 claim.

[5] All citations to the Statement of Material Facts ("SMF") are to Defendants' Statement of Material Facts, filed with Defendants' Motions for Summary Judgment, Doc. No. [451].

Looking to Plaintiffs' evidence, they have failed to set forth <u>any</u> evidence of racial disparity for several of the surviving practices. Plaintiffs have no evidence of any racial disparity on failure to train election officials, because Plaintiffs' expert never even looked at that issue. SMF at ¶ 105. Nor is there any evidence of any racial disparities in provisional ballots. On voter-list maintenance, there was no disparity affecting Black voters, because as a percentage of their share of the voter list, white voters were more likely to be moved to cancelled status than Black voters. SMF at ¶ 123. As a percentage of their total registered voters, Black voters were also on the inactive list for reason of "no contact" less often than other racial categories. SMF at ¶ 124. Consequently, these claims do not even make it out of the starting gate because no evidence exists upon which to assert a lack of "equal openness" of the electoral process. Doc. No. [535] at 32 n.19 (citing <u>Greater Birmingham Ministries</u>, 966 FDA at 1231–35) (noting Plaintiffs' failure to contest lack of disparate impact evidence ends the inquiry).

Plaintiffs put forth evidence of *some* disparate impact for only three challenged practices: (1) the rejection rate for absentee ballots (to the extent this remains as a valid issue after this Court's jurisdictional rulings), (2) the voters identified in the HAVA-match process, and (3) line length at some

Fulton County precincts in the 2018 General Election.[6]   None of these practices, and certainly none of Plaintiffs' evidence, show that Georgia's elections are not equally open to all Georgians.

         a.    <u>Absentee Ballot Rejection Rates</u>.

Plaintiffs argue that Georgia's county officials reject absentee ballots of minority voters too frequently.  Doc. No. [490] at 43-44.  Their claim against the State is that it does not sufficiently train county election supervisors on when and why to reject absentee ballots.  Doc. No. [582] at ¶¶ 133–147. <u>Brnovich</u> precludes any injunctive relief on this claim.

**First**, as a threshold matter, Plaintiffs never identified particular practices they said caused the disparities.  Instead, they identified burdens that can be cured and, at worst, represent the kind of "mere inconvenience[s]" that "cannot be enough to demonstrate a violation of § 2." <u>Brnovich</u>, 141 S. Ct. at 2338.  Georgia law makes curing any rejected absentee ballot an easy fix. H.B. 316 added a cure provision that amended O.C.G.A. § 21-2-386(a)(1)(C), and that is inarguably a far more open process than the system in place in 1982, which left voters with no option to cure a rejected absentee ballot other

---

[6] Plaintiffs' experts scrupulously avoided saying that any racial disparity was caused by any act or omission of Defendants. SMF at ¶¶ 124-25 (McDonald); 69, 105, 185 (Kennedy).

than to request a new one.  None of Plaintiffs' experts addressed this, and no admissible declarant evidence indicated that voters could not avail themselves of the cure process.  At most, Plaintiffs vaguely assert that lack of training led to absentee ballot rejections, but Plaintiffs provided no declarant who claimed their absentee ballot was wrongly rejected because of a failure to train.  Indeed, this Court held in the context of Plaintiffs' fundamental right to vote claims that they failed to "connect their facts regarding absentee ballot rejection rates to training in any way."  Doc. No. [617] at 24.

Nor have Plaintiffs considered the "extensive efforts" Georgia has undertaken to make absentee voting easy.  Brnovich, 141 S. Ct. at 2344.  No genuine argument is available to them on this issue.  Georgia's absentee-voting process is one of many ways Georgians may cast ballots, including early voting and voting on Election Day.  New Ga. Project v. Raffensperger, 976 F.3d 1278, 1281 (11th Cir. 2020).  Georgians who have their absentee ballots rejected receive notice and an opportunity to cure any defect for up to three days after the election.  O.C.G.A. § 21-2-386(a)(1)(C).  And voters whose absentee ballots are rejected can always vote in person during early voting or on Election Day.  O.C.G.A. §§ 21-2-385(d), 21-2-388.  Thus, on the whole, "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots."  New Ga. Project, 976 F.3d at 1281.

