## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

STATEMENT OF FACTS ....................................................................3

I.     Georgia's History of Racism .........................................................3

II.    Exact Match ..........................................................................6

III.   Procedural History ...................................................................9

LEGAL STANDARD ......................................................................10

ARGUMENT ..............................................................................12

I.     The totality of the circumstances test applies to Plaintiffs' Section 2
       challenge to Exact Match, and *Brnovich* is of limited relevance. ................12

II.    Genuine issues of fact exist about whether Exact Match violates
       Section 2 under the totality of the circumstances. ...............................14

III.   Genuine issues of fact exist about whether Exact Match violates
       Section 2 under *Brnovich*'s guideposts. ..........................................17

CONCLUSION ............................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................11

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).......................13

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)............*passim*

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) ..............................13

*Chisom v. Roemer*, 501 U.S. 380 (1991) .................................................................25

*Greater Birmingham Ministries v. Secretary of State for Alabama*,
    992 F.3d 1299 (11th Cir. 2021) .............................................................................13

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) .....................................................11

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ......................................................8

*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997)....................................................5

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................................................11, 13, 17

*United States v. Marengo County Commission*, 731 F.2d 1546 (11th
    Cir. 1984) .............................................................................................................16

**STATUTES**

52 U.S.C. § 10301 ..............................................................................................11, 12

52 U.S.C. § 21083(a)(5)(B)(i)..............................................................................8, 24

Ga. Code Ann. § 21-2-217 (1982) .....................................................................20, 21

Ga. Code Ann. § 21-2-221 (1982) .....................................................................20, 21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a)...............................................................................................10

Nat'l Ass'n of Sec'ys of State, *NASS Report: Maintenance of State Voter Registration Lists* (updated Dec. 2017), https://www.nass.org/sites/default/files/reports/nass-report-voter-reg-maintenance-final-dec17.pdf.......................................................................24

Public Papers of the Presidents, Lyndon B. Johnson, Vol. 2, Aug. 6, 1965 (1966).............................................................................................................1

## INTRODUCTION

The Voting Rights Act (VRA) was enacted to "achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021). As President Lyndon B. Johnson observed, the VRA is "one of the most monumental laws in the entire history of American freedom." Public Papers of the Presidents, Lyndon B. Johnson, Vol. 2, Aug. 6, 1965, p. 841 (1966). Georgia's Exact Match policy violates Section 2 of the VRA and amply demonstrates the continued relevance of the Act.

Under Exact Match, the State matches information on voter registration applications against information in the state Department of Driver Services (DDS) or the federal Social Security Administration (SSA) databases to "verify" applicants' citizenship and identity. An applicant whose information cannot be verified must provide additional proof of identification or citizenship before the applicant may vote. While this policy may sound innocuous in theory, it is pernicious in practice. The Secretary of State (SOS) requires a character-by-character match widely understood to result in false nonmatches. SOS General Counsel Ryan Germany testified he had seen "error rates" of "20 or 30 percent" when the SOS matched voter registration information against the SSA database, which, he noted, "seem[ed] pretty ridiculous." SAMF ¶ 420. Meanwhile, for

1

citizenship, the State uses a database it knows to contain outdated information. As a result, applicants—particularly Black and brown applicants—are incorrectly flagged and prevented from voting unless they provide additional proof. This policy is the very definition of a burden on the right to vote.

Kia Marlene Carter's story paints a vivid picture of Exact Match's flaws. At the polls in 2018, Ms. Carter was told she was not a citizen. But Ms. Carter was born in Virginia and had voted in Georgia since she was eighteen years old. At a loss as to what to do, the poll workers sent Ms. Carter to the Henry County voter registration office, where she was told to get her registration fixed before the next election; she was not offered a provisional ballot. Ms. Carter "didn't even know where to begin to fix" her registration and prove her citizenship. SAMF ¶ 516. She was not allowed to vote in the 2018 gubernatorial election.

Ms. Carter is not alone, as Plaintiffs' declarations and other evidence show. Voters of color bear the brunt of the State's Exact Match policy. As of January 2020, people of color comprised over 75% of those in "pending" status for citizenship nonmatches despite comprising only 37% of active registered voters in the State. People of color were between six and ten times more likely to be in "Missing ID Required" (MIDR) status than white registrants. The disparities are stark, burdensome, and state-sanctioned.

2

Plaintiffs' evidence is sufficient to establish that Exact Match violates Section 2, and at minimum, establishes a genuine dispute of material fact. Defendants' renewed motion for summary judgment should be denied.

