**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FAIR FIGHT ACTION, INC., *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civ. Act. No. 18-cv-5391 (SCJ)

**<u>PLAINTIFFS' EXCERPTED STATEMENT OF MATERIAL FACTS</u>**

To assist the Court and Defendants, Plaintiffs hereby submit excerpts from their Statement of Additional Material Facts (Corrected), ECF 506 (SAMF). The paragraph numbers, text, and exhibit numbers referenced in this document are the same as in the SAMF.  The provisions of the 1982 Georgia Election Code cited in the brief are attached as exhibits to the brief for ease of reference.

387.   State law assigns responsibility for the voter verification process to the SOS. *See* O.C.G.A. § 21-2-50.2(a) ("The Secretary of State, as the chief election official designated under the federal Help America Vote Act of 2002, shall be responsible for coordinating the obligations of the state under the federal Help America Vote Act of 2002"); O.C.G.A. § 21-2-50(b) (the SOS is the State's "chief election official"); O.C.G.A. § 21-2-216(g)(7) (the SOS "shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship").

391.   HAVA does not specify which information must be matched between the databases. 52 U.S.C. § 21083(a)(5)(B).

392.   HAVA also does not establish any consequences for a non-match. 52 U.S.C. § 21083(a)(5)(B).

1

393.   According to Ryan Germany, "HAVA requires the match to be run, but . . . it d[oes] not say what the State then does with that information." Exh. 26, Dec. 11, 2019 R. Germany Dep. 122:12-19. Id. 122:25-123:3 (stating, "HAVA also doesn't say what the consequences of a failing match are").

406.   In 2009, DOJ denied preclearance to Georgia's Exact Match program. Exh. 1,007, Loretta King, Acting Assistant Attorney General, to Attorney General Thurbert Baker, May 29, 2009, p. 1-3, available at: https://www. justice.gov/crt/voting-determination-letter-58. *See also* Expert Report of P. McCrary, ECF No. 339 at 60-61 (discussing preclearance).

407.   DOJ explained the program "[did] not produce accurate and reliable information" and cited testimony "that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields." Exh. 1,007, Loretta King, Acting Assistant Attorney General, to Attorney General Thurbert Baker, May 29, 2009, p. 1-3, available at: https://www. justice.gov/crt/voting-determination-letter-58.

408.   In denying preclearance, DOJ noted that "[t]he impact of these errors falls disproportionately on minority voters." Exh. 1,007, Loretta King, Acting Assistant Attorney General, to Attorney General Thurbert Baker, May 29, 2009, p. 4 (available at: https://www.justice.gov/crt/voting-determination-letter-58). *See*

*also* Exh. 26, Dec. 11, 2019 R. Germany Dep. 83:10-20 (noting the SOS's initial request for preclearance was rejected).

416.   According to Elections Director Chris Harvey, both before and after H.B. 316, the SOS has interpreted the statute to require "an exact match on last name, first name, date of birth, and last four of social. That has to match exactly." Exh. 23, Aug. 16, 2019 SOS 30(b)(6) Dep. 238:12-18. *See also* Exh. 596, Mar. 25, 2019 Legislation and Litigation presentation, State-Defendants-00080648, at -00080654 (stating that HAVA Verification checks "First Name, Last Name, Last 4 of SSN, DOB, driver's license number, and citizenship"); *but see* Exh. 26, Dec. 11, 2019 R. Germany Dep. 143:24-144:23 (SOS General Counsel Ryan Germany: "My understanding at the time was the match that DDS used only used the first letter of the first name . . . I was under the impression that that's how the process worked . . . We learned at some point that . . . they actually were matching the entire first name, and we asked them to change it to just do first letter.").

418.   According to analysis by Plaintiffs' expert, individuals can be flagged for a verification failure even if the failure results from "a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error; errors made by Georgia election officials manually entering information from paper registration forms; incorrect data in the verification files, such as outdated citizenship or name

3

data in Georgia DDS or SSA files; [or] differences in data for the same individual in voter registration, DDS, or Social Security Administration files . . . ." Expert Report of K. Mayer, ECF No. 238 at 6.

420.   The error rates for the match process with the SSA are high. Exh. 26, Dec. 11, 2019 R. Germany Dep. 91:6-17 (testifying that, "I think the error rates I've seen are 20 or 30 percent, so it seems pretty ridiculous.").

427.   H.B. 268 provided that applicants whose information was not verified would be placed in pending status and would be allowed to vote if they provided identification on or before Election Day, but that their registration would be rejected if they did not correct the verification error within 26 months. See O.C.G.A. § 21-2-220.1 (Jul. 1, 2017).

