**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**FAIR FIGHT ACTION, INC., et al.,**

    **Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, et al.,**

    **Defendants.**

**CIVIL ACTION FILE**

**No. 1:18-CV-5391-SCJ**

## ORDER

This matter appears before the Court on Defendants' Motion for Summary Judgment concerning the substantive merits of the case. Doc. Nos. [450]; [623].[1] On March 31, 2021, this Court entered an Order granting the motion in part, denying the motion in part, staying the motion in part, and finding the motion moot in part. Doc. No. [617]. The Court stayed Defendants' Motion as to Count V of the Second Amended Complaint relating to Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, pending a decision of the United States

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Supreme Court in <u>Arizona Republican Party v. Democratic National Committee</u>, 141 S. Ct. 221 (Mem.) (2020) (No. 19-1258). <u>See</u> <u>id.</u> at 95. That case was consolidated with <u>Brnovich v. Democratic National Committee</u>, 141 S. Ct. 222 (Mem.) (2020) (No. 19-1257).

The United States Supreme Court issued its opinion in <u>Brnovich</u> on July 1, 2021. <u>See</u> <u>Brnovich</u>, --- U.S. ----, 141 S. Ct. 222 (2020). Thus, on July 2, 2021, the Court ordered Defendants to re-brief their motion for summary judgment on Plaintiffs' Section 2 claims in light of <u>Brnovich</u>. Doc. No. [621]. Defendants filed their Renewed Motion for Summary Judgment on Plaintiffs' Section 2 claims on July 21, 2021. Doc. No. [623]. Plaintiffs responded in opposition on August 10, 2021. Doc. No. [627]. Defendants replied on August 24, 2021. Doc. No. [630]. The matter is now ripe for this Court's review.

## I.     BACKGROUND

Plaintiffs Fair Fight Action, Inc., Care in Action, Inc., Ebenezer Baptist Church of Atlanta, Georgia, Inc., Baconton Missionary Baptist Church, Inc., Virginia-Highland Church, Inc., and The Sixth Episcopal District, Inc. (collectively, "Plaintiffs") first filed this lawsuit on November 27, 2018. Doc. No. [1]. Since then, Plaintiffs have twice amended their Complaint (Doc. Nos. [41];

[582]), and the Court dismissed several of Plaintiffs' original claims. Doc. No. [68].

Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief brings certain claims against Defendants Brad Raffensperger (in his official capacity as Secretary of State of the State of Georgia (the "SOS" or the "Secretary") and as Chair of the State Election Board of Georgia), Members of the State Election Board in their official capacities (Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le), and the State Election Board (collectively, "Defendants"). Doc. No. [582].

In their Second Amended Complaint, Plaintiffs allege that in the 2018 General Election, Defendants "enforced unconstitutional and otherwise unlawful legislation, created and enforced unconstitutional and otherwise unlawful policies, and engaged in gross mismanagement that resulted in an election that deprived Georgia citizens, and particularly citizens of color, of their fundamental right to vote." Id. ¶ 2. Plaintiffs assert that Defendants' actions violated the First, Fourteenth, and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the VRA. Id. ¶ 3.

On June 10, 2020, upon Defendants' request, the Court informed the parties that they would be allowed to file two separate summary judgment motions for

3

purposes of addressing jurisdictional and substantive/merits issues. Doc. No. [379]. The Court ruled on the jurisdictional motion on February 16, 2021 (Doc. No. [612]) and the merits motion on March 31, 2021 (Doc. No. [617]). As mentioned supra, it stayed Defendants' motion as to Plaintiffs' Section 2 claims pending the decision in Brnovich. After permitting the parties to re-brief the issue, the Court now turns to it.

### A.   Statement of Facts

A full recitation of the material facts in this case can be found in the Court's two previous summary judgment orders. Doc. Nos. [612]; [617]. Defendants' Motion for Summary Judgment on Plaintiffs' Section 2 claims addressed several state election policies (training on in-person absentee ballot cancellations, exact match, and the accuracy of Georgia's registered voter list). See Doc. No. [623], 3. However, Plaintiffs concede in their response to Defendants' motion that the "sole question before this Court regarding Section 2 is whether Plaintiffs' challenge to Exact Match can proceed."[2] Doc. No. [627], 14.

---

[2]  As stated in Plaintiffs' brief, "Plaintiffs have not argued the SOS's voter list inaccuracies or the inadequate training on absentee ballot cancellations—the only two other challenged policies that remain in the case—violate the VRA. And the remaining VRA claims are no longer in the case because of the Court's earlier summary judgment rulings." Doc. No. [627], 14 n.6.

4

The Court makes the following findings of fact for the purpose of resolving the pending motion for summary judgment. In doing so, the Court derives the facts from the admitted portions of the parties' statements of material facts and the Court's own review of the record. Doc. Nos. [451] (Defendants' Statement of Material Facts) ("DSMF"); [628] (Plaintiffs' Statement of Material Facts for VRA Section 2 Claims) ("PSMF").

The Court resolved the parties' objections to each other's facts as it reviewed the record.[3] If a party admitted a fact in part, the Court includes the substance of the undisputed part. If a party denied a fact in whole or in part, the Court reviewed the record to determine if a dispute exists and if it is material. The Court excludes facts, or parts of facts, that are legal conclusions, immaterial, inadmissible at trial, or not supported by citation to record evidence. See LR 56.1(B)(2)(a)(2), NDGa. With that in mind, the Court sets forth the following facts

---

[3] As the Court noted in its prior order, because nearly every paragraph of the parties' submitted material facts has been objected to, the Court will not follow its usual practice of addressing individual objections for each item of material evidence. The Court further notes that most of the objections are hearsay objections. The Court has resolved said objections in accordance with applicable law by considering any declaration or document that can be reduced to an admissible form at trial. See Doc. No. [617], 26–28.

for purposes of the pending Motion for Partial Summary Judgment as it relates to Plaintiffs' Section 2 ("Exact Match") claim.

### 1.  History of Exact Match

The term "Exact Match" means the voter verification program for voter registration application data, including citizenship status, used by the State of Georgia to meet the requirements of the Help America Vote Act, 52 U.S.C. § 21083(a)(5). Doc. No. [617], 11; see also Doc. No. [510-14] (Pl. Ex. 1007).[4]

The Help America Vote Act ("HAVA"), passed by Congress in 2002, requires that

> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

---

[4] For purposes of this Order, the Court uses the term "Exact Match." However, the Court recognizes that the same practice is sometimes referred to as "HAVA Match" by Defendants in reference to the Help America Vote Act, 52 U.S.C. § 21083(a)(5) identification requirements. Plaintiffs do not agree that HAVA requires the "Exact Match" procedures in use by the State of Georgia. See Doc. No. [492], 31.

