**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FAIR FIGHT ACTION, INC, *et al.*, <br> *Plaintiffs*, <br> v. <br> BRAD RAFFENSPERGER, *et al.*, <br> *Defendants*. | Civil Action No. <br> 1:18-cv-05391-SCJ |

**PLAINTIFFS' ATTACHMENT C (STATEMENT OF THE CASE)**

**I.   Plaintiffs' Factual Statement**

This case is about Georgians' right to vote. Plaintiffs contend that Defendants the Georgia Secretary of State (SOS), the State Election Board (SEB) and the SEB members are denying and abridging Georgians' right to vote through: (1) the SOS's "Exact Match" policy and its application; (2) extensive mismanagement of the statewide voter registration list; and (3) non-uniform and improper practices regarding in-person cancellation of absentee ballots. These three policies and practices violate federal law, as follows:

- The Exact Match policy and its application: (a) violate the fundamental right to vote as guaranteed by the First and Fourteenth Amendments; (b) racially discriminate against Georgians of color in violation of the

Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment; (c) discriminate against Georgians based on where they live and based on naturalized citizenship status in violation of the Equal Protection Clause of the Fourteenth Amendment; and (d) deny or abridge the right to vote in violation of the Voting Rights Act.

- Defendants' extensive mismanagement of the statewide voter registration list violates Georgians' fundamental right to vote in violation of the First and Fourteenth Amendments.

- The non-uniform and improper practices regarding in-person cancellation of absentee ballots (a) violate Georgians' fundamental right to vote in violation of the First and Fourteenth Amendments; and (b) discriminate against Georgians based on where they live, in violation of the Equal Protection Clause of the Fourteenth Amendment.

A. Exact Match Policy

The SOS's Exact Match policy and processes apply to voter registration applications in Georgia. The Exact Match policy needlessly burdens would-be voters by erroneously flagging people eligible to vote as "non-matches." The improper flags impose burdens on would-be-voters through no fault of their own.

Defendants have not identified any evidence that the Exact Match policy prevents voter fraud or serves any other legitimate state interest.

Under the Exact Match policy, information from voter registration applications is matched against information contained in either the Georgia Department of Driver Services (DDS) or Social Security Administration (SSA) databases. This matching process has two components: (1) matching the applicant's United States citizenship as reflected in DDS records; and (2) matching the applicant's identity, specifically the applicant's first name; last name; date of birth; and Georgia drivers' license number, Georgia identification card number, or the last four digits of the applicant's Social Security number.

The Exact Match citizenship matching protocol works differently for naturalized citizens than it does for native-born citizens. The DDS database used to "verify" citizenship is known to be outdated and unreliable. Many naturalized citizens lawfully obtain their Georgia drivers' licenses before becoming United States citizens. When these non-citizens attain United States citizenship, they are not required to update their citizenship status with DDS, and many do not do so. As a result, when the SOS matches their citizenship status against the DDS database, as required by the Exact Match policy, the DDS database erroneously flags naturalized citizens as non-citizens. Neither the DDS nor SOS warns

naturalized citizens that, unless they update their citizenship information with DDS, they will be flagged as non-citizens when they try to register to vote.

When the voter registration applications of naturalized citizens fail the DDS match on citizenship, the applications are placed in "pending" status, which means these citizens cannot vote until they provide documentary proof of citizenship to a county election official. By contrast, the SOS requires no documentary proof of citizenship from people who do not provide a Georgia drivers' license number when registering to vote. These applicants need only attest to their citizenship by checking a box on the application form and the SOS accepts their word as true. And Georgia residents who are native-born citizens are not required to present documentary proof of citizenship when registering to vote, because those registrants do not undergo a citizenship-status change that would render their outdated DDS data erroneous.

