# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, INC., *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia; *et al.*,<br><br>     Defendants. | Civil Action File<br><br>No. 1:18-cv-05391-SCJ |

## ATTACHMENT H-2
## DEFENDANTS' PRELIMINARY TRIAL BRIEF

Pursuant to LR 16.4 and for the Court's convenience, Defendants hereby submit this trial brief containing citations to legal authority on evidentiary questions and other legal issues that may arise at trial. Defendants reserve the right to amend and/or supplement this trial brief, and any other portion of the pretrial order, as necessary and in accordance with paragraph 14 of the Court's November 30, 2021 Order. Doc. No. [641].

## INTRODUCTION

In what appears now to be the beginning of a trend, Plaintiffs filed this action in 2018 after their preferred candidate for Governor (and candidate once more) Stacey Abrams lost to Governor Brian Kemp.  Since 2018,

Plaintiffs have raised tens of millions of dollars by imploring donors that their money is necessary to fight the "secretary of suppression," and "architect of disenfranchisement," while still defending the 2020 elections when their preferred candidates (and litigants in this lawsuit) won. This is no accident; Fair Fight first poll-tested the phrase "voter suppression" back in 2014 and found that this highly charged but ambiguous phrase was very motivational for its target audience. Others have benefited from this as well. Rev. Raphael Warnock, of Plaintiff Ebenezer Baptist Church, is now Senator Warnock, and former State Senator and Plaintiff Care in Action representative Nikema Williams is now Congresswoman Williams.

As an actual lawsuit, however, this action has been less successful for Plaintiffs. Where once Plaintiffs' claims covered virtually every aspect of elections conducted in Georgia, the Court's orders at summary judgment have rightly dispensed with most of Plaintiffs' claims. Plaintiffs' remaining claims address, at most, three issues involving Georgia elections. First, Plaintiffs allege that the Defendant Secretary provided insufficient training to county registrars and election superintendents regarding absentee ballot in-person cancellation procedures. Second, Plaintiffs allege that the Defendant Secretary has failed in his duty to sufficiently maintain an "accurate voter registration list." (The first and second issues are collectively referred to

herein as Plaintiffs' "Administrative Claims").  Lastly, Plaintiffs challenge the State's implementation of the verification procedures set forth in the Help America Vote Act ("HAVA"), whereby information provided by individuals registering to vote is cross-referenced with information on file with the Georgia Department of Driver Services ("DDS") or United States Social Security Administration ("SSA"), as required by 52 U.S.C. § 21083(a)(5) ("HAVA Match" a/k/a "Exact Match").  Consistent with the statutes and case law identified herein, and without the benefit of a deferential review of the evidence, Plaintiffs' remaining claims go the way of the rest of them: failure.

## DEFENDANTS' CITATIONS TO LEGAL AUTHORITY

### I.   Jurisdictional and Standing Issues.

A threshold issue to be examined at trial is Plaintiffs' lack of standing to bring the remaining claims.  As the Court is aware, standing must be established at each stage of the litigation.  The below legal authority establishes that Plaintiffs cannot do so here.

*a. Plaintiffs' claim regarding absentee ballot cancellation training is moot.*

At the outset, at least one of Plaintiffs' claims stands to be dismissed as moot prior to trial.  In its Summary Judgment Order, the Court found that a single training issue, regarding training of county officials on in-person

3

absentee ballot cancellation procedures, could conceivably be traced to the

Secretary of State.  Doc. No. [617] at 36.  The Court's decisions was due to the

fact that, although poll worker training is exclusively handled at the county

level, the Secretary provides a manual used to train poll workers and that

manual did not possess updated information to account for the new

procedures set forth in HB 316 as of April 2020. Doc. No. [617] at 32-33.

The most recent manual, however, specifically addresses in-person

absentee ballot cancellation procedures as set forth in HB 316. (Georgia Poll

Worker Manual 2021 at 55-56; available at:

https://georgiapollworkers.sos.ga.gov/Shared%20Documents/Georgia%20Poll

%20Worker%20Manual%202021.pdf).[1]  Thus, at present, there is no evidence

to show that any voter's inability to cancel an absentee ballot in person is or

could be traceable to Defendants.  The issue is moot.

Mootness is a threshold jurisdictional issue that may be raised at any

point during proceedings.  *Cole v. Nat'l Collegiate Athletic Ass'n*, 120 F. Supp.

2d 1060, 1068 (N.D. Ga. 2000) ("The Constitution's case or controversy

requirement mandates that the case be viable at all stages of the litigation; it

---

[1] The 2021 Georgia Poll Worker Manual is also included as Exhibit 309 of
Defendants' Exhibit List and Exhibit 1315 of Plaintiffs' Exhibit List.

is not sufficient that the controversy was live only at its inception.")
(quotations omitted).  "A case is moot when events subsequent to the
commencement of a lawsuit create a situation in which the court can no
longer give the plaintiff meaningful relief."  *Jews for Jesus, Inc. v.
Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998).  And
here, because Plaintiffs are limited to prospective injunctive relief, *see
Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105–106 (1984),
the Court cannot order any relief beyond what the State has already done.
Accordingly, Plaintiffs' claims regarding training of county officials regarding
in-person absentee ballot cancellation must be dismissed for lack of
jurisdiction. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) ("A
case that becomes moot at any point during the proceedings is "no longer a
'Case' or 'Controversy' for purposes of Article III," and is outside the
jurisdiction of the federal courts.") (quoting *Already, LLC v. Nike, Inc.*, 568
U.S. 85, 91 (2013)).

