IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT ACTION, INC., *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official Capacity as Secretary of State of Georgia; *et al.*,<br><br>        Defendants. | Civil Action File<br><br>No. 1:18-cv-05391-SCJ |

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' EVIDENTIARY BRIEF ON RELEVEANCE <u>REGARDING THEIR "LIST ACCURACY" CLAIM</u>

Defendants hereby submit this Response to Plaintiffs' Brief on Relevance Regarding Their "List Accuracy" Claim (Doc. No. [795]), showing the Court as follows:

### <u>Introduction</u>

Plaintiffs told the Court almost three years ago to the day that they were "confident that as this case progresses, we will be able to crystallize what [the] issues are." (Apr. 29, 2019 Hearing Tr. at 76:5-19). Now, and only after the **trial** testimony of John Hallman (a former Secretary of State employee identified in numerous produced documents and 30(b)(6) testimony), have Plaintiffs begun to articulate their List Accuracy claim. But the latest theory goes well beyond

anything to date and does not save Plaintiffs' attempt to introduce inadmissible evidence into the record. Instead, it is improper and warrants sustaining Defendants' timely objections.

Despite the present dispute, the Parties fully agree on at least one point: "it is important to clarify the nature of Plaintiffs' database mismanagement ["List Accuracy"] claim." Doc. [795] at 2.[1] Doing so will likely resolve most, if not all, of Defendants' relevance objections to the admission of Plaintiffs' exhibits and related questioning as to this claim. Put simply, Plaintiffs' proffered exhibits and questions are not relevant to their current and new List Accuracy claim because the claim as now articulated does not, and cannot, encompass the breadth they now suggest. Plaintiffs are limited, by both the law and the rulings already made in this case, to challenging, if anything, Defendants' **direct** actions in maintaining the voter registration database. Anything else is simply not a constitutional claim as a matter of law.

<u>Argument and Citation to Authority</u>

Since the beginning of this case, Plaintiffs have resisted identifying what, precisely, they were challenging with their List Accuracy claim. At least the

---

[1] References to page numbers herein are to those assigned by the CM/ECF system unless otherwise noted.

Court's summary judgment orders and entry of the consolidated pretrial order should have resolved that Plaintiffs' list maintenance, list security, training claims (apart from in-person absentee ballot cancellation procedures), and claims brought directly under the Help America Vote Act ("HAVA") were dismissed and not part of the trial. Doc. Nos. [612] at 59-62, 72; [617] at 46-56.

Thus, all that remained on the first day of trial was a narrow challenge to whatever actions the Secretary of State takes to maintain the voter registration database **directly**.[2] Which is precisely what the Court's summary judgment order and the consolidated pretrial order made clear. See Doc. No. [612] at 42-44 (Georgia statutes "provide a **direct link** to the Secretary" and claim was "**directly traceable to and redressable by** Defendants" based on "asserted injuries for **the Secretary's challenged conduct**.") (emphasis added); Doc. No. [753] at 8 (claim asks "[w]hether the **Defendants' mismanagement** of the voter database violates the fundamental right to vote guaranteed by the First and Fourteen Amendments?") (emphasis added).

---

[2] The Court did not address Plaintiffs' List Accuracy claim on the merits at summary judgment, finding that Defendants had not moved for summary judgment on this claim. Doc. No. [617] at 44. As explained herein, Plaintiffs are now attempting to create and exploit a perceived ambiguity in the ruling to revive and/or create new claims under its name.

Indeed, this Court's evidentiary rulings during the testimony of Ms. Liza Conrad demonstrated the veracity of this distinction.  There, Plaintiffs attempted to reintroduce the list maintenance (a/k/a the "purge") claims through the List Accuracy claim by contending the list was not accurate because of allegedly improper list maintenance.  In response, the Court clarified that it understood the List Accuracy claim to be about "people removed [from the voter registration database] for reasons other than the 'purge.'"[3] Defendants concur with this understanding.

The Court witnessed the same attempt to resurrect a general training claim during the cross-examination of Mr. Hallman last week.  There, Plaintiffs contended—for the first time—that the State's efforts *to train* on database entries were distinct from training causes of action and part of database management.  Perhaps next, Plaintiffs will attempt to bring back polling location changes based on alleged data entry errors impacting the size of a precinct.