-11-

**Second**, as in <u>Brnovich</u>, Plaintiffs have failed to show that absentee ballots were widely used when Congress enacted the current version of Section 2 in 1982. 141 S. Ct. at 2338-39. It is "relevant that in 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." <u>Id.</u> at 2339. This matters, and it weighs strongly against a Section 2 vote denial claim based on vague challenges to training on absentee ballot practices that predate the current law.[7]

**Third**, at most, Plaintiffs' evidence shows a "small [racial disparity] in absolute terms." <u>Brnovich</u>, 141 S. Ct. at 2344. They relied on the testimony of Dr. Smith, who calculates a rejection rate of 2.35% for white voters' absentee ballots in the 2018 election and a rejection rate of 3.74% for Black voters in the same election.[8] SMF at ¶ 186. The difference in rejection rates for white and Black voters is thus 1.39 percentage points, but that is not the analysis the <u>Brnovich</u> Court employed. Put in the absolute terms required by <u>Brnovich</u>,

---

[7] It is important to recall that Dr. Kennedy testified he had not read the 2020 poll worker training manual. SMF at ¶ 100.

[8] Dr. Smith's report only covers "roughly 100 counties with more than zero rejected" absentee ballots in 2018, and does not address how the changes to absentee-ballot laws as a result of H.B. 316 could affect his analysis. SMF at ¶ 186 n.18.

Dr. Smith's data show that 96.26% of Black voters who voted absentee had their ballots accepted and 97.65% of white voters who voted absentee had their ballots accepted.  Thus, a policy "that appears to work for [96%] of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open."[9]  141 S. Ct. at 2344-45 (evaluating 98% impact).

Finally, the reason to check absentee ballots—the prevention of absentee ballot fraud—is plainly a "legitimate interest" of the State.  Brnovich, 141 S. Ct. at 2348.  The Brnovich Court cited to the Carter-Baker Commission and noted that "'[a]bsentee balloting is vulnerable to abuse in several ways: … Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation.'"  141 S. Ct. at 2347 (modifications in original) (citing Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (Sept. 2005)).  The

---

[9] Plaintiffs continue to have a causation problem as well.  The Eleventh Circuit held that any Section 2 challenge must demonstrate that the voting practice "must have *caused* the denial or abridgement of the right to vote on account of race."  Greater Birmingham Ministries v. Sec'y of State for State of Alabama, 992 F.3d 1299, 1330 (11th Cir. 2021).  Plaintiffs' evidence falls well short of creating a material question of fact on this point.  Dr. Smith agreed that the difference in the rejection rate could have been caused by any number of non-racial factors, including age, voting experience, or other categories besides race.  SMF at ¶¶ 187-88.  Plaintiffs did not fill this gap with evidence of any particular practice related to absentee ballots (signature matching, which has since been eliminated as a requirement; absentee-ballot timelines, etc.) that caused the racial disparity in the rejection rate.

same report also noted the importance of verifying voter identity and endorsed verifying the identity of absentee voters by reviewing "the voter's signature on the absentee ballot" compared to "a digitized version of the signature that an election administrator maintains." Id. at 20.   Plaintiffs did not provide sufficient evidence to overcome summary judgment before Brnovich; the Supreme Court's analytical framework makes the same conclusion all the more clear.

### b.   The HAVA-Match Policy.

Plaintiffs' vote-denial claim also fails as it relates to the HAVA-match policy.   See 52 U.S.C. 21083(a)(5); O.C.G.A. 21-2-216(g)(7).   Here, Plaintiffs assert that Georgia's application of the requirements of the Help America Vote Act has a disparate impact on voters of color and amounts to a vote denial under Section 2 of the Voting Rights Act.   Doc. No. [490] at 19-21.   Applying the Brnovich factors, Plaintiffs' claim cannot overcome summary judgment.