## STATEMENT OF FACTS[1]

### I. Georgia's History of Racism

Georgia has a long history of overt racism. In its first four constitutions, Georgia limited voting rights to white males. *See* Expert Report of Dr. Adrienne Jones at 2, ECF No. 92 (Jones Report). During Reconstruction, when Georgia was forced to extend the franchise, the State used poll taxes, voter purges, grandfather clauses, literacy tests, and all white primaries to keep Black citizens from voting. *See* Pls.' Corrected Statement of Additional Material Facts ¶¶ 1131–1132, 1162, ECF No. 506 (SAMF); Expert Report of Peyton McCrary at 13-15, ECF No. 339 (McCrary Report). As soon as Reconstruction ended and Georgia was released from federal oversight, Georgia again excluded Black voters through less direct means. Jones Report at 3; *see also* SAMF ¶¶ 1160–1161.

The VRA outlawed Georgia's creative maneuvers and explicitly sought to extend the franchise to *all* citizens. Georgia staunchly opposed the VRA,

---

[1] Unlike Defendants, Plaintiffs have filed a statement of facts with this brief, pursuant to Local Rule 56.1(B). This statement of facts contains excerpts from Plaintiffs' SAMF (Corrected), ECF No. 506—specifically, it excerpts all the SAMF paragraphs cited in this brief.

repeatedly mounted legal challenges, and refused to submit its electoral laws to the Department of Justice (DOJ) for preclearance. SAMF ¶¶ 1133–1136. When Georgia did submit its proposed election laws, DOJ blocked the proposals because of their retrogressive effects on voters of color. *Id.* ¶ 1137.

Defendants dismiss this history as "sad and distant." Defs.' Renewed Mot. for Summ. Judgment at 20, ECF No. 623. But "distant" it is not, and "sad" mischaracterizes its deliberate cruelty. In 2006, then-Governor Sonny Perdue stoked fears that immigrants might participate in Georgia elections, stating: "It is simply unacceptable for people to sneak into this country illegally on Thursday, obtain a government-issued ID on Friday, head for the welfare office on Monday, and go to vote on Tuesday." SAMF ¶ 1149. In 2018, then-Secretary of State Brian Kemp accused Democrats of "registering all these minority voters that are out there." ECF No. 481-1 at 204. And in the last five years alone, a congressional candidate's husband referred to Black Democrats as being on the "plantation"; a gubernatorial candidate drove a "deportation bus" around the State, adorned with a sign warning that the bus contained "[m]urderers, rapists, kidnappers, [and] child molesters"; and an ousted congressman offered to give voters rifles to ward off the "looting hordes from Atlanta." SAMF ¶¶ 1150–1156. In the 2018 gubernatorial election, a hate group called voters pretending to be Oprah Winfrey, calling

Winfrey a "magical Negro" and dubbing Stacey Abrams her "fellow Negress" and a "poor man's Aunt Jemima." SAMF ¶ 1148.

Voting in Georgia is also strikingly polarized. Beginning in the 1990s, white voters shifted dramatically to the Republican Party, with Democratic support dropping from 45% in the 1990s to just 25% by 2002. *Id.* ¶ 1139. That ratio has remained stable ever since: 25% of white voters cast a ballot for the Democratic gubernatorial candidate in 2014, while 73% voted for the Republican. *Id.* ¶ 1140. By contrast, since 1992, Black support for the Democratic Party has remained high, hovering between 81% and 92%. *Id.* ¶ 1139. In 2014, just 10% of Black voters supported the Republican gubernatorial candidate. *Id.* ¶ 1140.

Georgia has elected just three Black candidates to non-judicial statewide office: Reverend Raphael Warnock as U.S. Senator this year; Mike Thurmond as Labor Commissioner in 1999; and Thurbert Baker as Attorney General in 1997.[2] Centuries of discrimination have resulted in Black Georgians having markedly worse educational achievement, employment rates, health outcomes, and rates of houselessness than white Georgians, not to mention lower income and wealth. *See* SAMF ¶¶ 1141–1146. Nearly 40% of Hispanic Georgians and 17% of Black

---

[2] Questions of "political history," such as who was a political official at any given time, are appropriate subjects of judicial notice, as they are not subject to reasonable dispute. *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

Georgians lack a high school degree, as compared to just 10% of non-Hispanic whites. McCrary Report at 76. Compared to just 5.6% of non-Hispanic whites, 11.5% of Black Georgia residents are unemployed. *Id.* at 76–77. And Black and brown Georgians are overwhelmingly more likely than non-Hispanic white Georgians to live below the poverty line—24.4% of Black residents, 26.7% of Hispanic residents, and just 11.1% of white residents.

Georgia's long and persistent efforts to prevent eligible Black and brown residents from voting underlie the Exact Match policy.