434.   In 2019, the Georgia General Assembly enacted H.B. 316. H.B. 316 revised O.C.G.A. § 21-2-220.1 to provide that in cases of an inexact match, "the applicant shall nevertheless be registered to vote but shall be required to produce proof of his or her identity . . . at or before the time that such applicant requests a ballot for the first time." O.C.G.A. § 21-2-220.1.

435.   H.B. 316 did not change the citizenship verification and identification requirements. See Exh. 131, June 26, 2019 OEB, State-Defendants -00007766 (stating, "The citizenship verification and identification requirements remain unchanged").

4

436. Since April 2, 2019, registrants who fail the verification process are either placed on the active rolls with an "MIDR" notation (for "Missing ID Required"), or placed in pending status and not added to the voter rolls if they are flagged as potential non-citizens. Exh. 26, Dec. 11, 2019 R. Germany Dep. 123:4-20; Exh. 23, Aug. 16, 2019 SOS 30(b)(6) Dep. 243:17-24; Exh. 131, April 3, 2019 election bulletin, State-Defendants-00007501, at 305; *see also* Expert Report of K. Mayer, ECF No. 238 at 5-6.

437. Ryan Germany stated that the result of being placed in Active-MIDR status is that "you've got to come with ID and then you can vote." Exh. 26, Dec. 11, 2019 R. Germany Dep. 123:18-124:5.

439. Plaintiffs' expert Kenneth Mayer is "certain that the verification process imposes a burden on eligible individuals by incorrectly flagging citizens as noncitizens . . . ." Expert Report of K. Mayer, ECF No. 238 at 7. Of the nearly 460,000 voting-age naturalized citizens in Georgia in 2017, "over 80% . . . were members of minority groups." *Id*. at 4, 22.

440. Lawfully present individuals are eligible for Georgia driver's licenses regardless of citizenship status and people are not required to update their citizenship information with DDS. Mayer Expert Rep. at 4. As a result, newly naturalized citizens can continue to be listed in DDS's records as non-citizens. Exh. 26, Dec. 11, 2019 R. Germany Dep. 125:11-23 (testifying that, "the DDS

5

record may well show that [a newly naturalized citizen] ha[s] a driver's license but [is]n't a citizen"); Mayer Expert Rep. at 4.

441.   Ryan Germany has acknowledged that DDS will flag naturalized citizens as a non-match for citizenship in some circumstances, and that documentation should resolve the problem but he does not know how the process takes place. Exh. 26, Dec. 11, 2019 R. Germany Dep. 125:6-127:18.

443.   In 2018, Eduardo Antonio Feliz Minaya was placed in pending status and directed to produce evidence of citizenship, even though he is a U.S. citizen. Gwinnett County Board of Registrars letter and E. Feliz Minaya passport scan, Exh. 773, State-Defendants-00287385. *See also* Exh. 772, Oct. 15, 2018 D. Stewart email, State-Defendants-00287383 (explaining that Mr. Minaya was "very excited to vote").

444.   In 2018, Vanessa Alva was erroneously placed in pending status for citizenship verification, even though she had become a U.S. citizen prior to registering to vote. Exh. 480, Nov. 4, 2018 J. Houk email, GA01225647 at -01225653-01225654.

445.   In 2016, voter Gabrielle Marisa Hernandez was left in pending status due to citizenship verification even though she submitted her passport when she applied. Exh. 986, Nov. 4, 2016 J. Houk email, State-Defendants-00892523, at -

00892523-00892524. After an attorney contacted the State, Hernandez was moved to active status. *Id.*

453.    For instance, the SOS's Exact Match process placed a voter in pending status because the voter's registration used the name "Smith-Jones" and the voter's driver's license and certificate of naturalization used the name "Smith Jones." Exh. 446, Email from Morgan County Official to SOS re Hyphenated Last Name, GA00777539.

454. A voter failed verification twice in Townes County because her first name had two different spellings in the systems (Kathlynn and Katlynn). Exh. 765, May 2, 2018 H. Smith email, State-Defendants-00279677.

455.    A voter in Fulton County was rejected twice because the system could not accommodate her hyphenated last name. Exh. 826, May 21, 2018 Elections Complaint from J. Kohut-Bartels, State-Defendants-00331993.

456.    Voter Casey Brooks was placed in pending status for SSN verification because his year of birth was incorrectly listed in eNet as 1997 instead of 1970. Exh. 441, Sept. 26, 2018 K. Rayburn email, GA00768848.

458. Voter Ra'Shad Johnson completed a paper application in 2016 and the county entered his registration with the first name "Reshed," which resulted in a non-match with DDS and Mr. Johnson's application being placed in pending status. Exh. 450, Oct. 16, 2018 K. Rayburn email, GA00780564, at -00780564.