6

52 U.S.C. § 21083(a)(5)(B).[5]

While HAVA requires a matching process, it does not say what the consequences of failing a match are on voter registration. Doc. No. [507-1], Pl. Ex. 26, R. Germany Dep. 123:1–3. The State of Georgia has, however, imposed consequences, which are addressed below.[6] According to SOS General Counsel, Ryan Germany, the purpose of Exact Match "is to make sure that it's a real person and that you're getting accurate information." PSMF ¶ 591.

In 2009, the United States Department of Justice ("DOJ") denied preclearance to Georgia's Exact Match program. PSMF ¶ 406; see also Doc. No. [510-14], 143–147 (Pl. Ex. 1007).[7] The DOJ explained that the program "does not produce accurate and reliable information" and cited testimony "that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields." Id. In denying

_____

[5] "HAVA represents Congress's attempt to strike a balance between promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other." Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1168 (11th Cir. 2008).

[6] The Eleventh Circuit has indicated that HAVA "does not seem to prohibit states from implementing" matching as a requirement of voter registration. Id.

[7] Prior to 2013 and the United States Supreme Court's decision in Shelby County v. Holder, 570 U.S. 529 (2013), certain states, including Georgia, needed to seek preclearance from the DOJ for new voting changes.

preclearance, the DOJ noted that "[t]he impact of these errors falls disproportionately on minority voters." Id.

In 2010, Georgia again sought preclearance of its Exact Match procedures based upon a revised verification process that called for daily monitoring of the voter verification process and prompt notice to applicants who could not be verified. PSMF ¶¶ 409–410. The DOJ indicated that it did not intend to object to Georgia's implementation of the revised verification process. Id. (citing Georgia v. Holder, 748 F. Supp. 2d 16, 18 (D.D.C. 2010) ("On August 16, 2010, [Georgia] amended its complaint to reflect that it had revised its proposed Verification Process. That same day, [the United States Attorney General] notified the Court that after having 'conferred extensively with Plaintiff State of Georgia concerning this matter since the fall of 2008,' and having reviewed the revised proposed verification process, it no longer opposed preclearance by the Court. Then, on August 18, 2010, the [DOJ] informed [Georgia] that it did not intend to object to implementation of the revised Verification Process.") (citations omitted)).

Despite the DOJ's non-objection to a revised verification process, since 2010, there have been additional legislative enactments pertaining to voter

registration, HB 268 and HB 316,[8] a 2018 notice of disproportionate impact letter from the NAACP to the State of Georgia, and two voting rights lawsuits challenging Georgia's "Exact Match policy"—one of the lawsuits resulted in a settlement and the second resulted in a preliminary injunction and remains pending. See NAACP v. Kemp, No. 2:16-cv-00219-WCO (N.D. Ga. 2017); Ga. Coal. for People's Agenda, Inc. v. Kemp, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018) (referencing the settlement agreement in the 2016 case and issuing a preliminary injunction by stating "[p]laintiffs have shown a substantial likelihood of success on the merits of their claim that Defendant [then-Secretary of State, Brian Kemp] is violating the right to vote, as guaranteed by the First and Fourteenth Amendments to the United States Constitution, for individuals Defendant has flagged and placed into pending status due to citizenship. The election scheme here places a severe burden on these individuals.");[9] see also PSMF ¶¶ 430, 433,

---

[8] HB 268 was enacted in 2017. PSMF ¶ 426. HB 316 was enacted "on or about April 2, 2019," after this lawsuit was filed. Doc. No. [492] ¶ 29.

[9] As both lawsuits were filed in the Northern District of Georgia, the Court takes judicial notice of these filings pursuant to Federal Rule of Evidence 201. See United States v. Rey, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

609; see generally Doc. Nos. [339], Expert Report of P. McCrary; [510-8], 7–19 (Pl. Ex. 644, p. 22); [510-8], 22 (Pl. Ex. 645).

### 2.   *Exact Match Process*

The parties dispute whether Exact Match is currently codified law in the State of Georgia. Doc. No. [532] ¶ 426. While the record shows that two Georgia statutes, O.C.G.A. §§ 21-2-216(g) and -220.1, concern voter registration documentation requirements and required evidence of citizenship to register to vote, Plaintiffs assert that the matching process to verify the identity of the applicant (utilizing data from the Georgia Department of Driver Services ("DDS") and Social Security Administration ("SSA")) is actually an internal procedure of the SOS. Plaintiffs' Response to DSMF ¶¶ 135–136. However, the SOS's designee, Chris Harvey, indicated at his deposition that he believed that it was correct to say that there is no written standard issued by the SOS that explains what a match is. Doc. No. [507-1], Pl. Ex. 23, C. Harvey Dep. 253:15–19.

There is also conflicting evidence as to how the *entire* process works. PSMF ¶ 415 (citing Doc. No. [238], 10). However, some parts of the process are undisputed. More specifically, it is undisputed that there is an overnight electronic process whereby the following fields from paper voter registration

10

applications are checked against the DDS database: "first name, last name, date of birth, driver's license number, and social security number." DSMF ¶ 140. It is also undisputed that if an individual does not have a driver's license, the information is compared to SSA records for verification by using the last four digits of the individual's social security number. PSMF ¶ 419; Plaintiffs' Response to DSMF ¶ 141. The process also compares the registrant's citizenship status as it was presented to DDS.[10] According to Plaintiffs' voting rights expert, Dr. Peyton McCrary, under an information-sharing agreement between DDS and the SOS, "DDS was . . . to flag any individual whose information did not exactly match in this process as unverified." Doc. No. [339], 56.

Prior to the passage of HB 316 in 2019, if an applicant's information did not match that which was on file with DDS or the SSA (if no driver's license number was used to register), his or her registration would be placed in "pending" status and eventually rejected after twenty-six months in "pending" status without a cure. DSMF ¶¶ 143, 151.[11] The parties dispute whether an applicant placed in

---

[10] Plaintiffs dispute whether the DDS citizenship check is reliable. Plaintiffs' Response to DSMF ¶ 142.

[11] Plaintiffs offer evidence that the rejection clock has not consistently been set at twenty-six months. Plaintiffs' Response to DSMF ¶ 151.

"pending" status could provide a photo ID at the polls, cure the verification issue, and vote normally thereafter. Plaintiffs' Response to DSMF ¶ 144.

According to Defendants, following the passage of HB 316, an applicant who registers using a paper application, and whose information cannot be verified (for a basis other than citizenship), is placed in Missing Identification Required ("MIDR") status, which means the applicant will have to provide valid photo ID to complete the registration process but is nevertheless considered an active voter and issued a precinct card. DSMF ¶¶ 145–146. Plaintiffs dispute whether this is how the process actually works in practice and whether SOS guidance is clear that applicants in MIDR status must provide "valid photo ID" to complete their registrations. Plaintiffs' Responses to DSMF ¶¶ 145–146, 148.