To match voter registration applicants' identity (the other component of the matching process), the Exact Match policy requires voter registration application information—specifically the first letter of the applicant's first name, the applicant's entire last name, the applicant's birthday, and the applicant's Georgia drivers' license number or Georgia identification card number—to be matched against DDS records. If the applicant does not have a Georgia drivers' license or

Georgia identification card number but provides the last four digits of the applicant's Social Security number, the applicant's information is sent to the Social Security Administration for matching.

The Exact Match policy requires these matches to be exact. Differences as minor or irrelevant as a transposed letter or a missing hyphen or apostrophe in the applicant's last name will be flagged as non-matches. Identity non-matches result in voter registration applications being placed in "Active MIDR" status ("MIDR" for "Missing Identification Required"), and applicants must provide identification to county election officials to vote a regular ballot.

Data entry errors, made when county election personnel type voter registration application information into the voter registration database so it can be matched against the DDS or SSA databases, cause many of these match failures. Despite their duty to obtain uniformity in county election practices, neither the SOS nor the SEB has set statewide quality control protocols that would prevent these data entry errors.

Georgia law requires that people in pending or MIDR status be sent a notice of the match failure and directions on how to cure it, but the required notice is often ineffective. First, many applicants do not receive the notice. Second, the notice is published only in English except in Gwinnett County, where the notice is

also in Spanish. Thus, even if naturalized citizens receive the notice, they may not understand what they are being told to do.

The Exact Match policy also discriminates against voters of color, violating the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act (VRA). Georgia has tried to keep voters of color from voting or having their ballots counted since the Fifteenth Amendment was ratified. The Exact Match policy perpetuates this history of voter suppression.

Before adopting the Exact Match policy in 2010, the SOS, who at the time was Brian Kemp, was told by the United States Department of Justice that the Exact Match policy was unreliable for accurately matching identity and citizenship and that the burdens of that unreliability would fall disproportionately on voters of color. The SOS nonetheless adopted the policy. And, in 2018, after learning from an analysis conducted in-house that 70 percent of the people whose voter registration applications failed the Exact Match test were African American, the SOS did not alleviate, or even attempt to alleviate, the disproportionate burden of its policy on voters of color.

The motive underlying the Exact Match policy is clear. When running for re-election as Secretary of State in 2014, Brian Kemp warned supporters at a fund-

6

raiser of the threat to his campaign posed by the large number of "minorities" registering to vote. He repeated the theme in 2018, when he was still Secretary of State but was running for governor, although in 2018 referred to these voters as the Democratic Party "base." During that same 2018 campaign, Secretary of State Kemp ran a television campaign ad in which he boasted that he owns a big pick-up truck so he can round up "criminal illegals."

Race discrimination is not the only way the Exact Match policy violates the Equal Protection Clause. The policy also violates the Equal Protection Clause by: (1) subjecting voters to differential treatment based on their geographic location; and (2) treating naturalized citizens differently from native-born citizens.

The differential treatment based on geographic location comes from counties applying Exact Match differently. As described above, the SOS and SEB set no statewide protocols for counties' data entry. In addition, the SOS gives counties discretion to disregard questionable non-matches but does not provide statewide standards for how counties exercise that discretion. Therefore, significant discrepancies exist among the counties' pending and MIDR rates for voter registration applications.

The differential treatment based on naturalized versus native-born citizen status is caused by the Exact Match Policy's use of outdated DDS records to match

citizenship status, as set forth above. Because the outdated DDS information creates citizenship mismatches for naturalized citizens but not for native-born citizens, only naturalized citizens are prohibited from voting until they provide documentary proof of citizenship. Meanwhile, the SOS requires no documentary proof of citizenship from voter registration applicants who do not provide a Georgia drivers' license number with their applications or who are native-born citizens in the DDS database.

B.  Extensive Mismanagement of Statewide Voter Registration Database

The SOS, by law, is responsible for maintaining an accurate statewide voter database. Georgia's voter database, called eNet, is both the backbone of the Georgia voting system and the gateway for Georgians to be able to cast ballots and have their ballots counted. Election personnel use eNet data to determine whether voters can be given a ballot at the polls, whether voters are entitled to receive absentee ballots, and whether absentee and provisional ballots should be counted. For voters to vote and have their votes counted, eNet must be accurate.