> b. *Plaintiffs lack standing because they have not suffered any injury.*

Federal courts may decide only active "cases" and "controversies." U.S.
Const. art. III, § 2. To establish standing to present a case or controversy, a
litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the
challenged action of the defendant and (3) is likely to be redressed by a

favorable decision." *Jacobson v. Fla Sec'y*, <u>974 F.3d 1236, 1245</u> (11th Cir. 2020) citing *Lujan v. Defs. of Wildlife*, <u>504 U.S. 555, 560-61</u>, <u>112 S. Ct. 2130, 119 L. Ed. 2d 351</u> (1992); *U.S. v. Amodeo*, <u>916 F.3d 967, 971</u> (11th Cir. 2019). "'[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Jacobson*, <u>974 F.3d at 1245</u> (quoting *Lujan*, <u>504 U.S. at 561</u>). The plaintiffs in this litigation cannot establish any of those elements with admissible evidence.

Organizational plaintiffs making such claims must prove that counteracting the defendant's allegedly illegal acts required diversion of either financial resources or its personnel's time and energy. *Arcia v. Sec'y of Fla.*, <u>772 F.3d 1335, 1341</u> (11th Cir. 2014); *Common Cause of Ga. v. Billups*, <u>554 F.3d 1340, 1350</u> (11th Cir. 2009).  And, the diversion of resources must be linked to the specific harms alleged. *See*, *e.g.*, *Fla. State Conf. of N.A.A.C.P. v. Browning*, <u>522 F.3d 1153, 1165</u> (11th Cir. 2008) ("organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract **those illegal acts**.") (emphasis added).  At this stage of the case, Plaintiffs must sustain their burden of proof with trial-worthy evidence, *Lujan*, <u>504 U.S. at 561</u>, which must show an injury—in this case diversion of resources—as of the time that the plaintiffs filed their complaint. *A&M*

*Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1212 (11th Cir. 2019); *Arcia*, 772 F.3d at 1340; *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003).

Further, each plaintiff must be more than just a "concerned bystander" who is interested in a problem—the plaintiff must show that the injury is distinct to that plaintiff. *Gardner v. Mutz*, 962 F.3d 1329, 1343 (11th Cir. 2020) (no injury when only generalized interest in preserving history); *see also Arcia*, 772 F.3d at 1342 ("[A]bstract social interest[s]" cannot establish a concrete injury in fact); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) ("abstract concern . . . does not impart standing."). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified [an] organization is in evaluating the problem, is not sufficient by itself." *Gardner*, 962 F.3d at 1341 (11th Cir. 2020) (quotations omitted), quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). And standing must exist "for each claim and . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017). Other circuit courts and another district court within this circuit have recognized the particularity requirement as mandating that an organization demonstrate that "the asserted illegal acts are in conflict with the organization's mission." *People for the Ethical Treatment of Animals,*

*Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1337-38 (S.D. Fla. 2016)

(citing *Arcia*, 772 F.3d at 1342) (finding standing where PETA protests

against captivity of a whale and efforts to secure its release "impaired its

mission of protecting animals from abuse through legislative and educational

efforts"); *see also Nat'l Treasury Emps. Union v. U.S.*, 101 F.3d 1423, 1430

(D.C. Cir. 1996) (if the conduct "does not directly conflict with the

organization's mission," the claimed injury is likely shared by many citizens

and thus insufficient).

Finally, while a conflict with the mission of the organization is

necessary to confer standing, it is not sufficient. *Id.* at 1429 ("Individual

persons cannot obtain judicial review of otherwise non-justiciable claims

simply by incorporating, drafting a mission statement, and then suing on

behalf of the newly formed and extremely interested organization."").

Litigation expenses cannot be used to impart standing on an organization. *Id.*

at 1434. Plaintiffs cannot claim injury simply by diverting resources to new

initiatives. They must identify what activities they must "divert resources

away *from* in order to spend additional resources" combatting the specific

policy or law at issue. *Jacobson*, 974 F.3d at 1250 (emphasis in original).

Furthermore, they must demonstrate a concrete injury such as perceptible

impairment of organizational activities or daily operations, *Food & Water*

*Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended," *Cigar Ass'n of Am. v. U.S.*, 323 F.R.D. 54, 63 (D.C. Dist. 2017). *Accord*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (no evidence that plaintiff was forced to divert resources, "let alone that such diversion impairs the Party."); *Ga. Latino Alliance for Human Rights v. Deal*, 691 F.3d 1250, 1260 (11th Cir. 2012) (challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").

c. <u>*Plaintiffs lack standing to challenge practices that are not traceable to, or redressable by, Defendants.*</u>

As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 quoting *Lujan*, 504 U.S. at 560. Further, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotations omitted).

"[F]ederal courts have no authority to erase a duly enacted law from the statute books." *Jacobson*, 974 F. 3d at 1255, quoting Jonathan F.

Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018). And even a "favorable declaratory judgment . . . cannot make [] an unconstitutional statute disappear." *Steffel v. Thompson*, 415 U.S. 452, 469 (1974). Thus, while this Court may "enjoin executive officials from taking steps to enforce a statute," *Mitchell*, *supra* at 936, it may "exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit," *Jacobson*, 974 F. 3d at 1255.[2] This is because "a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may 'lawfully enjoin the world at large,'" *Whole Woman's Health v. Jackson*, No. 21-463, 2021 U.S. LEXIS 6144, at *23 (Dec. 10, 2021), and especially not "absent nonparties," *Jacobson*, 974 F. 3d at 1254.

Plaintiffs' failure to sue the entities that can remedy their alleged harms, namely county boards of elections, could lead to "arbitrary and disparate treatment to voters in its different counties." *Bush v. Gore*, 531 U.S.

---

[2] Unlike Georgia law, the Florida law considered in *Jacobson* empowered its Secretary of State to redress the alleged harm required the Florida Secretary to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws" and to "[p]rovide written direction and opinions to the supervisors of elections," Fla. Stat. § 97.012, and the Eleventh Circuit found even that insufficient to establish traceability or redressability.

98, 107, 121 S. Ct. 525 (2000). Some counties would defer to Defendants'

directions, while others would simply continue to follow the law as it exists.[3]

*Jacobson*, 974 F. 3d at 1255; *see also Friedman v. Snipes*, 345 F. Supp. 2d

1356, 1381 (S.D. Fla. 2004).

A federal court cannot apply declaratory relief or an injunction to those

"who are not parties to this action." *Jacobson*, 974 F. 3d at 1254. And even if

this Court attempted to extend its ruling to counties not presently before it,

they are in no way "obliged . . . in any binding sense . . . to honor an

incidental legal determination [this] suit produce[s]." *Lewis*, 944 F. 3d at

1302 (internal quotation marks omitted).

As to Plaintiffs' list-accuracy claim, the Court correctly noted that, "in

practice, updates to the voter registration rolls are made at the county (not

state) level." Doc No. [612] at 43.  Indeed, this is set forth by statute:

> "It shall be the duty of the county board of registrars to determine
> the eligibility of each person applying to register to vote in such
> county. […] Upon finding an elector eligible to vote in the county,
> the county board of registrars shall have the duty of determining
> and placing the elector in the proper congressional district; state

---

[3] An earlier case that predates *Jacobson* and the en banc decision in *Lewis*, *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011), was decided only under a proper-party analysis and did not consider standing, making it a "drive-by jurisdictional ruling[]" that either has no precedential effect or is limited to the proper-party context. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91, 118 S. Ct. 1003, 1011 (1998).

> Senate district; state House district; county commission district, if
> any; county or independent board of education district, if any; and
> municipal governing authority district, if any; such other voting
> districts, if any; and precinct."

O.C.G.A. § 21-2-226(a)-(b); *see also* O.C.G.A. § 21-2-215 (a) (county registrars
to be designated by chief registrar "for the purpose of taking and processing
applications for registration and for the purpose of registering electors").

Due to the Secretary's statutory obligation to "maintain" the list of
registered voters pursuant to HAVA, however, Plaintiffs' list accuracy claims
were allowed to go forward on their "asserted injuries **for the Secretary's
challenged conduct**." Doc. No. [612] at 43 (emphasis added).  In other
words, Plaintiffs' list accuracy claim was allowed to go forward to the extent
it seeks redress from the *Secretary's* conduct; the Court did not, and should
not, hold that the Secretary is responsible for actions that are taken by, and
are the statutory duty of, *county* officials.

This is what federal law requires. "Redressability requires that the
court be able to afford relief through the exercise of its power, not through the
persuasive or even awe-inspiring effect of the opinion explaining the exercise
of its power." *Id.* at 1305, quoting *Franklin v. Massachusetts*, 505 U.S. 788,
825, 112 S. Ct. 2767 (1992) (Scalia, J. concurring in part and concurring in
the judgment) (emphasis in original). "Any persuasive effect a judicial order

might have upon the [non-party counties] . . . cannot suffice to establish redressability." *Jacobson*, <u>974 F. 3d at 1254</u>. Moreover, if a plaintiff sues the wrong defendant, an order enjoining a non-party "cannot suddenly make the plaintiff's injury redressable." *Id.* at 1255. The "failure to join the [county officials] is an independent reason that [Plaintiffs] lack standing." *Id.* at 1253.

> d. <u>*Plaintiffs lack standing because their claims, at least in part, constitute generalized grievances regarding election administration that cannot serve as bases for constitutional claims.*</u>

As to Plaintiffs' Administrative Claims, this Court lacks jurisdiction as these claims amount to general grievances regarding election administration, which courts have consistently held do not create constitutional claims. "A particularized injury is one that 'affect[s] the plaintiff in a personal and individual way.'" *Wood v. Raffensperger*, <u>981 F.3d 1307, 1314</u> (11th Cir. 2020), cert. denied, <u>141 S. Ct. 1379</u> (2021) (quoting *Spokeo, Inc. v. Robins*, <u>578 U.S. 330, 339</u> (2016), as revised (May 24, 2016). In contrast, "[a]n injury to the right to require that the government be administered according to the law is a generalized grievance. [] And the Supreme Court has made clear that a generalized grievance, 'no matter how sincere,' cannot support standing. *Wood* at 1314. (quoting *Hollingsworth v. Perry*, <u>570 U.S. 693, 706</u> (2013)

(other quotation and citation omitted).  Put differently, challenges to government <u>acts</u> are viewed differently than lawsuits about government <u>inactivity</u>.