These are just a few examples of how Plaintiffs seek to reinvent the List Accuracy claim. Based on Plaintiffs' Brief, Plaintiffs' List Accuracy claim is no

---

[3] At the time of this filing, Defendants have not received a transcript of the April 18, 2022 morning trial proceedings.  The quotation provided here is based on the best recollection of Defendants' counsel.

longer a single claim, but *at least*[4] six separate challenges to the internal operating

procedures of Georgia's elections (Plaintiffs' "Sub-Claims"):

- Choosing to delegate to the counties the ultimate decision as to whether a voter's registration is cancelled without providing meaningful rules or even guidance to protect voters;

- Choosing to set overinclusive matching criteria;

- Choosing to tee up this overinclusive group of registrations for cancellation, which is too large for at least some counties to carefully evaluate;

- Choosing not to add alerts in the database alerting users of criteria that do not match when comparing records;

- Choosing not to train county users on any information that must be taken into account when those users make cancellation decisions; and

- Choosing not to assist database users when they seek help deciding whether to disenfranchise registrants—including eligible voters.

Doc. No. [795] at 2-3.[5]

This strained interpretation of Plaintiffs' List Accuracy claim is both

practically and legally incoherent. These Sub-Claims, independently and

---

[4] Plaintiffs include the caveat in their brief that their List Accuracy challenge includes each of these claims, "but [is] not limited to" them. Doc. No. [795] at 2. That Plaintiffs apparently envision adding new claims under the umbrella of their "List Accuracy" claim as the trial proceeds just shows how unwieldly and absurd their position is.

[5] As stated above, the questioning of Ms. Conrad by Plaintiffs' counsel on April 18, 2022 further confused this issue as such seemed to imply that the List Accuracy claim was also an extension of, or related to, Plaintiffs' dismissed list maintenance claim.

collectively, are fundamentally flawed as a matter of law. Put simply, Plaintiffs'

present formulation of their "List Accuracy" claim cannot be correct because

such is not a viable claim under the First and Fourteenth Amendments to begin

with. Accordingly, it cannot provide a basis to introduce the evidence that the

Plaintiffs have raised to the Court.[6]

I.   *Plaintiffs' List Accuracy claim, as <u>now</u> defined by Plaintiffs, challenges the administrative details of Georgia's elections rather than laws or rules suitable for <u>Anderson</u>-<u>Burdick</u> analysis.*

It is now apparent that the Plaintiffs are seeking to transform their List

Accuracy claim into something it was not and has never been. Plaintiffs' theory—

as shown through the various and unlimited Sub-Claims—is not part of this

lawsuit and could not be in any case. First, none of the Sub-Claims—particularly

those addressing **non**-action by the Secretary—constitute laws or rules to which

an <u>Anderson</u>-<u>Burdick</u> analysis could be applied. As the Eleventh Circuit has

explained, "[a]lthough federal courts closely scrutinize state laws whose very

design infringes on the rights of voters, federal courts will not intervene to . . .

supervise the **administrative details** of a local election." <u>Curry v. Baker</u>, 802 F.2d

---

[6] As detailed in the Defendants' other brief on hearsay, filed contemporaneously herewith, this briefing is limited to the issues before the Court and not Plaintiffs' apparent attempt to have this Court admit several exhibits before they are even presented to a witness.

1302, 1314 (11th Cir. 1986) (emphasis added). Plaintiffs' Sub-Claims do not challenge the State's laws or rules.  Instead, they focus entirely on the administrative details of Georgia's elections like: how data is entered, what coding to use when a registrant's birthday is unknown, the existence or non-existence of protocols to address all conceivable variants, what happens when registrants share names, or when to engage in an entire host of conduct without (understandably) informing the State. The United States Constitution does not govern such minutiae, and at the very least, the Anderson-Burdick test is not intended to address these types of non-policy election administration details. See Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1261 (11th Cir. 2020) (Anderson-Burdick provides "the legal standards that apply to **laws** that burden the right to vote.") (emphasis added).

Plaintiffs' argument that the evidence at issue "is relevant to the burden on the voters" misses the point. Doc. No. [795] at 22. Every voting law imposes some burden on voters. See Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("Election laws will invariably impose some burden upon individual voters."). That does not mean, however, that any alleged burden is relevant to this lawsuit. Even if a voter was or could have been burdened by a mistake in the registration or voting process—which Plaintiffs' proffered evidence does not establish—to be

actionable here (and, thus, for the evidence to be relevant), the mistake must be (a) made by a State (as opposed to local) actor; and (b) intentional. This Court's summary judgment order makes the first point plain. See Doc. No. [617] at 9-10. A legal decision from the Seventh Circuit, later adopted by the Fifth Circuit, explains the second requirement:

> [T]he record here shows at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent; it does not show conduct which is discriminatory by reason of its effect or inherent nature. Voting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation, assuming these events to have occurred, fall far short of constitutional infractions, absent aggravating circumstances of fraud or other wilful conduct found not to exist by the District Court and not shown by any evidence offered.
>
> […]
>
> Except for the overall supervision of the county clerk, or his counterpart, and appointed subordinates, the work of conducting elections in our society is typically carried on by volunteers and recruits for whom it is at most an avocation and whose experience and intelligence vary widely. Given these conditions, **errors and irregularities, including the kind of conduct proved here, are inevitable, and no constitutional guarantee exists to remedy them**. Rather, state election laws must be relied upon to provide the proper remedy.