**First**, the burden of being misidentified due to a HAVA-match issue is low and more consistent with the "'usual burdens of voting'" like showing a photo identification.   Brnovich, 141 S. Ct. at 2338 (citing Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 198 (2008) (Stevens, J.)).   That process provides multiple outlets for a voter to correct a mismatched record. SMF at ¶¶ 137–138. Georgia provides a number of opportunities to register to vote, including

automatic voter registration, online voter registration, and mail-in voter registration.  Id. at ¶ 133.  In considering the minimal burden on voters imposed by the matching process, it does not make Georgia's election system unequally open to all voters.  This is true whether the person is flagged for MIDR status or otherwise needs to provide some form of identification.  Indeed, Georgians can register through a variety of means and are still marked as "active" even if they fail the matching process following H.B. 316.  O.C.G.A. § 21-2-220.1(b) ("In the event that the [pertinent identifying information] provided by the person registering to vote [with a paper application] does not match information about the applicant on file at [DDS or SSA], the applicant shall nevertheless be registered to vote . . . .").  Given the multitude of options to register and vote, this factor also weighs against a finding that the system is not equally open.

**Second**, when Congress passed the current version of the Voting Rights Act in 1982, county registrars were required to verify whether a person was eligible to vote before voting.  See, e.g., McCoy v. McLeroy, 348 F. Supp. 1034, 1036-37 (M.D. Ga. 1972) (describing process registrars used for verifying eligibility prior to 1982).  HAVA-Match is an extension of that policy, which means it has the same kind of "long pedigree or … widespread use in the

United States …. that must be taken into account." Brnovich, 141 S. Ct. at 2339.

**Third**, Plaintiffs' alleged disparate impact is the same kind of small amount that does not, itself, establish a Section 2 violation. Specifically, Plaintiffs' expert on HAVA-match, Dr. Mayer, could not identify a single individual who was incorrectly flagged by the matching process. SMF at ¶ 169; Ex. No. (24), Mayer Dep., 40:20-43:2. In addition, the disparities Dr. Mayer identified only exist when comparing against the entire voter file, and Dr. Mayer did not review the number of registrants at any particular time-period. SMF at ¶ 170. Dr. Mayer only identified 4,688 individuals in pending status and 60,477 individuals in Active-MIDR status, Doc. No. [238] at 18–19, this is a small portion of the nearly eight-million Georgians registered to vote. Dr. Mayer also makes the claim that minority registrants are "between 6 and 10 times more likely to be in MIDR status than non-Hispanic White registrants." Id. at 20. But like the Plaintiffs in Brnovich, this is magnifying a small disparity of less than 2% between those groups.

As with the absentee ballot security measures, Georgia has a "strong and entirely legitimate state interest" in complying with federal law and preventing fraud in the registration process. Brnovich, 141 S. Ct. at 2340. While Dr. McCrary attempted to tie together a variety of facts about Georgia's

history, those distant facts do not demonstrate a violation of the results test, and Plaintiffs have not brought an intentional-discrimination claim under Section 2.

Taken together, and applying the Brnovich guideposts, Plaintiffs have not established a question of material fact on the issue of HAVA-match policy.

        c.    Lines in Fulton County.

The entirety of Plaintiffs' evidence on race and its impact on lines is limited to a small subset of Fulton County precincts in 2018, and a difference of 96 seconds in wait times between Black-majority polling places and non-Black-majority sites.  SMF at ¶ 218 (citing Doc. No. [166] at 5–6).  This does establish a vote denial claim after Brnovich.[10]

**First**, the size of the burden here is miniscule, both the 18.8-minute and 17.2-minute average wait times, for Black- and non-Black-majority polling places respectively, are below that recommended by the Presidential Commission on Election Administration.  SMF at ¶ 218.  Moreover, the burden

---

[10] Plaintiffs attempt to obfuscate this lack of evidence by stating their Section 2 claims are not premised on wait times, but instead are premised on the closure and relocation of polling places. Doc. No. [490] at 42–43. But this Court held that Plaintiffs lack standing to "pursue their claims related to the moving and closing of precincts and polling places because those claims are neither traceable to nor redressable by Defendants." Doc. No. [612] at 37–38.

of waiting in line must be viewed in the light of the "opportunities provided by a State's entire system of voting … where a State provides multiple ways to vote, any burden imposed on voters who chose one of the available options cannot be evaluated without also taking into account the other available means." Brnovich, 141 S. Ct. at 2339.  As discussed above, Georgia provides multiple opportunities to vote besides in-person voting on Election Day.  New Ga. Project, 976 F.3d at 1281.  As importantly, Georgia offers weeks of advance voting to cut down on election day lines.  O.C.G.A. § 21-2-385(d).  This shows that the State's "political process" is equally open to all.  Brnovich, 141 S. Ct. at 2339.