## II. Exact Match

The SOS says that it applies Exact Match to confirm an applicant is a citizen and to determine whether an applicant's first name, last name, date of birth, and last four digits of the Social Security Number match the information in the DDS or SSA databases. *See* SAMF ¶ 416. A citizenship nonmatch places the registration in "pending" status; a nonmatch in any other field relegates the registration to "MIDR" status. Flagged applicants may not vote until they provide further proof of ID or citizenship. *See id.* ¶¶ 434–437.

Exact Match is inherently flawed. For citizenship, Exact Match relies on outdated information to "verify" voter registrations. Specifically, for naturalized citizens who obtained driver's licenses before they were naturalized, the DDS database rarely reflects updated citizenship status. As a result, Exact Match often

6

falsely flags these citizens as noncitizens and does not process their voter registrations. SAMF ¶¶ 439–441, 496. Once flagged, applicants must provide proof of citizenship to their county board of elections within twenty-six months (even if the applicants never discover that the proof is required). Absent proof, the State rejects the applicant's registration outright. *Id.* ¶¶ 427, 435, 495.

Exact Match is just as dysfunctional when it comes to "verifying" identity. The SOS has designed Exact Match to yield nonmatches for even a single-character difference (such as a misplaced space, hyphen, letter, or number) between information in the voter registration database and the DDS or SSA databases. SAMF ¶ 453; *see also id.* ¶¶ 454, 458, 460, 461. These differences can occur because of errors in data entry from paper voter registration forms, incorrect data in the DDS or SSA databases, or immaterial differences in how information is entered across the various databases—errors that are not the applicants' fault and bear no connection to the applicants' eligibility to vote. *See* SAMF ¶¶ 418, 420.

Registrants in "pending" status for citizenship reasons are disproportionately people of color. As of January 2020, people of color comprised more than 75% of those in "pending" status for citizenship nonmatches despite comprising only 37% of the active registered voters in the State. *Id.* ¶ 604; *see id.* ¶ 605 (finding Hispanic and Asian registrants comprised 31.2% of registrants in "pending" status even though they made up only 5.7% of active registrants); *see also id.* ¶ 439. Just as

7

striking, registrants of color were between six and ten times more likely to be in "MIDR" status than non-Hispanic white registrants. *Id.* ¶ 606. Though fewer than 30% of active registered voters were Black, nearly 70% of voters in "MIDR" status were Black. *Id.* ¶ 607.

The racially disparate impact of Exact Match is on par with its checkered history. The 2002 Help America Vote Act (HAVA) directed state election officials to match voter registration information with state motor vehicle authority databases "to the extent required to enable each such official to verify the accuracy of the information provided." 52 U.S.C. § 21083(a)(5)(B)(i).[3] When HAVA was enacted, Georgia had in place a voter registration policy that was later held to violate the VRA because it struck voters from the rolls based on "information irrelevant" to their eligibility. *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

In the wake of *Schwier*, Georgia introduced Exact Match, but it did so without obtaining DOJ preclearance. McCrary Report at 55. In 2009, after the State had made repeated (inadequate) submissions to the federal government, DOJ denied preclearance for Exact Match, explaining the policy did "not produce accurate and reliable information" and "an error as simple as transposition of one

---

[3] HAVA does not require an exact match and does not specify the consequences a state must impose in the event of a nonmatch. Defendants mischaracterize Exact Match as "HAVA match." *See infra* at 24.

digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields." SAMF ¶¶ 406–407. As DOJ observed, the "impact of these errors falls disproportionately on minority voters." *Id.* ¶ 408.[4]

DOJ's assessment of the racially disparate impact of Exact Match proved true, yet Georgia did nothing to eliminate that impact. In the 2018 general election, Exact Match was estimated to have obstructed the registrations of more than 53,000 Georgians, over 70% of whom were reported to have been voters of color. *Id.* ¶ 609. The SOS acknowledged that more than 65% of first-time voters placed in "pending" status were Black. *Id.* ¶¶ 611–612. Even though the SOS has long known Exact Match has a racially disparate impact on Black and brown voters' opportunities to register and to vote, the policy remains in place. *Id.* ¶ 614.

## III.   Procedural History

Plaintiffs brought suit in November 2018, contending that several of the SOS's and State Election Board's policies and practices violated Georgia voters' constitutional and statutory rights. *See* Second Am. Compl., ECF No. 582. Defendants moved for summary judgment, and the Court denied summary judgment on Plaintiffs' challenges to three policies: absentee ballot cancellations;

---

[4] DOJ precleared Exact Match only after the SOS submitted a proposal that "called for careful monitoring" of the process "on a daily basis," with "prompt notice to any applicant whom the system could not verify." McCrary Report at 63.