460. Voter Franklin Javier Viloria was improperly placed in pending status because of a data entry error—Gwinnett County had entered his name as "Viloriq." Exh. 480, Nov. 5, 2018 B. Sells, email GA01225647, at-01225649, -01225651.

461. Marsha Appling-Nunez had a voting record flagged for pending status when she moved from one county to another because she was listed as "Ppling-Nunez" instead of "Appling-Nunez"—an error she is sure she did not make. Exh. 917, Nov. 20, 2018 S. Levine email, State-Defendants-00738881, at -00738881-82; see also Exh. 918, Nov. 20, 2018 C. Broce email, State-Defendants-00738960, at -00738960 (Candice Broce stating that Ms. Appling-Nunez had both a "pending" and an "active" voter record "at the same time").

483.   In response to a 2017 election bulletin, a Brooks County official asked for clarification from Chris Harvey on "appropriate verification documents" that an applicant in "pending" status could use to update the applicant's status to "active." *See* Exh. 128, Feb. 23, 2017 Official Election Bulletin, State-Defendants-00177398, at -00177398; Exh. 674, Feb. 23, 2017 K. Collins email, State-Defendants-00165968, at -00165969.

484.   The official said that "[i]f a voter registration fails to clear DDS because of a name problem that's one thing," but he asked whether a voter who fails SSA verification needs to have proper SSA documents "to clear those

problems." Exh. 674, Feb. 23, 2017 K. Collins email, State-Defendants-00165968, at -00165969

495.   Applicants in pending status for citizenship must produce documentary proof of citizenship to become an "active voter," and their registration will be rejected if they cannot do so within 26 months. Exh. 23, Aug. 16, 2019 Harvey Dep. 242:24-243:24; Exh. 30, State-Defendants-00095893, at -00095898.

496.   In January 2020, over 3,000 voter registrations were in pending status due to a citizenship flag. Expert Report of K. Mayer, ECF No. 238 at 21. For the parallel 2014-2019 pending file, over 99% of noncitizen flags were generated using DDS data. *Id.* at 21-22.

497.   "Of the 2,671 registrants who were pending in July 2019 because of a noncitizenship flag, only 630—23.6%—had been restored to active status by January 2020." Expert Report of K. Mayer, ECF No. 238 at 24.

498.   "[T]he battle faced by persons whose registration was cancelled or pending carries additional burdens . . . In addition to the need for sufficient education to understand the application form, trying to secure approval of their voter registration requires rejected applicants to 'overcome a series of unduly burdensome and arbitrary hurdles.'" Expert Report of P. McCrary, ECF No. 339 at 74.

9

499.   First, each failed applicant must find "out just why his or her registration application was flagged as a non-match—and how to cure the defect." Expert Report of P. McCrary, ECF No. 339 at 74.

500.   Applicants required to provide proof of citizenship may be left without notice, sometimes for months. *See* Exh. 651, Oct. 17, 2016 G. Saleh email, State-Defendants-00155223 ("I provided a copy of my citizenship [documents] and have not heard on the status of my registration. It has been [a] few months . . . I am at odds as to what may have gone wrong.").

513.   Ms. Einzig-Roth, who was born in New York, produced a passport card as proof of citizenship. Exh. 69, P. Einzig-Roth Decl. ¶¶ 4a, b. She also produced her driver's license and school ID card to prove her identity. *Id*.

514.   Ms. Einzig-Roth was then given a provisional ballot to vote. Exh. 69, P. Einzig-Roth Decl. ¶ 4c. She was assured it would be counted, yet she was not provided with a receipt or told that she needed to follow up on the ballot. *Id*.

515.   Three days later, on November 9, 2018, Ms. Einzig-Roth went to the DeKalb County voter registration office to confirm her ballot. Exh. 69, P. Einzig-Roth Decl. ¶ 4d. The employee working told Ms. Einzig-Roth that she could not help her because Ms. Einzig-Roth did not have the documents or receipt that the poll workers were supposed to give to her when she completed the provisional ballot. *Id*.

516.   On Election Day in 2018, Kia Carter arrived at the voter registration building with the intention of voting there, but she was told by an employee that she needed to vote at a different location. Exh. 70, K. Carter ¶¶ 4a-b. The employee used Ms. Carter's ID to find Ms. Carter's polling place. *Id*.

517.   Ms. Carter arrived at the polling location the registration office directed her to, filled out the necessary information card, and gave her ID to the poll worker. Exh. 70, K. Carter Decl. ¶¶ 4b-c. After scanning Ms. Carter's ID, the poll worker told Ms. Carter she could not vote because "It says you are not a US Citizen." *Id.* ¶ 4c-d.