Individuals flagged as potential non-citizens are placed in pending status and not added to the voter rolls. PSMF ¶ 436; see also Doc. No. [507-1], Pl. Ex. 23, C. Harvey Dep. 243:21–24. Applicants in pending status for citizenship must produce documentary proof of citizenship to become an "active voter," and their registration will be rejected if they cannot do so within twenty-six months. PSMF ¶¶ 450, 495; see also Doc. No. [510-5], 116.

### 3.     Notification of Verification Failure

Prior to the passage of HB 316, applicants would receive a notification letter, triggering a forty-day clock to provide the necessary documentation or have their registrations cancelled. PSMF ¶ 422. SOS training materials appear to provide for letter notifications after HB 316. Doc. No. [507-2], 24–25. However, Plaintiffs' evidence shows that some voters received notification of the verification failure only after they called their county registrar's office (or the SOS) to inquire. PSMF ¶¶ 503, 509–511 (citing Doc. No. [508-7], 269, Pl. Ex. 480).

### 4.     Errors in the Exact Match Process

Plaintiffs' voter registration expert, Dr. Kenneth R. Mayer, wrote in his report that there is "no unique identifier in" the data sets linked in the voter verification process and "[e]xact-match linkage using combined data attributes is likely to produce false nonmatches, particularly when alphanumeric data are used, and even more likely when names are used." Doc. No. [238], 13. Dr. Mayer also wrote in his report that an individual can be flagged for verification failure even for "a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error." Id. at 6. Nonmatches may also result from errors made

13

by Georgia election officials manually entering information from paper registration applications. Id.; see also Defendants' Response to PSMF ¶ 418.

The General Counsel for the SOS testified in his deposition that the error rate for the SSA match process (using the last four digits of the individual's social security number) "seems pretty ridiculous," and he also thought the rates were "20 or 30 percent." Doc. No. [507-1], 1148, Pl. Ex. 26, R. Germany Dep. 91:15–17.

It is also undisputed that a registration application may be placed in "pending" status for non-citizenship based on outdated information. PSMF ¶ 418; Defendants' Response to PSMF ¶ 418; Doc. No. [238], 6. As Defendants acknowledge in their briefing, "an applicant may be placed in 'pending' status if information on file with DDS affirmatively indicates that the applicant has provided documents to DDS in the past showing that he or she is not a United States citizen." Doc. No. [630], 4.[12] Thus, if an applicant was naturalized as a

---

[12]  As stated by Plaintiffs' expert,

> non-U.S. citizens are eligible for a Georgia driver's license or state ID card if they are legally present in the country . . . . If a noncitizen obtains a license or ID, their noncitizenship status at that time is recorded in DDS files. If that person later naturalizes, they are not required to update their information with DDS, but will continue to be flagged as noncitizens by the DDS verification process if they register

14

United States citizen after the applicant obtained a driver's license with DDS while a non-citizen, the applicant may be erroneously flagged as a non-citizen during the post-naturalization voter registration process. PSMF ¶ 440; Defendants' Response to PSMF ¶ 418; Doc. No. [507-1], 1161 (Dec. 11, 2019 Germany Dep.) Tr. 125:11–23 (confirming that "the DDS record may well show that [a newly naturalized citizen] ha[s] a driver's license but [is]n't a citizen").

### 5.    *Rates of Failure*

Plaintiffs' expert, Dr. Mayer, identified particular processes that he said "produce higher verification failure rates and noncitizenship flags for minority registrants compared to non-Hispanic White registrants." DSMF ¶ 168.[13] The SOS's General Counsel has testified concerning the SOS's awareness as follows: "of the [records] that failed verification, I would say our office was aware that it

---

        to vote unless they present naturalization documents at the time they register.

Doc. No. [238], 5.

[13] Dr. Mayer was not, however, able to say if this disparity was the result of people improperly failing verification, because he could not determine "whether someone is in that status and shouldn't be." DSMF ¶ 169. Dr. Mayer further stated that he is "absolutely certain" that the number of people incorrectly placed in MIDR or pending status "was greater than zero" and that this was "not a matter of belief, [but] a matter of certainty." Plaintiffs' Response to DSMF ¶ 169 (citing Doc. No. [412], Mayer Dep. 41:24–43:22)).

was a largely African American population." PSMF ¶ 612; <u>see also</u> PSMF 610

(describing a SOS analysis of the pending voter list).[14]

**B.    <u>Defendants' Motion for Summary Judgment</u>**

Defendants argue that summary judgment is proper on Plaintiffs' Section 2

claim because Plaintiffs "have not presented evidence that the election system in

Georgia is not 'equally open' to participation by individuals of all races." Doc.

No. [623], 1. First, they argue that "the burden of being misidentified due to a[n]

[Exact Match] issue is low and more consistent with the 'usual burdens of voting'

like showing a photo identification." <u>Id.</u> at 14 (quoting <u>Brnovich</u>, 141 S. Ct. at

2338). Second, they argue Exact Match is an "extension" of longstanding

requirements that county registrars verify whether an individual is eligible to

vote. <u>Id.</u> at 15. Third, they argue that the disparate impact of Exact Match "is the

same kind of small amount that does not, itself, establish a Section 2 violation."

<u>Id.</u> at 16.

---

[14] Additional facts will be set forth as they become necessary for discussion of Plaintiffs' Section 2 claim and the issues presented in Defendants' Renewed Motion for Summary Judgment.

16

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325 (internal quotations omitted).

17

In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). "In doing so, the district court may not weigh the evidence or find facts. Nor may the court make credibility determinations of its own." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015) (internal quotations and citations omitted). Further, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924–25 (11th Cir. 2018) (holding that "conclusory allegations without specific supporting facts have no probative value").

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Celotex Corp., 477 U.S. at 324 (requiring the nonmoving party to "go beyond the pleadings" to establish that there is a "genuine issue for trial"). All reasonable doubts should be resolved

18

in the favor of the nonmovant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." <u>Id.</u> (citations omitted).

As with its prior summary judgment orders, the Court approaches this case "with caution, bearing in mind that these circumstances involve 'one of the most fundamental rights of . . . citizens: the right to vote.'" <u>Ga. State Conf. of NAACP</u>, 775 F.3d at 1345 (citations omitted). The Court also recognizes that the Eleventh Circuit has held that summary judgment in Section 2 cases "presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent" and that "[n]ormally, claims brought under [Section 2] of the VRA are resolved pursuant to a bench trial." <u>Id.</u> at 1343, 1348. However, "[i]t is irrefutable that a motion for summary judgment can—and should—be granted when the conditions of Rule 56 are met." <u>Greater Birmingham Ministries v. Sec'y of State for Ala.</u>, 966 F.3d 1202, 1221 (11th Cir. 2020).