But ENet is not accurate. It is error-ridden. Those errors are not just the result of occasional and unavoidable human errors. Instead, those errors result directly and predictably from avoidable design flaws within eNet programming itself; the nearly unfettered discretion the SOS chooses to give counties to enter,

modify, and remove voter information in the database; and the SOS's decision not to place various basic and reasonable controls on county users to ensure accuracy and consistency. The result is a voter database in which eligible voters' registrations have been deleted erroneously and in which voter' names, dates of birth, voter histories, addresses, and precinct information are incorrect. These errors lead to severe burdens on voters.

These inaccuracies prevent eligible voters from voting or at a minimum abridge their rights by imposing barriers beyond "the usual burdens of voting." Those burdens include (but are not limited to) having to travel to another location to vote, having to first go to the county's central election office and then having to return to the polls to vote, or having to vote a provisional ballot—a ballot that will not be counted unless the voter provides proof, within three days of the election, of eligibility to have voted. The SOS has no legitimate state interest in having an inaccurate database. Thus, the inaccuracies in eNet caused by the SOS violate Georgians' fundamental right to vote under the First and Fourteenth Amendments.

C. <u>Absentee Ballot Cancellation</u>

Georgia permits voters who have requested absentee ballots to cancel their ballots and vote in person if the ballot has not yet been returned and accepted. Voters cancel their ballots for many reasons, including not having received their

ballots on time or out of a concern their ballots will not reach election officials by the deadline. Voters who try to cancel their absentee ballots face a variety of obstacles that should not exist and depend on where the voter lives. For example, some voters trying to cancel their absentee ballots have been turned away from the polls outright, some have been sent to the main county office, and some have been permitted to vote only provisionally.

These obstacles stem from inadequate SOS training of county election superintendents and poll workers and from the failure of the SOS and SEB to obtain statewide uniformity in county election practices. Defendants have no legitimate state interest in improper or varied practices for cancelling absentee ballots. These improper and geography-specific absentee ballot cancellation practices violate Georgians' fundamental right to vote under the First and Fourteenth Amendments and violate the Equal Protection Clause of the Fourteenth Amendment.

D. <u>Remedies</u>

Plaintiffs seek declaratory and injunctive relief sufficient to remedy these unlawful practices. Plaintiffs also seek their reasonable attorney's fees and costs.

## II. Relevant Authority

Relevant regulations, statutes, and ordinances creating specific legal duties on the Defendants include:

1. Amendments I, XIV, and XV to the United States Constitution
2. 42 U.S.C. § 1983
3. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301
4. Sections 301-303 of the Help America Vote Act of 2002, 52 U.S.C. §§ 21081-83
5. O.C.G.A. §§ 21-2-31, 21-2-32, 21-2-33, 21-2-33.1, 21-2-33.2, 21-2-50, 21-2-50.2, 21-2-99, 21-2-101, 21-2-210, 21-2-216, 21-2-220, 21-2-220.1, 21-2-231, 21-2-388
6. Ga. Comp. R. & Regs. 183-1-6-.03, 183-1-14-.09

Cases articulating Defendants' relevant legal duties include:

1. *Burdick v. Takushi*, 504 U.S. 428 (1992)
2. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)
3. *Bush v. Gore*, 531 U.S. 98 (2000)
4. *Thornburg v. Gingles*. 478 U.S. 30 (1986)
5. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

11

6. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)

7. *Graham v. Richardson*, 403 U.S. 365 (1971)

8. *Schneider v. Rusk*, 377 U.S. 163 (1964)

9. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019)

10. *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011)

11. *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018)

12. *Ga. Coal. for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018)

The preceding citations are illustrative only; Plaintiffs incorporate by reference and may rely on other authorities identified in, for example, their prior briefing, their forthcoming motions in limine, and their Proposed Findings of Fact and Conclusions of Law.