Plaintiffs' "diversion of resources" theory of injury regarding the Administrative Claims turns this standing jurisprudence on its head. Effectively, under Plaintiffs' theory, any organizational plaintiff has standing to bring a lawsuit to address an underlying alleged "burden" on voting in the form of a generalized grievance regarding election administration, that an actual voter could not themself bring for lack of a particularized injury.  This is a bizarre and distortion of standing and Article III jurisdiction that elevates corporate rights over those of actual voters.

As the Eleventh Circuit explained, "[a]lthough federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election." *Curry v. Baker*, <u>802 F.2d 1302, 1314</u> (11th Cir. 1986).  How and how much to train county election officers (for absentee ballot cancellation procedures or anything else) and the Secretary's efforts in maintaining an accurate voter registration list are distinctly "administrative details" of elections.  *See also Hubbard v. Ammerman*, <u>465 F.2d 1169, 1176</u> (5th Cir. 1972) (a federal court had no

jurisdiction in an election contest, and cautioned about the role of federal courts in election cases).

## II.   Plaintiffs' Claims on the Merits.

Plaintiffs' claims further fail on the merits because they lack evidence to substantiate their allegations. Defendants submit and describe the following citations to legal authority in support of their defenses on the merits:

### a.   *The Anderson-Burdick analysis.*

"Under *Anderson* and *Burdick*, courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal quotation marks omitted).  If the law at issue imposes a "severe burden" on the right to vote, then it may survive only if it is "narrowly tailored" and only if the State advances a "compelling interest." *Id.* But if the law imposes only "reasonable, nondiscriminatory restrictions," then "a State's important regulatory interests will usually be enough" to justify it. *Id.* (internal quotation marks omitted).

"As the Supreme Court explained in *Anderson* and then in *Burdick*, election laws 'invariably impose some burden upon individual voters.'" *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280–81 (11th Cir. 2020) (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059). "That means strict scrutiny is not required for every voting regulation; to say otherwise would "tie the hands of States" as they seek "order, rather than chaos" in their elections." *Id.* (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059). "In other words, 'lesser burdens . . . trigger less exacting review.'" Doc. No. [188] at 22 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

   b. *Defendants' Training and List Maintenance Efforts.*

   The Secretary of State is statutorily obligated to train county election superintendents and registrars. O.C.G.A. § 21-2-50(a)(11).  This Court recognized that the Secretary of State does not train poll workers.  Doc. No. [617] at 22-23. Georgia law provides that only election superintendents train poll workers, and that the superintendent provide that training.  *Id.*; *see also* O.C.G.A. § 21-2-99.  The Secretary is also required to "maintain the official list of registered voters for this state and the list of inactive voters." O.C.G.A. § 21-2-50.

   The *Anderson-Burdick* test is used to evaluate laws, regulations, and/or rules enacted by the State and in which they possess some interest in

maintaining.  *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020) (*Anderson-Burdick* provides "the legal standards that apply to laws that burden the right to vote."); *see also id.* (collecting cases in which "laws" were evaluated under *Anderson-Burdick* by the Eleventh Circuit and Supreme Court).  It is not suited to evaluate complaints of mere election administration or alleged failures to comply with *state* law.  Plaintiffs' claims regarding training of county officials on in-person absentee-ballot cancellation procedures and maintenance for voter-list accuracy demonstrate this problem.  These claims do not challenge a specific law, regulation, or rule enforced by the Secretary of State; rather, they question whether Defendants' efforts were "sufficient" or "adequate" because some voters allegedly still experienced problems. *See*, *e.g.*, Doc. No. [582] at 85 ("Defendants violated Section 2 of the Voting Rights Act [by] . . . failing to train **adequately** county elections officials on laws governing elections . . . .") (emphasis added).

Precedent cautions that courts must "recognize a distinction between state laws and patterns of state action that systematically deny equality in

voting, and episodic events" of human error. *Gamza v. Aguirre*, <u>619 F.2d 449, 453</u> (5th Cir. 1980).[4]  As the *Gamza* Court explained:

> If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss. Section 1983 did not create a delictual action for the torts of state officials, and it did not authorize federal courts to be state election monitors.
>
> [...]
>
> In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters or motivated by a desire to subvert the right of the voters to choose their school board representative, we cannot conclude that the error constituted a denial of equal protection of the laws.

*Gamza*, <u>619 F.2d at 453</u>–54 (citations omitted).  "Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a constitutional violation."  *Curry v. Baker*, <u>802 F.2d 1302, 1314</u> (11th Cir. 1986) (quotation omitted) (alteration in original accepted).

Moreover, federal courts have examined much of the law in this area after the 2020 election disputes.  They have almost uniformly weighed

---

[4] In *Bonner v. City of Prichard*, <u>661 F.2d 1206, 1209</u> (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

against intervening in cases like this one.  "[I]t is well-established that even violations of state election laws by state officials . . . do not give rise to federal constitutional claims except in unusual circumstances."  *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 391 (W.D. Pa. 2020).  If such were the case, "it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works." *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 355 (3d Cir. 2020), cert. granted, judgment vacated sub nom. *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (quotations omitted).