Hennings v. Grafton, 523 F.2d 861, 865 (7th Cir. 1975) (emphasis added). The Fifth Circuit established binding precedent here in 1980, when it recognized the

reasoning of the <u>Hennings</u> decision as "appropriate." <u>Saxon v. Fielding</u>, 614 F.2d

78, 80 (5th Cir. 1980) ("The decisions from other circuits have clearly indicated an

unwillingness to become embroiled in suits attacking state elections on the

grounds of administrative or technical irregularities. […] We think that this

unwillingness to intervene in the absence of aggravating factors . . . is

appropriate.") (quotation and citations omitted) (collecting cases);[7] <u>see also</u>

<u>Shipley v. Chicago Bd. of Election Commissioners</u>, 947 F.3d 1056, 1062 (7th Cir.

2020) ("[A]llegations [of administrative misconduct] may state a claim for

violation of the [state] Election Code. But that is a state law claim for a violation

of state law, not a federal claim for a violation of constitutional rights. […]

Plaintiffs may have other avenues available to raise their complaints, but federal

court is not one of them.").  This precedent means that Plaintiffs' attempt to

expand their claim does not render otherwise inadmissible evidence admissible.

II.   *Plaintiffs' List Accuracy claim, as <u>now</u> defined by Plaintiffs, addresses political
       questions outside the jurisdiction of this Court.*

There is another reason why Plaintiffs' reconstituted List Accuracy claim

does not provide a mechanism to enter Plaintiffs' proffered exhibits into

---

[7] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth
Circuit handed down prior to October 1, 1981.

evidence: each of the Sub-Claims constitutes a political question not fit for resolution by the Court. This is because they involve "'[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department" and/or "[2] a lack of judicially discoverable and manageable standards for resolving it.'" McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1357 (11th Cir. 2007) (quoting Baker v. Carr, 369 U.S. 186 (1962)).

As to the first characteristic, it is well known that the issue of managing elections has been constitutionally committed to the State. U.S. Const. art. I § 4, cl. 1; see also Clingman v. Beaver, 544 U.S. 581, 586 (2005). "[C]ourts have no business interfering with [the State's management of elections] absent a compelling need to do so." Anderson v. Raffensperger, 497 F. Supp. 3d 1300, 1330 (N.D. Ga. 2020); see also New Georgia Project v. Raffensperger, 976 F.3d 1278, 1283 (11th Cir. 2020) ("the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules."). "A federal court should not be 'the arbiter of disputes' which arise in elections; it is not the federal court's role to "oversee the administrative details of a local election. Rather, the 'Constitution leaves to the states broad power to regulate the conduct of federal and state elections.'" Georgia Shift v. Gwinnett Cty., No. 1:19-

CV-01135-AT, 2020 WL 864938, at *5 (N.D. Ga. Feb. 12, 2020) (quoting <u>Curry v. Baker</u>, 802 F.2d 1302, 1315 (11th Cir. 1986)) (other citation and quotation omitted). Put simply, "courts should not second-guess coordinate branches of government on matters explicitly committed to them." <u>Coalition for Good Governance, et al. v. Brad Raffensperger, et al.</u>, No. 1:20-CV-1677-TCB, 2020 WL 2509092, at *3–4 (N.D. Ga. May 14, 2020), appeal dismissed sub nom. <u>Coal. for Good Governance v. Raffensperger</u>, No. 20-12362-BB, 2020 WL 5753330 (11th Cir. Aug. 17, 2020).

To escape this reality and precedent, Plaintiffs turn to federal law and argue that the exhibits are relevant to the Secretary's federal duty to "implement 'safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.'" Doc. No. [795] at 4 (quoting 52 U.S.C. § 21803). But this too is to no avail.  The federal law Plaintiffs cite is HAVA, and as this Court recognized, HAVA provides no private right of action. <u>Bellitto v. Snipes</u>, 935 F.3d 1192, 1202 (11th Cir. 2019). In other words, because Plaintiffs cannot bring a claim directly under HAVA, they are precluded from using it indirectly through a reconstituted List Accuracy claim.