**Second**, these options for Georgia voters far exceed those available in 1982, when the only options were excuse-only absentee voting or Election Day voting.  The mere seconds of disparity—well under two minutes in total—are hardly enough to form any sort of actionable claim.  "What are at bottom are very small differences should not be artificially magnified."  Brnovich, 141 S. Ct. at 2344.

**Third**, Dr. Graves's analysis—limited to some precincts in one Georgia county—does not show the kinds of "size of any disparity" needed to overcome summary judgment.  Brnovich, 141 S. Ct. at 2339.  Indeed, Dr. Graves did not analyze cause or even conclude that his findings about line length were

-18-

statistically significant.   SMF at ¶ 221.   Even Justice Kagan's proposed standard announced in her dissenting opinion in <u>Brnovich</u> would have required a showing of statistical significance—something the undisputed evidence does not show here.   <u>Brnovich</u>, 141 S. Ct. at 2361 ("Section 2 demands proof of a statistically significant racial disparity in electoral opportunities (not outcomes) resulting from a law not needed to achieve a government's legitimate goals") (Kagan, J., dissenting).

In addition, Plaintiffs have not shown the kind of causation that the Eleventh Circuit mandated in <u>Greater Birmingham Ministries.</u>  992 F.3d at 1330.   As this Court is aware, counties make the decisions on equipment allocation, polling place locations, and other issues that could possibly affect voting-line lengths.[11]   Doc. No. [612] at 44-49; <u>see also</u> <u>Anderson v. Raffensperger</u>, 497 F. Supp. 3d 1300, 1329 (N.D. Ga. 2020).   In this context, it is doubtful that line length is even a "standard, practice, or procedure" of voting.   <u>Lee v. Va. State Bd. of Elections</u>, 155 F. Supp. 3d 572, 583 (E.D. Va. 2015) partially modified after reconsideration on other grounds by <u>Lee v. Va. State Bd. of Elections</u>, Civil Action No. 3:15CV357-HEH, 2016 U.S. Dist.

---

[11] Recent legislation underscores this responsibility" requiring county officials to check wait times and make changes to precincts if lines exceed one hour at any point during election day. O.C.G.A. § 21-2-263(b).

LEXIS 185846, at *5 (E.D. Va. Feb. 2, 2016).  But even if it is, it is even more difficult to trace such an injury to the Defendants.

Thus, the undisputed facts demonstrate that there is no unequal openness of Georgia's election system based on line length.  Plaintiffs' Section 2 claim must be dismissed in its entirety.

## CONCLUSION

When considered as a whole, even given Georgia's sad and distant history of discrimination, <u>Greater Birmingham Ministries</u>, 992 F.3d at 1331-32, Georgia's voting system is equally open to all voters, and the handful of slight differences between Black and white voters put forward by Plaintiffs does not violate Section 2 of the Voting Rights Act.

Despite Plaintiffs' best efforts, they cannot demonstrate that Georgia's election system is not equally open to all voters, regardless of race.  This ends their Section 2 claim.  Of the three challenged practices that they claim have any racial impact, they can—at most—show minor disparities and outlier situations.  This is not the stuff of which an unequal election system is made, and Defendants are entitled to judgment as a matter of law on the entirety of Count V of Plaintiffs' Second Amended Complaint.

Respectfully submitted this 21st day of July, 2021.

Christopher M. Carr
Attorney General
GA Bar No. 112505
Bryan K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Josh B. Belinfante*
Josh B. Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander F. Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street N.W.

Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:  (404) 856-3255

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

**BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR**

**PARTIAL SUMMARY JUDGMENT** was prepared double-spaced in 13-

point Century New Schoolbook font, approved by the Court in Local Rule

5.1(C).

*/s/ Josh Belinfante*
Josh Belinfante

## <u>CERTIFICATE OF SERVICE</u>

This certifies that I have this date electronically filed the foregoing

**BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR**

**PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such

filing to the attorneys of record listed on the case.

This 21st day of July, 2021.

_/s/ Josh Belinfante_
Josh Belinfante