Exact Match; and the inaccuracy of Georgia's voter list. The Court denied summary judgment on all counts with respect to Exact Match, *see* ECF No. 617 at 56–57 (Count I); *id.* at 74–75 (Count II); *id.* at 83–84 (Count III), and deferred ruling on the Section 2 claim until the United States Supreme Court's ruling in *Brnovich v. Democratic National Committee*, *id.* at 95. With this Court's leave, Defendants have now moved for partial summary judgment on the Section 2 claim on all of the policies challenged in the complaint. *See* ECF No. 623 at 9–10.[5]

The sole question before this Court regarding Section 2 is whether Plaintiffs' challenge to Exact Match can proceed.[6] For the reasons set forth below, the Court should deny Defendants' renewed motion for summary judgment on this claim.

## LEGAL STANDARD

Summary judgment is proper only where the movant proves "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "The evidence of

---

[5] Although Defendants did not file a motion alongside their memorandum of law, Plaintiffs will treat Defendants' memorandum as a renewed motion.

[6] Plaintiffs have not argued the SOS's voter list inaccuracies or the inadequate training on absentee ballot cancellations—the only two other challenged policies that remain in the case—violate the VRA. And the remaining VRA claims are no longer in the case because of the Court's earlier summary judgment rulings. Plaintiffs further note that, while Defendants argue the voter list accuracy claim was dismissed for Counts II and III, *see* ECF No. 623 at 3 n.2, this Court was clear that summary judgment was denied as to Plaintiffs' claims concerning list accuracy in Count I—the only count to which Plaintiffs argued this evidence was relevant at summary judgment, ECF No. 617 at 94.

the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To show a genuine dispute of material fact, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

In evaluating a vote-denial claim under Section 2, the plain text of the VRA requires a court to determine whether, under "the totality of the circumstances," a voting qualification or voting practice "results in a denial or abridgment" of the right to vote "on account of race or color." 52 U.S.C. § 10301; *see also Brnovich*, 141 S. Ct. at 2337–38. The totality of the circumstances includes factors such as the history of racism in the jurisdiction, racial polarization in voting, the use of overt racial appeals in campaigns, socioeconomic disparities across races, the success of candidates of color in elections, and the tenuousness of the challenged policy—factors collectively dubbed the "Senate Factors." *See Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986). "The presence or absence of each factor . . . serves as a piece of evidence pointing either towards or away from an ultimate conclusion that an electoral system is or is not" abridging the right to vote based on race. *Nipper v. Smith*, 39 F.3d 1494, 1526 (11th Cir. 1994).

11

The totality of the circumstances remains the operative standard, which *Brnovich* did not change. In *Brnovich*, the Supreme Court addressed Section 2 in the context of challenges to time, place, and manner restrictions as to how and where voters can cast ballots. *See* 141 S. Ct. at 2340. The Court underscored that its opinion neither set forth prerequisites to Section 2 vote-denial claims nor "announce[d] a test to govern all VRA" vote-denial claims. *Id.* at 2336. Instead, the opinion highlighted five "guideposts" that could carry significant weight in certain vote-denial contexts such as *Brnovich*: (1) the burden on the voter; (2) comparable practices when the VRA was amended in 1982 and today; (3) the racial disparity created by the practice; (4) the practice's role in the context of the state's electoral system as a whole; and (5) the legitimacy and strength of the state's interest served by the practice. *Id.* at 2338–41. In addition, the Court emphasized that certain Senate Factors—those addressing past and present discrimination—are likely to be especially significant. *See id.* at 2340.

## ARGUMENT

**I.    The totality of the circumstances test applies to Plaintiffs' Section 2 challenge to Exact Match, and *Brnovich* is of limited relevance.**

Under *Brnovich*, the relevant Section 2 inquiry is whether, "under the totality of the circumstances," a policy or practice abridges the right to vote on account of race. *Brnovich*, 141 S. Ct. at 2336; 52 U.S.C. § 10301. Looking at the

totality of the circumstances, a Court must assess "the impact of the contested structure or practice" based on "objective factors," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999) (quoting *Gingles*, 478 U.S. at 44), including the policy's racially disparate impact and the social and historical conditions giving rise to racial discrimination in voting. *See Gingles*, 478 U.S. at 36–37.[7]