518.   Ms. Carter was born in Virginia and previously voted in Georgia. Exh. 70, K. Carter Decl. ¶ 4e.

519.   Ms. Carter then offered the poll workers her Social Security card, but was told it "won't work" because "that just has numbers on it." Exh. 70, K. Carter Decl. ¶ 4g.

520.   Ms. Carter then went back to the voter registration office where she was told that she needed to get the issue fixed before the next election. Exh. 70, K. Carter Decl. ¶ 4i.

521.   At this point, it was too late to vote. Exh. 70, K. Carter Decl. ¶ 4i. Ms. Carter was not able to vote and was not offered a provisional ballot. *Id.* ¶ 4j.

11

527.    Individuals placed in pending status were often unsure of how to resolve the issue and experienced difficulty getting the information they needed. *See* Exh. 788, Oct. 22, 2018 T. Douglas email, State-Defendants-00312607 (reporting that a family member had been placed in pending status, "[t]he letter did not inform as to why," and she needed to vote absentee but the absentee ballot application required a Georgia ID and her ID was a U.S. passport, not a state ID); Exh. 655, Oct. 26, 2016 C. McDonald email, State-Defendants-00156282 (registrant reporting that she had "heard nothing" after registering to vote, and SOS employee responding that her status was "Pending for Social Security Verification").

528.    Post-H.B. 316, the flaws in the notice process have continued. After counties mailed a number of letters to voters in pending status due to citizenship and in MIDR status, Gwinnett County reported receiving "several phone calls from residents stating that the individuals do not live at their address and/or have never lived at that address." Exh. 559, Aug. 6, 2019 K. Royston email, State-Defendants-00047371, at -00047372.

529.    When voters try to correct their statuses, voters can experience confusing communications from county officials. *See* Exh. 271, C. Thi Ashling Decl. ¶¶ 3d-e (describing conflicting information conveyed to Mrs. Ngoc Anh Thi Tran). *See also* Exh. 136, N. Tran Decl.

12

555.    In November 2018, a poll watcher in Gwinnett County reported that a voter was informed he was on the pending list, and then the poll worker said she would have to call the registrar because the electronic poll book did not give the reason for his pending status and the poll worker could not determine what documents he would need to present to vote. Exh. 126, Nov. 6, 2018 C. Harvey email, State-Defendants-00054589 ("The whole process caused significant delay.").

556.    Subsequent correspondence among SOS employees demonstrates that the County was following the wrong procedures. *See* Exh. 1,051, Nov. 6, 2018 K. Rayburn email, State-Defendants-00085329 ("[t]he specific reason why the person is in V status should not be necessary to let them vote if they have proper identification").

600.    "The evidence is conclusive that [the burdens of the verification process] fall disproportionately on racial or ethnic minority registrants who are members of protected classes of voters under Section II of the Voting Rights Act." Expert Report of K. Mayer, ECF No. 238 at 7.

601.    "At nearly every level, and at every combination of status, no matter when individuals registered, registrants in the pending file are disproportionately minority: this includes registrants in pending status, registrants in 'Missing ID Required' (MIDR) status, registrants flagged as noncitizens, registrants who failed

13

the Georgia [DDS] or [SSA] verification process, registrants whose names did not match into DDS or SSA records, and pending registrants who were not moved to the active voter file. The only category of registrants not disproportionately minority are those who are pending because of age." Expert Report of K. Mayer, ECF No. 238 at 4.

602.   Registrants in pending status (excluding those under 18) are disproportionately people of color. 39.4% are Black, compared to 29.6% of the state's active registrants. Expert Report of K. Mayer, ECF No. 238 at 16-17.

603.   Only 14.7% are non-Hispanic White, even though those individuals make up 52.9% of the active registrants in the state. Expert Report of K. Mayer, ECF No. 238 at 16-17.

604.   Over three-quarters of those in pending status are members of minority groups (76.3%), even though minority registrants are only 37.0% of the active registered voters. Expert Report of K. Mayer, ECF No. 238 at 18.

605.   Hispanic and Asian registrants make up 31.2% of registrants in pending status even though they make up only 5.7% of active registrants. Expert Report of K. Mayer, ECF No. 238 at 18.

606.   "Minority registrants are between 6 and 10 times more likely to be in MIDR status than non-Hispanic White registrants." Expert Report of K. Mayer, ECF No. 238 at 19.