## III.   DISCUSSION

Section 2 of the Voting Rights Act provides:

19

(a)   No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b)   A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (emphasis in statute). "The key requirement is that the political processes leading to nomination and election (here, the process of voting) must be 'equally open' to minority and non-minority groups alike." Brnovich, 141 S. Ct. at 2337. Because § 2(b) defines what is needed to show a violation of § 2(a), as the Supreme Court recently clarified, "equal openness and equal opportunity are

not separate requirements. Instead, equal opportunity helps to explain the meaning of equal openness." Id. at 2337–38.

### A.   Applicability of Brnovich Guideposts and Gingles Factors

Before it turns to Defendants' Motion, the Court must address the applicability of Brnovich and, more broadly, what legal analysis it will undertake. Plaintiffs argue that Brnovich "expressly cabins its reach to time, place, and manner restrictions" and thus "is of limited relevance" to Plaintiffs' Section 2 claim concerning Exact Match. Doc. No. [627], 17 (citing Brnovich, 141 S. Ct. at 2333). Plaintiffs further argue that the Court should analyze this issue under the factors provided for in Thornburg v. Gingles, 478 U.S. 30 (1986). See id. at 18–21.[15] Defendants counter that Brnovich, not Gingles, controls. See Doc. No. [630], 8. For the reasons discussed below, the Court finds that it must conduct its analysis using relevant guideposts and factors from both Brnovich and Gingles.

Congress amended Section 2 in 1982 "to make clear that a violation could be proved by showing discriminatory effect alone and to establish" a new legal standard for Section 2 claims. Gingles, 478 U.S. at 34–35. Gingles provided the

---

[15] Plaintiffs also argue, however, that they survive summary judgment even if the Court were to incorporate Brnovich into its analysis. Doc. No. [627], 21–29.

Supreme Court its first opportunity to construe Section 2 as amended. <u>Id.</u> at 34. In its decision, the Court set out a "non-exhaustive list of factors" to consider in a "totality of the circumstances" analysis for vote-dilution claims. <u>See</u> <u>Brnovich</u>, 141 S. Ct. at 2333 (citing <u>Gingles</u>, 478 U.S. 30).[16] Before <u>Brnovich</u>, the Supreme Court only considered how <u>Gingles</u> applied to Section 2 vote-dilution claims. <u>Id.</u> During the intervening period, lower courts evaluated vote-denial claims using <u>Gingles</u>. <u>Id.</u> at 2333 n.6. <u>Brnovich</u> was the first time that the Supreme Court granted certiorari on a Section 2 vote-denial case. <u>Id.</u> As such, <u>Brnovich</u> was the Supreme Court's first opportunity to develop a mode of analysis for Section 2 vote-denial claims, and it did so specifically in the context of "time, place, and manner" voting rules. <u>Id.</u> at 2333, 2340. In <u>Brnovich</u>, the Supreme Court maintained that Section 2 requires a "totality of circumstances" analysis, and it stated that "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." <u>See</u> <u>id.</u> at

---

[16] These "<u>Gingles</u>" or "Senate" factors include the history of discrimination in the relevant state, the extent to which voting in the state is racially polarized, and the history of voting-related discrimination in the state, among others. <u>Gingles</u>, 478 U.S. at 44–51, 80. The Court discusses relevant factors in greater depth below.

2338. More specifically, however, the Supreme Court offered five "guideposts" to consider for "time, manner, and place" cases. Id. at 2337–40.[17]

To the extent Plaintiffs argue that Brnovich most directly addresses Section 2 claims "involving rules . . . that specify the time, place, or manner for casting ballots," Brnovich, 141 S. Ct. at 2336, the Court agrees. But the Court does not agree that the "guideposts" enumerated in Brnovich are inapplicable to the Exact Match claim. To be sure, Plaintiffs' claim does not concern the type of "time, manner, and place" policies that were at issue in Brnovich. But at base, it is still a vote-denial claim, and Brnovich stands as the Supreme Court's sole guidance on vote-denial claims.[18] Ultimately, this Court must analyze Section 2 claims under the guidance handed down to it by the appellate courts. To that end, as much as the Court agrees that the claims at issue in Brnovich are in some respects distinguishable from the claim here, the Court cannot agree that it—or Gingles—

_____

[17] The Court discusses these guideposts in greater depth below.

[18] Indeed, the Court finds that the guideposts enumerated in Brnovich were intended broadly to address Section 2 claims that cannot be characterized as vote-dilution claims. See Brnovich, 141 S. Ct. at 2340. Because most Section 2 precedent involves vote-dilution claims, it was necessary for the Supreme Court to provide guidance on Section 2 challenges that cannot be categorized as vote-dilution claims. See Brnovich, 141 S. Ct. at 2333, 2340 (stating that the Supreme Court had "heard a steady stream of § 2 vote-dilution cases" and noting the "relevance" of Gingles and the Senate factors is "much less direct" in cases that do not allege vote dilution).

is irrelevant or does not apply to this case.[19] Instead—and especially considering both Gingles and Brnovich encourage lower courts to consider the totality of the relevant circumstances—this Court finds it prudent to center its analysis on the Brnovich guideposts and Gingles factors that are most relevant to the Exact Match claim.

Other considerations support drawing from both decisions. For example, the Court in Brnovich engaged in a lengthy discussion of the history and text of Section 2. See Brnovich, 141 S. Ct. at 2336–38. That discussion is relevant here. Further, the Court in Brnovich expressly stated that it declined to "announce a test to govern all" Section 2 challenges, that courts are "require[d]" to consider "the totality of the circumstances," and that the Gingles factors should not

---

[19] For instance, Plaintiffs argue that Exact Match is distinguishable from the policies challenged in Brnovich because "Exact Match regulates *who* may vote in elections—only those whose voter registration applications exactly match government records," (Doc. No. [627], 18 (emphasis in original)), whereas Brnovich addressed challenges to policies that "govern *how* ballots are collected and counted" (Brnovich, 141 S. Ct. at 2330, 2333) (emphasis added)). In Brnovich, one challenged policy required that in-person election day ballots be cast in the voter's assigned precinct. 141 S. Ct. at 2330. Thus, both here and in Brnovich, the result of the challenged policy is that an otherwise eligible voter is prevented from voting or having their ballot counted. In other words, both cases involve vote-denial claims. Even if the way the denial occurs is distinguishable, the Exact Match claim involves allegations that Defendants' policy resulted in the denial of voters' right to vote. The Court will not ignore recent guidance from the Supreme Court regarding how to analyze vote-denial claims.

necessarily be disregarded. Id. at 2336, 2340.[20] Combining that instruction with the Eleventh Circuit's observation that these cases are "fact-driven" and require consideration of "all relevant evidence," Ga. State Conf. of NAACP, 775 F.3d at 1348, this Court finds it should tailor its analysis to the facts at issue.[21]

Thus, the Court proceeds with a totality of the circumstances analysis of Plaintiffs' Exact Match claim under the relevant Brnovich guideposts and Gingles factors. The Court will first discuss each of the Brnovich guideposts: (1) the size of the burden imposed; (2) the deviation from standard practice in 1982; (3) the size of the disparity of the burden; (4) other available means of voting; and (5) the strength of the state interest. The Court will then discuss the following relevant factors from Gingles: (1) the history of official discrimination in Georgia; (2) whether there is racially polarized voting in Georgia; (3) voting practices and

_____

[20] In particular, the Court stated that certain Gingles may be relevant to vote-denial claims insofar as they "show that minority group members suffered discrimination in the past . . . and that effects of that discrimination persist." Brnovich, 141 S. Ct. at 2340.