Courts across the country have held that "[i]t is not every election irregularity . . . which will give rise to a constitutional claim and an action under section 1983. Mere violation of a state statute by an election official, for example, will not." *Hennings v. Grafton*, 523 F.2d 861, 865 (7th Cir. 1975). The Seventh Circuit, for example, recently reaffirmed its decision on this point: "[A]llegations [of administrative misconduct] may state a claim for violation of the [state] Election Code. But that is a state law claim for a violation of state law, not a federal claim for a violation of constitutional rights. A violation of state law does not state a claim under § 1983, and, more

19

specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) (quotations omitted).  In one of the seminal cases confirming that administrative problems in elections did not establish a constitutional claim, the *Hennings* Court stated as follows:

> "[T]he record here shows at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent; it does not show conduct which is discriminatory by reason of its effect or inherent nature. Voting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation, assuming these events to have occurred, fall far short of constitutional infractions, absent aggravating circumstances of fraud or other wilful conduct found not to exist by the District Court and not shown by any evidence offered.

> […]

> Except for the overall supervision of the county clerk, or his counterpart, and appointed subordinates, the work of conducting elections in our society is typically carried on by volunteers and recruits for whom it is at most an avocation and whose experience and intelligence vary widely. Given these conditions, **errors and irregularities, including the kind of conduct proved here, are inevitable, and no constitutional guarantee exists to remedy them**. Rather, state election laws must be relied upon to provide the proper remedy."

*Hennings*, 523 F.2d at 865 (emphasis added); *see also Saxon v. Fielding*, 614 F.2d 78, 80 (5th Cir. 1980) ("The decisions from other circuits have clearly indicated an unwillingness to become embroiled in suits attacking state elections on the grounds of administrative or technical irregularities. [...] We think that this unwillingness to intervene in the absence of aggravating factors . . . is appropriate.") (quotation and citations omitted) (collecting cases).

Even if *Anderson-Burdick* were applied, Plaintiffs have also failed to show an underlying unconstitutional burden on voting of any actionable "magnitude" for purposes of an *Anderson-Burdick* analysis. Doc No. [617] at 25; *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  Indeed, as the Supreme Court has described failure to train claims as the "most tenuous" of civil rights causes of action.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).[5]

---

[5] In a typical failure to train claim, a plaintiff would have to show: (1) a constitutional injury, (2) caused by the Secretary's acts, (3) which constitute deliberate indifference to the need to train superintendents or poll workers. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (citation omitted). *Respondeat superior* theory does not apply.  *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Liability attaches "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice," id., and deliberate indifference "is a stringent standard of fault, requiring proof that a [governmental] actor disregarded a known or obvious consequence of his action.'" *Connick*, 563 U.S. at 61 (citing *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)). To be known or obvious, policymakers must be on notice of "obvious, flagrant, rampant" and ongoing constitutional violations that existing training does not

As the Court has already noted, the Secretary's obligations as to training and voter list maintenance are set by statute and the law does not impose constitutional liability for governments because they do not *exceed* their statutory obligations.  Doc. No. [617] at 22; *see also cf. Gwinnett Cty.*

---

represent.  *Brown*, 906 F.2d at 671.  Further, to be constitutionally deficient, the challenged training must knowingly diverge from a known "accepted standard." *See Owaki v. City of Miami*, 491 F. Supp.2d 1140, 1162 (S.D. Fla. 2007); *see also Eberhardinger v. City of York*, 341 F. Supp. 3d 420, 430 (M.D. Pa. 2018), *aff'd* 782 F. App'x 180 (3d Cir. 2019).

The Eleventh Circuit has not applied failure to train and failure to supervise theories in the context of elections, other courts have applied *Harris*'s and *Connick*'s test to such claims.  *See, e.g., Minnesota Majority v. Mansky*, 708 F.3d 1051, 1060 (8th Cir. 2013); *Acosta v. Democratic City Comm.*, CV 17-1462, 2018 WL 4178522, at *11 (E.D. Pa. Aug. 30, 2018), *aff'd* 767 Fed. Appx. 392 (3d Cir. 2019); *Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 844-46 (S.D. Ohio 2012).  Failure to supervise and failure to train theories are similar, and courts have blended the two causes of action.  *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1555 (11th Cir. 1989).  The Eleventh Circuit described a failure to supervise claim as one that alleges that the (1) "supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation;" and (2) the deprivations are "widespread … obvious, flagrant, rampant and of continued duration." *Brown*, 906 F.2d at 671.  A plaintiff would have to show a conscious choice by a defendant to continue a "'policy of inaction' in light of [such] notice." *Connick*, 563 U.S. at 51 (citing *Harris*, 489 U.S. at 395).  Liability does not attach because a government entity could do "better or more." *Harris*, 489 U.S. at 391; *see also Connick*, 563 U.S. at 67.

Defendants have found no other analytical framework that has been applied in these circumstances.  This Court, however, applied the *Anderson-Burdick* analysis alone. Doc. No. [617] at 21-22.