Independent of HAVA appropriate deference to state governments, Plaintiffs' newly articulated List Accuracy claim also invokes the political question doctrine given the wholesale lack of judicially discoverable and

manageable standards for the Court to apply to Plaintiffs' Sub-Claims. What, for example, would constitute "**meaningful**" rules and guidance to county officials in the processing of voter registrations? How many potential matches, that do not ultimately prove to be "true" matches, would show certain matching criteria to be "**overinclusive**?" At what size does a group of registrations become "**too large**" for a county to "**carefully**" evaluate? What kind or how must alerts be applied to the ENET interface to notify the county officials when comparing records? What information would trigger these alerts and what guarantees exist to suggest that such would prevent improper cancellations? What would it cost to implement this alert system (assuming it is even feasible)? What kind of specific information must be "taken into account" when county officials make cancellation decisions? How much and what kind of assistance and training should the State give to database users as they go about their statutorily-required business of processing voter applications?

Neither Plaintiffs nor the Court can provide objective answers to these inherently subjective questions. These are just a few among the countless variables that the Secretary of State has both the duty, and authority, to weigh and consider when making political decisions about how best to achieve the statutory mandates of his office. Plaintiffs—like anyone else—are free to criticize

the decisions made by government officials and argue that their way of doing things would be better. But these are arguments to be made on the campaign trail or in a legislative committee, not a court of law. See, e.g., Rucho v. Common Cause, 139 S. Ct. 2484, 2500, 204 L. Ed. 2d 931 (2019) ("There are no legal standards discernible in the Constitution for making such judgments [as to what is fair], let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is 'fair' in this context would be an unmoored determination of the sort characteristic of a political question beyond the competence of the federal courts.") (quotation omitted); Jacobson, 974 F.3d at 1242 ("[P]icking among the competing visions of fairness poses basic questions that are political, not legal."); Coal. for Good Governance, 2020 WL 2509092, at *3–4 (dismissing claims as presenting nonjusticiable political questions where "there are no discernable and manageable standards to decide issues such as how early is too early to hold the election or how many safety measures are enough.").

III.   *Plaintiffs' List Accuracy claim, as* <u>*now*</u> *defined by Plaintiffs, is not traceable or redressable by Defendants.*

Plaintiffs' current List Accuracy theory also falls squarely into the Jacobson problem that this Court concluded the Plaintiffs avoided by (seemingly) limiting

their List Accuracy claims to things the Secretary actually does. Doc. No. [612] at 43. As shown, the List Accuracy claim was deemed traceable to the Secretary only when it turned on acts of the Secretary himself.  [Id.] at 42. Plaintiffs' Sub-Claims, however, seek to unwind this ruling and pursue a theory of general or supervisory liability against the Secretary based on actions taken by county officials because of "the Secretary's statutory **overall** responsibility for database maintenance." Doc. No. [795] at 25 (emphasis added). This is not permissible as a matter of law and clearly contrary to the Court's summary judgment order. Id.; see also Swann v. Sec'y, Georgia, 668 F.3d 1285, 1288 (11th Cir. 2012) ("[A] plaintiff lacks standing to challenge a rule if an independent source would have caused him to suffer the same injury.")

Plaintiffs' Sub-Claims lack traceability to Defendants because they rely on actions of other individuals not within the control of the Secretary of State. Plaintiffs cannot, for example, show that any voter was disenfranchised because the ENET screen did not display an "alert" message to the county official when presenting a potential match. Contrary to Plaintiffs' contention that the Secretary "chose" to have county officials process this information, the statutes delegate this duty to counties. See O.C.G.A. §§ 21-2-226(a) ("It shall be the duty of the county board of registrars to determine the eligibility of each person applying to

register to vote in such county."); <u>see also</u> O.C.G.A. §§ 21-2-10, <u>et seq.</u>).[8] Notably,

nowhere have Plaintiffs challenged the statutes they identify as

unconstitutional—under <u>Anderson-Burdick</u> or any other theory. Using evidence

law to belatedly amend the complaint is improper.

Alternatively, Plaintiffs opine that such delegation (even if it were not

statutorily mandated) is not a *per se* violation and "would not necessarily result

in undue burdens on voters." Doc. No. [795] at 25. Under this alternative theory,

Plaintiffs contend that Secretary has not "equipped county users to make

accurate cancellation decisions; responded to inquiries about when and how to

modify voter data; or addressed reports of database problems" following that

delegation. Doc. No. [795] at 25. These arguments explicitly seek to revive some

of the training claims that have already been dismissed in this case. <u>See</u> Doc. No.