Notwithstanding Defendants' claims to the contrary, *Brnovich*'s "guideposts" are not applicable to all Section 2 vote-denial challenges. *Brnovich* expressly cabins its reach to time, place, and manner restrictions. *See* 141 S. Ct. at 2333; *see also id.* at 2336, 2337, 2339, 2340. Time, place, and manner restrictions generally govern *how* federal elections are held, while voter qualifications regulate *who* may vote in them. *Cf. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013).[8] Arizona's out-of-precinct policy and ballot-harvesting ban at issue in *Brnovich* required voters to cast ballots at their assigned polling places and place their ballots in the mail themselves. 141 S. Ct. at 2334. Both policies regulated *how*

---

[7] *Brnovich* abrogated *Greater Birmingham Ministries v. Secretary of State for Alabama*, 992 F.3d 1299, 1331–32 (11th Cir. 2021), by making clear the Senate Factors remain relevant to vote-denial claims. *See Brnovich*, 141 S. Ct. at 2340 (rejecting argument that "these factors should be disregarded" in every vote-denial case).

[8] Although Section 2 does not implicate the Elections Clause, the Court's repeated references to "time, place, and manner regulations" in *Brnovich* evoke the distinction the Court has set forth in that line of cases.

13

voters cast their ballots; neither limited who could vote in the first place. By contrast, Exact Match regulates *who* may vote in elections—only those whose voter registration applications exactly match government records. In other words, Exact Match is not a time, place, or manner restriction to which *Brnovich* applies.

Exact Match also bears little resemblance to the rules challenged in *Brnovich*. There, the challenged rules regulated how and where voters could cast their ballots. By contrast, Plaintiffs challenge a voter registration system that is uniquely burdensome both because of the SOS's needlessly stringent protocol, and because of the SOS's maladministration of that protocol. The SOS unnecessarily requires an exact match, relies on flawed databases, fails to timely notify applicants whose registrations are flagged, and fails to provide adequate training as to how applicants can cure the falsely flagged registrations. This poorly designed and error-filled system precludes eligible applicants from exercising their franchise no matter how much effort those applicants would willingly assume. This system is different in kind from the policies *Brnovich* addressed.

## II.   Genuine issues of fact exist about whether Exact Match violates Section 2 under the totality of the circumstances.

Under the "totality of circumstances," more than a genuine issue of material fact exists as to whether Exact Match violates Section 2. Defendants' brief all but ignores the powerful historical and societal facts at play in this inquiry. Following

14

Section 2's admonishment to consider the "totality of the circumstances," such circumstances, including those identified in *Brnovich,* are discussed below.

*Disparate Impact.* Defendants themselves cite Plaintiffs' evidence of the disparate impact Exact Match has on the registrations of people of color, *see* ECF No. 623 at 16—which, as Plaintiffs' expert has explained, amounts to a significant disparate burden on communities of color, *see infra* at 21–22.

*History of Discrimination. Brnovich* stressed that the key historical question under the totality-of-the-circumstances inquiry is whether "minority group members suffered discrimination in the past (factor one)" and whether "effects of that discrimination persist (factor five)." 141 S. Ct. at 2340. Defendants concede the State's sordid history of state-sanctioned racism against Black voters, stating: "Georgia had a long and sad history of racist policies in a number of areas including voting. A fact of which this Court can take judicial notice." ECF No. 450-1 at 47 n.38. Just as Georgia officials once asked Black registrants "how the writ of habeas corpus [could] be suspended" before allowing them to vote, McCrary Report at 14, Georgia now asks registrants to navigate a Byzantine system structured to disproportionately exclude voters of color. *See* SAMF ¶ 615.

*Present-Day Effects of Racism.* The effects of centuries of discrimination continue to permeate Georgia society. Over twice as many Black Georgians as white Georgians live below the poverty line, SAMF ¶ 1145; the unemployment

15

rate for Black Georgians is double that of their white counterparts, *id.* ¶ 1144; and Black Georgians are less likely to attain a high school or college degree, *id.* ¶ 1146.

The other Senate Factors, particularly racial appeals in campaigns, polarized voting, and the dearth of candidates of color for statewide office, are relevant in their own right and because they provide additional evidence of continuing racial animus. *See Brnovich*, 141 S. Ct. at 2340. Plaintiffs' evidence provides such proof.

**Overt Racial Appeals in Campaigns.** Plaintiffs' evidence demonstrates that racism continues to drive legislative policy and political campaigns. *See supra* at 4–5. In recent election cycles, candidates have called Black voters "slaves to the Democratic Party," dubbed prominent Democrats as Nazis, referred to Stacey Abrams by a racially charged epithet, and prominently identified with white supremacist organizations. *See* SAMF ¶¶ 1152–1156.