14

607.   "Without exception, minority registrants are disproportionately present in every category of pending or MIDR status. In some cases, the disparities are stark: Asian and Pacific Islanders comprise only 2.4% of all active registrants, but are 16.8% of pending voters and 23.2% of registrants flagged as noncitizens. Hispanic registrants are 3.3% of all active registrants, but are 15.3% of pending registrants and 20.9% of registrants flagged as noncitizens. African Americans are 29.6% of active registrants, but are 69.4% of those in MIDR status and 55.9% of those in pending status for reasons other than citizenship verification. Non-Hispanic Whites make up over half of all registrants, but are only 14.7% of pending, 13.0% of flagged noncitizens, 11.4% of MIDR status, and 15.6% of pending for reasons other than citizenship verification." Expert Report of K. Mayer, ECF No. 238 at 24.

608.   "The burden will fall most heavily on individuals without a Georgia driver's license or ID. License and ID possession rates among minority populations are lower than for non-Hispanic Whites, both generally . . . and in Georgia." Expert Report of K. Mayer, ECF No. 238 at 13.

609.   The Secretary of State has long been on notice of the disproportionate impact of Exact Match on voters of color protected by the Voting Rights Act. Exh. 645, See Oct. 12, 2018 NAACP LDF Letter, State-Defendants-00148010, at -00148011 (stating that Exact Match has blocked the registration of more than

15

53,000 Georgia voters, over 70% of whom are reportedly people of color, and that

the SOS knows or should know that the protocol "imposes discriminatory burdens

on Black, Latinx, and Asian-American voters"); Exh. 440, July 18, 2018 Lawyer's

Committee for Civil Rights Under Law and CLC Letter, GA00767552, at -

00767555 (stating "As you are . . . aware, the 'exact match' verification process

disproportionately prevented tens of thousands of eligible African-American,

Latino-American and Asian-American Georgia citizens from successfully

completing the voter registration process between 2010 and 2016.").

611.   Candice Broce of the SOS's office told Reuters in 2018 that 65.82%

of first-time applicants placed in pending status self-identified as non-Latinx

Black. She blamed the minority voters' use of handwritten applications for the

higher rate of verification failures. Exh. 449, Mar. 6, 2018 C. Broce Email,

GA00779850, at -00779851.

612.   According to Ryan Germany, "of the [records] that failed verification,

I would say our office was aware that it was a largely African American

population, and I think we tried to kind of figure out why is this the case." Exh. 26,

Dec. 11, 2019 R. Germany Dep. 142:16-143:23; see also Exh. 23, Aug. 16, 2019

SOS 30(b)(6) Dep. 258:3-18 (stating that the SOS's analysis completed in 2017

found that 70% of the people on the pending list were Black); id. 257:21-24 ("the

16

analysis showed that the people that were in pending status as a result of not being verified were majority African American").

614.   Even though the SOS knew of the disparate impact of Exact Match, it did not take action to eliminate that disparate impact, and the disparate impact continues today. According to Plaintiffs' expert Peyton McCrary, "Georgia's implementation of its voter verification process under HAVA since 2006 has exercised a persistent discriminatory effect on minority voters' opportunity to register and vote . . . [and] forms a very substantial obstacle to fair and equal registration." Expert Report of P. McCrary, ECF No. 339 at 6-7.

615.   Georgia's implementation of Exact Match is closely linked to Georgia's history of discriminatory voter registration policies. *See* Expert Report of P. McCrary, ECF No. 339 at 12-16 (describing the history of racial discrimination affecting registration prior to the 1965 Voting Rights Act); *id.* 16-21 (describing similar history from 1965 to 1999); *id.* 98 (the "current pattern" of Exact Match "has its analogue in the system of voter registration in the Jim Crow era before 1965").

617.   Implementation of election laws varies considerably within jurisdictions, often in ways "that are biased against minority voters." Expert Report of K. Mayer, ECF No. 238 at 27.

17

726.    County officials regularly turn to the SOS for instruction on how to perform tasks affecting data in the voter registration system. See e.g., Exh. 739, Jan. 17, 2017 Email from Hall County re 40 Day Clock, State-Defendants-00238801; Exh. 713, Jan. 25, 2017 Email from Decatur County re Moving City of Bainbridge Residents into Different Precinct, State-Defendants-00189385; Exh. 28, Feb. 23, 2017 Email from Houston County re Commercial Addresses, State-Defendants-00166546; Exh. 664, March 15, 2017 Email to DDS re Voter Addresses, State-Defendants-00158302; Exh. 29, March 17, 2017 Email from Richmond County re DDS Application, State-Defendants-00171403; Exh. 766, April 19, 2018 Email from Catoosa County re DDS Transfer, State-Defendants-00282643.

1131.    Georgia's first constitution, of 1777, as well as its 1789, 1861, and 1865 constitutions, denied Black Georgians the right to vote. Expert Report of A. Jones, ECF No. 92 at 2.