[21] Notably, although the Supreme Court issued its decision in Brnovich mere months ago, this Court is already not alone in determining that the fact-specific nature of Section 2 claims may require courts to draw factors from both Gingles and Brnovich. See Fla. State Conf. of NAACP v. Lee Nat'l Republican Senatorial Comm., No. 4:21CV187-MW/MAF, 2021 WL 4818913, at *17–19 (N.D. Fla. Oct. 8, 2021) (denying a motion to dismiss a Section 2 claim and considering both guideposts from Brnovich and factors from Gingles).

procedures in Georgia; (4) discrimination outside the voting context in Georgia; (5) racial appeals in campaigns in Georgia; and (6) minority candidate success in Georgia. With the benefit of Brnovich's guidance, the Court's analysis remains focused on the "touchstone" of Section 2 claims: "equal openness" to voting. Brnovich, 141 S. Ct. at 2338.

**B.     Analysis of the Applicable Factors and Guideposts**

**1.     Brnovich Guideposts**

**a)     Size of the burden imposed**

Plaintiffs have met their summary judgment burden of coming forward with specific facts showing a genuine dispute as to whether Exact Match imposes a burden that blocks or seriously hinders voting.

In Brnovich, the Supreme Court recognized that "every voting rule imposes a burden of some sort." 141 S. Ct. at 2338. The Court also stated: "because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.'" Id. The Court did not enumerate the acts that constitute "usual burdens of voting," but it did state that having to identify one's own polling place and then travel there

26

to vote are "unremarkable burdens" that do not exceed the usual burdens of voting. Id. at 2344. The Court further stated that "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2." Id. at 2338.[22]

In the case *sub judice*, Plaintiffs argue that the burdens at issue are "state dysfunction" and "a novel set of hoops [that applicants] must jump through before being allowed to even register to vote." Doc. No. [627], 22–23. In contrast, Defendants assert that failing to match records of DDS (or SSA) and being placed in Active-MIDR status "does not impose a burden on the voter" because the voters are placed on the rolls as active voters and can vote with the same identification materials as other voters. Doc. No. [630], 4. Defendants argue that an applicant placed in "pending" status based on citizenship non-match "may still cast a ballot if he or she provides documentation on or before election day establishing his or her citizenship, which includes a REAL ID,[23] non-limited term

_____

[22] Similarly, in the voter identification law jurisprudence (which Defendants in the case *sub judice* rely upon by analogy), the Supreme Court stated that: "[f]or most voters who need [identification cards], the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 198 (2008).

[23] "In 2005, Congress enacted the REAL ID Act, Pub. L. 109-13, 119 Stat. 231. The REA[L]

27

Georgia driver's license, among other options." Id. (citing O.C.G.A. § 21-2-216(g)(1); O.C.G.A. § 21-2-216(g)(2); SEB Rule 183-1-6-.06). Defendants further argue that "at the very least, a voter who does not 'match' can re-register to vote using the same name on the DDS or SSA databases." Doc. No. [630], 5.

The Court is unable to conclude that Defendants are entitled to summary judgment as their arguments are based upon factual premises for which Plaintiffs have presented evidence in opposition showing that there are genuine disputes of material facts that will need to be resolved at trial.

More specifically, contrary to Defendants' assertion that voters in MIDR status can vote by simply presenting identification, Plaintiffs have presented evidence of at least one voter who was in the MIDR verification status and unable to vote when the voter appeared at the polls on election day. PSMF ¶ 557. Plaintiffs have also presented evidence showing that at least one voter was not able to vote due to having been improperly placed in the non-citizen category.

---

ID Act establishes minimum federal requirements for state-issued drivers' licenses and identification cards to gain entry to federal facilities and board federally regulated commercial aircrafts." Kearns v. Cuomo, 415 F. Supp. 3d 319, 324 (W.D.N.Y. 2019), aff'd, 981 F.3d 200 (2d Cir. 2020) (citations omitted).

Id. ¶ 517.[24] Lastly, Plaintiffs have presented evidence of a voter who tried to cure the verification failure by re-registering and was unsuccessful. Id. ¶ 530. [25] Brnovich instructs the Court to determine whether a burden exists, and if so, the size of that burden; at this time the Court does not make a finding of fact as to whether a burden exists or the size of such a burden.[26] Instead, the Court finds that a genuine issue of material facts exists.

_____

[24] The Court recognizes Defendants' traceability argument and attempt to distinguish Plaintiffs' evidence as "at most" a failure on the part of the county election official in not providing a provisional ballot to the voter. Doc. No. [630], 10. However, Defendants' argument does not take into account the voter's statement that she was born in Virginia (PSMF ¶ 518), which is evidence of citizenship. In essence, if the voter was improperly in the non-citizen category, there is traceability to SOS conduct under the Court's prior rulings concerning standing and traceability. Doc. Nos. [612]; [617].

[25] The Court recognizes Defendants' arguments labeling Plaintiffs' evidence as of "limited impact" due to the small number of voters at issue. Doc. No. [630], 10. However, at this stage of the case, it is not proper for the Court to weigh the evidence. Ga. State Conf. of NAACP, 775 F.3d at 1343. As indicated above, the evidence at issue meets Plaintiffs' burden of coming forward with evidence that shows the existence of a genuine dispute of material fact.

[26] Under Brnovich and Gingles, the Court is considering whether there is a burden and the size of the burden in conjunction with numerous other guideposts and factors. In the Court's previous summary judgment order on the merits, however, the Court addressed the issue of voter-list maintenance by undertaking the Anderson-Burdick burden-shifting analysis and thus assessing the severity of the voters' burden against the state's interests in enforcing its list maintenance process. Doc. No. [617], 46–56. There, the nature of the Anderson-Burdick analysis required the Court to determine the severity of the alleged burden. Under Brnovich, the Court does not need to undertake that analysis at this stage.

The Court also notes that a portion of Defendants' argument is based upon the premise that the applicants are provided notice of their verification failure status (i.e., pending or MIDR status). But Plaintiffs have presented evidence of flaws in the notification system such that there are genuine disputes of material fact as to whether all applicants are notified of a verification failure. PSMF ¶¶ 499–500, 526, 528.