*NAACP v. Gwinnett Cty. Bd. of Registration & Elections,* 446 F. Supp. 3d 1111, 1123 (N.D. Ga. 2020).  Moreover, the Eleventh Amendment provides a jurisdictional defense that precludes states from being sued in federal court on the basis of state law. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 117.[6]

### c. *HAVA Match Generally.*

Georgia's voter-verification law checks a voters' identifying information as entered by a county registrar from a paper voter-registration application with information on file with the Georgia Department of Driver Services ("DDS") or United States Social Security Administration ("SSA"), as required by 52 U.S.C. § 21083(a)(5).  *See* O.C.G.A. § 21-2-220.1(b).  Federal and state law require that applicants who have a Georgia driver's license or a state ID

---

[6] As addressed above, the Secretary's obligations regarding training of county election officials and maintenance of the state's list of registered voters are set by statute.  *See, e.g.*, O.C.G.A. §§ 21-2-50(a)(11), (14).  Plaintiffs' claims on these issues seek nothing more than to enforce these statutes; a quintessential prohibited "obey-the-law" injunction.  *See SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012).  While Defendants raised this issue at summary judgment, the Court ultimately deferred, finding that "it is premature (at the current state of the case) to review the precise nature of any type of injunction."  Doc. No. [617] at 92-93.  The Court did acknowledge, however, that questions remained as to its "remedial powers in constitutional litigation."  *Id.* at 93-94, n.55 (citing *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1331 (11th Cir. 2019) (J. Tjoflat, dissenting)).  Now, as this case heads to trial without Plaintiffs having offered anymore specificity as to the relief they seek or how such differs from what is mandated by state law, Defendants must re-raise this open question for the Court's consideration.

card include the number of that respective card on their application when they register to vote. 52 U.S.C. § 21083(a)(5); O.C.G.A. § 21-2-220.1. When an individual registers to vote using a paper registration form, federal law requires the Secretary's office to provide their information to DDS for verification. 52 U.S.C. § 21083(a)(5)(B)(i). If an individual has no record in the DDS database because they never had a Georgia driver's license, their information must be sent to the SSA for verification. *Id*. HAVA also requires first-time registrants by mail to show identification prior to voting for the first time, including utility bills, bank statements, or other government documents that show their name and address. 52 U.S.C. § 21083(b)(2)(A).

Georgians can register to vote through a variety of means and are still marked as "active" even if they fail the matching process following H.B. 316. O.C.G.A. § 21-2-220.1(b) ("In the event that the [pertinent identifying information] provided by the person registering to vote [with a paper application] does not match information about the applicant on file at [DDS or SSA], the applicant shall nevertheless be registered to vote . . . ."). If there is no match, the voter is simply registered as "Missing ID Required" or "MIDR." After HB 316, voters in MIDR status may vote after showing proper identification, just like any other voter. O.C.G.A. §§ 21-2-220.1(c); 21-2-216(g). That "proper" identification for an MIDR voter includes the same list

24

as HAVA requires for first-time registrants, including utility bills, bank statements, or other government documents that show their name and address. <u>O.C.G.A. § 21-2-417(c)</u>.

Separately, an applicant may be placed in "pending" status if information on file indicates that he or she is not a United States citizen. *See* <u>O.C.G.A. § 21-2-216(g)</u>. An applicant is placed in "pending" status if the applicant previously provided documents to DDS affirmatively indicating that he or she is not a United States citizen and has not updated their DDS record since that time. *See* <u>O.C.G.A. § 21-2-216(g)</u>. Similar to voters on Active-MIDR status, an applicant placed in "pending" status may still cast a ballot if he or she provides documentation on or before election day establishing his or her citizenship, which includes a REAL ID, non-limited term Georgia driver's license, among other options. <u>O.C.G.A. § 21-2-216(g)(1)</u>; <u>O.C.G.A. § 21-2-216(g)(2)</u>; SEB Rule 183-1-6-.06 (listing additional acceptable documentation).

> d. <u>*Intentional Discrimination under the Fifteenth Amendment and Equal Protection Clause.*</u>

Plaintiffs' claims regarding HAVA Match under the Fifteenth Amendment and Equal Protection Clause (Counts II and III) contain allegations of intentional discrimination by Defendants. While Plaintiffs

have no evidence of such intentional discrimination, Defendants nevertheless submit and describe the following legal authority that may be pertinent to the Court's consideration of this issue.

The Fifteenth Amendment prevents states from enacting election laws that discriminate on the basis of color. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 61 (1980). Plaintiffs' challenge to facially neutral laws and policies requires evidence of (1) a disparate racial impact caused by State policies; and (2) a "racially discriminatory purpose chargeable to the state." *Lucas v. Townsend*, 967 F.2d 549, 551 (11th Cir. 1992). As to the Equal Protection Clause, Plaintiffs must show more than a disproportionate effect on voters of color; they must also show evidence of discriminatory intent. *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *see also Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1319, n.9 (11th Cir. 2019) (distinguishing traditional equal protection claims which require discriminatory animus from *Anderson-Burdick* claims). Intent can be shown if the policy or action is "unexplainable on grounds other than race." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "The Supreme Court cautioned that it would be rare to find a case involving 'a clear pattern, unexplainable on grounds other than race" and that, '[a]bsent a pattern as stark as that, ... [discriminatory] impact alone is not determinative, and the Court must look

26

to other evidence.'" *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021) (quoting *Vill. of Arlington Heights*, 429 U.S. at 266).

Plaintiffs have not shown the requisite "*present* intent to discriminate[,] which implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1349 (11th Cir. 2005) (emphasis in original) (citations omitted). Under such circumstances, the Eleventh Circuit considers the following factors on intent and not just disparate impact: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives. *Greater Birmingham Ministries*, 992 F.3d at 1322.