[617] at 18-44. They are also, as discussed above, clear political questions that

seek a remedy to "do more." <u>See</u> <u>supra</u> Section II; <u>see also</u>, <u>e.g.</u>, <u>Anderson</u>, 497 F.

Supp. 3d at 1330 (dismissing, as a matter of law, Plaintiffs' claims that various

actions and non-actions by the Secretary caused "long lines" at polling places)

---

[8] Most states in the country similarly utilize county voting offices to register
voters.

Regardless, the counties' actions with respect to the voter registration database are not traceable to Defendants. Plaintiffs are speculating, for example, that an alert screen would have prevented the county official—an independent actor—from mistakenly merging two records that should not have been merged. But as Plaintiffs have acknowledged, some level of human error in an election is inevitable. Georgia Shift, 2020 WL 864938, at *6 ("This Court does not sit as a guarantor of a flawless election.").[9] Such is outside the Secretary's control.

IV.   *Plaintiffs' List Accuracy claim, as now defined by Plaintiffs, seeks impermissible micromanagement of the State's elections by this Court to address what are, at most, state law claims regarding human error.*

Plaintiffs' attempt to dissect their List Accuracy claim into component pieces would necessarily require the Court to impermissibly engage in "micromanagement" of the State's election process. Coal. for Good Governance, 2020 WL 2509092, at *3-4. For example, Plaintiffs now contend that the evidence they seek to admit goes to show that "the current administration of eNet falls far

---

[9] Plaintiffs attempt to circumvent their Jacobson problem by arguing the Secretary is responsible for all of the counties' actions that preclude a "uniform" management of the database. Doc. No. [795] at 3-4. The Court has already rejected this argument by holding that the Secretary was not liable for polling place closures and supplying polling places as such duties were statutorily-designated to the Counties. This is also virtually identical to the argument that the Eleventh Circuit rejected in Jacobson, and Plaintiffs' expansive reading of the Secretary's authority wrongly removes the guardrails this Court imposed at summary judgment. See 974 F.3d 1236 (11th Cir. 2020).

short of [52 U.S.C. § 21803's and O.C.G.A. § 21-2-50.2's] statutory mandate. Even putting aside the obvious subjectivity of this assertion, no such claim exists. Plaintiffs' claim under HAVA has been dismissed, (Doc. No. [612] at 72), and a claim for violation of state law is not a constitutional claim. See supra Section I; see also, e.g., Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 391 (W.D. Pa. 2020) (""[I]t is well-established that even violations of state election laws by state officials . . . do not give rise to federal constitutional claims except in unusual circumstances.").

Courts must "recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events" of human error. Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980). As the Gamza Court explained:

> If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss. Section 1983 did not create a delictual action for the torts of state officials, and it did not authorize federal courts to be state election monitors.
>
> […]
>
> In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to

17

> discriminate against the affected voters or motivated by a desire to
> subvert the right of the voters to choose their school board
> representative, we cannot conclude that the error constituted a denial
> of equal protection of the laws.

Gamza, 619 F.2d at 453–54 (citations omitted). "Unlike systematically

discriminatory laws, isolated events that adversely affect individuals are not

presumed to be a constitutional violation." Curry, 802 F.2d at 1314 (quotation

omitted) (alteration in original accepted).

## Conclusion

In sum, Plaintiffs want to use the ambiguity of their ill-defined List

Accuracy claim to expand the scope of this litigation to encompass almost the

entirety of the Secretary of State's operations—as well as those of county

officials—that may have some tangential effect on the voter-registration

database. This effort is inconsistent with Plaintiffs' prior representations,

irreconcilable with the Court's rulings, legally untenable, and practically

unsustainable. It should, and must, be rejected by the Court. As a result,

Defendants' relevance objections to Plaintiffs' exhibits and questioning that do

not bear on the Secretary of State's direct actions regarding the voter registration

database should be sustained.[10]

---

[10] In the alternative, if the Court finds that Plaintiffs' List Accuracy claim is what
they say it is, Defendants respectfully request leave to file a motion to dismiss on

Respectfully submitted this 19th day of April, 2022.

Christopher M. Carr
Attorney General
GA Bar No. 112505
Brian K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson

---

jurisdictional grounds. <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction, <u>see</u> Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation.").

Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Danielle M. Hernandez
Georgia Bar No. 736830
dhernandez@robbinsfirm.com
**Robbins Alloy Belinfante Littlefield LLC**
500 14th Street N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
Telephone: (678) 336-7249

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing brief was prepared double-spaced in 13-point Book Antiqua font, approved by the Court in Local Rule 5.1(C).

*/s/Josh Belinfante*
Josh Belinfante