**Racial Polarization and Political Responsiveness.** Plaintiffs' evidence reveals voting remains highly racially polarized. *See* SAMF ¶¶ 1139–1140. Not only is this fact relevant on its own, but it also provides "strong evidence that the elected officials are not meeting the political needs" of voters of color. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1573 (11th Cir. 1984).

**Success of Candidates of Color.** Just three Black candidates have *ever* been elected to non-judicial statewide office. *See supra* at 5.

In sum, racism in Georgia is not the "distant" phenomenon Defendants claim. ECF No. 623 at 20. Defendants' motion must be denied because Plaintiffs have presented ample evidence to show a genuine dispute as to whether, under the totality of the circumstances, Georgia's elections are equally open.

## III.  Genuine issues of fact exist about whether Exact Match violates Section 2 under *Brnovich*'s guideposts.

In addition to showing a genuine dispute of fact regarding the usual factors in the totality-of-the circumstances analysis, the record is replete with genuine issues of material fact that speak to the Section 2 guideposts highlighted by *Brnovich* (if indeed *Brnovich* even applies). Those guideposts reveal Georgia's electoral system is not "equally open" to voters of color. 141 S. Ct. at 2341.

As a threshold matter, not all of the guideposts are relevant to every Section 2 vote-denial challenge. Section 2 claims are "peculiarly dependent upon the facts of each case." *Gingles*, 478 U.S. at 79 (quotation marks omitted). In *Brnovich* itself, the Court declined to consider certain guideposts—such as comparable practices in 1982—when analyzing the ballot-harvesting ban, even as it considered this factor when evaluating the out-of-precinct policy. *Compare* 141 S. Ct. at 2345, *with id.* at 2346–49. Likewise, comparing Exact Match to policies in place in 1982 is inapposite since the SOS's policy of matching voter registration information to the DDS database was adopted largely in response to HAVA, a law not enacted until 2002. Defendants appear to agree, addressing only a few of the *Brnovich*

17

guideposts. *See* ECF No. 623 at 16. But even *if* all five guideposts were relevant, Plaintiffs' challenge survives summary judgment.

*First*, the "size of the burden[s] imposed" by Exact Match are significant. *Brnovich*, 141 S. Ct. at 2338. They are hardly the "usual burdens of voting," such as providing a photo ID at the polls or arriving at a particular time and place to vote, which often bear on *how* a ballot is cast. ECF No. 623 at 14–17. With Exact Match, the SOS has erected a novel set of hoops Georgians must jump through before being allowed to even register to vote. *See* SAMF ¶¶ 497–498. Applicants must first find out that their applications have been placed in "MIDR" or "pending" status (easier said than done, given the pervasive errors in the mailing address information DDS collects, *see* SAMF ¶ 726, Exhs. 28, 664, and notice issues, *see* SAMF ¶¶ 499–500, 527–528) and then cure the flag by providing the documents the SOS demands (again, not an easy task, given voter, county official, and poll worker confusion about what documents suffice to cure Exact Match flags, *see, e.g.*, *id.* ¶¶ 483–484, 529, 555–556).[9] In other words, Exact Match requires eligible applicants—who have made no errors of their own—to take additional action to cure the *SOS*'s errors before being able to vote.

---

[9] Defendants' passing observation that Georgia provides various ways of registering to vote is a red herring given that *all* voter registration applications, regardless of form, are subject to Exact Match. ECF No. 623 at 14–15.

Plaintiffs have presented the testimony of Georgians who have been burdened by Exact Match, including both natural-born and naturalized citizens who were falsely flagged as noncitizens and either could not vote or were made to clear unnecessary hurdles to vote. *See* SAMF ¶¶ 516–521 (describing how natural-born citizen Kia Carter was told she could not vote because she was flagged as a noncitizen in the voter registration database, despite having previously voted); *id.* ¶ 529; Exhs. 136, 271 (describing how eighty-year-old Ngoc Anh Thi Tran was given conflicting information and told she could not vote until she produced her naturalization paperwork because she was flagged as a noncitizen). Simply calling a burden "minimal" does not make it so. ECF No. 623 at 15; *see also* SAMF ¶¶ 443–445, 453, 455–456, 513–515, 617.

These experiences illustrate another flaw in Defendants' argument. While a State may set up its own system of voter registration, it does not have the right to arbitrarily exclude eligible voters from that system by virtue of its unnecessary complexity and the SOS's inability to administer that system. Here, Defendants attempt to justify a voter registration system that is not only untethered from the requirements of federal law but riddled with errors. By no measure did *Brnovich* bless state dysfunction as a "usual burden" of voting. Attempting to mask the burdens of Exact Match, Defendants assert that registrants are marked as "active" "even if they fail the matching process." ECF No. 623 at 15. Defendants are

19

wrong. Applicants flagged for a citizenship nonmatch are *not* registered and their applications are placed in "pending" status and rejected unless the nonmatch is fixed within twenty-six months. *See* SAMF ¶¶ 427, 435, 495. Applicants flagged for a nonmatch for other reasons are placed in "MIDR" status and *not* moved to fully "active" status until they cure their registrations. *See id.* ¶¶ 436–437. The process is more burdensome for voters with limited resources, time, education, and/or English proficiency, as was the case for some of Plaintiffs' declarants. *See id.* ¶¶ 439, 516–521, 529, 608.