1132.    Despite extending the franchise to Black voters in 1867, from the end of Reconstruction to the mid-20th century, Georgia denied and limited Black Georgians' right to vote through, *inter alia*, violence and threats of violence, literacy tests, poll taxes, residency requirements, registration restrictions, voter challenges and purges, and the creation of primary elections in which only white

18

people were allowed to vote. Expert Report of A. Jones , ECF No. 92 at 2-4;
Expert Report of P. McCrary, ECF No. 339 at 13-15.

1133.  The VRA was passed in 1965 to abolish these kinds of state-erected
barriers to Black voters' access to the franchise. Expert Report of A. Jones , ECF
No. 92 at 6; Expert Report of P. McCrary, ECF No. 339 at 16-17.

1134.  Georgia legislators opposed passage of the VRA and its preclearance
provision, and argued against the VRA's reauthorization until Shelby County
struck down preclearance in 2013. Expert Report of A. Jones, ECF No. 92 at 5, 6,
9-10.

1135.  After the VRA's passage, Georgia supported and brought its own
legal challenges to the law. Expert Report of A. Jones, ECF No. 92 at 5, 9, 27.

1136.  When challenges to the VRA failed, Georgia repeatedly refused to
comply with the preclearance process by submitting changes to state and local
elections laws to the Department of Justice ("DOJ") for review, or with the law
more generally. Expert Report of A. Jones, ECF No. 92 at 6, 8.

1137.  When Georgia did submit laws for preclearance review, many were
blocked—prior to Shelby County, DOJ blocked 177 changes to the State's election
laws proposed by Georgia and its counties and municipalities, finding that each
law had a retrogressive impact on voters of color in Georgia. Expert Report of P.
McCrary, ECF No. 339 at 21.

19

1139.  Around 25% of white voters in Georgia voted Democratic beginning in 2002 (down from 30% to 45% in the 1990s), and 85% to 92% of Black voters favoring Democratic candidates. Expert Report of P. McCrary, ECF No. 339 at 31, 32. Since 1992, between 81% and 92% of Black voters have supported Democratic candidates. Id. at 32.

1140.  During the 2014 Gubernatorial Election in Georgia, only 25% of white voters voted for the Democratic gubernatorial candidate, compared to 89% of Black voters; 73% of white voters, and just 10% of Black voters, voted for the Republican candidate. Expert Report of P. McCrary, ECF No. 339 at 35.

1141.  Black Georgians have worse health outcomes than white Georgians. Black Georgians die of cancer, heart disease, and diabetes at higher rates than white Georgians; almost twice as many Black Georgians die from diabetes as white Georgians. *See* Exh. 1,017, *Diabetes*, GA. DEP'T OF CMTY. HEALTH, https://dch.georgia.gov/diabetes (last visited July 1, 2020); Exh. 1,018, Kaiser Family Foundation, Number of Diabetes Deaths per 100,000 Population by Race/Ethnicity (2018), https://www.kff.org/other/state-indicator/diabetes-death-rate-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22georgia%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D; Exh. 1,019, Kaiser Family Foundation, Number of Heart Disease Deaths per 100,000 Population by

Race/Ethnicity (2018), https://www.kff.org/other/state-indicator/number-of-heart-disease-deaths-per-100000-population-by-raceethnicity-2/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22georgia%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D; Exh. 1,020, Kaiser Family Foundation, Number of Cancer Deaths per 100,000 Population by Race/Ethnicity (2018), https://www.kff.org/other/state-indicator/cancer-death-rate-by-raceethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22georgia%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

1142. The infant mortality rate in Georgia is over twice as high for Black infants as the rate for white infants. *See* Exh. 1,021, Kaiser Family Foundation, Infant Mortality Rate by Race/Ethnicity (2018), https://www.kff.org/other/state-indicator/infant-mortality-rate-by-race-ethnicity/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22georgia%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

1143. More recently, Black Georgians have been disproportionately impacted by COVID-19: A survey of eight hospitals conducted in April by the Centers for Disease Control and Prevention found that out of 305 individuals

21

hospitalized for COVID-19, 83 percent were Black. *See* Exh. 1,022, Centers for Diseases Control and Prevention, *Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia, March 2020*, 69 MORBIDITY & MORTALITY WEEKLY REP. 545, 545 (May 8, 2020), https://www.cdc. gov/mmwr/volumes/69/wr/pdfs/mm6918e1-H.pdf? deliveryName=USCDC_921-DM26922. Another study reports that Black Georgians account for nearly half of Georgia's deaths from COVID-19, despite only making up 31 percent of the state's population. Exh. 1,023, *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RESEARCH LABS, https://www.apmresearchlab.org/covid/deaths-by-race (last updated June 24, 2020).