Defendants' arguments and citation of authority also do not fully address Plaintiffs' argument that the alleged burden is "state dysfunction" and that it is not a "usual burden of voting," to have to cure mistakes made by the state—even when the voter is otherwise eligible to vote.

Finally, the Court notes that in conducting its burden analysis in Brnovich, the Supreme Court reviewed evidence that showed that the state "made extensive efforts to reduce [the burden's] impact on the number of valid votes ultimately cast," such that the identified burdens were "moderate" when considering the process as a whole. Brnovich, 141 S. Ct. at 2344. In the case *sub judice*, the Court is unable to conduct a similar analysis as there are genuine disputes of material fact as to how the Exact Match process works as a whole and in practice. See PSMF ¶ 415 (citing Doc. No. [238], 10). These disputes will need

to be resolved by the fact-finder at trial. See Anderson, 477 U.S. at 255. Accordingly, summary judgment is inappropriate on this guidepost.

### b)   Deviation from standard practice in 1982

Defendants argue that HAVA is "an extension" of longstanding voter verification requirements, and thus enjoys the kind of "long pedigree" or "widespread use" that is less likely to trigger a Section 2 violation. Doc. No. [623], 15–16 (citing Brnovich, 141 S. Ct. at 2339). The Court disagrees for two reasons.

First, neither Exact Match nor HAVA has a "long pedigree." Congress passed HAVA in 2002 and the SOS, in response, devised Exact Match. As Plaintiffs note, in 1982, Georgia required voter registration applicants to provide an election registrar with "proper identification and information" that the registrar would use to complete a simple registration card with the voter's identifying information. O.C.G.A. §§ 21–2–217, –221 (1982). The voter would then take an oath swearing to or affirming their citizenship and eligibility to vote. Id. The county registrars did not compare the information provided by the applicant to a separate database, maintained by a different state or federal agency, which contains potentially outdated information.

Indeed, far from having been long accepted, as indicated above, in 2009[27] the DOJ initially denied preclearance for Georgia's "Exact Match" program. PSMF ¶ 406; see also Doc. No. [510-14], 143–47 (Pl. Ex. 1007).

Second, Georgia's verification requirements in Exact Match are much narrower than what HAVA itself requires. HAVA does not require comparison of a registration applicant's first name, last name, date of birth, or citizenship information. 52 U.S.C. § 21083(a)(5). Nor does it require identifying information to match **exactly**. Id.[28] Finally, HAVA does not specify the consequences for a failure to match. Id.

For these reasons, Exact Match as it exists today is not fairly characterized as an extension of longstanding general verification requirements. This guidepost weighs against Defendants' motion for summary judgment.

_____

[27] Prior to the United States Supreme Court's decision in Shelby County v. Holder, 570 U.S. 529 (2013), certain states, including Georgia, needed to seek preclearance from the DOJ for new voting changes.

[28] The Court recognizes that the Eleventh Circuit in Florida State Conference of NAACP v. Browning assessed a system in Florida similar to Exact Match and found that its exact-matching protocol was not preempted by the less strict, baseline requirements set by HAVA. 522 F.3d 1153, 1175 (11th Cir. 2008). The Eleventh Circuit stated, however, that the question of whether such an exact match system was "unjustifiably burdensome" on voters was "an argument for another day." Id. That is the argument the Court considers now, so the Court finds that Browning does not directly control this question.

c)      **Disparate impact**

As the Court found in its previous summary judgment order, there is evidence in the record that shows that Exact Match disproportionately affects minority voters. Doc. No. [617], 66. Defendants now argue, however, that "Plaintiffs' alleged disparate impact is the same kind of small amount that does not, itself, establish a Section 2 violation." Doc. No. [623], 16. In Brnovich, the Supreme Court stated that "[t]he *size* of any disparities in a rule's impact on members of different racial or ethnic groups is . . . an important factor to consider." 141 S. Ct. at 2339 (emphasis added). It cautioned that small disparities may not necessarily show "that a system is not equally open or that it does not give everyone an equal opportunity to vote." Id. The Court further advised that "[w]hat are at bottom very small differences should not be artificially magnified." Id. And it criticized the practice of "dividing one percentage by another," which can create a "distorted picture." Id. (citing Frank v. Walker, 768 F.3d 744, 752 n.3 (7th Cir. 2014)).[29]

---

[29]  In Frank, the court gave the following example: "If 99.9% of whites had photo IDs, and 99.7% of blacks did, the same approach would yield the statement 'blacks are three times as likely as whites to lack qualifying ID' (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." 768 F.3d at 753.

Here, Plaintiffs provide enough evidence of "a meaningful comparison" to weigh against granting summary judgment. Plaintiffs' expert reviewed and analyzed statewide voter lists, lists of individuals in MIDR status, and related materials. Doc. No. [238], 2. He found that more than 60,000 individuals were in MIDR status—around 1% of the total number of registered voters. Id. at 6. Although Plaintiffs' expert acknowledged that the key information at issue is "the number of otherwise eligible people *incorrectly* placed in 'MIDR' status," he conceded that this number "is not completely and directly observable with the available data." Id. at 6–7 (emphasis added). Nevertheless, Plaintiffs' expert was certain "that the number is nonzero," that "the verification process imposes a burden on eligible individuals" due to errors attributable to the State, and that "these burdens fall disproportionately on racial or ethnic minority registrants." See id. at 7–8. Specifically, he found that while minorities constitute around 37% of registered voters, they account for over 76% of individuals in pending status and almost 80% of registered voters in MIDR status. Id. at 17–20.[30] Nearly 70% of

---

[30]  White non-Hispanic individuals, on the other hand, constitute around 53% of registered voters, but they are only 14.7% of registrants in pending status and 11.4% of registrants in MIDR status. Doc. No. [238], 17–20.

those in MIDR status are Black. Id. at 19. Plaintiffs' expert also provided the rate

at which registrants are in MIDR status. Id. at 20–21. While 0.19% of white non-

Hispanic registrants are in MIDR status, over 2% of Black voters are in MIDR

status. Id. Additionally, 1.5% of Hispanic and 1.19% of Asian or Pacific Islander

registrants are in MIDR status. Id. In other words, "[m]inority registrants are

between 6 and 10 times more likely to be in MIDR status than non-Hispanic

White registrants." Id. at 19.[31] While Plaintiffs' expert could not independently

confirm how many registrants were incorrectly placed on pending, MIDR, or a

similar status, Plaintiffs have presented evidence that some errors are attributable

to the SOS and that SOS representatives have considered the error rates to be

_____

[31] Similarly, a disproportionate number of minorities were flagged as noncitizens. Doc. No. [238], 22–23. Because lawfully present individuals are eligible for Georgia drivers' licenses, but new citizens are not required to update their citizenship status with DDS, the risk of an inaccurate nonmatch is highest for naturalized citizens. Id. at 4, 7. Of the nearly 460,000 voting-age naturalized citizens in Georgia in 2017, "over 80% . . . were members of minority groups." Id. at 4, 22. Plaintiffs' expert found that, as of January 2020, people of color comprised more than seventy-five percent of those in "pending" status for citizenship nonmatches, even though people of color made up only 37% of active registered voters. PSMF ¶ 604. "Hispanic and Asian registrants are massively overrepresented among pending voters: while these groups comprise only 5.7% of active registrants, they make up 31.2% of registrants in pending status." Doc. No. [238], 19. Again, though, Plaintiffs' expert notes that only a few thousand total registrants fell into this category, and he could not determine precisely how many were *incorrectly* flagged as noncitizens. Id. at 22–23.

high. See PSMF ¶¶ 418, 420 (quoting Ryan Germany, who stated that he had seen error rates of "20 or 30 percent," which he stated "seems pretty ridiculous").