Campaign speech is not evidence of intent as to government action; reliance on such would raise serious First Amendment concerns and require engaging in disfavored "judicial psychoanalysis." *Washington v. Trump*, 858

F.3d 1168, 1173-74 (9th Cir. 2017) (Kozinski dissenting) (citation omitted);

*see also Trump v. Hawaii*, 138 S.Ct. 2392, 2418-20 (2018); compare Doc. No.

[617] at 73-74.  Moreover, where the statements at issue "were not made

about the law at issue in this case [they] do not evidence discriminatory

intent behind it."  *Greater Birmingham Ministries*, 992 F.3d at 1323.

      *e.*  *The Voting Rights Act of 1965.*

      Plaintiffs' sole cause of action under the Voting Rights Act of 1965 is

their vote denial claim based on the HAVA Match process.  Doc. No. [636] at

4 n.2.  "Unlike discrimination claims brought pursuant to the Fourteenth and

Fifteenth Amendments, which require proof of both discriminatory intent and

actual discriminatory effect, the language of Section 2(a) of the VRA requires

only proof of discriminatory "results," not of discriminatory intent."  *Greater

Birmingham Ministries*, 992 F.3d at 1328–29.  Section 2 of the Voting Rights

Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting

qualification or prerequisite to voting or standard, practice, or procedure . . .

which results in a denial or abridgement of the right of any citizen of the

United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). "The

essence of a Section 2 claim is that a certain electoral law, practice, or

structure interacts with social and historical conditions to cause an

inequality in the opportunities enjoyed by black and white voters to elect

their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (emphasis added).

This Court has ruled that both the *Gingles* factors and *Brnovich* guideposts are to be considered regarding Plaintiffs' claim.  Doc. No. [636] at 21. In *Gingles*, the Supreme Court identified a "non-exhaustive list of factors" to consider in a "totality of the circumstances" analysis. 478 U.S. 30.  These factors include, *inter alia*, the "history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," the extent to which voting in the state is "racially polarized," and "the extent to which members of the minority group have been elected to public office in the jurisdiction," among others. *Gingles*, 478 U.S. at 37.

*Brnovich* did not dispense with the *Gingles* factors, but did caution that not all factors would be applicable in non-vote-dilution cases:

> [I]t is important to keep in mind that the *Gingles* or "Senate" factors grew out of and were designed for use in vote-dilution cases. Some of those factors are plainly inapplicable in a case involving a challenge to a facially neutral time, place, or manner voting rule. Factors three and four concern districting and election procedures like "majority vote requirements," "anti-single shot provisions," and a "candidate slating process." *See Gingles*, 478 U.S. at 37, 106 S.Ct. 2752 (internal quotation marks omitted). Factors two, six, and seven (which concern racially polarized voting, racially tinged campaign appeals, and the election of minority-group candidates), *ibid.*, have a bearing on whether a districting plan affects the

29

opportunity of minority voters to elect their candidates of choice. But in cases involving neutral time, place, and manner rules, the only relevance of these and the remaining factors is to show that minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five). *Id.*, at 36–37, <u>106 S.Ct. 2752</u>. We do not suggest that these factors should be disregarded. After all, § 2(b) requires consideration of "the totality of circumstances." But their relevance is much less direct.

*Brnovich v. Democratic Nat'l Comm.*, <u>141 S. Ct. 2321, 2340</u> (2021).

*Brnovich* made clear that "equal openness [to voting] remains the touchstone" of a Section 2 claim. *Id.* at 2325. But "Section 2 does not impose a 'freewheeling disparate-impact regime.'" *Veasey v. Abbott*, <u>13 F.4th 362, 378</u> (5th Cir. 2021) (Ho, J. concurring) (quoting *Brnovich*, <u>141 S. Ct. at 2341</u>). Instead, "Section 2(b) 'directs us to consider 'the totality of circumstances' ' that 'have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote'—and not 'the totality of just one circumstance,' namely, 'disparate impact.'" *Id.*

Under *Brnovich*, the "key requirement [of a Section 2 vote denial claim] is that the political process leading to the nomination and election (here, the process of voting) must be equally open to minority and non-minority groups alike." *Id.* at 2337. To that end, the *Brnovich* Court declined to "compile an exhaustive list," but did identify "several important circumstances" which should be considered. *Id.* <u>First</u>, courts must consider the "size of the burden

imposed by a challenged voting rule." *Id.* at 2338.  Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort." *Id.*  The concepts of openness and opportunity relate to "the absence of obstacles and burdens that **block or seriously hinder voting**." *Id.* (emphasis added).

Second, the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration." *Brnovich*, 141 S. Ct. at 2338.  The analysis must take into account the Court's "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Id.* at 2339.

Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Brnovich*, 141 S. Ct. at 2339.  This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may result in some predicable disparities … but the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Id.*  For this reason, a "meaningful comparison is essential." *Id.*

31

In *Brnovich*, that meaningful comparison focused on racial disparities in "absolute terms." 141 S. Ct. at 2344-45. It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." *Id.* Contrary to the dissent's analysis, the *Brnovich* majority did not highlight the difference between 0.5% (white voters) and 1% (voters of color). *Id.* Instead, the majority looked to the numbers in the aggregate and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[7] *Id.*

Importantly, the *Brnovich* majority disagreed with the dissenters on this weight of a finding of disparate impact: "The dissent … would rewrite the text of § 2 and make it turn almost entirely on just one circumstance—disparate impact. This is a radical project." *Id.* at 2342. Thus, disparate impact is a factor, but it is not dispositive.