***Second***, Exact Match was not "standard practice" in 1982. Defendants are wrong to tout Exact Match as having a "long pedigree." ECF No. 623 at 15–16 (quoting *Brnovich*, 141 S. Ct. at 2339). The SOS devised Exact Match in the wake of HAVA's passage in 2002—although HAVA has never required either an exact matching protocol or the denial or subordinate classification of registrations that do not match. McCrary Report at 55.

Even if the Court *were* to look back to 1982, Exact Match is not the type of policy or practice in use at the time. In 1982, Georgia required voter registration applicants to provide an election registrar with "proper identification and information" that the registrar would use to complete a simple registration card with the voter's identifying information. Ga. Code Ann. §§ 21-2-217, -221

(1982).[10] The voter would then take an oath that required the voter to swear to or affirm their citizenship and eligibility to vote. *Id.* No Georgians were kept off the rolls because their registration cards did not match information entered into a different state or federal database, by a different person, at a different time.[11] Plaintiffs do not dispute that voters must be eligible, or that the State may take reasonable steps to ascertain eligibility. But Exact Match is not reasonable, and past practice does not condone the current system.

**Third**, the "size of [the] disparities" resulting from Exact Match is significant. *Brnovich*, 141 S. Ct. at 2339; *see* SAMF ¶¶ 600–601. Plaintiffs' expert found that, as of January 2020, people of color comprised more than 75% of those in "pending" status for citizenship nonmatches, even though people of color made

---

[10] The relevant statute in 1982 stated: "Any person desiring to register as an elector" must "furnish such officer with proper identification and information which will enable him to fill in all blanks appearing on the registration card." Ga. Code Ann. § 21-2-221 (1982). The statute continued: "[P]roper identification may be made by exhibiting a valid driver's license, birth certificate, or any other document that *will reasonably reflect the true identity* of the applicant. Upon completion of the form, the officer *shall* administer the oath to the applicant." *Id.* (emphases added). Notably, Georgia law in 1982 did not require proof of identification to vote at the polls, marking a further departure from the State's current regime. These 1982 statutes are attached as Exhibit A.

[11] Defendants undermine their own argument that Exact Match has a "long pedigree," ECF No. 623 at 15–16 (quoting *Brnovich*, 141 S. Ct. at 2339), citing a case that proves Plaintiffs' point: Registrars verified voters' eligibility by merely asking a series of questions rather than requiring rigid documentary proof, *see id.* (citing *McCoy v. McLeroy*, 348 F. Supp. 1034, 1036–37 (M.D. Ga. 1972)).

up only 37% of active registered voters in the State. SAMF ¶ 604. Nearly 40% of

the people in "pending" status for citizenship reasons were Black, compared to

30% of the State's active registrants. *Id.* ¶ 602. Hispanic and Asian registrants

made up just over 30% of the registrants in "pending" status even though they

made up less than 6% of the State's active registrants. *Id.* ¶ 605; *see also id.* ¶ 603.

These numbers are not "[s]mall disparities." *Brnovich*, 141 S. Ct. at 2339.

The overly stringent protocol of name and birthdate matching likewise has a

significant racially disparate impact. Plaintiffs' expert found applicants of color are

six to ten times more likely than non-Hispanic white registrants to be in "MIDR"

status. SAMF ¶¶ 606–607 (finding Black registrants comprised less than 30% of

all active registrants but nearly 70% of registrants in "MIDR" status, while non-

Hispanic whites made up more than half of all registrants but only 11.4% of

registrants in "MIDR" status). This finding alone shows a genuine dispute of

material fact as to Exact Match's substantial disparities.

Defendants claim this finding "is magnifying a small disparity of less than

2% between those groups," ECF No. 623 at 16, but that claim is belied by the

numbers. A "meaningful comparison," *Brnovich*, 141 S. Ct. at 2339, between

Exact Match's impact on voters of color and white voters shows a disparity of six

to ten times—a disparity significantly greater in order of magnitude than that in

*Brnovich*, where, "a little over 1% of Hispanic voters, 1% of African-American

22

voters, and 1% of Native American voters" cast an out-of-precinct ballot, while the "rate was around 0.5%" for "non-minority voters." 141 S. Ct. at 2344–45.