1144. Black Georgians have worse employment outcomes than white Georgians. The unemployment rate among Black Georgians is over twice as high as the rate for white Georgians. Expert Report of P. McCrary, ECF No. 339 at 76-77; *see* also Exh. 1,024, Economic Policy Institute, *Report: Black unemployment is at least twice as high as white unemployment at the national level and in 14 states and the District of Columbia* (Apr. 4, 2019), https://www.epi.org/publication/valerie-figures-state-unemployment-by-race/.

1145. Over twice as many Black Georgians as white Georgians live below the poverty line. Expert Report of P. McCrary, ECF No. 339 at 76; *see also* Exh.

1,025, *American Community Survey 2018: Poverty Status in the Past 12 Months*,
U.S. CENSUS BUREAU, https://data.census.gov/cedsci/table?q=S1701&g=0400000
US13&tid=ACSST1Y2018.S1701 (accessed June 30, 2020).

1146. Black Georgians have worse education outcomes than white
Georgians. Black Georgians are less likely than white Georgians to attain a high
school or college degree. Expert Report of P. McCrary, ECF No. 339 at 76; Exh.
1,026, Jennifer Lee, *2019 Georgia Higher Education Data Book* 6, Ga. Budget &
Policy Institute (Sept. 2019), http://gbpi.org/georgia-higher-education-data-book-
2019/. Black Georgians who do attain a bachelor's degree nonetheless earn, on
average, less than white Georgians with the same degree. Id. at 9.

1148. Racist political appeals in Georgia have continued into the modern
era. During the 2018 Gubernatorial Election, a robo-call producer who pretended
to be Oprah Winfrey called Georgian voters and made racist comments about
Stacey Abrams. Exh. 1,027, Cleve R. Wootson Jr., Racist 'magical Negro' robo-
call from 'Oprah' targets Stacey Abrams in Georgia governor's race, Wash. Post
(Nov. 5, 2018), https://www.washingtonpost.com/politics/2018/11/04/racist-
magical-negro-robo-call-oprah-targets-stacey-abrams-georgia-governors-race/.

1149. In 2006, Georgia legislators adopted SB 529, the "Security and
Immigration Compliance Act," which required verification of citizenship for
employment and public benefits applications. Expert Report of P. McCrary, ECF

23

No. 339 at 41. As then-Governor Sonny Perdue signed the bill, he commented: "It is simply unacceptable for people to sneak into this country illegally on Thursday, obtain a government-issued ID on Friday, head for the welfare office on Monday, and go to vote on Tuesday." Id. at 43.

1150. In September 2016, a Douglas County commissioner was recorded making disparaging statements to voters about Black candidates in local races, stating that a government run by African American leadership would "bankrupt you." Exh. 1,028, Ernie Suggs, Douglas Leader's Racial Comments Spark Calls that He Resign, Atlanta J. Const. (Sept. 30, 2016), https://www.ajc.com/news/local/douglas-leader-racial-comments-spark-calls-that-resign/AVjoe8BDCXLsut6OBPjIHI/. He also warned voters that a Black sheriff candidate would put unqualified African Americans in high-ranking positions if elected. Id.

1151. In May 2017, the husband of Republican congressional candidate Karen Handel shared a meme on Twitter stating that votes for his wife would help "free the black slaves from the Democratic plantation." Exh. 1,029, Sophia Tesfaye, Karen Handel's Husband Shares Meme Urging Voters to "Free the Black Slaves from the Democratic Plantation," Salon (May 3, 2017), https://www.salon.com/2017/05/03/karen-handels-husband-shares-meme-urging-voters-to-free-the-black-slaves-from-the-democratic-plantation/.

24

1152. During the 2018 Republican gubernatorial primary, then-candidate state Sen. Michael Williams conducted a "deportation bus" tour with a school bus emblazoned with the words "Fill this bus with illegals." Exh. 1,030, Johnny Kauffman, Georgia Candidate For Governor Doesn't Plan to Use 'Deportation Bus' to Deport Anyone, NPR (May 16, 2018), https://www.npr.org/2018/05/16/611680288/georgia-candidate-for-governor-doesnt-plan-to-use-deportation-bus-to-deport-anyo. The back of the bus read: "Danger! Murderers, rapists, kidnappers, child molesters, and others on board." Id. Williams' bus tour followed a similarly-themed television ad from then-SOS Kemp, a gubernatorial candidate (and future governor), who stated that he had "a big truck … Just in case I need to round up criminal illegals and take them home myself." Id.