Notably, while Plaintiffs' expert states that the more than 60,000 people in MIDR status is not trivial, he concedes that "the percentages of individuals in the active voter file in MIDR status or pending status is not large (on the order of 1% of registered voters)." Id. at 6. Taking note of this fact, Defendants argue that Plaintiffs' evidence is insufficient because "exact match works for over 98% of Georgia voters." Doc. No. [630], 3. The Court agrees with Defendants that Brnovich diminishes some of the power of Plaintiffs' evidence concerning disparity of impact. After all, Brnovich admonished the practice of magnifying percentages of disparities in a manner that ignores the actual *size* of the disparities. And in this case, Plaintiffs present evidence of disparate impact that, in total, appears not to affect around 96% of voters.

Nevertheless, as Plaintiffs argue, "VRA claims will frequently challenge policies that have a severely destructive impact but affect only a relatively small percentage of voters, as the VRA's very purpose is to enfranchise traditionally minority communities." Doc. No. [627], 27. Moreover, the types of "distorted" percentages used as examples in Brnovich involved instances where minorities

36

were two or three times more likely to be impacted. See Brnovich, 141 S. Ct. at 2345. Here, though, Plaintiffs have shown that minorities are six to ten times more likely than non-Hispanic whites to be placed on the relevant lists, and those percentages concerning the disproportionality of the impact far exceed the examples used in Brnovich. Thus, the Court finds that Plaintiffs' expert did not simply divide percentages in the manner described in Brnovich; instead, he compared a group's share of the total registered voter population to its share of the MIDR and pending status lists.

The Court recognizes that there is a difference between being placed in MIDR, pending, and non-citizenship status and being *incorrectly* placed in such a status. Much of Plaintiffs' statistical evidence goes towards registrants simply being placed in such a status, which does not necessarily mean that those registrants were *wrongly* placed in that status. Still, for purposes of summary judgment, the Court finds that Plaintiffs have presented enough evidence to create a genuine issue of material fact by showing that minorities are disproportionately flagged and also providing evidence of a high error rate concerning those percentages.

For the above reasons, the Court finds Plaintiffs have created a genuine issue of material fact on disparate impact. In light of <u>Brnovich</u>'s instructions concerning the size of disparities, however, the Court finds that Plaintiffs' evidence weighs only slightly against Defendants' summary judgment motion.[32]

### d)    <u>Other available means</u>

Next, the Court looks to Georgia's election system "as a whole." <u>Brnovich</u>, 141 S. Ct. at 2339. <u>Brnovich</u> explained that "where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." <u>Id.</u> Unlike the policies challenged in <u>Brnovich</u>, however, Exact Match does not affect only one method of voting among several. There are no alternative means of registering to vote that avoid Exact Match. All registration applications are subject to the policy. Thus, while Defendants are right that "Georgia provides multiple opportunities to vote besides in-person voting on Election Day" (Doc. No. [623], 18]), that fact is of little significance when considering an issue that first manifests not at the polls but during the registration process. Accordingly, the

---

[32] Of course, the Court is considering multiple factors and guideposts, and as even Defendants note, this guidepost does not establish a Section 2 violation on its own. <u>See</u> Doc. No. [623], 16. Thus, this guidepost need not carry Plaintiffs' claim.

Court finds that the policy affects the entire system of voting in Georgia, and this guidepost weighs against Defendants' motion for summary judgment.

### e)   Strength of state interest

"[I]n determining 'based on the totality of circumstances' whether a rule goes too far, it is important to consider the reason for the rule." Brnovich, 141 S. Ct. at 2339–40. Defendants argue they have a "'strong and entirely legitimate state interest' in complying with federal law and preventing fraud in the registration process." Doc. No. [623], 16 (quoting Brnovich, 141 S. Ct. at 2339).

The Court agrees that the state has a strong, legitimate interest in verifying voter registration applications and complying with the federal requirements set forth in HAVA. However, as mentioned supra, HAVA does not require exact matching. 52 U.S.C. § 21083(a)(5)(B)(i) (directing state election officials to "enter into an agreement to match" voter registration information with information in the state motor vehicle authority database "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration").[33]

─────────────────────

[33] The Eleventh Circuit in Browning indicated that Exact Match may not be preempted by HAVA, see Browning 522 F.3d at 1175, but this Court does not find that adhering to Exact Match is necessary to comply with the lesser requirements of HAVA.

39

Defendants also argue they have a strong interest in preventing fraud in the registration process. The Court agrees that this is a legitimate interest. See Brnovich, 141 S. Ct. at 2340 ("One strong and entirely legitimate state interest is the prevention of fraud."). However, a state cannot simply cite fraud as a state interest for every voting rule without showing that rule prevents fraud or otherwise legitimately furthers that state interest. The Eleventh Circuit in Browning expressly left this question—whether "the likelihood of error combined with the consequences are unjustifiably burdensome on the applicant in light of other available and more error-tolerant ways of verifying identity, and in light of the overall balance of effects on social utility"—unanswered. Browning, 552 F.3d at 1175. While the Supreme Court stated that "Section 2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives," Brnovich, 141 S. Ct. at 2345–46, a question remains as to how verifying citizenship against a database with admittedly outdated information or requiring an exact match of the four other identifiers assists the State in preventing voter fraud. Thus, Plaintiffs have created a genuine issue of material fact on whether Exact

Match serves a strong, legitimate state interest, and this guidepost slightly weighs against granting summary judgment.

### 2. *Gingles* Factors

#### a) **History of past discrimination**

As the Court noted in its previous summary judgment order, Defendants do not contest that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Doc. No. [617], 70–71 (citing Doc. No. [450-1], 50 n.38). The Court also takes judicial notice of this fact. See Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020) (noting that "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.") (citations omitted).

Accordingly, the history of past discrimination factor does not weigh in favor of granting summary judgment.