---

[7] The Court also opined on how the "use of statistics [can be] highly misleading." *Brnovich*, 141 S. Ct. at 2345. For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." *Id.* (quoting *Frank v. Walker*, 768 F.3d 744, 752, n. 3 (7th Cir. 2014)) (internal quotation marks omitted).

Fourth, the *Brnovich* Court instructed federal courts to "consider the opportunities provided by a State's <u>entire</u> system of voting when assessing the burden imposed by a challenged provision." *Id.* at 2339 (emphasis added). In other words, "where a State provides multiple ways to vote," any burden imposed by one of those available methods "cannot be evaluated without also taking into account the other available means." *Id.* at 2339.

Fifth, "the strength of a state's interests served by a challenged voting rule" must also be considered. *Id.* Here, the *Brnovich* majority reaffirmed that the prevention of fraud is a "strong and entirely legitimate state interest." *Id.* at 2340. And, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Id.* at 2348.

The Supreme Court also addressed what does <u>not</u> constitute proper analysis under a Section 2 vote denial claim. For example, the "disparate impact model employed in Title VII and Fair Housing Act cases [is not] useful" when considering Section 2. *Id.* at 2340. Adopting such a standard would lead to impermissible federal micromanaging of State elections. *Id.* The Court also rejected the "cat's paw" theory of liability when looking to questions of intentional discrimination. *Id.* at 2349-50. That theory is typically used in employment contests where a plaintiff "seeks to hold the plaintiff's employer

33

liable for the 'animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Id.* at 2350 (quoting *Staub v. Proctor Hosp.*, <u>562 U.S. 411, 415</u> (2011)). Thus, in Section 2 cases, that one policymaker may have acted with improper intent does not mean others did; indeed "it is insulting to suggest that they are mere dupes or tools." *Id.*

### III.   Potential Evidentiary Issues.

Plaintiffs' documentary evidence includes numerous statements that constitute, or contain in part, hearsay, speculation, and/or otherwise incompetent statements offered as fact. Defendants expect to raise this issue should Plaintiffs attempt to present such evidence at trial without the proper foundation.

In short, inadmissible hearsay is an "out-of-court statement, presented for the purpose of establishing the truth of the statement's contents, that does not fall within an exception to the hearsay rule." *Macuba v. Deboer*, <u>193 F.3d 1316, 1327</u> n.11 (11th Cir. 1999). This includes a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." <u>F.R.E. 801(c)</u>. A witness's statements regarding another's actions or intent constitute inadmissible speculation if they are not based on

direct knowledge or otherwise lack the required foundation to draw such conclusions. *See* Fed. R. Evid. 602; *Riley v. Univ. of Alabama Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) ("A party's mere 'belief' and/or speculation is not based on personal knowledge . . . .").

The "public records" exception to the hearsay rule does not cover all statements in documents maintained by a public office; only those that set out (a) the office's activities; (b) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (c) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and the Defendant does not show that the source of information or other circumstances indicate a lack of trustworthiness. Fed. R. Evid. 803(8).

The "learned treatise" exception to the hearsay rule requires that the statement be "contained in a treatise, periodical, or pamphlet" and be (a) "called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and … (b) established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." Fed. R. Evid. 803(18).

Finally, the residual hearsay exception of Fed. R. Evid. 807 requires that:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; [and] (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."

Rule 807 also contains a notice requirement: "[t]he statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." *Id.* "Given the presumption of unreliability, and because it is not a firmly rooted hearsay exception, the residual exception is to be used only rarely, in truly exceptional circumstances." *Fed. Trade Comm'n v. U.S. Work All., Inc.*, No. 1:08-CV-2053-WSD, 2010 WL 11509130, at *2 (N.D. Ga. Jan. 28, 2010) (quotation omitted); *see also United States v. Jayyousi*, 657 F.3d 1085, 1113 (11th Cir. 2011) ("Congress intended the residual hearsay exception to be used only in exceptional circumstances.").

## CONCLUSION

In accordance with the legal authority cited herein, the Court should award Defendants a verdict in their favor as to all remaining counts in this case.

Respectfully submitted, this 15th day of December 2021.

> */s/ Josh Belinfante*
> Josh Belinfante
> Georgia Bar No. 047399
> jbelinfante@robbinsfirm.com
> Vincent Russo
> Georgia Bar No. 242628
> vrusso@robbinsfirm.com
> Carey Miller
> Georgia Bar No. 976240
> cmiller@robbinsfirm.com
> Brian Lake
> Georgia Bar No. 575966
> blake@robbinsfirm.com
> Alexander Denton
> Georgia Bar No. 660632
> adenton@robbinsfirm.com
> Melanie Johnson
> Georgia Bar No. 466756
> mjohnson@robbinsfirm.com
> **Robbins Alloy Belinfante Littlefield LLC**
> 500 14th Street NW
> Atlanta, GA 30318
> Telephone:  (678) 701-9381
> Facsimile:  (404) 856-3255
>
> Bryan P. Tyson
> Georgia Bar No. 515411
> btyson@taylorenglish.com

37

Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

**ATTACHMENT H-2 DEFENDANTS' PRELIMINARY TRIAL BRIEF**

was prepared double-spaced in 13-point Century Schoolbook font, approved

by the Court in Local Rule 5.1(C).

*/s/ Josh Belinfante*
Josh Belinfante