Reading *Brnovich* to require large absolute disparities is illogical. VRA claims will frequently challenge policies that have a severely destructive impact but affect only a relatively small percentage of voters, as the VRA's very purpose is to enfranchise traditionally minority communities. Although the Court in *Brnovich* questioned the very small percentages at issue in that case, it by no means announced a rule that *no* policy whose absolute impacts affect less than a large percentage of a jurisdiction's voters could ever violate the VRA. Rather, *Brnovich*'s fact-specific inquiry permits courts to recognize that voting practices that create a chasm between voters of different races violate Section 2, irrespective of whether those practices affect a large percentage of the total voting population. The stark racial disparities caused by Exact Match are paradigmatic of a voting system that is "unequally open." *Brnovich*, 141 S. Ct. at 2345.

**Fourth**, looking to the State's "entire system of voting" only strengthens Plaintiffs' arguments. *Id.* at 2339. Every voter registration application is subject to Exact Match. Unlike a challenge to a voting rule that affects one method of casting a ballot, Plaintiffs' challenge is to the system impeding any registrant's ability to register and cast a ballot by any method. Thus, this guidepost strongly cuts in Plaintiffs' favor, and Defendants do not argue otherwise.

23

**Fifth**, Exact Match does not serve any state interest. To begin, Exact Match does not serve a state interest in complying with federal law. HAVA directs state election officials to "enter into an agreement to match" voter registration information with information in the state motor vehicle authority database "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B)(i). HAVA does *not* specify how states are to "verify" voter registrations and does *not* require states to exactly match names, birthdates, and citizenship information. *See id.*; SAMF ¶¶ 391–393; *see also id.* ¶ 387.[12] Nor does HAVA set forth requirements for the consequences of nonmatches.

Defendants have not shown Exact Match serves a state interest in preventing fraud either. Defendants proffer no evidence that verifying citizenship against a database with outdated information assists the State in identifying ineligible voters attempting to vote fraudulently. Likewise, Defendants fail to show—or even meaningfully argue—that their overinclusive exact matching protocol, which flags eligible voters as potentially ineligible because of single-character mismatches in

---

[12] Other states have adopted a "substantial" match approach, whereby certain values must match, but for other values—like first names—common sense may be used. *See* Nat'l Ass'n of Sec'ys of State, *NASS Report: Maintenance of State Voter Registration Lists* 10–11 (updated Dec. 2017), https://www.nass.org/sites/default/files/reports/nass-report-voter-reg-maintenance-final-dec17.pdf.

name or birthdate and has an error rate as "ridiculous[ly]" high as 20 or 30 percent, serves a state interest. SAMF ¶ 420.[13]

In sum, Plaintiffs' evidence makes clear that Georgia's error-ridden Exact Match system produces elections that are "unequally open" to people of color. *Brnovich*, 141 S. Ct. at 2345.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' renewed motion for partial summary judgment.

This 10th day of August, 2021.

Respectfully submitted,

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Celeste Coco-Ewing (admitted *pro hac vice*)
Michelle L. McClafferty (GA Bar No. 161970)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**

---

[13] As is well established, Section 2 of the VRA prohibits practices adopted with a discriminatory purpose. *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991); *see also Brnovich*, 141 S. Ct. at 2330. This Court has already denied Defendants' motion for summary judgment on Plaintiffs' claims regarding Exact Match under Count II (Fifteenth Amendment) and Count III (Fourteenth Amendment). *See* ECF No. 617 at 74-75; *see also id.* at 80. In denying summary judgment on these claims, the Court determined that there existed at a minimum a dispute of material fact as to whether Exact Match was adopted with a discriminatory purpose. *Id.* at 75, 80. These rulings provide yet another basis upon which to deny Defendants' renewed motion for partial summary judgment.

1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
celeste.coco-ewing@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: (202) 479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

26

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson Street
Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac* vice)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
nanderson@kaiserdillion.com

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali N. Bracey (Admitted *pro hac vice*)
Ishan K. Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066

27

kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E.
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice*)
Paul M. Smith (Admitted *pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14 Street NW
Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Baconton Missionary Baptist Church, Inc.; Virginia-Highland Church, Inc.; and The Sixth Episcopal District, Inc.*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been prepared with a font size and point selection (Times New Roman, 14 pt.) that is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

This, the 10th day of August, 2021.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 10, 2021, I filed the within and foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF electronic filing system which will automatically send counsel of record e-mail notification of such filing.

This, the 10th day of August, 2021.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence

29