1153. In April 2020, former U.S. congressman Paul Broun, Jr., running to reclaim his former seat, posted a campaign ad in which he offered to give away an assault rifle, stating that such guns were needed to protect against the "looting hordes from Atlanta." See Exh. 1,031, Ed Kilgore, Georgia Republican Raffles Assault Rifle to Defend Against 'Looting Hordes From Atlanta,' N.Y. Mag.: Intelligencer (Apr. 7, 2020), https://nymag.com/intelligencer/2020/04/ga-candidate-raffles-ar-15-for-looting-hordes-from-atlanta.html.

1154. In May 2020, state Rep. Matt Gurtler, a Republican U.S. Congressional candidate, posed for a photo with a Georgia man with longstanding

25

ties to numerous white supremacist groups. Exh. 1,032, Chris Joyner and Tia

Mitchell, Georgia Candidates Embrace Group with Extremist Ties, Atlanta J.

Const. (May 16, 2020), https://www.ajc.com/news/state--regional-govt--

politics/georgia-candidates-embrace-group-with-extremist-

ties/LtUVaLX44kEFMvK7ECIOdP/.

1155. A Republication candidate in another Congressional district, Marjorie

Taylor Greene, was also criticized for posing for a photo with the same man.

1156. In June 2020, Greene received national criticism for racist,

Islamophobic, and anti-Semitic views expressed in a series of Facebook videos.

Exh. 1,033, Ally Mutnick & Melanie Zanona, House Republican Leaders

Condemn GOP Candidate Who Made Racist Videos, Politico (June 17, 2020),

https://www.politico.com/news/2020/06/17/house-republicans-condemn-gop-

candidate-racist-videos-325579. Specifically, Greene suggested that Muslims do

not belong in government; that Black people "are held slaves to the Democratic

Party"; that George Soros is a Nazi; and that African Americans should feel

"proud" to see a Confederate monument because it symbolizes progress made

since the Civil War. Id.

1160. In Georgia and other Deep South states during and after

Reconstruction, "[p]olling places were established at significant distances from

black communities . . . common modes of transportation to access polling places

26

were destabilized at election time. . . [and] [p]olling places were moved without notice." A. Jones Report, ECF No. 92 at 15.

1161. During and after Reconstruction, Georgia further disenfranchised Black voters by letting ballots go "unrecognized," stuffing ballot boxes with fraudulent ballots, and manipulating vote counts. A. Jones Report, ECF No. 92 at 15.

1162. Georgia also placed barriers to registration by imposing stringent qualification criteria or citizenship-based obstacles on prospective voters. Expert Report of P. McCrary, ECF No. 339 at 13-14; A. Jones Report, ECF No. 92 at 5-6, 20, 25.

This, 10th day of August, 2021.

Respectfully submitted,

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Celeste Coco-Ewing (admitted *pro hac vice*)
Michelle L. McClafferty (GA Bar No. 161970)
Maia Cogen (GA Bar No. 832438)
Suzanne Smith Williams (GA Bar No. 526105)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
celeste.coco-ewing@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com
maia.cogen@lawrencebundy.com
suzanne.williams@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

28

Dara Lindenbaum (Admitted *pro hac vice*)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: (202) 479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson Street
Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
Norman G. Anderson (Admitted *pro hac* vice)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com
nanderson@kaiserdillon.com

29

Andrew D. Herman (Admitted *pro hac vice*)
Nina C. Gupta (Admitted *pro hac vice*)
**MILLER & CHEVALIER CHARTERED**
900 Sixteenth Street, NW
Washington, DC 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
aherman@milchev.com
ngupta@milchev.com

Kali N. Bracey (Admitted *pro hac vice*)
Ishan K. Bhabha (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com

Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com

Von A. DuBose
**DUBOSE MILLER LLC**
75 14th Street N.E.
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Fax: (404) 921-9557
dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice*)
Paul M. Smith (Admitted *pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14 Street NW
Suite 400
Washington, DC 20005
Telephone: (202)736-2200
psmith@campaignlegal.org
jdiaz@campaignlegal.org

*Counsel for Fair Fight Action, Inc.; Care in
Action, Inc.; Ebenezer Baptist Church of Atlanta,
Georgia, Inc.; Baconton Missionary Baptist
Church, Inc.; Virginia-Highland Church, Inc.; and
The Sixth Episcopal District, Inc.*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been prepared with a font size and

point selection (Times New Roman, 14 pt.) that is approved by the Court pursuant

to Local Rules 5.1(C) and 7.1(D).

This, the 10th day of August, 2021.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence

## CERTIFICATE OF SERVICE

I hereby certify that, on August 10, 2021, I filed the within and foregoing

**PLAINTIFFS' EXCERPTED STATEMENT OF MATERIAL FACTS** with

the Clerk of Court using the CM/ECF electronic filing system which will

automatically send counsel of record e-mail notification of such filing.

This, the 10th day of August, 2021.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence

32