#### b) **Racially Polarized Voting**

Under Gingles, racially polarized voting exists when there is "a correlation between the race of voters and the selection of certain candidates. Plaintiffs need

41

not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of cause or intent." Gingles, 478 U.S. at 74.

In the case *sub judice*, Plaintiffs rely upon the following evidence in support of their case and to demonstrate racial bloc voting: (1) in 2002, 25% of white voters supported the Democratic Party (PSMF ¶ 1139); (2) in the 2014 gubernatorial election, 25% of white voters voted for the Democratic gubernatorial candidate and 73% of white voters voted for the Republican candidate (id. ¶ 1140); (3) since 1992, between 81% and 92% of Black voters support the Democratic Party (id. ¶ 1139); and (4) in the 2014, gubernatorial election, 10% of Black voters voted for the Republican gubernatorial candidate (id. ¶ 1140).

Because Plaintiffs have presented evidence of racial bloc voting, summary judgment is not warranted on this factor at this time.

### c) Practices and Procedures

The third Gingles factor is effectively the same as the Brnovich third guidepost. The Gingles factor evaluates "the extent to which the state or political subdivision has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group," Gingles, 478 U.S. at

42

37, and the Brnovich guidepost analyzes "the size of any disparities in a rule's impact on members of different racial or ethnic groups," Brnovich, 141 S. Ct. at 2339. Because the Brnovich decision is more recent than Gingles and it evaluated Arizona's voting procedures in light of today's election procedures, the Court evaluates this Gingles factor using the standards set forth in Brnovich. As the Court discussed in depth in the disparate impact section, *infra* section III.B.1.c, Plaintiffs have created a genuine issue of material fact with respect to disparate impact. Accordingly, this factor weighs against summary judgment.

### d)      Discrimination in Other Areas

Plaintiffs provide evidence that Georgia still experiences the effects of past discrimination in various facets of society. See Doc. No. [339] ¶¶ 17, 93–95. The district court in Gingles found that historic discrimination of minorities in housing, education, employment, and healthcare led to many minorities being in a lower socioeconomic class. Gingles, 478 U.S. at 39. The district court concluded that this "gives rise to special group interests and hinders blacks' ability to participate effectively in the political process and to elect representatives of their choice." Id. The Supreme Court did not discuss or disrupt the district court's finding.

43

Here, Plaintiffs provide evidence of similar statistics as follows: twice as many Black Georgians as white Georgians live below the poverty line (PSMF ¶ 1145); the unemployment rate for Black Georgians is double that of white Georgians (id. ¶ 1144); Black Georgians are less likely to attain a high school or college degree (id. ¶ 1146); and Black Georgians die of cancer, heart disease and diabetes at a higher rate than white Georgians (id. ¶ 1141). Plaintiffs' evidence of the impact of past discrimination on Georgia's current socioeconomic demographics is similar to the evidence that the district court discussed in Gingles. Gingles, 478 U.S. at 39. Accordingly, this factor weighs against summary judgment.

### e)       Racial Appeals in Campaigns

Plaintiffs have provided evidence that racial appeals were made in recent Georgia elections. In Gingles, the district court found, and the Supreme Court did not discuss or disturb, that "white candidates in North Carolina have encouraged voting along color lines by appealing to racial prejudice." Gingles, 478 U.S. at 40. The district court further held that "the use of racial appeals in political campaigns in North Carolina persists to the present day and that its current effect

44

is to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice." Id.

Here, Plaintiffs offer examples of racial appeals used in recent Georgia elections. For example, Plaintiffs point to a 2014 speech (by then-Secretary of State Brian Kemp) concerning registering minority voters. Doc. No. [481-1], 204. Other examples of these appeals cited by Plaintiffs include a Douglas County commissioner's 2016 statement that "a government run by African American leadership would 'bankrupt you'" (PSMF ¶ 1150); a gubernatorial candidate's 2018 driving of "a 'deportation bus' tour with a school bus emblazoned with the words 'Fill this bus with illegals' . . . [and] [t]he back of the bus read: 'Danger! Murderers, rapists, kidnappers, child molesters, and others on board'" (id. ¶ 1152); and then-Secretary of State Kemp's 2018 campaign advertisement stating that he had "a big truck . . . Just in case I need to round up criminal illegals and take them home myself" (id. ¶ 1152).

Defendants argue that a number of these examples are unavailing because the candidates were ultimately unsuccessful. Doc. No. [630], 5-6. This argument asks the Court to weigh the evidence, which is inappropriate at this stage of the case. See Anderson, 477 U.S. at 255. Even if the Court were to weigh the evidence,

this factor does not require that racially polarized statements be made by successful candidates. The factor simply asks whether campaigns include racial appeals. <u>Gingles</u>, 478 U.S. at 37. Plaintiffs proffer evidence of racial appeals in recent Georgia elections and have carried their summary judgment burden. Accordingly, this factor weighs against summary judgment.

### f)   <u>Minority Candidate Success</u>

There remains a genuine issue of material fact about whether minority candidates can have sustained success in statewide Georgia elections. The Supreme Court held that just because some Black candidates have succeeded is not dispositive of a Section 2 claim. <u>Gingles</u>, 478 U.S. at 76. However, courts must consider the sustained success of Black candidates. <u>Id.</u> at 77. Plaintiffs argue that only three Black candidates have been elected to non-judicial statewide offices: Labor Commissioner Mike Thurmond in 2002 and 2006; former Attorney General Thurbert Baker in 1998, 2002, and 2006; and Senator Raphael Warnock in 2020. Doc. No. [627], 9. Defendants argue that these elections in addition to the minority judges who have been elected to the Georgia Court of Appeals and the Georgia Supreme Court show that Black candidates can have success in Georgia elections. Doc. No. [630], 5. There remains a genuine issue of material fact about

whether these instances of minority candidate success in statewide elections constitute sustained success in elections. Accordingly, Plaintiffs have demonstrated that a genuine issue of material fact exists, and this factor weighs against summary judgment.

### C.  <u>Summary</u>

The Court finds that the relevant <u>Brnovich</u> guideposts and <u>Gingles</u> factors all weigh against granting summary judgment. Under the totality of the circumstances, the Court finds that a genuine issue of material fact remains as to whether Exact Match is permissible under Section 2 of the VRA. Accordingly, the Court denies Defendants' Renewed Motion for Summary Judgment. Doc. No. [623].

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Summary Judgment on Plaintiffs' Section 2 VRA Claims (Doc. No. [623]) is **DENIED**.

Pursuant to Local Rule 16.4, a proposed consolidated pretrial order shall be filed within **THIRTY DAYS** of the entry of this Order. A preliminary pretrial conference to discuss trial scheduling and other logistical matters will be held on **NOVEMBER 29, 2021** at **11:00 A.M.** (Courtroom 1907, Richard B. Russell Federal

Building and United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, Georgia).

IT IS SO ORDERED this _____15th_____ day of November, 2021.

_____

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

48